# EXHIBIT 23

Confidential - Subject to Further Confidentiality Review

1                UNITED STATES DISTRICT COURT

                 EASTERN DISTRICT OF LOUISIANA

2

    IN RE:                    §   MDL NO. 2047

3   CHINESE-MANUFACTURED      §   SECTION: L

    DRYWALL PRODUCTS          §   JUDGE FALLON

4   LIABILITY LITIGATION      §   MAG. JUDGE WILKINSON

5

    * * * * * * * * * * * * * * * * * * * * * * * * *

6   CONFIDENTIAL - SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

7            ORAL AND VIDEOTAPED DEPOSITION OF

8                      RONNIE GARCIA

9                TAKEN ON NOVEMBER 1, 2012

10

    * * * * * * * * * * * * * * * * * * * * * * * * *

11

12       ORAL AND VIDEOTAPED DEPOSITION of RONNIE GARCIA,

13   produced as a witness at the instance of the Class

14   Counsel, and duly sworn, was taken in the above-styled

15   and numbered cause on the 1st day of November, 2012,

16   from 2:17 p.m. to 5:52 p.m., before SYLVIA KERR, CSR,

17   RPR, CRR in and for the State of Texas, reported by

18   machine shorthand, at the offices of Huseman, Dodson &

19   Hummell, 615 North Upper Broadway, Suite 2000, Corpus

20   Christi, Nueces County, Texas, pursuant to the Federal

21   Rules of Civil Procedure.

22

23

24            GOLKOW TECHNOLOGIES, INC.

         877.370.3377 ph | 917.591.5672 fax

25                deps@golkow.com

Confidential - Subject to Further Confidentiality Review

```
 1                 A P P E A R A N C E S

 2

     COUNSEL FOR THE PLAINTIFFS':

 3       FREDERICK S. LONGER, ESQUIRE
         MATTHEW C. GAUGHAN, ESQUIRE

 4       Levin, Fishbein, Sedran & Berman
         510 Walnut Street, Suite 500

 5       Philadelphia, Pennsylvania  19106
         (215) 592-1500

 6

 7

 8   COUNSEL FOR THE DEPONENT RONNIE GARCIA:

         VAN HUSEMAN, ESQUIRE

 9       PAUL DODSON, ESQUIRE

         Huseman, Dodson & Hummell, PLLC

10       615 North Upper Broadway, Suite 2000

         Corpus Christi, Texas  78401

11       (361) 883-3563

12

13   ALSO PRESENT:

         HANK WISRODT, Videographer

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                        INDEX
 2                                           PAGE
 3   Appearances..................................  2
     RONNIE GARCIA
 4        Examination by Mr. Gaughan..............  6
          Examination by Mr. Huseman.............  141
 5
 6
 7
 8
                         EXHIBITS
 9
10   NUMBER        DESCRIPTION                  PAGE
11   No. 11 Box of Documents......................  6
            (Exhibits 11 to 25 retained by Mr. Huseman)
12
     No. 12 Box of Documents......................  6
13
     No. 13 Box of Documents......................  6
14
     No. 14 Box of Documents......................  6
15
     No. 15 Box of Documents......................  6
16
     No. 16 Box of Documents......................  6
17
     No. 17 Box of Documents......................  6
18
     No. 18 Box of Documents......................  6
19
     No. 19 Box of Documents......................  6
20
     No. 20 Box of Documents......................  6
21
     No. 21 Box of Documents......................  6
22
     No. 22 Box of Documents......................  6
23
     No. 23 Box of Documents......................  6
24
     No. 24 Box of Documents......................  6
25
```

| 1 | NUMBER | DESCRIPTION | PAGE |
|---|---|---|---|
| 2 | No. 25 | Box of Documents.......................... | 6 |
| 3 | No. 26 | Objector Ronnie Garcia's and Bay Area | |
|   |   | Construction's Answers and Objections to | |
| 4 |   | Interrogatories Propounded by Class Counsel | 73 |
| 5 | No. 27 | Objectors Ronnie Garcia and Bay Area | |
|   |   | Contracting & Construction's Responses and | |
| 6 |   | Objections to Requests For Production | |
|   |   | Propounded by Class Counsel................ | 74 |
| 7 |   | | |
|   | No. 28 | Class Action Objector Power of Attorney and | |
| 8 |   | Contingent Fee Agreement for Ronnie Garcia | 102 |
| 9 | No. 29 | Attorney Disclosure to Client and Client | |
|   |   | Consent.................................... | 119 |
| 10 |   | | |
|   | No. 30 | Articles of Incorporation of Bay Area | |
| 11 |   | Contracting & Construction, Inc............ | 138 |
| 12 | No. 31 | IRS Taxpayer Identification Number......... | 139 |
| 13 | No. 32 | Letter of Good Standing from Texas | |
|   |   | Comptroller of Public Accounts............ | 140 |

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1              (Exhibit Nos. 11 to 25 were marked.)

 2              THE VIDEOGRAPHER:  We are now on the

 3   record.  My name is Hank Wisrodt.  I am a videographer

 4   for Golkow Technologies.  Today's date is November 1st,

 5   2012, and the time is 2:17 p.m.  The video deposition is

 6   being held in Corpus Christi, Texas, In Re:  Chinese

 7   Drywall Products Liability Litigation for the United

 8   States District Court, Eastern District of Louisiana.

 9   The deponent today is Ronnie Garcia.  Will counsel

10   please identify themselves for the record.

11              MR. GAUGHAN:  Matthew Gaughan for class

12   counsel.

13              MR. LONGER:  Fred Longer on behalf of

14   class counsel.

15              MR. HUSEMAN:  Van Huseman on behalf of

16   Mr. Garcia.

17              MR. DODSON:  Paul Dodson for Mr. Garcia.

18              THE VIDEOGRAPHER:  Would the court

19   reporter please swear in the witness.

20                   RONNIE GARCIA,

21   having been first duly sworn, testified as follows:

22              MR. GAUGHAN:  And I guess before I start

23   asking the witness questions, I just wanted to confirm

24   that we were available this morning, ready, able and

25   willing to take the deposition of Ms. Jan Petrus.  And
```

1    it's my understanding that she's not going to show up

2    for deposition.  And also, we're also available to

3    depose Mr. Vitela.  And also, he's not going to be

4    produced, correct?

5              MR. HUSEMAN:  As far as I know.  I don't

6    represent them, so...

7              MR. GAUGHAN:  Okay.

8              MR. HUSEMAN:  But that's what the rumor on

9    the street is.

10                  EXAMINATION

11   BY MR. GAUGHAN:

12       Q.   All right.  And then I guess -- good morning,

13   Mr. Garcia.

14       A.   Yes, sir.

15       Q.   I guess as an initial matter, we've marked a

16   series of boxes over here as Exhibits 11 through 25.

17   And I guess these are records that you obtained last

18   night; is that correct?

19       A.   I was able to obtain them.

20       Q.   Okay.  And these pertain to your business; is

21   that correct?

22       A.   Yes, sir.

23       Q.   And what's the name of your business?

24       A.   Bay Area Contracting & Construction.

25       Q.   Okay.  And were you able to review all of these

Confidential - Subject to Further Confidentiality Review

 1   documents?

 2       A.   No, sir.

 3       Q.   Okay.  Did you identify any records in there

 4   that you've sorted out as specifically involving Chinese

 5   drywall?

 6       A.   I haven't had time to look at that.

 7       Q.   Okay.  Were you able to identify some documents

 8   that involved drywall?

 9       A.   Yes, sir.

10       Q.   Okay.  And are those the documents we see over

11   there at the edge of the table?

12       A.   They were some of the documents that I was able

13   to pick out while I was looking through them.

14       Q.   Okay.  And having had a chance to pick out some

15   of those documents, did you see anything on there that

16   specifically reference that the drywall in those records

17   was, in fact, Chinese?

18       A.   I didn't look at them, just -- I was just

19   looking for drywall.

20       Q.   Okay.  So you can't say one way or the other

21   whether any of those records actually involved the

22   purchase of Chinese drywall?

23       A.   Well, they don't say specifically Chinese

24   drywall.

25       Q.   Okay.  So you don't know; is that correct?

Confidential - Subject to Further Confidentiality Review

 1     A.   Well, that's what it says right there off the

 2   invoices.

 3     Q.   All right.  So you really have no way of

 4   knowing one way or the other if those records, in fact,

 5   involve purchases of Chinese drywall, correct?

 6     A.   I'm not too sure.

 7     Q.   Okay.  Could you please state your name and

 8   address for the record.

 9     A.   My name is Ronnie Garcia.  My address is at

10   39 -- 3938 Surfside Boulevard.

11     Q.   And what's your --

12     A.   Corpus Christi, Texas 78402.

13     Q.   Okay.  And what's your Social Security number?

14     A.   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.

15     Q.   And just as kind of an introductory matter, you

16   know, we've noticed both your deposition individually as

17   well as a deposition of Bay Area Contracting &

18   Construction, Inc.  Are you aware of that fact?

19     A.   Sir?

20     Q.   Are you aware that we've noticed your

21   deposition individually as well as noticing the

22   deposition of Bay Area Contracting & Construction, Inc.?

23     A.   I'm not -- I mean, I don't understand it.

24          MR. HUSEMAN:  He will be speaking for both

25   of them.

Confidential - Subject to Further Confidentiality Review

1                    MR. GAUGHAN:  Okay.  That's what I want to

2    establish.

3                    THE WITNESS:  Okay.

4         Q.   (By Mr. Gaughan)  So you're prepared today to

5    answer questions both for yourself personally and for

6    Bay Area?

7         A.   Yes, sir.

8         Q.   Okay.  Thank you.  What's your -- what's your

9    specific position at Bay Area Contracting &

10   Construction?

11        A.   I was the president.

12        Q.   Okay.  Are there any other officers or

13   directors of that company?

14        A.   No, sir.

15        Q.   Okay.  And do you have any employee?  Does that

16   company have any employees?

17        A.   Yeah, it had employees.

18        Q.   How many employees?

19        A.   Eight.  Sometimes it depends on the projects.

20        Q.   And I guess going back to 2008 through present,

21   would you say that that company had approximately eight

22   employees during that --

23        A.   Yes, sir.

24        Q.   Okay.  Was it always the same employees?

25        A.   Yes, sir.

Confidential - Subject to Further Confidentiality Review

1     Q.   And who are those individuals?

2     A.   My brothers, Rocky Garcia, Domingo Garcia,

3    Danny Mendieta, my secretary, her name is Estella

4    Terraza, and myself.  And I can't remember who else.

5    Joe Perez.

6     Q.   And are these the same individuals that have

7    been with Bay Area Contracting & Construction, Inc., you

8    know, from 2008 to present?

9     A.   Well, yes, sir.

10    Q.   Okay.  And you kind of gestured.  Is there --

11   there's been some --

12    A.   There's some that -- that have been laid off

13   because of the job market.

14    Q.   Okay.  But there are no other individuals that

15   you didn't identify --

16    A.   No.

17    Q.   -- during that time period?  Thank you.

18         Have you ever been a party to a lawsuit before?

19    A.   No, sir.

20    Q.   Okay.  Was your company sued by an Ashley Combs

21   for a car accident?

22    A.   Yes, sir.

23    Q.   Okay.  Were you ever a party to any other

24   actions beyond that one?

25    A.   Well, they were trying to sue me, but it was --

Confidential - Subject to Further Confidentiality Review

1    the vehicle that they hit was -- it was actually my --

2    one part of the company, it was my brother's truck.

3        Q.    Okay.  But is that the only lawsuit that you or

4    your company has been involved in?

5        A.    Yes, sir.

6        Q.    Okay.  No breach of contract claims, anything

7    like that?

8        A.    No, sir.

9        Q.    Can you tell me a little bit more about that

10   accident?

11       A.    What's that?

12       Q.    The lawsuit with Ms. Combs, can you tell me a

13   little bit more about that action?

14       A.    I don't know what that pertains to, but -- I

15   don't know.  I just know that she had Thomas J. Henry

16   and they were just trying to sue the company and I was

17   telling them it's not a company vehicle.  That was it.

18       Q.    Did you -- were you deposed in that lawsuit?

19       A.    I ended up settling.  I just told them, you

20   know what, here's X amount of dollars.  That's it.

21       Q.    Okay.  Well, you're appearing here today at a

22   deposition.  I guess my question is:  In that particular

23   lawsuit, did you also appear for a deposition?

24       A.    I don't know.  I guess it would be a

25   deposition.  I don't know.  I don't know if it's called

 1    that.  I mean, we had attorneys -- well, I had my

 2    attorney there and he was going back and forth.  It

 3    wasn't a deposition, I don't think.

 4         Q.  Were they asking you questions like I'm asking

 5    you questions right now with a court reporter present?

 6         A.  I can't remember.  I think so.  Yeah, I think

 7    you're right.

 8         Q.  Okay.  So you might have been deposed?  You're

 9    not sure?

10         A.  I don't know what you're trying to get on that

11    part.

12         Q.  Well, do you understand --

13         A.  That's -- you're saying something about lawsuit

14    there.

15         Q.  Yeah.  Well, I guess what I'm trying to ask

16    you, Mr. Garcia, is right now what's going on is I'm

17    taking your deposition.

18         A.  Uh-huh.

19         Q.  And we have a stenographer here who is taking

20    down what I'm asking you as well as, you know, your

21    answers.

22              Now, what I'm trying to figure out is in

23    connection with the lawsuit by Ms. Combs, was there a

24    similar process where a lawyer was asking you questions

25    and a stenographer was taking --

1      A.    I don't remember.

2      Q.    -- creating a record?

3      A.    I don't remember.

4      Q.    Okay.  And so you testified that you ultimately

5   settled that lawsuit?

6      A.    Yes, sir.

7      Q.    How much money did you settle it for?

8      A.    I think like 2 grand.

9      Q.    2 grand.  And did Ms. Combs allege any sort of

10  personal injuries?

11     A.    That's -- I guess that's what it was about.

12     Q.    Okay.  And are you a party to any lawsuits that

13  specifically involve Chinese drywall?

14     A.    No, sir.

15     Q.    Okay.  So you're not a plaintiff or a defendant

16  in any litigation involving Chinese drywall?

17     A.    No, sir.

18     Q.    Can you tell me the address of each of the

19  properties where you installed Chinese drywall?

20     A.    I cannot.

21     Q.    Can you tell me the address of any property

22  where you installed Chinese drywall?

23     A.    No, sir.

24     Q.    Can you tell -- give me an approximate number

25  of homes where you installed Chinese drywall?

1      A.   I don't remember.  I mean, I don't know what --

2   I just know I installed drywall.

3      Q.   Okay.  You said that you know that you

4   installed drywall.  How do you know that you installed

5   Chinese drywall?

6      A.   I've seen it.  That's all I can say.  I know

7   I've seen it.  It could be in Dallas, it could have

8   been in Galveston, it could have been in Houston.  I

9   mean, I've seen all kinds of drywall.

10     Q.   Now, where specifically did you see this

11  Chinese drywall?

12     A.   What's that?

13     Q.   Where do you actually recall seeing the Chinese

14  drywall?

15     A.   You know, like I said, it could be Houston,

16  Dallas or Fort Worth.  I mean, I've, you know...

17     Q.   At a job site?

18     A.   At a project we did.

19     Q.   Okay.  Do you have any recollection of actually

20  seeing Chinese drywall in a -- anywhere else?

21     A.   Well, just letterings.  Just letterings.  It's

22  like USG.  We used Tempo made from Mexico.  We used

23  different types of drywall.  You know, we tried to use,

24  you know, for the value, the prices, you know.

25     Q.   Okay.  But I guess what I'm trying to figure

Confidential - Subject to Further Confidentiality Review

1   out is you testified that you actually remember seeing

2   Chinese drywall at some point at a job site?

3       A.   Well, I said I've seen, you know, the name

4   Chinese drywall at one time or another.  I don't know.

5   I can't -- I can't remember that accident like you're

6   telling me, if I had somebody, you know, taking my

7   deposition or what.  I can't remember that far back.

8       Q.   Okay.  What I'm trying to ask you, again, is

9   where -- was it at a job site?  Do you recall seeing it

10  at a store?  Where do you remember seeing it?

11      A.   At one of the projects.

12      Q.   Okay.  So you have no memory, as you sit here,

13  of actually seeing Chinese drywall at a store, for

14  instance?  No memory?

15      A.   I just know I've seen it on a project.

16      Q.   Okay.  And then you just mentioned a couple of

17  brands of drywall.  One of them was USG?

18      A.   Uh-huh.

19      Q.   Now, is it your belief that USG makes Chinese

20  drywall?

21      A.   No.

22      Q.   Okay.  And then was the other company Temple or

23  Tempo?

24      A.   I think it's Tempo from -- it's a Mexican

25  drywall made from Mexico.

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  And is it your belief that that company

 2   also makes Chinese drywall or sells it?

 3      A.   I don't know.

 4      Q.   Okay.

 5      A.   I'm not a -- I just -- I just purchase and

 6   install it.

 7      Q.   Okay.  So is it fair to say with respect to

 8   Tempo drywall, it's your understanding that drywall is

 9   actually made in China and not in -- excuse me -- made

10   in Mexico and not in China?

11      A.   Now, what was that again?

12      Q.   All right.  I'll ask again.  Specifically with

13   respect to Tempo drywall, is it your -- it's your

14   understanding, correct, that that drywall is actually

15   from Mexico and not from China?

16      A.   Well, Tempo.

17      Q.   Yeah.

18      A.   I think that's what -- I think that's what I

19   recall them telling us.

20      Q.   Now, have you actually gone back and spoken to

21   any of your customers to let them know that you think

22   you may have installed Chinese drywall in their homes?

23      A.   No, sir.

24      Q.   Do you intend to do so?

25      A.   Not unless it arises.
```

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  So what do you mean by if "it arises"?

2      A.    Well, I mean, I had a customer, you know, a

3   while back tell me about some drywall that's coming --

4   you know, screws are coming -- corroding and, you know,

5   they had a water leak and stuff like that.  And we went

6   back and repaired it.  But I never thought of anything

7   happening because of the drywall.

8      Q.    Now, you just mentioned a customer that you

9   went to their house and there was some issue with the

10  screws?

11     A.    Yeah, the drywalls and screws.

12     Q.    Was that recently?

13     A.    No, it's been years.

14     Q.    Okay.  And could you tell us who that homeowner

15  is?

16     A.    I can't recall.

17     Q.    When you were at that homeowner's property, did

18  you observe anything that you thought was Chinese

19  drywall?

20     A.    I can't recall.

21     Q.    Did you save any of that drywall that you

22  removed from that property?

23     A.    It's been too many -- it's been a couple of

24  years.

25     Q.    Have you saved any drywall that you think is

Confidential - Subject to Further Confidentiality Review

1   Chinese drywall from any job whatsoever?

2       A.   No, sir.

3       Q.   So you don't have any samples of what you

4   believe to be Chinese drywall?

5       A.   Not at this time.

6       Q.   Okay.  And let me next ask you:  You know,

7   should some of your customers come forward that contend

8   that you installed Chinese drywall in their properties,

9   how do you -- do you have any intention to remedy that

10  situation?

11      A.   Well, I'd have to, you know, go in there and

12  repair it as much as I can.

13      Q.   You would do that, though?

14      A.   Yes, sir.

15      Q.   Okay.  Now, when is it you first remember

16  hearing problems -- or scratch that.

17           When is it that you first remember hearing that

18  there were problems with drywall that had been imported

19  from China?

20      A.   I don't recall.  I mean, I just remember a

21  customer saying something about their house having it at

22  one time.  Because we used to do insurance work

23  remediation on it and just, you know, overhearing stuff

24  like that.

25      Q.   So you said you heard about it from a customer?

Confidential - Subject to Further Confidentiality Review

```
1        A.   Uh-huh.

2        Q.   Was this one of your former customers?

3        A.   I don't recall.  I mean, it's just -- you know,

4    it's been so long ago you hear -- you hear it and it

5    stays in your head somehow.  And we go in there and just

6    do the work, you know.  We just tell them put a claim

7    in.  You know, what else can, you know...

8        Q.   So you're not telling me that this is someone

9    that came to you and said, hey, you installed this bad

10   drywall in my house, I need you to replace it?

11       A.   Well, like I said -- like I said, we used to do

12   insurance remediation, so I don't think it was -- might

13   not have been one of my homes.  It could have been -- it

14   could have been, but I can't remember.  I can't recall.

15       Q.   Okay.  And I'll just represent to you that one

16   of the things you did in connection with your objection

17   that you filed with our settlement is that you

18   represented that none of your former customers had

19   complained to you that you had installed defective

20   Chinese drywall in their house.

21       A.   That's what I'm saying.  That's exactly what

22   I'm saying.

23       Q.   Okay.  All right.  I just want to make sure I

24   understood correctly.

25            This individual or individuals that you're
```

Confidential - Subject to Further Confidentiality Review

1    saying told you that there was Chinese drywall in your

2    house, you're not telling me that these individuals

3    were --

4        A.   My customers.

5        Q.   -- any of your existing customers?

6        A.   Well, not the homes that I built, no.  It's

7    like I said, it might have been an insurance claim that

8    somebody put in and they call me out to go take care of

9    it.

10       Q.   Is that a large part of your business, doing

11   insurance claims?

12       A.   No, not really.

13       Q.   And I guess you mentioned insurance claims.

14   Are these individuals that put in claims because they

15   had Chinese drywall in their house?

16       A.   It was just one of those, you know, like I get

17   calls every once in a while and I get the -- you know,

18   if I do it, I do it.  If I don't, I don't.

19       Q.   And what can you tell me about when these

20   conversations occurred, if anything?

21       A.   I can't.

22       Q.   So this could have been four years ago, it

23   could have been one year ago?

24       A.   It was a little bit more than -- probably about

25   four years, maybe five years.

1      Q.   Okay.  And as you sit here today, you can't --

2   I'm sorry.  You can't tell me -- identify these

3   particular customers that you did work with Chinese

4   drywall, can you?

5      A.   No, sir.

6      Q.   Did you do any sort of demolition work at these

7   properties?

8      A.   We did a lot of demolition work.

9      Q.   And do you remember seeing Chinese drywall when

10  you did this demolition work?

11     A.   I could have.  Like I said, my memory is not as

12  good as it used to be.

13     Q.   Okay.  So you testified that the first time you

14  remember hearing about homeowners having problems with

15  Chinese drywall was from customers, correct?

16     A.   Well, from -- I guess it would be a customer or

17  someone who did some repairs to the house.

18     Q.   You don't recall seeing anything in the news

19  media or anything like that?

20     A.   No, sir.

21     Q.   How about from other contractors that you were

22  friendly with?

23     A.   I don't recall.

24     Q.   So as you sit here today, you can't tell me

25  when you first, you know, remember hearing, you know,

Confidential - Subject to Further Confidentiality Review

1    that there are problems with Chinese drywall?

2         A.   No, sir.  Just like I said, I think it was just

3    like a conversation, you know, a long time ago.

4         Q.   And that was --

5         A.   And I never thought of anything about that.  I

6    just -- like I said, I just try to do my work the best I

7    can and keep on going.

8         Q.   But you think that was more than four years

9    ago; is that correct?

10        A.   Yes, sir.

11        Q.   Okay.  Now, if you remember hearing about these

12   sort of problems more than four years ago with Chinese

13   drywall, did you take any sort of action yourself to

14   make sure you weren't using Chinese drywall at that

15   point?

16        A.   You know, like I say, we try to use USGA

17   product but, you know, we try to go with, you know, with

18   the best value to get to -- to meet the market's -- what

19   our profitability market.

20        Q.   So you just install the cheapest drywall?

21        A.   We try to.  Or who will give us the best price.

22        Q.   Even after you remember hearing complaints

23   about defective Chinese drywall, you continued to use

24   it?

25        A.   Well, like I said, I didn't really look into

Confidential - Subject to Further Confidentiality Review

1    it.  I mean, you know, like I said, I just try to pick

2    up drywall and let's go.  You know, we got deadlines to

3    meet and we got to meet them, you know.

4        Q.   Just turn a blind eye to it?

5        A.   Well, like I said, I don't know.  I didn't know

6    what -- I didn't know it was this bad or if it's, you

7    know...

8        Q.   But you still installed Chinese drywall in

9    people's homes after you had heard others complain about

10   it?

11       A.   We could have.  If it's still in the market,

12   like I said, you know, you put it out there if it's

13   still in the market.

14       Q.   Okay.  But you don't remember actually

15   installing any drywall during that time period, do

16   you, from when you first heard that there were

17   problems with drywall to, you know, four years ago till

18   now?

19       A.   Now, what are you saying again?

20       Q.   What I'm trying to say is you don't have

21   any specific recollection, as you sit here today,

22   that you actually installed Chinese drywall in

23   someone's house after you -- you know, four years ago

24   when someone first mentioned there were problems with

25   it?

Confidential - Subject to Further Confidentiality Review

1    A.   Well, like I said, you know, if it was out

2    there, like you said, we try to put, you know, the

3    cheapest drywall out there.  And if it was part of it,

4    it goes -- you know, it's -- that's what we try to do.

5    We order it and let's get it.  You know, get it into

6    where we need to get to the project and get it up and

7    taped and floated and painted.

8    Q.   Okay.  So you used the cheapest drywall, but

9    you don't know -- you have no idea whether it was

10   Chinese, Mexican, American?  You don't know?

11   A.   No, sir.

12   Q.   Okay.  Thank you.  Do you know what brand of

13   Chinese drywall that you may have installed?  Any sense

14   of that?

15   A.   It's been too long.

16   Q.   Now, specifically with respect to the

17   settlement that you're objecting to, do you remember

18   seeing any sort of advertisements, anything like that

19   about the settlement?

20   A.   No, sir.

21   Q.   How is it that you came to know about the

22   settlement?

23   A.   What's that?

24   Q.   How did you come to learn about the settlement?

25   A.   Another -- a person, another friend of mine

Confidential - Subject to Further Confidentiality Review

```
 1   telling me about it.

 2        Q.   Who is the friend?

 3        A.   Bert Chapa.

 4        Q.   Bert.  What was his last name?

 5        A.   Chapa.

 6        Q.   How do you spell that?

 7        A.   C-h-a-p-a.

 8        Q.   Okay.  Now, who is Mr. Chapa?

 9        A.   He's a golf buddy of mine.

10        Q.   Okay.  And what does Mr. Chapa do for a living?

11        A.   He's a legal assistant.

12        Q.   Where?  What firm?

13        A.   What's that?

14        Q.   What firm is he with, do you know?

15        A.   Here in Corpus.

16        Q.   Okay.  But do you know the name of the law

17   firm?

18        A.   It's Batman Law Office.

19        Q.   Okay.  That's Mr. Batman?

20        A.   Yes, sir.

21        Q.   Okay.  And so Mr. Chapa, what does he do

22   specifically at Batman's office?

23        A.   He works for Batman.

24        Q.   Is he a paralegal?  Is he an investigator?  Do

25   you know what his --
```

Confidential - Subject to Further Confidentiality Review

1      A.   I think he's an investigator.

2      Q.   Okay.  And you testified that you played golf

3  with Mr. Chapa?

4      A.   I would, golf buddies.

5      Q.   How long have you guys been golf buddies?

6      A.   Ten, 12 years.

7      Q.   And had Mr. Chapa, during that time period,

8  ever asked you about -- or brought to your attention

9  other litigations like this one?

10      A.   No, sir.

11      Q.   Okay.  And backing up to -- when would you tell

12  me that Mr. Chapa -- is that two P's or one P?  I'm

13  sorry.

14      A.   Just one.

15      Q.   Just one P.  Mr. Chapa first told you about the

16  settlement, when was that?

17      A.   I guess about two months ago.

18      Q.   So at some point in September, late August,

19  some time around then?

20      A.   What are we, October?  We're already in

21  November.

22      Q.   November 1, yeah.

23      A.   Yeah, probably late September or beginning

24  of -- something like that.  September.  Yeah, September.

25      Q.   Late September?

Confidential - Subject to Further Confidentiality Review

1    A.    I think it might have been beginning of

2  September because I was up in Dallas and Fort Worth.

3    Q.    Okay.  What did Mr. Chapa tell you about the

4  settlement at that time?

5    A.    He didn't tell me nothing about the settlement.

6    Q.    I thought you had just testified that you first

7  learned of the settlement from Mr. Chapa?

8    A.    Well, not the settlement, but the -- about

9  the -- about what's going on with the Chinese drywall.

10   Q.    What did he tell you what was going on with

11 Chinese drywall?

12   A.    Well, he said if I've ever worked with it, you

13 know, since he knows I work with a lot of drywall.

14   Q.    Okay.  So you told him yes, you might have

15 worked with it, I'm assuming?

16   A.    Yes, sir.

17   Q.    And then what else did he tell you?

18   A.    Well, he told me exactly what you're saying.

19 Hey, where did you see it?  I said, I don't know.  It

20 could have been in a project in Houston, Galveston or

21 Dallas, you know, the same thing, or in Corpus, I said.

22 But I know I've seen it, but I don't really -- you don't

23 really pay attention to stuff like that.  Like I said,

24 you just slap that thing in the wall, you see an emblem,

25 you know, like you see a lot of them.  You know, we just

Confidential - Subject to Further Confidentiality Review

1    did a project -- we're doing a project right now in

2    Portland and, you know, we see it, it's got an emblem

3    that says USG ultra-light.  And, you know, I just put it

4    up and let's go, you know.

5        Q.   Okay.  So Mr. Chapa asked you if you had ever

6    seen Chinese drywall at any work sites; is that correct?

7        A.   Yes, sir.

8        Q.   And you told him yes, is that --

9        A.   Well, I told him I vaguely remember.

10       Q.   You didn't specifically remember it,

11   but you might have seen it, is that what you told

12   him?

13       A.   Yes, I told him I vaguely remember.

14       Q.   And then what did he tell you next?

15       A.   Well, he said there's, you know -- he

16   introduced me to Chris and he told me if I wanted to

17   pursue this.

18       Q.   And when did he introduce you to Chris?

19       A.   In September.

20       Q.   And when you say "Chris," you're talking about

21   Chris Bandas; is that correct?

22       A.   Chris Bandas, yes.

23       Q.   Now, at the time he introduced you to Chris,

24   was that the same day when you retained Mr. Bandas?  Or

25   is it a different time?

Confidential - Subject to Further Confidentiality Review

```
 1        A.    It wasn't the same day.

 2        Q.    Okay.  So where did you meet him?

 3        A.    Who's that?

 4        Q.    Mr. Bandas.

 5        A.    At his office.

 6        Q.    Okay.  So at some point in September you went

 7    into Mr. Bandas' office, correct?

 8        A.    Yes, sir.

 9        Q.    And what was your intention at that time?

10        A.    We just talked about what we were talking about

11    now, about the Chinese drywall.

12        Q.    Did you go into his office with the intention

13    of retaining a lawyer to represent you with potential

14    claims that you might have against distributors and

15    other parties that you purchased drywall from?

16        A.    Yes, sir.

17        Q.    Okay.  And did you ultimately retain

18    Mr. Bandas?

19        A.    Well, I told him -- you know, we talked about

20    it, I told him --

21              MR. HUSEMAN:  Just a minute.  Ronnie, I

22    don't want you talking about any communications you had

23    with Chris.  That's attorney/client privilege and we

24    assert that.  So you can talk to Matthew about things

25    which do not involve any communications between you and
```

1    your lawyer.  Yeah, we've given them copies of the

2    contracts and all, which will speak for themselves as to

3    the relationship there.

4        Q.   (By Mr. Gaughan)  And I guess my last question

5    was:  Ultimately did you retain Mr. Bandas?

6        A.   Yes, sir.

7        Q.   And what's your understanding of the scope of

8    his representation of you?

9        A.   It's -- you know, that's how come I retained

10   him, to make sure I'm, you know -- he does what we need

11   to do on this matter.

12       Q.   And when you say "this matter," are you

13   referring to this objection that you're currently --

14   have filed to --

15       A.   Yes, sir.

16       Q.   You don't understand that he's representing

17   you with respect to claims that you may assert

18   against other parties that you think sold drywall,

19   defective drywall to you, do you?

20       A.   Well, like you said, I've used it.  And then

21   you were saying that if I, you know, did it on purpose.

22   You know, I don't feel like I did it on purpose.  I did

23   it because it was the best value out there at the time.

24       Q.   I guess what I'm trying to ask you is:  Do you

25   understand that Mr. Bandas's representation of you is

Confidential - Subject to Further Confidentiality Review

1    limited to this objection that you have filed to this

2    class-action settlement?  Or do you understand that his

3    representation is broader in scope than that?

4        A.   I don't -- I don't understand what you're

5    applying.

6        Q.   Well, I guess we'll come back to this a little

7    later.  I wanted to follow-up on something first.

8    Hopefully at that point I can clarify what I'm trying to

9    ask you.

10            But Mr. Chapa, you mentioned you had been

11   playing golf with him and at some point he brought to

12   your attention that there were issues with Chinese

13   drywall; is that correct?

14       A.   No.  He just asked me if I had seen it or if I

15   installed it, and I said probably, I installed all kinds

16   of drywall.

17       Q.   How is it that you went from playing golf to

18   looking to retain an attorney?

19       A.   What's that?

20       Q.   How did you go from playing golf with Mr. Chapa

21   to, hey, I'm going to go retain an attorney?  How did

22   that come about?

23       A.   I don't remember.  We just talked about it.

24       Q.   Did Mr. Chapa bring to your attention at any

25   point that there was a settlement involving installers

Confidential - Subject to Further Confidentiality Review

1  and builders and distributors and insurance carriers at

2  some point?

3      A.  He just said, you know, there was something

4  about, you know, what's going on with Chinese drywall.

5      Q.  But how did you get from there to going to meet

6  Mr. Bandas?

7      A.  He said, you know, you might need to look --

8  you know, talk to Chris about it.

9      Q.  Talk to Chris about what?

10     A.  About the Chinese drywall.

11     Q.  I guess just to tell him about Chinese drywall?

12 What was he telling you that you needed to talk to him

13 about?

14     A.  That there was maybe a settlement on it or

15 there was a legal action on it or something.

16     Q.  Was it your understanding when you were going

17 in to see Mr. Bandas that you were going to discuss the

18 prospect of you objecting to the settlement?

19     A.  No, sir.

20     Q.  When did that come to your attention?  After

21 meeting Mr. Bandas?

22     A.  I don't recall.

23     Q.  Now, before you went in to meet with

24 Mr. Bandas, did your golf buddy, Mr. Chapa, mention to

25 you that there was a prospect that you might make some

Confidential - Subject to Further Confidentiality Review

1    money if you pursued an objection to the class

2    settlement?

3        A.   No, sir.

4        Q.   And what did your golf buddy, Mr. Chapa, tell

5    you that you might expect out of this meeting with

6    Mr. Bandas?

7        A.   He didn't really say anything about it.  He

8    just said just talk to Chris about it and see what --

9    you know, to make sure you're not -- you're not -- your

10   company don't come up on the lawsuit or anything like

11   that.

12       Q.   Now, did your golf buddy, Mr. Chapa, tell you

13   at any point that Mr. Bandas had a history of objecting

14   to class settlements before you met with him?

15       A.   No, sir.

16       Q.   And did he tell you at any point that, you

17   know, Mr. Bandas, some courts had considered him a

18   serial objector to class settlements?

19       A.   No, sir.

20       Q.   Now, I just want to briefly ask you, you know,

21   in addition to yourself, there's a couple of other

22   individuals who also objected to this settlement along

23   with yourself.  Jan Petrus, do you know Ms. Petrus?

24       A.   No.

25       Q.   How about Ernest Vitela, do you know him?

1      A.   I think I've heard of him.

2      Q.   Have you ever met him?

3      A.   No, sir.

4      Q.   How about E&E Construction, are you familiar

5   with that company?

6      A.   No, sir.

7      Q.   Mr. Soto, Saul Soto, do you know Mr. Soto?

8      A.   I've met him briefly.

9      Q.   When did you meet him?

10      A.   About a day ago.

11      Q.   Not yesterday, the day before yesterday?

12      A.   Yeah, the day before yesterday, yeah.

13      Q.   Okay.  When did you -- what was the context of

14   this meeting?

15      A.   What's that?

16      Q.   What was the context of you meeting him?

17      A.   I just met him, in and out.

18      Q.   Grabbing a cup of coffee somewhere?  You bumped

19   into him at Dunkin' Donuts?

20      A.   No.  He came up here and I was up here.

21      Q.   So when you were meeting with your counsel?

22      A.   Yes, sir.

23      Q.   Okay.  By the way, when you originally retained

24   Mr. Bandas, he was your only counsel at that point?

25      A.   Who's that?

Confidential - Subject to Further Confidentiality Review

1        Q.   Mr. Bandas?

2        A.   Bandas.

3        Q.   When did you come to learn that you were going

4    to be represented by other attorneys at this deposition?

5        A.   When I talked to Mr. Van Huseman.

6        Q.   Okay.  And when was that?  Just a couple of

7    days ago?

8        A.   I would think four or five days ago.

9        Q.   Okay.  And I guess you mentioned that you

10   retained Mr. Bandas, and he's not here today, is he?

11       A.   No, sir.

12       Q.   How do you feel about that?

13       A.   I've got a good counsel here.

14            MR. HUSEMAN:  Thank you.

15       Q.   (By Mr. Gaughan)  Do you think that, you know,

16   the individual you retained specifically to represent

17   you on your appeal -- or on your objection should be

18   present today defending your deposition?

19       A.   I'm not a lawyer.  I don't know.  I don't know

20   how it works, you know.  I'm just -- I'm just a

21   contractor.

22       Q.   Okay.  And you mentioned that Mr. Chapa works

23   for the Batman Law Firm?

24       A.   Yes, sir.

25       Q.   And you never retained them as counsel, did

1   you?

2       A.   No, not really.  I've talked to -- for advice

3   I've talked to Batman.

4       Q.   Advice in connection with your objection?

5       A.   No, sir.

6       Q.   What sort of advice?

7       A.   You know --

8            MR. HUSEMAN:  Well, hold on.  If it's

9   legal advice you're talking about -- I don't know what

10  you're talking about.  If it's legal advice, you're not

11  to disclose that to him.

12           THE WITNESS:  It's not.

13           MR. GAUGHAN:  He just testified he didn't

14  retain him.

15           MR. HUSEMAN:  If it's about what golf ball

16  to use, that's okay.

17      A.   No, it's just, you know, like in construction

18  you've got to put a lien on somebody for them to pay

19  you.  You know, you talk to an attorney to see how --

20  you know, can you get a lien out there in place for a

21  company to pay you.

22      Q.   And so how long have you known Batman?

23      A.   I guess about five years.

24      Q.   Did you ever play golf with Batman?

25      A.   Yes, sir.

Confidential - Subject to Further Confidentiality Review

```
1        Q.   How is he?  Is he good?

2        A.   Sucks.

3        Q.   Does he?  So --

4             MR. LONGER:  He spends too much time in

5    the office.

6             THE WITNESS:  What's that?

7             MR. LONGER:  Spends too much time in the

8    office.

9             THE WITNESS:  He enjoys the whole course.

10   He's all over the course.  He gets his money's worth on

11   the course.  But he goes out there and has fun.

12       Q.   (By Mr. Gaughan)  Have you ever paid him for

13   any of this legal advice?

14       A.   No, sir.  No.  No, I don't think -- I don't

15   know, sir.

16       Q.   Is it fair to say you're buddies with Batman?

17       A.   Not really.

18       Q.   You just play golf with him every so often?

19       A.   We haven't played that often, but I wouldn't

20   want to play with him too often.

21       Q.   How many times a year -- how many times a year

22   would you say you play golf with Batman?

23       A.   Maybe once a year, at the most.

24       Q.   Okay.  And you testified --

25       A.   Maybe once a year.
```

1      Q.   You testified that he gave you some legal

2   advice?

3      A.   Yes, sir.

4      Q.   And I guess I'm trying to figure out why he's

5   giving you free legal advice.  Can you tell me?  Because

6   of your friendship with Mr. Chapa?

7      A.   Yes, with Bert.

8      Q.   Okay.  And you've never actually retained

9   Mr. Chapa to represent you in any litigation, anything

10  like that?

11     A.   Well, he's not an attorney.

12     Q.   Batman is not an attorney?

13     A.   No, Bert isn't.

14     Q.   Did I say Chapa?  I'm sorry.  You've never

15  actually retained Mr. Batman as counsel?

16     A.   Not really.  No, I don't remember.  I mean, I

17  was going to retain him once, but he's not a family

18  lawyer.

19     Q.   Have you ever referred to -- any cases to

20  Batman?

21     A.   No, sir.

22     Q.   How about any cases to Mr. Bandas, have you

23  ever referred any cases to Mr. Bandas?

24     A.   No, sir.

25     Q.   Did you know Mr. Bandas prior to Chapa bringing

1   you to meet Mr. Bandas?

2       A.   I've met him once on occasion.  I think it was

3   at Batman's party or something.

4       Q.   Okay.  Just once?

5       A.   I think so.

6       Q.   How long ago was this?

7       A.   I think last year.

8       Q.   2011?

9       A.   I think so.

10      Q.   And you didn't talk about Chinese drywall or

11  anything like that at that point?

12      A.   We didn't know what -- I mean, he knew I was --

13  he knew -- I knew he was a lawyer and he didn't know

14  what I was.  I was just association just walking around,

15  you know.

16      Q.   Okay.  Did Chapa ever mention that he had a

17  connection with Mr. Bandas?

18      A.   No, sir.

19      Q.   Do you understand that his office is located in

20  the same building as Mr. Bandas' office?

21      A.   Yes, sir.

22      Q.   Do you know if Mr. Chapa is going to make any

23  money for referring you to Mr. Bandas?

24      A.   I do not know.

25      Q.   Your golf buddies never mentions anything about

Confidential - Subject to Further Confidentiality Review

1    that?

2         A.    No, sir.

3         Q.    He never picks up a round of beers or anything

4    like that?

5         A.    He's always buying the beer.

6         Q.    Okay.  Maybe I'll start hanging out with him.

7         A.    Yeah.

8         Q.    Okay.  So you testified that you don't recall

9    seeing any sort of advertisements with respect to this

10   Chinese drywall settlement; is that correct?

11        A.    On TV?

12        Q.    Yeah.

13        A.    No.

14        Q.    How about in paper publication format?

15        A.    No, sir.

16        Q.    Now, did Bert ever show you anything in

17   connection with the settlement that you're now objecting

18   to?

19        A.    No, sir.

20        Q.    He didn't show you, you know, a copy of the

21   settlement, anything like that?

22        A.    No, sir.

23        Q.    Did he tell you about the website

24   ChineseDrywallSettlement.com, anything like that?

25        A.    No, sir.

Confidential - Subject to Further Confidentiality Review

1    Q.   How about did he provide you a copy of the

2    notice of that settlement?

3    A.   No, sir.

4              THE WITNESS:  Can I take a break and get

5    some water or something?

6              MR. GAUGHAN:  Yes.  And by the way, if --

7              THE WITNESS:  I need some water.

8              MR. GAUGHAN:  Any time you need to take a

9    break, just let me know.

10              THE VIDEOGRAPHER:  Off the record at 2:58.

11              (A recess was taken.)

12              THE VIDEOGRAPHER:  We're back on the

13    record at 3:06.

14    Q.   (By Mr. Gaughan)  Mr. Garcia, I want to

15    follow-up on some of the things we were talking about

16    earlier.  Specifically you mentioned that you're not a

17    party to any Chinese drywall litigation as a defendant

18    or as a plaintiff; is that correct?

19    A.   I think so.  Yes, you are correct.

20    Q.   I am correct?

21    A.   Well, unless you're talking about this right

22    here with Bandas.

23    Q.   Well, you didn't actually file a lawsuit, to

24    your knowledge, did you?

25    A.   No, sir.

```
 1       Q.    Just an objection, correct?

 2       A.    Just an objection.

 3       Q.    And you haven't been sued by anyone --

 4       A.    No, sir.

 5       Q.    -- as someone that installed Chinese drywall in

 6   their home, correct?

 7       A.    That's correct.

 8       Q.    Okay.  So I guess my question is for you:  If

 9   you haven't been sued, why are you retaining counsel?

10   Why did you approach Mr. Bandas?

11       A.    In case I do get sued.

12       Q.    So when you met with Mr. Chapa and he advised

13   you that there were some problems with Chinese drywall,

14   is it your testimony that at that point in time you

15   wanted to meet with a lawyer in the event someone

16   actually sues you for Chinese drywall?

17       A.    Well, I got counsel just to make sure I'm okay,

18   I'm covered.

19       Q.    Is that customary practice for you, that you go

20   and meet with lawyers because you think you might be

21   sued?

22       A.    No, sir.

23       Q.    And you didn't do that when there was the auto

24   accident with Ms. Combs, did you?

25       A.    What's that?
```

Confidential - Subject to Further Confidentiality Review

1    Q.   Did you do that after the auto accident with

2   Ms. Combs?  Did you consult with a lawyer?

3    A.   Yes, sir.

4    Q.   Before you got sued?

5    A.   No.

6    Q.   Okay.  Well, why in this particular instance

7   did you think you should consult with a lawyer before

8   you actually got sued?

9    A.   It was just, you know -- I talked to Bandas

10   about it and he said there was something --

11        MR. HUSEMAN:  Nothing he says.  Nothing

12   you say to him, okay?

13    Q.   (By Mr. Gaughan)  I guess what I'm trying to

14   figure out is not what you talked to Mr. Bandas about

15   but, you know, why it is that you actually felt that you

16   should meet with an attorney when you hadn't even been

17   sued yet.  Why is that?

18    A.   Why is that?

19    Q.   Yeah.  Why is that?

20    A.   Oh, because I installed -- you know, I think I

21   installed some bad -- the Chinese drywall.

22    Q.   You think you did, but you don't know any way,

23   correct?

24    A.   I know I've seen it.  I know I put it -- I

25   don't remember -- recall where.  Like I said, I don't

1    recall that -- that lawsuit that that lady filed

2    against me.

3        Q.   So is it your testimony today that when you

4    talked to your -- Mr. Chapa and, you know, it first came

5    up that maybe you should meet with a lawyer that you

6    were thinking you might be sued at that point?

7        A.   Well, also, they were saying there was some

8    health reasons or some other stuff that might come up.

9        Q.   Did they mention anything about the settlement

10   that you're currently objecting to?

11       A.   Not really.

12            MR. LONGER:  What was the answer?

13       A.   I said not really.  I don't know what the

14   settlement is.

15       Q.   Not really or no?

16       A.   No.

17       Q.   So your testimony today, that you didn't hear

18   about the settlement until after you met with

19   Mr. Bandas?

20       A.   I still don't know really know what the

21   settlement is.  I don't know enough about it yet.

22       Q.   Okay.  I guess we'll explore that a little bit

23   then.  I guess if we could show the witness what's been

24   marked yesterday as Exhibit 5.

25       A.   Exhibit 5.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   That's from yesterday's deposition.  If you
 2   could just take a moment and look at it and just let me
 3   know if you've seen this document before.
 4        A.   This document?
 5        Q.   Yes.
 6        A.   Yes.
 7        Q.   When did you see this document?
 8        A.   When I went over to Bandas' house -- Bandas'
 9   office.
10        Q.   Okay.  So I guess we should back up a minute.
11   This document is dated September 28, 2012.  If you look
12   to page number 4 of this document, do you see it's dated
13   September 28, 2012?
14        A.   On 4?
15        Q.   Yeah.  At the bottom there, on the bottom
16   left-hand side?
17        A.   Yes, sir.
18        Q.   Okay.  Now, was -- as you look at this today,
19   does this refresh your memory that it was September 28,
20   2012 when you went to Mr. Bandas' office?
21        A.   Yes.
22        Q.   Okay.  And you didn't meet with him prior to
23   this date?
24        A.   Prior?  Meaning before?
25        Q.   Yeah.
```

 1      A.    I met with him before this date.

 2      Q.    Other than the party that you talked about

 3  earlier where you met him?

 4      A.    Yes, sir.

 5      Q.    Okay.  So in connection with this objection,

 6  this was -- the first time you met with Mr. Bandas was

 7  September 28, 2012?

 8      A.    No.  I think it was the day before, then I met

 9  with him afterwards.

10      Q.    Did you meet with him both days?

11      A.    Both days.

12      Q.    September 27 and 28?

13      A.    Yes, sir.

14      Q.    Okay.  Did you ever go to Mr. Bandas's house?

15      A.    No, sir.

16      Q.    Okay.  So when was the first time you actually

17  saw this document?  Was it on the 27th then?

18      A.    Well, this one says the 28th, so it's got to be

19  28.

20      Q.    I guess that's the date it was filed, but --

21  okay.

22            And are you aware this document, this

23  objection, was actually filed with the court?

24      A.    That's what it says here.

25      Q.    And is this a document that you reviewed during

```
 1   your preparation for today's deposition?

 2       A.   I reviewed it sort of.  I don't understand most

 3   of it.

 4       Q.   Okay.  What is your understanding of the nature

 5   of your objection to the settlement in this case?

 6       A.   The objection?

 7       Q.   Yeah.

 8       A.   Whatever it says here.  It was saying something

 9   about the 32 percent award fees.

10       Q.   And is that why you're objecting to the

11   settlement because there is a 32 percent award of fees?

12       A.   And plus -- I think that's what it is.

13       Q.   Have you actually ever read the settlement?

14       A.   No, sir, just read through here.  I don't know

15   the actual facts about it.

16       Q.   How did you come to -- I'm sorry.

17            MR. LONGER:  He doesn't know the actual

18   facts about it.

19       A.   I just know about Chinese drywall.

20       Q.   Well, how did you come to learn that there was,

21   you know, what you're calling a 32 percent fee provision

22   if you had never actually read the settlement?

23       A.   My attorney is the one that --

24            MR. HUSEMAN:  Okay.  Let's not go into

25   that.
```

Confidential - Subject to Further Confidentiality Review

 1      A.   -- went through this.

 2      Q.   Now, have you ever visited the settlement

 3  website, the ChineseDrywallSettlement.com?

 4      A.   No, sir.  Is it on here?

 5      Q.   On your objection?

 6      A.   Yes.

 7      Q.   No, it's not on your objection.  So you've

 8  never visited that website?

 9      A.   No, sir.

10      Q.   Are you familiar with any of what we're calling

11  the participating defendants in this settlement?

12      A.   No, sir.

13      Q.   Do you know whether you have purchased drywall

14  from any of these participating defendants?

15      A.   Can you go through them and let me know which

16  ones they are?

17      Q.   Well, I'm asking you the question, I guess.  Do

18  you know one way or the other whether you purchased

19  drywall from any of these participating defendants?

20      A.   Depends on where they're at.  Whether -- I

21  mean, I know I've installed some.  I must have bought

22  some somewhere.  I don't know if it's Building

23  Specialties or L&W or McCoy's or I don't know which one

24  it was.

25      Q.   So you don't know?

Confidential - Subject to Further Confidentiality Review

 1      A.   What's that?

 2      Q.   You don't know?

 3      A.   I don't think I would know if Chinese -- you

 4  know, unless it was printed out on my invoices.

 5      Q.   So you're objecting to a settlement and you

 6  don't know whether you purchased drywall from any of the

 7  participating defendants; is that fair to say?

 8      A.   I just know I've seen it.  I installed it at

 9  one point or another.

10      Q.   Okay.  And if we can just take a look at this

11  objection you have here.  I'm looking at page number 2

12  of the objection.  And in the second paragraph there, it

13  mentions that you're not attending the fairness hearing.

14           Can you tell me why you don't intend to attend

15  the fairness hearing?

16      A.   Because counsel said I probably didn't need to

17  attend it.

18      Q.   And are you aware that your counsel is not

19  planning on attending the fairness hearing either?

20      A.   I don't know.  I don't know what Bandas is

21  going to do or if he's not going to show up.

22      Q.   Would you expect your counsel to attend the

23  fairness hearing where you've raised an objection to,

24  you know, the terms of a settlement?

25      A.   If you're asking me, I think I would.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Does that cause concern for you that your

 2   lawyer is not intending to attend this fairness hearing?

 3        A.   I'm not a lawyer.  I don't know what -- how --

 4   what goes on in none of this.  That's why I -- you know,

 5   I'm not an attorney.

 6        Q.   You think he should attend, though?

 7        A.   I would think, if he's got some type of

 8   interest with it, he would -- he would be attending.

 9        Q.   Okay.  And if we look at the final paragraph of

10   this second page, it looks like one of the things you're

11   objecting to is the procedures or requirements for

12   objecting.

13             What specifically about those procedures and

14   requirements are you objecting to?

15        A.   Which part of it is?  Where is it at again?

16        Q.   If you look at paragraph 4 on this page.

17        A.   Oh, on page 4?

18        Q.   Page 2.  Page 2.

19        A.   Oh, page 2?  Okay.  Now, what was the question

20   again?

21        Q.   What specific -- why are you objecting to the

22   procedures and requirements for objecting?  What's your

23   understanding of those procedures and requirements?

24        A.   Well, actually, I can't understand what he's

25   trying to say here.
```

Confidential - Subject to Further Confidentiality Review

1    Q.   So you're objecting to the procedures and

2    requirements, but you don't know what they are; is that

3    fair to say?

4    A.   Well, my counsel is the one that put it

5    together for me.

6    Q.   And if you turn to the next page, page

7    number 3.

8    A.   Page 3.

9    Q.   That top paragraph, you're also objecting to

10   the class definition.  What's your understanding of what

11   the class definition is in this case?

12   A.   I don't know.  I don't actually know what the

13   definition of this case is.  I just know it's Chinese

14   drywall.

15   Q.   Okay.

16   A.   Other than that, that's the only thing I know.

17   Q.   So there's nothing that you can point to here

18   today that you think is flawed with the class

19   definition?

20   A.   I don't understand it.  Can you explain it to

21   me?

22   Q.   I'm just asking:  Is there anything that you --

23   as you sit here today, you've objected to the class

24   definition.  Is there something you can tell me about

25   the class definition that you find to be flawed?

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Well, the way that he wrote it up here is --
 2  it's over my head on this.
 3      Q.   So you don't know, I guess; is that fair to
 4  say?
 5      A.   I don't know.
 6      Q.   Do you need to take that?
 7      A.   No.  It's my son.  I'll call him later.
 8      Q.   Okay.  If we go down one -- if we go down six
 9  lines in the same paragraph, there's a sentence
10  beginning, "Moreover, the class is defined in terms of"
11  merit-based "criteria."
12           And what is your understanding of what that
13  term means, "merit-based criteria"?
14      A.   Merit-based criteria.  I don't understand that
15  one either.
16      Q.   Okay.  And if we go down three more lines -- I
17  guess two more lines, you see that sentence beginning,
18  "Objection is also made to the class definition in that
19  allowing defendants to be class members creates a
20  conflict of interest"?
21      A.   Now, which one is that again?
22      Q.   The -- I guess if we go eight lines down from
23  the top of the first paragraph, you see a sentence that
24  says, "Objection is also made to the class definition in
25  that allowing defendants to be class members creates a
```

Confidential - Subject to Further Confidentiality Review

1    conflict of interest and objection is made on" this

2    "basis."  Do you see that?

3         A.    Yes.

4         Q.    Okay.  What's your understanding of the

5    conflict of interest?

6         A.    Conflict of interest.  Well, the conflict of

7    interest is if, you know, Chinese drywall was -- is used

8    in a certain place.

9         Q.    There's a conflict of interest because drywall

10   is used in a certain place?

11        A.    It could have been used in a certain project;

12   you know, homes or commercial or Naval base.

13        Q.    And that's the conflict of interest that you

14   were concerned about when you filed this objection?

15        A.    Or it could be -- it would be a conflict of

16   interest with me if, you know, they come back after me

17   on it.

18        Q.    Okay.  And in the next paragraph -- and I'm not

19   going to read the whole sentence, but you object to the

20   fairness, adequacy and reasonableness of the settlement.

21   Can you describe to me what your objection is there?

22        A.    The only thing that I object on it was the 32

23   percent that's going to be awarded to attorneys' fees.

24        Q.    That's what this whole paragraph to you --

25        A.    That's all I can come up with on that.

1      Q.   Just the award of attorneys' fees?

2      A.   I don't know what the total amount is.

3      Q.   I guess if you can turn to page 4.  And I think

4   this gets into what your understanding of your objection

5   is, the second paragraph there, the middle paragraph.

6      A.   Yes.

7      Q.   Okay.  And if you read that first sentence, can

8   you tell me what your understanding of what the term

9   "percentage of recovery basis" is?

10     A.   Understand the "Percentage of recovery basis on

11  the lodestar analysis."  I don't even know what that is.

12     Q.   Okay.  So do you know what percentage of

13  recovery basis is?

14     A.   Not really.

15     Q.   How about lodestar?  You just mentioned you

16  didn't know what that was?

17     A.   I don't know what lodestar is.

18     Q.   So yes, you don't know what it is?

19     A.   No, sir.

20     Q.   And then we also talk about, if you go down to

21  that third line there's a reference to a mega-fund case?

22     A.   Where is that at?

23     Q.   The third line of that paragraph talks about

24  mega-fund case.

25     A.   Yeah, okay.

Confidential - Subject to Further Confidentiality Review

1      Q.   Do you know what -- what's a mega-fund case?

2   Can you tell me?  Is that a no?

3      A.   No, sir.

4      Q.   Okay.  If we move down two lines from there, it

5   says that "attorneys' fees should not exceed 10 percent

6   of the common fund."  Do you see that?

7      A.   Common fund.  Common fund.  Yes.

8      Q.   So is it your position that attorneys' fees

9   should not exceed 10 percent of the fund?

10     A.   Yes, sir.

11     Q.   And have you actually -- you haven't actually

12  reviewed the settlement, have you?

13     A.   No, sir.

14     Q.   So if I told you that attorneys' fees, common

15  benefit fees were actually capped at 15 percent, would

16  that make a difference to you in terms of filing this

17  objection?

18     A.   At this time I don't know.  I would have to

19  check with counsel on that.

20     Q.   What's your opinion?

21     A.   What's that?

22     Q.   What's your opinion?  Do you think 15 percent

23  common benefit fees is reasonable?

24     A.   Depends on the amount, the total amount.

25     Q.   Total amount of what?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   Of the funds.

 2        Q.   And would you agree with me there's not much of

 3   a difference between ten and 15 percent?

 4        A.   Well, there is a big difference.  Depends on

 5   what you're talking about.

 6        Q.   But certainly you allege that it was a 32

 7   percent common benefit fee before, correct?

 8        A.   That's what it says here.

 9        Q.   Okay.  So you'd agree at least that 15 percent

10   is much closer to ten percent than 32?

11        A.   Yeah, it would be half the cost, yeah.

12        Q.   And what's your understanding of how much --

13   you know, what the value of -- the total value of the

14   settlement is?

15        A.   Total value depends on what is the total value.

16        Q.   I'm asking you.  What's your understanding of

17   how much the settlement is for?

18        A.   Like I said, I don't know.

19        Q.   So it could be $5 million?  You don't know?

20        A.   It could be 5 million.

21        Q.   If I told you it was 82 million, would that

22   ring a bell in any way for you?

23        A.   I'm trying to figure if it's 80 million at 32

24   percent, that's a lot.  So, you know, you figure, you

25   know, 2 percent of 80 -- what was it, 80 something
```

Confidential - Subject to Further Confidentiality Review

1    million?

2        Q.    82 million.

3        A.    Two percent would be good, too, or 5 percent.

4        Q.    So you're objecting to basically the attorneys'

5    fees and that's it, correct, with this settlement?

6        A.    I would think so.

7        Q.    Okay.  If what you just told me is, in fact,

8    correct, then the rest of this objection here that's

9    been filed by counsel that talks about class definition,

10   et cetera, that does not -- that doesn't reflect what

11   you yourself, your actual objection to this settlement

12   is; is that correct?

13       A.    Now, what was the class definition again?

14       Q.    I didn't tell you the class definition.  You

15   don't know the class definition from what I appreciate

16   from your earlier testimony.

17            So what I'm trying to gather is from what

18   you're telling me, your only objection to this

19   settlement is the fees; is that right?

20       A.    That's what we were talking about.

21       Q.    So far as your counsel has raised other

22   issues, you know, procedures, policies, class

23   definition, those sort of things, that's not why you're

24   here today?  That's not why you're objecting to the

25   settlement; is that fair to say?

Confidential - Subject to Further Confidentiality Review

1     A.   Well, the reason I'm here is just to -- you

2  know, I installed this product and they're saying

3  they're going to award somebody 32 percent.

4     Q.   So you're here because of the 32 percent, in

5  your opinion, and not because of --

6     A.   Well --

7     Q.   -- class definition, for instance?

8     A.   Like I said, I don't know what the class

9  definition, but I want to know -- see what the other

10  customers or the other clients are going to get other

11  than --

12     Q.   I think you're agreeing with me.

13     A.   Okay.

14     Q.   Are you?  Is that a yes?  Do you agree with me?

15     A.   What's that?  About?

16     Q.   You're objecting to fees?  You're not here

17  because of the class definition?

18     A.   Well, like I said, I'm here to make sure

19  everything is legally, you know, in the -- that the

20  clients are going to get their fair share, you know.

21     Q.   And by that, you mean you're concerned about

22  this -- what you consider to be a 32 percent fee

23  provision, correct?

24     A.   Yes.  Yes, sir.

25     Q.   Okay.  Do you know what class counsel or common

Confidential - Subject to Further Confidentiality Review

1   benefit counsel is?

2       A.   Where is that at?

3       Q.   I'm just asking, have you ever heard the term

4   "common benefit counsel"?

5       A.   No.  I'm not an attorney.  What was that again?

6   Common what?

7       Q.   Common benefit counsel.  It's not in this

8   document, that I know of.

9            So you don't know what that term means?

10      A.   No.

11      Q.   So I take it you don't appreciate the

12  difference between common benefit counsel and

13  individually retained counsel?

14      A.   It says -- it's unclear.  Common benefit fees.

15  I don't know.

16      Q.   You don't know?

17      A.   No.

18      Q.   And also is it your understanding that Judge

19  Fallon, who is presiding over this MDL litigation, must

20  approve any sort of fees that are ultimately paid to

21  common benefit counsel?

22      A.   I don't know who the judge is.

23      Q.   If I represent to you that Judge Fallon is

24  overseeing MDL 2047 and would ultimately approve any

25  sort of fees that went to common benefit counsel, would

Confidential - Subject to Further Confidentiality Review

1   that change your basis of your objection in any way?

2       A.   It could.

3       Q.   Okay.  So in other words, the settlement has

4   not been approved by the court yet, so 15 percent, 32

5   percent, whatever you think it is, the fee amount, is

6   not etched in stone.  The court must approve it.

7            So does that change your basis for objecting at

8   all?  In other words, it's oversight here by a federal

9   judge who will ultimately decide how much in fees should

10  be awarded to common benefit counsel.

11      A.   Okay.

12      Q.   I mean, don't you think that's adequate

13  safeguards when we're dealing with the difference

14  between 10 percent, which you think is adequate, as

15  opposed to 15 percent, which is in the settlement

16  agreement?

17      A.   Is that in the settlement agreement?  I don't

18  know.

19      Q.   I'll represent to you it is, that common

20  benefit fees are capped at 15 percent.

21      A.   Okay.

22      Q.   So if the settlement agreement caps fees,

23  common benefit fees at 15 percent and you think they

24  should be 10 percent, don't you think that having Judge

25  Fallon in place to approve the fees adequately

Confidential - Subject to Further Confidentiality Review

 1    safeguards your concerns about the amount of attorney

 2    fees in this case?

 3        A.   It could be.

 4        Q.   And do you have any sense or knowledge about

 5    the actual efforts that it took class counsel to

 6    negotiate the settlement?

 7        A.   No, sir.

 8        Q.   Time and effort, you have no sense of that?

 9    And if I told you this litigation has been going on

10    since 2009, would that change your opinion about how

11    much compensation class counsel might be entitled to?

12        A.   2009, huh?

13        Q.   What's that?

14        A.   You said 2009?

15        Q.   Yes.

16        A.   Okay.

17        Q.   Would that change your opinion at all about 10

18    percent versus 15 percent?

19        A.   I'd have to get with counsel on that and see

20    what they say.

21        Q.   So you have no opinion yourself --

22        A.   No, sir.

23        Q.   -- as you sit here today?  And do you have any

24    sense of how expensive it is to litigate this case?

25        A.   No, sir.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Are you familiar with the Hague Service

 2   requirements?

 3        A.   No.

 4        Q.   And if I told you that it sometimes costs us

 5   over $100,000 to prepare and serve a complaint in China,

 6   would that shock you?

 7        A.   No, sir.

 8        Q.   You think that's a small chunk of change,

 9   $100,000 to file and serve a complaint?

10        A.   That's a lot.  That's a lot of change.

11        Q.   So you'd agree you have no real sense of, you

12   know, the cost or the scope of this litigation, correct?

13        A.   No, sir.

14        Q.   And actually, I'm going to have you turn a few

15   pages to what's actually Exhibit C to this objection,

16   which is actually your affidavit.

17        A.   What exhibit is that?

18        Q.   It's Exhibit C to this objection.

19        A.   Okay.

20        Q.   And is that your signature down there in the

21   bottom?

22        A.   Yes, sir.

23        Q.   And this is also dated September 28, 2012,

24   correct?

25        A.   Yes, sir.
```

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Okay.  If you look at the third paragraph of

 2   this document, which starts with "I am a member of the

 3   class," do you see that paragraph?

 4      A.   Yes, sir.

 5      Q.   If you look at the final sentence, it says

 6   you're not within the exclusions in the class

 7   definition.  What is your appreciation of what those

 8   exclusions are?

 9            MR. HUSEMAN:  Incidentally, Mr. Garcia, I

10   don't want you repeating anything Mr. Bandas told you in

11   your discussions with him in your answer, so exclude

12   that from any answer, please.

13      Q.   (By Mr. Gaughan)  Can you identify any of the

14   exclusions for me?

15      A.   No, sir.

16      Q.   Not one?

17      A.   I don't know what the exclusions are right now.

18      Q.   And if you look to that next paragraph, it

19   says, "Either I personally or through Bay Area

20   Contracting & Construction, Inc. (a company I own)

21   purchased, installed, and used thousands and thousands

22   of sheets of drywall over the last 15 plus years.  Over

23   the years, I...purchased drywall from Lowe's,

24   Home Depot, Builder's Square (now out of business),

25   McCoy's, and a variety of other building supply
```

1    companies."  Do you see that?

2        A.   Yes, sir.

3        Q.   Can you give me any sense of where you actually

4    purchased the bulk of your drywall?

5        A.   The bulk?

6        Q.   Yes.

7        A.   That would probably be like Building

8    Specialties and L&W or something like that.  That's part

9    of Building Specialties.  And McCoy's.

10       Q.   Okay.  And I guess what percentage of drywall

11   would you say you purchased from those?  Was that three

12   entities you just identified?  Could you give me a

13   ballpark number there?

14       A.   At least 50 percent.

15       Q.   From those three?

16       A.   (Witness moves his head up and down.)

17       Q.   And then you've identified a couple of others

18   here, including Lowe's and Home Depots.  What percentage

19   of drywall would you buy from Lowe's and Home Depot?

20       A.   The other percentage.

21       Q.   Okay.  And would you say that's approximately

22   half between Lowe's and half between -- or is there some

23   other way you would break it down?

24       A.   Well, I mean, it's -- like I said, it could

25   be -- I don't know.  It varies.  Like when we do

Confidential - Subject to Further Confidentiality Review

1   projects out of -- out of Corpus we'd pick them up, you

2   know, in Home Depot or Lowe's or, you know, Building

3   Specialties out in that area or what was ever, you know,

4   say in the area where we're working at.

5       Q.   Let's throw a number out there.  So you said --

6   you estimated that you bought between 50 percent of your

7   dry -- about 50 percent of your drywall either at Lowe's

8   or Home Depot.  Would you say that you bought --

9       A.   Maybe 20 and 20 or 10 and 10.

10      Q.   Somewhere around that neighborhood?  Okay.

11  Now, are you aware that your counsel has represented I

12  think one of his -- either his secretary or one of his

13  officer workers in pursuing an objection to a settlement

14  that involved Lowe's Home Centers?

15      A.   No.

16      Q.   Okay.  That's never been brought to your

17  attention in any way?

18      A.   No, sir.

19      Q.   And you yourself, you didn't object to this

20  settlement involving Lowe's, did you?

21      A.   Is this about Lowe's?

22      Q.   This is not about Lowe's, no, sir.

23          So apart from this objection, you didn't --

24  you're not aware of doing any other objection to another

25  drywall settlement, are you?

Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, sir.

 2      Q.   Okay.  And are you aware that under the

 3  terms of the Lowe's settlement, which has been finally

 4  approved by a court in Muscogee County, Georgia, that

 5  your claims against Lowe's are barred?  Are you aware

 6  of that fact?

 7      A.   No, sir.

 8      Q.   And can you tell me whether any of these

 9  entities that you've identified in paragraph 4 are what

10  we referred to earlier as participating defendants?

11      A.   I don't know.

12      Q.   And if I told you that Home Depot is the only

13  entity here that's actually a participating defendant in

14  this settlement, would that refresh your memory one way

15  or the other?

16      A.   No, sir.

17      Q.   Okay.  And I'll represent to you that Home

18  Depot is -- excuse me -- Home Depot is, in fact, a

19  participating defendant in this settlement, okay?

20           And we've had some discussions with counsel for

21  Home Depot, and one thing that they represented to us is

22  that they never purchased any drywall from a Chinese

23  company and they never, to their knowledge, distributed

24  any Chinese drywall.  Do you have any reason to disagree

25  with those assertions by Home Depot?
```

Confidential - Subject to Further Confidentiality Review

```
 1        A.    I don't know.  No, I don't have no --
 2        Q.    And as you sit here today, you have no memory
 3   of standing in a Home Depot store and actually
 4   purchasing drywall, do you?
 5        A.    No memory in purchasing drywall?
 6        Q.    Do you remember actually sitting in a Home
 7   Depot and buying Chinese drywall?
 8        A.    I don't -- I mean, I bought drywall.
 9        Q.    But you can't --
10        A.    But I don't know, you know, from where or
11   from -- you're saying if I sat in a Home Depot and
12   purchased Chinese drywall?
13        Q.    I'm saying you testified earlier that you
14   recall seeing Made in China and other markings on --
15        A.    But not -- I didn't say where I got it.  I
16   don't know where.
17        Q.    But I'm asking you:  Do you remember, have a
18   specific memory of actually standing in a Home Depot
19   store and seeing those markings?
20        A.    No, I don't think -- I don't recall.
21        Q.    So you really have no idea whether you bought
22   Chinese drywall from Home Depot, do you?
23        A.    I don't -- like you said, you know, you're
24   saying that they didn't purchase Chinese drywall.
25        Q.    And are you aware of the fact that no homeowner
```

Confidential - Subject to Further Confidentiality Review

1    in the State of Texas has initiated a lawsuit against

2    Home Depot for the purchase of defective Chinese

3    drywall?

4         A.   Like I said, I'm not aware of it, but like I

5    said, I heard, you know, that there was a complaint

6    about it.  That we went and did some remediation on it

7    and that's how I heard about it, too, what the customers

8    were saying about that.  But it went in one ear and went

9    out the other, you know, until this came up.

10        Q.   And that wasn't about Home Depot, was it?

11        A.   No, not that I recall.

12        Q.   And so you have no basis to refute Home Depot's

13   counsel's representation that Home Depot never

14   distributed or sold Chinese drywall?

15        A.   I mean, I'm not an attorney.  So what are you

16   trying to say?  Can you explain that a little bit

17   better?

18        Q.   Sure.  What I'm trying to ask you is:  You have

19   no personal knowledge that would in any way call into

20   question Home Depot's counsel's representation that Home

21   Depot never sold Chinese drywall?

22        A.   I don't know.  I can't tell you.

23        Q.   You can't -- you have nothing to -- nothing

24   there?

25        A.   No.

Confidential - Subject to Further Confidentiality Review

1      Q.   Okay.

2      A.   I don't know if they did or not.  Like I said,

3  I just purchased drywall.

4      Q.   Okay.  And do you also own a company called

5  Corsand General Contractors, LLC?

6      A.   No.

7      Q.   And I didn't bring it with me today, but we did

8  do some research, and it appears actually that you own

9  the company.  It's got the same property address as your

10  home address.

11     A.   What's it called?

12     Q.   Corsand General Contractors, LLC.  C-o-r --

13     A.   Corsand?

14     Q.   Yeah.

15     A.   Oh, that's -- yeah, I've owned that.  Well,

16  it's not really existing.

17     Q.   What do you mean by that?

18     A.   We just -- we opened it and we shut it down.

19     Q.   Did it ever do any business?

20     A.   Yes, sir.

21     Q.   It did?

22     A.   Yes, sir.

23     Q.   During the time period 2006 through present,

24  did it do any business?

25     A.   2006, we built a couple of houses.

Confidential - Subject to Further Confidentiality Review

1     Q.   And did you install drywall in those houses?

2     A.   Yes, sir.

3     Q.   And so is it possible that some of the Chinese

4  drywall, some or all of the Chinese drywall that you saw

5  was actually purchased by Corsand and installed by

6  Corsand and not by your Bay Area Consulting &

7  Contractors -- Construction?  Excuse me.

8     A.   I can't -- you know, I don't really -- I can't

9  tell you there.  I mean, because I also did a joint

10  venture with another company called -- it was called

11  Ramcia.

12     Q.   What do you mean by a joint venture?

13     A.   I did a couple of houses with them, too.

14     Q.   Well, when you say you did a couple of houses

15  with them, were you also -- was your company working on

16  that or you assisting?

17     A.   I was sort of like a partner with that company.

18  But we only did a couple of houses and it dissolved, and

19  that's it.

20     Q.   And that was another entity that was set up?

21     A.   Well, it wasn't an LLC or nothing.

22     Q.   What was it?

23     A.   Just a proprietorship.

24     Q.   Okay.  So when you did that work, you were

25  doing it yourself, not as Bay Area Consulting &

Confidential - Subject to Further Confidentiality Review

1   Construction?

2       A.   Yes, sir.

3       Q.   You were doing it individually as yourself?

4       A.   Yes, sir.

5       Q.   Okay.  And it's also possible that the Chinese

6   drywall that you recall seeing with the markings made in

7   China, etcetera, was actually on one of those job sites

8   and not on one of the job sites where Bay Area

9   Consulting & Contract -- or Construction was performing

10  the job; is that correct?

11      A.   I can't tell you if it was or was not.

12      Q.   And to your knowledge, neither of these

13  entities that we just mentioned, Corsand, and what was

14  the other one?

15      A.   Ramcia.

16      Q.   Filed objections to this settlement, did they?

17      A.   No, sir.

18      Q.   So to the extent the work you did where you saw

19  the Chinese drywall involved one of these entities, no

20  objection has been filed?

21      A.   Not at this time.

22      Q.   And what's your understanding of whether it's

23  too late or whether there's still time to file an

24  objection?

25      A.   You know, I can't believe you came up with that

1   one.

2        Q.   Well, coincidentally, your retainer agreement

3   and the date of your objection were actually the last

4   day to opt out of this -- or to opt out and object to

5   the settlement.  Did you know that?

6        A.   No, sir.

7        Q.   It was just a coincidence?

8        A.   What's that?

9        Q.   This was just a coincidence that the final day

10  for objecting you -- or the day before, I should say,

11  you met Chris Bandas and the next day you filed an

12  objection?

13       A.   I guess it was.

14       Q.   Just coincidence?

15       A.   Corsand, I already forgot about that one.

16       Q.   Don't worry, I found out about it.

17       A.   I thought we dissolved that.

18            MR. GAUGHAN:  Okay.  I'll mark this as

19  Exhibit 25 -- 26.  I'm sorry.

20            (Exhibit No. 26 was marked.)

21            THE WITNESS:  Can I get some more water?

22            MR. GAUGHAN:  Yes.  We can go off the

23  record.

24            THE VIDEOGRAPHER:  Off the record at 3:50.

25  This concludes tape one.

Confidential - Subject to Further Confidentiality Review

```
 1                (A recess was taken.)

 2                THE VIDEOGRAPHER:  We're back on the

 3     record at 3:58.  This is the beginning of tape number 2.

 4         Q.   (By Mr. Gaughan)  Mr. Garcia, I'm showing you

 5     what's been marked as Exhibit 26.  I think it's right

 6     there.

 7         A.   This one?

 8         Q.   Yes.  Have you seen this document before?

 9         A.   Yes, sir.

10         Q.   When did you see this document?

11         A.   I'd say probably about three or four days ago.

12         Q.   Okay.  Now, did you see this document -- if you

13     look at the top of this document, it says over on the

14     right-hand side before the page number, it says "filed

15     10/18/12."  Do you see that?

16         A.   Yes, sir.

17         Q.   I take it you didn't see this document before

18     10/18/12; is that correct?

19         A.   Before?

20         Q.   Yeah.

21         A.   No.

22         Q.   You just saw it for the first time a couple of

23     days ago?

24         A.   I didn't notice those numbers up there.

25         Q.   Did you know that your counsel was filing this
```

 1   document before 10/18/12?

 2        A.   No, sir.

 3        Q.   Okay.  Now, did your counsel ever seek

 4   information to respond to these interrogatories from

 5   you?

 6        A.   Before then?

 7        Q.   Yeah.

 8        A.   Before 10/18/12?

 9        Q.   Yes.

10        A.   No, sir.

11        Q.   And I'm going to also mark as Exhibit 27 --

12             (Exhibit No. 27 was marked.)

13        Q.   (By Mr. Gaughan)  Did I just give you -- let me

14   see that copy real quick.

15        A.   This is 27.

16        Q.   Yeah.  Sometimes I like to give out the version

17   that I wrote on, so making sure I do not.  No, this is

18   clean.  There you go, sir.

19             So, sir, can you look at Exhibit 27 there as

20   well right in front of you.  And I'm going to ask you

21   the same question.  When was the first time you saw this

22   document?

23        A.   10/19/12.

24        Q.   You saw it on 10/18/12?

25        A.   No.

Confidential - Subject to Further Confidentiality Review

```
 1       Q.   Was it the same time frame?  You saw it a
 2  couple of days ago for the first time?
 3       A.   Yes, sir.
 4       Q.   And this is, I'll represent to you --
 5       A.   That's in October.
 6       Q.   Yeah.  This is in October, sir.  I'll represent
 7  to you that these are responses to requests for
 8  documents that was directed to you and Bay Area
 9  Contracting & Construction.
10       A.   September, October.  Now, what was that again?
11  Can you repeat that?
12       Q.   I'm representing to you that this document in
13  front of you, Exhibit 27, is your responses -- response
14  of yourself and Bay Area Contracting & Construction to
15  requests for production of documents that were by class
16  counsel.  Now, I guess my question for you is --
17       A.   Okay.  Go ahead.
18       Q.   -- did your counsel ever request that you
19  provide any sort of documents in your possession before
20  10/18/12?
21       A.   Can you go ahead and repeat that?  I was
22  thinking of something else real quick.
23       Q.   Did anyone request that you provide
24  documentation in connection with this request for
25  production of documents before 10/18/12?
```

```
 1                 MR. HUSEMAN:  Ronnie, understand, you are

 2   not to say anything you discussed with your lawyer or

 3   any communications.

 4       A.   No, I'm just trying to figure out -- I had to

 5   have seen this on 10/18, right?

 6       Q.   10/18 actually it's dated.

 7       A.   Yeah.

 8       Q.   Well, you don't remember if -- seeing this

 9   document before 10/18/12, do you?

10       A.   I don't remember.

11       Q.   Okay.  Did there come a time when you were

12   asked to provide documents that supported your objection

13   in this litigation?

14       A.   Yes, sir.

15       Q.   When was that?

16                 MR. HUSEMAN:  Just a minute.  If you're

17   dealing -- talking about dealings with your lawyer,

18   you're not to talk about those with him, okay?

19                 THE WITNESS:  Okay.

20                 MR. HUSEMAN:  And you can tell him if

21   you've looked for documents previously to try to

22   determine whether you sold any Chinese drywall or

23   involved with it.  You can tell him you have gone to

24   look for them, but I don't want any communications with

25   any lawyer discussed.
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE WITNESS:  Because I don't really
 2   understand what he's trying to say.  Something about
 3   looking for documents.
 4       A.   I've looked for documents.
 5       Q.   When?
 6       A.   A week ago, a couple days ago.  You know, I've
 7   been looking.
 8       Q.   But more recently, not, you know, two weeks ago
 9   or three weeks ago; is that correct?
10       A.   No.  He just said, you know, make sure I have
11   documents.
12       Q.   But that was within the last two weeks or so?
13       A.   Yes, sir.
14       Q.   Not before 10/18/12?
15       A.   I can't recall.
16       Q.   Okay.  And you can go back to Exhibit 26.
17       A.   26.
18       Q.   And I want you to look at Interrogatory No. 1.
19   "State the date you retained your counsel."  It's on
20   page 2 on the bottom there.
21       A.   Oh, on No. 1, objectives, objector, objectives.
22       Q.   No.  I'm sorry.  At the bottom of page 2.
23       A.   "State the date you retained counsel."
24       Q.   And then if you flip the page, I'm not going to
25   read that first paragraph, but the second sentence says,
```

Confidential - Subject to Further Confidentiality Review

1    "I retained the Bandas Law Firm, PC on September 28,

2    2012."  Is that consistent with your memory?

3         A.    Well, that's when we signed an agreement.

4         Q.    So that's a yes?

5         A.    Yes, sir.

6         Q.    Okay.  And if you go to page 4 of this document

7    and look at Interrogatory No. 6 --

8         A.    Number 4, No. 6.

9         Q.    -- and it actually says, "identify" --

10        A.    "Identify the person who installed any

11   drywall."  Okay.  Go ahead.

12        Q.    Yeah, "in Ingleside, Texas and the manufacturer

13   of the drywall."  And then do you see your response to

14   that interrogatory?

15        A.    "I do not own a home in Ingleside."

16        Q.    Yes, I see that.  But you do own a home in

17   Corpus Christi, correct, according to this?

18        A.    Yes.

19        Q.    And that's accurate?

20        A.    (Witness moves his head up and down.)

21        Q.    And you're saying you remodeled your house

22   three years ago?  About three years ago?

23              Okay.  So you remodeled your house three years

24   ago; is that correct, sir?

25        A.    Yes, sir.

1              MR. LONGER:  Which home?

2       Q.   (By Mr. Gaughan)  And which home is that?

3       A.   What's that?  I got one in Sinton and I got a

4  condo in -- I had a house here in Corpus.

5       Q.   So this involves the house in Corpus?

6       A.   A condo and -- the house, I ended up selling my

7  house in Corpus to move back into my condo because I

8  didn't have nobody -- it was just there, and so I

9  decided to budget down myself and I sold my house.

10      Q.   All right.  So you have a condo that you're

11  currently living at?

12      A.   Uh-huh.

13      Q.   What's the address of that property?

14      A.   3839 Surfside Boulevard.

15      Q.   And then you mentioned a home that you owned in

16  Corpus Christi.  What's the address of that property?

17      A.   It's 525 Indiana.

18      Q.   And is that the house that's at issue in this

19  interrogatory here?

20      A.   Well, it's actually probably all three of them

21  because I -- at the same time I built a home in Sinton.

22      Q.   Okay.  What's the address of the property --

23  did you just say the address of the property in Corpus

24  Christi?

25      A.   Yes, 525 Indiana.

Confidential - Subject to Further Confidentiality Review

1      Q.    And what's the third property?  What's the

2    address of that?

3      A.    1816 Avenue C.

4      Q.    And so you remodeled all three of these houses;

5    is that what you're saying?

6      A.    Yes, sir.

7      Q.    Around three years ago?

8      A.    Well, actually the one in Sinton is a new home.

9      Q.    When did you build that house?

10     A.    In 2007.  I think '07.

11     Q.    Okay.  '07.  And then when did you remodel the

12    house for each of the properties in Corpus Christi?

13     A.    2008.

14     Q.    And I guess let me ask you:  Do you have any

15    understanding of some of the symptoms that one would

16    expect to encounter in a home that has Chinese drywall

17    installed in it?  Defective Chinese drywall, I should

18    say?

19     A.    No, sir.

20     Q.    You never heard that people experienced rotten

21    egg odors, anything like that?

22     A.    You know, somebody told me about it.

23     Q.    Have you yourself or any of -- anyone that's

24    been in your house at any of these three properties ever

25    told you that they noticed anything like a rotten egg

Confidential - Subject to Further Confidentiality Review

1   odor or a foul odor?

2       A.   Not at this time.

3       Q.   Now, has it -- has anyone ever told you that

4   another symptom of Chinese drywall is it causes

5   corrosion to wiring and metal surfaces?

6       A.   No.  That's the only time I -- you know, was

7   going back to when I redid that remediation for that

8   lady.

9       Q.   Let me ask you this:  These three properties

10  that we just talked about, have you experienced any of

11  those sort of problems where there was corrosion or --

12  to any metal surfaces or wiring, anything like that?

13      A.   Not at this time.

14      Q.   You haven't had to replace any AC coils or

15  anything like that, HVAC units?

16      A.   Not at this time.

17      Q.   How about --

18      A.   I think it's because of the -- the AC coil is

19  in the attic.  Most of the time the ones that are inside

20  the closet areas are the ones that has the problems, I

21  think.

22      Q.   And which property are we talking about?

23      A.   I don't have none of that right now.

24      Q.   Okay.  So you haven't had any of that in any of

25  the properties?

Confidential - Subject to Further Confidentiality Review

```
 1      A.   No, sir.

 2      Q.   How about have you heard that sometimes people

 3  with Chinese drywall experience irritation of the eyes,

 4  throat, that sort of thing?  Have you ever heard

 5  anything like that?

 6      A.   I'm having that right now in my condo, so I

 7  don't know.  I don't know if that's the problem.

 8      Q.   Just right now?  That's not something that

 9  you've experienced regularly since you've had the condo,

10  is it?

11      A.   (Witness moves his head side to side.)

12      Q.   How about for any of the other properties, have

13  you experienced that sort of problem?

14      A.   No, sir.

15           MR. LONGER:  What was his answer to the

16  question?  He didn't answer.

17      Q.   (By Mr. Gaughan)  Okay.  And maybe I was

18  looking at your head nodding side to side here, but I

19  had asked, just right now you said you had some

20  irritation of your sinuses, was it?

21      A.   Sinuses and eyes.

22      Q.   And I'm asking:  That's not something you've

23  experienced regularly since you did these -- you built

24  the one property and you remediated the two other

25  properties?
```

```
 1        A.   I don't -- I just -- I don't -- it just comes

 2   and goes.  I don't know what happened.

 3        Q.   So that's not something you experience

 4   regularly?

 5        A.   Not regularly.

 6        Q.   And to your knowledge, it has nothing to do

 7   with Chinese drywall?  It could be anything; is that

 8   fair to say?

 9        A.   That's fair to say.

10        Q.   So is it fair to say that there's really

11   nothing -- there's nothing you can point to that leads

12   you to believe that there's Chinese drywall in any of

13   these three properties you just mentioned?

14        A.   I wouldn't know.

15        Q.   Okay.  You don't recall installing Chinese

16   drywall in any of these properties?

17             MR. LONGER:  Is that a yes or no?

18        A.   Oh, I don't know.

19        Q.   You don't know?

20        A.   No, sir.

21        Q.   I guess no is the answer; is that right?

22        A.   Yes, sir.

23             MR. HUSEMAN:  His answer was he didn't

24   know; how is it no?

25             MR. GAUGHAN:  That's why I'm asking him to
```

1    clarify.

2        Q.   (By Mr. Gaughan)  Is that a no?

3        A.   Well, I don't know if I did or not.  I don't

4    know.  It's been too long ago.

5        Q.   So just earlier you said you don't know whether

6    you installed Chinese drywall in any of these three

7    properties?

8        A.   I don't recall.  I mean, maybe I could.  Maybe

9    I couldn't.  We use materials from other projects to

10   finish these.  You know, like to renovate my condo,

11   renovate this, instead of being sitting in the

12   warehouse, you utilize it somehow.

13       Q.   So that's a maybe, you don't actually remember?

14       A.   I don't remember.

15       Q.   Okay.  So why is it that you're concerned that

16   there might be Chinese drywall in any of these three

17   properties?

18       A.   Well, that's because my parents lived in that

19   one house in Sinton and I live in the --

20       Q.   I guess what specifically leads you to think

21   there's actually Chinese drywall there?

22       A.   There could be.

23       Q.   But you have no idea?

24       A.   I don't have no idea.

25       Q.   And in all likelihood there is no Chinese

Confidential - Subject to Further Confidentiality Review

1    drywall in any of these properties?

2        A.    We don't know unless we go in there and open it

3    all up.

4        Q.    Are you going to go in there and open it up?

5        A.    I'm not.

6        Q.    Why not?

7        A.    What's that?

8        Q.    Why not?

9        A.    Too much work.

10       Q.    Yeah, but if there's potentially corrosive

11   Chinese drywall, don't you think you would want to see

12   if it's in there?

13       A.    Well, I would think if it's like asbestos and

14   you start messing with it, then you'll have more

15   problems.  You just wait until -- see what happens.

16       Q.    And --

17       A.    If it starts coming off the wall, then we'll

18   know.

19       Q.    And this drywall has been in the wall for about

20   four years?

21       A.    Yes, sir.

22       Q.    And you haven't had any problems?

23       A.    Well, with the shifting grounds and everything

24   else that we have in Texas, you know, it does move,

25   but...

Confidential - Subject to Further Confidentiality Review

1      Q.   But no problems that you think or can point to

2    that would be associated with Chinese drywall, correct?

3      A.   I'm not an expert.  I don't know.  I can't tell

4    you that.

5      Q.   I understand you're not an expert, but you

6    sitting here right now --

7      A.   It's like I was telling him earlier today,

8    yesterday, I started renovating my bathroom a little bit

9    in my condo and, you know, I was looking at the drywall

10   but, you know, I didn't want to -- I didn't want to open

11   it up to find out if it had Chinese drywall.

12     Q.   You actually looked at it or you didn't?

13     A.   I was looking at it but, you know, I was

14   renovating the floor of my condo's bathroom.

15     Q.   You could -- could you see in there or not?

16     A.   No.  I'd have to open it up.  But I looked at

17   it.  It looks like, you know --

18     Q.   Could you see anything, any markings on that

19   drywall?

20     A.   Yeah, you could see some type of discoloration,

21   but I'm not going to -- I'm just going to repaint it.

22     Q.   Is it green board?

23     A.   It's not green board.

24     Q.   What color was it?

25     A.   It's white, just regular board.

Confidential - Subject to Further Confidentiality Review

1       Q.    White?

2       A.    Yeah.

3       Q.    Did you see any labeling on it?

4       A.    You couldn't, it's painted over it.

5       Q.    Okay.  So I guess what specifically makes you

6   think that the value of your property or any of these

7   three properties has been diminished in any way?  Can

8   you point to anything?

9       A.    Not if we have to -- you know, if I have to

10  disclose if it's, you know -- if it's Chinese drywall.

11      Q.    But you just testified that you didn't -- you

12  don't know.

13      A.    We don't know.

14      Q.    So why would you have to disclose what you

15  don't know?

16      A.    That's true.

17      Q.    And why is it that you fear for your own health

18  and the health of your family as set forth in this

19  interrogatory response?

20      A.    That may be the negative impact of it.

21      Q.    I'm sorry.  What it says here in this

22  interrogatory response is that you fear for your own

23  health and the health of your family, and I'm

24  paraphrasing a bit.

25      A.    Yeah.

```
 1        Q.   But why?  I mean, I guess I'm trying to figure

 2   out why.  I mean, from what you're telling me, you

 3   haven't had any problems and no one in your family has

 4   either.

 5        A.   You know, well, my parents are old, so you

 6   never know.

 7        Q.   And how much fear are you really dealing with?

 8   I mean, have you had to go see any sort of healthcare

 9   providers to treat you for this fear?

10        A.   For me?

11        Q.   Yeah.

12        A.   Personally?

13        Q.   Yeah.

14        A.   I have, but not -- not -- just for my eye

15   irritation and for my health.

16        Q.   Well, did you ever get screened by any

17   physician to determine whether you've suffered any sort

18   of adverse health consequences --

19        A.   No, sir.

20        Q.   -- for being exposed to Chinese drywall?

21        A.   Well, I don't know.

22        Q.   Okay.  So that's a no, you have not?

23        A.   I haven't gotten screened.

24        Q.   And have you seen a psychiatrist or a

25   psychologist to help you cope with this fear that you or
```

Confidential - Subject to Further Confidentiality Review

1    your family might develop an illness associated with

2    Chinese drywall exposure?

3        A.   Can you repeat that again?

4        Q.   Have you or anyone in your family, I should

5    say, seen either a psychiatrist or a psychologist --

6        A.   No.

7        Q.   -- or other healthcare provider --

8        A.   No.

9        Q.   -- to deal with this, cope with this fear that

10   you might develop an injury in the future from your

11   exposure to Chinese drywall?

12       A.   No, sir.

13       Q.   No?  When did you first start having this fear

14   that you might develop health problems or someone in

15   your family might develop health problems by virtue of

16   being exposed to Chinese drywall?

17       A.   What was that again?  When did I start having

18   these fears?

19       Q.   Yeah.  When did you start becoming afraid that

20   either you yourself or someone in your family might

21   develop an illness from being exposed to Chinese

22   drywall?

23       A.   Just finding out that, you know, I might have

24   this in my homes, probably, you know, two or three weeks

25   ago.

```
 1        Q.   Two or three weeks ago?

 2        A.   Yes, sir.

 3        Q.   So around the time that you were first having

 4   conversations with Mr. Chapa about Chinese drywall?

 5        A.   Uh-huh.

 6        Q.   And before that time, you never were afraid

 7   that either yourself or someone in your family might

 8   develop some sort of illness from being exposed to

 9   Chinese drywall; is that fair?

10        A.   Yes, sir.

11        Q.   Okay.  And what did Mr. Chapa tell you that

12   made you suddenly --

13        A.   It wasn't actually Mr. Chapa, it was

14   Mr. Bandas.

15        Q.   Okay.

16             MR. HUSEMAN:  Once again, I repeat myself,

17   don't talk about what Chris Bandas told you or any of

18   your lawyers told you or what you told them, okay?

19        Q.   (By Mr. Gaughan)  Okay.  Mr. Garcia, a little

20   while ago you testified that you saw an eye doctor to

21   deal with some eye irritation you were experiencing.

22   Who was that doctor?

23        A.   Dr. Perez.

24        Q.   And what did they tell you about the nature of

25   your condition with your eye?  Or is it both eyes?  I'm
```

1    sorry.  Or is it one?

2        A.   Both eyes.  Just, you know, they're just

3    irritation from what's in the air.  And I don't know

4    what's -- just dryness pretty much.

5        Q.   Did that -- did that doctor tell you that your

6    condition with your eyes had anything to do with

7    possible exposure to Chinese drywall?

8        A.   No.  They couldn't tell.  They can't tell that.

9        Q.   And have you --

10       A.   And I don't even know if, you know...

11       Q.   Have you seen any other healthcare provider

12   that's told you any --

13       A.   No, sir.

14       Q.   -- physical condition that you're experiencing

15   is in any way related to your exposure to Chinese

16   drywall?

17       A.   No, sir.

18       Q.   And you mentioned some congestion recently?

19       A.   Sinus.

20       Q.   Sinus problems.  Has any doctor told you that

21   the problem you're experiencing with your sinuses is in

22   any way related to your exposure to Chinese drywall?

23       A.   They don't know anything about Chinese drywall.

24       Q.   And are you aware that not all drywall that

25   comes from China is reactive or off-gasses?

1       A.   I'm not aware about that.  If they're still

2   selling Chinese drywall?

3       Q.   You're asking me?

4       A.   Yes.

5       Q.   I'm the one asking the questions, I guess.

6            So I'm just asking --

7                 MR. LONGER:  Who's the "they"?

8                 THE WITNESS:  What's that?

9                 MR. LONGER:  Who's the "they"?  They're

10   selling Chinese drywall in China.

11                THE WITNESS:  But not in Texas.  Or not in

12   the --

13                MR. LONGER:  They are, whoever they are.

14                THE WITNESS:  Oh, I don't know.  That's

15   what I asked.

16                MR. HUSEMAN:  Is it one of the settling

17   parties?

18                MR. LONGER:  I didn't mean to interrupt.

19   Excuse me.

20       Q.   (By Mr. Gaughan)  So for all you know, this

21   recent sinus problems that you've been experiencing

22   could be an allergy or some other non-Chinese drywall

23   related?

24       A.   Well, I don't know actually all the facts of

25   Chinese drywall, if it does or does not.  So like I

Confidential - Subject to Further Confidentiality Review

1   said, you know...

2        Q.   You have no idea one way or the other --

3        A.   No, sir.

4        Q.   -- whether the sinus problems you're having

5   have anything to do with Chinese drywall, correct?

6        A.   No, sir.

7        Q.   And what is your level of knowledge about the

8   adverse health consequences that have been associated

9   with Chinese drywall?  I take it from your prior answer

10  you don't have any; is that fair to say?

11       A.   I don't know.

12       Q.   You never reviewed any sort of medical

13  literature that brought to your attention that there

14  were potential adverse health consequences associated

15  with exposure to drywall?

16       A.   Is there some literature out there?

17       Q.   I'm asking you.  You haven't reviewed any?

18       A.   I haven't had time.

19       Q.   And are you aware that a federal agency, the

20  CPSC, conducted a study and concluded that there were no

21  adverse health consequences that are associated with

22  Chinese drywall?

23       A.   I haven't recalled anything like that, haven't

24  reviewed it.

25       Q.   And I'm looking on page 5 in response to the

Confidential - Subject to Further Confidentiality Review

1    same interrogatory.  And just to kind of paraphrase a

2    bit there in that second full paragraph, there's really

3    just two sentences.  You indicated that you had some

4    damage to personal property and saw blades and router

5    bits that corroded quickly?

6        A.   Some routers and blades.  And we took some of

7    those things back to Home Depot and they were able to

8    reimburse us on stuff like that, that went out quicker

9    than what they usually do.

10       Q.   So you didn't suffer any out-of-pocket loss

11   because they were replaced by Home Depot?

12       A.   There was just a small fee.

13       Q.   What's a small fee?

14       A.   What's that?

15       Q.   What small fee is that?

16       A.   For just the shipping part of it.

17       Q.   How much would that be?

18       A.   I don't recall.

19       Q.   If you could quantify, you know, the totality

20   of those fees that you paid in connection with saw

21   blades and router bits corroding and having to be

22   replaced --

23       A.   The routers, the routers alone --

24       Q.   -- how much would that be?

25       A.   I don't recall.

Confidential - Subject to Further Confidentiality Review

1       Q.   Less than $20?

2       A.   Probably about 100 bucks, something like that.

3       Q.   Okay.  At maximum, say, 100 bucks, no more than

4    that?

5       A.   No, sir.

6       Q.   Okay.  Do you have any sort of receipts or

7    anything like that that go along with -- that support

8    your claim that you incurred out-of-pocket expenses for

9    these?

10      A.   It's been three years ago, four years ago, I

11   don't know.

12      Q.   So it's possible that --

13      A.   I mean, for me, I don't know.  I mean, you

14   know, I don't know.

15      Q.   You don't know.  Okay.  Now, did you

16   maintain -- I take it you didn't actually maintain

17   possession of any of these corroded saw blades or router

18   bits?

19      A.   No, sir.

20      Q.   So you have no proof that the corrosion --

21      A.   Those things have been replaced already, you

22   know.

23      Q.   And you have no proof that the corrosion that

24   affected these items had anything to do with Chinese

25   drywall?

Confidential - Subject to Further Confidentiality Review

```
 1        A.   I can't tell you.

 2        Q.   You didn't have an expert or anyone like that

 3   look at these items?

 4        A.   No, no expert.

 5        Q.   And I guess in the next paragraph of this

 6   interrogatory response, you're talking about your

 7   business reputation being damaged.  Do you see that?

 8        A.   Yes.

 9        Q.   And I guess how has your business reputation

10   been damaged?  Can you tell me a little bit about that?

11        A.   Well, it's not damaged unless it's out that,

12   you know, we replaced Chinese drywall.

13        Q.   So it hasn't been damaged because you haven't

14   had to replace any Chinese drywall?

15        A.   That's true.

16        Q.   And none of your customers have complained

17   about Chinese drywall on any of the jobs that your

18   company did; is that correct?

19        A.   Not at this time.

20        Q.   Mr. Bandas -- I'm going to have you look again

21   at Exhibit No. 5, if you don't mind.  You're not writing

22   on that, are you?

23        A.   Just underlining.  Sorry.

24        Q.   I ask that you don't do that in the future just

25   because that's part of the record.
```

Confidential - Subject to Further Confidentiality Review

1     A.   Oh, okay.

2          MR. DODSON:  Is it something we can make

3  another copy?  Then we can substitute.

4          MR. LONGER:  What kind of marking is it?

5          THE WITNESS:  I just underlined it.

6          MR. GAUGHAN:  He underlined a couple

7  things.  Unless you want to just keep it.  All right.

8  Well, just have the record reflect that you've just

9  written in -- underlined some things in one of the

10  exhibits here.

11     Q.   (By Mr. Gaughan)  And what exhibit was that

12  that you were just writing on?

13     A.   It's 26.

14     Q.   And have you underlined anything else in any of

15  the other exhibits today?

16     A.   I hope not.  Nobody said anything.

17     Q.   I'm sorry, I should have.  I don't know that I

18  gave you instructions at the beginning, but --

19     A.   No, that's it.

20     Q.   That's it.  Okay.

21          MR. HUSEMAN:  It ain't that big of a deal,

22  Ronnie, don't worry about it.

23          MR. GAUGHAN:  I'm not going to cry about

24  it.

25     Q.   (By Mr. Gaughan)  And could you turn back to

Confidential - Subject to Further Confidentiality Review

1    Exhibit No. 5.  We were looking at that earlier.

2         A.    26?

3         Q.    No.  No. 5, it's the objection.

4         A.    Number 5.

5         Q.    Specifically I'd like you to turn back to that

6    affidavit we looked at earlier.

7         A.    Affidavit.  Affidavit.  What page is that?

8         Q.    Well, you want to go past page 4, which is the

9    end of the actual objection and then you'll see -- or

10   actually, page 6 after that, you'll see Exhibit A.  Flip

11   through that.  And Exhibit B, go through that, and the

12   next Exhibit is C.  I couldn't give you a page number

13   because there's no consecutive page numbers there.

14        A.    Well, I did sign this one.

15        Q.    And I want you to look at that, I guess,

16   paragraph that begins with --

17        A.    I wrote on this one, too.  Now what?

18        Q.    Can I just see that for a second?  I want to

19   make sure you're on the right page here.  And just so

20   the record reflects, you underlined something else on

21   this exhibit as well?

22        A.    Yes.

23        Q.    And that's Exhibit 5.  All right.  Here you go,

24   Mr. Bandas.  This is Exhibit C.

25        A.    You called me Bandas.

1    Q.    I'm sorry.  I think it's maybe a little slip

2    there.

3          This is Exhibit C to your objection.  We looked

4    at this earlier.  This is your affidavit.  And if you

5    look at, you know, the second full paragraph under

6    where, you know, you I guess set forth that you're

7    stating the below items under penalty of perjury, you

8    see, "I am the owner of Bay Area Contracting &

9    Construction, Inc."?

10   A.    Uh-huh.

11   Q.    And then it lists the address as 3902 South

12   Port Avenue in Corpus Christi, Texas, 78415.  And I

13   guess my question for you:  Is that the address you

14   currently reside in?

15   A.    Right now?

16   Q.    Yeah.

17   A.    On the construction?

18   Q.    Is that where --

19   A.    The construction part of it?

20   Q.    I'm asking:  Is that where you currently

21   reside, that address there?

22   A.    Reside to live or to do business?

23   Q.    Is that where you're living?

24   A.    No.

25   Q.    And what do you mean by "do business"?

1     A.   Doing business right now at that address or

2  what?

3     Q.   Yeah.  What -- I guess what's going on at that

4  address?  Let's back up.

5     A.   Right now I've got the building up for sale.

6     Q.   Okay.  And you don't currently live there or

7  maintain a business out of that location; is that

8  correct?

9     A.   Not at this time.

10     Q.   And I guess my question for you is:  We

11  attempted service on you at this address and obviously

12  there was no one there to receive the subpoena.  So, you

13  know, I guess why did you include this address in your

14  affidavit if it was no longer being used?

15     A.   Because that's what they asked me at that time.

16     Q.   Okay.  So you're just saying that's the address

17  of your company?

18     A.   Uh-huh.

19     Q.   Are you planning --

20     A.   Right now I got a P.O. Box for the company.

21     Q.   Are you planning to change the address of your

22  company officially?

23     A.   Yes, sir.

24     Q.   With the Secretary of State Corporations

25  Division of Texas?

Confidential - Subject to Further Confidentiality Review

```
 1       A.   (Witness moves his head up and down.)

 2       Q.   Okay.  And just to that last question, so you

 3   are planning to change the corporation's address with

 4   the Secretary of State for the State of Texas?

 5       A.   I will.

 6       Q.   Okay.  What's the current address for your

 7   company?  You said it's a P.O. Box?

 8       A.   It's a P.O. Box.

 9       Q.   Can you just tell me what address is so we have

10   it?

11       A.   It's P.O. Box 897, Corpus Christi, Texas,

12   78403.

13       Q.   And if we needed to, say, serve you with a

14   subpoena at a future date, for whatever reason, where

15   would be the best place to actually accomplish that?

16       A.   At my condo.

17       Q.   And what's the address there?

18       A.   3938 Surfside Boulevard, Unit 2125, Corpus

19   Christi, Texas, 78403.  Let me check real quick.

20       Q.   Okay.

21       A.   It's 402.

22       Q.   That's the -- what is that, the unit number,

23   the 402?

24       A.   No.  The zip code.

25       Q.   Zip code, okay.  So it's 84 -- 78402?
```

```
1       A.   Yes.

2       Q.   Okay.  Thank you.  And I take it you would

3  accept service of a subpoena on behalf of Bay Area --

4       A.   Yes.

5       Q.   -- as well?  Thank you.

6            (Exhibit No. 28 was marked.)

7       Q.   (By Mr. Gaughan)  The next exhibit that I'm

8  showing you is Exhibit 28.  And this is a copy of your

9  Class-Action Objector Power of Attorney and Contingent

10  Fee Agreement.  And have you seen this document before?

11       A.   Yes, sir.

12       Q.   When did you first see this document?

13       A.   When I signed the other document.

14       Q.   If you look to the third page, does that

15  refresh your memory of when you saw this document?

16       A.   On the 28th.

17       Q.   28th of September, 2012?

18       A.   Yes, sir.

19       Q.   Okay.  And I guess earlier we were talking

20  about the scope of Mr. Bandas' representation of you and

21  your company, I guess.  But as I look at this document,

22  it's made between Ronnie Garcia and Bandas Law Firm, PC.

23  Do you see that?

24       A.   Yes, sir.

25       Q.   So is there any separate agreement where
```

1    Mr. Bandas undertook to represent Bay Area -- was it

2    Consulting?

3         A.   Bay Area Contracting & Construction.

4         Q.   Contracting & Construction.  Is there a

5    separate document like this that you signed on behalf

6    of --

7         A.   No.  This is the only thing we got.

8         Q.   And then if we look at section 1, it talks

9    about the scope and method of representation.  Do you

10   see that?

11        A.   Yes.

12        Q.   And under section 1.1 it talks about attorneys'

13   legal services.  Do you see that?

14        A.   Yes.

15        Q.   And can you just review that section real quick

16   and let me know when you're done.  Just look up, please.

17        A.   Yes, sir.

18        Q.   And would you agree that essentially the scope

19   of the representation here is for Mr. Bandas to prepare

20   and file on your behalf an objection to a proposed

21   class-action settlement in the case styled MDL 2047?

22        A.   That's what it says here.

23        Q.   And then in that next bit, we also see the tail

24   end of that next sentence, "and to represent you in an

25   appeal therefrom the objection."  Do you see that?

1      A.    Yes, sir.

2      Q.    So I was asking you before what your

3  understanding of the scope of the representation was.

4  Would you agree that based on this paragraph, Mr. Bandas

5  is only representing you with respect to your objection

6  and any appeal that might -- may follow from that

7  objection?

8      A.    Well, I just know he's counsel.  A lot of these

9  words that -- you know, I haven't really read it, so...

10     Q.    You never read this before?

11     A.    No, sir.  I looked at it, but it don't -- you

12  know, I can read.

13     Q.    Well, let me ask you this question:  Is it your

14  understanding that Mr. Bandas is representing you so far

15  as you may pursue damages for any, you know, fear of

16  future illness you might have, any loss to your business

17  reputation?

18     A.    I think that's what it's saying here.

19     Q.    I agree this is him saying he's only

20  representing you with respect to your objection and any

21  appeal that follows.  You think that there's something

22  in this document that means he's -- the representation

23  is more broad than that?

24     A.    I don't know.

25     Q.    Okay.  So is it your understanding that, you

Confidential - Subject to Further Confidentiality Review

```
1   know, he's representing you for any future claims you

2   might bring as well?

3       A.   I hope.  I don't know.  I don't really know.  I

4   don't know what to tell you on that part.  What kind of

5   future claims?

6       Q.   Well, have you filed a lawsuit?  You haven't

7   filed a lawsuit, have you, against anyone?

8       A.   (Witness moves his head side to side.)

9       Q.   Do you plan to do that?

10      A.   No, sir.

11      Q.   You don't plan to?

12      A.   I don't think I need to.

13      Q.   So I take it your fear of future -- any sort of

14  future personal injury --

15      A.   On this, on what we're talking about right now,

16  on the Chinese drywall?

17      Q.   Yes.  You don't think that rises to the level

18  where you need legal representation to file a lawsuit?

19      A.   Well, hopefully Bandas will be there to keep

20  going with this.

21      Q.   But is it your understanding that he's actually

22  going to represent you if you wanted to file a lawsuit

23  to recover those damages?

24      A.   I don't understand what you're saying, trying

25  to say again.
```

Confidential - Subject to Further Confidentiality Review

1      Q.   Well, I mean, you hired Mr. Bandas, so I'm

2    trying to figure out -- you hired him, I'm assuming, to

3    pursue an objection, right?

4      A.   You're saying future lawsuits.  Future lawsuits

5    against?

6      Q.   Well, you haven't filed a lawsuit.

7      A.   I know, but you're saying if I'm going to be

8    filing a future lawsuit against somebody.  I don't know.

9      Q.   Yeah, that's what I'm trying --

10     A.   I don't know who's that somebody yet.

11     Q.   Well, we went through your response to

12   interrogatories where it was talking about your -- you

13   had some sort of fear of future injuries.

14     A.   Oh, okay.

15     Q.   I guess do you intend to file a lawsuit against

16   Home Depot or any other entity in connection with that

17   fear of future injury?

18     A.   I don't know what the correct answer would be

19   on that.  I don't know at this time.

20     Q.   Okay.  So would it be fair to say that you

21   don't currently intend to file a lawsuit?

22     A.   Yes, sir.

23     Q.   If you turn to section 3.2 and just read

24   through that for me real quick.  And that's at the

25   bottom, starting at the bottom of page 1 of this

Confidential - Subject to Further Confidentiality Review

1    agreement.

2        A.    Okay.

3        Q.    Now, this section is talking about a possible

4    incentive award to you of $5,000, correct?

5        A.    That's what it's saying.

6        Q.    Now, I want to go back to the time when you

7    first talked to Bert Chapa.  Was this something that

8    Mr. Chapa told you about, that you might get a possible

9    incentive award --

10       A.    No.

11       Q.    -- if you pursued an objection with Mr. Bandas?

12       A.    He didn't say that.

13       Q.    Is this something that you thought you might

14   get when you first filed this objection?  That you

15   might -- hey, if I pursue this objection, I might get

16   $5,000?

17       A.    No, sir.

18       Q.    When did you first become aware of this

19   provision?

20       A.    Right now.  I didn't read -- I didn't read

21   through -- I didn't read through this.

22       Q.    What are you hoping to get out of this

23   objection?

24       A.    What's that?

25       Q.    What are you hoping to get out of this

Confidential - Subject to Further Confidentiality Review

 1    objection that you're pursuing?

 2        A.   I hope it's a fair settlement with all the

 3    people in this case.

 4        Q.   Are you expecting to get any sort of money out

 5    of it yourself?

 6        A.   No, sir.

 7        Q.   You have no idea what you'd actually want --

 8    you yourself would actually want other than to see

 9    attorneys make less money?

10        A.   That's true.

11        Q.   So there's nothing other than the attorney fee

12    provision that you actually have an objection to in this

13    settlement; is that right?

14        A.   On this settlement?

15        Q.   Yeah.  You're objecting to a settlement, right?

16        A.   Yes, sir.  It's the attorneys' fees.

17        Q.   You're not hoping to get anything other than to

18    see attorneys make less money?

19        A.   What's that?

20        Q.   I'm trying to figure out why you're objecting

21    to the settlement.  What are you trying to get out of

22    this?  You don't expect to receive any --

23        A.   Well, I just want to make sure I'm not caught

24    in the middle if somebody else comes up and says, you

25    know, you used Chinese drywall in my business up here in

Confidential - Subject to Further Confidentiality Review

```
 1    Houston or Dallas.  At least I'll be waived at that part

 2    of it.

 3        Q.   So you're just really -- from what I gather

 4    from what you just said, you want to get some sort of

 5    release?

 6        A.   Yes, sir.

 7        Q.   You're not hoping to get any sort of benefit

 8    under the settlement?

 9        A.   No, sir.

10        Q.   Could I have you turn to paragraph 4.  And

11    actually, it looks like there's 4.4 and 4.5 and

12    underneath that we see 4.  It must have been some sort

13    of mix-up of the numbering here.  But do you see where

14    it says "conflicts of interests"?

15        A.   Conflict of interests, okay.  Attorneys have

16    explained to you...

17        Q.   Yeah, please read through that and then let me

18    know when you're finished.

19        A.   Okay.

20        Q.   Do you understand this provision at all?  Let

21    me just start there.

22        A.   Yes and no.

23        Q.   Okay.  I'm just going to have you focus on a

24    little bit of that first sentence there.  And I'll try

25    to break it down so it will be a little bit more
```

1    understandable.  But it says, "Attorneys have explained

2    and you understand that, if successful, the objection or

3    any appeal there from may result in the disapproval or

4    rejection of the proposed settlement."  Do you see that?

5        A.   Yes, sir.

6        Q.   Okay.  At the time you filed this -- I'm sorry.

7    At the time your counsel filed this objection, did you

8    understand that by filing this objection you may wipe

9    out the settlement entirely for other -- other people

10   that are eligible for the settlement?

11       A.   At the time I signed this?

12       Q.   Yes.

13       A.   I didn't know.

14       Q.   Do you think that your objection in this case,

15   the objection that you're filing or your counsel has

16   filed for you, is justified in delaying compensation to

17   thousands of homeowners who have been affected by

18   Chinese drywall?

19       A.   It's delaying it?

20       Q.   It could delay it.  It could completely do away

21   with the settlement.

22       A.   I didn't know that.

23       Q.   How do you feel about that?

24       A.   A little discouraged, but...

25       Q.   I mean, do you think -- do you want to go

Confidential - Subject to Further Confidentiality Review

```
 1   forward with your objection with the understanding that

 2   you could prevent homeowners from getting any benefit

 3   under this settlement agreement?

 4       A.   I'd have to talk to my attorney.

 5       Q.   But as you sit here today, you don't know

 6   without talking to your attorney?

 7       A.   I mean, I don't -- I mean, he's got this --

 8   he's got my interest on it, but I'd have to see what

 9   he's -- on behalf of what he's -- you know, since he's

10   counsel.

11       Q.   If I told you --

12       A.   Or these guys are my counsel now.

13       Q.   If I told you I represent families who live in

14   these homes and can't actually stay in these homes

15   because the environment is so toxic that they have had

16   to rent apartments and their homes are foreclosed upon

17   because they couldn't pay the mortgage and, you know,

18   your objection is potentially going to tank any sort of

19   recovery by those people, how does that make you feel?

20       A.   I thought you said Chinese drywall wasn't

21   toxic.

22       Q.   Well, it's irritating.

23       A.   That's what you said earlier.

24       Q.   It's irritating.  I told you earlier --

25       A.   Did you say that earlier?
```

Confidential - Subject to Further Confidentiality Review

 1      Q.   I said there's no long-term health -- proven

 2  health consequence.

 3      A.   But you just said right now it's toxic.

 4      Q.   Well, if I told you that -- have you ever been

 5  in a house with Chinese drywall where you've actually

 6  experienced it?

 7      A.   I don't -- you know, like I said, I didn't

 8  know.  I mean, I didn't know it was toxic like you're

 9  saying it is.

10      Q.   Well --

11      A.   How toxic is it?

12      Q.   It releases gasses that are extremely

13  irritating.  Now, has it been proven that that's going

14  to cause any sort of long-term health effect?  It has

15  not been proven.  Okay?  But is it pleasant to live

16  somewhere where your eyes are watering all the time or

17  your throat is sore?

18      A.   I'm having that problem.

19      Q.   Would you like to live there --

20      A.   I'm having that problem.

21      Q.   -- constantly?

22      A.   My eyes are watering right now, you know.

23      Q.   For four years?

24           MR. LONGER:  It's a blistering

25  examination.

1              THE WITNESS:  Is it that bad?

2              MR. HUSEMAN:  Be nice, Fred.

3     Q.   (By Mr. Gaughan)  That's what I'm trying to

4    figure out, is you think that you holding up this

5    settlement for these people, you think that's justified,

6    based on your very weak demonstration that you actually

7    had any sort of -- you installed any Chinese drywall?

8     A.   What do you want me to say about that again?  I

9    mean, it's -- you're saying it's weak?

10    Q.   I mean --

11             MR. LONGER:  Go to another question.

12    Q.   (By Mr. Gaughan)  All right.  I'll ask another

13   question.  So I guess it's okay with you that you're

14   potentially holding up the settlement or even your

15   objection could completely tank the settlement?  That's

16   okay with you?

17    A.   No, it's not.

18    Q.   Okay.  And could you -- what do you mean by

19   that?

20    A.   Well, it's not -- it's not okay with me, but

21   like I said, I'd have to -- that's why I got legal

22   counsel and we got Bandas.  We needed to review and see

23   what we -- you know, what -- I'm not holding it up.  You

24   know, hopefully they can work something out and we can

25   proceed.

 1      Q.   What if it actually results in the settlement

 2  being either tanked or -- I'm using the term tanked, but

 3  if it gets disapproved by the court?

 4      A.   Tanked is like nobody gets paid on anything?  I

 5  don't understand what the word is, tanked.

 6      Q.   Yeah.  Basically -- I know you haven't read the

 7  settlement, but, you know, the participating defendants

 8  have a right to walk away from this agreement based on

 9  objections, based on opt-outs, that sort of thing.

10          And so if a whole bunch of the participating

11  defendants decide, hey, we're pulling out, we don't want

12  to participate in this agreement, then there would be no

13  money available for homeowners.  So I'm just asking:

14  You know, that's okay with you?

15      A.   It's -- like I said, it's not -- it's not okay

16  with me, but I'd have to check with counsel.

17      Q.   Okay.  And I think we just read the first

18  paragraph -- or the first sentence of this paragraph

19  that attorneys have explained and you understand "that

20  if successful, the objection or any appeal therefrom may

21  result in the disapproval or rejection of the proposed

22  settlement," correct?  Do you remember looking at that

23  earlier?

24      A.   Yes, sir.

25      Q.   Okay.  Did you understand that at the time you

Confidential - Subject to Further Confidentiality Review

1    signed this agreement?

2        A.   Like I said, I didn't -- I hadn't really

3    reviewed it.

4        Q.   So you didn't understand it?

5        A.   No.

6        Q.   Okay.  And is it fair to say, sitting here

7    today, this is the first time that you understood this

8    was a potential outcome?

9        A.   Pretty much.

10       Q.   Okay.  And I want to direct you down to the

11   third full sentence of this paragraph.  It says,

12   "Attorneys have also explained and you understand that

13   if there are negotiations to settle your objection,

14   Attorneys may negotiate the amount of any payment to you

15   as well as the amount of attorneys' fees concurrently in

16   order to arrive at a total settlement amount."  Do you

17   see that paragraph -- that sentence?  Excuse me.

18       A.   Yes, sir.

19       Q.   How do you feel about the prospect of your

20   attorneys trying to simultaneously negotiate a

21   resolution of your objection and trying to negotiate

22   their own fees?

23       A.   I mean, I don't know what to say there.  I'm

24   not an attorney.  I don't know what -- I don't know what

25   he's doing.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   Do you think that's appropriate?  You don't

 2   know?

 3        A.   I don't know.

 4        Q.   And I guess what do you think an appropriate

 5   fee for your counsel would be in this case?  Is there a

 6   dollar amount or a percentage, anything like that?

 7        A.   I don't -- I don't know.

 8        Q.   And as far as you know, your counsel has

 9   produced no benefit to the class that's in this

10   settlement agreement; is that correct?

11        A.   I don't -- you know, that sounds -- like I

12   said, I don't really know about that.  I don't know what

13   they do.  I don't know what Bandas does as an attorney.

14        Q.   Do you know whether your counsel participated

15   in the negotiation of this settlement at all?

16        A.   No, sir.

17        Q.   And other than representing you in this

18   objection, are you aware of any other conduct by the

19   attorney, Mr. Bandas, in terms of the Chinese drywall

20   litigation generally?

21        A.   No, sir.

22             MR. GAUGHAN:  We're going to go off the

23   record for a minute.

24             THE VIDEOGRAPHER:  Off the record at 4:56.

25             (Off the record.)
```

Confidential - Subject to Further Confidentiality Review

```
 1              THE VIDEOGRAPHER:  We're back on the

 2    record at 5:08.  This begins tape three.

 3        Q.   (By Mr. Gaughan)  Mr. Garcia, you just

 4    testified that you don't know what Bandas does as an

 5    attorney.  Do you recall that testimony?

 6        A.   Yes, sir.

 7        Q.   I guess I could tell you what he does, but are

 8    you aware in Brown v. Walmart stores, "In order of

 9    denying his objections to his settlement fees, the court

10    observed that Bandas' objection filed on behalf of

11    Ms. Clawson is a generic boilerplate objection prepared

12    and filed by attorneys working for their own personal

13    benefit and not for the benefit of this class or for the

14    lawyers' clients.  The record before the court

15    demonstrates that Bandas is a professional objector who

16    is improperly attempting to high-jack the settlement of

17    this case from deserving class members and dedicated,

18    hard working counsel, solely to coerce ill-gotten,

19    inappropriate and unspecified legal fees."

20             How do you feel about having an individual like

21    that representing you?

22        A.   I didn't know that.

23        Q.   And how do you feel about having an individual

24    like that representing you on this objection?  Does it

25    make you think twice about --
```

```
 1                    MR. DODSON:  All right.  At this point

 2   we're terminating this line of inquiry as being outside

 3   the scope of examination, as we understand the judge

 4   allowed.  And do not answer.

 5                    MR. GAUGHAN:  Okay.  And we obviously

 6   disagree on that, but with that aside...

 7                    MR. LONGER:  It may become a point of

 8   motions practice with the court.

 9        Q.   (By Mr. Gaughan)  And I guess I presented it to

10   you earlier, was it -- I think it's Exhibit 27, which is

11   answers to interrogatories.  And we looked a little bit

12   at the interrogatories earlier, which were Exhibit 26,

13   and we went through a few of those.

14             But I want to ask you:  Did you -- do you have

15   a recollection of going through this request for

16   documents and looking for documents that were responsive

17   to this request for documents?

18        A.   Are you saying looking for documents, for --

19        Q.   Yeah.  Was there a point in time when you were

20   given a copy of Plaintiff's Request For Production of

21   Documents to yourself and your company and you were

22   looking for those documents?

23        A.   Yes.  I just -- I got tied up doing what I was

24   doing and didn't have time to look for them.

25        Q.   When was this?
```

1      A.   What's that?  When they -- when you all

2  requested that or when --

3      Q.   Can you give me a point in time?

4      A.   What's that?  Some time last week.

5      Q.   Last week, not -- not before October 18, 2012

6  when your counsel filed these answers to our request for

7  production of documents?

8      A.   I didn't.

9           (Exhibit No. 29 was marked.)

10     Q.   (By Mr. Gaughan)  I'm going to show you what's

11  been marked as Exhibit 29.  Have you seen this document

12  before?

13     A.   Yes, sir.

14     Q.   When did you -- when did you see this document?

15     A.   I think it was on the 28th of September.  What

16  are we, October?

17     Q.   Well, this is actually -- I think we looked

18  earlier at your retainer agreement with Mr. Bandas.

19  This is a different document.  And it looks like -- I

20  don't see a day in there, but it looks like it's from

21  October 2012 at some point.  Do you see at the bottom

22  right above your signature?

23     A.   This one doesn't have a date, but it's October

24  12.

25     Q.   October --

1    A.   October 2012.

2    Q.   At some point in October, correct?

3    A.   Yes, sir.

4    Q.   Okay.  Do you remember receiving this document?

5    A.   I signed it.

6    Q.   Do you remember when you signed it?

7    A.   In October some time.

8    Q.   Okay.  Well, let me ask you this question:  In

9  preparing for today's deposition, who did you -- who did

10  you meet with, if anyone?

11    A.   To prepare for it?

12    Q.   Yeah.

13    A.   Mr. Van Huseman.

14    Q.   And when exactly was that?

15    A.   When was that?

16    Q.   Yeah.

17    A.   About a week ago.

18    Q.   Okay.  And had you signed this agreement before

19  you met with Mr. Van Huseman?

20    A.   Sir?

21    Q.   Had you signed this agreement before you met

22  with Mr. Van Huseman?

23    A.   Yes, sir.

24    Q.   Okay.  So that was about a week ago?

25    A.   (Witness moves his head up and down.)

```
 1        Q.   Did you sign it when you were at that meeting

 2   or before?

 3        A.   What's that again?  Can you read that?

 4        Q.   Did you sign this document, Exhibit 29, before

 5   or after the meeting, I guess?  We'll start there.

 6        A.   That was before the meeting.

 7        Q.   Did you bring it with you to the meeting to

 8   give to Mr. Huseman?

 9        A.   No.  I was running late and I didn't bring it

10   to him.

11        Q.   Did you give it to Mr. Bandas?

12        A.   Yes, sir.

13        Q.   Did you stop by his office and drop it off?  Or

14   did you mail it to him?

15        A.   Yes, sir.

16        Q.   Which one was it?

17        A.   I dropped it off.

18        Q.   Okay.  When you were actually prepping for

19   today's deposition, was there any -- who was present

20   during that -- that meeting?

21        A.   Mr. Van and Mr. Paul.

22        Q.   Okay.

23        A.   And there was somebody else.  Eric.  Eric.

24        Q.   Okay.  Was Mr. Soto also present during that

25   meeting?
```

Confidential - Subject to Further Confidentiality Review

1    A.   One meeting, yes, sir.

2    Q.   You had more than one meeting?

3    A.   Yes, sir.

4    Q.   Okay.  So you met last week.  And when was the

5  other meeting?

6    A.   This week.

7    Q.   Okay.  And so Mr. Soto was present during this

8  more recent meeting?

9    A.   Yes, sir.

10   Q.   Okay.  And did you take any notes during that

11  meeting?

12   A.   Sir?

13   Q.   Did you take any notes?

14   A.   Not really.

15   Q.   Not really?

16   A.   I scribbled some stuff down.

17   Q.   And do you have those notes somewhere in your

18  possession?

19   A.   I don't have them with me.

20   Q.   What happened to them?

21   A.   Huh?

22   Q.   What happened to those notes?

23   A.   They told me not to bring any notes in.

24   Q.   Okay.  Well, do you have them at home?

25   A.   Sir?

1    Q.    Do you have those notes at home?

2    A.    Yes, sir.

3    Q.    Did you review them before today's deposition?

4    A.    Well, actually, just what was here pretty much.

5    Q.    That's your notes?

6    A.    No.  That's just the stuff that I needed to

7    know about.

8    Q.    Okay.  So I guess what I'm trying to ask is:

9    Before you came in today, did you look at those notes at

10   any point?

11   A.    I reviewed them a little bit just to be aware

12   of what you all were going to be telling me.

13   Q.    Did they refresh your recollection or your

14   memory before you came in today's deposition?

15   A.    Not really.

16   Q.    Why did you look at the notes?

17   A.    What's that?

18   Q.    Why did you look at the notes?

19   A.    Just to try to be calm.  They said try to be

20   calm and just take my time in answering questions.  What

21   are you getting at?

22   Q.    I'm just trying to ask if you looked at them

23   before today to refresh your memory.

24   A.    I don't take good notes.  I don't.  He's

25   smiling over there.  I don't know why.

1     Q.   Okay.

2              MR. LONGER:  Would you object to producing

3     those notes to us?

4              MR. DODSON:  Yes.

5              THE WITNESS:  Why do you need notes for?

6              MR. LONGER:  As bad as the notes are,

7     would you object to their production?

8              MR. DODSON:  We do object to them.  This

9     is not proper method for asking for production.

10     Q.   (By Mr. Gaughan)  Okay.  So we've just

11     established your counsel would object to the production.

12     I'll move on now.

13          So is it your understanding that counsel

14     appearing today here are actually representing you?

15     A.   At this time, yes, sir.

16     Q.   And what's your understanding of the scope of

17     that representation?

18     A.   Just like what he just did right now.

19     Q.   So is it -- is this a representation that you

20     believe is going to be ongoing after we complete this

21     deposition?

22     A.   I can't tell -- I can't say if it is or not.  I

23     don't know.

24     Q.   Okay.  Did you review this agreement?

25     A.   This agreement?

Confidential - Subject to Further Confidentiality Review

```
 1      Q.   Yeah.  Specifically paragraph 3.

 2      A.   3.  Now I have.

 3      Q.   And so is it your understanding based on what's

 4  in this paragraph that Mr. Van Huseman is present here

 5  today to represent you solely in connection with today's

 6  deposition?

 7      A.   Is that what that says?

 8      Q.   Is that -- I'm asking.

 9      A.   It says defending any deposition.

10      Q.   Okay.  Well, you've only been -- this is the

11  one and only deposition that's been noticed of you so

12  far, correct?

13      A.   Yes, sir.

14      Q.   Okay.  And unless we notice another deposition

15  and get that deposition, is it your understanding based

16  on this paragraph that that's the end of the

17  representation after today by Mr. Van Huseman?

18      A.   I guess.  I'm not too -- I mean, to me it's

19  just, you know -- I don't know.  It's up to my attorney,

20  I guess, if he wants to -- if we're going to do another

21  deposition or not.

22      Q.   So you don't -- I guess what I'm trying to get

23  is you don't understand or appreciate the scope of the

24  representation?

25      A.   What do you mean "appreciate"?  I'm glad
```

1    they're here.  That's the truth.

2        Q.    Thank you.

3              MR. HUSEMAN:  No, I'm the one that says

4    thank you.

5        Q.    (By Mr. Gaughan)  So I guess so do you

6    appreciate that they're going to be representing you in

7    pursuing your drywall claims after today, Mr. Van

8    Huseman?

9        A.    Sure.

10       Q.    Okay.  That's your understanding, that they

11   represent you going forward?

12       A.    (Witness moves his head up and down.)

13       Q.    Yes?

14       A.    Yes, sir.  It actually says that on line 4.

15       Q.    What does it say on line 4?

16       A.    It says Van Huseman will represent --

17   "undertakes the limits to what is described in foregoing

18   paragraphs."

19       Q.    So what does that mean to you?

20       A.    That they'll represent me.

21       Q.    So the limited part, that doesn't --

22       A.    I don't see limited part.

23       Q.    "The scope of the representation by Huseman

24   undertakes -- that Huseman undertakes is limited to what

25   is described in the foregoing paragraph."

Confidential - Subject to Further Confidentiality Review

```
 1      A.   Yeah.

 2      Q.   So you read that to mean that they're

 3  representing you going forward?

 4      A.   I would think going forward.

 5      Q.   Okay.

 6      A.   Forward going.

 7      Q.   And let me ask you a question.  Did you have

 8  any sort of concern about potential long-term health

 9  consequences, stigma to the value of your home or damage

10  to your personal reputation before your conversation

11  with Bert Chapa that we talked about earlier with

12  respect to Chinese drywall?  Let me clarify.

13      A.   Now you're saying three things, right?  You

14  said health, home, and what else?

15      Q.   And damage to your personal reputation?

16      A.   Oh, my reputation.  Till I talked to -- I

17  always have -- I always have problems with reputation,

18  but --

19      Q.   I'm not sure what that means.  But I meant

20  specifically with respect to Chinese drywall.

21      A.   With Chinese drywall?  Well, if it comes up.  I

22  mean, if it's having, like you're saying, these effects,

23  of course.

24      Q.   But before we talked about this conversation

25  you had with Mr. Chapa, and what I'm trying to figure
```

Confidential - Subject to Further Confidentiality Review

1  out is did you have these concerns before you met with

2  him about Chinese drywall?

3      A.   I never did really think about it.

4      Q.   Okay.  That's what I'm trying to figure out.

5      A.   Okay.

6      Q.   And we talked about your -- I believe it was

7  two meetings you had with Mr. Van Huseman.  How many

8  total meetings did you have with Mr. Bandas regarding

9  Chinese drywall?  And I'll expand that to telephone

10  calls as well.  I'll break it down, okay?  We'll start

11  with meetings, actual physical meetings where you met in

12  person.

13      A.   I think two.  And two phone calls.

14      Q.   So the 27th and 28th, which we talked about

15  before, where you met him initially and then you went in

16  and signed the objection paperwork?  Those are the first

17  two meetings?

18      A.   No.  I think it was just phone calls first.

19      Q.   Okay.  So you had a phone call on --

20      A.   Yes, sir.

21      Q.   When was the phone call?

22      A.   I don't recall.  I don't know if it's two days

23  before that.

24      Q.   Okay.  So a couple of days before the 27th?

25      A.   Yes, sir.

1      Q.   Who called who, I guess?

2      A.   What's that?

3      Q.   Did he call you or did you call him?

4      A.   I got his number and I called him and then he

5   called me and then I called him and we were playing

6   phone tags.

7      Q.   So you were the first -- you made the -- you

8   initiated the contact?

9      A.   Yes, sir.

10      Q.   Okay.  And so you talked to him on that first

11   occasion.  And then did you go meet him?  Or was there

12   another phone call before that?

13      A.   It was another phone call.  We set up a time

14   and date.

15      Q.   And was that the same day?  Or are we talking

16   about the next day?

17      A.   I want to say maybe -- because I think it was

18   on a weekend.  And I think we talked on Sunday and then

19   I think I came in on a Monday and talked to him or

20   something like that.

21      Q.   Okay.

22      A.   But, you know, I can't be definite.

23      Q.   And by the time you went in and signed the

24   retainer agreement on the 28th, was it your

25   understanding at that point that you were going to

1    pursue an objection to the settlement?

2        A.   Yeah, we explained about what we were doing.

3             MR. HUSEMAN:  Let's not talk about what

4    you and Chris talked about.

5             THE WITNESS:  Well, that's it.

6        Q.   (By Mr. Gaughan)  Yeah, I don't want to know

7    what you talked about.  I just want to know your

8    understanding when you were going in to sign the

9    retainer agreement is you were going to do an objection,

10   correct?

11       A.   Correct.

12       Q.   Okay.  And so the two meetings that were in

13   person were on the 27th and 28th?

14       A.   I'd have to see a calendar, but...

15       Q.   Do you have it on your phone or something?

16   Does that help?

17       A.   Yeah, let me look it up real quick.  Because I

18   think -- I'm thinking the 28th is like on a -- what was

19   it?  September, right?

20       Q.   Yeah.

21       A.   September.  See, September -- oh, no, it was

22   October.  See, because it was -- because September was

23   on a Friday.  So like I said, I think I talked to him --

24   I went and seen him on Thursday and then we organized

25   that and met again on Sunday -- on the 28th.

Confidential - Subject to Further Confidentiality Review

 1     Q.   And I guess how long were both meetings,

 2  starting with the Thursday meeting?

 3     A.   I would want to say like maybe, you know, 30

 4  minutes to an hour.

 5     Q.   Okay.  And then when you met on the 28th, was

 6  that a similar duration?

 7     A.   Yes, sir.

 8     Q.   Longer or shorter?

 9     A.   Give or take.

10     Q.   And I gather from today's testimony that you

11  don't really know much about the terms of the settlement

12  itself; is that fair to say?

13     A.   Yes, sir.

14     Q.   Okay.  And would you agree that your objection

15  is really at the behest of Mr. Bandas?

16     A.   I don't really -- I can't really tell you.

17     Q.   You don't know?

18     A.   No, sir.

19     Q.   So it was your intention to object?  You

20  yourself came up with the idea?  It was your idea to

21  object?

22     A.   Oh, he -- we just talked about it.  He did all

23  the objections and everything.  Is that fair to say?

24     Q.   I guess I'm asking you.

25     A.   We talked about that.

```
 1              MR. HUSEMAN:  Yeah, let's not talk about

 2   what we talk about with our lawyer.  I keep coming back

 3   to that and we keep having to come back to that.

 4              MR. GAUGHAN:  Some clients are different

 5   than others, right?

 6     Q.   (By Mr. Gaughan)  I guess what I'm really

 7   trying to figure out is you didn't at any point go in

 8   there and say, hey, I want to object to this settlement.

 9   You know, I came up with this idea to object, I want to

10   object?

11     A.   Yeah, it was my idea.

12              MR. HUSEMAN:  See, once again, that's

13   going into things he's talking with Chris Bandas about,

14   and I'm going to ask him not to testify to those things.

15     Q.   (By Mr. Gaughan)  All right.  Well, before you

16   met or talked with Mr. Bandas, did you have an intention

17   to object to this settlement agreement?

18     A.   Before I met -- before I went to go talk to

19   him, you're talking about?

20     Q.   Before you talked to him on the phone or met

21   with him in person?

22     A.   Well, we talked --

23     Q.   Again, I don't want you to talk about what you

24   talked about, but --

25     A.   Well, you know, it was just, you know, have I
```

1    ever seen this product kind of stuff.  I've seen it.

2         Q.    Okay.  So you had no intention of objecting at

3    that point in time before you actually met with him or

4    talked to him on the phone?  Do you not understand my

5    question?

6         A.    I didn't have that -- what was that again?

7         Q.    Okay.  Before you spoke with Mr. Bandas on the

8    phone or met with him in person, you had no intention of

9    objecting to this settlement, did you?

10        A.    No, I didn't.

11        Q.    Can you tell me anything about the settlement?

12        A.    No, sir.

13        Q.    And I guess I'll ask this:  Did you have an

14   understanding that at any time that you had an option of

15   opting out of the settlement as opposed to objecting to

16   it?

17        A.    No, sir.

18        Q.    Do you know what opting out is?

19        A.    Getting out of it.

20        Q.    Okay.  So you wouldn't be bound -- if you opted

21   out, you wouldn't be bound by the settlement?

22        A.    What's that?

23        Q.    So you're saying you're getting out of the

24   settlement if you opt out, and I'm just trying to

25   clarify.  By that, do you mean that you wouldn't be

```
 1   bound by the settlement?

 2        A.   Repeat it again.

 3        Q.   All right.  Did it ever --

 4        A.   You said something about opting out.

 5        Q.   Opting out, yeah.

 6        A.   Yeah.

 7        Q.   That's settlement -- you know, some of the

 8   jargon if you read the notice, there was a couple of

 9   options you would have.  One is you can do nothing.  And

10   if you do nothing, that means you would be bound by the

11   settlement and you could participate in any benefits

12   that might be available to you under the settlement.

13             Option number 2 is you opt out, which means you

14   would not receive any benefits from the settlement, but

15   you also would not be bound by it, meaning you could

16   pursue claims against Home Depot or any other

17   participating defendant.

18             And option 3 is what you did, which is

19   objecting to the settlement.  So you're, in effect,

20   bound by the settlement, but you're raising issues that

21   you think are flawed with the settlement.  Did you

22   understand that you had those options?

23             MR. HUSEMAN:  Well, just a minute.

24   Basically I object to that as a backdoor attempt to try

25   to invade attorney/client privilege again because you're
```

1    asking him after discussion with Chris what he

2    understood, which is the same as asking him what Chris

3    told him.  So don't answer that one.

4              MR. GAUGHAN:  I completely disagree with

5    that characterization.

6              MR. HUSEMAN:  All right.

7              MR. GAUGHAN:  I just want to know what he

8    understood.

9              MR. HUSEMAN:  Right.  What he understood

10   from his lawyer is the same as asking him what his

11   lawyer told him essentially, and that's why we're not

12   going to talk about it.

13             MR. GAUGHAN:  So you're not going to let

14   me ask him if he understood that he had an option to opt

15   out?

16             MR. HUSEMAN:  You can ask him.  You can

17   ask him, but he's not going to tell you what Chris told

18   him.

19        Q.   (By Mr. Gaughan)  I don't want you to tell me

20   what Chris told you.

21        A.   I mean, that's the only thing you'd have to do

22   is just -- you'd have to talk to my attorney about that

23   part.

24        Q.   Well, I'm trying to figure out if you

25   understood that you had those three options

Confidential - Subject to Further Confidentiality Review

1    specifically.  You could opt out, you could object, or

2    you could participate in the settlement?

3        A.   Well, like I said, I'd have to get with my

4    attorney and see which way to go.

5        Q.   Okay.  But I take it you didn't understand

6    before today that you had those three options?

7             MR. HUSEMAN:  Well, you're basically

8    trying to find out what Chris told him by that.  Hold on

9    just a minute.

10            MR. LONGER:  You're make a privilege

11   objection.

12            MR. HUSEMAN:  No.  Hold on just a minute.

13            MR. LONGER:  We don't have to have a

14   speaking objection.  You've made your objection.

15            MR. HUSEMAN:  Okay.  The objection is --

16            MR. LONGER:  Answer the question.  Or tell

17   him don't answer.

18            MR. HUSEMAN:  Are both of you all doing

19   this?

20            MR. GAUGHAN:  Well, I happen to agree with

21   what he's saying.  Are you telling him not to answer?

22   Or are you -- I just want to understand if he knew he

23   had those three options.

24       A.   I had looked them over.

25       Q.   You looked over those three options?

1      A.    I saw -- when I was reviewing it, I did.

2      Q.    Reviewing what?

3      A.    It's in here, in here.

4      Q.    In where?

5      A.    One of these exhibits about the opting out.  I

6    remember seeing it.  Is it -- ain't it in here?

7      Q.    I don't know.

8      A.    Well, that's what I'm saying, you know it more

9    than I do.  And I know I read something about it when I

10   was reviewing it a little bit.  Yeah, it's got to be in

11   here.  But I think I did see it.  Let me see.  Not that

12   one.  This guy wrote on his, too.

13     Q.    All right.  I guess I'm going to ask you a

14   different question.

15     A.    It's in here, right?  Because I know I thought

16   I saw it.

17     Q.    It may be in one of the other documents you

18   have.  I didn't give you the notice, if that's what

19   you're -- the class notice.  Let me ask you this.

20           Before September 28, 2012, did you review, you

21   know, the notice of the class settlement, anything like

22   that?

23     A.    If I reviewed the class settlement?

24     Q.    No, not the settlement.  There's a notice

25   that's actually something that would be mailed out to

Confidential - Subject to Further Confidentiality Review

```
 1    known class members and was also available in that

 2    website we talked about earlier, which is the

 3    ChineseDrywallSettlement.com?

 4        A.   No, I didn't.

 5        Q.   So you didn't review that notice?

 6        A.   No, I didn't.

 7        Q.   Okay.  So you didn't understand at that time

 8    that you had a right to either opt out, object or

 9    participate in the settlement?

10        A.   No, sir.

11        Q.   And because you didn't object or opt out of the

12    settlement, do you understand that you're currently

13    bound by the settlement as approved by the court if it

14    is approved?

15        A.   I'm bound to what?

16        Q.   If the settlement is approved by the court and

17    affirmed on appeal, you'll be bound by the settlement,

18    do you understand that?

19        A.   No, sir.

20        Q.   Because you didn't object?  Or you didn't opt

21    out.  I'm sorry.

22        A.   No, sir.

23             (Exhibit No. 30 was marked.)

24        Q.   (By Mr. Gaughan)  Okay.  And these are -- just

25    for the record, these are the Articles of Incorporation
```

1    of Bay Area Contracting & Construction, Inc.  And I'm

2    just marking these as being -- you know, they were

3    produced today during your -- before your deposition.

4    Do you recognize these?

5         A.   Yes, sir.

6         Q.   And these are, in fact, the Articles of

7    Incorporation --

8         A.   Yes, sir.

9         Q.   -- for Bay Area Contracting?

10        A.   Yes, sir.

11        Q.   Okay.  You can put that aside.

12             MR. GAUGHAN:  Mark that as 31.

13             (Exhibit No. 31 was marked.)

14        Q.   (By Mr. Gaughan)  And these also were produced

15   in advance of today's deposition.  And these look like

16   documents from the Department of Treasury, Internal

17   Revenue Service pertaining to Bay Area Contracting &

18   Construction, Inc.  And we see the Taxpayer ID as

19   74-2967377.

20             And based on these documents, it appears that

21   Bay Area Contracting & Construction, Inc. was set up as

22   an S corporation; is that your appreciation?

23        A.   Yes, sir.

24        Q.   And this looks like it calls for the submission

25   of some paperwork.  Did you submit that paperwork?

Confidential - Subject to Further Confidentiality Review

1      A.   For what?  What was that for?

2      Q.   You know, if you read that first paragraph in

3   the letter, the second sentence says, "In order to make

4   an S corporation election, you must file and complete a

5   timely Form 2553."  And I'm asking you:  You completed

6   and returned that form, to your knowledge?

7      A.   I didn't; my CPA did.

8      Q.   Okay.  You can put that aside.

9           (Exhibit No. 32 was marked.)

10     Q.   (By Mr. Gaughan)  And I'm going to also mark

11  this as 32.  This was produced today as well.  And this

12  more or less looks like a Certificate of Good Standing

13  dated October 30, 2003 from the Texas Comptroller of

14  Public Accounts.  Is that what this, in fact, is, to

15  your knowledge?

16     A.   Yes, sir.

17     Q.   Okay.  You can put that aside.

18     A.   I didn't know I brought all this stuff.

19          MR. GAUGHAN:  I'm going to go off the

20  record, I think.

21          THE VIDEOGRAPHER:  Off the record at 5:40.

22          (A recess was taken.)

23          THE VIDEOGRAPHER:  We're back on the

24  record at 5:49.

25          MR. GAUGHAN:  Mr. Garcia, I don't have --

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. HUSEMAN:  If we had a really good

 2      videographer that could shoot pictures of this.

 3                    MR. GAUGHAN:  Mr. Garcia, this concludes

 4      our deposition.  I have no further questions subject to

 5      a motion we will be filing obviously seeking to pursue

 6      some additional areas of inquiry that your counsel

 7      objected to today.  So it's possible we will be back

 8      here to continue this deposition.  But at this time, I

 9      have no further questions for you.  So thank you for

10      your time.

11                    THE WITNESS:  Thank you.

12                         EXAMINATION

13      BY MR. HUSEMAN:

14           Q.  I want to break tradition, Mr. Garcia, and ask

15      you a question or two on our behalf.

16                And I want to direct your attention back to the

17      series of questions that was asked by opposing counsel

18      concerning the details of the objection and the legal

19      basis for -- remember discussions of lodestar and

20      mega-fund and those types of things?

21           A.  Yes, sir.

22           Q.  And the various definitions of the class and

23      such as that.  Did you make personally any decisions as

24      to what would be the nature of the objection or what

25      objections to make or which ones were legally viable?
```

```
 1                MR. GAUGHAN:  Objection, form.

 2        Q.   (By Mr. Huseman)  Go ahead and answer it.

 3        A.    No, sir.  I let my legal counsel do that.

 4        Q.    All right.  And I'm asking you these questions

 5   because the Judge and his briefing clerks will probably

 6   read some of this, and I don't want things picked out of

 7   context to say that you don't mean these things.

 8                In terms of making decisions, what objections

 9   are legally viable, supported by the facts, and are

10   appropriate, is that a decision that you personally

11   made?  Or is that one that you delegated to your

12   retained lawyers?

13                MR. GAUGHAN:  Objection to form.  You can

14   answer.

15        A.    I let my legal attorney set all the objections.

16        Q.    And I thank you for struggling through those,

17   trying to read those and figure out what they meant.

18   But did you understand what all the objections meant and

19   what the implications were?

20                MR. GAUGHAN:  Object to form.

21        A.    No, sir.

22                MR. HUSEMAN:  Okay.  All right.  Thank you

23   very much, Mr. Garcia.

24                MR. LONGER:  Before we actually go off the

25   record, what we've talked about with your co-counsel --
```

Confidential - Subject to Further Confidentiality Review

1    your partner, I'm sorry, is that we will have these

2    documents that are in Exhibits --

3                    MR. GAUGHAN:  11 through 25.

4                    MR. LONGER:  -- 11 through 25, they were

5    marked for identification.  I would ask you to -- we had

6    talked about having an outside vendor reproduce these

7    documents.

8                    MR. HUSEMAN:  We can do that.

9                    MR. LONGER:  Because it seems to me that

10   it's so voluminous that it just makes the most sense.

11                   MR. HUSEMAN:  I think it does.  I'm in

12   agreement with you.

13                   MR. LONGER:  And then we would also ask

14   that you identify and cull down from that what is

15   relevant and what is not.

16                   MR. HUSEMAN:  As I told you yesterday with

17   regard to Mr. Soto, I have now conferred with Chris

18   Bandas, called him and told him that I had a job for

19   him, and he said he would do it.  So I think you're -- I

20   think both of your wishes are granted on this one.

21                   MR. LONGER:  Very good.  All right.  Well,

22   thank you.  Thank you for your time.

23                   THE VIDEOGRAPHER:  Off the record at 5:52.

24

25                         * * * * * * *

Confidential - Subject to Further Confidentiality Review

```
 1
 2                    CERTIFICATE
 3
 4
 5            I HEREBY CERTIFY that the
      witness was duly sworn by me and that the
 6    deposition is a true record of the
      testimony given by the witness.
 7
             It was requested before
 8    completion of the deposition that the
      witness, RONNIE GARCIA have the
 9    opportunity to read and sign the
      deposition transcript.
10
11

             _____
12           SYLVIA KERR, Texas CSR #4776
             Certified Reporter
13           Notary Public
             Dated:  November 5, 2012
14
15
16           (The foregoing certification
17    of this transcript does not apply to any
18    reproduction of the same by any means,
19    unless under the direct control and/or
20    supervision of the certifying reporter.)
21
22
23
24
25
```

```
1                 -  -  -  -  -  -

                      E R R A T A

2                 -  -  -  -  -  -

3

4    PAGE   LINE   CHANGE

5    _____  _____  _____

6        REASON: _____

7    _____  _____  _____

8        REASON: _____

9    _____  _____  _____

10       REASON: _____

11   _____  _____  _____

12       REASON: _____

13   _____  _____  _____

14       REASON: _____

15   _____  _____  _____

16       REASON: _____

17   _____  _____  _____

18       REASON: _____

19   _____  _____  _____

20       REASON: _____

21   _____  _____  _____

22       REASON: _____

23   _____  _____  _____

24       REASON: _____

25
```

1

2            ACKNOWLEDGMENT OF DEPONENT

3

4             I,_____, do

5    hereby certify that I have read the

6    foregoing pages, and that the same is

7    a correct transcription of the answers

8    given by me to the questions therein

9    propounded, except for the corrections or

10   changes in form or substance, if any,

11   noted in the attached Errata Sheet.

12

13

14   _____

15   RONNIE GARCIA                      DATE

16

17

18   Subscribed and sworn

     to before me this

19   _____ day of _____, 20_____.

20   My commission expires:_____

21

     _____

22   Notary Public

23

24

25

```
 1                    LAWYER'S NOTES

 2    PAGE   LINE

 3    _____  _____   _____

 4    _____  _____   _____

 5    _____  _____   _____

 6    _____  _____   _____

 7    _____  _____   _____

 8    _____  _____   _____

 9    _____  _____   _____

10    _____  _____   _____

11    _____  _____   _____

12    _____  _____   _____

13    _____  _____   _____

14    _____  _____   _____

15    _____  _____   _____

16    _____  _____   _____

17    _____  _____   _____

18    _____  _____   _____

19    _____  _____   _____

20    _____  _____   _____

21    _____  _____   _____

22    _____  _____   _____

23    _____  _____   _____

24    _____  _____   _____

25    _____  _____   _____
```

Exhibit 28 to Garcia 11/1/2012 Deposition

This agreement ("Agreement") is made between RONNIE GARCIA ("Client(s)" or "you") and BANDAS LAW FIRM, P.C. (hereinafter "Attorneys").

In consideration of the mutual promises contained herein, Client(s) and Attorneys agree as follows:

1. **SCOPE AND METHOD OF REPRESENTATION**

   1.1 **Attorneys' Legal Services.** You agree Attorneys will: Prepare and file on your behalf an objection to a proposed class action settlement in the case styled *MDL 2047; In Re: Chinese-Manufactured Drywall Products Liability Litigation*; In the United States District Court, Eastern District of Louisiana, and represent you in any appeal therefrom (the "Objection").

   1.2 **Method of Representation.** BLF is a Texas law firm located at 500 N. Shoreline, Suite 1020, Corpus Christi, Texas 78471, (361) 698-5200. No lawyer of the BLF is licensed in Louisiana federal court. However, if necessary, Attorneys will seek admission before Louisiana courts *pro hac vice* or as required by the applicable federal rules of practice and/or will seek to associate local counsel in order to properly effectuate this representation. Client authorizes that Attorneys prepare the Objection for filing *pro se* if necessary so as to allow Attorneys meet the Objection filing deadline and sufficient time in which seek admission *pro hac vice* and/or associate Lousiana counsel if the later cannot be accomplished before the Objection filing deadline.

2. **YOUR REPRESENTATIONS AND DUTIES AS AN OBJECTOR**

   2.1 You represent you are a member of the Class as defined in the materials published at https://chinesedrywallclass.com

   2.2 You represent you can demonstrate you are entitled to receive settlement benefits as a member of the Class through documentation or by affidavit.

3. **ATTORNEYS' FEES, EXPENSES AND PAYMENTS TO YOU**

   3.1 **Class Action Settlement:** If a settlement is approved by the Court, you will receive the full amount of any benefits you are entitled to receive under the settlement as a class member. Attorneys shall not be entitled to receive any portion of your share of the benefits under the class settlement.

   3.2 **Incentive Award:** If the outcome of your objection is determined by the Court or is settled and the settlement is presented to the Court for approval, Attorneys may, in their sole discretion, petition the Court for approval of a modest (not to exceed

DEPOSITION
EXHIBIT
28

$5,000) payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector (an "incentive award"). If the Court grants or approves an incentive award, you will receive the amount awarded to you by the Court in addition to the benefits set forth in paragraph 3.1. If Attorneys petition the Court for an incentive award on your behalf and the Court denies the incentive award, you will receive only the benefits set forth in section 3.1.

3.3    Settlement: In the alternative to section 3.2 above, if your objection is settled without the necessity for Court approval, Attorneys agree to request as part of the settlement a separate payment to you to compensate you for your time, effort and/or the benefit you confer on the Class through your service as an objector. The amount of the payment is contingent on the outcome of the settlement negotiations, but will not exceed $5,000. If the settling parties agree to make such a payment, you will receive the amount of that payment in addition to the benefits set forth in paragraph 3.1. If the settling parties do not agree to make a separate payment to you, you will receive only the benefits set forth in paragraph 3.1.

4.4    Attorneys' Fees: You agree the payment of attorneys' fees will be contingent upon the outcome of the objection. You will not be responsible to pay attorneys' fees or expenses of any kind. You agree Attorneys may receive a fee for their services if they are successful in pursuing an objection to the class settlement or any appeal therefrom. The attorneys' fees will be paid by the defendants or as part of the attorneys' fees awarded to class counsel. You acknowledge you do not have any interest in any such fees. You further acknowledge the attorneys' fees may substantially exceed any payments to you as set forth above.

4.5    You understand and acknowledge you will not receive any special benefits or recovery not afforded to other members of the Class by reason of your service as an objector other than as set forth above. You further acknowledge no other benefits or payments have been promised to you.

## 4.    CONFLICTS OF INTEREST

Attorneys have explained and you understand that, if successful, the objection or any appeal there from may result in the disapproval or rejection of the proposed settlement which may, in turn, cause you to lose your right to receive settlement benefits under the proposed settlement, to which you object. You acknowledge and agree to this risk and waive any conflict of interest arising from the objection or any appeal there from. Attorneys have also explained and you understand that if there are negotiations to settle your objection, Attorneys may negotiate the amount of any payment to you as well as the amount of attorneys' fees concurrently in order to arrive at a total settlement amount. You acknowledge and waive any conflict of interest between Attorneys and you arising out of any such negotiations and grant Attorneys sole discretion to propose the amount of any payment to you during the negotiations. The settlement will not be finally agreed upon, however, until you have approved the terms of the settlement, the amount of the payment to you, and the amount of attorneys' fees.



5.1 Termination: Attorneys reserve the right to withdraw from this matter if you fail to honor this Agreement or for any reason permitted or required under the rules of the court or state in which the class action is pending.

5.2 Association of Co-counsel: Attorneys may associate other lawyers to assist in representing you if, before any association becomes effective, you agree in writing to the terms of the arrangement including (1) the identity of all lawyers or law firms involved, (2) whether fees will be divided based on the proportion of services performed or by lawyers agreeing to assume joint responsibility for the representation, and (3) the share of the fee each lawyer or law firm will receive, or if the division is based on the proportion of services performed, the basis on which the division will be made.

5.3 No Guaranty of Results: Attorneys will use their best efforts in representing you in this matter, but we cannot guarantee the outcome of any given matter. You acknowledge Attorneys have made no promises or guarantees concerning the outcome of this matter, and nothing in this agreement shall be construed as such a promise or guarantee.

5.4 Entire Agreement: This Agreement contains the entire agreement between us regarding this matter and the fees, expenses and payments relative thereto. This Agreement shall not be modified except by written agreement signed by both parties.

I certify and acknowledge that I have had the opportunity to read this Agreement, that I have voluntarily entered into this Agreement fully aware of its terms and conditions, and that I have received a copy of this Agreement.

Signed and accepted on this 28 day of September 2012.

Clients:

_____

Attorneys:

_____
Christopher A. Bandas