**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | x<br>x<br>x<br>x<br>x<br>x | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO ALL CASES | x<br>x | |

**PLAINTIFFS' OPPOSITION TO THE MOTION *IN LIMINE* OF INTERIOR EXTERIOR REGARDING IRRELEVANT AND/OR PREJUDICIAL EVIDENCE**

Counsel for Plaintiff's Steering Committee ("PSC") and the Plaintiffs in the upcoming trial against Interior Exterior Building Supply, L.P. ("INEX") and North River Insurance Company ("North River") hereby files this in response to the Motion *In Limine* filed by INEX on November 2, 2012, Regarding Irrelevant and/or Prejudicial Evidence.

BACKGROUND

INEX seeks to exclude a laundry-list of potential evidence, testimony and argument from the up-coming trial in this litigation claiming that such matters are irrelevant to the claims in this case and, under Fed.R.Civ.P. 403, arguing that such evidence is unduly prejudicial. Federal Rule of Evidence 401 provides that relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The Fifth Circuit has characterized this Rule as embodying a "broad standard," under which the trial court's discretion for admitting evidence is "necessarily quite broad." *United States v. Hays*, 872 F.2d 582, 586, 587 (5th Cir. 1989); *see also Conway v. Chemical Leaman Tank Lines, Inc*., 525 F.2d 927, 930 (5th Cir. 1975

(noting "[t]he policy of the new Rules [of Federal Evidence] is one of broad admissibility" and "the generous definition of 'relevant evidence" in Rule 401").

The Supreme Court favors a liberal standard of admissibility. *See Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 587 (1993). Indeed, there is a presumption of admissibility of relevant evidence. *See Spring v. Beverly Enterprises Mississippi, Inc*., 208 F.3d 1007 (Table), 2000 WL 178163, at *4 (5th Cir. 2000) (unpublished disposition) ("Although, the testimony is prejudicial to the plaintiff's case, the mere fact that evidence is prejudicial is insufficient to exclude its admissibility under Rule 403. In order to trump the presumption of admissibility of relevant evidence under Rule 403, the prejudicial nature of the evidence must be *unfair and* the prejudice must *substantially* outweigh the evidence's probative value.") (emphasis in original); *see also Vaughn v. Cockrell*, 46 Fed. Appx. 227, 2002 WL 1940096, at *8 (5th Cir. 2002) ("'the approach under Rule 403 [is] to favor the admissibility of relevant evidence, and . . . a presumption exist[s] under the Rule that relevant evidence will be more probative than prejudicial") (unpublished disposition).

Under Federal Rule of Evidence 403, a court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Fed.R.Evid. 403 (relevant evidence is inadmissible only if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"); *see also United States v. Dillon,* 532 F.3d 379, 391 (5th Cir. 2008) ("it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403 . . . .") (emphasis in original) (quotation omitted).

The Fifth Circuit Court of Appeals has also routinely cautioned that "unfair prejudice as used in Rule 403 is not to be equated with testimony simply adverse to the opposing party. Virtually all evidence is prejudicial or it isn't material. The prejudice must be 'unfair.'" *Ballou v. Henri Studios, Inc.,* 656 F.2d 1147, 1155 (5th Cir. 1981) (citing *Dollar v. Long Mfg., N.C., Inc.,* 561 F.2d 613, 618 (5th Cir. 1977)). Because Rule 403 allows for the exclusion of relevant evidence, it is an extraordinary remedy that must be used sparingly. *Brady v. Fort Bend County,* 145 F.3d 691, 715 (5th Cir. 1998); *Herrington v. Hiller,* 883 F.2d 411, 414 (5th Cir. 1989); *Dartez v. Fibreboard Corp.,* 765 F.2d 456, 461 (5th Cir. 1985). Accordingly, the court must consider the evidence as true when balancing the potential prejudice against the probative force of the evidence. *See Ballou,* 656 F.2d at 1154.

Furthermore, "[t]he Fifth Circuit has observed that '[m]otions in limine are frequently made in the abstract and in anticipation of some hypothetical circumstance that may not develop at trial." *Collins v. Wayne Corp.,* 621 F.2d 777, 784 (5th Cir. 1980)." *Fair v. Allen*, 2011 WL 830291, at *1 (W.D. La. Mar. 3, 2011). "Evidence should not be excluded in limine unless it is clearly inadmissible on all potential grounds." *Fair*, 2011 WL 830291, at *1 (citation omitted). Evidentiary rulings, especially those addressing broad classes of evidence, should often be deferred until trial so that questions of foundation, relevancy and potential prejudice can be resolved in proper context. *Id*. (citations omitted).

## ARGUMENT

The PSC submits the responses to each of the numbered matters offered by Defendant:

1.  INEX's Role as an Importer: INEX was not only the culpable domestic distributor but, as the importer in 2005-2006 of Chinese-manufactured drywall, the only link between the defective Chinese-manufactured drywall and Louisiana consumers. INEX actively sought out

manufacturing sources in China from which to purchase and import drywall, but did no vetting, inspection or testing of the manufacturers or their drywall.  Such vetting, inspection or testing should have lead INEX  to break-off  negotiations as they proceeded, or lead to a discovery that the drywall was, in fact, defective.  INEX did nothing.  This duty is heightened given the facts of the case, including  that INEX had no prior dealings with either Knauf Plasterboard Tianjin ("KPT") or Taian Taishan Plasterboard ("TTP"); that  INEX dealt with a broker which admitted having no prior experience in building materials; and that INEX was provided information that the TTP products were not ASTM compliant and received certifications of ASTM testing  that deviated from good practice, and warranted, on its own, further investigation.  The PSC offers expert testimony regarding INEX's duties presented with such facts, including its duties to research, inspect and test.  The cases relied on by Defendant are inapposite, dealing only with ordinary distributors of domestically manufactured products.  Rather, INEX stands responsible for its acts as both the seller and importer of the drywall.  *See Buteau v. Leleux*, 591 So.2d 1261 (La. 1991); *Hoychick v. Gulf States Toyota, Inc*., 386 So. 2d 681, 683 (La. Ct. App. 1980) *writ refused,* 393 So. 2d 748 (La. 1980).

2. INEX's Duty to Inspect or Test: INEX was not only the culpable domestic distributor but, as the importer in 2005-2006 of Chinese-manufactured drywall, the direct link between the defective Chinese-manufactured drywall and Louisiana consumers.  INEX actively sought out manufacturing sources in China from which to purchase and import drywall, but did no vetting, inspection or testing of the manufacturers or their drywall.  Such vetting, inspection or testing should have lead INEX  to break of negotiations as they proceeded, or lead to a discovery that the drywall was, in fact, defective.  INEX did nothing.  As such, the PSC intends to offer evidence and testimony about opportunities INEX had to research the Chinese

manufacturers and inspect both the Chinese-manufactured drywall and the manufacturing facilities. This duty is heightened given the facts of the case, including that INEX had no prior dealings with either Knauf Plasterboard Tianjin ("KPT") or TaianTaishan Plasterboard ("TTP"); that INEX dealt with a broker which admitted have no prior experience in building materials; and that INEX was provided information that the TTP products were not ASTM compliant and received certifications of ASTM testing that deviated from good practice, and warranted, on its own, further investigation. The PSC offers expert testimony regarding INEX's duties presented with such facts, including its duties to inspect and test. The cases relied on by Defendant are inapposite, dealing only with ordinary distributors of domestically manufactured products. Rather, INEX stands responsible for its acts as both the seller and importer of the drywall. *See Buteau v. Leleux*, 591 So.2d 1261 (La. 1991); *Hoychick v. Gulf States Toyota, Inc.*, 386 So. 2d 681, 683 (La. Ct. App. 1980) *writ refused,* 393 So. 2d 748 (La. 1980). North River cites *Loper v. Nat. Union Fire Ins. Co.*, No. Civ. A. 99-1350, 2001 WL 210367, *4 (E.D. La. Mar. 02, 2001) for the proposition that a seller is not presumed to know of obvious defects in a product it is not required to inspect. However, pursuant to ASTM requirements, INEX was required to test the drywall, and *Loper*, as well as the cases cited by INEX are inapposite. The evidence which Defendant attempts to exclude makes up a significant part of the evidence which proves that INEX was a bad-faith seller. INEX's motion *in limine* is an attempt to take away from the jury the ultimate issue which we are trying to find instruction on – whether INEX was a bad-faith seller.

   3. Evidence of INEX's Quality Control Procedures: Whether INEX acted in good or bad faith as a seller of the Chinese-manufactured drywall is further supported by its absence of quality control procedures. Initially, the absence of such procedures establishes, as a general

matter, the nature of its faith toward its consumers. It had no procedures to ensure the quality of the goods it sold, or respond to wide-spread problems when the arose. Moreover, INEX claims that it could not know about issues related to the Chinese-manufactured drywall ("CDW"). However, immediately after it first started selling the Chinese-manufactured drywall, it received mounting complaints about the imported drywall, and received repeated requests such as "No Import Rock", "No Knauf No Knauf No Knauf", "Domestic Rock Only" or "No Chinc Rock". After receiving literally hundreds of complaints and instructions such as "No Knauf" and "No Import Rock" – INEX did nothing to investigate these complaints and requests. Plaintiffs will set forth the evidence about INEX's lack of quality control and procedures as one reason for such lack of action. North River also claims that the defect in CDW is "not observable on a visual inspection on the product," but there exists significant evidence from INEX employees, INEX customers and INEX invoices which contradicts such a claim. Further, there is an obvious smell associated with CDW that INEX would/should/could have noticed. . The "no quality control" issue is similar to the issue of INEX failing to research the Chinese manufacturers, inspect the manufacturing facilities and inspect the manufacturing processes. The "ostrich with his head in the sand" defense may be argued, however, all of the facts surround same are relevant and important. INEX's lack of quality controls or procedures particularly in the face of mounting customer requests is relevant to its bad faith. Accordingly, the Court should not exclude evidence that INEX did not have any quality control procedures, and Plaintiffs should be permitted to present evidence on INEX's lack of quality control procedures.

    4.  Evidence of the Weight and Brittleness of Chinese-manufactured Drywall: There were several junctures at which INEX could have fulfilled its duties as an importer/distributor, particularly when there were warning signs and red flags that called into question the quality of

the CDW INEX imported for distribution in the United States. Two of the warning signs or red flags about the CDW was the heaviness and brittleness of the product. Rosemary Coates, plaintiffs' import and distribution expert, opines that the heaviness and brittleness of the CDW were each red flags which should have led a reasonable importer or distributor to conduct further inspection and testing of the CDW. The further inspecting and testing first should have occurred once the heaviness was shown through the shipping/importing documents. The next juncture where these red flags manifested themselves were, as testified to by multiple witnesses, when INEX received the product and had trouble stocking and delivering the product due to heaviness and brittleness. The last juncture was after it sold the drywall to its customers, and received complaints about its quality, particularly as to the heaviness and brittleness of the drywall. INEX took no action in regards to such complaints, and ignored standing orders by its customers for "Domestic Only" or "No Knauf" drywall. Such matters are clearly probative of INEX's faith as a seller. This evidence should not be excluded.

5. **Evidence of Customer Requests for No Import Board:** Plaintiffs hereby adopt and incorporate by reference the arguments made in section nos. 3 & 4 above. The standing orders by INEX customers that no import board be delivered, or that "No Knauf" rock be sent or that only domestic board be purchased, are relevant for several reasons. Indeed, one of the owners of INEX made such a request when he was renovating his own home. First as stated above, INEX ignored these requests, delivering CDW in contravention of such requests, and acting in bad faith toward its customers. Second, these requests arise from the bad experience its customers were having with the CDW, which, as discussed herein, INEX failed to investigate, blinding itself for the final time to potential problems with this drywall. In addition, the fact that customers noticed the sulfur smell is evidence that INEX and its employees should have also

noticed the presence of sulfur prior to providing the CDW to its customers. Finally, the record indicates that such requests are not mere "brand preference." These requests arose after and only because of the issues INEX's customers were having with the Chinese-manufactured drywall.

6.	Evidence of Wider Problems with Chinese Goods:  INEX's duty to investigate and test is based on many facts, including the fact that it was importing merchandise from a country with a bad track record with manufacturing issues.  Accordingly evidence of other problems with Chinese manufacturing, particularly contemporaneous news, is plainly relevant to setting the stage on which INEX was acting when it imported Chinese-manufactured drywall to sell and distribute to its customers.

7.	Evidence of ASTM Labeling:  There were several junctures at which INEX could have fulfilled its duties as an importer/distributor, particularly when it received warning signs as to the quality of the manufacturer operations or the manufacturers' drywall.  One of these was the failure of both KPT and TTP to satisfy basic ASTM labeling requirements, which are undisputed.  Indeed, there were not mere deficiencies in dimensional labeling, but the failure to disclose the manufacturer which would preclude builders and homeowners from subsequent identification of the original manufacturers (an issue that has plagued this litigation).  Faced with such deficiency, INEX took no action to investigate or seek compliance with United States standards.  Moreover, INEX's failure to note or act on the labeling deficiencies is additional evidence of its bad faith.

8.	INEX's Conduct After the Sale of Chinese-manufactured Drywall:  INEX's post sale conduct is relevant to show its willful blindness about the qualities of the drywall it imported for sale and distribution to its customers.  As discussed above, one of the last warnings it received were the mounting complaints by its customers about the CDW, and increasing standing

orders (which INEX disregarded) that no import drywall and only domestic drywall be shipped to satisfy sales.  Even after it sold-through the CDW, INEX continued to disregard the interests of its customers and never informed them that they should have their drywall inspected, tested or removed despite knowing that it had sold them CDW.  Such conduct is plainly relevant to its good or bad faith as a seller.

9. INEX had no Formal Complaint Department:  Whether INEX acted in good or bad faith as a seller of the CDW is further supported by its absence of quality control procedures.  Initially, the absence of such procedures establishes, as a general matter, the nature of its faith toward its consumers.  It had no procedures to ensure the quality of the goods it sold, or respond to wide-spread problems when they arose.  Moreover, INEX claims that it could not know about issues related to the CDW.  However, immediately after it first started selling the CDW, it received mounting complaints about the imported drywall, and received repeated requests such as "No Import Rock", "No Knauf No Knauf No Knauf", "Domestic Rock Only" or "No ChincRock".  It did nothing to investigate these complaints and requests. Its lack of a customer complaint department or procedure particularly in the face of mounting customer requests is relevant to its bad faith.  This evidence should not be excluded.

10. Articles Relating to Chinese-manufactured Drywall:  Articles about Chinese-manufactured drywall that appeared after INEX stopped selling such drywall may be relevant. Indeed, such articles reflect facts and matters that were known or knowable at the time INEX decided to import, sell and distribute such drywall as well as statements by it and its competitors.

11. Phosphogypsum:  Around the time that CDW was being purchased for import, distribution and sale by INEX, news was published about another problem with imported drywall, relating to phosphogypsum,  Moreover, an article outlining these problems and warning

importers and distributors to stay away from CDW was published (while INEX was still selling CDW) in a journal which INEX received.  Notwithstanding such news, INEX took not measures to ensure the quality of its Chinese-manufactured drywall.  It is noteworthy that INEX produced this article in its discovery responses.  As such, the phosphogypsum article and problem in question is not just a theoretical argument of plaintiffs that INEX should have seen or otherwise known about this warning. Rather, INEX actually received it and did nothing - no further investigation, no testing-  and continued to sell CDW in spite of receiving this article.  Such evidence is directly relevant to INEX's failure to inspect or test, as well as to its good faith as a seller.

12. **Remediation of Plaintiffs' Homes:**  While full presentation of such matters are squarely relevant to the second phase of the upcoming trial, succinct presentation  and discussion of the impact that CDW had on the lives of Plaintiffs is plainly relevant to the presentation of their cases as well as the measure of the risk disregarded by INEX.

13. **Physical or Bodily Injury:**  While full presentation of such matters are squarely relevant to the second phase of the upcoming trial, succinct presentation ad discussion of the impact that CDW had on the lives of Plaintiffs is plainly relevant to the presentation of their cases as well as the measure of the risk disregarded by INEX.

14. **Chinese-manufactured Drywall Settlements:**  The PSC agrees that such matters, including INEX's settlement, are not properly before the jury.

15. **Jurisdictional Rulings:**  The PSC opposes any blanket prohibition on such references, particularly as such matters may establish a standard, fact or matter to be adjudged by or otherwise presented to the jury.

Respectfully submitted,

Dated: November 9, 2012                /s/ Leonard A. Davis_____
Russ M. Herman, Esquire (Bar No. 6819)
Leonard A. Davis, Esquire (Bar No. 14190)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN & KATZ, L.L.C.
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin
Fred S. Longer
Matthew C. Gaughan
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
Daniel@wbmllp.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

Victor M. Diaz, Jr.
119 Washington Avenue
Suite 402
Miami Beach, FL 33139
victor@diazpartners.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony Irpino
Irpino Law Firm
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that the above and foregoing pleading has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 9th day of November, 2012.

      /s/ Leonard A. Davis
      Leonard A. Davis, Esquire
      Herman, Herman & Katz, L.L.C.
      820 O'Keefe Avenue
      New Orleans, Louisiana 70113
      Phone: (504) 581-4892
      Fax: (504) 561-6024
      Ldavis@hhklawfirm.com
      Plaintiffs' Liaison Counsel
      MDL 2047

      *Co-counsel for Plaintiffs*