NOVO812RVDEP

1

```
 1              R O U G H   C O P Y
 2              (Thursday, November 8, 2012.
 3              VIDEOGRAPHER:   This is the video
 4      taped deposition of Saul Soto taken on
 5      November 8, 2012, time is 3:29 p.m. in the
 6      matter of Chinese manufactured drywall
 7      products liability litigation will counsel
 8      please identify themselves.
 9              MR. GAUGHAN:   Matthew gone for
10      class counsel.
11              MR. HUSEMAN:   Van Huseman on behalf
12      of Mr. Soto.
13              SPEAKER2:   And Paul Dodson as
14      women.
15              VIDEOGRAPHER:   Will the kort err
16      please swear in the witness.
17              THE WITNESS:   Saul
18      Soto.(SWORN.ecl).
19  BY MR. GAUGHAN:
20      Q    (By Mr. Huseman)
21              MR. HUSEMAN:   Before we get started
22      I want to say something here which is sort of
23      inviting you to agree with me on something on
24      this, it's my understanding from what my
25      sense what the judge ordered is he doesn't
```

♀

2

NOVO812RVDEP
R O U G H   C O P Y

1       want us instructing witnesses not to answer
2       save except on privilege claims.
3               MR. GAUGHAN:   That's correct,
4       that's my understanding.
5               MR. HUSEMAN:   We have objection z
6       as you're probably aware and we don't
7       necessarily or not entirely happy of the
8       judge's ruling as you might expect but we do
9       have objections relating to privilege, work
10      product particularly with regard to the notes
11      that the judge produced, also have claims
12      about harassment which we've discussed sort
13      of informally in the past and I was wondering
14      if you would be so kind to allow us to have
15      running objection on this so we don't have to
16      be on our toast quite so much and you don't
17      have your deposition interrupted so much, can
18      we do that, what you're.
19              MR. GAUGHAN:   What you're asking me
20      for is a.
21              MR. HUSEMAN:   Running objecting.
22              MR. GAUGHAN:   You're objecting to
23      any question pertaining to his notes.
24              MR. HUSEMAN:   Any harassment type
25      things as opposed to your getting him

                                        3
                    R O U G H   C O P Y
1       answering all this and aim braking in saying

NOVO812RVDEP

2      that's harassing etc., can we have a pass on

3      that in terms of having to make those

4      objections here.

5            MR. GAUGHAN:  We'll agree that your

6      objection will be understood, running

7      objection.

8            MR. HUSEMAN:  And I think it's

9      easier on both of us that means I can sit

10     over here sleep through it and you don't get

11     interrupted.

12           MR. GAUGHAN:  That sounds

13     excellent.

14           MR. GAUGHAN:  Before we get started

15     as well aid just like to put on the record

16     that last night we received a letter from Mr.

17     Bandas with a series of documents I think for

18     Mr. Soto's deposition total of 6856 documents

19     and immediately prior to today's deposition

20     we minutes ago really received a letter from

21     the Bandas law firm supposedly showing us

22     more limited set of documents that were

23     relevant to today's deposition.  Three page

24     document with just Bates numbers on it.  I

25     think it's not realistic that we're going --

                                          4

             R O U G H   C O P Y

1      that I'm going to have an opportunity even if

2      we printed up all these documents to review

3      them and to ask the witness questions about

             Page 3

NOVO812RVDEP

4          those documents, so I just like to put that

5          on the record that we're intending to seek

6          sanctions and we will request that in that

7          motion request the witness appear in New

8          Orleans to be deposed further but I'm going

9          to put that on the record before we get

10         started and of course we'll seek costs and

11         attorneys fees and everything else.

12              MR. HUSEMAN:  Sure, the point of it

13         is on that and I think I'm a little bit out

14         of my area here, but my understanding of this

15         is that all of us deciding what's relevant

16         and what isn't is that when they're doing

17         remodeling a huge amount involves drywall

18         errs connected with it etc. and trying to siv

19         that out trying to strain that out there was

20         people talking about doing all night errs

21         trying to do this to get things sorted out.

22         I understand what your point is but it has

23         not been from what I've heard without a lot

24         of effort on our side as well.

25              MR. GAUGHAN:  What I'm trying to

♀

                                                      5

                    R O U G H   C O P Y

1          say is I think this is a pretty lengthy list

2          of documents and I will actually mark it in a

3          minute for the record, but I don't think it's

4          realistic for us to for me to have been able

5          to actually review these documents since it

                         Page 4

NOVO812RVDEP

 6    got produced to me at 3:00 and it's now 3:30.
 7              MR. HUSEMAN:  Well you mean the
 8    refined version of it.
 9              MR. GAUGHAN:  The refined version.
10              MR. HUSEMAN:  Sure and if you need
11    to we'll give you all the time you need on
12    that if you need doing that type of thing.
13              MR. GAUGHAN:  I guess it was my
14    understanding before that the documents or at
15    least this sort of list would be produced on
16    a rolling basis so we would have it in time
17    to review and that office live didn't happen.
18              MR. HUSEMAN:  I don't know who is
19    doing what on that.  That isn't my niche.
20              MR. GAUGHAN:  I understand.  We'll
21    visit that matter with the court so I just
22    want to put that on the record before we get
23    started though and I will have the court
24    reporter mark this as exhibit 33 which is
25    just a letter that I received immediately

♀

                                                 6
                    R O U G H   C O P Y
 1    before this deposition.
 2              (Exhibit 33 marked.)
 3              MR. GAUGHAN:  The other thing I'd
 4    like to put on the record before we get
 5    started is I think I know the answer to this
 6    question --
 7              MR. HUSEMAN:  You only get to put

NOVO812RVDEP
```
 8      one thing on the record, you've done it.
 9                MR. GAUGHAN:  I wish that were the
10      rule, but it's my understanding Ms. Petris
11      has not been served yet and she's not
12      appearing at all and I'd like to verify you
13      guys don't have any different understanding.
14                MR. HUSEMAN:  I have eaf never
15      talked to her about this thing so I don't
16      know what sthees's doing.
17                MR. GAUGHAN:  And your a he not
18      representing her.
19                MR. HUSEMAN:  At this point I'm
20      not.
21                MR. GAUGHAN:  The same with Mr. Vi
22      tell a and e and e construction it's my
23      understanding he's not going to appear he
24      hasn't been served yet.
25                MR. HUSEMAN:  That's what the rumor
```

                                             7

                      R O U G H   C O P Y
```
 1      on street is I never talked to either one of
 2      them about this matter so I don't know.
 3                MR. GAUGHAN:  And you don't
 4      represent him or e and e construction.
 5                MR. HUSEMAN:  Not at this point it
 6      may be that task falls to us in the future
 7      but that bridge hasn't been crossed yet.
 8                MR. GAUGHAN:  I think we can get
 9      started.
```
                         Page 6

NOVO812RVDEP

10    BY MR. GAUGHAN:

11    Q.    Good afternoon Mr. Soto thank you for your

12    patience in listening to this lengthy lawyer speak

13    and I want to thank you for appearing today.

14    Before we get started I'm assuming he's appearing

15    and I think this is kind of agreed to for himself

16    and for shs construction?

17                  MR. HUSEMAN:   That's correct.

18    A.    Yes, sir.

19                  MR. HUSEMAN:   I think aits a sole

20          proprietorship.

21    A.    Yes it's doing business as.

22                  MR. GAUGHAN:   I understand ip

23          wanted to put that on the record that was my

24          appreciation last time and I want to make

25          sure it's the understanding going into

                                          8

                    R O U G H   C O P Y

1           today's deposition.

2     A.    Yes, sir.

3     BY MR. GAUGHAN:

4     Q.    And I take it Mr. Bandas is not appearing

5     again?

6                   MR. HUSEMAN:   Well he's got a

7           hearing in the morning from the judge he's

8           already -- I talked to him while ago but he

9           was at the airport getting ready to fly to

10          New Orleans so I guess he's not going to be

11          here.

NOVO812RVDEP

12                    MR. GAUGHAN:  In front of judge

13        fallen.

14                    MR. HUSEMAN:  In the morning.

15                    MR. GAUGHAN:  That would certainly

16        explain why he's not here.

17    BY MR. GAUGHAN:

18    Q.    All right.  Just I guess since you were last

19    deposed I just want to make sure a couple of

20    circumstances have not changed, you haven't been

21    sued by any sort of homeowners that claim that you

22    installed Chinese drywall in their home, have you?

23    A.    I have not been sued by anyone.

24    Q.    Have you received any complaints from any

25    homeowners that they think you installed Chinese

♀

                                              9
                      R O U G H   C O P Y

1     drywall in their home?

2     A.    Not at this point.

3     Q.    It's my understanding that during last week's

4     deposition that you did not recall any homes that

5     you think you installed Chinese drywall in?

6     A.    Not any specific homes, correct.

7     Q.    And that hasn't changed?

8     A.    No, sir.

9     Q.    As you sit here today.  And I guess one of

10    the things that was asked of you last week was

11    whether you had discussed your obligation to

12    disclose that you may have installed Chinese

13    drywall in someone's home in a customer's home

NOVO812RVDEP

14  with counsel and I wanted to ask did you discuss

15  that in the time between last week's deposition

16  and this week's deposition?

17              MR. HUSEMAN:  Okay that's one of

18        the ones I'm going to have to tell him not to

19        answer because a its discussions with counsel

20        and that of course we assert the privilege

21        and work product exemptions on that.

22              MR. GAUGHAN:  Okay.

23  BY MR. GAUGHAN:

24  Q.   Can you tell me this do you have an

25  understanding of whether you're required to make a

♀

                                        10
              R O U G H   C O P Y

1   disclosure to any of these customers that you

2   think you might have possibly installed Chinese

3   drywall?

4   A.   I don't know, sir.

5   Q.   And one of the things we talked about last

6   week as well was whether you understood that by

7   filing your objection to the settlement there was

8   a possibility that that objection could result in

9   the settlement either being disapproved or tanked

10  in some way I guess is the term we used, do you

11  remember that testimony?

12  A.   I remember we spoke about it.  I don't

13  remember the specific thing we said at that point.

14  Q.   Okay.  Now understanding that that's a

15  possibility that this settlement could be tanked

              Page 9

NOVO812RVDEP

16    in the time that's elapsed since your deposition,

17    has that changed your desire in any way to go

18    forward with your objection?

19    A.    Well I mean I feel that if things change and

20    the lawyers get paid less and the class gets more

21    it would be a good favorable thing for the class.

22    Q.    And what's your understanding of what

23    percentage class counsel should be awarded or your

24    opinion I guess of how much class counsel should

25    be awarded with respect to this settlement?


♀

11

R O U G H   C O P Y

1    A.    My opinion is ten percent or less, that's my

2    opinion.   That I can't change.

3    Q.    And do you have an understanding of what

4    percentage the settlement April greement actually

5    contemplates for class counsel?

6    A.    You probably have to remind me on that.

7    Q.    15 percent, does that sound familiar?

8    A.    I don't think so.

9    Q.    And that's for what's called common benefit

10    counsel which would be where class counsel fits,

11    so I guess based on that, my understanding is you

12    think it should be ten percent or less, right, is

13    that correct in terms of --

14    A.    That's what I feel it should be.

15    Q.    And I guess would you agree that ten percent

16    versus 15 percent isn't that much of a difference

17    especially considering that the court, judge

NOVO812RVDEP

18    fallen will have to approve any award of fees to
19    class counsel?
20    A.    Can you rephrase that for me just one more
21    time.  I'm sorry sir.
22    Q.    All right I guess my question is do you
23    understand that judge fallen is actually going to
24    approve the award to class counsel, that has to be
25    approved by the court?

                                                    12

                    R O U G H   C O P Y

1    A.    That, I understand.
2    Q.    And I guess based on that understanding,
3    would you agree that there's not that much of a
4    difference between ten and 15 percent, you know
5    because judge fallen could decide to say award
6    8 percent?
7    A.    Okay, I don't agree that it's the little bit
8    if that's what you're asking me.
9    Q.    I am asking you that.
10    A.    I don't agree.
11    Q.    You don't agree.  You think even with the
12    court taking on a supervisory role where the court
13    will actually approve fees for class counsel you
14    think that's still a big golf I guess between the
15    ten and 15 percent?
16    A.    I think that's a big amount.
17    Q.    Okay.  And I guess another question I have
18    for you is can you tell me if you followed judge
19    fallen's preservation order that's in place with

                    Page 11

NOVO812RVDEP
20    respect to maintaining evidence of Chinese drywall
21    claims?
22    A.    I don't know anything about that.
23    Q.    You don't know about the preservation order?
24    A.    I don't, sir.
25    Q.    Okay.  So you can't say one way or the other,

♀

                                                            13
                    R O U G H   C O P Y
 1    did you retain any sort of samples of Chinese
 2    drywall or I guess -- it wasn't saw blades, was it
 3    drills and drill bits?
 4    A.    Drills, correct.
 5    Q.    You didn't retain those items?
 6    A.    No, sir, I don't have those things with me.
 7    Q.    So so far as Judge Fallon's preservation
 8    order would require to you keep those items, you
 9    did not do that, is that correct?
10    A.    I don't have those things with me.
11    Q.    And have you seen any doctors since last
12    week's deposition to screen you for any sort of
13    personal injuries that you think might be related
14    to your exposure to Chinese drywall?
15    A.    I have not seen a doctor.
16    Q.    How about have you seen any healthcare
17    professionals to treat you for the emotional
18    distress that you claim you're under going with
19    respect to your fear of developing an illness in
20    the future?
21    A.    I have not sir.

NOVO812RVDEP

22    Q.    And how is your health today?

23    A.    Right now I'm okay.

24    Q.    And I guess Mr. Bandas is not present again

25    during today's deposition, how do you feel about

♀

14

R O U G H   C O P Y

1    that, you think he should be here?

2    A.    I'm sure he's attending important matters.

3    Q.    So you're not troubled by the fact that Mr.

4    Bandas is not here defending your deposition?

5    A.    I am not sir, I feel really comfortable.

6    Q.    And that he didn't defend your deposition

7    last week you're not uncomfortable with that at

8    all?

9    A.    I'm fine with my representation.

10                   MR. HUSEMAN:   That's the right

11        answer.

12    BY MR. GAUGHAN:

13    Q.    And I guess since last week's deposition did

14    you approach any of your customers who to advise

15    them that you may have installed Chinese drywall

16    in their properties?

17    A.    I have not sir.

18    Q.    Do you intend to do so?

19    A.    I have the intention, yes, sir.

20    Q.    When is it you think you're actually going to

21    do that?

22    A.    I'm not sure.

23    Q.    And do you have any sense of the number of

Page 13

NOVO812RVDEP

24    homes that you might have worked on that where you

25    installed drywall during let's say 2006 to 2009,

♀

15

R O U G H   C O P Y

1    do you have a sense of the number of homes?

2    A.    No, it's a lot.

3    Q.    And I guess by the way, did you discuss last

4    week's deposition with anyone that's not in the

5    room right now and I'll extend that to Mr. Bandas

6    as well?

7    A.    Anyone that's -- I did, yes, sir.

8    Q.    And who is that?

9    A.    With my wife.

10    Q.    And what did you tell her about the

11    deposition?

12    A.    She just asked me how it went and I told her

13    the questions that were asked of me and stuff like

14    that.

15    Q.    And how did you tell her it went?

16    A.    I just told her it was exhausting.

17    Q.    Did you talk about any particular questions

18    that you were asked?

19    A.    I mean we talked about different questions

20    that were asked, that's pretty much it and told

21    her what y'all asked me.

22    Q.    You told her what we asked you, is that what

23    you said?

24    A.    Yes.

25    Q.    And what specific questions do you recall

Page 14

NOVO812RVDEP

♀

R O U G H   C O P Y

1    discussing with your wife?

2    A.    Okay, give me a second here.

3          I remember y'all asking me you know do I

4    remember specific home or customer that we had

5    installed and stuff like that which I didn't,

6    that's one of them.  I guess it was more in

7    general I guess, I don't remember the specific

8    questions, I guess.

9    Q.    Did you discuss your testimony about whether

10   you might be entitled to an incentive fee with

11   your wife?

12   A.    No, we didn't talk about that.

13   Q.    Did you discuss your understanding about the

14   actual terms of the settlement agreement with your

15   wife?

16   A.    No, I didn't talk about that.

17   Q.    And did you discuss last week's deposition

18   with anyone else, for instance I believe you had

19   testified that Mr. Batman had was the individual

20   you initially spoke with?

21   A.    Correct, I haven't spoken to him since he

22   referred me.

23   Q.    And you didn't talk to anyone from his

24   office, I don't know if you know Mr. Chapa or not?

25   A.    No I haven't.

♀

NOVO812RVDEP

17

R O U G H   C O P Y

1   Q.    Did you discuss any of your concerns about

2   possible personal injuries that you might

3   experience in the future with your wife?

4   A.    Personal injuries?  Like what, I'm sorry.

5   Q.    Well, I guess it was my appreciation that one

6   of the things that you're contending in your

7   objection is that you're concerned in the future

8   you might suffer some sort of personal injuries

9   from having been exposed to Chinese drywall, is

10   that correct?

11   A.    Yes, yes.

12   Q.    Did you discuss that subject with your wife?

13   A.    I don't remember if we went over that, to be

14   honest with you at that point.

15   Q.    Did you work in any homes this week that you

16   think were possible homes where you might have

17   instawltd Chinese drywall in the past?

18   A.    No these customers are pretty knew actually.

19   Q.    And let me ask you what did you do for prep

20   today?  Did you do any additional prep?  I know I

21   walked by and I saw you in the meeting with your

22   counsel here, in the kitchen, so was that --

23   A.    I prepped before I got here I mean I prayed

24   just to make sure that I'm calm and able to

25   answer.

°
†

18

R O U G H   C O P Y

NOVO812RVDEP

1    Q.    And apart from I guess praying which you're a
2    better man than I, it's been a while since I've
3    done any prepare but did you do any other sort of
4    prep for today, did you meet with counsel or
5    anything like that?
6    A.    I met with counsel.
7    Q.    Can you tell me the length of that meeting
8    and who was present?
9    A.    The length, I could tell you that, maybe 30
10   minutes, if that.  I wasn't here that long before
11   you got here.
12   Q.    I think you got in around the same time as
13   me?
14   A.    Yeah, probably something like that otherwise
15   I was trying to get a little something to snack on
16   because I hadn't eaten lunch.
17   Q.    Hopefully I'll get you out of here soon?
18               MR. HUSEMAN:   Take that banana with
19        him.
20               THE WITNESS:   Yeah.
21   BY MR. GAUGHAN:
22   Q.    Was that the extent you didn't have any sort
23   of phone calls with counsel?
24   A.    No, sir.
25   Q.    And you didn't meet or talk to Mr. Bandas or

♀

19

R O U G H   C O P Y

1    anyone else from his office?
2    A.    I talked to Mr. Bandas I think it was

Page 17

NOVO812RVDEP

3    yesterday or today, I can't remember.

4    Q.    Was that to prepare you for today's

5    deposition?

6    A.    To confirm the time.

7    Q.    And of course I don't want to talk about

8    anything that you might have discussed with Mr.

9    Bandas but can you tell me the approximate

10   duration of that conversation, was it pretty quick

11   or are we talking about something more

12   substantial?

13   A.    I believe I talked to him twice.  First time

14   was probably like maybe about ten minutes, the

15   most and the second time probably maybe about a

16   minute.

17   Q.    And so this was about scheduling, the

18   conversation, it wasn't about prep or any of the

19   substantive -- any substantive matters?

20   A.    Really wasn't prep, to be honest with you.

21   Q.    Okay.  And so when did those conversations

22   occur?  I kind of forgot that piece?

23   A.    Today and yesterday.

24   Q.    And I guess for today he was telling you we

25   had agreed to 3:00?

♀

                                              20
                     R O U G H   C O P Y

1    A.    Correct, because I wasn't going to be in town

2    tomorrow and that's when I was supposed to come,

3    tomorrow.

4    Q.    That's when it was initially noticed?

NOVO812RVDEP

5    A.    So y'all were able to fit me in so a preesht

6    that.

7    Q.    Sure.  Glad to do it.

8          (Exhibit 34 marked.)

9    BY MR. GAUGHAN:

10   Q.    This is a copy of the notice of deposition

11   that we served on you.   As your understanding

12   you're appearing today pursuant to this deposition

13   notice?

14   A.    Yes, sir.

15   Q.    And obviously we have eal changed the time

16   but it's you're appearing to --

17   A.    For this.

18   Q.    For this deposition.   I also have this.

19         (Exhibit 35 marked.)

20   BY MR. GAUGHAN:

21   Q.    And this is the notice for the shs

22   construction and we also served this document on

23   you as well and is it your understanding you're

24   appearing pursuant to this deposition notice today

25   to provide the testimony that we're seeking in

♀

                                                     21

                    R O U G H   C O P Y

1    this notice?

2    A.    For shs construction, yes.

3    Q.    And you can put those aside.

4               MR. GAUGHAN:   Next exhibit 36 this

5         is a copy of judge.

6    BY MR. GAUGHAN:

NOVO812RVDEP

7  Q.    This is just a copy of Judge Fallon's order
8  along with Mr. Soto's notes.  And Mr. Soto I'm
9  showing you what's been marked as exhibit 36 which
10  is a copy of Judge Fallon's order dated
11  November 7, 2012 which is document 16127 on the
12  court's docket and I'd like you to flip a few
13  pages to what are really your notes from your prep
14  with your counsel?
15  A.    Okay.
16  Q.    And I guess we marked it as exhibit a to your
17  deposition from last week?
18  A.    Okay.
19  Q.    And Judge Fallon has ordered that this that
20  these notes be produced to us and I'm going to ask
21  you a few questions about your actual notes.  I
22  guess looking at that first page I see something
23  that says how to respond and then to the right of
24  that I see I don't know and I can't quite make out
25  what that is underneath there?

♀

R O U G H   C O P Y

1  A.    You know what I saw that earlier and I don't
2  know what it is either.  Right underneath I don't
3  know, is that what you're asking me?
4  Q.    Yeah, can you read that?
5  A.    I can't.  I know it says it but the other
6  word I don't.
7  Q.    And so I guess my question for you is how to
8  respond it says I don't know, was that -- what I'm

NOVO812RVDEP

9    going to ask, when we were taking your deposition

10   last week, was that something that you were --

11   something that was shaping your answer to the

12   question that you should say I don't know to

13   certain questions?

14   A.    No, sir, no, sir.  That is to help me

15   understand if that way if I don't know about

16   something, I don't know, that's pretty much it.  I

17   can't say something that I don't know and growing

18   up you try to say more than you know.

19   Q.    Interesting.  And then it says ask question

20   and then we see reword the question, don't say

21   yes.  What does that mean?

22   A.    It's pretty much what it says there.  If I

23   don't understand it, to reword it, don't answer

24   yes right away.

25   Q.    Is that if you don't understand the question

♀

                                                    23

                         R O U G H   C O P Y

1    or if we ask you a question that you don't like.

2    It's only if you don't understand the question?

3    A.    Correct.

4    Q.    I see game plan dot dot dot, don't let him

5    force you, what is a that say after that?

6    A.    Out of it.

7    Q.    What does that mean?

8    A.    That's you know helps me understand to you

9    know not answer you know let's say for example,

10   you're asking me a lot of yes questions and for me

NOVO812RVDEP

11   not to say yes because you're asking me a lot of

12   questions that say yes, that's what I understood.

13   Q.   What do you mean by that I guess?

14   A.   Just to you know help me I mean that's what I

15   wrote on there to help me understand the question

16   and just to not say yes right away and make sure

17   that I have everything.

18   Q.   What is the don't let him force you out of it

19   mean though?

20   A.   Just don't let me force me out of where I'm

21   going.

22   Q.   You mean if I'm trying owe tow if we were

23   trying to make you change an earlier answer, is

24   that what you mean by it, don't let you force you

25   out of it?

o
+

                                                          24

                    R O U G H   C O P Y

1   A.   Pretty much, to stay on point, the same

2   point.

3   Q.   But it's yes or no question, to say on point

4   I'm having trouble understanding?

5   A.   To stay on point, yes.

6   Q.   But if it's a yes or no question I guess you

7   would just say yes or no depending on what the

8   answer is, right?

9   A.   Just answer what I do know.

10   Q.   Okay but how would that take you off point if

11   the answer is yes for instance to a question?

12   A.   Well it just helps me take every question as

NOV0812RVDEP

13    it comes and not be quick to say yes.

14    Q.    Understood.  How about this, little bit below

15    that we see answer question and shut up, do you

16    see that?

17    A.    Uh-huh.

18    Q.    And then to the right of that in parentheses

19    it says heard us learn about us and waste time I

20    believe?

21    A.    Yes, that's what it says.

22    Q.    Does that answer question shut up, does that

23    all of that to the right of there hurt us learn

24    about us and waste time does that all apply to

25    that first answer, that first answer question and

♀

                                                        25

                        R O U G H   C O P Y

1    shut up part?

2    A.    I think it applies to a lot of that stuff.

3    Q.    I guess what do you mean by hurt us, learn

4    about us and waste time?

5    A.    That's what I got out of the -- that's what I

6    understood out of that, and that's what I wrote

7    down at that point.

8    Q.    Was it your objective to waste time?

9    A.    No, the objective is to not ways time.

10    Q.    And I get the part about not a social

11    conversation as I tell my own witnesses similar

12    stuff?

13    A.    That's true.

14    Q.    What is below that where it says think like a

NOVO812RVDEP

15    dad mean?

16    A.    When I say that and I remember this is that

17    my dad is a man of little words and he just tells

18    you the fact.  If he knows it if he doesn't know

19    he'll tell you he doesn't know and that's the way

20    my dad is.

21    Q.    I guess if you look down towards the bottom

22    of the page under what says 30 minute then break

23    it says courteous nice slash not hostile, so I

24    take it your intention going in the deposition was

25    to not appear hostile, is that --

♀

                                                    26

                    R O U G H   C O P Y

1    A.    Correct.

2    Q.    Is there something I need to be afraid of?

3    A.    No, sir.

4    Q.    And then below that I see no need to argue or

5    explain and I guess can you tell me what that

6    means in terms -- to you, I guess?

7    A.    That I don't need to like if maybe you're

8    being confrontational with me that I don't need to

9    be arguing with you and just state the answer to

10    the question you're asking me.

11    Q.    Okay.  How about right below there it says

12    yes objection of class, what does that mean.

13    Q.    At least that's what I see?

14    A.    Yeah, that's what it says.  It's just yes as

15    far as objection of it, that's what it says on

16    there.

NOVO812RVDEP

17    Q.    That means just yes I'm objecting to the
18    class settlement is that what that means?
19    A.    Yeah, because you know it's all these lengthy
20    lawyer words you got to try to understand them and
21    that's just what I wrote.
22    Q.    And if you go to the next page, to the right
23    there under written objection says don't agree how
24    much lawyers are getting paid on a class that I am
25    a part of.   What does that mean?

                                                     27
                    R O U G H   C O P Y
1     A.    That's what I felt and that's what I wrote.
2     Q.    And these are your opinions?
3     A.    Those are my opinions.
4     Q.    How did you come up with that -- this was
5     during the prep that you came wup this?
6     A.    Actually it was kind of more towards the end
7     of it I was just writing things that were coming
8     to mine.
9     Q.    And those are your words not your counsel's
10    words?
11    A.    Those are my words.   Those are my words.
12    Q.    Then we see a little bit further down had to
13    talk to lawyer?
14    A.    Uh-huh.
15    Q.    What does that mean?
16    A.    It means that you know I couldn't have
17    written all these things out here by myself, I
18    needed to talk to a lawyer to be able to have an
                    Page 25

NOVO812RVDEP

19    objection.

20    Q.    And you came up with that on your own as

21    well?

22    A.    That I wrote down, yes.

23    Q.    And then we see completed sticky, is that

24    what that says, sticky, tricky?

25    A.    Complicated and tricky.

♀

28

R O U G H   C O P Y

1    Q.    And what does that mean?

2    A.    Just lawyer stuff that's complicated and

3    tricky.

4    Q.    And I guess based on all these notes, is it

5    your testimony that these are all your own

6    thoughts and not things that your counsel was

7    telling to you say?

8    A.    The back part really is more of my own

9    thoughts and the back -- the front is more of

10    things we talked about.

11    Q.    So I guess so far as some of these things

12    appear to be substantive, I don't agree how much

13    lawyers are getting paid, that's your own thought?

14    A.    That's my own thought in the back, yes, sir.

15    Q.    And you understand you're under oath and

16    everything?

17    A.    I understand that, yes.

18    Q.    Can you tell me if you look to the left is

19    this represent -- these calculations here does

20    that represent the incentive fee that you think

NOVO812RVDEP

21    you're going to get?

22    A.    No, sir.

23    Q.    What does it represent?

24    A.    That represents my checking account that I

25    needed to make a deposit.  I needed to pay $600

♀

29

R O U G H   C O P Y

1    out pay $500 pay $400 pay 90 and I was left with

2    $1,600 from there I had to pay a couple other

3    things then I remember I had to make a deposit on

4    the right so that was the end of my balance, 1160.

5    As you can see it wasn't like written down nice

6    and neatly because I just needed a paper to write

7    it down.

8                MR. HUSEMAN:   Nice try Matthew.

9                MR. GAUGHAN:   Didn't necessarily

10          add up to me either in terms of what we

11          thought would be the 5,000, but I figured I

12          would ask anyway.

13    A.    Those are checks I had to pay.

14    Q.    So you're balancing your checkbook here more

15    or less?

16    A.    Pretty much.  I could probably pull the

17    checks on those to show you.

18    Q.    I think that's it for that document?

19    A.    Okay, sir.

20                MR. GAUGHAN:   We'll mark this as

21          37.  I'll give you a copy to your counsel.

22    BY MR. GAUGHAN:

NOVO812RVDEP

23    Q.    And I'm showing you what's been marked as
24    exhibit 37 to your deposition or to this
25    continuing depositions, I guess and what this is

                                                        30

                        R O U G H   C O P Y
1     is a copy of class counsel's motion for sanctions
2     and we filed this or when I say we I mean class
3     counsel filed this motion on ten/ 24/ 12, it's now
4     on file and pending before Judge Fallon and I
5     believe we discussed this a little bit at your
6     deposition last week?
7     A.    Yeah, I think so.
8     Q.    And I guess do you understand that class
9     counsel has moved for sanctions and is seeking not
10    only to sanction Mr. Bandas but also to sanction
11    yourself with respect to a motion that Mr. Bandas
12    filed with the court?
13    A.    That's what I see.
14    Q.    Okay.   And when did you first become aware of
15    this motion?
16    A.    After October 24th.   I don't remember, to be
17    honest with you.   I know we talked about it last
18    week.
19    Q.    Yeah and that's what I was going to ask you
20    because it was my appreciation based on your
21    testimony that you weren't aware of this motion
22    before your deposition, is that fair to say?
23    A.    Before last week's, yes.
24    Q.    So you first became aware of this motion last
                          Page 28

NOVO812RVDEP

25    week?

⚥

31

R O U G H   C O P Y

1    A.    Yes.

2    Q.    Is that correct?

3    A.    Yes, sir.

4    Q.    Now is this something that you think that Mr.

5    Bandas should have told you about, and by

6    something I mean that class counsel was moving for

7    sanctions because Mr. Bandas had filed a frivolous

8    motion with the court?

9    A.    The question again, I'm sorry?

10    Q.    Is this something, this motion that you're

11    looking at as exhibit 37 motion for sanctions that

12    requests that you be sanctioned in addition to

13    your counsel, is this something that you would

14    have expected Mr. Bandas to tell you about?

15    A.    Well I feel if it's something that we need to

16    talk about he would have called me on it.

17    Q.    So you're not concerned at all that Mr.

18    Bandas didn't tell you that class counsel was

19    asking that you be sanctioned in connection with

20    the motion that Mr. Bandas filed?

21    A.    Not really, not right now, no.

22    Q.    Good for you.  Are you willing to appear

23    before Judge Fallon if he orders you to appear?

24    A.    Of course if he orders me to appear I'll be

25    there.

NOVO812RVDEP

♀

32

R O U G H   C O P Y

1   Q.    And what is your expectation of who would

2   have to pay that cost?

3   A.    I don't know sir.

4   Q.    And would you be willing to pay those costs

5   if you were required to do so, to travel to New

6   Orleans and stay in a hotel, etc.?

7   A.    Depends what the judge says for me to do.

8   Q.    And how about if the court sanctions you, are

9   you prepared to pay sanctions?

10   A.    I mean I can't object to a court.  If they

11   tell me I got to do something, I got to do

12   something.

13   Q.    Is that something that as you sit here today

14   you want to go forward with your objection even

15   though there's a possibility you might be

16   sanctioned?

17   A.    I mean if I feel unfair about something I'm

18   going to try to see it through and if it comes out

19   to that the court orders me to do something, well

20   I'll have to comply.

21   Q.    And you're willing to risk that you might be

22   sanctioned in order to continue your objection?

23   A.    Yes, sir.

24   Q.    Okay.

25        (Exhibit 38 marked for identification.)

♀

NOVO812RVDEP

R O U G H   C O P Y

1   BY MR. GAUGHAN:

2   Q.    I'm showing you what's been marked as Exhibit

3   38 which is a motion that was also filed on ten/

4   24/ 12 by class counsel and this motion is license

5   and response in motion class counsel omnibus

6   response to the Bandas objectors motion to dismiss

7   objection and response to motion for leave to

8   conduct discovery regarding the fairness of

9   proposed class action settlement?

10  A.    Where are we reading.

11  Q.    I'm reading from right here (Mark).  I guess

12  were you aware that we, by we I mean class counsel

13  had made this filing with Judge Fallon?

14  A.    You made me aware of that last week.

15  Q.    The first time you became aware of this was

16  last week?

17  A.    Yes, sir.

18  Q.    And are you aware that this motion was filed

19  in response to Ms. Petris who works for Mr.

20  Bandas's motion to dismiss her objection?

21  A.    I don't know anything about her what --

22  Q.    Let me back up.  Do you appreciate that Mr.

23  Bandas filed an objection to this settlement that

24  involved not only yourself but several other

25  individuals?

♀

R O U G H   C O P Y

NOVO812RVDEP

```
 1   A.    Do I what?  Sorry.
 2   Q.    Are you aware that when Mr. Bandas filed this
 3   objection to the settlement on behalf of yourself
 4   and shs construction?
 5   A.    Yes.
 6   Q.    That he also included other individuals?
 7   A.    I know there was other people, I didn't know
 8   who.
 9   Q.    Okay.  So but you know that Mr. Garcia is one
10   of those individuals, correct?
11   A.    That I have met him before.
12   Q.    And you also know that his company is also
13   objecting, do you know that?
14   A.    I believe so.
15   Q.    Okay and did you know that a Mr. Vatello was
16   also objecting?
17   A.    I don't know him.
18   Q.    And you don't know Jan Petris?
19   A.    I don't know her .
20   Q.    So those are the objectors in addition to
21   yourself and your company?
22   A.    Okay.
23   Q.    And I guess class -- Ms. petrous moved to
24   dismiss her objection and we filed this motion
25   class counsel filed this motion in response to
```

φ

                                        35
                         R O U G H   C O P Y
```
 1   that filing?
 2   A.    Okay.
```
                       Page 32

NOVO812RVDEP

3    Q.    And another thing that Mr. Bandas did was he
4    filed a motion to conduct discovery regarding the
5    fairness of the proposed class action settlement,
6    are you aware of that fact?
7    A.    I don't know anything about that sir.
8    Q.    He didn't show you that motion or bring it to
9    your attention that he was going to be filing that
10   motion before it was filed with the court?
11   A.    I honestly can't remember anything about
12   that.
13   Q.    Did he show you any motions that he was
14   proposing to file other than the objection?
15   A.    The objections, yes.
16   Q.    So that was it, just the objections?
17   A.    That's all I remember.
18   Q.    Okay.  Is that something you would have liked
19   Mr. Bandas to have brought to your attention?
20   A.    Again I feel if it's something that needed to
21   be brought to my attention, he would have.
22   Q.    And this is something that resulted in our
23   motion for sanctions, his filing of that motion,
24   would you have liked to have known that you might
25   be subject to a motion for sanctions before he

♀

                                                36
                        R O U G H   C O P Y
1    filed his motion to conduct discovery?
2    A.    I mean it didn't happen so I can't say
3    anything about that, you know.
4    Q.    What didn't happen, he didn't tell you?

NOVO812RVDEP

5    A.    I didn't know about the you know somebody
6    else, what they did as far as jan pe trust or
7    something like that.
8    Q.    I'm not asking about jan pe trust I'm asking
9    about Mr. Bandas filed a motion seeking discovery
10   regarding fairness of the class settlement?
11   A.    Okay.
12   Q.    Isn't that something you'd expect him to tell
13   you about?
14   A.    No.
15   A.    I would have hoped he would have told me if
16   it's something I needed to know about.
17   Q.    So you don't expect him to keep you up to
18   date on what he's filing with the court?
19   A.    I expect him to let me know that if he feels
20   it's important that he let me know.
21   Q.    So I take it as a no you don't expect him to
22   tell you about filings that he's making in
23   connection with your objection?
24   A.    Again if it's important I'm sure he would
25   have called me.

♀

37

R O U G H   C O P Y

1    Q.    Okay.  Now has he called you in -- other than
2    scheduling your deposition has he called you about
3    any other matters, strategy matters I should say?
4    A.    Not that I can think of.
5    Q.    Okay so other than scheduling your deposition
6    and filing your objection, those are the things --

Page 34

NOVO812RVDEP

7      those are the only things you talked about I

8      guess?

9      A.    I can't discuss that.

10                 MR. HUSEMAN:  That's right.  That

11          hungs on attorney/client privilege please

12          don't answer that.

13     A.    Yeah I won't.

14     BY MR. GAUGHAN:

15     Q.    But he didn't discuss this particular motion,

16     the motion to seeking discovery?

17                 MR. HUSEMAN:  Once again that

18          involves attorney/client communications,

19          privilege and please don't answer that

20          Mr. Soto.

21     BY MR. GAUGHAN:

22     Q.    You weren't aware he was going to make

23     this -- he was going to file this motion for leave

24     to conduct discovery?

25     A.    No, I didn't know anything about that.

♀

                                    38

              R O U G H   C O P Y

1      Q.    And you're okay with that?

2      A.    I'm fine with that right now.

3      Q.    And I take it you didn't actually ever see

4      the motion that Mr. Bandas filed seeking discovery

5      regarding the fairness of the class settlement,

6      did you?

7      A.    Is that what you're just talking about?

8      Q.    Yes.

NOVO812RVDEP

9    A.    No I haven't seen it.

10   Q.    Okay.  And would it trouble you at all that

11   that motion included information about another

12   settlement that didn't involve Chinese drywall at

13   all?

14   A.    I don't know anything about that.

15   Q.    Does that concern you that your counsel he's

16   filing a motion seeking discovery in the Chinese

17   drywall litigation and his motion is actually

18   talking about a completely different settlement

19   involving Hill marathon.

20   A.    I don't know anything about that, sir.

21   Q.    Would you expect your lawyer to file motions

22   that -- in the proper case?

23   A.    You might need to rephrase that for me.  I

24   don't understand.

25   Q.    Well you're pursuing objection?

♀

                                                39

                    R O U G H   C O P Y

1    A.    Correct.

2    Q.    Of one of our Chinese drywall settlements,

3    correct?

4    A.    Yes, sir.

5    Q.    Now I'm trying to figure out when you retain

6    attorney do you expect them to actually proofread

7    and review motions that they file?

8    A.    Oh, like if somebody made a mistake, is that

9    what you're saying?

10   Q.    Yeah, for instance the motion that Mr. Bandas

NOVO812RVDEP

11  filed seeking discovery in this case talk about a

12  40 percent contingency fee and from my

13  understanding of your objection, you're objecting

14  because of a 32 percent fee provision, is that

15  correct?

16  A.   I think that's what I remember.

17  Q.   So he's talking about a completely different

18  case, does that trouble you at all?

19  A.   I'm sure we all make mistakes.

20  Q.   He's also talking about a 16 million-dollar

21  settlement and you're aware, correct, that this

22  Chinese drywall settlement you're opposing to

23  involves $83 million, correct?

24  A.   I remember the 80 million.

25  Q.   And then he talks about a class

♀

                                                    40
                       R O U G H   C O P Y

1  representative by the name of Mrs. Ellis Hill in

2  his papers and I'll represent to you that there's

3  no Mrs. Hill is in any way involved in our Chinese

4  drywall litigation so I guess based on that it was

5  my understanding that this was a cookie cutter

6  motion where he neglected to take out information

7  about some other motion he filed in a different

8  case and what I'm asking you is are you troubled

9  by the fact that your counsel hasn't taken the

10  time to proofread his motion and make sure he's

11  filing it in the right case?

12  A.   I'm sure we all make mistakes.

NOVO812RVDEP

13   Q.   That's okay with you?

14   A.   We're not all perfect.

15   Q.   We strive to be, but of course so I guess the

16   long short of it is that doesn't bother you at

17   all?

18   A.   No.

19   Q.   That your counsel -- doesn't have his facts

20   straight when he's filing a motion?

21   A.   I know I've messed up too, so.

22   Q.   And I guess I'm going to ask you a few

23   questions about your understanding of Mr. Bandas

24   and his practice.   Now before you actually met

25   with Mr. Bandas, did Mr. Batman or anyone else

♀

41

R O U G H   C O P Y

1   ever tell you that several courts had sanctioned

2   Mr. Bandas for his objections to class settlements

3   in other cases?

4   A.   I don't know anything about that, sir.

5   Q.   Okay now if you had known that, would that

6   have impacted your decision on whether or not to

7   retain Mr. Bandas for purposes of seeking your

8   objection in this case?

9   A.   Well, I mean I don't know any of that to be

10   true, so I mean unless I know for sure then I

11   would make a decision after that.

12   Q.   If you knew for sure that Mr. Bandas had

13   filed in excess of 23 objections to different

14   class settlements around the country, would that

NOVO812RVDEP

15  have impacted your decision to retain him as
16  counsel for purposes of objecting to this Chinese
17  drywall settlement?
18  A.   Well he was referred to me, so I take a
19  referral quite a bit seriously, so usually if
20  somebody refers me to somebody it's because they
21  know the person and that's what I based it off of.
22  Q.   And because Mr. Bandas has been sanctioned in
23  the past for similar conduct, do you at all
24  concerned that you yourself might be sanctioned?
25  A.   Well I mean it could concern me but I don't

§

                                                42

                    R O U G H   C O P Y
1  know anything about what he has or hasn't done as
2  far as that.
3  Q.   And you still want to go forward with your
4  objection?
5  A.   Yes, sir.
6  Q.   How about if I told you that the honorable
7  mark vand a wheel vandewiele in brown versus
8  Wal-Mart stores Inc. which is a case in Illinois
9  circuit court observed in that case that the
10  Bandas objection filed on behalf of Mrs. Carl son
11  is a generic boiler plate objection prepared and
12  filed by attorneys working for their own personal
13  benefit and not for the benefit of this class or
14  for those lawyers clients.  Directly before the
15  court demonstrates that Bandas is a professional
16  object err who has been properly attempting to
                    Page 39

NOVO812RVDEP

17  high jack the settlement of this case from
18  deserving class members and dedicated, hard
19  working counsel, solely to coerce I will gotten in
20  appropriate and unspecified legal fees.
21      If I told you that judge vand a wheel had
22  suppressed those opinions in a -- not a published
23  opinion but in one of his opinions, would that --
24  does that trouble you at all that this is the
25  lawyer you've retained in this case?

                                                        43

                    R O U G H   C O P Y

1   A.    I mean I don't know anything about that, so I
2   can't have an opinion on something that I don't
3   know anything about.
4   Q.    If you had known about this particular
5   opinion by judge vand a wheel before you had
6   retained Mr. Bandas as counsel, would that have
7   impacted your decision on whether or not to retain
8   Mr. Bandas for purposes of objecting to the
9   drywall settlement?
10  A.    I can't honestly say, honestly, I mean.
11  We're talking about ifs, I don't know what would
12  have happened.
13  Q.    That doesn't affect your opinion as you sit
14  here today that you know this judge wrote a pretty
15  harsh opinion where he chastised Mr. Bandas, it
16  does than bother you at all?
17  A.    I can't change anything that's been said.
18  Q.    That doesn't cause you any sort of concern

NOVO812RVDEP

19    that maybe you shouldn't have retained Mr. Bandas?

20    A.    I'm happy with my counsel.

21    Q.    You're happy with him being a professional

22    object err?

23    A.    I'm just happy with my counsel.

24    Q.    Who objects to all different class

25    settlements just so he can coerce a fee, you like

                                                    44

                  R O U G H   C O P Y

1    that?

2    A.    That's your opinion.  I can't say anything

3    about that.

4    Q.    That he is judge vand a wheel's opinion?

5    A.    Okay.

6    Q.    That doesn't bother you at all?

7    A.    I'm happy with my representation.

8    Q.    Okay.  You're happy that Mr. Bandas has

9    attempted to high jack settlements to -- from

10   deserving class members so that he can coerce a

11   legal fee, you think that's something you're happy

12   with?

13   A.    I don't know anything about that.  I can't

14   say something that I don't know.

15   Q.    But you're willing to participate in an

16   objection where he could be doing the same thing,

17   right?

18   A.    I mean I don't know about that.  I really

19   don't.

20   Q.    So far as he gets you your 5,000-dollar

NOVO812RVDEP
21    incentive fee, right?
22    A.    We haven't had an arrangement or anything
23    like that so I don't know anything about that.
24    Q.    But we did look at your retainer agreement
25    which talks about a 5,000-dollar incentive fee,

                                                        45
                      R O U G H   C O P Y
1    correct?
2    A.    Well that's what the paper said.
3    Q.    So so far as you getting that 5,000-dollar
4    incentive fee you're willing to go along for the
5    ride, is that correct?
6    A.    That's only if something happens in we're
7    come to something but I'm not expecting I'm going
8    to make a whole bunch of money I'm not expecting
9    that I'm just happy with the fact that the lawyers
10   are getting a big chunk of money and I feel the
11   class should have more.
12   Q.    So your attorney can actually get some of
13   that money, is that part of your understanding?
14   A.    I mean we're all here because it's benefits
15   us in some way.
16   Q.    Who is we?
17   A.    You, everybody, you know we're all going to
18   probably benefit from the class in a sense that
19   you know being part of the class you know I was
20   affected so you know I don't know if that's going
21   to happen or not.
22   Q.    So long as you get your $5,000 you're happy?
                      Page 42

NOVO812RVDEP

23    A.    I didn't say that.

24    Q.    I'm asking you?

25    A.    I'm not even answering that because that

♀

                                                    46

                        R O U G H   C O P Y

1    doesn't make sense.

2    Q.    You have to answer the question?

3    A.    Getting $5,000 is not going to make me happy.

4    Q.    So you are willing to go forward with the

5    objection even though your counsel has been called

6    out by various courts as a professional object err

7    who's highjacking settlements for a fee?

8    A.    I am willing to go forward with the

9    settlement.

10    Q.    Even though you know at least judge vand a

11    wheel expressed the opinion that Mr. Bandas was

12    not working -- he was working for his own personal

13    benefit not for the benefit of the class, that

14    doesn't trouble you at all?

15    A.    I can't change what was written.

16    Q.    If that's an opinion of learned judge, does

17    that who's actually participated in a case where

18    Mr. Bandas was objecting, you don't lend any sort

19    of credibility to that observation?

20    A.    I don't know the facts about that so I can't

21    say much about what I don't know.

22    Q.    Are you going to research this particular

23    case after today's deposition?

24    A.    I don't know.

NOVO812RVDEP
25    Q.    So you're willing to go forward with an

♀

47

R O U G H   C O P Y

 1    objection even though your counsel has been called
 2    out as a professional object err who high jacks
 3    settlements for his own personal benefit, not for
 4    the benefit of the class, you're still willing to
 5    go forward with the objection under those
 6    circumstances?
 7    A.    I'm still willing to go forward with the
 8    objection.
 9    Q.    Okay.  How about in were you aware that the
10    honorable David h-S-I-V-R-I-G-H-T junior in must
11    man M u s smanv Wal-Mart stores Inc. observed that
12    and stated in October 13, 2009 opinion the court
13    has considered all the materials and pleadings
14    filed of record in this case as well as related
15    judicial rulings.  As a result, the court
16    concludes that attorney Christopher a Bandas is a
17    professional object err.  The court is concerned
18    that attorney Bandas is seeking to wrongfully use
19    the class action and objection process for
20    personal gain, and without any corresponding
21    benefit to any individual object error the
22    settlement class as a whole.
23         Were you aware that judge sif right had made
24    this observation as to your counsel before you
25    retained him?

Page 44

NOVO812RVDEP

⚥

48

R O U G H   C O P Y

1    A.    No, sir.

2    Q.    And will I'll ask the same questions if Mr.

3    Batman had told you when he was referring you to

4    Mr. Bandas that you know judge sif right had made

5    these observations about Mr. Bandas, would you

6    have still retained him?

7    A.    My answer is the same.

8    Q.    So you're happy with Mr. Bandas even though

9    several courts have accused him of being a

10   professional object err?

11   A.    I'm happy with my representation.

12   Q.    Even though you might get sanctioned?

13   A.    If the court is the one that decides that, so

14   if the court decides that I need to do something,

15   well, then I will.

16   Q.    Okay.   You're willing to go forward, you

17   don't care if you get sanctioned?

18   A.    I'm willing to go forward with my objection.

19   Q.    Even if it means you're going to get

20   sanctioned?

21   A.    I'm willing to go forward with my objection.

22   Q.    Okay.   How about if I told you that the

23   honorable coal b peel in owe lay,

24   O-U-E-L-L-E-T-T-E versus Wal-Mart stores Inc.

25   observed that the court finds that a lack of

⚥

NOVO812RVDEP

R O U G H   C O P Y

1    involvement and participation of the objectors and

2    their counsel who are not present and a lack of

3    involvement and participation of the attorneys

4    that were present combined with their attempt to

5    inject themselves at the last minute into an eight

6    year litigation constitutes an effort to extort

7    money from the class and or class counsel.

8         Would that bother you that -- does that

9    bother you at all that this court made that

10   observation about your counsel?

11   A.    I mean don't know anything about that.

12   Q.    So far we've got three judges all expressing

13   harsh opinions about your counsel that doesn't

14   bother you at all?

15   A.    I'm happy with my representation.

16   Q.    Even though we have another court observing

17   that your counsel is trying to extort money from

18   the class and or class counsel and that's based --

19   A.    I'm happy with my representation.

20   Q.    Kind of just del may care at teut?

21   A.    Rp ee with my representation.

22   Q.    As long as you get the 5,000?

23   A.    As long as the class gets more and the

24   lawyers get less.

25   Q.    Does that apply to your counsel that he gets

♀

50

R O U G H   C O P Y

1    less?

NOVO812RVDEP

2   A.   As long as the class gets more that's what
3   I'll be happy with.
4   Q.   To your knowledge has Mr. Bandas produced any
5   sort of benefit for the class other than filing a
6   base less objection?
7   A.   I don't know.
8   Q.   You don't know?
9   A.   No, sir.
10  Q.   So you think he'd be entitled to a fee?
11  A.   Probably.
12  Q.   More or less than your 5,000-dollar
13  incentive?
14  A.   I don't know.
15  Q.   How about would it trouble you at all if the
16  honorable Perry m Buckner observed in Carter vers
17  Wal-Mart stores Inc. that Mr. Bandas is a serial
18  professional object err.  Again this is the fourth
19  judge.  Does that trouble you at all?
20  A.   I'm happy with my representation.
21  Q.   And you would still if you had known that
22  these four judges had made these sort of
23  observations about Mr. Bandas, you still would
24  have gone forward in retaining him to make your
25  objection in this case, is that correct?

♀

                                          51
            R O U G H   C O P Y
1   A.   I'm happy with my representation, I don't
2   know what would happen if again what we're talking
3   about ifs, I don't know.
            Page 47

NOVO812RVDEP

4    Q.    Well I'm saying assuming you did know?

5    A.    I don't know.

6    Q.    What's that?

7    A.    I don't know.

8    Q.    You know now?

9    A.    Okay.

10    Q.    Does that affect your willingness to go

11    forward with your objection?

12    A.    I mean the objection is for the class to get

13    more, so I'm willing to go forward with the

14    objection.

15    Q.    So long as you get the $5,000 and your lawyer

16    gets his fee?

17    A.    As long as the class gets more.

18    Q.    And would you be willing -- say your

19    objection is overruled by Judge Fallon?

20    A.    Okay.

21    Q.    Would you be willing to post a bond if you're

22    to pursue an appeal of Judge Fallon's ruling?

23    A.    I don't know much about how that works so I

24    don't even know how to answer that.

25    Q.    How about if I told that you in convoys v3m

♀

52

R O U G H   C O P Y

1    corporation a case out in California, judge

2    Claudia will kin determined that Mr. Bandas's

3    appeal was pat en li frivolous and bore no

4    particular relationship to the circumstances of

5    the settlement and then imposed a 431,167-dollar

Page 48

NOVO812RVDEP

6   appeal bond, would that be something that you'd be

7   willing to pay to pursue your objection in this

8   case?

9   A.    I don't know how that works, I don't know

10  anything about that.

11  Q.    Would you be willing to post a 431167 appeal

12  bond?

13  A.    I don't have that type of money.

14  Q.    So I'll take that as a no?

15  A.    Yeah, no.

16  Q.    And how do you feel about judge will kin

17  observing that Mr. Bandas's objection in that case

18  was patently frivolous and that it bore no

19  particular relationship to the circumstances of

20  the settlement.  Again no impact on you?

21  A.    I don't know anything about that.

22  Q.    And if you had known that these three judges

23  had -- I mean five judges, scratch that, if you

24  had known that these five judges had expressed

25  such opinions of Mr. Bandas's frivolous objection

♀

53

R O U G H   C O P Y

1   z that that wouldn't have impacted your decision

2   to retain Mr. Bandas?

3   A.    I needed a lawyer so I retained a person who

4   would help me with this objection.

5   Q.    Even if that's a professional object err who

6   has a history of filing frivolous objections?

7   A.    I don't know anything about that.

NOVO812RVDEP

8   Q.   You do know so I guess I'm asking, that does

9   than trouble you, you still would have retained

10  him?

11  A.   Can't do anything about that.

12  A.   Sir do you mind if we take a break.

13            MR. GAUGHAN:   Sure go ahead.

14            VIDEOGRAPHER:   Off the record at

15       4:35.

16            VIDEOGRAPHER:   We're back on the

17       record at 4:47 this is the beginning of tape

18       two.

19            MR. HUSEMAN:   Mr. Rodney Garcia

20       will be here in a minute just for your record

21       purposes.   Paul went to get him.

22            MR. GAUGHAN:   Get him prepped.

23            MR. HUSEMAN:   You're going to help

24       us prep him.

25            MR. GAUGHAN:   I don't want him in

♀

                                              54

                   R O U G H   C O P Y

1        here.

2             MR. HUSEMAN:   He's a party he's

3        entitled to be here, why would he not be.

4             MR. GAUGHAN:   I guess that's true.

5   BY MR. GAUGHAN:

6   Q.   Now we left off before we just took a break

7   we were talking about you know some cases where

8   judges had made particular observations, rulings

9   that sort of thing that pertained to your counsel

NOVO812RVDEP

10    and your objection and I guess what I do want to

11    ask you next is I got some more for you -- how you

12    doing Mr. Garcia.

13        If I told you in Embrey verse Acer American

14    Corp.  Judge h James wear had required Mr. Bandas

15    to post a $70,000.650 bond in order to participate

16    or to pursue an appeal where the court found that

17    the merits of the objectors appeal weighed heavy

18    heavily in favor of requiring bond insofar as the

19    objections to the settlement are lacking in merit,

20    would that impact if you had known about this

21    would thf impacted your decision to retain

22    Mr. Bandas on your objection?

23    A.    I don't know anything about that.

24    Q.    And I'll ask the same question, would you be

25    willing to post a 70,000-dollar plus --


♀

R O U G H   C O P Y

1    A.    I wouldn't be able to do that.

2    Q.    You wouldn't be able to afford that?

3    A.    No, sir.

4    Q.    And would it influence your decision at all

5    if this meritless appeal in Embrey verse Acer

6    involved an issue where attorneys fees were the

7    only issue that was being objected to, would

8    that -- where you're objecting to attorneys fees,

9    would that impact your decision to pursue an

10    appeal?

11    A.    No.

Page 51

NOVO812RVDEP

12    Q.    How about in if I told you in in RE: a trust

13    litigation judge h Samuel Conte overruled

14    Mr. Bandas's objection where his client failed to

15    submit proof to establish they were a class

16    member, kind of like yourself and found that that

17    object err lacked standing, would that impact your

18    decision to -- would that have impacted your

19    decision to retain Mr. Bandas if you had known

20    that before you filed an objection?

21    A.    I don't know anything about that, no.

22    Q.    I take it you would agree that you haven't

23    produced much in terms of evidence that you

24    actually have standing to object to this

25    settlement?

♀

                                                        56
                        R O U G H   C O P Y

1    A.    I produced a lot.

2    Q.    You haven't produced any actual evidence that

3    you purchased Chinese drywall as opposed to

4    American drywall?

5    A.    I produced everything that I had.

6    Q.    And do you know of any receipts that you show

7    that you purchased Chinese drywall?

8    A.    If you can show me what that looks like I'll

9    look for it.

10    Q.    So I'll take that as a no?

11    A.    No.

12    Q.    You don't know what it looks like you're the

13    one that have the receipts?

NOVO812RVDEP

14    A.    I produced all that I could and that I had.

15    Q.    And how about if I told you in in re Wal-Mart

16    wage and hour employment practices litigation

17    judge Philip m pro, P-R-O, I am poalsd a

18    500,000-dollar bond requirement for Mr. Bandas one

19    of Mr. Bandas's clients to pursue an appeal in

20    that case.   Would that -- if you had known that

21    before you filed this objection, would that fact

22    have influenced your decision to retain

23    Mr. Bandas?

24    A.    Again, I don't know anything about that so

25    no.

º

57

R O U G H   C O P Y

1    Q.    Again where the court found that Mr. Bandas's

2    clients objection lacked any merit and imposed a

3    500,000-dollar bond, that wouldn't if you had

4    known that before, now we have eight judges in

5    eight different cases observing that Mr. Bandas is

6    pursuing objection where there's no merits and

7    another case where bond is being imposed that does

8    than trouble you at all that you would still

9    retain Mr. Bandas?

10    A.    Again I don't know anything about that, so

11    no.

12    Q.    And you're willing to risk that you might

13    have to pay sanctions?

14    A.    I mean if the court orders me to do

15    something, I have to abide by that.

NOVO812RVDEP

16   Q.   And you're willing to take that risk?

17   A.   As long as the class gets more.

18   Q.   And you understand that there's a current

19   motion for sanctions pending and that we'll be

20   filing another motion for sanctions based on the

21   documents that were produced at the last minute

22   today you're still okay with going forward with

23   your objection under all these circumstances?

24   A.   Yes.

25   Q.   Even though we have eight plus judges

♀

                                                        58

                         R O U G H   C O P Y

1   different judges that we just discussed who have

2   observed that Mr. Bandas's objections are

3   meritless?

4   A.   Yes.

5   Q.   That doesn't trouble you that your objection

6   is meritless as well?

7   A.   If the court finds that, we'll go with that.

8   Q.   And you're willing to pay any sort of

9   sanctions?

10   A.   I can't not do what the court tells me so I

11   have to do something.

12   Q.   But that's not changing your opinion today?

13   A.   As long as the class gets more.

14   Q.   And you're not concerned that Mr. Bandas has

15   filed in excess of 23 objections, 23 that I found

16   to different class settlements that this is a

17   business practice for him more or less?

NOVO812RVDEP

18   A.    I mean he's pretty good at being able to file

19   an objection.

20   Q.    Frivolous -- you don't mind if they're

21   frivolous objections?

22   A.    Well, I don't know anything about that.

23   Q.    Well, I just read you several opinions of

24   different judges eight plus and eight of those 23

25   where Mr. Bandas has pursued objections the court

♀

59

R O U G H   C O P Y

1    ruled that they were frivolous and you know were

2    filed solely for the benefit of counsel and not

3    for the benefit of class members, that doesn't

4    trouble you at all?

5    A.    I don't know anything about that.

6    Q.    You're still willing to pursue your objection

7    in this case?

8    A.    Yes.

9    Q.    And are you troubled by the fact that Mr.

10   Bandas has frequently used his office manager to

11   object to various different settlements?

12   A.    I don't know anything about that sir.

13   Q.    If I told you that he's used his office

14   manager to object to at least two settlements in

15   two different cases that wouldn't trouble you at

16   all?

17   A.    Maybe she's upset about something.

18   Q.    And if I told you he's got other individuals

19   Kervin M. Walsh for one and Lolita Wells who have

NOVO812RVDEP

20   similarly filed multiple objections at the behest
21   of Mr. Bandas, that doesn't trouble you at all?
22   A.   No.
23   Q.   Now are you aware that Mr. Bandas has in the
24   past abandoned his client's objections?
25   A.   I don't know anything about that, sir.

♀

                                                              60
                        R O U G H   C O P Y
1   Q.   And if I told you that he has in the past
2   abandoned his clients objections, would you still
3   be willing to go forward with your objection in
4   this case?
5   A.   I'm still willing to go forward.
6   Q.   Even though it's possible that he might just
7   walk away and not pursue the objection and leave
8   you hanging?
9   A.   I don't know anything about that.
10   Q.   Does that trouble you at all?
11   A.   I'm still willing to go forward with my
12   objection.
13   Q.   Can I ask you if Mr. Batman, is that his
14   birth name or did he change his last name to bat
15   man?
16   A.   I don't know, sir.
17   Q.   You don't know?
18   A.   No.   I think I had that same question when I
19   me him.
20   Q.   Did he answer your question?
21   A.   I didn't ask him I just thought it in my
                        Page 56

NOVO812RVDEP

22    head.

23    Q.    Okay.   Now are you aware that Mr. Batman has

24    also filed several objections in other cases?

25    A.    No, sir.


♀

                                                    61

                    R O U G H   C O P Y

1    Q.    In at least four different cases?

2    A.    I don't know anything about that.

3    Q.    Does that trouble you at all that your friend

4    is using these objections to try to make money?

5    A.    I don't know anything about that.

6    Q.    And that doesn't change anything about your

7    decision to go forward with your appeal?

8    A.    I'm still willing to go forward.

9    Q.    Not your appeal but your objection?

10   A.    My objection, yes.

11   Q.    And you're again you're tolling risk that you

12   might be sanctioned by court?

13   A.    I'm willing to go forward with my objection.

14   Q.    And we have one sanction motion pending and

15   another one that's going to be filed shortly?

16   A.    Uh-huh.

17   Q.    You're still willing to go forward?

18   A.    I'm still willing to go forward with my

19   objection.

20                   MR. GAUGHAN:   I guess we'll go off

21        the record I think I'm probably done.

22                   THE WITNESS:   We're done.

23                   VIDEOGRAPHER:   Off the record at
                         Page 57

NOVO812RVDEP

24          4:59.

25                    (Break.)


♀

                                              62

                    R O U G H   C O P Y

  1  BY MR. GAUGHAN:

  2       Q     (By Videographer)

  3                    VIDEOGRAPHER:  We're back on the

  4            record at 5:10 p.m.

  5  BY MR. GAUGHAN:

  6  Q.   I guess we're concluding your deposition.

  7  Thank you Mr. Soto I appreciate you coming in

  8  again on short notice.  Thank you.

  9                    THE WITNESS:  Thank you for

 10            changing it for me.

 11                    MR. GAUGHAN:  No problem.

 12                    MR. GAUGHAN:  But I would again I'm

 13            not going to conclude the deposition per se

 14            I'm going to reserve my right to continue

 15            since documents were produced to us at the

 16            last minute.  I didn't have an opportunity to

 17            review them.  I had some 6800 plus documents

 18            produced to the liaison counsel last night.

 19            I obviously didn't receive these documents

 20            because I was here in Corpus Christi, liaison

 21            counsel is in Louisiana.  Also today when I

 22            think I put on the record before the

 23            deposition that I received a letter from Mr.

 24            Bandas purporting to provide a more limited

 25            range of documents that were relevant to

NOVO812RVDEP

ₒ

63

R O U G H   C O P Y

1    Mr. Soto's objection.  Obviously since I
2    received that at 3:00 before a deposition
3    that was scheduled for 3:00 and there were
4    several hundred documents perhaps upwards of
5    three, 400 documents listed, I did not have
6    ample time to review those documents to ask
7    you questions and I have put on the record
8    that we're going to be filing or intend to
9    file a motion for sanctions and request that
10   we receive costs, attorneys fees and that
11   your deposition be scheduled in Louisiana and
12   that you be required to travel there and
13   that's it and I have no other -- nothing else
14   at this point in time.
15        SPEAKER2:  I'm letting you know
16   that we have documents here you're welcomed
17   to examine them.  We're not asking you to
18   stop.
19        MR. GAUGHAN:  I don't think that's
20   a full set, I don't think that's all the
21   documents and I don't think that I could
22   possibly review all the documents that are in
23   set forth in the letter without us spending
24   the whole night here, so I'm going to
25   conclude the deposition and reserve the right

NOVO812RVDEP

⚲

R O U G H   C O P Y

1          to recall subject to a motion, of course

2          which court may or may not grant.   Okay.

3                    THE WITNESS:   Okay.

4                    VIDEOGRAPHER:   Off the record at

5          5:12.

6                    Starting second witness.   Ronnie

7          Garcia.

8                    VIDEOGRAPHER:   This is the video

9          taped deposition of Ronnie Garcia taken on

10         November 8, 2012, time is 5:25 p.m. will

11         counsel please identify themselves for the

12         record.

13                    MR. GAUGHAN:   Matthew gone for

14         class counsel.

15                    MR. HUSEMAN:   Van Huseman and Paul

16         Dodson on behalf of Mr. Gar stee I can't.

17                    VIDEOGRAPHER:   Will the court

18         reporter please swear m the witness.

19                    THE WITNESS:   My name is Ronnie

20         Garcia.(SWORN.ecl).

21     BY MR. GAUGHAN:

22         Q    (By Mr. Huseman)

23                    MR. HUSEMAN:   We have the same

24         agreement we had on Mr. Soto's about the

25         running objection.

⚲

NOVO812RVDEP
R O U G H   C O P Y

1            MR. GAUGHAN:  Yeah about the
2    questions you object to earlier as
3    harassment.
4            MR. HUSEMAN:  Harassment and other
5    things you would otherwise be giving trouble
6    about.
7            MR. GAUGHAN:  Yes I allow you
8    running objection on the harassment type
9    questions and I do want to put on the record
10   that last night liaison counsel received a
11   disk of some 9250 documents with respect to
12   Mr. Garcia and bay area contracting and
13   construction's objection in this matter and
14   right now I just received what I've marked as
15   exhibit 39 which is a letter from Mr. Bandas
16   dated November 8, 2012 which I just received
17   immediately before we began this deposition
18   that lists maybe 50 to a hundred documents
19   that are more limited range documents
20   obviously it being almost 5:30 right now well
21   at the end of the business day there's
22   insufficient time to review these documents
23   and we may very well file a motion for
24   sanctions and request that Mr. Garcia appear
25   in New Orleans, that we be awarded our costs

♀

                                          66

R O U G H   C O P Y

1    for appearing today and that we also receive

Page 61

NOVO812RVDEP

2       attorneys fees for appearing today for this

3       deposition and I just want to put that on the

4       record before we get going, okay.

5              MR. HUSEMAN:  We're here at your

6       pleasure.

7              MR. GAUGHAN:  Of course.

8  BY MR. GAUGHAN:

9  Q.   I guess Mr. Garcia or actually I should ask

10 counsel really?

11             MR. GAUGHAN:  He's appearing today

12      for himself as well as his company, correct.

13             MR. HUSEMAN:  Your understanding is

14      correct.

15             MR. HUSEMAN:  He speaks for both.

16             MR. GAUGHAN:  Okay.

17 BY MR. GAUGHAN:

18 Q.   And I guess one of the things we talked about

19 last week when I deposed you, I think it was

20 Thursday was about the scope of your lawyer's

21 representation of you and I was trying to ask you

22 if it was your understanding whether Mr. Bandas

23 was representing you solely with respect to your

24 objection and any appeal that may follow out of

25 that objection if the court over rules your

⚬

67

R O U G H   C O P Y

1  objection and do you remember that?

2  A.   I don't remember.

3  Q.   You don't remember.  And I guess at that time

Page 62

NOVO812RVDEP

4    it was your understanding that Mr. Bandas was
5    representing you more broadly than just in terms
6    of this objection and any appeal that may follow,
7    do you remember that?
8    A.   I don't remember at that time.  I don't
9    remember what I said at that time.
10   Q.   Okay well if you don't remember what you said
11   I'll just ask you again.  Do you understand that
12   Mr. Bandas is representing you?
13   A.   I know he's representing me right now.
14   Q.   And that's not just limited to this objection
15   that you're pursuing any appeal that might follow?
16   A.   I'm not sure I understand.  I would have to
17   talk to counsel on that.
18   Q.   Okay.  Well I understand that but maybe
19   you're noft understanding what I'm asking you but
20   let me just ask again.  Your objecting to the
21   settlement, correct?
22   A.   Yes, sir.
23   Q.   And but you might have you might actually
24   have claims against -- assuming you're correct
25   that you distributed Chinese drywall you might

♀

                                                  68
                      R O U G H   C O P Y
1    have claims against say did you buy drywall at Mc
2    kois?
3    A.   Yes, sir.
4    Q.   So it's possible you have a claim against Mc
5    kois eve than though they're not a party or
                      Page 63

NOVO812RVDEP

```
 6    participant in this settlement.  Now do you
 7    appreciate that Mr. Ban as would be representing
 8    you if you decided to bring a claim against
 9    McCoy's for instance?
10    A.   I'd have to talk to counsel, I'd have to talk
11    to Mr. Bandas on that.
12    Q.   But that's not your understanding?
13    A.   At this time, no.
14    Q.   You'd have to talk to him?
15    A.   Yes, sir.
16    Q.   How is your eye doing, by the way?
17    A.   Red as ever.
18    Q.   What's that?
19    A.   They're red.
20    Q.   And your sinuses are you still having
21    problems with your sinuses?
22    A.   Comes and goes.
23    Q.   And have you seen a doctor between now and
24    when I deposed you?
25    A.   I haven't, I'm thinking about needing to go
```

♀

69

R O U G H   C O P Y

```
 1    check you know go get but I just haven't had time.
 2    Q.   And who is the doctor originally how went to
 3    see about your you said you had seen a doctor
 4    about your eyes and your sinuses, who was that
 5    doctor?
 6    A.   Doctor Perez.
 7    Q.   Who.
```

Page 64

NOVO812RVDEP

 8    A.    Elizabeth Perez.

 9    Q.    Where does she practice?

10    A.    Here in Corpus.

11    Q.    Do you have a name?

12    A.    Bay area vision.

13    Q.    So you just saw her for your eyes?

14    A.    Yes.

15    Q.    Did you see anyone with respect to your sinus

16    problems?

17    A.    Doctor villa.

18    Q.    And where is doctor villa practice?

19    A.    He's off of Morgan somewhere.

20    Q.    Do you know the name of his practice?

21    A.    Villa I know him as doctor villa I know his

22    first that I am is Robert villa.  I think it's

23    called villas.

24    Q.    Does the name villa appear in the title of

25    his practice?

                                                      70

                  R O U G H   C O P Y

 1    A.    Yeah, pretty sure.

 2    Q.    And when was the last time you saw doctor

 3    villa?

 4    A.    I'm thinking around February.

 5    Q.    Back in February?

 6    A.    Yes.

 7    Q.    And I take it you haven't told either of

 8    these two doctors we just mentioned that you think

 9    your symptoms might be related to Chinese drywall

                  Page 65

NOVO812RVDEP

10    exposure?

11    A.    No, sir.

12    Q.    That something you intend to discuss with

13    either of these two doctors?

14    A.    Well, if it gets any worst I probably will.

15    Q.    And --

16    A.    I don't know if they --

17    Q.    How long have your eyes been bothering you?

18    A.    It's been a couple years.

19    Q.    Can you may be pinpoint more accurately when

20    you think it started?

21    A.    Like I said I couple years maybe two, three

22    years ago.

23    Q.    You don't have a real solid date on that?

24    A.    No, sir.

25    Q.    And did you see a doctor at that time?

⚲

                                                        71
                         R O U G H   C O P Y

1     A.    Yes.

2     Q.    So you saw a doctor right away when your eyes

3     started bothering you?

4     A.    Yes, ma'am.

5     Q.    And can you describe to me what it feels

6     like, is it just dry or what is it?

7     A.    It's a burning sensation.

8     Q.    Burning.  How about the problem with your

9     sinuses how would you describe that?

10    A.    It's like I said comes and goes.

11    Q.    But what does it feel like when it comes, I

NOVO812RVDEP

12    guess?

13    A.    The dry sensation too, itching, burning.

14    Q.    But it's not constant?

15    A.    No, sir.

16    Q.    And how about your problem with your eyes, is

17    that a constant thing?

18    A.    Yeah it's a daily thing.

19    Q.    So that's been bothering you couple years?

20    A.    Yes.

21    Q.    What has your doctor told you about why

22    you're experiencing that problem if anything?

23    A.    Well, they gave me some antibiotics for.

24    Q.    So did it clear it up at all?

25    A.    It helped but I haven't gone back.  Us guys

♀

                                                          72

                              R O U G H   C O P Y

1     we just we don't want to see doctors.

2     Q.    And what's your understanding of whether

3     antibiotics are an effective treatment as to

4     Chinese drywall exposure?

5     A.    I do not know.  I can't tell you that.

6     Q.    And since your last deposition you haven't

7     been sued by any homeowners who claim you

8     installed Chinese drywall in their home, have you?

9     A.    No, sir.

10    Q.    Has anyone complained to you that they think

11    that you installed Chinese drywall in their home?

12    A.    No, sir.

13    Q.    And do you intend to disclose to your former

NOVO812RVDEP

14    customers that you think you might have installed
15    Chinese drywall in their homes?
16    A.    I don't -- you know, if it comes up.
17    Q.    So you're not going to go out and start
18    knocking on doors or anything?
19    A.    No, sir.
20    Q.    And have you discussed that whether you're
21    obligated or not to notify people that you might
22    have installed Chinese drywall with your counsel
23    or anyone?
24    A.    Not too sure, I don't think we talked about
25    that unless we -- it gets to a point I guess.

                                                        73
                        R O U G H   C O P Y
1              MR. HUSEMAN:  Let's not talk about
2          what you said with your lawyer.
3              THE WITNESS:  Okay.
4    BY MR. GAUGHAN:
5    Q.    And since your last deposition, at that time
6    you couldn't recall any houses that you thought
7    you actually installed Chinese drywall in.  Have
8    you since changed -- has that changed I guess so
9    now you think you could identify a particular
10    property where you had installed Chinese drywall?
11    A.    No, sir.
12    Q.    And one of the things we discussed last week
13    was the fact that you having filed an objection to
14    this settlement created a possibility that the
15    settlement could be disapproved or I think we used

NOVO812RVDEP

16     the term tanked, just completely wiped out based
17     on your objection, do you recall discussing that
18     last week?
19     A.    Yes, sir.
20     Q.    In the time that has elapsed since your
21     deposition, have you given any second thought to
22     whether you want to pursue your objection in light
23     of that possibility that you might tank the
24     settlement?
25     A.    I haven't really thought about it.

♀

74

R O U G H   C O P Y

1     Q.    You don't have any concern that your
2     objection might deprive deserving individuals of
3     benefits under the settlement?
4     A.    I'd have to talk to counsel on that.
5     Q.    But you're not concerned about it.
6     Q.    As you sit here today?
7     A.    I haven't had time it's been a couple days
8     and I've been out of town so I haven't thought
9     about it.
10     Q.    So as you sit here today it's not something
11     that's bothering you or keeping you up at night or
12     anything like that?
13     A.    It's not bothering me at this time.
14     Q.    And you think that's a risk that you're
15     willing to take that your objection might deprive
16     all these people of benefits that you're willing
17     to take that risk?

NOVO812RVDEP

18  A.   It's up to counsel on that.  I mean that's

19  why I hired a lawyer.

20  Q.   That's your understanding, it's up to counsel

21  whether to object or not?

22  A.   What's that?

23  Q.   I'm trying to figure out it's your

24  understanding it's up to counsel?

25  A.   Well I haven't really thought about

♀

                                          75

                    R O U G H   C O P Y

1  everything we talked about since Thursday, so.

2  Q.   But earlier you said it was up to counsel I'm

3  trying to figure out what you meant by that?

4  A.   Can you repeat what you said?

5  Q.   It wasn't what I said it was what you said

6  you said it was up to counsel?

7  A.   Well you said something about -- I don't even

8  know what you said.

9  Q.   Okay?

10  A.   I would have to talk to my attorneys.

11  Q.   I guess so it doesn't bother you at all that

12  you could wipe out a benefit to deserving class

13  members?

14  A.   Like I said I have never really had the time

15  to think about it.

16  Q.   Is that something you're going to think

17  about?

18  A.   If it gets to the point.

19  Q.   What do you mean by that?

                    Page 70

NOVO812RVDEP

20    A.    What's that?

21    Q.    If it gets to the point, what do you mean by

22    that?

23    A.    If it tanks, you know, the settlement.

24    Q.    Well I'll tell you the court scheduled a

25    fairness hearing for next week so we're kind of at

♀

76

R O U G H   C O P Y

1    that point.  If the court might not approve the

2    settlement, the court might (Strike if.) or I

3    should say some of the settling defendants might

4    pull out of the settlement and there might be --

5    either the whole settlement could fall apart or

6    substantially less benefits might be available to

7    the class, so I'll represent to you we're at that

8    point.

9         Now knowing that, are you still willing to go

10    forward with your objection?

11    A.    Yes, sir.

12    Q.    Okay.  And you feel that your objection to

13    attorneys fees under the settlement is worth

14    possibly tanking the settlement?

15    A.    Can you repeat that again?

16    Q.    And you feel that your objection as I

17    appreciated which is that you oppose the

18    15 percent attorneys fees provision and you think

19    ten percent is more appropriate, you feel that

20    objection is worth possibly tanking a 83

21    million-dollar settlement?

Page 71

NOVO812RVDEP

22    A.    Ten percent, I don't know.

23    Q.    You don't know?

24    A.    I don't know about that.

25    Q.    Is that something you're going to think

♀

77

R O U G H   C O P Y

1    about?

2    A.    What's that?

3    Q.    Is that something you're going to think

4    about.  The 14th is six days from now.  Is that

5    something you're going to think about for the

6    fairness hearing?

7    A.    I probably won't have time to think about it.

8    Q.    So you're going to go forward with your

9    objection?

10    A.    I'm going to go forward with the objection.

11    Q.    Whether or not it ends up tanking the

12    settlement, that's just the cost of doing

13    business?

14    A.    Yes, sir.

15    Q.    And I think we talked a little bit last week

16    about was it saw blades you had problems with, saw

17    blades when you were --

18    A.    It was route errs.

19    Q.    Route errs?

20    A.    Yes, sir.

21    Q.    And we talked about you didn't retain any of

22    those you didn't retain any drywall samples or

23    anything like that, is that correct?

NOVO812RVDEP

24    A.    That's true.

25    Q.    And you mentioned that you did some work on a

♀

78

R O U G H   C O P Y

1     property where you removed drywall and the owner

2     said that they thought it was Chinese drywall?

3     A.    No, we did an insurance rehab on it.

4     Q.    Did you repair and replace drywall during

5     that or is it something else?

6     A.    Yeah we went in there and replaced the

7     drywall, did some repairs.

8     Q.    You didn't keep any of that drywall you took

9     out?

10    A.    It's been 20 years.

11    Q.    So to your knowledge you didn't comply with

12    judge fall P en's preservation order that requires

13    people to hold on to those sort of things (Judge

14    Fallon's)?

15    A.    No, sir, I don't understand what you mean,

16    it's been three or four years ago.  We don't -- we

17    usually get rid of all debris.

18    Q.    Well you didn't hold on to it, to the extent

19    that it's violative of Judge Fallon's order you

20    didn't hold on to it?

21    A.    No, sir.

22    Q.    And you mentioned that you hadn't seen any

23    doctors since your deposition?

24    A.    No, sir.

25    Q.    Are you planning to follow up with any of

NOVO812RVDEP

♀

R O U G H   C O P Y

1    those doctors?

2    A.    Yes, sir.

3    Q.    You have -- do you currently have an

4    appointment?

5    A.    No I was going to make an appointment but I

6    like I said I've been out of town and got into

7    town Tuesday as I was trying to catch up.

8    Q.    Which doctor was it?

9    A.    What's that?

10   Q.    Which doctor were you planning to see, the

11   one that treated you?

12   A.    Doctor Perez, Elizabeth Perez.

13   Q.    How long you been out of town for?

14   A.    Since Saturday.

15   Q.    Were your eyes bothering during that time?

16   A.    Yes, sir.

17   Q.    There was no improvement from when you left

18   town to today -- strike that.

19         Was there any improvement from when you left

20   town on Saturday to when you came back in your

21   condition?

22   A.    No, sir.

23   Q.    And if I told that you most people that live

24   in homes with Chinese manufactured drywall who are

25   experiencing some sort of physical problems that

♀

Page 74

NOVO812RVDEP

80

R O U G H   C O P Y

1    are related to the exposure, that they generally

2    see improvement when they are away from their

3    home, would that lead you to believe that your eye

4    problem is caused from something else and not from

5    drywall exposure?

6    A.    I didn't know about it just like I said I'm

7    not an expert about that so I don't know.

8    Q.    You're not a doctor?

9    A.    I'm not a doctor.

10   Q.    You don't know what's causing your eyes to be

11   irritated?

12   A.    No, sir.

13   Q.    And have you seen anyone to treat you for any

14   sort of emotional distress since we had the

15   deposition last week, you had mentioned that you

16   had some anxiety or emotional distress because of

17   your fear that you might develop future injuries

18   based on your exposure to Chinese drywall?

19   A.    I did say that?

20   Q.    Did you not say that?

21   A.    I don't remember.

22   Q.    Is that what you're saying?

23   A.    Fear of what, chien ee drywall, in my condo

24   or what?

25   Q.    I think we talked a little bit about there

⚲

81

NOVO812RVDEP

1  was an affidavit that you prepared that was
2  attached to your objection, do you remember
3  looking at that last week?
4  A.    I looked at it a little bit.
5  Q.    Maybe the way I asked this is do you have any
6  sort of emotional distress that you think you're
7  going to have some sort of injury in the future
8  based on your exposure to Chinese drywall?
9  A.    It's always in the back of my mind.
10 Q.    You haven't seen treatment for this emotional
11 distress, have you, from a doctor?
12 A.    Well I've got -- take stress pills for it.  I
13 don't know if that's part of it.
14 Q.    Stress pills for what?
15 A.    Hu?
16 Q.    You take stress pills is that what you said?
17 A.    Well it's like a relaxer.
18 Q.    For what?
19 A.    For stress.
20 Q.    When did you get that prescribed?
21 A.    About a year and a half ago.
22 Q.    And that was before it even came to your
23 attention that you might have Chinese drywall in
24 your house?
25 A.    Yes, sir.

♀

82
R O U G H   C O P Y
1  Q.    And I take it you haven't seen any sort of
2  medical professionals to treat you for any sort of

NOVO812RVDEP

3    emotional distress related to Chinese drywall

4    exposure since our last deposition?

5    A.    No, sir.

6    Q.    And Mr. Bandas is not here today, he wasn't

7    at your deposition last week, you retained him to

8    represent you with respect to your objection, are

9    you at all troubled that he's not here today?

10   A.    No, sir.

11   Q.    And you don't think that he should have to

12   appear at this deposition to defend you with

13   respect to your objection?

14   A.    I don't know nothing about that much of law,

15   if he should be here or shouldn't be here.

16   Q.    And I apologize if I already asked you this

17   question but I had just concluded a deposition

18   that I asked some of these same questions, but so

19   since last week when I deposed you you haven't

20   approached any of your customers to let them know

21   that you think you might have installed Chinese

22   drywall in their house?

23   A.    No, sir.

24   Q.    And you have no intention of doing so, do

25   you?

♀

                                                  83

             R O U G H   C O P Y

1    A.    No, sir.

2    Q.    And by the way did you talk about your

3    earlier deposition from last week with anyone?

4    A.    My deposition, no, sir.  Like I said I was

NOVO812RVDEP

5    out of town.

6    Q.    You didn't discuss it with -- are you married

7    by the way?

8    A.    No, sir.

9    Q.    You didn't talk to any of your friends about

10   it or anyone that works for you with you?

11   A.    Oh, yeah I talked -- I just talked to him the

12   day I went to the deposition on Thursday.

13   Q.    And did you talk about any of the questions

14   that I asked you?

15   A.    No, sir.

16   Q.    What did you talk about?

17   A.    What's that?

18   Q.    What?

19   A.    I just told him that I had a deposition on

20   Chinese drywall and that's pretty much about it.

21   Q.    And who was this individual?

22   A.    One of my partners up in Dallas.

23   Q.    What's the name?

24   A.    What's that?

25   Q.    What's his name?

♀

                                                  84
                        R O U G H   C O P Y

1    A.    Peter Gomez.

2    Q.    And you just told him your deposition, was

3    there anything else about it did you tell him

4    anything about the deposition?

5    A.    No, sir.

6    Q.    Did you tell him you're objecting to a class

NOVO812RVDEP

7   action settlement?

8   A.   I don't recall, I don't think so, no.

9   Q.   Did he ask you why you were deposed?

10  A.   What's that?

11  Q.   Did he ask you why you were being --

12  A.   No, he didn't, he's just a friend, we just

13  talked.

14  Q.   And you didn't discuss any of the questions I

15  asked you or any of the things that came up during

16  the deposition with this individual?

17  A.   No, sir.

18  Q.   Was there anyone else you spoke to about the

19  deposition?

20  A.   No, that's it.  Just brief like that.

21  Q.   And what did you do to prepare for today's

22  deposition?

23  A.   Didn't.

24  Q.   You didn't.  Did you meet with counsel at

25  all?

♀

                                                        85

                          R O U G H   C O P Y

1   A.   I talked to Paul a little while that's it.

2   Q.   Just today?

3   A.   Well I called him yesterday because when I

4   got served I called him what's going on.

5   Q.   How long did you guys talk?

6   A.   I didn't time it, maybe minute, two minutes.

7   Q.   It was minutes as opposed to?

8   A.   Hours, yeah.

                          Page 79

NOVO812RVDEP

9    Q.    Thirty minutes?

10   A.    Just minutes.

11   Q.    Under 30 minutes would you say?

12   A.    Yes.

13   Q.    Under ten minutes maybe five, ten minutes?

14   A.    Ten minutes, brief.

15   Q.    And did you talk to anyone else about today's

16   deposition before appearing today on the phone?

17   A.    I called the band as law office.

18   Q.    And did you talk to Mr. Bandas?

19   A.    I left a message he called me in the morning

20   I think it was this morning because we were

21   supposed to meet on Friday and I told him I really

22   don't -- I'm going to be busy on Friday he said

23   let me check into it so aim here on Thursday.

24   Q.    And did you guys -- did he prepare you for

25   the deposition?

⚲

                                                86
                         R O U G H   C O P Y

1    A.    No, sir.

2    Q.    Scheduling, was that the extent of it?

3    A.    I think just the scheduling part of it.

4    Q.    And how long did that call last?

5    A.    Ten minutes, the most maybe.

6    Q.    Just the two calls or was there any other

7    phone calls?

8    A.    Just two calls.

9    Q.    Then did you meet with anyone to help prepare

10   you other than Paul?

                         Page 80

NOVO812RVDEP

11    A.    Went to band as office dropped off a copy,

12    they wanted a copy of the what's it called when I

13    got served?

14    Q.    The subpoena?

15    A.    Yes.   So I went to his office he was than

16    there just made a copy, walked out.

17    A.    Secretary's name is marg owe, I don't know

18    her last name.

19    Q.    What was her name?

20    A.    Mar go.

21    Q.    And you met with Paul today you said?

22    A.    Just right now when I walked in.

23    Q.    How long was that five, ten minutes longer?

24    A.    Just, you know, five, ten minutes.

25    Q.    And did you guys talk.  He did some prep of

♀

R O U G H   C O P Y

1    you for the deposition?

2              MR. HUSEMAN:  Let's not talk about

3         what you talked with the lawyer about.

4              MR. GAUGHAN:  I'm not asking -- I'm

5         trying to figure out if it was friendly or if

6         it was.

7    A.    Always friendly I saw he went to school at

8    University of Texas.

9    Q.    But did you actually do prep, I guess?

10    A.    No sir.

11    Q.    And does that pretty much cover everything

12    you did in relation to today's deposition, the two

NOVO812RVDEP

13    phone calls and you met with Paul briefly?

14    A.    Yes, sir.

15    Q.    Did you discuss with anyone else that you

16    were going to be deposed today?

17    A.    No, sir.  I think Mr. When I talked to him

18    for a little while I said hi, how is it going he

19    wanted me to come in.

20    Q.    This was when you came in, I guess?

21    A.    Yes, sir.

22          (Exhibit 40 marked for identification.)

23    BY MR. GAUGHAN:

24    Q.    (Exhibit 41 marked for identification.)

25    BY MR. GAUGHAN:

                                                    88
                    R O U G H   C O P Y

1    Q.    And I'm showing you what's been marked as

2    exhibits 40 and 41.  Do you have those in front of

3    you Mr. Garcia?

4    A.    Yes, sir.

5    Q.    And these are the what we call notices of

6    deposition and these would have been presented to

7    you in connection with the subpoena that was

8    served on you, do you recall receiving these

9    materials?

10    A.    Yes.

11    Q.    Is it --

12    A.    Well they look different but I think they're

13    the same.

14    Q.    They look different?

NOVO812RVDEP

15    A.    Yeah.

16    Q.    Let me ask you this way, do you understand

17    that you're appearing today pursuant to these

18    notices to provide testimony?

19    A.    Yes, sir.

20    Q.    On behalf of yourself as well as your

21    company?

22    A.    Yes, sir.

23    Q.    Which is bay area contracting and

24    construction, Inc., is that a yes?

25    A.    Yes, sir.

♀

                                                        89

R O U G H   C O P Y

1     Q.    You can put those aside, by the way.  I'm

2     going to show you what's been previously marked as

3     exhibit 37.

4          Now, this is I'll represent to you a motion

5     that was filed by class counsel on October 24,

6     2012, it was filed in eastern district of

7     Louisiana with Judge Fallon it's now pending

8     before Judge Fallon and I'll represent to you that

9     this motion in this motion we're requesting that

10    Mr. Bandas and yourself as a client of Mr. Bandas

11    be sanctioned in connection with a motion that Mr.

12    Bandas filed seeking discovery related to the

13    settlement you're objecting to and ask you is that

14    something that you are aware of that class counsel

15    had moved to sanction you as well as your counsel

16    in connection with a discovery motion that your

Page 83

NOVO812RVDEP

17    lawyer filed?

18    A.    What do you mean about sanction?

19    Q.    Okay.  Are you aware that sometimes courts

20    will issue orders where someone files a frivolous

21    motion, that sort of thing and they'll require

22    that if they oppose the sanctions that the person

23    being sanctioned pay over money based on the

24    filing of a frivolous motion?

25    A.    No, sir.

♀

90

R O U G H   C O P Y

1    Q.    Okay.  And I'll elaborate a little bit.  So

2    basically one of the things that courts have an

3    inherent authority to do is if they deem that a

4    party has filed something that's frivolous or

5    vexatious, that sort of thing, filed with bad

6    intention courts will sometimes impose sanctions

7    because if you file a motion that's meritless that

8    sort of thing, the other side still has to respond

9    to the motion and certain circumstances a ways of

10    time for the court, for the parties and under

11    those circumstances sometimes a court will impose

12    sanctions and those sanctions might be things like

13    costs or attorneys fees in imposing the motion,

14    does that clarify what a sanction is to you?

15    A.    Just if I have to testify?

16    Q.    No basically a sanction would be imposed in a

17    situation where you file a frivolous motion, point

18    less motion that's meritless, court says it's

NOVO812RVDEP

19     meritless why are you filing this you're just
20     doing it to harass the other party, something like
21     that, so if a court makes a determination that
22     that's going on, sometimes the court will order
23     the party that filed the motion pay money and that
24     might be for costs that the other side incurred to
25     defend against the motion, it could be attorneys

♀

91

R O U G H   C O P Y

1     fees, does that help you understand what a motion
2     for sanctions is?
3     A.     If we're at fault then we have to pay
4     attorneys fees.
5     Q.     Yes, so basically in this particular instant
6     exhibit 37 your lawyer Mr. Bandas filed a motion
7     seeking discovery we believe that motion was
8     frivolous and meritless and filed just to cause
9     problems and we requested that the court impose
10    sanctions upon Mr. Bandas as well as yourself
11    since you're an object err?
12    A.     Okay.
13    Q.     Did you have an appreciation that we had
14    requested sanctions from yourself?
15    A.     I didn't know this was filed.
16    Q.     Is that something you would have expected
17    your lawyer to tell you about?
18    A.     When was this filed?
19    Q.     On the 24th of October?
20    A.     I don't know if we talked about it, but yeah

NOVO812RVDEP

21    I think he would have told me about it.

22    Q.    You would have liked him to tell you about

23    that?

24    A.    Yes.

25    Q.    And do you have an understanding that we're

♀

92

R O U G H   C O P Y

1    also requesting that the court order you to appear

2    in New Orleans to defend against this motion?

3    A.    When is that again.

4    Q.    Well, I'm not sure the court has scheduled a

5    hearing date yet for this motion, but do you

6    understand that that's something that we're asking

7    the court to do to order that you appear?

8    A.    Okay, well then I have to appear.

9    Q.    Okay.  Well if it orders you to appear but

10    were you aware that we requested?

11    A.    You requested for us to appear?

12    Q.    Yeah were you aware that we were doing that?

13    A.    No, sir.

14    Q.    Again is that something that you would have

15    liked your lawyer to tell you about?

16    A.    Well I mean when it happens I guess he will

17    tell me.

18    Q.    Okay, well is that something you would have

19    liked to have known about before he filed the

20    motion seeking discovery?

21    A.    I'll leave it up to Mr. Bandas.

22    Q.    Did he tell you that he was going to file a

NOVO812RVDEP

```
23    motion seeking discovery?
24              MR. HUSEMAN:  Don't answer that
25         question we're on asserting attorney/client
```

♀

                                         93

                      R O U G H   C O P Y

```
 1         privilege on that.
 2              MR. GAUGHAN:  What was the
 3         question.
 4              MR. HUSEMAN:  Did he tell you, did
 5         the lawyer tell the client something.
 6              MR. GAUGHAN:  I understand.  I
 7         thought what I asked him is that something
 8         that you would have wanted your lawyer to
 9         tell you about.
10    A.   I guess like I said we only met a couple
11    times, so I don't --
12    A.   I leave it up to him he is eap an attorney.
13    Q.   Was it your understanding that Mr. Bandas was
14    filing a motion seeking discovery from class
15    counsel?
16    A.   Well I just know we objected, that's all I've
17    known.
18    Q.   So he hasn't told you anything after the
19    objection?
20    A.   No, sir.
21    Q.   And again would you want to know that he was
22    doing something that might cause you to be
23    sanctioned and have to appear before a judge in
24    New Orleans?
```

NOVO812RVDEP

25    A.    He's just my attorney, that's all I know.

⚥

                                                            94
                        R O U G H   C O P Y
 1    Q.    I'm asking would you want him to tell you
 2    that hey I'm filing this motion?
 3    A.    If it's important I guess he will tell me.
 4    Q.    So you don't think it's important that you
 5    might be sanctioned and ordered to appear in New
 6    Orleans?
 7    A.    If I have to appear I'll appear.
 8    Q.    But that's not something you'd want to know
 9    about?
10    A.    Sir?
11    Q.    Would you P want to know that he was filing a
12    motion that may result in you being sanctioned and
13    ordered to appear in New Orleans?
14    A.    I guess as an attorney if he wants me to know
15    about it he'll let me know.
16    Q.    I'm asking that I'm asking would you please
17    want to know before he filed the motion?
18    A.    I'll leave it up to him.
19    Q.    So your a he a hundred percent relying upon
20    Mr. Bandas to do what is correct?
21    A.    Yes, sir.
22    Q.    And I'm going to ask that you look at that
23    big document there with the binder clip on it
24    which is marked as exhibit 38 and this is also
25    dated ten/ 24/ 12 and I take it you haven't seen

NOVO812RVDEP

♀

95

R O U G H   C O P Y

1    this motion before, have you?

2    A.    No, sir.

3    Q.    And all just represent to you that we filed

4    this motion and we being class counsel in response

5    to certain of the band as objectors motion to

6    dismiss their objections and also in response to

7    your counsel's motion for leave to than could duck

8    discovery regarding the fairness of the proposed

9    class action settlement and that was the motion we

10   just talked about the discovery motion that

11   resulted in our motion for sanctions, okay?

12   A.    Yes, sir.

13   Q.    Let me just ask you real quick one of the

14   things that prompted us to file or one of the

15   facts that we highlighted in this motion was that

16   your counsel Mr. Bandas when he filed the

17   discovery motion he included certain facts that

18   are completely incorrect about the settlement that

19   you're objecting to and they appeared to come from

20   another case where he filed an objection.  For

21   instance he said the contingency fee provision was

22   40 percent and here you've actually objected

23   because you think the fee provision is 32 percent

24   he also listed amount of settlement is 16 million

25   whereas the settlement here is 83 million and he

♀

NOVO812RVDEP

96

R O U G H   C O P Y

1   also identified a purported class representative

2   by the name of Mrs. Alice hill who is not a party

3   to the Chinese drywall litigation at all so I

4   guess my question for you is does that cause any

5   sort of concern for you that you have hired a

6   lawyer who can't even get the facts right when he

7   files an objection or files excuse me a motion

8   that's related to your objection in this case?

9   A.   I don't know what attorneys do.  That's their

10  job, I don't know what the attorneys -- behind

11  that.

12  Q.   Do you expect them to get the facts right?

13  A.   I would hope they get the facts right.

14  Q.   Would it trouble you that Mr. Bandas got the

15  facts completely wrong?

16  A.   Doesn't trouble me because I am a he not an

17  attorney.

18  Q.   Well he's representing you and not doing a

19  great job of it is I guess what I'm trying to say

20  does that trouble you at all?

21  A.   No, sir.

22  Q.   Would you expect him to look over any sort of

23  filing he made with the court to make sure the

24  facts are right?

25  A.   Als a business owner I try to cover myself,

♀

97

R O U G H   C O P Y

NOVO812RVDEP

1   so you know I can't tell him how to do his job, he
2   can't tell me how to do my job.
3   Q.    This is one of the reasons why we're moving
4   for sanctions is because it's obvious he just
5   filed this motion without even bothering to get
6   his facts straight and this is one of the reasons
7   you might actually be sanctioned because your
8   lawyer just through together this motion without
9   investigating the facts or getting them correct
10  and does that bother you that you might
11  potentially be sanctioned or ordered to appear in
12  New Orleans because your lawyer didn't do his job?
13  A.    It doesn't bother me right now but if I have
14  to appear it will bother me.
15  Q.    And if you get sanctioned I guess it will
16  bother you as well?
17  A.    Yes, sir.
18  Q.    So at minimum I take it you expect your
19  lawyer to do a job that won't result in you being
20  sanctioned or required to appear in another state
21  to -- before a judge?
22  A.    Yes, sir.
23  Q.    And we don't know if that's going to happen
24  or not.  You might be ordered to appear before
25  Judge Fallon, you might be sanctioned?

♀

98

R O U G H   C O P Y

1   A.    I don't know that.
2   Q.    You're willing to still go forward with your

Page 91

NOVO812RVDEP

3    objection with the understanding that you might be

4    sanctioned and forced to appear in Louisiana?

5    A.    Yes, sir.

6    Q.    Okay.   Now I guess one of the things that I

7    kind of briefly got into last deposition, your

8    counsel objected, but and Judge Fallon actually

9    ruled on it, so we got into some of the issues

10   where I was asking you about your lawyer's history

11   as a professional object err, do you remember

12   talking about that at all?

13   A.    I didn't do the talking you were talking a

14   lot.

15   Q.    I do a lot of talking, yes?

16   A.    I just listened.

17   Q.    Do you remember listening to me?

18   A.    Yes, sir.

19   Q.    How do you feel about that, that -- I

20   shouldn't say how do you feel about it, I should

21   say if I told you that at least eight courts have

22   spoken very harshly about your lawyer's history of

23   objecting to settlements that are not having any

24   real basis for the objection frivolous objections

25   that are being pursued solely to recover attorneys

♀

99

R O U G H   C O P Y

1    fees, would that in any way disuade you from

2    continuing with your objection to this settlement?

3    A.    No, sir.

4    Q.    And if you had known that your lawyer had a

NOVO812RVDEP

    5    long history of being professional object err who
    6    was seeking to lawyers fees or legal fees and not
    7    seeking anything positive for the class, would
    8    that have disuade had you from pursuing objection
    9    in this case?
   10    A.    I don't know what his job is but at that time
   11    I guess if I known what I know now or whatever you
   12    might want to say I don't know.
   13    Q.    Well that's what I'm asking you.  And there's
   14    a possibility you're going to be sanctioned, you
   15    understand that based on some of your lawyer's
   16    conduct before the court and what I'm trying to
   17    say is I've got eight different judges who have
   18    made various rulings pertaining to your lawyer's
   19    objections that have been very harsh of your
   20    lawyer and say that he's highjacking settlements,
   21    they say that he's only in it to get legal fees,
   22    he's not doing anything for the actual people that
   23    are injured, the class members, it's will all
   24    about legal fees.
   25    A.    I'm still moving on with this case.

                                                        100
                        R O U G H   C O P Y
    1    Q.    You're still moving on even though your
    2    lawyer is seeking objections solely to recover
    3    legal fees?
    4    A.    Yes, sir.
    5    Q.    That doesn't bother you?
    6    A.    Not at this time.
                        Page 93

NOVO812RVDEP

```
 7   Q.   Even though you might be sanctioned?
 8   A.   No, sir.
 9   Q.   Is it worth it just for the 5,000-dollar
10   incentive fee?
11   A.   What's that?
12   Q.   Is it worth it just for a 5,000-dollar
13   incentive fee?
14   A.   No it's not, I don't know what the fee is I
15   don't know where you came up with that.  Is that
16   on the paperwork?
17   Q.   Yeah, it was actually remember last week you
18   looked at your retainer agreement?
19   A.   Haven't really looked at it at all totally.
20   Q.   It's in front of you it's marked exhibit 28
21   if you could take a look at that really quick.
22        (Exhibit 28.)
23   BY MR. GAUGHAN:
24   Q.   You don't remember talking about exhibit 28
25   last week?
```

º

                                                          101
                        R O U G H   C O P Y

```
 1   A.   Did we go over it?
 2   Q.   Yes.
 3   A.   3.3.
 4   Q.   Well 3.2 and 3.3, do you remember going over
 5   these provisions last week?
 6   A.   Yeah, I do.
 7   Q.   So you remember that part of your retainer
 8   agreement with counsel dealt with the prospect of
```
                        Page 94

NOVO812RVDEP

9    you getting an incentive fee of $5,000?

10   A.    I remember now, I think.  Didn't really think

11   about it.

12   Q.    Well what I'm trying to ask is do you think

13   with the prospect of you might be sanctioned, you

14   might be required to appear before Judge Fallon,

15   does 5,000-dollar incentive fee really worth it?

16   A.    No, sir.

17   Q.    Then are you reconsidering your decision to

18   object to the settlement?

19   A.    No, sir.

20   Q.    Why not?

21   A.    Because I leave it up to Mr. Bandas see where

22   we get to move forward on this.

23   Q.    What are you hoping that Mr. Bandas is going

24   to accomplish aside from getting a legal fee and

25   maybe a 5,000-dollar incentive fee for you?

♀

                                              102
                    R O U G H   C O P Y

1    A.    What's that?

2    Q.    What are you hoping he's going to accomplish

3    besides getting a legal fee for himself and maybe

4    a 5,000-dollar incentive fee for you?

5    A.    I don't know what he's going to accomplish.

6    Hopefully it will be fair.

7    Q.    And are you aware that Mr. Bandas has a long

8    history of filing objections --

9    A.    No, sir.

10   Q.    And with drawing those objections after he

NOVO812RVDEP

11    gets paid off without any change to the settlement

12    agreement?

13    A.    No, sir.

14    Q.    If I told you that, would that -- if I told

15    that you fact, would that change your mind about

16    pursuing objection that he's really not going to

17    accomplish in the change to the settlement other

18    than to get a fee?

19    A.    No, sir.

20    Q.    That doesn't change your mind?

21    A.    No, sir.

22    Q.    So at the end of the day you might just end

23    up with $5,000, Mr. Ban as gets a fee, settlement

24    doesn't change at all, that doesn't trouble you at

25    all?

♀

                                                        103

ROUGH COPY

1    A.    I'll leave it up to Mr. Bandas.

2    Q.    Are you looking at something sir?

3    A.    Just reading this stuff.

4    Q.    Were you looking at something?

5    A.    I was just looking at --

6    Q.    I'd like to have you turn back to exhibit 38

7    for a minute and just go through some of the

8    things that different courts have said about your

9    lawyer in brown v Wal-Mart you can follow along on

10    page five, brown v Wal-Mart stores Inc., the

11    honorable mark V-A-N-D-E-W-I-E-L-E, said the band

12    as objection filed on behalf of Ms. Carl son is a

Page 96

NOVO812RVDEP

13    generic boiler plate objection prepared and filed
14    by attorneys working for their own personal
15    benefit and not for the benefit of this class or
16    for those lawyers clients.
17        So essentially the court observed that Mr.
18    Bandas filed a boiler plate objection that was
19    solely for his own benefit and not for the benefit
20    of anyone else, not even his own client, does that
21    trouble you that that's what your lawyer is doing?
22    A.    It does trouble me, but.
23    Q.    Well if you had known that fact before you
24    actually pursued your objection, do you think you
25    would have retained Mr. Bandas?

♀

                                                    104
                      R O U G H   C O P Y
1    A.    Before the fact, yeah, probably.
2    Q.    You would have retained him anyway?
3    A.    What's that?
4    Q.    You would have still hired Mr. Bandas?
5    A.    If I knew the facts.
6    Q.    If you knew what this judge had said about
7    Mr. Bandas, essentially he's filing objection
8    boiler plate objection that's solely for his own
9    benefit not even for the benefit of his own
10    client, that doesn't trouble you at all?
11    A.    Not at this time.
12    Q.    So if you knew that fact before you filed
13    your objection, you still would have filed an
14    objection?

NOV0812RVDEP

15  A.    Because this is totally different from my
16  objection.   We're talking about Chinese drywall,
17  we're talking about Wal-Mart store.
18  Q.    We're talking about the same concept,
19  objecting to a settlement meritless objection
20  that's done solely for legal fees.   I'll continue
21  on -- ment (Interruption.)
22        I'm going to continue reading what judge vand
23  wheel said about Mr. Ban as in the same case, he
24  also continued on to say the record before the
25  court demonstrates that band as is a professional

°f

105

R O U G H   C O P Y

1  object err who is improperly attempting to high
2  jack the settlement of this case from deserving
3  class members and dedicated, hard working counsel,
4  solely to coerce I will gotten, inappropriate and
5  unspecified legal fees.
6        Do you see that?
7  A.    Yes, sir.
8  Q.    I'm just going to ask the same question, you
9  really want to go forward with an attorney who's
10  trying to high jack a settlement to coerce a legal
11  fee?
12  A.    At this time, yes.
13  Q.    Even though he's not pursuing an objection
14  for your benefit, it's for his own been it, you
15  still want to go forward with that?
16  A.    Well I've hired Mr. Bandas for that, so.
                    Page 98

NOVO812RVDEP

17   Q.   I'm going to say it again there's a
18   possibility you're going to get sanctioned, that
19   doesn't trouble you at all?
20   A.   I'll be troubled if I get sanctioned.
21   Q.   You're going to wait and see?
22   A.   Yes, sir.
23   Q.   And I'll continue on the next one.  Must man
24   v Wal-Mart stores Inc. honorable David h sif right
25   stated the court has considered all the materials

106

R O U G H   C O P Y

1   and pleadings filed of record in this case.  As
2   well as related judicial rulings.  As a result,
3   the court concludes that attorney Christopher a
4   band as is a professional object err.  The court
5   is concerned that attorney band as is seek to go
6   wrongfully use the class action and objection
7   process for general -- excuse me for personal gain
8   and without any corresponding benefit to any
9   individual object error the settlement class as a
10   whole.
11        Do you see that?
12   A.   Yes, sir.
13   Q.   And this is another judge more or less saying
14   the same thing, that Mr. Bandas is a professional
15   object err and he's trying to use the class action
16   process for his own personal gain, he's objecting
17   for his own personal gain and he's not trying to
18   produce any benefit for his own client or for the

NOVO812RVDEP

19  settlement class.  I'll ask you, is that really --
20  you really want to hire someone that's just trying
21  to extort a fee?
22  A.   He must be good at what he does.
23  Q.   Extorting fees?
24  A.   He's an attorney, I don't know the facts of
25  this stuff.

⚲

107
R O U G H   C O P Y
1  Q.   But you're okay with hiring a lawyer that
2  judges think is just trying to extort a fee?
3  A.   I'm still going to move forward with this
4  case.
5  Q.   And how about the next case, owe lay v
6  Wal-Mart stores Inc. honorable coal b peel
7  observed the court finds a lack of involvement and
8  participation of the objectors and their counsel
9  who are not present and lack involvement and
10  participation of the attorneys that were present
11  combined with their attempt to inject themselves
12  in the last minute into this eight year litigation
13  constitutes an effort to extort money from the
14  class and or class counsel.
15      Do you see that?
16  A.   Yes, sir.
17  Q.   This is another court, a third court
18  observing that your lawyer, Mr. Ban as is again a
19  professional object err trying to extort a fee and
20  again you're okay with this?

Page 100

NOVO812RVDEP

21   A.   Well I don't even know if this is facts or

22   what, you just copied it from somewhere.

23   Q.   If you want to look these are all attached

24   and if that makes you feel better if you look at

25   exhibit d to this motion you'll find a copy of the

♀

108
R O U G H   C O P Y

1   judge's opinion.   These are facts these are

2   rulings by a court, rulings that say that your

3   lawyer is a professional object err and trying to

4   extort money.

5   A.   Where is that at?

6   Q.   Do you want to see it?  Is that what you

7   want?

8   A.   Might as well look at it.

9   Q.   Which one do you want to look at?  Do you

10   want to look at the top one?

11   A.   It says attached exhibit d.

12   Q.   Up find exhibit d?

13   A.   No I found b.

14   Q.   If you want to look sir, it's about here?

15   A.   Here it is.

16   Q.   Okay.  I'll tell you right where you want to

17   find it.  It's going to be on page five of that

18   document, see the bottom there, three, four, five?

19   A.   Uh-huh.

20   Q.   And at paragraph 20?

21   A.   Yes.

22   Q.   That's where he says this?

NOV0812RVDEP

23    A.   This says filed ten/24/2012.

24    Q.   That's when we filed and I guess you -- when

25    you file something in federal court it's all

♀

109

R O U G H   C O P Y

1    electronic nowadays so what you're seeing there at

2    the top is actually relates to the motion itself?

3    A.   Oh okay because this is like in 20 --

4    Q.   Yeah it's just the way the court flags the

5    documents on its record so it knows where they

6    are.   But if you turn to page number -- if you go

7    back to exhibit d and you look at page ten of

8    exhibit d you see that's the date of judge peel's

9    opinion done and ordered in circuit court in the

10    Washington County chip Lee Florida on this 21st

11    day of August, 2009, do you see that?

12    A.   Yes, sir.

13    Q.   So this opinion is from August 2009 and if

14    you look at that paragraph 20 on page five, that

15    says what I just quoted to you, okay, so this is

16    an actual judge, not me who has made this

17    determination that your lawyer is a professional

18    object err and what I'm trying fo figure out, does

19    that trouble you at all?

20    A.   It troubles me.

21    Q.   But you still want to go forward with your

22    objection?

23    A.   Yes, sir.

24    Q.   Even with the understanding that you might be

NOV0812RVDEP

25    sanctioned?

♀

110

R O U G H   C O P Y

 1    A.    Yes, sir.

 2    Q.    Because some meritless objection?

 3    A.    Well I dealt with -- I've seen Chinese

 4    drywall in my time.

 5    Q.    But you have no understanding of where or if

 6    you eve than installed it in someone's home?

 7    A.    I don't know where, like I said we have eap

 8    installed a bunch of different types of drywall.

 9    Q.    And you don't know if it relates to your

10    company, bay area contracting, we talked about you

11    had at least one other company that you were

12    involved in where you might have installed this

13    drywall, assuming you did install Chinese drywall,

14    so you know that other company didn't object it's

15    only bay area contracting that objected?

16    A.    Yes, sir.

17    Q.    So you have no way of knowing as you sit here

18    whether you actually, you or your company bay area

19    contracting ever installed Chinese drywall, you

20    might have seen it on a different job site that

21    related to another company?

22    A.    Like I said, I think it was in Dallas Fort

23    Worth or Houston area.

24    Q.    Of course none of your customers have come

25    forward and complained that they think you

Page 103

NOVO812RVDEP

♀

R O U G H   C O P Y

1    installed Chinese drywall on their properties?

2    A.    Which would be good, that's good.

3    Q.    It is good but it also suggests to me that

4    you didn't install any Chinese drywall in their

5    homes?

6    A.    Some of it was commercial too.

7    Q.    What do you mean by commercial?

8    A.    Commercial buildings.

9    Q.    But commercial clients also complain don't

10   they if there's a problem, so no one has

11   complained so you don't know?

12   A.    Uh-huh.

13   Q.    If you want to go to page six of this motion

14   I'll show you yet a fourth instance where a court

15   has disparaged your lawyer.  The honorable perry m

16   Buckner in Carter v Wal-Mart stores Inc., in his

17   opinion stated in spite of the fact that Mr.

18   Bandas is a serial professional object err I

19   reviewed the objection on its merits.  The court

20   finds that for a plethora of reasons the band as

21   objection lacks substantive merit.

22         Again this is another court saying your

23   lawyer is a professional object err pursuing an

24   objection that lacks substantive merit and again

25   you're okay with this?

♀

NOVO812RVDEP

R O U G H   C O P Y

1   A.    I don't know what he does -- I guess that's

2   what he does for a living.

3   Q.    He pursues meritless objection z?

4   A.    That's what it sounds like you're saying

5   right there.

6   Q.    So you're willing to hire someone as your

7   lawyer who pursues meritless objections?

8   A.    I guess so because he's my attorney.

9   Q.    Are you concerned ump might be sanctioned?

10   A.    You already said that a couple times.

11   Q.    I just want to make sure you're concern?

12   A.    I guess so.

13   Q.    You're dealing with someone who's gt a

14   history, the court Judge Fallon who's presiding

15   over the Chinese drywall P litigation has been

16   advised of this history, there's a motion pending

17   that details this history you're looking at it,

18   you know, are you at all concerned that you might

19   get sanctioned here?

20   A.    Yes, sir.

21   Q.    Okay.  And again that doesn't disuade you in

22   any way from going forward with your objection?

23   A.    Not at this time.

24   Q.    And how about if we look at the next case,

25   the fifth case?

♀

R O U G H   C O P Y

1   A.    Seems like we got a bunch of cases we're

NOVO812RVDEP

2    going to look at.

3    Q.    Yeah we're going to look at them all.   In

4    convoys v3m corporation on page six honorable

5    Claudia will kin found that Mr. Bandas found that

6    the objections of the O of Mr. Bandas clients to

7    be patently frivolous and bore no particular

8    relationship to the circumstance of the

9    settlement.   Kind of like in this case.   Then

10   imposed 431,167-dollar appeal bond requirement.

11   And that's a lot have money 431,000, is that money

12   that you would have handy in case you had to post

13   a bond?

14   A.    No, sir.

15   Q.    Okay I'll explain real quickly what's

16   happening there.   This is an instance where what

17   your lawyer does he files objections, the courts

18   overrule the objections and then he'll file an

19   appeal and the purpose of that is to try to hold

20   up and delay the settlement in the hopes that the

21   lawyers will pay him off to go away and so what

22   this court did was in order to prevent Mr. Ban as

23   from doing that it imposed a 431,000-dollar bond

24   requirement.   Does that trouble you at all that

25   the court would say the appeal is frivolous, the

                                                    114

R O U G H   C O P Y

1    objections are frivolous I'm going to impose a

2    431,000-dollar bond requirement?

3    A.    What's a requirement on that.

NOV0812RVDEP

4    Q.    You have to come forward with $431,000?

5    A.    Not for a bond there's a percentage.

6    Q.    Well usually you go to a company but yeah?

7    A.    It's like a 3 percent, 5 percent.

8    Q.    But would you actually to have pay the money

9    if the court -- if at the end of the appeal the

10   court determines the appeal is frivolous you have

11   to come forward with the $431,000?

12   A.    But a bond -- that's just the total amount of

13   the bond.

14   Q.    Well in this instance they have to actually

15   pay over cash I don't know if you understand that

16   with an appeal bond you have to pay cash you don't

17   pay 3 percent, you pay cash?

18   A.    Yeah.

19   Q.    It usually goes into like an escrow account

20   sits fl collects interest are you willing to pay

21   $431,000 to pursue an appeal if Judge Fallon

22   strikes down your objection?

23   A.    Yes, sir.

24   Q.    Okay you have that money?

25   A.    No, sir.

♀

115

R O U G H   C O P Y

1    Q.    Okay how are you going to pay ipt then?

2    A.    Hopefully Mr. Bandas come up with the money.

3    Q.    You yourself don't have the money?

4    A.    No, sir.

5    Q.    And aren't going to pay it forward?

NOVO812RVDEP

6    A.    No, sir.

7    Q.    How about the next case Kevin Acer American

8    Corp. and in this case the Honorable H. James wear

9    required that band as post an appeal bond of

10   $70,650 and imposing that bond the court found

11   that the merits of the object err's appeal weigh

12   heavily in favor of requiring a bond insofar as

13   his objections to the set many ment are lacking in

14   merit.   Object err band as makes no objection to

15   the terms of the settlement its but objects only

16   to attorney fees.   Continues on but I'll leave it

17   off there.

18        Again do you have $70,000 to put up as a

19   bond?

20   A.    No, sir.

21   Q.    Are you willing to do so if you're required

22   to?

23   A.    If required to.

24   Q.    And again are you -- this is the sixth court

25   that's observed that Mr. Bandas is pursuing an

º

116

R O U G H   C O P Y

1    appeal or an objection that lacks merit, are you

2    troubled by that and do you still want to go

3    forward with band as as your counsel under those

4    circumstances?

5    A.    I'll still go forward with it we're already

6    this far.   Can I take a break I need to get some

7    more water and go to the bathroom.

Page 108

NOVO812RVDEP

8          VIDEOGRAPHER:   Off the record it's

9      6:31.   This concludes tape one.

10          VIDEOGRAPHER:   We're back on the

11      record at 6:44 this is the beginning of tape

12      two.

13  BY MR. GAUGHAN:

14  Q.    Mr. Garcia picking up where we left off, I'm

15  going to ask you continuing on that same line of

16  questions and start by asking if I told you then

17  in Embrey v Acer American Corp. the honorable h

18  James wear had required Mr. Bandas to post a

19  70,650-dollar bond in light of a meritless

20  objection that Mr. Ban as was pursuing in a

21  subsequent appeal, would that cause you to in any

22  way change your current course of conduct with

23  Mr. Ban as as your counsel?

24  A.    Not at this time.

25  Q.    Okay.   And in that case Mr. Bandas was also

º

117

R O U G H   C O P Y

1  opposing attorneys fees and as I appreciate it

2  that's what your opposing is the attorney fee

3  provision, correct?

4  A.    Yes, sir.

5  Q.    And you're still willing to go forward with

6  that objection to attorneys fees even though we're

7  seeing instance where another court ruled that Mr.

8  Bandas's objection to attorneys fees were

9  meritless?

Page 109

NOVO812RVDEP

10      A.      Yes, sir.

11      Q.      And again the court imposed a 70,650-dollar

12      bond and that's not something that you would be

13      able to afford to post, if it came to it, could

14      you?

15      A.      No, sir.

16      Q.      And the next case which is in re cat owe ray

17      to crt anti trust litigation which is a case in

18      the new district of California appearing before h

19      Samuel Conti, that court recently on March 22,

20      2012 overruled the objection of Mr. Ban as's

21      client since they failed to submit proof of

22      otherwise establishing that he was a member of the

23      class and therefore that individual lacked

24      standing to challenge a settle now this is

25      something that we feel we have here as well that

♀

118

R O U G H   C O P Y

1       you don't have standing to attack the settlement

2       because you know there's really no real evidence

3       that you installed Chinese drywall in anyone's

4       home and there's really no evidence that you have

5       incurred any sort of personal injuries or anything

6       like that so you're still willing to go forward

7       with your settlement even though court could rule

8       that you don't have any standing to object?

9       A.      Yes, sir.

10      Q.      And you understand that you could be

11      sanctioned?

Page 110

NOV0812RVDEP

12    A.    Yes, sir.

13    Q.    And that the court could require you to post

14    substantial bond possibly 400,000, 70,000,

15    whatever it might be, you understand that and?

16    A.    I hope not.

17    Q.    What is it?

18    A.    I hope not.

19    Q.    But it has no impact on your decision to

20    continue your objection?

21    A.    No, sir.

22    Q.    And possible appeal?

23    A.    No, sir.

24    Q.    And the next case I want to show you is on

25    the next page in ray Wal-Mart wage an hour

♀

119

R O U G H   C O P Y

1    employment practices litigation which was a case

2    in the United States District Court for the

3    district of Nevada in which Philip m pro actually

4    impose an even larger bond requirement of $500,000

5    per object err since the objections were not

6    supported by the law or the facts and are indeed

7    meritless.   Again this is a case where your

8    counsel objected to a settlement, the court

9    observed that objectors counsel have enough

10   documented history -- there after dismissing said

11   appeals when they and their clients were

12   compensated by the settling class or counsel for

13   the settling class (Mark).

NOVO812RVDEP

14      And I guess this is what we were talking

15      about before that your lawyer has a history of

16      pursuing objections and then when those objections

17      are overruled by the court, he'll file an appeal

18      to try to slow things down and could cause a delay

19      of up to a year or possibly longer by pursuing an

20      appeal in order -- and what he's looking for is

21      fees to go away and again this doesn't trouble you

22      in any way?

23      A.    Not at this time.

24      Q.    And you're still willing to go forward with

25      your appeal?

                                                    120

R O U G H   C O P Y

1       A.    Yes, sir.

2       Q.    And you understand that you could have be

3       required to post a bond could be $500,000 could be

4       more?

5       A.    And get sanctioned.

6       Q.    And you understand that we have eaf gone

7       through now eight different courts that have

8       criticized your counsel for his pattern of

9       pursuing frivolous appeals and objections?

10      A.    Yes, sir.

11      Q.    And you're still willing to go forward and

12      understand that you could be sanctioned by the

13      court?

14      A.    Yes, sir.

15      Q.    How about the fact if I told that you Mr.

NOVO812RVDEP

16    Bandas has at least objected to 23 settlement

17    class settlements that I'm aware of, does that

18    trouble you that he's opposed that many objected

19    to that many settlements, 23 class settlements?

20    A.   I'm not aware of that.

21    Q.   I'm asking you, does that bother you assuming

22    that's true and I'll represent to you that it is

23    that he's opposed more than 23 class settlements,

24    I mean that's problematic and troubling, isn't it?

25    A.   I don't know what the answer for that is.

♀

121

R O U G H   C O P Y

1    He's an attorney, I'm not.

2    Q.   So he's making a living extorting fees based

3    on frivolous objections, does that have --

4    A.   I think that's what you're saying.

5    Q.   I am saying that?

6    A.   That's what I said I think that's what you're

7    saying.

8    Q.   Of course?

9    A.   Okay.

10   Q.   Because it's true.

11   A.   I don't know if it's true.

12   Q.   We just read through eight different opinions

13   or sections of eight different opinions where

14   courts have observed that Mr. Bandas is a?

15   A.   Professional object err.

16   Q.   Professional object err, and that he's trying

17   to extort fees and went through -- it's my opinion

NOVO812RVDEP

18    it's courts have found this, different judges have
19    found him to be a professional object err who's
20    only after fees.  So it's not just my observation.
21    I'm telling you that I found more than 23 cases
22    where Mr. Bandas has pursued objections and
23    appeals and or appeals I should say to class
24    settlements.   And that's problematic in my opinion
25    I'm asking you what's your opinion, filing

♀


                                                              122

                        R O U G H   C O P Y

1    objections to extort fees?
2    A.    Are you trying to -- I need to say something
3    or you need -- what are you trying me to tell you,
4    that if it bothers me?
5    Q.    You want that person representing you?
6    A.    Well he's representing me now.
7    Q.    You want him to represent you?
8    A.    Yes, sir.
9    Q.    You're happy with that?
10   A.    Yes, sir.
11   Q.    And obviously you understand you can be
12   sanctioned?
13   A.    You told me that already.
14   Q.    Telling you again just to make sure it sings
15   in?
16   A.    Sanctioned and bonded and, okay.
17   Q.    I don't know about the bonded part but there
18   could be a bond requirement.  How about if I told
19   you that Mr. Ban as has frequently used members of

NOVO812RVDEP

20    his -- or employees of his office to pursue

21    objections do you find that problematic in any

22    way?

23    A.    Yes, sir.

24    Q.    Filing the same person in more than one case

25    filing?

♀

                                                                123
                        R O U G H   C O P Y

1    A.    Like I said I don't know what he does.

2    Q.    He's used the son of his office manager to

3    object to another settlement, is that troubling?

4    A.    What's office manager's name again.

5    Q.    Jan pet trust?

6    A.    Don't know her.

7    Q.    She objected to this settlement along with

8    yourselves?

9    A.    Really.

10    Q.    When originally filed, she also objected to

11    Chinese drywall settlement involving lowes and she

12    also objected to a case involving Bank of America

13    and her son objected to that same case involving

14    Bank of America and also objected in a case called

15    Sullivan vdb investments Inc. so he's using people

16    that work in his office or their family members to

17    oppose settlements so that he can earn more legal

18    fees, extort more legal fees, sorry and this is

19    who you want representing you?

20    A.    At this time, yes, sir.

21    Q.    And you're willing to go forward with him?
                        Page 115

NOVO812RVDEP

22    A.    Yes, sir.

23    Q.    If I told you he's got other people who he's

24    used other individuals, Lolita wells who's

25    objected to more than one settlement with Mr.

                                                    124

                    R O U G H   C O P Y

1    Bandas as counsel and a Mr. Ker VIN m wawsh who's

2    objected to two settlements with Mr. Ban as as

3    counsel, that doesn't bother you?

4    A.    I don't know who these people are.

5    Q.    I guess my point is he's using people to --

6    the same people to oppose multiple different

7    settlements in some cases, people that are after

8    these 5,000-dollar incentive fees so that he can

9    get paid, the client gets paid like you're going

10    to get paid your 5,000-dollar incentive fee and

11    what I'm trying to figure out is you really want

12    to go forward with someone under those

13    circumstances and oppose a settlement?

14    A.    Yes, sir.

15    Q.    And if I told that you Mr. Batman has opposed

16    at least four settlements that we're aware of and

17    he's the individual, I guess his investigator

18    brought you in, but he's doing the same thing,

19    he's opposing settlements, he's extorting fees?

20    A.    Who is that bat man?

21    Q.    Bat man, Mr. Batman, excuse me.  You sure you

22    want to get mixed up with these people?

23    A.    I'm still moving forward with this.

NOVO812RVDEP

24    Q.    What I'd like to finish off with is we have
25    moved for sanctions against you with respect to


♀

125

R O U G H   C O P Y

1    Mr. Bandas's motion seeking discovery and so if
2    the court orders you to appear in New Orleans, you
3    will do so?
4    A.    Yes, sir.
5    Q.    And if the court sanctions you, you'll pay
6    the sanction?
7    A.    Yes, sir.
8    Q.    Okay.  And we've already gone on record at
9    least in the beginning of this deposition saying
10   that in light of the late production of documents
11   and at this depo owe before this deposition last
12   night as well as immediately before this
13   deposition we're going to be seeking sanctions or
14   costs in appearing today, attorneys fees and
15   asking that you appear for a deposition in New
16   Orleans to after these documents have been
17   reviewed.  That's where we stand and if that
18   happens you'll pay any sort of sanctions that the
19   court imposes and you'll appear in New Orleans?
20   A.    If I have to.
21   Q.    Okay.
22                    MR. GAUGHAN:  That's it.
23                    MR. HUSEMAN:  Aren't you glad I
24        wasn't making objections.
25                    VIDEOGRAPHER:  Off the record at

NOVO812RVDEP

♀

126

R O U G H   C O P Y

1          6:57.   P.m.
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

N0V0812RVDEP

⚲