IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED          MDL NO. 09-2047
DRYWALL PRODUCTS LIABILITY
LITIGATION                            SECTION L

                                      JUDGE FALLON

THIS DOCUMENT RELATES TO
ALL CASES                             MAG. JUDGE WILKINSON


MEMORANDUM IN SUPPORT OF THE
MOTION OF THE NORTH RIVER INSURANCE COMPANY
TO EXCLUDE OR LIMIT THE TESTIMONY
OF ROSEMARY COATES

MAY IT PLEASE THE COURT:

Defendant The North River Insurance Company ("North River") asks the Court to either

exclude or limit the testimony of Rosemary Coates that will be offered on behalf of Plaintiffs at

the trial of this case scheduled to begin on November 26, 2012.  The testimony of Ms. Coates is

not admissible under FED. R. EVID. 702.

## THE OPINIONS OF MS. COATES

Rosemary Coates has been designated as a proposed expert witness on behalf of

Plaintiffs.  According to the Plaintiffs' witness list, Ms. Coates is to testify about "importing and

distribution."  Her opinions can be divided into three categories.

In her original report in this proceeding, Ms. Coates describes herself as a licensed

customs broker who has over 25 years of experience in "global supply chain management, which

includes sourcing and manufacturing in China, global freight forwarding, import/export, logistics

and warehousing as well as other business operations and manufacturing."   There is no

indication, however, that Ms. Coates has any direct experience with drywall or construction materials in general or with the duties of a seller under Louisiana law.

The opinion set forth in Ms. Coates' original report all relate to her conclusion that INEX did not act as a reasonable importer of goods:

1.  INEX "did not adhere to the standard of care for the building materials industry and for importers of Chinese goods."

2.  "INEX failed to act as a reasonably prudent buyer and importer and as a result, defective Chinese drywall was allowed to enter the US market, and to be distributed for installation in private homes."

3.  INEX "had the opportunity to check the quality of the Chinese drywall" but "failed to do so."

4.  INEX "should have engaged SGS, or other quality assurance and lab testing companies, to test the product quality before the drywall left China."

5.  INEX "did not engage an outside firm to do any quality testing."

6.  INEX "did not check references of the Knauf or Taishan manufacturing sites, they did not visit the Knauf or Taishan Chinese operations, they did not request to review drywall samples nor did they ask for proof of lab testing of any materials."

7.  INEX "did not engage inspection services, consultants or sourcing services to validate the production process nor validate the quality and content of raw materials."

8.  INEX "took no steps to have the products either inspected during the manufacturing process or tested for quality after delivery to the US."

Ms. Coates' multiple statements really boil down to one opinion: she believes that INEX should have tested both the raw materials used in drywall INEX sold as well as testing the final

product, preferably by some third party, before selling the drywall in the United States.  Perhaps Ms. Coates thinks that if she says something eight different ways, it will sound more important. All of her opinions, however, are shades of the same core opinion: INEX, as the importer of the drywall, had a duty to inspect the imported drywall it sold.

Ms. Coates issued a "rebuttal report" dated October 17, 2012, in which she again expressed her opinion that INEX should have tested Chinese-manufactured drywall before selling it.  This time, she goes on to opine that INEX should have gone to China to inspect the manufacturing facilities or at least hired a consultant to inspect the plants on INEX's behalf.  She also asserts that there was information in the "public domain" in 2005 and 2006, although none of that information dealt with Chinese-manufactured drywall and there is no evidence that INEX or its representatives or employees ever saw any of that information.  Instead, the information to which she refers relates to recalls of Chinese-manufactured goods such as toys, tools, candles, computer batteries, and plywood.

The rebuttal report also includes a section entitled "Production and Characteristics of Chinese Drywall."  Ms. Coates expresses no opinions of her own in this section.  Instead, she parrots parts of two reports prepared by Lydia Luckevich which discuss physical characteristics of Chinese-manufactured drywall and conditions at drywall manufacturing plants in China.  The rebuttal report does not explain why Ms. Coates found the opinions of Ms. Luckevich reliable.

Finally, at her deposition on October 30, 2012, Ms. Coates announced a new and previously-undisclosed opinion: that it was "common sense" that the weight and brittleness of Chinese-manufactured drywall was directly connected to the presence of elevated levels of elemental sulfur in Chinese-manufactured drywall.  Despite freely admitting that she was not a chemist and was not qualified to make chemical analyses of products, Ms. Coates adhered to her

newfound belief that the weight and working characteristics of Chinese-manufactured drywall were red flags that should have alerted INEX to the risk that Chinese-manufactured drywall could release gases containing sulfur compounds.

### MS. COATES' EXPERT OPINIONS ARE NOT RELIABLE OR ADMISSIBLE

As will be explained below, Ms. Coates' opinions are not reliable and are not admissible under FED. R. EVID. 702 and 703 for several reasons:

1.  All of her opinions relating to testing or inspecting Chinese-manufactured drywall are based upon what she believes is the applicable standard of care for an importer of foreign-manufactured goods.  In this trial, however, INEX has been sued only as a seller in redhibition, not as an importer and not under any other theory of liability.  Opinions about what an importer should or should not have done are irrelevant to the redhibition claims that the jury will be asked to resolve.  Therefore, Ms. Coates' experience in the area of importing does not qualify her to testify in this case and her opinions about the duties of an importer are not relevant to any issue in this case.

2.  Louisiana law is absolutely clear and consistent that a seller has no duty to inspect or test a product for latent or hidden defects.  Ms. Coates' opinions are contrary to the controlling law that applies to the redhibition claims against INEX and her opinions will mislead the jury rather than assist the jury.

3.  Ms. Coates' testing and inspecting opinions exist only in the abstract, are not tied to the particular facts of this case, and are meaningless in the absence of some competent evidence that the testing she thinks should have been done would have disclosed the defect at issue in this suit.  The presence of sulfur in drywall that could offgas was an unknown phenomenon in 2006, the time during which INEX sold Chinese-manufactured drywall.  Ms. Coates does not opine

that a reasonable importer of drywall in 2006 would have tested for the presence of sulfur in drywall that could offgas under certain climate conditions nor does she opine that the kind of tests she says should have been done would have disclosed the defect upon which the claims against INEX are based.

4.   Ms. Coates cannot rely upon the hearsay statements of Ms. Luckevich because Ms. Coates has not (and cannot) independently verify the reliability of those statements; the statements are therefore not admissible under FED. R. EVID. 703.

5.   Ms. Coates' opinion about a relationship between weight, brittleness and sulfur content of drywall are not based upon any reliable foundation.  In addition, if the issue is a matter of "common sense," it is not a proper subject of expert testimony.

Ms. Coates should not be allowed to testify at the November trial because she is not qualified and has no opinions about what is at issue in this case; what she wants to talk about is not at issue in this case.  Further, she is not qualified to serve as a mouthpiece to mindlessly recite opinions of persons who will not be allowed to testify at trial.

## THE COURT MUST ACT AS GATEKEEPER TO AVOID UNFOUNDED, MISLEADING, OR INCOMPETENT EXPERT OPINIONS

It has become increasingly clear over the last twenty years that a federal court has a firm obligation to determine the reliability and relevance of proposed expert testimony before allowing the opinion testimony of an expert witness to be placed before a jury.  In the present case, that requires the Court to consider whether Ms. Coates' opinions satisfy the requirement of Federal Rules of Evidence 702 and 703.

*Rule 702*

The admissibility of expert testimony is generally governed by FED. R. EVID. 702:[1]

If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The role of a trial court in applying Rule 702 to the circumstances of a particular case was clarified by the seminal decision of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993), which stressed that the Rules of Evidence, and especially Rule 702, "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Before admitting expert testimony, a trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue."  *Id*. at 592-93.

In *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the United States Supreme Court made it clear that *Daubert's* gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge."  *Id.* at 141.  The objective of the gatekeeping requirement placed upon a trial court is to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Id.* at 152.

---

[1] Rule 702 governs expert testimony even when the cause of action at issue is based on state law.  *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012).

This Court has had many opportunities to consider the admissibility of expert testimony. The Court has set forth the general principles it follows in performing its Rule 702 gatekeeping duty in these terms:

Rule [702] reflects the Supreme Court's decisions of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert* charges trial courts to act as "gate-keepers" to ensure that the proffered expert testimony is both relevant and reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. The relevant and reliable standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. at 147, 119 S.Ct. 1167.

*Daubert* provides a two-prong test for determining the admissibility of expert testimony. The court "must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. 2786. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. Id. at 595, 113 S.Ct. 2786. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. 2786. The second prong, i.e., whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Id.* at 591, 113 S.Ct. 2786. Indeed, this examination is described in *Daubert* as whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id*. (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir.1985)). Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

When expert testimony is challenged under *Daubert,* the burden of proof rests with the party seeking to present the testimony. *Moore v. Ashland Chem., Inc*., 151 F.3d 269 (5th Cir.1998). To meet this burden, a party cannot simply rely on its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Id.* Nonetheless, the Court's role as a gatekeeper does not replace the traditional adversary system and the place of the jury within that

system. *Daubert,* 509 U.S. at 596, 113 S.Ct. 2786. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas,* 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

*Matthews v. Allstate Ins. Co.*, 731 F.Supp.2d 552, 556 (E.D.La.2010).

### *Rule 703*

An expert witness can rely upon inadmissible evidence in the limited circumstances allowed by FED. R. EVID. 703 (emphasis added):

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted*. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The reliance provision of Rule 703 is very narrow and does not allow "the wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on." *Lightfoot v. Hartford Fire. Ins. Co.*, No. 07-4833, 2011 WL 39010, *4 (E.D. La. Jan. 4, 2011), (quoting *Threet v. Corr. Health Care Mgmt.*, No. 07-0943-HE, 2009 WL 3335596, *5 (W.D. Okla. Oct. 15, 2009)).  This rule is necessary to make sure that an "expert isn't being used as a vehicle for circumventing the rules of evidence." *Matter of James Wilson Assoc.*, 965 F.2d 160, 173 (7th Cir. 1992).

For example, in *In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999), an expert witness was prepared to testify about the levels of radiation to which residents of the Three Mile Island nuclear facility had been exposed.  Those opinions were based exclusively upon work done by other experts that the testifying expert assumed were correct and the testifying expert "never

made any attempt to assess the validity of any of the assumptions the other experts used to formulate their opinions." *Id.* at 715. The Third Circuit affirmed the exclusion on the expert's testimony because "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *Id.*

The Tenth Circuit used the same rationale for rejecting expert testimony in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), in which an expert witness on damages wanted to testify to opinions based upon sales projections prepared by an employee of the party offering the expert. The court affirmed the trial court's exclusion of the architect's testimony:

> Hearsay is normally not permitted into evidence because the absence of an opportunity to cross-examine the source of the hearsay information renders it unreliable. Rule 703 permits experts to rely on hearsay, though, because the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Rule 703, Advisory Committee Notes. That rationale is certainly not satisfied in this case, where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction.[...] Dr. Boswell's lack of familiarity with the methods and the reasons underlying Werber's projections virtually precluded any assessment of the validity of the projections through cross-examination of Dr. Boswell. *Cf. In re: James Wilson Associates*, 965 F.2d 160, 173 (7th Cir.1992) (The judge must make sure that the expert isn't being used as a vehicle for circumventing the rule against hearsay.) Moreover, while Boswell testified that he considered the Werber study reliable and adequate, there was no evidence that other experts in his field would rely on such a study and would adopt it for purposes of forming an opinion of the amount of lost profits of an unestablished business. *Cf. Wilson v. Merrell Dow Pharmaceuticals, Inc.*, 893 F.2d 1149, 1153 (10th Cir.1990) (Information must be of a type reasonably relied upon by others in the witness' field of expertise.); 3 J. Weinstein & M. Burger, Weinstein's Evidence ¶ 703[03] at 703–25 (1988) (The rule implicitly requires that the information be viewed as reliable by some independent, objective standard beyond the opinion of the individual witness.). The record simply does not support appellants' contention that the use of the Werber projections was proper under Rule 703.

*Id.* at 732-33.

This Court has similarly recognized that Rule 703 cannot be used to allow an expert witness to simply parrot the opinions of a witness who has not been allowed into the courtroom. In *JRL Enterprises, Inc. v. Procorp Associates, Inc.*, No. Civ.A. 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003), the Court granted a motion to exclude the testimony of a certified public accountant who wanted to testify on damages on behalf of the plaintiff.  The expert wanted to use a compilation of the plaintiff's sales forecasts prepared by the plaintiff's vice-president in charge of sales, but he made no independent verification of the numbers and simply relied on what he was told.  *Id.* at *4-5.  The plaintiff asserted that the testifying expert could rely on the information under Rule 703, but this Court easily rejected that position.  The Court recognized that other courts "have similarly excluded expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions," *id.* at *8, and specifically referred to the decision in the *TK-7 Corp.* case, in which the court had noted that "the fact that [the expert] relied upon the report did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report."  *Id.* at *7, n.3, (quoting *TK-7 Corp.*, 993 F.2d at 732).  The Court concluded:

> When these principles are applied to the Asher report, this Court finds that JRL has not met its burden of relevance and reliability under Rule 702. Asher has merely accepted as true the facts given him by JRL. JRL's assertion that it is not offering Asher as an expert in causation or statistics but as an expert on the calculation of damages is not enough. Asher performed no independent analysis of the numbers given him by JRL; in fact, his report is devoid of any analysis of figures other than those provided by JRL. He has failed to show that reasonable accountants would simply and blindly accept such numbers in formulating opinions. His theory cannot be tested, and the rate of error is not known. Basically, the plaintiff is presenting its own estimation of damages in the guise of an expert opinion.

*JRL*, 2003 WL 21284020, at *8.

Another decision of this Court excluding expert testimony that was simply an attempt to circumvent the rules against hearsay is *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, 2010 WL 8367142 (E.D. La. Feb. 17, 2010), in which the Court granted a motion by the PSC to exclude expert testimony that Knauf sought to submit in the *Germano* case.   After the deadline for designation of expert witnesses had passed, Knauf identified Tracey Dodd and Robert Sproles as expert witnesses, and produced written reports from those two individuals.  *Id.* at *1.  The PSC claimed that the expert affidavits were "an attempt, at the last minute, to introduce new experts, new protocols, and new methodologies to fill holes in the key opinions of Knauf's trial experts."  *Id.*  The Court granted the PSC's Motion:

> Although Knauf timely filed its expert witness list, it did not include Sproles or Dodd. Additionally, Knauf did not provide a timely expert report for Sproles or Dodd. Knauf filed the Affidavit of Dodd, a consultant with knowledge of the XRF gun, a week after Dr. Perricone was cross-examined in deposition on the use of the XRF gun. The Court finds that Dr. Perricone should not be allowed, after rendering his complete opinion on the XRF gun to now bootstrap the Dodd affidavit into his opinion. Similarly, the Declaration of Robert Sproles involving the corrosion grading scale was introduced after the testimony of Dr. Perricone which discussed the use of the scale.

*Id.* at *2.

It is more than mildly ironic that the PSC, who two years ago convinced this Court that the opinions of experts who will not testify cannot be bootstrapped into the opinions of a testifying expert, now wants the Court to rewrite the rules of evidence to allow them to do just that.  The Court should not do so.

11

## MS. COATES OPINIONS ABOUT TESTING AND INSPECTION OF CHINESE-MANUFACTURED DRYWALL ARE NOT ADMISSIBLE UNDER RULE 702

Ms. Coates' opinions that INEX should have tested drywall manufactured in China before INEX sold the drywall, or that INEX should have inspected the product or toured the manufacturing plants, are not admissible under Rule 702 for three reasons:

(1) All of the opinions relate to her opinions of what an importer should or should not do, which is not at issue in this case, and do not relate to the duties of a seller under Louisiana law, which is the only issue to be submitted to the jury in the November trial;

(2) Her opinions on testing and inspection conflict with the controlling Louisiana substantive law which does not place upon a seller an obligation to test or inspect a product for a hidden or latent defect, and

(3)  Because her opinions are given in the abstract and are not tied to the facts of this case or the issue of causation, the opinions will not assist the jury.

### A.  *Ms. Coates Has No Experience With or Opinions About a Louisiana Seller*

The only issue that will be submitted to the jury in this case is whether INEX was a good faith seller of CDW under the applicable redhibition statutes.  Ms. Coates, however, offers no opinions about the conduct of a seller.  Instead, all of her opinions deal with what an importer of goods should or should not do.  While Ms. Coates is not shy about touting her experience as an importer, her background and report give no indication of any experience as a seller of goods in Louisiana.  Ms. Coates has nothing to offer the jury on the sale of goods in Louisiana.

Rule 702 allows expert testimony only if it "will assist the trier of fact to understand the evidence or to determine a fact in issue."  The duties applicable to an importer are not at issue in this case, nor will the jury be asked to evaluate the conduct of INEX as an importer.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful."

*Daubert,* 509 U.S. at 591, (quoting 3 JACK B. WEINSTEIN & MARGARET A. BERGER, WEINSTEIN'S EVIDENCE ¶ 702[02], p. 702–18 (Joseph M. McLaughlin ed., 1ˢᵗ ed., rev. vol. 1996)).  Ms. Coates' opinions about importers does not relate to the issues in this case, which involve the conduct of INEX as a seller.  Because Ms. Coates' opinions are not related to any matter that will be at issue in the trial, her testimony is not admissible under Rule 702.

### B.  Ms. Coates' Opinions Are in Conflict With Louisiana Law

One of the basic premises in redhibition law involving claims against a seller is that "[a] seller is not presumed to know of non-obvious defects in a product and it is not required to inspect its products prior to sale to detect such defects."  *Loper v. Nat. Union Fire Ins. Co.*, No. Civ.A. 99-1350, 2001 WL 210367, *4 (E.D. La. Mar 02, 2001).  This principle has remained steadfast in redhibition jurisprudence.[2]

All of Ms. Coates' opinions are premised on her belief that INEX had a duty to inspect CDW before selling it.  The existence of a legal duty is a question of law.  *Hardy v. Bowie*, 744 So.2d 606, 614 (La. 1999); *Cavet v. La. Extended Care Hosp.*, 92 So.3d 1122, 1128 (La. Ct. App. 2012).  Rule 702 does not allow the introduction of expert testimony based on an undisclosed legal standard because of the risk that the testimony will be based on an erroneous

---

[2] *See, e.g.*, *La. Farm Bureau Mut. Ins. Co. v. Lowes Home Ctrs. Inc.*, 149 F.3d 1174 (5th Cir. 1998) (a non-manufacturing seller "is not required to inspect the product for redhibitory defects or vices prior to sale"); *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1414 (5th Cir.1993) ("A seller is not required, however, to inspect a product prior to sale to determine the possibility of inherent vices or defects which are not apparent."), *cert. denied sub nom. Kelley v. Indus. Refrigerated Sys., Inc.*, 510 U.S. 1043 (1994); *State Farm v. Norcold Inc.*, No. 07-1024, 2008 WL 4853030, *2 (W.D. La. Oct. 17, 2008) ("a seller is not required to inspect a product to determine the possibility of non-apparent defects"); *Ratliff v. Porter Cable Co. of N.Y.*, 210 F. Supp. 957 (E.D. La. 1962) ("The only question to consider is whether it was incumbent upon the vendor to inspect the saw prior to sale to determine the possibility of an inherent vice or defect. The law is clear that no such duty lies."); *Haley v. Wellington Specialty Ins. Co.*, 4 So.3d 307, 314 (La. Ct. App. 2009) ("the retailer of the sign . . . had no duty to disassemble the sign to search for hidden defects"); *Adams v. Owens-Corning Fiberglas Corp.*, 923 So.2d 118, 123 (La. Ct. App. 2005) ("a non-manufacturer seller is not required to inspect the product prior to sale to determine the possibility of inherent vices or defects"); *Jackson v. Sears Authorized Retail Dealer Store*, 821 So.2d 590, 593 (La. Ct. App. 2002) (a non-manufacturing seller is not required "to inspect the product prior to sale to determine the possibility of inherent vices or defects") *Ferruzzi, U.S.A., Inc. v. R.J. Tricon Co.*, 645 So.2d 685, 688 (La. Ct. App. 1994) ("a non manufacturer seller is not required under Louisiana law to inspect a product before selling it to determine the possibility of inherent vices or defects").

legal standard.  *See, e.g.*, *United States v. Scop*, 846 F.2d 135, 140 (2d Cir. 1988); *Torres v. Cnty. of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985).  *See also* Advisory Committee Note to FED. R. EVID. 704 (stating that Rules 403, 701, and 702 "stand ready to exclude opinions phrased in terms of inadequately explored legal criteria")  If expert opinions based on unexplained legal standards are inadmissible, then obviously an expert opinion based on an incorrect legal standard is admissible.  *Martinez v. Porta*, 601 F. Supp. 2d 865, 866 (N.D. Tex. 2009).

Because all of Ms. Coates' opinions are based on a duty that does not exist under Louisiana law, her opinions are not admissible under Rule 702.

### C.  Ms. Coates' Opinions Are Abstract and Not Tied to the Facts of the Case

Finally, Ms. Coates' opinions will not assist the jury in the case because they are abstract and not tied to the facts of the case.  While Ms. Coates expresses with great enthusiasm what she thinks INEX should have done, neither she nor any other expert witness designated by Plaintiffs can or will say that if INEX had done the type of testing that Ms. Coates would impose (even though Louisiana law affirmatively rejects such a requirement), that testing would have disclosed the presence of sulfur that could offgas in CDW.  The type of problems associated with CDW imported after Hurricane Katrina was an unknown phenomenon at the time CDW was being sold throughout the United States.  Nobody would have thought to look for sulfur, nor would the testing methods available at that time included examination for sulfur.  And even if sulfur would have been detected in the CDW, that would have been no indication that the sulfur could potentially offgas after the board was installed in homes in a hot and humid environment.  There is simply no basis, scientific or otherwise, to expect anybody selling drywall to have tested CDW (or any other drywall) for the potential of offgassing sulfur in 2005 or 2006.

Without competent proof that the type of testing that Ms. Coates suggests would have disclosed the potential problem with CDW, her claim that testing should have been done is really meaningless. Because neither she nor any other person can competently testify that a person selling CDW in 2005 or 2006 should have done the type of testing that would have disclosed not just the presence of sulfur in CDW but the potential that the sulfur would offgas once it had been placed in a home, her opinions are abstract and are not tied to any theory of causation. If available testing would not have disclosed the problem that forms the basis of the claims against INEX, then all the testing that might have been done would have not changed anything.

## MS. COATES' MINDLESS REPETITION OF THE LUCKEVICH OPINIONS IS NOT ADMISSIBLE UNDER RULE 703

Ms. Coates is not a chemist or a scientist, and her original report had no opinions concerning what might have happened if someone from INEX had toured the mine in China from which the gypsum contained in some of the Chinese-manufactured drywall sold by INEX was mined or toured the manufacturing facilities where the gypsum was processed into drywall. But then weeks later her rebuttal report appeared and, *mirabile dictu*, Ms. Coates has opinions about the manufacturing and raw materials testing of Chinese drywall manufacturers and about what would have happened if someone had toured the Taishan manufacturing plant in 2006.

Her new opinions, which stray far outside her experience, her knowledge, and her designation, are not, however, such a wonder to behold. Ms. Coates admits in her rebuttal report that these opinions were based upon reports prepared by Lydia Luckevich, an individual who the Court has ruled cannot be offered as a rebuttal report by Plaintiffs. There is nothing in Ms. Coates' rebuttal report that discusses how Ms. Coates determined that Ms. Luckevich's reports were reliable and based on sound methodology. At her deposition, Ms. Coates affirmatively

testified that she had done nothing to independently verify Ms. Luckevich's opinions and that, in fact, Ms. Coates was not qualified to do so. Instead, Ms. Coates simply took Ms. Luckevich's work and placed it, without moderation and without any independent thought, into Ms. Coates' own rebuttal report.

This is precisely the type of the "wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on" that has been repeatedly rejected by the courts. *See, e.g., Lightfoot v. Hartford*, 2011 WL 39010, at *4. Ms. Coates' "failure to assess the validity of the opinions of the experts [s]he relied upon together with h[er] unblinking reliance on those experts' opinions, demonstrates that the methodology [s]he used to formulate h[er] opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *TMI Litig.*, 193 F.3d 613 at 715.

In *JRL Enterprises*, this Court recognized that courts "have . . . excluded expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions." 2003 WL 21284020, at *7. The Court specifically referred to the decision in the *TK-7 Corp.* case, where the court had noted that "the fact that [the expert] relied upon the report did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report. *Id.* at *7, n.3, (quoting *TK-7 Corp.*, 993 F.2d at 732). Ms. Coates' attempt to mechanically parrot the words of an absent expert, relating to a field which is entirely outside her background and experience, is just as egregious an attempt to violate the hearsay rule as the attempt that was refused by this Court in *JRL Enterprises*. Ms. Coates has not and cannot independently review the opinions of Lydia Luckevich; Ms. Coates admitted at her deposition that she was not qualified to conduct an independent verification of the conclusions reached by Ms. Luckevich.

Ms. Coates' attempt to blindly adopt the conclusions of an absent witness is not allowed under FED. R. EVID. 703.   Her reliance on Ms. Luckevich is a poorly-disguised attempt to circumvent the hearsay rules through the charade of "reliance" by Ms. Coates.   Because Ms. Coates has no basis or methodology which makes her reliance on the opinions of Ms. Luckevich reasonable, her attempt to speak for the absent Ms. Luckevich are not allowed under Rule 703.

### MS. COATES' "COMMON SENSE" OPINIONS ABOUT A RELATIONSHIP BETWEEN WEIGHT, BRITTLENESS, AND SULFUR CONTENT OF DRYWALL ARE NOT PROPER OR ADMISSIBLE

Even though she has no experience with drywall, is not a chemist, and had no opinion in her two reports about the relationship between weight, brittleness, and sulfur content in drywall, Ms. Coates announced at her deposition that issues about the relative weight and brittleness between some domestic drywall and some foreign drywall could not be separated from the presence of elevated levels of sulfur in Chinese-manufactured drywall.  Ms. Coates did no testing of the drywall, nor did she even seek to rely on the conclusions or opinions of a qualified expert. Instead, when questioned about the methodology and facts upon which her conclusion was based, she simply replied that it was a matter of "common sense."

North River does not agree that it is common sense that because one brand of drywall is heavier or harder to work with than another brand of drywall, there must be a dangerous chemical substance lying in ambush in the drywall.   It may well be that differences in the manufacturing process, in the method of storage, the method of transportation, or exposure to water or other items can account for differences in weight or in the ease of use of a product. There has been substantial testimony in discovery that foreign-manufactured drywall brought into the United States in approximately 1999 was reported to be heavier and more brittle than domestic drywall available at that time, as well as testimony that some domestically-

manufactured drywall is considered heavier or more brittle than other brands of domestic drywall.  In none of those instances, however, did the heavier or more brittle drywall have any type of offgassing or other chemical reaction.  The historical facts themselves contradict Ms. Coates' view of "common sense."

If the previously-known relationship between the weight, brittleness, and sulfur content of sulfur – which has only been brought to light by Ms. Coates, who has not previously been involved in the large numbers of studies of Chinese-manufactured drywall that have occurred since 2009 – is a matter of common sense, then it is not a matter of expert testimony.  Expert testimony is only proper when "scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."  FED. R. EVID. 702. There is no reason to suspect that the jury in this case will be deprived of the ability to exercise common sense, and Ms. Coates can offer no scientific, technical, or other specialized knowledge on common sense that will assist the jury.[3]

To be considered expert testimony, the testimony must involve more than common sense. *United States v. Ebron*, 683 F.3d 105, 138 (5th Cir. 2012), (quoting *United States v. Jackson*, 549 F.3d 963, 975 (5th Cir. 2008)).  *See also Wong v. Belmontes*, 558 U.S. 15, 130 S.Ct. 383 (U.S. 2009) (a jury simply does not need expert testimony on a matter on which the jurors can use their own common sense).  If Ms. Coates is correct that a link between the weight or brittleness of drywall and the presence of sulfur in the drywall is a matter of common sense, then it is not a proper subject of expert testimony.  If she is not correct, then she is not qualified to render an expert opinion on the topic.  In either event, she cannot offer her opinion on the "Coates

---

[3] The deposition of Ms. Coates made it clear that she is not qualified to offer scientific opinions about the potential relationship of different physical characteristics of drywall.

Chemical Quandary," known only to her, if she is allowed to present evidence as an expert witness.

## CONCLUSION

For the reasons discussed above, Defendant The North River Insurance Company ("North River") asks the Court to either exclude or limit the testimony of Rosemary Coates that will be offered on behalf of Plaintiffs at the trial of this case scheduled to begin on November 26, 2012

Respectfully submitted,

THOMPSON COE COUSINS & IRONS LLP

By: _____/s Eric B. Berger_____

BRIAN S. MARTIN, ESQ.
KEVIN RISLEY, ESQ.
RODRIGO "DIEGO" GARCIA, JR., ESQ.
One Riverway, Suite 1600
Houston, Texas 77056
Phone: (713) 403-8206
Fax:  (713) 403-8299
bmartin@thompsoncoe.com


LOBMAN CARNAHAN BATT ANGELLE & NADER, PLC

SIDNEY J. ANGELLE, ESQ.
La. Bar No. 1002
ERIC B. BERGER, ESQ.
La. Bar No. 26196
400 Poydras Street, Suite 2300
New Orleans, Louisiana 70130
Phone: (504) 586-9292
Fax:   (504) 586-1290
sja@lcba-law.com
ebb@lcba-law.com

ATTORNEYS FOR THE NORTH RIVER INSURANCE COMPANY

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Hermann, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on November 9, 2012.


_____/s Eric B. Berger_____
ERIC B. BERGER