**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 09-2047**<br><br>**SECTION L**<br><br>**JUDGE FALLON** |
| **THIS DOCUMENT RELATES TO ALL CASES** | **MAG. JUDGE WILKINSON** |

**MEMORANDUM IN SUPPORT OF
MOTION OF THE NORTH RIVER INSURANCE COMPANY
TO LIMIT THE TESTIMONY
OF DR. LORI STREIT**

MAY IT PLEASE THE COURT:

Defendant The North River Insurance Company ("North River") asks the Court to limit

the testimony of Dr. Lori Streit that will be offered on behalf of Plaintiffs at the trial of this case

scheduled to begin on November 26, 2012.  The rebuttal opinions of Dr. Streit are not admissible

under FED. R. EVID. 702 and 703.

### THE OPINIONS OF DR. STREIT

Dr. Lori Streit has been designated as a proposed expert witness on behalf of Plaintiffs.

According to the Plaintiffs' witness list, Dr. Streit is to testify about the potential effects of the

release of sulfur compounds from Chinese-manufactured drywall into the air after the drywall

has been installed in a residence.  Dr. Streit's original expert report and a supplemental report she

prepared adhered to that limitation.  North River believes that the trial stipulations that the parties

have reached make most of Dr. Streit's opinions unnecessary.  While North River is not seeking

to totally preclude Dr. Streit from testifying on that topic at trial, North River reserves the right

to object to Dr. Streit's testimony if it becomes unduly cumulative or otherwise is improper.

Dr. Streit prepared a Rebuttal Report dated October 17, 2012, which goes far beyond her designation or her initial reports.  Now Dr. Streit is prepared to place before the jury five rather amazing opinions:

1.  If INEX or its agents had visited the gypsum mine in China where the gypsum in Knauf drywall and Taishan drywall was mined, they "should have" noted that hydrogen sulfide levels in the mine were a "concern."

2.  If INEX or its agents had visited the "gypsum board manufacturing facility in China" (Dr. Streit does not identify which facility she means), they "should have been aware" of the sulfur odor that was emanating from the raw gypsum and the manufactured wallboard.

3.  If INEX or its agents had visited the "gypsum testing laboratory" (once again, Dr. Streit does not identify what facility she means), they "should have been aware" of the sulfur odor that was emanating from the raw gypsum and the manufactured wallboard.

4.  Had INEX contracted with SGS North America to perform production monitoring and laboratory testing of gypsum board, the sulfur smell associated with "Chinese manufactured gypsum should have been detected."

5.  No evidence has been presented to indicate that INEX or its agents reviewed certain ASTM test data taken on "Chinese manufactured gypsum board for compliance with the standards."

### DR. STREIT'S REBUTTAL OPINIONS ARE NOT RELIABLE OR ADMISSIBLE

Dr. Streit's rebuttal opinions are not reliable and are not admissible under FED. R. EVID. 702 and 703 for several reasons:

1.  The first four of her rebuttal opinions are irrelevant and misleading.  Louisiana law is absolutely clear and consistent that a seller has no duty to inspect or test a product for latent or

hidden defects.  Dr. Streit's opinions are based on her assumptions of what would have happened had INEX inspected either the raw material used in drywall, the manufacturing facility where the drywall was made, or the finished product.  Because INEX had no duty to test or inspect the product at any point during the manufacturing process, Dr. Streit's opinions about what might have happened if testing had been done are irrelevant and intended only to mislead the jury.

2.  None of the rebuttal opinions offered by Dr. Streit involve matters of expert opinion. The first four rebuttal opinions purport to magically divine what representatives of INEX would have seen or smelled if they had been at some undisclosed location at some unspecified time, and the fifth opinion is Dr. Streit's interpretation of the evidence in this case.  None of those is a proper subject of expert testimony.

3.  Dr. Streit does not have a reliable methodology for forecasting what a representative of INEX might have smelled or observed at some point in 2005 or 2006.

4.  Dr. Streit's opinions are based on a vague and unknown standard: that if INEX or its representatives had taken certain actions, they "should have" – not would have – observed certain physical phenomena.

5.  Dr. Streit improperly relies on the opinions of Lydia Luckevich, a person the Court has held cannot present expert testimony in this case.

Dr. Streit's opinions are not those of an analytical chemist, but those of a chemist-cum-travel agent.  She is not qualified to give those opinions, nor are her opinions based on a reliable methodology.

### THE COURT MUST ACT AS GATEKEEPER TO AVOID UNFOUNDED, MISLEADING, OR INCOMPETENT EXPERT OPINIONS

It has become increasingly clear over the last twenty years that a federal court has a firm obligation to determine the reliability and relevance of proposed expert testimony before

allowing the opinion testimony of an expert witness to be placed before a jury.  In the present case, that requires the Court to consider whether Dr. Streit's opinions satisfy the requirement of Federal Rules of Evidence 702 and 703.

### Rule 702

The admissibility of expert testimony is generally governed by FED. R. EVID. 702:[1]

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The role of a trial court in applying Rule 702 to the circumstances of a particular case was clarified by the seminal decision of *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993), which stressed that the Rules of Evidence, and especially Rule 702, "assign to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  Before admitting expert testimony, a trial court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id*. at 592-93.

In *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999), the United States Supreme Court made it clear that *Daubert's* gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Id*. at 141.  The objective of the gatekeeping requirement placed upon a trial court is to "make certain that an expert, whether basing testimony upon professional

---

[1] Rule 702 governs expert testimony even when the cause of action at issue is based on state law.  *Roman v. W. Mfg., Inc.*, 691 F.3d 686, 692 (5th Cir. 2012).

4

studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152.

This Court has had many opportunities to consider the admissibility of expert testimony. The Court has set forth the general principles it follows in performing its Rule 702 gatekeeping duty in these terms:

> Rule [702] reflects the Supreme Court's decisions of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). *Daubert* charges trial courts to act as "gate-keepers" to ensure that the proffered expert testimony is both relevant and reliable. *Daubert,* 509 U.S. at 589, 113 S.Ct. 2786. The relevant and reliable standard announced in *Daubert* for scientific expert testimony applies to all types of expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. at 147, 119 S.Ct. 1167.

> *Daubert* provides a two-prong test for determining the admissibility of expert testimony. The court "must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert*, 509 U.S. at 592, 113 S.Ct. 2786. Both prongs of the *Daubert* test must be satisfied before the proffered expert testimony may be admitted. *Id.* at 595, 113 S.Ct. 2786. This analysis "entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

> Thus, the first prong of *Daubert* focuses on whether the expert testimony is based on a reliable methodology. In determining an expert's reliability, the Court's focus "must be solely on principles and methodology, not on the conclusions that they generate." *Id*. at 595, 113 S.Ct. 2786. The second prong, i.e., whether the proposed testimony will assist the trier of fact to understand or determine a fact in issue, goes primarily to the issue of relevancy. *Id*. at 591, 113 S.Ct. 2786. Indeed, this examination is described in *Daubert* as whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute. *Id.* (citing *United States v. Downing*, 753 F.2d 1224, 1242 (3rd Cir.1985)). Federal Rule of Evidence 401 defines "relevant evidence" as that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

> When expert testimony is challenged under *Daubert*, the burden of proof rests with the party seeking to present the testimony. *Moore v. Ashland Chem., Inc*., 151 F.3d 269 (5th Cir.1998). To meet this burden, a party cannot simply rely on

its expert's assurances that he has utilized generally accepted scientific methodology. Rather, some objective, independent validation of the expert's methodology is required. *Id.* Nonetheless, the Court's role as a gatekeeper does not replace the traditional adversary system and the place of the jury within that system. *Dauber*t, 509 U.S. at 596, 113 S.Ct. 2786. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (citing *Rock v. Arkansas*, 483 U.S. 44, 61, 107 S.Ct. 2704, 97 L.Ed.2d 37 (1987)).

*Matthews v. Allstate Ins. Co.*, 731 F.Supp.2d 552, 556 (E.D.La.2010).

### Rule 703

An expert witness can rely upon inadmissible evidence in the limited circumstances allowed by FED. R. EVID. 703 (emphasis added):

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted*. Facts or data that are otherwise inadmissible shall not be disclosed to the jury by the proponent of the opinion or inference unless the court determines that their probative value in assisting the jury to evaluate the expert's opinion substantially outweighs their prejudicial effect.

The reliance provision of Rule 703 is very narrow and does not allow "the wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on." *Lightfoot v. Hartford Fire. Ins. Co.*, No. 07-4833, 2011 WL 39010, *4 (E.D. La. Jan. 4, 2011), (quoting *Threet v. Correctional Health Care Mgmt.*, No. 07-0943-HE, 2009 WL 3335596, *5 (W.D. Okla. Oct. 15, 2009)). This rule is necessary to make sure that an "expert isn't being used as a vehicle for circumventing the rules of evidence." *Matter of James Wilson Assoc.*, 965 F.2d 160, 173 (7th Cir. 1992).

For example, in *In re TMI Litigation*, 193 F.3d 613 (3d Cir. 1999), an expert witness was prepared to testify about the levels of radiation to which residents of the Three Mile Island

nuclear facility had been exposed.  Those opinions were based exclusively upon work done by other experts that the testifying expert assumed were correct and the testifying expert "never made any attempt to assess the validity of any of the assumptions the other experts used to formulate their opinions."  *Id.* at 715.  The Third Circuit affirmed the exclusion on the expert's testimony because "failure to assess the validity of the opinions of the experts he relied upon together with his unblinking reliance on those experts' opinions, demonstrates that the methodology he used to formulate his opinion was flawed under *Daubert* as it was not calculated to produce reliable results."  *Id.*

The Tenth Circuit used the same rationale for rejecting expert testimony in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722 (10th Cir. 1993), in which an expert witness on damages wanted to testify to opinions based upon sales projections prepared by an employee of the party offering the expert.  The court affirmed the trial court's exclusion of the architect's testimony:

> Hearsay is normally not permitted into evidence because the absence of an opportunity to cross-examine the source of the hearsay information renders it unreliable. Rule 703 permits experts to rely on hearsay, though, because the expert's "validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." Rule 703, Advisory Committee Notes. That rationale is certainly not satisfied in this case, where the expert failed to demonstrate any basis for concluding that another individual's opinion on a subjective financial prediction was reliable, other than the fact that it was the opinion of someone he believed to be an expert who had a financial interest in making an accurate prediction. [...]  Dr. Boswell's lack of familiarity with the methods and the reasons underlying Werber's projections virtually precluded any assessment of the validity of the projections through cross-examination of Dr. Boswell. *Cf. In re: James Wilson Associates,* 965 F.2d 160, 173 (7th Cir.1992) (The judge must make sure that the expert isn't being used as a vehicle for circumventing the rule against hearsay.) Moreover, while Boswell testified that he considered the Werber study reliable and adequate, there was no evidence that other experts in his field would rely on such a study and would adopt it for purposes of forming an opinion of the amount of lost profits of an unestablished business. *Cf. Wilson v. Merrell Dow Pharmaceuticals, Inc*., 893 F.2d 1149, 1153 (10th Cir.1990) (Information must be of a type reasonably relied upon by others in the witness' field of expertise.); 3 J. Weinstein & M. Burger, Weinstein's Evidence ¶ 703[03] at 703–25 (1988) (The rule implicitly requires that the

information be viewed as reliable by some independent, objective standard beyond the opinion of the individual witness.). The record simply does not support appellants' contention that the use of the Werber projections was proper under Rule 703.

*Id.* at 732-33.

This Court has similarly recognized that Rule 703 cannot be used to allow an expert witness to simply parrot the opinions of a witness who has not been allowed into the courtroom. In *JRL Enterprises, Inc. v. Procorp Associates, Inc.*, No. Civ.A. 01-2893, 2003 WL 21284020 (E.D. La. June 3, 2003), the Court granted a motion to exclude the testimony of a certified public accountant who wanted to testify on damages on behalf of the plaintiff. The expert wanted to use a compilation of the plaintiff's sales forecasts prepared by the plaintiff's vice-president in charge of sales, but he made no independent verification of the numbers and simply relied on what he was told. *Id.* at *4-5. The plaintiff asserted that the testifying expert could rely on the information under Rule 703, but this Court easily rejected that position. The Court recognized that other courts "have similarly excluded expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions," *id.* at *8, and specifically referred to the decision in the *TK-7 Corp.* case, where the court had noted that "the fact that [the expert] relied upon the report did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report." *Id.* at *7, n.3, (quoting *TK-7 Corp.*, 993 F.2d at 732). The Court concluded:

When these principles are applied to the Asher report, this Court finds that JRL has not met its burden of relevance and reliability under Rule 702. Asher has merely accepted as true the facts given him by JRL. JRL's assertion that it is not offering Asher as an expert in causation or statistics but as an expert on the calculation of damages is not enough. Asher performed no independent analysis of the numbers given him by JRL; in fact, his report is devoid of any analysis of figures other than those provided by JRL. He has failed to show that reasonable accountants would simply and blindly accept such numbers in formulating opinions. His theory cannot be tested, and the rate of error is not known.

> Basically, the plaintiff is presenting its own estimation of damages in the guise of an expert opinion.

*JRL*, 2003 WL 21284020, at *8.

Another decision of this Court excluding expert testimony that was simply an attempt to circumvent the rules against hearsay is *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, 2010 WL 8368142 (E.D. La. Feb. 17, 2010), in which the Court granted a motion by the PSC to exclude expert testimony that Knauf sought to submit in the *Germano* case. After the deadline for designation of expert witnesses had passed, Knauf identified Tracey Dodd and Robert Sproles as expert witnesses, and produced written reports from those two individuals. *Id.* at *1. The PSC claimed that the expert affidavits were "an attempt, at the last minute, to introduce new experts, new protocols, and new methodologies to fill holes in the key opinions of Knauf's trial experts." *Id.* The Court granted the PSC's Motion:

> Although Knauf timely filed its expert witness list, it did not include Sproles or Dodd. Additionally, Knauf did not provide a timely expert report for Sproles or Dodd. Knauf filed the Affidavit of Dodd, a consultant with knowledge of the XRF gun, a week after Dr. Perricone was cross-examined in deposition on the use of the XRF gun. The Court finds that Dr. Perricone should not be allowed, after rendering his complete opinion on the XRF gun to now bootstrap the Dodd affidavit into his opinion. Similarly, the Declaration of Robert Sproles involving the corrosion grading scale was introduced after the testimony of Dr. Perricone which discussed the use of the scale.

*Id.* at *2.

It is more than mildly ironic that the PSC, who two years ago convinced this Court that the opinions of experts who will not testify cannot be bootstrapped into the opinions of a testifying expert, now wants the Court to rewrite the rules of evidence to allow them to do just that. The Court should not do so.

**DR. STREIT'S REBUTTAL OPINIONS ABOUT WHAT "SHOULD HAVE BEEN" OBSERVED AT THE MINE OR THE MANUFACTURING PLANT ARE IRRELEVANT AND MISLEADING BECAUSE THEY ASSUME A DUTY TO TEST OR INSPECT A PRODUCT THAT DOES NOT EXIST IN LOUISIANA**

One of the basic premises in redhibition law involving claims against a seller is that a "seller is not presumed to know of non-obvious defects in a product and it is not required to inspect its products prior to sale to detect such defects."  *Loper v. Nat. Union Fire Ins. Co.*, No. Civ.A. 99-1350, 2001 WL 210367, *4 (E.D. La. Mar. 2, 2001).  This principle has remained steadfast in redhibition jurisprudence.[2]

The first four of Dr. Streit's rebuttal opinions are factual conclusions about what "should have" happened if INEX had been involved in the testing or inspection of the mining of drywall or the manufacture of drywall.  Those opinions all assume that INEX should have been inspecting or testing Chinese-manufactured drywall before selling it in Louisiana.  While the opinions are not expressly couched in terms of a duty to defend, the opinions only make sense if INEX had a duty to test or inspect and failed to do so.

It would be unfair and misleading for Dr. Streit to testify about what "should have" happened had INEX done something it did not do and had no obligation to do.  In the absence of

---

[2] *See, e.g.*, *La. Farm Bureau Mut. Ins. Co. v. Lowes Home Ctrs. Inc.*, 149 F.3d 1174 (5th Cir. 1998) (a non-manufacturing seller "is not required to inspect the product for redhibitory defects or vices prior to sale"); *Kelley v. Price–Macemon, Inc.*, 992 F.2d 1408, 1414 (5th Cir. 1993) ("A seller is not required, however, to inspect a product prior to sale to determine the possibility of inherent vices or defects which are not apparent."), *cert. denied sub nom. Kelley v. Indus. Refrigerated Sys., Inc.*, 510 U.S. 1043 (1994); *State Farm v. Norcold Inc.*, No. 07-1024, 2008 WL 4853030, *2 (W.D. La. Oct. 17, 2008) ("a seller is not required to inspect a product to determine the possibility of non-apparent defects"); *Ratliff v. Porter Cable Co. of N.Y.*, 210 F. Supp. 957 (E.D. La. 1962) ("The only question to consider is whether it was incumbent upon the vendor to inspect the saw prior to sale to determine the possibility of an inherent vice or defect. The law is clear that no such duty lies."); *Haley v. Wellington Specialty Ins. Co.*, 4 So.3d 307, 314 (La. Ct. App. 2009) ("the retailer of the sign . . . had no duty to disassemble the sign to search for hidden defects"); *Adams v. Owens-Corning Fiberglas Corp.*, 923 So.2d 118, 123 (La. Ct. App. 2005) ("a non-manufacturer seller is not required to inspect the product prior to sale to determine the possibility of inherent vices or defects"); *Jackson v. Sears Authorized Retail Dealer Store*, 821 So.2d 590, 593 (La. Ct. App. 2002) (a non-manufacturing seller is not required "to inspect the product prior to sale to determine the possibility of inherent vices or defects") *Ferruzzi, U.S.A., Inc. v. R.J. Tricon Co.*, 645 So.2d 685, 688 (La. Ct. App. 1994) ("a non manufacturer seller is not required under Louisiana law to inspect a product before selling it to determine the possibility of inherent vices or defects").

a legal duty for a seller to test or inspect a product before selling it – a duty absolutely and repeatedly rejected by the courts of Louisiana – opinions about what would have happened if testing or inspection had been done are not relevant and not admissible under FED. R. EVID. 702. In addition, even if some attenuated theory of relevance might otherwise allow the admission of these opinions, the opinions should be excluded under Fed. R. Evid. 403 because the danger of unfair prejudice, confusion of the issues, or misleading the jury substantially outweighs any probative value of the opinions.

## DR. STREIT'S SPECULATION ABOUT FACTUAL MATTERS IS NOT A PROPER SUBJECT OF EXPERT TESTIMONY

Dr. Streit's final rebuttal opinion is nothing but her interpretation that no evidence has been presented that INEX or its representatives reviewed certain material. That may or may not be true, but is nevertheless a factual matter and not a subject of expert testimony. It is for the jury to decide what the evidence shows, not an expert being paid by one of the parties.

The remaining four rebuttal opinions of Dr. Streit all consist of what "should have" happened if INEX or its representatives had been involved in various steps of the mining or manufacturing process that resulted in drywall. Of course, as discussed above, there was no reason INEX should have been doing that; Louisiana law certainly does not require that a seller being sued in redhibition have inspected or tested the product it sold. Beyond the legal irrelevance, however, what might have happened if INEX or a third party acting on behalf of INEX had gone to a mine or a manufacturing plant is a matter of fact, not of expert opinion. Dr. Streit has not chosen to opine on conditions at the mine or the manufacturing plant, nor does she offer any qualification or experience to do so. Instead, however, she wants to talk about what "should have" happened factually.

While what "should have" happened is a factual matter, it is not even the right factual inquiry for the jury's resolution.  The jury will be asked whether INEX knew that the Chinese-manufactured drywall it sold contained elevated levels of sulfur that could emit gases.  That determination will have to be based on what did or did not happen, not what "should have" happened or what might have happened.  Dr. Streit's flights of fancy about what should, might, or could happen factually are based on hypothetical situations that did not happen.  Rule 702 does not allow an expert witness to travel to a parallel universe, assume facts that never existed, and then opine about what "should happen" in that unknown and unrealized world.

## DR. STREIT HAS NOT PROVIDED A RELIABLE METHODOLOGY FOR HER REBUTTAL OPINIONS

The overarching purpose of Rule 702 is to ensure that before a witness is allowed to offer expert opinions to a jury, the court as gatekeeper properly determines that the witness is qualified, the witness's opinions are relevant, and the opinions are the result of a reliable methodology.  *Daubert*, 509 U.S. at 597.  Dr. Streit's testimony fails this basic test on several grounds.

First, Dr. Streit is an analytical chemist who professes to have some experience in the analysis of failures on heating, ventilation, and air conditioning systems.  She discloses no training or experience in environmental conditions in a mine or in a manufacturing plant in China.  She discloses no training or experience in the ability of a person to smell and identify particular substances.  She was retained by the PSC to provide expert opinions regarding (1) the chemical analysis of both Chinese manufactured drywall and surface deposits taken from homes, (2) the chemical composition of corrosion deposits, and (3) the dispersion of the sulfide gases at issue in this litigation.  Her opinions about what a mythical person in a plant she has never been

to "should have" smelled or observed is not even close to her experience or the purposes for which she was retained as an expert witness.

Second, Dr. Streit does not disclose the discipline upon which she bases her opinions. North River does not doubt that Dr. Streit is qualified to talk about the chemical properties of certain substances and how those substances react in certain situations.  Her rebuttal opinions go far beyond her recognized expertise, however, and appear to be based upon a rare talent of being able to predict what should happen when a person she has never met before goes to a place she has never been to before on an unknown day and encounters an environment she has never examined before.  Her opinions about what "should happen" when all of those unknown factors come together on the other side of the world are not based solely on her abilities as a person who can talk about the reactive products of drywall containing elevated levels of sulfur.  Dr. Streit does not possess training in areas such as industrial hygiene, biology, human factors, and other disciplines that would let her know to a "reasonable degree of scientific certainty" what "should happen" in a set of facts that never actually happened.

Dr. Streit similarly does not identify the factual assumptions she is making or account for the possibility that her assumptions are not realized.  What if INEX sent someone to the mine to investigate and was told by the Chinese authorities that he or she could not enter the mine?  (The Court may remember that the name and location of the mine is such a state secret in China that several fact witnesses refused to even speak its name.)  What if the person who was touring the plant had a cold or an allergic reaction that effectively deadened his or her sense of smell?  What if the plant the person toured was not actually the plant where the drywall was being made? (Rosemary Coates has suggested that the use of "shadow plants" is a serious concern in China.)

What type of ventilation system did the plant have and how would that affect Dr. Streit's assumptions?

The reliance materials identified by Dr. Streit in her rebuttal report contain several documents and reports that involve specific factual and environmental criteria. What has she done to determine that the conditions in those tests and reports are substantially similar to the conditions in the mine in China or in a manufacturing plant? Based on her report, the answer is that she did nothing.

Even assuming that Dr. Streit might be able to draw some conclusions from a specific set of criteria, she does not know the specific criteria in the mine where the gypsum was obtained or in any of the plants in which the drywall was manufactured. If the actual data from the mine or the plant are now known, then conclusions as to what "should have" happened if a person went to the mine or the plant have no reliable basis and are based on nothing more than speculation.

There are simply too many unknowns for the Court to determine that Dr. Streit has used verifiable data and applied a reliable methodology to the data upon which she relied. In the absence of that determination, Dr. Streit's rebuttal opinions fail to meet the requirements for expert testimony set by Rule 702.

Even if all of these deficiencies in Dr. Streit's methodology could be cured, the Court would still be left with an expert who wants to talk about what "should happen" instead of what did happen. North River has been unable to identify any issue on this case or in Louisiana law in general where liability is determined by what "should happen." That inquiry is not tied to any issue in this case, is not relevant, and will not assist the jury.

### DR. STREIT'S ATTEMPTS TO SERVE AS A SURROGATE
### FOR LYDIA LUCKEVICH DOES NOT MAKE HER
### REBUTTAL OPINIONS ADMISSIBLE UNDER RULE 703

Even though the reliance materials identified by Dr. Streit come from a variety of sources, it is not a secret that Plaintiffs want to use Dr. Streit to offer the opinions of Lydia Luckevich, whom the Court has held cannot testify at trial.  Dr. Streit bases her opinions not just on a Chinese Drywall Expert Analysis from Ms. Luckevich dated October 17, 2012, but also on "personal communication" with Ms. Luckevich.

This is precisely the type of "wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on" that has been repeatedly rejected by the courts.  *See, e.g., Lightfoot v. Hartford*, 2011 WL 39010, at *4.  Dr. Streit's "failure to assess the validity of the opinions of the experts [s]he relied upon together with h[er] unblinking reliance on those experts' opinions, demonstrates that the methodology [s]he used to formulate h[er] opinion was flawed under *Daubert* as it was not calculated to produce reliable results." *TMI Litigation*, 193 F.3d 613 at 715.

In *JRL Enterprises*, this Court recognized that courts "have . . . excluded expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions."  2003 WL 21284020, at *7.  The Court specifically referred to the decision in the *TK-7 Corp.* case, where the court had noted that "the fact that [the expert] relied upon the report did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report.  *Id.* at *7, n.3, (quoting *TK-7 Corp.*, 993 F.2d at 732).  Dr. Streit's attempt to mechanically parrot the words of an absent expert, on an issue about which she has done no independent validation of the opinions she is prepared to offer, is just as egregious an attempt to violate the hearsay rule as the testimony that was refused by this Court in *JRL Enterprises*.

It is clear from Dr. Streit's own rebuttal report that she made no effort to independently verify the reliability of Ms. Luckevich's opinions.  Both the rebuttal report and the report of Ms. Luckevich upon which Dr. Streit relies are dated October 17, 2012.  It is self-evident that Dr. Streit did nothing with the opinions of Ms. Luckevich except to unquestioningly insert them into her rebuttal report.  Dr. Streit has not even pretended to take time to review, understand, and verify the reliability of Ms. Luckevich's opinions.

Rule 702 does not authorize the use of a ventriloquist's dummy in which an in-court witness can mindlessly and uncritically mouth the words of a witness who is not allowed to testify.  Dr. Streit's desire to blindly adopt the conclusions of an absent witness is not allowed under FED. R. EVID. 703.  Her reliance on Ms. Luckevich is a poorly-disguised attempt to circumvent the hearsay rules through the charade of "reliance" by Dr. Streit.  Because Dr. Streit has no basis or methodology which makes her reliance on the opinions of Ms. Luckevich reasonable, her attempt to speak for the absent Ms. Luckevich is not allowed under Rule 703.

### CONCLUSION

For the reasons discussed above, Defendant The North River Insurance Company ("North River") asks the Court to limit the testimony of Dr. Lori Streit that will be offered on behalf of Plaintiffs at the trial of this case scheduled to begin on November 26, 2012.

Respectfully submitted,

THOMPSON COE COUSINS & IRONS LLP

By:  _____/s Eric B. Berger_____
       BRIAN S. MARTIN, ESQ.
       KEVIN RISLEY, ESQ.
       RODRIGO "DIEGO" GARCIA, JR., ESQ.
       One Riverway, Suite 1600
       Houston, Texas 77056
       Phone: (713) 403-8206
       Fax:  (713) 403-8299
       bmartin@thompsoncoe.com

          -AND-


       LOBMAN CARNAHAN BATT ANGELLE
       & NADER, PLC

       SIDNEY J. ANGELLE, ESQ.
       La. Bar No. 1002
       ERIC B. BERGER, ESQ.
       La. Bar No. 26196
       400 Poydras Street, Suite 2300
       New Orleans, Louisiana 70130
       Phone: (504) 586-9292
       Fax:   (504) 586-1290
       sja@lcba-law.com
       ebb@lcba-law.com

      ATTORNEYS FOR THE NORTH RIVER
      INSURANCE COMPANY

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Hermann, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on November 9, 2012.

_____ /s Eric B. Berger _____
ERIC B. BERGER