## Settlement Agreement For The
## Demonstration Remediation Of Homes With KPT Drywall

This Agreement ("Demonstration Remediation Agreement" or "Agreement") is entered into by and between the MDL Plaintiffs' Steering Committee (the "PSC") in *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (the "MDL"), including class counsel in *Harrell v. South Kendall Construction Corp, et al.*, No. 09-08401 (11th Judicial Circuit of Florida) ("Harrell Class Action"), and Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co. Ltd., Guandong Knauf New Building Material Product Co. Ltd., Knauf International GmbH, Knauf Insulation GmbH (referred to in MDL 2047 as Knauf Insulation USA), Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda., Gebr., Knauf Verwaltungsgesellschaft, PT.Knauf Gypsum Indonesia, and Knauf Gips KG (collectively the "Knauf Entities").

## RECITALS

WHEREAS, the parties have concluded that it is in their best interests to explore means of resolving lawsuits arising from alleged defects in drywall manufactured and exported to the United States by KPT (the "KPT Drywall Litigations");

WHEREAS, the parties agree that nothing in this Agreement constitutes a waiver of any claims or defenses, except as expressly stated below, and that nothing in this Agreement constitutes an admission of liability by the Knauf Entities;

WHEREAS, in an effort to resolve the KPT Drywall Litigations, the Knauf Entities have agreed to remediate up to 300 homes with KPT drywall, pursuant to the terms described below, the purpose of which is to serve as a model for a possible future global remediation program;

WHEREAS, suppliers and builders who installed or supplied KPT drywall to the homes and their insurers ("Other Participating Companies"), have already agreed, or may agree in the future, to contribute to the cost of remediation of these homes as described below;

NOW, THEREFORE, for the good and valuable consideration described below, the sufficiency of which is hereby acknowledged, the parties, each and all intending to be legally bound, hereby stipulate and agree as follows:

## TERMS AND CONDITIONS

I.    **Purpose of the Demonstration Remediation Agreement**

This Demonstration Remediation Agreement creates a program by which the Knauf Entities will remediate up to 300 homes ("the Remediation Homes") whose owners acquired title to their homes prior to the execution of this Agreement ("homeowners"), have claims against the Knauf Entities and the Other Participating Companies pending in the MDL (the "Demonstration Remediation Program" or "Program").

II.     **Eligible Homes**

A.      **Eligible Homes.**  Homes eligible for the Program ("Eligible Homes") must (1) contain all or substantially all KPT drywall board ("KPT board") in terms of the number of KPT boards compared to the total number of drywall boards in the home; (2) not contain other defective Chinese drywall board ("Chinese drywall") (*i.e.*, homes with a mix of defective Chinese drywall will not be eligible for the Program); (3) be located in 4 states: Florida, Louisiana, Alabama, or Mississippi; and (4) have been built, or had KPT drywall board supplied by, one or more of the Other Participating Companies.  For purposes of this Agreement, "substantially all" is defined to mean 95% or more KPT board; however, the Knauf Entities may at their sole discretion waive such requirement.

B.      **Identified Eligible Homes.**  For purposes of expeditiously commencing the Demonstration Remediation Program, the PSC and the Knauf Entities have identified Eligible Homes, listed on Exhibit A, other than the Harrell Remediation Homes (defined below) in Florida listed and identified therein, satisfying the conditions in Paragraph II (A), and have selected, from these homes, the homes listed on Exhibit B for which the remediation process will commence as soon as practicable after the execution of this Agreement.  The Harrell Remediation Homes listed on Exhibit A, which are the subject of the Harrell Class Action, are subject to approval by the Knauf Entities as Eligible Homes and to the conditions listed in Paragraph II (C).

C.      **Identification of Harrell Remediation Homes in Florida.**  Class Counsel in the Harrell Class Action ("Harrell Class Counsel") and the Knauf Entities have reached an agreement, subject to the satisfaction of certain conditions precedent and the execution of definitive documentation and approval by the 11th Judicial Circuit of Florida, as part of a class action settlement, to include in the Program homes of class members that satisfy the conditions in Paragraph II (A) ("the Harrell Remediation Homes").  For purposes of this Agreement, references to the Harrell Class Counsel's undertakings, rights and obligations concern only the Harrell Remediation Homes.

D.      **Identification of Other Eligible Homes.**  Within 30 business days of the execution of this Demonstration Remediation Agreement, the PSC will identify any other potentially Eligible Homes in the above four states, at its own expense, by using a reliable and effective method of inspection and provide the results of such inspection to the Knauf Entities.  Within 30 business days of the notice by the PSC of identification of potentially Eligible Homes, and receipt of the results of such inspections, the Knauf Entities, at their sole discretion and expense, will determine, based on the results of such drywall inspections, whether the other potentially Eligible Homes, in fact, contain all or substantially all KPT board and are therefore Eligible Homes, notify the PSC of its determination, and, as soon as practicable, commence the remediation process as to any Eligible Home meeting the requirements of Paragraph II (A).  In the event that the Knauf Entities determine that a potentially Eligible Home does not meet the requirements of

Paragraph II (A), the Knauf Entities will provide an explanation, and any supporting documentation, to the PSC, including as to the Harrell Remediation Homes, to Harrell Class Counsel.  The foregoing deadlines may be extended by mutual consent in writing of the parties, such consent not to be unreasonably withheld.

E.   **Homeowner Affirmations**.  As part of the above-described identification process, the PSC, including, Harrell Class Counsel, will submit in the case of potentially Eligible Homes, not listed on Exhibit A, to the Knauf Entities (i) an affirmation from the homeowner, in the form annexed as Exhibit C, that, to the best of the homeowner's information and belief, the potentially Eligible Home contains all or substantially all KPT board as described in Paragraph II (A), and (ii) all documents in the PSC or homeowner's possession (or the possession of the homeowner's counsel if other than the undersigned PSC attorneys) that in any way identify the manufacturer of the drywall in the potentially Eligible Home including, but not limited to, home building contracts, drywall supply agreements, and home repair or renovation contracts ("Supporting Materials").

F.   **Contributions by Other Participating Companies.**

1.   As regards Eligible Homes, as identified on Exhibit A, and the Harrell Remediation Homes, the Other Participating Companies will contribute funds pursuant to separate settlement agreements with the Knauf Entities and the anticipated class action settlement in the Harrell Class Action ("the Funds").

2.   As regards other potentially Eligible Homes in the four states above that may be included in the Program, the Knauf Entities reserve the right to select Eligible Homes for which a contribution to the costs of the Program can be obtained from Other Participating Companies.

3.   Funds contributed by Other Participating Companies shall be used solely by the Knauf Entities for remediation, and/or payment of Other Covered Expenses (defined below) of those Eligible Homes for which the contributing Other Participating Companies supplied or installed drywall, and/or satisfaction of the Knauf Entities' obligations under Paragraph X.

4.   In the event that Funds allocable to an Eligible Home are not used for the remediation of that Eligible Home, or in the event that the Program is terminated by either Party before such Eligible Home is remediated, then the Funds allocated to the unremediated Eligible Home shall be returned to the Other Participating Company and any release provided by the homeowner of such Eligible Home shall be null and void.

5.   Agreements with Other Participating Companies, including the allocation of Funds to Eligible Homes, will be disclosed by the Knauf Entities to lead and liaison counsel for the PSC and to the MDL Court under seal.  In

order to ensure confidentiality of those agreements, such agreements shall be marked "Confidential – Not for Public Distribution" prior to any such disclosure, not disclosed other than as stated above, and filed under seal in the MDL Court, absent mutual agreement of lead and liaison counsel for the PSC and the Knauf Entities ("the Confidentiality Procedures").

G.   **Scope of Demonstration Remediation Agreement.**  Nothing in this Demonstration Remediation Agreement obligates the PSC or the Knauf Entities to include in the Program (i) more than 300 homes; or (ii) any specific potentially Eligible Home that is found prior to remediation to fail to satisfy the requirements of Paragraph II (A).  Further, the PSC, including Harrell Class Counsel, and the Knauf Entities reserve the discretion to terminate this Program at any time (other than as to any Eligible Homes for which the remediation process has begun) for example and without limitation, if upon commencing remediation, the Knauf Entities learn that the homes undergoing remediation in the Program do not contain all or substantially all KPT board.  As to the Harrell Remediation Homes, subject to the satisfaction of certain conditions precedent and execution of definitive documentation, the Knauf Entities and the Harrell Class Counsel have agreed that the Knauf Entities will be reimbursed, subject to a maximum amount agreed upon between the Harrell Class Counsel and the Knauf Entities, from settlement proceeds in connection with, and resulting from, the claims asserted in the Harrell Class Action for the following remediation costs of the Harrell Remediation Homes: (i) full reimbursement for remediation arising from any non-KPT drywall board installed in the home that was manufactured by other Chinese companies and (ii) partial reimbursement for non-KPT drywall board, installed in the home, manufactured by domestic companies.  The amount of such partial reimbursement in (ii) will be derived by multiplying the total cost of remediation of the non-KPT domestic drywall board by the ratio of non-KPT drywall board manufactured by other Chinese companies to all Chinese-manufactured drywall board.  For purposes of calculating the foregoing reimbursement obligations (i) the above ratios will be based on the number of boards removed from the home in each category, that is, respectively, domestic, KPT and non-KPT Chinese drywall board and (ii) the Knauf Entities' remediation costs will be calculated on the basis of their actual costs of remediation, as set forth in the Statement described in Paragraph VI (C), plus the Other Covered Expenses, as set forth in Paragraph III (B), less contribution from Other Participating Companies, as provided for in Paragraph II (F).

H.   **Geographical Distribution of Eligible Homes.**  To the extent possible, the PSC and the Knauf Entities have or will select for remediation the Eligible Homes in Florida, Louisiana, Mississippi and Alabama based on an equitable distribution of Eligible Homes among these states.  Eligible Homes in each state will be selected to the maximum extent feasible, in order to realize economies of scale, in clusters.

I.   **Execution of This Demonstration Remediation Agreement by Counsel for an Eligible Home.**  Counsel for the owner of an Eligible Home, if other than the signatories on behalf of the PSC below, must, as a precondition to any

4

Remediation Work, as described below, agree in writing to the terms and conditions of this Demonstration Remediation Agreement.

**III.   Remediation Work and Other Covered Expenses**

**A.   Scope of Remediation Work.** The Remediation Homes, that is, those Eligible Homes selected for remediation, will be remediated pursuant to the Scope of Work set forth in Exhibit D (the "Remediation Work").

**B.   Other Covered Expenses.** The Knauf Entities will make the following payments to the owner of a Remediation Home as reimbursement of all alternative living expenses, personal property damage, maintenance of the house during the Remediation Work, including, but not limited to, payment of all utility bills, insurance, property taxes and maintenance of landscaping, and moving and storage expenses ("Other Covered Expenses"):

1.   A single payment ("Lump Sum Payment") of $8.50 per square foot of the Remediation Home "under air," as determined by the Assigned Contractor or Substitute Contractor identified in Paragraph IV and Exhibit E ("Under Air Area") and as set forth in the Work Authorization Agreement (defined in Paragraph IV (D) below), a copy of which, including all exhibits, will be furnished to the PSC for each of the homes on Exhibit B. The Lump Sum Payment will be paid to the homeowner as soon as practicable, but not more than five business days, after the homeowner and the Knauf Entities receive notice of the actual move-out date pursuant to the Work Authorization Agreement.

2.   In the event that the Remediation Work is not substantially complete at the end of the three-month period commencing with the move-out date that the contractor provides to the homeowner pursuant to the Work Authorization Agreement, on not less than 20 business days notice, or on such other date as the homeowner and the contractor agree, with the approval of the Knauf Entities, an additional $1.50 per square foot of the Under Air Area for each additional month that the homeowner is displaced from his home during the remediation period until 10 business days after the homeowner has received either by hand delivery or by overnight Federal Express both a Certificate of Occupancy and an Environmental Certification from the contractor ("the Delay Period"). Such payments will be made on a monthly basis in advance ("the Delay Period Payment").

3.   In the event that the Delay Period is less than one full month, the homeowner will refund on a pro rata basis the amount of the Delay Period Payment for that part of the month which is not within the Delay Period, unless the homeowner provides documentation adequate to establish that the entire Delay Period Payment was required to meet Other Covered Expenses.

4. Garages, attics, or basements containing all or substantially all KPT board shall be remediated, but the square footage of such garages, attics, or basements shall not be used to calculate the Under Air Area used as the basis for the Lump Sum Payment and Delay Period Payment.

C. In the event that a homeowner of a Remediation Home has remediated their property prior to the date of this agreement, and/or is in foreclosure proceedings or been foreclosed upon by a financial institution, and/or has vacated his home prior to remediation, such homeowner's claim or the claim, if any, of a financial institution, shall be the subject of additional negotiations.

IV. **Contractors**

A. The Knauf Entities, in consultation with the PSC have selected the Assigned Contractor identified on Exhibit E to undertake the Remediation Work described herein.

B. The Knauf Entities, in consultation with the PSC, will finalize the list of Substitute Contractors on Exhibit E. In finalizing such list, the PSC shall have the right to face-to-face interviews with the Substitute Contractors and to review their marketing materials and firm descriptions.

C. After finalization of the list of Substitute Contractors on Exhibit E, the Knauf Entities reserve the right to assign a Substitute Contractor to perform and/or oversee the Remediation Work in a particular Remediation Home for any reason, including, but not limited to, circumstances in which the Assigned Contractor is unable to perform and/or oversee the performance of the Remediation Work in a particular Remediation Home.

D. Ordinary and customary construction performance, *inter alia*, completion of punch list items, definitions of terms such as "Substantial Completion," and warranties shall be included in, governed by, and/or determined in accordance with agreements between the owner of the Eligible Home and the Assigned Contractor, or the Substitute Contractor, which shall be executed prior to commencement of the Remediation Work, substantially in the form of the Work Authorization Agreement in Exhibit F. In the event of a conflict between the terms of the Work Authorization Agreement and this Agreement, this Agreement shall govern.

E. Copies of agreements between the Assigned Contractor or any Substitute Contractors, and any payments made pursuant to those contracts to the Contractors in relation to the Remediation Work, shall be promptly disclosed to the lead and liaison counsel for the PSC and Harrell Class Counsel, subject to the Confidentiality Procedures.

6

V.    **Contractor and Environmental Certification**

    A.    At the conclusion of the Remediation Work on a Remediation Home, the Assigned Contractor, or Substitute Contractor, will provide the homeowner with a Contractor Certification substantially in the form of Exhibit G.

    B.    Pursuant to the Work Authorization Agreement, after receiving the Contractor Certification, the Knauf Entities will assign one environmental inspector from the list on Exhibit H ("Environmental Inspector"), which list is subject to finalization prior to the commencement of any remediation of any Eligible Home and in consultation with the PSC (which consultation shall include face-to-face interviews), to each Remediation Home to certify, in accordance with Exhibit D, the absence in the Home of any remaining problem drywall-associated odors and contamination, including, but not limited to, corrosion, tarnish, and pitting.

        1.    If the Environmental Inspector concludes the Remediation Home is free of any and all problem drywall-associated odors and contamination, the Environmental Inspector will provide a certification substantially in the form set forth in Exhibit I ("Environmental Certification") to the Assigned Contractor, or the Substitute Contractor, and to the homeowner for that Remediation Home that, in accordance with Exhibit D, the home is free of any and all problem drywall-associated odors and contamination.

        2.    If the Environmental Inspector concludes the Remediation Home is not free of any and all problem drywall-associated odors and contamination, the Assigned Contractor, or the Substitute Contractor, will continue to remediate any issues identified by the Environmental Inspector until such time that the Environmental Inspector concludes the Remediation Home is free of any and all problem drywall-associated odors and contamination, in which case the Environmental Inspector will provide the Environmental Certification in the form of Exhibit I as specified in the above subparagraph V (B) (1).

        3.    The Homeowner and/or his counsel, upon sufficient notice, shall have the right to be present, but not to interfere with, any environmental inspection by the Environmental Inspector, and to videotape, or otherwise make a record of, such inspection.  The costs of the Environmental Inspector will be paid by the Knauf Entities.

VI.    **The Remediation Fund**

    A.    For each Remediation Home, the Assigned Contractor, or the Substitute Contractor, will provide to the lead and liaison counsel for the PSC, including, as to the Harrell Remediation Homes, Harrell Class Counsel, and the Knauf Entities a detailed estimate of the cost to do the Remediation Work in the Remediation Home ("Cost Estimate"), which Cost Estimates are subject to the Confidentiality Procedures.

**B.**     The Knauf Entities, using their own funds and the funds contributed by the Other Participating Companies shall create a Remediation Fund in the amount of (i) the Cost Estimate plus an additional 10% of the Cost Estimate ("the Excess Amount") and (ii) the Lump Sum Payment (collectively the "Remediation Fund"). Within 10 business days of the execution of the Work Authorization Agreement by the homeowner, the Knauf Entities and the Assigned Contractor, or a Substitute Contractor, the Knauf Entities will fund the Remediation Fund by wire transferring an amount equal to the Remediation Fund, with notice to the homeowner's counsel, to an escrow account with U.S. Bank, a national banking association (the "Escrow Agent"), with final wire instructions to be provided at the time such funds become due; provided, however, that such wire transfer takes place in sufficient time for the Knauf Entities to meet their obligations under Paragraph III (B) including, but not limited to, payment of the Lump Sum Payment to the homeowner within the timeframe provided for therein. The Knauf Entities will use an interest-bearing U.S. Bank escrow account for all Remediation Funds established pursuant to this Agreement, and will be responsible for the costs of the Escrow Agent. Interest from such escrow account may be used by the Knauf Entities to pay any taxes due on such interest and the Escrow Agent's costs.

**C.**     Upon completion of the Remediation Work and receipt of the Certifications pursuant to Paragraph V, the Assigned Contractor, or the Substitute Contractor, shall submit a final statement to the lead and liaison counsel for the PSC, including, as to the Harrell Remediation Homes, Harrell Class Counsel, and the Knauf Entities describing the Remediation Work and its cost (the "Statement").

**D.**     The Remediation Fund will be used to pay the Assigned Contractor, or the Substitute Contractor, for the performance of the Remediation Work, including punch list work, and to pay the Other Covered Expenses to the homeowner. Upon completion of the Remediation Work, receipt of the Certifications pursuant to Paragraph V, payment to the Assigned Contractor, or the Substitute Contractor, for the Remediation Work and punch list work, and payment of the Other Covered Expenses to the homeowner, any funds remaining in the escrow account, including any accrued interest, will be returned to the Knauf Entities.

**VII.**   **Warranty of Remediation Work And Lien Clearance**

**A.**     The Assigned Contractor to a Remediation Home, or the Substitute Contractor, will provide the homeowner with a warranty substantially in the form of the warranty provided for in the Work Authorization Agreement in Exhibit F.

**B.**     If the Assigned Contractor, or the Substitute Contractor, does not perform, or is unable to perform, work required by the warranty described in subparagraph VII (A), the Knauf Entities will assume responsibility for procuring substitute performance under the warranty ("Guaranty of Warranty").

C.  The Assigned Contractor, or the Substitute Contractor, is responsible for clearing all material and labor liens placed on the property in connection with the Remediation Work as described in Paragraph IX (B).

## VIII.  Dispute Resolution

A.  In the event that a dispute arises between the homeowner and the contractor over the Scope of Work in Exhibit D for an individual Remediation Home, such dispute will be submitted to John W. Perry, Jr. of Perry Atkinson, Balhoff, Mengis & Burns, LLC ("the Mediator"), the MDL Court-appointed mediator, who, with the assistance of any technical experts hired by the Mediator with notice to and input from the PSC, including Harrell Class Counsel, and the Knauf Entities, will resolve the dispute (the "Dispute Resolution Process"). Such technical experts shall be unaffiliated with the Assigned Contractor, or the Substitute Contractors, and any Environmental Inspectors. The parties shall cooperate with the Mediator to resolve any disputes expeditiously and avoid to the maximum extent possible any delay in the remediation. The Mediator's decisions shall be binding.

B.  Any expenses associated with a homeowner-contractor dispute ("Mediation Expenses") as regards the Scope of Work, including progress and quality, and the warranty and Guaranty of Warranty described in Paragraph VII, will be jointly shared by the Knauf Entities and the homeowner, except that Mediation Expenses associated with the Dispute Resolution Process as regards the interpretation and administration of this Demonstration Remediation Agreement will be jointly shared by the Knauf Entities and the PSC, including, if Harrell Remediation Homes are involved, Harrell Class Counsel. In the event that disputes asserted by a party, either singly or in combination, delay the remediation by two days, the Mediator may in his discretion direct that, thereafter, the Mediation Expenses incurred in resolving any disputes asserted by that party will be paid by same, regardless of whether the Mediator resolves the dispute in that party's favor; otherwise, expenses will be shared equally by the parties to the dispute. The Mediator's decisions shall be binding.

## IX.  Release and Stipulation of Dismissal With Prejudice

A.  As consideration for the funding by the Knauf Entities and Other Participating Companies of the Remediation Work for the Remediation Homes in Louisiana, Florida, Alabama and Mississippi and the payment to the homeowner in those states pursuant to Paragraph III (B) and the Guaranty of Warranty pursuant to Paragraph VII (B), the homeowners of the Remediation Homes in those states shall release the Knauf Entities and Other Participating Companies, and any party that supplied, installed and/or facilitated in such supply or installation of KPT drywall in Remediation Homes, and without limitation, their successors, predecessors, assigns, affiliates, shareholders, investors, and their past, present, and future officers, directors, partners, attorneys, agents, employees, parent companies, partnerships, subsidiaries, sister corporations and representatives

(collectively, "Released Parties") from and against all claims and future claims relating to his/her home, except for claims (the "Reserved Claims") against the Knauf Entities by (i) the homeowner for bodily injury, (ii) a singular attorneys fee (to be allocated between individual retained counsel and common benefit counsel) and reasonable and appropriate expenses (collectively "Attorneys' Fees") against the Knauf Entities, and (iii) claims in connection with the performance of, and any obligations arising under, the Demonstration Remediation Agreement, including, but not limited to, warranty claims and punch list items (the "Release"). The Knauf Entities reserve all defenses, including but not limited to jurisdictional defenses, against bodily injury claims. As to Attorneys' Fees, the Knauf Entities only reserve the right to dispute the reasonableness of the PSC's claims, including Harrell Class Counsel.

B.     The Release will be executed and provided by the homeowner upon the establishment of the Remediation Fund for that homeowner's Remediation Home but held in escrow by counsel for the Knauf Entities, and will become effective only upon (i) Certification pursuant to Paragraph V, (ii) "Substantial Completion" as that term is defined in the Work Authorization Agreement, and (iii) production by the Assigned Contractor, or the Substitute Contractor, to the homeowner, of a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the Remediation Work have been either released or bonded off such that the homeowner's title is clear of all liens related to the Remediation Work, except that, subject to Paragraph II (F) (4), such release shall be effective as to the Other Participating Companies on the date of its execution. A sample Form Release is attached as Exhibit J.

C.     The Knauf Entities and Other Participating Companies shall, in their agreement by which the Other Participating Companies are providing funds, release, and indemnify and otherwise hold harmless, each other and without limitation, their successors, predecessors, assigns, affiliates, shareholders, investors, and their past, present, and future officers, directors, partners, attorneys, agents, employees, parent companies, partnerships, subsidiaries, sister corporations and representatives from and against all claims and future claims relating to any Remediation Homes as to which the Other Participating Companies or Parties have contributed funds for the remediation with the exception that the foregoing indemnity obligations shall not apply to the Reserved Claims and any ongoing obligations or undertakings agreed to by these parties. A sample Agreement and Release is attached as Exhibit K.

D.     The counsel for the homeowner of a Remediation Home, within 5 business days of the effective dates of the Release described in Paragraph IX (B) above, shall file stipulations of dismissal with prejudice with the MDL Court of the homeowner's lawsuit against the Other Participating Companies and the Knauf Entities, respectively, which will provide for the Court to 'so order" the dismissals with prejudice, in the form annexed as Exhibit L. Counsel for the homeowner shall cooperate with the Knauf Entities and the Other Participating Companies in any way necessary to obtain such dismissals with prejudice.

## X.    Attorney Fees

Subject to, and consistent with, any order entered by the MDL Court and the 11th Judicial Circuit of Florida governing Attorneys' Fees, the parties agree that the PSC, including Harrell Class Counsel, common benefit attorneys, and the counsel for the homeowner are entitled to Attorneys' Fees, paid by the Knauf Entities separately and in addition to any consideration received by a homeowner under this Agreement, the calculation and/or amount of which will be determined by a separate agreement(s) between the PSC, including, as to the Harrell Remediation Homes, Harrell class counsel, and the Knauf Entities, which agreement(s) will be submitted to the MDL Court for approval and, in the case of the Harrell Remediation Homes, to the 11th Judicial Circuit of Florida, unless these respective courts, upon application of the PSC, including Harrell Class Counsel, direct otherwise.  In the event the parties are unable to agree on the calculation and/or amount of Attorney's Fees within six months of the execution of this Demonstration Remediation Agreement, then the dispute will be submitted to the MDL Court for resolution, and/or, as to the Harrell Remediation Homes, to the 11th Judicial Circuit of Florida.  In either event, (i) no distribution of Attorneys' Fees will take place without the approval of the MDL Court and, as to the Harrell Class Action, the 11th Judicial Circuit Court of Florida; (ii) and the rulings of those courts regarding Attorneys' Fees shall be non-appealable.

## XI.    Court Oversight

Solely and exclusively for purposes of the Program, and the obligations incurred thereunder, as to any home remediated pursuant to this Program, the Knauf Entities consent to the jurisdiction of the MDL Court, which will oversee implementation of the Program and the Dispute Resolution Process outlined in Paragraph VIII and to the jurisdiction of the 11th Judicial Circuit of Florida, which will exercise oversight of the implementation of the Program and the Dispute Resolution Process as to the Harrell Remediation Homes, and their oversight rulings shall be non-appealable.  All other jurisdictional defenses, arguments and rights are fully reserved by the Knauf Entities and nothing in the Demonstration Remediation Agreement is intended to prejudice the assertion in any forum against any party of those jurisdictional defenses, arguments and rights.

## XII.    Miscellaneous

A.    **No Admission of Liability.**  Nothing in this Agreement shall constitute any (i) admission of liability or fault of any kind on the part of the Knauf Entities, who expressly deny any liability to the plaintiffs and who are entering into this Agreement to avoid the expense and uncertainty of litigation; (ii) an admission of or consent to jurisdiction or waiver of any defenses, jurisdictional or otherwise, except as provided in Paragraphs X and XI; and (iii) consent to service by the Knauf Entities.  Neither this Agreement nor any Release shall be admissible in

evidence in any proceedings except in an action to enforce the terms of the Agreement or the Releases.

**B.**     **Continuation of Litigation.** Nothing in this Agreement shall stay, or otherwise delay or interfere with, ongoing discovery and other proceedings in the MDL or any State Court.

**C.**     **Non-Binding Effect as to Other Homes.** Subject to Paragraph II (G), nothing in this Agreement obligates or binds either the PSC, including Harrell Class Counsel, or the Knauf Entities to any course of conduct, including but not limited to the scope of work for any remediation of homes not within the scope of this Agreement.

**D.**     **Best Efforts Obligations.** Prospectively, unless and until the Program is terminated, the Knauf Entities, without waiving any rights under Paragraph XII (C), (i) shall use best efforts to settle any lawsuits by homeowners of homes with all or substantially all KPT drywall in accordance with the substantive terms of this Agreement (ii) and will disclose any such settlement agreements to lead and liaison counsel for the PSC and the MDL Court pursuant to the Confidentiality Procedures. The PSC, including Harrell Class Counsel, shall use best efforts to inform counsel for homeowners of such homes of the terms of the Program, which have been negotiated at arm's length. Both parties recognize that the decision whether to participate in the Program is ultimately the decision of a homeowner based on the advice of the homeowner's counsel.

**E.**     **Representation Regarding Knauf Insulation GmbH.** The Knauf Entities represent that Knauf Insulation GmbH is a corporate entity which is doing business in the United States with its U.S. corporate offices in Shelbyville, Indiana. The Knauf Entities further represent that Knauf Insulation GmbH owns substantially all of the Knauf Entities' assets in the United States.

**F.**     **Notice of Liquidation or Asset Disposition.** The Knauf Entities shall provide 10 business days notice to the PSC, including Harrell Class Counsel, of insolvency, bankruptcy, receivership, and any liquidation or disposition of all or substantially all of the U.S. assets of Knauf Insulation GmbH. Such notice obligations expire upon termination of the Program.

**G.**     **No Presumption as to Drafting.** This Agreement is the product of arm's length negotiations between the PSC, including Harrell Class Counsel, and the Knauf Entities. Neither the PSC, including Harrell Class Counsel, or the Knauf Entities shall be deemed to be the drafter of this Agreement or any provision thereof. No presumption shall be deemed to exist in favor of or against either the PSC, including Harrell class counsel, or the Knauf Entities, as a result of the preparation or negotiation of this Agreement.

**H.**     **Inadvertent Errors.** The Parties recognize that inadvertent errors may occur in the information provided by the PSC, including Harrell class counsel, and the

Knauf Entities relating to the Remediation Homes and/or the Knauf Entities'
and/or the PSC's and the Harrell Class Counsel's processing of that information.
If, and to the extent that, such inadvertent errors occur, the parties agree to work
together to correct the error and to resolve the matter in a manner consistent with
the overall intent of this Agreement.

I.   **Compliance With Ethical Requirements and Guidelines.**  The parties have
been advised and believe that this Agreement comports in all respects with
applicable ethical requirements and guidelines and is fully in the interests of their
respective clients.  However, if a mutually agreed-upon ethics expert or a Court or
a disciplinary body concludes that any provision of this Agreement violates any
applicable ethics requirement, the parties shall immediately negotiate in good
faith for a mutually satisfactory substitute provision that shall comply with all
applicable ethical requirements while preserving insofar as possible the substance
of the original provision.

J.   **Not Affected by Change in Law.**  This Agreement shall be binding on the parties
regardless of any change in the law that might occur after the date the PSC,
Harrell Class Counsel, and the Knauf Entities have all signed this Agreement.

K.   **Applicable Law.**  This Agreement is being executed and delivered, and is
intended to be performed, in the State in which the Remediation Home is located.
The substantive laws of the State in which the Remediation Home is located,
irrespective of choice of law principles, shall govern the validity, construction,
and interpretation of this Agreement.  For purposes of any enforcement
proceeding, the MDL court, or with respect to enforcement proceedings regarding
Harrell Remediation Homes, the 11th Judicial Circuit of Florida, will determine
the applicable law.

L.   **Enforceability and Severability.**  In case any provision (or any part of any
provision) contained in this Agreement shall for any reason be held to be invalid,
illegal or unenforceable in any respect, such invalidity, illegality or
unenforceability shall not affect any other provision (or remaining part of the
affected provision) of this Agreement, but this Agreement shall be construed as if
such invalid, illegal or unenforceable provision (or any part thereof), had never
been contained herein, but only to the extent it is invalid, illegal or unenforceable.
In the event that the 11th Judicial Circuit of Florida rejects, or otherwise modifies
the terms of, the class settlement of the Harrell Class Action, all other terms of
this Agreement shall remain in full force and effect, and the Program will be
implemented pursuant to those terms.

M.   **Entire Agreement.**  The parties acknowledge that this Agreement is the entire
agreement between the PSC, including Harrell Class Counsel and the Knauf
Entities.  The parties have not received or relied on any agreements or promises
other than as contained in writing in this Agreement.

**N.**    **Agreement Photocopies.** A photocopy of the fully executed original of this Agreement shall be deemed to be an original for any and all purposes.

**O.**    **Amendments or Assignments in Writing.** This Agreement may not be modified or amended, or assigned in whole or in part, unless such modification, amendment or assignment is in writing executed by all parties.

**P.**    **Authority to Enter Agreement.** Each of the signatories hereto hereby warrants that he or she is authorized to enter into this Agreement on behalf of the parties on whose behalf he or she has executed this Agreement.

**Q.**    **Effective Date.** With respect to all homes, except for homes subject to the Harrell Class Action, this Agreement is effective upon execution by the PSC and the Knauf Entities. As to the homes subject to the Harrell Class Action, this Agreement shall be effective upon execution by Harrell Class Counsel.

**R.**    **Execution.** This Agreement may be executed in multiple counterparts, all of which taken together shall constitute one and the same Agreement.

**S.**    **Notification.** All notices and other communications under this Agreement shall be in writing and shall be sent by hand delivery or overnight courier (e.g., Express Mail, Overnight UPS or Federal Express) to: For the Knauf Entities: Gregory J. Wallance, Kaye Scholer LLP, 425 Park Avenue, New York, New York 10022; For the PSC: Arnold Levin (lead counsel for the PSC), Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, Pennsylvania 19106, Russ Herman (liaison counsel for the PSC), Herman, Herman, Katz & Cotler, LLP, 820 O'Keefe Avenue, Suite 100, New Orleans, Louisiana 70113, Christopher A. Seeger (trial team chair), Seeger Weiss, LLP, 1 William Street, New York, New York 10004; For Harrell Class Counsel: Victor M. Diaz, Podhurst Orseck, P.A., 25 West Flagler Street, Suite 800, Miami, Florida 33130.

**Agreed to By**

For Knauf Entities

| | |
|---|---|
| Gregory J. Wallance | Kerry J. Miller |
| Kaye Scholer LLP | Frilot L.L.C. |
| 425 Park Avenue | Suite 3700 |
| New York, New York 10022 | 1100 Poydras Street |
| Phone: (212) 836-8000 | New Orleans, LA 70163 |
| Fax: (212) 836-6478 | Phone: (504) 599-8000 |
| gwallance@kayescholer.com | Fax: (504) 599-8145 |
| | kmiller@frilot.com |

14

On Behalf of, and With the Full Authority of The Plaintiffs' Steering Committee

Arnold Levin (lead counsel )
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

Christopher A. Seeger (trial team chair)
Seeger Weiss, LLP
1 William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Russ Herman (ex-officio and liaison))
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue, Suite 100
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
rherman@hhke.com

For Harrell Class Counsel

Victor M. Diaz
Podhurst Orseck, P.A.
25 West Flagler Street, Suite 800
Miami, Flrida 33130
Phone: (305)-358-2800
Fax: (305) 358-2382
vdiaz@podhurst.com

# EXHIBIT

# A

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| ABOULAFIA, Steven & Unruean | 3735 Yucatan Pkwy | Cape Coral | FL | 33993 | Arnold Levin | AAA |
| Aguilar, Eleanor | 3583 NW 14th Court (GT07-048) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Albano, Carol Aurbach, Suely Braithwaite, Judy Crawford, Monique and Shand, Elaine James, Janelle | 1401 NW 36th Way (GT01-001); 3598 NW 14th Court (GT27-197); 3513 NW 14th Court (GT08-055); 3609 NW 14th Court (GT05-025); 3606 NW 14th Court (GT27-193) | Lauderhill | FL | 31333 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Ambroise, Donald | 1425 NW 36th Way (GT02-011) | Lauderhill | FL | 31333 | Alters/Baron & Budd | AA |
| Amerson, Amy | 1205 Magnolia Alley | Mandeville | LA | 70471 | Becnel Law Firm (Daniel Jr) | A |
| Ancira, Chris & Lilah | 110 Pine Alley Rd. | Mandeville | LA | 70471 | Becnel Law Firm (Daniel Jr) | A |
| Armstrong, David & Bonnie | 8929 Glenfield Drive | Baton Rouge | LA | 70809 | Martzell & Bickford (Centola) | A |
| Arnaud, Lester & Cathrine | 17504 Rosemont Dr. | Prairieville | LA | 70769 | Joshua Palmintier | A |
| Ashley, Tatiana | 3579 NW 14th Court (GT08-052) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Back, Charles & Mary Ann | 1215 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |
| Banner, William F. & Kitty | 70486 4th Street | Covington | LA | 70433 | Lewis & Roberts, PLLC | A |
| Barry, Scott & Judy | 3801 SW 2nd Street | Cape Coral | FL | 33991 | Jerrold Seth Parker | AAA |
| Berthaut, Colin | 1218 Magnolia Alley, #42 | Mandeville | LA | 70471 | Martzell & Bickford (Centola) | A |
| Bissoon, Suresh & Oma | 1056 NW Leonardo Circle (VFA066) | Port St. Lucie | FL | 34986 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Boquet, Edwin | 17454 Rosemont Dr. | Prairieville | LA | 70769 | Becnel Law Firm (Daniel Jr) | A |
| Borne, Barry & Mary | 1217 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |
| Borne, Carol | 835 Montgomery St. | Mandeville | LA | 70448 | Jeffrey Berniard | A |
| BOTELHO, Florencio & Maria | 1819 SW 47th Street | Cape Coral | FL | 33914 | | AAA |
| Boucher, Gordon & Nancy | 11001 Gulf Reflections Drive #A208 | Ft. Myers | FL | 33908 | Wayne Kreger | AAA |
| Boudreaux, Virginia R. | 209 Cottage Green Lane | Covington | LA | 70435 | Peyton B. Burkhalter | A |
| Bourdon, Lucille | 15074 Pamela Dr. | Covington | LA | 70433 | Paul A. Lea, Jr. | A |
| Bourgeois, Richard, Sr. & Gail | 10968 Shoreline Dr. | Baton Rouge | LA | 70809 | Walters Papillion Thomas Cullens | A |
| Boutte', Donald J. | 11051 Shoreline Dr. | Baton Rouge | LA | 70809 | Herman, Herman, Katz & Cotlar | A |
| Boxe, Kevin & Roxanne | 1104 NW Leonardo Circle (VFA058) | Port St. Lucie | FL | 34986 | Parker, Waichman, Alonso | AA |
| Bradley, James "Jimmy" & Wanda Louise | 19405 Kelly Wood Court | Baton Rouge | LA | 70809 | Joshua Palmintier | A |
| Braselman, Ryan & Holly | 1206 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |
| Bronaugh, David & Heather | 2323 Sunset Blvd | Slidell | LA | 70461 | Kanner & Whitley, LLC; Allan Kanner & Melissa Fueslier | A |
| Brown, Larry | | | AL | | | |
| Brown, Raymond & Syndee | 1213 Magnolia Alley | Mandeville | LA | 70471 | Jeffrey Berniard | A |
| Brumfield, Ollie & Adrienne | 608 Huseman Lane | Covington | LA | 70435 | Morris Bart, LLC | A |
| Butler, James, Dr., & Joycelyn Louise | 5720 Wright Road | New Orleans | LA | 70128 | Kanner & Whitley, LLC; Allan Kanner & Melissa Fueslier | A |
| Caliper Cpaital of Florida, LLC | 3614 NW 12th Court (GT26-192) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Carroll, Cynthia | 1220 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |

EXHIBIT A

| Property Owner | Street | City | State | Zip | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Casey, Hugh | 10440 SW Stephanie Way, Unit 206 (TR4-206) | Port St. Lucie | FL | 34987 | McIntosh, Sawren, Peltz & Cartaya | AA |
| Cassagne, Brande & Jordan | 209 Place Saint Jean | Covington | LA | 70433 | Morris Bart, LLC | A |
| Cassard, Jesse & Angela | 1708 Ashland Dr. | Zachary | LA | 70791 | Gaines Gaudermen, PA | A |
| Ceruti, Ronald & Sharon | 745 Spring Thyme Dr. | Belle Chasse | LA | 70037 | Becnel Law Firm (Daniel Jr) | A |
| Chavous, George & Lorine | | | AL | | | |
| Chery, Jean-Robert & Presina | 990 NW Leonardo Circle (VFA077) | Port St. Lucie | FL | 34986 | Colson Hicks | AA |
| Chiappetta, Kevin & Karen | 727 ARCTIC FOX RUN | Madisonville | LA | 70447 | Becnel Law Firm (Daniel Jr) | A |
| Colby, Richard & Susan | 16347 Hwy 931 | Prairieville | LA | 70769 | L.Y. Hymel | A |
| Comick, Ronnie | No Hits; No PPF or DPF | | LA | | May not be in Louisiana | A |
| Commer, Cynthia | | | AL | | | |
| Conte, Margaret Ann | 11001 Gulf Reflections Drive #A106 | Ft. Myers | FL | 33908 | Milstein, Adelman & Kreger | AAA |
| Cooper, Brenda | 1812-14 Mazant St. | New Orleans | LA | 70117 | Pro se | A |
| Cove, Joseph | 214 SW 39th Terrace | Cape Coral | FL | 33991 | | AAA |
| CRAMER, David & Denise | 2521 SW 52nd Lane | Cape Coral | FL | 33914 | Jeremy W. Alters | AAA |
| CREUS, Benny & Evelyn | 1818 SE 7th Street | Cape Coral | FL | 33990 | | AAA |
| Cucci, Jacqueline | 138 NW Leonardo Circle (VFA069) | Port St. Lucie | FL | 34986 | Parker, Waichman, Alonso | AA |
| CUDDAPHA, Prabhakara | 3317 Celtus Pkwy | Cape Coral | FL | 33991 | Wayne Kreger | AAA |

as of 10.13.2010

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Cummins, Rolland & Charlene | 11001 Gulf Reflections Drive #A108 | Ft. Myers | FL | 33908 | Russ Herman Lenny Davis | AAA |
| Cunningham, Dennis & Susan | 288 Penn Mill Lakes Blvd. | Covington | LA | 70435 | Herman, Herman, Katz & Cotlar | A |
| Dalmage, Dilworth & Hyacinth | 3445 NW 14th Court (GT10-072) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Darensbourg, Mark & Barbara | 1924 Bayou Paul Lane | St. Gabriel | LA | 70776 | Herman, Herman, Katz & Cotlar | A |
| De Los Santos, Brian & Rosibel | 973 NW Leonardo (VFA039) | Port St. Lucie | FL | 34986 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| DeBENEDICTIS, Frank & Deborah | 4408 SW 20th Ave. | Cape Coral | FL | 33914 | Ben W. Gordon, Jr. | AAA |
| DeJan, Charlotte | 4635 Evangaline St. | New Orleans | LA | 70127 | Herman, Herman, Katz & Cotlar | A |
| DeJan, Leroy & Ann | 4624 Chantilly Dr. | New Orleans | LA | 70126 | Herman, Herman, Katz & Cotlar | A |
| Dennis, Patrick & Kathleen | 517 Snead Court | Slidell | LA | 70458 | Kanner & Whitley, LLC; Allan Kanner & Melissa Fuesler | A |
| Desporte, Edward T., Jr. & JoAnn | 28140 Chukkar Lane | Folsom | LA | 70437 | Thornhill Law Firm | A |
| Diehl, Scott | 16 NW 12th Place | Cape Coral | FL | 33993 | Richard Serpe | AAA |
| Dobbins, Margaret & Glenwood | 39130 Old Bayou Ave. | Gonzales | LA | 70737 | F. Gerald Maples, PA | A |
| Donaldson, Malcolm & Kelli | 293 Penn Mill Lakes Blvd | Covington | LA | 70435 | Paul A. Lea, Jr. | A |
| Dorsey, Glenda F. | 39085 Pirogue Ave. | Gonzales | LA | 70737 | Lewis & Roberts, PLLC | A |

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Duhon, Christopher & Kimberly | 17469 Rosemont Dr. | Prairieville | LA | 70769 | Becnel Law Firm | A |
| Dupuy, Cullen & Mary | 15246 Campanile Court | Baton Rouge | LA | 70810 | Walters Papillion Thomas Cullens | A |
| Edwards, Norma | 1050 NW Leonardo Circle (VFA067) | Port St. Lucie | FL | 34986 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Espino, Julio & Evangelina | 1032 NW Leonard Circle (VFA070) | Port St. Lucie | FL | 34986 | Krupnick, Campbell, Malone | AA |
| Fayard, Crystal & Formica, Conrad | 3216 Rachel Lane | Ocean Springs | MS | 39564 | Levin Papantonio | A |
| Feinberg, Manley & Dianne | Unit 13 1524 Island Blvd. | Aventura | FL | 33160 | | A |
| Felton, Kenturah | | | AL | | | |
| Ferguson, Howard "Bud" Jr. & Anna Catherine | 6502 Antioch Crossing | Baton Rouge | LA | 70817 | Lewis & Roberts, PLLC | A |
| Fineschi, Nicola & Connie | 1200 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |
| Finger, Simon & Rebecca | 1844 State St. | New Orleans | LA | 70118 | Allan Kanner & Melissa Fueslier | A |
| Fisher, Steve and Corrinn | 580 Huseman Lane | Covington | LA | 70435 | Lambert & Nelson | A |
| FMY Ventures, LLC | 11001 Gulf Reflections Drive #A101 | Ft. Myers | FL | 33908 | Milstein, Adelman & Kreger | AAA |
| Fothergill, Zen | 3525 NW 14th Court (GT08-049) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Franatovich, Mitchell & Sarah | 2251 3rd Street | Mandeville | LA | 70471 | Watts Hilliard, LLC | A |
| FRANCIPANE, Sal & Susan | 4005 SW 23rd Ave | Cape Coral | FL | 33914 | Jeremy W. Alters | AAA |
| FRAWLEY, Don & Amy | 1237 NW 36th Ave | Cape Coral | FL | 33993 | Geraghty, Dougtherty & Edwards | AAA |

as of 10.13.2010

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| FRAZIER, Larry & Dorothy | 927 SW 4th Ave | Cape Coral | FL | 33991 | Jeremy W. Alters | AAA |
| Fulks, Richard & Bonnie | 4304 NW 39th Avenue | Cape Coral | FL | 33993 | Jeremy W. Alters | AAA |
| Gammage, Daniel, Dr. | 1210 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |
| Gardette, Michael & Nicole | 268 Penn Mill Lakes | Covington | LA | 70435 | Joseph M. Bruno | A |
| Gardette, Michael & Rhonda | 276 Penn Mill Lakes | Covington | LA | 70435 | Herman, Herman, Katz & Cotlar | A |
| Garrett, Roger | 13496 Addison Ave. | Gulfport | MS | 39503 | Lumpkin & Reeves | A |
| Garton, Timothy | 4005 Campton Tif | Gonzales | LA | 70737 | Lewis & Roberts, PLLC | A |
| GERACI, Vincent & Joan | 420 NW 38th Ave | Cape Coral | FL | 33993 | | A |
| GIGGEY, Richard & Linda | 1813 NE 23rd Ave | Cape Coral | FL | 33090 | Jeremy W. Alters | AAA |
| Goldberg, Scott | 7422 Briella Drive | Boynton Beach | FL | 33438 | Alters/Baron & Budd | AA |
| Graham, Wayne and Rainner, Stephanie | 3602 NW 14th Court (GT27-195) | Lauderhill | FL | 33311 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Greco, Vincent J. | 70461 11th Street | Covington | LA | 70433 | Lewis & Roberts, PLLC | A |
| Greene, Craig & Kristen | 3117 McClendon Court | Baton Rouge | LA | 70810 | Lewis & Roberts, PLLC | A |
| Grissom, John & Becky | 118 S. Willow bend Rd. | Monroe | LA | 71203 | Matthews & Associates | A |
| Guidry, Chris & Jerene | 5396 Courtyard Dr. | Gonzales | LA | 70737 | Becnel Law Firm (Daniel Jr) | A |
| GUILHEMPE, Edmund | 335 SW 24th Street | Cape Coral | FL | 33991 | Russ Herman Lenny Davis | AAA |
| Haindel, Mary Virginia | 1224 Magnolia Ave. | Mandeville | LA | 70471 | Becnel Law Firm (Daniel Jr) | A |

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Hansen, Deborah | 3537 NW 14th Court (GT07-046) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Harrell | 2140 SE 191-14 AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1946 SE 22ND COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1954 SE 22ND COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1938 SE 22ND COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2017 SE 21ST COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1974 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2913 AUGUSTA DRIVE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2708 AUGUSTA DRIVE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1932 SE 21ST COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1987 SE 21ST COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1948 SE 21ST COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1982 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2806 AUGUSTA DRIVE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2155 SE 20TH AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2165 SE 20TH AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1957 SE 22ND COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2226 SE 20TH AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2236 SE 20TH AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1892 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1970 SE 22ND COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1935 SE 22ND DRIVE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2810 AUGUSTA DRIVE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2248 SE 19Th TERRACE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1926 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1912 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2235 SE 20Th AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2225 SE 20TH AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2230 SE 19ᵗ AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2259 SE 19TH AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1966 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1990 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |

as of 10.13.2010

EXHIBIT A

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Harrell | 1975 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1950 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1958 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2250 SE 19Th AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 1934 SE 23RD COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2240 SE 19Th AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2239 SE 19" AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell | 2229 SE 19Th AVENUE | HOMESTEAD | FLORIDA | 33035 | | |
| Harrell * all homes listed as "Harrell" are subject to approval by the Knauf Entities as eligible homes and to the conditions listed in Paragragh 2C of the Demonstration/Remediation Agreement | 1931 SE 21ST COURT | HOMESTEAD | FLORIDA | 33035 | | |
| Hary, Michael & Sara | 1922 SW 30th Street | Cape Coral | FL | 33914 | Scott W. Weinstein | AAA |
| Haynes, Elvis & Carol | 3512 NW 14th Court (GT30-222) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Hebert, Loney & Vickie | 5190 Courtyard Drive | Gonzales | LA | 70237 | Becnel Law Firm (Daniel Jr) | A |
| Henderson, Linda | 70510 4th Street | Covington | LA | 70433 | Herman, Herman, Katz & Cotlar | A |
| HENRY, Michael | 5424 SW 16th Place | Cape Coral | FL | 33914 | Milstein, Adelman & Kreger | AAA |
| Herbert, Brian | 11001 Gulf Reflections Drive #A201 | Ft. Myers | FL | 33908 | Wyane Kreger | AAA |
| HERNANDEZ, Ernest | 409 NW 38th Ave | Cape Coral | FL | 33993 | Allison Grass (?) | AAA |

as of 10.13.2010

EXHIBIT A

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Hidalgo, Sidney & Tonya | 273 Penn Mill Lakes Blvd. | Covington | LA | 70435 | Morris Bart, LLC | A |
| Hill, Chris | | | AL | | | |
| Hoffman, Marvin & Dorecia | 948 Lonardo Circle (VFA084) | Port St. Lucie | FL | 34986 | Krupnick, Campbell, Malone | AA |
| Holder, David | 11005 Shoreline Dr. | Baton Rouge | LA | 70809 | Walters Papillion Thomas Cullens | A |
| HOLMES, Elena | 7407 Cobb Road | Bokeelia | FL | 33922 | Arnold Levin | AAA |
| Hopkins, Terrell & Raeshonda | | | AL | | | |
| Hulsey, Charles & Sarah | 701 Arctic Fox Run | Madisonville | LA | 70447 | Becnel Law Firm (Daniel Jr) | A |
| JACKSON, Douglas & Debra | 3714 SW 4th Lane | Cape Coral | FL | 33991 | Jeremy W. Alters | AAA |
| Jarrell, Chad & Darlene | 400 Briar Meadow Lane | Covington | LA | 70433 | Gainsburg Benjamin | A |
| JARVIS, Frank & Kathy | 1219 NW 38th Place | Cape Coral | FL | 33993 | Leopold Kuvin | AAA |
| Jordan, Hugh Richard & Susan | 16347 Hwy 931 | Prairieville | LA | 70769 | LJ Hymel; Hymel Davis & Petersen | A |
| Joseph, Roderick & Nadira | 3523 NW 14th Court (GT08-50) | Lauderhill | FL | 33311 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Joseph, Todd & Quividias | 17470 Rosemont Dr. | Prairieville | LA | 70769 | Becnel Law Firm (Daniel Jr) | A |
| KAMPF, Richard & Patricia | 233 SE 44th Terrace | Cape Coral | FL | 33904 | Jeremy W. Alters | AAA |
| Kehoe, Molly | 220 Bellingrath Place | Madisonville | LA | 70471 | Hugh Lambert | A |
| Kirby, Jay & Nina | 11001 Gulf Reflections Drive #A202 | Ft. Myers | FL | 33908 | | AAA |

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Kroeger, Jeff | 11001 Gulf Reflections Drive #A204 | Ft. Myers | FL | 33908 | Wayne Kreger | AAA |
| LaCroix, Jim | 1429 Natchez Loop | Covington | LA | 70433 | Lemmon Law Firm | A |
| LAKE, William & Jacqueline | 2542 SW 27th Place | Cape Coral | FL | 33914 | Jeremy W. Alters | AAA |
| Landry, Justin & Renee | 12302 Dutchtown Villa Dr. | Geismar | LA | 70734 | Lewis & Roberts, PLLC | A |
| Laurence, Marc & Michelle | 11069 Gottschalk Rd. | Covington | LA | 70435 | P. David Carollo | A |
| Ledet, Darryl & Trisha | 17480 Rosemont Dr. | Prairieville | LA | 70769 | Becnel Law Firm (Daniel Jr) | A |
| Lee, Tamanika | | | AL | | | |
| LeJeune, Michael & Melissa | 680 Silverthorne Lane | Madisonville | LA | 70461 | Paul A. Lea, Jr. | A |
| LINDNER, Thomas | 605 SW 28th Terrace | Cape Coral | FL | 33914 | Viles & Beckman LLC | AAA |
| LUNDBERG, Richard & Kathleen | 2116 SW 28th Lane | Cape Coral | FL | 33914 | Jeremy W. Alters | AAA |
| MACRI, Joseph | 1825 SE 2nd Street | Cape Coral | FL | 33990 | Scott W. Weinstein | AAA |
| Maritza Torres & Orlando Rodriguez | 317 NW 1st Street | Cape Coral | FL | 33993 | | AAA |
| Mason, Fay & Michael | 3583 NW 14th Court (GT06-038) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Matus, Aldo & Ghedy | 41299 Tulip Hill Ave. | Prairieville | LA | 70769 | Joshua Palmintier | A |
| Mayfield, Jeffrey & Vanessa | 309 De Zaire Dr. | Madisonville | LA | 70447 | Becnel Law Firm | A |
| Mayo, Edward & Jacqueline | 5803 Windchester Park Dr. | New Orleans | LA | 70117 | Pro se | A |
| Mayo, Jake & Emily | 4268 Arrowhead St. | Baton Rouge | LA | 70808 | Lewis & Roberts, PLLC | A |
| McCoy, Ira | 11417 S. St. Andrews Circle | New Orleans | LA | 70128 | Pro se | A |
| Mercado, Juan & Irena | 1226 NE 10th Lane | Cape Coral | FL | 33909 | Scott W. Weinstein | AAA |

EXHIBIT A

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Mercante, Joseph & Barbara | 43249 Happy Woods Rd. | Hammond | LA | 704036 | Becnel Law Firm (Daniel Jr) | A |
| Meyer, Lawrence & Elizabeth | 29310 Laurel Dr. | Lacombe | LA | 70445 | Dominick Impastato | A |
| MILLER, Daniel & Jacqueline Perry | 1903 SW 46th Terrace | Cape Coral | FL | 33914 | Arnold Levin | A |
| Mills, Jeanette | 11052 Shoreline Dr | Baton Rouge | LA | 70809 | Herman, Herman, Katz & Cotlar | A |
| Mitchell, James | 1214 Magnolia Alley | Mandeville | LA | 70471 | Becnel Law Firm (Daniel Jr) | A |
| Mizell, Fred & Taffenie | 14123 Hwy. 25 | Franklinton | LA | 70438 | Paul A. Lea, Jr. | A |
| MORRISON, Jeffrey & Leigh | 7518 Wedelia | Punta Gorda | FL | 33955 | Scott W. Weinstein | AAA |
| MOZDZONEK, Agnes | 5257 Pocatella Court | Cape Coral | FL | 33904 | Jerrold Seth Parker | AAA |
| Mulligan, Vicent & Virginia | 3542 NW 14th Court (GTR29-209) | Lauderhill | FL | 33311 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Mullings, Robert | 3440 NW 14th Court (GT33-241) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Murphy, Ronald K. | 11001 Gulf Reflections Drive #A107 | Ft. Myers | FL | 33908 | Wayne Kreger | AAA |
| Naden, Roberta & Craig | 5263 Courtyard Dr. | Gonzales | LA | 70737 | Herman, Herman, Katz & Cotlar | A |
| Nelson, Brian | 6835 Long Leaf Drive | Parkland | FL | 33076 | Baron and Budd, PC | RUSS |
| Njie, Josephina | 3411 NW 14th Court (GT13-089) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Nunez, Ernest III & Marie | 612 Huseman Ln. | Covington | LA | 70435 | Becnel Law Firm (Daniel Jr) | A |
| Nunez, Fredrick & Lisa | 123 Dominion Blvd. | Madisonville | LA | 70447 | Herman, Herman, Katz & Cotlar | A |
| Pagador, Tony & Tabitha | 13429 Libby Lane | Gulfport | MS | 39503 | Lumpkin & Reeves | A |

as of 10.13.2010

EXHIBIT A

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Perez, Geraldo and Alfonso, Olga | 3523 SW 2nd Avenue | Cape Coral | FL | 33914 | Scott W. Weinstein | AAA |
| PEREZ, Ty | 1201 Rush Ave | Lehigh Acres | FL | 33972 | Jerrold Seith Parker | AAA |
| Perry, Timothy & Tracy | 15190 Westin Cove | Gulfport | MS | 39503 | David McMullen | A |
| Pierson, Neil & Jan | 348 Jade Court | Madisonville | LA | 70447 | Lambert & Nelson | A |
| Porter, Lindsey , Sr. & Doris A. | 23620 Kirtley Drive | Plaquemine | LA | 70765 | Lewis & Roberts, PLLC | A |
| Pray, Jeffrey & Lana | 3824 Acadian Village Dr. | Ocean Springs | MS | 39564 | Lewis & Roberts, PLLC | A |
| Properties in Miami, LLC | 3538 NW 14th Court (GT29-211) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Properties in Miami, LLC | 3586 NW 14th Court (GT28-203) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| QUIMBY, Clayton & Cheryl | 23976 Vincent Ave. | Punta Gorda | FL | 33955 | Scott W. Weinstein | AAA |
| Rabadia, Murji & Vekaria, Anjni | 7424 Briella Drive | Boynton Beach | FL | 33437 | Alters/Baron & Budd | AA |
| Ramaskevicius, Gintautas | 11001 Gulf Reflections Drive #A102 | Ft. Myers | FL | 33908 | | AAA |
| Ramsey, Keith | | | AL | | | |
| Reese, Jean | 2348 Soult St. | Mandeville | LA | 70448 | Herman, Herman, Katz & Cotlar | A |
| REHRIG, Neil | 3512 SE 1st Place | Cape Coral | FL | 33904 | Jeremy W. Alters | AAA |
| Ribello & Joan Bertoni | 11001 Gulf Reflections Drive #A203 | Ft. Myers | FL | 33908 | | AAA |
| RICUPERO, Kevin & Karen | 3214 SW 11th Place | Cape Coral | FL | 33914 | Russ Herman Lenny Davis | AAA |

as of 10.13.2010

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Rigney, George & Raffy | 42166 Autumn Run Drive | Hammond | LA | 70403 | Becnel Law Firm (Daniel Jr) | A |
| Ristovski, Van | 961 Leonardo Circle (VFA037) | Port St. Lucie | FL | 34986 | Parker, Waichman, Alonso | AA |
| Robair, Alexander J. | 39055 Bayou View Ave. | Gonzales | LA | 70737 | Martzell & Bickford (Centola) | A |
| Roberson, Sandra | 929 Flora Lane | Baton Rouge | LA | 70810 | Herman, Herman, Katz & Cotlar | A |
| Roberts, Jeffery D. | 285 Penn Mill Lakes Blvd. | Covington | LA | 70435 | Joseph M. Bruno | A |
| Robinhood Terrace, LLC | 1014 NM Leonardo Circle (VFA073) | Port St. Lucie | FL | 34986 | Carey & Danis | AA |
| ROCHE, Ross & Mary | 2816 NW 25th Lane | Cape Coral | FL | 33993 | Scott W. Weinstein | AAA |
| Rogers, Brad & Cassandra | 516 Mare Court | Covington | LA | 70435 | Wolfe Law Group; Scott Wolfe | A |
| Roth, Robert & Langlois, Rebecca | 4218 Bluebonnet Rd. | Baton Rouge | LA | 70809 | Walters Papillion Thomas Cullens | A |
| ROTTAU, Erwin & Mary Jane Cloeren | 2607 NW 15th Street | Cape Coral | FL | 33993 | Milstein, Adelman & Kreger | AAA |
| Roy, Gerard | 2832 SW 36th Terrace | Cape Coral | FL | 33914 | Jerrold Seth Parker | AAA |
| Rucker, Johnnie | 3547 NW 14th Court (GT07-041) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Runyon, Thomas & Sonia | 121221 Via Del Fontana Way | Ft. Myers | FL | 33919 | Scott W. Weinstein | AAA |
| SAEKS, Sieglinde | 2810 NW 14th Terrace | Cape Coral | FL | 339933 | | A |
| Samlai, Nalinie | 3430 NW 14th Court (GT33-246) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| SCHATZLE, Ralph & Judith | 3445 NW 18th Terrace | Cape Coral | FL | 33993 | Jerrold Seth Parker | AAA |
| Schruff, Pat & Marcel | 616 Charleston Ln. | Long Beach | MS | 39560 | Vaughn & Bowden, PA | A |

EXHIBIT A

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Sharper, Darren | Unit 12<br>1522 Island Boulevard | Aventura | FL | 33160 | Simon, Sigalos, & Spyredes PA | AAA |
| Shelton, Michael & Leslie | 568 Huseman Lane | Covington | LA | 70435 | Baron and Budd, PC | A |
| Sill, Garth | 3544 NW 14th Court (GT29-208) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Singleton, Enrica | 11413 Longview Dr. | New Orleans | LA | 70128 | Becnel Law Firm | A |
| Skinner, Helen (& the Estate of Albert D. Skinner, Jr.) | 29300 Laurel Dr. | Lacombe | LA | 70445 | Dominick Impastato | A |
| Smith, Adrian & Micaile | 1098 NW Leonardo Circle (VFA059) | Port St. Lucie | FL | 34986 | Saunders & Walker | AA |
| Smith, Dione & Pryce, Hazel | 1068 NW Leonardo Circle (VZ64A) | Port St. Lucie | FL | 34986 | Parker, Waichman, Alonso | AA |
| SMITH, FRANK & TODD, Debra | 3396 NE 29th Ave. | Lighthouse Point | FL | 33064 | | A |
| Spencer, Patricia & Levi, Jr. | 3637 Edgewood Circle | Avondale | LA | 70094 | Morris Bart, LLC | A |
| Spivey, Sharon | | | AL | | | |
| St. Cyr, Emmanuel & Randa | 3535 NW 14th Court (GT07-047) | Lauderhill | FL | 33311 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Staton, Lori Ann | 1216 Magnolia Alley | Mandeville | LA | 70471 | Becnel Law Firm (Daniel Jr) | A |
| Staub, Marcus G. & Dana E. | 1208 Magnolia Alley | Mandeville | LA | 70471 | Daniel Becnel Law Firm | A |
| STOCK, Wayne & Suzanne | 10604 Broadland Pass | Thonotosassa | FL | 33592 | | A |
| Taylor, Charles & Rosa | 3517 NW 14th Court (GT08-53) | Lauderhill | FL | 33311 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Taylor, David & Amanda | 3216 Joy Lane | Ocean Springs | MS | 39564 | Lewis & Roberts, PLLC | A |
| Tedesco, Robert & Caroline | 709 Simpson Way | Covington | LA | 70435 | Baron and Budd, PC | A |
| Tenorio, Eric P. | 15101 Warren Dr. | Gulfport | MS | 39503 | Lumpkin & Reeves | A |

**EXHIBIT A**

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Thomas, Brian & Tamara | 856 Water Oak Drive | Brusly | LA | 70719 | Lewis & Roberts, PLLC | A |
| Tom, San & Jianran | 602 Charlston Lane | Long Beach | MS | 39560 | Lewis & Roberts, PLLC | A |
| TRAN, Andy | 167 Gleason Pky | Cape Coral | FL | 33914 | Scott W. Weinstein | AAA |
| TUCKER, Jarl & Janice | 1632 SW 19th Terr | Cape Coral | FL | 33991 | Wayne Kreger | AAA |
| Turner, Tyrone C. | 17447 Rosemont Dr. | Prairieville | LA | 70769 | Joshua Palmintier | A |
| VENTUROS, Maria | 1113 NE 32nd Street | Cape Coral | FL | 33909 | Jerrold Seth Parker | AAA |
| VERISSIMO, Jorge | 1815 SW 47th Street | Cape Coral | FL | 33914 | | AAA |
| Volke, Chip & Christina | 894 NW Leonardo Circle (VFA093) | Port St. Lucie | FL | 34986 | Lewis & Roberts, PLLC | AA |
| WAGNER, Tracey | 18896 SE Jupiter Inlet Way | Tequesta | FL | 33469 | Leopold Duvin | AAA |
| Ward, Amy & Truman | 5367 Courtyard Dr. | Gonzales | LA | 70737 | Herman, Herman, Katz & Cotlar | A |
| Watson, Patrick & Paula | 978 NW Leonardo Circle (VFA079) | Port St. Lucie | FL | 34986 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Watts, Sharon | 29284 Laurel Dr. | Lacombe | LA | 70445 | Becnel Law Firm? (blank) | A |
| Wayne, William & Kelly | 576 Huseman Lane | Covington | LA | 70435 | Davis & Duncan, LLC | A |
| Wheeler, Don M. & Agnes | 41311 Tulip Hill Ave. | Prairieville | LA | 70769 | Joshua Palmintier | A |
| White, Taenia | 828 N. Sabine Dr. | Baton Rouge | LA | 70810 | Herman, Herman, Katz & Cotlar | A |
| Wilfer, Rosanne | 1202 Magnolia Alley | Mandeville | LA | 70471 | Lambert & Nelson | A |
| Williams, Albert & Curbelo, Anika | 3526 NW 14th Court (GT30-215) | Lauderhill | FL | 33311 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |

EXHIBIT A

| Property Owner | Street | City | State | ZIP | Lawyer/Firm | List |
|---|---|---|---|---|---|---|
| Williams, Demitrius | 3499 NW 14th Court (GT09-062) | Lauderhill | FL | 33311 | Alters/Baron & Budd | AA |
| Williams, Dina | 520 Mare Court | Covington | LA | 70435 | Seeger Weiss, LLP | A |
| Williams, Margaret Angela & Chin, Jahari | 967 NW Leonardo Circle (VFA038) | Port St. Lucie | FL | 34986 | Roberts & Durkee; Milstein, Adelman & Kreger | AA |
| Wood, Sheila | 13492 Addison Ave. | Gulfport | MS | 39503 | Lumpkin & Reeves | A |
| Woods, Rechanda | 29311 Willow Dr. | Lacombe | LA | 70445 | Becnel Law Firm (Daniel Jr) | A |
| Youmans, Cassandra | 5201 Chamberlain Dr. | New Orleans | LA | 70122 | Daniel K. Bryson | A |
| Young, Raymond Sr. & Linda | 577 Huseman Ave. | Covington | LA | 70435 | Baron and Budd, PC | A |
| Zeber, Michelle & Neal | 8949 Glenfield Drive | Baton Rouge | LA | 70809 | Wolfe Law Group; Scott Wolfe | A |

as of 10.13.2010

# EXHIBIT

# B

EXHIBIT B

| Property Owner | Street | City | State | Zip | Lawyer/Firm |
|---|---|---|---|---|---|
| Aguilar, Eleanor | 3583 NW 14th Court | Lauderhill | FL | 33311 | Alters/Baron & Budd |
| Ambroise, Donald | 1425 NW 36th Way | Lauderhill | FL | 33311 | Alters/Baron & Budd |
| Amerson, Amy | 1205 Magnolia Alley | Mandeville | LA | 70471 | Becnel Law Firm (Daniel) |
| Ancira, Chris & Lilah | 110 Pine Alley Road | Mandeville | LA | 70471 | Becnel Law Firm (Daniel) |
| Armstrong, David & Bonnie | 8829 Glenfield Drive | Baton Rouge | LA | 70809 | Martzell & Bickford |
| Barry, Scott & Judy | 3801 SW 2nd Street | Cape Coral | FL | 33991 | Jordan Chaikin |
| Boquet, Edwin | 17454 Rosemont Drive | Prairieville | LA | 70769 | Becnel Law Firm (Daniel) |
| Borne, Carol | 835 Montgomery Street | Mandeville | LA | 70448 | Jeffrey Berniard |
| Boudreaux, Virginia R. | 209 Cottage Green Lane | Covington | LA | 70435 | Peyton B. Burkhalter |
| Bourdon, Lucille | 15074 Pamela Drive | Covington | LA | 70433 | Paul A. Lea, Jr. |
| Cassagne, Brande & Jordan | 209 Place Saint Jean | Covington | LA | 70433 | Morris Bart, LLC |
| DeBenedictis, Frank & Deborah | 4408 SW 20th Ave | Cape Coral | FL | 33914 | Ben Gordon |
| Donaldson, Malcom & Kelli | 293 Penn Mill Lakes Blvd. | Covington | LA | 70435 | Paul A. Lea, Jr. |
| Dorsey, Glenda F | 39085 Pirogue Avenue | Gonzales | LA | 70737 | Lewis & Roberts PLLC |
| Fayard, Crystal & Formica, Conrad | 3216 Rachel Lane | Ocean Springs | MS | 39564 | Levin Papantonio |
| Franatovich, Mitchell & Sarah | 2251 3rd Street | Mandeville | LA | 70471 | Watts Guerra Craft LLP |
| Garrett, Roger | 13496 Addison Ave. | Gulfport | MS | 39503 | Lumpkin & Reeves |
| Guidry, Chris & Jerene | 5396 Courtyard Drive | Gonzales | LA | 70737 | Becnel Law Firm (Daniel) |
| Hebert, Loney & Vickie | 5190 Courtyard Drive | Gonzales | LA | 70237 | Becnel Law Firm (Daniel) |
| Henderson, Linda | 70510 4th Street | Covington | LA | 70433 | HHKC |

**EXHIBIT B**

| Property Owner | Street | City | State | Zip | Lawyer/Firm |
|---|---|---|---|---|---|
| Hidalgo, Sidney & Tonya | 273 Penn Mille Lakes Blvd. | Covington | LA | 70435 | Morris Bart, LLC |
| Hulsey, Charles & Sarah | 701 Arctic Fox Run | Madisonville | LA | 70447 | Becnel Law Firm (Daniel) |
| Jarvis, Frank & Kathy | 1219 NW 38th Pl | Cape Coral | FL | 33993 | Leopold Kuvin |
| Landry, Justin & Renee | 12302 Dutchtown Villa Dr. | Geismar | LA | 70734 | Lewis & Roberts PLLC |
| LeJune, Michael & Melissa | 680 Silverthorne Lane | Madisonville | LA | 70461 | Paul A. Lea, Jr. |
| Matus, Aldo & Ghedy | 41299 Tulip Hill Ave. | Prairieville | LA | 70769 | Joshua Palmantier |
| Mercado, Juan & Irena | 1226 NE 10th Lane | Cape Coral | FL | 33909 | Scott Weinstein |
| Miller, Daniel & Jacqueline Perry | 1903 SW 46th Terrace | Cape Coral | FL | 33914 | Arnold Levin |
| Milk, Jeanette | 11052 Shoreline Drive | Baton Rouge | LA | 70809 | HHKC |
| Naden, Roberta & Craig | 5263 Courtyard Drive | Gonzales | LA | 70737 | HHKC |
| Pagador, Tony & Tabitha | 13429 Libby Lane | Gulfport | MS | 39503 | Lumpkin & Reeves |
| Perry, Timothy & Tracy | 15190 Westin Cove | Gulfport | MS | 29503 | David McMullen |
| Ristovski, Van | 961 Leonardo Circle | Port St. Lucie | FL | 34986 | Jordan Chaikin |
| Robair, Alexander J. | 39055 Bayou View Ave. | Gonzales | LA | 70737 | Martzell & Bickford |
| Roberson, Sandra | 829 Flora Lane | Baton Rouge | LA | 70810 | HHKC |
| Smith, Dione & Pryce, Hazel | 1068 NW Leonardo Circle (VZ64A) | Port St. Lucie | FL | 34986 | Parker, Waichman, Alonso |
| Taylor, David & Amanda | 3216 Joy Lane | Ocean Springs | MS | 39564 | Lewis & Roberts PLLC |
| Tom, San and Jianran | 602 Charleston Lane | Long Beach | MS | 39560 | Lewis & Roberts PLLC |
| Ward, Truman & Amy | 5367 Courtyard Drive | Gonzales | LA | 70737 | HHKC |
| Wheeler, Don M. & Agnes | 41311 Tulip Hill Ave. | Prairieville | LA | 70769 | Joshua Palmantier |
| Zeber, Michelle & Neal | 8849 Glenfield Drive | Baton Rouge | LA | 70809 | Wolfe Law Group |

EXHIBIT B

| |
|---|
| Florida Group |
| Mandeville Group |
| Baton Rouge Group |
| Mississippi Group |
| Covington Group |
| Prairieville/Gonzales Group |

# EXHIBIT

# C

**Exhibit C**

# HOMEOWNER AFFIRMATION

I _____ , residing at

_____ ,

hereby submit this Affirmation regarding the Settlement Agreement For The Demonstration

Remediation Of Homes With KPT Drywall.

     I am the owner of the property located at

_____ .

     To the best of my knowledge, information, and belief, the property contains all or

substantially all KPT Drywall (Drywall manufacturer by Knauf Plasterboard (Tianjin) Co., Ltd.).

Further, I have provided to my counsel all documents that, to my knowledge, identify the

manufacturer of the Drywall used in that property.

_____     _____

Property Owner                Property Owner

_____     _____

Property Owner Social Security #     Property Owner Social Security #

                                      _____

                                      Counsel
                                      LAW FIRM

STATE OF _____ , COUNTY OF _____

     I certify that on _____ , 2010, _____ personally came
before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and
personally signed this document; and (b) signed, sealed and delivered this document by her act
and deed.

                                        _____

                                        Notary Public

# EXHIBIT

# D

Exhibit D

# SCOPE OF WORK

The Remediation Work at the Home is described generally below. In conducting the Remediation Work and in resolving any disputes pursuant to the mediation process described in the Demonstration Remediation Agreement, the Homeowner and Contractor agree that the objective of the Remediation Work is to remove on a cost effective basis all drywall, problem drywall-related odors, and contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"); and to leave the Home with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the Remediation Work.

1.  **Drywall Removal.** Removing and replacing all drywall in the home, including ceilings, with the exception of the following materials unless removal of such materials is required in order to complete the Remediation Work pursuant to this Scope of Work:

    a.  Type X fire rated board

    b.  Thicknesses other than ½"

    c.  Moisture Resistant Drywall ("Green board")

    d.  Sag Resistant Gypsum Board

    e.  Tile Backer Board

2.  **Electrical Wiring.** Remove and replace all electrical wiring (including low-voltage wiring), switches, service panels, circuit breakers, receptacles, and all Contaminated circuit boards.

3.  **Fire Safety and Home Security Equipment.** Remove and replace all fire safety equipment, including security alarms, intercoms, smoke detectors, fire suppression sprinkler systems, and carbon monoxide alarms.

4.  **Copper gas lines.** Replace all copper gas lines and fittings.

5.  **Fixtures.** Remove, store and reinstall the following to the extent such fixtures interfere with the removal of the drywall as described in Paragraph 1. Otherwise, such fixtures will remain in place with suitable protection. In the event of any damage to such fixtures from the possible problem drywall or the drywall removal and replacement, such fixtures will be replaced.[1]

---

[1]   In the event that equipment, appliances or fixtures need replacement, the replacement will be with new equipment, appliances or fixtures and not with reconditioned ones.

a.    Hot water heaters

b.    Cabinets

c.    Countertops

d.    Doors

e.    Moldings and trim as required to remove drywall as described in Paragraph 1

f.    Sinks

g.    Toilets

h.    Bathtubs, shower enclosures

i.    Mirrors

j.    Lighting fixtures

k.    Ceiling fans

l.    Plumbing fixtures

m.    Exhaust Grills and Diffusers

n.    Marble pieces

o.    Doors and attached door hardware

6.    **Dust Control and Removal**.  Remove the drywall using methods for dust control routinely used in drywall renovation projects.

a.    These control methods typically include installation of drop cloths and walk-off mats, negative pressurization of work area with exhaust fans, and cleanup of dust and debris.

b.    Following the removal of all drywall as described in Paragraph 1, sweep all bulk debris and remove from site.

c.    Following the sweeping, vacuum all surfaces including wall cavities using vacuums equipped with drywall bags and/or, where appropriate or necessary, HEPA (high efficiency particulate air) filters, to remove drywall dust.

d.    Damp wipe all surfaces with water.

7.    **HVAC**.  The following HVAC repairs will be performed by a manufacturer-qualified firm, but if such firm is not available, by a licensed HVAC technician.

2

    a.      Remove and replace the coils from all affected air handling units.

    b.      Replace thermostats in affected areas and control boards in affected air handling units; and otherwise clean and/or replace as needed the air handler.

    c.      Replace over limit controls on electric heating coils in affected units.

    d.      Remove and replace the flexible duct.

    e.      Inspect and clean the metal duct work.

    f.      Remove and replace all other damaged HVAC system components.

8.    **Insulation.**  Remove and replace porous insulation and repair or replace as necessary non-porous insulation in direct contact with the drywall to be removed.

    a.      Porous Insulation

        (i)      Fiber glass insulation

        (ii)     Cellulose insulation

        (iii)    Open cell foam insulation

    b.      Non-Porous Insulation

        (i)      Closed cell foam insulation

        (ii)     Reflective insulation

9.    **Carpet.**  Remove and replace all carpet.

10.    **Plumbing.**

    a.      Remove and replace all affected plumbing components that either show discoloring or pitting on exposed components such as faucets, and handles.

    b.      All other piping, fittings and components to be inspected, cleaned of any Contamination, and, if functionally unaffected, remain in place.

11.    **Appliances.**  Remove and replace all built-in appliances, defined to mean refrigerators, freezers, washers and dryers, garbage disposals, stoves, dishwashers, and microwaves, affected by possible problem drywall where the performance or appearance is compromised, for example, where there is evidence of Contamination.

12.    **Finishing.**  Finish and paint all new drywall using a primer and two coats of paint.

13. **Final Cleaning**.  Clean the Home to pre-repair condition, which will be documented in the Work Authorization Agreement, Exhibit F, to the Demonstration Remediation Agreement.

14. **Documentation and Preservation**.  In the course of remediation, the contractor will fully document the remediation work using photographic and other documentation methods, including but not limited to identification of the manufacturer and condition of the possible problem drywall on a room by room, wall by wall and board by board basis. At the option and sole expense of KPT, all possible problem drywall and fixtures, wiring, fire safety equipment, plumbing, wiring, carpets, and appliances or other items removed from the home will be maintained for scientific analysis.

15. **Government Agency Access.**  Relevant government agencies, including but not limited to the Consumer Product Safety Commission, will be allowed to observe the Remediation Work and given access to the documentation materials and items described in Paragraph 14.

# EXHIBIT

# E

## Exhibit E

# CONTRACTORS

| Assigned Contractor | Moss & Associates, LLC (Joe Harris) 2101 N. Andrews Avenue, Suite 300 Ft. Lauderdale, FL 33311 |
|---|---|
| Substitute Contractors (subject to finalization) | B.D. Welch Construction, LLC (Bobby D. Welch) One Riverchase Ridge, Suite 100 Birmingham, AL 35244 Schuler Construction, LLC (Chris Schuler) 124 Oakridge Park East Metairie, LA 70005 Jim Fussell Builder, Inc. (Jim Fussell) 8841 Bluebonnet Blvd, Suite Baton Rouge, LA 70810 Da Pau Enterprises II, Inc. (Dana Paul) 17641 E. Colonial Drive Orlando, FL 32820 Benchmark Custom Builders II Inc. (Alex Locay) 1040 Bayview Drive #520 Ft. Lauderdale, FL 33305 Jewel Construction Corporation (Richard Jones) 231 SW 12th Avenue Pompano Beach, Fl 33069 Crawford & Co. (Kirby Klosson) 1001 Sumitt Blvd Atlanta, GA 30319 2450 Severn Avenue, Suite 500 Metairie, LA 70001 |

# EXHIBIT

# F

<u>Exhibit F</u>

**Work Authorization Agreement**

# THIS DOCUMENT HAS LEGAL CONSEQUENCES. PLEASE READ THIS DOCUMENT CAREFULLY AND CONSULT WITH YOUR ATTORNEY AS YOU DEEM NECESSARY BEFORE SIGNING

This Work Authorization Agreement defines the specific work necessary to complete remediation of the home indicated below, and authorizes the Contractor to perform this work. The terms below are subject to the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall in *In re: Chinese Manufactured Drywall Products Liability Litigation,* MDL No. 2047 (the "Demonstration Remediation Agreement"), which the Homeowner should carefully review with counsel prior to signing.

The Homeowner, the Knauf Entities (as that term is defined in the Demonstration Remediation Agreement attached as Exhibit 1) and the Contractor agree as follows:

**Homeowner:**
Name:
Address:

**Knauf Entities' Authorized Representative:**
Name:
Address:

**Contractor:**
Name:
Address

**Project:**
Remediation of house located at:
Street:
City:

**Estimated Move-Out Date:**
**Estimated Substantial Completion Date:**

**Under Air Square Footage of Home:**

The Homeowner, Knauf Entities and Contractor, as the Knauf Entities' agent, have reviewed the work necessary to accomplish the remediation of Chinese

**Page 1 of 16**

## Exhibit F

drywall, as described in Exhibit D, Scope of Work, to the Demonstration Remediation Agreement ("Scope of Work"), attached to this Work Authorization, and have agreed that this work consists of the following items, which are attached:

1. Terms and Conditions of the Work Authorization Agreement
   a. Appliance, Fixture, Equipment and Fire System Schedule
   b. Room Finish Schedule
   c. Schedule of Work – Detailed room by room description of the scope of remediation work (attached as Exhibit 2)
2. Scope of Work – Exhibit D to the Demonstration Remediation Agreement (attached hereto as Exhibit 3)
3. Requirements for Move-Out/Move-In (attached as Exhibit 4)
4. Contractor Insurance Certificates (attached as Exhibit 5)
5. Homeowner Release of Contractor (attached as Exhibit 6)
6. American National Standard for Single Family Residential Building, Method for Calculating Square Footage (attached as Exhibit 7)

Photographic and/or videographic documentation of the existing interior of the house, including, but not limited to, fixtures and finishes will be included as a reference. In addition, if this box is checked [__], the following original construction drawings and specifications are included and attached as Exhibit 8 for reference purposes:

[list construction drawings and specifications]

Homeowner, Knauf Entities' Authorized Representative and Contractor, as Knauf Entities' agent, agree that these are an accurate and correct representation of the construction quality and finishes as existed prior to the start of the Repair Work.

Homeowner represents that he (she) is the owner of the residence to be remediated and that he (she) is fully authorized to enter into this agreement and bind himself (herself), all dependants who live in the home, and any other guests or residents who reside in the home.

Effective the ___ day of ____, 201__ ("Effective Date")

_____        _____
Homeowner                                        Date


_____        _____
Contractor, as Agent for Knauf Entities          Date

**Page 2 of 16**

## Exhibit F

_____
Knauf Entities' Authorized Representative          Date

<u>Exhibit F</u>

**Terms and Conditions of the Work Authorization Agreement**

I.    <u>REPAIR WORK</u>

    1.  The repair (*i.e.*, remediation) work at the Home is described generally in the Scope of Work attached as Exhibit D to the Demonstration Remediation Agreement and specifically in the Schedule of Work attached to this Work Authorization Agreement ("Work Authorization") (together "Repair Work"). In conducting the Repair Work and in resolving any disputes pursuant to the mediation process described in Paragraph VIII of the Demonstration Remediation Agreement, the Homeowner and Contractor agree that the objective of the Repair Work is to remove on a cost effective basis all drywall and Chinese drywall-related odors and contamination, including, but not limited to, corrosion, tarnishing, and pitting ("Contamination"), and to leave the Home with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the Repair Work.

    2.  For clarification, the Scope of Work describes the overall remediation work agreed to by the Parties to the Demonstration Remediation Agreement and which must be followed as to all homes participating in the remediation program established by the Demonstration Remediation Agreement. The attached Schedule of Work is created by the Contractor in consultation with the homeowner, including through their joint inspection of the home, and is the agreed upon remediation work that will be specifically performed by the Contractor on behalf of and, as agent under contract to the Knauf Entities. **By executing this Work Authorization, which incorporates and follows the Scope of Work, Homeowner agrees that this is the complete Repair Work to which Homeowner is entitled under this Work Authorization and the Demonstration Remediation Agreement.**

    3.  All materials, systems and equipment that are removed during the course of remediation work will either be reinstalled or replaced in accordance with the Scope of Work and, where replaced, replaced with new materials that are of the same construction, quality and finishes as those removed.

    4.  All Repair Work will be performed in accordance with applicable codes and regulations as these codes and regulations exist as of the last date that all required building and construction permits have been filed. Neither the Knauf Entities nor Contractor are responsible for the failure of the home to comply with building codes and regulations where such failure is unrelated to the Repair Work. Except where such failures are corrected as a consequence of the Repair Work, the Homeowner will

## Exhibit F

be responsible for correcting such failures and any delays in the Repair Work resulting from such corrective work. If correction of such a failure is not accomplished during the Repair Work, but is required by governmental or other authority with jurisdiction, then the Homeowner is responsible for such correction. For example, Repair Work includes replacement of the electrical system so that any existing non-compliant electrical work will be corrected during the normal course of the Repair Work. But non-compliant roof construction is unaffected by the Repair Work and therefore would remain the responsibility of the Homeowner. If the authority with jurisdiction requires correction of non-compliant roof construction in order to secure a certificate of occupancy, such correction would, thus, be the responsibility of the Homeowner. In addition, if such corrective work will interfere with the Repair Work, the Contractor will cease the Repair Work until such time as the corrective work is completed, and the estimated Construction Duration (defined below) will be extended without penalty to the Contractor or the Knauf Entities.

5. In accordance with the Scope of Work, materials, systems and equipment that are retained, but damaged by the Repair Work, will be restored to the condition that existed prior to the start of Repair Work, and where necessary replaced with new materials, systems and/or equipment.

6. Where necessary, new work will be integrated into existing work so that, to the extent reasonably feasible, one cannot reasonably be distinguished from the other. Transitions between new and existing work will, wherever possible, occur at a transition such as a corner or other break point.

7. All electrical work will be performed by a licensed electrician and will be in accordance with requirements of the National Electrical Code (NEC) and any applicable local building codes as these codes and regulations exist as of the last date that all required building and construction permits have been filed. Electrical work will be inspected by the electrical inspector of the local Authority having jurisdiction. In addition, all other trades, including plumbing, will be performed by licensed subcontractors, to the extent required by applicable law, regulation or building code.

8. The Repair Work is set forth in the attached Schedule of Work, which, consistent with the Scope of Work, establishes specific components of the residence that are to be either removed and replaced, or removed and reinstalled. Building materials, building systems and fixtures not listed in the Schedule of Work will be retained in place and protected during the work.

**Exhibit F**

9. Homeowner Requested Work. The Homeowner may request additional work by the Contractor or others that is not included in the Repair Work ("Homeowner Requested Work"). Such work may be performed by the Contractor under separate agreement with the Homeowner as long as such work does not impede the progress of the Repair Work. Such Homeowner Requested Work will be paid for in advance by the Homeowner to the Contractor.

## II.  SCHEDULE

1. The Construction Duration shall be measured from the actual Move-Out Date to the actual Substantial Completion date as defined below. By executing this Work Authorization Agreement, the Homeowner acknowledges (1) the estimated Move-Out Date, and (2) the Estimated Substantial Completion date provided on the first page of this document, as may be adjusted in accordance with these terms and conditions. These dates are merely estimates and the actual Move-Out Date and actual Substantial Completion date will likely vary.

2. The Move-Out Date is the date upon which the Contractor will commence Repair Work. Homeowner agrees to complete move out of all personal property, to remove and properly dispose of all trash, and to leave the premises by the Move-Out Date so that the home is fully, and without impediment, available to the Contractor to begin Repair Work. The Homeowner agrees that the move-out requirements contained in Exhibit 4 (Requirements for Move-Out/Move-In) will be completed to the reasonable satisfaction of the Contractor and that such completion is a precondition to the start of Repair Work.

3. On at least twenty business days notice, the Contractor will schedule the Move-Out Date with the Homeowner. This date will not be scheduled until all preconditions to the start of Repair Work set forth in the Requirements for Move-Out/Move-In (Exhibit 4) have been satisfied, including but not limited to, receipt of required permits and scheduling and/or delivery of materials with long-delivery times.

4. Contractor shall have complete control of the house at all times during the Construction Duration, and to the extent the Homeowner needs to enter the house, he shall do so with advance notice to the Contractor and in such a manner so as not to interfere with the Repair Work. Separate contractors of Homeowner shall not enter the house during the Construction Period unless accompanied by Contractor's authorized representative and only after they have executed a visitor waiver in which they assume all risks, and waive all claims, in connection with entering the house during the construction period.

**Page 6 of 16**

## Exhibit F

5. Homeowner, at his (her) own expense, shall be responsible for ordinary exterior maintenance of the house including maintenance of landscaping, pools, exterior finishes, roof, etc. and payment of all utility bills, property taxes and other similar expenses during the Construction Duration. The Contractor will be responsible for maintaining the areas inside and outside of the house affected by its work.

6. To the extent the Homeowner has property insurance on the house, he (she) shall provide proof of such insurance to the Contractor prior to the Move-Out Date and will maintain such property insurance during the Construction Duration. **If the Homeowner does not have property insurance or cannot obtain such insurance, Homeowner acknowledges that he (she), not the Contractor, will be liable for damage to the home, other than that caused by the Repair Work.**

7. Drywall Removal and Cleanup. The initial phase of the Repair Work involves demolition, including the removal of all drywall, as set forth in the Scope of Work, Exhibit D to the Demonstration Remediation Agreement, drywall debris and visible dust, and elimination of all Chinese-drywall associated odors and Contamination. After completion of demolition, the Contractor will perform a careful cleaning of the house to remove all remaining drywall debris and visible dust as provided for in the Scope of Work.

8. Contractor Certification. Throughout the cleanup, the house will be "aired out" by leaving all windows and doors open. Such "air-out" period will be no less than 24 hours. Contractor will continue to clean all surfaces in the house, including, by vacuuming using, drywall bags and/or, where appropriate or necessary, HEPA (high efficiency particulate air) filters, until a visual inspection by the Contractor verifies that all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) are free of visible dust, debris or residue and that no detectable odor of Chinese drywall remains. Evaluation of odor is to be performed at first entry to the house after it has been vacant and with all windows and doors closed for a period of at least 8 hours. Contractor shall certify completion of the drywall and Contamination removal and cleanup work by executing the Contractor Certification found in Exhibit G to the Demonstration Remediation Agreement and providing such Certification to the Homeowner and Knauf Entities. After completion of the Contractor Certification, the Contractor will notify the Environmental Inspector that the house is ready for inspection.

9. Environmental Certification. Following the Contractor Certification, and notice that the home is ready for environmental inspection, the Environmental Inspector will perform an independent inspection to

**Page 7 of 16**

## Exhibit F

verify the Contractor's certification that all drywall has been removed in accordance with the Scope of Work, including all debris and visible dust, and that there is no detectable odor of Chinese drywall in the house. If the Environmental Inspector concludes that the home is not free of any and all Chinese drywall-associated odors and Contamination, the Contractor will perform remediation work as required to complete the remediation as judged by the Environmental Inspector's visual inspection and odor evaluation of the house. Once the Environmental Inspector concludes that the house is free of any and all Chinese drywall-associated odors and Contamination and that the atmosphere in the house is representative of the atmosphere in houses built without Chinese drywall, he (she) will execute the Environmental Certification found in Exhibit I of the Demonstration Remediation Agreement and provide such Certification to the Homeowner and the Knauf Entities.

10. Substantial Completion is the stage in the progress of the Repair Work when the Repair Work is sufficiently complete so that the Homeowner can occupy or utilize the residence for its intended use. Substantial Completion occurs only after the Environmental Inspector has concluded that the residence is free of any and all Chinese drywall-associated odors and Contamination and has signed the Environmental Certification, consistent with the terms of the Demonstration Remediation Agreement, and any certificates of occupancy have been issued by the authority with jurisdiction over the project.

11. So as to minimize the risk of damage and/or theft, certain appliances that are not required for a Certificate of Occupancy may be delivered and installed on the day the Homeowner moves back in and assumes responsibility for the home.

12. Punch List: If at the time of Substantial Completion there are any items that do not affect occupancy of the residence, but do require finishing or correcting, the Contractor shall prepare, with input from, and the agreement of, the Homeowner, a comprehensive Punch List of such items that are to be completed or corrected prior to final payment. Failure to include an item on the Punch List does not alter the responsibility of the Contractor to complete all Repair Work.

## III. WARRANTY

1. The Contractor warrants to the Homeowner that materials and equipment furnished as part of the Repair Work will be of good quality and new unless this Work Authorization requires or permits otherwise, and will not include (i) any Chinese-manufactured drywall or plasterboard products, (ii) any Knauf Entities' drywall or plasterboard

## Exhibit F

products, or (iii) any products manufactured by the Knauf Entities outside of the United States ("Restricted Materials"). The Contractor or its subcontractors shall in their sole discretion, without any influence from the Knauf Entities, select all materials and equipment, but not any Restricted Materials, to be furnished as part of the Repair Work. The Contractor further warrants that the Repair Work will conform to the requirements of the Work Authorization, including the Scope of Work, and will be free from defect, except for those inherent in the quality of the materials and equipment as required or permitted by the Work Authorization. The Contractor's warranty includes damage or defects in the Repair Work caused by the Contractor. Damage caused by the Homeowner is not warranted by the Contractor.

2. As to items within the House that were purchased and installed by the Contractor but that were not manufactured by the Contractor, including but not limited to, any HVAC Equipment, Appliances, other equipment or "consumer products," Contractor provides no warranty on such items, but shall transfer to Homeowner the manufacturer's warranty. However, the Contractor's warranty does extend to the installation of such items. Copies of applicable warranties will be turned over to the Homeowner at Substantial Completion. All items, appliances, or equipment reinstalled or replaced pursuant to Paragraphs 2, 3, 5, 7 and 11 in the Scope of Work will be tested in place prior to, or at, the Move-In Date.

3. **Contractor is not responsible for, and accepts no liability for, any defects or deficiencies in work that was not replaced or reinstalled by Contractor.**

4. If, within one year or other time frame required by applicable law or regulation, whichever is longer (the "Warranty Period") after the date of Substantial Completion of the Repair Work, any of the Repair Work is found to be not in accordance with the requirements of the Work Authorization, the Homeowner shall promptly notify the Contractor, in writing, of the condition, and the Contractor shall correct such condition promptly. If the Homeowner fails to notify the Contractor during the Warranty Period and fails to give the Contractor an opportunity to make the correction, the Homeowner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If upon written notification during the Warranty Period, the Contractor fails to promptly correct the nonconforming Repair Work, then the Homeowner may request that the Knauf Entities' promptly correct the nonconforming Repair Work under the terms of the Knauf Entities' agreement with the Contractor.

**Exhibit F**

IV.    **MISCELLANEOUS**

1.  The Contract Sum, excluding any Homeowner Requested Work, will be paid by the Knauf Entities, pursuant to the terms of a separate agreement between the Knauf Entities and Contractor.  The Homeowner is not responsible for paying the Contractor any of the costs associated with its work, except to the extent the Contractor undertakes any Homeowner Requested Work.  **In return for the Knauf Entities' payment of the Contract Sum, as provided for in the Demonstration Remediation Agreement, the Homeowner must provide a release of his claims, other than those relating to bodily injury, against the Knauf Entities, and a full release of his claims against other companies, such as builders, suppliers and insurers, contributing to the costs of the Repair Work, and therefore, the Homeowner should discuss the terms of the release with his attorney before entering into this Work Authorization. Such release shall become effective upon Substantial Completion and the Contractor providing to the homeowner a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the Repair Work have been either released or bonded off such that that the Homeowner's title is clear of all liens related to the Repair Work ("All Clear Lien Certificate"); however, the Knauf Entities will remain obligated pursuant to the Demonstration Remediation Agreement solely as to the Punch List items and the expiration of the warranty.**

2.  Upon Substantial Completion and the submission by the Contractor to the homeowner of an All Clear Lien Certificate prior to moving back into the home, the Homeowner shall sign an additional release in favor of the Contractor in the form attached as Exhibit 6.

3.  In accordance with Paragraph III (B) of the Demonstration Remediation Agreement, the Contractor has determined the square footage of the home using the American National Standard for Single-Family Residential Building's methodology attached as Exhibit 7.  The square footage is listed on the first page of this document.

4.  If concealed or unknown physical conditions at the site that differ materially from those indicated in the Work Authorization or from those conditions ordinarily found to exist or in the event of a Force Majeure (as defined in this paragraph), the Contract Sum and estimated Construction Duration (as measured from the estimated Move-Out Date to the estimated Substantial Completion date provided on the first page of this document) shall be subject to equitable adjustment. "Force Majeure" means any of the following acts or events that prevents the affected Party from performing its obligations in

## Exhibit F

accordance with this Work Authorization, if such act or event is beyond the reasonable control of and not the result of the fault or negligence of the affected Party and such Party has been unable to overcome such act or event by the exercise of due diligence or taking reasonable alternative measures: (a) unusually severe storms of extended duration or impact, other than heavy storms or climatic conditions which could generally be anticipated by the Contractor or subcontractors, as well as floods, droughts, tidal waves, fires, hurricanes, earthquakes, landslides, or other catastrophes; (b) wars, acts of terrorism, civil disturbances, riots, insurrections and sabotage; (c) transportation disasters, whether by sea, rail, air or land; (d) any industry-wide labor boycotts, strikes, picketing or similar situations, (e) actions of a Governmental Authority that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Work Authorization, including any change in Laws. It is expressly understood and agreed that Force Majeure shall not include any of the following events: (1) economic hardship; (2) changes in market conditions; (3) late delivery of materials, except to the extent such late delivery is itself caused by an event of Force Majeure; (4) any strike, work-to-rule action, go-slow or similar labor difficulty that is limited to the Contractor's and/or subcontractor's employees; or (5) jurisdictional disputes or labor actions affecting a single or small group of contractors or suppliers.

5. In the event that a dispute arises between the Homeowner and the Knauf Entities or Contractor, this dispute will be resolved in accordance with the Dispute Resolution Process set forth in Paragraph VIII of the Demonstration Remediation Agreement.

6. If the Contractor encounters any materials that it believes may be hazardous, excluding Chinese drywall, materials made hazardous by Chinese drywall, and other materials routinely found in residential construction (collectively, "Excluded Items"), the Contractor will immediately stop work and notify the Homeowner and the Knauf Entities' representative. Contractor shall not resume work until Homeowner removes the hazardous material. To the fullest extent permitted by law, the Homeowner shall indemnify and hold harmless the Contractor and its subcontractors and the Knauf Entities from claims, damages, losses, delays, and expenses, including but not limited to attorneys' fees and costs, arising out of or resulting from the hazardous materials less Excluded Items. The Homeowner shall not be responsible for materials and substances brought to the site by the Contractor or for the drywall being remediated.

7. Before starting work, Contractor shall provide proof of the following insurance coverage:

**Exhibit F**

TBD

8. Homeowner does not waive claims against the Contractor for bodily injury or property damage caused by the Work Authorization and/or the Repair Work, except the Homeowner waives claims for such injury and/or damage that seek recovery of emotional distress (except for such emotional distress claims related to a bodily injury claim), loss of profits, loss of use, and/or diminution of property value damages. "Loss of Use" does not include loss of use during the Construction Duration.

9. By entering into this Work Authorization, Homeowner affirmatively represents that it is not aware of any code violations, concealed conditions materially affecting the house, leaks, or Defects unrelated to the drywall. "Defects" means a condition, other than the presence of Chinese drywall and anything that may have been contaminated by Chinese drywall, that would either (a) have a significant adverse effect on the value of the property, (b) significantly impair the health or safety of occupants or of the workers, or (c) that if not repaired, removed or replaced, shorten or adversely affect the expected normal life of the house.  Homeowner acknowledges that it has had the opportunity to review the Work Authorization with counsel of its choice and is encouraged to do so.

This Work Authorization entered into as of the Effective Date first written above.

**HOMEOWNER** *(Signature)*

*(Printed name and title)*

**CONTRACTOR as Agent for Knauf** *(Signature)*

*(Printed name and title)*

**Knauf Entities**  *(Signature)*

*(Printed name and title)*

**Exhibit F**

**Appliance, Fixture, Equipment and Fire System Schedule**

In accordance with the Scope of Work, all built-in appliances, defined to mean refrigerators, freezers, washers and dryers, garbage disposals, stoves, dishwashers, and microwaves affected by possible problem drywall where the performance or appearance is compromised, for example, where there is evidence of Contamination. Nothing in this schedule is intended to limit or modify the Scope of Work.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Refrigerator | | | |
| Stove | | | |
| Cook Top | | | |
| Oven | | | |
| Microwave | | | |
| Range Hood | | | |
| Dishwasher | | | |
| Freezer | | | |
| Washer | | | |
| Dryer | | | |
| Garbage Disposal | | | |

In accordance with the Scope of Work, in the event that fixtures need replacement, the replacement will be with new equipment, fixtures and not with reconditioned ones. Nothing in this schedule is intended to limit or modify the Scope of Work.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Ceiling Fan | | | |
| Chandelier | | | |
| Light Fixture | | | |
| Hot Water Heater | | | |
| Cabinets | | | |
| Countertop | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Page 13 of 16**

**Exhibit F**

In accordance with the Scope of Work, the following fire and security systems will be replaced regardless of condition.  Nothing in this schedule is intended to limit or modify the Scope of Work.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Smoke Detectors | | | |
| Security Alarms | | | |
| Intercoms | | | |
| Smoke Detectors | | | |
| Fire-Suppression Sprinkler Systems | | | |
| Carbon Monoxide Alarms | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Exhibit F**

**Room Finish Schedule**

In accordance with the Scope of Work, existing finishes and trim that are removed during the remediation will be replaced with new finishes and trim of like kind and quality. The following is a schedule of finishes and trim found in the house prior to remediation. Nothing in this schedule is intended to limit or modify the Scope of Work.

| Room Name | Wall Color/Finish | Ceiling Color /Finish | Floor Type/Color | Trim Color |
|---|---|---|---|---|
| Living Room | | | | |
| Dining Room | | | | |
| Kitchen | | | | |
| Hallway | | | | |
| Stairs | | | | |
| Den | | | | |
| Family Room | | | | |
| Bathroom | | | | |
| Master Bed Room | | | | |
| Master BR Closet | | | | |
| Master Bath | | | | |
| Bed Room 1 | | | | |
| Bed Room 2 | | | | |
| Bed Room 3 | | | | |
| Bathroom | | | | |
| | | | | |
| | | | | |

Add Photos for Multi Colored Walls

**Page 15 of 16**

<u>Exhibit F</u>

**Schedule of Work**

The following Schedule of Work describes the specific materials, systems and equipment to be removed and either replaced or reinstalled during the remediation work.  The Homeowner and Contractor agree that this describes the extent of the work required to complete remediation of the residence pursuant to the Scope of Work.

Appliances, fixtures and equipment will be replaced with units of like kind and quality to those listed in the Appliance, Fixture and Equipment Schedule.

Replacement finishes will, to the extent reasonably achievable, match those in the Room Finish Schedule.

(Attach detailed Schedule of Work document)


Note:  The following *sample* Schedule of Work is intended only to provide an example of the level of detail involved in the Repair Work the Contractor will perform pursuant to the Work Authorization Agreement.  **IT DOES NOT DESCRIBE THE REPAIR WORK THAT THE CONTRACTOR WILL PERFORM IN YOUR HOME.**  The Schedule of Work prepared for your home will follow this sample in form, but will be tailored to the finishes and conditions in your home.  Further, as in the sample Schedule of Work, the Repair Work in your home will meet all of the requirements set forth in the Scope of Work attached to both the Work Authorization Agreement as Exhibit 3 and to the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall as Exhibit D.

# EXHIBIT

# F-1

To Be Inserted By Contractor

# EXHIBIT

# F-2

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

| | |
|---|---|
| Insured: | Home Owner |
| Property: | 1234 My Street |
| | Anywhere, LA |

| | | | |
|---|---|---|---|
| Contractor: | | Business: | (954) 524-5678 |
| Company: | Moss and Associates | | |
| Business: | 2101 N. Andrews Ave. Suite 300 | | |
| | Fort Lauderdale, FL 33311 | | |

| Claim Number: | Policy Number: | Type of Loss: |
|---|---|---|

| | | | |
|---|---|---|---|
| Date of Loss: | | Date Received: | |
| Date Inspected: | | Date Entered: | |

| | |
|---|---|
| Price List: | LANO7X_SEP10 |
| | Restoration/Service/Remodel |
| Estimate: | SAMPLE-1 |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

SAMPLE-1

**General**

| DESCRIPTION | QNTY |
|---|---|
| 1.  Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 EA |
| 2.  Clean stud wall | 5476.00 SF |
| 3.  Clean floor or roof joist system | 1617.00 SF |
| 4.  Final cleaning - construction - Residential | 1617.00 SF |
| 5.  Temporary power usage (per month) | 3.00 MO |
| 6.  Temporary water - usage - per month - Commercial | 3.00 MO |

NOTES:

**HVAC**

| DESCRIPTION | QNTY |
|---|---|
| 7.  Remove and Replace Coil - 3 ton - cased | 1.00 EA |
| 8.  Remove and Replace Flexible ductwork system - hot or cold air - 1200 to 1599 SF home | 1.00 EA |
| 9.  Detach & Reset Heat/AC register - Mechanically attached | 10.00 EA |
| 10.  Remove and Replace Thermostat - High grade | 1.00 EA |

NOTES:

Main Level

**Main Level**

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

| DESCRIPTION | QNTY |
|---|---|
| Remove and replace insulation from exterior wall | |

NOTES:



**2 Car Garage** **Height: 9' 4"**

| | |
|---|---|
| 731.11 SF Walls | 381.50 SF Ceiling |
| 1112.61 SF Walls & Ceiling | 381.50 SF Floor |
| 42.39 SY Flooring | 78.33 LF Floor Perimeter |
| 78.33 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 11. Remove and Replace 1/2" drywall – hung, taped, floated, ready for paint | 1112.61 SF |
| Garage walls and ceiling to remain unpainted. | |
| 12. Detach & Reset Overhead (garage) door opener – Standard grade | 1.00 EA |
| 13. Detach and Reset Overhead Door Track | 30.00 LF |
| 14. Remove and Replace Switch | 1.00 EA |
| 15. Remove and Replace Outlet for garage door opener | 1.00 EA |
| 16. Remove and Replace Ground fault interrupter (GFI) outlet | 1.00 EA |

NOTES:

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Bed 3**                                                                                    **Height: 9'**

384.00 SF Walls                              113.33 SF Ceiling
497.33 SF Walls & Ceiling               113.33 SF Floor
12.59 SY Flooring                             42.67 LF Floor Perimeter
42.67 LF Ceil. Perimeter

| DESCRIPTION | QNTY |
|---|---|
| 17. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 497.33 SF |
| 18. Add for bullnose (rounded) corners | 497.33 SF |
| 19. Texture drywall - heavy hand texture | 497.33 SF |
| 20. Paint the walls and ceiling - two coats | 497.33 SF |
| 21. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 113.33 SF |
| 22. Remove and Replace Baseboard - 2 1/4" | 42.67 LF |
| 23. Paint baseboard - two coats | 42.67 LF |
| 24. Remove Carpet - Standard grade | 113.33 SF |
| 25. Carpet - Standard grade | 130.33 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 26. Remove and Replace Carpet pad - Standard grade | 113.33 SF |
| 27. Remove and Replace Batt insulation - 4" - R13 | 168.00 SF |
| 28. Remove and Replace Window sill | 2.00 LF |
| 29. Seal & paint window sill | 2.00 LF |
| 30. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 31. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 32. Paint casing - two coats | 34.00 LF |
| 33. Rewire - average residence - copper wiring | 113.33 SF |
| 34. Remove and Replace Smoke detector | 1.00 EA |
| 35. Detach & Reset Light fixture | 1.00 EA |
| 36. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 37. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 38. Remove and Replace Television cable outlet | 1.00 EA |
| 39. Remove and Replace Switch | 1.00 EA |
| 40. Remove and Replace Outlet | 4.00 EA |

SAMPLE-1

10/6/2010          Page: 4

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Bed 3**

**DESCRIPTION**                                                                           **QNTY**

NOTES:



| LN | | Height: 9' |
|---|---|---|
| 68.36 SF Walls | 3.60 SF Ceiling | |
| 71.96 SF Walls & Ceiling | 3.60 SF Floor | |
| 0.40 SY Flooring | 7.60 LF Floor Perimeter | |
| 7.60 LF Ceil. Perimeter | | |

| **DESCRIPTION** | **QNTY** |
|---|---|
| 41.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 71.96 SF |
| 42.  Texture drywall - heavy hand texture | 71.96 SF |
| 43.  Paint the walls and ceiling - two coats | 71.96 SF |
| 44.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 3.60 SF |
| 45.  Remove and Replace Baseboard - 2 1/4" | 7.60 LF |
| 46.  Paint baseboard - two coats | 7.60 LF |
| 47.  Detach & Reset Shelving - 12" - in place | 10.00 LF |
| 48.  Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 49.  Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 50.  Paint casing - two coats | 34.00 LF |
| 51.  Remove Carpet - Standard grade | 3.60 SF |
| 52.  Carpet - Standard grade | 4.14 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 53.  Remove and Replace Carpet pad - Standard grade | 3.60 SF |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - LN

| DESCRIPTION | QNTY |
|---|---|

NOTES:



| Bed 2 | | Height: 9' |
|---|---|---|
| 383.89 SF Walls | 113.27 SF Ceiling | |
| 497.17 SF Walls & Ceiling | 113.27 SF Floor | |
| 12.59 SY Flooring | 42.65 LF Floor Perimeter | |
| 42.65 LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY |
|---|---|
| 54. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 497.17 SF |
| 55. Add for bullnose (rounded) corners | 497.17 SF |
| 56. Texture drywall - heavy hand texture | 497.17 SF |
| 57. Paint the walls and ceiling - two coats | 497.17 SF |
| 58. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 113.27 SF |
| 59. Remove and Replace Baseboard - 2 1/4" | 42.65 LF |
| 60. Paint baseboard - two coats | 42.65 LF |
| 61. Remove Carpet - Standard grade | 113.27 SF |
| 62. Carpet - Standard grade | 130.27 SF |
| 15 % waste added for Carpet - Standard grade | |
| 63. Remove and Replace Carpet pad - Standard grade | 113.27 SF |
| 64. Remove and Replace Batt insulation - 4" - R13 | 80.00 SF |
| 65. Remove and Replace Window sill | 2.00 LF |
| 66. Seal & paint window sill | 2.00 LF |
| 67. Detach & Reset Interior door unit - Standard grade | 1.00 EA |

SAMPLE-1

10/6/2010                    Page: 6

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Bed 2

| DESCRIPTION | QNTY |
|---|---|
| 68. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 69. Paint casing - two coats | 34.00 LF |
| 70. Rewire - average residence - copper wiring | 113.27 SF |
| 71. Remove and Replace Smoke detector | 1.00 EA |
| 72. Detach & Reset Light fixture | 1.00 EA |
| 73. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 74. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 75. Remove and Replace Television cable outlet | 1.00 EA |
| 76. Remove and Replace Switch | 1.00 EA |
| 77. Remove and Replace Outlet | 4.00 EA |

NOTES:



Cl 3                                                     Height: 9'

| | |
|---|---|
| 115.41 SF Walls | 8.82 SF Ceiling |
| 124.23 SF Walls & Ceiling | 8.82 SF Floor |
| 0.98 SY Flooring | 12.82 LF Floor Perimeter |
| 12.82 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 78. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 124.23 SF |
| 79. Texture drywall - heavy hand texture | 124.23 SF |
| 80. Paint the walls and ceiling - two coats | 124.23 SF |
| 81. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 8.82 SF |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - C13

| DESCRIPTION | QNTY |
|---|---|
| 82. Remove and Replace Baseboard - 2 1/4" | 12.82 LF |
| 83. Paint baseboard - two coats | 12.82 LF |
| 84. Remove Carpet - Standard grade | 8.82 SF |
| 85. Carpet - Standard grade | 10.15 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 86. Remove and Replace Carpet pad - Standard grade | 8.82 SF |
| 87. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 88. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 89. Paint casing - two coats | 34.00 LF |
| 90. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 91. Rewire - average residence - copper wiring | 8.82 SF |
| 92. Detach & Reset Light fixture | 1.00 EA |
| 93. Remove and Replace Switch | 1.00 EA |

NOTES:



C12                                                    Height: 9'

| | |
|---|---|
| 116.23 SF Walls | 8.91 SF Ceiling |
| 125.15 SF Walls & Ceiling | 8.91 SF Floor |
| 0.99 SY Flooring | 12.91 LF Floor Perimeter |
| 12.91 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 94. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 125.15 SF |
| 95. Texture drywall - heavy hand texture | 125.15 SF |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - CI 2

| DESCRIPTION | QNTY |
|---|---|
| 96. Paint the walls and ceiling - two coats | 125.15 SF |
| 97. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 8.91 SF |
| 98. Remove and Replace Baseboard - 2 1/4" | 12.91 LF |
| 99. Paint baseboard - two coats | 12.91 LF |
| 100. Remove Carpet - Standard grade | 8.91 SF |
| 101. Carpet - Standard grade | 10.25 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 102. Remove and Replace Carpet pad - Standard grade | 8.91 SF |
| 103. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 104. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 105. Paint casing - two coats | 34.00 LF |
| 106. Remove and Replace Batt insulation - 4" - R13 | 16.00 SF |
| 107. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 108. Rewire - average residence - copper wiring | 8.91 SF |
| 109. Detach & Reset Light fixture | 1.00 EA |
| 110. Remove and Replace Switch | 1.00 EA |

NOTES:



| Util | | Height: 9' |
|---|---|---|
| 228.63 SF Walls | 40.31 SF Ceiling | |
| 268.94 SF Walls & Ceiling | 40.31 SF Floor | |
| 4.48 SY Flooring | 25.40 LF Floor Perimeter | |
| 25.40 LF Ceil. Perimeter | | |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

| DESCRIPTION | QNTY |
|---|---|
| 111.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 268.94 SF |
| 112.  Texture drywall - heavy hand texture | 268.94 SF |
| 113.  Paint the walls and ceiling - two coats | 268.94 SF |
| 114.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 40.31 SF |
| 115.  Remove and Replace Baseboard - 2 1/4" | 25.40 LF |
| 116.  Paint baseboard - two coats | 25.40 LF |
| 117.  Detach & Reset Interior door unit - Standard grade | 2.00 EA |
| 118.  Detach & Reset Washer/Washing Machine - Top-loading - Standard grade | 1.00 EA |
| 119.  Detach & Reset Dryer - Electric - Standard grade | 1.00 EA |
| 120.  Remove and Replace Casing - 2 1/4" | 68.00 LF |
| 121.  Paint casing - two coats | 68.00 LF |
| 122.  Detach & Reset Shelving - 12" - in place | 6.00 LF |
| 123.  Rewire - average residence - copper wiring | 40.31 SF |
| 124.  Detach & Reset Light fixture | 2.00 EA |
| 125.  Floor protection - corrugated cardboard and tape | 40.31 SF |
| 126.  Remove and Replace Switch | 1.00 EA |
| 127.  Remove and Replace Outlet | 2.00 EA |
| 128.  Remove and Replace 220 volt outlet - Heavy duty | 1.00 EA |

NOTES:



**Bath 2**                                                   Height: 9'

278.84 SF Walls                    50.73 SF Ceiling
329.57 SF Walls & Ceiling          50.73 SF Floor
5.64 SY Flooring                   30.98 LF Floor Perimeter
30.98 LF Ceil. Perimeter

| DESCRIPTION | QNTY |
|---|---|

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Bath 2**

| DESCRIPTION | QNTY |
|---|---|
| 129. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 329.57 SF |
| 130. Texture drywall - heavy hand texture | 329.57 SF |
| 131. Add for bullnose (rounded) corners | 329.57 SF |
| 132. Paint the walls and ceiling - two coats | 329.57 SF |
| 133. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 50.73 SF |
| 134. Remove and Replace Baseboard - 2 1/4" | 30.98 LF |
| 135. Paint baseboard - two coats | 30.98 LF |
| 136. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 137. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 138. Paint casing - two coats | 34.00 LF |
| 139. Remove and Replace Mirror - 1/4" plate glass | 10.25 SF |
| 140. Detach & Reset Vanity | 3.00 LF |
| 141. Detach & Reset Vanity top - one sink - cultured marble | 3.00 LF |
| 142. Detach & Reset Toilet | 1.00 EA |
| 143. Detach & Reset Bathtub | 1.00 EA |
| 144. Detach & Reset Tub/shower faucet - Standard grade | 1.00 EA |
| 145. Remove and Replace Tile tub surround - 60 to 75 SF | 1.00 EA |
| 146. Detach & Reset Towel bar | 2.00 EA |
| 147. Detach & Reset Toilet paper holder | 1.00 EA |
| 148. Detach & Reset Sink faucet - Bathroom | 1.00 EA |
| 149. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 150. Rewire - average residence - copper wiring | 50.73 SF |
| 151. Floor protection - corrugated cardboard and tape | 50.73 SF |
| 152. Detach & Reset Light bar - 3 lights | 1.00 EA |
| 153. Remove and Replace Exhaust fan | 1.00 EA |
| 154. Remove and Replace Switch | 1.00 EA |
| 155. Remove and Replace Ground fault interrupter (GFI) outlet | 1.00 EA |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Bath 2

| DESCRIPTION | QNTY |
|---|---|

NOTES:



| M. CL | Height: 9' |
|---|---|

| | |
|---|---|
| 121.48 SF Walls | 10.76 SF Ceiling |
| 132.24 SF Walls & Ceiling | 10.76 SF Floor |
| 1.20 SY Flooring | 13.50 LF Floor Perimeter |
| 13.50 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 156. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 132.24 SF |
| 157. Texture drywall - heavy hand texture | 132.24 SF |
| 158. Paint the walls and ceiling - two coats | 132.24 SF |
| 159. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 10.76 SF |
| 160. Remove and Replace Baseboard - 2 1/4" | 13.50 LF |
| 161. Paint baseboard - two coats | 13.50 LF |
| 162. Remove Carpet - Standard grade | 10.76 SF |
| 163. Carpet - Standard grade | 12.37 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 164. Remove and Replace Carpet pad - Standard grade | 10.76 SF |
| 165. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 166. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 167. Paint casing - two coats | 34.00 LF |
| 168. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 169. Rewire - average residence - copper wiring | 10.76 SF |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - M. CL

| DESCRIPTION | QNTY |
|---|---|
| 170. Detach & Reset Light fixture | 1.00 EA |
| 171. Remove and Replace Switch | 1.00 EA |

NOTES:



**M. Cl 2**        **Height: 9'**

| | |
|---|---|
| 172.39 SF Walls | 21.85 SF Ceiling |
| 194.25 SF Walls & Ceiling | 21.85 SF Floor |
| 2.43 SY Flooring | 19.15 LF Floor Perimeter |
| 19.15 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 172. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 194.25 SF |
| 173. Texture drywall - heavy hand texture | 194.25 SF |
| 174. Paint the walls and ceiling - two coats | 194.25 SF |
| 175. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 21.85 SF |
| 176. Remove and Replace Baseboard - 2 1/4" | 19.15 LF |
| 177. Paint baseboard - two coats | 19.15 LF |
| 178. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 179. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 180. Paint casing - two coats | 34.00 LF |
| 181. Detach & Reset Shelving - 12" - in place | 12.00 LF |
| 182. Remove and Replace Batt insulation - 4" - R13 | 90.00 SF |
| 183. Rewire - average residence - copper wiring | 21.85 SF |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - M. Cl 2

| DESCRIPTION | QNTY |
|---|---|
| 184. Detach & Reset Light fixture | 1.00 EA |
| 185. Floor protection - corrugated cardboard and tape | 21.85 SF |
| 186. Remove and Replace Switch | 1.00 EA |

NOTES:



**Mast. Bed**  Height: 9'

| | |
|---|---|
| 504.00 SF Walls | 182.71 SF Ceiling |
| 686.71 SF Walls & Ceiling | 182.71 SF Floor |
| 20.30 SY Flooring | 56.00 LF Floor Perimeter |
| 56.00 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 187. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 686.71 SF |
| 188. Remove and Replace Add on for trayed, dropped or coffered ceiling | 182.71 SF |
| 189. Add for bullnose (rounded) corners | 686.71 SF |
| 190. Texture drywall - heavy hand texture | 686.71 SF |
| 191. Paint the walls and ceiling - two coats | 686.71 SF |
| 192. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 182.71 SF |
| 193. Remove and Replace Baseboard - 2 1/4" | 56.00 LF |
| 194. Paint baseboard - two coats | 56.00 LF |
| 195. Remove Carpet - Standard grade | 182.71 SF |
| 196. Carpet - Standard grade | 210.12 SF |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Mast. Bed**

| DESCRIPTION | QNTY |
|---|---|
| 15 % waste added for Carpet - Standard grade. | |
| 197. Remove and Replace Carpet pad - Standard grade | 182.71 SF |
| 198. Remove and Replace Batt insulation - 4" - R13 | 288.00 SF |
| 199. Remove and Replace Window sill | 4.00 LF |
| 200. Seal & paint window sill | 4.00 LF |
| 201. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 202. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 203. Paint casing - two coats | 34.00 LF |
| 204. Rewire - average residence - copper wiring | 182.71 SF |
| 205. Detach & Reset Light fixture | 1.00 EA |
| 206. Remove and Replace Smoke detector | 1.00 EA |
| 207. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 208. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 209. Remove and Replace Television cable outlet | 1.00 EA |
| 210. Remove and Replace Switch | 1.00 EA |
| 211. Remove and Replace Outlet | 5.00 EA |

NOTES:

SAMPLE-1

10/6/2010        Page: 15

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Mast. Bath**                                                                               **Height: 9'**

433.33  SF Walls                          77.12  SF Ceiling
510.44  SF Walls & Ceiling                77.12  SF Floor
8.57  SY Flooring                         48.15  LF Floor Perimeter
48.15  LF Ceil. Perimeter

**Missing Wall:**     1 -   **2' 7" X 9'**      **Opens into Exterior**          **Goes to Floor/Ceiling**

| DESCRIPTION | QNTY |
|---|---|
| 212.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 510.44 SF |
| 213.  Remove and Replace Add on for trayed, dropped or coffered ceiling | 77.12 SF |
| 214.  Add for bullnose (rounded) corners | 510.44 SF |
| 215.  Texture drywall - heavy hand texture | 510.44 SF |
| 216.  Paint the walls and ceiling - two coats | 510.44 SF |
| 217.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 77.12 SF |
| 218.  Remove and Replace Baseboard - 2 1/4" | 48.15 LF |
| 219.  Paint baseboard - two coats | 48.15 LF |
| 220.  Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 221.  Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 222.  Paint casing - two coats | 34.00 LF |
| 223.  Remove and Replace Mirror - 1/4" plate glass | 17.08 SF |
| 224.  Detach & Reset Vanity | 5.00 LF |
| 225.  Detach & Reset Vanity top - one sink - cultured marble | 5.00 LF |
| 226.  Detach & Reset Toilet | 1.00 EA |
| 227.  Detach & Reset Bathtub | 1.00 EA |
| 228.  Detach & Reset Shower faucet - Standard grade | 1.00 EA |
| 229.  Detach & Reset Tub faucet | 1.00 EA |
| 230.  Remove and Replace Tile shower - up to 60 SF | 1.00 EA |
| 231.  Remove Custom shower door & partition - 1/4" glass w/frame | 35.00 SF |
| 232.  (Install) Custom shower door & partition - 1/4" glass w/frame | 35.00 SF |
| 233.  Detach & Reset Towel bar | 2.00 EA |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Mast. Bath**

| DESCRIPTION | QNTY |
|---|---|
| 234. Detach & Reset Toilet paper holder | 1.00 EA |
| 235. Detach & Reset Sink faucet - Bathroom | 2.00 EA |
| 236. Floor protection - corrugated cardboard and tape | 77.12 SF |
| 237. Remove and Replace Batt insulation - 4" - R13 | 126.00 SF |
| 238. Remove and Replace Window sill | 2.00 LF |
| 239. Seal & paint window sill | 2.00 LF |
| 240. Rewire - average residence - copper wiring | 77.12 SF |
| 241. Detach & Reset Light bar - 5 lights | 1.00 EA |
| 242. Detach & Reset Light fixture - Standard grade | 2.00 EA |
| 243. Remove and Replace Exhaust fan | 1.00 EA |
| 244. Remove and Replace Switch | 2.00 EA |
| 245. Remove and Replace Ground fault interrupter (GFI) outlet | 2.00 EA |

NOTES:



**Hall**          **Height: 9'**

| | |
|---|---|
| 266.75 SF Walls | 44.59 SF Ceiling |
| 311.34 SF Walls & Ceiling | 44.59 SF Floor |
| 4.95 SY Flooring | 28.94 LF Floor Perimeter |
| 31.36 LF Ceil. Perimeter | |

Missing Wall:     1 -     2' 5" X 6' 8"       Opens into FAMILY_RM       Goes to Floor

| DESCRIPTION | QNTY |
|---|---|
| | |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Hall

| DESCRIPTION | QNTY |
|---|---|
| 246. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 311.34 SF |
| 247. Texture drywall - heavy hand texture | 311.34 SF |
| 248. Paint the walls and ceiling - two coats | 311.34 SF |
| 249. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 44.59 SF |
| 250. Attic Entrance Pull Down - Detach and Reset | 1.00 EA |
| 251. Paint baseboard - two coats | 28.94 LF |
| 252. Add for bullnose (rounded) corners | 311.34 SF |
| 253. Remove Carpet - Standard grade | 44.59 SF |
| 254. Carpet - Standard grade | 51.28 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 255. Remove and Replace Carpet pad - Standard grade | 44.59 SF |
| 256. Rewire - average residence - copper wiring | 44.59 SF |
| 257. Detach & Reset Light fixture | 1.00 EA |
| 258. Remove and Replace Switch | 2.00 EA |
| 259. Remove and Replace Outlet | 1.00 EA |
| 260. Remove and Replace Smoke detector | 1.00 EA |

NOTES:

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Family Rm**                                                                    **Height: 9'**

536.46  SF Walls                      234.63  SF Ceiling
771.08  SF Walls & Ceiling            234.63  SF Floor
 26.07  SY Flooring                    58.91  LF Floor Perimeter
 61.33  LF Ceil. Perimeter

| Missing Wall: | 1 - | 14' 8 3/16" X 0" | Opens into KITCHEN | Goes to Floor |
|---|---|---|---|---|
| Missing Wall: | 1 - | 2' 5" X 6' 8" | Opens into HALL | Goes to Floor |

| DESCRIPTION | QNTY |
|---|---|
| 261.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 771.08 SF |
| 262.  Add for bullnose (rounded) corners | 771.08 SF |
| 263.  Remove and Replace Add on for trayed, dropped or coffered ceiling | 234.63 SF |
| 264.  Additional labor charge for arched openings | 1.00 EA |
| 265.  Texture drywall - heavy hand texture | 771.08 SF |
| 266.  Paint the walls and ceiling - two coats | 771.08 SF |
| 267.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 234.63 SF |
| 268.  Remove and Replace Baseboard - 2 1/4" | 58.91 LF |
| 269.  Paint baseboard - two coats | 58.91 LF |
| 270.  Remove and Replace Batt insulation - 4" - R13 | 270.00 SF |
| 271.  Remove and Replace Window sill | 6.00 LF |
| 272.  Seal & paint window sill | 6.00 LF |
| 273.  Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 274.  Remove and Replace Casing - 2 1/4" | 17.00 LF |
| 275.  Paint casing - two coats | 17.00 LF |
| 276.  Remove Carpet - Standard grade | 234.63 SF |
| 277.  Carpet - Standard grade | 269.82 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 278.  Remove and Replace Carpet pad - Standard grade | 234.63 SF |
| 279.  Rewire - average residence - copper wiring | 234.63 SF |
| 280.  Remove and Replace Smoke detector | 1.00 EA |
| 281.  Detach & Reset Ceiling fan & light | 1.00 EA |

SAMPLE-1                                               10/6/2010        Page: 19

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Family Rm**

| DESCRIPTION | QNTY |
|---|---|
| 282. Remove and Replace Television cable outlet | 1.00 EA |
| 283. Remove and Replace Switch | 2.00 EA |
| 284. Remove and Replace Outlet | 6.00 EA |

NOTES:



**Kitchen**                                                                 Height: 9'

|  |  |
|---|---|
| 371.78 SF Walls | 133.14 SF Ceiling |
| 504.92 SF Walls & Ceiling | 133.14 SF Floor |
| 14.79 SY Flooring | 40.52 LF Floor Perimeter |
| 43.22 LF Ceil. Perimeter |  |

| Missing Wall: | 1 - | 14' 8 3/16" X 0" | Opens into FAMILY_RM | Goes to Floor |
|---|---|---|---|---|
| Missing Wall: | 1 - | 4' 4 3/16" X 9' | Opens into FOYER | Goes to Floor/Ceiling |
| Missing Wall: | 1 - | 2' 8 3/8" X 6' 8" | Opens into DINING_RM | Goes to Floor |

| DESCRIPTION | QNTY |
|---|---|
| 285. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 504.92 SF |
| 286. Add for bullnose (rounded) corners | 504.92 SF |
| 287. Remove and Replace Add on for trayed, dropped or coffered ceiling | 133.14 SF |
| 288. Texture drywall - heavy hand texture | 504.92 SF |
| 289. Paint the walls and ceiling - two coats | 504.92 SF |

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Kitchen

| DESCRIPTION | QNTY |
|---|---|
| 290. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 133.14 SF |
| 291. Remove and Replace Batt insulation - 4" - R13 | 90.00 SF |
| 292. Detach & Reset Refrigerator - top freezer - 18 to 22 cf | 1.00 EA |
| 293. Detach & Reset Range - slide in - gas | 1.00 EA |
| 294. Detach & Reset Microwave oven - over range w/built-in hood | 1.00 EA |
| 295. Detach & Reset Dishwasher | 1.00 EA |
| 296. Detach & Reset Garbage disposer | 1.00 EA |
| 297. Detach & Reset Sink - double | 1.00 EA |
| 298. Detach & Reset Sink faucet - Kitchen - Standard grade | 1.00 EA |
| 299. Floor protection - corrugated cardboard and tape | 133.14 SF |
| 300. Detach & Reset Cabinetry - lower (base) units | 16.00 LF |
| 301. Detach & Reset Cabinetry - upper (wall) units | 9.00 LF |
| 302. Detach & Reset Countertop - Flat laid plastic laminate - Standard grade | 26.00 LF |
| 303. Remove Backsplash - plastic laminate | 29.00 SF |
| 304. (Install) Backsplash - plastic laminate | 29.00 SF |
| 305. Rewire - average residence - copper wiring | 133.14 SF |
| 306. Detach & Reset Recessed light fixture - Standard grade | 1.00 EA |
| 307. Detach & Reset Fluorescent light fixture - Standard grade | 1.00 EA |
| 308. Detach & Reset 220 volt outlet - Heavy duty | 1.00 EA |
| 309. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 310. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 311. Remove and Replace Switch | 3.00 EA |
| 312. Remove and Replace Ground fault interrupter (GFI) outlet | 4.00 EA |

NOTES:

SAMPLE-1

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



| Dining Rm | | Height: 9' |
|---|---|---|
| 294.05 SF Walls | 106.28 SF Ceiling | |
| 400.33 SF Walls & Ceiling | 106.28 SF Floor | |
| 11.81 SY Flooring | 29.14 LF Floor Perimeter | |
| 40.42 LF Ceil. Perimeter | | |

| Missing Wall: | 1 - | 5' 11 7/8" X 6' 8" | Opens into FOYER | Goes to Floor |
|---|---|---|---|---|
| Missing Wall: | 1 - | 2' 8 3/8" X 6' 8" | Opens into KITCHEN | Goes to Floor |
| Missing Wall: | 1 - | 2' 7" X 6' 8" | Opens into Exterior | Goes to Floor |

| DESCRIPTION | QNTY |
|---|---|
| 313. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 400.33 SF |
| 314. Add for bullnose (rounded) corners | 400.33 SF |
| 315. Remove and Replace Add on for trayed, dropped or coffered ceiling | 106.28 SF |
| 316. Additional labor charge for arched openings | 3.00 EA |
| 317. Texture drywall - heavy hand texture | 400.33 SF |
| 318. Paint the walls and ceiling - two coats | 400.33 SF |
| 319. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 106.28 SF |
| 320. Remove and Replace Baseboard - 2 1/4" | 29.14 LF |
| 321. Paint baseboard - two coats | 29.14 LF |
| 322. Remove and Replace Batt insulation - 4" - R13 | 162.00 SF |
| Remove and replace insulation from exterior walls | |
| 323. Seal & paint window sill | 4.00 LF |
| 324. Remove and Replace Window sill | 4.00 LF |
| 325. Remove and Replace Carpet pad - Standard grade | 106.28 SF |
| 326. Remove Carpet - Standard grade | 106.28 SF |
| 327. Carpet - Standard grade | 122.22 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 328. Rewire - average residence - copper wiring | 106.28 SF |
| 329. Detach & Reset Chandelier | 1.00 EA |
| 330. Remove and Replace Switch | 1.00 EA |
| 331. Remove and Replace Outlet | 4.00 EA |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Dining Rm**

**DESCRIPTION**                               **QNTY**

NOTES:



**Coat**                                       **Height: 9'**

| | |
|---|---|
| 82.15 SF Walls | 5.15 SF Ceiling |
| 87.30 SF Walls & Ceiling | 5.15 SF Floor |
| 0.57 SY Flooring | 9.13 LF Floor Perimeter |
| 9.13 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 332. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 87.30 SF |
| 333. Texture drywall - heavy hand texture | 87.30 SF |
| 334. Paint the walls and ceiling - two coats | 87.30 SF |
| 335. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 5.15 SF |
| 336. Remove and Replace Baseboard - 2 1/4" | 9.13 LF |
| 337. Paint baseboard - two coats | 9.13 LF |
| 338. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 339. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 340. Paint casing - two coats | 34.00 LF |
| 341. Floor protection - corrugated cardboard and tape | 5.15 SF |
| 342. Detach & Reset Shelving - 12" - in place | 4.00 LF |

SAMPLE-1                                                    10/6/2010     **Page: 23**

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Coat

| DESCRIPTION | QNTY |
|---|---|

NOTES:



| Foyer | | Height: 9' |
|---|---|---|
| | 251.01 SF Walls | 68.17 SF Ceiling |
| | 319.18 SF Walls & Ceiling | 68.17 SF Floor |
| | 7.57 SY Flooring | 25.90 LF Floor Perimeter |
| | 31.89 LF Ceil. Perimeter | |

| Missing Wall: | 1 - | 2' 3 11/16" X 9' | Opens into Exterior | Goes to Floor/Ceiling |
|---|---|---|---|---|
| Missing Wall: | 1 - | 2' 10 13/16" X 9' | Opens into Exterior | Goes to Floor/Ceiling |
| Missing Wall: | 1 - | 5' 11 7/8" X 6' 8" | Opens into DINING_RM | Goes to Floor |
| Missing Wall: | 1 - | 4' 4 3/16" X 9' | Opens into KITCHEN | Goes to Floor/Ceiling |

| DESCRIPTION | QNTY |
|---|---|
| 343. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 319.18 SF |
| 344. Add for bullnose (rounded) corners | 319.18 SF |
| 345. Texture drywall - heavy hand texture | 319.18 SF |
| 346. Paint the walls and ceiling - two coats | 319.18 SF |
| 347. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 68.17 SF |
| 348. Remove and Replace Baseboard - 2 1/4" | 25.90 LF |
| 349. Paint baseboard - two coats | 25.90 LF |
| 350. Floor protection - corrugated cardboard and tape | 68.17 SF |
| 351. Rewire - average residence - copper wiring | 68.17 SF |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Foyer

| DESCRIPTION | QNTY |
|---|---|
| 352. Detach & Reset Light fixture | 1.00 EA |
| 353. Remove and Replace Switch | 1.00 EA |
| 354. Remove and Replace Outlet | 2.00 EA |

NOTES:



**Pantry**                                                                 **Height: 9'**

| 136.21 SF Walls | 12.45 SF Ceiling |
|---|---|
| 148.65 SF Walls & Ceiling | 12.45 SF Floor |
| 1.38 SY Flooring | 15.13 LF Floor Perimeter |
| 15.13 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 355. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 148.65 SF |
| 356. Texture drywall - heavy hand texture | 148.65 SF |
| 357. Paint the walls and ceiling - two coats | 148.65 SF |
| 358. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 12.45 SF |
| 359. Remove and Replace Baseboard - 2 1/4" | 15.13 LF |
| 360. Paint baseboard - two coats | 15.13 LF |
| 361. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 362. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 363. Paint casing - two coats | 34.00 LF |
| 364. Detach & Reset Shelving - 12" - in place | 50.00 LF |
| 365. Floor protection - corrugated cardboard and tape | 12.45 SF |

SAMPLE-1                                                    10/6/2010          Page: 25

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Pantry**

| DESCRIPTION | QNTY |
|---|---|
| 366. Rewire - average residence - copper wiring | 12.45 SF |
| 367. Detach & Reset Light fixture | 1.00 EA |
| 368. Remove and Replace Switch | 1.00 EA |

NOTES:

**Grand Total Areas:**

| | | | | | |
|---|---|---|---|---|---|
| 5,476.08 | SF Walls | 1,617.34 | SF Ceiling | 7,093.42 | SF Walls and Ceiling |
| 1,617.34 | SF Floor | 179.70 | SY Flooring | 597.84 | LF Floor Perimeter |
| 0.00 | SF Long Wall | 0.00 | SF Short Wall | 622.65 | LF Ceil. Perimeter |
| 1,617.34 | Floor Area | 1,752.03 | Total Area | 5,607.97 | Interior Wall Area |
| 2,050.60 | Exterior Wall Area | 212.04 | Exterior Perimeter of Walls | | |
| 0.00 | Surface Area | 0.00 | Number of Squares | 0.00 | Total Perimeter Length |
| 0.00 | Total Ridge Length | 0.00 | Total Hip Length | | |

Main Level



Main Level

# EXHIBIT

# F-3

**To Be Inserted By Contractor**

# EXHIBIT

# F-4

## Requirements for Move-out / Move-in

**<u>Move-out</u>**

**Prior to commencement of the Repair Work (as defined in the Work Authorization Agreement) in your home, it will be necessary for you to empty your <u>entire</u> home, including the attic, basement and garage.**

Move out need not occur until the Contractor has confirmed the Move-Out Date which pursuant to the Work Authorization Agreement is the date on which the Repair Work will begin. The Contractor will not confirm the Move-Out Date until it has completed the following pre-requisites for conducting the Repair Work efficiently and in compliance with all local rules and regulations:

- Secured all necessary building permits
- Identified and scheduled for delivery all materials that have long delivery times
- Completed all other items as may be set forth in the Schedule of Work

Once ALL of these are complete, the Contractor will confirm the Move-Out Date and you should make all necessary arrangements to move out of the home in accordance with the below requirements.

Move-out includes the removal of all personal property from the home including, but not limited to the following:

- Furniture, area rugs, accessories
- Small appliances such as coffee makers, portable microwaves, mixers
- Owner-purchased/installed appliances, not including refrigerators, freezers, washers and dryers, garbage disposals, stoves, dishwashers, and microwaves
- Clothing/personal effects
- Sports/hobby equipment
- Electronics
- Window treatments including mounting hardware
- Wall decorations (mirrors, photos, pictures, shelving, etc.)
- Tools/lawn equipment (Items can be left in metal sheds on property, but the Contractor has no responsibility any such items. Risk of damage or loss to such items remains with you, the homeowner)
- Food (frozen, refrigerated, dry goods, canned)
- Indoor plants
- Pets

In addition to the removal of all personal property, you must also comply with the following:

- Remove all trash and unwanted items from the home.

1

- No items may be stored within the home including in kitchen cabinets, utility rooms, storage closets, attic spaces, basements, and garage.

- No vehicles, trailers, or storage containers can be left in the driveway or in areas that restrict access to the property in any way.

- Electrical power and water serving the property must remain <u>on</u> during the entire remediation process.  Gas service must be turned <u>off</u>.

- Suspend and turn off alarm service monitoring.

- Properly label and provide one (1) complete set of keys which operate all locks to the Contractor.

- To the extent you have property insurance on the home, provide proof of property insurance to the Contractor, and maintain such insurance during the duration of the Repair Work.

Further, we recommend that you forward U.S. mail service to an alternate address, and turn off or suspend your telephone, cable/satellite TV service and/or newspaper service.

The homeowner is responsible for ensuring that the above requirements are met prior to the commencement of the Repair Work, including, but not limited to, making all arrangements for moving the above-listed items out of the home and storage of such items.  The homeowner is also responsible for paying the costs associated with meeting the above requirements from the Lump Sum Payment provided to the homeowner pursuant to Paragraph III (B) (1) of the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall.

**IF ALL OF THE ITEMS ABOVE ARE NOT COMPLETE, CONTRACTOR WILL NOTIFY YOU.  NO WORK WILL START ON YOUR HOUSE UNTIL ALL OF THESE ITEMS ARE COMPLETE.**

<u>Move-in</u>

Prior to moving back into your home, you will be given the opportunity to inspect the completed home with the Contractor.  During this inspection you can work with the Contractor to make a list, called a Punch List, of items that are incomplete or incorrect when compared to the conditions in the home prior to the Repair Work, but that will not affect your ability to move back into the home.  The Contractor will take care of the items on the Punch List, and may perform some, or all, of the work on the Punch List after you have moved back into the home.  Any Punch List item that the Contractor intends to complete after you have moved back into the home, will be scheduled with you in advance.

Prior to your moving back into the home, the Contractor will do the following:

2

- Secure a Certificate of Occupancy, Certificate of Completion, or final approval from the Authority Having Jurisdiction (AHJ)
- Deliver the Contractor Certification and Environmental Certification to you, the homeowner
- Provide to you, the homeowner, a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the Repair Work have been either released or bonded off such that your title is clear of all liens related to the Repair Work
- Require that you sign the Homeowner Release of Contractor

The Contractor has extended a one-year warranty (or other timeframe required by applicable law or regulation, whichever is longer) on the Repair Work. If any items subject to the warranty are discovered during the warranty period the Contractor should be contacted as soon as possible at the following address and/or phone number:

[enter Contractor contact information for warranty work]

# EXHIBIT

# F-5

**To Be Inserted By Contractor**

# EXHIBIT

# F-6

## HOMEOWNER RELEASE OF CONTRACTOR

Name: _____

Day Telephone: _____ Night Telephone: _____
Address: _____
_____

I/We, _____, certify that I/We am/are the owner(s) of the above listed property.

In consideration of the Substantial Completion of the Repair Work by the Contractor, I/We agree as follows:

1.  All defined terms in this Release will have the same meaning as those terms are defined in the Work Authorization I/We previously executed.

2.  Except for latent defects (hidden defects that cannot be discovered by reasonable inspection), warranty claims pursuant to the Work Authorization, claims arising from any and all liens related to the Repair Work, Punch List work listed on the attached Punch List, and/or claims for consequential damages as described in Paragraph 3 below, I/We hereby release the Contractor and its subcontractors, employees and agents of and from any and all claims or causes of action which arise out of, or relate in any way, to the Repair Work or the Work Authorization. This release covers all rights and causes of action of every kind, nature and description, which the undersigned ever had, now has/have and, but for this release, may have against the Contractor. This release binds the undersigned and his/her/their heirs, representatives and assignees.

3.  Notwithstanding any other provision of this Release, I/We do not waive claims against the Contractor for bodily injury or property damage caused by the Work Authorization and/or the Repair Work, except I/We waive all claims for such injury and/or damage that seek recovery of emotional distress (except for such emotional distress related to a bodily injury claims), loss of profits, loss of use, and/or diminution of property value damages. "Loss of Use" does not include loss of use during the Construction Duration as defined in the Work Authorization Agreement.

4.  Except for items noted on the Punch List, the Repair Work has been performed to my/our satisfaction and in accordance with the Schedule of Work.

SIGNATURE: _____ DATE: _____
PRINTED NAME: _____

SIGNATURE: _____ DATE: _____
PRINTED NAME: _____

# EXHIBIT

# F-7

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

# SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

APPROVED NOVEMBER 2003

AMERICAN NATIONAL STANDARDS INSTITUTE, INC.



© 2010 NAHB Research Center, Inc. All rights reserved. This document may not be reproduced, downloaded, distributed, published, displayed, or transferred in any form or by any means, except with the prior written permission of NAHB Research Center, Inc. [Please note that copyright infringement is a violation of federal law subject to potential civil and criminal penalties.]

**NAHB RESEARCH CENTER**

## CONTENTS

**STANDARD**

1
SCOPE AND PURPOSE
PAGE 1

2
DEFINITIONS
PAGE 1

3
CALCULATION OF SQUARE
FOOTAGE
PAGE 2

4
STATEMENT OF FINISHED
SQUARE FOOTAGE
PAGE 3


**ANNEX**

COMMENTARY ON ANSI Z765
PAGE 4


**FIGURES**

1
ENTRY-LEVEL PLAN
PAGE 6

2
UPPER-LEVEL PLAN
PAGE 7

3
BASEMENT PLAN
PAGE 8

4
BUILDING SECTION
PAGE 9

5
BUILDING SECTION
PAGE 10

6
STAIRS
PAGE 11

Published by
NAHB Research Center
400 Prince George's Boulevard
Upper Marlboro, Maryland
20774-8731
800-638-8556 phone
301-430-6180 fax

Copyright 2003
by NAHB Research Center.
All rights reserved.

No part of this publication may
be reproduced in any form—
mechanical, electronic, or
otherwise—without the prior
written permission of
the publisher.

Printed in the United States
of America.

FOREWORD



An American National Standard is developed through a consensus process that involves those organizations and individuals directly and materially affected by the existence of a standard. A standard itself is a voluntary guide for producers and consumers. The American National Standards Institute is the central body responsible for identifying a single, consistent set of voluntary standards and verifying that the principles of openness and due process are heeded. All American National Standards are subject to periodic review and revision.

A standard allows individuals and organizations that use different terminologies based on different points of view to communicate, cooperate, and calculate quantities on a common basis. This standard promotes these goals in the hope that square footage calculation can become an item of agreement rather than a point of contention between groups with different interests and concerns.

This standard for the calculation and reporting of above-grade square footage and below-grade square footage in single-family houses is offered for voluntary application. The standard must be applied as a whole. The standard is not meant to replace or supersede any legal or otherwise required existing area measurement method. It may be used in proposed, new, or existing single-family houses of any style or construction but is not applicable to apartment/multifamily buildings. It does not cover room dimensions.

Before the adoption of the standard in 1996, no nationwide standard existed in the United States for measuring square footage in single-family houses. By contrast, a standard applicable to commercial buildings has been in effect for 80 years. In 1915, the Building Owners and Managers Association International (BOMA) developed a standard method for measuring floor area in office buildings. The BOMA standard was revised in 1952, 1955, 1971, 1980, 1989, and 1996 and now bears the title *Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-1996*.

The Ontario New Home Warranty Program issued *Builder Bulletin No. 22—Floor Area Calculations* on November 15, 1989. The bulletin's set of requirements for uniform floor area calculation applies to single-family houses and condominiums that enroll in the program and only when a numeric value for floor area is used in advertising and sales materials, in an agreement of purchase and sale, in a construction contract, or whenever the size of the house is stated in printed materials. Over the years, other groups have developed their own conventions for square footage calculation within their organizations.

In April 1994, the National Association of Home Builders (NAHB)—at the request of the Home Builders Association of Greater New Orleans and other builder members—commissioned the NAHB Research Center (a wholly owned subsidiary of NAHB) to act as secretariat for an ANSI Accredited Standards Committee and to assemble a group of organization representatives and individuals materially and directly affected by the development of an ANSI Standard for the measurement of square footage in detached and attached single-family houses. The committee held its first meeting on November 22, 1994.

ANSI procedures require periodic review to ensure that standards are current and relevant. In 2001 a standard committee was formed to consider changes to the 1996 edition of ANSI Z765. The committee accepted changes to Section 4 of the standard and to its Annex. The changes to Section 4 consisted of an editorial reorganization of its provisions and the addition of a subsection specifying reporting requirements for calculation results produced using other measurement methods. The changes to the Annex consisted of (1) the addition of a description of decorative finishes for concrete floors, along with recognition of this type of concrete floor as a type of floor finish; and (2) the addition of text acknowledging that the standard does not address differences between calculations made by multiple parties for the same property.

The standard embodies one informative Annex that is intended to comment on and illustrate the standard; however, the Annex is not considered part of the standard.

**SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003**

Suggestions for improvement of the standard are welcome and should be forwarded to the secretariat:

NAHB Research Center
400 Prince George's Boulevard
Upper Marlboro, Maryland 20774-8731
301-249-4000 phone
301-430-6180 fax
http://www.nahbrc.org

This standard was processed and approved for submittal to ANSI by the Accredited Standards Committee on Residential Square Footage, Z765. Committee approval of the standard does not necessarily imply that all committee members voted for its approval. At the time it approved this standard, the Z765 Committee consisted of the following members listed in the right column.

Wayne M. Foley, Chair
Thomas Kenney, Secretariat—NAHB Research Center

NAME OF REPRESENTATIVE AND ORGANIZATION REPRESENTED

Paul Armstrong
International Code Council

Craig Auberger
American Association of Certified Appraisers

John Battles
International Code Council

Ron Burton
BOMA International

Mark Obenson
Golling-Chambers Home, Inc.

Gerald Davis
International Centre for Facilities

Wayne Foley
W. M. Foley Construction Group

Steven Hamlet
National Association of Realtors

Charles Hardin
Fran-Hardy Homes, Inc.

James Hill
National Institute of Standards and Technology

Jane Kneessi
U.S. Department of Commerce, Bureau of the Census

A.J. Tony Martinez
Yavapai County Assessor

James Nanni
Consumers Union

Tracy Riggen
MCL Companies



AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

# SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

## 1. SCOPE AND PURPOSE

**Scope**

This standard describes the procedures to be followed in measuring and calculating the square footage of detached and attached single-family houses.

**Purpose**

It is the purpose of this standard to describe a method of measurement that will make it possible to obtain accurate and reproducible measurements of square footage in single-family houses.

## 2. DEFINITIONS

**Attached Single-Family House**

A house that has its own roof and foundation, is separated from other houses by dividing walls that extend from roof to foundation, and does not share utility services with adjoining houses; may be known as a townhouse, rowhouse, or duplex, for example.

**Detached Single-Family House**

A house that has open space on all its sides.

**Finished Area**

An enclosed area in a house that is suitable for year-round use, embodying walls, floors, and ceilings that are similar to the rest of the house.

**Garage**

A structure intended for the storage of automobiles and other vehicles.

**Grade**

The ground level at the perimeter of the exterior finished surface of a house.

**Level**

Areas of the house that are vertically within 2 feet of the same horizontal plane.

**Square Footage**

An area of a house that is measured and calculated in accordance with the standard. When employing Metric or Standard International (SI) measurement units, the term floor area is used in place of square footage.

**Unfinished Area**

Sections of a house that do not meet the criteria of *finished area*.

SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS



SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

## 3. CALCULATION OF SQUARE FOOTAGE

To claim adherence to this standard, the following methods of measurement and calculation must be employed when quantifying square footage in single-family houses. When using English measurement units, the house is measured to the nearest inch or tenth of a foot; the final square footage is reported to the nearest whole square foot. When using Metric or Standard International (SI) measurement units, the house is measured to the nearest 0.01 meter; the final floor area is reported to the nearest 0.1 square meter.

**Calculation Methods**

Calculation of square footage made by using exterior dimensions but without an inspection of the interior spaces is allowed but must be stated as such when reporting the result of the calculation. Calculation of square footage for a proposed house made by using plans must be stated as such when reporting the result of the calculation.

Circumstances can exist when direct measurement of a structure is not possible. Access to the interior may not be available and the nature of the terrain, structure, or other obstacles may preclude direct physical measurement of the exterior in the time available. Building dimensions developed through some means other than direct measurement or plans can be susceptible to inaccuracy, as is the calculated area. Calculation of square footage developed under such circumstances must be identified as such when reporting the result of the calculation.

**Detached Single-Family Finished Square Footage**

For detached single-family houses, the finished square footage of each level is the sum of finished areas on that level measured at floor level to the exterior finished surface of the outside walls.

**Attached Single-Family Finished Square Footage**

For attached single-family houses, the finished square footage of each level is the sum of the finished areas on that level measured at floor level to the exterior finished surface of the outside wall or from the centerlines between houses, where appropriate.

**Finished Areas Adjacent to Unfinished Areas**

Where finished and unfinished areas are adjacent on the same level, the finished square footage is calculated by measuring to the exterior edge or unfinished surface of any interior partition between the areas.

**Openings to the Floor Below**

Openings to the floor below cannot be included in the square footage calculation. However, the area of both stair treads and landings proceeding to the floor below is included in the finished area of the floor from which the stairs descend, not to exceed the area of the opening in the floor.

**Above- and Below-Grade Finished Areas**

The above-grade finished square footage of a house is the sum of finished areas on levels that are entirely above grade. The below-grade finished square footage of a house is the sum of finished areas on levels that are wholly or partly below grade.

**Ceiling Height Requirements**

To be included in finished square footage calculations, finished areas must have a ceiling height of at least 7 feet (2.13 meters) except under beams, ducts, and other obstructions where the height may be 6 feet 4 inches (1.93 meters); under stairs where there is no specified height requirement; or where the ceiling is sloped. If a room's ceiling is sloped, at least one-half of the finished square footage in that room must have a vertical ceiling height of at least 7 feet (2.13 meters); no portion of the finished area that has a height of less than 5 feet (1.52 meters) may be included in finished square footage.

**Finished Areas Connected to the House**

Finished areas that are connected to the main body of the house by other finished areas such as hallways or stairways are included in the finished square footage of the floor that is at the same level. Finished areas that are not connected to the house in such a manner cannot be included in the finished square footage of any level.

**Garages, Unfinished Areas, and Protrusions**

Garages and unfinished areas cannot be included in the calculation of finished square footage. Chimneys, windows, and other finished areas that protrude beyond the exterior finished surface of the outside walls and do not have a floor on the same level cannot be included in the calculation of square footage.

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

## 4. STATEMENT OF FINISHED SQUARE FOOTAGE

Failure to provide the declarations listed below—where applicable—voids any claim of adherence to this standard.

### Rounding

The finished square footage of a house is to be reported to the nearest whole square foot for above-grade finished square footage and for below-grade finished square footage. When using SI units, floor area is reported to the nearest 0.1 square meter.

### Reporting of Above- and Below-Grade Areas

No statement of a house's finished square footage can be made without the clear and separate distinction of above-grade areas and below-grade areas.

### Areas Not Considered Finished

Finished areas that are not connected to the house, unfinished areas, and other areas that do not fulfill the requirements of finished square footage prescribed above cannot be included in the Statement of Finished Square Footage but may be listed separately if calculated by the methods described in this standard. Any calculation and statement of unfinished square footage must distinguish between above-grade areas and below-grade areas.

### Interior Spaces Not Inspected Method

If the calculation of finished square footage is made without an inspection of interior spaces to confirm finished areas, unfinished areas, or openings in the floor, the Statement of Finished Square Footage must include a declaration similar to the following:

---

DECLARATION 1

"Finished square footage calculations for this house were made based on measured dimensions only and may include unfinished areas, openings in floors not associated with stairs, or openings in floors exceeding the area of associated stairs."

---

### Plans-Based Method

If the calculation of finished square footage is made from the plans of a proposed house, the Statement of Finished Square Footage must include a declaration similar to the following:

---

DECLARATION 2

"Finished square footage calculations for this house were made based on plan dimensions only and may vary from the finished square footage of the house as built."

---

### Other Methods

Circumstances can exist when direct measurement of a structure is not possible. Access to the interior may not be available and the nature of the terrain, structure, or other obstacles may preclude direct physical measurement of the exterior in the time available. Building dimensions developed through some means other than direct measurement or plans can be susceptible to inaccuracy, as is the calculated area. Calculations developed under such circumstance must include a declaration similar to the following:

---

DECLARATION 3

"Finished square footage calculations for this house were made based on estimated dimensions only and may include unfinished areas, or openings in floors not associated with stairs, or openings in floors exceeding the area of associated stairs."

---

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

ANNEX (Informative)



SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

# COMMENTARY ON ANSI Z765

This standard is not designed for and cannot be applied to the measurement of apartment/multifamily buildings, but it may be employed to measure all detached and attached single-family houses, including townhouses, rowhouses, and other side-by-side houses.

Practitioners of the standard are cautioned to confirm the appropriate legal definition of ownership of the house if applied to detached single-family or attached single-family condominium units to avoid violation of state law. Differences between the method for calculating finished square footage as set out in the standard and methods prescribed by state law to calculate the area of a condominium unit must be resolved on an individual basis. Legal definitions of condominium ownership can be obtained from the state body charged with archiving state law.

The committee chose to use the term square *footage* (instead of *floor* area) because of its common use by producers and consumers of housing.

The methods of measurement and calculation put forth in this standard are not intended or designed to cover the dimensions of rooms within single-family houses. Room dimensions are typically measured between interior finished surfaces rather than between exterior finished surfaces as described in this standard.

The term *habitable space* is often used by established building codes to describe a room or space that has as one of its requirements a specified amount of natural or mechanical light and ventilation sources. The definition of *finished* area–as employed in this standard–does not imply that finished spaces conform to any requirement for light and ventilation.

This standard makes a clear delineation between above-grade square footage and below-grade square footage; no statement of a house's square footage can be made without that clear and separate distinction. Given the above-grade and below-grade distinction and the definition of *grade*, the committee acknowledges that this may result in houses that–depending on topography, design, or grade line–have no calculated above-grade finished square footage derived from the method of measurement employed by this standard. This possible consequence arises from the committee's intent to quantify a house's area while minimizing the likelihood of misinterpretation or misapplication. Houses that are alternatively described as *at grade* or *on grade* are typically considered above-grade houses.

Wall and ceiling finishes include but are not limited to painted gypsum wall board, wallpaper-covered plaster board, and wood paneling. Floor finishes include but are not limited to carpeting, vinyl sheeting, hardwood flooring, and concrete floors with decorative finishes but do not include bare or painted concrete.

Decorative finishes are long-lasting or permanent components of the slab produced by such methods as chemical staining, integral coloration of the concrete, scoring, or stamping that modify the texture or appearance of the slab.

For a room to be included in the square footage calculation, the floor located under sloping ceilings must have a clearance of at least 5 feet (1.52 meters); further, at least one-half of the square footage in the room must have ceilings of at least 7 feet (2.13 meters) in height. For example, a one-and-one-half-story, 28 by 42 foot Cape Cod-style house has a first level with a ceiling height of 8 feet. On the second level, the ceiling has a maximum height of 9 feet but a minimum height of 4 feet at the walls as the ceiling slopes to match the pitch of the roof. All areas are finished. While the first level has 1,176 above-grade finished square feet, only that portion of the second level meeting the ceiling height requirements described above is included in the square footage calculation.

Where finished and unfinished areas are adjacent on the same level, finished square footage is calculated by measuring to the exterior edge or unfinished surface of any interior partition between the areas. For partitions between a finished area and a garage (usually a fire-rated wall), the measurement is made to the surface of the gypsum wall board on the garage side of the partition. For a partition that separates a finished area from an unfinished area (often not a fire-rated wall), the measurement is made to the portion of the partition closest to the unfinished area–usually a wood stud or other framing member.

Porches, balconies, decks, and similar areas that are not enclosed or not suitable for year-round occupancy cannot be included in the Statement of Finished Square Footage but may be listed separately, measured from the exterior finished surface of the house to the outer edge of the floor surface area or exterior surface, and calculated by using the method referenced in the standard.

ANNEX (Informative)

The treatment of garage area in the standard allows practitioners to apply local customs. While garages can never be included in finished square footage, the standard does allow the area to be included in unfinished square footage. In the diagrams that accompany this standard, Figure 1 largely shows the garage (and the adjoining laundry) as a structure attached to the main body of the house. As such, the garage is not typically treated as an unfinished area of the house but rather as a separate area simply referred to as "garage." However, if the garage is located beneath the main body of the house, some localities treat the area as part of the house and contributing to unfinished square footage. Practitioners are urged to heed common local convention with regard to garages.

Finished areas above garages are included in the finished square footage that is at the same level in the main body of the house, but only if they are connected to the house by continuous finished areas such as hallways or staircases.

Exterior finishes include but are not limited to masonry or masonry veneer; wood, aluminum, or vinyl siding; or gypsum wall board when used on the exterior wall common to an attached garage.

Protruding areas beyond the exterior finished surface of the outside walls—such as chimneys and windows—cannot be included in finished square footage unless the protrusions have a floor on the same level and meet ceiling height requirements. For example, a hearth that is within the exterior finished surface is included, as is a window that extends from floor to ceiling. Further, if the hearth is on the first level and the chimney extends through the interior of the second level without a hearth on the second level, no deduction is made from the finished square footage of the second level. However, if the hearth or chimney is located beyond the exterior finished surface or the window does not have a floor, the area cannot be included in the finished square footage.

A common construction practice is to provide a floor opening for stairs that is the same size as the stairs themselves. Therefore, the area of stairs included in finished square footage is typically equal to the area of the opening in the floor. For example, a two-story, 28 by 42 foot house embodies 1,176 finished square feet on the first level and 1,176 finished square feet on the second level, provided that all areas are finished and the opening in the floor of the second level does not exceed the area of the stair treads. Further, stairs that descend to an unfinished basement are included in the finished square footage of the first level regardless of the degree of finish of the stairs or the degree of finish of the area around the stairs. In addition, areas beneath stairs are included in the finished square footage regardless of the distance between the stairs and the floor below or of the degree of finish of that area.

The standard makes no statement concerning differences between square footage calculations made by multiple parties for the same property. The method for calculating square footage requires measurements to be taken to the nearest inch or tenth of a foot using English measurement units or to the nearest hundredth of a meter using the Metric system. The final floor area must be reported to either the nearest square foot or tenth of a meter, as appropriate.

## Examples

An example of a Statement of Finished Square Footage of a detached single-family house with basement follows:

---

**DECLARATION 1**

"A 28.2 by 42.5 foot two-story detached single-family house with 2,201 above-grade finished square feet and 807 below-grade finished square feet, plus 96 above-grade unfinished square feet in a utility room and 392 below-grade unfinished square feet in a basement. The first level has a 100-square-foot two-story space. In addition, the property includes a 240-square-foot enclosed porch and a two-car garage."

---

An example of the square footage description of a two-story attached single-family house follows:

---

**DECLARATION 2**

"A 22.1 by 30.9 foot two-story attached single-family carriage townhouse with 1,366 above-grade finished square feet and 176 above-grade unfinished square feet in a utility/storage room. In addition, the property includes a 120-square-foot deck and a one-car garage."

---

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

## AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003



**FIGURE 1.**

Entry-Level Plan
(above grade)

Figures 1 through 4 depict a two-story single-family house with basement. The entry and upper levels are entirely above grade and the basement is entirely below grade. The dashed line encircles the finished floor area that is counted as above-grade finished square footage and below-grade finished square footage. As shown, the upper-level plan has an open foyer and a protruding window that does not extend to the floor; neither area contributes to the square footage of the upper level. The calculated finished square footage of the entry level does not include the protruding fireplace, covered patio, garage, or unfinished laundry. The finished area of the basement is counted toward the below-grade finished square footage in its entirety, including the area under the stairs that descend from the entry level. The area of the unfinished utility room is calculated by using the method prescribed in the standard but is not included in the below-grade finished square footage.

Case 2:09-md-02047-EEF-MBN Document 16189-1 Filed 11/12/12 Page 114 of 151

**FIGURE 2.**
Upper-Level Plan
(above grade)



SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

**FIGURE 3.**
Basement Plan
(below grade)



Note: Measure to exterior face
of walls where below grade

Up

RECREATION ROOM

BATH

Unfinished Utility Room
(List separately from
finished floor area)

LEGEND:

— — — — —  FINISHED FLOOR AREA

/////////////  UNFINISHED FLOOR AREA
(To be listed separately)

## AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS



SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

**FIGURE 4.**
Building Section

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003



**FIGURE 5.**
Building Section

Figure 5 presents the building section of a one-and-one-half-story house with a partially below-grade entry level. The area in the finished loft/attic counting toward the finished square footage of that level has a ceiling height of at least 5 feet (1.52 meters), and at least one-half of the finished square footage has a ceiling height of at least 7 feet (2.13 meters). The entire area of the entry level is considered below-grade finished square footage.

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS



SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

**FIGURE 6.**

Stairs

Figure 6 demonstrates two typical stair configurations. Viewed from above, the stair treads and the landing in the drawing on the left fill the entire opening through which they descend. By definition, the area of the stairs and landing (or, by interpretation, the area of the opening) is included in the square footage of the level above. In the drawing on the right, the stair treads and landing merely skirt the opening. Here, the area of the treads and landing must be calculated to be included in the upper-level square footage; the remaining area of the opening is not included.



NAHB
RESEARCH
CENTER
400 PRINCE GEORGE'S BLVD.
UPPER MARLBORO, MD 20774
1-800-638-8556

© 2003 NAHB RESEARCH CENTER

# EXHIBIT

# G

**Exhibit G**

## CONTRACTOR CERTIFICATION

I certify that all drywall, including all debris and visible dust, electrical wiring, fire safety and home security equipment, and copper gas lines have been removed in accordance with the Scope of Work, Exhibit D to the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall. Completion of removal work has been confirmed by a visual inspection of all surfaces in the work area and any adjacent areas (including but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. Evaluation for odor was performed at first entry to the house after it had been vacant and with all windows and doors closed for a period of at least 8 hours.

Contractor Name:_____

By:
(Signature)_____ Date_____

(Print Name)_____

(Print Title)_____

# EXHIBIT

# H

**Exhibit H**

## PROPOSED ENVIRONMENTAL INSPECTORS

Eva M. Ewing CIH
*Christopher DePasquale, MPH, CIH
*Pamela Hogue
Compass Environmental
1751 McCollum Parkway
Kennesaw, GA 30144
770-499-7127
emewing@aol.com or emewing@compassenv.com
*Will assist Eva Ewing.

Robert Sproles
Center for Toxicology and Environmental Health LLC (CTEH)

Tracey Dodd
U.S. Risk Management LLC

Steve Hays CIH PE
Gobbell Hays Partners, Inc.
Nashville, TN

[Additional names to be added by the PSC and the Knauf Entities.]

# EXHIBIT

# I

**Exhibit I**

# ENVIRONMENTAL CERTIFICATION

I certify that I have verified the Contractor's certification that all drywall has been removed, including all debris and visible dust, as set forth in the Scope of Work, Exhibit D to the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall. This certification is based upon an independent visual inspection of all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. In addition, the atmosphere in the house was found to be representative of the atmosphere in houses built without "problem" drywall.


Name:_____

By:
(Signature)_____   Date_____

(Print Name)_____

(Print Title)_____

# EXHIBIT

# J

Exhibit J

# FORM OF CONFIDENTIAL HOMEOWNER RELEASE

This CONFIDENTIAL RELEASE ("Release"), dated this _____ day of _____,
2010 is entered into by [name of homeowner] _____ (hereinafter
"Claimant(s)") (Social Security Number(s) _____), owner of the property located at
_____, which Claimant(s) acquired title to on [date] _____.

WHEREAS, on or about_____, Claimant(s)  commenced a
lawsuit on his/her own behalf against one or more of Knauf Plasterboard (Tianjin) Co., Ltd.
("KPT"), Knauf Plasterboard (Wuhu) Co. Ltd., Guandong Knauf New Building Material Product
Co. Ltd., Knauf International GmbH, Knauf Insulation GmbH (referred to in MDL 2047 as
Knauf Insulation USA), Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda., Gebr. Knauf
Verwaltungsgesellschaft, PT.Knauf Gypsum Indonesia, or Knauf Gips KG (collectively "Knauf
Defendants"), and [insert name of Builder-Supplier-Insurer] (collectively "the [Builder]
[Supplier] [Insurer] Defendants") (The Knauf Defendants and the [Builder] [Supplier] [Insurer]
Defendants, collectively are the "Released Parties."). Claimaint(s') action was filed as:
_____[case caption]_____
in the_____[Court]_____
(hereinafter "Action"); and

WHEREAS, the Knauf Defendants and the MDL Plaintiffs' Steering Committee
(the "PSC") in *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No.
2047 (the "MDL"), including class counsel in *Harrell v. South Kendall Construction Corp, et al.*
No. 09-08401 (11th Judicial Circuit of Florida) ("Harrell Class Counsel"), have entered into a
Settlement Agreement For the Demonstration Remediation of Homes with KPT Drywall (the

"Demonstration Remediation Agreement") to create a program (the "Program") to remediate homes that contain all or substantially all KPT drywall board ("KPT Drywall"); and

WHEREAS, the Claimant(s) hereby represents that he/she is authorized under applicable law to represent and bind all other relevant parties, including any and all representatives, agents, successors, assigns, beneficiaries, heirs, or executors of the Claimant(s), his/her estate, or the estate of any of them, who are not signatories to this Release and by signing this Release does so bind; and

WHEREAS, the Claimant(s) and the Released Parties believe it would be in their respective best interests to settle the Claim by including Claimant's home in the Program and avoid the risk, expense, inconvenience, and distraction of continued litigation; and

WHEREAS, Claimants' counsel has explained to Claimant(s), and Claimant(s) understands, (i) the terms of this Release and (ii) the conditions set forth in the Demonstration Remediation Agreement;

NOW, THEREFORE, in consideration of the obligations of Released Parties both under the Demonstration Remediation Agreement and pursuant to confidential settlement agreements entered into between the Knauf Defendants and the [Builder] [Supplier] [Insurer] Defendants ("the Confidential Agreements"), whereby such defendants have agreed to contribute funds to offset the costs of the remediation of Claimant's home pursuant to the Program, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, each and all intending to be legally bound, hereby stipulate and agree as follows:

1. The Undersigned Claimant(s) represents that they own and occupy the above listed property and that no other individual or entity has any direct or indirect ownership

interest in the above listed property other than a mortgagee or other lien holder, and further represents that any such mortgagee or lien holder has not commenced foreclosure proceedings or acquired an ownership interest in such property and that Claimant(s) is/are not in default on any financial obligations for which the property is security or collateral for repayment of such obligations.

2. The Undersigned Claimant(s) agrees that the consideration and actions performed by the Released Parties in satisfying their obligations under the Demonstration Remediation Agreement and the Confidential Agreements, will constitute full compensation and settlement arising out of or related to claims asserted in the action or to the KPT Drywall in the Claimant(s)'s home, and that he/she will not seek anything further, including any other payment, from Released Parties, or any other person or entity related to the Action, except as described below.

3. The Claimant(s) and the Released Parties further agree that in exchange for the consideration that is described in the Demonstration Remediation Agreement, including but not limited to the offer of home remediation followed by delivery of a Certificate of Occupancy and Environmental Certificate pursuant to Paragraph V of the Demonstration Remediation Agreement, the Claimant(s) will dismiss with prejudice the Action.

4. The Claimant(s) unconditionally release and relinquish all rights they have or may have against Released Parties arising out of or relating to claims asserted in the Action and/or the KPT Drywall in his/her home, any and all persons or entities who furnished services for, or in any way facilitated or assisted in, the installation of KPT drywall in the Claimant's home, including without limitation, any actual or potential defendants,

including but not limited to, contractors, builders, suppliers, designers, real estate agents, hangers, and/or consultants, and their respective insurance carriers; and all of their past, present, and future parents, subsidiaries, affiliates, controlling persons, officers, directors, employees, shareholders, suppliers, distributors, contractors, agents, servants, counsel, and insurers; and all predecessors, successors, assigns, heirs, executors, estate administrators, any person who may have a claim of indemnity or contribution against Released Parties, and personal representatives of each of the foregoing, separately or collectively.  This general release includes without limitation past, present, and future remediation, construction, reconstruction, repair or claims for any and all damages, compensatory and/or punitive and/or other, penalties, costs, expenses, attorney's fees, and interest, pre-judgment and/or post-judgment, and includes those KPT Drywall-related damages of the Claimant(s) of which the Claimant(s) are not aware, and those the Claimant(s) do not anticipate, with the sole exception of claims ("the Reserved Claims") against the Knauf Defendants by (i) the claimant(s) for bodily injury, (ii) by the claimants' counsel for "Attorneys' Fees" as defined in Paragraph IX of the Demonstration Remediation Agreement, and (iii) claims in connection with the performance of, and any obligations arising under, the Demonstration Remediation Agreement, including, but not limited to, warranty claims and performance of punch list items.  The Knauf Defendants reserve all defenses, including jurisdictional defenses, as to bodily injury claims.  Other than as to the Reserved Claims, this is a full, final and absolute general release and covenant not to sue.

5.   This Release is effective immediately with exception that it shall be effective as to the Knauf Defendants upon (i) compliance by the Knauf Defendants with Paragraph V of

the Demonstration Remediation Agreement concerning the Certificate of Occupancy and Environmental Certificate, (ii) "Substantial Completion" as that term is defined in the Work Authorization Agreement, and (iii) receipt by the Claimant(s) of a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the remediation of the home have been either released or bonded off such that the Claimant's title is clear of all liens related to the remediation. In the event that the Program is terminated before remediation of the home has commenced, this Release, in its entirety and as to all Released Parties, will be null and void, and any amount paid by a Released Party will be refunded.

6.  The Claimant(s) understand and acknowledge the significance and consequence of releasing all of the Claimants' KPT Drywall-related causes of action and/or claims (including presently existing, but unknown, unasserted, unsuspected, or undiscovered KPT Drywall-related causes of action and/or claims), and hereby assume full risk and responsibility for any and all injuries, losses, damages, assessments, penalties, charges, expenses, costs, and/or liabilities that the Claimant(s) may hereinafter incur or discover that in any way arise out of or relate to such causes of action. To the extent that any law, statute, ordinance, rule, regulation, case or other such legal provision or authority may purport to preserve the Claimant(s) right hereafter to assert presently existing but unknown, unasserted, unsuspected, or undiscovered KPT drywall-related causes of action and/or claims, which would otherwise be barred by the terms of this Release, the Claimant(s) hereby specifically and expressly waive their rights under such law, statute, ordinance, rule, regulation, case or other such legal provision or authority.

7. The Claimant(s) and their counsel, and every person employed or retained by them who has any knowledge of any term of this Release or of any settlement, release, or waiver referred to herein (the "Restricted Persons") shall keep STRICTLY CONFIDENTIAL and agree not to disclose to any other party, person or entity the terms of remediation or amount of this settlement, any of the terms of this Release, or the amount received by any Claimant(s), or the amounts of money offered, demanded or discussed during the course of settlement negotiations (the "Confidential Information"), except as required by law, and then only to the extent necessary.

8. Except as permitted in the preceding paragraph, no Restricted Person shall offer in evidence in any civil, criminal, administrative or other action or proceeding, or otherwise publicly refer to any of, the Confidential Information other than as may be necessary to consummate or enforce this Release. If the subject of such Confidential Information should arise in any legal proceedings, other than a proceeding to consummate or enforce this Release, the Restricted Persons will, to the extent possible, give Released Parties notice and an opportunity to intervene and oppose, file under seal any documents disclosing the Confidential Information, and take all reasonable measures to ensure that it is kept confidential and that any disclosure thereof takes place *in camera.*

9. No Restricted Person will rely on or attempt to rely on this Release, or any portion of the contents thereof, or any amount provided herein, or any amount received by any Claimant(s), in any proceeding other than a proceeding to consummate or enforce this Release. No Restricted Person will attempt to lift, or to cause any court or other body to lift, the confidentiality provisions of this Release for any purpose.

10. Claimant(s), and each of them, hereby represent and warrant that they have not disclosed prior to the execution of this Release terms of this settlement, or any substance of the settlement negotiations to any person to whom disclosure is not authorized hereunder.

11. In further consideration of the foregoing, and with the exception of the Reserved Claims, Claimant(s) and their undersigned counsel further agree and covenant to forever indemnify, defend and hold harmless the Released Parties, and without limitation, their successors, predecessors, assigns, affiliates, shareholders, investors, and their past, present and future officers, directors, partners, attorneys, agents, employees, parent companies, partnerships, subsidiaries, sister corporations and representatives from and against all claims and future claims relating to the KPT Drywall in his/her home.

12. The Claimant(s) is/are bound by this Release.  Anyone who succeeds to his/her rights and responsibilities, including any and all representatives, agents, successors, assigns, beneficiaries, heirs, or executors of the Claimant(s), his/her estate, or the estate of any of them is also bound.  This Release is made for the benefit of the Claimant(s) and the Released Parties.

13. The Claimant(s) authorizes and instructs his/her counsel to deliver to Released Parties a Notice of Dismissal with prejudice of the Action, which shall be "so ordered" by the Court where the Action is pending, as against all defendants in accordance with the provisions herein and the terms of the Agreement.  The Claimant(s) and his/her counsel shall cooperate with Released Parties in any additional way reasonably necessary to obtain such dismissal with prejudice.  Such delivery of the Notice of Dismissal shall be

made to Kerry J. Miller, Frilot L.L.C., Suite 3700, 1100 Poydras Street, New Olreans, Louisiana 70163.

14. The Claimant(s) acknowledge that they have not received or relied on any agreements or promises other than as contained in writing in this Release. In executing this Release the Claimant(s) have relied on his/her own or his/her counsel's analysis of the facts and information of which they are independently aware, and assumes the risk that there may prove to be facts or information different from or in addition to what they now know or believe.

15. Nothing in this agreement shall constitute any admission of liability or fault of any kind on the part of Knauf Defendants who expressly deny any liability to the Claimant(s) and who are entering this agreement to avoid the expense and uncertainty of litigation; (ii) an admission of or consent to jurisdiction or waiver of any jurisdictional defenses, except as provided in the Demonstration Remediation Agreement; and (iii) or consent to service by the Knauf Defendants. Neither this Release nor any Agreement shall be admissible in evidence in any proceedings except in an action to enforce the terms of the Release or the Demonstration Remediation Agreement.

Witness

Claimant

Claimant SS #

Counsel
LAW FIRM

STATE OF _____, COUNTY OF _____

       I certify that on _____, 2010, _____ personally came before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally signed this document; and (b) signed, sealed and delivered this document by her act and deed.


_____
Notary Public


Witness

_____
[Builder] [Supplier] [Insurer] Defendants


_____

Counsel
LAW FIRM

STATE OF _____, COUNTY OF _____

       I certify that on _____, 2010, _____ personally came before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally signed this document; and (b) signed, sealed and delivered this document by her act and deed.

_____
Notary Public

_____
Witness

_____
The Knauf Defendants

_____
Counsel
LAW FIRM

STATE OF _____, COUNTY OF _____

      I certify that on _____, 2010, _____ personally came before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally signed this document; and (b) signed, sealed and delivered this document by her act and deed.

                                                _____
                                                Notary Public

# EXHIBIT

# K

**Exhibit K**

# FORM OF CONFIDENTIAL BUILDER-SUPPLIER-INSURER SETTLEMENT AGREEMENT AND RELEASE

This CONFIDENTIAL SETTLEMENT AGREEMENT AND RELEASE ("Agreement"), dated this _____ day of _____, 2010 is entered into by [Builder] [Supplier] [Insurer] ("the [Builder] [Supplier] [Insurer] Defendants") and Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co. Ltd., Guandong Knauf New Building Material Product Co. Ltd., Knauf International GmbH, Knauf Insulation GmbH (referred to in MDL 2047 as Knauf Insulation USA), Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda., Gebr. Knauf Verwaltungsgesellschaft, PT.Knauf Gypsum Indonesia, or Knauf Gips KG, (" the Knauf Defendants");

WHEREAS, on or about_____, the Claimant(s) listed on Exhibit A to this Agreement commenced lawsuits against one or more of the Knauf Defendants and the [Builder] [Supplier] [Insurer] Defendants, alleging that their homes ("the Remediation Home") contained defective KPT drywall board ("the KPT Drywall");

WHEREAS, the [Builder] [Supplier] [Insurer] Defendants and the Knauf Defendants have asserted, may assert or could assert claims against each other arising from the Actions;

WHEREAS, the [Builder] [Supplier] [Insurer] Defendants and the Knauf Defendants (collectively referred to below as the "Released Parties") believe it would be in their respective best interests to settle any claims between them arising from the Actions and avoid the risk, expense, inconvenience, and distraction of continued litigation; and

WHEREAS, the Knauf Defendants, the MDL Plaintiffs' Steering Committee (the "PSC") in *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047

SUBJECT TO SETTLEMENT CONFIDENTIALITY

(the "MDL") including class counsel in *Harrell v. South Kendall Construction Corp, et al.* No.

09-08401 (11th Judicial Circuit of Florida) ("Harrell Class Counsel"), have entered into a

Settlement Agreement For the Demonstration Remediation of Homes with KPT Drywall (the

"Demonstration Remediation Agreement") to create a demonstration program (the "Program") to

remediate homes that contain all or substantially all KPT drywall board ("KPT Drywall"),

including the Remediation Homes;

WHEREAS, the settlement amounts described below will be applied by the Knauf

Defendants to the costs of remediation of the Remediation Homes pursuant to the Program;

NOW, THEREFORE, for good and valuable consideration, including but not

limited to the terms of this Agreement, the receipt and sufficiency of which is hereby

acknowledged, the parties hereto, each and all intending to be legally bound, hereby stipulate and

agree as follows:

1. The [Builder] [Supplier] [Insurer] Defendants agree to pay the Knauf Defendants the
   amount of [$_____] and/or [describe other terms or undertakings, if any, and attach list
   of homes included in the agreement (Exhibit A) and describe how such amount is
   allocated among the homes].

2. In consideration of the foregoing, the Demonstration Remediation Agreement requires
   the owners of the Remediation Homes, pursuant to the Release Agreement annexed
   thereto as Exhibit J, a copy of which has been furnished in advance to the [Builder]
   [Supplier] [Insurer] Defendants, to unconditionally release and relinquish all rights they
   have or may have against the Released Parties, as defined in Exhibit J to the
   Demonstration Remediation Agreement, arising out of or relating to claims asserted in
   the Actions and/or the KPT Drywall in the Remediation Homes; any and all persons or

SUBJECT TO SETTLEMENT CONFIDENTIALITY

entities who furnished services for, or in any way facilitated or assisted in, the installation of drywall in the Remediation Homes, including without limitation, any actual or potential defendants, including but not limited to, contractors, builders, suppliers, designers, real estate agents, hangers, and/or consultants, and their respective insurance carriers; and all of their past, present, and future parents, subsidiaries, affiliates, controlling persons, officers, directors, employees, shareholders, suppliers, distributors, contractors, agents, servants, counsel, and insurers; and all predecessors, successors, assigns, heirs, executors, estate administrators, any person who may have a claim of indemnity or contribution against Released Parties, and personal representatives of each of the foregoing, separately or collectively. This general release includes without limitation past, present, and future remediation, construction, reconstruction, repair or claims for any and all damages, compensatory and/or punitive and/or other, penalties, costs, expenses, attorney's fees, and interest, pre-judgment and/or post-judgment, and includes those KPT Drywall-related damages that the owner of a Remediation Home is not aware, or has not anticipated, with the sole exception of claims ("the Reserved Claims") against the Knauf Defendants by (i) the homeowner of a Remediation Home for bodily injury, (ii) by the Remediation Home homeowners' counsel for "Attorneys Fees" as defined in Paragraph IX of the Demonstration Remediation Agreement , and (iii) claims in connection with the performance of, and any obligations arising under, the Demonstration Remediation Agreement, including, but not limited to, warranty claims and performance of punch list items. Other than as to the Reserved Claims, this is a full, final and absolute general release and covenant not to sue.

SUBJECT TO SETTLEMENT CONFIDENTIALITY

3. To further assure the maximum finality of this settlement of claims relating to KPT Drywall in the Remediation Homes, the Knauf Defendants and [Builder] [Supplier] [Insurer] Defendants shall release, indemnify and otherwise hold harmless, each other and without limitation, their successors, predecessors, assigns, affiliates, shareholders, investors, and their past, present and future officers, directors, partners, attorneys, agents, employees, parent companies, partnerships, subsidiaries, sister corporations and representatives from and against all claims and future claims relating to any Remediation Homes, with the exception (a) of any undertakings in Paragraphs 1, 6 and 7 of this Agreement and (b) that the foregoing indemnity obligations shall not apply to the Reserved Claims.

4. The parties understand and acknowledge the significance and consequence of releasing all of their KPT Drywall-related causes of action and/or claims (including presently existing, but unknown, unasserted, unsuspected, or undiscovered KPT Drywall-related causes of action and/or claims), and hereby assume full risk and responsibility for any and all injuries, losses, damages, assessments, penalties, charges, expenses, costs, and/or liabilities that the parties may hereinafter incur or discover that in any way arise out of or relate to such causes of action.  To the extent that any law, statute, ordinance, rule, regulation, case or other such legal provision or authority may purport to preserve the parties' right hereafter to assert presently existing but unknown, unasserted, unsuspected, or undiscovered KPT Drywall-related causes of action and/or claims, which would otherwise be barred by the terms of this Release, the parties hereby specifically and expressly waive their rights under such law, statute, ordinance, rule, regulation, case or other such legal provision or authority.

SUBJECT TO SETTLEMENT CONFIDENTIALITY

5. In the event that the amount allocated to a home, as set forth on Exhibit A, is not used for the remediation of that home, or in the event that the Program is terminated before remediation on such home has commenced, then the amount allocated to the unremediated home shall be returned to the [Builder][Supplier][Insurer] Defendant and any release provided by the homeowner of such home shall be null and void.

6. The parties and their counsel, and every person employed or retained by them who has any knowledge of any term of this Release or of any settlement, release, or waiver referred to herein (the "Restricted Persons") shall keep STRICTLY CONFIDENTIAL and agree not to disclose to any other party, person or entity the terms of remediation or amount of this settlement, any of the terms of this Release, or any amount received by any owner of a Remediation Home, or the amounts of money offered, demanded or discussed during the course of settlement negotiations (the "Confidential Information"), except as required by law or court order, and then only to the extent necessary; except that the Knauf Entities may disclose this Agreement to lead and liaison counsel for the Plaintiffs' Steering Committee in MDL 2047 and to the MDL Court, provided that such lead and liaison counsel agree to keep such financial terms confidential as required by the "Confidentiality Procedures" described in the Demonstration Remediation Agreement.

7. Except as permitted in the preceding paragraph, no Restricted Person shall offer in evidence in any civil, criminal, administrative or other action or proceeding, or otherwise publicly refer to any of the Confidential Information other than as may be necessary to consummate or enforce this Agreement. If the subject of such Confidential Information should arise in any legal proceedings, other than a proceeding to

consummate or enforce this Agreement, the Restricted Persons will, to the extent possible, give the Released Parties notice and an opportunity to intervene and oppose, file under seal any documents disclosing the Confidential Information, and take all reasonable measures to ensure that it is kept confidential and that any disclosure thereof takes place *in camera*.

8. No Restricted Person will rely on or attempt to rely on this Agreement, or any portion of the contents thereof, or any amount provided herein, or any amount received by any owner of a Remediation Home, in any proceeding other than a proceeding to consummate or enforce this Agreement. No Restricted Person will attempt to lift, or to cause any court or other body to lift, the confidentiality provisions of this Agreement for any purpose.

9. The parties hereby represent and warrant that they have not disclosed prior to the execution of this Agreement the amount of any terms of this settlement, or any substance of the settlement negotiations to any person to whom disclosure is not authorized hereunder.

10. The parties are bound by this Agreement. Anyone who succeeds to the rights and responsibilities of the respective parties, including any and all representatives, agents, successors, assigns, beneficiaries, heirs, or executors of the parties, or the estate of any of them, is also bound. This Agreement is made for the benefit of the Knauf Defendants and the [Builder][Supplier] [Insurer] Defendants.

11. Where applicable, the [Builder][Supplier][Insurer] Defendants authorize and instruct their respective counsel to deliver to the Knauf Defendants a Notice of Dismissal with prejudice of any lawsuits against the Knauf Defendants in connection with the

SUBJECT TO SETTLEMENT CONFIDENTIALITY

Remediation Homes. The [Builder][Supplier][Insurer] Defendants shall cooperate with the Knauf Defendants in any additional way reasonably necessary to obtain such dismissal with prejudice.

12. The parties acknowledge and agree that they have not received or relied on any agreements or promises other than as contained in writing in this Agreement. In executing this Agreement the parties have each relied on his/her own or his/her counsel's analysis of the facts and information of which they are independently aware, and assumes the risk that there may prove to be facts or information different from or in addition to what they now know or believe.

13. Costs and attorney's fees will be borne by the party incurring same.

SUBJECT TO SETTLEMENT CONFIDENTIALITY

_____    _____
Witness                    [Builder][Supplier] Defendant


                           _____
                           Counsel
                           LAW FIRM


STATE OF _____, COUNTY OF _____

       I certify that on _____, 2010,_____ personally came before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally signed this document; and (b) signed, sealed and delivered this document by her act and deed.

                           _____
                           Notary Public


_____    _____
Witness                    The Knauf Defendants


                           _____
                           Counsel
                           LAW FIRM

SUBJECT TO SETTLEMENT CONFIDENTIALITY

STATE OF _____, COUNTY OF _____

        I certify that on _____, 2010,_____ personally came before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally signed this document; and (b) signed, sealed and delivered this document by her act and deed.

                                       _____

                                       Notary Public

# EXHIBIT

# L

Exhibit L

## FORM OF STIPULATION OF DISMISSAL

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

```
- - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                     :
IN RE:                                               :     MDL DOCKET NO. 2047
                                                     :
CHINESE MANUFACTURED DRYWALL                         :     Judge Eldon E. Fallon
PRODUCTS LIABILITY LITIGATION                        :
                                                     :
                                                     :
This Document Relates To:                            :
                                                     :
[insert case caption and plaintiff name]             :
                                                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - x
```

### DISMISSAL PURSUANT TO STIPULATION

Pursuant to Rule 41(a)(1)(a)(ii) of the Federal Rules of Civil Procedure and in accordance with the terms of the Settlement Agreement for the Demonstration Remediation Of Homes With KPT Drywall among the parties whereby the parties have stipulated that this action shall be dismissed with prejudice on the merits thereof, Plaintiff herein, through their undersigned counsel, hereby dismisses [his or her claims in] the above-entitled action with prejudice on the merits thereof against [defendants], without costs to any party.

Date: _____, 2010  By: _____

                                        [PLAINTIFFS' COUNSEL SIGNATURE BLOCK]

1

Date: _____, 2010  By: _____

[DEFENSE COUNSEL SIGNATURE BLOCK]