UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | ) ) ) ) | CIVIL ACTION NO. 09-2047 JUDGE FALLON |
| _____ | ) | |
| This Document Relates to: ALL CASES | | MAGISTRATE WILKINSON |

**MEMORANDUM IN SUPPORT OF INTERIOR EXTERIOR'S
FOURTH MOTION *IN LIMINE* REGARDING LORI STREIT**

MAY IT PLEASE THE COURT:

Defendants, Interior Exterior Building Supply, L.P. and Interior Exterior Enterprises, L.L.C. ("Interior Exterior") move this Court for an order *in limine* prohibiting the plaintiffs from presenting any opinion testimony of Lori Streit as set forth in her rebuttal report on the grounds that (1) she is not qualified to render any such opinions by her knowledge, skill, experience, training, or education and (2) her opinions are not reliable pursuant to the doctrines set forth in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and Rule 703 of the Federal Rules of Evidence.

**BACKGROUND**

As the Court is keenly aware, plaintiffs have asserted a redhibition claim against Interior Exterior arising out of the sale by Interior Exterior of Chinese-manufactured drywall. The relevant inquiry for this trial is whether Interior Exterior knew, or in the exercise of reasonable care in light of known facts, should have known of the off-gassing of sulfur defect in the Chinese-manufactured drywall.

Plaintiffs have presented Dr. Lori Streit as an expert, who has proffered the following opinions in her rebuttal report:

(1) if Interior Exterior had visited the gypsum mine in China, they would have noted that hydrogen sulfide levels were a concern at the mine;

(2) if Interior Exterior had visited the manufacturing plant, they would have been aware that a sulfur odor was emanating from the drywall and the raw gypsum;

(3) if Interior Exterior had visited a gypsum testing laboratory, they would have been aware that a sulfur odor was emanating from the drywall;

(4) if Interior Exterior had contracted with a third party testing and monitoring entity, the sulfur smell associated with the drywall would have been detected; and

(5) Interior Exterior did not review certain ASTM testing results that showed the Chinese manufactured drywall was not in compliance with ASTM standards.

At her deposition, Mr. Streit identified one additional opinion regarding what Interior Exterior should have known based on alleged representations to Interior Exterior about whether the Taishan plant was ASTM certified. This opinion, however, was not contained in her report, contrary to Rule 26, and was based upon her review of documents the day before her deposition.

Dr. Lori Streit has previously been admitted as an expert in other Chinese drywall matters to opine as to the effects of the release of sulfurous compounds from Chinese manufactured drywall into the air after being installed in homes. Originally, Plaintiffs intended to offer her for these same opinions in this case, but the parties' stipulations have rendered those opinions moot. Thus, those opinions and testing methodology are not being challenged.

However, when Plaintiffs discovered that they were not properly prepared to address the expert opinions of Interior Exterior's experts, Dr. Tonyan, an expert in the ASTM testing of drywall and the standard of care for drywall distributors, and Dr. Tompkins, an expert in the standard of care for a distributor of foreign manufactured products, Plaintiffs scrambled to bootstrap Ms. Streit into an expert that she is not by having her offer the above five opinions.

Dr. Streit has a Ph.D. in chemistry; and considers herself an expert in chemistry, materials analysis and testing.[1] She, however, admits that she is not an expert in the manufacturing process of drywall.[2] She further admits that she has not made any visits to the gypsum mine or to any manufacturing plants of Chinese drywall.[3] Finally, she admits that she has not performed any ASTM testing on the Chinese-manufactured drywall.

Dr. Streit's first report in this matter dated, September 20, 2012, is grounded in reliable chemical testing and analysis. Her rebuttal report dated October 17, 2012, however, strays away from reliable chemical testing and analysis of which she is deemed an expert, to the adoption of speculative conclusions of another who cannot testify in this matter and of which she has not independently verified. She freely admits that she must rely on Lydia Luckevich, an expert that is not allowed to testify, for her opinions set forth in her rebuttal report concerning the manufacturing, testing, and mining process of the drywall.[4]

Specifically, regarding this exclusive reliance on Ms. Luckevich, Dr. Streit testified as follows:

> Q. Do you know what smells are commonly associated with the manufacture of drywall?
>
> A. Well, other than just a discussion with Lydia, because she's my reference for manufacturing process because she's been doing that for 20 years as a consultant to the manufacturers. She tells me that sulfur smells of that nature, reduced sulfur smells, any type of reduced sulfur smells, whether it's from bacteria, elemental sulfur, whatever it is, would be noticeable.[5]
>
> \*   \*   \*
>
> Q. What investigation have you done into her background?

---

[1] See Exhibit A, deposition of Lori Streit at p. 11:7-9; Exhibit B, CV of Lori Streit.
[2] Exhibit A at p. 22:7-16.
[3] Exhibit A at pp. 19:22-20:2.
[4] Exhibit A at pp. 96:7-97:15.
[5] Exhibit A at p 89:16-25.

A.      I've talked to her specifically. I mean, I asked her what her background was.

Q.      Other than asking her what her background was, have you done any investigation into her background?

A.      No. I just talked to her.

Q.      Why do you choose to use her as your reference as opposed to some other expert on manufacturing of drywall?

A.      Because she is the person that USG and National and Temple and other people go to as an independent consultant.

Q. How do you know that?

A. Because she told me.[6]

\*      \*      \*

Q.      Do you know whether a sulfur smell is typically associated with the manufacture of drywall?

A.      Not that type of sulfur smell. In other words, gypsum has -- when you're processing it, I'm sure, has some odor.

Q.      Right.

A.      But it's distinguishable from a reduced sulfur odor. It's bound up in the sulfate, so it doesn't smell like a reduced sulfur particle would. Just like -- just like H2S. Okay. When people smell H2S, they think it's rotten eggs. When you go into these homes, it doesn't smell like rotten eggs. It smells like a burnt fireworks kind of thing because it's a blend of smells. And so when you go into a drywall plant, there is a certain odor, of course. You have wet paper. I mean, you have all kinds of stuff going on. But it doesn't have that reduced elemental sulfur smell. It would be a different smell that would send up a signal to them that, you know, hey, we've got some impurities in here that we need to deal with.

Q.      How do you know that?

A.      From discussion with Lydia.

Q.      So you rely on Lydia for that opinion?

A.      Yes.[7]

---

[6] Exhibit A at p. 91:8-23.

-4-

-5-

\*     \*     \*

I am told by Lydia that with respect to drywall processing, this would have come up as being a distinctly different smell than what normal processing would be, and I have to rely on her for that because I have never been in a plant.

Q. And you haven't done anything to test the veracity of that statement by Lydia, have you?

A. I have not been in a plant, so there's nothing I can do other than rely on her.

Q. You haven't been in a plant; you haven't spoken with any other experts as to what they think the smell might be, correct?

A. That's correct.

Q. You haven't read any publications or articles or anything of the like regarding what the smell would be like in one of these manufacturing facilities, have you?

A. No. I'm relying on her expertise.

Q. Exclusively, correct?

A. Yes.

Q. You're just simply, for lack of a better word, parroting what she's told you?

A. She is -- she is a recognized expert in that area. She is the expert that I went to.

Q. And you're just parroting what she's told you?

A. Again, I'm relying on her opinion as an expert in that area.

Q. If she's incorrect in her opinion, then your opinion is incorrect; is that right?

A. Well, since I'm relying on her opinion, then doesn't that follow?

Q. I'm asking you whether it follows.

A. Like I said, she's the recognized expert in that area. If she tells me that this is what's going to happen, since I haven't been in a plant, I'm going to believe her.

---

[7] Exhibit A at pp. 92:23-93:23.

Q. Do you think it's fair for you to rely exclusively on what she has to say without performing any independent investigation of that?

A. I think that people do that all the time. You know, what's the difference if I had gone to Tim Tonyan and asked him to do that and relied exclusively on him?

Q. Did you do that?

A. No. Because I relied on Lydia.[8]

\*   \*   \*

Q. But in this case, she was specifically hired by the Plaintiff Steering Committee, correct?

A. In some capacity, that's my understanding, yes.

Q. And she was compensated for the opinions that she rendered on behalf of the Plaintiff Steering Committee, correct?

A. I assume so.

Q. You would agree with me that she's not really impartial when it comes to Chinese-manufactured drywall, is she?

A. No, I think you need to talk to her about that.[9]

\*   \*   \*

Q. So what equipment -- ventilation equipment or other procedures were in place at the Knauf and Taishan manufacturing facilities in China?

A. I don't know. I haven't been there.

Q. So you can't say what ventilation they would have had in place then?

A. I have no idea what's in the plant.

Q. Ms. Luckevich doesn't know either, does she?

A. She does not.[10]

\*   \*   \*

---

[8] Exhibit A at pp. 96:2 - 97:24
[9] Exhibit A at pp. 99:25 – 100:12.
[10] Exhibit A at p. 119:20 – 120:4.

Q. Your opinion is, had they gone to the facility, they would have smelled a sulfur smell, but you don't know what ventilation equipment was in place that would have possibly eliminated that sulfur smell, correct?

A. Like I said, you have a situation where you probably do have some ventilation equipment, okay, and you're trying to collect the gas and send it out, but you are grinding and humidifying and drying and pushing this stuff out throughout the entire process, and it's my understanding that the entire process is typically not ventilated.

According to Lydia -- now, I'm not talking specifically about this plant, because no one went to see it. Okay? But under normal circumstances, there are collection of gases at the calciner and there may be collection of gases at one other point in the process where it's all mixed together and then goes out and gets pressed between the board. At that point, she really thought that that would be an obvious place where you would smell it, because she doesn't believe that the ventilation there would be good enough, that you would smell it, and that was her opinion.[11]

\*   \*   \*

Q. Okay. Any other smells? Any other odors would be released during that process?

A. Again, there probably are, but they're not the distinct smell that you would smell with the reduced sulfur gases.

Q. Could they be more distinct than reduced sulfur gases, though? Could they overpower the sulfur smell?

A. Not according to Lydia.

Q. Okay. So you rely on Lydia for that. You don't have any independent opinion as to whether there could be other gases, smells released during that slurry pool -- during that slurry pool process that could overwhelm the sulfur smell?

A. Again, I'm referring -- I am basing that opinion on what she tells me, and my knowledge of what the smell of the sulfur should be, someone should have smelt it. If she tells me, based on her knowledge of the manufacturing process, that someone should have smelt it, I believe her.[12]

---

[11] Exhibit A at pp. 120:17 – 121:13.
[12] Exhibit A at pp 159:17 – 160:14.

-7-

The entirety of Dr. Streit's rebuttal testimony is summed up in that one concluding statement: **If [Lydia Luckevich] tells me, based on her knowledge of the manufacturing process, that someone should have smelt it, I believe her.**[13]

## LEGAL STANDARD

The standards are well established for the admission or exclusion of expert testimony pursuant to the United States Supreme Court decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).. Under Rule 702 of the Federal Rules of Evidence, an expert qualified by "knowledge, skill, experience, training, or education" is allowed to give testimony where his or her "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; *Daubert*, 509 U.S. at 589. In assessing the basis of an expert's proposed testimony, the Fifth Circuit has held that an "expert's testimony [should be] based mainly on his personal observations, professional experience, education and training." *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002).

In order to be admissible, the testimony offered must rise above the level of "subjective belief" or "speculation," which means that the reasoning or methodology underlying the testimony must be scientifically valid (i.e., "reliable"). *See Sorensen*, 31 F.3d at 649; *see also Daubert*, 509 U.S. at 590. Rule 702 requires that expert opinion testimony be rendered by a qualified expert, based upon reliable data and methodology. *Hathaway v. Bazany*, 507 F.3d 312, 317 (5th Cir. 2007); *Lassiegne v. Taco Bell Corp.*, 202 F. Supp. 2d 512, 514 (E.D. La. 2002). The trial court has the responsibility of determining, under Rule 104(a), whether the expert's proposed testimony is reliable and helpful under Rule 702. *Daubert*, 509 U.S. at 589.

---

[13] Exhibit A at p. 160:12-14.

> When evaluating expert testimony, the overarching concern is whether or not it is relevant and reliable. A party seeking to introduce expert testimony must show "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

*Smith v. Goodyear Tire & Rubber Co.*, 495 F.3d 224, 227 (5th Cir. 2007) (quoting Fed. R. Evid. 702) (citation omitted). The court should "make certain that an expert, whether basing testimony upon professional studies or personal experiences, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). When conducting its review, the court must also consider whether the facts and data relied on by the expert are those facts "of a type reasonably relied on by experts in the particular field" under Rule 703. *Id.* at 589-90. Finally, while opinions formed for litigation are not automatically unreliable, courts recognize that research conducted independently of litigation is less easily tailored to serve a party's interests. *Robinson*, 923 S.W.2d at 559; *see also Daubert*, 43 F.3d at 1317.

    The burden is on the proponent of the evidence to demonstrate that the expert is qualified and his/her testimony is based upon a reliable foundation. *See e.g., Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). The focus of the court's inquiry is on the reasoning and methodology of the expert, and not simply his or her final conclusion. *Daubert*, 509 U.S. at 595. However, conclusions and methodology are not entirely distinct from each other. *General Electric Co. v. Joiner*, 118 S. Ct. 512, 519 (1997); *see Lust*, 89 F.3d at 598. Nothing in the Rules or the *Daubert* decision requires a district court to admit evidence that is connected to the existing data only by the subjective claim of the expert. *Joiner*, 118 S. Ct. at 519. Where the data or studies relied on by an expert simply do not support the ultimate opinion offered or are so dissimilar to the actual facts that the expert could not have relied on them, the expert's testimony is properly excluded. *Id.* Further, where the assumptions made by an expert

are not supported by the record, the expert's methodology is subject to a rate of error that is too high to be allowed before the jury. *See Sorensen*, 31 F.3d at 649.

Moreover, Federal Rule of Evidence Rule 703 may exclude expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions. *See JRL Enterprises, Inc. v. Procorp Associates, Inc.*, No. Civ. A. 01-2893, 2003 WL21284020 (E.D. La. June 2, 2003).

## ARGUMENT

### 1.     Dr. Streit is not qualified to render her opinions.

Interior Exterior does not challenge Dr. Streit's qualifications concerning her chemical analysis of the corrosive effect of the Chinese-manufactured drywall outlined in her original report dated September 20, 2012. Rather, Interior Exterior submits that Dr. Streit does not have the proper qualifications to put forth her opinions in her rebuttal report dated October 17, 2012. In her rebuttal report, Dr. Streit opines on what "smells" would Interior Exterior may have noticed had they visited the mining, manufacturing, or testing facilities. However, Dr. Striet has no "personal observations, professional experience, education and training" that would allow her to discuss what "smells" may have been noticed if an inspection had been made at various points during the manufacture of the drywall. *See, Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002).

Dr. Streit is a self-admitted forensic materials investigator. She performs chemical analysis of products to determine the source of contamination. She admits, however, that she is not an expert in gypsum mining.[14] She is not an expert in gypsum wallboard manufacturing.[15] She is not an expert in standard drywall testing.[16] She has not worked for a manufacturer of

---

[14] Exhibit A at p 22:11-16.
[15] *Id.*
[16] Exhibit A at pp. 19:22-20:2.

drywall. She has not worked for a distributor of drywall. Most importantly, she has never visited a gypsum mine; she has never visited a drywall manufacturing facility; and she has never observed standard ASTM testing on drywall.[17] She has no education in these areas and has never published any writings or performed any studies in these areas.

She has no personal observations of what "smells" occur at the manufacturing plant, gypsum mining facility, or the testing facility during standard drywall testing. She has no professional experience of what "smells" occur at the manufacturing plant, gypsum mining facility, or the testing facility during standard drywall testing. She has no education on what "smells" occur at the manufacturing plant, gypsum mining facility, or the testing facility during standard drywall testing. She has no training on what "smells" occur at the manufacturing plant, gypsum mining facility, or the testing facility during standard drywall testing. Rather, she relies exclusively on the alleged expertise and experience of Lydia Lukevich's to draw all of her conclusions on what "smells" may have been observed.[18]

Accordingly, Dr. Streit is not qualified to render any of the opinions expressed in her rebuttal report. While she "understands" what Ms. Lukevich is talking about, she has no personal basis from which to reach the same conclusion. In this sense, she is no more qualified than any lay witness to render the rebuttal opinions she offers. Under Rule 702 and the standards set forth in *Daubert*, then, Plaintiffs should be prevented from presenting the rebuttal opinions of Dr. Streit.

### 2. Dr. Lori Streit's opinions are not reliable.

Dr. Streit's testimony fails all three prongs of the test for reliability: (1) her testimony is not based on sufficient facts or data, (2) her testimony is not the product of reliable principles or

---

[17] Exhibit A at pp. 19:22-20:2; 127:24-128:1.
[18] Exhibit A at p.96:2-10.

-11-

methods, and (3) she has not applied the principles and methods reliably to the facts of this case. As discussed above, Dr. Streit has no personal experience with the manufacturing process of drywall or with the smells associated in the drywall manufacturing plants. Her opinions that a sulfur odor would have been present at the manufacturing plants are pure speculation. She has insufficient data from which to draw any reliable conclusions. She does not know the physical layout or environment of any of the facilities used in the manufacture of the Chinese drywall. She does not know what the plants looked it, what ventilation equipment was in place, or what processes of the manufacturing was performed in what parties of the facility. She does not know what smells are typically associated with the mining or manufacturing of drywall. She does not know what the testing facilities looked like or what ventilation equipment was present for the testing. Without this information, Dr. Streti cannot reliable conclude what "smells" would have been observed.

Again, Dr. Streit must rely exclusively on Lydia Luckevich's experience for the facts and data that underlying her opinions.[19] The sum total of her testimony is that Ms. Luckevich says you would have been able to smell sulfur and Dr. Striet believes her. Dr. Streit's rebuttal opinions are not based on "upon professional studies or personal experiences;" and, accordingly, Plaintiffs cannot establish that Dr. Streit's rebuttal opinions will "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co,* 526 U.S. at 152. Accordingly, Plaintiffs should be prevented from offering her rebuttal opinions.

### 3. Dr. Lori Streit's opinions parroting the opinions of Lydia Luckevich are not reliable or admissible.

---

[19] Exhibit A at p.96:2-10.

Dr. Streit freely admits that the exclusive basis of her opinions regarding what "smells" Interior Exterior would have noticed had they made visits at various times in the manufacturing process is the opinions of Ms. Luckevich. Under Federal Rule of Evidence 703, an expert may base an opinion on inadmissible evidence if the facts or data are of the kind reasonably relied upon by experts in the field. However, an opinion based on such facts or data may only be disclosed to the jury if their probative value outweighs any prejudicial effect they may have. Fed. R. Evid. 703. If the underlying information is admitted under this balancing test, but is otherwise inadmissible, the trial judge must give a limiting instruction upon request. *See Sinclair v. State Farm and Cas. Co.*, No. 09-447, 2010 WL 81506778, p. *4 (E.D.La. Feb. 10, 2010).

With regard to the reliability inquiry, Rule 703 of the Federal Rules of Evidence permits experts to rely on information that otherwise would not be admissible, including hearsay evidence so long as the information is of the type reasonably relied on by experts in his field. Fed. R. Evid. 703; *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94 (2d. Cir.2000) ("[A]n expert may rely on data that [he] did not personally collect."); *Bryan v. John Bean Division FMC Corp.,* 566 F.2d 541, 545 (5th Cir.1978) ("The modern view in evidence law recognizes that experts often rely on facts and data supplied by third parties."). **Nevertheless, Rule 703 does not allow "the wholesale adoption of another expert's opinions without attempting to assess the validity of the opinions relied on."** *Lightfoot v. Hartford Fire Ins. Co.*, CIV.A. 07-4833, 2011 WL 39010 (E.D. La. Jan. 4, 2011). *See also, Threet v. Correctional Health Care Mgmt of Okla., Inc.,* No. 07–843–HE, 2009 WL 3335596, at *5 (W.D.Okla. Oct. 15, 2009).

In *Threet v. Correctional Health Care Management of Oklahoma, Inc.,* the court excluded the plaintiff's expert from testifying because the expert did not conduct any independent investigation and relied solely on a DOJ Report as the basis for some of his opinions. *Threet,* 2009 WL 3335596, at *5–6. Notwithstanding the expert's impressive

credentials, the court concluded that the expert's opinions were inadmissible under *Daubert* because the expert lacked a reliable basis for his opinions. *Id.; see also TK–7 Corp. v. Estate of Barbouti,* 993 F .2d 722, 732 (10th Cir.1993) ("[T]he fact that [the expert] relied upon the report did not relieve the plaintiffs from their burden of proving the underlying assumptions contained in the report.").

Likewise, in *JRL Enterprises v. Procorp Associates, Inc.,* Your Honor precluded the plaintiff's expert from testifying because the expert failed to conduct any independent research to determine the reliability of his assumptions, and merely adopted figures calculated by another expert. 2003 WL 21284020, at *8. This Court reasoned that the expert's testimony was inadmissible because the expert failed to demonstrate that the other expert's opinions and figures were reliable. *Id.* at *7–8. Similarly, in *Bracco Diagnostics, Inc. v. Amersham Health Inc.,* Judge Wolfson of the District Court of New Jersey held that two of the proffered experts were not allowed to testify because they failed to conduct any independent investigation to refute the opinions offered by the plaintiff's experts. 627 F.Supp.2d 384, 449–50 (D.N.J.2009).

In addition to reliability, reliance on the opinions of others must pass the standards set forth in *Daubert*. *Moore v. Ashland Chemical, Inc.*, 126 F.3d 679, 691 (5th Cir. 1997)*; see also, Sinclair v. State Farm and Cas. Co.*, No. 09-447, 2010 WL 81506778, p. *4 (E.D.La. Feb. 10, 2010). "Just as *Daubert* rejected the general acceptance standard as too narrow for Rule 702, Rule 703 should not be reduced to the similarly narrow inquiry of whether experts in the field customarily rely on data of the general type in question." *Id.* Courts have identified several "objective earmarks of reasonable reliability" for evaluating the bases of expert opinions under FRE 703. *Id.* Some of the factors used in this determination are:

1) Was the basis published or documented in some other form?[20][1]

---

[20][1] *See Soden v. Freightliner Corp.*, 714 F.2d 498, 503 (5th Cir. 1983).

-14-

2) Was the basis subjected to peer review?
3) Was the expert's basis derived from sources that were impartial?[21][2]
4) Was the basis complete and logically sufficient?
5) Was the basis disclosed to the adverse party before trial?
6) Was the opinion more than just a summary of another expert's opinion?[22][3]
7) Was the opinion more than just a summary of inadmissible evidence?[23][4]
8) Do most experts in the field rely on data of the type in question?

This approach of refusing to allow an expert to simply wholesale adopt the opinions of another expert has been endorsed across the Federal circuits. In *In re TMI Litigation*, 93 F.3d 613, 715-16 (3rd Cir. 1999), the United States Court of Appeal for the Third Circuit found that "the expert's methodology was flawed when he relied entirely on another expert's report." Similarly, in *TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993), the United States Tenth Circuit held that an expert's lack of familiarity with the methods and the reasons underlying the projections of another individual upon which the expert based his own opinion "virtually precluded any assessment of the validity of the projections through cross-examination…" The expert's testimony that was based on those projections was therefore excluded. The court cited a United States Seventh Circuit case, *In re: James Wilson Associates*, 965 F.2d 160, 173 (7th Cir. 1992), for the admonition that "[t]he judge must make sure that the expert isn't being used as a vehicle for circumventing the rule against hearsay." *TK-7*, 993 F.2d at 732-33. FRE 703 "implicitly requires that the information be viewed as reliable by some independent, objective standard beyond the opinion of the individual witness." *Id.*

Regarding Dr. Streit, unlike her previously issued reports where she did independent testing of samples, in this matter she simply adopted the opinions of another, Lydia Luckevich,

---

[21][2] *See Soden*, supra; *U.S. v. Marine Shale Processors*, 81 F.3d 1361, 1370 (5th Cir. 1996); and *U.S. v. Trang Trong*, 18 F.3d 1132, 1143-44 (4th Cir. 1994)(opinions based on reports specifically prepared for litigation are not necessarily of a type reasonably relied upon); *see also Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 424 (5th Cir. 1987)(expert's testimony was "no more than [plaintiff's] testimony dressed up and sanctified as the opinion of an expert.").
[22][3] *Id. See TK-7 Corp. v. Estate of Barbouti*, 993 F.2d 722, 732 (10th Cir. 1993)(expert damages testimony excluded when expert was unable to show that opinion upon which his opinion was based was reliable).
[23][4] *Id.*

as her own.  Federal Rule of Evidence 703 prohibits the parroting of another's opinion as one's own without the independent analysis and determination.  While she suggests that his opinions were through independent analysis, it is apparent that she simply paired down Ms. Luckevich's inadmissible report as a guise to call it her own; and she should not be allowed to testify concerning those opinions.

Dr. Streit did not perform any independent verification of the opinions offered by Mr. Luckevich.[24]  Moreover, Ms. Luckevich's opinions were not published, peer reviewed, or impartial.  Her opinions, upon which Dr. Streit relies, rather were specifically prepared for this litigation at Plaintiffs' counsel's requests.  Mr. Luckevich's opinions have not been viewed as reliable by some independent, objective standard beyond the opinion of Dr. Streit and Plaintiff's other retained experts.  *See*, *TK-7*, 993 F.2d at 732-33.  Because Dr. Streit's testimony is nothing more than a summary of Mr. Luckevich's uncorroborated testimony, FRE 703 requires that he be prohibited from offering such opinions.

## **CONCLUSION**

Because Dr. Streit is not qualified and her opinions are not reliable as to her rebuttal report, she should be allowed to offer any expert opinions in this matter.  For this reason, Interior Exterior requests that this Court issue an order *in limine* prohibiting the defendants from presenting any opinion testimony of Dr. Lori Streit regarding her rebuttal report.

---

[24] Exhibit A at p. 96:2-10.

Respectfully submitted,

*Richard G. Duplantier, Jr.   /s/*
Richard G. Duplantier, Jr. (# 18874)
Lambert J. Hassinger, Jr. (# 21683)
Benjamin R. Grau (#26307)
Carlina C. Eiselen, (# 28524)
GALLOWAY, JOHNSON, TOMPKINS,
BURR & SMITH
701 Poydras Street, 40th Floor
New Orleans, Louisiana 70139
Telephone:  (504) 525-6802 / Fax:   (504) 525-2456
rduplantier@gjtbs.com /jhassinger@gjtbs.com
bgrau@gjtbs.com / ceiselen@gjtbs.com
*Counsel for Defendant, Interior Exterior Building Supply, L.P. and Interior Exterior Enterprises, LLC*

**Certificate of Service**

The undersigned certifies that this document has been served on Plaintiffs' Liaison counsel Russ Herman and Defendants' Liaison Counsel Kerry Miller, by email and United States Mail, and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with Pretrial Order No. 6, and that the foregoing was filed with the Clerk of Court for the United States District Court for the Eastern District of Louisiana by using the CM/ECF System which will send a notice of electronic filing in accord with the procedures established in MDL 2047, on the 12th day of November, 2012.

*Richard G. Duplantier, Jr.   /s/*
RICHARD G. DUPLANTIER, JR.