Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED       :  MDL NO. 2047
DRYWALL PRODUCTS LIABILITY         :
LITIGATION                         :  SECTION:  L
                                   :
------------------------------     :  JUDGE FALLON
This Document Relates to:          :
ALL CASES                          :  MAG. JUDGE
                                   :  WILKINSON

CONFIDENTIAL - SUBJECT TO FURTHER

CONFIDENTIALITY REVIEW

THURSDAY, NOVEMBER 1, 2012

- - -

        Videotaped deposition of DEAN A. RUTILA,
P.E., held at the Law Offices of Herman, Herman &
Katz, L.L.C., 820 O'Keefe Avenue, New Orleans,
Louisiana, commencing at 1:07 p.m., on the above
date, before Leslie B. Doyle, Certified Court
Reporter (LA), Registered Diplomate Reporter,
Certified LiveNote Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.

877.370.3377 ph | 917.591.5672 fax

deps@golkow.com

Exhibit B

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

**Page 2**

1  A P P E A R A N C E S :
2
3  APPEARING ON BEHALF OF THE PLAINTIFFS' STEERING
4  COMMITTEE:
5     SCOTT ALAN GEORGE, ESQUIRE
         Email: Sgeorge@seegerweiss.com
6      Phone: (215) 553-7982
       SEEGER WEISS, LLP
7      1515 Market Street, Suite 1380
       Philadelphia, Pennsylvania 19102
8
9     DANIEL K. BRYSON, ESQUIRE
         Email: Dan@wbmllp.com
10     Phone: (919) 600-5000
       WHITFIELD, BRYSON & MASON, LLP
11     900 W. Morgan Street
       Raleigh, North Carolina 27603
12
13    CAYCE C. PETERSON, ESQUIRE
         Email: Cpeterson@lambertandnelson.com
14     Phone: (504) 581-1750
       LAMBERT & NELSON, PLC
15     701 Magazine Street
       New Orleans, Louisiana 70130
16
17  APPEARING ON BEHALF OF INTERIOR/EXTERIOR BUILDING
18  SUPPLY, L.L.C.:
19     CARLINA C. EISELEN, ESQUIRE
         Email: Ceiselen@gjtbs.com
20     Phone: (504) 525-6802
       GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, PLC
21     One Shell Square
       701 Poydras Street, 40th Floor
22     New Orleans, Louisiana 70139
23
24
25

**Page 3**

1  APPEARANCES (CONTINUED):
2
3  APPEARING ON BEHALF OF NORTH RIVER INSURANCE
4  COMPANY:
5     SUZANNE M. PATRICK, ESQUIRE
         Email: Spatrick@thompsoncoe.com
6      Phone: (713) 403-8210
       THOMPSON, COE, COUSINS & IRONS, L.L.P.
7      One Riverway, Suite 1600
       Houston, Texas 77056
8
9  APPEARING ON BEHALF OF LANDMARK AMERICAN INSURANCE
10  COMPANY:
11  (VIA TELEPHONE)
12     JUDY L. BURNTHORN, ESQUIRE
         Email: Jburnthorn@dkslaw.com
13     Phone: (504) 593-0689
       DEUTSCH, KERRIGAN & STILES, LLP
14     755 Magazine Street
       New Orleans, Louisiana 70130
15
16  VIDEOGRAPHER:
17     TANYA NORGRESS
       Golkow Technologies, Inc.
18          ---
19
20
21
22
23
24
25

**Page 4**

1         INDEX OF EXAMINATIONS
2  EXAMINATION
3     BY MS. EISELEN...........................7
4  ACKNOWLEDGMENT OF DEPONENT...................97
5  ERRATA.........................................98
6  LAWYER'S NOTES.............................99
7  CERTIFICATE..............................100
8          * * *
9
10        INDEX OF EXHIBITS
11  EXHIBIT 1....................................11
12     9/21/12 REPORT OF DEAN A. RUTILA
13  EXHIBIT 2....................................32
14     DEAN A. RUTILA EXPERT TESTIMONY
15  EXHIBIT 3....................................53
16     ASTM STANDARD C1264 - 99 (REAPPROVED 2004)
17  EXHIBIT 4....................................53
18     ASTM STANDARD C1264 - 05
19  EXHIBIT 5....................................55
20     PHOTOGRAPH (INT/EXT06038)
21  EXHIBIT 5A...................................76
22     GOOGLE TRANSLATION
23  EXHIBIT 6....................................61
24     MEDITERRANEAN SHIPPING COMPANY BILL OF
25     LADING

**Page 5**

1  EXHIBITS (CONTINUED):
2
3  EXHIBIT 7....................................61
4     2/9/06 SALES CONTRACT
5     (INT/EXT00957 - INT/EXT00958)
6  EXHIBIT 8....................................64
7     METRO RESOURCES PACKING LIST (INT/EXT00972)
8  EXHIBIT 9....................................73
9     ASTM STANDARD C473 - 07
10  EXHIBIT 10...................................74
11     TEST REPORT (INT/EXT05774 - INT/EXT05775)
12  EXHIBIT 11...................................82
13     COMPETITIVE REPORTS
14     (L&W MDL 031012 - L&W MDL 031017)
15  EXHIBIT 12...................................87
16     ASTM STANDARD C1396/C1396M - 04
17  EXHIBIT 13...................................90
18     ASTM STANDARD C22/C22M - 00
19     (REAPPROVED 2005)
20          * * *
21
22
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 6

1            PROCEEDINGS
2            THE VIDEOGRAPHER:  We are on the
3    record.  The time now is approximately
4    1:07 p.m.  I'm Tanya Norgress, the
5    videographer for Golkow Technologies.  The
6    date today is November 1st, 2012.
7            This is the video deposition of Dean
8    Rutila taken in New Orleans, Louisiana, in
9    the matter of In Re:  Chinese-Manufactured
10   Drywall Products Liability Litigation for
11   the Court in the U.S. District Court,
12   Eastern District of Louisiana.  The MDL
13   number is 2047 in Section L.  The court
14   reporter is Leslie Doyle.
15           Will counsel please identify
16   yourselves and your affiliation.
17           MR. BRYSON:  Dan Bryson for the PSC.
18           MR. GEORGE:  Scott George for the PSC.
19           MS. PATRICK:  Suzanne Patrick for the
20   North River Insurance Company.
21           MS. EISELEN:  Carlina Eiselen on
22   behalf of Interior/Exterior Building
23   Supply.
24           THE VIDEOGRAPHER:  The court reporter
25   will swear in the witness.

Page 7

1                  ***
2            DEAN A. RUTILA, P.E.,
3    having been first duly sworn, was examined and
4            testified as follows:
5                  ***
6            EXAMINATION
7    BY MS. EISELEN:
8        Q.  Good afternoon, Mr. Rutila.  My name is
9    Carlina Eiselen, and I represent Interior/Exterior
10   in this litigation.
11           Can I just have your name for the record,
12   please?
13       A.  Dean A. Rutila.
14       Q.  And what is your home address?
15       A.  6 Belfry Terrace, Lexington,
16   Massachusetts.
17       Q.  And what is your business address, sir?
18       A.  41 Seyon Street, S-E-Y-O-N, Waltham,
19   Massachusetts.
20       Q.  It's my understanding you've been
21   previously deposed in this matter, correct, in
22   Chinese drywall litigation?
23       A.  I have been deposed previously in Chinese
24   drywall.
25       Q.  How many times before Chinese drywall have

Page 8

1    you been deposed?
2        A.  Somewhere around 20 to 40.
3        Q.  Is that 20 or 40 over your career?
4        A.  Yes.  That's how I understood the
5    question.
6        Q.  Yes.  Did you provide us in your report a
7    list of previous testimony?
8        A.  I did not.  When I got the notice, though,
9    I did -- yesterday --
10       Q.  Yes.
11       A.  -- I did cause one to be prepared and,
12   hopefully, somebody will print it out down here
13   today.
14       Q.  Okay.
15           MS. EISELEN:  And I'm just going to
16   hold open the deposition for that
17   information, gentlemen.  Is that okay?
18           MR. GEORGE:  Yeah, I'll be getting a
19   copy for you in a few minutes.
20           MR. BRYSON:  It is.
21           MS. EISELEN:  All right.  Well, thank
22   you.
23           MR. BRYSON:  Sorry about that.
24           MS. EISELEN:  No.  We've been on a
25   speedy track.

Page 9

1    BY MS. EISELEN:
2        Q.  So I'm just going to remind you of the
3    rules, the deposition ground rules.  And we've been
4    doing a very good job at this thus far, where you'll
5    allow me to ask my question and then you'll respond
6    with your answer before I will probably interrupt
7    you quite a bit.  So I'm going to try my best to let
8    you finish your answer, and I'll ask that you
9    finish -- allow me to finish my question.  Fair
10   enough?
11       A.  Fair enough.
12       Q.  All right.
13       A.  Except for the part of you interrupting
14   me.
15       Q.  I know.  I'm going to try not to do that.
16           I'm going to also assume that if you
17   answer my question without me -- requesting
18   clarification, or if you have some sort of question
19   in regards to what I'm asking, that if you answer
20   that question, though, I'm going to assume that you
21   understood the question.  Is that fair?
22       A.  Yes, I'll answer the question as I
23   understand it.
24       Q.  Thank you.
25           And I'm going to also ask -- let you know

3 (Pages 6 to 9)

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 10

1  that I may not use the terminology -- the right
2  terminology in regards to this matter.  My
3  understanding is that you're a professional
4  engineer.  I am not one.  So if you'll go ahead and
5  give me a little leeway on that, if that will be
6  okay, as well.
7    A.  Leeway, yes.  I will give you some leeway.
8    Q.  Thank you.
9        Mr. Rutila, I'm going to hand you a binder
10 which I believe is your report submitted in this
11 drywall matter for the Interior/Exterior case dated
12 September of 2012 and October of 2012.  If you could
13 for me, make sure that those are -- that is your
14 complete report.
15   A.  It's not practical for me to make sure
16 that there isn't a page missing here or there.
17   Q.  Okay.
18   A.  But I know the content of the report
19 sufficiently that I should be able to tell you if
20 there's anything substantial missing.
21   Q.  Thank you.
22       And just for the record, the yellow
23 divider sheets I put in there, and I believe those
24 were to separate the appendixes -- appendices.
25   A.  (Reviewing Document.)  This looks to be a

Page 11

1  complete copy of the two documents.
2    Q.  Thank you.
3        And I'm just going to go ahead and mark
4  that binder as Exhibit 1, and just go ahead and keep
5  that in front of you.
6        (Deposition Exhibit 1 was marked for
7             identification.)
8        Thank you, sir.
9    A.  Usually, you'll find they don't stay stuck
10 to vinyl like this, but...
11   Q.  Well, we'll make sure that the court
12 reporter takes care of that for us.
13       If we can go to the --
14   A.  Excuse me.
15   Q.  Yes.
16       THE WITNESS:  Dan, would you mind
17       moving that?  I'm afraid I'm going to
18       slosh it onto your...
19       MR. BRYSON:  Sure.
20 BY MS. EISELEN:
21   Q.  If we can go to your Appendix 1 of your
22 September report, which I believe is your -- is this
23 your CV?
24   A.  It is.
25   Q.  Okay.  Is there -- is this current?

Page 12

1    A.  Yes.  I only want to look to see if
2  there's been any changes that I remember.  This was
3  printed out in March of this year.
4    Q.  Okay.
5    A.  I don't recall making any changes since
6  March of this year.
7    Q.  Okay.  So there are no corrections to the
8  CV?
9    A.  No, ma'am.
10   Q.  And no additions?
11   A.  I have not chosen to add anything.
12   Q.  Okay.  It appears as if you are the senior
13 principal safety director for -- is it Simpson,
14 Gumpertz & Heger?
15   A.  It's Simpson, Gumpertz & Heger, and I'm
16 one of the senior principals.  There are several of
17 us, and I am, among other things, the safety
18 director.
19   Q.  As safety director, what does that entail?
20   A.  We have over 400 employees, several
21 laboratories.  We work on construction sites and
22 investigation sites all over the world, and the --
23 my task as safety director is to establish the
24 standards for safety training, to be responsible for
25 that training taking place, to investigate accidents

Page 13

1  and near misses, and to deal with any and all safety
2  issues that arise within the firm.
3    Q.  Anything else as a safety director?
4    A.  Oh, I'm sure there are other things.  I
5  gave you a very general summary.  I believe that it
6  encompasses everything, but I'm sure there is some
7  particular nuance that I haven't listed.
8    Q.  All right.  And it appears as if your
9  registration as a professional engineer includes
10 some of the states in the union, particularly
11 Louisiana.  When were you registered as a
12 professional engineer in Louisiana?
13   A.  I don't recall precisely, but it would
14 have been about the time of Chinese drywall
15 litigation that I was involved with in Louisiana, so
16 that would have been about 2009.
17   Q.  Was your retention in Chinese drywall the
18 reason you became registered in Louisiana as a
19 professional engineer?
20   A.  It was slightly different that it was
21 the -- it's a requisite to offer professional
22 services as a professional engineer in the State of
23 Louisiana that you be a licensed professional.  So
24 it's the same reason, but the cart before the horse,
25 if you will.

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

**Page 14**

1    Q. Okay. Fair enough.
2        You have other registrations. NCEES; what
3    is NCEES?
4    A. That's the National Council of Engineering
5    and -- Engineering and something -- Examiners, but
6    it is a -- it is the body that most states in the
7    United States and the District of Columbia rely upon
8    for the administration of -- and maintenance of
9    professional qualifications as engineers.
10    Q. When did you become a member?
11    A. I don't remember.
12    Q. Have you ever held an office with NCEES?
13    A. No, ma'am.
14    Q. Have you ever been part of a committee?
15    A. With NCEES?
16    Q. Yes.
17    A. No, ma'am.
18    Q. Under other registrations, you have listed
19    OSHA Training Institute qualified instructor. What
20    does that entail?
21    A. It's a qualification that allows me to
22    teach certain courses, specifically 10-hour and
23    30-hour courses in occupational safety in the
24    construction industry, and to grant through the OSHA
25    Training Institute certifications that people have

**Page 15**

1    completed that training.
2        The question also could reasonably be
3    understood to mean, what does it take to be such an
4    instructor, and that requires two courses and
5    passing exams, and then every three years, I believe
6    it is, a recertification.
7    Q. When did you first become an OSHA Training
8    Institute qualified instructor?
9    A. Five or six years ago.
10    Q. Do you currently instruct?
11    A. I do.
12    Q. When was the last time you taught?
13    A. We -- I require four training sessions a
14    year at our company. I have another qualified
15    instructor who I delegate to. I think I did -- the
16    last one I did was March of this year, sometime like
17    that.
18    Q. Okay. And under education, you received
19    your Bachelor's of Science in civil engineering in
20    1978 from University of Michigan?
21    A. That's correct.
22    Q. And your Master's of Science in civil
23    engineering the following year in '79; is that
24    correct?
25    A. That's correct.

**Page 16**

1    Q. Sir, what do you consider yourself
2    to be an expert in?
3    A. I'm an expert in civil engineering,
4    structural engineering, building enclosure
5    engineering, investigation of building and material
6    property problems and failures, and specifically an
7    expert in the conduct of multidisciplinary
8    investigations. And when I say, "building
9    enclosures," it's all of the elements of building
10    enclosures, roofing, waterproofing, cladding
11    materials, assembly materials and the construction
12    and assembly of those materials.
13    Q. So I have listed civil engineering,
14    structural engineering, building enclosures and
15    failures.
16    A. I said building enclosure engineering.
17    Q. Okay. And multi -- I guess
18    multi-district -- or multidisciplinary
19    investigations; is that correct?
20    A. I said all those things and more.
21    Q. Okay. Hold on.
22        With building enclosures, it's also -- you
23    also look into the elements of the building
24    enclosures, roofing, waterproofing, cladding
25    materials, assembly materials and construction and

**Page 17**

1    assembly of those materials, correct?
2    A. That is correct.
3    Q. All right. Your professional experience,
4    I see here. It appears from when you graduated with
5    your BS in civil engineering in 1978, you worked for
6    a company called Spalding Dedecker & Associates?
7    A. Dedecker (different pronunciation), yes.
8    Q. Okay. And what did you do?
9    A. I designed building structures.
10    Q. The following year, it appears as if --
11    well, from '79 to 1987, you then went to Giffels &
12    Associates?
13    A. Yes. After my master's degree, I joined
14    Giffels (different pronunciation) --
15    Q. Giffels.
16    A. -- Associates.
17    Q. What did you do there?
18    A. Giffels Associates is a -- was; they've
19    been since consumed by other firms -- a
20    multidisciplinary architecture and engineering firm,
21    and I did design and investigative work on new and
22    existing buildings for our clients.
23    Q. And then you've been with your current
24    firm from 1987 through the present; is that correct?
25    A. That's correct.

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

---

Page 18

1   Q.  Okay.  Have you always been the safety
2   director?
3      A.  No.
4      Q.  Let's start with the first position you
5   held with your current employer.  What was that?
6      A.  I was hired as a senior engineer.
7      Q.  Uh-huh.
8      A.  Yes, a senior engineer.
9      Q.  And what did you do as a senior engineer?
10     A.  I was a licensed professional at that
11  time, and I investigated building and structure
12  problems.  I designed building enclosures, and I
13  provided construction oversight of projects that I
14  had designed.
15     Q.  After being -- how long were you a senior
16  engineer?
17     A.  Just under two years.
18     Q.  After your -- those two years, I assume
19  you got a promotion?
20     A.  That's fair.
21     Q.  Okay.  And what was that?
22     A.  Staff engineer.
23     Q.  As a staff engineer, what did you do?
24     A.  I do precisely the same things, just with
25  more authority and with increasing responsibilities

---

Page 19

1   for scope definition, budget definition and other
2   staff members.
3      Q.  And how long were you a staff engineer?
4      A.  A little under two years.
5      Q.  All right.  After those two years?
6      A.  I was a senior staff engineer.
7      Q.  Okay.  What did you do as a senior staff
8   engineer?
9      A.  Precisely the same description as a staff
10  engineer, just with increasing responsibilities for
11  all of the items I mentioned.
12     Q.  Okay.  And how long were you a senior
13  staff engineer?
14     A.  About a year.
15     Q.  After that year, what did -- what was your
16  next position?
17     A.  Senior project manager.
18     Q.  And what did you do as a senior project
19  manager?
20     A.  All of the same duties, just with
21  increasing scope and responsibilities.
22     Q.  And how long were you a senior project
23  manager?
24     A.  I think a year and a half.
25     Q.  All right.  After that year and a half,

---

Page 20

1   what was your next position?
2      A.  I was an associate.
3      Q.  Okay.  And what did you do as an
4   associate?
5      A.  All the same things, except at that point
6   in time, I had contract authority for all of the
7   businesses that SGH is engaged -- Simpson, Gumpertz
8   & Heger, is engaged in.
9      Q.  And how long were you an associate?
10     A.  I think about two years.
11     Q.  After those two years, what was your next
12  position level?
13     A.  Principal.
14     Q.  And as a principal?
15     A.  I did all the same things, with increasing
16  corporate management responsibilities, that is,
17  increasing roles for the actual running of our
18  corporation.  I became a director when I was a
19  principal, and I took on roles as a director.
20     Q.  Okay.  And how long were you a principal?
21     A.  I've never stopped being a principal.  We
22  renamed our titles five, six, maybe seven years ago.
23  So all of us who were principals, we directors
24  decided we would all become senior principals, and
25  we changed -- we created two positions, one an

---

Page 21

1   associate principal and one a principal, and
2   separated our associates into those two categories.
3        MR. BRYSON:  I just handed you, by the
4   way, the list of the testimony and then a
5   document which was inadvertently omitted
6   when Mr. Rutila's reliance materials were
7   produced.  It's the MRC packing list.
8        MS. EISELEN:  Oh, okay.  Thank you.
9        Did you give Mr. Rutila a copy of his
10  deposition testimony, or is that --
11       MR. BRYSON:  I think you have the
12  copies of it.
13       MS. EISELEN:  I'll make a copy.
14  BY MS. EISELEN:
15     Q.  There you go, sir.  Is this the list
16  of your deposition testimony that you provided
17  recently?
18     A.  It's a list both of depositions, as well
19  as court testimony, which is how I understood the
20  request, that I had prepared yesterday.
21     Q.  Thank you for doing that.
22     A.  And this is for four years.
23     Q.  For four years.
24        Is it chronological from the first to
25  current or current going back?

---

6  (Pages 18 to 21)

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 22

1    A.  It's intended to have the most recent --
2    Q.  Recent?
3    A.  -- testimony for each project.  So if you
4  were to look at it, you would see, for example, that
5  some projects, the deposition might have been years
6  ago, but there might have been more recent
7  testimony, and the most recent testimony in each of
8  the matters listed sets its order on the list.
9    Q.  Thank you.
10        If you'll look at No. 1, Stratton
11  Corporation versus Engelberth, what was that case
12  involved?
13    A.  That involved a property developer, that
14  is, Stratton Corporation, Intrawest Stratton
15  Development Corporation, that's the entity, had
16  developed luxury homes on a ski mountain in Vermont.
17  The roofs leaked shortly after construction.  After
18  the roof leakage was not resolved with Engelberth,
19  its general contractor, we were engaged both to
20  solve that problem and then eventually to
21  participate in this litigation.
22    Q.  The second listing that you have is Eden
23  Brook Condominium.  What is that case about?
24    A.  That is a national nationwide home
25  builder, NVR, Inc., being sued by a condominium for

Page 23

1  alleged defective construction, and that's what it's
2  about.
3    Q.  What was the alleged defective
4  construction?
5    A.  A long list, but the essence of it is
6  water leakage and noncode-compliant veneer
7  construction, brick veneer construction.
8    Q.  The third one, Rising Bear Lodge, what was
9  that case about?
10    A.  This is the developer.  It's a related
11  entity to the first one, Intrawest Stratton
12  Development Corporation -- and it's just misspelled
13  on the Court document, so that's why it's misspelled
14  in my document -- being sued by homeowners
15  association for two properties.  One is called Bear
16  Lodge and the other one is Hearthstone Lodge.
17  They're multi-story condominium resort properties.
18    Q.  And what was the defect?
19    A.  Well, the claim is water leakage and
20  related damage.
21    Q.  The fourth one, Brenda White and Kevin
22  Barwin, what was that case about?
23    A.  That case is still about -- Brenda White
24  and Kevin Barwin are homeowners in Ontario.  They're
25  two different people that own two different homes.

Page 24

1  They're not related other than in the lawsuit, and
2  they have brought a lawsuit in a manner that is
3  similar to, but, in important ways, apparently
4  different from what we would call class action
5  lawsuit in the United States, and they've brought a
6  lawsuit against the manufacturer and related
7  entities of their roofing shingles.
8    Q.  The fifth case is Eastern Exterior Wall
9  Systems.  What was that about?
10    A.  That is a dispute between a general
11  contractor and a condominium regarding nonpayment or
12  payment and alleged defective construction of an
13  exterior wall assembly.
14    Q.  The sixth one, Debra Zanetti, what was
15  that case about?
16    A.  That is in many ways very similar to the
17  fourth one.  In this instance, it's in the United
18  States multi-district litigation out of Illinois
19  regarding alleged defective shingles made by a
20  shingle manufacturer.
21    Q.  And I note that you were retained by the
22  plaintiffs in that matter, and that firm was Levin,
23  Fishbein & Sedran in Philadelphia; is that correct?
24    A.  That's correct.
25    Q.  The seventh case that is listed is

Page 25

1  Treetop.  What was that case about?
2    A.  That's a case about a condominium
3  association, that is, Treetop at Stratton
4  Condominium Association, bringing litigation against
5  the development company over allegations of
6  structural defect, mechanical system defect,
7  exterior envelope defects, site work defects, a fair
8  few things.
9    Q.  The eighth case is Villas of St. John.
10  What was that case about?
11    A.  That's a lawsuit between a -- ultimately,
12  an insurance company that stood in the financial
13  ownership position of an apartment building in
14  Jacksonville, Florida, and their lawsuit against
15  their general contractor and others regarding
16  exterior envelope leakage and other failures.
17    Q.  The ninth one is CED Construction
18  Partners.  What was that case about?
19    A.  That is a general contractor, CED
20  Construction Partners, in a dispute with its various
21  subcontractors over defective construction of
22  apartment buildings in Florida.
23    Q.  What was the defect?
24    A.  I'd have to remember, but it's -- it's a
25  combination of roofing, deck waterproofing, exterior

Confidential - Subject to Further Confidentiality Review

Page 26

1  assemblies performance, including waterproofing, but
2  other deficiencies, as well.
3      Q.  The third page, Item No. 10, is Simon and
4  Rebecca Finger.  Was that the first deposition for
5  Chinese drywall that you've --
6      A.  No, ma'am.  Because these are in reverse
7  order, it's the first one we're coming to, but it's
8  -- chronologically, it's the most recent one.
9      Q.  This was a Chinese drywall matter,
10 correct?
11     A.  That's correct.
12     Q.  The 11th one, again, looks like another
13 CED Construction.  Is that the same CED as before?
14     A.  It's the same CED before, general
15 contractor in a dispute with its subcontractors.
16     Q.  Same alleged defect?
17     A.  Well, similar.  I mean, this company
18 builds apartment buildings for a living, and they
19 own and operate them for a living, and the apartment
20 buildings have similar characteristics.  They all
21 have roofs, walls, most have balconies, and the
22 differences between them differ.  Buildings have
23 different problems.  They differ.  I mean, every one
24 is different.  But the essence of the properties,
25 they look similar, they have similar materials and

Page 27

1  some of the same subcontractor entities, but the
2  particulars of each case is different.
3      Q.  And then the 12th one is also a CED
4  Construction Partners.  Looks like that deposition
5  was in November of 2010, while the one listed in
6  No. 11 was July and February.  So is that the --
7  would that be the same characterizations as the
8  other two CED?
9      A.  Yeah.  The only problem I have with your
10 question is that it might read in the record that --
11 the February deposition, that was in 2011, as it's
12 stated, not 2010, as it might have appeared in the
13 question.
14     Q.  Okay.
15     A.  But they're otherwise, with the same
16 limitations, similar.  The buildings have similar
17 characteristics, but the problems are unique to the
18 properties.
19     Q.  The 13th one is Stratton Corp.  It
20 appears -- is that the same one listed as No. 1 on
21 page 1?
22     A.  It's -- it's a related entity.
23     Q.  Okay.
24     A.  Yeah, those two are precisely the same
25 entity.

Page 28

1      Q.  Okay.
2      A.  They have -- it's not that rare in
3  developers to have a variety of entities sometimes,
4  but the primary litigants, that is, Stratton
5  Corporation into a Stratton Development Corp. and
6  Engelberth, are the same entities.
7      Q.  And what was the defect in No. 13?  Was it
8  also that the roof leaked after construction?
9      A.  No.
10     Q.  No.  What was No. 13's issues?
11     A.  No. 13 was wall, window and balcony deck
12 leakage and other performance problems.
13     Q.  No. 14 is another CED Construction
14 Partners case.  Is that the same as the other ones
15 previously discussed?
16     A.  Yeah, with all the same limitations, it is
17 similar.
18     Q.  Okay.  It looks like Kennesaw State
19 University Foundation, No. 15.  What was that about?
20     A.  That's a dispute between a state-owned
21 university, and they hold the -- certain properties
22 that they build in this foundation, as opposed to
23 other ownerships that you can imagine, and a dispute
24 between the owner, the ownership foundation, the
25 developer of the property, that's Place Collegiate,

Page 29

1  and the general contractor, Manhattan Construction
2  Company.  So those three entities were in dispute
3  with each other regarding water leakage and other
4  performance problems with the building.
5      Q.  No. 16 is Olen Communities.  What was that
6  case about?
7      A.  Olen Communities develops residential
8  properties in many places in the United States.
9  It's a dispute between their architect and their
10 general contractor for a apartment property,
11 multiple buildings in Delray Beach, Florida.
12     Q.  What was the issue in that case?
13     A.  There were substantial structural
14 problems, floor slabs sagging, concrete floor slabs
15 sagging on the second floor excessively, as well as
16 cracking of the exterior wall assembly and water
17 leakage of the exterior wall assembly.
18     Q.  The seventh [sic] one is, it appears to me
19 that that is a Chinese drywall matter in Florida,
20 Seifert or Seifart; is that correct?
21     A.  That's correct.
22     Q.  And was -- we'll skip that one.  18 was
23 Payton, which is also a Chinese drywall matter?
24     A.  That's correct.
25     Q.  Okay.  19 is Harrell; that appears to be a

8 (Pages 26 to 29)

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 30

1   Florida Chinese drywall matter?
2       A.  It is.
3       Q.  No. 20, Vantage Point Condominium, what
4   was that case about?
5       A.  That was a case where Vantage Point
6   Condominium Owners Association, the owners of a
7   condominium in Vermont, were suing the developer,
8   and this was about 20 years after the property was
9   built, and it was over exterior enclosure
10  performance and leakage issues.
11      Q.  21 is Tatum Hernandez, which appears to be
12  a Chinese drywall matter; is that correct?
13      A.  It is.
14      Q.  And 22 looks to be the Germano matter from
15  Virginia, which is also a Chinese drywall matter; is
16  that correct?
17      A.  That's correct.
18      Q.  All right.  No. 23, City of Rutland, what
19  was that case about?
20      A.  The City of Rutland was suing its general
21  contractor and design engineer over the failure of
22  the concrete structure and waterproofing of its
23  municipal water treatment facility.
24      Q.  The issue was with the concrete structure
25  and the waterproofing of --

Page 31

1       A.  Those are two -- those are two very
2   different issues, but those were the two issues.
3       Q.  Okay.  No. 24 on page 6 is the Villas at
4   Quantum Lake.  What was that case about?
5       A.  That's a dispute between an apartment
6   property owner and various contractors and designers
7   over exterior assembly defects.
8       Q.  CED Construction is listed as No. 25.
9   Would that be the same as the previous CED cases
10  that we discussed?
11      A.  Yeah.  They're similar in terms of
12  ownership and the nature of the dispute.  The
13  particulars are different.
14      Q.  Okay.  No. 26 says Tarragon Stoneybrook
15  Apartments.  What was that case about?
16      A.  That's a dispute between a property
17  developer, that's Tarragon Stoneybrook Apartments,
18  L.L.C., and its general contractor and
19  subcontractors over various performance problems
20  with the buildings.
21      Q.  What was the performance problems?
22      A.  That's a combination of cracks, water
23  leakage.  I'm sure there are other issues, but those
24  are the ones that stick in my mind.
25      Q.  Cracks and water leakage of what?

Page 32

1       A.  Of the exterior assembly.
2       Q.  And No. 27 and 28 appears to be CED
3   Construction.  Is that the same issues as discussed
4   before with the other CED or is different?
5       A.  They're similar.  I mean, the fact of 27,
6   the litigation being principally against a stair and
7   rail manufacturer, there's a subtlety to that one,
8   but the essence of it is, is performance problems on
9   apartment buildings and a dispute between the
10  general contractor and its subcontractors.
11      Q.  I'm going to go ahead and mark that as
12  Exhibit 2 since we've gone through that thoroughly.
13          (Deposit Exhibit 2 was marked for
14              identification.)
15          Mr. Rutila, when were you first retained
16  for a Chinese drywall matter?
17      A.  November 2009.
18      Q.  Who first contacted you or who -- excuse
19  me.  Who retained you?
20      A.  Plaintiff Steering Committee, specifically
21  through Mr. Bryson.
22      Q.  Had you done work with Mr. Bryson before?
23      A.  I had not.  The firm had.
24      Q.  Okay.  What type of work did your firm do
25  for Mr. Bryson?

Page 33

1       A.  I only know the most general
2   characterization of it, not being specifically
3   involved.  But it involved material science of
4   concrete.  There may have been structural
5   engineering and other things involved, but I just
6   don't have that in my mind.
7       Q.  What is your hourly rate for the Chinese
8   drywall matter?
9       A.  For all the matters I'm engaged in
10  presently, my rate is $275 an hour.
11      Q.  Do you know how much you've billed thus
12  far for Chinese drywall?
13      A.  I don't.  It's in the order of a million
14  dollars, but I don't really know the precise number.
15      Q.  Okay.  How many reports have you issued in
16  Chinese drywall?
17      A.  I don't know.  We could -- I can endeavor
18  to give you an approximation.  Somewhere in the
19  neighborhood of ten.
20      Q.  Okay.  Is that including rebuttals or
21  supplements?
22      A.  I included everything I would call reports
23  in my answer.  I may be off by one or two either
24  way, but...
25      Q.  Did anyone assist you in preparing those

Confidential - Subject to Further Confidentiality Review

Page 34

1  reports?
2      A.  Yes, ma'am.
3      Q.  Who?
4      A.  In the first report, the Germano matter,
5  we did thousands of hours of work in just a couple
6  months, and as such, we had dozens of people working
7  on it, so my ability to recall from memory all of
8  them is reasonably limited, although I could do a
9  pretty darn good job.  With that caution, the
10 principal folks working with me, Peter Nelson, Mauro
11 Scali, Paul Shiner, Andrew Jeffrey, Scott Tomlinson,
12 Dan Clark.  I could go on.  I just have to keep
13 thinking.
14         But the most important thing to go on with
15 is, besides within SGH, there were also others
16 outside of Simpson, Gumpertz, and that would be
17 Dr. Scully from the University of Virginia, Brad
18 Krantz, Don Galler, certainly Dr. Streit.  And there
19 are others, but I think if we went through, in the
20 end, the total list, it would be in the neighborhood
21 of 30 or 40 persons.
22     Q.  When you were first originally retained
23 for Chinese drywall, what were you retained to opine
24 on?
25     A.  It would be best if we pulled out our

Page 35

1  report from early in 2010, because it's specifically
2  enumerated there.  But the essence of the task was
3  to understand relationship between Chinese drywall
4  and alleged damage and to develop an understanding
5  of what needed to be done to address the damage.
6      Q.  Since the Germano -- well, say, since the
7  Germano trial, there's been many efforts, and I --
8  in regards to Judge Fallon coming out with his
9  judgment and his findings on that, and I believe
10 that there is a stipulation in this trial against
11 Interior/Exterior.  Has your attorneys -- have they
12 discussed those stipulations with you?
13     A.  Discussed sort of implies a conversation,
14 and I would characterize it more as my being
15 informed that there's a stipulation where the
16 parties agree that the drywall is defective, that
17 that's what I understand from their communication to
18 me.
19     Q.  Okay.  And when was that -- when were you
20 informed of that?  Recently?
21     A.  Well, I was -- not recently.  I was
22 reminded of it recently, but I was informed of it
23 prior to -- actually, I don't remember if I was
24 informed prior to or after preparing the 21
25 September, 2012, report.  I don't remember the

Page 36

1  precise date I was informed, but -- I can't
2  remember.
3      Q.  It's under your understanding that some of
4  the KPT board and some of the Taishan board
5  off-gases sulfur; is that correct?
6      A.  It off-gases sulfur gases.
7      Q.  Okay.
8      A.  That is gases that include the element
9  sulfur.
10     Q.  And that that off-gassing also may corrode
11 metals, certain metals; is that correct?
12     A.  It's certainly my testimony that the
13 off-gases do corrode certain metals as opposed to
14 may corrode certain metals.
15     Q.  Okay.  Have you, Mr. Rutila, ever worked
16 for a distributor?
17     A.  No.
18     Q.  Have you ever worked for a gypsum
19 manufacturer?
20     A.  No.
21     Q.  Other than Chinese drywall, have you
22 worked in any other cases in Louisiana?
23     A.  Yes.
24     Q.  Which case was that?
25     A.  I don't recall the names.  Early in my --

Page 37

1  earlier in my career.  This would be somewhere
2  around 1990, probably a little bit before.
3      Q.  Uh-huh.
4      A.  There's a community in Louisiana -- I may
5  say it wrong, but I believe it's New Iberia -- that
6  had a lot of storm damage.  I don't remember if it's
7  a hurricane or not.  My memory is it was a
8  hurricane, but -- and we were involved with
9  another -- a senior person who since has retired,
10 was a principal at the time, was in charge of that
11 work, and I assisted with some of that work.
12     Q.  But you were not actually registered in
13 the State of Louisiana at that time, correct?
14     A.  That's correct, I was not.
15     Q.  All right.  For the Interior/Exterior
16 trial, what were you requested to opine
17 to?
18     A.  I just want to be -- make sure that we're
19 clear.  I had a earlier Chinese drywall matter with
20 the Plaintiff Steering Committee that was also
21 called Interior/Exterior, and I just want to make
22 sure we're not talking about that.  I don't know --
23 I don't know -- I've seen it, but I don't remember
24 the style of this case, but you're talking about the
25 one for which I prepared, among other things, the 21

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 38

1   September, 2012, report?
2       Q.  Correct.
3       A.  Fair enough.
4       Q.  Yes.
5       A.  I will -- if you keep that same name for
6   the case, I will use that as my understanding, and
7   we'll just remember that I have another
8   Interior/Exterior matter in case you go to a
9   different place in your questions.
10      Q.  Will do.
11          What were you retained to opine
12  about for this Interior/Exterior trial?
13      A.  Specifically, I identify that in a report.
14      Q.  Is that on page 1, your scope of -- scope
15  of work?
16      A.  I have to open it and see.  Yes.  That's
17  really the -- the general description of what I set
18  out to do.
19      Q.  And that would be No. 1, evaluate damage
20  to building components in the homes and determine
21  that the damage was caused by Chinese-manufactured
22  drywall?
23      A.  That's correct.
24      Q.  And No. 2 is to evaluate the supply of
25  apparently improperly labeled Chinese-manufactured

Page 39

1   drywall to the plaintiffs' home during
2   reconstruction after Hurricane Katrina in and around
3   2006?
4       A.  That's correct.
5       Q.  Okay.
6       A.  And then, later on, I was asked to read
7   reports by defendant consultants and respond to
8   them.
9       Q.  Okay.  So let's go with the first one.  I
10  believe your executive summary starts at the bottom
11  of page 1?
12          MR. BRYSON:  Are we going to discuss
13      the things that were stipulated to now, or
14      do you -- were you going to leave that
15      out?
16          MS. EISELEN:  We can discuss those
17      things.  I just wanted to go through his
18      report.
19          MR. BRYSON:  Okay.  Not a problem.
20      I'm just -- you know, a lot of his report
21      goes to things that were stipulated to.
22      Why don't we go off the record for one
23      second?
24          MS. EISELEN:  Okay.
25          THE VIDEOGRAPHER:  Okay.  We're off

Page 40

1   the record at 1:59.
2   (Off the record.)
3       THE VIDEOGRAPHER:  Okay.  We're back
4   on the record at 2:00 o'clock p.m.
5   BY MS. EISELEN:
6       Q.  So, Mr. Rutila, before we took a little
7   break, we were going to discuss your evaluation of
8   the building components in the home and determine if
9   there was damage caused by Chinese drywall.  So what
10  did you do to prepare for your opinion based on
11  that?
12      A.  I did several things.  I assigned a task
13  to an engineer to travel to Louisiana to collect
14  samples.  I refreshed my recollection on prior
15  activities in Chinese drywall.  I contacted
16  Mr. Krantz and Mr. Galler so that they were not
17  surprised when samples arrived at their doorstep.  I
18  certainly spoke to Mr. Bryson, and I set about both
19  myself and assigning tasks to staff members to doing
20  certain items of document research that I wished to
21  have done.
22      Q.  Okay.  And if you look on page 4 of your
23  report is the basis for your opinions.  No. 5 -- I'm
24  sorry -- page 4, No. 5, basis for opinions.
25      A.  I know.  I'm just --

Page 41

1       Q.  Oh, okay.
2       A.  -- getting context of the --
3       Q.  Okay.  Sure.  Please, take your time.
4       A.  Okay.
5       Q.  The first one is -- the first bullet point
6   is confirming the presence of Chinese drywall in the
7   homes, identifying the damage that resulted from the
8   Chinese drywall and confirming that the plaintiffs'
9   homes met the definition of problem Chinese drywall
10  provided by U.S. Consumer Product Safety Commission;
11  is that correct?
12      A.  That's correct.
13      Q.  No. 5.1, you have observations.  And it
14  appears as if Mr. Jeffrey went to the offices of
15  W.D. Scott in New Orleans?
16      A.  That's correct.
17      Q.  And that's what you were talking about
18  earlier?
19      A.  That's one of the things I was talking
20  about.
21      Q.  Okay.  And it looks like he collected some
22  samples for testing?
23      A.  He collected samples both at W.D. Scott
24  office, as well as at a home and observed the
25  collection of samples.

11 (Pages 38 to 41)

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 42

1    Q.  Okay.  And some of those samples were sent
2  to Dr. Streit and Mr. Krantz; is that correct?
3    A.  Well, they were -- the ones that we
4  collected were sent to Dr. Streit, Mr. Krantz and
5  Mr. Galler.  Other samples that were collected and
6  not yet available for Mr. Jeffrey to transfer to
7  other parties was sent directly by W.D. Scott to
8  Dr. Krantz and Mr. -- excuse me -- Dr. Streit and
9  Mr. Krantz.
10    Q.  Okay.  Mr. Jeffrey, it appears, also
11  confirmed that each sample was -- it looks like
12  copper electrical wire showed black corrosion?
13    A.  That's right.  One of the things I asked
14  him to do was to look at the samples and apply the
15  knowledge that we've learned, as well as to document
16  the way in which the samples were stored and found
17  by him, and that's one of the things he did.
18    Q.  Okay.  It looks like he, Mr. Jeffrey, also
19  visited the Blue and the Mundee residences --
20    A.  That's correct.
21    Q.  -- and collected samples.
22    A.  I'm sorry.  It is correct he collected
23  samples from the Mundee, in particular.
24    Q.  It appears as if evidence was found that
25  corrosion was found at those homes?

Page 43

1    A.  Certainly in terms of observations at the
2  Mundee.  The Blue, the sampling was done separately,
3  and we used the other method, that is, looking at
4  the previously collected samples for that evidence.
5    Q.  It looks as if samples that were examined
6  by SGH, but it doesn't appear by whom, but it shows
7  that there were drywall samples marked "Made in
8  China," and that was from the 1921 Alvar Street,
9  1925 Alvar Street, the Blues' residence and Gross
10  residence.  Do you know who examined those samples?
11    A.  Mr. Jeffrey made the first examination,
12  and then I reviewed that with him.
13    Q.  Okay.  And it appears as if there was --
14  one home had Knauf markings at that -- from those
15  samples, and that was 1909 Alvar Street; is that
16  correct?
17    A.  That is correct.
18    Q.  All right.  And you didn't observe any
19  markings from -- of drywall samples in the Mora or
20  in the Mundee residences.  Is there a reason for
21  that?
22    A.  Those -- a lot of the drywall samples were
23  sent directly to Dr. Streit, so we did not see them
24  ourselves.
25    Q.  Okay.  And from that, you identify that --

Page 44

1  well, let me strike that.
2       In 5.2, you have here listed the Galler 17
3  September, 2012, report.  What did you look at
4  Mr. Galler's report for?
5    A.  I looked at it for everything that I had
6  asked him to do.
7    Q.  Which was?
8    A.  We had selected samples and sent them to
9  him.  Most of them are electrical light switches,
10  and we asked him to look at, to disassemble them,
11  look at the silver contact and to investigate
12  whether or not there was corrosion, particularly
13  silver sulfide corrosion product, to document that.
14  Also sent him some wires and sent him a smoke
15  detector and a thermostat for the same reasons.
16  Obviously -- not obviously -- with the wires, he's
17  looking for copper sulfide corrosion products.  And
18  so then, with respect to his report, I looked at it
19  for his results.
20    Q.  And what were his results?
21    A.  His results, I summarize there, but he
22  found corrosion on samples from all the homes that
23  we sent him, the corrosion is consistent with
24  corrosion from Chinese drywall.  I'm able to
25  conclude from this that it is caused by Chinese

Page 45

1  drywall, but his report demonstrates to me that,
2  those findings.  There was one sample that there was
3  so much grease on the contact in the process of
4  removing it, that made the sample indeterminative.
5  But, other than that, his testing demonstrates the
6  corrosion from Chinese drywall.
7    Q.  Did you -- and you reviewed his reports in
8  regards to all of that?
9    A.  Yes, ma'am.
10    Q.  Did you do any investi -- independent
11  investigation on those samples or in any samples
12  from those homes?
13    A.  Yes.  We looked at them and documented our
14  observations.  Prior to sending them, we selected
15  the samples that went sent to him.  We disassembled
16  samples.  For example, Mr. Galler would get the
17  switch and Mr. Krantz would get the wires.  And so
18  we did all of those things and documented our
19  observations and then sent them off.  So that was
20  our direct independent work on these samples.
21       We have done -- worked with Mr. Galler and
22  Mr. Krantz on many Chinese drywall samples and have
23  independently verified the results on other samples.
24  We didn't see it as necessary here.
25    Q.  Okay.  And Mr. Krantz's report was -- is

12  (Pages 42 to 45)

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 46

1    that -- what did he conclude?
2        A.   Mr. Krantz looked at numerous electrical
3    wires that showed evidence of corrosion from Chinese
4    drywall.  He made thin -- he made sections of them.
5    He was able to document both the accumulation of
6    corrosion product and pitting, and among other
7    things, concluded that those -- the corrosion was
8    consistent with severe environmental corrosion.
9    From that -- he also looked at electrical light
10   switch similar to Mr. Galler, but from his work of
11   identifying corrosion products, we conclude that
12   it's caused by Chinese drywall.
13       Q.   Okay.  And Dr. Streit's report,
14   September 20th, 2012, what did she conclude?
15       A.   The principal -- the principal conclusions
16   that I rely upon are her -- that she did the
17   elemental testing necessary to demonstrate that
18   the -- of the drywall itself and the corrosion
19   testing of the drywall itself necessary to
20   demonstrate that the homes meet the definition from
21   the Consumer Product Safety Commission of
22   identification, guidance of homes with corrosion
23   from problem drywall.
24       Q.   Okay.  Your -- I'm going to go back to
25   your second scope of work, which is to evaluate the

Page 47

1    supply of apparently improperly labeled
2    Chinese-manufactured drywall to the plaintiffs'
3    home.
4        MR. BRYSON:  You got the MR -- the
5    Metro Resource document.
6        MS. EISELEN:  Yes.
7        MR. BRYSON:  Those have been provided,
8    and they were supposed to be part of the
9    reliance materials, but they weren't in
10   what he had.  So...
11       MS. EISELEN:  Thank you.
12       MR. BRYSON:  There's three or four
13   more of those we're making copies of for
14   you.
15       MS. EISELEN:  All right.
16   BY MS. EISELEN:
17       Q.   Now, it looks on page 4, the basis of
18   opinion No. 5, your fourth bullet, your -- the last
19   bullet was comparing the Chinese drywall supply to
20   the homes by INEX with the requirements of the
21   applicable building code.  What did you do to
22   determine that?
23       A.   We researched the adoption of building
24   codes in or about the time of the work.  We compared
25   the results with the information in terms of when

Page 48

1    drywall was supplied to these particular homes from
2    INEX, so that we could understand the applicable
3    code, which code or codes applied at the time, and
4    then we looked at both the codes immediately before
5    and immediately after that for possible differences,
6    because sometimes there is a formal or informal
7    grace period after an adoption of codes, and one
8    cannot always tell from published information if
9    those informal actions are underway.
10       So we looked at all of those documents so
11   we could understand and reach -- you know, reach our
12   conclusions based on our looking at documents.
13       Q.   And what was your conclusion?
14       A.   That the 2003 International Residential
15   Building Code was applicable, but even if an earlier
16   code or a later code were applicable, the same
17   requirements would apply.  Those specific
18   requirements we enumerate from paragraph R702.3.1
19   and related documents that give the requirements for
20   the marking of gypsum board, gypsum wallboard, for
21   use in residential construction, and that was not
22   complied with with the material supplied by INEX.
23       Q.   It's my understanding that it's your --
24   what standard were you looking at?
25       A.   Well, --

Page 49

1        Q.   Which ASTM standard were you looking at?
2        A.   I was looking at a lot of them.
3        Q.   Uh-huh.
4        A.   But the particular ones that I enumerate
5    in the report are ASTM C1396, which is specifically
6    referenced in the International Residential Building
7    Code, and standard C1264, which is referenced within
8    C1396.  There are a whole host of other ASTM
9    standards that I also reviewed as part of this and
10   are in my reliance materials from -- most of them
11   are in the reliance materials as far back as
12   Germano, and I pulled those out again and looked at
13   them, as well.
14       Q.   And what was it in ASTM C1396 that made
15   the Chinese drywall that Interior/Exterior sold --
16   what was not correct about that?
17       A.   Specifically, the building code requires
18   that the drywall be marked, to use its language,
19   according to C1264.  And C1264 specifically requires
20   thickness, name of producer, supplier, brand name,
21   if there is one, and the ASTM specification for the
22   product.  It requires those things.  And based on
23   the samples that we reviewed at this time, at the
24   time of writing this report, that requirement was
25   not followed.

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

---

Page 50

1      Q.  What type of samples were you provided for
2  this case?
3      A.  Samples which we enumerate.  They're
4  pieces of drywall.  We enumerate specifically our
5  observations of those samples, which you had asked
6  me questions about earlier on page 5, and then every
7  sample that we had examined, we photographed and we
8  just put a summary of the information on page 5.
9      Q.  Were you provided actual drywall panels?
10     A.  We were provided pieces of drywall panels.
11     Q.  How big were the pieces?
12     A.  They varied from a few inches to a few
13  inches by a few inches to a little bit larger.
14     Q.  So you were -- your determination was
15  based on a few inches of drywall?
16        MR. BRYSON:  Objection; form.
17     A.  Based on samples taken that were a few
18  inches by a few inches, yes, ma'am.
19  BY MS. EISELEN:
20     Q.  So you weren't actually able to examine a
21  full sheet of drywall?
22     A.  That's correct.  As -- at the time of
23  preparing this, we did not have a full sheet of
24  drywall.
25     Q.  So you wouldn't be able to tell me whether

---

Page 51

1  or not, in fact, the board met ASTM standards with
2  the markings; is that correct?
3        MR. BRYSON:  Objection to form.
4      A.  I can tell you at the time of 21
5  September, 2012, the information I had was
6  incomplete on that subject.  I knew what -- I knew
7  and I reported it, but I did not -- I've since
8  learned other information that is relevant to that.
9  BY MS. EISELEN:
10     Q.  What other information have you learned
11  from that?
12     A.  Among other things, there's a document
13  which is a summary of markings provided, markings on
14  boards provided, supplied to INEX that enumerate the
15  markings on thousands of boards, as well as a
16  photograph that I described, as well as various
17  correspondence between INEX and others describing
18  the markings on the board -- on the boards that make
19  it clear that the board was not labeled according to
20  the requirements of the International Residential
21  Building Code.
22     Q.  Okay.  We've talked a little bit about the
23  ASTM C1264.  Which version did you look to?
24     A.  We had the 2000, as well as the 2009
25  version.  What they do is they publish them and tell

---

Page 52

1  you where there are any changes, so we had those,
2  and we also had -- well, those are the two that I
3  used.
4      Q.  Those were the two.  Did you not -- I'm
5  going to show you what I'm going to go ahead and
6  mark as Exhibit 3 and 4.  Well, this is Exhibit 3.
7  Is that the one you were looking at?  And then
8  Exhibit 4 --
9      A.  I must have misunderstood your question.
10  I thought we were talking about 1396 when I was
11  answering your question.
12     Q.  No, I apologize.  Did I say 1396?
13     A.  I don't know.  I don't know what you said.
14        MR. BRYSON:  I thought you said 1264.
15     A.  Okay.  Regardless, I was --
16  BY MS. EISELEN:
17     Q.  All right.  Let's go -- we'll just go with
18  the 1264.  That's the one I've given to you.
19     A.  Okay.
20     Q.  I'm going to go ahead and mark as --
21  Exhibit 3 as that one.  If you'll just go ahead,
22  Mr. Rutila.
23        I believe Mr. Bryson is correct.  Just
24  joking.
25        MR. BRYSON:  Objection.

---

Page 53

1        (Deposition Exhibit 3 was marked for
2           identification.)
3  BY MS. EISELEN:
4      Q.  Is that -- was that one of the versions
5  that you looked at?
6      A.  This is -- this is one of the versions I
7  looked at.  I specifically quoted in a report the
8  '05 version, but I had this, as well.
9      Q.  Okay.  No.  And I'm going to go ahead and
10  mark Exhibit No. 4 as, I believe, the '05 version.
11  Is that correct?
12        (Deposition Exhibit 4 was marked for
13           identification.)
14     A.  Yeah.  It looks like you don't have the
15  full document, but other than that, it is correct.
16     Q.  All right.  If you'll look at, I guess,
17  No. 6, which is the packaging and marking, and I
18  believe they're the same on both versions, the '05
19  and the 1999 version, if I look at the top.
20     A.  That's what I recall, as well.
21     Q.  Right?  I don't think there was anything
22  different.
23     A.  In paragraph 6, that's correct.
24     Q.  Okay.  Can you tell me whether or not, in
25  your opinion, that the Knauf board met those

---

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 54

1  requirements?
2      A.  I would -- don't recall.  I'd have to go
3  back to the -- my earlier files where I have full
4  sheets of Knauf board to refresh my recollection.
5  The document that I referred to of the materials
6  supplied to INEX, I don't recall it identifying any
7  Knauf board in it.
8      Q.  Okay.
9      A.  I don't remember.  I have full sheets of
10 labels on Knauf board.  I don't remember.
11     Q.  You have full sheets of Knauf board?
12     A.  I don't have the full sheet, but I have --
13 we saw full sheets of Knauf boards in earlier
14 Chinese drywall litigation, and I'd have to refresh
15 my recollection on its markings.
16     Q.  Have you asked to see full sheets of
17 Taishan board?
18     A.  I haven't asked to see them.  If I was in
19 a house that I had the liberty to take full sheets
20 off, I would -- I would do so, but I didn't ask.
21     Q.  What, in your opinion, is improperly
22 marked in regard to the Taishan board?
23     A.  The most important -- Taishan board.  The
24 only place I've seen the name Taishan board in the
25 documents that I have, I recall, is a photograph

Page 55

1  that was sent on the -- on the -- showed Taishan on
2  the edge tape, and that, based on the documents I
3  have, is not the manufacturer's name; it's not --
4  it's not the producer's name; it's not the
5  supplier's name; and that, even if it were the
6  producer's or the supplier's name, it doesn't match
7  the documents that describe who the producer is.
8          So the problem -- the problem with the
9  markings on what you describe as the Taishan board
10 is that the producer or supplier is not identified,
11 or if it is, it's not consistent with the name of
12 the producer or supplier identified in the other
13 documents.  That's the problem.
14     Q.  Is this the photograph that you were
15 describing to us?
16     A.  I can't be sure it's precisely the same
17 one, but it sure looks like it.
18         MR. BRYSON:  It's Taihe, not Taishan
19 on the photograph.
20         THE WITNESS:  This is Taihe?  Okay.
21 BY MS. EISELEN:
22     Q.  We're going to go ahead and mark that as
23 Exhibit 5.
24         (Deposition Exhibit 5 was marked for
25             identification.)

Page 56

1      A.  Okay.  This is the photograph I was
2  talking about in answer to your question.  Taishan.
3  I thought you were describing that name.  The
4  name --
5      Q.  Do you have --
6      A.  -- of the manufacturer, as I understand
7  it, and this may have been what you meant, is --
8  I've never heard anybody pronounce this before --
9  Tianjin Taishan Plasterboard Company, Limited.  If
10 that's what you meant by Taishan, then I was
11 misunderstanding your question.
12     Q.  No.  That's exactly what I was talking in
13 regards about, Taishan.
14         In No. C1264, under packaging and marking,
15 is there a requirement that says which language is
16 required to be used to mark the boards?
17     A.  No, it's not -- certainly doesn't say --
18 it doesn't give a language in 1264.  But that said,
19 what we're talking about here is a requirement of
20 the building code, and as a professional who uses
21 and applies the building code, the requirements of
22 the building code are that it be properly labeled,
23 and, among other things, that it have the producer
24 or supplier's name on it.  And as a user of the
25 building code, I don't consider marking it in

Page 57

1  China -- in Chinese to be meeting the requirements
2  of the building code.
3      Q.  So if -- in fact, if these Chinese
4  symbols, if they were to actually specify that it
5  was a Taishan brand of gypsum drywall, that would
6  not, in your opinion, be correct?
7      A.  It would not meet the requirements of the
8  International Residential Building Code.  It might
9  be correct if that was the name that was on there in
10 terms of whose name it was.
11     Q.  No. 6, packaging and marking, back to
12 C1264, it says, "Unless otherwise specified in the
13 purchase agreement, each board or package shall have
14 legibly marked thereupon" --
15         COURT REPORTER:  I'm sorry.
16         MS. EISELEN:  Yes.
17         COURT REPORTER:  Each board or package
18 shall have?
19         MS. EISELEN:  "Have legibly marked
20 thereon the following."
21 BY MS. EISELEN:
22     Q.  All right?  And I'm -- and it says in
23 here, "Unless otherwise specified in the purchase
24 agreement."  Have you seen the purchase agreement in
25 regards to the Taishan board for Interior/Exterior?

Confidential - Subject to Further Confidentiality Review

Page 58

1      A.  I've seen purchasing documents.  I haven't
2  seen anything that I would understand as
3  specifically a purchase agreement.  I've seen
4  correspondence related to the -- what's called the
5  LOC, which I understand is a letter of credit.  I've
6  seen invoices and similar documents, but I haven't
7  seen anything that I would -- that has been
8  described as a purchase agreement.
9      Q.  Okay.  I'm going to show you what's a
10  sales contract.
11         MS. EISELEN:  And I apologize, Dan.  I
12  don't have an extra copy.
13         MR. BRYSON:  Is this the broker
14  contract or the contract with Taishan?
15         MS. EISELEN:  No.  This is a contract
16  with Metro Resources for the Taishan
17  product.
18         MR. BRYSON:  So this is the broker
19  contract?
20         MS. EISELEN:  Correct.  I'm going to
21  take a look at the documents that you've
22  provided.
23         MR. BRYSON:  I think I'm going to hand
24  this one back to him.
25  BY MS. EISELEN:

Page 59

1      Q.  Have you seen that before?
2      A.  Yes.
3      Q.  And on here, if you'll look in the -- I
4  guess the first big box in that -- it's a very bad
5  copy; I apologize -- it says, "Paper faced regular
6  gypsum plasterboard"?
7      A.  I see that.
8      Q.  Okay.  "Made in China."  Sizes, it looks
9  like half-inch by 4 feet by 12 feet?
10      A.  That's right.  It's got the metric
11  equivalences on there, as well.
12      Q.  Okay.  If you look down towards the bottom
13  of the paper, and it says, Packaging and shipping
14  marks per seller's instructions," and then "Terms of
15  payment, signed letter of credit"?
16      A.  I'm reading.
17      Q.  Okay.  Reference that LC, which I believe
18  is the letter of credit, correct?
19      A.  Yeah.  I've seen it written as LOC.
20      Q.  Okay.
21      A.  But I understand it to be the same thing.
22      Q.  Earlier today, your attorney provided me a
23  copy of what looks like a Mediterranean Shipping
24  Company, Geneva, the original bill of lading.
25         MR. BRYSON:  Yeah.

Page 60

1         MS. EISELEN:  This one.
2         MR. BRYSON:  I just provided you some
3  of your documents.  Yeah, I gave him the
4  same copy.
5         MS. EISELEN:  Okay.  Mine is
6  highlighted.
7         MR. BRYSON:  I added the highlighting.
8         MS. EISELEN:  Thank you.  Did you
9  highlight his?
10         MR. BRYSON:  I did.
11         THE WITNESS:  He did.
12  BY MS. EISELEN:
13      Q.  All right.  So we're all looking at the
14  same thing, and it appears as if it's gypsum board,
15  tapered edge, 4 by 12 by half-inch, is that correct,
16  on these shipping documents?
17      A.  I just want to make sure I'm looking at
18  the same piece of paper you are.
19      Q.  I believe -- yes.  I believe --
20      A.  So I take off my glasses and look.
21      Q.  It's very hard to --
22      A.  I can read it.  I just have to get in
23  there.  Yep.  I see that, for example, there's one,
24  two, three, four, five sort of sections of printing,
25  and the first one -- yeah, each of them -- each of

Page 61

1  them says 4 feet by 12 feet by half-inch gypsum
2  board, tapered edge.
3      Q.  Okay.  And so on the packaging slip on the
4  cargo description, it shows the thickness, correct,
5  on that in regards to ASTM standards?
6      A.  It shows the thickness.  It doesn't show
7  the thickness according to ASTM standards.  It just
8  shows the --
9      Q.  But it shows the --
10      A.  It shows the thickness.
11      Q.  It shows the dimensions?
12      A.  That's what it shows.
13      Q.  Okay.  All right.  I'll go ahead and, I
14  guess, since we're looking at that -- what number
15  are we on?  6?  I'll mark that as 7, I suppose.
16  We'll go ahead and mark this as 6 and the sales
17  contract, guys, as 7.  All right?
18      (Deposition Exhibits 6 and 7 were marked for
19            identification.)
20         Here's a packing list, Mr. Rutila.
21         MS. EISELEN:  Did I give you one
22  already, Dan?
23         MR. BRYSON:  Yeah.  I gave you a copy
24  of those, --
25         MS. EISELEN:  Oh, okay.

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 62

1      MR. BRYSON: -- what I thought were in
2  kind of chronological order.
3      MS. EISELEN:  The packing list --
4      MR. BRYSON:  Which one?  Is this the
5  June 20th, 2006?
6      MS. EISELEN:  No.  Yeah.  June 20th,
7  2006.  It's INEX 972.
8      MR. BRYSON:  Yeah.
9      MS. EISELEN:  All right.
10 BY MS. EISELEN:
11     Q.  If you look at the bottom there, sir, it
12 says, two pieces one set, each set labeled with the
13 manufacturer brand name, at the back of each sheet,
14 made in China, meet or exceed ASTM C1396 '04
15 standard.  It looks like this is the packing list.
16 Would that meet ASTM standards C1264?
17     A.  No, ma'am.
18     Q.  Why not?
19     A.  Because it doesn't have -- it doesn't
20 describe having the manufacturer's name, and if the
21 quotes -- which is what I understand the question
22 and the document, if the quotes are what's written
23 on there, it doesn't meet the requirements of the
24 International Residential Building Code.  It doesn't
25 say who made it.  It doesn't say a supplier's name.

Page 63

1  It could be one or the other.  And it doesn't have
2  the thickness.  Those are -- if that quote is what's
3  written on the board, those are the two specific
4  violations of the building code.
5      Q.  Can you take that also with photograph as
6  Exhibit No. 5?  There's obviously a manufacturer of
7  some sort, a name there?
8      A.  There's a name.  It's not clear whether
9  that's the manufacturer or, as I guess that it might
10 be, or what it is, but it's a name and it's not the
11 same name as I understand the manufacturer to be.
12 So if that name -- either the name is wrong on the
13 material or the name is wrong on the representations
14 of who the manufacturer was.  Either way, if it has
15 the wrong name, it doesn't meet the building code.
16     Q.  Okay.
17     MS. EISELEN:  Apparently, we have only
18     a few minutes left on this tape, so we'll
19     go ahead and just break very shortly and
20     have her change this tape.
21     THE VIDEOGRAPHER:  Okay.  This is the
22     end of tape No. 1.  The time now is
23     approximately 2:38 p.m.  We're off the
24     record.
25 (Recess.)

Page 64

1      THE VIDEOGRAPHER:  This is the
2  beginning of tape No. 2.  The time now is
3  2:52 p.m.  We're back on the record.
4      MS. EISELEN:  Just so the record is
5  clear, I'm going to attach Exhibit 8,
6  which is Interior/Exterior 972, just for
7  the record.
8  (Deposition Exhibit 8 was marked for
9      identification.)
10 BY MS. EISELEN:
11     Q.  Okay, Mr. Rutila.  I'm going to go back to
12 page 7, No. 6, your summary conclusions for your
13 first -- well, your September 21st report.  It
14 appears as if you found for the nine homes
15 containing drywall manufactured in China which
16 sulfur compounds were off-gassing in those homes and
17 caused some corrosion to the electrical components,
18 and I guess copper components, as well.
19     A.  Well, the opinion is electrical components
20 and referring to both copper and silver in that
21 description.
22     Q.  All right.  And then that the nine homes
23 were damaged due to the off-gassing of the sulfur
24 compounds from the Chinese drywall, correct?
25     A.  That's correct.

Page 65

1      Q.  And that current corrosion creates a risk
2  of electrical fire and shock, correct?
3      A.  That's correct.
4      Q.  All right.  And that risk further corrodes
5  when -- even if the drywall is removed?
6      A.  That's correct.
7      Q.  All right.  And so there's a full
8  remediation process that must be required to
9  alleviate that issue; is that correct?
10     A.  There's a remediation process that's
11 required.  Whether it's full or not depends on the
12 meaning of the world "full."
13     Q.  All right.  And then your last paragraph
14 is that, "The labeling of the drywall as required by
15 the code and referenced standards" -- is the
16 referenced standards the ASTM standards that we have
17 talked about earlier?
18     A.  That's correct.
19     Q.  All right.  "Of the drywall panels during
20 distribution and construction, it appears that the
21 panels were not properly labeled, thickness."
22     But you have not seen any packaging,
23 correct?
24     A.  At that time, that's correct.
25     Q.  Have you seen packaging now?

17 (Pages 62 to 65)

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 66

1     A.   I've seen the packaging in Exhibit 5.
2     Q.   Any other materials?
3     A.   No.  I've seen the packaging in Exhibit 5.
4     Q.   But you've not actually seen a full sheet
5  of Taishan drywall?
6     A.   That's correct.  As I said, I have not
7  seen relative to this investigation a full sheet.
8     Q.   Okay.
9     A.   It actually didn't even occur to me till
10  you just asked that question to go back and see if
11  I've seen a full sheet in the other investigations.
12  That's something I will do.
13     Q.   And that such labeling defect with the
14  manufacturing in China should have made INEX
15  question the suitability of the Chinese drywall.
16  What is it that, with manufacturing in China,
17  which -- which would make Interior/Exterior, or
18  should have made Interior/Exterior question the
19  suitability?  What is that opinion based on?
20     A.   It's a combination of the fact that INEX
21  is importing improperly labeled material; it's not
22  the fact that it's from China.  If they had imported
23  it from Argentina, I wouldn't hold a different
24  opinion.  The fact that it is not properly labeled
25  is a significant defect that should cause INEX to

Page 67

1  question the product that it's importing.
2     Q.   So is it your opinion that because the
3  drywall was not labeled with thickness, that would
4  cause INEX to question its suitability?
5     A.   That's the item identified in
6  September 2012.  I've since identified other items.
7  But my experience is that, when I see mislabeled
8  products, I question them, and those questions
9  sometime are resolved favorably to the product.
10  Sometimes they're resolved unfavorably to the
11  product.  And I've had both outcomes.  But that is
12  why we label products, so that we can understand and
13  compare them with standards or what we're intending
14  to buy or intending to install or what we're
15  inspecting, and an improper label is one of those
16  items that I have seen and questioned.
17     Q.   To confirm thickness, couldn't INEX or
18  contractors or installers, couldn't they take a
19  standard tape measure to see if it was, in fact,
20  half-inch?
21     A.   Not every board after it's installed.  You
22  could cut holes and do it, or you might happen to
23  have a board with a hole, for example, for
24  electrical outlet, which will happen often enough.
25  But after it's installed, you can't.  But when it's

Page 68

1  sitting there in a pile, you could measure it.
2     Q.   Okay.  You could also measure how wide it
3  was and how long it was, correct, to determine the
4  length and the width?
5     A.   If that's what you wanted to do, you
6  could.
7     Q.   All right.  Let's go to your supplemental
8  report, Mr. Rutila.  We'll just move right along.
9  How's that?  Just bear with me.
10          Mr. Rutila, your supplemental report is
11  dated October 17th, 2012; is that correct?
12     A.   That's correct.
13     Q.   And you attached your CV to Appendix 1.
14  Is there anything different from this CV than the
15  first report from September?
16     A.   No, ma'am.
17     Q.   Okay.  Let's go to page 2 of the
18  supplemental report, your executive summary.  So
19  your first summary is that INEX received cautionary
20  advice about the quality of Chinese-manufactured
21  drywall that it was importing.  What was that based
22  upon?
23     A.   Based upon communication which I enumerate
24  in the document, specifically on page 3.  First, a
25  suggestion for -- from a e-mail to a Mr. Rudy

Page 69

1  Remont -- I don't know if I say that right; it might
2  be Remont (different pronunciation) -- where it
3  specifically says quality suggestion SGS inspection
4  necessary.  And the second one is later
5  correspondence where it specifically says that
6  Chinese boards which we provide you can meet or
7  exceed ASTM C1396-04.  The quality is lower than
8  Knauf.  And then it goes on to say it's
9  41 kilograms, KGS, per sheet, half-inch, 4-foot by
10  8, 12-foot.  Those are the specific comments about
11  quality that I was referring to.
12     Q.   Can a board meet ASTM standards but be a
13  lesser quality of another board that also meets ASTM
14  standards?
15     A.   Oh, yes.
16     Q.   Okay.  And it looks -- from that first
17  section on 17 April, 2006, INEX is advised, it looks
18  like they're talking about the weight of the board;
19  is that correct?
20     A.   Well, they're --
21     Q.   At the top, about 41 kilograms per piece,
22  and the domestic board is 1.8 pounds per square
23  feet?
24     A.   They're talking about lots of things.
25     Q.   Okay.

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 70

1    A.  That's one of the things -- I'm not done.
2    Q.  Okay.
3    A.  They're talking about weight.  They're
4  talking about availability.  They're talking about
5  price and they're talking about quality.  So they're
6  talking about all four of those things in that
7  e-mail.
8    Q.  It appears as if the Chinese board is --
9  I'm bad at math, Mr. Rutila, so bear with me.  Is
10  that 9/100ths of a pound heavier than the domestic
11  board?  Did I do that right?
12    A.  That's about right.  It's about 8 pounds
13  per -- about 8 pounds per board, something like
14  that.
15    Q.  Okay.  So the Chinese board is about
16  8 pounds heavier than the domestically U.S.
17  manufactured board?
18    A.  That's what this document says.
19    Q.  Is there an ASTM standard regarding weight
20  of the board?
21    A.  There's one regarding minimum weight, as I
22  recall.
23    Q.  And what is the minimum weight?
24    A.  I don't recall.  I would have to find out.
25  I don't have that document in front of me, and I am

Page 71

1  not going to remember it.
2    Q.  No.  That's fine.
3    Is there an ASTM standard regarding
4  maximum weight?
5    A.  I don't -- no, I don't believe there is.
6    Q.  So the heaviness of the board most
7  likely was not an issue; is that correct?
8    A.  Well, it's an issue or they wouldn't have
9  reported it.  It's a clear issue.  It shows up in
10  other documents about quantity of boards that can be
11  shipped in containers, and, you know, clearly a
12  heavier board is heavier to carry and install.  So
13  it's an issue or they wouldn't have reported it.
14    Q.  And we've already discussed that one board
15  can meet ASTM standards but be of lesser quality of
16  another board that also meets ASTM standards,
17  correct?
18    A.  Yeah.  You use the word "discuss."  You
19  asked me.  My opinion is that it can be.
20    Q.  I apologize.
21    MS. EISELEN:  Dan.  I'm sorry.  You
22    got it?
23  BY MS. EISELEN:
24    Q.  Mr. Rutila, I'm just going to go ahead,
25  and if you'll look, this is ASTM C473.  If you look

Page 72

1  on page 12, --
2    A.  If you just let me catch up.
3    Q.  Sure, sure.  I apologize.
4    MR. BRYSON:  Which version did
5    Ms. Streit identify this morning?  Was it
6    the 07 version or an earlier version?
7    MS. EISELEN:  I don't remember, but I
8    don't -- from my understanding, I don't
9    believe ASTM 473 has been substantially
10    changed with regards to what I'm going to
11    ask.
12    MR. BRYSON:  Okay.
13  BY MS. EISELEN:
14    Q.  You saw -- have you seen 473 before?
15    A.  Oh, yeah.  It's in my file.
16    Q.  Right.  I think I actually got this
17  version from your file.  On page 12, Mr. Rutila, --
18    A.  Oh, I'm sorry.
19    Q.  12, not section.
20    A.  I was at section.  That was my mistake.
21    Q.  Yeah.  No, no, no.  It's been a long day.
22    So it says, Introduction -- Appendixes,
23  Introduction, X1.1, and it appears as if there is no
24  ASTM standard regarding specifications for weight
25  for gypsum panel products.  Am I reading that right?

Page 73

1    A.  That's correct.
2    Q.  Okay.  I'll go ahead and mark this as
3  Exhibit No. 9.  I'm sure we'll come back to it,
4  though.
5    (Deposition Exhibit 9 was marked for
6    identification.)
7    On Section 4.2, going back to your report,
8  I think on page 3.  We're still on page 3,
9  Mr. Rutila.  This is in regards to that the labels
10  and the test reports don't match, correct?
11    A.  That's the heading, yes, ma'am.
12    Q.  And what test report were you specifying?
13    A.  I was referring to a document in my
14  reliance material which is a report of tests on the
15  Taian Taishan Plasterboard Company, Limited, board.
16  The version I put in my report, I think, was dated
17  in 2006, but it all -- I've seen versions of the
18  same reports with earlier dates, but that's what I
19  was referring to.
20    Q.  Mr. Rutila, is that the document you're
21  referring to?
22    A.  I've seen several versions of this.  I'm
23  convinced it's the same report with different
24  versions.  So I don't know that this is the one
25  exactly that I have, but it sure looks -- it sure

Confidential - Subject to Further Confidentiality Review

Page 74

1    looks to be the same document.
2        Q.   Okay.  We're going to go ahead and mark
3    this test report as Exhibit 10.  And just to confirm
4    that I've marked ASTM standard C473 as Exhibit 9.
5    All right.
6        (Deposition Exhibit 10 was marked for
7             identification.)
8        So on this, the product is gypsum
9    wallboard, correct?
10       A.   Yes.  That's what it says in the test
11   report box there.
12       Q.   We're going to just go ahead and read the
13   English because -- well, I can't read Chinese.
14       A.   Nor can I.
15       Q.   Okay.  So we're good.  So -- and then it
16   said, "Entrusted by Taian Taishan Plasterboard
17   Company," and the manufacturer appears to be Taian
18   Taishan Plasterboard Company, as well.
19       A.   That's what it says.
20       Q.   The test based it on 473, and I -- there's
21   another one in regards to based upon ASTM 1396, but
22   it appear -- it's a little blurry.
23       A.   I read it as, "Judgment Based Upon."
24       Q.   Okay.  It looks like this piece of
25   wallboard that they were testing was produced

Page 75

1    February 9th, 2006, and delivered to, I imagine --
2    I'm speculating -- to the Quality Supervision and
3    Inspection Center?
4        A.   I thought -- I thought I heard you say
5    "produced."
6        Q.   Yes.  Produce date, February 9th, 2006.
7        A.   I'm trying to see where it says that on
8    here.
9        Q.   If you look right by the next column, by
10   test based upon ASTM 473, right across the row would
11   be produce date.
12       A.   Oh, yeah.  I see.  I see where you're
13   saying it.  Let me read -- see if that is a separate
14   item.  (Reviewing Document.)  Yeah.  It says,
15   produce date, and that might mean manufacture date.
16   I'm with you.  Yep.
17       Q.   Okay.  But it appears that 4.2, your
18   contention is that the labels and the tests don't
19   match, correct?
20       A.   That's right.  The manufacturer is Taian
21   Taishan Plasterboard Company, Limited.
22       Q.   And it's your contention that it does not
23   match the board labeling?
24       A.   That's right.
25       Q.   Okay.  But, again, on Exhibit 5, we don't

Page 76

1    know whether or not the Chinese actually says Taian
2    Taishan Plasterboard Company?
3        A.   I don't know what you know, but I don't
4    know what it says.
5        Q.   Okay.  I've done actually a Google
6    translate of some of the Chinese markings, and I'll
7    provide that with you in regards to that, and I
8    believe that the board markings say Taishan Brand
9    Gypsum Board.  I'll go ahead and mark that as
10   Exhibit -- mark that as Exhibit 5A since it goes
11   with --
12       THE WITNESS:  Do you want to do that
13   now?
14       COURT REPORTER:  Yes.
15       MS. EISELEN:  Dan, I'll go ahead and
16   give you --
17       MR. BRYSON:  Why did they put the
18   English on the test board -- on the test
19   report?
20       (Deposition Exhibit 5A was marked for
21            identification.)
22   BY MS. EISELEN:
23       Q.   And, again, ASTM does not require that the
24   markings need to be in English, correct?
25       A.   ASTM is silent on what language it says.

Page 77

1    Actually, it would be an interesting exercise to see
2    what ASTM says about different languages.  It's a
3    question that's never been asked of me.  It's
4    something that's easily enough to look into.  But it
5    certainly is silent on the subject of language.
6        Q.   Okay.  So on the next page --
7        A.   Next page of?
8        Q.   -- of your report, page 4 of your
9    supplemental report, again, it's the drywall labels
10   don't meet ASTM C1264, and that goes back to the
11   improperly labeled drywall, correct?
12       A.   That's correct.
13       Q.   And that it does not specify thickness,
14   the name of the producer or supplier and the brand
15   name, correct?
16       A.   The brand name, I'm not so worried about.
17   The producer, supplier and thickness are the
18   critical items.
19       Q.   All right.
20       MR. BRYSON:  What exhibit number is
21   your Google search or your Google
22   translate?
23       MS. EISELEN:  5A, Dan.
24       MR. BRYSON:  Exhibit 5A?
25       MS. EISELEN:  Yes, because it -- you

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 78

1    can attach it to -- I just made it easier
2    for reference later.
3        Do you have that picture?
4        MR. BRYSON:  Yeah, we got it.
5        MS. EISELEN:  For your --
6        MR. BRYSON:  If you've got an extra
7    one.  Thank you.
8        MS. EISELEN:  Yeah.
9    BY MS. EISELEN:
10       Q.  So No. 4.4, INEX negotiates inspection
11   without testing.  What is that in regards -- what's
12   your opinion based on in that respect?
13       A.  I enumerate a document which really is a
14   e-mail chain.
15           (Brief interruption.)
16       MS. EISELEN:  You just hung them up.
17       MR. GEORGE:  Oh.
18       MS. EISELEN:  Okay.  Let's go off the
19   record real quick.
20       THE VIDEOGRAPHER:  Off the record at
21   3:16.
22   (Recess.)
23       THE VIDEOGRAPHER:  We're back on the
24   record at 3:28 p.m.
25   BY MS. EISELEN:

Page 79

1        Q.  Mr. Rutila, I think the last time we --
2    before we took our break, we were looking at Section
3    4.4 on page 4 of your supplemental report in regards
4    to INEX negotiates -- excuse me -- negotiates
5    inspection without testing.  Does that go back to
6    the labeling issue that you've had before?
7        A.  Well, it's more than just the labeling.
8    It certainly is one of the items there.  There's --
9    I list just -- I think the last e-mail that I have
10   in the chain, and there's a whole series of e-mails
11   describing these negotiations over what SGS North
12   America was to do.
13       And, certainly, the first paragraph is the
14   fact that where they were to do random inspection
15   for details and specs.  Certainly, that -- that
16   inspection failed because it didn't recognize the
17   labeling discrepancy compared to between the test
18   report, the manufacturer's name and what was
19   labeled.  They didn't apparently have or use ASTM
20   C1264 in that process, so that's one item.
21       The other part of it is the second
22   paragraph, which says not to do any testing, so
23   specifically excluding other things that might have
24   been done to look into or examine the Taian Taishan
25   Plasterboard Company, Limited, drywall for other

Page 80

1    issues of quality.
2        Q.  Okay.
3        A.  So it's both of those items.
4        Q.  But that e-mail, apparently, also mentions
5    that they were to review the dimensions, overall
6    condition, damages, construction and visual external
7    verification of specifications; is that correct?
8        A.  That's what it says.
9        Q.  Okay.  So page 5 of your supplemental
10   report, 4.5, is testing by United States Gypsum
11   Company, and it appears as if there was a -- that
12   USG did a report on Knauf board in regards to low
13   core purity and heavy weight.  What is this opinion
14   based on?
15       A.  There are two -- two Knauf test reports
16   that I've seen, and I'm describing them here.  And
17   these are characterizations that USG put in its
18   reports in terms of -- they describe as major
19   deficiencies and another one -- they describe as
20   minor deficiencies.  Including them are -- both
21   reports use the phrase "low core purity" as a
22   deficiency.
23       Q.  Is this the -- and this is subject to a
24   confidential protective order.  Is this the reports
25   that you were looking at?

Page 81

1        A.  You've got six pages, and I don't
2    remember --
3        Q.  You don't remember seeing six pages?
4        A.  Six -- I remember four, but it could be
5    six.  I'd have to check my file to see.  But let's
6    just read.  (Reviewing Document.)  Certainly, the
7    document that has the Bates number L&W, L ampersand
8    W, MDL 031015 is the -- the first -- the first page
9    may well be the -- the first page, L&W MDL 031012,
10   may be the same.  I just -- I don't recognize some
11   of the text on there, but it's essentially similar.
12       Q.  Okay.  All right.  But you recognize L&W
13   MDL 31015 as the document you reviewed?
14       A.  That and the subsequent pages, yes.
15       Q.  Okay.  15 through 17, correct?
16       A.  Yes.
17       Q.  All right.
18       A.  The documents I produced are there.  We
19   can go dig them out, but I certainly recognize that
20   page.
21       Q.  Okay.
22       A.  And I know I read -- I know I read two of
23   these reports.
24       Q.  All right.  I'm going to go ahead and
25   attach this as Exhibit 11.  You can go ahead and

Confidential - Subject to Further Confidentiality Review

Page 82

1  keep that for your document. I'll make sure not to
2  mark up the exhibit.
3       (Deposition Exhibit 11 was marked for
4            identification.
5       Do you know whether or not
6  Interior/Exterior was provided this document prior
7  to litigation?
8       A.  The only -- the only information I have on
9  that, as I recall, is either in the Tonyan or
10 Tompkin reports -- Tompkins report where, as I
11 recall, one or both of them represent that INEX did
12 not, but that's the only thing that I've seen on
13 that subject.
14      Q.  Okay. Can you describe to me what low
15 core purity is?
16      A.  No. I can -- I can refer to -- I think
17 it's C22, if we had a copy. But they use a slightly
18 different language, so it may or may not be an
19 application of ASTM C -- I think it's C22. We'd
20 have -- I'd have to pull out the standard. It could
21 be -- it may be referred by C22 to 471, or something
22 like that. I don't remember the precise chain of
23 documents.
24      But what I did do is I looked through the
25 ASTM standards that are produced in my file on the

Page 83

1  subject, and they might be referring to an
2  exploration of the percentage of calcium sulfate
3  based on sort of the numbers presented in the
4  report. But there are other things that they might
5  have been looking at, as well, in terms of minerals,
6  in terms of paper. It's hard to know from this
7  report.
8       Q.  From your understanding of this report,
9  does core purity indicate -- well, let me ask you
10 this a different way.
11      Would higher core purity equate to the
12 better strength of the board? Are you able to tell
13 from this USG document?
14      A.  I mean, the document -- I haven't compared
15 that with their spec, but we can -- we can look, for
16 example, at the second one, where they --
17      Q.  The second one on page --
18      A.  The second test, that's 031015 through 17.
19      Q.  Okay.
20      A.  And we can look at that where, on that
21 particular one, they compare the Knauf core purity
22 with the USG core purity, and we can see that, at
23 least for those samples, certain tests like ASTM
24 transverse strength, the USG boards with greater
25 purity are stronger. At the same point in time, if

Page 84

1  you look at the first one, and that is 12, 13 and
2  14, and compare the same variables, the data for the
3  same variables, you might reach a different
4  conclusion because the core purity numbers for the
5  Knauf board show to be lower in the first test
6  results but the strength is higher.
7       So I don't think you can reach that
8  conclusion there. And you can't reach it for
9  another reason is that certain manufacturing
10 processes of gypsum board are known to produce
11 higher strength, and that isn't necessarily --
12 although it's generally related to core -- lack of
13 contaminants in the core, it may not show up in
14 these numbers if you run the same test. But we
15 don't know what tests they ran, so it's hard to
16 know.
17      Q.  Okay. Mr. Rutila, what is your
18 understanding that is the problem with the
19 Chinese-manufactured drywall? What is it that makes
20 it defective?
21      A.  In the end, it's the fact that it produces
22 significant sulfur gases that destroy property and
23 create a noxious odor. And our investigation into
24 that identified sulfur-containing minerals within
25 it, and I've read other reports of -- and,

Page 85

1  certainly, the tests by Dr. Streit and others show
2  that it -- high elemental sulfur content, which is
3  consistent with our observations. But the bottom
4  line is, it's defective because it creates sulfur
5  gases that corrode and damage material and create
6  noxious odor.
7       Q.  I think we've already -- we're going to go
8  ahead and mark that as Exhibit 11, the USG reports.
9  I'm going to go ahead and take this back,
10 Mr. Rutila.
11      I think we've already marked -- have we
12 marked C473 as an exhibit? I believe --
13           MR. BRYSON: I thought you did.
14           MS. EISELEN: I believe we have. I'll
15      refer back to that.
16           MR. BRYSON: Exhibit 9.
17           MS. EISELEN: Okay.
18 BY MS. EISELEN:
19      Q.  Mr. Rutila, if you'll take a look again at
20 Exhibit 9, can you tell me the test to determine the
21 attributes of drywall, those contained in ASTM 473?
22 Well, first of all, have you seen ASTM 473?
23      A.  Yes. I testified earlier that -- and you
24 suggested that you got this from my file, so I've
25 seen it before. I reviewed it prior to this. I'm

22 (Pages 82 to 85)

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 86

1  just trying to understand your question.
2       Again, this is the leeway you asked for
3  earlier, where you perhaps use layman's language,
4  and I'm --
5       Q.  Yes.
6       A.  -- interpreting it as an engineer and
7  trying to understand what you mean.  You asked me
8  what -- I can't remember which way you asked -- what
9  attributes are tested based on ASTM C473; is that
10 the question?
11      Q.  Well, let me -- well, no.  Let me ask you
12 it this way: Is ASTM 473 the test methods to
13 determine -- to test gypsum drywall?
14      A.  It is one of the -- one of the standards.
15 I think we have to refer to -- I think we have to
16 refer to C -- that's not it -- I'm looking for --
17 maybe we didn't do it as an exhibit.
18      MR. BRYSON:  Which ASTM?
19      MS. EISELEN:  Which one are you
20 looking for?  I may --
21      MR. BRYSON:  1396?
22      THE WITNESS:  1396, yeah.
23      MS. EISELEN:  Yes, I have 1396.
24      THE WITNESS:  I don't see it in front
25 of -- I don't see it in front of me here.

Page 87

1       MS. EISELEN:  I have one for you.
2       MR. BRYSON:  Mark it as an exhibit.
3       MS. EISELEN:  We're going to go ahead
4  and mark that as Exhibit 12, Mr. Rutila.
5  If you'll go ahead and put that on the
6  bottom.
7       THE WITNESS:  Okay.
8  (Deposition Exhibit 12 was marked for
9       identification.)
10      MS. EISELEN:  Dan.
11      A.  Right.  And this Exhibit 12, ASTM 1396,
12 has a handful of documents that it refers to, not
13 the least of which is C473, which is for physical
14 properties.  There is -- and I lost -- I lost
15 Exhibit 12.  I'm sorry.
16 BY MS. EISELEN:
17      Q.  Did you find Exhibit 12, Mr. Rutila?
18      A.  I did.
19      Q.  Okay.  I just wanted --
20      A.  So this -- this is testing physical
21 properties.  It's not testing chemical properties.
22 That's in another standard.  So this is -- this is
23 just one of the standards.
24      Q.  If I wanted to look at the chemical --
25 well, let's go back to the physical testing.  What

Page 88

1  are the tests enumerated in 473 to test gypsum?
2       A.  473.  There is a -- first off, tests are
3  allowed to be under two different methods, but
4  within the methods, there's a flexural strength,
5  core edge -- core end and edge hardness, nail pull
6  resistance, and then both of those can be tested --
7  excuse me -- all three of those can be tested by
8  either the constant rate of crosshead speed or the
9  constant rate of loading.  You can get slightly
10 different results.
11      There's also a humidification, humidified
12 deflection test, end squareness test, width, length.
13 And then for certain samples, water -- that don't
14 apply to this particular matter, water resistance of
15 core-treated water repellant gypsum product panels,
16 surface water resistance of gypsum panels with
17 water-repellant surfaces.  So those are the -- those
18 are the enumerated physical property tests in 473.
19      Q.  Have you done any of these tests to
20 any drywall products before?
21      A.  No, ma'am, I have not.  These are things
22 that we would do in a laboratory, but it's not tests
23 that I have done.
24      Q.  Okay.  Has your firm done any of these
25 tests on any drywall panels before?

Page 89

1       A.  We've tested drywall.  I don't -- I
2  haven't actually been involved with those, so I
3  don't know if we've done those specific tests or
4  not.
5       Q.  In regards to the chemical analysis of the
6  drywall, where would we find those ASTM standards?
7       A.  My memory is it's C22, but I'd have to go
8  into my file.
9       Q.  Do you have C22 with you?
10      A.  I don't have a paper copy.  I've got a
11 million documents on a hard drive somewhere.  A
12 million is an exaggeration.  Sorry.
13      Q.  I think it's close to it.
14      I have C22.  Let's see.  Hold on a second.
15 Do you recall which version you looked at,
16 Mr. Rutila?  Was it the '97 version or the 2000
17 version?  I'm happy to provide you both of them,
18 though.
19      A.  I may well have both of them in my file.
20 I may have others.  I just don't recall.
21      Q.  So this is -- I apologize.  I only have
22 C22, '97 version.  I can't read today.
23      MS. EISELEN:  So here is, Counsel,
24      C22.
25 BY MS. EISELEN:

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 90

```
1      Q.  C22, Mr. Rutila. If you'll --
2           MS. EISELEN:  What exhibit are we on?
3           COURT REPORTER:  13.
4   BY MS. EISELEN:
5      Q.  Go ahead and mark that as Exhibit 13, ASTM
6   C22.
7      (Deposition Exhibit 13 was marked for
8           identification.)
9      A.  Yeah, I remembered correctly, and this
10  refers to two other standards, 471 and 472, in terms
11  of -- 471 is the chemical testing.
12     Q.  And did you perform the chemical analysis
13  in regards to C22 on the drywall, Chinese drywall?
14     A.  No.  We did -- in Germano and Hernandez,
15  we did certain chemical tests, but we did not do C22
16  tests.  Our chemical tests were designed towards
17  understanding the impurities that we had identified
18  optically.
19     Q.  What did -- in Germano, what did you
20  identify optically?
21     A.  We had identified optically what appeared
22  to be and what we determined would be pieces of
23  stone -- I call it mineral -- pieces of stone in
24  the -- in the drywall.
25     Q.  Are you aware of any drywall distributor
```

Page 91

```
1   who tested for core purity?  Did I say that right?
2   Yes, core purity.
3      A.  In the history of mankind or --
4      Q.  In regards to the Chinese drywall
5   litigation.  Are you aware of any distributor?
6      A.  A distributor?
7      Q.  Yes.
8      A.  No, ma'am, I'm not.
9      Q.  Who would you think would test for core
10  purity?
11     A.  A testing company engaged by virtually
12  anybody in the manufacturing and supply of the
13  product who had an interest in core purity would
14  either do the test themself or engage a testing
15  agency to do the test.
16     Q.  Would that primarily be the manufacturer,
17  a duty of a manufacturer to test core purity?
18     A.  Well, primary duty is a different
19  question.  Certainly, I would expect a manufacturer
20  wishing to meet the International Residential
21  Building Code to do such a test.  Whether that's a
22  primary duty or not, I don't know, but I certainly
23  would expect them to do it.
24     Q.  Do you know what tests are conducted to
25  determine core purity?
```

Page 92

```
1      A.  The problem -- the problem with the term
2   of art used by USG in its document is that the data
3   makes it appear that they're doing a chemical
4   analysis for calcium sulfate content, but there are
5   other tests, such as -- there's a test for paper,
6   there's a test for -- I use the word "mineral."  I
7   don't think that's the word they use, but you can
8   understand it as little pieces of stone.
9           Those are the ones that come to mind that
10  you might test for.  And the problem is, is that I
11  don't remember that the standard uses the term "core
12  purity," and that's a problem I have with the word
13  or the phrase.
14     Q.  Okay.  Can you tell me whether or not low
15  core purity is an indicator of excess sulfur
16  off-gassing?
17     A.  No, I cannot tell you that, in terms of I
18  don't know of any tests that demonstrate that as
19  being a standard way of identifying problem drywall.
20     Q.  Do you -- excuse me -- do you know whether
21  or not high levels of sulfur in the drywall, does
22  that make it heavier than domestically-manufactured
23  drywall?
24     A.  No.  Our -- our work indicates that the
25  weight is more likely due to the lack of -- we use
```

Page 93

```
1   the term of art from petrographic examination of
2   material such as gypsum board of a poorly developed
3   air void system.  The Chinese drywall --
4   Chinese-manufactured drywall that we've examined has
5   a less well-developed air void, and that's -- that's
6   what we've seen as the cause of the weight, not --
7   we haven't related it to sulfur content.
8      Q.  What testing did you do that that opinion
9   is based on?
10     A.  It's -- it's documented in our Germano
11  report extensively, but it is referred to as a
12  petrographic examination, and it's a standard -- our
13  way of examining materials like gypsum board.
14     Q.  And did your firm do that examination?
15     A.  Yes, ma'am.
16     Q.  Okay.  Are you aware of any other building
17  material products that have the sulfur off-gassing
18  problem as the Chinese-manufactured drywall?
19     A.  I'm not aware of any building products.  I
20  think that's what you said.  You might have used
21  building material products.  No, I'm aware of a lot
22  of -- I'm aware that there are materials we could
23  put in building products that might well do it, but
24  I'm not aware of it having been done.
25     Q.  So is the sulfur off-gassing problem, is
```

Golkow Technologies, Inc. - 1.877.370.DEPS

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

---

Page 94

1  that -- is this a unique thing to
2  Chinese-manufactured drywall up to this point in
3  time?
4      A.  Well, sulfur --
5          MR. BRYSON:  Objection to form.
6          THE WITNESS:  Excuse me.
7  BY MS. EISELEN:
8      Q.  You can answer.
9      A.  I know that.  I'm just apologizing for
10  interrupting him.
11          Sulfur gas corrosion is certainly not
12  unique.  That's -- there's nothing new about that.
13  In terms of -- and there's nothing new about sulfur
14  gas corrosion damaging building components.  What is
15  new is it being the gypsum wallboard as the source
16  in terms of drywall used in United States in -- in
17  my lifetime.  You know, prior to that, I don't know
18  whether they had problems, you know, 50, 70 years
19  ago.  I don't know the answer to that.
20      Q.  I'm going to go through my notes,
21  Mr. Rutila.  Mrs. --
22          MS. PATRICK:  I have no questions.
23          MS. EISELEN:  I'm just going to go
24      through my notes real quick.
25          Can we just go off the record real

---

Page 95

1      quick?
2          THE VIDEOGRAPHER:  We're off the
3      record at 3:58 p.m.
4  (Recess.)
5          THE VIDEOGRAPHER:  Okay.  We're back
6      on the record at 4:02 p.m.
7  BY MS. EISELEN:
8      Q.  Mr. Rutila, I have one more question, and
9  depending on what your answer is will be the end of
10  our deposition.
11          In your two reports, are any of your
12  opinions based upon Lydia Luckevich's report?
13      A.  Yes, inasmuch as her report is supportive.
14  Had -- had her report contained new information that
15  was contrary to other documents or other information
16  I had, I certainly would have investigated it
17  further, but that is the -- that is the limit that I
18  used her report for.
19      Q.  Your two reports, your October 17, 2012,
20  your September 2012 report, are all your
21  opinions?
22      A.  Oh, yes, ma'am.
23      Q.  Okay.
24          MS. EISELEN:  Ms. Patrick?
25          MS. PATRICK:  I don't have any

---

Page 96

1  questions.
2          MS. EISELEN:  Thank you, Mr. Rutila.
3          THE WITNESS:  Thank you.
4          THE VIDEOGRAPHER:  Okay.  This
5  concludes the deposition of Dean Rutila on
6  November 1st, 2012.  The time is 4:04 p.m.
7  We're off the record.
8          (DEPOSITION CONCLUDED.)

---

Page 97

1          ACKNOWLEDGMENT OF DEPONENT
2
3      I,_____, do hereby
4  certify that I have read the foregoing pages and
5  that the same is a correct transcription of the
6  answers given by me to the questions therein
7  propounded, except for the corrections or changes in
8  form or substance, if any, noted in the attached
9  Errata Sheet.
10  _____
11      DEAN A. RUTILA, P.E.          DATE
12
13  Subscribed and sworn to before me this
14  _____ day of _____, 20 _____.
15  My commission expires: _____
16
17  Notary Public
18
19
20
21
22
23
24
25

---

a85698d1-2ee6-49fe-aee7-3b1e7fd4969b

Confidential - Subject to Further Confidentiality Review

Page 98

```
1            ------
2           ERRATA
3            ------
4    PAGE  LINE  CHANGE/REASON
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____
```

Page 99

```
1            ------
2       LAWYER'S NOTES
3            ------
4    PAGE  LINE
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25   ____  ____  _____
```

Page 100

```
1                CERTIFICATE
2        I, LESLIE B. DOYLE, Certified Court
3    Reporter (LA), NCRA Registered Professional Reporter
4    and Certified LiveNote™ Reporter, do hereby certify
5    that prior to the commencement of the examination,
6    DEAN A. RUTILA, P.E. was duly sworn by me to testify
7    to the truth, the whole truth and nothing but the
8    truth.
9        I DO FURTHER CERTIFY that the foregoing is
10   a verbatim transcript of the testimony as taken
11   stenographically by and before me at the time, place
12   and on the date hereinbefore set forth, to the best
13   of my ability.
14       I DO FURTHER CERTIFY that I am neither a
15   relative nor employee nor attorney nor counsel of
16   any of the parties to this action, and that I am
17   neither a relative nor employee of such attorney or
18   counsel, and that I am not financially interested in
19   the action.
20       This 5th day of November, 2012.
21
22
23
     _____
24   LESLIE B. DOYLE, RMR, RDR
     Certified Court Reporter (LA)
25   Certified LiveNote™ Reporter
```

26 (Pages 98 to 100)