## CHINESE DRYWALL EXPERT ANALYSIS
PREPARED BY LYDIA LUCKEVICH, OCT 17, 2012

### 1.    EXECUTIVE SUMMARY

The objectives of this analysis are to provide factual observations and opinions on reports submitted by James Tomkins and Timothy Tonyan, to review and comment on documents produced by Knauf, one of the CDW manufacturers and to review and comment on documents relating to correspondence between SGS and INEX.

Plant visits are a standard component of quality assurance and it is concluded that INEX could have initiated visits (either itself or through its agents) to the wallboard manufacturing plant and to associated test facilities to confirm that the standards at these facilities were comparable to those common in North America.  If such a visit had been conducted the emission of odiferous sulfurous gases would have been detected and may have initiated further scrutiny of the wallboard.

### 2.    INTRODUCION

In 2009 I was retained by the Plaintiffs' Steering Committee to evaluate differences between defective Chinese manufactured wallboard and complying wallboard manufactured domestically.  Specifically my tasks were to:

1. Suggest testing including providing validated test methods and other test procedures
2. Review data collected to identify relevant differences between the defective and complying wallboard
3. Provide an expert opinion regarding the nature of the defect in Chinese manufactured wallboard and its impact on performance in houses after installation.

A general conclusion of the report was that the subject wallboard was defective due to deleterious impurities in the raw materials used in the manufacture of the wallboard and that the manufacturers did not adequately specify and test their raw materials.

Since that report was prepared more information has become available.  The report provides responses to 2 expert reports that have been submitted since 2009 and discusses other information that has been introduced into the case.

### 3.    DISCUSSION OF AND FACTUAL RESPONSE TO JAMES TOMPKINS EXPERT REPORT

#### 3.1    CONTENT OF JAMES TOMPKINS EXPERT REPORT

The general theme of this report is that INEX performed all actions required to ensure that the CDW was defect free and that the manufacturer was the negligent party.  The James Tompkins report states that:

1. INEX imported CDW from reputable suppliers/manufacturers

2. that all CDW imported complied with applicable standards

3. that the manufacturer was aware of defects in the CDW and that the manufacturer failed to disclose said defects

4. that only minimal differences (pertaining to weight and brittleness) were observed during storage and shipping of the defective CDW

5. that "INEX took reasonable precautions and performed satisfactory due diligence in choosing suppliers"

6. that "no amount of additional or non-industry standard testing could have foreseen the sulfur problem in the drywall",

7. that the suppliers "conspired to keep it (the defect) a secret" and

8. that "Had the manufacturers informed INEX of the issues in a timely manner…." INEX would have ceased selling the defective drywall and remediated homes where the defective CDW had been installed.

9. that employees of Tomkins International had visited the Taishan manufacturing facilities to conduct interviews and inspections and that Taishan "was and is a world class company and facility".

There is no mention in the report of INEX taking other measures that are often taken to ensure compliance and verification of product quality.  Such measures may include visiting the manufacturing plant, visiting quality assurance facilities, observing test procedures including data collection and maintenance of statistics and investigating equipment calibration procedures and schedules.  Such measures would confirm that information submitted to support claims of compliance to applicable standards were valid and reliable.  If such measures had been taken there is a high probability that the defect in the CDW would have been observed.

## 3.2   RESPONSE

Wallboard companies generally have specifications for all raw materials used in the manufacturing process.  Gypsum specifications generally address purity, concentration of impurities and the nature of impurities.  When a wallboard manufacturer is assessing a new source of gypsum, comprehensive analysis of the gypsum is performed.  Specifications vary among manufacturers and even sometimes within manufacturers depending on supply and market considerations.  For example, if synthetic gypsum is the raw material being used (for example a gypsum byproduct from flue gas desulfurization (FGD)) a specification is negotiated between the supplier and the manufacturer.  This specification relates back to the FGD process and specifications for raw materials used therein.  In some FGD gypsum specifications a "neutral odor" is specified in conjunction with the chemical specifications.

With respect to item 4 and compliance to standards, the relevant ASTM specifications and test procedures are relatively straightforward and reliable, and it is unlikely that this aspect of quality assurance would have been any different than that in a North American plant.  However, if the gypsum was stored in a warehouse it is unlikely that the only differences between the defective CDW and compliant wallboard would have been "weight" and "brittleness".  The smell of the gases being emitted from the defective CDW and the associated corrosion were probably observed even though they may not have been attributed to the defective CDW.

With regard to item 6 that "no amount of additional or non-industry standard testing could have foreseen the sulfur problem in the drywall", it is suggested that plant visits are a standard component of quality assurance and that if a plant visit had been conducted by INEX or its agent, that observations at the plant would have indicated that the CDW was problematic even if it conformed to the ASTM standards.

The Taishan plant was visited by Tompkins employees well after the defective CDW was manufactured and the manufacturing conditions may have changed.  If the plant visit had occurred when defective CDW was being produced there is a high probability that the following observations would have been made:

1. There would have been off gassing of sulfurous components wherever there was elevated temperature and humidity, namely at the calcination step and at the board drying step. These gases would have been emitted at the calciner and dryer exhaust.  As the calcined gypsum (stucco) was cooling sulfurous gases would be emitted inside the plant.  Therefore there would have been elevated concentrations of these sulfur containing gases both inside and outside the plant.  The first relevant observation during a plant visit when the defective CDW was being manufactured would probably have been the smell of sulfurous gases in the area immediately around and downwind of the plant.  Although it is possible to use stack gas treatments to remove these compounds, such treatments are expensive and it is unlikely that they were used.

2. Upon entering, the interior of the plant would smell similar to the outside.  In addition to the smell, electrical components in the manufacturing equipment would have exhibited signs of corrosion.  A modern wallboard plant contains numerous electronics and control systems. These metallic components would have exhibited signs of corrosion similar to those observed in the homes in which the defective CDW had been installed.

3. If there was an enclosed testing laboratory at the plant, (which is usually standard in North America to prevent dust exposure of the equipment) there would have been similar off gassing and corrosion of metallic components.  If the lab had been visited to observe ASTM compliance testing, questions could have been asked about the smell and about the observed corrosion.

4. In a wallboard plant there are usually stacks of finished wallboard waiting to be shipped.  If the holding area for this wallboard had been entered, there would have been a strong sulfurous smell.  This smell, at the point where the manufacturing process was complete, would have been a strong indicator that the drywall was defective.

CDW-0507-0003

## 4. DISCUSSION OF AND RESPONSE TO TIMOTHY TONYAN EXPERT REPORT

### 4.1 CONTENT OF TIMOTHY TONYAN EXPERT REPORT

The general theme of this report is that INEX exercised a "reasonable standard of care" and that until reports of the defect were reported in the media, INEX had no way of knowing that the CDW was defective. The Timothy Tonyan expert report states that:

1. INEX "acted reasonably in relying on their (Knauf's) product certifications"

2. INEX had no "reasonable means of being aware that the drywall was defective in any way" and that

3. the only installer feedback INEX received related to the weight and brittleness of the defective board

This report essentially states that except for minor aspects relating to board weight and stiffness the defective CDW resembled domestic drywall in all material ways and that INEX performed all necessary steps to ensure compliance to standards. It further states that the first INEX knew of defects in the CDW was through media reports.

### 4.2 RESPONSE

The CDW was purchased from Taishan and Knauf. The Tonyan report implies that by choosing reputable suppliers and including a specification that the CDW meet ASTM standards that INEX had fulfilled its responsibilities to ensure a defect free product was being imported. As stated above, plant visits are a standard component of quality assurance and if a plant visit had been conducted by INEX or its agent, observations at the plant would have indicated that the CDW was problematic even as it conformed to the ASTM standards. There is no evidence that INEX requested supporting documentation from the suppliers detailing what steps were taken to confirm quality assurance in the CDW. Plant visits either directly or through and agent are reasonable means to confirm that the manufacturing process and compliance testing were as stated in the supporting documents.

## 5. OTHER REVIEWED DOCUMENTS

Other documents reviewed are as follows:

- Documents related to Knauf , the wallboard manufacturer

- Documents related to SGS, a company that is contracted to perform overseas inspections and

A brief discussion on the contents of these documents follows.

## 5.1 KNAUF DOCUMENTS

The Knauf documents reviewed were

- a Visit Report dated December 11, 2006 written by Dr. Yuan of Knauf regarding a visit to the Luneng Mine on December 6, 2006

- an undated report from Professor Hummel to Isabel Knauf and

- Pages 927-933 from day 3 of the deposition of Professor Hummel.

### 5.1.1 Visit Report to the Luneng Mine

On December 6, 2006 three Knauf representatives visited the Luneng gypsum mine. In the Visit Report several references to the presence of reduced sulfur compounds are made. The first indication is the statement that there was a sign at the mine stating that $H_2S$ gas levels would be "checked every shift". It is also stated in Section 2 that the sulfur content was not included in the specification and that the mine had no way of measuring it. This reference is not to the total sulfur in the gypsum (because gypsum itself contains oxidized sulfur) but to reduced sulfur compounds which are often toxic and odiferous. These reduced sulfur compounds were present in the shale layer and although it was possible to somewhat selectively mine the gypsum and beneficiate the mined material, it was not possible to completely eliminate the shale impurities because the particles were too small. This shale contamination of the gypsum was causing the "stink in…gypsum storage".

### 5.1.2 Hummel Report to Isabel Knauf

This report appears undated but does refer to the December 6, 2006 visit to the Luneng mine. It is stated in this report that the odor problem is correlated with the shale impurity and was caused by organo-sulfur compounds which contaminated the drywall "where emissions continuously take place". Further reference is made to the fact that these compounds were "high boiling" and that they were not driven off at 160°C (which is a common gypsum calcination temperature) and would remain in the middle of the product. It is stated that Knauf was investigating incorporation of a zeolitic adsorbent into the process to capture the gaseous reduced sulfur compounds causing the problem.

### 5.1.3 Hummel Deposition

This document confirms the information in the Hummel report to Isabel Knauf that a shale contaminant in the gypsum rock was responsible for the sulfur odors

## 5.2 SGS DOCUMENTS

These documents pertain to communications between SGS and INEX regarding the inspection of the CDW in China prior to shipment. The subject inspection included verification of the quantity of gypsum as well as a visual inspection to identify defects such as cockles (bubbles under the paper), dents, cracks

CDW-0507-0005

and peelers (delamination of the paper from the board core). The end result of these communications was the SGS did not perform the inspection and that INEX did not seek out or retain any other independent 3rd party to perform the inspections.

### 5.3 DISCUSSION

The Knauf documents show that the contamination of gypsum by reduced sulfur compounds and the manufacture of defective CDW was identified in late 2006 and that solving the problem would not be simple. The gypsum specification did not include any reference to reduced sulfur compounds, there was no equipment at the mine to measure the concentration of these reduced sulfur compounds, and it was not possible to remove the contaminants at the minesite or in the wallboard manufacturing process. The one possible remediation suggested, introducing a zeolitic adsorbent would be expensive and would take time to develop. These documents also confirm the fact that the gypsum had a sulfurous odor both in raw storage and in the finished product.

The SGS documents confirm that SGS was available to perform an independent 3rd party inspection of the CDW for INEX. INEX declined to have SGS or any other independent 3rd party perform an inspection of the manufacturing facilities. If SGS had performed the inspection it is highly probable that sulfurous odors would have been detected as described in Section 2.2 and suspicions about wallboard quality would have been communicated to INEX.

## 6. DISCUSSION

Gypsum is calcium sulfate dihydrate, a mineral that contains calcium, sulfur and oxygen atoms and 2 water molecules for every molecule of calcium sulfate. It is written as $CaSO_4 \cdot 2H_2O$. The sulfur in gypsum is fully oxidized and is present as the sulfate ion, i.e. $SO_4^{2-}$. It is thermodynamically stable and is in its lowest energy state. In gypsum deposits where all the sulfur is oxidized and present as gypsum, the total sulfur in the gypsum is often used as a measure of purity. It is reported as "sulfur as $SO_3$" in the elemental analysis and is essentially a measure of purity.

The wallboard manufacturing process was invented and developed in North America and has evolved into a high speed process with sophisticated engineering and process control. Since the early to mid 1900's there has been a culture of quality and continuous improvement in manufacturing. Gypsum companies have established research facilities where raw materials, slurry additives and finished boards are tested and where new products are developed. In North America there is rigorous testing and analysis of wallboard raw materials prior to use as well as quality control of the finished product. This is in part due to the fact that the wallboard business is very competitive and manufacturers are always looking for a competitive edge whether it relates to appearance, board weight or to performance under adverse conditions.

The manufacture of gypsum wallboard began in China much later in the 20th century and the focus there may be more on production rather than innovation. The development of the wallboard manufacturing industry in China has entailed importing and using existing manufacturing technology rather than

research and development. This results in a different industry culture and different responses to observed differences in raw materials and finished products.

If a gypsum deposit contains sulfur in any state except the fully oxidized state, total sulfur cannot be used as a measure of purity. Rather reduced sulfur is a significant impurity and should be measured and specified separately. The sulfur that caused the problems in the defective CDW was reduced sulfur. Reduced sulfur exists in a wide variety of compounds. Hydrogen sulfide gas is an example of a sulfur compound in which the sulfur is present in a reduced state. In the Hummel report it was stated that the reduced sulfur that contaminated the gypsum used in defective CDW manufacture was present as iron sulfide and in organo-sulfur compounds and that these deleterious compounds were associated with layers of shale that were present in the gypsum deposit. Since the Hummel report was written, it has been determined that a useful marker for defective CDW is elemental sulfur. As stated in "Identification Guidance for Homes with Corrosion from Problem Drywall as of March 18, 2011" published by the U.S. Consumer Product Safety Commission and the U.S. Department of Housing and Urban Development on March 18, 2011, a chemical marker for the gypsum used in defective CDW is elemental sulfur: In this document it is stated that "Elemental sulfur levels in samples of drywall core…exceeding 10 ppm" are an indicator of problem drywall.

The gypsum mine was contaminated with layers of shale. In some instances it was possible to selectively mine the gypsum and avoid the shale. In some instances it was possible to beneficiate the gypsum manually by removing the shale contaminants because they were easily identified by their dark color and were large enough to remove from the gypsum rock. However, in some instances the shale was intrinsically mixed with the gypsum and the shale particles were too small to be identified and removed from the gypsum. In this last case it is virtually impossible to mechanically beneficiate the gypsum by removing the shale particles. The only way to remove these compounds would be by subjecting the gypsum to high temperature in the presence of oxygen to oxidize the sulfur.

During the calcination of gypsum to stucco, (an unit operation in the wallboard manufacturing process), the gypsum is exposed to high temperatures for a brief period of time. This temperature would probably be high enough to destroy some organo sulfur compounds. However, if the concentration of organo sulfur compounds in the gypsum was elevated above a certain threshold, the residence time in the calciner would not be sufficient to destroy them. Also, according to the Hummel report, the organo sulfur compounds were "high boiling" by which it is probably meant that the subject compounds were temperature resistant and the temperature/time environment in the calciner was not sufficient to destroy them.

If this gypsum deposit were to be used as a source of raw material in wallboard manufacture the specification should include a reference to the concentration of reduced sulfur. The allowable concentration provided in the specification would need to be determined through an experimental process and would be a function of the calcination environment. Only parts of the deposit that conformed to this specification would then be used as a raw material for gypsum wallboard manufacture. By including reduced sulfur in the gypsum specification, only parts of the deposit that had low levels of reduced sulfur would be used in wallboard manufacture.

CDW-0507-0007

From the documents reviewed it is concluded that INEX could have initiated a visit and inspection (itself or through its agents) to the wallboard manufacturing plant and to associated test facilities to confirm that the standards at these facilities were comparable to those in North America.  Such a visit would have been a "reasonable precaution…and satisfactory due diligence in choosing suppliers".  If such a visit had been conducted the same conditions that have been observed in homes in which the defective CDW has been installed would have been observed in and around the manufacturing plant.  These observations would have indicated that there were problems with the CDW in spite of its compliance to ASTM standards and that further investigations to ensure a quality product were warranted.