Confidential - Subject to Further Confidentiality Review

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2


 3   _____    §   MDL NO. 2047
     IN RE:                     §
 4   CHINESE-MANUFACTURED       §   SECTION: L
     DRYWALL PRODUCTS           §
 5   LIABILITY LITIGATION       §   JUDGE FALLON
                                §
 6   _____    §   MAG. JUDGE WILKINSON
 7
 8          CONFIDENTIAL - SUBJECT TO FURTHER
                 CONFIDENTIALITY REVIEW
 9
                       — — —
10
                     JOHNNY ODOM
11
             THURSDAY, OCTOBER 18, 2012
12
                       — — —
13
14
15          Oral and videotaped deposition of JOHNNY
16   ODOM, held at Herman, Herman & Katz, L.L.C., 820
17   O'Keefe Avenue, New Orleans, Louisiana, commencing
18   at 11:40 a.m., on the above date, before Kari J.
19   Behan, Certified Court Reporter, Registered
20   Professional Reporter, Certified Realtime Reporter.
21                     — — —
22
23          GOLKOW TECHNOLOGIES, INC.
24       877.370.3377 ph | 917.591.5672 fax
25              deps@golkow.com
```

**EXHIBIT**

_A_

Confidential - Subject to Further Confidentiality Review

| Page 2 |
| --- |

1 A P P E A R A N C E S :
2 GAINSBURGH, BENJAMIN, DAVID,
  MEUNIER & WARSHAUER, L.L.C.
3 BY: GERALD E. MEUNIER, ESQUIRE
      gmeunier@gainsben.com
4 2800 Energy Centre
  1100 Poydras Street
5 New Orleans, Louisiana 70163-2800
  (504) 528-9973
6 Counsel for Plaintiffs
7
8 LAMBERT & NELSON, PLC
  BY: CAYCE PETERSON, ESQUIRE
9    cpeterson@thelambertfirm.com
  701 Magazine Street
10 New Orleans, Louisiana 70130-3629
   (504) 581-1750
11 Counsel for Plaintiffs
12
13 THOMPSON, COE, COUSINS & IRONS, LLP
   BY: KEVIN F. RISLEY, ESQUIRE
14    krisley@thompsoncoe.com
   One Riverway, Suite 1600
15 Houston, Texas 77056
   (713) 403-8210
16 Counsel for North River Insurance Company
17
18 GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, PLC
   BY: BENJAMIN R. GRAU, ESQUIRE
19    bgrau@gjtbs.com
   BY: CARLINA C. EISELEN, ESQUIRE (VIA PHONE)
20    ceiselen@gjtbs.com
   One Shell Square
21 701 Poydras Street, 40th Floor
   New Orleans, Louisiana 70139
22 (504) 525-6802
   Counsel for Interior Exterior Building Supply, L.P.
23
24
25

| Page 3 |
| --- |

1 APPEARANCES (CONTINUED):
2 CITY OF NEW ORLEANS, LAW DEPARTMENT
   BY: CHURITA H. HANSELL, ESQUIRE
3    chhansell@nola.gov
   1300 Perdido Street, Suite 5E03
4 New Orleans, Louisiana 70112
   (504) 658-9850
5 Counsel for the City of New Orleans
6
7 VIDEOGRAPHER:
8 Henry Cobb
   Golkow Technologies, Inc.
9
             - - -
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

| Page 4 |
| --- |

1                    INDEX
2 EXAMINATION OF JOHNNY ODOM:
3
4 BY MR. GRAU.........................    7
5 BY MR. MEUNIER.....................   33
6 BY MR. RISLEY.......................   59
7 BY MR. GRAU.........................   65
8 BY MR. MEUNIER.....................   73
9 BY MR. GRAU.........................   75
10 BY MR. MEUNIER....................   77
11 BY MR. GRAU.........................   78
12 BY MR. RISLEY.......................   79
13
14 REPORTER'S CERTIFICATE.............   81
15
16                 * * *
17       INDEX TO EXHIBITS
18
19 EXHIBITS                 PAGE
20 Exhibit 1 ..........................   36
      (Pages 3 and 4 from The.
21    Building Code of the City of
      New Orleans, Louisiana)
22
23 Exhibit 2 ..........................   41
      (2000 International.
24    Residential Code, Section
      R702.3)
25

| Page 5 |
| --- |

1 EXHIBITS (CONTINUED):
2 Exhibit 3 ..........................   42
      (Provision from ASTM C36,
3     paragraph 12)
4 Exhibit 4 ..........................   42
      (Provision of ASTM C1396,
5     Section 14, 14.1)
6 Exhibit 5 ..........................   42
      (Paragraph 8 and 8.1 of ASTM
7     C1264)
8 Exhibit 6 ..........................   43
      (Document from USG website)
9
10 Exhibit 7 ..........................   45
      (Invoice dated November 8,
11    2006, Bates-numbered
      Interior Exterior 26512)
12 Exhibit 8 ..........................   50
      (Certificate of Origin,
13    INEX 960)
14 Exhibit 9 ..........................   50
      (Invoice, INEX 973)
15
16 Exhibit 10 .........................   53
      (ASTM Test Report,
      Bates-numbered INEX 1990
17    and 1991)
18 Exhibit 11 .........................   54
      (Photograph, Bates-numbered.
19    INEX 6038)
20 Exhibit 12A.......................   80
      (Photograph)
21
22 Exhibit 12B.......................   80
      (Photograph)
23 Exhibit 12C.......................   80
      (Photograph)
24
25

Confidential - Subject to Further Confidentiality Review

Page 6

1      STIPULATION
2      It is stipulated and agreed by and among all
3  parties that the deposition of JOHNNY ODOM is hereby
4  being taken under the Federal Rules of Civil
5  Procedure, for all purposes.
6
7      The witness saves the right to read and sign
8  the deposition. The original is to be retained by
9  BENJAMIN R. GRAU, ESQUIRE, for proper filing with
10 the Clerk of Court.
11
12     All objections, except those as to the form
13 of the question and responsiveness of the answer,
14 are hereby reserved until the time of the trial of
15 the cause.
16                 * * * * *
17
18     Kari J. Behan, (LA Certificate #97019),
19 Certified Court Reporter in and for the State of
20 Louisiana, officiated in administering the oath to
21 the witness.
22
23
24
25

Page 7

1          PROCEEDINGS:
2      (Thursday, October 18, 2012, at 11:40 a.m.)
3      THE VIDEOGRAPHER: We are now on the
4  record. My name is Henry Cobb. I'm the
5  videographer for Golkow Technologies. Today's date
6  is October 18th, 2012. Time now is 11:40 a.m. This
7  video deposition is being held in New Orleans,
8  Louisiana, in the matter of Chinese Drywall. The
9  deponent is Johnny Odom.
10         Counsel will be noted on the
11 stenographic record. The court reporter is Kari
12 Behan and will now swear in the witness.
13         JOHNNY ODOM,
14 City Hall, 1300 Perdido Street, Department of Safety
15 & Permits, Room 7E04, New Orleans, Louisiana 70112,
16 after having been first duly sworn by the
17 above-mentioned Certified Court Reporter, was
18 examined and testified as follows:
19         EXAMINATION
20 BY MR. GRAU:
21     Q.   Good morning, Mr. Odom.
22     A.   Good morning.
23     Q.   Thank you for being here.
24         My name is Ben Grau. I represent
25 Interior Exterior in some litigation involving

Page 8

1  Chinese drywall. We're here to take your
2  deposition.
3          Have you given a deposition before?
4      A.   Yes, I have.
5      Q.   Okay. In -- and in your official
6  capacity with the City of New Orleans or --
7      A.   Yes.
8      Q.   Okay. Let me just go over a couple of
9  quick ground rules for you. The court reporter is
10 going to take everything down that we say, so it's
11 important for you to verbalize all your answers and
12 try and avoid nods of the head and shakes of the
13 head.
14         If you don't understand any of my
15 questions, please ask me to clarify or rephrase my
16 question.
17     A.   Okay.
18     Q.   If you answer the question, I'm going to
19 assume that you understood it. Is that fair?
20     A.   That's fair.
21     Q.   Okay. At any point if you need to take
22 a break, just let us know; we'll be happy to
23 accommodate. Okay?
24     A.   I will.
25     Q.   What is your address?

Page 9

1      A.   My home address?
2      Q.   Yes, sir.
3          MS. HANSELL: Excuse me.
4          THE WITNESS: I live at 6 --
5          MS. HANSELL: I'm sorry. Objection.
6  City employees have to give their business address.
7  It's not subject to disclosure; the home address is
8  not subject to disclosure.
9          MR. GRAU: Okay.
10 BY MR. GRAU:
11     Q.   I'll take your business address,
12 that's fine.
13     A.   It's City Hall, 1300 Perdido Street,
14 Department of Safety & Permits, Room 7E04.
15     Q.   What is your position with the
16 City of New Orleans?
17     A.   I'm the Chief Building Inspector.
18     Q.   How long have you been the Chief
19 Building Inspector?
20     A.   Approximately 15 years.
21     Q.   Can you provide for me your educational
22 background, please?
23     A.   I have a high school diploma. I have
24 some college. I do not have a degree, and I am
25 certified under the -- in an IBC certification as a

Confidential - Subject to Further Confidentiality Review

---

**Page 10**

1 building inspector and fire inspector 1 and 2.
2    Q.    Where did you graduate from high
3 school?
4    A.    John F. Kennedy Senior High School.
5    Q.    Where -- where'd you do some college
6 work?
7    A.    U- -- University of New Orleans.
8    Q.    You did not get a degree from
9 UNO --
10    A.    No, I did not.
11    Q.    -- is that correct?
12          Okay.  You have any associate degree
13 or junior college degree?
14    A.    No.
15    Q.    All right.  What did you study at UNO?
16    A.    Business.
17    Q.    You indicated that you were a certified
18 building inspector by IBC; is that right?
19    A.    Yeah, under the I- -- International Code
20 Council.  Okay?
21    Q.    When did you -- when did you first
22 become certified as a building inspector?
23    A.    It was in the late 1990s.  I don't know
24 exactly when.
25    Q.    And you're a certified fire inspector as

---

**Page 11**

1 well?
2    A.    Yes.
3    Q.    Who is that certification from, same
4 group?
5    A.    Same group, yes.
6    Q.    Did you obtain your fire cert- --
7 inspector certification at the same time as your
8 building certification?
9    A.    Shortly thereafter, yeah; around the
10 same time, yes.
11    Q.    What are your responsibilities as the
12 Chief Building Inspector for the City of New
13 Orleans?
14    A.    I oversee basically the building
15 inspection section of the Department of Safety &
16 Permits.
17    Q.    You indicated you've been the Chief
18 Building Inspector for 15 years, correct?
19    A.    Uh-huh.
20    Q.    What did you do before that?
21    A.    I've been with the City 35.  I was a
22 building inspector for -- since 1987.  Prior to
23 that, I was a fire inspector, and prior to that, I
24 was a housing inspector, all with the City of New
25 Orleans.

---

**Page 12**

1    Q.    What does a building inspector do for
2 the City of New Orleans?
3    A.    Enforce compliance of the International
4 Building Code.
5    Q.    What does a housing inspector do for the
6 City of New Orleans?
7    A.    Inspects houses for -- to see if they
8 meet the minimum housing standard.
9    Q.    What are the minimum housing standards?
10    A.    It's a city code governing conditions
11 that property must meet in order to be in
12 compliance.
13    Q.    Okay.  So building inspector inspect
14 both residential and commercial properties?
15    A.    Yes.
16    Q.    Okay.  And is that inspection done at
17 the time of construction or renovation of the
18 property?  Is that --
19    A.    During the time of construction,
20 required inspections are required.
21    Q.    What inspections are required during the
22 course of construction?
23    A.    Foundation, framing and final
24 inspection.
25    Q.    And what is meant by "foundation"?

---

**Page 13**

1 That's at the time that the foundation is poured?
2    A.    Before -- yeah.  Pour the foundation --
3 before concrete is poured in the foundation, yes.
4    Q.    And framing, when is that inspection
5 done?
6    A.    When the structure is framed, plumbing
7 and electrical have been installed, but before the
8 walls are closed.
9    Q.    And when you say "before the walls are
10 closed," you mean before the Sheetrock or whatever
11 -- other material's being put on?
12    A.    Before the gypsum board or other
13 materials are put up, yes.
14    Q.    Okay.  And when is the final inspection
15 done?
16    A.    When it's completed prior to occupancy.
17    Q.    Those would be the time periods you've
18 just described -- or the inspections you just
19 described, the one done for the foundation, framing
20 and then the final inspection, those would be done
21 for new construction; is that correct?
22    A.    New residential, yes.
23    Q.    Okay.  What inspections are done when
24 there is a remodel or refurbishment of an existing
25 property, residential property?

---

Confidential - Subject to Further Confidentiality Review

Page 14

1    A.    Re- -- the foundation's already
2 existing, so there would be none.  There would be a
3 framing inspection, followed by a final inspection.
4    Q.    And those two inspections would be
5 basically done at the same time; is that right?
6 Not -- that's a bad question.
7    A.    Uh-huh.
8    Q.    They would -- the framing inspection for
9 a renovation of a property would, again, be done
10 after the framing work had been done, the plumbing
11 and electrical, but before the walls were enclosed;
12 is that correct?
13    A.    Yes.
14    Q.    Okay.  And the final inspection, again,
15 would be done when all the work was completed prior
16 to the Certificate of Occupancy?
17    A.    Correct.
18    Q.    Okay.  When are housing inspections
19 done?
20    A.    If a neighbor or occupant made a
21 complaint against the property that it was
22 substandard, then inspections would be made.  But
23 that's another department.
24    Q.    Okay.  That's not -- the housing
25 inspections are not done under your --

Page 15

1    A.    Under --
2    Q.    -- office?
3    A.    -- the Department of Safety & Permits,
4 yeah.
5    Q.    Okay.  You just had previously worked as
6 a housing inspector?
7    A.    That is correct.
8    Q.    All right.  How many building inspectors
9 work under you currently?
10    A.    Thirteen.
11    Q.    Was that -- in -- following Hurricane
12 Katrina in 2005 to the present, has that number been
13 approximately the same?
14    A.    Yeah.  It's approximately the same, but
15 people -- you know, we've had a couple retire and
16 replaced, things like that.
17    Q.    Okay.  I'm just trying to find out:  Was
18 there a period of time since Katrina where the
19 office sort of ballooned and you had more inspectors
20 than you have now?
21    A.    We hired several inspectors right after
22 Katrina to fill open vacancies, but we have not done
23 any hiring since.
24    Q.    Okay.  Since Hurricane Katrina, what's
25 the most number of building inspectors who have

Page 16

1 worked for your office?
2    A.    Oh, I would say 15.
3    Q.    Are your building inspectors -- are
4 building inspectors for the City of New Orleans
5 required to have any certifications or licenses?
6    A.    Yes.  They all have to be certified
7 under the IBC.
8    Q.    That's the same certification that you
9 hold; is that correct?
10    A.    That is correct.
11    Q.    Since Hurricane Katrina, have -- well,
12 let me ask it this way:  As the Chief Building
13 Inspector for the City of New Orleans, do you
14 yourself personally perform any building
15 inspections?
16    A.    Very rarely.
17    Q.    Okay.  Was there a period of time since
18 Hurricane Katrina where you have, in fact, performed
19 building inspections?
20    A.    Right after Katrina we did damage
21 assessments for FEMA, but that's the only ones,
22 basically.
23    Q.    Okay.  Other than a damage --
24 performing damage assessments for FEMA, have you
25 personally performed any building inspections since

Page 17

1 Hurricane Katrina?
2    A.    No.
3          I think I should -- can I say
4 something?
5    Q.    Absolutely.
6    A.    I think I better clarify that.  You say
7 no- -- I've done no residential.  I have done some
8 inspections on large commercial projects.
9    Q.    Okay.
10    A.    Okay?  I think that would be clear.
11    Q.    I appreciate that clarification.
12    A.    Okay.
13    Q.    So since Hurricane Katrina, other than
14 damage assessments that may have been done for
15 FEMA --
16    A.    Uh-huh.
17    Q.    -- you have not performed any building
18 inspections of any residential properties; is that
19 correct?
20    A.    No.
21    Q.    What -- currently, what is the
22 applicable International Building Code for
23 residential properties in the City of New Orleans?
24    A.    2009 International Building Code and
25 Residential Code.

Confidential - Subject to Further Confidentiality Review

Page 18

1  Q.  When was the 2009 version of the
2  International Residential Code adopted by the City
3  of New Orleans?
4  A.  Oh, I don't know right offhand.  I don't
5  know.
6  Q.  Okay.  In 2005, 2006 and 2007, what was
7  the applicable building code adopted by the City of
8  New Orleans?
9  A.  I believe we were using the 2000 IBC
10  code, but the State had adopted the wind provisions
11  for the 2003, I believe.  I could be wrong about
12  that order.
13  Q.  Now, you've referred to it as the IBC
14  several times, and I've --
15  A.  There's IBC, IRC.  It's two books.
16  Q.  Two different books, okay.
17  A.  Right.
18  Q.  The -- are they both applicable to
19  residential properties?
20  A.  No.
21  Q.  Okay.
22  A.  The IRC is for one- and two-family
23  dwellings; the IBC covers all other structures.
24  Q.  Okay.  So, again, 2005 through 2007 time
25  frame, would it have -- what version of the IRC

Page 19

1  would have been applicable?
2  A.  I believe it was the 2000 IRC.
3  Q.  Okay.  As the Chief Building Inspector
4  for the City of New Orleans, are you familiar with
5  the provisions of the IRC?
6  A.  Yes, I am.
7  Q.  Do the building inspectors for the City
8  of New Orleans -- you in- --- you told me that it was
9  their responsibility to ensure compliance with the
10  applicable building code.
11  Do they ensure compliance with all
12  portions and provisions of the building code?
13  A.  No.
14  Q.  Okay.  Are there certain sections or
15  portions that a building inspector will ensure
16  compliance with?
17  A.  We make periodic inspections to the best
18  that we can determine that it's in compliance with
19  the code.
20  Q.  Are you familiar with sections of the
21  IRC that deal with the appropriateness of certain
22  building materials?
23  A.  I don't understand the question.
24  Q.  Okay.  Are there sections of the IRC
25  that specify what type of building materials are

Page 20

1  acceptable for use in a residential property?
2  A.  Yes.
3  Q.  Okay.  Are those provisions provisions
4  that are enforced by the city building inspectors?
5  A.  No.
6  Q.  Why not?
7  A.  'Cause there's -- we're -- we just don't
8  have the abilities to -- or we not -- we can't.  I
9  mean, we just don't have that information on us in
10  the field.
11  Q.  Well, I presume that there are
12  certain provisions applicable to building materials
13  that would be enforced.
14  Say, for example, does the building
15  code require -- the IRC require a certain type of
16  Romex cable be used?
17  A.  That's an electrical question.  I can't
18  answer that.
19  Q.  Okay.  Does the IRC require
20  pressure-treated lumber be used in certain
21  applications?
22  A.  In certain locations, yes.
23  Q.  Okay.  Is that the type of requirement
24  that the city building inspectors will note and
25  enforce?

Page 21

1  A.  Yes.
2  Q.  Okay.  Do you know whether the IRC
3  requires gypsum board to meet certain minimum
4  requirements?
5  A.  There is a section on gypsum board.  The
6  only requirement that an inspector would be looking
7  at was the thickness and the -- how it was
8  installed.
9  Q.  So a building inspector for the City of
10  New Orleans would look at the thickness of the
11  gypsum board to ensure that it complied with the
12  provision of the IRC; is that correct?
13  A.  The table in the IRC, yes.
14  Q.  Okay.  Do you know whether the IRC
15  requires that gypsum board comply with certain ASTM
16  standards?
17  A.  Some of the standards are referenced in
18  the code.
19  Q.  Some of the ASTM standards are
20  referenced in the IRC?
21  A.  Are referenced in the code under gypsum
22  board, yes.
23  Q.  Okay.  Do the City of New Orleans
24  building inspectors do anything to ensure that the
25  gypsum board used in a residential property complies

Confidential - Subject to Further Confidentiality Review

---

Page 22

1 with the applicable ASTM standards referenced in the
2 code?
3    A.    No.
4    Q.    Why not?
5    A.    It's not something we can inspect in the
6 field.
7    Q.    Why is that?
8    A.    Like, it's -- it's just something we
9 can't -- those are industry standards that cover a
10 broad range of requirements that -- you know, like I
11 say, we're looking at the thickness and how it's
12 attached to the application, the walls, ceilings.
13    Q.    I appreciate that.
14        I guess what I -- I'm trying to
15 figure out is why would you look to enforce those
16 provisions of the IRC but not necessarily ensure
17 compliance with other provisions of the IRC related
18 to gypsum board?
19    A.    The building code is written not only
20 for building inspectors; it's written for all people
21 in the industry.  So, in other words, it's other
22 people's responsibility to see that, you know, some
23 of those standards are complied with.
24    Q.    At some point in time, did you become
25 aware of the fact that drywall or gypsum board was

---

Page 23

1 being imported from China for use in residential
2 properties in the City of New Orleans?
3    A.    Not until I read it in the newspaper
4 and, you know -- you know, public announcements --
5    Q.    Okay.
6    A.    -- things like that.
7    Q.    And when you say "read it in the
8 newspaper," read about problems associated --
9    A.    Yeah.
10    Q.    -- with that drywall --
11    A.    Yes.
12    Q.    -- is that what you mean?
13    A.    Yes.
14    Q.    Okay.  Do you recall approximately the
15 time frame when you would have first learned about
16 that --
17    A.    No, I --
18    Q.    -- reading it in the newspaper?
19    A.    I don't even remember, no.
20    Q.    At any point in time from -- following
21 Hurricane Katrina in 2005 until 2007, did you ever
22 hear from any of your building inspectors that they
23 had seen drywall made in China being used in any
24 residential properties in the City of New Orleans?
25    A.    No.

---

Page 24

1    Q.    During that same time period, did you
2 ever hear any reports from any city building
3 inspectors of any strange odors or smells that were
4 being detected in homes in the City of New Orleans?
5    A.    No.
6    Q.    Between 2005 and 2007, did you ever hear
7 any reports of -- from any of your building
8 inspectors about corrosion of electrical systems in
9 new construction homes?
10    A.    No.
11    Q.    Between 2005 and 2007, did you ever hear
12 any reports from any city building inspectors about
13 corrosion of any copper pipes or other plumbing in
14 new construction homes?
15    A.    No.
16    Q.    And the same would be true with respect
17 to corrosion of plumbing or copper pipes in
18 renovated or remodeled homes?
19    A.    Yeah, I --
20    Q.    Did you ever hear any of those
21 complaints either?
22    A.    -- never heard any of those complaints.
23    Q.    As the Chief Building Inspector for the
24 City of New Orleans, between 2005 and 2007, did you
25 ever hear any complaints about gypsum board being

---

Page 25

1 used in any residential properties in the City?
2    A.    No.  I received no complaints.
3    Q.    And, of course, we've already confirmed
4 during that period of time you personally did not
5 perform any building inspections of residential
6 properties, correct?
7    A.    Correct.
8    Q.    Okay.  Since learning of potential
9 problems associated with the use of Chinese drywall,
10 has the city building inspection department
11 undertaken any inspections of homes that used
12 Chinese drywall or that have Chinese drywall?
13    A.    No.
14    Q.    In 2005 through 2007, are you aware of
15 any provision of the IRC which prohibited the use of
16 gypsum board imported from outside the United
17 States?
18    A.    Ask that again.
19    Q.    Yes.
20        Between 2005 and 2007, that time
21 period, are you aware of any provision of the IRC
22 which prohibited the use of gypsum board imported
23 from outside of the United States?
24    A.    No.
25    Q.    Are you aware of any such provision

---

Confidential - Subject to Further Confidentiality Review

Page 26

1 today?
2    A.   No.
3    Q.   Do you know one way or the other whether
4 any of the gypsum board imported from China and used
5 in residential properties in the City of New Orleans,
6 whether that board complied with the IRC?
7    A.   I don't know.
8    Q.   Your name has been identified as a
9 potential witness in a trial against Interior
10 Exterior relating to Chinese drywall. Are you aware
11 of that?
12    A.   Yes.
13    Q.   When did you first become aware that
14 your name was being listed as a potential witness?
15    A.   Last week.
16    Q.   I'm sorry. When?
17    A.   Last week.
18    Q.   Last week?
19      How did you learn that?
20    A.   I met with a couple of attorneys.
21    Q.   Who did you meet with?
22    A.   I met with a Hugh Lambert and a Daniel
23 Bryson.
24    Q.   What did you and Mr. Lambert and
25 Mr. Bryson discuss?

Page 27

1    A.   Nothing. They just asked questions like
2 you are.
3    Q.   They ask you any questions on any areas
4 that I haven't asked you any questions on?
5    A.   I don't think so. I don't think so.
6    Q.   Did they tell you why you would be
7 potentially called as a witness?
8    A.   Just to discuss, you know, the
9 provisions of the building code.
10    Q.   What provisions of the building code did
11 you discuss with Mr. Lambert and Mr. Bryson?
12    A.   Basically the -- the requirements on
13 gypsum board.
14    Q.   Did you review those provisions with
15 Mr. Bryson and Mr. Lambert?
16    A.   What do you mean? Which ones, the --
17 the -- the sections of the building code?
18    Q.   Yes, the section of the building code.
19    A.   Yes, they did -- yeah, we did discuss --
20 they also brought in dis- -- some discussion about
21 the ASTM standards and things.
22    Q.   Prior to that meeting with Mr. Lambert
23 and Mr. Bryson, were you familiar with the ASTM
24 standards that were applicable to gypsum board?
25    A.   No, other than that their list -- that

Page 28

1 there are standards listed in the code. But, no, I
2 wasn't familiar with the standards, correct.
3    Q.   Had you ever -- having seen or being
4 familiar with some ASTM standards listed in the
5 code, prior to that meeting with them, had you ever
6 gone and looked at those ASTM standards?
7    A.   Never had reason to.
8    Q.   Okay. And of course, as you sit here
9 today, you cannot say one way or the other whether
10 any of the drywall imported from China complied with
11 those ASTM standards; is that right?
12    A.   I have no idea.
13    Q.   How do the building inspectors ensure
14 that the drywall is the appropriate thickness?
15    A.   Tape measure.
16    Q.   Let me show you Chapter 7 of the 2003
17 International Residential Code.
18      (Tenders document to witness.)
19    A.   Uh-huh. Okay.
20    Q.   Do you recognize this?
21    A.   (Witness examines document.) Yes.
22    Q.   Okay. Now, this is the 2003 version
23 of the IRC. Do you know whether this was ever
24 adopted by the City of New Orleans?
25    A.   No, it was not.

Page 29

1    Q.   Okay. So the -- as I understood your
2 testimony earlier, the 2000 version of the IRC was
3 in place until the 2009 version of the IRC was
4 adopted; is that right?
5    A.   No. We adopted the 2006, but I'm not
6 sure of the date that it was.
7    Q.   Do you know when the 2006 version of the
8 IRC would have come out?
9    A.   It would have came out in 2006, but I
10 don't know when it was adopted.
11    Q.   Okay. Do you think it's likely it was
12 adopted sometime in 2006, or would it likely have
13 been later than that?
14    A.   I think it was a later date, but I'm not
15 sure.
16    Q.   I mean, it usually takes a little while
17 for it to be --
18    A.   Takes a while for it to be circulated
19 and, you know, approved.
20    Q.   Did you review these provisions of the
21 IRC with Mr. Lambert and Mr. Bryson?
22    A.   Not specifically, no.
23    Q.   Okay. Let me show you an ASTM standard
24 C36-97.
25      (Tenders document to witness.)

Confidential - Subject to Further Confidentiality Review

Page 30

1   A.   Okay.

2   Q.   Have you seen these before?

3   A.   (Witness examines document.) I don't

4   recall seeing it, no.

5   Q.   Did you review any ASTM standards with

6   Mr. Bryson and Mr. Lambert?

7   A.   There was one they showed me, but I

8   don't think this was it.

9   Q.   Okay. Let me show you ASTM standard

10  C1396.

11       (Tenders document to witness.)

12  A.   (Witness examines document.)

13  Q.   Have you seen this one before?

14  A.   Yes, I believe this was the one that

15  they referenced or showed me, but it looks to be in

16  a different format. I'm not sure.

17  Q.   Okay. Prior to meeting with Mr. Lambert

18  and Mr. Bryson, had you ever seen the ASTM standard

19  1396 before?

20  A.   I don't re- -- recall having a reason to

21  look this standard up.

22  Q.   Okay. Let me just show you one more,

23  then. This is ASTM standard C1264.

24       (Tenders document to witness.)

25  A.   (Witness examines document.)

Page 31

1   Q.   Have you seen this one before?

2   A.   No, I don't recall seeing this, no.

3   Q.   Okay. Following your meeting with

4   Mr. Lambert and Mr. Bryson, did they indicate to you

5   whether they anticipated calling you as a witness at

6   trial?

7   A.   They said i- -- it was possible, yeah.

8   Q.   After meeting with them, they didn't

9   tell you anything different? They didn't say: I

10  don't think we'll need to call you or an- -- or

11  anything to that effect?

12  A.   No. They -- they said it was possible.

13  It's like it -- it wasn't no decision one way or the

14  other.

15  Q.   Sure. Okay.

16       MR. GRAU: Let's take a break for a

17  minute if we can.

18       THE VIDEOGRAPHER: Time now is 12:10

19  p.m. We are now off the record.

20       (Recess taken at 12:10 p.m. Back on

21  the record at 12:14 p.m.)

22       THE VIDEOGRAPHER: Time now is 12:14

23  p.m. We are now back on the record. Continuation

24  of tape 1.

25  BY MR. GRAU:

Page 32

1   Q.   Mr. Odom, if, during the course of a

2   building inspection, a city inspector notices a

3   smell or an odor that's unusual to them, is that

4   something that they would note or investigate

5   further?

6   A.   They probably would, yes.

7   Q.   Okay. Is that something that you would

8   instruct one of your building inspectors to do?

9   A.   There's a lot of strange odors out there

10  in a construction job, so, I mean, it would have to

11  be pretty unusual for somebody to do any further

12  investigation on it.

13  Q.   Is it common during building

14  instruction -- building inspections to smell a

15  sulfur smell in a home?

16  A.   Sure.

17  Q.   That's not uncommon to smell that?

18  A.   I wouldn't think so. Like I said,

19  there's many strange smells out there. That would

20  not really set off any red flags.

21  Q.   Okay.

22       MR. GRAU: Thank you, Mr. Odom.

23  That's all the questions I have for you.

24       THE WITNESS: Okay.

25       EXAMINATION

Page 33

1   BY MR. MEUNIER:

2   Q.   Good afternoon, Mr. Odom.

3   A.   Good afternoon.

4   Q.   I'm Gerry Meunier representing some of

5   the plaintiff homeowners.

6       You and I have never met before,

7   have we?

8   A.   No, we have not.

9   Q.   Never spoken on the phone or otherwise?

10  A.   No, we have not.

11  Q.   Let me clarify if I can a little bit

12  about the -- is the International Residential Code.

13      The 2000 version of the

14  International Residential Code was adopted and

15  incorporated into the State's residential code,

16  correct?

17  A.   It was adopted by the City --

18  Q.   By the --

19  A.   -- and the State, I believe, yes.

20  Q.   By the City and State.

21      So the provisions of the

22  International Residential Code of 2000 became part

23  of both the Louisiana residential code and the

24  Orleans Parish building code?

25  A.   Yes.

Confidential - Subject to Further Confidentiality Review

Page 34

1  Q.   And then the 2003 version of the
2  International Residential Code, you say, may or may
3  not have been adopted, because the next adoption
4  activity took place in 2006, at which point there
5  was already a 2006 version of the International
6  Residential Code?
7       MR. RISLEY:  Objection; form.
8  BY MR. MEUNIER:
9  Q.   Is that -- am I correct on that?
10      MR. RISLEY:  Objection; form.
11      But you can answer.
12      THE WITNESS:  The 2000 code was
13  adopted, and the -- and it took a while for that --
14  it wasn't adopted in 2000.  I don't know the exact
15  date.  You'll have to check the -- the ordinance,
16  say, where it was adopted for an effective date of
17  it.  I don't have it right here.
18      Then in -- after Katrina, it is my
19  understanding that the State at that time adopted
20  certain portions of the 2003 code as far as wind
21  loads and other requirements that they wanted to
22  increase after the storm.  But they did not adopt
23  the whole code, from what I remember, but that,
24  you'd have to verify.
25  BY MR. MEUNIER:

Page 35

1  Q.   Okay.
2  A.   I can't say that.  That is how I
3  remember it happening.
4  Q.   All right.  Thank you.
5       Are the standards for building
6  materials that are set forth in these codes
7  considered to be minimum standards?
8  A.   Yes.
9  Q.   What do you mean by that?
10 A.   Well, that any product area -- or
11 whatever is being used in construction has to meet
12 that minimum standard and the reference codes in
13 there.
14 Q.   So for provisions on quality, marking,
15 labeling, that sort of thing, these are considered
16 to you -- to be the very least that should be done,
17 correct?
18 A.   I believe that, yes.
19 Q.   I have with me the Orleans Parish
20 building code, and I want to show you the entire
21 document, but I'm only going to refer to one portion
22 of it.  (Tenders document to witness.)
23 A.   Okay.
24 Q.   And that's at pages 3 and 4.
25 A.   Uh-huh.  (Witness examines document.)

Page 36

1  Q.   And it's under the title "Section 101.3:
2  Intent."
3       Would you read what is written in
4  that section?
5  A.   "The purpose of this code is to
6  establish the minimum requirements to safeguard the
7  public health, safety and general welfare through
8  structural strength, means of egress" -- "means of
9  egress facility, stability, sanitation, adequate
10 light and ventilation, energy conservation and
11 safety to life and property from fire and other
12 hazards attributed to the built environment and to
13 provide safety to firefighters and emergency
14 responders during emergency operations."
15 Q.   A-- as Chief Building Inspector, do
16 you consider that general purpose and intent
17 language to be true with respect to all of the
18 provisions that are contained in the Orleans Parish
19 and state building code?
20 A.   Yes.
21      MR. MEUNIER:  Let me mark as Odom
22 No. 1 pages 3 and 4 of the Orleans Parish building
23 code; in particular, the section on intent that he
24 has just read from.
25      (Exhibit 1 was marked for

Page 37

1  identification.)
2  BY MR. MEUNIER:
3  Q.   Now, you've indicated that these
4  standards and provisions in these various
5  codes are minimum standards.  Are they also
6  mandatory standards?
7       MR. RISLEY:  Objection; form.
8       THE WITNESS:  I don't know.  I...
9  BY MR. MEUNIER:
10 Q.   Well, if in a given provision, for
11 example, the word "shall" is used, do you consider
12 as Chief Building Inspector that to be a mandatory
13 standard, one that must be followed?
14      MR. RISLEY:  Objection; form.
15      MR. GRAU:  Same objection.
16      THE WITNESS:  I'd have to answer
17 yes.
18 BY MR. MEUNIER:
19 Q.   Now, let me refer you to the
20 International Residents Code [sic] for a moment, and
21 I will use the 2000 version of that.  And I want to
22 specifically refer you to Section R702.3 entitled
23 "Gypsum Board."  (Tenders document to witness.)
24 A.   Okay.
25 Q.   Before I ask this question, let me make

Confidential - Subject to Further Confidentiality Review

Page 38

1  sure I'm correct about something, Mr. Odom.
2       These codes, the International
3  Residential Code and then the provisions of it
4  adopted in the State and the Parish of Orleans, do
5  refer, don't they, in different places to the ASTM
6  requirements?
7       A.   There's a whole chapter on reference
8  standards, yes.
9       Q.   Do you understand the ASTM requirements
10 to be industry standards?
11      A.   Yes.
12      Q.   So the standards published for the
13 industry and by the industry are put into and become
14 part of these codes, correct?
15      A.   That's my understanding, yes.
16      Q.   And in particular, the 2000
17 International Residential Code in this section on
18 gypsum board -- and I'm referring to R702.3.1 --
19 specifies that all gypsum board materials and
20 accessories shall conform to...
21           And then it lists a number of ASTM
22 provisions, correct?
23      A.   Correct.
24      Q.   Would you agree the word "shall" there
25 means that this is mandatory?

Page 39

1           MR. GRAU:  Objection.
2           THE WITNESS:  Yes.
3           MR. RISLEY:  Objection; form.
4  BY MR. MEUNIER:
5       Q.   And one of the provisions that's
6  referred to is ASTM C36, correct?
7       A.   Yes.
8       Q.   And I next want to show you a document
9  that I believe Counsel for INEX has referred you
10 to; although, it's not yet marked as an exhibit,
11 and it's ASTM C36, and in particular, it's Section
12 12 of C36.
13           And I'd ask you to read Section 12
14 for us, please.  (Tenders document to witness.)
15      A.   "Packaging and Package Marking:  Unless
16 otherwise required by the purchase agreement, each
17 board or package shall have legible mark thereon the
18 following:  the thickness, the time, the producer or
19 supplier" -- "the name of the sup-" -- "producer or
20 supplier, the brand name, if any, and the ASTM
21 designation for the product."
22      Q.   And, again, the use of the word "shall,"
23 which we talked about earlier, would make these
24 labeling requirements mandatory, wouldn't they?
25           MR. GRAU:  Objection.

Page 40

1           MR. RISLEY:  Objection; form.
2           THE WITNESS:  In my opinion, yes.
3  BY MR. MEUNIER:
4       Q.   Now, Counsel also referred you to ASTM
5  C1396, and I want to refer you to that again.  It's
6  Section 14 dealing with sampling, inspection, et
7  cetera.  And this is all a standard specification
8  for gypsum board.
9           Do you have that document?
10      A.   Yes, I do.
11      Q.   Do you see in Section 14.1 certain
12 language about sampling, inspection, et cetera?
13      A.   (Witness examines document.)
14           "Sampling, inspection, rejection,
15 certification, packaging, marking, shipping,
16 handling and storage"?
17      Q.   Yes.  Would you read that for me,
18 please?
19      A.   "Sampling, inspection, rejection,
20 certification, packaging, marking, shipping,
21 handling and storage of gypsum board shall be in
22 accordance with specification C1264."
23      Q.   And, again, the use of the word "shall"
24 would indicate to you as a building inspector that
25 that's mandatory, wouldn't it?

Page 41

1           MR. RISLEY:  Objection; form.
2           THE WITNESS:  In my opinion, yes.
3  BY MR. MEUNIER:
4       Q.   So let me refer you now to Section -- to
5  another ASTM requirement.  Again, Counsel for INEX,
6  I think, referred you to it earlier.  It's C1264,
7  paragraph 8, and I'd like you to read for us the
8  language of 8.1.
9       A.   "Each gypsum panel product or package
10 shall have legible marking thereon the following:
11 the thickness, the name of the producer or supplier,
12 the brand name, if any, and the ASTM specifications
13 for the product."
14      Q.   And, again, the use of the word "shall"
15 in that ASTM requirement would indicate that it is
16 mandatory, wouldn't it?
17           MR. RISLEY:  Objection; form.
18           THE WITNESS:  In my opinion, yes.
19           MR. MEUNIER:  Let me mark as Odom
20 No. 2 the provision from the 2000 IRC that we talked
21 about, which is R702.3.
22           (Exhibit 2 was marked for
23 identification.)
24           MR. MEUNIER:  I'll mark as Odom No.
25 3 the provision from ASTM C36, paragraph 12, read by

Confidential - Subject to Further Confidentiality Review

Page 42

1 the witness. That would be Odom 3.
2          (Exhibit 3 was marked for
3 identification.)
4          MR. MEUNIER: I'll mark as Odom 4
5 the provision of ASTM C1396, in particular Section
6 14, 14.1, read by the witness.
7          (Exhibit 4 was marked for
8 identification.)
9          MR. MEUNIER: And I will mark as
10 Odom 5 the section from ASTM C1264, specifically
11 paragraph 8; and, in particular, paragraph 8.1 read
12 by the witness.
13          (Exhibit 5 was marked for
14 identification.)
15 BY MR. MEUNIER:
16    Q.   Now, Mr. Odom, in these provisions,
17 reference is made to gypsum panel products and
18 gypsum wallboard; true?
19    A.   Yes.
20    Q.   As a building inspector familiar with
21 building supplies, is the term "Sheetrock" a -- a
22 brand name?
23    A.   I believe -- I believe it's a brand name
24 or a tradename. I -- I'm not sure, okay, but...
25    Q.   Let me show you a printout from the

Page 43

1 website of USG Corporation.
2          (Tenders document to witness.)
3          And ask you whether or not that
4 corporation identifies Sheetrock as a brand name for
5 its product?
6          MR. GRAU: Objection.
7          THE WITNESS: Yes, it does.
8          MR. RISLEY: Objection; form.
9          MR. MEUNIER: Okay. And I'll
10 label that as Odom No. 6.
11          (Exhibit 6 was marked for
12 identification.)
13 BY MR. MEUNIER:
14    Q.   Let me next show you a document that's
15 been Bates-numbered Interior Exterior 26512, an
16 invoice dated November 8, '06.
17          MR. GRAU: Do you have copies of
18 that Exhibit 6?
19          MR. PETERSON: Yep.
20          THE WITNESS: Sorry.
21          MR. GRAU: That's okay.
22 BY MR. MEUNIER:
23    Q.   (Tenders document to witness.)
24    A.   (Witness examines document.)
25          MR. PETERSON: (Tenders document to

Page 44

1 Counsel.)
2          MR. GRAU: Thank you.
3 BY MR. MEUNIER:
4    Q.   I'm showing you the Interior Exterior
5 invoice with the Bates number I've given from
6 November of '06, and I call your attention to the
7 fact that this invoice makes reference to the sale
8 of, quote, Sheetrock. Do you see that?
9    A.   Yes, I do.
10    Q.   As a building inspector with your
11 experience in the building supplies and materials'
12 industry, would you interpret reference to Sheetrock
13 as reference to a specific brand of gypsum board
14 made by USG?
15          MR. GRAU: Objection.
16          MR. RISLEY: Objection.
17          THE WITNESS: Sheetrock is a -- is
18 not the generic -- is not the term -- it's
19 referenced in the code as gypsum board, and
20 Sheetrock, in my opinion, yes, is a brand name or
21 tradename or something. I -- it's -- that's all I
22 can say.
23 BY MR. MEUNIER:
24    Q.   And if you -- if you were referring
25 on a document like that to gypsum board, let's say,

Page 45

1 imported from China and not made by any domestic
2 company, wouldn't you, as a building inspector,
3 expect the reference to be to gypsum wallboard or
4 gypsum panel --
5          MR. RISLEY: Objection.
6          MR. GRAU: Objection.
7 BY MR. MEUNIER:
8    Q.   -- as opposed to a brand name like
9 Sheetrock?
10          MR. RISLEY: Objection.
11          THE WITNESS: I can't answer that
12 question. I -- I don't know how a supplier is going
13 to write it up or request it. I can't answer that.
14          MR. MEUNIER: I'll label the invoice
15 from INEX that I've referred to as Odom No. 7.
16          (Exhibit 7 was marked for
17 identification.)
18 BY MR. MEUNIER:
19    Q.   Now, Odom No. 5, which is the ASTM
20 standard that each gypsum panel product shall be
21 legibly marked with the thickness and the name of
22 the producer or supplier, I'm interested, Mr.
23 Odom, in how building inspectors would be in a
24 position to enforce that particular requirement.
25          You -- you've indicated that the

Confidential - Subject to Further Confidentiality Review

Page 46

1 people in the field, who do the work under your
2 supervision, show up three times: at the
3 foundation, at the framing and then for final
4 inspection?
5    A.   Correct.
6    Q.   And as I appreciate it, in response to
7 Counsel for INEX's questioning, the framing phase is
8 before any gypsum panel is installed; is that true?
9    A.   Probably.
10    Q.   That final construction phase would be
11 after the gypsum panel's already been put in the
12 walls; true?
13    A.   Correct.
14    Q.   So there'd be no way for a field
15 inspector from the City enforcing any of these
16 requirements to look at the labeling of the gypsum
17 to see if it's got the labeling of the thickness
18 and brand and -- and -- I'm sorry -- supplier on
19 it?
20        MR. GRAU: Objection.
21 BY MR. MEUNIER:
22    Q.   Is that true?
23        MR. RISLEY: Objection.
24        THE WITNESS: No. He's probably not
25 going to see it at all. And even if he does, he's

Page 47

1 not even checking that. He's checking for thickness
2 and -- and the -- you know, how it's attached to the
3 structure.
4 BY MR. MEUNIER:
5    Q.   How is he going to measure for thickness
6 if he shows up --
7    A.   Tape measure.
8    Q.   -- in those phases?
9    A.   Well, tape measure. So, you know, even
10 if it's placed up, you can always look inside of an
11 electrical outlet or some other opening there and
12 measure the thickness of Sheetrock, if necessary.
13    Q.   Okay. So you'd have to be measuring it
14 through a -- like a small opening --
15    A.   Yeah.
16    Q.   -- like, for a light switch or
17 something?
18    A.   Small opening for a light switch,
19 anyplace like that.
20    Q.   That wouldn't allow you to see the
21 entire board?
22    A.   Probably not, no.
23    Q.   And it certainly wouldn't allow you to
24 see any labeling on the board that's behind the
25 board?

Page 48

1    A.   No, I doubt we'd be able to see the
2 labeling there.
3    Q.   And I want to refer you to two documents
4 that have been Bates-stamped INEX 960 and INEX 971.
5 (Tenders documents to witness.)
6    A.   (Witness examines documents.)
7        THE VIDEOGRAPHER: We have about ten
8 minutes left on the tape.
9 BY MR. MEUNIER:
10    Q.   And I'll represent to you, Mr. Odom,
11 that these are the -- 960 is the -- as it's entitled,
12 "Certificate of Origin," and 973, a packing list
13 from a company called Metro Resources Corporation.
14 Do you see that?
15    A.   (Witness examines document.)
16    Q.   See that --
17    A.   This one (indicating)?
18    Q.   See that one is a Certificate of Origin,
19 and the other is a packing list from Metro Resources
20 Corporation?
21    A.   This is -- this one is what
22 (indicating)?
23    Q.   Certificate of Origin (indicating).
24    A.   All right.
25    Q.   Okay. Do you see in the Certificate of

Page 49

1 Origin, which is Bates-numbered 960, where it says,
2 "marks and numbers"? You see that?
3    A.   Yeah.
4    Q.   What's written after marks and numbers?
5    A.   Manufacturer's brand name.
6    Q.   Is the manufacturer brand name the same
7 as the name of the manufacturer?
8    A.   Oh, I don't know.
9    Q.   Look at Bates No. 973.
10    A.   973. (Witness complies.)
11    Q.   See the highlighted language, two pieces
12 of board, one set, each set, et cetera?
13    A.   (Witness examines document.)
14    Q.   You see that?
15    A.   Yes.
16    Q.   And it references, again, the
17 manufacturer brand name, correct?
18    A.   Yes.
19    Q.   And then it states: Made in China, meet
20 or exceed, et cetera. That's what's written on the
21 board according to this; you see that?
22    A.   According to this document, yeah.
23    Q.   Does any of that refer to the label -- a
24 labeling giving the thickness of the board?
25    A.   No.

Confidential - Subject to Further Confidentiality Review

Page 50

1       MR. MEUNIER: Let me mark as Odom
2   No. 8, the Certificate of Origin, which is Bates No.
3   960.
4       (Exhibit 8 was marked for
5   identification.)
6       MR. MEUNIER: And as Odom 9, the
7   invoice which is Bates No. 973.
8       (Exhibit 9 was marked for
9   identification.)
10      MR. GRAU: 972, right?
11      MR. MEUNIER: 973.
12      MR. GRAU: Is there another
13  document?
14      MR. MEUNIER: It --
15      MR. GRAU: It's the same thing.
16      MR. MEUNIER: They're all the same.
17  We noticed that there were different Bates numbers
18  given by INEX, but they're -- it's a repeat
19  document; it's exactly the same. For example,
20  here's 974, and it's all the same, so...
21      MR. GRAU: (Examines document.)
22  Okay.
23  BY MR. MEUNIER:
24      Q.   Mr. Odom, I next want to refer you
25  to a document that's Bates-numbered INEX 1990 and

Page 51

1   1991, and I'd ask you to read on this Test Report,
2   which I'll represent to you was given to us in
3   production of documents from INEX and something they
4   said they've received from the plant, which made the
5   Chinese wallboard they imported in this case.
6       (Tenders document to witness.)
7       Who is identified on that document,
8   that ASTM Test Report, as the manufacturer of the
9   wallboard?
10      A.   (Witness examines document.)
11      Taian "Taishan" Plasterboard
12  Company, Ltd.
13      Q.   When the ASTM requirement, which we read
14  as Odom 5, which is in C1264, says that each gypsum
15  panel product shall have legibly marked on it the
16  name of the producer or supplier, would you, as a
17  building inspector, expect that name to be marked on
18  the wallboard to comply with 1264?
19      MR. RISLEY: Objection.
20      MR. GRAU: Objection.
21      THE WITNESS: If that was the
22  manufacturer. I don't know who is the man- -- you
23  know, if that was the manufacturer, yeah.
24  BY MR. MEUNIER:
25      Q.   Okay.

Page 52

1       A.   But, I mean, I don't -- I don't know.
2       Q.   Finally, I want to show you some
3   photographs of some of the drywall that's involved
4   in this case. And I'll show you INEX -- it's
5   Bates-numbered INEX 6038. (Tenders document to
6   witness.)
7       A.   (Witness examines photograph.)
8       Q.   Do you see the word "Taihe" written
9   on the end tape of this drywall?
10      A.   There's something written on the end of
11  it. Yeah, it looks like Taihe, I guess, I mean...
12      Q.   If you were the building inspector asked
13  to look into compliance with 1264, would you take it
14  that Taihe is the name of the manufacturer of that
15  drywall?
16      MR. GRAU: Objection.
17      MR. RISLEY: Objection.
18      THE WITNESS: It depends on -- you'd
19  have to check the whole board to see what markings
20  were on it. I'd say if that was the only word, then
21  I would assume, yes, that's the manufacturer, but I
22  don't know what other markings are on the board.
23  BY MR. MEUNIER:
24      Q.   All right. Let me show you three more
25  pictures, and then we'll complete that -- the

Page 53

1   answer to that question. These are not Bates
2   numbered.
3       I want to show you three photographs
4   of drywall involved in this case. (Tenders
5   photographs to witness.)
6       A.   (Witness examines photographs.)
7       Q.   You see the first photograph shows some
8   tape again which appears to have the name "Taihe" on
9   it?
10      A.   It's -- yeah, appears, yeah, I think.
11      MR. MEUNIER: And I'll label that as
12  Odom No. -- what was --
13      MR. PETERSON: 10 is the ASTM
14  report. That's 11.
15      MR. GRAU: You haven't attached a
16  couple of the last ones you did.
17      MR. MEUNIER: I'm sorry.
18      MR. GRAU: No, that's okay. I just
19  --
20      MR. PETERSON: Let's start with the
21  ASTM report, which is 10.
22      MR. MEUNIER: I'll make the ASTM
23  Test Report -- I'm sorry -- I didn't mark that.
24  That'll be Odom 10.
25      (Exhibit 10 was marked for

Confidential - Subject to Further Confidentiality Review

Page 54

1 identification.)
2      THE VIDEOGRAPHER: We're down to
3 almost two minutes. Would you like to go ahead and
4 change the tape?
5      MR. MEUNIER: Go ahead and change,
6 yeah. We'll get the documents straight.
7      THE VIDEOGRAPHER: Time now is
8 12:42, and we are now off the record. This is the
9 end of tape 1.
10      (Recess taken at 12:42 p.m. Back on
11 the record at 12:42 p.m.)
12      THE VIDEOGRAPHER: Time now is 12:42
13 p.m. We are now back on the record. It's the
14 beginning of tape 2.
15      MR. MEUNIER: For the record, we've
16 marked the ASTM Test Report, which is Bates-numbered
17 INEX 1990 and 1991, as Odom 10.
18      MR. MEUNIER: And we'll mark the
19 photograph of the end tape of stacked gypsum board
20 with Taihe on it, which is Bates-numbered INEX 6038,
21 as Odom 11.
22      (Exhibit 11 was marked for
23 identification.)
24 BY MR. MEUNIER:
25   Q.   The photographs I've now shown you,

Page 55

1 Mr. Odom, are three pictures of, again, the
2 drywall involved in this case. And you'll see one
3 picture has end tape on it that appears to have the
4 same name, "Taihe." Do you see that?
5   A.   Yes.
6   Q.   Do you see another picture that has the
7 stencilling on the board that says "Made in China"?
8   A.   Yes.
9   Q.   And then do you see in the third picture
10 additional language where it says, "meets or exceeds
11 ASTM," et cetera?
12   A.   Yes.
13   Q.   Do any of the markings in these pictures
14 identify the thickness of the board?
15   A.   No.
16   Q.   And assuming that Taian Taishan
17 Plasterboard is the manufacturer, as indicated on
18 that ASTM report, do any of the photographic -- do
19 any of the markings in these photographs show the
20 manufacturer of the board?
21   A.   Taihe or whatever.
22   Q.   But I'm asking you to assume that the
23 manufacturer is Taian Taishan Plasterboard. Do you
24 see that?
25   A.   If that's the manufacturer, then, no,

Page 56

1 it's not on here.
2   Q.   Now, my question is: Assuming you have,
3 in this case, a violation of the ASTM labeling
4 requirements that we've been looking at,
5 specifically for thickness of the board and the
6 identity of the producer or manufacturer, and
7 assuming, as we've already discussed, that there's
8 no way for your team in the field in service of this
9 purpose of public protection to find out about that
10 kind of labeling violation, how can we expect as
11 citizens for that requirement to be enforced?
12      MR. RISLEY: Objection.
13      MR. GRAU: Objection.
14 BY MR. MEUNIER:
15   Q.   How would you -- how would -- let
16 me ask the question this way: How would you as
17 building inspector -- who would you count on as
18 building inspector to see that that labeling
19 requirement is satisfied?
20      MR. GRAU: Objection.
21      MR. RISLEY: Objection.
22      THE WITNESS: The courts.
23 BY MR. MEUNIER:
24   Q.   Would you assume that the importer
25 distributor of the building material would comply

Page 57

1 with those provisions?
2      MR. RISLEY: Objection.
3      MR. GRAU: Objection.
4      THE WITNESS: Well, for compliance
5 with industry standards, it's going to be the
6 manufacturer. And I assume the suppliers would, you
7 know, get the data from their -- the manufacturer
8 that they're in compliance with the industry
9 standards for the product they're selling.
10      MR. RISLEY: Objection;
11 nonresponsive.
12 BY MR. MEUNIER:
13   Q.   And although you've indicated you
14 don't recall receiving any complaints about odor
15 or other indications of Chinese drywall until after
16 you read about it and learned about it in the
17 reporting in the media, if you, as a building
18 inspector, or the Chief Building Inspector, became
19 aware that installed gypsum board from China was not
20 ASTM-compliant and the ASTM provisions in particular
21 were those that were incorporated into the building
22 code that you enforce, what action would you feel
23 was appropriate to take?
24      MR. GRAU: Objection.
25      MR. RISLEY: Objection.

Confidential - Subject to Further Confidentiality Review

Page 58

1    THE WITNESS: I would ask the -- or
2  I may even issue a correction notice to the
3  contractor to give me the manufacturer's
4  specifications on how to -- you know, or give me
5  documentation that that product met the standards
6  referenced in the building code.
7  BY MR. MEUNIER:
8    Q.   And if it didn't, if you then, after
9  investigation, found that the -- it would -- the
10 material was not ASTM-compliant, particularly in
11 regard to the labeling and marking that we're
12 looking at, what would the available steps be for
13 your office?
14     MR. RISLEY: Objection.
15     MR. GRAU: Objection.
16     THE WITNESS: It's -- issue a
17 violation letter and then, like you say, there would
18 be -- we -- we would not allow occupancy of the
19 building until the matter was resolved, either
20 through submitting the documentation to us or to
21 having a, you know, hearing of some type or -- on
22 the matter -- on the violation.
23 BY MR. MEUNIER:
24   Q.   And if you barred occupancy from the
25 building, could the owner pass title to someone

Page 59

1  else?
2      MR. RISLEY: Objection.
3      THE WITNESS: I don't know that. I
4  don't know that. I -- I don't think so, but I'm --
5  it's not a question I can answer.
6  BY MR. MEUNIER:
7    Q.   But the limit of your office's authority
8  would be to prevent occupancy of the building until
9  this matter was corrected?
10   A.   Until the -- we had documentation or,
11 you know, that there was clarification on the
12 violation, whether it was or wasn't a violation.
13     MR. MEUNIER: Thank you, sir. No
14 further questions.
15     MR. RISLEY: May I have a turn?
16     MR. GRAU: Yeah, go ahead.
17     EXAMINATION
18 BY MR. RISLEY:
19   Q.   Mr. Odom, my name is Kevin Risley. I
20 appreciate you taking the time to be with us today.
21 I'll be as quick as I can.
22   A.   Okay, Kevin.
23   Q.   You just had in front of you a
24 series of documents and pictures.
25     Have you seen any of those before

Page 60

1  today?
2    A.   When I met with the two -- three
3  attorneys originally, I -- I was shown some
4  documents, I believe this ASTM document. But it was
5  in a different format, I believe. I...
6    Q.   Okay.
7    A.   And this is the first time -- they did
8  show me a picture -- they did show me these pi- --
9  these three pictures here. I don't know -- now,
10 they did show me this.
11   Q.   Okay.
12   A.   Okay? But that's -- that's all I recall
13 seeing. Okay.
14   Q.   Other than meeting with lawyers for the
15 plaintiffs in the last week or so, have you ever
16 seen any of -- all -- any of those documents or
17 pictures before the lawyers showed them to you?
18   A.   No.
19   Q.   You were shown some documents that were
20 identified as Certificates of Origin and packing
21 lists and ASTM Test Reports.
22     Are those documents you use in your
23 job?
24   A.   No.
25   Q.   Okay. Do you feel qualified to talk

Page 61

1  about what those documents contain and what they
2  mean?
3    A.   No.
4      MR. MEUNIER: Objection; form.
5  BY MR. RISLEY:
6    Q.   In your experience, whether Sheetrock is
7  or not a brand name, does some people call gypsum
8  board Sheetrock?
9    A.   It is a common term that's used quite
10 often, yes.
11   Q.   And is "drywall" also a common term for
12 gypsum board?
13   A.   Drywall is another term it's often
14 referred to.
15   Q.   Do you have any personal knowledge about
16 the -- what is or is not labeled on the drywall in
17 any home in Orleans Parish that has drywall that was
18 manufactured in China?
19   A.   No.
20   Q.   When one of your inspectors goes out
21 and does the final inspection, if the -- and
22 let's focus on houses here, let's leave the
23 commercial side out of it.
24     If the house is found to be in
25 compliance with all the building code requirements,

Confidential - Subject to Further Confidentiality Review

Page 62

1  is anything issued at that point in time?
2      A.    Certificate of Occupancy.
3      Q.    You were asked that if the drywall
4  put into a house in this area, in your -- in
5  New Orleans Parish did not comply with the ATM --
6  ASTM labeling standards, certain things might or
7  might not happen.
8              Would your building inspectors
9  typically issue Certificates of Occupancy without
10  deciding whether or not the labeling requirements
11  had been met?
12      A.    They would probably never require the
13  labeling requirements be met; they wouldn't see
14  that.
15      Q.    Okay. Assume with me, if you would,
16  that building inspectors from Orleans Parish have
17  granted Certificates of Occupancy for hundreds of
18  houses in Orleans Parish that have
19  Chinese-manufactured drywall in it.
20              Were those Certificates of Occupancy
21  issued in error?
22              MR. MEUNIER: Objection to the form.
23              THE WITNESS: I don't think I can
24  answer that. This -- this lawsuit might answer
25  that, but, no, I don't think I can answer that.

Page 63

1  BY MR. RISLEY:
2      Q.    All right. If one of your inspectors
3  had called you and said, you know: Chief, I'm out
4  here on a job, I can't see the name of the
5  manufacturer on the drywall, would you tell them not
6  to issue a Certificate of Occupancy?
7      A.    No. I would tell them to measure the --
8  the thickness of the occupancy and check how it was
9  attached to the structure.
10      Q.    So you would not criticize your building
11  inspectors if they had issued Certificates of
12  Occupancy with homes that had Chinese drywall that
13  didn't meet the ASTM labeling standards, would you?
14      A.    No.
15      Q.    They did their job right, didn't they?
16      A.    Yes.
17      Q.    Okay. Now, you've, in some of your
18  answers, made a distinction between the thickness of
19  the gypsum board and how it's applied and other
20  elements that may exist under the residential code
21  or the ASTM, correct?
22      A.    Which ones are you talking --
23      Q.    Well, for example, you want to make sure
24  that it's the right thickness and it's attached
25  correctly --

Page 64

1      A.    Correct.
2      Q.    -- but you're not as concerned about
3  what the labeling is on the back of the board, are
4  you?
5      A.    No.
6      Q.    Why do you make that distinction?
7      A.    Because that's the emphasis of my
8  building inspection is, you know, I can't verify
9  that every product in that building meets industry
10  standards. I -- there's no way I can do that.
11      Q.    If an inspector is out there on a job,
12  on a final inspection, or even, I guess, on the
13  framing inspection and just looking at the
14  gypsum board, and they can't see a labeling on the
15  board and where it says what size is it, what are
16  they supposed to do?
17      A.    Measure it.
18      Q.    With the tape measure you said they
19  ought to have, right?
20      A.    Yes.
21      Q.    And is that typically how your
22  inspectors ensure compliance with the thickness
23  requirement is by measuring it?
24      A.    Yes.
25      Q.    Okay. From your experience as a

Page 65

1  building inspector, does the labeling that may or
2  may not be on the back of a piece of gypsum board
3  affect its functionality in the house?
4      A.    No.
5      Q.    And as long as the gypsum board is the
6  proper thickness, does the fact that it's not
7  labeled with the thickness on the back of the board
8  affect its ability to function as gypsum board is
9  supposed to function?
10      A.    Repeat that.
11      Q.    Yeah. Let's assume that there was
12  gypsum board -- what is the code requirement
13  for thickness of gypsum board in residential?
14      A.    Half-inch.
15      Q.    Let's assume drywall is being installed
16  that is half-inch drywall; it just doesn't say so on
17  the back.
18              Will that make it not act as
19  half-inch drywall is supposed to act?
20      A.    No.
21              MR. RISLEY: Thank you. I'm going
22  to let someone else ask some.
23                  RE-EXAMINATION
24  BY MR. GRAU:
25      Q.    Mr. Odom, I just have a couple of

Confidential - Subject to Further Confidentiality Review

Page 66

1  questions --
2      A.   Sure.
3      Q.   -- follow-up questions for you.
4           You inspect for the thickness of the
5  drywall gypsum board and that it's properly adhered
6  at the time of final inspection; is that right?
7      A.   Yes.
8      Q.   How do you tell if the wallboard is
9  properly adhered at the time of final inspection?
10     A.   We're probably not even going to be able
11 to determine it.
12     Q.   Because it's been floated and finished,
13 right?
14     A.   It's been floated and taped --
15     Q.   Okay.
16     A.   -- you know.
17     Q.   So you can't see the screws; you
18 don't know if the screw pattern is correct or not,
19 do you?
20     A.   No.
21     Q.   So really the only thing your inspectors
22 look at is the thickness; is that right?
23     A.   Thickness, yes.
24     Q.   Okay.  You don't read Chinese, do you?
25     A.   No, I do not.

Page 67

1      Q.   Okay.  You have no idea what -- in
2  looking at photograph 11, what those Chinese symbols
3  on the side of that board mean?
4      A.   I have no idea.
5      Q.   Do -- have you seen any labeling
6  requirements in the ASTM that requires labels be in
7  English versus some other language?
8      A.   No, not that I've seen, no.
9      Q.   Okay.  You were asked several questions
10 about some of these ASTM standards in front of you,
11 and --
12     A.   Uh-huh.
13     Q.   -- look at Exhibit 4 for me --
14     A.   Okay.
15     Q.   -- which is ASTM 1396.
16     A.   Okay.  (Witness complies.)
17     Q.   Do you see that one?
18     A.   Yeah, I got it.
19     Q.   Do you see that that's the 2011 version
20 of 1396?
21     A.   Yes.
22     Q.   Okay.  You haven't seen the -- that --
23 you would agree with me that that obviously would
24 not have been applicable in 2005 to 2007; is that
25 right?

Page 68

1      A.   Not this edition, correct.
2      Q.   Okay.  And you have never seen, as you
3  sit here today, a version of 1396 that would have
4  been applicable at that time; is that correct?
5      A.   Well, like I say, when I met with the
6  attorneys previously, there was one shown, but it
7  didn't look like this, and --
8      Q.   Okay.
9      A.   -- I -- I don't remember exactly what
10 the ASTM standard was.
11     Q.   You don't know what that one is though?
12     A.   This one right here (indicating)?
13     Q.   No, the one that was shown --
14     A.   No.
15     Q.   -- to you, do you?
16     A.   I -- I don't know.  I don't know.
17     Q.   Okay.  And if you take a look at Exhibit
18 5, which is the ASTM standard 1264 --
19     A.   (Witness complies.)
20     Q.   You see that one?  The originals are
21 right here if that helps.
22     A.   Yeah, I got it, pro- -- right.
23     Q.   Okay.  You agree with me, again, that
24 that's the 2011 version, correct?
25     A.   Yes.

Page 69

1      Q.   Okay.  And you have not seen the
2  applicable version -- or the version that would have
3  been in place in 2005 through 2007, correct?
4      A.   No, I don't recall seeing it, no.
5      Q.   Okay.  Take a look at Exhibit -- well,
6  I'm not sure of the exhibit number.  It's C36,
7  Exhibit 3.
8      A.   (Witness complies.)
9      Q.   And earlier you were referred to Section
10 12 of C36 of the ASTM.
11          Do you see that, 12.1 in particular?
12     A.   Yeah.
13     Q.   Okay.  And this is the section on
14 packaging, correct?
15     A.   Correct.
16     Q.   All right.  Now, that starts off with:
17 Unless otherwise required by the purchase
18 agreement...
19          Do you see that?
20     A.   Yes, I do.
21     Q.   What does that mean?
22     A.   I have no idea.
23     Q.   Okay.  If the purchase documents
24 relating to the gypsum board required other labeling
25 besides the labeling that's identified in 12.1, or

Confidential - Subject to Further Confidentiality Review

Page 70

1  in lieu of the labeling that's identified in 12.1,
2  would you be able to say whether that labeling then
3  was compliant with ASTM C36?
4       A.    I -- I don't know.
5       Q.    So, for example, the purchase documents,
6  or some of the purchase documents that you were
7  shown earlier, specifically Exhibit 9, indicates
8  that the board is supposed to be labeled with
9  certain items, correct?
10      A.    Correct.
11      Q.    Okay.  It indicates the board should be
12  labeled with a manufacturer brand name, correct?
13      A.    Uh-huh.
14      Q.    And at the back of each board, it should
15  be labeled Made in China, meet or exceed ASTM
16  C1396-04 standard.  You see that?
17      A.    No, I don't see that.
18      Q.    On Exhibit 9; let me show you my copy.
19      A.    Yeah, okay.  All right.
20      Q.    You see that down there, the highlighted
21  portion --
22      A.    Yeah.
23      Q.    -- that Counsel showed you earlier?
24      A.    Uh-huh.
25      Q.    Okay.  Do you have any view, one way or

Page 71

1  the other, whether those labeling instructions would
2  fall within the carve-out provision of 12.1 that
3  says: Unless otherwise required by the purchase
4  agreement...?
5       A.    No.
6             MR. MEUNIER:  Let me just object to
7  form that you are suggesting that's part of the
8  purchase agreement, but just for the record.
9             MR. GRAU:  Just asking him whether
10  it does or it doesn't.
11  BY MR. GRAU:
12      Q.    I guess -- you've gone through an
13  exercise today of looking at various documents,
14  which you've told us you hadn't seen before and
15  which you don't ordinarily look at in the course of
16  your business; is that right?
17      A.    Correct.
18      Q.    You are not an expert on determining
19  whether building materials comply with ASTM
20  standards, are you?
21      A.    No, I'm not.
22      Q.    As you sit here today, do you -- as the
23  Chief Building Inspector for the City of New
24  Orleans, do you have an opinion as to whether the
25  drywall imported from China and used in residents in

Page 72

1  the City of New Orleans complied with the applicable
2  residential code?
3             MR. MEUNIER:  Objection, without
4  certain hypothets being given to the witness.
5             THE WITNESS:  I don't know.  I can't
6  answer that que- -- I'm not qualified to answer that
7  question.
8  BY MR. GRAU:
9       Q.    Not only are you not qualified to answer
10  that question in your view, but you don't have an
11  opinion; is that correct?
12             MR. MEUNIER:  Objection, unless
13  certain hypothetical assumptions are made.
14             MR. GRAU:  I don't know what
15  that means.
16             MR. MEUNIER:  Well, you're asking a
17  question that's incomplete.
18             MR. RISLEY:  No, he's not.
19  BY MR. GRAU:
20      Q.    I'm asking you whether you have an
21  opinion, as you sit here today, whether the drywall
22  imported from China and used in any homes in the
23  City of New Orleans complied with the International
24  Residential Code?
25      A.    I don't know.

Page 73

1             MR. MEUNIER:  And I'm objecting only
2  in -- to the extent that you don't provide
3  hypothetical assumptions that allow him to express a
4  view.
5  BY MR. GRAU:
6       Q.    In any event, you don't think -- no
7  matter how many hypothetical assumptions you're
8  given, you don't think you are qualified to render
9  that opinion, do you?
10             MR. MEUNIER:  Objection.
11             THE WITNESS:  No, I don't.
12             MR. GRAU:  Thank you, Mr. Odom.
13  That's all I have.
14             RE-EXAMINATION
15  BY MR. MEUNIER:
16      Q.    Just --
17      A.    Uh-huh.
18      Q.    -- Mr. Odom, you were asked before if --
19      A.    Uh-huh.
20      Q.    -- if the clearance for the building of
21  these homes with Chinese drywall in it had been -- I
22  think Counsel used the word "in error," and your
23  answer was that you're really not -- your team is
24  not set up to find out all -- about all the
25  violations of building material requirements, et

Confidential - Subject to Further Confidentiality Review

Page 74

1  cetera. Is that true?
2      A.    I can't verify that every product meets
3  industry standards, no, I can't.
4      Q.    And isn't it for that reason that in the
5  Orleans building code, it states that when you
6  inspect and permit any structure, it's never to be
7  construed by any court as a warranty of the
8  thickness of the structure?
9      A.    Correct.
10     Q.    And that's set forth in Section 10.3.2
11  of the Orleans building code that we referred to --
12     A.    Yeah.
13     Q.    -- earlier, correct?
14     A.    Yes, sir --
15           MR. MEUNIER:  I'll label that --
16           THE WITNESS: -- that is correct.
17           MR. MEUNIER:  Thank you.
18           I'll label that section as -- no.
19           MR. GRAU:  It's already --
20           MR. MEUNIER:  No -- no, that --
21  that's a different section.  This is Section -- I
22  have the whole code here somewhere, Ben.
23           THE WITNESS:  Yeah.  Here.
24           MR. MEUNIER:  We didn't refer to
25  that earlier.

Page 75

1           MR. GRAU:  Oh, it's 10 point --
2           MR. MEUNIER:  So Section --
3           MR. GRAU:  -- 10.3.2.  Is that what
4  you said?
5           MR. MEUNIER:  Right.
6           MR. GRAU:  Yeah, it's part of
7  Exhibit 1 (indicating).
8           MR. MEUNIER:  Oh, I'm sorry, you're
9  right.  It continues on the second page.  It -- so
10  we don't have to give that a new number; it's
11  already been labeled as 1.  Thank you.
12           No further questions.
13           RE-EXAMINATION
14  BY MR. GRAU:
15     Q.    Whose responsibility is it to ensure
16  that a construction project complies with the
17  building code of the City of New Orleans?
18     A.    The Department of Safety & Permits.
19     Q.    Anyone else?
20     A.    Well, under a, you know -- well, you
21  have, you know, electrical, mechanical, plumbing,
22  building inspections, and once all of those have
23  been done and approved, then the Certificate of
24  Occupancy is issued.
25     Q.    Okay.  Is it the responsibility of the

Page 76

1  contractor building a home to ensure that the home
2  complies with the building code?
3      A.    Sure.
4      Q.    Okay.  Now, you've been asked some
5  questions about whether you can ensure building
6  materials comply with every nuanced portion of the
7  residential code.
8            You could in fact do that, correct?
9            MR. MEUNIER:  Objection; the form.
10           THE WITNESS:  Could I specifically
11  research a question and find an answer?  Probably.
12  BY MR. GRAU:
13     Q.    I mean, you could -- for example, you
14  could expect -- inspect every building material
15  that's used in a home before you put it in the home,
16  right?
17     A.    No.  It's impossible.
18     Q.    Well, if you were on the building site
19  every day --
20     A.    Every day, yeah, and I wa-- -- yeah, if I
21  was on the building site every day and that's the
22  only and -- job I had, yeah --
23     Q.    Yeah.
24     A.    -- I could.
25     Q.    So if you had one building inspector for

Page 77

1  every project going on --
2      A.    Everything.
3      Q.    -- in the City of New Orleans and you
4  were on site every day, you could presumably ensure
5  compliance with every portion of the residential
6  code; is that right?
7      A.    I would say probably, yes.
8      Q.    That's not very practical, though,
9  correct?
10     A.    No.
11     Q.    What would happen if that was the sort
12  of requirement that we had put in place in the City
13  of New Orleans?
14     A.    Nothing would get approved.
15     Q.    Houses wouldn't get built, would they?
16     A.    Wouldn't get built and occupancy
17  certificates would never be issued.
18     Q.    Okay.
19           MR. GRAU:  Thank you, Mr. Odom.
20  That's all I have.
21           RE-EXAMINATION
22  BY MR. MEUNIER:
23     Q.    One more question:  And it's prec-- --
24           MR. RISLEY:  I have three more now.
25           EXAMINATION

Confidential - Subject to Further Confidentiality Review

Page 78

1  BY MR. MEUNIER:
2      Q.   -- it's precisely because the government
3  doesn't have the resources to do what Counsel just
4  did that you must rely on industry to honor its own
5  standards, such as the ASTM; true?
6          MR. GRAU:  Objection.
7          MR. RISLEY:  Objection.
8          THE WITNESS:  The building code --
9  anybody who's in the building industry has the
10 responsibility to try the best they can for the code
11 -- to comply with the code, in my opinion.
12 BY MR. MEUNIER:
13     Q.   Including the suppliers of building
14 materials; true?
15         MR. GRAU:  Objection.
16         MR. RISLEY:  Objection.
17         THE WITNESS:  Everybody involved has
18 some responsibility for compliance with the building
19 code, in my opinion.
20         MR. RISLEY:  Objection;
21 nonresponsive.
22         MR. GRAU:  Objection.
23         MR. MEUNIER:  Thank you.
24         THE WITNESS:  Okay.
25             RE-EXAMINATION

Page 79

1  BY MR. RISLEY:
2      Q.   Three quick questions.
3      A.   Sure.
4      Q.   Do you consider yourself an expert in
5  compliance with ASTM labeling standards?
6      A.   No.
7      Q.   Do you have any personal knowledge of
8  the inspections done by your staff on any house in
9  Orleans Parish that has Chinese drywall in it?
10     A.   No.
11     Q.   Most of the Chinese drywall that was
12 put into houses in this area was installed in
13 2006.
14         Since that time, has your office
15 either revoked a Certificate of Occupancy in a house
16 that has Chinese-made Sheetrock or done anything
17 else to investigate the presence of the Sheetrock in
18 those houses?
19         MR. MEUNIER:  Objection to the use
20 of the word "Sheetrock."
21         MR. RISLEY:  All right.
22         THE WITNESS:  No, we have not, but
23 we have had building permits where the -- the
24 Chinese drywall had been removed and replaced in
25 certain structures.

Page 80

1  BY MR. RISLEY:
2      Q.   And if my last question, I used the word
3  "drywall" instead of "Sheetrock," would your answer
4  be the same?
5      A.   Yeah, it'd be the same.
6          MR. RISLEY:  Thank you.  That's all
7  I have.
8          MR. MEUNIER:  Thank you, Mr. Odom.
9          THE WITNESS:  You're welcome.
10         MR. RISLEY:  You put up with us
11 pretty well.
12         (Exhibits 12A, B and C was marked for
13 identification.)
14         THE VIDEOGRAPHER:  Time now is 1:06
15 p.m.  This concludes the videotaped deposition of
16 Mr. Odom.
17     (Deposition concluded at 1:06 p.m.)
18         * * * * *
19
20
21
22
23
24
25

Page 81

1          REPORTER'S CERTIFICATE
2
3      I, KARI J. BEHAN, CCR, CSR, RPR, CRR, CLR, a
4  Certified Court Reporter (LA Certificate #97019), in
5  good standing with the State of Louisiana, do hereby
6  certify that the foregoing 80 pages constitute the
7  transcript of the proceedings in the above-entitled
8  and numbered cause; that said witnesses were duly
9  sworn and thereafter testified as hereinabove set
10 forth;
11     That the proceedings were reported by me in
12 stenographic shorthand and transcribed thereafter by
13 me on computer and that same is a true and correct
14 transcript to the best of my ability and
15 understanding;
16     That I am not of counsel, nor related to
17 counsel or the parties hereto, and in no way
18 interested in the outcome of this matter.
19     Signed this the 23rd day of October, 2012.
20
21
22
                    _____
23                  KARI J. BEHAN, CCR, CSR, RPR, CRR, CLR
                    Certified Court Reporter
24                  LA Certificate #97019
                    TX Certificate #8564
25

Confidential - Subject to Further Confidentiality Review

---

Page 82

1    ACKNOWLEDGMENT OF DEPONENT
2    I, JOHNNY ODOM, do hereby certify that I have read
     the foregoing pages and that the same is a correct
3    transcription of the answers given by me to the
     questions therein propounded, except for the
4    corrections or changes in form or substance, if any,
     noted in the attached          Errata Sheet.
5
6
     _____
7    JOHNNY ODOM              DATE
8        Subscribed and sworn to before me this
     _____ day of _____, 20 _____.
9
     My commission expires: _____
10
     Notary Public
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 83

1         _ _ _ _ _ _ _
            ERRATA
2         _ _ _ _ _ _ _
3    PAGE  LINE  CHANGE/REASON
4    ____  ____  _____
5    ____  ____  _____
6    ____  ____  _____
7    ____  ____  _____
8    ____  ____  _____
9    ____  ____  _____
10   ____  ____  _____
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24   ____  ____  _____
25

---