1                UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4  IN RE:  CHINESE MANUFACTURED   *      Docket 09-MD-2047
         DRYWALL PRODUCTS         *
5         LIABILITY LITIGATION     *      Section L
                            *
6                            *      New Orleans, Louisiana
                            *
7  Relates to:  All Cases         *      November 16, 2012
    * * * * * * * * * * * * * * *

8

9

10                HEARING ON MOTIONS BEFORE
          THE HONORABLE ELDON E. FALLON
11          UNITED STATES DISTRICT JUDGE

12

13  <u>Appearances</u>:

14  For the Plaintiffs:        Herman Herman & Katz, LLC
                        BY:  LEONARD A. DAVIS, ESQ.
15                    820 O'Keefe Avenue
                        New Orleans, Louisiana 70113

16

17  For the Plaintiffs:        Gainsburgh Benjamin David
                          Meunier & Warshauer, LLC
18                    BY:  GERALD E. MEUNIER, ESQ.
                        1100 Poydras Street, Suite 2800
19                    New Orleans, Louisiana 70163

20

21  For the Plaintiffs:        Seeger Weiss, LLP
                          BY:  SCOTT ALAN GEORGE, ESQ.
22                    77 Water Street
                        New York, New York 10005

23

24  For the Plaintiffs:        Whitfield Bryson & Mason, LLP
                          BY:  DANIEL K. BRYSON, ESQ.
                        900 W. Morgan Street
25                    Raleigh, North Carolina 27603

```
 1   For Interior Exterior         Galloway Johnson Tompkins
     Building Supply, LP:            Burr & Smith
 2                                  BY:   BENJAMIN R. GRAU, ESQ.
                                    701 Poydras Street, 40th Floor
 3                                  New Orleans, Louisiana 70139

 4
     For The North River           Thompson Coe Cousins & Irons, LLP
 5   Insurance Company:            BY:  KEVIN F. RISLEY, ESQ.
                                         BRIAN S. MARTIN, ESQ.
 6                                  One Riverway, Suite 1600
                                    Houston, Texas 77056
 7

 8   For The North River           Lobman Carnahan Batt Angelle
     Insurance Company:             & Nader
 9                                  BY:   SIDNEY J. ANGELLE, ESQ.
                                    400 Poydras Street, Suite 2300
10                                  New Orleans, Louisiana 70130

11
     Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
12                                  500 Poydras Street, HB-406
                                    New Orleans, Louisiana 70130
13                                  (504) 589-7778
                                    Toni_Tusa@laed.uscourts.gov
14

15

16   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
17

18

19

20

21

22

23

24

25
```

**<u>PROCEEDINGS</u>**

**(November 16, 2012)**

(The following proceedings were held in open court.)

**THE COURT:**  Be seated, please.  Good morning, ladies and gentlemen.  I understand we have a few folks on the phone, so please try to use the microphones.

Let's call the case, please.

**THE DEPUTY CLERK:**  MDL 2047, In Re: Chinese Manufactured Drywall Products Liability Litigation.

**THE COURT:**  Counsel, make your appearance for the record, please.

**MR. DAVIS:**  Good morning, Your Honor.  Leonard Davis on behalf of plaintiffs' liaison counsel and the plaintiffs' steering committee.  On behalf of the plaintiffs' side, arguing today will be Jerry Meunier, Dan Bryson, and Scott George.

**MR. RISLEY:**  Good morning, Your Honor.  Kevin Risley from North River Insurance Company, along with Brian Martin and Sidney Angelle.

**MR. GRAU:**  Good morning, Your Honor.  Benjamin Grau for Interior Exterior.

**THE COURT:**  We are here today on a number of motions. I have several *Daubert* motions and also some motions on the question of the standard of knowledge applicable to the case.

I know that some of you have plane problems, and so the first motion that I wanted to take up was the motion for

a continuance.  I have a motion filed by North River for a
continuance.

I might say that because of the number of
motions, I can only give you three hours for them, so we are
going to have to move them fairly fast.

**MR. RISLEY:**  Thank you, Your Honor.  The motion for
continuance is filed on behalf of North River and the
plaintiffs, and it is not opposed by InEx.  They agreed to a
continuance but for a different reason.

The reason we are asking for the continuance is
the Court still has pending before it motions on class
settlements, not just the certification and fairness of both
the InEx and Knauf settlements that were heard on Tuesday, but
also the second amendment to the InEx and Knauf settlements
that has not been heard but is sitting out there pending.

The Court had said when we put this trial
together it was to be a single-issue trial focusing on whether
InEx knew or did not know of the defect in the board that it
sold.  The Court said it was important to have real plaintiffs
involved because they give context to the case, let the jurors
know where the case fit in the real world.

We have that issue right now too.  We don't know
what the context of this trial is.  Is it a bellwether trial on
that one issue?  Or if the second amendment is eventually
approved, is it the classwide damages trial?  I know the Court

| | | |
|---|---|---|
| 09:03:10 | 1 | is familiar with the proposed second amendment, but basically |
| 09:03:11 | 2 | it sets out the high-low agreement between everyone except |
| 09:03:16 | 3 | North River where the damages could be anywhere from zero to |
| 09:03:19 | 4 | $72 million. |
| 09:03:20 | 5 | I have a client asking me 10 days before trial, |
| 09:03:22 | 6 | What is this trial about?  What does it mean? |
| 09:03:24 | 7 | I can't tell them.  I don't know if it's a |
| 09:03:27 | 8 | discrete issue or if we are trying the whole enchilada in one |
| 09:03:33 | 9 | oven. |
| 09:03:33 | 10 | **THE COURT:**  Maybe I can help out on that. |
| 09:03:34 | 11 | Let me mention a couple of things to everybody, |
| 09:03:37 | 12 | both in the courtroom and on the phone.  I'm the MDL Court.  Of |
| 09:03:47 | 13 | course, this case was given to me as an MDL judge on June 15, |
| 09:03:52 | 14 | 2009.  So it's been three years, about, since I had the case, a |
| 09:04:01 | 15 | little over that.  MDL cases involve both individual cases as |
| 09:04:07 | 16 | well as class actions.  This one is the same.  It involves both |
| 09:04:14 | 17 | individuals as well as class actions. |
| 09:04:18 | 18 | In the MDL context, and that's the way I focus |
| 09:04:22 | 19 | on it, what I try to do is to move the case as quickly as I |
| 09:04:28 | 20 | can, as reasonably as I can.  One thing with the MDL is that we |
| 09:04:36 | 21 | all know that under 1407 and the Supreme Court decision in |
| 09:04:41 | 22 | *Lexicon*, the theory of 1407 is that the cases are consolidated |
| 09:04:46 | 23 | before one court, and it is consolidated for the purposes of |
| 09:04:52 | 24 | discovery.  That's what the statute says. |
| 09:04:59 | 25 | Realistically, the history of the MDL has |

| | |
|---|---|
| 09:05:03 | 1 |
| 09:05:07 | 2 |
| 09:05:15 | 3 |
| 09:05:21 | 4 |
| 09:05:25 | 5 |
| 09:05:31 | 6 |
| 09:05:36 | 7 |
| 09:05:43 | 8 |
| 09:05:47 | 9 |
| 09:05:51 | 10 |
| 09:05:55 | 11 |
| 09:06:00 | 12 |
| 09:06:04 | 13 |
| 09:06:07 | 14 |
| 09:06:11 | 15 |
| 09:06:21 | 16 |
| 09:06:27 | 17 |
| 09:06:33 | 18 |
| 09:06:37 | 19 |
| 09:06:43 | 20 |
| 09:06:47 | 21 |
| 09:06:54 | 22 |
| 09:07:00 | 23 |
| 09:07:06 | 24 |
| 09:07:11 | 25 |

involved generally more than simply discovery in the transferee court.  It is not unusual for cases to proceed to some degree of finality before the transferee court.  Discovery leads to some trials perhaps, and then that leads to an analysis of the case.  Many of the cases have found that because of the extended period of discovery, they get enough information from that that they can realistically resolve the case.

The element of bellwether trials has crept into the discussion.  I look around the room and I see many people who were involved in the creation of the bellwether trials.  There was no concept of bellwether trials in MDLs prior to *Propulsid*; there was none prior to *Vioxx*.

With the help of the lawyers, many of whom are in the room, this concept was fashioned.  The purpose of it is to try to make some decision on cases that could or should be tried.  In MDL cases, there are thousands and thousands of them.  You can't start with the lowest number because you may try a hundred cases the same case.  That helps no one.  So the concept of bellwether has crept into it.

The concept is to allow the Court and the lawyers to first analyze the census of the litigation and then to try to look at that census to see whether or not there's any subcategories that that census can be carved into, and four or five generally come out of it.  Then the concept is to try to take a case from each one of those categories and to try it.

09:07:18  1          The problem with the bellwether situation is

09:07:22  2   that you can't try an issue like you can with the class

09:07:25  3   action 23 where you can have a discrete legal issue, try that,

09:07:31  4   and then make that a class issue and applicable to the whole

09:07:40  5   class.  You can't do that with the MDL because there's no

09:07:43  6   consistency and no commonality.  It might be better if you

09:07:48  7   could, but you can't.  So the best you can do is to select some

09:07:53  8   cases and to try those cases.

09:07:57  9          I call them bellwether cases because they are

09:08:02  10   representative or sort of representative of a group.  But I

09:08:09  11   can't say because the jury found for the plaintiff in this

09:08:15  12   group, every case in that group must go to the plaintiff, or

09:08:19  13   because they found for the defendant in that group, everyone in

09:08:22  14   that group must go for the defendant.  It doesn't work that

09:08:26  15   way.

09:08:27  16          So the best you can do with a bellwether is to

09:08:31  17   have it applicable to the cases before you.  If you are going

09:08:37  18   to try one case, it's applicable to that case; if you are going

09:08:41  19   to try four cases, it's only applicable to those four cases.

09:08:44  20   It has nothing to do with the other cases.

09:08:47  21          So why do you do a bellwether case?  Well, you

09:08:50  22   do it so that the lawyers, who are very experienced and very

09:08:55  23   talented in these types of litigation matters, can get some

09:09:03  24   information.  They get information.  Sometimes it's helpful to

09:09:11  25   know how a jury feels about this kind of case.  I used to think

| | |
|---|---|
| 09:09:15 | 1 |
| 09:09:21 | 2 |
| 09:09:26 | 3 |
| 09:09:28 | 4 |
| 09:09:31 | 5 |
| 09:09:35 | 6 |
| 09:09:39 | 7 |
| 09:09:44 | 8 |
| 09:09:48 | 9 |
| 09:09:52 | 10 |
| 09:09:56 | 11 |
| 09:10:00 | 12 |
| 09:10:05 | 13 |
| 09:10:06 | 14 |
| 09:10:09 | 15 |
| 09:10:12 | 16 |
| 09:10:16 | 17 |
| 09:10:19 | 18 |
| 09:10:25 | 19 |
| 09:10:31 | 20 |
| 09:10:40 | 21 |
| 09:10:40 | 22 |
| 09:10:42 | 23 |
| 09:10:48 | 24 |
| 09:10:53 | 25 |

that was the only thing that was valuable, but I've lived with it long enough to know that may not be the most significant value of the bellwether.

The real value of the bellwether is that it gives the lawyers an opportunity to prepare their case, to find out how much it costs to prepare a case, to find how the witnesses act in the case, to find how the jury charges are fashioned, and all of the other exhibits and all of the logistical aspects of the case.

Then they get some information about that. If they try four or five or six bellwethers, they can say, Well, each of these cases cost us $1 million to try or $2 million to try.

In *Vioxx* it was two to three for the defendants, one to two for the plaintiffs. The cases lasted two weeks and three days each. They didn't go for months at a time.

It's a lot of money. But they are bellwethers in the sense that you are trying to find out as much as you can about that particular case and hopefully about that particular category. That's what I have tried to apply in this particular case.

The plaintiffs in this case take the position that InEx is responsible. They are a distributor, and the plaintiffs say that InEx knew and the plaintiffs say InEx should have known that this product was defective.

09:10:57  1          Now, we have tried enough cases here, we have

09:11:00  2     about 10 of them, that I don't see anybody disputing the fact

09:11:04  3     that this drywall is defective.  It puts off gases.  It smells

09:11:10  4     bad.  It creates problems with silver and copper.

09:11:17  5          The question with InEx is they are not a

09:11:22  6     manufacturer, so there has to be some fault involved.

09:11:25  7     Plaintiffs say they knew or plaintiffs say they should have

09:11:27  8     known, and they feel that's the standard.

09:11:30  9          North River says InEx is not liable at all, so

09:11:35  10    why should North River, who is an excess insurer, be asked to

09:11:41  11    pay anything?  InEx may have settled, but North River must feel

09:11:51  12    they made a mistake by settling or they shouldn't have settled.

09:11:55  13    Whatever it is, InEx takes the position that they are not at

09:11:59  14    fault.  It's a factual issue.

09:12:02  15         So what do I do?  First of all, I try to focus

09:12:05  16    you all on the issues.  I appoint a special master to help you

09:12:13  17    discuss it, to sit down and talk about it, and you do.  We have

09:12:19  18    one, maybe two, maybe even three knockdown-dragout sessions

09:12:25  19    that you all participated in, all in good faith.  You gave it

09:12:30  20    your best efforts, and you couldn't resolve the case because of

09:12:34  21    legitimate differences.  North River says InEx is free of

09:12:40  22    fault.  Plaintiffs say InEx is at fault.

09:12:45  23         The best I can do for you, the only thing I can

09:12:47  24    do for you is to try a case and get you some information from a

09:12:54  25    jury, how's the jury feel about this.

09:12:57  1          I don't pick a case.  I ask you all to pick a
09:12:59  2   case.  You say, Well, how can we pick a case?  There's 4,000
09:13:04  3   cases involved or thereabouts from InEx, and we would have to
09:13:09  4   discover every case to really make a good decision.  That would
09:13:13  5   cost so much money that it would just be bad for the system.
09:13:18  6   It makes sense to me.
09:13:22  7          So in these bellwether cases, I try to give you
09:13:25  8   a pool.  I say, You take 10, you take 10, create a pool.  Then
09:13:32  9   from that pool, discover the pool, and get enough preliminary
09:13:37  10  information so that you can pick the cases in that pool that
09:13:41  11  you feel comfortable trying.  Hopefully there's some diversity
09:13:47  12  in it so that you can get some information so you don't just
09:13:50  13  waste time trying the same case.
09:13:54  14          That's the method.  So you meet.  You pick a
09:13:59  15  pool.  Frankly, I had to constantly urge you all to hurry up
09:14:07  16  and pick the pool.  You got the pool, and then you discovered
09:14:09  17  it.  But then you have got to pick the cases for trial from
09:14:14  18  that pool.  Eventually you did that.
09:14:17  19          So I felt originally that we would try one case,
09:14:22  20  see how the jury goes, try another case and see how the jury
09:14:25  21  goes, try another case; three, four different cases before four
09:14:29  22  different juries.
09:14:30  23          You folks say, We can do better than that,
09:14:32  24  Judge.  We can do four at a time.
09:14:34  25          I say, That's fine.  Let's do four at a time,

then.

You get down to four.  That's where we are at this point.

I asked you in the process, Do you want a questionnaire?  Because this is a big thing.  You are trying cases.  This is a big case.  I want to help you as much as I can.

You say a questionnaire would be helpful.  You give me drafts.  You give me drafts.  I look at them.  I tweak them.  I send the drafts to get printed.  I then call over 150 people from the community of 13 parishes and I say, Come to court, sit down and answer this questionnaire.

150 people show up.  They sit down for two hours.  They answer the questionnaire.  I take the questionnaire, I scan it, I immediately send it to the lawyers to look at.  I say, We'll get together in a week and we'll talk about cause challenges.

You folks do that.  You come to court yesterday.  I do all the cause challenges for you with the exception of the ones that may come up during the trial.

So we are ready to try the case now.  I don't feel that this case is going to be applicable to the entire class.  I'm looking at it as an MDL case.  This case will be dispositive on these four plaintiffs.  Only four.  I'm not going to say, because the jury found for these four, none for

the plaintiffs, all for the plaintiffs, two for the plaintiffs, two for the defendants, that's going to be applicable to the entire class.  I don't think it is.  I don't intend it to be. This is an MDL case.  I have 30,000 or thereabout cases.  It has nothing to do with the other cases.

Now, on the side, people make some agreements. It's even not unusual for lawyers to say, I bet you a dollar somebody is going to win this case, or the plaintiff is going to win or the defendant is going to win.

It has nothing to do with the trial.  That's a side bet.  This is a side agreement.  The only thing that may have some relevance is whether or not it's a *Mary Carter* and whether or not it's introducible, whether or not the jury is advised of it.  I don't know.  I haven't even focused on that. But I don't see it affecting this trial.  I don't care what these folks feel, it's applicable or not applicable.  They can agree that if the plaintiffs win one, everybody is going to Rome or to Paris.

MR. RISLEY:  I think, then, the thing to do is deny the second amendment motion and that issue goes away.

Can I respond to two points quickly?

THE COURT:  Sure.

MR. RISLEY:  Number one is we agree with finality and agree with the process.  We believe the bellwether trial gives us information that gets us closer to finality, and that's why

09:18:03  1  we have been a proponent of this from day one.  But as long as

09:18:07  2  the second amendment is out there, we are facing the risk that

09:18:10  3  if we get an adverse result at trial, we are going to have

09:18:13  4  someone standing in front of us -- whether it's Knauf or the

09:18:15  5  plaintiffs, it's not clear, but someone saying, Your insured

09:18:18  6  had agreed to a $72 million or $36 million judgment based on

09:18:22  7  that trial, and you can't contest it.

09:18:24  8          As long as that issue is out there, it puts a

09:18:26  9  big cloud over the trial.  We don't know what we are trying.

09:18:30  10         **THE COURT:**  I understand.

09:18:30  11         **MR. RISLEY:**  The Court expressed some frustration

09:18:33  12  over the timing of the motion.

09:18:34  13         **THE COURT:**  Not at you all.  Don't feel that way.  I

09:18:36  14  think that you all are absolutely super lawyers, all of you.

09:18:40  15         **MR. RISLEY:**  I appreciate that.

09:18:42  16         **THE COURT:**  Take no feeling about that.

09:18:44  17         **MR. RISLEY:**  All of us, despite our differences, are

09:18:46  18  working very hard to get this done.

09:18:48  19         **THE COURT:**  I know that, and you need to know I

09:18:49  20  appreciate that.

09:18:50  21         **MR. RISLEY:**  My concern is we heard Mr. Glickstein,

09:18:52  22  who I believe is here today, on Tuesday tell you once the

09:18:56  23  mediation didn't work in May, Knauf and InEx and the plaintiffs

09:19:00  24  started trying to find a way to get to this point.  They didn't

09:19:03  25  file that motion until October 16, just about a month before

1    trial.

2              Now, we had hoped that on Tuesday we would get

3    some clarification on the class motions and what was going to

4    happen on that.  For understandable reasons, we don't have that

5    yet.  It's really prejudicial to us to go to trial without

6    knowing that.  We obviously would have filed this motion

7    earlier if we could have, but it didn't really mature to this

8    point until Tuesday afternoon.

9              THE COURT:  I understand.

10             MR. DAVIS:  Your Honor, on behalf of the PSC, we have

11   put a trial team together that has worked tirelessly.  They

12   have worked hours upon hours upon hours and have worked into

13   even last night.  We are prepared to proceed as the Court

14   directs.

15             THE COURT:  Thank you very much, both of you all.

16             I've really given this some thought.  I take it

17   seriously.  I understand what North River's concern is, but I

18   don't share that concern, so I'm going to deny the motion for a

19   continuance.

20             Let me talk with you all about the *Daubert*

21   motions.  I've reviewed all the material.  I usually have at

22   this stage the reports themselves, but apparently I don't have

23   the reports that you all are contesting.  I'm ready to rule

24   with or without your oral argument, either way.

25             MR. DAVIS:  Your Honor, I need to clear that up

| | | |
|---|---|---|
| 09:20:45 | 1 | because I'm a little confused.  I believe the reports were |
| 09:20:48 | 2 | filed with our briefs. |
| 09:20:49 | 3 | **THE COURT:**  I didn't see them. |
| 09:20:51 | 4 | **MR. DAVIS:**  I'm concerned if the Court doesn't have |
| 09:20:53 | 5 | them. |
| 09:20:54 | 6 | **THE COURT:**  I didn't have them attached. |
| 09:20:57 | 7 | **MR. BRYSON:**  Your Honor, Dan Bryson for the PSC.  For |
| 09:20:59 | 8 | Mr. Rutila and Dr. Streit, their rebuttal reports, of which |
| 09:21:03 | 9 | they are taking issue, are attached to our papers. |
| 09:21:10 | 10 | **MR. GEORGE:**  Your Honor, Scott Alan George from the |
| 09:21:12 | 11 | PSC.  Dr. Tonyan's report was attached to the PSC's motion to |
| 09:21:16 | 12 | strike. |
| 09:21:17 | 13 | **THE COURT:**  Let me tell you basically what I feel |
| 09:21:21 | 14 | about it with Rosemary Coates.  Rosemary Coates is an expert in |
| 09:21:29 | 15 | supply chain and global manufacturing.  She's written some |
| 09:21:34 | 16 | books on the area.  She's got some experience on it, but she's |
| 09:21:39 | 17 | not a chemist.  She's not a scientist. |
| 09:21:42 | 18 | I don't have any problem with her opining, based |
| 09:21:49 | 19 | on her experience in supply chain and in global manufacturing, |
| 09:21:58 | 20 | what somebody should do or shouldn't do or what they know or |
| 09:22:03 | 21 | should know.  That seems to me to be within her realm. |
| 09:22:09 | 22 | She's vulnerable.  She has some issues that are |
| 09:22:13 | 23 | clear.  She's never been to a drywall plant.  She's got some |
| 09:22:25 | 24 | experience in building materials, but it's a lot different. |
| 09:22:30 | 25 | That's clear.  And the experience may or may not be limited, |

| | |
|---|---|
| 09:22:34 | 1 | but that's a question of cross-examination. I think that |
| 09:22:41 | 2 | that's the way that that should be handled. |
| 09:22:44 | 3 | I don't see her testifying as to the brittleness |
| 09:22:51 | 4 | or the heaviness. I don't have any problem with the 703 |
| 09:22:57 | 5 | situation. But a person who, let's say, is an economist can't |
| 09:23:04 | 6 | use an X-ray technician's report or a roentgenologist's report |
| 09:23:12 | 7 | and conclude that the bone is broken. I don't have any problem |
| 09:23:16 | 8 | if a doctor uses a roentgenologist's report and says the bone |
| 09:23:21 | 9 | is broken. The doctor is an orthopedist, and he didn't take |
| 09:23:27 | 10 | the X-ray. He doesn't take X-rays, but he is an expert in |
| 09:23:34 | 11 | medicine, so to use the report is okay. |
| 09:23:39 | 12 | This person is not a chemist. For her to say |
| 09:23:42 | 13 | that because somebody who is a scientist says that it's brittle |
| 09:23:48 | 14 | and, therefore, it's defective or whatever it is, or it's heavy |
| 09:23:52 | 15 | or light, therefore, it is heavy or light, that to me -- so I |
| 09:23:58 | 16 | grant the motion. I would deny the motion to exclude her but |
| 09:24:06 | 17 | grant the motion to limit her testimony and exclude her |
| 09:24:13 | 18 | testifying about the brittleness or the makeup of this |
| 09:24:18 | 19 | particular drywall. That's the way I see that situation. |
| 09:24:23 | 20 | MR. RISLEY: I appreciate it, Your Honor. I would |
| 09:24:24 | 21 | like to clarify one point. All of her opinions that the Court |
| 09:24:28 | 22 | would admit, then, go to her opinions as to what an importer |
| 09:24:31 | 23 | should do. There are no importation claims in this case. This |
| 09:24:35 | 24 | is a redhibition claim against a seller. |
| 09:24:38 | 25 | THE COURT: Well, that's really not totally right. |

09:24:41  1   She's represented or at least advised some people who are both
09:24:45  2   manufacturers and distributors.  Some of them distribute their
09:24:50  3   own manufacturing things.
09:24:53  4          She equates the distribution chain and
09:25:01  5   interprets that broadly, and she feels that that's within her
09:25:08  6   purview.  She's well recognized, apparently, in the field of
09:25:15  7   supply chain, global manufacturing, and she feels that that's
09:25:19  8   part of it, the distribution aspect.  That's the way I read it.
09:25:24  9          **MR. RISLEY:**  It's certainly clear she takes a very
09:25:26  10  broad view of that, but that's not what is at issue in this
09:25:29  11  case, is our view.
09:25:31  12          **THE COURT:**  I understand that.
09:25:33  13          **MR. RISLEY:**  Thank you, Your Honor.
09:25:33  14          **THE COURT:**  You can make that argument very clear in
09:25:36  15  cross-examination.
09:25:37  16          So I would deny in part and grant in part.  I
09:25:43  17  deny excluding her and grant limiting her testimony to her
09:25:52  18  expertise and deny her the opportunity to utilize a scientist's
09:25:59  19  report to make some scientific conclusions.
09:26:03  20          Johnny Odom, he is the chief building inspector
09:26:11  21  for the City of New Orleans.  Now, the plaintiffs take the
09:26:13  22  position that they're calling him as a fact witness.  Prior to
09:26:19  23  the amendment to 702 and prior to the amendment to 701, that
09:26:32  24  might have been able to be done.  But 701 led to so many
09:26:39  25  problems that 702 experts were being offered under 701 simply

09:26:50  1   because they worked for the defendant.  I saw some cases where

09:26:54  2   a defendant's in-house expert was put up as a 701 and they

09:27:03  3   testified just like a 702; but since they were 701, they didn't

09:27:10  4   have to give a report.

09:27:12  5               The amendment says that 701 is not applicable if

09:27:20  6   the information is scientific, technical, or other specialized

09:27:28  7   knowledge.  A building inspector has to have some specialized

09:27:36  8   knowledge.  Otherwise, why is he a building inspector?  Why

09:27:40  9   don't they just get somebody off the street and say, Go inspect

09:27:44  10  the building and give us what you think about it.

09:27:47  11              So he has some specialized knowledge.  Otherwise

09:27:52  12  we are overpaying the guy.  Therefore, he has to give reports.

09:28:01  13  The defendants say the fellow didn't give a report.  They don't

09:28:05  14  have anything from him.  To me that's a legitimate objection.

09:28:13  15  He may be able to take the stand and say he is a building

09:28:20  16  inspector.  I don't know where you go with that.

09:28:23  17              MR. MEUNIER:  May I be heard, Your Honor?

09:28:24  18              THE COURT:  Sure.

09:28:25  19              MR. MEUNIER:  Jerry Meunier for plaintiffs.  Judge,

09:28:27  20  this raises a distinction which we have had before, as you well

09:28:31  21  know, in *Vioxx*, I know we also had it in *FEMA Trailer*, the

09:28:37  22  distinction being between a retained and nonretained expert.

09:28:41  23  So in *Vioxx*, for example, there's an FDA official who certainly

09:28:46  24  is offering more than lay testimony.  He is talking about

09:28:49  25  things that directly grow out of his position.  In *FEMA Trailer*

| | |
|---|---|
| 09:28:54 | 1 |
| 09:28:58 | 2 |

we had a doctor from a federal agency who had come in and done
some testing of the trailers.

So these are not individuals that either side is
in a position to hire, to pay, and to get a report from.  I've
always considered there to be, in the federal practice, an
allowance of nonretained expert testimony.  I think
Judge Engelhardt limited it in *FEMA* when the opinion grows out
of the position.  In other words, you can't just bring in an
official and say, Tell me what you think about the case.

But if you have a witness who is testifying
about specialized knowledge that grows directly out of his
position of responsibility, he hasn't been retained, he hasn't
written an expert report, I thought that distinction would
continue to apply.  That would seem to fit Mr. Odom.

**THE COURT:**  I appreciate that clarification.  I'm
going to grant the motion to exclude.

Timothy Tonyan, the plaintiff attacks part of
his qualifications.  You really are disagreeing with his
conclusion.  You don't like what he is saying.  Also, I think
you feel that since the defendant has made all these motions
about your expert, you all really ought to shoot at their
expert.  Why give them a free ride?  But I think he is
qualified, and I'm going to deny the motion.

I'm going to deny the motion on the others, too,
Dean Rutila and Lori Streit.

09:30:47  1    Lori Streit is different than the first person,
09:30:56  2  Rosemary Coates.  She's a scientist, has some scientific
09:31:03  3  information or background, and it's not unusual for one person
09:31:07  4  to utilize the report.  703 says that you can, but she has to
09:31:12  5  be an expert.  If you qualify her as an expert, she can use
09:31:17  6  somebody else's report and opine.
09:31:19  7    We are dealing with the rebuttal situation.  By
09:31:24  8  then I will have a better feel for it, but my feeling at this
09:31:27  9  time is I'm going to deny the motion to exclude her.
09:31:33  10    **MR. GRAU:**  Your Honor, if I may, on Ms. Streit just
09:31:35  11  for a moment.  Ben Grau on behalf of Interior Exterior.  I
09:31:39  12  certainly appreciate your position that she's a chemist and
09:31:42  13  therefore can rely on other chemists or on other opinions
09:31:45  14  within that scientific field, but I do think that the case law
09:31:51  15  under 703 makes it clear that she has to undertake some effort
09:31:54  16  to verify the information that she's relying upon.  She freely
09:31:58  17  admits in her deposition that she undertook no such effort.  I
09:32:03  18  won't argue it any more than that, but I do want to make that
09:32:07  19  point for the record.
09:32:09  20    **THE COURT:**  I think that that's a legitimate point.
09:32:12  21  It goes to her credibility.  It focuses on whether she is solid
09:32:23  22  in the basis of doing it.
09:32:25  23    We get that a lot of times with doctors, too,
09:32:28  24  from the standpoint of looking at the X-ray, and then the
09:32:33  25  correct question is, Have you ever taken an X-ray?  They

| | |
|---|---|
| 09:32:36 | 1 |
| 09:32:42 | 2 |
| 09:32:47 | 3 |
| 09:32:47 | 4 |
| 09:32:49 | 5 |
| 09:32:53 | 6 |
| 09:32:56 | 7 |
| 09:32:59 | 8 |
| 09:33:02 | 9 |
| 09:33:06 | 10 |
| 09:33:09 | 11 |
| 09:33:12 | 12 |
| 09:33:16 | 13 |
| 09:33:17 | 14 |
| 09:33:19 | 15 |
| 09:33:21 | 16 |
| 09:33:22 | 17 |
| 09:33:24 | 18 |
| 09:33:28 | 19 |
| 09:33:35 | 20 |
| 09:33:38 | 21 |
| 09:33:39 | 22 |
| 09:33:45 | 23 |
| 09:33:51 | 24 |
| 09:33:54 | 25 |

haven't.  What do you make of it?  So I understand the objection, but I don't find that it's --

        **MR. GRAU:**  I appreciate that.

        One clarification, if I can.  I think Your Honor said that it's rebuttal testimony and that we will know more when we get to that point in the trial.  I do want to make clear, at least clarify that what Your Honor means by that is Ms. Streit is not to render these opinions in her direct examination in the plaintiffs' case insofar as they are not contained in her original report but are, in fact, rebuttal opinions that would only come in after the defendants' experts.

        **THE COURT:**  I thought she sent a rebuttal report and that was the deal.

        **MR. GRAU:**  It is a rebuttal report.  That's how I understood, Your Honor, and how the rule works.

        **THE COURT:**  What's your situation?

        **MR. BRYSON:**  Your Honor, Dan Bryson again for the PSC.  We certainly disagree with the representations Mr. Grau was making.  We do think that verification of Ms. Luckevich's opinions were rendered.  They have worked together now for years, since 2009.

        Now that we have seen from their expert reports their view of the world in the case, Dr. Streit has given some opinions about that, and we certainly think now that they know there's opinions, they have had a long deposition about those

| | | |
|---|---|---|
| 09:33:58 | 1 | opinions, within the context of our trial strategy, we ought to |
| 09:34:01 | 2 | be able to decide how we want to present our case. |
| 09:34:04 | 3 | THE COURT:  I understand and I agree with that. |
| 09:34:07 | 4 | She's going to testify. |
| 09:34:10 | 5 | MR. GRAU:  Testify in her direct examination, |
| 09:34:12 | 6 | Your Honor? |
| 09:34:12 | 7 | THE COURT:  Sure. |
| 09:34:14 | 8 | MR. MEUNIER:  Your Honor, I'm a little confused now |
| 09:34:16 | 9 | when counsel talks about rebuttal.  Let me seek some |
| 09:34:21 | 10 | clarification.  In the expert report process, we had original |
| 09:34:24 | 11 | and rebuttal reports.  We are not talking about the defendant |
| 09:34:27 | 12 | resting and then -- |
| 09:34:29 | 13 | THE COURT:  I understand.  No.  I hopefully clarified |
| 09:34:33 | 14 | that.  She can testify at any time. |
| 09:34:39 | 15 | MR. MEUNIER:  As part of our case in chief. |
| 09:34:40 | 16 | THE COURT:  As part of your case in chief. |
| 09:34:43 | 17 | MR. GRAU:  Thank you, Your Honor. |
| 09:34:47 | 18 | The other motions that I have dealt with, I read |
| 09:34:55 | 19 | the briefs on the standard of care.  It seems to me that the |
| 09:35:02 | 20 | article that we are dealing with, the codal article, 2531, says |
| 09:35:06 | 21 | "a seller who did not know" and talks about "the seller knew or |
| 09:35:12 | 22 | didn't know." |
| 09:35:16 | 23 | The defendants take the position that that's |
| 09:35:20 | 24 | clear, *knowledge* meaning what they knew, that's clear, and you |
| 09:35:29 | 25 | don't need to go any further than that.  Defendants say, Let's |

look at the cases.

There are about 20 cases that have dealt with some of this.  They say *know* is surely a word, *know*, K-N-O-W, but they talk about what they knew in a broader way than actuality.  They talk about inspecting.  They talk about the cases say they could have inspected; they didn't.  It was open and obvious, and for them to say they don't know is not accurate.

The Supreme Court hasn't spoken on the issue, but I look to *Erie*.  To some extent I make an *Erie* guess because the Supreme Court hasn't spoken.  But there's so many places, both district and appellate courts and the court of appeal in the state system that have expanded the *know* to know or could have known or should have known.  That's the way I see it.  It's a broader standard than just *know*.  I understand that.

Here's a person who takes the stand and says, I didn't know.  Who is going to say they did know other than what they could have known or should have known?  If they say, It's so open and obvious, well, I didn't look at it or I didn't know or -- I don't know how you can just say something is knowledge, be that specific.

I understand the defendants' position, and it certainly is part of the briefing, but I'll --

**MR. RISLEY:**  I would like to be heard on that because

| | | |
|---|---|---|
| 09:37:26 | 1 | this is a very basic point for this trial, obviously. |
| 09:37:30 | 2 | THE COURT:  Sure.  I understand. |
| 09:37:30 | 3 | MR. RISLEY:  We think that both the Louisiana |
| 09:37:32 | 4 | Supreme Court and this Court have spoken on the issue.  This |
| 09:37:48 | 5 | Court had a 12(b)(6) motion in a redhibition case where the |
| 09:37:52 | 6 | allegations were knew or should have known, and the Court said |
| 09:37:55 | 7 | to the extent they allege knowledge, they stated a claim for |
| 09:37:58 | 8 | relief.  I take that to mean the "should have known" didn't |
| 09:38:02 | 9 | state a claim, but it's the Court's opinion so the Court is |
| 09:38:02 | 10 | probably more qualified on that than I am. |
| 09:38:03 | 11 | I went through the 16 cases in the brief and put |
| 09:38:10 | 12 | together -- it's not very formal.  If I may. |
| 09:38:14 | 13 | THE COURT:  That's all right.  Let me see it. |
| 09:38:22 | 14 | MR. RISLEY:  Because I found it interesting, when the |
| 09:38:24 | 15 | plaintiff cited those in their brief, they didn't provide any |
| 09:38:28 | 16 | detail about any of the cases.  I want to give the Court some |
| 09:38:31 | 17 | of that detail.  I gave somebody a copy with my notes on it, I |
| 09:38:33 | 18 | believe.  Would you like to have one? |
| 09:38:39 | 19 | THE COURT:  I have one here.  I'm sorry.  Here, you |
| 09:38:45 | 20 | want to swap it?  Let me give you that one.  I didn't see that, |
| 09:38:49 | 21 | but I do see some writing on it. |
| 09:38:56 | 22 | MR. RISLEY:  Out of those 16 cases, with four |
| 09:39:00 | 23 | exceptions, either there was no redhibition liability, so |
| 09:39:04 | 24 | obviously the claim of lower standard didn't mean anything, or |
| 09:39:07 | 25 | the defendant didn't even raise that issue.  It came up only in |

09:39:10  1    connection with the attorneys' fees.

09:39:13  2         The four cases that did find liability using

09:39:16  3    that language, three of them involved situations -- the

09:39:18  4    *Spillers* case, *Lacey*, and *Wade* -- where the seller actually did

09:39:24  5    something to the product.  In the *Spillers* case, they added a

09:39:28  6    second axle so they could use it in some specialized process.

09:39:33  7    In *Lacey* it was a used vehicle they did substantial renovations

09:39:36  8    to.  In *Wade* they installed a windshield that leaked.

09:39:41  9         In each of those cases, the Court looked not at

09:39:43  10   what they knew or should have known, but their conduct was the

09:39:45  11   source of the defect.  The one exception to that is the *Meche*

09:39:49  12   case, which is another car case.  The facts in that case were

09:39:52  13   that the defendant, in fact, did an inspection and saw stuff

09:39:57  14   that anybody with experience in bodywork would know.  That's

09:40:00  15   what I call turning the blind eye to an obvious defect.

09:40:04  16        **THE COURT:**  Isn't that another way of saying he

09:40:06  17   should have known?

09:40:07  18        **MR. RISLEY:**  Under those facts, because they did an

09:40:09  19   inspection, and anybody that knew what they were doing and did

09:40:12  20   that inspection would have seen that.  So if you do an

09:40:14  21   inspection, you can't ignore what you find.  I have no problems

09:40:17  22   with that.

09:40:18  23        The law is clear, though, that there is no duty

09:40:21  24   on a seller to inspect for hidden defects.  Very clearly, this

09:40:25  25   is a latent defect.  The sulfur is in there, and it wasn't

| | | |
|---|---|---|
| 09:40:29 | 1 | until it was installed in houses that it began to off-gas.  I |
| 09:40:34 | 2 | don't think there's anyone that says you can look at the |
| 09:40:36 | 3 | drywall and see there's excess levels of sulfur in there.  So |
| 09:40:39 | 4 | those cases that have used *they should have known* involved |
| 09:40:43 | 5 | substantially the facts we have here. |
| 09:40:45 | 6 | We think it's significant that in the |
| 09:40:46 | 7 | redhibition statutes itself, in Article 1998, with nonpecuniary |
| 09:40:51 | 8 | damages, they used a *should have known* standard.  So if you can |
| 09:40:55 | 9 | establish a redhibition defect, then you can get to knew or |
| 09:41:01 | 10 | should have known. |
| 09:41:02 | 11 | I think it does damage to the legislature's |
| 09:41:07 | 12 | plan, when they use *know* in one section and *should have known* |
| 09:41:14 | 13 | in the other section, to say they're the same thing.  I know we |
| 09:41:15 | 14 | have briefed that and the Court's read it, but I feel pretty |
| 09:41:15 | 15 | strongly about this. |
| 09:41:15 | 16 | THE COURT:  I do appreciate that, and I recognize it. |
| 09:41:16 | 17 | MR. GRAU:  Your Honor, if I may be heard briefly on |
| 09:41:18 | 18 | this issue as well.  We briefed the issue, and we do think the |
| 09:41:24 | 19 | language of the statute is clear, the codal article is clear. |
| 09:41:28 | 20 | We certainly don't disagree with the fact there is a |
| 09:41:30 | 21 | *should have known* standard or language that is used in some of |
| 09:41:33 | 22 | these cases.  It's clear that will be the standard that's |
| 09:41:36 | 23 | presented.  But what's not clear is what the *should have known* |
| 09:41:40 | 24 | means, and that's really at the heart, I think, of the issue |
| 09:41:43 | 25 | and really what we need clarification on today. |

09:41:47  1         Louisiana law is clear, as Mr. Risley pointed
09:41:50  2  out, that a seller has absolutely no duty to investigate and
09:41:55  3  find hidden or latent defects.  There's a laundry list of cases
09:42:00  4  citing that, and plaintiffs have cited absolutely no cases to
09:42:03  5  the contrary on that point.
09:42:04  6         The cases that do find *should have known* are
09:42:09  7  based upon defects that are obvious based upon a visual
09:42:14  8  inspection of the product.  We have cited several of these
09:42:17  9  cases, and plaintiffs themselves cite several of these cases.
09:42:19  10  I think the most telling of those cases is the *Martin* case that
09:42:22  11  the plaintiffs cite.  This is a case where diesel fuel is sold
09:42:27  12  and the diesel fuel has water mixed into it.  They try to hold
09:42:31  13  the seller liable in bad faith for redhibition.
09:42:35  14         What the court says is that, first off, the
09:42:37  15  nonmanufacturing seller is only liable if they knew or should
09:42:40  16  have known of it.  They have no duty to investigate, to
09:42:43  17  determine the hidden defect in that diesel fuel.  And when
09:42:47  18  simple visual observation of the diesel fuel does not reveal
09:42:50  19  the defect, the seller cannot be found liable in bad faith.
09:42:55  20         Based upon that standard, the plaintiffs create
09:42:58  21  an entire new body of law.  They don't just say based upon
09:43:03  22  visual observation of this, like in the *Martin* case or like in
09:43:06  23  the *Meche* case; but they instead want to place the affirmative
09:43:09  24  burden upon a seller, a nonmanufacturing seller, to discover
09:43:16  25  any discoverable defect in the product, and those are the

09:43:19  1    questions that they are asking of our experts.

09:43:22  2                Is a seller obligated to discover anything that

09:43:26  3    is discoverable in the product, which would include the

09:43:30  4    extensive chemical analytical testing that was required in this

09:43:33  5    case to discover the very defect that's at issue?

09:43:37  6                The plaintiffs argue that the nonmanufacturing

09:43:39  7    seller has an obligation to audit the manufacturing process and

09:43:42  8    facilities, to literally get on a plane and fly to China and

09:43:47  9    walk around and look at the manufacturing facility.  And then

09:43:49  10   they take it one step further and say, You have a duty to

09:43:52  11   inspect the mine where the raw material is gathered for that

09:43:57  12   manufacturer.  They have a duty to verify the test reports.

09:44:00  13   They have a duty to perform independent testing.  They have a

09:44:03  14   duty to take every precaution necessary to ensure the quality

09:44:06  15   assurance and quality control of the product.

09:44:11  16                The plaintiffs' simple argument is that a

09:44:12  17   nonmanufacturing seller is charged with constructive

09:44:14  18   knowledge -- should have known -- any time they had an

09:44:17  19   opportunity to discover any latent defect that is in any way

09:44:21  20   discoverable by any type of testing.

09:44:24  21                That clearly is not the law in Louisiana.  If

09:44:28  22   that's the standard we are going forward with in this trial,

09:44:30  23   then we will be here for two weeks or perhaps more listening to

09:44:36  24   countless experts talking about everything a seller should have

09:44:42  25   done when the law is clear, you have no duty to investigate.

09:44:44  1          The only way you can be charged with
09:44:46  2   constructive knowledge is in two instances:  If you undertake
09:44:49  3   to repair or assemble or do something to the product yourself,
09:44:52  4   which clearly is not at issue here; or if there is something
09:44:57  5   visibly wrong with the product that is the defect, if the
09:45:00  6   defect is visibly observable to you.
09:45:05  7          The *Martin* case is right on point here,
09:45:07  8   Your Honor, in terms of what it means to say the seller should
09:45:10  9   have known.  Your Honor, at least I would ask that we could get
09:45:15  10  some clarification as to what it means to say *should have*
09:45:18  11  *known*.
09:45:19  12          **THE COURT:**  One thing that's a little different in
09:45:21  13  this case that you don't see in the other cases -- I think your
09:45:25  14  argument would be stronger if we were talking about one sheet
09:45:29  15  of drywall or maybe even two sheets of drywall, and no other
09:45:33  16  drywall was defective but these two sheets.  That would be an
09:45:39  17  argument that I think you could make.
09:45:41  18          The problem that this case poses is that there
09:45:45  19  are thousands of sheets of drywall.  They are stored in
09:45:50  20  warehouses before they are sold in the same environment that
09:45:56  21  they are going to be placed in.  There's some testimony that I
09:46:01  22  have heard in the other cases that these off-gases are noted or
09:46:09  23  available or could be noted in the warehouses as well as the
09:46:13  24  houses.  I don't know what the evidence is going to show in
09:46:16  25  this particular case.  But the product, the thousands of sheets

| | |
|---|---|
| 09:46:22 | 1 |
| 09:46:30 | 2 |
| 09:46:33 | 3 |

over a longer period of time than just one sheet puts a little

different situation in this particular case that I'm struggling

with.

**MR. GRAU:**  Your Honor, perhaps we don't disagree that

the plaintiffs should be able to put forward evidence of things

that we actually knew, like it might have smelled in the

warehouse where we stored it here in New Orleans; or people

complained about certain things about that product and,

therefore, we should have known.

That's different than saying, before we ever

bought this product, here's a laundry list of 20 things we

should have done to investigate this product to determine

whether or not it had an unknown, unheard of, latent defect in

it.  That's really a big difference.

**THE COURT:**  I take your point.  I understand it.  The

issue that's presented here also with that scenario is if you

are going to buy thousands of sheets of drywall, is it

different than if you are just going to buy one sheet of

drywall, and do you have any historical or customary -- what do

your colleagues do when they are going to buy 10,000 sheets of

drywall?  What's the industry standard when you are going to do

that?  Do you just say, Send them in, or do you kind of

scrutinize it?  I don't know the answer to it.  But there's

some suggestion, at least in the briefs that I have looked at,

that makes some reference to that.

09:48:09 1          Let me hear from the plaintiffs, and then I will

09:48:11 2     give you all an opportunity to rebut.

09:48:14 3          **MR. GRAU:**  Thank you, Your Honor.

09:48:17 4          **MR. MEUNIER:**  Your Honor, after hearing that

09:48:18 5     argument, I don't know whether I'm debating in advance a JNOV

09:48:24 6     after a verdict or a motion in limine.

09:48:26 7          So let's get back to the motion.  The question

09:48:28 8     presented by these motions in limine is a legal question.  The

09:48:33 9     legal question is, under 2545, is a plaintiff in redhibition

09:48:40 10    who seeks damages and/or fees from a seller "with knowledge"

09:48:45 11    obliged to show actual knowledge or will proof of constructive

09:48:49 12    knowledge suffice?

09:48:52 13         The answer, as the Court has noted, is provided

09:48:55 14    in a long series of jurisprudential cases interpreting the word

09:49:03 15    *knowledge* as it appears in the article.  These cases have

09:49:06 16    studied the ancient Roman and French civilian roots of

09:49:10 17    redhibition.  They have emphasized that this is a proconsumer

09:49:13 18    remedy distinguished from the common law which emphasizes

09:49:18 19    caveat emptor.  They have said that the whole fundamental

09:49:21 20    purpose here is to protect the buyer against undisclosed

09:49:26 21    defects.  After all that analysis, this long line of cases has

09:49:28 22    said that proof of constructive knowledge is sufficient for

09:49:31 23    2545 liability.

09:49:33 24         As a matter of policy, if the defendants were

09:49:37 25    right about limiting this to actual knowledge, you would

convert this into a fraud statute, and sellers would only be
liable if they were going to jail because they actually knew
something was bad and sold it anyway.  As you said, the
difficulty of proof would be enormous.  So all of that would be
fundamentally consistent with the purpose of redhibition.

It is truly rare in my career to be able to
stand in front of this Court and tell you that our position in
this is supported by no less than 16 reported Louisiana cases,
including the *Spillers* case, the Louisiana Supreme Court case,
including two Louisiana appellate cases in which the
Supreme Court denied review.  It's also supported by a
Fifth Circuit case in the U.S. system and three Eastern
District cases.  So I really don't see how, on the legal
question of constructive fault, there's a debate.

Now, in face of that overwhelming authority,
here's what I hear the defendants doing.  They depart from the
strict motion in limine legal question argument and they say,
Well, Judge, let's talk about the factual scenarios in which
*should have known* can be proven.

Judge, it's a little bit like saying, Let's
debate whether the *reasonable man* standard applies to this
negligence case.  But, oh, let's not stop there.  In advance of
trial, let's try to have the Court tease out the facts of all
the *reasonable man* cases and build a fence factually around
what the plaintiffs have to prove.

|          |    |                                                                          |
|----------|----|--------------------------------------------------------------------------|
| 09:51:05 | 1  | Insofar as that is concerned, you cannot, from                          |
| 09:51:08 | 2  | these 20 or so reported cases, even construct a factual line to         |
| 09:51:15 | 3  | draw.  It will be up to the jury to decide the question that            |
| 09:51:18 | 4  | counsel asks, which is, Judge, how do we know what *should have*        |
| 09:51:21 | 5  | *known* means?                                                           |
| 09:51:22 | 6  | Well, *should have known* applies as the legal                          |
| 09:51:24 | 7  | standard.  The jury will decide whether *should have known* is          |
| 09:51:27 | 8  | satisfied by the proof.                                                  |
| 09:51:29 | 9  | Insofar as the duty to inspect, we have cited                           |
| 09:51:35 | 10 | the *Boos* case, for example, in which an auto dealer was found         |
| 09:51:37 | 11 | by the Court to have a duty to find out that there was prior            |
| 09:51:42 | 12 | damage with the vehicle being sold.  Why?  Because that was the         |
| 09:51:45 | 13 | position and that was the reasonable expectation of the user.           |
| 09:51:48 | 14 | Rosemary Coates is an expert on supply chain.                           |
| 09:51:53 | 15 | She says, I've never, ever advised a client who is going to             |
| 09:51:59 | 16 | source for the first time from a Chinese plant a product, a             |
| 09:52:06 | 17 | building material, and not advise that they go to the plant or          |
| 09:52:10 | 18 | send someone to the plant, smell what there is to be smelled,           |
| 09:52:14 | 19 | check out the raw materials.  It's appalling to her that this           |
| 09:52:18 | 20 | happened.                                                                |
| 09:52:19 | 21 | I'll also tell you this, Judge.  In this case                           |
| 09:52:22 | 22 | InEx even took steps to undertake the duty to inspect.  They            |
| 09:52:28 | 23 | contacted a company called SGS and told them in repeated                |
| 09:52:32 | 24 | e-mails, Please go to the plant.  We want you to go to the              |
| 09:52:34 | 25 | plant.  We want you to be there during the production process.          |

| | | |
|---|---|---|
| 09:52:37 | 1 | So for InEx to say, Gee, this duty to inspect is |
| 09:52:40 | 2 | never heard of, or how could we ever be expected to do that, |
| 09:52:45 | 3 | that's not going to be the evidence in this case.  There was a |
| 09:52:48 | 4 | reasonable expectation that this professional distributor of |
| 09:52:51 | 5 | building materials would have conducted a fair and reasonable |
| 09:52:55 | 6 | inspection. |
| 09:52:56 | 7 | So, Judge, much of what we are debating now |
| 09:52:59 | 8 | could be parked on the other side of the verdict.  And if InEx |
| 09:53:03 | 9 | feels after the verdict, if there's one in favor of the |
| 09:53:06 | 10 | plaintiffs, that *should have known* as the standard has not been |
| 09:53:09 | 11 | satisfied, couldn't have been found by a reasonable jury under |
| 09:53:11 | 12 | the facts, they have motion practice available to them.  But as |
| 09:53:14 | 13 | far as the motion in front of you, I think the Court is correct |
| 09:53:17 | 14 | that the standard is constructive knowledge as well as actual. |
| 09:53:19 | 15 | Thank you. |
| 09:53:23 | 16 | **MR. RISLEY:**  Your Honor, I would like to respond to |
| 09:53:24 | 17 | two points. |
| 09:53:25 | 18 | **THE COURT:**  Sure. |
| 09:53:26 | 19 | **MR. RISLEY:**  One, the Court raised the question that |
| 09:53:28 | 20 | this is a little bit different because it involves a larger |
| 09:53:32 | 21 | amount of sheets than one tank of gas.  First off, I don't |
| 09:53:34 | 22 | think the redhibition statute bases liability on volume.  It |
| 09:53:38 | 23 | talks about a seller. |
| 09:53:39 | 24 | Secondly, I think the legislature dealt with |
| 09:53:43 | 25 | that situation in the Louisiana Products Liability Act where a |

manufacturer has responsibility for that.  The legislature
chose not to include sellers in the liability act, and we think
it would be an abuse of the redhibition statute to broaden it
to do that.

Now, the second point, I understand why
Mr. Meunier wants to stay away from the facts, because it's not
good for them.  I think what we are trying to do is limit
testimony that shouldn't go before the jury.

I think if there was testimony that InEx went
into its warehouse and said, This stuff smells bad.  There must
be something wrong with it.  Let's sell it before anybody finds
out, that should come in.  You're not going to hear that,
though.  I'm not aware of any testimony that anybody -- InEx,
its customers, the delivery men, anybody -- reported a smell
until long after they stopped selling it.

What they want to go and say is, Your customers
didn't like this because it was brittle and heavy and,
therefore, you should have tested it.  If you tested it, you
would have found there was sulfur in there.

In all the cases they cite and talk about that
involve a defect, what's obvious is the defect.  For example,
in the car case, when they inspected the car, they saw
something.  That was the defect that later formed the
redhibition claim.

The redhibition claim here is not based upon the

weight or brittleness of the board.  So what they are going to try to do is say that because of the weight and brittleness, you should inspect it for sulfur, and there's no relationship there.  They won't have any testimony that relates to those two.  Rosemary Coates tried to say that we are relying upon Ms. Luckevich.  I think the Court quite properly struck that out.

I'll use this analogy:  If I am a car dealer and I take the car in on trade and the engine knocks and I sell it and it turns out the block was cracked, I think there's potentially some liability there.  If, however, the paint on the back of the trunk is chipped, that doesn't put me on notice there might be an engine problem.

What they are trying to do is take -- it's not even a defect, it's a heavier, brittle board, and say, Because your customers didn't like the board, you should have figured out there was something nobody knew about.

So I know we are ruling in the abstract here, but if there's going to be *should have known* testimony, it must relate to the defect and not other issues with the board.

THE COURT:  Okay.

MR. GRAU:  Your Honor, I will try and be brief.  I hope I'm not beating a dead horse.  I certainly understand Your Honor's inclination to rule.

THE COURT:  I just told you that so that you could

| | |
|---|---|
| 09:56:19 | 1 |
| 09:56:22 | 2 |
| 09:56:25 | 3 |
| 09:56:31 | 4 |
| 09:56:31 | 5 |
| 09:56:32 | 6 |
| 09:56:34 | 7 |
| 09:56:37 | 8 |
| 09:56:43 | 9 |
| 09:56:46 | 10 |
| 09:56:50 | 11 |
| 09:56:53 | 12 |
| 09:56:56 | 13 |
| 09:56:58 | 14 |
| 09:57:01 | 15 |
| 09:57:03 | 16 |
| 09:57:06 | 17 |
| 09:57:10 | 18 |
| 09:57:12 | 19 |
| 09:57:15 | 20 |
| 09:57:20 | 21 |
| 09:57:23 | 22 |
| 09:57:28 | 23 |
| 09:57:29 | 24 |
| 09:57:33 | 25 |

argue to me.  I'm going to take this under advisement and look at it in light of what you all have told me, and I'm going to write something on it.

     **MR. GRAU:**  I appreciate that, Your Honor.  Perhaps this might not even be the correct procedural vehicle for this. In essence, what we are asking, Your Honor, is what's the charge the jury is going to get at the end of the day?

     Mr. Meunier says that you just charge the jury, put the question of *should have known* before the jury, and let them tell us what that standard means based on all these facts, but you would never do that in a negligence case.  You would never say to the jury, Do you find that the defendant is negligent, without telling them what does negligence mean, and that's really what we are asking.

     I'm not hear to argue the facts.  I can certainly argue the facts, like Mr. Risley, in terms of what Interior Exterior did or didn't or what they knew and should have known.  That's not the purpose of this motion.

     This motion is simply to get the standard that's applicable.  What does it mean to say to the jury, Did Interior Exterior know or should they have known of this defect, and what are the duties that are incumbent upon them?

     The final point I want to make here, Your Honor, is this is a trial limited to redhibition.  We have made that point.  I'm sure Your Honor got tired of reading it in every

single one of the briefs we filed.

The purpose of making that point is Interior Exterior may have some sort of liability outside of redhibition under a negligence standard as an importer of this product, and maybe there are things that they should have done, or at least the plaintiffs can argue there are things they should have done as an importer.  But that's a negligence case; that's not a redhibition case.

The plaintiffs chose not to bring that negligence case.  The reason they chose not to bring that case is because then we have the liability of Knauf on the table and comparative fault and apportionment of fault.  That's not the case they wanted to try.

They wanted to put Interior Exterior into a box and say, We are only going to try you on redhibition.  If we find that you are a bad faith seller, we believe, the plaintiffs, that there is solidary liability, you get no pass-through rights, there is no comparative negligence, and you are responsible for all these damages.  As a consequence, that's going to scare North River into ponying up their money to make this thing go away.

That's the box they put themselves in.  They then are constrained by the standard in redhibition.  They can't morph redhibition into a negligence claim, apply all this standard of care for an importer, disobey or disregard

Louisiana law that says in redhibition a seller has no duty to
investigate, and then get a bad faith seller charge or finding
by this jury.  This is a redhibition case, and we have to focus
it on that and the applicable standard.

So what we would ask, Your Honor -- if we didn't
make it clear in our motion, what we are looking for is some
help on what's the standard and what's the charge that's going
to go to the jury on this issue.  Thank you, Your Honor.

**THE COURT:**  Both of you all have given me a lot of
food for thought.  I'm going to take this under advisement.  I
have the weekend to work on it, so I will try to get it out for
you the first part of the week.

Any other motions that we are concerned with?

**MR. MEUNIER:**  Your Honor, the plaintiffs had brought
a motion in limine on manufacturer fault, and we advised the
Court that it was initially driven by the fact that one of the
defendant experts, Jim Tompkins, in his expert report went on
and on and on about how bad the manufacturer was.  It was a
manufacturer conspiracy, they were egregious, shame on them,
etc., etc.  We attached excerpts from his report and asked you
to strike those excerpts because, as counselor just said, we
are focusing this on just the question of the fault of the
seller.

Your Honor earlier, in ruling on our motion on
solidary liability, said we can defer that issue because this

10:00:24  1   is just going to be about the seller, not the manufacturer.
10:00:27  2   Well, in his trial deposition -- because Dr. Tompkins will not
10:00:31  3   be here -- neither under questioning by counsel for InEx nor in
10:00:37  4   cross-examination did he repeat those views, so we advised the
10:00:43  5   Court we can stand down on that motion.
10:00:46  6            However, I wanted to still be clear to the Court
10:00:51  7   that our in limine and our trial position is that this is not a
10:00:56  8   case about the fault of the manufacturers.  We recognize you
10:00:59  9   can come up to that line.  We recognize that one of the things
10:01:01 10   InEx says is, Look, when you say we should have known, these
10:01:04 11   manufacturers didn't tell us what they knew.
10:01:07 12            That's fair and relevant, but you can cross over
10:01:10 13   that line when you start inviting the jury to point the finger
10:01:13 14   at the manufacturers.  It's their product.  It's defective
10:01:17 15   because of them.  Why are we being blamed?  We are victims of
10:01:21 16   the manufacturers.
10:01:22 17            I think when we get into that area, it's unfair.
10:01:25 18   It's a limited trial, and the manufacturers are not going to be
10:01:28 19   there to defend themselves.  We want to ask the Court to defer
10:01:33 20   ruling on our motion regarding manufacturer fault, but we would
10:01:36 21   alert the Court to our need to bring it up if at trial the
10:01:39 22   evidence starts to go in that direction.
10:01:45 23            MR. RISLEY:  There are two motions that have some
10:01:48 24   impact on North River.  One was the plaintiffs' motion to
10:01:50 25   exclude evidence of Habitat testing.  I don't know if they

10:01:53  1   intended to go forward with that today or not.  Then we have

10:01:58  2   what we call our general motion in limine.

10:02:00  3          I think most of the items in there that are

10:02:02  4   contested relate to specific evidence about *should have known*,

10:02:06  5   so it would probably make sense to at least defer that until

10:02:09  6   the Court rules on the --

10:02:10  7          THE COURT:  I think that's right.

10:02:13  8          MR. GRAU:  On that general motion, Your Honor, we

10:02:15  9   filed a similar one.  I think Mr. Risley is correct that most

10:02:18  10  of those issues relate to the standard on redhibition.

10:02:21  11         There was one issue, we thought it would not be

10:02:23  12  opposed, that we included a provision that the parties were not

10:02:26  13  to make reference to any jurisdictional issues as they relate

10:02:29  14  to Taishan or Knauf.  Apparently there's an opposition to that.

10:02:36  15         THE COURT:  What is that?  Let's not get into

10:02:38  16  jurisdictional issues.  We are not trying Taishan.

10:02:43  17         MR. GRAU:  Certainly we don't want anyone arguing to

10:02:46  18  the jury Taishan is not here or can't be here and, therefore,

10:02:49  19  look at these guys.

10:02:51  20         MR. MEUNIER:  Just as we don't want InEx suggesting

10:02:53  21  why don't they go after Taishan.  It's quid pro quo.

10:02:58  22         THE COURT:  That's right.

10:03:03  23         MR. GEORGE:  Good morning, Your Honor.  Scott Alan

10:03:04  24  George for the PSC.  As you are aware, one of the trial

10:03:08  25  plaintiffs in this case is the New Orleans Area Habitat for

| | | |
|---|---|---|
| 10:03:10 | 1 | Humanity.  You're familiar with the organization.  I will spare |
| 10:03:15 | 2 | you our opening argument to the jury. |
| 10:03:19 | 3 | One of the things learned in discovery was that |
| 10:03:24 | 4 | Habitat for Humanity in around 2007, after using a lot of |
| 10:03:28 | 5 | Interior Exterior drywall for their homes, bought an abandoned |
| 10:03:32 | 6 | shipment of Crescent City drywall here in New Orleans, put it |
| 10:03:36 | 7 | in a warehouse, used it for construction, gave it to charity. |
| 10:03:41 | 8 | The end. |
| 10:03:45 | 9 | Interior Exterior intends in this trial to bring |
| 10:03:48 | 10 | before the jury all of Habitat for Humanity's experience with |
| 10:03:53 | 11 | that drywall; later, after it was tested, how it did or didn't |
| 10:03:57 | 12 | work, and so forth and so on.  We request that that testimony |
| 10:04:01 | 13 | relating to the Crescent City drywall and its experience as a |
| 10:04:04 | 14 | drywall distributor or its handling of drywall be excluded from |
| 10:04:07 | 15 | the jury.  It's both prejudicial and, more importantly, will |
| 10:04:13 | 16 | confuse the jury. |
| 10:04:14 | 17 | The standard under redhibition is what is |
| 10:04:16 | 18 | reasonable for InEx in the circumstances to do.  The |
| 10:04:21 | 19 | circumstances between Habitat and Interior Exterior are |
| 10:04:23 | 20 | extremely different.  Habitat for Humanity is a nonprofit, |
| 10:04:27 | 21 | charitable home building organization.  It happened to have an |
| 10:04:32 | 22 | opportunity to buy drywall as it is.  It didn't import the |
| 10:04:34 | 23 | drywall.  It didn't have any duties to inspect the drywall.  It |
| 10:04:39 | 24 | was just trying to fill a need and gave the drywall away, for |
| 10:04:42 | 25 | the most part. |

| | | |
|---|---|---|
| 10:04:43 | 1 | Interior Exterior, as we know, is in the |
| 10:04:45 | 2 | business of drywall.  It imported drywall.  It sold drywall. |
| 10:04:48 | 3 | It sold thousands and thousands of sheets of drywall.  It |
| 10:04:51 | 4 | received customer complaints.  It didn't respond to them. |
| 10:04:53 | 5 | These are factually very different situations. |
| 10:04:57 | 6 | Moreover, we're looking at two different time |
| 10:04:59 | 7 | frames.  These again link to the fact that Habitat is in a |
| 10:05:04 | 8 | different factual situation than Interior Exterior. |
| 10:05:06 | 9 | Interior Exterior failed to inspect the drywall before it came |
| 10:05:10 | 10 | over, inspect the plants.  It failed to respond to customer |
| 10:05:13 | 11 | complaints, and it continued to sell the drywall. |
| 10:05:16 | 12 | Habitat for Humanity, in 2009, when it first |
| 10:05:18 | 13 | heard word that there was a problem out there with Chinese |
| 10:05:21 | 14 | Drywall, started trying to make an effort to test.  They did |
| 10:05:25 | 15 | air-grabbing tests.  We are not suggesting that |
| 10:05:28 | 16 | Interior Exterior should have done air-grabbing tests in the |
| 10:05:31 | 17 | plant.  We don't state they should have done air-grabbing tests |
| 10:05:34 | 18 | in the ships.  It's a test that is unrelated to our proof |
| 10:05:38 | 19 | against Interior Exterior's failures as a duty of a seller in |
| 10:05:42 | 20 | redhibition. |
| 10:05:43 | 21 | Basically the testimony, from soup to nuts, |
| 10:05:45 | 22 | would confuse the jury.  What Habitat did on the side while it |
| 10:05:50 | 23 | was trying to build houses is a far different situation than |
| 10:05:54 | 24 | what Interior Exterior did for its livelihood.  The bulk of its |
| 10:05:58 | 25 | business is drywall.  It can only serve to prejudice not only |

| | |
|---|---|
| 10:06:02 | 1 |

Habitat but the other three plaintiffs who are going to be
presented to the jury.

    **MR. GRAU:**  Your Honor, you have already ruled on this
issue to the extent that it relates to the discovery.  I don't
think anything through that discovery has suggested that this
evidence now is somehow not relevant or that its probative
value is outweighed by its prejudicial effect.

    The irony here is that one of the very
plaintiffs in this case will be arguing that Interior Exterior
should have done more to discover a defect that they knew
nothing about when that very plaintiff didn't do the same
things they are complaining of InEx doing and, when they even
knew of this problem, undertook to perform testing to discover
whether they had that problem and couldn't find it.  So it's
relevant on two counts, Your Honor.

    **THE COURT:**  I agree.  Look, there's no question it's
a 401 situation.  It's relevant.  It's relevant.

    The question is the 403.  Now, the 403 can be
clarified or can be cleared up by examination and
cross-examination, but to say that this is not relevant is not
accurate.  It is relevant.  It's admissible.

    **MR. RISLEY:**  I will say that if the Court rules in
our favor on the standard of knowledge, this may become
irrelevant because if it's limited to what InEx knew, what
somebody else knew doesn't really matter.

10:07:27  1        **MR. GRAU:**  Your Honor, I did forget one last thing.

10:07:30  2   We still have pending our motion to strike plaintiffs'

10:07:33  3   exhibits.

10:07:35  4        **THE COURT:**  Look, I understand that plaintiffs are

10:07:39  5   late a day or two or whatever it is, but you had an opportunity

10:07:43  6   to review them.  I don't see any prejudice, so I'm going to

10:07:48  7   deny that motion.  Thank you very much.

10:07:51  8             Anything else?  All right, folks, thank you very

10:07:52  9   much for your help.  I appreciate it.  Court will stand in

10:07:57  10  recess.

10:07:58  11       **THE DEPUTY CLERK:**  All rise.

10:08:00  12       (Proceedings adjourned.)

10:12:28  13                        * * *

14                   <u>**CERTIFICATE**</u>

15        I, Toni Doyle Tusa, CCR, FCRR, Official Court

16   Reporter for the United States District Court, Eastern District

17   of Louisiana, do hereby certify that the foregoing is a true

18   and correct transcript, to the best of my ability and

19   understanding, from the record of the proceedings in the

20   above-entitled matter.

21

22

23                   <u>*s/ Toni Doyle Tusa*</u>
                     Toni Doyle Tusa, CCR, FCRR
24                   Official Court Reporter

25