**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 09-2047 |
| | SECTION L |
| | JUDGE FALLON |
| THIS DOCUMENT RELATES TO ALL CASES | MAG. JUDGE WILKINSON |

**OPPOSITION OF DEFENDANT THE NORTH RIVER**
**INSURANCE COMPANY TO THE JOINT MOTION FOR PRELIMINARY**
**AND FINAL APPROVAL OF THE SECOND AMENDMENT**
**TO THE AMENDED INEX AND KNAUF SETTLEMENTS**

Defendant The North River Insurance Company ("North River") asks that the Joint Motion for Final Approval of the Second Amendment to the Amended INEX and Knauf Settlements filed by Interior/Exterior Building Supply ("INEX") and on behalf of the Knauf Defendants ("Knauf") and the Plaintiffs' Steering Committee ("PSC") be denied.  There are procedural, substantive, and constitutional reasons that preclude the Court from approving an amendment to the pending Knauf and INEX Settlements on the eve of the fairness hearings and without notice of the amendment being sent to all class members.  The motion should be denied because:

1.   INEX describes the proposed high/low settlement terms set forth in the proposed amendments to the pending class settlements as a "reasonable settlement of a disputed claim."  Under Fed. R. Civ. P. 23(e)(1), however, before a court can approve a class-wide settlement, the court "must direct notice in a reasonable manner to all class members who would be bound by the proposal."  INEX, Knauf, and the PSC do not want to give notice to class members.  Without notice to class members, the belated attempt to redo the class-wide settlements must be denied.

---

2.   Fed. R. Civ. P. 23(e)(2) provides that a court may only approve a class-wide settlement "after a hearing on finding that it is fair, reasonable, and adequate."  INEX, Knauf, and the PSC have provided no proof to show that their proposed settlement satisfies the fairness requirement of Rule 23(e)(2), nor have they identified the sources from which such proof, if it exists, may be obtained.  North River disputes that the artificial high/low settlement agreement proposed by INEX, Knauf, and the PSC is fair, reasonable, or adequate.  Fundamental fairness requires that North River be entitled an opportunity to conduct discovery and marshal evidence in opposition to the settlement before the Court conducts a fairness hearing on the proposed amendments to the pending settlements.

3.   The INEX Settlement has been pending before the Court for eighteen months and the Knauf Settlement has been pending for ten months.  INEX, Knauf, and the PSC could have filed their present motion at any time over the last year and a half.  Instead, they have waited until less than a month before the fairness hearings to bring this matter before the Court.  The Court should not consider a motion that has been needlessly delayed and thrust before the Court as a false emergency.

4.   The current version of the INEX Settlement pending before the Court already provides a complete release of all class claims against INEX.  The Court should not grant or even consider a motion filed by INEX that will have no effect on INEX's liability and is intended only as an effort to deprive North River of its right to contest liability and damages as well as potentially limit its right to pass the damages to the real culpable party, Knauf.

5.   The Court began a trial involving the issue of whether INEX was a good faith seller of Chinese-manufactured drywall on November 26, 2012.  As North River has previously indicated to the Court, if the INEX and Knauf Settlements are approved, 90% or more of the Plaintiffs with claims against INEX, and derivatively against North River, will be releasing their claims

against INEX and assigning their claims against North River to Knauf. Damages are not to be an issue at the November trial. Under the amended settlement contained in the Amendment Approval Motion, INEX is consenting to damages at various levels based on the outcome of the bellwether trial on the issue of whether INEX was a good faith seller. That would mean that the bellwether trial has gone forward with (1) plaintiffs who are not the real parties in interest and who have no standing to assert the claims, (2) a defendant that can never have liability and (3) stipulated damages based upon an agreement by a party that is being fully released and will never have to pay those damages. The bellwether trial will become a sham trial with false parties and potential implications far beyond what was intended when the Court set the trial.

6. Despite repeated procedural shenanigans by INEX, Knauf, and PSC, it is clear that the main purpose of the belated request to amend the Knauf Settlement and the INEX Settlement is to try to bind North River to a settlement to which it has not consented and a damage determination to which it has not agreed. The Court should not sanction an agreement that does not affect the parties to the agreement but whose sole purpose is to deprive another party of the right to litigate damages.

7. The policies issued by North River to INEX have a no action clause that precludes the enforcement of a settlement against North River if North River has not consented to the settlement. INEX, Knauf, and the PSC have tried to falsely manufacture a claim that "time is of the essence" in order to incorrectly assert that changing the INEX Settlement at this late date will bind North River to the settlement in the absence of North River's consent. Louisiana law will not allow such an unfair and improper result. Because the proposed amendments, if granted, will not achieve the nefarious purpose for which they are offered, the Court should not grant the motion.

The proposed amendments to the pending Knauf and INEX Settlements are a punitive attempt to extort money from North River by INEX, Knauf, and the PSC.  Because North River will not accede to the ridiculous settlement demands by the PSC, the PSC has colluded with INEX and Knauf to try to strip North River of its right to contest the liability and amount of damages being sought against it.  Because of the way the proposed amendments are structured, and because of the purposes for which the proposed amendments are being offered, North River will refer to the Joint Motion for Preliminary and Final Approval of the Second Amendment to the Amended INEX and Knauf Settlements by the less cumbersome and more accurate name of the "Collusion Deal."

Any doubts about the unfair and underhanded nature of the Collusion Deal were dispelled at the fairness hearings on November 13, 2012. when counsel for Knauf announced to the Court and to the world that Knauf, INEX, and the PSC had been jointly working on a plan to deprive North River of the ability to defend itself since the unsuccessful mediation held in May 2012. Steve Glickstein, counsel for Knauf, admitted as much:

> The Court scheduled a mediation on May 31.  That mediation failed.  So after May 31, beginning in June, the parties began to discuss whether there was another way of reaching a resolution that could be achieved without North River's participation.

> What we did is we researched the law.  There is a series of cases under Louisiana law that permits an insured, here INEX, to settle a case without the consent of the insurer where time is of the essence, meaning there will be immediate damage to the insured if they don't settle, where the insurer unjustifiably declines to settle the case and settlement is reasonable.

Fairness Hearing Transcript of November 13, 2012, pp. 125-126.

Despite their agreement half a year ago to find some way of prejudicing North River because North River would not meekly submit to unreasonable settlement demands, INEX, Knauf, and the PSC hid their plan from the Court and from the class members until the Collusion

---

Deal was filed on October 16, 2012.  Why did they wait almost five months before springing their insidious agreement on the Court?  INEX, Knauf, and the PSC decided that, in order to maximize their chances of harming North River, they should keep their plan a secret until the last available moment, raise the false cry that "time is of the essence," and hope that the Court would throw fairness and reasoned decisionmaking out of the courtroom.

The Collusion Deal is a pernicious sham that should not receive Court approval.  It is pernicious because its stated purpose is to harm North River without any real benefit to the conspirators who created the Collusion Deal through a self-manufactured scheme to create a time emergency that does not exist.  The Collusion Deal is a vehicle of vengeance intended to punish North River without serving any legitimate purpose.

The Collusion Deal is a sham because the Collusion Deal makes sense only if Knauf has not been honest with the Court.  The proffered justification for the Collusion Deal is the ability of Knauf to unilaterally veto the INEX Settlement.  While Knauf has consistently used the existence of its veto power as a negotiating threat, Knauf has never told the Court that Knauf would back out of the INEX Settlement.  To the contrary, on September 4, 2012, Knauf filed a joinder in the PSC's motion to approve the INEX Settlement, the Knauf Settlement, and other pending class settlements, as well as an 84-page Memorandum of Law in Support of Final Approval of the Knauf Settlement.  On November 13, 2012, at the fairness hearing, three different attorneys spoke on behalf of Knauf to urge approval of the pending class settlements. Despite the ominous wailing contained in the motion to approve the Collusion Deal, Knauf has represented to the Court that Knauf wants all of the class settlements approved.  What Knauf tells the Court it wants to do and what INEX and the PSC tell the Court Knauf wants to do are diametrically opposed.  That inconsistency shows the deceitful nature of the Collusion Deal.

**I.**

## NORTH RIVER HAS STANDING
## TO OBJECT TO THE COLLUSION DEAL

In their latest effort to force the Joint Agreement through without notice to class members or a full and fair notice for anyone to be heard, INEX, Knauf, and the PSC filed a "Joint Motion to Set Hearing and to Amend Relief Requested" on November 19, 2012, six days after the fairness hearings held on November 13.  This time, instead of asking to amend the Collusion Deal, INEX, Knauf and the PSC assert that the question of whether the Collusion Deal is fair and reasonable is a "separate issue" than whether the Collusion Deal is binding against North River. Having magically transformed a single Joint Motion into multiple issues, INEX, Knauf, and the PSC then ask that (1) any order approving the Collusion Deal should reflect that the Court is not ruling on whether North River is bound by any finding of the Court with respect to the Collusion Deal and (2) all of the class settlement orders be modified to reflect that the Court is not ruling on whether the proposed assignments of rights under the Settlements or the finding of exhaustion of primary coverage available to INEX is binding on North River.

INEX, Knauf and the PSC offer no authority for their device of selective enforcement of class settlements.  There is nothing in Rule 23(e) that allows the Court to approve a class settlement as to some affected parties now and delay resolution of the enforceability of the agreement against others until a later, unspecified date.  The Court should not go outside the limits of Rule 23 to satisfy the punitive desires of some disgruntled parties.

The Court should also recognize that the Collusion Deal is really meaningless unless it is enforceable against North River.  The Collusion Deal has no impact on any potential liability of INEX because INEX is going to receive a full release of liability under the current version of the INEX Class Settlement.  If the Collusion Deal is not enforceable against North River, it will

---

result in no benefit to Knauf or the class members because – regardless of who ends up being the real party in interest on the claims against North River – neither Knauf nor the class members will be able to collect the liquidated damages from North River.  How can the Court possibly decide that the Collusion Deal is fair and reasonable without knowing whether it will result in any benefit to whomever is eventually determined to be the real party in interest on the claims against North River?

Even though INEX, Knauf, and the PSC now want the Court to enter an order approving the Collusion Deal with the proviso that the Court is not ruling on the enforceability of the Collusion Deal against North River, what they really mean is that they do not want the Court to rule on that issue right now.  The Court knows full well that if the bellwether trial results in a verdict adverse to INEX and North River, Knauf and the PSC will be rushing to the Court to have the Collusion Deal enforced against North River.  Because the Collusion Deal will only serve its purpose if it is enforceable against North River, the request by INEX, Knauf, and the PSC to delay resolution of the enforceability issue until some unspecified time in the future is amazing.  They are asking the Court to approve a pig in a poke that may or may not be of some value to some undetermined person or persons at some unspecified time in the future.  Neither Rule 23 nor sound judicial practices support the approval of such a vague and illusory deal.

In terms of standing, however, it is not disputed that INEX, Knauf, and the PSC intend that the Collusion Deal be enforceable against North River at some point.  Because they are asking the Court to determine that a liquidated amount of damages that is being sought from North River is fair and reasonable, even though it may not be enforceable, North River's rights are being affected.  That is sufficient to give North River standing to contest the Collusion Deal.

## II.

## THE PURPOSE OF THE PROPOSED AMENDMENTS
## TO THE CLASS SETTLEMENTS IS TO PUNISH
## <u>NORTH RIVER, NOT TO HELP THE CLAIMANTS</u>

The key dates in the odyssey that has led to the Collusion Deal have spanned over

eighteen months:

04/25/11:   INEX files its Settlement Agreement with the PSC and requests Court
approval.

05/13/11:   The Court preliminarily approves the INEX Class Settlement and
conditionally certifies the INEX settlement class.

12/20/11:   Knauf files motion requesting approval of Knauf Settlement.   The
proposed Settlement contains provisions for Knauf to unilaterally veto
the Settlement if Knauf is not subjectively satisfied with other events.
North River has not agreed to settle the claims against it at this time.

01/10/12:   The Court preliminarily approves the Knauf Settlement and
conditionally certifies the Knauf settlement class.   Nothing at the
hearing or in the order granting preliminary approval expressly states
that Knauf will exercise its veto power over the Settlement if North
River does not agree to a settlement.

01/24/12:   INEX files the first proposed amendment to the INEX Settlement

05/31/12:   Court-ordered mediation between PSC, INEX, Knauf, and North
River.  The Court sets a trial on whether INEX was a good faith seller
for Nov. 26, 2012.

09/14/28:   Counsel for INEX sends proposed Second Amendment to INEX
Settlement to counsel for North River and demands that North River
respond by Sept. 28 as to whether North River will consent to the
proposed amendment.

09/28/12:   North River informs INEX that North River will not consent to the
proposed second amendment to the INEX Settlement.

10/16/12:   INEX files motion with Court for preliminary and final approval of
proposed second amendment to the INEX Settlement and asks for an
expedited hearing on the motion.

Approximately 95% of the claims against INEX in this MDL proceeding involve homes

that have all or at least some board manufactured by Knauf.   Under the pending INEX

Settlement, INEX and its primary insurance carriers get a full release of liability from all claimants whose home contain at least some Knauf drywall and INEX assigns its claims, if any, to Knauf. Under the pending Knauf Settlement, Knauf will pay an undisclosed amount, which appears to be at least several hundred million dollars,[1] and the members of the INEX Settlement Class (all of those whom have Knauf board in their houses) will assign all of their claims against North River to Knauf.

That means that, if the Knauf Settlement and the INEX Settlement in their current versions are approved:

1. INEX is fully released from all potential liability and will never have to pay a dollar of its own money to settle the claim of any class member.

2. The class members will assign their claims against North River to Knauf, so the class members will no longer be the real parties in interest and will have no standing to assert claims against North River.

3. Knauf, the manufacturer who is responsible for 95% of the Chinese-manufactured drywall sold by INEX, will be the owner of the Knauf-related claims asserted against North River arising out of the sale of Knauf drywall by INEX.

4. Because of Knauf's commitment to an unlimited remediation fund, any settlement that North River may make will not add a single dollar to the amount available to fix homes that have suffered because of the presence of Knauf drywall. Instead, any settlement monies paid by North River for Knauf-related claims will either (1) reduce Knauf's liability on a dollar-for-

---

[1] The exact amount of the settlement by Knauf cannot be determined because, in addition to $30 million available to pay non-remediation claims and $160 million in attorney's fees to the PSC, Knauf will provide an uncapped remediation fund to fix houses that contain or contained Knauf Board. If the PSC's press release is to be believed, the value of the uncapped remediation fund could be as much as $1 billion. Knauf, however, has been very careful not to adopt that statement, which suggests that Knauf believes its ultimate liability for the remediation fund is substantially lower.

dollar basis or (2) go to the PSC in attorney's fees, even though the PSC has already negotiated a $160 million attorney's fee payment from Knauf as well as additional attorney's fees from four or five other pending class settlements.

Now INEX, Knauf, and the PSC want to amend the INEX Settlement, which has been pending for eighteen months, and the Knauf Settlement, which has been pending for nine months.  They argue that the amendments to the pending settlements are necessary because of a provision in the Knauf Settlement that gives Knauf the absolute right to walk away from any or all of the pending class settlements if Knauf, who is the cause of problems to thousands of homeowners across the United States, does not believe that Knauf has received enough in settlement from innocent parties along the distribution claim.  If INEX and the PSC now believe that it was a bad idea to give the ultimate wrongdoer full control of the settlement of class claims based on the wrongdoer's conduct, they should never have agreed to give Knauf veto power in the first place. Perhaps the Court would not have given preliminary approval if it had been told that the Knauf settlement was never a settlement at all, but really more of an "it's-a-deal-if-Knauf-wants-it-to-be-a-deal" approach to the litigation.

For whatever reason, INEX, Knauf, and the PSC have now decided they do not like the deals they negotiated and placed before the Court for approval as class-wide settlements.  It is not clear who is the driving force behind this last-minute attempt to retrade the deal (the motion asking for approval of the Collusion Deal suggests Knauf approached INEX and the PSC, although North River has received information that suggests it may have been the other way around), but the intent behind the Collusion Deal is clear.  In a tripartite scheme to punish North River for not capitulating to the excessive settlement demands of the PSC, INEX, Knauf and the PSC now want to liquidate the claims against INEX (claims that INEX will never have to pay because it is being released) asserted by the Plaintiffs (who will never recover on those claims

because they are being assigned to Knauf) in hopes that the stipulated amount of damages will be binding against North River, who has not consented to the liquidated damages amount and who has not consented to the pending class settlements.

The ultimate goal of the Collusion Deal is therefore to deprive North River of the right to contest the amount of damages being sought against North River, because North River does not believe that the settlement demands made by the PSC are remotely close to the range of reasonableness.  North River will discuss the major problems with the Collusion Deal in the following pages, but North River believes it is important to point out one of the unstated assumptions made by the PSC in asking the Court to approve the Collusion Deal: that damages against INEX will automatically result in damages against North River.  The reality, however, is that the liquidation of claims against INEX does not determine liability against North River. There are several coverage issues under the North River policies to which the PSC has consistently turned a blind eye.[2]  For example, the policies issued by North River to INEX are occurrence-based policies which only provide coverage for certain events that occur during the period the policy is in effect. INEX only sold Chinese-manufactured drywall for a few months, but the PSC has always based its settlement demands on the assumption that policies issued over a period of four years are applicable to claims that occurred over a relatively short time.  Just because a policy was issued to INEX for a certain period of time does not mean that the claims against INEX fall within that specific policy period.

North River believes that a proposed settlement whose purpose is to punish a party instead of provide benefits to class members seeking redress can never satisfy the requirements

---

[2]  North River has raised numerous defenses to coverage in the MDL proceeding including whether the damages are bodily injury and/or property damage that are caused by an occurrence during the applicable policy period and the proper exhaustion and maintenance of all applicable underlying insurance.  Further, North River has asserted that the damages may fall within one of several exclusions.

of Rule 23 to be fair, reasonable, and adequate.  In the present case, however, there are several more immediate reasons why the Collusion Deal should not be approved by the Court.

III.

**THE PROPOSED CLASS SETTLEMENT DOES NOT
PROVIDE FOR NOTICE TO BE GIVEN TO ALL CLASS MEMBERS**

The Collusion Deal purportedly has three main purposes:

1.  It liquidates damages against INEX at zero, $36 million, or $72 million, depending on the outcome of the trial which commenced November 26, 2012.

2.  It allocates any recovery from North River between the uncapped remediation fund and the $30 million additional fund established in the Knauf Settlement.

3.  Knauf relinquishes its right to unilaterally veto the INEX Settlement.

The Collusion Deal will not achieve these goals, for the reasons discussed below. Regardless of the merits (or lack thereof) to the Collusion Deal, however, the Court cannot give final approval to the Collusion Deal without giving notice to all class members who would be affected by the amended version of the Settlement.

Before the Court can approve a class-wide settlement, the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal."  Fed. R. Civ. P. 23(e)(1).  Rule 23 was amended in 2003 in order to "strengthen the process of reviewing proposed class-action settlements."  *See* 2003 Notices of Advisory Committee to Fed. R. Civ. P. 23.  The purpose of the notice requirement is to ensure that "the class as a whole had notice adequate to flush out whatever objections might reasonably be raised to the settlement."  *Turner v. Murphy Oil USA, Inc*., 472 F.Supp.2d 830, 840 (E. D. La.2007), citing *Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1375 (9th Cir.1993).

It is apparent that North River has different views about the merits of the Collusion Deal than does INEX, Knauf, or the PSC.  They think that a liquidation of the claims against INEX will be binding against North River, while North River believes that if INEX agrees to a settlement without North River's consent, INEX will forfeit all coverage under the insurance policies issued by North River.  INEX, Knauf, and the PSC believe that the Collusion Deal is significant because Knauf releases its ability to veto the INEX Settlement, while North River believes that is a chimerical suggestion: even if Knauf relinquishes its right to withdraw its approval from the INEX Settlement, Knauf retains the right to withdraw its approval from the Knauf Settlement and other class settlements pending before the Court.  Since, as Knauf has made clear, all of the proposed class settlements are interrelated, Knauf merely needs to exercise its veto power over any of the several other pending settlements and the INEX Settlement will necessarily fall, according to Knauf.[3]

A settlement that is worth anywhere from zero dollars to $72 million dollars is significant.  Plaintiffs who had previously not opted out of the Knauf Settlement may want to do so if they are informed that INEX and the PSC may be giving away the claims against North River for nothing.  Conversely, Plaintiffs who had previously chosen not to participate in the INEX Settlement may change their minds if they believe there may be a potential additional $72 million in the settlement pot.  Whatever the views of North River, INEX, Knauf, the PSC, or the

---

[3] Knauf's role in this proceeding is very curious.  Knauf, along with Taishan, are the manufacturers of all of the Chinese-manufactured drywall sold by INEX, which makes them the 800-pound gorillas in the room.  Knauf, however, insists that it is not even in the courthouse because of a challenge to personal jurisdiction it originally filed. Since that time, however, Knauf has filed multiple pleadings seeking affirmative relief from the Court, including a request for approval of multiple class-wide settlements worth potentially hundreds of millions of dollars.  If the settlements pending before the Court are approved, Knauf will be the ultimate beneficiary of any settlement by North River.  By actively seeking the Court's assistance to resolve the thousands of claims against it, Knauf has long ago waived any challenge to personal jurisdiction.  "When 'a party seeks affirmative relief from a court, it normally submits itself to the jurisdiction of the court with respect to the adjudication of claims arising from the same subject matter.'" *Painewebber Inc. v. The Chase Manhattan Private Bank*, 260 F.3d 453, 460-61 (5th Cir. 2001), *quoting Bel-Ray Co., Inc. v. Chemrite (Pty.) Ltd.*, 181 F.3d 435, 443 (3d Cir. 1999).

Court, it is the right of the class members to be informed of the settlement so each class member can make an individual decision on whether they want to participate in a class settlement. *See In re Katrina Canal Breaches Lit.*, 628 F.3d 185, 198 (5th Cir. 2010) (notice that did not inform class members that they would not receive any direct benefit from a settlement is misleading and inadequate). The Collusion Deal would give no notice to class members, and no notice is obviously not adequate notice. Because it does not comply with Rule 23(e)(1), the Collusion Deal must be rejected by the Court.

## IV.

### RULE 23(e)(2) REQUIRES THAT NORTH RIVER BE GIVEN THE OPPORTUNITY TO CONDUCT DISCOVERY ON THE MERITS OF THE COLLUSION DEAL

If a proposed class settlement would bind class members – which the Collusion Deal undoubtedly intends to do - the Court "may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). The essential, although unstated, premise of the Collusion Deal is that if INEX is found not to be a good faith seller, liquidated damages against INEX in the amount of either $36 million or $72 million is fair and reasonable. INEX, Knauf, and the PSC offer no evidence to show that this is true. Instead, they offer only unsubstantiated assumptions about the number of houses in the INEX Settlement Class or the actual cost of remediating any house in the Settlement Class. They seem to assume that the same cost will apply to remediate every house in the INEX Settlement Class regardless of size, finish, or amount of Knauf drywall in the house.

If the value of the INEX Settlement is to be liquidated based on assumptions, then a better assumption is that INEX had no knowledge of the sulfur problems in the Chinese-manufactured drywall it sold and that INEX is a good faith seller. That is a much more likely result of the November 26 trial. Under that assumption, the amount of liability against INEX

would be less than the amount of its primary insurance carrier, which means that the excess coverage from North River and other carriers would never be implicated.  Suffice it to say, North River does not agree with the assumptions of INEX, Knauf, and the PSC, and the Court cannot approve a settlement based on no evidence of fairness, reasonableness, or adequacy.

If the Court intends to conduct a fairness hearing on the Collusion Deal – and Rule 23(e)(2) requires a fairness hearing before the Collusion Deal can be approved – North River is entitled to discovery to determine what facts INEX, Knauf, and the PSC intend to place before the Court in order to try to convince the Court that a settlement that just happens to be in an amount that those parties believe are North River's policy limits is fair, reasonable, and adequate.  The need for adequate discovery before class certification was recognized in *Chateau de Ville Productions v. Tams-Witmark Music Library, Inc.*, 586 F.2d 962, 966 (2d Cir. 1978):

> Although the trial court must determine if an action is to be maintained as a class action "(a)s soon as practicable after the commencement" of the action, Fed.R.Civ.P. 23(c) (1), this does not mandate precipitous action. The court should defer decision on certification pending discovery if the existing record is inadequate for resolving the relevant issues. In particular, "discovery may be necessary in order to . . . appraise the adequacy of representation." Frankel, Some Preliminary Observations Concerning Civil Rule 23, 43 F. R.D. 39, 41 (1967). See generally Cruz v. Estelle, 497 F.2d 496, 499 (5th Cir. 1974); Huff v. N.D. Cass Company of Alabama, 485 F.2d 710, 712-13 (5th Cir. 1973) (en banc); Yaffe v. Powers, 454 F.2d 1362, 1366 (1st Cir. 1972). Failure to allow discovery, where there are substantial factual issues relevant to certification of the class, makes it impossible for the party seeking discovery to make an adequate presentation either in its memoranda of law or at the hearing on the motion if one is held.

The Fifth Circuit has held that "in most cases 'a certain amount of discovery is essential in order to determine the class action issue and the proper scope of a class action.'"  *Stewart v. Winter*, 669 F.2d 328, 331 (5th Cir. 1982), *quoting Pittman v. E. I. duPont de Nemours & Co.*, 552 F.2d 149, 150 (5th Cir. 1977).  *See also Boutain et al. v. Radiator Specialty Co. et al.,* 2011

WL 6130754, *3 (E. D. La. Dec. 8, 2011); *Lang v. DirecTV, Inc.,* 735 F.Supp.2d 421, 438 n. 122 (E. D. La. 2010).

North River was not involved in prior trials nor has it been a participant in the pilot remediation program approved by the Court, so North River has no direct knowledge of what it has taken to actually repair houses owned by members of the INEX Settlement Class. North River has heard anecdotal information which suggests that the assumptions made by INEX, Knauf, and the PSC vastly overstate the number of houses involved in the INEX Settlement Class and grossly overstate the actual cost of repairing homes in Louisiana. North River has previously requested some of that information from the PSC and was told that the PSC "wasn't going to do North River's work for it." North River is ready to do that work if it is necessary, but the obduracy of the PSC means that discovery is necessary, and the Court must allow a reasonable opportunity for discovery before a fairness hearing can be held. If INEX, Knauf, and the PSC do not want to allow discovery on the merits of the value of the proposed settlement – and the motion to approve the Collusion Deal asks for an expedited hearing without any discovery – then the Court should deny the Collusion Deal. If the Court intends to conduct a fairness hearing, due process requires that North River be given a reasonable opportunity to conduct the discovery necessary to allow North River to gather evidence to put before the Court.

Although North River has not yet had adequate time to determine all of the discovery that would be helpful to determine whether a settlement that is potentially worth $72 million is fair, reasonable, and adequate, there has been sufficient experience in remediating homes that contained Chinese drywall that it is no longer necessary to make speculative estimates or rely upon experience from other jurisdictions. In order to obtain that information, it will be necessary to conduct discovery that identifies houses that contained Chinese drywall and have been remediated, either through the Pilot Remediation Program approved by the Court, by the

homeowners themselves, or through third-party remediation (such as the Habitat for Humanity homes), and then obtain the information on the actual costs of those remediation projects.  It will also be necessary to conduct written discovery and depositions of persons who have been involved in the remediation to understand what goes into the remediation of a home and how the past history of Chinese drywall remediations will help determine what the remediation costs may be going forward on other homes.

It is obvious that the required discovery cannot be completed in time for a full and adversarial hearing on December 11, 2012.  North River has been fully engaged in preparing for the bellwether trial that began on November 26, 2012.  The impossibility of discovery by December 11 may be the reason that INEX, Knauf, and the PSC want the Court to approve the Collusion Deal without allowing any discovery (although North River strongly suspects that the real reason is that discovery of the actual facts will establish the unreasonableness of the high/low figures to which INEX, who will never pay a dime of the damages, is willing to consent).  Fundamental fairness, which finds expression in the Due Process Clause, requires that North River be allowed a reasonable opportunity to conduct the necessary discovery so that it can respond to the attempt of INEX, Knauf, and the PSC to obtain judicial approval of the Collusion Deal.

**V.**

### ANY DELAY IN RESOLUTION OF THE INEX SETTLEMENT IS UNNECESSARY AND COULD HAVE BEEN AVOIDED

While INEX, Knauf, and the PSC have asked the Court to consider the Collusion Deal on an expedited basis and without observing most of the procedural safeguards contained in Rule 23, the unmistakable fact is that the request by INEX, Knauf, and the PSC to delay the entire MDL while the Collusion Deal is considered is a matter of choice, not necessity, that could have

---

been avoided and should not be condoned by the Court.  When INEX and the PSC announced the INEX Settlement in April of 2011, there was no settlement with Knauf and no settlement with North River.  When the Knauf Settlement was filed with the Court in December of last year and approved by the Court nine months ago, there was no settlement with North River, and the Knauf Settlement gave Knauf the power to back out of the INEX Settlement and the Knauf Settlement for purely subjective reasons known only to Knauf.  It was perhaps inaccurate for the proponents of the Knauf Settlement to call the deal a settlement.  Instead, it really was more like the parties were "engaged to be engaged"[4] instead of being firmly committed to a resolution.

Putting nomenclature aside, the reasons that INEX, Knauf, and the PSC want the Court to approve the Collusion Deal on an expedited basis are that Knauf has the ability to back out of the INEX Settlement, and Knauf has suggested that it will do so if INEX does not agree to a settlement in terms dictated by Knauf.  While Knauf has suggested, as a bargaining tool, that it might back out of the settlement if North River does not accede to Knauf's demands, Knauf has never told the Court that it would do so.  Knauf is not even a signatory to the motion to approve the Collusion Deal, although the motion is filed on Knauf's behalf and also amends the Knauf Settlement Agreement.

Knauf's most recent statements to the Court on the issue of settlement are Knauf's joinder in a motion filed by the PSC to approve all five pending class settlements and an 84-page memorandum of law in support of its joinder in the request for approval of the INEX Settlement, the Knauf Settlement, and other class-wide settlements.  Knauf's joinder and memorandum were filed on September 5, 2012.  Nowhere in the motion to approve the settlements, Knauf's joinder, or Knauf's exhaustive memorandum does Knauf tell the Court that the INEX Settlement is at

---

[4] Eric Stratton, under the assumed name of Frank Lyman from Amherst, in Animal House (1978).

peril because of the absence of a settlement agreement with North River.  The memorandum even goes as far as to identify in a footnote on the first page particular contingencies which can activate Knauf's power to avoid the settlements entirely, and Knauf notably does not identify North River as one of those contingencies.

The point of all this is that the alleged emergency that is the basis for a request that the Court ignore the procedural requirements of Rule 23 and act on an expedited and uninformed basis is not an emergency at all.  Knauf's right to collapse all of the pending class-wide settlements in the absence of a North River settlement was exactly the same in December of last year (when Knauf filed a motion for approval of the Knauf Settlement), in January of this year (when the Court preliminarily approved the Knauf Settlement and INEX filed an amendment to the INEX Settlement that had already been on file nine months), in May of this year (when mediation involving INEX, Knauf, the PSC and, North River was unsuccessful), and in September (when the PSC and INEX filed documents asking that all pending class settlements be approved which made no reference to the situation involving North River).

The reason that INEX, Knauf, and the PSC have delayed presenting the Collusion Deal to the Court is a very misguided attempt to strip North River of its right to contest damages as punishment for not settling on the terms dictated by Knauf and the PSC.  North River will address the insurmountable flaws in that approach in a subsequent section of this opposition. The issue here, however, is that the Collusion Deal could have been presented to the Court at any time over the last ten months since the INEX Settlement was filed.  Knauf's veto power over the INEX Settlement and the absence of a settlement with North River have remained absolutely unchanged since that time.  Now, in a selfish last-minute act, INEX, Knauf, and the PSC have put the Collusion Deal before the Court for approval in a way that threatens the Court's ability to proceed timely with the fairness hearing and resolve the claims of thousands of homeowners who

have Knauf drywall in their homes.  INEX, Knauf, and the PSC should not be rewarded for their dilatory tactics, nor should they be allowed to hold the rest of the MDL hostage in a futile attempt to extort a settlement from North River.

## VI.

### THE COLLUSION DEAL IS A SHAM BECAUSE IT DOES NOT INCREASE THE AMOUNT OF MONEY TO BE RECEIVED BY CLASS MEMBERS OR THE LIABILITY AGAINST INEX AND IT WILL NEVER RESULT IN LIABILITY TO NORTH RIVER

In an effort to assist the parties, the Court has set a bellwether trial for November 26 that will address the question of whether or not INEX was a good faith seller under the Louisiana redhibition statutes.  As North River has pointed out, most recently in its response to INEX's Motion to Strike Trial Plaintiffs, the relationship among the parties to the trial is most unusual. At least some of the plaintiffs in the trial will have no standing and not be real parties in interest, because they are going to be assigning all of their claims against INEX to Knauf.  That will be true whether or not the Collusion Deal is considered and approved by the Court.  INEX, the nominal defendant in the trial, will have a full release from liability from the plaintiffs and from Knauf, so INEX will never have any actual liability regardless of the trial outcome.  That is also true whether or not the Collusion Deal is considered and approved.

INEX, Knauf and the PSC argue that the Collusion Deal is necessary because Knauf will give up its right to unilaterally veto the INEX Settlement.  While that statement may be true, it is fairly misleading.  Under the terms of the Knauf Settlement, Knauf will retain the right to back out of the Knauf Settlement, the Global Settlement, the Banner Settlement, and the L&W Settlement.  Knauf has also repeatedly insisted that all of the class settlements are interrelated and it views the settlements as an all-or-nothing deal.  Therefore, even if Knauf cannot directly

destroy the INEX Settlement, it can effectively do so by backing out of any of the other four pending class settlements, which will also bring an end to the INEX Settlement.

Knauf could end all of this gamesmanship by simply telling the Court whether or not it wants the settlements approved, as Knauf did in its written papers submitted to the Court on September 4, 2012.  If Knauf has changed its mind and is going to back out of any or all of the pending class settlements, it should state so now and avoid wasted time of the Court and of all of the other affected parties who have to prepare for hearings that are only one week away.

The greatest irony in the rushed effort to get Court approval for the Collusion Deal is that approval of the Collusion Deal will fail to achieve its real goal, which is to impose liability against North River through a settlement to which North River has not consented.  Under La. Civ. Code Article 2531, any liability ultimately assessed against North River will provide North River with a claim against Knauf ("A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition").  North River will have that right whether or not INEX is found to be a good faith seller and whether or not INEX and Knauf are solidarily liable to the claimants.  *See, e.g., McGough v. Oakwood Mobile Homes,* 779 So.2d 793, 805 (La. App. 2000); *Evangeline Medical & X-Ray Distributors Corp. v. Coleman Oldsmobile, Inc.*, 402 So.2d 208, 212 (La. App. 1981); *Peterson v. Coleman Oldsmobile, Inc.*, 393 So.2d 372, 377 (La. App. 1980).[5]  This means that if Knauf, who will be the owner of the Knauf-related claims against INEX in the November trial,

---

[5] One of the many flaws in the Collusion Deal is the provision that makes the difference between a liquidated damage amount of $36 million and a liquidated damage amount of $72 million turn solely on whether or not the result of the November trial is a finding that INEX and North River are held to have solidary liability to the claimants.  Knauf's liability to the plaintiffs will be settled and will not be at issue in the November trial, so the November trial cannot possibly result in liquidated damages of $72 million against INEX.

ever tries to assert those claims against North River, North River will have a full offset of those claims under Article 2531.

The real purpose of the Collusion Deal is to punish North River by liquidating the damages sought against INEX and then arguing that the liquidated damage agreement is binding against North River in an amount determined by the outcome of the November trial. The reality of the trial, however, is that:

1. At least some of the trial Plaintiffs will have no standing to assert the claims and no right to try to enforce the claims or any subsequent judgment against North River.

2. INEX will never have any liability to the Plaintiffs or Knauf.

3. Any liability ultimately assessed against North River will establish the amount of its claim against Knauf as manufacturer (and that amount will not be $72 million, because the liability of Knauf to the Plaintiffs is not part of the November trial).

4. Knauf will never be able to effectively assert the claims it acquires from INEX and the Plaintiffs against North River because North River will have a full offset under the redhibition statutes.

In the face of these eventualities, there is good reason to wonder what purpose, if any, the November trial will serve if the Knauf Settlement and the INEX Settlement are approved. The Collusion Deal is nothing more than an illusory arrangement that will not result in more money to class members, will not impose any liability against INEX, and will not result in any liability against North River. The Court should not approve a settlement that serves no purpose.

## VII.

### THE COURT SHOULD NOT APPROVE A SETTLEMENT WHOSE ONLY PURPOSE IS TO PREJUDICE SOMEONE WHO DOES NOT CONSENT TO THE SETTLEMENT

Because the Collusion Deal will not (1) increase funds available to the settlement class, (2) increase the liability of INEX, or (3) result in liability against North River, it is fair to inquire into why it is being urged upon the Court at all, much less at the last minute and on an expedited basis.  The only reason the Collusion Deal is being put forward at such a late date is to try to deny North River the right to contest the amount of the damages being sought against it, as retribution for North River's refusal to crater to excessive and unreasonable settlement demands from the PSC.  That devious and punitive strategy is fatally flawed, however, because the amount of liquidated damages will not be binding upon North River and will perhaps relieve North River of any contractual obligation to the class members or INEX.  The policies issued by North River prohibit INEX from settling covered claims without the consent of North River, and INEX's settlement without North River's consent will render the assignment of claims to Knauf unenforceable.  Because the class members and Knauf have acted in concert with INEX to enter into the settlement without North River's consent, they will also be barred from recovering under the policies.

In addition, the terms and conditions of the policies issued to INEX are occurrence-based policies. Liquidation of the total amount of INEX's "damages" will not determine when the class members' "property damage" or "bodily injury" occurred.[6]  Thus, the Collusion Deal will not advance the ball at all in determining the liability, if any, of North River.

The Court must decide, after notice to class members, an opportunity for discovery, and a hearing, whether the Collusion Deal is fair, reasonable and adequate.  The facts and procedural posture of this MDL make it virtually impossible that the Court could find the Collusion Deal fair, reasonable, and adequate.  The added fact that the Collusion Deal will not even serve its

---

[6] Under the terms of the INEX settlement, a maximum $14 million in policy limits are available in policy years 2006 and 2007, and a maximum of $22 million in policy limits are available in policy years 2008 and 2009.

intended purpose of punishing North River only provides extra justification for rejection of the Collusion Deal.

## VIII.

### THE COLLUSION DEAL WILL NOT BE
### BINDING ON NORTH RIVER

The linchpin of the motivation behind seeking approval of the Collusion Deal is the flawed theory of INEX, Knauf, and the PSC is that they placed the talismanic phrase "time is of the essence" in the Collusion Deal, they can enter into a class-wide settlement that is binding against North River even though North River has not consented to the Collusion Deal.  The policies issued by North River to INEX contain a provision requiring North River's consent before it is bound by any settlement.  The Collusion Deal developed over the period from May 31, 2012 to November, 2012 according to Mr. Glickstein, Knauf's counsel, is an attempt by INEX and its cohorts to destroy INEX's contractual agreement that it will not settle a claim against it without North River's consent.[7]

The general rule in Louisiana is that a clause in an insurance policy that requires the insurer's consent to a settlement by the insured is valid and enforceable.  *See, e.g., New England Ins. Co. v. Barnett*, 465 Fed. Appx. 302, 307-08 (5th Cir. 2012).  That means that a settlement by INEX without the consent of North River will prevent the settlement from being enforceable against North River.  *Id.  See also Danrik Const. v. Am. Cas. Co.,* 314 Fed. Appx. 720 (5th Cir. 2009).  That is the rule that will control the question of whether the Collusion Deal is binding against North River, even if it is considered and approved by the Court.

In its effort to get out of its contractual promise, INEX looks to *Emile M. Babst Co. v. Nichols Construction Corp.*, 488 So.2d 699, 703 (La. App. 1 Cir.1986), in which an intermediate

---

[7]  It is disturbing how a scheme developed over almost six months is characterized as "time is of the essence."

Louisiana appellate court held that a "no action clause has been held to be of no effect when an insurer denies coverage where there is coverage, or unjustifiably delays settlement, forcing the insured to settle separately."  The court concluded that because "time was of the essence, both in the performing of subcontract . . . and in the completion of the repairs," the insured was not bound by the no action clause and could settle without the consent of the insurer.  *Id.*

The holding in *Babst* is of very questionable parentage.  The only authority cited by the *Babst* court for its variance with existing Louisiana law was *Thomas W. Hooley & Sons v. Zurich General Accident and Liability Insurance Co.*, 235 La. 289, 103 So.2d 449 (1958).  The language used in *Babst* is not a correct statement of the *Hooley* decision.  In *Hooley*, the Louisiana Supreme Court held that an insurer who wrongfully denied coverage under a liability policy could not contest a settlement made by its insured with a third-party claimant:

> Although most of the cases involved not only (as here) an unjustified denial of liability but also a specific refusal to defend an action brought against the insured, the reasoning therein as well as the equitable reasons therefore support the conclusion that by the mere denial of the insurer to its insured of any liability under the insurance policy for the damages claimed by a third person, the insurer forfeits its right to claim the benefits of the 'no action' clause, and the insured policyholder even in the absence of litigation may compromise the claim against him without prejudicing his right to recover from the insurer the amount of a reasonable and good faith settlement made by him. Especially when as here liability to the third person is unquestioned, and after a denial of coverage by the insurer the policyholder minimizes the loss and avoids the expenses of litigation by a reasonable compromise, the insurer should be unable to claim that reimbursement to its insured of damages clearly covered by the insurance contract is barred by such compromise which was to the ultimate benefit of the insurer.

103 So.2d 449, 452-53.

The Louisiana Supreme Court affirmed the rule in *Hooley* just last year in *Arceneaux v. Amstar Corp.*, 66 So.3d 438 (La. 2011), in which an insured claimed that when an insurer breached the duty to defend the insured by wrongfully withdrawing a defense, the insurer waived not just its right to consent to settlements but other policy terms and conditions, including policy

---

exclusions.  The insured relied upon *Hooley* for this argument.  The Louisiana Supreme Court deftly rejected such a misuse of *Hooley*:

> While *Hooley* did find a waiver of a policy provision by breach of the duty to defend, the provision was unrelated to coverage and related only to a preliminary matter dealing with the insurer's defense obligation. The narrow holding of *Hooley* cannot be extended to find waiver of other insurance contract provisions, particularly those related to coverage. *Hooley* simply stands for the proposition that where an insurer wrongfully refuses to defend its insured, the insured is free to settle the case against it without the insurer's approval.

66 So.3d at 452.

There can be no doubt that the Louisiana Supreme Court would similarly reject the *Babst* court's unjustified attempt to expand *Hooley*.

The *Hooley* rule is totally inapplicable to the present situation.  The policies issued to INEX create no duty to defend on North River's part and therefore North River cannot have breached a duty to defend because the duty does not exist.  (As has been discussed in prior proceedings, no duties under the North River policies have matured because the primary insurance available to INEX that underlies the North River policies has not been exhausted).

Not only does *Babst* misstate the holding in *Hooley*, the rationale of *Babst* does not apply to this case because the facts of *Babst* were rather unique and quite unlike the situation in this case.  In *Babst*, a cherrypicker operated by a subcontractor and being used to construct a dock, fell over and damaged the dock.  Under the subcontract, if the subcontractor did not complete its work on time, it would not only lose the amount it was to be paid under the subcontract but would also have liability to third parties under an indemnity provision in the subcontract. 488 So.2d at 703.  In order to avoid additional loss, the subcontractor paid for the repairs and sought to recover the payment from its liability carrier. *Id.*  Because of the risk of additional loss, an issue which was completely outside of the settlement of the lawsuit, the carrier denied the payment because of a "no action" clause in its policy.  The Louisiana First Circuit Court of

Appeals held that "time was of the essence, both in the performing of subcontract . . . and in the completion of the repairs" and that the subcontractor "stood to lose the subcontract amount and to be held liable under the "hold harmless" clause of the subcontract entered . . . if it did not complete its work timely." *Id*.

Therefore, even if *Babst* is an accurate statement of Louisiana law – and its unexplained expansion of *Hooley* beyond the holding of the Louisiana Supreme Court makes that extremely doubtful – *Babst* means, at most, that an insured who is under external time pressure and chooses to complete the performance of a contract in order to avoid loss of income and additional damages to third parties does not lose its insurance coverage because its insurer does not approve the insured's conduct before the insured completes the contract. *Babst* has no application where (a) the purpose of the non-consensual settlement involves something other than completion of preexisting contractual obligations to third parties, (b) the time deadline upon which the insured relies is a contractual deadline voluntarily assumed by the insured after the loss, and (c) the time pressures are manufactured rather than genuine.

INEX does not face the same type of time pressures that existed in *Babst*. INEX reached its settlement with the PSC in April of 2011, over eighteen months ago. Under the terms of the INEX Settlement, INEX will have no direct liability to the Plaintiffs or anyone else. The primary insurers of INEX will contribute money to the settlement and the claims against North River will be assigned to Knauf. By January of 2012, the Court had preliminarily approved the Knauf Settlement and INEX was aware that Knauf has the power to unilaterally veto the INEX Settlement. The Collusion Deal which seeks to amend the INEX Settlement a second time could have been filed at any time since December of last year. The potential for a Knauf veto of the INEX Settlement has existed for more than ten months. The terms of the Collusion Deal have been agreed to and in writing for almost three months.

As discussed earlier, the intentional delay by INEX, Knauf, and the PSC in presenting the Collusion Deal for Court approval is sufficient reason by itself to reject the Collusion Deal.  In addition, the Collusion Deal will not be binding on North River and will not serve any legitimate purpose.  The Court and all of the affected parties will be better served by rejecting the Collusion Deal and going forward with the fairness hearings on five class-wide settlements set for hearing in less than three weeks.

## IX.

## CONCLUSION

The Collusion Deal is a flawed and futile effort to force a settlement by North River.  The Collusion Deal will not increase funds available to class members, will not impose liability upon INEX, will not determine or impose liability against North River, and will not be binding against North River.  Even without regard to the merits, consideration of the Collusion Deal will inevitably delay the five fairness hearings set for December 11, 2012 (unless the Court accepts the request by INEX, Knauf, and the PSC to ignore the notice requirement of Rule 23 and deny North River due process by depriving it of a reasonable opportunity to conduct discovery).  For all of the reasons set forth above, the Collusion Deal is fraught with procedural, substantive, and constitutional problems and should be rejected by the Court.

Respectfully submitted,

THOMPSON COE COUSINS & IRONS LLP

_____*/s Eric B. Berger*_____
BRIAN S. MARTIN, ESQ.
KEVIN RISLEY, ESQ.
RODRIGO "DIEGO" GARCIA, JR., ESQ.
One Riverway, Suite 1600
Houston, Texas 77056
Phone: (713) 403-8206
Fax:  (713) 403-8299
bmartin@thompsoncoe.com

LOBMAN CARNAHAN BATT ANGELLE
& NADER

SIDNEY J. ANGELLE, ESQ.
La. Bar No. 1002
ERIC B. BERGER, ESQ.
La. Bar No. 26196
400 Poydras Street, Suite 2300
New Orleans, Louisiana 70130
Phone: (504) 586-9292
Fax:    (504) 586-1290
sja@lcba-law.com

ATTORNEYS FOR THE NORTH RIVER
INSURANCE COMPANY


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served on Plaintiffs' Liaison Counsel, Russ Hermann, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on December 3rd, 2012.


_____/s Eric B. Berger_____
ERIC B. BERGER