President Barak Obama
The White House

October 15th, 2013

RECEIVED
OCT 21 2013
CHAMBERS OF
U.S. DISTRICT JUDGE
ELDON E. FALLON

The Honorable Eldon E. Fallon
United States District Court
Eastern District Of Louisiana

The Honorable Tim Johnson
Chairman
United States Senate Committee On Banking, Housing, & Urban Affairs

The Honorable Jeb Hensarling
Chairman
The Committee On Financial Services

The Honorable Marco Rubio
Senator
Florida

The Honorable Ted Deutch
US Representative
Florida District 21

The Honorable Jared Evan Moskowitz
Florida State Representative District 97

Sun-Sentinel
Earl Mauker

Steve Croft
60 Minutes

Dear Mr. President and distinguished gentleman,

Should our letter to Secretary Donovan find its way to your desk, on behalf of both us, we appreciate your time and effort in reading through it. We trust that you will draw the same conclusion. Namely, that the FHA should readdress our situation, including all others under the same circumstances, and conclude that a short sale is the best route for all interested parties.

Any help, advice, or support in our efforts would be greatly appreciated.

Regards,

Floyd Goodson

Tracy S. Goodson

**FLOYD AND TRACY GOODSON II**
8060 NW 126TH TERRACE
PARKLAND, FL 33076

Mr. Shaun Donovan                                          October 15, 2013
Secretary
U.S. Department Of Housing And Urban Development
451 7th St SW,
Washington, D.C., DC 20410
Phone: (202) 708-1420

Dear Secretary Donovan,

My wife and I are writing to you today about our request for an approved FHA short sale through SunTrust Bank.

Our request is based on conclusive evidence for the presence of Chinese drywall in our home from a May 31st 2013 report from GFA, who inspected our home prior to us listing it for sale. That report is attached for your review and records.

At the moment, the FHA guidelines simply state to fix the Chinese drywall issue. For a short sale, we must prove financial hardship. It is questionable on several levels that the current guidelines do not give equal credence to mitigating factors such as Chinese drywall, as it relates to proving a current financial hardship, because they do not include the material loss of property value or cost to repair. To demonstrate a current financial hardship to the FHA, we must die, get divorced, get sick (how sick is not specified), or quit our jobs.

In our view, the FHA guidelines themselves will cause a financial hardship for us if we are not given relief through a short sale. SunTrust and the FHA are expecting monthly payments, even though you have denied the short sale. We have to move out of the home in the very near future to preserve our health as well as our financial health and we will not be able to afford payments on two homes and the related costs of maintenance and up keep.

We have made every payment to SunTrust and it seems very clear that we are now being penalized by FHA guidelines because we are not broke, sick, dead, or out of a job. Not surprisingly, many lawyers have suggested that we get sick, go broke, run up our credit card balances, or lose our jobs as a means to get an FHA approved short sale.

We have a current offer to sell our home to a buyer who is willing to take on the risk and liability of owning and remediating a home full of Dragon Brand Chinese Drywall for $320,000. Between SunTrust and the FHA, I believe your shared loss is about $45,000 each.

There are no other avenues of recourse for us to seek. Obviously, PMI insurance has no part in this. Insurance companies have classified Chinese drywall as a "total pollution exclusion", and the IRS deduction is meaningless as it relates to the total cost of repairs. A 203 K loan is not an option since that has to be done on the front end and even if you offered it, we probably could not afford it. SunTrust will not modify the loan to reflect the homes new value either and even if they did, the change in the payment amount is not enough to save as it relates to fixing the home in the foreseeable future (years).

Floyd and Tracy Goodson
October 15th, 2013
Page 2


If the short sale is not approved, we will have to ultimately adapt to your guidelines for a short sale which will more likely force us into foreclosure proceedings vs. a short sale. The only tactic we have available is to quit paying but because the FHA guidelines don't include non-payment as an option for a short sale, it is reasonable to infer that SunTrust will bypass the short sale and go immediately to foreclosure.

At the same time, our house is uninhabitable because of the hydrogen sulfide off-gassing.  Among other conditions for approval, the house must be habitable. Ours, based on formal and scientific testing as well as our health, is not.

I have attached some photos so that you can see the impact we are talking about to our home. This home is located two doors down from ours.  The buyer of the home, which has the **identical floor plan to ours,** had to completely strip the home down to the cinder blocks to remediate the effects of Chinese drywall. Our home must undergo the same treatment.  In the meantime, and prior to our move to a rental property on October 25th, we have moved our bed into the kitchen as the walls were not opened to complete the Chinese Drywall inspections.  The Master Bedroom and all other areas of the house now have areas of drywall cut out and are off gassing causing my wife to have  headaches, dizziness and a bloody nose.  As an aside, we began to feel better (mental concentration, stamina, lack of coughing, etc) once we moved from the bedroom.




With all due respect,



Floyd P. Goodson II
(C) 770-331-4918
(O) 305-577-7284
(H) 954-575-5695

Tracy S. Goodson II
(C) 786-879-0168
(O) 305-358-9807
(H) 954-575-5695

Floyd and Tracy Goodson
October 15th, 2013
Page 3


CC:

**SunTrust Bank**

SunTrust Bank
Mr. William H. Rogers, Jr.
Chairman & Chief Executive Officer
SunTrust Bank
303 Peachtree St
Atlanta, Ga. 30308

Jerome T. Lienhard, II
President and Chief Executive Officer, SunTrust Mortgage, Inc.
SunTrust Bank
303 Peachtree St
Atlanta, Ga. 30308

**Elected Officials & Representatives**

President Barak Obama
The White House
1600 Pennsylvania Ave.
Washington, DC 20500

The Honorable Eldon E. Fallon
United States District Court
Eastern District Of Louisiana
500 Poydras St
Room C-456
New Orleans, La. 70130

The Honorable Tim Johnson
Chairman
United States Senate Committee On Banking, Housing, & Urban Affairs
136 Hart Senate Office Building
Washington, DC 20510
(202) 224-5842

Floyd and Tracy Goodson
October 15th, 2013
Page 4


The Honorable Jeb Hensarling
Chairman
The Committee On Financial Services



The Honorable Marco Rubio
284 Russell Senate Office Building
Washington DC, 20510


The Honorable Ted Deutch
1024 Longworth House Office Building
Washington, DC 20515
Phone: 202-225-3001


The Honorable Jared Evan Moskowitz
Florida State Representative District 97
2850 North University Dr.
Coral Springs, Florida 33065


**Editorial**

Sun-Sentinel
Earl Mauker
500 E. Broward Blvd.
Fort Lauderdale, FL 33394


Steve Croft
60 Minutes
**524 West 57th St.**
**New York, NY 10019**

Floyd and Tracy Goodson
October 15th, 2013
Page 5



Home Under Remediation                    Our Home



Home Under Remediation                    Our Home



Home Under Remediation                    Our Home

Floyd and Tracy Goodson
October 15th, 2013
Page 6



Home Under Remediation



Our Home



Bed now in the kitchen due to bedroom off gassing



**SunTrust Mortgage, Inc.**
Mail Code: RVW5113
P.O. Box 26150
Richmond, VA 23224

Your loan or line ending in: 0725

September 22, 2013

Floyd Peck Goodson
8060 NW 126TH Ter
Parkland, FL 33076-4918

Dear Floyd Peck Goodson:

Thank you for requesting a Short Sale to your Mortgage. After reviewing your information, we regret that we are unable to approve your request for a Short Sale based on the following reason(s):

> Unable to determine hardship

Information that factored into the decline decision included:

The request has been declined by the investor or master servicer of your loan. The reason for hardship has either not been provided, or if provided, the reason for hardship is not acceptable per program guidelines.

The name of the investor of your loan is:

SUNTRUST MORTGAGE
FEDERAL HOUSING AUTH

If you have any questions regarding the reason(s) we were unable to approve your request, please contact DELILAH BAILEY at 855.223.4680, Ext. 67119. Our standard business hours are 8 a.m. to 10 p.m., ET, Monday through Friday and 9 a.m. to 3 p.m., ET, Saturday.

Please be advised that collection activity, including referral to foreclosure or foreclosure proceedings, may continue unless your circumstances qualify you for a further review by SunTrust. If you have received or do receive a notice of foreclosure proceedings, you should contact the representative or attorney noted in the correspondence.

The consumer reporting agency referenced below did not make this decision and is unable to provide you with the specific reasons why your application was not approved. However, since our decision was based in whole or in part on information from this consumer reporting agency, under the Fair Credit Reporting Act, you are entitled to know the information provided to us. You also have the right to receive a free copy of your consumer report from the consumer reporting agency, if you request it within 60 days of this notice. In addition, you also have the right to notify the consumer reporting agency and dispute the accuracy or completeness of any information on your consumer report. To receive this information, contact:

TransUnion Consumer Relations
2 Baldwin Place
P.O. Box 1000
Chester, PA 19022
1-800-888-4213

See the following page(s) for additional information



**SunTrust Mortgage, Inc.**
Mail Code: RVW5113
P.O. Box 26150
Richmond, VA 23224

September 22, 2013

Your loan or line ending in: 0725

Tracy L Story
8060 NW 126TH Ter
Parkland, FL 33076

Dear Tracy L Story:

Thank you for requesting a Short Sale to your Mortgage.  After reviewing your information, we regret that we are unable to approve your request for a Short Sale based on the following reason(s):

     Unable to determine hardship

Information that factored into the decline decision included:

The request has been declined by the investor or master servicer of your loan.  The reason for hardship has either not been provided, or if provided, the reason for hardship is not acceptable per program guidelines.

The name of the investor of your loan is:

    SUNTRUST MORTGAGE
    FEDERAL HOUSING AUTH

If you have any questions regarding the reason(s) we were unable to approve your request, please contact DELILAH BAILEY at 855.223.4680, Ext. 67119. Our standard business hours are 8 a.m. to 10 p.m., ET, Monday through Friday and 9 a.m. to 3 p.m., ET, Saturday.

Please be advised that collection activity, including referral to foreclosure or foreclosure proceedings, may continue unless your circumstances qualify you for a further review by SunTrust.  If you have received or do receive a notice of foreclosure proceedings, you should contact the representative or attorney noted in the correspondence.

The consumer reporting agency referenced below did not make this decision and is unable to provide you with the specific reasons why your application was not approved.  However, since our decision was based in whole or in part on information from this consumer reporting agency, under the Fair Credit Reporting Act, you are entitled to know the information provided to us.  You also have the right to receive a free copy of your consumer report from the consumer reporting agency, if you request it within 60 days of this notice.  In addition, you also have the right to notify the consumer reporting agency and dispute the accuracy or completeness of any information on your consumer report.  To receive this information, contact:

    Experian
    701 Experian Parkway
    P.O. Box 2002
    Allen, TX 75013-0036
    1-888-397-3742

## FLOYD AND TRACY GOODSON II
8060 NW 126TH TERRACE
PARKLAND, FL 33076

Mr. William H. Rogers, Jr.                                            September 30th, 2013
Chairman & Chief Executive Officer
SunTrust Bank
303 Peachtree St
Atlanta, Ga. 30308

Dear Mr. Rogers,

We appreciate your time and while we have tried to be concise we feel it necessary to give you as much background as possible as this letter is about our request for a timely short-sale due to a product defect (Chinese drywall), and not a foreclosure.

**Background**

We are writing to you today as customers of SunTrust Mortgage. Our mortgage account number is 0211568072. My wife and I have owned our home since October of 2009. It is our primary home and the only home that we own. Over the last 4 years, we have invested about $60,000 into the property, which is something we enjoy doing as do-it-yourselfers. Some of those refinements include hardwood flooring, painting, crown molding, extensive work in the front and back yard, in addition to our down payment.

This is not the first home that we have owned with SunTrust. Between 1992 & 1997, I owned a property with your bank at 12135 Laurelwood Farm Dr. in Alpharetta, Ga.   Combined my wife and I have owned five houses.  In each case, we have never missed a payment.

This letter, however, is not about home improvements or making house payments.

Tragically, we found out on May 31st, that our home is "infested" with Chinese drywall. The reason we found out is that we had plans to move from South Florida back to my home in Knoxville, Tennessee to work for my family business. During the course of making the final refinements and arrangements to list the home in the spring, we noticed that several of our neighboring homes had undergone a full remediation for Chinese drywall. Two of the homes were immediately to our north, and a third one across the street to our east. All of the homes were built by WCI communities, which filed for bankruptcy not long after the Chinese drywall issue became a significant legal and financial issue for them.

Because we had a concern that an inspection could show that we had the problem without realizing it, we decided to have testing done by an independent company, GFA, to get in front of the concern or to demonstrate that we did not have it at closing. We have included a copy of that report with this letter. The testing fees were just over $5,000.

It's reasonable to ask "how did we not know" of this issue when we bought the house. We spent several months looking for a home in 2008 & 2009. Previously, we were renting because the homes were too expensive to purchase after we moved from Atlanta to South Florida in 2006. After renting two homes, where both owners went into foreclosure, we decided to buy. Home prices had started to normalize and we were able to save or access enough down payment

Floyd and Tracy Goodson
September 30, 2013
Page 2

fundsto start looking for a FHA based loan. It was a difficult process.  Not only had cash investors entered the market, many houses had been stripped of appliances, cabinets, even copper by the prior owner when their house went into foreclosure. We looked at over 100 homes in person and made 13 offers in 9 months. The 14th, our current home, was free and clear of any issues (pending foreclosure, owner still living there, no behind the scenes bidding wars, etc.)

Chinese drywall was a known issue and of those 100 that we looked at, many had the tell-tale rotten egg smell which explained why they were so cheaply priced. There are several brands of Chinese drywall. Most notably, Knaupf is a brand with a fast "burn" meaning that the sulfur content, and subsequent toxic emissions, where noticeable the moment you walked in and the smell could be evident immediately after installation. We have a slow" burn" drywall meaning that it has not reached its full apex in terms of the effect on copper, wiring, the AC system or smell, but eventually will. As you can see in the report however, the effects are significantly present in our home at this point.

In 2009, we had our home inspected during the purchase process. Standard Chinese drywall testing of the time was limited to a visual inspection, noticeable and apparent odors, as well as looking for obvious signs of copper or AC coil corrosion. Our inspection did not show any of proof of Chinese drywall.   Thus, the slow "burn" effect where the drywall is present but not readily evident.

When we had the house tested this year using the drywall board by board method, the house tested positive.  While no smell was evident when we purchased the house in 2009, surprisingly, after GFA took drywall board samples from our home, the smell became obvious that day. GFA later came back for additional samples to confirm, which was then that we knew we had the issue. Most of the Chinese drywall is in the interior rooms, not exterior walls. In fact, after we placed duct tape to cover up one of the holes left behind after a sample, it turned yellow.

**The last few months**

My wife has been in commercial real estate her entire career. I have been in financial services for most of my career, including American Express, Wachovia Bank (Winston Salem, through First Union, through Wells Fargo) and I am now at a community bank, City National.

Once we realized the issue we had, we both spent every available waking hour trying to understand the impact of our misfortune to and determine a few things:

1.  Do we have recourse with anyone?
2.  What are the potential costs of this issue (to us, our health, etc.)?
3.  What are our options or what is the best next step (remediate the house, sell it, etc.)?
4.  How does this change our future financially?
5.  What is our reputational risk from a credit standpoint?
6.  Do we continue to pay SunTrust?

Floyd and Tracy Goodson
September 30, 2013
Page 3


**Point # 1 – Do we have recourse with anyone?**

Because the lawyers that advertise their representation of drywall plaintiffs are refusing new clients (including us) and due to our finding out about the issue so late, we were forced to file our class action settlement claim Pro Se. The funding of all legal fees has already been set aside through the class action global settlement and therefore there is no interest on behalf of the lawyers to dilute that fund. The class action has been divided into two parties, those with Knaupf drywall (the Knaupf settlement) and those with other brands (called the global settlement). There is immediate recourse if you have a specific type of Knaupf Drywall as they have settled their portion of the class action case. It is the full scholarship version of remediation. Meaning, the house would be fully restored with new wiring, HVAC, appliances, and finishes. All while, the homeowner, receives temporary living expenses. Regrettably, that is not the brand we have. Our brand is Dragon Brand by Bejing New Building Materials and currently our recourse is through the global settlement. The global settlement and the amount funded to homeowners through the global settlement has not yet been determined pending a review of all claims; claims are due September 30, 2013. If you opt into the global settlement, a claim cannot be made in the future should Beijing New Building Materials settle separately.

Dragon Brand and other brands, effectively owned by the Chinese government, have not settled a federal class action lawsuit. They will continue to fight jurisdiction, and it will likely be some time, if ever, before a remediation program is set up for the rest of the Chinese drywall victims in this country. Many of which have already been forced to short sale or have lost their home to foreclosure.

Part of the class action decision was that Chinese drywall was not an "insurable event" as it was product defect and not pollution. We would have been in a better position from a recourse standpoint had we been hit by an asteroid, flood, hurricane, or a 747.

We cannot sue WCI, because WCI communities filed for bankruptcy shortly after the issue with Chinese drywall became public. Ironically, the trust set aside to help their victims closed in August 2009 – we purchased our home in October 2009 and therefore are not eligible for their fund. The inspector we engaged when we purchased the home is not an option because he used the acceptable testing methods at the time. The previous owners do not appear to have filed anything formally with the local tax authority, or any of the Chinese drywall lawsuits. In other words, there is no evidence that they knew of a Chinese drywall issue and therefore had no duty to disclose. We feel that we have investigated all of our avenues for recovery of costs thoroughly.

**Point # 2 – What are the potential costs of this issue?**

We had planned on listing the house for $525,000 this year. With our principal balance at $389,000 and after closing costs, we estimated that we would have enough to transfer as a down payment to a future home in Knoxville. The market value of our home since the discovery of Chinese drywall has plummeted as you would expect. We have a current offer in, who is also a SunTrust customer, for $325,000. That is an approximately a $200,000 swing to the negative which is a complete and swift evaporation of equity, sweat equity, principal, and in our view, time.

As for our health, we are different. Our lack of short term memories are a point of daily conversation with each other and our coworkers. Our fatigue levels are at an all time high and Tracy wakes up with a bloody nose at least once a

Floyd and Tracy Goodson
September 30, 2013
Page 4

month.  Even spreadsheets that I (Floyd) have built myself seem strange on some days as if I didn't even build them to begin with. These "changes" have been amplified with the opening of the walls to take the samples.

**Point # 3 – What are our options or what is the best next step?**

Without Knaupf as an option as the basis to have the home fixed, we are left with two options. First is to fix it ourselves which involves leaving the home for a period of time between 4 & 6 months but that is only after securing the contractors, building permits, etc. In addition to the cost of the remediation, we would have to fund a second household.  In Florida, rentals require a first, last and a full security deposit at lease execution.  We do not have the funds to maintain two houses.

The timing of a self-remediation could extend deep into 2014 if not beyond. There is a very important adjacent issue to beginning a remediation, and that is by which standard do we go buy to remediate the home?

The first standard is the Knaupf standard, which is the gold standard. The entire home is stripped down to the cinder blocks, leaving only the metal studs. Wiring, AC systems, and major appliances, especially with any copper components, are replaced. The second standard, is the non-Knaupf standard so to speak where there are no clear cut guidelines only HUD recommendations. It is also the riskiest because without specialized insurance, proving that the house does not have one remaining system, wall, or copper component with residual gassing issues it is believed to be an insurmountable burden of proof for the seller.

If you put two houses side by side for sale, we believe we know which one you would pick. Aside from the type of remediation done, consider the costs below in the following context. If you asked us to stay with the house under the assumption of a LOC or even a construction loan, we still come out negative as it relates to the balance, versus the market value. Among other consequences, that extends our time in Florida by several years, and assuming market conditions stay in form and there are no natural or economic disasters, it would be 2017 and possibly 2018. Those timeframes are just to break even. If you and I elected for the higher remediation standard, it would be well beyond those time frames.  The numbers below do not consider the rental necessary for the construction time period which will add an additional $50,000 to our out of pocket expenses at a minimum.

Floyd and Tracy Goodson
September 30, 2013
Page 5

| Repair Paid by Goodson's | | | |
|---|---|---|---|
| payoff | $389,000 | | |
| cost of repair | $120,903 | | |
| total | $509,903 | | |
| commission | $30,594 | | |
| closing costs | $10,198 | | |
| total needed sale price | $550,696 | | |
| Today's market value | 490,000 - 510,000 | | |
| **to short sale** | **low estimate** | **mid-range** | **high side** |
| market value repaired | $490,000 | $490,000 | $490,000 |
| cost of repair | $91,590 | $115,020 | $156,100 |
| profit to seller at flip | $50,000 | $50,000 | $50,000 |
| Seller's costs to flip | $24,500 | $24,500 | $24,500 |
| Short sale offer | $320,010 | $300,000 | $259,400 |
| payoff | $389,000 | $389,000 | $389,000 |
| amount of short sale | ($69,010) | ($89,000) | ($129,600) |
| commission at short sale | ($19,435) | ($18,029) | ($15,564) |
| cost of sale | ($3,239) | ($3,005) | ($2,594) |
| short sale to bank | ($87,764) | ($110,034) | ($147,758) |

Our friends in the residential construction business, lawyers that we know, financial advisors, and those that have legal experience with drywall have unanimously supported and hoped for, an approved short sale.

We both know, that even if SunTrust wanted to offer us a loan to fix it, that the size of the loan exceeds the current value of the home by a long stretch. There is no way this would get through loan committee using traditional underwriting standards and we do not have the assets to even rationalize it. If we did, I would not be writing this letter to you.

The second option is to sell our home. We do have a buyer who is also a SunTrust customer. Prior to listing our home, a contractor bidding on remediation repairs made an offer of $240,000. Once we listed the house, we received an offer of $300,000 which we negotiated up to $320,000 in an effort to mitigate SunTrust's losses. This is the offer in front of SunTrust at this time. A short-sale with a cash investor who is also a SunTrust customer is truly the best possible outcome for all parties as our house in uninhabitable.

Floyd and Tracy Goodson
September 30, 2013
Page 6

**Point # 4 – How does this change our future financially?**

My wife will be 50 in December, I will be 48 in January.  Never in our lives have we contemplated such a reversal of fortune.  Because of the market conditions over the last several years and other circumstances, we are wiped out and basically live paycheck to paycheck with minimal savings. Our 401K's (what was left of them after economic downturns) have been used towards the purchase of this house. While our combined income is roughly $240,000 per year, before any smaller S chapter payments are made to us from the family business, after expenses, we average about $5,000 in our accounts month to month, sometimes lower, sometimes higher, but not much either way. We do not belong to any clubs or have major financial obligations to anyone that if eliminated, would allow us to chip into this situation we are in so to speak. It will be some time before we can call ourselves homeowners again due to the impact of our lost equity, lack of financial means, as well as the anticipated impact to our credit scores. We will recover, but at the price of time and money.

**Point # 5 – What is our reputational risk from a credit standpoint?**

Our credit reputation is as important to us as any other reputation. Based on our Equifax report, we are both excellent credit risks.  It was disturbing to us when we received a letter from SunTrust with our FICO scores which (1) came with no explanation and (2) scores lower than we have been seeing on our own reports.  Given that our issue was not a financial issue per say, we could not understand why our scores were of any importance, at least, not until we got SunTrust's offer as outlined further below.

We have been responsible credit borrowers for many years now. When the opportunity presented itself, we have paid down debt instead of taking elaborate vacations or going on shopping sprees. We have yet to take our honeymoon trip after we were married in October, 2010. We realize that a short sale may cost us 100 points or more and limit our ability to obtain credit if need be or costly credit if the situation is more dire, which I hope does not become necessary.  Again, at no point in our lives could we have contemplated knowingly and willingly making a decision such as short-selling our house that would destroy what was so difficult to build and maintain.

**Point # 6 - Do we continue to pay SunTrust?**

Yes.

Amongst all the anguish, issues, and the rocky road we have been on for the last few months, it has never crossed our mind to not pay. This is not a financial issue so much as a property defect issue – our house is simply uninhabitable. Given our trust in the banking system, as homeowners the only option we see at this time is what we deem a bona-fide request for a short sale transaction.  We do not feel that not paying our mortgage should be used as a threat to move the short sale forward even though some have advised us differently.  However, as we have stated previously, we cannot continue to live in the house, we cannot afford to repair the house and live elsewhere at the same time. Therefore at some point in the near future, there must be some form of equitable resolution.

Floyd and Tracy Goodson
September 30, 2013
Page 7

**Today**

To this point, we have filed all of the short sale paperwork with your mortgage department as required by early to mid-August.  We did retain a law firm who specializes in short sale transactions. Our broker, who also works for them, specializes in short sales.

About 10 days ago, our broker heard from SunTrust that we can expect to receive the following offer and explanation from the mortgage department:

1.  Our credit score is too good for a short sale.
2.  We cash flow to make the mortgage payment.
3.  We have never missed a payment.
4.  SunTrust was willing to transfer the balance owed to the new owner.
5.  SunTrust was going to ask us to pay the closing costs.

I trust you will agree on the following points:

1.  Our house in uninhabitable.
2.  Our credit and cash flow is not the issue.
3.  Your mortgage department is not seeing the forest from the trees.
4.  This is not an offer.

More importantly is the following. We have been responsible owners who have had the narrowest of unfortunate circumstances, if not tragedy, drop on top of us. I don't believe it is in the best interest of the SunTrust mortgage department to square off with us over a legal short sale vs. us stopping monthly mortgage payments. For SunTrust to potentially drive us (or point, infer, or suggest a direction that reasonable people could infer) into either a foreclosure or chapter 11 over $90,000 simply due to the fact that our home lost $200,000 in value due to a federally recognized product defect is surely not the direction you or any other regulatory agency would support.

We have lost much more than the bank has at this point.   Of note, we purchased this home from a cash investor who had bought it out of foreclosure for $320,000 – there is no gain in value for the bank to push for foreclosure – if it was worth $320,000 before anyone knew it had Chinese Drywall, it will only be worth less to most investors at this juncture. There is no remedy with HARP, no immediate legal recourse with any entity, there is no loan that the OCC would audit and conclude that it was a good under the circumstances, and certainly we do not have the means to fix this problem ourselves and continue to make a mortgage payment.

Thank-you for your time.  We hope that you will share this letter with Mr. Lienhard II, and one or  both of you let me or my wife know what you believe are the next steps from SunTrust's mortgage perspective. We ask that you approve a short sale whereby:

Floyd and Tracy Goodson
September 30, 2013
Page 8

1. You have a SunTrust cash buyer ready to assume the property, without any transfer of principal. Otherwise, the purchase does not make sense for him and it is no longer a short sale.
2. SunTrust agrees to pay the closing costs.
3. We will continue to make payments until closing provided we receive approval of a short sale within 45 days of this letter.

We are ready to move on. What used to be happy memories of our hard work, our wedding days, friends, and family are now behind the Chinese drywall.

With all due respect,


_____

Floyd P. Goodson II
(C) 770-331-4918
(O) 305-577-7284
(H) 954-575-5695

_____

Tracy S. Goodson II
(C) 786-879-0168
(O) 305-358-9807
(H) 954-575-5695

# GFA International, Inc.

**Florida's Leading Engineering Source**

## THRESHOLD INSPECTION AND CORROBORATING EVIDENCE REPORT

**Sable Point - Heron Bay**

**8060 Northwest 126th Terrace, Parkland, Broward County County, Florida 33076**

**GFA Project No. 13-1038.00**
**July 11, 2013**



### GFA Contacts – Delray Beach

**Steven A. Snyder**
Environmental Department Manager
**ssnyder@teamgfa.com**

**Frederick G. Kaub, P.G.**
President
**fkaub@teamgfa.com**

**Our Specialties**
Environmental Consulting ❘ Geotechnical Engineering ❘ Construction Materials Testing
Threshold & Special Inspections ❘ Private Provider & Code Compliance



**Since 1988**                    *Florida's Leading Engineering Source*

Environmental · Geotechnical · Construction Materials Testing · Threshold and Special Inspections · Plan Review & Code Compliance

## SIGNATURE OF ENVIRONMENTAL PROFESSIONALS

**Sable Point - Heron Bay**
8060 Northwest 126th Terrace
Parkland, Broward County, Florida 33076

GFA Project No.: 13-1038.00
July 11, 2013

### REPORT PREPARED BY:

Toi Akien
Environmental Specialist                                        *Signature*

### REVIEWED BY:

Steven A. Snyder
Environmental Department Manager
Environmental Professional                                     *Signature*

*GFA International, Inc.*
*Project No.: 13-1038.00: Sable Point - Heron Bay*

*Threshold Inspection and Corroborating Evidence Report*
*Table of Contents*

## <u>TABLE OF CONTENTS</u>

**1.0   INTRODUCTION** ........................................................................................ 1

    **1.1   Background** ................................................................................. 1

**2.0   FIELD ACTIVITIES** ............................................................................... 1

    **2.1   Threshold Inspection and Observations** ............................... 1

    **2.2   XRF Screening – Strontium Level Measurements** ................... 2

    **2.3   Drywall Sampling and Analysis** ............................................ 3

**3.0   LABORATORY ANALYTICAL RESULTS** ............................................ 4

    **3.1   Elemental Sulfur and Total Sulfur Compounds** ..................... 4

**4.0   CONCLUSIONS** ................................................................................... 4

**5.0   RECOMMENDATIONS** ........................................................................ 4

**APPENDICES**
    **Appendix A** – Threshold Inspection Photographs
    **Appendix B** – Drywall Science, LLC Drywall Inspection Report (XRF Report)
    **Appendix C** – Laboratory Reports and Chain-of-Custody Documentation



## 1.0     INTRODUCTION

GFA International, Inc. (GFA) is pleased to present this Threshold Inspection and Corroborating Evidence Report for the residential home, located at 8060 Northwest 126th Terrace, Parkland, Broward County, Florida; herein referred as to the "subject building" or "site." The threshold inspection was performed based on the documents entitled "Interim Guidance – Identification of Homes with Corrosion from Problem Drywall" produced by the Consumer Product Safety Commission (CPSC) and the Department of Housing and Urban Development (HUD) dated March 18, 2011. The CPSC/HUD and Florida Department of Health programs both consist of a two-phased approach consisting of an initial "threshold inspection" for visual signs of contaminated drywall ("sentinel indicators") and a supplemental investigation for "corroborating evidence," "supporting indicators," and/or "confirmatory evidence" confirming its presence.

### 1.1     <u>Background</u>

The objective of this Drywall Threshold and Corroborating Evidence sampling and Inspection is to assess the presence or likely presence of Problem Chinese drywall in the subject building. According to the Broward County Property Appraiser, the subject building was constructed in 2006/2007. The Client requested GFA perform a visual inspection for the "sentinel indicators" of drywall associated corrosion and to note observations made of building components that typically show evidence (blackening) of contamination from Problem Chinese drywall (potentially contaminated components) such as HVAC coils, copper pipes and fittings, copper wires, ground wires, electrical connectors, chrome-plated fixtures, and mirror backing.

## 2.0     FIELD ACTIVITIES

### 2.1     <u>Threshold Inspection and Observations</u>

On May 30 and June 18, 2013, GFA conducted a walkthrough inspection and XRF Screening of the subject property. The following observations were made:

➢ Various outlet and switch covers were removed throughout the home. Significant discoloration or blackening of the bare copper ground wires was observed in varied portions of the home.

➢ Air conditioning (HVAC) air handler unit was observed. Interior coils of unit exhibited blackening of copper components, (in addition, portions of the copper was green, indicating a leak). According to the date provided as part of the units serial number the HVAC unit appears to have been installed from the original home construction.



➢ Interior wall board surfaces throughout the home were scanned using an x-ray fluorescence (XRF) device for strontium levels. (Strontium levels are markers for problem drywall and aid in the sampling process).

➢ Exposed markings of the back of the drywall indicated the presence Chinese made drywall within the beneath-stair storage area.

➢ Drywall within the home was noted to include the following manufacturer's marking: *DRAGON BRAND DRYWALL PER ½" 4`X12` ASTM C1396-04. MADE IN CHINA \*\*/\*\*/06.*

➢ Various outlet and switch covers were removed throughout the home. Significant discoloration or blackening of the bare copper ground wires was observed in varied portions of the home.

Photographs taken during the threshold inspection and observations are included as **Appendix A**.

## 2.2    <u>XRF Screening – Strontium Level Measurements</u>

X-ray fluorescence (XRF) screening was performed by Drywall Science, LLC of Fort Myers, Florida. XRF screening is utilized to determine levels of strontium (Sr) present within the drywall. The investigation is performed to assess for "markers" of strontium typically associated with Chinese drywall.

| Test # | Location | Result – ppm Sr |
|--------|----------|-----------------|
| # 1 | Nook | 2,256 |
| # 2 | Kitchen | 2,429 |
| # 3 | Family Room | 2,188 |
| # 4 | Dining Room | 2,156 |
| # 5 | Living Room | 2,189 |
| # 6 | 1st Floor. Hall | 2,212 |
| # 7 | Bath 1st floor | 2,134 |
| # 8 | Gym | 2,241 |
| # 9 | Gym Closet | 2,164 |
| # 10 | Laundry | 2,228 |
| # 11 | Garage | 1,265 |
| # 12 | Stairs | 2,113 |
| # 13 | Landing | 2,081 |



| Test # | Location | Result – ppm Sr |
|--------|----------|-----------------|
| # 14 | Room 1 | 2,113 |
| # 15 | Closet 1 | 2,047 |
| # 16 | Bath 2nd floor | 2,101 |
| # 17 | Room 2 | 2,217 |
| # 18 | Closet 2 | 2,238 |
| # 19 | HVAC Closet | 2,410 |
| # 20 | Bonus Room | 2,206 |
| # 21 | Nook | 2,256 |

**Notes:**
ppm Sr = parts per million strontium

Typically, each manufacturer or manufacture date of drywall will have a strontium signature. The levels of strontium within the subject building's drywall were not consistent with those found in domestic drywall, indicating the presence of Chinese drywall. A copy of the **Drywall Inspection Report** prepared by Drywall Science, LLC, which includes the XRF results, is provided as **Appendix B**.

## 2.3   Drywall Sampling and Analysis

On May 30, 2013, two (2) drywall samples, #2 and #3 (sample #1 not needed), were taken to confirm the presence of reactive/problem drywall within the home. Sample #2 was collected within the hobby room adjacent the entrance and Sample #3 was collected within the downstairs storage room beneath the stairs (bathroom wall).

On June 18, 2013, three (3) additional drywall samples, #4, #5, and #6, were taken to confirm the presence of reactive/problem drywall within the home. Sample #4 was collected within the blue room at the window wall, Sample #5 was collected within the large bedroom closet of the red room, and Sample #6 was collected within the small bedroom closet of the red room.

Drywall samples were submitted to ALS laboratories in Simi Valley, California for analysis of elemental sulfur and hydrogen sulfide emissions.



## 3.0   LABORATORY ANALYTICAL RESULTS

### 3.1   Elemental Sulfur and Total Sulfur Compounds

| Sample # | Location | Elemental Sulfur (mg/Kg) | Total Sulfur Compounds (µg/Kg) |
|---|---|---|---|
| #2 | Upstairs Hobby Room | ND* | ND* |
| #3 | Downstairs Beneath-Stair/ Bathroom Wall | 9.7 | 0.36 – Hydrogen Sulfide |
| #4 | Blue Room – Window Wall | 9.4 | ND* |
| #5 | Master Bedroom - Large Closet – Interior Wall | 9.8 | ND* |
| #6 | Master Bedroom - Small Closet – Exterior Wall | ND* | 0.61 – Hydrogen Sulfide |

Notes:
Elemental sulfur as per ALS's Orthorhombic Cyclooctasulfur test
Total sulfur compounds as emissions test ASTM D5504-08
mg/Kg = milligrams per kilogram (parts per million)
µg/Kg = micrograms per kilogram (parts per billion)
*ND = compound was analyzed for, but not detected above the limit of quantitation

Copies of the laboratory analytical reports and chain-of-custody documentation are included as **Appendix C.**

## 4.0   CONCLUSIONS

Based on our site investigation, onsite testing, laboratory analytical results and research, all drywall within the home except for the ceilings has been manufactured in China. Significant discoloration or blackening of the bare copper ground wires was observed in varied portions of the home. In addition, portions of the drywall within the home have been found to contain elemental sulfur at concentrations which approach the threshold for corrosive drywall, according to the CPSC/HUD and Florida Department of Health guidelines.

## 5.0   RECOMMENDATIONS

Based on the comprehensiveness of this investigation and findings, no further assessment is recommended at this time.



*GFA International, Inc.*
*Project No.: 13-1038.00: Sable Point - Heron Bay*

*Threshold Inspection and Corroborating Evidence Report*
*Page 5 of 5*

For additional information regarding Chinese Drywall, please review the information provided by the CPSC at http://www.cpsc.gov/en/Newsroom/News-Releases/2010/CPSC-Identifies-Manufacturers-of-Problem-Drywall-Made-in-China/.



# APPENDIX A

Threshold Inspection Photographs



**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**1:** Subject Property – 8060 Northwest 126th Terrace, Parkland, Florida.



**2:** Beneath-stair storage room where drywall markings were located.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**3:** Chinese drywall markings within beneath-stair storage area.



**4:** Chinese drywall-end-tape markings within the beneath-stair storage area.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**5:** HVAC unit located within second floor hall closet.



**6:** View of the eastern boundary of the subject property from the northwest corner of the site.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**7:** Second floor hobby room area.



**8:** Electrical copper ground wires for switch and outlet.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**9:** First floor room.



**10:** First floor room outlets.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**11:** First floor room.




**12:** Outlets.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**13:** Upstairs sample location No.2.



**14:** Downstairs sample location No.3.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**15:** Downstairs sample location No.4.



**16:** Downstairs sample location No.5.

**APPENDIX A – THRESHOLD INSPECTION PHOTOGRAPHS**
**Sable Point – Heron Bay**
**8060 Northwest 126th Terrace**
**Parkland, Broward County, Florida**
**GFA INTERNATIONAL PROJECT NO.: 13-1038.00**



**17:** Downstairs sample location No.6.

**This space intentionally left blank.**

**APPENDIX B**

Drywall Science, LLC Drywall Inspection Report (XRF Report)





# Drywall Science, LLC

**7600 Alico Road**
**Suite 1, Box 1221**
**Fort Myers, FL 33912**
**(239) 989-8519**
www.drywallscience.com

## DRYWALL INSPECTION REPORT

This report summarizes testing of drywall and possible related conditions
for the residence at:  8060 NW 126th Ter., Parkland, FL  33076

**Date of test:**  5/30/2013
**Tracking:**  053013-01

### Step 1 - ODORS
Does the home or certain rooms have either a sulfur-like odor or other unusual odors? Defective drywall apparently causes a chemical reaction that gives off a rotten-egg stench, which grows worse with heat and humidity.

**There was a sulfur-like smell in the residence.**

### Step 2 – CHARCOAL OR BLACK CORROSION OF COPPER FREON LINES

Look to see if the compressed Freon line into the air handler has a black appearance, due to sulfur corrosion. Blackening copper corrosion is typically caused by exposure to corrosive gases. Blackening copper corrosion is typically caused by exposure to corrosive gases.

Normal Tubing

Residence Tubing

**No photo available**





**GFA to take their own photos of the air handler and freon lines.**

### Step 3 – BLACKENED CORRODED WIRING
Inspect electrical wiring for distinctive corrosion.

Normal Wiring

Residence Wiring

**No photo available**



**GFA to take their own photos of the Copper wiring.**

**Step 4 - SCIENTIFIC ANALYTICAL TESTING**
X-Ray fluorescence (XRF) is utilized to determine levels of Strontium (Sr).

The EH&E study also found that by using hand-held x-ray fluorescence (XRF) and Fourier Transform Infrared (FTIR) instruments, they were able to detect markers that could identify Chinese-made dry wall at a sheet-by-sheet level.
USCPSC Press Statement 23 November 2009

Steps 1-3 above are possible results of gases emitted by defective drywall. These gases are reported to include carbon disulfide, carbonyl sulfide, hydrogen sulfide, and mercaptan.  It has recently been reported (4-09) that strontium sulfide or strontium sulfate may be a contaminant contributing to defective drywall.

Strontium is a chemical element with the symbol Sr and the atomic number 38. An alkaline earth metal, strontium is a soft silver-white or yellowish metallic element that is highly reactive chemically. The metal turns yellow when exposed to air. It occurs naturally in the minerals clestine and strontianite. The 90 Sr isotope is present in radioactive fallout and has a half-life of 28.90 years. Both strontium and strontianite are named after Strontian, a village in Scotland near which the mineral was first discovered.

**Characteristics**
Due to its extreme reactivity with oxygen and water, this element occurs naturally only in compounds with other elements, as in the minerals strontianite and celestite.

Strontium is a grey/silvery metal that is softer than calcium and even more reactive in water, with which strontium reacts on contact to produce strontium hydroxide and hydrogen gas. It burns in air to produce both strontium oxide and strontium nitride, but since it does not react with nitrogen below 380°C it will only form the oxide spontaneously at room temperature. It should be kept under kerosene to prevent oxidation; freshly exposed strontium metal rapidly turns a yellowish color with the formation of the oxide. Finely powdered strontium metal will ignite spontaneously in air at room temperature. Volatile strontium salts impart a crimson color to flames, and these salts are used in pyrotechnics and in the production of flares. Natural strontium is a mixture of four radiostable isotopes.

**Sr Conclusions and Summary**
The federal government does not regulate the chemical ingredients of imported drywall.

However, testing of drywall manufactured in the USA and imported drywall from China using XRF has shown the imported drywall has consistently higher levels of Strontium.

"The initial analysis shows the presence of strontium at 2570ppm and 2670ppm in the Chinese drywall samples, whereas strontium was detected in the US-manufactured drywall at 244ppm to 1130ppm."
EPA report 7 May 2009

" These statistical findings are consistent with the previous EPA studies of different drywall samples that showed elevated levels of Strontium and Sulfur in Chinese drywall."
USCPSC study 28 October 2009

**Figure 1** below shows the levels of Sr  in drywall analyzed from various USA manufacturers (USA 1-7) and from China imports (Import 1-4).

**Figure 2** shows XRF measurements from various locations in the residence; therefore a direct comparisome can be made.

Baseline ppm Sr

| Test 1: | 1228 USA 1 |
| Test 2: | 228 USA 2 |
| Test 3: | 1150 USA 3 |
| Test 4: | 298 USA 4 |
| Test 5: | 271 USA 5 |
| Test 6: | 1276 USA 6 |
| Test 7: | 449 USA 7 |
| Test 8: | 4888 Import 1 |
| Test 9: | 3700 Import 2 |
| Test 10: | 2090 Import 3 |
| Test 11: | 2885 Import 4 |



Figure 1

Residence ppm Sr

| Test 1: | 2256 Nook |
| Test 2: | 2429 Kitchen |
| Test 3: | 2188 Family Rm |
| Test 4: | 2156 Dining Rm |
| Test 5: | 2189 Living rm |
| Test 6: | 2212 1st Flr. Hall |
| Test 7: | 2134 Bath 1st Flr. |
| Test 8: | 2241 Gym |
| Test 9: | 2164 Gym Closet |
| Test 10: | 2228 Laundry |
| Test 11: | 1265 Garage |
| Test 12: | 2113 Stairs |
| Test 13: | 2081 Landing |
| Test 14: | 2113 Rm 1 |
| Test 15: | 2047 Closet 1 |
| Test 16: | 2101 Bath 2nd Flr. |
| Test 17: | 2217 Rm 2 |
| Test 18: | 2238 Closet 2 |
| Test 19: | 2410 HVAC Closet |
| Test 20: | 2206 Bonus Rm |



Figure 2

\* The test locations were randomly selected from each respective room.  The stated results may not be necessarily indicative of all the drywall in the respective room.

Conclusion: The levels of Sr  in numerous areas were not consistent with those found in Domestic drywall nindicating the presence of Chinese drywall. Confirmation of Beijing New Buildings Material Chinese Drywall found in the residence. See photo below.

 A sample was not taken from the residence and sent to a laboratory for further testing.
\*\* Samples with high levels of Sr may be sent to independent laboratories for further analysis\*\*\*

**Tainted Drywall History**

At the height of the U.S. housing boom, when building materials were in short supply, American construction companies used millions of pounds of Chinese-made drywall because it was abundant and cheap.

Now that decision is haunting hundreds of homeowners and apartment dwellers who are concerned that the wallboard gives off fumes that can corrode copper pipes, blacken jewelry and silverware, and possibly sicken people.

Shipping records indicate that imports of potentially tainted Chinese building materials exceeded 500 million pounds during a four-year period of soaring home prices. The drywall may have been used in more than 100,000 homes, according to some estimates, including houses rebuilt after Hurricane Katrina.

The drywall apparently causes a chemical reaction that gives off a rotten-egg stench, which grows worse with heat and humidity. The Chinese drywall is also made with a coal byproduct called fly ash that is less refined than the form used by U.S. drywall makers.

Dozens of homeowners in the Southeast have sued builders, suppliers and manufacturers, claiming the very walls around them are emitting smelly sulfur compounds that are potentially poisoning their families and rendering their homes uninhabitable.

Builders have filed their own lawsuits against suppliers and manufacturers, claiming they unknowingly used the bad building materials.

The Consumer Product Safety Commission is investigating, as are health departments in Virginia, Louisiana, North Carolina, Florida, and Washington State.

Companies that produced some of the wallboard said they are looking into the complaints, but downplayed the possibility of health risks.

Federal authorities say they are investigating just how much of the wallboard was imported. Shipping records show that more than 540 million pounds of plasterboard — which includes both drywall and ceiling tile panels — was imported from China between 2004 and 2008, although it's unclear whether all of that material was problematic or only certain batches.

Most of it came into the country in 2006, following a series of Gulf Coast hurricanes and a domestic shortage brought on by the national housing boom.

The Chinese board was also cheaper. One homeowner was quoted saved $1,000 by building his house with it instead of a domestic product.

In 2006, enough wallboard was imported from China to build some 100,000 homes of roughly 2,000 square feet each, according to the shipping records and estimates supplied by the nationwide drywall supplier United States Gypsum.

Experts and advocates say many homes may have been built with a mixture of Chinese and domestic drywall, potentially raising the number of affected homes much higher.

So far, the problem appears to be concentrated in the Southeast, which blossomed with new construction during the housing boom and where the damp climate appears to cause the gypsum in the building material to degrade more quickly. In Florida alone, more than 35,000 homes may contain the product, experts said.

In Louisiana, the state health department has received complaints from at least 350 people in just a few weeks. Many of the affected homeowners rebuilt after Hurricane Katrina only to face the prospect of tearing down their houses and rebuilding again.

The drywall furor is the latest in a series of scares over potentially toxic imports from China. In 2007, Chinese authorities ratcheted up inspections and tightened restrictions on exports after manufacturers were found to have exported tainted cough syrup, a toxic pet food ingredient and toys decorated with lead paint.

Scientists hope to understand the problem by studying the chemicals in the board. Drywall consists of wide, flat boards used to cover walls.

It is often made from gypsum, a common mineral that can be mined or manufactured from the byproducts of coal-fired power plants.

**US Product Safety Commission Recommendations to Affected Homeowners**

To date, CPSC has received more than 2000 reports from 32 states, the District of Columbia and Puerto Rico from consumers and homeowners concerned about problem drywall in their homes.

Homeowners who believe they may have problem drywall should immediately report to CPSC by calling 800-638-2772 or logging on to www.cpsc.gov Hearing- or speech challenged individuals may access the phone number through TTY by calling the toll-free Federal Relay Service at 800-877-8339.

Federal and state health experts suggest these steps to improve indoor air quality and to reduce exposure to substances that can cause health concerns:

o  Open windows as much as possible to let in fresh air.
o  Keep the temperature inside homes at the lowest comfortable setting.
o  Run the air conditioner or dehumidifier.
o  Also, spend as much time outdoors in fresh air as possible.
o  Do not smoke, and especially do not smoke indoors. Cigarette smoke contains, among other contaminants, formaldehyde.

To read the technical research reports or for more information, log on to www.DrywallResponse.gov.





BNBM Chinese drywall

Thank you for your business!

# APPENDIX C

Laboratory Reports and Chain-of-Custody Documentation






2655 Park Center Drive, Suite A, Simi Valley, CA 93065      805 526 7161      www.caslab.com

# LABORATORY REPORT

June 3, 2013


Toi Akien
GFA International, Inc.
1215 Wallace Drive
Delray Beach, FL 33444

**RE: Sable Point-Heron Bay / 13-1038.00**

Dear Toi:

Enclosed are the results of the samples submitted to our laboratory on June 3, 2013. For your reference, these analyses have been assigned our service request number P1302315.

All analyses were performed according to our laboratory's NELAP and DoD-ELAP-approved quality assurance program. The test results meet requirements of the current NELAP and DoD-ELAP standards, where applicable, and except as noted in the laboratory case narrative provided. For a specific list of NELAP and DoD-ELAP-accredited analytes, refer to the certifications section at www.caslab.com. Results are intended to be considered in their entirety and apply only to the samples analyzed and reported herein.


If you have any questions, please call me at (805) 526-7161.

Respectfully submitted,

**ALS | Environmental**

*Kate Aguilera*

By Kate Aguilera at 11:05 am, Jun 17, 2013

For Sue Anderson
Project Manager



Columbia
Analytical Services

Now part of the (ALS) Group

2655 Park Center Drive, Suite A, Simi Valley, CA 93065     805 526 7161     www.caslab.com

| Client: | GFA International, Inc. | Service Request No: P1302315 |
|---|---|---|
| Project: | Sable Point-Heron Bay / 13-1038.00 | |

## CASE NARRATIVE

The samples were received intact under chain of custody on June 3, 2013 and were stored in accordance with the analytical method requirements. Please refer to the sample acceptance check form for additional information. The results reported herein are applicable only to the condition of the samples at the time of sample receipt.

Orthorhombic Cyclooctasulfur Analysis

A portion of the wallboard samples was prepared and analyzed for orthorhombic cyclooctasulfur according to CAS AQL 103A using a gas chromatograph equipped with an electron capture detector (ECD). This method is not included on the laboratory's NELAP or DoD-ELAP scope of accreditation.

The results for both of the samples in this delivery group are indicative of non-suspect wallboard.

Sulfur Analysis

A portion of the wallboard samples was also prepared according to CAS AQL 104 and analyzed for twenty sulfur compounds per ASTM D 5504-08 using a gas chromatograph equipped with a sulfur chemiluminescence detector (SCD). All compounds with the exception of hydrogen sulfide and carbonyl sulfide are quantitated against the initial calibration curve for methyl mercaptan. This method is not included on the laboratory's NELAP or DoD-ELAP scope of accreditation.

*The results of analyses are given in the attached laboratory report. All results are intended to be considered in their entirety, and Columbia Analytical Services, Inc. dba ALS Environmental (ALS) is not responsible for utilization of less than the complete report.*

*Use of Columbia Analytical Services, Inc. dba ALS Environmental (ALS)'s Name. Client shall not use ALS's name or trademark in any marketing or reporting materials, press releases or in any other manner ("Materials") whatsoever and shall not attribute to ALS any test result, tolerance or specification derived from ALS's data ("Attribution") without ALS's prior written consent, which may be withheld by ALS for any reason in its sole discretion. To request ALS's consent, Client shall provide copies of the proposed Materials or Attribution and describe in writing Client's proposed use of such Materials or Attribution. If ALS has not provided written approval of the Materials or Attribution within ten (10) days of receipt from Client, Client's request to use ALS's name or trademark in any Materials or Attribution shall be deemed denied. ALS may, in its discretion, reasonably charge Client for its time in reviewing Materials or Attribution requests. Client acknowledges and agrees that the unauthorized use of ALS's name or trademark may cause ALS to incur irreparable harm for which the recovery of money damages will be inadequate. Accordingly, Client acknowledges and agrees that a violation shall justify preliminary injunctive relief. For questions contact the laboratory.*





2655 Park Center Drive, Suite A, Simi Valley, CA 93065     805.526.7161     www.caslab.com

**Columbia Analytical Services, Inc. dba ALS Environmental – Simi Valley**

**Certifications, Accreditations, and Registrations**

| Agency | Web Site | Number |
|---|---|---|
| AIHA | http://www.aihaaccreditedlabs.org | 101661 |
| Arizona DHS | http://www.azdhs.gov/lab/license/env.htm | AZ0694 |
| DoD ELAP | http://www.pjlabs.com/search-accredited-labs | L11-203 |
| Florida DOH (NELAP) | http://www.doh.state.fl.us/lab/EnvLabCert/WaterCert.htm | E871020 |
| Maine DHHS | http://www.maine.gov/dhhs/mecdc/environmental-health/water/dwp-services/labcert/labcert.htm | 2012039 |
| Minnesota DOH (NELAP) | http://www.health.state.mn.us/accreditation | 494864 |
| New Jersey DEP (NELAP) | http://www.nj.gov/dep/oqa/ | CA009 |
| New York DOH (NELAP) | http://www.wadsworth.org/labcert/elap/elap.html | 11221 |
| Oregon PHD (NELAP) | http://public.health.oregon.gov/LaboratoryServices/EnvironmentalLaboratoryAccreditation/Pages/index.aspx | CA200007 |
| Pennsylvania DEP | http://www.depweb.state.pa.us/labs | 68-03307 (Registration) |
| Texas CEQ (NELAP) | http://www.tceq.texas.gov/field/qa/env_lab_accreditation.html | T104704413-12-3 |
| Utah DOH (NELAP) | http://www.health.utah.gov/lab/labimp/certification/index.html | CA015272012-2 |
| Washington DOE | http://www.ecy.wa.gov/programs/eap/labs/lab-accreditation.html | C946 |

Analyses were performed according to our laboratory's NELAP and DoD-ELAP approved quality assurance program.   A complete listing of specific NELAP and DoD-ELAP certified analytes can be found in the certifications section at www.caslab.com, www.alsglobal.com, or at the accreditation body's website.

Each of the certifications listed above have an explicit Scope of Accreditation that applies to specific matrices/methods/analytes; therefore, please contact the laboratory for information corresponding to a particular certification.

# ALS ENVIRONMENTAL

## DETAIL SUMMARY REPORT

Client:            GFA International, Inc.                              Service Request: P1302315
Project ID:        Sable Point-Heron Bay / 13-1038.00

Date Received:     6/3/2013
Time Received:     09:45

| Client Sample ID | Lab Code | Matrix | Date Collected | Time Collected | Sulfur Red - H2S - SulfurCrushRd + | S8-ECD - S8 |
|---|---|---|---|---|---|---|
| #2 | P1302315-001 | Solid | 5/30/2013 | 13:00 | X | X |



**ALS**

2655 Park Center Drive, Suite A
Simi Valley, California 93065
Phone (805) 526-7161
Fax (805) 526-7270

# Drywall - Chain of Custody Record & Analytical Service Request

Page  1  of  1

**Sample Requirements:** 2" x 2" piece of drywall required for S$_8$ GC/ECD test.
5" x 5" piece of drywall required if additional tests are desired.

Standard Turnaround Time (TAT) for Drywall Testing is 2-4 weeks
Expedited TATs available for selected tests for a surcharge; please call to inquire

ALS Contact: **Samantha Henningsen**

ALS Project: P13 ⊃ 23 15

Company Name & Address (Reporting Information)

**GFA International**

Project Manager: **Toi Akien**

Phone: **(561) 347-0700**    Fax: **(561) 395-5805**

Email Address for Result Reporting: **takien@teamgfa.com**

Project Name

Project Number

P.O. # / Credit Card / Billing Information

| Client Sample ID | Laboratory ID Number | Date Collected | Time Collected | Drywall Description/Location/Other Information | Elemental Sulfur (S$_8$) Marker Test (GC/ECD) | Hydrogen Sulfide Emission Test | Copper Corrosion Jar Test | Comments |
|---|---|---|---|---|---|---|---|---|
| # 2 | ① | 5/30/13 | 1300 | Upstairs Hobby Room, Entrance Door Adjacent | X | X | | Include Emissions for 20 Sulfers |
| # 3 | ② | 5/30/13 | 1320 | Downstairs Storage Room, Under Stairs - Bathroom Wall | X | X | | Include Emissions for 20 Sulfers |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Analysis**

**Report Tier Levels - please select one**
Tier II - (Results + QC /Default if not specified) _____
Tier IV (Data Validation Package) 10% Surcharge _____

| | Date: | Time: | | Date: | Time: |
|---|---|---|---|---|---|
| Relinquished by: (Signature) Toi A. Akien | 5/31/13 | 09:50 | Received by: (Signature) | 5/7/13 | 09:45 |
| Relinquished by: (Signature) | Date: | Time: | Received by: (Signature) | Date: | Time: |
| Relinquished by: (Signature) | Date: | Time: | Received by: (Signature) | Date: | Time: |

## ALS Environmental
### Sample Acceptance Check Form

| | | |
|---|---|---|
| Client: GFA International, Inc. | Work order: | P1302315 |

Project: Sable Point-Heron Bay / 13-1038.00

Sample(s) received on: 6/3/13     Date opened: 6/3/13     by:     MZAMORA

**Note:** This form is used for <u>all</u> samples received by ALS. The use of this form for custody seals is strictly meant to indicate presence/absence and not as an indication of compliance or nonconformity. Thermal preservation and pH will only be evaluated either at the request of the client and/or as required by the method/SOP.

| | | Yes | No | N/A |
|---|---|---|---|---|
| 1 | Were **sample containers** properly marked with client sample ID? | ☒ | ☐ | ☐ |
| 2 | Container(s) **supplied by ALS**? | ☐ | ☒ | ☐ |
| 3 | Did **sample containers** arrive in good condition? | ☒ | ☐ | ☐ |
| 4 | Were **chain-of-custody** papers used and filled out? | ☒ | ☐ | ☐ |
| 5 | Did **sample container labels** and/or tags agree with custody papers? | ☒ | ☐ | ☐ |
| 6 | Was **sample volume** received adequate for analysis? | ☒ | ☐ | ☐ |
| 7 | Are samples within specified holding times? | ☒ | ☐ | ☐ |
| 8 | Was proper **temperature** (thermal preservation) of cooler at receipt adhered to? | ☐ | ☐ | ☒ |
| 9 | Was a **trip blank** received? | ☐ | ☐ | ☒ |
| 10 | Were **custody seals** on outside of cooler/Box? | ☐ | ☒ | ☐ |
| | Location of seal(s)? _____ Sealing Lid? | ☐ | ☐ | ☒ |
| | Were signature and date included? | ☐ | ☐ | ☒ |
| | Were seals intact? | ☐ | ☐ | ☒ |
| | Were custody seals on outside of sample container? | ☐ | ☒ | ☐ |
| | Location of seal(s)? _____ Sealing Lid? | ☐ | ☐ | ☒ |
| | Were signature and date included? | ☐ | ☐ | ☒ |
| | Were seals intact? | ☐ | ☐ | ☒ |
| 11 | Do containers have appropriate **preservation**, according to method/SOP or Client specified information? | ☐ | ☐ | ☒ |
| | Is there a client indication that the submitted samples are **pH** preserved? | ☐ | ☐ | ☒ |
| | Were **VOA vials** checked for presence/absence of air bubbles? | ☐ | ☐ | ☒ |
| | Does the client/method/SOP require that the analyst check the sample pH and <u>if necessary</u> alter it? | ☐ | ☐ | ☒ |
| 12 | **Tubes:**    Are the tubes capped and intact? | ☐ | ☐ | ☒ |
| | Do they contain moisture? | ☐ | ☐ | ☒ |
| 13 | **Badges:**    Are the badges properly capped and intact? | ☐ | ☐ | ☒ |
| | Are dual bed badges separated and individually capped and intact? | ☐ | ☐ | ☒ |

| | | | | | | |
|---|---|---|---|---|---|---|
| P1302315-001.01 | 1 each Plastic Bag | | | | | |
| P1302315-001.02 | 1 L Zefon Bag | | | | | Added by Lab |
| P1302315-001.03 | 4oz Glass Jar | | | | | Added by Lab |
| P1302315-002.01 | 1 each Plastic Bag | | | | | |
| P1302315-002.02 | 1 L Zefon Bag | | | | | Added by Lab |
| P1302315-002.03 | 4oz Glass Jar | | | | | Added by Lab |
| | | | | | | |

Explain any discrepancies: (include lab sample ID numbers):
The project name & number were referenced per e-mail instructions sent 6/4/13.

RSK - MEEPP, HCL (pH<2); RSK - CO2, (pH 5-8); Sulfur (pH>4)

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS

Page 1 of 1

**Client:** **GFA International, Inc.**
**Client Project ID:** **Sable Point-Heron Bay / 13-1038.00**

ALS Project ID: P1302315

## Orthorhombic Cyclooctasulfur

| | |
|---|---|
| Test Code: | ALS AQL 103A |
| Instrument ID: | HP6890+/GC23/ECD |
| Analyst: | Evelyn Ibarra |
| Sample Type: | Wallboard |
| Test Notes: | |

Date Received: 6/3/13
Date Extracted: 6/10/13
Date Analyzed: 6/12/13

| Client Sample ID | ALS Sample ID | Sample Amount Gram(s) | Extract Volume ml(s) | Dilution Factor | **Result mg/Kg** | LOQ mg/Kg | Data Qualifier |
|---|---|---|---|---|---|---|---|
| #2 | P1302315-001 | 1.00 | 5.0 | 1.00 | ND | 2.5 | |
| #3 | P1302315-002 | 1.00 | 5.0 | 1.00 | 9.7 | 2.5 | |
| Negative Control Sample | P130610-NCS | 1.00 | 5.0 | 1.00 | ND | 2.5 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.

LOQ = Limit of Quantitation.

According to the Florida Department of Health (http://www.doh.state.fl.us/environment/community/indoor-air/casedefinition.html, 1/5/2010), a positive result above 10 mg/kg is indicative of corrosive drywall.

A positive result between 5-10 mg/kg is inconclusive; further testing may be warranted.

## LABORATORY CONTROL SAMPLE / DUPLICATE LABORATORY CONTROL SAMPLE SUMMARY

| Client Sample ID | CAS Sample ID | Spike Amount LCS / DLCS mg/Kg | LCS mg/Kg | DLCS mg/Kg | % Recovery LCS | DLCS | CAS Acceptance Limits | RPD | RPD Limit | Data Qualifier |
|---|---|---|---|---|---|---|---|---|---|---|
| Dup Lab Control Sample | P130610-DLCS | 156 | 156 | 156 | 100 | 100 | 89-113 | 0 | 10 | |

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS

Page 1 of 1

**Client:** GFA International, Inc.
**Client Sample ID:** #2
**Client Project ID:** Sable Point-Heron Bay / 13-1038.00

ALS Project ID: P1302315
ALS Sample ID: P1302315-001

| | | | |
|---|---|---|---|
| Test Code: | CAS AQL 104 | Date Received: | 6/3/13 |
| Instrument ID: | Agilent 6890A/GC13/SCD | Date Analyzed: | 6/14/13 |
| Analyst: | Mike Conejo | Sample Amount: | 25.32 Gram(s) |
| Sample Type: | Wallboard | Chamber Volume: | 0.50 Liter(s) |
| Test Notes: | | | |

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | ND | 0.28 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.48 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.39 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.50 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.50 | |
| 75-15-0 | Carbon Disulfide | ND | 0.31 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.61 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.73 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.61 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.61 | |
| 110-02-1 | Thiophene | ND | 0.68 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.73 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.73 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.73 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.38 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.79 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.71 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.91 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.91 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.49 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS

Page 1 of 1

**Client:** **GFA International, Inc.**

**Client Sample ID:** **#3**                                        ALS Project ID: P1302315

**Client Project ID:** **Sable Point-Heron Bay / 13-1038.00**        ALS Sample ID: P1302315-002

| | | |
|---|---|---|
| Test Code: | CAS AQL 104 | Date Received: 6/3/13 |
| Instrument ID: | Agilent 6890A/GC13/SCD | Date Analyzed: 6/14/13 |
| Analyst: | Mike Conejo | Sample Amount: 25.09 Gram(s) |
| Sample Type: | Wallboard | Chamber Volume: 0.50 Liter(s) |
| Test Notes: | | |

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | **0.36** | 0.28 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.49 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.39 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.51 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.51 | |
| 75-15-0 | Carbon Disulfide | ND | 0.31 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.62 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.73 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.62 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.62 | |
| 110-02-1 | Thiophene | ND | 0.69 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.73 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.73 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.73 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.38 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.80 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.72 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.91 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.91 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.50 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS
Page 1 of 1

**Client:** **GFA International, Inc.**
**Client Sample ID:** **Negative Control Sample**
**Client Project ID:** **Sable Point-Heron Bay / 13-1038.00**

ALS Project ID: P1302315
ALS Sample ID: P130614-NCS

Test Code: CAS AQL 104
Instrument ID: Agilent 6890A/GC13/SCD
Analyst: Mike Conejo
Sample Type: Wallboard
Test Notes:

Date Received: NA
Date Analyzed: 6/14/13
Sample Amount: 25.54 Gram(s)
Chamber Volume: 0.50 Liter(s)

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | ND | 0.27 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.48 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.39 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.50 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.50 | |
| 75-15-0 | Carbon Disulfide | ND | 0.30 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.61 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.72 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.61 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.61 | |
| 110-02-1 | Thiophene | ND | 0.67 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.72 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.72 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.72 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.38 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.79 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.71 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.90 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.90 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.49 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS

Page 1 of 1

**Client:**            **GFA International, Inc.**
**Client Sample ID:**  **Positive Control Sample**                                    ALS Project ID: P1302315
**Client Project ID:** **Sable Point-Heron Bay / 13-1038.00**                        ALS Sample ID: P130614-PCS

Test Code:      CAS AQL 104                                          Date Received: NA
Instrument ID:  Agilent 6890A/GC13/SCD                               Date Analyzed: 6/14/13
Analyst:        Mike Conejo                                          Sample Amount:    24.76 Gram(s)
Sample Type:    Wallboard                                            Chamber Volume:    0.50 Liter(s)
Test Notes:

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|-------|----------|-------------|-----------|----------------|
| 7783-06-4 | Hydrogen Sulfide | 0.74 | 0.28 | |
| 463-58-1 | Carbonyl Sulfide | 0.71 | 0.50 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.40 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.51 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.51 | |
| 75-15-0 | Carbon Disulfide | 1.2 | 0.31 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.63 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.74 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.63 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.63 | |
| 110-02-1 | Thiophene | ND | 0.69 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.74 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.74 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.74 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.39 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.81 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.73 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.93 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.93 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.50 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.



2655 Park Center Dr., Suite A
Simi Valley, CA 93065
**T:** +1 805 526 7161
**F:** +1 508 526 7270
**www.alsglobal.com**

## LABORATORY REPORT

July 6, 2013

Toi Aiken
GFA International, Inc.
1215 Wallace Drive
Delray Beach, FL 33444

**RE: Sable Point-Heron Bay / 13-1038.00**

Dear Toi:

Enclosed are the results of the samples submitted to our laboratory on June 21, 2013. For your reference, these analyses have been assigned our service request number P1302659.

All analyses were performed according to our laboratory's NELAP and DoD-ELAP-approved quality assurance program. The test results meet requirements of the current NELAP and DoD-ELAP standards, where applicable, and except as noted in the laboratory case narrative provided. For a specific list of NELAP and DoD-ELAP-accredited analytes, refer to the certifications section at www.alsglobal.com. Results are intended to be considered in their entirety and apply only to the samples analyzed and reported herein.

If you have any questions, please call me at (805) 526-7161.

Respectfully submitted,

**ALS | Environmental**

*By Sue Anderson at 9:46 am, Jul 06, 2013*

Sue Anderson
Project Manager



2655 Park Center Dr., Suite A
Simi Valley, CA 93065
**T:** +1 805 526 7161
**F:** +1 508 526 7270
**www.alsglobal.com**

Client:     GFA International, Inc.                    Service Request No:    P1302659
Project:    Sable Point-Heron Bay / 13-1038.00

## CASE NARRATIVE

The samples were received intact under chain of custody on June 21, 2013 and were stored in accordance with the analytical method requirements. Please refer to the sample acceptance check form for additional information. The results reported herein are applicable only to the condition of the samples at the time of sample receipt.

Orthorhombic Cyclooctasulfur Analysis

A portion of the wallboard samples was prepared and analyzed for orthorhombic cyclooctasulfur according to CAS AQL 103A using a gas chromatograph equipped with an electron capture detector (ECD). This method is not included on the laboratory's NELAP or DoD-ELAP scope of accreditation.

The results for samples #4 (P1302659-001) and #5 (P1302659-002) fell within the inconclusive range and additional testing may be warranted. The result for sample #6 (P1302659-003)is is indicative of non-suspect wallboard.

Sulfur Analysis

A portion of the wallboard samples was also prepared according to CAS AQL 104 and analyzed for twenty sulfur compounds per ASTM D 5504-08 using a gas chromatograph equipped with a sulfur chemiluminescence detector (SCD). All compounds with the exception of hydrogen sulfide and carbonyl sulfide are quantitated against the initial calibration curve for methyl mercaptan. This method is not included on the laboratory's NELAP or DoD-ELAP scope of accreditation.

*The results of analyses are given in the attached laboratory report. All results are intended to be considered in their entirety, and ALS Environmental (ALS) is not responsible for utilization of less than the complete report.*

*Use of ALS Environmental (ALS)'s Name. Client shall not use ALS's name or trademark in any marketing or reporting materials, press releases or in any other manner ("Materials") whatsoever and shall not attribute to ALS any test result, tolerance or specification derived from ALS's data ("Attribution") without ALS's prior written consent, which may be withheld by ALS for any reason in its sole discretion. To request ALS's consent, Client shall provide copies of the proposed Materials or Attribution and describe in writing Client's proposed use of such Materials or Attribution. If ALS has not provided written approval of the Materials or Attribution within ten (10) days of receipt from Client, Client's request to use ALS's name or trademark in any Materials or Attribution shall be deemed denied. ALS may, in its discretion, reasonably charge Client for its time in reviewing Materials or Attribution requests. Client acknowledges and agrees that the unauthorized use of ALS's name or trademark may cause ALS to incur irreparable harm for which the recovery of money damages will be inadequate. Accordingly, Client acknowledges and agrees that a violation shall justify preliminary injunctive relief. For questions contact the laboratory.*



2655 Park Center Dr., Suite A
Simi Valley, CA 93065
**T:** +1 805 526 7161
**F:** +1 508 526 7270
**www.alsglobal.com**

ALS Environmental – Simi Valley

Certifications, Accreditations, and Registrations

| Agency | Web Site | Number |
|---|---|---|
| AIHA | http://www.aihaaccreditedlabs.org | 101661 |
| Arizona DHS | http://www.azdhs.gov/lab/license/env.htm | AZ0694 |
| DoD ELAP | http://www.pjlabs.com/search-accredited-labs | L11-203 |
| Florida DOH (NELAP) | http://www.doh.state.fl.us/lab/EnvLabCert/WaterCert.htm | E871020 |
| Maine DHHS | http://www.maine.gov/dhhs/mecdc/environmental-health/water/dwp-services/labcert/labcert.htm | 2012039 |
| Minnesota DOH (NELAP) | http://www.health.state.mn.us/accreditation | 494864 |
| New Jersey DEP (NELAP) | http://www.nj.gov/dep/oqa/ | CA009 |
| New York DOH (NELAP) | http://www.wadsworth.org/labcert/elap/elap.html | 11221 |
| Oregon PHD (NELAP) | http://public.health.oregon.gov/LaboratoryServices/EnvironmentalLaboratoryAccreditation/Pages/index.aspx | CA200007 |
| Pennsylvania DEP | http://www.depweb.state.pa.us/labs | 68-03307 (Registration) |
| Texas CEQ (NELAP) | http://www.tceq.texas.gov/field/qa/env_lab_accreditation.html | T104704413-12-3 |
| Utah DOH (NELAP) | http://www.health.utah.gov/lab/labimp/certification/index.html | CA015272012-2 |
| Washington DOE | http://www.ecy.wa.gov/programs/eap/labs/lab-accreditation.html | C946 |

Analyses were performed according to our laboratory's NELAP and DoD-ELAP approved quality assurance program. A complete listing of specific NELAP and DoD-ELAP certified analytes can be found in the certifications section at www.alsglobal.com, or at the accreditation body's website.

Each of the certifications listed above have an explicit Scope of Accreditation that applies to specific matrices/methods/analytes; therefore, please contact the laboratory for information corresponding to a particular certification.

# ALS ENVIRONMENTAL

## DETAIL SUMMARY REPORT

Client:           GFA International, Inc.                                    Service Request: P1302659
Project ID:       Sable Point-Heron Bay / 13-1038.00

Date Received:    6/21/2013
Time Received:    09:45

| Client Sample ID | Lab Code | Matrix | Date Collected | Time Collected | S8-ECD - S8 | Sulfur Red+ H2S - SulfurCrushRd + |
|---|---|---|---|---|---|---|
| #4 | P1302659-001 | Solid | 6/19/2013 | 15:30 | X | X |
| #6 | P1302659-003 | Solid | 6/19/2013 | 16:30 | X | X |

# Drywall - Chain of Custody Record & Analytical Service Request

Page ___1___ of ___1___

**Sample Requirements: 2" x 2" piece of drywall required for S₈ GC/ECD test.**
**5" x 5" piece of drywall required if additional tests are desired.**

ALS

2655 Park Center Drive, Suite A
Simi Valley, California 93065
Phone (805) 526-7161
Fax (805) 526-7270

**Company Name & Address (Reporting Information)**

**GFA International**

Project Manager: **Toi Akien**

Phone: **(561) 347-0700**     Fax: **(561) 395-5805**

Email Address for Result Reporting: **takien@teamgfa.com**

Project Name: **SABLE POINT - HERON BAY**

Project Number:

P.O. # / Credit Card / Billing Information

13 - 1038.00

Standard Turnaround Time (TAT) for Drywall Testing is 24 weeks
Expedited TATs available for selected tests for a surcharge; please call to inquire

ALS Contact: **Samantha Henningsen**

ALS Project No. **P130 2659**

| Client Sample ID | Laboratory ID Number | Date Collected | Time Collected | Drywall Description/Location/Other Information | Elemental Sulfur (S₈) Marker Test (GC/ECD) | Hydrogen Sulfide Emission Test | Copper Corrosion Jar Test | Comments |
|---|---|---|---|---|---|---|---|---|
| #4 | | 6/19/2013 | 1530 | Downstairs, Blue Room - Window Wall | X | X | | Include Emissions 20 Sulfer |
| #5 | | 6/19/2013 | 1600 | Downstairs, Red Room - Large Bedroom Closet - Inside Wall | X | X | | Include Emissions 20 Sulfer |
| #6 | | 6/19/2013 | 1630 | Downstairs, Red Room - Small Bedroom Closet - Exterior Wall | X | X | | Include Emissions 20 Sulfer |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |

**Analysis**

**Report Tier Levels - please select one**

Tier II - (Results + QC /Default if not specified) _____

Tier IV (Data Validation Package) 10% Surcharge _____

| Relinquished by: (Signature) | Date: | Time: | Received by: (Signature) | Date: | Time: |
|---|---|---|---|---|---|
| [signature] Toi Akien | 6/20/13 | 1200 | [signature] | 06/21/13 | [time] |
| Relinquished by: (Signature) | Date: | Time: | Received by: (Signature) | Date: | Time: |
| Relinquished by: (Signature) | Date: | Time: | Received by: (Signature) | Date: | Time: |

**ALS Environmental**
**Sample Acceptance Check Form**

Client: GFA International, Inc.                                    Work order:      P1302659

Project: Sable Point-Heron Bay / 13-1038.00

Sample(s) received on: 6/21/13                    Date opened: 6/21/13      by:   KHORIUCHI

*Note:* This form is used for all samples received by ALS. The use of this form for custody seals is strictly meant to indicate presence/absence and not as an indication of compliance or nonconformity. Thermal preservation and pH will only be evaluated either at the request of the client and/or as required by the method/SOP.

|   |   | Yes | No | N/A |
|---|---|:---:|:---:|:---:|
| 1 | Were **sample containers** properly marked with client sample ID? | ☒ | ☐ | ☐ |
| 2 | Container(s) **supplied by ALS**? | ☐ | ☒ | ☐ |
| 3 | Did **sample containers** arrive in good condition? | ☒ | ☐ | ☐ |
| 4 | Were **chain-of-custody** papers used and filled out? | ☒ | ☐ | ☐ |
| 5 | Did **sample container labels** and/or tags agree with custody papers? | ☒ | ☐ | ☐ |
| 6 | Was **sample volume** received adequate for analysis? | ☒ | ☐ | ☐ |
| 7 | Are samples within specified holding times? | ☒ | ☐ | ☐ |
| 8 | Was proper **temperature** (thermal preservation) of cooler at receipt adhered to? | ☒ | ☐ | ☐ |
| 9 | Was a **trip blank** received? | ☐ | ☐ | ☒ |
| 10 | Were **custody seals** on outside of cooler/Box? | ☐ | ☒ | ☐ |
|  | Location of seal(s)? _____ Sealing Lid? | ☐ | ☐ | ☒ |
|  | Were signature and date included? | ☐ | ☐ | ☒ |
|  | Were seals intact? | ☐ | ☐ | ☒ |
|  | Were custody seals on outside of sample container? | ☐ | ☒ | ☐ |
|  | Location of seal(s)? _____ Sealing Lid? | ☐ | ☐ | ☒ |
|  | Were signature and date included? | ☐ | ☐ | ☒ |
|  | Were seals intact? | ☐ | ☐ | ☒ |
| 11 | Do containers have appropriate **preservation**, according to method/SOP or Client specified information? | ☐ | ☐ | ☒ |
|  | Is there a client indication that the submitted samples are **pH** preserved? | ☐ | ☐ | ☒ |
|  | Were **VOA vials** checked for presence/absence of air bubbles? | ☐ | ☐ | ☒ |
|  | Does the client/method/SOP require that the analyst check the sample pH and *if necessary* alter it? | ☐ | ☐ | ☒ |
| 12 | **Tubes:**   Are the tubes capped and intact? | ☐ | ☐ | ☒ |
|  | Do they contain moisture? | ☐ | ☐ | ☒ |
| 13 | **Badges:**   Are the badges properly capped and intact? | ☐ | ☐ | ☒ |
|  | Are dual bed badges separated and individually capped and intact? | ☐ | ☐ | ☒ |

| | | | | | |
|---|---|---|---|---|---|
| P1302659-001.01 | 1 each Plastic Bag | | | | |
| P1302659-001.02 | 1 L Zefon Bag | | | | Added by Lab |
| P1302659-002.01 | 1 each Plastic Bag | | | | |
| P1302659-002.02 | 1 L Zefon Bag | | | | Added by Lab |
| P1302659-003.01 | 1 each Plastic Bag | | | | |
| P1302659-003.02 | 1 L Zefon Bag | | | | Added by Lab |
| | | | | | |
| | | | | | |

Explain any discrepancies: (include lab sample ID numbers): _____

_____

_____

RSK - MEEPP, HCL (pH<2); RSK - CO2, (pH 5-8); Sulfur (pH>4)

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS

Page 1 of 1

**Client:** **GFA International, Inc.**
**Client Project ID:** **Sable Point-Heron Bay / 13-1038.00**

ALS Project ID: P1302659

## Orthorhombic Cyclooctasulfur

| | | |
|---|---|---|
| Test Code: | ALS AQL 103A | |
| Instrument ID: | HP6890+/GC23/ECD | Date Received: 6/21/13 |
| Analyst: | Zheng Wang | Date Extracted: 6/27/13 |
| Sample Type: | Wallboard | Date Analyzed: 6/27/13 |
| Test Notes: | | |

| Client Sample ID | ALS Sample ID | Sample Amount Gram(s) | Extract Volume ml(s) | Dilution Factor | Result mg/Kg | LOQ mg/Kg | Data Qualifier |
|---|---|---|---|---|---|---|---|
| #4 | P1302659-001 | 1.00 | 5.0 | 1.00 | **9.4** | 5.0 | |
| #5 | P1302659-002 | 1.00 | 5.0 | 1.00 | **9.8** | 5.0 | |
| #6 | P1302659-003 | 1.00 | 5.0 | 1.00 | ND | 5.0 | |
| Negative Control Sample | P130627-NCS | 1.00 | 5.0 | 1.00 | ND | 5.0 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.
According to the Florida Department of Health (http://www.doh.state.fl.us/environment/community/indoor-air/casedefinition.html, 1/5/2010),
a positive result above 10 mg/kg is indicative of corrosive drywall.
A positive result between 5-10 mg/kg is inconclusive; further testing may be warranted.

## LABORATORY CONTROL SAMPLE / DUPLICATE LABORATORY CONTROL SAMPLE SUMMARY

| Client Sample ID | CAS Sample ID | Spike Amount LCS / DLCS mg/Kg | Result LCS mg/Kg | DLCS mg/Kg | % Recovery LCS | DLCS | CAS Acceptance Limits | RPD | RPD Limit | Data Qualifier |
|---|---|---|---|---|---|---|---|---|---|---|
| Dup Lab Control Sample | P130627-DLCS | 139 | 154 | 152 | 111 | 109 | 89-113 | 2 | 10 | |

# ALS ENVIRONMENTAL

### RESULTS OF ANALYSIS
Page 1 of 1

**Client:** GFA International, Inc.
**Client Sample ID:** #4
**Client Project ID:** Sable Point-Heron Bay / 13-1038.00

ALS Project ID: P1302659
ALS Sample ID: P1302659-001

| | | | |
|---|---|---|---|
| Test Code: | CAS AQL 104 | Date Received: | 6/21/13 |
| Instrument ID: | Agilent 6890A/GC13/SCD | Date Analyzed: | 7/3/13 |
| Analyst: | Mike Conejo | Sample Amount: | 10.95 Gram(s) |
| Sample Type: | Wallboard | Chamber Volume: | 0.20 Liter(s) |
| Test Notes: | | | |

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | ND | 0.25 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.45 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.36 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.46 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.46 | |
| 75-15-0 | Carbon Disulfide | ND | 0.28 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.57 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.67 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.57 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.57 | |
| 110-02-1 | Thiophene | ND | 0.63 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.67 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.67 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.67 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.35 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.73 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.66 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.84 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.84 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.46 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

### RESULTS OF ANALYSIS
Page 1 of 1

**Client:**              **GFA International, Inc.**
**Client Sample ID:**    **#5**                                        ALS Project ID: P1302659
**Client Project ID:**   **Sable Point-Heron Bay / 13-1038.00**        ALS Sample ID: P1302659-002

Test Code:        CAS AQL 104
Instrument ID:    Agilent 6890A/GC13/SCD                   Date Received: 6/21/13
Analyst:          Mike Conejo                              Date Analyzed: 7/3/13
Sample Type:      Wallboard                                Sample Amount:    10.99 Gram(s)
Test Notes:                                                Chamber Volume:    0.20 Liter(s)

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | ND | 0.25 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.45 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.36 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.46 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.46 | |
| 75-15-0 | Carbon Disulfide | ND | 0.28 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.57 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.67 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.57 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.57 | |
| 110-02-1 | Thiophene | ND | 0.63 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.67 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.67 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.67 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.35 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.73 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.66 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.83 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.83 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.45 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS
Page 1 of 1

**Client:** GFA International, Inc.
**Client Sample ID:** #6
**Client Project ID:** Sable Point-Heron Bay / 13-1038.00

ALS Project ID: P1302659
ALS Sample ID: P1302659-003

**Test Code:** CAS AQL 104
**Instrument ID:** Agilent 6890A/GC13/SCD
**Analyst:** Mike Conejo
**Sample Type:** Wallboard
**Test Notes:**

Date Received: 6/21/13
Date Analyzed: 7/3/13
Sample Amount:    11.09 Gram(s)
Chamber Volume:    0.20 Liter(s)

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | **0.61** | 0.25 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.44 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.35 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.46 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.46 | |
| 75-15-0 | Carbon Disulfide | ND | 0.28 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.56 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.66 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.56 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.56 | |
| 110-02-1 | Thiophene | ND | 0.62 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.66 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.66 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.66 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.35 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.72 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.65 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.83 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.83 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.45 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

## RESULTS OF ANALYSIS
Page 1 of 1

**Client:** GFA International, Inc.
**Client Sample ID:** Negative Control Sample
**Client Project ID:** Sable Point-Heron Bay / 13-1038.00

ALS Project ID: P1302659
ALS Sample ID: P130703-NCS

Test Code: CAS AQL 104
Instrument ID: Agilent 6890A/GC13/SCD
Analyst: Mike Conejo
Sample Type: Wallboard
Test Notes:

Date Received: NA
Date Analyzed: 7/03/13
Sample Amount: 10.33 Gram(s)
Chamber Volume: 0.20 Liter(s)

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|-------|----------|--------------|-----------|----------------|
| 7783-06-4 | Hydrogen Sulfide | ND | 0.27 | |
| 463-58-1 | Carbonyl Sulfide | ND | 0.48 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.38 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.49 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.49 | |
| 75-15-0 | Carbon Disulfide | ND | 0.30 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.60 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.71 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.60 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.60 | |
| 110-02-1 | Thiophene | ND | 0.67 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.71 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.71 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.71 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.37 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.78 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.70 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.89 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.89 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.48 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.

# ALS ENVIRONMENTAL

RESULTS OF ANALYSIS
Page 1 of 1

**Client:** **GFA International, Inc.**
**Client Sample ID:** **Positive Control Sample**
**Client Project ID:** **Sable Point-Heron Bay / 13-1038.00**

ALS Project ID: P1302659
ALS Sample ID: P130703-PCS

| | |
|---|---|
| Test Code: | CAS AQL 104 |
| Instrument ID: | Agilent 6890A/GC13/SCD |
| Analyst: | Mike Conejo |
| Sample Type: | Wallboard |
| Test Notes: | |

Date Received: NA
Date Analyzed: 7/03/13
Sample Amount:    11.35 Gram(s)
Chamber Volume:    0.20 Liter(s)

Dilution Factor: 1.00

| CAS # | Compound | Result µg/Kg | LOQ µg/Kg | Data Qualifier |
|---|---|---|---|---|
| 7783-06-4 | Hydrogen Sulfide | **0.45** | 0.25 | |
| 463-58-1 | Carbonyl Sulfide | **0.46** | 0.43 | |
| 74-93-1 | Methyl Mercaptan | ND | 0.35 | |
| 75-08-1 | Ethyl Mercaptan | ND | 0.45 | |
| 75-18-3 | Dimethyl Sulfide | ND | 0.45 | |
| 75-15-0 | Carbon Disulfide | **0.53** | 0.27 | |
| 75-33-2 | Isopropyl Mercaptan | ND | 0.55 | |
| 75-66-1 | tert-Butyl Mercaptan | ND | 0.65 | |
| 107-03-9 | n-Propyl Mercaptan | ND | 0.55 | |
| 624-89-5 | Ethyl Methyl Sulfide | ND | 0.55 | |
| 110-02-1 | Thiophene | ND | 0.61 | |
| 513-44-0 | Isobutyl Mercaptan | ND | 0.65 | |
| 352-93-2 | Diethyl Sulfide | ND | 0.65 | |
| 109-79-5 | n-Butyl Mercaptan | ND | 0.65 | |
| 624-92-0 | Dimethyl Disulfide | ND | 0.34 | |
| 616-44-4 | 3-Methylthiophene | ND | 0.71 | |
| 110-01-0 | Tetrahydrothiophene | ND | 0.64 | |
| 638-02-8 | 2,5-Dimethylthiophene | ND | 0.81 | |
| 872-55-9 | 2-Ethylthiophene | ND | 0.81 | |
| 110-81-6 | Diethyl Disulfide | ND | 0.44 | |

ND = Compound was analyzed for, but not detected above the limit of quantitation.
LOQ = Limit of Quantitation.