# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

-------------------------------------------------------------x

IN RE:

CHINESE MANUFACTURED DRYWALL
PRODUCTS LIABILITY LITIGATION

: MDL NO. 2047
: SECTION:  L
:
:
: JUDGE FALLON
:
:
: MAG. JUDGE WILKINSON

-------------------------------------------------------------x

THIS DOCUMENT RELATES TO:
ALL CASES AND

*Payton, et al. v. Knauf Gips KG, et al.*
Case No. 2:09-cv-07628 (E.D. La.)

*Gross, et al. v. Knauf Gips KG, et al.*
Case No. 2:09-cv-06690 (E.D. La.)

*Rogers, et al. v. Knauf Gips KG, et al.*
Case No. 2:10-cv-00362 (E.D. La.)

*Abreu, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft KG, et al.*
Case No. 2:11-cv-00252 (E.D. La.)

*Block, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft KG, et al.*
Case No. 2:11-cv-2349 (E.D. La.)

*Arndt, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft KG, et al.*
Case No. 2:11-cv-2349 (E.D. La.)

*Cassidy, et al. v. Gebrueder Knauf*
*Verwaltungsgesellschaft KG, et al.*
Case No. 2:11-cv-3023 (E.D. La.)

*Vickers, et al. v. Knauf Gips KG, et al.*
Case No. 2:09-cv-04117

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

-------------------------------------------------------------x

## SETTLEMENT AGREEMENT REGARDING CLAIMS AGAINST THE KNAUF DEFENDANTS IN MDL NO. 2047

# TABLE OF CONTENTS

Page

1. Definitions................................................................................................. 1

2. Effective Date .......................................................................................... 11

3. Settlement of All Claims Against The Knauf Defendants ............................... 12

4. Settlement Funds...................................................................................... 12

    4.2.    Establishment and Administration of the Remediation Fund .............................. 12

    4.3.    Remediation Fund Benefits.................................................................. 14

        4.3.1.  Option 1.  Program Contractor Remediation Option/Property Not Yet Remediated................................................................ 14

            4.3.1.1.  Lump Sum Payment.............................................. 14

            4.3.1.2.  Delay Period Payment.......................................... 15

        4.3.2.  Option 2.  Self-Remediation Option .................................... 16

        4.3.3.  Option 3.  Cash-Out Option ................................................ 17

        4.3.4.  Mixed Property Owners ...................................................... 18

        4.3.5.  Foreclosed Properties ......................................................... 20

        4.3.6.  Multiple Unit Properties ..................................................... 20

            4.3.6.1.  General Terms ...................................................... 20

            4.3.6.2.  Options available to the  Multiple Unit Property Governing Body where, pursuant to Section 4.3.6.1.2, it is feasible treat each unit as a single property........................ 23

            4.3.6.3.  Options Available to the Multiple Unit Property Governing Body where, pursuant to Section 4.3.6.1.2, it is not feasible to treat each unit as a single property ............. 24

        4.3.7.  Already Remediated Properties ........................................... 25

        4.3.8.  Timing for Election of Options........................................... 25

    4.4.    Remediation Fund Qualifying Procedures............................................. 26

    4.5.    Cost Control and Dispute Resolution Mechanisms for Program Contractor Remediation Option ........................................................................... 27

    4.6.    Establishment and Administration of the Other Loss Fund....................... 31

    4.7.    Other Loss Fund Benefits ................................................................... 32

            4.7.1.1.  Pre-Remediation Alternative Living Expenses:..................... 32

            4.7.1.2.  Lost Use, Sales and Rentals ................................. 33

            4.7.1.3.  Foreclosures ........................................................ 36

i

Page

4.7.1.4.  Short Sales ........................................................... 38

4.7.1.5.  Tenant Losses ...................................................... 40

4.7.2.  Bodily Injury ...................................................................... 41

4.7.3.  Other Loss Exclusions .................................................... 43

4.7.4.  Other Loss Fund Claims Procedures ............................. 43

4.7.5.  MMSEA Compliance ...................................................... 45

4.8.  Allocation of Amounts from Banner, InEx and Prospective L&W Class Settlements Or Any Other Settlements .................................................. 46

4.9.  Qualifications for Class Members in Properties with Lower-Case KPT Chinese Drywall ........................................................................ 48

5.  Releases ........................................................................................ 50

5.1.  Released Claims ........................................................................ 50

5.2.  Class Release ............................................................................ 54

6.  Certification of Federal Rule of Civil Procedure 23(b)(3) Settlement Class and Related Motions ............................................................................ 56

7.  Notice to Class Members ............................................................... 56

8.  Opt-Out ......................................................................................... 57

8.1.  Opt-Out Period ......................................................................... 57

8.2.  Opt-Out Process ....................................................................... 57

8.3.  Rights With Respect to Opt Outs ............................................ 57

9.  Objections ..................................................................................... 58

10.  Fairness Hearing ......................................................................... 59

11.  Dismissals ................................................................................... 59

12.  Bar Order ..................................................................................... 60

13.  Termination of This Settlement .................................................. 60

14.  Attorneys' Fees ........................................................................... 61

15.  Court to Retain Jurisdiction to Implement and Enforce Settlement Agreement ............. 63

16.  Representations ........................................................................... 63

17.  Security ........................................................................................ 66

18.  Miscellaneous ............................................................................. 70

19.  Federal Rule of Evidence 408 ..................................................... 72

<u>**SETTLEMENT AGREEMENT REGARDING CLAIMS AGAINST**</u>
<u>**THE KNAUF DEFENDANTS IN MDL NO. 2047**</u>
**(Subject to Court Approval)**

This Settlement Agreement is entered into by and between the Plaintiffs' Steering Committee in *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, and Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co., Ltd. ("Wuhu"), Guangdong Knauf New Building Material Products Co., Ltd. ("Dongguan"), Knauf Gips KG ("Knauf Gips"), Gebr. Knauf Verwaltungsgesellschaft KG, Knauf International GmbH, Knauf Insulation GmbH ("KI"), Knauf UK GmbH, Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda. and PT Knauf Gypsum Indonesia (collectively, the "Knauf Defendants") as of December 20, 2011.

**WHEREAS**, the Plaintiffs' Steering Committee has made a demand on the Knauf Defendants to settle Chinese Drywall claims against the Knauf Defendants;

**WHEREAS**, the Knauf Defendants have been named as defendants in MDL No. 2047 and in state court litigation and are alleged to be liable for KPT Chinese Drywall that was installed in Affected Properties;

**WHEREAS**, the Knauf Defendants have denied liability for the sale of such KPT Chinese Drywall; and

**WHEREAS**, the Parties wish to avoid the effort, expense and risk of continued litigation,

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and intending to be legally bound, the Parties agree as follows:

1. <u>**Definitions**</u>

  1.1. Parties**. "Parties" shall mean the Knauf Defendants and the Class:

    1.1.1. **Knauf Defendants.** "Knauf Defendants" shall mean all Knauf entities that are signatories to this Agreement.

    1.1.2. **Class; Settlement Class; Class Members.** "Class," also referred to as "Settlement Class" or "Class Members," shall mean all members of one of the three Subclasses in Sections 1.1.2.1, 1.1.2.2 and 1.1.2.3 below who, as of December 9, 2011, filed a lawsuit in the Litigation as a named plaintiff (*i.e.*, not an absent class member) asserting claims arising from, or otherwise related to, KPT Chinese Drywall, whether or not the Knauf Defendants are named parties to the lawsuit. The following persons or entities are members of the class only for the purpose of obtaining benefits under the Other Loss Fund, but not for the purpose of obtaining benefits under the Remediation Fund as those Class Members' Remediation Claims have been or will be resolved outside this Settlement: (i) any person or entity which has settled claims against the Knauf Defendants

under the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall ("Pilot Program") by executing both the Work Authorization and Release as defined in the Pilot Program, whose Affected Property has been or will be remediated under the Pilot Program; (ii) any person or entity whose Affected Property has been remediated under a Major Builder Settlement Agreement; and (iii) any person or entity whose Affected Property has been remediated under a settlement with a Builder or Supplier (including claims assigned by Class Members that were later settled by the assignee). The Class also shall include Multiple Unit Property Governing Bodies to the extent that any unit(s) of a Multiple Unit Property is the subject of a filed lawsuit in the Litigation. The Class shall not include claims relating to Chinese Drywall manufactured by Knauf entities other than KPT. There shall be three subclasses:

1.1.2.1. **The Residential Owner Subclass:** All members of the Class who are owners of and reside or have resided in Affected Property ("**Residential Owners**"). The Residential Owner Subclass shall not include Owners, other than Mortgagees, who purchased Affected Properties with knowledge that the properties contained KPT Chinese Drywall. The Residential Owner Subclass also shall not include Owners who sold or otherwise disposed of Affected Properties except for former owners who lost Affected Properties due to foreclosure or sold Affected Properties in a Short Sale to avoid foreclosure.

1.1.2.2. **The Commercial Owner Subclass:** All members of the Class who are owners of Affected Property for the purpose of selling or renting the Affected Property or using the Affected Property to conduct a business and who do not reside in the Affected Property ("**Commercial Owners**"). The Commercial Owner Subclass shall not include Owners, other than Mortgagees, who acquired Affected Properties through foreclosure with knowledge that the properties contained KPT Chinese Drywall except for former owners who lost Affected Properties due to foreclosure or sold Affected Properties in a Short Sale to avoid foreclosure. Members of the Residential and Commercial Owner Subclasses also are referred to as "Owners".

1.1.2.3. The Residential Owner Subclass and the Commercial Owner Subclass shall be referred to collectively as the "Owner Subclasses."

1.1.2.4. **The Tenant Subclass:** All members of the Class who rent Affected Property. Members of the Tenant Subclass also are referred to as "Tenants".

2

1.2. **Administrative Expenses.** "Administrative Expenses" shall mean expenses associated with administering the Remediation Fund and the Other Loss Fund, and shall include, but not be limited to, the expenses of the Settlement Administrator, Special Masters, escrow agents, accountants, pro se attorneys and Ombudsmen.

1.3. **Affected Property.** "Affected Property" shall mean any real or personal property, residential or commercial, containing KPT Chinese Drywall.

1.4. **Already Remediated Properties Protocol.** "Already Remediated Properties Protocol" shall mean the protocol attached as Exhibit A for resolving Remediation Claims of Owners who have self-remediated Affected Properties or have entered into contracts to self-remediate Affected Properties prior to the Execution Date.

1.5. **Approved Claims.** "Approved Claims" shall mean claims submitted by Class Members that have been approved for reimbursement from the Remediation Fund and/or the Other Loss Fund.

1.6. **Banner.** "Banner" shall mean Banner Supply Co., Banner Supply Co. - Pompano, LLC, Banner Supply Co. - Port St. Lucie, LLC, Banner Supply Co. - Fort Myers, LLC, and Banner Supply Co. - Tampa, LLC and all of their past, present and future owners, partners, shareholders, officers, directors, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers, and all predecessors and successors, assigns, or legal representatives.

1.7. **Banner Class Settlement.** "Banner Class Settlement" shall mean the class action settlement with Banner preliminarily approved by the Court on August 11, 2011.

1.8. **Builder.** "Builder" shall mean any entity or person engaged principally in the business of construction of properties and to whom a Developer sells or has sold one or more lots on which the property construction will take place. A Builder shall not include a Developer engaged solely in selling the lot on which such property is constructed, who does not have the authority to manage or control the actual construction. Other entities or persons excluded from the term Builder include, but are not limited to, subcontractors, material suppliers, installers, and design professionals.

1.9. **Court.** "Court" shall mean The Honorable Eldon E. Fallon, who presides over *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, in the Eastern District of Louisiana.

1.10. **Developers.** "Developers" shall mean the developer of any properties with KPT Chinese Drywall.

1.11. **Environmental Certificate.** "Environmental Certificate" shall mean a certification substantially in the form of Exhibit B from GFA International (1215 Wallace Drive, Del Ray Beach, Florida 33444) or another environmental

inspector, provided that both the Knauf Defendants and Settlement Class Counsel consent to such other environmental inspector.

1.12. **Excluded Releasee.** "Excluded Releasee" shall mean any person or entity eligible to be an Other Releasee that does not participate in the Prospective Insurer Agreement or otherwise settle with the PSC and the Knauf Defendants. An Excluded Releasee can also be an Other Releasee pursuant to Section 1.48.1.

1.13. **Execution Date.** "Execution Date" shall mean December 20, 2011.

1.14. **Final Cost Estimate.** "Final Cost Estimate" shall mean the final cost to remediate the KPT Property prepared by the Lead Contractor or Other Approved Contractor and agreed to by the Knauf Defendants.

1.15. **Foreclosed Property.** "Foreclosed Property" shall mean an Affected Property that is owned by a Mortgagee.

1.16. **General Contractor.** "General Contractor" shall mean any general contractor which (i) took part in the building, remodeling or restoration of any property with KPT Chinese Drywall, and (ii) did so working under contract with, and/or under the direction of a Builder, Owner or his or her insurer, or Developer.

1.17. **Held Costs.** "Held Costs" shall have the meaning set forth by the Court in Pretrial Order No. 9.

1.18. **Importers.** "Importers" shall mean any importer, which imported, marketed, distributed or supplied KPT Chinese Drywall.

1.19. **Individual Participating Class Members' Costs.** "Individual Participating Class Members' Costs" shall mean those costs reasonably incurred by a Participating Class Member in connection with the prosecution of a claim relating to an Affected Property.

1.20. **InEx.** "InEx" shall mean Interior Exterior Building Supply, L.P. and all of its past, present and future owners, partners, shareholders, officers, directors, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers, and all predecessors and successors, assigns, or legal representatives.

1.21. **InEx Class Settlement.** "InEx Class Settlement" shall mean the class action settlement with InEx preliminarily approved by the Court on May 13, 2011, including any supplemental recovery against InEx's excess insurer, The North River Insurance Company.

1.22. **Inspection Protocol.** "Inspection Protocol" shall mean the protocol for inspecting properties for KPT Chinese Drywall attached as Exhibit C.

1.23. **Installer.** "Installer" shall mean any person or entity involved in the installation, hanging, taping, and/or floating of KPT Chinese Drywall in any property.

1.24.   **Knauf Investment Assets.**  "Knauf Investment Assets" shall mean the deposited funds and/or asset(s) described in Section 17.1.3.

1.25.   **KPT Chinese Drywall.**  "KPT Chinese Drywall" shall mean any and all  drywall products manufactured, sold, marketed, distributed, and/or supplied by KPT and which are alleged to be defective.   "KPT Chinese Drywall" shall not include drywall products, manufactured, sold, marketed, distributed, and /or supplied by any Knauf Defendant other than KPT.

    1.25.1. **Lower-Case KPT Chinese Drywall.**   "Lower-Case KPT Chinese Drywall" shall mean KPT Chinese Drywall bearing the lower-case "TianJin, China" markings.  Class Members with only Lower-Case KPT Chinese Drywall in their properties shall be eligible for benefits under this Settlement only if the Class Member who owns or rents a particular property satisfies the requirements of Section 4.9.

1.26.   **KPT Drywall Percentage.** "KPT Drywall Percentage" shall mean the amount of KPT Chinese Drywall in the Affected Property divided by the total amount of KPT Chinese Drywall and Non-KPT Chinese Drywall in the Affected Property rounded to the next highest 10% increment, as determined according to paragraph II.C of the Inspection Protocol.  For example, if the amount of KPT Chinese Drywall in the Affected Property divided by the total amount of KPT Chinese Drywall and Non-KPT Chinese Drywall equals 82%, the KPT Drywall Percentage shall be 90%.  However, if the amount equals 90%, the KPT Drywall Percentage shall not be adjusted upward.   Applying this definition, if an inspection of an Affected Property reveals that there are 4 boards consisting of KPT Chinese Drywall, 2 boards consisting of Non-KPT Chinese Drywall and 4 non-reactive boards in the Affected Property, then the KPT Drywall Percentage will be 70% (four KPT Chinese Drywall boards divided by six total KPT Chinese Drywall boards and Non-KPT Chinese Drywall boards, rounded up to the next highest 10% increment).

1.27.   **KPT Property.**  "KPT Property" shall mean any Affected Property in which the KPT Drywall Percentage exceeds 90%.

1.28.   **KPT Property Owners.**  "KPT Property Owners" shall mean Owners of KPT Property.

1.29.   **L&W.**  "L&W" shall mean L&W Supply Co. and all of its past, present and future owners, partners, shareholders, officers, directors, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers, and all predecessors and successors, assigns, or legal representatives.

1.30.   **Lead Contractor.** "Lead Contractor" shall mean Moss & Associates, LLC, 2101 N. Andrews Avenue, Suite 300, Ft. Lauderdale, FL 33311.   The Knauf Defendants and Settlement Class Counsel may by agreement change the Lead Contractor.

1.31. **Lienholder.** "Lienholder" shall mean any person or entity which holds a lien on Affected Property with KPT Chinese Drywall.

1.32. **Litigation.** "Litigation" shall mean all Class Action Omnibus Complaints ("Omni Complaints") filed in MDL No. 2047, and all Related Actions.

1.33. **Major Builder Settlement Agreement.** "Major Builder Settlement Agreement" shall mean any one of the agreements among the Knauf Defendants, the PSC and certain Builders listed in Exhibit D filed under seal.

1.34. **Mixed Property.** "Mixed Property" shall mean Affected Properties in which the KPT Drywall Percentage is less than or equal to 90%.

1.35. **Mixed Property Owner.** "Mixed Property Owner" shall mean an Owner of a Mixed Property.

1.36. **Mortgagee.** "Mortgagee" shall mean any person or entity which made a loan secured by Affected Property with KPT Chinese Drywall.

1.37. **Mortgaged Property.** "Mortgaged Property" shall mean the real property and buildings of KI, as agreed upon by the Parties, pledged to secure the obligations of the Knauf Defendants to make payments under the Settlement pursuant to the Mortgages.

1.38. **Mortgages.** "Mortgages" shall mean mortgage agreements in respect of the Mortgaged Property.

1.39. **Multiple Unit Property.** "Multiple Unit Property" shall mean an Affected Property that contains more than one living unit.

1.40. **Multiple Unit Property Governing Body.** "Multiple Unit Property Governing Body" shall mean the person(s) or entity(ies) having the legal authority or control to bind a Multiple Unit Property, including but not limited to, a condominium association.

1.41. **Non-KPT Chinese Drywall.** "Non-KPT Chinese Drywall" shall mean any and all reactive drywall products manufactured, sold, marketed, distributed, and/or supplied by a Chinese manufacturer other than KPT, including but not limited to, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd.; Taian Taishan Plasterboard, Ltd.; Pingyi Zhongxin Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd.; Crescent City Gypsum, Inc.; Beijing New Building Materials Public Ltd. Co., and China National Building Material Co., Ltd., and China National Building Material Group Corporation. Counterfeit drywall products that purport to be manufactured by KPT, but that are in fact manufactured by an entity other than KPT shall not be considered "KPT Chinese Drywall" and shall be considered "Non-KPT Chinese Drywall" only if the drywall is reactive. "Non-KPT Chinese Drywall" shall not include drywall products manufactured, sold, marketed, distributed, and/or

6

supplied by Wuhu or Dongguan, and shall not include drywall bearing the lower-case "TianJin, China" markings.

1.42.   **Ombudsman**.   "Ombudsman" shall mean a construction expert available to advise Class Members who select the Program Contractor Option described in Section 4.3.1.  The Ombudsmen shall be selected according to the procedures set forth in Section 4.5.1.7.2.

1.43.   **Order and Judgment.**  "Order and Judgment" shall mean an order and judgment entered by the Court that:

(i)     Certifies the Settlement Class pursuant to Fed. R. Civ. P. 23(b)(3);

(ii)    Finds that the Settlement is fair, reasonable, and adequate, was entered into in good faith and without collusion, and should be approved; and approves the Settlement;

(iii)   Approves the Class Release provided in Section 5.2 and orders that, as of the Effective Date, the Released Claims as defined in Section 5.1 will be released as to the Knauf Defendants and Other Releasees;

(iv)    Enjoins and forever bars any and all Participating Class Members from commencing and/or maintaining any action, legal or otherwise, against the Knauf Defendants arising out of, or otherwise relating to, KPT Chinese Drywall;

(v)     Finds that the indemnity, defense and judgment reduction provisions in Sections 5.2.4, 5.2.5 and 5.2.6 are valid, binding, and enforceable; and therefore, bars the assertion by any entity or person against the Knauf Defendants of any contribution, indemnification, subrogation, or other claims arising out of the Participating Class Members' claims concerning (i) the KPT Chinese Drywall claims against the Knauf Defendants and Other Releasees or (ii) this Settlement;

(vi)    Enjoins non-Class Members and Class Members who opt out under Section 8 from seeking or obtaining any recovery against or from, or seeking to execute or otherwise exercise remedies against the Knauf Investment Assets and any proceeds thereof, which asset(s) have been procured by the Knauf Defendants in furtherance of the Settlement for the benefit of the Settlement Class.

(vii)   Finds that, pursuant to Fed. R. Civ. P. 54(b), there is no just reason for delay of entry of final judgment with respect to the foregoing.

1.44.   **Other Approved Contractor.**  "Other Approved Contractor" shall mean a contractor other than the Lead Contractor approved by the Knauf Defendants and Settlement Class Counsel to perform the remediation work under the Program Contractor Remediation Option set forth in Section 4.3.1.

1.45.   **Other Covered Expenses.**  "Other Covered Expenses" shall mean reimbursement for all alternative living expenses, personal property damage, maintenance of the KPT Property during remediation, including, but not limited to, payment of all utility bills, insurance, property taxes and maintenance of landscaping, and moving and storage expenses, incurred as a result of the remediation of the KPT Property, pursuant to Section 4.3.1.1 through 4.3.1.3.

1.46.   **Other Loss.**  "Other Loss" shall have the meaning set forth in Section 4.7.1 below.

1.47.   **Other Loss Fund.**  "Other Loss Fund" shall mean the Fund described in Section 4.6 below.

1.48.   **Other Releasee.**  "Other Releasee" shall mean any person or entity that supplied, installed or facilitated and/or assisted in such supply or installation of KPT Chinese Drywall, including but not limited to, Banner, InEx, L&W, Importers, Suppliers, Builders, Developers, General Contractors, Installers, Realtors, Subcontractors, and Subsuppliers which purchased or received KPT Chinese Drywall from a Supplier, used Chinese Drywall sold, marketed, distributed and/or supplied by a Supplier in the construction of Affected Property, or sold or marketed Affected Property containing KPT Chinese Drywall, and all of their past, present and future owners, partners, shareholders, officers, directors, agents, attorneys, employees, parents, associates, subsidiaries, divisions, affiliates, insurers and all predecessors and successors, assigns, or legal representatives, except for **Excluded Releasees**.

   1.48.1. A person or entity can be both an Other Releasee and an Excluded Releasee if some but not all of his (its) insurers participate in the Prospective Insurer Agreement or other settlement with the PSC and the Knauf Defendants.  In that case, the person or entity will be treated as an Other Releasee with respect to uninsured claims and claims insured by participating insurers and as an Excluded Releasee with respect to claims insured by the non-participating insurers.

1.49.   **Participating Class Member.**  "Participating Class Member" shall mean all Class Members who do not opt-out as provided in Sections 8.1 and 8.2.

1.50.   **Plaintiffs' Steering Committee; PSC.**  "Plaintiffs' Steering Committee" or "PSC" shall mean the group of plaintiffs' counsel appointed by the Honorable Eldon E. Fallon to manage and administer the affairs of all plaintiffs in MDL No. 2047 and to assist the Court in administering its docket.  The PSC, as currently constituted, is described by Pretrial Order No. 8A (Rec. Doc. No. 6960).

1.51.   **Pledged Assets.**  "Pledged Assets" shall mean the assets of KI, as agreed upon by the Parties, pledged to secure the obligations of the Knauf Defendants to make payments under the Settlement pursuant to the Security Agreement.

1.52. **Preliminary Approval Order.** "Preliminary Approval Order" shall mean an order of this Court preliminarily approving the Settlement.

1.53. **Proof of Claim Form.** "Proof of Claim Form" shall mean the form by which Class Members submit claims for benefits in a format to be mutually agreed upon by the Parties and approved by the Court.

1.54. **Prospective Insurer Agreement.** "Prospective Insurer Agreement" shall mean an agreement negotiated, or to be negotiated, between the PSC and the Knauf Defendants on the one hand, and the insurers for Other Releasees (other than Banner, InEx and L&W) on the other. The Prospective Insurer Agreement shall not release any liability of a surety, as opposed to an insurer.

1.55. **Prospective L&W Class Settlement.** "Prospective L&W Class Settlement" shall mean a class action settlement to be negotiated by the PSC, the Knauf Defendants and L&W.

1.56. **Realtors.** "Realtors" shall mean any realtors involved in any real estate transaction with respect to any property with KPT Chinese Drywall.

1.57. **Related Actions.** "Related Actions" shall mean any and all state court, federal court, foreign court, international tribunal or arbitration claims against the Knauf Defendants arising out of, or related to KPT Chinese Drywall, including, but not limited to, the matters identified in Exhibit E hereto.

1.58. **Related Claims.** "Related Claims" shall mean unlitigated claims of a Class Member against the Knauf Defendants arising out of, or related to KPT Chinese Drywall.

1.59. **Released Claims.** "Released Claims" shall have the meaning set forth in Section 5.1.

1.60. **Released Party.** "Released Party" or "Released Parties" shall mean the Knauf Defendants and the Other Releasees and their respective parents, subsidiaries, affiliates, divisions, predecessors, successors, heirs, legal representatives, legatees and/or assigns, together with past, present and future officers, directors, board members, shareholders, members, presidents, managers, partners, employees, distributors, retail dealers, agents, servants, representatives, consultants, in-house or outside attorneys, insurers, and reinsurers of each of the foregoing.

1.61. **Remediation Claims.** "Remediation Claims" shall mean claims associated with the KPT Property Owner's or Mixed Property Owner's remediation of the Affected Property prior to the Execution Date, including the reasonable costs of remediation and the Other Covered Expenses.

1.62. **Remediation Fund.** "Remediation Fund" shall mean the Fund described in Section 4.2 below.

1.63.   **Remediation Protocol.**   "Remediation Protocol" shall mean the protocol for remediating Affected Properties attached as Exhibit F.

1.64.   **Replacement Security.**   "Replacement Security" shall mean the letter of credit, bank guarantee and/or collateral assets described in Section 17.1.4.

1.65.   **Security Agreement.**   "Security Agreement" shall mean the security agreement to be agreed upon by the Parties and approved by the Court in a form that will be attached hereto as Exhibit G.   A mutually satisfactory Security Agreement is a condition precedent to the performance of the Parties' obligations under this Agreement.

1.66.   **Settlement.**   "Settlement" shall mean this Settlement Agreement and the settlement for which it provides resolving all claims against the Knauf Defendants, as well as all exhibits attached hereto or incorporated herein by reference.

1.67.   **Settlement Administrator.**   "Settlement Administrator" shall mean the person or entity appointed by the Court to administer the Settlement.   The parties shall jointly recommend that Lynn C. Greer, Esq. of BrownGreer PLC (115 S. 15th Street, Suite 400, Richmond, VA 23219-4209, Tel: (804) 521-7202, Fax: (804) 521-7299, e-mail:   lgreer@browngreer.com) be appointed Settlement Administrator.

1.68.   **Settlement Class Counsel.**   "Settlement Class Counsel" shall mean MDL No. 2047 Plaintiffs' Liaison Counsel and MDL No. 2047 Plaintiffs' Lead Counsel Russ Herman and Arnold Levin.

1.69.   **Settlement Funds.**   "Settlement Funds" shall mean the Remediation Fund and the Other Loss Fund.

1.70.   **Settling Defendants.**   "Settling Defendants" shall mean the Knauf Defendants.

1.71.   **Shared Costs.**   "Shared Costs" shall have the meaning set forth by the Court in Pretrial Order No. 9.

1.72.   **Special Master.**   "Special Master" shall mean the person or entity appointed by the Court responsible for reviewing information submitted by Participating Class Members and making determinations concerning individual Participating Class Members' benefits under the Settlement Funds.   The parties shall jointly recommend that John W. Perry, Jr. of Perry Atkinson Balhoff Mengis & Burns, LLC be appointed Special Master.   The parties shall jointly recommend that Patrick A. Juneau of the Juneau Firm be appointed as an additional Special Master in the event that the Special Master appointed by the Court is unable to perform all the duties assigned.

1.73. **Subcontractor.** "Subcontractor" shall mean any subcontractor which took part in the building, remodeling or restoration of any property with KPT Chinese Drywall.

1.74. **Subsupplier.** "Subsupplier" shall mean any person or entity to which a Supplier sold, marketed, distributed, or supplied KPT Chinese Drywall, directly or indirectly, to be provided to another for use or installation, in any property.

1.75. **Suppliers.** "Suppliers" shall mean, Banner, InEx and L&W.

1.76. **Tenants.** "Tenants" shall mean any person or entity who rents Affected Property with KPT Chinese Drywall.

1.77. **Xactimate.** "Xactimate" shall mean the full estimate, including 10% for contractor overhead and 10% for contractor profit (but no additional overhead and profit for the Lead Contractor), prepared by the Lead Contractor using the Xactimate software as described in the Court's Findings of Fact and Conclusions of Law in *Hernandez v. Knauf Gips KG*, No. 09-6050 and the testimony and exhibits cited therein for purposes of determining benefits under Sections 4.3.2 through 4.3.6. For each KPT Property, the Lead Contractor shall prepare the Xactimate based on the KPT Property's geographic location and the most recent complete Xactimate pricing.

## 2.  <u>Effective Date</u>

2.1. It shall be a condition precedent to the Knauf Defendants' and PSC's obligations under this Settlement that the Prospective Insurer Agreement be finalized in a form satisfactory to the PSC and the Knauf Defendants, including a release by the insurers and their insureds of all claims against the Knauf Defendants and Other Releasees arising from KPT Chinese Drywall, including but not limited to direct claims and claims for indemnity, contribution and subrogation.

2.2. The "Effective Date" of this Settlement shall be the date when the Settlement becomes Final. "Final" means:

2.2.1. If no objections to the Settlement are filed, or if any objections are filed and voluntarily withdrawn prior to entry of the Order and Judgment, then the date 30 days following the approval by the Court of the Order and Judgment and its entry on the Court's docket, if there is no appeal; or

2.2.2. If any objections are filed and not voluntarily withdrawn prior to the entry of the Order and Judgment, then the later of: (a) the expiration of the time to file or notice any appeal from the Court's Order and Judgment approving this Settlement; or (b) the date of final affirmance of any appeals therefrom.

3.      **Settlement of All Claims Against The Knauf Defendants**

3.1.    The Settlement will settle and resolve with finality the Litigation, the Released Claims, and the Related Claims against the Knauf Defendants and any other claims that have been brought, could have been brought or could be brought now or at any time in the future in the Litigation or any other proceeding relating to KPT Chinese Drywall, whether legal or otherwise.

3.2.    The Settlement will not settle or release any claims by way of contribution or indemnification that the Knauf Defendants may have against third parties or any claims by Participating Class Members against third parties that any Knauf Defendant has obtained by way of assignment arising out of, in any manner related to, or connected in any way with KPT Chinese Drywall, except to the extent such third party has provided the Knauf Defendants with a reciprocal release and except that the Knauf Defendants release all such claims against Other Releasees, to the extent their insurers participate in the Prospective Insurer Agreement.  The Parties will not interfere with the Knauf Defendants' rights or efforts to assert claims by way of contribution or indemnity against third parties arising out of, in any manner related to, or connected in any way with KPT Chinese Drywall.

4.      **Settlement Funds**

4.1.    In consideration of settlement of all claims against the Knauf Defendants, the Knauf Defendants shall establish two funds, a Remediation Fund and an Other Loss Fund.   Only the Owner Subclasses are eligible to participate in the Remediation Fund.  Both the Owner Subclasses and the Tenant Subclass are eligible to participate in the Other Loss Fund.

4.2.    **Establishment and Administration of the Remediation Fund**:

4.2.1.  The Remediation Fund will be a Court-approved Qualified Settlement Fund pursuant to Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended.  The escrow agreement establishing the Remediation Fund will be in a form mutually agreed upon by the Parties and approved by the Court.

4.2.2.  The Remediation Fund will be established through an initial deposit by the Knauf Defendants of $200 million paid within 30 days of the Court's Order and Judgment approving the Settlement and shall be replenished in increments of $50 million as of each time the balance of the Fund is reduced to $25 million.  All funding of the Remediation Fund shall be in US dollars.  The parties may agree, or the Court may order, that there be a lower amount of replenishment upon a showing that the remaining liabilities of the Remediation Fund are less than $75 million, and that there

be no replenishment upon a showing that the remaining liabilities of the Remediation Fund are less than $25 million.

4.2.3.   The net amounts recovered after payment of attorneys' fees and costs from the Prospective Insurer Agreement and from Excluded Releasees and/or their insurers toward payment of claims related to KPT Chinese Drywall and after allocation between KPT Chinese Drywall and Non-KPT Chinese Drywall shall be deposited 50% into the Remediation Fund and 50% into the Other Loss Fund.

4.2.4.   If the amount specified in paragraphs 4.2.2 and 4.2.3 is insufficient at any time to pay all or any outstanding Approved Claims and Administrative Expenses, upon fifteen (15) days notice, the Knauf Defendants will replenish the Remediation Fund in payments on an as needed basis to satisfy the outstanding Approved Claims and Administrative Expenses. Within the time period described above, the Settlement Administrator shall determine when, and if so the amount of any replenishment payments required under this Section.  The Settlement Administrator shall retain the services of a certified public accountant, following approval of the Court, to assist in overseeing and administering this Fund.

4.2.5.   The Knauf Defendants will be entitled to receive a refund of any amounts remaining in the Remediation Fund after all Participating Owner Class Members have been compensated and all Administrative Expenses have been paid.

4.2.6.   Administrative Expenses of the Remediation Fund will be paid from interest earned on the amounts deposited.  If the interest is insufficient to pay all expenses, the Remediation Fund will pay any amounts necessary to cover the shortfall out of principal.

4.2.7.   The Settlement Administrator shall provide to the Court on a monthly basis, and as requested, financial reports, including all expenditures and receipts, the expense of which is to be borne by the Remediation Fund. Copies of the monthly financial reports shall also be provided to the Knauf Defendants and Settlement Class Counsel.  Settlement Class Counsel and the Knauf Defendants shall have the right to audit the Remediation Fund at their own expense.

4.2.8.   All decisions by the Settlement Administrator or Special Master with respect to the Remediation Fund shall be in writing and shall be served on the parties by overnight mail to Settlement Class Counsel, Arnold Levin (Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106) and Russ M. Herman (Herman, Herman, Katz & Cotlar, LLP, 820 O'Keefe Avenue, New Orleans, Louisiana 70113), and the Knauf Defendants' counsel, Kerry Miller (Frilot L.L.C., 1100 Poydras Street, Suite 3700, New Orleans, LA 70163).

4.2.9. Unless otherwise final and binding pursuant to the relevant sections below, decisions of the Special Master with respect to the Remediation Fund may be appealed by Settlement Class Counsel, the Knauf Defendants or an affected Class Member within 15 days of service of the Special Master's decision by filing an objection with the Court, but only after Settlement Class Counsel, the Knauf Defendants, and, if applicable, an affected Class Member's counsel meet and confer in an attempt to resolve such issue.  Unless the Court orders otherwise, appeals will be based on the record and briefing before the Special Master without further evidentiary submissions, briefing or argument.  Any Party may, at its own expense, request that proceedings before the Special Master be transcribed.  The Court's decision on any objections will be final, with no further appeals permitted.

4.3. **Remediation Fund Benefits.**  KPT Property Owner Subclass Members can elect one of the following benefits from the Remediation Fund:

4.3.1. **Option 1.  Program Contractor Remediation Option/Property Not Yet Remediated:**  For KPT Property Owners selecting this option, the Remediation Fund will pay the Lead Contractor or Other Approved Contractor to remediate the Owner's KPT Property, according to the Remediation Protocol and consistent with Section 4.5 below, plus, for Residential Owners, the applicable Other Covered Expenses according to the following criteria:

4.3.1.1. **Lump Sum Payment.**

4.3.1.1.1. For KPT Properties that are less than or equal to 3,500 square feet "under air," as determined by the Lead Contractor or Other Approved Contractor and as set forth in the Sample Contractor-KPT Property Owner Agreement attached as an exhibit to the Remediation Protocol ("Under Air Area"), a single payment ("Lump Sum Payment") of $8.50 per square foot of the Under Air Area.

4.3.1.1.2. For KPT Properties that have an Under Air Area greater than 3,500 square feet, a Lump Sum Payment of $10.00 per square foot of the Under Air Area.

4.3.1.1.3. The Lump Sum Payment will be paid to the KPT Property Owner as soon as practicable, but not more than fifteen (15) days, after the KPT Property Owner executes an agreement

substantially in the form of the Sample Contractor-KPT Property Owner Agreement.

4.3.1.2.     **Delay Period Payment.** In the event that the remediation work is not substantially complete at the end of the three-month period commencing with the date on which the Lead Contractor or Other Approved Contractors starts the remediation work ("Move-Out Date"),

4.3.1.2.1.     For KPT Properties that have an Under Air Area less than or equal to 3,500 square feet, an additional payment of $1.50 per square foot of the Under Air Area for each additional month ("the Delay Period Payment") that the KPT Property Owner is displaced from the KPT Property (the "Delay Period"), subject to the following:

a.     In the event of an unanticipated delay in the scheduled time for remediation, as disclosed to the KPT Property Owner prior to the Move-Out Date, such Delay Period shall be the period commencing three months after the Move-Out Date and terminating 10 business days after the KPT Property Owner has received both a certificate of occupancy and an Environmental Certificate from the Lead Contractor or Other Approved Contractor.

b.     However, where the Lead Contractor or Other Approved Contractor initially schedules a remediation to go beyond the three-month period commencing with the Move-Out Date, and the Lead Contractor or Other Approved Contractor so advises the KPT Property Owner prior to the Move-Out Date, the Delay Period shall be the period commencing three months after the Move-Out Date and terminating at the initially scheduled completion date. For example, if the Lead Contractor initially schedules a remediation to last four months beyond the Move-Out Date and the remediation is completed on schedule, the Delay Period shall be one month (the period commencing three months after the Move-Out Date and terminating at the initially scheduled completion date).

15

4.3.1.2.2.   For KPT Properties that have an Under Air Area greater than 3,500 square feet, a single, one-time Delay Period Payment of $1.50 per square foot of the Under Air Area.

4.3.1.3.   The Lump Sum Payment and any Delay Period Payment are solely for the benefit of the KPT Property Owner.   KPT Property Owners' counsel shall not deduct any contingency fee or any other fee or expenses from the Lump Sum Payment and any Delay Period Payment.   To the extent fees or expenses are to be paid based on such Payments, such fees and expenses shall be determined according to the procedures set forth in Section 14.

4.3.2.   **Option 2.   Self-Remediation Option:**   For KPT Property Owners selecting this option, the Remediation Fund will pay the KPT Property Owner's chosen contractor an amount equal to the higher of the Final Cost Estimate prepared by the Lead Contactor or 65% of the Xactimate prepared by the Lead Contractor to remediate the KPT Property under the Remediation Protocol.   The Lead Contractor shall provide the Final Cost Estimate and Xactimate to the Settlement Administrator who shall make it available to the KPT Property Owner.   In addition, for Residential Owners who select the Self-Remediation Option, the Remediation Fund will pay the Lump Sum Payment under Section 4.3.1.1, but not the Delay Period Payment under Section 4.3.1.2.

4.3.2.1.   To exercise this option, the KPT Property Owner must submit a binding contract with an insured and bonded licensed contractor providing for the scope of work equivalent to that set forth in the Remediation Protocol.   The contract must include a representation that the contractor is insured for residential construction and that it is bonded.

4.3.2.2.   Any payments pursuant to this option will be made directly to the licensed contractor upon a determination by the Settlement Administrator that the licensed contractor has performed satisfactory work consistent with the contract, except that for Residential Owners, the payment for Other Covered Expenses will be made directly to the KPT Property Owner.   Of the amount designated for remediation, 30% will be paid to the licensed contractor for building permits and fees and as a down payment  within 15 days of the provision by the KPT Property Owner of a binding contract with the licensed contractor under Section 4.3.2.1, 30% upon the KPT Property Owner's providing the Settlement Administrator with the Environmental Certificate and certification of removal of the electrical wiring, home security equipment, and copper gas lines in compliance with the

16

Remediation Protocol; 30% upon completion of drywall installation, and the remaining 10% to be paid upon the KPT Property Owner's submission of proof acceptable to the Settlement Administrator that the remediation of the KPT Property has been completed according to the Remediation Protocol and that the Contractor has provided to the homeowner a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the remediation work have been either released or bonded off such that the KPT Property Owner's title is clear of all liens related to the remediation work. The amount designated for Other Covered Expenses will be paid upon the Settlement Administrator's determination that the claim is qualified.

4.3.2.3.  The licensed contractor or any subcontractor or any person or entity retained by the licensed contractor shall not be the agent of the Knauf Defendants, the PSC or the Remediation Fund. Nor shall the Knauf Defendants, the PSC or the Remediation Fund be responsible for or warrant any facet of the remediation work, including but not limited to, the removal and disposal of the drywall from the KPT Property, which shall be disposed of at an appropriate construction and demolition solid waste landfill in accordance with waste regulations of the jurisdiction where the KPT Property is located, the remediation work performed by the licensed contractor, any damages caused by the remediation, and/or any appliances replaced or reinstalled during the remediation. The licensed contractor must provide a certification to the Settlement Administrator that, in disposing the drywall, it has complied with the applicable waste regulations of its jurisdiction. The Knauf Defendants, the PSC and the Remediation Fund shall not be responsible for any warranties and/or liens placed on the KPT Property as a result of the remediation work performed under Section 4.3.2. The KPT Property Owner and the licensed contractor shall indemnify, defend and hold harmless the Knauf Defendants, the PSC and the Remediation Fund from and against all claims and future claims relating to any facet of the remediation work performed under Section 4.3.2. The Knauf Defendants, the PSC and the Remediation Fund shall have no liability related to the remediation work performed under Section 4.3.2. other than the Knauf Defendants' and the Remediation Fund's obligation to provide funds for the remediation according to the terms of this Settlement.

4.3.3.  **Option 3.  Cash-Out Option:**  For KPT Property Owners selecting this option, the Remediation Fund will pay the KPT Property Owner an amount of money equal to the amount specified in Section 4.3.2; however,

because the KPT Property Owner is not remediating that KPT Property, and therefore to account for additional risk to the Knauf Defendants and the fact that the KPT Property Owner will not incur alternative living expenses, such amount shall be reduced by $7.50 per square foot and the KPT Property Owner shall be entitled to a reduced Lump Sum Payment of $3.50 per square foot under Section 4.3.1.1, but not to a Delay Period Payment under Section 4.3.1.2. The KPT Property Owner may select this option only (i) if there is no mortgage or other lien on the property, or if the KPT Property Owner provides a release by the Mortgagee(s) or Lienholder(s) to the Knauf Defendants and Other Releasees; (ii) if the KPT Property Owner records the existence of reactive Chinese Drywall in the local property clerks' office, if permitted by local law; and (iii) covenants to inform subsequent purchasers of the KPT Property of the presence of KPT Chinese Drywall by stating under oath in application for this benefit that "I will inform any subsequent purchaser in writing that there is reactive KPT Chinese Drywall in the KPT Property and I will defend and indemnify the Knauf Defendants and any other person or entity released by the Settlement against claims asserted by subsequent purchasers arising from KPT Chinese Drywall."

4.3.4. **Mixed Property Owners:** Mixed Property Owners may select only the Self-Remediation Option (as set forth in Section 4.3.2) or the Cash-Out Option (as set forth in Section 4.3.3).

4.3.4.1. In the event a Mixed Property Owner selects the Self-Remediation Option, in accordance with Section 4.3.4.1.1, the Remediation Fund will pay the Mixed Property Owner's chosen contractor amounts equal to the cash payments specified in Section 4.3.2 multiplied by the KPT Drywall Percentage and pursuant to the payment schedule set forth in Section 4.3.2.2. In accordance with Section 4.3.4.1.1, the Mixed Property Owner shall be responsible for paying the chosen contractor the remaining amounts due under his or her contract with the chosen contractor (the "Mixed Property Owner Payment"). In addition, the Remediation Fund will pay the Mixed Property Owner the Lump Sum Payment specified in Section 4.3.1.1 multiplied by the KPT Drywall Percentage.

4.3.4.1.1. As a precondition to the Remediation Fund's obligation to pay the Mixed Property Owner's chosen contractor, within 15 days of the Mixed Property Owner's submission to the Settlement Administrator, the Mixed Property Owner will deposit the Mixed Property Owner Payment into an escrow account to be established by the Mixed Property Owner and the Knauf Defendants, . There shall be a single escrow agent mutually

agreeable to the Parties for all such escrow accounts. After the Mixed Property Owner deposits the Mixed Property Owner Payment into the escrow account, the Remediation Fund shall deposit an amount equal to the cash payments specified in Section 4.3.2 multiplied by the KPT Drywall Percentage. The Mixed Property Owner's chosen contractor shall be paid from the escrow account pursuant to the schedule in Section 4.3.2.2. If the Mixed Property Owner fails to deposit the Mixed Property Owner Payment, the Mixed Property Owner shall be deemed to have selected the Cash-Out Option under Section 4.3.3.

4.3.4.1.2. The Mixed Property Owner and his or her chosen contractor shall be subject to all the terms, conditions and deadlines set forth in Sections 4.3.2.1 through 4.3.2.3.

4.3.4.1.3. The Mixed Property Owner may choose the Lead Contractor or an Other Approved Contractor as his or her chosen contractor. In that event, the Mixed Property Owner and the Lead Contractor or an Other Approved Contractor shall be subject to all the terms and conditions set forth in Section 4.3.2.

4.3.4.2. In the event a Mixed Property Owner selects the Cash-Out Option, the Remediation Fund will pay the Mixed Property Owner an amount equal to the payment specified in Section 4.3.2 multiplied by the KPT Drywall Percentage and the Lump Sum Payment specified in Section 4.3.1.1 multiplied by the KPT Drywall Percentage. The Remediation Fund will not pay the Delay Period Payment to a Mixed Property Owner who selects the Cash-Out Option. A Mixed Property Owner who selects the Cash-Out Option must satisfy the conditions specified in the last sentence of Section 4.3.3.

4.3.4.3. Mixed Property Owners shall retain all their rights against any and all parties responsible for damages incurred as a result of Non-KPT Chinese Drywall to the extent not previously resolved by settlement or judgment. The Knauf Defendants shall retain all their rights to contribution and indemnity to recover Mixed Property Payments from any and all parties responsible for damages incurred as a result of Non-KPT Chinese Drywall.

19

4.3.5. **Foreclosed Properties:** In the case of Foreclosed Properties:

4.3.5.1.   For those Foreclosed Properties foreclosed upon prior to the Execution Date, (a) the Mortgagee shall be entitled to the benefits under Sections 4.3.1, 4.3.2 or 4.3.3, except for the Other Covered Expenses, but only if the Mortgagee became the Owner after foreclosure and remains the Owner of the Affected Property and the Mortgagee is a Class Member which filed a lawsuit by December 9, 2011; and (b) the Owner prior to the foreclosure shall be entitled to the Lump Sum Payment under Section 4.3.1.1, but not the Delay Period Payment under Section 4.3.1.2.

4.3.5.2.   For those Foreclosed Properties foreclosed upon on or after the Execution Date, any benefits under the Remediation Fund are contingent on the KPT Property Owner prior to foreclosure providing a release by the Mortgagee(s) or Lienholder(s) to the Knauf Defendants and Other Releasees.

4.3.6. **Multiple Unit Properties.**

4.3.6.1.   **General Terms**

4.3.6.1.1.   **Choice of Remediation Options Based on Feasibility of Individual Unit Remediation.** The Remediation Fund options available for Multiple Unit Properties will depend upon (i) whether it is feasible to treat each individual unit in the Multiple Unit Property as an individual property, and (ii) whether all units with KPT Chinese Drywall in a Multiple Unit Property are KPT Properties or whether some are Mixed Properties.

4.3.6.1.2.   **Determination of Feasibility.** It is feasible to treat each unit in a Multiple Unit Property as a single property if the unit can be remediated without need to remediate any other part of the Multiple Unit Property. The Lead Contractor and/or Other Approved Contractor shall determine, in their sole discretion, whether it is feasible to remediate individual units without need to remediate any other part of the Multiple Unit Property.

4.3.6.1.3.   **Limitations on Choice of Options.** Where it is feasible to treat each unit in a Multiple Unit

Property as an individual property and the Multiple Unit Property Governing Body selects the Program Contractor Remediation Option (as set forth in Section 4.3.1) for some individual units and the Self-Remediation Option (as set forth in Section 4.3.2) for other individual units and/or remediation of common areas, no work under the Self-Remediation Option shall commence until all work under the Program Contractor Remediation Option in the Multiple Unit Property has been completed because of the infeasibility of having multiple contractors remediate a single Multiple Unit Property.

4.3.6.1.4.   **Calculation of the KPT Drywall Percentage**. For Multiple Unit Properties that are Mixed Properties, the following method shall be used to calculate the KPT Drywall Percentage:

a.   Any individual unit that is not inspected shall be presumed to contain only Non-KPT Chinese Drywall and its KPT Drywall Percentage shall be presumed to be 0%. The Multiple Unit Property Governing Body may seek to rebut that presumption by requesting an inspection at its own costs of any or all such units under the Inspection Protocol.

b.   In determining the KPT Drywall Percentage for the Multiple Unit Property, the numerator shall be calculated by adding the KPT Drywall percentage for each individual unit (expressed as a decimal, for example a unit with a KPT Drywall Percentage of 100% shall equal 1 and a unit with a KPT Drywall Percentage of 50% shall equal .5). The denominator shall be the total number of individual units.

c.   For example, assume a Multiple Unit Property has 100 individual units with (i) 25 individual units that have a KPT Drywall Percentage of 100%; (ii) 25 individual units that have a KPT Drywall Percentage of 50%; and (iii) 50 individual units that were not inspected. In that circumstance, in determining the KPT Drywall Percentage for the Multiple Unit Property, the numerator shall be 37.5 (25 individual units x 1, plus 25 individual

21

units x .5, plus 50 individual units x 0). The denominator shall be 100 (the total number of units in the building). The KPT Drywall Percentage for the Multiple Unit Property shall be 37.5%, which, pursuant to Section 1.26, shall be rounded to 40%.

4.3.6.1.5. **Obligations of the Multiple Unit Property Governing Body.**

a. Regardless of its selection of either the Program Contractor Remediation Option or Self-Remediation Option, the Multiple Unit Property Governing Body must do the following;

(i) as to the common areas provide a written representation that it has the legal authority to bind all individual unit property owners to its selection; and

(ii) as to individual units that are Affected Properties, obtain informed written consent of all owners of such individual units to the Multiple Unit Property Governing Board's selection.

(iii) In addition, due to possible inconvenience caused by the remediation to all owners of individual units that are not Affected Properties, the Multiple Unit Property Governing Body must obtain informed written consent of all owners of such individual units to the Multiple Unit Property Governing Board's selection. In the event that the Multiple Unit Property Governing Body is unable to obtain informed written consent of all owners of individual units that are not Affected Properties, the Multiple Unit Property Governing Body shall be limited to the Cash-Out Option unless otherwise agreed to by the Knauf Defendants.

b. To the extent that the Multiple Unit Property Governing Body selects the Program Contractor Remediation Option, it, and the individual unit owners and tenants, must comply with the

22

remediation schedule and relocation plan created by the Lead Contractor or Other Approved Contractor.

(i)     The Lead Contractor or Other Approved Contractor shall provide a proposed remediation schedule and relocation plan to Settlement Class Counsel, the Knauf Defendants and the Multiple Unit Governing Body. Within 15 days after notice, any Party may object to the proposed remediation schedule and relocation plan in writing to the Special Master and provide copies to the other parties. If, after 15 days, there are no objections, the proposed remediation schedule and relocation plan shall be final. If, after 15 days, there are objections, the Special Master shall resolve them.

c.     To the extent that the Multiple Unit Property Governing Body selects the Cash-Out Option for an individual unit, the Multiple Unit Governing Body and/or the individual unit owners of Affected Properties shall comply with all the requirements in Section 4.3.3. and the Multiple Unit Governing Body must provide the Releases set forth in Section 5 from the individual unit owners of Affected Properties.

d.     The Multiple Unit Property Governing Body must secure from all individual unit owners a dismissal with prejudice of the individual unit owners' claims against the Knauf Defendants and Other Releasees, but not the Excluded Releasees, relating to the KPT Chinese Drywall in the individual unit.

**4.3.6.2.** **Options available to the Multiple Unit Property Governing Body where, pursuant to Section 4.3.6.1.2, it is feasible treat each unit as a single property.** For individual units that are KPT Properties located in a Multiple Unit Property, where feasible as defined in Section 4.3.1.6.2, each individual unit shall be treated as a single KPT Property without regard to its existence in a Multiple Unit Property.

4.3.6.2.1.  Where no individual unit in the Multiple Unit Property is a Mixed Property, the Multiple Unit Property Governing Body for the Multiple Unit Property shall be permitted to select from among the Program Contractor Remediation Option (set forth in Section 4.3.1), the Self Remediation Option (set forth in Section 4.3.2), and the Cash-Out Option (set forth in Section 4.3.3), for each individual unit, subject to Section 4.3.5.  Such options will be available for the common areas.  In the event that the Multiple Unit Property Governing Body opts out of this Settlement, subject to the Knauf Defendants' termination rights under Sections 8.3 and 13.2, nothing in this Settlement shall prevent an individual unit owner from participating in this Settlement, and receiving benefits available to Owners, provided that the individual unit can be remediated on an individual basis, included but not limited to without the need for consent to the remediation by the Multiple Unit Property Governing Body.  In such instance, however, unless all such individual unit owners select the Program Contractor Remediation Option, such individual unit owners will be permitted to select only between the Self-Remediation Option and the Cash-Out Option.

4.3.6.2.2.  Where any individual unit in the Multiple Unit Property is a Mixed Property, the Program Contractor Remediation Option shall not be available, and the Multiple Unit Property Governing Body shall only be permitted to select from among the Self-Remediation Option and the Cash-Out Option both of which shall be subject to terms set forth in Section 4.3.4 governing Mixed Properties.  Such options will be available for the common areas.  The KPT Drywall Percentage for the common areas will be the KPT Drywall Percentage of the entire Multiple Unit Property as determined under Section 4.3.6.1.4.

4.3.6.3.  **Options Available to the Multiple Unit Property Governing Body where, pursuant to Section 4.3.6.1.2, it is not feasible to treat each unit as a single property.**

4.3.6.3.1.  Where there are no individual units that are Mixed Properties, the Multiple Unit Property Governing

24

Body shall be permitted to select a single option from among the Program Contractor Remediation Option (set forth in Section 4.3.1), the Self-Remediation Option (set forth in Section 4.3.2) and the Cash-Out Option (set forth in Section 4.3.3), which shall apply to the entire Multiple Unit Property, subject to Sections 4.3.5 and 4.3.6.1.5.

4.3.6.3.2. Where there are individual units that are Mixed Properties or that contain Non-KPT Chinese Drywall (but not KPT Chinese Drywall), the Multiple Unit Property Governing Body shall be permitted to select between the Self-Remediation Option and the Cash-Out Option, which shall apply to the entire Multiple Unit Property, subject to Sections 4.3.4, 4.3.5, and 4.3.6.1.5, and to the common areas. The KPT Drywall Percentage for the common areas will be the KPT Drywall Percentage of the entire Multiple Unit Property as determined under Section 4.3.6.1.4.

4.3.6.4. To the extent that the Multiple-Unit Property Governing Body chooses the Cash-Out Option for the common areas, any payments with respect to the common areas will be equitably distributed to all individual unit owners and/or the Multiple Unit Property Governing Body to the extent of their respective legal ownership in the common areas.

4.3.7. **Already Remediated Properties.**

4.3.7.1. Owners who have self-remediated Affected Properties or have entered into contracts to self-remediate Affected Properties prior to the Execution Date shall be entitled to benefits to resolve their Remediation Claims as provided in the Already Remediated Properties Protocol. Such benefits shall be paid from the Remediation Fund. In addition, such Owners are entitled to seek benefits from the Other Loss Fund.

4.3.8. **Timing for Election of Options.**

4.3.8.1. Prior to any qualified Class Member selecting one of the above options, the Lead Contractor or Other Approved Contractor shall prepare an Xactimate and a Final Cost Estimate for the Affected Property and shall provide such documents to the Settlement Administrator, who shall make them available to the Class Member.

25

4.3.8.2.   Subject to the conditions set forth in Section 4.3.1 through 4.3.6, within 45 days of the receipt of the Xactimate and Final Cost Estimate from the Settlement Administrator, the Class Member shall notify the Settlement Administrator of his or her election of the Program Contractor Remediation Option (as set forth in Section 4.3.1), the Self-Remediation Option (as set forth in Section 4.3.2), or the Cash-Out Option (as set forth in Section 4.3.3).

4.3.8.2.1.   To the extent that the Class Member elects the Self-Remediation Option, the Class Member must also submit a binding contract as provided in Section 4.3.2.1 at the same time as the election.

4.3.8.2.2.   To the extent that the Class Member elects the Cash Option, the Class Member must also have complied with the requirements set forth in Section 4.3.3 by the time of election.

## 4.4.   Remediation Fund Qualifying Procedures

4.4.1.   In order to qualify for benefits of the Remediation Fund an Owner Subclass Member whose property has not already been remediated must submit physical proof such as photographic evidence or inspection reports satisfactory to the Settlement Administrator that the property has KPT Chinese Drywall.  The Settlement Administrator shall be trained on the identification of KPT Chinese Drywall by the Approved Inspectors identified in the Inspection Protocol.  An Owner Subclass Member who has submitted satisfactory physical proof must submit his property for an inspection pursuant to the Inspection Protocol by an inspector retained by the Knauf Defendants to verify (a) that the property contains KPT Chinese Drywall, (b) proof of corrosion or other acceptable evidence that the KPT Chinese Drywall was reactive, and (c) the KPT Chinese Drywall Percentage (which will also determine whether the Affected Property is a KPT Property or a Mixed Property).  As soon as practicable, but not less than 15 days from the Settlement Administrator's determination that the Owner Subclass Member has submitted satisfactory physical proof, the inspector shall contact the Owner Subclass Member to schedule a date for the inspection.  All inspections and inspectors shall be paid out of the Remediation Fund unless the inspection has been procured by fraud.  Inspections shall be conducted pursuant to the Inspection Protocol and all inspectors must be approved by the Knauf Defendants and Settlement Class Counsel.  The inspector shall determine whether the property has KPT Chinese Drywall and if so the KPT Drywall Percentage based solely on the methodology set forth in the Inspection Protocol.  The inspector's determination shall be final unless the Knauf Defendants, Settlement Class Counsel or the Owner Subclass Member objects to the inspector's

determination.  In that event, the Knauf Defendants, Settlement Class Counsel and the Owner Subclass Member shall meet and confer in an attempt to resolve the objection, and to the extent the objection is not resolved within 5 business days, the objection shall be submitted to the Special Master who shall resolve the objection based solely on the methodology set forth in the Inspection Protocol, which shall be final and binding on all Parties, and not on any other methodology.

4.4.2.   All Owner Subclass Members must submit their claims to the Settlement Administrator by a date to be established by the Court.  Untimely submitted claims shall be rejected unless the Court extends the deadline for good cause shown.

4.5.   **Cost Control and Dispute Resolution Mechanisms for Program Contractor Remediation Option**

4.5.1.   In conducting their duties, the Lead Contractor and Other Approved Contractors shall conduct the remediation work so as to achieve, on a cost effective basis, the removal of all KPT Chinese Drywall, KPT Chinese Drywall-related odors and contamination; and to leave the home with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the KPT Chinese Drywall, as existed prior to the start of the remediation or damages caused by the remediation work subject to the Sample Contractor-KPT Property Owner Agreement attached as an exhibit to the Remediation Protocol.  To that end, the Parties agree to the following cost-control procedures:

4.5.1.1.   The Knauf Defendants, in consultation with Settlement Class Counsel, have selected the Lead Contractor to undertake the remediation of KPT Properties to be remediated pursuant to the Program Contractor Remediation Option described in Section 4.3.1.  The contract between the Lead Contractor and the Knauf Defendants entered into for purposes of the Pilot Program shall remain in effect but shall be modified or amended so as to achieve the objectives of this Settlement, including to provide that payments due the Lead Contractor shall be made from the Remediation Fund.

4.5.1.1.1.   The Knauf Defendants reserve the right to assign an Other Approved Contractor to perform and/or oversee the remediation in a particular KPT Property, being remediated pursuant to the Program Contractor Remediation Option, for any reason, including, but not limited to, circumstances where the Other Approved Contractor can remediate the KPT Property on a more cost-efficient basis.

4.5.1.2. For KPT Properties to be remediated pursuant to the Program Contractor Remediation Option described in Section 4.3.1, the Knauf Defendants shall solicit and approve a detailed estimate of the costs to do the remediation work ("Preliminary Cost Estimate") from the Lead Contractor or an Other Approved Contractor.  The Lead Contractor or an Other Approved Contractor shall submit the Preliminary Cost Estimate to the Settlement Administrator.  Absent action by the Knauf Defendants within five business days, the Preliminary Cost Estimate shall be deemed the Final Cost Estimate.  Upon the Knauf Defendants' approval of the Final Cost Estimate, the Final Cost Estimate shall be submitted to the Settlement Administrator.

4.5.1.2.1. In the event that a dispute arises between a KPT Property Owner and the Lead Contractor or Other Approved Contractor over the Remediation Protocol for the individual KPT Property, such dispute shall be submitted to the Special Master who will resolve the dispute.  The parties shall cooperate with the Special Master to resolve any disputes expeditiously and avoid, to the maximum extent possible, any delay in the remediation.

4.5.1.2.2. Any expenses associated with a dispute between a KPT Property Owner and the Lead Contractor or Other Approved Contractor ("Mediation Expenses") as regards the Remediation Protocol, including progress and quality, and any warranties provided by the Contractor, will be jointly shared by the Knauf Defendants and the KPT Property Owner.  In the event that disputes asserted by a Party are asserted in bad faith, the Special Master may in his discretion direct that the Mediation Expenses incurred in resolving any such bad faith disputes asserted by that Party will be paid by same; otherwise, expenses will be shared equally by the Parties to the dispute.

4.5.1.3. As soon as practicable after the Effective Date, the Settlement Administrator shall provide the Lead Contractor with a list of those Class Members who have selected the Program Contractor Remediation Option.  Thereafter, the Lead Contractor shall develop a remediation schedule that will provide a consistent flow of work to the Lead Contractor to allow the Lead Contractor to maintain the necessary staffing levels during the period required to remediate KPT Properties

28

with a goal of commencing the remediation process in at least 200 KPT Properties each month under Sections 4.3.1 and 4.3.2. The remediation plan shall be developed in a manner that maximizes economies of scale, including, for example, by releasing KPT Properties to the Lead Contractor in the same neighborhood or geographic location.   To the extent that the Lead Contractor lacks sufficient staff or other resources to commence the remediation process in order to meet the above goal, the Knauf Defendants will assign an Other Approved Contractor to assist the Lead Contractor in meeting that goal.

4.5.1.4.   In creating the Final Cost Estimate, the Lead Contractor or Other Approved Contractors shall (a) reasonably pursue all economies of scale, where applicable, to reduce the cost of performing the repair work required by the Remediation Protocol, (b) to the extent that portions of the repair work are to be performed by a subcontractor, base the Cost Estimate on a competitive bidding process among potential subcontractors, and (c) obtain materials or equipment fabricated especially for the repair work through a competitive bidding process.   All documents pertaining to the Cost Estimate and the remediation work, including but not limited to the documents identified in Section 4.5.1.5 shall be submitted to the Settlement Administrator.

4.5.1.5.   The Settlement Administrator shall place all documents submitted under Section 4.5.1.4 and related to the remediation in electronic depositories (either shared or separate, to be determined by technical experts or by the Court if the technical experts cannot reach agreement) to which Settlement Class Counsel and Individual Class Members' counsel shall each have private, password-protected and secure access.   Those documents shall include but not be limited to the following:

4.5.1.5.1.   All Xactimate computations;

4.5.1.5.2.   Any computations evidencing discounts to any remediation performed;

4.5.1.5.3.   All itemized bids;

4.5.1.5.4.   Any contracts;

4.5.1.5.5.   A comprehensive listing of all administrative expenses;

4.5.1.5.6.   All subcontractor agreements and/or any other contract entered into by the Lead Contractor,

29

including but not limited to any subcontractor bids;

    4.5.1.5.7.    Copies of all governmental charges, inspections and permits;

    4.5.1.5.8.    The applicable Lead Contractor mediation process;

    4.5.1.5.9.    All work authorizations;

    4.5.1.5.10.    Evidence of payments to contractors, subcontractors, claimants, vendors;

    4.5.1.5.11.    Subcontractor and contractor warranties; and

    4.5.1.5.12.    All substitute contractors.

4.5.1.6.    Any Party shall have the right to apply to the Court for good cause shown to replace the Lead Contractor, Other Approved Contractors or the Special Master. The Lead Contractor, Other Approved Contractors or the Special Master shall not be replaced absent an order of the Court finding good cause. The Court's decision on such matters shall be final, with no further appeals permitted.

4.5.1.7.    Class Members who select the Program Contractor Remediation Option described in Section 4.3.1 shall have the right to consult with the designated Ombudsman for his or her Affected Property regarding matters relating to the remediation process other than having to do with the Final Cost Estimate or Preliminary Cost Estimate, including, but not limited to, the actual remediation work, and, in the event that a dispute arises, during the dispute resolution process described in Sections 4.5.1.2.1 and 4.5.1.2.2.

    4.5.1.7.1.    There shall be two Ombudsmen whose responsibilities shall be divided along geographical lines – one who is situated in Florida and will advise on Affected Properties in Florida and one who is situated in New Orleans, Louisiana and will advise on Affected Properties in any other state.

    4.5.1.7.2.    Within 30 days of the Effective Date, the PSC shall appoint the Ombudsmen.

          4.5.1.7.3.     The Lead Contractor shall work to familiarize the Ombudsmen with each facet of the Remediation Protocol, including but not limited to the scope of work under the Remediation Protocol and the remediation process.

**4.6.    Establishment and Administration of the Other Loss Fund**

4.6.1.    The Other Loss Fund will be a Court-approved Qualified Settlement Fund pursuant to Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended. The escrow agreement establishing the Other Loss Fund will be in a form mutually agreed upon by the Parties and approved by the Court.

4.6.2.    The Other Loss Fund will be established through a deposit by the Knauf Defendants of $30 million paid within 30 days of the Court's Order and Judgment approving the Settlement. All funding of the Other Loss Fund shall be in US dollars.

4.6.3.    Any amounts recovered from the Prospective Insurer Agreement and from Excluded Releasees and/or their insurers toward payment of claims related to KPT Chinese Drywall shall be deposited 50% into the Remediation Fund and 50% into the Other Loss Fund.

4.6.4.    The Knauf Defendants' contribution to the Other Loss Fund shall be fixed under Sections 4.6.2. The Knauf Defendants shall have no obligation to make further payments into the Fund and shall not be entitled to a refund of any amounts deposited.

4.6.5.    Administrative Expenses of the Other Loss Fund will be paid from interest earned on the amounts deposited. If the interest is insufficient to pay all expenses, the Remediation Fund will pay any amounts necessary to cover the shortfall.

4.6.6.    The Settlement Administrator shall provide to the Court on a monthly basis an accounting of all funds held in the Other Loss Fund. Copies of the monthly accountings shall also be provided to the Knauf Defendants and Settlement Class Counsel. Settlement Class Counsel and the Knauf Defendants shall have the right to audit the Other Loss Fund at their own expense.

4.6.7.    The Settlement Administrator shall retain the services of a certified public accountant, following appointment by the Court, to assist in overseeing and administering this Fund. All decisions by the Special Master with respect to the Other Loss Fund shall be in writing and shall be served on the parties by overnight mail to Settlement Class Counsel, Arnold Levin (Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106) and Russ M. Herman (Herman, Herman, Katz &

31

Cotlar, LLP, 820 O'Keefe Avenue, New Orleans, Louisiana 70113), and the Knauf Defendants' counsel, Kerry Miller (Frilot L.L.C., 1100 Poydras Street, Suite 3700, New Orleans, LA 70163).

4.6.8. Unless otherwise final and binding pursuant to the relevant sections below, decisions of the Special Master with respect to the Other Loss Fund may be appealed by Settlement Class Counsel, the Knauf Defendants or an affected Class Member within 15 days of service of the Special Master's decision by filing an objection with the Court, but only after Settlement Class Counsel, the Knauf Defendants, and, if applicable, an affected Class Member's counsel meet and confer in an attempt to resolve such issue. Unless the Court orders otherwise, appeals will be based on the record and briefing before the Special Master without further evidentiary submissions, briefing or argument. Any Party may, at its own expense, request that proceedings before the Special Master be transcribed. The Court's decision on any objections will be final, with no further appeals permitted.

## 4.7. Other Loss Fund Benefits

4.7.1. Subject to the procedures set forth in Section 4.7.4, the Other Loss Fund will be used to provide the following benefits:

4.7.1.1. **Pre-Remediation Alternative Living Expenses:** For Residential Owners, alternative living expenses arising from the need to vacate the Affected Property incurred prior to remediation as a result of property damage caused by KPT Chinese Drywall; provided that the Residential Owner vacated the Affected Property on or before the Execution Date. For Residential Owners, Other Loss shall not include alternative living expenses during remediation and personal property damage, as that is reimbursed by the Remediation Fund.

4.7.1.1.1. To obtain benefits under this Section, a Residential Owner must establish that the pre-remediation alternative living expenses were substantially caused by KPT Chinese Drywall.

4.7.1.1.2. To obtain benefits under this Section, the Residential Owner must submit the following:

a. physical proof such as photographic evidence or inspection reports satisfactory to the Settlement Administrator that the Affected Property has KPT Chinese Drywall and proof of corrosion and that the KPT Chinese Drywall was reactive prior to the Residential Owner vacating the Affected Property;

32

b.    all verified and authenticated documents regarding alternative living expenses, including, but not limited to, a lease;

c.    to the extent applicable, all loan documents, including but not limited to, a mortgage;

d.    to the extent applicable, all documents relating to mortgage or lease payments, including but not limited to, cancelled checks and past due notices;

e.    affidavits from the Residential Owner in support of the claim with supporting documentation; and

f.    a report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure from an expert in support of the claim that the alternative living expenses were substantially caused by the need to vacate the Affected Property prior to remediation as a result of damage caused by KPT Chinese Drywall may be required by the Special Master.

g.    If the Special Master requires a report pursuant to subsection (f), within a time to be determined by the Court, any Party shall have the right to challenge the admissibility of the expert's opinion, including without limitation, under the principles set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny by filing a motion with the Court.  The Court shall then establish a briefing and hearing schedule on any such challenge.  The Court's ruling on any such motion shall be final with no appeals.

4.7.1.2.  **Lost Use, Sales and Rentals:**    For Commercial Owners, economic loss for a period not to exceed three months, arising from the inability to use or rent Affected Property during remediation, and economic losses arising from the inability to sell Affected Property as a result of property damage caused by KPT Chinese Drywall, but only to the extent that such economic loss could not be mitigated or has not been reimbursed by insurance.    For Commercial Owners, Other Loss shall not include alternative living expenses during remediation and personal property damage.

4.7.1.2.1.   To obtain benefits under this Section, a Commercial Owner must establish that the lost use, sales or rentals were substantially caused by KPT Chinese Drywall.

4.7.1.2.2.   To obtain benefits under this Section, the Commercial Owner must submit the following:

a.   physical proof such as photographic evidence or inspection reports satisfactory to the Settlement Administrator that the Affected Property has KPT Chinese Drywall and proof of corrosion or other acceptable evidence that the KPT Chinese Drywall was reactive;

b.   proof of purchase of the Affected Property;

c.   purchase price and appraised value at purchase of the Affected Property;

d.   all documents relating to communications with third parties, including but not limited to, real estate agents and contractors, regarding using, leasing or sale of the Affected Property;

e.   all documents relating to mortgage or lease payments, including but not limited to, cancelled checks, past due notices and late fees or other charges;

f.   all documents regarding the inability to use, rent or sell  the Affected Property as a result of property damage caused by KPT Chinese Drywall;

g.   tax returns for each of the three years prior to the inability to use, rent or sell the Affected Property as a result of property damage caused by KPT Chinese Drywall and up to the date of the submission;

h.   profit and loss statements for the three years prior to the inability to use, rent or sell the Affected Property as a result of property damage caused by KPT Chinese Drywall and up to the date of the submission;

34

       i.    affidavits from the Commercial Owner in support of the claim with supporting documentation; and

       j.    a report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure from an expert in support of the claim that the inability to use, rent or sell the Affected Property was substantially caused by KPT Chinese Drywall and the Commercial Owner incurred losses as a result.

       k.    Within a time to be determined by the Court, any Party shall have the right to challenge the admissibility of the expert's opinion, including without limitation, under the principles set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny by filing a motion with the Court. The Court shall then establish a briefing and hearing schedule on any such challenge. The Court's ruling on any such motion shall be final with no appeals.

4.7.1.2.3.    The Special Master shall consider the following principles in evaluating a claim by a Commercial Owner for economic loss arising from the inability to sell Affected Property due to KPT Chinese Drywall:

       a.    The Special Master shall assume that the Affected Property or any units within a Multiple Unit Property will be sold at a fair market value after the remediation is completed.

       b.    The Commercial Owner shall be entitled only to the lost value of money resulting from the delay in selling the Affected Property or units within a Multiple Unit Property.

       c.    If a Commercial Owner who is qualified to obtain benefits under this Section has outstanding loans on the Affected Property, the Commercial Owner shall be entitled to recover interest (but not principal) payments on the loan or loans, but only to the extent that the Commercial Owner was unable to sell the Affected Property due to KPT Chinese Drywall. For example, a Commercial Owner of an Affected Multiple Unit Property with

100 units who was unable to sell 50 units due to KPT Chinese Drywall would be entitled to 50% of the interest payments.

    d.    If a Commercial Owner who is qualified to obtain benefits under this Section has no outstanding loans on the Affected Property, the Commercial Owner shall be entitled to claim lost interest as if the Commercial Owner invested in 1-year U.S. Treasury bills, but only to the extent that the Commercial Owner was unable to sell the Affected Property due to KPT Chinese Drywall.

4.7.1.3.    **Foreclosures:**  With respect to Foreclosed Properties foreclosed upon prior to the Execution Date, for Owners prior to foreclosure, an amount to be determined by the Special Master for lost equity (but not lost anticipated market value) in the Foreclosed Property less the Owners' recovery under Section 4.3.5.1(b).

4.7.1.3.1.    To obtain benefits under this Section, an Owner must establish that the foreclosure was substantially caused by KPT Chinese Drywall.

4.7.1.3.2.    To obtain benefits under Section 4.7.1.3, an Owner must establish the following

    a.    For a Residential Owner Subclass Member who owned the Foreclosed Property prior to foreclosure, he or she must establish that the KPT Chinese Drywall substantially caused the foreclosure by causing the Owner to vacate the Foreclosed Property, and thereby pay for alternative living expenses, which, in turn, left the Owner with insufficient funds to pay the mortgage.

    b.    For a Commercial Owner Subclass Member who owned the Foreclosed Property prior to foreclosure, he or she must establish that the KPT Chinese Drywall substantially caused (i) the Tenants of the Foreclosed Property to vacate, causing the Commercial Owner to lose rent, or (ii) decreased revenue to the Commercial Owner's business, which, in turn, left the Commercial

36

Owner with insufficient funds to pay the mortgage.

c.   For the Owner of a Foreclosed Property where the Foreclosure is attributable to circumstances other than those described in 4.7.1.3.2.a or 4.7.1.3.2.b above, such as economic downturns, personal financial losses and/or loss of employment, the Owner shall not be entitled to payments under Section 4.7.1.3

4.7.1.3.3.   An Owner prior to foreclosure seeking benefits under Section 4.7.1.3 must submit

a.   physical proof such as photographic evidence or inspection reports satisfactory to the Settlement Administrator that the Affected Property has KPT Chinese Drywall and proof of corrosion prior to foreclosure or other acceptable evidence that the KPT Chinese Drywall was reactive prior to foreclosure;

b.   proof of purchase of the Affected Property;

c.   purchase price and appraised value at purchase of the Affected Property;

d.   sale price and tax assessed value at sale of the Affected Property;

e.   for a Residential Owner Subclass Member, all verified and authenticated documents regarding alternative living expenses, including, but not limited to, a lease;

f.   for a Commercial Owner Subclass Member, all documents regarding the occupancy arrangement with the Tenant(s), including, but not limited to, a lease;

g.   all loan documents, including but not limited to, the mortgage;

h.   all documents regarding the foreclosure proceeding, including but not limited to, forbearance agreements, all court documents and correspondence between the Owner and the bank;

i. all documents relating to mortgage payments, including but not limited to, cancelled checks and past due notices;

j. all documents regarding attempts to sell or rent the Affected Property;

k. tax returns for each of the three years prior to the foreclosure and up to the date of the submission;

l. profit and loss statements for the three years prior to the foreclosure and up to the date of the submission;

m. affidavits from the Owner in support of the claim with supporting documentation; and

n. a report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure from an expert in support of the claim that the foreclosure was substantially caused by KPT Chinese Drywall and the Owner incurred losses as a result.

o. Within a time to be determined by the Court, any Party shall have the right to challenge the admissibility of the expert's opinion, including without limitation, under the principles set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny by filing a motion with the Court. The Court shall then establish a briefing and hearing schedule on any such challenge. The Court's ruling on any such motion shall be final with no appeals.

4.7.1.4. **Short Sales:** For Residential or Commercial Owners who, due to the presence of KPT Chinese Drywall, to avoid foreclosure and upon agreement with the mortgagee, sold Affected Properties for less than the outstanding balance of their mortgages ("Short Sale"), an amount to be determined by the Special Master for lost equity .

4.7.1.4.1. To obtain benefits under this Section an Owner must establish that the Short Sale was substantially caused by KPT Chinese Drywall.

4.7.1.4.2. An Owner who seeks benefits under this Section must submit the following:

38

a.    physical proof such as photographic evidence or inspection reports satisfactory to the Settlement Administrator that the Affected Property has KPT Chinese Drywall and proof of corrosion prior to the Short Sale or other acceptable evidence that the KPT Chinese Drywall was reactive prior to the Short Sale;

b.    proof of purchase of the Affected Property;

c.    closing documents, including but not limited to the sales price of the Affected Property, appraised value at purchase of the Affected Property, down payment on the purchase price and mortgage amount related to the purchase of the Affected Property;

d.    Short Sale price, appraised value at Short Sale and tax assessed value at Short Sale of the Affected Property;

e.    for a Residential Owner Subclass Member, all verified and authenticated documents regarding alternative living expenses, including, but not limited to, a lease;

f.    for a Commercial Owner Subclass Member, all documents regarding the occupancy arrangement with the Tenant(s), including, but not limited to, a lease;

g.    all loan documents, including but not limited to, the mortgage;

h.    all documents relating to mortgage payments, including but not limited to, cancelled checks and past due notices;

i.    all documents regarding attempts to sell or rent the Affected Property;

j.    tax returns for each of the three years prior to the foreclosure and up to the date of the submission;

k.    profit and loss statements for the three years prior to the foreclosure and up to the date of the submission;

39

l.   affidavits from the Owner in support of the claim explaining that the Short Sale was not related to other factors with supporting documentation; and

m.   a report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure from an expert in support of the claim that the Short Sale was substantially caused by KPT Chinese Drywall and the Owner incurred losses as a result.

n.   Within a time to be determined by the Court, any Party shall have the right to challenge the admissibility of the expert's opinion, including without limitation, under the principles set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny by filing a motion with the Court. The Court shall then establish a briefing and hearing schedule on any such challenge. The Court's ruling on any such motion shall be final with no appeals.

4.7.1.5.   **Tenant Losses:**  For Tenants, an amount to be determined by the Special Master to compensate for moving expenses (if the Tenant is displaced by remediation) and personal property damage, such as to jewelry and Tenant-owned appliances, caused by KPT Chinese Drywall that is incurred by Tenant Subclass Members.

4.7.1.5.1.   To obtain benefits under this Section, a Tenant must establish that the personal property damage and moving expenses were substantially caused by KPT Chinese Drywall.

4.7.1.5.2.   A Tenant who seeks benefits under this Section must submit the following:

a.   physical proof such as photographic evidence or inspection reports satisfactory to the Settlement Administrator that the Affected Property has KPT Chinese Drywall and proof of corrosion and that the KPT Chinese Drywall was reactive;

b.   all verified and authenticated documents regarding moving expenses and personal property damage, including but not limited to, mover

40

receipts and proof of purchase of personal property;

c.   affidavits from the Tenant in support of the claim with supporting documentation.

4.7.1.6.   For Residential Owners or Tenants who lived or worked in Affected Property for more than one year, a mechanism as set forth in Section 4.7.2 for Residential Owners or Tenants to raise, for Knauf Defendants to challenge and for the Court to decide disputed bodily injury claims.

4.7.1.6.1.   The PSC has received complaints of alleged bodily injury.  The Knauf Defendants deny that there is any evidence of bodily injury arising from or related to KPT Chinese Drywall.

4.7.1.6.2.   The Class Notice shall expressly inform Class Members that:  "The Knauf Defendants vigorously deny that KPT Drywall causes bodily injury.  The Knauf Defendants state that no published study or government agency has found that KPT Drywall causes bodily injury.  The Knauf Defendants reserve the right to contest bodily injury claims submitted by Class Members under the procedures set forth in this Agreement."

4.7.2.   **Bodily Injury:**  A Residential Owner or Tenant seeking reimbursement from the Other Loss Fund for bodily injury allegedly attributable to KPT Chinese Drywall must:

4.7.2.1.   Have sought medical treatment for the alleged injury prior to the Execution Date.

4.7.2.2.   Have received a contemporaneous diagnosis by the treating physician that the alleged injury was caused by KPT Chinese Drywall.

4.7.2.3.   Within a time to be determined by the Court, produce to the Settlement Administrator, Knauf Defendants and Settlement Class Counsel: (a) all pharmacy records since January 1, 2005, including all pharmacy records regarding the dispensing of medication to treat the alleged bodily injury ("Pharmacy Records"), along with a signed certification from the respective pharmacy or pharmacies indicating that the production is complete and (b) all medical records from healthcare providers since January 1, 2005, including all medical records documenting treatment of the alleged bodily injury ("Medical

41

Records"), along with a signed certification from each such healthcare provider indicating that all such records in the custody, possession or control of the healthcare provider have been produced.

4.7.2.3.1.    In connection with any claim made for bodily injury, the full costs, fees and expenses of that claim shall be borne by the parties involved in the bodily injury claim. The PSC shall have no responsibility to assist in the bodily injury claim beyond furnishing the claimant and their attorney materials that are, at the time of any request, maintained in the PSC depository.

4.7.2.4.    Within a time to be determined by the Court, produce to the Settlement Administrator, Knauf Defendants and Settlement Class Counsel an affidavit signed by the Participating Class Member (i) attesting that all Pharmacy Records and all Medical Records have been collected and (ii) attesting that all Pharmacy Records and all Medical Records have been produced pursuant to Section 4.7.2.3, along with an index or list identifying the source of said records.

4.7.2.5.    Within a time to be determined by the Court, produce to the Settlement Administrator, the Knauf Defendants and Settlement Class Counsel a report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure, from his or her treating physician or an expert based upon contemporaneous medical records and diagnosis, providing (i) the evidence specified in Section 4.7.2.3 that the alleged bodily injury was substantially caused by KPT Chinese Drywall; and (ii) the medical and scientific bases for that opinion, including the medical and scientific bases for both general and specific causation. The Court, in its discretion, may permit depositions of the treating physician and/or expert.

4.7.2.6.    Within a time to be determined by the Court, any Party shall have the right to challenge the admissibility of the treater's or expert's opinion, including without limitation, under the principles set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny by filing a motion with the Court. The Court shall then establish a briefing and hearing schedule on any such challenge. The Court's ruling on any such motion shall be final with no appeals.

4.7.2.7.    Each side will bear its own fees and costs with respect to establishing or refuting a claim of bodily injury. Class

Members and their counsel may not seek fees or costs under Section 14 in pursuing a bodily injury claim. Any attorneys' fees and costs in connection with a bodily injury claim will come from the award, if any.

4.7.3.   **Other Loss Exclusions:**  Other Loss does not include damage or loss for stigma, injury to reputation, loss of enjoyment of home, psychological or emotional injury, medical monitoring, injury to reputation, credit rating loss, legal and accounting expenses, loss of investment opportunity, or any other loss or damage not specifically covered by Sections 4.7.1.1, 4.7.1.2, 4.7.1.3, 4.7.1.4, 4.7.1.5 and 4.7.1.6 above.  Nonetheless, such claims will be released under this Settlement.

4.7.4.   **Other Loss Fund Claims Procedures:**  Each Owner and Tenant shall be entitled to receive its pro rata share of the Other Loss Fund, as determined by the following procedures:

4.7.4.1.   All Participating Class Members shall submit their claims via the Proof of Claim Form, all documents required under Section 4.7 relating to any Other Loss claims and any applicable insurance policies by a date to be established by the Court. Untimely submitted claims shall be rejected unless the Court extends the deadline for good cause shown.

4.7.4.2.   The Special Master shall not consider any claims for bodily injury allegedly caused by KPT Chinese Drywall unless the claim satisfies all the requirements of Sections 4.7.2 and the Knauf Defendants have not challenged the claim or the claim has withstood challenge under Section 4.7.2.6. If any claims for bodily injury satisfy these requirements, the Special Master shall determine the validity and amount of such claims pursuant to Section 4.7.4.3.

4.7.4.3.   The Special Master will evaluate all claims and may reject, accept in part or accept in whole each claim submitted.  In evaluating each Participating Class Member's claim, the Special Master shall apply tort principles regarding causation and loss of the state where the Affected Property relating to that Participating Class Member is located.  Participating Class Members submitting claims for Other Loss from Mixed Properties shall have their claims determined by the amount of Other Loss as determined by the Special Master multiplied by the KPT Drywall Percentage.  As a result of this evaluation, the Special Master shall determine the amount of reimbursable Other Loss for each Approved Claim and the total for all Approved Claims.  The Special Master may appoint accounting or other experts to assist in the evaluation of claims.

43

        4.7.4.3.1.    The Special Master shall reduce any Approved Claim by any amount that was or could have been reimbursed for the Other Loss under the Class Member's insurance policies.

4.7.4.4.    If the total of all Approved Claims for Other Loss Fund benefits is more than the amount deposited in the Other Loss Fund, each claim shall be decreased pro rata so that the distribution does not exceed the amount in the Fund less Administrative Expenses.  If the total of all Approved Claims for Other Loss Fund Benefits is less than the amount deposited in the Other Loss Fund, the PSC may petition the Court to use such remaining funds to pay for post-Effective Date administrative legal fees and costs of Settlement Class Counsel, subject to Court approval.  If there are funds remaining after payment of post-Effective Date administrative legal fees and costs of Settlement Class Counsel, the PSC may petition the Court to use those funds to offset any deficiency in common benefit legal fees and costs of the PSC and common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, Settlement Class Counsel and individual retained counsel, subject to a determination by the Court that the common benefit counsel work was valid and bona fide and Court approval.  The Knauf Defendants will take no position on any such request or on the allocation or priority of any such payments.  If there are funds remaining after satisfaction of any approved payment of post-Effective Date administrative legal fees and costs of Settlement Class Counsel and other common benefit attorneys' fees and costs, any remaining funds may be the subject of a *cy pres* distribution for medical or legal *pro bono* purposes, subject to Court approval.  No funds from the Other Loss Fund will revert to the Knauf Defendants.

4.7.4.5.    The Settlement Administrator shall not distribute any funds from the Other Loss Fund until such time that the Special Master determines the amount of reimbursable Other Loss for each Approved Claim.

4.7.4.6.    If prior to the determination of the final amounts to be distributed from the Other Loss Fund, a Participating Class Member who has an Approved Claim demonstrates unusual and compelling financial needs, the Participating Class Member may petition the Special Master to authorize the Settlement Administrator to make a partial payment.

4.7.5. **MMSEA Compliance:** The Parties agree to comply with the provisions of Section 111 of the Medicare, Medicaid & SCHIP Extension Act of 2007 ("MMSEA"), as codified in 42 U.S.C. § 1395y(b)(8).

4.7.5.1. Any funds allocated for bodily injury under Section 4.7.4 above will be paid directly to the Participating Class Members.

4.7.5.2. Each Participating Class Member who receives in excess of the MMSEA dollar threshold in effect at the time of the Effective Date from the Other Loss Fund ("Excess Recipient") acknowledges his/her duty to cooperate with the Knauf Defendants in order to permit Responsible Reporting Entity(ies), as defined by MMSEA, to fulfill their reporting obligations to comply with MMSEA. Each Excess Recipient and his/her attorney agrees to provide the Responsible Reporting Entity(ies) with any and all information necessary for the Responsible Reporting Entity(ies) to comply with MMSEA, including his or her identity, date of birth, social security number, and gender, so as to allow the insurers, or their agents, to determine whether the Excess Recipient is a Medicare Beneficiary, as defined by MMSEA (a "Triggering Claimant").

4.7.5.3. Each Triggering Claimant and his/her attorney shall provide any additional information requested by the Responsible Reporting Entity(ies) to comply with MMSEA, including the identify of his/her attorney, his/her address, his/her ICD9 number (if applicable), and information related to the injuries allegedly arising from KPT Chinese Drywall. Such information may be reported to the Centers for Medicare & Medicaid Services (CMS), as well as certain agent(s) necessary to facilitate reporting to CMS, pursuant to the Responsible Reporting Entity's duty to comply with MMSEA.

4.7.5.4. Each Triggering Claimant represents and warrants that all bills, costs or liens resulting from or arising out of alleged injuries, claims or lawsuits related to KPT Chinese Drywall are his/her responsibility to pay, including all Medicare conditional payments, subrogation claims, liens, or other rights to payment, relating to medical treatment or lost wages that have been or may be asserted by any health care provider, insurer, governmental entity, employer or other person or entity. Further, each Triggering Claimant will indemnify, defend and hold each Knauf Defendant harmless from any and all damages, claims and rights to payment, including any attorneys' fees, brought by any person, entity or governmental agency to recover any of these amounts.

        4.7.5.5.    The procedures set forth in this Section are intended to ensure compliance with 42 U.S.C. § 1395y. The Parties resolved this matter in compliance with both state and federal law.

**4.8.**    **Allocation of Amounts from Banner, InEx and Prospective L&W Class Settlements Or Any Other Settlements**

    4.8.1.    Any amounts received or to be received by a Participating Class Member under a settlement agreement with any person or entity other than the Knauf Defendants arising from KPT Chinese Drywall to the extent of the KPT Drywall Percentage shall be deposited into the Remediation Fund. If (and only if) the Participating Class Member does not deposit an amount equal to his/her recovery to the extent of the KPT Drywall Percentage into the Remediation Fund, that amount shall be deducted from any benefit otherwise owing to that Participating Class Member.

    4.8.2.    Each Participating Class Member shall assign his/her claims (to the extent that they relate to KPT Chinese Drywall) to any net recovery under the InEx, Banner and Prospective L&W Settlements to the Knauf Defendants, if not already assigned. Any amounts recovered from the InEx, Banner and Prospective L&W Settlements based on such assignments shall be deposited into the Remediation Fund, for purposes of providing Settlement benefits to the individual Participating Class Member(s) involved. For example, if the KPT Drywall Percentage for a Participating Class Member is 40%, then 40% of the Participating Class Member's recovery under the InEx, Banner and/or Prospective L&W Settlements shall be deposited into the Remediation Fund and the Participating Class Member shall be entitled to 60% of the recovery. To the extent a Participating Class Member already has recovered amounts from the InEx, Banner and Prospective L&W Settlements, the Participating Class Member shall deposit an amount equal to his/her recovery to the extent of the KPT Drywall Percentage into the Remediation Fund for purposes of providing Settlement benefits to the individual Participating Class Member(s) involved. If (and only if) the Participating Class Member does not deposit an amount equal to his/her recovery to the extent of the KPT Drywall Percentage into the Remediation Fund, that amount shall be deducted from any benefit otherwise owing to that Participating Class Member.

        4.8.2.1.    A Participating Class Member who has opted out of the InEx, Banner and/or Prospective L&W Settlements must successfully apply to the Court to opt back in to those Settlements to be eligible to obtain benefits under this Settlement. If the Participating Class Member remains an opt out from the InEx, Banner and/or Prospective L&W Class Settlements, then the Participating Class Member shall be deemed an opt out from this Settlement.

4.8.3. Any amounts obtained directly by the Knauf Defendants or the PSC toward payment of claims involving KPT Chinese Drywall shall be deposited to the extent that they relate to KPT Chinese Drywall into the Remediation Fund other than amounts reflecting payments made to remediate Affected Properties under the Pilot Program as set forth in Exhibit H, which amounts were filed under seal.

    4.8.3.1. Pursuant to the terms of the Prospective Insurer Agreement, amounts from such Agreement that are attributable to claims involving KPT Chinese Drywall will be deposited into the Remediation Fund or Other Loss Fund as set forth in Section 4.2.3. For example, if under the Prospective Insurer Agreement, 40% of the recovery is allocated to claims with KPT Chinese Drywall and 60% of the recovery is allocated to claims with Non-KPT Chinese Drywall, only 40% of the recovery under the Prospective Insurer Agreement will be deposited into the Settlement Funds.

4.8.4. The Major Builder Settlement Agreements, the Prospective Insurer Agreement and any settlements between the PSC or Class members and Other Releasees or Excluded Releasees or any of their insurers shall provide for releases by any party to such settlements of all their claims against the Knauf Defendants related in any way to KPT Chinese Drywall, the Litigation and/or the Related Actions, including but not limited to any and all claims against the Knauf Defendants that the party has, may have, or may have had, regardless of whether such claim is known or unknown, filed or unfiled, asserted or as yet unasserted, or existing or contingent, and whether asserted by petition, complaint, cross-claim, third-party demand or otherwise.

4.8.5. If Banner and/or InEx exercise their rights to terminate their respective Class Settlements or file a bankruptcy petition or if L&W exercises its anticipated right to terminate the Prospective L&W Class Settlement or files a bankruptcy petition  (respectively, "Terminated Banner Class Settlement," "Terminated InEx Class Settlement" and "Terminated L&W Class Settlement"), then the Knauf Defendants, at their sole and exclusive discretion and option, may terminate this Settlement either in its entirety or only as to the particular Participating Class Members who would have been class members in the Terminated Banner Class Settlement, Terminated InEx Class Settlement and/or Terminated L&W Class Settlement.  The Knauf Defendants' exercise of their rights under this Section shall not be reviewable by the Court.

4.8.6. If the Knauf Defendants fail to agree with Banner and/or InEx on a solution acceptable to the Knauf Defendants that extinguishes any potential claims of Banner and InEx or their insurers against the Knauf Defendants, then the Knauf Defendants can terminate the Settlement either

in its entirety or as to all Participating Class Members who are members of or were eligible to participate in the Banner Class Settlement (if the failure to agree is with Banner or its insurers) or the InEx Class Settlement (if the failure to agree is with InEx or its insurers).

4.8.7.   On the last day of each month, the Knauf Defendants shall provide to Settlement Class Counsel a comprehensive listing identifying any sums received in connection with Section 4.8.1, together with a complete identification of the person or entity who provided such sums.

4.9.   **Qualifications for Class Members in Properties with Lower-Case KPT Chinese Drywall.**

4.9.1.   Some properties may contain Lower-Case KPT Chinese Drywall. The Knauf Defendants deny that there is evidence that Lower-Case KPT Chinese Drywall is reactive.

4.9.2.   To be eligible for benefits under the Settlement, a Class Member whose claims are in connection with a property that contains Lower-Case KPT Chinese Drywall must establish that the Lower-Case KPT Chinese Drywall is reactive under the following procedures:

4.9.2.1.   To prove that Lower-Case KPT Chinese Drywall is reactive, the Class Member must prove that the Lower-Case KPT Chinese Drywall meets all of the following requirements.

4.9.2.1.1.   Elemental Sulfur levels in samples of Lower-Case KPT Chinese Drywall core found in the property exceeding 10 ppm as measured by GC/MS;

4.9.2.1.2.   Confirmed markings of Lower-Case KPT Chinese Drywall in the property;

4.9.2.1.3.   Elevated Levels of hydrogen sulfide, carbonyl sulfide and/or carbon disulfide emitted from samples of Lower-Case KPT Chinese Drywall found in the property when placed in test chambers using ASTM Standard Test Method D5504-08; and

4.9.2.1.4.   Corrosion of copper metal to form copper sulfide when copper is placed in test chambers with Lower-Case KPT Chinese Drywall samples found in the property.

4.9.2.2.   Within a time to be determined by the Court, the Class Member must produce to the Settlement Administrator, the Knauf Defendants and Settlement Class Counsel, test results

48

establishing that the Lower-Case KPT Chinese Drywall is reactive under Section 4.9.2.1. Such testing will be at the expense of the Class Member. The Class Member shall provide access to samples of the Lower-Case KPT Chinese Drywall to the Knauf Defendants sufficient to permit the Knauf Defendants to test the Lower-Case KPT Chinese Drywall at their own cost.

4.9.2.3.   Within a time to be determined by the Court, the Class Member must produce to the Settlement Administrator, the Knauf Defendants and Settlement Class Counsel, a report pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure providing the evidence specified in Section 4.9.2.1 that the Lower-Case KPT Chinese Drywall is reactive and the scientific bases for that opinion.

4.9.2.4.   Within a time to be determined by the Court, any Party shall have the right to challenge the admissibility of the expert's opinion, including without limitation, under the principles set forth in Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993) and its progeny by filing a motion with the Court. The Court shall then establish a briefing and hearing schedule on any such challenge. The Court's ruling on any such motion shall be final with no appeals.

4.9.2.5.   After the Court's determination on a challenge under Section 4.9.2.4 or, if there is no challenge, after the time for a challenge has expired, the Court shall consider and determine the Class Member's claim that the Lower-Case KPT Chinese Drywall is reactive. The Court's ruling shall be final with no appeals.

4.9.2.6.   If the Court rules that the Lower-Case KPT Chinese Drywall is reactive, the Lower-Case KPT Chinese Drywall shall be considered KPT Chinese Drywall and the Class Member shall be entitled to benefits under the Settlement subject to all its terms and conditions.

4.9.2.7.   If the Court rules that the Lower-Case Chinese Drywall is not reactive, the Class Member shall not be entitled to benefits under the Settlement.

4.10.   Any documents, forms or other material or information required to be submitted under Section 4, shall be submitted to the Settlement Administrator. The Settlement Administrator, in conjunction with Settlement Class Counsel and the Knauf Defendants, shall establish electronic depositories (either shared or separate, to be determined by technical experts or by the Court if the technical experts cannot reach agreement) in which all such documents will be stored, and

49

to which Settlement Class Counsel and Individual Class Members' counsel shall each also have private, password-protected and secure access.

4.11.  The Settlement Funds are available only to resolve claims of Participating Class Members.  The Settlement Funds shall not be available to satisfy the claims of any non-Class Member or Class Member who opts out under Section 8.  Non-class members and Class Members who opt out under Section 8 shall not be permitted to execute on the Settlement Funds or on any amount that the Knauf Defendants may be entitled to receive from the Settlement Funds through reversion under Section 4.2.5 to satisfy any judgment or for any other reason.

4.12.  The PSC does not warrant any work and is not responsible for any warranties and/or liens that may be placed on Affected Property as a result of the remediation work, performed under Section 4 or for any negligence or construction defect.

## 5.  Releases

5.1.  **Released Claims**

5.1.1.  "Released Claim" or "Released Claims" shall mean any and all claims against any Released Party whatsoever (a) arising out of, in any manner related to, or connected in any way with KPT Chinese Drywall, or the collective mitigation of, response to, and/or recovery from the damage caused by KPT Chinese Drywall and/or any act and/or failure to act related in any way to any of the foregoing, and/or (b) for any and all losses, damages and/or injuries arising from, in any manner related to, or connected in any way with all and/or any of the foregoing, including but not limited to any and all claims that a Participating Class Member has, may have, or may have had, regardless of whether such claim is known or unknown, filed or unfiled, asserted or as yet unasserted, or existing or contingent, and whether asserted by petition, complaint, cross-claim, third party demand, or otherwise (or any judgment or order entered on such claims), and which is based upon or alleges any act, conduct, status or obligation of any person or entity (including the Released Parties) and/or any source of liability whatsoever, and regardless of the legal theory or theories of damages involved.  Notwithstanding the above, the only parties released are those persons or entities defined as Released Parties. This Settlement does not provide complete compensation to redress all Class Members' damages and therefore Class Members' claims are reserved against the Non-Released Parties who have been named as defendants in the Omni Complaints pending in MDL No. 2047.

5.1.2.  The term "Released Claim" or "Released Claims" includes, but is not limited to, the following claims arising out of, in any manner related to, or in any way connected with, KPT Chinese Drywall, the Litigation, or other Related Actions as to the Released Parties:

5.1.2.1.    For personal injury, bodily injury (including death), property damage, remediation and/or clean-up of property, diminution of property value, foreclosure, groundwater contamination, economic loss, fear, fear of illness or disease, fear of developing illness or disease, fright, mental or emotional distress, pain and suffering, loss of earnings, impairment of earning capacity, loss of consortium, loss of support, love and affection, equity and medical monitoring, bystander liability, wrongful death, survival actions, breach of contract, all statutory claims, punitive or exemplary damages, attorneys' fees, costs or expenses, moving expenses, additional rental or mortgage payments;

5.1.2.2.    For nuisance, trespass, inconvenience, loss of use or enjoyment, negligence, private nuisance, custody of a thing containing a vice or defect, strict liability, liability for ultrahazardous activities or conduct, absolute liability, wanton and reckless misconduct, malicious misconduct, servitude or obligation of vicinage, abuse of right, or any other liability legally asserted or assertable under any federal, state, or local statute, law, directive or regulation, redhibition, violation of Louisiana New Home Warranty Act, Louisiana Products Liability Act (or similar statutes of other states), negligent discharge of a corrosive substance, unjust enrichment, breach of implied warranty of fitness and merchantability, breach of implied warranty of habitability, violation of consumer protection laws and/or deceptive and unfair trade practices laws of any state, negligent misrepresentation, building code violations, or fraud;

5.1.2.3.    For damages or alleged damages resulting in whole or in part from exposure of the Class or Participating Class Members or property of the Participating Class Members to hazardous or allegedly hazardous, toxic, dangerous or harmful substances;

5.1.2.4.    For bad faith or extra-contractual damages;

5.1.2.5.    For derivative or vicarious liability arising out of the conduct or fault of others for which the Released Parties and/or Knauf Defendants may be responsible;

5.1.2.6.    For any right legally assertable by the Class or any Participating Class Member now or in the future, whether the claim is personal to each individual, derivative of a claim now or in the future, or as assignee, successor, survivor, legatee, beneficiary, subrogee, or representative of a Participating Class Member;

5.1.2.7. For a past, present, future, known, unknown, foreseen, unforeseen, contingent, nascent, mature claim or a claim arising at law, in equity or otherwise, including but not limited to, claims for survival and wrongful death;

5.1.2.8. For any claim, right, or action arising out of, based on, or relating to any body of law whatsoever; and for all injuries or damages of any type, nature, or character arising from, attributable to, or in any way resulting from KPT Chinese Drywall;

5.1.2.9. For any conduct of any of the Released Parties and/or Knauf Defendants with respect to, arising out of or in any way resulting from KPT Chinese Drywall, the Litigation, or the Related Claims; however, this provision is not intended to prevent or impede the enforcement of claims or entitlements to benefits under this Settlement;

5.1.2.10. For any claim, known or unknown, for contribution, subrogation, or indemnity, contractual or otherwise, arising out of, attributable to, or in any way related to KPT Chinese Drywall.

5.1.2.11. For Class Members who self-remediated their Properties or entered into contracts to self-remediate their Properties prior to the Execution Date, Released Claims shall not include the Remediation Claims unless the Class Member and the Knauf Defendants reach an agreement to resolve the Class Member's Remediation Claims under the Already Remediated Properties Protocol.

5.1.3. The term "Released Claim" or "Released Claims" also includes, but is not limited to, the following causes of action arising out of, in any manner related to, or in any way connected with KPT Chinese Drywall, the Litigation, or other Related Actions as to the Knauf Defendants:

5.1.3.1. Strict liability;

5.1.3.2. Violations of the Alabama Deceptive Trade Practices Act (Ala. Code 1975 § 8-19-1, *et seq.*), the Florida Deceptive and Unfair Trade Practices Act (Fla. Stat. § 501.201, *et seq.*), the Louisiana Unfair Trade Practices and Consumer Protection Law (L.SA-R.S. 51:1401, *et seq.*), the Texas Deceptive Trade Practices-Consumer Protection Act (Tex. Bus. Com. Code Ann. § 17.41, *et seq.*), the Mississippi Consumer Protection Act (Miss. Code Ann. § 75-24-1, *et seq.*), or any other state or federal consumer protection laws and unfair trade practices laws;

52

5.1.3.3.   Negligence;

5.1.3.4.   Private and public nuisance;

5.1.3.5.   Tort;

5.1.3.6.   Equity and medical monitoring;

5.1.3.7.   Breach of contract;

5.1.3.8.   Loss of use;

5.1.3.9.   Loss of enjoyment;

5.1.3.10.   All statutory claims;

5.1.3.11.   Personal injury, including death therefrom, related statutory violations, and emotional distress and mental anguish;

5.1.3.12.   Bodily injury, including death therefrom, and emotional distress and mental anguish;

5.1.3.13.   Indemnity;

5.1.3.14.   Contribution;

5.1.3.15.   Breach of express or implied warranty;

5.1.3.16.   Redhibition;

5.1.3.17.   Negligence per se;

5.1.3.18.   Violation of the Louisiana New Home Warranty Act (La. R.S. 9:3141, *et seq.*);

5.1.3.19.   Violation of the Louisiana Products Liability Act (La. R.S. 9:28000.51 *et seq.*);

5.1.3.20.   Violation of the Louisiana Hazardous Substances Act (La. R.S. 30:2271, *et seq.*);

5.1.3.21.   Negligent discharge of a corrosive substance;

5.1.3.22.   Unjust enrichment;

5.1.3.23.   Breach of the implied warranty of fitness and merchantability;

5.1.3.24.   Breach of implied warranty of habitability;

5.1.3.25.  Negligent misrepresentation;

5.1.3.26.  Building code violations;

5.1.3.27.  Relief by way of subrogation, contractual indemnity, common law indemnity and/or contribution against the Knauf Defendants;

5.1.3.28.  Attorneys' fees and any and all costs and expenses of litigation;

5.1.3.29.  Fraud; and

5.1.3.30.  Any further claims and/or liabilities arising out of, or otherwise relating to, the sale, supply, marketing, distribution, or use of KPT Chinese Drywall at issue in this Settlement, including, but not limited to, punitive damages, exemplary damages, multiplication of damages, and fines.

**5.2.**   **Class Release**

5.2.1.  As of the Effective Date, and with the approval of the Court, all Participating Class Members, and anyone claiming by, through and/or on behalf of any of them, hereby fully, finally, and forever release, waive, discharge, surrender, forego, give up, abandon, and cancel any and all Released Claims (as defined in Section 5.1) against the Knauf Defendants and the Other Releasees, including (but not limited to) those asserted, or that could have been asserted, in the Litigation, the Related Actions, and/or the Related Claims.

5.2.2.  As of the Effective Date, all Participating Class Members, and anyone claiming by, through and/or on behalf of any of them, will be forever barred and enjoined from prosecuting any action against the Knauf Defendants and the Other Releasees asserting any and/or all Released Claims.

5.2.3.  The execution of the Settlement shall not be construed as a release of any claims the Participating Class Members may have against any person and/or entity other than the Knauf Defendants and the Other Releasees. All Participating Class Members reserve all claims (including, but not limited to, any and all rights and causes of action, no matter how arising, under any ordinance, code, law, statute, federal or state, pending or dismissed, known or unknown) against any person and/or entity other than the Knauf Defendants and the Other Releasees named, or who could have been named, in the Related Actions, including but not limited to manufacturers of Non-KPT Chinese Drywall.

5.2.4.  To avoid inconvenience to the Knauf Defendants, in any action in which any Knauf Defendant is or may be a defendant or a third-party defendant

together with other alleged tortfeasors, the Parties agree that each of the Participating Class Members shall satisfy any judgment to the extent necessary (under applicable state law whether it be *pro rata*, *pro tanto* and/or set-off) to extinguish any claims for contribution, indemnity (common law or contractual), and/or subrogation whether arising out of tort, contract or otherwise, by the other alleged tortfeasors. This provision is intended to obviate the necessity and expense of having the Knauf Defendants remain a party on the record and obliged to participate in a trial merely for the purpose of determining if in fact any Knauf Defendant was a tortfeasor so as to entitle the other tortfeasors to a pro rata or pro tanto reduction or set-off of any judgment. It is the further intent of the Parties that the Knauf Defendants shall have no further liability in connection with the Released Claims. However, this provision does not constitute an admission of liability by the Knauf Defendants.

5.2.5.  As of the Effective Date, to the extent of each Participating Class Member's individual net recovery, and to the extent the claim described in this Section arises out of the claim of that Participating Class Member, each Participating Class Member shall defend, indemnify, and hold harmless each of the Knauf Defendants from and against (a) any and all claims by, on behalf of, through, or deriving from his, her, or its heirs, executors, representatives, attorneys or former attorneys, successors, employers, insurers, employers' insurers, health insurers, health care providers, assignees, subrogees, predecessors in interest, successors in interest, beneficiaries or survivors; and (b) any claims for contribution; indemnity, common law or contractual; and/or subrogation, whether arising under tort, contract or otherwise, related in any way to the Released Claims of said Participating Class Member released by this Settlement.

5.2.6.  It is expressly understood and agreed that the indemnity, defense, and judgment reduction obligations detailed above shall exist regardless of the legal basis for the claim, demand, cause of action, right of action, liability, lien, or judgment demand asserted by any person or entity to the extent related to the Released Claims against any Released Party and/or Knauf Defendant. In particular, the Participating Class Members expressly bind themselves to the foregoing indemnity, defense and judgment reduction obligations regardless of whether the claim, demand, suit, liability, lien, judgment, cause of action, or right of action is based on or related to (a) the negligence of any of the Knauf Defendants, sole or concurrent; (b) the strict liability of any of the Knauf Defendants under any theory whatsoever; (c) the absolute liability of any of the Knauf Defendants; (d) the wanton, reckless, or willful misconduct of any of the Knauf Defendants; (e) any actual, alleged or purported right, asserted by any Knauf Defendant or any Participating Class Member under a policy of insurance issued by one or more insurers; or (f) any other basis whatsoever.

6.    **Certification of Federal Rule of Civil Procedure 23(b)(3) Settlement Class and Related Motions**

6.1.    This Settlement shall be subject to approval of the Court.

6.2.    Within ten (10) days of the Execution Date, the Parties will move jointly for an order:

6.2.1.    Preliminarily certifying the Settlement Subclasses and approving the Settlement (the "Preliminary Approval Order"); and

6.2.2.    Staying all claims in the Litigation as to all Knauf Defendants.

6.3.    The Knauf Defendants shall have the right to withdraw from the Settlement if the Court does not issue any of the requested orders (including the Order and Judgment) or if the Settlement Class is not certified.

6.4.    The Parties will stipulate to the Court in the request for entry of the Preliminary Approval Order and at the Certification Hearing that (i) the Class is being certified for settlement purposes only pursuant to the Settlement, (ii) the Knauf Defendants reserve the right to object to class certification *de novo* in the event this Settlement is terminated for any reason, including termination pursuant to Section 13, and (iii) this Settlement shall have no precedential effect with regard to certification of a litigation class that may arise if this matter is not fully and completely resolved through this settlement effort, or otherwise and may not be cited in any class certification proceeding contested by the Knauf Defendants in either federal or state court.

7.    **Notice to Class Members**

7.1.    Type of Notice Required

7.1.1.    Upon entry of the Preliminary Approval Order preliminarily certifying the Settlement Class as defined in Section 1.1.2, the Settlement Class Counsel will disseminate the Class Settlement Notice ("Notice") approved by the Court as follows:

7.1.1.1.    By first-class mail to the last known address of the following persons and entities:  (i) all plaintiffs in the Litigation who, as of December 9, 2011, asserted claims arising from, or otherwise related to, KPT Chinese Drywall, (ii) all plaintiffs in the Omni complaints in MDL No. 2047 who, as of Execution Date, asserted claims arising from, or otherwise related to, KPT Chinese Drywall, (iii) all plaintiffs in all Related Actions who, as of December 9, 2011, asserted claims arising from, or otherwise related to, KPT Chinese Drywall, and (iv) the counsel of all the foregoing;

7.1.1.2.   By providing a copy of the Notice and requesting that it be posted on the Court's Chinese Drywall MDL website; and

7.1.1.3.   As the Court may direct.

7.1.1.4.   The cost of Notice shall be paid by the Knauf Defendants.

## 8.   **Opt-Out**

8.1.   **Opt-Out Period**

8.1.1.   Class Members will have seventy (70) days following the Notice (or such different period as the Court may direct) to opt out of the Settlement in accordance with Section 8.2.  If the Settlement is finally approved by the Court, all Class Members who have not opted out by the end of the seventy (70) day period will be bound by the Settlement, and the relief provided by the Settlement will be their sole and exclusive remedy for the claims alleged by the Class.  To assure that each Class Member has adequate time for consideration of the Settlement, no opt out will be effective if filed earlier than 21 days after the issuance of the Notice under Section 7.  The Knauf Defendants and Settlement Class Counsel will certify to the Court the date that Notice issues.

8.2.   **Opt-Out Process**

8.2.1.   Individual Class Members must request to opt out and must sign any requisite pleading or form.  A pleading or form or any other request made or signed by counsel shall not be sufficient.  An original opt-out form signed by the Class Member must be mailed to Settlement Class Counsel, Arnold Levin (Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106) and Russ M. Herman (Herman, Herman, Katz & Cotlar, LLP, 820 O'Keefe Avenue, New Orleans, Louisiana  70113), and to the Knauf Defendants' counsel, Kerry Miller (Frilot L.L.C., 1100 Poydras Street, Suite 3700, New Orleans, LA 70163).  The opt out request must be postmarked within the 70-day period described in Section 8.1.1.  Settlement Class Counsel shall be obliged to file all opt outs with the Court by a date prior to the Fairness Hearing to be determined by the Court.

8.2.2.   The Parties shall seek an order of the Court compelling mediation of opt-out claims.

8.3.   **Rights With Respect to Opt Outs**

8.3.1.   The Parties agree and acknowledge that any opt-out may be detrimental, so that each of them will have a right to terminate the Settlement on account of the existence of any opt out.

8.3.2. If any Class Members remain as opt outs fourteen (14) days prior to the Fairness Hearing, then each of the Knauf Defendants individually has the right, acting at its sole and exclusive discretion and option, to terminate the Settlement in its entirety or as to all Participating Class Members who are members of or were eligible to participate in the Banner Class Settlement (if any opt out was supplied by Banner), the InEx Class Settlement (if any opt out was supplied by InEx), and/or the Prospective L&W Class Settlement (if any opt out was supplied by L&W). This right to terminate the Settlement must be exercised by written notice to the Court seven (7) days before the Fairness Hearing. If timely exercised, the Knauf Defendants' exercise of their rights under this Section shall not be reviewable by the Court.

## 9.   Objections

9.1.   Any Class Member who has any objection to certification of the Class, or to approval of this Settlement or any terms hereof, or to the approval process must make that objection by the following procedure:

9.1.1.   The objection must be in writing;

9.1.2.   The objection must set forth all objections and the reasons therefore, and a statement whether the Class Member intends to appear at the Certification Hearing or Fairness Hearing either with or without the objector's counsel. The objection must identify any witnesses intended to be called, the subject area of the witnesses' testimony, and all documents to be used or offered into evidence, at the Certification Hearing or Fairness Hearing;

9.1.3.   The objection must be signed by the individual Class Member and by his/her/its counsel; an objection signed by counsel alone shall not be sufficient;

9.1.4.   The objection must contain the caption of the Litigation and include the name, mailing address, e-mail address, if any (an e-mail address is not required), and telephone number of the objecting Class Member;

9.1.5.   The objection must be mailed to Plaintiffs' Lead Counsel, Arnold Levin (Levin, Fishbein, Sedran & Berman, 510 Walnut Street, Suite 500, Philadelphia, PA 19106), and to the Knauf Defendants' counsel, Kerry Miller (Frilot L.L.C., 1100 Poydras Street, Suite 3700, New Orleans, LA 70163). The objection must be postmarked by the date prescribed by the Court. Plaintiffs' Lead Counsel shall be obliged to file all objections with the Court by a date prior to the Certification Hearing and the Fairness Hearing to be determined by the Court.

9.2.   Failure to comply timely and fully with these procedures shall result in the invalidity and dismissal of any objection. No Class Member shall be entitled to be heard at the Certification Hearing or Fairness Hearing (whether individually or

through the objector's counsel), or to object to certification of the Class or to the Settlement, and no written objections or briefs submitted by any Class Member shall be received or considered by the Court at the Certification Hearing or Fairness Hearing, unless written notice of the Class Member's objection and any brief in support of the objection have been filed with the Court and served upon Plaintiffs' Lead Counsel and the Knauf Defendants' counsel not later than twenty (20) days before the date of the Certification Hearing or the Fairness Hearing as appropriate, in accordance with Section 9.1.

9.3. Class Members who fail to file and serve timely written objections in accordance with Section 9.1 shall be deemed to have waived any objections and shall be foreclosed from making any objection (whether by appeal or otherwise) to the certification of the Settlement Class or to the Settlement.

## 10.   Fairness Hearing

10.1. Within ten (10) days of the entry of the Preliminary Approval Order, Settlement Class Counsel shall request that the Court hold a Fairness Hearing. The Fairness Hearing shall not be held until after the Opt Out Period has concluded.

10.2. At the Fairness Hearing the Court shall, *inter alia*, (i) consider any properly filed objections to the Settlement, (ii) determine *de novo* whether the Settlement is fair, reasonable, and adequate, was entered into in good faith and without collusion, and should be approved, and shall provide findings in connection therewith, and (iii) enter the Order and Judgment, including final approval of the Settlement Class and the Settlement.

## 11.   Dismissals

11.1. Within thirty (30) days of the occurrence of the Effective Date:

11.1.1. The Parties shall jointly submit to the Court a proposed order or orders dismissing with prejudice as to the Knauf Defendants and the Other Releasees (i) all Omni Complaints filed in MDL No. 2047 but only to the extent that they assert claims against the Knauf Defendants and the Other Releasees, and (iii) all Related Actions pending in the Eastern District of Louisiana and/or MDL No. 2047 but only to the extent that they assert claims against the Knauf Defendants and the Other Releasees;

11.1.2. The members of the PSC shall file motions to dismiss with prejudice all Related Actions against the Knauf Defendants and the Other Releasees by Class Members whom they represent which are pending in any state court and/or in any federal court outside the Eastern District of Louisiana or MDL 2047 but only to the extent that they assert claims against the Knauf Defendants or Other Releasees;

11.1.3. The PSC shall use its best efforts to assist the Knauf Defendants in obtaining dismissal with prejudice of any other Related Actions

59

maintained by any Participating Class Member whether in state court, federal court or any arbitral forum.

11.2.   The dismissal orders, motions or stipulation to implement Section 11.1. shall seek or provide for a dismissal with prejudice, with each Participating Class Member and Knauf Defendant bearing its own attorneys' fees and costs, and waiving any rights of appeal.

## 12.   <u>Bar Order</u>

12.1.   As part of the Order and Judgment, the Court shall issue a bar order and permanent injunction against any and all pending or future claims against the Knauf Defendants and Other Releasees arising from, or otherwise relating to KPT Chinese Drywall.

12.2.   The bar order and permanent injunction shall:

12.2.1. Enjoin and forever bar any and all Participating Class Members from commencing and/or maintaining any action, legal or otherwise, against the Knauf Defendants and Other Releasees arising out of, or otherwise relating to, KPT Chinese Drywall;

12.2.2. Bar the assertion by any entity or person against the Knauf Defendants and Other Releasees of any contribution, indemnification, subrogation, or other claims arising out of the Participating Class Members' claims concerning (i) the KPT Chinese Drywall claims against the Knauf Defendants or (ii) this Settlement.

12.3.   This provision is not intended to prevent or impede the enforcement of claims or entitlement to benefits under this Settlement.

## 13.   <u>Termination of This Settlement</u>

13.1.   This Settlement shall be terminated and cancelled upon any of the following events:

13.1.1. The Court declines to enter the Preliminary Approval Order;

13.1.2. The Fairness Hearing is not held by the Court;

13.1.3. The Order and Judgment approving the Settlement and certifying the Class is not entered by the Court, or is reversed by a higher court, or is inconsistent with the terms of the Settlement; or

13.1.4. The Court declines to dismiss the Knauf Defendants and Other Releasees with prejudice.

13.2.   In addition to any other right to terminate under this Settlement, the Knauf Defendants may, at their sole and exclusive discretion and option, withdraw from, terminate, and cancel their obligations under this Settlement upon any of the following events:

    13.2.1. The Knauf Defendants exercise their rights pursuant to Sections 4.8.5 or 4.8.6.

    13.2.2. The Class Settlement Notice does not comply with Section 7.1 or with the order of the Court concerning Notice;

    13.2.3. The Knauf Defendants exercise their rights regarding opt outs pursuant to Section 8.3;

    13.2.4. The dismissals as provided in Sections 11.1.1, 11.1.2, and 11.2 do not occur as provided in Section 11;

    13.2.5. The bar order and permanent injunction as provided in Section 12.2 are not entered by the Court as provided in Section 12;

    13.2.6. The PSC, acting on behalf of the Class, materially breaches the Settlement and such breach materially frustrates the purposes of this Agreement; or

    13.2.7. This Settlement is changed in any material respect, except by written consent of the Parties.

13.3.   If the Knauf Defendants materially breach the Settlement Agreement, and such breach materially frustrates the purpose of this Agreement, then the Settlement Class Counsel shall, at their sole discretion, pursue whatever other remedies are available to them.

## 14.   Attorneys' Fees

14.1.   Separately and in addition to any consideration received by a Participating Class Member under this Settlement, the Knauf Defendants shall pay a singular attorneys' fee (to be allocated among the PSC and common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, Settlement Class Counsel and individual retained counsel) and reasonable and appropriate costs, including but not limited to Held Costs, Shared Costs and Individual Participating Class Members' Costs limited to reasonable inspection costs.

14.2.   The PSC shall be entitled to petition the Court for an award of attorneys' fees and costs, and provided that the PSC does not seek an award of attorneys' fees and costs exceeding $160 million from the Knauf Defendants, the Knauf Defendants agree not to oppose any such request.  All attorneys' fees and costs as well as the allocation of attorneys' fees and costs among the PSC, common benefit counsel authorized and working at the direction of the PSC, other common benefit

counsel, Settlement Class Counsel and individual retained counsel are subject to the approval of the Court and to a determination by the Court that the common benefit counsel work was valid and bona fide. The Court's determination shall be final and not subject to appeal.

14.2.1. In connection with the Court's determination of the PSC's application for attorneys' fees and costs, the PSC shall request without objection from the Knauf Defendants that the Court consult with state court Judges who have presided over Related Actions filed in state court as the Court deems appropriate. The PSC shall also request without objection from the Knauf Defendants that the Court determine a procedure for the appropriate allocation of attorneys' fees and costs among the PSC, common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, Settlement Class Counsel and individual retained counsel. In the event the Court appoints the Special Master to assist in the determination of a procedure for the appropriate allocation of attorneys' fees and costs, then each fee applicant may select either Special Master Perry or Special Master Juneau to review their fee application.

14.3.  The Court's award of attorneys' fees and costs shall settle and finally resolve any claim for attorneys' fees or costs that can be claimed by any counsel representing or working for the benefit either of a Participating Class Member or the Class. The award for attorneys' fees and costs shall include, but not be limited to: (i) all preparation and litigation work on behalf of any Participating Class Member or the Class; (ii) this Settlement; (iii) the Pilot Program; (iv) the Major Builder Settlement Agreements; (v) any agreement governing homes remediated prior to the Execution Date; and (vi) any other previous settlement between Knauf and any other party relating to claims arising from KPT Chinese Drywall unless attorneys' fees and reasonable costs have already been separately addressed under such settlement. Upon final approval, this agreement concerning attorneys' fees and costs shall supersede and replace the attorneys' fees and costs arrangements in the Pilot Program and the Major Builder Settlement Agreements.

14.4.  In no event will the Knauf Defendants' liability for attorneys' fees and costs exceed $160 million. The Knauf Defendants shall have no further obligation for attorneys' fees and costs to any counsel representing or working on behalf of either a Participating Class Member or the Class.

14.5.  In addition to an award of attorneys' fees and costs under this Settlement, the Knauf Defendants agree that the PSC, common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, Settlement Class Counsel and individual retained counsel are entitled to seek an award of attorneys' fees and costs from the Banner Class Settlement, the InEx Class Settlement, the Prospective L&W Class Settlement and the Prospective Insurer Agreement. The Knauf Defendants shall take no position on the amount of attorneys' fees and costs to which any party or their counsel might be entitled under any of those Agreements. The Knauf Defendants will not be entitled to any

credit for attorneys' fees and costs owed under those Settlements, nor will the Knauf Defendants be responsible for any shortfalls in attorneys' fees and costs recovered under those Settlements.

14.6.    In addition to fees sought under Section 14.2, if there is a surplus in the Other Loss Fund, Settlement Class Counsel and/or the PSC may petition for attorneys' fees and costs from the surplus pursuant to Section 4.7.4.4, provided, however that the Knauf Defendants will not be responsible for any such attorneys' fees and costs.

14.7.    The PSC shall establish an "MDL 2047 PSC Shared Costs Fund" in an appropriate financial institution approved by the Court.  Fourteen (14) days after the Execution Date, the Knauf Defendants will make an advance payment of $6 million (non-refundable) to the Shared Costs Fund for costs incurred by the PSC, common benefit counsel, other common benefit counsel, Settlement Class Counsel and individual retained counsel.  After the Settlement becomes Final, the amount advanced shall be credited against any amount of attorneys' fees and costs awarded by the Court.  If the Settlement does not become Final, the amount advanced by the Knauf Defendants shall be credited against any award of attorneys' fees and costs associated with the Pilot Program.

14.8.    Pursuant to the direction of the Court, the Knauf Defendants will pay any attorneys' fees and costs awarded by the Court beyond the advance payment of $6 million within 30 days after the Court issues an order determining the amount of attorneys' fees and costs.

## 15.    **Court to Retain Jurisdiction to Implement and Enforce Settlement Agreement**

15.1.    Notwithstanding any other provision of this Settlement, the Court shall retain (a) continuing jurisdiction over the Litigation, the Class, the Participating Class Members, the Knauf Defendants and the Settlement for the purposes of administering, supervising, construing and enforcing the Settlement; and (b) continuing and exclusive jurisdiction over (i) the Settlement Funds and (ii) the distribution of same to Participating Class Members.  Each of the Knauf Defendants consent to the jurisdiction of the Court solely for the purposes of administering, supervising, construing and enforcing the Settlement (including the Security Agreement) and for no other purpose.  All other jurisdictional defenses arguments and rights are fully reserved by the Knauf Defendants and nothing in this Settlement is intended to prejudice the assertion in any forum against any party of those jurisdictional defenses, arguments and rights.

## 16.    **Representations**

16.1.    The PSC represents and agrees that the Settlement is a fair, equitable and just process for determining eligibility for, and amount of, compensation for any given Class Member who has asserted a claim arising from, or related to, KPT Chinese Drywall.

16.2.   The PSC and counsel for the Knauf Defendants represent that, based on their respective independent consultations with qualified ethics experts or whomever else they deemed necessary, as to their respective ethical obligations and responsibilities, this Section 16 is consistent with the rules of professional responsibility and requirements of the respective jurisdictions in which they practice law, as described below.

16.3.   The following representations apply to claims against the Knauf Defendants and Other Releasees arising from, or related to, KPT Chinese Drywall.  Nothing in this Section shall apply to claims against Excluded Releasees or claims arising from, or related to, Non-KPT Chinese Drywall.

16.3.1.  Each member of the PSC represents that, while nothing in this Settlement is intended to operate as a "restriction" on the right of the PSC members to practice law within the meaning of the equivalent to Rule 5.6(b) of the ABA Model Rules of Professional Conduct in any jurisdictions in which the PSC Members practice or whose rules may otherwise apply, the PSC members have no present intent to (i) solicit new clients for the purpose of bringing claims against the Knauf Defendants or any of their related corporate affiliates, or any other entity or individual in connection with KPT Chinese Drywall, or (ii) acquire or receive a financial interest in any such claims or (iii) provide support or assistance to any other attorney in connection with a claim arising from KPT Chinese Drywall, except by providing access to materials contained in the PSC depository and a trial package developed by the PSC which shall include depositions and legal analysis of key issues.  Subject to the foregoing, the PSC further represents that, upon funding of the Settlement, because they have no present intent to represent clients with claims arising from, or related to, KPT Chinese Drywall in any cases or claims, it is their present intent not to provide assistance of any kind to any plaintiff's counsel who represents clients with claims arising from, or related to, KPT Chinese Drywall in any cases or claims or to participate in any way in the prosecution of such cases or claims.  However, notwithstanding the foregoing, the PSC will comply with PTO 8 entered in MDL No. 2047 concerning, among other things, the administration of the MDL and maintenance and transmittal of court orders and other documents or information to plaintiff's counsel.

16.3.2.  Each member of the PSC represents that he or she has no present intention to solicit new clients with claims arising from KPT Chinese Drywall.

16.3.3.  Each member of the PSC and the Knauf Defendants agree that the amounts to be paid under this Settlement to each Participating Class Member represent the satisfaction of that Participating Class Member's claims for compensatory damages.   No portion of such settlement represents the payment of punitive or exemplary damages.  Nonetheless, in consideration for the satisfaction of each Participating Class Member's

claim for compensatory damages, claims for punitive or exemplary damages shall be released as provided in Section 5.1.2.1.

16.3.4. Each member of the PSC represents and agrees that he or she has carefully reviewed the provisions of this Agreement, has consulted with whomever he or she deemed necessary, and has exercised independent judgment in concluding that the Settlement is in the best interests of his or her clients, and shall recommend the Settlement to his or her clients.

16.3.4.1. If any Class Member represented by a PSC member for any reason opts out of the Class, the PSC member who represents that Class Member shall present to the Court the issue of whether there is a conflict of interest which requires the PSC member to take (or have taken, as the case may be) all necessary steps to disengage and withdraw from the representation of such Class Member. The Court's decision on such matters shall be final and non-appealable.

16.3.5. Except as such agreement may be forbidden by the equivalent of Rule 1.16(d) or Rule 5.6(b) of the ABA Model Rules of Professional Conduct in the jurisdictions in which the PSC members practice law or whose rules otherwise apply, each member of the PSC represents and agrees that he or she will not share or make available to any other counsel's non-Participating Class Member, potential plaintiff with claims arising from, or related to, KPT Chinese Drywall or such other counsel for such Class Member or potential plaintiff: (i) any materials or information developed in the Litigation relating to KPT Chinese Drywall, including but not limited to, correspondence, notes, analyses, interview memoranda, exhibit and witness lists, demonstrative exhibits, witness examination outlines, expert reports and exhibits, and results of jury research ("Materials and Information"), other than materials contained in the PSC depository and a trial package developed by the PSC which shall include depositions and legal analysis of key issues; or (ii) experts, if any, with whom the PSC member has entered into exclusive retention agreements other than for the purpose of prosecuting claims arising from, or related to, Non-KPT Chinese Drywall.

16.3.6. Except as such agreement may be forbidden by the equivalent of Rule 1.16(d) or Rule 5.6(B) of the ABA Model Rules of Professional Conduct in the jurisdictions in which the PSC members practice law or whose rules might otherwise apply, each member of the PSC represents and agrees that, within 60 days after the conclusion of the Litigation, he or she will return to the Knauf Defendants, or certify destruction of, all materials produced by the Knauf Defendants in discovery, including confidential information as defined in PTO 16 entered in MDL No. 2047 or any other applicable confidentiality order(s), whether in their possession or in the possession of their clients, experts, consultants or other persons within

their control, and shall provide a declaration to the Knauf Defendants that such return or destruction has occurred. Such declaration shall be substantially in the form of Exhibit I. If necessary, the PSC and the Knauf Defendants shall jointly move to amend any applicable confidentiality order(s) to provide for such return or destruction of confidential information.

16.3.7. Each member of the PSC represents and agrees that he or she will not hereafter use or reveal information, including but not limited to information relating to the representation of, or gained in the professional relationship with a Participating Class Member, or privileged information, including without limitation the Materials and Information, where use or revelation is prohibited by the rules of professional conduct, the code of professional responsibility, or equivalent authority, or by any other law, governing the conduct of lawyers, in the jurisdictions in which the PSC member practices law or whose rules might otherwise apply (including but not limited to the equivalent of Rules 1.6(a), 1.8(b) and 1.9(c)(2) of the ABA Model Rules of Professional Conduct in any such jurisdiction). Each member of the PSC represents that no Participating Class Member has consented to the use or revelation of such information, except to the extent required for the PSC to comply with the requirements of the equivalent to Rule 1.8(g) of the ABA Model Rules of Professional Conduct in the jurisdictions in which the members of the PSC practice law or whose rules might otherwise apply.

16.4. Settlement Class Counsel represents that they have obtained the requisite authority from all members of the PSC to enter this Agreement in a manner that binds each PSC member to its terms.

16.5. The Knauf Defendants represent that they have obtained the requisite authority to enter this Agreement in a manner that binds each of them to its terms.

## 17. **Security**

17.1. In furtherance of their payment obligations under this Agreement, the Knauf Defendants agree as follows:

17.1.1. Knauf Gips guarantees performance of all obligations by the Knauf Defendants under this Settlement.

17.1.2. To secure the obligations of the Knauf Defendants to make payments under this Agreement, KI shall grant to Settlement Class Counsel, as collateral agent for the Settlement Class, a first-priority lien and security interest in the Pledged Assets and Mortgaged Property, in each case subject to agreed-upon permitted liens under the terms and conditions set forth in the Security Agreement and the Mortgages. The Security

Agreement and the Mortgages shall be executed and delivered as of the Effective Date.

17.1.3. The Knauf Defendants shall also either deposit funds in an account located in the United States or acquire asset(s) located in the United States and having an aggregate value of not less than $50 million in excess of the amount of any indebtedness secured by security interests in such funds and asset(s), and shall maintain ownership of such funds and asset(s) (or any assets acquired in replacement thereof or in addition thereto) and preserve unencumbered value (without regard to depreciation) of at least $50 million therein until the Knauf Defendants' payment obligations under this Agreement have been satisfied in full (the "Knauf Investment Assets"). The Knauf Defendants will provide notice to Settlement Class Counsel of the type and location of the Knauf Investment Assets.

17.1.4. The Knauf Defendants may elect to terminate Settlement Class Counsel's security interest in one or more of the Pledged Assets or Mortgaged Property or elect as an initial matter to provide an alternative to the Pledged Assets or Mortgaged Property by providing Replacement Security in any of the following three manners.

17.1.4.1. The Knauf Defendants may terminate Settlement Class Counsel's security interest in one or more of the Pledged Assets or Mortgaged Property or elect as an initial matter to provide an alternative to the Pledged Assets or Mortgaged Property by delivering a guarantee of the Knauf Defendants' obligations to make payments under this Agreement, in a principal amount not less than the value of such Pledged Assets or Mortgaged Property (based on the value maintained on the books and records of KI in accordance with generally accepted accounting principles), in favor of Settlement Class Counsel, for the benefit of the Settlement Class, issued by a commercial bank (i) that is chartered under the laws of the United States, any State thereof or the District of Columbia, and which is insured by the Federal Deposit Insurance Corporation, or (ii) whose long-term, unsecured and unsubordinated debt obligations are rated at least single A by Standard & Poor's Ratings Services (S&P) or an equivalent rating by Fitch Ratings Ltd. (Fitch), Moody's Investors Service, Inc. (Moody's) or DBRS and their respective successors, and which guarantee is maintained in effect until the Knauf Defendants' obligations to make payments under the Settlement Agreement are fully satisfied.

17.1.4.2. The Knauf Defendants may terminate the security interest in one or more of the Pledged Assets or Mortgaged Property or elect as an initial matter to provide an alternative to the Pledged Assets or Mortgaged Property by delivering an irrevocable

standby letter of credit, in a face amount not less than the value of such Pledged Assets or Mortgaged Property (based on the value maintained on the books and records of KI in accordance with generally accepted accounting principles), payable to Settlement Class Counsel, as collateral agent for the Settlement Class, issued by a commercial bank (i) that is chartered under the laws of the United States, any State thereof or the District of Columbia, and which is insured by the Federal Deposit Insurance Corporation, or (ii) whose long-term, unsecured and unsubordinated debt obligations are rated at least single A by Standard & Poor's Ratings Services (S&P) or an equivalent rating by Fitch Ratings Ltd. (Fitch), Moody's Investors Service, Inc. (Moody's) or DBRS and their respective successors, and which letter of credit is maintained in effect until the Knauf Defendants' payment obligations under this Agreement have been satisfied in full.

17.1.4.3.   The Knauf Defendants may terminate the  security interest in one or more of the Pledged Assets or Mortgaged Property or elect as an initial matter to provide an alternative to the Pledged Assets or Mortgaged Property by pledging to Settlement Class Counsel, as collateral agent for the Settlement Class, such other collateral assets of one or more of the Knauf Defendants located in the United States, having a fair market value, as agreed to by the Parties or, in the absence of agreement by the Parties, as determined by the Court, not less than the value of such Pledged Assets or Mortgaged Property (based on the value maintained on the books and records of KI in accordance with generally accepted accounting principles).

17.1.5. Following the Knauf Defendants' replenishment of the Remediation Fund in accordance with Section 4.2.2, the Knauf Defendants may (a) terminate the liens and security interests granted to Settlement Class Counsel, as collateral agent for the Settlement Class, in one or more of the Pledged Assets, the Mortgaged Property and/or Replacement Security (in the case of substitute collateral as described in Section 17.1.3.3), (b) reduce the amount of Replacement Security (in the case of a guarantee as described in Section 17.1.3.1 or a letter of credit as described in Section 17.1.3.2) and/or (c) reduce the amount or unencumbered value of the Knauf Investment Assets, together in an aggregate amount (in the case of the Pledged Assets, the Mortgaged Property and the Replacement Security (constituting substitute collateral as described in Section 17.1.3.3), based on the value maintained on the books and records of KI in accordance with generally accepted accounting principles) reasonably equivalent to the amount by which the Remediation Fund has been replenished at such time, and Settlement Class Counsel, as collateral agent for the Settlement Class, shall execute, deliver, record and file such documents, instruments

and agreements as are necessary, convenient or reasonably requested by the Knauf Defendants to evidence the termination of such liens and security interests.

17.1.6. Settlement Class Counsel, as collateral agent for the Settlement Class, may only exercise remedies against the Pledged Assets, the Mortgaged Property, the Knauf Investment Assets and the Replacement Security in the event of default by the Knauf Defendants of their obligations to make payments under this Agreement or event of default under the Security Agreement or Mortgages, in each case subject to all applicable grace periods, and in each case subject to the entry of an order of the Court authorizing such exercise.  Before exercising any remedies, Settlement Class Counsel, as collateral agent for the Settlement Class, shall serve a notice of default on the Knauf Defendants and the Knauf Defendants shall have thirty (30) days to remedy such default including, if applicable, by providing Replacement Security as set forth in Section 17.1.3.  If the Knauf Defendants do not remedy the default within such thirty day period, Settlement Class Counsel, as collateral agent for the Settlement Class, may seek an order from the Court permitting them to exercise remedies against the Pledged Assets, Mortgaged Property, the Knauf Investment Assets and/or the Replacement Security (including to execute or foreclose thereon) as provided in the Security Agreement and Mortgages. Settlement Class Counsel, as collateral agent for the Settlement Class, may only exercise remedies against the Pledged Assets, the Mortgaged Property, the Knauf Investment Assets or the Replacement Security in the manner authorized by Court order and subject to compliance with such Court order.  In no event shall any member of the Settlement Class be permitted to exercise remedies against the Pledged Assets, the Mortgaged Property, the Knauf Investment Assets or the Replacement Security.

17.1.7. The Knauf Defendants will timely provide Settlement Class Counsel with all reasonable due diligence materials so that Settlement Class Counsel can assess the adequacy of the security.  In the event of any dispute regarding the adequacy of the due diligence provided, the Parties will meet and confer in a good faith attempt to resolve the dispute. If the Parties are unable to resolve the dispute, the Parties will submit the dispute to the Court for resolution.

17.1.8. The liens and security interests granted to Settlement Class Counsel, as collateral agent for the Settlement Class, in the Pledged Assets and the Mortgaged Property and their interests in any Replacement Security shall be terminated in all respects after the Knauf Defendants' payment obligations under this Agreement have been satisfied in full.  Upon such termination, Settlement Class Counsel, as collateral agent for the Settlement Class, shall execute, deliver, record and file such documents, instruments and agreements as are necessary, convenient or reasonably

69

requested by the Knauf Defendants to evidence the termination of all such liens and security interests.

17.1.9. The Pledged Assets, the Mortgaged Property and the assets described in Section 17.1.4 shall not be available to satisfy the claims of any non-Class Member or Class Member who opts out under Section 8.

## 18. __Miscellaneous__

18.1. The Knauf Defendants do not admit or concede that they have any liability for, or owe any damages whatsoever relating to, KPT Chinese Drywall.

18.2. The Knauf Defendants represent that KI is a corporate entity which is doing business in the United States with its U.S. corporate offices in Shelbyville, Indiana.  The Knauf Defendants further represent that KI owns substantially all of the Knauf Defendants' assets in the United States.

18.3. On the Execution Date, the PSC and the Knauf Defendants shall issue a joint press release.

18.4. All persons should be on notice of  their continuing duty to monitor the Court's docket for the most current filings and information.  The Court, in its discretion, may alter, postpone or amend  any of the deadlines scheduled by the Court in connection with the certification of the class and the approval of this Agreement without additional formal notice.  Orders of any such changes are expected to be presented on the Court's website: http://www.laed.uscourts.gov/Drywall/Drywall.htm.

18.5. Any Class Member (or his or her attorney) who submits false or intentionally misleading information, through any form of deception, dishonesty or fraud shall be subject to appropriate sanctions (including monetary sanctions and costs).

18.6. In order to achieve transparency, the Knauf Defendants shall provide Settlement Class Counsel with copies of all fee contracts with the Settlement Administrator, any banking institutions, invoices of the Settlement Administrator, and other related persons and/or entities performing settlement administration functions.

18.7. The retention of all banking institutions are subject to approval by Settlement Class Counsel and the Court.

18.8. Unless otherwise specified, any written notices and other communications under this Settlement shall be in writing and shall be sent to:

For the Knauf Defendants:

Kerry J. Miller
Frilot LLC
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163
kmiller@frilot.com

Steven Glickstein
Gregory J. Wallance
Kaye Scholer LLP
425 Park Avenue
New York, New York 10022
sglickstein@kayescholer.com
gwallance@kayescholer.com

Candace Bankovich
General Counsel
Knauf Insulation
One Knauf Drive
Shelbyville, Indiana 46176
candace.bankovich@us.knaufinsulation.com

For Settlement Class Counsel:

Arnold Levin
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
alevin@lfsblaw.com
flonger@lfsblaw.com

Russ Herman
Leonard A. Davis
Herman, Herman, Katz & Cotlar, LLP
820 O'Keefe Avenue
Suite 100
New Orleans, Louisiana 70113
rherman@hhkc.com
ldavis@hhkc.com

Routine communications may be by email.  Communications asserting a breach of the Settlement shall be by hand delivery or overnight courier (*e.g.*, Express Mail, Overnight UPS or Federal Express).

18.9.   This Agreement is the product of arm's length negotiations between the PSC and the Knauf Defendants.   Neither the PSC nor the Knauf Defendants shall be

deemed the drafter of this Agreement or any provision thereof. No presumption shall be deemed to exist in favor of or against either the PSC or the Knauf Defendants as a result of the preparation or negotiation of this Agreement.

18.10. This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of the State of Louisiana without regard to conflict of laws principles.

18.11. This Agreement, including its exhibits, constitutes the entire agreement between the Parties. The Parties have not received or relied on any agreements or promises other than as contained in writing in this Agreement, including its exhibits. Prior drafts shall not be used to construe this Agreement.

18.12. This Agreement may not be modified or amended unless such modification or amendment is in writing executed by all parties.

18.13. This Agreement may be executed in multiple counterparts, all of which taken together shall constitute one and the same Agreement.

## 19. **Federal Rule of Evidence 408**

19.1. The Parties specifically acknowledge, agree and admit that this Settlement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations, correspondence, orders or other documents shall be considered a compromise within the meaning of Federal Rules of Evidence Rule 408, and any equivalent rule of evidence of any state, and shall not (i) constitute, be construed, be offered, or received into evidence as an admission of the validity of any claim or defense, or the truth of any fact alleged or other allegation in the Litigation, the Related Actions, or in any other pending or subsequently filed action, or of any wrongdoing, fault, violation of law, or liability of any kind on the part of any Party, or (ii) be used to establish a waiver of any defense or right, or to establish or contest jurisdiction or venue.

19.2. The Parties also agree that this Settlement and its exhibits, along with all related drafts, motions, pleadings, conversations, negotiations, correspondence, orders or other documents entered in furtherance of this Settlement, and any acts in the performance of this Settlement are not intended to be, nor shall they in fact be, admissible, discoverable, or relevant in any case or other proceeding against the Knauf Defendants (i) to establish grounds for certification of any class involving any Class Member, or (ii) as evidence of any obligation that any Party hereto has or may have to anyone.

19.3. The provisions of this Settlement, and any orders, pleadings or other documents entered in furtherance of this Settlement, may be offered or received in evidence solely (i) to enforce the terms and provisions hereof or thereof, (ii) as may be specifically authorized by a court of competent jurisdiction after an adversary hearing upon application of a Party hereto, (iii) in order to establish payment, or an affirmative defense of exhaustion of insurance coverage or *res judicata* in a

Related Action or a subsequent case, (iv) in connection with any motion to enjoin or stay any of the Related Actions, or (v) to obtain Court approval of the Settlement.

[Remainder of this page intentionally left blank.]

**IN WITNESS HEREOF**, the Parties have executed this Settlement Agreement by their duly authorized representatives on the dates stated below.

For the Plaintiffs' Steering Committee:

**Witnesses:**

**Russ M. Herman**
**Plaintiffs' Liaison Counsel with the full authority and consent of the PSC**

_____

By: _____

Print Name: _____

Print Name: _____

_____

Title: _____

Print Name: _____

Date: _____

**Witnesses:**

**Arnold Levin**
**Plaintiffs' Lead Counsel with the full authority and consent of the PSC**

_____

By: _____

Print Name: _____

Print Name: _____

_____

Title: _____

Print Name: _____

Date: _____

For the Knauf Defendants:

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Knauf Plasterboard (Tianjin) Co., Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Knauf Plasterboard (Wuhu) Co., Ltd.**

By: _____

Print Name: _____

Title: _____

Date: _____

**Witnesses:**

**Guangdong Knauf New Building Material Products Co., Ltd.**

_____

By: _____

Print Name: _____

Print Name: _____

_____

Title: _____

Print Name: _____

Date: _____

**Witnesses:**

**Knauf Gips KG**

_____

By: _____

Print Name: _____

Print Name: _____

_____

Title: _____

Print Name: _____

Date: _____

**Witnesses:**

**Gebr. Knauf Verwaltungsgesellschaft KG**

_____

By: _____

Print Name: _____

Print Name: _____

_____

Title: _____

Print Name: _____

Date: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Knauf International GmbH**

By: _____

Print Name: _____

Title: _____

Date: _____

**Knauf Insulation GmbH**

By: _____

Print Name: _____

Title: _____

Date: _____

**Knauf UK GmbH**

By: _____

Print Name: _____

Title: _____

Date: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Witnesses:**

_____

Print Name: _____

_____

Print Name: _____

**Knauf AMF GmbH & Co. KG**

By: _____

Print Name: _____

Title: _____

Date: _____

**Knauf do Brasil Ltda.**

By: _____

Print Name: _____

Title: _____

Date: _____

**PT Knauf Gypsum Indonesia**

By: _____

Print Name: _____

Title: _____

Date: _____

# EXHIBIT A

**Exhibit A**

**Already Remediated Properties Protocol**

I.      Objective of Protocol

This protocol creates a process by which to resolve the Remediation Claims of individual Owners who self-remediated their Affected Properties or entered into a contract to self-remediate their Affected Properties prior to the Execution Date of the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 (the "Settlement Agreement") on an Affected-Property-by-Affected-Property basis.  This process consists of:  (1) the Owner's provision of documents concerning the remediation; (2) a negotiation period; (3) a non-binding mediation, if necessary; and (4) if the mediation fails, a proceeding before the Court to resolve the Remediation Claims.

II.     Definitions

Unless otherwise noted in this protocol, all defined terms shall have the meanings set forth in the Settlement Agreement.

III.    Materials to Be Provided by the Owner

A.      Prior to scheduling a negotiation pursuant to Paragraph IV, the Owner shall submit to the Settlement Administrator the following documentation concerning remediation of the Affected Property, to the extent that such documentation is in the possession, custody or control of the Owner or any person or entity hired or otherwise used by the Owner in connection with the remediation of the Affected Property, including, but not limited to, builders, contractors, and subcontractors:

1.      Photographs and/or video images of all drywall removed from the Affected Property during remediation.  For those Owners with claims pending in *In re: Chinese Drywall Products Liability Litigation*, MDL No. 2047 (the "MDL"), where available, such submission shall be in the form required by MDL Pretrial Order 1B.  For those Owners with claims pending in state court, the submission shall comply with the state court's rules regarding the preservation of evidence.

2.      Any evidence of KPT Chinese Drywall and Non-KPT Chinese Drywall, if any, in the Affected Property prior to remediation.

3.      Proof of corrosion or other evidence that the KPT Chinese Drywall was reactive.

4.      Interior photographs of the Affected Property immediately prior to the commencement of, and following completion of, the remediation, including photographs and/or video images of the flooring and major components such as cabinets, moldings, doors, intercom systems, and

fixtures for every room and bathroom, and, to the extent possible, security systems, appliances and audio such as surround sound.

    a.    The photographs do not need to be pictures taken specifically for the litigation. For example, family photographs or photographs taken for purposes of refinancing a mortgage are acceptable in the absence of other photographs.

5.    The remediation contract and an itemization from the contractor who performed the remediation work of the materials used during the remediation, including, but not limited to, manufacturer, model number, and quantity.

6.    An itemized invoice from the contractor who performed the remediation work ("Itemized Invoice").

7.    Proof of payment of the Itemized Invoice and any other expenses, such as cancelled checks, credit card statements, etc.

8.    A floor plan of the Affected Property with dimensions.

9.    An Environmental Certificate.

10.    An Owner Disclosure Affidavit in the form attached as Exhibit 1, which includes a certification that the materials provided comprise all of the available documentation regarding the following:

    a.    The drywall that was in the Affected Property prior to the commencement of the remediation; and

    b.    The scope, extent, and cost of the remediation.

## IV. Procedures for Resolving Remediation Claims

### A. Negotiation Period

1.    Within 25 business days of receipt of the Owner Disclosure Affidavit, the Knauf Defendants and the Owner shall schedule and hold an initial negotiation session to attempt to resolve the Owner's Remediation Claims in accordance with Paragraph IV (D) and subject to the conditions set forth in Paragraph V.

2.    The Knauf Defendants and the Owner shall have 25 business days from the date of the first negotiation session to resolve the Owner's Remediation Claims (the "Negotiation Period"). For good cause, such as scheduling issues, the Negotiation Period may be extended by mutual agreement.

2

B.     Non-Binding Mediation

    1.    If at the end of the Negotiation Period, the Knauf Defendants and the Owner have not resolved the Owner's Remediation Claims, the Knauf Defendants and Owner shall submit the Owner's Remediation claims to non-binding mediation before the Special Master. The Special Master shall schedule the non-binding mediation at a mutually agreeable date with the Owner and the Knauf Defendants, but in no event shall the mediation be more than 25 business days after the last day of the Negotiation Period unless the period is mutually extended by the parties.

    2.    Prior to the non-binding mediation, the Knauf Defendants and the Owner shall submit a brief statement describing the issues in dispute. Such statements shall not exceed 7 type-written double-spaced pages and shall attach any relevant documentation produced pursuant to Paragraph III as exhibits or other documents that may have been generated during the Negotiation Period to support or refute the Owner's claims.

    3.    In mediating the Remediation Claims, the Special Master shall follow the provisions set forth in Paragraph IV(D).

    4.    The Remediation Fund shall pay the cost of the non-binding mediation, including, but not limited to, the Special Master's time.

    5.    The parties may mutually agree to use a mediator other than the Special Master.

C.     Court Proceeding

    1.    In the event the Mediation is unsuccessful, within 20 business days, the parties shall each make a written submission to the Court with respect to the Remediation Claims. Such submission shall not exceed 7 type-written double-spaced pages and shall attach any relevant documentation produced pursuant to Paragraph III as exhibits or other documents that may have been generated during the Negotiation Period and non-binding mediation to support or refute the Owner's claim. In addition, by mutual agreement of the parties, the Special Master shall also make a submission to the Court.

        a.    If there is an issue as to the KPT Percentage in the Affected Property, by mutual agreement the parties may make submissions that exceed 7 type-written double-spaced pages.

    2.    The scope of the Court's review shall be limited to the Reimbursable Costs set forth in Paragraph IV (D).

3. To the extent that a Remediation Claim is submitted to the Court, the Court shall resolve the claims without a jury, as participation in this settlement constitutes a waiver by all parties to a jury trial.

4. The Court's resolution of the Remediation Claims shall be final without appeal.

5. Each party shall bear its own costs in connection with any Remediation Claim submitted to the Court.

D. Reimbursable Costs

1. The Knauf Defendants will reimburse the Owner only for reasonable costs that the Owner incurred in remediating the Affected Property ("Reimbursable Costs"). In determining Reimbursable Costs, the Knauf Defendants and Owner, Special Master (where necessary) and Court (where necessary), shall employ the following criteria:

a. Only remediation work reasonably consistent with the Remediation Protocol shall be eligible for reimbursement.

b. Any upgrades made to the Affected Property are not eligible for reimbursement.

(1) To the extent that anything in the Affected Property was replaced, including, but not limited to, appliances baseboards, molding, flooring, cabinets and countertops, any reimbursement owed to the homeowners for such replacement shall be limited to the replacement costs of the specific item that was in place prior to the remediation. For example, if a Owner had to replace his/her 50-gallon water heater as part of the remediation, but replaced it with a 75-gallon water heater, only the cost of replacing the 50-gallon water heater with either an identical 50-gallon water heater or, if such water heater is no longer available, one that is substantially the same in quality and capacity as that which was replaced, shall be eligible for reimbursement.

(2) To the extent that upgrades were made to comply with building codes and regulations in effect at the time of the remediation work, the Owner will be reimbursed solely to the extent that such upgrades are related to work covered by the Remediation Protocol. For example, the Remediation Protocol includes replacement of the electrical system. Therefore, if replacement of the electrical system included upgrades to comply with building codes and regulations in effect at the time of the remediation work, the Owner will be reimbursed for those upgrades. In

4

contrast, the Remediation Protocol does not include replacement of the roof. Therefore, if the authority with jurisdiction requires repair of the roof to secure a certificate of occupancy, the Owner will not be reimbursed for such repair.

c.     Reimbursable Costs shall not include costs attributable to contractor double billing, waste or fraud.

2.     Any amounts received or to be received by an Owner under a settlement agreement with any person or entity other than the Knauf Defendants arising from KPT Chinese Drywall shall be subject to Sections 4.8.1 and 4.8.2 of the Settlement Agreement.

3.     The Knauf Defendants' responsibility for the Reimbursable Costs shall be limited to the KPT Drywall Percentage, subject to the following conditions:

a.     For Mixed Properties where the Owner has provided sufficient evidence to determine the KPT Drywall Percentage, the Reimbursable Costs shall be multiplied by the KPT Drywall Percentage.

b.     For Mixed Properties where the Owner did not provide sufficient evidence to determine the KPT Drywall Percentage, the Knauf Defendants will separately negotiate with the Residential Property Owners, or in the event of a Court proceeding pursuant to Paragraph IV (C), the Court shall resolve, on an Affected-Property-by-Affected-Property basis, an appropriate discount of the Reimbursable Costs.

4.     The Special Master and the Court will take into consideration, in determining whether to allow a claim or the amount of the claim, whether the Owner has complied with MDL Pretrial Order 1B (if the claim is pending in the MDL) or with applicable state law requirements for preservation of evidence (if the claim is pending in state court). Subject to review by the Special Master or the Court, the failure to preserve evidence as required by law will result in disallowance or reduction in the amount of the claim if the failure has been prejudicial to a determination of the claim.

5.     All monies owed by the Knauf Defendants under an agreement between the Knauf Defendants and the Owner to resolve the Remediation Claims or Court resolution shall be paid by the Remediation Fund.

a.     For Owners of individual units in Multiple Unit Properties, prior to payment of any amounts owed by the Knauf Defendants, the

Owner must provide a release from the Multiple Unit Property Governing Body.

V.   Other Covered Expenses

The Remediation Fund will pay the Residential Owner a Lump Sum Payment pursuant to the terms set forth in Section 4.3.1.1 of the Settlement Agreement, but not the Delay Period Payment under Section 4.3.1.2, and subject to the following conditions:

A.   Residential Owners of Mixed Properties who have provided sufficient evidence to determine the KPT Drywall Percentage, shall be paid an amount equal to the Lump Sum Payment multiplied by the KPT Drywall Percentage.

B.   For those Residential Owners of Mixed Properties who did not provide sufficient evidence to determine the KPT Drywall Percentage, the Knauf Defendants will separately negotiate with the Residential Property Owners, or in the event of a Court proceeding pursuant to Paragraph IV (C), the Court shall resolve, on an Affected-Property-by-Affected-Property basis, an appropriate discount of the Lump Sum Payment consistent with the provisions in Section 4.3.4.1 of the Class Settlement Agreement.

VI.   Entitlement to Benefits of Other Loss Fund

Pursuant to Section 1.1.2 of the Settlement Agreement, Owners are Class Members and shall be entitled to benefits under the Other Loss Fund as defined in Section 1.47 of the Settlement Agreement.

VII.   Miscellaneous

A.   Release and Dismissal

The Owner will release the Released Parties pursuant to the terms of the Settlement Agreement. In addition, the Owner shall dismiss with prejudice all claims relating to the KPT Chinese Drywall in the Affected Property pursuant to the terms of the Settlement Agreement.

B.   Attorneys' Fees and Costs

All claims for attorneys' fees and costs arising from the Owner's claims, if such negotiation and/or mediation results in a resolution of the claims, shall be governed by Section 14 of the Settlement Agreement without regard to whether the Owner reaches an agreement with the Knauf Defendants to resolve the Remediation Claims.

C.   Federal Rule of Evidence 408 and State-Law Analogs

Any settlement discussions between the Knauf Defendants and an individual Owner pursuant to Paragraph IV as well as submissions to the Special Master

6

pursuant to Paragraph IV (B) (2) are not intended to be, nor shall they in fact be, admissible, discoverable, or relevant in any case or other proceeding against the Knauf Defendants other than the Court proceeding described in Paragraph IV (C).

# EXHIBIT A-1

# Owner Disclosure Affidavit

Owner name: _____

Affected Property address: _____

Purchase date and price of Affected Property: _____

List the manufacturers of all drywall found in the Affected Property: _____
_____
_____

Move-out date: _____

Move-in date: _____

Storage expenses paid: _____

Moving expenses paid: _____

Utility expenses paid: _____

Alternative living expenses paid: _____

Total cost of construction paid: _____

Total claim: _____

General Contractor name and phone #:_____

Total amount paid to general contractor: _____

Affected Property air conditioned square footage: _____

Was Owner aware of the defective drywall before purchasing the Affected Property: _____

_____
_____

Please describe the remediation of the Affected Property. If you removed and reused an item, please circle 'reused'. In the event that you replaced an item, with another of the same material and quality please circle 'replaced'. In the event that you replaced and upgraded an item, please note at the end of this form and leave that item blank. Circling 'replaced' indicates that you replaced the items with one of equal value.

**Kitchen cabinets:**                                   Reused                    Replaced

1 of 7                                Owner Initial _____ Contractor Initial _____

**Kitchen countertop:**                    Reused              Replaced

If replaced indicate material:        Formica        Corion        Tile        Granite

**Kitchen Plumbing Fixtures:** (Faucets, sink)        Reused              Replaced

**Kitchen floor:**                        Reused              Replaced

**Appliances:**                        Reused              Replaced

If replaced, please list appliance manufacture and model: _____

_____

_____

_____

**Bathroom cabinets:**                    Reused              Replaced

**Bathroom tops:**                        Reused              Replaced

If replaced indicate material:        Formica        Cultured  marble        Tile        Granite

**Bathroom flooring:**                    Reused              Replaced

**Bathroom enclosures:**                    Reused              Replaced

**Bathroom lighting:**                    Reused              Replaced

**Bathroom Accessories** (towel bars, etc.):        Reused              Replaced

**Bathroom Mirrors:**                    Reused              Replaced

**Tub:**                            Reused              Replaced

If replaced indicate master bath tub type            Fiberglass        Steel        Jacuzzi

**Plumbing fixtures** (toilets, sinks):            Reused              Replaced

If replaced please provide description of original manufactures:

_____

_____

**Plumbing faucets:**                    Reused              Replaced

If replaced please provide description of original manufactures:

_____

_____

**Plumbing lines:**                        Reused              Replaced

If replaced indicate material:                Copper        CPVC        PEX

Owner Initial _____    Contractor Initial _____

**Base boards:**                                              Reused              Replaced

**Interior doors:**                                          Reused              Replaced

If replaced indicate:        Hollow core 6' 8" doors        Hollow core 8' doors     Solid core 8' doors

**Window wood molding:**                       N/A    Reused              Replaced

**Crown molding:**                             N/A    Reused              Replaced

If replaced please indicate original locations:

_____
_____

**Chair Rail:**                                N/A    Reused              Replaced

If replaced please indicate original locations:

_____
_____

**Tile flooring:**                             N/A    Reused              Replaced

If replaced please indicate locations of tile floors:

_____
_____

**Marble Flooring:**                           N/A    Reused              Replaced

If replaced please indicate locations of marble floors:

_____
_____

**Wood Flooring Type:**                        N/A    Wood                Pergo/float

**Wood flooring:**                             N/A    Reused              Replaced

If replaced please indicate locations of wood floors:

_____
_____

**Carpet:**                                             Reused              Replaced

Owner Initial _____    Contractor Initial _____

If replaced please provide description of original manufactures:

_____

_____


If replaced please indicate locations of carpet:

_____

_____

| **HVAC replacement:** | Ducts | Coils | Air handler(interior) | Condenser(exterior) |
|---|---|---|---|---|

**HVAC manufacturer:** _____

| **Insulation:** | | Reused | Replaced |
|---|---|---|---|
| **Electrical fixtures:** | | Reused | Replaced |
| **Electrical wiring:** | | Reused | Replaced |
| **Electrical fans:** | | Reused | Replaced |

If replaced please indicate how many and which rooms:

_____

| **Stair rails:** | N/A | Reused | | Replaced |
|---|---|---|---|---|
| **Window sills:** | | Reused | | Replaced |
| If replaced indicate original material: | Wood | | Marble | Drywall |
| **Alarm system:** | N/A | Reused | | Replaced |
| Fire suppression system: | N/A | Reused | | Replaced |
| **Intercom:** | N/A | Reused | | Replaced |
| **Surround sound:** | N/A | Reused | | Replaced |
| **Wall papers:** | N/A | | | Replaced |

**Interior paint:**                    Total colors used: _____


Additional construction related items replaced:

_____

_____

_____

Personal items replaced:

Owner Initial _____  Contractor Initial _____

_____
_____
_____

Items that were upgraded and deducted from construction replacement cost:

_____
_____
_____


The following items should have been produced given the nature of the remediation project and will help us confirm the remediation costs associated with your property.  Please provide the additional supporting documents listed below:

1. Photographs and/or video images of all drywall removed from the Affected Property during remediation.  If your claims are pending in *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047, where available, such submission shall be in the form required by MDL Pretrial Order 1B.   If your claims are pending in state court, such submission shall comply with the state court's rules regarding the preservation of evidence.

2. Any evidence of KPT Chinese Drywall or Non-KPT Chinese Drywall in the Affected Property prior to remediation.

3. Proof of corrosion or other evidence that the KPT Chinese Drywall was reactive.

4. Interior photographs of the Affected Property immediately prior to the commencement of, and following completion of, the remediation, including photographs and/or video images of the flooring and major components such as cabinets, moldings, doors, intercom systems, and fixtures for every room and bathroom, and, to the extent possible, security systems, appliances and audio such as surround sound.

   a. The photographs do not need to be pictures taken specifically for the litigation.  For example, family photographs or photographs taken for purposes of refinancing a mortgage are acceptable in the absence of other photographs.

5. The remediation contract and an itemization from the contractor who performed the remediation work of the materials used during the remediation, including, but not limited to, manufacturer, model number, and quantity.

6. An itemized invoice from the contractor who performed the remediation work ("Itemized Invoice").

7. Proof of payment of the Itemized Invoice and any other expenses, such as cancelled checks, credit card statements, etc.

8. A floor plan of the Affected Property with dimensions.

Owner Initial _____   Contractor Initial _____

9.  An Environmental Certificate.


Please note that this is not a comprehensive list or final request and the Knauf Defendats may request additional documentation such as cancelled checks, receipts or photographs in the future.

Owner Initial _____   Contractor Initial _____

I declare under penalty of perjury under the laws of the United States that all of the information provided in this Owner Disclosure Affidavit is true and correct to the best of my knowledge, information and belief. I further declare that I have supplied all the documents requested in this Owner Disclosure Affidavit, to the extent that such documents are in my possession or in the possession of my lawyers. Further, I acknowledge that I have an obligation to supplement the above responses if I learn that they are in some material respects incomplete or incorrect.

Date: _____

Homeowner Signature: _____

Subscribed and sworn to before me on

_____
Notary Public

My commission expires on

Date: _____

Contractor Signature: _____

Subscribed and sworn to before me on

_____
Notary Public

My commission expires on

Owner Initial _____ Contractor Initial _____

# EXHIBIT B

**Exhibit B**

**ENVIRONMENTAL CERTIFICATE**

I certify that I have verified the Contractor's certification that all drywall has been removed, including all debris and visible dust, as set forth in the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047. This certification is based upon an independent visual inspection of all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. In addition, the atmosphere in the house was found to be representative of the atmosphere in houses built without "problem" drywall.

Name:_____

By:
(Signature)_____ Date_____

(Print Name)_____

(Print Title)_____

(Print Company)_____

# EXHIBIT C

**Exhibit C**

**INSPECTION PROTOCOL**

**Phase I  Visual Inspection for Indicia of KPT Chinese Drywall or Non-KPT Chinese
Drywall**

    A.    Scope of Visual Inspection

        1.    Inspector will remove one electrical cover plate from an outlet in each room[1] to inspect exposed wires for contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"). The exposed wires will be digitally photographed and the cover plate will be re-attached.

        2.    The Inspector will open accessible HVAC air-handler units to visually inspect all immediately accessible areas of the units, including, but not limited to, coils and air-handling lines, for Contamination. Each unit, including the coils and air-handling lines, will be digitally photographed and returned to its original condition. The Inspector will also inquire of the property owner whether any of the units have previously malfunctioned or whether they have been repaired. Any records produced by the property owner regarding previous repairs to the units shall be provided to the Inspector in advance of the Inspection.

        3.    Inspector will visually inspect for Contamination and digitally photograph (1) at least one plumbing fixture and (2) where present, at least one exposed copper piping in each room with plumbing fixtures and/or exposed piping.

        4.    Inspector will visually inspect and digitally photograph any exposed drywall (*e.g.* unfinished drywall in the attic) for manufacturer labeling using the attached "Drywall Indicia Guide" to confirm the manufacturer.

    B.    Next Steps

        1.    If the Visual Inspection reveals evidence of Contamination and either KPT Chinese Drywall (as defined in Section 1.25 of the Settlement Agreement Regarding Claims against the Knauf Defendants in MDL No. 2047

---

[1] For purposes of this protocol, a room is defined as a space within the property with walls or other physical separation on all sides, including, for example, a bedroom, a den, a game room, a dining room, a living room, a garage, where a wall is accessible for inspection, a kitchen, or any other such locations that are greater than 50 square feet. Rooms shall not include closets, bathrooms, hallways, laundry rooms, or entranceways, unless they are greater than 50 square feet.

("Agreement")) or Non-KPT Chinese Drywall (as defined in Section 1.41 of the Agreement), a Phase II Room-by Room inspection will be conducted immediately.

    a)    As set forth in Section 1.25.1 of the Agreement and as detailed in the Drywall Indicia Guide, KPT Chinese Drywall does not include drywall bearing the lower-case "TianJin, China" markings, unless the Inspector is notified by the Settlement Administrator that such board in the property has been deemed to be reactive pursuant to Section 4.9 of the Settlement Agreement. If the Settlement Administrator <u>does not</u> notify the Inspector that such board in the property has been deemed to be reactive, to the extent the Inspector finds such board in the property, he shall not count it as either KPT Chinese Drywall or Non-KPT Chinese Drywall and he shall not include such board in the calculation of the KPT Drywall Percentage under Paragraph II (C).

    b)    As set forth in Sections 1.25 and 1.41 of the Agreement, drywall products manufactured, sold, marketed, distributed and/or supplied by any Knauf entity other than Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), including, but not limited to, Knauf Plasterboard (Wuhu) Co., Ltd. ("Wuhu") and Guangdong Knauf New Building Material Products Col., Ltd. ("Dongguan") shall not count as either KPT Chinese Drywall or Non-KPT Chinese Drywall and shall not be included in the calculation of the KPT Drywall Percentage under Paragraph II (C).

    2.    If the Visual Inspection does not reveal Contamination, KPT Chinese Drywall, or Non-KPT Chinese Drywall, further inspection is not warranted, and the property shall be deemed ineligible to participate in the settlement program outlined in the Agreement ("Ineligible Property").

**Phase II Room-by-Room Inspection and Determination of KPT Drywall Percentage**

    A.    Inspection Protocol:

    1.    Subject to the Drywall Board Inspection Minimum described in Paragraph II (A) (1) (a), the Inspector shall, at the very least, inspect one drywall board in each room in the property. In a room where the Visual Inspection revealed Contamination in the exposed wires of an electrical outlet, the inspector shall inspect the board closest to the electrical outlet provided that such board is accessible. The Inspector shall inspect the board by cutting three sides of an approximately 18" by 18" opening square located within an interior wall of a room at a randomly chosen location in that wall and to do the least amount of damage as possible. The three sides

will be opened like a small door and digitally photographed.[2]  The Inspector will use the attached Drywall Indicia Guide to determine the manufacturer of the exposed drywall.  To identify KPT Chinese Drywall, the Inspector must look for KPT Chinese Drywall Markings consistent with the Drywall Indicia Guide; the end tape shall not be used to determine that a board is KPT Chinese Drywall.[3]  If the Inspector finds some evidence, but not definitive evidence, of KPT Chinese Drywall – for example, a "Knauf" marking – he shall expand the opening to confirm that such board is in fact KPT Chinese Drywall by photographing at least part of the "TIANJIN" name or such other definitive marking identified in the attached Drywall Indicia Guide.

a)      Drywall Board Inspection Minimum.  The Inspector shall inspect a minimum number of drywall boards in each property according to the following:

(1)      For properties that are less than or equal to 1,000 square feet, the Inspector shall inspect a minimum of 4 drywall boards;

(2)      For properties that are greater than 1,000 square feet, but less than or equal to 2,000 square feet, the Inspector shall inspect a minimum of 6 drywall boards;

(3)      For properties that are greater than 2,000 square feet, the Inspector shall inspect a minimum of 10 drywall boards.

b)      To limit the number of openings and thereby minimize the inconvenience to the property owner, where two rooms are adjacent and the opening reveals drywall markings both on the 18" by 18" "door" cut into the board and on the drywall board of the adjacent room, the Inspector shall not cut another opening in the adjacent room.  Instead, the Inspector shall photograph the markings on the exposed drywall "door" and on the drywall in the adjacent room, and use the Drywall Indicia Guide to determine the manufacturer of both drywall boards.  Both drywall boards shall

---

[2] All openings opened during Phase II Inspections will be repaired pursuant to the procedures set forth in Paragraph II (D).

[3] End tape is not sufficient to identify KPT Chinese Drywall because other non-reactive drywall manufactured under the "Knauf" name use identical end tape.  In addition, there are other non-reactive drywall brands that use similar end tape.  In the event that end-tape indicative of KPT Chinese Drywall is found, the inspector shall continue to inspect the board to confirm the manufacturer of the board.

separately count toward the Drywall Board Inspection Minimum for the property described in Paragraph II (A) (1) (a).

c)   If the Visual Inspection of an attic with exposed board, described in Phase I (A) (4) above, reveals either KPT Chinese Drywall or Non-KPT Chinese Drywall, the board found in the attic shall count as one board toward meeting the Drywall Board  Inspection Minimum for the property described in Paragraph II (A) (1) (a) and shall be included, as a single board, in the determination of the KPT Drywall Percentage described in Paragraph II (C) (1).

d)   If the Visual Inspection finds non-reactive drywall (*e.g.*, domestic drywall) in a ceiling or in an attic, such board shall not count toward the Drywall Board Inspection Minimum in Paragraph II (A) (1) (a).

e)   If the number of rooms in a property is insufficient to meet the Drywall Board Inspection Minimum for the property in Paragraph II (A) (1), the Inspector shall inspect the board in other areas not included in the room count, such as hallways or the entranceway, chosen at random prior to the start of the Room-by-Room Inspection, until the inspector has inspected enough boards to satisfy the Drywall Board Inspection Minimum in Paragraph II (A) (1) (a).

> Illustration 1:   In a property that is greater than 2,000 square feet and has 8 rooms, if the Visual Inspection in the attic finds KPT Chinese Drywall in the ceiling board, the attic ceiling board shall count as one board toward the Drywall Board Inspection Minimum in Paragraph II (A) (1) (a).  In addition to the 8 rooms and the attic ceiling board, the Inspector will, therefore, only be required to inspect one board in a kitchen, hallway, or entranceway chosen at random prior to the start of the Room-by-Room inspection.

2.   Inspection of Unmarked Board

a)   If an opening in a drywall board does not reveal any markings sufficient to determine the manufacturer of the exposed drywall, the Inspector shall open a maximum of three additional openings in that drywall board until markings sufficient to identify the manufacturer of the board are exposed.

b)   If after making four openings in the drywall board, the Inspector is still unable to identify the manufacturer of the drywall board and the Visual Inspection revealed Contamination in the electrical outlets located in that room, such unmarked drywall shall be considered Non-KPT Chinese Drywall and shall be included in the

calculation of the KPT Drywall Percentage described in Paragraph II (C) (1).  If the Visual Inspection revealed no Contamination in the electrical outlets located in that room, such unmarked drywall shall be considered non-reactive drywall and shall not be included in the calculation of the KPT Drywall Percentage.

B.    Analysis of Inspection Results

1.    If the inspection exposes only KPT Chinese Drywall and non-reactive drywall (*e.g.*, domestic drywall), the property shall be deemed to be a KPT Property, as defined in Section 1.27 of the Agreement.

2.    If the inspection exposes both KPT Chinese Drywall and Non-KPT Chinese Drywall, determination as to whether the property is a KPT Property or a Mixed Property, as that term is defined in Section 1.34 of the Agreement, shall be made by calculating the KPT Drywall Percentage pursuant to the procedures set forth in Paragraph C below, which calculation shall be provided in writing to the Settlement Administrator, as that term is defined in Section 1.67 of the Agreement, with copies to the property owner's counsel and the Knauf Defendants.

3.    If the openings do not reveal any KPT Chinese Drywall, the property shall be deemed an Ineligible Property.  The Inspector shall provide a certification to the Settlement Administrator, with copies to the property owner's counsel and the Knauf Defendants, that the home does not contain KPT Chinese Drywall.

4.    Second Inspections.  Within 15 business days after receiving such certification of the absence of KPT Chinese Drywall or of the KPT Drywall Percentage, the owner of an Ineligible Property or the owner of a Mixed Property may request a second inspection to be conducted by the Approved Inspectors ("Second Inspection").

a)    The Second Inspection will be conducted pursuant to the protocol set forth in Paragraph II (A).  During the Second Inspection, the Inspector shall inspect a board on the wall directly opposite from the wall containing the board that was inspected during the initial Room-By-Room Inspection.  If there is no wall directly opposite from the wall containing the board that was inspected during the initial Room-by-Room inspection, the inspector shall inspect a board on one of the walls adjacent to the wall containing the board that was inspected during the initial Room-by-Room inspection.

b)    Prior to the Second Inspection, the owner must deposit $600 – the cost of the Second Inspection – into an escrow account administered by the Settlement Administrator.

c)    The Settlement Administrator shall reimburse the $600 to the owner from the escrow account according to the following:

        (1)     If, for properties where the initial inspection did not reveal KPT Chinese Drywall, the Second Inspection revealed KPT Chinese Drywall, or

        (2)     If the Second Inspection results in a higher KPT Drywall Percentage, as determined pursuant to Paragraph II (C), than was calculated on the basis of the initial inspection.

    d)     If the Second Inspection does not reveal KPT Chinese Drywall, or results in the same or lower KPT Drywall Percentage than was calculated on the basis of the initial inspection, the Settlement Administrator shall direct the escrow account to pay the $600 to the Remediation Fund.

    e)     At least five business days prior to the scheduled Second Inspection, the Settlement Administrator shall inform the Knauf Defendants of the Second Inspection, and the Knauf Defendants may, at their own expense, attend the Second Inspection.

    f)     Under no circumstances will there be a Third Inspection.

C.     Determination of KPT Drywall Percentage

    1.     The KPT Drywall Percentage shall be determined by dividing the number of exposed boards that are confirmed to be KPT Chinese Drywall by the total number of exposed boards confirmed to be KPT Chinese Drywall and/or Non-KPT Chinese Drywall and rounding to the next highest 10% increment.

        Illustration 2:  In a 12-room property, that is greater than 2,000 square feet, where the Visual Inspection of the attic ceiling board revealed Non-KPT Chinese Drywall (*e.g.*, board manufactured by Taishan Gypsum Co., Ltd. ("Taishan board")), which pursuant to Paragraph II (A) (1) (c) shall count as 1 board in the calculation of the KPT Drywall Percentage, the Room-by-Room inspection of the 12 rooms confirmed 4 boards as KPT Chinese Drywall, 4 as Non-KPT Chinese Drywall (*e.g.*, Taishan board) and 4 as non-reactive drywall, the KPT Drywall Percentage would be calculated by dividing 4 (*i.e.*, the number of confirmed KPT Chinese Drywall in the property) by 9 (*i.e.*, the number of confirmed KPT Chinese Drywall in the property plus the number of Non-KPT Chinese Drywall in the property, including the attic ceiling board).  Thus, the KPT Drywall Percentage would be 44% and rounded up to 50%.

    2.     If there is a Second Inspection, the KPT Drywall Percentage will take into account both the exposed boards from the initial inspection and the exposed boards from the Second Inspection by averaging the results of the inspections.

<u>Illustration 3</u>:  After the initial inspection described in Illustration 2 above, the Property Owner requests a Second Inspection.  The Second Inspection confirms 2 boards as KPT Chinese Drywall, 6 board as Non-KPT Chinese Drywall (*e.g.* Taishan board) and 4 boards as non-reactive drywall.  The KPT Drywall Percentage would be calculated by dividing 6 (*i.e.*, the total number of confirmed KPT Chinese Drywall in the property from the initial and Second Inspections) by 17 (*i.e.*, the total number of confirmed KPT Chinese Drywall in the property from the initial and Second Inspections plus the number of Non-KPT Chinese Drywall in the property, including the attic ceiling board, from the initial and Second Inspections).  Thus, the KPT Drywall Percentage would be 35% and rounded up to 40%.

3.    Assessment of Property

a)    If the KPT Drywall Percentage is greater than 90%, the property shall be considered a KPT Property.

b)    If the KPT Drywall Percentage is less than or equal to 90%, the property shall be considered a Mixed Property.

D.    Restoration of Property

1.    For a KPT Property or an Ineligible Property (*i.e.*, where the inspection does not find any KPT Chinese Drywall), after the inspection is complete, the inspector shall close and tape all openings opened during the Room-by-Room Inspection.  The areas around the openings will be vacuumed to remove any debris.

2.    For a Mixed Property, after the inspection is complete, each opening shall be repaired and the wall containing the opening shall be repainted to match the condition of the room prior to the commencement of the inspection.  The areas around the openings will be vacuumed to remove any debris.

**Inspectors**

Inspections performed pursuant to this protocol, including the Second Inspection, shall be conducted by one of the approved inspectors on the attached list of "Approved Inspectors" which may be amended upon notice to the Settlement Administrator and Settlement Class Counsel (as that term is defined in Section 1.68 of the Agreement).

**Report of Findings**

All findings from such inspections will be carefully documented in a report to the Settlement Administrator, which shall include the following information:

- Property owner's name and counsel

- Address of property
- Description of property
- Date of inspection
- Personnel present
- Pictures with a description of the picture.
- Detailed room-by-room report of the drywall found
- Summary of findings, including the KPT Drywall Percentage

# EXHIBIT C-1

# Drywall

# Indicia

# Guide

**KPT CHINESE Drywall**

   # 1    Knauf Plasterboard (Tianjin) Ltd.           page  3 - 4

**NON-KPT CHINESE DRYWALL**

   # 2    Crescent City           page  5

   # 3    Taihe           page  6

   # 4    Taishan           page  7 - 8

   # 5    Venture Supply           page  9

   # 6    BNBM           page  10

   # 7    C&K           page  11

   # 8    Dragon Brand           page  12

   # 9    IMG           page  13

   # 10    Bedrock Gypsum           page  14

   # 11    IMT           page  15

   # 12    ProWall Inc.           page  16

   # 13    KNAUF MADE IN GERMANY – Counterfeit Board           page  17

   # 14    LAFARGE MADE IN GERMANY – Counterfeit Board           page  18

   # 15    Unknown Chinese Manufacturer 1           page  19

   # 16    Unknown Chinese Manufacturer 2           page  20

   # 17    Unknown Chinese Manufacturer 3           page  21

**NON-REACTIVE DRYWALL**

   # 18    National Gypsum           page  22

   # 19    American Gypsum           page  23 - 25

   # 20    CertainTeed/ProRoc           page  26 - 27

   # 21    Georgia Pacific           page  28 - 29

   # 22    Lafarge           page  30 - 31

   # 23    NORGIPS USA Inc.           page  32

   # 24    Panel Rey           page  33

   # 25    USG           page  34 - 35

   # 26    PT Knauf Gypsum Indonesia Ltd.           page  36

   # 27    Guangdong Knauf New Building Material Products Co. Ltd.           page  37

   # 28    Knauf Plasterboard (Wuhu) Co. Ltd.           page  38

   # 29    Knauf do Brasil Ltd.           page  39

   # 30    Knauf Gips KG           page  40

   # 31    James Hardie           page  41

   # 32    Federal Gypsum Company           page  42

   # 33    Temple Inland           page  43

   # 34    Flintcote Company           page  44

| KPT CHINESE DRYWALL | **# 1    Knauf Plasterboard (Tianjin) Ltd.** | 1 of 2 |
| --- | --- | --- |

## Reactive KPT Chinese Drywall

### M1:

Label:



Marking:           **KNAUF – TIANJIN CHINA – ASTM C36**

Printing Type:    BLUE – DOUBLE – DOT

Requirements:   Indicia photos must clearly indicate the presence of KPT drywall
by displaying the full marking or distinctive parts such as
"KNAUF-" and/or "TIANJIN CHINA" in blue-double-dot printing.

Please note that photos only displaying "KNAUF", "ASTM C36"
or parts of it are not a unique indicia for KPT and therefore
insufficient.

## Non - reactive KPT Chinese Drywall (subject to Section 4.9 of the Settlement   Agreement)

### M 2:

Label:



Marking:           **KNAUF – TianJin, China – ASTM C36 -  [DATE]  [TIME]**

Printing Type:    BLUE – DOUBLE – DOT

Requirements:   Photo must allow unique identification of KPT drywall by
displaying the full marking or distinctive parts such as "KNAUF-"
and/or "TianJin, CHINA" in blue-double-dot printing.

Please note that photos only displaying "KNAUF", "ASTM C36"
or parts of it are not a unique indicia for KPT and therefore
insufficient.



**KPT CHINESE DRYWALL**

**# 1    Knauf Plasterboard (Tianjin) Ltd.**                    2 of 2

**Insufficient Indicia for KPT**

Edge Tape:      Blue – Yellow

Label:



Marking:        " KNAUF    CERTIFIED TO ISO 9001    KNAUF    STANDARD BOARD "

Note:           The blue-yellow edge tape is also used by other Knauf companies, see Guangdong Knauf New Building Material Products Co. Ltd (# 27, p. 36), and therefore an insufficient indicia for KPT. Please provide a photo either of the marking M1 or M2 as stated above.


Front marking:  " K "

Label:



Note:           The label "K" on the front side of the drywall sheet is used by most Knauf companies and therefore insufficient indicia for KPT. Please provide a photo either of the marking M1 or M2 of the back side of the board as stated above.

**NON – KPT CHINESE DRYWALL**

## # 2 Crescent City

**Marking:**

Label:



Marking: **Made in China Crescent City Gypsum**

Printing Type: black letters

## # 3    Taihe

NON – KPT CHINESE DRYWALL

**Marking:**

Label:





Marking:        **MADE IN CHINA, MEETS OR EXCEEDS ASTM C1396 04 STANDARD**

Printing Type:  black letters

Edge Tape:      White – Blue – Green

Label





Marking:        " Taihe "   +   white triangle in red circle   +   [chinese symbols]



**NON – KPT CHINESE DRYWALL**

**# 4    Taishan**

**M 1:**

Label:



Marking:        **4feetX12feetX1/2inch        DrYwall        [DATE] [TIME]**

Printing Type:    black letters

**M 2:**

Label:



Marking:        **TAIAN  TAISHAN**

Printing Type:    black letters

**M 3:        Drywall  4feetx12feetx1/2inch**

Label:



Marking:        **Drywall  4feetx12feetx1/2inch**

Printing Type:    black letters

**# 4    Taishan**

**M 4:**

Label:



Marking:        **DRYWALL  4feet*12feet*1/2inch**

Printing Type:  black letters

Edge Tape:     White – Glossy  (<u>Material:</u> plastic)

Label:



Marking:        no marking on edge tape

**NON – KPT CHINESE DRYWALL**

## # 5    Venture Supply

---

**M 1:**

Label:



Marking:        **VENTURE SUPPLY INC.**  MFG TAJHE CHINA

Printing Type:   black letters

---

**M 2:**

Label:



Marking:        **VENTURE SUPPLY INC.**  MFG TAIHE CHINA

Printing Type:   black letters

NON – KPT
CHINESE
DRYWALL

**# 6    BNBM**

**M 1:**

Label:



Marking:     **BEIJING NEW BUILDING MATERIALS CO LTD.**

Printing Type:   Blue letters,  framed

**M 2:**

Label:



Marking:     **BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY
Beijing, China ASTM 1396-04  [DATE]  [TIME]**

Printing Type:   black letters

**NON – KPT CHINESE DRYWALL**    # 7    C & K

**Marking:**

Label



Marking:    **C&K GYPSUM BOARD ASTM C 1396 MADE IN CHINA**

Printing Type:    black letters

Edge Tape:    Blue – Grey – White

Label:





Marking:    " C&K"   +   [Chinese symbol]

NON – KPT
CHINESE
DRYWALL

**# 8    Dragon Brand**

**Marking:**

Label:



Marking:   **DRAGON BRAND DRYWALL PER ½" 4`X12`ASTM C 1396  MADE IN CHINA    [TIME] [DATE]**

Printing Type:   black letters

Edge Tape:   Light – Dark Blue – White

Label:



Marking:   " DRYWALL "

NON – KPT
CHINESE
DRYWALL

**# 9    IMG**

**Marking:**

Label:



Marking:       **IMG ASTM C 1396** **Made in CHINA [DATE]**

Printing Type:   black letters

Edge Tape:    Blue – White

Label:



Marking:      n/a

p. 13

NON – KPT
CHINESE
DRYWALL

# # 10   Bedrock Gypsum

| | |
|---|---|
| Edge Tape: | Yellow – Black – White |
| Label: |  |
| Marking: | Bedrock Gypsum$^{TM}$ Manufactured to ASTM C 1396 388 Market Street 4th Floor, San Francisco CA 94111 Made in China |

p. 14

**NON – KPT CHINESE DRYWALL**

# # 11  IMT

**Marking:**

Label:



Marking:     **MADE IN CHINA IMTGYPSUM.COM ASTM C 1396**

Printing Type:  black letters

**NON – KPT CHINESE DRYWALL**

# # 12   Pro Wall Inc.

Marking:

Label:



Marking:   **MADE IN CHINA MEETS ASTM C36/C1396 STANDARD**

Printing Type:   black letters

Edge Tape:   White – Blue – Yellow

Label:



Marking:   " ½" x 12`TE    ProWall "

<table>
<tr><td>

**NON – KPT CHINESE DRYWALL**

</td><td>

# # 13   KNAUF MADE IN GERMANY

## COUNTERFEIT BOARD

</td></tr>
</table>

**M 1:**

Label:



Marking:  GYPSUM WALLBOARD [DATE] [TIME]  -96-  MADE IN   GERMANY BY   **KNAUF**
MADE TO ASTM C36                ½"  THICK             FDG GYPSUM

Printing Type:  blue – single – dot   **and**   blue – double – dot

Note:  This marking is apparently a counterfeit board and has not been produced by any Knauf company

" FDG " is the wrong shortcut of flue gas desulflurization

**Correct:  FGD**

---

**M 2:**

Label:



Marking:     **[DATE]    MADE IN GERMANY**

Printing Type:  black letters

Note:     Printing " MADE IN GERMANY "  **and**  [DATE] (Month/Day/Year) is no typical marking for any German company

p. 17

**NON – KPT CHINESE DRYWALL**

# # 14   LAFARGE MADE IN GERMANY

**Marking:**

Label:



| Marking: | **LAFARGE   [DATE] [TIME]         GER 1    ASTM C36** |
|---|---|
| | **MADE IN GERMANY** |

Printing Type:   black letters

Note:         This is assumingly a counterfeit board produced in China

Printing " MADE IN GERMANY "  **and**  [DATE] (Month/Day/Year) is no typical marking for any German company

**NON – KPT CHINESE DRYWALL**

# # 15   Unknown Chinese Manufacturer 1

**Marking:**

Label:



Marking:    **[DATE] J  [TIME]  1  MEETS ASTM C36**

Printing Type:  black letters

Note:        Unknown Chinese Manufacturer

NON – KPT
CHINESE
DRYWALL

# # 16   Unknown Chinese Manufacturer 2

**Marking:**

Label:





Marking:     **Manufactured to Conform to ASTM Standard C36**

**4 x 12 x 1/2          MADE IN CHINA**

Printing Type:   black letters

Note:            Unknown Chinese Manufacturer

**NON – KPT CHINESE DRYWALL**

# # 17   Unknown Chinese Manufacturer 3

**Marking:**

Label:



Marking:        **MADE IN CHINA ASTM C 1396**

Printing Type:  black letters

Note:                Unknown Chinese Manufacturer

**NON REACTIVE DRYWALL**

# # 18   National Gypsum

**M 1:**

Label:



Marking: **National Gypsum company**

Printing Type:   black letters

**M 2:**

Label:



Marking:   **GridMarX ™ Patent Product**
**National Gypsum Properties**
**PRODUCT  INFO  @  www.gridmarx.com**

Printing Type:   black letters

Edge Tape:   White – Black – Yellow

Label:



Marking:   (12,7 x 3658mm)      National Gypsum Company  Charlotte, NC 28211

Case 2:09-md-02047-EEF-MBN   Document 17311-3   Filed 10/28/13   Page 132 of 264
Case 2:09-md-02047-EEF-JCW   Document 12061-10   Filed 12/20/11   Page 24 of 45

**M 1:**

Label:



Marking:       **ARMENDARTZ  [TIME]**

Printing Type:  black letters

**M 2:**

Label:



Marking:       **UNDERWRITER LABORATORIES INC.  [DATE]
[NAME, eg. C. Stone]**

Printing Type:  black letters

Note:          There are different varieties of the marking behind [DATE]

NON
REACTIVE
DRYWALL

# 19   American Gypsum

**M 3:**

Label:



Marking:   **Gypsum Board F-3724 FIRE RESISTANCE CLASSIFICATION SEE UL FIRE RESISTANCE DIRECTORY R14169**

Printing Type:   blue – single – dot

---

Edge Tape:   Blue – White – Red

Label:



**M 1:**   AMERICAN GYPSUM, ALBUQUERQUE, NM

Label:



**M 2:**   MANUFACTURED TO MEET ASTM C1396 AND C36

**NON REACTIVE DRYWALL**

# # 19   American Gypsum

3 of 3

| | |
|---|---|
| Edge Tape: | White – Purple |

Label:



**M 1:**   AMERICAN GYPSUM, INTERIOR CEILING BOARD  Panel de techo para interiors

Label:



**M 2:**   MANUFACTURED BY AMERICAN GYPSUM, DALLAS, TX

**NON REACTIVE DRYWALL**

# # 20   CertainTeed / ProRoc

**Marking:**

Label:





Marking:   **GYPSUM BOARD ISSUE NO. F-3600 FIRE RESISTANCE CLASSIFICATION SEE UL PRODUCTS CERTIFIED FOR CANADA DIRECTORY AND FIRE RESISTANCE DIRECTORY R3660**

**MADE IN USA ASTM 1396 & C36  CAN/CSA**

Printing Type:   black letters

Edge Tape:   Black – Blue

Label:



Marking:      CertainTeed      ProRoc      REGULAR GYPSUM BOARD

# NON REACTIVE DRYWALL

## # 20   CertainTeed / ProRoc

| | |
|---|---|
| Edge Tape: | White with Red letters |
| Label: |  |
| Marking: | ProRoc    PANEL DE YESO TIPO X |

NON REACTIVE DRYWALL

**# 21   Georgia Pacific**

## M 1:

Label:



Marking:   **GP DENSGLASS ULTRA**

Printing Type:   black letters

## M 2:

Label:



Marking:   **[DATE]   IN1B   [TIME]   GP TR: CERTIFIED 96% RECYCLED**

Printing Type:   black letters

## M 3:

Label:



Marking:   **DENS SHIELD TILE BACKER   [DATE]**

Printing Type:   black letters

## NON REACTIVE DRYWALL

# # 21   Georgia Pacific

**M 4:**

Label:



Marking:          **[DATE]  /  TX1   08**

Printing Type:  black letters

Edge Tape:    Black – White – Red

Label:

Marking:        TOUGHROCK

NON REACTIVE DRYWALL

# # 22   Lafarge

## M 1:

Label:



Marking:        LABORATORIES INC. GYPSUM BOARD FIRE RESISTANCE
DIRECTORY IN WIDE TYPE LGC6A

Printing Type:  black letters

## M 2:

Label:



Marking:        [DATE]      PALATKA, FL           [TIME]

Printing Type:  black letters

NON
REACTIVE
DRYWALL

# 22  Lafarge

**M 3:**

Label:



Marking:        [TIME]  [COLOUR]   TEAM

Printing Type:  black letters

Note:           [Colour] could be WHITE, YELLOW, BLUE or RED

Edge Tape:      white

Label:



Marking:        LAFARGE    Manufactured by Lafarge North America Inc.

                Fabricado por Lafarge North America Inc.

**NON REACTIVE DRYWALL**

# 23   NORGIPS Inc.

**M 1:**

Label:



Marking:        NORGIPS USA INC. GYPSUM WALLBOARD THICKNESS ½"

Printing Type:   blue letters

**M 2:**

Label:



Marking:        MADE IN POLAND OPOLEN

Printing Type:   blue letters

NON REACTIVE DRYWALL

# # 24   Panel Rey

**M 1:**

Label:



Marking:          PANEL REY 2

Printing Type:   black letters

**M 2:**

Label:





Marking:          ½"X12´ REG   [TIME]   [DATE]

Printing Type:   black letters

Edge Tape:        White - Blue

Label:



Marking:          Hecho en Mèxico por PANEL REY S.A., Hidalgo

**NON REACTIVE DRYWALL**

# # 25  USG

**M 1:**

Label:





Marking:       100 % RECYCLED PAPER SINCE 1967

Printing Type:  black letters

**M 2:**

Label:



Marking:        GYPSUM BOARD

Printing Type:  black letters,  framed

# 25   USG

| | |
|---|---|
| Edge Tape: | White – Blue |
| Label: |  |
| **M 1:** | USG SHEETROCK  Brand    Interior Ceiling Panel  Sag-Resistant |
| Label: |  |
| **M 2:** | United States Gypsum Company<br>125 South Franklin Street, Chicago, IL 60606<br>A Subsidiary of USG Corporation |

| | |
|---|---|
| Edge Tape: | White – Yellow – Green |
| Label: |  |
| **Marking:** | United States Gypsum Company<br>125 South Franklin Street, Chicago, IL 60606<br>A Subsidiary of USG Corporation |

**NON REACTIVE DRYWALL**

## # 26   PT Knauf Gypsum Indonesia Ltd.

**M 1:**

Label:





Marking:      **KNAUF –**      PLASTERBOARD 48  STD  12,5x1220x3660 mm TE
NATURAL  GYPSUM      [DATE] ASTM C36

Printing Type:    blue letters

Note:        plant number:  48

Edge Tape:    Grey – Blue

Label:



Marking:      STANDARD BOARD      KNAUF

p. 36

NON REACTIVE DRYWALL

# # 27  Guangdong Knauf New Building Material Products Co. Ltd.

**M 1:**

Label:



Marking:          Dongguan China ASTM C 36

Printing Type:    blue – single – dot

**M 2:**

Label:



Marking:          plant number:  38

Printing Type:    blue – single – dot

Edge Tape:        Blue – Yellow

Label:



Marking:          " KNAUF    CERTIFIED TO ISO 9001    KNAUF    STANDARD BOARD "

NON
REACTIVE
DRYWALL

# # 28   Knauf Plasterboard (Wuhu) Co. Ltd.

**M 1:**

Label:



 

Marking:        KNAUF – WuHu,   China – ASTM C36 – [DATE]  [TIME]

Printing Type:  blue letters

**M 2:**

Label:



Marking:        KNAUF  [Chinese symbols]  18  (plant number)

Printing Type:  blue letters

Edge Tape:      Blue – Yellow - White

Label:



Marking:        " KNAUF "

**NON
REACTIVE
DRYWALL**

## # 29  Knauf do Brasil Ltd.

**Marking:**

Label:







Marking:          KNAUF ST – 12,5mm – ARMAZENAR EM LOCAL SECO - OO

Printing Type:   blue – double – dot                blue – single – dot

Edge Tape:      Blue - Yellow

Label:

Marking:          " KNAUF "

NON REACTIVE DRYWALL

# # 30  Knauf Gips KG

**Marking:**

Label:





| | | |
|---|---|---|
| Marking: | CE KNAUF | AUSBAUPLATTE |
| Printing Type: | blue – or – red – double dot | blue – single - dot |

**NON REACTIVE DRYWALL**

# # 31   James Hardie

**Marking:**

Label:



Marking:          HARDIEBACKER

**NON REACTIVE DRYWALL**

# # 32  Federal Gypsum Company

| | |
|---|---|
| Edge Tape: | White - Green |
| Label: |  |
| Marking: | Federal Gypsum Company |

NON
REACTIVE
DRYWALL

# # 33  Temple Inland

**Marking:**

Label:



Marking:        A071806 01144

Printing Type:  black letters

Edge Tape:      White – Blue – Pink

Label:



 



Marking:        Temple Inland        ½" X 12            54



# # 34   Flintcote Company

**Marking:**

Label:



Marking:        THE FLINTCOTE COMPANY

# EXHIBIT C-2

# INSPECTION PROTOCOL

## <u>Approved Inspectors</u>

**Benchmark Remediation Group LLC**
1040 Bayview Drive suite 520
Ft. Lauderdale, FL 33304
Phone: 954-914-6993
www.benchmarkcustombuilders.com

Inspectors
- Brian Collins
- Shawn Dosh
- Joel Holton
- Victor Lawton
- Devin Locay
- Eric Purtic
- Bill Saunders
- Kane Schirmer
- Jeff Spruce
- David Taylor
- Luis Villas
- Jason Wade
- Jason Wyler

**Morse Zehnter Associates**
580 Village Blvd. Suite 110
West Palm Beach, FL 33409
Phone: 561-712-4777

Rensselaer Technology Park
165 Jordan Road
Troy, NY 12180
Phone: (518) 283 7671
www.mzaconsulting.com

Inspectors
- Alex Bader
- Tim Buhl
- Dave Cowan
- Matt Divine
- Andrea Grdina
- Juan Hernandez

- Joe Hoffman
- Steve Lattanzio
- Roger Morse
- Brent Specht
- Robby Wyre
- Dean Zehnter

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L |
| THIS DOCUMENT RELATES TO:<br>ALL CASES AND | JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| *Payton, et al. v. Knauf Gips, KG, et al.*<br>Case No. 2:09-cv-07628 (E.D. La.) | |
| *Gross, et al. v. Knauf Gips, KG, et al.*<br>Case No. 2:09-cv-06690 (E.D. La.) | |
| *Rogers, et al. v. Knauf Gips, KG, et al.*<br>Case No. 2:10-cv-00362 (E.D. La.) | |
| *Abreu, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 2:11-cv-00252 (E.D. La.) | |
| *Block, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 11-cv-1363 (E.D. La.) | |
| *Arndt, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 11-cv-2349 (E.D. La.) | |
| *Cassidy, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 11-cv-3023 (E.D. La.) | |
| *Vickers, et al. v. Knauf Gips KG, et al.*<br>Case No. 2:09-cv-04117 (E.D. La.) | |

EXHIBIT D TO SETTLEMENT AGREEMENT (EXHIBIT A TO MEMORANDUM OF LAW
IN SUPPORT OF JOINT MOTION OF PROPOSED SETTLEMENT CLASS COUNSEL,
THE PSC, AND THE KNAUF DEFENDANTS FOR AN ORDER: (1) PRELIMINARILY APPROVING
THE KNAUF SETTLEMENT; (2) CONDITIONALLY CERTIFYING A SETTLEMENT CLASS;
(3) ISSUING CLASS NOTICE; (4) SCHEDULING A FAIRNESS HEARING; AND
(5) STAYING CLAIMS AGAINST THE KNAUF DEFENDANTS)

# FILED UNDER SEAL

# EXHIBIT E

Related Actions

| Case Name | Case Court Name | Docket |
|---|---|---|
| Allen, Patricia et al. v. Knauf Gips KG et al. | USDC - Eastern District of Louisiana | 2:11cv02946 |
| Godwin, Jack and Pamela v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06525 |
| Kokoszka, Jason and Heather v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06841 |
| Ledford, Samuel v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04292 |
| Loftis, Dell J. et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv00507 |
| McDuffie, Claude and Jimmie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv00333 |
| Pampel, Terry L. and Nancy J et al v. Knauf GIPS KG et al | USDC - Eastern District of Louisiana | 2:10cv01109 |
| Panneton, Clyde and Ruth v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06526 |
| Rayfield, Sylvia et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04293 |
| Abiega, Elisa v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06845 |
| Aboulafia, Steven v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06844 |
| Allen, Shane M. and Nicole J. v. Knauf Plasterboard Tianjin Co., Ltd. et al | USDC - Eastern District of Louisiana | 2:09cv04112 |
| Alvarez, Emilio and Martha v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06539 |
| Ankney, Duane v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04113 |
| Badchkam, Annette v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04318 |
| Bagley, Jerald v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01220 |
| Belfour, Ed and Ashli v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06532 |
| Berson, Gloria et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07133 |
| Bloom, Andrew and Ina v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06550 |
| Borges, Haroldo and Maria v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06843 |
| Bradford, Deborah v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04313 |
| Busbee, Clarence and Sheri et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01217 |
| Byrne, Gertrude v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:11cv00338 |
| Campanelli, Larry and Karen v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06507 |
| Candela, Hilario et al v. Knauf Plasterboard Tianjin Co., Ltd | USDC - Eastern District of Louisiana | 2:10cv01111 |
| Caretti, Giovanni et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv00509 |

*Omnibus Complaint

Case 2:09-md-02047-EEF-MBN   Document 17214-13   Filed 10/28/13   Page 160 of 264
Case 2:09-md-02047-EEF-JCW   Document 12061-13   Filed 12/20/11   Page 6 of 204
Related Actions

| | | |
|---|---|---|
| Carey, Vernon and Latavia v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06534 |
| Catalano, Thomas and Faye v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04316 |
| Charles, Frantz et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06847 |
| Christian, Kevin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06848 |
| Colman, Kevin and Maria v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06846 |
| Coombs, Donald Martin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01223 |
| Cronin, Willliam and Margaret v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06527 |
| Davis, Jesse W.  v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06863 |
| Davy, Christopher and Amy v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06533 |
| de Gamboa, Harnan and Ana Teixeira et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04659 |
| Debenedictis, Frank and Deborah v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04658 |
| Deutsch, Hunting F. and Mary v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06740 |
| Diaz, Fernando et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06742 |
| Difilippo, Steven and Kathleen v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06547 |
| Downs, Terel and Patricia v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04309 |
| Egan, Michelle L. et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06749 |
| Elzein, Hassib v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06748 |
| Eskenazi, Mark and Anna v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06549 |
| Feliciano, Felix and Annabelle v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04295 |
| Fernandez, Jorge and Michele v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04296 |
| Feuerberg, Bryan and Emily v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04321 |
| Flores, Julian and Nathalia v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04299 |
| Foster, Katherine L. v. Northstar Holdings, Inc. et al | USDC - Eastern District of Louisiana | 2:09cv04320 |
| Frais, Sherley v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04322 |
| Frenchman, Beth and Brian v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06548 |
| Fulks, Richard and Bonnie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06737 |
| Galvin, Larry and Rene v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04294 |
| Garcia, Lorena et al v. Lennar Corporation et al | USDC - Eastern District of Louisiana | 2:09cv04118 |

*Omnibus Complaint

Case 2:09-md-02047-EEF-MBN Document 17214-13 Filed 10/28/13 Page 161 of 204
Case 2:09-md-02047-EEF-JCW Document 17261-13 Filed 12/20/11 Page 4 of 204
Related Actions

| | | |
|---|---|---|
| Ghafari, David v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07131 |
| Goldstein, Cindy A v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05869 |
| Gonzalez, Omar et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06747 |
| Gonzalez, Ronald et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv04337 |
| Grguric, Slavko v. Knauf Plasterboard Tianjin Co., Ltd. et al | USDC - Southern District of Florida | 0:11cv60206 |
| Guarneri, Corrado G. and Laura v. Knauf Plasterboard Tianjin Co., Ltd. et al | USDC - Eastern District of Louisiana | 2:10cv02754 |
| Guerrazzi, Diego et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01221 |
| Harbison, Kirk and Angela v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01224 |
| Harrell, Jason and Melissa v. Knauf Plasterboard Tianjin Co., Ltd. et al | USDC - Eastern District of Louisiana | 2:09cv06543 |
| Hay, Robert and Maria v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06851 |
| Heritage Homes of Northwest Florida, LLC v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06738 |
| Hoagland, Lawrence and Ann v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07132 |
| Jaramillo, Consuelo et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06745 |
| Jesus, Manuel and Liliane v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06739 |
| Jones, Gail v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06536 |
| Kelly, Francine v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04308 |
| Knapp, Russell et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04314 |
| Kottkamp, Jeffrey and Cynthia v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06528 |
| Lamaa, Husein v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06850 |
| Leben, Roger and Janet v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04302 |
| Lebron, Lisa et al v. Breezes At Galloway, Inc. et al | USDC - Eastern District of Louisiana | 2:09cv06741 |
| Lukaszewski, Lynn and Thomas E. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06750 |
| Malkki, Donna and Sppo v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04311 |
| Mardeni, Marirose and Roberto v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06541 |
| Martinez, Tania v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06542 |
| Meister, Robert P., III v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv00860 |
| Metzl, Justin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06538 |
| Miller, Daniel Scott et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06849 |

*Omnibus Complaint

Related Actions

| Mitchell Company Inc v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04115 |
|---|---|---|
| Morris-Chin, Janet et al v. Knauf Plasterboard Tianjin Co., Ltd. et al | USDC - Eastern District of Louisiana | 2:09cv04119 |
| Navarro, Ronnie and Marivic v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05868 |
| Novello, Robin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01225 |
| O'Hear, Anne v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04312 |
| Olschewski, Krzysztof et al v. Centerline Homes, Inc. et al | USDC - Eastern District of Louisiana | 2:09cv06751 |
| Oves, Jose Francisco v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04301 |
| Pelligra, Anna v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04297 |
| Peterson, Derrick and Robin v. Treasure Coast Homes, LLC et al | USDC - Eastern District of Louisiana | 2:09cv04319 |
| Plaza, Ana Maria v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05871 |
| Ramsarran, Lloyd v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06544 |
| Riesz, Lawrence et al v. Knauf Plasterboard Tianjin Co., Ltd. et al | USDC - Eastern District of Louisiana | 2:09cv04116 |
| Rinaldi, Joseph J. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06540 |
| Rizzo, Ricardo et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04298 |
| Roberts, Steven and Jennifer et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05870 |
| Rosen, Michael and Robyn v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:11cv00337 |
| Rosen, Richard et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06537 |
| Rossi, Richard and Joanna v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01012 |
| Sardina, Raymond and Jennifer v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04304 |
| Sarkar, Immanuel v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06743 |
| Schatzle, Ralph and Judith v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04656 |
| Schurer, John v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04315 |
| Scritchfield, Ronald et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04306 |
| Sirota, Alli and Paul et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01218 |
| Skora, Gregory and Danielle v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04317 |
| Smith, Nancy v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04655 |
| Solabella Company Limited et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01219 |
| Souza, Juliana v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06842 |

*Omnibus Complaint

Case 2:09-md-02047-EEF-MBN Document 17214-13 Filed 10/28/13 Page 163 of 264
Case 2:09-md-02047-EEF-JCW Document 12001-3 Filed 12/20/11 Page 8 of 201
Related Actions

| | | |
|---|---|---|
| Starkman, Jeffrey and Sharlene v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06535 |
| Teefy, Thomas and Susan v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04310 |
| Trepkowski, Carrie and David v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04305 |
| Valdes, Enrique and Ivy v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04300 |
| Vickers, Karin et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04117 |
| Victores, Didio and Monica et al v. Lennar Homes, LLC et al | USDC - Eastern District of Louisiana | 2:09cv05872 |
| Villalta, Daniel and Yesenia v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04303 |
| Wisdom, Gloria C. and Katori and Patrick v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06744 |
| Zervos, Angelo and Gregoria v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06746 |
| Abreu, Daniel v. Gebrueder Knauf Verwaltungsgesellschaft, KG et al (Omnibus Class Action Complaint VIII) | USDC - Eastern District of Louisiana | 2:11cv00252 * |
| Alexander, Penny and Henry v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03135 |
| Allen, Darius et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05844 |
| Alonzo, Lana v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03959 |
| Amato, Dean and Dawn v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06805 |
| Ambrose, Rosalie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06096 |
| Amerson, Amy et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04275 |
| Ancira, Chris and Lilah v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03156 |
| Antoine, Gary V. and Patrice et al  v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03932 |
| Arndt, Dorothy et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG et al (Omnibus Class Action Complaint XII) | USDC - Eastern District of Louisiana | 2:11cv02349 * |
| Ashford, Otis et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07042 |
| Bailey, Deloris J. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06086 |
| Barone, John Joseph, III v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03243 |
| Bartholomew, Alexandra and Craig v. Knauf Plasterboard Tianjin Co., et al | USDC - Eastern District of Louisiana | 2:09cv07495 |
| Berthaut, Colin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03840 |
| Berthelotte, Anna et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04351 |
| Block, Robert W., III v. Gebrueder Knauf Verwaltungsgesellschaft, KG et al (Omnibus Class Action Complaint X) | USDC - Eastern District of Louisiana | 2:11cv01363 * |
| Bourg, Junius et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03426 |

*Omnibus Complaint

Related Actions

| | | |
|---|---|---|
| Broesder, Stan v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04381 |
| Brumfield, Ollie and Adrianne v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03535 |
| Bryant, Debra v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03634 |
| Carter, Daniel v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06087 |
| Carter, James and Alexis et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04147 |
| Cassagne, Jordan and Brande v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03637 |
| Cassidy, Jessica et al v. Gebrueder Knauf Verwaltungsgesellschaft KG et al. (Omnibus Class Action Complaint XIV) | USDC - Eastern District of Louisiana | 2:11cv03023 * |
| Ceruti, Ronald P. and Sharon L. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03526 |
| Chiappetta, Kevin David and Karen Ann  v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03923 |
| Clark, Carolyn v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06097 |
| Conrad, Ariane v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03309 |
| Cresson, Robert Anthony et al. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03427 |
| D'Amico, Daniel and Michelle v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04367 |
| D.R. Horton, Inc. - Gulf Coast v. Interior/Exterior Builing Supply et al | USDC - Eastern District of Louisiana | 2:10cv00804 |
| Dakin, Kim et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04274 |
| Davis, Lolita et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03525 |
| Defalco, John et al v. Gebrueder Knauf Verwaltungsgesellschaft, KG et al | USDC - Eastern District of Louisiana | 2:10cv04538 |
| Donaldson, Jill et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv02981 |
| Donnelly, Jerome and Daphine v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03635 |
| Dufrene, Rosetta and Ernest v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07358 |
| Dunn, Dianne et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04345 |
| Enclarde, Mary et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04513 |
| Eugene, Adrian v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06090 |
| Evans, Ronald et al v. Knauf Gips KG et al (1) | USDC - Eastern District of Louisiana | 2:09cv04102 |
| Evans, Ronald v. Knauf Gips KG et al (2) | USDC - Eastern District of Louisiana | 2:09cv04538 |
| Fazande, Dwayne and Latanja T. et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03479 |
| Fisher, Donald and Nadja v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03927 |
| Foret, Kimber and Ryan v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:10cv01553 |

*Omnibus Complaint

Related Actions

| | | | |
|---|---|---|---|
| Francis, Timothy and Ashley v. Colony Insurance Company et al | USDC - Eastern District of Louisiana | 2:10cv00720 | |
| Gardette, Michael and Nicole v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06094 | |
| Gilberti, Jeff et al v. Knauf Gips KG | USDC - Eastern District of Louisiana | 2:09cv03136 | |
| Greco, Vincent J. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03812 | |
| Green, William and Jamie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05874 | |
| Gritter, Joseph V. and Catherine et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04273 | |
| Gross, David/Benes, Mary Anne et al v. Knauf Gips KG et al (Omnibus Class Action Complaint III, III.A) | USDC - Eastern District of Louisiana | 2:09cv06690 | * |
| Guidry, Richard and Amy v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04122 | |
| Haindel, Mary v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03157 | |
| Hakenjos, Candace and Todd v. Tallow Creek LLC et al | USDC - Eastern District of Louisiana | 2:10cv02579 | |
| Harding, Matthew and Kristin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03836 | |
| Hernandez, Diane and John v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06103 | |
| Hopper, Dena and Dean v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05830 | |
| Hubbell, Wendy et al v. Tallow Creek, LLC, et al | USDC - Eastern District of Louisiana | 2:10cv02064 | |
| Jarrell, Chad and Darlene v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05828 | |
| Jaruzel, Karin and John v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03636 | |
| Jones, Daphne v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06085 | |
| Jordan, Richard and A. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07550 | |
| Joseph, Louise  v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06088 | |
| Kuykendall, Beverly v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06089 | |
| LeBlanc, Steven and Dana v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05946 | |
| Ledet, Darryl P. and Trisha A. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04323 | |
| Leverette, Donna and Gillette et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05845 | |
| Lewis, Jared and Emily v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07549 | |
| Lewis, Willie et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04101 | |
| Macombrer, Shawn et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03837 | |
| Maggiore, Peter and Frankie and Justin v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03926 | |
| Mai, Lien et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03422 | |

*Omnibus Complaint

Case 2:09-md-02047-EEF-MBN Document 17214-13 Filed 10/28/13 Page 166 of 264
Case 2:09-md-02047-EEF-JCW Document 17261-3 Filed 12/20/13 Page 9 of 204
Related Actions

| | | |
|---|---|---|
| Mai, Long et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03536 |
| Martin, Michael et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03425 |
| Maykut, Kent and Donna v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05944 |
| Mays, Gina et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03638 |
| McCrary, Rose et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04154 |
| Methvin, William and Deborah v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03930 |
| Meyer, Lawrence and Elizabeth et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03960 |
| Mills, Jeanette v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06752 |
| Mitchell, Crystal v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05337 |
| Mitchell, Kelsey and James G v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03192 |
| Moore, Evelyn et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04145 |
| Moreau, Patrick and Catherine v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04368 |
| Morlas, Ralph and Paula v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03265 |
| Myers, Christopher et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04146 |
| Myles, Jessie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06092 |
| North River Insurance Company v. Knauf International Gmbh et al. | USDC - Eastern District of Louisiana | 2:11cv01670 |
| Orduna, Judith and Albert v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06052 |
| Pastentine, Judith Ellen  v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06051 |
| Payton, Sean and Beth, et al v. Knauf Gips KG (Omnibus Class Action Complaint I, I.A, I.B, I.C) | USDC - Eastern District of Louisiana | 2:09cv07628 * |
| Pennington, Dorothy v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03838 |
| Peres, Tony and Kathy v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03961 |
| Perez, Sandra E. and Pedro v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03384 |
| Peters, Ronald v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06081 |
| Peyton, Sean and Beth v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03424 |
| Pierson, Neil and Jan v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06658 |
| Pizani, Calvin and Lindsey v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04287 |
| Price, Joshua and Kimberlea v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07170 |
| Roberts, Jeffrey D. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06082 |

*Omnibus Complaint

| Roberts, Mona et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03127 | |
|---|---|---|---|
| Robins, Kelvin Hayes et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07551 | |
| Robinson, Jerome and Ellen v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03282 | |
| Rogers, Joyce W., et al v. Knauf Gips KG (Omnibus Class Action Complaint IV, IV.A, IV.B, IV.C) | USDC - Eastern District of Louisiana | 2:10cv00362 | * |
| Ruesch, Kevin and Dorothy et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04660 | |
| Schields, Larry and Randall v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04344 | |
| Shelton, Michael and Leslie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05943 | |
| Simmons, Melinda and Andre et al  v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03639 | |
| Slidell Property Management, L.L.C v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06068 | |
| Smith, Gerry and Carlette v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06083 | |
| Smith, Tanika v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06091 | |
| St. Martin, Janeau v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06084 | |
| Staub, Marc and Dana et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04100 | |
| Stayton, Laurie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03193 | |
| Tabor, Edward and Emmilou v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03929 | |
| Theard, Avery and Tjaynell v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03931 | |
| Tromatore, Ronald and Peggy et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06093 | |
| Vu, Jessie et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv03423 | |
| Young, Raymond and Linda v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05945 | |
| Zubrowski, Linda and Michael v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06095 | |
| Adkins, Lynard v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05501 | |
| Alldredge, Rufus and Emily v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06553 | |
| Coats, Charles and Angela v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06511 | |
| Gagnard, Gary and Ann v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06551 | |
| Hillier, Billie and Carl v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06552 | |
| Huckabee, Harold v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06510 | |
| Langdale, James H. and Norman G. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07137 | |
| Legendre, Paul and Jaunet Carol v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06753 | |

*Omnibus Complaint

| Lowry Developments, LLC et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07552 |
|---|---|---|
| Mahner, John and Cynthia v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07135 |
| Oliver, Patches and Richard v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06509 |
| Palmer, Edith v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07136 |
| Perry, Timothy and Tracey v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv05500 |
| Pitre, David and Laurie v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06330 |
| Tenorio, Eric P. v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv06754 |
| Vinh, Le Van et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv07134 |
| Whitfield, Christopher et al v. Knauf Gips KG et al | USDC - Eastern District of Louisiana | 2:09cv04324 |
| Minafri, Steven v. M/I Homes, Inc. et al | USDC - Eastern District of Louisiana | 2:09cv04120 |
| Adams, Candace v. HPH Properties LLC | Alabama - Circuit Court of Shelby County | 2010cv977 |
| Adams, David et al v. HPH Properties et al | Alabama - Circuit Court of St. Clair County | 2011cv25 |
| Adamson, Mike and Beverly v. Capstone Partners LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv901753 |
| Bakane, John v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv26 |
| Bales, Dennis and Linda v. Capstone Partners, LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv900906 |
| Ballard, Monty and Suzanne v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv958 |
| Ballentine, Lester v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv37 |
| Bolle, Jonathan and Raeanne v. HPH Properties et al | Alabama - Circuit Court of St. Clair County | 2010cv140 |
| Bond, Arthur and Marilyn v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv955 |
| Buckley, Brenda v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv978 |
| Burns, Chris v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv35 |
| Burson, Glenda et al v. Vintage Home LLC et al | Alabama - Circuit Court of Jefferson County | 2008cv000317 |
| Burton, Lydell and Jenise v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv27 |
| Carlin, Charles and Yvonne v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000979 |
| Cash, Charles and Barbara v. HPH Properties LLC | Alabama - Circuit Court of St. Clair County | 2011cv28 |
| Chandler, John Eric and Jessica v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv40 |
| Chavous, George and Lorine et al v. Holman Building Co., LLC et al | Alabama - Circuit Court of Jefferson County | 2010-901890 |
| Conner, Cynthia v. Holman Building Co. et al | Alabama - Circuit Court of Jefferson County | 2010cv2944 |

*Omnibus Complaint

| Cook, William and Wendy v. HPH Properties, LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv903410 |
|---|---|---|
| Cowart, Patricia and Jerry v. Capstone Partners, LLC et al | Alabama - Circuit Court of Jefferson County | 2009cv900456 |
| Cox, Donnis and Thomas v. Eddleman Homes, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv900771 |
| Crawford, Daniel and Sarah v. Continental Construction, LLC et al | Alabama - Circuit Court of St. Clair County | 2010cv900073 cons. with 2010cv900099 |
| Daniel, Michael and Monica v. Liberty Park Join Venture LLP et al | Alabama - Circuit Court of Jefferson County | 2010cv904442 |
| Daniel, William E, Jr. and Grace v. Brantley Homes, Inc. et al | Alabama - Circuit Court of Shelby County | 2010cv900717 |
| Davidson, T. Blake and Devon v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000956 |
| Davis, William and Lucinda v. Interior Exterior Supply L.P. et al. | Alabama - Circuit Court of Jefferson County | 2010-903185 |
| Davis, William Jr. and Nancy v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000959 |
| Donnelly, Paul et al v. Eddleman Properties, Inc. et al | Alabama - Circuit Court of Shelby County | 2010cv900495 |
| Eddleman Homes LLC et al. v. Knauf USA et al | Alabama - Circuit Court of Jefferson County | 2010cv904507 |
| Edmonds, Lee and Susan v. Lifescape Builders LLC et al. | Alabama - Circuit Court of Jefferson County | 2010cv003112 |
| Felton, Kenturah v. Holman Building Co. LLC | Alabama - Circuit Court of Jefferson County | 2010cv3199 |
| Forbes, William and Mary v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000960 |
| Ford, Summer and Jason v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv42 |
| Foster, Daniel J. and Brenda B. v. Capstone Partners LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv901754 |
| Fowler, David and Nan v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000961 |
| Freeland, Andrew and Emily v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000980 |
| Gibbs, Michael and Eileen v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000964 |
| Gordon, Russell and Judy v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000976 |
| Griffiths, Lilly Gaye v. HPH Properties, LLC et al | Alabama - Circuit Court of St. Clair County | 2010cv141 |
| Grosfeld, Radolph and Donna v. Lifescape Builders LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv003110 |
| Haralson, Tommy and Sandra et al v. Eddleman Homes, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv900700 |
| Harbour, James and Jennifer v. Lifescape Builders LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv003109 |
| Headley, Art and Mary v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000957 |
| Helm, Melina and Gary v. Hendrickson Construction, LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv902864 |
| Henderson, Robert et al vs. The Mitchell Company, Inc. et al | Alabama - Circuit Court of Mobile County | 2009-901381 Cons. with CV-09-901118 + CV-09-901153 |

*Omnibus Complaint

| Hensley, Donna v. The Houston Company and Phillip Houston | Alabama - Circuit Court of Jefferson County | 2008cv000316 |
|---|---|---|
| Hill, Chris v. Holman Building Co., LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv002945 |
| Hoit, Charles and Leta v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000963 |
| Hontzas, Betty v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000981 |
| Hopkins, Terrell and Raeshonda v. Holman Building Co., LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv002942 |
| Hutson, April v. HPH Properties, LLC et al | Alabama - Circuit Court of St. Clair County | 2010cv144 |
| Jackson, Valerie v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv29 |
| Jones, Roy and Carol v. Jimmie Parker Custom Homes, Inc. et al | Alabama - Circuit Court of Shelby County | 2010cv9000936 |
| Jones, Starla v. Stonecrest Builders LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000973 |
| Jones, Steven and Jessica v. HPH Properties LLC et al | Alabama - Circuit Court of Shelby County | 2010cv900237 |
| King, Gregory and Wendy v. HPH Properties LLC | Alabama - Circuit Court of St. Clair County | 2011cv30 |
| Kramer, Eric and Lori v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv38 |
| Lay, Stephen and Kristen v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv39 |
| Lifescape Builders LLC and Liberty Park Joint Venture LLP vs. Knauf Insulation GmbH a/k/a Knauf USA; et al. | Alabama - Circuit Court of Jefferson County | 2010cv001165 |
| Little, Diges E. et al. v. The Mitchell Company, Inc. et al | Alabama - Circuit Court of Mobile County | CV-09-901153 Cons. with CV-09-901118 + 2009-901381 |
| Lybarger, Rayman and Chong Suk v. HPH Properties LLC | Alabama - Circuit Court of St. Clair County | 2011cv41 |
| McClure, Paul and Tamla v. Interior Exterior Building Supply LP et al | Alabama - Circuit Court of Jefferson County | 2010cv002343 |
| Metheny, Bryance and Julie v. Lifescape Builders LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv003113 |
| Moulin, William and JoAnn v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000965 |
| Nearing, Wayne and Virginia v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000968 |
| Nguyen, Katie and Knanh Duc Luong v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000971 |
| Nguyen, Thach and Minthu Lee v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000982 |
| Nichols, John and Pamela v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000966 |
| Nichols, W. Barrett and Linda v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000983 |
| Patel, Mayur v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000984 |
| Peace, Dan and Sharon v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000962 |
| Penala, Sadanandam et al. v. HPH Properties, LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv903404 |

*Omnibus Complaint

| Perez, Edgar v. HPH Properties, LLC et al | Alabama - Circuit Court of St. Clair County | 2010cv139 |
|---|---|---|
| Prichard Housing Authority v. The Mitchell Company et al. | Alabama - Circuit Court of Mobile County | CV-09-901118 Cons. with 2009-901381 + CV-09-901153 |
| Prickett, Javis B. et al v. HPH Properties LLC | Alabama - Circuit Court of St. Clair County | 2011cv31 |
| Ramsey, Keith v. Holman Building Co. LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv904465 |
| Ranelli, Frank and Rosalind v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000986 |
| Reeser, Darrell v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv34 |
| Rice, James and Leigh et al v. Lifescape Builders, LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv901053 |
| Robinson, Linda v. HPH Properties, LLC et al | Alabama - Circuit Court of St. Clair County | 2010cv142 |
| Rogers, Vanessa Van Giessen v. Stonecrest Builders LLC | Alabama - Circuit Court of Shelby County | 2010cv000972 |
| Sargent, Judith et al v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv900261 |
| Scott, Brenda v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv36 |
| Scott, Gregory and Joan v. Interior Exterior Building Supply LP et al | Alabama - Circuit Court of Jefferson County | 2010cv902555 |
| Seifert, Charles and Lois v. Stonecrest Home Builders, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv900684 |
| Sharit, Juanita v. HPH Properties, LLC et al | Alabama - Circuit Court of St. Clair County | 2010cv143 |
| Simon, David and Andrea  v. HPH Properties et al. | Alabama - Circuit Court of Shelby County | 2010cv000985 |
| Spivey, Sharon v. Holman Building Co., LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv002943 |
| Stastny, Steven and Lauren v. Lifescape Builders LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv003111 |
| Stephenson, Randy Lynn v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv32 |
| Sumner, David and Amy v. Eddleman Homes LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000967 |
| Supernaugh, John and Deborah v. HPH Properties LLC et al | Alabama - Circuit Court of St. Clair County | 2011cv33 |
| Velazquez, Andrew and Romney v. Lifescape Builders LLC et al | Alabama - Circuit Court of Jefferson County | 2010cv003114 |
| Wallace, Stephen and Jeanie v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000974 |
| Wallace, Stephen and Walter (Trustees of Katherine Dutton) v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000975 |
| Walters, Charles and Suzanne v. HPH Properties, LLC et al | Alabama - Circuit Court of Shelby County | 2010cv000954 |
| Zortorres, Tracey v. Holman Building Co., LLC | Alabama - Circuit Court of Jefferson County | 2010cv003201 |
| Alvarez, Emilio and Martha I. vs. Eastern Construction Group Inc. et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 09-071623-CA-42 |
| Banner Supply, LLC v. Hinkle Drywall, LLC et al | Florida - Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County | 10-006882 |

*Omnibus Complaint

| Bullock, Craig v. Knauf Plasterboard Tianjin Co. Ltd. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 11-0078 CA 08 |
|---|---|---|
| Camposano, Francisco and Maria Del Pilar v. Knauf Gips KG et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 10-45796 CA 42 |
| Carroll, Gary and April v. J.S.D. Builders, Inc. | Florida - Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County | 50 2010CA015432XXXX |
| Crawford, Scott and Dawn vs. Master Builders of South Florida Inc. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 10015295 |
| Echevarria, Joel and Moraima v. Knauf Plasterboard (Tianjin) Co., Ltd. et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 10-64471 CA 08 |
| Falke, Kenneth and Maureen vs. Masters Builders of South Florida Inc. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 9047546 |
| Foster, Katherine vs. Northstar Holdings Inc et al | Florida - Circuit Court of the Fifteenth Judicial Circuit, in and for Palm Beach County | 2009CA014594 |
| Fulks vs Paul Homes, Inc., et al | Florida - Circuit Court of the Twentieth Judicial Circuit in and for Charlotte, Collier, Glades, Hendry and Lee Counties | 09-CA-001747 |
| Garcia, Jose and Elizabeth v. Knauf Plasterboard (Tianjin) Co. Ltd. et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 11-06615 CA 42 |
| Gesualdo, Domenic and Darlene vs. Master Builders of South Florida Inc. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 9054664 |
| Glickman, David and Joan vs. Master Builders of South Florida | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 9042551 |
| Harrell, Jason and Melissa v. South Kendall Construction et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 09-08401CA(42) |
| Hershoff, Jay and Nancy v. Knauf Gips et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 10-61008 CA 42 |
| HWB Construction, Inc. et al v. Knauf Gips KG et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 10-30149 |
| KB Home Orlando LLC v. Central Florida Finishers, Inc. | Florida - Circuit Court of the Tenth Judicial Circuit in and for Polk County | 53-2010CA-004265, Sec 4 |
| Lennar Homes LLC v. Knauf Gips KG et al. | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 09-07901 CA 23 |
| Levy, Jeffrey T. and Karen B. v. Emerald Greens at Carrollwood LLC et al | Florida - Circuit Court of the Thirteenth Judicial Circuit for Hillsborough County | 10012855 Div. 1 |
| Mackle, Frank et al vs. CDC Builders et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 056362-CA-13 |
| Metzl, Justin M. v. Lennar Corporation, et al. | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 09-31980 CA (42) |
| Mollano, Ida v. Knauf Plasterboard Tianjin Co. Ltd. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 11cv13147 |
| Raio, Joseph vs. Master Builders of South Florida, Inc. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 9052483 |

*Omnibus Complaint

| Robin, Jeffrey and Elisa v. Knauf Plasterboard (Tianjin) Co. et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 2010-059323-CA-01 |
|---|---|---|
| Rodriguez, Frank and Jeanette v. Knauf Plasterboard Tianjin Co. Ltd. et al | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | 10-64481 CA 30 |
| Russo, Charles and Melinda v. Knauf Plasterboard (Tianjin) Co. Ltd. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 11005012 |
| San Filippo, Keith and Linda vs. Master Builders of South Florida, Inc. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 9042256 |
| Seifart, Armin G. and Lisa M. Gore vs. Knauf Gips KG et al. | Florida - Circuit Court of the Eleventh Judicial Circuit, in and for Miami-Dade County | CV09-38887 CA (42) |
| Siegel, William and Sandra vs. Master Builders of S. Florida | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 9049418 |
| Synalovski, Manuel and Lisa v. Knauf Plasterboard Tianjin Co. Ltd. et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 10-41716 CA 12 |
| Westchester Surplus Lines Insurance Company Westchester Surplus Lines Insurance Company (a/s/o Nunno Builders, Inc.) v. Knauf Gips KG et al | Florida - Circuit Court of the Seventeenth Judicial Circuit, in and for Broward County | 10 46310 |
| Alexander, Derrick v. General Fidelity Insurance Company et al | Louisiana - Civil District Court, Orleans Parish | 2010-8237 |
| Back, Charles and Mary v. Interior Exterior Building Supply, L.P. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-15030 I |
| Barlow, John and Regine v. L.A. Homes, Inc. | Louisiana - 24th Judicial District Court for the Parish of Jefferson, Louisiana | 676-194F |
| Barrow, Clarence and Marion v. Hilliard Butler Construction Co., Inc. et al. | Louisiana - Civil District Court, Orleans Parish | 2010-9182 Div. K-5 |
| Barry, John T. and Sandra v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17564 |
| Blue, John B. and Rachelle vs. Interior/Exterior Building Supply L.P. et al | Louisiana - Civil District Court, Orleans Parish | 2009-09641 |
| Borne, Barry and Mary v. Interior Exterior Building Supply L.P. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-15104-I |
| Boudreaux, Virginia Richard v. Big Bear Construction Co., Inc. et al. | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-14915 H |
| Braselman, Holly and Ryan v. Interior Exterior Building Supply L.P. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-15310A (Replaces 2009-15102 G) H |
| Bronaugh, David and Heather vs. Savoie Construction, Inc. et al. | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | |
| Butler, James and Joycelyn et al v. Interior Exterior Building Supply L.P. et al | Louisiana - Civil District Court, Orleans Parish | 2009-11702 13 |
| Cambre, David C. and Jessica H. v. M. Carbine Restorations Ltd. et al | Louisiana - Civil District Court, Orleans Parish | 2010-11192 |
| Caminita, Jennifer and Frank v. Regina wife of/ and Barney Core, Smith and Core, Inc. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 100,021 F |
| Caminita, Michael R. Jr. and Johanna F. v. Levet Homes LLC et al | Louisiana - Civil District Court, Orleans Parish | 2010-07867 |
| Campos, Carlos A. v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-9920 Sec. G-11 |

*Omnibus Complaint

| Carey, Charles E. and Catherine A. v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17231 |
|---|---|---|
| Carroll, Cynthia et al. v. Interior Exterior Building Supply, LP et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010 - 11897 H |
| Cathcart, Jeff and Robin and Amber v. v. Interior Exterior Building Supply, LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-06013 |
| Cheramie III, Bertoul J. and Joan B. v. Oak Tree Homes, Inc. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14992 |
| Copeland, Robert M. and Nancy A. v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-13004 E-7 |
| Crosby, Patrick and Jennifer v. Knauf Gips KG et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-12795 A |
| Crovetto, Barbara v. Interior Exterior Building Supply LP | Louisiana - 21st Judicial District Court for the Parish of Tangipahoa, Livingston and St. Helena | 2010-0004498 |
| Cunningham, Dennis and Susan v. Sun Construction, LLC et al | Louisiana - Civil District Court, Orleans Parish | 2010-4203 |
| d'Hemecourt, Thomas and Marcelle v. Gremillion Homes, Inc. | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-16743 I |
| Daigle, Theresa and Rodney v. Tallow Creek LLC et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-17466 |
| Darensbourg, Mark and Barbara v. Cretin Homes, Inc. et al. | Louisiana - Civil District Court, Orleans Parish | 2010-9358 Div. C-10 |
| Dauterive, Val J. Jr. and Margaret et al. v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17219 |
| Dennis, Patrick and Kathleen v. Interior Exterior Building Supply, L.P. et al | Louisiana - Civil District Court, Orleans Parish | 2009-8144 |
| Donaldson, III, Malcolm and Kelli v. Interior/Exterior Building Supply, Limited Partnership et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-12370 D |
| Dorsey, Mark and Shalanda Zoe v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-1770 |
| Dupree, Melissa v. Interior Exterior Building Suppply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-13005 M-13 |
| Fernandez, Vernon and Joann v. Knauf Gips et al | Louisiana - 21st Judicial District Court for the Parish of Tangipahoa, Livingston and St. Helena | 10-0002195 C |
| Finger, Simon and Rebecca v. Interior Exterior Building Supply, L.P. et al | Louisiana - Civil District Court, Orleans Parish | 2009-07004 |
| Flattmann, Grady J. and Laura L. v. Tallow Creek LLC et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-14914 |
| Francis, Carrol A. v. PHL Construction, LLC et al | Louisiana - 19th Judicial District Court for the Parish of East Baton Rouge | 595110 |
| Gagnon, Chad and Amy v. Interior Exterior Building Supply, LP et al | Louisiana - Civil District Court, Orleans Parish | 09-13031 |
| Galatas, Bernadette v. Oak Tree Homes Inc. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-15545 |
| Galloway, James and Cynthia v. Interior Exterior Building Supply L.P. | Louisiana - Civil District Court, Orleans Parish | 2010-1260 I/14 |

*Omnibus Complaint

Related Actions

| | | |
|---|---|---|
| Gammage, Daniel D. v. Interior Exterior Building Supply LP et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-10674 D |
| Gardette, Michael and Rhonda v. Sun Construction, LLC et al | Louisiana - Civil District Court, Orleans Parish | 2010-4380 |
| Genovese, Karen F. v. Resource Rental and Renovation LLC et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14616 |
| Gleason, Herman and Deborah v. Summit Contractors, Inc. et al | Louisiana - Civil District Court, Orleans Parish | 2010-04292 |
| Gorman, Thomas M. et al. v. Knauf Gips KG et al | Louisiana - Civil District Court, Orleans Parish | 2011-7737 K-5 |
| Harbison, Paula v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17223 |
| Harding, Matthew and Kristin et al. v. LA Homes Inc. et al | Louisiana - 24th Judicial District Court for the Parish of Jefferson, Louisiana | 679-634 A |
| Harris, Norman and Corliss v. JandH Drywall Supplies, LLC et al (2) | Louisiana - Civil District Court, Orleans Parish | 2010-5564 |
| Henderson, Linda v. J and J Builders Northshore Inc. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-13605 |
| Jefferson, Trenace and James v. Pro Builders and Restoration of Louisiana LLC | Louisiana - 21st Judicial District Court for the Parish of Tangipahoa, Livingston and St. Helena | 2009-0003300 |
| Kee, Michael A. and Pamela H. v. Holmes Building Materials, LLC et al | Louisiana - 19th Judicial District Court for the Parish of East Baton Rouge | C593592, Sec. 24 |
| Kehoe, Molly v. Interior Exterior Building Supply L.P. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-15458 I |
| King, David and Mary vs. Interior/Exterior Supply, LP et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-12378 |
| Lartigue, Clement W. and Margaret C. v. Team Work Construction LLC et al | Louisiana - 24th Judicial District Court for the Parish of Jefferson, Louisiana | 690-973 Div. K |
| Lee, Max and Blakeley v. Interior Exterior Building Supply LP et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2011-11791 A |
| Marrero, Charlene Green v. Interior Exterior Building Supply et. al. | Louisiana - Civil District Court, Orleans Parish | 2009-05916 |
| Mason Jr., Hiram L. v. Springhill LLC et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14872 |
| McAvoy, Michael and Atara v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-07442 |
| Mills, Jeanette F. v. E. Jacob Construction, Inc. et al | Louisiana - 19th Judicial District Court for the Parish of East Baton Rouge | C581172-25 |
| Monte, Frank J. and Marti S. v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-12675 N-8 |
| Naden, Craig and Roberta v. Acadian Builders and Contractors LLC et al | Louisiana - 23rd Judicial District Court for the Parish of Ascension | 97417 |
| Nieto, Peter v. Regina wife of/ and Barney Core, Smith and Core, Inc. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 100,020 D |
| Nunez, Frederick D. and Lisa v. Arthur Homes LLC et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14805 |
| Oster, Donald and Betty v. v. Southern Homes, LLC et al | Louisiana - Civil District Court, Orleans Parish | 2010-05481 N-8 |

*Omnibus Complaint

| | | |
|---|---|---|
| Piwetz, Randy L. and Jeanne v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17214 |
| Pizani, Lindsey and Calvin v. Ciara Homes LLC et al | Louisiana - 24th Judicial District Court for the Parish of Jefferson, Louisiana | 677080 |
| Poole, Sam III and Valerie v. John L. Crosby LLC et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-14897 D |
| Quilo, Sandra v. Lee Roy Jenkins | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14073 |
| Reece, Ryan and Ashlin v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-08131 |
| Roberson, Sandra v. E. Jacob Construction, Inc. et al | Louisiana - Civil District Court, Orleans Parish | 2010-06716 - I-14 |
| Rogers, Joyce W. v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17226 |
| Rome, Erwin J. III and Karen G.v. Interior Exterior Building Supply LP et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14410 |
| Ross, Terrence M. and Rhonda B. v. C. Adams Construction and Design LLC et al | Louisiana - 24th Judicial District Court for the Parish of Jefferson, Louisiana | CV-676-185 |
| Savoie and Savoie, III LLC v. HC Seals Drywall Partners et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17607 |
| Segreto, Mark R. and Victoria v. Interior Exterior Building Supply LP | Louisiana - Civil District Court, Orleans Parish | 2010-11600 |
| Southern Homes, LLC et al v. Interior Exterior Building Supply, Inerior Exterior Enterprises, South Cortez, L.L.C. | Louisiana - Civil District Court, Orleans Parish | 2009-06564 |
| Stanfield, Sidney S. Jr. v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17567 |
| Temperato, Cynthia and John v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2011-10268 J |
| Thompson, Melanie L. v. David E. Diggs et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-16137 |
| Verrett, Chavis M. and Catherine M. v. Interior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-11404 G |
| Waguespack, Jacques v. Knauf Gips KG et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-14371 A |
| Ward, Truman L. and Amy G. v. Acadian Builders and Contractors LLC et al | Louisiana - 23rd Judicial District Court for the Parish of Ascension | 97,352 |
| Wayne, William and Kelly v. Knauf Gips KG et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2009-13466 A |
| Wheeler, Alicia v. Ming K. Wong et al. | Louisiana - Civil District Court, Orleans Parish | 2010-2773 |
| White, John K. and Harriet B. v. Alvin R. Savoie and Associates, Inc. et al | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-14756 |
| White, Taeneia v. E. Jacob Construction, Inc. et al | Louisiana - Civil District Court, Orleans Parish | 2010-06622 E |
| Whittington, Thomas and Karen v. Interior Exterior Exterior Building Supply LP et al | Louisiana - Civil District Court, Orleans Parish | 2010-06699 I-14 |

*Omnibus Complaint

Case 2:09-md-02047-EEF-MBN  Document 17211-3  Filed 10/29/13  Page 177 of 264
Case 2:09-md-02047-EEF-JCW  Document 12061-3  Filed 12/20/11  Page 20 of 20
Related Actions

| Wood, Pamela Ann v. Interior Exterior Building Supply LP | Louisiana - 22nd Judicial District Court for the Parish of St. Tammany | 2010-17215 |
|---|---|---|
| Zeber, Michele D. and Neal A. v. SEC Enterprises LLC et al | Louisiana - 19th Judicial District Court for the Parish of East Baton Rouge | C582192 Section 23 |
| Clark, Marilyn et al. v. Knauf Gips et al | Mississippi - Circuit Court of the 1st Judicial District of Harrison County | A2401-2010-418 |
| Ladner, Shea Michael et al. v. Knauf Gips KG et al. | Mississippi - Circuit Court of the 1st Judicial District of Harrison County | A2401-11-128 |
| Newman, Kyle E. and Denise v. Knauf Gips et al | Mississippi - Circuit Court of the 1st Judicial District of Harrison County | A2401-2010-419 |
| Sand, David and Jacqueline et al. v. Knauf Gips et al. | Mississippi - Circuit Court of the 1st Judicial District of Harrison County | A2401-11-127 |
| Sanderford, Anita and James and Wes v. Knauf Gips et al | Mississippi - Circuit Court of the 1st Judicial District of Harrison County | A2401-11-225 |

*Omnibus Complaint

# EXHIBIT F

**Exhibit F**

**REMEDIATION PROTOCOL**

I.     **Scope of Work**

The remediation work to be performed in a KPT Property is described generally below. In conducting the remediation work and in resolving any disputes pursuant to the dispute resolution process in the Settlement Agreement (reprinted in Paragraph V below), the KPT Property Owner and Lead Contractor or Other Assigned Contractor agree that the objective of the remediation work is to remove on a cost effective basis all drywall, problem drywall-related odors, and contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"); and to leave the KPT Property with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the remediation work.

A.     **Drywall Removal**.  Removing and replacing all drywall in the home, including ceilings, with the exception of the following materials unless removal of such materials is required in order to complete the Remediation Work pursuant to this Scope of Work:

   1.     Type X fire rated board

   2.     Thicknesses other than ½"

   3.     Moisture Resistant Drywall ("Green board")

   4.     Sag Resistant Gypsum Board

   5.     Tile Backer Board

B.     **Electrical Wiring**.  Remove and replace all electrical wiring (including low-voltage wiring), switches, service panels, circuit breakers, receptacles, and all Contaminated circuit boards.

C.     **Fire Safety and Home Security Equipment**.  Remove and replace all fire safety equipment, including security alarms, intercoms, smoke detectors, fire suppression sprinkler systems, and carbon monoxide alarms.

D.     **Copper gas lines.** Replace all copper gas lines and fittings.  All other gas lines and fittings will be inspected for Contamination and replaced if Contamination is found.

E.     **Fixtures.**   Remove, store and reinstall the following to the extent such fixtures interfere with the removal of the drywall as described in Paragraph A.  Otherwise, such fixtures will remain in place with suitable protection.  In the event of any

Contamination to such fixtures caused by the possible problem drywall or damage from the drywall removal and replacement, such fixtures will be replaced.[1]

1. Hot water heaters

2. Cabinets

3. Countertops

4. Doors

5. Moldings and trim as required to remove drywall as described in Paragraph A

6. Sinks

7. Toilets

8. Bathtubs, shower enclosures

9. Mirrors

10. Lighting fixtures

11. Ceiling fans

12. Plumbing fixtures

13. Exhaust Grills and Diffusers

14. Marble, granite and other natural-stone pieces

15. Doors and attached door hardware

F. **Dust Control and Removal**. Remove the drywall using methods for dust control routinely used in drywall renovation projects.

1. These control methods typically include installation of drop cloths and walk-off mats, negative pressurization of work area with exhaust fans, and cleanup of dust and debris.

2. Following the removal of all drywall as described in Paragraph A, sweep all bulk debris and remove from site.

3. Following the sweeping, vacuum all surfaces including wall cavities using vacuums equipped with drywall bags and/or, where appropriate or

---

[1] In the event that equipment, appliances or fixtures need replacement, the replacement will be with new equipment, appliances or fixtures and not with reconditioned ones.

necessary, HEPA (high efficiency particulate air) filters, to remove drywall dust.

    4.    Damp wipe all surfaces with water.

    5.    As a final step, use Odorox® hydroxyl generators to resolve any residual indoor air problems.

G.    **HVAC**.  The following HVAC repairs will be performed by a manufacturer-qualified firm, but if such firm is not available, by a licensed HVAC technician.

    1.    Remove and replace all air handler units, including the coils.

    2.    Remove and replace all line sets.

    3.    Replace thermostats in affected areas and control boards in affected air handling units; and otherwise clean and/or replace as needed the air handler.

    4.    Replace over limit controls on electric heating coils in affected units.

    5.    Remove and replace the flexible duct work.

    6.    Inspect and clean the metal duct work.

    7.    Remove and replace all other damaged HVAC system components.

H.    **Insulation.**  Remove and replace porous insulation and repair or replace as necessary non-porous insulation in direct contact with the drywall to be removed.

    1.    Porous Insulation

        a)    Fiber glass insulation

        b)    Cellulose insulation

        c)    Open cell foam insulation

    2.    Non-Porous Insulation

        a)    Closed cell foam insulation

        b)    Reflective insulation

I.    **Carpet and Flooring.**  Remove and replace all carpet, carpet padding, laminate flooring and laminate padding.  All other flooring will remain in place and be protected during the remediation work.

J.     **Plumbing**.

    1.    Remove and replace all affected plumbing components that either show discoloring or pitting on exposed components such as faucets, and handles.

    2.    All other piping, fittings and components to be inspected, cleaned of any Contamination, and, if functionally unaffected, remain in place.

K.     **Appliances**.   Appliances shall mean refrigerators, freezers, dishwashers, washers, dryers, garbage disposals, wine coolers, ice machines, microwaves, cooktops, ovens, ranges and warming drawers.

    1.    For KPT Properties that are less than or equal to 3,500 square feet "under air," as determined by the Lead Contractor or Other Approved Contractor ("Under Air Area") and as set forth in the attached Sample Contractor-KPT Property Owner Agreement, remove and replace refrigerators and freezers located in the kitchen, wine coolers, ice machines, microwaves, cooktops and ovens.  All other Appliances, including, secondary and auxiliary refrigerators and freezers, shall be removed and replaced where the performance or appearance is compromised, for example, where there is Contamination.

    2.    For KPT Properties that have an Under Air Area greater than 3,500 square feet, all Appliances shall be removed and replaced where the performance or appearance is compromised.

L.     **Items not Replaced**.  Building materials, building systems, fixtures and Appliances that will be removed and reinstalled shall be placed in storage. Building materials, building systems, fixtures and Appliances that will be retained in place will be protected during the remediation work.  Any Building materials, building systems, fixtures or Appliances that are retained, but damaged during the remediation work, will be restored to the condition that existed prior to the start of the remediation work, and where necessary, replaced.

M.     **Finishing**.  Finish and paint all new drywall using a primer and two coats of paint of the same color and finish (*e.g.* flat, eggshell, satin, semi-gloss, and glossy).

N.     **Final Cleaning**.  Clean the Home to pre-repair condition, which will be documented prior to the start of the remediation work.

O.     **Documentation and Preservation**.  In the course of remediation, the contractor will fully document the remediation work using photographic and other documentation methods, including but not limited to identification of the manufacturer and condition of the possible problem drywall on a room by room, wall by wall and board by board basis.  At the option and sole expense of KPT, all possible problem drywall and fixtures, wiring, fire safety equipment, plumbing, wiring, carpets, and appliances or other items removed from the home will be maintained for scientific analysis.

P.   **Government Agency Access.**  Relevant government agencies, including but not limited to the Consumer Product Safety Commission, will be allowed to observe the remediation work and given access to the documentation materials and items described in Paragraph I (O).

II.   **Form of Agreement between Contractor and KPT Property Owner**

The agreement by which the Lead Contractor, or Other Approved Contractor, will perform the remediation work in the KPT Property shall take the form of the attached Sample Agreement between Contractor and KPT Property Owner.

III.   **Contractor and Environmental Certification**

A.   After completion of the Drywall Removal and Dust Control and Removal pursuant to Paragraphs I (A) and (F) above, the Lead Contractor or Other Approved Contractor will provide the Settlement Administrator and KPT Property Owner with a Contractor Certification substantially in the form of Exhibit 6 to the attached Sample Agreement between Contractor and KPT Property Owner.

B.   After receiving the Contractor Certification, the Settlement Administrator will assign an environmental inspector to certify the absence in the KPT Property of any remaining problem drywall-associated odors and contamination, including, but not limited to, corrosion, tarnishing, and pitting.

1.   If the environmental inspector concludes the KPT Property is free of any and all KPT Chinese Drywall and Non KPT Chinese Drywall ("Problem Drywall") associated odors and contamination, the environmental inspector will provide an Environmental Certificate (in the form attached as Exhibit B to the Settlement Agreement) to the Settlement Administrator and the KPT Property Owner certifying that the home is free of any and all Problem Drywall-associated odors and contamination.

2.   If the Environmental Inspector concludes the KPT Property is not free of any and all Problem-Drywall associated odors and contamination, the Lead Contractor, or Other Approved Contractor, will continue to remediate any issues identified by the environmental inspector until such time that the environmental inspector concludes the KPT Property is free of any and all Problem-Drywall associated odors and contamination, in which case the environmental inspector will provide the Environmental Certificate as specified in the above subparagraph II (B) (1).

C.   The KPT Property Owner and/or his counsel, upon sufficient notice, shall have the right to be present, but not to interfere with, any environmental inspection by the environmental inspector, and to videotape, or otherwise make a record of, such inspection.  The costs of the environmental inspector will be paid by the Remediation Fund.

IV. **Warranty**

    A.    The Lead Contractor, or Other Approved Contractor, will provide the KPT Property Owner with a warranty substantially in the form of the warranty provided for in the attached Sample Agreement between Contractor and KPT Property Owner.

    B.    If Lead Contractor, or Other Approved Contractor, does not perform, or is unable to perform, work required by the warranty described in subparagraph IV (A), the Remediation Fund will assume responsibility for procuring substitute performance under the warranty ("Guaranty of Warranty").

    C.    The Lead Contractor, or Other Approved Contractor, is responsible for satisfaction of all material and labor liens placed on the KPT Property in connection with the remediation work.

V. **Dispute Resolution** (reprinted from Sections 4.5.1.2.1 and 4.5.1.2.2 of the Settlement Agreement)

    A.    In the event that a dispute arises between a KPT Property Owner and the Lead Contractor or Other Approved Contractor over the Remediation Protocol for the individual KPT Property, such dispute shall be submitted to the Special Master who will resolve the dispute. The parties shall cooperate with the Special Master to resolve any disputes expeditiously and avoid, to the maximum extent possible, any delay in the remediation.

    B.    Any expenses associated with a dispute between a KPT Property Owner and the Lead Contractor or Other Approved Contractor ("Mediation Expenses") as regards the Remediation Protocol, including progress and quality, and any warranties provided by the Contractor, will be jointly shared by the Knauf Defendants and the KPT Property Owner. In the event that disputes asserted by a Party, either singly or in combination, unreasonably delay the remediation or are asserted in bad faith, the Special Master may in his discretion direct that the Mediation Expenses incurred in resolving any such bad faith disputes asserted by that Party will be paid by same, regardless of whether the Special Master resolves the dispute in that Party's favor; otherwise, expenses will be shared equally by the Parties to the dispute.

VI. **Ombudsmen**

The KPT Property Owner shall be able to consult with an Ombudsman, as that term is defined in Section 1.42 of the Settlement Agreement, regarding matters relating to the remediation process, including, but not limited to, the actual remediation work, and, in the event that a dispute arises during the dispute resolution process described in Paragraph V above.

# EXHIBIT F-1

## Sample Agreement between Contractor and KPT Property Owner

# THIS DOCUMENT HAS LEGAL CONSEQUENCES. PLEASE READ THIS DOCUMENT CAREFULLY AND CONSULT WITH YOUR ATTORNEY AS YOU DEEM NECESSARY BEFORE SIGNING

**This Agreement between Contractor and Property Owner ("Work Authorization") defines the specific work necessary to complete remediation of the Property indicated below, and authorizes the Contractor to perform this work. The terms below are subject to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 ("Settlement Agreement" attached as Exhibit 1), which the KPT Property Owner ("Property Owner") should carefully review with counsel prior to signing.**

The Property Owner and the Contractor, as agent for the Knauf Defendants (defined in Section 1.1.1 of the Settlement Agreement), agree as follows:

**Property Owner:**
Name:
Address:

**Contractor:**
Name:
Address

**Project:**
Remediation of property located at:
Street:
City:

**Estimated Move-Out Date:**
**Estimated Substantial Completion Date:**

**Under Air Square Footage of Home:**

The Property Owner and Contractor have reviewed the work necessary to accomplish the remediation of Chinese drywall, as described in the Remediation Protocol, Exhibit F to the Settlement Agreement, attached to this Work Authorization, and have agreed that this work consists of the following items, which are attached:

1. Terms and Conditions of the Work Authorization Agreement
   a. Appliance, Fixture, Equipment and Fire System Schedule
   b. Room Finish Schedule

**Page 1 of 15**

     c.  Schedule of Work – Detailed room by room description of the scope of
       remediation work (attached as Exhibit 2)
2.  Remediation Protocol (attached hereto as Exhibit 3)
3.  Requirements for Move-Out/Move-In (attached as Exhibit 4)
4.  Contractor Insurance Certificates (attached as Exhibit 5)
5.  Contractor Certification (attached as Exhibit 6)
6.  Property Owner Release of Contractor (attached as Exhibit 7)
7.  American National Standard for Single Family Residential Building, Method for
    Calculating Square Footage (attached as Exhibit 8)

Photographic and/or videographic documentation of the existing interior of the Property,
including, but not limited to, fixtures and finishes will be included as a reference.  In
addition, if this box is checked [__], the following original construction drawings and
specifications are included and attached as Exhibit 9 for reference purposes:

[list construction drawings and specifications]

Property Owner and Contractor, as Knauf Defendants' agent, agree that these are an
accurate and correct representation of the construction quality and finishes as existed
prior to the start of the Repair Work.

Property Owner represents that he (she) is the owner of the property to be remediated and
that he (she) is fully authorized to enter into this agreement and bind himself (herself), all
dependants who live in the Property, and any other guests or residents who reside in the
Property.

Effective the ____ day of _____, 201__ ("Effective Date")


_____

Property Owner                                                                        Date


_____

Contractor, as Agent for Knauf Defendants                          Date

**Page 2 of 15**

**Terms and Conditions of the Work Authorization**

I.    **REPAIR WORK**

1.   The repair (*i.e.*, remediation) work at the Property is described generally in the Remediation Protocol and specifically in the Schedule of Work attached to this Work Authorization (together "Repair Work"). In conducting the Repair Work and in resolving any disputes pursuant to the dispute resolution process described in Sections 4.5.1.2.1 and 4.5.1.2.2 of the Settlement Agreement, the Property Owner and Contractor agree that the objective of the Repair Work is to remove on a cost effective basis all drywall and Chinese drywall-related odors and contamination, including, but not limited to, corrosion, tarnishing, and pitting ("Contamination"), and to leave the Property with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the Repair Work.

2.   For clarification, the Remediation Protocol describes the overall remediation work agreed to by the Parties to the Settlement Agreement and which must be followed as to all KPT Properties (defined in Section 1.27 of the Settlement Agreement) whose owners select either the Program Contractor Remediation Option or Self Remediation Option pursuant to Sections 4.3.1 and 4.3.2 of the Settlement Agreement. The attached Schedule of Work is created by the Contractor in consultation with the Property Owner, including through their joint inspection of the Property, and is the agreed upon remediation work that will be specifically performed by the Contractor as agent under contract to the Knauf Defendants. **By executing this Work Authorization, which incorporates and follows the Scope of Work, Property Owner agrees that this is the complete Repair Work to which Property Owner is entitled under this Work Authorization and the Settlement Agreement.**

3.   All materials, systems and equipment that are removed during the course of remediation work will either be reinstalled or replaced in accordance with the Remediation Protocol and, where replaced, replaced with new materials that are of the same construction, quality and finishes as those removed.

4.   All Repair Work will be performed in accordance with applicable codes and regulations as these codes and regulations exist as of the last date that all required building and construction permits have been filed. Neither the Knauf Defendants nor Contractor are responsible for the failure of the Property to comply with building codes and regulations where such failure is unrelated to the Repair Work. Except where such failures are corrected as a consequence of the Repair Work, the Property Owner will be responsible for correcting such failures and any delays in the Repair Work resulting from such corrective work. If correction of such a failure is not accomplished during the Repair Work, but is required by governmental or other authority with jurisdiction, then the Property Owner is responsible for such correction. For example,

Repair Work includes replacement of the electrical system so that any existing non-compliant electrical work will be corrected during the normal course of the Repair Work. But non-compliant roof construction is unaffected by the Repair Work and therefore would remain the responsibility of the Property Owner. If the authority with jurisdiction requires correction of non-compliant roof construction in order to secure a certificate of occupancy, such correction would, thus, be the responsibility of the Property Owner. In addition, if such corrective work will interfere with the Repair Work, the Contractor will cease the Repair Work until such time as the corrective work is completed, and the estimated Construction Duration (defined below) will be extended without penalty to the Contractor or any additional payments from the Remediation Fund (as that term is defined in the Settlement Agreement) or the Knauf Defendants.

5.  In accordance with the Remediation Protocol, materials, systems and equipment that are retained, but damaged by the Repair Work, will be restored to the condition that existed prior to the start of Repair Work, and where necessary replaced with new materials, systems and/or equipment.

6.  Where necessary, new work will be integrated into existing work so that, to the extent reasonably feasible, one cannot reasonably be distinguished from the other. Transitions between new and existing work will, wherever possible, occur at a transition such as a corner or other break point.

7.  All electrical work will be performed by a licensed electrician and will be in accordance with requirements of the National Electrical Code (NEC) and any applicable local building codes as these codes and regulations exist as of the last date that all required building and construction permits have been filed. Electrical work will be inspected by the electrical inspector of the local Authority having jurisdiction. In addition, all other trades, including plumbing, will be performed by licensed subcontractors, to the extent required by applicable law, regulation or building code.

8.  The Repair Work is set forth in the attached Schedule of Work, which, consistent with the Remediation Protocol, establishes specific components of the Property that are to be either removed and replaced, or removed and reinstalled. Building materials, building systems and fixtures not listed in the Schedule of Work will be retained in place and protected during the work.

9.  Property-Owner Requested Work. The Property Owner may request additional work by the Contractor or others that is not included in the Repair Work ("Property-Owner Requested Work"). At its sole discretion, the Contractor may decline to perform Property Owner Requested Work. In addition, the Contractor may only accept such work, which shall be under a separate agreement with the Property Owner, if such work does not impede the progress of the Repair Work. Such Property-Owner Requested Work will be paid for in advance by the Property Owner to the Contractor.

**Page 4 of 15**

II.  **SCHEDULE**

1.  The Construction Duration shall be measured from the actual Move-Out Date to the actual Substantial Completion date as defined below.  By executing this Work Authorization, the Property Owner acknowledges (1) the estimated Move-Out Date, and (2) the Estimated Substantial Completion date provided on the first page of this document, as may be adjusted in accordance with these terms and conditions.  These dates are merely estimates and the actual Move-Out Date and actual Substantial Completion date will likely vary.

2.  The Move-Out Date is the date upon which the Contractor will commence Repair Work.  Property Owner agrees to complete move out of all personal property, to remove and properly dispose of all trash, and to leave the premises by the Move-Out Date so that the home is fully, and without impediment, available to the Contractor to begin Repair Work.  The Property Owner agrees that the move-out requirements contained in Exhibit 4 (Requirements for Move-Out/Move-In) will be completed to the reasonable satisfaction of the Contractor and that such completion is a precondition to the start of Repair Work.

3.  On at least twenty business days notice, the Contractor will schedule the Move-Out Date with the Property Owner.  This date will not be scheduled until all preconditions to the start of Repair Work set forth in the Requirements for Move-Out/Move-In (Exhibit 4) have been satisfied, including but not limited to, receipt of required permits and scheduling and/or delivery of materials with long-delivery times.

4.  Contractor shall have complete control of the Property at all times during the Construction Duration, and to the extent the Property Owner needs to enter the Property, he shall do so with advance notice to the Contractor and in such a manner so as not to interfere with the Repair Work.  Separate contractors of Property Owner shall not enter the Property during the Construction Period unless accompanied by Contractor's authorized representative and only after they have executed a visitor waiver in which they assume all risks, and waive all claims, in connection with entering the Property during the construction period.

5.  Property Owner, at his (her) own expense, shall be responsible for ordinary exterior maintenance of the Property including maintenance of landscaping, pools, exterior finishes, roof, etc. and payment of all utility bills, property taxes and other similar expenses during the Construction Duration.  The Contractor will be responsible for maintaining the areas inside and outside of the Property affected by its work.

6.  To the extent the Property Owner has property insurance on the Property, he (she) shall provide proof of such insurance to the Contractor prior to the Move-Out Date and will maintain such property insurance during the

Construction Duration. **If the Property Owner does not have property insurance or cannot obtain such insurance, Property Owner acknowledges that he (she), not the Contractor, will be liable for damage to the Property, other than that caused by the Repair Work.**

7. Drywall Removal and Cleanup. The initial phase of the Repair Work involves demolition, including the removal of all drywall, as set forth in the Remediation Protocol, drywall debris and visible dust, and elimination of all Chinese-drywall associated odors and Contamination. After completion of demolition, the Contractor will perform a careful cleaning of the Property to remove all remaining drywall debris and visible dust as provided for in the Remediation Protocol.

8. Contractor Certification. Throughout the cleanup, the Property will be "aired out" by leaving all windows and doors open. Such "air-out" period will be no less than 24 hours. Contractor will continue to clean all surfaces in the Property, including, by vacuuming using, drywall bags and/or, where appropriate or necessary, HEPA (high efficiency particulate air) filters, until a visual inspection by the Contractor verifies that all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) are free of visible dust, debris or residue and that no detectable odor of Chinese drywall remains. Evaluation of odor is to be performed at first entry to the Property after it has been vacant and with all windows and doors closed for a period of at least 8 hours. Contractor shall certify completion of the drywall and Contamination removal and cleanup work by executing the Contractor Certification attached as Exhibit 6 and providing such Certification to the Settlement Administrator (defined in Section 1.67 of the Settlement Agreement), Property Owner and Knauf Defendants. After completion of the Contractor Certification, the Contractor will notify the Environmental Inspector that the Property is ready for inspection.

9. Environmental Certification. Following the Contractor Certification, and notice that the Property is ready for environmental inspection, the Environmental Inspector will perform an independent inspection to verify the Contractor's certification that all drywall has been removed in accordance with the Remediation Protocol, including all debris and visible dust, and that there is no detectable odor of Chinese drywall in the Property. If the Environmental Inspector concludes that the home is not free of any and all Chinese drywall-associated odors and Contamination, the Contractor will perform remediation work as required to complete the remediation as judged by the Environmental Inspector's visual inspection and odor evaluation of the Property. Once the Environmental Inspector concludes that the Property is free of any and all Chinese drywall-associated odors and Contamination and that the atmosphere in the Property is representative of the atmosphere in properties built without Chinese drywall, he (she) will execute the Environmental Certification found in Exhibit B of the Settlement Agreement

and provide such Certification to the Settlement Administrator, Property Owner and the Knauf Defendants.

10. Substantial Completion shall be defined as the date that the Repair Work is sufficiently completed, as determined by the Contractor, to allow the Property Owner to occupy or utilize the Property for its intended use.  Substantial Completion occurs only after all government inspections required for the Property Owner to occupy or utilize the Property are complete and any corresponding certificates (for example, a certificate of occupancy, if applicable) are issued by the authority with jurisdiction over the project.  For the purposes of this definition, remaining punch list items or warranty work commonly associated with residential construction, including minor finish work, touch ups, or correction of defects or warranty items, shall not preclude substantial completion so long as such work may be safely performed without unreasonable disruption while the Property Owner occupies or utilizes the Property.

11. So as to minimize the risk of damage and/or theft, certain appliances that are not required for a Certificate of Occupancy may be delivered and installed on the day the Property Owner moves back in and assumes responsibility for the Property.

12. Punch List:  If at the time of Substantial Completion there are any items that do not affect occupancy of the Property, but do require finishing or correcting, the Contractor shall prepare, with input from, and the agreement of, the Property Owner, a comprehensive Punch List of such items that are to be completed or corrected prior to final payment.  Failure to include an item on the Punch List does not alter the responsibility of the Contractor to complete all Repair Work.

## III.   **WARRANTY**

1. The Contractor warrants to the Property Owner that materials and equipment furnished as part of the Repair Work will be of good quality and new unless this Work Authorization requires or permits otherwise, and will not include (i) any Chinese-manufactured drywall or plasterboard products, (ii) any Knauf Defendants' drywall or plasterboard products, or (iii) any products manufactured by the Knauf Defendants outside of the United States ("Restricted Materials").  The Contractor or its subcontractors shall in their sole discretion, without any influence from the Knauf Defendants, select all materials and equipment, but not any Restricted Materials, to be furnished as part of the Repair Work.  The Contractor further warrants that the Repair Work will conform to the requirements of the Work Authorization, including the Remediation Protocol, and will be free from defect, except for those inherent in the quality of the materials and equipment as required or permitted by the Work Authorization.  The Contractor's warranty includes damage or

defects in the Repair Work caused by the Contractor. Damage caused by the Property Owner is not warranted by the Contractor.

2. As to items within the Property that were purchased and installed by the Contractor but that were not manufactured by the Contractor, including but not limited to, any HVAC Equipment, Appliances, other equipment or "consumer products," Contractor provides no warranty on such items, but shall transfer to Property Owner the manufacturer's warranty. However, the Contractor's warranty does extend to the installation of such items. Copies of applicable warranties will be turned over to the Property Owner at Substantial Completion. All items, appliances, or equipment reinstalled or replaced pursuant to Paragraphs I(B), I(C), I(E), I(G), and I(K) in the Remediation Protocol will be tested in place prior to, or at, the Move-In Date.

3. **Contractor is not responsible for, and accepts no liability for, any defects or deficiencies in work that was not replaced or reinstalled by Contractor.**

4. If, within one year or other time frame required by applicable law or regulation, whichever is longer (the "Warranty Period") after the date of Substantial Completion of the Repair Work, any of the Repair Work is found to be not in accordance with the requirements of the Work Authorization, the Property Owner shall promptly notify the Contractor, in writing, of the condition, and the Contractor shall correct such condition promptly. If the Property Owner fails to notify the Contractor during the Warranty Period and fails to give the Contractor an opportunity to make the correction, the Property Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If upon written notification during the Warranty Period, the Contractor fails to promptly correct the nonconforming Repair Work, then the Property Owner may request, through the Settlement Administrator, that the Knauf Defendants promptly correct the nonconforming Repair Work under the terms of the Knauf Defendants' agreement with the Contractor.

IV. <u>**MISCELLANEOUS**</u>

1. The Contract Sum, excluding any Property Owner Requested Work, will be paid by the Remediation Fund (defined in Section 1.62 of the Settlement Agreement). The Property Owner is not responsible for paying the Contractor any of the costs associated with its work, except to the extent the Contractor undertakes any Property-Owner Requested Work.

2. Upon Substantial Completion and the submission by the Contractor to the Property Owner a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the Repair Work have been either released or bonded off such that the

Property Owner's title is clear of all liens related to the Repair Work ("All Clear Lien Certificate") prior to moving back into the home, the Property Owner shall sign an additional release in favor of the Contractor in the form attached as Exhibit 7.

3. In accordance with Section 4.3.1.1 of the Settlement Agreement, the Contractor has determined the square footage of the home using the American National Standard for Single-Family Residential Building's methodology attached as Exhibit 8. The square footage is listed on the first page of this document.

4. If concealed or unknown physical conditions at the site differ materially from those indicated in the Work Authorization or from those conditions ordinarily found to exist or in the event of a Force Majeure (as defined in this paragraph), the Contract Sum and estimated Construction Duration (as measured from the estimated Move-Out Date to the estimated Substantial Completion date provided on the first page of this document) shall be subject to equitable adjustment. "Force Majeure" means any of the following acts or events that prevents the affected Party from performing its obligations in accordance with this Work Authorization, if such act or event is beyond the reasonable control of and not the result of the fault or negligence of the affected Party and such Party has been unable to overcome such act or event by the exercise of due diligence or taking reasonable alternative measures: (a) unusually severe storms of extended duration or impact, other than heavy storms or climatic conditions which could generally be anticipated by the Contractor or subcontractors, as well as floods, droughts, tidal waves, fires, hurricanes, earthquakes, landslides, or other catastrophes; (b) wars, acts of terrorism, civil disturbances, riots, insurrections and sabotage; (c) transportation disasters, whether by sea, rail, air or land; (d) any industry-wide labor boycotts, strikes, picketing or similar situations, (e) actions of a Governmental Authority that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Work Authorization, including any change in Laws. It is expressly understood and agreed that Force Majeure shall not include any of the following events: (1) economic hardship; (2) changes in market conditions; (3) late delivery of materials, except to the extent such late delivery is itself caused by an event of Force Majeure; (4) any strike, work-to-rule action, go-slow or similar labor difficulty that is limited to the Contractor's and/or subcontractor's employees; or (5) jurisdictional disputes or labor actions affecting a single or small group of contractors or suppliers.

5. In the event that a dispute arises between the Property Owner and Contractor or the Remediation Fund, this dispute will be resolved in accordance with the dispute resolution process set forth in Sections 4.5.1.2.1 and 4.5.1.2.2 of the Settlement Agreement.

6.   If the Contractor encounters any materials that it believes may be hazardous, excluding Chinese drywall, materials made hazardous by Chinese drywall, and other materials routinely found in residential construction (collectively, "Excluded Items"), the Contractor will immediately stop work and notify the Settlement Administrator, Property Owner and the Knauf Defendants. Contractor shall not resume work until Property Owner removes the hazardous material.  To the fullest extent permitted by law, the Property Owner shall indemnify and hold harmless the Contractor and its subcontractors, the Remediation Fund, and the Knauf Defendants from claims, damages, losses, delays, and expenses, including but not limited to attorneys' fees and costs, arising out of or resulting from the hazardous materials less Excluded Items.  The Property Owner shall not be responsible for materials and substances brought to the site by the Contractor or for the drywall being remediated.

7.   Before starting work, Contractor shall provide proof of the following insurance coverage:

     TBD

8.   Property Owner does not waive claims against the Contractor for bodily injury or property damage caused by the Work Authorization and/or the Repair Work, except the Property Owner waives claims for such injury and/or damage that seek recovery of emotional distress (except for such emotional distress claims related to a bodily injury claim), loss of profits, loss of use, and/or diminution of property value damages.  "Loss of Use" does not include loss of use during the Construction Duration.

9.   By entering into this Work Authorization, Property Owner affirmatively represents that it is not aware of any code violations, concealed conditions materially affecting the Property, leaks, or Defects unrelated to the drywall. "Defects" means a condition, other than the presence of Chinese drywall and anything that may have been contaminated by Chinese drywall, that would either (a) have a significant adverse effect on the value of the Property, (b) significantly impair the health or safety of occupants or of the workers, or (c) that if not repaired, removed or replaced, shorten or adversely affect the expected normal life of the Property.  Property Owner acknowledges that it has had the opportunity to review the Work Authorization with counsel of its choice and is encouraged to do so.

This Work Authorization entered into as of the Effective Date first written above.


**PROPERTY OWNER** *(Signature)*

*(Printed name and title)*


**CONTRACTOR as Agent for Knauf** *(Signature)*

*(Printed name and title)*

**Appliance, Fixture, Equipment and Fire System Schedule**

All Appliances shall mean refrigerators, freezers, dishwashers, washers, dryers, garbage disposals, wine coolers, ice machines, microwaves, cooktops, ovens, ranges and warming drawers. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Refrigerator | | | |
| Range | | | |
| Cook Top | | | |
| Oven | | | |
| Microwave | | | |
| Range Hood | | | |
| Dishwasher | | | |
| Freezer | | | |
| Washer | | | |
| Dryer | | | |
| Garbage Disposal | | | |

In accordance with the Remediation Protocol, in the event that fixtures need replacement, the replacement will be with new equipment, fixtures and not with reconditioned ones. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Ceiling Fan | | | |
| Chandelier | | | |
| Light Fixture | | | |
| Hot Water Heater | | | |
| Cabinets | | | |
| Countertop | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Page 12 of 15**

In accordance with the Remediation Protocol, the following fire and security systems will be replaced regardless of condition. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Smoke Detectors | | | |
| Security Alarms | | | |
| Intercoms | | | |
| Smoke Detectors | | | |
| Fire-Suppression Sprinkler Systems | | | |
| Carbon Monoxide Alarms | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Room Finish Schedule**

In accordance with the Remediation Protocol, existing finishes and trim that are removed during the remediation will be replaced with new finishes and trim of like kind and quality.  The following is a schedule of finishes and trim found in the Property prior to remediation.  Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Room Name | Wall Color/Finish | Ceiling Color /Finish | Floor Type/Color | Trim Color |
|-----------|-------------------|-----------------------|------------------|------------|
| Living Room | | | | |
| Dining Room | | | | |
| Kitchen | | | | |
| Hallway | | | | |
| Stairs | | | | |
| Den | | | | |
| Family Room | | | | |
| Bathroom | | | | |
| Master Bed Room | | | | |
| Master BR Closet | | | | |
| Master Bath | | | | |
| Bed Room 1 | | | | |
| Bed Room 2 | | | | |
| Bed Room 3 | | | | |
| Bathroom | | | | |
| | | | | |
| | | | | |

Add Photos for Multi Colored Walls

**Page 14 of 15**

**Schedule of Work**

The following Schedule of Work describes the specific materials, systems and equipment to be removed and either replaced or reinstalled during the remediation work.  The Property Owner and Contractor agree that this describes the extent of the work required to complete remediation of the residence pursuant to the Remediation Protocol.

Appliances, fixtures and equipment will be replaced with units of like kind and quality to those listed in the Appliance, Fixture and Equipment Schedule.

Replacement finishes will, to the extent reasonably achievable, match those in the Room Finish Schedule.

(Attach detailed Schedule of Work document)


Note:  The following *sample* Schedule of Work is intended only to provide an example of the level of detail involved in the Repair Work the Contractor will perform pursuant to the Work Authorization Agreement.  **IT DOES NOT DESCRIBE THE REPAIR WORK THAT THE CONTRACTOR WILL PERFORM IN YOUR PROPERTY.** The Schedule of Work prepared for your Property will follow this sample in form, but will be tailored to the finishes and conditions in your Property.  Further, as in the sample Schedule of Work, the Repair Work in your Property will meet all of the requirements set forth in the Remediation Protocol.

# EXHIBIT F-1-1

To Be Inserted By Contractor

# EXHIBIT F-1-2

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

|  |  |  |  |
|---|---|---|---|
| Insured: | Home Owner | | |
| Property: | 1234 My Street | | |
| | Anywhere, LA | | |

|  |  |  |  |
|---|---|---|---|
| Contractor: | | Business: | (954) 524-5678 |
| Company: | Moss and Associates | | |
| Business: | 2101 N. Andrews Ave. Suite 300 | | |
| | Fort Lauderdale, FL 33311 | | |

**Claim Number:**                                **Policy Number:**                           **Type of Loss:**

|  |  |  |  |
|---|---|---|---|
| Date of Loss: | | Date Received: | |
| Date Inspected: | | Date Entered: | |

|  |  |
|---|---|
| Price List: | LANO7X_SEP10 |
| | Restoration/Service/Remodel |
| Estimate: | SAMPLE-1 |

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**SAMPLE-1**

### General

| DESCRIPTION | QNTY |
|---|---|
| 1. Dumpster load - Approx. 20 yards, 4 tons of debris | 2.00 EA |
| 2. Clean stud wall | 5476.00 SF |
| 3. Clean floor or roof joist system | 1617.00 SF |
| 4. Final cleaning - construction - Residential | 1617.00 SF |
| 5. Temporary power usage (per month) | 3.00 MO |
| 6. Temporary water - usage - per month - Commercial | 3.00 MO |

NOTES:

### HVAC

| DESCRIPTION | QNTY |
|---|---|
| 7. Remove and Replace Coil - 3 ton - cased | 1.00 EA |
| 8. Remove and Replace Flexible ductwork system - hot or cold air - 1200 to 1599 SF home | 1.00 EA |
| 9. Detach & Reset Heat/AC register - Mechanically attached | 10.00 EA |
| 10. Remove and Replace Thermostat - High grade | 1.00 EA |

NOTES:

**Main Level**

**Main Level**

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

| DESCRIPTION | QNTY |
|---|---|
| Remove and replace insulation from exterior wall | |

NOTES:



| 2 Car Garage | Height: 9' 4" |
|---|---|

| | |
|---|---|
| 731.11 SF Walls | 381.50 SF Ceiling |
| 1112.61 SF Walls & Ceiling | 381.50 SF Floor |
| 42.39 SY Flooring | 78.33 LF Floor Perimeter |
| 78.33 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 11.  Remove and Replace 1/2" drywall - hung, taped, floated, ready for paint | 1112.61 SF |
| Garage walls and ceiling to remain unpainted. | |
| 12.  Detach & Reset Overhead (garage) door opener - Standard grade | 1.00 EA |
| 13.  Detach and Reset Overhead Door Track | 30.00 LF |
| 14.  Remove and Replace Switch | 1.00 EA |
| 15.  Remove and Replace Outlet for garage door opener | 1.00 EA |
| 16.  Remove and Replace Ground fault interrupter (GFI) outlet | 1.00 EA |

NOTES:

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Bed 3**        **Height: 9'**

| | |
|---|---|
| 384.00 SF Walls | 113.33 SF Ceiling |
| 497.33 SF Walls & Ceiling | 113.33 SF Floor |
| 12.59 SY Flooring | 42.67 LF Floor Perimeter |
| 42.67 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 17. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 497.33 SF |
| 18. Add for bullnose (rounded) corners | 497.33 SF |
| 19. Texture drywall - heavy hand texture | 497.33 SF |
| 20. Paint the walls and ceiling - two coats | 497.33 SF |
| 21. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 113.33 SF |
| 22. Remove and Replace Baseboard - 2 1/4" | 42.67 LF |
| 23. Paint baseboard - two coats | 42.67 LF |
| 24. Remove Carpet - Standard grade | 113.33 SF |
| 25. Carpet - Standard grade | 130.33 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 26. Remove and Replace Carpet pad - Standard grade | 113.33 SF |
| 27. Remove and Replace Batt insulation - 4" - R13 | 168.00 SF |
| 28. Remove and Replace Window sill | 2.00 LF |
| 29. Seal & paint window sill | 2.00 LF |
| 30. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 31. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 32. Paint casing - two coats | 34.00 LF |
| 33. Rewire - average residence - copper wiring | 113.33 SF |
| 34. Remove and Replace Smoke detector | 1.00 EA |
| 35. Detach & Reset Light fixture | 1.00 EA |
| 36. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 37. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 38. Remove and Replace Television cable outlet | 1.00 EA |
| 39. Remove and Replace Switch | 1.00 EA |
| 40. Remove and Replace Outlet | 4.00 EA |

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Bed 3**

---

**DESCRIPTION**                                                                    **QNTY**

NOTES:

---



| LN | | Height: 9' |
|---|---|---|
| 68.36 SF Walls | 3.60 SF Ceiling | |
| 71.96 SF Walls & Ceiling | 3.60 SF Floor | |
| 0.40 SY Flooring | 7.60 LF Floor Perimeter | |
| 7.60 LF Ceil. Perimeter | | |

---

| DESCRIPTION | QNTY |
|---|---|
| 41. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 71.96 SF |
| 42. Texture drywall - heavy hand texture | 71.96 SF |
| 43. Paint the walls and ceiling - two coats | 71.96 SF |
| 44. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 3.60 SF |
| 45. Remove and Replace Baseboard - 2 1/4" | 7.60 LF |
| 46. Paint baseboard - two coats | 7.60 LF |
| 47. Detach & Reset Shelving - 12" - in place | 10.00 LF |
| 48. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 49. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 50. Paint casing - two coats | 34.00 LF |
| 51. Remove Carpet - Standard grade | 3.60 SF |
| 52. Carpet - Standard grade | 4.14 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 53. Remove and Replace Carpet pad - Standard grade | 3.60 SF |

---

SAMPLE-1                                          10/6/2010          Page: 5

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

## CONTINUED - LN

| DESCRIPTION | QNTY |
|---|---|

NOTES:

---



| Bed 2 | Height: 9' |
|---|---|

| | |
|---|---|
| 383.89 SF Walls | 113.27 SF Ceiling |
| 497.17 SF Walls & Ceiling | 113.27 SF Floor |
| 12.59 SY Flooring | 42.65 LF Floor Perimeter |
| 42.65 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 54. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 497.17 SF |
| 55. Add for bullnose (rounded) corners | 497.17 SF |
| 56. Texture drywall - heavy hand texture | 497.17 SF |
| 57. Paint the walls and ceiling - two coats | 497.17 SF |
| 58. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 113.27 SF |
| 59. Remove and Replace Baseboard - 2 1/4" | 42.65 LF |
| 60. Paint baseboard - two coats | 42.65 LF |
| 61. Remove Carpet - Standard grade | 113.27 SF |
| 62. Carpet - Standard grade | 130.27 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 63. Remove and Replace Carpet pad - Standard grade | 113.27 SF |
| 64. Remove and Replace Batt insulation - 4" - R13 | 80.00 SF |
| 65. Remove and Replace Window sill | 2.00 LF |
| 66. Seal & paint window sill | 2.00 LF |
| 67. Detach & Reset Interior door unit - Standard grade | 1.00 EA |

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Bed 2

| DESCRIPTION | QNTY |
|---|---|
| 68. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 69. Paint casing - two coats | 34.00 LF |
| 70. Rewire - average residence - copper wiring | 113.27 SF |
| 71. Remove and Replace Smoke detector | 1.00 EA |
| 72. Detach & Reset Light fixture | 1.00 EA |
| 73. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 74. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 75. Remove and Replace Television cable outlet | 1.00 EA |
| 76. Remove and Replace Switch | 1.00 EA |
| 77. Remove and Replace Outlet | 4.00 EA |

NOTES:



**Cl 3**            **Height: 9'**

| | |
|---|---|
| 115.41 SF Walls | 8.82 SF Ceiling |
| 124.23 SF Walls & Ceiling | 8.82 SF Floor |
| 0.98 SY Flooring | 12.82 LF Floor Perimeter |
| 12.82 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 78. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 124.23 SF |
| 79. Texture drywall - heavy hand texture | 124.23 SF |
| 80. Paint the walls and ceiling - two coats | 124.23 SF |
| 81. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 8.82 SF |

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Cl 3

| DESCRIPTION | QNTY |
|---|---|
| 82. Remove and Replace Baseboard - 2 1/4" | 12.82 LF |
| 83. Paint baseboard - two coats | 12.82 LF |
| 84. Remove Carpet - Standard grade | 8.82 SF |
| 85. Carpet - Standard grade | 10.15 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 86. Remove and Replace Carpet pad - Standard grade | 8.82 SF |
| 87. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 88. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 89. Paint casing - two coats | 34.00 LF |
| 90. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 91. Rewire - average residence - copper wiring | 8.82 SF |
| 92. Detach & Reset Light fixture | 1.00 EA |
| 93. Remove and Replace Switch | 1.00 EA |

NOTES:



| Cl 2 | | Height: 9' |
|---|---|---|
| 116.23 SF Walls | 8.91 SF Ceiling | |
| 125.15 SF Walls & Ceiling | 8.91 SF Floor | |
| 0.99 SY Flooring | 12.91 LF Floor Perimeter | |
| 12.91 LF Ceil. Perimeter | | |

| DESCRIPTION | QNTY |
|---|---|
| 94. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 125.15 SF |
| 95. Texture drywall - heavy hand texture | 125.15 SF |

SAMPLE-1                                        10/6/2010          Page: 8

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Cl 2**

| DESCRIPTION | QNTY |
|---|---|
| 96.  Paint the walls and ceiling - two coats | 125.15 SF |
| 97.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 8.91 SF |
| 98.  Remove and Replace Baseboard - 2 1/4" | 12.91 LF |
| 99.  Paint baseboard - two coats | 12.91 LF |
| 100.  Remove Carpet - Standard grade | 8.91 SF |
| 101.  Carpet - Standard grade | 10.25 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 102.  Remove and Replace Carpet pad - Standard grade | 8.91 SF |
| 103.  Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 104.  Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 105.  Paint casing - two coats | 34.00 LF |
| 106.  Remove and Replace Batt insulation - 4" - R13 | 16.00 SF |
| 107.  Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 108.  Rewire - average residence - copper wiring | 8.91 SF |
| 109.  Detach & Reset Light fixture | 1.00 EA |
| 110.  Remove and Replace Switch | 1.00 EA |

NOTES:



| Util | | Height: 9' |
|---|---|---|
| 228.63  SF Walls | 40.31  SF Ceiling | |
| 268.94  SF Walls & Ceiling | 40.31  SF Floor | |
| 4.48  SY Flooring | 25.40  LF Floor Perimeter | |
| 25.40  LF Ceil. Perimeter | | |

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

| DESCRIPTION | QNTY |
|---|---|
| 111.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 268.94 SF |
| 112.  Texture drywall - heavy hand texture | 268.94 SF |
| 113.  Paint the walls and ceiling - two coats | 268.94 SF |
| 114.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 40.31 SF |
| 115.  Remove and Replace Baseboard - 2 1/4" | 25.40 LF |
| 116.  Paint baseboard - two coats | 25.40 LF |
| 117.  Detach & Reset Interior door unit - Standard grade | 2.00 EA |
| 118.  Detach & Reset Washer/Washing Machine - Top-loading - Standard grade | 1.00 EA |
| 119.  Detach & Reset Dryer - Electric - Standard grade | 1.00 EA |
| 120.  Remove and Replace Casing - 2 1/4" | 68.00 LF |
| 121.  Paint casing - two coats | 68.00 LF |
| 122.  Detach & Reset Shelving - 12" - in place | 6.00 LF |
| 123.  Rewire - average residence - copper wiring | 40.31 SF |
| 124.  Detach & Reset Light fixture | 2.00 EA |
| 125.  Floor protection - corrugated cardboard and tape | 40.31 SF |
| 126.  Remove and Replace Switch | 1.00 EA |
| 127.  Remove and Replace Outlet | 2.00 EA |
| 128.  Remove and Replace 220 volt outlet - Heavy duty | 1.00 EA |

NOTES:



**Bath 2**                                                            **Height: 9'**

278.84  SF Walls                          50.73  SF Ceiling
329.57  SF Walls & Ceiling                50.73  SF Floor
  5.64  SY Flooring                       30.98  LF Floor Perimeter
 30.98  LF Ceil. Perimeter

| DESCRIPTION | QNTY |
|---|---|

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Bath 2

| DESCRIPTION | QNTY |
|---|---|
| 129. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 329.57 SF |
| 130. Texture drywall - heavy hand texture | 329.57 SF |
| 131. Add for bullnose (rounded) corners | 329.57 SF |
| 132. Paint the walls and ceiling - two coats | 329.57 SF |
| 133. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 50.73 SF |
| 134. Remove and Replace Baseboard - 2 1/4" | 30.98 LF |
| 135. Paint baseboard - two coats | 30.98 LF |
| 136. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 137. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 138. Paint casing - two coats | 34.00 LF |
| 139. Remove and Replace Mirror - 1/4" plate glass | 10.25 SF |
| 140. Detach & Reset Vanity | 3.00 LF |
| 141. Detach & Reset Vanity top - one sink - cultured marble | 3.00 LF |
| 142. Detach & Reset Toilet | 1.00 EA |
| 143. Detach & Reset Bathtub | 1.00 EA |
| 144. Detach & Reset Tub/shower faucet - Standard grade | 1.00 EA |
| 145. Remove and Replace Tile tub surround - 60 to 75 SF | 1.00 EA |
| 146. Detach & Reset Towel bar | 2.00 EA |
| 147. Detach & Reset Toilet paper holder | 1.00 EA |
| 148. Detach & Reset Sink faucet - Bathroom | 1.00 EA |
| 149. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 150. Rewire - average residence - copper wiring | 50.73 SF |
| 151. Floor protection - corrugated cardboard and tape | 50.73 SF |
| 152. Detach & Reset Light bar - 3 lights | 1.00 EA |
| 153. Remove and Replace Exhaust fan | 1.00 EA |
| 154. Remove and Replace Switch | 1.00 EA |
| 155. Remove and Replace Ground fault interrupter (GFI) outlet | 1.00 EA |

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Bath 2

| DESCRIPTION | QNTY |
|---|---|

NOTES:



| M. CL | Height: 9' |
|---|---|

| | |
|---|---|
| 121.48 SF Walls | 10.76 SF Ceiling |
| 132.24 SF Walls & Ceiling | 10.76 SF Floor |
| 1.20 SY Flooring | 13.50 LF Floor Perimeter |
| 13.50 LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 156. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 132.24 SF |
| 157. Texture drywall - heavy hand texture | 132.24 SF |
| 158. Paint the walls and ceiling - two coats | 132.24 SF |
| 159. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 10.76 SF |
| 160. Remove and Replace Baseboard - 2 1/4" | 13.50 LF |
| 161. Paint baseboard - two coats | 13.50 LF |
| 162. Remove Carpet - Standard grade | 10.76 SF |
| 163. Carpet - Standard grade | 12.37 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 164. Remove and Replace Carpet pad - Standard grade | 10.76 SF |
| 165. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 166. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 167. Paint casing - two coats | 34.00 LF |
| 168. Detach & Reset Shelving - 12" - in place | 5.00 LF |
| 169. Rewire - average residence - copper wiring | 10.76 SF |

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - M. CL

| DESCRIPTION | QNTY |
|---|---|
| 170. Detach & Reset Light fixture | 1.00 EA |
| 171. Remove and Replace Switch | 1.00 EA |

NOTES:

**M. Cl 2**     Height: 9'

172.39 SF Walls
194.25 SF Walls & Ceiling
2.43 SY Flooring
19.15 LF Ceil. Perimeter

21.85 SF Ceiling
21.85 SF Floor
19.15 LF Floor Perimeter

| DESCRIPTION | QNTY |
|---|---|
| 172. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 194.25 SF |
| 173. Texture drywall - heavy hand texture | 194.25 SF |
| 174. Paint the walls and ceiling - two coats | 194.25 SF |
| 175. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 21.85 SF |
| 176. Remove and Replace Baseboard - 2 1/4" | 19.15 LF |
| 177. Paint baseboard - two coats | 19.15 LF |
| 178. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 179. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 180. Paint casing - two coats | 34.00 LF |
| 181. Detach & Reset Shelving - 12" - in place | 12.00 LF |
| 182. Remove and Replace Batt insulation - 4" - R13 | 90.00 SF |
| 183. Rewire - average residence - copper wiring | 21.85 SF |

SAMPLE-1

10/6/2010     Page: 13

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - M. Cl 2

| DESCRIPTION | QNTY |
|---|---|
| 184.  Detach & Reset Light fixture | 1.00 EA |
| 185.  Floor protection - corrugated cardboard and tape | 21.85 SF |
| 186.  Remove and Replace Switch | 1.00 EA |

NOTES:



**Mast. Bed**                                                                 **Height: 9'**

| | |
|---|---|
| 504.00  SF Walls | 182.71  SF Ceiling |
| 686.71  SF Walls & Ceiling | 182.71  SF Floor |
| 20.30  SY Flooring | 56.00  LF Floor Perimeter |
| 56.00  LF Ceil. Perimeter | |

| DESCRIPTION | QNTY |
|---|---|
| 187.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 686.71 SF |
| 188.  Remove and Replace Add on for trayed, dropped or coffered ceiling | 182.71 SF |
| 189.  Add for bullnose (rounded) corners | 686.71 SF |
| 190.  Texture drywall - heavy hand texture | 686.71 SF |
| 191.  Paint the walls and ceiling - two coats | 686.71 SF |
| 192.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 182.71 SF |
| 193.  Remove and Replace Baseboard - 2 1/4" | 56.00 LF |
| 194.  Paint baseboard - two coats | 56.00 LF |
| 195.  Remove Carpet - Standard grade | 182.71 SF |
| 196.  Carpet - Standard grade | 210.12 SF |

SAMPLE-1                                                    10/6/2010          Page: 14

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Mast. Bed

| DESCRIPTION | QNTY |
|---|---|
| 15 % waste added for Carpet - Standard grade. | |
| 197. Remove and Replace Carpet pad - Standard grade | 182.71 SF |
| 198. Remove and Replace Batt insulation - 4" - R13 | 288.00 SF |
| 199. Remove and Replace Window sill | 4.00 LF |
| 200. Seal & paint window sill | 4.00 LF |
| 201. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 202. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 203. Paint casing - two coats | 34.00 LF |
| 204. Rewire - average residence - copper wiring | 182.71 SF |
| 205. Detach & Reset Light fixture | 1.00 EA |
| 206. Remove and Replace Smoke detector | 1.00 EA |
| 207. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 208. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 209. Remove and Replace Television cable outlet | 1.00 EA |
| 210. Remove and Replace Switch | 1.00 EA |
| 211. Remove and Replace Outlet | 5.00 EA |

NOTES:

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Mast. Bath**                                                                 **Height: 9'**

433.33  SF Walls                      77.12  SF Ceiling
510.44  SF Walls & Ceiling            77.12  SF Floor
8.57  SY Flooring                     48.15  LF Floor Perimeter
48.15  LF Ceil. Perimeter

**Missing Wall:**      1 -    **2' 7" X 9'**        **Opens into Exterior**        **Goes to Floor/Ceiling**

| DESCRIPTION | QNTY |
|---|---|
| 212.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 510.44 SF |
| 213.  Remove and Replace Add on for trayed, dropped or coffered ceiling | 77.12 SF |
| 214.  Add for bullnose (rounded) corners | 510.44 SF |
| 215.  Texture drywall - heavy hand texture | 510.44 SF |
| 216.  Paint the walls and ceiling - two coats | 510.44 SF |
| 217.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 77.12 SF |
| 218.  Remove and Replace Baseboard - 2 1/4" | 48.15 LF |
| 219.  Paint baseboard - two coats | 48.15 LF |
| 220.  Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 221.  Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 222.  Paint casing - two coats | 34.00 LF |
| 223.  Remove and Replace Mirror - 1/4" plate glass | 17.08 SF |
| 224.  Detach & Reset Vanity | 5.00 LF |
| 225.  Detach & Reset Vanity top - one sink - cultured marble | 5.00 LF |
| 226.  Detach & Reset Toilet | 1.00 EA |
| 227.  Detach & Reset Bathtub | 1.00 EA |
| 228.  Detach & Reset Shower faucet - Standard grade | 1.00 EA |
| 229.  Detach & Reset Tub faucet | 1.00 EA |
| 230.  Remove and Replace Tile shower - up to 60 SF | 1.00 EA |
| 231.  Remove Custom shower door & partition - 1/4" glass w/frame | 35.00 SF |
| 232.  (Install) Custom shower door & partition - 1/4" glass w/frame | 35.00 SF |
| 233.  Detach & Reset Towel bar | 2.00 EA |

SAMPLE-1                                                    10/6/2010        Page: 16

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Mast. Bath

| DESCRIPTION | QNTY |
|---|---|
| 234. Detach & Reset Toilet paper holder | 1.00 EA |
| 235. Detach & Reset Sink faucet - Bathroom | 2.00 EA |
| 236. Floor protection - corrugated cardboard and tape | 77.12 SF |
| 237. Remove and Replace Batt insulation - 4" - R13 | 126.00 SF |
| 238. Remove and Replace Window sill | 2.00 LF |
| 239. Seal & paint window sill | 2.00 LF |
| 240. Rewire - average residence - copper wiring | 77.12 SF |
| 241. Detach & Reset Light bar - 5 lights | 1.00 EA |
| 242. Detach & Reset Light fixture - Standard grade | 2.00 EA |
| 243. Remove and Replace Exhaust fan | 1.00 EA |
| 244. Remove and Replace Switch | 2.00 EA |
| 245. Remove and Replace Ground fault interrupter (GFI) outlet | 2.00 EA |

NOTES:



| Hall | | | Height: 9' |
|---|---|---|---|
| 266.75 SF Walls | | 44.59 SF Ceiling | |
| 311.34 SF Walls & Ceiling | | 44.59 SF Floor | |
| 4.95 SY Flooring | | 28.94 LF Floor Perimeter | |
| 31.36 LF Ceil. Perimeter | | | |

**Missing Wall:**  1 -  2' 5" X 6' 8"  **Opens into FAMILY_RM**  **Goes to Floor**

| DESCRIPTION | QNTY |
|---|---|

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

### CONTINUED - Hall

| DESCRIPTION | QNTY |
|---|---|
| 246. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 311.34 SF |
| 247. Texture drywall - heavy hand texture | 311.34 SF |
| 248. Paint the walls and ceiling - two coats | 311.34 SF |
| 249. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 44.59 SF |
| 250. Attic Entrance Pull Down - Detach and Reset | 1.00 EA |
| 251. Paint baseboard - two coats | 28.94 LF |
| 252. Add for bullnose (rounded) corners | 311.34 SF |
| 253. Remove Carpet - Standard grade | 44.59 SF |
| 254. Carpet - Standard grade | 51.28 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 255. Remove and Replace Carpet pad - Standard grade | 44.59 SF |
| 256. Rewire - average residence - copper wiring | 44.59 SF |
| 257. Detach & Reset Light fixture | 1.00 EA |
| 258. Remove and Replace Switch | 2.00 EA |
| 259. Remove and Replace Outlet | 1.00 EA |
| 260. Remove and Replace Smoke detector | 1.00 EA |

NOTES:

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Family Rm**                                                               **Height: 9'**

|  |  |
|---|---|
| 536.46 SF Walls | 234.63 SF Ceiling |
| 771.08 SF Walls & Ceiling | 234.63 SF Floor |
| 26.07 SY Flooring | 58.91 LF Floor Perimeter |
| 61.33 LF Ceil. Perimeter |  |

| Missing Wall: | 1 - | 14' 8 3/16" X 0" | Opens into KITCHEN | Goes to Floor |
|---|---|---|---|---|
| Missing Wall: | 1 - | 2' 5" X 6' 8" | Opens into HALL | Goes to Floor |

| DESCRIPTION | QNTY |
|---|---|
| 261. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 771.08 SF |
| 262. Add for bullnose (rounded) corners | 771.08 SF |
| 263. Remove and Replace Add on for trayed, dropped or coffered ceiling | 234.63 SF |
| 264. Additional labor charge for arched openings | 1.00 EA |
| 265. Texture drywall - heavy hand texture | 771.08 SF |
| 266. Paint the walls and ceiling - two coats | 771.08 SF |
| 267. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 234.63 SF |
| 268. Remove and Replace Baseboard - 2 1/4" | 58.91 LF |
| 269. Paint baseboard - two coats | 58.91 LF |
| 270. Remove and Replace Batt insulation - 4" - R13 | 270.00 SF |
| 271. Remove and Replace Window sill | 6.00 LF |
| 272. Seal & paint window sill | 6.00 LF |
| 273. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 274. Remove and Replace Casing - 2 1/4" | 17.00 LF |
| 275. Paint casing - two coats | 17.00 LF |
| 276. Remove Carpet - Standard grade | 234.63 SF |
| 277. Carpet - Standard grade | 269.82 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 278. Remove and Replace Carpet pad - Standard grade | 234.63 SF |
| 279. Rewire - average residence - copper wiring | 234.63 SF |
| 280. Remove and Replace Smoke detector | 1.00 EA |
| 281. Detach & Reset Ceiling fan & light | 1.00 EA |

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Family Rm**

| DESCRIPTION | QNTY |
|---|---|
| 282. Remove and Replace Television cable outlet | 1.00 EA |
| 283. Remove and Replace Switch | 2.00 EA |
| 284. Remove and Replace Outlet | 6.00 EA |

NOTES:



| Kitchen | Height: 9' |
|---|---|

371.78 SF Walls
504.92 SF Walls & Ceiling
14.79 SY Flooring
43.22 LF Ceil. Perimeter

133.14 SF Ceiling
133.14 SF Floor
40.52 LF Floor Perimeter

| Missing Wall: | 1 - | 14' 8 3/16" X 0" | Opens into FAMILY_RM | Goes to Floor |
|---|---|---|---|---|
| Missing Wall: | 1 - | 4' 4 3/16" X 9' | Opens into FOYER | Goes to Floor/Ceiling |
| Missing Wall: | 1 - | 2' 8 3/8" X 6' 8" | Opens into DINING_RM | Goes to Floor |

| DESCRIPTION | QNTY |
|---|---|
| 285. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 504.92 SF |
| 286. Add for bullnose (rounded) corners | 504.92 SF |
| 287. Remove and Replace Add on for trayed, dropped or coffered ceiling | 133.14 SF |
| 288. Texture drywall - heavy hand texture | 504.92 SF |
| 289. Paint the walls and ceiling - two coats | 504.92 SF |

SAMPLE-1

10/6/2010     Page: 20

**Moss and Associates**

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

CONTINUED - Kitchen

| DESCRIPTION | QNTY |
|---|---|
| 290. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 133.14 SF |
| 291. Remove and Replace Batt insulation - 4" - R13 | 90.00 SF |
| 292. Detach & Reset Refrigerator - top freezer - 18 to 22 cf | 1.00 EA |
| 293. Detach & Reset Range - slide in - gas | 1.00 EA |
| 294. Detach & Reset Microwave oven - over range w/built-in hood | 1.00 EA |
| 295. Detach & Reset Dishwasher | 1.00 EA |
| 296. Detach & Reset Garbage disposer | 1.00 EA |
| 297. Detach & Reset Sink - double | 1.00 EA |
| 298. Detach & Reset Sink faucet - Kitchen - Standard grade | 1.00 EA |
| 299. Floor protection - corrugated cardboard and tape | 133.14 SF |
| 300. Detach & Reset Cabinetry - lower (base) units | 16.00 LF |
| 301. Detach & Reset Cabinetry - upper (wall) units | 9.00 LF |
| 302. Detach & Reset Countertop - Flat laid plastic laminate - Standard grade | 26.00 LF |
| 303. Remove Backsplash - plastic laminate | 29.00 SF |
| 304. (Install) Backsplash - plastic laminate | 29.00 SF |
| 305. Rewire - average residence - copper wiring | 133.14 SF |
| 306. Detach & Reset Recessed light fixture - Standard grade | 1.00 EA |
| 307. Detach & Reset Fluorescent light fixture - Standard grade | 1.00 EA |
| 308. Detach & Reset 220 volt outlet - Heavy duty | 1.00 EA |
| 309. Remove and Replace Phone/low voltage outlet rough-in | 1.00 EA |
| 310. Remove and Replace Phone, TV, or speaker outlet | 1.00 EA |
| 311. Remove and Replace Switch | 3.00 EA |
| 312. Remove and Replace Ground fault interrupter (GFI) outlet | 4.00 EA |

NOTES:

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678



**Dining Rm**                                                                        **Height: 9'**

|  |  |
|---|---|
| 294.05 SF Walls | 106.28 SF Ceiling |
| 400.33 SF Walls & Ceiling | 106.28 SF Floor |
| 11.81 SY Flooring | 29.14 LF Floor Perimeter |
| 40.42 LF Ceil. Perimeter | |

| Missing Wall: | 1 - | 5' 11 7/8" X 6' 8" | Opens into FOYER | Goes to Floor |
|---|---|---|---|---|
| Missing Wall: | 1 - | 2' 8 3/8" X 6' 8" | Opens into KITCHEN | Goes to Floor |
| Missing Wall: | 1 - | 2' 7" X 6' 8" | Opens into Exterior | Goes to Floor |

| DESCRIPTION | QNTY |
|---|---|
| 313. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 400.33 SF |
| 314. Add for bullnose (rounded) corners | 400.33 SF |
| 315. Remove and Replace Add on for trayed, dropped or coffered ceiling | 106.28 SF |
| 316. Additional labor charge for arched openings | 3.00 EA |
| 317. Texture drywall - heavy hand texture | 400.33 SF |
| 318. Paint the walls and ceiling - two coats | 400.33 SF |
| 319. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 106.28 SF |
| 320. Remove and Replace Baseboard - 2 1/4" | 29.14 LF |
| 321. Paint baseboard - two coats | 29.14 LF |
| 322. Remove and Replace Batt insulation - 4" - R13 | 162.00 SF |
| Remove and replace insulation from exterior walls | |
| 323. Seal & paint window sill | 4.00 LF |
| 324. Remove and Replace Window sill | 4.00 LF |
| 325. Remove and Replace Carpet pad - Standard grade | 106.28 SF |
| 326. Remove Carpet - Standard grade | 106.28 SF |
| 327. Carpet - Standard grade | 122.22 SF |
| 15 % waste added for Carpet - Standard grade. | |
| 328. Rewire - average residence - copper wiring | 106.28 SF |
| 329. Detach & Reset Chandelier | 1.00 EA |
| 330. Remove and Replace Switch | 1.00 EA |
| 331. Remove and Replace Outlet | 4.00 EA |

SAMPLE-1

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Dining Rm**

| DESCRIPTION | QNTY |
|---|---|

NOTES:

---



**Coat**                                                            **Height: 9'**

82.15  SF Walls                    5.15  SF Ceiling
87.30  SF Walls & Ceiling          5.15  SF Floor
0.57  SY Flooring                  9.13  LF Floor Perimeter
9.13  LF Ceil. Perimeter

| DESCRIPTION | QNTY |
|---|---|
| 332. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 87.30 SF |
| 333. Texture drywall - heavy hand texture | 87.30 SF |
| 334. Paint the walls and ceiling - two coats | 87.30 SF |
| 335. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 5.15 SF |
| 336. Remove and Replace Baseboard - 2 1/4" | 9.13 LF |
| 337. Paint baseboard - two coats | 9.13 LF |
| 338. Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 339. Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 340. Paint casing - two coats | 34.00 LF |
| 341. Floor protection - corrugated cardboard and tape | 5.15 SF |
| 342. Detach & Reset Shelving - 12" - in place | 4.00 LF |

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Coat**

**DESCRIPTION**                                                           **QNTY**

NOTES:



**Foyer**                                                           **Height: 9'**

| | | |
|---|---|---|
| 251.01 SF Walls | | 68.17 SF Ceiling |
| 319.18 SF Walls & Ceiling | | 68.17 SF Floor |
| 7.57 SY Flooring | | 25.90 LF Floor Perimeter |
| 31.89 LF Ceil. Perimeter | | |

| Missing Wall: | 1 - | 2' 3 11/16" X 9' | Opens into Exterior | Goes to Floor/Ceiling |
|---|---|---|---|---|
| Missing Wall: | 1 - | 2' 10 13/16" X 9' | Opens into Exterior | Goes to Floor/Ceiling |
| Missing Wall: | 1 - | 5' 11 7/8" X 6' 8" | Opens into DINING_RM | Goes to Floor |
| Missing Wall: | 1 - | 4' 4 3/16" X 9' | Opens into KITCHEN | Goes to Floor/Ceiling |

| DESCRIPTION | QNTY |
|---|---|
| 343. Remove and Replace 1/2" drywall - hung, taped, ready for texture | 319.18 SF |
| 344. Add for bullnose (rounded) corners | 319.18 SF |
| 345. Texture drywall - heavy hand texture | 319.18 SF |
| 346. Paint the walls and ceiling - two coats | 319.18 SF |
| 347. Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 68.17 SF |
| 348. Remove and Replace Baseboard - 2 1/4" | 25.90 LF |
| 349. Paint baseboard - two coats | 25.90 LF |
| 350. Floor protection - corrugated cardboard and tape | 68.17 SF |
| 351. Rewire - average residence - copper wiring | 68.17 SF |

SAMPLE-1                                       10/6/2010        Page: 24

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Foyer**

| DESCRIPTION | QNTY |
|---|---|
| 352.  Detach & Reset Light fixture | 1.00 EA |
| 353.  Remove and Replace Switch | 1.00 EA |
| 354.  Remove and Replace Outlet | 2.00 EA |

NOTES:

---

**Pantry**                                                      **Height: 9'**

136.21  SF Walls                    12.45  SF Ceiling
148.65  SF Walls & Ceiling          12.45  SF Floor
1.38  SY Flooring                   15.13  LF Floor Perimeter
15.13  LF Ceil. Perimeter

| DESCRIPTION | QNTY |
|---|---|
| 355.  Remove and Replace 1/2" drywall - hung, taped, ready for texture | 148.65 SF |
| 356.  Texture drywall - heavy hand texture | 148.65 SF |
| 357.  Paint the walls and ceiling - two coats | 148.65 SF |
| 358.  Remove and Replace Blown-in cellulose insulation - 8" depth - R30 | 12.45 SF |
| 359.  Remove and Replace Baseboard - 2 1/4" | 15.13 LF |
| 360.  Paint baseboard - two coats | 15.13 LF |
| 361.  Detach & Reset Interior door unit - Standard grade | 1.00 EA |
| 362.  Remove and Replace Casing - 2 1/4" | 34.00 LF |
| 363.  Paint casing - two coats | 34.00 LF |
| 364.  Detach & Reset Shelving - 12" - in place | 50.00 LF |
| 365.  Floor protection - corrugated cardboard and tape | 12.45 SF |

SAMPLE-1                                          10/6/2010          Page: 25

## Moss and Associates

2101 N. Andrews Ave.
Suite 300
Fort Lauderdale, FL 33311
(954) 524-5678

**CONTINUED - Pantry**

| DESCRIPTION | QNTY |
|---|---|
| 366. Rewire - average residence - copper wiring | 12.45 SF |
| 367. Detach & Reset Light fixture | 1.00 EA |
| 368. Remove and Replace Switch | 1.00 EA |

NOTES:

## Grand Total Areas:

| | | |
|---|---|---|
| 5,476.08 SF Walls | 1,617.34 SF Ceiling | 7,093.42 SF Walls and Ceiling |
| 1,617.34 SF Floor | 179.70 SY Flooring | 597.84 LF Floor Perimeter |
| 0.00 SF Long Wall | 0.00 SF Short Wall | 622.65 LF Ceil. Perimeter |
| 1,617.34 Floor Area | 1,752.03 Total Area | 5,607.97 Interior Wall Area |
| 2,050.60 Exterior Wall Area | 212.04 Exterior Perimeter of Walls | |
| 0.00 Surface Area | 0.00 Number of Squares | 0.00 Total Perimeter Length |
| 0.00 Total Ridge Length | 0.00 Total Hip Length | |



Main Level

# EXHIBIT F-1-3

To Be Inserted By Contractor

# EXHIBIT F-1-4

# Requirements for Move-out / Move-in

**<u>Move-out</u>**

**Prior to commencement of the Repair Work (as defined in the Work Authorization Agreement) in your property, it will be necessary for you to empty your <u>entire</u> property, including the attic, basement and garage**.

Move out need not occur until the Contractor has confirmed the Move-Out Date which pursuant to the Work Authorization is the date on which the Repair Work will begin. The Contractor will not confirm the Move-Out Date until it has completed the following pre-requisites for conducting the Repair Work efficiently and in compliance with all local rules and regulations:

- Secured all necessary building permits;

- Identified and scheduled for delivery all materials that have long delivery times; and

- Completed all other items as may be set forth in the Schedule of Work

Once ALL of these are complete, the Contractor will confirm the Move-Out Date and you should make all necessary arrangements to move out of the home in accordance with the below requirements.

Move-out includes the removal of all personal property from the property including, but not limited to the following:

- Furniture, area rugs, accessories

- Small appliances such as coffee makers, portable microwaves, mixers

- Owner-purchased/installed appliances, not including refrigerators, freezers, washers and dryers, garbage disposals, stoves, dishwashers, and microwaves

- Clothing/personal effects

- Sports/hobby equipment

- Electronics

- Window treatments including mounting hardware

- Wall decorations (mirrors, photos, pictures, shelving, etc.)

- Tools/lawn equipment (Items can be left in metal sheds on property, but the Contractor has no responsibility for any such items. Risk of damage or loss to such items remains with you, the property owner)

- Food (frozen, refrigerated, dry goods, canned)

- Indoor plants

- Pets

In addition to the removal of all personal property, you must also comply with the following:

- Remove all trash and unwanted items from the home.
- No items may be stored within the home including in kitchen cabinets, utility rooms, storage closets, attic spaces, basements, and garage.
- No vehicles, trailers, or storage containers can be left in the driveway or in areas that restrict access to the property in any way.
- Electrical power and water serving the property must remain <u>on</u> during the entire remediation process. Gas service must be turned <u>off</u>.
- Suspend and turn off alarm service monitoring.
- Properly label and provide one (1) complete set of keys which operate all locks to the Contractor.
- To the extent you have property insurance on the property, provide proof of property insurance to the Contractor, and maintain such insurance during the duration of the Repair Work.

Further, we recommend that you forward U.S. mail service to an alternate address, and turn off or suspend your telephone, cable/satellite TV service and/or newspaper service.

You, the property owner, are responsible for ensuring that the above requirements are met prior to the commencement of the Repair Work, including, but not limited to, making all arrangements for moving the above-listed items out of the home and storage of such items. You are also responsible for paying the costs associated with meeting the above requirements from the Lump Sum Payment provided to your pursuant to Section 4.3.1.1 of the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL 2047.

**IF ALL OF THE ITEMS ABOVE ARE NOT COMPLETE, CONTRACTOR WILL NOTIFY YOU. NO WORK WILL START ON YOUR PROPERTY UNTIL ALL OF THESE ITEMS ARE COMPLETE.**

<u>**Move-in**</u>

Prior to moving back into your property, you will be given the opportunity to inspect the completed home with the Contractor. During this inspection you can work with the Contractor to make a list, called a Punch List, of items that are incomplete or incorrect when compared to the conditions in the home prior to the Repair Work, but that will not affect your ability to move back into the home. The Contractor will take care of the items on the Punch List, and may perform some, or all, of the work on the Punch List after you have moved back into the home. Any Punch List item that the Contractor intends to

complete after you have moved back into the home, will be scheduled with you in advance.

Prior to your moving back into the home, the Contractor will do the following:

- Secure a Certificate of Occupancy, Certificate of Completion, or final approval from the Authority Having Jurisdiction (AHJ);

- Deliver the Contractor Certification and Environmental Certification to you, the property owner;

- Provide to you, the property owner, a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the Repair Work have been either released or bonded off such that your title is clear of all liens related to the Repair Work; and

- Require that you sign the Property Release of Contractor

The Contractor has extended a one-year warranty (or other timeframe required by applicable law or regulation, whichever is longer) on the Repair Work. If any items subject to the warranty are discovered during the warranty period the Contractor should be contacted as soon as possible at the following address and/or phone number:

[enter Contractor contact information for warranty work]

# EXHIBIT F-1-5

To Be Inserted By Contractor

# EXHIBIT F-1-6

# CONTRACTOR CERTIFICATION

I certify that all drywall, including all debris and visible dust, electrical wiring, fire safety and home security equipment, and copper gas lines have been removed in accordance with the Remediation Protocol, Exhibit F to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047. Completion of removal work has been confirmed by a visual inspection of all surfaces in the work area and any adjacent areas (including but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) that found no dust, debris or residue. Also there was no detectable odor of Chinese drywall at the completion of removal and cleaning work and prior to the start of new drywall installation. Evaluation for odor was performed at first entry to the property after it had been vacant and with all windows and doors closed for a period of at least 8 hours.

Contractor Name:_____

By:
(Signature)_____ Date_____

(Print Name)_____

(Print Title)_____

# EXHIBIT F-1-7

# PROPERY OWNER RELEASE OF CONTRACTOR

Name:

_____

Day Telephone: _____ Night Telephone: _____

Address: _____

_____

I/We, _____, certify that I/We am/are the owner(s) of the above listed property.

In consideration of the Substantial Completion of the Repair Work by the Contractor, I/We agree as follows:

1.      All defined terms in this Release will have the same meaning as those terms are defined in the Work Authorization I/We previously executed.

2.      Except for latent defects (hidden defects that cannot be discovered by reasonable inspection), warranty claims pursuant to the Work Authorization, claims arising from any and all liens related to the Repair Work, Punch List work listed on the attached Punch List, and/or claims for consequential damages as described in Paragraph 3 below, I/We hereby release the Contractor and its subcontractors, employees and agents of and from any and all claims or causes of action which arise out of, or relate in any way, to the Repair Work or the Work Authorization. This release covers all rights and causes of action of every kind, nature and description, which the undersigned ever had, now has/have and, but for this release, may have against the Contractor. This release binds the undersigned and his/her/their heirs, representatives and assignees.

3.      Notwithstanding any other provision of this Release, I/We do not waive claims against the Contractor for bodily injury or property damage caused by the Work Authorization and/or the Repair Work, except I/We waive all claims for such injury and/or damage that seek recovery of emotional distress (except for such emotional distress related to a bodily injury claims), loss of profits, loss of use, and/or diminution of property value damages.  "Loss of Use" does not include loss of use during the Construction Duration as defined in the Work Authorization.

4.      Except for items noted on the Punch List, the Repair Work has been performed to my/our satisfaction and in accordance with the Schedule of Work.

SIGNATURE: _____ DATE: _____
PRINTED NAME: _____

SIGNATURE: _____ DATE: _____
PRINTED NAME: _____

# EXHIBIT F-1-8

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

# SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

A P P R O V E D   N O V E M B E R   2 0 0 3

AMERICAN NATIONAL STANDARDS INSTITUTE, INC.



© 2010 NAHB Research Center, Inc. All rights reserved. This document may not be reproduced, downloaded, distributed, published, displayed, or transferred in any form or by any means, except with the prior written permission of NAHB Research Center, Inc. [Please note that copyright infringement is a violation of federal law subject to potential civil and criminal penalties.]

**NAHB RESEARCH CENTER**

## CONTENTS

STANDARD

1
SCOPE AND PURPOSE
PAGE 1

2
DEFINITIONS
PAGE 1

3
CALCULATION OF SQUARE
FOOTAGE
PAGE 2

4
STATEMENT OF FINISHED
SQUARE FOOTAGE
PAGE 3

ANNEX

COMMENTARY ON ANSI Z765
PAGE 4

FIGURES

1
ENTRY-LEVEL PLAN
PAGE 6

2
UPPER-LEVEL PLAN
PAGE 7

3
BASEMENT PLAN
PAGE 8

4
BUILDING SECTION
PAGE 9

5
BUILDING SECTION
PAGE 10

6
STAIRS
PAGE 11

Published by
NAHB Research Center
400 Prince George's Boulevard
Upper Marlboro, Maryland
20774-8731
800-638-8556 phone
301-430-6180 fax

Copyright 2003
by NAHB Research Center.
All rights reserved.

No part of this publication may
be reproduced in any form—
mechanical, electronic, or
otherwise—without the prior
written permission of
the publisher.

Printed in the United States
of America.

An American National Standard is developed through a consensus process that involves those organizations and individuals directly and materially affected by the existence of a standard. A standard itself is a voluntary guide for producers and consumers. The American National Standards Institute is the central body responsible for identifying a single, consistent set of voluntary standards and verifying that the principles of openness and due process are heeded. All American National Standards are subject to periodic review and revision.

A standard allows individuals and organizations that use different terminologies based on different points of view to communicate, cooperate, and calculate quantities on a common basis. This standard promotes these goals in the hope that square footage calculation can become an item of agreement rather than a point of contention between groups with different interests and concerns.

This standard for the calculation and reporting of above-grade square footage and below-grade square footage in single-family houses is offered for voluntary application. The standard must be applied as a whole. The standard is not meant to replace or supersede any legal or otherwise required existing area measurement method. It may be used in proposed, new, or existing single-family houses of any style or construction but is not applicable to apartment/multifamily buildings. It does not cover room dimensions.

Before the adoption of the standard in 1996, no nationwide standard existed in the United States for measuring square footage in single-family houses. By contrast, a standard applicable to commercial buildings has been in effect for 80 years. In 1915, the Building Owners and Managers Association International (BOMA) developed a standard method for measuring floor area in office buildings. The BOMA standard was revised in 1952, 1955, 1971, 1980, 1989, and 1996 and now bears the title *Standard Method for Measuring Floor Area in Office Buildings, ANSI/BOMA Z65.1-1996.*

The Ontario New Home Warranty Program issued *Builder Bulletin No. 22–Floor Area Calculations* on November 15, 1989. The bulletin's set of requirements for uniform floor area calculation applies to single-family houses and condominiums that enroll in the program and only when a numeric value for floor area is used in advertising and sales materials, in an agreement of purchase and sale, in a construction contract, or whenever the size of the house is stated in printed materials. Over the years, other groups have developed their own conventions for square footage calculation within their organizations.

In April 1994, the National Association of Home Builders (NAHB)–at the request of the Home Builders Association of Greater New Orleans and other builder members–commissioned the NAHB Research Center (a wholly owned subsidiary of NAHB) to act as secretariat for an ANSI Accredited Standards Committee and to assemble a group of organization representatives and individuals materially and directly affected by the development of an ANSI Standard for the measurement of square footage in detached and attached single-family houses. The committee held its first meeting on November 22, 1994.

ANSI procedures require periodic review to ensure that standards are current and relevant. In 2001 a standard committee was formed to consider changes to the 1996 edition of ANSI Z765. The committee accepted changes to Section 4 of the standard and to its Annex. The changes to Section 4 consisted of an editorial reorganization of its provisions and the addition of a subsection specifying reporting requirements for calculation results produced using other measurement methods. The changes to the Annex consisted of (1) the addition of a description of decorative finishes for concrete floors, along with recognition of this type of concrete floor as a type of floor finish; and (2) the addition of text acknowledging that the standard does not address differences between calculations made by multiple parties for the same property.

The standard embodies one informative Annex that is intended to comment on and illustrate the standard; however, the Annex is not considered part of the standard.

SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

Suggestions for improvement of the standard are welcome and should be forwarded to the secretariat:

NAHB Research Center
400 Prince George's Boulevard
Upper Marlboro, Maryland 20774-8731
301-249-4000 phone
301-430-6180 fax
http://www.nahbrc.org

This standard was processed and approved for submittal to ANSI by the Accredited Standards Committee on Residential Square Footage, Z765. Committee approval of the standard does not necessarily imply that all committee members voted for its approval. At the time it approved this standard, the Z765 Committee consisted of the following members listed in the right column.

Wayne M. Foley, Chair
Thomas Kenney, Secretariat–NAHB Research Center

NAME OF REPRESENTATIVE AND ORGANIZATION REPRESENTED

Paul Armstrong
International Code Council

Craig Auberger
American Association of Certified Appraisers

John Battles
International Code Council

Ron Burton
BOMA International

Mark Chambers
Godfrey-Chambers Homes, Inc.

Gerald Davis
International Centre for Facilities

Wayne Foley
W. M. Foley Construction Group

Swayn Hamlet
National Association of Realtors

Charles Hardie
Fran-Hardy Homes, Inc.

James Hill
National Institute of Standards and Technology

Jane Kneessi
U.S. Department of Commerce, Bureau of the Census

A.J. Tony Martinez
Yavapai County Assessor

James Nanni
Consumers Union

Tracy Riggan
MCL Companies

ii

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

# SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

## 1. SCOPE AND PURPOSE

### Scope

This standard describes the procedures to be followed in measuring and calculating the square footage of detached and attached single-family houses.

### Purpose

It is the purpose of this standard to describe a method of measurement that will make it possible to obtain accurate and reproducible measurements of square footage in single-family houses.

## 2. DEFINITIONS

### Attached Single-Family House

A house that has its own roof and foundation, is separated from other houses by dividing walls that extend from roof to foundation, and does not share utility services with adjoining houses; may be known as a townhouse, rowhouse, or duplex, for example.

### Detached Single-Family House

A house that has open space on all its sides.

### Finished Area

An enclosed area in a house that is suitable for year-round use, embodying walls, floors, and ceilings that are similar to the rest of the house.

### Garage

A structure intended for the storage of automobiles and other vehicles.

### Grade

The ground level at the perimeter of the exterior finished surface of a house.

### Level

Areas of the house that are vertically within 2 feet of the same horizontal plane.

### Square Footage

An area of a house that is measured and calculated in accordance with the standard. When employing Metric or Standard International (SI) measurement units, the term floor area is used in place of square footage.

### Unfinished Area

Sections of a house that do not meet the criteria of *finished area*.

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

# 3. CALCULATION OF SQUARE FOOTAGE

To claim adherence to this standard, the following methods of measurement and calculation must be employed when quantifying square footage in single-family houses. When using English measurement units, the house is measured to the nearest inch or tenth of a foot; the final square footage is reported to the nearest whole square foot. When using Metric or Standard International (SI) measurement units, the house is measured to the nearest 0.01 meter; the final floor area is reported to the nearest 0.1 square meter.

## Calculation Methods

Calculation of square footage made by using exterior dimensions but without an inspection of the interior spaces is allowed but must be stated as such when reporting the result of the calculation. Calculation of square footage for a proposed house made by using plans must be stated as such when reporting the result of the calculation.

Circumstances can exist when direct measurement of a structure is not possible. Access to the interior may not be available and the nature of the terrain, structure, or other obstacles may preclude direct physical measurement of the exterior in the time available. Building dimensions developed through some means other than direct measurement or plans can be susceptible to inaccuracy, as is the calculated area. Calculation of square footage developed under such circumstances must be identified as such when reporting the result of the calculation.

## Detached Single-Family Finished Square Footage

For detached single-family houses, the finished square footage of each level is the sum of finished areas on that level measured at floor level to the exterior finished surface of the outside walls.

## Attached Single-Family Finished Square Footage

For attached single-family houses, the finished square footage of each level is the sum of the finished areas on that level measured at floor level to the exterior finished surface of the outside wall or from the centerlines between houses, where appropriate.

## Finished Areas Adjacent to Unfinished Areas

Where finished and unfinished areas are adjacent on the same level, the finished square footage is calculated by measuring to the exterior edge or unfinished surface of any interior partition between the areas.

## Openings to the Floor Below

Openings to the floor below cannot be included in the square footage calculation. However, the area of both stair treads and landings proceeding to the floor below is included in the finished area of the floor from which the stairs descend, not to exceed the area of the opening in the floor.

## Above- and Below-Grade Finished Areas

The above-grade finished square footage of a house is the sum of finished areas on levels that are entirely above grade. The below-grade finished square footage of a house is the sum of finished areas on levels that are wholly or partly below grade.

## Ceiling Height Requirements

To be included in finished square footage calculations, finished areas must have a ceiling height of at least 7 feet (2.13 meters) except under beams, ducts, and other obstructions where the height may be 6 feet 4 inches (1.93 meters); under stairs where there is no specified height requirement; or where the ceiling is sloped. If a room's ceiling is sloped, at least one-half of the finished square footage in that room must have a vertical ceiling height of at least 7 feet (2.13 meters); no portion of the finished area that has a height of less than 5 feet (1.52 meters) may be included in finished square footage.

## Finished Areas Connected to the House

Finished areas that are connected to the main body of the house by other finished areas such as hallways or stairways are included in the finished square footage of the floor that is at the same level. Finished areas that are not connected to the house in such a manner cannot be included in the finished square footage of any level.

## Garages, Unfinished Areas, and Protrusions

Garages and unfinished areas cannot be included in the calculation of finished square footage. Chimneys, windows, and other finished areas that protrude beyond the exterior finished surface of the outside walls and do not have a floor on the same level cannot be included in the calculation of square footage.

# 4. STATEMENT OF FINISHED SQUARE FOOTAGE

Failure to provide the declarations listed below--where applicable--voids any claim of adherence to this standard.

## Rounding

The finished square footage of a house is to be reported to the nearest whole square foot for above-grade finished square footage and for below-grade finished square footage. When using SI units, floor area is reported to the nearest 0.1 square meter.

## Reporting of Above- and Below-Grade Areas

No statement of a house's finished square footage can be made without the clear and separate distinction of above-grade areas and below-grade areas.

## Areas Not Considered Finished

Finished areas that are not connected to the house, unfinished areas, and other areas that do not fulfill the requirements of finished square footage prescribed above cannot be included in the Statement of Finished Square Footage but may be listed separately if calculated by the methods described in this standard. Any calculation and statement of unfinished square footage must distinguish between above-grade areas and below-grade areas.

## Interior Spaces Not Inspected Method

If the calculation of finished square footage is made without an inspection of interior spaces to confirm finished areas, unfinished areas, or openings in the floor, the Statement of Finished Square Footage must include a declaration similar to the following:

### DECLARATION 1

"Finished square footage calculations for this house were made based on measured dimensions only and may include unfinished areas, openings in floors not associated with stairs, or openings in floors exceeding the area of associated stairs."

## Plans-Based Method

If the calculation of finished square footage is made from the plans of a proposed house, the Statement of Finished Square Footage must include a declaration similar to the following:

### DECLARATION 2

"Finished square footage calculations for this house were made based on plan dimensions only and may vary from the finished square footage of the house as built."

## Other Methods

Circumstances can exist when direct measurement of a structure is not possible. Access to the interior may not be available and the nature of the terrain, structure, or other obstacles may preclude direct physical measurement of the exterior in the time available. Building dimensions developed through some means other than direct measurement or plans can be susceptible to inaccuracy, as is the calculated area. Calculations developed under such circumstance must include a declaration similar to the following:

### DECLARATION 3

"Finished square footage calculations for this house were made based on estimated dimensions only and may include unfinished areas, or openings in floors not associated with stairs, or openings in floors exceeding the area of associated stairs."

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

SQUARE FOOTAGE–METHOD FOR CALCULATING: ANSI Z765-2003

## COMMENTARY ON ANSI Z765

This standard is not designed for and cannot be applied to the measurement of apartment/multifamily buildings, but it may be employed to measure all detached and attached single-family houses, including townhouses, rowhouses, and other side-by-side houses.

Practitioners of the standard are cautioned to confirm the appropriate legal definition of ownership of the house if applied to detached single-family or attached single-family condominium units to avoid violation of state law. Differences between the method for calculating finished square footage as set out in the standard and methods prescribed by state law to calculate the area of a condominium unit must be resolved on an individual basis. Legal definitions of condominium ownership can be obtained from the state body charged with archiving state law.

The committee chose to use the term square *footage* (instead of *floor* area) because of its common use by producers and consumers of housing.

The methods of measurement and calculation put forth in this standard are not intended or designed to cover the dimensions of rooms within single-family houses. Room dimensions are typically measured between interior finished surfaces rather than between exterior finished surfaces as described in this standard.

The term *habitable space* is often used by established building codes to describe a room or space that has as one of its requirements a specified amount of natural or mechanical light and ventilation sources. The definition of *finished* area–as employed in this standard–does not imply that finished spaces conform to any requirement for light and ventilation.

This standard makes a clear delineation between above-grade square footage and below-grade square footage; no statement of a house's square footage can be made without that clear and separate distinction. Given the above-grade and below-grade distinction and the definition of *grade*, the committee acknowledges that this may result in houses that–depending on topography, design, or grade line–have no calculated above-grade finished square footage derived from the method of measurement employed by this standard. This possible consequence arises from the committee's intent to quantify a house's area while minimizing the likelihood of misinterpretation or misapplication. Houses that are alternatively described as *at grade* or *on grade* are typically considered above-grade houses.

Wall and ceiling finishes include but are not limited to painted gypsum wall board, wallpaper-covered plaster board, and wood paneling. Floor finishes include but are not limited to carpeting, vinyl sheeting, hardwood flooring, and concrete floors with decorative finishes but do not include bare or painted concrete.

Decorative finishes are long-lasting or permanent components of the slab produced by such methods as chemical staining, integral coloration of the concrete, scoring, or stamping that modify the texture or appearance of the slab.

For a room to be included in the square footage calculation, the floor located under sloping ceilings must have a clearance of at least 5 feet (1.52 meters); further, at least one-half of the square footage in the room must have ceilings of at least 7 feet (2.13 meters) in height. For example, a one-and-one-half-story, 28 by 42 foot Cape Cod-style house has a first level with a ceiling height of 8 feet. On the second level, the ceiling has a maximum height of 9 feet but a minimum height of 4 feet at the walls as the ceiling slopes to match the pitch of the roof. All areas are finished. While the first level has 1,176 above-grade finished square feet, only that portion of the second level meeting the ceiling height requirements described above is included in the square footage calculation.

Where finished and unfinished areas are adjacent on the same level, finished square footage is calculated by measuring to the exterior edge or unfinished surface of any interior partition between the areas. For partitions between a finished area and a garage (usually a fire-rated wall), the measurement is made to the surface of the gypsum wall board on the garage side of the partition. For a partition that separates a finished area from an unfinished area (often not a fire-rated wall), the measurement is made to the portion of the partition closest to the unfinished area–usually a wood stud or other framing member.

Porches, balconies, decks, and similar areas that are not enclosed or not suitable for year-round occupancy cannot be included in the Statement of Finished Square Footage but may be listed separately, measured from the exterior finished surface of the house to the outer edge of the floor surface area or exterior surface, and calculated by using the method referenced in the standard.

Case 2:09-md-02047-EEF-MBN   Document 12061-33 Filed 12/20/11   Page 52 of 57

ANNEX (Informative)

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

The treatment of garage area in the standard allows practitioners to apply local customs. While garages can never be included in finished square footage, the standard does allow the area to be included in unfinished square footage. In the diagrams that accompany this standard, Figure 1 largely shows the garage (and the adjoining laundry) as a structure attached to the main body of the house. As such, the garage is not typically treated as an unfinished area of the house but rather as a separate area simply referred to as "garage." However, if the garage is located beneath the main body of the house, some localities treat the area as part of the house and contributing to unfinished square footage. Practitioners are urged to heed common local convention with regard to garages.

Finished areas above garages are included in the finished square footage that is at the same level in the main body of the house, but only if they are connected to the house by continuous finished areas such as hallways or staircases.

Exterior finishes include but are not limited to masonry or masonry veneer; wood, aluminum, or vinyl siding; or gypsum wall board when used on the exterior wall common to an attached garage.

Protruding areas beyond the exterior finished surface of the outside walls—such as chimneys and windows—cannot be included in finished square footage unless the protrusions have a floor on the same level and meet ceiling height requirements. For example, a hearth that is within the exterior finished surface is included, as is a window that extends from floor to ceiling. Further, if the hearth is on the first level and the chimney extends through the interior of the second level without a hearth on the second level, no deduction is made from the finished square footage of the second level. However, if the hearth or chimney is located beyond the exterior finished surface or the window does not have a floor, the area cannot be included in the finished square footage.

A common construction practice is to provide a floor opening for stairs that is the same size as the stairs themselves. Therefore, the area of stairs included in finished square footage is typically equal to the area of the opening in the floor. For example, a two-story, 28 by 42 foot house embodies 1,176 finished square feet on the first level and 1,176 finished square feet on the second level, provided that all areas are finished and the opening in the floor of the second level does not exceed the area of the stair treads. Further, stairs that descend to an unfinished basement are included in the finished square footage of the first level regardless of the degree of finish of the stairs or the degree of finish of the area around the stairs. In addition, areas beneath stairs are included in the finished square footage regardless of the distance between the stairs and the floor below or of the degree of finish of that area.

The standard makes no statement concerning differences between square footage calculations made by multiple parties for the same property. The method for calculating square footage requires measurements to be taken to the nearest inch or tenth of a foot using English measurement units or to the nearest hundredth of a meter using the Metric system. The final floor area must be reported to either the nearest square foot or tenth of a meter, as appropriate.

**Examples**

An example of a Statement of Finished Square Footage of a detached single-family house with basement follows:

**DECLARATION 1**

"A 28.2 by 42.5 foot two-story detached single-family house with 2,201 above-grade finished square feet and 807 below-grade finished square feet, plus 96 above-grade unfinished square feet in a utility room and 392 below-grade unfinished square feet in a basement. The first level has a 100-square-foot two-story space. In addition, the property includes a 240-square-foot enclosed porch and a two-car garage."

An example of the square footage description of a two-story attached single-family house follows:

**DECLARATION 2**

"A 22.1 by 30.9 foot two-story attached single-family carriage townhouse with 1,366 above-grade finished square feet and 176 above-grade unfinished square feet in a utility/storage room. In addition, the property includes a 120-square-foot deck and a one-car garage."

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003



**FIGURE 1.**

Entry-Level Plan
(above grade)

Figures 1 through 4 depict a two-story single-family house with basement. The entry and upper levels are entirely above grade and the basement is entirely below grade. The dashed line encircles the finished floor area that is counted as above-grade finished square footage and below-grade finished square footage. As shown, the upper-level plan has an open foyer and a protruding window that does not extend to the floor; neither area contributes to the square footage of the upper level. The calculated finished square footage of the entry level does not include the protruding fireplace, covered patio, garage, or unfinished laundry. The finished area of the basement is counted toward the below-grade finished square footage in its entirety, including the area under the stairs that descend from the entry level. The area of the unfinished utility room is calculated by using the method prescribed in the standard but is not included in the below-grade finished square footage.

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

**FIGURE 2.**
Upper-Level Plan
(above grade)



SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003



**FIGURE 3.**
Basement Plan
(below grade)

Note: Measure to exterior face of walls where below grade

Up

RECREATION ROOM

BATH

Unfinished Utility Room
(List separately from finished floor area)

LEGEND:

— — — — — FINISHED FLOOR AREA

/////////// UNFINISHED FLOOR AREA
(To be listed separately)

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS



SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003

**FIGURE 4.**
Building Section

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS

SQUARE FOOTAGE—METHOD FOR CALCULATING: ANSI Z765-2003



**FIGURE 5.**

Building Section

Figure 5 presents the building section of a one-and-one-half-story house with a partially below-grade entry level. The area in the finished loft/attic counting toward the finished square footage of that level has a ceiling height of at least 5 feet (1.52 meters), and at least one-half of the finished square footage has a ceiling height of at least 7 feet (2.13 meters). The entire area of the entry level is considered below-grade finished square footage.

AMERICAN NATIONAL STANDARD FOR SINGLE-FAMILY RESIDENTIAL BUILDINGS



**FIGURE 6.**

Stairs

Figure 6 demonstrates two typical stair configurations. Viewed from above, the stair treads and the landing in the drawing on the left fill the entire opening through which they descend. By definition, the area of the stairs and landing (or, by interpretation, the area of the opening) is included in the square footage of the level above. In the drawing on the right, the stair treads and landing merely skirt the opening. Here, the area of the treads and landing must be calculated to be included in the upper-level square footage; the remaining area of the opening is not included.







NAHB
RESEARCH
CENTER

400 PRINCE GEORGE'S BLVD.
UPPER MARLBORO, MD 20774
1-800-638-8556

© 2003 NAHB RESEARCH CENTER

# EXHIBIT G

Form of Security Agreement to be mutually agreed upon pursuant to Section 1.65

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L |
| THIS DOCUMENT RELATES TO:<br>ALL CASES AND | JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| *Payton, et al. v. Knauf Gips, KG, et al.*<br>Case No. 2:09-cv-07628 (E.D. La.) | |
| *Gross, et al. v. Knauf Gips, KG, et al.*<br>Case No. 2:09-cv-06690 (E.D. La.) | |
| *Rogers, et al. v. Knauf Gips, KG, et al.*<br>Case No. 2:10-cv-00362 (E.D. La.) | |
| *Abreu, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 2:11-cv-00252 (E.D. La.) | |
| *Block, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 11-cv-1363 (E.D. La.) | |
| *Arndt, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 11-cv-2349 (E.D. La.) | |
| *Cassidy, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*<br>Case No. 11-cv-3023 (E.D. La.) | |
| *Vickers, et al. v. Knauf Gips KG, et al.*<br>Case No. 2:09-cv-04117 (E.D. La.) | |

**EXHIBIT H TO SETTLEMENT AGREEMENT (EXHIBIT A TO MEMORANDUM OF LAW IN SUPPORT OF JOINT MOTION OF PROPOSED SETTLEMENT CLASS COUNSEL, THE PSC, AND THE KNAUF DEFENDANTS FOR AN ORDER:  (1) PRELIMINARILY APPROVING THE KNAUF SETTLEMENT; (2) CONDITIONALLY CERTIFYING A SETTLEMENT CLASS; (3) ISSUING CLASS NOTICE; (4) SCHEDULING A FAIRNESS HEARING; AND (5) STAYING CLAIMS AGAINST THE KNAUF DEFENDANTS)**

# FILED UNDER SEAL

# EXHIBIT I

**DECLARATION REGARDING RETURN OR DESTRUCTION OF DOCUMENTS**

_____, declares under penalty of perjury

     1.     I am a member of the Plaintiffs' Steering Committee ("PSC") appointed in *In re Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (E.D. La.).  The PSC is a party to Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 ("Settlement Agreement").

     2.     Pursuant to paragraph 16.3.6, I certify that the Litigation as that term is used in the Settlement Agreement having concluded, on or about _____, I returned to the Knauf Defendants or destroyed all documents produced by the Knauf Defendants in discovery, including all such documents in the possession of me, my firm, clients, experts, consultants or any other persons within the control of me or my firm.

Dated: _____

_____
NAME
LAW FIRM