# UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

No. 10-30568

United States Court of Appeals
Fifth Circuit

**FILED**

January 28, 2014

Lyle W. Cayce
Clerk

D.C. Docket No. 2:09-MD-2047
D.C. Docket No. 2:09-CV-6687

Consolidated with

Case No. 12-31017

## IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION

--------------------------------------------------------------------------------

MICHELLE GERMANO, Individually and on behalf of all others similarly situated; Et Al,

      Plaintiffs

JERRY BALDWIN; INEZ BALDWIN; STEVEN HEISCHOBER; ELIZABETH HEISCHOBER; JOSEPH LEACH; KATHY LEACH; PRESTON MCKELLAR; RACHAEL MCKELLAR; J. FREDERICK MICHAUX; VANNESSA MICHAUX; WILLIAM MORGAN; DEBORAH MORGAN; ROBERT ORLANDO; LEA ORLANDO,

      Intervenors - Appellees

v.

TAISHAN GYPSUM COMPANY, LIMITED, formerly known as Shandong Taihe Dongxin Company, Limited,

      Defendant - Appellant

Appeals from the United States District Court for the
Eastern District of Louisiana, New Orleans

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

## J U D G M E N T

This cause was considered on the record on appeal and was argued by counsel.

It is ordered and adjudged that the judgment of the District Court is affirmed.

IT IS FURTHER ORDERED that each party bear its own costs on appeal.


ISSUED AS MANDATE:    1 9 FEB 2014

1 9 FEB 2014

A True Copy
Attest

Clerk, U.S. Court of Appeals, Fifth Circuit

By: _Danthell Johnson_

Deputy

New Orleans, Louisiana

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

# F I L E D

January 28, 2014

No. 10-30568
c/w No. 12-31017

Lyle W. Cayce
Clerk

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY
LITIGATION

MICHELLE GERMANO, Individually and on behalf of all others similarly
situated; et al,

                              Plaintiffs,

JERRY BALDWIN; INEZ BALDWIN; STEVEN HEISCHOBER; ELIZABETH
HEISCHOBER; JOSEPH LEACH; KATHY LEACH; PRESTON MCKELLAR;
RACHAEL MCKELLAR; J. FREDERICK MICHAUX; VANNESSA MICHAUX;
WILLIAM MORGAN; DEBORAH MORGAN; ROBERT ORLANDO; LEA
ORLANDO,

                              Intervenors - Appellees,

v.

TAISHAN GYPSUM COMPANY, LIMITED, formerly known as Shandong Taihe
Dongxin Company, Limited,

                              Defendant - Appellant.

Appeals from the United States District Court
for the Eastern District of Louisiana

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

No. 10-30568 & 12-31017

This is a products liability case arising from the sale of allegedly defective drywall from a Chinese manufacturer (Taishan Gypsum Co. Ltd., or "TG"), through a Virginia distributor (Venture Supply, Inc., or "Venture"), to Virginia homeowners ("Plaintiffs").[1] TG contests the district court's determination that it had personal jurisdiction over TG. TG further asserts that, even if the district court does have jurisdiction, it abused its discretion in refusing to vacate the default judgment against TG. We disagree, and accordingly AFFIRM the district court on both issues.

## I.

Venture is a Virginia company that distributed drywall and other building materials to customers in multiple states, including Virginia.[2] In November 2005, a Venture agent contacted TG—a Chinese corporation with its principal place of business in Tai'an City, Shandong Province, China—to inquire about purchasing TG's drywall.[3] This call initiated a business relationship that lasted approximately two years. Shortly after the initial phone call, a Venture agent traveled to China where he negotiated a contract to purchase drywall from TG. The first contract between TG and Venture was executed on November 17, 2005. Venture signed the contract in Virginia and faxed its signature to TG in China. The first contract provided that TG would manufacture and sell 100,000

---

[1] This case involves both a group of "Original Plaintiffs," and "Plaintiff-Intervenors." Where the distinction matters, we refer to the groups by these names. Where it does not, we refer to them collectively as "Plaintiffs."

[2] The district court made a number of factual findings about the contacts between TG and Venture, some of which TG contests on appeal. To the extent that any of the facts included here are contested, we hold that these findings are supported by the extensive record before us, and were not clearly erroneous.

[3] It is undisputed that TG does not have any physical presence in Virginia and that the vast majority of TG's drywall is sold and used within the domestic Chinese market. All of TG's contacts with the State of Virginia relevant to this case involve its business relationship with Venture.

No. 10-30568 & 12-31017

sheets of TG drywall to Venture for $358,000.00. The contract specified that delivery would occur at a Chinese port, and that Venture was responsible for arranging and paying for transportation to Virginia from that port. All disputes under the contract were to be settled by negotiation, or submitted to the Foreign Trade Arbitration Commission of the China Council for the Promotion of International Trade. The contract noted Venture's address in Virginia.

Following this first contract, the two companies had extensive discussions regarding future business. During these discussions TG offered to lower the price of the drywall for Venture and to give Venture priority in purchasing drywall. TG sought to increase its business with Venture and to make Venture the exclusive distributor of its drywall in the United States. TG also sought Venture's assistance in providing a third-party with shipping information for its drywall. TG's representative communicated in English during these discussions and used an Americanized version of his name. TG also considered sending one of its employees to visit the United States. Based on these discussions, the district court found that TG and Venture both sought to expand future drywall sales in the United States through Venture.

In December 2005, Venture's agent returned to China to inspect the drywall it purchased under the first contract, and entered into a second contract with TG on behalf of Venture. The terms of the second contract were nearly identical to the first, with TG agreeing to sell an additional 100,000 sheets of drywall for $366,800.00. TG imprinted the drywall that is sold to Venture under these contracts with the following marks: "VENTURE SUPPLY INC. MFG: SHANDONG TAIHE, CHINA" and placed sealing tape around the edges of the drywall marked "GYPSUM BOARD DISTRIBUTED BY VENTURE SUPPLY INC. 757-855-5433 VENTURESUPPLY.COM." The drywall was also cut to Venture's specifications.

3

No. 10-30568 & 12-31017

Venture retained a shipping agent that TG recommended to deliver the drywall from the Chinese port to Virginia for the first shipment, and to New Jersey for the second shipment. The second shipment was then taken by rail to Virginia. TG received invoices from the shipping agent, which noted Venture's address in Virginia and that the drywall was shipped to Virginia. Venture shipped and sold TG's drywall to customers in at least three states other than Virginia, including New York, Georgia, Florida, and possibly Alabama. Venture sold a substantial amount of the TG drywall to Porter-Blaine Corp., which in turn sold the drywall to subcontractors, who allegedly used it to build homes in Virginia.

Plaintiffs Michelle Germano, Dennis and Sharon Jackson, and Jason and Lisa Dunaway (collectively "Original Plaintiffs") commenced a putative class action against TG on May 1, 2009, in the Eastern District of Virginia. Original Plaintiffs are all Virginia homeowners who allege that they suffered property damage due to the presence of TG's defective drywall in their homes. Specifically, they assert claims against TG for negligence, negligence per se, breach of express and/or implied warranties, private nuisance, unjust enrichment, and violation of the Virginia Consumer Protection Act. They also seek equitable and injunctive relief and medical monitoring to prevent health problems as a result of exposure to the allegedly defective drywall. In their First Amended Complaint, Original Plaintiffs asserted claims against TG as individuals, and also in their capacity as proposed representatives of a class of Virginia property owners similarly affected. Original Plaintiffs served TG with the First Amended Complaint on August 3, 2009, in Chinese and in accordance with the Hague Convention. It is undisputed that TG was properly served with the First Amended Complaint.

4

No. 10-30568 & 12-31017

Contractors installed hundreds of millions of square feet of drywall imported from China in homes across the United States between 2005 and 2008. A number of the owners and occupiers of these homes filed suit in state and federal courts against those involved in the drywall chain of distribution. Like Plaintiffs, these homeowners also allege that this drywall caused them property damage and health problems. Beginning in the summer of 2009, the Panel on Multi-district Litigation began transferring drywall-related lawsuits to the Eastern District of Louisiana as part of a multi-district litigation captioned *In re Chinese Manufactured Drywall Products Liability Litigation*, No. 09-MD-2047 (E.D. La.) ("MDL"), to oversee and manage pre-trial proceedings. This case was transferred to the MDL in October 2009. As part of this MDL, the district court is also overseeing claims raised against TG's wholly-owned subsidiary, Taian Taishan Plasterboard Co, Ltd. ("TTP"), which are not relevant to the case here.[4]

On November 18, 2009, the district court granted Original Plaintiffs' motion to file a default judgment against TG pursuant to Federal Rule of Civil Procedure 55 for TG's failure to appear or otherwise defend the action and issued a preliminary default judgment. That same day, the district court also granted Original Plaintiffs' motion to file a Second Amended Complaint. The Second Amended Complaint did not assert any new claims, but did expand the plaintiff class to a nationwide class. On December 21, 2009, the district court granted the motion of seven couples (collectively "Plaintiff-Intervenors")[5] to

---

[4] The district court frequently referred to TG and TTP collectively as "Taishan" or "Taishan Entities." As explained below, the district court found that TTP had no contacts with Virginia during the relevant time period. As a result, only TG's actions are relevant to this case.

[5] Plaintiff-Intervenors are Jerry and Inez Baldwin, Steven and Elizabeth Heischober, Joseph and Kathy Leach, Preston and Rachel McKellar, J. Frederick and Vanessa Michaux, William and Deborah Morgan, and Robert and Lea Orlando.

No. 10-30568 & 12-31017

intervene in this action. Plaintiff-Intervenors allege that they are also Virginia homeowners who suffered losses due to TG and other defendants' allegedly defective drywall.

In February 2010, the district court held a two-day hearing on damages allegedly suffered by Plaintiff-Intervenors. On May 11, 2010, the Court issued a default judgment ("Default Judgement") against TG awarding Plaintiff-Intervenors damages, pre-judgment interest, post-judgment interest, and costs.[6] TG waited until June 10, 2010, to file an appearance in this action. That same day, TG filed a notice of appeal seeking to have the Default Judgment vacated for (1) lack of personal jurisdiction, and (2) because the service of process was procedurally defective. This court remanded TG's appeal to the district court for the limited purpose of permitting it to rule on TG's motion to vacate the Default Judgment.

The parties spent more than a year and a half engaged in extensive discovery regarding personal jurisdiction over TG. Discovery was closely monitored by the district court. On June 29, 2012, the district court presided over a hearing on TG's motions, after which it ruled that Plaintiffs had established that there was personal jurisdiction over TG by a preponderance of the evidence ("Order & Reasons").[7] The district court concluded that, as the MDL transferee court, it should apply the substantive state law of the transferor court (Virginia) and the federal law of its own circuit (the Fifth Circuit). The

---

[6] According to TG, it owes a total of $2,758,356.20 to Plaintiff-Intervenors under the Default Judgment. As counsel for TG confirmed at oral argument, only the Plaintiff-Intervenors are parties to the Default Judgment against TG. Original Plaintiffs only have a preliminary default judgment against TG, and the district court has not yet held a hearing on damages for these claims.

[7] The district court determined that it had held an evidentiary hearing on discovery because it relied on discovery evidence, including depositions. As a result, Plaintiffs had to prove that there was personal jurisdiction over TG by a preponderance of the evidence. *See Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008).

6

No. 10-30568 & 12-31017

district court applied Virginia's long-arm statute, and found that subsections (A)(4) and (A)(5) of § 8.01-328.1 of the Virginia Code applied to TG because it had obtained substantial revenue from Virginia.[8]

The district court acknowledged the disparate approaches to the personal jurisdiction minimum contacts analysis that have followed the Supreme Court's plurality opinions in both *Asahi Metal Industry Co., Ltd. v. Superior Court of California*, 480 U.S. 102 (1987), and *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011). Following Fifth Circuit precedent, the district court applied the stream-of-commerce test from Justice Brennan's concurrence in *Asahi*. *See Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 178 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 644 (2013). The district court concluded that it had specific jurisdiction over TG for this suit because "TG placed its drywall into the stream of commerce with the knowledge that its drywall would end up in and be used in Virginia." The district court then concluded that the Plaintiffs' claims "relate to" or "arise out of" TG's contacts with Virginia because the presence of TG's drywall in Virginia properties was the alleged cause of their injuries. The district court declined to impute the contacts of TG's wholly-owned subsidiary, TTP, onto TG for the purposes of determining personal jurisdiction, noting that "the present evidence demonstrates that TTP had no contacts with Virginia during the relevant time period, leaving no forum contacts to impute to TG." The district court also determined that exercising jurisdiction over TG comported with "traditional notions of fair play and substantial justice."

---

[8] The parties appear to agree that the relevant question is whether TG established minimum contacts with Virginia, rather than the MDL court, necessary to give rise to personal jurisdiction. We agree that the analysis properly focuses on TG's contact with Virginia, rather than Louisiana. *See* Charles Alan Wright et. al., 4 Federal Practice & Procedure Civil § 1067.3 (3d ed.) ("It also seems clear that the minimum contacts requirement does not apply to a plaintiff's contacts with the transferee forum in a case transferred pursuant to the multidistrict litigation (MDL) statute.").

No. 10-30568 & 12-31017

TG also argued that the Default Judgment was invalid because it had not been properly served with the Second Amended Complaint or motion to intervene prior to the entry of the Default Judgment. The district court denied TG's motion to vacate the Default Judgment in its Order & Reasons. As the district court explained, TG was properly served with the First Amended Complaint, and the Second Amended Complaint

> only amended the First Amended Complaint insofar as expanding the class definition against [TG] to a national class and expanding the Virginia consumer protection claims to consumer protection claims for each state involved. None of these amendments would have affected Intervening Plaintiffs' claims. Thus, the Court finds that whether or not the Second Amended Complaint was properly served upon [TG], the Court has sufficient jurisdiction . . . as a result of the proper service of the First Amended Complaint since Intervening Plaintiffs' claims were properly within the First Amended Complaint.

TG timely filed separate notices of appeal contesting both the Default Judgment and the Order & Reasons. We consolidated the two appeals. Because the Default Judgment is only proper if the district court had personal jurisdiction over TG, we begin with that issue.

## II.

A district court's denial of a motion to vacate a default judgment made on the ground that the judgment is void for lack of personal jurisdiction is subject to *de novo* review. *Jackson v. FIE Corp.*, 302 F.3d 515, 521 (5th Cir. 2002). Absent any dispute as to the relevant facts, whether personal jurisdiction can be exercised over a defendant is a question of law and subject to *de novo* review. *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 335 (5th Cir. 1999); *Ruston Gas Turbines, Inc. v. Donaldson Co., Inc.*, 9 F.3d 415, 418 (5th Cir. 1993). A district court's determination of the legal significance of the facts is also subject to *de novo* review. *Martinez–Aguero v. Gonzalez*, 459 F.3d 618, 621 (5th Cir. 2006). A district court's findings of fact are subject to review based on

8

No. 10-30568 & 12-31017

a "clearly erroneous" standard. *See* Fed. R. Civ. P. 52(a)(6); *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 572 (1985). A finding is "clearly erroneous" when there is no evidence to support it, or if the reviewing court, after assessing all of the evidence, is left with the definite and firm conviction that a mistake has been committed. *See Anderson*, 470 U.S. at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).[9]

The plaintiff bears the ultimate burden of establishing jurisdiction over a non-resident defendant. *Caldwell v. Palmetto State Sav. Bank of S.C.*, 811 F.2d 916, 917 (5th Cir. 1987). Because the district court held an evidentiary hearing on the issue of personal jurisdiction, Plaintiffs must establish personal jurisdiction by a preponderance of the admissible evidence. *See Walk Haydel & Assocs., Inc.*, 517 F.3d at 241–42.[10] Once Plaintiffs establish minimum contacts, the burden shifts to TG to show that the assertion of personal jurisdiction in the forum would be unfair or unreasonable. *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266, 271 (5th Cir. 2006) (citations omitted); *see also ESAB Grp., Inc. v. Zurich Ins. PLC*, 685 F.3d 376, 392–93 (4th Cir. 2012).

III.

TG argues that had the district court applied Fourth Circuit precedent rather than our circuit's precedent then it would have concluded that there was no personal jurisdiction over TG. According to TG, the Fourth Circuit requires a stronger showing to establish minimum contacts over a foreign defendant than we do. This difference in approaches stems from how our circuit and the Fourth Circuit have interpreted the Supreme Court's most recent personal jurisdiction decisions, which have not produced a majority for any one rationale regarding

---

[9] The Fourth Circuit applies the same standard of review. *See Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009).

[10] *See also Mylan Labs., Inc. v. Akzo, N.V.*, 2 F.3d 56, 59–60 (4th Cir. 1993).

No. 10-30568 & 12-31017

when an out of state defendant has "purposefully availed" itself of the forum state. In *Asahi*, the Supreme Court split on whether the foreign defendant had sufficient minimum contacts with the forum to satisfy specific personal jurisdiction, but it agreed that exercising personal jurisdiction over the defendant in that case violated Due Process on fairness and reasonableness grounds. 480 U.S. 102. Justice Brennan's concurring opinion held that when a manufacturer places a product in the stream of commerce, the defendant has purposefully availed itself of the forum so long as it is foreseeable that the product would end up in the forum state. *Id.* at 116. (Brennan, J., concurring). In contrast, Justice O'Connor's opinion for the plurality would require "additional conduct" beyond merely placing the product in the stream of commerce in order to exercise jurisdiction over a defendant. *Id.* at 112. The approach advocated by Justice Brennan has become known as the stream-of-commerce test, and Justice O'Connor's approach is referred to as the stream-of-commerce-plus test.

Following *Asahi*, the Supreme Court addressed minimum contacts in another plurality decision. *McIntyre*, 131 S.Ct. 2780. In *McIntyre*, the majority of the Supreme Court agreed that New Jersey did not have personal jurisdiction over a foreign defendant who had never marketed or directly sold its products into the forum state. *Id.* at 2785, 2791. Justice Kennedy's plurality opinion emphasized that the defendant must purposefully avail itself of the forum state, explaining that "as a general rule, it is not enough that the defendant might have predicted that its goods will reach the forum State. . . . This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment." *Id.* at 2788–89. In his concurrence, Justice Breyer explained that, "on the record present here, resolving this case requires no more than adhering to our precedents." *Id.* at 2792 (Breyer, J., concurring). He emphasized that "[n]one of our precedents

10

No. 10-30568 & 12-31017

finds that a single isolated sale, even if accompanied by the kind of sales effort indicated here, is sufficient" and noted that "the Court, in separate opinions, has strongly suggested that a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." *Id.* at 2792.

In assessing minimum contacts, the Fourth Circuit has repeatedly applied the stream-of-commerce-plus test from Justice O'Connor's opinion in *Asahi* and cited Justice Kennedy's plurality opinion in *McIntyre.  See, e.g., Unspam Technologies,* 716 F.3d at 328; *ESAB Grp.,* 685 F.3d at 392; *Lesnick v. Hollingsworth & Vose Co.,* 35 F.3d 939, 946–47 (4th Cir. 1994).  In contrast, we apply the stream-of-commerce test from Justice Brennan's concurrence in *Asahi,* and Justice Breyer's concurrence in *McIntyre.  See Ainsworth,* 716 F.3d at 178.

TG argues that the district court should have applied Fourth Circuit law based on our decision in *In re Ford Motor,* 591 F.3d 406, 413 n.15 (5th Cir. 2009). In *Ford Motor* we held that the transferee court should apply the transferor court's interpretation of federal law when addressing issues of forum-availability. *Id. Ford Motor* addressed which circuit's law should apply to a forum *non conveniens,* rather than personal jurisdiction, question in an MDL transfer case.  TG argues that the language in *Ford Motor* suggests that its result should apply here as well.  Specifically, in *Ford Motor* we said that "because forum-availability law is 'geographically non-uniform,' a tranferee court should use the rule of the transferor forum." *Id.*  TG argues that personal jurisdiction is also a question of forum-availability.  In response, Plaintiffs argue that personal jurisdiction is not a question of "forum-availability" or "geographically non-uniform" federal law.  They argue that instead we should apply the law of our own forum because "it is logically inconsistent to require one judge to apply simultaneously different and conflicting interpretations of what

No. 10-30568 & 12-31017

is supposed to be a unitary federal law." *In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1175–76 (D.C. Cir. 1987), *aff'd sub nom. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989).

We disagree with TG's assessment. First, *Ford Motor* is not determinative of which circuit's precedent applies here, as it dealt with the separate issue of forum *non conveniens.* *See Ford Motor*, 591 F.3d at 411. Moreover, we need not reach the issue of which circuit's law should apply because regardless of which circuit's approach we use, the outcome is the same. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 839 n.20 (1985) ("[F]alse conflict really means no conflict of laws. If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." (internal quotation marks omitted) (citing R. Leflar, American Conflicts Law § 93 (3d ed. 1977); E. Scoles & P. Hay, Conflict of Laws § 2.6 (1982)).

We now analyze TG's forum contacts under the Fourth Circuit's more stringent approach and consider only TG's contacts with Virginia.[11] "In general, federal district court may only exercise personal jurisdiction over a foreign corporation if such jurisdiction is authorized by the long-arm statute of the state in which it sits and application of the long-arm statute is consistent with the due process clause of the Fourteenth Amendment." *ESAB Grp., Inc. v. Zurich Ins.*

---

[11] In *McIntyre* both the plurality and concurring opinions emphasized that the defendant must have an intent to serve a market in the particular forum state, rather than simply the "U.S. market." 131 S.Ct. at 2790. Thus, the proper inquiry focuses exclusively on forum-specific, rather than nationwide contacts. *Id.* at 2790; *id.* at 2793 (Breyer, J., concurring). Given the Supreme Court's directive in *McIntyre*, our analysis focuses exclusively on TG's potential contacts with Virginia, rather than "U.S. contacts." Plaintiffs frequently cite facts regarding the nationwide contacts of TG and its wholly owned subsidiary, TTP, which Plaintiffs collectively refer to as "Taishan." The district court found that TTP did not have any contacts with Virginia during the relevant time period and did not impute TTP's contacts onto TG. Defendants have not contested this finding on appeal. As a result, we consider only TG's contacts with Virginia. *See Windsor v. Spinner Indus. Co., Ltd.*, 825 F. Supp. 2d 632, 638 (D. Md. 2011), *as amended* (Dec. 15, 2011).

12

No. 10-30568 & 12-31017

*PLC*, 685 F.3d 376, 391 (4th Cir. 2012) (internal quotation marks and citations omitted). Because the scope of Virginia's long-arm statute is coextensive with the Due Process Clause, we proceed directly to the constitutional analysis.[12] *See Danville Plywood Corp. v. Plain & Fancy Kitchens*, Inc., 238 S.E. 800, 801 (Va. 1977) (citing *Carmichael v. Snyder*, 164 S.E.2d 703, 707 (Va. 1968)).

"Since *International Shoe* [*Co. v. Washington*, 326 U.S. 310 (1945)], specific jurisdiction has become the centerpiece of modern jurisdiction theory, while general jurisdiction [has played] a reduced role." *Daimler AG v. Bauman*, No. 11-965, slip op. at 9 (U.S. Jan. 14, 2014) (internal quotation marks and citations omitted).[13] The Fourth Circuit employs a three-part inquiry to determine whether the exercise of specific jurisdiction over a party comports with Due Process. *ESAB Grp.*, 685 F.3d at 391–92 (citing *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 278 (4th Cir. 2009)). Under this test, the Fourth Circuit considers "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiff['s] claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (internal quotation marks and citations omitted). We address each prong in turn.

---

[12] The district court applied Virginia's long-arm statute, and found that subsections (A)(4) and (A)(5) of § 8.01-328.1 of the Virginia Code applied to TG because it had obtained substantial revenue from Virginia. We agree.

[13] In *Daimler* the Supreme Court determined that there was no general jurisdiction over the defendant. Here, we hold that there is specific jurisdiction over TG. *See Daimler*, No. 11-965, slip op. at 2 ("In *Goodyear Dunlop Tires Operations, S. A. v. Brown*, 564 U.S. ___ (2011), we addressed the distinction between general or all-purpose jurisdiction, and specific or conduct linked jurisdiction."); *id.* at 14–15 (noting the differences between the Supreme Court's general and specific jurisdiction jurisprudence and stating that "Plaintiffs have never attempted to fit this case into the specific jurisdiction category").

13

No. 10-30568 & 12-31017

A.

"[T]he Due Process Clause prohibits a court from exercising personal jurisdiction over a defendant unless that defendant has certain minimum contacts . . . such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Unspam Technologies, Inc. v. Chernuk*, 716 F.3d 322, 328 (4th Cir. 2013) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Such contacts exist when a defendant 'purposely avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its law.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

> Jurisdiction . . . may not be avoided merely because the defendant did not physically enter the forum State. . . . [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

*Id.* at 476 (citation omitted); *see also Daimler*, No. 11-965, slip op. at 9 ("*International Shoe*[] . . . unleashed a rapid expansion of tribunals' ability to hear claims against out-of-state defendants when the episode in-suit occurred in the forum or the defendant purposefully availed itself of the forum.").

It does not appear that the Fourth Circuit has addressed the precise situation at issue here, where an out-of-state defendant sold an allegedly defective product to a forum-resident distributor. Instead, most cases address contacts when a product only reaches the forum state after an out-of-state

14

No. 10-30568 & 12-31017

distributor sells the out-of-state defendant's product into the forum. *See, e.g.,* *Lesnick*, 35 F.3d at 946–47.  The fact that TG knowingly sold its products directly to Venture—a Virginia resident—is, on its own, a significant contact with the forum.  We need not decide whether this contact alone would suffice to meet the first prong of the minimum contacts test because TG also designed its product for market in Virginia, and because it was not an isolated sale.

The Fourth Circuit uses the "stream-of-commerce-plus" framework developed in *Asahi* and its progeny when assessing whether or not the out-of-state manufacturer of an allegedly defective product has established minimum contacts with the forum state where the end-user of the product resides.  *See, e.g., Lesnick*, 35 F.3d at 946–47. The stream-of-commerce-plus test is premised on the notion that once a manufacturer has placed its product into distribution channels, it is foreseeable that the stream will eventually sweep the product into the forum state.  *Asahi*, 480 U.S. at 110.  In addition to this "mere foreseeablity," the stream-of-commerce-plus test requires "[a]dditional conduct of the defendant" that "may indicate an intent or purpose to serve the market in the forum State."  *Asahi*, 480 U.S. at 112.  In *Asahi*, Justice O'Connor provided several explicit examples of such conduct, including "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State." *Id; see also Daimler*, No. 11-965, slip op. at n.7 ("[S]pecific jurisdiction may lie over a foreign defendant that places a product into the 'stream of commerce' while also 'designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the

15

No. 10-30568 & 12-31017

sales agent in the forum State.'") (quoting *Asahi*, 480 U. S. at 112 (opinion of O'Connor, J.)).

Here, TG designed its product and packaging for Venture, a Virginia resident. TG manufactured its drywall to Venture's requested dimensions on a made-to-order basis. It also imprinted the drywall with the following marks: "VENTURE SUPPLY INC. MFG: SHANDONG TAIHE, CHINA" and placed sealing tape on its edges that read "GYPSUM BOARD DISTRIBUTED BY VENTURE SUPPLY INC. 757-855-5433 VENTURESUPPLY.COM." These were active steps, specifically taken by TG, to purposefully direct its product toward Virginia. TG not only included the name of a Virginia company on its product, it also included a phone number with a Virginia area code. Through its own acts, TG connected its product to Virginia, and ensured that the product's end-users would identify its product with a Virginia resident. Thus, by "designing the product for the market in the forum State" TG engaged in the "additional conduct" necessary for the district court to exercise personal jurisdiction here. *Asahi*, 480 U.S. at 112.

Moreover, TG's contact with Virginia was neither random nor isolated. "[E]ven a single contact may be sufficient to create jurisdiction when the cause of action arises out of that . . . contact, provided that the principle of 'fair play and substantial justice' is not thereby offended." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 397 (4th Cir. 2003); *see also Daimler*, No. 11-965, slip op. at n.7 ("[I]f the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others.") (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U. S. 286, 297 (1980)); *Chung v.*

16

No. 10-30568 & 12-31017

*NANA Dev. Corp.*, 783 F.2d 1124, 1129 (4th Cir. 1986). TG entered into not just one, but two contracts to sell a substantial amount of drywall to a company that it knew to be a Virginia resident. Each sale was for 100,000 made-to-order sheets of drywall, and in each case TG was to receive more than $350,000.00 from its sale into Virginia. Nor is this a case where the defendant was unaware that it was selling to a forum resident. TG dealt directly with Venture during the negotiations and contracting. Venture representatives made several trips to China to meet with TG, and TG was involved in ongoing communications with Venture regarding these two sales over multiple months. Both the contracts and shipping receipts clearly stated TG's address in Virginia, as did the markings on the drywall tape. Unlike cases where the manufacturer sells its product through an out-of-state intermediary, TG knowingly sold its product directly to a Virginia resident. As the district court noted, the communications between TG and Venture were regular and relatively extensive.[14] For example, TG sought to increase its business with Venture and discussed making Venture the exclusive distributor of its drywall in the United States. TG also sought Venture's assistance in providing a third-party with shipping information for its drywall. As the district court noted, TG sought to expand its future drywall sales in the United States through Venture. Given these facts, TG's contacts were not "of an isolated or unsolicited character." *See Chung*, 783 F.2d at 1128–29 ("The factors considered in determining whether the defendant

---

[14] Although TG contests the extent of these communications, the district court cited a number of employee affidavits, declarations, depositions, and emails that support its finding. In particular, the district court cited and quoted from several e-mails that a TG employee wrote to Venture emphasizing TG's desire to continue to work with Venture in the future, and to use TG as a point from which it might expand its market. The district court was actively involved in overseeing the discovery process, and even attended a number of depositions. The Order & Reasons demonstrates that the district court was intimately familiar with the extensive record in this case. While TG points to other information in the record that could support a contrary conclusion, the district court's conclusions here are well-supported. TG has not met its burden to show that these findings were clearly erroneous.

No. 10-30568 & 12-31017

purposefully established minimum contacts with the forum include "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." (citing *Burger King*, 471 U.S. at 479)).

This case is thus distinguishable from cases in which there was "no evidence that [the defendant] designed the products for the market in Virginia, advertised in Virginia, established channels for providing regular advice to customers in Virginia, or marketed the product through a distributor who agreed to serve as the sales agent in Virginia." *St. Jarre v. Heidelberger Druckmaschinen, A.G.*, No. 93-1848, 1994 WL 95944, at *3 (4th Cir. Mar. 25, 1994) (quoting *Asahi*, 480 U.S. at 112) (unpublished but persuasive). Here, TG *did* market its product to a forum resident. By contracting with Venture, TG *did* benefit legally from the laws of the forum and economically from indirect sales to forum residents. *Cf. Fed. Ins. Co. v. Lake Shore Inc.*, 886 F.2d 654, 659 (4th Cir. 1989) (finding no personal jurisdiction and explaining that "[this] case is therefore distinguishable from those 'stream of commerce' cases *where a manufacturer employs an intermediary or distributor in the forum state* and thereby benefits legally from the protection provided by the laws of the forum and economically from indirect sales to forum residents." (emphasis added) (citing *Nelson v. Park Indus., Inc.*, 717 F.2d 1120, 1125–26 (7th Cir. 1983); *Oswalt v. Scripto, Inc.*, 616 F.2d 191, 199–200 (5th Cir. 1980)).

In addition, TG *did* design its product for the Virginia market. *Cf. Lesnick*, 35 F.3d at 946–47 (finding no purposeful availment but acknowledging that "the result might be different if Hollingsworth & Vose had changed production to comply with Maryland regulations"). By designing its product in this way, TG sought to directly benefit from Venture's distribution system into Virginia. *Cf. Fed. Ins. Co*, 886 F.2d at 659. Following the sales, TG continued to deal with Venture to discuss both shipping arrangements and the possibility

18

No. 10-30568 & 12-31017

of future business. *See Cancun Adventure Tours, Inc. v. Underwater Designer Co.*, 862 F.2d 1044, 1046–47 (4th Cir. 1988) ("[A]ppellants subsequently negotiated and undertook a contractual obligation with a Virginia resident. UDC mailed purchase orders to Cancun Adventure Tours in Virginia and accepted payment from Virginia. After sale of the air compressor, UDC and Califano continued to deal with Cancun Adventure Tours in Virginia by telephone and through the mails. These contacts were such that litigation in Virginia was reasonably foreseeable."). TG accepted payment from Virginia for these sales. Indeed, TG showed a desire to use Venture as a gateway for future sales in the U.S. market, including in Virginia.

This case is also very different from the situation in *McIntyre*, where the manufacturer sold to an out-of-state distributor, and a few products happened to make their way into the forum state as a result of the distribution chain. *McIntyre*, 131 S.Ct. at 2786. Here, TG directly contracted to sell a significant amount of drywall to a forum resident through multiple sales, and personally designed its product in a way that identified it with the forum resident. TG purposefully availed itself of Virginia. The first prong is therefore met.[15]

B.

While the first prong of the personal jurisdiction test assesses the connection between the defendant and the forum, the second prong looks at the relationship between the defendant's forum contacts and the plaintiffs' claims. Under Fourth Circuit precedent, the second prong "requires that the defendant's contacts with the forum state form the basis of the suit." *Consulting Eng'rs*

---

[15] TG argues that because the two contracts with Venture specified that any disputes would be settled by arbitration in China that it was not reasonably foreseeable that it would be haled into court in Virginia. Plaintiffs were not party to these contracts, and their products liability claims are not governed by the arbitration clauses. TG knew that Venture was a drywall distributor, and that it would sell TG's drywall on to end-users. Given that TG made two large sales to a Virginia distributor, and designed the product in a way that identified the product with that Virginia distributor, was reasonably foreseeable that Virginia residents might bring suit against TG as a result of these sales.

19

No. 10-30568 & 12-31017

*Corp.*, 561 F.3d at 278–79. "Where activity in the forum state is 'the genesis of [the] dispute,' this prong is easily satisfied." *See Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co., Ltd.*, 682 F.3d 292, 303 (4th Cir. 2012), *cert. denied*, 133 S. Ct. 846 (2013) (citing *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 295 (4th Cir. 2009)). Here, TG's contacts with Virginia stem from its sales to Venture, and the basis of the suit is that Plaintiffs' Virginia homes were allegedly injured by TG's drywall. TG's allegedly defective drywall only ended up in Plaintiffs' Virginia homes as a result of TG's sales to Venture. TG's contacts with Virginia thus form the basis for this suit. Accordingly, we agree with the district court that the second prong is met.

C.

The third prong, constitutional reasonableness, protects a party from litigation "so gravely difficult and inconvenient that [the] party unfairly is at a severe disadvantage in comparison to [its] opponent." *ESAB Grp., Inc.*, 685 F.3d at 392 (citing *Burger King*, 471 U.S. at 478). The burden is on the defendant to establish a "compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Id.* at 393 (internal quotation marks and citations omitted). In assessing this prong, the Fourth Circuit considers additional factors including: "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Consulting Eng'rs Corp.*, 561 F.3d at 279 (citing *Burger King*, 471 U.S. at 477).

The first factor addresses the burden on the defendant. "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders." *Asahi*, 480 U.S. at 114.

20

No. 10-30568 & 12-31017

Once minimum contacts have been established, however, "often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Id.*  TG is a foreign defendant, and the district court determined that this first factor was "undeniably the strongest in opposition to personal jurisdiction." The district court found that TG "will face burdens if it is subjected to personal jurisdiction in Virginia." The district court noted, however, that this burden was somewhat offset by TG's size and the magnitude of TG's operations.[16]  *See CFA*, 551 F.3d at 296 (personal jurisdiction over foreign defendant appropriate because "[a]s shown by these proceedings, [the defendant] has been able to secure counsel to represent its interests, and its litigation burden is thus no more substantial than that encountered by other entities that choose to transact business in Virginia. More simply, [the defendant] is not shielded from civil liability in Virginia because it is headquartered in India.").

Regarding the second and third factors, the district court found that Virginia has a great interest in its citizens being able to litigate against TG for the alleged damages caused to their homes, and that Plaintiffs likewise had a strong interest in obtaining efficient relief against TG. *See also CFA Inst.*, 551 F.3d at 297 (citing *Lee v. Walworth Valve Co.*, 482 F.2d 297, 299 (4th Cir. 1973) (recognizing forum state's "paternal interest in the recovery by one of its

---

[16]   As the district court noted, this case is different from the scenario presented in *Asahi*, where the Supreme Court found that it was not fair and reasonable to exercise jurisdiction over the foreign plaintiff:

> In *Asahi*, the Court concluded that the exercise of personal jurisdiction over a foreign defendant was unreasonable and unfair because of the burden placed on the foreign defendant to litigate in the United States, the argument raised by [TG], but also on the basis that the only remaining claims against the foreign defendant were by another foreign defendant, diminishing the forum's interest in these entirely foreign claims. *See* 480 U.S. at 114. Here, the claims against [TG] are made by forum plaintiffs who were injured by [TG's] products in the forum, maximizing the interest of the forum state, the forum plaintiffs, the shared states, and the judicial system.

No. 10-30568 & 12-31017

citizens of appropriate compensation, if there is a substantive cause of action")).
The district court determined that the fourth factor also weighed in favor of
jurisdiction because the judicial system has a strong interest in resolving
related, consolidated claims against TG in the MDL.   TG argues that the
second, third, and fourth factors do not weigh in favor of jurisdiction because
Venture has already agreed to settle with all Plaintiffs, and Venture can seek
indemnification from TG in the Chinese arbitration.   TG did not, however, cite
any record facts or cases supporting this argument.   As a result, it did not meet
its burden in proving that these factors weigh in its favor.

Finally, the district court determined that the fifth factor also indicated
that the assertion of personal jurisdiction here comports with traditional
notions of fair play and substantial justice.   Although it recognized that China
may not favor personal jurisdiction over its manufacturers, it concluded that
given the global nature of the economy, "it is in everyone's interest to discourage
the manufacture and distribution of defective products."   The district court
determined that in their totality, these factors weigh in favor of exercising
jurisdiction.   Based on the record before this court, we agree that TG has not
met its burden to prove that these factors weigh against exercising jurisdiction.
For essentially the same reasons as given by the district court, we hold that this
third and final prong of the Due Process analysis is met here.[17]   The district
court therefore has personal jurisdiction over TG with regard to Plaintiff-
Intervenors, and all Original Plaintiffs who have met their burden in proving
that their claims arise out of TG's contacts with Virginia.

---

[17] Although the district court considered this question under Fifth Circuit law, the
Fourth Circuit considers the same factors for this part of the analysis, and both circuits place
the burden of proof on the defendant.

No. 10-30568 & 12-31017
IV.

Because the district court had personal jurisdiction over TG, we now turn to whether it erred by refusing to vacate the Default Judgment against TG.[18] We hold that it did not. Denial of a motion for relief from judgment under Rule 60(b), unless the judgment is otherwise void, is reviewed for abuse of discretion. *See Behringer v. Johnson*, 75 F.3d 189, 190 (5th Cir. 1996); *Fackelman v. Bell*, 564 F.2d 734, 736 (5th Cir. 1977). TG argues that the Default Judgment was void because TG was not properly served with the Second Amended Complaint or the motion to intervene.[19] We disagree. TG was already in default when the district court granted Plaintiffs' motion to file the Second Amended Complaint and motion to intervene. As a result, Federal Rule of Civil Procedure 5(a)(2) governs the service requirements for these two pleadings. Rule 5(a)(2) does not require a party in default be served with a pleading unless that pleading that asserts a *new claim* for relief. Because Rule 24(c) provides that, "[a] motion to intervene must be served on the parties as provided in Rule 5," Plaintiff-Intervenors only needed to serve TG with the Second Amended Complaint and motion to intervene if either pleading raised new claims.

The district court concluded that the Second Amended Complaint did not assert any new claims against TG, but "only amended the First Amended Complaint insofar as expanding the class definition against [TG] to a national

---

[18] As we noted in footnote 7, only TG and Plaintiff-Intervenors were parties to the Default Judgment; at present the Original Plaintiffs only have a preliminary default judgment against TG. As we hold that there is personal jurisdiction over TG, it naturally follows that TG's argument that the Default Judgment is void for lack of personal jurisdiction is unavailing. We now consider TG's other arguments for vacating the order.

[19] The district court addressed this argument under Rule 60(b)(6), which allows a district court to vacate a default judgment for "any other reason that justifies relief." Fed. R. Civ. P. 60(b)(6). Rule 60(b)(6) "is a catch-all provision, meant to encompass circumstances not covered by Rule 60(b)'s other enumerated provisions. Rule 60(b)(6) motions will be granted only if extraordinary circumstances are present." *Hess v. Cockrell*, 281 F.3d 212, 216 (5th Cir. 2002) (citations omitted).

23

No. 10-30568 & 12-31017

class and expanding the Virginia consumer protection claims to consumer protection claims for each state involved. None of these amendments would have affected Intervening Plaintiffs' claims."[20] We agree. Plaintiff-Intervenors are all Virginia homeowners within the class covered by the First Amended Complaint. They raise identical claims as those in the First Amended Complaint. TG was properly served with the First Amended Complaint, and was thus on notice that a class action of Virginia homeowners with these claims had been filed against it. Likewise, the motion to intervene did not raise any new claims. Accordingly, the Default Judgment was not void.

We now review TG's remaining arguments for vacating the Default Judgment under the abuse of discretion standard. *See Behringer*, 75 F.3d at 190. "Because of the seriousness of a default judgment, and although the standard of review is abuse of discretion, even a slight abuse of discretion may justify reversal." *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000). Any factual determinations underlying that decision are reviewed for clear error. *Id.* We have adopted a policy in favor of resolving cases on their merits and against the use of default judgments. *Rogers v. Hartford Life & Accident Ins. Co.*, 167 F.3d 933, 936 (5th Cir. 1999). "This policy, however, is counterbalanced by considerations of social goals, justice and expediency, a weighing process [that] lies largely within the domain of the trial judge's discretion." *Id.* (internal quotation marks and citations omitted). Rule 60(b) provides several statutory bases for vacating a default judgment, including mistake, inadvertence, surprise, or excusable neglect. Fed. R. Civ. P. 60(b). As we have previously explained, Rules 55(c) and 60(b) allow a district court to set aside an entry of default or default judgment for "good cause." *Lacy*, 227 F.3d at 291–92. To determine

---

[20] The district court did not decide whether or not TG was properly served with the Second Amended Complaint, because it determined that no new claims were raised in the Second Amended Complaint.

whether or not good cause is present, we consider three factors: (1) whether the default was willful; (2) whether setting aside the default judgment would prejudice Plaintiffs; and (3) whether TG presented a meritorious defense. *Id.* at 292. We may also consider other factors, including whether TG acted expeditiously to correct the default. *Id.*

"A finding of willful default ends the inquiry, for when the court finds an intentional failure of responsive pleadings there need be no other finding." *Id.* (internal quotation marks and citations omitted). The district court did not decide whether TG's failure to respond was willful. TG claims that it was not; instead, it explains that it was "wholly unsophisticated and unfamiliar with U.S. litigation practice, and failed to understand the significance of the complaint." When, as here, a defendant's neglect is at least a partial cause of its failure to respond, the defendant has the burden to convince the court that its neglect was excusable, rather than willful, by a preponderance of the evidence. *See Rogers*, 167 F.3d at 939 (citation omitted); *In re OCA, Inc.*, 551 F.3d 359, 372 (5th Cir. 2008). TG did not meet that burden here.

TG cites our decision *Lacy* and argues that its default was not willful, but rather an excusable neglect, because it promptly retained counsel in China and the United States after the district court issued the Default Judgment, and has since fully cooperated in this litigation. TG would thus have us consider its conduct after the district court issued the Default Judgment. In making this argument, TG misunderstands the relevant time period. Our inquiry properly focuses on whether TG willfully failed to respond to the First Amended Complaint within the allotted time period, and not how it responded once it was already in default. Based on our assessment of TG's conduct following service of the First Amended Complaint, we conclude that TG has not demonstrated that its default was excusable. In *Lacy*, we found that the defendant's default was not willful when the defendant "concede[d] that it mistakenly assumed that

No. 10-30568 & 12-31017

the April 27-ordered mailing was redundant and wrongly failed to realize that service was validly effected with that mailing." *Lacy*, 227 F.3d at 292. In *Lacy*, we noted that the defendant was not choosing to "play games" with the court:

> Quite to the contrary, counsel for Sitel made repeated contacts with Lacy in an attempt to resolve the suit. During those contacts, which began within two weeks of Sitel's first receipt of the petition, counsel requested written confirmation that Lacy was representing himself in the litigation so that they could begin discussing potential resolutions of the matter.

*Id.* at 292–93.

In contrast, TG waited nearly a year after it was served with the First Amended Complaint to file a notice of appearance. *See In re Chinese-Manufactured Drywall Products Liab. Litig.*, 706 F. Supp. 2d 655, 659 (E.D. La. 2010) (noting that "[o]n August 3, 2009, Plaintiffs received notice that service of process of the First Amended Complaint was perfected on Defendant [TG]"). Moreover, unlike the defendant in *Lacy*, TG has not offered any evidence that it made similar efforts to engage with opposing counsel before the district court entered the Default Judgment.

TG's argument that its default was not willful because it was unfamiliar with U.S. litigation practice likewise fails. We have already rejected this argument in *Matter of Dierschke*, 975 F.2d 181, 184 (5th Cir. 1992). In that case, the defendant admitted that he had received the complaint, but explained that he had failed to respond because he was involved in another suit and did not understand that he was being served in a new case. *Id.* Based on those facts, the district court found, and we affirmed, that the defendant willfully failed to respond. *Id.* ("Dierschke chose to make a decision that he hadn't been served when, in fact, he had."). Here, TG presents a very similar argument that it did not understand the legal implications of the First Amended Complaint. TG does not contest that it was served with the First Amended Complaint, which was translated into Chinese. If TG did not fully understand the

26

No. 10-30568 & 12-31017

significance of the First Amended Complaint, it should have sought legal advice. Based on these facts, TG has not met its burden to prove that its neglect was excusable. When pressed at oral argument, TG was again unable to provide any justification acceptable under our case law for its failure to make a timely response. *See Lacy*, 227 F.3d at 292. While the district court did not determine whether TG's default was willful, it did conclude that the default was not the result of excusable neglect. Even assuming *arguendo* that TG's default was not willful, TG has not demonstrated that the district court abused its discretion in declining to vacate the Default Judgment. The district court weighed several relevant factors, including the merit of TG's asserted defense, before concluding that vacatur was unwarranted. Accordingly, the district court did not abuse its discretion by refusing to vacate the Default Judgment.

V.

For the reasons stated above, we AFFIRM.