UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: *ALL ACTIONS* | |

**MEMORANDUM  OF LAW IN SUPPORT OF CONSOLIDATED JOINT PETITION OF THE FEE COMMITTEE AND THE PLAINTIFFS' STEERING COMMITTEE FOR A  GLOBAL AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF EXPENSES, FILED PURSUANT TO PRETRIAL ORDER NO. 28**

Date:   May 16, 2014

Russ M. Herman (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA  70113
Phone:  (504) 581-4892
Fax:  (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel in MDL 2047*
*Fee Committee Co-Chair/Secretary*

Arnold Levin
Frederick S. Longer
Sandra L. Duggan
Matthew C. Gaughan
**LEVIN, FISHBEIN, SEDRAN & BERMAN**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel in MDL 2047*
*Fee Committee Chair*

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    GLOBAL FEE REQUESTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    FACTUAL BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    A.    The Unique Chinese Drywall MDL and Coordinated State
        Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        1.    *MDL 2047*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        2.    *Virginia State Court Litigation*. . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        3.    *Florida State Court Litigation*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

        4.    *Individual Homeowner Representation*. . . . . . . . . . . . . . . . . . . . . . . 32

    B.    The PSC's Efforts to Identify and Bring All Responsible Parties
        into this Litigation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

    C.    Extensive and Widespread Discovery Efforts of the PSC. . . . . . . . . . . . . . . . 40

    D.    The PSC Expended Considerable Efforts on Pleadings, Motion
        Practice, Briefing and Other Filings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

    E.    Experts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

    F.    Bellwether Trials. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        1.    *Germano*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

        2.    *Hernandez*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

        3.    *Campbell and Clement*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

        4.    *InEx/North River*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    G.    Settlement Negotiations, Drafting Agreements, Settlement
        Briefing, and Objections. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**Page**

IV.   CLASS SETTLEMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    A.   Overview. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

    B.   The InEx, Banner, Knauf, L&W, and Global Settlements.. . . . . . . . . . . . . . . . 67

        1.   The InEx Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

        2.   The Banner Settlement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

        3.   The Knauf Settlement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 74

            a.   *Remediation Fund.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 75

                i.   *Option 1:  Program Contractor Remediation Option.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

                ii.   *Option 2:  Self-Remediation Option.* . . . . . . . . . . . . . . . 78

                iii.   *Option 3:  Cash-Out Option.* . . . . . . . . . . . . . . . . . . . . . 78

            b.   *Other Loss Fund.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

            c.   *Attorneys' Fees.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

        4.   The L&W Settlement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        5.   The Global Settlement.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

    C.   The Virginia Settlements.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

    D.   Post-Settlement Administration Efforts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 88

    E.   Ongoing Litigation Efforts.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

    F.   PSC Administrative Services Not Billed to MDL 2047. . . . . . . . . . . . . . . . . . 90

V.   ARGUMENT.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

**Page**

A.  Principles Governing the Determination of the
    Amount of a Global Fee Award in this MDL. . . . . . . . . . . . . . . . . . . . . . . . . . 92

B.  Selecting the Proper Percentage Award When Multiple Settlement
    Funds Are Present and Both Individually Retained Counsel and
    Common Benefit Counsel Are to Be Compensated.. . . . . . . . . . . . . . . . . . . . . 94

C.  The Historic Underpinnings for Awarding Common Benefit Fees Lend
    Authority to a Global Percentage Fee Award. . . . . . . . . . . . . . . . . . . . . . . . . . 98

D.  Principles Governing Determination of an Appropriate Fee Award
    under *Johnson*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

    1.   *The Time and Labor Required.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 105

    2.   *The Novelty and Difficulty of the Questions Involved.* . . . . . . . . . . . . . 106

    3.   *The Skill Requisite to Perform the Legal Service Properly.* . . . . . . . . . . 107

    4.   *The Preclusion of Other Employment by the
         Attorney Due to Acceptance of the Case.* . . . . . . . . . . . . . . . . . . . . . . . 107

    5.   *The Customary Fee.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

    6.   *Whether the Fee Is Fixed or Contingent.* . . . . . . . . . . . . . . . . . . . . . . . 108

    7.   *Time Limitations Imposed by the Client or the Circumstances.* . . . . . . . 108

    8.   *The Amount Involved and the Results Obtained.* . . . . . . . . . . . . . . . . . 109

    9.   *The Experience, Reputation, and Ability of the Attorneys.* . . . . . . . . . . . 110

    10.  *The "Undesirability" of the Case.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    11.  *The Nature and Length of the Professional
         Relationship with the Client.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

    12.  *Awards in Similar Cases.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

F.  Common Benefit Counsel Should Be Entitled to Reimbursement of
    Expenses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 111

**Page**

VI.     CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 113

## TABLE OF AUTHORITIES

**CASES**                                                                **Page(s)**

*Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525
  (N.D. Miss. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*Blum v. Stenson*, 465 U.S. 886 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Boeing v.Van Gemert*,  444 U.S. 472 (1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Builders Mut. Ins. Co. v. Parallel Design & Development, LLC*, 2010
  WL 6573365 (E.D. Va. Oct. 5, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Builders Mut. Ins. Co. v. Parallel Design and Development, LLC, et al.*,
  785 F. Supp. 2d 535 (E.D. Va. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768 (11th Cir. 1991). . . . . . . . . . . . . . . . . 101, 111

*Casey v. Merck & Co.*, 283 Va. 411 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Central Railroad & Banking Co. v.  Pettus*, 113 U.S. 116 (1885).. . . . . . . . . . . . . . . . . . . 98

*Dragas Management Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 766
  (E.D. Va. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013). . . . . . . . . . . . . . . . . . passim

*Evanston Ins. Co. v. Harbor Walk Development, LLC*, 814 F. Supp. 2d
  635 (E.D. Va. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Florin v. Nationsbank, N.A.*, 34 F.3d 560 (7th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Foster v. Boise-Cascade, Inc.*, 577 F.2d 335 (5th Cir. 1978). . . . . . . . . . . . . . . . . . . . . . . . 102

*Gottlieb v. Barry*, 43 F.3d 474 (10th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Guidant Corp. Implantable Defibulators Prod. Liab. Litig.*,
  2008 WL 682174 (D. Minn. Mar. 7, 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 99

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . 108

*Hensley v. Eckerhart*, 461 U.S. 424 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 109

**Page(s)**

*In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011). . . . . . . . . . . . . . . . . 100

*In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, --- F.3d ----,
 2014 WL 321844 (5th Cir. Jan. 28, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2013 WL 499474
 (E.D. La. Feb. 7, 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 67, 107

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d
 1346 (J.P.M.L. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In re Chinese-Manufactured Drywall Prods. Liab. Litig. (Germano)*,
 706 F. Supp. 2d 655 (E.D. La. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp.
 2d 819 (E.D. La. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*In re Chinese-Manufactured Drywall Prods. Liab. Litig. (Hernandez)*,
 2010 WL 1710434 (E.D. La. Apr. 27, 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 60

*In re Enron Corporation Securities, Derivative & "ERISA" Litig.*,
 586 F. Supp. 2d 732 (S.D. Tex. 2008). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108

*In re ETS*, 447 F. Supp. 2d 612 (E.D. La. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 110

*In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*,
 55 F.3d 768 (3d Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100, 101

*In re Orthopedic Bone Screw Prod. Liab. Litig.*, 2001 WL 1622741
 (E.D. Pa. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 112

*In re Prudential-Bache Energy Income Partnership Securities Litigation*,
 1994 WL 150742 (E.D. La. Apr. 13, 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

*In re Quintus Sec. Litig.*, 148 F. Supp. 2d 967 (N.D. Cal. 2001). . . . . . . . . . . . . . . . . . . . . . . 112

*In re Silicone Gel Breast Implant Prods. Liab. Litig.*, 1994 WL 114580
 (N.D. Ala. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

**Page(s)**

*In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire
Litig.*, 56 F.3d 295 (1st Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

*In re Vioxx Prod. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008). . . . . . . . . . . . . . . . . passim

*In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640 (E.D. La. 2010). . . . . . . . . . . . . . . . passim

*In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291 (9th Cir. 1994). . . . . . . . . . . . 101

*In re Zyprexa Prods. Liab. Litig.*, 424 F. Supp. 2d 488 (E.D.N.Y. 2006). . . . . . . . . . . . . . . . . . 96

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974). . . . . . . . . . . . . passim

*Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241 (8th Cir. 1996). . . . . . . . . . . . . . . . 100, 101

*Migis v. Pearle Vision, Inc.*, 135 F.3d 1041 (5th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . 109

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502
 (E.D. Va. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*QBE Ins. Corp. v. Estes Heating & Air Conditioning, Inc.*, 2012 WL
 413968 (S.D. Ala. Feb. 8, 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Rawlings v. Prudential-Bache Props.*, 9 F.3d 513 (6th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . 101

*Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942 (E.D. Tex. 2000). . . . . . . . . . . . . . . 102

*Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939). . . . . . . . . . . . . . . . . . . . . . . . . . 98, 99, 111

*Swedish Hosp. Corp. v. Shalala*, 1 F.3d 1261 (D.C. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . 101

*Travco Ins. Co. v. Ward*, 284 Va. 547, 736 S.E.2d 321 (Va. 2012). . . . . . . . . . . . . . . . . . . 26, 29

*Trustees v. Greenough*, 105 U.S. 527 (1881). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007). . . . . . . . . . . . . . 103, 110

*Union Asset Management Holding, A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012). . . . . . passim

-vii-

Page(s)

*Vincent v. Hughes Air West, Inc.*, 557 F.2d 759 (9th Cir. 1977)... . . . . . . . . . . . . . . . . . . . . . . . . . 101

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005). . . . . . . . . . . . . . . . . . . 101

## STATUTES, RULES AND REGULATIONS

28 U.S.C. §1292(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

28 U.S.C. § 1407. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18-19

Louisiana Code of Civil Procedure Article 2520, *et seq*... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

Louisiana Products Liability Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

## OTHER AUTHORITIES

*Awarding Attorneys' Fees and Managing Fee Litigation* (Fed. Jud. Ctr. 1994). . . . . . . . . . . . . . 99

Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*,
  74 LA. L. REV. 371 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

CPSC's Remediation Guidance for Homes with Corrosion from Problem
  Drywall as of September 15, 2011 published at
  www.cpsc.gov/info/drywall/Remediation091511.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Gypsum Association Comments, archived at
  http://web.archive.org/web/20101216021748/http://gypsum.org/pdf/
  Gypsum_Association_Comments_on_Chinese_Wallboard_Issue.pdf. . . . . . . . . . . . . . . . . . 16

Health Consultation: Possible Health Implications from Exposure to Sulfur
  Gases Emitted From Chinese-Manufactured Drywall, Prepared by U.S.
  Department of Health and Human Services, Agency for Toxic Substances
  and Disease Registry Division of Community Health Investigations
  (May 2, 2014) available at http://www.atsdr.cdc.gov/drywall/
  docs/Drywall_HC_05-02-2014_508.pdf. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Hon. Eldon E. Fallon, Jeremy T. Grabill, Robert Pitard Wynne, "Bellwether Trials
  in Multidistrict Litigation," 82 TUL. L. REV. 2323 (June 2008). . . . . . . . . . . . . . . . . . . . . . . 58

MANUAL FOR COMPLEX LITIGATION, FOURTH, § 14.121 (Fed. Jud. Ctr. 2004). . . . . . . . . . . . . . 99

**Page(s)**

MANUAL FOR COMPLEX LITIGATION, FOURTH, *Attorney Fee Awards* §21.7
  (Fed. Jud. Ctr. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

*Report of the Third Circuit Task Force, Court Awarded Attorneys Fees*,
  108 F.R.D. 237 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

## TABLE OF EXHIBITS

| Exhibit | Description |
| --- | --- |
| A | Declaration of Russ M. Herman and Arnold Levin, dated May 14, 2014 |
| 1 | Chart of Costs of Administration Paid by Settling Defendants |
| 2 | List of Defendants named in Omnibus Complaints |
| 3 | List of Counsel Seeking Compensation for Common Benefit Attorneys' Fees and Reimbursement of Expenses Pursuant to PTO 28 |
| 4 | Affidavit of Philip A. Garrett, CPA |
| 5 | Villa Lago class settlement Letter Agreement |
| 6 | Chart of PSC Court Appearances from Inception through December 31, 2013 |
| 7 | Index and Appendix containing Judge Hall's Chinese Drywall Orders |
| 8 | List of Virginia Trial Settings |
| 9 | Motions, briefs and other Virginia court filings in the insurance litigation |
| 10 | *Seifart v. Banner Supply* Verdict |
| 11 | Chart of Discovery Propounded by the PSC |
| 12 | Chart of Discovery Responded to by the PSC |
| 13 | Chart of PSC FOIA Requests |
| 14 | Press Release and Letter to Taishan Gypsum Co., Ltd. from Senators, dated Feb. 26, 2014 |
| 15 | Chart of PSC Discovery Motions |
| 16 | Chart of Common Benefit Depositions |
| 17 | Chart of PSC Pleadings, Motions, and Other Filings |
| 18 | Chart of Plaintiffs' Experts |
| 19 | Chart of Defendants' Experts |
| 20 | Chart of Voluntary Common Benefit Payments into Court Registry (filed under seal) |

I.    **INTRODUCTION**

The substantial hurdles presented by this extremely complex, predominantly property damage, *sui generis* Chinese Drywall litigation against more than 1,650 Defendants, many of them located half way around the globe, are unprecedented.  Against tremendous odds and at great expense, the Court-appointed Plaintiffs' Steering Committee ("PSC") and/or individually retained counsel dedicated themselves for over five years to (i) identifying responsible parties, many of them difficult to find and/or defunct, (ii) serving foreign manufacturers, their parents, alter egos and agents with novel Omnibus Complaints through the Hague Convention, (iii) coordinating the prosecution of claims on behalf of thousands of Plaintiffs from numerous and diverse jurisdictions in the MDL, State Courts, and Courts of Appeals, (iv) traveling the world to conduct jurisdictional and substantive discovery, and (v) fighting dismissals and other motions in the MDL and Courts of Appeals.[1]  Their unwavering, consistent and intensive efforts have produced a series of unique interrelated and interdependent class action settlements that provide up to $1.1 billion in substantial benefits to the victims of Chinese-Manufactured Drywall ("CDW" or "Chinese Drywall").

After the devastation of Hurricanes Katrina and Rita in 2005 and a critical shortage of domestic drywall, Chinese Drywall was imported to the United States and used in the construction and reconstruction of thousands of properties, primarily in the Gulf Coast states and along the East Coast.  Once installed, this defective product produced particularly unpleasant

---

[1]  *See*, *generally*, Declaration of Plaintiffs' Liaison Counsel Russ M. Herman and Plaintiffs' Lead Counsel Arnold Levin, dated May 14, 2014 ("2014 Herman-Levin Decl."), filed herewith and attached hereto as Exhibit "A."

"rotten egg" odors and caused corrosion to metal plumbing, electrical wiring, sprinkler systems, HVAC systems, appliances, utensils, mirrors, jewelry and other property in Plaintiffs' homes containing copper or silver.  Owners and residents were forced to evacuate their homes, incur expenses for relocation and alternative living arrangements, and either expend large sums of money to remediate their properties themselves or await relief in the court system and risk foreclosure and suffer other damages, including diminished property values.

Unfortunately, in most cases the names of the manufacturers of the drywall could not be ascertained without drilling holes in the walls to inspect the back of the plasterboard for identifiable markings or without further destructive testing.  Even once identified, however, these manufacturers were foreign entities not easily located or amenable to service of process. Moreover, the potentially responsible importers, suppliers, distributers, builders, and installers who handled CDW in the United States, and their insurers, were also difficult to identify and bring into the litigation.  The PSC created an innovative legal vehicle that brought more than 1,650 Defendants into this MDL[2] through 18 Omnibus ("Omni") Complaints[3] on behalf of

---

[2]  *See* List of Defendants, attached to the 2014 Herman-Levin Decl. as Exhibit "2."

[3]  *See Payton, et al. v. Knauf Gips, KG, et al.*, No. 09-7628 (E.D. La.) (Omnibus I, I(A), I(B), I(C)); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, No. 10-361 (E.D. La.) (Omnibus II, II(A), II(B), II(C)); *Gross, et al. v. Knauf Gips, KG, et al.*, No. 09-6690 (E.D. La.) (original complaint, Omnibus III, III(A)); *Rogers, et al. v. Knauf Gips, KG, et al.*, No. 10-362 (E.D. La.) (Omnibus IV, IV(A), IV(B), IV(C)); *Amato, et al. v. Liberty Mutual Ins. Co.*, No. 10-932 (E.D. La.) (Omnibus V); *Hernandez, et al. v. AAA Ins., et al.*, No. 10-3070 (E.D. La.) (Omnibus VI); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-080 (E.D. La.) (Omnibus VII); *Abreu, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No. 11-252 (E.D. La.) (Omnibus VIII); *Haya, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, No. 11-1077 (E.D. La.) (Omnibus IX); *Block, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No.

(continued...)

2

approximately 10,000 Plaintiffs from numerous jurisdictions, including Louisiana, Florida, Texas, Alabama, Mississippi, North Carolina, South Carolina, Georgia, Tennessee, and Virginia, who alleged property damages and/or personal injury resulting from CDW.

The PSC and other common benefit counsel have worked tirelessly since early 2009 to identify and locate the manufacturers of Chinese Drywall, as well as their related alter egos and agents, and then translate and serve Plaintiffs' complaints on numerous foreign entities in China, Germany, France, Brazil, Australia, Canada, Indonesia, Taiwan, and Hong Kong through the incredibly expensive, time-consuming, and complicated process of the Hague Convention. Though the PSC reached a settlement with the Knauf Defendants, these service efforts are still ongoing, as the recalcitrant Chinese entities have refused to accept service or recognize the jurisdiction of this Court.  The PSC has faced numerous significant challenges in attempting to efficiently coordinate and prosecute Plaintiffs' claims against the multitude of foreign and domestic Defendants in this litigation based on a variety of diverse governing state laws.

Accordingly, the class settlements reached to date with more than 700 CDW Defendants are a monumental and unparalleled achievement, considering the great impediments that had to

---

[3](...continued)
11-1363 (E.D. La.) (Omnibus X); *Benoit, et al. v. Lafarge S.A., et al.*, No. 11-1893 (E.D. La.) (Omnibus XI); *Arndt, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No. 11-2349 (E.D. La.) (Omnibus XII); *Almeroth, et al., v. Taishan Gypsum Co., Ltd., et al.*, No. 12-0498 (Omnibus XIII); *Cassidy, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No. 11-3023 (E.D. La.) (Omnibus XIV); *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1672 (Omnibus XV); *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1395 (Omnibus XVI); *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1673 (Omnibus XVII); *Beane, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No. 13-609 (Omnibus XVIII).

be surmounted.  As a result of hundreds of protracted, arm's-length face-to-face negotiations, telephone conferences, and Court mediations with hundreds of builders, installers, suppliers and manufacturing Defendants and their insurers,[4] the PSC reached a series of nine separate, but interrelated and interdependent class settlements with:  (1) the Knauf Defendants[5] (the "Knauf Settlement"); (2) supplier Interior Exterior Building Supply, LP ("InEx") and its insurers[6] (the "InEx Settlement"); (3) the Banner entities[7] and their insurers[8] (the "Banner Settlement"); (4) L&W Supply Corporation ("L&W") and USG Corporation (the "L&W Settlement"); (5) more than 700 Participating Builders, Suppliers, Installers, and their Participating Insurers (the "Global

---

[4]  *See*, *generally*, 2014 Herman-Levin Decl.; *see also* Declaration of Russ M. Herman and Arnold Levin dated 8/30/2012 ("2012 Herman-Levin Decl."), attached as Exhibit 2 to the PSC's Motion for Final Approval of the InEx, Banner, Knauf, L&W, and Global Class Settlements and Certification of Settlement Classes [Rec. Doc. #15749-5].

[5]  The Knauf Defendants include:  Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong Knauf New Building Material Products Co., Ltd., Knauf Gips KG, Gebr. Knauf Verwaltungsgesellschaft KG, Knauf International GmbH, Knauf Insulation GmbH ("KI"), Knauf UK GmbH, Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda. and PT Knauf Gypsum Indonesia.

[6]  InEx's Insurers that have entered into a class settlement include Arch Insurance Company ("Arch") and Liberty Mutual Fire Insurance Company ("Liberty").

[7]  The Banner entities include:  Banner Supply Co., Banner Supply Co. Pompano, LLC, Banner Supply Co. Port St. Lucie, LLC, Banner Supply Co. Ft. Myers, LLC, Banner Supply Co. Tampa, LLC, Banner Supply International, LLC, and any other entity insured under the Banner Insurance Policies (collectively, "Banner").

[8]  Banner's Insurers include:  Chartis Specialty Ins. Co. (formerly known as "American International Specialty Lines Ins. Co."), Illinois National Ins. Co., National Union Fire Ins. Co. of Pittsburgh, Pa., Commerce & Industry Ins. Co., FCCI Ins. Co., FCCI Commercial Ins. Co., National Trust Ins. Co., FCCI Mutual Ins. Holding Co., FCCI Group, Inc., FCCI Ins. Group, Inc., Monroe Guaranty Ins. Co., FCCI Services, Inc., FCCI Advantage Ins. Co., Brierfield Ins. Co., FCCI Agency, Inc., Hanover American Ins. Co., Hanover Ins. Group, Inc., Maryland Casualty Co., and all companies in the Zurich North America group of insurance companies.

Settlement"); and (6) Builders Mutual Insurance Company ("Builders Mutual"),[9] Nationwide Insurance Company ("Nationwide"),[10] Porter-Blaine/Venture Supply/Insurers,[11] and Tobin Trading/Builders Plaster & Drywall/JMM Drywall/Insurers[12] (together, the four "Virginia Settlements").

All of these settlements are centered around and based on the principal Knauf Settlement, which creates an underlined_uncapped Remediation Fund (to which certain funds from the supplemental class settlements, *i.e.*, the InEx, Banner, L&W, Global, and Virginia Settlements, are added). This Remediation Fund provides owners of properties containing KPT Chinese Drywall with comprehensive and complete remediation and/or cash benefits so that displaced owners and residents can return to their properties free of Chinese Drywall.[13]  To date, over 4,000 homes have been completely remediated or are in the process of remediation under this program.

In addition to the remediation benefits, a reserve referred to as an "Other Loss Fund" has been established with more than $100 million to compensate homeowners, commercial building

---

[9]  The Participating Defendants in the Builders Mutual Settlement are identified on Exhibit 1 to the Settlement and the Participating Insurers are identified on Exhibit 2 thereto [*see* Rec. Doc. #16478-3].

[10]  Nationwide includes Nationwide Mutual Ins. Co., Nationwide Mutual Fire Ins. Co., and Nationwide Property and Casualty Ins. Co. [*see* Rec. Doc. #15969-5].  The Participating Defendants in the Nationwide Settlement are identified on Exhibit 1 to the Settlement.

[11]  The Settling Defendants are Porter-Blaine Corp. and Venture Supply, Inc. and their Participating Insurers, Hanover and Citizens Ins. Co. of America [*see* Rec. Doc. #15969-6].

[12]  The Participating Defendants in the Tobin Trading Settlement are identified on Exhibit 1 to the Settlement, and the Participating Insurers are State Farm Fire and Casualty Co. and State Farm Fla. Ins. Co. [*see* Rec. Doc. #15969-7].

[13]  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2013 WL 499474 (E.D. La. Feb. 7, 2013) (Knauf, Banner, InEx, L&W, and Global Settlements).

owners and tenants of Affected Properties for "other losses" arising from CDW, including

alternative living expenses, personal property damage, property maintenance costs (including

utility bills, insurance, property taxes and maintenance of landscaping), moving and storage

expenses, losses resulting from lost use, sales and rentals, sales in mitigation or foreclosures,

and/or bodily injuries.[14]

Importantly and significantly, on top of the remediation and other loss benefits provided

under these Settlements, the Knauf Defendants have agreed to pay separately $160 million in

attorneys' fees and costs, if approved by the Court, to compensate the PSC, common benefit

counsel authorized and working at the direction of the PSC, other common benefit counsel,[15] and

---

[14] *See id.*

[15] Pursuant to Pretrial Order. No. 28, ¶¶ 4 & 15 [Rec. Doc. #17379], 42 Law Firms submitted Initial Affidavits and/or Second Affidavits to the Fee Committee, summarizing their common benefit contributions to this litigation.  These counsel, seeking compensation for common benefit attorneys' fees and reimbursement of expenses, are listed on the Chart attached to the 2014 Herman-Levin Decl. as Exhibit "3."

Additional firms, *e.g.*, Weinburg, Wheeler, Hudgins, Gunn & Dial (counsel for Banner, a Settling Defendant), submitted time and expenses to the Court-appointed CPA Philip A. Garrett pursuant to Pretrial Order No. 9 [Rec. Doc. #147] or 9A [Rec. Doc. #12961] (setting forth guidelines for the maintenance and reporting of common benefit time and expenses and guidelines for attorney fee and cost reimbursement), but did not provide Affidavits to the Fee Committee pursuant to Pretrial Order No. 28.  The PSC takes the position that counsel for Banner (or any other entity in any of the CDW chains of distribution for that matter) are not entitled to any attorneys' fees to be awarded by the Court, beyond what they have already been paid by their clients, as they have not created any common benefit for the Plaintiffs.  On the contrary, the PSC and common benefit counsel created a benefit for Banner by bringing the manufacturing Defendants into the litigation, by creating an uncapped fund that will provide comprehensive remediation benefits and/or cash payments for KPT Property and Mixed Property owners, by obtaining class releases for Banner, and by paying for the Banner class notice after Banner and its insurers refused to do so.  In fact, Banner's insurers, due to the PSC's efforts, funded the entire Banner Settlement thereby saving the Banner entities from their threatened

(continued...)

individually retained counsel (together, the "Joint Petitioners") for all preparation and litigation work performed on behalf of any Participating Class Member or the Class.[16]  Knauf is also paying and will continue to pay 100% of the costs of administration of the uncapped Remediation Fund and the Other Loss Fund (*e.g.*, Settlement Administrator, *Pro Se* Curator, Ombudsman, Inspectors and Environmental Certification Providers, Special Master, and settlement-related Court-appointed CPA charges), through interest earned on deposits in the funds, or otherwise.[17]  Normally, these costs would be borne by class members to the extent they were paid out of a settlement fund benefitting those class members.

Thus, individual Participating Class Members will not be responsible for payment of attorneys' fees or costs out of their recovery of benefits under the Knauf Settlement, except for recoveries on bodily injury claims,[18] which is an additional significant benefit for Class Members.

Having taken on the significant risks of this litigation and devoted their practices and economic resources to these cases since 2009 with no guarantee of remuneration, the Joint Petitioners are seeking a global award of attorneys' fees and cost reimbursements at this time. Ironically, in addition to creating significant remediation and/or cash benefits for Class Members and supporting unconditionally the remediation of Plaintiffs' properties, the PSC's efforts have

---

[15](...continued)
bankruptcy.

[16]  Third Amended Knauf Settlement, Section 14.2 [Rec. Doc. #16407-3].

[17]  *See id*. at Sections 4.2.6 & 4.6.5; *see also* Chart of Ongoing Costs of Administration Paid by Settling Defendants, attached to the 2014 Herman-Levin Decl. as Exhibit "1."

[18]  *Id*. at Section 4.7.2.7.

also benefitted numerous Defendants.

Suppliers InEx and Banner have been released in exchange for only their insurance money.  In the Global Settlement, the Participating Defendants were released in exchange for the insurance money provided by the Participating Insurers.  The same is true of the Virginia Settlements.  Even Knauf was benefitted by the PSC's efforts and the creation of the InEx, Banner, L&W, and Global Settlements that will provide millions of dollars to the Remediation Fund and the Other Loss Fund, thus lessening Knauf's responsibilities to the class.  The PSC also has provided certain builders who actively pursued this litigation with cash benefits that they will be claiming from the InEx, Banner, and Global Settlements.  Finally, the PSC has conferred a substantial benefit on all builders by supporting the Major Builder Settlements.[19]  The PSC thus finds itself in the unique position of having not only served its clients but also having conferred substantial benefits on the entities that it sued.

## II.    GLOBAL FEE REQUESTS

The Joint Petitioners request a global award of attorneys' fees totaling $193,552,383.14, plus an amount to be determined for the L&W Settlement, and reimbursement of costs totaling $5,547,011.68.[20]  This global request for an award of fees and costs has been calculated as

---

[19]  Rec. Doc. #10227-6; Rec. Doc. #11279.

[20]  On January 17, 2014, this Court granted authorization for the funding of set-asides for fees and costs from the Knauf, InEx, Banner, Global, Virginia, and Villa Lago Settlements into Qualified Settlement Funds previously approved by the Court.  *See* Order entered 1/21/2014 [Rec. Doc. #17398], as amended and clarified on February 11, 2014 [Rec. Doc. #17426].  The instant global request for attorneys' fees does not seek fees from the Villa Lago Settlement, as a separate agreement has been reached with counsel for Villa Lago regarding common benefit fees. *See* Villa Lago class settlement Letter Agreement, attached to the 2014 Herman-Levin Decl. as

(continued...)

follows:

      (i)  $142,565,000 for attorneys' fees and costs, including Held Costs,[21] Shared

Costs[22] and Individual Participating Class Members' reasonable inspection costs, from the Knauf

Settlement, which the Knauf Defendants agreed to pay[23];

      (ii)  $2,560,000 for attorneys' fees from the InEx Settlement (which represents

32% of the InEx Settlement gross value)[24];

      (iii)  $16,986,103.14 for attorneys' fees from the Banner Settlement (which

---

[20](...continued)
Exhibit "5."

[21]  Held Costs are defined by the Court in Pretrial Order No. 9.

[22]  Shared Costs are defined by the Court in Pretrial Order No. 9.

[23]  The Knauf Defendants agreed as part of the class settlement to pay the Joint Petitioners $160 million in attorneys' fees and costs.  Knauf already has made advance payments of $17,435,000 towards this obligation, pursuant to Section 14.7 of the Third Amended Knauf Settlement and Order dated 1/17/2014 [Rec. Doc. #17398].  Of these amounts advanced, the Court has authorized the use of approximately $12 million to pay Shared Costs and/or reimburse common benefit assessments.  As of March 31, 2014, approximately $5 million remains, which will be used for ongoing Shared Costs in the litigation, subject to Court approval.

    A separate fee agreement has been reached with the Knauf Defendants regarding Class Members who filed lawsuits against these Defendants after December 9, 2011.  *See* Settlement Agreement Regarding Post-December 9, 2011 Claims Against the Knauf Defendants in MDL 2047 [Rec. Doc. #16978-1].  This Global Fee Petition does not address that agreement, and any fees sought or paid pursuant to that agreement will be addressed at a later date.

[24]  Pursuant to the InEx Settlement Allocation Plan ("InEx Allocation Plan"), this 32% sum has been set aside for attorneys' fees.  *See* InEx Allocation Plan, ¶ 3 [Rec. Doc. #16609-2]; The InEx Attorney Fee Settlement Fund [Rec. Doc. #17072]; Amended InEx Settlement, Section 16.7 [Rec. Doc. #12258-3].

represents 32% of the Banner Settlement gross value)[25];

      (iv)  $23,473,280 for attorneys' fees from the Global Settlement (which represents

32% of the Global Settlement gross value)[26];

      (v)  an amount to be determined for attorneys' fees and costs from the L&W

Settlement[27];

      (vi)  $5,568,000 for attorneys' fees from the four Virginia Settlements (which

represents 32% of the aggregate gross value of the four Virginia Settlements)[28];

      (vii)  $2,400,000 for attorneys' fees and costs associated with the InEx/North

---

[25] Pursuant to the Second Amended Banner Settlement Allocation Plan ("Banner Allocation Plan"), this 32% sum has been set aside for attorneys' fees. *See* Banner Allocation Plan, ¶ 3 [Rec. Doc. #16527-1]; The Banner Attorney Fee Settlement Fund [Rec. Doc. #17064]. For certain builders only who have actively pursued this litigation and are seeking payments from the Banner Settlement for Affected Properties they repaired, a 22% overage in attorneys' fees will be returned to them, since the Banner Settlement provides for only 10% attorneys' fees to the PSC and common benefit counsel in those cases. *See id.*; Amended Banner Settlement, Section 14.7 [Rec. Doc. #10033-3].

[26] Pursuant to the Second Amended Settlement Allocation Plan for Settlement Involving Builders, Installers, Suppliers, and Participating Insurers ("Global Allocation Plan"), this 32% sum of the gross value of the Global Settlement, less credits provided for in Section 4.2.1, has been set aside for attorneys' fees. *See* Global Allocation Plan, ¶¶ 2 & 4 [Rec. Doc. #16528-1]; The Builders, Installers, Suppliers and Participating Insurers Attorney Fee Settlement Fund [Rec. Doc. #17069]; Amended Global Settlement, Section 16.6 [Rec. Doc. #15695-2]. There remains a dispute as to what amount in fees and costs should be paid for Affected Properties that were repaired by a Defendant who actively pursued this litigation and/or whose homeowner did not actively pursue litigation. The Parties have agreed to submit this dispute for resolution by the Court. *See* Global Allocation Plan, at fn. 1.

[27] *See* L&W Settlement, Section 15.1 [Rec. Doc. #13913-3].

[28] *See* Virginia Settlements Allocation Plan [Rec. Doc. #16800-7 at ¶ 3]; The Builders Mutual Attorney Fee Settlement Fund [Rec. Doc. #17078]; The Nationwide Attorney Fee Settlement Fund [Rec. Doc. #17080]; The Porter-Blaine/Venture Supply Attorney Fee Settlement Fund [Rec. Doc. #17082]; The Tobin Trading and Installers Attorney Fee Settlement Fund [Rec. Doc. #17084].

River bellwether trial[29]; and

(viii) $5,547,011.68 for reasonable and appropriate cost reimbursements, including costs of Notice advanced by the PSC, from the InEx, Banner, Global, and Virginia Settlements.[30]

The amounts requested herein, which cannot be completely quantified at this point given certain determinations that will be made in the future, will be used to compensate all counsel involved in the Chinese Drywall litigation – the PSC Members, other common benefit attorneys, and individually retained counsel.  The totality of the global fee request necessarily reflects a relatively modest percentage of recovery when taking into consideration the fact that the Knauf

---

[29]  The Knauf Defendants agreed to pay $2.4 million in attorneys' fees and costs to the PSC law firms that conducted the bellwether trial seeking excess insurance funds from North River Insurance Company ("North River") in connection with the InEx Settlement.  Those monies, intended to pay for InEx/North River fees and costs, are being held in a separate supervised account.  See Stipulation and Order, 7/31/2013 [Rec. Doc. #16966].  Disbursement and allocation of these funds will be the subject of separate proceedings.

[30]  See Rec. Doc. #17398; Banner Allocation Plan, ¶ 3; Global Allocation Plan, ¶ 4; InEx Allocation Plan, ¶ 3; Virginia Settlements Allocation Plan.

With regard to costs for Virginia litigation, counsel for the majority of the Virginia Settlement Class Members incurred significant costs from litigating approximately 200 individual Virginia state court actions.  PSC Members and private attorneys brought these actions in Virginia because Virginia law does not provide for class action tolling and Defendants challenged Class Action Fairness Act jurisdiction.  See Casey v. Merck & Co., 283 Va. 411, 418-419 (2012) (holding that, under Virginia law, "[a] putative class action cannot toll the running of the statutory period for unnamed putative class members who are not recognized as plaintiffs or represented plaintiffs in the original action.").  The PSC takes the position that the efforts undertaken in these actions helped create a common benefit for all CDW victims, as the cases in Virginia helped establish appropriate remediation protocols and drove the KPT Pilot Program that has remediated thousands of homes.  The Virginia attorneys have made all Voluntary Common Benefit Payments into the Court's registry, see fn. 39, infra, and will continue to do so.

Defendants are paying the large majority of the global attorneys' fees (76.7%), separate and apart from the uncapped Remediation Fund, so that no fees or costs come out of the recoveries of the individual KPT Chinese Drywall victims.  The fee requests of 32% from the InEx, Banner, Global and Virginia Settlements also include fees for individually retained counsel (with a common benefit percentage to be determined separately and awarded from the 32% funds), such that Class Members recovering from the InEx, Banner, Global, and Virginia Settlements will not be responsible for any additional fees beyond the 32%, if approved by the Court (or costs beyond any reimbursements approved by the Court).[31]  This hybrid approach – with attorneys' fees for the principal class settlement (Knauf Settlement) being paid separately by the Settling Defendants at no cost to the Plaintiffs, and attorneys' fees from the supplemental class settlements (InEx, Banner, Global, and Virginia) being awarded as a percentage of the common funds created, in order to pay both common benefit counsel and individually retained counsel's contingent fees – will result in a global fee award that is very low when compared to the range in other mass tort actions.

While the PSC is mindful that this fee authorization is for a substantial amount of money, it is respectfully submitted that the requested compensation has been fairly earned.  The counsel who submitted time and expenses to the Court-appointed Accountant pursuant to Pretrial Order

---

[31]  As noted in fn. 25, *supra*, the PSC agreed that builders who were actively involved in the litigation and are seeking compensation from the Banner Settlement for their damages will be obligated to pay only 10% in attorneys' fees (rather than 32%), if approved by the Court.  Any overages that were set aside from the builders' Banner Settlement recoveries (*i.e.*, 22%, or 32%-10%) will be returned to those builder Defendants.  As noted in fn. 26, *supra*, the parties dispute whether this provision also applies with respect to the Global Settlement.  *See* Global Allocation Plan, at fn. 1.

No. 9 or 9A devoted 245,871.19 hours to this litigation from its inception through December 31, 2013.[32]  The actual hourly rate reported by each professional submitting time to Mr. Garrett pursuant to Pretrial Order No. 9 or 9A at the inception of the litigation multiplied by the number of hours reported results in a total of $119,864,907.65.[33]

The law firms that submitted expenses to the Court-appointed CPA incurred $4,598,113.97 in Held Costs.  Common benefit counsel contributed $11,335,000 in assessments towards the funding of this litigation.[34]  While a substantial portion of the common benefit assessments ($9,148,000) has been reimbursed, $2,187,000 in assessments remain outstanding.  In total, as set forth above and in the Garrett Affidavit, the Joint Petitioners seek reimbursement of $5,547,011.68 in costs through December 31, 2013.[35]

Notably, the PSC will continue to incur significant costs to pursue the non-settling Taishan Defendants so that Plaintiffs with Taishan Chinese Drywall in their homes may be fully

---

[32] *See* Affidavit of Philip A. Garrett, CPA, dated May 15, 2014 ("Garrett Aff.") at ¶ 15, attached to the 2014 Herman-Levin Decl. as Exhibit "4."

[33] *Id*. at ¶ 16.  It would be presumptuous to provide the Court's Lodestar calculation at this time, since a determination of "the total amount of the common benefit fund and the amount of funds for individual counsel for claimants," the Court's "enhancement analysis," and an allocation of the fees have been left for another day.  *Id*. at ¶¶ 10, 11-20.  Similarly, in accordance with the Court's views, at the appropriate time, a Lodestar analysis will be made with respect to "an appropriate hourly rate," which is solely within the Court's province.  *See* Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371, 382-83 (2014).  In essence, the above figure comports with the view that the attorneys reporting time in this MDL "come from all parts of the country," and their rates vary according to their region.  When the total hours for each professional are multiplied by his or her hourly rate at inception of the litigation, and then those amounts are added together, the sum of $119,864,907.65 is produced.  If this sum is then divided by the total hours in the litigation, an average hourly rate is produced.

[34] *See* Garrett Aff., ¶¶ 19-21.

[35] *Id*.

13

compensated for their damages.  The PSC will also continue to administer the estimated $1.1 billion in settlement funds from the Knauf, Banner, InEx, L&W, Global, and Virginia Settlements, so that Plaintiffs can return to their homes and recoup losses caused by Chinese Drywall.

Further, in Pretrial Order No. 28, the Court appointed a Fee Committee consisting of both common benefit counsel and individually retained attorneys:  Arnold Levin as the Chair, Russ Herman as the Co-Chair/Secretary, and Dawn Barrios, Christopher A. Seeger, Gerald Meunier, Richard Serpe, and Michael J. Ryan as Fee Committee Members.[36]  The Fee Committee has compiled all of the Initial Affidavits and Second Affidavits of counsel seeking compensation for common benefit attorneys' fees and reimbursement of expenses pursuant to Pretrial Order No. 28,[37] and in consultation with the PSC, common benefit counsel, and individually retained counsel, the Fee Committee is filing this Global Fee Petition.  The Fee Committee also will meet with and take testimony from all Fee Applicants and evaluate their common benefit contributions to the litigation in order to make a recommendation to the Court on a fair allocation of any fees awarded by the Court.[38]

Many counsel working on Plaintiffs' behalf have dedicated their entire practice to this litigation for more than five years, and substantial efforts still are being undertaken by the Court-appointed counsel to pursue the non-settling Taishan Defendants, oversee a complex settlement

---

[36]  Rec. Doc. #17379.

[37]  *Id*. at ¶ 6.  These Affidavits are filed herewith under seal, as the litigation is continuing against the Taishan Defendants.

[38]  *Id*. at ¶¶ 16-20.

administration, and ensure the fair and equitable distribution of settlement benefits to tens of

thousands of Participating Class Members.  For counsel undertaking such risks, ample reward is

justified,[39] and, here, the global award requested is well within any judicially-established

benchmark.  Given the superlative efforts by counsel and the unique obstacles presented by this

litigation, the global fee request is not only eminently fair and reasonable, but well-deserved.

The Court has left for another day a determination of a fair and reasonable common

benefit assessment for any Chinese Drywall claim that is not subject to the Global Fee Petition.[40]

The Court has also deferred the allocation of any award of attorneys' fees and common benefit

assessment among the relevant petitioners.[41]  Accordingly, the present determination of the

global fee award and reimbursement of common benefit expenses merely sets the bounds by

---

[39]  In a separate filing, as contemplated by the Court, the PSC intends to seek a common benefit assessment for any Chinese Drywall case or claim not participating as a Class Member or claimant in any of the various Class Action Settlement Agreements addressed herein.  *See* Pretrial Order No. 28, ¶ 9; *see also* Amended Global Settlement, Sections 4.2.2 & 16.6.  In some cases, agreements have been reached with regard to common benefit fees.  *See, e.g.*, Villa Lago class settlement Letter Agreement (2014 Herman-Levin Decl. Ex. 5).  In other cases, claims have been assigned to the PSC.  *E.g.*, Shoma Homes Splendido, Inc. [Rec. Doc. #15695-6].

[40]  *See* Pretrial Order No. 28, ¶¶ 9-20.  Previously, in anticipation of a common benefit fee award, the Court entered an Order establishing a procedure whereby settling parties could voluntarily set-aside payments from any settlement proceeds received outside of the nine class settlements at issue here ("Voluntary Common Benefit Payments"), in order to compensate common benefit counsel "at a future date" [Rec. Doc. #8389].  Under this program, attorneys may deposit into the registry of the Court an amount equal to 17% of all settlement proceeds from any settlement amount for a particular property, representing 12% for common benefit fees and 5% for common costs.  *Id.*  To date, $970,360.82 in Voluntary Common Benefit Payments have been made.  *See* Chart of Voluntary Common Benefit Payments into Court Registry, filed herewith under seal and attached to the 2014 Herman-Levin Decl. as Exhibit "20."  Some common benefit firms, however, have failed or refused to make Voluntary Common Benefit Payments.  The collection of these common benefit fees must be pursued by the PSC.

[41]  Pretrial Order No. 28, ¶ 10; *see also id.* at ¶¶ 11-20.

15

which all counsel will be compensated.

As will be demonstrated, the fee award requested herein falls well within the Fifth

Circuit's jurisprudence of *Union Asset Management Holding, A.G. v. Dell, Inc.*, 669 F.3d 632,

644 (5th Cir. 2012); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir.

1974); *Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013) (Africk, J.); *In re Vioxx*

*Prod. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008); and Hon. Eldon E. Fallon, *Common*

*Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371 (2014) ["*Common Benefit Fees*"].

## III.   FACTUAL BACKGROUND

### A.   The Unique Chinese Drywall MDL and Coordinated State Court Litigation.

This predominantly property damage litigation arose out of thousands of individual and

class action lawsuits filed in state and federal courts throughout the country on behalf of

Plaintiffs seeking compensation for damages caused by Chinese Drywall.  In the aftermath of the

devastation caused by Hurricanes Katrina and Rita at the end of the summer of 2005 and in

conjunction with an American housing boom, there was a critical shortage of domestic drywall

available for new construction and the reconstruction of damaged properties.  This led to the

importation of millions of square feet of Chinese Drywall beginning in the fall of 2005 and

continuing through 2008,[42] during which time this product was installed in tens of thousands of

homes, commercial buildings and other structures.

---

[42]  The Gypsum Association reported that 320 million square feet of Chinese Drywall
were imported to the United States between 2005-2007.  *See* Gypsum Association Comments,
archived at
http://web.archive.org/web/20101216021748/http://gypsum.org/pdf/Gypsum_Association_Com
ments_on_Chinese_Wallboard_Issue.pdf.

Once installed, residents and owners began to notice extremely unpleasant "rotten egg" odors from the CDW and corrosion to anything in the home made of metal.[43]  Plaintiffs alleged that Chinese Drywall emits sulfur gases that are corrosive to metals, particularly copper and silver.[44]  This causes damage to the structural, mechanical and plumbing systems, such as the framing, heating, air-conditioning and ventilation ("HVAC") units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring.  Chinese Drywall also damages microwaves, utensils, electronic appliances, jewelry, mirrors, door handles, hinges, and other household and personal property items.[45]  Some individuals alleged that they suffered physical ailments, such as nose bleeds, skin irritation, and respiratory problems, as a result of exposure to Chinese Drywall.[46]  Many residents were forced to leave their homes due to these problems and risk of fire.

In response to these consumer complaints, the U.S. Consumer Product Safety Commission ("CPSC"), with support from the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Centers for Disease Control and Prevention ("CDC"), and other federal and state agencies, began investigations and testing of Chinese Drywall to examine the risks to consumers and their homes.  The CPSC and the Department of Housing and Urban Development ("HUD") found "a strong association between the presence of problem drywall and

---

[43]  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*Germano*), 706 F. Supp. 2d 655, 663 (E.D. La. 2010) (Findings of Fact and Conclusions of Law).

[44]  *Id*. at 664.

[45]  *See id*. at 664-66.

[46]  Order appointing Special Master [Rec. Doc. #505 at 1].

corrosion of metal in homes."[47]  These agencies recommended the removal of all possibly

problematic drywall from the property, along with smoke alarms and carbon monoxide alarms,

electrical distribution components (including receptacles, switches, and circuit breakers, but not

necessarily wiring), and fusible-type fire sprinkler heads.[48]

　　　With regard to health hazards posed by Chinese Drywall, the Government recently

reported that "[p]eople who were exposed to hydrogen sulfide and other sulfur compounds

emitted by some drywall manufactured in China may have experienced adverse health effects or

a reduced quality of life."[49]  The Government concluded that the estimated contaminant

concentrations from Chinese Drywall increased with increasing temperature and humidity.[50]

　　　　　1.　　*MDL 2047*

　　　On June 15, 2009, the Judicial Panel for Multidistrict Litigation transferred all federal

actions alleging damages from Chinese Drywall to the Eastern District of Louisiana for

coordinated discovery and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C.

---

[47] *See* CPSC's Remediation Guidance for Homes with Corrosion from Problem Drywall
as of September 15, 2011, published at www.cpsc.gov/info/drywall/Remediation091511.pdf.

[48] *Id*.  This Court additionally held that <u>all</u> electrical wiring must be removed in order to
properly remediate property impacted by Chinese Drywall.  *See Germano* Findings of Fact; *In re
Chinese-Manufactured Drywall Prods. Liab. Litig*. (*Hernandez*), 2010 WL 1710434, *8-*9 (E.D.
La. Apr. 27, 2010) (Findings of Fact and Conclusions of Law); Transcript of Proceedings,
3/23/2011, at 18:4-19:14.

[49] Health Consultation: Possible Health Implications from Exposure to Sulfur Gases
Emitted From Chinese-Manufactured Drywall, Prepared by U.S. Department of Health and
Human Services, Agency for Toxic Substances and Disease Registry Division of Community
Health Investigations (May 2, 2014), at 4, available at
http://www.atsdr.cdc.gov/drywall/docs/Drywall_HC_05-02-2014_508.pdf.

[50] *Id*.

18

§ 1407. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009) [Rec. Doc. #1]. Upon the formation of this MDL, the Court entered an initial case management order[51] and other administrative orders,[52] and appointed various committees to represent, organize and streamline the divergent interests involved in this case. For the Plaintiffs, the Court appointed Plaintiffs' Liaison Counsel Russ M. Herman,[53] Plaintiffs' Lead Counsel Arnold Levin and the PSC, consisting of: Arnold Levin, Dawn M. Barrios; Daniel E. Becnel, Jr.; Robert C. Josefsberg; Bruce William Steckler; Ervin A. Gonzalez; Ben W. Gordon, Jr.; Hugh P. Lambert; Gerald E. Meunier; Jerrold Seth Parker; Scott Wm. Weinstein; James Robert Reeves, Jr.; Christopher A. Seeger; Daniel K. Bryson; Richard J. Serpe; and Victor M. Diaz, Jr.[54] Further, the Court appointed Defendants' Liaison Counsel,[55] a Defendants' Steering Committee,[56] Homebuilders and Installers Liaison Counsel,[57] and an Insurer Steering Committee

---

[51] *See* Pretrial Order No. 1 [Rec. Doc. #2].

[52] Pretrial Order Nos. 2 [Rec. Doc. #3] and 2A [Rec. Doc. #248] (Procedures for transfer of cases and tracking of remands in MDL 2047); Pretrial Order No. 6 [Rec. Doc. #138 ] (Electronic Service).

[53] *See* Pretrial Order No. 3 [Rec. Doc. #21]. The Court also appointed Mr. Herman as an ex-officio member of the PSC. *See* Pretrial Order No. 8 [Rec. Doc. #144-2].

[54] Pretrial Order No. 8; *see also* Pretrial Order Nos. 8A [Rec. Doc. #6960], 8B [Rec. Doc. #13084], 8C [Rec. Doc. #16608], and 8D [Rec. Doc. #17600] (reappointing the PSC for consecutive one-year terms). Attorneys Anthony D. Irpino, Richard S. Lewis and Andrew A. Lemmon served as Of-Counsel to the PSC.

[55] *See* Pretrial Order No. 4 [Rec. Doc. #22].

[56] *See* Pretrial Order Nos. 7 [Rec. Doc. #143], 7A [Rec. Doc. #152], and 7B [Rec. Doc. #180].

[57] *See* Pretrial Order No. 18 [Rec. Doc. #414].

19

as well as Co-Lead Counsel for the First-Party Insurer Subcommittee.[58]  The Court also

appointed Plaintiffs' and Defendants' State and Federal Coordination Committees[59] and a curator

for *pro se* litigants.[60]

The Court tasked the PSC with the following responsibilities:  (i) to prepare and respond

to pleadings and motions; (ii) to engage in discovery, pretrial preparation, trial and settlement of

cases; (iii) to manage the MDL docket; (iv) to establish and administer a document depository;

(v) to communicate with individual Plaintiffs and their counsel; (vi) to liaison with Defendants;

and (vii) to attend court status conferences and hearings.[61]

In furtherance of their Court-appointed and fiduciary duties, PSC counsel and their firms

lodged an all-out, uninterrupted, multi-pronged prosecution of Plaintiffs' claims in the MDL and

coordinated state court proceedings, as well as appellate court activities.  They directed,

supervised and coordinated all of the litigation efforts of behalf of Plaintiffs.  They formed 23

PSC Committees and 9 PSC Subcommittees,[62] and led and/or participated in over 60 PSC

---

[58]  *See* Pretrial Order No. 20 [Rec. Doc. #2369].

[59]  *See* Pretrial Order No. 19 [Rec. Doc. #1871].

[60]  Rec. Doc. #11327.

[61]  *See* Pretrial Order No. 3.

[62]  The PSC formed the following Committees and Subcommittees:  (1) Administration and Depository Committee; (2) Bankruptcy and Financial Research Committee; (3) Case Tracking Committee; (4) Discovery Deposition Committee; (5) Discovery Written Committee; (6) Ethics Referrals Committee; (7) Expert Science (Property) Committee; (8) Expert Science (PI) Committee; (9) Government Relations Committee; (10) Inspections Committee; (11) Insurance Committee; (12) IT and Electronic Discovery Committee; (13) Law Committee (Overall Law and MDL Law Subcommittee; Alabama Law Subcommittee; Florida Law Subcommittee; Louisiana Law Subcommittee; Mississippi Law Subcommittee; North Carolina

(continued...)

20

meetings.  In addition, they interfaced with the Court, communicated with and assisted individual

Plaintiffs' counsel and *pro se* litigants, and coordinated with defense liaison counsel and the

Court-appointed Curator and Ombudsman, as necessary.  The PSC administered the MDL docket

with more than 17,650 entries and interfaced with the Clerk of Court and its staff.  Further, since

the MDL was formed, the PSC has prepared 54 monthly status reports for the Court and has

assumed primary responsibility for all of the Court's monthly status conferences and hearings to

date, all major motions, jurisdictional hearings, and Settlement Fairness Hearings.  They continue

to perform these services.[63]

　　　　For purposes of coordination, consistency and global treatment of Chinese Drywall

claims, the PSC has monitored and participated in related state court Chinese Drywall

proceedings in Norfolk, Virginia before the Honorable Mary Jane Hall, presiding Judge of the 4th

Judicial Circuit Court of Norfolk, Virginia.  These cases were filed because Virginia law does not

recognize any tolling of statutes of limitations for class actions.  The extensive litigation in the

Virginia state courts has created a common benefit.  PSC Members participated in hearings in

Virginia related to motions to disqualify, motions craving oyer (the equivalent of a motion to

---

[62](...continued)
Law Subcommittee; Ohio and Minnesota Law Subcommittee; South Carolina Law
Subcommittee; Virginia Law Subcommittee); (14) Litigation Group and Seminar Planning
Committee; (15) Medical Monitoring Committee; (16) New Defendants Committee; (17) Public
Relations Committee; (18) Research and Collection of Standards (Domestic and Foreign
Publications and Journals/FOIA/Public Records Requests) Committee; (19) Remediation/Release
Committee; (20) Special Projects Committee; (21) State/Federal Committee; (22) Trial and Trial
Package Committee; and (23) Witness Development Committee.

[63]  *See*, *e.g.*, Chart of PSC Court Appearances from Inception through December 31,
2013, attached to the 2014 Herman-Levin Decl. as Exhibit "6."

dismiss), demurrers, a motion to compel, and other matters, prepared for trial, and engaged experts.  The PSC also participated in mediations in the Virginia state court proceedings, and negotiations of the Virginia Settlements, which were approved by this Court.[64]

In addition, the PSC has monitored related state court proceedings in Florida, particularly Miami Dade County, and attended hearings there before the Honorable Joseph Farina (ret.) from the 11th Judicial Circuit Court of Florida in person or by telephone on substantive matters and with respect to the Knauf Settlement to explain the proceedings occurring before the MDL Court. The Court has also consulted with numerous state court judges and other federal judges also overseeing Chinese Drywall litigation, including Judge Farina and the Honorable Charles Greene from the 17th Judicial Circuit Court of Florida (Broward County).[65]  In coordination with these jurists, this MDL Court strived to achieve finality in the resolution of this litigation.[66]

## 2.    *Virginia State Court Litigation*

Hundreds of families in Virginia were impacted by Chinese Drywall.  The initial investigation into this problem began in Virginia in February, 2009.  As little was known at that time, the litigation team in Virginia (which included PSC Members, Plaintiffs' Lead Counsel and Plaintiffs' Liaison Counsel) conducted extensive inquiries – including hours of meetings with

---

[64]  Rec. Doc. #16934 (Builders Mutual, Nationwide, Porter-Blaine/Venture Supply/Insurers, and Tobin Trading/ Builders Plaster & Drywall/JMM Drywall/Insurers Virginia Settlements).

[65]  *E.g.*, Transcript of Status Conference at 2:17-3:17, Oct. 14, 2010 (comments of J. Fallon praising "the help of state court judges:" "I've counted on their wisdom, on their suggestions in trying to gather all of the cases and move them forward."); Transcript of Status Conference at 7:5-17, Mar. 23, 2011.

[66]  Transcript of Status Conference at 7:19-25, Mar. 23, 2011.

victims of CDW damage, significant legal research, and work with scientific experts around the country – to develop a testing program to confirm the presence of CDW in homes in Virginia. This preliminary investigation revealed that hundreds of homes in Virginia were built with Chinese Drywall primarily, if not exclusively, manufactured by Shandong Taihe Dongxin Co., Ltd. (which, on Sept. 10, 2007, changed its name to Taishan Gypsum Co., Ltd. ("Taishan")) and supplied by Venture Supply, Inc. ("Venture") of Norfolk, Virginia.[67]

In the fall of 2005, Venture sought to secure a source of foreign drywall and entered into a contract with Phillip Perry, who was in the business of importing and exporting supplies under the corporate name "Tobin Trading, Inc." ("Tobin").  Tobin traveled to China and, in November, 2005, began negotiations with Taishan for the terms of a large shipment to Venture in Norfolk. Tobin was directly involved in the inspection of the drywall in the Taishan factory and had extensive meetings, phone calls and emails with Taishan to arrange a shipment.

On November 9, 2005, Venture provided an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihi Dongxin for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards.[68]  On November 14, 2005, Venture was advised that the manufacturer was not clear on U.S. ASTM ratings.  However, Taishan insisted that Venture remove U.S. ASTM requirements from the letter of credit and rely solely upon Chinese

---

[67] *Chinese Drywall*, 706 F. Supp. 2d at 661.

[68] *Id*.

ratings.[69]  Venture then contracted with Taishan to purchase drywall.[70]  Accordingly, on November 15, 2005, Venture directed its bank to remove the U.S. ASTM requirement from the letter of credit to Taishan.[71] Venture compensated Tobin for expenses incurred in negotiating this contract and Tobin received a percentage of the purchase price of all drywall sold between Taishan and Venture.

Pursuant to contract, on December 25, 2005, Taishan had 2,000 pallets of drywall shipped to the United States, which arrived in February 2006.[72]  A second shipment of 53,912 sheets on 586 pallets was shipped and off-loaded in Camden, New Jersey.[73]  Tobin signed the two purchase agreements as an agent for Venture, which allowed over 150,000 total sheets of Chinese Drywall to enter the United States.  Venture sold the drywall to its related company Porter-Blaine, and then shipped the drywall to Plaintiffs' homes in Virginia, where Porter-Blaine installed it.[74]

This drywall was never tested pursuant to the U.S. ASTM standard.[75]  Venture relied on a representation that Chinese testing was equivalent to the U.S. testing standards.[76]  However, the Chinese tests were administered by a Chinese government agency and not by an independent

---

[69]  *Id.*

[70]  *Id.*

[71]  *Id.*

[72]  *Id.*

[73]  *Id.*

[74]  *Id.*

[75]  *Id.* at 662.

[76]  *Id.*

testing laboratory, and the "Quality Management System Certification" predated the production of the drywall that was shipped to the U.S. by at least two years.[77]

Although there were significant challenges to litigation in Virginia, including unfavorable case law regarding insurance coverage exclusions and inflexible statutes of limitations, the Virginia team filed the *Germano* class action complaint in federal court against Taishan and Venture on behalf of affected Virginia homeowners on May 1, 2009.[78]  Additionally, because Virginia does not recognize tolling for class action cases, and to avoid minimal diversity arguments raised by Venture, Plaintiffs' counsel were required to file parallel actions in both state court and federal court against builders, installers and other responsible parties.  The litigation, which was consolidated in Norfolk, Virginia, included individual filed suits for approximately 200 families, as well as a multi-plaintiff complaint, which was amended on multiple occasions so as to include all filed Virginia claims.  The Defendants challenged venue in Norfolk, and sought to block the consolidation of the cases, but were unsuccessful in reversing the trial court's rulings, despite an interlocutory appeal to the Virginia Supreme Court.  The Virginia state court litigation was crucial in light of Defendants' jurisdictional motions to dismiss the *Germano* class.

Judge Hall of the Norfolk Circuit Court managed an efficient litigation, conducting monthly status conferences, disposing of scores of motions, and selecting bellwether trials for 34

---

[77] *Id.*

[78] *Germano v. Taishan, et al.*, 09-cv-0202 (E.D. Va.).  This action was transferred to MDL 2047.

cases.[79]  The 200 Virginia state court cases included claims against over 50 Defendants, each of whom actively pursued defensive motions and discovery.  Litigating individual cases against scores of Defendants required enormous time and effort on behalf of Plaintiffs' counsel.

Virginia CDW victims faced and overcame a major setback when the Virginia Supreme Court held that the pollution exclusion, contained in numerous insurance policies, unambiguously excluded coverage for CDW.  With one decision, the Virginia Supreme Court held that over $80 million in coverage for Venture alone was unavailable to compensate victims.[80]  Once again, investigation broadened to "a home-by-home" basis, carefully reviewing insurance coverage for responsible builders and installers.  This review of insurance policies revealed a variant of the pollution exclusion that contained a critical "performing operations" clause, which demonstrably provides coverage for CDW homes.  In order to flesh out the full extent of this coverage, the Virginia state court plaintiffs sought and obtained a court order requiring the production of every insurance policy for multiple Defendants over a five-year time period.  The state court Plaintiffs enforced this order, and carefully reviewed these policies to locate the critical "performing operations clause."  The state court Plaintiffs pressed on with new sets of trial settings against these Defendants.[81]

Virginia investigation revealed that Nationwide provided the lion's share of coverage to

---

[79]  *See* Index and Appendix containing Judge Hall's Chinese Drywall orders, attached to the 2014 Herman-Levin Decl. as Exhibit "7."

[80]  *Travco Ins. Co. v. Ward*, 284 Va. 547, 736 S.E.2d 321 (Va. 2012).

[81]  *See* List of Virginia Trial Settings to pursue this strategy, attached to the 2014 Herman-Levin Decl. as Exhibit "8."

builders and installers of CDW supplied by Venture.  The state court Plaintiffs selected

Nationwide-insured Defendants for litigation and trial, including crucially, Atlantic Homes, LLC

("Atlantic"), which built several of the *Germano* intervenor homes. This litigation opened a

"third front" as Atlantic sought relief from building code violations at both the local and state

level.  The state court Plaintiffs quickly intervened, retained experts and presented evidence at

every level of the Virginia Building Code administrative process.  Virginia efforts culminated in

successful rulings that included:  finding Venture-supplied CDW as a per se building code

violation, finding that every entity involved in the construction process was responsible for these

code violations, finding that Venture-supplied CDW created a "corrosive environment" that

rendered the initial building permit void, and requiring the complete removal of all electrical

components from the homes as part of remediation.  These critical successes formed the basis of

further successful motion practice on liability and scope of remediation before Judge Hall.

Extensive discovery and briefing was required in Virginia on the issue of the

foreseeability of CDW damages.  Defendants attempted to argue that they had no knowledge that

CDW would off-gas, and therefore could not be held responsible for resulting damages.  The

state court Plaintiffs developed a series of installer fact witnesses who acknowledged apparent

problems with Venture-supplied CDW at the time of installation.  These problems included

excessive weight of the drywall which resulted in poor performance (especially on ceilings) and

the propensity of the drywall to ripple, crack and distort, requiring extensive repairs.  These fact

witnesses testified to a process whereby Venture started mixing domestic drywall into every

delivery to cover ceilings and other problem spots.  The Virginia Defendants faced damning

evidence of their own knowledge of the defective nature of CDW.

The odor of the drywall when cut was also an area of fruitful fact witness development and testimony.  Several installer Defendants acknowledged that the smell (a sign of off-gassing and defect) was obviously a problem and some testified that they complained to Venture about the issue.  Coupled with the physical problems with the drywall, the state court Plaintiffs overcame the foreseeability defense and demonstrated that Defendants had reason to know that CDW was going to cause problems for the homeowners.  Thereafter, Judge Hall ruled that, as long as some harm was foreseeable, the Defendants were responsible for all harm associated with the product.

While litigating these cases against local counsel for Nationwide, the state court Plaintiffs began a series of settlement negotiations with national counsel and the head of environmental claims for Nationwide.  These negotiations culminated in a, now-finalized, class settlement of $10 million.  The state court Plaintiffs also negotiated with three additional groups of Defendants and carriers, resulting in, after months of concerted effort, the four Virginia Settlements, discussed *infra*.

Additional carriers and Defendants rejected efforts to join in these Virginia Settlements, and litigation continued, uninterrupted, against additional builders and installers.  As reflected in Exhibit 8 to the 2014 Herman-Levin Decl., these trials continue unabated, and have resulted in millions of dollars of additional settlements for Venture victims, even non-class settlements, including both the *Torres* and *Ramirez* QSF settlements which were approved by this Court and by Judge Hall.[82]  Settlement negotiations with remaining Defendants continue.

---

[82] Rec. Doc. #16541 (*Torres* Order); Rec. Doc. #16901 (*Ramirez* Order).

In addition to these tort matters, Virginia became the most prolix jurisdiction for insurance litigation.  It would be hard to overstate the tremendous volume of insurance litigation over Virginia insurance policies.[83]  In connection with extensive litigation in Virginia regarding the "pollution exclusion" clause included in insurance contracts issued to various Defendants,[84] the Virginia PSC handled significant issues involving the construction of the exclusion and other key contract wording.  Declaratory judgment actions in U.S. District Courts issued unfavorable rulings regarding the pollution exclusion clause when read in conjunction with long-standing Virginia law applying the plain meaning of contracts.  In one key case, however, the Eastern District of Virginia held that contractual language was ambiguous and found that the insurance company had a duty to defend under its insurance policy.  *See Builders Mut. Ins. Co. v. Parallel Design and Development, LLC, et al.*, 785 F. Supp. 2d 535 (E.D. Va. 2011) (holding the pollution exclusion insurer's policy was inoperative because the term "pollutants" was not defined).  This ruling had significant effects on insurance coverage litigation going forward. Insurance policies that failed to include strong policy exclusion language defining the term "pollutants" could be strictly construed against the insurance company.  The team in Virginia litigated multiple actions at the district court level, in the Fourth Circuit Court of Appeals, and

---

[83]  *See* Exhibit "9" to the 2014 Herman-Levin Decl. for details on the motions, briefs and other Virginia court filings in the insurance litigation.

[84]  *See*, *e.g.*, *Travco Ins. Co. v. Ward*, 284 Va. 547, 736 S.E.2d 321, 324 (2012); *Evanston Ins. Co. v. Harbor Walk Development, LLC*, 814 F. Supp. 2d 635 (E.D. Va. 2011); *Dragas Management Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 766 (E.D. Va. 2011); *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502 (E.D. Va. 2011); *QBE Ins. Corp. v. Estes Heating & Air Conditioning, Inc.*, 2012 WL 413968 (S.D. Ala. Feb. 8, 2012); *Builders Mut. Ins. Co. v. Parallel Design & Development, LLC*, 2010 WL 6573365 (E.D. Va. Oct. 5, 2010).

before the Virginia Supreme Court regarding the applicability of the pollution exclusion and the scope of its reach.

Although the Supreme Court of Virginia refuses to differentiate between traditional environmental pollution and other forms of pollution, the consistent efforts of the Virginia team to litigate insurance coverage interpretation led to "chinks in the armor" of some insurance policies. One argument, regarding "performing operations" language in Nationwide policies of insurance, ultimately led to a significant settlement with Nationwide, and other insurance settlements followed suit. These insurance settlements have greatly benefitted Virginia Plaintiffs who otherwise would have had limited remedies.

### 3.   *Florida State Court Litigation*

As the Court is aware, Florida was dramatically impacted by the distribution and installation of Chinese Drywall in homes in that State. More than 300 Chinese Drywall suits were filed in Florida state courts against builder Defendants and supplier Defendants, namely Banner. In South Florida alone, approximately 128 cases were filed in the 11th Judicial Circuit (Miami-Dade County Circuit Court), including first homeowner case, *Harrell v. South Kendall Construction Corp. et al.*, No. 2009-8401 CA 42 (Feb. 3, 2009). Approximately 88 cases were filed in the 17th Judicial Circuit (Broward County Circuit Court), where the first homeowner case, *Morris v. Knauf Plasterboard Tianjin Co.*, No. CACE 09-22664, was filed on April 21, 2009. Approximately 104 cases were filed in the 15th Judicial Circuit (Palm Beach Circuit Court), where the first homeowner case, *Olschewski v. Centerline Homes, Inc., et al.*, No. 2009-CA-13464, was filed on April 9, 2009.

Chinese Drywall cases were aggressively litigated in Florida state courts. The trial judges

in Florida coordinated many matters informally with this Court, and formally by conducting joint oral arguments.  However, the Florida state court litigation proceeded on a separate track from the MDL.  In these cases, there were motions to dismiss, discovery motions, trial settings, appellate or extraordinary relief sought by Defendants (in at least one District Court of Appeal), Plaintiff depositions, depositions of Banner representatives, production of documents, answers to interrogatories, retention of experts and preparation of experts for trial and/or class certification evidentiary hearings.  The Florida trial courts held regularly scheduled case management conferences and numerous hearings on disputed issues.

The litigation in these Circuit Courts focused heavily on the Florida-based Banner entities, as well as viable homebuilders and installers.  The various state court filings had a large number of Defendants named to bring into the litigation viable parties other than the manufacturing Defendants.  In the early stages, an important legal hurdle was establishing entitlement to recovery under Florida law.  Florida's "Economic Loss Rule" was a potential barrier to full recovery for homeowners, but after significant briefing and oral argument, Plaintiffs successfully defeated the "Economic Loss Rule" argument aggressively asserted by the target Defendants.

On June 18, 2010, after substantial factual and expert discovery involving Banner, the first jury verdict in the nation was rendered in favor Plaintiffs against the Chinese Drywall suppliers.  The jury in *Armin G. Seifart and Lisa M. Gore Seifart v. Banner Supply Co.*, No. 09-38887CA 01(42), found Banner liable under Florida Deceptive and Unfair Trade Practices Act, common law negligence and common law private nuisance, and awarded nearly $2.5 million

31

in damages.[85]  The damages awarded included remediation costs, costs for temporary housing and moving expenses, loss of enjoyment and diminution of value/stigma damages.  Additionally, the pre-trial discovery and trial testimony in *Seifart* served as a template for other Plaintiffs in Florida and, in some respects, throughout the nation in regards to the conduct of Knauf.

On July 9, 2010, a statewide class action complaint, *Orlando, et al. v. Banner Supply Co.*, No. CACE-10-28090, was filed in Broward County Circuit Court, partially as a result of the *Seifart* verdict.  Production of documents from Banner served as a resource for identifying potential homes supplied by Banner.  This identification allowed many homeowners to participate in the Banner Settlement approved by this Court and discussed, *infra*.  Plaintiffs' depositions were defended, depositions of Banner representatives were taken, and substantial briefing was filed with the Broward County Circuit Court relating to the class certification. Plaintiffs were preparing to proceed to the scheduled class certification evidentiary hearing while the Defendants' efforts concentrated on continuing the class certification hearing in the Circuit Court and the Fourth District Court of Appeals.  Ultimately, though, on the eve of the class certification hearing, the class action case was stayed to allow the parties to conduct settlement discussions through the MDL.

### 4. *Individual Homeowner Representation*

Attorneys handling individual Chinese Drywall claims were faced with a variety of challenges, on a case-by-case basis, depending on the individual circumstances presented.

---

[85]  *See* Verdict, attached to the 2014 Herman-Levin Decl. as Exhibit "10."  The award as it relates to Banner was reduced by 45% for the percentage of fault of Knauf Plasterboard (Tianjin) Co., La Supreme Enterprise, Inc., and Rothchilt International, Ltd.  *Id*.

Perhaps unlike any other mass litigation, some of these homeowner clients faced unprecedented complexities outside the four corners of a complaint.  At times, the representation of some of the individual homeowners impacted by Chinese Drywall required substantial efforts by individual attorneys separate and apart from the common benefit work performed by the PSC.  For example, attorneys representing homeowners may have been required, depending on the circumstances, to provide individual advice on matters such as mortgage relief, property tax relief, homeowner insurance claims, homeowner association responsibilities, IRS casualty loss claims, competing remediation solutions, preservation protocols, disclosure for subsequent sales, foreclosure and health concerns.

By way of background, for the vast majority of homeowners impacted by Chinese Drywall, their home was their largest or most significant personal investment.  In some cases, these homes were purchased at the height of the market prices.  Yet, while many other homeowners had undergone foreclosure, these homeowners were, by definition, able to meet their contractual obligations irrespective of the market value of the home.  Importantly, all of the Chinese Drywall homeowners who qualified for a class settlement owned their homes at the time the reactive drywall was discovered.

The first step in representing these homeowners required attorneys to conduct an inspection of the property, either by way of an expert or through their own efforts.  Unlike a medical case where records could be reviewed to determine if there was a potential case, each home required a thorough and detailed inspection.  In the early stages, determining which homes, or which parts of homes, were impacted by CDW was an effort without published guidelines or criteria.  This required, in some instances, multiple inspections and evaluations.  Particularly in

33

the early stages, identification of the manufacturer was challenging, since identifying markings were difficult to locate.  After the Court entered Pretrial Order Nos. 10 and 13, and the PSC facilitated the preparation of a published catalog of photographs identifying manufacturers, these identifications were easier.

Even once the presence of CDW was confirmed, however, because many of the homes impacted were new construction, the identification of other potentially responsible parties was challenging.  In many cases, while the homeowners knew the builder, identification of the supplier and installer was a labor intensive effort on the part of the individual attorneys.

Upon discovery of CDW in the property, the home's value plummeted to a fraction of its previous worth, and unfortunately, as CDW was discovered in surrounding homes, an economic blight quickly fell upon neighborhoods.  Not long after press reports highlighted this situation, the real estate market responded by requiring disclosures prior to listing or sale of a home in CDW-impacted neighborhoods.  Later, formal disclosures were required for every sale in certain parts of the country.  However, prior to consensus as to the remediation protocol, these homes simply were not marketable.

For homeowners, litigation was the only option to address this economic and personal tragedy, but it was a long-term strategy.  More immediately, because of their inability to liquidate their largest asset at a fair market value, the vast majority of Plaintiffs faced a potential financial catastrophe.  Vacating the home for an indefinite and unpredictable period of time was not a viable option for homeowners.  Many could not absorb the monthly carrying costs of maintaining two homes and most could not withstand the financial consequences of simply selling the home given the lack of marketability and downward economic pressure caused by CDW.  On the other

hand, concerns over potential health effects naturally counterbalanced this financial challenge.

As a result, where necessary, individual attorneys put extended efforts into contacting the banks involved, seeking to abate mortgage obligations so homeowners could either move out or stop the potential and continuing financial losses associated with having a CDW-impacted home. However, as this issue was unprecedented, virtually all banks were unresponsive because they were unfamiliar with the existence of CDW and the potential remediation solutions. Attorneys persistently educated lenders on the scope of the problem through multiple communications.

Because of diminished home values, attorneys were asked in some cases to advocate for a reduction of assessed property taxes from local Property Tax Assessors. This effort required educating Property Assessors on the scope of the CDW problem, a lack of marketability, and potential remediation solutions. Property Assessors in Florida, Louisiana, and other states required the submission of paperwork, often prepared by counsel, in order to reduce property tax assessments.

Homeowners had numerous questions, and there was uncertainty, surrounding the ability to assert a claim under existing homeowners insurance policies. For many lawyers, this required both an evaluation of the policy exclusions as well as the governing law.

In addition to mortgage and property tax relief, many homeowners needed advice on homeowner association fees and city charges related to maintaining their home and potential eligibility for Internal Revenue Service casualty loss deductions.

Further, individual homeowners routinely requested advice from counsel on whether or not there was a consensus in the scientific community or the real estate market before initiating remediation efforts. The fear of potential health effects from CDW, whether transient or

35

permanent, resulted in another level of individual engagement with the attorneys representing homeowners.

Because a funded remediation settlement solution was not available immediately, some homeowners were forced to renegotiate loans on their homes or, alternatively, defaulted. Attorneys were routinely asked to provide individual advice on such matters as "deed in lieu" or other potential strategies, including necessary disclosures. The change in ownership of the home did not relieve the attorneys from providing advice and, later, initiating a claim.

For homeowners who had the financial capacity to self-remediate while the litigation proceeded, attorneys regularly advised on the scope of acceptable remediation and issues associated with preservation of evidence. In the early stages, before there was a clear consensus as to the acceptable scope of remediation, attorneys were required to analyze the best existing evidence. This analysis was particularly difficult as it was well understood that there would not be an opportunity to perform remediations twice, and the ultimate decisions carried an associated risk for future recovery. Later, once protocols were developed, attorneys provided advice as to how to proceed with remediation while protecting their rights against responsible parties.

For those eligible for the Knauf remediation program, the process was more complicated than a simple settlement. First, every homeowner had to undergo eligibility determinations, requiring the lawyers to coordinate product identification inspections, and in some circumstances, re-inspections. Eligible homeowners had detailed questions about the protocol and their rights under the program, and many homeowners requested the assistance of counsel throughout the process of remediation, including negotiations over such matters as replacement of "like" items and how to resolve damage to the property. As would be expected in any home

project of this magnitude, many homeowners ultimately had "punch list" issues that required further assistance of counsel. Some remediation issues expanded to warranty claims requiring additional advocacy to find solutions. Thus, unlike a typical settlement where on a date certain a release is signed, monies are transferred, and the case is over, embarking on the remediation program was simply the next stage of representation.

For Mixed Property owners, there was a further complication in determining the percentages of relative responsibility amongst the manufacturing companies. This required attorney engagement through the inspection protocol. Lawyers then had to advise clients on the multiple resolution options available for a "mixed home."

For homeowners who self-remediated their properties, the obligation to submit all receipts and proofs of payment was onerous. In many cases, these resolutions were handled as a negotiation, with multiple communications back and forth between Knauf's counsel and the homeowners. In some circumstances, meetings with Knauf, Knauf's counsel, and Knauf's chosen contractor were required prior to resolution.

The claims process constructed as part of the Knauf Settlement required a substantial effort on the part of individual attorneys to navigate multiple available claim options on behalf of all eligible homeowners, including those who had already remediated their homes. This was a labor-intensive process that was more involved than simply gathering records for a claim submission. The efforts included generating the claims information, preparation of affidavits, accumulation of documents for evidence, calculations, and advice to clients on available claim options. Often, because of the difficulty in determining certain qualifying criteria, the attorneys had to find innovative methods to help advocate for the homeowners.

37

Finally, for many of the attorneys representing the individual homeowners, the current Court-approved settlement provisions may not permit the full recovery of all expenses expended on behalf of individual homeowners.[86]  As a result, many individual attorneys may have incurred costs on behalf of CDW clients, which would normally be recoverable, but which will not be recoverable here.  Such unrecoverable costs will erode somewhat any attorneys' fees awarded to individual attorneys.

Given the complexity of the factual and legal issues, as well as the financial consequences to the impacted homeowners, some individual homeowners required substantial efforts by the individual lawyers retained to represent their interests based on their individual circumstances.  This effort by individual attorneys on behalf of individual homeowners was necessary in addition to the common benefit work of the PSC.

**B.**    **The PSC's Efforts to Identify and Bring All Responsible Parties into this Litigation.**

The first obstacle in this litigation was to identify and locate all parties responsible for Plaintiffs' damages and then bring those Defendants into the MDL.  Initial discovery and testing revealed that a large majority of the Affected Properties that are the subject of this litigation contained either KPT Chinese Drywall manufactured by one of the Knauf Defendants ("KPT Properties") or "Taishan" or "DUN" brand drywall manufactured by the one of the Taishan Defendants, or a combination of both ("Mixed Properties").  The process of bringing the Chinese

---

[86]  *See, e.g.*, Knauf Settlement, Section 14.1, limiting cost recovery by individual attorneys to "reasonable inspection costs."  Set-asides for costs have been made in the InEx, Banner, Global, and Virginia Settlements.  At a later date, the disbursement and allocation of those set-asides shall be the subject of further proceedings and determination by the Court.

Drywall manufacturers, their parents, and their alter egos/agents into the MDL was complicated by the fact that these Defendants were foreign entities located outside the confines for traditional service of process in the United States.

The PSC conceived of and created 18 different novel Omni Complaints,[87] which allowed the claims of thousands of Plaintiffs to be joined in a singular complaint so that service of process of these complaints could be coordinated through the Hague Convention on foreign Defendants who would not accept service.  The Omni Complaints also facilitated the joinder of individual Plaintiffs' claims against more than 1,000 different importers, suppliers, distributors, builders, and installers, as well as their insurers, involved in the supply chain of CDW installed in Plaintiffs' properties.[88]

Then, the PSC intervened into these Omni Complaints approximately 10,000 Plaintiffs alleging property damages and/or personal injury resulting from CDW installed in homes located in numerous jurisdictions along the Gulf Coast and East Coast of the United States, including Louisiana, Florida, Texas, Alabama, Mississippi, North Carolina, South Carolina, Georgia, Tennessee, and Virginia.  The leadership committee painstakingly oversaw the translation of the lengthy Omni Complaints into the various appropriate languages and served them on the foreign manufacturers and their related entities under the extraordinarily prolix and expensive process required by the Hague Convention, which is still ongoing for the Chinese Taishan Defendants.

The PSC presented proposed schedules and deadlines to the Court for the completion of

---

[87] *See* fn. 3, *supra*.

[88] *See* fn. 2, *supra*.

the Omni Complaints, responsive pleadings, notices of appearance, and the preservation of physical evidence in Plaintiffs' homes during repairs or other remediation efforts. The Court entered Pretrial Orders addressing these issues.[89]

### C.    Extensive and Widespread Discovery Efforts of the PSC.

The PSC developed a comprehensive and efficient discovery strategy designed to maximize Plaintiffs' results in the litigation:

First, they prepared proposed Defendant Profile Forms for manufacturers, distributors, exporters, importers, brokers, builders, contractors/installers, retailers, and insurers, which required these Defendants to certify under penalty of perjury important detailed information about their roles in bringing Chinese Drywall into the United States and into Plaintiffs' homes, as well as information about their insurers. The PSC prepared and submitted proposed Pretrial Orders regarding deadlines for completion and service and distribution of these profile forms.[90]

Second, the PSC created Plaintiff Profile Forms intended for Plaintiffs to identify responsible parties in the CDW supply chain.[91] To assist the Plaintiffs in identifying the manufacturer in the Plaintiff Profile Form, the PSC established a Court-approved photographic catalog of markings, brands, endtapes and other identifying markers of CDW, collected the data,

---

[89]   *See* Pretrial Order Nos. 1A [Rec. Doc. #186], 1B [Rec. Doc. #337], 1C [Rec. Doc. #509], 1D [Rec. Doc. #718], 1E [Rec. Doc. #1078], 1F [Rec. Doc. #1692], 1G [Rec. Doc. #3348], 1H [Rec. Doc. #6083], 1I [Rec. Doc. #12257].

[90]   *See* Pretrial Order Nos. 11 [Rec. Doc. #168], 12 [Rec. Doc. #173], 12A [Rec. Doc. #174], 14 [Rec. Doc. #281], 14A [Rec. Doc. #336], 23 [Rec. Doc. #2778], 25 [Rec. Doc. #11151].

[91]   *See id.*

and submitted the critical information to the Court for publication on the Court's website.[92]

Third, with the assistance of experts, the PSC developed a Threshold Inspection Program ("TIP") to further identify and assist Plaintiffs in identifying the Chinese Drywall in their homes. The PSC presented this program to the Court for approval, and the TIP was instituted.[93]  The PSC expended tremendous efforts in formulating the scope and method of inspection to be used in the TIP, ensuring compliance with the TIP, and analyzing the results of the TIP, all of which benefitted all Plaintiffs.

Fourth, the PSC orchestrated a formal discovery program that involved the preparation and service of extensive written interrogatories, requests for admission, letters rogatory, and/or requests for production of documents on Defendants.[94]  Through FOIA requests, they also directed the investigation of complaints alleging problems with CDW, which were filed with the U.S. Consumer Product Safety Commission ("CPSC") and other state consumer agencies.  They oversaw the preparation and service of discovery requests on the CPSC, the United States Environmental Protection Agency, the Centers for Disease Control, the United States Department of State, the Florida Department of Health, the Florida Department of Financial Services (Division of State Fire Marshall), and the Louisiana Departments of Health, Environmental

---

[92]  *See* Pretrial Order No. 10 [Rec. Doc. #171]; and Catalog published on the Court's official Chinese Drywall, MDL 2047 website at http://www.laed.uscourts.gov/drywall/DrywallMarkings.htm.

[93]  *See* Pretrial Order Nos. 13 [Rec. Doc. #181] and 13A [Rec. Doc. #508].

[94]  *See* Chart of Discovery Propounded by the PSC, attached to the 2014 Herman-Levin Decl. as Exhibit "11."  *See also* Chart of Discovery Responded to by the PSC, attached to the 2014 Herman-Levin Decl. as Exhibit "12."

41

Quality, Economic Development, and Justice.[95]  Members of the PSC met with the CPSC at its

headquarters in Maryland, after which relevant material and information were exchanged

between the PSC and the CPSC.

Fifth, the PSC was instrumental in reaching out to United States Senators and

Congressmen and Congresswomen for legislative support to remedy the Chinese Drywall

debacle.  The following legislators filed an *amicus* brief in support of Plaintiffs in the Taishan

jurisdictional appeals before the Fifth Circuit and/or signed onto a letter to the Taishan

Defendants urging them to answer these lawsuits:  Senator Bill Nelson (FL); Senator Marco

Rubio (FL); Senator Mary L. Landrieu (LA); Senator David Vitter (LA); Senator Tim Kaine

(VA); Senator Mark Warner (VA); Senator Mark Pryor (AR); Congressman Ted Deutch (FL);

Congressman Alcee L. Hastings (FL); Congressman Bill Posey (FL); Congresswoman Lois

Frankel (FL); Congresswoman Debbie Wasserman Schultz (FL); Congressman Cedric Richmond

(LA); Congressman Steve Scalise (LA); Congressman Scott Rigell (VA); Congressman Randy

Forbes (VA); and Congressman Rob Wittman (VA).[96]

Sixth, the PSC prepared proposed Pretrial Orders for the creation of privilege logs for

documents withheld in response to discovery requests and regarding the disclosure, use and

protection of confidential information and treatment of privileged and work product materials

---

[95]  *See* Chart of PSC FOIA Requests, attached to the 2014 Herman-Levin Decl. as Exhibit "13."

[96]  *See* Amicus Brief of United States Senators and Congressmen, filed in *Germano, et al. v. Taishan Gypsum Co. Ltd.*, No. 10-30568, Consolidated with No. 12-31017 (5th Cir. May 13, 2013) [5th Cir. Dkt. Doc. #00512240187]; Press Release and Letter to Taishan Gypsum Co., Ltd. from Senators, dated Feb. 26, 2014, attached to the 2014 Herman-Levin Decl. as Exhibit "14."

produced during the course of this MDL.[97]  Then, the PSC analyzed the Defendants' responses to written discovery.  Due to the recalcitrance of certain Defendants, the Taishan Defendants in particular, in failing to comply with proper discovery requests, the PSC was forced to prepare a number of motions to compel and respond to several motions for protective orders and motions to quash.[98]  The PSC also filed third-party discovery motions against JP Morgan Chase & Co., T. Rowe Price Group, Inc., Bank of America Corporation, Yahoo!, and Morgan Stanley.[99]  All of these efforts were critical in achieving important discovery rulings from the Court.[100]

Seventh, in order to analyze the document productions of the Defendants, Government Agencies, and third parties, the PSC set up a document depository in New Orleans and funded the costs of the depository and the salaries of the personnel managing it full-time.  The PSC collected and oversaw the inspection and analysis of tens of thousands of documents totaling over a million pages, as well as the deposition transcripts, trial and hearing transcripts, trial exhibits and other materials.  The PSC engaged in extensive analysis and review of these documents, including those produced by the Knauf and Taishan manufacturing Defendants and their importers, and suppliers Venture, Inc./Porter-Blaine, Banner, and InEx, as well as their insurers.  The PSC carefully analyzed the respective liability of the Defendants, highlighted the key "hot" documents, and prepared a time line of events and a cast of characters.  These

---

[97]  *See* Pretrial Order Nos. 15 [Rec. Doc. #289] and 16 [Rec. Doc. #288].

[98]  *See* Chart of PSC Discovery Motions, attached to the 2014 Herman-Levin Decl. as Exhibit "15."

[99]  These companies and others will become relevant in a next stage of this litigation when the PSC executes on the *Germano* judgment.

[100]  *See*, *e.g.*, Rec. Doc. #7136; Rec. Doc. #7511.

document analyses were critical in establishing jurisdiction over the Knauf Defendants.

Ultimately, the PSC's efforts led to the resolution of Plaintiffs' claims against Knauf and its

related entities, and as well as the settlements of claims against numerous Defendants in the KPT

Chinese Drywall chain of distribution, and their insurers, and the Virginia Settlements with

Venture, Porter-Blaine, and their insurers.  The PSC's document review efforts also were a key

element in establishing jurisdiction over the Taishan Defendants.

Eighth, the PSC prepared a deposition protocol and a template for summarizing the

testimony.  They noticed more than 200 depositions of the Defendant manufacturers, importers,

suppliers, distributors, builders, and installers, and prepared third-party subpoenas where

necessary.[101]  Then, the PSC devoted many months to reviewing relevant documents, preparing

for, conducting and/or participating in depositions on behalf of Plaintiffs, traveling abroad to

Germany, China, and the United Kingdom to elicit testimony from numerous employees,

directors, and officers of the manufacturers and importers of CDW.  The PSC and common

benefit counsel also traveled to numerous U.S. cities, including Norfolk, Virginia, Corpus

Christi, Texas, Houston, Texas, Coral Gables, Florida, Bartow, Florida, New York, New York,

Gulfport, Mississippi, St. Paul, Minnesota, Long Beach, California, Tulsa, Oklahoma,

Shreveport, Louisiana, Belle Chasse, Louisiana, Lafayette, Louisiana, Baton Rouge, Louisiana,

and New Orleans, Louisiana to depose dozens of companies in the CDW supply chains and third

parties involved in sales of CDW in the United States, or other interested parties.

Early on in the litigation, in *Germano*, the PSC took the deposition of the owner of

---

[101]  *See* Chart of Common Benefit Depositions, attached to the 2014 Herman-Levin Decl.
as Exhibit "16."

Venture and Porter-Blaine, Samuel G. Porter, in Norfolk, Virginia.  This deposition was instrumental in leading the way to proving that the Court has jurisdiction over Taishan in Virginia and other forums in the United States, and it was key in obtaining the *Germano* judgment, discussed in more detail, *infra*.  The Porter deposition also created the roadmap for achieving the four Virginia Settlements.

The PSC took the depositions of the Knauf Defendants (*e.g.*, Baldwin Knauf, Isabel Knauf, Hans Peter Ingenillem, Martin Halbach, Hans Ulrich Hummel, and Mark Norris), which directly led to the culmination of the KPT Pilot Program and ultimately to the Knauf Settlement and the L&W Settlement, discussed *infra*.  The PSC also took numerous depositions in the insurance litigation, in *Pate v American Int'l Specialty Lines Ins. Co., et al.*, No. 09-7791; *Centerline Homes Construction, Inc., et al. v. Mid-Continent Casualty Co., et al.*, No. 10-178; and *Northstar Holdings, Inc., et al. v. General Fidelity, Inc., Co.*, No. 10-384.  The PSC prepared abstracts of all common benefit depositions taken in this case.

In April, 2011, attorneys representing the PSC conducted Rule 30(b)(6) depositions of Taishan Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary Tai'an Taishan Plasterboard Co., Ltd. ("TTP") in Hong Kong.  Due to the deponents' lack of knowledge and/or responsiveness as well as disagreement among counsel and the translators regarding the questions and answers, these depositions degenerated into "chaos and old night," as held by the Court.[102]  Thereafter, the PSC filed another motion to compel and a motion for sanctions,[103]

---

[102]  Rec. Doc. #10269 at p. 5.

[103]  Rec. Doc. #8685.

45

which the Court granted in part, ruling that the Taishan depositions be retaken in Hong Kong

under supervision of the Court and that Taishan:  (a) produce discovery of upstream- and

downstream-affiliated Taishan Companies; (b) expand its ESI search; (c) produce documents

regarding the Taishan entities' marketing and sales efforts aimed at the United States, and (d)

produce VAT-related documents.[104]

Following the Court's discovery rulings, the PSC prepared for the Taishan depositions

and again traveled to Hong Kong in January, 2012, to participate in the jurisdictional discovery

of these witnesses.  The Court also traveled to Hong Kong personally to oversee the depositions

and rule on any objections.

In addition, the PSC deposed various shippers, importers and distributors of Taishan's

drywall in the U.S.  In total, the PSC took 17 jurisdictional depositions of Taishan and entities

involved in the distribution of Taishan's CDW in the United States.

### D.    The PSC Expended Considerable Efforts on Pleadings, Motion Practice, Briefing and Other Filings.

This prolix Chinese Drywall litigation has posed many significant legal obstacles.  The

PSC has led all briefing in the MDL on behalf of Plaintiffs and has prepared or overseen the

preparation of every major motion, memorandum of law, proposed order, and responsive brief,

which benefitted all Plaintiffs.  In addition to numerous discovery motions (*i.e.*, motions to

compel, motions for sanctions, responses to motions to quash and motions for protective orders),

the PSC has filed hundreds of significant and dispositive motions and/or briefs in the MDL, on

appeal to the Fourth, Fifth, and Ninth Circuit Courts of Appeals, and in Virginia and Florida

---

[104]   *See* Rec. Doc. #9107; Rec. Doc. #10092; Rec. Doc. #10269.

State Courts on behalf of Plaintiffs on a wide variety of topics, including, but not limited to: default judgments; personal jurisdiction over the Defendants; economic loss doctrine; exclusions under homeowners insurance policies; service of process; class settlement certification and approval; objections to settlement and class notice; All Writs Act authority of the Court; dismissal of Defendants; and a litigation fee and expense fund.[105]

Early on, the PSC obtained preliminary default judgments against the Taishan entities and other potentially responsible parties who refused to participate in the proceedings despite the PSC's successful efforts in achieving service on these foreign Defendants under the Hague.  The default judgments against Taishan ultimately put considerable pressure on the Knauf Defendants and others, and were a strong factor in bringing about the class settlements.  For example, on November 20, 2009, the Court entered a preliminary default judgment against TG in response to the PSC's motion for preliminary default judgment in *Germano*.[106]  This preliminary default judgment served as a springboard to the eventual settlement of many of the claims in this litigation, as it was the basis for the Court's evidentiary hearing in the *Germano* bellwether trials, discussed *infra*, confirming the preliminary default judgment against Taishan.[107]  The Court's Findings of Fact and Conclusions of Law in *Germano* and *Hernandez*, in particular, provided a framework for the eventual settlement of claims against the Knauf Defendants.[108]

---

[105]  *See* Chart of PSC Pleadings, Motions, and Other Filings, attached to the 2014 Herman-Levin Decl. as Exhibit "17."

[106]  *See* Rec. Doc. #487.

[107]  Rec. Doc. #2380 & #3013.

[108]  Rec. Doc. #2380.

The PSC also filed motions for preliminary default judgment that resulted in preliminary default judgments against 33 Defendants including Taishan's parents China National Building Material Company, Limited ("CNBM"), CNBM Group and Beijing New Building Materials, Ltd. ("BNBM"), and several entities affiliated with Taishan in *Gross*.[109]  Similarly, the PSC obtained a preliminary default judgment against BNBM in *Wiltz*.[110]  In addition, the PSC drafted omnibus motions for preliminary default judgment that resulted in the entry of sweeping default judgments orders by the Court:  (a) 71 Defendants in *Payton*[111]; (b) 33 defendants in *Wiltz*[112]; (c) 83 Defendants in *Gross*[113]; (c) 14 Defendants in *Rogers*[114]; (e) 42 Defendants in *Abel*[115]; (f) 20 Defendants in *Abreu*[116]; (g) 40 Defendants in *Haya*[117]; (h) 39 Defendants in *Block*[118]; (i) 7

---

[109]  Rec. Doc. #7302 & #7736.

[110]  Rec. Doc. #7735.

[111]  Rec. Doc. #12599 & #15687.

[112]  *Id*.

[113]  *Id*.

[114]  *Id*.

[115]  *Id*.

[116]  *Id*.

[117]  *Id*.

[118]  *Id*.

Defendants in *Benoit*[119]; (j) 18 Defendants in *Arndt*[120]; (k) 50 Defendants in *Almeroth*[121]; and (l) 19 defendants in *Cassidy*.[122]  The PSC prepared and filed two additional omnibus motions for entry of preliminary default in *Amorin*, No. 11-1672; *Amorin*, No. 11-1395; and *Amorin*, No. 11-1673, which remain pending before the Court.[123]  These outstanding motions for preliminary default judgments likewise involve many of the critical foreign Defendants in this litigation, including BNBM, CNBM, CNBM Group, Taishan, and other entities affiliated with Taishan.

Significant additional briefing occurred after the bellwether trials in *Germano* and the Court's entry of judgment against TG in that case.  Taishan moved to vacate the default judgment and challenged the Court's exercise of personal jurisdiction over the company.  Taishan also filed separate motions to dismiss the complaints against TG in *Mitchell Co., Inc. v. Taishan Gypsum Co., Ltd.*, 09-4115 (N.D. Fla.) ("*Mitchell*") (originally filed in Florida but transferred to MDL 2047) and against TG and TTP in *Gross* and *Wiltz* (filed in Louisiana), relying on Chinese law to argue that for jurisdictional purposes, the acts of TG's subsidiary should not be imputed to TG, and vice versa.  Taishan's briefs were voluminous, totaling in the aggregate more than 450 pages.  In addition, Taishan relied on thousands of pages of exhibits, deposition testimony, and a Chinese law expert.

The PSC prepared all of the responses to Taishan's jurisdictional motions.  Over a period

---

[119] Rec. Doc. #16030.

[120] *Id*.

[121] *Id*.

[122] *Id*.

[123] Rec. Doc. #17089, #17172 & #17378.

of approximately one month, the PSC prepared:  (a) a Global Statement of Facts totaling 95

pages; (b) a 58-page Affidavit of Russ M. Herman; (c) 202 evidentiary exhibits supporting the

exercise of jurisdiction over Taishan; (d) three declarations of experts on Chinese law from a law

professor in China, a corporate attorney in China, and a law professor from Georgetown

University; (e) a 39-page Global Memorandum of Law on personal jurisdiction and imputing the

acts of TTP to its parent TG and vice versa based on alter ego principles; and (f) three separate

individual Memoranda of Law, totaling 81 pages, addressing each of the jurisdictions and long-

arm statutes challenged by Taishan (*i.e.*, Virginia, Florida, and Louisiana) and choice of law

provisions.  In addition, the PSC filed an omnibus response to Taishan's evidentiary objections.

Further, the PSC presented oral argument to the Court at the evidentiary hearing on these

motions.  These efforts were successful.  The Court denied all four of Taishan's jurisdictional

motions in a consolidated 142-page Order and Reasons.  *In re Chinese-Manufactured Drywall*

*Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012).

Taishan then appealed the jurisdictional ruling in *Germano* and sought permission to

appeal the jurisdictional rulings in *Mitchell*, *Gross*, and *Wiltz* under 28 U.S.C. §1292(b).  The

PSC opposed Taishan's petitions at the District Court and appellate levels.  After permission to

appeal was granted, the PSC prepared Joint Designations of the Records on Appeal, which in

*Germano* alone consisted of more than 16,000 pages.  Due to the magnitude of the jurisdictional

record, the Fifth Circuit ordered that separate briefs could be filed in each case, and allowed extra

pages upon motions from each side.  Again, Taishan's briefs were voluminous, totaling in the

aggregate more than 550 pages, not including the Record Excerpts.  The PSC authored

Appellees' briefs and Record Excerpts in *Germano*, *Gross*, and *Wiltz*, and assisted Mitchell's

counsel with its Appellee brief and Record Excerpts, specifically with regard to Taishan's contacts in Florida and on the issues pertaining to Chinese law and the alter ego relationship between TG and TTP. A senior partner in a PSC firm worked full-time for more than five months opposing Taishan's appeals. These briefs totaled almost 400 pages. In addition, the PSC solicited, coordinated, and assembled *amici* briefs supporting Appellees in *Germano*. The PSC also prepared an *amicus* brief in the *Mitchell* appeal addressing the Court's jurisdiction over Taishan in Florida since the PSC represents thousands of Florida homeowners with CDW in their properties. Further, the PSC filed and responded to motions regarding the consolidation of oral argument in these cases, and also filed and responded to Rule 28(j) submissions of Supplemental Authority. In October, 2013, the PSC presented oral argument to the Fifth Circuit Court of Appeals in *Germano*, which resulted in a published opinion and mandate affirming Plaintiffs' judgment against Taishan. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, --- F.3d ----, 2014 WL 321844 (5th Cir. Jan. 28, 2014). The PSC recently presented oral argument to the Fifth Circuit in *Gross*, *Mitchell*, and *Wiltz*. The parties are awaiting a decision in those appeals.

The PSC prepared several motions for certification of litigation classes in *Germano*, *Payton* (Knauf), and *Payton/Vickers v. Knauf Gips KG*, No. 09-4117 (E.D. La.). The PSC also filed motions for Florida and/or Louisiana Homeowners classes for damages and/or declaratory relief.[124] In addition, the PSC prepared briefs in the Fifth Circuit on behalf of the InEx Settlement Class when Defendants Southern Homes, LLC, Tallow Creek, LLC, and Springhill,

---

[124] Rec. Doc. #3293 (*Germano*); Rec. Doc. #5567 & #8125 (*Silva v. Interior Exterior Building Supply, LP*, No. 09-8030 (E.D. La.)); Rec. Doc. #5611 & #8195 (*Vickers/Payton*); Rec. Doc. #5612 & #8197 (*Payton*).

LLC challenged the Court's stay of state court proceedings during the approval process for the InEx Settlement (*Plaintiffs' Steering Committee v. Southern Homes, LLC*, No. 11-30619 (5th Cir.)).  Further, in order to protect the Court's jurisdiction over the MDL class settlements, the PSC filed an All Writs Act motion when a competing settlement class (*Vereen v. Lowe's Home Centers, Inc.*, No. SU10-cv-2267B (Super. Ct. Muscogee Cty. Ga.)) was filed in Georgia state court.

Further, the PSC prepared a motion to establish a Plaintiffs' Litigation Expense Fund to compensate and reimburse attorneys for common benefit services performed and expenses incurred for MDL Administration.[125]

In a related vendor services suit, *Cataphora, Inc. v. Parker, et al.*, No. 09-5749 (N.D. Calif.), the PSC defended the litigation, assisted in the preparation of pretrial motions, a summary judgment motion, motions *in limine*, and *Daubert* motions.  They then prepared for and participated in a week-long jury trial, where they presented testimony as witnesses, and thereafter filed a multitude of post-trial motions.  On appeal to the Ninth Circuit, the PSC designated the appellate record, prepared an Appendix, and prepared and filed principal and reply briefs.  In related litigation before this MDL Court and on appeal to the Fifth Circuit, the PSC prepared motions, appellate briefs and presented oral argument to both Courts.  Then, they participated in mediation sessions and finally settled the *Cataphora* litigation.

---

[125]  Rec. Doc. #4603.

E.      **Experts.**

The PSC researched relevant scientific articles and selectively engaged the services of a variety of experts for the initial inspections and the TIP.  These experts were needed in order to develop a protocol for home inspections.  The PSC retained experts in the fields of corrosion, metallurgy, electrical engineering, power electronics, electrical machinery, and failure analysis to demonstrate the devastating effects of having CDW installed in Plaintiffs' homes.  They also engaged experts to calculate the losses sustained by the Plaintiffs and the costs of remediation and economic impact of CDW on real estate in support of Plaintiffs' damages.[126]  The PSC prepared these experts for their depositions and presented them in support of Plaintiffs' cases at the bellwether trials in *Germano*, *Hernandez*, and *InEx/North River*, discussed *infra*.  The PSC also took the depositions of Defendants' Experts.[127]

In addition, the PSC retained three prominent experts on Chinese law in conjunction with the complex and prolix Taishan jurisdictional briefing:  Dr. Liu Junhai, Professor of Law, Renin University of China; Bing Cheng, a practicing corporate attorney in China with an International Practice; and Dr. James V. Feinerman, Professor at Georgetown University Law Center.  The PSC directed the preparation of their expert declarations and affidavits, and used them in opposition to Taishan's motions to dismiss for lack of jurisdiction and to oppose Taishan's Chinese law expert, Professor Zhu Yan, and his interpretation of alter ego principles under

---

[126]  *See* Chart of Plaintiffs' Experts, attached to the 2014 Herman-Levin Decl. as Exhibit "18."

[127]  *See* Chart of Defendants' Experts, attached to the 2014 Herman-Levin Decl. as Exhibit "19."

Chinese corporate law and its applicability to these proceedings.  The PSC also relied on these experts before the Fifth Circuit in Appellees' briefs filed in opposition to Taishan's jurisdictional appeals.

Early in the litigation, the PSC retained experts and consultants to advise on Chinese law, to serve as interpreters/translators, and to undertake "on-the-ground" investigations within China and Germany.  Yan Gao, a Chinese attorney with an L.L.M. in American Business Law from Tulane Law School, a Juris Master (J.D. equivalent) from China University of Politcal Science and Law (Beijing, China), and a Graduate from Jishou University Foreign Language Department (Hunan, China) was retained by the PSC to assist with legal issues, research and translation. Additionally, the PSC retained an investigator, who conducted investigations for the PSC in Germany, Hong Kong and mainland China.  These investigations assisted the PSC in acquiring information about the Defendant entities, as well as their drywall operations.

The PSC also retained political consultants to canvas Senators and Congress persons from the Gulf South and Virginia to enlist their aid, monitor Congressional action and respond to political media.  Further, qualified inspectors were vetted and retained by the PSC to perform property inspections and to assist in creating inspection protocols and provide recommendations to attorneys and claimants in the Gulf South states for inspections of their properties.  Additional consultants retained by the PSC included special counsel experts and tax advisors in securities and other technical areas of the litigation, as required in connection with the Settlement Agreements.

F.      **Bellwether Trials.**

1.      *Germano*

Shortly after the MDL was established, this Court, on November 25, 2009, issued a scheduling order setting an evidentiary hearing to address the scope and extent of appropriate remediation, and the cost of remediation.  The PSC formed a trial team and developed a protocol in *Germano* for the selection of test cases that would be used in a bellwether trial on behalf of Virginia homeowners.  The Knauf Defendants intervened in the action, participated in the defense of the litigation, and proffered their own experts in support of their defense.

Through significant discovery efforts in preparation of the *Germano* trial, the PSC actively developed the science case in the MDL.  The PSC prepared dozens of experts for reports, deposition testimony, and trial testimony, drafted and argued *Daubert* motions, and cross-examined Defendant experts.  They were involved in overseeing extensive laboratory testing of copper and silver components from Virginia homes to identify corrosion as the cause of an HVAC coil failure and severe corrosion deposits at the operative connections in the appliances and in consumer electronics,[128] as well as sampling and testing of Chinese drywall to determine the extent of chemical off-gassing.[129]

Shortly before the trial, the Knauf Defendants withdrew from the *Germano* proceedings.  The trial proceeded over a two-day period in February, 2010, even though the obstinate Chinese Defendants refused to enter their appearance.  The PSC drafted proposed Findings of Fact and

---

[128]  Rec. Doc. #2380 at 15, 26.

[129]  *Id.*

55

Conclusions of Law.[130]

The significance of developing the CDW science case and damages case for the *Germano* bellwether trial can hardly be overstated.  On April 8, 2010, this Court issued its scientific findings regarding Chinese Drywall, which distinguish it from typical benign drywall – including specific findings about concentrations and emissions of strontium and elemental sulfur, effects of emissions on the human body, quality of life in the home, fire risk, corrosion, and the failure of electrical and mechanical devices.[131]  PSC Members were further able to confirm that problematic Chinese Drywall products share similar chemical and physical properties.[132] Through extensive testing in the home, they were able to demonstrate that Chinese Drywall homes constituted corrosive environments under standards set out by the Consumer Product Safety Commission, Florida Division of Health, Battelle and International Standards Association, and peer-reviewed literature.[133]

With respect to the damages case, the *Germano* Findings of Fact and Conclusions of Law set the standard for all CDW cases regarding the scope of remediation, based on the testing and conclusions of the PSC's experts.  The Court determined that the appropriate remediation for the

---

[130]  Rec. Doc. #1514.

[131]  Rec. Doc. #2380, at 12-17.

[132]  *Id.* at 17.

[133]  *Id.* at 17-26.

Plaintiffs' homes included the removal of all drywall,[134] all electrical wiring,[135] the entire HVAC system,[136] all copper pipes,[137] and many other items such as appliances, carpet, cabinetry, trim work, flooring, and insulation.[138]  The Court concluded that the scope of remediation was "supported by both the scientific and practical evidence presented" and cited to Plaintiffs' expert testimony.[139]  Specifically, the Court's conclusion that "all drywall" needed to be removed was based on Plaintiffs' submission that selective removal of only CDW was not feasible or cost-effective – despite Knauf's competing expert submissions in *Germano*.[140]  The Court adopted Plaintiffs' expert Dean Rutila's six reasons why observation of corrosion on a wire is not a reliable tool to be used for the purpose of selective identification and removal of CDW.[141]  These Court-issued findings, which were based on the science case the PSC developed, resulted in a scientifically reliable remedy, assured adequate damages recovery, and ensured that homes would be safe if the protocols were followed.  Additionally, the Court found in *Germano* that the average cost per square foot to repair homes was $86, setting the benchmark for subsequent

---

[134] *Id.* at 30.

[135] *Id.* at 34.

[136] *Id.* at 40.

[137] *Id.* at 39.

[138] *Id.* at 26-27, 46-52.

[139] *Id.* at 27.

[140] *Id.*

[141] *Id.* at 30-34.

remediation and settlements.[142]  Prior to our research, expert analysis, laboratory testing, and

investigation for the *Germano* bellwether trial, the findings issued by this Court did not yet exist

in any Government protocol.  The science work that supported these findings was extensive,

groundbreaking, and developed for and in the *Germano* bellwether trial.

The PSC's key role in and supervision over the bellwether trial against Taishan in

*Germano* on behalf of seven Virginia families resulted in a $2,758,356.20 judgment against

TG[143] and a detailed 55-page Findings of Fact and Conclusions of Law holding that Chinese

Drywall "has to be remediated."[144]  This bellwether trial was instrumental in serving as a useful

tool and basis for all cases involved in the litigation, as well as to the Court to evaluate the

strengths of Plaintiffs' claims.[145]

### 2.    *Hernandez*

Following *Germano*, the PSC expended over $1 million to successfully conduct another

bellwether trial in *Hernandez v. Knauf Gips, KG*, No. 09-6050 (E.D. La.), against Defendant

---

[142]  *Id.* at 57.

[143]  Rec. Doc. #3013.

[144]  *Chinese Drywall*, 706 F. Supp. 2d at 671.

[145]  *See* Hon. Eldon E. Fallon, Jeremy T. Grabill, Robert Pitard Wynne, "Bellwether Trials in Multidistrict Litigation," 82 TUL. L. REV. 2323 (June 2008) (concluding that the use of a bellwether trial is "one of the most innovative and useful techniques for the resolution of complex cases"); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019 (5th Cir. 1997) ("The notion that the trial of some members of a large group of claimants may provide a basis for enhancing prospects of settlement or for resolving common issues or claims is a sound one that has achieved general acceptance by both bench and bar. . . .  The reasons for acceptance by bench and bar are apparent.  If a representative group of claimants are tried to verdict, the results of such trials can be beneficial for litigants who desire to settle such claims by providing information on the value of the cases as reflected by the jury verdicts.").

Knauf Plasterboard Tianjin Co., Ltd., arising out of damages caused by CDW used for construction in Plaintiffs' home in Louisiana.  The Hernandez Plaintiffs claimed that the CDW in their home was defective and emitted levels of sulfur, methane and/or other volatile organic chemical compounds that caused corrosion of HVAC coils and refrigerator units, certain electrical wiring and plumbing components and other household items, as well as created noxious "rotten egg-like" odors.  The PSC reached stipulations with Knauf involving jurisdiction and an agreement that Knauf would not assert certain defenses as a result of any alleged conduct or fault of any other person.  The trial sought damages due to claims in redhibition pursuant to Louisiana Code of Civil Procedure Article 2520, *et seq.* and the Louisiana Products Liability Act.

The matter proceeded to trial on March 15, 2010, and culminated on March 19, 2010. This trial resulted in a Judgment in favor of Plaintiffs in the amount of $164,049.64, plus reasonable attorneys' fees, costs and legal interest.[146]  Knauf stipulated that the CDW in the Plaintiffs' home was defective and not fit for its intended use and agreed that remediation was necessary.  Thus, the issue for trial was the scope and cost of remediation, and this trial established the appropriate costs to restore an affected CDW home.  The PSC utilized experts Lori Streit, Bradley D. Krantz, Dean A. Rutila, Donald Galler, J.C. Tuthill, and Alexis Mallet, Jr. to support their liability and damage claim.[147]  The PSC prepared and presented to the Court

---

[146]  Rec. Doc. #3012.

[147]  Additional time and effort was expended on other experts who were fully prepared for trial purposes, but were not called as witnesses.  These included, among others, Arthur Sterbcow, and Kenneth Acks, who were intended to address real estate valuation and stigma issues.

proposed Findings of Fact and Conclusions of Law.[148]

In its opinion, the Court determined that as a practical matter, everything in front of the drywall, such as cabinets, trim, fixtures and bathroom porcelain needed to be removed prior to the removal of the problematic drywall and that a substantial amount of these items within the home was not worth salvaging.  The Court established a remediation protocol and ordered that the cost of the scope of remediation would include:

1.  Removal and replacement of all drywall;
2.  Removal and replacement of all components of the HVAC system;
3.  Removal and replacement of the entire electrical system;
4.  Removal and replacement of all insulation;
5.  Removal and replacement of molding, counter tops, cabinets and other items that must be removed during drywall removal that likely would be damaged and cheaper to replace than preserve;
6.  Removal and replacement of copper and silver components in the plumbing system;
7.  Removal and replacement of carpet, storage and reinstallation of undamaged wood flooring; and protection of tile flooring during remediation;
8.  Cleaning after remediation, including use of HEPA vacuuming and wet-dash wiping or power-washing all surfaces;
9.  Certification from an environmental consultant that the property was free of any CDW; and
10.  Any actions incident to or necessary to carry out and finalize the preceding items.[149]

The Court further ordered alternative living costs be reimbursed to the Hernandez Plaintiffs and that they be reimbursed for repair costs they had incurred prior to trial and for lost wages.  This opinion in *Hernandez* was the seminal decision that led to the successful KPT Pilot Program.

---

[148]  Rec. Doc. #2248.

[149]  *See Chinese Drywall*, 2010 WL 1710434.

### 3.   *Campbell and Clement*

The PSC prepared two additional bellwether cases for trial, *Campbell v. KPT*, No. 09-7628 (E.D. La.) and *Clement v. KPT*, No. 09-7628 (E.D. La.).  The Campbell and Clement Plaintiffs were selected as bellwether plaintiffs.  Extensive stipulations were compiled, negotiated and entered into with the Knauf Defendants.  The case was fully worked up for trial purposes (in a similar manner as prior trials) and settled on the eve of trial on June 18, 2010.  The PSC spent extensive time pre-trying these cases to a mock jury that enabled the PSC to develop trial themes and strategy.  Extensive Plaintiff and property-specific depositions were taken in connection with this trial.  Furthermore, experts such as Lori Streit, Bradley D. Krantz, Dean A. Rutila, Donald Galler, Alexis Mallet, Arthur Sterbcow and Rosemary Coates were all worked up and prepared for trial.  Depositions in advance of trial were extensive.

*      *      *

Ultimately, all these bellwether trials led to the culmination of the nine class settlements. The *Germano* and *Hernandez* judgments and the favorable Findings of Fact and Conclusions of Law in *Germano* and *Hernandez* brought the Knauf Defendants to the negotiating table and enabled the PSC to successfully reach global settlements with not only the Knauf Defendants, but also Banner, InEx, L&W and hundreds of builders, installers, and distributors of CDW and their insurers, all of which provide, in combination, up to an estimated $1.1 billion in significant benefits to Class Members, as discussed in more detail, *infra*.

### 4.   *InEx/North River*

As shown below, the InEx Settlement was funded by InEx's primary insurance only, but assigned to Plaintiffs the right to pursue $72 million in excess insurance written by North River,

which ultimately, if successful, would be used to fund remediation benefits as part of the Knauf

Settlement.  The PSC's agreement with the Knauf Defendants as well as their fiduciary duties to

Plaintiffs required that the PSC pursue recovery under the North River policy.  Accordingly, the

PSC participated in discovery of North River, taking the important deposition of Ms. Agnes

Reiss of North River.  The PSC also led the mediation efforts to resolve the dispute with North

River.  When that failed, they formed a trial team to adjudicate before a jury the question of

InEx's role and level of responsibility in the CDW debacle.  Over a period of several months, the

PSC oversaw and coordinated the careful selection of 12 test cases for discovery and the

bellwether trial of four of these cases from the test pool.  In connection with the InEx/North

River bellwether trial, the PSC expended extensive efforts to prepare a number of experts to be

utilized in the trial, including Arthur Sterbcow (stigma damage/real estate valuation) and

Rosemary Coates (import/export and distribution expert).

　　　　The InEx/North River bellwether trial resulted in a judgment for InEx and North River on

Plaintiffs' claims that InEx was a bad faith seller under Louisiana law.[150]

### G.    Settlement Negotiations, Drafting Agreements, Settlement Briefing, and Objections.

　　　　The intensive discovery and litigation efforts of the PSC and the successful results

achieved in the bellwether trials in *Germano* and *Hernandez*, along with court-facilitated

mediations, brought many Defendants to the negotiating table and opened the door for a global

resolution of Plaintiffs' claims.  Early in the litigation, Members of the PSC, who are skilled

attorneys with extensive and vast experience in class action and multidistrict litigation, began

---

[150]  Rec. Doc. #16409.

negotiations with the Knauf Defendants, certain builders, and Banner.  Then, beginning in November 2009, the Court appointed a Special Master "to explore opportunities for an ultimate resolution of the instant matter as to any and all interested parties."[151]  The PSC thereafter devoted hundreds of hours, over many months, to intense and hard-fought settlement negotiations and mediations with the Knauf Defendants and hundreds of Defendant importers, suppliers, builders, distributors and installers in the KPT Chinese Drywall supply chain, and their insurers.  These negotiations required extensive travel to many locations throughout the world.  The PSC's efforts resulted, first, in Court approval of the KPT Pilot Program in October, 2010, and Court approval of the remediation protocols and the Already Remediated Homes program, which then created the roadmap to the InEx, Banner, Knauf, L&W, Global, and Virginia Settlements.

PSC Members and common benefit attorneys traveled numerous times to New Orleans, New York, Florida, and other locations to meet with Knauf's counsel and the principals in the Knauf organization, and they had numerous phone meetings with the Knauf Defendants to hammer out the details of the KPT Pilot Program and the Knauf Settlement.  Similarly, these attorneys were integral in the negotiations that led to the Banner, InEx, L&W, and Global Settlements.  They traveled to New Orleans and New York and had many face-to-face and telephone meetings with Banner's counsel, InEx's counsel, Insurers' Counsel, Liaison Counsel for the Insurers, and counsel for L&W.

In fact, the PSC had at least 98 face-to-face meetings and 35 telephone conferences with

---

[151]  Order Appointing Special Master [Rec. Doc. #505 at 4].

the Knauf Defendants and/or their counsel, along with at least 19 settlement conferences and 2 mediations before the Court, in an attempt to reach a global resolution of Plaintiffs' claims.  For the Banner Settlement, the PSC participated in at least 11 negotiation sessions and 16 conference calls with Banner, its counsel and/or its insurers' counsel, and 10 conferences with the Court (including conference calls).  The InEx Settlement involved at least 6 separate meetings, 6 conference calls with InEx's counsel and/or its insurers' counsel, 1 mediation, and 3 conferences with the Court.  The complex Global Settlement required at least 19 meetings, 27 conference calls, and 1 conference with the Court.  Finally, in order to reach the L&W Settlement, the PSC had 1 meeting and 2 conference calls with L&W's attorneys.[152]

The KPT negotiations resulted in an agreement with the Knauf Defendants in October 2010, known as the "KPT Pilot Program," for the remediation of homes containing KPT Chinese Drywall.[153]  In addition to the Knauf Defendants, InEx and Banner participated in and contributed funds to this settlement.[154]  Pursuant to the KPT Pilot Program thousands of homes were remediated.  The success of this program laid the foundation for the InEx, Banner, Knauf, L&W, Global, and Virginia Settlements to be reached.

After the parties reached agreements in principal, the PSC spent hundreds of hours over many months negotiating the details of each settlement, including the class and subclass definitions, forms of relief, class benefits, security provisions, claims administration, stay

---

[152]  *See* 2014 Herman-Levin Decl., ¶ 127.

[153]  This agreement is posted on the Court's website at http://www.laed.uscourts.gov/Drywall/DemonstrationRemediationAgreement.pdf.

[154]  Transcript of Proceedings, 10/14/10, at 5:3-5.

provisions, appeal and audit rights, releases, and judgment reduction provisions, etc.  Then, they drafted each of the individual, but related, class Settlement Agreements, accompanying exhibits, class notices, motions for preliminary approval, supporting memoranda of law, proposed preliminary approval orders, and final orders and judgments.  The PSC also took primary responsibility for disseminating class notices, tracking opt-outs and rescissions of opt-outs, responding to objections, and handling the Fairness Hearings.

The PSC took sole responsibility for deposing questionable and professional objectors, including the clients of Attorney Christopher Bandas, one of whom was Bandas' office manager, Jan Petrus.  Upon learning that the PSC intended to conduct their depositions, several of these Bandas objectors (including Jan Petrus) sought to withdraw their objections to the settlements in order to avoid being deposed.[155]  After successfully serving these objectors with subpoenas, at the insistence of Mr. Bandas, the PSC moved forward with the depositions of the Bandas objectors, even though these objectors went to great lengths to evade service with subpoenas.  In the case of Ernest Vitela, after successfully serving Mr. Vitela with a subpoena to conduct his deposition, Mr. Bandas moved in the United States District Court for the Southern District of Texas to quash the subpoena.  At the hearing on the motion to quash, the PSC presented argument on behalf of the Settlement Classes, and the court refused to quash the subpoena.  Mr. Vitela was ordered to appear for a deposition, but he remains in contempt of the court's order, as he did not appear at the time and location set for his deposition.

---

[155]  Rec. Doc. #15957 (Jan Petrus' Motion to Dismiss Objection); Rec. Doc. #15979 (Earnest Vitela's Motion to Dismiss Objection); Rec. Doc. #16040 (E&E Construction Co.'s Motion to Dismiss Objection).

The PSC traveled to Corpus Christi, Texas on several occasions to take the depositions of the Bandas objectors (Ronnie Garcia and Saul Soto). At these depositions it was learned that they had no knowledge of the terms of the class settlements to which they were objecting, that Mr. Bandas had used a third-party law firm (the Batman Law Firm) to solicit clients for purposes of objecting to settlements, that the objectors were asserting entirely pretextual objections to the settlements, and that the objectors had been solicited to pursue their objections with a promise of a $5,000 bounty as incentive for pursuing their baseless objections. The PSC filed a motion for sanctions against Bandas himself, which has not yet been ruled upon by the Court.

The PSC also deposed objector Wayne Kaplan in Coral Gables, Florida in connection with the Banner and Global Settlements.

Further, the PSC filed numerous briefs addressing all objections to the settlements, which ultimately were dismissed by the Court. With the departure of these objections, the PSC's efforts cleared the path for the orderly disposition and approval of the class settlements.

## IV.   CLASS SETTLEMENTS

### A.   Overview.

The class settlements in this litigation are providing necessary remediation and monetary relief to the tens of thousands of claimants impacted by Chinese Drywall, many of whom have been displaced from their homes, lost their properties due to foreclosure or sales in mitigation and suffered loss of personal property. The nine settlements provide, in the aggregate, up to an estimated $1.1 billion in comprehensive remediation and cash benefits to owners of KPT Properties and Mixed Properties (*i.e.*, from the Remediation Fund), and additional compensation to homeowners, commercial building owners and tenants of Affected Properties for other losses

arising from Chinese Drywall, including alternative living expenses, personal property damage, property maintenance costs (including utility bills, insurance, property taxes and maintenance of landscaping), moving and storage expenses, losses resulting from lost use, sales and rentals, sales in mitigation or foreclosures, and/or bodily injuries (*i.e.*, from the Other Loss Fund).[156]  The Knauf Defendants are also paying the costs of administration of the Remediation Fund and the Other Loss Fund, and they have agreed to pay $160 million in attorneys' fees and costs.  These are substantial benefits to CDW victims.

### B.      The InEx, Banner, Knauf, L&W, and Global Settlements.

On February 7, 2013, the Court granted final approval to the InEx, Banner, Knauf, L&W, and Global Settlements.  *Chinese Drywall*, 2013 WL 499474.  These class settlements are integrally related.  For example, any net recoveries from the InEx, Banner and L&W Settlements will be assigned to and/or deposited into the Remediation Fund of the Knauf Settlement (to the extent those recoveries relate to claims arising from KPT Chinese Drywall) so that those monies may be used to remediate Class Members' Affected Properties.[157]  Likewise, net monies received from the Global Settlement (to the extent they relate to KPT Chinese Drywall) will be deposited

---

[156]  *See* Chart of Knauf Settlement Benefits, attached to the Knauf class Notice [Rec. Doc. #12061-28].

[157]  *See*, *generally*, Amended Knauf Settlement, Section 4.8:  "4.8.2.  Each Participating Class Member shall assign his/her claims (to the extent that they relate to KPT Chinese Drywall) to any net recovery under the InEx, Banner and L&W Settlements to the Knauf Defendants, if not already assigned.  Any amounts recovered from the InEx, Banner and L&W Settlements based on such assignments shall be deposited into the Remediation Fund, for purposes of providing Settlement benefits to the individual Participating Class Member(s) involved."

50% into the Remediation Fund and 50% into the Other Loss Fund of the Knauf Settlement.[158]

####        1.      *The InEx Settlement.*

InEx sold both KPT Chinese Drywall and Taishan Chinese Drywall to suppliers, developers, homebuilders, and installers in a number of Gulf Coast states, predominantly Alabama, Louisiana, Mississippi, and Texas.[159]  Early in the litigation, the PSC undertook a comprehensive review and analysis of InEx and sought to discover through this entity the extent of distribution of Chinese Drywall in the Gulf States region.  A document request was issued to InEx, and in October, 2009, InEx began its production of documents responsive to discovery by providing approximately 50,000 pages of documents, all of which were reviewed by the PSC in preparation of the initial InEx 30(b)(6) deposition that took place on February 5, 2010.

Through this discovery, the PSC was able to identify the manufacturers that exported Chinese Drywall to the United States.  An extensive investigation of the shipping process from China to the U.S., including shipping details and ports of entry, were discovered.  This established the basis for defeating the foreign manufacturers' claims that they were not subject to the jurisdiction of our courts.  Furthermore, the PSC was able to discover through shipping records which builders InEx shipped its product to, as well as the property addresses where the problematic drywall may have been installed.

Multiple discovery requests were subsequently issued to InEx, and additional documents continued to be produced by InEx, all of which were reviewed by the PSC and utilized in

---

[158]   Amended Knauf Settlement, Section 4.2.3.

[159]   *See* InEx Distributor Profile Form [Rec. Doc. #14356-1]; InEx Preliminary Approval Order dated 5/13/2011 [Rec. Doc. #8818].

mediations with this Defendant, as well as in preparation for depositions and bellwether trials.

As the case progressed, the PSC took additional depositions of InEx owners and employees, including, among others, Clay Geary and Jim Geary, the principal owners, Brandon Carlisle, April Chauffe Casey, Joseph Guerra, Robert McCay, Gary Meade, Mark Peterson, Veda Redman, Melissa Smith, Rebecca Galleon, Don Joseph, Kelly Burke, and Brandyn Smith.  These depositions enabled the PSC to further discover other sources of recovery for Plaintiffs, including builders and installers, many of whom ultimately became Participating Defendants in the Global Settlement.

As this Court found, InEx's Chinese Drywall "eventually ended up in the homes of numerous individuals who have since filed claims against InEx, seeking relief for the property damage and personal injuries they have sustained as a result of the presence of this drywall in their homes.  Additionally, homebuilders who have repaired these homes at their own cost have filed claims against InEx."[160]  Following the PSC's extensive discovery of the claims against InEx, the Court scheduled both a hearing on Plaintiffs' motion for class certification and a jury trial of Plaintiffs' claims commencing in the summer of 2011.[161]  Just prior to trial, the PSC reached a class settlement with InEx after months of arm's-length negotiations and various mediations among the PSC, InEx, Arch, and Liberty.[162]

The settlement provides for the tender of all of this Defendant's remaining primary

---

[160]  InEx Preliminary Approval Order, at 3.

[161]  Minute Entry dated 2/8/2011 [Rec. Doc. #7352].

[162]  2012 Herman-Levin Decl. at ¶ 16.

insurance, which encompasses an aggregate cash payment of $8,000,000, minus payments made in prior Chinese Drywall settlements with InEx[163] and minus the some of the costs of Notice advanced by InEx's insurers.  Pending Settlements with InEx that were entered into but not paid prior to the Execution Date of the InEx Settlement Agreement will be paid out of and credited against the InEx Settlement Fund,[164] which benefits a nationwide class of persons or entities with claims against InEx and the InEx Settling Defendants[165] arising from Chinese Drywall sold, marketed, distributed and/or supplied by InEx.[166]

The InEx Settlement created two subclasses:  (1) for members of the InEx Class with claims arising from or related to "Affected Property," *i.e.*, any real or personal property, residential or commercial, containing Chinese Drywall sold, marketed, distributed and/or

---

[163]  All previous bona fide Chinese Drywall settlements of claims against InEx and/or its insurers entered into and paid prior to the Execution Date of the InEx Settlement Agreement ("Prior Settlements") will be deducted from the insurance proceeds that InEx's insurers deposit into the InEx Settlement Fund.  The amounts paid for each Prior Settlement claim are listed on Exhibit 1.23 to the Amended InEx Settlement.

[164]  Pending Settlements are listed on Exhibit 1.21 to the Amended InEx Settlement.

[165]  The InEx Settling Defendants are InEx, Arch, Liberty and the "Downstream InEx Releasees" (including, but not limited to, those listed on Exhibit 1.10 to the Amended InEx Settlement Agreement), except that any Builder listed on Exhibit 1.10 is not a Settling Defendant.  The InEx Settling Defendants are not permitted to make a claim under the InEx Settlement Fund.

[166]  The InEx Settlement defines Chinese Drywall as "any and all drywall products sold, marketed, distributed and/or supplied by InEx and which are alleged to be defective, and which were manufactured, in whole or in part, in China, or that include components manufactured, in whole or in part, in China, including, but not limited to, drywall manufactured by (i) [the Knauf Defendants] and (ii) [Taishan]; Pingyi Zhongxin Paper-Faced Plasterboard Co., Ltd. f/k/a Shandong Chenxiang Building Materials Co., Ltd.; Crescent City Gypsum, Inc.; [BNBM]; and any other manufacturer of Chinese drywall, whether reactive or not."  Amended InEx Settlement, Section 1.7.

supplied by InEx, located in Louisiana (the "Louisiana Subclass"), and (2) for members of the

Class with claims arising from or related to Affected Property located in states other than

Louisiana (the "Non-Louisiana Subclass").  As part of the InEx Settlement, InEx assigned to the

Non-Louisiana Subclass its rights and claims against its Excess Insurance Carrier North River for

$72 million of excess insurance and for damages for bad faith and extra-contractual conduct.

The InEx Settlement also reserved the rights of the Louisiana Subclass to pursue a claim against

North River to the extent of the Available Policy Limits of the Excess Policies.  Ultimately, as

detailed above, the PSC scheduled a bellwether trial against InEx and its insurer, North River, to

determine the legal issue associated with a good faith/bad faith seller under Louisiana redhibition

law, with a damages phase to follow.[167]  This trial was required as part of the Knauf Settlement,

discussed *infra*.  The PSC prepared and tried the InEx/North River case.

Under the Court's direction, the parties selected 12 Louisiana property owners (6

Plaintiffs selected by the PSC and 6 Plaintiffs selected by InEx) to undergo discovery.  InEx

propounded requests for production of documents to all 12 owners, and depositions were taken

of Plaintiffs.  The PSC took important discovery from North River, and led mediation efforts to

resolve the dispute.  When settlement efforts failed, the PSC tried four InEx cases before a jury

addressing the question of InEx's role and level of responsibility in the CDW debacle.  This

resulted in a defense verdict.[168]

---

[167] *See* Minute Entry dated 6/13/2012 [Rec. Doc. #14686]; Minute Entry dated 6/29/2012 [Rec. Doc. #15229]; Minute Entry dated 7/10/2012 [Rec. Doc. #15238]; Scheduling Order dated 8/2/2012 [Rec. Doc. #15588].

[168] Rec. Doc. #16409.

The Court appointed several PSC Members as Class Counsel and Subclass Counsel for the InEx Settlement and also as Members of the InEx Allocation Committee.  In these positions, they negotiated an Allocation Plan designed to fairly accommodate the interests of all InEx claimants.[169]   Both KPT Property owners and Taishan Drywall owners are eligible to recover from the InEx Settlement, provided they have InEx-supplied CDW in their homes, even though Taishan has been intransigent in these proceedings.  Under the InEx Allocation Plan there is a set-aside of 5% to compensate or reimburse InEx Class Members for alleged bodily injury and personal property losses.

Further, under the InEx Settlement, the PSC advanced the costs of class Notice in excess of $100,000.[170]  As set forth in the InEx Settlement, the PSC, common benefit attorneys and privately retained counsel for Class Members are petitioning the Court herein for an award of attorneys' fees constituting, in the aggregate, 32% of the InEx Settlement fund, plus reimbursement of reasonable expenses.  The Court will determine the allocation of said fees and reimbursement of reasonable costs.[171]

### 2.    *The Banner Settlement.*

The Banner entities supplied both KPT Chinese Drywall as well as Taishan Chinese Drywall along the Gulf Coast, but primarily throughout the State of Florida.[172]  Homeowners as well as homebuilders who repaired homes containing Banner-supplied Chinese Drywall sued

---

[169]  *See* InEx Allocation Plan.

[170]  Amended InEx Settlement, Section 6.2.2.

[171]  Amended InEx Settlement, Section 16.7.

[172]  *See* Banner Distributor Profile Forms [Rec. Doc. #15232-3, 4, 5, 6 and 7].

Banner in state and federal court actions.  After extensive discovery of the Banner entities and many months of arm's-length negotiations with Banner and its insurers, the PSC reached a class settlement with these Defendants in June, 2011.[173]

The Banner Settlement benefits a nationwide class consisting of all persons or entities with claims against Banner and its insurers arising from Chinese Drywall purchased from, supplied, distributed, marketed, used, sold and/or delivered by Banner.  The settlement consists of the gross proceeds of all of Banner's Triggered Policies, less sums paid or committed to be paid pursuant to Pending Settlements and Prior Settlements.  These Banner Settlement Funds total $53,081,572.30, plus any interest earned in the Escrow Account.

The Court appointed several PSC Members as Class Counsel for the Banner Settlement and as Members of the Banner Allocation Committee.  In these roles, they negotiated a Plan of Allocation that provides for a fair allocation of Banner Settlement Funds based on objective criteria such as the square footage of the Affected Property and whether the Chinese Drywall involved is KPT Chinese Drywall, Taishan Chinese Drywall, or a combination of both types of Chinese Drywall.  Thus, both KPT Property owners and Taishan Drywall owners are eligible to recover from the Banner Settlement, even though Taishan has refused to cooperate and participate in this MDL.  Under the Banner Allocation Plan there is a set-aside of 5% to compensate or reimburse Banner Class Members for alleged bodily injury and personal property losses.

---

[173]   *See* 2012 Herman-Levin Decl. at ¶ 19.

The PSC advanced the costs of Notice to the Banner class.[174]  Pursuant to the Banner Settlement, the PSC, Class Counsel, common benefit attorneys, and privately retained attorneys for all Class Members are petitioning the Court for attorneys' fees of 32% of the Banner Settlement Funds and reimbursement of reasonable expenses, including the cost of Notice.[175] The allocation of attorneys' fees between and amongst the Petitioning Attorneys will be determined by the Court in subsequent proceedings.[176]

The Petitioning Attorneys will also be entitled to petition the Court for a fee of 10% from those builders who actively pursued this litigation and who recover from the Settlement Funds.[177]

### 3.     *The Knauf Settlement.*

The Knauf Settlement was culminated after more than one year of in-person and telephonic negotiation sessions between the PSC and the Knauf Defendants, with oversight by the Court.[178]  The settlement is intended to resolve the claims of "[a]ll persons or entities who, as of the December 9, 2011,[179] filed a lawsuit in the Litigation as a named plaintiff (*i.e.*, not an absent class member) asserting claims arising from KPT Chinese Drywall, whether or not the

---

[174]   Banner Settlement, Section 5.3.1.

[175]   Amended Banner Settlement, Section 14.7.

[176]   *Id*.

[177]   *Id*.

[178]   *See* 2012 Herman-Levin Decl. at ¶¶ 23-24.

[179]   *See* fn. 23, *supra.*

Knauf Defendants are named parties to the lawsuit."[180]  The Settlement defines "KPT Chinese Drywall" as "any and all drywall products manufactured, sold, marketed, distributed, and/or supplied by KPT and which are alleged to be defective."[181]  The Knauf Settlement establishes a "Remediation Fund" and an "Other Loss Fund" to benefit three subclasses:  (1) a Residential Owner Subclass; (2) a Commercial Owner Subclass; and (3) a Tenant Subclass.

### a.  *Remediation Fund*

The Remediation Fund is an <u>uncapped fund</u> that is being used to remediate Owner Class Members' properties impacted by KPT Chinese Drywall.  In addition, 50% of net amounts (after payment of attorneys' fees and costs and after allocation between KPT Chinese Drywall and Non-KPT Chinese Drywall) recovered from the Global Settlement[182] and from settlements with Excluded Releasees and/or their insurers prior to the Fairness Hearing[183] will be deposited into

---

[180]   The following persons or entities are members of the Knauf Class only for the purpose of obtaining benefits under the Other Loss Fund, but not under the Remediation Fund, as those Class Members' Remediation Claims have been or will be resolved outside the Knauf Settlement:  (i) any person or entity which has settled claims against the Knauf Defendants under the [KPT Pilot Program]; (ii) any person or entity whose Affected Property has been remediated under a Major Builder Settlement Agreement; and (iii) any person or entity whose Affected Property has been remediated under a settlement with a Builder or Supplier (including claims assigned by Class Members that were later settled by the assignee).  Amended Knauf Settlement, Section 1.1.2.

[181]   Amended Knauf Settlement, Section 1.26.

[182]   *See* Amended Knauf Settlement, Section 4.2.3.

[183]   *See id.*  Under the Knauf Settlement, "Excluded Releasee" is defined as "any person or entity eligible to be an Other Releasee that does not participate in the [Global Settlement] or otherwise settle with the PSC and the Knauf Defendants.  An Excluded Releasee can also be an Other Releasee."  Amended Knauf Settlement, Section 1.12.  "Other Releasee" is defined in the Knauf Settlement as "any person or entity that supplied, installed or facilitated and/or assisted in such supply or installation of KPT Chinese Drywall, including but not limited to, Banner, InEx,

(continued...)

the Remediation Fund for purposes of providing remediation benefits to Class Members.[184]

Further, each Participating Class Member who is also an InEx, Banner and/or L&W Class

Member will assign his/her claims (to the extent that they relate to KPT Chinese Drywall) to any

net recovery under those settlements to the Knauf Defendants, if not already assigned.  Any net

amounts recovered from the InEx, Banner and L&W Settlements based on such assignments will

also be deposited into the Remediation Fund, for purposes of providing remediation benefits to

the individual KPT Property Owner involved.

     Residential KPT Property Owners and Commercial KPT Property Owners have three

available options for remediation benefits:  (1) they may have their properties completely

remediated pursuant to the Settlement's Remediation Protocol (Exhibit F to the Settlement

Agreement); (2) they may self-remediate their Affected Property and be compensated for those

costs under the Settlement; or (3) they may receive a discounted cash-out payment if they choose

not to remediate their property.  Mixed Property Owners[185] may only elect either the self-

---

[183](...continued)
L&W, Importers, Suppliers, Builders, Developers, General Contractors, Installers, Realtors, Subcontractors, and Subsuppliers which purchased or received KPT Chinese Drywall from a Supplier, used Chinese Drywall sold, marketed, distributed and/or supplied by a Supplier in the construction of Affected Property, or sold or marketed Affected Property containing KPT Chinese Drywall, . . . except for Excluded Releasees."  Amended Knauf Settlement, Section 1.50.

[184]  The remaining 50% of net amounts recovered from the Global Settlement will be deposited into the Other Loss Fund.

[185]  Mixed Property Owners (Amended Knauf Settlement, Sections 1.36 & 1.37) own Affected Properties in which the KPT Drywall Percentage is less than or equal to 90%.  All Owners must submit proof of KPT Chinese Drywall in their property, which will be inspected to confirm the presence and determine the percentage of KPT Chinese Drywall in the property in

(continued...)

remediation option or the cash-out payment.

<blockquote>

**i.**      ***Option 1:  Program Contractor Remediation Option***

</blockquote>

The purpose of the Program Contractor Remediation Option is to make Residential and

Commercial KPT Property Owners whole within a three-month period by completely

remediating their Affected Property damaged by KPT Chinese Drywall.  The remediation work

removes on a cost-effective basis all CDW and any other type of drywall, problem

drywall-related odors, and contamination caused by the drywall, including corrosion, tarnishing

and pitting, in order to leave the KPT Property with the same construction quality and finishes,

including remediating any damage to the quality and finishes that was caused by the drywall, as

existed prior to the start of the remediation work.[186]

Residential KPT Property Owners receive from the Remediation Fund a Lump Sum

Payment of either $8.50 or $10 per square foot depending on the size of the Affected Property.

The purpose of the Lump Sum Payment is to compensate the Residential KPT Property Owner

for Other Covered Expenses, which include reimbursement for all alternative living expenses,

personal property damage, maintenance costs, including utility bills, insurance, property taxes

and maintenance of landscaping, and moving and storage expenses, incurred by the Residential

---

[185](...continued)
comparison to the total amount of reactive Chinese drywall.  That percentage will be rounded to
the next highest 10% increment (the "KPT Drywall Percentage").  If the KPT Chinese Drywall
Percentage exceeds 90%, the Class Member is entitled to full benefits.  If the property is a
"Mixed Property," *i.e.*, the KPT Chinese Drywall Percentage is less than or equal to 90%, the
benefits will be discounted so the Class Member receives the benefit amount multiplied by the
KPT Drywall Percentage.  If the property has no KPT Chinese Drywall, the claim will be
rejected.

[186]  *See* Remediation Protocol, Exhibit F to the Knauf Settlement.

KPT Property Owner during the remediation process.  Commercial Owners are not entitled to a Lump Sum Payment.

Finally, in the event of a delay in the substantial completion of the remediation work within three months, Residential KPT Property Owners are entitled to a Delay Period Payment from the Remediation Fund, as specified in the Amended Knauf Settlement at Section 4.3.1.2.

### ii.      *Option 2:  Self-Remediation Option*

Residential Owners and Commercial Owners may seek a cash payment from the Remediation Fund to self-remediate their properties.  Under this scenario, Residential Owners will still receive the Lump Sum Payment.  In the case of Mixed Property Owners, the cash payment to the chosen contractor will be discounted by multiplying the payment by the KPT Drywall Percentage.  For Mixed Property Residential Owners, the Lump Sum Payment will be similarly reduced.

### iii.      *Option 3:  Cash-Out Option*

All Owners have a third option to select a discounted cash-out payment in the event they choose not to remediate their Affected Property.[187]  Under this Option, Class Members must comply with certain disclosure requirements.[188]

### b.      *Other Loss Fund*

The Knauf Defendants made a deposit of $30 million into the "Other Loss Fund."  In addition, 50% of net amounts recovered toward payment of claims related to KPT Chinese

---

[187]  Amended Knauf Settlement, Section 4.3.3.

[188]  *Id.*

Drywall from the Global Settlement will also be deposited into this fund.  The Other Loss Fund is a capped fund that provides additional benefits to Class Members for economic losses, depending on the particular Subclass to which they belong and certain qualifying conditions. Residential Owners may be entitled to:  (1) reimbursement of alternative living expenses arising from the need to vacate the Affected Property prior to remediation and/or (2) recovery of economic losses from foreclosures and sales to mitigate losses caused by KPT Chinese Drywall. Commercial Owners may be entitled to:  (1) economic loss for a period not to exceed three months arising from the inability to use or rent the Affected Property during remediation, to the extent that these damages are not capable of mitigation and have not previously been reimbursed by insurance; (2) reimbursement of carrying costs (*i.e.*, interest expenses) arising from the inability to sell Affected Properties, to the extent that these damages are not capable of mitigation and have not previously been reimbursed by insurance; and/or (3) lost equity due to foreclosure or sales in mitigation caused by KPT Chinese Drywall.  Finally, Tenants may seek an award from the Other Loss Fund to compensate for moving expenses if the Tenant is displaced by remediation work in the Affected Property and for personal property damage, such as to jewelry and Tenant-owned appliances.

The Knauf Settlement also provides a mechanism for Residential Owners and Tenants to seek from the Other Loss Fund compensation for bodily injuries allegedly caused by KPT Chinese Drywall.  The Other Loss Fund will not pay claims for stigma, injury to reputation, loss of enjoyment of home, psychological or emotional injury, medical monitoring, injury to reputation, credit rating loss, legal and accounting expenses, or loss of investment opportunity.

Class Members who do not have KPT Chinese Drywall in their properties will not receive

any benefits under the Knauf Settlement.  However, they may pursue claims under the InEx,

Banner and/or Global Settlements, as appropriate, related to the non-KPT Chinese Drywall in

their Affected Properties.  In addition, these Class Members, as well as Mixed Property Owners,

will retain claims against the manufacturers of the non-KPT Chinese Drywall.

### c.   *Attorneys' Fees*

In addition to the Remediation Fund benefits and Other Loss Fund benefits provided

under the Settlement, the Knauf Defendants agreed to pay separately $160 million in attorneys'

fees and costs, if approved by the Court, to compensate the PSC and valid and bona fide common

benefit counsel, Settlement Class Counsel, and individually-retained Plaintiffs' attorneys for:  (i)

all preparation and litigation work performed on behalf of any Participating Class Member or the

Class; (ii) the Knauf Settlement; (iii) the KPT Pilot Program; (iv) the Major Builder Settlement

Agreements; (v) any agreement governing homes remediated prior to the Execution Date; and

(vi) any other previous settlement between the Knauf Defendants and any other party relating to

claims arising from KPT Chinese Drywall, unless attorneys' fees and reasonable costs were

already separately addressed under such settlement.[189]  Thus, <u>individual Class Members will not

be responsible for payment of attorneys' fees or costs out of their recovery of benefits under the

Knauf Settlement, except for recoveries on bodily injury claims, which is an additional

significant benefit for Class Members</u>.  The reimbursement of costs under the Knauf Settlement

includes but is not limited to Held Costs, Shared Costs, and Individual Participating Class

---

[189]  Amended Knauf Settlement, Section 14.2.  The Knauf Defendants have made advance payments of $17,435,000 towards their obligation to pay attorneys' fees, pursuant to Section 14.7 of the Amended Knauf Settlement and Order dated 1/17/2014 [Rec. Doc. #17398].

Members' Costs limited to reasonable inspection costs.

The obligation of the Knauf Defendants for attorneys' fees and costs is capped at $160 million, but if there is a surplus of funds remaining in the Other Loss Fund after all Approved Claims and Administrative Expenses have been accounted for, then that surplus may be used to offset post-Effective Date administrative legal fees and costs of Settlement Class Counsel, subject to Court approval. Any additional funds remaining in the Other Loss Fund after payment of post-Effective Date fees and costs may be used to offset any deficiency in legal fees and costs of the PSC and valid and bona fide common benefit counsel, Settlement Class Counsel and individual retained counsel, subject to Court approval.

The Court appointed PSC Members as Class Counsel and Subclass Counsel for the Knauf Settlement. Class Counsel have worked and continue to work with the Ombudsmen to provide support for Class Members participating in the KPT Pilot Program and the Knauf Settlement.

### 4.    *The L&W Settlement*

In March 2012, the PSC reached a class settlement with Chinese Drywall supplier L&W, USG Corporation and the Knauf Defendants after arm's-length negotiations.[190] The L&W Settlement is another component of the plan for global resolution of the claims arising out of KPT Chinese Drywall. The settlement benefits a nationwide class consisting of "[a]ll persons or entities who are Participating Class Members in the Knauf Class Settlement and who (a) as of December 9, 2011, is a named plaintiff in the Litigation (*i.e.*, not an absent class member) asserting claims arising from L&W Supplied KPT Chinese Drywall, whether or not L&W and/or

---

[190]  *See* 2012 Herman-Levin Decl. at ¶ 22.

81

USG are named parties to the lawsuit, and (b) own Affected Property.[191]

The L&W Settlement defines "L&W Supplied KPT Chinese Drywall" as:  "any and all drywall purchased from, or distributed, supplied, sold, and/or delivered by USG and/or L&W, that was manufactured by KPT and is alleged to be defective."[192]  L&W Supplied KPT Chinese Drywall does not include drywall that was manufactured, sold, marketed, distributed and/or supplied by any Knauf Defendant other than KPT.[193]  Pursuant to the L&W Settlement, all claims against L&W and USG related to L&W Supplied KPT Chinese Drywall will be resolved according to the Settlement Agreement and Release that USG and L&W entered into with the Knauf Defendants on or about April 3, 2011 ("Knauf/L&W Agreement").[194]  That agreement provides that L&W and USG will make a Cash Payment equal to $7 per square foot of "Under Air Area" for each Affected Property of Participating L&W Class Members, which contains or contained L&W Supplied KPT Chinese Drywall.[195]

Under the L&W Settlement, in cases where the Affected Property is a KPT Property

---

[191]   L&W Settlement, Section 1.1.4.  The L&W Class also includes Multiple Unit Property Governing Bodies to the extent that any unit(s) of a Multiple Unit Property is the subject of a filed lawsuit in the Litigation.  The L&W Class does not include any person or entity who has settled claims against L&W and/or USG under the KPT Pilot Program or any other settlement (including claims assigned by L&W Class Members that were later settled by the assignee).  The L&W Class also does not include any owner of an Affected Property that has already been the subject of a settlement for which L&W and/or USG have contributed payment either to the current or former owner of the property or to any party to that settlement.  *Id.*

[192]   L&W Settlement, Section 1.14.

[193]   *Id*.

[194]   The Settlement Agreement and Release between Knauf and L&W and USG is attached as Exhibit 3 to the L&W Settlement.  L&W Settlement, Section 1.13.

[195]   Knauf/L&W Agreement, ¶ 4.

(having a KPT Drywall Percentage greater than 90%), USG and L&W will pay to the Knauf

Defendants the Cash Payment for that Affected Property, less attorneys' fees and costs awarded

by the Court.[196]  The resulting Net KPT Property Cash Payment will be applied toward

Remediation Settlement Benefits for the Participating L&W Class Members.[197]  For Mixed

Properties (having a KPT Drywall Percentage of 90% or less), USG and L&W will pay to the

Knauf Defendants the Cash Payment for the Mixed Property multiplied by the KPT Drywall

Percentage, less attorneys' fees and costs awarded by the Court.[198]  The resulting Net Mixed

Property Cash Payment will be applied toward Remediation Settlement Benefits for the

Participating L&W Class Members.[199]

In exchange for making these Cash Payments, L&W and USG receive a full release from

Participating L&W Class Members, and Participating L&W Class Members receive all of the

benefits that Class Members may be entitled to under the Knauf Settlement.  By definition, L&W

Class Members are Participating Class Members in the Knauf Settlement.[200]

The Settling Parties agreed that USG and L&W shall pay attorneys' fees and reasonable

and appropriate expenses (to be allocated among the PSC, common benefit counsel authorized by

---

[196]  L&W Settlement, Section 4.1.1.  Under the L&W Settlement, L&W shall deposit the attorneys' fees and costs into an L&W Attorneys' Fees and Costs Fund to be established pursuant to an order of the Court.

[197]  L&W Settlement, Section 4.1.1.

[198]  L&W Settlement, Section 4.1.2.  Under the L&W Settlement, L&W shall deposit the attorneys' fees and costs into an L&W Attorneys' Fees and Costs Fund to be established pursuant to an order of the Court.

[199]  L&W Settlement, Section 4.1.2.

[200]  L&W Settlement, Section 1.1.4.

83

and working at the direction of the PSC, L&W Class Counsel and individual retained counsel),

the calculation and/or amount of which will be determined by a separate agreement between the

PSC and USG, L&W and the Knauf Defendants, which will be submitted to the Court for

approval.[201]  The obligation for attorneys' fees, as approved by the Court, will be deducted from

the Cash Payment for each Participating L&W Class Member.  Individual L&W Class Members

will not be obligated to pay any attorneys' fees under the L&W Settlement.

     The Court appointed several PSC Members as Class Counsel for the L&W Settlement.

### 5.      *The Global Settlement*

     The Global Settlement was the byproduct of almost a year of arm's-length negotiations

among the PSC and hundreds of builders, suppliers, installers and their insurers.[202]  It resolves

many of the claims against the Participating Builder, Supplier, and Installer Defendants and their

Participating Insurers.  There are 620 Participating Defendants and 86 Participating Insurers who

agreed to this settlement.  The settlement is designed to compensate all persons and entities for

claims arising from or related to any Chinese Drywall purchased, imported, supplied, distributed,

marketed, installed, used, sold, delivered or in any way alleged to be within the legal

responsibility of the Participating Defendants and/or the Participating Insurers.[203]  The amended

Global Settlement provides $82,784,000 for Class Members.[204]  The Settling Defendants paid a

---

[201]  L&W Settlement, Section 15.1.

[202]  *See* 2012 Herman-Levin Decl. at ¶ 27.

[203]  *See* Amended Global Settlement, Section 1.1.1.

[204]  The PSC consented to the accelerated payment of $9,430,000 from those funds to
accommodate certain "separate" full or partial settlements involving Chinese Drywall claims that
(continued...)

non-refundable deposit up-front of 5% of the total sum, to be used for payment of the mediator's costs and costs of class Notice.  Further, as noted above, 50% of the net payments made pursuant to the Global Settlement, which relate to KPT Chinese Drywall, will be deposited into the Knauf Remediation Fund and 50% of those same net payments will be deposited into the Knauf Other Loss Fund.[205]

The Global Settlement is designed to compensate Class Members irrespective of the brand of Chinese Drywall that is or was installed in their Affected Properties.  Pursuant to the Global Settlement, Class Members will receive compensation regardless of whether they filed their claims in this Court or in another forum.  In fact, Class Members may receive compensation even if they failed to perfect their claims by filing a complaint against the Participating Defendants and Participating Insurers in any forum.

The Court appointed several PSC Members as Class Counsel for the Global Settlement and as Members of the Global Allocation Committee.  In these roles, they prepared a Plan of Allocation of the Global Settlement Funds that will fairly distribute funds to Class Members based on objective criteria such as the square footage of the Affected Property and whether their

---

[204](...continued)
the Participating Defendants and Participating Insurers had either reached with Plaintiffs or were in negotiations to resolve.  *See* Amended Global Settlement, Sections 4.2 & 4.2.1.  In agreeing to this accommodation, the PSC benefitted <u>both</u> the Plaintiffs receiving monies from those settlements in advance of final approval of the Global Settlement <u>and</u> the Settling Defendants, including Knauf, since they were able to obtain releases of Plaintiffs' in advance of approval of the class settlement.

[205]  Amended Knauf Settlement, Section 4.2.3.

property is a KPT Property, a Taishan Property, or a Mixed Property.[206]  Both KPT Property

owners and Taishan Drywall owners are eligible to recover from the Global Settlement, despite

the fact that Taishan has made every attempt to avoid the jurisdiction of this Court.  The PSC

will be aggressively pursuing the Taishan Defendants.

Under the Global Settlement Agreement, the PSC, Class Counsel, common benefit

attorneys, and privately retained attorneys are entitled to petition the Court for attorneys' fees,

including common benefit fees, up to 32% of the settlement funds, with no more than 15% of the

funds reserved for common benefit fees, and reimbursement of reasonable expenses, excluding

the costs of Notice.

### C.    The Virginia Settlements.

Starting in March, 2012, the Virginia PSC, along with PSC Members, participated in

multiple negotiations with four major insurance companies – Nationwide, State Farm Insurance

Company, Citizens/Hanover Insurance Company, and Builders Mutual – to achieve resolution of

claims against multiple builders, suppliers, and installers of CDW, primarily in Virginia.  These

efforts included extensive research regarding insurance coverage limitations and factual

investigation regarding the extent of damage to homes in Virginia.  Ultimately, the PSC reached

four class settlements, totaling $17.4 million. These four settlements relating to Virginia and

certain other remaining claims received resounding support from Class Members,[207] and were

---

[206]  *Id*.

[207]  *See* Reply Brief in Support of Final Approval [Rec. Doc. #16819].

approved by this Court on July 9, 2013.[208]  These settlements will provide Class Members with much-needed relief, though the PSC continues to pursue litigation against Taishan to make these CDW victims whole.

In addition to conducting several in-person and telephonic settlement discussions to achieve these settlements, PSC Members dedicated months to drafting the four settlement agreements,[209] preliminary approval papers,[210] final approval papers,[211] reply brief,[212] and assisted in the development of a Notice plan.  In April, 2013, the Court appointed an Allocation Committee for the Virginia Settlements comprised of PSC Members.[213]  The Allocation Committee has worked closely with the Special Master to develop and administer the Allocation Plan.[214]  The allocation process is already underway – Real Property and Other Loss claims forms have been submitted and are under review.  PSC Members have devoted significant time to overseeing the allocation process in an effort to make sure that the process runs smoothly and quickly, and is consistent with the MDL settlements administration.

---

[208]  Rec. Doc. #16934.

[209]  Nationwide Settlement; Porter-Blaine Settlement [Rec. Doc. #15969-6]; Tobin Trading Settlement [Rec. Doc. #15969-7]; Builders Mutual Settlement.

[210]  Rec. Doc. #16463-1; Rec. Doc. #15969-1.

[211]  Rec. Doc. #16000.

[212]  Rec. Doc. #16819.

[213]  Rec. Doc. #16781.

[214]  Rec. Doc. #16800-7.

D.      **Post-Settlement Administration Efforts**.

Following approval of the nine class settlements, the PSC has worked with defense counsel and the Clerk of Court to effectuate dismissals of Settling Defendants from the appropriate Omni actions.  The PSC Members who were appointed as Class Counsel and/or Subclass Counsel for the Knauf, Banner, InEx, L&W, Global, and Virginia Settlements continue to work diligently to make sure that settlement funds are fairly administered.  Similarly, the PSC Members who were appointed to the Allocation Committees for the InEx, Banner, Global, and Virginia Settlements, along with Class Counsel, work closely with the Settlement Claims Administrators BrownGreer and Garretson Resolution Group, the Court-appointed Curator Bob Johnston, various defense liaison counsel, other Members of the Settlement Allocation Committees, and the Court-appointed Ombudsmen to oversee Settlement Administration and ensure fair and equitable distribution of an estimated $1.1 billion in settlement funds and benefits to Class Members from the Knauf, InEx, Banner, L&W, Global, and Virginia Settlements.

Specifically, Class Counsel and PSC Members have made significant efforts to prepare and develop Court-approved settlement websites and call centers, Court-approved hard-copy and electronic claim forms and other Claims Administration Procedures ("CAPs").[215]  They continue to assist in the administration of all class settlements on an ongoing basis.  As of April 2, 2014, almost 4,000 homes with KPT Chinese Drywall have been completely remediated or are in the process of remediation, enabling Plaintiffs who were displaced from their homes due to defective

---

[215]  CAP No. 1 [Rec. Doc. #17090-1]; CAP No. 2 [Rec. Doc. #17090-2]; CAP No. 3 [Rec. Doc. #17090-3]; CAP No. 4 [Rec. Doc. #17160-1]; CAP No. 5 [Rec. Doc. #17160-2]; CAP No. 6 [Rec. Doc. #17372-1].

Chinese Drywall to return to their residences.  Plaintiffs have filed approximately 22,000 claims for cash and/or other loss benefits in these settlement programs.[216]

In addition, Class Counsel have established and monitored the Court-approved Qualified Settlement Funds.

### E.   Ongoing Litigation Efforts.

The PSC's consistent, ongoing, and significant contributions to the litigation continue uninterrupted.  The PSC is solely and vigorously pursuing claims against the Taishan Defendants and their related entities, including their upstream entities – CNBM and BNBM.[217]  As part of the PSC's global settlement with the Knauf Defendants, the PSC agreed to continue the labor-intensive task of pursuing the Taishan entities so that Knauf would not be at an economic disadvantage in the Chinese marketplace following the settlement.  Thus, the PSC will continue to pursue Plaintiffs' claims against these Defendants in an effort to provide compensation for non-KPT Property Owners.  They will continue to prosecute these claims as long as necessary, recognizing the fiduciary obligations owed to these Plaintiffs and the Court despite potentially diminished remuneration for counsel.  In *Germano*, the PSC is in the process of executing on the $2,758,356.20 judgment against TG on behalf of seven Virginia families that is now final.  In addition, after Taishan challenged this Court's exercise of jurisdiction over it in Louisiana, Florida, and Virginia, the PSC prepared and filed the three *Amorin* Complaints (Omnibus XV,

---

[216]  *See* Status Report #9 of Settlement Administrator BrownGreer, filed 4/16/2014 [Rec. Doc. #17616]; Fourth Status Report of Settlement Administrator Matthew L. Garretson for the Four Virginia-Based Settlements, filed 4/16/2014 [Rec. Doc. #17617].

[217]  *See* 2012 Herman-Levin Decl. at ¶ 31.

filed in the Southern District of Florida; Omnibus XVI, filed in the Eastern District of Louisiana; and Omnibus XVII, filed in the Eastern District of Virginia), and intervened all Plaintiffs with Taishan CDW in their homes into those actions, as a protective measure for jurisdictional purposes. These states, along with California, contain important ports of entry for Taishan's product into the United States. Accordingly, the PSC also prepared and filed a protective class complaint against Taishan in the Central District of California, *see Abner, et al. v. Taishan Gypsum Co. Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-3094 (E.D. La.), and will prosecute all of these cases against the Taishan Defendants.

Claims remain as well in Omnibus III against non-Settling Defendants. *See Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 2:09-cv-06690 (E.D. La.) (original complaint, Omnibus III, III(A)) (asserting alternative liability theory against all known manufacturers for drywall that cannot be traced to a particular manufacturer). The PSC continues to vigorously pursue those claims on behalf of Plaintiffs.

**F.       PSC Administrative Services Not Billed to MDL 2047.**

On top of the hours and expenses reported by the PSC and common benefit attorneys pursuant to Pretrial Order Nos. 9 and 9A, the PSC has provided and/or managed important administrative services for the prosecution of Plaintiffs' cases, which in large part were not billed to this case, but, rather, absorbed by PSC Members and their firms. These unbilled administrative services include, but are not limited to: preparing and updating Plaintiff and Defendant lists; receipt of contact information pursuant to Pretrial Order No. 5 and updating it throughout the litigation; establishing and maintaining the electronic service (LexisNexis) pursuant to Pretrial Order No. 6; liaisoning with Defendants' Liaison Counsel and other liaison

counsel; coordinating with the various defendants, homebuilders and other steering committees; preparation and service of paper copies of appellate briefs, record excerpts, and appendices on parties to appeals; maintaining pleadings files; maintaining a database of entries of court appearances; scheduling court reporters and videographers for depositions and coordinating cross-noticing of depositions; maintaining a database of notices of depositions, deposition transcripts, trial transcripts and exhibits, and hearing transcripts; monitoring email blasts regarding Federal/State CDW coordination; tracking and responding to phone calls from parties and Class Members; and reviewing emails.

In addition, throughout this litigation, Plaintiffs' Lead Counsel and Plaintiffs' Liaison Counsel monitored and managed all common benefit work assignments, and audited and continue to audit the time and expenses of common benefit counsel, in conjunction with the Court-appointed CPA Philip Garrett.  They have coordinated the time and billing guidelines and cost submissions of the PSC Members and common benefit counsel with the Court and Court-appointed CPA pursuant to Pretrial Order No. 9, as well as state court counsel submissions pursuant to Pretrial Order No. 9A, and reviewed Shared Costs and sought Court approval for payment of those costs.  Finally, Plaintiffs' Liaison Counsel has coordinated and overseen the distribution and retention of profile forms, distributed communications to coordinate all Plaintiffs' counsel, and completed and served Proofs of Service on all Defendants, including those in the various Omni Complaints.

*   *   *

For more than five years, since 2009, the PSC's serious commitment to this litigation has prevented many Members of the PSC from working on additional cases and engaging in other

financially rewarding endeavors.  From the outset, the PSC treated this MDL and the related state court Chinese Drywall litigation as a single endeavor, with no one aspect more important than any other.  The PSC pursued all Defendants aggressively in order to maximize Plaintiffs' recoveries, and they continue their efforts against the Taishan Defendants.

## V.   ARGUMENT

### A.   The Principles Governing the Determination of the Amount of a Global Fee Award in this MDL.

In this unique Chinese Drywall litigation, the Court required that a joint global fee petition be filed on behalf of all counsel seeking attorneys' fees.[218]  This global fee petition seeks compensation for the full panoply of counsel involved in CDW litigation, *i.e.*, both individually retained counsel and common benefit counsel.  One of the more prominent features of the inter-related settlements approved by this Court is that claimants will not only have their homes remediated, but no claimant from the principal Knauf Settlement has to pay their counsel or common benefit counsel a fee out of any recovery, with the exception for a personal injury recovery, because the Knauf Defendants agreed to pay $160 million to the Joint Petitioners for fees and common benefit costs, plus reasonable individual inspection costs, subject to Court approval, separate and apart from the settlement Remediation and Other Loss benefits.[219]  For these CDW victims, they will be 100% compensated without concern that their counsel will

---

[218]  Pretrial Order Nos. 28, 28A, and 28B.

[219]  *See* Amended Knauf Settlement, Section 14.2.

92

share in their recovery.[220]  In the case of the supplemental non-Knauf Settlements (*i.e.*, the InEx, Banner, Global, and Virginia Settlements), the Joint Petitioners are seeking a fee award of 32% of the gross value of the Settlement funds, plus reasonable costs, which will compensate <u>both</u> individual attorneys <u>and</u> common benefit counsel.  Viewed from the clients' perspective (or, for that matter, any perspective), the benefits conferred by this litigation are remarkable.

This Court has the inherent authority to award attorneys' fees and regulate counsel fees of those attorneys practicing before it, which authority is only reinforced by the class Settlement Agreements that anticipate this Court's rulings on the counsel fees requested.[221]  The requested fees and costs of $160 million from the Knauf Settlement for both common benefit counsel and individually retained counsel represent only 14.5% of the estimated $1.1 billion value of the Knauf Settlement.  This percentage is even lower considering that Knauf is providing a substantial additional benefit by paying the costs of administration of the Remediation Fund and the Other Loss Fund (which would normally be paid out of the settlement fund itself).  The percentage is lower still since the requested award is for attorneys' fees <u>and</u> costs, and the award is not only for common benefit counsel, but also Plaintiffs' individually retained counsel to satisfy their contingent fee agreements.  A hybrid fee and cost award of $160 million from the Knauf Settlement, plus 32% of the gross values of the InEx, Banner, Global, and Virginia Settlements, would represent only 18.9% of the $1.1 billion Knauf Settlement value (and less if

---

[220]  Those claimants with Taishan Chinese Drywall are still being vigorously represented by the PSC.

[221]  *See* InEx Amended Settlement Agreement, Section 16.7; Amended Banner Settlement Agreement, Section 14.7; & Amended Global Settlement Agreement, Section 16.6.

the value of the Virginia Settlements is added and payment of individually retained counsel fees is factored in).  The global request for attorneys' fees is thus eminently reasonable under the circumstances of this case.  *See*, *e.g.*, *Union Asset Management Holding, A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir. 1974); *Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013) (Africk, J.); *In re Vioxx Prod. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008); and *Common Benefit Fees*, 74 LA. L.REV. 371 (2014).

Subsequent to this global fee award, and also consistent with Step Five of Pretrial Order No. 28, ¶ 10, the Court will later be called upon to award a common benefit percentage and an allocation of attorneys' fees among the Joint Petitioners.  *See*, *generally*, *Common Benefit Fees*, 74 LA. L.REV. at 375; *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 653 (E.D. La. 2010) (analogizing the tension between individually retained counsel and common benefit counsel as a "taffy pull").  But that "taffy pull" is left for another day, and is not necessary to the instant petition.

**B.     Selecting the Proper Percentage Award When Multiple Settlement Funds Are Present and Both Individually Retained Counsel and Common Benefit Counsel Are to Be Compensated.**

This case presents the unique circumstance where both individually retained counsel and common benefit counsel are to share from the same pool of funds.  This combined, hybrid approach to compensating all counsel who played a role in achieving benefits for a group of Plaintiffs affords the individual claimant complete remediation relief and/or cash for other losses without the payment of attorneys' fees.  The PSC accepted this challenge from Day One of the litigation to bring relief to Chinese Drywall victims, many of whom were displaced from their

homes and unable to find or sue the manufacturers of these defective products or other responsible parties.  Creating the Omnibus Complaints and securing service of those complaints on responsible foreign entities as well as thousands of builders, installers, suppliers and their insurers was critical, and ultimately resulted in the global settlements providing relief to the victims of Chinese Drywall.  Like the PSC, individual attorneys representing individual homeowners also handled these cases on a contingency basis and provided individual counsel as needed, as set forth above.  Therefore, relevant to the current fee award presented by this joint global fee petition is the opinion of this Court in the *Vioxx* litigation, 574 F. Supp. 2d 606, and Judge Africk's opinion in *Evans*, *supra.*

In *Vioxx*, this Court presided over a nationwide product liability case involving personal injuries resulting from ingestion of a prescription medication.  Approximately 50,000 individually retained and *pro se* claimants were eligible to participate in a private settlement program involving a $4.85 billion settlement fund that had been negotiated by the PSC.  The Court recognized that a substantial amount of the settlement fund would ultimately be paid to individually retained counsel.  Although the Court recognized that given the risks inherent in the litigation, a reasonable contingent fee could range between 33% to 40%, but because individual counsel "benefitted from a uniform and highly efficient resolution procedure; the claimants should similarly benefit from fees reduced to reflect that uniformity and efficiency."  *Id.* at 617.  Therefore, to insure that reasonable attorneys' fees were charged to claimants, the Court imposed a cap of 32% plus reasonable costs on all individual contingent fee arrangements.  *Vioxx*, 574 F.

Supp. 2d at 617.[222]  Significant to this Court's determination that a global fee limitation of 32%

was reasonable was "the fact that any award for common benefit work will later be deducted

from this sum." *Id*. at 618.[223]

    The reasoning of this Court in *Vioxx* echoed in Judge Africk's opinion in *Evans.*  In

*Evans*, consolidated proceedings involving at least 33 separate actions resolved via a class action

settlement.  Three funds, collectively valued at $9 million, were established to compensate

subclasses of real property owners, business entities and other impacted persons.  Separate from

the funds to compensate class members, the defendant agreed to a $4.5 million administration

fund from which common benefit attorneys fees and expenses were to be paid.  *Evans*, 2013 WL

4501061 at *2-*3.  Class counsel sought and the court awarded common benefit fees of 25.89%

of the total value of the settlement (*i.e.*, $13,500,000).

    Secondary to its findings but more important to this discussion, the Court also engaged in

a review of the total attorneys' fees recoverable by all counsel, including privately retained

counsel.  The court found justified and reasonable a global percentage fee award of 39.22% from

---

    [222] The Plaintiffs' Negotiating Committee in *Vioxx* accepted the Court's benchmark of
32% in its negotiations.  To aid in the Court's determination of a reasonable percentage, the
Court cited as authority *In re Silicone Gel Breast Implant Prods. Liab. Litig*., 1994 WL 114580,
*4 (N.D. Ala. 1994) (25% of $4.2 billion settlement fund allocated for attorneys' fees for both
court-appointed and privately retained attorneys) and *In re Zyprexa Prods. Liab. Litig*., 424 F.
Supp. 2d 488, 491 (E.D.N.Y. 2006) (court considered aggregated settlement of related cases to be
in effect a quasi-class which allowed court to impose flexible 35% cap on privately retained
attorneys' fees, where common benefit counsel were compensated "out of the general settlement
fund, not by individual plaintiffs.").

    [223] The 32% award in *Vioxx* was the source for all fees, as referenced in the InEx, Banner,
and Global Settlement Agreements.  *See* InEx Amended Settlement Agreement, Section 16.7;
Amended Banner Settlement Agreement, Section 14.7; & Amended Global Settlement
Agreement, Section 16.6.

all settlement funds for both common benefit and individually retained counsel.  *Id*. at *15 &

n.11.  Hewing closely to the reasoning of this Court in *Vioxx,* Judge Africk concluded that a 20%

cap on individually retained counsel's fees was appropriate.  Recognizing that absent such a cap,

up to 40% of the class recovery could be paid over to lawyers, the court sought to resolve the

"taffy pull" between common benefit counsel and individually retained counsel.  *Id*. at *12,

*quoting*, *Vioxx*, 760 F. Supp. 2d at 653.  Employing a *Johnson* analysis, and following a report

and recommendation by Special Master John Perry, the court found the additional remaining

work of individually retained counsel to complete settlement claim forms to be only "of

consequence."  *Id.* at *13.  The court concluded that limiting individually retained counsel to a

20% contingency fee was reasonable "when compared to the nature and value" of the work

performed by common benefit counsel.[224]

From the reasoning of *Vioxx* and *Evans,* it therefore appears that percentage awards of

overall fees from cases that have taken into consideration both individually retained attorneys

and common benefit counsel may range from 32% up to 40%.   Based on this authority, the fees

sought by the Joint Petitioners for both common benefit counsel and individually retained

attorneys, which in the case of the Knauf Settlement comprise the bulk of the fee and cost

recovery and represent less than 12.7% of the overall value of that settlement, and for the InEx,

Banner, Global, and Virginia Settlements represent 32% of the gross value of those settlements,

is more than reasonable and substantially justified.

---

[224]  This reasoning will also become pertinent at the time this Court will need to make the
division between common benefit counsel and individually retained counsel.  *See* Step Five of
Pretrial Order 28, ¶ 10.

### C.    The Historic Underpinnings for Awarding Common Benefit Fees Lend Authority to a Global Percentage Fee Award.

Since the common benefit aspect of this award is an integral component of the analysis for evaluating the global fee award, a brief review of the jurisprudence of common benefit fees is appropriate.  The Court need not decide what that the common benefit percentage award should be until subsequent Step Five proceedings.  *See* Pretrial Order No. 28, ¶ 10.

Over one century ago, in *Trustees v. Greenough*, 105 U.S. 527 (1881), the United States Supreme Court made it clear that the federal trial courts possess equity power to reach beyond the confines of formal joinder, case captions and attorney fee contracts, to ensure that all who are the beneficiaries of litigation efforts undertaken for the common good would contribute proportionately to those services.  This doctrine was further articulated and applied in a series of landmark Supreme Court decisions, including *Central Railroad & Banking Co. v.  Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing v.Van Gemert*,  444 U.S. 472 (1980); and  *Blum v. Stenson*, 465 U.S. 886 (1984).

 In essence, the common benefit doctrine acknowledges "the original authority" of the courts "to do equity in a particular situation" to prevent unjust enrichment.  *Sprague v. Ticonic,* 307 U.S. at 166.  As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs' expense."  *Mills v. Electric Auto-Lite*, 396 U.S. at 392.

While the common benefit doctrine is routinely invoked as the basis for the award of attorneys' fees from common funds or benefits generated in class actions, it is clear that its

application is not limited to the class context.  The Supreme Court's opinion in *Sprague*

illuminates this point.  *Sprague* involved a trust fund that was jeopardized when a bank went into

receivership.  After the plaintiff successfully sued for a lien establishing her right to recover from

the trust, she sought reimbursement of attorneys' fees from the trust.  Although the suit was not a

class action, had only indirectly established the rights of others, and had not created a fund, the

Court held that the plaintiff was entitled to compensation from those benefitted by her efforts:

> That the party in a situation like the present neither purported to
> sue for a class nor formally established by litigation a fund
> available to the class, does not seem to be a differentiating factor
> so far as it affects the source of the recognized power of equity to
> grant reimbursements of the kind for which the petitioner in this
> case appealed to the chancellor's discretion.  Plainly the foundation
> for the historic practice of granting reimbursement for the costs of
> litigation other than the conventional taxable costs is part of the
> original authority of the chancellor to do equity in a particular
> situation.
>
> Whether one sues representatively or formally makes a fund
> available for others may, of course, be relevant circumstances in
> making the fund liable for his costs in producing it.  But when such
> a fund is for all practical purposes created for the benefit of others,
> the formalities of the litigation - the absence of an avowed class
> suit or the creation of a fund, as it were, through stare decisis rather
> than through a decree - hardly touch the power of equity in doing
> justice as between a party and the beneficiaries of his litigation.

*Sprague*, 307 U.S. at 166.  *See also Guidant Corp. Implantable Defibulators Prod. Liab. Litig.*,

2008 WL 682174, *5 (D. Minn. Mar. 7, 2008), *citing*, *Awarding Attorneys' Fees and Managing*

*Fee Litigation* at p. 51 (Fed. Jud. Ctr. 1994) ("[a]lthough many common fund cases are class

actions, . . . the doctrine is not limited to class actions"); MANUAL FOR COMPLEX LITIGATION,

FOURTH, § 14.121 at 186 (Fed. Jud. Ctr. 2004) ("The common-fund exception to the American

Rule is grounded in the equitable powers of the courts under the doctrines of *quantum meruit* and

unjust enrichment.") [hereafter the "MCL"]; *Common Benefit Fees*, 74 La. L.Rev. at 375 ("But this doctrine is not limited solely to class actions:  it has been used in complex litigation to compensate attorneys whose work benefits others similarly situated.").

The Common Fund doctrine has also been applied to those rare instances, like that presented by the Knauf Settlement, where the defendant agrees to pay to create two funds – one to provide benefits to the class and another to pay for attorneys' fees and costs.  In 1995, the court in *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995) (Becker, J.) [hereafter "*GMC Pick-Up*"], coined such arrangements as creating a "constructive common fund."  Since then, the concept has been widely recognized to permit percentage-of-fund fee awards provided they conform to accepted practices related to the valuation of the overall benefit to the class.  *See Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("Although under the terms of each settlement agreement, attorney fees technically derive from the defendant rather than out of the class' recovery, in essence the entire settlement amount comes from the same source. . . .  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 943 (9th Cir. 2011) (recognizing constructive common fund approach).  *See also* MCL, *Attorney Fee Awards* §21.7 ("In class actions whose primary objective is to recover money damages, settlements may be negotiated on the basis of a lump sum that covers both class claims and attorney fees. . . . [T]he sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel.").

The majority of courts accept the percentage-of-recovery methodology to determine the

amount of the common benefit fee in a mass tort setting where a common fund is created.  Since

the issuance of the *Report of the Third Circuit Task Force, Court Awarded Attorneys Fees*, 108

F.R.D. 237 (1985) in 1985, virtually every circuit court, including the Fifth Circuit, has joined

the United States Supreme Court in approving use of the percentage-of-the-fund method in

common fund cases.  *See, e.g.*, *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza

Hotel Fire Litig.*, 56 F.3d 295, 308 (1ˢᵗ Cir. 1995) ("the court below did not err in proposing to

allocate fees based on the POF method, emphasizing the attorneys' 'relative contribution' to the

creation of the Fund"); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005)

("The trend in this Circuit is toward the percentage method"); *GMC Pick-Up*, 55 F.3d at 821

(Third Circuit recognizes application of the "percentage-of-recovery method" in mass tort cases

"which do not actually generate a common fund"); *Rawlings v. Prudential-Bache Props.*, 9 F.3d

513, 515-17 (6ᵗʰ Cir. 1993); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564-65 (7ᵗʰ Cir. 1994);

*Johnston*, 83 F.3d at 246 (8ᵗʰ Cir. 1996); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 774-75

(9ᵗʰ Cir. 1977); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9ᵗʰ Cir.

1994); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10ᵗʰ Cir. 1994) (authorizing percentage approach and

holding that use of lodestar/multiplier method was abuse of discretion); *Camden I Condo. Ass'n

v. Dunkle*, 946 F.2d 768, 774 (11ᵗʰ Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task

Force Report, and . . . cases from other circuits, we believe that the percentage of the fund

approach is the better reasoned in a common fund case."); *Swedish Hosp. Corp. v. Shalala*,1 F.3d

1261, 1271 (D.C. Cir. 1993) (percentage of the fund recovered is the *only* permissible measure of

awarding fees in common fund cases).

The Fifth Circuit recently accepted the principle in 2012.  *See Union Asset Management*

*Holding, A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012).  In *Dell*, the Fifth Circuit permitted

district courts discretion to choose between  a percentage award or a lodestar analysis in

awarding a common fund fee provided that whatever method is employed it is informed by the

traditional standards of *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974):

> We join the majority of circuits in allowing our district courts the
> flexibility to choose between the percentage and lodestar methods
> in common fund cases, with their analyses under either approach
> informed by the *Johnson* considerations.

*Dell*, 669, F.3d at 644.[225]  Some commentators consider the *Dell* opinion to have advanced a

hybrid approach to percentage fee awards referred to as a "blended approach."  *See Common*

---

[225]  Judge Vance of the Fifth Circuit, in his separate opinion in *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 337 n.1 (5th Cir. 1978), anticipated the Fifth Circuit's trend away from the lodestar method:

> [I]f mechanically applied, the hourly rate approach almost
> inevitably leads to an unsatisfactory result in this type of litigation.
> This method of compensation–which equates professional services
> to those of laborers and mechanics–frequently has little or no
> relationship to the value of the services performed in anything but
> the most routine work.  A flash of brilliance by a trial lawyer may
> be worth far more to his clients than hours or days of plodding
> effort.  Few among us would contend that an operation by a gifted
> surgeon who removes an appendix in fifteen minutes is worth only
> one-sixth that performed by his marginal colleague who requires an
> hour and a half for the same operation.

In fact, many district courts in the Fifth Circuit employed the percentage award method well before *Dell*'s endorsement of same.  *See In re Prudential-Bache Energy Income Partnership Securities Litigation*, 1994 WL 150742, *4 (E.D. La. Apr. 13, 1994); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003) ("A percentage fee approach, as opposed to a lodestar computation, is the preferred method for determining awards of attorneys' fees in common fund, or class action, cases."); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 967 n.15 (E.D. Tex. 2000) ("the Fifth Circuit has *never* . . . reversed a district court judge's decision to award a fee as a percentage"); *Vioxx*, 760 F. Supp. 2d at 650-51 (employing a blended percentage award).

102

*Benefit Fees*, 74 La.L.Rev. at 385-86 & n.62.  In essence, under this blended approach to common fund fee awards, an initial benchmark percentage is selected, followed by adjustments from a lodestar cross-check based upon the *Johnson* factors.[226]  *Id.* at 385 n.61, *citing Vioxx*, 760 F. Supp. 2d 640; *Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007); and other cases.  The percentage-of-fund or lodestar methods have proven themselves over time in standard common benefit fee settings.

The application of these principles to the unique factual situation presented by the inter-related settlements presented to this Court requires special consideration.  In particular, unlike the common benefit fee awards addressed only to common benefit counsel in the many cases referenced above, none presented the district court with an amalgam of several discrete class action settlements from which a global fee award was requested.  For that matter, none of the fee awards presented simultaneous consideration of a global award of attorneys' fee to both individually retained counsel *and* class counsel/common benefit counsel.  Because of the hybrid situation this petition presents to the Court, a singular percentage award does not easily lend itself to reaching the proper award.  To find the right fit, the percentage award will, by necessity, need to reflect a range of percentage awards (*e.g.*, 32% for the InEx, Banner, Global, and Virginia Settlements, and 14.5% for the Knauf Settlement) that may subsequently be expressed

---

[226]  The twelve *Johnson* factors are well known to courts in this circuit:  (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.  *Johnson*, 488 F.2d at 717-19.

as a blended percentage.  When similar concerns were presented to the courts in *Vioxx* and *Evans*, in order to recognize the interests of privately retained counsel, these courts recognized that percentages ranging from 32% to 40% were permissible.  Comparatively speaking the global award requested here is much lower, and should be granted.

### D. Principles Governing Determination of an Appropriate Fee Award under *Johnson*.

The application of the *Johnson* factors to the requested global fee award is not necessarily required by *Dell* since the hybrid determination of a global fee award extends beyond the common fund percentage award and reaches the retainer contracts between individually retained counsel and their clients.  *See Dell*, *supra* (addressing only percentage awards of common funds).  In *Vioxx*, 574 F. Supp. 2d at 617-18, where the Court set an overall cap on counsel fees, no *Johnson* factor analysis applied.  However, because of the integral nature of our request, in order to determine the total fees available to be awarded we cannot ignore the *Johnson* factor analysis.[227]  Thus, only out of an abundance of caution, we engage in an abbreviated *Johnson* factor analysis, which supports the hybrid award.

The requested global fee award is especially proper and consistent with the Fifth Circuit edict where the attorneys have created a common benefit fund, as was accomplished in this case *sub judice*.  In recent experience, district courts within the Fifth Circuit allowed a global fee award of 32% in *Vioxx*, where the common fund created was valued at $4.85 billion, and in *Evans*, both individually retained and common benefit counsel were permitted to recover 39.22%

---

[227] As previously noted, in Step Five of the proceedings contemplated by the Court in Pretrial Order No. 28, a more rigorous *Johnson* factor analysis will of necessity be required.

of a fund valued at \$13.5 million.  As demonstrated below, and as set forth above in Section III

and in the 2014 Herman-Levin Decl. (Exhibit A hereto), providing a detailed summary of the

PSC's common benefit efforts in this litigation, the requested award here is fully justified by an

evaluation of each of the *Johnson* factors.

> 1.    ***The Time and Labor Required***

Assembling, administrating and successfully resolving an MDL of the magnitude of this

case is a very tall order.  During the course of this litigation, approximately 10,000 Plaintiffs

were on file in the MDL and thousands of Defendants and their insurers were in litigation.

Consequently, countless tasks existed that were necessary to marshal such a large, disparate

group.  Indeed, given the adversary nature of this litigation, much attention had to be expended to

manage the docket and develop the caseload for matters both expected and unexpected.  Given so

many moving parts, to direct the assemblage efficiently and effectively, the PSC was obliged to

negotiate case management orders, engage in extensive discovery involving thousands of

documents from the major Defendants and third parties, develop Plaintiff Profile Forms as well

as Defendant Profile Forms, and expend tens of thousands of hours on pleadings and complex

motions practice.

Early on, the PSC began preparing Omni Complaints, which required sweeping efforts to

investigate the parties responsible for Chinese Drywall and its importation and delivery to the

United States for installation in Plaintiffs' homes, compile the material allegations against

Defendants based on diverse governing state laws, and engage in the prolix, time-consuming and

expensive efforts to perfect service of process on the foreign Defendants through the Hague

Convention.  Extensive motions practice, including motions to dismiss based upon the economic

loss doctrine, jurisdictional issues, pollution exclusion provisions in insurance, and other issues were briefed and argued.  The PSC conducted several bellwether trials that required the expenditure of enormous resources in time, effort and money.  Assembling lay and expert witnesses, exhibits, deposition, video testimony and other trial materials engaged the trial teams that were assembled and many PSC Members who were constantly and consistently occupied in ensuring that the task of proving the Plaintiffs' claims was accomplished.

Tremendous efforts were also made to globally resolve the litigation.  The leadership of the MDL devoted themselves to negotiating the terms of the various inter-related settlements to expeditiously and efficiently obtain compensation and remediation for all of the clients participating in the settlements.  And, for those Defendants, particularly the Taishan Defendants, who refused to answer the claims against them and did not participate in the class settlements, the PSC will relentlessly continue to pursue those parties.

Overall, the PSC, common benefit counsel, and others reported 245,871.19 hours of attorney and para-professional time expended on common benefit CDW litigation as of December 31, 2013, pursuant to Pretrial Order No. 9 or 9A.[228]  The actual hourly rate reported by each professional submitting time to Mr. Garrett at the inception of the litigation multiplied by the number of hours reported results in a total of $119,864,907.65.[229]

### 2.    *The Novelty and Difficulty of the Questions Involved*

The corrosive environment created by the off-gassing of reduced sulpher gasses from

---

[228]  *See* Garrett Affidavit, ¶ 15 (Ex. 4 to the 2014 Herman-Levin Decl.).

[229]  *Id*. at ¶ 16.

Defendants' defective drywall introduced petitioners into a new area of science.  The scientific

knowledge needed to understand this phenomenon and the legal arguments needed to address the

matter were highly technical and difficult, yet due to the perseverance of petitioners we were able

to persuade the Settling Defendants and their insurers to agree to the terms of the several class

action settlements.

Throughout this litigation, the Court has repeatedly been reminded of the complex nature

of this prolix multidistrict, multi-party litigation.  Indeed, in rendering final approval of the

settlements, the court noted: "the litigation is complex, expensive, uncertain, and has the

potential for lengthy duration."  *Chinese Drywall*, 2013 WL 499474 at *10.  Finally, the novelty

of the layered settlements achieved reflects the creativity of counsel who developed a platform by

which this massive litigation could be efficiently resolved.

### 3.      *The Skill Requisite to Perform the Legal Service Properly*

The skill necessary to bring about the result achieved here was not ordinary.  Counsel's

success in confronting the difficult and complex issues presented by this litigation and in

ultimately obtaining so much relief for so many individuals should be rewarded.  This litigation

required considerable skill and experience to bring it to such a successful conclusion.  The ability

of Plaintiffs' counsel to obtain these innovative settlements in the face of formidable legal

opposition confirms the superior quality of our representation.

### 4.      *The Preclusion of Other Employment by the*
### *Attorney Due to Acceptance of the Case*

This factor is not pertinent to the overall fee award requested at this time, but will become

relevant when the matter of the common benefit award is determined as some counsel devoted

their entire practice to this litigation for sustained periods of time.

### 5.      *The Customary Fee*

Recently, this Court determined that global reasonable fees for a large litigation, such as

this case, could range between 33% - 40%, but selected a 32% cap while leaving until a later

time to address separately the appropriate common benefit award.  *Vioxx,* 574 F. Supp. 2d at 607.

In *Evans*, the court selected an even higher rate of 39.22% for the global award of attorneys' fees.

*See* discussion, *supra*.  Given these ranges in value, the amount requested here, 32% for the InEx,

Banner, Global, and Virginia Settlements, and 12.7% for Knauf Settlement, is eminently

reasonable.

### 6.      *Whether the Fee Is Fixed or Contingent*

All Plaintiffs' counsel undertook this litigation on a contingent fee basis, assuming a

substantial risk that the litigation would yield no recovery and leave them uncompensated.

Courts have consistently recognized that the risk of receiving little or no recovery is a major

factor in considering an award of attorneys' fees.  *See, e.g.*, *In re Enron Corporation Securities,*

*Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008).

The time in which to evaluate the risk is *ex ante*, *i.e.*, as of the time suit was initiated, not

with the benefit of hindsight.  *See Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991).

Where counsel face such substantial risks and recover significant compensation for their clients,

courts find this factor to favor the fee applicant.  *See Enron*, 586 F. Supp. 2d at 796.

### 7.      *Time Limitations Imposed by the Client or the Circumstances*

This Court has frequently noted the potential for MDL litigation to become so bogged

down as to warrant the appellation of a "black hole."  Mindful of this potential morass, the Court

has used every device available to it to avoid such a consequence.  The Court has regularly held monthly status conferences and employed "hands-on" management to see that discovery was being conducted promptly and that the litigation was progressing at an appropriate rate. Bellwether trials occurred with unprecedented speed.  Always, counsel worked extremely hard to meet the Court's deadlines.  Counsel were keenly aware of this Court's fierce determination to force them to obtain trial verdicts, mature the litigation, and get to the point where compromise could be accomplished.  This strategy proved itself to be successful and petitioners submit that the requested global award is justified.

### 8.    *The Amount Involved and the Results Obtained*

The eighth *Johnson* factor – the amount involved and the results achieved – is entitled to significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the plaintiffs.  As the Supreme Court has observed, "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983).  *See also Migis v. Pearle Vision, Inc.*, 135 F.3d 1041, 1047 (5th Cir. 1998) (". . . Where recovery of private damages is the purpose, . . . consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern.").  The inter-related settlements provide remediation and other relief totaling approximately $1.1 billion to resolve all of the eligible claimants' damages.  The Settling Defendants are paying 100% of the costs of settlement administration, which is ongoing, and the Knauf Defendants have agreed to pay $160 million in attorneys' fees and costs.  By any measure, the nine class settlements are an outstanding result.  Given such an outstanding result, this, the most important factor, amply supports the requested fee award.

### 9.      *The Experience, Reputation, and Ability of the Attorneys*

When this MDL litigation began, the Court underwent an arduous vetting and selection

process to obtain experienced, reputable and able counsel to participate on the PSC.  *See* Pretrial

Order No. 8.  Since then, the Court has reappointed PSC Members for one-year terms.  *See*

Pretrial Order Nos. 8A, 8B, 8C, and 8D.  This factor supports the requested percentage here.

### 10.      *The "Undesirability" of the Case*

The risks presented by taking on such a massive case were daunting at the inception of

this litigation.  The fact that the manufacturers of Chinese Drywall were foreign entities located

halfway around the world posed a high degree of risk and caution because of the anticipated

service problems, travel expenses, and the potential collectibility problems of a judgment against

foreign defendants.  Nevertheless, the case was not undesirable as the client-base was comprised

of innocent victims of a patently defective product.

### 11.      *The Nature and Length of the Professional*
### *Relationship with the Client*

This *Johnson* factor was designed to consider those instances when, "a lawyer in private

practice may vary his fee for similar work in the light of the professional relationship of the client

with his office."  *Johnson,* 488 F.2d at 719.  This factor is therefore neutral as it relates to the

requested fee award since there are few, if any, longstanding client relations with the CDW

claimants.  As this Court pointed out in *Murphy Oil*, "'the relationship did not antedate the

litigation, nor will it likely continue beyond the closure of this case,' other than as it relates to

this litigation."  *Murphy Oil*, 472 F. Supp. 2d at 866-67, *quoting*, *In re ETS*, 447 F. Supp. 2d 612,

632 (E.D. La. 2006).  Accordingly, little weight is to be afforded this factor.

### 12.   *Awards in Similar Cases*

All but two of the *Johnson* fee adjudication factors are abstract in that they do not purport to have any mathematical correlation to the computation of an appropriate percentage award. The final *Johnson* factor provides guidance as to how to concretize abstract consideration of the other factors into a definitive percentage fee award.  That factor prescribes consideration of "awards in similar cases."  *Johnson*, 448 F.2d at 719.  Such consideration is a dominant feature of contemporary percentage-of-the-fund fee adjudication.  *See*, *e.g.*, *Dell*, *supra.*

As demonstrated above, the requested percentages are well within the range of percentages that have been awarded by courts in this Circuit.  *See* discussion, *supra* at Section V.B.  Accordingly, the "awards in similar cases" factor powerfully argues in support of the reasonableness of the fee requested.

*   *   *

There is no doubt that the hybrid global fee requested is well within the range of awards established by other courts employing the same rigorous analysis.  Indeed, the requested percentage award falls in the lower end of such awards.  As the other *Johnson* factors fully endorse the requested fee, the global fee requested should be awarded.

### F.   <u>Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses.</u>

The relevant fee jurisprudence authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of plaintiffs' in MDL litigation.  *See Sprague v. Ticonic*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Camden I Condominium Ass'n*, 946 F.2d at 771 ("In accordance with the well-established common fund exception to the American

111

Rule, . . . class counsel . . . are entitled to an award of their . . . expenses out of the fund that has been created for the class by their efforts"); *In re Quintus Sec. Litig.*, 148 F. Supp. 2d 967, 973 (N.D. Cal. 2001); *In re Orthopedic Bone Screw Prod. Liab. Litig.*, 2001 WL 1622741, *9-*10 (E.D. Pa. 2001) (awarding 5% of the gross recovery for reimbursement of litigation expenses). Accordingly, reimbursement of costs should be separately recognized and provided for in any fee award by the Court.

Based upon the records maintained by Mr. Garrett and as set forth in his Affidavit (2014 Herman-Levin Decl. Ex. 4), as of December 31, 2013, the law firms submitting expenses to the Court-appointed CPA pursuant to Pretrial Order No. 9 or 9A, which includes the PSC and common benefit counsel, have incurred $4,598,113.97 in Held Costs, and common benefit counsel have contributed $11,335,000 in assessments towards the funding of this litigation.[230]  A substantial portion of the common benefit assessments ($9,148,000) has been reimbursed previously, but $2,187,000 in assessments remain outstanding.  The Joint Petitioners' cost reimbursement request of $5,547,011.68 should be found reasonable and reimbursement of these costs should be awarded.[231]  In addition, counsel are also entitled to reimbursement of reasonable costs of individual home inspections in an amount to be determined by the Court.

---

[230]  *See* Garrett Aff., ¶¶ 19 - 21.

[231]  In addition, as explained earlier, the costs of individual Virginia state court cases should be considered common benefit costs and reimbursed as part of this global fee petition.

## VI.    <u>CONCLUSION</u>

As provided under Pretrial Order No. 28, the filing of this joint petition for a global award of attorneys' fees and reimbursement of costs is the first step in a series of petitions regarding compensation for all Chinese Drywall Plaintiffs' counsel.  This initial joint petition was prepared with input from all members of the Fee Committee, which includes PSC Members and individually retained counsel, and the brief makes no argument regarding any division of fees among the various interests.  The section of this Memorandum addressing Individual Homeowner Representation (Section III.A.4) was based on a report by a Fee Committee Member who has predominantly handled individual cases, and the sections of the Memorandum addressing the efforts of the PSC and common benefit counsel were prepared by Plaintiffs' Lead Counsel, Plaintiffs' Liaison Counsel, and other Fee Committee Members and assigned common benefit counsel.  As set forth above, the intent of the Joint Petitioners here is to seek an overall sum of money, which will later be allocated among the PSC, other common benefit counsel, and individually retained attorneys, without advocating a position at this time on how the allocation should be made.

The global request for attorneys' fees and cost reimbursements is more than reasonable and justified under the law.  The Joint Petitioners respectfully request that their petition be granted.

Respectfully submitted,


Dated: May 16, 2014                     /s/ Russ M. Herman
                                        Russ M. Herman, Esquire (Bar No. 6819)
                                        (On the Brief)
                                        Leonard A. Davis, Esquire (Bar No. 14190)
                                        (On the Brief)
                                        Stephen J. Herman, Esquire (Bar No. 23129)
                                        HERMAN, HERMAN & KATZ, LLC
                                        820 O'Keefe Avenue
                                        New Orleans, LA 70113
                                        Phone: (504) 581-4892
                                        Fax: (504) 561-6024
                                        Ldavis@hhklawfirm.com
                                        *Plaintiffs' Liaison Counsel in MDL 2047*
                                        *Fee Committee Co-Chair/Secretary*


                                        Arnold Levin (On the Brief)
                                        Fred S. Longer (On the Brief)
                                        Sandra L. Duggan (On the Brief)
                                        Matthew C. Gaughan (On the Brief)
                                        LEVIN, FISHBEIN, SEDRAN & BERMAN
                                        510 Walnut Street, Suite 500
                                        Philadelphia, PA 19106
                                        Phone: (215) 592-1500
                                        Fax: (215) 592-4663
                                        Alevin@lfsblaw.com
                                        *Plaintiffs' Lead Counsel in MDL 2047*
                                        *Fee Committee Chair*


**PLAINTIFFS' STEERING COMMITTEE**

| | |
|---|---|
| Dawn M. Barrios (On the Brief) | Daniel E. Becnel, Jr. |
| BARRIOS, KINGSDORF & CASTEIX, LLP | BECNEL LAW FIRM, LLC |
| 701 Poydras Street, Suite 3650 | P.O. Drawer H |
| New Orleans, LA 70139 | 106 W. Seventh Street |
| Phone: (504) 524-3300 | Reserve, LA 70084 |
| Fax: (504) 524-3313 | Phone: (985) 536-1186 |
| Barrios@bkc-law.com | Fax: (985) 536-6445 |
| *Fee Committee Member* | dbecnel@becnellaw.com |

114

Robert C. Josefsberg
PODHURST ORSECK, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler
STECKLER LLP
12720 Hillcrest Road - Suite 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez
COLSON HICKS EIDSON
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com

Ben W. Gordon, Jr.
LEVIN, PAPANTONIO, THOMAS, MITCHELL
 ECHSNER & PROCTOR, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
LAMBERT AND NELSON
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier (On the Brief)
GAINSBURGH, BENJAMIN, DAVID, MEUNIER
 & WARSHAUER, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com
*Fee Committee Member*

Jerrold Seth Parker
PARKER, WAICHMAN, ALONSO, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
MORGAN & MORGAN
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves, Jr.
REEVES & MESTAYER, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher A. Seeger (On the Brief)
Scott Alan George (On the Brief)
SEEGER WEISS, LLP
77 Water Street, 26th Floor
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com
*Fee Committee Member*

Daniel K. Bryson
WHITFIELD BRYSON & MASON LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5035
dan@wbmllp.com

Richard J. Serpe (On the Brief)
LAW OFFICES OF RICHARD J. SERPE
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com
*Fee Committee Member*

Victor M. Diaz, Jr.
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis (On the Brief)
Kristen Ward Broz (On the Brief)
HAUSFELD LLP
1700 K Street, NW, Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
LEMMON LAW FIRM, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino (On the Brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

**FEE COMMITTEE MEMBER**

Michael J. Ryan (On the Brief)
KRUPNICK CAMPBELL MALONE
BUSER SLAMA HANCOCK LIBERMAN
12 S.E. Seventh Street, Suite 801
Fort Lauderdale, FL 33301
Phone: (954) 763-8181
Fax: (954) 763-8292
*Fee Committee Member*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 16th day of May, 2014.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*
*Co-counsel for Plaintiffs*

117