**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON** |
| **THIS DOCUMENT RELATES TO:** **ALL ACTIONS** | |

## DECLARATION OF RUSS M. HERMAN AND ARNOLD LEVIN

Russ M. Herman and Arnold Levin declare, pursuant to 28 U.S.C. §1746, based upon their personal knowledge, information and belief, the following:

1.  We submit this Declaration in support of the consolidated joint petition of the Fee Committee and the Plaintiffs' Steering Committee ("PSC") for a global award of attorneys' fees and reimbursement of expenses, filed pursuant to PTO 28 (the "Global Fee Brf.").

2.  This Court appointed Russ M. Herman as Plaintiffs' Liaison Counsel in *In re: Chinese-Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (E.D. La.), and set forth the duties and functions of PLC, pursuant to PTO 3.  The Court also appointed Mr. Herman as an ex-officio member of the PSC, pursuant to PTO 8, and as the Co-Chair/Secretary of the Fee Committee, pursuant to PTO 28.  Mr. Herman has extensive and vast experience in class action and multidistrict litigation.

3.  The Court appointed Arnold Levin as Plaintiffs' Lead Counsel and as a member of the PSC, pursuant to PTO 8, and as Chair of the Fee Committee, pursuant to PTO 28.  Mr. Levin has extensive and vast experience in class action and multidistrict litigation.

1

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

4.  The Court appointed the PSC and set forth the functions and duties of the PSC in PTO 8.

5.  PTO 9A was complied with, which required distribution of PTO 9A as well as time and expense standards and procedures set forth in PTO 9 to: (1) all counsel associated with state court Chinese Drywall Litigation who may be engaged in state court common benefit activities, and (2) to members of the Plaintiffs' State/Federal Coordination Committees appointed pursuant to PTO 19 for distribution to all known Plaintiffs' State Court Counsel.

6.  Attached hereto are true and correct copies of exhibits being submitted in support of the Global Fee Brf.  These exhibits are as follows: (1) Exhibit 1, Chart of Ongoing Costs of Administration Paid by Settling Defendants, (2) Exhibit 2, a List of Defendants named in Omnibus Complaints, (3) Exhibit 3, a List of Counsel Seeking Compensation for Common Benefit Attorneys' Fees and Reimbursement of Expenses Pursuant to PTO 28, (4) Exhibit 4, Affidavit of Philip A. Garrett, CPA, (5) Exhibit 5, Villa Lago class settlement Letter Agreement, (6) Exhibit 6, a Chart of PSC Court Appearances from Inception through December 31, 2013, (7) Exhibit 7, an Index and Appendix containing Judge Hall's Chinese Drywall Orders, (8) Exhibit 8, a List of Virginia Trial Settings, (9) Exhibit 9, a Chart of Motions, briefs and other Virginia court filings in the insurance litigation, (10) Exhibit 10, *Seifart v. Banner Supply* Verdict, (11) Exhibit 11, a Chart of Discovery Propounded by the PSC, (12) Exhibit 12, a Chart of Discovery Responded to by the PSC, (13) Exhibit 13, a Chart of PSC FOIA Requests, (14) Exhibit 14, Press Release and Letter to Taishan Gypsum Co., Ltd. from Senators, dated Feb. 26, 2014, (15) Exhibit 15, a Chart of PSC Discovery Motions, (16) Exhibit 16, a Chart of Common Benefit Depositions, (17) Exhibit 17, a Chart of PSC Pleadings, Motions, and Other Filings, (18) Exhibit 18, a Chart

2

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

of Plaintiffs' Experts, (19) Exhibit 19, a Chart of Defendants' Experts, and (20) Exhibit 20, a

Chart of Voluntary Common Benefit Payments into Court Registry (filed under seal).  Exhibits 2,

3, 6, 7, 8, 9, 11, 12, 13, 15, 16, 17, 18, and 19 are charts summarizing relevant pleadings, filings,

discovery motions, requests and/or responses, expert reports and orders involving the CDW

proceedings in this Court as well as in coordinated state court litigation, which were filed on the

docket and/or served on the parties.  Exhibit 1 was prepared based on settlement administration

cost records provided by counsel for the Knauf Defendants, the *Pro Se* Curator, the Ombudsman,

the Settlement Administrator, the Special Master, and the Court-appointed CPA.  The

information contained in Exhibit 20 reflects voluntary common benefit payment deposits into the

Court registry pursuant to Court order, and is filed under seal.  We attest that all exhibits were

accurately prepared and/or presented to the best of our ability.

**<u>INTRODUCTION</u>**

7.  The substantial hurdles presented by this extremely complex, predominantly property

damage, *sui generis* Chinese Drywall litigation against more than 1,650 Defendants, many of

them located half way around the globe, are unprecedented.  Against tremendous odds and at

great expense, the PSC and/or individually retained counsel dedicated themselves for over five

years to (i) identifying responsible parties, many of them difficult to find and/or defunct, (ii)

serving foreign manufacturers, their parents, alter egos and agents with novel Omnibus

Complaints through the Hague Convention, (iii) coordinating the prosecution of claims on behalf

of thousands of Plaintiffs from numerous and diverse jurisdictions in the MDL, state courts, and

Courts of Appeals (iv) traveling the world to conduct jurisdictional and substantive discovery,

and (v) fighting dismissals and other motions in the MDL and Courts of Appeals.  Their

3

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

unwavering, consistent and intensive efforts have produced a series of unique interrelated and interdependent class action settlements that provide up to $1.1 billion in substantial benefits to the victims of Chinese-Manufactured Drywall ("CDW" or "Chinese Drywall").

8. After the devastation of Hurricanes Katrina and Rita in 2005 and a critical shortage of domestic drywall, Chinese Drywall was imported to the United States and used in the construction and reconstruction of thousands of properties, primarily in the Gulf Coast states and along the East Coast. Once installed, this defective product produced particularly unpleasant "rotten egg" odors and caused corrosion to metal plumbing, electrical wiring, sprinkler systems, HVAC systems, appliances, utensils, mirrors, jewelry and other property in Plaintiffs' homes containing copper or silver. Owners and residents were forced to evacuate their homes, incur expenses for relocation and alternative living arrangements, and either expend large sums of money to remediate their properties themselves or await relief in the court system and risk foreclosure and suffer other damages including diminished property values.

9. Unfortunately, in most cases the names of the manufacturers of the drywall could not be ascertained without drilling holes in the walls to inspect the back of the plasterboard for identifiable markings or without further destructive testing. Even once identified, however, these manufacturers were foreign entities not easily located or amenable to service of process. Moreover, the potentially responsible importers, suppliers, distributors, builders, and installers who handled CDW in the United States, and their insurers, were also difficult to identify and bring into the litigation. The PSC created an innovative legal vehicle that brought more than 1,650 Defendants into this MDL, *see* List of Defendants (Exhibit 2 hereto), through 18 Omnibus ("Omni") Complaints on behalf of approximately 10,000 Plaintiffs from numerous jurisdictions,

4

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

including Louisiana, Florida, Texas, Alabama, Mississippi, North Carolina, South Carolina,

Georgia, Tennessee, and Virginia, who alleged property damages and/or personal injury resulting

from CDW.  *See Payton, et al. v. Knauf Gips, KG, et al.*, No. 09-7628 (E.D. La.) (Omnibus I,

I(A), I(B), I(c); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, No.

10-361 (E.D. La.) (Omnibus II, II(A), II(B), II(c); *Gross, et al. v. Knauf Gips, KG, et al.*, No.

09-6690 (E.D. La.) (original complaint, Omnibus III, III(A)); *Rogers, et al. v. Knauf Gips, KG, et

al.*, No. 10-362 (E.D. La.) (Omnibus IV, IV(A), IV(B), IV(c)); *Amato, et al. v. Liberty Mutual

Ins. Co.*, No. 10-932 (E.D. La.) (Omnibus V); *Hernandez, et al. v. AAA Ins., et al.*, No. 10-3070

(E.D. La.) (Omnibus VI); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe

Dongxin Co., Ltd., et al.*, No. 11-080 (E.D. La.) (Omnibus VII); *Abreu, et al. v. Gebrueder Knauf

Verwaltungsgesellschaft, KG, et al.*, No. 11-252 (E.D. La.) (Omnibus VIII); *Haya, et al. v.

Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, No. 11-1077 (E.D. La.)

(Omnibus IX); *Block, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No.

11-1363 (E.D. La.) (Omnibus X); *Benoit, et al. v. Lafarge S.A., et al.*, No. 11-1893 (E.D. La.)

(Omnibus XI); *Arndt, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*, No.

11-2349 (E.D. La.) (Omnibus XII); *Almeroth, et al., v. Taishan Gypsum Co., Ltd., et al.*, No.

12-0498 (Omnibus XIII); *Cassidy, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*,

No. 11-3023 (E.D. La.) (Omnibus XIV); *Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a

Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1672 (Omnibus XV); *Amorin, et al. v. Taishan

Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-1395 (Omnibus XVI);

*Amorin, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No.

11-1673 (Omnibus XVII); *Beane, et al. v. Gebrueder Knauf Verwaltungsgesellschaft, KG, et al.*,

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

No. 13-609 (Omnibus XVIII).

10.  The PSC and other common benefit counsel have worked tirelessly since early 2009 to identify and locate the manufacturers of Chinese Drywall, as well as their related alter egos and agents, and then translate and serve Plaintiffs' complaints on numerous foreign entities in China, Germany, France, Brazil, Australia, Canada, Indonesia, Taiwan, and Hong Kong through the incredibly expensive, time-consuming, and complicated process of the Hague Convention. Though the PSC reached a settlement with the Knauf Defendants, these service efforts are still ongoing, as the recalcitrant Chinese entities have refused to accept service or recognize the jurisdiction of this Court.  The PSC has faced numerous significant challenges in attempting to efficiently coordinate and prosecute Plaintiffs' claims against the multitude of foreign and domestic Defendants in this litigation based on a variety of diverse governing state laws.

11.  Accordingly, the class settlements reached to date with more than 700 CDW Defendants are a monumental and unparalleled achievement, considering the great impediments that had to be surmounted.  As a result of hundreds of protracted, arm's-length face-to-face negotiations, telephone conferences, and Court mediations with hundreds of builders, installers, suppliers and manufacturing Defendants and their insurers, the PSC reached a series of nine separate, but interrelated and interdependent class settlements with:  (1) the Knauf Defendants[1] (the "Knauf Settlement"); (2) supplier Interior Exterior Building Supply, LP ("InEx") and its

---

[1]  The Knauf Defendants include:  Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong Knauf New Building Material Products Co., Ltd., Knauf Gips KG, Gebr. Knauf Verwaltungsgesellschaft KG, Knauf International GmbH, Knauf Insulation GmbH ("KI"), Knauf UK GmbH, Knauf AMF GmbH & Co. KG, Knauf do Brasil Ltda. and PT Knauf Gypsum Indonesia.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

insurers[2] (the "InEx Settlement"); (3) the Banner entities[3] and their insurers[4] (the "Banner

Settlement"); (4) L&W Supply Corporation ("L&W") and USG Corporation (the "L&W

Settlement"); (5) more than 700 Participating Builders, Suppliers, Installers, and their

Participating Insurers (the "Global Settlement"); and (6) Builders Mutual Insurance Company

("Builders Mutual"),[5] Nationwide Insurance Company ("Nationwide"),[6] Porter-Blaine/Venture

Supply/Insurers,[7] and Tobin Trading/Builders Plaster & Drywall/JMM Drywall/Insurers[8]

(together, the four "Virginia Settlements").

    12.  All of these settlements are centered around and based on the principal Knauf

---

[2]  InEx's Insurers that have entered into a class settlement include Arch Insurance Company ("Arch") and Liberty Mutual Fire Insurance Company ("Liberty").

[3]  The Banner entities include:  Banner Supply Co., Banner Supply Co. Pompano, LLC, Banner Supply Co. Port St. Lucie, LLC, Banner Supply Co. Ft. Myers, LLC, Banner Supply Co. Tampa, LLC, Banner Supply International, LLC, and any other entity insured under the Banner Insurance Policies (collectively, "Banner").

[4]  Banner's Insurers include:  Chartis Specialty Ins. Co. (formerly known as "American International Specialty Lines Ins. Co."), Illinois National Ins. Co., National Union Fire Ins. Co. of Pittsburgh, Pa., Commerce & Industry Ins. Co., FCCI Ins. Co., FCCI Commercial Ins. Co., National Trust Ins. Co., FCCI Mutual Ins. Holding Co., FCCI Group, Inc., FCCI Ins. Group, Inc., Monroe Guaranty Ins. Co., FCCI Services, Inc., FCCI Advantage Ins. Co., Brierfield Ins. Co., FCCI Agency, Inc., Hanover American Ins. Co., Hanover Ins. Group, Inc., Maryland Casualty Co. and all companies in the Zurich North America group of insurance companies.

[5]  The Participating Defendants in the Builders Mutual Settlement are identified on Exhibit 1 to the Settlement and the Participating Insurers are identified on Exhibit 2 thereto.

[6]  Nationwide includes Nationwide Mutual Ins. Co., Nationwide Mutual Fire Ins. Co., and Nationwide Property and Casualty Ins. Co.  The Participating Defendants in the Nationwide Settlement are identified on Exhibit 1 to the Settlement.

[7]  The Settling Defendants are Porter-Blaine Corp. and Venture Supply, Inc. and their Participating Insurers, Hanover and Citizens Ins. Co. of America.

[8]  The Participating Defendants in the Tobin Trading Settlement are identified on Exhibit 1 to the Settlement, and the Participating Insurers are State Farm Fire and Casualty Co. and State Farm Fla. Ins. Co.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Settlement, which creates an <u>uncapped</u> Remediation Fund (to which certain funds from the supplemental class settlements, *i.e.*, the InEx, Banner, L&W, Global, and Virginia Settlements, are added). This Remediation Fund provides owners of properties containing KPT Chinese Drywall with comprehensive and complete remediation and/or cash benefits so that displaced owners and residents can return to their properties free of Chinese Drywall. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 2013 WL 499474 (E.D. La. Feb. 7, 2013) (Knauf, Banner, InEx, L&W, and Global Settlements). To date, over 4,000 homes have been completely remediated or are in the process of remediation under this program.

13. In addition to the remediation benefits, a reserve referred to as an "Other Loss Fund" has been established with more than $100 million to compensate homeowners, commercial building owners and tenants of Affected Properties for "other losses" arising from CDW, including alternative living expenses, personal property damage, property maintenance costs (including utility bills, insurance, property taxes and maintenance of landscaping), moving and storage expenses, losses resulting from lost use, sales and rentals, sales in mitigation or foreclosures, and/or bodily injuries.

14. Importantly and significantly, on top of the remediation and other loss benefits provided under these Settlements, the Knauf Defendants have agreed to pay separately $160 million in attorneys' fees and costs to compensate the PSC, common benefit counsel authorized and working at the direction of the PSC, other common benefit counsel, and individually retained counsel (together, the "Joint Petitioners") for all preparation and litigation work performed on behalf of any Participating Class Member or the Class. *See* Third Amended Knauf Settlement, Section 14.2. Knauf is also paying and will continue to pay 100% of the costs of administration

8

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

of the uncapped Remediation Fund and the Other Loss Fund (*e.g.*, Settlement Administrator, *Pro Se* Curator, Ombudsman, Inspectors and Environmental Certification Providers, Special Master, and settlement-related Court-appointed CPA charges), through interest earned on deposits in the funds, or otherwise.  Knauf Settlement, Sections 4.2.6 & 4.6.5.  *See also* Chart of Ongoing Costs of Administration Paid by Settling Defendants (Exhibit 1 hereto).  Normally, these costs would be borne by class members.

15.  Thus, individual Participating Class Members will not be responsible for payment of attorneys' fees or costs out of their recovery of benefits under the Knauf Settlement, except for recoveries on bodily injury claims,  *id*. at Section 4.7.2.7, which is an additional significant benefit for Class Members.

16.  Pursuant to Pretrial Order. No. 28 (¶¶ 4 & 15), 42 Law Firms submitted Initial Affidavits and/or Second Affidavits to the Fee Committee, summarizing their common benefit contributions to this litigation.  These counsel, seeking compensation for common benefit attorneys' fees and reimbursement of expenses, are listed on the Chart attached hereto as Exhibit 3.  Additional firms, *e.g.*, Weinburg, Wheeler, Hudgins, Gunn & Dial (counsel for Banner, a Settling Defendant), submitted time and expenses to the Court-appointed CPA Philip A. Garrett, pursuant to PTO 9 or 9A, but did not provide Affidavits to the Fee Committee pursuant to PTO 28.  The PSC takes the position that counsel for Banner (or any other entity in any of the CDW chains of distribution for that matter) are not entitled to any attorneys' fees to be awarded by the Court, beyond what they have already been paid by their clients, as they have not created any common benefit for the Plaintiffs.  On the contrary, the PSC and common benefit counsel created a benefit for Banner by bringing the manufacturing Defendants into the litigation, by creating an

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

uncapped fund that will provide comprehensive remediation benefits and/or cash payments for KPT Property and Mixed Property owners, by obtaining class releases for Banner, and by paying for the Banner class notice after Banner and its insurers refused to do so.  In fact, Banner's insurers, due to the PSC's efforts, funded the entire Banner Settlement thereby saving the Banner entities from their threatened bankruptcy.

17.  Having taken on the significant risks of this litigation and devoted their practices and economic resources to these cases since 2009 with no guarantee of remuneration, the Joint Petitioners are seeking a global award of attorneys' fees and cost reimbursements at this time. Ironically, in addition to creating significant remediation and/or cash benefits for Class Members and supporting unconditionally the remediation of Plaintiffs' properties, the PSC's efforts have also benefitted numerous Defendants.

18.  <u>Suppliers InEx and Banner have been released in exchange for only their insurance money</u>.  In the Global Settlement, the Participating Defendants were released in exchange for the insurance money provided by the Participating Insurers.  The same is true of the Virginia Settlements.  Even Knauf was benefitted by the PSC's efforts and the creation of the InEx, Banner, L&W, and Global Settlements that will provide millions of dollars to the Remediation Fund and the Other Loss Fund, thus lessening Knauf's responsibilities to the class.  The PSC also has provided certain builders who actively pursued this litigation with cash benefits that they will be claiming from the InEx, Banner, and Global Settlements.  Finally, the PSC has conferred a substantial benefit on all builders by supporting the Major Builder Settlements.  *See* Rec. Doc. #10227-6; Rec. Doc. #11279.  The PSC finds itself in the unique position of having not only served its clients but also having conferred substantial benefits on the entities that it sued.

10

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

**GLOBAL FEE REQUESTS**

19.  The Joint Petitioners request a global award of attorneys' fees totaling

$193,552,383.14, plus an amount to be determined for the L&W Settlement, and reimbursement

of costs totaling $5,547,011.68.  On January 17, 2014, this Court granted authorization for the

funding of set-asides for fees and costs from the Knauf, InEx, Banner, Global, Virginia, Villa

Lago Settlements into Qualified Settlement Funds previously approved by the Court.  *See* Rec.

Doc. #17398.  The instant global request for attorneys' fees does not seek fees from the Villa

Lago Settlement, as a separate agreement has been reached with counsel for Villa Lago regarding

common benefit fees.  *See* Villa Lago class settlement Letter Agreement [Exhibit 5 hereto].  Joint

Petitioners' global request for an award of fees and costs has been calculated as follows:

(i)  $142,565,000 for attorneys' fees and costs, including Held Costs, Shared

Costs and Individual Participating Class Members' reasonable inspection costs, from the Knauf

Settlement, which the Knauf Defendants agreed to pay.  The Knauf Defendants agreed as part of

the class settlement to pay the Joint Petitioner $160 million in attorneys' fees and costs.  Knauf

already has made advance payments of $17,435,000 towards this obligation, pursuant to Section

14.7 of the Third Amended Knauf Settlement and Order dated 1/17/2014 [Rec. Doc. #17398].

Of these amounts advanced, the Court has authorized the use of approximately $12 million to

pay Shared Costs and/or reimburse common benefit assessments.  As of March 31, 2014,

approximately $5 million remains, which will be used for ongoing Shared Costs in the litigation,

Subject to Court approval.  A separate fee agreement has been reached with the Knauf

Defendants regarding Class Members who filed lawsuits against these Defendants after

December 9, 2011.  *See* Settlement Agreement Regarding Post-December 9, 2011 Claims

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Against the Knauf Defendants in MDL 2047 [Rec. Doc. #16978-1]. This Global Fee Petition does not address that agreement, and any fees sought or paid pursuant to that agreement will be addressed at a later date.

(ii) $2,560,000 for attorneys' fees from the InEx Settlement (which represents 32% of the InEx Settlement gross value). Pursuant to the InEx Settlement Allocation Plan ("InEx Allocation Plan"), this 32% sum has been set aside for attorneys' fees. *See* InEx Allocation Plan, ¶ 3; The InEx Attorney Fee Settlement Fund; Amended InEx Settlement, Section 16.7.

(iii) $16,986,103.14 for attorneys' fees from the Banner Settlement (which represents 32% of the Banner Settlement gross value). Pursuant to the Second Amended Banner Settlement Allocation Plan ("Banner Allocation Plan"), this 32% sum has been set aside for attorneys' fees. *See* Banner Allocation Plan, ¶ 3; The Banner Attorney Fee Settlement Fund. For certain builders who have actively pursued this litigation and are seeking payments from the Banner Settlement for Affected Properties they repaired, a 22% overage in attorneys' fees will be returned to them, since the Banner Settlement provides for only 10% attorneys' fees to the PSC and common benefit counsel in those cases. *See id.*; Amended Banner Settlement, Section 14.7.

(iv) $23,473,280 for attorneys' fees from the Global Settlement (which represents 32% of the Global Settlement gross value). Pursuant to the Second Amended Settlement Allocation Plan for Settlement Involving Builders, Installers, Suppliers, and Participating Insurers ("Global Allocation Plan"), this 32% sum of the gross value of the Global Settlement, less credits provided for in Section 4.2.1, has been set aside for attorneys' fees. *See* Global Allocation Plan, ¶¶ 2 & 4; The Builders, Installers, Suppliers and Participating Insurers Attorney

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Fee Settlement Fund; Amended Global Settlement, Section 16.6.  There remains a dispute as to what amount in fees and costs should be paid for Affected Properties that were repaired by a Defendant who actively pursued this litigation and/or whose homeowner did not actively pursue litigation.  The Parties have agreed to submit this dispute for resolution by the Court.  *See* Global Allocation Plan, at fn. 1.

(v)  an amount to be determined for attorneys' fees and costs from the L&W Settlement.  *See* L&W Settlement, Section 15.1.

(vi)  $5,568,000, for attorneys' fees from the four Virginia Settlements (which represents 32% of the aggregate gross value of the four Virginia Settlements).  *See* Virginia Settlements Allocation Plan; The Builders Mutual Attorney Fee Settlement Fund; The Nationwide Attorney Fee Settlement Fund; The Porter-Blaine/Venture Supply Attorney Fee Settlement Fund; The Tobin Trading and Installers Attorney Fee Settlement Fund.

(vii) $2,400,000 for attorneys' fees and costs associated with the InEx/North River bellwether trial.  The Knauf Defendants agreed to pay $2.4 million in attorneys' fees and costs to the PSC law firms that conducted the bellwether trial seeking excess insurance funds from North River Insurance Company ("North River") in connection with the InEx Settlement.  Those monies, intended to pay for InEx/North River fees and costs, are being held in a separate supervised account.  *See* Stipulation and Order, 7/31/2013 [Rec. Doc. #16966].  Disbursement and allocation of these funds will be the subject of separate proceedings.

(viii) $5,547,011.68 for reasonable and appropriate cost reimbursement including costs of Notice advanced by the PSC, for the InEx, Banner, Global, and Virginia Settlements. *See* Rec. Doc. #17398; Banner Allocation Plan, ¶ 3; Global Allocation Plan, ¶ 4; InEx Allocation

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Plan, ¶ 3; Virginia Settlements Allocation Plan.  With regard to costs for Virginia Litigation, counsel for the majority of the Virginia Settlement Class Members incurred significant costs from litigating approximately 200 individual Virginia state court actions.  PSC Members and private attorneys brought these actions in Virginia because Virginia law does not provide for class action tolling and Defendants challenged Class Action Fairness Act jurisdiction.  The PSC takes the position that the efforts undertaken in these actions helped create a common benefit for all CDW victims, as the cases in Virginia helped establish appropriate remediation protocols and drove the KPT Pilot Program that has remediated thousands of homes.  The Virginia attorneys have made all Voluntary Common Benefit Payments into the Court's registry and will continue to do so.

20.  The amounts requested herein, which cannot be completely quantified at this point given certain determinations that will be made in the future, will be used to compensate all counsel involved in the Chinese Drywall litigation – the PSC Members, other common benefit attorneys, <u>and</u> individually retained counsel.  The totality of the global fee request necessarily reflects a relatively modest percentage of recovery when taking into consideration the fact that the Knauf Defendants are paying the large majority of the global attorneys' fees (76.7%), separate and apart from the uncapped Remediation Fund, so that no fees or costs come out of the recoveries of the individual KPT Chinese Drywall victims.  The fee requests of 32% from the InEx, Banner, Global and Virginia Settlements also include fees for individually retained counsel (with a common benefit percentage to be determined separately and awarded from the 32% funds), such that Class Members recovering from the InEx, Banner, Global, and Virginia Settlements will not be responsible for any additional fees beyond the 32%, if approved by the

14

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Court (or costs beyond any reimbursement by the Court).   As noted in ¶ 19(iii), *supra*, the PSC agreed that builders who were actively involved in the litigation and are seeking compensation from the Banner Settlement for their damages will be obligated to pay only 10% in attorneys' fees (rather than 32%), if approved by the Court.  Any overages that were set aside from the builders' Banner Settlement recoveries (*i.e.*, 22%, or 32%-10%) will be returned to those builder Defendants.  As noted in ¶ 19(iv), *supra*, the parties dispute whether this provision also applies with respect to the Global Settlement.  *See* Global Allocation Plan, at fn. 1.

21.   This hybrid approach – with attorneys' fees for the principal class settlement (Knauf Settlement) being paid separately by the settling defendants at no cost to the Plaintiffs, and attorneys' fees from the supplemental class settlements (InEx, Banner, Global, and Virginia) being awarded as a percentage of the common funds created, in order to pay both common benefit counsel and individually retained counsel's contingent fees – will result in a global fee award that is very low when compared to the range in other mass tort actions.

22.   The counsel who submitted time and expenses to the Court-appointed CPA pursuant to Pretrial Order No. 9 or 9A devoted 245,871.19 hours to this litigation from its inception through December 31, 2013.  *See* Affidavit of Philip A. Garrett, CPA, dated May 16, 2014 ("Garrett Aff.") (Exhibit 4 hereto).  The actual hourly rate reported by each professional submitting time to Mr. Garrett pursuant to Pretrial Order No. 9 or 9A at the inception of the litigation multiplied by the number of hours reported results in a total of $119,864,907.65. Id. at ☐ 16.

23.   The law firms that submitted expenses to the Court-appointed CPA, which includes PSC Members, common benefit counsel, and others, incurred $4,598,113.97 in Held Costs.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Common benefit counsel contributed $11,335,000 in assessments towards the funding of this litigation.  *See* Garrett Aff., ¶¶ 19-21.  While a substantial portion of the common benefit assessments ($9,148,000) has been reimbursed, $2,187,000 in assessments remain outstanding. In total, as set forth in the Garrett Affidavit, the Joint Petitioners seek reimbursement of $5,547,011.68 in costs through December 31, 2013.  *Id.*

24.  Notably, the PSC will continue to incur significant costs to pursue the non-settling Taishan Defendants so that Plaintiffs with Taishan Chinese Drywall in their homes may be fully compensated for their damages.  The PSC will also continue to administer the estimated $1.1 billion in settlement funds from the Knauf, Banner, InEx, L&W, Global, and Virginia Settlements, so that Plaintiffs can return to their homes and recoup losses caused by Chinese Drywall.

25.  In compliance with PTO 28 (¶ 6), the Fee Committee has compiled all of the Initial Affidavits and Second Affidavits of counsel seeking compensation for common benefit attorneys' fees and reimbursement of expenses pursuant to PTO 28 (these Affidavits are filed herewith under seal, as the litigation is continuing against the Taishan Defendants), and in consultation with the PSC, common benefit counsel, and individually retained counsel, the Fee Committee is filing the Global Fee Petition.  The Fee Committee also will meet with and take testimony from all Fee Applicants and evaluate their common benefit contributions to the litigation in order to make a recommendation to the Court on a fair allocation of any fees awarded by the Court.  *Id.* at ¶¶ 16-20.

26.  Many counsel working on Plaintiffs' behalf have dedicated their entire practice to this litigation for more than five years, and substantial efforts still are being undertaken by the

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

court appointed counsel to pursue the non-settling Taishan Defendants, oversee a complex settlement administration, and ensure the fair and equitable distribution of settlement benefits to tens of thousands of Participating Class Members.

27.   In a separate filing, as contemplated by the Court, the PSC intends to seek a common benefit assessment for any Chinese Drywall case or claim not participating as a Class Member or claimant in any of the various Class Action Settlement Agreements addressed herein.  *See* PTO 28, ¶ 9.  In some cases, agreements have been reached with regard to common benefit fees.  *See*, *e.g.*, Villa Lago class settlement Letter Agreement (Exhibit 5 hereto).  In other cases, claims have been assigned to the PSC.  *E.g.*, Shoma Homes Splendido, Inc. [Rec. Doc. #15695-6].

28.   The Court has left for another day a determination of a fair and reasonable common benefit assessment for any Chinese Drywall claim that is not subject to the Global Fee Petition.  *See* PTO 28.  Previously, in anticipation of a common benefit fee award, the Court entered an Order establishing a procedure whereby settling parties could voluntarily set-aside payments from any settlement proceeds received outside of the nine class settlements at issue here ("Voluntary Common Benefit Payments"), in order to compensate common benefit counsel "at a future date" [Rec. Doc. #8389].  Under this program, attorneys may deposit into the registry of the Court an amount equal to 17% of all settlement proceeds from any settlement amount for a particular property, representing 12% for common benefit fees and 5% for common costs.  *Id.*  To date, $970,360.82 in Voluntary Common Benefit Payments have been made.  *See* Chart of Voluntary Common Benefit Payments into Court Registry (Exhibit 20 hereto) (filed under seal).  Some common benefit firms, however, have failed or refused to make Voluntary Common Benefit Payments.  The collection of these common benefit fees must be pursued by the PSC.

17

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

29.  The Court has also deferred the allocation of any award of attorneys' fees and common benefit assessment among the relevant petitioners.  *See* PTO 28, ¶ 10; *see also id*. at ¶¶ 11-20.  Accordingly, the present determination of the global fee award and reimbursement of common benefit expenses merely sets the bounds by which all counsel will be compensated.

### The Unique Chinese Drywall MDL and Coordinated State Court Litigation

30.  This predominantly property damage litigation arose out of thousands of individual and class action lawsuits filed in state and federal courts throughout the country on behalf of Plaintiffs seeking compensation for damages caused by Chinese Drywall.  In the aftermath of the devastation caused by Hurricanes Katrina and Rita at the end of the summer of 2005 and in conjunction with an American housing boom, there was a critical shortage of domestic drywall available for new construction and the reconstruction of damaged properties.  This led to the importation of millions of square feet of Chinese Drywall beginning in the fall of 2005 and continuing through 2008, during which time this product was installed in tens of thousands of homes, commercial buildings and other structures.

31.  Once installed residents and owners began to notice extremely unpleasant "rotten egg" odors from the CDW and corrosion to anything in the home made of metal.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig*. (*Germano*), 706 F. Supp. 2d 655, 663 (E.D. La. 2010) (Findings of Fact and Conclusions of Law).  Plaintiffs alleged that Chinese Drywall emits sulfur gases that are corrosive to metals, particularly copper and silver.  *Id*. at 664.  This causes damage to the structural, mechanical and plumbing systems, such as the framing, heating, air-conditioning and ventilation ("HVAC") units, refrigeration coils, copper tubing, faucets, metal surfaces, electrical wiring, and computer wiring.  Chinese Drywall also damages

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

microwaves, utensils, electronic appliances, jewelry, mirrors, door handles, hinges, and other household and personal property items. *See id.* at 664-66. Some individuals alleged that they suffered physical ailments, such as nose bleeds, skin irritation, and respiratory problems, as a result of exposure to Chinese Drywall. Many residents were forced to leave their homes due to these problems and risk of fire.

32. In response to these consumer complaints, the U.S. Consumer Product Safety Commission ("CPSC"), with support from the U.S. Agency for Toxic Substances and Disease Registry ("ATSDR"), the U.S. Centers for Disease Control and Prevention ("CDC"), and other federal and state agencies, began investigations and testing of Chinese Drywall to examine the risks to consumers and their homes. The CPSC and the Department of Housing and Urban Development ("HUD") found "a strong association between the presence of problem drywall and corrosion of metal in homes." *See* CPSC's Remediation Guidance for Homes with Corrosion from Problem Drywall as of September 15, 2011, published at www.cpsc.gov/info/drywall/Remediation091511.pdf. These agencies recommended the removal of all possibly problematic drywall from the property, along with smoke alarms and carbon monoxide alarms, electrical distribution components (including receptacles, switches, and circuit breakers, but not necessarily wiring), and fusible-type fire sprinkler heads. *Id.* This Court additionally held that all electrical wiring must be removed in order to properly remediate property impacted by Chinese Drywall. *See Germano* Findings of Fact; *In re Chinese-Manufactured Drywall Prods. Liab. Litig.* (*Hernandez*), 2010 WL 1710434, *8-*9 (E.D. La. Apr. 27, 2010) (Findings of Fact and Conclusions of Law); Transcript of Proceedings, 3/23/2011, at 18:4-19:14.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

33.   With regard to health hazards posed by Chinese Drywall, the Government recently reported that "[p]eople who were exposed to hydrogen sulfide and other sulfur compounds emitted by some drywall manufactured in China may have experienced adverse health effects or a reduced quality of life."  *See* Health Consultation: Possible Health Implications from Exposure to Sulfur Gases Emitted From Chinese-Manufactured Drywall, Prepared by U.S. Department of Health and Human Services, Agency for Toxic Substances and Disease Registry Division of Community Health Investigations (May 2, 2014), at 4, available at http://www.atsdr.cdc.gov/drywall/docs/Drywall_HC_05-02-2014_508.pdf.  The Government concluded that the estimated contaminant concentrations from Chinese Drywall increased with increasing temperature and humidity.  *Id*.

### *MDL 2047*

34.   On June 15, 2009, the Judicial Panel for Multidistrict Litigation transferred all federal actions alleging damages from Chinese Drywall to the Eastern District of Louisiana for coordinated discovery and consolidated pretrial proceedings in MDL 2047 pursuant to 28 U.S.C. § 1407.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. 2009).  Upon the formation of this MDL, the Court entered an initial case management order, *see* PTO 1, and other administrative orders, PTO 2 and PTO 2A (Procedures for transfer of cases and tracking of remands in MDL 2047); PTO 6 (Electronic Service), and appointed various committees to represent, organize and streamline the divergent interests involved in this case. For the Plaintiffs, the Court appointed Plaintiffs' Liaison Counsel, *see* PTO 3, Plaintiffs' Lead Counsel and the PSC, *see* PTO 8; *see also* PTO 8A, PTO 8B, PTO 8C, PTO 8D (reappointing the PSC for consecutive one-year terms).  Attorneys Anthony D. Irpino, Richard S. Lewis and

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Andrew A. Lemmon served as Of-Counsel to the PSC.  Further, the Court appointed Defendants' Liaison Counsel, *see* PTO 4, a Defendants' Steering Committee, *see* PTO 7, PTO 7A, PTO 7B, Homebuilders and Installers Liaison Counsel, *see* PTO 18, and an Insurer Steering Committee as well as Co-Lead Counsel for the First-Party Insurer Subcommittee, *see* PTO 20.  The Court also appointed Plaintiffs' and Defendants' State and Federal Coordination Committees, *see* PTO 19 [Rec. Doc. #1871], and a curator for *pro se* litigants.  *See* Rec. Doc. #11327.

35.   The Court tasked the PSC with the following responsibilities:  (i) to prepare and respond to pleadings and motions; (ii) to engage in discovery, pretrial preparation, trial and settlement of cases; (iii) to manage the MDL docket; (iv) to establish and administer a document depository; (v) to communicate with individual Plaintiffs and their counsel; (vi) to liaison with Defendants; and (vii) to attend court status conferences and hearings.  *See* PTO 3.

36.   In furtherance of their court-appointed and fiduciary duties, PSC counsel and their firms lodged an all-out, uninterrupted, multi-pronged prosecution of Plaintiffs' claims in the MDL and coordinated state court proceedings, as well as appellate court activities.  They directed, supervised and coordinated all of the litigation efforts of behalf of Plaintiffs.  They formed 23 PSC Committees and 9 PSC Subcommittees, and led and/or participated in over 60 PSC meetings.  The PSC formed the following Committees and Subcommittees:  (1) Administration and Depository Committee; (2) Bankruptcy and Financial Research Committee; (3) Case Tracking Committee; (4) Discovery Deposition Committee; (5) Discovery Written Committee; (6) Ethics Referrals Committee; (7) Expert Science (Property) Committee; (8) Expert Science (PI) Committee; (9) Government Relations Committee; (10) Inspections Committee; (11) Insurance Committee; (12) IT and Electronic Discovery Committee; (13) Law

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Committee (Overall Law and MDL Law Subcommittee; Alabama Law Subcommittee; Florida

Law Subcommittee; Louisiana Law Subcommittee; Mississippi Law Subcommittee; North

Carolina Law Subcommittee; Ohio and Minnesota Law Subcommittee; South Carolina Law

Subcommittee; Virginia Law Subcommittee); (14) Litigation Group and Seminar Planning

Committee; (15) Medical Monitoring Committee; (16) New Defendants Committee; (17) Public

Relations Committee; (18) Research and Collection of Standards (Domestic and Foreign

Publications and Journals/FOIA/Public Records Requests) Committee; (19) Remediation/Release

Committee; (20) Special Projects Committee; (21) State/Federal Committee; (22) Trial and Trial

Package Committee; and (23) Witness Development Committee.

    37.  In addition, they interfaced with the Court, communicated with and assisted

individual Plaintiffs' counsel and *pro se* litigants, and coordinated with defense liaison counsel

and the Court-appointed Curator and Ombudsman, as necessary.  The PSC administered the

MDL docket with more than 17,650 entries and interfaced with the Clerk of Court and its staff.

Further, since the MDL was formed, the PSC has prepared 54 monthly status reports for the

Court and has assumed primary responsibility for all of the Court's monthly status conferences

and hearings to date, all major motions, jurisdictional hearings, and Settlement Fairness

Hearings.  They continue to perform these services.  *See, e.g.*, Chart of PSC Court Appearances

from Inception through December 31, 2013 (Exhibit 6 hereto).

    38.  For purposes of coordination, consistency and global treatment of Chinese Drywall

claims, the PSC has monitored and participated in related state court Chinese Drywall

proceedings in Norfolk, Virginia before the Honorable Mary Jane Hall, presiding Judge of the 4th

Judicial Circuit Court of Norfolk, Virginia.  These cases were filed because Virginia law does not

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

recognize any tolling of statutes of limitations for class actions.  The extensive litigation in the Virginia state courts has created a common benefit.  PSC Members participated in hearings in Virginia related to motions to disqualify, motions craving oyer (the equivalent of a motion to dismiss), demurrers, a motion to compel, and other matters, prepared for trial, and engaged experts.  The PSC also participated in mediations in the Virginia state court proceedings, and negotiations of the Virginia Settlements, which were approved by this Court.  *See* Rec. Doc. #16934 (Builders Mutual, Nationwide, Porter-Blaine/Venture Supply/Insurers, and Tobin Trading/ Builders Plaster & Drywall/JMM Drywall/Insurers Virginia Settlements).

39.  In addition, the PSC has monitored related state court proceedings in Florida, particularly Miami Dade County, and attended hearings there before the Honorable Joseph Farina (ret.) from the 11th Judicial Circuit Court of Florida in person or by telephone on substantive matters and with respect to the Knauf Settlement to explain the proceedings occurring before the MDL Court.  The Court has also consulted with numerous state court judges and other federal judges also overseeing Chinese Drywall litigation, including Judge Farina and the Honorable Charles Greene from the 17th Judicial Circuit Court of Florida (Broward County).  In coordination with these jurists, this MDL Court strived to achieve finality in the resolution of this litigation.

### *Virginia State Court Litigation*

40.  Hundreds of families in Virginia were impacted by Chinese Drywall.  The initial investigation into this problem began in Virginia in February, 2009.  As little was known at that time, the litigation team in Virginia (which included PSC Members, Plaintiffs' Lead Counsel and Plaintiffs' Liaison Counsel) conducted extensive inquiries – including hours of meetings with

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

victims of CDW damage, significant legal research, and work with scientific experts around the country – to develop a testing program to confirm the presence of CDW in homes in Virginia. This preliminary investigation revealed that hundreds of homes in Virginia were built with Chinese Drywall primarily, if not exclusively, manufactured by Shandong Taihe Dongxin Co., Ltd. (which, on Sept. 10, 2007, changed its name to Taishan Gypsum Co., Ltd. ("Taishan")) and supplied by Venture Supply, Inc. ("Venture") of Norfolk, Virginia. *See Chinese Drywall*, 706 F. Supp. 2d at 661.

41.  In the fall of 2005, Venture sought to secure a source of foreign drywall and entered into a contract with Phillip Perry, who was in the business of importing and exporting supplies under the corporate name "Tobin Trading, Inc." ("Tobin").  Tobin traveled to China and, in November, 2005, began negotiations with Taishan for the terms of a large shipment to Venture in Norfolk.  Tobin was directly involved in the inspection of the drywall in the Taishan factory and had extensive meetings, phone calls and emails with Taishan to arrange a shipment.

42.  On November 9, 2005, Venture provided an original letter of credit in the amount of $429,600.00 to the order of Shandong Taihi Dongxin for 120,000 sheets of drywall to meet all USA ASTM ratings and fire rating standards.  *Id*.  On November 14, 2005, Venture was advised that the manufacturer was not clear on U.S. ASTM ratings.  However, Taishan insisted that Venture remove U.S. ASTM requirements from the letter of credit and rely solely upon Chinese ratings.  *Id*.  Venture then contracted with Taishan to purchase drywall.  *Id*.  Accordingly, on November 15, 2005, Venture directed its bank to remove the U.S. ASTM requirement from the letter of credit to Taishan.  *Id*.  Venture compensated Tobin for expenses incurred in negotiating this contract and Tobin received a percentage of the purchase price of all drywall sold between

24

Taishan and Venture.

43.  Pursuant to contract, on December 25, 2005, Taishan had 2,000 pallets of drywall shipped to the United States, which arrived in February 2006.  *Id*.  A second shipment of 53,912 sheets on 586 pallets was shipped and off-loaded in Camden, New Jersey.  *Id*.  Tobin signed the two purchase agreements as an agent for Venture, which allowed over 150,000 total sheets of Chinese Drywall to enter the United States.  Venture sold the drywall to its related company Porter-Blaine, and then shipped the drywall to Plaintiffs' homes in Virginia, where Porter-Blaine installed it.

44.  This drywall was never tested pursuant to the U.S. ASTM standard.  *Id*. at 662. Venture relied on a representation that Chinese testing was equivalent to the U.S. testing standards.  *Id*.  However, the Chinese tests were administered by a Chinese government agency and not by an independent testing laboratory, and the "Quality Management System Certification" predated the production of the drywall that was shipped to the U.S. by at least two years.  *Id*.

45.  Although there were significant challenges to litigation in Virginia, including unfavorable case law regarding insurance coverage exclusions and inflexible statutes of limitations, the Virginia team filed the *Germano* class action complaint in federal court against Taishan and Venture on behalf of affected Virginia homeowners on May 1, 2009.  *See Germano v. Taishan, et al.*, 09-cv-0202 (E.D. Va.).  This action was transferred to MDL 2047. Additionally, because Virginia does not recognize tolling for class action cases, and to avoid minimal diversity arguments raised by Venture, Plaintiffs' counsel were required to file parallel actions in both state court and federal court against builders, installers and other responsible

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

parties.  The litigation, which was consolidated in Norfolk, Virginia, included individual filed suits for approximately 200 families, as well as a multi-plaintiff complaint, which was amended on multiple occasions so as to include all filed Virginia claims.  The Defendants challenged venue in Norfolk, and sought to block the consolidation of the cases, but were unsuccessful in reversing the trial court's rulings, despite an interlocutory appeal to the Virginia Supreme Court.  The Virginia state court litigation was crucial in light of Defendants' jurisdictional motions to dismiss the *Germano* class.

46.  Judge Hall of the Norfolk Circuit Court managed an efficient litigation, conducting monthly status conferences, disposing of scores of motions, and selecting bellwether trials for 34 cases.  *See* Index and Appendix containing Judge Hall's Chinese Drywall orders (Exhibit 7 hereto).  The 200 Virginia state court cases included claims against over 50 Defendants, each of whom actively pursued defensive motions and discovery.  Litigating individual cases against scores of Defendants required enormous time and effort on behalf of Plaintiffs' counsel.

47.  Virginia CDW victims faced and overcame a major setback when the Virginia Supreme Court held that the pollution exclusion, contained in numerous insurance policies, unambiguously excluded coverage for CDW.  With one decision, the Virginia Supreme Court held that over $80 million in coverage for Venture alone was unavailable to compensate victims. *See Travco Ins. Co. v. Ward*, 284 Va. 547, 736 S.E.2d 321 (Va. 2012).  Once again, investigation broadened to "a home-by-home" basis, carefully reviewing insurance coverage for responsible builders and installers.  This review of insurance policies revealed a variant of the pollution exclusion that contained a critical "performing operations" clause, which demonstrably provides coverage for CDW homes.  In order to flesh out the full extent of this coverage, the Virginia state

26

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

court plaintiffs sought and obtained a court order requiring the production of every insurance policy for multiple Defendants over a five-year time period.  The state court Plaintiffs enforced this order, and carefully reviewed these policies to locate the critical "performing operations clause."  The state court Plaintiffs pressed on with new sets of trial settings against these Defendants.  *See* List of Virginia Trial Settings to pursue this strategy (Exhibit 8 hereto).

48.  The Virginia investigation revealed that Nationwide provided the lion's share of coverage to builders and installers of CDW supplied by Venture.  The state court Plaintiffs selected Nationwide-insured Defendants for litigation and trial, including crucially, Atlantic Homes, LLC ("Atlantic"), which built several of the *Germano* intervenor homes. This litigation opened a "third front" as Atlantic sought relief from building code violations at both the local and state level.  The state court Plaintiffs quickly intervened, retained experts and presented evidence at every level of the Virginia Building Code administrative process.  Virginia efforts culminated in successful rulings that included:  finding Venture-supplied CDW as a per se building code violation, finding that every entity involved in the construction process was responsible for these code violations, finding that Venture-supplied CDW created a "corrosive environment" that rendered the initial building permit void, and requiring the complete removal of all electrical components from the homes as part of remediation.  These critical successes formed the basis of further successful motion practice on liability and scope of remediation before Judge Hall.

49.  Extensive discovery and briefing was required in Virginia on the issue of the foreseeability of CDW damages.  Defendants attempted to argue that they had no knowledge that CDW would off-gas, and therefore could not be held responsible for resulting damages.  The

27

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

state court Plaintiffs developed a series of installer fact witnesses who acknowledged apparent problems with Venture-supplied CDW at the time of installation.  These problems included excessive weight of the drywall which resulted in poor performance (especially on ceilings) and the propensity of the drywall to ripple, crack and distort, requiring extensive repairs.  These fact witnesses testified to a process whereby Venture started mixing domestic drywall into every delivery to cover ceilings and other problem spots.  The Virginia Defendants faced damning evidence of their own knowledge of the defective nature of CDW

50.  The odor of the drywall when cut was also an area of fruitful fact witness development and testimony.  Several installer Defendants acknowledged that the smell (a sign of off-gassing and defect) was obviously a problem and some testified that they complained to Venture about the issue.  Coupled with the physical problems with the drywall, the state court Plaintiffs overcame the foreseeability defense and demonstrated that Defendants had reason to know that CDW was going to cause problems for the homeowners.  Thereafter, Judge Hall ruled that, as long as some harm was foreseeable, the Defendants were responsible for all harm associated with the product.

51.  While litigating these cases against local counsel for Nationwide, the state court Plaintiffs began a series of settlement negotiations with national counsel and the head of environmental claims for Nationwide.  These negotiations culminated in a, now-finalized, class settlement of $10 million.  The state court Plaintiffs also negotiated with three additional groups of Defendants and carriers, resulting in, after months of concerted effort, the four Virginia Settlements, discussed *infra*.

52.  Additional carriers and Defendants rejected efforts to join in these Virginia

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Settlements, and litigation continued, uninterrupted, against additional builders and installers.  As reflected in Exhibit 8 hereto, these trials continue unabated, and have resulted in millions of dollars of additional settlements for Venture victims, even non-class settlements, including both the Torres and Ramirez QSF settlements which were approved by this Court and by Judge Hall.  *See* Rec. Doc. #16541 (*Torres* Order); Rec. Doc. #16901 (*Ramirez* Order).  Settlement negotiations with remaining Defendants continue.

53.  In addition to these tort matters, Virginia became the most prolix jurisdiction for insurance litigation.  It would be hard to overstate the tremendous volume of insurance litigation over Virginia insurance policies.  *See* Exhibit 9 hereto, for details on the motions, briefs and other Virginia court filings in the insurance litigation.  In connection with extensive litigation in Virginia regarding the "pollution exclusion" clause included in insurance contracts issued to various Defendants, the Virginia PSC handled significant issues involving the construction of the exclusion and other key contract wording.  *See*, *e.g.*, *Travco Ins. Co. v. Ward*, 284 Va. 547, 736 S.E.2d 321, 324 (2012); *Evanston Ins. Co. v. Harbor Walk Development, LLC*, 814 F. Supp. 2d 635 (E.D. Va. 2011); *Dragas Management Corp. v. Hanover Ins. Co.*, 798 F. Supp. 2d 766 (E.D. Va. 2011); *Nationwide Mut. Ins. Co. v. Overlook, LLC*, 785 F. Supp. 2d 502 (E.D. Va. 2011); *QBE Ins. Corp. v. Estes Heating & Air Conditioning, Inc.*, 2012 WL 413968 (S.D. Ala. Feb. 8, 2012); *Builders Mut. Ins. Co. v. Parallel Design & Development, LLC*, 2010 WL 6573365 (E.D. Va. Oct. 5, 2010).  Declaratory judgment actions in U.S. District Courts issued unfavorable rulings regarding the pollution exclusion clause when read in conjunction with long-standing Virginia law applying the plain meaning of contracts.  In one key case, however, the Eastern District of Virginia held that contractual language was ambiguous and found that the insurance

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

company had a duty to defend under its insurance policy.  *See Builders Mut. Ins. Co. v. Parallel Design and Development, LLC, et al.*, 785 F. Supp. 2d 535 (E.D. Va. 2011) (holding the pollution exclusion insurer's policy was inoperative because the term "pollutants" was not defined).  This ruling had significant effects on insurance coverage litigation going forward. Insurance policies that failed to include strong policy exclusion language defining the term "pollutants" could be strictly construed against the insurance company.  The team in Virginia litigated multiple actions at the district court level, in the Fourth Circuit Court of Appeals, and before the Virginia Supreme Court regarding the applicability of the pollution exclusion and the scope of its reach.

54.  Although the Supreme Court of Virginia refuses to differentiate between traditional environmental pollution and other forms of pollution, the consistent efforts of the Virginia team to litigate insurance coverage interpretation led to "chinks in the armor" of some insurance policies.  One argument, regarding "performing operations" language in Nationwide policies of insurance, ultimately led to a significant settlement with Nationwide, and other insurance settlements followed suit.  These insurance settlements have greatly benefitted Virginia Plaintiffs who otherwise would have had limited remedies.

### *Florida State Court Litigation*

55.  Florida was dramatically impacted by the distribution and installation of Chinese Drywall in homes in that State.  More than 300 Chinese Drywall suits were filed in Florida state courts against builder Defendants and supplier Defendants, namely Banner.  In South Florida alone, approximately 128 cases were filed in the 11th Judicial Circuit (Miami-Dade County Circuit Court), including first homeowner case, *Harrell v. South Kendall Construction Corp. et*

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

*al.*, No. 2009-8401 CA 42 (Feb. 3, 2009).  Approximately 88 cases were filed in the 17th Judicial

Circuit (Broward County Circuit Court), where the first homeowner case, *Morris v. Knauf*

*Plasterboard Tianjin Co.*, No. CACE 09-22664, was filed on April 21, 2009.  Approximately

104 cases were filed in the 15th Judicial Circuit (Palm Beach Circuit Court), where the first

homeowner case, *Olschewski v. Centerline Homes, Inc., et al.*, No. 2009-CA-13464, was filed on

April 9, 2009.

56.  Chinese Drywall cases were aggressively litigated in Florida state courts.  The trial

judges in Florida coordinated many matters informally with this Court, and formally by

conducting joint oral arguments.  However, the Florida state court litigation proceeded on a

separate track from the MDL.  In these cases, there were motions to dismiss, discovery motions,

trial settings, appellate or extraordinary relief sought by Defendants (in at least one District Court

of Appeal), Plaintiff depositions, depositions of Banner representatives, production of

documents, answers to interrogatories, retention of experts and preparation of experts for trial

and/or class certification evidentiary hearings.  The Florida trial courts held regularly scheduled

case management conferences and numerous hearings on disputed issues.

57.  The litigation in these Circuit Courts focused heavily on the Florida-based Banner

entities, as well as viable homebuilders and installers.  The various state court filings had a large

number of Defendants named to bring into the litigation viable parties other than the

manufacturing Defendants.  In the early stages, an important legal hurdle was establishing

entitlement to recovery under Florida law.  Florida's "Economic Loss Rule" was a potential

barrier to full recovery for homeowners, but after significant briefing and oral argument,

Plaintiffs successfully defeated the "Economic Loss Rule" argument aggressively asserted by the

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

target Defendants.

58.   On June 18, 2010, after substantial factual and expert discovery involving Banner, the first jury verdict in the nation was rendered in favor Plaintiffs against the Chinese Drywall suppliers.  The jury in *Armin G. Seifart and Lisa M. Gore Seifart v. Banner Supply Co.*, No. 09-38887CA 01(42), found Banner liable under Florida Deceptive and Unfair Trade Practices Act, common law negligence and common law private nuisance, and awarded nearly $2.5 million in damages.  *See* Verdict (Exhibit 10 hereto).  The award as it relates to Banner was reduced by 45% for the percentage of fault of Knauf Plasterboard (Tianjin) Co., La Supreme Enterprise, Inc., and Rothchilt International, Ltd.  *Id.*  The damages awarded included remediation costs, costs for temporary housing and moving expenses, loss of enjoyment and diminution of value/stigma damages.  Additionally, the pre-trial discovery and trial testimony in *Seifart* served as a template for other Plaintiffs in Florida and, in some respects, throughout the nation in regards to the conduct of Knauf.

59.   On July 9, 2010, a statewide class action complaint, *Orlando, et al. v. Banner Supply Co.*, No. CACE-10-28090, was filed in Broward County Circuit Court, partially as a result of the *Seifart* verdict.  Production of documents from Banner served as a resource for identifying potential homes supplied by Banner.  This identification allowed many homeowners to participate in the Banner Settlement approved by this Court and discussed *infra*.  Plaintiffs' depositions were defended, depositions of Banner representatives were taken, and substantial briefing was filed with the Broward County Circuit Court relating to the class certification. Plaintiffs were preparing to proceed to the scheduled class certification evidentiary hearing while the Defendants' efforts concentrated on continuing the class certification hearing in the Circuit

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Court and the Fourth District Court of Appeals.  Ultimately, though, on the eve of the class

certification hearing, the class action case was stayed to allow the parties to conduct settlement

discussions through the MDL.

### *Individual Homeowner Representation*

60.  Attorneys handling individual Chinese Drywall claims were faced with a variety of

challenges, on a case-by-case basis, depending on the individual circumstances presented.

Perhaps unlike any other mass litigation, some of these homeowner clients faced unprecedented

complexities outside the four corners of the complaint.  At times, the representation of some of

the individual homeowners impacted by Chinese Drywall required substantial efforts by

individual attorneys separate and apart from the common benefit work performed by the PSC.

For example, attorneys representing homeowners may have been required, depending on the

circumstances, to provide individual advice on matters such as mortgage relief, property tax

relief, homeowner insurance claims, homeowner association responsibilities, IRS casualty loss

claims, competing remediation solutions, preservation protocols, disclosure for subsequent sales,

foreclosure and health concerns.

61.  By way of background, for the vast majority of homeowners impacted by Chinese

Drywall, their home was their largest or most significant personal investment.  In some cases,

these homes were purchased at the height of the market prices.  Yet, while many other

homeowners had undergone foreclosure, these homeowners were, by definition, able to meet

their contractual obligations irrespective of the market value of the home.  Importantly, all of the

Chinese Drywall homeowners who qualified for a class settlement owned their homes at the time

the reactive drywall was discovered.

33

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

62. The first step in representing these homeowners required attorneys to conduct an inspection of the property, either by way of an expert or through their own efforts. Unlike a medical case where records could be reviewed to determine if there was a potential case, each home required a thorough and detailed inspection. In the early stages, determining which homes, or which parts of homes, were impacted by CDW was an effort without published guidelines or criteria. This required, in some instances, multiple inspections and evaluations. Particularly in the early stages, identification of the manufacturer was challenging, since identifying markings were difficult to locate. After the Court entered Pretrial Order Nos. 10 and 13, and the PSC facilitated the preparation of a published catalog of photographs identifying manufacturers, these identifications were easier.

63. Even once the presence of CDW was confirmed, however, because many of the homes impacted were new construction, the identification of other potentially responsible parties was challenging. In many cases, while the homeowners knew the builder, identification of the supplier and installer was a labor intensive effort on the part of the individual attorneys.

64. Upon discovery of CDW in the property, the home's value plummeted to a fraction of its previous worth, and unfortunately, as CDW was discovered in surrounding homes, an economic blight quickly fell upon neighborhoods. Not long after press reports highlighted this situation, the real estate market responded by requiring disclosures prior to listing or sale of a home in CDW-impacted neighborhoods. Later, formal disclosures were required for every sale in certain parts of the country. However, prior to consensus as to the remediation protocol, these homes simply were not marketable.

65. For homeowners, litigation was the only option to address this economic and

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

personal tragedy, but it was a long-term strategy. More immediately, because of their inability to liquidate their largest asset at a fair market value, the vast majority of Plaintiffs faced a potential financial catastrophe. Vacating the home for an indefinite and unpredictable period of time was not a viable option for homeowners. Many could not absorb the monthly carrying costs of maintaining two homes and most could not withstand the financial consequences of simply selling the home given the lack of marketability and downward economic pressure caused by CDW. On the other hand, concerns over potential health effects naturally counterbalanced this financial challenge.

66. As a result, where necessary, individual attorneys put extended efforts into contacting the banks involved, seeking to abate mortgage obligations so homeowners could either move out or stop the potential and continuing financial losses associated with having a CDW-impacted home. However, as this issue was unprecedented, virtually all banks were unresponsive because they were unfamiliar with the existence of CDW and the potential remediation solutions. Attorneys persistently educated lenders on the scope of the problem through multiple communications.

67. Because of diminished home values, attorneys were asked in some cases to advocate for a reduction of assessed property taxes from local Property Tax Assessors. This effort required educating Property Assessors on the scope of the CDW problem, a lack of marketability, and potential remediation solutions. Property Assessors in Florida, Louisiana, and other states required the submission of paperwork, often prepared by counsel, in order to reduce property tax assessments.

68. Homeowners had numerous questions, and there was uncertainty, surrounding the

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

ability to assert a claim under existing homeowners insurance policies.  For many lawyers, this required both an evaluation of the policy exclusions as well as the governing law.

69.  In addition to mortgage and property tax relief, many homeowners needed advice on homeowner association fees and city charges related to maintaining their home and potential eligibility for Internal Revenue Service casualty loss deductions.

70.  Further, individual homeowners routinely requested advice from counsel on whether or not there was a consensus in the scientific community or the real estate market before initiating remediation efforts.  The fear of potential health effects from CDW, whether transient or permanent, resulted in another level of individual engagement with the attorneys representing homeowners.

71.  Because a funded remediation settlement solution was not available immediately, some homeowners were forced to renegotiate loans on their homes or, alternatively, defaulted.  Attorneys were routinely asked to provide individual advice on such matters as "deed in lieu" or other potential strategies, including necessary disclosures.  The change in ownership of the home did not relieve the attorneys from providing advice and, later, initiating a claim.

72.  For homeowners who had the financial capacity to self-remediate while the litigation proceeded, attorneys regularly advised on the scope of acceptable remediation and issues associated with preservation of evidence.  In the early stages, before there was a clear consensus as to the acceptable scope of remediation, attorneys were required to analyze the best existing evidence.  This analysis was particularly difficult as it was well understood that there would not be an opportunity to perform remediations twice, and the ultimate decisions carried an associated risk for future recovery.  Later, once protocols were developed, attorneys provided advice as to

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

how to proceed with remediation while protecting their rights against responsible parties.

73. For those eligible for the Knauf remediation program, the process was more complicated than a simple settlement. First, every homeowner had to undergo eligibility determinations, requiring the lawyers to coordinate product identification inspections, and in some circumstances, re-inspections. Eligible homeowners had detailed questions about the protocol and their rights under the program, and many homeowners requested the assistance of counsel throughout the process of remediation, including negotiations over such matters as replacement of "like" items and how to resolve damage to the property. As would be expected in any home project of this magnitude, many homeowners ultimately had "punch list" issues that required further assistance of counsel. Some remediation issues expanded to warranty claims requiring additional advocacy to find solutions. Thus, unlike a typical settlement where on a date certain a release is signed, monies are transferred and the case is over, embarking on the remediation program was simply the next stage of representation.

74. For Mixed Property owners, there was a further complication in determining the percentages of relative responsibility amongst the manufacturing companies. This required attorney engagement through the inspection protocol. Lawyers then had to advise clients on the multiple resolution options available for a "mixed home."

75. For homeowners who self-remediated their properties, the obligation to submit all receipts and proofs of payment was onerous. In many cases, these resolutions were handled as a negotiation, with multiple communications back and forth between Knauf's counsel and the homeowners. In some circumstances, meetings with Knauf, Knauf's counsel and Knauf's chosen contractor were required prior to resolution.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

76.  The claims process constructed as part of the Knauf Settlement required a substantial effort on the part of individual attorneys to navigate multiple available claim options on behalf of all eligible homeowners, including those who had already remediated their homes.  This was a labor-intensive process that was more involved than simply gathering records for a claim submission.  The efforts included generating the claims information, preparation of affidavits, accumulation of documents for evidence, calculations, and advice to clients on available claim options.  Often, because of the difficulty in determining certain qualifying criteria, the attorneys had to find innovative methods to help advocate for the homeowners.

77.  Finally, for many of the attorneys representing the individual homeowners, the current Court-approved settlement provisions may not permit the full recovery of all expenses expended on behalf of individual homeowners.  *See*, *e.g.*, Knauf Settlement, Section 14.1, limiting cost recovery by individual attorneys to "reasonable inspection costs."  Set-asides for costs have been made in the InEx, Banner, Global, and Virginia Settlements.  At a later date, the disbursement and allocation of those set-asides shall be the subject of further proceedings and determination by the Court.  As a result, many individual attorneys have incurred costs on behalf of CDW clients which would normally be recoverable, but which will not be recoverable here.  Such unrecoverable costs will erode somewhat any attorneys' fees awarded to individual attorneys.

78.  Given the complexity of the factual and legal issues, as well as the financial consequences to the impacted homeowners, some individual homeowners required substantial efforts by the individual lawyers retained to represent their interests based on their individual circumstances.  This effort by individual attorneys on behalf of individual homeowners was

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

necessary in addition to the common benefit work of the PSC.

### The PSC's Efforts to Identify and Bring All Responsible Parties into this Litigation

79.  The first obstacle in this litigation was to identify and locate all parties responsible for Plaintiffs' damages and then bring those Defendants into the MDL.  Initial discovery and testing revealed that a large majority of the Affected Properties that are the subject of this litigation contained either KPT Chinese Drywall manufactured by one of the Knauf Defendants ("KPT Properties") or "Taishan" or "DUN" brand drywall manufactured by the one of the Taishan Defendants, or a combination of both ("Mixed Properties").  The process of bringing the Chinese Drywall manufacturers, their parents, and their alter egos/agents into the MDL was complicated by the fact that these Defendants were foreign entities located outside the confines for traditional service of process in the United States.

80.  The PSC conceived of and created 18 different novel Omni Complaints, *see* ¶ 9, *supra*, which allowed the claims of thousands of Plaintiffs to be joined in a singular complaint so that service of process of these complaints could be coordinated through the Hague Convention on foreign Defendants who would not accept service.  The Omni Complaints also facilitated the joinder of individual Plaintiffs' claims against more than 1,000 different importers, suppliers, distributors, builders, and installers, as well as their insurers, involved in the supply chain of CDW installed in Plaintiffs' properties.  *Id*.

81.  Then, the PSC intervened into these Omni Complaints approximately 10,000 Plaintiffs alleging property damages and/or personal injury resulting from CDW installed in

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

homes located in numerous jurisdictions along the Gulf Coast and East Coast of the United

States, including Louisiana, Florida, Texas, Alabama, Mississippi, North Carolina, South

Carolina, Georgia, Tennessee, and Virginia.  The leadership committee painstakingly oversaw

the translation of the lengthy Omni Complaints into the various appropriate languages and served

them on the foreign manufacturers and their related entities under the extraordinarily prolix and

expensive process required by the Hague Convention, which is still ongoing for the Chinese

Taishan Defendants.

82.  The PSC presented proposed schedules and deadlines to the Court for the completion

of the Omni Complaints, responsive pleadings, notices of appearance, and the preservation of

physical evidence in Plaintiffs' homes during repairs or other remediation efforts.  The Court

entered Pretrial Orders addressing these issues.  *See* Pretrial Order Nos. 1A, 1B, 1C, 1D, 1E, 1F,

1G, 1H and 1I.

## Extensive and Widespread Discovery Efforts of the PSC

83.  The PSC developed a comprehensive and efficient discovery strategy designed to

maximize Plaintiffs' results in the litigation.

84.  First, they prepared proposed Defendant Profile Forms for manufacturers,

distributors, exporters, importers, brokers, builders, contractors/installers, retailers, and insurers,

which required these Defendants to certify under penalty of perjury important detailed

information about their roles in bringing Chinese Drywall into the United States and into

Plaintiffs' homes, as well as information about their insurers.  The PSC prepared and submitted

proposed Pretrial Orders regarding deadlines for completion and service and distribution of these

profile forms.  *See* Pretrial Order Nos. 11, 12, 12A, 14, 14A, 23, 25.

85.   Second, the PSC then created Plaintiff Profile Forms intended for Plaintiffs to identify responsible parties in the CDW supply chain.  *See id*.  To assist the Plaintiffs in identifying the manufacturer in the Plaintiff Profile Form, the PSC established a Court-approved photographic catalog of markings, brands, endtapes and other identifying markers of CDW, collected the data, and submitted the critical information to the Court for publication on the Court's website.  *See* PTO 10 and Catalog published on the Court's official Chinese Drywall, MDL 2047 website at http://www.laed.uscourts.gov/drywall/DrywallMarkings.htm.

86.   Third, with the assistance of experts, the PSC developed a Threshold Inspection Program ("TIP") to further identify and assist Plaintiffs in identifying the Chinese Drywall in their homes.  The PSC presented this program to the Court for approval, and the TIP was instituted.  *See* Pretrial Order Nos. 13 and 13A.  The PSC expended tremendous efforts in formulating the scope and method of inspection to be used in the TIP, ensuring compliance with the TIP, and analyzing the results of the TIP, all of which benefitted all Plaintiffs.

87.   Fourth, the PSC orchestrated a formal discovery program that involved the preparation and service of extensive written interrogatories, requests for admission, letters rogatory, and/or requests for production of documents on Defendants.  *See* Chart of Discovery Propounded by the PSC (Exhibit 11 hereto).  *See also* Chart of Discovery Responded to by the PSC (Exhibit 12 hereto).  Through FOIA requests, they also directed the investigation of complaints alleging problems with CDW, which were filed with the U.S. Consumer Product Safety Commission ("CPSC") and other state consumer agencies.  They oversaw the preparation and service of discovery requests on the CPSC, the United States Environmental Protection Agency, the Centers for Disease Control, the United States Department of State, the Florida

41

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Department of Health, the Florida Department of Financial Services (Division of State Fire

Marshall), and the Louisiana Departments of Health, Environmental Quality, Economic

Development, and Justice.  *See* Chart of PSC FOIA Requests (Exhibit 13 hereto).  Members of

the PSC met with the CPSC at its headquarters in Maryland, after which relevant material and

information were exchanged between the PSC and the CPSC.

88.   Fifth, the PSC was instrumental in reaching out to United States Senators and

Congressmen and Congresswomen for legislative support to remedy the Chinese Drywall

debacle.  The following legislators filed an *amicus* brief in support of Plaintiffs in the Taishan

jurisdictional appeals before the Fifth Circuit and/or signed onto a letter to the Taishan

Defendants urging them to answer these lawsuits:  Senator Bill Nelson (FL); Senator Marco

Rubio (FL); Senator Mary L. Landrieu (LA); Senator David Vitter (LA); Senator Tim Kaine

(VA); Senator Mark Warner (VA); Senator Mark Pryor (AR); Congressman Ted Deutch (FL);

Congressman Alcee L. Hastings (FL); Congressman Bill Posey (FL); Congresswoman Lois

Frankel (FL); Congresswoman Debbie Wasserman Schultz (FL); Congressman Cedric Richmond

(LA); Congressman Steve Scalise (LA); Congressman Scott Rigell (VA); Congressman Randy

Forbes (VA); and Congressman Rob Wittman (VA).  *See* Amicus Brief of United States Senators

and Congressmen, filed in *Germano, et al. v. Taishan Gypsum Co. Ltd.*, No. 10-30568,

Consolidated with No. 12-31017 (5th Cir. May 13, 2013) [5[th] Cir. Dkt. Doc. #00512240187];

Press Release and Letter to Taishan Gypsum Co., Ltd. from Senators, dated Feb. 26, 2014

(Exhibit 14 hereto).

89.   Sixth, the PSC proposed Pretrial Orders for the creation of privilege logs for

documents withheld in response to discovery requests and regarding the disclosure, use and

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

protection of confidential information and treatment of privileged and work product materials produced during the course of this MDL.  *See* Pretrial Order Nos. 15 and 16.  Then, the PSC analyzed the Defendants' responses to written discovery.  Due to the recalcitrance of certain Defendants, the Taishan Defendants in particular, in failing to comply with proper discovery requests, the PSC was forced to prepare a number of motions to compel and respond to several motions for protective orders and motions to quash.  *See* Chart of PSC Discovery Motions (Exhibit 15 hereto).  The PSC also filed third-party discovery motions against JP Morgan Chase & Co., T. Rowe Price Group, Inc., Bank of America Corporation, Yahoo!, and Morgan Stanley.[9] All of these efforts were critical in achieving important discovery rulings from the Court.  *See*, *e.g.*, Rec. Doc. #7136; Rec. Doc. #7511.

90.   Seventh, in order to analyze the document productions of the Defendants, Government Agencies, and third parties, the PSC set up a document depository in New Orleans and funded the costs of the depository and the salaries of the personnel managing it full-time. The PSC collected and oversaw the inspection and analysis of tens of thousands of documents totaling over a million pages, as well as the deposition transcripts, trial and hearing transcripts, trial exhibits and other materials.  The PSC engaged in extensive analysis and review of these documents, including those produced by the Knauf and Taishan manufacturing Defendants and their importers, and suppliers Venture, Inc./Porter-Blaine, Banner, and InEx, as well as their insurers.  The PSC carefully analyzed the respective liability of the Defendants, highlighting the key "hot" documents and prepared a time line of events and a cast of characters.  These

---

[9]   These companies and others will become relevant in a next stage of this litigation when the PSC executes on the *Germano* judgment.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

document analyses were critical in establishing jurisdiction over the Knauf Defendants. Ultimately, the PSC's efforts led to the resolution of Plaintiffs' claims against Knauf and its related entities, and as well as the settlements of claims against numerous Defendants in the KPT Chinese Drywall chain of distribution, and their insurers, and the Virginia Settlements with Venture, Porter-Blaine, and their insurers. The PSC's document review efforts also were a key element in establishing jurisdiction over the Taishan Defendants.

91. Eighth, the PSC prepared a deposition protocol and a template for summarizing the testimony. They noticed more than 200 depositions of the Defendant manufacturers, importers, suppliers, distributors, builders, and installers, and prepared third-party subpoenas where necessary. *See* Chart of Common Benefit Depositions (Exhibit 16 hereto). Then, the PSC devoted many months to reviewing relevant documents, preparing for, conducting and/or participating in depositions on behalf of Plaintiffs, traveling abroad to Germany, China, and the United Kingdom to elicit testimony from numerous employees, directors, and officers of the manufacturers and importers of CDW. The PSC and common benefit counsel also traveled to numerous U.S. cities, including Norfolk, Virginia, Corpus Christi, Texas, Houston, Texas, Coral Gables, Florida, Bartow, Florida, New York, New York, Gulfport, Mississippi, St. Paul, Minnesota, Long Beach, California, Tulsa, Oklahoma, Shreveport, Louisiana, Belle Chasse, Louisiana, Lafayette, Louisiana, Baton Rouge, Louisiana, and New Orleans, Louisiana to depose dozens of companies in the CDW supply chains and third parties involved in sales of CDW in the United States, or other interested parties.

92. Early on in the litigation, in *Germano*, the PSC took the deposition of the owner of Venture and Porter-Blaine, Samuel G. Porter, in Norfolk, Virginia. This deposition was

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

instrumental in leading the way to proving that the Court has jurisdiction over Taishan in

Virginia and other forums in the United States, and it was key in obtaining the *Germano*

judgment, discussed in more detail, *infra*.  The Porter deposition also created the roadmap for

achieving the four Virginia Settlements.

93.  The PSC took the depositions of the Knauf Defendants (*e.g.*, Baldwin Knauf, Isabel

Knauf, Hans Peter Ingenillem, Martin Halbach, Hans Ulrich Hummel, and Mark Norris), which

directly led to the culmination of the KPT Pilot Program and ultimately to the Knauf Settlement

and the L&W Settlement, discussed *infra*.  The PSC also took numerous depositions in the

insurance litigation, in *Pate v American Int'l Specialty Lines Ins. Co., et al.*, No. 09-7791;

*Centerline Homes Construction, Inc., et al. v. Mid-Continent Casualty Co., et al.*, No. 10-178;

and *Northstar Holdings, Inc., et al. v. General Fidelity, Inc., Co.*, No. 10-384.  The PSC prepared

abstracts of all common benefit depositions taken in this case.

94.  In April, 2011, attorneys representing the PSC conducted Rule 30(b)(6) depositions

of Taishan Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary Tai'an Taishan

Plasterboard Co., Ltd. ("TTP") in Hong Kong.  Due to the deponents' lack of knowledge and/or

responsiveness as well as disagreement among counsel and the translators regarding the

questions and answers, these depositions degenerated into "chaos and old night," as held by the

Court.  *See* Rec. Doc. #10269 at p. 5.  Thereafter, the PSC filed another motion to compel and a

motion for sanctions, *see* Rec. Doc. #8685, which the Court granted in part, ruling that the

Taishan depositions be retaken in Hong Kong under supervision of the Court and that Taishan:

(a) produce discovery of upstream- and downstream-affiliated Taishan Companies; (b) expand its

ESI search; (c) produce documents regarding the Taishan entities' marketing and sales efforts

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

aimed at the United States, and (d) produce VAT-related documents.  *See* Rec. Doc. #9107; Rec. Doc. #10092; Rec. Doc. #10269.

95.  Following the Court's discovery rulings, the PSC prepared for the Taishan depositions and again traveled to Hong Kong in January, 2012, to participate in the jurisdictional discovery of these witnesses.  The Court also traveled to Hong Kong personally to oversee the depositions and rule on any objections.

96.  In addition, the PSC deposed various shippers, importers and distributors of Taishan's drywall in the U.S.  In total, the PSC took 17 jurisdictional depositions of Taishan and entities involved in the distribution of Taishan's CDW in the United States.

<b>The PSC Expended Considerable Efforts on<br><u>Pleadings, Motion Practice, Briefing and Other Filings</u></b>

97.  This prolix Chinese Drywall litigation has posed many significant legal obstacles. The PSC has led all briefing in the MDL on behalf of Plaintiffs and has prepared or overseen the preparation of every major motion, memorandum of law, proposed order, and responsive brief, which benefitted all Plaintiffs.  In addition to numerous discovery motions (*i.e.*, motions to compel, motions for sanctions, responses to motions to quash and motions for protective orders), the PSC has filed hundreds of significant and dispositive motions and/or briefs in the MDL, on appeal to the Fourth, Fifth, and Ninth Circuit Courts of Appeals, and in Virginia and Florida State Courts on behalf of Plaintiffs on a wide variety of topics, including, but not limited to: default judgments; personal jurisdiction over the Defendants; economic loss doctrine; exclusions under homeowners insurance policies; service of process; class settlement certification and approval; objections to settlement and class notice; All Writs Act authority of the Court;

46

dismissal of Defendants; and a litigation fee and expense fund.  *See* Chart of PSC Pleadings,

Motions, and Other Filings (Exhibit 17 hereto).

98.   Early on, the PSC obtained preliminary default judgments against the Taishan entities

and other potentially responsible parties who refused to participate in the proceedings despite the

PSC's successful efforts in achieving service on these foreign Defendants under the Hague.  The

default judgments against Taishan ultimately put considerable pressure on the Knauf Defendants

and others, and were a strong factor in bringing about the class settlements.  For example, on

November 20, 2009, the Court entered a preliminary default judgment against TG in response to

the PSC's motion for preliminary default judgment in *Germano*.  *See* Rec. Doc. #487.  This

preliminary default judgment served as a springboard to the eventual settlement of many of the

claims in this litigation, as it was the basis for the Court's evidentiary hearing in the *Germano*

bellwether trials, discussed *infra*, confirming the preliminary default judgment against Taishan.

*See* Rec. Doc. #2380 & #3013.  The Court's Findings of Fact and Conclusions of Law in

*Germano* and *Hernandez*, in particular, provided a framework for the eventual settlement of

claims against the Knauf Defendants.  *See* Rec. Doc. #2380.

99.   The PSC also filed motions for preliminary default judgment that resulted in

preliminary default judgments against 33 Defendants including Taishan's parents China National

Building Material Company, Limited ("CNBM"), CNBM Group and Beijing New Building

Materials, Ltd. ("BNBM"), and several entities affiliated with Taishan in *Gross*.  *See* Rec. Doc.

#7302 & #7736.  Similarly, the PSC obtained a preliminary default judgment against BNBM in

*Wiltz*.  *See* Rec. Doc. #7735.  In addition, the PSC drafted omnibus motions for preliminary

default judgment that resulted in the entry of sweeping default judgments orders by the Court:

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

(a) 71 Defendants in *Payton*, *see* Rec. Doc. #12599 & #15687; (b) 33 defendants in *Wiltz, id.*; (c) 83 Defendants in *Gross*, *id*; (c) 14 Defendants in *Rogers*, *id*; (e) 42 Defendants in *Abel*, *id*; (f) 20 Defendants in *Abreu*, *id*; (g) 40 Defendants in *Haya*, *id*; (h) 39 Defendants in *Block*, *id*; (i) 7 Defendants in *Benoit*, *see* Rec. Doc. #16030; (j) 18 Defendants in *Arndt*, *id.*; (k) 50 Defendants in *Almeroth*, *id.*; and (l) 19 defendants in *Cassidy*. *Id.* The PSC prepared and filed two additional omnibus motions for entry of preliminary default in *Amorin*, No. 11-1672; *Amorin*, No. 11-1395; and *Amorin*, No. 11-1673, which remain pending before the Court. *See* Rec. Doc. #17089, #17172 & #17378. These outstanding motions for preliminary default judgments likewise involve many of the critical foreign Defendants in this litigation, including BNBM, CNBM, CNBM Group, Taishan, and other entities affiliated with Taishan.

100. Significant additional briefing occurred after the bellwether trials in *Germano* and the Court's entry of judgment against TG in that case. Taishan moved to vacate the default judgment and challenged the Court's exercise of personal jurisdiction over the company. Taishan also filed separate motions to dismiss the complaints against TG in *Mitchell Co., Inc. v. Taishan Gypsum Co., Ltd.*, 09-4115 (N.D. Fla.) ("*Mitchell*") (originally filed in Florida but transferred to MDL 2047) and against TG and TTP in *Gross* and *Wiltz* (filed in Louisiana), relying on Chinese law to argue that for jurisdictional purposes, the acts of TG's subsidiary should not be imputed to TG, and vice versa. Taishan's briefs were voluminous, totaling in the aggregate more than 450 pages. In addition, Taishan relied on thousands of pages of exhibits, deposition testimony, and a Chinese law expert.

101. The PSC prepared all of the responses to Taishan's jurisdictional motions. Over a period of approximately one month, the PSC prepared: (a) a Global Statement of Facts totaling

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

95 pages; (b) a 58-page Affidavit of Russ M. Herman; (c) 202 evidentiary exhibits supporting the exercise of jurisdiction over Taishan; (d) three declarations of experts on Chinese law from a law professor in China, a corporate attorney in China, and a law professor from Georgetown University; (e) a 39-page Global Memorandum of Law on personal jurisdiction and imputing the acts of TTP to its parent TG and vice versa based on alter ego principles; and (f) three separate individual Memoranda of Law, totaling 81 pages, addressing each of the jurisdictions and long-arm statutes challenged by Taishan (*i.e.*, Virginia, Florida, and Louisiana) and choice of law provisions.  In addition, the PSC filed an omnibus response to Taishan's evidentiary objections.  Further, the PSC presented oral argument to the Court at the evidentiary hearing on these motions.  These efforts were successful.  The Court denied all four of Taishan's jurisdictional motions in a consolidated 142-page Order and Reasons.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012).

102.  Taishan then appealed the jurisdictional ruling in *Germano* and sought permission to appeal the jurisdictional rulings in *Mitchell*, *Gross*, and *Wiltz* under 28 U.S.C. §1292(b).  The PSC opposed Taishan's petitions at the District Court and appellate levels.  After permission to appeal was granted, the PSC prepared Joint Designations of the Records on Appeal, which in *Germano* alone consisted of more than 16,000 pages.  Due to the magnitude of the jurisdictional record, the Fifth Circuit ordered that separate briefs could be filed in each case, and allowed extra pages upon motions from each side.  Again, Taishan's briefs were voluminous, totaling in the aggregate more than 550 pages, not including the Record Excerpts.  The PSC authored Appellees' briefs and Record Excerpts in *Germano*, *Gross*, and *Wiltz*, and assisted Mitchell's counsel with its Appellee brief and Record Excerpts, specifically with regard to Taishan's

49

contacts in Florida and on the issues pertaining to Chinese law and the alter ego relationship

between TG and TTP.  A senior partner in a PSC firm worked full-time for more than five

months opposing Taishan's appeals.  These briefs totaled almost 400 pages.  In addition, the PSC

solicited, coordinated, and assembled *amici* briefs supporting Appellees in *Germano*.  The PSC

also prepared an *amicus* brief in the *Mitchell* appeal addressing the Court's jurisdiction over

Taishan in Florida since the PSC represents thousands of Florida homeowners with CDW in their

properties.  Further, the PSC filed and responded to motions regarding the consolidation of oral

argument in these cases, and also filed and responded to Rule 28(j) submissions of Supplemental

Authority.  In October, 2013, the PSC presented oral argument to the Fifth Circuit Court of

Appeals in *Germano*, which resulted in a published opinion and mandate affirming Plaintiffs'

judgment against Taishan.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, --- F.3d ----,

2014 WL 321844 (5th Cir. Jan. 28, 2014).  The PSC recently presented oral argument to the Fifth

Circuit in *Gross*, *Mitchell*, and *Wiltz*.  The parties are awaiting a decision in those appeals.

103.  The PSC prepared several motions for certification of litigation classes in *Germano*,

*Payton* (Knauf), and *Payton/Vickers v. Knauf Gips KG*, No. 09-4117 (E.D. La.).  The PSC also

filed motions for Florida and/or Louisiana Homeowners classes for damages and/or declaratory

relief.  *See* Rec. Doc. #3293 (*Germano*); Rec. Doc. #5567 & #8125 (*Silva v. Interior Exterior*

*Building Supply, LP*, No. 09-8030 (E.D. La.)); Rec. Doc. #5611 & #8195 (*Vickers/Payton*); Rec.

Doc. #5612 & #8197 (*Payton*).  In addition, the PSC prepared briefs in the Fifth Circuit on behalf

of the InEx Settlement Class when Defendants Southern Homes, LLC, Tallow Creek, LLC, and

Springhill, LLC challenged the Court's stay of state court proceedings during the approval

process for the InEx Settlement (*Plaintiffs' Steering Committee v. Southern Homes, LLC*, No. 11-

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

30619 (5ᵗʰ Cir.)).  Further, in order to protect the Court's jurisdiction over the MDL class

settlements, the PSC filed an All Writs Act motion when a competing settlement class (*Vereen v.*

*Lowe's Home Centers, Inc.*, No. SU10-cv-2267B (Super. Ct. Muscogee Cty. Ga.)) was filed in

Georgia state court.

104.  Further, the PSC prepared a motion to establish a Plaintiffs' Litigation Expense

Fund to compensate and reimburse attorneys for common benefit services performed and

expenses incurred for MDL Administration.  *See* Rec. Doc. #4603.

105.  In a related vendor services suit, *Cataphora, Inc. v. Parker, et al.*, No. 09-5749

(N.D. Calif.), the PSC defended the litigation, assisted in the preparation of pretrial motions, a

summary judgment motion, motions *in limine*, and *Daubert* motions.  They then prepared for and

participated in a week-long jury trial, where they presented testimony as witnesses, and thereafter

filed a multitude of post-trial motions.  On appeal to the Ninth Circuit, the PSC designated the

appellate record, prepared an Appendix, and prepared and filed principal and reply briefs.  In

related litigation before this MDL Court and on appeal to the Fifth Circuit, the PSC prepared

motions, appellate briefs and presented oral argument to both Courts.  Then, they participated in

mediation sessions and finally settled the *Cataphora* litigation.

## Experts

106.  The PSC researched relevant scientific articles and selectively engaged the services

of a variety of experts for the initial inspection and the TIP.  These experts were needed in order

to develop a protocol for home inspections.  The PSC retained experts in the fields of corrosion,

metallurgy, electrical engineering, power electronics, electrical machinery, and failure analysis to

demonstrate the devastating effects of having CDW installed in Plaintiffs' homes.  They also

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

engaged experts to calculate the losses sustained by the Plaintiffs and the costs of remediation

and economic impact of CDW on real estate in support of Plaintiffs' damages. *See* Chart of

Plaintiffs' Experts (Exhibit 18 hereto). The PSC prepared these experts for their depositions and

presented them in support of Plaintiffs' cases at the bellwether trials in *Germano*, *Hernandez*,

and *InEx/North River*, discussed *infra*. The PSC also took the depositions of Defendants'

Experts. *See* Chart of Defendants' Experts (Exhibit 19 hereto).

107. In addition, the PSC retained three prominent experts on Chinese law in conjunction

with the complex and prolix Taishan jurisdictional briefing: Dr. Liu Junhai, Professor of Law,

Renin University of China; Bing Cheng, a practicing corporate attorney in China with an

International Practice; and Dr. James V. Feinerman, Professor at Georgetown University Law

Center. The PSC directed the preparation of their expert declarations and affidavits, and used

them in opposition to Taishan's motions to dismiss for lack of jurisdiction and to oppose

Taishan's Chinese law expert, Professor Zhu Yan, and his interpretation of alter ego principles

under Chinese corporate law and its applicability to these proceedings. The PSC also relied on

these experts before the Fifth Circuit in Appellees' briefs filed in opposition to Taishan's

jurisdictional appeals.

108. Early in the litigation, the PSC retained experts and consultants to advise on

Chinese law, to serve as interpreters/translators, and to undertake "on-the-ground" investigations

within China and Germany. Yan Gao, a Chinese attorney with an L.L.M. in American Business

Law from Tulane Law School, a Juris Master (J.D. equivalent) from China University of Political

Science and Law (Beijing, China), and a Graduate from Jishou University Foreign Language

Department (Hunan, China) was retained by the PSC to assist with legal issues, research and

52

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

translation.  Additionally, the PSC retained an investigator, who conducted investigations for the PSC in Germany, Hong Kong and mainland China.  These investigations assisted the PSC in acquiring information about the Defendant entities, as well as their drywall operations.

109.  The PSC also retained political consultants to canvas Senators and Congress persons from the Gulf South and Virginia to enlist their aid, monitor Congressional action and respond to political media.  Further, qualified inspectors were vetted and retained by the PSC to perform property inspections and to assist in creating inspection protocols and provide recommendations to attorneys and claimants in the Gulf South states for inspections of their properties.  Additional consultants retained by the PSC included special counsel experts and tax advisors in securities and other technical areas of the litigation, as required in connection with Settlement Agreements.

### Bellwether Trials

#### *Germano*

110.  Shortly after the MDL was established, this Court, on November 25, 2009, issued a scheduling order setting an evidentiary hearing to address the scope and extent of appropriate remediation, and the cost of remediation.  The PSC formed a trial team and developed a protocol in *Germano* for the selection of test cases that would be used in a bellwether trial on behalf of Virginia homeowners.  The Knauf Defendants intervened in the action, participated in the defense of the litigation, and proffered their own experts in support of their defense.

111.  Through significant discovery efforts in preparation of the *Germano* trial, the PSC actively developed the science case in the MDL.  The PSC prepared dozens of experts for reports, deposition testimony, and trial testimony, drafted and argued *Daubert* motions, and

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

cross-examined Defendant experts.  They were involved in overseeing extensive laboratory testing of copper and silver components from Virginia homes to identify corrosion as the cause of an HVAC coil failure and severe corrosion deposits at the operative connections in the appliances and in consumer electronics, *see* Rec. Doc. #2380 at 15, 26, as well as sampling and testing of Chinese drywall to determine the extent of chemical off-gassing.  *Id.*

112.  Shortly before the trial, the Knauf Defendants withdrew from the *Germano* proceedings.  The trial proceeded over a two-day period in February, 2010, even though the obstinate Chinese Defendants refused to enter their appearance.  The PSC drafted proposed Findings of Fact and Conclusions of Law.  *See* Rec. Doc. #1514.

113.  The significance of developing the CDW science case and damages case for the *Germano* bellwether trial can hardly be overstated.  On April 8, 2010, this Court issued its scientific findings regarding Chinese Drywall, which distinguish it from typical benign drywall – including specific findings about concentrations and emissions of strontium and elemental sulfur, effects of emissions on the human body, quality of life in the home, fire risk, corrosion, and the failure of electrical and mechanical devices.  *See* Rec. Doc. #2380, at 12-17.  PSC Members were further able to confirm that problematic Chinese Drywall products share similar chemical and physical properties.  *Id.* at 17.  Through extensive testing in the home, they were able to demonstrate that Chinese Drywall homes constituted corrosive environments under standards set out by the Consumer Product Safety Commission, Florida Division of Health, Battelle and International Standards Association, and peer-reviewed literature.  *Id.* at 17-26.

114.  With respect to the damages case, the *Germano* Findings of Fact and Conclusions of Law set the standard for all CDW cases regarding the scope of remediation, based on the

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

testing and conclusions of the PSC's experts.  The Court determined that the appropriate remediation for the Plaintiffs' homes included the removal of all drywall, *id.* at 30, all electrical wiring, *id.* at 34, the entire HVAC system, *id.* at 40, all copper pipes, *id.* at 39, and many other items such as appliances, carpet, cabinetry, trim work, flooring, and insulation.  *Id.* at 26-27, 46-52.  The Court concluded that the scope of remediation was "supported by both the scientific and practical evidence presented" and cited to Plaintiffs' expert testimony.  *Id.* at 27.  Specifically, the Court's conclusion that "all drywall" needed to be removed was based on Plaintiffs' submission that selective removal of only CDW was not feasible or cost-effective – despite Knauf's competing expert submissions in *Germano*.  *Id.*  The Court adopted Plaintiffs' expert Dean Rutila's six reasons why observation of corrosion on a wire is not a reliable tool to be used for the purpose of selective identification and removal of CDW.  *Id.* at 30-34.

115.  These Court-issued findings, which were based on the science case the PSC developed, resulted in a scientifically reliable remedy, assured adequate damages recovery, and ensured that homes would be safe if the protocols were followed.  Additionally, the Court found in *Germano* that the average cost per square foot to repair homes was $86, setting the benchmark for subsequent remediation and settlements.  *Id.* at 57.  Prior to our research, expert analysis, laboratory testing, and investigation for the *Germano* bellwether trial, the findings issued by this Court did not yet exist in any Government protocol.  The science work that supported these findings was extensive, groundbreaking, and developed for and in the *Germano* bellwether trial.

116.  The PSC's key role in and supervision over the bellwether trial against Taishan in *Germano* on behalf of seven Virginia families resulted in a $2,758,356.20 judgment against TG, *see* Rec. Doc. #3013, and a detailed 55-page Findings of Fact and Conclusions of Law holding

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

that Chinese Drywall "has to be remediated." *Chinese Drywall*, 706 F. Supp. 2d at 671.  This

bellwether trial was instrumental in serving as a useful tool and basis for all cases involved in the

litigation, as well as to the Court to evaluate the strengths of Plaintiffs' claims.

### *Hernandez*

117.  Following *Germano*, the PSC expended over $1 million to successfully conduct

another bellwether trial in *Hernandez v. Knauf Gips, KG*, No. 09-6050 (E.D. La.), against

Defendant Knauf Plasterboard Tianjin Co., Ltd., arising out of damages caused by CDW used for

construction in Plaintiffs' home in Louisiana.  The Hernandez Plaintiffs claimed that the CDW in

their home was defective and emitted levels of sulfur, methane and/or other volatile organic

chemical compounds that caused corrosion of HVAC coils and refrigerator units, certain

electrical wiring and plumbing components and other household items, as well as created

noxious "rotten egg-like" odors.  The PSC reached stipulations with Knauf involving jurisdiction

and an agreement that Knauf would not assert certain defenses as a result of any alleged conduct

or fault of any other person.  The trial sought damages due to claims in redhibition pursuant to

Louisiana Code of Civil Procedure Article 2520, *et seq.* and the Louisiana Products Liability Act.

118.  The matter proceeded to trial on March 15, 2010, and culminated on March 19,

2010.  This trial resulted in a Judgment in favor of Plaintiffs in the amount of $164,049.64, plus

reasonable attorneys' fees, costs and legal interest.  *See* Rec. Doc. #3012.  Knauf stipulated that

the CDW in the Plaintiffs' home was defective and not fit for its intended use and agreed that

remediation was necessary.  Thus, the issue for trial was the scope and cost of remediation, and

this trial established the appropriate costs to restore an affected CDW home.  The PSC utilized

experts Lori Streit, Bradley D. Krantz, Dean A. Rutila, Donald Galler, J.C. Tuthill, and Alexis

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

Mallet, Jr. to support their liability and damage claim.  Additional time and effort was expended

on other experts who were fully prepared for trial purposes, but were not called as witnesses.

These included, among others, Arthur Sterbcow, and Kenneth Acks, who were intended to

address real estate valuation and stigma issues.  The PSC prepared and presented to the Court

proposed Findings of Fact and Conclusions of Law.  *See* Rec. Doc. #2248.

119.   In its opinion, the Court determined that as a practical matter, everything in front of

the drywall, such as cabinets, trim, fixtures and bathroom porcelain needed to be removed prior

to the removal of the problematic drywall and that a substantial amount of these items within the

home was not worth salvaging.  The Court established a remediation protocol and ordered that

the cost of the scope of remediation would include:

1.   Removal and replacement of all drywall;
2.   Removal and replacement of all components of the HVAC system;
3.   Removal and replacement of the entire electrical system;
4.   Removal and replacement of all insulation;
5.   Removal and replacement of molding, counter tops, cabinets and other items that must be removed during drywall removal that likely would be damaged and cheaper to replace than preserve;
6.   Removal and replacement of copper and silver components in the plumbing system;
7.   Removal and replacement of carpet, storage and reinstallation of undamaged wood flooring; and protection of tile flooring during remediation;
8.    Cleaning after remediation, including use of HEPA vacuuming and wet-dash wiping or power-washing all surfaces;
9.    Certification from an environmental consultant that the property was free of any CDW; and
10.   Any actions incident to or necessary to carry out and finalize the preceding items.

*See Chinese Drywall*, 2010 WL 1710434.

120.   The Court further ordered alternative living costs be reimbursed to the Hernandez

Plaintiffs and that they be reimbursed for repair costs they had incurred prior to trial and for lost

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

wages. This opinion in *Hernandez* was the seminal decision that led to the successful KPT Pilot Program.

### ***Campbell* and *Clement***

121. The PSC prepared two additional bellwether cases for trial, *Campbell v. KPT*, No. 09-7628 (E.D. La.) and *Clement v. KPT*, No. 09-7628 (E.D. La.). The Campbell and Clement Plaintiffs were selected as bellwether plaintiffs. Extensive stipulations were compiled, negotiated and entered into with the Knauf Defendants. The case was fully worked up for trial purposes (in a similar manner as prior trials) and settled on the eve of trial on June 18, 2010. The PSC spent extensive time pre-trying these cases to a mock jury that enabled the PSC to develop trial themes and strategy. Extensive Plaintiff and property-specific depositions were taken in connection with this trial. Furthermore, experts such as Lori Streit, Bradley D. Krantz, Dean A. Rutila, Donald Galler, Alexis Mallet, Arthur Sterbcow and Rosemary Coates were all worked up and prepared for trial. Depositions in advance of trial were extensive.

122. Ultimately, all these bellwether trials led to the culmination of the nine class settlements. The *Germano* and *Hernandez* judgments and the favorable Findings of Fact and Conclusions of Law in *Germano* and *Hernandez* brought the Knauf Defendants to the negotiating table and enabled the PSC to successfully reach global settlements with not only the Knauf Defendants, but also Banner, InEx, L&W and hundreds of builders, installers, and distributors of CDW and their insurers, all of which provide, in combination, up to an estimated $1.1 billion in significant benefits to Class Members, as discussed in more detail, *infra*.

### ***InEx/North River***

EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses

123.  As shown below, the InEx Settlement was funded by InEx's primary insurance only, but assigned to Plaintiffs the right to pursue $72 million in excess insurance written by North River, which ultimately, if successful, would be used to fund remediation benefits as part of the Knauf Settlement.  The PSC's agreement with the Knauf Defendants as well as their fiduciary duties to Plaintiffs required that the PSC pursue recovery under the North River policy. Accordingly, the PSC participated in discovery of North River, taking the important deposition of Ms. Agnes Reiss of North River.  The PSC also led the mediation efforts to resolve the dispute with North River.  When that failed, they formed a trial team to adjudicate before a jury the question of InEx's role and level of responsibility in the CDW debacle.  Over a period of several months, the PSC oversaw and coordinated the careful selection of 12 test cases for discovery and the bellwether trial of four of these cases from the test pool.  In connection with the InEx/North River bellwether trial, the PSC expended extensive efforts to prepare a number of experts to be utilized in the trial, including Arthur Sterbcow (stigma damage/real estate valuation) and Rosemary Coates (import/export and distribution expert).

124.  The InEx/North River bellwether trial resulted in a judgment for InEx and North River on Plaintiffs' claims that InEx was a bad faith seller under Louisiana law.  *See* Rec. Doc. #16409.

**Settlement Negotiations, Drafting Agreements, Settlement Briefing, and Objections**

125.  The intensive discovery and litigation efforts of the PSC and the successful results achieved in the bellwether trials in *Germano* and *Hernandez*, along with court-facilitated mediations, brought many Defendants to the negotiating table and opened the door for a global resolution of Plaintiffs' claims.  Early in the litigation, Members of the PSC, who are skilled

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

attorneys with extensive and vast experience in class action and multidistrict litigation, began

negotiations with the Knauf Defendants, certain builders, and Banner.  Then, beginning in

November 2009, the Court appointed a Special Master "to explore opportunities for an ultimate

resolution of the instant matter as to any and all interested parties."  *See* Order Appointing

Special Master [Rec. Doc. #505 at 4].  The PSC thereafter devoted hundreds of hours, over many

months, to intense and hard-fought settlement negotiations and mediations with the Knauf

Defendants and hundreds of Defendant importers, suppliers, builders, distributors and installers

in the KPT Chinese Drywall supply chain, and their insurers.  These negotiations required

extensive travel to many locations throughout the world.  The PSC's efforts resulted, first, in

Court approval of the KPT Pilot Program in October, 2010, and Court approval of the

remediation protocols and the Already Remediated Homes program, which then created the

roadmap to the InEx, Banner, Knauf, L&W, Global, and Virginia Settlements.

126.  PSC Members and common benefit attorneys traveled numerous times to New

Orleans, New York, Florida, and other locations to meet with Knauf's counsel and the principals

in the Knauf organization, and they had numerous phone meetings with the Knauf Defendants to

hammer out the details of the KPT Pilot Program and the Knauf Settlement.  Similarly, these

attorneys were integral in the negotiations that led to the Banner, InEx, L&W, and Global

Settlements.  They traveled to New Orleans and New York and had many face-to-face and

telephone meetings with Banner's counsel, InEx's counsel, Insurers' Counsel, Liaison Counsel

for the Insurers, and counsel for L&W.

127.  In fact, the PSC had at least 98 face-to-face meetings and 35 telephone conferences

with the Knauf Defendants and/or their counsel, along with at least 19 settlement conferences

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

and 2 mediations before the Court, in an attempt to reach a global resolution of Plaintiffs' claims. For the Banner Settlement, the PSC participated in at least 11 negotiation sessions and 16 conference calls with Banner, its counsel and/or its insurers' counsel, and 10 conferences with the Court (including conference calls).  The InEx Settlement involved at least 6 separate meetings, 6 conference calls with InEx's counsel and/or its insurers' counsel, 1 mediation, and 3 conferences with the Court.  The complex Global Settlement required at least 19 meetings, 27 conference calls, and 1 conference with the Court.  Finally, in order to reach the L&W Settlement, the PSC had 1 meeting and 2 conference calls with L&W's attorneys.

128.   The KPT negotiations resulted in an agreement with the Knauf Defendants in October 2010, known as the "KPT Pilot Program," for the remediation of homes containing KPT Chinese Drywall.  This agreement is posted on the Court's website at http://www.laed.uscourts.gov/Drywall/DemonstrationRemediationAgreement.pdf.  In addition to the Knauf Defendants, InEx and Banner participated in and contributed funds to this settlement. *See* Transcript of Proceedings, 10/14/10, at 5:3-5.  Pursuant to the KPT Pilot Program thousands of homes were remediated.  The success of this program laid the foundation for the InEx, Banner, Knauf, L&W, Global, and Virginia Settlements to be reached.

129.   After the parties reached agreements in principal, the PSC spent hundreds of hours over many months negotiating the details of each settlement, including the class and subclass definitions, forms of relief, class benefits, security provisions, claims administration, stay provisions, appeal and audit rights, releases, and judgment reduction provisions, etc.  Then, they drafted each of the individual, but related, class Settlement Agreements, accompanying exhibits, class notices, motions for preliminary approval, supporting memoranda of law, proposed

preliminary approval orders, and final orders and judgments. The PSC also took primary responsibility for disseminating class notices, tracking opt-outs and rescissions of opt-outs, responding to objections, and handling the Fairness Hearings.

130. The PSC took sole responsibility for deposing questionable and professional objectors, including the clients of Attorney Christopher Bandas, one of whom was Bandas' office manager, Jan Petrus. Upon learning that the PSC intended to conduct their depositions, several of these Bandas objectors (including Jan Petrus) sought to withdraw their objections to the settlements in order to avoid being deposed. *See* Rec. Doc. #15957 (Jan Petrus' Motion to Dismiss Objection); Rec. Doc. #15979 (Earnest Vitela's Motion to Dismiss Objection); Rec. Doc. #16040 (E&E Construction Co.'s Motion to Dismiss Objection). After successfully serving these objectors with subpoenas, at the insistence of Mr. Bandas, the PSC moved forward with the depositions of the Bandas objectors, even though these objectors went to great lengths to evade service with subpoenas. In the case of Ernest Vitela, after successfully serving Mr. Vitela with a subpoena to conduct his deposition, Mr. Bandas moved in the United States District Court for the Southern District of Texas to quash the subpoena. At the hearing on the motion to quash, the PSC presented argument on behalf of the Settlement Classes, and the court refused to quash the subpoena. Mr. Vitela was ordered to appear for a deposition, but he remains in contempt of the court's order, as he did not appear at the time and location set for his deposition.

131. The PSC traveled to Corpus Christi, Texas on several occasions to take the depositions of the Bandas objectors (Ronnie Garcia and Saul Soto). At these depositions it was learned that they had no knowledge of the terms of the class settlements to which they were objecting, that Mr. Bandas had used a third-party law firm (the Batman Law Firm) to solicit

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

clients for purposes of objecting to settlements, that the objectors were asserting entirely

pretextual objections to the settlements, and that the objectors had been solicited to pursue their

objections with a promise of a $5,000 bounty as incentive for pursuing their baseless objections.

The PSC filed a motion for sanctions against Bandas himself, which has not yet been ruled upon

by the Court.

132.   The PSC also deposed objector Wayne Kaplan in Coral Gables, Florida in

connection with the Banner and Global Settlements.

133.   Further, the PSC filed numerous briefs addressing all objections to the settlements,

which ultimately were dismissed by the Court.  With the departure of these objections, the PSC's

efforts cleared the path for the orderly disposition and approval of the class settlements.  The

InEx, Banner, Knauf, L&W, Global Settlements, and Virginia Settlements have now been finally

approved by the Court.  *See* Rec. Doc. #s16570, 16934.

### Post-Settlement Administration Efforts

134.   Following approval of the nine class settlements, the PSC has worked with defense

counsel and the Clerk of Court to effectuate dismissals of settling Defendants from the

appropriate Omni actions.  The PSC Members who were appointed as Class Counsel and/or

Subclass Counsel for the Knauf, Banner, InEx, L&W, Global, and Virginia Settlements continue

to work diligently to make sure that settlement funds are fairly administered.  Similarly, the PSC

Members who were appointed to the Allocation Committees for the InEx, Banner, Global, and

Virginia Settlements, along with Class Counsel, work closely with the Settlement Claims

Administrators BrownGreer and Garretson Resolution Group, the court-appointed Curator Bob

Johnston, various defense liaison counsel, other Members of the Settlement Allocation

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

Committees, and the Court-appointed Ombudsmen to oversee Settlement Administration and ensure fair an equitable distribution of an estimated $1.1 billion in settlement funds and benefits to Class Members from the Knauf, InEx, Banner, L&W, Global, and Virginia Settlements.

135.   Specifically, Class Counsel and PSC Members have made significant efforts to prepare and develop Court-approved settlement websites and call centers, Court-approved hard-copy and electronic claim forms and other Claims Administration Procedures ("CAPs").  *See* CAP No. 1; CAP No. 2; CAP No. 3; CAP No. 4; CAP No. 5; CAP No. 6.  They continue to assist in the administration of all class settlements on an ongoing basis.  As of April 2, 2014, almost 4,000 homes with KPT Chinese Drywall have been completely remediated or are in the process of remediation, enabling Plaintiffs who were displaced from their homes due to defective Chinese Drywall to return to their residences.  Plaintiffs have filed approximately 22,000 claims for cash and/or other loss benefits in these settlement programs.  *See* Status Report #9 of Settlement Administrator BrownGreer, filed 4/16/2014; Fourth Status Report of Settlement Administrator Matthew L. Garretson for the Four Virginia-Based Settlements, filed 4/16/2014.

136.   In addition, Class Counsel have established and monitored the Court-approved Qualified Settlement Funds.

**Ongoing Litigation Efforts**

137.   The PSC's consistent, ongoing, and significant contributions to the litigation continue uninterrupted.  The PSC is solely and vigorously pursuing claims against the Taishan Defendants and their related entities, including their upstream entities – CNBM and BNBM.  As part of the PSC's global settlement with the Knauf Defendants, the PSC agreed to continue the labor-intensive task of pursuing the Taishan entities so that Knauf would not be at an economic

64

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

disadvantage in the Chinese marketplace following the settlement.  Thus, the PSC will continue

to pursue Plaintiffs' claims against these Defendants in an effort to provide compensation for

non-KPT Property Owners.  They will continue to prosecute these claims as long as necessary,

recognizing the fiduciary obligations owed to these Plaintiffs and the Court despite potentially

diminished remuneration.  In *Germano*, the PSC is in the process of executing on the

$2,758,356.20 judgment against TG on behalf of seven Virginia families that is now final.  In

addition, after Taishan challenged this Court's exercise of jurisdiction over it in Louisiana,

Florida, and Virginia, the PSC prepared and filed the three *Amorin* Complaints (Omnibus XV,

filed in the Southern District of Florida; Omnibus XVI, filed in the Eastern District of Louisiana;

and Omnibus XVII, filed in the Eastern District of Virginia), and intervened all Plaintiffs with

Taishan CDW in their homes into those actions, as a protective measure for jurisdictional

purposes.  These states, along with California, contain important ports of entry for Taishan's

product into the United States.  Accordingly, the PSC also prepared and filed a protective class

complaint against Taishan in the Central District of California, *see Abner, et al. v. Taishan

Gypsum Co. Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, No. 11-3094 (E.D. La.), and

will prosecute all of these cases against the Taishan Defendants.

138.  Claims remain as well in Omnibus III against non-Settling Defendants.  *See Gross,

et al. v. Knauf Gips, KG, et al.*, Case No. 2:09-cv-06690 (E.D. La.) (original complaint, Omnibus

III, III(A)) (asserting alternative liability theory against all known manufacturers for drywall that

cannot be traced to a particular manufacturer).  The PSC continues to vigorously pursue those

claims on behalf of Plaintiffs.

### PSC Administrative Services Not Billed to MDL 2047

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee
Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys'
Fees and Reimbursement of Expenses**

139.  On top of the hours and expenses reported by the PSC and common benefit attorneys pursuant to Pretrial Order Nos. 9 and 9A, the PSC has provided and/or managed important administrative services for the prosecution of Plaintiffs' cases, which in large part were not billed to this case, but, rather, absorbed by PSC Members and their firms.  These unbilled administrative services include, but are not limited to:  preparing and updating Plaintiff and Defendant lists; receipt of contact information pursuant to PTO 5 and updating it throughout the litigation; establishing and maintaining the electronic service (LexisNexis) pursuant to PTO 6; liaisoning with Defendants' Liaison Counsel and other liaison counsel; coordinating with the various defendants, homebuilders and other steering committees; preparation and service of paper copies of appellate briefs, record excerpts, and appendices on parties to appeals; maintaining pleadings files; maintaining a database of entries of court appearances; scheduling court reporters and videographers for depositions and coordinating cross-noticing of depositions; maintaining a database of notices of depositions, deposition transcripts, trial transcripts and exhibits, and hearing transcripts; monitoring email blasts regarding Federal/State CDW coordination; tracking and responding to phone calls from parties and Class Members; and reviewing emails.

140.  In addition, throughout this litigation, Plaintiffs' Lead Counsel and Plaintiffs' Liaison Counsel monitored and managed all common benefit work assignments, and audited and continue to audit the time and expenses of common benefit counsel, in conjunction with the Court-appointed CPA Philip Garrett.  They have coordinated the time and billing guidelines and cost submissions of the PSC Members and common benefit counsel with the Court and Court-appointed CPA Philip Garrett, pursuant to PTO 9, as well as state court counsel submissions

pursuant to PTO 9(A), and reviewed Shared Costs and sought Court approval for payment of those costs.  Finally, Plaintiffs' Liaison Counsel has coordinated and overseen the distribution and retention of profile forms, distributed communications to coordinate all Plaintiffs' counsel, and completed and served Proofs of Service on all Defendants, including those in the various Omni Complaints.

141.  For more than five years, since 2009, the PSC's serious commitment to this litigation has prevented many Members of the PSC from working on additional cases and engaging in other financially rewarding endeavors.  From the outset, the PSC treated this MDL and the related state court Chinese Drywall litigation as a single endeavor, with no one aspect more important than any other.  The PSC pursued all Defendants aggressively in order to maximize Plaintiffs' recoveries, and they continue their efforts against the Taishan Defendants.

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**

We declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of May, 2014

_____          _____
RUSS M. HERMAN                                      ARNOLD LEVIN

68

**EXHIBIT A to Memo of Law in Support of Consolidated Joint Petition of the Fee Committee and the Plaintiffs' Steering Committee for a Global Award of Attorneys' Fees and Reimbursement of Expenses**