# EXHIBIT K



Colson
Hicks
Eidson

ERVIN A. GONZALEZ
Board Certified Civil &
Business Trial Attorney

October 1, 2013

*VIA FEDERAL EXPRESS*

Mindy Nunnally
Analyst II
BROWNGREER PLC
250 Rockets Way
Richmond, Virginia 23231

   Re: Knauf – (Self Remediation Option – Milestone 1 Docs)
     Jason Santiago
     2140 SE 19th Avenue
     Homestead, Florida 33035

Dear Mindy Nunnally,

Enclosed please find the following materials:

1. Homeowner Wire Transfer Instruction;
2. Contractor Wire Transfer Instruction Form;
3. W-9 for Contractor;
4. Property Owner Release and Assignment of Claims;
5. Binding Contractor between homeowner and insured and bonded licensed
   contractor.
   - Copy of Contractor license;
   - Copy of certificate of insurance, and;

6. Rider to Self-Remediation Contract Pursuant to the Settlement Agreement
   Regarding Claims against the Knauf Defendants in MDL No. 2047.
   - Exhibit F (enclosed)
   - Moss Xactimate Scope of Work (provided via e-mail)

Should you have any questions, please do not hesitate to contact us.

       Very Truly Yours,

       ERVIN A. GONZALEZ
       PATRICK S. MONTOYA
       NATALIE M. RICO

EAG/PSM/NMR/brf

## HOMEOWNER WIRE TRANSFER INSTRUCTIONS

All payments issued, pursuant to the terms of the Settlement Agreement for the Demonstration Remediation of Homes with KPT Drywall, to the owner of a Remediation Home ("Homeowner") will be made by the Escrow Agent by wire transfers ("wire"). Wires can be issued to either the Homeowner or to a firm account designated by Primary Counsel. No payments can be issued to a Homeowner or Primary Counsel until this form has been completed and returned to the Remediation Program Administrator.

### A. HOMEOWNER INFORMATION

| Homeowner Name | Jason Santiago | | | |
|---|---|---|---|---|
| Property Address | Street 2140 SE 19 Avenue | | | |
| | City Homestead | State FL | Zip 33035 | Country USA |

### B. BANK WIRING INSTRUCTIONS

| Bank Name to Which Wire is to be Sent | Bank Name NORTHERN TRUST BANK | | | |
|---|---|---|---|---|
| | Street 700 Brickell Avenue, 4th Floor | | | |
| | City Miami | State FL | Zip 33131 | Country USA |
| Bank Telephone Number | 305-789-1143 | | | |
| Bank ABA/ Routing Number | | | | |
| Account Name | Colson Hicks Eidson Trust Account | | | |
| Account Number | | | | |

### C. CERTIFICATION BY COUNSEL
(IF WIRE IS BEING ISSUED TO COUNSEL ON BEHALF OF THE HOMEOWNER, COUNSEL MUST COMPLETE THE FOLLOWING)

By my signature below, I represent and warrant, on behalf of the Counsel identified below, that:

(a) Counsel will comply with all laws and ethical rules and obligations under applicable law as to any payment received in the Remediation program, including without limitation those regarding the handling and disposition of client funds;

(b) The account or fund into which the payments will be received by wire is an appropriate escrow, trust or other such account required by applicable law and ethical rules for the receipt of client funds and/or a payment on the settlement of a claim.

| Signature | | Date | 10 / 1 / 13 (month) (day) (year) |
|---|---|---|---|
| Printed Name | First Natalie | MI M. | Last Rico |
| Firm Name | Colson Hicks Eidson | | |

382080

Contractor Wire Transfer Instructions

## CONTRACTOR WIRE TRANSFER INSTRUCTIONS

*All payments issued to the contractor of a Remediation Home ("contractor") will be made by the Escrow Agent by wire transfer ("wire"). Wires can be issued to an account designated by the contractor. No payments can be issued to a contractor until this form has been completed and returned to BrownGreer through the Chinese Drywall secure web portal or by mail to Remediation Program Administrator, 115 S. 15th Street, Suite 400, Richmond, VA 23219, or by fax to (804) 521-7299.*

### A. CONTRACTOR INFORMATION

| Contractor Name | CAli Greens Construction, Inc. | | | |
|---|---|---|---|---|
| Contractor Address | Street 2358 SW 17 TERR | | | |
| | City Homestead | State FL | Zip 33035 | Country USA |

### B. PROPERTY INFORMATION

| Homeowner Name | JASon Santiago | | | |
|---|---|---|---|---|
| Homeowner Address | Street 2140 SE 19 Ave. | | | |
| | City Homestead | State FL | Zip 33035 | Country USA |

### C. BANK WIRING INSTRUCTIONS

| Bank Name to Which Wire is to be Sent | Bank Name 1st National Bank of South Florida | | | |
|---|---|---|---|---|
| | Street 1550 N. Krome Ave | | | |
| | City Homestead | State FL | Zip 33030 | Country USA |
| Bank Telephone Number | (305) 247-5541 | | | |
| Bank ABA / Wire Transfer Number | | | | |
| Account Name | CAli Greens Construction, Inc. | | | |
| Account Number | | | | |
| For Further Credit | | | | |
| Account Number | | | | |

406845
5/15/12

| Form **W-9**<br>(Rev. January 2011)<br>Department of the Treasury<br>Internal Revenue Service | **Request for Taxpayer**<br>**Identification Number and Certification** | Give Form to the<br>requester. Do not<br>send to the IRS. |

Name (as shown on your income tax return)
**Cali Greens Construction, Inc.**

Business name/disregarded entity name, if different from above

Check appropriate box for federal tax classification (required): ☐ Individual/sole proprietor  ☐ C Corporation  ☑ S Corporation  ☐ Partnership  ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=partnership) ▶ _____

☐ Other (see instructions) ▶

☐ Exempt payee

Address (number, street, and apt. or suite no.)
**2358 SE 17 TERR.**

Requester's name and address (optional)

City, state, and ZIP code
**Homestead, FL 33035**

List account number(s) here (optional)

## Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on the "Name" line to avoid backup withholding. For individuals, this is your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the Part I instructions on page 3. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN on page 3.

Note. If the account is in more than one name, see the chart on page 4 for guidelines on whose number to enter.

Social security number

Employer identification number
**36-4656868**

## Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me), and

2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding, and

3. I am a U.S. citizen or other U.S. person (defined below).

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions on page 4.

**Sign Here** | Signature of U.S. person ▶ _Tony Joseph_ | Date ▶ 7/29/13

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

## Purpose of Form

A person who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) to report, for example, income paid to you, real estate transactions, mortgage interest you paid, acquisition or abandonment of secured property, cancellation of debt, or contributions you made to an IRA.

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN to the person requesting it (the requester) and, when applicable, to:

1. Certify that the TIN you are giving is correct (or you are waiting for a number to be issued),

2. Certify that you are not subject to backup withholding, or

3. Claim exemption from backup withholding if you are a U.S. exempt payee. If applicable, you are also certifying that as a U.S. person, your allocable share of any partnership income from a U.S. trade or business is not subject to the withholding tax on foreign partners' share of effectively connected income.

Note. If a requester gives you a form other than Form W-9 to request your TIN, you must use the requester's form if it is substantially similar to this Form W-9.

Definition of a U.S. person. For federal tax purposes, you are considered a U.S. person if you are:

• An individual who is a U.S. citizen or U.S. resident alien,

• A partnership, corporation, company, or association created or organized in the United States or under the laws of the United States,

• An estate (other than a foreign estate), or

• A domestic trust (as defined in Regulations section 301.7701-7).

Special rules for partnerships. Partnerships that conduct a trade or business in the United States are generally required to pay a withholding tax on any foreign partners' share of income from such business. Further, in certain cases where a Form W-9 has not been received, a partnership is required to presume that a partner is a foreign person, and pay the withholding tax. Therefore, if you are a U.S. person that is a partner in a partnership conducting a trade or business in the United States, provide Form W-9 to the partnership to establish your U.S. status and avoid withholding on your share of partnership income.

Cat. No. 10231X

Form **W-9** (Rev. 1-2011)

Self-Remediation Option Release

## PROPERTY OWNER RELEASE
## AND ASSIGNMENT OF CLAIMS

This RELEASE ("Release"), dated this _31st_ day of _July_

201_3_ is entered into by [name(s) of property owners] _Jason Sanntaga_

(hereinafter "Claimant") (Social Security Number(s)     , owner of the property

located at _2140 SE 19TH Avenue, Homestead, FL 33035_

("Property"), which Claimant acquired title to on [date] _12/27/2007_.

WHEREAS, on or about _12/9/2009_____, Claimant commenced a lawsuit

on Claimant's own behalf against one or more of Knauf Plasterboard (Tianjin) Co., Ltd.

("KPT"), Knauf Plasterboard (Wuhu) Co. Ltd., Guangdong Knauf New Building Material

Products Co., Ltd., Knauf International GmbH, Knauf Insulation GmbH (referred to in MDL

2047 as Knauf Insulation USA), Knauf AMF GmbH & Co. KG, Knauf UK GmbH, Knauf do

Brasil Ltda., Gebr. Knauf Verwaltungsgesellschaft, PT.Knauf Gypsum Indonesia, or Knauf Gips

KG (collectively "Knauf Defendants"), and the builder, supplier, installer, and insurer defendants

(collectively "the Supply Chain Defendants"). Claimant's action was filed as:

[case caption] _Payton v. Knauf Gips, KG et al. in the USDC for the EDLA._
_Case No. 09-7628 and Vickers et al. v. Knauf_

in the [Court] _Gips KG et al, Case No. 09-4117 in the USDC for the_
_EDLA._

(hereinafter "Action"); and

WHEREAS, on October 14, 2010, the Knauf Defendants and the MDL Plaintiffs'

Steering Committee (the "PSC") in *In re: Chinese Manufactured Drywall Products Liability

Litigation*, MDL No. 2047 (the "MDL") entered into a Settlement Agreement for the

Demonstration Remediation of Homes with KPT Drywall (the "Demonstration Remediation

Agreement") to create a program (the "Program") to remediate homes that contain all or substantially all KPT drywall board ("KPT Chinese Drywall");

WHEREAS, on December 20, 2011, the Knauf Defendants and the PSC entered into the Settlement Agreement Regarding Claims against the Knauf Defendants in MDL No. 2047 ("Class Settlement Agreement"), which, based on the Program created by the Demonstration Remediation Agreement, provides property owners whose properties contain KPT Chinese Drywall with the option to remediate their properties, or in lieu of remediation, a cash payment as calculated pursuant to Section 4.3.3 of the Class Settlement Agreement;

WHEREAS, on January 10, 2012, the MDL Court preliminarily approved the Class Settlement Agreement;

WHEREAS, pending the MDL Court's final approval of the Class Settlement Agreement, and irrespective of whether the Class Settlement Agreement is finally approved, the Knauf Defendants, without waiving any rights under the Demonstration Remediation Agreement, will offer owners of properties eligible for the Program the following remediation options set forth in Sections 4.3.1 through 4.3.3 of the Class Settlement Agreement: (i) the Program Contractor Remediation Option; (ii) the Self-Remediation Option; and (iii) the Cash-Out Option;

WHEREAS, the Claimant hereby represents that Claimant is authorized under applicable law to represent and bind all other relevant parties, including any and all representatives, agents, successors, assigns, beneficiaries, heirs, or executors of the Claimant, Claimant's estate, or the estate of any of them, who are not signatories to this Release and by signing this Release does so bind;

WHEREAS, the Claimant has selected the Self-Remediation Option pursuant to Section 4.3.2 of the Class Settlement Agreement;

WHEREAS, Claimants' counsel has explained to Claimant, and Claimant understands, (i) the terms of this Release; (ii) the terms and conditions set forth in the Demonstration Remediation Agreement; and (iii) the terms and conditions set forth in Section 4.3.2 of the Class Settlement Agreement;

NOW, THEREFORE, for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties hereto, each and all intending to be legally bound, hereby stipulate and agree as follows:

1. Claimant represents that Claimant owns and occupies the above listed property and that no other individual or entity has any direct or indirect ownership interest in the above listed property other than a mortgagee or other lien holder, and further represents that any such mortgagee or lien holder has not commenced foreclosure proceedings or acquired an ownership interest in such property and that Claimant is not in default on any financial obligations for which the property is security or collateral for repayment of such obligations.

2. Claimant agrees that the consideration and actions performed by the Knauf Defendants in satisfying their obligations under the Demonstration Remediation Agreement and the Class Settlement Agreement, will constitute full compensation and settlement arising out of or related to claims asserted in the Action or to the KPT Chinese Drywall in the Property, and that Claimant will not seek anything further, including any other payment, from any other person or entity related to the Action, except as described below.

3.    Claimant and the Knauf Defendants further agree that, in exchange for the consideration that is described herein, including but not limited to the offer to pay Claimant's chosen contractor a sum certain towards the remediation of Claimant's property pursuant to the terms of Section 4.3.2 of the Class Settlement Agreement, the Claimant will dismiss with prejudice the Action.

4.    Claimant unconditionally releases and relinquishes all rights that Claimant has or may have against the Knauf Defendants and the Supply Chain Defendants arising out of or relating to claims asserted in the Action and/or the KPT Chinese Drywall in the Property, any and all persons or entities who furnished services for, or in any way facilitated or assisted in, the installation of KPT Chinese Drywall in the Property, including without limitation, any actual or potential defendants, including but not limited to, contractors, builders, suppliers, designers, real estate agents, hangers, and/or consultants, and their respective insurance carriers; and all of their past, present, and future parents, subsidiaries, affiliates, controlling persons, officers, directors, employees, shareholders, suppliers, distributors, contractors, agents, servants, counsel, and insurers; and all predecessors, successors, assigns, heirs, executors, estate administrators, any person who may have a claim of indemnity or contribution against the Knauf Defendants or Supply Chain Defendants, and personal representatives of each of the foregoing, separately or collectively.  This general release includes without limitation past, present, and future remediation, construction, reconstruction, repair or claims for any and all damages, compensatory and/or punitive and/or other, penalties, costs, expenses, attorney's fees, and interest, pre-judgment and/or post-judgment, and includes those KPT Chinese Drywall-related damages of Claimant of which Claimant is

not aware, and those Claimant) does not anticipate, with the sole exception of the Reserved Claims defined in Paragraph 5 below. Other than as to the Reserved Claims, this is a full, final and absolute general release and covenant not to sue.

5.   The following claims against the Knauf Defendants are reserved (the "Reserved Claims"):

a.   Claims by Claimant for bodily injury and economic injuries solely to the extent that such claims are covered by the Other Loss Fund created by the Class Settlement Agreement and solely to the extent that Claimant seeks to resolve such claims by participating in the Class Settlement Agreement. In the event that the MDL Court does not grant final approval of the Class Settlement Agreement or in the event that the Knauf Defendants or PSC exercise their termination rights under the Class Settlement Agreement, Claimant shall reserve (i) Claimant's bodily injury claims and (ii) claims covered by Paragraph III(C) of the Demonstration Remediation Agreement, and the Knauf Defendants shall reserve all defenses, including jurisdictional defenses, as to bodily injury claims;

b.   Claims by Claimant's counsel for "Attorneys' Fees" as defined in Paragraph IX of the Demonstration Remediation Agreement and, upon final approval by the MDL Court, if such final approval is granted, pursuant to the terms of the Class Settlement Agreement. In the event that the MDL Court does not grant final approval of the Class Settlement Agreement or in the event that the Knauf Defendants or the PSC exercise their termination rights under the Class Settlement Agreement, claims for Attorneys' Fees shall be resolved pursuant to Paragraph X of the Demonstration Remediation Agreement; and

    c.   Claims in connection with the performance of, and any obligations arising under, the Demonstration Remediation Agreement and, upon final approval, the Class Settlement Agreement.

6.   Except as to the Reserved Claims, Claimant hereby assigns, transfers and otherwise relinquishes to the Knauf Defendants any and all of Claimant's claims and/or causes of action Claimant has, or may have, (1) in connection with the KPT Chinese Drywall in the Claimant's Property, against the Supply Chain Defendants and (2) in connection with any non-KPT drywall manufactured in China ("Other Chinese Board") found in the Property, if any, against the manufacturers of the Other Chinese Board (the "Assigned Claims").  The Knauf Defendants shall be permitted to prosecute the Assigned Claims at their own expense, in which case Claimant shall reasonably cooperate in the prosecution of the Assigned Claims.  However, if the Knauf Defendants elect not to prosecute the Assigned Claims against one or more of the Supply Chain Defendants, the release in Paragraph 4 above shall be effective as to any or all of the Supply Chain Defendants as against whom the Knauf Defendants decline to bring the Assigned Claims.

7.   Subject to Paragraph 6 above, this Release is effective immediately with exception that it shall be effective as to the Knauf Defendants upon payment by the Knauf Defendants to Claimant's chosen contractor, under Section 4.3.2.2 of the Class Settlement Agreement, of the first 30% of the amount the Knauf Defendants will contribute toward the remediation of the Property as calculated pursuant to Section 4.3.2 of the Class Settlement Agreement.  The effectiveness of this Release as against the Knauf Defendants is subject to the Knauf Defendants' continuing obligation to make the

payments described in Section 4.3.2.2 of the Class Settlement Agreement to Claimant's chosen contractor provided that Claimant continues to meet their obligations under Section 4.3.2.2, for example, providing the Knauf Defendants with an Environmental Certificate as defined in Section 1.11 of the Class Settlement Agreement.

8.  Claimant understands and acknowledges the significance and consequence of releasing all of Claimant's KPT Chinese Drywall-related causes of action and/or claims (including presently existing, but unknown, unasserted, unsuspected, or undiscovered KPT Chinese Drywall-related causes of action and/or claims), and hereby assume full risk and responsibility for any and all injuries, losses, damages, assessments, penalties, charges, expenses, costs, and/or liabilities that Claimant may hereinafter incur or discover that in any way arise out of or relate to such causes of action. To the extent that any law, statute, ordinance, rule, regulation, case or other such legal provision or authority may purport to preserve Claimant's right hereafter to assert presently existing but unknown, unasserted, unsuspected, or undiscovered KPT Chinese Drywall-related causes of action and/or claims, which would otherwise be barred by the terms of this Release, Claimant hereby specifically and expressly waives Claimant's rights under such law, statute, ordinance, rule, regulation, case or other such legal provision or authority.

9.  As provided for in Rule 408 of the Federal Rules of Evidence or its equivalent in state court jurisdictions, Claimant and the Knauf Defendants, and every person employed or retained by them who has any knowledge of any term of this Release or of any settlement, release, or waiver referred to herein will not introduce in evidence this Release, or any portion of the contents thereof, or any amount provided herein, or any

amount received by Claimant, in any proceeding other than a proceeding to consummate or enforce this Release.

10. In further consideration of the foregoing, and with the exception of the Reserved Claims, Claimant and Claimant's undersigned counsel further agree and covenant to forever indemnify, defend and hold harmless the Knauf Defendants, and without limitation, their successors, predecessors, assigns, affiliates, shareholders, investors, and their past, present and future officers, directors, partners, attorneys, agents, employees, parent companies, partnerships, subsidiaries, sister corporations and representatives from and against all claims and future claims relating to the KPT Chinese Drywall in the Property.

11. Claimant is bound by this Release.  Anyone who succeeds to Claimant's rights and responsibilities, including any and all representatives, agents, successors, assigns, beneficiaries, heirs, or executors of the Claimant, Claimant's estate, or the estate of any of them is also bound.  This Release is made for the benefit of Claimant and the Knauf Defendants.

12. The Claimant authorizes and instructs Claimant's counsel to deliver to the Knauf Defendants a Notice of Dismissal with prejudice of the Action, which shall be "so ordered" by the Court where the Action is pending, as against all defendants in accordance with the provisions herein and the terms of the Demonstration Remediation Agreement and, in the event the MDL Court grants final approval, the Class Settlement Agreement.   Claimant and Claimant's counsel shall cooperate with the Knauf Defendants in any additional way reasonably necessary to obtain such dismissal with

prejudice.  Such delivery of the Notice of Dismissal shall be made to Kerry J. Miller, Frilot L.L.C., Suite 3700, 1100 Poydras Street, New Orleans, Louisiana 70163.

13. Claimant acknowledges that Claimant has not received or relied on any agreements or promises other than as contained in writing in this Release.  In executing this Release Claimant has relied on Claimant's own or Claimant's counsel's analysis of the facts and information of which they are independently aware, and assumes the risk that there may prove to be facts or information different from or in addition to what they now know or believe.

14. Nothing in this Release shall constitute (i) any admission of liability or fault of any kind on the part of Knauf Defendants who expressly deny any liability to the Claimant  and who are entering this agreement to avoid the expense and uncertainty of litigation; (ii) an admission of or consent to jurisdiction or waiver of any jurisdictional defenses, except as provided in the Demonstration Remediation Agreement and, in the event the MDL Court grants final approval, the Class Settlement Agreement; or (iii) consent to service by the Knauf Defendants.  Neither this Release nor any Agreement shall be admissible in evidence in any proceedings except in an action to enforce the terms of the Release, the Demonstration Remediation Agreement, or in the event the MDL Court grants final approval, the Class Settlement Agreement.

_____

Jason R. Suter
Claimant

_____
Claimant SS #

STATE OF _FLORIDA_ , COUNTY OF _MIAMI - DADE_

    I certify that on _JULY 31_ , 201_3_, _Jason R. Suter_ personally came before me
and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally
signed this document; and (b) signed, sealed and delivered this document by her act and deed.

_Kathryn E Mayefsky_
Notary Public

_KATHRYN E MAYEFSKY_
[Printed Name of Notary]

My Commission Expires: _3/10/15_

_____
Counsel

Law Firm: _Colson Hicks Eidson_

_(signature)_
Claimant

_____
Claimant SS #

STATE OF _FLORIDA_____, COUNTY OF _MIAMI - DADE_____

    I certify that on _July 31_____, 201_2_, _Jas. R Swing_ personally came before me and acknowledged under oath, to my satisfaction, that this person (a) is named in and personally signed this document; and (b) signed, sealed and delivered this document by her act and deed.

_(signature)_
Notary Public

_KATHRYN E MAYEFSKY_
[Printed Name of Notary]

My Commission Expires: _3/10/15_

_(signature)_
Counsel

Law Firm: _Colson Hicks Eidson_

Sample Agreement between Contractor and KPT Property Owner

## THIS DOCUMENT HAS LEGAL CONSEQUENCES. PLEASE READ THIS DOCUMENT CAREFULLY AND CONSULT WITH YOUR ATTORNEY AS YOU DEEM NECESSARY BEFORE SIGNING

This Agreement between Contractor and Property Owner ("Work Authorization") defines the specific work necessary to complete remediation of the Property indicated below, and authorizes the Contractor to perform this work. The terms below are subject to the Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL No. 2047 ("Settlement Agreement" attached as Exhibit 1), which the KPT Property Owner ("Property Owner") should carefully review with counsel prior to signing.

The Property Owner and the Contractor, as agent for the Knauf Defendants (defined in Section 1.1.1 of the Settlement Agreement), agree as follows:

Property Owner:
Name:   JASon SAntiago
Address:  2140 SE 19 Ave., Homestead, FL 33035

Contractor:
Name:   Cali Greens Construction, Inc.
Address  2358 SE 17 TERR., Homestead, FL 33035

Project:
Remediation of property located at:
Street:   2140 SE 19 AVE
City:   Homestead, FL 33035

Estimated Move-Out Date:
Estimated Substantial Completion Date:

Under Air Square Footage of Home: 2214

The Property Owner and Contractor have reviewed the work necessary to accomplish the remediation of Chinese drywall, as described in the Remediation Protocol, Exhibit F to the Settlement Agreement, attached to this Work Authorization, and have agreed that this work consists of the following items, which are attached:

1. Terms and Conditions of the Work Authorization Agreement
    a. Appliance, Fixture, Equipment and Fire System Schedule
    b. Room Finish Schedule

      c.  Schedule of Work – Detailed room by room description of the scope of
          remediation work (attached as Exhibit 2)

2.  Remediation Protocol (attached hereto as Exhibit 3)
3.  Requirements for Move-Out/Move-In (attached as Exhibit 4)
4.  Contractor Insurance Certificates (attached as Exhibit 5)
5.  Contractor Certification (attached as Exhibit 6)
6.  Property Owner Release of Contractor (attached as Exhibit 7)
7.  American National Standard for Single Family Residential Building, Method for
    Calculating Square Footage (attached as Exhibit 8)

Photographic and/or videographic documentation of the existing interior of the Property, including, but not limited to, fixtures and finishes will be included as a reference. In addition, if this box is checked [__], the following original construction drawings and specifications are included and attached as Exhibit 9 for reference purposes:

[list construction drawings and specifications]

Property Owner and Contractor, as Knauf Defendants' agent, agree that these are an accurate and correct representation of the construction quality and finishes as existed prior to the start of the Repair Work.

Property Owner represents that he (she) is the owner of the property to be remediated and that he (she) is fully authorized to enter into this agreement and bind himself (herself), all dependants who live in the Property, and any other guests or residents who reside in the Property.

Effective the 7 day of 30 , 2013  ("Effective Date")


_____     7/31/13
Property Owner                                          Date

_____     7/30/13
Contractor, as Agent for Knauf Defendants      Date

Terms and Conditions of the Work Authorization

I.   **REPAIR WORK**

1. The repair (*i.e.*, remediation) work at the Property is described generally in the Remediation Protocol and specifically in the Schedule of Work attached to this Work Authorization (together "Repair Work"). In conducting the Repair Work and in resolving any disputes pursuant to the dispute resolution process described in Sections 4.5.1.2.1 and 4.5.1.2.2 of the Settlement Agreement, the Property Owner and Contractor agree that the objective of the Repair Work is to remove on a cost effective basis all drywall and Chinese drywall-related odors and contamination, including, but not limited to, corrosion, tarnishing, and pitting ("Contamination"), and to leave the Property with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the Repair Work.

2. For clarification, the Remediation Protocol describes the overall remediation work agreed to by the Parties to the Settlement Agreement and which must be followed as to all KPT Properties (defined in Section 1.27 of the Settlement Agreement) whose owners select either the Program Contractor Remediation Option or Self Remediation Option pursuant to Sections 4.3.1 and 4.3.2 of the Settlement Agreement. The attached Schedule of Work is created by the Contractor in consultation with the Property Owner, including through their joint inspection of the Property, and is the agreed upon remediation work that will be specifically performed by the Contractor as agent under contract to the Knauf Defendants. **By executing this Work Authorization, which incorporates and follows the Scope of Work, Property Owner agrees that this is the complete Repair Work to which Property Owner is entitled under this Work Authorization and the Settlement Agreement.**

3. All materials, systems and equipment that are removed during the course of remediation work will either be reinstalled or replaced in accordance with the Remediation Protocol and, where replaced, replaced with new materials that are of the same construction, quality and finishes as those removed.

4. All Repair Work will be performed in accordance with applicable codes and regulations as these codes and regulations exist as of the last date that all required building and construction permits have been filed. Neither the Knauf Defendants nor Contractor are responsible for the failure of the Property to comply with building codes and regulations where such failure is unrelated to the Repair Work. Except where such failures are corrected as a consequence of the Repair Work, the Property Owner will be responsible for correcting such failures and any delays in the Repair Work resulting from such corrective work. If correction of such a failure is not accomplished during the Repair Work, but is required by governmental or other authority with jurisdiction, then the Property Owner is responsible for such correction. For example,

Repair Work includes replacement of the electrical system so that any existing non-compliant electrical work will be corrected during the normal course of the Repair Work. But non-compliant roof construction is unaffected by the Repair Work and therefore would remain the responsibility of the Property Owner. If the authority with jurisdiction requires correction of non-compliant roof construction in order to secure a certificate of occupancy, such correction would, thus, be the responsibility of the Property Owner. In addition, if such corrective work will interfere with the Repair Work, the Contractor will cease the Repair Work until such time as the corrective work is completed, and the estimated Construction Duration (defined below) will be extended without penalty to the Contractor or any additional payments from the Remediation Fund (as that term is defined in the Settlement Agreement) or the Knauf Defendants.

5. In accordance with the Remediation Protocol, materials, systems and equipment that are retained, but damaged by the Repair Work, will be restored to the condition that existed prior to the start of Repair Work, and where necessary replaced with new materials, systems and/or equipment.

6. Where necessary, new work will be integrated into existing work so that, to the extent reasonably feasible, one cannot reasonably be distinguished from the other. Transitions between new and existing work will, wherever possible, occur at a transition such as a corner or other break point.

7. All electrical work will be performed by a licensed electrician and will be in accordance with requirements of the National Electrical Code (NEC) and any applicable local building codes as these codes and regulations exist as of the last date that all required building and construction permits have been filed. Electrical work will be inspected by the electrical inspector of the local Authority having jurisdiction. In addition, all other trades, including plumbing, will be performed by licensed subcontractors, to the extent required by applicable law, regulation or building code.

8. The Repair Work is set forth in the attached Schedule of Work, which, consistent with the Remediation Protocol, establishes specific components of the Property that are to be either removed and replaced, or removed and reinstalled. Building materials, building systems and fixtures not listed in the Schedule of Work will be retained in place and protected during the work.

9. Property-Owner Requested Work. The Property Owner may request additional work by the Contractor or others that is not included in the Repair Work ("Property-Owner Requested Work"). At its sole discretion, the Contractor may decline to perform Property Owner Requested Work. In addition, the Contractor may only accept such work, which shall be under a separate agreement with the Property Owner, if such work does not impede the progress of the Repair Work. Such Property-Owner Requested Work will be paid for in advance by the Property Owner to the Contractor.

II.   SCHEDULE

1.  The Construction Duration shall be measured from the actual Move-Out Date to the actual Substantial Completion date as defined below. By executing this Work Authorization, the Property Owner acknowledges (1) the estimated Move-Out Date, and (2) the Estimated Substantial Completion date provided on the first page of this document, as may be adjusted in accordance with these terms and conditions. These dates are merely estimates and the actual Move-Out Date and actual Substantial Completion date will likely vary.

2.  The Move-Out Date is the date upon which the Contractor will commence Repair Work. Property Owner agrees to complete move out of all personal property, to remove and properly dispose of all trash, and to leave the premises by the Move-Out Date so that the home is fully, and without impediment, available to the Contractor to begin Repair Work. The Property Owner agrees that the move-out requirements contained in Exhibit 4 (Requirements for Move-Out/Move-In) will be completed to the reasonable satisfaction of the Contractor and that such completion is a precondition to the start of Repair Work.

3.  On at least twenty business days notice, the Contractor will schedule the Move-Out Date with the Property Owner. This date will not be scheduled until all preconditions to the start of Repair Work set forth in the Requirements for Move-Out/Move-In (Exhibit 4) have been satisfied, including but not limited to, receipt of required permits and scheduling and/or delivery of materials with long-delivery times.

4.  Contractor shall have complete control of the Property at all times during the Construction Duration, and to the extent the Property Owner needs to enter the Property, he shall do so with advance notice to the Contractor and in such a manner so as not to interfere with the Repair Work. Separate contractors of Property Owner shall not enter the Property during the Construction Period unless accompanied by Contractor's authorized representative and only after they have executed a visitor waiver in which they assume all risks, and waive all claims, in connection with entering the Property during the construction period.

5.  Property Owner, at his (her) own expense, shall be responsible for ordinary exterior maintenance of the Property including maintenance of landscaping, pools, exterior finishes, roof, etc. and payment of all utility bills, property taxes and other similar expenses during the Construction Duration. The Contractor will be responsible for maintaining the areas inside and outside of the Property affected by its work.

6.  To the extent the Property Owner has property insurance on the Property, he (she) shall provide proof of such insurance to the Contractor prior to the Move-Out Date and will maintain such property insurance during the

Construction Duration. If the Property Owner does not have property insurance or cannot obtain such insurance, Property Owner acknowledges that he (she), not the Contractor, will be liable for damage to the Property, other than that caused by the Repair Work.

7.  Drywall Removal and Cleanup. The initial phase of the Repair Work involves demolition, including the removal of all drywall, as set forth in the Remediation Protocol, drywall debris and visible dust, and elimination of all Chinese-drywall associated odors and Contamination. After completion of demolition, the Contractor will perform a careful cleaning of the Property to remove all remaining drywall debris and visible dust as provided for in the Remediation Protocol.

8.  Contractor Certification. Throughout the cleanup, the Property will be "aired out" by leaving all windows and doors open. Such "air-out" period will be no less than 24 hours. Contractor will continue to clean all surfaces in the Property, including, by vacuuming using, drywall bags and/or, where appropriate or necessary, HEPA (high efficiency particulate air) filters, until a visual inspection by the Contractor verifies that all surfaces in the work area and any adjacent areas (including, but not limited to, floor, walls, ceiling, wall cavities, trusses, joists, studs, pipes, beams, ledges, and framing) are free of visible dust, debris or residue and that no detectable odor of Chinese drywall remains. Evaluation of odor is to be performed at first entry to the Property after it has been vacant and with all windows and doors closed for a period of at least 8 hours. Contractor shall certify completion of the drywall and Contamination removal and cleanup work by executing the Contractor Certification attached as Exhibit 6 and providing such Certification to the Settlement Administrator (defined in Section 1.67 of the Settlement Agreement), Property Owner and Knauf Defendants. After completion of the Contractor Certification, the Contractor will notify the Environmental Inspector that the Property is ready for inspection.

9.  Environmental Certification. Following the Contractor Certification, and notice that the Property is ready for environmental inspection, the Environmental Inspector will perform an independent inspection to verify the Contractor's certification that all drywall has been removed in accordance with the Remediation Protocol, including all debris and visible dust, and that there is no detectable odor of Chinese drywall in the Property. If the Environmental Inspector concludes that the home is not free of any and all Chinese drywall-associated odors and Contamination, the Contractor will perform remediation work as required to complete the remediation as judged by the Environmental Inspector's visual inspection and odor evaluation of the Property. Once the Environmental Inspector concludes that the Property is free of any and all Chinese drywall-associated odors and Contamination and that the atmosphere in the Property is representative of the atmosphere in properties built without Chinese drywall, he (she) will execute the Environmental Certification found in Exhibit B of the Settlement Agreement

and provide such Certification to the Settlement Administrator, Property Owner and the Knauf Defendants.

10. Substantial Completion shall be defined as the date that the Repair Work is sufficiently completed, as determined by the Contractor, to allow the Property Owner to occupy or utilize the Property for its intended use. Substantial Completion occurs only after all government inspections required for the Property Owner to occupy or utilize the Property are complete and any corresponding certificates (for example, a certificate of occupancy, if applicable) are issued by the authority with jurisdiction over the project. For the purposes of this definition, remaining punch list items or warranty work commonly associated with residential construction, including minor finish work, touch ups, or correction of defects or warranty items, shall not preclude substantial completion so long as such work may be safely performed without unreasonable disruption while the Property Owner occupies or utilizes the Property.

11. So as to minimize the risk of damage and/or theft, certain appliances that are not required for a Certificate of Occupancy may be delivered and installed on the day the Property Owner moves back in and assumes responsibility for the Property.

12. Punch List: If at the time of Substantial Completion there are any items that do not affect occupancy of the Property, but do require finishing or correcting, the Contractor shall prepare, with input from, and the agreement of, the Property Owner, a comprehensive Punch List of such items that are to be completed or corrected prior to final payment. Failure to include an item on the Punch List does not alter the responsibility of the Contractor to complete all Repair Work.

## III.   WARRANTY

1. The Contractor warrants to the Property Owner that materials and equipment furnished as part of the Repair Work will be of good quality and new unless this Work Authorization requires or permits otherwise, and will not include (i) any Chinese-manufactured drywall or plasterboard products, (ii) any Knauf Defendants' drywall or plasterboard products, or (iii) any products manufactured by the Knauf Defendants outside of the United States ("Restricted Materials"). The Contractor or its subcontractors shall in their sole discretion, without any influence from the Knauf Defendants, select all materials and equipment, but not any Restricted Materials, to be furnished as part of the Repair Work. The Contractor further warrants that the Repair Work will conform to the requirements of the Work Authorization, including the Remediation Protocol, and will be free from defect, except for those inherent in the quality of the materials and equipment as required or permitted by the Work Authorization. The Contractor's warranty includes damage or

defects in the Repair Work caused by the Contractor. Damage caused by the Property Owner is not warranted by the Contractor.

2. As to items within the Property that were purchased and installed by the Contractor but that were not manufactured by the Contractor, including but not limited to, any HVAC Equipment, Appliances, other equipment or "consumer products," Contractor provides no warranty on such items, but shall transfer to Property Owner the manufacturer's warranty. However, the Contractor's warranty does extend to the installation of such items. Copies of applicable warranties will be turned over to the Property Owner at Substantial Completion. All items, appliances, or equipment reinstalled or replaced pursuant to Paragraphs I(B), I(C), I(E), I(G), and I(K) in the Remediation Protocol will be tested in place prior to, or at, the Move-In Date.

3. **Contractor is not responsible for, and accepts no liability for, any defects or deficiencies in work that was not replaced or reinstalled by Contractor.**

4. If, within one year or other time frame required by applicable law or regulation, whichever is longer (the "Warranty Period") after the date of Substantial Completion of the Repair Work, any of the Repair Work is found to be not in accordance with the requirements of the Work Authorization, the Property Owner shall promptly notify the Contractor, in writing, of the condition, and the Contractor shall correct such condition promptly. If the Property Owner fails to notify the Contractor during the Warranty Period and fails to give the Contractor an opportunity to make the correction, the Property Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty. If upon written notification during the Warranty Period, the Contractor fails to promptly correct the nonconforming Repair Work, then the Property Owner may request, through the Settlement Administrator, that the Knauf Defendants promptly correct the nonconforming Repair Work under the terms of the Knauf Defendants' agreement with the Contractor.

IV.   **MISCELLANEOUS**

1. The Contract Sum, excluding any Property Owner Requested Work, will be paid by the Remediation Fund (defined in Section 1.62 of the Settlement Agreement). The Property Owner is not responsible for paying the Contractor any of the costs associated with its work, except to the extent the Contractor undertakes any Property-Owner Requested Work.

2. Upon Substantial Completion and the submission by the Contractor to the Property Owner a final release of lien or liens, or such other sufficient evidence, demonstrating that any actual or potential liens filed in relation to the Repair Work have been either released or bonded off such that the

Property Owner's title is clear of all liens related to the Repair Work ("All Clear Lien Certificate") prior to moving back into the home, the Property Owner shall sign an additional release in favor of the Contractor in the form attached as Exhibit 7.

3. In accordance with Section 4.3.1.1 of the Settlement Agreement, the Contractor has determined the square footage of the home using the American National Standard for Single-Family Residential Building's methodology attached as Exhibit 8. The square footage is listed on the first page of this document.

4. If concealed or unknown physical conditions at the site differ materially from those indicated in the Work Authorization or from those conditions ordinarily found to exist or in the event of a Force Majeure (as defined in this paragraph), the Contract Sum and estimated Construction Duration (as measured from the estimated Move-Out Date to the estimated Substantial Completion date provided on the first page of this document) shall be subject to equitable adjustment. "Force Majeure" means any of the following acts or events that prevents the affected Party from performing its obligations in accordance with this Work Authorization, if such act or event is beyond the reasonable control of and not the result of the fault or negligence of the affected Party and such Party has been unable to overcome such act or event by the exercise of due diligence or taking reasonable alternative measures: (a) unusually severe storms of extended duration or impact, other than heavy storms or climatic conditions which could generally be anticipated by the Contractor or subcontractors, as well as floods, droughts, tidal waves, fires, hurricanes, earthquakes, landslides, or other catastrophes; (b) wars, acts of terrorism, civil disturbances, riots, insurrections and sabotage; (c) transportation disasters, whether by sea, rail, air or land; (d) any industry-wide labor boycotts, strikes, picketing or similar situations, (e) actions of a Governmental Authority that were not voluntarily induced or promoted by the affected Party, or brought about by the breach of its obligations under this Work Authorization, including any change in Laws. It is expressly understood and agreed that Force Majeure shall not include any of the following events: (1) economic hardship; (2) changes in market conditions; (3) late delivery of materials, except to the extent such late delivery is itself caused by an event of Force Majeure; (4) any strike, work-to-rule action, go-slow or similar labor difficulty that is limited to the Contractor's and/or subcontractor's employees; or (5) jurisdictional disputes or labor actions affecting a single or small group of contractors or suppliers.

5. In the event that a dispute arises between the Property Owner and Contractor or the Remediation Fund, this dispute will be resolved in accordance with the dispute resolution process set forth in Sections 4.5.1.2.1 and 4.5.1.2.2 of the Settlement Agreement.

6.  If the Contractor encounters any materials that it believes may be hazardous, excluding Chinese drywall, materials made hazardous by Chinese drywall, and other materials routinely found in residential construction (collectively, "Excluded Items"), the Contractor will immediately stop work and notify the Settlement Administrator, Property Owner and the Knauf Defendants. Contractor shall not resume work until Property Owner removes the hazardous material. To the fullest extent permitted by law, the Property Owner shall indemnify and hold harmless the Contractor and its subcontractors, the Remediation Fund, and the Knauf Defendants from claims, damages, losses, delays, and expenses, including but not limited to attorneys' fees and costs, arising out of or resulting from the hazardous materials less Excluded Items. The Property Owner shall not be responsible for materials and substances brought to the site by the Contractor or for the drywall being remediated.

7.  Before starting work, Contractor shall provide proof of the following insurance coverage:

    TBD

8.  Property Owner does not waive claims against the Contractor for bodily injury or property damage caused by the Work Authorization and/or the Repair Work, except the Property Owner waives claims for such injury and/or damage that seek recovery of emotional distress (except for such emotional distress claims related to a bodily injury claim), loss of profits, loss of use, and/or diminution of property value damages. "Loss of Use" does not include loss of use during the Construction Duration.

9.  By entering into this Work Authorization, Property Owner affirmatively represents that it is not aware of any code violations, concealed conditions materially affecting the Property, leaks, or Defects unrelated to the drywall. "Defects" means a condition, other than the presence of Chinese drywall and anything that may have been contaminated by Chinese drywall, that would either (a) have a significant adverse effect on the value of the Property, (b) significantly impair the health or safety of occupants or of the workers, or (c) that if not repaired, removed or replaced, shorten or adversely affect the expected normal life of the Property. Property Owner acknowledges that it has had the opportunity to review the Work Authorization with counsel of its choice and is encouraged to do so.

This Work Authorization entered into as of the Effective Date first written above.

_____
PROPERTY OWNER *(Signature)*

JASON R. SANTORO, Owner
*(Printed name and title)*

_____
CONTRACTOR/as Agent for Knauf
*(Signature)*

JERRY JOSEPH, Pres
*(Printed name and title)*

Appliance, Fixture, Equipment and Fire System Schedule

All Appliances shall mean refrigerators, freezers, dishwashers, washers, dryers, garbage disposals, wine coolers, ice machines, microwaves, cooktops, ovens, ranges and warming drawers. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Refrigerator | | | |
| Range | | | |
| Cook Top | | | |
| Oven | | | |
| Microwave | | | |
| Range Hood | | | |
| Dishwasher | | | |
| Freezer | | | |
| Washer | | | |
| Dryer | | | |
| Garbage Disposal | | | |

In accordance with the Remediation Protocol, in the event that fixtures need replacement, the replacement will be with new equipment, fixtures and not with reconditioned ones. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Ceiling Fan | | | |
| Chandelier | | | |
| Light Fixture | | | |
| Hot Water Heater | | | |
| Cabinets | | | |
| Countertop | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

In accordance with the Remediation Protocol, the following fire and security systems will be replaced regardless of condition. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Fixture/ Appliance | Manufacturer | Model No | Quantity |
|---|---|---|---|
| Smoke Detectors | | | |
| Security Alarms | | | |
| Intercoms | | | |
| Smoke Detectors | | | |
| Fire-Suppression Sprinkler Systems | | | |
| Carbon Monoxide Alarms | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

Room Finish Schedule

In accordance with the Remediation Protocol, existing finishes and trim that are removed during the remediation will be replaced with new finishes and trim of like kind and quality. The following is a schedule of finishes and trim found in the Property prior to remediation. Nothing in this schedule is intended to limit or modify the Remediation Protocol.

| Room Name | Wall Color/Finish | Ceiling Color /Finish | Floor Type/Color | Trim Color |
|---|---|---|---|---|
| Living Room | | | | |
| Dining Room | | | | |
| Kitchen | | | | |
| Hallway | | | | |
| Stairs | | | | |
| Den | | | | |
| Family Room | | | | |
| Bathroom | | | | |
| Master Bed Room | | | | |
| Master BR Closet | | | | |
| Master Bath | | | | |
| Bed Room 1 | | | | |
| Bed Room 2 | | | | |
| Bed Room 3 | | | | |
| Bathroom | | | | |
| | | | | |
| | | | | |

Add Photos for Multi Colored Walls

Schedule of Work

The following Schedule of Work describes the specific materials, systems and equipment to be removed and either replaced or reinstalled during the remediation work. The Property Owner and Contractor agree that this describes the extent of the work required to complete remediation of the residence pursuant to the Remediation Protocol.

Appliances, fixtures and equipment will be replaced with units of like kind and quality to those listed in the Appliance, Fixture and Equipment Schedule.

Replacement finishes will, to the extent reasonably achievable, match those in the Room Finish Schedule.

(Attach detailed Schedule of Work document)

Note:  The following *sample* Schedule of Work is intended only to provide an example of the level of detail involved in the Repair Work the Contractor will perform pursuant to the Work Authorization Agreement.  **IT DOES NOT DESCRIBE THE REPAIR WORK THAT THE CONTRACTOR WILL PERFORM IN YOUR PROPERTY.** The Schedule of Work prepared for your Property will follow this sample in form, but will be tailored to the finishes and conditions in your Property.  Further, as in the sample Schedule of Work, the Repair Work in your Property will meet all of the requirements set forth in the Remediation Protocol.

THIS DOCUMENT HAS A COLORED BACKGROUND • MICROPRINTING • LINEMARK • PATENTED PAPER

AC# 6272215

**STATE OF FLORIDA**
DEPARTMENT OF BUSINESS AND PROFESSIONAL REGULATION
CONSTRUCTION INDUSTRY LICENSING BOARD

SEQ# L12081502532

| DATE | BATCH NUMBER | LICENSE NBR |
|------|--------------|-------------|
| 08/15/2012 | 128035728 | CRC1328160 |

The RESIDENTIAL CONTRACTOR
Named below IS CERTIFIED
Under the provisions of Chapter 489 FS
Expiration date: AUG 31, 2014

JOSEPH, JERRY L
CALI GREENS CONSTRUCTION INC
2358 SE 17 TERR
HOMESTEAD                    FL 33035

RICK SCOTT
GOVERNOR

KEN LAWSON
SECRETARY

DISPLAY AS REQUIRED BY LAW

# ACORD™ CERTIFICATE OF LIABILITY INSURANCE

**DATE (MM/DD/YYYY)** 07/30/2013

| PRODUCER (305) 270-1424 | THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW. | | |
|---|---|---|---|
| Pan Am Assurance Agency, Inc 9100 Sunset Drive | | | |
| Miami          FL  33173-3433 | **INSURERS AFFORDING COVERAGE** | | **NAIC #** |
| **INSURED** | INSURER A: RLI INSURANCE CO | | |
| Cali Greens Construction Inc 2358 SE 17 Terrace | INSURER B: MOUNT VERNON FIRE | | |
| | INSURER C: | | |
| | INSURER D: | | |
| Homestead          FL  33035- | INSURER E: | | |

## COVERAGES

THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED. NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. AGGREGATE LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | ADDL INSRD | TYPE OF INSURANCE | POLICY NUMBER | POLICY EFFECTIVE DATE (MM/DD/YY) | POLICY EXPIRATION DATE (MM/DD/YY) | LIMITS | |
|---|---|---|---|---|---|---|---|
| A | | **GENERAL LIABILITY** | MCF0005041 | 11/05/2012 | 11/05/2013 | EACH OCCURRENCE | $ 1,000,000 |
| | | [X] COMMERCIAL GENERAL LIABILITY | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | | [ ] CLAIMS MADE  [ ] OCCUR | | / / | / / | MED EXP (Any one person) | $ |
| | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | / / | / / | GENERAL AGGREGATE | $ |
| | | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | PRODUCTS - COMP/OP AGG | $ |
| | | [ ] POLICY [ ] PRO-JECT [X] LOC | | / / | / / | Liquor Liability | 1,000,000 |
| | | **AUTOMOBILE LIABILITY** | | / / | / / | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | | [ ] ANY AUTO | | | | | |
| | | [ ] ALL OWNED AUTOS | | / / | / / | BODILY INJURY (Per person) | $ |
| | | [ ] SCHEDULED AUTOS | | | | | |
| | | [ ] HIRED AUTOS | | / / | / / | BODILY INJURY (Per accident) | $ |
| | | [ ] NON-OWNED AUTOS | | | | | |
| | | | | / / | / / | PROPERTY DAMAGE (Per accident) | $ |
| | | **GARAGE LIABILITY** | | | | AUTO ONLY - EA ACCIDENT | $ |
| | | [ ] ANY AUTO | | / / | / / | OTHER THAN          EA ACC | $ |
| | | | | | | AUTO ONLY:          AGG | $ |
| | | **EXCESS/UMBRELLA LIABILITY** | | / / | / / | EACH OCCURRENCE | $ |
| | | [ ] OCCUR  [ ] CLAIMS MADE | | | | AGGREGATE | $ |
| | | | | | | | $ |
| | | [ ] DEDUCTIBLE | | / / | / / | | $ |
| | | [ ] RETENTION  $ | | | | | $ |
| | | **WORKERS COMPENSATION AND EMPLOYERS' LIABILITY** | | / / | / / | [ ] WC STATU-TORY LIMITS  [ ] OTH-ER | |
| | | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED? | | / / | / / | E.L. EACH ACCIDENT | $ |
| | | If yes, describe under SPECIAL PROVISIONS below | | | | E.L. DISEASE - EA EMPLOYEE | $ |
| | | | | | | E.L. DISEASE - POLICY LIMIT | $ |
| B | | **OTHER** PERSONAL PROPERTY | CF2553560A | 11/20/2012 | 11/20/2013 | 1,000 DED EXC WIND& HAIL | 35,000 |
| | | | | / / | / / | | |

DESCRIPTION OF OPERATIONS/LOCATIONS/VEHICLES/EXCLUSIONS ADDED BY ENDORSEMENT/SPECIAL PROVISIONS

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| ( )     - | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, THE ISSUING INSURER WILL ENDEAVOR TO MAIL ____ DAYS WRITTEN NOTICE TO THE CERTIFICATE HOLDER NAMED TO THE LEFT, BUT FAILURE TO DO SO SHALL IMPOSE NO OBLIGATION OR LIABILITY OF ANY KIND UPON THE INSURER, ITS AGENTS OR REPRESENTATIVES. |
| ( )     - | |
| City of Homestead 650 NE 22 Terrace | |
| Homestead          FL  33033- | **AUTHORIZED REPRESENTATIVE** |

ACORD 25 (2001/08)                                                                      © ACORD CORPORATION 1988

INS025 (0108).05                    ELECTRONIC LASER FORMS, INC. - (800)327-0545                    Page 1 of 2

ACORD®  **CERTIFICATE OF LIABILITY INSURANCE**

| DATE (MM/DD/YYYY) |
|---|
| 07/29/2013 |

THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER. THIS CERTIFICATE DOES NOT AFFIRMATIVELY OR NEGATIVELY AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.  THIS CERTIFICATE OF INSURANCE DOES NOT CONSTITUTE A CONTRACT BETWEEN THE ISSUING INSURER(S), AUTHORIZED REPRESENTATIVE OR PRODUCER, AND THE CERTIFICATE HOLDER.

IMPORTANT:  If the certificate holder is an ADDITIONAL INSURED, the policy(ies) must be endorsed.  If SUBROGATION IS WAIVED, subject to the terms and conditions of the policy, certain policies may require an endorsement.  A statement on this certificate does not confer rights to the certificate holder in lieu of such endorsement(s).

| PRODUCER | CONTACT NAME: | | |
|---|---|---|---|
| Marsh USA, Inc. | PHONE (A/C, No, Ext): | | FAX (A/C, No): |
| 3031 N. Rocky Point Drive West, Suite 700 | E-MAIL ADDRESS: | | |
| Tampa, FL  33607 | | | |
| | INSURER(S) AFFORDING COVERAGE | | NAIC # |
| 342881-FL-WC-13-14        5770 | INSURER A : Illinois National Insurance Company | | 23817 |
| INSURED | INSURER B : | | |
| DecisionHR, Inc. | INSURER C : | | |
| PO Box 33024 | INSURER D : | | |
| St. Petersburg, FL  33733-8024 | INSURER E : | | |
| | INSURER F : | | |

**COVERAGES**           CERTIFICATE NUMBER:           ATL-003200166-01           REVISION NUMBER: 13

THIS IS TO CERTIFY THAT THE POLICIES OF INSURANCE LISTED BELOW HAVE BEEN ISSUED TO THE INSURED NAMED ABOVE FOR THE POLICY PERIOD INDICATED.  NOTWITHSTANDING ANY REQUIREMENT, TERM OR CONDITION OF ANY CONTRACT OR OTHER DOCUMENT WITH RESPECT TO WHICH THIS CERTIFICATE MAY BE ISSUED OR MAY PERTAIN, THE INSURANCE AFFORDED BY THE POLICIES DESCRIBED HEREIN IS SUBJECT TO ALL THE TERMS, EXCLUSIONS AND CONDITIONS OF SUCH POLICIES. LIMITS SHOWN MAY HAVE BEEN REDUCED BY PAID CLAIMS.

| INSR LTR | TYPE OF INSURANCE | ADDL INSR | SUBR WVD | POLICY NUMBER | POLICY EFF (MM/DD/YYYY) | POLICY EXP (MM/DD/YYYY) | LIMITS | |
|---|---|---|---|---|---|---|---|---|
| | **GENERAL LIABILITY** | | | | | | EACH OCCURRENCE | $ |
| | ☐ COMMERCIAL GENERAL LIABILITY | | | | | | DAMAGE TO RENTED PREMISES (Ea occurrence) | $ |
| | ☐ CLAIMS-MADE ☐ OCCUR | | | | | | MED EXP (Any one person) | $ |
| | | | | | | | PERSONAL & ADV INJURY | $ |
| | | | | | | | GENERAL AGGREGATE | $ |
| | GEN'L AGGREGATE LIMIT APPLIES PER: | | | | | | PRODUCTS - COMP/OP AGG | $ |
| | ☐ POLICY ☐ PRO-JECT ☐ LOC | | | | | | | $ |
| | **AUTOMOBILE LIABILITY** | | | | | | COMBINED SINGLE LIMIT (Ea accident) | $ |
| | ☐ ANY AUTO | | | | | | BODILY INJURY (Per person) | $ |
| | ☐ ALL OWNED AUTOS ☐ SCHEDULED AUTOS | | | | | | BODILY INJURY (Per accident) | $ |
| | ☐ HIRED AUTOS ☐ NON-OWNED AUTOS | | | | | | PROPERTY DAMAGE (Per accident) | $ |
| | | | | | | | | $ |
| | ☐ UMBRELLA LIAB ☐ OCCUR | | | | | | EACH OCCURRENCE | $ |
| | ☐ EXCESS LIAB ☐ CLAIMS-MADE | | | | | | AGGREGATE | $ |
| | ☐ DED ☐ RETENTION $ | | | | | | | $ |
| A | WORKERS COMPENSATION AND EMPLOYERS' LIABILITY           Y / N | | N/A | WC 020729724 | 06/01/2013 | 06/01/2014 | X WC STATU-TORY LIMITS ☐ OTH-ER | |
| | ANY PROPRIETOR/PARTNER/EXECUTIVE OFFICER/MEMBER EXCLUDED?  N (Mandatory in NH) | | | | | | E.L. EACH ACCIDENT | $ 1,000,000 |
| | If yes, describe under DESCRIPTION OF OPERATIONS below | | | | | | E.L. DISEASE - EA EMPLOYEE | $ 1,000,000 |
| | | | | | | | E.L. DISEASE - POLICY LIMIT | $ 1,000,000 |

DESCRIPTION OF OPERATIONS / LOCATIONS / VEHICLES (Attach ACORD 101, Additional Remarks Schedule, if more space is required)

Coverage is provided for only those employees leased to but not subcontractors of Cali Greens Construction, Inc.

| CERTIFICATE HOLDER | CANCELLATION |
|---|---|
| City of Homestead | SHOULD ANY OF THE ABOVE DESCRIBED POLICIES BE CANCELLED BEFORE THE EXPIRATION DATE THEREOF, NOTICE WILL BE DELIVERED IN ACCORDANCE WITH THE POLICY PROVISIONS. |
| 650 NE 22 Terr. | |
| Homestead, FL  33033 | AUTHORIZED REPRESENTATIVE of Marsh USA Inc. |
| | Kim Arvanitis         *Kim Arvanitis* |

© 1988-2010 ACORD CORPORATION.  All rights reserved.

ACORD 25 (2010/05)           The ACORD name and logo are registered marks of ACORD

Rider to Self-Remediation Contract Pursuant to the
Settlement Agreement Regarding
Claims against the Knauf Defendants in MDL No. 2047

Contractor _Cali Greens Construction, Inc._

Owner _Jason Santiago_

Property _2140 SE 19 Ave., Homestead, FL_

Contractor and Owner hereby agree as follows:

I.      Scope of Rider

A.      Notwithstanding any merger clause in the _7/30/13_ [Date] contract between
        Contractor and Owner (the "Contract"), Contractor and Owner expressly
        incorporate this Rider into the Contract.

B.      To the extent that this Rider to the Contract is in conflict with the Contract, this
        Rider shall control.

II.     Incorporation of Class Settlement Agreement

A.      Contractor and Owner have had an opportunity to review, and Contractor and
        Owner understand, the terms of the Settlement Agreement Regarding Claims
        against the Knauf Defendants in MDL No. 2047 (the "Class Settlement
        Agreement").

B.      Contractor and Owner acknowledge, incorporate and adopt the terms of the Class
        Settlement Agreement, including, but not limited to Section 4.3.2.3, into the terms
        of the Contract.

III.    Repair Work

A.      The repair (*i.e.*, remediation) work at the Property, which Contractor agrees to
        perform, is described generally in the Remediation Protocol (attached as Exhibit F
        to the Class Settlement Agreement and attached to this Rider as Exhibit 1), and
        specifically in the Schedule of Work created by Moss & Associates, LLC, the
        Lead Contractor under the Class Settlement Agreement (attached as Exhibit 2).
        Together this shall be referred to as the Repair Work.

B.      If, at any time, there are contradictions between the Remediation Protocol and the
        Schedule of Work, the Remediation Protocol shall control.

1

IV.   Payments to Contractor

    A.   Contractor and Owner acknowledge that pursuant to Section 4.3.2 of the Class Settlement Agreement, the Knauf Defendants (as that term is defined in Section 1.1.1 of the Class Settlement Agreement) have agreed to fund up to $ 99,122.42 of the cost to complete the Repair Work (the "Knauf Payment") provided such work is in accordance with the Repair Work described in Paragraph III(A) above.

    B.   The Knauf Defendants shall have no obligations beyond the Knauf Payment. To the extent that the cost of the Repair Work exceeds the Knauf Payment, Owner shall be responsible for all additional moneys owed to Contractor.

    C.   All payments from the Knauf Defendants shall be in accordance with the payment schedule outlined in Section 4.3.2 of the Class Settlement Agreement. Before any such scheduled payments are made, Contractor shall provided all necessary materials, described in the Contractor Milestone Payment Requirements Form (attached as Exhibit 3), for receipt of such scheduled payment, to Owner. Owner shall ensure that such materials are provided to the Settlement Administrator, as that term is defined in Section 1.67 of the Class Settlement Agreement. Contractor and Client acknowledge that only if the Settlement Administrator approves such materials as complete and sufficient, shall such scheduled payment be made to Contractor.

V.   **Contractor Representations**

    A.   Contractor is licensed for residential construction.

    B.   Contractor is insured for residential construction.

_____Jerry Joseph_____ 7/30/13
Contractor                              Date

_____Jason R Santy_____ 7/31/13
Owner                                      Date

2

Exhibit F

REMEDIATION PROTOCOL

1.    Scope of Work

The remediation work to be performed in a KPT Property is described generally below. In conducting the remediation work and in resolving any disputes pursuant to the dispute resolution process in the Settlement Agreement (reprinted in Paragraph V below), the KPT Property Owner and Lead Contractor or Other Assigned Contractor agree that the objective of the remediation work is to remove on a cost effective basis all drywall, problem drywall-related odors, and contamination, including, but not limited to, corrosion, tarnishing and pitting ("Contamination"); and to leave the KPT Property with the same construction quality and finishes, including remediating any damage to such quality and finishes that was caused by the drywall, as existed prior to the start of the remediation work.

A.   **Drywall Removal.** Removing and replacing all drywall in the home, including ceilings, with the exception of the following materials unless removal of such materials is required in order to complete the Remediation Work pursuant to this Scope of Work:

  1.    Type X fire rated board

  2.    Thicknesses other than ½"

  3.    Moisture Resistant Drywall ("Green board")

  4.    Sag Resistant Gypsum Board

  5.    Tile Backer Board

B.   **Electrical Wiring.** Remove and replace all electrical wiring (including low-voltage wiring), switches, service panels, circuit breakers, receptacles, and all Contaminated circuit boards.

C.   **Fire Safety and Home Security Equipment.** Remove and replace all fire safety equipment, including security alarms, intercoms, smoke detectors, fire suppression sprinkler systems, and carbon monoxide alarms.

D.   **Copper gas lines.** Replace all copper gas lines and fittings. All other gas lines and fittings will be inspected for Contamination and replaced if Contamination is found.

E.   **Fixtures.** Remove, store and reinstall the following to the extent such fixtures interfere with the removal of the drywall as described in Paragraph A. Otherwise, such fixtures will remain in place with suitable protection. In the event of any

Exhibit 1

Contamination to such fixtures caused by the possible problem drywall or damage from the drywall removal and replacement, such fixtures will be replaced.[1]

1. Hot water heaters

2. Cabinets

3. Countertops

4. Doors

5. Moldings and trim as required to remove drywall as described in Paragraph A

6. Sinks

7. Toilets

8. Bathtubs, shower enclosures

9. Mirrors

10. Lighting fixtures

11. Ceiling fans

12. Plumbing fixtures

13. Exhaust Grills and Diffusers

14. Marble, granite and other natural-stone pieces

15. Doors and attached door hardware

F. **Dust Control and Removal.** Remove the drywall using methods for dust control routinely used in drywall renovation projects.

1. These control methods typically include installation of drop cloths and walk-off mats, negative pressurization of work area with exhaust fans, and cleanup of dust and debris.

2. Following the removal of all drywall as described in Paragraph A, sweep all bulk debris and remove from site.

3. Following the sweeping, vacuum all surfaces including wall cavities using vacuums equipped with drywall bags and/or, where appropriate or

---

[1] In the event that equipment, appliances or fixtures need replacement, the replacement will be with new equipment, appliances or fixtures and not with reconditioned ones.

necessary, HEPA (high efficiency particulate air) filters, to remove drywall dust.

    4.      Damp wipe all surfaces with water.

    5.      As a final step, use Odorox® hydroxyl generators to resolve any residual indoor air problems.

G.    **HVAC.** The following HVAC repairs will be performed by a manufacturer-qualified firm, but if such firm is not available, by a licensed HVAC technician.

    1.      Remove and replace all air handler units, including the coils.

    2.      Remove and replace all line sets.

    3.      Replace thermostats in affected areas and control boards in affected air handling units; and otherwise clean and/or replace as needed the air handler.

    4.      Replace over limit controls on electric heating coils in affected units.

    5.      Remove and replace the flexible duct work.

    6.      Inspect and clean the metal duct work.

    7.      Remove and replace all other damaged HVAC system components.

H.    **Insulation.** Remove and replace porous insulation and repair or replace as necessary non-porous insulation in direct contact with the drywall to be removed.

    1.      Porous Insulation

            a)      Fiber glass insulation

            b)      Cellulose insulation

            c)      Open cell foam insulation

    2.      Non-Porous Insulation

            a)      Closed cell foam insulation

            b)      Reflective insulation

I.    **Carpet and Flooring.** Remove and replace all carpet, carpet padding, laminate flooring and laminate padding. All other flooring will remain in place and be protected during the remediation work.

J.    Plumbing.

    1.    Remove and replace all affected plumbing components that either show discoloring or pitting on exposed components such as faucets, and handles.

    2.    All other piping, fittings and components to be inspected, cleaned of any Contamination, and, if functionally unaffected, remain in place.

K.    **Appliances.**  Appliances shall mean refrigerators, freezers, dishwashers, washers, dryers, garbage disposals, wine coolers, ice machines, microwaves, cooktops, ovens, ranges and warming drawers.

    1.    For KPT Properties that are less than or equal to 3,500 square feet "under air," as determined by the Lead Contractor or Other Approved Contractor ("Under Air Area") and as set forth in the attached Sample Contractor-KPT Property Owner Agreement, remove and replace refrigerators and freezers located in the kitchen, wine coolers, ice machines, microwaves, cooktops and ovens. All other Appliances, including, secondary and auxiliary refrigerators and freezers, shall be removed and replaced where the performance or appearance is compromised, for example, where there is Contamination.

    2.    For KPT Properties that have an Under Air Area greater than 3,500 square feet, all Appliances shall be removed and replaced where the performance or appearance is compromised.

L.    **Items not Replaced.**  Building materials, building systems, fixtures and Appliances that will be removed and reinstalled shall be placed in storage. Building materials, building systems, fixtures and Appliances that will be retained in place will be protected during the remediation work. Any Building materials, building systems, fixtures or Appliances that are retained, but damaged during the remediation work, will be restored to the condition that existed prior to the start of the remediation work, and where necessary, replaced.

M.    **Finishing.**  Finish and paint all new drywall using a primer and two coats of paint of the same color and finish (*e.g.* flat, eggshell, satin, semi-gloss, and glossy).

N.    **Final Cleaning.**  Clean the Home to pre-repair condition, which will be documented prior to the start of the remediation work.

O.    **Documentation and Preservation.**  In the course of remediation, the contractor will fully document the remediation work using photographic and other documentation methods, including but not limited to identification of the manufacturer and condition of the possible problem drywall on a room by room, wall by wall and board by board basis. At the option and sole expense of KPT, all possible problem drywall and fixtures, wiring, fire safety equipment, plumbing, wiring, carpets, and appliances or other items removed from the home will be maintained for scientific analysis.

P.      Government Agency Access. Relevant government agencies, including but not limited to the Consumer Product Safety Commission, will be allowed to observe the remediation work and given access to the documentation materials and items described in Paragraph I (O).

II.     **Form of Agreement between Contractor and KPT Property Owner**

The agreement by which the Lead Contractor, or Other Approved Contractor, will perform the remediation work in the KPT Property shall take the form of the attached Sample Agreement between Contractor and KPT Property Owner.

III.    **Contractor and Environmental Certification**

A.      After completion of the Drywall Removal and Dust Control and Removal pursuant to Paragraphs I (A) and (F) above, the Lead Contractor or Other Approved Contractor will provide the Settlement Administrator and KPT Property Owner with a Contractor Certification substantially in the form of Exhibit 6 to the attached Sample Agreement between Contractor and KPT Property Owner.

B.      After receiving the Contractor Certification, the Settlement Administrator will assign an environmental inspector to certify the absence in the KPT Property of any remaining problem drywall-associated odors and contamination, including, but not limited to, corrosion, tarnishing, and pitting.

        1.     If the environmental inspector concludes the KPT Property is free of any and all KPT Chinese Drywall and Non KPT Chinese Drywall ("Problem Drywall") associated odors and contamination, the environmental inspector will provide an Environmental Certificate (in the form attached as Exhibit B to the Settlement Agreement) to the Settlement Administrator and the KPT Property Owner certifying that the home is free of any and all Problem Drywall-associated odors and contamination.

        2.     If the Environmental Inspector concludes the KPT Property is not free of any and all Problem-Drywall associated odors and contamination, the Lead Contractor, or Other Approved Contractor, will continue to remediate any issues identified by the environmental inspector until such time that the environmental inspector concludes the KPT Property is free of any and all Problem-Drywall associated odors and contamination, in which case the environmental inspector will provide the Environmental Certificate as specified in the above subparagraph II (B) (1).

C.      The KPT Property Owner and/or his counsel, upon sufficient notice, shall have the right to be present, but not to interfere with, any environmental inspection by the environmental inspector, and to videotape, or otherwise make a record of, such inspection. The costs of the environmental inspector will be paid by the Remediation Fund.

IV.   Warranty

    A.   The Lead Contractor, or Other Approved Contractor, will provide the KPT Property Owner with a warranty substantially in the form of the warranty provided for in the attached Sample Agreement between Contractor and KPT Property Owner.

    B.   If Lead Contractor, or Other Approved Contractor, does not perform, or is unable to perform, work required by the warranty described in subparagraph IV (A), the Remediation Fund will assume responsibility for procuring substitute performance under the warranty ("Guaranty of Warranty").

    C.   The Lead Contractor, or Other Approved Contractor, is responsible for satisfaction of all material and labor liens placed on the KPT Property in connection with the remediation work.

V.   Dispute Resolution (reprinted from Sections 4.5.1.2.1 and 4.5.1.2.2 of the Settlement Agreement)

    A.   In the event that a dispute arises between a KPT Property Owner and the Lead Contractor or Other Approved Contractor over the Remediation Protocol for the individual KPT Property, such dispute shall be submitted to the Special Master who will resolve the dispute. The parties shall cooperate with the Special Master to resolve any disputes expeditiously and avoid, to the maximum extent possible, any delay in the remediation.

    B.   Any expenses associated with a dispute between a KPT Property Owner and the Lead Contractor or Other Approved Contractor ("Mediation Expenses") as regards the Remediation Protocol, including progress and quality, and any warranties provided by the Contractor, will be jointly shared by the Knauf Defendants and the KPT Property Owner. In the event that disputes asserted by a Party, either singly or in combination, unreasonably delay the remediation or are asserted in bad faith, the Special Master may in his discretion direct that the Mediation Expenses incurred in resolving any such bad faith disputes asserted by that Party will be paid by same, regardless of whether the Special Master resolves the dispute in that Party's favor; otherwise, expenses will be shared equally by the Parties to the dispute.

VI.   Ombudsmen

The KPT Property Owner shall be able to consult with an Ombudsman, as that term is defined in Section 1.42 of the Settlement Agreement, regarding matters relating to the remediation process, including, but not limited to, the actual remediation work, and, in the event that a dispute arises during the dispute resolution process described in Paragraph V above.