# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 20, 2014

Lyle W. Cayce
Clerk

No. 12-31213

---

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY
LITIGATION

------------------------------------------------------------------------

TAISHAN GYPSUM COMPANY, LIMITED; TAI'AN TAISHAN
PLASTERBOARD, COMPANY, LIMITED,

                              Defendants-Appellants

v.

DAVID GROSS; CHERYL GROSS; LOIS VELEZ, individually and on behalf
of others similarly situated,

                              Plaintiffs-Appellees

------------------------------------------------------------------------

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY
LITIGATION

------------------------------------------------------------------------

TAISHAN GYPSUM COMPANY, LIMITED,

                              Defendant-Appellant

v.

MITCHELL COMPANY INCORPORATED, individually and on behalf of
others similarly situated,

                              Plaintiff-Appellee

------------------------------------------------------------------------

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY
LITIGATION

------------------------------------------------------------------------

TAISHAN GYPSUM COMPANY, LIMITED; TAI'AN TAISHAN
PLASTERBOARD, COMPANY, LIMITED,

No. 12-31213

Defendants-Appellants

v.

KENNETH WILTZ, individually and on behalf of all others similarly
situated, BARBARA WILTZ, individually and on behalf of all others similarly
situated,

Plaintiffs-Appellees

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before SMITH, DeMOSS, and HIGGINSON, Circuit Judges.

HIGGINSON, Circuit Judge:

This appeal encompasses three cases in the Chinese Drywall
multidistrict litigation—*Mitchell*, *Gross*, and *Wiltz*. Picking up where we left
off in *Germano v. Taishan Gypsum Company, Ltd.*, 742 F.3d 576 (5th Cir. 2014)
(affirming as to a fourth), we hold that personal jurisdiction lies over Taishan
Gypsum Company, Limited and Tai'an Taishan Plasterboard Company,
Limited, in their respective cases. We further hold that the district court did
not abuse its discretion when it refused to vacate the preliminary default
entered in *Mitchell*. We therefore AFFIRM.

## I.

From 2005 to 2008, a housing boom coincided with the destruction of
Hurricanes Katrina and Rita to sharply increase the demand for construction
materials in the Gulf South and East Coast. In response, Chinese companies
manufactured considerable quantities of gypsum wallboard ("Chinese
drywall") and sold it to United States companies. Homeowners experienced

No. 12-31213

problems with the drywall,[1] and affected parties sued entities involved in manufacturing, importing, and installing the Chinese drywall. The cases multiplied, and the Judicial Panel on Multidistrict Litigation transferred the cases to a single court in the Eastern District of Louisiana (the "MDL" court). The Honorable Eldon E. Fallon presides over the MDL.

Four cases in the MDL have reached our court: *Germano*, *Mitchell*, *Gross*, and *Wiltz*. *Germano* is a class action originally filed by Virginia homeowners in the United States District Court for the Eastern District of Virginia. *Mitchell* is a class action originally filed by homebuilders in the United States District Court for the Northern District of Florida. *Gross* and *Wiltz* are class actions on behalf of property owners and were directly filed in the MDL in the Eastern District of Louisiana.

Plaintiffs-Appellees are the class-action plaintiffs in each of the four cases. Defendants-Appellants are two Chinese companies that manufacture and sell drywall: Taishan Gypsum Company, Limited ("TG") and Tai'an Taishan Plasterboard Company, Limited ("TTP") (collectively "Taishan"). Both entities are defendants in *Gross* and *Wiltz*, but only TG is a defendant in *Germano* and *Mitchell*. TG and TTP appeal in their respective cases from the MDL court's omnibus September 4, 2012 order. In *Germano v. Taishan Gypsum Company, Ltd.*, 742 F.3d 576 (5th Cir. 2014), our court affirmed the district court's decision finding personal jurisdiction over TG. We are tasked with the three remaining appeals: *Mitchell*, *Gross*, and *Wiltz*.

A.    ***Mitchell, Gross*, and *Wiltz***

    1.    ***Mitchell***

---

[1] For example, they allege that the drywall "emits various sulfide gases," damages the structural, mechanical and plumbing systems of the home, and damages other appliances in the home. We express no view on these allegations.

3

No. 12-31213

The Mitchell Company ("Mitchell") is an Alabama construction company that has built homes and apartments in Alabama, Mississippi, Louisiana, Georgia, and Florida. On March 6, 2009, Mitchell sued TG, among others, in the United States District Court for the Northern District of Florida. Mitchell sued on behalf of itself and a class "composed of all persons and entities" in Alabama, Mississippi, Louisiana, Georgia, Texas, and Florida who "constructed an improvement to real estate using drywall manufactured or distributed by Defendants" and incurred expenses associated with repairing the drywall itself, repairing property damage that the drywall caused, and liability to property owners as a result of the damage.

Mitchell properly served TG on May 8, 2009. On June 15, 2009, the MDL panel transferred *Mitchell* to the Eastern District of Louisiana. TG failed to appear, and Mitchell moved for a default judgment. The Clerk entered a preliminary default against TG on September 22, 2009, and on June 10, 2010, TG made its first appearance. TG moved to vacate the preliminary default under Rule 55(c) and also moved to dismiss the case for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). The MDL court denied TG's motions in its omnibus September 4, 2012 order.

2.  *Gross*

The *Gross* plaintiffs filed directly in the MDL court on October 7, 2009. The plaintiffs sued, among others, TG and TTP, on behalf of themselves and all United States homeowners who have defective drywall in their homes. They allege that defendants' drywall has caused them economic harm from the costs of inspection, costs of repairs, and devaluation of their homes, and physical harm such as an increased risk of disease. Because plaintiffs concede that they have failed to "identify the manufacturer of the product that caused the harm," they urge liability for the defendants "in ratio to their proportionate share of

4

No. 12-31213

the relevant market."[2] After jurisdictional discovery, TG and TTP moved to dismiss for lack of personal jurisdiction under Rule 12(b)(2). The district court denied the motion in its omnibus September 4, 2012 order.

### 3. *Wiltz*

The *Wiltz* plaintiffs also filed directly in the MDL court. They are suing, among others, TG and TTP, on behalf of themselves and all owners and residents of property containing defective Chinese drywall. After completing jurisdictional discovery, TG and TTP moved to dismiss *Wiltz* for lack of personal jurisdiction under Rule 12(b)(2). The district court denied the motion in its omnibus September 4, 2012 order.[3]

### B.   The Taishan Entities (TG and TTP)

TG is a Chinese corporation with its principal place of business in Ta'in City, Shandong Province, China. It began manufacturing drywall in 1992 and has grown to be one of the largest drywall manufacturers in China. In 2006, TG formed a wholly owned subsidiary, TTP. TTP stopped operating in 2008. TG and TTP are referred to collectively as "Taishan."

### C.   The District Court's Order

On September 4, 2012, the district court ruled on Taishan's motions in *Germano*, *Mitchell*, *Gross*, and *Wiltz* in a 142-page order. In *Germano* the

---

[2] Two sets of plaintiffs intervened in the *Gross* action contending that they were absent class members: the *Benes* plaintiffs and the *Jaen* plaintiffs. Like *Gross*, both allege market-share liability theories with respect to the manufacturers of the defective drywall. Unlike *Gross*, the intervening plaintiffs have identified defendants in the chain of distribution. Appellants point out that many of the plaintiffs in the *Gross* action (including the intervening classes) do not reside in Louisiana. The district court held that this concern is resolved "by the PSC's [Plaintiffs' Steering Committee] suggestion to sever and transfer any non-Louisiana plaintiffs from *Gross*."

[3] The similarities between *Gross* and *Wiltz* allow for merged consideration of the personal jurisdiction issues in this appeal. As the district court noted, the key difference in the actions is that the *Gross* plaintiffs are alleging market-share liability because they cannot determine the appropriate defendants, while the *Wiltz* plaintiffs identify TG and TTP as the manufacturers of the drywall in their properties.

5

No. 12-31213

district court determined that personal jurisdiction was proper over TG in Virginia. The district court also denied TG's motion to vacate the default judgment.[4] In *Mitchell*, the district court determined that personal jurisdiction was proper over TG in Florida. In so holding, the district court determined that TTP's contacts with Florida could be imputed to TG for the purposes of personal jurisdiction. The district court also denied TG's motion to vacate the preliminary default. In *Gross* and *Wiltz*,[5] the district court determined that personal jurisdiction was proper over TG and TTP in Louisiana. The district court again held that TTP's contacts could be imputed to TG for the purposes personal jurisdiction. The district court subsequently certified an interlocutory appeal under 28 U.S.C. § 1292(b), and this court granted permission to appeal.

## II.

Whether personal jurisdiction can be exercised over a defendant is a question of law subject to *de novo* review. *Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 652 (5th Cir. 2002) (citing *Dickson Marine, Inc. v. Panalpina, Inc.*, 179 F.3d 331, 335 (5th Cir. 1999)). A district court's jurisdictional findings of fact, however, are reviewed for clear error. *Lonatro v. United States*, 714 F.3d 866, 869 (5th Cir. 2013). "The burden of establishing personal jurisdiction over a non-resident defendant lies with the plaintiff." *Ainsworth v. Moffett Eng'g, Ltd.*, 716 F.3d 174, 176 (5th Cir.), *cert. denied*, 134 S. Ct. 644 (2013). Because the district court held an evidentiary hearing on personal jurisdiction, the plaintiffs must establish personal jurisdiction by a preponderance of the evidence. *Germano*, 742 F.3d at 585; *see also Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241–42 (5th Cir. 2008).

---

[4] As discussed, our court affirmed this ruling.
[5] The district court applied the same analysis to both cases.

No. 12-31213

Under Federal Rules of Civil Procedure 55(c) and 60(b), a district court may set aside an entry of default for "good cause." *Lacy v. Sitel Corp.*, 227 F.3d 290, 291–92 (5th Cir. 2000). The denial of such relief is reviewed for abuse of discretion and any factual determinations underlying the district court's decision are reviewed for clear error. *Id.*

## III.

We begin with the *Mitchell* appeal, in which TG argues that the district court erred in finding specific jurisdiction over it in Florida. "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 134 S. Ct. 1115, 1121 (2014) (internal quotations omitted). "This is in contrast to 'general' or 'all purpose' jurisdiction, which permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit (*e.g.*, domicile)." *Id.* at n. 6; *see also Daimler AG v. Bauman*, 134 S. Ct. 746, 757–58 (2014).

## A.    TTP's contacts may be imputed to TG

TG first argues that TTP's contacts with Florida may not be imputed to TG for purposes of personal jurisdiction. We hold that they can.

### 1.    Choice of law

TG faults the district court for applying the forum state's law (Florida law) instead of Chinese law to the question of whether to impute TTP's Florida contacts to TG. TG concedes, however, that "Chinese law is not materially different on this issue from Florida law, and the outcome should be the same under either law." Accordingly, we need not choose because "if the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them." *Phillips*

7

No. 12-31213

*Petroleum Co. v. Shutts*, 472 U.S. 797, 839 n.20 (1985). Therefore, we apply Florida law.[6]

## 2.    Imputation under Florida Law

Under Florida law, a foreign parent corporation is generally not "subject to the jurisdiction of a forum state merely because a subsidiary is doing business there." *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1272 (11th Cir. 2002). But if:

> the subsidiary is merely an agent through which the parent company conducts business in a particular jurisdiction or its separate corporate status is formal only and without any semblance of individual identity, then the subsidiary's business will be viewed as that of the parent and the latter will be said to be doing business in the jurisdiction through the subsidiary for purposes of asserting personal jurisdiction.

*Id.* (quoting Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed. 2002)). Indeed, Florida's long-arm statute recognizes that an agent's contacts with Florida can be imputed to its principal

---

[6] Applying Florida law is also consistent with *Lennar Homes, LLC v. Knauf GIPS KG*, No. 09-07901 CA 42 (Fla. Cir. Ct. Aug. 31, 2012). As noted in the district court opinion, Judge Fallon and Judge Farina coordinated their hearings because of the overlapping issues in TG's motions in the MDL court and those in the Florida court. In *Lennar Homes*, the court held that Florida law applied to the imputation question:

> Here, Florida is not only the place of business for many of the parties, but it is also the place where the injuries that gave rise to the causes of action occurred. The property damage suffered by hundreds of Florida residents comprises the foundation of this litigation, and this factor weighs heavily in finding that Florida law should apply in determining whether TTP's actions can be attributed to TG under Florida principles of agency.

*Lennar Homes*, No 09-07901 at 2. The Third District Court of Appeal in Florida summarily affirmed Judge Farina's decision. *Taishan Gypsum Co. Ltd. v. Lennar Homes, LLC*, 123 So. 3d 637 (Fla. Dist. Ct. App. Sept. 11, 2013) (per curiam). In support of its affirmance, the court relied on the portion of Judge Fallon's September 4, 2012 Order discussing *Mitchell*, which applied Florida law to the imputation decision. *Lennar Homes* is instructive because "when the supreme court of a state has not spoken to a particular issue, the well-established practice of this Circuit is to follow the opinion of the highest court which *has* written on the matter." *Birmingham Fire Ins. Co. of Pa. v. Winegardner & Hammons, Inc.*, 714 F.2d 548, 550 (5th Cir. 1983); *see also Temple v. McCall*, 720 F.3d 301, 307 (5th Cir. 2013).

No. 12-31213

for jurisdictional purposes: "A person, whether or not a citizen or resident of this state, who personally *or through an agent* does any of the acts enumerated in this subsection thereby submits . . . to the jurisdiction of the courts of this state." Fla. Stat. Ann. § 48.193(1)(a) (emphasis added); *see also Dev. Corp. of Palm Beach v. WBC Constr., LLC*, 925 So. 2d 1156, 1161 (Fla. Dist. Ct. App. 2006) ("While a parent corporation is not subject to jurisdiction in Florida solely because its subsidiary does business here, the control of a parent over a subsidiary may permit the conclusion that the subsidiary is acting as the agent of the parent, thus subjecting the parent to jurisdiction under section 48.193(1) and supporting 'minimum contacts.'" (internal citations omitted)).

"Essential to the existence of an actual agency relationship is (1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990). "The issue of control is critical to the determination of agency." *State v. Am. Tobacco Co.*, 707 So. 2d 851, 854 (Fla. Dist. Ct. App. 1998). The parent's control "must be high and very significant." *Enic, PLC v. F.F. S. & Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004). "[T]he parent corporation, to be liable for its subsidiary's acts under the . . . agency theory, must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Id.*

### 3.    Imputation and Due Process

While Florida law contemplates the imputation of jurisdictional contacts between an agent and its principal, authority is split over whether imputation on the basis of an agency relationship comports with Federal Due Process. In *Daimler AG v. Bauman*, the Supreme Court was presented with the question of whether a principal can be subject to general jurisdiction based on its agent's contacts with the forum state. 134 S. Ct. 746 (2014). The court recognized:

9

No. 12-31213

"Daimler argues, and several Courts of Appeals have held, that a subsidiary's jurisdictional contacts can be imputed to its parent only when the former is so dominated by the latter as to be its alter ego." The court, however, then decided "we need not pass judgment on invocation of an agency theory in the context of general jurisdiction, for in no event can the appeals court's analysis be sustained." *Daimler*, 134 S. Ct. at 759. As for agency imputation in *specific* jurisdiction cases, the Court noted:

> Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction. . . . *As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there.* . . . It does not inevitably follow, however, that similar reasoning applies to general jurisdiction.

*Id.* at 759 n.13 (emphasis added). *Daimler* therefore embraces the significance of a principal-agent relationship to the specific-jurisdiction analysis, though it suggests that an agency relationship alone may not be dispositive. *See id.* at 759 ("Agencies . . . come in many sizes and shapes . . . [a] subsidiary, for example, might be its parent's agent for claims arising in the place where the subsidiary operates, yet not its agent regarding claims arising elsewhere.").[7]

---

[7] Even accepting that the principles of imputation translate to specific-jurisdiction analysis, there are material differences between the Ninth Circuit's agency test and Florida's (and the Eleventh Circuit's) agency test that mitigate concerns about imputation in this case. *Daimler* described the Ninth Circuit's test as "a less rigorous test" than alter-ego inquiries focusing on the parent's domination of the subsidiary. *Daimler*, 134 S. Ct. at 759. The Ninth Circuit's agency analysis "is satisfied by a showing that the subsidiary functions as the parent corporation's representative in that it performs services that are sufficiently important to the foreign corporation that if it did not have a *representative* to perform them, the corporation's own officials would undertake to perform substantially similar services." *Bauman v. DaimlerChrysler Corp.*, 644 F.3d 909, 920 (9th Cir. 2011), *rev'd sub nom. Daimler AG v. Bauman*, 134 S. Ct. 746 (2014). An alter-ego finding in the Ninth Circuit, however, "is predicated upon a showing of parental *control* over the subsidiary." *Id.* As discussed, unlike the agency test in the Ninth Circuit, under Florida law an agency relationship is predicated on the parent's control of the subsidiary: "[T]he parent corporation, to be liable for its subsidiary's acts under the . . . agency theory, must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Enic*, 870 So. 2d at 891. This control-focused inquiry overlaps with the alter-ego test adopted by most circuits. *See Daimler*, 134 S. Ct. at

10

No. 12-31213

*Daimler*'s illustrative example of when the principal-agent relationship informs the specific-jurisdiction analysis of related entities is present here. The agency relationship between TG and TTP reflects TG's purposeful availment of the Florida forum. *See Daimler*, 134 S. Ct. at 759 n.13. The record, as set forth by the district court, and assessed below, demonstrates that TG's parental control over its agent, TTP, pervaded TTP's dealings with the forum, and therefore allows TTP's contacts with Florida to be imputed to TG for the purpose of specific jurisdiction. *See, e.g., Pesaplastic, C.A. v. Cincinnati Milacron Co.*, 750 F.2d 1516, 1521–23 (11th Cir. 1985) (upholding finding of specific jurisdiction based on agency relationship); *John Scott, Inc. v. Munford, Inc.*, 670 F. Supp. 344, 347 (S.D. Fla. 1987) (assessing specific jurisdiction, and holding that "the contacts of ASIAN ARTS's agent MUNFORD, whose agency relationship has been established by *prima facie* evidence, may be attributed to ASIAN ARTS for the purposes of satisfying due process.").

**4.      TG and TTP**

To find that TTP was acting as TG's agent in order to impute its contacts to TG, we must examine their corporate relationship. The district court based its factual findings on the entities' relationship on almost two years of jurisdictional discovery, multiple rounds of briefing, and a hearing. The district judge also personally attended depositions taken in Hong Kong. With the benefit of these efforts, we describe the entities' relationship.

**a.      TG creates TTP.**

---

759 (noting that several Courts of Appeals impute jurisdictional contacts when "when the former is so dominated by the latter as to be its alter ego."). Accordingly, the Eleventh Circuit (and the Fifth Circuit) recognize that imputation of jurisdictional contacts between an agent and its principal can comport with Due Process. *See, e.g., Dickson Marine*, 179 F.3d at 339 ("Therefore we are convinced that Dickson failed to carry the burden of establishing a prima facie showing of sufficient control to establish an alter-ego or agency relationship between Air Sea and Panalpina Gabon.").

No. 12-31213

TG is a Chinese corporation with its principal place of business in Ta'in City, Shandong Province, China. TG began manufacturing drywall in 1992 and has become one of the largest drywall manufacturers in China. TG's former names include Shandong Taihe Taishan Plasterboard Main Factory (Group) and Shandong Taihe Dongxin Co., Ltd. ("Taihe"). Because TG uses recycled materials, it was exempt from the value added tax ("VAT"), but in 2006 the Chinese tax bureau informed TG that if it "wants to continue to enjoy the exemption for VAT tax, [it] cannot issue VAT invoices to these customers." Some of TG's customers, however, still required VAT invoices. Accordingly, in 2006, TG formed a wholly owned subsidiary, TTP, to execute its sales accompanied with VAT invoices.

### b.    TG employees sit on TTP's Board of Directors.

TTP appointed Peng Shiliang ("Peng"), Fu Tinghuan ("Fu"), and Wang Fengquin ("Wang") to its Board of Directors. All three directors of TTP "came from TG." Peng had offices at both TG and TTP. Fu did not receive compensation for his position on TTP's board, and was "only compensated by TG" for his position as TG's Deputy General Manager and Director of Sales. TTP held board meetings "irregularly, [but] usually once a year." TTP submitted written monthly reports to TG, and at times TTP's directors— specifically Peng—would report directly to TG. These reports would tell TG "the specifics of the production and also the volume of sales."

### c.    TG capitalizes, staffs, and deals with TTP.

TG provided TTP with a capital contribution, sold it equipment, and rented it a factory. TG's initial capital contribution was RMB 15,000,000, and TG provided a subsequent capital contribution of RMB 7,234,900. TTP purchased manufacturing equipment from TG, but TTP's financial records do not show how much TTP paid for the equipment. When TTP ceased operation, TG purchased back the equipment, offices, and factory it had sold or rented to

12

No. 12-31213

TTP. TG's financial reports do not account for the amounts of the buy-back purchases.

TG's headquarters was located about 1,000 meters west of TTP's office, and TG and TTP maintained separate offices and factories. But TTP conducted "all of the export sales" previously executed by TG. TG also authorized TTP to "use the Taishan name," i.e. the "brand name." TTP did not pay TG for the use of the Taishan brand, which is TG's trademark. Many of TTP's employees had previously worked for TG, and when TTP ceased operation, they "went back to work at TG." To staff TTP, TG instructed its employees to simply "volunteer." TTP's employees continued to use TG email addresses, and phone numbers; sign emails "Taihe Group"; and use TG business cards when dealing with customers. TTP employees also directed their customers and potential customers to TG's website at "www.taihegroup.com." When TTP salespeople gave an introduction to their company they would introduce their company as TG, would not mention TTP at all, and would include "Taihe Dongxin Co., Ltd." (TG) under their signature.

### d.    TTP holds itself out to be the same entity as TG.

TTP consistently held itself out as being synonymous with TG in its dealings with two American companies. In particular, it referred to itself as "Taihe." Guardian Building Supplies ("Guardian"), a South Carolina company, entered into dealings with an entity it knew only as "Taihe." When Guardian's representative, John Gunn, visited China, Taihe's representatives did not discuss TG or TTP. Gunn met with Taihe representative Apollo Yang, who told Gunn that he worked for Taihe and gave Gunn a business card that represented he worked for Taihe Dongxin. Taihe, however, was the "only name [Gunn] knew." Guardian purchased drywall from Taihe, and Gunn "understood it was buying Taihe drywall."

No. 12-31213

While Gunn's purchase order went to Taihe, Taian Taigo Trading Corporation ("TTT") served as the broker. At the time of the transaction, however, Gunn "had no idea of [TTT's] existence." When homeowners began to complain about the drywall, Guardian alerted Taihe and went to China to meet with them. When Gunn traveled to China in October 2006, he met with TTT, and "[t]his was the first time [he] realized there's someone else involved." Gunn testified that TTT "was a front set up by Taihe to distance . . . Guardian[] from Taihe." Gunn traveled to China again in 2008 to work out a settlement with Taihe. In these discussions, however, Gunn was dealing with Taihe. Specifically, Gunn thought he was meeting with the General Manager of Taihe. Nevertheless, Guardian eventually settled with TTP.

Oriental Trading Company ("OTC"), a Florida company, had a similar experience. TTP's representatives never differentiated between TG and TTP, but instead consistently represented themselves to be "Taihe." TTP and OTC entered into an agreement in which TTP agreed to sell OTC "DUN" brand drywall, and make OTC the sole sales agent of "DUN" drywall in the United States. Importantly, TG exclusively produced DUN drywall, and TG never formally authorized TTP to produce DUN brand drywall. But authorization was obvious: TTP sold OTC 60,000 pieces of DUN drywall. Moreover, OTC made a $100,000 deposit to TTP, but it was TG that worked to return that deposit to TTP at the end of their business relationship.

### e.   TG winds down TTP.

In 2008, the boards of directors of TG and TTP decided to have TTP discontinue producing drywall. TTP remains incorporated, though it has no income and TG or one of its subsidiaries pays TTP's remaining employees.

### 5.   Imputation is Proper

The record demonstrates that TTP acted as TG's agent under Florida law when it conducted its Florida contacts. This principal-agent relationship

14

No. 12-31213

allows for imputation of TTP's contacts to TG for the purposes of personal jurisdiction. *See Pesaplastic,* 750 F.2d at 1522–23. First, TG allowed TTP to act on its behalf, and TTP did act on TG's behalf. *See, e.g., Stubbs v. Wyndham Nassau Resort & Crystal Palace Casino,* 447 F.3d 1357, 1361–63 (11th Cir. 2006) (finding an agency relationship supporting imputation when, among other things, the agent "acted as an advertising and booking department" for the principal); *Benson v. Seestrom,* 409 So. 2d 172, 173 (Fla. Dist. Ct. App. 1982) ("Even where an agent's act is unauthorized, the principal is liable if the agent had the apparent authority to do the act and that apparent authority was reasonably relied upon by the third party dealing with the agent."). For instance, TG authorized TTP to use TG's trademark in producing drywall but did not charge TTP for this authorization. TTP also sold the exclusive right to purchase TG's "DUN" brand of drywall even though TG did not formally authorize TTP to sell this brand. *See id.* at 173 ("While Paschall was not cloaked with authority to execute contracts on appellant's behalf, he certainly had the apparent authority necessary to conduct negotiations between the parties.").

Second, TG and TTP held themselves out to be the same entity to customers such as OTC (a Florida company) and Guardian. *See, e.g., John Scott,* 670 F. Supp. at 346 (finding fact that entity acted on behalf of principal in negotiating contracts was a factor favoring agency relationship). TTP employees used TG email address, fax numbers, phone numbers, business cards, and websites when dealing with customers. *See Stubbs,* 447 F.3d at 1362 (finding an agency relationship supporting imputation when, among other things, the principal listed the agent's address on checks). Moreover, the entities settled each other's debts.

Third, TTP was formed to conduct a narrow function for TG and it acted only to serve TG. *See, e.g., Stubbs,* 447 F.3d at 1362–63 (noting that imputation

15

No. 12-31213

was appropriate when the Florida subsidiary conducted business "solely for the nonresident corporation[]"); *Meier*, 288 F.3d at 1275 (finding that one factor to consider in determining imputation is whether the subsidiary "render[s] services on behalf of" the parent that are "sufficiently important" to the parent that the parent would "perform the equivalent services if [the subsidiary] did not exist"). For example, some of TTP's board members did not receive compensation from TTP, TG rented or sold to TTP offices, factories, and equipment, and TTP returned these properties to TG when it ceased operating; TG and TTP did not accurately report their dealings with each other in their financial reports,[8] and TTP and TG were used interchangeably in contracts. *See, e.g., PFM Air, Inc. v. Dr. Ing. hc. F. Porshe A.G.*, 751 F. Supp. 2d 1264, 1276 (M.D. Fla. 2010) (finding imputation appropriate when, among other things, the parent paid the salaries of the subsidiary's employees and the parent "controlled the warranty program" that issued in the subsidiary's name).

These factors demonstrate TG's control over TTP. As *Lennar Homes* summarized, "TTP had no independent purpose outside of servicing TG's needs and, as such, was its agent under Florida law." *Lennar Homes*, No. 09-7901 CA 42, at 5. Accordingly, because TTP acted as TG's agent when it executed its Florida contacts, those contacts can be imputed to TG for the purposes of personal jurisdiction.

## B.   The Florida Long-Arm Statute

"A federal district court sitting in diversity may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant; and (2) exercise

---

[8] As the district court found: "[T]he financial records of the companies do not reflect the exact amount of these transactions" and "[t]hese rental and sales transactions were not accurately reflected in the financial records of either company."

No. 12-31213

of such jurisdiction by the forum state is consistent with due process under the United States Constitution." *Ainsworth*, 716 F.3d at 177 (quoting *Latshaw v. Johnston*, 167 F.3d 208, 211 (5th Cir. 1999)). The first prong of this two-prong jurisdictional analysis asks "whether the long-arm statute of the forum state confers personal jurisdiction over the defendant." *Stripling v. Jordon Prod. Co., LLC*, 234 F.3d 863, 869 (5th Cir. 2000). It is undisputed that Florida's long-arm statute—Fla. Stat. Ann. § 48.193—applies. Florida's long-arm statute provides in relevant part:

> (1)(a) A person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal representative to the jurisdiction of the courts of this state for any cause of action arising from any of the following acts:
>
> 1.    Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.
>
> 2.    Committing a tortious act within this state.
>
> . . .
>
> 6.    Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:
>
>     a.    The defendant was engaged in solicitation or service activities within this state; or
>
>     b.    Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

§ 48.193. "Florida's long-arm statute is to be strictly construed," *Sculptchair Inc. v. Century Arts, Ltd.*, 94 F.3d 623, 627 (11th Cir. 1996) (*citing Oriental Imports & Exports, Inc. v. Maduro & Curiel's Bank, N.V.*, 701 F.2d 889, 891 (11th Cir. 1983)), and some courts interpreting Florida's statute have noted that it "confers less jurisdiction upon Florida courts than allowed by the Due Process Clause." *Am. Investors Ins. Co. v. Webb Life Ins. Agency, Inc.*, 876 F.

No. 12-31213

Supp. 1278, 1280 (S.D. Fla. 1995); *see also McRae v. J.D./M.D., Inc.*, 511 So. 2d 540, 543 n.4 (Fla. 1987) ("It has been held by other courts that our long arm statute requires more activities or contacts than is mandated by the constitution." (citing *Mallard v. Aluminum Co. of Canada, Ltd.*, 634 F.2d 236, 241 (5th Cir. Jan. 1981))).

First we overlay Taishan's (TTP and TG's) contacts with Florida and then analyze their sufficiency under § 48.193(1)(a)(1).[9]

### 1. Taishan's contacts with Florida

Having concluded that TTP was TG's agent under Florida law allowing imputation of TTP's contacts to TG, we next ask whether the entities' contacts with Florida were sufficient to allow personal jurisdiction over TG in Florida. Again, we benefit from the district court's extensive factual findings on Taishan's contacts with Florida.

### a. Taishan deals with OTC.

Taishan sold 200,000 sheets of its drywall to Florida customers or customers doing business in Florida and made almost $800,000 from these sales. Taishan's specific dealings with OTC, however, are particularly relevant to our jurisdictional analysis. TTP entered into a sole agency agreement with OTC—a Florida company—in which OTC agreed to purchase at least 20,000 sheets of TTP drywall between November 2006 and February 2007, and not less than 1,000,000 sheets in the following twelve months. The agreement with OTC was notarized under Florida law, OTC paid a $100,000 deposit to TTP under the agreement, and OTC purchased about 57,800 sheets of drywall for $208,711.20 from TTP.

---

[9] Though the district court found that jurisdiction was proper under § 48.193(1)(a)(1), (2), and (6), because we find § 48.193(1)(a)(1) satisfied, we do not need to address these alternative grounds for long-arm jurisdiction.

No. 12-31213

Taishan knew through communications with OTC that its drywall would be shipped to Florida, as invoices and emails provided that shipments would be to Miami, Florida.[10] TTP also issued export invoices on 44,490 pieces of drywall sold to OTC and shipped to Miami. OTC and Taishan discussed expanding the sales in the United States, and Taishan said it would help OTC market and sell the drywall.

Further, OTC requested that the drywall meet American Codes and Standards. Specifically, Taishan customized its drywall to meet American Society for Testing and Materials ("ASTM") standards and provided ASTM certificates. Taishan also manufactured its drywall in inches, altered its DUN brand colors to reflect the colors of the American flag, and shipped samples of its drywall to Florida. Moreover, Taishan hosted OTC's representative for a visit in China.

Taishan arranged shipments from China to Florida, and although the shipping was FOB China, Taishan handled and paid for the shipping of drywall to Florida.[11] Taishan made suggestions as to which Florida port would be best for shipping,[12] and all of OTC's shipments went to Florida. Taishan also complied with Florida Department of Transportation's regulations. After their business relationship ended, OTC and Taishan discussed a new business relationship, in which Taishan would provide electronics to OTC in the United States.

---

[10] Indeed OTC emailed TTP instructing, "I think the best thing to do right now is to let you operate the ocean freight and shipping from Qingdao to Miami, Fl" and "Half of this order will have Miami, FL as a destination; the other half will go to Orlando, FL."

[11] As Ivan Gonima of OTC testified: "[T]hey were in charge of finding the shipping company, they were in charge of making the deal with the shipping company, and we were to pay, because they said that they could get a better price through their connections in China . . . So, yes, it was free on board, the price they were giving us was free on board, but they were the ones hiring or making the arrangements for the shipping."

[12] Gonima explained that they would take care of the shipping and that "they also mentioned . . . Jacksonville, Florida" as a possible port.

No. 12-31213

### b.    Taishan deals with B. America.

TTP also sold drywall to B. America Corporation through Onyx GBB Corporation—both Florida companies. B. America purchased 1,320 sheets of TTP drywall, compliant with ASTM standards, and delivered "CFR MIAMI." B. America wired half of the purchase price to TTP, but the deal fell through when the American market suffered. B. America tried to get a refund for the wire transfer, but TTP refused. As a result, B. America purchased the drywall from TTP and contacted R&R Building Materials ("R&R") to purchase this drywall from B. America. TTP prepared an invoice selling 660 sheets to B. America in exchange for $5,656.20 and noting that the delivery was "CIF [cost, insurance, freight] Miami Port." In communications to Onyx and B. America, Taishan wrote: "We will arrange the shipping to Miami Port at an early time." TTP took out insurance on its shipment to B. America, and the policy notes that the shipment is going to Florida. After the shipment reached Florida, Onyx sold it to R&R in Miami.

### c.    Taishan deals with Wood Nation.

Wood Nation, Inc.—another Florida company—also purchased drywall from TTP. Richard Hannam, the president of Wood Nation, visited TTP in China, and entered into a contract with TTP for the purchase of 333,000 sheets of TTP drywall. The contract provided that the port of discharge was Tampa, Florida and that Wood Nation was registered at Tampa, Florida. TTP provided Wood Nation with test reports showing that it qualified with ASTM standards. Wood Nation requested that TTP customize the drywall by putting "ASTM C 1396-04" on the back of each piece of drywall, and TTP stamped each board with "Tampa, Florida" as the contact location as well as a Florida phone number as the contact phone number.[13] Wood Nation revised its contract to

---

[13] Wenlong Peng testified, "We would stamp it for the customer."

No. 12-31213

purchase only 26,000 sheets of drywall in order to accommodate a smaller order from its customer. Wood Nation handled shipping the drywall from China to Florida.

### d. Taishan sells drywall to Devon.

A Pennsylvania company, Devon International Trading, was also interested in purchasing Chinese drywall. Devon's president toured Taishan's factory in China, and TG sent samples of its drywall to Devon. Devon and another company, North Pacific Group, entered a purchase order of 485,044 sheets of drywall to be sent to Pensacola, Florida. Devon requested to purchase drywall from TG to satisfy the North Pacific purchase order. The product was purchased through a trading company, Shanghai Yu Yuan Import & Export Company, and the Devon logo was stamped on each package. Each piece of drywall was also stamped with a guarantee that it met ASTM standards. In the course of the drywall's transit to Pensacola, Florida, about half of the drywall was damaged, and North Pacific only purchased a fraction of what it original ordered. Devon sold the left over drywall to distributors, wholesalers, and some individuals. Devon sold some drywall to Emerald Coast Building Supply, and Emerald Coast sold 840 boards of drywall to Rightway Drywall, who finally sold it to Mitchell—the named plaintiff. This drywall had the same markings requested by Devon, specifically, the drywall is stamped that it is "made in China" and "Meet[s] or exceeds ASTM C1396 04 standard." Mitchell then used the drywall to build homes in Florida.

### e. Taishan sends Carn Construction samples in Florida.

Carn Construction Corporation, a Florida corporation, also contacted Taishan to purchase drywall after it discovered Taishan through Alibaba.com. Taishan represents on this website that it exports drywall on Alibaba.com, and when Carn contacted Taishan and informed Taishan that it was a Florida company, Taishan represented that it exported to the United States and said

21

No. 12-31213

it was willing to "ship their products to [Carn] in Florida." Taishan sent drywall samples to Carn in Florida. "[F]or marketing purposes," Taishan would "give [Carn] the option in [the] order to mark a brand" on the drywall.[14]

## 2.    Conducting business within Florida

Under § 48.193(1)(a)(1) TG is subject to jurisdiction in Florida for "any cause of action arising from . . . [o]perating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state." In order to satisfy this provision, "[t]he activities of the [defendant] sought to be served . . . must be considered collectively and show a general course of business activity in the State for pecuniary benefit." *Sculptchair*, 94 F.3d at 627 (quoting *Dinsmore v. Martin Blumenthal Assocs., Inc.*, 314 So. 2d 561, 564 (Fla. 1975)); *see also Future Tech Today, Inc. v. OSF Healthcare Sys.*, 218 F.3d 1247, 1249 (11th Cir. 2000) (per curiam); *Golant v. German Shepard Dog Club of Am., Inc.*, 26 So. 3d 60, 63 (Fla. Dist. Ct. App. 2010) (noting the same); *Citicorp Ins. Brokers (Marine), Ltd. v. Charman*, 635 So. 2d 79, 81 (Fla. Dist. Ct. App. 1994) (noting the same).

Further, "[i]t is not necessarily the number of transactions, but rather the nature and extent of the transaction(s) that determines whether a person is 'carrying on a business venture' within the state." *Joseph v. Chanin*, 869 So. 2d 738, 740 (Fla. Dist. Ct. App. 2004). In *Horizon Aggressive Growth, L.P. v. Rothstein-Kass, P.A.*, 421 F.3d 1162, 1167 (11th Cir. 2005), the court highlighted "[f]actors relevant, but not dispositive" to this analysis. These

---

[14] The district court also noted other contacts between Taishan and Florida. For instance, Taishan sold drywall to Beijing Building Materials Import and Export Co., Ltd., which sold the drywall to Rothchilt International, Ltd., which shipped it to La Suprema Enterprises, Inc. and La Suprema Trading, Inc., which finally sold it to Banner in Florida. Taishan also represented that it could ship to Florida when contacted by SCI Co., Ltd. Guardian also purchased drywall from Taishan, which was subsequently shipped to Stock Building Supplies, which in turn sold it to builders in Florida.

22

No. 12-31213

include: (1) "the presence and operation of an office in Florida," (2) "the possession and maintenance of a license to do business in Florida," (3) "the number of Florida clients served," and (4) "the percentage of overall revenue gleaned from Florida clients." *Id.* (citing Florida cases utilizing each factor).

The third and fourth factors are relevant here. First, Taishan sold 200,000 sheets of drywall for about $800,000 in Florida.[15] Second, Taishan negotiated with Florida companies, and arranged shipping to Florida. *See Robert D. Harley Co. v. Global Force (H.K.) Ltd.*, No. 05-21177-CIV-SEITZ/MCALILEY, 2007 WL 196854, at *4 (S.D. Fla. Jan. 23, 2007) (jurisdiction proper under Florida law because, among other reasons, defendant "shipped from [its] factories in Jordan and China directly to VF Corp's Tampa location"). Third, Taishan granted a Florida company the sole right to purchase a specific brand of its drywall. *See Sierra v. A Betterway Rent-A-Car, Inc.*, 863 So. 2d 358, 360 (Fla. Dist. Ct. App. 2003) (finding statute satisfied when defendants "were aware that its vehicles were driven in Florida," "did not discourage or prohibit its customers from driving in Florida," and advertised itself as a "global system of rental agencies, available for worldwide rental arrangements"). Fourth, Taishan specifically altered some boards by stamping "Tampa, Florida" and a Florida phone number; shipped samples to Florida; and insured its shipments to Florida.

These and the other Florida contacts "show a general course of business activity in the state for pecuniary benefits." *Citicorp Ins.*, 635 So. 2d at 81 (deriving commissions of $600,000 over five years, "sending numerous letters

---

[15] TG argues that the amounts attributed to TG were clearly erroneous and takes issue with Exhibit 1, which it objected to below. The district court overruled its objection. On appeal, TG argues that this exhibit was based on inadmissible evidence, but does not explain in any detail how the district court abused its discretion in admitting it beyond this assertion. Further, the district court computed its amounts by looking at multiple sources including testimony explaining that 30% of the $4,000,000 purchase order was paid up front.

No. 12-31213

and telefaxes back and forth to negotiate a deal with a Florida insurance broker," and responding to a request by the Florida Insurance broker to provide coverage for a vessel moored in Florida, all supported long-arm jurisdiction); *see Lennar Homes*, No. 09-07901 CA 42, at 8 (holding that "Taishan was 'carrying on business' in Florida and that the Court may assert jurisdiction over Taishan under Section 48.193(1)(a)(1) of the Florida long-arm statute."), *aff'd sub nom. Taishan Gypsum Co. Ltd.*, 123 So. 3d at 637.

### 3.   "Arise-from" requirement

Florida's long-arm statute also requires that plaintiff's cause of action arise from the defendant's acts. TG argues that the statute is not satisfied because plaintiffs' causes of action do not arise from its contacts with Florida.[16] As the Court in *Lennar Homes* recognized: "It is enough under the long-arm statute that the type of Taishan drywall that injured homeowners, and caused the damages sustained by plaintiffs, was otherwise available for purchase in Florida."[17] The arise-from requirement is met because Mitchell's complaint alleges that the homebuilders incurred costs because they installed Taishan's drywall, the profile forms submitted by the parties demonstrate that the drywall at issue in *Mitchell* is traceable to Taishan, and testimony from Lennar—a Florida homebuilder—identifies 400 homes containing Taishan drywall.

Additional evidence supports tracing Taishan drywall to the *Mitchell* plaintiffs: Devon and North Pacific Group, entered a purchase order of 485,044 sheets of drywall *to be sent to Pensacola, Florida*. Devon requested to purchase drywall from TG to satisfy the North Pacific purchase order. The product was purchased through a trading company, Shanghai Yu Yuan Import & Export

---

[16] § 48.193.
[17] No. 09-07901 CA 42, at 10.

No. 12-31213

Company, and the Devon logo was stamped on each package. Devon sold some drywall to Emerald Coast Building Supply, and Emerald Coast sold 840 boards of drywall to Rightway Drywall, who finally sold it to Mitchell—the named plaintiff. Accordingly, the district court properly found the Florida long-arm statute satisfied.

## C.   Due Process

Having satisfied Florida's long-arm statute, Taishan's contacts must also support a finding of personal jurisdiction consistent with Due Process. For specific jurisdiction to be proper, Due Process requires (1) minimum contacts by the defendant purposefully directed at the forum state, (2) a nexus between the defendant's contacts and the plaintiff's claims, and (3) that the exercise of jurisdiction over the defendant be fair and reasonable. *ITL Int'l, Inc. v. Constenia, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012). In sum, to satisfy Due Process, the defendant's connection with the forum state must be such that it "should reasonably anticipate being haled into court" in the forum state. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

### 1.   Choice of Law

As explained below, circuit authority varies in interpreting the Due Process requirements of personal jurisdiction. TG argues that the district court should have applied the Eleventh Circuit's more demanding minimum-contacts test instead of the Fifth Circuit's more permissive interpretation. As in *Germano*, "we need not reach the issue of which circuit's law should apply because regardless of which circuit's approach we use, the outcome is the same." *Germano*, 742 F.3d at 586. Even under the Eleventh Circuit's more demanding test, TG (through its agent TTP) has the requisite contacts with Florida.

### 2.   Minimum Contacts

#### a.   Supreme Court Precedent

25

No. 12-31213

Fractured opinions in the Supreme Court have allowed for two different understandings of the quality of contacts a defendant must have with the forum state in order to satisfy Due Process. In *Ashahi Metal Industry Co. v. Superior Court of Cal., Solano Cnty.*, 480 U.S. 102 (1987), the Court split over whether simply placing products in the stream of commerce could satisfy personal jurisdiction. Justice O'Connor's plurality opinion explained:

> The placement of a product into the stream of commerce, without more, is not an act of the defendant purposefully directed toward the forum State. Additional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State . . . [b]ut a defendant's awareness that the stream of commerce may or will sweep the product into the forum State does not convert the mere act of placing the product into the stream into an act purposefully directed toward the forum State.

480 U.S. at 112. Justice Brennan's concurrence disagreed with Justice O'Connor's "stream of commerce plus" test:

> The stream of commerce refers not to unpredictable currents or eddies, but to the regular and anticipated flow of products from manufacture to distribution to retail sale. As long as a participant in this process is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise. . . .

*Id.* at 1034 (Brennan, J., concurring). Most recently in *J. McIntyre Machinery, Ltd. v. Nicastro*, 131 S. Ct. 2780 (2011), the Court was divided still. Justice Kennedy's plurality opinion embraced the "stream of commerce plus" test:

> Since *Asahi* was decided, the courts have sought to reconcile the competing opinions. But Justice Brennan's concurrence, advocating a rule based on general notions of fairness and foreseeability, is inconsistent with the premises of lawful judicial power. This Court's precedents make clear that it is the defendant's actions, not his expectations, that empower a State's courts to subject him to judgment.

No. 12-31213

*McIntyre*, 131 S. Ct. at 2789. Justice Breyer's concurring opinion, however, did not explicitly embrace Justice O'Connor's stream of commerce plus theory, but instead opined:

> I do not doubt that there have been many recent changes in commerce and communication, many of which are not anticipated by our precedents. But this case does not present any of those issues. So I think it unwise to announce a rule of broad applicability without full consideration of the modern-day consequences. . . . In my view, the outcome of this case is determined by our precedents.

*Id.* at 2791 (Breyer, J., concurring).

Circuit courts interpreting *McIntyre* have concluded that under *Marks v. United States*, 430 U.S. 188, 193 (1977), Justice Breyer's concurring opinion "furnished the narrowest grounds for the decision and controls." *Ainsworth*, 716 F.3d at 178; *see also AFTG-TG, LLC v. Nucoton Tech. Corp.*, 689 F.3d 1358, 1363 (Fed. Cir. 2012). As this court noted in *Ainsworth*, the narrowest ground, as expressed in Justice Breyer's concurrence, is that the law remains the same after *McIntyre*, and that circuit courts may continue to attempt to reconcile the Supreme Court's competing articulations of the stream of commerce test. *See Ainsworth*, 716 F.3d at 178–79 (noting that "Justice Breyer's concurrence was explicitly based on Supreme Court precedent and on *McIntyre*'s specific facts" and citing with approval the Federal Circuit's holding that the Supreme Court's framework had not changed and that it should apply its circuit precedent interpreting these decisions).

### b.    TG satisfies the stream of commerce plus test

Unlike the Fifth Circuit, *see Ainsworth*, 716 F.3d at 178, the Eleventh Circuit has not yet interpreted *McIntyre*; instead "[r]elevant Eleventh Circuit case law is unclear as to which test it would adopt," because "the Eleventh Circuit had applied, but had never explicitly adopted [the stream of commerce plus test], which arose from Justice O'Connor's plurality opinion in [*Asahi*]."

27

No. 12-31213

*Hatton v. Chrysler Canada, Inc.*, 937 F. Supp. 2d 1356, 1365 (M.D. Fla. 2013); *Simmons v. Big No.1 Motor Sports, Inc.*, 908 F. Supp. 2d 1224, 1228–29 (N.D. Ala. 2012) ("It is unclear which of the two tests the Eleventh Circuit endorses."). But, even assuming that the Eleventh Circuit would conclusively embrace the stream of commerce plus test after *McIntyre* (or had done so prior to *McIntyre)*, Taishan's contacts with Florida suffice.

The evidence demonstrates that Taishan engaged in "additional conduct such that it could be said to have 'purposefully availed' itself of the privilege of conducting business in" Florida. *Vermeulen v. Renault, U.S.A., Inc.*, 985 F.2d 1534, 1549 (11th Cir. 1993). Among other availments, Taishan entered into a sole agency agreement with a Florida company to sell its products and arranged the shipping of its drywall to Florida. *See Vermeulen*, 985 F.2d at 1548 (noting that defendant "created and controlled the distribution network that brought its products into the United States"). TTP agreed to sell OTC TG's exclusive brand of drywall and make OTC—a Florida company—the sole sales agent of TG's drywall, which reflects TG's purposeful availment of Florida through its agency relationship with TTP. *See Daimler*, 134 S. Ct. at 759 n.13 (recognizing that "a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there"); *id.* (noting approvingly that "'marketing [a] product through a distributor who has agreed to serve as the sales agent in the forum State' may amount to purposeful availment." (quoting *Asahi*, 480 U.S. at 112 (opinion of O'Connor, J.)).

Moreover, Taishan specifically altered its products to suit the forum state by marking its packaging "Tampa," stamping a Florida phone number on the packaging, and marking its drywall with a certification that it met or exceeded American standards. *See Asahi*, 480 U.S. at 112 (noting that "[a]dditional conduct of the defendant may indicate an intent or purpose to serve the market in the forum State, for example, designing the product for the

No. 12-31213

market in the forum State"); *Germano*, 742 F.3d at 589 (holding the stream-of-commerce-plus test satisfied because "TG not only included the name of a Virginia company on its product, it also included a phone number with a Virginia area code. Through its own acts, TG connected its product to Virginia, and ensured that the product's end-users would identify its product with a Virginia resident."). Similarly here, Wenlong Peng testified: "We would stamp it for the customer." These actions go beyond merely placing a product in the stream of commerce and demonstrate purposeful availment.[18]

TG relies on *Banton Indus., Inc v. Dimatic Die & Tool Co.*, 801 F.2d 1283, 1284–85 (11th Cir. 1986), which addressed whether "the due process clause prohibits the exercise of personal jurisdiction over a defendant whose sole contact with the forum state was an out-of-state sale of goods to a resident of the forum state." *Id.* at 1284. Jurisdiction did not lie, the court held, because

> Dimatic is not an Alabama corporation and has no contacts with that state other than its sale of goods to an Alabama resident. Nor does Dimatic actively seek business in Alabama. In fact, the contract and sale upon which Banton bases its claim arose out of Banton's unsolicited order of goods from Dimatic. Furthermore, Dimatic tendered the goods to Banton in Omaha, Nebraska. At no time did any representative of Dimatic enter Alabama.

*Id.* at 1284.

Here, Taishan made more than a single sale to a Florida company and did actively seek business in Florida—it entered a sole sales agreement with a Florida company to sell TG drywall, arranged shipping to Florida ports on

---

[18] As our court in *Germano* recognized, these facts do not present a traditional "stream-of-commerce" case: "most cases address contacts when a product only reaches the forum state after an out-of-state distributor sells the out-of-state defendant's product into the forum." *Germano*, 742 F.3d 576. As in *Germano*, that Taishan "knowingly sold its products directly to" Florida residents "is, on its own, a significant contact with the forum." *Id.* But we also "need not decide whether this contact alone would suffice to meet the first prong of the minimum contacts test because [Taishan] also designed its product for market in [Florida], and because it was not an isolated sale." *Id.*

29

No. 12-31213

multiple occasions, expressed a willingness to expand shipping to Florida, and expressed a desire to expand its sales in the United States with OTC, a Florida company.[19] Accordingly, even assuming that TG would benefit from the most stringent minimum-contacts test, jurisdiction would still be proper.

### 3.    "Arise out of or relate to" requirement

The second prong of the Due Process specific-jurisdiction test asks if "the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). The Supreme Court has yet to distinguish between the "arise out of" and "relate to" requirements. *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415 n.10 (1984) ("Absent any briefing on the issue, we decline to reach the questions (1) whether the terms 'arising out of' and 'related to' describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contacts with a forum is necessary to a determination that either connection exists.").

The Eleventh Circuit has held that "the defendant's contacts with the forum must relate to the plaintiff's cause of action or have given rise to it," and explained "[n]ecessarily, the contact must be a 'but-for' cause of the tort, yet the causal nexus between the tortious conduct and the purposeful contact must be such that the out-of-state resident will have fair warning that a particular

---

[19] Moreover, that some of Taishan's shipments were marked "FOB" does not vitiate its other contacts with Florida because Taishan arranged the shipping to Florida despite the FOB notation. Even if Taishan faithfully followed the FOB notation, Taishan's other contacts with Florida would outweigh its shipping mark. OTC's representative explained:

> [T]hey were in charge of finding the shipping company, they were in charge of making the deal with the shipping company, and we were to pay, because they said that they could get a better price through their connections in China . . . So, yes, it was free on board, the price they were giving us was free on board, but they were the ones hiring or making the arrangements for the shipping.

No. 12-31213

activity will subject [it] to the jurisdiction of a foreign sovereign." *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220–21, 1223 (11th Cir. 2009) (internal citations and quotation marks omitted); *see also id.* at 1224 ("While we do not suggest that our decision today establishes a definitive relatedness standard—as flexibility is essential to the jurisdictional inquiry—we do find that the fact-sensitive inquiry must hew closely to the foreseeability and fundamental fairness principles forming the foundation upon which the specific jurisdiction doctrine rests.").

TG asks us to read the *Mitchell* complaint narrowly to require the plaintiffs to prove that the drywall it installed can be traced directly to Taishan's Florida related activities. Even assuming that this is required by the "arise from and *relate to*" test, a chain of transactions traces the Mitchell plaintiffs' drywall to Taishan's contact with Florida. Devon purchased drywall *to be sent to Pensacola, Florida*, and there is evidence showing a series of transactions placing the drywall with Mitchell. At this stage, Mitchell must only establish personal jurisdiction by a preponderance of the evidence, and in light of the evidence in the record, Mitchell has established that it is more likely than not that Taishan drywall connected from the Devon transaction ended up in Mitchell's hands and forms the basis of this action.

But Mitchell's complaint is not as narrow as Appellants represent. As the district court noted, Mitchell sues on behalf of homebuilders and alleges that Taishan has "continuously and systematically distributed and sold drywall to numerous purchasers in the State of Florida and Taishan's drywall is installed in numerous homes in Florida." These claims therefore, arise out of and relate to Taishan's extensive Florida contacts. In *Oldfield*, the Eleventh Circuit focused on whether the defendant could foresee being haled into this forum to answer plaintiffs' claims. 558 F.3d at 1220–21. Here, Taishan sold allegedly faulty drywall to Florida companies, shipped drywall to Florida,

31

No. 12-31213

entered into a sole agency agreement with a Florida company, and even marked some drywall boards with Florida phone numbers. It should come as no surprise to Taishan that it is defending suit in Florida. Accordingly, this test is also satisfied.

### 4. Fairness

The specific jurisdiction inquiry next asks whether jurisdiction "would comport with 'fair play and substantial justice.'" *Licciardello v. Lovelady*, 544 F.3d 1280, 1284 (11th Cir. 2008) (quoting *World-Wide Volkswagen*, 444 U.S. at 292). In assessing fair play, courts balance (1) the defendant's burden; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the state's shared interest in furthering fundamental social policies. *Burger King*, 471 U.S. at 476–77.

The district court found that TG would face burdens if subjected to jurisdiction, and that this factor cut strongest in TG's favor. Balanced, however, against TG's sophistication, Florida's interest in litigating against defendants that harmed its residents, the plaintiffs' interest in litigating in the United States as opposed to China, the judicial system's interest in resolving these cases (and TG's failure to appear), and the interests of comity, the district court nonetheless found jurisdiction proper. *See Asahi*, 480 U.S. at 114 ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant."). The district court's balancing of these factors is consistent with cases upholding jurisdiction over foreign manufacturer defendants. *Mitchell* is distinguishable from *Asahi*, where the claim was for "indemnification asserted by Cheng Shin, a Taiwanese corporation, against Asahi," and "[t]he transaction on which the indemnification claim is based took place in Taiwan." *Asahi*, 480 U.S. at 114–

32



No. 12-31213

15. In contrast, *Mitchell* includes Florida-based plaintiffs alleging causes of action arising in Florida. Accordingly, the district court did not err in finding that notions of fair play and substantial justice were not offended by exercising jurisdiction over TG. *See Germano*, 742 F.3d at 593 ("For essentially the same reasons as given by the district court, we hold that this third and final prong of the Due Process analysis is met here.").

Personal jurisdiction is therefore proper over TG in Florida.

## IV.

TG next argues that the district court abused its discretion when it denied TG's motion to set aside the entry of preliminary default under Rule 55(c).

### A.  Standard

Rule 55(c) provides: "The court may set aside an entry of default for good cause, and it may set aside a default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c).[20] "In determining whether to set aside a default decree, the district court should consider whether the default was willful, whether setting it aside would prejudice the adversary, and whether a meritorious defense is presented." *One Parcel of Real Prop.*, 763 F.2d at 183. Because the same factors identified in Rule 60(b) are "typically relevant," *Johnson v. Dayton Elec. Mfg. Co.*, 140 F.3d 781, 783 (5th Cir. 1988), courts may also consider:

> whether the public interest was implicated, whether there was significant financial loss to the defendant, and whether the

---

[20] This circuit has "interpreted Rule 60(b)(1) as incorporating the Rule 55 'good-cause' standard applicable to entries of default." *In re OCA, Inc.*, 551 F.3d 359, 369 (5th Cir. 2008). "This inquiry follows a recognition in our previous holdings that courts apply essentially the same standard to motions to set aside a *default* and a *judgment by default*." *Id.* (citations and quotations omitted). This court has also held that "[a]lthough a motion to set aside a default decree under Fed. R. Civ. P. 55(c) is somewhat analogous to a motion to set aside a judgment under Fed. R. Civ. P. 60(b), the standard for setting aside a default decree is less rigorous than setting aside a judgment for excusable neglect." *United States v. One Parcel of Real Prop.*, 763 F.2d 181, 183 (5th Cir. 1985).

33

No. 12-31213

defendant acted expeditiously to correct the default. The district court need not consider all of the above factors in ruling on a defendant's 60(b)(1) motion; the imperative is that they be regarded simply as a means of identifying circumstances which warrant the finding of "good cause."

*In re OCA*, 551 F.3d 359, 369 (5th Cir. 2008) (quotations omitted).

## B.   Application[21]

The district court did not find that TG's failure to appear was willful. Nevertheless, it declined to set aside the entry of default because (1) TG was served with the complaint in its native language, (2) TG was aware that it sold drywall to several Florida companies, (3) the plaintiffs had invested a significant amount of time and money to serve TG, (4) TG's defense is speculative, and (5) the public has an interest in seeing that plaintiffs harmed by defective foreign products be accorded relief for their damages. The district court also doubted whether TG acted expeditiously because TG did not appear in the MDL until it was notified of the default judgment in *Germano*, and even then TG only appeared on the last day possible to challenge that default judgment. The district court acknowledged, however, that TG would suffer significant financial losses.

"The decision to set aside a default decree lies within the sound discretion of the district court," *One Parcel of Real Prop.*, 763 F.2d at 183, and the district court accounted for the relevant interests. Consistent with *Germano*, which held that the district court did not abuse its discretion by refusing to vacate the default judgment,[22] and *Lennar Homes*, which declined to vacate a default judgment against TG because "Taishan waited an inexplicably long time before moving to set aside the default, and has not put

---

[21] TG argues that the district court did not have jurisdiction to enter the default. This issue is resolved above.

[22] *See Germano*, 742 F.3d at 595.

34

No. 12-31213

forth any evidence of exceptional circumstances justifying the delay,"[23] the district court did not abuse its discretion when it determined that TG did not show good cause to vacate the preliminary entry of default in *Mitchell*. Fed. R. Civ. P. 55(c).

## V.

TG and TTP challenge the district court's finding of personal jurisdiction in *Gross* and *Wiltz*. Although the forum is different, the outcome is the same—specific jurisdiction is proper over TG and TTP in Louisiana.

## A.     TTP's contacts may be imputed to TG

### 1.     Choice of Law

Though it argues that the district court should have applied Chinese law rather than Louisiana law to test the appropriateness of imputation, Taishan, however, concedes that that "the outcome would be the same under the application" of either Chinese or Louisiana law. Accordingly, there is no conflict and we apply Louisiana law. *See Shutts*, 472 U.S. at 839 n.20.

### 2.     Imputation under Louisiana Law

In Louisiana, courts may impute contacts between two entities under either an alter-ego or agency theory. *See, e.g., Admins. of Tulane*, 450 F. App'x at 330–33 (noting that imputation may stem from both theories); La. Rev. Stat. Ann. § 13:3201(A) ("A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent . . . ."). Because Taishan's corporate relationship establishes alter-ego imputation under Louisiana law, we need not address the district court's alternate finding of an agency relationship. *See Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 586 (5th Cir. 2010) (recognizing that contacts can be imputed to alter-egos for the purpose of specific jurisdiction).

---

[23] No. 09-07901 CA 42, at 13–15.

No. 12-31213

This court has noted that "the alter ego test for attribution of contacts, *i.e.*, personal jurisdiction, is less stringent than that for liability." *Stuart v. Spademan*, 772 F.2d 1185, 1198 n.2 (5th Cir. 1985). Under Louisiana law, courts consider a number of factors when determining whether an entity should be considered an alter ego:

> 1. corporations with identity or substantial identity of ownership, that is, ownership of sufficient stock to give actual working control; 2. common directors or officers; 3. unified administrative control of corporations whose business functions are similar or supplementary; 4. directors and officers of one corporation act independently in the interest of that corporation; 5. corporation financing another corporation; 6. inadequate capitalization ("thin incorporation"); 7. corporation causing the incorporation of another affiliated corporation; 8. corporation paying the salaries and other expenses or losses of another corporation; 9. receiving no business other than that given to it by its affiliated corporations; 10. corporation using the property of another corporation as its own; 11. noncompliance with corporate formalities; 12. common employees; 13. services rendered by the employees of one corporation on behalf of another corporation; 14. common offices; 15. centralized accounting; 16. undocumented transfers of funds between corporations; 17. unclear allocation of profits and losses between corporations; and 18. excessive fragmentation of a single enterprise into separate corporations.

*Green v. Champion Ins. Co.*, 577 So. 2d 249, 257–58 (La. Ct. App. 1991).

As discussed and considered above, the district court found facts implicating many of these factors. For instance, TG authorized TTP to use TG's trademark in producing drywall but did not charge TTP for this authorization, TG and TTP did not accurately report their dealings with each other in their financial reports, and some of TTP's board members did not receive compensation from TTP. *See e.g.*, *Green*, 577 So. 2d at 258–259. Appellants rely on *Jackson*, which found imputation improper because "there [was] no evidence of undocumented transfers of funds between various entities," "no evidence of unclear allocation of profits and losses between corporations," and

36

No. 12-31213

no evidence that the entities paid another entities' employees. *Jackson*, 615 F.3d at 587. *Jackson* is inapposite because of the undocumented transfers between TG and TTP, as well as the evidence that TG paid TTP's employees; additionally, many of the factors that *Jackson* recognized as favoring imputation are present here:

> For instance, the Tanfoglio entities appear to have been operated in a way that their brands and products appear identical and their business relationships are deeply intertwined. The Tanfoglio entities shared office space, phone numbers, and the Tanfoglio siblings were officers and directors of each of the Tanfoglio entities. . . . As well, the Tanfoglio entities were indebted to one another through a variety of business transactions.

*Id.* at 587. Accordingly, TG and TTP are alter egos under Louisiana law, and imputation is proper. Treated as one, each entity's Louisiana contacts reflect its collective availment of the forum.

## B.   Due Process

The Louisiana Supreme Court has held that "[t]he limits of the Louisiana Long-arm Statute and the limits of constitutional due process are now coextensive," accordingly, "the sole inquiry into jurisdiction over a nonresident is a one-step analysis of the constitutional due process requirements." *Petroleum Helicopters, Inc. v. Avco Corp.*, 513 So. 2d 1188, 1192 (La. 1987). All parties agree that *Gross* and *Wiltz* are governed by Fifth Circuit law.

### 1.   Taishan's Louisiana Contacts

The district court recognized that Taishan lacked direct physical contacts with Louisiana. Taishan has never manufactured drywall, advertised, or performed services in Louisiana. Taishan is not registered to do business, does not have an office, bank account, or an agent appointed to accept service of process in Louisiana. Taishan has never paid taxes nor had a mailing address or telephone in Louisiana.

37

No. 12-31213

Nevertheless, Taishan's Louisiana contacts are substantial. Taishan sold at least 45,756 sheets of drywall that ended up in Louisiana and earned Taishan $195,915.29. A potential customer emailed Taishan and informed it: "After Hurricane Katrina, the Great New Orleans area need rebuild[sic], and housing market in USA is very hot in these days. The both effects, we hope you and us can both take advantage from it." Taishan told its customers it was able and willing to sell its drywall to Louisiana. OTC's representative explained that Taishan was "very familiar with what port to use depending on what areas in the United States we were trying to sell to" and Taishan provided shipping information and rates for sending drywall to New Orleans.

Taishan's dealings with American companies also show relevant contacts with Louisiana. Taishan sold drywall to Advanced Products International Corp. ("API") and GD Distributors, LLC ("GD Distributors"). GD Distributors, a Louisiana company, emailed Taishan about shipping drywall to the United States. They discussed "sizes of the sheetrock, how to get transported over," and the history of the company. GD Distributors' owner traveled to China to visit Taishan's factory. At the visit, the parties discussed the product, price, and ASTM certification. Taishan provided GD Distributors with test reports asserting that its drywall met ASTM standards. Taishan provided a sample to GD Distributors. GD Distributors agreed to purchase 1,320 sheets of drywall in exchange for $11,601.22. The invoice for the purchase was "CIF NEW ORLEANS." Taishan arranged the shipment of the drywall to New Orleans. GD Distributors's owner testified that he "told them that I lived in New Orleans . . . [and] I'm assuming that's why . . . they set it up to come to the Port of New Orleans." According to GD Distributors, Taishan

No. 12-31213

"absolutely" knew that the drywall was going to New Orleans.[24] GD Distributors sold the drywall it purchased from Taishan to Helton Construction, another Louisiana company.

TTP also sold 5,676 sheets of drywall for $24,123.00 to API, which is based in California. The invoices marked the sale as FOB China with a final destination of New Orleans, Louisiana. API made a second purchase of 5,760 sheets of drywall for $24,998.40 from TTP. The invoice provided that shipment was FOB China with final destination New Orleans, Louisiana. TTP did not ship this drywall. API handled the shipping arrangements from China to New Orleans. Another Louisiana company, Interior Exterior Building Supply, LP, purchased TTP drywall from Metro Resources Corporation. Taishan also sent samples of drywall to TP Construction, a Louisiana corporation. Finally, Taishan shipped 100,000 boards to New Orleans for an entity named Phoenix.

## 2.    Minimum Contacts

In *Ainsworth*, we interpreted our law as unchanged after *McIntyre*. As such, in order to satisfy the minimum contacts requirements, plaintiffs must show that "the defendant delivered the product into the stream of commerce with the expectation that it would be purchased by or used by consumers in the forum state." *Ainsworth*, 716 F.3d at 177. "Under that test, mere foreseeability or awareness [is] a constitutionally sufficient basis for personal jurisdiction if the defendant's product made its way into the forum state while still in the stream of commerce, but [t]he defendant's contacts must be more than random, fortuitous, or attenuated, or of the unilateral activity of another party or third person." *Id.* (internal quotations and citations omitted).

---

[24] When asked if his understanding was "that they 100 percent knew the product was coming into New Orleans," Darrin Steber, owner of GD Distributors, testified "Oh, absolutely."

No. 12-31213

This test is more than satisfied in *Gross* and *Wiltz* because, again, there is evidence showing that Taishan "absolutely" knew that the drywall was going to New Orleans.[25] Taishan sold drywall to Louisiana customers, facilitated the shipment of drywall to New Orleans, and received an email explaining that after Hurricane Katrina, there was an increased demand for construction materials in the New Orleans area. Moreover, Taishan did not conduct an isolated sale. Rather, Taishan sold at least 45,756 sheets of drywall, which ended up in Louisiana and earned Taishan $195,915.29. *See McIntyre*, 131 S. Ct. at 2791; *Ainsworth*, 716 F.3d at 179 ("This is not a case of a single, or even a few, isolated sales in Mississippi. The facts in the record establish that Moffett could have 'reasonably anticipated' being haled into court in Mississippi.").[26] Accordingly, Taishan has the requisite minimum contacts with Louisiana.

### 3. "Arise out of or relate to" requirement

This court has framed the second prong of the due-process test as requiring that "the plaintiff's cause of action . . . arise[ ] out of or result[ ] from the defendant's forum-related contacts." *ITL*, 669 F.3d at 500 (quoting *Luv N' Care, Ltd. v. Insta-Mix, Inc.*, 438 F.3d 465, 469 (5th Cir. 2006)); *see also Clemens v. McNamee*, 615 F.3d 374, 378–79 (5th Cir. 2010).

In *Gross*, the plaintiffs are asserting a market-share liability claim, which rests on the theory that Taishan drywall, among other defective drywall, was shipped to Louisiana and injured them. The plaintiffs' market-share

---

[25] "Q: It's your understanding that they 100 percent knew the product was coming into New Orleans, correct? A: Oh, absolutely."

[26] As *Ainsworth* recognized, "Our stream-of-commerce test, in not requiring that the defendant target the forum, is in tension with [*McIntyre's*] plurality opinion." *Ainsworth*, 716 F.3d at 178. Nevertheless, the record evidences Taishan's purposeful availment of the Louisiana forum. Taishan sold to Louisiana customers and arranged shipments to Louisiana. Even under the *McIntyre* plurality's more demanding test, Taishan's contacts demonstrate that it "target[ed]" Louisiana. *McIntyre*, 131 S. Ct. at 2788 (Kennedy, J.).

No. 12-31213

theory arises from Taishan's Louisiana contacts—Taishan marketed, sold, and shipped drywall to Louisiana customers. For instance, Taishan sold drywall to GD Distributors, which in turn sold the drywall to another Louisiana company, Helton Construction. As the district court held,

> The profile forms, TIP inspections, and photographic catalog, all Court-ordered and providing information on the type of drywall in homes, also demonstrate the presence of Taishan's drywall in the homes of Louisiana plaintiffs. The Court finds no law which supports Taishan's narrow reading of the "arise from" and "relate to" requirement for specific personal jurisdiction.

Moreover, this record contrasts sharply with that in *Irvin v. S. Snow Mfg., Inc.,* 517 F. App'x 229 (5th Cir. 2013). In *Irvin*, there was not an adequate nexus between the defendant's contacts and the plaintiff's claim based on an "arose-out-of" theory because "Southern Snow sold the machine to a Louisiana customer and had no knowledge that, years later, Irvin unilaterally transported it into Mississippi." *Id.* at 232. Additionally, we recognized:

> Irvin's claims [do not] sufficiently "relate to" Southern Snow's Mississippi contacts. Although Irvin points to the allegedly large figure of sales by Southern Snow to various Mississippi-based customers, this number includes sales of syrup and other snowball-making accessories—which did not cause Irvin's injuries—and no evidence in the record allows a comparison of the amount of sales attributable to these types of accessories versus the sales attributable to actual snowball machines. Indeed, on this record, we have no basis to determine how many snowball machines Southern Snow sends outside of Louisiana in general, or to Mississippi in particular.

*Id.* Conversely, a close nexus exists between Taishan's marketing and selling drywall to Louisiana customers and arranging shipping to Louisiana and plaintiffs' claims that Taishan's drywall was installed in their homes and injured them. While Taishan challenges the validity of the *Gross* plaintiffs' market-share theory, our inquiry is whether "*the plaintiff's cause of action . . . arise[s] out of or result[s] from the defendant's forum-related contacts,*" *ITL,*

41

No. 12-31213

669 F.3d at 500 (emphasis added), whatever the claims' ultimate merits. Accordingly, plaintiffs' claims—that Taishan sold drywall to the Louisiana market and injured them—arise out of or relate to Taishan's Louisiana contacts of marketing, selling, and shipping drywall to Louisiana customers.

The *Wiltz* plaintiffs' claims also rest on the allegedly faulty Taishan drywall installed in their homes. These claims too arise from Taishan's manufacturing allegedly faulty drywall, marketing it to Louisiana customers, and shipping it to Louisiana. We need not express any view of the merits of plaintiffs' claims because at this preliminary jurisdictional inquiry the plaintiffs' burden is to prove the appropriateness of jurisdiction by a preponderance of the evidence. They have satisfied their burden here as their claims arise from or relate to Taishan's Louisiana contacts.

### 4.    Fairness

The same reasons that jurisdiction is fair and reasonable over TG in Florida are applicable to TG and TTP in Louisiana. Accordingly, personal jurisdiction lies over TG and TTP in *Gross* and *Wiltz*.

## VI.

The record in this case reflects an intimate relationship between TG and TTP. By virtue of this relationship, they capitalized on a spike in demand for drywall in the Gulf South. As their dealings demonstrate, TG and TTP availed themselves of Florida and Louisiana—two of the market's focal points. We perceive no statutory or constitutional impediment to their now defending suit there. We therefore AFFIRM the district court in *Mitchell*, *Gross*, and *Wiltz*.

Print Form

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

**BILL OF COSTS**

NOTE: The Bill of Costs is due in this office within 14 days from the date of the opinion, See FED. R. APP. P. & 5TH CIR. R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

In re: Chinese-Manufactured Drywall Products Liability Litigation v. (Wiltz, et al. v. Beijing New Building Materials, et al.)   No. 12-31213 (10-361 E.D.La)

The Clerk is requested to tax the following costs against: Appellants, Taishan Gypsum Company United and Tai'an Taishan Plasterboard, Company, Ltd.

| COSTS TAXABLE UNDER Fed. R. App. P. & 5th Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | | | | | |
| Appendix or Record Excerpts | 6 | 52 | 0.15 | 46.80 | 4 | 52 | .15 | 31.20 |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 9 | 113 | 0.15 | 152.55 | 7 | 113 | .15 | 118.62 |
| Appellant's Reply Brief | | | | | | | | |
| Other: Binding | 15 | | 4.00 | 60.00 | 11 | 1 | 1.50 | 16.70 |
| | | | Total $ | 259.35 | | | | |

Costs are taxed in the amount of $ 166.25

Costs are hereby taxed in the amount of $ 166.35   this 11th   day of June, 2014.

LYLE W. CAYCE, CLERK

By _Rudolph Lindsay_   Deputy Clerk

State of Pennsylvania;
County of Philadelphia

I, Frederick S. Longer, do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon. This 28th day of May, 2014.

/s/ Frederick S. Longer
(Signature)

Attorney for Appellees

*SEE REVERSE SIDE FOR RULES GOVERNING TAXATION OF COSTS

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

## BILL OF COSTS

**NOTE:** The Bill of Costs is due in this office *within 14 days from the date of the opinion*, *See* FED. R. APP. P. & 5ᵀᴴ CIR. R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

In re: Chinese-Manufactured Drywall Products Liability Litigation *v.* (The Mitchell Co., et al. *v.* Knauf Gips, KG, et al.)   No. 12-31213 (09-4115 E.D.La)

No. 12-31213 (09-4115 E.D.La)

The Clerk is requested to tax the following costs against: Appellants, Taishan Gypsum Company United and Tai'an Taishan Plasterboard, Company, Ltd.

| COSTS TAXABLE UNDER Fed. R. App. P. & 5ᵗʰ Cir. R. 39 | REQUESTED | | | | ALLOWED (if different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | | | | | |
| Appendix or Record Excerpts | | | | | | | | |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 2 | 35 | 0.15 | 47.25 | 7 | 35 | .15 | 36.75 |
| Appellant's Reply Brief | | | | | | | | |
| Other: Binding | 15 | | 4.00 | 60.00 | 7 | 1 | 1.50 | 10.50 |
| | | | Total $ | 107.25 | | | | |

Costs are taxed in the amount of $ 47.25

Costs are hereby taxed in the amount of $ 47.25   this ____ 11th ____ day of ____ June ____, 2014.

LYLE W. CAYCE, CLERK

By _____ Deputy Clerk

State of   Pennsylvania;
County of   Philadelphia

I   Frederick S. Longer   , do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged were actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon.  This   28th   day of   May   2014.

/s/ Frederick S. Longer
(Signature)

Attorney for   Appellees

*SEE REVERSE SIDE FOR RULES
GOVERNING TAXATION OF COSTS

Print Form

UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

## BILL OF COSTS

**NOTE:** The Bill of Costs is due in this office *within 14 days from the date of the opinion, See* FED. R. APP. P. & 5TH CIR. R. 39. Untimely bills of costs must be accompanied by a separate motion to file out of time, which the court may deny.

In re: Chinese-Manufactured Drywall Products Liability Litigation. v. (Gross, et al. v. Knauf Gips, et al.) No. 12-31213 (09-6690 E.D.La.)

The Clerk is requested to tax the following costs against: Appellants, Taishan Gypsum Company United and Tai'an Taishan Plasterboard, Company, Ltd.

| COSTS TAXABLE UNDER Fed. R. App. P. & 5ᵗʰ Cir. R. 39 | REQUESTED | | | | ALLOWED (If different from amount requested) | | | |
|---|---|---|---|---|---|---|---|---|
| | No. of Copies | Pages Per Copy | Cost per Page* | Total Cost | No. of Documents | Pages per Document | Cost per Page* | Total Cost |
| Docket Fee ($450.00) | | | | | | | | |
| Appendix or Record Excerpts | 8 | 37 | 0.15 | 33.30 | 4 | 37 | .15 | 22.20 |
| Appellant's Brief | | | | | | | | |
| Appellee's Brief | 8 | 113 | 0.15 | 152.55 | 7 | 113 | .15 | 118.65 |
| Appellant's Reply Brief | | | | | | | | |
| Other: Binding | 15 | | 4.00 | 60.00 | 11 | 1 | 1.50 | 16.50 |
| | | | Total $ | 245.85 | | | Costs are taxed in the amount of $ | 157.35 |

Costs are hereby taxed in the amount of $ 157.35 this 11th day of June , 2014

State of Pennsylvania,
County of Philadelphia

I, Frederick S. Longer _____ do hereby swear under penalty of perjury that the services for which fees have been charged were incurred in this action and that the services for which fees have been charged have been actually and necessarily performed. A copy of this Bill of Costs was this day mailed to opposing counsel, with postage fully prepaid thereon. This 28th day of May 2014

/s/ Frederick S. Longer
(Signature)

Attorney for Appellees

LYLE W. CAYCE, CLERK

By Rudney Lowndry
Deputy Clerk

*SEE REVERSE SIDE FOR RULES
GOVERNING TAXATION OF COSTS

Print Form