# Exhibit 1

CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS

STATE OF LOUISIANA

CASE NO.                    SECTION     L             DIVISION __

THE STATE OF LOUISIANA, *ex rel.* JAMES D. ("BUDDY") CALDWELL,
the Attorney General of Louisiana,

vs.

KNAUF GIPS KG; KNAUF INTERNATIONAL GMBH; KNAUF PLASTERBOARD
(TIANJIN) CO. LTD; KNAUF PLASTERBOARD (WUHU) CO. LTD; GUANGDONG
KNAUF NEW BUILDING MATERIAL PRODUCTS CO. LTD; KNAUF INSULATION,
GMBH; GEBRUEDER KNAUF VERWALTUNGSGESELLSCHAFT, KG;  TAISHAN
GYPSUM CO.  LTD.; TAIAN TAISHAN PLASTERBOARD CO. LTD; INTERIOR
EXTERIOR BUILDING SUPPLY, L.P; USG CORPORATION; UNITED STATES GYPSUM
COMPANY; USG INTERIORS, INC; and L&W SUPPLY CORPORATION D/B/A
SEACOAST SUPPLY.

FILED:_____                          _____
                                            Deputy Clerk

**FIRST AMENDED AND RESTATED PETITION**

Plaintiff, the State of Louisiana, through James D. ("Buddy") Caldwell, the Attorney

General of Louisiana ("the State"), brings this action on its own behalf and as *parens patriae*,

against the following Defendants (the "Defendants"):  Knauf Gips KG, Knauf International

GmbH, Knauf Plasterboard (Tianjin) Co. Ltd, Knauf Plasterboard (Wuhu) Co. Ltd, Guangdong

Knauf New Building Material Products Co. Ltd, Knauf Insulation, GmbH , Gebrueder Knauf

Verwaltungsgesellschaft, KG (collectively sometimes referred to herein as "Knauf" or the

"Knauf Entities"); Taishan Gypsum Co. Ltd, Taian Taishan Plasterboard Co. Ltd, Interior

Exterior Building Supply, L.P.; and USG Corporation, United States Gypsum Company, USG

Interiors, Inc., and L&W Supply Corporation d/b/a Seacoast Supply (the latter four are

collectively sometimes referred to herein as "USG/L&W").  All facts contained in this Petition

are alleged upon information and belief and based upon the investigation of counsel, including

depositions and other discovery conducted in Chinese drywall litigation to date.

**GENERAL ALLEGATIONS**

1.       This action arises out of Defendants' manufacture, importation, distribution, sale,

and/or installation of defective, noxious, and toxic drywall from China ("Chinese drywall") that

was installed in homes and other buildings in Louisiana in the rebuilding efforts following

-1-

Hurricane Katrina and Hurricane Rita and also installed in new construction in Louisiana since that time.

2.      In August 2005 and again in September 2005, Louisiana was devastated by Hurricanes Katrina and Rita.  Countless homes and other buildings throughout Louisiana were destroyed or damaged by the hurricanes.

3.      In the aftermath of Hurricanes Katrina and Rita, the State of Louisiana has spent and continues to spend billions of dollars seeking to help the citizens of Louisiana rebuild homes, lives, and livelihoods.  The State has also worked to rebuild the State's damaged economy and tourism following the hurricanes, both independently and in cooperation with local political subdivisions throughout the State.

4.      Necessary to the post-Katrina and Rita rebuilding efforts of the State of Louisiana and its citizens was drywall.

5.      Because of the massive damage caused by Hurricanes Katrina and Rita and also because of a building boom then existing throughout the United States, a critical shortage of domestic drywall arose.  Prior to that time, very little Chinese produced and manufactured drywall had been imported into the United States.  In pursuit of profit, Defendants proactively pushed their defective Chinese drywall into Louisiana in massive quantities, knowing that domestic supplies were very low and that Louisiana desperately needed drywall to commence its rebuilding efforts.

6.      The Knauf Entities, controlled by defendants Gebrueder Knauf Verwaltungsgesellschaft, KG ("GKV") and Knauf Gips KG ("Gips"), and coordinated by managing partners Baldwin Knauf and Nicholas Knauf, carefully planned to take advantage of the need for drywall occurring "in the wake of the two most recent hurricanes," particularly Hurricane Katrina, to sell drywall from  excess inventory and "spare capacity" from the Knauf Chinese drywall factories to their Louisiana customers, defendants Interior Exterior Building Supply, L.P. ("Interior Exterior") and USG/L &W,  at carefully selected prices that guaranteed the Knauf entities a "reasonable profit", liquidated the excess inventories there and took advantage of "spare capacity" at the Knauf Chinese operations.  Upon information and belief, Knauf sold Knauf Chinese drywall to Louisiana customer defendant Interior Exterior only after obtaining permission to do so from its other customer with Louisiana operations, USG/L&W.  Knauf's third customer for Knauf Chinese drywall was Florida customer, Banner Supply.

7.     Defendants' Chinese drywall is and was inherently defective and not suitable for its intended use.  It is and was defective, noxious, and toxic, and will remain so for a long but unknown span of years.

8.     Upon information and belief, Defendants' Chinese drywall is inherently defective because it emits sulfur based chemicals and/or other harmful chemicals through a process generally referred to as "off-gassing."

9.     Upon information and belief, Defendants' Chinese drywall corrodes, tarnishes, pits, or destroys electrical wiring, smoke alarms, security systems, electrical appliances, air conditioner and refrigerator coils, computers, televisions, microwaves, faucets, metal fixtures, certain plumbing components, copper tubing, computer wiring, utensils, jewelry and other metals in the homes and other buildings containing Defendants' Chinese drywall.

10.     The risk of corrosion caused by the off-gassing of sulfur based and other harmful chemicals from Defendants' Chinese drywall caused the State and the United States Consumer Products Safety Commission ("CPSC") to be concerned that such corrosion and/or damage to electrical wiring and equipment could create a dangerous fire hazard, putting lives and property at risk and to issue warnings to that effect .

11.     Defendants' Chinese drywall also emits foul, noxious, "rotten egg-like" odors.

12.     Upon information and belief, the defect in Defendants' Chinese drywall is latent and existed  at the time the Chinese drywall was manufactured, shipped, imported, distributed, sold and installed regardless of the way the product was installed, maintained, and/or painted. There is no known repair that will correct the defect in Defendants' Chinese drywall.  Because of the nature of drywall and the manner in which it must be installed in accordance with proper construction techniques, it is impossible to simply remove Defendants' defective Chinese drywall and return it to the seller or manufacturer substantially intact.

13.     Defendants' Chinese drywall has caused, and is continuing to cause, damages to the State, to political subdivisions of the State and to the citizens of Louisiana.

14.     As a result of the ongoing harm caused by Defendants' Chinese drywall, citizens of Louisiana, the State and its political subdivisions have suffered damages and have required, and will require in the future, additional expenses for monitoring, disposal of defective drywall and other waste, remediation of contaminated homes and buildings, environmental testing, loss of revenue, additional expenses, medical ailments, health monitoring, and additional related

expenditures for Medicaid and Medicare expenses incurred as a result of the presence within the State of Defendants' defective Chinese drywall.

## **JURISDICTION**

15.     The Civil District Court for the Parish of Orleans has personal jurisdiction over the non-resident Defendants pursuant to La. Rev. Stat. § 13:3201.  All Defendants transacted business in the State of Louisiana, contracted or sought to contract to supply drywall in the State of Louisiana either directly or through agents and intermediaries, and/or manufactured and placed in the stream of commerce a product—Chinese drywall— Defendants knew was intended and could be reasonably expected to be eventually found in the State of Louisiana.  Defendants have engaged in substantial and not isolated activity and transactions within this State. Additionally, the causes of action asserted herein all arise from Defendants, personally or through their agents or alter egos, causing injury to persons and property within the State of Louisiana.  At the time of the injury, the defective Chinese drywall manufactured, distributed, supplied, installed, marketed, sold, or otherwise provided by Defendants was used and consumed within the State of Louisiana in the ordinary course of commerce, trade, or use.

## **PARTIES**

16.     The State brings this action both on behalf of the State's own proprietary interests, and as *parens patriae* for the State's local political subdivisions and its citizens, for the damage caused by the Defendants' conduct alleged herein.  With respect to all claims and claimants herein, the Attorney General is authorized to bring this action by Article 4, Section 8 of the Louisiana Constitution, by La. R.S. 13:5036, by La. R.S. 51:1407 and by La. R.S. 51:1408.

17.     Upon information and belief, defendant GKV is a German entity owned by members of the Knauf family and is the parent of Knauf International Gmbh doing business internationally, including within the State of Louisiana, with its principal place of business located at Am Bahnoff 7, 97346 Iphofen, Germany.

18.     Upon information and belief, Defendant Gips KG ("Gips") is a corporation organized under the laws of Germany doing business internationally, including within the State of Louisiana, with its principal place of business located at Am Bahnhof 7, 97346 Iphofen, Germany.

19.     Upon information and belief, Defendant Knauf International, Gmbh ("Knauf International") is a corporation organized under the laws of Germany doing business

-4-

internationally, including within the State of Louisiana, with its principal place of business located at Bahnhof 7, 97346, Iphofen, Germany.

20.     Upon information and belief, Defendants GKV, Gips and Knauf International are closely affiliated by common ownership, common control or otherwise such that each of them is the mere alter ego of the other with respect to all causes of action asserted herein.

21.     Upon information and belief, Defendant Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT") is a corporation organized under the laws of China doing business internationally, including within the State of Louisiana, with its principal place of business located at North Yinhe Bridge, East Jingjin Road, RC-300400, Tianjin, P.R. China.

22.     Upon information and belief, Defendant Knauf Plasterboard (Wuhu) Co., Ltd. ("Knauf Wuhu") is a corporation organized under the laws of China doing business internationally, including within the State of Louisiana, with its principal place of business located at No. 2 Gang Wan Road, RC-241009, Wuhu Anhui, P.R. China.

23.     Upon information and belief, Defendant Guangdong Knauf New Building Material Products Co. Ltd. ("Knauf Dongguan") is a corporation organized under the laws of China doing business internationally, including within the State of Louisiana, with its principal place of business located at No. 2 Xinsha Development Zone, RC-523147, Guangdong, P.R. China.

24.     Upon information and belief, Defendant Knauf Insulation GmbH ("Knauf Insulation") is a corporation organized under the laws of Germany doing business internationally, including within the State of Louisiana, from its headquarters in Shelbyville, Indiana.  At all times relevant hereto, Knauf Insulation has had a Certificate of Admission to conduct business in Indiana, which Certificate imbues Knauf Insulation with the same rights and restrictions as a domestic corporation.  In addition, upon information and belief, Knauf Insulation has had a registered agent for service of legal process in the United States at all times relevant hereto.

25.     Upon information and belief, Defendants KPT, Knauf Wuhu, Knauf Dongguan and Knauf Insulation are each direct or indirect subsidiaries of Defendants GKV, Gips or Knauf International, or they are each otherwise controlled by said Defendants.

26.     *Robin v. Knauf Gips et al.,* a 2013 jury trial in Miami-Dade County, Florida state court, established that the wrongful conduct of the managing agents, directors, officers and other

persons responsible for making policy decisions on behalf of the KPT and Gips was motivated solely by unreasonable financial gain and such managing agents, directors, officers and persons making policy decisions *actually knew* that such conduct was unreasonably dangerous and had a high likelihood of resulting in the damages, including the damages suffered by the State.

27.     Upon information and belief, Defendant Taishan Gypsum Co. Ltd ("TG") is a corporation organized under the laws of China doing business internationally, including within the State of Louisiana, and is a subsidiary of Beijing New Building Materials Company PLC ("BNBM").  TG's principal place of business is in Taian City, Shandong Province, China.

28.     Upon information and belief, Defendant Taian Taishan Plasterboard Co. Ltd ("TTP") is a corporation organized under the laws of China doing business internationally, including within the State of Louisiana.  TTP is a wholly owned subsidiary of TG.  TTP's contacts with the State can be properly imputed to TG.

29.     Upon information and belief, Defendant Interior Exterior Building Supply, L.P. ("Interior Exterior") is a Louisiana limited partnership with its principal place of business located at 727 S. Cortez Street, New Orleans, Louisiana 70119.

30.     Upon information and belief, Defendant USG Corporation is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661.  At all relevant times, it was authorized to conduct business and conducted business within the State of Louisiana.

31.      Upon information and belief, Defendant United States Gypsum Company is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661.  At all relevant times, it conducted business within the State of Louisiana.

32.     Upon information and belief, Defendant USG Interiors, Inc. is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661.  At all relevant times, it conducted business within the State of Louisiana.

33.     USG Corporation, United States Gypsum Company, and USG Interiors, Inc. are sometimes referred to herein collectively as "USG" or as the "USG Entities."

34.     Upon information and belief, Defendant L&W Supply Corporation d/b/a Seacoast Supply ("L&W") is a Delaware corporation with its principal place of business located at 550 W.

Adams Street, Chicago, Illinois 60661.  At all relevant times it conducted business within the State of Louisiana.

**THE ENTRY OF DEFENDANTS' DRYWALL INTO LOUISIANA**

35.     Louisiana's Port of New Orleans received a large number of shipments of Defendants' Chinese drywall.

36.     Upon information and belief, over 1.1 million sheets of Defendants' Chinese drywall imported through the Port of New Orleans were used in the construction, repair, or rebuilding of Louisiana homes and buildings after Hurricanes Katrina and Rita.

**Knauf Drywall**

37.     The overwhelming majority of the Chinese drywall installed in Louisiana homes and buildings came from the Knauf Entities.

38.     The Knauf Entities are leading worldwide manufacturers of drywall, building materials and systems.  Knauf has more than 130 production plants in over 40 countries generating annual sales in excess of 4.8 billion Euros.  Knauf provides building materials and systems to customers in over 50 countries, including the United States, and more particularly, the State of Louisiana.

39.     Defendant GKV is owned by the Knauf family and controls all operations of the Knauf companies through managing partners chosen by the Knauf family.  GKV controls Defendants Gips and Knauf International, which in turn control KPT, Knauf Wuhu and Knauf Dongguan.

40.     In 1995, one or more Knauf Entities began manufacturing drywall in China. Between 1997 and 2001, Knauf established three drywall plants in China located in Wuhu (Anhui province), Tianjin, and Dongguan (Guangdong province).

41.     Gips or Knauf International is the direct or indirect parent company of defendants KPT, Knauf Wuhu, Knauf Dongguan, and Knauf Insulation.

42.     Upon information and belief, at all relevant times, Gips and/or Knauf International supervised, operated, trained, and otherwise exercised control and/or had the right to control the operations and employees of KPT, Knauf Wuhu, Knauf Dongguan, and Knauf Insulation.

43.     Upon information and belief, selection and qualification of  raw materials, the manufacturing process and  product quality at all Knauf plants in China, including KPT, Knauf

Wuhu and Knauf Dongguan, are, and were at all relevant times, strictly supervised, overseen, and controlled according to the requirements set by Gips' and/or Knauf International's headquarters in Germany.

44.     Upon information and belief, GKV, Gips and/or Knauf International supervises, monitors, and controls KPT, Knauf Wuhu, Knauf Dongguan, and Knauf Insulation's daily conduct and operations, including the manufacturing, distribution, marketing and sale of KPT, Knauf Wuhu, and Knauf Dongguan's drywall products.

45.     Gips and/or Knauf International is, and was at all relevant times, responsible for implementing and supervising the manufacturing process and  quality control measures to be used by KPT, Knauf Wuhu, and Knauf Dongguan.

46.     Upon information and belief, Gips' and/or Knauf International's sales and technical support teams support Knauf businesses throughout the world, including KPT, Knauf Wuhu, and Knauf Dongguan.

47.     Knauf Insulation's sales and technical support team supports, and at all relevant times supported,  Knauf's businesses and the sales of Knauf 's products in the United States, including Knauf Chinese drywall.

48.     By establishing KPT, Knauf Wuhu, and Knauf Dongguan in China, and by exercising strict control over the conduct and operations of KPT, Knauf Wuhu, and Knauf Dongguan, GKV, Gips and/or Knauf International acknowledged that KPT, Knauf Wuhu, and Knauf Dongguan would act on their behalf as their actual and/or apparent agents.

49.     By exercising strict control over the conduct and operations of Knauf Insulation, GKV, Gips and/or Knauf International acknowledged that Knauf Insulation would act on its behalf as its actual and/or apparent agent.

50.     KPT, Knauf Wuhu, Knauf Dongguan, and Knauf Insulation each accepted the undertaking of acting on GKV's, Gips' and/or Knauf International's behalf and as their agent.

51.     Shipping records show coordination between Knauf's Chinese subsidiaries, such as sharing the same vessel to transport their product to the United States.  For example, in April, 2006, the cargo ship *Yong An Cheng* transported three shipments from Knauf (Wuhu) and a fourth from Knauf (Dongguan) to the United States.  All were imported by Defendants USG/L&W, which are, and were at all relevant times, the largest distributors of drywall and related building products in the United States.  On information and belief, GKV, owners of

Knauf Gips and/or Knauf International, held a substantial equity interest in Defendant USG Corporation at all relevant times.

52.     GKV, Gips and/or Knauf International participated, ratified, approved, and directed the improper or illegal acts and omissions of KPT, Knauf Wuhu, Knauf Dongguan, and/or Knauf Insulation, described herein.

53.     KPT, Knauf Wuhu, Knauf Dongguan, Knauf Insulation, and their employees, are all the actual or apparent agents of GKV, Gips and/or Knauf International.

54.     GKV, Gips, Knauf International, KPT, Knauf Wuhu, Knauf Dongguan, and Knauf Insulation also acted in joint enterprise, joint venture, and as each other's agent within the course and scope of said agency.

55.     Upon information and belief, the Knauf Entities have continuously and systematically distributed and sold drywall to numerous purchasers in the State of Louisiana with the knowledge and expectation that their drywall would be (and has been) installed in thousands of homes and other buildings in Louisiana.

56.     GKV, Gips and/or Knauf International, through their agents, subsidiaries, and/or affiliates, including KPT, Knauf Wuhu, Knauf Dongguan and Knauf Insulation systematically, deliberately and  continuously manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall directly or indirectly to certain suppliers in the State of Louisiana, including Interior Exterior, and that defective drywall was later installed into the homes and other buildings of the State and the citizens of Louisiana.

57.     GKV, Gips and/or Knauf International, through their agents, subsidiaries, and/or affiliates, including KPT, Knauf Wuhu, Knauf Dongguan and Knauf Insulation, failed to provide adequate warnings in Louisiana regarding the hazardous and defective nature of their drywall.

58.     All of the Knauf Entities participated in and profited from the wrongful acts described herein.

59.     Upon information and belief, the Knauf Entities failed to conduct adequate inspection of their raw materials as part of the manufacturing process.

60.     Upon information and belief, during 2006 the Knauf Entities exported approximately 67.3 million pounds of Chinese drywall to the United States, which is enough to build approximately 7,500 average-size single-family homes.

61.     KPT admits that it alone manufactured and exported at least 20% of the imported Chinese drywall that came into the United States in 2005, 2006 and 2007.

62.     Shipping information for 2006 indicates that KPT sent at least 38.7 million pounds of Chinese drywall to the United States while Knauf Wuhu sent at least 28.6 million pounds of Chinese drywall.  Based on United States Customs and Border Control information, these figures indicate that approximately 78 percent of Chinese drywall imports into Louisiana in 2006 came from these two Knauf plants.  Drywall manufactured by Knauf Dongguan also reached Louisiana.

63.     Upon information and belief, the Knauf Entities have sold around 23.5 million square feet of its drywall to Interior Exterior since Hurricanes Katrina and Rita.

64.     Interior Exterior is in the business of distributing drywall and distributed drywall manufactured by Defendants.

65.     In 2005, an executive of Defendant Knauf Insulation named Jeff Brisley, acting as an agent of the Knauf Entities, contacted Interior Exterior about the prospect of importing drywall from Knauf facilities in China.  Seeking to profit from the desperation of Louisianans harmed by Hurricanes Katrina and Rita, Knauf Insulation urged Interior Exterior to purchase Chinese drywall from Knauf.

66.     In October, 2005, just one month after Hurricane Rita, Interior Exterior entered into a contract with KPT.

67.     Throughout Interior Exterior's relationship with KPT and Knauf Wuhu, Knauf Insulation acted as an agent of the Knauf Entities.

68.     Interior Exterior purchased drywall from KPT and Knauf Wuhu on five occasions between October, 2005, and July, 2006.

69.     On or about October 21, 2005, Interior Exterior entered into an agreement with KPT to purchase 100,000 pieces of STD board measuring 1,220 x 3,660 x 12.5 mm at a price of $4.20 each.  On or about December 8, 2005, KPT shipped 100,030 pieces of tapered edge gypsum board measuring 4' x 12' x 1/2" at a price of $4.20 each.  The cargo was sent by ship from the Port of Tianjin, China, to the Port of New Orleans, Louisiana, by the China Marine Shipping Agency Tianjin Company, Ltd., acting as agents for and on behalf of STX Pan Ocean Company, Ltd.  KPT certified that the gypsum boards were of good quality (certificate of

-10-

warranty, certificate of good condition, mill certificate, statement for letter of credit, certificate of origin).  The cargo arrived at the Port of New Orleans on or about January 13, 2006.

70.     On or about November 17, 2005, Interior Exterior entered into an agreement with KPT to purchase 150,000 pieces of STD board measuring 1,220 x 3,660 x 12.5 mm at a price of $4.40 each.  On or about December 23, 2005, KPT shipped 142,800 pieces of tapered edge gypsum board measuring 4' x 12' x 1/2" at a price of $4.40 each.  KPT certified that the gypsum boards were of good quality (certificate of warranty dated December 23, 2005, certificate of good condition, mill certificate, statement for letter of credit, certificate of origin).  The cargo was sent by ship from the Port of Tianjin, China, to the Port of New Orleans, Louisiana, by the China Marine Shipping Agency Tianjin Company, Ltd., acting as agents for and on behalf of STX Pan Ocean Company, Ltd.  The cargo arrived at the Port of New Orleans on or about January 27, 2006.

71.     On or about December 13, 2005, Interior Exterior entered into an agreement with KPT to purchase 100,000 pieces of STD board measuring 1,220 x 3,660 x 12.5 mm at a price of $4.40 each.  On or about March 3, 2006, KPT shipped 129,948 pieces of tapered edge gypsum board measuring 4' x 12' x 1/2" at a price of $4.40 each.  The cargo was sent by ship aboard the vessel *Dual Confidence* captained by Ador Vicente S. Cabarron from the Port of Tianjin, China, to the Port of New Orleans, Louisiana, by the Tianjin Ligang Shipping Agency Company, Ltd. KPT certified that the gypsum boards were of good quality (certificate of warranty, certificate of good condition, mill certificate, statement for letter of credit, certificate of origin).  The cargo arrived at the Port of New Orleans on or about April 6, 2006.

72.     On or about December 21, 2005, Interior Exterior entered into an agreement with KPT to purchase 100,000 pieces of STD board measuring 1,220 x 3,660 x 12.5 mm at a price of $4.40 each.  On or about March 3, 2006, KPT shipped 37,740 pieces of tapered edge gypsum board measuring 4' x 12' x 1/2" at a price of $4.40 each.  The cargo was sent by ship aboard the vessel *Dual Confidence* captained by Ador Vicente S. Cabarron from the Port of Tianjin, China, to the Port of New Orleans, Louisiana, by the Tianjin Ligang Shipping Agency Company, Ltd. KPT certified that the gypsum boards were of good quality (certificate of warranty, certificate of good condition, mill certificate, statement for letter of credit, certificate of origin).  The cargo arrived at the Port of New Orleans on or about April 6, 2006.

73.     On or about July 5, 2006, Interior Exterior entered into an agreement with Knauf Wuhu to purchase 68,000 pieces of STD board measuring 1,220 x 3,660 x 12.5 mm at a price of $10.27 each.  On or about July 10, 2006, Knauf Wuhu shipped 68,000 pieces of STD board measuring 1,220 x 3,660 x 12.5 mm at a price of $10.27 each.  The cargo was sent by ship aboard the vessel *Alexandergracht* captained by Master Captain Scholtsz from the Port of Shanghai, China, to the Port of New Orleans.  Knauf Wuhu certified that the gypsum boards were of good quality (certificate of warranty, certificate of good condition, mill certificate, statement for letter of credit, certificate of origin, all dated July 10, 2006)  The cargo arrived at the Port of New Orleans on or about July 20, 2006.

74.     Upon information and belief, each piece of drywall manufactured and/or sold by KPT contained a written stamp warranting that the drywall complied with ASTM C36.

75.     Upon information and belief, each piece of drywall manufactured and/or sold by Knauf Wuhu contained a written stamp warranting that the drywall complied with ASTM C36.

76.     Upon information and belief, the Knauf Entities provided with their drywall a CGIC (Chinese Government Inspection Certificate), which purported to "show these cargos quality meet with ASTM C36 standard."

77.     American Society for Testing and Materials ("ASTM") specification standard ASTM C36 requires gypsum wallboard to be made of "noncombustible core, essentially gypsum, surfaced with paper bonded to the core."

78.     Upon information and belief, the defective drywall manufactured by KPT, Knauf Wuhu and Knauf Dongguan did not meet standard ASTM C36.

79.     USG/L&W are in the business of distributing drywall, and imported into Louisiana drywall manufactured by the Knauf Entities, including approximately 3,165 metric tons of drywall manufactured by Defendant Knauf Dongguan which entered the Port of New Orleans on or about June 7, 2006.

80.     GKV, Gips, KPT, Knauf Wuhu, Knauf Dongguan and/or Knauf Insulation purposefully availed themselves of the benefits of doing business in and through Louisiana and therefore are subject to the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Louisiana.

-12-

81.     GKV, Gips, KPT, Knauf Wuhu, Knauf Dongguan and Knauf Insulation have failed and refused to take responsibility for their damages caused to the State and citizens of Louisiana by their defective product.

**TTP (Taihe) Drywall**

82.     Upon information and belief, TTP manufactured, exported, imported, sold and distributed defective Chinese drywall to Louisiana.  TTP is owned by TG.

83.     In 2006 TG formed TTP to execute sales accompanied with Value Added Tax ("VAT") invoices.

84.     TTP appointed Peng Shiliang, Fu Tanghuan and Niang Fenguih to the Board of Directors.  All three directors came from TG.  Peng had offices at both TG and TTP.  Fu was TG's Deputy General Manager and Director of Sales, and was only compensated by TG.

85.     TTP only held irregular board meetings and submitted written monthly reports to TG.

86.     TTP's monthly written reports told TG "the specifics of the production and also the volume of sales."

87.     TG provided TTP with its capital, sold equipment to TTP, rented TTP a factory and purchased back all equipment when TTP ceased operations.

88.     TG is owned by BNBM.

89.     TG's financial reports do not account for the amounts paid by TG to repurchase equipment or other matters from TTP.

90.     TTP conducted all of the export from China sales exported by TG.

91.     TG authorized TTP to use TG's trademark name, Taishan.  TTP did not pay TG for the use of TG's trademark.

92.     Many of TTP's employees had previously worked for TG.  When TTP ceased operations, these employees simply went back to TG.

93.     TTP's employees used TG email addresses, phone numbers, and signed emails as the "Taihe Group."  TTP employees also used TG business cards when dealing with customers.

94.     TTP employees directed customers and potential customers to TG's website, www.taihegroup.com and used that website as a strategy to reach customers and potential customers in Louisiana and throughout the United States.

95.     When TTP customers introduced TTP to customers and potential customers, they would introduce TTP as TG, would not mention TTP, and would include "Taihe Dongxin Co, LTD" (TG) under their signature.

96.     TTP held itself out as being synonymous with TG in dealing with American companies.

97.     TG formed TTP for a narrow purpose and TTP acted only to serve TG.

98.     TG and TTP continuously and systematically distributed and sold drywall to purchasers in the State of Louisiana and their drywall is installed in numerous homes in Louisiana.

99.     TG and TTP sold defective drywall to Louisiana customers and shipped drywall to Louisiana.

100.    TG and TTP sold at least 45,756 sheets of drywall that ended up in Louisiana.

101.    TG and TTP earned at least $195,915.29 from these sales to Louisiana.

102.    TG and TTP had contracts with GD Distributors, a Louisiana company.  They discussed shipping drywall to Louisiana with GD Distributors, and GD Distributor's owner visited TTP's factory.

103.    GD Distributors agreed to purchase at least 1,320 sheets of drywall from TG and TTP. The invoice stated "CIF New Orleans."

104.    TG and TTP arranged to ship drywall to GD Distributors in New Orleans.

105.    TTP sold at least 5,676 sheets of drywall to Advanced Products International Corp. ("API"), with destination New Orleans, Louisiana.

106.    API made a second purchase of 5,760 sheets from TTP of drywall intended for shipment to Louisiana.

107.    TG and TTP sold drywall to Metro Resources Corporation for sale to defendant Interior Exterior, for delivery to Louisiana.

108.    TG and TTP sent samples of its drywall to Louisiana customers.

109.    TG and TTP shipped at least 100,000 boards to New Orleans, Louisiana to an entity called Phoenix.

110.    TG and TTP's sales to Louisiana customers or shipments to Louisiana were not isolated.

72080-0001/LEGAL122488602.4

111.    TG and TTP knew that their drywall was going to Louisiana to be used by Louisiana customers.

112.    TTP sold Chinese drywall under the brand name "Taihe."

113.    Upon information and belief, TTP continuously and systematically distributed and sold drywall to numerous purchasers in the State of Louisiana, including Interior Exterior,  with the knowledge and expectation that its drywall would be (and was) installed in numerous homes and other buildings in Louisiana.  Interior Exterior indirectly purchased defective drywall manufactured by Defendant TTP five times in 2006 through a broker, Metro Resources Corporation ("Metro Resources").

114.    TTP placed its drywall in the stream of commerce with the knowledge and expectation that its drywall would be purchased by thousands of consumers, if not more, in the State of Louisiana.

115.    Moreover, TTP purposefully availed itself of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into the State of Louisiana.

116.    With each sale to Interior Exterior, Metro Resources provided a Certificate of Warranty, which warranted in writing: "METRO RESOURCES CORP. CERTIFYING THAT THE GYPSUM BOARDS MANUFACTURED ARE SOLD TO INTERIOR/EXTERIOR TO BE FREE FROM DEFECTS IN MATERIALS AND WORKMANSHIP."

117.    With each sale to Interior Exterior, Metro Resources provided a Letter of Credit, which warranted in writing the following: "Made in China," "Meet or Exceed ASTMC1396-04," and "All gypsum boards are non-defective."

118.    Contrary to its written warranty, the drywall procured and provided by Metro Resources was not free from defects in materials and/or workmanship.

119.    Upon information and belief, TTP's Chinese drywall sold to Interior Exterior does not meet ASTM C 1396.

120.    Upon information and belief, defective drywall manufactured by TTP and imported by Metro Resources has been installed into the homes, businesses, and buildings of the State and the People of Louisiana, thereby causing substantial damage.

**TG Drywall**

121.    Upon information and belief, some of the defective Chinese drywall that is currently causing harm in Louisiana was manufactured by Defendant TG.

122.     Upon information and belief, TG manufactured, exported, distributed, delivered, supplied, inspected, marketed, and/or sold defective drywall directly or indirectly to certain suppliers in the State of Louisiana and that defective drywall has been installed into the homes and other buildings within Louisiana, thereby causing substantial damage.

123.     Upon information and belief, TG has continuously and systematically distributed and sold drywall to numerous purchasers within Louisiana with the knowledge and expectation that its drywall would be (and was) installed in numerous homes, businesses, and buildings in Louisiana.

124.     TG placed its drywall within the stream of commerce with the expectation that the drywall would be purchased by thousands of consumers, if not more, within Louisiana.

125.     Moreover, TG purposefully availed itself of the jurisdiction of this Court by selling and shipping substantial quantities of drywall into Louisiana.

### THE DEFECTS OF DEFENDANTS' DRYWALL

126.     Upon information and belief, Defendants' defective drywall is off-gassing various dangerous gases, including hydrogen sulfide, carbonyl sulfide, carbon disulfide, as well as a number of other hazardous substances.

127.     Upon information and belief, Defendants' Chinese drywall contained naturally mined gypsum or a varying mix of naturally mined gypsum and synthetic gypsum made from flue-gas desulfurization ("FGD").

128.     The process used by each of the Defendants at their manufacturing facilities was essentially the same and had no quality control procedures or steps to determine if the Chinese drywall manufactured and ultimately sold to customers in Louisiana would off-gas the sulfur compounds that have resulted in the property damages and health effects observed in homes with the defective Chinese drywall.

129.     Upon information and belief, the Knauf Entities received complaints from builders and contractors about "rotten egg" smells coming from its Chinese-manufactured drywall as far back as  mid-2006.

130.     The Knauf Entities' testing activities in Germany from mid-2006 onward have been led by Dr. Hans-Ulrich Hummel, the head of the research and development department of Gips and a Gips board member during the subject period.  Upon information and belief, Knauf

-16-

has not produced the entire Gips files concerning testing conducted by or for Gips on Chinese manufactured drywall sold into Louisiana and other states during 2005 and 2006.

131.    Upon information and belief, the Knauf Entities and/or Dr. Hummel have destroyed some or all of Gips' files on testing, including some or all of Dr. Hummel's files on such testing and on testing after 2006.

132.    As a result of the foregoing, Gips and KPT have been found to have engaged in spoliation of evidence.

**The Knauf Entities Knew Chinese Drywall Was Defective**

133.    According to the May 22, 2013 testimony of Dr. Christian Scherer and the documents produced in association with his deposition, Gips hired a German testing laboratory named the Fraunhofer Institute in mid-2006 to perform testing of samples provided from Knauf's Chinese entities, including samples of drywall manufactured there, as well as samples of gypsum ore, raw materials used in production of artificial gypsum by the FGD process, paper, additives and water used by KPT in its 2006 production process, among other things.  The Knauf Entities subsequently lost, destroyed and/or permitted to be destroyed both the remaining samples and the test results.

134.    After a full evidentiary hearing, the Court in *Robin v. Knauf Gips et al.*, in Miami-Dade County, Florida state court, entered an order on October 17, 2013 finding that the jury was to be instructed that it was up to the jury to determine if the missing physical evidence and missing tests of the physical evidence were intentionally or negligently lost, misplaced or destroyed.  At trial, the Knauf Entities introduced no evidence to prove that the loss of the tests and the destruction of the physical evidence was not intentional.

135.    The *Robin* Court also found in the same order that email communications between the Fraunhofer Institute and certain Knauf Gips personnel, including Dr. Hummel, concerning such testing were destroyed, lost or misplaced and that such communications were crucial to proof of the exact defect or origin of the product defect in the Knauf Chinese drywall  and punitive damages, notwithstanding KPT's admission of liability as to negligence and strict liability of its drywall.  The *Robin* court permitted the Knauf Entities to prove at trial that such conduct was negligent and not intentional.  Upon information and belief, the Knauf Entities introduced no evidence to prove that such conduct was not intentional.

136.    The *Robin* Court also found that other documents not produced by the Fraunhofer Institute concerning its testing for the Knauf Entities had not been produced.  Those documents have not been produced to this day.

137.    Upon information and belief, the above findings of the *Robin* court and testimony of Dr. Scherer, together with the sworn testimony of Gips employee Martin Halbach, shows that the Knauf Entities knew in mid- 2006, *before* Dr. Hummel traveled to south Florida in early November, 2006 to inspect homes there, that drywall manufactured by Knauf's Chinese entities was defective in that it emitted sulfur-containing compounds when placed in hot, humid conditions and that that defect related to the raw materials and production process used the Knauf Chinese operations.

138.    As a result, well before the late October 2006 reports of odors associated with Knauf Chinese drywall in south Florida, Mr. Halbach directed that the recipe and the production process at the Knauf Chinese operations be changed.

**USG and L&W Also Knew Knauf Chinese Drywall Was Defective**

139.    Upon information and belief, Defendants the USG Entities and L&W sold Knauf Chinese drywall for use in homes in Louisiana *after* they were informed by the Knauf defendants that sulfur compounds were emitted from Knauf Chinese drywall.

140.    In early November, 2006, with the help of Defendants USG and L&W, Dr. Hummel inspected homes with Knauf Chinese drywall and Knauf drywall sold by its customer, Banner Supply, to home builders and homeowners in south Florida.  With the help and support of USG/L &W technical and sales employees, Dr. Hummel sent samples of that drywall to the Fraunhofer Institute.

141.    By November 10, 2006, the Knauf Entities through Dr. Hummel had been informed that the Fraunhofer Institute testing had found that "the smell as characteristic for (sic) elemental sulfur" but had determined that "[T]he information was handled strictly confidential."

142.    Consistent with the handling of the test results "strictly confidential," Dr. Hummel did not tell its customer Banner Supply or the homeowners and homebuilders who had complained of the odors associated with subject drywall that the cause was the emission of elemental sulfur from the drywall; instead Dr. Hummel and other representatives of the Knauf defendants told them that the odor was not hazardous but "typical for a 100% natural product and therefore some added value."

143.    In fact, as documents recently produced demonstrate, that statement of Dr. Hummel, repeated by other representatives of the Knauf Entities, was false and was known to be false when the statement was made.

144.    On November 13, 2006, Mark Norris, on behalf of Defendant KPT, wrote Rochchilt, KPT's exclusive agent for sales of drywall in Florida and its intermediary in sales to Banner Supply, that "we" are investigating "the cause of the bad smell" and would "get back to you" as soon as "we know the details of the problem."  Norris asked Rothchilt to "stop all further sales of our plasterboards" and to instruct all customers and contractors "not to install these boards until you receive further instructions from us."

145.    In fact, Dr. Hummel, the Fraunhofer Institute and the others at Defendants Gips, Knauf International and GKV already knew that emissions of elemental sulfur from Knauf Chinese drywall was the cause of the odors and also knew of the characteristics of elemental sulfur as a corrosion causing chemical but chose to keep that information quiet.

146.    The Knauf Defendants set out to cover up that information, with the willing help and knowing assistance of USG/L&W, the only Knauf customer who was told about the findings of elemental sulfur emissions from Knauf Chinese boards before Chinese drywall litigation began.

147.    As Mark Norris, the person authorized to represent the Knauf Chinese entities in the 2006 Florida investigation, testified, it was "unfair", "deceptive" and "unethical" not to share with its Louisiana customer, Interior Exterior, the information that the drywall tested was emitting sulfur. By not telling Interior Exterior, Mr. Norris admitted that Knauf "covered up" that information. Mr. Norris also admitted that Knauf did "nothing" to inquire how the drywall that Knauf manufactured in China and sold into Louisiana was performing in Louisiana.

148.    On November 13, 2006, Knauf hired the Center for Environmental Health ("CTEH"), led by Dr. Philip Goad, as their U.S. spokesperson, but did not provide Dr. Goad or CTEH with the results of any of the Fraunhofer Institute testing until many years later.  In fact, the results of air oven testing showing the emission of elemental sulfur from Knauf Chinese boards were first provided to Dr. Goad in his deposition following the May 22, 2013 Scherer deposition described above.

149.    With the help and prior review and consent to its terms by Defendants USG and L&W, Knauf entered into an agreement with Knauf Chinese drywall customer Banner Supply,

-19-

whereby Knauf bought up all of Banner Supply's unused Knauf Chinese drywall in exchange for Banner's explicit promise that the Banner entities would "keep confidential the terms and provisions of the Settlement Agreement" and not divulge their contents to anyone, including "to any entity whatsoever." In so doing, the Knauf Entities secured the silence and support of two of its three American Chinese drywall customers, USG/L&W and Banner Supply.

150.    By email dated on or about November 30, 2006, Dr. Hummel wrote Dr. William White, head of research for USG/L &W, informing him of the results of the testing to that time at Fraunhofer, Knauf's test lab in Germany, including disclosing to him that "the problem is associated with natural rock containing $FeS_2$, sulphur and some other sulphur containing admixtures" which were not removed by the manufacturing process and asking him to keep the information confidential. Upon information and belief, Dr. White immediately shared the information with key executives at USG/L&W.

151.    Neither the  Knauf Defendants nor the USG/L &W defendants provided such information to Knauf's Louisiana customer, Defendant Interior Exterior, until after litigation began, even though Knauf  and USG/L&W knew that Interior Exterior had been instrumental in helping Knauf take advantage of the drywall sales opportunity presented in the aftermath of Hurricanes Katrina and Rita.

152.    Upon information and belief, Dr. Hummel and testing laboratories in Germany hired by the Knauf Entities continued their testing of  Knauf Chinese drywall both before litigation began and afterward, including testing conducted by or for Dr. Hummel at Gips on apparatus and testing equipment set up by the Fraunhofer Institute at the Gips R & D facility in Germany. Upon information and belief, Dr. Hummel and Gips have not produced the results of such testing and have destroyed files containing the results of such testing.

**Knauf Entities Attempt to Mislead the CPSC's and the State's Investigation**

153.    In July 2009, the State entered into a Memorandum of Understanding with the CPSC whereby the State provided information to the CPSC that the State had obtained from the ongoing activities of its agencies in responding to requests for assistance from homeowners with Chinese drywall and in return obtained confidential access to the products of the  CPSC-led investigation, including testing conducted for the CPSC.

154.    The investigation and testing conducted by and for the CPSC from 2009 through 2011 into problem drywall found "considerably higher hydrogen sulfide emissions rates from the

-20-

2006 tested samples of Chinese drywall manufactured by the Defendants as compared to North American drywall" and that increases in temperature and humidity corresponded with increased emission rates of the most reactive sulfur gases.  Those findings helped to explain the number and nature of the many complaints made by Louisiana homeowners to State agencies.

155.    Beginning in May and July 2009, the Knauf Entities met with the CPSC and accompanied the CPSC to China as part of the CPSC-led  investigation of Chinese drywall.  To conceal, or at least hide, the results of the investigation led by Knauf and its laboratories regarding the causes of the emissions from its Chinese produced drywall, the Knauf Entities chose to present Dr. Goad as their lead technical spokesperson, rather than Dr. Hummel, because they and their counsel had concealed from Dr. Goad the testing that Dr. Hummel, the Fraunhofer Institute and other laboratories had done.  At that time and to this day, Dr. Hummel was the person "most knowledgeable" about the production of Knauf's Chinese drywall and had stated as early as May 19, 2009,  "On the causation of the emissions, we have a full understanding."

156.    Upon information and belief, the decision to not have Dr. Hummel appear as Knauf's spokesperson before the CPSC was made by "top management" which included the managing partners of the Knauf Entities and members of the Knauf family.

157.    The Knauf Entities and their counsel allowed Dr. Goad to deny to the CPSC that Knauf had sampled and tested of samples from KPT's production process and drywall from that process, even though the Knauf Entities and their counsel were aware that samples had been obtained and tested in 2006 but information regarding that testing had been intentionally withheld from Dr. Goad.

158.    Upon information and belief, the Knauf Entities withheld from the CPSC information about testing that Knauf Gips and testing laboratories hired by Knauf had conducted in 2006 which reached conclusions similar to those ultimately reached by or for the CPSC.  Had Knauf been forthright with the CPSC and told the CPSC and the State about its testing when it met with CPSC in 2009, millions of dollars spent for the CPSC-led testing and years of delay by the CPSC  and other governmental entities in providing remediation recommendations based on that testing could have been averted.

159.    Upon information and belief, in the 2009 meetings between Knauf and the CPSC, the CPSC requested samples of processing materials from the three Knauf Chinese entities and

samples of 2006 drywall made by each of them.  Dr. Goad, as spokesperson for the Knauf

Entities, did not inform the CPSC that Knauf had obtained processing samples in 2006 and had

tested or had those samples tested and had allowed the remaining samples to be destroyed

because he did not know of that testing and was not informed of those facts.  To this day, the

Knauf Entities have not made the results of that testing available to anyone.

160.    Upon information and belief,  the Knauf Entities likewise did not provide to the

CPSC samples of 2006 drywall manufactured by Knauf Wuhu and Knauf Dongguan when the

CPSC requested them and have not provided complete results of Knauf Gips' own testing of

those samples to anyone.

161.    On May 11, 2009, the Knauf Entities and their technical spokesperson, Dr. Goad,

met with representatives of the State of Louisiana to conduct a briefing regarding the knowledge

of the Knauf Entities of the extent of problems with their Chinese drywall.  Upon information

and belief, the Knauf Entities' representatives failed to disclose what they knew from testing that

Knauf and the German labs that they hired had conducted.

162.    In so doing, the Knauf Entities obstructed the CPSC investigation and the related

investigation of the State of Louisiana.   Knauf's presentations to the State and the CPSC were,

in Knauf counsel's words, "coordinated and carefully choreographed" to hide critical

information and to mislead the CPSC, along with anyone who might rely on the results of the

CPSC's investigation, including the State of Louisiana.

**Public Health, Insurance, Property Value and Decreased Tax Revenue Problems Created
By Defendants' Chinese Drywall**

163.    Upon information and belief, the off-gassing by Defendants' Chinese drywall of

various harmful chemicals is causing various health problems.

164.    On May 2, 2014, the ATSDR, a federal public health agency of the U.S.

Department of Health and Human Services, released a report, "Health Consultation: Possible

Health Implications from Exposure to Sulfur Gases Emitted from Chinese-Manufactured

Drywall".  The report found, among other things, that "exposure to estimated levels of hydrogen

sulfide and sulfur dioxide from drywall samples manufactured in China between 2005 and 2006

were a public health concern".

165.    Upon information and belief, these findings are inconsistent with those presented

to Louisiana representatives in the May 11, 2009 meeting described above by Dr. Goad and other

Knauf representatives and in letters and presentations made since November 2006 in which Dr.

-22-

Goad stated that the effects of the emissions from Knauf Chinese drywall were "not a public health concern".

166.    The Louisiana Department of Health and Hospitals has received many medical complaints believed to be caused by Defendants' Chinese drywall.

167.    The most frequent health complaints resulting from Defendants' Chinese drywall are difficult breathing, asthma attacks, respiratory problems, coughing, recurring headaches, heart disease, neuron-behavioral problems, sore throats, throat infection, eye irritation, irritated and itchy skin, bloody noses, runny noses, allergic reactions, and sinus infections.

168.    Upon information and belief, Defendants knew or should have known that their use of substandard materials and their shoddy manufacturing and inadequate or non-existent quality-control processes would result in defective, noxious, and toxic drywall which emits a variety of dangerous chemicals.

169.    In addition, evidence shows that Defendants' defective Chinese drywall is corroding or pitting electrical equipment.  Such corrosion and pitting can cause electric failures and property damage.

170.    Upon information and belief, due to the health problems caused by Defendants' drywall, the State has also paid out and will continue to pay out money for health care expenses and other necessary assistance to eligible citizens throughout Louisiana for the treatment of Chinese drywall-related injuries, illnesses, and health problems.  The effects of Defendants' drywall will increase the cost of such programs and render them less efficient.

171.    Having the Medicaid and Medicare programs operated in an efficient and cost-effective manner also improves the general health and welfare of the people of Louisiana.

172.    As a result of the Defendants' drywall, the State, local political subdivisions and citizens of Louisiana also have suffered and continue to suffer property damages as a result of Defendants' drywall and the corrosive effects of its sulfur compounds.  These damages include, but are not limited to, the costs of inspection, testing and monitoring, the costs and expenses necessary to remove, remediate and replace the defective drywall itself and also to remove or remediate its sulfur compounds in migratory locations such as electrical wiring, appliances, fixtures, interior finishes, and personal property.

173.    Defendants' drywall is also devastating property values across Louisiana both in contaminated and, to a lesser extent, uncontaminated buildings, all of which have been stigmatized by the actual or perceived possible presence of Defendants' drywall.

174.    Due to the harms caused by Defendants' drywall, tax assessors in affected areas of Louisiana have reduced and continue to reduce assessments for homes containing Chinese drywall.  Parish and municipal building permit offices reduced and are reducing or waiving permit fees for the repair of homes containing Defendants' drywall in an effort to aid affected homeowners.

175.    The declining property values of unremediated homes and buildings with Defendants' drywall has reduced and is reducing the amount of property taxes and permit fees the State and local taxing authorities will collect, which in turn harms Louisiana's public schools, law enforcement, fire protection, parks and recreation, libraries, public retirement systems, local health services and all other public services funded in whole or part through property taxes that are generated by local political subdivisions.

176.    To the extent the declines in assessments on properties contaminated by Defendants' drywall are offset by increased millage rates, the owners of property which are not contaminated are forced to assume an unfair portion of the total property tax burden.

177.    After Hurricanes Katrina and Rita, the State has been making massive efforts to help homes and businesses rebuild and jump start the State's hard hit economy.  For example, through the Road Home program the State has distributed approximately $8 billion to approximately 125,000 Louisiana homeowners harmed by Hurricanes Katrina and/or Rita to help them rebuild or repair their damaged homes.  To the extent that any homes rebuilt through the Road Home program used Defendants' drywall, those rebuilt homes are of less value and may be uninhabitable unless they are remediated again.

178.    The State Office of Community Development ("OCD"), formerly known as the Louisiana Recovery Authority, has expended time and set aside and distributed money to address these issues, including to pay for inspections of such homes to determine if they contained defective Chinese drywall.  That work continues and will continue until all of these homes are remediated.

## PROPRIETARY CLAIMS BY STATE

179.    Defendants' drywall has caused and will continue to cause injury and damage to

the sovereign and proprietary interests of the State and all departments, divisions, boards, commissions, agencies and other political subdivisions and offices which are part of state government (hereinafter referred to as the State's "Proprietary Claims").

180.    The State itemizes its Proprietary Claims as follows:

a.    All expenses incurred or to be incurred as a result of the activities of the State and its departments, divisions, boards, commissions and agencies relating to Defendants defective drywall;

b.    All expenses incurred and to be incurred by the State in connection with the inspection and testing of State buildings to determine the presence or absence of Defendants' drywall.

c.    All expenses incurred and to be incurred by the State in connection with testing and monitoring of homes and other businesses in the State for the presence of Defendants' drywall, and in developing remediation procedures for its effects.

d.    All expenses incurred and to be incurred by the State to supervise and insure that Defendants' drywall is ultimately disposed of in a safe and environmentally appropriate manner.

e.    All expenses incurred or to be incurred by the State associated with community monitoring, reporting and permitting by State agencies.

f.    All increased disposal fees incurred or to be incurred paid by the State and its citizens as a result of the disposal of materials from homes with defective Chinese drywall in landfills and the resulting reduction of landfill capacity in those landfills.

g.    Additional medical expenses incurred and to be incurred by the State under Medicare, Medicaid and other federal and state programs to provide medical treatment to eligible citizens for testing, treatment and/or monitoring of health problems caused by their exposure to Defendants' drywall.

h.    Losses to the State's Road Home Program incurred as a result of loans, advances or grants made by it to homeowners who received such funding as a result of Hurricanes Katrina, Rita, Gustav or Ike to repair homes which have been harmed because of the presence and toxic effects of Defendants' drywall.

i.    Other similar losses, damages and expenses incurred and to be incurred by the State which are the foreseeable result of the presence of Defendants' drywall in any home or building in the State (regardless of by whom owed), but whose existence cannot yet be ascertained.

### *PARENS PATRIAE* **CLAIMS**

181.    In addition to asserting its Proprietary Claims set forth above, the State also appears herein in its quasi-sovereign *parens patriae* capacity as trustee, guardian and representative on behalf of all citizens of the State of Louisiana and on behalf of all parishes, municipalities and other local political subdivisions of Louisiana (collectively, the "Local Subdivisions") which have been injured by the presence of Defendants' drywall in this State (the "*Parens Patriae* Claims").

182.    The Attorney General of the State of Louisiana is authorized to assert and allege the *Parens Patriae* Claims on behalf of the State of Louisiana pursuant to Article 4, §8 of the Louisiana Constitution and pursuant to his statutory authority as Louisiana's Attorney General including, but not by way of limitation, La. R.S. 13:5036 and the Unfair Trade Practices and Consumer Protection Law (La. R.S. 51:1401-1426).

183.    Unless hereinafter specifically reserved or excepted below, it is the intention of the State and its Attorney General to assert any and all claims of its citizens and Local Subdivisions arising from the presence of Defendants' drywall in this State which may be recoverable under their *parens patriae* authority.  Subject to the foregoing and to any applicable limitations on parens patriae authority necessarily arising under federal or state constitutional or statutory law, the *Parens Patriae* claims are itemized in the following paragraphs.

184.    Under *its parens patriae* authority, the State seeks recovery for damages, losses and injuries already caused and hereafter to be caused to its Local Subdivisions by reason of the presence of Defendants' drywall both within the geographic boundaries of the Local Subdivisions and elsewhere within the State, including but not limited to:

a.    All expenses incurred and to be incurred by a Local Subdivision in connection with the inspection and testing of the Local Subdivision's buildings to determine the presence or absence of Defendants' drywall.

b.    All expenses incurred and to be incurred by a Local Subdivision in connection with testing and monitoring of homes and other businesses in the Local Subdivision for the presence of Defendants' drywall, and in developing remediation procedures for its effects.

c.    All expenses incurred and to be incurred by a Local Subdivision to supervise and insure that Defendants' drywall is ultimately disposed of in a safe and environmentally appropriate manner.

d.    All increased disposal fees incurred or to be incurred paid by a Local Subdivision as a result of the disposal of materials from homes with defective Chinese drywall in landfills and the resulting reduction of landfill capacity in those landfills.

e.    Additional medical expenses incurred and to be incurred by a Local Subdivision under Medicare, Medicaid and other federal and state programs to provide medical treatment to eligible citizens of the Local Subdivision for testing, treatment and/or monitoring of health problems caused by their exposure to Defendants' drywall.

f.    Past and future losses of expected ad valorem (property) tax, permit fees and other revenues caused by the negative impact of the presence of Defendants' drywall.

g.    Other similar losses, damages and expenses incurred and to be incurred by a Local Subdivision which are the foreseeable result of the presence of Defendants' drywall in any home or building in the Local Subdivision (regardless of by whom owed), but whose existence cannot yet be ascertained.

185.    Numerous private lawsuits, including yet uncertified class actions, have already been filed in state and federal courts by private counsel to protect the individual rights of owners and occupants of homes in Louisiana which are contaminated with Defendants' drywall.  Many of those lawsuits are presently consolidated in the Eastern District of Louisiana in Multi-District Litigation proceedings titled "In Re:  Chinese-Manufactured Drywall Products Liability Litigation", Docket No. 2:09-md-02047.  The Attorney General believes that the filing of such private lawsuits by counsel chosen by individual homeowners is the appropriate method of protecting their private rights.  Accordingly, nothing contained in this Petition shall be construed to duplicate or otherwise assert any claim for relief properly asserted in such lawsuits on behalf of owners or occupants of homes in Louisiana which are contaminated with Defendants' drywall, or which may be properly asserted in any similar lawsuits hereafter filed by or on behalf of owners or occupants of homes in Louisiana which are contaminated with Defendants' drywall.  Likewise, nothing in this Petition shall be deemed or construed as a claim by the State on behalf of any citizen for:

a.      Any damages recoverable by a homeowner or occupant for losses arising from the presence of Defendants' drywall in his or residence, including the contents thereof.

b.      Any damages recoverable by a citizen for health-related losses or issues from exposure to defendants' drywall.

### CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**(Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. § 51:1401 et seq. – Against Defendants Knauf Gips KG, Knauf International GMBH; Knauf Plasterboard (Tianjin) Co. Ltd, Knauf Plasterboard (Wuhu) Co. Ltd, Guangdong Knauf New Building Material Products Co. Ltd, Knauf Insulation, GMBH, Gebrueder Knauf Verwaltungsgesellschaft, KG, Taishan Gypsum Co. Ltd, Taian Taishan Plasterboard Co. Ltd, USG Corporation, United States Gypsum Company, USG Interiors, Inc. and L&W Supply Corporation d/b/a Seacoast Supply)**

186.    The State incorporates the preceding paragraphs as if fully set forth here.

187.    This is an action for relief under the Louisiana Unfair Trade Practices and Consumer Protection Law ("LUTPA"), La. Rev. Stat. § 51:1401, et seq.

188.    As fully set forth above, Defendants fundamentally misrepresented material facts regarding the characteristics of the drywall and omitted other material facts that should have been disclosed.  These misrepresentations and omissions were made recklessly and with the intent of defrauding members of the public for profit.

-27-

189.     Defendants unfairly, deceptively, knowingly, and fraudulently represented to the public that their drywall was safe, efficacious, well tested, of high quality and free of defects. The drywall was not safe, efficacious, well tested, of high quality or free of defects.

190.     Defendants' drywall was installed in reliance on the veracity of the above-mentioned unfair, deceptive, knowing, and fraudulent representations.

191.     The above-specified acts and omissions by Defendants constitute unfair, deceptive, unethical, oppressive, unscrupulous acts and practices in violation of La. R.S. 51:1401 *et seq*.   These acts and/or practices have caused, and will continue to cause, substantial damages and injuries to Louisiana consumers.

192.     Defendants' drywall was defective and unreasonably dangerous at the time it left the manufacturers' control, subsequently causing substantial damage upon installation.  The damage arose from a reasonable anticipated use of the drywall.

193.     Defendants' drywall deviated in a material way from the manufacturers' specification or performance standards or from identical products manufactured by Defendants.

194.     The Defendants' acts and omissions, which were substantially injurious to Louisiana consumers and which were done with fraud, deceit, or misrepresentations, constitute unfair and deceptive trade practices.

195.     Based on the misrepresentations alleged above, Louisiana consumers would not have purchased defective Chinese drywall had they known the truth.

196.     The practices alleged above constitute a pattern of unfair and deceptive trade practices in violation of  La. Rev. Stat. § 51:1405.

197.     Pursuant to La. Rev. Stat. § 51:1405, unfair and deceptive acts and practices in the conduct of any trade or business are unlawful.

198.     Pursuant to La. Rev. Stat. § 51:1407, whenever the Attorney General has reason to believe that any person is using, has used, or is about to use any method, act, or practice declared by R.S. 51:1405 to be unlawful, he may bring an action for injunctive relief in the name of the State against such person to restrain and enjoin the use of such method, act, or practice; such restraining orders or injunctions shall be issued without bond.

199.     Pursuant to La. Rev. Stat. 51:1407, the Attorney General may request civil penalties against any person found by the court to have engaged in any method, act, or practice

in Louisiana declared to be unlawful under LUTPA, as well as additional penalties for violations committed against an elder person or a disabled person.

200.    Pursuant to La. Rev. Stat. 51:1408, the court may issue such additional orders or render judgments against any party, as may be necessary to compensate any aggrieved person for any property, movable or immovable, corporeal or incorporeal, which may have been acquired from such person by means of any method, act, or practice declared unlawful by R.S. 51:1405, including but not limited to the following: (1) Revocation, forfeiture, or suspension of any license, charter, franchise, certificate, or other evidence of authority of any person to do business in the state; (2) Appointment of a receiver; (3) Dissolution of domestic corporations or associations; (4) Suspension or termination of the right of foreign corporations or associations to do business in this state; and (5) Restitution.

201.    The Defendants' violations of LUTPA have caused damages for which the State is entitled to relief, including civil penalties, attorneys' fees, and costs and the State is entitled to all other relief specified in La. Rev. Stat. 51:1407 and 51:1408.

202.    TG and TTP conspired to violate LUTPA and should thus be held solidarily liable for all damages and penalties under LUPTA attributable to the violations committed by either of the Defendants.

203.    The Knauf Entities conspired to violate LUTPA and should thus be held solidarily liable for all damages and penalties under LUTPA attributable to violations committed by any of the Knauf Entities.

204.    The Knauf Entities conspired with USG/L&W to violate LUTPA and these entities should thus be solidarily liable for all damages and penalties under LUTPA attributable to violations committed by any of the Knauf Entities or USG/L&W.

205.    These Defendants should also be solidarily liable under La. Civil Code Art. 1797.

### SECOND CAUSE OF ACTION
### (Breach of Louisiana Products Liability Act, La. Rev. Stat. 9:2800.51 et seq. – Against All Defendants)

206.    The State incorporates the preceding paragraphs as if fully set forth here.

207.    Defendants' drywall described herein is unreasonably dangerous in construction, manufacture and/or composition under La. Rev. Stat. 9:2800.55, and/or is unreasonably dangerous in design under La. Rev. Stat. 9:2800.56, and/or is unreasonably dangerous because of inadequate warnings under La. Rev. Stat. 9:2800.57.

-29-

208.     At the time the drywall left the Defendants' control, an alternative design was available which would not have caused the damages complained of herein.  This alternative design was not only feasible but well known to the Defendants.  Defendants' failure to adopt this feasible alternative design was solely to defraud the public for profit.

209.     Defendants knew or should have known of the harmful nature of their products.  However, Defendants failed to provide an adequate warning to all users and handlers prior to the time the drywall left Defendants' control or upon subsequently learning that their products contain dangerous characteristics.  Instead, Defendants misrepresented that their drywall was safe, efficacious, well tested, of high quality, and free of defects.

210.     Defendants' violations of the Louisiana Products Liability Act directly and proximately caused damages to the State for which Defendants are liable to it for all damages caused by the unreasonable characteristics of the drywall they manufactured, distributed or installed.

211.     Defendants are solidarily liable for the damages caused by the manufacturing, selling, and distribution of the defective drywall.

<u>THIRD CAUSE OF ACTION</u>
<u>(Negligence – Against All Defendants)</u>

212.     The State incorporates the preceding paragraphs as though fully set forth here.

213.     Defendants owed a duty to the State, its Local Subdivisions and citizens of Louisiana to exercise reasonable care in the a) design, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, i) testing j) installation, k) marketing, and/or l) selling drywall, including a duty to adequately warn of its failure to do the same.  Defendants' duties include, but are not limited to the following:

      a.     using reasonable care in the design of the drywall to prevent it from containing defects as set forth herein;

      b.     using reasonable care in the manufacturing of the drywall to prevent it from containing defects as set forth herein;

      c.     using reasonable care in the exporting of the drywall to prevent it from containing defects as set forth herein;

      d.     using reasonable care in the importing of the drywall to prevent it from containing defects as set forth herein;

      e.     using reasonable care in the distributing of the drywall to prevent it from containing defects as set forth herein;

      f.     using reasonable care in the delivering of the drywall to prevent it from containing defects as set forth herein;

-30-

g.      using reasonable care in the supplying of the drywall to prevent it from containing defects as set forth herein;

h.      using reasonable care in the inspection and testing  of the drywall to prevent it from containing defects as set forth herein;

i.      using reasonable care in the marketing of the drywall to prevent it from containing defects as set forth herein;

j.      using reasonable care in the selling of the drywall to prevent it from containing defects as set forth herein;

k.      using reasonable care in the installation of the drywall to prevent it from containing defects as set forth herein;

l.      adequately warning and instructing the State and the local political subdivisions and citizens of Louisiana of the defects associated with drywall;

m.      properly manufacturing the drywall to prevent it from containing the defects as set forth herein;

n.      properly selecting gypsum that did not contain excessive levels of sulfur;

o.      recalling or otherwise notifying users at the earliest date that it became known that the drywall was dangerous and defective;

p.      advertising and recommending the use of drywall with sufficient knowledge as to its manufacturing defect and dangerous propensities;

q.      not misrepresenting that the drywall was safe for its intended purpose when, in fact, it was not;

r.      not manufacturing drywall in a manner which was dangerous to its intended and foreseeable users;

s.      not exporting and/or importing drywall in a manner which was dangerous to its intended and foreseeable users;

t.      not distributing, delivering, and/or supplying drywall in a manner which was dangerous to its intended and foreseeable users;

u.      not concealing information from the State, its Local Subdivisions and citizens of Louisiana regarding reports of adverse effects associated with drywall;

v.      not improperly concealing and/or misrepresenting information from the State, its Local Subdivisions and citizens of Louisiana concerning the severity of risks and dangers of Defendants' drywall and/or the manufacturing defects; and

w.      otherwise exercising reasonable care in the design, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, testing, marketing, and/or selling drywall to prevent it from containing defects as set forth herein.

214.    Defendants were negligent and breached their duties set forth in the previous paragraph. *See* La. Civ. Code Art. 2316.

215.    As a direct and proximate cause of Defendants' acts and omissions, the State, its Local Subdivisions and citizens of Louisiana have incurred economic and other damages and are entitled to recover monetary damages.

-31-

216.     Defendants knew or should have known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

217.     Defendants are solidarily liable for the damages caused by their negligence.

### FOURTH CAUSE OF ACTION
**(Fraudulent Concealment – Against Defendants KPT, Knauf Wuhu, Knauf Dongguan, Gips, Knauf International, Knauf Insulation, GKV, USG Corporation, United States Gypsum Company, USG Interiors, Inc. and L&W Supply Corporation**

218.     The State incorporates the preceding paragraphs as though fully set forth here.

219.     In connection with its sale and shipment of Chinese drywall to Interior Exterior in Louisiana, KPT falsely stated in Certificates of Warranty dated November 23, 2005, December 23, 2005, March 3, 2006, and March 3, 2006 that the gypsum boards were "free from defects in materials and workmanship."

220.     In connection with its sale and shipment of Chinese drywall to Interior Exterior in Louisiana, KPT falsely stated in Certificates of Quantity, Quality, and Condition dated November 23, 2005, December 23, 2005, March 3, 2006, and March 3, 2006 that the drywall was "in good condition" and "in accordance to ASTM C36."

221.     In connection with its sale and shipment of Chinese drywall to Interior Exterior in Louisiana, KPT falsely stated in Mill Certificates dated November 23, 2005, December 23, 2005, March 3, 2006, and March 3, 2006 that the "gypsum boards were manufactured in accordance to ASTM C36."

222.     In connection with its sale and shipment of Chinese drywall to Interior Exterior in Louisiana, Knauf Wuhu falsely stated in a Certificate of Warranty dated July 20, 2006 that the gypsum boards were "free from defects in materials and workmanship."

223.     In connection with its sale and shipment of Chinese drywall to Interior Exterior in Louisiana, Knauf Wuhu falsely stated in a Certificate of Quantity, Quality, and Condition dated July 20, 2006 that the drywall was "in good conditions" and "in accordance to ASTM C36."

224.     In connection with its sale and shipment of Chinese drywall to Interior Exterior in Louisiana, Knauf Wuhu falsely stated in a Mill Certificate dated July 20, 2006 that the "gypsum boards were manufactured in accordance to ASTM C36."

225.     The entry of defective Chinese drywall from the Knauf Entities into Louisiana would not have occurred but for the affirmative actions of Knauf Insulation executive Jeff Brisley who, acting as an agent of the Knauf Entities, induced Interior Exterior to purchase Chinese drywall from the Knauf Entities.

226.    At all relevant times, the Knauf Entities knew that the above-mentioned representations made to members of the public, including Interior Exterior, were specious, false, and fraudulent.  These representations were made recklessly and with the intent of defrauding members of the public for profit.

227.    At all relevant times, said Defendants knew or should have known that their drywall was defective, unsafe, and poorly manufactured.

228.    Said Defendants fraudulently concealed that their drywall was defective, unsafe, and poorly manufactured.  The concealments were made with the intent of defrauding members of the public for profit.

229.    Said Defendants knew or should have known that their drywall would cause corrosion of, among other things, electrical wiring, air conditioner coils, plumbing, and other personal property throughout the affected homes and other buildings.

230.    Said Defendants fraudulently concealed that their drywall caused damage to, among other things, electrical wiring, air conditioner coils, plumbing, and other personal property throughout the affected homes and other buildings.

231.    Said Defendants fraudulently concealed that they had received and/or otherwise learned of complaints regarding their drywall product.

232.    The Knauf Entities fraudulently concealed from the public, the State and the CPSC, the results of testing of their Chinese drywall products by the Fraunhofer Institute, their own testing and testing performed for them by other labs that they hired.

233.    Said Defendants' above-mentioned concealments of key facts regarding their drywall resulted in physical and economic damages that have been, and continue to be, incurred by the State, its Local Subdivisions and all of its citizens.

234.    As a result of the Defendants' fraudulent concealments regarding their drywall product, physical and economic damages have been, and continue to be, incurred by the State, its Local Subdivisions and its citizens.

235.    The Knauf Entities conspired with each other and with USG/L&W to fraudulently conceal the facts listed above and these Defendants should thus be held solidarily liable for the damages resulting from the fraudulent concealment.

236.    Alternatively, said Defendants are solidarily liable under La. Civil Code Art. 1797.

-33-

**FIFTH CAUSE OF ACTION**
**(Fraudulent Misrepresentation – Against Defendants KPT, Knauf Wuhu, Knauf**
**Dongguan, Gips, Knauf International, Knauf Insulation and GKV, USG Corporation,**
**United States Gypsum Company, USG Interiors, Inc., and L&W Supply Corporation**

237.    The State incorporates the preceding paragraphs as though fully set forth here.

238.    Defendants in this Cause of Action fraudulently represented to the public,

including Interior Exterior, that their Defendants' drywall was safe, efficacious, well tested, of

high quality, and free of defects.

239.    Said Defendants' drywall was installed in Louisiana in reliance on the veracity of

the above-mentioned fraudulent representations.

240.    As a result of said Defendants' fraudulent representations regarding their drywall

product, physical and economic damages have been, and continue to be, incurred by the State, its

Local Subdivisions and its citizens.

241.    The Knauf Entities conspired with each other and with USG/L&W to fraudulently

misrepresent that the drywall was safe, efficacious, well tested, of high quality, and free from

defects and these Defendants should thus be held solidarily liable for the damages resulting from

the fraudulent misrepresentations.

242.    Alternatively, these Defendants are solidarily liable pursuant to La. Civil Code

Art. 1797.

**SIXTH CAUSE OF ACTION**
**(Negligent Misrepresentation – Against All Defendants)**

243.    The State incorporates the preceding paragraphs as though fully set forth here.

244.    All Defendants fundamentally misrepresented material facts regarding the

characteristics of their drywall and omitted other material facts that should have been disclosed.

In disseminating information regarding their drywall, all Defendants negligently caused

statements to be made which they knew or should have known were inaccurate and untrue.

245.    Defendants' drywall was installed in Louisiana in reliance on the veracity of these

negligent misrepresentations.

246.    As a direct consequence of Defendants' negligent misrepresentations and

omissions of material facts regarding their defective drywall, the State, its Local Subdivisions

and all of its citizens have incurred and will continue to incur physical and economic damages.

247.    Defendants are solidarily liable for the damages caused by their negligent

misrepresentation(s).

**Equitable Tolling on Applicable Statutes of Limitations**

248.    The running of any statute of limitations has been tolled by reason of Defendants' fraudulent concealment.  Defendants, through failing to disclose a known defect in their drywall and misrepresenting their drywall as safe for its intended use, actively concealed the true risks associated with it.

249.    In addition, upon information and belief, the Knauf Entities in 2006 retained the Fraunhofer Institute for Building Physics ("Fraunhofer Institute") of Valley, Germany to study Chinese drywall manufactured by the Knauf Entities which emitted "unpleasant sulfur like odor" and the gypsum material mined in China from which that drywall was manufactured.

250.    Upon information and belief, in 2006, the Fraunhofer Institute informed the Knauf entities that Knauf Chinese drywall and the raw material from which that drywall was manufactured were the source of the "unpleasant sulfur like odor," that elemental sulfur and other sulfur containing compounds were being emitted from the drywall and were corrosive,  and that the compounds formed "had never been reported as odor active compounds released by building products" before.

251.    The Knauf entities told defendants USG and L &W of Fraunhofer's findings on or before November 30,  2006 but otherwise concealed this information and did not communicate the findings of the Fraunhofer Institute and others to anyone else outside the Knauf entities, including the CPSC, the State, its other U.S. customers, importers, distributors, installers and homeowners with Knauf Chinese drywall products that were imported into the State of Louisiana, and ultimately incorporated into homes and other buildings throughout Louisiana.

252.    For several years after 2006, the Knauf Entities performed their own testing and hired other test laboratories who performed testing but Knauf has also withheld results of that testing and has destroyed or allowed to be destroyed, remaining test samples, test results, and communications concerning testing, as described in greater detail above.

253.    As a result of Defendants' actions, the State, its Local Subdivisions and its citizens could not reasonably know or have learned through reasonable diligence of the manufacturing defects in Defendants' drywall, that they had been exposed to the risks alleged herein, or that those risks were a direct and proximate result of Defendants' acts and omissions.

254.    Furthermore, Defendants are estopped from relying on any statute of limitations because of their fraudulent concealment of the defective nature of their drywall, which was either

known or should have been known by all Defendants.  Defendants were under a duty to disclose the true character, quality, and nature of their products because this was non-public information over which the Defendants had, and continue to have, exclusive control, and because Defendants knew that this information was not available to the State, its Local Subdivisions or citizens of Louisiana.

## PRAYER FOR RELIEF

WHEREFORE, the State of Louisiana, through its Attorney General, requests judgment against all Defendants in accordance with the several Counts of this Petition and that this Honorable Court grant the following relief on its statutory, proprietary and Parens Patriae claims asserted herein:

1.      All actual, incidental, consequential, exemplary, punitive and/or statutory relief and damages to which the State may be entitled, in an amount to be determined at trial;

2.      Civil penalties as allowed under La. Rev. Stat. § 51:1407 and other relief allowed under La. Rev. Stat. 51:1408;

3.      Reimbursement, restitution, disgorgement of profits and all other equitable relief to which the State may be entitled;

4.      The costs, expenses and damages attributable to reductions in property tax assessments and permit fees;

5.      The costs, expenses and damages related to activities of the State and its departments, divisions, boards, commissions, agencies and other public subdivisions and offices which are part of the State government;

6.      The increased costs of Medicaid and Medicare attributable to health problems or potential health problems caused by defective drywall;

7.      The cost of disposing and waste monitoring of Defendants' defective drywall and increased disposal costs to the State and its citizens as a result of the disposal of Defendants' defective drywall and related building materials;

8.      The cost of community monitoring, reporting and permitting;

9.      Costs and expenses to reimburse the Office of the Attorney General for all costs and expenses incurred in the investigation and prosecution of this action, including but not limited to attorneys' fees, expert fees, filing fees, and costs;

10.      Pre-judgment and post-judgment interest;

11.      A finding that Defendants are solidarily liable for the damages, penalties, fees and other costs;  and

12.      Such other relief as the Court may deem just and appropriate.


By Attorneys:

_____
James D. "Buddy" Caldwell, La. Bar #2211
Louisiana Attorney General
Louisiana Department of Justice
1885 N. 3rd St.,
P.O. Box 94005
Baton Rouge,  LA  70804
(225) 326-6000

L. Christopher Styron, La. Bar #30747
Assistant Attorney General
Louisiana Department of Justice
1885 N. 3rd St.,
P.O. Box 94005
Baton Rouge,  LA  70804
(225) 326-6000

Sanettria Glasper Pleasant, La. Bar #25396
Assistant Attorney General
Louisiana Department of Justice
Director, Public Protection Division
1885 N. 3rd St.,
P.O. Box 94005
Baton Rouge,  LA  70804
(225) 326-6000

Usry, Weeks & Matthews, APLC
T. Allen Usry, La. Bar #12988
John F. Weeks, II,  La. Bar #13309
1615 Poydras St., Ste. 1250
New Orleans,  LA  70112
(504) 592-4600

Shows, Cali, Berthelot & Walsh, LLP
E. Wade Shows, La. Bar #7637
John C. Walsh, La. Bar #24903
628 St. Louis St.,
P. O. Drawer 4425
Baton Rouge, LA 70821
(225) 346-1461

_____
  s/ David L. Black
Perkins Coie, LLP
David L. Black, *Pro Hac Vice*
1900 Sixteenth St. #1400
Denver,  CO  80202
(303) 291-2300

72080-0001/LEGAL122488602.4