# EXHIBIT "A"

E-SERVICE
55762304
Jul 21 2014
03:16PM
File & ServeXpress

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br><br>**Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al., Case No. 2:09-cv-6687 (E.D. La.)**<br><br>**The Mitchell Co., Inc. v. Knauf Gips KG, et al., Case No. 09-4115 (E.D. La.)**<br><br>**Wiltz v. Beijing New Building Materials Public Ltd. Co., et al., Case No. 10-361 (E.D. La.)**<br><br>**Gross v. Knauf Gips KG, et al., Case No. 2:09-cv-06690 (E.D. La.)** | |

## REQUEST FOR ADMISSIONS

**TO**:   Taishan Gypsum Co., Ltd.
f/k/a Shandong Taihe Dongxin Co., Ltd
**Through its Counsel of Record**:
Joe Cyr
Frank T. Spano
Courtney L. Colligan
HOGAN LOVELLS US LLP
875 Third Avenue
New York, New York
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

Richard C. Stanley
Thomas P. Owen, Jr.
STANLEY, REUTER, ROSS, THORNTON & ALFORD, LLC
909 Poydras Street, Suite 2500
Telephone: (504) 523-1580
Facsimile: (504) 524-0069

**PLEASE TAKE NOTICE** that Plaintiffs-Intervenors/Judgment Creditors and putative Plaintiff Class Members, through undersigned Counsel, propound the following Request for Admissions upon Defendant/Judgment Debtor Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd (hereinafter "Taishan" or "Judgment Debtor") pursuant to Rule 36 of the Federal Rules of Civil Procedure ("FRCP"), said Request to be responded to within the time specified therein.

## <u>INSTRUCTIONS</u>

Pursuant to FRCP 36(a)(1), you are asked to admit for the purposes of this Litigation, the truth of the following statements of fact, the application of laws to fact, opinions about either, and/or the genuineness of described (or attached) documents. Pursuant to FRCP 36(a)(4), you may not assert lack of knowledge or information in failing to admit or deny a matter, unless you have made, and confirm that you have made, a reasonable inquiry and unless you specify the information readily ascertainable by You in this regard. In responding to a properly stated request, you are hereby required to make reasonable inquiry or information known or readily obtainable. You shall not provide as a response, "lack of information or knowledge" as a reason for failure to admit or deny, unless you have made such inquiry and certify such with contemporaneous documentary evidence regarding the same. For each and every request that is denied, you are asked to fully explain the denial and produce any and all papers, books, and/or documents in support thereof. You are hereby advised that you are under a duty to seasonably amend your answers if you obtain information upon the basis of which:

1.  You know that the answer was incorrect when made; and/or

2. You know that the answer, though correct when made, is no longer true and the circumstances are such that a failure to amend the answer is in substance a knowing concealment or misrepresentation.

## **DEFINITIONS**

1. The terms " **you**," " **your**," and " **yours**" as used herein shall mean the entity named herein, as well as all of its subsidiaries, parent companies, sibling companies, officers, contractors, subcontractors, agents, personnel, representatives, or other persons acting on behalf of, or at the request of, each individual entity named in Plaintiff' s most recent Complaint.

2. "**Taishan**" as used herein shall mean "Taishan Gypsum Company, Ltd. f/k/a/ Shandong Taihe Dongxim Co., Ltd." and any of its subsidiaries.

3. The acronym "**TTP**" as used herein, refers to Taian Taishan Plasterboard Co., Ltd. and any of its subsidiaries, parent companies, sibling companies, officers, contractors, subcontractors, agents, personnel, representatives, or other persons acting on behalf of, or at TTP's request.

4. The acronym "**BNBM**" as used herein shall mean "Beijing New Building Materials Public Limited Company" and any of its subsidiaries, parent companies, sibling companies, officers, contractors, subcontractors, agents, personnel, representatives, or other persons acting on behalf of, or at BNBM request.

5. "**BNBM Group**" as used herein shall mean "Beijing New Building Materials Group Company, Limited" and any of its subsidiaries, parent companies, sibling companies, officers, contractors, subcontractors, agents, personnel, representatives, or other persons acting on behalf of, or at BNBM Group's request.

6. The acronym "**CNBM**" as used herein shall mean "China National Building Material Company, Limited" and any of its subsidiaries, parent companies, sibling companies, officers, contractors, subcontractors, agents, personnel, representatives, or other persons acting on behalf of, or at CNBM's request.

7. "**CNBM Group**" as used herein shall mean "China National Building Material Group Corporation" and any of its subsidiaries, parent companies, sibling companies, officers, contractors, subcontractors, agents, personnel, representatives, or other persons acting on behalf of, or at CNBM Group's request.

8. The term "**incident**" as used herein shall mean the incident or incidents that form the basis of the Complaints of Plaintiffs and Plaintiff-Intervenors in the above-referenced cases, as well as those consolidated in the present Multi-District Litigation.

3

9. The term "**document**" as used herein shall mean any written, recorded, or graphic matter, however produced or reproduced, including photographs. The term " document" shall be interpreted in its customary broad sense and shall include, but is not limited to, the following items: letters of credit; promissory notes; budgets, journals; registers; cancelled checks; accounts; work sheets; books; records; reports; notes; summaries; surveys; estimates; agreements; diaries; calendars; day timers; correspondence; letters; telegrams; e-mails; electronic archives of e-mails (whether deleted or not); voicemail; magnetically or optically recorded documents; archival copies of magnetically or optically recorded documents; documents that have been logically deleted but not physically erased; the actual media (whether magnetic, optical or other) that have been used to record or forward documents; telexes; memoranda (including intra-office memoranda); summaries; notes; records of meetings; records of conferences; records of telephone conversations; records of personal interviews or conversations; drafts of documents; business records; maps; drawings; blueprints; charts; plans; specifications; computer printouts; computer archives (deleted or not); computer tapes; computer disks; CD ROMS; microfilm; microfiches; photographs; slides; negatives; motion pictures; video recordings; audio recordings (including transcription); data compilations from which information can be obtained, or translated into, a reasonably usable form; and any other information containing paper, writing, or physical thing in defendants' actual or constructive possession, custody or control. If any documents were, but are no longer, in defendant' s actual or constructive possession, custody, or control, identify the document and state the date and manner of its disposition.

10. With respect to the production of any documents which are claimed to be privileged, a statement shall be provided by the attorneys for the respondent setting forth as to each such documents (and, where applicable, each attachment thereto):

    a. the name of the sender, if any, of the documents;

    b. the name of the author of the document;

    c. the name of the person, if any, to whom the document and copies were sent;

    d. the date of the document;

    e. the date on which the document was received by those having possession of the document;

    f. a description of the nature and the subject matter of the document;

    g. the statute, rule or decision which is claimed to give rise to the privilege;

    h. the last-known custodian of the document and the present location of the document;

    i. attachments to the document;

    j. the number of pages comprising the document;

    k. whether the document is handwritten, typewritten or otherwise prepared; and

    l.  any other information which is useful in identifying or is necessary to identify the document.

11. The term "**identify**," when used with respect to a natural person, shall mean that person' s full name, present or last known employment, present or last known address, and most recent telephone number or numbers.

12. The term "**identify**," when used with respect to a document or photographs, shall mean to state the type of document (e.g. lease, memorandum, contract, e-mail, chart, diagram, etc.), its location and custodian, the date the document was created, and the identity of the party or parties whose names appear thereon.  You may attach a copy of such document in lieu thereof.

13. The term "**identify**," when used with respect to a corporation, partnership, company or any other business entity, shall mean to provide the name of the entity along with its primary business address and telephone number.

14. "**Describe**" or "**Specify**" as used herein shall mean the following:

    a.  to offer a detailed description of the thing sought including where appropriate, to identify the thing;

    b.  to set forth the matter which you are asked to "**describe**"  or "**specify,**"  and do so fully in detail, by reference to underlying facts rather than reference to ultimate facts or conclusion of fact and law;

    c.  to state particulars as to (I) time and (ii) place;

    d.  " **identify**"  the " **person**"  participating, present or involved at any time; and

    e.  to set forth all facts necessary to a complete understanding of the "**fact**" , process, or thing in questions.

15. The singular of each word herein shall be deemed to include the plural and vice-versa; the term "**and**" shall be deemed to include "**or**" and vice-versa; the term "**any**" shall be construed to include the term "**all**" and vice-versa; and the term "**each**" shall be construed to include the term "**every**" and vice-versa; the present tense shall be construed to include the past tense and vice-versa.

16. The terms "**defendant**,"  "**judgment debtor**," and "**you**" as used herein shall be deemed synonymous and shall be deemed to include any and all appropriate agents, servants, employees, attorneys and other representatives of the defendant, expert witness, or any other person who has been retained or has otherwise been employed by Defendant in connection with this civil action or its underlying subject matter.

17. The term "**date**" as used herein shall mean the day of the month, the month, and the year. If the exact date is not known and is not available, give the approximate date and indicate that it is only approximate.

18. The term "**address**" as used herein shall mean the post office box number, street number, street, city, state or province, country (other than the United States of America), and zip code.

19. The terms "**relating**," "**concerning**," "**evidencing**," and "**reflecting**" (or any of their forms) as used herein shall mean relating to, reflecting, constituting, representing, supporting, contradicting, referring to, relevant to, containing information about, stating, describing, analyzing, learning, embodying, containing, mentioning, studying, recording, discussing, or evaluating whether in opposition to or in support of defendant's allegations, contentions, positions, and claims in this action.

20. The term "**communication**" as used herein shall mean any transmission of information (whether written, electronic, or oral), the information transmitted, and the process by which the information is transmitted.

21. The term "**person**" as used herein shall mean any natural person, business, legal or governmental entity or association.

22. The term "**manufacture**" as used herein shall mean manufacture, produce, assemble, and distribute.

23. The term "**sale**" as used herein shall mean sale, donation, giving in kind, giving in payment, and all other acts that transfer ownership.

24. The term "**standards**" as used herein shall mean standards, specifications, rules, regulations, and guidelines.

25. The term "**facilities**" as used herein shall mean yards, offices, warehouses, production plants, manufacturing facilities, storage facilities and all other locations owned or leased by you in which your business is transacted.

26. The terms "**occurrence**" and "**transaction**" as used herein shall mean the events described in the Complaint and other pleadings, as pleadings is defined in Fed. R. Civ. P.7 (a).

27. The term "**manufacturer**" as used herein shall mean any entity that manufactured, produced, and/or otherwise placed into the stream of commerce Chinese drywall.

28. The term "**owned**" as used herein shall mean a partial or full ownership of equity or interest ownership.

29. The term "**control**" as used herein shall mean the possession or exercise of authority or influence sufficient to direct the activities or outcomes of the controlled entity.

30. The phrase "**at all relevant times**" as used herein shall mean the period during which the Chinese drywall manufactured by Taishan Gypsum and/or any of its predecessors, parent, affiliated, or subsidiary entities, was sold and/or distributed for actual or potential use in the United States of America.

## REQUESTS FOR ADMISSIONS

1.  Admit that the document entitled "TAISHAN 2006 STRUCTURE—Pre global Offering" and made Attachment I, sets forth information that is true, correct, and reliable for the period prior to March 13, 2006 Global Offering by/on behalf of China National Building Material Company, Limited.

2.  Admit that the document entitled "History, Reorganization, and Group Structure" and made Attachment II, is an authentic excerpt (pages 85-97) from the aforementioned Global Offering, and sets forth information that is true, correct and reliable at all relevant times herein.

3.  Admit that the document entitled "TAISHAN 2006 STRUCTURE—Post March 16 Global Offering" and made Attachment III, sets forth information that is true, correct and reliable for the period after March 16, 2006 and otherwise for all relevant times herein.

4.  Admit that the document entitled "TAISHAN 2010 STRUCTURE" and made Attachment "IV," sets forth information that is true, correct and reliable at all relevant times herein.

5.  Admit that the document entitled "Illustration of Shareholders . . ." made Attachment V, sets forth information that is true, correct and reliable at all relevant times herein.

6.  Admit that the document entitled "Taishan Directors and Supervisors" made Attachment VI sets forth information that is true, correct and reliable at all relevant times herein.

7.  Admit that at all relevant times, CNBM and CNBM Group were and continue to be affiliates of Taishan.

8.  Admit that at all relevant times, BNBM and BNBM Group were and continue to be affiliates of Taishan.

9.  Admit that at all relevant times, CNBM Group was/is an enterprise owned by the Peoples Republic of China (hereinafter "PRC").

10. Admit that CNBM Group, identified as "the Parent" in CNBM's Prospectus Filing, directly and indirectly holds majority equity interest in CNBM.

11. Admit that at all relevant times, CNBM was/is a joint stock limited company.

12. Admit that at all relevant times, CNBM owns equity interest in BNBM.

13. Admit that at all relevant times, BNBM was/is a joint stock limited company incorporated on May 30, 2997 under the laws of the PRC.

14. Admit that at all relevant times BNBM was/is a wholly-owned subsidiary of CNBMG.

15. Admit that at all relevant times, BNBM holds equity interest in Taishan.

7

16.   Admit that at all relevant times, Taishan was/is a joint stock limited company incorporated on June 24, 1998 under the laws of the People's Republic of China ("PRC").

17.   Admit that at all relevant times, Taishan was/is a direct subsidiary of BNBM, CNBM, BNBM Group, and CNBM Group by virtue of each entity's respective equity interest in one or more of the foregoing entities.

18.   Admit that at all relevant times, TTP was/is a wholly owned subsidiary of Taishan.

19.   Admit that at all relevant times, Taishan and BNBM and BNBM Group had substantial identity of ownership, that is BNBM owned sufficient stock and/or equity ownership in Taishan to give actual working control.

20.   Admit that at all relevant times, Taishan in addition to its wholly owned subsidiary TTP, and BNBM and BNBM Group shared common officers, directors, board members, and/or chairmen.

21.   Admit that at all relevant times, BNBM and BNBM Group had common employees with Taishan and TTP.

22.   Admit that at all relevant times, the business functions of Taishan and BNBM and BNBM Group were similar and/or supplementary of the other.

23.   Admit that at all relevant times, the administrative control of Taishan, BNBM and BNBM Group was unified into a single body of oversight and control.

24.   Admit that at all relevant times, the directors and officers of Taishan who were also the directors and officers of BNBM and BNBM Group acted in concert in the interest of BNBM and BNBM Group, in addition to all entities having an ownership or equity interest therein.

25.   Admit that at all relevant times, the same person(s) directly controlled the finances of Taishan, BNBM and BNBM Group, including but not limited to:
   a.   Loan agreements between Taishan and BNBM, and Taishan and BNBM Group (formal or informal, written or verbal);
   b.   Wire transfers of funds to Taishan from BMBM and from BNBM to Taishan
   c.   Wire Transfers of funds to Taishan from BNBM Group, and BNBM Group to Taishan; and
   d.   A joint banking and/or checking account for Taishan, BNBM, and BNBM Group.

26.   Admit that at all relevant times, Taishan was undercapitalized, inadequately capitalized, and thinly incorporated such that it was insufficiently funded, or had insufficient capital to support its operations.

27.   Admit that at all relevant times, BNBM and BNBM Group directly and/or indirectly, financed all or substantially all of Taishan's operations.

28.   Admit that at all relevant times CNBM and CNBM Group, directly and/or indirectly, financed all or substantially all of Taishan's operations.

29.   Admit that at all relevant times, BNBM and BNBM Group paid all or substantially all of Taishan's expenses.

30.   Admit that at all relevant times, CNBM and CNBM Group paid all or substantially all of Taishan's expenses.

31.   Admit that at all relevant times, BNBM and BNBM Group siphoned funds from Taishan.

32.   Admit that at all relevant times, CNBM and CNBM Group siphoned funds from Taishan.

33.   Admit that at all relevant times, BNBM was Taishan's dominant stockholders.

34.   Admit that at all relevant times, BNBM exerted sufficient control over Taishan as its dominant stockholder.

35.   Admit that in 2005, BNBM and BNBM Group further expanded its gypsum boards and acoustical ceiling panels, thereby necessitating the incorporation or establishment of Taishan.

36.   Admit that the terms of the March 19, 2005 share subscription agreement included an express, implied, or inherent assumption of any and all of Taishan's outstanding liabilities and debts.

37.   Admit that CNBM's Corporate Restructuring on March 28, 2005, the equity holders of CNBM and CNBM Group, as the parent of CNBM, arranged for Taishan's assets to be sold to a new company in which CNBM Group, by virtue of its wholly owned subsidiary CNBM, also holds an equity or other stake for less value than would be produced if the assets were deployed by the original company in the ordinary course of business.

38.   Admit that at all relevant times, BNBM and BNBM Group received its business solely from its affiliated corporations, including Taishan in addition to its other subsidiaries and sister corporations.

39.   Admit that at all relevant times, Taishan, BNBM, and BNBM Group used the same office spaces and shared resources including, but not limited to:
       e.   Facsimile machines;

9

      f.   Telephones;
      g.  Internet servers;
      h.  Email accounts;
      i.   Secretarial staff; and
      j.   Office supplies.

40. Admit that at all relevant times, Taishan, BNBM and BNBM Group maintained the same corporate books.

41. Admit that at all relevant times, the salaries and other expenses or losses of Taishan were paid by or paid directly with funds originating from BNBM, BNBM Group, or any of their parents, subsidiaries, or sister entities.

42. Admit that at all relevant times, employees of Taishan rendered services on behalf of BNBM and/or BNBM Group and vice versa—employees of BNBM and/or BNBM Group rendered services on behalf of Taishan in fulfilling its contractual or business obligations.

43. Admit that at all relevant times, Taishan, BNBM, and BNBM Group had centralized accounting.

44. Admit that at all relevant times, there were multiple undocumented transfers of funds between Taishan and BNBM and/or BNBM Group—both from Taishan to BNBM and/or BNBM Group and from BNBM and/or BNBM Group to Taishan.

45. Admit that at all relevant times, BNBM and BNBM Group had the authority to withdraw money from Taishan's operating account, and actually did so on several occasions without notice to or permission by Taishan.

46. Admit that at all relevant times, Taishan never complied with requisite corporate formalities including, but not limited to, issuance of stock, annual shareholder meetings, formal board meetings, and corporate authorization for major transactions.

47. Admit that the allocation of profits and losses as between BNBM, BNBM Group, and Taishan is unclear and virtually non-existent.

48. Admit that at all relevant times, Taishan and CNBM and CNBM Group had substantial identity of ownership, that is BNBM owned sufficient stock and/or equity ownership in Taishan to give actual working control.

49. Admit that at all relevant times, Taishan in addition to its wholly owned subsidiary TTP, and CNBM and CNBM Group shared common officers, directors, and/or chairmen.

50. Admit that at all relevant times, CNBM and CNBM Group had common employees with Taishan and TTP.

51. Admit that at all relevant times, CNBM and CNBM Group had common personnel and management with Taishan.

52. Admit that at all relevant times, BNBM and BNBM Group had common personnel and management with Taishan.

53. Admit that at all relevant times, the business functions of Taishan and CNBM and CNBM Group were similar and/or supplementary of the other.

54. Admit that at all relevant times, the administrative control of Taishan, CNBM and CNBM Group was unified into a single body of oversight and control.

55. Admit that at all relevant times, the directors and officers of Taishan who were also the directors and officers of CNBM and CNBM Group acted in concert in the interest of CNBM and CNBM Group, in addition to all entities having an ownership or equity interest therein.

56. Admit that at all relevant times the same person(s) directly controlled the finances of Taishan CNBM and CNBM Group, including but not limited to:
   a. Loan agreements between Taishan and CNBM and/or Taishan and CNBM Group (formal or informal, written or verbal);
   b. Wire transfers of funds to Taishan from CMBM and/or from CNBM to Taishan;
   c. Wire Transfers of funds to Taishan from CNBM Group and/or CNBM Group to Taishan; and
   d. A joint banking and/or checking account for Taishan, CNBM, and/or CNBM Group.

57. Admit CNBM and/or CNBM Group expressly, impliedly, or inherently assumed any and all of Taishan's and/or TTP's outstanding liabilities and debts.

58. Admit that at all pertinent times, CNBM and CNBM Group received its business solely from its affiliated corporations, including Taishan in addition to its other subsidiaries and sister corporations.

59. Admit that at all relevant times Taishan, CNBM, and CNBM Group used the same office spaces and shared resources including, but not limited to:
   e. Facsimile machines;
   f. Telephones;
   g. Internet servers;
   h. Email accounts;
   i. Secretarial staff; and

      j.   Office supplies.

60.   Admit that at all relevant times, the salaries and other expenses or losses of Taishan were paid by or paid directly with funds originating from CNBM, CNBM Group, or any of their parents, subsidiaries, or sister entities.

61.   Admit that at all relevant times, employees of Taishan rendered services on behalf of CNBM and/or CNBM Group and vice versa—employees of CNBM and/or CNBM Group rendered services on behalf of Taishan in fulfilling its contractual or business obligations.

62.   Admit that at all relevant times, Taishan, CNBM, and CNBM Group had centralized accounting.

63.   Admit that at all relevant times, there were multiple undocumented transfers of funds between Taishan and CNBM and/or CNBM Group—both from Taishan to CNBM and/or CNBM Group and from CNBM and/or CNBM Group to Taishan.

64.   Admit that at all relevant times, CNBM and CNBM Group had the authority to withdraw money from Taishan's operating account, and actually did so on several occasions without notice to or permission by Taishan.

65.   Admit that at all relevant times, Taishan never complied with requisite corporate formalities including, but not limited to, issuance of stock, annual shareholder meetings, formal board meetings, and corporate authorization for major transactions.

66.   Admit that the allocation of profits and losses as between CNBM, CNBM Group, and Taishan is unclear and virtually non-existent.

67.   Admit that the Corporate Restructuring of CNBM Group and CNBM, wherein BNBM purchased all Taishan stock, BNBM expressly agreed to assume Taishan's liabilities upon its acquisition of Taishan stock.

68.   Admit that the Corporate Restructuring of CNBM Group and CNBM, wherein BNBM purchased all Taishan stock, BNBM impliedly agreed to assume Taishan's liabilities upon its acquisition of Taishan stock.

69.   Admit that the Corporate Restructuring of CNBM Group and CNBM, wherein BNBM purchased all Taishan stock, was in effect, a *de facto merger*, meaning that there was a continuity of ownership between the selling and purchasing entities.

70. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM purchased all Taishan stock, the new entity retained the same employees, personnel, and management.

71. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, the new entity retained the same supervisory personnel.

72. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, all sister and subsidiary entities retained the same production facilities in the same physical location.

73. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, the new entity continued to produce the same products and engaged in the same business as its predecessors.

74. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, the new entity retained the same name.

75. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, the new entity had continuity of assets.

76. Admit that following the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, the new entity had continuity of general business operations.

77. Admit that the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, the purchase of Taishan's stock was not an arms-length transaction.

78. Admit that the officers of Taishan were not strangers from the officers of BNBM at the times BNBM purchased Taishan's stock.

79. Admit that in Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock, Taishan's stock was sold to BNBM for inadequate consideration.

80. Admit that the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock for inadequate consideration, was for the purpose of defrauding Taishan's creditors.

81. Admit that the Corporate Restructuring of CNBM and CNBM Group, wherein BNBM bought all Taishan stock for inadequate consideration, was for the purpose of avoiding liability to creditors.

82. Admit that all relevant times, Taishan and/or TTP were express and/or implied mandataries (i.e. agents) of CNBM and CNBM Group, in that CNBM and/or CNBM Group had and still has the right to control the conduct and/or actions of Taishan and TTP and Taishan and/or TTP have authority to bind CNBM and/or CNBM Group.

83. Admit that all relevant times, Taishan and/or TTP were express and/or implied mandataries (i.e. agents) of BNBM and BNBM Group, in that BNBM and/or BNBM Group had and still has the right to control the conduct and/or actions of Taishan and TTP and Taishan and/or TTP have authority to bind BNBM and/or BNBM Group.

84. Admit that at all relevant times, BNBM caused the drywall at issue to be imported to the United States.

85. Admit that at all relevant times, BNBM had and still has control over Taishan and all of its subsidiaries.

86. Admit that at all relevant times, CNBM caused the drywall at issue to be imported to the United States.

87. Admit that at all relevant times, CNBM had and still has control over Taishan and all of its subsidiaries.

88. Admit that at all relevant times, the State-owned Assets Supervision and Administration Commission ("SASAC") of the State Counsel of the People's Republic of China controlled/controls plasterboard manufacturing and manages the state-owned assets of Taishan.

89. Admit that at all relevant times, SASAC exercised and continues to exercise "control" over Taishan.

90. Admit that that at all relevant times SASAC exercised and continues to exercise influence over Taishan.

91. Admit that SASAC owns 100 percent of the China National Building Material Group Corporation ("CNBM Group").

92. Admit that at all relevant times, BNBM advertised on its website that it is a global company.

93. Admit that at all relevant times, BNBM has advertised on its website that it looks "forward to building long term relationships with customers all over the world."

14

94.   Admit that at all relevant times, BNBM was and continues to be a wholly state-owned corporation of the PRC.

95.   Admit that at all relevant times, BNBM has advertised on its website that "is the most important and integrated company of the CNBM Group."

96.   Admit that on March 19, 2005, BNBM became the largest shareholder of Taishan.

97.   Admit that at all relevant times, Taishan and BNBM were "joint ventures."

98.   Admit that at all relevant times, Taishan and BNBM undertook investments together.

99.   Admit that at all relevant times, Taishan and BNBM undertook drywall related investments together, as demonstrated by the 2005 Annual Shareholders Meeting (TG0020677) and the Resolution of the 4th Extraordinary Meeting of 2005 (TG0020682).

100.  Admit that in the 2006 BNBM Bylaws (TG0020686), BNBM maintained the right to purchase interest in all present and future subsidiaries of Taishan.

101.  Admit that BNBM and Taishan's development and production capacities were reported as one in CNBM May 2010 Overseas Regulatory Announcement (Q0000975-981).

102.  Admit that BNBM and Taishan's development and production capacities were reported as one unified report in the 2009 BNBM Annual Report (Q000155-223).

103.  Admit that BNBM and Taishan's development and production capacities were reported as one unified report in the Summary of BNBM 2008 Annual Report (Q000091-154).

104.  Admit that at all relevant times, BNBM and Taishan's development and production capacities were reported as one unified report in the 2006 BNBM Annual Report.

105.  Admit that at all relevant times, Taishan acted as an agent for BNBM and/or BNBM Group in the sale of drywall in the United States.

106.  Admit that at all relevant times, Taishan acted as an agent for BNBM and/or BNBM Group in the sale of drywall in Florida.

107.  Admit that at all relevant times, Taishan acted as an agent for BNBM and/or BNBM Group in the sale of drywall in Florida.

108. Admit that at all relevant times, Taishan was aware that there were complaints that the drywall it sold to entities in the United States was defective at the times its stock was sold to BNBM and/or BNBM Group.

109. Admit that after BNBM's acquisition of all/substantially all of Taishan's stock, Taishan continued in the same offices as it had before.

110. Admit that after BNBM's acquisition of all/substantially all of Taishan's stock, Taishan's telephone number remained the same.

111. Admit that after BNBM's acquisition of all/substantially all of Taishan's stock, Taishan's address remained the same.

112. Admit that BNBM has agreed, either expressly or impliedly, to assume all of Taishan's outstanding liabilities.

113. Admit that BNBM's purchase of all or substantially all of Taishan stock was, in effect, a consolidation of the two corporations.

114. Admit at all relevant times, BNBM and BNBM Group directly and/or indirectly obtained revenue for sales made by Taishan.

115. Admit at all relevant times, CNBM and CNBM Group directly and/or indirectly obtained revenue for sales made by Taishan.

116. Admit that at all relevant times, BNBM and BNBM Group directly controlled and/or made all decisions relative to Taishan's non-compliance with the District Court's June 19, 2014 Order (Rec. Doc. 17774).

117. Admit that at all relevant times, CNBM and CNBM Group directly controlled and/or made all decisions relative Taishan's non-compliance with the District Court's June 19, 2014 Order (Rec. Doc. 17774).

118. Admit that at all relevant times, BNBM and BNBM Group exercised some degree of active participation in Taishan's refusal to obey the June 19th Order (Rec. Doc. 17774).

119. Admit that at all relevant times, CNBM and CNBM Group exercised some degree of active participation in Taishan's refusal to obey the June 19th Order (Rec. Doc. 17774).

120. Admit that at all relevant times, BNBM paid or contributed to paying, in whole or in part, some or all of the litigation expenses and/or attorneys' fees incurred in the representation of Taishan in connection with claims in this consolidated litigation or in any other claims arising out of the manufacture of Chinese Drywall.

121. Admit that at all relevant times, BNBM Group paid or contributed to paying, in whole or in part, some or all of the litigation expenses and/or attorneys' fees incurred in the representation of Taishan in connection with claims in this consolidated litigation or in any other claims arising out of the manufacture of Chinese Drywall.

122. Admit that at all relevant times, CNBM paid or contributed to paying, in whole or in part, some or all of the litigation expenses and/or attorneys' fees incurred in the representation of Taishan in connection with claims in this consolidated litigation or in any other claims arising out of the manufacture of Chinese Drywall.

123. Admit that at all relevant times, CNBM Group paid or contributed to paying, in whole or in part, some or all of the litigation expenses and/or attorneys' fees incurred in the representation of Taishan in connection with claims in this consolidated litigation or in any other claims arising out of the manufacture of Chinese Drywall.


Dated: July 21, 2014                     Respectfully Submitted,

                                         **BY:  _/s/ Leonard A. Davis___**
                                              Russ M. Herman, Esquire
                                              Leonard A. Davis, Esquire
                                              Stephen J. Herman, Esquire
                                              Herman, Herman & Katz, LLC
                                              820 O'Keefe Avenue
                                              New Orleans, Louisiana 70113
                                              Phone: (504) 581-4892
                                              Fax: (504) 561-6024
                                              ldavis@hhklawfirm.com
                                              *Plaintiffs' Liaison Counsel*
                                              *MDL 2047*

                                              Arnold Levin, Esquire
                                              Fred S. Longer, Esquire
                                              Levin, Fishbein, Sedran & Berman
                                              510 Walnut Street, Suite 500
                                              Philadelphia, PA 19106
                                              215-592-1500 (phone)
                                              215-592-4663 (fax)
                                              Alevin@lfsblaw.com
                                              *Plaintiffs' Lead Counsel*
                                              *MDL 2047*

Gerald E. Meunier, Esquire
Gainsburgh, Benjamin, David,
Meunier & Warshauer, L.L.C.
2800 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2800
Telephone:  (504) 522-2304
Facsimile:  (504) 528-9973
E-mail:  gmeunier@gainsben.com

*Co-counsel for Plaintiffs*

18

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios, Esquire
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr., Esquire
Becnel Law Firm. LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto, Esquire
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler, Esquire
The Steckler Law Firm
12700 Park Central Drive, Ste 1900
Dallas, TX 75251
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez, Esquire
Colson, Hicks, Eidson, Colson
Matthews, Martinez, Gonzales,
Kalbac & Kane
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444

Ben W. Gordon, Jr., Esquire
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert., Esquire
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Gerald E. Meunier, Esquire
Gainsburgh, Benjamin, David, Meunier
& Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker, Esquire
Parker Waichman LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein, Esquire
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves, Esquire
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher Seeger, Esquire
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson, Esquire
Whitfield, Bryson & Mason
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

20

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis, Esquire
HAUSFELD LLP
1700 K Street, N.W. Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Anthony D. Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

Andrew A. Lemmon, Esquire
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

**CERTIFICATE OF SERVICE**

  I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 21st day of July, 2014.

       Respectfully Submitted,

    BY: */s/ Leonard A. Davis*
       Russ M. Herman, Esquire
       Leonard A. Davis, Esquire
       Stephen J. Herman, Esquire
       Herman, Herman & Katz, LLC
       820 O'Keefe Avenue
       New Orleans, Louisiana 70113
       Phone: (504) 581-4892
       Fax: (504) 561-6024
       ldavis@hhklawfirm.com

       *Plainitffs' Liason Counsel*
       *MDL 2047*



TAISHAN 2006 STRUCTURE – Pre Global Offering                    August 4, 2011 Mtg.



TAISHAN 2006 STRUCTURE – Pre Global Offering                                                  August 4, 2011 Mtg.

1. State Owned Asset Supervision and Administration Commission of the State Counsel [Doc. Ref. Taishan & BNBM Structure/Government Control 00113 & 00136-00137; CNBM Global Offering P. 29]
2. [Doc. Ref. CNBM Global Offering P. 27 & P. 96]
3. Beijing New Building Material (Group) Company Limited [Doc. Ref. CNBM Global Offering P. 18 & P. 96]
4. China National Building Material Import and Export Company[Doc. Ref. CNBM Global Offering P. 20 & P. 96]
5. [Doc. Ref. CNBM Global Offering P. 19 & P. 96]
6. China Cinda Asset Management Corporation [Doc. Ref. CNBM Global Offering P. 20 & P. 96]
7. [Doc. Ref. CNBM Global Offering P. 20 & P. 96]
8. [Doc. Ref. CNBM Global Offering P. 18 & P. 96]
9. [Doc. Ref. CNBM Global Offering P. 31 & P. 96]
10. [Doc. Ref. Jia Tongchun Deposition, Dated April 5, 2011 P. 480:24 – 481:24; Wenlong Peng Deposition, Dated April 7, 2011 P. 135:3-5 & Declaration of Jia Tongchun dated August 15, 2010, Paragraph 39]

**History**

Before the establishment of the Company as a joint stock limited company on March 28, 2005, our cement, lightweight building materials, glass fiber and FRP products and engineering services businesses were conducted by Parent through its subsidiaries. Parent is a state-owned enterprise under the direct supervision and administration of SASAC. Parent, formerly known as China National New Building Material Company (中國新型建築材料公司), was established as the holding company of the building materials businesses of the PRC government in 1984.

*Cement*

*China United*

China United, being the holding company of our cement business, was converted from China National New Building Material Import and Export Company (中國新型建築材料進出口公司), a state-owned enterprise established in January 1985, to a limited liability company, in June 1999. Upon completion of the conversion, Parent directly and indirectly held the entire equity interest in China United.

Prior to the Reorganization, China United conducted its cement operations, including our current NSP cement operations, primarily through Lunan Cement, Julong Cement and Nanyang Hangtian. Lunan Cement Plant (魯南水泥廠), a cement plant established by the PRC Government in 1993, was acquired by Parent Group and underwent a debt restructuring arrangement in 1999. Lunan Cement Plant's assets were injected into China United in 1999 and in the same year, Lunan Cement Plant was converted into Lunan Cement whereby its equity interests were held by China United and Shandong International Trust Investment Company Limited (山東省國際信托投資有限公司) as to 74.78% and 25.22%, respectively. In May 2000, an additional 5.56% equity interest in Lunan Cement was allocated to China United, thereby increasing its equity interest to 80.34%.

Julong Cement was a limited liability company converted in 1996 from Huaihai Cement Plant (淮海水泥廠), a cement plant established by the PRC Government in 1979. Julong Cement's 73.8% equity interest was allocated by the PRC Government to Parent in April 2002 and by Parent to China United in July 2002.

Nanyang Hangtian was established in 1987. Its entire equity interest was allocated by the PRC Government to Parent in 1999 and by Parent to China United in May 2001. In 2003, Nanyang Hangtian established a branch factory in Zhenping for the production of cement using NSP technology.

In 2004, a subsidiary of China United, Qingzhou, was established to operate Parent's cement business in Qingzhou, Shandong. Our new cement plant in Qingzhou is still under construction and is scheduled for completion by the end of 2006.

In April 2005, China United acquired Shizhongqu's 30% equity interest in Zaozhuang Luhong at a consideration of RMB9 million and contributed RMB20 million to its capital. As a result, China United obtained a 58% equity interest in Zaozhuang Luhong.

On April 20, 2005, China United and Xinlei entered into a debt restructuring agreement for the transfer of Xinlei's 67.71% equity interest in Ziyan to China United to set off Xinlei's indebtedness of approximately RMB 33 million to China United. The set off amount was determined by reference to the net asset value of Ziyan as at 31 March 2005.

After acquiring a majority interest in each of Ziyan and Zaozhuang Luhong, China United's cement operations were expanded to Xingtai, Hebei and Zaozhuang, Shandong. Immediately before the Reorganization, China United was directly and indirectly owned as to 100% by Parent and principally managed by Mr. Cui Xingtai (崔星太), Mr. Zhang Jindong (張金棟), Mr. Song Zhiping (宋志平), Mr. Tian Ye (田野), Mr. Xing Ning (邢寧) and Mr. Guo Yiming (郭一鳴).

*Other Investments of Parent*

In 2001 and 2002, Parent transferred to China United by way of allocation at nil consideration its minority equity interests in certain cement operations, including Guangxi Yufeng Cement Group Company Limited (廣西魚峰水泥集團有限公司), Hubei Baoshi Group Guanghua Cement Company Limited (湖北寶石集團光華水泥有限公司), Guangxi Hongshuihe Cement Company Limited (廣西紅水河水泥股份有限公司), Hunan Shaofeng Cement Group Company Limited (湖南韶峰水泥集團有限公司), Gansu Qilianshan Building Material Holding Company Limited (甘肅祁連山建材控股有限公司), Sichuan Jinsha Cement Company Limited (四川金沙水泥股份有限公司), Inner Mongolia Wulan Cement Company Limited (內蒙古烏蘭水泥有限公司), Henan Yunan Cement Company Limited (河南豫南水泥有限責任公司) and Heilongjiang Haolianghe Cement Company Limited (黑龍江浩良河水泥有限責任公司). Parent's equity interest in each of the above companies was less than 20%.

## *Lightweight Building Materials*

We operate our lightweight building materials business through BNBM, a company whose A shares have been listed on the Shenzhen Stock Exchange since 1997. Prior to the Reorganization, BNBM was a subsidiary of BNBMG, a wholly-owned subsidiary of Parent. The history of BNBMG can be traced back to the establishment of Beijing New Building Materials Testing Factory (北京新型建築材料試驗廠) in 1977. With the approval of SETC and the State Building Material Industry Bureau in 1995, the factory was converted into BNBMG. Immediately before the Reorganization, BNBM was owned as to 60.33% by BNBMG and the remainder by the public. It was principally managed by Mr. Cao Jianglin (曹江林) (who has managed BNBM as a director from April 2001 to the present and is also an executive Director and president of the Company, the chairman of BND, BNBM Homes and BNBM, a director of China Composites and China Triumph), Mr. Wang Bing (王兵) (who has managed BNBM as a general manager from February 2004 to the present and is also a director of Tianfeng, China United and Taihe), Mr. Lu Jinshan (盧金山) (who has managed BNBM as a director from June 1997 to the present and is also the vice chairman of BNBM and a director of BND), Mr. Zhou Huan (周桓) (who has managed BNBM as a deputy general manager from June 1997 to the present), Mr. He Jingjing (何晶晶) (who has managed BNBM as a chief engineer from November 2001 to the

present and deputy general manager from 2004 to the present), Mr. Li Yimin (李誼民) (who managed BNBM between May 1997 and February 2004 and is also an executive Director and vice president of the Company) and Mr. Bao Wenchun (包文春) (who managed BNBM between May 1997 and October 2004, and is also a Supervisor of the Company).

In 2001, BND was founded by BNBM, China National Building Material and Equipment Import and Export Zhujiang Company (中國建築材料及設備進出口珠江公司), BNBMG and Shenzhen Zhujiang Building Material Enterprise Company (深圳珠江建材實業公司), to operate our international trading business and retail distribution business.

In 2002, BNBM entered into a joint venture, BNBM Homes, with BNBMG, Nippon Steel Corporation, Toyota Motor Corporation and Mitsubishi Corporation for developing the business of prefabricated homes. BNBM currently has a 64% equity interest in BNBM Homes.

In 2005, BNBM further expanded its gypsum boards and acoustical ceiling panels businesses.

On February 25, 2005, BNBM entered into a share transfer agreement for acquiring a 50% and a 25% equity interest in Tianfeng from Yan Yu and Zhang Zhonghua, respectively, for a total consideration of RMB 22 million. The consideration was determined by reference to the net asset value attributable to such equity interest as at October 31, 2004.

On March 19, 2005, BNBM entered into a share subscription agreement for, among other things, the subscription of 65,362,500 shares, representing 42% of the registered capital of Taihe upon completion of the share subscription. The subscription price paid by BNBM was approximately RMB 117.65 million, which was determined by reference to the net asset value of Taihe as at March 31, 2005.

***Glass Fiber and FRP Products***

*China Fiberglass*

China Fiberglass is the holding company of our glass fiber business. It was formerly named China National Chemical Building Material Company Limited (中國化學建材股份有限公司), a joint stock limited company established by Parent, Zhejiang Tongxiang Zhenshi Company Limited (浙江桐鄉振石股份有限公司), Zhejiang Yonglian Group Company (浙江永聯集團公司) and CNBM Equipment as promoters. Its A shares have been listed on the Shanghai Stock Exchange since April 1999.

China Fiberglass operates its business primarily through Jushi Group, a sino-foreign equity joint venture established by China National Chemical Building Material Company Limited, the staff shareholding union of Jushi Group and Surest Finance Limited in June 2001.

Immediately before the Reorganization, China Fiberglass was principally managed by Mr. Cao Jianglin (曹江林), Mr. Zhang Yuqiang (張毓強), Mr. Chen Lei (陳雷), Mr. Jia Jianjun (賈建軍) and Mr. Chen Tieshen (陳鐵身).

*China Composites*

China Composites is the holding company of our FRP products business. It was formerly named China National Inorganic Non-Metal Material Technology Enterprise Company (中國無機非金屬材料科技實業公司). China National Inorganic Non-Metal Material Technology Enterprise Company was established in June 1988 as an enterprise under the State Building Materials Industry Bureau and was one of the parties to a merger in 1996 that resulted in the formation of China Composites (formerly named China National Inorganic Non-Metal Material Technology Corporation (中國無機非金屬材料科技實業總公司) and China National Inorganic Non-Metal Technology Group Company (中國無機材料科技實業集團公司). In 1999, China Composites was separated from the State Building Materials Industry Bureau and transferred to Parent by way of allocation at nil consideration. Immediately before the Reorganization, China Composites was principally managed by Mr. Zhang Dingjin (張定金) and Mr. Xue Jirui (薛繼瑞).

We operate our FRP pipes and tanks business primarily through Zhongfu Lianzhong, a subsidiary of China Composites. Zhongfu Lianzhong was converted from an FRP pipes and tanks factory in Lianyungang, established in October 1989, into a limited liability company in October 1997. In 2003, Parent acquired, through China Composites, a 51% equity interest in Zhongfu Lianzhong by injecting cash into its capital in 2003 and increased its equity interest in Zhongfu Lianzhong to 94.5% in 2005.

We operate our glass fiber mats business through Zhongxin Tianma, a sino-foreign equity joint venture established by Tianma Group, Parent and JM International in December 1995. In 2004, Parent transferred its 40% equity interest in Zhongxin Tianma to China Composites by way of allocation at nil consideration.

Zhongfu Liberty was established by China Composites and CNBM Equipment in December 2003. On February 10, 2004, CNBM Equipment and Liberty Group entered into a share transfer agreement for the transfer of CNBM Equipment's 20% equity interest in Zhongfu Liberty to Liberty Group at a consideration of RMB 10 million. It is principally engaged in the production of glass fiber and composites products.

After a series of share allocations in 1999 and 2002, China Composites acquired from China National Building Material Technology and Equipment Company (中國建材技術裝備公司) and Beijing Zhongbei Glass Industrial Company (北京中北玻璃工業公司) a 16.83% equity interest in Yaohua, a major float glass manufacturer in the PRC, whose shares are listed on the Shanghai Stock Exchange.

*Engineering Services*

We carry out engineering services through China Triumph. China New Building Material Property Development Company (中國新型建築材料房地產開發公司), a wholly-owned subsidiary of Parent, was renamed China Triumph International Engineering Consulting Company (中國凱盛國際工程諮詢公司) and changed its scope of business to the provision of engineering design and construction services in July 2000 and further changed its name to China Triumph International Engineering Company (中國凱盛國際工程公司) in March 2002. China Triumph initially provided its services to glass manufacturers and later extended its services to cement manufacturers through Nanjing Triumph.

Nanjing Triumph was established by China Triumph and Bengbu Design & Research Institute for Glass Industry (蚌埠玻璃工業設計研究院) on December 26, 2001. Shenzhen Triumph was established by China Triumph, Bengbu Huajin Technology Development Company Limited (蚌埠市華金技術開發有限責任公司) and 13 individuals on April 8, 2002. Bengbu Triumph was established by China Triumph, Shenzhen Triumph and Nanjing Triumph in July 2004. It principally supplies equipment for projects undertaken by China Triumph, Nanjing Triumph and Shenzhen Triumph. Immediately before the Reorganization, China Triumph was principally managed by Mr. Peng Shou (彭壽) and Mr. Shi Chunren (施純仁).

## Reorganization

In anticipation of the Global Offering, we underwent the Reorganization. The objective of the Reorganization was to position the Company, then a wholly-owned subsidiary of Parent, as the holding company of our cement, lightweight building materials, glass fiber and FRP products and engineering services businesses. Our proposal for the Reorganization was approved by SASAC in November 2004.

Prior to the Reorganization, CNBM Equipment was principally engaged in the import and export business. As part of the Reorganization, (i) CNBM Equipment transferred all of its operations, assets and liabilities to CNBM Trading, a subsidiary of Parent, by way of allocation at nil consideration; and (ii) Parent Group injected into CNBM Equipment all of our current operations, assets and liabilities. We underwent a series of asset and shareholding restructuring, which included the following:

### *Cement*

The purpose of the Reorganization included the separation of our NSP cement operations from other operations. The asset restructuring of China United involved the following:

- On September 30, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 441) the restructuring of China United. The restructuring involved the disposal by China United of assets mainly relating to its mining and vertical kiln cement operations and minority interests in certain cement operations and the capitalization of retained earnings of approximately RMB 9.75 million. As a result, China United was held as to 44.79%, 47.42% and 7.79% by Parent, CNBM Equipment and Hefei Institute, respectively.

- On November 2, 2004, Parent approved the adjustment of the shareholding structure of China United (Zhong Jian Cai Ban Fa [2004] No. 442), under which (a) Parent transferred a 9.9% equity interest in China United to BNBMG; (b) CNBM Equipment transferred its entire 47.42% equity interest in China United to CNBM Trading; and (c) Hefei Institute transferred its entire 7.79% equity interest in China United to Parent. As a result, China United was held as to 42.68%, 47.42% and 9.9% by Parent, CNBM Trading and BNBMG, respectively.

- On December 3, 2004, Parent approved (Zhong Jian Cai ban Fa [2004] No. 514) the transfer of a 90.1% equity interest in China United. Pursuant to the approval, Parent and CNBM Trading transferred their respective entire 42.68% and 47.42% equity interest in China United to CNBM Equipment. As a result, China United was held as to 90.1% by CNBM Equipment.

- China United retained the assets and liabilities relating to NSP cement production that were held by Lunan Cement (through Luhong), Julong Cement (through Huaihai) and Nanyang Hangtian's Zhenping branch factory (through Nanyang), prior to the Reorganization, as they were the core cement operations of Parent. Other assets and liabilities, including cement operations using the vertical kiln technique and the mining rights in respect of certain limestone and clay quarries, were transferred to Parent by way of allocation at nil consideration. Such assets and liabilities were historically associated with the NSP cement production, but do not form part of the core business.

- China United transferred to Parent Group its 98.55% equity interest in Xinlei as well as minority investment holdings in certain cement operations in Guangxi, Hunan, Hubei, Henan, Gansu, Sichuan, Inner Mongolia Autonomous Region and Heilongjiang by way of allocation at nil consideration. Xinlei is currently principally engaged in the production of cement using the vertical kiln technique.

### *Lightweight Building Materials*

- On December 27, 2004, SASAC issued an approval (Guo Zi Chan Quan [2004] No. 1204) approving, amongst other things, the transfer of BNBMG's 60.33% equity interest in BNBM to CNBM Equipment.

- On January 28, 2005, CSRC issued an opinion (Zheng Jian Gong Si Zi [2005] No. 6) relating to, amongst other things, the waiver from the obligation for CNBM Equipment to make a general offer for the A shares in BNBM, which were listed on the Shenzhen Stock Exchange, as a result of the above transfer.

- On March 24, 2005, registration procedures relating to the transfer of BNBMG's 60.33% equity interest in BNBM to CNBM Equipment were completed. As a result, BNBM was held as to 60.33% by CNBM Equipment and 39.67% by the public.

### *Glass Fiber and FRP Products*

#### *China Fiberglass*

- On December 28, 2004, SASAC issued an approval (Guo Zi Chan Quan [2004] No. 1204) approving, amongst other things, the transfer of BNBMG's 37.79% equity interest in China Fiberglass to CNBM Equipment.

- On January 28, 2005, CSRC issued an opinion (Zheng Jian Gong Si Zi [2005] No. 6) relating to, amongst other things, the waiver from the obligation for CNBM Equipment to make a general offer for the A shares in China Fiberglass, which were listed on the Shanghai Stock Exchange, as a result of the above transfer.

- As part of the Reorganization, (i) BNBMG and CNBM Trading respectively transferred to CNBM Equipment 37.79% and 0.31% equity interests in China Fiberglass by way of allocation at nil consideration; and (ii) CNBM Equipment acquired a 2.07% equity interest from China Fiberglass for a total cash consideration of RMB12,890,000. As a result, China Fiberglass was held as to 40.17% by CNBM Equipment.

*China Composites*

- On July 14, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 283) the transfer of China Composites' equity interests in companies which it does not control, have ceased operation or do not produce its core glass fiber mats and FRP products (including certain glass product manufacturers) to Parent Group at nil consideration.

- On September 8, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 353) the conversion of China Composites into a limited liability company. Upon completion of the conversion, China Composites was held as to 80% and 20% by CNBM Equipment and Parent, respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 444) the transfer of CNBM Equipment's 3% equity interest in China Composites to Parent at nil consideration. As a result of such transfer, China Composites was held as to 77% and 23% by CNBM Equipment and Parent, respectively.

- On December 17, 2004, Parent and China Fiberglass entered into a share transfer agreement for the transfer of Parent's 23% equity interest in China Composites to China Fiberglass. As a result, China Composites was held as to 77% and 23% by CNBM Equipment and China Fiberglass, respectively.

- As part of the Reorganization, China Composites retained the assets and liabilities which form part of its core glass fiber mats and FRP products business. China Composites' equity interests in companies which it does not control, have ceased operation or do not produce its core products were transferred to Parent Group by way of allocation at nil consideration.

*Engineering Services*

- On July 30, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 282) the transfer of cash of RMB 11 million held by Bengbu Design and Research Institute for Glass Industry, a wholly-owned subsidiary of Parent, to China Triumph, to ensure that China Triumph has sufficient funds to meet its working capital requirement. Such funds were mainly used by China Triumph for purchasing supplies for its engineering services business.

- On September 8, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 352) the conversion of China Triumph into a limited liability company. Upon completion of the conversion, China Triumph was held as to 91% and 9% by Parent and Bengbu Huajin Technology and Development Company Limited (蚌埠市華金技術開發有限責任公司), respectively.

- On November 2, 2004, Parent approved (Zhong Jian Cai Ban Fa [2004] No. 443) the transfer of Parent's 91% equity interest in China Triumph to CNBM Equipment at nil consideration. As a result, China Triumph was held as to 91% and 9% by CNBM Equipment and Bengbu Huajin Technology and Development Company Limited (蚌埠市華金技術開發有限責任公司), respectively.

*Properties*

- On January 27, 2005, Beijing Haidian State Land Resources and Housing Management Bureau (北京市海澱區國土資源和房屋管理局) approved the allocation of the land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 sq.m. from BNBMG to CNBM Equipment.

- On April 18, 2005, Beijing Municipal State Land Resources Bureau (北京市國土資源局) approved the change of the registered owner of the land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 sq.m. from CNBM Equipment to the Company.

As a result, the Company currently holds, directly and indirectly, the following:

- 96.07% equity interest in China United;

- 60.33% equity interest in BNBM;

- 40.17% equity interest in China Fiberglass;

- 86.24% equity interest in China Composites;

- 91.00% equity interest in China Triumph; and

- land use rights in respect of 11 parcels of land having a total area of approximately 383,906.88 square meters, which is occupied by us for production and office purposes.

**Split Share Structure Reform**

The Company currently holds equity interests directly or indirectly in three public companies listed in the PRC, namely, BNBM, China Fiberglass and Yaohua. As with most other public companies listed in the PRC, these companies had a "split share" structure during the Track Record Period, whereby in addition to freely tradable shares denominated in RMB, or "A shares," listed on the PRC stock exchanges, these companies had also issued non-tradable shares. All of the Company's equity interests in BNBM and China Fiberglass are held in the form of non-tradable shares. All of the Company's equity interests in Yaohua were held in the form of non-tradable shares during the Track Record Period.

On September 4, 2005, the CSRC issued "Administrative Measures on the Split Share Structure Reform of Listed Companies," permitting companies listed in the PRC to eliminate the transfer restrictions placed on their non-tradable shares through a consideration arrangement that balances the interests of holders of non-tradable shares and those of holders of A shares (the "Conversion Scheme"). In accordance with such measures, holders of at least two-thirds of a listed company's non-tradable shares shall have the power to propose and then negotiate a Conversion Scheme with holders of A shares. The Conversion Scheme is then subject to the approval of two-thirds majority of the holders of A shares participating in the vote, two-thirds majority of all shareholders participating in the vote and, in the case of BNBM and China Fiberglass, the SASAC.

# HISTORY, REORGANIZATION AND GROUP STRUCTURE

The consideration arrangements under the Conversion Schemes proposed or implemented to date have been primarily in the form of share transfers from holders of non-tradable shares to holders of A shares, and in certain cases supplemented or substituted by other considerations, including, without limitation, payments in cash, issuances of warrants, cancellation of outstanding non-tradable shares, promises of asset injections into listed companies by holders of non-tradable shares, or a combination of the above.

The Company currently holds a 60.33% equity interest, while holders of A shares have a 39.67% equity interest, in BNBM. As at September 30, 2005, BNBM had a net asset value of RMB 1,396.3 million, of which the Group's share of interest amounted to RMB 842.4 million. For the nine months ended September 30, 2005, BNBM generated a net profit of RMB 84.0 million, of which RMB 50.7 million was attributable to the Group. The Company currently has no plan to propose a Conversion Scheme with respect to BNBM prior to the Global Offering. If the Company were to propose a Conversion Scheme with respect to BNBM following the Global Offering, the Company's equity interest in BNBM and/or the Company's asset value may be reduced as a result of the consideration arrangement involved in the Conversion Scheme. If the proposed Conversion Scheme involves only the transfer of non-tradable shares from the Company to holders of A shares of BNBM, the Company's equity interest in BNBM will be reduced. As a result, the Company will incur a one-time disposal charge in the net asset value of BNBM and a recurring reduction of BNBM's income attributable to equity holders of the Company, both in proportion to the non-tradable shares transferred from the Company to the holders of A shares of BNBM. If the Conversion Scheme involves only payment of cash by the Company to the holders of A shares of BNBM, the Company's equity interest in BNBM will not be affected, but the net asset value of the Company will be reduced by the amount of cash paid to the holders of A shares of BNBM. If the Conversion Scheme involves both the transfer of non-tradable shares and the payment of cash the Company will be subject to a combined effect discussed above. It is currently the intention of the Company that it will not propose any Conversion Scheme pursuant to which the Company will not be able to maintain its controlling position in BNBM.

The Company currently holds a 40.17% equity interest, while holders of A shares have a 33.33% equity interest and certain other shareholders hold a 26.50% non-tradable equity interest, in China Fiberglass. As at September 30, 2005, China Fiberglass had a net asset value of RMB 691.0 million, of which the Group's share of interest amounted to RMB 277.6 million. For the nine months ended September 30, 2005, China Fiberglass generated a net profit of RMB 89.0 million, of which RMB 35.8 million was attributable to the Group. The Company currently has no plan to propose a Conversion Scheme with respect to China Fiberglass prior to the Global Offering. If the Company were to propose a Conversion Scheme with respect to China Fiberglass following the Global Offering, the Company's equity interest in China Fiberglass and/or the Company's asset value may be reduced as a result of the consideration arrangement involved in the Conversion Scheme. If the proposed Conversion Scheme involves only the transfer of non-tradable shares from holders of non-tradable shares to holders of A shares of China Fiberglass, the Company's equity interest in China Fiberglass will be reduced. As a result, the Company will incur a one-time disposal charge in its share of the net asset value of China Fiberglass and a recurring reduction of its share of profit of associates from China Fiberglass, both in proportion to the non-tradable shares transferred from the Company to the holders of A shares of China Fiberglass. If the Conversion Scheme involves only a payment of cash by the holders of non-tradable shares to the holders of A shares of China Fiberglass, the Company's equity interest in China Fiberglass will not be affected, but the net asset value of the Company will be reduced by the amount of cash paid by the Company to the holders of A shares of China Fiberglass. If the Conversion Scheme involves both the transfer of non-tradable shares and the payment of cash, the Company will be subject to a combined effect discussed above.

In the event that either BNBM or China Fiberglass implements a Conversion Scheme following the Global Offering that requires holders of non-tradable shares to pay a consideration in excess of two non-tradable shares for every ten A shares, Parent has agreed to be responsible for the excess consideration payable by the Company.

China Composites held a 16.83% equity interest in the form of non-tradable shares in Yaohua, including a 0.13% equity interest held in the form of a special type of publicly purchased non-tradable shares, during the Track Record Period. The shareholders of Yaohua recently approved and Yaohua implemented a Conversion Scheme whereby each holder of A shares in Yaohua was entitled to receive from holders of non-tradable shares (excluding the special type of public purchased non-tradable shares) of Yaohua 3.5 existing non-tradable shares in respect of every ten existing A shares held, and following which all the non-tradable shares were converted to A shares. The implementation of this Conversion Scheme reduced the Company's total equity interests in Yaohua to approximately 16.26%. As at September 30, 2005, Yaohua had a net asset value of RMB 1,868.3 million, of which the Group's share of interest amounted to RMB 242.1 million. For the nine months ended September 30, 2005, Yaohua generated a net profit of RMB 101.4 million, of which RMB 13.1 million was attributable to the Group.

## Segregation of Certain Liabilities

Immediately prior to disposal of all assets and liabilities by CNBM Equipment to CNBM Trading, CNBM Equipment had certain liabilities of (1) approximately RMB 25.9 million plus accrued interest arising from a bank debt incurred by it prior to such disposal, and (2) RMB 28.0 million plus penalty and accrued interest arising from a legal proceeding against CNBM Equipment prior to the disposal. As part of the Reorganization, these liabilities were transferred to CNBM Trading. However, based on the advice of our PRC legal counsel, we may remain liable if CNBM Trading fails to fulfill its obligations in respect of these transferred liabilities (the "Transferred Liabilities").

CNBM Trading has agreed with us to be responsible for the Transferred Liabilities. In addition, pursuant to an indemnification undertaking, Parent has agreed to indemnify and hold us harmless against all damages that may arise from the Transferred Liabilities. This above-mentioned indemnity includes, without limitation, all payments, costs or expenses arising from the resolution of related claims. See "*Risk Factors — Risks Relating to the Group — Failure by Parent Group to fulfill its obligations to us may have a material adverse effect on our business operations, growth prospects and profitability*."

We may be liable for the Transferred Liabilities only if: (1) CNBM Trading fails to fulfill its obligations in respect of the Transferred Liabilities; and (2) Parent fails to indemnify and hold us harmless against all damages that may arise from the Transferred Liabilities. As at September 30, 2005, the Transferred Liabilities represented approximately 1.66% (excluding the accrued interest in relation to the bank debt and the penalty and interest in relation to the legal proceeding against CNBM Equipment) of the consolidated net assets of the Company.

After the Reorganization, we entered into two debt restructuring agreements with Parent Group on May 16, 2005 and May 20, 2005 to settle certain outstanding amounts due from and to Parent Group. After a series of debt restructuring as provided in the above debt restructuring agreements, a total of approximately RMB 57.3 million due from Parent to us was set off against part of the dividend declared by the Company in favour of Parent. See "*Financial Information — Dividends*", "*Appendix I — Accountants' Report — Note 25. Amounts due from and to related parties*" and "*Appendix VIII — Statutory and General Information — Further Information about the Business — Summary of materials contracts.*"

## Establishment of the Company

With Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy as Promoters, the Company was converted into a joint stock limited company on March 28, 2005. The Company allotted and issued a total of 1,387,760,000 Domestic Shares to the Promoters according to their respective contributions. Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy contributed by way of assets and cash RMB566,579,600, RMB1,261,969,800, RMB193,440,800, RMB112,000,000 and RMB1,000,000 to the capital of the Company, respectively. As a result, the Company was held as to 26.54%, 59.11%, 9.06%, 5.25% and 0.05% by Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy, respectively.

To effect the Reorganization, the Company and the Promoters entered into the Reorganization Agreement on March 7, 2006, pursuant to which the Promoters have agreed to indemnify the Company against any claims or costs incurred in connection with or arising from the Reorganization. These are more fully described in "*Connected Transactions — Non-Recurrent Connected Transactions — Reorganization Agreement.*"

Parent retained some of its cement operations as well as certain design and research institutes which provide engineering services to cement and glass manufacturers. To deal with competition between the businesses retained by Parent and our businesses, the Company entered into a Non-Competition Agreement with Parent on February 28, 2006, details of which are set out in "*Relationship with Parent — Competition — Non-Competition Agreement.*"

Parent retained certain non-core assets which will continue to provide certain production supplies and support services to our core businesses after the Reorganization. Parent also retained its mining operations in respect of certain limestone and clay quarries. The quarries were not transferred to us as part of the Reorganization because the nature of the mining operations is very different from that of our core business, which is mainly the production and sale of building materials. We have entered into a number of agreements with Parent for these transactions, the terms of which are described in more detail below in the section headed "*Connected Transactions.*"

Further details of the Reorganization and subsequent shareholding changes are set out in "*Further Information About the Company — 4. Corporate Reorganization and Subsequent Shareholding Changes*" in Appendix VIII to this prospectus.

## Group Structure

The following charts set out the simplified corporate structure of the Group immediately before the Global Offering, assuming no changes in shareholding after the Latest Practicable Date (all percentages shown are approximate figures):



* Sum of these shareholding percentages may differ from total due to rounding.

The following chart sets out the simplified corporate structure of the Group immediately after the Global Offering, assuming the Over-allotment Option is not exercised:



* Sum of these shareholding percentages may differ from total due to rounding.



TAISHAN 2006 STRUCTURE – Post March 16 Global Offering

August 4, 2011 Mtg.



Q000956

TAISHAN 2006 STRUCTURE – Post March 16 Global Offering        August 4, 2011 Mtg.

1. State Owned Asset Supervision and Administration Commission of the State Counsel [Doc. Ref. Taishan & BNBM Structure/Government Control 00113 & 00136-00137; CNBM Global Offering P. 29]
2. [Doc. Ref. CNBM Global Offering P. 27 & P. 97]
3. Beijing New Building Material (Group) Company Limited [Doc. Ref. CNBM Global Offering P. 18 & P. 97]
4. China National Building Material Import and Export Company[Doc. Ref. CNBM Global Offering P. 20 & P. 97]
5. [Doc. Ref. CNBM Global Offering P. 19 & P. 97]
6. China Cinda Asset Management Corporation [Doc. Ref. CNBM Global Offering P. 20 & P. 97]
7. [Doc. Ref. CNBM Global Offering P. 97]
8. [Doc. Ref. CNBM Global Offering P. 20 & P. 97]
9. [Doc. Ref. CNBM Global Offering P. 18 & P. 97]
10. [Doc. Ref. CNBM Global Offering P. 31 & P. 97]
11. [Doc. Ref. Zhang Deposition, Dated April 6, 2011 P. 141:24 – 142:21; Jai Deposition, Dated April 5, 2011 P. 480:24 – 481:24; Peng Deposition, Dated April 7, 2011 P. 135:3-5 & Declaration of Jia Tongchun dated August 15, 2010, Paragraph 39]
12. [Doc. Ref. China National Building Company Limited Announcement re: Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment Trading Company Limited Connected Transaction Provision of Financial Assistance to Taian State Owned Assets Management Company]

TAISHAN 2010 STRUCTURE

August





TAISHAN 2010 STRUCTURE                                                    August 4, 2011 Mtg.

1.  State Owned Asset Supervision and Administration Commission of the State Counsel [Doc. Ref. "Meeting 1"]
2.  [Doc. Ref. CNBM 2010 Annual Report P. 8 & P. 13]
3.  Beijing New Building Material (Group) Company Limited [Doc. Ref. CNBM 2010 Annual Report P. 7 & P. 13]
4.  China National Building Material Import and Export Company [Doc. Ref. CNBM 2010 Annual Report P.8 & P. 13]
5.  China Building Materials Academy [Doc. Ref. CNBM 2010 Annual Report P. 7 & P. 13]
6.  China CINDA Asset Management Co., Ltd [Doc. Ref. CNBM 2010 Annual Report P. 8 & P. 13]
7.  [Doc. Ref. CNBM 2010 Annual Report P. 13]
8.  [Doc. Ref. CNBM 2010 Annual Report P. 8 & P. 13]
9.   [Doc. Ref. CNBM 2010 Annual Report P. 7 & P. 13]
10. [Doc. Ref. CNBM 2010 Annual Report P. 11 & P. 13] and Affidavit of Jia Tongchun dated September 16, 2010,
Paragraph 3, filed in Southern Homes, LLC vs. Interior/Exterior Building Supply, LLP, et al, CDC Docket No. 2009-6564
(in 2007, Shandong Taihe Dongxin Co., Ltd. became Taishan Gypsum Company Limited)
11. [Doc. Ref. Affidavit of Jia Tongchun dated September 16, 2010 filed in Southern Homes, LLC vs. Interior/Exterior
Building Supply, LLP, et al, CDC Docket No. 2009-6564, Paragraph 26 & Declaration of Jia Tongchun dated August 15,
2010, Paragraph 39]

E-SERVICE
55762304
Jul 21 2014
03:16PM
File & ServeXpress

## Illustration of Shareholding and Controlling Relation between BNBM and Its Ultimate Controlling Shareholders



E-SERVICE
55762304
Jul 21 2014
03:16PM
File & ServeXpress

**Taishan Directors and Super**

| Name | TG | | | BNBM | | | CNBM | | |
|---|---|---|---|---|---|---|---|---|---|
| | Role | Title | Years | Role | Titile | Years | Role | Title | Years |
| Cao, Jianglin | x | Supervisor/ Chairman of Supervisory Committee | 2005 (TG 0020663) to present | x | Chairman( 2004- 2009)/ CPC Committee Secretary (2005-2009)/Chairman of Supervisory Committee (starting in 2009) (BNBM 2010 Annual) | 2004 to present | x | President/Executive Director | 2005 to present (BNBM 2010 Annual) |
| Wang, Bing | x | Director /Member of Compensation Committee (Starting in 2008) (TG 0020787) | 2005 (TG 0020601) to present | x | Director/GM (2004-2009)/ Chairman(starting in 2009) (BNBM 2010 Annual) | 2004 to present | x | VP | 2009 to present (BNBM 2010 Annual) |
| Yang, Yanjun | x | Director/Representative of BNBM | 2006 (TG 0020675) to present | x | Deputy GM/CFO/Finance Director | 2005 to present | x | Chief Accountant/Deputy GM | record 2010 |
| Hu, Jinyu | | Director | 2005 (TG 0020601) to 2006 (TG 0020675) | x | Supervisor | 2005 to present | | Manager of Audit Department (BNBM 2010 Annual) | 2005 to present |
| Jia, Jianjun | x | Director | 2005(TG 0020601) to 2008 (TG 0020760) | x | Deputy GM/Secretary to Board | 2005-2008 (BNBM 2008 Annual) | | | |
| Zhang, Nailing | | Director | Starting in 2008 (TG 0020760) | x | Director/Deputy GM (starting 2005) | 2004 to present | | | |
| Jia, Tongchun | x | Director/GM/Chairman | all record time | x | Director ( Starting in 2008 )/Deputy GM | 2005 to present | | | |
| Fu, Tinghuan | x | Supervisor (Starting in 2005) (TG 0020601) /Deputy GM (Starting in 2008) (TG 0020787) | 2005 to present | | | | | | |
| | | Representative for Taian Anxin Investment & | | | | | | | |

**Taishan Directors and Supervisors**

| Name | TG | | | BNBM | | | CNBM | | |
|---|---|---|---|---|---|---|---|---|---|
| | Role | Title | Years | Role | Titile | Years | Role | Title | Years |
| Qin, Qingwen | x | Supervisor | 2008 (TG 0020760) to present | | | | | | |
| Ren, Xulian | x | Director (to 2007) (TG 0020715)/Deputy GM (Starting in 2002) (TG 0020587) | 2002 to present | | | | | | |
| Shan, Jianmin | x | Director /Head of Compensation Committee (Starting in 2008) (TG 0020787) / Representative for Taian State-owned Assets Management Co., Ltd. | 2007(TG 0020752) to 2010 (TG 0020805) | | | | | | |
| Zhou, Changxin | x | Director / Representative for Taian State-owned Assets Management Co., Ltd. | 2010 (TG 0020805) to present | | | | | | |
| Wan, Guangjin | x | Deputy GM | 2008 (TG 0020787) to present | | | | | | |
| Wang, Lifeng | x | Agent for government filings | all record time | | | | | | |
| Xu, Xinghu | x | Director/ Representative for Taian State-owned Assets Management Co., Ltd. | to end 2007 | | | | | | |
| Xue, Yuli | x | Director (to 2007) (TG 0020715)/Deputy GM (Starting in 2002) (TG 0020587) | 2002 to present | | | | | | |
| Yang, Quanmin | x | Supervisor | 2006 (TG 0020673) to present | | | | | | |

**Taishan Directors and Supervisors**

| Name | TG | | | BNBM | | | CNBM | | |
|---|---|---|---|---|---|---|---|---|---|
| | Role | Title | Years | Role | Titile | Years | Role | Title | Years |
| Bao, Wenchun | | | | x | Chairman of Supervisory Committee/Director (2001-2004)/ GM (2002-2004)/ Chairman (2004) (BNBM 2007 & 2008 Annuals) | 2004-2008 | x | Supervisor | 2005-2007 |
| Chang, Zhangli | | | | x | Director/Secretary to Board (2000-2005) (BNBM 2009 & 2010 Annuals) | 2008 to present | x | VP (2006 to present)/GM of Legal Div/Joint Secretary/ Board Secretary (2005-present) | 2005-present |
| Cui, Lijun | | | | x | Director | 2003 to present | x | Non-executive Director and member Audit Committee | 2005 to present |
| Li, Yimin | | | | x | GM (1997-2002)/Chairman (2002-2004) /Supervisor/Chairman of Board of Supervisors (2008-2009) (BNBM 2008 & 2009 Annuals) | 1997-2009 | x | VP and Executive Director | 2005 to present |
| Wu, Fade | | | | x | Deputy GM (BNBM 2010 Annual) | 2006 to present | x | Deputy GM | record 2010 |
| Zhou, Huan | | | | x | Deputy GM (BNBM 2010 Annual) | 1997 to present | x | Deputy GM | record 2010 |
| Zou, Yunxiang | | | | x | Deputy GM (BNBM 2010 Annual) | 2006 to present | x | Deputy GM | record 2010 |
| Chen, Yu | | | | x | Director/GM/Secretary to Board | 2009 to present | | | |
| Guang, Zhaoyu | | | | x | Director (BNBM 2007 & 2008 Annuals) | 2003-2008 | | | |
| He, Jingling | | | | x | Deputy GM (BNBM 2007 & 2008 Annuals) | 2004-2008 | | | |
| | | | | x | Independent Director (BNBM 2007 & 2008 | | | | |

**Taishan Directors and Supervisors**

| Name | TG | | | BNBM | | | CNBM | | |
|---|---|---|---|---|---|---|---|---|---|
| | Role | Title | Years | Role | Titile | Years | Role | Title | Years |
| Tao, Zheng | | | | x | Secretary to Board (BNBM 2009 & 2010 Annuals) | 2008 to 2009 | | | |
| Wang, Junsheng | | | | x | Independent Director (BNBM 2007 & 2008 Annuals) | 2002-2008 | | | |
| Xu, Jingchang | | | | x | Independent Director | 2008 to present | | | |
| Zhang, Chengong | | | | x | Deputy GM (BNBM 2009 & 2010 Annuals) | 2006 to 2010 | | | |
| Zheng, Jiayun | | | | x | Independent Director | 2003 to present | | | |
| Zhou, Jiming | | | | x | Supervisor (BNBM 2007 & 2008 Annuals) | 2000-2008 | | | |
| Cai, Guobin | | | | | | | x | VP | record 2010 |
| Chen, Xuean | | | | | | | x | CFO | record 2010 |
| Zhang, Chengong | | | | | | | x | Deputy GM | record 2010 |
| Chi, Haibin | | | | | | | x | Independent Non-executive Director and Chairmman of Audit Committee | 2005 to present |
| Cui, Shuhong | | | | | | | x | Supervisor | 2005 to present |
| Cui, Xingtai | | | | | | | x | VP and Executive Director | 2009 to present |
| Zhang, Dingjin | | | | | | | x | VP | record 2010 |
| Pei, Hongyan | | | | | | | x | Qualified Accountant | record 2010 |
| Huang, Anzhong | | | | | | | x | Non-executive Director | 2005 to present |
| Lau Ko Yuen (Tom) | | | | | | | x | Independent Non-executive Director | 2005 to present |
| Li, Decheng | | | | | | | x | Independent Non-executive Director | 2008 to present |
| Liu, Chijin | | | | | | | x | Supervisor (Independent) | 2005 to present |
| | | | | | | | | | 2008 to |

**Taishan Directors and Supervisors**

| Name | TG | | | BNBM | | | CNBM | | |
|------|-----|-------|-------|------|--------|-------|------|-------|-------|
| | Role | Title | Years | Role | Titile | Years | Role | Title | Years |
| Song, Zhiping | | | | | Chairman | 1997-2002 | x | Executive Director /Chairman/member of Remuneration Committee | 2005 to present |
| Xiao, Jiaxiang | | | | | | | x | VP | record 2010 |
| Yao, Jixin | | | | | | | x | VP | record 2010 |
| Zhang, Renwei | | | | | | | x | Independent Non-executive Director and Chairman of Remuneration Committee | 2005 to present |
| Zhang, Zhaomin | | | | | | | x | Supervisor | 2005-2007 |
| Zhou, Daojiong | | | | | | | x | Independent non-executive Director and member of Audit Committee and Remuneration Committee | 2005 to present |
| Zhou, Guoping | | | | | | | x | Supervisor | 2005 to present |
| Zuo, Fenggao | | | | | | | x | Non-executive Director | 2005 to present |
| Wei, Chunshan | | | | | | | | | |
| Li, Jiang | | | | | | | | | |
| Yu, Xianfeng | | | | | | | | | |
| Peng, Shiliang | | | | | | | | | |
| Song, Qinghai | | | | | | | | | |