# EXHIBIT "E"

### IN THE CIRCUIT COURT OF ESCAMBIA COUNTY, ALABAMA

| | | |
|---|---|---|
| **GREG E. WIGGINS and** | * | |
| **SHERRY WIGGINS** | * | **PLAINTIFFS** |
| | * | |
| | * | **CIVIL ACTION NO.:30-CV-2013-900145** |
| **vs.** | * | |
| | * | |
| **BASS HOMES, INC.; ACE HOME** | * | |
| **CENTER, INC., et al.** | * | **DEFENDANTS** |

---

### PLAINTIFF, GREG E. WIGGINS, ANSWERS and RESPONSES TO DEFENDANT, ACE HOME CENTER, INC.'S, FIRST INTERROGATORIES AND REQUESTS FOR PRODUCTION OF DOCUMENTS

---

COMES NOW, the Plaintiff, Greg E. Wiggins, along with undersigned counsel, and answers and responds to the following Interrogatories and Requests for Production of Documents as follows, to-wit:

### GENERAL OBJECTIONS

1. Each of the foregoing objections is specifically incorporated by reference into each of the following responses.

2. Plaintiffs object to Defendant's discovery requests insofar as said requests seek information or documents protected from disclosure by the attorney-client privilege or work product doctrine or which were prepared in anticipation of litigation.

3. Plaintiffs object to discovery requests to the extent that they seek information or documents that are irrelevant, immaterial and not reasonably calculated to lead to discovery of admissible evidence.

4. Plaintiffs objects to these discovery requests to the extent that they are overbroad, oppressive, duplicative and cumulative and seek information that may be

determined the entire amount of damages. They reserve the right to supplement their response to this request. However, Plaintiffs can state these damages include, but may not be limited to: the removal and abatement of the CDW and all affected components, air quality testing, cleaning, storage, moving, alternative housing, loss of use, diminished value of the home, litigation costs, expert fees and attorney fees as allowed by law. The full scope of the proposed remediation is set for in the ruling by Judge Eldon Fallon in *Hernandez v. Knauf, Case No.: 2:09-cv-06050.*

26.    Please state whether any of the allegedly defective drywall has been removed from your home, and if so, please state the date the drywall was removed, the name and address of any person present at the time the drywall was removed and please provide the name and address of the current custodian of the drywall.

ANSWER: None of the defective drywall has been removed from the home.

27.    In your Complaint you allege that you are an intended third-party beneficiary to an agreement made by Bass Homes, which was breached by "subcontractors" (Compl. ¶¶ 96-101). Please describe each and every agreement including its terms to which you contend you are a third-party beneficiary from a contract entered into by Ace Home Center, Inc. Identify any information, witnesses, and/or documentation, which tends to support or refute your position, and produce any documents that support or refute the same.

ANSWER: At this time Plaintiffs have not received discovery from Ace Home Center relative to these matters, therefore, they will supplement their Answer to this Interrogatory.

28.    In your Complaint you allege Ace Home Center, Inc. is guilty of violating the Deceptive Trade Practices Act as defined in § 8-19-1, et seq. of the Alabama Code

(1975). Regarding these allegations, identify the particular section and/or subsection of the Act that you claim was violated by Ace Home Center, Inc. and state each and every fact that supports said claim. Identify each and every person with any information, witnesses, and/or documentation, which tends to support or refute your position, and produce any documents that support or refute the same.

**ANSWER: This is due to the fact that the drywall in question was not only defective Chinese drywall but was salvaged drywall taken from a marine vessel, *Sanco Rilley*, which was not disclosed to the Plaintiffs at any given time. Please refer to the depositions previously produced.**

**Plaintiffs would further state that they have learned from prior litigation the following facts:**

**1.     Devon International Industries, Inc. received an order from North Pacific ("NorPac") for the manufacture of 485,044 pieces of gypsum drywall in accordance with "North American ASTM Standards" (Deposition of Ruth Wu, page 54).**

**2.     When Devon received the order from NorPac for the manufacturer of gypsum drywall in accordance with ASTM Standards, Ruth Wu was serving as the Vice President of Devon International Industries, Inc., f/k/a Devon International Trading, Inc. (hereinafter referred to as "Devon"). Robert Scharf served as the President of Devon. (Deposition of Wu, pages 18-20).**

**3.     As Vice President of Devon, Ruth Wu's duties included obtaining quality standards and specifications from customers and conveying them to Devon's office in Shanghai, China. (Deposition of Wu, pages 24-26). The project managers working for Devon out of the Shanghai, China office were responsible for coordinating with factories in China to manufacture the products to the**

19

quality standards and specifications provided by Ms. Wu on behalf of Devon. (Deposition of Wu, pages 24-26, 29). According to Ms. Wu, Devon's customers relied on Devon to provide proper samples of the products manufactured in China so that tests could be run to make sure the samples met the specifications and quality standards of Devon's customers. (Deposition of Wu).

4.     Devon markets and advertises its services via internet web pages produced by Devon's marketing department. (Deposition of Wu, pages 42-43). Devon marketed its building products under the trade name "Devon Building Products." (Deposition of Wu, pages 42-45). Devon began using the name "Devon Building Products" in 2005. The logo "Devon Building Products" was placed on packaging and shipping protectors for products imported and sold by Devon. (Deposition of Wu, pages 46-47). Devon's website was utilized to advertise the services of Devon International Industries and Devon Building Products. Devon identified itself via its website as a manufacturer of "drywall," "quality plywood" and other building materials. (Deposition of Wu, pages 46-48). Through its webpage, Devon International Industries advertises the following services:

> Devon Building Products is a leading supplier of building materials that have been used in the construction of homes and businesses across America since its inception in 2002. Quality assurance at our manufacturing facilities ensures your confidence in our products. Devon Building Products manufactures quality plywood, fasteners, fire treated lumber, windows, patio doors and drywall. We constantly strive to develop new products and to improve existing ones. Our experienced staff anticipates the needs of our clients by delivering durable, high quality products, on time and at the best price.

5.     The "Devon Building Products" logo was placed on full sized sheets of drywall affixed to the exterior "packaging" of the bundles of drywall.

(Deposition of Robert Scharf, Exhibit "D", page 129) (Exhibit 26 to the deposition of Scharf, attached hereto as Exhibit "E"). The drywall did not have any other manufacturer, producer or suppliers name printed on the drywall boards. When the order was placed by North Pacific with Devon for the manufacture and importation of drywall, Devon was aware that the drywall would be utilized for construction of residential homes (Deposition of Wu, page 211). Devon was further aware that the drywall to be sold by Devon to various vendors and distributors, including North Pacific, ultimately would be installed in residential homes. (Deposition of Wu, pages 211212).

6.   Mr. Scharf, President of Devon, requested that the manufacturing facility "plant" or "stamp" each individual sheet of drywall with the words "Made in China Meet or Exceeds ASTM 1396." (Deposition of Scharf, pages 165-170). NorPac provided Mr. Scharf with a copy of a photograph indicating the ASTM Standard which Mr. Scharf provided to the manufacturing facility to stamp the ASTM Standard on each individual sheet of drywall. (Deposition of Scharf, pages 170-171).

7.   Devon, Ace, Bass Homes, the CPSC nor did anyone test the drywall prior to requesting the ASTM Standard 1396 stamp on each sheet of drywall. Devon never tested the drywall to ensure it complied with the applicable ASTM Standards. (Deposition of Scharf, pages 118-119, 136, 374-375).

8.   After the drywall was manufactured and in the process of being shipped via truck from the factory to the port for shipment to the U.S., Devon attempted to obtain the contact information for a testing facility to test the drywall for the purpose of attempting to sell the drywall to other customers. (Deposition of Scharf, pages 190-191).

9.    Devon never requested a copy of an ASTM certification test report from the manufacturing facility. (Deposition of Scharf, page 62). Devon never requested a copy of the ASTM "Certification." *(Id.).*

10.    Devon did not obtain any type of ASTM certification documents from the manufacturing facility. (Deposition of Scharf, page 64). Devon did not obtain a certificate of formaldehyde emissions from the manufacturing facility. (Deposition of Scharf, page 84). Devon failed to obtain a specification sheet from the manufacturing facility (Deposition of Scharf, pages 84-85). Devon failed to obtain test results from the manufacturing facility substantiating the ASTM "stamp" that Devon requested the manufacturing facility "print" on each sheet of drywall. (Deposition of Scharf, page 74). Devon failed to obtain an MSDS sheet from the manufacturing facility. (Deposition of Scharf, pages 72-73).

11.    Of the four factories inspected by Devon for the manufacture of drywall pursuant to the quality standards and specifications of NorPac, three of the factories inspected by Devon utilized "filler" consisting of "cinders" that "looked like little pebbles that were like burnt". (Deposition of Scharf, pages 50-54). According to Scharf, three of the four factories inspected by Devon did not appear to be using gypsum for the manufacture of drywall, but instead used these "burnt" "pebbles" or "cinders" as "filler" in the drywall. These factories had a "terrible odor coming out" that smelled like "some type of chemical odor". (Deposition of Scharf, pages 52-53).

12.    Bob Scharf has never reviewed ASTM Standard 1396. Bob Scharf has never reviewed ASTM Standard 1264. Bob Scharf has never reviewed ASTM Standard 36. Bob Scharf has never reviewed any ASTM Standards that pertain to drywall. (Deposition of Scharf, pages 468-469).

22

13.   It cost Devon $2.99 per sheet to produce the drywall in China. (Deposition of Wu, pages 135-136).

14.   Devon intended to sell the drywall for $8.50 per sheet. (Deposition of Scharf, page 98-99).

15.   In August of 2006 Devon was selling drywall for $8.50 per sheet to its customers. (Deposition of Wu, pages 286-287).

16.   Approximately fifty-five percent of the shipment of 485,044 sheets of Chinese drywall was damaged in transit upon the marine vessel, *Sanko Rilley*, as a result of rough seas. (Deposition of Colleen Fitzgerald, pages 95-97).

17.   Devon filed an insurance claim with its insurance carrier Fireman's Fund Insurance Company regarding damage the Chinese drywall cargo sustained in transit to the U.S. Ms. Fitzgerald was the claims examiner that handled the claim filed by Devon on behalf of Fireman's Fund Insurance Company. (Deposition of Fitzgerald, pages 7-10).

18.   Fireman's Fund Insurance Company retained W. K. Webster and a surveyor, Ken Atkinson with Sabine Surveyors to assist in surveying the loss with respect to the Chinese drywall cargo. (Deposition of Fitzgerald, pages 26-27).

19.   Fireman's Fund Insurance Company paid W. K. Webster and the surveyor, Ken Atkinson for services rendered with respect to the drywall loss. (Deposition of Fitzgerald, pages 25-26).

20.   Fireman's Fund Insurance Company and Devon agreed that fifty-five percent of the cargo was damaged and would be the subject of the insurance claim filed by Devon with Fireman's Fund Insurance Company. (Deposition of Fitzgerald, pages 44-45, 6062).

21.    Fireman's Fund Insurance Company instructed its retained surveyor, Ken Atkinson to segregate the damaged cargo from the good cargo in an attempt to mitigate the loss. (Deposition of Fitzgerald, pages 36-38).

22.    Fireman's Fund Insurance Company's retained surveyor was on site during the unloading of the vessel which took approximately thirty-six days. (Deposition of Fitzgerald, pages 36-37) (Deposition of Scharf, pages 221-223).

23.    Fireman's Fund Insurance Company's retained surveyor reported to Fireman's Fund via Ms. Fitzgerald throughout the unloading process and the segregation of the cargo. (Deposition of Fitzgerald, pages 37-38).

24.    Fireman's Fund Insurance Company and Devon agreed that approximately 3,622 bundles of drywall were damaged. (Deposition of Scharf, pages 230-231) (Deposition of Fitzgerald, pages 61-62).

25.    Fireman's Fund Insurance Company controlled the unloading and segregation process. (Deposition of Scharf, pages 225-228).

26.    Fireman's Fund Insurance Company would not release the cargo for sale by Devon until all cargo was offloaded and segregated into two warehouses as "sellable" and "nonsellable." (Deposition of Scharf, page 228).

27.    Fireman's Fund Insurance Company's surveyor determined that approximately 3,600 bundles were damaged and approximately 3,373 bundles were declared salvageable. (Deposition of Scharf, page 229). The drywall used for the Wiggins' home is believed to have come from this stack.

28.    The 3,622 bundles that were declared damaged by Devon and Fireman's Fund Insurance Company were purchased by Pensacola Stevedore. (Deposition of Scharf, page 231).

29.    Devon attempted to sell approximately 3,373 bundles that were declared salvageable after they were released by Fireman's Fund Insurance Company (Deposition of Scharf, pages 232-233).

30.    Fireman's Fund Insurance Company retained SalvageSale Services, Inc. to sell the damaged drywall. (Deposition of Fitzgerald, Exhibit "J", pages 29-30) (Deposition of Scharf, pages 233-234) (Deposition of Chad Farrell, pages 18-19).

31.    SalvageSale Services, Inc. (hereinafter "SalvageSale") is an online market place that markets salvaged goods to increase the return on the sale of the salvaged goods. (Deposition of Farrell, pages 11-13). Chad Farrell was the Vice President of Sales Operations for SalvageSale in 2006 at the time the damaged drywall was sold to Mike Pate, Pate and/or Pensacola Stevedore Company. (Deposition of Farrell, pages 11-12).

32.    SalvageSale utilized its "market makers" to market the damaged drywall to potential purchasers. (Deposition of Farrell, pages 12-13).

33.    Fireman's Fund Insurance Company eventually released the drywall that was declared good to enable Devon to sell the drywall to its customers. (Deposition of Scharf, page 241).

34.    Prior to Devon rejecting the drywall that was declared damaged or not sellable at retail, the salvage company hired by Fireman's Fund Insurance Company was marketing the drywall for $2.00 to $3.00 a board on the internet. (Deposition of Scharf, pages 383-384,387-388).

35.    Bob Scharf, the President of Devon understood that Fireman's Fund Insurance Company owned the drywall cargo until the forty-five percent that was declared good or undamaged was released to Devon to sell and the fifty-five

percent that was declared damaged was sold to Pensacola Stevedore Company. *(Id.)* (Deposition of Fitzgerald, pages 53-54,61-62).

36.    Fireman's Fund Insurance Company approved of the bid made by Pensacola Stevedore to purchase the drywall for $40,000.00. (Deposition ofFarrell, Exhibit "K", page 50)

37.    SalvageSale did not take title to the drywall. (Deposition of Farrell, page 46).

38.    After Devon released the damaged drywall for sale, if SalvageSale was unable to find a buyer for the drywall, the goods would have been disposed of and paid for by Fireman's Fund Insurance Company. (Deposition of Farrell, page 56).

39.    SalvageSale attempted to obtain detailed specifications on the drywall through Fireman's Fund Insurance Company's surveyor, Ken Atkinson for the purpose of marketing the materials in an attempt to increase the return on the damaged drywall. (Deposition of Fan-ell, pages 24-26).

40.    When SalvageSale was retained to market the drywall, Fireman's Fund Insurance Company was aware that SalvageS ale would market the drywall on the internet. (Deposition of Fitzgerald, pages 158-159). SalvageSale was paid to market the drywall on the internet to increase the return on the sale of the drywall. (Deposition of Fitzgerald, pages 158-159).

41.    Fireman's Fund Insurance Company retained SalvageSale to market the damaged drywall. (Deposition of Farrell, page 19).

42.    Michael Pate ("Mike") was tendered as the 30(b )(6) representative of Pensacola Stevedore Company, Inc. Mike Pate has served as the President of Pensacola Stevedore Company, Inc. since its inception in 2002. (Deposition of

26

Michael Pate, pages 1517).

43.   Pensacola Stevedore Company, Inc. doing business as Pate Stevedore Company, Inc. sold 5,316 sheets of Chinese drywall to Ace Home Center, Inc. from August 30, 2006 through October 31, 2006. (Deposition of Pate, pages IIS-122). The Wiggins' drywall was from this sale.

44.   Pensacola Stevedore did not receive any written disclaimer of warranties from Fireman's Fund Insurance Company. (Deposition of Pate, Volume II, pages 163164).

45.   Pensacola Stevedore offloaded all drywall from the Sanko Rally and segregated it into warehouses as "good" and "damaged" drywall. (Deposition of Pate, pages 4243). The "good" drywall was retained and sold by Devon. (Deposition of Pate, page 42). The drywall designated as "damaged" was purchased by Pensacola Stevedore. (Deposition of Pate, page 42).

46.   The drywall that Pensacola Stevedore sold to its customers came out of the damaged stack of drywall and the drywall retained by Devon and sold to its customers came out of the good stack of drywall. (Deposition of Pate, page 88). Therefore, all the Ace drywall was damaged drywall.

47.   Mr. Scharf was present at the dock in Pensacola during the unloading process. (Deposition of Pate, pages 55-56).

48.   At the time of the contracts for sale of the damaged drywall, the drywall was not installed in residential homes. The drywall sold by Pensacola Stevedore was paid for when Pate's customers picked up the drywall or Pensacola Stevedore would invoice its customers for payment within thirty days. (Deposition of Pate, pages 112-113).

49.   All drywall sold by Pensacola Stevedore to Ace Home Center, Inc. was either paid for when it was picked up and shipped to Ace Home Center, Inc., or Ace Home Center, Inc. paid for the drywall within thirty days. Ace Home Center, Inc. paid Pensacola Stevedore for the drywall prior to Ace Home Center, Inc. selling the drywall to builders for installation in homes. (Deposition of Pate, pages 113-114).

50.   Ace Home Center, Inc. deducted dumpster and labor charges incurred by Ace Home Center, Inc. from the purchase price paid to Pensacola Stevedore for the drywall. (Deposition of Pate, pages 125-126).

51.   The drywall was sold by Pensacola Stevedore for such a cheap price because it was damaged to the point of decreasing its value. (Deposition of Pate, pages 212213).

52.   The drywall sold by Pensacola Stevedore was not in the condition of brand new drywall that one would expect to purchase at Home Depot. (Deposition of Pate, pages 185 and 213).

53.   Pensacola Stevedore sold drywall to Ace Home Center, Inc. for as cheap as $1.15 on October 31, 2006. (Deposition of Pate).

54.   Michael Chemielewski was tendered as the 30(b )(6) representative of Ace Hardware Corporation. According to Mr. Chemielewski, Ace Hardware Corporation maintains a file on each of its retail centers. (Deposition of Ace Corp., page 30).

55.   It would not be permissible for Ace Home Center, Inc. to sell damaged products as new without disclosing it to the customers. (Deposition of Ace Corp., pages 89-93).

56.    Ace Corp. requires its members to subscribe to and implement the company's retail training program. Ace Corp. requires all stores to administer a posted "No hassle return policy." Ace Corp. expects its retail stores to honor the "No hassle return policy." (Deposition of Ace Corp., pages 101-103).

57.    Ace Corp. members should honor the return policy with respect to products that have been determined defective by the Consumer Product Safety Commission.

58.    Ace Home Center, Inc. was a member of the "Vision 21 Team" starting March of 2005. (Deposition of Ace Corp., pages 110-111). The purpose of the Vision 21 Team was to increase the profit margin and benefit the retailer and Ace Corp. (Deposition of Ace Corp., pages 112-115). 103. Ace Home Center, Inc. pays Ace Corp. each month a fee for advertising services for the purposes of promoting the business, including Ace Home Center. The purpose of the advertisements is to increase foot traffic into the store and the advertisements pertain to Ace branded merchandise, as well as all merchandise sold in the store. (Deposition of Ace Corp., pages 118-120).

59.    Henry Vick is the President of Ace Home Center, Inc. He has served as President since 1989. (Deposition of Henry Vick, Volume II, pages 23-24). Henry Vick previously owned an air conditioning and heating company for approximately thirty years. According to Mr. Vick, air conditioning coils are supposed to last an average of ten to fifteen years. Coils are not supposed to require replacement every six months to a year. (Deposition of Henry Vick, Volume II, pages 20-21).

60.    Wayne Vick is the Vice President of Ace Home Center, Inc. Wayne Vick is responsible for handling warranty claims on behalf of Ace Home Center,

Inc. Wayne Vick has handled warranty claims on behalf of Ace Home Center, Inc. for approximately six to eight years. (Deposition of Wayne Vick, pages 12,16-18).

61.    Henry Vick inspected the drywall at the port of Pensacola prior to entering into an arrangement with Pensacola Stevedore for the purchase of the Chinese manufactured drywall. Henry Vick did not perform any type of investigation in an attempt to determine who manufactured the drywall. (Deposition of Henry Vick, Volume 2, page 33).

62.    Henry Vick did not perform any type of investigation to ensure the drywall he purchased from Pate and sold to Ace Home Center, Inc.'s customers met the applicable ASTM Standards. Henry Vick did not request any test reports or any other documentation, specifications or MSDS sheets to ensure the drywall was safe for use. (Deposition of Henry Vick, Volume II, pages 51-52, 171-172).

63.    Henry Vick was aware that there are ASTM Standards for building materials such as drywall to ensure they are manufactured to a certain standard so that they are safe for use. (Deposition of Henry Vick, Volume II, page 51).

64.    Ace Home Center, Inc. purchased approximately 5,000 sheets of Chinese drywall from Pensacola Stevedore. Ace Home Center, Inc. did not receive any type of disclaimer of implied warranties from Pensacola Stevedore. Ace Home Center, Inc. did not receive any type of written document indicating that Pensacola Stevedore was selling the drywall to Ace Home Center, Inc. "as is". (Deposition of Henry Vick, Volume II, pages 79-80).

65.    Ace Home Center, Inc. bought drywall from Pensacola Stevedore for ninety seven cents (.97) a sheet in October of 2006. (Deposition of Wayne Vick, page 61).

66.     Ace Home Center, Inc. purchased the Chinese drywall from Pensacola Stevedore. Drywall was in high demand at the time due to a shortage of stock which drove the price up. (Deposition of Henry Vick, Volume 2, pages 39-40).

67.     Ace Home Center, Inc. is a retail store. (Deposition of Wayne Vick, Exhibit "S", page 24). Ace Home Center, Inc. has never sold salvaged lumber out of the Ace Home Center store. Ace Home Center, Inc. has never sold salvaged shingles, insulation, plywood or siding out ofthe Ace Home Center, Inc. store. (Deposition of Wayne Vick, pages 25-30).

68.     Ace Home Center, Inc. sold the salvaged Chinese drywall at the same price as the new domestic drywall it purchased from Allied Building Supply. (Deposition of Wayne Vick, pages 41-42).

69.     According to Henry Vick, some of the packaging and straps utilized to secure the bundles had been removed "probably" at the port in Pensacola. (Deposition of Henry Vick, Volume II, pages 134-135). Some of the exterior packing had been removed from the drywall prior to Henry Vick's inspection of the drywall at the port in Pensacola. (Deposition of Henry Vick, Volume II, pages 179-180).

70.     Ace Home Center, Inc. does not have any written quality control standards with respect to products purchased outside the normal supply chain for Ace Home Center, Inc. Ace Home Center, Inc. does not have any oral quality control standards with respect to products purchased outside of its normal chain of distribution. (Deposition of Henry Vick, Volume II, pages 171-172).

71.     Henry Vick was aware at the time Ace Home Center, Inc. purchased arid inspected each sheet of drywall for damage that the drywall was made in

China. Ace Home Center, Inc. continued to sell Chinese drywall after Ace Home Center discovered that the Chinese manufactured drywall was "tainted." (Deposition of Henry Vick, Volume II, pages 46-49) (Deposition of Wayne Vick, page 117).

72.   After Henry Vick learned that the drywall manufactured in China was "tainted," Mr. Vick did not perform any type of research or investigation to find out if the drywall sold by Ace Home Center, Inc. was "tainted." (Deposition of Henry Vicle, Volume II, pages 58-59). Henry Vick has never performed any type of investigation to try to determine the manufacturer of the Chinese drywall sold by Ace Home Center, Inc. (Deposition of Henry Vick, Volume II, pages 58-59).

73.   Wayne Vick learned about the "off gassing" issues pertaining to Chinese drywall from the news. At the time Wayne Vick learned of the "off gassing issues", Ace Home Center, Inc. was selling Chinese drywall. Ace Home Center, Inc. continued to sell Chinese drywall after Wayne Vick learned of the "off gassing" issues pertaining to Chinese drywall. (Deposition of Wayne Vick, pages 116-117).

74.   Wayne Vick did not perform any type of investigation to determine whether the Chinese drywall sold by Ace Home Center, Inc. was safe for use. (Deposition of Wayne Vick, pages 112-113).

75.   Wayne Vick did not perform any type of research or investigation after Ace Home Center, Inc. learned that the Chinese drywall was tainted to determine whether the Chinese drywall sold by Ace Home Center, Inc. was safe for use. (Deposition of Wayne Vick, pages 112-113).

76.   Wayne Vick continued to assure customers that the Chinese drywall

32

sold by Ace Home Center, Inc. was not defective after Wayne Vick learned that Chinese drywall could "off gas." (Deposition of Wayne Vick, pages 114-116).

77.    After Ace Home Center, Inc. learned of the off gassing issues, Ace Home Center, Inc. failed to contact Pensacola Stevedore to determine whether any quality control testing data existed on the drywall. (Deposition of Wayne Vick, page 117).

78.    Ace Home Center, Inc. does not employ any type of written checklist regarding quality control standards. (Deposition of Wayne Vick, page 118).

79.    Ace Home Center, Inc. never disclosed to its customers the fact that the Chinese drywall was purchased outside of Ace Home Center, Inc.'s normal supply or distribution chain. (Deposition of Henry Vick, Volume II, page 104-106).

80.    Allied Building Supply sells quality products manufactured by reputable manufacturers to Ace Home Center, Inc. (Deposition of Henry Vick, Volume II, page 150). Henry Vick would not expect Allied Building Supply to buy salvaged building materials from Pensacola Stevedore and sell them to Ace Home Center, Inc. (Deposition of Henry Vick, Volume II, page 151).

81.    Drywall is not intended to corrode electrical wiring. Drywall is not intended to corrode evaporator coils in air conditioners. Drywall is not intended to make people sick. (Deposition of Henry Vick, Volume II, page 155) (Deposition of Wayne Vick, page 82).

82.    Ace Horne Center, Inc. relies upon suppliers to provide quality products that have been tested to make sure they are safe for use. (Deposition of Wayne Vick, page 82).

83.   The Chinese drywall purchased by Ace Home Center, Inc. from Pate was not wrapped or sealed in a container such that Ace Horne Center, Inc. could not open and inspect the Chinese drywall. Ace Home Center, Inc. opened each and every container of Chinese drywall to inspect the Chinese drywall prior to selling the Chinese drywall. (Deposition of Henry Vick, Volume II, page 159).

84.   Ace Horne Center, Inc. provides warranties on building materials such as two by fours and would exchange or return money to a purchaser of a defective two by four. (Deposition of Henry Vicle, Volume II, page 157).

85.   Ace Horne Center, Inc. did not purchase any Chinese drywall from any other supplier or distributor besides Pensacola Stevedore. (Deposition of Wayne Vick, page 30).

86.   Ace Home Center, Inc. provides price quotes to builders such as Bass Homes for complete house packages for the supply of all materials utilized to construct a residential home. (Deposition of Wayne Vick, pages 43-44). The products supplied by Ace Home Center, Inc. to construct residential homes are purchased from various vendors including Ace Hardware Corporation. (Deposition of Wayne Vick, pages 52-55). The materials utilized by Bass Homes, Inc. to construct the Wiggins' home was purchased from Ace Home Center.

87.   Ace Home Center, Inc. would have supplied to Bass Homes, Inc. certain materials purchased or obtained from Ace Hardware Corporation that were utilized for the construction of Plaintiff's homes such as paint and fasteners. (Deposition of Wayne Vick, pages 52-55).

88.   Wayne Vick has obtained MSDS sheets on products sold by Ace Home Center, Inc. in the past. Ace Home Center, Inc. maintains a book of MSDS sheets at Ace Home Center, Inc. 's principle place of business. (Deposition of

34

Wayne Vick, pages 87-88).

89.    Wayne Vick never looked for MSDS sheets pertaining to the Chinese drywall purchased from Pensacola Stevedore and sold by Ace Home Center, Inc. Wayne Vick never requested MSDS sheets on the Chinese drywall sold by Ace Home Center, Inc. to ensure it was safe for use prior to selling it to its customers. (Deposition of Wayne Vick, page 89).

90.    Ace Home Center, Inc. never performed any investigation or sought information to determine who the manufacturer of the Chinese drywall was prior to selling the drywall. (Deposition of Wayne Vick, Exhibit "S", page 89).

91.    Wayne Vick knew that Ace Home Center, Inc. would sell the Chinese drywall to builders to be used to construct residential homes. Ace Home Center, Inc. did not employ any independent quality control standards to ensure the drywall was safe for use. (Deposition of Wayne Vick, page 90-91).

92.    If Ace Home Center, Inc.'s homebuilder customers did not have a preference, Ace Home Center, Inc. sold them Chinese drywall. (Deposition of Henry Vick, page 71). If Bass Homes had expressed a preference not to buy the defective Chinese drywall, then Ace Home Center would not have sold it to Bass.

93.    Ace Home Center, Inc. charged a delivery fee to deliver drywall to its customers. (Deposition of Henry Vick, Volume 1, pages 75-76).

94.    Allied Building Supply was the only supplier of drywall to Ace Home Center, Inc. since August of 2006 besides Pensacola Stevedore. (Deposition of Henry Vick, Volume 1, page 84).

95.    Henry Vick was made aware of issues regarding damage the Chinese drywall was causing to air conditioning evaporator coils. (Deposition of Henry Vick, Volume I, pages 91-92).

96.   The Chinese drywall sold by Ace Home Center, Inc. is intended to be utilized on the interior of the homes. It is not intended to be utilized as an exterior weather barrier. (Deposition of Wayne Vick, page 229).

97.   William "Bill" Bass is the President of Bass Homes, Inc. Bill Bass has experience in framing and constructing residential homes. Mr. Bass has been framing and constructing residential homes since 1983. (Deposition of Bill Bass, page 23).

98.   When drywall is installed in a home, the home is already framed. When drywall is installed in a home, the exterior cladding has already been installed. The home already has a roof on it. (Deposition of Bass, pages 101-102).

99.   Drywall is a finishing product. Drywall is not the "base integrity of the house structure." Homes are already structurally sound and contain the bracing and straps required by code before drywall is installed. (Deposition of Bass, pages 102, 143).

100.   Bass Homes, Inc. purchased the drywall utilized to construct the Wiggins' home from Ace Home Center, Inc.

101.   Ace Home Center, Inc. did not provide any written disclaimer of warranty with the sale of the drywall to Bass Homes. (Deposition of Bass, pages 107-108).

102.   When Bass Homes, Inc. purchases materials such as drywall from Ace Home Center, Inc. to construct a home, Bass Homes is purchasing those materials pursuant to a contract with the homeowner for construction of the home. (Deposition of Bass, page 107).

103.   Bass Homes, Inc. was not provided ally written disclaimers of warranties by any of the distributors of the drywall installed in the Plaintiff's

homes. **(Deposition of Bass, page 108).**

29.    For each expert identified by the Plaintiffs in this case, please provide the expert's name, business address, educational background, and experience, state the subject matter to which the expert will testify and state specifically and in detail the substance of any facts and/or opinions to which the expert is expected to testify, with a summary of the grounds for any such opinion.

**ANSWER: Plaintiffs object to this request to the extent that is premature. Subject to and without waiving the foregoing objections, Plaintiffs state that they have not identified their expert witnesses at this time and will supplement their response in accordance with local rules, Alabama Rules of Civil Procedure, scheduling order or discovery plan in this matter.**

30.    Other than divorce or other family-type proceedings, identify by style, case number, and general description each and every lawsuit in which you have ever been involved either as a plaintiff or a defendant.

**ANSWER:   Plaintiffs object to this interrogatory to the extent that it requests information that is not relevant or likely to lead to admissible evidence in this matter. Without waiving said objection, Plaintiffs state the following: Plaintiffs have not been a party to any other lawsuit.**

31.    Have you ever been included in a class of plaintiffs or been a party to any litigation the subject of which was Chinese, toxic, or defective drywall. With regards to this issue please state:

a)     The parties, date, and case number of such litigation;

b)     Any recovery that was sought or received by and from any such action;

c)     Any settlement agreements entered into regarding Chinese or toxic or defective drywall; and

22.   Please produce all documents that tend to prove or disprove that this Defendant is liable to Plaintiff under the Deceptive Trade Practices Act as defined in § 8-19-1, et seq. of the Alabama Code (1975) as alleged in your Complaint.

RESPONSE:   **Plaintiffs have produced for inspection copies of all those responsive, non-privileged documents, if any, within their possession, control or custody.**

23.   Please produce all documents that tend to prove or disprove your contention that the drywall made subject of this action caused accompanying corrosion of and/or damage to pipes, wiring, metal finishes and fixtures, HVAC system, and other electronic products in the home.

RESPONSE:   **Plaintiffs have produced for inspection copies of all those responsive, non-privileged documents, if any, within their possession, control or custody.**

RESECTFULLY SUBMITTED this, the 8th day of May, 2014.

_____
GREG WIGGINS, Plaintiff

AS TO OBJECTIONS:

LUCKEY & MULLINS, PLLC, Their Attorneys

BY: _____
STEPHEN W. MULLINS

STEPHEN W. MULLINS  (ASB-1338-M74S)
LUCKEY & MULLINS, PLLC
2016 Bienville Blvd., Suite 102   (39564)
Post Office Box 990
Ocean Springs, MS  39566
Phone:      228.875.3175
Fax:   228.872.4719
smullins@luckeyandmullins.com

44

STATE OF ALABAMA

COUNTY OF *Escambia*

PERSONALLY CAME AND APPEARED BEFORE ME, the undersigned authority in and for said County and State, the within named, GREG WIGGINS, who, after having been by me first duly sworn, states on his oath that he signed the above and foregoing Answers to Ace Home Center's First Set of Interrogatories and Requests for Production, and that the matters and facts contained therein are true and correct as therein stated.

_____
GREG E. WIGGINS

SWORN TO AND SUBSCRIBED BEFORE ME this, the 8th day of May, 2014.

_____
NOTARY PUBLIC

45

**CERTIFICATE OF SERVICE**

I, STEPHEN W. MULLINS, do hereby certify that I have this day forwarded by U.

S Mail, postage prepaid, a true and correct copy of the above and foregoing Answers &

Responses to the following counsel of record:

Attorneys for Bass Homes

Stewart L. Howard
Jonathan G. Festa
STEWART HOWARD, P.C.
Post Office Box 1903
Mobile, Alabama 36633

Attorneys for Ace Home Center

Lloyd E. Taylor, Esquire
Taylor & Taylor, LLC
18350 Michigan Street
Robertsdale, AL  36567

Jeffrey L. Luther, Esquire
Danny J. Collier, Jr., Esquire
Luther, Collier, Hodges & Cash, LLP
Post Office Box 1002
Mobile, AL  36633

DATED this, the 8th day of May, 2014.

STEPHEN W. MULLINS

46