**Daniel H. Skerritt**, OSB #681519
  Direct Dial:  503.802.2024
  Direct Fax:  503.972.3724
  Email:  jon.stride@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2099

    Attorneys for Intervenors Eduardo and
    Carmen Amorin, Albert and Betsy Butzer,
    Jack and Anna McGinn, Thomas and
    Virginia Spencer, and Elliot and Angelina
    Everard

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| **CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION,** a People's Republic of China corporation, and **CMBM FOREST PRODUCTS (CANADA) LTD.**, a Canadian corporation<br><br>                    Plaintiff,<br><br>    v.<br><br>**MURPHY OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC,** an Oregon limited liability company; **MURPHY OVERSEAS U.S.A. TIMBER AND LAND DEVELOPMENT, LLC**, an Oregon limited liability company; and **MURPHY OVERSEAS U.S.A. HOLDINGS, LLC,**<br><br>                    Defendants. | Civil No. 3:14-cv-00746-ST<br><br>**DECLARATION OF FREDERICK S. LONGER IN SUPPORT OF MOTION TO INTERVENE OF EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA McGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD**<br><br>*ORAL ARGUMENT REQUESTED*<br><br>*EXPEDITED HEARING REQUESTED* |

Page 1 -    DECLARATION OF FREDERICK S. LONGER IN SUPPORT OF MOTION TO
          INTERVENE OF EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY
          BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER,
          AND ELLIOT AND ANGELINA EVERARD

I, Frederick S. Longer, declare as follows:

1.      I am a partner with Levin, Fishbein, Sedran & Berman.  I make this declaration in support of the Motion to Intervene of Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard.

2.      Attached hereto as Exhibit A is a true and correct copy of a July 17, 2014 Contempt Order (Rec. Doc. 17869) ("Contempt Order"), entered by the Honorable Eldon E. Fallon in the United States District Court for the Eastern District of Louisiana.

3.      Attached hereto as Exhibit B is a true and correct copy of the 2013 Annual Report of China National Building Material Company Limited.

4.      Attached hereto as Exhibit C is a true and correct copy of a class notice with respect to a class certified by Judge Fallon against the Taishan Defendants.  *See In re Chinese Manufactured Drywall Products Liability Litig.*, 2014 WL 4809520 (E.D. La. September 26, 2014).

5.      Attached hereto as Exhibit D is a true and correct copy of Plaintiffs' Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice that was filed by Intervenors in the proceedings before Judge Fallon.

6.      Attached hereto as Exhibit E is a true and correct copy of the Amorin complaint, which was previously filed in the MDL proceedings before Judge Fallon, and sets forth their claims against the Taishan Defendants.

Page 2 -      DECLARATION OF FREDERICK S. LONGER IN SUPPORT OF MOTION TO INTERVENE OF EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

EXECUTED on this 29th day of December, 2014, Philadelphia, Pennsylvania.

*/s/ Frederick S. Longer*
FREDERICK S. LONGER

080000/02024/6116178v1

Page 3 -   DECLARATION OF FREDERICK S. LONGER IN SUPPORT OF MOTION TO INTERVENE OF EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD

# EXHIBIT A

Case 3:14-cv-00746-ST   Document 59-1   Filed 12/30/14   Page 2 of 5
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 5 of 298
Case 2:09-md-02047-EEF-JCW   Document 17869   Filed 07/17/14   Page 1 of 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL | : | MDL NO. 2047 |
| PRODUCTS LIABILITY LITIGATION | : | SECTION: L |
|  | : |  |
|  | : | JUDGE FALLON |
|  | : | MAG. JUDGE WILKINSON |

.. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. ... :

**THIS DOCUMENT RELATES TO:** *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 2:09-cv-6687 (E.D. La.)**

<u>ORDER</u>

From 2005 to 2008, a housing boom coincided with the destruction caused by Hurricanes Katrina and Rita to sharply increase the demand for construction materials in the Gulf South and East Coast. In response, Chinese companies manufactured, and sold to homeowners throughout the United States, considerable quantities of gypsum wallboard which came to be known as "Chinese drywall." Homeowners experienced problems with the drywall. Specifically, the drywall emits various sulfide gases, damages structural mechanical and plumbing systems of the home, and damages other appliances in the home. The affected parties sued the entities involved in the manufacturing, importing, and installing the Chinese drywall. The cases multiplied and the Judicial Panel on Multidistrict Litigation ("MDL"), declared the matter an MDL and transferred the cases to this Court. After a period of discovery, it became clear that there were two principal manufacturers, (1) the Knauf Entities, and (2) the Taishan Entities. There are four cases in particular in which Taishan Entities have been served (via international means at the Hague, costing at least $100,000 per service of process). These four cases are *Germano*, *Mitchel*, *Gross*, and *Wiltz*. The matters were set to trial and default judgments were entered. In the instant case, *Germano*, Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd ("Taishan") is the

Case 3:14-cv-00746-ST    Document 59-1    Filed 12/30/14    Page 3 of 5
Case 2:09-md-02047-EEF-MBN    Document 18251-2    Filed 01/08/15    Page 6 of 298
Case 2:09-md-02047-EEF-JCW    Document 17869    Filed 07/17/14    Page 2 of 4

Defendant. Taishan refused to participate in any of these proceedings.

The day before the expiration of the window for appeal, Taishan appeared and appealed to the Fifth Circuit Court of Appeals, arguing – for the first time – that this Court lacked personal jurisdiction. The matters were remanded to this Court for further discovery on the jurisdictional issue. After a period of discovery, this issue was briefed and argued. In due course, this Court rendered an opinion finding it had jurisdiction over the Defendant Taishan. The Defendant appealed the Court's judgment. Ultimately, two separate Fifth Circuit panels affirmed this Court's exercise of jurisdiction over Taishan. In *Germano*, the time for seeking writs to the Supreme Court has passed, so such judgment has become final and enforceable. In order to execute the judgment, Plaintiffs moved for a Judgment Debtor Examination. The Court ordered Taishan to appear in open court on the morning of July 17, 2014 for a Judgment Debtor Examination (Rec. Doc. 17774).

Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination. Taishan, in fact, has *refused* to appear in open court for the Examination. As stated by counsel for Taishan, both in open court and in a brief (Rec. Doc. 17846), Taishan has received notice of the Examination and has refused to appear or otherwise participate in the proceedings.

As a consequence of Taishan's refusal to appear at this Judgement Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds Taishan in contempt of court, both criminally and civilly. This refusal to appear is a direct contemptuous act occurring in open court after actual notice of the proceedings. Such disobedience of the Court's order harms both the many other parties in this case and the decorum of the Court. Due to the "affront to the Court's dignity [that] is [] widely observed," it is necessary to summarily punish

Case 3:14-cv-00746-ST   Document 59-1   Filed 12/30/14   Page 4 of 5
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 7 of 298
Case 2:09-md-02047-EEF-JCW   Document 17869   Filed 07/17/14   Page 3 of 4

Taishan's contempt. *Pounders v. Watson*, 521 (U.S. 982, 988-89) (1997); Fed. Rule Crim. Pro.

42(b).

  In punishing Taishan's contempt, the Court "has broad discretion in assessing sanctions to

protect the sanctity of its decrees and the legal process." *Test Masters Educational Servs. v.

Singh*, 428 F.3d 559 (5th Cir. 2005). In this massive suit, the harm from Taishan's noncompliance

is high and requires strong sanctions to coerce compliance and restore integrity to these

proceedings. *Lamar Financial Corp. v. Adams*, 918 F.2d 564, 567 (5th Cir. 1990) (setting forth

four factors by which the Court assesses an appropriate contempt sanction); *see Manhattan

Industries v. Sweater Bee, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989) (affirming the propriety of an award

of unjust enrichment contempt sanctions aligned with the contemptor's profits to punish the

wrongdoing). Accordingly,

  **IT IS ORDERED** that Taishan pay **$15,000** in attorneys' fees to Plaintiffs' counsel.

  **IT IS FURTHER ORDERED** that Taishan pay **$40,000** as a penalty for contempt.

  **IT IS FURTHER ORDERED** that Taishan, and any of its affiliates or subsidiaries, is

hereby **ENJOINED** from conducting any business in the United States until or unless it

participates in this judicial process. If Taishan violates this injunction, it must pay a further

penalty of **25%** of the profits earned by the company or its affililates who violate the order, for

the year of the violation.

  **IT IS FURTHER ORDERED** that the clerk of court forward this contempt order to the

U.S. Secretary of Commerce, the Chair of the U.S. Senate Committee on Commerce, Science,

and Transportation, and the U.S. Attorney General, so that these officials are aware of the

seriousness of the situation, and for any appropriate action they may see fit.

Case 3:14-cv-00746-ST    Document 59-1    Filed 12/30/14    Page 5 of 5
Case 2:09-md-02047-EEF-MBN    Document 18251-2    Filed 01/08/15    Page 8 of 298
Case 2:09-md-02047-EEF-JCW    Document 17869    Filed 07/17/14    Page 4 of 4

New Orleans, Louisiana this 17th day of July 2014.

UNITED STATES DISTRICT JUDGE

CC:   Secretary Penny Pritzker
U.S. Department of Commerce
1401 Constitution Ave., NW
Washington, DC 20230

U.S. Senator Jay Rockefeller
Chair of U.S. Senate Committee on Commerce, Science, and Transportation
Russell Senate Building, Room 254
2 Constitution Ave., NE
Washington, DC 20002

U.S. Attorney General Eric Holder
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530-0001

# EXHIBIT B



# CNBM

China National Building Material Company Limited*

(Stock Code:3323)



**2013**

Annual Report 年度報告

\* For identification only

# Financial and Business Highlights

|  | As at 31 December | | Growth rate |
|---|---|---|---|
|  | **2013** | 2012 | |
|  | | *(RMB in millions)* | |
| Bank balances and cash | **8,980** | 10,222 | −12.2% |
| Total assets | **291,631** | 246,434 | 18.3% |
| Equity attributable to equity holders | **35,378** | 30,496 | 16.0% |
| Earnings per share-basic *(RMB)* | **1.07** | 1.03 | 3.3% |

|  | For the year ended 31 December | | Growth rate |
|---|---|---|---|
|  | **2013** | 2012 | |
|  | | *(RMB in millions)* | |
| Revenue | **117,688** | 87,218 | 34.9% |
| Profit after taxation | **8,312** | 7,737 | 7.4% |
| Profit attributable to equity holders of the Company | **5,762** | 5,580 | 3.3% |
| Net cash flows from operating activities | **11.656** | 10,017 | 16.4% |
| Sales volume of cement and clinker *(in thousand tonnes)* | **285,104** | 220,884 | 29.1% |
| — China United | **67,102** | 61,740 | 8.7% |
| — South Cement | **118,579** | 98,835 | 20.0% |
| — North Cement | **21,219** | 21,208 | 0.1% |
| — Southwest Cement | **76,184** | 38,400 | 98.4% |
| Commercial concrete sales volume *(in thousand m³)* | **87,079** | 31,151 | 179.5% |
| — China United | **33,140** | 14,006 | 136.6% |
| — South Cement | **49,412** | 16,153 | 205.9% |
| — North Cement | **1,378** | 629 | 119.1% |
| — Southwest Cement | **1,204** | 274 | 339.4% |
| Gypsum board *(in million m²)* | **1,230** | 1,053 | 16.8% |
| Revenue from engineering service *(RMB in millions)* | **6,760** | 6,067 | 11.4% |
| Rotor blade *(in blade)* | **3,241** | 3,507 | −7.6% |
| Glass fibre yarn *(in thousand tonnes)* | **822** | 793 | 3.7% |
| Selling price | | | |
| Cement sold by China United *(RMB per tonne)* | **253.1** | 266.7 | −5.1% |
| Clinker sold by China United *(RMB per tonne)* | **226.4** | 236.0 | −4.1% |
| Commercial concrete sold by China United *(RMB per m³)* | **306.0** | 303.7 | 0.8% |
| Cement sold by South Cement *(RMB per tonne)* | **250.3** | 265.5 | −5.7% |
| Clinker sold by South Cement *(RMB per tonne)* | **220.4** | 218.7 | 0.8% |
| Commercial concrete sold by South Cement *(RMB per m³)* | **315.5** | 294.5 | 7.1% |
| Cement sold by North Cement *(RMB per tonne)* | **347.0** | 369.4 | −6.1% |
| Clinker sold by North Cement *(RMB per tonne)* | **275.4** | 308.9 | −10.8% |
| Commercial concrete sold by North Cement *(RMB per m³)* | **385.2** | 353.0 | 9.1% |
| Cement sold by Southwest Cement *(RMB per tonne)* | **256.0** | 250.5 | 2.2% |
| Clinker sold by Southwest Cement *(RMB per tonne)* | **240.9** | 248.0 | −2.9% |
| Commercial concrete sold by Southwest Cement *(RMB per m³)* | **275.6** | 305.7 | −9.8% |
| Gypsum board | | | |
| — BNBM *(RMB per m²)* | **6.93** | 7.09 | −2.3% |
| — Taishan Gypsum *(RMB per m²)* | **4.80** | 4.94 | −2.8% |
| Rotor blade *(RMB per blade)* | **396,100.0** | 375,900.0 | 5.4% |



# Contents

CORPORATE PROFILE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

CORPORATE INFORMATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   7

SHAREHOLDING STRUCTURE OF THE GROUP. . . . . . . . . . . . . . . . .   13

FINANCIAL HIGHLIGHTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

BUSINESS HIGHLIGHTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

CHAIRMAN'S STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   18

MANAGEMENT DISCUSSION AND ANALYSIS. . . . . . . . . . . . . . . . . .   21

CORPORATE GOVERNANCE REPORT . . . . . . . . . . . . . . . . . . . . . . . .   45

DIRECTORS' REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   60

REPORT OF THE SUPERVISORY COMMITTEE . . . . . . . . . . . . . . . . .   78

SIGNIFICANT EVENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   80

BIOGRAPHICAL DETAILS OF DIRECTORS, SUPERVISORS
  AND SENIOR MANAGEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   81

INDEPENDENT AUDITOR'S REPORT. . . . . . . . . . . . . . . . . . . . . . . . . .   95

CONSOLIDATED INCOME STATEMENT . . . . . . . . . . . . . . . . . . . . . . .   97

CONSOLIDATED STATEMENT OF
  COMPREHENSIVE INCOME . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   98

CONSOLIDATED STATEMENT OF FINANCIAL POSITION . . . . . . . . . .   99

CONSOLIDATED STATEMENT OF CHANGES IN EQUITY . . . . . . . . . .   101

CONSOLIDATED STATEMENT OF CASH FLOWS. . . . . . . . . . . . . . . .   103

NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS . . . . . . .   106

FINANCIAL SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   216

This Annual Report, in both Chinese and English versions, is available on the Company's website at http://cnbm.wsfg.hk (the "Company Website"). Shareholders who have chosen or have been deemed consented to receive the corporate communications of the Company (the "Corporate Communications") via the Company Website and who for any reason have difficulty in receiving or gaining access to the Corporate Communications posted on the Company Website will promptly upon request be sent the Corporate Communications in printed form free of charge.

Shareholders may at any time change their choice of the means of receipt of the Corporate Communications (either in printed form or via the Company Website).

Shareholders may send their requests at any time to receive the Annual Report and/or to change their choice of the means of receipt of the Corporate Communications by notice in writing to the H share registrar of the Company, Tricor Investor Services Limited at Level 22, Hopewell Centre, 183 Queen's Road East, Hong Kong or by sending an email to the H share registrar of the Company at cnbm3323-ecom@hk.tricorglobal.com.

# Corporate Profile

With Parent, BNBMG, CNBM Trading, Cinda and Building Materials Academy as Promoters, the Company was converted into a joint stock limited company on 28 March 2005. The Company's H shares under the initial public offering were listed on the Stock Exchange on 23 March 2006 (Stock Code: 3323) and approximately 150 million H shares, 300 million H shares and 240 million H shares were placed on 9 August 2007, 5 February 2009 and 14 September 2010, respectively. The Company issued bonus shares on 13 June 2011 on the basis of ten bonus shares to be issued for every ten shares held by the Shareholders. As at 31 December 2013, the Company has a total issued share capital of 5,399,026,262 Shares.

The Group is mainly engaged in cement, lightweight building materials, glass fibre, composite materials and engineering services businesses. As regards the current market positions (in terms of the production capacity in 2013), the Group is:

• the largest cement producer in the world;

• the largest commercial concrete producer in the world;

• the largest gypsum board producer in the world;

• the largest rotor blade producer in the PRC;

• a leading glass fibre producer in the world through China Fiberglass, an associate of the Company;

• an international engineering firm that provides glass and cement production lines design and EPC services in the PRC, designed and/or constructed over 50% of the float glass production lines in the PRC.

EXHIBIT B
Page 5 of 218

# Corporate Information

## DIRECTORS:

### Executive Directors

Song Zhiping *(Chairman of the Board)*
Cao Jianglin *(President)*
Peng Shou *(Vice President)*
Cui Xingtai *(Vice President)*
Chang Zhangli *(Vice President)*

### Non-executive Directors

Guo Chaomin
Huang Anzhong
Cui Lijun

### Independent Non-executive Directors

Qiao Longde
Li Decheng
Ma Zhongzhi
Shin Fang
Wu Liansheng

## STRATEGIC STEERING COMMITTEE:

Song Zhiping *(Chairman)*
Qiao Longde
Cao Jianglin

## NOMINATION COMMITTEE:

Qiao Longde *(Chairman)*
Li Decheng
Song Zhiping

## REMUNERATION AND PERFORMANCE APPRAISAL COMMITTEE:

Shin Fang *(Chairman)*
Li Decheng
Song Zhiping

# Corporate Information *(Continued)*

## AUDIT COMMITTEE:

Wu Liansheng *(Chairman)*
Ma Zhongzhi
Cui Lijun

## SUPERVISORS:

Wu Jiwei *(Chairman of the Supervisory Committee)*
Zhou Guoping
Tang Yunwei *(Independent Supervisor)*
Zhao Lihua *(Independent Supervisor)*
Cui Shuhong *(Staff Representative Supervisor)*
Liu Zhiping *(Staff Representative Supervisor)*

| | |
|---|---|
| **Secretary of the Board:** | Chang Zhangli |
| **Joint Company Secretaries:** | Chang Zhangli<br>Lo Yee Har Susan (FCS, FCIS) |
| **Authorized Representatives:** | Song Zhiping<br>Chang Zhangli |
| **Alternate Authorized Representative:** | Lo Yee Har Susan (FCS, FCIS)<br>(Lee Mei Yi (FCS, FCIS), alternate to Lo Yee Har Susan) |
| **Qualified Accountant:** | Pei Hongyan (FCCA) |
| **Registered Address:** | No. A-11 Sanlihe Road<br>Haidian District, Beijing<br>The PRC |
| **Principal Place of Business:** | 21st Floor<br>Tower 2, Guohai Plaza<br>No. 17 Fuxing Road<br>Haidian District, Beijing<br>The PRC |
| **Postal Code:** | 100036 |
| **Place of Representative Office in Hong Kong:** | Level 54<br>Hopewell Centre<br>183 Queen's Road East<br>Hong Kong |

# Corporate Information *(Continued)*

| | |
|---|---|
| **Principal Bankers:** | Bank of Communications Co., Ltd. |
| | Agricultural Bank of China Limited |
| | China Construction Bank Corporation |
| | |
| **PRC Legal Adviser:** | Jingtian and Gongcheng Law Office |
| | Level 34, Tower 3, China Central Palace |
| | 77 Jianguo Road |
| | Chaoyang District, Beijing |
| | The PRC |
| | |
| **Hong Kong Legal Adviser:** | Slaughter and May |
| | 47th Floor, Jardine House |
| | 1 Connaught Place |
| | Central |
| | Hong Kong |
| | |
| **International Auditor:** | Baker Tilly Hong Kong Limited |
| | 2nd Floor |
| | 625 King's Road, North Point |
| | Hong Kong |
| | |
| **Domestic Auditor:** | Baker Tilly China Certified Public Accountants |
| | Building 12, Foreign Cultural and Creative Garden |
| | No. 19, Chegongzhuang West Road |
| | Haidian District, Beijing |
| | The PRC |
| | |
| **H Share Registrar in Hong Kong:** | Level 22 |
| | Hopewell Centre |
| | 183 Queen's Road East |
| | Hong Kong |
| | |
| **Stock Code:** | 3323 |
| | |
| **Company Website:** | http://cnbm.wsfg.hk |
| | www.cnbmltd.com |

# Definitions

*In this annual report, unless the context otherwise requires, the following terms shall have the meanings set out below:*

| | |
|---|---|
| "Articles of Association" | the articles of association of the Company |
| "Baker Tilly China" | 天職國際會計師事務所（特殊普通合夥）(Baker Tilly China Certified Public Accountants) |
| "Baker Tilly HK" | 天職香港會計師事務所有限公司 (Baker Tilly Hong Kong Limited) |
| "Beijing Triumph" | 北京凱盛建材工程有限公司 (Beijing Triumph Building Materials Engineering Co., Ltd.) |
| "Bengbu Triumph" | 蚌埠凱盛工程技術有限公司 (China Triumph Bengbu Engineering and Technology Company Limited) |
| "Binzhou Cement" | 黑龍江省賓州水泥有限公司 (Heilongjiang Binzhou Cement Company Limited) |
| "BNBM" | 北新集團建材股份有限公司 (Beijing New Building Material Public Limited Company) |
| "BNBMG" | 北新建材集團有限公司 (Beijing New Building Materials Group Company Limited) |
| "BNBM Homes" | 北新房屋有限公司 (BNBM Homes Company Limited) |
| "BNBM Ningbo" | 寧波北新建材有限公司 (BNBM Ningbo Company Limited) |
| "BNBM PNG" | 中建投巴新公司 (BNBM PNG Limited) |
| "BNBM Taicang" | 太倉北新建材有限公司 (BNBM Taicang Company Limited) |
| "BNBM Zhaoqing" | 肇慶北新建材有限公司 (BNBM Zhaoqing Company Limited) |
| "BNS" | 北新科技發展有限公司 (BNS Company Limited) |
| "Board" | the board of directors of the Company |
| "Building Materials Academy" | 中國建築材料科學研究總院 (China Building Materials Academy) |
| "China Composites" | 中國複合材料集團有限公司 (China Composites Group Corporation Limited) |
| "China Fiberglass" | 中國玻纖股份有限公司 (China Fiberglass Company Limited) |
| "China Triumph" | 中國建材國際工程集團有限公司 (China Triumph International Engineering Company Limited) |

EXHIBIT B
Page 9 of 218

# Definitions *(Continued)*

| | |
|---|---|
| "China United" | 中國聯合水泥集團有限公司 (China United Cement Corporation) |
| "Chongqing Southwest Cement" | 重慶西南水泥有限公司 (Chongqing Southwest Cement Company Limited) |
| "Cinda" | 中國信達資產管理股份有限公司 (China Cinda Asset Management Co., Ltd.) |
| "CNBM Investment" | 中建材投資有限公司 (CNBM Investment Company Limited) |
| "CNBMI Logistics" | 中建投物流有限公司 (CNBMI Logistics Company Limited) |
| "CNBMIT" | 中建投商貿有限公司 (CNBMIT Co., Ltd) |
| "CNBM Trading" | 中建材集團進出口公司 (China National Building Material Import and Export Company) |
| "Company" or "CNBM" | 中國建材股份有限公司 (China National Building Material Company Limited) |
| "Company Law" | the Company Law of the PRC |
| "controlling shareholder" | has the meaning ascribed thereto under the Listing Rules |
| "CSRC" | 中國證券監督管理委員會 (China Securities Regulatory Commission) |
| "Dequan Wangqing" | 吉林德全集團汪清水泥有限責任公司 (Jilin Dequan Cement Group Wangqing Co., Ltd.) |
| "Dezhou China United" | 德州中聯大壩水泥有限公司 (China United Cement Dezhou Daba Co., Ltd.) |
| "Director(s)" | the member(s) of the Board of the Company |
| "Domestic Shares" | the ordinary shares with a nominal value of RMB1.00 each in the registered capital of the Company, which are subscribed for in RMB |
| "EPC" | turn-key project services that include design, procurement and construction etc. |
| "Fa Gai Chan Ye [2013] No. 892 Document" | "Notice about the Determination to Suppress Unchecked Expansion of Industries with Severe Excess Capacity" (《關於堅決遏制產能嚴重過剩行業盲目擴張的通知》) jointly issued by the National Development and Reform Commission of the PRC（國家發展和改革委員會）and MIIT on 10 May 2013 |

# Definitions *(Continued)*

| | |
|---|---|
| "Five C" | marketing centralisation, procurement centralisation, financial centralisation, technical centralisation and investment decision-making centralisation |
| "GDP" | gross domestic product |
| "Group", "we" and "us" | the Company and, except where the context otherwise requires, all its subsidiaries |
| "Guangxi South Cement" | 廣西南方水泥有限公司(Guangxi South Cement Company Limited) |
| "Guizhou Southwest Cement" | 貴州西南水泥有限公司 (Guizhou Southwest Cement Company Limited) |
| "Guo Fa [2013] No. 41 Document" | "the State Council's Guidelines on Addressing Severe Overcapacity" (國務院關於化解產能嚴重過剩矛盾的指導意見) issued on 15 October 2013 |
| "H Share(s)" | the overseas listed foreign shares with a nominal value of RMB1.00 each in the share capital of the Company, which are listed on the Stock Exchange and subscribed for and traded in HK$ |
| "Heihe Guanniaohe Cement" | 黑河關鳥河水泥有限責任公司 (Heihe Guanniaohe Cement Company Limited) |
| "HK$" | Hong Kong dollars, the lawful currency of the Hong Kong Special Administrative Region |
| "Huaihai" | including (but not limited to) southern Shandong, northern Jiangsu, eastern Henan and northern Anhui |
| "Huaihai China United" | 淮海中聯水泥有限公司 (China United Cement Huaihai Co., Ltd.) |
| "Hunan South Cement" | 湖南南方水泥集團有限公司 (Hunan South Cement Group Company Limited) |
| "IFRS" | International Financial Reporting Standards |
| "Independent Third Party(ies)" | person(s) or company(ies) which is (are) independent of the directors, supervisors, controlling shareholder, substantial shareholder and the chief executive (such terms as defined in the Listing Rules) of the Company or any of its subsidiaries or an associate of any of them |
| "Jiamusi North Cement" | 佳木斯北方水泥有限公司 (Jiamusi North Cement Company Limited) |
| "Jiangxi South Cement" | 江西南方水泥有限公司 (Jiangxi South Cement Company Limited) |
| "Jingang Group" | 遼源金剛水泥（集團）有限公司 (Liaoyuan Jingang Cement (Group) Company Limited) |
| "Jushi Group" | 巨石集團有限公司 (Jushi Group Company Limited) |

## Definitions *(Continued)*

| | |
|---|---|
| "KPI" | Key performance index |
| "Listing Rules" | the Rules Governing the Listing of Securities on the Stock Exchange as amended from time to time |
| "Lunan China United" | 魯南中聯水泥有限公司 (China United Cement Lunan Co., Ltd.) |
| "MIIT'' | Ministry of Industry and Information Technology of the People's Republic of China |
| "Nanjing Triumph" | 南京凱盛國際工程有限公司 (Nanjing Triumph International Engineering Company Limited) |
| "NBS" | 中國國家統計局(National Bureau of Statistics of China) |
| "Non-Competition Agreement" | the non-competition agreement dated 28 February 2006 entered into between the Company and the Parent, which is stated on pages 160 to 162 of the prospectus of the Company |
| "North Cement" | 北方水泥有限公司 (North Cement Company Limited) |
| "Northern China" | including (but not limited to) Heilongjiang, Jilin and Liaoning |
| "NSP" | cement produced by clinker made through the new suspension preheater dry process |
| "Parent" | 中國建築材料集團有限公司 (China National Building Material Group Corporation) |
| "Parent Group" | collectively, Parent and its subsidiaries (excluding the Group) |
| "PCP" | PCP, being Price-Cost-Profit |
| "PRC" | the People's Republic of China |
| "preparation, meticulosity, refinement, solidity" | making deployment of operation in advance, implementing plans and accomplishing goals as early as possible; further refining objectives and measures, and formulating specific strategies based on the markets and features; advancing management enhancement, meticulous organisation and delicacy management to improve quality and profitability; working solidly with sound dedication to enhance the basis for development and strengthen foundation |
| "Promoters" | the initial promoters of the Company, being the Parent, BNBMG, Cinda, the Building Materials Academy and the CNBM Trading |
| "Qingzhou China United" | 青州中聯水泥有限公司 (Qingzhou China United Cement Company Limited) |

## Definitions *(Continued)*

| | |
|---|---|
| "Qufu China United" | 曲阜中聯水泥有限公司 (Qufu China United Cement Company Limited) |
| "Reporting Period" | the period from 1 January 2013 to 31 December 2013 |
| "RMB"or "Renminbi" | Renminbi yuan, the lawful currency of the PRC |
| "SFO" | Securities and Futures Ordinance (Cap. 571 of the Laws of Hong Kong) |
| "Shanghai South Cement" | 上海南方水泥有限公司 (Shanghai South Cement Company Limited) |
| "Shanghai Yaopi" | 上海耀華皮爾金頓玻璃股份有限公司 (Shanghai Yaohua Pilkington Glass Co., Ltd.) |
| "Shanghai Zhentong" | 上海圳通股權投資管理有限公司 (Shanghai Zhentong Equity Investment Management Company Limited) |
| "Share(s)" | ordinary shares of the Company with a nominal value of RMB1.00 each, comprising both the Domestic Shares and the H Shares |
| "Shareholder(s)" | holder(s) of Share(s) |
| "Shenzhen Jinda" | 深圳京達股權投資管理有限公司 (Shenzhen Jinda Equity Investment Management Company Limited) |
| "Shenzhen Triumph" | 深圳市凱盛科技工程有限公司 (CTIEC Shenzhen Scieno-tech Engineering Company Limited) |
| "Sichuan Jiahua" | 四川嘉華企業（集團）股份有限公司 (Sichuan Jiahua Enterprise (Group) Co., Ltd) |
| "Sichuan Southwest Cement" | 四川西南水泥有限公司 (Sichuan Southwest Cement Company Limited) |
| "South Cement" | 南方水泥有限公司 (South Cement Company Limited) |
| "Southwest Cement" | 西南水泥有限公司（Southwest Cement Company Limited） |
| "State" | the government of the PRC including all political subdivisions (including provincial, municipal and other regional or local government entities) and instrumentalities thereof |
| "Stock Exchange" | The Stock Exchange of Hong Kong Limited |
| "Supervisor(s)" | the member(s)of the Supervisory Committee |
| "Supervisory Committee" | the supervisory committee of the Company |
| "Taishan China United" | 泰山中聯水泥有限公司 (China United Cement Taishan Co., Ltd.) |

# Definitions *(Continued)*

| | |
|---|---|
| "Taishan Gypsum" | 泰山石膏股份有限公司 (Taishan Gypsum Company Limited) |
| "'Three Five' management" | Five N (operation mode), i.e. integration, modelization, institutionalization, processisation and digitalisation. Five C (management mode), i.e. marketing centralisation, procurement centralisation, financial centralisation, technical centralisation and investment decision-making centralization. Five I (five key operation indices), i.e. net profit, selling price and sales volume, cost, cash flow and gearing ratio |
| "Three Formulations" | Formulation of functions, formulation of structure and formulation of staffing |
| "Weijin Jingang" | 遼源渭津金剛水泥有限公司 (Liaoyuan Weijin Jingang Cement Company Limited) |
| "Wulanchabu China United" | 烏蘭察布中聯水泥有限公司 (China United Cement Wulanchabu Co., Ltd.) |
| "Xinjiang Triumph" | 新疆凱盛建材設計研究院 (Xinjiang Triumph Building Materials Designing Institute) |
| "Xuzhou China United" | 徐州中聯水泥有限公司 (China United Cement Xuzhou Co., Ltd.) |
| "Yichun North Cement" | 伊春北方水泥有限公司 (Yichun North Cement Company Limited) |
| "Yunnan Southwest Cement" | 雲南西南水泥有限公司 (Yunnan Southwest Cement Company Limited) |
| "Zaozhuang China United" | 棗莊中聯水泥有限公司 (China United Cement Zaozhuang Co., Ltd.) |
| "Zhejiang South Cement" | 浙江南方水泥有限公司 (Zhejiang South Cement Company Limited) |
| "Zhongfu Lianzhong" | 連雲港中複連眾複合材料集團有限公司 (Lianyungang Zhongfu Lianzhong Composite Material Group Company Limited) |
| "Zhongfu Liberty" | 常州中複麗寶第複合材料有限公司 (Changzhou China Composites Liberty Company Limited) |
| "Zhongfu Shenying" | 中複神鷹碳纖維有限責任公司 (Zhongfu Shenying Carbon Fiber Company Limited) |

# Shareholding Structure of the Group

The simplified structure of the Group as at 31 December 2013 is set out as below:



Note: The aforementioned percentages are rounded to 2 decimal places.

EXHIBIT B
Page 15 of 218

# Financial Highlights

The summary of financial results of the Group for 2013 and 2012 is as follows:

| | For the year ended 31 December | |
| | 2013 | 2012 |
| | (RMB in thousands) | |
|---|---|---|
| Revenue | 117,687,840 | 87,217,629 |
| Gross profit | 30,137,997 | 20,128,462 |
| Profit after taxation | 8,311,870 | 7,736,986 |
| Profit attributable to equity holders of the Company | 5,761,854 | 5,579,601 |
| Distribution made to the equity holders of the Company | 836,849 | 1,160,791 |
| Earnings per share basic *(RMB)*[1] | 1.07 | 1.03 |

Note:

(1)    The calculations of basic earnings per share are based on the profit attributable to equity holders of the Company of each period and on the weighted average number of 5,399,026,262 shares for 2012 and the weighted average number of 5,399,026,262 shares for 2013.

| | As at 31 December | |
| | 2013 | 2012 |
| | (RMB in thousands) | |
|---|---|---|
| Total assets | 291,631,175 | 246,433,547 |
| Total liabilities | 238,055,276 | 202,368,700 |
| Net assets | 53,575,899 | 44,064,847 |
| Non-controlling interests | 18,197,476 | 13,568,749 |
| Equity attributable to equity holders of the Company | 35,378,423 | 30,496,098 |
| Net assets per share weighted average *(RMB)*[1] | 6.55 | 5.65 |
| Debt to assets ratio[2] | 58.4% | 57.9% |
| Net debts/equity ratio[3] | 300.9% | 300.5% |

Notes:

(1)    The calculations of weighted average net assets per share are based on the equity attributable to equity holders of the Company of each period and on the weighted average number of 5,399,026,262 shares for 2012 and the weighted average number of 5,399,026,262 shares for 2013.

(2)    Debt to assets ratio = total borrowings/total assets*100%

(3)    Net debt ratio = (total borrowings-bank balances and cash)/(non-controlling interests + equity attributable to equity holders of the Company)*100%

# Business Highlights

The major operating data of each segment of the Group for 2013 and 2012 are set out below:

## CEMENT SEGMENT

### China United

| | For the year ended 31 December | |
| --- | --- | --- |
| | 2013 | 2012 |
| Production volume-cement *(in thousand tonnes)* | **48,560.0** | 42,590.1 |
| Production volume-clinker *(in thousand tonnes)* | **54,030.0** | 46,348.8 |
| Sales volume-cement *(in thousand tonnes)* | **43,752.0** | 40,390.0 |
| Sales volume-clinker *(in thousand tonnes)* | **23,350.0** | 21,350.0 |
| Unit selling price-cement *(RMB per tonne)* | **253.1** | 266.7 |
| Unit selling price-clinker *(RMB per tonne)* | **226.4** | 236.0 |
| Sales volume-commercial concrete *(in thousand m³)* | **33,140.0** | 14,006.1 |
| Unit selling price-commercial concrete *(RMB per m³)* | **306.0** | 303.7 |

### South Cement

| | For the year ended 31 December | |
| --- | --- | --- |
| | **2013** | 2012 |
| Production volume-cement *(in thousand tonnes)* | **102,170.0** | 80,462.4 |
| Production volume-clinker *(in thousand tonnes)* | **95,005.8** | 76,010.1 |
| Sales volume-cement *(in thousand tonnes)* | **92,517.0** | 76,816.5 |
| Sales volume-clinker *(in thousand tonnes)* | **26,062.1** | 22,018.9 |
| Unit selling price-cement *(RMB per tonne)* | **250.3** | 265.5 |
| Unit selling price-clinker *(RMB per tonne)* | **220.4** | 218.7 |
| Sales volume-commercial concrete *(in thousand m³)* | **49,411.8** | 16,153.1 |
| Unit selling price-commercial concrete *(RMB per m³)* | **315.5** | 294.5 |

# Business Highlights *(Continued)*

## North Cement

| | For the year ended 31 December | |
| --- | --- | --- |
| | **2013** | 2012 |
| Production volume-cement *(in thousand tonnes)* | **13,701.3** | 13,080.6 |
| Production volume-clinker *(in thousand tonnes)* | **15,372.7** | 15,804.0 |
| Sales volume-cement *(in thousand tonnes)* | **13,789.5** | 13,272.3 |
| Sales volume-clinker *(in thousand tonnes)* | **7,429.1** | 7,937.7 |
| Unit selling price-cement *(RMB per tonne)* | **347.0** | 369.4 |
| Unit selling price-clinker *(RMB per tonne)* | **275.4** | 308.9 |
| Sales volume-commercial concrete *(in thousand m³)* | **1,377.6** | 629.1 |
| Unit selling price-commercial concrete *(RMB per m³)* | **385.2** | 353.0 |

## Southwest Cement

| | For the year ended 31 December | |
| --- | --- | --- |
| | **2013** | 2012 |
| Production volume-cement *(in thousand tonnes)* | **72,739.0** | 36,117.9 |
| Production volume-clinker *(in thousand tonnes)* | **55,127.4** | 28,109.9 |
| Sales volume-cement *(in thousand tonnes)* | **71,915.5** | 36,294.7 |
| Sales volume-clinker *(in thousand tonnes)* | **4,268.8** | 2,105.0 |
| Unit selling price-cement *(RMB per tonne)* | **256.0** | 250.5 |
| Unit selling price-clinker *(RMB per tonne)* | **240.9** | 248.0 |
| Sales volume-commercial concrete *(in thousand m³)* | **1,204.3** | 274.3 |
| Unit selling price-commercial concrete *(RMB per m³)* | **275.6** | 305.7 |

# Business Highlights *(Continued)*

## LIGHTWEIGHT BUILDING MATERIALS SEGMENT

| | For the year ended 31 December | |
| --- | --- | --- |
| | **2013** | 2012 |
| **Gypsum boards — BNBM** | | |
| Production volume *(in million m²)* | **208.3** | 156.7 |
| Sales volume *(in million m²)* | **204.6** | 163.8 |
| Average unit selling price *(RMB per m²)* | **6.93** | 7.09 |
| **Gypsum boards — Taishan Gypsum** | | |
| Production volume *(in million m²)* | **1,044.7** | 887.1 |
| Sales volume *(in million m²)* | **1,025.6** | 889.5 |
| Average unit selling price *(RMB per m²)* | **4.80** | 4.94 |

## GLASS FIBRE AND COMPOSITE MATERIALS SEGMENT

| | For the year ended 31 December | |
| --- | --- | --- |
| | **2013** | 2012 |
| Rotor blade | | |
| Production volume *(in blade)* | **2,807.0** | 3,067.0 |
| Sales volume *(in blade)* | **3,241.0** | 3,507.0 |
| Average unit selling price *(RMB per blade)* | **396,100.0** | 375,900.0 |

EXHIBIT B
Page 19 of 218

# Chairman's Statement

**Dear Shareholders,**

In 2013, confronted with complex economic situations both at home and abroad, the central government of China concentrated on improving the quality and efficiency of economic growth as the main focus, adhered to the general tone of making progress while ensuring stability, firmly deepened reform and opening-up and made innovation of macro-control in a scientific way. As a result, the overall national economic performance showed good momentum of stable moderate growth. Compared with the same period last year, China's GDP increased by 7.7%, while the total investments in fixed assets and real estate development increased by 19.6% and 19.8% respectively. Benefited from the rapid increase of the investments in infrastructure construction and real estate development, the demand for the building material industry grew stably and its economic efficiency improved steadily.



**SONG ZHIPING**
**Chairman**
**Executive Director**

EXHIBIT B
Page 20 of 218

# Chairman's Statement *(Continued)*

In 2013, under the discerning decisions of the Board, the management team led our staff to actively tackle the complicated external environment and the unprecedented economic pressures. We focused on working thought of "integration and optimization, profit raising and gearing reduction". In adherence to the principle of "preparation, meticulosity, refinement, solidity", we consolidated construction of the core profit-generating regions, deepened management integration, strived to reduce costs and increase profit, and facilitated the transformation and upgrading, aiming to improve development quality and efficiency indeed and to achieve stable development. Under the IFRS, the Group's consolidated revenue amounted to RMB117,688 million for the year of 2013, representing an increase of 34.9% over the same period last year. Profit attributable to equity holders of the Company amounted to RMB5,762 million, representing an increase of 3.3% over the same period last year. Taking this opportunity, I would like to express my heartfelt gratitude to the management team and all the staff for their hard work and contribution, especially all our Shareholders for their lasting trust and support.

On behalf of the Board, I am pleased to present the Company's 2013 Annual Report and major results to you:

In accordance with the strategic target of "establishing a world-class building material enterprise with international competence", CNBM adhered to the operational mode of "Market-oriented Operation of Central State-owned Enterprises" to conduct market-oriented reforms. We merged state-owned economy with private economy to construct a strong platform of mixed ownership industry at high degree, and formed a series of typical enterprises with mixed-ownership. As a result, the cohesion, innovation and competence of the enterprises were significantly improved. CNBM conducted consolidation and restructuring in a market-oriented way, implemented management integration in accordance with the market principle and carried out integrated innovation driven by the market to realize the steady and healthy development of the enterprise. Based on the rapid development in the past few years, CNBM has changed its development strategy in the new environment with its focus shifted to integration and optimization, profit raising and gearing reduction. It solidly launched management enhancement, deepened the "Three Five" Management, strengthened benchmark management, optimized organizational structure, tapped potential, reduced costs and increased profit to further improve management standard and competitiveness of the enterprise.

Confronted with the severe overcapacity and the prolonged low industry value of the building material industry, the State Council issued Guo Fa [2013] No. 41 Document (國發〔2013〕41號文件), aiming to resolve the overcapacity issue in cement and some other industries. As the leading enterprise in the industry, CNBM focused on policy guidance and market stabilization. Through fully leveraging on the effect of market consolidation as a large enterprise, it continuously promoted consolidation and restructuring, enhanced industrial concentration ratio and developed with optimized inventory and reduced production. CNBM insisted on the business ideology of "PCP", enhanced its market competition and cooperation, promoted self-discipline in the industry and protected the harmonious and healthy market environment with rational competition. Furthermore, it actively enhanced the industry chain extension to increase the added-value of products, and adhered to the low-carbon development to facilitate energy conservation and emission reduction. All these not only helped CNBM to achieve its own development, but also helped solve the overcapacity problem and promote the sustainable development of the industry.

## Chairman's Statement *(Continued)*

The past year witnessed our endeavour and achievement, and we are fully confident to face the future.

The domestic economic situation in 2014 is still complicated, but it is expected to see some improvement in general. China is in a significant period with strategic opportunities, a crucial period of structural adjustment and a transformational period of economic growth, but the favourable fundamentals for the long term development remain invariant. The central government of China will continue to adhere to the general tone of making progress while ensuring stability with the anticipated GDP growth rate at approximately 7.5%. In respect to the building material industry, the supply and demand dynamics is expected to be improved in 2014. The National Conference on Urbanisation（全國城鎮化工作會議）and the National New-type Urbanization Plan (2014-2020) (《國家新型城鎮化規劃（2014-2020年）》) paid more emphasis on the new-type urbanisation construction and proposed to develop "several urban agglomerations". Consequently, the central government of China will provide more support for the construction of railways and roads as well as public service facilities and social housing etc. The urbanization rate is expected to reach approximately 60% in 2020, which will bring about a long-term and stable demand for the building material industry. Meanwhile, the central government of China will continue to take a firm stand on solving the overcapacity issue by announcing no more new capacity added in the cement and some other industries by 2017 and releasing schemes of abolishing the standard for P.C 32.5 cement product and encouraging merge and restructuring of enterprises and the local governments will also propose measures of production restriction and eliminating outdated capacity to curb air pollution, which will alleviate the imbalance between supply and demand of the building material industry to some extent.

2014 is a year of deep management integration for CNBM. We will concentrate on the operating target of "making progress while ensuring stability". "Stability" refers to consolidating management foundations, stabilizing revenue, market and price, strengthening risk control and deepening management integration. "Progress" refers to improvement in the overall quality and core competence of the enterprise, accelerating transformation and upgrading, adhering to innovation and fully implementing "integration and optimization, profit raising and gearing reduction". It will fully implement "Eight Working Methods" of deep integration, which include "Five C", KPI management, zero inventory, "PCP", benchmark management and optimization, counsellor system, core profit-generating regions and market competition and cooperation. Deeply adhering to the principle of "preparation, meticulosity, refinement, solidity", we shall make great efforts on each work of the year 2014, endeavor to improve quality and efficiency of development and to reward the Shareholders and the society with outstanding results.

**Song Zhiping**
*Chairman of the Board*

Beijing, the PRC
25 March 2014

## Management Discussion and Analysis



**CAO JIANGLIN**
President
Executive Director

## BUSINESS OVERVIEW

The business segments and the major operating entities of each business segment for the Group as at the date of this report are summarized as follows:

| Business segments | Major products and services | Major operating entities | Direct and indirect equity interests held by the Company |
|---|---|---|---|
| Cement | NSP cement and commercial concrete | China United | 100.00% |
| | | South Cement | 80.00% |
| | | North Cement | 70.00% |
| | | Southwest Cement | 70.00% |
| Lightweight building materials | Dry wall and ceiling system | BNBM | 52.40% |
| Glass fibre and composite materials | Rotor blades | China Composites | 100.00% |
| | Glass fibre | China Fiberglass | 32.79% |
| Engineering services | Design and engineering EPC services: Float glass production lines and NSP cement production lines | China Triumph | 91.00% |

EXHIBIT B
Page 23 of 218

# Management Discussion and Analysis *(Continued)*

In 2013, the Group actively confronted with the difficulties and challenges arising from the slow-down economy, severe overcapacity issue and more significant imbalance between the supply and demand, etc. In line with the thinking focused on "integration and optimization, profit raising and gearing reduction" and the principle of "preparation, meticulosity, refinement, solidity", the Group monitored its KPI carefully, insisted on the business ideology of "PCP" to enhance marketing and strengthened management integration to realize cost reduction and profit raising. Focused the construction of the core profit-generating regions, the Group steadily promoted consolidation and restructuring to increase its market control. In spite of unfavourable conditions, the efforts enabled to the Group to maintain a sound development, with achievements in deep management integration, continuous decrease in production cost and the gradual consummation of the construction of the core profit-generating regions. In 2013, the Group achieved a steady increase in the sales volume of its major products, the revenue and the profit. The cement and clinker total sales volume increased by 29.1% year on year to 285.1 million tonnes, commercial concrete sales volume increased by 179.5% year on year to 87.1 million m³, gypsum board sales volume increased by 16.8% year on year to 1,230 million m², glass fiber total sales volume increased by 3.7% year on year to 822 thousands tonnes. The revenue increased by 34.9% year on year to RMB117,688 million and the profit attributable to the equity holders of the Company increased by 3.3% year on year to RMB5,762 million.

## CEMENT SEGMENT

In 2013, the national economic growth experienced a slowdown, whilst the investment in fixed assets saw a steady growth with a recovery in the investments of infrastructure and real estate. As a result, the national cement production increased by 9.3% year on year to 2.42 billion tonnes and the economic profitability of the cement industry was improved. (source of information: NBS)

The central government of China was highly concerned about the overcapacity issue, and promulgated documents Fa Gai Chan Ye [2013] No.892 Document（發改產業〔2013〕892號文件）and Guo Fa [2013] No. 41 Document（國發〔2013〕41號文件）. A series of policy measures were proposed including prohibition on the construction of new capacity projects, eliminating obsolete production capacity, implementing replacement of existing capacity with the same or less amount, and promoting the use of high-grade cement and high-performance concrete. In the meantime, the central government of China paid more attention to the air pollution prevention. Thus, it encouraged energy and emissions reductions and facilitated industry transformation and upgrade through raising the emission standards of pollutants. In 2013, the fixed assets investment in the cement industry of China decreased by 6.5% over the last year. The additional production capacity of clinkers was 94.3 million tonnes, with a total outdated cement production capacity of approximately 95 million tonnes phased out, whilst the NSP clinker capacity accounted for over 90%. The industry consolidation continued to make progress with increasing concentration ratio, while the total market shares of top ten cement companies reaching 50.3% in term of NSP clinker production capacity. However, the imbalance between the industry demand and supply remains prominent, with a cement capacity utilization rate remaining relatively low. The cement price presented a "low at first and high at end" pattern throughout this year. The cement price maintained low in the first half of the year and experienced recovery in the second half of year benefiting from better-than-expected demand growth, especially the significant increase in the fourth quarter. (source of information: NBS, MIIT and China Cement Association)

# Management Discussion and Analysis *(Continued)*

## CEMENT SEGMENT *(CONTINUED)*

In 2013, the cement segment of Group actively dealt with the situation of severe overcapacity issue in the industry, obvious contradiction between supply and demand and intense competition by changing its business idea and shifting its work focus on "integration and optimization, profit raising and gearing reduction". It insisted on the business ideology of "PCP", strictly implemented benchmarking management and counsellor system with the focus on KPI , and enhanced marketing to its full potential by leveraging its scale and the core profit-generating regions. Furthermore, it carried forward with deep management integration by consolidating and optimizing organizational structures steadily pursuant to the principle of "simplified organization and capable personnel" to increase its operating efficiency. Through strengthening "Five C" management, delicacy management and lean production, it comprehensively implemented the cost and expense saving plan to realize cost reduction and profit raising. In accordance with the principle and plan of capital expenditure, the cement segment of Group carried out the consolidation and restructuring of cement and commercial concrete businesses with a focus on consolidating and improving the core profit-generating regions to creat positive market synergy between the cement and commercial concrete businesses. As at the end of 2013, the production capacity of cement reached 388 million tonnes, whilst that of commercial concrete reached 406 million $m^3$.

## China United

China United insisted on the "PCP" business ideology and promoted emission reduction with self-discipline and sales-driven production approach, which relieved the imbalance between supply and demand effectively. Focusing on the marketing, it promoted the combination of production and sales through further integrating sales channels and improving and innovating marketing mode. In the second half of the year, China United led the steady rise in cement prices, which safeguarded the stable development of the regional market.

China United promoted deep management integration and enhanced benchmark optimization and counsellor system. Meanwhile, in order to reduce procurement price of raw materials and fuel and improve the overall efficiency, "Five C" management was deeply proceeded with central planning and coordinating marketing, procurement, capital allocation and technology promotion. For the purpose of cost reduction and profit raising, it strengthened delicacy management with optimization of technical indicators, intensified cost saving in logistics, enhanced expense management, and actively carried out the cost and expense saving plan. Based on the principle of "simplified organization and capable personnel", it merged the original Shandong and Huaihai operations management regions into a new Huaihai operations management region. Such "two-in-one" integration further improved control over the regional market and operational efficiency. It continued to refine operations management system of commercial concrete business so as to improve operational quality and competitiveness. It effectively strengthened its efforts on collecting receivables to guard against capital risks. Moreover, control over product quality was reinforced with the purpose of increasing brand influence.

China United duly adjusted and improved consolidating and restructuring mode. In the core profit-generating regions, cooperation with its peers was carried out via ways such as joint venture. The positive market synergy between the cement and commercial concrete business was brought into full play, to increase control and power in the terminal markets and improve the profitability of the enterprise. As at the end of 2013, the production capacity of cement reached 91 million tonnes, whilst that of commercial concrete reached 180 million $m^3$.

EXHIBIT B
Page 25 of 218

# Management Discussion and Analysis *(Continued)*

## CEMENT SEGMENT *(CONTINUED)*

### South Cement

With "marketing, cost reduction and profit raising, deep integration" as its core targets, South Cement insisted on the business ideology of "PCP" with marketing as the priority while strengthening its marketing and control capability in the regional markets by further dividing the market. It arranged enterprises to suspend production for maintenance in an orderly manner according to the market demand. Driven by the opportunities arising from the energy saving and emission reduction policies imposed in some regions and the strong demand in the second half of the year, both the volume and price of cement recorded increase.

South Cement deepened management integration starting by integrating the organizational structure. Based on the principle of "simplified organization and capable personnel", it merged seven regional companies in the regions of Jiangsu, Zhejiang, Shanghai and Anhui into two companies of Shanghai South Cement and Zhejiang South Cement, streamlined management and launched the concept of "Three Formulations", resulting in a lower labor costs and improved productivity. South Cement accelerated integration of commercial concrete business by establishing a sales center based on the geographic reach of sales and promoting management consolidation of enterprises to increase management efficiency. Leveraging on delicacy management, South Cement was able to deepen benchmark management and reduce energy consumption effectively. It also fulfilled the cost and expense saving plan to achieve cost reduction and profit raising. Relying on the strength of centralized purchasing, it launched strategic cooperation with large suppliers to lower procurement prices of raw and fuel materials effectively. It also continued to carry out informationization construction in a bid to integrating the finance and business and enhancing management and control. Meanwhile, it strengthened the management of operating cash flow and built the long-term mechanism concerning control, collection and evaluation of the receivables to effectively control risks.

South Cement steadily promoted consolidation and restructuring based on the principle and plan of capital expenditure. It expedited consolidation of new enterprises and optimized the layout of industry chain in the core profit-generating regions. It also continued to consolidate the mines and logistics to achieve sustainable development of the enterprise. As at the end of 2013, the production capacity of cement reached 148 million tonnes, whilst that of commercial concrete reached 199 million $m^3$.

# Management Discussion and Analysis *(Continued)*

## CEMENT SEGMENT *(CONTINUED)*

### North Cement

Confronted with inadequate demand of cement in Northeast China, North Cement adhered to the "PCP" business ideology, leveraged its strength in the core profit-generating regions. It arranged production rationally and intensified efforts on marketing which protected and maintained the balance of supply and demand in the industry and continuously promoted the healthy development of the regional market.

North Cement proactively promoted deep management integration. It strengthened "Five C" management, continued to centralize marketing and enhanced market control through a new division of inner sales regions and effective integration of market resources. It continued to strengthen centralized procurement with a focus on the purchase of bulk commodity while unified management and coordination was adopted for member enterprises' inventory, which significantly lowered purchase costs of raw materials and fuel, i.e. coals. It also carried out centralized management to improve management and control. Additionally, it upgraded process technology, which enabled improving product quality and reducing energy-consumption indicators effectively. The costs and expense saving plan was completed with cost reduction and profit raising.

North Cement promoted the consolidation and restructuring along with a focus on the development of core profit-generating regions. It further increased concentration in the regional cement market and enhanced its control and discourse power in the terminal market through certain key methods including leasing, cement grinding station trusteeship and restructuring commercial concrete enterprise. As at the end of 2013, the production capacity of cement reached 33 million tonnes, whilst that of commercial concrete reached 13 million m³.

### Southwest Cement

Southwest Cement adhered to the business ideology of "PCP" to intensify marketing and strengthen channel management through establishing a win-win cooperation relationship with core clients in the long term, resulting in a steady increase in the market share.

Southwest Cement promoted deep management integration. It strengthened "Five C" management, and reduced purchasing prices of raw materials through centralized procurement and long-term cooperation with high-quality suppliers. Additionally, it enhanced delicacy management and lean production, continued to develop alternative fuels and admixtures, intensified technology update, deepened benchmarking management and counselor system, to reduce production cost. It further deepened management of capital centralizing and financing, and expedited informationization development. Based on the principle of "simplified organization and capable personnels, it continued to intensify constructing the performance management system with a focus on the sales and cost reduction. The work of "Three Formulations" was implemented comprehensively to further refine the quantity of organizations, posts and employees and improve productivity. Indicators of account receivables were further optimized by imposing more stringent control over the key business index including account receivables.

Southwest Cement continued to carry out consolidation and restructuring work within the core profit-generating regions to optimize industrial layout. As at the end of 2013, the production capacity of cement reached 114 million tonnes, whilst that of commercial concrete reached 7 million m³.

# Management Discussion and Analysis *(Continued)*

## LIGHTWEIGHT BUILDING MATERIALS SEGMENT

BNBM deepened its focusing strategy and improved the marketing competence comprehensively, which brought steady growth for Dragon and Taishan gypsum board, achieving increase in both revenue and net profit.

BNBM upheld the strategy of seizing the prominent position. Focusing on the technology and brand, it seized the prominent position in engineering projects and in the housing field, a move further enhanced its impact. It has innovated products with great efforts in order to increase competitiveness in the market. BNBM promoted market differentiation and intensified communication and corporation with major clients, which further consolidated its leading position in the industry.

BNBM continued to improve its management enhancement, optimized the organizational structure, and enhanced its overall management and operational efficiency. It fully implemented the cost and expense saving plan and leveraged its strength in centralized procurement, in a bid to reduce purchase cost. Through technological innovation, BNBM lowered investment cost and unit consumption of products to increase profitability.

## GLASS FIBRE AND COMPOSITE MATERIALS SEGMENT

### Composite materials business

China Composites seized the favourable recovery in the wind power industry and adjusted its product mix according. It adhered to "big projects, big customers, big orders", accelerated the development of new customer groups and made great efforts to develop new way to grow profit to consolidate its leading status in the industry. It also endeavoured to explore global markets to improve competitiveness worldwide. By leveraging on its well-located production bases, it guaranteed production and supply of blades in the key regions. Its dry-jet wet spinning process for carbon fibre passed the national-level appraisal strived to enter into special industries to further expand the high-end market.

Special attention was paid to profit raising and gearing reduction while technology innovation was vigorously proceeded to constantly reduce production cost. It strengthened management enhancement and effectively implemented its cost and expense saving plan thoroughly, and realized cost reduction and profit raising. Investment projects were also under strict review to achieve an effective control over capital expenditure.

# Management Discussion and Analysis *(Continued)*

## GLASS FIBRE AND COMPOSITE MATERIALS SEGMENT *(CONTINUED)*

### Glass fibre business

China Fiberglass actively coped with the adverse influence arising from slower growth in industry development, lackluster demand and growing energy price and labour cost by accelerating the adjustment on production structure and transforming development mode. In the meantime, by reasonably planning production layout, it improved concentration of production and stability of product quality effectively. The product portfolio was optimized while sticking to the strategy focus on the high-end products. Moreover, it successfully reduced cost and strengthened competitiveness through management enhancement, exerting advantages of delicacy and differential management as well as implementation of revenue increase, cost and consumption reduction.

The internal industrial chain was further fine-tuned and improved to promote profitability. The alkali-free glass fiber pool kiln wiredrawing production line with an annual capacity of 80,000 tonnes in Egypt was completed and put into trial production, representing a significant progress in "going out" strategy.

## ENGINEERING SERVICES SEGMENT

China Triumph placed great emphasis on market operation of engineering technologies such as glass, cement and new energy with improvement in technology innovation. Upon the engagement of contract in relation to orders of ultra large tonne float glass production lines in developed countries, its competitiveness in international markets was further strengthened. At the same time, China Triumph expanded its industrial chain and developed high-end equipment manufacturing to continuously increase additional value of engineering services and overall benefits. It led transformation of traditional capacity and industrial upgrade by promoting application of energy-saving technology, i.e. a combination of desulfuration, denitrification and cogeneration, in the building material industry and constructing the world-class demonstration line in terms of energy-saving and emission reduction while redirected its business scope to "synergistic treatment of waste and sludge in the urban". It adhered to combination of independent innovation and integrated innovation, and thus won the Second Prize at the 2013 National Technology Progress Award（國家2013年科技進步二等獎）once again, which reinforced its core competitiveness in enterprise development.

In the meantime, China Triumph strictly implemented management enhancement, further strengthened standardized operation and delicacy management. It also vigorously promoted optimization of organizational structure based on the principle of "simplified organization and capable personnel". On the other hand, it linked the cost and expense saving plan to the performance assessment, which achieved cost reduction and profit raising

EXHIBIT B
Page 29 of 218

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW

Revenue of the Group increased by34.9% to RMB117,687.8 million in 2013 from RMB87,217.6 million during 2012. Profit attributable to equity holders increased by 3.3% to RMB5,761.9 million in 2013 from RMB5,579.6 million during 2012.

## Revenue

Our revenue increased by 34.9% to RMB117,687.8 million in 2013 from RMB87,217.6 million during 2012. The major reason was that although revenue ofof South Cement increased by RMB14,279.8 million, revenue of Southwest Cement increased by RMB10,072.1 million, revenue of China United increased by RMB6,433.3 million, revenue of Engineering services segment increased by RMB692.7 million, revenue from the lightweight building materials segment increased by RMB346.1 million and the revenue of the glass fibre and composite materials segment increased by RMB81.8 million, they were partially offset by the revenue decrease of RMB213.9 million from North Cement.

## Cost of sales

Our cost of sales increased by 30.5% to RMB87,549.8 million in 2013 from RMB67,089.2 million during 2012. The major reason was that although the cost of sales of South Cement increased by RMB10,166.9 million, the cost of sales of Southwest Cement increased by RMB6,677.2 million, the cost of sales of China United increased by RMB4,576.6 million, the cost of sales of Engineering services segment increased by RMB401.5 million, the cost of sales of North Cement increased by RMB75.0 million and the cost of sales of the lightweight building materials segment increased by RMB11.5 million, they were partially offset by the decrease in cost of sales of RMB37.9 million of the glass fibre and composite materials segment.

## Other income

Other income of the Group decreased by 19.2% to RMB4,204.1 million in 2013 from RMB5,200.3 million during 2012. This was primarily due to a decrease in government grants from RMB2,277.2 million in 2012 to RMB1,468.6 million in 2013. Net gain from change in fair value of held-for-trading investments of the Group decreased from RMB144.7 million in 2012 to RMB-57.8 million in 2013, and the income from technical and services decreased from RMB302.8 million in 2012 to RMB253.7 million in 2013, which was partially offset by the increase in the refund of value-added tax of the Group from RMB1,942.1 million from 2012 to RMB2,106.9 million in 2013.

## Selling and distribution costs

Selling and distribution costs increased by 78.5% from RMB3,880.9 millionin 2012 to RMB6,928.5 million in 2013. The major reasons for such increase were an increase of RMB1,351.4 million in transportation costs, an increase of RMB419.3 million in packaging fees, an increase of RMB215.6 million in depreciation and amortisation costs and an increase of RMB159.3 million in the expenses for business trips due to an increase in commercial concrete business of the Group and the inclusion of newly acquired cement subsidiaries.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### Administrative expenses

Administrative expenses increased by 48.6% to RMB8,134.7 million during 2013 from RMB5,475.5 million in 2012. This was primarily due to the increase in commercial concrete business of the Group and the inclusion of newly acquired cement subsidiaries, resulting in an increase of RMB611.1 million in labour costs, an increase of RMB311.3 million in depreciation and amortisation of intangible assets, an increase of RMB139.1 million in research and development expenses, an increase of RMB101.2 million in administrative expenses and utility bills, an increase of RMB98.1 million in tax (mainly including property tax, land use tax and vehicle and vessel taxes) and an increase of RMB46.3 million in the expenses for business trips.

### Finance costs

Finance costs increased by 43.0% to RMB9,306.5 million in 2013 from RM6,507.1 million in 2012, due to our increased borrowings which were required to support the increase in the business activities in the cement and commercial concrete business segments.

### Share of profits of associates

Our share of profit of associates increased by 37.5% to RMB630.5 million in 2013 from RMB458.6 million in 2012, primarily due to an increase in profits of our associated companies in the cement segment as well as an increase in the profit of China Fiberglass, an associate of the Group.

### Income tax expense

Income tax expense increased by 4.8% to RMB2,291.2 million in 2013 from RMB2,186.9 million in 2012, primarily due to the increase in profit before taxation.

### Profit attributable to non-controlling interests

Profit attributable to non-controlling interests increased by 18.2% to RMB2,550.0 million in 2013 from RMB2,157.4 million in 2012, primarily due to the increase in operating profit in each of our business segments.

### Profit attributable to equity holders of the Company

Profit attributable to equity holders of the Company increased by 3.3% to RMB5,761.9 million in 2013 from RMB5,579.6 million in 2012. Net profit margin decreased to 4.9% in 2013 from 6.4% in 2012.

EXHIBIT B
Page 31 of 218

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### China United

China United merged with 34 commercial concrete companies as at 31 December 2013 and 28 as at 31 December 2012. The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned commercial concrete companies for the both periods and their respective percentage in China United.

| | The abovementioned commercial concrete companies For the year ended 31 December | | | |
| | 2013 | | 2012 | |
| | *RMB in millions* | *Percentage in China United* | *RMB in millions* | *Percentage in China United* |
|---|---|---|---|---|
| Revenue | **10,140.2** | **38.3** | 4,254.2 | 21.2 |
| Cost of sales | **7,188.7** | **36.5** | 3,083.5 | 20.4 |
| Gross profit | **2,951.5** | **43.4** | 1,170.7 | 23.7 |
| Operating profit | **1,686.0** | **36.5** | 698.2 | 14.9 |

### Acquisition of cement subsidiaries

China United acquired 13 cement companies after 31 December 2012. Operating results of the above 13 cement companies were consolidated into the operating results of China United for the year ended 31 December 2013, but excluded from the operating results for the year ended 31 December 2012.

The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned 13 cement companies for the year ended 31 December 2013 and their respective percentage in China United.

| | Total amount in China United | |
| | *RMB in millions* | *Percentage* |
|---|---|---|
| Revenue | 927.2 | 3.5 |
| Cost of sales | 825.9 | 4.2 |
| Gross profit | 101.3 | 1.5 |
| Operating profit | 25.4 | 0.5 |

Save the reasons stated below, changes in the operating results of China United for year ended 31 December 2013 as compared with the year ended 31 December 2012 were also due to the inclusion of operating results of the abovementioned commercial concrete business and the new acquisition of cement subsidiaries.

## Management Discussion and Analysis *(Continued)*

### FINANCIAL REVIEW *(CONTINUED)*

#### Revenue

Revenue from China United increased by 32.1% to RMB26,498.8 million in 2013 from RMB20,065.4 million in 2012, mainly attributable to the inclusion of the abovementioned commercial concrete business and the new acquisition of cement subsidiaries, partially offset by the decrease in the average selling price of cement products.

#### Cost of sales

Cost of sales from China United increased by 30.3% to RMB19,696.4 million in 2013 from RMB15,119.8 million in 2012, mainly attributable to the inclusion of the abovementioned commercial concrete business and the new acquisition of cement subsidiaries, partially offset by the decrease in the coal prices.

#### Gross profit and gross profit margin

Gross profit from China United increased by 37.5% to RMB6,802.4 million in 2013 from 4,945.6 million in 2012. Gross profit margin of China United increased from 24.6% in 2012 to 25.7% in 2013. The increase in gross profit margin was mainly due to a lower coal proices, but was partially offset by lower average selling price of cement products.

#### Operating profit

Operating profit from China United decreased by 1.3% to RMB4,622.9 million in 2013 from RMB4,685.3 million in 2012. Operating profit margin for the segment decreased from 23.3% in 2012 to17.4% in 2013. The decrease was primarily due to the increase in transportation fees due to the increase in the business volume of commercial concrete as well as the decrease in government grants, yet partially offset by the increase in gross profit margin.

### South Cement

South Cement merged with 194 commercial concrete companies as at 31 December 2013 and 144 as at 31 December 2012. The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned commercial concrete companies for the both periods and their respective percentage in South Cement.

| | The abovementioned commercial concrete companies | | | |
| | For the year ended 31 December | | | |
| | 2013 | | 2012 | |
| | RMB in millions | Percentage in South Cement | RMB in millions | Percentage in South Cement |
|---|---|---|---|---|
| Revenue | 15,591.8 | 35.0 | 4,801.6 | 15.9 |
| Cost of sales | 11,232.7 | 33.5 | 3,340.6 | 14.3 |
| Gross profit | 4,359.1 | 39.9 | 1,461.0 | 21.4 |
| Operating profit | 1,835.3 | 30.1 | 742.5 | 15.2 |

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### South Cement *(Continued)*

#### Acquisition of cement subsidiaries

South Cement acquired 10 cement companies after 31 December 2012. Operating results of the above 10 cement companies were consolidated into the operating of South Cement for the year ended 31 December 2013, but excluded from the operating results for the year ended 31 December 2012.

The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned 10 cement companies for the year ended 31 December 2013 and their respective percentage in South Cement.

|  | RMB in millions | Total amount in South Cement Percentage |
|---|---|---|
| Revenue | 3,005.0 | 6.8 |
| Cost of sales | 2,503.7 | 7.5 |
| Gross profit | 501.3 | 4.6 |
| Operating profit | 370.7 | 6.1 |

Save the reasons stated below, changes in the operating results of South Cement for year ended 31 December 2013 as compared with the year ended 31 December 2012 were also due to the inclusion of operating results of the abovementioned commercial concrete business and the acquisition of cement subsidiaries.

#### Revenue

Revenue from South Cement increased by 47.3% to RMB44,489.7 million in 2013 from RMB30,209.8 million in 2012, mainly attributable to the inclusion of the aforementioned commercial concrete business and the newly acquired cement subsidiaries, but was partially offset by the decrease in the average selling price of cement products.

#### Cost of sales

Cost of sales from South Cement increased by 43.5% to RMB33,554.3 million in 2013 from RMB23,387.4 million in 2012, mainly attributable to the inclusion of the aforementioned commercial concrete business and the newly acquired cement subsidiaries, but was partially offset by the decrease in the coal prices.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### South Cement *(Continued)*

#### Gross profit and gross profit margin

Gross profit from South Cement increased by 60.3% to RMB10,935.4 million in 2013 from RMB6,822.5 million in 2012. Gross profit margin of South Cement increased from to 22.6% in 2012 to 24.6% in 2013. The increase in gross profit margin was mainly due to the decrease of coal prices, but was partially offset by a lower average selling price of cement products.

#### Operating profit

Operating profit from South Cement increased by 25.0% to RMB6,096.8 million in 2013 from RMB4,875.9 million in 2012. Operating profit margin for the segment decreased from 16.1% in 2012 to 13.7% in 2013. The decrease was primarily due to the increase of transportation cost generated from the increase of commercial concrete business and the decrease of government subsidies, but was partially offset by the increase in gross profit margin.

## North Cement

North Cement merged with 11 commercial concrete companies as at 31 December 2013 and 5 as at 31 December 2012. The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned commercial concrete companies for both periods and their respective percentage in North Cement.

| | The abovementioned commercial concrete companies For the year ended 31 December | | | |
| | 2013 | | 2011 | |
| | RMB in millions | Percentage in North Cement | RMB in millions | Percentage in North Cement |
|---|---|---|---|---|
| Revenue | 530.7 | 7.2 | 222.1 | 2.9 |
| Cost of sales | 371.4 | 7.4 | 141.6 | 2.9 |
| Gross profit | 159.3 | 6.8 | 80.5 | 3.0 |
| Operating profit | 103.8 | 5.5 | 47.4 | 1.8 |

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### North Cement *(Continued)*

#### Acquisition of cement subsidiaries

North Cement acquired 6 cement companies after 31 December 2012. Operating results of the above 6 cement companies were consolidated into the operating results of North Cement for the year ended 31 December 2013, but excluded from the operating results for the year ended 31 December 2012.

The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned 6 cement companies for the year ended 31 December 2013 and their respective percentage in North Cement.

|  | RMB in millions | Total amount in North Cement Percentage |
| --- | --- | --- |
| Revenue | 487.0 | 6.6 |
| Cost of sales | 449.7 | 9.0 |
| Gross profit | 37.3 | 1.6 |
| Operating profit | 6.2 | 0.3 |

Save the reasons stated below, changes in the operating results of North Cement for year ended 31 December 2013 as compared with the year ended 31 December 2012 were also due to the inclusion of operating results of the abovementioned commercial concrete business and the acquisition of cement subsidiaries.

#### Revenue

Revenue from North Cement decreased by 2.8% to RMB7,362.0 million in 2013 from RMB7,575.9 million in 2012, mainly attributable to the decrease in the average selling price of cement products.

#### Cost of sales

Cost of sales from North Cement increased by 1.5% to RMB5,008.8 million in 2013 from RMB4,933.8 million in 2012, mainly attributable to the inclusion of the aforementioned commercial concrete business and the newly acquired cement subsidiaries, but was partially offset by the decrease of coal prices.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### North Cement *(Continued)*

#### Gross profit and gross profit margin

Gross profit from North Cement decreased by 10.9% to RMB2,353.2 million in 2013 from RMB2,642.1million in 2012. Gross profit margin of North Cement decreased from 34.9% in 2012 to 32.0% in 2013, mainly owing to a lower average selling price of cement products, but was partially offset by the decrease of coal prices.

#### Operating profit

Operating profit from North Cement decreased by 29.6% to RMB1,870.5 million in 2013 from RMB2,658.5 million in 2012. Operating profit margin for the segment decreased from 35.1% in 2012 to 25.4% in 2013, primarily due to the decrease in gross profit margin.

## Southwest Cement

Southwest Cement merged with 8 commercial concrete companies as at 31 December 2013 and 4 as at 31 December 2012. The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned commercial concrete companies for both periods and their respective percentage in Southwest Cement.

| | The abovementioned commercial concrete companies | | | |
|---|---|---|---|---|
| | For the year ended 31 December | | | |
| | 2013 | | 2012 | |
| | *RMB in millions* | *Percentage in Southwest Cement* | *RMB in millions* | *Percentage in Southwest Cement* |
| Revenue | **331.9** | **1.7** | 83.9 | 0.9 |
| Cost of sales | **288.3** | **2.1** | 67.4 | 0.9 |
| Gross profit | **43.6** | **0.8** | 16.5 | 0.7 |
| Operating profit | **14.2** | **0.4** | 11.3 | 0.7 |

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### Southwest Cement *(Continued)*

#### Acquisition and establishment of cement subsidiaries

Southwest Cement acquired and established 33 cement companies after 31 December 2012. Operating results of the above 33 cement companies were consolidated into the operating results of Southwest Cement for the year ended 31 December 2013, but excluded from the operating results for the year ended 31 December 2012.

The following table sets out the revenue, cost of sales, gross profit and operating profit of the abovementioned 33 cement companies for the year ended 31 December 2013 and their respective percentage in Southwest Cement.

|  | Total amount in Southwest Cement | |
|  | *RMB in millions* | *Percentage* |
|---|---|---|
| Revenue | **3,794.1** | 19.2 |
| Cost of sales | **2,674.9** | 19.1 |
| Gross profit | **1,119.3** | 19.3 |
| Operating profit | **876.0** | 22.0 |

Save the reasons stated below, changes in the operating results of Southwest Cement for year ended 31 December 2013 as compared with the year ended 31 December 2012 were also due to the inclusion of operating results of the abovementioned commercial concrete business related to the acquisition of cement subsidiaries.

### Revenue

Revenue from Southwest Cement increased by 103.9% to RMB19,769.4 million in 2013 from RMB9,697.4 million in 2012, mainly attributable to the inclusion of the aforementioned commercial concrete business and the newly acquired cement subsidiaries and the slight increase in the average selling price of cement products.

### Cost of sales

Cost of sales from Southwest Cement increased by 91.5% to RMB13,975.6 million in 2013 from RMB7,298.5 million in 2012, mainly attributable to the inclusion of the aforementioned commercial concrete business and the newly acquired cement subsidiaries, but partially offset by the decrease in coal prices.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### Southwest Cement *(Continued)*

#### Gross profit and gross profit margin

Gross profit from Southwest Cement increased by 141.5% to RMB5,793.8 million in 2013 from RMB2,398.9 million in 2012. Gross profit margin of Southwest Cement increased from 24.7% in 2012 to 29.3% in 2013, mainly owing to the increase in the average selling price of cement products and a lower coal price.

#### Operating profit

Operating profit from Southwest Cement increased by 140.5% to RMB3,973.9 million in 2013 from RMB1,652.5 million in 2012. Operating profit margin for the segment increased from 17.0% in 2012 to 20.1% in 2013., primarily due to the increase in gross profit margin.

## Lightweight building materials segment

### Revenue

Revenue from the lightweight building materials segment increased by 5.2% to RMB6,981.6 million in 2013 from RMB6,635.4 million in 2012. This was mainly attributable to the increase in sales volume from our main product, gypsum boards, but partially offset by a reduction of its selling price.

### Cost of sales

Cost of sales from the lightweight building materials segment increased by 0.2% to RMB5,252.7 million in 2013 from RMB5,241.1 million in 2012. This was mainly attributable to the increase in sales volume from our main product, gypsum boards, but partially offset by a reduction of the price of principal raw materials and coal price.

### Gross profit and gross profit margin

Gross profit from the lightweight building materials segment increased by 24.0% to RMB1,728.9 million in 2013 from RMB1,394.3 million in 2012. Our gross profit margin from the lightweight building materials segment increased to 24.8% in 2013 from 21.0% in 2012, mainly due to a reduction of the price of principal raw materials and coal price, but partially offset by the drop in selling prices.

### Operating profit

Operating profit from the lightweight building materials segment increased by 33.6% to RMB1,600.0 million in 2013 from RMB1,197.9 million in 2012. The gross profit margin from this segment increased to 22.9% in 2013 from 18.1% in 2012, mainly due to a rise in gross profit margin and the increase of VAT refunds.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### Glass fibre and composite materials segment

As China Fiberglass is an associate but not a subsidiary of the Group, its operating results will not be accounted into our consolidated statements regarding operating results, nor will it be accounted into our segment results of the glass fibre and composite materials segment. Unless otherwise indicated, any reference regarding the operating results of the segment excludes that of China Fiberglass.

### Revenue

Our revenue from the glass fibre and composite materials segment increased by 3.7% to RMB2,277.2 million in 2013 from RMB2,195.4 million in 2012. The main reason is that although our revenue from the FRP pipes and tanks business and rotor blade has increased RMB68.0 million, our revenue from the flooring business has increased RMB32.1 million, they are partially offset by our revenue decrease in the carbon fiber business and shipping business.

### Cost of sales

Our cost of sales from the glass fibre and composite materials segment decreased by 2.2% to RMB1,708.8 million in 2013 from RMB1,746.7 million in 2012. The main reason is that our cost from the FRP pipes and tanks business and rotor blade has reduced RMB41.1 million, the carbon fiber business has decreased RMB23.5 million in addition to our cost decrease of RMB6.7 million in the shipping business, but was partially offset by the cost increase of flooring business.

### Gross profit and gross profit margin

Our gross profit from the glass fibre and composite materials segment increased by 26.7% to RMB568.3 million in 2013 from RMB448.7 million in 2012. Our gross profit margin from the glass fibre and composite materials segment increased to 25.0% in 2013 from 20.4% in 2012. This is mainly due to an increase in the gross profit margin of the FRP pipes and tanks business and rotor blade business in 2013.

### Operating profit

Operating profit for our glass fibre and composite materials segment increased by 34.9% to RMB231.8 million in 2013 from RMB171.8 million in 2012. The operating profit margin for the segment increased to 10.2% in 2013 from 7.8% in 2012, primarily due to a increase in gross profit margin.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

## Engineering services segment

### Revenue

Our revenue from the engineering services segment increased by 11.4% to RMB6,760.1 million in 2013 from RMB6,067.4 million in 2012, mainly because of an increase in the completed construction services in the period.

### Cost of sales

Our cost of sales from the engineering services segment increased by 8.2% to RMB5,293.5 million in 2013 from RMB4,892.0 million in 2012, mainly because of an increase in the completed construction services in the period.

### Gross profit and gross profit margin

Our gross profit from the engineering services segment increased by 24.8% to RMB1,466.5 million in 2013 from RMB1,175.4 million in 2012, mainly because of an increase in the completed construction services in the period. Our gross profit margin from the engineering services segment increased to 21.7% in 2013 from 19.4% in 2012, primarily due to the increase in gross profit margin of EPC projects.

### Operating profit

Operating profit for our engineering services segment increased by 11.3% to RMB800.3 million in 2013 from RMB718.9 million in 2012, while the operating profit margin for the engineering service segment of the Group was 11.8% in these two periods, mainly because of an increase in the research and development expenses for the period, which offset the impact from the increase in gross profit.

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

### Liquidity and financial resources

As at 31 December 2013, the Group had unused banking facilities and bonds registered but not yet issued of approximately RMB97,286.9 million in total.

The table below sets out our borrowings in the periods shown below:

|  | As at 31 December 2013 | 2012 |
|---|---|---|
|  | *(RMB in millions)* | |
| Bank loans | **170,208.2** | 108,168.7 |
| Other borrowings from non-financial institutions | **—** | 34,447.8 |
|  | **170,208.2** | 142,616.5 |

The table below sets out the maturities of the Group's borrowings as at the dates indicated:

|  | As at 31 December 2013 | 2012 |
|---|---|---|
|  | *(RMB in millions)* | |
| Borrowings are repayable as follows: | | |
| Within one year or on demand | **113,331.8** | 90,751.9 |
| Between one and two years | **21,721.2** | 19,365.0 |
| Between two and three years | **20,550.2** | 20,349.3 |
| Between three and five years (inclusive of both years) | **14,157.0** | 10,167.0 |
| Over five years | **448.0** | 1,983.3 |
| Total | **170,208.2** | 142,616.5 |

As at 31 December 2013, bank loans in the amount of RMB6,498.0 million were secured by assets of the Group with a total carrying value of RMB17,209.0 million.

As at 31 December 2013 and 31 December 2012, we had a debt-to-asset ratio of 58.4% and 57.9%, respectively.

## Management Discussion and Analysis *(Continued)*

### FINANCIAL REVIEW *(CONTINUED)*

### Exchange Risks

Almost all of the Group's businesses were operated in RMB. The Group is not exposed to any significant exchange risks.

### Contingent Liabilities

Certain contingent liabilities were incurred resulting from the Group's provision of guarantee to banks in respect of bank credits used by an independent third party. The highest un-discounted values of the underlying payment resulting from such guarantees are set out as follows:

| | As at 31 December 2013 | 2012 |
|---|---|---|
| | *(RMB in millions)* | |
| Guarantee to banks in respect of bank credits used by an independent third party of subsidiaries before acquisition | **85.0** | 355.0 |
| Total | **85.0** | 355.0 |

### Capital Commitments

The following table sets out our capital commitments as at the dates indicated:

| | As at 31 December 2013 | 2012 |
|---|---|---|
| | *(RMB in millions)* | |
| Capital expenditure of the Company in respect of acquisition of property, plant and equipment (contracted but not provided for) | **667.3** | 553.9 |
| Capital expenditure of the Company in respect of prepaid lease payments (contracted but not provided for) | **49.4** | 93.0 |
| Capital expenditure of the Company in respect of equity acquisition (contracted but not provided for) | **165.2** | 963.0 |

# Management Discussion and Analysis *(Continued)*

## FINANCIAL REVIEW *(CONTINUED)*

## Capital Expenditures

The following table sets out our capital expenditures for the year ended 31 December 2013 by segment:

| | For the year ended 31 December 2013 | |
| | *(RMB in millions)* | *% of total* |
|---|---|---|
| Cement | 6,058.4 | 71.6 |
| Among: China United | 2,572.7 | 30.4 |
|       South Cement | 1,174.3 | 13.9 |
|       North Cement | 612.2 | 7.2 |
|       Southwest Cement | 1,662.5 | 19.7 |
| Commercial concrete | 513.9 | 6.1 |
| Among: China United | 342.3 | 4.0 |
|       South Cement | 124.2 | 1.5 |
|       North Cement | 18.1 | 0.2 |
|       Southwest Cement | 28.1 | 0.3 |
| Lightweight building materials | 920.1 | 10.9 |
| Glass fibre and composite materials | 214.4 | 2.5 |
| Engineering services | 83.1 | 1.0 |
| Others | 668.8 | 7.9 |
| Total | 8,458.7 | 100.0 |

## Cash Flow from Operating Activities

For 2013, our net cash inflow generated from operating activities was RMB11,656.5 million. Such net cash inflow was primarily due to RMB25,405.8 million of cash flow from operating activities before the change in working capital, partially offset by a RMB7,548.7 million increase in trade and other receivables and a RMB2,673.3 million decrease in trade and other payables.

## Management Discussion and Analysis *(Continued)*

### FINANCIAL REVIEW *(CONTINUED)*

### Cash Flow from Investing Activities

For 2013, our net cash outflow from investing activities was RMB28,486.9 million, which was primarily due to an expenditure of RMB3,480.6 million for acquisition of subsidiaries, the purchase of property, plant and equipment mainly used for the cement and lightweight building materials segments amounting to RMB9,409.8million in total, other payment for investing activities of RMB11,688.9 million and a RMB8,297.1 million paid in deposits.

### Cash Flow from Financing Activities

For 2013, we had a net cash inflow from financing activities amounting to RMB15,638.4 million, primarily attributable to a total of RMB132,271.2 million in new borrowings, partially offset by RMB108,477.1 million for repayment of borrowings.

### OUTLOOK FOR 2014

2014 is the first year of deepening reform comprehensively and a critical year of the completion of "Twelfth Five-year Plan". The central government of China will continue to insist on the general tone of making progress while ensuring stability in line with the continuity and stability of macroeconomic policy, and implement proactive fiscal policy and prudent monetary policy to ensure the steady growth of the economy. Meanwhile, regarding the concern about the severe overcapacity issue and the needs to control air pollution, the central government of China will further increasingly impose restrictions on new production capacity and phase out obsolete production capacity, successively issue specific measures on the "replacement of existing capacity with the same or less capacity"（等量或减量置换）, new standard of portland cement and policy measures on promoting corporate merging and restructuring to alleviate severe overcapacity issue in the cement industry. In 2014, new-type urbanization will drive investment for urban infrastructure, public service facilities, social housing construction, shanty town renovation and others. Benefiting from such policies and measures, the overall environment of the building material industry will become more positive, where demands will keep a stable growth and the dynamics of supply and demand will be improved.

# Management Discussion and Analysis *(Continued)*

## OUTLOOK FOR 2014 *(CONTINUED)*

2014 is a year of deep management integration for CNBM. The Group will firmly leverage the opportunity arising from the transformation of economic development mode and the adjustment of industrial structure. In adherence to the operation objective of "making progress while ensuring stability", the Group will regard performance as a matter of priority, continue to push forward "integration and optimization, profit raising and gearing reduction", detailed and implemented the "Eight Working Methods" of management integration, solidly carry forward capital operation, consolidation and restructuring and project construction to fully accomplish all the missions of the year 2014.

Firstly, we will adhere to the business ideology of "PCP", stick to KPI management, focus on performance, strengthen marketing, and thus improve the profitability level.

Secondly, we will endeavor to improve quality and increase efficiency, promote internal development capability and competitiveness of the enterprise. According to the principle of "simplified organization and capable personnel", we will continue to optimize organizational structure to enhance labor productivity and management standard. We will also implement the cost and expense saving plan to reduce cost and increase profit.

Thirdly, we will pay attention to cash flow management, unswervingly accomplish centralized management of funds to improve efficiency of capital utility .

Fourthly, we will solidly proceed with capital operation through expanding the financing platform to optimize capital structure and reduce financial cost and gearing.

Fifth, we will orderly push forward consolidation and restructuring of the cement and commercial concrete business in the core profit-generating regions based on the plan of capital expenditure and the principle of "Optimize Core Profit-generating Regions". On the other hand, we will positively explore innovative restructuring mode such as cooperation, joint venture, lease and so on to improve market control and bargaining power.

Sixthly, with a focus on quality improvement, cost reduction and profit raising, we will actively proceed with scientific and technological innovation, environmental protection and energy saving and emission reduction to accomplish intensive development with low investment, low consumption, low emission and high efficiency.

# Corporate Governance Report

The Company consistently adheres to the governance concept of combining prescribed standards with practicality. During the year from 1 January 2013 to 31 December 2013, the Company complied with the code provisions of the Corporate Governance Code (the "Code") as set out in Appendix 14 to the Listing Rules, proceeded with changes in the rules in a timely manner and took into account the development process and the management needs of the Company in conducting the multiple segments, multi-dimensional and extended review of system design, management decision, specific implementation and so on which resulted in the formation of an internal regulatory system closely adhering to the requirements under the Listing Rules and facilitated the optimization of the Company's corporate governance. Under the guidance of the regulatory documents such as the Listing Rules, the Articles of Association of the Company, the Terms of Reference of the Audit Committee, the Terms of Reference of the Remuneration and Performance Appraisal Committee and the Terms of Reference of the Nomination Committee, the general meetings, the Board and the Supervisory Committee have thoroughly clarified the rules of procedures, refined the management and control responsibilities, further broadened its forward-looking vision and improved the quality and efficiency of decision making on the solid basis of the existing governance structure leading to the healthy operation of the Company.

## I. COMPLIANCE WITH THE MODEL CODE FOR SECURITIES TRANSACTIONS BY DIRECTORS

The Company has adopted a set of code no less exacting than the standards set out in the Model Code for Securities Transactions by Directors of Listed Issuers as set out in Appendix 10 to the Listing Rules ("Model Code") as its own code of conduct regarding Directors' securities transactions. Having made specific enquiry of all Directors, the Company confirms that each of the Directors has complied with the required standards regarding securities transactions by Directors set out in the Model Code and the Code for Securities Transactions of China National Building Material Company Limited during the Reporting Period.

# Corporate Governance Report *(Continued)*

## II. THE BOARD

During 2013, the Board of the Company held 7 plenary Board meetings to consider and determine various matters including general corporate strategy, major investment and financing activities and major adjustments of the management system. All Directors attended the meetings in person or by proxy. The management is responsible for the implementation of strategies and administration work related to daily operations.

The members of the Board and the attendance of the Directors at Board meetings during the year are as follows:

| Position | Name | Attendance rate (%) | Meetings attended/held |
|---|---|---|---|
| Executive Director (Chairman of the Board) | Song Zhiping | 100 | 7/7 |
| Executive Director | Cao Jianglin | 100 | 7/7 |
| Executive Director | Peng Shou | 100 (14.3 of which by proxy) | 6/7(the remaining one was attended by proxy)[1] |
| Executive Director | Cui Xingtai | 100 | 7/7 |
| Executive Director | Chang Zhangli | 100 | 7/7 |
| Non-executive Director | Guo Chaomin | 100 | 7/7 |
| Non-executive Director | Huang Anzhong | 100 | 7/7 |
| Non-executive Director | Cui Lijun | 100 | 7/7 |
| Independent Non-executive Director | Qiao Longde | 100 (14.3 of which by proxy) | 6/7(the remaining one was attended by proxy)[2] |
| Independent Non-executive Director | Li Decheng | 100 | 7/7 |
| Independent Non-executive Director | Ma Zhongzhi | 100 (14.3 of which by proxy) | 6/7 (the remaining one was attended by proxy)[3] |
| Independent Non-executive Director | Shin Fang | 100 (28.6 of which by proxy) | 5/7 (the remaining two were attended by proxies)[4] |
| Independent Non-executive Director | Wu Liansheng | 100 | 7/7 |

# Corporate Governance Report *(Continued)*

## II.   THE BOARD *(CONTINUED)*

Note:

1.   Mr. Peng Shou, an executive Director of the Company, appointed Mr. Cao Jianglin, an executive Director of the Company, as his proxy to attend the sixth meeting of the third session of the Board and authorized him to exercise the right to vote.

2.   Mr. Qiao Longde, an independent non-executive Director of the Company, appointed Mr. Ma Zhongzhi, an independent non-executive Director of the Company, as his proxy to attend the fifth meeting of the third session of the Board and authorized him to exercise the right to vote.

3.   Mr. Ma Zhongzhi, an independent non-executive Director of the Company, appointed Mr. Wu Liansheng, an independent non-executive Director of the Company, as his proxy to attend the sixth meeting of the third session of the Board and authorized him to exercise the right to vote.

4.   Mr. Shin Fang, an independent non-executive Director of the Company, appointed Mr. Wu Liansheng and Mr. Li Decheng, each an independent non-executive Director of the Company, as his proxies to attend the fifth meeting of the third session of the Board as well as the sixth meeting of the third session of the Board, respectively, and authorized each of them to exercise the right to vote at the respective meeting.

There is no finance, business, family relationship(s) or any other material connection between the Directors including between the chairman and the chief executive.

# Corporate Governance Report *(Continued)*

## III.  FUNCTIONS AND OPERATION OF THE BOARD

The Board of the Company is elected by shareholders at general meeting and reports to general meeting. The Board is the highest decision-making authority during the adjournment of the general meeting. The Board is responsible for the unified administration and supervision of the corporate operation matters, acts with objectivity, performs duties with diligence, makes decisions efficiently and protects the best interests of the shareholders and the Company. The Board makes decisions on certain significant matters in the operation of the Company, including formulating the business plans and investment proposals of the Company; formulating the annual preliminary and final financial budgets of the Company; formulating the profit distribution plan of the Company (including final dividends distribution plan) and the proposal for making up for losses; formulating the debt and financial policies and proposals for increases or reductions of the Company's registered capital and the issue of corporate debentures; preparing material acquisition or disposal proposals of the Company and plans for the merger, division or dissolution of the Company; determining the Company's internal management structure; determining the appointment or removal of the general manager of the Company and the appointment or removal of the vice general manager and the chief financial officer subject to the nomination of the general manager and determining their remuneration; formulating the basic management systems including the financial management and personnel management systems; and formulating the revision plan for the Articles of Association. The Directors were elected and the board meetings were held in compliance with the procedures provided for in the Company's Articles of Association. All Directors are able to understand the operation status of the Company in a timely manner, thoroughly communicate with each other in respect of and consider significant matters of the Company, seek independent professional advice when appropriate, prudently determine the development plan of the Company, carefully arrange the management system and strive for long-term benefits of the Company. The Board authorizes the management to implement specific matters and report to the Board. The management of the Company is responsible for coordinating and guiding the Company's routine management, administration and operation, abstracting and preparing working reports for significant events for submission to the Board for review in accordance with the Articles of Association.

The Company has established a system of independent Directors. There are five independent non-executive Directors in the Board, which is in compliance with the minimum number of independent non-executive directors required under the Listing Rules. The Company has received a confirmation of independence from each of the five independent non-executive Directors pursuant to Rule 3.13 of the Listing Rules, and considers the five independent non-executive Directors to be independent from the Company, its substantial shareholders and the respective connected persons of the above entities, have no financial or other interests in the above entities that may affect his/her independence and in full compliance with the requirements concerning independent non-executive directors under the Listing Rules. Mr. Wu Liansheng, an independent non-executive Director of the Company, has appropriate accounting and financial management expertise as required under Rule 3.10 of the Listing Rules. Please refer to the section headed "Biographical Details of Directors, Supervisors and Senior Management" of this report for Mr. Wu Liansheng's biographies. The five independent non-executive Directors do not hold other positions in the Company. They protect the interests of the minority shareholders independently and objectively so as to duly serve their roles, and provide checks and balances in the decision-making process of the Board according to the Articles of Association of the Company and the requirements of the relevant laws and regulations.

## Corporate Governance Report *(Continued)*

### IV.  DIRECTOR'S CONTINUOUS TRAINING AND DEVELOPMENT

In compliance with the Listing Rules and the Code and to ensure that the Directors' contribution to the Board remains informed and relevant, the Company has arranged and funded suitable training for the continuous professional development of the Directors such as holding seminars and providing them with learning materials. In the light of the amendments to the provisions of the Securities and Futures Ordinance of Hong Kong and the Listing Rules in relation to the disclosure of inside information in 2013, the Company's lawyer has prepared detailed analyses on these amendments and provided onsite explanation to enable the Directors to understand the regulatory changes on a timely and accurate manner so that they can perform their duties in compliance with the relevant legal and regulatory requirements. To continuously improve the management standard and optimize the standardized operation of the Company, the Company organized the Directors to participate in onsite trainings regarding corporate governance, connected transactions, disclosable transactions, Model Code for Securities Transactions by Directors and securities interests disclosure and so forth in 2013. In addition, the Company provided monthly macroeconomic and capital market research in 2013 to the Directors to ensure that they were informed of macro information about the operation environment of the Company. The continuous and effective trainings helped enhance the Directors' understanding of their duties so that they can make appropriate and informed decisions on the Company's management based on more accurate understanding of the relevant laws and regulations and the industry's development. All Directors of the Company, namely, Song Zhiping, Cao Jianglin, Peng Shou, Cui Xingtai, Chang Zhangli, Guo Chaomin, Huang Anzhong, Cui Lijun, Qiao Longde, Li Decheng, Ma Zhongzhi, Shin Fang and Wu Liansheng have attended the above-mentioned trainings, and been provided with the above-mentioned training materials through which their knowledge and skills were further developed and refreshed leading to more constructive and professional opinions from the Directors and therefore ensuring that their contribution to the Board remains informed and relevant.

### V.  CHAIRMAN AND THE PRESIDENT

Mr. Song Zhiping is the chairman of the Board and Mr. Cao Jianglin is the president of the Company. Pursuant to the Company's Articles of Association, the primary duties and responsibilities of the chairman are chairing and convening the general meetings, presiding over Board meetings and organizing discussion on major business matters such as corporate development strategy and business philosophy, checking the implementation of Board resolutions, signing the securities issued by the Company, and other duties and powers authorized by the Company's Articles of Association and the Board. The major responsibilities of the president are taking charge of production, operation and management matters, organizing the implementation of Board resolutions, organizing the implementation of annual operating plans and investment proposals of the Company, formulating plans for the establishment of the Company's internal management structure, formulating plans for the establishment of the Company's branches, devising the basic management system of the Company, reviewing the basic rules and regulations of the Company, proposing the appointment or removal of the vice president and the Chief Financial Officer of the Company to the Board, appointing or removing management members apart from those that should be appointed or removed by the Board, and performing other duties and powers authorized by the Articles of Association of the Company and the Board.

EXHIBIT B
Page 51 of 218

# Corporate Governance Report *(Continued)*

## VI. TERM OF OFFICE OF NON-EXECUTIVE DIRECTORS

Pursuant to the Company's Articles of Association, the Directors including the non-executive Directors shall be elected by the general meeting and serve a term of three years. Upon the expiry of their terms of office, the Directors may be re-elected and re-appointed.

## VII. SPECIAL COMMITTEES UNDER THE BOARD

The Company has established 4 special committees under the Board, namely the Strategic Steering Committee, the Nomination Committee, the Remuneration and Performance Appraisal Committee and the Audit Committee, and has formulated respective terms of reference. The terms of reference for the Nomination Committee, the Remuneration and Performance Appraisal Committee and the Audit Committee were prepared with reference to the contents of the Code from time to time.

### THE STRATEGIC STEERING COMMITTEE

#### Members

The Strategic Steering Committee of the Company comprises two executive Directors and one independent non-executive Director, of whom Mr. Song Zhiping is the chairman and both Mr. Qiao Longde and Mr. Cao Jianglin are members. In particular, Mr. Song Zhiping and Mr. Cao Jianglin are executive Directors and Mr. Qiao Longde is an independent non-executive Director. The duties and the working system of the committee are explicitly specified in the Terms of Reference of the Strategic Steering Committee of the Company.

#### Duties and Summary of the Work

The Strategic Steering Committee of the Company is mainly responsible for studying and reviewing the Company's operation objectives and long-term development strategies, business and organisation development proposals, major investing and financing plans and other material matters that may affect the development of the Company; supervising and inspecting the implementation of the annual operation plan and investment plans under the authorisation of the Board; and making recommendations to the Board. The Strategic Steering Committee held one meeting with full attendance in 2013.

Set out below is a summary of work of the Strategic Steering Committee of the Company during 2013:

The first meeting of the third session of the Strategic Steering Committee of the Board considered and approved the proposals in relation to the major tasks of consolidation and restructuring and capital operation in 2013.

## Corporate Governance Report *(Continued)*

### VII. SPECIAL COMMITTEES UNDER THE BOARD *(CONTINUED)*

#### THE NOMINATION COMMITTEE

#### Members

The Nomination Committee of the Company comprises one executive Director and two independent non-executive Directors, of whom Mr. Qiao Longde is the chairman and both Mr. Li Decheng and Mr. Song Zhiping are members. In particular, Mr. Qiao Longde and Mr. Li Decheng are independent non-executive Directors and Mr. Song Zhiping is an executive Director. Such composition is in compliance with the requirements under the Code. The duties and the working system of the committee are explicitly specified in the Terms of Reference of the Nomination Committee of the Company (which are accessible on the websites of the Company and the Stock Exchange), pursuant to which, the chairman of the committee must be an independent non-executive Director.

#### Duties and Summary of the Work

The Nomination Committee of the Company is mainly responsible for formulating procedures and standards for electing the Directors of the Company, senior management members as well as members of the Remuneration and Performance Appraisal Committee, the Audit Committee and the Strategic Steering Committee; formulating standards for the directors or supervisors delegated to the wholly-owned subsidiaries of the Company; formulating standards for the directors or supervisors delegated or recommended to the controlled subsidiaries of the Company and conducting preliminary review on the qualifications and conditions of the Directors, senior management members as well as members of the Remuneration and Performance Appraisal Committee, the Audit Committee and the Strategic Steering Committee; reviewing the qualifications and conditions of the directors or supervisors delegated to the wholly-owned subsidiaries of the Company or the directors or supervisors delegated or recommended to the controlled subsidiaries of the Company based on the nominations of the chairman of the Board and assisting the chairman of the Board on submitting relevant matters to the Board. After the Stock Exchange's adoption of the code provision in relation to the board diversity policy which became effective on 1 September 2013, the Company has formulated its board diversity policy after reviewing the new requirements which was duly adopted by the Nomination Committee on 29 November 2013. The Company is committed to improving the corporate governance of the Company. The Company insists on hiring employees based on their competency. In selecting appropriate members to the Board, the Company considers factors such as a diversity of skills, professional and industry experience, cultural and educational background, ethnicity, length of service, gender and age based on objective standards. It also takes into account the Company's business model and specific needs from time to time. Pursuant to that policy, current members of the Board possess different professional background. Each of them has accumulated over 10 years of experience in areas such as building materials, business management, securities regulation, capital operation, accounting rules and corporate finance providing diversified perspectives for the strategic decisions of the Board and professional opinions for formulating operation policies of the Company. The committee held one meeting with full attendance in 2013.

# Corporate Governance Report *(Continued)*

## VII. SPECIAL COMMITTEES UNDER THE BOARD *(CONTINUED)*

### THE NOMINATION COMMITTEE *(Continued)*

#### Duties and Summary of the Work *(Continued)*

Set out below is a summary of work of the Nomination Committee of the Company during 2013:

The second meeting of the third session of the Nomination Committee of the Board considered and approved the proposals in relation to the existing Board structure and the independence of the independent non-executive Directors in 2013.

### THE REMUNERATION AND PERFORMANCE APPRAISAL COMMITTEE

#### Members

The Remuneration and Performance Appraisal Committee of the Company comprises one executive Director and two independent non-executive Directors. In particular, Mr. Li Decheng and Mr. Shin Fang are independent non-executive Directors and Mr. Song Zhiping is an executive Director. The third meeting of the third session of the Remuneration and Performance Appraisal Committee of the Board held on 24 March 2014 and the eighth meeting of the third session of the Board held on 25 March 2014 considered and approved the change of the chairman of the Remuneration and Performance Appraisal Committee from Mr. Li Decheng to Mr. Shin Fang. Such composition is in compliance with the requirements under the Listing Rules. The duties and the working system of the committee are explicitly specified in the Terms of Reference of the Remuneration and Performance Appraisal Committee (which are accessible on the websites of the Company and the Stock Exchange), pursuant to which, the chairman of the committee must be an independent non-executive director.

#### Duties and the Summary of the Work

The Remuneration and Performance Appraisal Committee of the Company is responsible for recommending and reviewing the specific remuneration and the performance of the Directors and the senior management based on the remuneration and performance management policies and framework pertaining to the Directors and the senior management which are formulated by the Board. The Remuneration and Performance Appraisal Committee makes recommendations to the Board in respect of the remuneration of the Directors and the senior management members. Remuneration of the Directors will be submitted for the consideration and approval of the Board. After the approval of the Board, the remuneration of the Directors will then be submitted for approval at the general meeting. The remuneration of the senior management members is considered and approved by the Board. The annual remuneration of the senior management members comprises four components including basic salary, performance-based salary, special rewards and share appreciation rights. The basic salary is determined by taking into consideration their positions, responsibility, competency and market rates. The performance-based salary is determined on the basis of assessment of economic responsibility. The special rewards are granted to those who have made prominent contributions to the Company's results or in certain material aspects. The share appreciation rights are granted under the Company's Share Appreciation Rights Proposal. The committee held one meeting with full attendance in 2013.

# Corporate Governance Report *(Continued)*

## VII. SPECIAL COMMITTEES UNDER THE BOARD *(CONTINUED)*

### THE REMUNERATION AND PERFORMANCE APPRAISAL COMMITTEE *(Continued)*

#### Duties and the Summary of the Work *(Continued)*

Set out below is a summary of work of the Remuneration and Performance Appraisal Committee of the Company during 2013:

The second meeting of the third session of the Remuneration and Performance Appraisal Committee of the Board considered and approved the remuneration adjustments of the Directors and the supervisors of the Company and the remuneration proposals for senior management members for 2012. The fees for the Directors of the third session of the Board and the supervisors of the third session of Supervisory Committee are still subject to the standards considered and approved at the first extraordinary general meeting in 2012 held on 5 January 2012. Pursuant to the resolutions of the 2012 Annual General Meeting convened on 23 May 2013, the Company has ceased to pay any remuneration to some directors, namely, Mr. Guo Chaomin, Mr. Huang Anzhong and Ms. Cui Lijun, and some supervisors, namely, Mr. Wu Jiwei and Ms. Zhou Guoping.

### THE AUDIT COMMITTEE

#### Members

The Audit Committee of the Company comprises one non-executive Director and two independent non-executive Directors, of whom Mr. Wu Liansheng is the chairman and both Mr. Ma Zhongzhi and Ms. Cui Lijun are members. In particular, Mr. Wu Liansheng and Mr. Ma Zhongzhi are independent non-executive Directors and Ms. Cui Lijun is a non-executive Director. Among them, Mr. Wu Liansheng possesses professional qualifications and experience in accounting and related financial management. Such composition is in compliance with the requirements under the Listing Rules. The duties and the working system of the committee are explicitly specified in the Terms of Reference of the Audit Committee of the Company (which are accessible on the websites of the Company and the Stock Exchange), pursuant to which, the chairman of the committee must be an independent non-executive Director.

# Corporate Governance Report *(Continued)*

## VII. SPECIAL COMMITTEES UNDER THE BOARD *(CONTINUED)*

### THE AUDIT COMMITTEE *(Continued)*

#### Duties and Summary of the Work

The specific duties of the Audit Committee include making recommendations in relation to the appointment of external auditors by the Board and supervising their work; supervising the Company's financial reporting procedures as well as the financial control system; supervising the Company's internal control and reviewing its results; reviewing the operating, financial and accounting policies and practice of the Company; formulating and reviewing the corporate governance policy and practice of the Company and reviewing the Company's compliance with the Code and its disclosures in the Corporate Governance Report; reviewing and supervising the Company and its Director's and senior management's compliance with the requirements of laws and regulations; reviewing and supervising the Directors' and senior management's professional ethics, trainings and continuous professional development. In 2013, the Audit Committee held two meetings, both with full attendance. The recommendations of the Audit Committee have been presented to the Board for review and action.

Set out below is a summary of work of the Audit Committee during 2013:

During the reporting period, the Audit Committee has operated in accordance with the Code. The Audit Committee issued its opinion in respect of the performance of its responsibilities relating to, among others, the issuance of interim and annual results and the review of the financial control system, the internal control system and the performance of the other responsibilities set out in the Code relating to the financial report for 2012 and the interim financial report for 2013. The committee further urged the Company to integrate and optimize its internal control systems in accordance with the key audit work of the Company to ensure that it is able to control the risk of operation management and business development. It performed the duties of corporate governance pursuant to the Terms of Reference of the Audit Committee. The committee provided suggestions to the Board on the improvement of the Company's policies and practices as well as the continuous development of the senior management. As at the date of the report, the Audit Committee has reviewed the Group's financial statements and results for the year ended 31 December 2013.

In addition, the Board is responsible for the preparation of the financial statements for each financial year which gives a true and fair view of the financial position of the Group. The Board has urged the management to provide important materials concerning the Company's operation. Taking into consideration the macroeconomic situation and the development of the industry, the Board has given an objective and balanced evaluation and made strategic decisions on the interim and annual financial performance, significant investment and financing plans, the creation of systematic regulatory structure and risk control. It also supervised and directed the management to implement specific plans and broadened the channels for the Company's development, endeavoring to safeguard the Shareholder's interests. The reporting responsibilities of external auditors are set out in the Independent Auditor's Report of the annual report.

# Corporate Governance Report *(Continued)*

## VIII. NOMINATION OF DIRECTORS

Pursuant to the Articles of Association and the Term of Reference of the Nomination Committee, the election and the change of Directors shall be considered by the shareholders at the general meetings. The Company's demands for new directors shall first be studied by the Nomination Committee. The committee may conduct extensive searches for qualified candidates for directorship in the Company, companies controlled or invested by the Company, the human resources market and through other channels. It will then review the candidates' specific qualification after seeking consent from the candidates. The committee makes recommendations and submits relevant materials to the Board after the review. The Board will then shortlist the candidates for submission to the general meeting for consideration. Shareholders holding in aggregate 5% or more of the Company's shares which carry voting rights may nominate directors to the Board directly and the Nomination Committee will then put forward the proposal to the general meeting for consideration. The election of the new Directors is subject to the approval of the shareholders holding more than half of the total voting shares or the independent representatives of the shareholders present at the general meeting.

In 2013, the Board did not hold any meeting to nominate Directors. The Board of the Company has set up the Nomination Committee, for details of which please refer to Section VII (Special Committees under the Board) in the Corporate Governance Report. The duties of the Nomination Committee include formulating the procedures and standards for electing Directors of the Company, looking for the candidates of Directors, conducting preliminary review of the qualifications and conditions of Directors and making recommendation to the Board. The Nomination Committee is accountable to the Board and its proposals are subject to the Board's review.

## IX. AUDITORS' REMUNERATION

At the Board meeting of the Company convened on 22 March 2013, the Directors resolved to propose to the general meeting the appointment of Baker Tilly HK and Baker Tilly China as the overseas and domestic auditors of the Company for 2013 respectively. The Board was authorized by the annual general meeting convened on 23 May 2013 to deal with the appointment of overseas and domestic auditors and determine their remunerations. During the year, an aggregate of RMB12.3 million was paid by the Company to the auditors for their professional audit services.

During the reporting period, save for the financial audit services, the aforesaid auditors did not provide to the Company other significant non-audit services.

## X. COMPANY SECRETARY

Mr Chang Zhangli is the internal joint company secretary of the Company.

Ms Lo Yee Har Susan of Tricor Services Limited, an external service provider, has been engaged by the Company as its joint company secretary. The primary contact person of the Company with Ms Lo is Mr Chang Zhangli, the joint company secretary and executive Director of the Company.

EXHIBIT B
Page 57 of 218

# Corporate Governance Report *(Continued)*

## XI. SHAREHOLDERS AND GENERAL MEETINGS

The Shareholders, as the owners of the Company, are entitled to the rights prescribed in laws, administrative regulations and the Articles of Association. The Shareholders exercise their rights through holding general meetings. The general meetings include annual general meeting and extraordinary general meetings. The annual general meeting shall be held once every year and within 6 months of the end of the preceding financial year. The Board will convene the extraordinary general meetings if the shareholder(s) holding in aggregate 10% or more of the Company's issued voting shares request(s) in writing. In the case of an annual general meeting, shareholders holding in aggregate 5% or more of the total number of shares carrying voting rights are entitled to put forward any new proposal in writing to the Company, and the Company will include such proposal in the agenda of such meeting to the extent that it falls within the powers of the general meeting. The Board is accountable to the general meeting which is the highest authority of the Company.

In the notice of the general meetings, the Board of the Company will provide the Shareholders with data and explanation required for them to make informed decisions on the matters to be considered as well as the contact information of the person(s) in charge for shareholders' enquiry of relevant issues. During the general meetings, the Shareholders can raise questions or suggestions for the proposals in doubt and the Directors attending the meeting are responsible for explaining, recording and, if necessary, providing relevant information in details. The Shareholders may inspect copies of the minutes of the general meetings free of charge during the business hours of the Company. In the event that any Shareholder requests for copies of such minutes, the Company will deliver the copies within 7 days upon receiving payment of reasonable charges.

At the Annual General Meeting of 2012 held on 23 May 2013, seven ordinary resolutions and two special resolutions in relation to the granting of a mandate to the Board to issue shares of the Company and in relation to the issue of debt financing instruments were considered and approved.

According to the Articles of Association, the Directors may attend the general meetings of the Company and are entitled to sign on the minutes containing the resolution(s) relating to the issue(s) discussed in the meeting(s) they attended. In 2013, the Company held one general meeting with full attendance.

## XII. SUPERVISORS AND THE SUPERVISORY COMMITTEE

The Supervisory Committee of the Company reports to the general meeting. Its members comprise two shareholders' representative supervisors and two supervisors elected by the staff representatives and two independent supervisors. The supervisors have discharged their duties conscientiously in accordance with the provisions of the Company's Articles of Association, attended all the Board meetings, constantly reported to the general meeting via submitting Supervisory Committee Reports and relevant proposals. In line with the spirit of accountability to all Shareholders, the Supervisory Committee has monitored the financial affairs and information disclosures of the Company and the performance of duties and responsibilities by the Directors, the president and other senior management personnel of the Company to ensure that they have performed their duties. The Supervisory Committee has participated actively in major matters of the Company such as production, operation and investment projects and has made constructive recommendations.

# Corporate Governance Report *(Continued)*

## XIII.  INTERNAL CONTROL

In order to comply with relevant domestic laws and regulations as well as the requirements under the Listing Rules, strengthen the Company's internal control management and ensure healthy and effective internal controls, the Company has formulated a series of internal management systems in line with the actual conditions of the Company covering finance regulation, operation regulation, compliance regulation and risk management. Besides, by taking into consideration the changes in overseas and domestic regulatory requirements, the Company has amended and improved the respective internal control systems in a timely manner, thereby ensuring the efficient operation of the Company's internal control system and the sustainable and robust development of the Company.

In the light of the amendments to the Listing Rules, the Code and the domestic regulatory requirements which became effective in 2013, the Board considered and approved the amendments to the Articles of Association, the Rules of Procedure for Shareholders' General Meetings, the Rules of Procedure for Board Meetings, the Terms of Reference of the Remuneration and Performance Appraisal Committee, the Terms of Reference of the Audit Committee, the Terms of Reference of the Nomination Committee, the Terms of Reference of the Strategic Steering Committee (《戰略決策委員會工作細則》), the Working System of the Independent Directors (《獨立董事工作制度》), the Terms of Reference of the General Manager (President) (《總經理（總裁）工作細則》), the Terms of Reference of the Secretary to the Board (《董事會秘書工作細則》), the Management System of Connected Transactions (《關連（關聯）交易管理制度》) and the Internal Control System (《內部控制制度》) and the Supervisory Committee considered and approved the amendments to the Rules of Procedure for Supervisory Committee Meetings on 29 November 2013. Among the above documents, the Articles of Association, the Rules of Procedure for Shareholders' General Meetings, the Rules of Procedure for Board Meetings and the Rules of Procedure for Supervisory Committee Meetings were considered and approved at the extraordinary general meeting convened on 17 January 2014. In 2013, each department of the Company smoothened its major working procedures, the departments and positions involved in the implementation of the procedures, the risks involved in the procedures and the control measures, etc. The Company described and delineated the departmental internal control procedures and the key control points in details in two major parts, namely, the procedural framework and the documentation for the procedures. Through the above work, the Company has established a business process-oriented management system covering the management personnel and each of the departments. In addition, the Company has further improved the efficiency and performance of various operations as a result of its efforts on standardising relevant procedures and key control areas. Through a series of internal control work such as the specific audit and the research and evaluation of the internal control, and by focusing on the budget estimates of construction projects and the final accounting after completion, the Company has strived to control the investment amount, improve the efficiency of capital use and reduce the construction costs in order to strengthen the products' market competitiveness and further uplift the standard of the internal control, financial control and risk management. In addition to the preparation of the comprehensive risk management report, the Company has established a risk management mechanism involving the identification and assessment of risks, prevention and rectification as well as post evaluation, thereby mitigating the major and material risks during the development process and facilitating the robust growth of the Company.

EXHIBIT B
Page 59 of 218

# Corporate Governance Report *(Continued)*

## XIII. INTERNAL CONTROL *(CONTINUED)*

The Board (through the Audit Committee of the Board of the Company) continues to be responsible for the review of the efficiency of the operation of the Company's internal control system. In accordance with the provisions C.2.1 of the Code, the Directors have reviewed the effectiveness of the internal control system of the Company and its subsidiaries during the reporting period, covering matters such as financial control, operation control, compliance control and risk management function control. The Board is not aware of any material events that might affect the shareholders' interests. The Board is of the opinion that the Company had fully complied with the code provisions regarding internal control in the Code. The internal monitoring system of the Company has been operating effectively.

## XIV. INVESTOR RELATIONS

The Company highly regards the investors' rights and interests. Therefore, the Company has established the Secretariat of the Board to be responsible for the management of investor relations in order to improve the management system of investor relations, to clarify the duties of investor relations management, and to establish the multi-channel communication mechanism at multiple levels and in multiple forms. During the reporting period, the Company communicated with investors by convening general meetings, arranging non-deal roadshows, participating in investor conferences, receiving investors' visits, arranging telephone conferences and conducting on-site surveys etc. Information disclosures were made as appropriate and a fair and transparent investment platform for the general investors was provided to improve the transparency of the Company. During the reporting period, the Company has strived for management enhancement. Through strengthening the management of investor relations, the standard of standardized management and corporate governance has been further enhanced.

During the reporting period, the Company has made a series of amendments to the Articles of Association. The amendments to the Articles of Association were considered and approved at the sixth meeting of the third session of the Board held on 29 November 2013. The amendments involve, among other things, the change of the Company's registered address, the number of Board meetings and the way of participating in the Board meetings, the attendance of supervisory proxies, the statements about public welfare fund and common reserve fund and supplementing the Articles of Association with the Rules of Procedure for Shareholders' General Meetings, the Rules of Procedure for Board Meetings and the Rules of Procedure for Supervisory Committee Meetings as appendices. The abovementioned amendments were considered and approved at the extraordinary general meeting convened on 17 January 2014. The details of the amendments were disclosed in the circular dated 2 December 2013, the announcement dated 3 December 2013 and the announcement dated 17 January 2014 of the Company.

# Corporate Governance Report *(Continued)*

## XIV.INVESTOR RELATIONS *(CONTINUED)*

Shareholder(s) may put forward any enquiries in writing to the Board of the Company. Shareholder(s) should send the duly signed written requisition, notice, statement or enquiry letter (as the case may be) to the business address of the Company or the place of representative office in Hong Kong, and provide their full name, contact details and identification. Shareholders' information may be disclosed as required by laws and regulations. The Company will not normally deal with verbal or anonymous enquiries.

Shareholders may send the documents as mentioned above to the following addresses:

Address: **Principal Place of Business:**
21st Floor, Tower 2, Guohai Plaza, No. 17 Fuxing Road, Haidian District, Beijing, the PRC
**Place of Representative Office in Hong Kong:**
Level 54, Hopewell Centre, 183 Queen's Road East, Hong Kong
Fax:        010-68138388
Email:     cnbmltd@cnbm.com.cn

# Directors' Report

The Board of the Company hereby presents its report together with the audited financial statements of the Group for the year ended 31 December 2013 to its shareholders.

## PRINCIPAL BUSINESS

The Group is a holding company and its subsidiaries and associates are mainly engaged in the cement, lightweight building materials, glass fibre, composite materials and engineering services businesses. Particulars of the principal businesses of the Company's subsidiaries are set out in Note 6, Note 19 and Note 20 to the Group's consolidated financial statements respectively.

## RESULTS

The results of the Group during the year are set out in the Consolidated Income Statements in this annual report.

## DIVIDENDS

The Board recommends the distribution of a final dividend of RMB863,844,201.92 in total (pre-tax) for the period from 1 January 2013 to 31 December 2013 (2012: RMB836,849,070.61 in total (pre-tax)) for Shareholders whose names appear on the Company's register of members on Wednesday, 4 June 2014, representing RMB0.160 per share (pre-tax) (2012: RMB0.155 per share (pre-tax)) based on 5,399,026,262 shares in issue as at 28 March 2014, being the latest practicable date prior to the printing of this report for the purpose of ascertaining certain information for inclusion in this report. The final amount of the dividend per share will be determined based on the number of shares of the Company in issue as at 4 June 2014.

According to the Articles of Association of the Company, dividends will be denominated and declared in Renminbi. Dividends on Domestic Shares will be paid in Renminbi and dividends on H Shares will be paid in Hong Kong dollars. The relevant exchange rate will be the average middle exchange rate of Renminbi to Hong Kong dollars as announced by the People's Bank of China for the week prior to the date of declaration of dividends by the annual general meeting.

The proposed final dividend is subject to approval at the annual general meeting to be held on Friday, 23 May 2014.

In accordance with tax law and relevant requirements under taxation regulatory institutions of the PRC, the Company is required to withhold 10% enterprise income tax when it distributes the final dividend for the year ended 31 December 2013 to all non-resident enterprise shareholders (including HKSCC Nominees Limited, other nominees, trustees or other entities and organizations, who will be deemed as non-resident enterprise shareholders) whose names appear on the H share register of members of the Company on Wednesday, 4 June 2014.

# Directors' Report *(Continued)*

## DIVIDENDS *(CONTINUED)*

Pursuant to the PRC Individual Income Tax Law (《中華人民共和國個人所得税法》), the Implementation Regulations of the Individual Income Tax Law (《中華人民共和國個人所得税法實施條例》), the Tentative Measures on Withholding and Payment of Individual Income Tax (《個人所得税代扣代繳暫行辦法》) and other relevant laws and regulations and based on the Company's consultation with the relevant PRC tax authorities, the Company is required to withhold and pay 20% individual income tax for the Company's individual H shareholders whose names appear on the register of members of H shares of the Company (the "Individual H Shareholders"). Pursuant to the Notice on Matters concerning the Levy and Administration of Individual Income Tax after the Repeal of Guo Shui Fa [1993] No. 045 (《關於國税發[1993]045號文件廢止後有關個人所得税征管問題的通知》) issued by the State Administration of Tax and the letter titled "Tax arrangements on dividends paid to Hong Kong residents by Mainland companies" issued by the Stock Exchange, the overseas resident individual shareholders of the shares issued by domestic non-foreign invested enterprises in Hong Kong are entitled to the relevant preferential tax treatment pursuant to the provisions in the tax arrangements between the countries where reside and China and the tax arrangements between China mainland and Hong Kong (Macau). The Company will identify the country of domicile of Individual H Shareholders according to their registered address on the H share register of members of the Company on Wednesday, 4 June 2014 (the "Registered Address"). The Company assumes no responsibility and disclaims all liabilities whatsoever in relation to the tax status or tax treatment of the Individual H Shareholders and for any claims arising from any delay in or inaccurate determination of the tax status or tax treatment of the Individual H Shareholders or any disputes over the withholding mechanism or arrangements. Details of arrangements are as follows:

- for Individual H Shareholders who are Hong Kong and Macau residents and those whose country of domicile is a country which has entered into a tax treaty with the PRC stipulating a dividend tax rate of 10%, the Company will withhold and pay individual income tax at the rate of 10% on behalf of the Individual H Shareholders.

- for Individual H Shareholders whose country of domicile is a country which has entered into a tax treaty with the PRC stipulating a dividend tax rate of less than 10%, the Company will withhold and pay individual income tax at the rate of 10% on behalf of the Individual H Shareholders. If relevant Individual H Shareholders would like to apply for a refund of the additional amount of tax withheld and paid, the Company can assist the relevant shareholder to handle the application for the underlying preferential tax benefits pursuant to the tax treaties, provided that the relevant shareholder shall submit to the Company the information required under the "Notice of the State Administration of Taxation in relation to the Administrative Measures on Preferential Treatment Entitled by Non-residents under Tax Treaties (Tentative)" (Guo Shui Fa [2009] No.124) (《國家税務總局關於印發<非居民享受税收協定待遇管理辦法試行>的通知》國税發[2009]124號) (the "Tax Treaties Notice") on or before Wednesday, 11 June 2014. Upon examination and approval by competent tax authorities, the Company will assist in refunding the additional amount of tax withheld and paid.

# Directors' Report *(Continued)*

## DIVIDENDS *(CONTINUED)*

• for Individual H Shareholders whose country of domicile is a country which has entered into a tax treaty with the PRC stipulating a dividend tax rate of more than 10% but less than 20%, the Company will finally withhold and pay individual income tax at the actual tax rate stipulated in the relevant tax treaty.

• for Individual H Shareholders whose country of domicile is a country which has entered into a tax treaty with the PRC stipulating a dividend tax rate of 20%, or a country which has not entered into any tax treaties with the PRC, or under any other circumstances, the Company will finally withhold and pay individual income tax at the rate of 20% on behalf of the Individual H Shareholders.

If the domicile of an Individual H Shareholder is not the same as the Registered Address or if the Individual H Shareholder would like to apply for a refund of the additional amount of tax finally withheld and paid, the Individual H Shareholder shall notify and provide relevant supporting documents to the Company on or before Wednesday, 11 June 2014. Upon examination of the supporting documents by the relevant tax authorities, the Company will follow the guidance given by the tax authorities to implement relevant tax withholding provisions and arrangements. Individual H Shareholders may either personally or appoint a representative to attend to the procedures in accordance with the requirements under the Tax Treaties Notices if they do not provide the relevant supporting documents to the Company within the time period stated above.

Shareholders are recommended to consult their tax advisers regarding PRC, Hong Kong and other tax implications arising from their holding and disposal of H Shares of the Company.

## CLOSURE OF REGISTER OF MEMBERS

In order to determine the shareholders who are eligible to attend and vote at the annual general meeting, the register of members of the Company will be closed from Wednesday, 23 April 2014 to Friday, 23 May 2014 (both days inclusive), during which period no transfer of shares in the Company will be effected. To be eligible to attend and vote at the forthcoming annual general meeting, holders of H Shares of the Company shall lodge all the share transfer documents and relevant certificates with the Company's H share registrar, Tricor Investor Services Limited for registration not later than 4:30p.m. on Tuesday, 22 April 2014 for share registration.

Shareholders whose names appear on the register of members on Wednesday, 4 June 2014 will be eligible for the final dividend. The register of members of the Company will be closed from Friday, 30 May 2014 to Wednesday, 4 June 2014 (both days inclusive), during such period no share transfer will be registered. In order to qualify for the final dividend mentioned above, holders of H Shares whose transfers have not been registered shall deposit the instrument(s) of transfer and the relevant share certificate(s) at Tricor Investor Services Limited, the Company's H Share Registrar, not later than 4:30p.m. on Thursday, 29 May 2014 to facilitate the share transfer registration. The final dividend is expected to be paid on or before Friday, 27 June 2014 to the shareholders whose names appear on the register of members of the Company on Wednesday, 4 June 2014.

# Directors' Report *(Continued)*

## PROPERTY, PLANT AND EQUIPMENT

The Group owns property, plant and equipment of approximately RMB123,486.0 million. Details of the movements in property, plant and equipment of the Group during the year are set out in Note 14 to the consolidated financial statements.

## SUBSIDIARIES AND ASSOCIATES

Details of each of the principal subsidiaries and associates of the Company are set out in Notes 19 and 20 to the consolidated financial statements.

## CAPITALIZED INTERESTS

Details of capitalized interests of the Company during the year are set out in Note 8 to the consolidated financial statements.

## Share Capital Structure (as at 31 December 2013)

|  | Number of shares | Percentage of total share capital *(%)* |
|---|---|---|
| Domestic Shares | 2,519,854,366 | 46.67 |
| H Shares | 2,879,171,896 | 53.33 |
| Total share capital | 5,399,026,262 | 100 |

## Substantial Shareholders (as at 31 December 2013)

| Name | Class of shares | Number of shares held | Percentage of total share capital *(%)* |
|---|---|---|---|
| Parent | Domestic Shares | 666,962,522 | 12.35 |
| BNBMG | Domestic Shares | 1,485,566,956 | 27.52 |
| CNBM Trading | Domestic Shares | 227,719,530 | 4.22 |
| Cinda | Domestic Shares | 138,432,308 | 2.56 |
| Building Materials Academy | Domestic Shares | 1,173,050 | 0.02 |
| Public Investors | H Shares | 2,879,171,896 | 53.33 |
| Total share capital |  | 5,399,026,262 | 100 |

Note:  Any discrepancies in the table between totals and sums of shareholding percentages are due to rounding.

# Directors' Report *(Continued)*

## DISCLOSURE OF INTERESTS

### I. Substantial Shareholders and persons who have an interest or short position discloseable under divisions 2 and 3 of Part XV of the Securities and Futures Ordinance ("SFO")

So far as was known to directors or supervisors of the Company, as at 31 December 2013, the shareholders (other than the directors or supervisors of the Company) who had interests or short positions in the shares or underlying shares of the Company which were required to be disclosed to the Company and the Stock Exchange under the provisions of Divisions 2 and 3 of Part XV of the SFO, or which were recorded in the register required to be kept by the Company under Section 336 of the SFO or had otherwise notified the Company were as follows:

| Name of Substantial Shareholder | Class of Shares | Long/ short position | Capacity | Number of Shares held | Notes | Percentage of the relevant class of share capital (%)[1,7] | Percentage of total share capital (%)[1,7] |
|---|---|---|---|---|---|---|---|
| Parent | Domestic Shares | Long | Beneficial owner | 666,962,522 | | | |
| | Domestic Shares | Long | Interest of controlled corporation | 1,714,459,536 | | | |
| | | | | 2,381,422,058 | 2, 3 | 94.50 | 44.10 |
| BNBMG | Domestic Shares | Long | Beneficial owner | 1,485,566,956 | 2 | 58.95 | 27.52 |
| CNBM Trading | Domestic Shares | Long | Beneficial owner | 227,719,530 | 2 | 9.04 | 4.22 |
| Cinda | Domestic Shares | Long | Beneficial owner | 138,432,308 | 3 | 5.49 | 2.56 |
| JPMorgan Chase & Co. | H Shares | Long | Beneficial owner | 54,423,073 | | | |
| | H Shares | Long | Investment manager | 22,852,000 | | | |
| | H Shares | Long | Custodian | 270,621,513 | | | |
| | | | | 347,896,586 | 4 | 12.08 | 6.44 |
| | H Shares | Short | Beneficial owner | 16,706,145 | 4 | 0.58 | 0.30 |
| Citigroup Inc. | H Shares | Long | Interest of controlled corporation | 68,829,121 | | | |
| | H Shares | Long | Custodian | 85,375,485 | | | |
| | H Shares | Long | Person having a security interest | 18,640,000 | | | |
| | | | | 172,844,606 | 5 | 6.00 | 3.20 |
| | H Shares | Short | Interest of controlled corporation | 123,020,895 | 5 | 4.27 | 2.27 |
| BlackRock, Inc. | H Shares | Long | Interest of controlled corporation | 148,402,558 | 6 | 5.15 | 2.74 |
| | H Shares | Short | Interest of controlled corporation | 8,394,000 | 6 | 0.29 | 0.15 |

# Directors' Report *(Continued)*

## DISCLOSURE OF INTERESTS *(CONTINUED)*

**I. Substantial Shareholders and persons who have an interest or short position discloseable under divisions 2 and 3 of Part XV of the Securities and Futures Ordinance ("SFO")** *(Continued)*

Notes:

1. As at 31 December 2013, the Company's total issued share capital comprises 5,399,026,262 shares, including 2,519,854,366 Domestic Shares and 2,879,171,896 H Shares.

2. Of these 2,381,422,058 shares, 666,962,522 are directly held by Parent, the remaining 1,714,459,536 shares are deemed corporate interest indirectly and separately held through BNBMG, CNBM Trading and Building Materials Academy. CNBM Trading and Building Materials Academy are wholly-owned subsidiaries of Parent. BNBMG is a subsidiary of Parent which directly and indirectly holds 100% of its equity interests, of which 69.45% is directly held and 30.55% is indirectly held through CNBM Trading. Under the SFO, Parent is deemed to be interested in the shares directly held by BNBMG (1,485,566,956 shares), CNBM Trading (227,719,530 shares) and Building Materials Academy (1,173,050 shares).

3. Pursuant to a share transfer agreement dated 31 December 2009 entered into between Parent and Cinda, Cinda agreed to transfer 49,000,000 Domestic Shares of the Company to Parent ("First Transfer of Shares"). Pursuant to another share transfer agreement dated 15 December 2010 entered into between Parent and Cinda, Cinda agreed to transfer 12,800,137 Domestic Shares of the Company to Parent ("Second Transfer of Shares"). As the proposal in relation to bonus issue of shares on the basis of ten bonus shares for every ten shares held by shareholders of the Company was passed at the 2010 annual general meeting of the Company, the Parent and Cinda entered into a supplemental agreement to the aforesaid two share transfer agreements on 31 August 2012, whereby Cinda agreed to adjust the 61,800,137 Domestic Shares of the Company transferred to the Parent to 123,600,274 Domestic Shares. Consequently, under the SFO, Parent was deemed to own 2,505,022,332 Domestic Shares (representing 99.41% in the domestic share capital and 46.39% in the total share capital) and Cinda was deemed to own 14,832,034 Domestic Shares (representing 0.58% in the domestic share capital and 0.27% in the total share capital). As at the date of this report, the formalities in respect of the share transfer registration of the aforementioned transactions of shares with the China Securities Depository and Clearing Corporation Limited had not yet been completed.

4. JPMorgan Chase & Co. was deemed to hold interests in a total of 347,896,586 H Shares (long position) and 16,706,145 H Shares (short position) in the Company by virtue of its control over the following corporations, which held direct interests in the Company:

   4.1 JPMorgan Chase Bank, N.A. held 270,621,513 H Shares (long position) in the Company. JPMorgan Chase Bank, N.A. was a wholly-owned subsidiary of JPMorgan Chase & Co..

   4.2 J.P. Morgan Whitefriars Inc. held 37,382,122 H Shares (long position) and 12,932,000 H Shares (short position) in the Company. J.P. Morgan Whitefriars Inc. was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

   4.3 J.P. Morgan Investment Management Inc. held 62,000 H Shares (long position) in the Company. J.P. Morgan Investment Inc. was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

EXHIBIT B
Page 67 of 218

# Directors' Report *(Continued)*

## DISCLOSURE OF INTERESTS *(CONTINUED)*

**I.    Substantial Shareholders and persons who have an interest or short position discloseable under divisions 2 and 3 of Part XV of the Securities and Futures Ordinance ("SFO")** *(Continued)*

Notes: *(Continued)*

4.    *(Continued)*

4.4    JPMorgan Asset Management (UK) Limited held 320,000 H Shares (long position) in the Company. JPMorgan Asset Management (UK) Limited was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

4.5    JPMorgan Asset Management (Taiwan) Limited held 1,768,000 H Shares (long position) in the Company. JPMorgan Asset Management (Taiwan) Limited was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

4.6    JF Asset Management Limited held 20,702,000 H Shares (long position) in the Company. JF Asset Management Limited was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

4.7    J.P. Morgan Securities plc held 17,028,154 H Shares (long position) and 3,772,149 H Shares (short position) in the Company. J.P. Morgan Securities plc was owned as to 99.31% by J.P. Morgan Chase International Holdings, which in turn was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

4.8    J.P. Morgan Securities LLC held 4,797 H Shares (long position) and 1,996 H Shares (short position) in the Company. J.P. Morgan Securities LLC was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

4.9    J.P. Morgan Clearing Corp held 8,000 H Shares (long position) in the Company. J.P. Morgan Clearing Corp was an indirect wholly-owned subsidiary of JPMorgan Chase & Co..

The entire interest and short position of JPMorgan Chase & Co. in the Company included a lending pool of 270,621,513 H Shares. Besides, 5,820,546 H Shares (long position) and 16,706,145 H Shares (short position) were held through derivatives as follows:

| | | |
|---|---|---|
| 2,240,000 H Shares (long position) and 908,000 H Shares (short position) | — | through physically settled derivatives (on exchange) |
| 12,932,000 H Shares (short position) | — | through cash settled derivatives (on exchange) |
| 4,797 H Shares (long position) and 1,996 H Shares (short position) | — | through physically settled derivatives (off exchange) |
| 3,575,749 H Shares (long position) and 2,864,149 H Shares (short position) | — | through cash settled derivatives (off exchange) |

# Directors' Report *(Continued)*

## DISCLOSURE OF INTERESTS *(CONTINUED)*

**I.    Substantial Shareholders and persons who have an interest or short position discloseable under divisions 2 and 3 of Part XV of the Securities and Futures Ordinance ("SFO")** *(Continued)*

Notes: *(Continued)*

5.    Citigroup Inc. was deemed to hold interests in a total of 172,844,606 H Shares (long position) and 123,020,895 H Shares (short position) in the Company by virtue of its control over the following corporations, which held direct interests in the Company.

   5.1    Citigroup Global Markets Hong Kong Limited held 41,096,704 H Shares (long position) and 80,955,884 H Shares (short position) in the Company. Citigroup Global Markets Hong Kong Limited was an indirect wholly-owned subsidiary of Citigroup Inc..

   5.2    Citigroup Global Markets Limited held 43,989,317 H Shares (long position) and 21,754,390 H Shares (short position) in the Company. Citigroup Global Markets Limited was an indirect wholly-owned subsidiary of Citigroup Inc..

   5.3    Citigroup Global Markets Inc. held 17,927,521 H Shares (short position) in the Company. Citigroup Global Markets Inc. was an indirect wholly-owned subsidiary of Citigroup Inc..

   5.4    Citibank N.A. held 87,758,585 H Shares (long position) and 2,383,100 H Shares (short position) in the Company. Citibank N.A. was an indirect wholly-owned subsidiary of Citigroup Inc..

   The entire interest and short position of Citigroup Inc. in the Company included a lending pool of 85,375,485 H Shares. Besides, 28,564,200 H Shares (long position) and 65,413,380 H Shares (short position) were held through derivatives as follows:

   | 2,383,100 H Shares (long position) and 4,519,380 H Shares (short position) | — | through physically settled derivatives (off exchange) |
   |---|---|---|
   | 26,181,100 H Shares (long position) and 60,894,000 H Shares (short position) | — | through cash settled derivatives (off exchange) |

6.    BlackRock, Inc. had a long position in 148,402,558 H Shares (in which 1,122,000 H Shares were held through cash settled derivatives (on exchange)) and a short position in 8,394,000 H Shares (in which 104,000 H Shares were held through cash settled derivatives (on exchange)) of the Company by virtue of its control over a number of wholly-owned subsidiaries.

7.    All the above percentages are calculated by rounding to two decimal places.

   Save as disclosed above, as at 31 December 2013, the Company has not been notified by any persons who have interests or short positions in the shares or underlying shares of the Company which would fall to be disclosed to the Company under the provisions of Divisions 2 and 3 of Part XV of the SFO, or which were recorded in the register required to be kept by the Company under Section 336 of the SFO.

# Directors' Report *(Continued)*

## DISCLOSURE OF INTERESTS *(CONTINUED)*

### II. Interests and Short Positions of Directors and Supervisors

As at 31 December 2013, as far as the Company is aware, none of the directors nor supervisors of the Company had any interests or short positions in the shares, underlying shares or debentures of the Company or any of its associated corporations (as defined in Part XV of the SFO) which were required to be recorded in the register required to be kept under Section 352 of the SFO, or otherwise required to be notified by the directors or supervisors to the Company and the Stock Exchange pursuant to the Model Code for Securities Transactions by Directors of Listed Issuers set out in Appendix 10 to the Listing Rules nor have they been granted the right to acquire any interests in shares or debentures of the Company or any of its associated corporations.

## MAJOR CUSTOMERS AND SUPPLIERS

During the year, the five largest customers of the Group accounted for less than 30% of the Group's total sales amount.

During the year, the five largest suppliers of the Group accounted for less than 30% of the Group's total purchase amount.

## PURCHASE, SALE OR REDEMPTION OF THE COMPANY'S LISTED SECURITIES

Neither the Company nor any of its subsidiaries purchased, sold or redeemed any securities of the Company during the year ended 31 December 2013 ("securities" shall have the meaning as defined in the Listing Rules).

## TAX REDUCTION FOR HOLDERS OF LISTED SECURITIES

For the year ended 31 December 2013, holders of the Company's securities were not entitled to any tax reduction for holding such securities pursuant to their legal status in the PRC.

## MINIMUM PUBLIC FLOAT

Based on the information that is publicly available to the Company and so far as the directors are aware, as at the date hereof, more than 25% of the Company's total issued shares are held by the public, which satisfied the requirement of the Listing Rules.

## RESERVES

Movements in the reserves of the Group during the year are set out in the Consolidated Statement of Changes in Equity of this annual report.

# Directors' Report *(Continued)*

## DISTRIBUTABLE RESERVES

The distributable reserves of the Company on 31 December 2013 were RMB2,761.5 million.

## EMPLOYEE AND REMUNERATION POLICY

As at 31 December 2013, the Group had approximately 134,780 employees.

The remuneration package of the Company's employees includes salary, bonuses and allowances. In accordance with relevant national and local labour and social welfare laws and regulations, the Group is required to pay on behalf of employees, a monthly social insurance premium covering pension insurance, injury insurance, medical insurance, unemployment insurance and housing reserve fund. The Company's remuneration policy for its staff is performance based, taking into account duties and responsibilities while bonus is linked to the overall economic efficiency of the Company.

The Company endeavours to provide training to its employees. On-job training and continuous training plans include management skills and technical training, overseas exchange schemes and other courses. The Company also encourages employees to improve themselves.

## SHARE APPRECIATION RIGHTS PLAN

In order to provide additional incentives to the Group's senior management and to enhance the alignment between the performance of the Group's senior management and shareholder value, on 28 February 2006, the Company adopted a long-term incentive plan of share appreciation rights for the Group's senior management officers, senior experts and specialist who make important contributions to the Group.

Under the Plan, a share appreciation rights ("SA Rights") represents the right to receive a cash payment equal to the appreciation, if any, in the fair market value of an H Share from the date of the grant of the right to the date of exercise.

SA Rights will be granted in units with each unit representing one H Share. All SA Rights will have an exercise period of six years from the date of grant. An individual may not exercise his or her SA Rights during the first two years after the date of grant. After two and three years of the date of grant, the total number of SA Rights exercised by an individual shall not in aggregate exceed one-third and two-thirds, respectively, of the total SA Rights granted to the individual. After four years of the date of grant, the SA Rights will be fully vested.

As the SA Rights vest at different amounts until the grantee have completed a specified period of service.

During the reporting period, there were no outstanding or unvested SA Rights and no SA Rights were granted.

According to Guo Zi Fa Fen Pei [2006] No.8, "Trial Method for Share Incentive Scheme of State-controlled Listing Company", the compensation should not exceed 40% of personal total salary and bonus.

# Directors' Report *(Continued)*

## DIRECTORS AND SUPERVISORS (AS AT THE DATE OF THIS REPORT)

### Executive Directors:

| | |
|---|---|
| Song Zhiping | (appointed on 10 March 2005) |
| Cao Jianglin | (appointed on 10 March 2005) |
| Peng Shou | (appointed on 20 June 2006) |
| Cui Xingtai | (appointed on 24 August 2009) |
| Chang Zhangli | (appointed on 15 November 2011) |

### Non-executive Directors:

| | |
|---|---|
| Guo Chaomin | (appointed on 15 November 2011) |
| Huang Anzhong | (appointed on 10 March 2005) |
| Cui Lijun | (appointed on 10 March 2005) |

### Independent Non-executive Directors:

| | |
|---|---|
| Qiao Longde | (appointed on 15 November 2011) |
| Li Decheng | (appointed on 29 August 2008) |
| Ma Zhongzhi | (appointed on 15 November 2011) |
| Shin Fang | (appointed on 15 November 2011) |
| Wu Liansheng | (appointed on 15 November 2011) |

### Supervisors:

| | |
|---|---|
| Wu Jiwei | (appointed on 15 November 2011) |
| Zhou Guoping | (appointed on 10 March 2005) |
| Tang Yunwei | (appointed on 15 November 2011) |
| Zhao Lihua | (appointed on 15 November 2011) |
| Cui Shuhong | (appointed on 10 May 2005) |
| Liu Zhiping | (appointed on 30 June 2008) |

## DIRECTORS' AND SUPERVISORS' SERVICE CONTRACTS

As at the date of this report, each of the directors and supervisors has entered into a service contract with the Company for a term of a maximum of three years. There is no unexpired service contract which is not determinable by the Company within one year without payment of compensation (other than statutory compensation) in respect of any director proposed to be re-elected.

# Directors' Report *(Continued)*

## DIRECTORS' AND SUPERVISORS' INTERESTS IN CONTRACTS

As at the date of this report, during the year and at any time during the period from the end of the year to the date of the report, except for the relevant service contracts, there were no contracts of significance to which the Company or any of its holding companies or its subsidiaries or fellow subsidiaries was a party and in which any of directors or supervisors had a material interest, whether directly or indirectly.

## DIRECTORS' AND SUPERVISORS' REMUNERATION AND THE FIVE HIGHEST PAID INDIVIDUALS

Details of the Directors' and Supervisors' remuneration who are the five highest paid individuals of the Company during the year are set out in Note 9 to the consolidated financial statements.

## BOARD OF DIRECTORS AND SPECIAL COMMITTEES

As at the date of this report, the Board comprised 13 directors, whose biographies are set out in the section headed "Biographical Details of Directors, Supervisors and Senior Management" of this report.

The Board established four special committees, namely, the Strategic Steering Committee, the Nomination Committee, the Remuneration and Performance Appraisal Committee and the Audit Committee, details of which are set out in the section headed "Corporate Governance Report" herein.

## CHANGES OF DIRECTORS, SUPERVISORS AND SENIOR MANAGEMENT

During the reporting period, there was no change in the Directors, Supervisors and senior management of the Company.

## MANAGEMENT CONTRACTS

Except for the service contracts of the management of the Company, no contracts were entered into between the Company and any individuals, companies or legal corporations, for the management or handling of all or any material part of the Company's business.

# Directors' Report *(Continued)*

## CONNECTED TRANSACTIONS

## Partially Exempted Continuing Connected Transactions

The connected transactions of the Company, which are also related party transactions, are set out in Note 41 to the consolidated financial statements in accordance with International Accounting Standard 24 "Related Party Disclosure".

The following transactions entered into by the Company constitute "continuing connected transactions" as defined under chapter 14A of the Listing Rules:

### Transactions with the Parent Group

As at the date of this report, the Parent has a direct equity interest of 12.35% and total direct and indirect equity interest of 44.10% in the Company. It is a controlling shareholder of the Company. Each of the Parent and its subsidiaries therefore constitutes a connected person of the Company under the Listing Rules.

### 1.    Master Purchase of Mineral Agreement

On 4 November 2010, the Company entered into a Master Purchase of Mineral Agreement with the Parent, for a term of three years commencing from 1 January 2011. Whereby the Parent agreed to supply, or procure its subsidiaries to supply, to the Company limestone and clay for the production of clinker and other cement products. The Parent shall supply to the Company limestone and clay from its quarries at market rates, namely, the price at which the same type of mineral is provided to Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

For the year ended 31 December 2013, the Group's expenditure for ore and clay supplied by the Parent Group was RMB19.6 million.

As the Master Purchase of Mineral Agreement expired on 31 December 2013, on 27 December 2013, the Company entered into a new Master Purchase of Mineral Agreement with the Parent for a term of three years commencing from 1 January 2014. Details of the new Master Purchase of Mineral Agreement were set out in the announcement of the Company dated 27 December 2013.

# Directors' Report *(Continued)*

## CONNECTED TRANSACTIONS *(CONTINUED)*

## Partially Exempted Continuing Connected Transactions *(Continued)*

### Transactions with the Parent Group *(Continued)*

**2.    Master Mutual Provision of Products and Services Agreement**

On 4 November 2010, the Company entered into a Master Mutual Provision of Products and Services Agreement with the Parent for a term of three years commencing from 1 January 2011. Pursuant to which:

(a)    the Parent agreed to provide, or procure its subsidiaries to provide, the following products and services to the Company:

- Production supplies: raw materials and commodities (including grinding aid, spare parts, refractory materials) and other similar raw materials for the Group's production; and

- Support services: transportation services; equipment repair, design and installation services; property management services; technology services; other similar services;

(b)    the Company agreed to provide, or procure its subsidiaries to provide the following production supplies and support services to the Parent:

- Production supplies: clinker, cement, diesel and petrol, lightweight building materials and other raw material and commodities; and

- Support services: equipment and conveyance leasing; water, electricity and steam supply services; and technology services.

The production supplies and support services pursuant to the Master Mutual Provision of Products and Services Agreement shall be provided at:

(a)    the government-prescribed price;

(b)    if there is no government-prescribed price but there is a government-guided price, the government-guided price applies;

(c)    if there is neither a government-prescribed price nor a government-guided price, then the market price applies. For the purpose of the Master Mutual Provision of Products and Services Agreement, the term "market price" is defined as the price at which the same type of products or services is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC; and

(d)    if none of the above is applicable, the price is to be agreed between the relevant parties for the provision of the relevant products or services, which shall be the reasonable costs incurred in providing the same products or services plus a profit margin of not more than 5% of such costs. For the purpose of the Master Mutual Provision of Products and Services Agreement, the term "reasonable costs" is defined as the costs confirmed by both parties after arm's length negotiations and permitted by the accounting principles of the PRC.

# Directors' Report *(Continued)*

## CONNECTED TRANSACTIONS *(CONTINUED)*

## Partially Exempted Continuing Connected Transactions *(Continued)*

### Transactions with the Parent Group *(Continued)*

**2.    Master Mutual Provision of Products and Services Agreement** *(Continued)*

The prices for electricity, water and steam are currently prescribed by the government.

For the year ended 31 December 2013, the Group's expenditure for the products and services provided by the Parent Group was RMB236.8 million.

For the year ended 31 December 2013, the Group's revenue from the production supplies and support services provided to the Parent Group was RMB995.3 million.

As the Master Mutual Provision of Products and Services Agreement expired on 31 December 2013, on 27 December 2013, the Company entered into a new Master Mutual Provision of Products and Services Agreement with the Parent for a term of three years commencing from 1 January 2014. Details of the new Master Mutual Provision of Products and Services Agreement were set out in the announcement of the Company dated 27 December 2013.

Due to the small transaction values, the former transactions in which the Group provided engineering service to the Parent Group were included in the provision of products and services to the Parent Group category in the three years ending 31 December 2013. However, considering the future demand for engineering services and the contracting method, on 27 December 2013 the Company entered into a Master Provision of Engineering Services Agreement with the Parent for a term of three years commencing from 1 January 2014, under which the engineering service transactions would be separated from the mutual provision of products and services between the Group and the Parent Group. This practice is in line with the previous treatment for the three years ended 31 December 2010. Details of the Master Provision of Engineering Services Agreement were set out in the announcement of the Company dated 27 December 2013.

# Directors' Report *(Continued)*

## CONNECTED TRANSACTIONS *(CONTINUED)*

## Partially Exempted Continuing Connected Transactions *(Continued)*

### Transactions with the Parent Group *(Continued)*

### 3. Master Purchase of Equipment Agreement

On 4 November 2010, the Company entered into a Master Purchase of Equipment Agreement with the Parent for a term of three years commencing from 1 January 2011. Whereby the Parent agreed to supply, or procure its subsidiaries to supply, equipment to the Company for the construction of our production lines. The equipment provided pursuant to the Master Purchase of Equipment Agreement shall be at market rate, namely, the price at which the same type of equipment is provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, in the vicinity or in the PRC.

For the year ended 31 December 2013, the Group's expenditure for equipment supplied by the Parent Group was RMB103.9 million.

As the Master Purchase of Equipment Agreement expired on 31 December 2013, on 27 December 2013, the Company entered into a new Master Purchase of Equipment Agreement with the Parent for a term of three years commencing from 1 January 2014. Details of the new Master Purchase of Equipment Agreement were set out in the announcement of the Company dated 27 December 2013.

### Transactions Between North Cement and Jingang Group

As Jingang Group holds a 20% equity interest in North Cement and North Cement is a subsidiary of the Company, therefore Jingang Group and its subsidiaries are connected persons of the Company pursuant to the Listing Rules.

### Master Agreement on Sale of Products

On 25 March 2013, North Cement, a 70% held subsidiary of the Company, entered into the Master Agreement on Sale of Products covering the period from 1 January 2013 to 31 December 2013 with Jingang Group, pursuant to which North Cement and its subsidiaries agreed to sell certain products to Jingang Group and its subsidiaries. The products included ultra-fine powder/slag, clinker and cement. The prices of the products under the agreement would be determined by the market price (which is the price of similar products provided by Independent Third Parties under normal commercial terms in the ordinary course of business in the same area, vicinity or in the PRC).

For the year ended 31 December 2013, the Group's revenue from the provision of products to Jingang Group and its subsidiaries (including ultra-fine powder/slag, clinker and cement) was approximately RMB933.2 million.

As the Master Agreement on Sale of Products expired on 31 December 2013, on 27 December 2013, North Cement entered into a new Master Agreement on Sale of Products with Jingang Group for a term of three years commencing from 1 January 2014. Details of the new Master Agreement on Sale of Products were set out in the announcement of the Company dated 27 December 2013.

# Directors' Report *(Continued)*

## CONNECTED TRANSACTIONS *(CONTINUED)*

## Partially Exempted Continuing Connected Transactions *(Continued)*

Pursuant to Rule 14A.38 of the Listing Rules, the Company has engaged the auditors of the Company to report on the Group's continuing connected transactions in accordance with Hong Kong Standard on Assurance Engagements 3000 "Assurance Engagements Other Than Audits or Reviews of Historical Financial Information" and with reference to Practice Note 740 "Auditor's Letter on Continuing Connected Transactions under the Hong Kong Listing Rules" issued by the Hong Kong Institute of Certified Public Accountants. The auditors have issued their unqualified letter containing their findings and conclusions in respect of the continuing connected transactions of the Group.

The auditors of the Company have reviewed the continuing connected transactions of the Group, and reported to the Board that:

(1)     nothing has come to their attention that causes them to believe that the transactions have not been approved by the Board;

(2)     nothing has come to their attention that causes them to believe that the transactions involving provision of goods or services provided by the Group were not conducted in accordance with the pricing policies of the Group;

(3)     nothing has come to their attention that causes them to believe that the transactions were not conducted in accordance with the terms of the agreement governing it; and

(4)     nothing has come to their attention that causes them to believe that the values of continuing connected transactions entered into between the Group and its connected persons which are subject to annual caps have exceeded their respective annual cap.

The Company has complied with the disclosure requirements in accordance with Chapter 14A of the Listing Rules.

The independent non-executive directors of the Company have reviewed these connected transactions and have considered the procedures performed by the auditors of the Company in reviewing them and confirmed that the connected transactions have been conducted:

(i)     in the ordinary and usual course of business of the Company;

(ii)    either on normal commercial terms or, if there are not sufficient comparable transactions to judge whether they are on normal commercial terms, on terms no less favourable to the Company than terms available to or from (as appropriate) Independent Third Parties; and

(iii)   in accordance with the relevant agreement governing them on terms that are fair and reasonable and in the interests of the shareholders of the Company as a whole.

# Directors' Report *(Continued)*

## NON-COMPETITION AGREEMENT

As at the date of this report, Parent confirmed that it has complied and will comply with the Non-Competition Agreement dated 28 February 2006 entered into with the Company. Pursuant to this agreement, Parent has agreed not to, and to procure its subsidiaries (excluding the Group) not to compete with the Group in its core businesses.

None of the directors of the Company is interested in any business which competes or is likely to compete, either directly or indirectly, with the business of the Group.

## DESIGNATED DEPOSITS AND OVERDUE TIME DEPOSITS

As of 31 December 2013, the Group had not placed any designated deposits with any financial institution in the PRC, nor had it failed to collect any time deposits upon maturity during the year.

## PRE-EMPTIVE RIGHTS

Under the Articles of Association of the Company and the laws of the PRC, there are no provisions about pre-emptive rights that require the Company to offer new shares to its existing shareholders in proportion to their shareholdings.

## AUDITORS

At the Board meetings held on 22 March 2013, pursuant to the authorisation granted at the 2012 AGM held on 23 May 2013 the Board determined to continue to engage Baker Tilly HK and Baker Tilly China as international and domestic auditors of the Company respectively, to hold office until the date of convening the annual general meeting in 2014, Baker Tilly HK has audited the financial statements prepared under the International Financial Reporting Standards.

By order of the Board
**Song Zhiping**
*Chairman of the Board*

Beijing, the PRC
25 March 2014

# Report of the Supervisory Committee

**Dear shareholders,**

During the reporting period, in accordance with relevant requirements of the Company Law and the Articles of Association of the Company, all members of the third session of the supervisory committee of the Company (the "Supervisory Committee"), had diligently and responsibly carried out effective supervision over the operational management, financial position and information disclosures as well as the performance of duties by the Directors and senior management of the Company for the year, which protected the interest of the Company and shareholders as much as possible.

During the reporting period, the Supervisory Committee held a total of three meetings and attended all the Board meetings. The Supervisory Committee has reviewed the Supervisory Committee Working Report of the Company for 2012, the auditor's report and audited financial statements of the Group for 2012, the profit distribution plan and the final dividend distribution plan for 2012, the interim financial report and results announcements for 2013, the interim auditor's report and the audited financial statements for 2013, as well as the handling of interim dividends for 2013, the amendments to the Rules of Procedures for the Supervisory Committee Meetings and other matters. The committee conducted compliance inspection on the implementation of the major operating guidelines, the fulfilment of financial targets, and the performance of duties and the main decision procedures of Directors and the senior management of the Company.

During the reporting period, through performing the supervisory power authorized by the Articles of Association, the Supervisory Committee is of the opinion that, the Board of the Company had complied with the requirements of the Company Law, the Articles of Association of the Company and other relevant rules, regulations and systems, followed relevant authorized rights and reasonable procedures to make effective decisions and enhanced the implementation of the resolutions at the general meetings. In the process of boosting management integration and promotion, Directors and the senior management of the Company conscientiously observed the implementation of the laws and regulations of the State, the Articles of Association, resolutions passed at shareholders' general meetings and Board meetings. They have also discharged their duties with honesty, diligence and dedication.

The supervisory committee reviewed the information disclosure position of the Company in accordance with the Information Disclosure System (《信息披露制度》) of the Company. It is of the view that the Company had complied with relevant requirements of the Listing Rules, the Information Disclosure System and other regulations; it performed well in information disclosures by disclosing appropriate information timely and the disclosed contents are truthful, accurate, complete, and effective, without false statements, misleading representations or material omission.

# Report of the Supervisory Committee *(Continued)*

The Company operated proper financial strategies, carried out standard financial audits and put in place a sound internal control system. The financial reports of the Company reflect, in an objective, true and fair manner, the Company's financial conditions and operating results in all major aspects, and are truthful and reliable as expected of the Company's development. In reviewing the Company's financial standing and examining the directors' and senior management's performance of duties, the Supervisory Committee did not find any breach of laws, regulations, the Articles of Association of the Company or any other rules or provisions, or any harm against the interests of the Company or its shareholders.

The Supervisory Committee has duly reviewed and approved the Report of the Board proposed to be submitted to the annual general meeting, the audited financial reports and profit distribution plans, and considers that the report is in consistence with the actual circumstances of the Company.

In face of the critical economic landscape for 2013, the Supervisory Committee is satisfied with the Company's achievement in all respect and economic benefit gained from overcoming difficulties, capturing opportunities, reinforcing and optimizing lean management in 2012, and is confident in the Company's prospects in 2013 onwards.

In 2014, the Supervisory Committee will stay vigilant to the development of the Company, perform its supervisory duties in the principle of honesty and diligence, carefully supervise the operational decisions and financial operation of the Company to improve the management of the Company, as well as concretely safeguard and guarantee the legitimate interests of the Company and its shareholders, in compliance with relevant laws, regulations and the Articles of Association of the Company.

**Wu Jiwei**
*Chairman of the Supervisory Committee*

Beijing, the PRC
25 March 2014

# Significant Events

## I.   MATERIAL LITIGATION AND ARBITRATION

During the Reporting Period, the Group was not involved in any litigation and arbitration which might have a significant impact on the Group's production and operation, nor were any of the directors, supervisors and senior management of the Group involved in any material litigation.

In respect of immaterial litigation, the Company published an overseas regulatory announcement on 30 May 2010 in respect of an announcement released by BNBM (a 52.4% held subsidiary of the Company) relating to the gypsum board incident in the United States. It mentioned that a US court had made an order against Taishan Gypsum (a 65% held subsidiary of BNBM), requiring it to pay damages of USD2,609,129.99. BNBM provided the following information on the stage of development of the incident in its 2013 annual report: Taishan Gypsum had filed several rounds of dismissal applications and appealed against the above court order. It had also applied for dismissal on the ground of jurisdiction in respect of other similar cases involved in the gypsum board incident in the United States. The above applications and appeals against the above court order and the applications in respect of one other case on the ground of jurisdiction had recently been finally dismissed by the US courts.

## II.   MATERIAL TRANSACTIONS

## Lapse of the Specific Mandate in Respect of the Proposed A Share Issue

The proposed A Share Issue was approved by the shareholders by Special Mandate on 16 September 2011 at the extraordinary general meeting, the H shareholders class meeting and the domestic shareholders class meeting of the Company. The Specific Mandate had an initial term ending on 15 September 2012 and was extended for a further period of 12 months commencing from 10 September 2012 by the shareholders at the extraordinary general meeting, the H shareholders class meeting and the domestic shareholders class meeting of the Company held on 10 September 2012.

In the light of the prevailing domestic capital market situation, the Company has decided not to seek the renewal of the Specific Mandate which will lapse on 9 September 2013. The Company may review its actual needs and the market conditions to decide whether or not to re-launch the proposed A Share Issue in the future and make relevant disclosures and take other steps as may be required under the Listing Rules.

Details of the lapse of the Specific Mandate in respect of the proposed A Share Issue were set out in the announcement of the Company dated 23 August 2013.

# Biographical Details of Directors, Supervisors and Senior Management

## DIRECTORS

## Executive Directors

**Mr. Song Zhiping,** born in October 1956, is the chairman of the Board and an executive director of the Company. Mr. Song has over 30 years of experience in business and management in China's building material industry. He has served as the chairman of Parent since October 2005 and the chairman of the Board and executive director of the Company since March 2005. He served as the chairman of China United from March 2003 to February 2005 and the general manager of Parent from March 2002 to October 2005. He also served as the vice general manager and the vice general manager of general affairs of Parent from October 1995 to March 2002, respectively. From May 1997 to May 2002, Mr. Song served as the chairman of BNBM and the chairman of BNBMG since January 1996. Mr. Song served several positions in BNBMG (both prior to and after its conversion) from September 1987 to July 2002, including the deputy director and the director of the factory, the general manager and the secretary to the Party Committee. Mr. Song has served as an external director and the chairman of China National Pharmaceutical Group Corporation since May 2009. Mr. Song received a bachelor's degree in polymer from Hebei University in September 1979 and received an MBA degree from Wuhan Poly-technic University (now Wuhan University of Technology) in July 1995 and a doctor's degree in management from Huazhong University of Science and Technology in May 2002. Mr. Song is qualified as a professor-grade senior engineer and was awarded a special grant of the government approved by the State Council. At present Mr. Song consecutively acts as the vice president of China Building Materials Industry Association（中國建築材料聯合會）, the vice president of China Enterprise Confederation, the chairman of the board（主席團主席）of China Federation of Industrial Economics, the vice president of China's Listed Companies Association（中國上市公司協會）, the vice president of China Logistics Alliance Network（中國物流與采購聯合會）, the vice president of general affairs and head of the China Capital Entrepreneurs' Club（首都企業家俱樂部）and the chairman of China Enterprise and Development Research Association（中國企業與發展研究會）. Mr. Song was elected as the representative of the Eighteenth National Congress of Communist Party of China. Mr. Song received a number of awards and titles for his management and entrepreneurial skills, including National Model Worker（全國勞動模範）, the Eighth Session of National Outstanding Entrepreneur "Golden Globe Awards"（第八屆全國優秀企業家金球獎）, Management Elite Award（管理人物精英獎）, one of the Top Ten Merger and Acquisition Businessmen in the PRC（中國十大併購人物）, the Yuan Baohua Enterprise Management Gold Award（袁寶華企業管理金獎）and the China Enterprise Reform Medallion in the Thirty Years of Reform and Opening Up（改革開放30年中國企業改革紀念章）, The People with Outstanding Contribution to Social Responsibility Undertakings（人民社會責任傑出貢獻人物）, the Golden Bauhinia Awards "Most Influential Leader"（中國證券金紫荊獎最 具影響力領袖獎 ）, The People of Financial Year 2012（2012年中國經濟年度人物獎）, China Economic Leaders Award（華人經濟領袖獎）, the first prize of National Corporate Management Modernization and Innovation Achievements（國家級企業管理現代化創新成果）, the "25 Most Influential Corporate Leaders in 2013" (2013年度最具影響力的25位企業領袖) as well as The Businessman of China Year 2013 (2013年度中國商人) etc.

**Biographical Details of Directors, Supervisors and Senior Management** *(Continued)*

## DIRECTORS *(CONTINUED)*

## Executive Directors *(Continued)*

**Mr. Cao Jianglin,** born in September 1966, is the president and an executive director of the Company. Mr. Cao has over 20 years of experience in business and management in the building material industry. Mr. Cao has been a director of China United and the chairman of the board of Southwest Cement since December 2011, the chairman of the supervisory committee of BNBM since September 2009, the chairman of North Cement since March 2009, the chairman of South Cement since September 2007, the chairman of the supervisory committee of BNBMG since August 2005, a director of Parent since October 2005, the chairman of the supervisory committee of China United from April 2005 to December 2011, the president and an executive director of the Company since March 2005. From October 2004 to August 2009, Mr. Cao was the chairman of BNBM, the director of both China Composites and China Triumph since September 2004, the chairman of China Fiberglass since June 2002 and the chairman of CNBM Investment since March 2002. From April 1998 to October 2005, Mr. Cao served in a number of positions in Parent and the Group, including the general manager assistant, the vice general manager and the vice chairman of BNBMG, the general manager assistant and the vice general manager of Parent, the president of BND Co., Limited (now CNBM Investment) and the general manager of China Fiberglass. Mr. Cao received a bachelor's degree in economics from Shanghai University of Finance and Economics in July 1990 and an MBA degree from Tsinghua University in January 2004. Mr. Cao is a researcher with professional technology qualifications and was awarded a special grant of the government approved by the State Council. Mr. Cao was granted Working Model of China Central Government Enterprises, Excellent Entrepreneur of the State and was awarded the first prize of National Corporate Management Modernization and Innovation Achievements（國家級企業管理現代化創新成果）.

**Mr. Peng Shou,** born in August 1960, is currently the vice president and an executive director of the Company. Mr. Peng has over 30 years of experience in business and management in the building material industry. He is an expert in inorganic materials research and development as well as engineering design and consulting. Mr. Peng has served as an executive director of the Company since June 2006, a vice president of the Company since March 2005, the chairman of China Triumph since September 2004 and the president of China Triumph since May 2002. He also served as the deputy general manager of China Triumph from June 2001 to May 2002. Mr. Peng received a bachelor's degree in engineering from Wuhan Institute of Building material industry (now Wuhan University of Technology) in December 1982 and a master's degree in management from Wuhan Poly-technic University (now Wuhan University of Technology) in June 2002. Mr. Peng is qualified as a senior engineer at professor level and was awarded a special grant of the government approved by the State Council. At present Mr. Peng consecutively acts as the chairman of International Commission on Glass, the director of State Key Laboratory of Float Glass New Technology （浮法玻璃新技術國家重點實驗室）, the vice chairman of China Silicate Association（中國硅酸鹽學會）, the deputy chairman of the China Building and Industrial Glass Committee and the vice president of China Building Material Federation. Mr. Peng was awarded National Model Worker（全國勞動模範）, National May Day Labor Medal, State Technology Advancement（國家級科技進步獎）and Guanghua Engineering Science and Technology Award of Chinese Academy of Engineering. As a National Engineering Survey and Design Master（國家級工程勘察設計大師）, he is also among the first group of national candidates for the New Century Hundred-Thousand-Ten Thousand Talents Project（新世紀百千萬人才工程）and State Outstanding Technical Officer（全國優秀科技工作者）.

**Biographical Details of Directors, Supervisors and Senior Management** *(Continued)*

## DIRECTORS *(CONTINUED)*

## Executive Directors *(Continued)*

**Mr. Cui Xingtai,** born in November 1961, is the vice president and an executive director of the Company. Mr. Cui has nearly 30 years of business and management experience in China's building material industry. He has served as a diretor of Southwest Cement since December 2011, an executive director of the Company since August 2009, a director of South Cement since September 2007, the chairman of China United since April 2005, a vice president of the Company since March 2005 and the secretary of the Party Committee of China United since August 2004. Mr. Cui served as the vice chairman of China United from August 2004 to April 2005, the deputy chief engineer of Parent from November 2003 to March 2005, and the deputy general manager of China United from April 2002 to August 2004, the chief engineer of China United from July 1999 to August 2004, From June 1997 to January 1999, Mr. Cui served as the head of Shandong Lunan Cement Factory. Mr. Cui received a bachelor's degree in engineering from Wuhan Institute of Building Material Industry (now Wuhan University of Technology) in July 1984 and received a master's degree in enterprise management from the Graduate School of the Chinese Academy of Social Sciences in July 1998. Further, he received an EMBA degree from Tsinghua University on January 2008. Mr. Cui is qualified as a professor-grade senior engineer and was awarded a special grant of the government approved by the State Council. At present Mr. Cui consecutively acts as the vice president of China Cement Association. Mr. Cui was awarded as an Outstanding Entrepreneur in China's Building Materials Industry（全國建築材料行業優秀企業家）and the first prize of National Corporate Management Modernization and Innovation Achievements in Building Materials Industry（國家級建材行業企業管理現代化創新成果），the first prize of National Corporate Management Modernization and Innovation Achievements（全國企業管理現代化創新成果）and an Outstanding Communist Party Member of China Central Government Enterprises（中央企業優秀共產黨員）honoured by SASAC.

**Mr. Chang Zhangli,** born in December 1970, is the vice president, a secretary to the Board and an executive director of the Company. Mr. Chang has over 15 years' experience in handling listing-related matters for the Company, with participation in all major matters relating to the global offering of the shares of the Company and listing of shares of the Company on the Stock Exchange. Mr. Chang has served as a director of China Triumph since October 2012, the director of China United and China Composites since December 2011, vice chairman of the board of Southwest Cement, the executive Director of the Company since November 2011 and the director of North Cement since March 2009, the director of BNBM since July 2008, the director of South Cement since September 2007, the vice president of the Company since August 2006, the director of China Fiberglass since July 2005, the secretary to the Board of the Company since March 2005 and the director of CNBM Investment since December 2000. From June 2000 to March 2005, Mr. Chang served in a number of key positions in BNBM, including the secretary to the board and the deputy general manager. Mr. Chang is an engineer who received a bachelor's degree in engineering from Wuhan Poly-technic University (now Wuhan University of Technology) in July 1994 and received an MBA degree from Tsinghua University in July 2005. Currently, Mr. Chang serves as the deputy secretary of the Listed Companies Association of Beijing. Mr. Chang was awarded the first prize of National Corporate Management Modernization and Innovation Achievements（國家級企業管理現代化創新成果）.

**Biographical Details of Directors, Supervisors and Senior Management** *(Continued)*

## DIRECTORS *(CONTINUED)*

## Non-executive Directors

**Mr. Guo Chaomin,** born in August 1957, is a non-executive director of the Company. Mr. Guo has over 35 years of experience in business and management in the building material industry of China. He has been a non-executive director of the Company since November 2011, the general manager of China National United Equipment Group Corp. from October 2006 to March 2010, the general manager of Parent since September 2003, the general manager assistant of Parent from April 2002 to September 2003, the general manager of investment and development department of Parent from April 2002 to August 2004, the general manager of Zhongbei Glass Industrial Company（中北玻璃工業公司）from December 2002 to February 2004 and the deputy chief accountant of Parent from May 1998 to April 2002. During the period from March 1983 to May 1998, Mr. Guo served successively for several positions in Parent including the deputy head, the head, the deputy manager and the manager of planning and finance department. Mr. Guo received a bachelor's degree in economics from Renmin University of China in March 1983 and an MBA degree from China Europe International Business School in May 1998. Mr. Guo is a senior economist.

**Mr. Huang Anzhong,** born in July 1963, is a non-executive director of the Company. Mr. Huang has over 25 years of experience in business and management in the building material industry. Mr. Huang has served as the vice general manager of Parent since December 2009, the non-executive director of the Company since March 2005 and the general manager of CNBM Trading since January 2005. Mr. Huang served as the supervisor of China Fiberglass from March 1999 to July 2005, the vice general manager and the general manager of China National Building Material & Equipment Import and Export Company from April 1996 to January 2005, Mr. Huang graduated with a bachelor's degree in engineering from Nanjing Institute of Chemical Technology in July 1985 and received an EMBA degree from Xiamen University in May 2005. Mr. Huang is a researcher with professional technology qualifications and was awarded a special grant of the government approved by the State Council. Mr. Huang was once rewarded as the Working Model of China Central Enterprises.

**Ms. Cui Lijun,** born in October 1960, is a non-executive director of the Company. Ms. Cui has over 25 years of experience in business and management in the building material industry. Ms. Cui has served as the vice chairman of BNBMG since August 2005, the chairman of the supervisory committee of China Fiberglass from July 2005 to April 2011, the non-executive Director of the Company and the general manager of the BNBMG since March 2005, the director of BNBM since June 2003, the director of China Fiberglass from May 2002 to July 2005 and the chief financial officer of BNBMG from April 2002 to September 2006. Ms. Cui received a bachelor's degree in industrial accounting from Beijing Open University in December 1986 and received a master's degree in investment management from the Graduate School of Chinese Academy of Social Sciences in November 1998. Ms. Cui is an accountant.

**Biographical Details of Directors, Supervisors and Senior Management** *(Continued)*

## DIRECTORS *(CONTINUED)*

### Independent Non-executive Directors

**Mr. Qiao Longde,** born in January 1948, is an independent non-executive director of the Company. Mr. Qiao has over 45 years of experience in business and management in the building material industry. Mr. Qiao has been an independent non-executive director since November 2011, the chairman of China Cement Association since October 2012, the chairman of China Building Materials Federation since June 2000, the vice-ministerial grade cadre of SASAC since July 2010, the chairman of the Supervisory Committee for Key State-owned Enterprises of the State Council from June 2000 to July 2010, the deputy head and a member of the Party Committee of the State Bureau of Building Material Industry from March 1995 to April 2011, the head and secretary to the Party Committee of Bureau of Building Materials Industry of Gansu Province（甘肅省建材局）from July 1991 to March 1995, the deputy head and vice secretary to the Party Committee of Bureau of Building Materials Industry of Gansu Province（甘肅省建材局）from October 1986 to June 1991, the secretary to the Party Committee and the chief commander of engineering construction of Gansu Wushan Cement Factory（甘肅武山水泥廠）from November 1980 to June 1983, as well as the deputy head and a member of the Party Committee of Bureau of Building Materials Industry of Gansu Province（甘肅省建材局）from April 1975 to June 1983. Mr. Qiao received a bachelor's degree from the Chinese Department of Gansu Northwest Normal University in September 1985, a bachelor's degree in economics and management from Correspondence Institute of the Party School of Central China of Communist Party of China（中共中央黨校函授學院）in July 1994, a master's degree in architecture and civil engineering from Wuhan University of Technology in July 2001 and a doctor's degree in engineering and management science from Wuhan University of Technology in June 2004. Mr. Qiao is a senior economist.

**Mr. Li Decheng,** born in May 1945, is an independent non-executive director of the Company. Mr. Li has accumulated over 40 years of experience in the field of economic management. Mr. Li has served as an independent non-executive director of the Company since August 2008, the executive vice chairman and the director of the China Enterprise Confederation（中國企業聯合會、中國企業家協會）since 2008. From March 2004 to April 2008, he served as the chairman and the secretary to the Party Committee of the 4th Shenzhen Committee of China People's Political Consultative Conference (the "CPPCC"). He was the chairman and the secretary of the Party Committee of the 3rd Shenzhen CPPCC from March 2002 to March 2004. He was the deputy secretary of the Communist Party of China Standing Committee of Shenzhen from May 2000 to March 2002. From May 1995 to March 2004, he was the standing deputy city mayor of Shenzhen. He was the secretary to Industry Committee and the general manager of Municipal Investment Management Company in Shenzhen from September 1993 to October 1994, a member of the Communist Party of China Standing Committee of municipal government of Shenzhen from September 1993 to March 2004 and served as the deputy chief, the chief and the secretary to the Party Committee for Economics System Reform Committee of Jilin Province from February 1988 to March 1992, and served as the chief and secretary to the Party Committee for Economic Planning Committee of Jilin Province from January 1985 to June 1987, and the deputy chief and a member of the Party Committee for Economic Committee of Jinlin Province from September 1983 to January 1985. Mr. Li is an engineer who received a bachelor's degree in laser and infrared ray from Changchun Institute of Optics and Fine Mechanics in August 1969. He is a member of the 11th National Committee of CPPCC and United Nations Global Compact Organization.

**Biographical Details of Directors, Supervisors and Senior Management** *(Continued)*

## DIRECTORS *(CONTINUED)*

### Independent Non-executive Directors *(Continued)*

**Mr. Ma Zhongzhi,** born in January 1944, is an independent non-executive director of the Company. Mr. Ma has more than 40 years of experience in business and management covering the supervision and management of banking and securities regulation. He has served as the independent non-executive director of the Company since November 2011, the independent supervisor of the Company from June 2008 to November 2011, the independent director and the chairman of the Audit Committee of Standard Chartered Bank (China) Limited since March 2008. Mr. Ma served as the chairman of the Supervisory Committee for Key State-owned Enterprises of the State Council from June 2000 to April 2007, and the audit commissioner of the State Council from November 1998 to June 2000. From September 1992 to November 1998, he served as the deputy head and the head of the office of Securities Commission of the State Council, including from June 1994 to November 1998, he took the position of a member of the Party Committee and secretary general of CSRC. He served as the deputy head of the headquarters of the People's Bank of China between November 1991 and September 1992, and the deputy branch manager of the People's Bank of China Shenyang Branch between June 1984 and November 1997. Since June 1993, he has also worked as a part-time professor and postgraduate supervisor in the Graduate School of the People's Bank of China. He is a senior economist who received a bachelor's degree in economic management from Liaoning University in August 1984. Mr. Ma wrote a book entitled Study and Thought on the Japanese Securities Market, edited books like A Must-read for Financing in the U.S. Securities Market and Issuance of Convertible Bonds and Market Practices, and authored a book entitled Basic Knowledge of Securities Market. He has been honoured as a national expert who has made outstanding contributions, by the People's Bank of China.

**Mr. Shin Fang,** born in December 1941, is an independent non-executive director of the Company. He has over 40 years of experience in business and management in respect of corporate management and capital operation and has been an independent non-executive director of the Company since November 2011. In May 2000, Mr. Fang established SF CAPITAL LTD., serving as its president, and he worked for GET MANUFACTURING INC. from January 1996 to May 2000 as its chairman. Mr. Fang has been the director of Chung Tak Lighting Control Systems (Guangzhou) Ltd.（廣州市中德電控有限公司）since August 1993 and the director of Yue-Sai Kan Cosmetics Ltd.（靳羽西化妝品有限公司）from July 1992 to December 2000. He served as the managing director of GENERAL ELECTRONICS (HK) LTD. from January 1969 to December 1995. Mr. Fang obtained a bachelor's degree in Physics from Rensselaer Polytechnic Institute in June 1964 and an MBA from Columbia University in US in June 1966.

## Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

### DIRECTORS *(CONTINUED)*

### Independent Non-executive Directors *(Continued)*

**Mr. Wu Liansheng,** born in December 1970, is an independent non-executive director of the Company. He has extensive research experience in the area of accounting rules and earnings management, corporate governance and corporate financial behaviour, Mr. Wu has been the deputy dean of the Guanghua Management Institute of Peking University since March 2012, the independent non-executive director of the Company since November 2011, the professor of the accounting department of Guanghua Management Institute of Peking University since August 2007 and head of the department of accounting of the Guanghua Management Institute of Peking University from August 2007 to December 2013, the deputy head of the department of accounting of the Guanghua Management Institute of Peking University from March 2003 to July 2007, a Ph.D supervisor of the Guanghua Management Institute of Peking University since August 2002 and has been a lecturer, associate professor and professor of the Guanghua Management Institute of Peking University since September 2001. Mr. Wu received a bachelor's degree in economics from Wuhan University in July 1993, a master's degree in economics from Wuhan University in June 1996 and a doctor's degree in management in June 1999. Mr. Wu has over a number of papers published in numerous renowned journals at home and abroad, including 3 masterpieces of his, namely "Studies on the Frontier Issues in Accounting: Development and Innovation", "Governance to Categorized Accounting Information Distortion: from Accounting Order to Accounting Rules" and "Studies on Accounting Report of Listed Companies" (上市公司會計報告研究). In addition, he has led six projects in total including the National Social Science Funds, National Natural Science Funds and Humanities and Social Sciences of the Ministry of Education. At present Mr. Wu acts as an independent director in listed companies such as Huaneng Power International Inc. and Western Mining Company Limited (西部礦業發展股份有限公司). He was shortlisted in the "New Century Outstanding Person Support Scheme" (新世紀優秀人才支持計劃) of the Ministry of Education.

### SUPERVISORS

**Mr. Wu Jiwei,** born in February 1971, currently serves as the chairman of the Supervisory Committee of the Company. He has accumulated over 15 years of experience in financial management. Mr. Wu has served as the chairman of the Supervisory Committee of the Company since November 2011, the chief accountant of Parent since April 2011, the director of financial management centre of China Chengtong Holdings Group Limited from December 2008 to April 2011, the deputy chief accountant of Engineering Technology Branch Company (工程技術分公司) of China National Petroleum Corporation from April 2008 to December 2008, the general manager assistant of China National Petroleum Corporation (the "CNPC") Services and Engineering Ltd. as well as the chief accountant of China National Logging Corporation from April 2005 to April 2008. Mr. Wu served a number of positions for the finance department of CNPC Services and Engineering Ltd from February 2001 to April 2005, such as the deputy manager of financial assets department and the manager of finance department. From September 1999 to February 2001, he worked as an accountant of fiscal budget division of financial assets department (財務資產部資金預算處) of China National Petroleum Corporation. He obtained a bachelor's degree in financial accounting from Xi'an Petroleum College in July 1994 and received his master's degree in management from Central University of Finance and Economics in March 2001. Mr. Wu is a senior accountant.

# Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

## SUPERVISORS *(CONTINUED)*

**Ms. Zhou Guoping,** born in February 1960, is a Supervisor of the Company. Ms. Zhou has over 20 years' experience in financial management. Ms. Zhou has been a director of China Triumph since October 2012, the chief economist of Parent since December 2009, a supervisor of the Company since March 2005, assistant to the general manager of Parent from October 2003 to December 2009 and the general manager of the finance department of Parent from October 2003 to December 2006 and the chief financial officer of Zhongxin Group Financial Company from July 2000 to April 2003. From March 1992 to October 2003, Ms. Zhou served successively as the deputy head of the Planning Division in the Integrated Planning Department, assistant to the manager of the Integrated Planning Department, assistant to the manager of Planning and Finance Department, and deputy manager and manager of the Planning and Finance Division and deputy manager of the financial management division of Parent. Ms. Zhou received a bachelor's degree in engineering from Wuhan Institute of Building Materials Industry (now Wuhan University of Technology) in July 1982 and an EMBA degree from Xiamen University in December 2006. Ms. Zhou is qualified as a professor-grade senior engineer.

**Mr. Tang Yunwei,** born in November 1944, is an independent Supervisor of the Company. He has over 25 years' experience in corporate operation and financial management. Mr. Tang has been an independent supervisor of the Company since November 2011 and served in Ernst & Young Da Hua as a senior consultant from December 2006 to December 2008. He has been the president of Shanghai Accounting Association（上海市會計學會）from 2002 to 2012 and served as the chief accountant in Ernst & Young Da Hua from January 2000 to December 2006. He has been the chairman of Shanghai Dahua Certified Public Accountants since January 2000 and served as a senior researcher in the International Accounting Standards Committee from March 1999 to January 2000. Mr. Tang has been a member of China Accounting Standards Committee（中國會計準則委員會）since 1997, a member of the Listing Committee of Shanghai Stock Exchange since 1996 and a member of China Auditing Standards Board（中國審計準則委員會）since 1994. He was the president of Shanghai University of Finance and Economics from October 1993 to January 1999 and served as a lecturer, associate professor, assistant to the president, professor and vice president of Shanghai University of Finance and Economics from 1984 to September 1993. Mr. Tang received a bachelor's degree in economics from Shanghai University of Finance and Economics in August 1968, a master's degree in economics from Shanghai University of Finance and Economics in August 1983 and a doctor's degree in accounting from Shanghai University of Finance and Economics in August 1987. Currently, Mr. Tang serves as independent directors of companies such as Ping An Insurance (Group) Company of China, Ltd. Mr. Tang was honored by American Accounting Association as a distinguished international visiting professor and was recognized by State Education Commission and Ministry of Human Resources as returned overseas with outstanding contributions to the progress of socialist modernization.

## Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

### SUPERVISORS *(CONTINUED)*

**Mr. Zhao Lihua,** born in September 1942, is an independent supervisor of the Company. Mr. Zhao has accumulated substantial experience in corporate management. He has been an independent Supervisor of the Company since November 2011 and served as an independent director of China Fiberglass from July 2003 to April 2011 and the chief supervisor of Sinosafe General Insurance Co. Ltd. He served as the chairman of the board of directors of Hebei Huda Technology and Education Development Co., Ltd. from March 2000 to October 2002, the vice chairman of Hunan Physics Association（湖南省物理學會）from March 1997 to August 2008. He has been a Ph.D supervisor in Hunan University since May 1996. From May 1995 to July 1995, he conducted cooperative research in University of Wisconsin-Madison. He served as a vice president of Hunan University from March 1992 to March 2000 and was a visiting professor of University of Hanover in Germany in 1989. He served as a professor of the Department of Applied Physics since June 1987 and the deputy head and head of Laboratory Management Department of Hunan University from March 1984 to March 1992. Mr. Zhao was a visiting scholar of the University of Wisconsin-Madison in the United States from August 1979 to August 1981 and successively served as an instructor, a lecturer and associate professor of the department of applied physics in Hunan University from May 1978 to June 1987. Mr. Zhao received a bachelor's degree in theoretical physics from Hunan University in July 1965 and published more than 160 scientific research papers in renowned domestic and international academic journals. Mr. Zhao was awarded a special grant of the government approved by the State Council. Mr. Zhao currently serves as an independent director of China Glass Holdings Limited. Mr. Zhao was awarded the second prize of technology advancement for the Ministry of Machine Building（機械工業部科技進步二等獎）and the third prize of technology advancement for the Ministry of Education（教育部科技進步三等獎）.

**Ms. Cui Shuhong,** born in March 1968, is currently a staff representative Supervisor and the general manager of the Administration and Human Resources Department of the Company. Ms. Cui has nearly 20 years' experience in management positions. Ms. Cui has been a staff representative supervisor since May 2005 and the general manager of the Administration and Human Resources Department of the Company since April 2005 and the chairman of the supervisory committee of the CNBM Investment since September 2004. She served as the deputy director of the General Manager's Office of Parent from April 2002 to April 2005, and the deputy manager of the Human Resources Office and deputy director of General Manager's Office of BNBM from November 2001 to April 2002. She also served as the deputy director of the General Manager's Office of BNBMG from August 1997 to October 2001. Ms. Cui received a bachelor's degree in economics from Beijing Economics Institute in July 1990. She is a senior economist.

**Mr. Liu Zhiping,** born in November 1962, is a staff representative Supervisor of the Company. Mr. Liu had nearly 25 years of experience in economic management and investment. Mr. Liu has been the executive vice president of Southwest Cement since March 2012, a staff representative supervisor of the Company since June 2008, a supervisor of South Cement since September 2007, the general manager of the Company's Investment Development Department since April 2005 and the chairman of the supervisory committee of China Composites since September 2004. He served as the deputy head of General Manager's Office of Parent from August 2004 and March 2005, the general manager of Strategic Development Department of Finance Company of HNA Group Co., Ltd. from January 2004 to July 2004, the general manager assistant of Zhongxin Group Finance Company from May 2002 to December 2003, the General Manager of Foreign Currency Department（外匯業務部）in China Education Technology Trust Investment Company from November 1994 to May 2002, the deputy head of Foreign Currency Management Office（外匯管理處）of National Foreign Currency Bureau (Hainan Branch) from November 1993 to November 1994 and the deputy head of policy and law department of National Foreign Currency Bureau from August 1988 to November 1993. Mr. Liu received a bachelor's degree in economics in July 1985 and a master's degree in banking and currency in July 1988 from Jilin Trade and Business College. He obtained a doctor's degree of management from Huazhong University of Science and Technology in October 2000. He is a senior economist.

EXHIBIT B

Page 91 of 218

## Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

### SENIOR MANAGEMENT

**Mr. Cao Jianglin** is the president of the Company. Please refer to the section headed "Executive Directors" for his biographical details.

**Mr. Peng Shou** is a vice president of the Company. Please refer to the section headed "Executive Directors" for his biographical details.

**Mr. Cui Xingtai** is a vice president of the Company. Please refer to the section headed "Executive Directors" for his biographical details.

**Mr. Chang Zhangli** is a vice president of the Company. Please refer to the section headed "Executive Directors" for his biographical details.

**Mr. Li Yimin,** born in January 1954, is a vice president of the Company. Mr. Li has nearly 35 years of experience in business and management in the building materials industry. Mr. Li has been the chairman of the supervisory committee of China United since December 2011, the chief engineer of the Company from November 2011 and the chairman of the supervisory committee of China Fiberglass since April 2011, a director of CNBM Investment since August 2008. He served as an executive Director of the Company from January 2006 to November 2011 and a director of China United from April 2005 to December 2011. He has been the vice president of the Company since March 2005 and served as the chief engineer of Parent from December 2003 to March 2005, the chairman of BNBM from April 2002 to February 2004, and the general manager of BNBM from May 1997 to April 2002. From January 1996 to December 2003, Mr. Li served successively as the executive vice general manager, vice chairman and the general manager of BNBMG. He also served as the deputy head of BNBMG (prior to its conversion from Beijing New Building Materials Factory) from September 1985 to January 1996. Mr. Li received a bachelor's degree in electro-mechanical engineering management from Shanghai Tongji University in August 1978 and a master's degree in engineering management from Wuhan Poly-technic University (now Wuhan University of Technology) in July 1995. He is a professor-grade senior engineer and was awarded a special grant of the government approved by the State Council.

**Mr. Zhang Dingjin,** born in November 1957, is a vice president of the Company. Mr. Zhang has over 25 years of experience in business and management in the building materials industry. He has served as the vice president of the Company since March 2005, the chairman of China Composites since September 2004 and the general manager of China Composites since January 2003. He also served as the general manager of China Inorganic Materials Science and Technology Enterprise (Group) Company from March 2002 to January 2003, the deputy general manager of China Inorganic Materials Science and Technology Enterprise (Group) Company from January 2001 to March 2002 and the general manager of Beijing Pennvasia Glass Company Limited from August 1999 to September 2001. From February 1997 to August 1999, Mr. Zhang served as the deputy dean of Shandong Industrial Ceramics Research and Design Institute. Mr. Zhang received a bachelor's degree in engineering from Anshan Institute of Iron and Steel in August 1982 and an EMBA degree from Xiamen University in June 2005. He is qualified as a professor-grade senior engineer and was awarded a special grant of the government approved by the State Council. At present Mr. Li consecutively acts as the vice president of China Composites Industry Association（中國複合材料工業協會）.

## Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

### SENIOR MANAGEMENT *(CONTINUED)*

**Mr. Chen Xuean,** born in April 1964, is a vice president and chief financial officer of the Company. Mr. Chen has over 20 years' experience in financial management. Mr. Chen has served as a director of BNBM since September 2012, a director of China Composites since December 2011, the vice president of the Company since November 2011, the chairman of the supervisory committee of North Cement since March 2009, a director of CNBM Investment since August 2008, a director of South Cement since September 2007, a director of China United since October 2006, a supervisor of China Fiberglass since July 2005 and the chief financial officer of the Company since March 2005. From April 1995 to March 2005, Mr. Chen served as the deputy head of finance department of general office of SASAC, the deputy head of Assets Inspection and Verification Department, the head of the Monitoring Department and the head of the Central Department of State-owned Assets Statistics and Evaluation Division of the Ministry of Finance. Mr. Chen received a bachelor's degree in economics from Shanghai University of Finance and Economics in July 1986 and a master's degree in management from Beijing Institute of Technology in November 1999. He is a researcher with professional technology qualifications and was awarded the first prize of National Corporate Management Modernization and Innovation Achievements（國家級企業管理現代化創新成果）.

**Mr. Yao Jixin,** born in May 1955, is a vice president of the Company. Mr. Yao has over 25 years of experience in operation and management in the cement industry. He has been a vice president of the Company since August 2009, the vice chairman of South Cement since June 2009 and the secretary to the Party Committee of South Cement since April 2009. He served as the president of South Cement from September 2008 to June 2009 and the general manager of Zhejiang Sanshi Group Company Limited from March 1999 to August 2009. Mr. Yao has served as secretary of the Party Committee of Sanshi Group Company Limited since March 1999 and the chairman of Sanshi Group Company Limited since March 1998. He served as the chairman of Zhejiang Sanshi Cement Company Limited（浙江三獅水泥股份有限公司）from September 1997 to July 2011, a Party Committee member, vice chairman and general manager of Zhejiang Sanshi Cement Company Limited（浙江三獅水泥股份有限公司）from August 1994 to September 1997, an executive deputy manager of Zhejiang Cement Plant from July 1990 to August 1994 and a Party Committee member and deputy manager of Jiangshan Cement Plant（江山水泥廠）from November 1984 to July 1990. Mr. Yao is a senior economist who received an MBA degree from Macau University of Science and Technology in October 2005 and a doctor's degree in management from Macau University of Science and Technology in October 2010. At present Mr. Yao consecutively acts as the vice president of China Building Material Federation and the vice president of China Cement Association. Mr. Yao has won many awards, including National Outstanding Young Entrepreneur, Outstanding Business Management Worker in the national building materials industry, National May Day Labor Medalist, National Excellent Entrepreneur, Top Ten Outstanding Figures in China's Cement Industry during the 15th Five-Year Plan Period as well as the first prize of National Corporate Management Modernization and Innovation Achievement（國家級企業管理現代化創新成果）.

## Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

### SENIOR MANAGEMENT *(CONTINUED)*

**Mr. Xiao Jiaxiang,** born in September 1963, is a vice president of the Company. Mr. Xiao has rich experience and achievements in business management, regional economic and social development, group management (especially in group strategy management and group control), as well as financing and cooperation in international capital market. He has served as a director of Southwest Cement since December 2011, the president of South Cement since June 2009, the deputy secretary to the Party Committee of South Cement since April 2009, a vice president of the Company and a director of South Cement since February 2009. From February 2006 to December 2008, he served as the president of Tianrui Corporation, and concurrent chairman and general manager of Tianrui Group Cement Co., Ltd. From March 2004 to December 2005, he served as a secretary of Party Committee in Daye City, Hubei Province and a director of the Standing Committee of People's Congress of Daye City. From November 2001 to March 2004, he served as deputy party secretary and mayor of Daye City, Hubei Province. From April 1997 to November 2001, he served as a director, the general manager assistant, the vice general manager and Standing Party Committee member in Huaxin Cement (Group) Co., Ltd.. From July 1991 to April 1997, he served as the head in the lime mine of Hubei Huaxin Cement (Group) Co., Ltd.. From July 1982 to July 1991, Mr. Xiao served as an engineer, the head of the mine workshop of Guizhou Shuicheng Cement Plant. Mr. Xiao received a bachelor's degree in mining engineering of the non-metallic department from Wuhan Institute of Building Materials Industry (now Wuhan University of Technology)in August 1982, an MBA degree from Wuhan Poly-technic University (now Wuhan University of Technology) in July 1997 and a doctor's degree in management from Huazhong University of Science and Technology in July 2004. He is a professor-grade senior engineer. At present Mr. Xiao consecutively acts as the vice chairman of China Cement Association. He was honoured as a National Outstanding Scientific Worker and the National Advanced Individual in Quality Management, and was granted honours including National Frontier Excellence Awards（全國邊陲優秀兒女獎章）and the first prize of National Corporate Management Modernization and Innovation Achievements（國家級企業管理現代化創新成果）.

## Biographical Details of Directors, Supervisors and Senior Management *(Continued)*

### SENIOR MANAGEMENT *(CONTINUED)*

**Mr. Wang Bing,** born in February 1972, is a vice president of the Company. Mr. Wang has accumulated over 15 years of experience in business and management in building materials industry. He has been a vice president of the Company and the chairman of BNBM since August 2009. From February 2004 to August 2009, he served as the general manager assistant and the deputy general manager of BNBM. Mr. Wang served as a general manager assistant and the deputy general manager of China Chemical Building Material Company Limited（中國化學建材股份有限公司, currently known as China Fiberglass) from October 2002 to February 2004, the general manager of Chengdu Southwest Beijing New Building Material Company Limited（成都西南北新建材有限公司）from July 1998 to September 2002, and the regional manager of BNBMG from July 1994 to July 1998. Mr. Wang received a bachelor's degree in industry and electricity automation from the Automation Department of Wuhan Poly-technic University (now Wuhan University of Technology) in July 1994 and received an MBA degree from China Europe International Business School in September 2005. Mr. Wang obtained a doctor's degree in management science and engineering from Wuhan University of Technology in June 2012. Mr. Wang is a senior engineer. At present Mr. Wang consecutively acts as a member of China Youth Federation, a member of the standing committee and the vice secretary of State-owned Enterprise Youth Federation (中央企業青聯), the vice chairman and deputy director of the China Capital Entrepreneurs' Club（企業家俱樂部）, the executive vice chairman of Gypsum Building Material Branch of China Building Materials Federation, a director of New Building Material Expert Committee under China Building Materials Industry Economic Research Association（中國建材工業經濟研究會新型建材專家委員會）, the chairman of Beijing Entrepreneurs Enterprise Confederation（北京企業聯合會北京市企業家協會）, the vice chairman of China Insulation and Energy Efficiency Materials Association（中國絕熱節能材料協會）and the vice chairman of China Construction and Decoration Material Association（中國建築裝飾裝修材料協會）. Mr. Wang was granted many awards, including the Fourth Session of National Building materials industry Outstanding Entrepreneur（第四屆全國建材行業優秀企業家）, the National Building Material and Decoration Industry Outstanding Entrepreneur（全國建築材料裝飾行業優秀企業家）, Beijing Outstanding Entrepreneur（北京市優秀企業家）and the first prize of National Corporate Management Modernization and Innovation Achievement（國家級企業管理現代化創新成果）

**Mr. Cai Guobin,** born in August 1967, is a vice president of the Company. Mr. Cai has over 20 years experience in building material industry. Mr. Cai has been a director of Southwest Cement since December 2011 and the vice chairman of China Fiberglass since October 2009, a vice president of the Company since August 2009 and a director of South Cement since September 2007. From May 2006 to October 2009, he served as the director and vice general manager of China Fiberglass. He has been the president of CNBM Investment since April 2004 and a director of CNBM Investment since March 2003. From July 2005 to May 2006, he served as a supervisor of China Fiberglass. From December 2000 to April 2004, he served as vice president of BND Co., Limited (currently known as CNBM Investment). From November 1999 to January 2001, he served as a general manager assistant of China National Building Material & Equipment Import and Export Company Zhujiang Branch. From June 1998 to November 1999, he served as a deputy manager in the planning and financial department of China National Building Material & Equipment Import and Export Company Zhujiang Branch. Mr. Cai is an accountant who received a bachelor's degree in economics (normal major) from Shanghai University of Finance and Economics in July 1990 and an EMBA degree from Tsinghua University in January 2012. He was honoured as Outstanding Party Member of Shenzhen, Outstanding Entrepreneur of Building Materials Industry（建材行業優秀企業家）, the first prize of National Corporate Management Modernization and Innovation Achievements（國家級企業管理現代化創新成果）and listed in Elites' Register of Building Materials Industry in 2008（建材行業精英錄）.

*Biographical Details of Directors, Supervisors and Senior Management (Continued)*

## QUALIFIED ACCOUNTANT

**Ms. Pei Hongyan,** born in December 1973, is the qualified accountant of the Company. She has over 10 years of experience in accounting. Ms. Pei has been a director of China Fiberglass since April 2011, a supervisor of North Cement since August 2010, a qualified accountant of the Company since June 2005 and the general manager of the finance department of the Company since April 2005. She served as a senior accountant in the finance division of Parent from November 2003 to April 2005 and a general manager assistant of the finance division of Parent from November 2002 to April 2005. She also served as a director of Kunming Cement Inc. from March 2002 to December 2004 and the chief financial officer of China Composites from May 2001 to October 2004. Ms. Pei received a bachelor's degree in economics from Dongbei University of Finance and Economics in July 1996 and a master's degree in management from Dongbei University of Finance and Economics in March 1999. She is a fellow member of the Association of Chartered Certified Accountants and also a non-practising member of the Chinese Institute of Certified Public Accountants. She was awarded the first prize of National Corporate Management Modernization and Innovation Achievements in National Building Materials Industry（國家級建材行業企業管理現代化創新成果）.

## JOINT COMPANY SECRETARIES

**Mr. Chang Zhangli** is the joint company secretary of the Company. Please refer to the section headed "Executive Directors" for the biographical details.

**Ms. Lo Yee Har Susan,** born in November 1958, is the joint company secretary of the Company. Ms. Lo is an executive director of Corporate Services Department of Tricor Services Limited and a fellow member of both the Institute of Chartered Secretaries and Administrators and the Hong Kong Institute of Chartered Secretaries. Ms. Lo has over 20 years of experience in the company secretarial area. She has served in a number of companies listed on the Stock Exchange. She is currently the joint company secretary of several companies listed on the Stock Exchange.

## CONFIRMATION OF THE INDEPENDENCE OF INDEPENDENT NON-EXECUTIVE DIRECTORS

The Company has received the annual confirmation letter issued by each of the independent non-executive directors in respect of their independence in accordance with Rule 3.13 of the Listing Rules. The Company considers that all of the independent non-executive directors are independent.

# Independent auditor's report



**To the shareholders of China National Building Material Company Limited**
*(a joint stock company incorporated in the People's Republic of China with limited liability)*

We have audited the consolidated financial statements of China National Building Material Company Limited  (the "Company") and its subsidiaries (collectively referred to as the "Group") set out on pages 97 to 215, which comprise the consolidated statement of financial position as at 31 December 2013, and the consolidated income statement, the consolidated statement of comprehensive income, the consolidated statement of changes in equity and the consolidated statement of cash flows for the year then ended, and a summary of significant accounting policies and other explanatory information.

## DIRECTORS' RESPONSIBILITY FOR THE CONSOLIDATED FINANCIAL STATEMENTS

The directors of the Company are responsible for the preparation of the consolidated financial statements that give a true and fair view in accordance with International Financial Reporting Standards issued by the International Accounting Standards Board, and the disclosure requirements of the Hong Kong Companies Ordinance and for such internal control as the directors determine is necessary to enable the preparation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

## AUDITOR'S RESPONSIBILITY

Our responsibility is to express an opinion on these consolidated financial statements based on our audit. This report is made solely to you, as a body, in accordance with our agreed terms of engagement, and for no other purpose. We do not assume responsibility towards or accept liability to any other person for the contents of this report.

We conducted our audit in accordance with Hong Kong Standards on Auditing issued by the Hong Kong Institute of Certified Public Accountants. Those standards require that we comply with ethical requirements and plan and perform the audit to obtain reasonable assurance as to whether the consolidated financial statements are free from material misstatement.

# Independent auditor's report *(Continued)*

## AUDITOR'S RESPONSIBILITY *(CONTINUED)*

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on the auditor's judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation of consolidated financial statements that give a true and fair view in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. An audit also includes evaluating the appropriateness of accounting polices used and the reasonableness of accounting estimates made by the directors, as well as evaluating the overall presentation of the consolidated financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

## OPINION

In our opinion, the consolidated financial statements give a true and fair view of the state of the affairs of the Group as at 31 December 2013 and of the Group's profit and cash flows for the year then ended in accordance with International Financial Reporting Standards and have been properly prepared in accordance with the disclosure requirements of the Hong Kong Companies Ordinance.

**Baker Tilly Hong Kong Limited**
*Certified Public Accountants*

Andrew David Ross
Practising certificate number P01183

Hong Kong, 25 March 2014

# Consolidated Income Statement

*For the year ended 31 December 2013*

| | Note | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|---|
| **Revenue** | 5 | **117,687,840** | 87,217,629 |
| Cost of sales | | **(87,549,843)** | (67,089,167) |
| | | | |
| **Gross profit** | | **30,137,997** | 20,128,462 |
| Investment and other income | 7 | **4,204,133** | 5,200,305 |
| Selling and distribution costs | | **(6,928,479)** | (3,880,879) |
| Administrative expenses | | **(8,134,660)** | (5,475,516) |
| Finance costs - net | 8 | **(9,306,502)** | (6,507,145) |
| Share of profit of associates | 20 | **630,536** | 458,642 |
| | | | |
| Profit before income tax | 10 | **10,603,025** | 9,923,869 |
| Income tax expense | 11 | **(2,291,155)** | (2,186,883) |
| | | | |
| **Profit for the year** | | **8,311,870** | 7,736,986 |
| | | | |
| **Profit attributable to:** | | | |
| Owners of the Company | | **5,761,854** | 5,579,601 |
| Non-controlling interests | | **2,550,016** | 2,157,385 |
| | | | |
| | | **8,311,870** | 7,736,986 |
| | | | |
| Earnings per share — basic and diluted *(RMB)* | 13 | **1.07** | 1.03 |

The accompanying notes are an integral part of the consolidated financial statements.

| Dividends | | | |
|---|---|---|---|
| — paid | 12 | **836,849** | 1,160,791 |
| | | | |
| — proposed | 12 | **863,844** | 836,849 |

EXHIBIT B
Page 99 of 218

# Consolidated Statement of Comprehensive Income

*For the year ended 31 December 2013*

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| **Profit for the year** | **8,311,870** | 7,736,986 |
| **Other comprehensive income/(expense),** | | |
| **net of tax: *(Note 11(b))*** | | |
| Items that may be subsequently reclassified to profit or loss | | |
| — Currency translation differences | **(72,404)** | 3,305 |
| — Changes in fair value of available-for-sale financial assets | **202,477** | (6,019) |
| — Shares of associates' other comprehensive | | |
| (expense)/income | **(50,327)** | 834 |
| Other comprehensive income/(expense) | | |
| for the year, net of tax | **79,746** | (1,880) |
| **Total comprehensive income for the year** | **8,391,616** | 7,735,106 |
| **Total comprehensive income attributable to:** | | |
| Owners of the Company | **5,850,256** | 5,578,960 |
| Non-controlling interests | **2,541,360** | 2,156,146 |
| **Total comprehensive income for the year** | **8,391,616** | 7,735,106 |

The accompanying notes are an integral part of the consolidated financial statements.

# Consolidated Statement of Financial Position

*As at 31 December 2013*

| | Note | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|---|
| **Non-current assets** | | | |
| Property, plant and equipment | 14 | 123,486,020 | 105,413,739 |
| Prepaid lease payments | 15 | 13,612,734 | 11,667,731 |
| Investment properties | 16 | 312,069 | 318,842 |
| Goodwill | 17 | 42,310,902 | 31,002,443 |
| Intangible assets | 18 | 4,506,125 | 3,420,644 |
| Interests in associates | 20 | 7,751,123 | 6,350,167 |
| Available-for-sale financial assets | 21 | 1,388,149 | 575,337 |
| Deposits | 23 | 8,297,064 | 8,409,669 |
| Deferred income tax assets | 31 | 2,710,241 | 1,764,154 |
| | | 204,374,427 | 168,922,726 |
| **Current assets** | | | |
| Inventories | 24 | 14,721,004 | 12,222,221 |
| Trade and other receivables | 25 | 52,211,189 | 45,611,201 |
| Held-for-trading investments | 22 | 189,897 | 247,663 |
| Amounts due from related parties | 26 | 8,259,238 | 5,824,406 |
| Pledged bank deposits | 28 | 2,895,511 | 3,383,274 |
| Cash and cash equivalents | 28 | 8,979,909 | 10,222,056 |
| | | 87,256,748 | 77,510,821 |
| **Current liabilities** | | | |
| Trade and other payables | 29 | 48,327,065 | 47,250,608 |
| Amounts due to related parties | 26 | 2,522,711 | 2,023,967 |
| Borrowings - amount due within one year | 30 | 113,341,816 | 90,751,945 |
| Obligations under finance leases | 32 | 2,678,785 | 1,749,899 |
| Current income tax liabilities | | 2,119,409 | 1,926,978 |
| Dividend payable to non-controlling interests | | 405,316 | 214,366 |
| | | 169,395,102 | 143,917,763 |
| **Net current liabilities** | | (82,138,354) | (66,406,942) |
| **Total assets less current liabilities** | | 122,236,073 | 102,515,784 |

# Consolidated Statement of Financial Position *(Continued)*

*As at 31 December 2013*

|  | Note | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|---|
| **Non-current liabilities** | | | |
| Borrowings - amount due after one year | 30 | **56,866,432** | 51,864,572 |
| Deferred income | | **1,398,280** | 1,026,178 |
| Obligations under finance leases | 32 | **7,980,801** | 3,514,960 |
| Financial guarantee contracts due after one year | 33 | **57,444** | 60,150 |
| Deferred income tax liabilities | 31 | **2,357,217** | 1,985,077 |
| | | **68,660,174** | 58,450,937 |
| **Net assets** | | **53,575,899** | 44,064,847 |
| **Capital and reserves** | | | |
| Share capital | 34 | **5,399,026** | 5,399,026 |
| Reserves | | **29,979,397** | 25,097,072 |
| **Equity attributable to** | | | |
| Owners of the Company | | **35,378,423** | 30,496,098 |
| Non-controlling interests | | **18,197,476** | 13,568,749 |
| **Total equity** | | **53,575,899** | 44,064,847 |

The accompanying notes are an integral part of the consolidated financial statements.

The consolidated financial statements on pages 97 to 215 were approved by the Board of Directors on 25 March 2014 and were signed on its behalf by:

_____

**Song Zhiping**

*Director*

_____

**Cao Jianglin**

*Director*

# Consolidated Statement of Changes in Equity

*For the year ended 31 December 2013*

| | Attributable to owners of the Company | | | | | | | | Non-controlling interests | Total equity |
|---|---|---|---|---|---|---|---|---|---|---|
| | Share capital | Share premium | Capital reserves | Statutory surplus reserve fund *(Note 35 (a))* | Fair value reserve *(Note 35 (b))* | Exchange reserve | Retained earnings | Total | | |
| | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Balance at 1 January 2012 | 5,399,026 | 4,824,481 | 281,282 | 925,123 | 11,435 | 26,249 | 14,864,172 | 26,331,768 | 11,279,394 | 37,611,162 |
| Profit for the year | – | – | – | – | – | – | 5,579,601 | 5,579,601 | 2,157,385 | 7,736,986 |
| Other comprehensive income/ (expenses), net of tax *(Note 11(b))* | | | | | | | | | | |
| — Currency translation differences | – | – | – | – | – | 3,340 | – | 3,340 | (35) | 3,305 |
| — Changes in fair value of available-for-sale financial assets, net | – | – | – | – | (4,815) | – | – | (4,815) | (1,204) | (6,019) |
| — Shares of associates' other comprehensive income | – | – | 834 | – | – | – | – | 834 | – | 834 |
| Total comprehensive income/ (expense) for the year | – | – | 834 | – | (4,815) | 3,340 | 5,579,601 | 5,578,960 | 2,156,146 | 7,735,106 |
| Dividends *(Note 12)* | – | – | – | – | – | – | (1,160,791) | (1,160,791) | – | (1,160,791) |
| Dividends paid to the non-controlling interests of subsidiaries | – | – | – | – | – | – | – | – | (1,353,666) | (1,353,666) |
| Increase in non-controlling interests as a result of acquisition of subsidiaries *(Note 36)* | – | – | – | – | – | – | – | – | 585,816 | 585,816 |
| Contributions from non-controlling interests | – | – | (453) | – | – | – | – | (453) | 1,381,788 | 1,381,335 |
| Acquisition of additional interests in subsidiaries *(Note 37(a))* | – | – | (264,250) | – | – | – | – | (264,250) | (484,959) | (749,209) |
| Appropriation to statutory reserve | – | – | – | 715,814 | – | – | (715,814) | – | – | – |
| Others | – | – | 10,864 | – | – | – | – | 10,864 | 4,230 | 15,094 |
| Balance at 31 December 2012 | 5,399,026 | 4,824,481 | 28,277 | 1,640,937 | 6,620 | 29,589 | 18,567,168 | 30,496,098 | 13,568,749 | 44,064,847 |

# Consolidated Statement of Changes in Equity *(Continued)*

*For the year ended 31 December 2013*

| | Share capital RMB'000 | Share premium RMB'000 | Capital reserves RMB'000 | Statutory surplus reserve fund (Note 35 (a)) RMB'000 | Fair value reserve (Note 35 (b)) RMB'000 | Exchange reserve RMB'000 | Retained earnings RMB'000 | Total RMB'000 | Non-controlling interests RMB'000 | Total equity RMB'000 |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Attributable to owners of the Company | | | | |
| Balance at 1 January 2013 | 5,399,026 | 4,824,481 | 28,277 | 1,640,937 | 6,620 | 29,589 | 18,567,168 | 30,496,098 | 13,568,749 | 44,064,847 |
| Profit for the year | – | – | – | – | – | – | 5,761,854 | 5,761,854 | 2,550,016 | 8,311,870 |
| Other comprehensive income/ (expenses), net of tax (Note 11(b)) | | | | | | | | | | |
| — Currency translation differences | – | – | – | – | – | (72,500) | – | (72,500) | 96 | (72,404) |
| — Changes in fair value of available-for-sale financial assets, net | – | – | – | – | 211,229 | – | – | 211,229 | (8,752) | 202,477 |
| — Shares of associates' other comprehensive expense | – | – | (50,119) | – | (208) | – | – | (50,327) | – | (50,327) |
| Total comprehensive income/(expense) for the year | – | – | (50,119) | – | 211,021 | (72,500) | 5,761,854 | 5,850,256 | 2,541,360 | 8,391,616 |
| Dividends *(Note 12)* | – | – | – | – | – | – | (836,849) | (836,849) | – | (836,849) |
| Dividends paid to the non-controlling interests of subsidiaries | – | – | – | – | – | – | – | – | (956,081) | (956,081) |
| Increase in non-controlling interests as a result of acquisition of subsidiaries *(Note 36)* | – | – | – | – | – | – | – | – | 248,005 | 248,005 |
| Contributions from non-controlling interests | – | – | – | – | – | – | – | – | 195,100 | 195,100 |
| Acquisition of additional interests in subsidiaries *(Note 37(a))* | – | – | (76,747) | – | – | – | – | (76,747) | (93,410) | (170,157) |
| Deemed partial disposal of interests in subsidiaries without losing control *(Note 37(b))* | – | – | (63,266) | – | – | – | – | (63,266) | 2,693,266 | 2,630,000 |
| Appropriation to statutory reserve | – | – | – | 520,989 | – | – | (520,989) | – | – | – |
| Others | – | – | 8,931 | – | – | – | – | 8,931 | 487 | 9,418 |
| Balance at 31 December 2013 | 5,399,026 | 4,824,481 | (152,924) | 2,161,926 | 217,641 | (42,911) | 22,971,184 | 35,378,423 | 18,197,476 | 53,575,899 |

The accompanying notes are an integral part of the consolidated financial statements.

China National Building Material Company Limited   Annual Report 2013

# Consolidated Statement of Cash Flows

*For the year ended 31 December 2013*

| | 2013 | 2012 |
|---|---|---|
| | **RMB'000** | *RMB'000* |
| **Operating activities** | | |
| Profit before income tax | **10,603,025** | 9,923,869 |
| Adjustments for: | | |
| Share of profit of associates | **(630,536)** | (458,642) |
| Finance costs | **9,954,595** | 7,181,731 |
| Interest income | **(648,093)** | (674,586) |
| Dividend from available-for-sale financial assets | **(4,732)** | (11,263) |
| Gain on disposal of associates | **(11,393)** | — |
| Impairment loss on property, plant and equipment (reversal)/recognised | **(2,668)** | 3,630 |
| Loss/(gain) on disposal of property, plant and equipment, investment properties, intangible assets and prepaid lease payments | **47,635** | (31,917) |
| Decrease/(increase) in fair value of held-for-trading investments | **57,766** | (144,745) |
| Deferred income released to the consolidated income statement | **(203,586)** | (387,324) |
| Depreciation of property, plant and equipment and investment properties | **5,443,773** | 3,924,911 |
| Amortisation of intangible assets | **289,258** | 230,472 |
| Financial guarantee income | **—** | (4,008) |
| Prepaid lease payments released to the consolidated income statement | **326,009** | 307,916 |
| Waiver of payables | **(62,830)** | (252,635) |
| Allowance for bad and doubtful debts | **253,550** | 65,728 |
| Write-down of inventories | **2,085** | 2,558 |
| Fair value changes on derivative financial instruments | **—** | (464) |
| Staff costs arising from share appreciation rights | **—** | 839 |
| Impairment loss on available-for-sales financial assets | **271** | — |
| Discount on acquisition of interests in subsidiaries | **(28,363)** | (42,965) |
| Net foreign exchange losses/(gains) | **20,070** | (846) |
| **Operating cash flows before working capital changes** | **25,405,836** | 19,632,259 |
| (Increase)/decrease in inventories | **(1,036,929)** | 96,398 |
| Increase in trade and other receivables | **(7,548,710)** | (2,578,577) |
| Decrease in held-for-trading investments | **—** | 196,883 |
| Increase in amounts due from related parties | **(653,740)** | (1,400,678) |
| Decrease in trade and other payables | **(2,673,337)** | (3,695,876) |
| Increase in amounts due to related parties | **30,900** | 146,050 |
| Increase in deferred income | **575,688** | 314,753 |
| **Cash generated from operations** | **14,099,708** | 12,711,212 |

EXHIBIT B
Page 105 of 218

# Consolidated Statement of Cash Flows *(Continued)*

*For the year ended 31 December 2013*

|  | **2013** | 2012 |
|---|---:|---:|
|  | **RMB'000** | *RMB'000* |
| **Cash generated from operations** | **14,099,708** | 12,711,212 |
| Income tax paid | **(3,041,528)** | (3,153,057) |
| Interest received | **598,270** | 458,841 |
| **Net cash generated from operating activities** | **11,656,450** | 10,016,996 |
| **Investing activities** |  |  |
| Purchases of available-for-sale financial assets | **(609,948)** | (17,789) |
| Purchase of property, plant and equipment | **(9,409,805)** | (11,411,120) |
| Addition to investment properties | **—** | (28) |
| Purchase of intangible assets | **(886,911)** | (601,796) |
| Proceeds on disposal of property, plant and equipment, investment properties, intangible assets and prepaid lease payments | **386,266** | 113,198 |
| Acquisition of interests in associates | **(919,916)** | (1,358,880) |
| Dividend received from associates | **121,368** | 92,508 |
| Proceeds from disposal of associates | **85,419** | — |
| Dividend received from available-for-sale financial assets | **4,732** | 11,263 |
| Deposits paid | **(8,297,064)** | (8,409,669) |
| Deposits refunded | **8,409,669** | 6,914,437 |
| Payments for prepaid lease payments | **(756,146)** | (314,524) |
| Payments for acquisition of subsidiaries, net of cash and cash equivalents acquired | **(3,480,591)** | (13,981,011) |
| Advances to related parties | **(1,743,004)** | (1,213,220) |
| Payments to immediate holding company | **(311,525)** | (95,540) |
| Other payments for investing activities | **(11,688,898)** | (6,655,711) |
| Increase in loans receivable | **—** | 49,893 |
| Decrease in pledged bank deposits | **609,493** | 210,715 |
| **Net cash used in investing activities** | **(28,486,861)** | (36,667,274) |

104    China National Building Material Company Limited    Annual Report 2013

# Consolidated Statement of Cash Flows *(Continued)*

*For the year ended 31 December 2013*

| | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| **Financing activities** | | |
| Interest paid | (10,466,327) | (7,590,007) |
| Dividend paid to shareholders | (836,849) | (1,160,791) |
| Dividend paid to non-controlling interests of subsidiaries | (779,236) | (1,701,298) |
| Payments for acquisition of additional interests in subsidiaries | (170,157) | (749,209) |
| Contributions from non-controlling interests | 2,825,700 | 1,368,831 |
| Repayment of borrowings | (108,477,062) | (62,446,330) |
| Other payments for financing activities | (4,443,626) | (14,930,365) |
| New borrowings raised | 132,271,223 | 112,886,297 |
| Increase/(decrease) in amounts due to related parties | 508,576 | (228,457) |
| Increase obligations under finance leases | 5,206,158 | 1,656,898 |
| | | |
| **Net cash generated from financing activities** | 15,638,400 | 27,105,569 |
| | | |
| Net (decrease)/increase in cash and cash equivalents | (1,192,011) | 455,291 |
| Exchange (loss)/gain on cash and cash equivalents | (50,136) | 28,512 |
| Cash and cash equivalents at beginning of the year | 10,222,056 | 9,738,253 |
| | | |
| **Cash and cash equivalents at end of the year** | 8,979,909 | 10,222,056 |

The accompanying notes are an integral part of the consolidated financial statements.

EXHIBIT B
Page 107 of 218

# Notes to the Consolidated Financial Statements

*For the year ended 31 December 2013*

## 1    GENERAL INFORMATION

China National Building Material Company Limited (the "Company") was established as a joint stock company with limited liability in the People's Republic of China (the "PRC") on 28 March 2005. On 23 March 2006, the Company's shares were listed on the Main Board of the Stock Exchange of Hong Kong Limited (the "Stock Exchange").

The addresses of registered office and the principal place of business of the Company are located at No. A-11 Sanlihe Road, Haidian District, Beijing, the PRC. and 21st Floor, Tower 2, Guohai Plaza, 17 Fuxing Road, Haidian District, Beijing, the PRC, respectively.

The Company's immediate and ultimate holding company is China National Building Material Group Corporation ("Parent"), which is a state-owned enterprise established on 3 January 1984 under the laws of the PRC.

The Company is an investment holding company. Particulars of the Company's principal subsidiaries are set out in Note 19. Hereinafter, the Company and its subsidiaries are collectively referred to as the "Group".

The consolidated financial statements are presented in Renminbi ("RMB") which is the same as the functional currency of the Company, unless otherwise stated.

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

The principal accounting policies applied in the preparation of these consolidated financial statements are set out below. These policies have been consistently applied to all the years presented, unless otherwise stated.

## 2.1    Basis of preparation

The consolidated financial statements of the Company have been prepared in accordance with International Financial Reporting Standards ("IFRSs") issued by the International Accounting Standards Board. The consolidated financial statements have been prepared under the historical cost convention, except for certain available-for-sale financial assets and held-for-trading investment, which are measured at fair values, as explained in the accounting policies set out below.

The preparation of the consolidated financial statements in conformity with IFRSs requires the use of certain critical accounting estimates. It also requires management to exercise its judgement in the process of applying the Group's accounting policies. The areas involving a higher degree of judgement or complexity, or areas where assumptions and estimates are significant to the consolidated financial statements are disclosed in Note 4.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.1   Basis of preparation *(continued)*

#### 2.1.1   New and amended standards adopted by the Group

The following amendments to IFRSs are mandatory for the first time adoption for the accounting period beginning on 1 January 2013:

| | |
|---|---|
| IFRS 7 (Amendments) | Disclosures - Offsetting Financial Assets and Financial Liabilities |
| IFRS 10 | Consolidated Financial Statements |
| IFRS 11 | Joint Arrangements |
| IFRS 12 | Disclosure of Interests in Other Entities |
| IFRS 10, IFRS 11, IFRS 12 (Amendments) | Consolidated Financial Statements, Joint Arrangements and Disclosure of Interests in Other Entities: Transition Guidance |
| IFRS 13 | Fair Value Measurement |
| IAS 1 (Amendments) | Presentation of Items of Other Comprehensive Income |
| IAS 19 (as revised in 2011) | Employee Benefits |
| IAS 27 (as revised in 2011) | Separate Financial Statements |
| IAS 28 (as revised in 2011) | Investments in Associates and Joint Ventures |
| IFRIC Interpretation-20 | Stripping Costs in the Production Phase of a Surface Mine |
| IFRSs (Amendments) | Annual Improvements to IFRSs 2009 - 2011 Cycle, except for amendments to IAS 1 |

Except for as described below, the application of the above new or revised IFRSs in the current year has had no material impact on the Group's financial performance and positions for the current and prior years and/or on the disclosures set out in these consolidated financial statements.

**New and revised Standards on consolidation, joint arrangements, associates and disclosures**

In the current year, the Group has applied for the first time the package of five standards on consolidation, joint arrangements, associates and disclosures comprising IFRS 10 "Consolidated Financial Statements", IFRS 11 "Joint Arrangements", IFRS 12 "Disclosure of Interests in Other Entities", IAS 27 (as revised in 2011) "Separate Financial Statements" and IAS 28 (as revised in 2011) "Investments in Associates and Joint Ventures", together with the amendments to IFRS 10, IFRS 11 and IFRS 12 regarding transitional guidance.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.1   Basis of preparation *(continued)*

#### 2.1.1   New and amended standards adopted by the Group *(continued)*

**New and revised Standards on consolidation, joint arrangements, associates and disclosures** *(continued)*

IAS 27 (as revised in 2011) is not applicable to the Group as it deals only with separate financial statements. The impact of the application of these standards is set out below.

*Impact of the application of IFRS 10*

IFRS 10 replaces the parts of IAS 27 "Consolidated and Separate Financial Statements" that deal with consolidated financial statements and SIC-12 "Consolidation - Special Purpose Entities". IFRS 10 changes the definition of control such that an investor has control over an investee when a) it has power over the investee, b) it is exposed, or has rights, to variable returns from its involvement with the investee and c) has the ability to use its power to affect its returns. All three of these criteria must be met for an investor to have control over an investee. Previously, control was defined as the power to govern the financial and operating policies of an entity so as to obtain benefits from its activities. Additional guidance has been included in IFRS 10 to explain when an investor has control over an investee.

The directors of the Company made an assessment as at the date of initial application of IFRS10 as to whether or not the Group has control over the investees in accordance with the new definition of control and the related guidance set out in IFRS 10, and concluded that the application of IFRS 10 does not change any of the control conclusions reached by the Group in respect of its involvement with other entities as at 1 January 2013.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.1    Basis of preparation *(continued)*

#### 2.1.2    New and revised IFRSs issued but not yet effective

The following new standards and amendments to standards and interpretations have been issued but are not yet effective for the accounting period beginning on 1 January 2013 and have not been early adopted:

| | |
|---|---|
| IFRS 9 | Financial Instruments[3] |
| IFRS 9 and IFRS 7 (Amendments) | Mandatory Effective Date of IFRS 9 and Transition Disclosures[3] |
| IFRS 10, IFRS 12 and IAS 27 (as revised in 2011) (Amendments) | Investment Entities[1] |
| IAS 19 (Amendments) | Defined Benefit Plans: Employee Contribution[2] |
| IAS 32 (Amendments) | Offsetting Financial Assets and Financial Liabilities[1] |
| IAS 36 (Amendments) | Recoverable Amount Disclosures for Non-Financial Assets[1] |
| IAS 39 (Amendments) | Novation of Derivatives and Continuation of Hedge Accounting[1] |
| IFRIC - Interpretation 21 | Levies[1] |
| IFRS (Amendments) | Annual Improvements to IFRSs 2010-2012 cycle[2] |
| IFRS (Amendments) | Annual Improvements to IFRSs 2011-2013 cycle[2] |

[1]    Effective for annual periods beginning on or after 1 January 2014.

[2]    Effective for annual periods beginning on or after 1 July 2014.

[3]    Available for application- the mandatory effective date will be determined when the outstanding phases of IFRS 9 are finalised.

The directors of the Company anticipate that the application of the above new or revised IFRSs have been issued but are not yet effective will have no material impact on the results and the financial position of the Group.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.2 Basis of consolidation

The consolidated financial statements incorporate the financial statements of the Company and entities controlled by the Company and its subsidiaries. Control is achieved when the Company:

- has power over the investee;

- is exposed, or has rights, to variable returns from its involvement with the investee; and

- has the ability to use its power to affect its returns.

The Group reassesses whether or not it controls an investee if facts and circumstances indicate that there are changes to one or more of the three elements of control listed above.

Consolidation of a subsidiary begins when the Group obtains control over the subsidiary and ceases when the Group loses control of the subsidiary. Specifically, income and expenses of a subsidiary acquired or disposed of during the year are included in the consolidated statement of profit or loss and other comprehensive income from the date the Group gains control until the date when the Group ceases to control the subsidiary.

Profit or loss and each component of the other comprehensive income are attributed to the owners of the Company and to the non-controlling interests. Total comprehensive income of subsidiaries is attributed to the owners of the Company and to the non-controlling interests even if this results in the non-controlling interests having a deficit balance.

Where necessary, adjustments are made to the financial statements of subsidiaries to bring their accounting policies into line with the Group's accounting policies.

All intra-group assets and liabilities, equity, income, expenses and cash flows relating to transactions between members of the Group are eliminated in full on consolidation.

#### 2.2.1 Changes in the Group's ownership interests in existing subsidiaries

Changes in the Group's ownership interests in subsidiaries that do not result in the Group losing control over the subsidiaries are accounted for as equity transactions. The carrying amounts of the Group's interests and the non-controlling interests are adjusted to reflect the changes in their relative interests in the subsidiaries. Any difference between the amount by which the non-controlling interests are adjusted and the fair value of the consideration paid or received is recognised directly in equity and attributed to owners of the Company.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.2    Basis of consolidation *(continued)*

#### 2.2.1    Changes in the Group's ownership interests in existing subsidiaries *(continued)*

When the Group loses control of a subsidiary, a gain or loss is recognised in profit or loss and is calculated as the difference between (i) the aggregate of the fair value of the consideration received and the fair value of any retained interest and (ii) the previous carrying amount of the assets (including goodwill), and liabilities of the subsidiary and any non-controlling interests. All amounts previously recognised in other comprehensive income in relation to that subsidiary are accounted for as if the Group had directly disposed of the related assets or liabilities of the subsidiary (i.e. reclassified to profit or loss or transferred to another category of equity as specified/permitted by applicable IFRSs). The fair value of any investment retained in the former subsidiary at the date when control is lost is regarded as the fair value on initial recognition for subsequent accounting under IAS 39, when applicable, the cost on initial recognition of an investment in an associate or a joint venture.

### 2.3    Business combinations

Acquisitions of businesses are accounted for using the acquisition method. The consideration transferred in a business combination is measured at fair value, which is calculated as the sum of the acquisition-date fair values of the assets transferred by the Group, liabilities incurred by the Group to the former owners of the acquiree and the equity interests issued by the Group in exchange for control of the acquiree. Acquisition-related costs are generally recognised in profit or loss as incurred.

At the acquisition date, the identifiable assets acquired and the liabilities assumed are recognised at their fair value, except that:

•    deferred tax assets or liabilities, and assets or liabilities related to employee benefit arrangements are recognised and measured in accordance with IAS 12 Income Taxes and IAS 19 Employee Benefits respectively;

•    liabilities or equity instruments related to share-based payment arrangements of the acquiree or share-based payment arrangements of the Group entered into to replace share-based payment arrangements of the acquiree are measured in accordance with IFRS 2 Share-based Payment at the acquisition date; and

•    assets (or disposal groups) that are classified as held for sale in accordance with IFRS 5 Non-current Assets Held for Sale and Discontinued Operations are measured in accordance with that Standard.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.3   Business combinations *(continued)*

Goodwill is measured as the excess of the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree, and the fair value of the acquirer's previously held equity interest in the acquiree (if any) over the net of the acquisition-date amounts of the identifiable assets acquired and the liabilities assumed. If, after reassessment, the net of the acquisition-date amounts of the identifiable assets acquired and liabilities assumed exceeds the sum of the consideration transferred, the amount of any non-controlling interests in the acquiree and the fair value of the acquirer's previously held interest in the acquiree (if any), the excess is recognised immediately in profit or loss as a bargain purchase gain.

Non-controlling interests that are present ownership interests and entitle their holders to a proportionate share of the entity's net assets in the event of liquidation may be initially measured either at fair value or at the non-controlling interests' proportionate share of the recognised amounts of the acquiree's identifiable net assets. The choice of measurement basis is made on a transaction-by-transaction basis. Other types of non-controlling interest are measured at fair value or, when applicable, on the basis specified in another IFRS.

When the consideration transferred by the Group in a business combination includes assets or liabilities resulting from a contingent consideration arrangement, the contingent consideration is measured at its acquisition-date fair value and included as part of the consideration transferred in a business combination. Changes in the fair value of the contingent consideration that qualify as measurement period adjustments are adjusted retrospectively, with corresponding adjustments against goodwill. Measurement period adjustments are adjustments that arise from additional information obtained during the 'measurement period' (which cannot exceed one year from the acquisition date) about facts and circumstances that existed at the acquisition date.

The subsequent accounting for changes in the fair value of the contingent consideration that do not qualify as measurement period adjustments depends on how the contingent consideration is classified. Contingent consideration that is classified as equity is not remeasured at subsequent reporting dates and its subsequent settlement is accounted for within equity. Contingent consideration that is classified as an asset or a liability is remeasured at subsequent reporting dates in accordance with IAS 39, or IAS 37 Provisions, Contingent Liabilities and Contingent Assets, as appropriate, with the corresponding gain or loss being recognised in profit or loss.

When a business combination is achieved in stages, the Group's previously held equity interest in the acquiree is remeasured to its acquisition-date fair value and the resulting gain or loss, if any, is recognised in profit or loss. Amounts arising from interests in the acquiree prior to the acquisition date that have previously been recognised in other comprehensive income are reclassified to profit or loss where such treatment would be appropriate if that interest were disposed of.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.3 Business combinations *(continued)*

If the initial accounting for a business combination is incomplete by the end of the reporting period in which the combination occurs, the Group reports provisional amounts for the items for which the accounting is incomplete. Those provisional amounts are adjusted during the measurement period (see above), or additional assets or liabilities are recognised, to reflect new information obtained about facts and circumstances that existed at the acquisition date that, if known, would have affected the amounts recognised at that date.

### 2.4 Goodwill

Goodwill arising on an acquisition of a business is carried at cost less accumulated impairment losses, if any, and is presented separately in the consolidated statement of financial position.

For the purposes of impairment testing, goodwill is allocated to each of the Group's cash-generating units (or groups of cash generating units) that is expected to benefit from the synergies of the combination. A cash-generating unit to which goodwill has been allocated is tested for impairment annually, or more frequently when there is indication that the unit may be impaired. If the recoverable amount of the cash-generating unit is less than its carrying amount, the impairment loss is allocated first to reduce the carrying amount of any goodwill allocated to the unit and then to the other assets of the unit on a pro-rata basis based on the carrying amount of each asset in the unit. Any impairment loss for goodwill is recognised directly in profit or loss in the consolidated statement of comprehensive income. An impairment loss recognised for goodwill is not reversed in subsequent periods.

On disposal of the relevant cash-generating unit, the attributable amount of goodwill is included in the determination of the profit or loss on disposal.

The Group's policy for goodwill arising on the acquisition of an associate is described as note 2.5 below.

### 2.5 Investments in associates

An associate is an entity over which the Group has significant influence. Significant influence is the power to participate in the financial and operating policy decisions of the investee but is not control or joint control over those policies.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.5 Investments in associates *(continued)*

The results and assets and liabilities of associates are incorporated in these consolidated financial statements using the equity method of accounting. The financial statements of associates used for equity accounting purposes are prepared using uniform accounting policies as those of the Group for like transactions and events in similar circumstances. Under the equity method, an investment in an associate is initially recognised in the consolidated statement of financial position at cost and adjusted thereafter to recognise the Group's share of the profit or loss and other comprehensive income of the associate. When the Group's share of losses of an associate exceeds the Group's interest in that associate (which includes any long-term interests that, in substance, form part of the Group's net investment in the associate), the Group discontinues recognising its share of further losses. Additional losses are recognised only to the extent that the Group has incurred legal or constructive obligations or made payments on behalf of the associate.

An investment in an associate is accounted for using the equity method from the date on which the investee becomes an associate. On acquisition of the investment in an associate, any excess of the cost of the investment over the Group's share of the net fair value of the identifiable assets and liabilities of the investee is recognised as goodwill, which is included within the carrying amount of the investment. Any excess of the Group's share of the net fair value of the identifiable assets and liabilities over the cost of the investment, after reassessment, is recognised immediately in profit or loss in the period in which the investment is acquired.

The requirements of IAS 39 are applied to determine whether it is necessary to recognise any impairment loss with respect to the Group's investment in an associate or a joint venture. When necessary, the entire carrying amount of the investment (including goodwill) is tested for impairment in accordance with IAS 36 "Impairment of Assets" as a single asset by comparing its recoverable amount (higher of value in use and fair value less costs of disposal) with its carrying amount. Any impairment loss recognised forms part of the carrying amount of the investment. Any reversal of that impairment loss is recognised in accordance with IAS 36 to the extent that the recoverable amount of the investment subsequently increases.

When a group entity transacts with an associate of the Group (such as a sale or contribution of assets), profits and losses resulting from the transactions with the associate are recognised in the Group's consolidated financial statements only to the extent of interests in the associate that are not related to the Group.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.6    Segment reporting

Operating segments are reported in a manner consistent with the internal report provided to the chief operating decision-maker. The chief operating decision-maker, who is responsible for allocating resources and assessing performance of the operating segments has been identified as the steering committee that makes strategic decisions.

### 2.7    Revenue recognition

Revenue is measured at the fair value of the consideration received or receivable and represents amounts receivable for the sales of goods and services provided in the normal course of business, net of discounts and sales related taxes.

Revenue from sale of goods is recognised when the goods are delivered and title has passed.

Revenue from engineering services performed in respect of construction contracts is recognised in accordance with the Group's accounting policy on construction contracts (see Note 2.12).

Other service income is recognised when the services are provided.

Interest income from a financial asset is accrued on a time basis, by reference to the principal outstanding and at the effective interest rate applicable, which is the rate that exactly discounts the estimated future cash receipts through the expected life of the financial asset to that asset's net carrying amount on initial recognition.

Dividend income from investments is recognised when the shareholders' rights to receive payment have been established.

### 2.8    Property, plant and equipment

Property, plant and equipment, other than construction in progress, are stated at cost less subsequent accumulated depreciation and any accumulated impairment losses. Construction in progress represents property, plant and equipment in the course of construction for production or its own use purposes.

Depreciation is provided to write off the cost of items of property, plant and equipment other than construction in progress over their estimated useful lives and after taking into account of their estimated residual values. Straight line depreciation method is applied to land and buildings, plant and machinery and motor vehicles.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.8 Property, plant and equipment *(continued)*

Construction in progress is stated at cost which includes all construction costs and other direct costs attributable to such projects including borrowing costs capitalised and less any recognised impairment loss, if any. Construction in progress is classified to the appropriate category of property, plant and equipment when completed and ready for intended use. Depreciation of these assets, on the same basis as other property assets, commences when the assets are ready for their intended use.

An item of property, plant and equipment is derecognised upon disposal or when no future economic benefits are expected to arise from the continued use of the asset. Any gain or loss arising on the derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the item) is included in the consolidated income statement in the year the item is derecognised.

### 2.9 Prepaid lease payments

Upfront prepayments made for the prepaid lease payments and leasehold land are initially recognised in the consolidated statement of financial position as prepaid lease payments and are released to the consolidated income statement on a straight line basis over the periods of the respective leases.

### 2.10 Investment properties

Investment properties, which are properties held to earn rentals and/or for capital appreciation, are stated at cost less depreciation and any accumulated impairment losses.

Depreciation is provided to write off the cost of the investment properties over their estimated useful lives and after taking into account their estimated residual value, using the straight line method.

An investment property is derecognised upon disposal or when the investment property is permanently withdrawn from use or no future economic benefits are expected from its disposal. Any gain or loss arising on derecognition of the asset (calculated as the difference between the net disposal proceeds and the carrying amount of the asset) is included in the consolidated income statement in the year in which the item is derecognised.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.11  Leasing

Leases are classified as finance leases whenever the terms of the lease transfer substantially all the risks and rewards of ownership to the lessee. All other leases are classified as operating leases.

**The Group as lessor**

Rental income from operating leases is recognised in the consolidated income statement on a straight line basis over the term of the relevant lease. Initial direct costs incurred in negotiating and arranging an operating lease are added to the carrying amount of the leased asset and recognised as an expense on a straight line basis over the lease term.

**The Group as lessee**

Assets held under finance leases are initially recognised as assets of the Group at their fair value at the inception of the lease or, if lower, at the present value of the minimum lease payments. The corresponding liability to the lessor is included in the consolidated statement of financial position as a finance lease obligation. Lease payments are apportioned between finance charges and reduction of the lease obligation so as to achieve a constant rate of interest on the remaining balance of the liability. Finance expenses are recoginsed immediately to the consolidated income statement.

Rentals payable under operating leases are charged to the consolidated income statement on a straight line basis over the term of the relevant lease. Benefits received and receivable as an incentive to enter into an operating lease are recognised as a reduction of rental expense over the lease term on a straight line basis.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.11  **Leasing** *(continued)*

**Leasehold land and building**

When a lease includes both land and building elements, the Group assesses the classification of each element as a finance or an operating lease separately based on the assessment as to whether substantially all the risks and rewards incidental to ownership of each element have been transferred to the Group. Specifically, the minimum lease payments (including any lump-sum upfront payments) are allocated between the land and the building elements in proportion to the relative fair values of the leasehold interests in the land element and building element of the lease at the inception of the lease.

When the lease payments cannot be allocated reliably between the land and building elements, the entire lease is generally classified as a finance lease and accounted for as property, plant and equipment.

To the extent the allocation of the lease payments can be made reliably, interest in leasehold land that is accounted for as an operating lease is presented as "prepaid lease payments" in the consolidated statement of financial position and is amortised over the lease term on a straight line basis.

### 2.12  **Constructions contracts**

Where the outcome of a construction contract can be estimated reliably, revenue and costs are recognised by reference to the stage of completion of the contract activity at the end of the reporting period, measured based on the proportion of contract costs incurred for work performed to date relative to the estimated total contract costs, except where this would not be representative of the stage of completion. Variations in contract work, claims and incentive payments are included to the extent that the amount can be reliably measured and they have been agreed with the customer.

Where the outcome of a construction contract cannot be estimated reliably, contract revenue is recognised to the extent of contract costs incurred that it is probable will be recoverable. Contract costs are recognised as expenses in the period in which they are incurred.

When it is probable that total contract costs will exceed total contract revenue, the expected loss is recognised as an expense immediately.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.12  **Constructions contracts** *(continued)*

Where contract costs incurred to date plus recognised profits less recognised losses exceed progress billings, the surplus is shown as amounts due from customers for contract work. For contracts where progress billings exceed contract costs incurred to date plus recognised profits less recognised losses, the surplus is shown as the amounts due to customers for contract work. Amounts received before the related work is performed are included in the consolidated statement of financial position, as a liability, as advances received. Amounts billed for work performed but not yet paid by the customer are included in the consolidated statement of financial position under trade and other receivables.

### 2.13  **Foreign currency translation**

The individual financial statements of each group entity are presented in the currency of the primary economic environment in which the entity operates (its functional currency). For the purpose of the consolidated financial statements, the results and financial position of each entity are expressed in RMB, which is the functional currency of the Company, and the presentation currency for the consolidated financial statements.

In preparing the financial statements of the individual group entities, transactions in currencies other than the entity's functional currency ("foreign currencies") are recorded at the rates of exchange prevailing at the dates of the transactions. At the end of the reporting period, monetary items denominated in foreign currencies are retranslated at the rates prevailing at that date. Non-monetary items carried at fair value that are denominated in foreign currencies are retranslated at the rates prevailing at the date when the fair value was determined. Non-monetary items that are measured in terms of historical cost in a foreign currency are not retranslated.

Exchange differences arising on the settlement of monetary items, and on the retranslation of monetary items, are included in the consolidated income statement for the period. Exchange differences arising on the retranslation of non-monetary items carried at fair value are included in the consolidated income statement for the period.

For the purpose of presenting consolidated financial statements, the assets and liabilities of the Group's foreign operations are expressed in RMB, using exchange rates prevailing at the end of each reporting period. Income and expense items are translated at the average exchange rates for the period unless exchange rates fluctuate significantly during that period, in which case, the exchange rates prevailing at the dates of transactions are used. Exchange differences arising, if any, are recognised in other comprehensive income and accumulated in equity under the heading of foreign exchange translation reserve (attributed to non-controlling interests as appropriate).

EXHIBIT B
Page 121 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.14 Government grants

Government grants, which take many forms including VAT refunds, are recognised as income when the conditions for the grants are met and there is a reasonable assurance that the grant will be received. Government grant relating to expense items are recognised as income over the period necessary to match the grant on a systematic basis to the costs that it is intended to compensate and reported separately as other income. Where the grant relates to a depreciable asset, it is credited to a deferred income account and is released to the consolidated income statement over the expected useful life of the relevant asset. Government grants that are receivable as compensation for expenses or losses already incurred or for the purpose of giving immediate financial support to the Group with no future related costs are recognised in profit or loss in the period in which they become receivable.

### 2.15 Borrowing costs

Borrowing costs directly attributable to the acquisition, construction or production of qualifying assets, are capitalised as part of the cost of those assets. Capitalisation of such borrowing costs ceases when the assets are substantially ready for their intended use or sale. Investment income earned on temporary investment of specific borrowings pending their expenditure on qualifying assets is deducted from the borrowing costs eligible for capitalisation.

All other borrowing costs are recognised as an expense in the period in which they are incurred.

Borrowings are classified as current liabilities unless the group has an unconditional right to defer settlement of the liability for at least 12 months after the end of the reporting date.

### 2.16 Retirement benefits costs

Payments to defined contribution retirement benefit schemes are recognised as an expense when employees have rendered service entitling them to the contributions. Payments made to state-managed retirement benefit schemes are dealt with as payments to defined contribution schemes where the Group's obligations under the schemes are equivalent to those arising in a defined contribution retirement benefit scheme.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.17 Cash-settled share-based payment transactions

Employees of the Group receive remuneration in the form of share-based payment transactions, whereby employees render services as consideration for share appreciation rights which are settled in cash. The cost of share appreciation rights is measured initially at fair value at the grant date using the Black-Scholes formula taking into accounts the terms and conditions upon which the instruments are granted. This fair value is expensed over the vesting period with recognition of a corresponding liability. The liability is re-measured at fair value at each reporting date up to and including the settlement date with changes in fair value recognised in the consolidated income statement.

### 2.18 Taxation

Income tax expense represents the sum of the tax currently payable and deferred tax.

The tax currently payable is based on taxable profit for the year. Taxable profit differs from profit as reported in the consolidated income statement because of items of income or expense that are taxable or deductible in other years and items that are never taxable or deductible. The Group's liability for current tax is calculated using tax rates that have been enacted or substantively enacted by the reporting dates.

Deferred income tax is recognised on temporary differences between the carrying amounts of assets and liabilities in the consolidated financial statements and the corresponding tax bases used in the computation of taxable profit. Deferred income tax liabilities are generally recognised for all taxable temporary differences. Deferred income tax assets are generally recognised for all deductible temporary differences to the extent that it is probable that taxable profits will be available against which those deductible temporary differences can be utilised. Such deferred income tax assets and liabilities are not recognised if the temporary difference arises from goodwill or from the initial recognition (other than in a business combination) of other assets and liabilities in a transaction that affects neither the taxable profit nor the accounting profit.

Deferred income tax liabilities are recognised for taxable temporary differences associated with investments in subsidiaries and associates, except where the Group is able to control the reversal of the temporary difference and it is probable that the temporary difference will not reverse in the foreseeable future. Deferred income tax assets arising from deductible temporary differences associated with such investments and interests are only recognised to the extent that it is probable that there will be sufficient taxable profits against which to utilise the benefits of the temporary differences and they are expected to reverse in the foreseeable future.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.18  Taxation *(continued)*

The carrying amount of deferred tax assets is reviewed at the end each reporting period and reduced to the extent that it is no longer probable that sufficient taxable profits will be available to allow all or part of the asset to be recovered.

Deferred income tax assets and liabilities are measured at the tax rates that are expected to apply in the period in which the liability is settled or the asset realised. Deferred income tax is charged or credited to the consolidated income statement, except when it relates to items charged or credited directly to equity, in which case the relevant amounts of deferred income tax is also dealt with in equity.

### 2.19  Intangible assets

**Patents**

Patents have finite useful lives and are measured initially at purchase cost and are amortised on a straight line basis over their estimated useful lives. Subsequent to initial recognition, patents are stated at cost less accumulated amortisation and any accumulated impairment losses.

**Trademarks**

Trademarks have indefinite useful lives and are carried at cost less any accumulated impairment losses.

**Mining rights**

Mining rights have finite useful lives and are measured initially at purchase cost and are amortised on a straight line basis over the concession period. Subsequent to initial recognition, mining rights are stated at cost less accumulated amortisation and any accumulated impairment losses.

Gains or losses arising from derecognition of the intangible assets are measured at the difference between the net disposal proceeds and the carrying amount of the intangible assets and are recognised in the consolidated income statement when the intangible assets are derecognised.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.20  Impairment of tangible and intangible assets excluding goodwill

At the end of each reporting period, the Group reviews the carrying amounts of its tangible and intangible assets with finite useful lives to determine whether there is any indication that those assets have suffered an impairment loss. If any such indication exists, the recoverable amount of the asset is estimated in order to determine the extent of the impairment loss (if any). Where it is not possible to estimate the recoverable amount of an individual asset, the Group estimates the recoverable amount of the cash-generating unit to which the asset belongs. Where a reasonable and consistent basis of allocation can be identified, corporate assets are also allocated into individual cash-generating units, or otherwise they are allocated to the smallest group of cash-generating units for which a reasonable and consistent allocation basis can be identified.

Intangible asset with indefinite useful life is tested for impairment annually or more frequently whenever there is an indication that the asset may be impaired.

Recoverable amount is the higher of fair value less costs to sell and value in use. In assessing value in use, the estimated future cash flows are discounted to their present value using a pre-tax discount rate that reflects current market assessments of the time value of money and the risks specific to the asset for which the estimates of future cash flows have not been adjusted.

If the recoverable amount of an asset (or cash-generating unit) is estimated to be less than its carrying amount, the carrying amount of the asset (cash-generating unit) is reduced to its recoverable amount. An impairment loss is recognised immediately in profit or loss.

Where an impairment loss subsequently reverses, the carrying amount of the asset (cash-generating unit) is increased to the revised estimate of its recoverable amount, but so that the increased carrying amount does not exceed the carrying amount that would have been determined had no impairment loss been recognised for the asset (or cash-generating unit) in prior years. A reversal of an impairment loss is recognised immediately in profit or loss.

### 2.21  Inventories

Inventories are stated at the lower of cost and net realisable value. Cost comprises direct materials and, where applicable, direct labour costs and those overheads that have been incurred in bringing the inventories to their present location and condition. Cost is calculated using the weighted average method. Net realisable value represents the estimated selling price less all estimated costs to completion and costs to be incurred in selling and distribution.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.22  Trade and other receivables

Trade and other receivables are initially recognised at fair value and thereafter stated at amortised cost using the effective interest method, less allowance for impairment of doubtful debts (see note 2.27) except where the receivables are interest-free loans made to related parties without any fixed repayment terms or the effect of discounting would be immaterial. In such cases, the receivables are stated at cost less allowance for impairment of doubtful debts.

### 2.23  Interest-bearing borrowings

Interest-bearing borrowings are recognised initially at fair value less attributable transaction costs. Subsequent to initial recognition, interest-bearing borrowings are stated at amortised cost with any difference between the amount initially recognised and redemption value being recognised in profit or loss over the period of the borrowings, together with any interest and fees payable, using the effective interest method.

### 2.24  Trade and other payables

Trade and other payables are initially recognised at fair value. Trade and other payables are subsequently stated at amortised cost unless the effect of discounting would be immaterial, in which case they are stated at cost.

### 2.25  Cash and cash equivalents

In the consolidated statement of cash flows, cash and cash equivalents includes cash in hand, deposits held at call with banks, other short-term highly liquid investments with original maturities of three months or less.

### 2.26  Financial Instruments

Financial assets and financial liabilities are recognised in the consolidated statement of financial position when the Group becomes a party to the contractual provision of the instrument. Financial assets and financial liabilities are initially measured at fair value. Transaction costs that are directly attributable to the acquisition or issue of financial assets and financial liabilities (other than financial assets and financial liabilities at fair value through profit or loss) are added to or deducted from the fair value of the financial assets or financial liabilities, as appropriate, on initial recognition. Transaction costs directly attributable to the acquisition of financial assets or financial liabilities at fair value through profit or loss are recognised immediately in the consolidated income statement.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.27    Financial assets

The Group's financial assets are classified into one of the three categories, including financial assets at fair value through profit or loss ("FVTPL"), loans and receivables and available-for-sale financial assets. The classification depends on the nature and purpose of the financial assets and is determined at the time of initial recognition. Regular way purchases or sales are purchases or sales of financial assets that require delivery of assets within the time frame established by regulation or convention in the marketplace.

**Effective interest method**

The effective interest method is a method of calculating the amortised cost of a financial asset and of allocating interest income over the relevant period. The effective interest rate is the rate that exactly discounts estimated future cash receipts (including all fees on points paid or received that form an integral part of the effective interest rate, transaction costs and other premiums or discounts) through the expected life of the financial asset, or, where appropriate, a shorter period to the net carrying amount on initial recognitions.

Income is recognised on an effective interest basis for debt instruments other than those financial assets classified as at FVTPL, of which income is included in investment and other income.)

**Financial assets at fair value through profit or loss**

Financial assets at FVTPL of the Group only include financial assets held-for-trading.

A financial asset is classified as held-for-trading if:

- it has been acquired principally for the purpose of selling in the near future; or

- it is a part of an identified portfolio of financial instruments that the Group manages together and has a recent actual pattern of short-term profit-taking; or

- it is a derivative that is not designated and effective as a hedging instrument.

At each reporting date subsequent to initial recognition, financial assets a FVTPL are measured at fair value, with changes in value recognised directly in the consolidated income statement in the period in which they arise. The net gain or loss recognised in the consolidated income statement includes any dividend or interest earned on the financial assets.

EXHIBIT B

Page 127 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.27  Financial assets *(continued)*

**Loans and receivables**

Loan and receivables are non-derivative financial assets with fixed or determinable payments that are not quoted in an active market. At each end of the reporting period subsequent to initial recognition, loans and receivables (including amounts due from associates, amounts due from related parties, trade and other receivables, pledge bank deposits and cash and deposits in banks and a financial institution) are measured at amortised cost using the effective interest method, less any identified impairment losses.

**Available-for-sale financial assets**

Available-for-sale financial assets are non-derivatives that are either designated as available-for-sale or not classified as financial assets at FVTPL, loans and receivables or held-to-maturity investments.

For available-for-sale equity investments that do not have a quoted market price in an active market and whose fair value cannot be reliably measured and derivatives that are linked to and must be settled by delivery of such unquoted equity instruments, they are measured at cost less any identified impairment losses at each reporting date subsequent to initial recognition (see accounting policy on impairment loss on financial assets below).

Available-for-sale equity securities are initially recognised at fair value plus transaction costs. At each reporting date, the fair value is remeasured, with any resultant gain or loss being recognised in other comprehensive income and accumulated separately in equity, except for impairment losses. When these investments are derecognised, the cumulative gain or loss previously recognised directly in equity is recognised in profit or loss.

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2 SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.27 **Financial assets** *(continued)*

**Impairment of financial assets**

Financial assets, other than those at FVTPL, are assessed for indicators of impairment at each reporting date. Financial assets are impaired where there is objective evidence that, as a result of one or more events that occurred after the initial recognition of the financial asset, the estimated future cash flows of the financial assets have been affected.

For an available-for-sale equity investment, a significant or prolonged decline in the fair value of that investment below its cost is considered to be objective evidence of impairment.

For all other financial assets, objective evidence of impairment could include:

• significant financial difficulty of the issuer or counterparty; or

• breach of contract, such as a default or delinquency in interest or principal payments; or

• it becoming probable that the borrower will enter bankruptcy or financial re-organisation; or

• the disappearance of an active market for that financial asset because of financial difficulties.

For financial assets carried at amortised cost, an impairment loss is recognised in the consolidated income statement when there is objective evidence that the asset is impaired, and is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the original effective interest rate.

For financial assets carried at cost, the amount of the impairment loss is measured as the difference between the asset's carrying amount and the present value of the estimated future cash flows discounted at the current market rate of return for a similar financial asset. Such impairment loss will not be reversed in subsequent periods.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.27  Financial assets *(continued)*

The carrying amount of the financial asset is reduced by the impairment loss directly for all financial assets with the exception of trade receivables, where the carrying amount is reduced through the use of an allowance account. Changes in the carrying amount of the allowance account are recognised in the consolidated income statement. When a trade receivable is considered uncollectible, it is written off against the allowance account. Subsequent recoveries of amounts previously written off are credited to the consolidated income statement.

For financial assets measured at amortised cost, if, in a subsequent period, the amount of impairment loss decreases and the decrease can be related objectively to an event occurring after the impairment losses was recognised, the previously recognised impairment loss is reversed through the consolidated income statement to the extent that the carrying amount of the asset at the date the impairment is reversed does not exceed what the amortised cost would have been had the impairment not been recognised.

Impairment losses on available-for-sale equity investments will not be reversed in the consolidated income statement in subsequent periods.

**Derecognition of financial assets**

The Group derecognises a financial asset only when the contractual rights to the cash flows from the asset expire; or it transfers the financial asset and substantially all the risks and rewards of ownership of the asset to another entity. If the Group neither transfers nor retains substantially all the risks and rewards of ownership and continues to control the transferred asset, the Group recognises its retained interest in the asset and an associated liability for amounts it may have to pay. If the Group retains substantially all the risks and rewards of ownership of a transferred financial asset, the Group continues to recognise the financial asset and also recognises collateralised borrowing for the proceeds received. On derecognition of a financial asset, the difference between the asset's carrying amount and the sum of the consideration received and receivable and the cumulative gain or loss that had been recognised in other comprehensive income and in equity is recognised in the consolidated income statement.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.28   Financial liabilities and equity instruments

Financial liabilities and equity instruments issued by a group entity are classified according to the substance of the contractual arrangement entered into and the definitions of a financial liability and an equity instrument.

**Equity instruments**

An equity instrument is any contract that evidences a residual interest in the assets of an entity after deducting all of its liabilities. Equity instruments issued by the Group are recognised at the proceeds received, net of direct issue costs.

**Financial liabilities at FVTPL**

Financial liabilities are classified as at FVTPL when the financial liability is either held-for-trading or it is designated as at FVTPL on initial recognition.

**Financial guarantee contract liabilities**

Financial guarantee contract liabilities are measured initially at their fair values and are subsequently measured at the higher of:

*   the amount of the obligation under the contract, as determined in accordance with IAS 37 Provisions, Contingent Liabilities and Contingent Assets; and

*   the amount initially recognised less, where appropriate, cumulative amortisation recognised in accordance with the interest revenue recognition policies above.

**Other financial liabilities**

Other financial liabilities, including borrowings, are initially measured at fair value, net of transaction cost.

Other financial liabilities are subsequently measured at amortised cost using the effective interest method, with interest expense recognised on an effective yield basis.

The effective interest method is a method of calculating the amortised cost of a financial liability, and of allocating interest expense over the relevant period.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.28  Financial liabilities and equity instruments *(continued)*

**Derecognition of financial liabilities**

The Group derecognises financial liabilities when, and only when, the Group's obligations are discharged, cancelled or they expire. The difference between the carrying amount of the financial liability derecognised and the consideration paid and payable is recognised in the consolidated income statement.

### 2.29  Provisions

Provisions are recognised when the Group has a present obligation (legal or constructive) as a result of a past event, and it is probable that the Group will be required to settle the obligation, and a reliable estimate can be made on the amount of the obligation.

The amount recognised as a provision is the best estimate of the consideration required to settle the present obligation at the end of the reporting period, taking into account the risks and uncertainties surrounding the obligation. Where a provision is measured using the cash flows estimated to settle the present obligation, its carrying amount is the present value of those cash flows.

When some or all of the economic benefits required to settle a provision are expected to be recovered from a third party, a receivable is recognised as an asset if it is virtually certain that reimbursement will be received and the amount of the receivable can be measured reliably.

### 2.30  Dividend distribution

Dividend distribution to the Company's shareholders is recognised as a liability in the consolidated financial statements in the period in which the dividends are approved by the Company's shareholders.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 2    SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES *(CONTINUED)*

### 2.31    Related parties

(a)    A person or a close member of that person's family is related to the Group if that person:

(i)    has control or joint control over the Group;

(ii)    has significant influence over the Group; or

(iii)    is a member of key management personnel of the Group or the Company's parent.

(b)    An entity is related to the Group if any of the following conditions apply:

(i)    The entity and the Group are members of the same Group (which means that each parent, subsidiary and fellow subsidiary is related to the others);

(ii)    One entity is an associate or joint venture of the other entity (or an associate or joint venture of a member of a Group of which the other entity is a member);

(iii)    Both entities are joint ventures of the same third party;

(iv)    One entity is a joint venture of a third entity and the other entity is an associate of the third entity;

(v)    The entity is a post-employment benefit plan for the benefit of employees of either the Group or an entity related to the Group;

(vi)    The entity is controlled or jointly controlled by a person identified in (a); and

(vii)    A person identified in (a) (i) has significant influence over the entity or is a member of the key management personnel of the entity (or of a parent of the entity).

Close members of the family of a person are those family members who may be expected to influence, or be influenced by, that person in their dealings with the entity.

### 2.32    Comparatives

Certain comparative figures have been reclassified in order to conform to the current year's presentation.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 3   FINANCIAL RISK MANAGEMENT

### 3.1   Financial risk factors

The Group's activities expose it to a variety of financial risks: market risk (including foreign currency risk, interest rate risk and equity price risk), credit risk, liquidity risk and capital risk. The Group's risk management focuses on the unpredictability of financial markets and seeks to minimise potential adverse effect on the Group's financial performance. The Group seeks to minimise the effects of some of these risks by using derivative financial instruments.

**(a)   Market risk**

The Group's activities expose it primarily to the financial risks of changes in foreign currency risk, interest rate risk and equity price risk. There has been no change to the Group's exposure to market risk or the manner in which it manages and measures the risk.

(i)   Foreign currency risk

The Group's functional currency is RMB in which most of the transactions are denominated. However, certain cash and cash equivalents and borrowings are denominated in foreign currencies. Foreign currencies are also used to collect the Group's revenue from overseas operations and to settle purchases of machinery and equipment suppliers and certain expenses.

The carrying amounts of the Group's foreign currency denominated monetary assets and monetary liabilities at the reporting date are as follows:

| | Liabilities | | Assets | |
| --- | --- | --- | --- | --- |
| | **2013** | 2012 | **2013** | 2012 |
| | **RMB'000** | RMB'000 | **RMB'000** | RMB'000 |
| United States Dollar ("USD") | **496,484** | 251,274 | **917,348** | 283,810 |
| European Dollar ("EUR") | **67,765** | 50,503 | **143,845** | 179,688 |
| Hong Kong Dollar ("HKD") | **—** | 41,509 | **929,305** | 23,006 |
| Papua New Guinea Kina ("PGK") | **34,808** | 56,993 | **156,992** | 130,511 |
| Saudi Arabian Riyal ("SAR") | **135** | 153 | **2,176** | 9,197 |
| Vietnamese Dong ("VND") | **—** | 27,428 | **1,669** | 28,402 |
| Kazakhstan Tenge ("KZT") | **—** | 57,035 | **16,467** | 9,759 |
| Australian Dollar ("AUD") | **28,948** | 9,240 | **19,628** | 503 |
| British Pound ("GBP") | **—** | — | **62,866** | — |
| Thai Baht ("THB") | **—** | — | **163,700** | — |
| Others | **—** | — | **355** | 9,859 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3    FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1    Financial risk factors *(continued)*

#### (a)    Market risk *(continued)*

(i)    Foreign currency risk *(continued)*

**Sensitivity analysis**

The following table details the Group's sensitivity to a 6.44% increase or decrease in RMB against the relevant foreign currencies. 6.44% is the sensitivity rate used when reporting foreign currency risk internally to key management personnel and represents management's assessment of the reasonably possible change in foreign exchange rates. The sensitivity analysis includes only outstanding foreign currency denominated monetary items and adjusts their translation at the year end for a 6.44% change in foreign currency rates. A negative number below indicates a decrease in profit where RMB strengthen 6.44% against the relevant currency. For a 6.44% weakening of RMB against the relevant currency, there would be an equal and opposite impact on the profit, and the balances below would be positive.

**Effect on profit after tax**

|  | **2013**<br>***RMB'000*** | 2012<br>*RMB'000* |
|---|---:|---:|
| USD | **(21,247)** | (1,634) |
| EUR | **(3,841)** | (6,485) |
| HKD | **(46,915)** | 929 |
| PGK | **(6,168)** | (3,691) |
| SAR | **(103)** | (454) |
| VND | **(84)** | (49) |
| KZT | **(831)** | 2,374 |
| AUD | **470** | 439 |
| GBP | **(3,174)** | — |
| THB | **(8,264)** | — |
| Others | **(18)** | — |
|  | **(90,175)** | (8,571) |

The change in exchange rate does not affect other component of equity.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3    FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1   Financial risk factors *(continued)*

#### (a)   Market risk *(continued)*

(ii)   Interest rate risk

The Group is exposed to interest rate risk due to the fluctuation of the prevailing market interest rate on bank borrowings which carry at prevailing market interest rates. The risk is managed by the Group by maintaining an appropriate mix between fixed and floating rate borrowings. The interest rate risk on bank balances is minimal as the fluctuation of the prevailing market interest rate is insignificant.

The Group cash flow interest rate risk is mainly concentrated on the fluctuation of the basic interest rate declared by People's Bank of China arising from the Group's long-term borrowings.

The Group regularly reviews and monitors the mix of fixed and floating interest rate borrowings in order to manage its interest rate risk. The Group currently does not use any derivative contracts to hedge its exposure to interest rate risk. However, the management will consider hedging significant interest rate exposure should the need arise.

**Sensitivity analysis**

For variable-rate bank borrowings the analysis is prepared assuming the amount of liability outstanding at the reporting date, which amounted RMB84,391.71 million (2012: RMB50,957.08 million), was outstanding for the whole year. A 126 basis points increase or decrease is used when reporting interest rate risk internally to key management personnel and represents management's assessment of the reasonably possible change in interest rates.

If interest rates had been 126 basis points higher and all other variables were held constant, the Group's net profit for the year ended 31 December 2013 would decrease by RMB833.56 million (2012: RMB500.57 million). This is mainly attributable to the Company's exposure to interest rates on its variable-rate bank borrowings. For a 126 basis points lower, there would be an equal and opposite impact on the profit, and the balances above would be negative.

The Company's sensitivity to interest rates has increased during the current year mainly due to the increase in variable-rate bank borrowings.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3   FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1   **Financial risk factors** *(continued)*

#### (a)   **Market risk** *(continued)*

(iii)   Equity price risk

Equity price risk is the risk that the fair values of available-for-sale and held-for-trading listed equity securities decrease as a result of changes in the levels of equity indices and the value of individual securities. The Group is exposed to equity price risk arising from individual equity investments classified as available-for-sale financial assets in Note 21 and held-for-trading investments in Note 22 as at 31 December 2013. The Group's listed investments are listed on the Hong Kong, Shenzhen and Shanghai Stock Exchanges and are valued at quoted market prices at the end of the reporting period.

The market equity indices for the following stock exchanges, at the close of business of the nearest trading day in the year to the end of the reporting period date, and its respective highest and lowest point during the year was as follows:

| | 31 December 2013 | High/low 2013 | 31 December 2012 | High/low 2012 |
|---|---|---|---|---|
| Hong Kong Stock Exchange | | | | |
| — Hang Seng Index | 23,306 | 24,111/19,426 | 22,657 | 22,719/18,056 |
| Shenzhen Stock Exchange | | | | |
| — A Share Index | 8,121 | 9,989/7,495 | 9,117 | 10,613/7,711 |
| Shanghai Stock Exchange | | | | |
| — Composite Index | 2,115 | 2,418/1,950 | 2,269 | 2,461/1,960 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3    FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1    Financial risk factors *(continued)*

#### (a)    Market risk *(continued)*

(iii)    Equity price risk *(continued)*

**Sensitivity analysis**

The following table details the Group's sensitivity to a 10% increase in the fair values against the Group's profit after tax with all other variables held constant on their carrying amounts at the end of the reporting period.

| | **2013** Carrying amount of equity investments *RMB'000* | **2013** Increase in profit after tax *RMB'000* | 2012 Carrying amount of equity investments *RMB'000* | 2012 Increase in profit after tax *RMB'000* |
|---|---|---|---|---|
| Investments listed in: Hong Kong, Shenzhen and Shanghai Stock Exchange | | | | |
| — Held-for-trading | **189,897** | **14,886** | 247,663 | 19,309 |
| — Available-for-sale | **1,093,700** | **85,737** | 231,099 | 18,017 |

For a 10% decrease in the fair values of the equity investments, there would be an equal and opposite impact on the profit.

#### (b)    Credit risk

The Group's credit risk arises from cash and cash equivalents, pledged bank deposits, amounts due from related parties as well as trade receivables and certain other receivables.

As at 31 December 2013, the Group's maximum exposure to credit risk which will cause a finance loss to the Group due to failure to discharge an obligation by the counterparties and financial guarantees provided by the Company is arising from:

•    the carrying amounts of the respective recognised financial assets as stated in the consolidated statement of financial position; and

•    the amounts of contingent liabilities in relation to financial guarantee issued by the Group as disclosed in Note 38.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3 FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1 Financial risk factors *(continued)*

#### (b) Credit risk *(continued)*

In order to minimise the credit risk, the management of the Group has delegated a team responsible for determination of credit limits, credit approvals and other monitoring procedures to ensure that follow-up action is taken to cover overdue debts. The management also sets several policies to encourage the salespersons increasing the receivables gathering. In addition, the Group reviews the recoverable amounts of trade receivables at each reporting period to ensure that adequate impairment losses are made for irrecoverable amounts. In this regard, the directors of the Company consider the Group's credit risk is significantly reduced.

The credit risk on bank balances is limited because the bank balances and pledged bank deposits are maintained with state-owned banks or other creditworthy financial institutions in the PRC.

The credit risk on bills receivable is limited because the bills are guaranteed by banks for payments and the banks are either the state-owned banks or other creditworthy financial institutions in the PRC.

The Group has no significant concentration of credit risk. Trade receivables (including amounts due from related parties with trading nature) consist of a large number of customers, spread across diverse geographical areas.

#### (c) Liquidity risk

In the management of the liquidity risk, the Group monitors and maintains a level of cash and cash equivalents deemed adequate by the management to finance the Group's operations and mitigate the effects of fluctuations in cash flows.

As at 31 December 2013, the Group has net current liabilities and capital commitments of approximately RMB82,138.35 million (2012: approximately RMB66,406.94 million) and approximately RMB881.93 million (2012: approximately RMB1,609.85 million) (Note 39), respectively. The Group is exposed to liquidity risk as a significant percentage of the Group's funding are sourced through short-term bank borrowings. The directors manage liquidity risk by monitoring the utilisation of borrowings, ensuring compliance with loan covenants and issuing new shares, domestic corporate bonds and debentures. In addition, the Group has obtained committed credit facilities from banks. As at 31 December 2013, the Group had unused banking facilities and bonds registered but not yet issued, of approximately RMB97,286.90 million (2012: approximately RMB63,074.16 million).

The following table details the Group's remaining contractual maturity for its non-derivative financial liabilities. The table has been drawn up based on the undiscounted cash flows of financial liabilities based on the earliest date on which the Group can be required to pay. The table includes both interest and principal cash flows.

EXHIBIT B
Page 139 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3    FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1   **Financial risk factors** *(continued)*

### (c)   **Liquidity risk** *(continued)*

| | Effective interest rate % | Within one year RMB'000 | One to two years RMB'000 | Two to three years RMB'000 | Three to four years RMB'000 | Four to five years RMB'000 | After five years RMB'000 | Total undiscounted cash flow RMB'000 | Carrying amount RMB'000 |
|---|---|---|---|---|---|---|---|---|---|
| As at 31 December 2013 | | | | | | | | | |
| Trade and other payables | — | 48,327,065 | — | — | — | — | — | 48,327,065 | 48,327,065 |
| Amounts due to related parties | | | | | | | | | |
| — interest-free | — | 1,811,110 | — | — | — | — | — | 1,811,110 | 1,811,110 |
| — fixed rate | 6.00% | 427,459 | — | — | — | — | — | 427,459 | 403,264 |
| Advances from immediate holding company | — | 308,337 | — | — | — | — | — | 308,337 | 308,337 |
| Borrowings | | | | | | | | | |
| — fixed rate bank loans | 5.99% | 32,586,132 | 3,216,632 | 4,562,672 | 657,200 | 465,044 | 155,634 | 41,643,314 | 39,616,543 |
| — variable rate bank loans | 6.02% | 47,276,304 | 17,461,120 | 14,877,311 | 4,732,862 | 3,792,207 | 303,457 | 88,443,261 | 84,391,705 |
| — other borrowings from non-financial institutions | — | — | — | — | — | — | — | — | — |
| — bonds | 4.96% | 38,803,946 | 2,096,533 | 2,211,073 | 5,241,333 | — | — | 48,352,885 | 46,200,000 |
| Obligations under finance leases | 6.72% | 2,791,361 | 2,455,209 | 1,582,192 | 1,052,708 | 4,643,018 | — | 12,524,488 | 10,659,586 |
| Dividend payable to non-controlling interests | — | 405,316 | — | — | — | — | — | 405,316 | 405,316 |
| Financial guarantee contracts | 5.35% | — | — | 60,518 | — | — | — | 60,518 | 57,444 |
| | | 172,737,030 | 25,229,494 | 23,293,766 | 11,684,103 | 8,900,269 | 459,091 | 242,303,753 | 232,180,370 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3    FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1    **Financial risk factors** *(continued)*

**(c)    Liquidity risk** *(continued)*

| | Effective interest rate % | Within one year RMB'000 | One to two years RMB'000 | Two to three years RMB'000 | Three to four years RMB'000 | Four to five years RMB'000 | After five years RMB'000 | Total undiscounted cash flow RMB'000 | Carrying amount RMB'000 |
|---|---|---|---|---|---|---|---|---|---|
| **As at 31 December 2012** | | | | | | | | | |
| Trade and other payables | — | 47,250,608 | — | — | — | — | — | 47,250,608 | 47,250,608 |
| Amounts due to related parties | | | | | | | | | |
|  — interest-free | — | 1,435,647 | — | — | — | — | — | 1,435,647 | 1,435,647 |
|  — variable rate | 6.86% | 491,673 | — | — | — | — | — | 491,673 | 460,109 |
|  — fixed rate | 6.74% | 133,429 | — | — | — | — | — | 133,429 | 125,000 |
| Advances from immediate holding company | — | 3,218 | — | — | — | — | — | 3,218 | 3,218 |
| Borrowings | | | | | | | | | |
|  — fixed rate bank loans | 5.56% | 47,877,800 | 6,003,325 | 5,824,934 | 961,719 | 562,084 | 305,103 | 61,534,965 | 57,211,658 |
|  — variable rate bank loans | 6.42% | 31,335,629 | 6,237,538 | 11,757,425 | 1,704,084 | 2,346,585 | 1,441,419 | 54,822,680 | 50,957,079 |
|  — other borrowings from non-financial institutions | 6.00% | — | — | — | — | — | 368,647 | 368,647 | 347,780 |
|  — bonds | 4.09% | 17,733,249 | 8,406,400 | 4,101,600 | — | 5,254,000 | — | 35,495,249 | 34,100,000 |
| Obligations under finance leases | 5.97% | 1,784,692 | 1,730,281 | 1,190,611 | 696,144 | 267,076 | — | 5,668,804 | 5,264,859 |
| Dividend payable to non-controlling interests | — | 214,366 | — | — | — | — | — | 214,366 | 214,366 |
| Financial guarantee contracts | 5.35% | — | — | — | 63,368 | — | — | 63,368 | 60,150 |
| | | 148,260,311 | 22,377,544 | 22,874,570 | 3,425,315 | 8,429,745 | 2,115,169 | 207,482,654 | 197,430,474 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3    FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.1    Financial risk factors *(continued)*

**(c)    Liquidity risk** *(continued)*

The contractual expiry periods of financial guarantees are as follows:

|  | **2013** | | 2012 | |
|---|---|---|---|---|
|  | **RMB'000** | **Expiry periods** | *RMB'000* | Expiry periods |
| Guarantee given to banks in respect of banking facilities utilised by independent third parties | **85,000** | **(2014)** | 355,000 | (2013–2016) |

The maximum amount the Group could be forced to settle under the financial guarantee contracts if the full guaranteed amount is claimed by the counterparty to the guarantee is approximately RMB85 million (2012: approximately RMB355 million). Based on expectations at the end of the reporting period, the Group considers that it is more likely that no amount will be payable under the arrangement. However, this estimate is subject to change depending on the probability of the counterparty claiming under the guarantee which is a function of the likelihood that the financial receivables held by the counterparty which are guaranteed suffer credit losses.

### 3.2    Capital risk

The Group manages its capital to ensure that entities in the Group will be able to continue as a going concern while maximising the return to stakeholders through the optimisation of the debt and equity balance. The Group's overall strategy remains unchanged from prior year.

The capital structure the Group consists of debt, which includes the borrowings disclosed in Note 30, cash and cash equivalents disclosed in Note 28 and equity attributable to owners of the Company, comprising issued share capital, reserves and retained earnings.

The directors of the Group review the capital structure periodically. As part of this review, the directors consider the cost of capital and the risks associates with each class of capital. Based on recommendations of the directors, the Group will balance its overall capital structure through the payment of dividends and new share issues as well as the issue of new debt or the redemption of existing debt.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3　FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.3　Fair value estimation

#### (a)　Financial instruments carried at fair value

The table below analyses financial instruments carried at fair value, by valuation method. The different levels have been defined as follows:

— 　Quoted prices (unadjusted) in active markets for identical assets or liabilities (level 1).

— 　Inputs other than quoted prices included within level 1 that are observable for the asset or liability, either directly (that is, as prices) or indirectly (that is, derived from prices) (level 2).

— 　Inputs for the asset or liability that are not based on observable market data (that is, unobservable inputs) (level 3).

The following table presents the Group assets and liabilities that are measured at fair value at 31 December 2013.

| | Level 1<br>*RMB'000* | Level 2<br>*RMB'000* | Level 3<br>*RMB'000* | Total<br>*RMB'000* |
|---|---|---|---|---|
| **Assets** | | | | |
| Held-for-trading investments | 189,897 | — | — | 189,897 |
| Available-for-sale financial assets | 1,093,700 | — | — | 1,093,700 |
| **Total assets** | 1,283,597 | — | — | 1,283,597 |
| **Liabilities** | | | | |
| Financial guarantee contracts | — | — | 57,444 | 57,444 |
| **Total liabilities** | — | — | 57,444 | 57,444 |

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 3   FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.3   Fair value estimation *(continued)*

#### (a)   Financial instruments carried at fair value *(continued)*

The following table presents the Group assets and liabilities that are measured at fair value at 31 December 2012.

|  | Level 1 RMB'000 | Level 2 RMB'000 | Level 3 RMB'000 | Total RMB'000 |
|---|---|---|---|---|
| **Assets** | | | | |
| Held-for-trading investments | 247,663 | — | — | 247,663 |
| Available-for-sale financial assets | 231,099 | — | — | 231,099 |
| **Total assets** | 478,762 | — | — | 478,762 |
| **Liabilities** | | | | |
| Financial guarantee contracts | — | — | 60,150 | 60,150 |
| **Total liabilities** | — | — | 60,150 | 60,150 |

The fair value of financial instruments traded in active markets is based on quoted market prices at the end of the reporting period. A market is regarded as active if quotes prices are readily and regularly available from an exchange, dealer, broker, industry group, pricing service, or regulatory agency, and those prices represent actual and regularly occurring market transactions on an arm's length basis. The quoted market price used for financial assets held by the group is the current bid price. The instruments are included in level 1. Instruments includes in level 1 comprise primarily Hong Kong Stock Exchange, Shenzhen Stock Exchange and Shanghai Stock Exchange equity investments classified as trading securities.

The fair value of financial instruments that are not traded in an active market is determined by using valuation techniques. These valuation techniques maximise the use of observable market data where it is available and rely as little as possible on entity specific estimates. If all significant inputs required to fair value an instrument are observable, the instrument is included in level 2.

The fair value of financial guarantee contracts is estimated by the directors with reference to the financial condition of the guarantee, which were considered as level 3 valuation.

There is no transfer of financial assets and liabilities between level 1, level 2 and level 3 fair value hierarchy classifications.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 3 FINANCIAL RISK MANAGEMENT *(CONTINUED)*

### 3.3 Fair value estimation *(continued)*

#### (b) Financial instruments carried at other than fair value

The carrying amounts of the Group's financial instruments carried at cost or amortised cost were not materially different from their fair value.

## 4 CRITICAL ACCOUNTING ESTIMATES AND ASSUMPTIONS

In the application of the Group's accounting policies, which are described in Note 2, management is required to make judgements, estimates and assumptions about the carrying amounts of assets and liabilities that are not readily apparent from other sources. The estimates and associated assumptions are based on historical experience and other factors that are considered to be relevant. Actual results may differ from these estimates.

The estimates and underlying assumptions are reviewed on an ongoing basis. Revisions to accounting estimates are recognised in the period in which the estimate is revised if the revision affects only that period or in the period of the revision and future periods if the revision affects both the current and future periods.

The followings are the key assumptions concerning the future, and other key sources of estimation uncertainty at the end of the reporting period, that have a significant risk of causing a material adjustment to the carrying amounts of assets and liabilities within the next financial year.

**Impairment of property, plant and equipment**

The Group assesses annually whether property, plant and equipment have any indication of impairment, in accordance with relevant accounting policies. The recoverable amounts of property, plant and equipment have been determined based on value-in-use calculations. These calculations and valuations require the use of judgement and estimates on future operating cash flows and discount rates adopted. As at 31 December 2013, the carrying value of property, plant and equipment is approximately RMB123,486.02 million (2012: approximately RMB105,413.74 million).

**Write down of inventories**

During the year, the Group made write down of inventories provision of approximately RMB2.09 million (2012: approximately RMB2.56 million). The Group makes write down of inventories based on assessment of the net realisable value of inventories. Write down of inventories is applied to inventories where events or changes in circumstances indicate that the net realisable value is lower than the cost of inventories. The identification of obsolete inventories required the use of judgement and estimates on the conditions and usefulness of the inventories.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 4 CRITICAL ACCOUNTING ESTIMATES AND ASSUMPTIONS *(CONTINUED)*

**Impairment of goodwill**

The Group tests annually whether goodwill has suffered any impairment, in accordance with the accounting policy stated in Note 2.4. Determining whether goodwill is impaired requires an estimation of the value in use of the cash-generating units to which goodwill has been allocated. The value-in-use calculation requires the entity to estimate the future cash flows expected to arise from the cash-generating unit and a suitable discount rate in order to calculate present value. As at 31 December 2013, the carrying amount of goodwill is approximately RMB42,310.90 million (2012: approximately RMB31,002.44 million). Details of the recoverable amount calculation are disclosed in Note 17.

**Allowance for bad and doubtful debts**

During the year, the Group provided allowance for bad and doubtful debts of approximately RMB253.55 million (2012: approximately RMB65.73 million) based on an assessment of the present value of the estimated future cash flow from trade and other receivables. Allowance on the estimated future cash flow is applied where events or changes in circumstances indicate that the part of or the whole balances may not be recoverable. The estimation of future cash flow from trade and other receivables requires the use of judgement and estimates.

Where the expectation is different from the original estimate, such difference will impact on the carrying value of trade and other receivables and doubtful debts expenses in the year in which such estimate has been changed.

**Fair value measurements and valuation processes**

Some of the Group's assets and liabilities are measured at fair value for financial reporting purposes. The directors of the Company are responsible in determining the appropriate valuation techniques and inputs for fair value measurements.

In estimating the fair value of an asset or a liability, the Group uses market-observable data to the extent it is available. Where Level 1 inputs are not available, the Group engages third party qualified valuers to perform the valuation. The directors of the Company work closely with the independent qualified professional valuers to establish the appropriate valuation techniques and inputs to the model. The directors regularly assess the impact and the cause of fluctuations in the fair value of the assets and liabilities.

The Group uses valuation techniques that include inputs that are not based on observable market data to estimate the fair value of certain types of investment properties and financial instruments. Note 3.3 provide detailed information about the valuation techniques, inputs and key assumptions used in the determination of the fair value of various assets and liabilities.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 5    REVENUE

|  | **2013** | 2012 |
|---|---|---|
|  | **RMB'000** | RMB'000 |
| Sale of goods | **110,157,827** | 83,279,665 |
| Provision of engineering services | **5,690,915** | 3,935,849 |
| Rendering of other services | **1,839,098** | 2,115 |
|  | **117,687,840** | 87,217,629 |

## 6    SEGMENTS INFORMATION

### (a)    Operating segments

For management purpose, the Group is currently organised into six major operating divisions during the year - cement, concrete, lightweight building materials, glass fiber and composite materials, engineering services and others. These activities are the basis on which the Group reports its primary segment information.

Principal activities are as follows:

| | | |
|---|---|---|
| Cement | — | Production and sale of cement |
| Concrete | — | Production and sale of concrete |
| Lightweight building materials | — | Production and sale of lightweight building materials |
| Glass fiber and composite materials | — | Production and sale of glass fiber and composite materials |
| Engineering services | — | Provision of engineering services to glass and cement manufacturers and equipment procurement |
| Others | — | Merchandise trading business and others |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION

### (a)    Operating segments *(continued)*

Information regarding the Group's reportable segments is presented below:

**Year ended 31 December 2013**

| | Cement RMB'000 | Concrete RMB'000 | Lightweight building materials RMB'000 | Glass fiber and composite materials RMB'000 | Engineering services RMB'000 | Others RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|
| **Income statement** | | | | | | | | |
| Revenue | | | | | | | | |
| External sales | 72,011,384 | 27,182,581 | 6,981,573 | 2,277,150 | 5,787,304 | 3,447,848 | — | 117,687,840 |
| Inter-segment sales *(Note)* | 4,295,458 | — | — | — | 972,773 | 3,228,031 | (8,496,262) | — |
| | 76,306,842 | 27,182,581 | 6,981,573 | 2,277,150 | 6,760,077 | 6,675,879 | (8,496,262) | 117,687,840 |
| Adjusted EBITDA | 17,800,680 | 4,535,455 | 1,909,842 | 336,828 | 696,462 | 238,816 | — | 25,518,083 |
| Depreciation and amortisation, and prepaid lease payments released to consolidated income statement | (4,744,973) | (818,328) | (313,276) | (105,943) | (56,850) | (24,922) | 23,045 | (6,041,247) |
| Unallocated other expense | | | | | | | | (23,909) |
| Unallocated administrative expenses | | | | | | | | (173,936) |
| Share of profit/(loss) of associates | 440,234 | 2,776 | 3,473 | 146,485 | (1,284) | 38,852 | — | 630,536 |
| Finance costs - net | (6,385,390) | (1,564,752) | (163,582) | (71,730) | (149,155) | (78,372) | — | (8,412,981) |
| Unallocated finance costs-net | | | | | | | | (893,521) |
| Profit before income tax | | | | | | | | 10,603,025 |
| Income tax expense | | | | | | | | (2,291,155) |
| Profit for the year | | | | | | | | 8,311,870 |

China National Building Material Company Limited    Annual Report 2013

EXHIBIT B

Page 148 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION *(CONTINUED)*

### (a)  **Operating segments** *(continued)*

Year ended 31 December 2013 *(continued)*

The segment result is disclosed as EBITDA, i.e. the profit earned by each segment without allocation of depreciation and amortisation, other expenses, central administration costs, net finance costs, other income, share of profit/(loss) of associates and income tax expense. This is the measure reported to the management for the purpose of resource allocation and assessment of segment performance. Management views the combination of these measures, in combination with other reported measures, as providing a better understanding for management and investors of the operating results of its business segments for the year under evaluation compared to relying on one of the measures.

Segment assets include all tangible, intangible assets and current assets with the exception of other corporate assets. Segment liabilities include trade creditors, accruals and bills payable attributable to sales activities of each segment with the exception of corporate expense payables.

| | Cement RMB'000 | Concrete RMB'000 | Lightweight building materials RMB'000 | Glass fiber and composite materials RMB'000 | Engineering services RMB'000 | Others RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|
| **Other information** | | | | | | | | |
| Capital expenditure: | | | | | | | | |
| — Property, plant and equipment | 5,099,646 | 418,091 | 702,494 | 176,532 | 42,183 | 297,061 | — | 6,736,007 |
| — Prepaid lease payments | 416,173 | 89,718 | 212,294 | 1,952 | 36,009 | — | — | 756,146 |
| — Intangible assets | 542,619 | 6,065 | 5,278 | 35,892 | 4,875 | 292,182 | — | 886,911 |
| — Unallocated | | | | | | | | 79,595 |
| | 6,058,438 | 513,874 | 920,066 | 214,376 | 83,067 | 589,243 | | 8,458,659 |
| — Acquisition of subsidiaries | 15,042,440 | 3,955,742 | 4,036 | — | — | — | — | 19,002,218 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION *(CONTINUED)*

### (a)    Operating segments *(continued)*

**Year ended 31 December 2013** *(continued)*

| | Cement RMB'000 | Concrete RMB'000 | Lightweight building materials RMB'000 | Glass fiber and composite materials RMB'000 | Engineering services RMB'000 | Others RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|
| **Other information** *(Continued)* | | | | | | | | |
| | | | | | | | | |
| **Depreciation and amortisation** | | | | | | | | |
| — Property, plant and equipment | 4,205,388 | 800,919 | 282,349 | 90,940 | 47,245 | 22,184 | (23,045) | 5,425,980 |
| — Intangible assets | 270,348 | 1,260 | 4,137 | 7,346 | 5,442 | 725 | — | 289,258 |
| — Unallocated | | | | | | | | 17,793 |
| | | | | | | | | |
| | 4,475,736 | 802,179 | 286,486 | 98,286 | 52,687 | 22,909 | | 5,733,031 |
| | | | | | | | | |
| Prepaid lease payments released to the consolidated income statement | 269,237 | 16,149 | 26,790 | 7,657 | 4,163 | 2,013 | — | 326,009 |
| Allowance for bad and doubtful debts | 125,387 | 26,896 | 4,872 | 44,718 | 40,567 | 11,110 | — | 253,550 |
| Write down of inventories | — | — | — | 2,085 | — | — | — | 2,085 |
| | | | | | | | | |
| **Statement of financial Position** | | | | | | | | |
| | | | | | | | | |
| **Assets** | | | | | | | | |
| Segment assets | 194,473,971 | 37,821,443 | 9,729,960 | 5,916,368 | 7,349,532 | 5,241,118 | — | 260,532,392 |
| Investment in associates | 5,757,234 | 31,915 | 103,623 | 1,713,933 | 42,625 | 101,793 | — | 7,751,123 |
| Unallocated assets | | | | | | | | 23,347,660 |
| | | | | | | | | |
| Total consolidated assets | | | | | | | | 291,631,175 |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Segment liabilities | 150,836,165 | 13,968,776 | 4,388,287 | 3,537,849 | 7,118,424 | 4,863,875 | — | 184,713,376 |
| Unallocated liabilities | | | | | | | | 53,341,900 |
| | | | | | | | | |
| Total consolidated liabilities | | | | | | | | 238,055,276 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION *(CONTINUED)*

### (a)    Operating segments *(continued)*

**Year ended 31 December 2012**

| | Cement RMB'000 | Concrete RMB'000 | Lightweight building materials RMB'000 | Glass fiber and composite materials RMB'000 | Engineering services RMB'000 | Others RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|
| **Income statement** | | | | | | | | |
| Revenue | | | | | | | | |
| External sales | 58,367,475 | 9,341,413 | 6,635,437 | 2,195,361 | 5,199,199 | 5,478,744 | — | 87,217,629 |
| Inter-segment sales *(Note)* | 1,416,813 | — | — | — | 868,212 | 1,007,406 | (3,292,431) | — |
| | 59,784,288 | 9,341,413 | 6,635,437 | 2,195,361 | 6,067,411 | 6,486,150 | (3,292,431) | 87,217,629 |
| Adjusted EBITDA | 16,194,593 | 1,669,811 | 1,445,262 | 265,983 | 601,252 | 368,922 | — | 20,545,823 |
| Depreciation and amortisation, and prepaid lease payments released to consolidated income statement | (3,764,620) | (275,633) | (244,890) | (93,302) | (43,177) | (18,942) | (13,057) | (4,453,621) |
| Unallocated other income | | | | | | | | 9,508 |
| Unallocated administrative expenses | | | | | | | | (129,338) |
| Share of profit/(loss) of associates | 338,075 | — | 4,153 | 110,923 | (348) | 5,839 | — | 458,642 |
| Finance costs - net | (4,931,320) | (189,203) | (144,540) | (73,216) | (95,483) | (14,194) | 10,215 | (5,437,741) |
| Unallocated finance costs-net | | | | | | | | (1,069,404) |
| Profit before income tax | | | | | | | | 9,923,869 |
| Income tax expense | | | | | | | | (2,186,883) |
| Profit for the year | | | | | | | | 7,736,986 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION *(CONTINUED)*

### (a)    Operating segments *(continued)*

**Year ended 31 December 2012** *(continued)*

| | Cement RMB'000 | Concrete RMB'000 | Lightweight building materials RMB'000 | Glass fiber and composite materials RMB'000 | Engineering services RMB'000 | Others RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|
| **Other information** | | | | | | | | |
| | | | | | | | | |
| **Capital expenditure:** | | | | | | | | |
| — Property, plant and equipment | 6,278,045 | 501,375 | 1,199,017 | 321,192 | 51,691 | 408,196 | — | 8,759,516 |
| — Prepaid lease payments | 219,517 | 13,759 | 30,896 | 20,069 | 9,506 | 20,777 | — | 314,524 |
| — Intangible assets | 570,250 | 1,871 | 5,354 | 21,306 | 2,562 | 453 | — | 601,796 |
| — Unallocated | | | | | | | | 64,372 |
| | | | | | | | | |
| | 7,067,812 | 517,005 | 1,235,267 | 362,567 | 63,759 | 429,426 | | 9,740,208 |
| | | | | | | | | |
| — Acquisition of subsidiaries | 27,391,864 | 7,406,483 | — | — | 41,874 | 838 | — | 34,841,059 |
| | | | | | | | | |
| Depreciation and amortisation | | | | | | | | |
| — Property, plant and equipment | 3,273,327 | 269,191 | 223,923 | 84,935 | 34,224 | 16,576 | 13,057 | 3,915,233 |
| — Intangible assets | 216,084 | 1,505 | 5,776 | 2,450 | 4,420 | 237 | — | 230,472 |
| — Unallocated | | | | | | | | 9,678 |
| | | | | | | | | |
| | 3,489,411 | 270,696 | 229,699 | 87,385 | 38,644 | 16,813 | | 4,155,383 |
| | | | | | | | | |
| Prepaid lease payments released to the consolidated income statement | 275,209 | 4,937 | 15,191 | 5,917 | 4,533 | 2,129 | — | 307,916 |
| Allowance/(reversal of provision) for bad and doubtful debts | (20,737) | 18,008 | 8,005 | 24,554 | 30,610 | 5,288 | — | 65,728 |
| Write down/(reversal of write down) of inventories | 1,352 | (1,372) | — | — | — | 2,578 | — | 2,558 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION *(CONTINUED)*

### (a)    Operating segments *(continued)*

**Year ended 31 December 2012** *(continued)*

| | Cement RMB'000 | Concrete RMB'000 | Lightweight building materials RMB'000 | Glass fiber and composite materials RMB'000 | Engineering services RMB'000 | Others RMB'000 | Eliminations RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|
| **Statement of financial Position** | | | | | | | | |
| **Assets** | | | | | | | | |
| Segment assets | 169,575,996 | 25,133,982 | 8,613,442 | 5,609,157 | 5,934,889 | 4,917,876 | — | 219,785,342 |
| Investment in associates | 4,406,955 | — | 198,812 | 1,643,970 | 41,269 | 59,161 | — | 6,350,167 |
| Unallocated assets | | | | | | | | 20,298,038 |
| Total consolidated assets | | | | | | | | 246,433,547 |
| **Liabilities** | | | | | | | | |
| Segment liabilities | 132,321,781 | 12,365,123 | 4,199,625 | 3,389,237 | 5,281,435 | 3,969,821 | — | 161,527,022 |
| Unallocated liabilities | | | | | | | | 40,841,678 |
| Total consolidated liabilities | | | | | | | | 202,368,700 |

*Note:*   The inter-segment sales were carried out with reference to market prices.

EXHIBIT B
Page 153 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 6    SEGMENTS INFORMATION *(CONTINUED)*

### (a)    Operating segments *(continued)*

A reconciliation of total adjusted profit before depreciation and amortisation, finance costs and income tax expense, is provided as follows:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Adjusted EBITDA for reportable segments | 25,279,267 | 20,176,900 |
| Adjusted EBITDA for other segment | 238,816 | 368,923 |
| Eliminations | — | — |
| Total segments profit | 25,518,083 | 20,545,823 |
| Depreciation of property, plant and equipment | (5,425,980) | (3,915,233) |
| Amortisation of intangible assets | (289,258) | (230,472) |
| Prepaid lease payments released to the consolidated income statements | (326,009) | (307,916) |
| Corporate items | (197,845) | (119,830) |
| Operating profit | 19,278,991 | 15,972,372 |
| Finance costs - net | (9,306,502) | (6,507,145) |
| Share of profit of associates | 630,536 | 458,642 |
| Profit before income tax | 10,603,025 | 9,923,869 |

### (b)    Geographical segments

The Group's revenue from the following geographical markets, based on the locations of customers:

|  | Revenue from external customers | |
|---|---|---|
|  | 2013 RMB'000 | 2012 RMB'000 |
| PRC | 115,891,215 | 86,459,164 |
| Europe | 253,798 | 94,336 |
| Middle East | 74,973 | 32,063 |
| Southeast Asia | 435,676 | 98,188 |
| Oceania | 534,145 | 515,701 |
| Others | 498,033 | 18,177 |
|  | 117,687,840 | 87,217,629 |

More than 90% of the Group's operations and assets are located in the PRC for the years ended 31 December 2013 and 2012.

### (c)    Information of major customers

No single customer amounted for 10% or more of the total revenue for the years ended 31 December 2013 and 2012.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 7    INVESTMENT AND OTHER INCOME

|  | 2013 | 2012 |
|---|---:|---:|
|  | **RMB'000** | *RMB'000* |
| Dividend from available-for-sale financial assets | **4,732** | 11,263 |
| Discount on acquisition of interests | | |
| in subsidiaries *(Note 36)* | **28,363** | 42,965 |
| Financial guarantee income *(Note 33)* | **—** | 4,008 |
| Gain on disposal of property, plant and | | |
| equipment, investment properties, intangible | | |
| assets and prepaid lease payments | **—** | 31,917 |
| Government subsidies: | | |
| — VAT refunds *(Note (a))* | **2,106,908** | 1,942,147 |
| — Government grants *(Note (b))* | **1,468,571** | 2,277,247 |
| — Interest subsidy | **44,656** | 69,271 |
| (Decrease)/increase in fair value of | | |
| held-for-trading investments | **(57,766)** | 144,745 |
| Net rental income from: | | |
| — Investment properties *(Note 16)* | **32,892** | 32,886 |
| — Equipment | **81,599** | 44,440 |
| Technical and other service income | **253,712** | 302,801 |
| Waiver of payables | **62,830** | 252,635 |
| Gain on disposal of associates | **11,393** | — |
| Others | **166,243** | 43,980 |
| | **4,204,133** | 5,200,305 |

*Notes:*

(a)    The State Council of the PRC issued a "Notice Encouraging Comprehensive Utilisation of Natural Resources (the "Notice") in 1996 to encourage and support enterprises, through incentive policies, to comprehensively utilise natural resources. Pursuant to the Notice, the Ministry of Finance and the State Administration of Taxation of the PRC enacted several regulations providing incentives in form of VAT refund for certain environmentally friendly products, including products that recognised industrial waste as part of their raw materials. Under the Notice and such regulations, the Group is entitled to receive immediate or future refund on any paid VAT with respect to any eligible products as income after it receives approvals from the relevant government authorities.

(b)    Government grants are awarded to the Group by the local government agencies as incentives primarily to encourage the development of the Group and the contribution to the local economic development.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 8 FINANCE COSTS - NET

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Interest expenses on bank borrowings: |  |  |
| — wholly repayable within five years | 7,554,155 | 5,890,775 |
| — not wholly repayable within five years | 14,136 | 33,515 |
|  | 7,568,291 | 5,924,290 |
| Interest expenses on bonds and other borrowings | 2,761,499 | 1,698,419 |
| Less: interest capitalised to construction in progress | (375,195) | (440,978) |
|  | 9,954,595 | 7,181,731 |
| Interest income: |  |  |
| — interest on bank deposits | (258,638) | (244,031) |
| — interest on loans receivables | (389,455) | (430,555) |
|  | (648,093) | (674,586) |
| Finance costs - net | 9,306,502 | 6,507,145 |

Borrowing costs capitalised for the year ended 31 December 2013 arose on the general borrowing pool and were calculated by applying a capitalisation rate of 5.66% (2012: 6.67%) per annum to expenditure on the qualifying assets.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 9  DIRECTORS', SUPERVISORS' AND EMPLOYEES' EMOLUMENTS

### (a)  Directors' and supervisors' emoluments

**Year ended 31 December 2013**

| | Fees RMB'000 | Salaries, allowance and benefits-in-kind RMB'000 | Discretionary bonuses RMB'000 | Retirement plan contributions RMB'000 | Share appreciation rights RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| **Executive directors** | | | | | | |
| Mr. Song Zhiping | — | — | — | — | — | — |
| Mr. Cao Jianglin | — | 355 | 492 | 36 | — | 883 |
| Mr. Chang Zhangli | — | 365 | 254 | 36 | — | 655 |
| Mr. Peng Shou | — | 417 | 540 | 24 | — | 981 |
| Mr. Cui Xingtai | — | 426 | 484 | 36 | — | 946 |
| **Non-executive directors** | | | | | | |
| Mr. Guo Chaomin | — | — | — | — | — | — |
| Mr. Huang Anzhong | — | — | — | — | — | — |
| Ms. Cui Lijun | — | — | — | — | — | — |
| **Independent non-executive directors** | | | | | | |
| Mr. Qiao Longde | 300 | — | — | — | — | 300 |
| Mr. Li Decheng | 300 | — | — | — | — | 300 |
| Mr. Ma Zhongzhi | 300 | — | — | — | — | 300 |
| Mr. Shin Fang | 300 | — | — | — | — | 300 |
| Mr. Wu Liansheng | 300 | — | — | — | — | 300 |
| **Supervisors** | | | | | | |
| Mr. Wu Jiwei | — | — | — | — | — | — |
| Ms. Zhou Guoping | — | — | — | — | — | — |
| Mr. Liu Zhiping | — | 154 | 92 | 36 | — | 282 |
| Ms. Cui Shuhong | — | 154 | 92 | 36 | — | 282 |
| **Independent supervisors** | | | | | | |
| Mr. Tang Yunwei | 200 | — | — | — | — | 200 |
| Mr. Zhao Lihua | 200 | — | — | — | — | 200 |
| | 1,900 | 1,871 | 1,954 | 204 | — | 5,929 |

EXHIBIT B
Page 157 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 9   DIRECTORS', SUPERVISORS' AND EMPLOYEES' EMOLUMENTS *(CONTINUED)*

### (a)   Directors' and supervisors' emoluments *(continued)*

**Year ended 31 December 2012**

| | Fees RMB'000 | Salaries, allowance and benefits-in-kind RMB'000 | Discretionary bonuses RMB'000 | Retirement plan contributions RMB'000 | Share appreciation rights RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|
| **Executive directors** | | | | | | |
| Mr. Song Zhiping | — | — | — | — | — | — |
| Mr. Cao Jianglin | — | 332 | 528 | 33 | — | 893 |
| Mr. Chang Zhangli | — | 402 | 300 | 33 | 58 | 793 |
| Mr. Peng Shou | — | 429 | 540 | 17 | 58 | 1,044 |
| Mr. Cui Xingtai | — | 425 | 540 | 33 | 58 | 1,056 |
| **Non-executive directors** | | | | | | |
| Mr. Guo Chaomin | 125 | — | — | — | — | 125 |
| Mr. Huang Anzhong | 125 | — | — | — | — | 125 |
| Ms. Cui Lijun | 155 | — | — | — | — | 155 |
| **Independent non-executive directors** | | | | | | |
| Mr. Qiao Longde | 300 | — | — | — | — | 300 |
| Mr. Li Decheng | 300 | — | — | — | — | 300 |
| Mr. Ma Zhongzhi | 300 | — | — | — | — | 300 |
| Mr. Shin Fang | 300 | — | — | — | — | 300 |
| Mr. Wu Liansheng | 300 | — | — | — | — | 300 |
| **Supervisors** | | | | | | |
| Mr. Wu Jiwei | 83 | — | — | — | — | 83 |
| Ms. Zhou Guoping | 83 | — | — | — | — | 83 |
| Mr. Liu Zhiping | — | 159 | 102 | 33 | 23 | 317 |
| Ms. Cui Shuhong | — | 159 | 102 | 33 | 23 | 317 |
| **Independent supervisors** | | | | | | |
| Mr. Tang Yunwei | 200 | — | — | — | — | 200 |
| Mr. Zhao Lihua | 200 | — | — | — | — | 200 |
| | 2,471 | 1,906 | 2,112 | 182 | 220 | 6,891 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 9  DIRECTORS', SUPERVISORS' AND EMPLOYEES' EMOLUMENTS *(CONTINUED)*

### (b)  Employees' emoluments

Of the five individuals with the highest emoluments in the Group, none (2012: nil) of the directors of the Company whose emoluments are included in the disclosures above. The emoluments of the remaining five (2012: five) individuals were as follows:

|  | 2013<br>*RMB'000* | 2012<br>*RMB'000* |
|---|---|---|
| Salaries, allowances and benefits-in-kind | 2,054 | 1,468 |
| Share appreciation rights | — | 58 |
| Discretionary bonuses | 5,666 | 6,267 |
| Retirement plan contributions | 165 | 114 |
|  | 7,885 | 7,907 |

Their emoluments paid by the Group are within the following bands:

|  | Number of the five highest paid individuals | |
|---|---|---|
|  | 2013 | 2012 |
| Nil - HKD1,000,000<br>  (equivalent to RMB786,200) | — | — |
| HKD1,000,001–HKD1,500,000<br>  (equivalent to RMB1,179,300) | — | — |
| HKD1,500,001–HKD2,000,000<br>  (equivalent to RMB1,572,400) | 3 | 3 |
| HKD2,000,001–HKD2,500,000<br>  (equivalent to RMB1,965,500) | 2 | 2 |

No emoluments were paid by the Group to the directors, supervisors nor the five highest paid individuals as an inducement to join or upon joining the Group or as compensation for loss of office, and none of the directors and supervisors has waived any emoluments for both years.

EXHIBIT B
Page 159 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 10   PROFIT BEFORE INCOME TAX

Profit before income tax has been arrived at after charging/(crediting):

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| Depreciation of: | | |
| — property, plant and equipment | **5,434,419** | 3,916,691 |
| — investment properties | **9,354** | 8,220 |
|  | **5,443,773** | 3,924,911 |
| Amortisation of intangible assets | **289,258** | 230,472 |
| Total depreciation and amortisation | **5,733,031** | 4,155,383 |
| Impairment loss on available-for-sale financial assets | **271** | — |
| Impairment loss on property, plant and equipment (reversed)/recognised | **(2,668)** | 3,630 |
| Cost of inventories recognised as expenses | **79,441,837** | 60,425,340 |
| Prepaid lease payments released to the consolidated income statement | **326,009** | 307,916 |
| Auditor's remuneration | **12,328** | 9,684 |
| Staff costs including directors' remunerations: | | |
| — Salaries, bonus and other allowances | **7,543,984** | 5,376,411 |
| — Share appreciation rights | **—** | 839 |
| — Retirement plan contributions | **786,951** | 554,609 |
| Total staff costs | **8,330,935** | 5,931,859 |
| Allowance for bad and doubtful debts | **253,550** | 65,728 |
| Write down of inventories | **2,085** | 2,558 |
| Operating lease rentals | **194,032** | 78,596 |
| Loss/(gain) on disposal of property, plant and equipment, investment properties, intangible assets and prepaid lease payments | **47,635** | (31,917) |
| Net foreign exchange losses/(gains) | **20,070** | (846) |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 11   INCOME TAX EXPENSE

### (a)   Taxation in the consolidated income statement

|  | **2013** | 2012 |
|---|---|---|
|  | **RMB'000** | RMB'000 |
| Current income tax | **3,188,243** | 2,817,223 |
| Deferred income tax *(Note 31)* | **(897,088)** | (630,340) |
|  | **2,291,155** | 2,186,883 |

PRC income tax is calculated at 25% (2012: 25%) of the estimated assessable profit of the Group as determined in accordance with relevant tax rules and regulations in the PRC for both years, except for certain subsidiaries of the Company, which are exempted or taxed at preferential rates of 15% entitled by the subsidiaries in accordance with relevant tax rules and regulations in the PRC or approvals obtained by the tax bureaus in the PRC.

The total charge for the year can be reconciled to the profit before income tax as follows:

|  | **2013** | 2012 |
|---|---|---|
|  | **RMB'000** | RMB'000 |
| Profit before income tax | **10,603,025** | 9,923,869 |
| Tax at domestic income tax rate |  |  |
|   of 25% (2012: 25%) | **2,650,756** | 2,480,967 |
| Tax effect of: |  |  |
| Share of profit of associates | **(157,634)** | (114,661) |
| Expenses not deductible for tax purposes | **96,687** | 61,148 |
| Income not taxable for tax purposes | **(90,634)** | (100,944) |
| Tax effect of tax losses not recognised | **389,254** | 260,024 |
| Utilisation of previously unrecognised tax losses | **(391,743)** | (310,926) |
| Income tax credits granted to subsidiaries |  |  |
|   on acquisition of certain qualified equipment *(Note)* | **(12,129)** | (14,644) |
| Effect of different tax rates of subsidiaries | **(193,402)** | (74,081) |
| Income tax expense | **2,291,155** | 2,186,883 |

EXHIBIT B
Page 161 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 11   INCOME TAX EXPENSE *(CONTINUED)*

### (a)   Taxation in the consolidated income statement *(continued)*

*Note:*

Pursuant to the relevant tax rules and regulations, certain subsidiaries of the Company can claim PRC income tax credits on 40% of the acquisition cost of certain qualified equipment manufactured in the PRC, to the extent of the PRC income tax expense for the current year in excess of that for the previous year. Such PRC income tax credits are allowed as a deduction of current income tax expenses upon relevant conditions were fulfilled and relevant tax approval was obtained from the relevant tax bureau.

### (b)   Tax effects relating to each component of other comprehensive income:

|  | Before taxation | 2013 Taxation charged (Note 31) | Net of taxation | Before taxation | 2012 Taxation Credited (Note 31) | Net of taxation |
|---|---|---|---|---|---|---|
|  | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 | RMB'000 |
| Currency translation differences | 72,404 | — | 72,404 | (3,305) | — | (3,305) |
| Changes in fair value of available-for-sale financial assets | (271,775) | 69,298 | (202,477) | 8,024 | (2,005) | 6,019 |
| Shares of associates' other comprehensive expense/(income), net | 50,327 | — | 50,327 | (834) | — | (834) |
| Other comprehensive (income)/expenses | (149,044) | 69,298 | (79,746) | 3,885 | (2,005) | 1,880 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 12 DIVIDENDS

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Dividends paid | 836,849 | 1,160,791 |
| Proposed final dividend | | |
| — RMB0.16 (2012: RMB0.155) per share (see below) | 863,844 | 836,849 |

The final dividend of RMB863,844,201.92 in total (per-tax) has been proposed by the board of directors on 25 March 2014 on the basis as disclosed on page 60 of the annual report.

The above proposed final dividends are subject to approval of the shareholders of the Company in the forthcoming annual general meeting.

## 13 EARNINGS PER SHARE - BASIC AND DILUTED

The calculation of the basic earnings per share attributable to the ordinary equity holders of the Company is based on the following data:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Profit attributable to owners of the Company | 5,761,854 | 5,579,601 |

|  | 2013 '000 | 2012 '000 |
|---|---|---|
| Weighted average number of ordinary shares in issue | 5,399,026 | 5,399,026 |

No diluted earnings per share have been presented as the Group did not have any dilutive potential ordinary shares outstanding during both years.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 14   PROPERTY, PLANT AND EQUIPMENT

**The Group**

| | Construction in progress RMB'000 | Land and buildings RMB'000 | Plant and machinery RMB'000 | Motor vehicles RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|
| **Cost** | | | | | |
| As at 1 January 2012 | 7,277,248 | 31,440,287 | 38,201,758 | 1,246,500 | 78,165,793 |
| | | | | | |
| Additions | 7,181,032 | 683,385 | 688,636 | 270,807 | 8,823,860 |
| Acquisition of subsidiaries *(Note 36)* | 4,223,032 | 12,747,877 | 10,313,287 | 2,886,211 | 30,170,407 |
| Transfer from construction in progress | (8,055,838) | 3,636,089 | 4,407,114 | 12,635 | — |
| Transfer to construction in progress for reconstruction | 807,880 | (435,639) | (612,252) | (66) | (240,077) |
| Transfer to prepaid lease payments *(Note 15)* | (100,197) | (3,743) | — | — | (103,940) |
| Transfer to investment properties *(Note 16)* | (15,920) | (32,087) | — | — | (48,007) |
| Disposals | (103,573) | (298,261) | (477,364) | (75,752) | (954,950) |
| | | | | | |
| As at 31 December 2012 and 1 January 2013 | 11,213,664 | 47,737,908 | 52,521,179 | 4,340,335 | 115,813,086 |
| | | | | | |
| Additions | 6,088,818 | 144,386 | 394,449 | 187,949 | 6,815,602 |
| Acquisition of subsidiaries *(Note 36)* | 1,928,763 | 7,257,630 | 6,090,994 | 1,578,377 | 16,855,764 |
| Transfer from construction in progress | (10,876,013) | 5,315,866 | 5,541,032 | 19,115 | — |
| Transfer to construction in progress for reconstruction | 423,972 | (105,231) | (392,193) | (342) | (73,794) |
| Transfer to prepaid lease payments *(Note 15)* | — | (484) | — | — | (484) |
| Transfer to investment properties *(Note 16)* | — | (4,131) | — | — | (4,131) |
| Disposals | (8,372) | (46,970) | (157,465) | (75,837) | (288,644) |
| | | | | | |
| As at 31 December 2013 | 8,770,832 | 60,298,974 | 63,997,996 | 6,049,597 | 139,117,399 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 14   PROPERTY, PLANT AND EQUIPMENT *(CONTINUED)*

**The Group** *(continued)*

| | Construction in progress RMB'000 | Land and buildings RMB'000 | Plant and machinery RMB'000 | Motor vehicles RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|
| **Depreciation and impairment** | | | | | |
| As at 1 January 2012 | 78,386 | 1,857,141 | 4,832,713 | 236,413 | 7,004,653 |
| | | | | | |
| Charge for the year | — | 1,001,895 | 2,659,650 | 255,146 | 3,916,691 |
| Transfer to construction in progress for reconstruction | — | (44,421) | (195,603) | (53) | (240,077) |
| Transfer to investment properties *(Note 16)* | — | (73) | — | — | (73) |
| Disposals | — | (51,750) | (187,899) | (45,828) | (285,477) |
| Impairment loss recognised/(reversal) | 4,604 | — | (675) | (299) | 3,630 |
| | | | | | |
| As at 31 December 2012 and 1 January 2013 | 82,990 | 2,762,792 | 7,108,186 | 445,379 | 10,399,347 |
| | | | | | |
| Charge for the year | — | 1,418,822 | 3,369,924 | 645,673 | 5,434,419 |
| Transfer to construction in progress for reconstruction | — | (10,884) | (62,725) | (185) | (73,794) |
| Transfer to prepaid lease payments *(Note 15)* | — | (22) | — | — | (22) |
| Transfer to investment properties *(Note 16)* | — | (646) | — | — | (646) |
| Disposals | — | (14,288) | (74,744) | (36,225) | (125,257) |
| Impairment loss (reversal)/recognised | (4,367) | — | 1,699 | — | (2,668) |
| | | | | | |
| As at 31 December 2013 | 78,623 | 4,155,774 | 10,342,340 | 1,054,642 | 15,631,379 |
| **Carrying values** | | | | | |
| As at 31 December 2013 | 8,692,209 | 56,143,200 | 53,655,656 | 4,994,955 | 123,486,020 |
| | | | | | |
| As at 31 December 2012 | 11,130,674 | 44,975,116 | 45,412,993 | 3,894,956 | 105,413,739 |

EXHIBIT B
Page 165 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 14   PROPERTY, PLANT AND EQUIPMENT *(CONTINUED)*

The carrying value amount of land and buildings shown above comprises leasehold interests in land situated in the PRC under medium term leases.

As at 31 December 2013, the carrying value of plant and machinery includes an amount of approximately RMB8,982.65 million (2012: approximately RMB5,135.77 million) in respect of assets held under finance leases.

At the reporting date, the carrying amount of the Group's property, plant and equipment pledged to secure the bank borrowings granted to the Group is analysed as follows:

|  | **2013** | 2012 |
|---|---:|---:|
|  | **RMB'000** | *RMB'000* |
| Construction in progress | **—** | 22,904 |
| Land and buildings | **1,685,307** | 2,325,897 |
| Plant and machinery | **9,006,503** | 4,040,694 |
| Motor vehicles | **2,837** | 26,361 |
| Total | **10,694,647** | 6,415,856 |

Depreciation is provided to write off the cost of property, plant and equipment other than construction in progress over their estimated useful lives and after taking into account their estimated residual value, using the straight line method, as follows:

| | |
|---|---:|
| Land and buildings | 2.38% |
| Plant and machinery | 5.28% to 9.50% |
| Motor vehicles | 9.50% |

At 31 December 2013, land and buildings with carrying value of approximately RMB5,439.50 million (2012: approximately RMB4,397.06 million) are still in the process of applying the title certificates.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 15   PREPAID LEASE PAYMENTS

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Carrying amount | | |
| As at 1 January | 11,915,101 | 8,093,256 |
| Additions | 756,146 | 314,524 |
| Acquisitions of subsidiaries *(Note 36)* | 1,620,719 | 3,760,889 |
| Released to the consolidated income statement | (326,009) | (307,916) |
| Disposals | (13,789) | (49,592) |
| Transfer from property, plant and equipment *(Note 14)* | 462 | 103,940 |
| Exchange difference | (12,819) | — |
| | | |
| As at 31 December | 13,939,811 | 11,915,101 |

Analysis of the carrying amount of prepaid lease payments is as follows:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| The carrying amount of prepaid lease payments are analysed as follows: | | |
| Non-current portion | 13,612,734 | 11,667,731 |
| Current portion included in trade and other receivables *(Note 25)* | 327,077 | 247,370 |
| | | |
| | 13,939,811 | 11,915,101 |

The amount represents the prepaid lease payments situated in the PRC for a period of 10 to 50 years.

As at 31 December 2013, prepaid lease payments with carrying value of approximately RMB107.48 million (2012: approximately RMB186.82 million) are still in the process of applying the title certificates.

As at 31 December 2013, the Group has pledged prepaid lease payments with a carrying value of approximately RMB1,071.63 million (2012: approximately RMB1,537.30 million) to secure bank borrowings granted to the Group.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 16   INVESTMENT PROPERTIES

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| **Cost** | | |
| As at 1 January | **390,385** | 345,778 |
| Additions | **—** | 28 |
| Disposal | **(1,200)** | (3,428) |
| Transfer from property, plant and equipment *(Note 14)* | **4,131** | 48,007 |
| As at 31 December | **393,316** | 390,385 |
| **Depreciation** | | |
| As at 1 January | **71,543** | 63,317 |
| Charge for the year | **9,354** | 8,220 |
| Disposals | **(296)** | (67) |
| Transfer from property, plant and equipment *(Note 14)* | **646** | 73 |
| As at 31 December | **81,247** | 71,543 |
| **Carrying values** | | |
| As at 31 December | **312,069** | 318,842 |

The cost of investment properties is depreciated over their estimated useful lives at an estimated rate of 2.38% (2012: 2.38%) per annum.

As at 31 December 2013, the Group has pledged investment properties with carrying value of approximately of RMB230.33 million (2012: approximately RMB165.00 million) to secure bank borrowings granted to the Group.

The fair value of the Group's investment properties as at 31 December 2013 was approximately RMB691.61 million (2012: approximately RMB643.95 million). The fair value has been arrived at on the basis of a valuation carried out at that date by independent local valuers, who are not connected with the Group. The valuation was arrived at by making reference to comparable sales transactions as available in the related market.

The property rental income earned by the Group during the year from its investment properties, all of which are leased out under operating leases, amounted to approximately RMB49.82 million (2012: approximately RMB47.74 million). Direct operating expenses arising on the investment properties amounted to approximately RMB16.93 million (2012: approximately RMB14.85 million).

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 17   GOODWILL

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| As at 1 January | 31,002,443 | 14,901,036 |
| Arising from acquisition of subsidiaries *(Note 36)* | 11,308,459 | 16,101,407 |
| As at 31 December | 42,310,902 | 31,002,443 |

Goodwill is allocated to the cash-generating units ("CGUs") that are expected to benefit from the business combination. The carrying amount of goodwill had been allocated as follows:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Cement | 33,447,836 | 25,332,156 |
| Concrete | 8,719,356 | 5,531,560 |
| Lightweight building materials | 92,188 | 87,205 |
| Glass fiber and composite materials | 32,690 | 32,690 |
| Engineering services | 62 | 62 |
| Others | 18,770 | 18,770 |
|  | 42,310,902 | 31,002,443 |

The Group tests goodwill annually for impairment, or more frequently, if there are indications that goodwill might be impaired.

The Group determines the value in use of CGUs based on estimated discounted cash-flows, the discount rates and annual growth rates.

The Group prepares cash flow forecasts derived from the most recent financial budgets of 5 years. The cash flows for the following five years are extrapolated with varying growth rates assuming the existing level of sales and production remaining the same and based on the average long-term growth rate for the business in which the CGU operates. The cash flows beyond the five-year period are extrapolated using zero growth rate. The average discount rates of 10% per annum are post-tax and reflect specific risks relating to the Group.

Management believes that any reasonably possible change in any of these assumptions would not cause the aggregate carrying amount of each CGU or groups of CGUs to exceed its recoverable amount.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 18   INTANGIBLE ASSETS

| | Mining rights<br>RMB'000 | Patents and<br>trademarks<br>RMB'000 | Total<br>RMB'000 |
|---|---|---|---|
| **Cost** | | | |
| As at 1 January 2012 | 2,350,306 | 140,955 | 2,491,261 |
| Additions | 540,865 | 60,931 | 601,796 |
| Acquisition of subsidiaries *(Note 36)* | 826,457 | 83,306 | 909,763 |
| Disposals | (14,442) | (12,683) | (27,125) |
| | | | |
| As at 31 December 2012 | | | |
| and 1 January 2013 | 3,703,186 | 272,509 | 3,975,695 |
| Additions | 846,812 | 40,099 | 886,911 |
| Acquisition of subsidiaries *(Note 36)* | 517,825 | 7,910 | 525,735 |
| Disposals | (52,870) | (20,732) | (73,602) |
| | | | |
| As at 31 December 2013 | 5,014,953 | 299,786 | 5,314,739 |
| | | | |
| **Amortisation and impairment** | | | |
| As at 1 January 2012 | 303,467 | 40,361 | 343,828 |
| Charge for the year | 200,014 | 30,458 | 230,472 |
| Disposals | (11,708) | (7,541) | (19,249) |
| | | | |
| As at 31 December 2012 and | | | |
| 1 January 2013 | 491,773 | 63,278 | 555,051 |
| Charge for the year | 248,244 | 41,014 | 289,258 |
| Disposals | (23,166) | (12,529) | (35,695) |
| | | | |
| As at 31 December 2013 | 716,851 | 91,763 | 808,614 |
| | | | |
| **Carrying values** | | | |
| As at 31 December 2013 | 4,298,102 | 208,023 | 4,506,125 |
| | | | |
| As at 31 December 2012 | 3,211,413 | 209,231 | 3,420,644 |

Trademarks have indefinite useful lives. Patents included above have finite useful lives, over which the assets are amortised. The amortisation rates of patents are ranging from 5% to 10% per annum. Mining rights are amortised over its concession period from 2 to 30 years.

As at 31 December 2013, the Group has pledged mining rights with carrying value of approximately RMB36.56 million (2012: approximately RMB22.18 million) to secure bank borrowings granted to the Group.

The directors of the Company reviewed the carrying amount of intangible assets. No impairment loss was recognised for the years ended 31 December 2013 and 31 December 2012 in the consolidated income statement.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 19   PARTICULARS OF PRINCIPAL SUBSIDIARIES

Details of the Company's principal subsidiaries as at 31 December 2013 and 31 December 2012, which are established and operated in the PRC, are as follows:

| Name of subsidiary | Nominal value of paid-in capital (Note i) | Direct 2013 % | Direct 2012 % | Indirect 2013 % | Indirect 2012 % | Principal activities |
|---|---|---|---|---|---|---|
| BNBM *(Note i, ii)* | RMB575,150,000 | 52.40 | 52.40 | — | — | Production and sale of lightweight building materials |
| Taishan Gypsum Company Limited ("Taishan Gypsum") *(Note iii)* | RMB155,625,000 | — | — | 34.06 | 34.06 | Production and sale of lightweight building materials |
| BNBM Suzhou Mineral Fiber Ceiling Company Limited | RMB80,000,000 | — | — | 52.40 | 52.40 | Production and sale of lightweight building materials |
| Heilongjiang Binzhou Cement Company Limited ("Binzhou Cement") | RMB50,000,000 | — | 100.00 | 70.00 | — | Production and sale of cement |
| China United Cement Group Corporation Limited ("China United") | RMB4,000,000,000 | 100.00 | 100.00 | — | — | Production and sale of cement |
| Lunan China United Cement Company Limited | RMB200,000,000 | — | — | 80.34 | 80.34 | Production and sale of cement |
| Huaihai China United Cement Company Limited | RMB364,909,100 | — | — | 80.88 | 80.88 | Production and sale of cement |
| Qingzhou China United Cement Company Limited | RMB200,000,000 | — | — | 100.00 | 100.00 | Production and sale of cement |
| Taishan China United Cement Company Limited | RMB270,000,000 | — | — | 95.68 | 95.68 | Production and sale of cement |
| Qufu China United Cement Company Limited | RMB130,000,000 | — | — | 90.00 | 90.00 | Production and sale of cement |
| Linyi China United Cement Company Limited | RMB165,200,000 | — | — | 100.00 | 100.00 | Production and sale of cement |
| Zaozhuang China United Cement Company Limited | RMB175,000,000 | — | — | 100.00 | 100.00 | Production and sale of cement |
| Xuzhou China United Cement Company Limited | RMB346,940,000 | — | — | 100.00 | 100.00 | Production and sale of cement |
| South Cement Company Limited ("South Cement") | RMB1,000,000,000 | 80.00 | 80.00 | — | — | Production and sale of cement |

EXHIBIT B
Page 171 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 19  PARTICULARS OF PRINCIPAL SUBSIDIARIES *(CONTINUED)*

| Name of subsidiary | Nominal value of paid-in capital (Note i) | Attributable equity interest to the Company | | | | Principal activities |
|---|---|---|---|---|---|---|
| | | Direct | | Indirect | | |
| | | 2013 % | 2012 % | 2013 % | 2012 % | |
| Hangzhou South Cement Company Limited | RMB1,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Jinhua South Cement Company Limited | RMB1,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Huzhou South Cement Company Limited | RMB390,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Jiazing South Cement Company Limited | RMB1,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Jiangsu South Cement Company Limited | RMB1,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Shanghai South Cement Company Limited | RMB300,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Hunan South Cement Company Limited | RMB3,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Jiangxi South Cement Company Limited | RMB3,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| Guangxi South Cement Company Limited | RMB1,000,000,000 | — | — | 80.00 | 80.00 | Production and sale of cement |
| North Cement Company Limited ("North Cement")/(Note iv) | RMB4,000,000,000 | 70.00 | 77.78 | — | — | Production and sale of cement |
| South West Cement Company Limited ("South West Cement") (Note v) | RMB10,000,000,000 | 70.00 | 88.95 | — | — | Production and sale of cement |
| China Composites Group Corporation Limited ("China Composites") | RMB350,000,000 | 100.00 | 100.00 | — | — | Production and sale of composite materials |
| Lianyungang Zhongfu Lianzhong Composite Material Group Company Limited | RMB261,307,535 | — | — | 62.96 | 62.96 | Production and sale of composite materials |
| Changzhou China Composites Liberty Company Limited | RMB180,000,000 | — | — | 75.00 | 75.00 | Production and sale of PVC tiles |

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 19 PARTICULARS OF PRINCIPAL SUBSIDIARIES *(CONTINUED)*

| | | Attributable equity interest to the Company | | | | |
| | Nominal value of | Direct | | Indirect | | |
| Name of subsidiary | paid-in capital | 2013 | 2012 | 2013 | 2012 | Principal activities |
| | *(Note i)* | % | % | % | % | |
|---|---|---|---|---|---|---|
| China Triumph International Engineering Company Limited ("China Triumph") | RMB220,000,000 | 91.00 | 91.00 | — | — | Provision of engineering services |
| CTIEC Shenzhen Triumph Scienotech Engineering Company Limited | RMB5,000,000 | — | — | 66.43 | 66.43 | Provision of engineering services |
| CTIEC Nanjing Triumph International Engineering Company Limited *(Note iii)* | RMB100,000,000 | — | — | 46.55 | 46.55 | Provision of engineering services |
| CTIEC BengBu Triumph Scienotech Engineering Company Limited | RMB30,000,000 | — | — | 91.00 | 91.00 | Provision of engineering services |
| CNBM Investment Company Limited | RMB500,000,00 | 100.00 | 100.00 | — | — | Sale of lightweight building materials |

*Notes:*

(i)    The paid-in capital of BNBM represents the issued ordinary listed share capital and paid-in capital of the rest of the companies represents registered capital.

(ii)   BNBM is a joint stock company listed on the Shenzhen Stock Exchange.

(iii)  The entity is considered to be controlled by the Company because it is a subsidiary of another Company's subsidiary.

(iv)   On 24 January 2013, non-controlling interests of North Cement Company Limited ("North Cement") injected additional share capital of RMB400.00 million as registered share capital and RMB100.00 million as share premium. After that, the Group's effective equity interests in North Cement were diluted from 77.78% to 70.00%.

(v)    On 24 June 2013, non-controlling interests of Southwest Cement Limited ("Southwest Cement") injected additional share capital of RMB2,130 million into Southwest Cement as registered share capital. After that, the Group's effective equity interests in Southwest Cement were diluted from 88.95% to 70.00%.

(vi)   The above table lists the subsidiaries of the Group which, in the opinion of the directors, principally affected the results or assets of the Group. To give details of other subsidiaries would, in the opinion of the directors, result in particulars of excessive length.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 19   PARTICULARS OF PRINCIPAL SUBSIDIARIES *(CONTINUED)*

Summarised financial information in respect of each of the Group's sub-group that has material non-controlling interests is set out below. The summarised financial information below represents amounts before intragroup eliminations.

**(i)**   **South Cement and its subsidiaries**

|  | 2013<br>*RMB'000* | 2012<br>*RMB'000* |
|---|---|---|
| Current assets | 27,405,020 | 28,800,606 |
| Non-current assets | 62,786,962 | 53,830,442 |
| Current liabilities | (53,507,764) | (51,145,239) |
| Non-current liabilities | (17,410,520) | (14,079,428) |
| Non-controlling interests | (4,604,635) | (749,836) |
| Equity attributable to owners of the Company | 14,669,063 | 16,656,545 |
| Revenue | 45,033,608 | 30,676,178 |
| Expenses | (42,541,365) | (28,302,702) |
| Profit for the year | 2,492,243 | 2,373,476 |
| | | |
| Profit attributable to owners of the Company | 1,848,735 | 1,811,954 |
| Profit attributable to the non-controlling interests | 643,508 | 561,522 |
| | | |
| Profit for the year | 2,492,243 | 2,373,476 |
| | | |
| Other comprehensive income attributable to owners<br>   of the Company | — | — |
| Other comprehensive income attributable to the<br>   non-controlling interests | — | — |
| | | |
| Other comprehensive income for the year | — | — |
| | | |
| Total comprehensive income for the year | 2,492,243 | 2,373,476 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 19   PARTICULARS OF PRINCIPAL SUBSIDIARIES *(CONTINUED)*

Summarised financial information in respect of each of the Group's sub-group that has material non-controlling interests is set out below. The summarised financial information below represents amounts before intragroup eliminations. *(continued)*

**(i)    South Cement and its subsidiaries** *(continued)*

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| Total comprehensive income attributable to owners of the Company | **1,848,735** | 1,811,954 |
| Total comprehensive income attributable to the non-controlling interests | **643,508** | 561,522 |
| Total comprehensive income for the year | **2,492,243** | 2,373,476 |
| Dividends paid to non-controlling interests | **166,507** | 514,767 |
| Net cash inflow from operating activities | **5,108,348** | 2,653,034 |
| Net cash outflow from investing activities | **(6,007,547)** | (9,411,278) |
| Net cash inflow from financing activities | **694,908** | 5,442,053 |
| Net cash outflow | **(204,291)** | (1,316,191) |

**(ii)    Southwest Cement and its subsidiaries**

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| Current assets | **12,818,622** | 11,345,008 |
| Non-current assets | **55,794,399** | 41,502,729 |
| Current liabilities | **(37,064,436)** | (36,149,975) |
| Non-current liabilities | **(19,525,967)** | (8,115,207) |
| Non-controlling interests | **(3,768,293)** | (328,610) |
| Equity attributable to owners of the Company | **8,254,325** | 8,253,945 |
| Revenue | **19,923,022** | 9,763,757 |
| Expenses | **(18,182,014)** | (9,080,015) |
| Profit for the year | **1,741,008** | 683,742 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 19   PARTICULARS OF PRINCIPAL SUBSIDIARIES *(CONTINUED)*

Summarised financial information in respect of each of the Group's sub-group that has material non-controlling interests is set out below. The summarised financial information below represents amounts before intragroup eliminations. *(continued)*

**(ii)**   **Southwest Cement and its subsidiaries** *(continued)*

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| Profit attributable to owners of the Company | **1,340,598** | 627,212 |
| Profit attributable to the non-controlling interests | **400,410** | 56,530 |
| Profit for the year | **1,741,008** | 683,742 |
| Other comprehensive income attributable to owners of the Company | **—** | — |
| Other comprehensive income attributable to the non-controlling interests | **—** | — |
| Other comprehensive income for the year | **—** | — |
| Total comprehensive income attributable to owners of the Company | **1,340,598** | 627,212 |
| Total comprehensive income attributable to the non-controlling interests | **400,410** | 56,530 |
| Total comprehensive income for the year | **1,741,008** | 683,742 |
| Dividends paid to non-controlling interests | **43,077** | — |
| Net cash inflow from operating activities | **2,838,756** | 676,100 |
| Net cash outflow from investing activities | **(9,535,615)** | (14,679,343) |
| Net cash inflow from financing activities | **6,903,691** | 14,405,357 |
| Net cash inflow | **206,832** | 402,114 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 20 INTERESTS IN ASSOCIATES

|  | 2013<br>*RMB'000* | 2012<br>*RMB'000* |
|---|---|---|
| Cost of investments in associates |  |  |
| — listed in the PRC | 1,761,361 | 666,838 |
| — unlisted | 3,941,361 | 3,835,379 |
| Share of post-acquisition profit, net of dividend received | 2,048,401 | 1,847,950 |
|  | 7,751,123 | 6,350,167 |
| Fair value of listed investments | 3,731,334 | 3,577,031 |
| Share of profit of associates | 630,536 | 458,642 |

As at 31 December 2013, the cost of investments in associates included goodwill of associates of approximately RMB1,033.97 million (2012: approximately RMB1,027.63 million).

Accounting policies of associates have been changed where necessary to ensure consistency with the policies adopted by the Group.

Set out below are the associates of the Group as at 31 December 2013, which in the opinion of the directors are material to the Group. The associates as listed below have share capital consisting solely of ordinary shares, which are held directly by the Group:

| Name of associate | Nominal value of<br>registered capital | Attributable direct equity<br>interest to the Group | | Principal activities |
|---|---|---|---|---|
|  |  | 2013<br>% | 2012<br>% |  |
| China Fiberglass Co., Ltd ("China Fiberglass") *(Note i)* | RMB872,629,500 | 32.79 | 32.79 | Production of glass fiber |
| Shangdong Quan Xing China United Cement<br>Company Limited ("Shangdong Quan Xing") | RMB2,000,000,000 | 49.00 | 49.00 | Sales and production<br>of cement |
| Gansu Shangfeng Cement Company Limited<br>("Gansu Shangfeng") *(Note ii)* | RMB813,619,871 | 21.77 | — | Sales and production<br>of cement |
| Mudanjiang North Cement Company<br>("Mudanjiang North") | RMB180,000,000 | 49.00 | 49.00 | Sales and production<br>of cement |
| Nanfang Wannianqing Cement Company Limited<br>("Nanfang Wannianqing") *(Note iii)* | RMB1,000,000,000 | 50.00 | 50.00 | Production<br>of cement |

*Notes:*

(i)   China Fiberglass is a joint stock company listed on the Shanghai Stock Exchange.

(ii)   Gansu Shangfeng is a joint stock company listed on the Shenzhen Stock Exchange.

(iii)   Nanfang Wannianqging was considered as an associate of the Group because South Cement can only nominate 2 out of 5 directors of the Board of Directors. Therefore, the Group only have significant influence but not control in Nanfang Wannianqing.

All of the above associates are accounted for using the equity method in the consolidated financial statement.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 20   INTERESTS IN ASSOCIATES *(CONTINUED)*

(a)   Summarised financial information in respect of each of the Group's material associates is set out below. The summarised financial information below represents amounts shown in the associate's financial statements prepared in accordance with IFRSs adjusted by the Group for equity accounting purposes.

**China Fiberglass**

|  | **2013**<br>**RMB'000** | 2012<br>RMB'000 |
|---|---:|---:|
| Current assets | **6,432,543** | 6,305,321 |
| Non-current assets | **12,798,032** | 12,207,151 |
| Current liabilities | **(9,297,903)** | (9,160,071) |
| Non-current liabilities | **(6,143,822)** | (5,539,511) |
| Non-controlling interests | **(83,413)** | (175,063) |
| Revenue | **5,209,641** | 5,103,082 |
| Profit for the year | **333,616** | 283,577 |
| Other comprehensive (loss)/income for the year | **(168,341)** | 16,734 |
| Total comprehensive income for the year | **165,275** | 300,311 |
| Dividends received from the associate during the year | **27,650** | 26,321 |

Reconciliation of the above summarised financial information to the carrying amount of the interest in China Fiberglass recognised in the consolidated financial statements:

|  | **2013**<br>**RMB'000** | 2012<br>RMB'000 |
|---|---:|---:|
| Net assets of the associates | **3,705,437** | 3,637,827 |
| Proportion of the Group's ownership interest in<br>   China Fiberglass | **32.79%** | 32.79% |
| Goodwill | **18,693** | 18,693 |
| Carrying amount of the Group's interest in<br>   China Fiberglass | **1,233,706** | 1,211,536 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 20  INTERESTS IN ASSOCIATES *(CONTINUED)*

(b)  Summarised financial information in respect of each of the Group's material associates is set out below. The summarised financial information below represents amounts shown in the associate's financial statements prepared in accordance with IFRSs adjusted by the Group for equity accounting purposes.

**Shangdong Quan Xing**

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Current assets | 1,371,059 | 199,958 |
| Non-current assets | 3,114,366 | 16 |
| Current liabilities | (1,368,052) | — |
| Non-current liabilities | (950,000) | — |
| Revenue | 880,660 | — |
| Profit for the year | 167,399 | — |
| Total comprehensive income for the year | 167,399 | — |

Reconciliation of the above summarised financial information to the carrying amount of the interest in Shangdong Quan Xing recognised in the consolidated financial statements:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Net assets of the associates | 2,167,373 | 199,974 |
| Proportion of the Group's ownership interest in Shangdong Quan Xing | 49% | 49% |
| Carrying amount of the Group's interest in Shangdong Quan Xing | 1,062,013 | 97,987 |

EXHIBIT B
Page 179 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 20   INTERESTS IN ASSOCIATES *(CONTINUED)*

(c)   Summarised financial information in respect of each of the Group's material associates is set out below. The summarised financial information below represents amounts shown in the associate's financial statements prepared in accordance with IFRSs adjusted by the Group for equity accounting purposes.

**Gansu Shangfeng**

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| Current assets | **996,278** | — |
| Non-current assets | **2,272,507** | — |
| Current liabilities | **(1,416,762)** | — |
| Non-current liabilities | **(377,225)** | — |
| Non-controlling interests | **(11,984)** | — |
| Revenue | **2,553,716** | — |
| Profit for the year | **264,493** | — |
| Total comprehensive income for the year | **264,493** | — |

Reconciliation of the above summarised financial information to the carrying amount of the interest in Gansu Shangfeng recognised in the consolidated financial statements:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| Net assets of the associates | **1,462,814** | — |
| Proportion of the Group's ownership interest in<br>   Gansu Shangfeng | **21.77%** | — |
| Goodwill | **846,299** | — |
| Carrying amount of the Group's interest in<br>   Gansu Shangfeng | **1,164,754** | — |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 20  INTERESTS IN ASSOCIATES *(CONTINUED)*

(d)  Summarised financial information in respect of each of the Group's material associates is set out below. The summarised financial information below represents amounts shown in the associate's financial statements prepared in accordance with IFRSs adjusted by the Group for equity accounting purposes.

**Mudanjiang North**

|  | **2013**<br>***RMB'000*** | 2012<br>*RMB'000* |
|---|---|---|
| Current assets | **2,619,879** | 1,718,213 |
| Non-current assets | **3,137,872** | 2,794,062 |
| Current liabilities | **(4,632,443)** | (3,567,016) |
| Non-current liabilities | **(84,061)** | (95,948) |
| Non-controlling interests | **(86,300)** | (83,229) |
| Revenue | **2,050,746** | 1,716,933 |
| Profit for the year | **214,706** | 346,430 |
| Total comprehensive income for the year | **214,706** | 346,430 |

Reconciliation of the above summarised financial information to the carrying amount of the interest in Mudanjiang North recognised in the consolidated financial statements:

|  | **2013**<br>***RMB'000*** | 2012<br>*RMB'000* |
|---|---|---|
| Net assets of the associates | **954,947** | 766,082 |
| Proportion of the Group's ownership interest in<br>   Mudanjiang North | **49%** | 49% |
| Goodwill | **4,038** | 4,038 |
| Carrying amount of the Group's interest in<br>   Mudanjiang North | **471,962** | 379,418 |

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 20   INTERESTS IN ASSOCIATES *(CONTINUED)*

(e)   Summarised financial information in respect of each of the Group's material associates is set out below. The summarised financial information below represents amounts shown in the associate's financial statements prepared in accordance with IFRSs adjusted by the Group for equity accounting purposes.

**Nanfang Wannianqing**

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| Current assets | **1,510,998** | 1,371,233 |
| Non-current assets | **3,040,656** | 2,926,825 |
| Current liabilities | **(1,812,665)** | (1,957,421) |
| Non-current liabilities | **(270,588)** | (326,023) |
| Non-controlling interests | **(605,711)** | (505,077) |
| Revenue | **3,847,088** | 2,963,298 |
| Profit for the year | **487,150** | 180,973 |
| Total comprehensive income for the year | **487,150** | 180,973 |

Reconciliation of the above summarised financial information to the carrying amount of the interest in Nanfang Wannianqing recognised in the consolidated financial statements:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| Net assets of the associates | **1,862,690** | 1,509,537 |
| Proportion of the Group's ownership interest in Nanfang Wannianqing | **50%** | 50% |
| Carrying amount of the Group's interest in Nanfang Wannianqing | **931,345** | 754,769 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 20   INTERESTS IN ASSOCIATES *(CONTINUED)*

(f)   Aggregate information of associates that are not individually material

| | 2013<br>*RMB'000* | 2012<br>*RMB'000* |
|---|---:|---:|
| The Group's share of profit from continuing operations | 183,048 | 156,043 |
| The Group's share of other comprehensive<br>   income/(expenses) | 4,872 | (6,321) |
| The Group's share of total comprehensive income | 187,920 | 149,722 |
| Aggregate carrying amount of the Group's interests<br>   in these associates | 2,887,344 | 3,906,457 |

## 21   AVAILABLE-FOR-SALE FINANCIAL ASSETS

| | 2013<br>*RMB'000* | 2012<br>*RMB'000* |
|---|---:|---:|
| Available-for-sale financial assets | | |
| — Unlisted equity shares, at cost *(Note)* | 294,449 | 344,238 |
| — Listed equity shares listed in Hong Kong | 918,871 | — |
| — Listed equity shares listed outside Hong Kong | 174,829 | 231,099 |
| | 1,388,149 | 575,337 |

*Note:*   The available-for-sale financial assets are accounted for at cost less accumulated impairment losses as such investments do not have a quoted market price in an active market and the range of reasonable fair value estimated is so significant that the directors are of the opinion that their fair values cannot be reliably measured.

## 22   HELD-FOR-TRADING INVESTMENTS

| | 2013<br>*RMB'000* | 2012<br>*RMB'000* |
|---|---:|---:|
| Held-for-trading investments at market value: | | |
| — Quoted investment funds listed outside Hong Kong | 697 | 663 |
| — Quoted listed equity shares listed outside Hong Kong | 189,200 | 247,000 |
| | 189,897 | 247,663 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 23   DEPOSITS

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Investment deposits for acquisition of subsidiaries | 1,655,065 | 4,493,080 |
| Deposits paid to acquire property, plant and equipment | 4,035,339 | 1,363,109 |
| Deposits paid to acquire intangible assets | 1,923,124 | 2,214,791 |
| Deposits paid in respect of prepaid lease payments | 683,536 | 338,689 |
|  | 8,297,064 | 8,409,669 |

*Note:*   The carrying amounts of the deposits approximate to their fair values.

## 24   INVENTORIES

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Raw materials | 9,383,308 | 7,537,816 |
| Work-in-progress | 1,766,250 | 1,614,260 |
| Finished goods | 3,298,892 | 2,869,939 |
| Consumables | 272,554 | 200,206 |
|  | 14,721,004 | 12,222,221 |

## 25   TRADE AND OTHER RECEIVABLES

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Trade receivables, net of allowance for bad and doubtful debts *(Note (b))* | 23,256,628 | 20,116,046 |
| Bills receivable *(Note (c))* | 6,111,533 | 6,134,407 |
| Amounts due from customers for contract work *(Note 27)* | 1,417,922 | 379,937 |
| Prepaid lease payments *(Note 15)* | 327,077 | 247,370 |
| Other receivables, deposits and prepayments | 21,098,029 | 18,733,441 |
|  | 52,211,189 | 45,611,201 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 25   TRADE AND OTHER RECEIVABLES *(CONTINUED)*

*Notes:*

(a)   The carrying amounts of the trade and other receivables approximate to their fair values.

(b)   The Group normally allowed an average of credit period of 60-180 days to its trade customers. Ageing analysis of trade receivables is as follows:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| Within two months | **9,157,388** | 8,178,120 |
| More than two months but within one year | **10,190,442** | 9,361,932 |
| Between one and two years | **3,367,852** | 2,226,311 |
| Between two and three years | **400,834** | 203,189 |
| Over three years | **140,112** | 146,494 |
| | **23,256,628** | 20,116,046 |

(c)   The bills receivable is aged within six months.

(d)   Included in the trade receivables are debtors with a carrying amount of approximately RMB5,284.76 million (2012: approximately RMB11,937.92 million) which are over the credit period at the reporting date for which the Group has already provided allowance for bad and doubtful debts in accordance with the Group's policy and no further impairment loss was made. According to specific analysis, the Group believes the amounts are still considered recoverable. The Group does not hold any collateral over these balances.

As at 31 December 2013, the retention receivables of approximately RMB355.28 million (2012: approximately RMB27.68 million) and receivables within contractual payment term of approximately RMB294.30 million (2012: approximately RMB15.36 million) with ageing over one year are not past due.

Ageing of trade receivables which are past due but not impaired:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| More than two months but within one year | **2,031,127** | 9,361,932 |
| Between one and two years | **2,755,947** | 2,226,311 |
| Between two and three years | **368,549** | 203,189 |
| Over three years | **129,137** | 146,494 |
| | **5,284,760** | 11,937,926 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 25   TRADE AND OTHER RECEIVABLES *(CONTINUED)*

*Notes: (continued)*

(e)     Movement in the allowance for bad and doubtful debts:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| As at 1 January | **1,461,757** | 744,747 |
| Additions from acquisition of subsidiaries | **113,357** | 651,282 |
| Allowances for bad and doubtful debts | **253,550** | 65,728 |
| As at 31 December | **1,828,664** | 1,461,757 |

(f)     Carrying amounts of trade and other receivables were denominated in the following currencies:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---|---|
| RMB | **51,158,848** | 45,149,458 |
| EUR | **68,301** | 133,850 |
| PGK | **38,968** | 22,423 |
| USD | **695,508** | 235,525 |
| SAR | **—** | 9,009 |
| VND | **—** | 26,733 |
| KZT | **7,431** | 5,269 |
| AUD | **15,585** | — |
| HKD | **—** | 19,833 |
| THB | **163,700** | — |
| Others | **62,848** | 9,101 |
|  | **52,211,189** | 45,611,201 |

In determining the recoverability of trade receivables, the Group considers any change in the credit quality of the trade receivables from the date credit was initially granted to the report date.

(g)     As at 31 December 2013, approximately RMB686.72 million (2012: approximately RMB1,365.46 million) of the trade receivables and approximately RMB1,593.61 million (2012: approximately RMB2,285.19 million) of bill receivables have pledged to secure bank loans granted to the Group.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 26  AMOUNTS DUE FROM/(TO) RELATED PARTIES

|  | 2013 | 2012 |
|---|---|---|
|  | **RMB'000** | *RMB'000* |
| **Amounts due from related parties** | | |
| Trading in nature: | | |
| Fellow subsidiaries | **2,457,584** | 2,234,179 |
| Associates | **604,344** | 42,139 |
| Immediate holding company | **—** | 30 |
| Non-controlling interests of subsidiaries | **308,945** | 440,815 |
| | **3,370,873** | 2,717,163 |
| Non-trading in nature: | | |
| Fellow subsidiaries | **565,734** | 537,822 |
| Associates | **3,899,408** | 2,448,019 |
| Immediate holding company | **46** | 46 |
| Non-controlling interests of subsidiaries | **423,177** | 121,356 |
| | **4,888,365** | 3,107,243 |
| | **8,259,238** | 5,824,406 |
| **Amounts due to related parties** | | |
| Trading in nature: | | |
| Fellow subsidiaries | **292,612** | 226,485 |
| Associates | **146,598** | 230,246 |
| Immediate holding company | **—** | — |
| Non-controlling interests of subsidiaries | **143,499** | 95,078 |
| | **582,709** | 551,809 |
| Non-trading in nature: | | |
| Fellow subsidiaries | **54,630** | 62,478 |
| Associates | **22,863** | 20,029 |
| Immediate holding company | **308,337** | 3,218 |
| Non-controlling interests of subsidiaries | **1,554,172** | 1,386,433 |
| | **1,940,002** | 1,472,158 |
| | **2,522,711** | 2,023,967 |

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 26 AMOUNTS DUE FROM/(TO) RELATED PARTIES *(CONTINUED)*

The carrying amounts of amounts due from and to related parties approximate to their fair values. All amounts are unsecured and repayable on demand. The trading nature portion of amounts due from and to related parties is aged within one year.

As at 31 December 2013, amounts due from related parties of approximately RMB3,832.55 million (2012: approximately RMB106.71 million) carry the fixed interest rate of 6.00% (2012: 6.00%) per annum. The remaining balances of amounts due from related parties are interest- free.

As at 31 December 2013, amounts due to related parties of approximately RMB403.26 million (2012: approximately RMB125.00 million) carry the fixed interest rate of 6.00% (2012: 6.74%) per annum and no amounts due to related parties carry the variable interest rate loan (2012: approximately 460.11 million carry the variable interest stipulated by the bank for the corresponding period at rate of 6.86% per annum). The remaining balances of amounts due to related parties are interest-free.

## 27 AMOUNTS DUE FROM/(TO) CUSTOMERS FOR CONTRACT WORK

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Contracts in progress at reporting date analysed for reporting purposes as: | | |
| Contract costs incurred plus recognised profits less recognised losses to date | 3,637,102 | 5,572,200 |
| Less: progress billings | (2,245,242) | (5,341,671) |
| | **1,391,860** | 230,529 |
| Amounts due from contract customers included in trade and other receivables *(Note 25)* | 1,417,922 | 379,937 |
| Amounts due to contract customers included in trade and other payables *(Note 29)* | (26,062) | (149,408) |
| | **1,391,860** | 230,529 |

As at 31 December 2013, advances received from customers for contract work amounted to approximately RMB26.06 million (2012: approximately RMB149.41 million) are included in trade and other payables. The retention receivables included in trade and other receivables, net of allowance for bad and doubtful debts, as set out in Note 25, amounted to approximately RMB355.28 million (2012: approximately RMB27.68 million).

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 28    CASH AND CASH EQUIVALENTS/PLEDGED BANK DEPOSITS

Cash and cash equivalents/pledged bank deposits denominated in non-functional currencies of the relevant Group entities are as follows:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| USD | **221,840** | 48,273 |
| EUR | **75,544** | 45,140 |
| PGK | **118,023** | 108,088 |
| SAR | **2,176** | 188 |
| HKD | **10,433** | 3,173 |
| VND | **1,669** | 1,669 |
| KZT | **9,036** | 4,490 |
| AUD | **4,043** | 503 |
| Others | **374** | 738 |
|  | **443,138** | 212,262 |

As at 31 December 2013, the Group pledged approximately RMB2,895.51 million (2012: approximately RMB3,383.27 million), which is denominated in RMB, to bankers of the Group to secure the bank borrowings due within one year and the short-term banking facilities granted to the Group. The pledged bank deposits will be released upon the settlement of relevant bank borrowings.

Bank balances and pledged bank deposits carry interest at market rates which range from 0.35% to 2.80% (2012: range from 0.36% to 2.75% ) per annum.

## 29    TRADE AND OTHER PAYABLES

Ageing analysis of trade and other payables is as follows:

|  | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| Within two months | **9,019,625** | 7,865,398 |
| More than two months but within one year | **7,616,287** | 7,032,522 |
| Between one and two years | **2,040,332** | 1,825,741 |
| Between two and three years | **450,458** | 339,739 |
| Over three years | **300,173** | 276,431 |
| Trade payables | **19,426,875** | 17,339,831 |
| Bills payable | **5,934,386** | 5,816,210 |
| Amounts due to customers for contract work *(Note 27)* | **26,062** | 149,408 |
| Other payables | **22,939,742** | 23,945,159 |
|  | **48,327,065** | 47,250,608 |

The carrying amount of trade and other payables approximate to their fair values. Bills payable is aged within six months.

EXHIBIT B
Page 189 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 30   BORROWINGS

|  | 2013<br>RMB'000 | 2012<br>RMB'000 |
|---|---|---|
| Bank borrowings |  |  |
| — Secured | 6,497,988 | 8,924,516 |
| — Unsecured | 117,510,260 | 99,244,221 |
|  | 124,008,248 | 108,168,737 |
| Bonds *(Note)* | 46,200,000 | 34,100,000 |
| Other borrowings from non-financial institutions | — | 347,780 |
|  | 170,208,248 | 142,616,517 |
| Analysed for reporting purposes: |  |  |
| — Non-current | 56,866,432 | 51,864,572 |
| — Current | 113,341,816 | 90,751,945 |
|  | 170,208,248 | 142,616,517 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 30   BORROWINGS *(CONTINUED)*

*Note:*

As at 31 December 2013, the following bonds/notes are still outstanding:

| Issuer | Name | Issue Amount RMB '000 | Issue Date | Period | Coupon rate (%) |
|---|---|---|---|---|---|
| CNBM | 2007 CNBM Domestic Corporate Bonds | 1,000,000 | 09-Apr-07 | 10 years | 4.32% |
| CNBM | 2011 CNBM 1st tranche Medium-term Notes | 3,000,000 | 10-Oct-11 | 3 years | 6.06% |
| CNBM | 2011 CNBM 2nd tranche Medium-term Notes | 5,000,000 | 05-Dec-11 | 3 years | 5.06% |
| CNBM | 2012 CNBM 1st tranche Medium-term Notes | 2,000,000 | 16-Mar-12 | 3 years | 4.72% |
| South Cement | Private bills | 2,000,000 | 30-Jul-12 | 3 years | 5.30% |
| CNBM | 2012 CNBM 2nd tranche Medium-term Notes | 4,000,000 | 15-Aug-12 | 5 years | 4.59% |
| South Cement | 2013 1st tranche Short-term Debentures | 1,500,000 | 17-Jan-13 | 1 year | 4.66% |
| North Cement | 2013 1st tranche Short-term Debentures | 1,200,000 | 12-Mar-13 | 1 year | 4.47% |
| China United | 2013 1st tranche Short-term Debentures | 1,000,000 | 22-Apr-13 | 1 year | 4.23% |
| China Triumph | 2013 1st tranche Short-term Debentures | 900,000 | 23-Apr-13 | 1 year | 4.50% |
| China United | 2013 2nd tranche Short-term Debentures | 1,000,000 | 02-May-13 | 1 year | 4.30% |
| South Cement | 2013 2nd tranche Short-term Debentures | 1,500,000 | 02-May-13 | 1 year | 4.30% |
| CNBM | 2013 3rd tranche Super Short-term Commercial Paper | 3,500,000 | 24-May-13 | 270 days | 3.88% |
| China Composites | 2013 1st tranche Short-term Debentures | 500,000 | 04-Jun-13 | 1 year | 4.47% |
| CNBM | 2013 5th tranche Super Short-term Commercial Paper | 4,000,000 | 08-Aug-13 | 270 days | 4.65% |
| CNBM | 2013 6th tranche Super Short-term Commercial Paper | 2,000,000 | 21-Aug-13 | 270 days | 4.80% |
| CNBM | 2013 7th tranche Super Short-term Commercial Paper | 4,000,000 | 08-Oct-13 | 180 days | 5.30% |
| South Cement | 2013 3rd tranche Short-term Debentures | 1,500,000 | 15-Oct-13 | 1 year | 5.60% |
| CNBM | 2013 8th tranche Super Short-term Commercial Paper | 2,500,000 | 16-Oct-13 | 270 days | 5.40% |
| South Cement | 2013 Medium-term debentures | 100,000 | 06-Nov-13 | 3 years | 6.15% |
| China United | Private bonds | 500,000 | 18-Nov-13 | 1 year | 6.30% |
| CNBM | 2013 9th tranche Super Short-term Commercial Paper | 3,500,000 | 21-Nov-13 | 270 days | 5.90% |
| Total | | 46,200,000 | | | |

EXHIBIT B
Page 191 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 30   BORROWINGS *(CONTINUED)*

The exposure of the fixed rate and variable rate bank borrowings and the contractual maturity dates are as follows:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Fixed rate bank borrowings repayable: |  |  |
| Within one year | 31,070,464 | 44,464,467 |
| Between one and two years | 3,022,945 | 5,594,119 |
| Between two and three years | 4,283,300 | 5,444,647 |
| Between three and four years | 634,400 | 897,020 |
| Between four and five years | 458,900 | 523,865 |
| More than five years | 146,534 | 287,540 |
|  | 39,616,543 | 57,211,658 |
| Variable rate bank borrowings repayable: |  |  |
| Within one year | 45,161,352 | 29,187,478 |
| Between one and two years | 16,698,296 | 5,770,865 |
| Between two and three years | 14,166,917 | 10,904,670 |
| Between three and four years | 4,471,885 | 1,590,761 |
| Between four and five years | 3,591,830 | 2,155,326 |
| More than five years | 301,425 | 1,347,979 |
|  | 84,391,705 | 50,957,079 |

|  | 2013 | 2012 |
|---|---|---|
| Effective interest rate per annum |  |  |
| Fixed rate borrowings | 3.12% to 7.8% | 2.96% to 7.87% |
| Variable rate borrowings | 2% to 8% | 2% to 8% |

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 30    BORROWINGS *(CONTINUED)*

The carrying amount of borrowings approximate to their fair value. In 2012, other borrowings are unsecured, interest-bearing at 6% per annum and repayable within 1 year.

As at 31 December 2013, bank borrowings of approximately RMB1,656.95 million (2012: approximately RMB965.23 million) were guaranteed by independent third parties.

The borrowings denominated in AUD, EUR and USD of approximately RMB10.32 million, RMB60.79 million and RMB483.92 million respectively (2012: approximately RMB9.24 million, RMB11.85 million and RMB235.71 million respectively), the remaining balance was denominated in RMB.

The bank borrowings of approximately RMB6,497.99 million (2012: approximately RMB8,924.52 million) are secured by the following assets of the Group:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Property, plant and equipment *(Note 14)* | 10,694,647 | 6,415,856 |
| Prepaid lease payments *(Note 15)* | 1,071,633 | 1,537,301 |
| Investment properties *(Note 16)* | 230,326 | 165,000 |
| Mining rights *(Note 18)* | 36,563 | 22,176 |
| Cash and cash equivalents *(Note 28)* | 2,895,511 | 3,383,274 |
| Trade receivables *(Note 25)* | 686,724 | 1,365,460 |
| Bills receivable *(Note 25)* | 1,593,613 | 2,285,190 |
|  | 17,209,017 | 15,174,257 |

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 31 DEFERRED INCOME TAX

The following are the major deferred income tax assets/(liabilities) recognised and movements thereon during the current and prior years:

| | Fair value adjustments on available-for-sale investment RMB'000 | Fair value adjustments on properties RMB'000 | Fair value adjustments on intangible assets RMB'000 | Fair value adjustments on prepaid lease payments RMB'000 | Loss on partial disposal of subsidiaries and associates RMB'000 | Write down of inventories and trade and other receivables RMB'000 | Impairment for properties RMB'000 | Tax losses RMB'000 | Financial guarantee contracts RMB'000 | Others RMB'000 | Total RMB'000 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| As at 1 January 2012 | 13,308 | (594,719) | (442,219) | (366,975) | 19,227 | 174,432 | 556,673 | 152,432 | 16,395 | (47,946) | (519,392) |
| Arising from acquisition of subsidiaries *(Note 36)* | — | (292,769) | (297,395) | — | — | 20,157 | 223,725 | 7,504 | — | 4,902 | (333,876) |
| Credit/(charge) to the consolidated income statement *(Note 11(a))* | (18,864) | 182,704 | (288,251) | — | (19,227) | 47,399 | 60,075 | 397,073 | 483 | 268,948 | 630,340 |
| Credit to the consolidated other comprehensive income *(Note 11(b))* | 2,005 | — | — | — | — | — | — | — | — | — | 2,005 |
| As at 31 December 2012 and 1 January 2013 | (3,551) | (704,784) | (1,027,865) | (366,975) | — | 241,988 | 840,473 | 557,009 | 16,878 | 225,904 | (220,923) |
| Arising from acquisition of subsidiaries *(Note 36)* | (59,945) | (214,033) | (139,318) | 8,991 | — | 23,023 | 103,093 | (3,046) | — | 27,392 | (253,843) |
| Credit/(charge) to the consolidated income statement *(Note 11(a))* | 14,575 | 92,432 | 15,420 | 4,683 | — | 48,282 | (11,671) | 752,713 | (675) | (18,671) | 897,088 |
| Charge to the consolidated other comprehensive income *(Note 11(b))* | (69,298) | — | — | — | — | — | — | — | — | — | (69,298) |
| As at 31 December 2013 | (118,219) | (826,385) | (1,151,763) | (353,301) | — | 313,293 | 931,895 | 1,306,676 | 16,203 | 234,625 | 353,024 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 31   DEFERRED INCOME TAX *(CONTINUED)*

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| For presentation purpose: |  |  |
| Deferred income tax assets | 2,710,241 | 1,764,154 |
| Deferred income tax liabilities | (2,357,217) | (1,985,077) |
|  | 353,024 | (220,923) |

The Group has unused tax losses were not recognised as deferred income tax assets due to the unpredictability of future profits streams. The unused tax losses can be carried forward for five years from the year of the incurrence and an analysis of their expiry dates are as follows:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Unused tax losses expiring in: |  |  |
| 2013 | — | 71,514 |
| 2014 | 210,157 | 214,585 |
| 2015 | 282,118 | 145,739 |
| 2016 | 934,914 | 777,615 |
| 2017 | 1,539,443 | 1,093,538 |
| 2018 | 1,374,261 | — |
|  | 4,340,893 | 2,302,991 |

EXHIBIT B
Page 195 of 218

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 32   OBLIGATIONS UNDER FINANCE LEASES

As at 31 December 2013, certain fixtures and equipment are under finance leases. The average lease term is 2 to 5 years (2012: 2 to 5 years). Interest rates underlying all obligations under finance leases are fixed at respective contract dates at range of 5.84% to 7.44% (2012: 4.32% to 7.25%). These leases have no terms of renewal or purchase options and escalation clauses. No arrangements have been entered into for contingent rental payment.

| | Minimum lease payments | | Present value of minimum lease payments | |
| --- | --- | --- | --- | --- |
| | **2013**<br>**RMB'000** | 2012<br>*RMB'000* | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
| Amounts payable under finance leases: | | | | |
| Within one year | **2,791,361** | 1,784,692 | **2,678,785** | 1,749,899 |
| In more than one year but not more than two years | **2,455,209** | 1,730,281 | **2,052,416** | 1,631,884 |
| In more than two years but not more than five years | **7,277,918** | 2,153,831 | **5,928,385** | 1,883,076 |
| | **12,524,488** | 5,668,804 | **10,659,586** | 5,264,859 |
| Less: future finance charge | **(1,707,721)** | (403,945) | **N/A** | N/A |
| Present value of lease obligations | **10,816,767** | 5,264,859 | **10,659,586** | 5,264,859 |
| Less: Amount due for settlement within 12 months (shown under current liabilities) | | | **(2,678,785)** | (1,749,899) |
| | | | **7,980,801** | 3,514,960 |

The Group's obligations under finance leases are secured by the lessors' charge over the leased assets.

## 33   FINANCIAL GUARANTEE CONTRACTS

| | **2013**<br>**RMB'000** | 2012<br>*RMB'000* |
| --- | --- | --- |
| As at 1 January | **60,150** | 64,158 |
| Financial guarantee recognised | **(2,706)** | — |
| Less: Amount released to the consolidated income statement *(Note 7)* | **—** | (4,008) |
| As at 31 December | **57,444** | 60,150 |

Subsidiaries had guaranteed bank borrowings of former related parties which are independent to the Group, which arising on the acquisition of subsidiaries of approximately RMB85 million (2012: approximately RMB355 million) for independent third parties. The fair value of the guarantees granted amounting to approximately RMB57 million (2012: approximately RMB60 million) is recognised as a liability.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 34 SHARE CAPITAL

| | Domestic Shares *(Note (a))* | | H Shares *(Note (b))* | | |
| | Number of shares | Amount RMB'000 | Number of shares | Amount RMB'000 | Total capital RMB'000 |
|---|---|---|---|---|---|
| Registered and paid up shares of RMB1.0 each | | | | | |
| As at 1 January 2012, 31 December 2012, 1 January 2013 and 31 December 2013 | 2,519,854,366 | 2,519,854 | 2,879,171,896 | 2,879,172 | 5,399,026 |

*Notes:*

(a)   Domestic shares are ordinary shares subscribed for and credited as fully paid up in RMB by PRC government and/or PRC incorporated entities only.

(b)   H shares are ordinary shares subscribed for and credited as fully paid up in RMB by persons other than PRC government and/or PRC incorporated entities only.

Other than the specific requirements on the holders of the shares as set out in Notes (a) and (b), the shares mentioned above rank pari passu in all respects with each other.

## 35 RESERVES

### (a)  Statutory surplus reserve fund

According to relevant laws and regulations of the PRC, the Company and its subsidiaries established in the PRC are required to make an appropriation at the rate of 10 percent of the profit after income tax of the respective company, prepared in accordance with PRC accounting standards, to the statutory surplus reserve fund until the balance has reached 50 percent of the registered capital of the respective company. Upon approved from the authorities, the statutory surplus reserve fund can be used to offset accumulated losses or to increase share capital, when it is utilised to increase share capital, the remaining balance of the statutory surplus reserve cannot fall below 25 percent of the share capital.

### (b)  Fair value reserve

The fair value reserve comprises the cumulative net change in the fair value of available-for-sale securities held at the end of the reporting period.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS

### Acquisition of subsidiaries and assets through acquisition of subsidiaries

In the year of 2013, the Group acquired 141 subsidiaries and acquired certain assets through acquisition of subsidiaries. The acquired subsidiaries and business are principally engaged in the production, storage and sale of cement and concrete.

These acquisitions have been accounted for using the purchase method.

Summary of net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | **2013** Fair value RMB'000 | 2012 Fair value RMB'000 |
|---|---|---|
| Net assets acquired: |  |  |
| Property, plant and equipment *(Note 14)* | 16,855,764 | 30,170,407 |
| Intangible assets *(Note 18)* | 525,735 | 909,763 |
| Interests in associates | — | 92 |
| Prepaid lease payments *(Note 15)* | 1,620,719 | 3,760,889 |
| Available-for-sale financial assets | 100 | 75,923 |
| Deferred income tax assets *(Note 31)* | 150,469 | 251,279 |
| Inventories | 1,463,939 | 2,643,957 |
| Trade and other receivables | 5,386,193 | 9,707,584 |
| Amounts due from the related parties | 38,118 | 222,883 |
| Held-for-trading investments | — | 399 |
| Pledged bank deposits | 121,730 | 329,334 |
| Cash and cash equivalents | 889,284 | 1,653,349 |
| Trade and other payables | (16,013,979) | (27,904,870) |
| Current income tax liabilities | (45,716) | (154,470) |
| Dividend payable to non-controlling interests | (69,667) | (394,005) |
| Amounts due to the related parties | (270,823) | (916,492) |
| Borrowings | (3,797,570) | (6,310,324) |
| Obligations under finance leases | (188,569) | (637,651) |
| Deferred income tax liabilities *(Note 31)* | (404,312) | (585,155) |
| Net assets | 6,261,415 | 12,822,892 |
| Non-controlling interests | (248,005) | (585,816) |
| Interest transferred from available-for-sale financial assets | (13,500) | — |
| Interest transferred from associated companies | (131,113) | (123,693) |
| Discount on acquisition of interests in subsidiaries *(Note 7)* | (28,363) | (42,965) |
| Goodwill *(Note 17)* | 11,308,459 | 16,101,407 |
| Total consideration | 17,148,893 | 28,171,825 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

|  | **2013** | 2012 |
|---|---|---|
|  | **Fair value** | Fair value |
|  | **RMB'000** | RMB'000 |
| Total consideration satisfied by: |  |  |
| Cash | **4,369,875** | 15,634,360 |
| Other payables | **12,779,018** | 12,537,465 |
|  | **17,148,893** | 28,171,825 |
| Net cash outflow arising on acquisition: |  |  |
| Cash consideration paid | **(4,369,875)** | (15,634,360) |
| Less: Cash and cash equivalents acquired | **889,284** | 1,653,349 |
|  | **(3,480,591)** | (13,981,011) |

The goodwill mainly arising on the acquisition of these companies is attributable to the benefit of expected revenue growth and future market development, the PRC and the synergies in consolidating the Group's cement and concrete operations. These benefits are not recognised separately from goodwill as the future economic benefits arising from them cannot be reliably measured.

The discount on acquisition was the result of losses incurred by those subsidiaries in prior years' operations and the additional capital to be injected by the Group required to expand the production facilities in future.

Included in the revenue and profit for the year are approximately RMB11,091.10 million and RMB968.52 million respectively attributable to the additional business mainly generated by these newly acquired cement and concrete companies.

Had these business combinations been effected at 1 January 2013, the revenue of the Group would be approximately RMB12,928.48 million, and profit for the year of the Group would be approximately RMB628.28 million. The directors of the Company consider these 'pro-forma' an approximate measure of the performance of the combined group on an annualised basis and reference point for comparison in future periods.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows:

(i)   Jiangxi Ganxian South Cement Company Limited (「江西贛縣南方水泥有限公司」)

On 1 January 2013, the Group acquired 100% of the equity interests of Jiangxi Ganxian South Cement Company Limited (「江西贛縣南方水泥有限公司」) for the consideration of RMB102.37 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of cement.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013<br>Fair value<br>*RMB'000* |
|---|---:|
| Net assets acquired: |  |
| Property, plant and equipment | 164,276 |
| Intangible assets | 422 |
| Prepaid lease payments | 8,044 |
| Inventories | 22,104 |
| Trade and other receivables | 23,313 |
| Cash and cash equivalents | 39,043 |
| Trade and other payables | (165,662) |
| Borrowings | (5,000) |
| Deferred income tax liabilities | (519) |
| Net assets | 86,021 |
| Goodwill | 16,347 |
| Total consideration | 102,368 |

China National Building Material Company Limited   Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 36 BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(i)     Jiangxi Ganxian South Cement Company Limited (「江西贛縣南方水泥有限公司」) *(continued)*

|  | 2013<br>*RMB'000* |
|---|---:|
| Total consideration satisfied by: |  |
|   Cash | — |
|   Other payables | 102,368 |
|  | 102,368 |
| Net cash inflow arising on acquisition: |  |
|   Cash consideration paid | — |
|   Less: Cash and cash equivalents acquired | 39,043 |
|  | 39,043 |

Included in the revenue and profit for the year are approximately RMB198.42 million and RMB1.23 million respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(ii)   Jilin Tian Yu Cement Company Limited (「吉林省天禹水泥有限責任公司」)

On 1 July 2013, the Group acquired 85% of the equity interests of Jilin Tian Yu Cement Company Limited (「吉林省天禹水泥有限責任公司」) for the consideration of RMB54.41 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of cement.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013 Fair value RMB'000 |
|---|---|
| Net assets acquired: | |
| Property, plant and equipment | 55,391 |
| Intangible assets | 2 |
| Deferred income tax assets | 2,717 |
| Inventories | 12,266 |
| Trade and other receivables | 11,399 |
| Cash and cash equivalents | 6,811 |
| Trade and other payables | (28,375) |
| Current income tax liabilities | (9,280) |
| Net assets | 50,931 |
| Non-controlling interests | (7,848) |
| Goodwill | 11,327 |
| Total consideration | 54,410 |

|  | 2013 RMB'000 |
|---|---|
| Total consideration satisfied by: | |
| Cash | 15,000 |
| Other payables | 39,410 |
|  | 54,410 |
| Net cash outflow arising on acquisition: | |
| Cash consideration paid | (15,000) |
| Less: Cash and cash equivalents acquired | 6,811 |
|  | (8,189) |

Included in the revenue and profit for the year are approximately RMB24.96 million and RMB0.09 million respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(iii)   Guizhou Zhijin Southwest Cement Company Limited (「貴州織金西南水泥有限公司」)

On 1 January 2013, the Group acquired 100% of the equity interests of Guizhou Zhijin Southwest Cement Company Limited (「貴州織金西南水泥有限公司」) for the consideration of RMB475.79 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of cement.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013 Fair value RMB'000 |
|---|---:|
| Net assets acquired: |  |
| Property, plant and equipment | 291,065 |
| Intangible assets | 7,655 |
| Prepaid lease payments | 19,670 |
| Deferred income tax assets | 20,139 |
| Inventories | 14,005 |
| Trade and other receivables | 9,109 |
| Cash and cash equivalents | 6,328 |
| Trade and other payables | (24,836) |
| Net assets | 343,135 |
| Goodwill | 132,659 |
| Total consideration | 475,794 |

|  | 2013 RMB'000 |
|---|---:|
| Total consideration satisfied by: |  |
| Cash | 83,110 |
| Other payables | 392,684 |
|  | 475,794 |
| Net cash outflow arising on acquisition: |  |
| Cash consideration paid | (83,110) |
| Less: Cash and cash equivalents acquired | 6,328 |
|  | (76,782) |

Included in the revenue and profit for the year are approximately RMB285.89 million and RMB83.45 million respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(iv)   Yuanjiang Dongliang Cement Company Limited (「元江棟樑水泥有限責任公司」)

On 30 April 2013, the Group acquired 100% of the equity interests of Yuanjiang Dongliang Cement Company Limited (「元江棟樑水泥有限責任公司」) for the consideration of RMB133.37 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of cement.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

| | 2013<br>Fair value<br>*RMB'000* |
|---|---:|
| Net assets acquired: | |
| Property, plant and equipment | 4,080 |
| Intangible assets | 4,799 |
| Prepaid lease payments | 48,021 |
| Trade and other receivables | 55,576 |
| Cash and cash equivalents | 370 |
| Trade and other payables | (5,575) |
| Deferred income tax liabilities | (10,083) |
| Net assets | 97,188 |
| Goodwill | 36,184 |
| Total consideration | 133,372 |

| | 2013<br>*RMB'000* |
|---|---:|
| Total consideration satisfied by: | |
| Cash | 67,857 |
| Other payables | 65,515 |
| | 133,372 |
| Net cash outflow arising on acquisition: | |
| Cash consideration paid | (67,857) |
| Less: Cash and cash equivalents acquired | 370 |
| | (67,487) |

Included in the revenue and profit for the year are approximately RMB nil and RMB8,424 respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(v)   Cemex (Qingdao) Company Limited (「西麥斯（青島）有限公司」)

On 1 December 2013, the Group acquired assets through acquiring 100% of the equity interests of Cemex (Qingdao) Company Limited (「西麥斯（青島）有限公司」) for the consideration of RMB89.78 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of concrete.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013 Fair value RMB'000 |
|---|---:|
| Net assets acquired: |  |
| Property, plant and equipment | 13,646 |
| Prepaid lease payments | 7,097 |
| Deferred income tax assets | 728 |
| Inventories | 2,793 |
| Trade and other receivables | 72,673 |
| Cash and cash equivalents | 4,447 |
| Trade and other payables | (13,537) |
| Current income tax liabilities | (470) |
| Borrowings | (4,650) |
| Deferred income tax liabilities | (2,681) |
| Net assets | 80,046 |
| Goodwill | 9,732 |
| Total consideration | 89,778 |

|  | 2013 RMB'000 |
|---|---:|
| Total consideration satisfied by: |  |
| Cash | 20,440 |
| Other payables | 69,338 |
|  | 89,778 |
| Net cash outflow arising on acquisition: |  |
| Cash consideration paid | (20,440) |
| Less: Cash and cash equivalents acquired | 4,447 |
|  | (15,993) |

Included in the revenue and profit for the year are approximately RMB18.92 million and RMB1.09 million respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(vi)   Yunnan Xingjian Cement Company Limited (「雲南興建水泥有限公司」)

On 1 April 2013, the Group acquired 100% of the equity interests of Yunnan Xingjian Cement Company Limited (「雲南興建水泥有限公司」) for the consideration of RMB698.22 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of cement.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013<br>Fair value<br>RMB'000 |
|---|---|
| Net assets acquired: | |
| Property, plant and equipment | 716,280 |
| Intangible assets | 93 |
| Prepaid lease payments | 97,637 |
| Deferred income tax assets | 1,291 |
| Inventories | 71,219 |
| Trade and other receivables | 103,958 |
| Cash and cash equivalents | 13,325 |
| Trade and other payables | (127,144) |
| Current income tax liabilities | (78) |
| Borrowings | (303,990) |
| Obligations under finance leases | (35,738) |
| Deferred income tax liabilities | (70,909) |
| Net assets | 465,944 |
| Goodwill | 232,273 |
| Total consideration | 698,217 |

|  | 2013<br>RMB'000 |
|---|---|
| Total consideration satisfied by: | |
| Cash | 117,193 |
| Other payables | 581,024 |
|  | 698,217 |
| Net cash outflow arising on acquisition: | |
| Cash consideration paid | (117,193) |
| Less: Cash and cash equivalents acquired | 13,325 |
|  | (103,868) |

Included in the revenue and profit for the year are approximately RMB367.36 million and RMB64.18 million respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(vii)   DaFang Yonggui Building Materials Company Limited (「大方永貴建材有限責任公司」)

On 31 August 2013, the Group acquired 82.87% of the equity interests of DaFang Yonggui Building Materials Company Limited(「大方永貴建材有限責任公司」) for the consideration of RMB182.13 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of cement.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013<br>Fair value<br>RMB'000 |
|---|---:|
| Net assets acquired: |  |
| Property, plant and equipment | 512,799 |
| Intangible assets | 1,523 |
| Prepaid lease payments | 95,128 |
| Inventories | 24,141 |
| Trade and other receivables | 13,302 |
| Cash and cash equivalents | 15,908 |
| Trade and other payables | (60,139) |
| Current income tax liabilities | (10,958) |
| Borrowings | (349,000) |
| Deferred income tax liabilities | (17,864) |
| Net assets | 224,840 |
| Non-controlling interests | (38,515) |
| Discount on acquisition | (4,194) |
| Total consideration | 182,131 |

|  | 2013<br>RMB'000 |
|---|---:|
| Total consideration satisfied by: |  |
| Cash | 57,427 |
| Other payables | 124,704 |
|  | 182,131 |
| Net cash outflow arising on acquisition: |  |
| Cash consideration paid | (57,427) |
| Less: Cash and cash equivalents acquired | 15,908 |
|  | (41,519) |

Included in the revenue and profit for the year are approximately RMB118.40 million and RMB31.68million respectively attributable to the additional business generated by acquired subsidiary.

EXHIBIT B
Page 207 of 218

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 36   BUSINESS COMBINATIONS *(CONTINUED)*

### Acquisition of subsidiaries and assets through acquisition of subsidiaries *(continued)*

Details of the Group's significant acquisitions during the year are as follows: *(continued)*

(viii)   Daqingshi Tianheshun Concrete Company Limited(「大慶市天和順混凝土製造有限公司」)

On 30 April 2013, the Group acquired 80% of the equity interests of Daqingshi Tianheshun Concrete Company Limited (「大慶市天和順混凝土製造有限公司」) for the consideration of RMB246.52 million from independent third party. The acquired subsidiary is principally engaged in the production and sale of concrete.

Net assets acquired in the transactions, and the goodwill arising, are as follows:

|  | 2013 Fair value RMB'000 |
|---|---|
| Net assets acquired: |  |
| Property, plant and equipment | 106,511 |
| Intangible assets | 7 |
| Prepaid lease payments | 48,533 |
| Deferred income tax assets | 6,654 |
| Inventories | 18,126 |
| Trade and other receivables | 127,536 |
| Cash and cash equivalents | 45,975 |
| Trade and other payables | (155,298) |
| Current income tax liabilities | (8,085) |
| Borrowings | (14,000) |
| Obligations under finance leases | (1,108) |
| Net assets | 174,851 |
| Non-controlling interests | (34,970) |
| Goodwill | 106,636 |
| Total consideration | 246,517 |

|  | 2013 RMB'000 |
|---|---|
| Total consideration satisfied by: |  |
| Cash | 98,560 |
| Other payables | 147,957 |
|  | 246,517 |
| Net cash outflow arising on acquisition: |  |
| Cash consideration paid | (98,560) |
| Less: Cash and cash equivalents acquired | 45,975 |
|  | (52,585) |

Included in the revenue and profit for the year are approximately RMB133.45 million and RMB10.06 million respectively attributable to the additional business generated by acquired subsidiary.

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 37    TRANSACTIONS WITH NON-CONTROLLING INTERESTS

### (a)  Acquisition of additional interests in subsidiaries without change in control

For the year ended 31 December 2013, the Group acquired additional issued shares of 5 subsidiaries for a purchase consideration of approximately RMB170.16 million. The carrying amount of the non-controlling interests in those subsidiaries on the date of acquisition was approximately RMB93.41 million. The Group recognised a decrease in non-controlling interests of approximately RMB93.41 million and a decrease in equity attributable to owners of the Group of approximately RMB76.75 million.

|  | 31 December 2013 RMB'000 | 31 December 2012 RMB'000 |
|---|---|---|
| Carrying amount of non-controlling interests acquired | 93,410 | 484,959 |
| Consideration paid to non-controlling interests | (170,157) | (749,209) |
| Excess of consideration paid recognised within parent's equity | (76,747) | (264,250) |

Details of the Group's significant acquisition of additional interests in subsidiaries during the year are as follows:

On 28 February 2013, Southwest Cement, a subsidiary of the Company, acquired an additional 35% of the issued share of China United Cement Beichuan Company Limited (「北川中聯水泥有限公司」) ("Beichuan") for a purchase consideration of approximately RMB70 million. The carrying amount of the non-controlling interests in Beichuan on the date of acquisition was approximately RMB49.32 million. The Group recognized a decrease in non-controlling interests of approximately RMB49.32 million and decrease in equity attributable to owners of the Group of approximately RMB20.68 million.

On 31 May 2013, North Cement, a subsidiary of the Company, acquired an additional 49% of the issued share of Yichun Jinshan Haolianghe Cement Company Limited (「伊春錦山浩良河水泥有限公司」) ("Yichun Jinshan") for a purchase consideration of approximately RMB22.2 million. The carrying amount of the non-controlling interests in Yichun Jinshan on the date of acquisition was approximately RMB11.59 million. The Group recognised a decrease in non-controlling interests of approximately RMB11.59 million and decrease in equity attributable to owners of the Group of approximately RMB10.61 million.

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 37   TRANSACTIONS WITH NON-CONTROLLING INTERESTS *(CONTINUED)*

### (b)   Deemed partial disposal of interests in subsidiaries without losing control

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Carrying amount of equity interest obtained by non-controlling interests | (2,693,266) | — |
| Capital contributed by non-controlling interests | 2,630,000 | — |
| Loss on disposal within equity | (63,266) | — |

On 24 January 2013, non-controlling interests of North Cement Company Limited ("North Cement") injected additional share capital of RMB400.00 million as registered share capital and RMB100.00 million as share premium. After that, the Group's effective equity interests in North Cement were diluted from 77.78% to 70%. As a result, the Group recognised a decrease in equity attributable to owners of the Company of approximately RMB41.14 million and increase in non-controlling interests of approximately RMB541.14 million.

On 1 January 2013, the 100% equity interests of Heilongjiang BinZhou Cement Company Limited ("BinZhou Cement") previously held by the Company were transferred to North Cement, a 70% owned subsidiary of the Group as per aforementioned. After that, the Group's effective equity interests in BinZhou Cement were diluted from 100% to 70%. As a result, the Group recognised a decrease in equity attributable to owners of the Company and increase in non-controlling interests of approximately RMB3.81 million.

On 24 June 2013, non-controlling interests of Southwest Cement Company Limited ("Southwest Cement") injected additional share capital of RMB2,130.00 million as registered share capital. After that, the Group's effective equity interests in Southwest Cement were diluted from 88.95% to 70%. As a result, the Group recognised a decrease in equity attributable to owners of the Company of approximately RMB18.32 million and increase in non-controlling interests of approximately RMB2,148.32 million.

## 38   CONTINGENT LIABILITIES

At the reporting date, the Group had the following undiscounted maximum amounts of potential future payments under guarantees:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Guarantees given to banks in respect of banking facilities utilised by independent third parties | 85,000 | 355,000 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 39   COMMITMENTS

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Capital expenditure of the Group contracted but not provided in the consolidated financial statements in respect of: | | |
| — Acquisition of property, plant and equipment | 667,331 | 553,863 |
| — Acquisition of prepaid lease payments | 49,417 | 92,985 |
| — Acquisition of subsidiaries | 165,186 | 962,999 |

## 40   OPERATING LEASE COMMITMENTS

**Lessee**

At the reporting date, the Group had outstanding commitments under non-cancellable operating leases, which fall due as follows:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Within one year | 65,114 | 46,241 |
| In the second to fifth year inclusive | 152,251 | 97,054 |
| Over five years | 99,240 | 65,166 |
|  | 316,605 | 208,461 |

Operating lease payments represent rentals payable by the Group for certain of its business premises. Leases are negotiated for an average term of fourteen years (2012: fourteen years) and rentals are fixed for an average term of fourteen years (2012: fourteen years).

**Lessor**

At the reporting date, the Group has contracted with tenants for the following future minimum lease payments:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Within one year | 108,097 | 43,400 |
| In the second to fifth year inclusive | 410,492 | 226,660 |
| Over five years | 245,214 | 112,871 |
|  | 763,803 | 382,931 |

The Group did not have contingent rental arrangement with the tenants in both years. The rentals are fixed at the commencement of the leases respectively. The lease periods are ranging from one year to twenty years (2012: one year to twenty years).

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 41   RELATED PARTY TRANSACTIONS

The Company is ultimately controlled by the Parent, which is a state-owned enterprise established in the PRC. The Parent itself is controlled by the PRC government, which also owns a significant portion of the productive assets in the PRC. In accordance with IAS 24 (revised), "Related Party Disclosure", government-related entities and their subsidiaries, directly or indirectly controlled, jointly controlled or significantly influenced by the PRC government are defined as related parties of the Group. On that basis, related parties include the Parent and its subsidiaries (other than the Group), other government-related entities and subsidiaries ("other stated-owned enterprises"), other entities and corporations in which the Company is able to control or exercise significant influence and key management personnel of the Company and the Parent as well as their close family members.

For the purposes of the related party transaction disclosures, the directors of the Company believe that meaningful information in respect of related party transactions has been adequately disclosed.

In addition to the transactions and balances detailed elsewhere in these consolidated financial statements, the Group had the following material transactions with related parties during the year.

## (a)   Transactions with related parties

The Group entered into the following transactions with China National Building Material Group Corporation (the "Parent") and its subsidiaries (collectively the "Parent Group"), the associates of the Group and the non-controlling interests of the Group's subsidiaries.

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---:|---:|
| Provision of production supplies to |  |  |
| — the Parent Group | 404,964 | 27,206 |
| — Associates | 635,320 | 193,294 |
| — Non-controlling interests of subsidiaries | 219,594 | 611,025 |
|  | **1,259,878** | 831,525 |
| Provision of support services to |  |  |
| — the Parent Group | 131,824 | 130,580 |
| — Associates | 129,724 | 34 |
| — Non-controlling interests of subsidiaries | 3,670 | 1,081 |
|  | **265,218** | 131,695 |
| Rental income received from |  |  |
| — the Parent Group | 1,889 | 588 |
| — Associates | 20,311 | 19,566 |
|  | **22,200** | 20,154 |
| Rendering of engineering service to the Parent Group | 458,494 | 346,556 |
| Interest income received from |  |  |
| — the Parent Group | 22,681 | 22,189 |
| — Associates | 23,760 | 7,382 |
|  | **46,441** | 29,571 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 41    RELATED PARTY TRANSACTIONS *(CONTINUED)*

### (a)    Transactions with related parties *(continued)*

|  | 2013<br>**RMB'000** | 2012<br>*RMB'000* |
|---|---:|---:|
| Provision of production supplies by |  |  |
| — the Parent Group | **217,023** | 117,957 |
| — Associates | **128,099** | 168,563 |
| — Non-controlling interests of subsidiaries | **1,632** | 72,432 |
|  | **346,754** | 358,952 |
| Provision of support services by |  |  |
| — the Parent Group | **3,240** | 6,626 |
| — Non-controlling interests of subsidiaries | **600** | 105 |
|  | **3,840** | 6,731 |
| Supplying of equipment by |  |  |
| — the Parent Group | **103,890** | 169,224 |
| — Associates | **—** | 1,014 |
|  | **103,890** | 170,238 |
| Rental expense paid to |  |  |
| — the Parent Group | **1,572** | — |
| — Non-controlling interests of subsidiaries | **—** | 100 |
|  | **1,572** | 100 |
| Interest expense paid to non-controlling<br>  interests of subsidiaries | **1,251** | 3,253 |
| Rendering of engineering services<br>  by the parent group | **15,234** | 63,765 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 41  RELATED PARTY TRANSACTIONS *(CONTINUED)*

### (a)  Transactions with related parties *(continued)*

|  | 2013<br>RMB'000 | 2012<br>RMB'000 |
|---|---:|---:|
| Supply of raw materials (limestone and clay) by |  |  |
| — the Parent Group | 19,605 | 56,431 |
| — Non-controlling interests of subsidiaries | — | 95,337 |
|  | 19,605 | 151,768 |
| Supply of raw materials by |  |  |
| — the Parent Group | 1,262 | 150,839 |
| — Associates | 178,719 | 49,397 |
| — Non-controlling interests of subsidiaries | 12,321 | 543 |
|  | 192,302 | 200,779 |

### (b)  Transactions and balances with other state-owned enterprises in the PRC

During the year ended 31 December 2013, the Group's significant transactions with other state-owned enterprises (excluding the Parent Group) are a large portion of its sales of goods and purchases of raw materials. In addition, substantially all bank deposits, cash and cash equivalents and borrowings as of 31 December 2013 and the relevant interest earned or paid during the year are transacted with banks and other financial institutions controlled by the PRC government. In establishing its pricing strategies and approval process for its products and services, the Group does not differentiate whether the counter-party is a state-controlled enterprise. In the opinion of the directors, all such transactions were conducted in the ordinary course of business and on normal commercial terms.

### (c)  Remuneration to key management

Key management personnel are those persons having authority and responsibility for planning, directing and controlling the activities of the Group, directly and indirectly including directors and supervisors of the Group. The key management personnel compensations during the year are as follows:

|  | 2013<br>RMB'000 | 2012<br>RMB'000 |
|---|---:|---:|
| Short-term benefits | 5,725 | 6,489 |
| Share-based payments | — | 220 |
| Post-employment benefits | 204 | 182 |
|  | 5,929 | 6,891 |

China National Building Material Company Limited  Annual Report 2013

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 42   EMPLOYEE BENEFITS PLAN

The PRC employees of the Group are members of state-managed retirement benefit scheme operated by the local government. The Group is required to contribute a specified percentage of their payroll costs to the retirement benefit scheme to fund the benefits. The only obligation of the Group with respect to the retirement benefit scheme is to make the specified contributions.

The contributions payable to the scheme by the Group at rate specified in the rules of the scheme included in staff costs are disclosed in Note 10.

## 43   SHARE APPRECIATION RIGHTS PLAN

In order to provide additional incentives to the Group's senior management and to enhance the alignment between the performance of the Group's senior management and shareholder value, on 28 February 2006, the Company adopted a long-term incentive plan of share appreciation rights (the "Plan") for the Group's senior management officers, senior experts and specialist who make important contributions to the Group.

Under the Plan, a share appreciation right ("SA Right") represents the right to receive a cash payment equal to the appreciation, if any, in the fair market value of a H share from the date of the grant of the right to the date of exercise.

SA Rights will be granted in units with each unit representing one H share. All SA Rights will have an exercise period of six years from the date of grant. An individual may not exercise his or her SA Rights during the first two years after the date of grant. After two and three years of the date of grant, the total number of SA Rights exercised by an individual may not in aggregate exceed one-third and two-thirds, respectively, of the total SA Rights granted to the individual. After four years of the date of granted, the SA Rights will be fully vested.

On 18 September 2006, the Company granted 5,880,000 units of SA Rights at exercise price of HKD3.50 each unit to the senior management of the Company as follows:

|  | Units of SA Rights granted |
|---|---|
| Directors and a supervisor of the Company | 2,680,000 |
| Other senior management | 3,200,000 |
|  | 5,880,000 |

According to Guo Zi Fa Fan Pei 2006 No.8, "Trial Method for Share Incentive Scheme of State-controlled Listing Company", the compensation should not exceed 40% of personal total salary and bonus.

The SA Rights vest at different amounts until the grantees have completed a specified period of service. As SA Rights were exercised and settled before their expiry during 2012, no services or liability is recognised at the reporting date (2012: approximately RMB0.84 million, being the estimated compensation paid for service rendered by the grantee during the year 2012).

# Notes to the Consolidated Financial Statements *(Continued)*
*For the year ended 31 December 2013*

## 44 INFORMATION ABOUT THE STATEMENTS OF FINANCIAL POSITION OF THE COMPANY

### (a) Information about the statement of financial position of the Company at the end of the reporting period includes:

|  | 2013 RMB'000 | 2012 RMB'000 |
|---|---|---|
| Investment in subsidiaries | 25,976,888 | 27,808,463 |
| Other non-current assets | 2,938,669 | 1,948,780 |
| Amount due from subsidiaries | 29,681,804 | 16,448,814 |
| Other current assets | 478,641 | 680,547 |
| Non-current liabilities | (15,084,186) | (19,885,625) |
| Current liabilities | (29,507,473) | (13,465,393) |
| Net assets | 14,484,343 | 13,535,586 |
| Share capital *(Note 34)* | 5,399,026 | 5,399,026 |
| Reserves | 9,085,317 | 8,136,560 |
| Total equity | 14,484,343 | 13,535,586 |

# Notes to the Consolidated Financial Statements *(Continued)*

*For the year ended 31 December 2013*

## 44   INFORMATION ABOUT THE STATEMENTS OF FINANCIAL POSITION OF THE COMPANY *(CONTINUED)*

**(b)   Details of the changes in the company's individual components of reserves between the beginning and the end of the year are set out below:**

| | Share premium | Capital reserves | Fair value reserve *(Note 35(b))* | Statutory surplus reserve fund *(Note 35(a))* | Retained earnings | Total |
|---|---|---|---|---|---|---|
| | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* | *RMB'000* |
| At 1 January 2012 | 4,824,481 | 501,310 | — | 318,783 | 1,013,598 | 6,658,172 |
| Net profit and total comprehensive income for the year | — | — | — | — | 2,639,179 | 2,639,179 |
| Dividends *(Note 12)* | — | — | — | — | (1,160,791) | (1,160,791) |
| Appropriation to statutory reserve | — | — | — | 269,003 | (269,003) | — |
| Balance at 31 December 2012 and 1 January 2013 | 4,824,481 | 501,310 | — | 587,786 | 2,222,983 | 8,136,560 |
| Net profit for the year | — | — | — | — | 1,539,573 | 1,539,573 |
| Other comprehensive income for the year | — | — | 246,033 | — | — | 246,033 |
| Dividends *(Note 12)* | — | — | — | — | (836,849) | (836,849) |
| Appropriation to statutory reserve | — | — | — | 164,224 | (164,224) | — |
| Balance at 31 December 2013 | 4,824,481 | 501,310 | 246,033 | 752,010 | 2,761,483 | 9,085,317 |

## (c)   Net profit attributable to shareholders

Net profit attributable to shareholders includes a profit of RMB1,539.57 million (2012: RMB2,639.18 million) which has been dealt with in the financial statements of the Company.

## 45   EVENTS AFTER THE BALANCE SHEET DATE

No significant events occured after the end of the reporting period and up to the approval date of the financial statements.

EXHIBIT B
Page 217 of 218

# Financial Summary

## CONSOLIDATED INCOME STATEMENT

|  | 2013<br>RMB'000 | 2012<br>RMB'000 | 2011<br>RMB'000 | 2010<br>RMB'000 | 2009<br>RMB'000 |
|---|---|---|---|---|---|
| Revenue | 117,687,840 | 87,217,629 | 80,058,470 | 51,987,763 | 33,297,363 |
| Cost of sales | (87,549,843) | (67,089,167) | (58,741,878) | (40,778,919) | (26,798,003) |
| | | | | | |
| Gross profit | 30,137,997 | 20,128,462 | 21,316,592 | 11,208,844 | 6,499,360 |
| Investment and other income | 4,204,133 | 5,200,305 | 2,993,345 | 2,158,284 | 2,036,833 |
| Selling and distribution costs | (6,928,479) | (3,880,879) | (2,212,707) | (1,810,719) | (1,267,429) |
| Administrative expenses | (8,134,660) | (5,475,516) | (4,609,812) | (3,071,615) | (2,019,763) |
| Finance costs - net | (9,306,502) | (6,507,145) | (3,859,060) | (2,578,960) | (1,516,443) |
| Share of profit of associates | 630,536 | 458,642 | 686,149 | 198,183 | 9,394 |
| | | | | | |
| Profit before income tax | 10,603,025 | 9,923,869 | 14,314,507 | 6,104,017 | 3,741,952 |
| Income tax expenses | (2,291,155) | (2,186,883) | (3,568,768) | (1,360,977) | (664,059) |
| | | | | | |
| Profit for the year | 8,311,870 | 7,736,986 | 10,745,739 | 4,743,040 | 3,077,893 |
| | | | | | |
| Profit attributable to: | | | | | |
| Owners of the Company | 5,761,854 | 5,579,601 | 8,015,074 | 3,369,433 | 2,352,396 |
| Non-controlling interests | 2,550,016 | 2,157,385 | 2,730,665 | 1,373,607 | 725,497 |
| | | | | | |
| | 8,311,870 | 7,736,986 | 10,745,739 | 4,743,040 | 3,077,893 |
| | | | | | |
| Final dividend proposed | 863,844 | 836,849 | 1,160,791 | 502,109 | 173,685 |
| | | | | | |
| **Extracts from the consolidated statement of financial position** | | | | | |
| | | | | | |
| Total assets | 291,631,175 | 246,433,547 | 158,395,218 | 111,516,350 | 77,009,037 |
| Total liabilities | (238,055,276) | (202,368,700) | (120,784,056) | (83,617,964) | (59,493,609) |
| Non-controlling interests | (18,197,476) | (13,568,749) | (11,279,394) | (8,735,906) | (4,620,661) |
| | | | | | |
| Equity attributable to owners of the Company | 35,378,423 | 30,496,098 | 26,331,768 | 19,162,480 | 12,894,767 |

# EXHIBIT C

LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street,
Suite 500
Philadelphia, PA 19106

**PLEASE FORWARD**

# FIRST CLASS MAIL

**PLEASE FORWARD—IMPORTANT LEGAL NOTICE**

EXHIBIT C
Page 1 of 4

The plaintiffs have obtained default judgments against the Taishan Defendants. Because of these default judgments, the Taishan Defendants will be precluded from offering any defenses concerning their liability to the Class. In future proceedings, plaintiffs will establish class-wide damages pursuant to Rule 55(b)(2)(B). Plaintiffs will prove class-wide damages on an aggregate basis by presenting evidence concerning the total square footage of properties owned by class members and the cost per square foot to repair and replace the defective drywall in class members' properties (*i.e.*, the current price per square foot to remediate multiplied by the number of square feet in class members' homes = damages).

THE PURPOSE OF THIS NOTICE IS TO ADVISE YOU OF THESE EVENTS AND THEIR POTENTIAL EFFECT ON YOUR RIGHTS.

## DEFINITION OF THE CLASS

The Court has certified a Class defined as follows:

All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.[2]

Plaintiffs, Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard ("Plaintiffs"), have been appointed by the Court to serve as representatives for the Class.

## FURTHER PROCEEDINGS

If you are a member of the Class you need do nothing at this time and your interests will be represented by the Plaintiffs and Class Counsel. If you choose, you may enter an appearance through your own attorney at your own expense. You may also request to be excluded from the Class (discussed below).

As a member of the Class, you will not be personally responsible for any attorneys' fees or litigation costs or expenses unless you retain your own attorney, in which case you will be responsible for your attorney's fees, costs and expenses.

If a recovery is ultimately obtained for the Class, either through a judgement or settlement, Class Counsel will seek to be awarded attorneys' fees and costs out of any recovery obtained on behalf of the Class. In such case, your share of the recovery will bear its proportionate share of those costs and fees.

As a member of the Class, you will be bound by the judgment or other final disposition of this lawsuit whether that disposition is favorable to the Class or to the Taishan Defendants. If relief is obtained for the Class, you may be entitled to participate in any measure of relief that is recovered. Also, you will have an opportunity to be heard respecting any proposed settlement or dismissal of the class action.

You may be required as a condition to participating in any recovery obtained through settlement or trial to present evidence respecting the presence of the Taishan Defendants' defective drywall in your property. You should, therefore, preserve any records that you have pertaining to the presence of the Taishan Defendants' defective drywall in your property.

## EXCLUSION FROM CLASS

If you fall within the definition of the Class (see above), you are automatically a Class member and need not do anything at this time unless you do not want to be a part of the Class. If you do not wish to be included in the Class, you must send a request for exclusion to HERMAN, HERMAN & KATZ, LLC, 820 O'Keefe Avenue, New Orleans, Louisiana 70113, in an envelope postmarked no later than **October 27, 2014.** Your request for exclusion should set forth your name, address, and telephone number. All requests for exclusion must be personally signed by the Class member requesting exclusion.

IF YOUR REQUEST FOR EXCLUSION DOES NOT INCLUDE ALL OF THE FOREGOING INFORMATION, IS NOT PERSONALLY SIGNED BY THE CLASS MEMBER, OR IS NOT POSTMARKED BY THE DEADLINE ABOVE, IT SHALL NOT BE A VALID REQUEST FOR EXCLUSION. THE PERSON OR ENTITY FILING AN INVALID REQUEST FOR EXCLUSION SHALL BE A MEMBER OF THE CLASS AND BOUND BY ANY FURTHER ACTION TAKEN BY THE COURT AFFECTING THE CLASS UNLESS LEAVE OF COURT IS OBTAINED.

---

[2] This class action includes all current and former owners of properties in the United States containing drywall manufactured by these defendants who are participants (either in the original action or in complaints in intervention) in the Class Action Complaints in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La.); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.). For administrative reasons the class definition is limited to the actions in *Amorin, Germano, Gross* and *Wiltz*. All class members are named plaintiffs in the *Amorin* actions.

EXHIBIT C
Page 2 of 4

If your~~ward request for exclusion is timely received, the Court will exclude you from the Class and you will~~ not be bound by—or entitled to participate in—any judgment in this action. The judgment will bind plaintiffs and all members of the Class who have not timely requested exclusion from the Class.

## ADDITIONAL INFORMATION

The following law firms have been approved by the Court to serve as counsel for the Class ("Class Counsel"):

Russ M. Herman, Esquire
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024

Arnold Levin, Esquire
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663

If you remain a member of the Class and you wish to communicate with Class Counsel, or if you have any questions concerning any of the matters contained in this Notice, you should contact Class Counsel directly.

This Notice is issued pursuant to an order of the Court. Additional notice(s) may be provided as the Court directs.

**PLEASE DO NOT TELEPHONE THE COURT REGARDING THIS NOTICE OR THE LITIGATION.
ALL INQUIRES SHOULD BE DIRECTED TO CLASS COUNSEL.**

BY ORDER OF THE HONORABLE
ELDON E. FALLON
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

DATED: September 26, 2014

EXHIBIT C
Page 3 of 4

LEVIN FISHBEIN SEDRAN & BERMAN
510 Walnut Street,
Suite 500
Philadelphia, PA 19106

**PLEASE FORWARD**

# FIRST CLASS MAIL

**PLEASE FORWARD—IMPORTANT LEGAL NOTICE**

EXHIBIT C
Page 4 of 4

# EXHIBIT D

Case 3:14-cv-00746-ST   Document 59-4   Filed 12/30/14   Page 2 of 8
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 234 of 298
Case 2:09-md-02047-EEF-JCW   Document 18086   Filed 10/29/14   Page 1 of 7

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |

**THIS DOCUMENT RELATES TO:**

*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.,* Case No. 09-6687 (E.D.La.);

*Gross, et al. v. Knauf Gips, KG, et al.,* Case No. 09-6690 (E.D.La.);

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.,* Case No 10-361 (E.D.La.);

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11-1672 (E.D.La.);

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11-1395 (E.D.La.);

*Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* Civ. Action No. 11-1673 (E.D.La.))

## PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES PURSUANT TO RULE 55(b)(2)(B) AND REQUEST FOR APPROVAL OF SUPPLEMENTAL NOTICE

On September 26, 2014, the Court granted the Plaintiffs' motion for class certification

1

Case 3:14-cv-00746-ST   Document 59-4   Filed 12/30/14   Page 3 of 8
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 235 of 298
Case 2:09-md-02047-EEF-JCW   Document 18086   Filed 10/29/14   Page 2 of 7

seeking to certify a class of existing class members[1] with claims against the Taishan Defendants.[2]  *See* Rec.Doc. # 18028 ((hereafter "CLASS FOFCOL").  In its CLASS FOFCOL the Court certified a class defined as follows:

> All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin, Germano, Gross,* and/or *Wiltz* (*i.e.,* not an absent class member), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

In accordance with the Court's CLASS FOFCOL, Plaintiffs issued notice to all class members by first class mail on September 26, 2014.  *See* Notice of Filing Affidavit of Tim Walters, Rec.Doc.No. 18035.  All class members wishing to opt out of the class are required to mail opt out forms to Class Counsel by no later than October 27, 2014.  To date, Class Counsel

---

[1] The class is comprised of active litigants (either in the original action or in complaints in intervention) who are participants in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.) ("*Germano*"); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.) ("*Gross*"); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361 (E.D.La.) ("*Wiltz*"); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080 (E.D.La.); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); and/or *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.) (collectively, "*Amorin*").  For administrative reasons the class definition is limited to the actions in *Amorin, Germano, Gross* and *Wiltz*.  All class members are named plaintiffs in the *Amorin* actions.

[2] The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd.; Beijing New Building Materials Limited Co.; Beijing New Building Materials Group Co., Ltd.; China National Building Materials Co., Ltd.; China National Building Materials Group Corporation; and Tai'an Taishan Plasterboard Co., Ltd..  The "Taishan Affiliates" are comprised of the following entities: Beijing New Building Materials Limited Co.; Beijing New Building Materials Group Co., Ltd.; China National Building Materials Co., Ltd.; China National Building Materials Group Corporation; and Tai'an Taishan Plasterboard Co., Ltd..

Case 3:14-cv-00746-ST    Document 59-4    Filed 12/30/14    Page 4 of 8
Case 2:09-md-02047-EEF-MBN    Document 18251-2    Filed 01/08/15    Page 236 of 298
Case 2:09-md-02047-EEF-JCW    Document 18086    Filed 10/29/14    Page 3 of 7

have received no requests for exclusion.

Based on the current status of the instant class proceedings, Plaintiffs' respectfully request that the Court award damages to the class. For the reasons set forth in the memorandum of law submitted in conjunction herewith, Plaintiffs request that the Court award $1,263,330,881.19 in damages to the class. In addition, Plaintiffs have prepared a supplemental notice that fully describes the damages model outlined in the memorandum of law. Plaintiffs request that the Court approve the supplemental notice and allow an additional forty day opt-out period to allow class members to consider the proposed damages model being pursued.

Dated: October 29, 2014                      Respectfully submitted,

                                             /s/ Leonard A. Davis
                                             Russ M. Herman, Esquire (LA Bar No. 6819)
                                             Leonard A. Davis, Esquire (LA Bar No. 14190)
                                             Stephen J. Herman, Esquire (LA Bar No. 23129)
                                             HERMAN, HERMAN & KATZ, LLC
                                             820 O'Keefe Avenue
                                             New Orleans, Louisiana 70113
                                             Phone: (504) 581-4892
                                             Fax: (504) 561-6024
                                             LDavis@hhklawfirm.com
                                             *Plaintiffs' Liaison Counsel*
                                             *MDL 2047*

                                             Arnold Levin (on the brief)
                                             Fred S. Longer (on the brief)
                                             Sandra L. Duggan (on the brief)
                                             Matthew C. Gaughan (on the brief)
                                             Levin, Fishbein, Sedran & Berman
                                             510 Walnut Street
                                             Suite 500
                                             Philadelphia, PA 19106
                                             Phone: (215) 592-1500
                                             Fax: (215) 592-4663
                                             ALevin@lfsblaw.com
                                             *Plaintiffs' Lead Counsel MDL 2047*

3

Case 3:14-cv-00746-ST   Document 59-4   Filed 12/30/14   Page 5 of 8
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 237 of 298
Case 2:09-md-02047-EEF-JCW   Document 18086   Filed 10/29/14   Page 4 of 7

## PROPOSED OF COUNSEL TO CLASS,
## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler
The Steckler Law Firm
12700 Park Central Drive, Ste 1900
Dallas, TX 75251
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ervin A. Gonzalez
Colson Hicks Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 29-2931
hlambert@thelambertfirm.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

4

Case 3:14-cv-00746-ST   Document 59-4   Filed 12/30/14   Page 6 of 8
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 238 of 298
Case 2:09-md-02047-EEF-JCW   Document 18086   Filed 10/29/14   Page 5 of 7

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax:(239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax:(228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

5

Case 3:14-cv-00746-ST   Document 59-4   Filed 12/30/14   Page 7 of 8
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 239 of 298
Case 2:09-md-02047-EEF-JCW   Document 18086   Filed 10/29/14   Page 6 of 7

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Anthony D. Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

6

Case 3:14-cv-00746-ST   Document 59-4   Filed 12/30/14   Page 8 of 8
Case 2:09-md-02047-EEF-MBN   Document 18251-2   Filed 01/08/15   Page 240 of 298
Case 2:09-md-02047-EEF-JCW   Document 18086   Filed 10/29/14   Page 7 of 7

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 29th day of October, 2014.

/s/ Leonard A. Davis
Leonard A. Davis, Esquire
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Ldavis@hhklawfirm.com

*Plaintiffs' Liaison Counsel*
*MDL 2047*

7

# EXHIBIT E

## UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF LOUISIANA

EDUARDO AND CARMEN AMORIN; KENNETH
ABEL; ARLEDYS GALLARDO; CHARMAINE FONG;
PERRY AND CASSANDRA FONTENOT; JULIANNE
AND JOSHUA FRANKZE; BRYON HAND; LAURA
HAYA, DANIEL HAYA AND IRENE HAYA; ROBERT
POPOVITCH; JASON PURSE; JOSEPH
QUARTARARO; FRANK AND YVONNE TOPF;
CATHY PARKER VAPY; HUGH AND TRACY VEST;
AND KENNETH AND BARBARA WILTZ,
individually, and on behalf of all others
similarly situated,

       Plaintiffs,

v.

TAISHAN GYPSUM CO., LTD. F/K/A SHANDONG
TAIHE DONGXIN CO., LTD.; TAIAN TAISHAN
PLASTERBOARD CO., LTD.; QINHUANGDAO
TAISHAN BUILDING MATERIALS CO., LTD. A/K/A
QINHUANG DAO TAISHAN BUILDING; MATERIALS
CO., LTD.; BEIJING NEW BUILDING MATERIALS
PUBLIC LIMITED CO.; CHINA NATIONAL
BUILDING MATERIAL CO., LTD.; BEIJING NEW
BUILDING MATERIALS (GROUP) CO., LTD.;
CHINA NATIONAL BUILDING MATERIALS GROUP
CO.; CNBM USA CORP.; BNBM OF AMERICA,
INC.; BNBM USA; UNITED SUNTECH CRAFT,
INC.; CNBMI CO., LTD.; CHANGZHOU YINHE
WOOD INDUSTRY CO., LTD.; FUXIN TAISHAN
GYPSUM AND BUILDING MATERIAL CO., LTD.;
HUBEI TAISHAN BUILDING MATERIAL CO., LTD.;
JINAN RUN & FLY NEW MATERIALS CO., LTD.;
NANHAI SILK IMP. & EXP. CORPORATION;
PINGYI BAIER BUILDING MATERIALS CO., LTD.;
QINHUANGDAO TAISHAN BUILDING MATERIAL
CO., LTD.; SHANGHAI YU YUAN IMP & EXP CO.,
LTD.; SINKIANG TIANSHAN BUILDING MATERIAL
AND GYPSUM PRODUCT CO., LTD.; SUNRISE

CASE NO.:

SECT L. Mag 2

CLASS ACTION COMPLAINT

# 11-1395

JURY TRIAL DEMAND

## SECT. L MAG. 2

1

BUILDING MATERIALS LTD.; TAI'AN JINDUN
BUILDING MATERIAL CO., LTD.; TAISHAN
GYPSUM CO., LTD. LUCHENG BRANCH; TAISHAN
GYPSUM (BAOTOU) CO., LTD.; TAISHAN GYPSUM
(CHONGQING) CO., LTD.; TAISHAN GYPSUM
(HENAN) CO., LTD.; TAISHAN GYPSUM
(PINGSHAN) CO., LTD.; TAISHAN GYPSUM
(PIZHOU) CO., LTD.; TAISHAN GYPSUM
(TONGLING) CO., LTD.; TAISHAN GYPSUM
(XIANGTAN) CO. LTD.; YUNAN TAISHAN GYPSUM
AND BUILDING MATERIAL CO., LTD.; SHAANXI
TAISHAN GYPSUM CO., LTD.; TAISHAN GYPSUM
(HENGSHUI) CO., LTD.; TAISHAN GYPSUM
(JIANGYIN) CO., LTD.; TAISHAN GYPSUM
(WENZHOU) CO., LTD.; BEIJING NEW MATERIAL
INCUBATOR CO., LTD.; QINGDAO YILIE
INTERNATIONAL TRADE CO., LTD.; SHANGHAI
EAST BEST ARTS & CRAFTS CO., LTD.;
SIIC SHANGHAI INTERNATIONAL TRADE (GROUP)
CO., LTD.; TIANJIN TIANBAO CENTURY
DEVELOPMENT CO., LTD.; SHANDONG ORIENTAL
INTERNATIONAL TRADING CORP.; LIANYUNGANG
YUNTAI INTERNATIONAL TRADE CO., LTD.;
SHANGHAI YUYUAN MARKET IMPORT & EXPORT
CO., LTD.; ORIENT INTERNATIONAL HOLDING
SHANGHAI FOREIGN TRADE CO., LTD.; QINGDAO
AONI DECORATION BOARD AND MATERIALS CO.,
LTD.; BEIJING BUILDING MATERIALS IMPORT &
EXPORT CO., LTD.; TAIAN TAIGAO TRADING
CO., LTD.; NANTONG ECONOMIC AND
TECHNOLOGICAL DEVELOPMENT ZONE
CORPORATION; QINGDAO KANGHONG IMPORT
AND EXPORT CO., LTD.; ZHEJIANG PROVINCIAL
SECOND LIGHT INDUSTRY ENTERPRISES GROUP
IMP. & EXP. CO., LTD.; SIIC SHANGHAI
INTERNATIONAL TRADE GROUP PUDONG CO.,
LTD.; JIANGSU SAINTY INTERNATIONAL
ECONOMIC & TECHNICAL COOPERATION CO.,
LTD.; ZIBO INTERNTIONAL ECONOMIC AND
TECHNICAL COOPERATION CORPORATION;
SHANGHAI KAIDUN DEVELOPMENT CO., LTD.;
SHANGHAI YUJIN INDUSTRY CO., LTD.;
HANGZHOU GREAT IMPORT AND EXPORT CO.,

2

LTD.; XUZHOU HANBANG GLOBAL TRADE CO.,
LTD.; CHINA XUZHOU INTERNATIONAL
ECONOMIC & TECHNOLOGICAL COOPERATION
CO., LTD.; JIANGSU EASTHIGH GROUP IMPORT &
EXPORT CO., LTD.; AND QINGDAO JOY
INDUSTRIAL & DEVELOPMENT CO., LTD.,

       **Defendants.**

_____/

## PLAINTIFFS' CLASS ACTION COMPLAINT

Pursuant to Fed. R. Civ. P. 23, the class representatives in this action bring suit on behalf

of themselves and all other similarly situated owners and residents of real property containing

problematic Chinese manufactured drywall that was designed, manufactured, imported,

distributed, delivered, supplied, marketed, inspected, or sold by the Defendants. Each of the class

representatives is pursuing a nationwide class action against Beijing New Building Materials

Public Limited Co. ("BNBM"); China National Building Material Co., Ltd.; Beijing New Building

Materials (Group) Co., Ltd. ("BNBM Group"); China National Building Materials Group Co.

("CNBM Group"); CNBM USA Corp.; BNBM of America, Inc.; BNBM USA; United Suntech

Craft, Inc. ("United Suntech"); CNBMI Co., Ltd. ("CNBMI"); Taishan Gypsum Co., Ltd. f/k/a

Shandong Taihe Dongxin Co., Ltd.; Taian Taishan Plasterboard Co., Ltd. ("TTP"); and

Qinhuangdao Taishan Building Materials Co., Ltd. a/k/a Qinhuang Dao Taishan Building

Materials Co., Ltd. ("Qinhuangdao"); Changzhou Yinhe Wood Industry Co., Ltd.; Fuxin Taishan

Gypsum And Building Material Co., Ltd.; Hubei Taishan Building Material Co., Ltd.; Jinan Run

& Fly New Materials Co., Ltd.; Nanhai Silk Imp. & Exp. Corporation; Pingyi Baier Building

Materials Co., Ltd.; Qinhuangdao Taishan Building Material Co., Ltd.; Shanghai Yu Yuan Imp &

Exp Co., Ltd.; Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd.; Sunrise

3

Building Materials Ltd.; Tai'an Jindun Building Material Co., Ltd.; Taishan Gypsum Co., Ltd.

Lucheng Branch; Taishan Gypsum (Baotou) Co., Ltd.; Taishan Gypsum (Chongqing) Co., Ltd.;

Taishan Gypsum (Henan) Co., Ltd.; Taishan Gypsum (Pingshan) Co., Ltd.; Taishan Gypsum

(Pizhou) Co., Ltd.; Taishan Gypsum (Tongling) Co., Ltd.; Taishan Gypsum (Xiangtan) Co. Ltd.;

Yunan Taishan Gypsum And Building Material Co., Ltd.; Shaanxi Taishan Gypsum Co., Ltd.;

Taishan Gypsum (Hengshui) Co., Ltd.; Taishan Gypsum (Jiangyin) Co., Ltd.; Taishan Gypsum

(Wenzhou) Co., Ltd.; Beijing New Material Incubator Co., Ltd.; Qingdao Yilie International

Trade Co., Ltd.; Shanghai East Best Arts & Crafts Co., Ltd.; Siic Shanghai International Trade

(Group) Co., Ltd.; Tianjin Tianbao Century Development Co., Ltd.; Shandong Oriental

International Trading Corp.; Lianyungang Yuntai International Trade Co., Ltd.; Shanghai Yuyuan

Market Import & Export Co., Ltd.; Orient International Holding Shanghai Foreign Trade Co.,

Ltd.; Qingdao Aoni Decoration Board and Materials Co., Ltd.; Beijing Building Materials Import

& Export Co., Ltd.; Taian Taigao Trading Co., Ltd.; Nantong Economic and Technological

Development Zone Corporation; Qingdao Kanghong Import and Export Co., Ltd.; Zhejiang

Provincial Second Light Industry Enterprises Group Imp. & Exp. Co., Ltd.; SIIC Shanghai

International Trade Group Pudong Co., Ltd.; Jiangsu Sainty International Economic & Technical

Cooperation Co., Ltd.; Zibo Interntional Economic and Technical Cooperation Corporation;

Shanghai Kaidun Development Co., Ltd.; Shanghai Yujin Industry Co., Ltd.; Hangzhou Great

Import and Export Co., Ltd.; Xuzhou Hanbang Global Trade Co., Ltd.; China Xuzhou

International Economic & Technological Cooperation Co., Ltd.; Jiangsu Easthigh Group Import &

Export Co., Ltd.; and Qingdao Joy Industrial & Development Co., Ltd. (collectively "the Taishan

Defendants"). Each of the Defendants in this action are liable for damages incurred by Plaintiffs

4

due to their role in the design, manufacture, importing, distributing, delivery, supply, marketing, inspecting, or sale of the problematic drywall at issue in this litigation.

## JURISDICTION, PARTIES, AND VENUE

1.  Original jurisdiction of this Court exists by virtue of 28 U.S.C. §1332(d)(2) and the Class Action Fairness Act ("CAFA"). *See* 28 U.S.C. § 1711, *et. seq*. The Plaintiffs and certain of the Defendants in these actions are citizens of different states and the amounts in controversy in these actions exceed five million dollars ($5,000,000.00), exclusive of interest and costs.

2.  Venue in this district satisfies the requirements of 28 U.S.C. §1391(b)(1)-(2) and (c) because Plaintiffs and a significant number of the absent class members reside in this jurisdiction and a substantial amount of the events and occurrences giving rise to these claims occurred in this District, or a substantial part of the property that is the subject of this action is situated in this district.  Venue is otherwise appropriate in this district consistent with 28 U.S.C. § 1407 and the June 15, 2009 Transfer Order of the Judicial Panel on Multidistrict Litigation ("JPML"). *See In re: Chinese-Manufactured Drywall Products Liability Litigation*, 626 F.Supp.2d 1346 (J.P.M.L. Jun. 15, 2009).

## PLAINTIFFS

3.  For purposes of clarity, the Plaintiffs are asserting claims on behalf of all owners and residents of the subject properties, including but not limited to, minors and other residents of the properties who do not appear herein as named plaintiffs.

4.  The Plaintiffs in this action are also asserting claims on behalf of all plaintiffs from prior complaints involving the Taishan Defendants.  These plaintiffs include but are not limited to those plaintiffs who asserted claims against the Taishan Defendants in *Kenneth and Barbara*

5

*Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Civ. Action No. 10-361;

*Gross, et al. v. Knauf Gips, KG, et al.*, Civ. Action No. 09-6690; *Kenneth Abel, et al. v. Taishan*

*Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-080; *Laura,*

*Daniel and Irene Haya, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co.,*

*Ltd., et al.*, Civ. Action No. 11-1077; and *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a*

*Shandong Taihe Dongxin Co. Ltd., et al.*, Civ. Action No. 9-6687.

5. Plaintiffs, Eduardo and Carmen Amorin are citizens of Florida and together own real property located at 240 West End Drive, Bldg. 7, Unit 721, Punta Gorda, Florida 33950. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

6. Plaintiff, Kenneth Abel is a citizen of Florida and owns real property located at 10400 SW Stephanie Way #5210, Port St. Lucie, Florida 34987. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

7. Plaintiff, Arledys Gallardo is a citizen of Florida and owns real property located at 4179 NE 16 Street, Homestead, Florida 33033. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

8. Plaintiff, Charmaine Fong is a citizen of Florida and owns real property located at 9816 Cobblestone Lakes Court, Boynton Beach, Florida 33472. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

9.   Plaintiffs, Perry and Cassandra Fontenot are citizens of Virginia and together own real property located at 1016 Hollymeade Circle, Newport News, Virginia 23602.  Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as a class representatives for similarly situated individuals.

10.   Plaintiffs, Julianne and Joshua Frankze are citizens of Florida and together own real property located at 1201 NW 2 Street, Cape Coral, Florida 33993.  Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representative for similarly situated individuals.

11.   Plaintiff, Bryon Hand is a citizen of Virginia and owns real property located at 3207 Arran Thistle, Williamsburg, Virginia 23188.  Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

12.   Plaintiffs, Laura Haya, Daniel Haya, and Irene Haya are citizens of Florida and together own real property located at 7574 Tamarind Avenue, Tampa, Florida 33625.  Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

13.   Plaintiff, Robert Popovitch is a citizen of Virginia and owns real property located at 1217 Avondale Lane, Newport News, Virginia 23602.  Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

14.   Plaintiff, Jason Purse is a citizen of Virginia and owns real property located at 4309 Creekside Loop, Williamsburg, Virginia 23188.  Plaintiff has incurred damages caused by the

EXHIBIT E
Page 7 of 57

drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

15. Plaintiff, Joseph Quartararo is a citizen of Louisiana and owns real property located at 5813 Ruth Street, Metairie, Louisiana 70003. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

16. Plaintiffs, Frank and Yvonne Topf are citizens of Virginia and together own real property located at 2417 Caitlan Loch Lane, Virginia Beach, Virginia 23602. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

17. Plaintiff, Cathy Parker Vapy is a citizen of Louisiana and owns real property located at 9700 Andover Drive, New Orleans, Louisiana 70127. Plaintiff has incurred damages caused by the drywall distributed by defendants and is participating as a class representative for similarly situated individuals.

18. Plaintiffs, Hugh and Tracy Vest are citizens of Virginia and together own real property located at 111 Eston's Run, Yorktown, Virginia 23693. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

19. Plaintiffs, Kenneth and Barbara Wiltz are citizens of Louisiana and together own real property located at 5337 Cameron Blvd., New Orleans, Louisiana 70112. Plaintiffs have incurred damages caused by the drywall distributed by defendants and are participating as class representatives for similarly situated individuals.

EXHIBIT E
Page 8 of 57

## DEFENDANTS

20. Defendant, Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd. is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Defendant manufactured and sold, directly and indirectly, to certain suppliers in the United States.

21. Defendant, Taian Taishan Plasterboard Co., Ltd. ("TTP") is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant, together with its affiliates and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information and belief, Defendant has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States.  Defendant manufactured and sold, directly and

9

indirectly, to certain suppliers in the United States.  Upon information and belief, certain of the

problematic drywall manufactured, imported, exported, distributed, supplied and/or brokered by

Defendant bear markings that state, "Crescent City Gypsum, Inc." or "Crescent City."

22.  Defendant, TTP is a wholly owned subsidiary of Defendant Taishan.  TTP works

collaboratively with Taishan and purchases and/or sells Taishan wallboard products with product

markings written in English designed for sale or resale in the United States.

23.  Defendant, Qinhuangdao Taishan Building Materials Co., Ltd. a/k/a Qinhuang Dao

Taishan Building Materials Co., Ltd. ("Qinhuangdao") is a foreign corporation doing business in

several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas,

North Carolina, and Virginia.  Upon information and belief, Defendant, together with its affiliates

and/or actual or apparent agents, manufactured, sold, distributed, marketed and placed within the

stream of commerce gypsum drywall with the expectation that the drywall would be purchased by

thousands of consumers, if not more, within various States, including but not limited to,

Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Upon information

and belief, Defendant has continuously and systematically distributed and sold drywall to

numerous purchasers in the United States and their drywall is installed in numerous structures in

the United States.  Defendant manufactured and sold, directly and indirectly, to certain suppliers

in the United States.  Upon information and belief, Defendant is the manufacturer, importer,

exporter, distributor, supplier and/or broker of drywall bearing markings that state, "Crescent City

Gypsum, Inc."

24.  Defendant, Qinhuangdao Taishan Building Materials Co., Ltd. a/k/a Qinhuang Dao

Taishan Building Materials Co., Ltd. is a wholly owned subsidiary of Defendant, Taishan Gypsum

10

Co., Ltd. F/k/a Shandong Taihe Dongxin Co., Ltd.

25. During the period when Taishan and its subsidiaries were distributing problematic drywall to the United States, these entities consistently misrepresented the drywall they were exporting complied with ISO and ASTM quality standards. For instance, Taishan's website boasted that it was exporting large quantities of drywall to the United States and that its drywall complied with ISO quality standards. The employees of Taishan and its subsidiaries also sent emails to potential customers boasting about their experience exporting large quantities of drywall to the United States. These employees also provided false assurances that the drywall they were exporting complied with ASTM quality standards.

26. Upon information and belief, Taishan is owned and/or controlled by defendant Beijing New Building Materials Public Limited Co. ("BNBM"), which is a state-owned entity and respectively controlled by the Chinese government. BNBM is traded on the Shenzhen Stock Exchange. Defendant, BNBM caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

27. BMBM consistently exerted control over Taishan and its subsidiaries when these entities were exporting problematic drywall to the United States. For instance, one of BNBM's board members, Tongchun Jia, is the chairman of the board of directors and general manager of Taishan. Mr. Tongchun Jia occupies similar positions with most of Taishan's subsidiaries. Through Mr. Tongchun Jia's positon with Taishan and its subsidiaries, BNBM controls the actions and operations of these entities. Even where Tongchun Jia does not formally hold a position with a Taishan subsidiary, BNBM is able to exert its control over the subsidiary through Mr. Tongchun Jia's influence. For instance, the chairman of the board of TTP, Peng Shi Liang,

11

was also an employee of Taishan. BNBM was thus able to control TTP since the chairman of its

board reported directly to Tongchun Jia. Accordingly, since BNBM had direct control over

Taishan and its subsidiaries, it should be held responsible for their sale of problematic drywall.

28. Defendant China National Building Material Co., Ltd. ("CNBM"), is a partially

owned subsidiary of BNBM Group. Defendant, China National Building Material Co., Ltd.

caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected,

marketed and/or sold.

29. Upon information and belief, defendant BNBM is owned and/or controlled by

defendant Beijing New Building Materials (Group) Co., Ltd. ("BNBM Group"), which is a state

owned entity and respectively controlled by the Chinese government. Defendant BNBM Group

caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected,

marketed and/or sold.

30. Upon information and belief, BNBM Group is owned and/or controlled by China

National Building Materials Group Co. ("CNBM Group"), which is a state owned entity and

respectively controlled by the Chinese government. CNBM Group is traded on the Hong Kong

stock exchange. Defendant CNBM Group caused the drywall at issue in the case to be imported,

distributed, delivered, supplied, inspected, marketed and/or sold.

31. Defendant CNBM USA Corp. is a California corporation with a principal place of

business in California. By information and belief, CNBM USA Corp. is a subsidiary of either

BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group. By

information and belief, CNBM USA Corp. acted as an agent for BNBM, China National Building

Material Co., Ltd., BNBM Group and/or CNBM Group by promoting and marketing the drywall

12

at issue in this litigation to American suppliers.  Accordingly, CNBM USA Corp. caused the

drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed

and/or sold.

32.  Defendant BNBM of American, Inc. ("BNBM America") is a Florida corporation with

a principal place of business in Florida.  By information and belief, BNBM America is a

subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM

Group.  By information and belief, BNBM America acted as an agent for BNBM, China National

Building Material Co., Ltd., BNBM Group and/or CNBM Group by promoting and marketing the

drywall at issue in this litigation to American suppliers.  Accordingly, BNBM America caused the

drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed

and/or sold.

33.  Defendant BNBM USA is a indeterminate entity with an address that is unknown at

this time.  By information and belief, BNBM USA is a subsidiary of either BNBM, China

National Building Material Co., Ltd., BNBM Group or CNBM Group.  By information and belief,

BNBM USA acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM

Group, CNBM Group and/or the Taishan entities by promoting and marketing the drywall at issue

in this litigation to American suppliers.  Accordingly, BNBM USA caused the drywall at issue in

the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

34.  Defendant United Suntech Craft, Inc. ("United Suntech") is a California corporation

with a principal place of business in California.  By information and belief, United Suntech is a

subsidiary of either BNBM, China National Building Material Co., Ltd., BNBM Group, CNBM

Group, or CNBMI Co., Ltd.  By information and belief, United Suntech acted as an agent for

13

BNBM, China National Building Material Co., Ltd., BNBM Group, CNBM Group and/or

CNBMI Co., Ltd. by promoting and marketing the drywall at issue in this litigation to American

suppliers. Accordingly, United Suntech caused the drywall at issue in the case to be imported,

distributed, delivered, supplied, inspected, marketed and/or sold.

35.  Defendant CNBMI Co., Ltd. ("CNBMI") is a foreign corporation doing business in

several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas,

North Carolina, California, and Virginia. By information and belief, CNBMI is a subsidiary of

either BNBM, China National Building Material Co., Ltd., BNBM Group or CNBM Group. By

information and belief, CNBMI is the parent corporation of United Suntech. By information and

belief, CNBMI acted as an agent for BNBM, China National Building Material Co., Ltd., BNBM

Group and/or CNBM Group by promoting and marketing the drywall at issue in this litigation to

American suppliers. Accordingly, CNBMI caused the drywall at issue in the case to be imported,

distributed, delivered, supplied, inspected, marketed and/or sold.

36.  Upon information and belief, Defendant Changzhou Yinhe Wood Industry Co., Ltd.,

is a foreign corporation doing business in several States, including but not limited to, Louisiana,

Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Changzhou Yinhe Wood

Industry Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon

information and belief, Changzhou Yinhe Wood Industry Co., Ltd. manufactured, sold,

distributed, marketed and/or placed within the stream of commerce gypsum drywall with the

expectation that the drywall would be purchased by thousands of consumers, if not more, within

various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas,

North Carolina, and Virginia. Changzhou Yinhe Wood Industry Co., Ltd. has continuously and

systematically distributed and sold drywall to numerous purchasers in the United States and their

drywall is installed in numerous structures in the United States.  Upon information and belief,

Changzhou Yinhe Wood Industry Co., Ltd. manufactured and/or sold to certain suppliers in the

United States.

37.  Defendant Fuxin Taishan Gypsum And Building Material Co., Ltd., is a foreign

corporation and is a subsidiary of Taishan.  Defendant Fuxin Taishan Gypsum And Building

Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered,

supplied, inspected, marketed and/or sold.

38.  Defendant Hubei Taishan Building Material Co., Ltd. is foreign corporation and is a

manufacturer of gypsum.  Defendant Hubei Taishan Building Material Co., Ltd. is a subsidiary of

Defendant BNBM.  Defendant Hubei Taishan Building Material Co., Ltd. caused the drywall at

issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

39.  Upon information and belief, Defendant Jinan Run & Fly New Materials Co., Ltd., is

a foreign corporation doing business in several States, including but not limited to, Louisiana,

Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Jinan Run & Fly New

Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall.  Upon

information and belief, Jinan Run & Fly New Materials Co., Ltd. manufactured, sold, distributed,

marketed and/or placed within the stream of commerce gypsum drywall with the expectation that

the drywall would be purchased by thousands of consumers, if not more, within various States,

including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and

Virginia.  Jinan Run & Fly New Materials Co., Ltd. has continuously and systematically

distributed and sold drywall to numerous purchasers in the United States and their drywall is

15

installed in numerous structures in the United States.  Upon information and belief, Jinan Run & Fly New Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

40.  Upon information and belief, Defendant Nanhai Silk Imp. & Exp. Corporation is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Nanhai Silk Imp. & Exp. Corporation is involved in the manufacturing and/or sale of gypsum drywall.  Upon information and belief, Nanhai Silk Imp. & Exp. Corporation manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Nanhai Silk Imp. & Exp. Corporation has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States.  Upon information and belief, Nanhai Silk Imp. & Exp. Corporation manufactured and/or sold to certain suppliers in the United States.

41.  Upon information and belief, Defendant Pingyi Baier Building Materials Co., Ltd., is a foreign corporation doing business in several States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia.  Pingyi Baier Building Materials Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall.  Upon information and belief, Pingyi Baier Building Materials Co., Ltd. manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum drywall with the expectation that the drywall would be purchased by thousands of consumers, if not more, within various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and

16

Virginia. Pingyi Baier Building Materials Co., Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in the United States and their drywall is installed in numerous structures in the United States. Upon information and belief, Pingyi Baier Building Materials Co., Ltd. manufactured and/or sold to certain suppliers in the United States.

42. Defendant Qinhuangdao Taishan Building Material Co., Ltd., is a foreign corporation and is a manufacturer of gypsum. Defendant Qinhuangdao Taishan Building Material Co., Ltd. is a subsidiary of Taishan. Defendant Qinhuangdao Taishan Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

43. Defendant Shanghai Yu Yuan Imp & Exp Co., Ltd. is a foreign corporation that is responsible for the import/export of the drywall at issue in this litigation to the United States. Defendant Shanghai Yu Yuan Imp & Exp Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

44. Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd, is a foreign corporation and is a manufacturer of plasterboard. Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd. is a subsidiary of Taishan. Defendant Sinkiang Tianshan Building Material And Gypsum Product Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

45. Defendant Sunrise Building Materials Ltd., is a Canadian Corporation with its principle place of business located at Unit 7, 55 Nugget Ave., Scarborough, Toronto, ON, Canada, M15 3L1. Sunrise Building Materials Ltd. is a supplier of drywall and related building products. By information and belief, Sunrise Building Materials Ltd., supplied the drywall at issue in this

17

litigation in certain of the affected states.

46. Defendant Tai'an Jindun Building Material Co., Ltd., is a foreign corporation and is a manufacturer and wholesaler of gypsum products. Defendant Tai'an Jindun Building Material Co., Ltd. has joint-stock agreement with Defendant BNBM. Defendant Tai'an Jindun Building Material Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

47. Defendant Taishan Gypsum Co., Ltd. Lucheng Branch is a foreign corporation that operates a manufacturing plant. Defendant Taishan Gypsum Co., Ltd. Lucheng Branch is a subsidiary of Taishan. Defendant Taishan Gypsum Co. Ltd. Lucheng Branch caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

48. Defendant Taishan Gypsum (Baotou) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Baotou) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

49. Defendant Taishan Gypsum (Chongqing) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Chongqing) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

50. Defendant Taishan Gypsum (Henan) Co., Ltd., is a foreign corporation and is a subsidiary of Taishan. Defendant Taishan Gypsum (Henan) Co., Ltd. caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

51. Defendant Taishan Gypsum (Pingshan) Co., Ltd., is a foreign corporation and is a manufacturer of gypsum products. Defendant Taishan Gypsum (Pingshan) Co., Ltd. is a

18

subsidiary of Taishan. Defendant Taishan Gypsum (Pingshan) Co., Ltd. caused the drywall at

issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

52. Defendant Taishan Gypsum (Pizhou) Co., Ltd. is a foreign corporation and is a

manufacturer of gypsum. Defendant Taishan Gypsum (Pizhou) Co. is a subsidiary of Taishan.

Defendant Taishan Gypsum (Pizhou) Co., Ltd. caused the drywall at issue in the case to be

imported, distributed, delivered, supplied, inspected, marketed and/or sold.

53. Defendant Taishan Gypsum (Tongling) Co., Ltd., is a foreign corporation and is a

subsidiary of Taishan. Defendant Taishan Gypsum (Tongling) Co., Ltd. caused the drywall at

issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

54. Defendant Taishan Gypsum (Xiangtan) Co. Ltd., is a foreign corporation. Defendant

Taishan Gypsum (Xiangtan) Co. Ltd. is a subsidiary of Taishan. Defendant Taishan Gypsum

(Xiangtan) Co. Ltd. caused the drywall at issue in the case to be imported, distributed, delivered,

supplied, inspected, marketed and/or sold.

55. Defendant Yunan Taishan Gypsum And Building Material Co., Ltd., is a foreign

corporation and is a manufacturer and wholesaler of gypsum products. Defendant Yunan Taishan

Gypsum And Building Material Co., Ltd. has a joint-stock agreement with Defendant BNBM.

Defendant Yunan Taishan Gypsum And Building Material Co., Ltd. caused the drywall at issue in

the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

56. Defendant Shaanxi Taishan Gypsum Co., Ltd., is a foreign corporation and subsidiary

of Taishan. Defendant Shaanxi Taishan Gypsum Co., Ltd. caused the drywall at issue in the case

to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

57. Defendant Taishan Gypsum (Hengshui) Co., Ltd., is a foreign corporation and is a

19

manufacturer of gypsum. Defendant Taishan Gypsum (Hengshui) Co. Ltd., is a subsidiary of

Taishan. Defendant Taishan Gypsum (Hengshui) Co,. Ltd. caused the drywall at issue in the case

to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

58. Defendant Taishan Gypsum (Jiangyin) Co., Ltd., is a foreign corporation and is a

manufacturer of gypsum. Defendant Taishan Gypsum (Jiangyin) Co., Ltd. is a subsidiary of

Taishan. Defendant Taishan Gypsum (Jiangyin) Co., Ltd. caused the drywall at issue in the case

to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

59. Defendant Taishan Gypsum (Wenzhou) Co., Ltd., is a foreign corporation and is a

subsidiary of Taishan. Defendant Taishan Gypsum (Wenzhou) Co., Ltd. caused the drywall at

issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold.

60. Defendant Beijing New Material Incubator Co., Ltd., is a foreign corporation and is a

subsidiary of Defendant BNBM. Defendant Beijing New Material Incubator Co., Ltd. caused the

drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed

and/or sold.

61. Upon information and belief, Defendant Qingdao Yilie International Trade Co., Ltd.,

is a foreign corporation doing business in several States, including but not limited to, Louisiana,

Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Qingdao Yilie International

Trade Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon

information and belief, Qingdao Yilie International Trade Co., Ltd. manufactured, sold,

distributed, marketed and/or placed within the stream of commerce gypsum drywall with the

expectation that the drywall would be purchased by thousands of consumers, if not more, within

various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas,

EXHIBIT E
Page 20 of 57

North Carolina, and Virginia. Qingdao Yilie International Trade Co., Ltd. has continuously and

systematically distributed and sold drywall to numerous purchasers in the United States and their

drywall is installed in numerous structures in the United States. Upon information and belief,

Qingdao Yilie International Trade Co., Ltd. manufactured and/or sold to certain suppliers in the

United States.

 62. Upon information and belief, Defendant Shanghai East Best Arts & Crafts Co., Ltd.,

is a foreign corporation doing business in several States, including but not limited to, Louisiana,

Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Shanghai East Best Arts &

Crafts Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall. Upon

information and belief, Shanghai East Best Arts & Crafts Co., Ltd. manufactured, sold,

distributed, marketed and/or placed within the stream of commerce gypsum drywall with the

expectation that the drywall would be purchased by thousands of consumers, if not more, within

various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas,

North Carolina, and Virginia. Shanghai East Best Arts & Crafts Co., Ltd. has continuously and

systematically distributed and sold drywall to numerous purchasers in the United States and their

drywall is installed in numerous structures in the United States. Upon information and belief,

Shanghai East Best Arts & Crafts Co., Ltd. manufactured and/or sold to certain suppliers in the

United States.

 63. Upon information and belief, Defendant Siic Shanghai International Trade (Group)

Co., Ltd., is a foreign corporation doing business in several States, including but not limited to,

Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Siic Shanghai

International Trade (Group) Co., Ltd. is involved in the manufacturing and/or sale of gypsum

drywall. Upon information and belief, Siic Shanghai International Trade (Group) Co., Ltd.
manufactured, sold, distributed, marketed and/or placed within the stream of commerce gypsum
drywall with the expectation that the drywall would be purchased by thousands of consumers, if
not more, within various States, including but not limited to, Louisiana, Alabama, Florida,
Mississippi, Texas, North Carolina, and Virginia. Siic Shanghai International Trade (Group) Co.,
Ltd. has continuously and systematically distributed and sold drywall to numerous purchasers in
the United States and their drywall is installed in numerous structures in the United States. Upon
information and belief, Siic Shanghai International Trade (Group) Co., Ltd. manufactured and/or
sold to certain suppliers in the United States.

64. Upon information and belief, Defendant Tianjin Tianbao Century Development Co.,
Ltd., is a foreign corporation doing business in several States, including but not limited to,
Louisiana, Alabama, Florida, Mississippi, Texas, North Carolina, and Virginia. Tianjin Tianbao
Century Development Co., Ltd. is involved in the manufacturing and/or sale of gypsum drywall.
Upon information and belief, Tianjin Tianbao Century Development Co., Ltd. manufactured, sold,
distributed, marketed and/or placed within the stream of commerce gypsum drywall with the
expectation that the drywall would be purchased by thousands of consumers, if not more, within
various States, including but not limited to, Louisiana, Alabama, Florida, Mississippi, Texas,
North Carolina, and Virginia. Tianjin Tianbao Century Development Co., Ltd. has continuously
and systematically distributed and sold drywall to numerous purchasers in the United States and
their drywall is installed in numerous structures in the United States. Upon information and
belief, Tianjin Tianbao Century Development Co., Ltd. manufactured and/or sold to certain
suppliers in the United States.

22

65. Defendant, Shandong Oriental International Trading Corp., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

66. Defendant, Lianyungang Yuntai International Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

67. Defendant, Shanghai Yuyuan Market Import & Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

68. Defendant, Orient International Holding Shanghai Foreign Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

69. Defendant, Qingdao Aoni Decoration Board and Materials Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

70. Defendant, Beijing Building Materials Import & Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

71. Defendant, Taian Taigao Trading Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

23

72.  Defendant, Nantong Economic and Technological Development Zone Corporation, is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

73.  Defendant, Qingdao Kanghong Import and Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

74.  Defendant, Zhejiang Provincial Second Light Industry Enterprises Group Imp. & Exp. Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

75.  Defendant, SIIC Shanghai International Trade Group Pudong Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

76.  Defendant, Jiangsu Sainty International Economic & Technical Cooperation Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

77.  Defendant, Zibo Interntional Economic and Technical Cooperation Corporation, is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

24

78.  Defendant, Shanghai Kaidun Development Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

79.  Defendant, Shanghai Yujin Industry Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

80.  Defendant, Hangzhou Great Import and Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

81.  Defendant, Xuzhou Hanbang Global Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

82.  Defendant, China Xuzhou International Economic & Technological Cooperation Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

83.  Defendant, Jiangsu Easthigh Group Import & Export Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

84.  Defendant, Qingdao Joy Industrial & Development Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

25

85.   To the extent any of the foreign defendants are deemed to be foreign sovereign entities, including but not limited to Taishan, BNBM, China National Building Material Co., Ltd., BNBM Group and CNBM Group, Plaintiffs bring their claims against these entities pursuant to 28 U.S.C. § 1605(a)(2), the commercial activity exception to the Foreign Sovereign Immunities Act, or alternatively under § 1605(a)(5), the tortious act exception.  Plaintiffs allege that the claims against the foreign defendants are based upon commercial activities carried on in the United States along with entities such as CNBM USA Corp, BNBM American, and United Suntech.  The claims also seeks monetary damages against a foreign state for damage to property occurring in the United States, caused by the tortious acts or omissions of that foreign state, or of any official or employee of that foreign state while acting within the scope of his office or employment.

## FACTS REGARDING DEFENDANTS' CONDUCT

### A.   DEFENDANTS PURPOSEFULLY AVAILED THEMSELVES OF THE BENEFITS OF CONDUCTING BUSINESS IN THE UNITED STATES AND COLLABORATED FOR PURPOSES OF CULTIVATING THE AMERICAN MARKET AND SELLING THEIR DRYWALL TO AMERICAN CONSUMERS

86.   Many of the Taishan defendants that sell and/or resell Taishan drywall with markings written in English for the explicit purpose of sale to the United States market, had counsel for Taishan state on their behalf but without entering an appearance on their behalf that they have no expectation whatsoever that they were going to purposely avail themselves of state markets of any particular state in the United States.

87.   Defendants were aware that their products were being sold in the United States notwithstanding this representation by their counsel.  For instance, during the time period when its drywall was being sold to American consumers, Taishan's website boasted that it was exporting

26

large quantities of drywall to the United States and that its drywall complied with ISO quality

standards. In addition, Taishan's employees as well as the employees of its subsidiaries sent

emails to potential customers boasting about their experience exporting large quantities of drywall

to the United States and providing false assurances that their drywall complied with ASTM

quality standards.

88. The Defendants in this litigation have not only purposefully availed themselves of the

benefits of conducting business in the United States by marketing their products in the United

States but also by establishing corporate entities with a physical presence in the United States.

These entities were set up by Defendants to further market and promote the sale of their products

to American consumers. For instance, the foreign defendants have incorporated at least three

entities in the United States (CNBM USA Corp, BNBM America and United Suntech) that

operate within the United States and coordinate the sale of Defendants' products to American

customers. These domestic entities are part of a larger effort to cultivate a market for Defendants'

products in the United States.

89. By way of example of Defendants' efforts to cultivate a market for their products in

the United States, discovery has revealed communications by an individual using an e-mail

address that includes the term "BNBM USA" as part of the address. Although Plaintiffs have

been unable to locate an entity by the name of BNBM USA, it is presumed that the individual

using this e-mail address is employed by one of the BNBM entities. The use of a "BNBM USA"

e-mail address by a BNBM employee demonstrates that Defendants intended to market their

products in the United States.

90. Defendants also collaborated for purposes of cultivating the market in the United

States and selling products to American consumers. Although Plaintiffs have been unable to locate an entity by the name of BNBM USA, the BNBM employee using the BNBM USA e-mail address coordinated the sale of Taishan products to American consumers. For instance, the individual using this e-mail address arranged for American customers to visit Taishan's factories in China.

91. By way of further example, Taishan and its subsidiaries operated as one entity for purposes of distributing drywall to the United States. For instance, TTP's employees often held themself out as Taishan employees through business cards and information communicated to potential customers via email. TTP's employees also participated in the sale of Taishan's drywall. Additionally, the sales people for Taishan and its subsidiaries would hold meetings to discuss matters involving the sale of drywall. Both Taishan and TTP also sold drywall under the same brand name.

**B.   THE DEFENDANTS HAVE DELIBERATELY INCREASED PLAINTIFFS' LITIGATION EXPENSES, DELAYED THESE PROCEEDINGS AND THWARTED PLAINTIFFS' DISCOVERY EFFORTS**

92. Upon information and belief, the manufacturing defendants have deliberately delayed the progress of this litigation and taken measures to increase the litigation costs to plaintiffs. For instance, Defendants like Taishan have only entered their appearances in a case after being served with a complaint consistent with the requirements of Hague Convention. Taishan refuses to accept service of process even though it has entered its appearance in this litigation and is represented by counsel. Taishan's clear purpose in refusing to accept service of process is to delay the service of complaints and to force plaintiffs to incur hundreds of thousands of dollars in service costs.

93. Taishan also deliberately increased plaintiffs' litigation costs by offering inadequate

28

witnesses for the jurisdictional deposition conducted in Hong Kong and by obstructing plaintiffs'
efforts to obtain discovery from these witnesses. Notwithstanding that plaintiffs incurred tens of
thousands of dollars to attend the depositions in Hong Kong, Taishan produced inadequate
witnesses, retained a check interpreter who repeatedly interupted the depositions, and did not
allow adequate questioning of the witnesses.

94. Taishan also deliberately increased plaintiffs' litigation costs by refusing to participate
in *Germano* until after plaintiffs had concluded default proceedings. Taishan was clearly aware of
the *Germano* default proceedings since it managed to file an appeal within the time period
contemplated by the Federal Rules of Civil Procedure. Instead of defending the case, Taishan
allowed plaintiffs to incur additional litigation expenses while it observed the default proceedings.
Taishan's appeal to the Fifth Circuit has further increased these litigation expenses to plaintiffs.

95. Upon information and belief, the manufacturing defendants have also taken deliberate
measures in concert with one another, designed to thwart discovery and to hide the interrelated
nature of the manufacturing defendants. For instance, defendants such as BNBM and their related
entities have been served with various complaints and have been held in default since they refuse
to enter an appearance or offer any defense in this litigation. The clear purpose of this refusal is to
hide the company's ownership interests in defendants like Taishan and to avoid discovery on
these and other topics, and deprive plaintiffs of the knowledge of their ownership and relationship
with each other. These defendants intransigence and failure to participate in federal judicial
proceedings highlights their fraudulent business practices in this jurisdiction.

## FACTS REGARDING DEFENDANTS' PROBLEMATIC DRYWALL

96. Defendants' drywall is predominantly composed of gypsum.

97. In "problematic drywall" (such as that designed, manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold by Defendants herein), sulfur compounds exit the drywall.

98. The sulfur compounds, including Hydrogen Sulfide, Carbonyl Sulfide, and Carbon Disulfide, exit Defendants' drywall and cause rapid sulfidation and damage to personal property (such as air conditioning and refrigerator coils, faucets, utensils, electrical wiring, copper, electronic appliances and other metal surfaces and property).

99. Exposure to the sulfur compounds that exit Defendants' drywall, causes personal injury resulting in eye problems, sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

100. Although the drywall functions according to its intended purpose as a building component, it is unfit for this purpose due to the damaging side effects and/or because its use is so inconvenient that Plaintiffs would not have purchased Taishan drywall and/or their homes had the side effects been disclosed by Defendants.

101. As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' and the Class Members' structures, personal property, and bodies have been exposed to Defendants' problematic drywall and the harmful effects of the sulfur compounds that exit from Defendants' problematic drywall.

102. Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold the problematic drywall, which was unfit for its intended purpose and unreasonably dangerous in its normal use in that the drywall caused rapid sulfidation and damage to personal property in Plaintiffs' and Class Members' homes, residences

30

or structures and/or caused personal injury resulting in eye problems, a sore throat and cough, nausea, fatigue, shortness of breath, fluid in the lungs, and/or neurological harm.

103. Defendants recklessly, wantonly, and/or negligently manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed and/or sold the problematic drywall at issue in this litigation.

104. Defendants recklessly, wantonly and/or negligently implemented faulty procedures for purposes of formulating, preparing, testing, and otherwise ensuring the quality and/or character of the problematic drywall at issue in this litigation.

105. As a direct and proximate result of Defendants' problematic and unfit drywall and the harmful effects of the sulfur compounds exit these products, Plaintiffs and Class Members have suffered, and continue to suffer economic harm and/or personal injury.

106. As a direct and proximate result of Defendants' problematic and unfit drywall and the harmful effects of the sulfur compounds exit these products, the Plaintiffs and the Class Members have suffered, and continue to suffer damages. These damages include, but are not limited to, costs of inspection; costs and expenses necessary to remedy, replace and remove the problematic drywall and other property that has been impacted; lost value or devaluation of their homes, residences or structures and property as a direct result of damage caused to the property and indirect damage resulting from perceived defects to the property, including stigma damages; loss of use and enjoyment of their home and property; and/or damages associated with personal injuries.

107. As a direct and proximate result of Defendants' problematic and unreasonably dangerous drywall and the harmful effects of the sulfur compounds that exit these products,

31

Plaintiffs and the Class Members have been exposed to harmful sulfur compounds, suffered

personal injury, have been placed at an increased risk of disease, and have need for injunctive

relief in the form of repair and remediation of their home, recision of contracts, the ordering of

emergency/corrective notice, the ordering of testing and monitoring, and/or the ordering of

medical monitoring.

**FACTS REGARDING UNITED STATES AND CHINESE
INVESTORS WHO AIDED AND ABETTED DEFENDANTS**

108.  J.P. Morgan Chase & Co. ("J.P. Morgan"), Morgan Stanley and certain other

corporations and entities (collectively the "Investing Entities"), engaged in a deliberate and/or

reckless course of conduct designed to aid and abet Defendants in the manufacture, exporting,

importing, distribution, delivery, supply, marketing, and/or sale of the defective drywall at issue in

this litigation.

109.  By information and belief, but for these investments by the Investing Entities,

Defendants would not have been able to manufacture, export, import, distribute, deliver, supply,

market, and/or sell of the defective drywall at issue in this litigation.

110.  The Investing Entities were aware or should have been aware that Defendants were

manufacturing, exporting, importing, distributing, delivering, supplying, marketing, and/or selling

the defective drywall at issue in this litigation with the intent to sell and distribute the drywall in

the United States.

111.  The Investing Entities were aware or should have been aware that Defendants were

manufacturing, exporting, importing, distributing, delivering, supplying, marketing, and/or selling

the defective drywall at issue in this litigation in a manner that would make it difficult for injured

32

consumers (located in the United States) to accomplish service on the foreign defendants.

112.  Notwithstanding their apparent knowledge and/or negligent failure to discover the tortious scheme by the foreign defendants, the Investing Entities purposefully made investments with these foreign defendants in a manner that was designed to shield them from liability to American property owners.

113.  For instance, J.P. Morgan acquired a 12.3% interest in CNBM's tradeable shares with the understanding that this entity would profit from its exploitation of homeowners seeking to rebuild their lives after the devastation of hurricanes Rita and Katrina.  This type of investment was ideal to the Investing Entities since these investments could be very profitable while avoiding the risk of loss where the foreign defendants can avoid the service of process by American consumers and responsibility for their tortious conduct.

114.  Other entities that are known to own an interest in CNBM are Atlantis Investment Management Ltd., Schroder Investment Management Limited, Baillie Gifford & Co., Callander Alex, Menzies Robin, Plowden Charles, Telfer Andrew, Warden Alison, Whitley Sarah, and Government of Singapore Investment Corporation Pte Ltd.

115.  Entities that are known to own an interest in BNBM are China Construction Bank, Cha Genlou, Industrial and Commercial Bank of China, Aerospace Science & Technology Finance Co., Ltd., China Social Insurance Fund Portfolia 108, Bank of China, Agricultural Bank of China, Zhongrong International Trust Co., Ltd.

116.  By investing in entities such as CNBM and BNBM, the Investing Entities put themselves in a position to profit from the exploitation of American consumers who were injured by Defendants.

33

117.    Accordingly, the Investing Entities engaged in a course of conduct, individually and/or collectively, that caused the Plaintiffs' and Class Members' exposure to the defective drywall at issue in this litigation by virtue of their interdependent conscious parallel conduct in investing in foreign entities responsible for the manufacture, exporting, importing, distribution, delivery, supply, inspection, marketing, and/or sale of the defective drywall.

118.    Additional discovery will reveal the full role and responsibility of the Investing Entities for the damages incurred by Plaintiffs and Class Members and their potential as party defendants.

## CLASS ACTION ALLEGATIONS

119.    All Plaintiffs bring this suit as a class action pursuant to Rules 23(a), (b)(1), (b)(2), (b)(3) and/or 23(c)(4) of the Federal Rules of Civil Procedure, on behalf of themselves and the following Class comprised of:

> All owners and residents (past or present) of real property located in the United States containing problematic Chinese drywall manufactured, sold, distributed, and/or supplied by the Defendants.

120.    The following Persons shall be excluded from the class: (1) Defendants and their subsidiaries, affiliates, officers and employees; (2) all persons who make a timely election to be excluded from the proposed Class; (3) governmental entities; and (4) the judge(s) to whom this case is assigned and any immediate family members thereof.

121.    Upon information and belief, Defendants' problematic and unreasonably dangerous drywall was installed in at least hundreds of homes, residences, or other structures owned by plaintiffs and class members.  Therefore, the class is sufficiently numerous such that the joinder of all members of the class in a single action is impracticable.

34

122.   There are numerous common questions of law and fact that predominate over any questions affecting only individual members of the class.  Among these common questions of law and fact are the following:

a.      whether Defendants' drywall products are problematic and/or unfit for their intended purpose;

b.      whether Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold problematic drywall products;

c.      whether plaintiffs are entitled to recover compensatory, exemplary, incidental, consequential, and/or other damages as a result of Defendants' unlawful and tortious conduct; and

d.      whether plaintiffs are entitled to recover injunctive and/or equitable relief as a result of Defendants' unlawful and tortious conduct.

123.   The legal claims of named Plaintiffs are typical of the legal claims of other class members.  Named plaintiffs have the same legal interests and need for legal remedies as other class members.

124.   Named plaintiffs are adequate representatives of the class.  Together with their legal counsel, each will fairly and adequately protect the interests of class members.  Named plaintiffs have no known conflict with the class and are committed to the vigorous prosecution of this action.

125.   The undersigned counsel are competent counsel experienced in class action litigation, mass torts, and complex litigation involving harmful products.  Counsel will fairly and adequately protect the interests of the class.

35

126. The various claims asserted in this action are certifiable under the provisions of Federal Rules of Civil Procedure 23(b)(1) because prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class; or adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other class members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

127. The claims for injunctive relief in this case are certifiable under Fed. R. Civ. P. 23(b)(2). Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief is appropriate respecting the class as a whole.

128. A class action is superior in this case to other methods of dispute resolution. The class members have an interest in class adjudication rather than individual adjudication because of their overlapping rights. It is highly desirable to concentrate the resolution of these claims in this single forum because it would be difficult and highly unlikely that the affected Class Members would protect their rights on their own without this class action case. Management of the class will be efficient and far superior to the management of individual lawsuits. Accordingly, plaintiffs' legal claims are properly certified pursuant to Rule 23(b)(3).

129. The issues particularly common to the class members' claims, some of which are identified above, are alternatively certifiable pursuant to Fed. R. Civ. P. 23(c)(4), as resolution of these issues would materially advance the litigation, and class resolution of these issues is superior to repeated litigation of these issues in separate trials.

**COUNT I**
**NEGLIGENCE**
**(All Defendants)**

130.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

131.  Defendants owed a duty to plaintiffs and class members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall, including a duty to adequately warn of their failure to do the same.

132.  Defendants knew or should have known that their wrongful acts and omissions would result in harm and damages in the manner set forth herein.

133.  Defendants breached their duty to exercise reasonable care in the designing, manufacturing, exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling the problematic drywall.

134.  Defendants likewise breached their duties to plaintiffs and class members by failing to warn about the problematic nature of the drywall.  Defendants, through the exercise of reasonable care, knew or should have known the nature of the problematic drywall and the adverse effects that it could have on the property and bodies of plaintiffs and class members.

135.  Defendants breached their duty to exercise reasonable care to timely remove and/or recall from the market and/or otherwise prevent the continued contact of plaintiffs and class members with the drywall, upon leaning it had been sold in an unreasonably dangerous condition.

136.  Given the problematic nature of Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to plaintiffs and class members.

37

137.  As a direct and proximate cause of Defendants' acts and omissions, plaintiffs and class members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT II
## NEGLIGENCE PER SE
### (All Defendants)

138.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

139.  Defendants owed statutory duties to plaintiffs and class members to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

140.  Defendants breached their statutory duties to the plaintiffs and class members by failing to exercise reasonable care in a) designing, b) manufacturing, c) exporting, d) importing, e) distributing, f) delivering, g) supplying, h) inspecting, I) marketing, and/or j) selling this drywall.

141.  Defendants likewise breached their statutory duties, including but not limited to those imposed under the International Building Code ("IBC") and other State and local Building Codes, to Plaintiffs and Class Members by failing to warn about the problematic nature of the drywall.  For instance, it is specifically alleged that Defendants furnished the drywall in violation of ASTMC C 1396/C 1396M-069, and its predecessor(s).

142.  Defendants, through the exercise of reasonable care, knew or should have known the nature of the problematic drywall and the adverse effects that it could have on the property and bodies of Plaintiffs and Class Members.

143.  Given the problematic nature of Defendants' drywall, Defendants knew or should have known that their product could, and would, cause harm, damages and/or personal injuries to plaintiffs and class members.

38

144. As a direct and proximate cause of Defendants' acts and omissions, plaintiffs and class members were harmed and have incurred damages and/or personal injuries as described herein.

## COUNT III
## STRICT LIABILITY
### (All Defendants)

145. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

146. At all times relevant hereto, Defendants were in the business of distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

147. The drywall, including that installed in the homes of class members was placed by Defendants in the stream of commerce.

148. Defendants knew that the subject drywall would be used without inspection by consumers.

149. Defendants intended that the drywall reach the ultimate consumers, such as class members, and it indeed reached class members when it was installed in their homes.

150. When installed in class members' homes, the drywall was in substantially the same condition as it was in when Defendants manufactured, sold, and/or delivered it.

151. At all times relevant hereto the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

152. The subject drywall was not misused or altered by any third parties.

153. The Defendants' drywall was improperly manufactured, designed, inspected, tested, marketed, distributed, and sold.

154. The design impropriety was in designing drywall that allows high levels of sulfur

39

compounds to exit the drywall.

155.  The manufacturing impropriety was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur compounds that were too high and allow high levels of sulfur compounds to exit the drywall.

156.  The drywall was also problematic because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a unacceptable condition, as described above.

157.  The Defendants' negligence in manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to class members.

158.  The drywall is also problematic and unreasonably dangerous because Defendants failed to adequately warn and instruct class members of their negligent design, inspection, testing, manufacturing, marketing, and selling of the drywall.

159.  Class Members were unaware of the unreasonably dangerous propensities and condition of the drywall, nor could class members, acting as reasonably prudent people discover that Defendants' drywall was problematic, as set forth herein, or perceive its danger.

160.  Defendants' problematic drywall was much more dangerous and harmful than expected by the average consumer and by class members.

161.  Defendants' problematic drywall benefit to class members, if any, was greatly outweighed by the risk of harm and danger to them.

162.  The harmful and dangerous propensities of the drywall, as well as Defendants' failure to adequately warn class members of these propensities rendered the drywall unreasonably dangerous and

was the direct and proximate cause of damages and/or personal injuries to class members.

**COUNT IV**
**BREACH OF EXPRESS AND/OR IMPLIED WARRANTIES**
**(All Defendants)**

163.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

164.  Defendants and/or their agents were in privity with plaintiffs and class members and/or plaintiffs and class members were foreseeable third party beneficiaries of any warranty.

165.  At the times Defendants utilized, supplied, inspected, and/or sold this drywall for use in structures owned by plaintiffs and class members, Defendants knew, or it was reasonably foreseeable, that the drywall would be installed in structures owned by plaintiffs and class members for use as a building material, and expressly or impliedly warranted the product to be fit for that use.

166.  Defendants placed their drywall products into the stream of commerce in a problematic condition and these products were expected to, and did, reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

167.  Although the drywall functions according to its intended purpose as a building component, it is unfit, problematic as alleged in Paragraph 100 and not merchantable for this purpose due to the damaging side effects and/or because its use is so inconvenient that Plaintiffs would not have purchased their homes had the side effects been disclosed by Defendants.

168.  The Defendants breached their warranty because the drywall was not fit and safe for the particular purposes for which the goods were required (to be installed in structures owned by plaintiffs and class members as a building material) due to the problems set forth herein.

169.  Defendants had reasonable and adequate notice of the plaintiffs' and the class members' claims for breach of warranty and failed to cure.

41

170. As a direct and proximate cause of Defendants' breach of warranties, plaintiffs and class members have incurred harm and damages and/or personal injuries as described herein.

## COUNT V
### REDHIBITION
#### (By Louisiana Plaintiffs Against All Defendants)

171. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

172. The drywall manufactured, distributed and/or sold by Defendants was not reasonably fit for its ordinary and intended purpose as alleged in Paragraph 100 above.

173. Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the premises, in accordance with La. Civ. Code art. 2524.

174. In addition, or in the alternative, the drywall manufactured, distributed and/or sold by Defendants contained redhibitory defects, in that, at the time of delivery, the propensity to allow sulfur compounds to exit the drywall renders the drywall so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known of the redhibitory defect or defects.

175. In the alternative, the defects are redhibitory defects in that, while not rendering the drywall totally useless, diminish the drywall's use and/or value to such an extent that it must be presumed that the buyer would have bought it, but for a lesser price.

176. The Defendants are conclusively presumed to know of the redhibitory defects in the drywall manufactured by them.

177. In addition, it is believed and alleged that Defendants knew of the redhibitory defects in the drywall at the time the drywall was delivered and/or sold.

178. Defendants have had numerous opportunities to repair and/or replace the drywall and

EXHIBIT E
Page 42 of 57

associated fixtures and/or building components and have failed to do so; in addition, and/or in the alternative, such requests have been, would have been and/or would be futile. All Defendants, in addition, or alternatively, had actual knowledge of the problems in the drywall and the need for replacement, remediation and/or repair.

179. All Defendants are therefore liable to all Louisiana Plaintiffs for a return of the purchase price, (with interest from the time it was paid), reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the drywall and associated items, for damages, and for reasonable attorneys' fees, in accordance with La. Civ. Code art. 2545.

**COUNT VI**
**LOUISIANA PRODUCTS LIABILITY ACT**
**(All Defendants)**

180. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

181. In addition to any and all damages, attorneys fees and other remedies made available to Louisiana Plaintiffs under the warranty of fitness and/or warranty against redhibitory defects, the Manufacturing Defendants are liable to Louisiana Plaintiffs under the Louisiana Products Liability Act, ("LPLA"), La. R.S. 9:2800.51, *et seq.*

182. The Manufacturing Defendants, upon information and belief, expressly warranted that the gypsumboards manufactured and sold are guaranteed to be free from defects in materials and workmanship.

183. The drywall at issue is, in all cases, unreasonably dangerous by virtue of the unreasonable emission of sulfur compounds which do not in any way contribute to or enhance the utility of the drywall, yet pose a risk to the wiring, plumbing, appliances, personal property, overall economic value of the property and financial security of the owner, and/or the health of the residents of the property.

43

184. At all times pertinent and material hereto, there existed alternative feasible manufacturing processes and/or designs of drywall which perform all of the functions and utility of traditional drywall, without allowing unreasonable levels of sulfur compounds to exit the drywall.

185. At all times pertinent and material hereto, Manufacturing Defendants knew that their drywall was unreasonably dangerous and/or problematic as set forth herein.

186. In the alternative, Manufacturing Defendants should have, at all times pertinent and material hereto, known of the unreasonably dangerous and/or problematic characteristics and/or conditions, had they reasonably employed then-existing scientific and/or technical knowledge, reasonable testing, and/or other reasonable and then-accepted methods of quality assurance and/or quality control.

187. Defendants' drywall is unreasonably dangerous in composition or construction in that, at the time it left Defendant's control, it deviated in a material way from Defendant's own specifications or performance standards.

188. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in design, in that, at the time the drywall left Defendant's control, there existed an alternative design for the product that was capable of preventing Plaintiffs' damage, and the likelihood of causing the plaintiffs' damage and the gravity of that harm outweighed the burden (if any) on the Defendants in adopting such alternative design and the adverse effect (if any) on the utility of the drywall.

189. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous in that it fails to conform to an express warranty about the product which induced the use of the product and caused damage to Plaintiffs to the extent that the warranty was untrue.

190. In addition, and in the alternative, Defendants' drywall is unreasonably dangerous due to

an inadequate warning, in that, at the time the drywall left Defendant's control, the drywall possessed a

characteristic that might cause damage and yet Defendant failed to use reasonable care to provide an

adequate warning of such characteristics and/or dangers to users and/or handlers of the drywall.

191.  Defendants are therefore liable to Louisiana Plaintiffs for all damages reasonable in the

premises.

## COUNT VII
## PRIVATE NUISANCE
### (All Defendants)

192.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

193.  The Defendants' tortious or wrongful acts or omissions have caused sulfur compounds

and/or other chemical leaching into structures owned by Plaintiffs and Class Members which has

unreasonably interfered, and continues to interfere, with the Plaintiffs' and Class Members' use and

enjoyment of their properties and caused them harm and damage as discussed herein.

194.  Defendants' interference has impaired the rights of Plaintiffs' and Class Members' health,

comfort, safety, free use of their property, and/or peaceful enjoyment of their property.

195.  Defendants' invasions were intentional and unreasonable, and/or unintentional but

otherwise negligent or reckless.

196.  The interference with Plaintiffs' and Class Members' use of their property caused by

Defendants is substantial and is ongoing.

197.  Defendants' private nuisance was the direct, proximate, and foreseeable cause of

Plaintiffs' and Class Members' damages, injuries, harm, loss, and increased risk of harm, which they

suffered and will continue to suffer.

45

198.  As a direct and proximate cause of Defendants' creation of a private nuisance, Plaintiffs and Class Members have incurred harm and damages and/or personal injuries as described herein.

## COUNT VIII
## UNJUST ENRICHMENT
### (All Defendants)

199.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

200.  Defendants received money as a result of plaintiffs' and class members' purchases of Defendants' problematic drywall, or purchases of structures containing this drywall, either directly or through an agent, and Defendants wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

201.  Defendants' acceptance and retention of these benefits under the circumstances make it inequitable and unjust for Defendants to retain the benefit without payment of the value to the plaintiffs and the class members.

202.  Defendants, by the deliberate and tortious conduct complained of herein, have been unjustly enriched in a manner which warrants restitution.

## COUNT IX
## VIOLATION OF CONSUMER PROTECTION ACTS
### (All Defendants)

203.  Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

204.  This is an action for relief under the various Consumer Protection Acts of the jurisdictions in which affected properties are present, including but not limited to, L.SA-R.S. 51:1401, *et seq.* (Louisiana Unfair Trade Practices and Consumer Protection Law); Ala. Code 1975 § 8-19-1, *et seq.* (Alabama Deceptive Trade Practices Act); G.S. § 75-1.1, *et seq.* (North Carolina Consumer Protection Act); F.S. § 501.201, *et seq.* (Florida Deceptive and Unfair Trade Practices Act); Va. Code.

46

Ann. § 59.1-196, *et seq.* (Virginia Consumer Protection Act); Tex. Bus. Com. Code Ann. § 17.41, *et seq.* (Texas Deceptive Trade Practices-Consumer Protection Act); Miss. Code Ann. § 75-24-1, *et seq.* (Mississippi Consumer Protection Act).

205. The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this complaint, including but not limited to, the knowing misrepresentation or failure to disclose the source, affiliation, origin, characteristics, ingredients, standards and quality of problematic drywall constitute violation of the provisions of the Consumer Protection Acts of the Relevant States.

206. Plaintiffs and class members have suffered actual damages as a result of Defendants' violation of these Consumer Protection Acts and are entitled to relief.

207. As a direct and proximate cause of Defendants' violations of the Consumer Protection Acts of the Relevant States, plaintiffs and class members have incurred harm and damages as described herein.

**COUNT X**
**EQUITABLE AND INJUNCTIVE RELIEF AND MEDICAL MONITORING**
**(All Defendants)**

208. Plaintiffs adopt and restate the preceding paragraphs as if fully set forth herein.

209. Plaintiffs and the class members are without adequate remedy at law, rendering injunctive and other equitable relief appropriate.

210. Plaintiffs and the class members will suffer irreparable harm if the Court does not render the injunctive relief and medical monitoring relief set forth herein, and if defendants are not ordered to recall, buy back, rescind, and/or repair the structures owned by plaintiffs and class members.

47

211. Plaintiffs, on behalf of themselves and all others similarly situated, demand injunctive and equitable relief and further, that defendants be ordered to: (1) to buy back or rescind the contracts for sale of the drywall installed in plaintiffs' and class members' homes or other structures, or in the alternative, remediate, repair and/or replace the drywall in such structures upon proof by the defendants of the feasibility of such remedy or repair; (2) cease and desist from misrepresenting to the Class and the general public that the drywall is not problematic and/or unreasonably dangerous as alleged herein; (3) institute, at their own cost, a public awareness campaign to alert the class and general public of the harm and dangers associated with the drywall; and (4) create, fund, and support a medical monitoring program.

212. Until Defendants' problematic drywall has been removed and remediated, Defendants must provide continued air monitoring in the structures owned by plaintiffs and class members.

213. Plaintiffs and class members have been exposed to greater than normal levels of sulfur compounds as a result of exposures to Defendants' problematic and unfit drywall and have suffered personal injuries as a result.

214. The sulfur compounds which exit from the Defendants' drywall and to which plaintiffs and class members have been exposed are proven unreasonably dangerous.

215. Plaintiffs' and class members' exposures were caused by the Defendant's negligent or otherwise tortious conduct.

216. Plaintiffs' and class members' exposure may lead to serious health problems, diseases, and medical conditions that may be prevented by timely medical diagnosis and treatment.

217. The method and means for diagnosing the plaintiffs' and class members' potential medical problems are well accepted in the medical and scientific community and will be of great

48

benefit to the plaintiffs and class members by preventing or minimizing health problems that they may encounter as a result of the problematic and unfit drywall.

218.   As a proximate result of their exposure to sulfide and other noxious compounds from Defendants' problematic and unfit drywall, plaintiffs and class members have developed a significantly increased risk of contracting a serious latent disease.

219.   Monitoring procedures exist that make the early detection of any latent disease possible that are different from those normally recommended in the absence of the exposure.

220.   The prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of the class members, hereby demand a trial by jury as to all issues so triable as a matter of right.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs, on behalf of themselves and all others similarly situated demand upon Defendants jointly and severally for:

a.   an order certifying the case as a class action;

b.   an order certifying the class;

c.   an order appointing plaintiffs as the class representatives of the class;

d.   an order appointing undersigned counsel and their firms as counsel for the class;

e.   compensatory and statutory damages;

f.   punitive damages as allowed by law;

49

g.     pre and post-judgment interest as allowed by law;

h.     injunctive relief;

I.     an award of attorneys' fees as allowed by law;

j.     an award of taxable costs; and

k.     any and all such further relief as this Court deems just and proper.

Respectfully submitted,

Dated: June 13, 2011

Russ M. Herman, Esquire (Bar No. 6819)
Leonard A. Davis, Esquire (Bar No. 14190)
Stephen J. Herman, Esquire (Bar No. 23129)
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
LDavis@hhkc.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin
Fred S. Longer
Matthew C. Gaughan
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*
*MDL 2047*

50

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm. LLC
P.O. Drawer H
106 W. Seventh Street
Reserve, LA 70084
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Robert C. Josefsberg
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
rjosefsberg@podhurst.com

Bruce William Steckler
Baron & Budd, P.C.
3102 Oak Lawn Ave., Suite 1100
Dallas, TX 75219
Phone: (214) 521-3605
Fax: (214) 520-1181
bsteckler@baronbudd.com

Ervin A. Gonzalez
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
Lambert and Nelson
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@lambertandnelson.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
  & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Jerrold Seth Parker
Parker, Waichman, Alonso LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

51

James Robert Reeves
Lumpkin & Reeves
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@lumpkinreeves.com

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Lewis & Roberts
3700 Glenwood Avenue, Suite 410
Raleigh, NC 27612
Phone: (919) 981-0191
Fax: (919) 981-0431
dkb@lewis-roberts.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
rserpe@serpefirm.com

## OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W
Suite 650
Washington, DC 20006
Phone: (202) 540-7200
Fax: (202) 540-7201
rlewis@hausfeldllp.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

Jeremy W. Alters
Alters Law Firm, P.A.
4141 N.E. 2nd Avenue
Suite 201
Miami, FL 33137
Phone: (305) 571-8550
Fax: (305) 571-8559
jeremy@alterslaw.com

52

# COUNSEL FOR INDIVIDUAL PLAINTIFFS[1]

**Allison Grant, P.A.,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Haya, Laura and Haya, Daniel and Irene


**Berniard Law Firm, Gregory DiLeo and Kanner & Whiteley,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Wiltz, Kenneth & Barbara

**Baron & Budd and Alters, Boldt, Brown, Rash & Culmo**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Amorin, Eduardo and Carmen

**Herman, Herman, Katz & Colar, LLP,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Quartararo, Joseph
Vapy, Cathy Parker

**Levin, Fishbein, Sedran & Berman**
**Colson, Hicks, Eidson, Colson, Matthews, Martinez, Gonzales,**
**Kalbac & Kane; and Hausfeld, LLP,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Fong, Charmaine                Gallardo, Arledys
Frankze, Julianne & Joshua

**Levin, Fishbein, Sedran & Berman**
**Colson, Hicks, Eidson, Colson, Matthews, Martinez, Gonzales, Kalbac & Kane;**
**Hausfeld, LLP and Law Offices of Richard J. Serpe,**
*Counsel on Behalf of the Following Individual Plaintiffs*:

Fontenot, Perry &          Popovitch, Robert          Vest\, Hugh & Tracy
Cassandra                  Purse, Jason
Hand, Bryon                Topf, Frank & Yvonne

---

[1]Attached hereto as Exhibit "A" is the contact information for each plaintiff's counsel and pro se plaintiff.

53

**Parker Waichman Alonso, LLP,**
*Counsel on Behalf of the Following Individual Plaintiffs:*

Abel, Kenneth

54

*Eduardo and Carmen Amorin, et al. v. Taishan Gypsum Co., Ltd.*
*f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*

**Exhibit "A"–Plaintiffs' Counsel and Plaintiffs' Contact
Information in Plaintiffs' Class Action Complaint**

| PLAINTIFFS' COUNSEL |
|---|
| Allison Grant, Esquire<br>Allison Grant, P.A.<br>950 Peninsula Corporate Circle<br>Suite 1022<br>Boca Raton, FL  33487<br>Phone:  (561) 994-9646<br>agrant@allisongrantpa.com |
| Jeremy W. Alters<br>Alters Law Firm, P.A.<br>4141 N.E. 2nd Avenue<br>Suite 201<br>Miami, FL 33137<br>Phone: (305) 571-8550<br>Fax: (305) 571-8559<br>jeremy@abbrclaw.com |
| Bruce Steckler<br>Baron & Budd<br>3102 Oak Lawn Avenue<br>Suite 1100<br>Dallas, TX  75219-4281<br>Phone: (214) 521-3605<br>Fax: (214) 520-1181<br>hflowers@baronbudd.com |
| Jeffrey P. Berniard<br>Berniard Law Firm<br>643 Magazine Street, Suite 402<br>New Orleans, LA 70130<br>Phone: (504) 527-6225<br>Fax: (504) 617-6300<br>Jeffberniard@laclaim.com |

| PLAINTIFFS' COUNSEL |
|---|
| Ervin A. Gonzalez<br>Colson, Hicks, Eidson, Colson<br>  Matthews, Martinez, Gonzales,<br>  Kalbac & Kane<br>255 Alhambra Circle, Penthouse<br>Cora Gables, FL 33134<br>Phone: (305) 476-7400<br>Fax: (305) 476-7444<br>Ervin@colson.com |
| Gregory Dileo<br>300 Lafayette Street, Suite 101<br>New Orleans, LA 70130<br>Phone: (504) 522-3456<br>Fax: (504) 522-3888<br>jjochumnola@gmail.com |
| Michael D. Hausfeld<br>Richard S. Lewis<br>Hausfeld LLP<br>1700 K Street, N.W.<br>Suite  650<br>Washington, DC 20006<br>Phone: (202) 540-7200<br>Fax: (202) 540-7201<br>rlewis@hausfeldllp.com |
| Russ M. Herman<br>Leonard A. Davis<br>Stephen J. Herman<br>Herman, Herman, Katz & Cotlar, LLP<br>820 O'Keefe Ave., Suite 100<br>New Orleans, LA 70113<br>Phone: (504) 581-4892<br>Fax. (504) 561-6024<br>rherman@hhkc.com |

Page 2 of  3

| PLAINTIFFS' COUNSEL |
|---|
| Alan Kanner<br>Kanner & Whiteley, L.L.C.<br>701 Camp Street<br>New Orleans, LA 70130<br>Phone: (504) 524-5777<br>Fax: (504) 524-5763<br>M.Fuselier@kanner-law.com |
| Arnold Levin<br>Fred S. Longer<br>Matthew Gaughan<br>Levin, Fishbein, Sedran & Berman<br>510 Walnut Street, Suite 500<br>Philadelphia, PA 19106<br>Phone: (215) 592-1500<br>Fax: (215) 592-4663<br>alevin@lfsblaw.com |
| Jerrold Parker<br>Jordan L. Chaikin<br>April S. Goodwin<br>Parker, Waichman, Alonso LLP<br>3301 Bonita Beach Road<br>Bonita Springs, FL 34134<br>Phone: (239) 390-1000<br>Fax: (239) 390-0055<br>Jchaikin@yourlawyer.com |
| Richard Serpe<br>Law Offices of Richard J. Serpe<br>Crown Center, Suite 310<br>580 East Main Street<br>Norfolk, VA 23510-2322<br>rserpe@serpefirm.com<br>Phone: (757) 233-0009<br>Fax: (757) 233-0455<br>rserpe@serpefirm.com |

Page 3 of 3