**Daniel H. Skerritt**, OSB No. 681519
  Direct Dial:  503.802.2024
  Direct Fax:  503.972.3724
  Email:  jon.stride@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 SW Fifth Avenue
Portland, OR  97204-2099

> Attorneys for Intervenors Eduardo and
> Carmen Amorin, Albert and Betsy Butzer,
> Jack and Anna McGinn, Thomas and
> Virginia Spencer, and Elliot and Angelina
> Everard

<br>

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## (PORTLAND DIVISION)

<br>

| | |
|---|---|
| **CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION,** a People's Republic of China corporation, and **CMBM FOREST PRODUCTS (CANADA) LTD.**, a Canadian corporation <br><br> Plaintiff, <br><br> v. <br><br> **MURPHY OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC**, an Oregon limited liability company; **MURPHY OVERSEAS U.S.A. TIMBER AND LAND DEVELOPMENT, LLC**, an Oregon limited liability company; and **MURPHY OVERSEAS U.S.A. HOLDINGS, LLC**, <br><br> Defendants. | Civil No. 3:14-cv-00746-ST <br><br> **EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING MOTION TO INTERVENE** <br><br> *ORAL ARGUMENT REQUESTED* <br><br> *EXPEDITED HEARING REQUESTED* |

<br>

Page 1 -   EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
          AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
          AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
          MOTION TO INTERVENE

## I.    INTRODUCTION

Intervenors, Eduardo and Carmen Amorin, Albert and Betsy Butzer, Jack and Anna McGinn, Thomas and Virginia Spencer, and Elliot and Angelina Everard, pursuant to Fed.R. Civ. P. 72(a), respectfully submit this Objection to the Honorable Magistrate Judge Janice M. Stewart's January 20, 2015 minute entry denying Intevenors' motion to intervene in the instant proceedings.

The intervention motion is important because Plaintiffs China National Building Materials Export and Import Corporation (hereafter "CNBM Trading") and CNBM Forest Products (Canada) Ltd. (hereafter "CNBM Canada") arguably are the subject of sanctions imposed under a civil and criminal contempt order entered by the Honorable Eldon E. Fallon in the United States District Court for the Eastern District of Louisiana on July 17, 2014 in *In re: Chinese-Manufactured Drywall Products Liability Litigation,* MDL 2047 (E.D. La.).[1] Furthermore, intervenors submit that CNBM Trading and CNBM Canada are affiliates of certain Chinese drywall manufacturers known as the "Taishan Defendants" in these multi-district proceedings.[2]  Judge Fallon's Contempt Order prohibits the Taishan Defendants and their affiliates (*i.e.*, Plaintiffs in the instant case) from conducting any business in the United States until the Taishan Defendants participate in Judgment Debtor proceedings before Judge Fallon in the Chinese Drywall MDL.  The Contempt Order further imposes a penalty of 25% of the

---

[1] *See* July 17, 2014 Contempt Order ("Contempt Order"), Exhibit "A" to the Declaration of Frederick S. Longer (Rec.Doc. 59-1).

[2] The "Taishan Defendants" are comprised of the following entities:  Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM"); Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd (hereafter "TTP").

Page 2 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
            AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
            AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
            MOTION TO INTERVENE

Plaintiffs' profits in the event the Order is violated, for the year of the violation. *Id*. Despite these sanctions, and arguably in violation of Judge Fallon's Contempt Order, Plaintiffs herein have negotiated a settlement of their dispute arising out of business activities in this federal judicial district, and then have utilized this Court to facilitate and finalize that settlement. (Plaintiffs have refused to provide a copy of this settlement agreement notwithstanding that it likely includes information relevant to the instant motion to intervene.)

At a hearing before the MDL Court today, January 22, 2015, Judge Fallon, having been apprised of these matters, made it clear on the record that any assets of the Taishan Defendants, or their affiliates, which are found to be located in the United States, may be the subject of a Seizure Order, which he is prepared to enter in the enforcement of his contempt/sanctions ruling (the transcript of MDL hearing has been ordered on an expedited basis and will be provided to the Court as soon as it is available). This Court-recognized potential for a seizure order makes it imperative that Your Honor grant the intervention motion and conduct a hearing for the critical purposes of: (1) exploring the "affiliate" relationship between and among these Chinese entities, and (2) determining whether there are any assets of any such affiliate which are subject to seizure. Since Intervenors effectively are seeking to intervene in order to enforce Judge Fallon's Contempt Order and sanctions, it also will be important to discover whether, under the settlement agreement now negotiated, further business activity in this jurisdiction is to be conducted by one or more affiliates of the Taishan Defendants.

Timing is of the essence. The Taishan Defendants and their affiliates have a history of taking advantage of the United States judicial system when it benefits them but fleeing our jurisdiction and evading court orders when they don't get their way, as they've done in the Chinese Drywall litigation. Judge Fallon entered the Contempt Order against the Taishan

Page 3 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
            AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
            AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
            MOTION TO INTERVENE

Defendants and their affiliates (which includes the Plaintiffs here) because they refused to appear

for a Judgment Debtor proceeding in MDL 2047 <u>after</u> they ignored Chinese Drywall complaints

filed against them, <u>after</u> a $2.7 million default judgment was entered against them, <u>after</u> they

moved to vacate the default judgment by contesting personal jurisdiction, <u>after</u> they lost in the

District Court and <u>after</u> two panels of the Fifth Circuit Court of Appeals ruled against them.

These Chinese Defendants then promptly attempted to dismiss their United States counsel in a

further effort to avoid having to pay for their defective products.

      Intervenors have asserted claims in the Chinese Drywall MDL against the Taishan

Defendants who are the manufacturers of the defective drywall that is installed in Intervenors'

homes.  Intervenors have been appointed by Judge Fallon to serve as class representatives for a

certified class of more than 4,000 plaintiffs whose homes were damaged by the Taishan

Defendants' defective drywall.  *See In re Chinese Manufactured Drywall Products Liability

Litig.*, 2014 WL 4809520 (E.D. La. September 26, 2014).  Intervenors seek to intervene into the

litigation *sub judice* for purposes of enforcing Judge Fallon's Contempt Order and uncovering the

nature and details of the settlement reached between the parties before this Court in violation of

the Contempt Order and determining whether any assets of the Plaintiffs may be subject to a

seizure order of Judge Fallon.

      In denying the motion to intervene, Magistrate Judge Stewart's Minute Entry

states that, "For the reasons stated on the record, the Motion to Intervene is DENIED."

Magistrate Judge Stewart plainly erred by denying the motion to intervene as she determined:

(1) there were no common questions of law and fact involving the underlying contractual dispute

and Intervenors' efforts to enforce the Contempt Order, and (2) allowing the intervention would

be prejudicial to the parties to the underlying dispute because Intervenors did not move for

Page 4 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
               AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
               AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
               MOTION TO INTERVENE

intervention at an earlier phase of the proceedings. *See* Transcript of January 20, 2015 Hearing at pp. 41-43, attached hereto as Exhibit "A". It is respectfully submitted that Magistrate Judge Stewart was plainly wrong to deny the motion to intervene on these grounds.

## II.    FACTUAL BACKGROUND

From 2005 to 2008, a housing boom coincided with the destruction caused by Hurricanes Katrina and Rita to dramatically increase demand for drywall in the United States, particularly in the Gulf Coast. As a result, large quantities of drywall were imported into the United States from China. The drywall, however, was defective. Specifically, the drywall emitted various sulfide gases, damaged structural mechanical and plumbing systems of the home, and damaged other appliances in the home. The repair and replacement of the defective drywall requires that the homes be stripped down to the studs and that all electrical components in the home must be replaced. Because this procedure generally costs in excess of $200,000 per home, many homeowners have been forced into foreclosure.

After numerous parties sued the entities involved in the manufacturing, importing, and installing of the Chinese drywall, the Judicial Panel on Multidistrict Litigation ("JPML") declared the matter an MDL and transferred all federal actions to Judge Fallon in the Eastern District of Louisiana. *See In re Chinese Manufactured Drywall Products Liability Litig.*, 626 F. Supp. 2d 1346 (J.P.M.L. June 15, 2009).

### A.    The Taishan Defendants' Refusal to Participate in the MDL Proceedings

During the course of the MDL litigation, it became evident that the two primary manufacturing defendants were the "Knauf Defendants"[3] and the Taishan Defendants. While the

---

[3] The Knauf Defendants include: Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), Knauf Plasterboard (Wuhu) Co., Ltd., Guangdong Knauf New Building Material Products Co., Ltd., Knauf Gips KG, Gebr. Knauf Verwaltungsgesellschaft KG, Knauf International GmbH, Knauf

Page 5 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
            AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
            AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
            MOTION TO INTERVENE

Knauf Defendants have settled the claims against them, the Taishan Defendants have stubbornly

refused to participate in the MDL proceedings. On February 7, 2013, Judge Fallon finally

approved the Knauf Settlement as well as five interrelated settlement agreements and certified

settlement classes. *See In re Chinese-Manufactured Drywall Products Liab. Litig.*, 2013

WL 499474 (E.D. La. Feb. 7, 2013).[4] The settlement with the Knauf Defendants is broad in

scope and has led to the resolution of claims involving in excess of 4,000 homeowners for more

than $1 billion. To date, in excess of 2,500 homes have been fully remediated pursuant to the

Knauf Settlement Program. Similar to the litigation involving the Knauf Defendants, the

litigation involving the Taishan Defendants involves claims stemming from the installation of

defective drywall in an equal number of homes.

After serving the Taishan Defendants consistent with the requirements of the Hague Convention

in four of the MDL cases (*Germano*, *Mitchel*, *Gross*, and *Wiltz*), default judgments were

obtained.[5] Following the issuance of the default judgment in *Germano*, the seven plaintiff

couples in that matter were awarded $2,609,129.99 in damages against Taishan. *See In re*

---

Insulation GmbH ("KI"), Knauf UK GmbH, Knauf AMF GmbH & Co. KG, Knauf do Brasil
Ltda. and PT Knauf Gypsum Indonesia.

[4] The settlement involving the Knauf Defendants involves the following interrelated settlement
agreements: (1) the Knauf Settlement, (2) the Interior/Exterior Settlement, (3) the L&W
Settlement, (4) the Banner Settlement, and (5) the Builder, Installer, Supplier & Insurer
Settlement. Interior/Exterior, L&W and Banner are large distributors who were responsible for
the distribution and sale of the Knauf Defendants' drywall to the majority of homeowners in the
United States. The Builder, Installer, Supplier & Insurer Settlement involves the settlement of
claims involves other parties in the chain of distribution, including their insurers. Copies of
these settlement agreements are available at http://www.laed.uscourts.gov/Drywall/
Settlements.htm.

[5] In addition to the default judgments involving Taishan, Plaintiffs have also obtained default
judgments against each of the other Taishan Defendants (Rec.Docs. 7302, 7735, 7736 and
15687). These defendants have similarly refused to participate in the MDL proceedings.

Page 6 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
            AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
            AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
            MOTION TO INTERVENE

*Chinese Manufactured Drywall Products Liability Litig.*, 706 F. Supp. 2d. 655, 713 (E.D. La. 2010).

The day before the expiration of the time to appeal the *Germano* damages award, Taishan appeared and appealed to the Fifth Circuit Court of Appeals. Taishan argued that the transferor court in Virginia lacked personal jurisdiction over Taishan. The parties agreed to stay the appeal and the matter was remanded back to the MDL court for purposes of conducting discovery on the question of personal jurisdiction. After a lengthy period of discovery that involved two sets of depositions in Hong Kong (the latter of which Judge Fallon personally presided over overseas), the matter was briefed and argued. Judge Fallon determined that Taishan was subject to personal jurisdiction in four separate matters filed in Virginia, Louisiana, and Florida.[6] *See In re Chinese Manufactured Drywall Products Liability Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012). Taishan again appealed these determinations to the Fifth Circuit Court of Appeals. Ultimately, two separate panels affirmed Judge Fallon's exercise of personal jurisdiction over Taishan. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014) and *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014). The time for seeking writs to the Supreme Court has passed and the MDL court's findings on personal jurisdiction became final and enforceable.

---

[6] These four cases are *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D. La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D. La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No 10-361 (E.D. La.); *The Mitchell Co., Inc., v. Knauf Gips, KG*, Case No. 09-4115 (E.D. La.).

Page 7 -     EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
             AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
             AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
             MOTION TO INTERVENE

### B.     Judge Fallon's Finding of Criminal and Civil Contempt

Thereafter, Taishan, in advance of a Judgment Debtor Hearing, fired its counsel

and deliberately refused to appear at the hearing.  The MDL Court swiftly and forcefully

imposed its contempt rulings not only against Taishan, but its affiliates, as well:

> **IT IS ORDERED** that Taishan pay $15,000 in attorneys' fees to
> Plaintiffs' counsel.
>
> **IT IS FURTHER ORDERED** that Taishan pay $40,000 as a
> penalty for contempt.
>
> **IT IS FURTHER ORDERED** that Taishan, and any of its
> affiliates or subsidiaries, is hereby **ENJOINED** from conducting
> any business in the United States until or unless it participates in
> this judicial process.  If Taishan violates this injunction, it must
> pay a further penalty of **25%** of the profits earned by the company
> or its affiliates who violate the order, for the year of the violation.

*See* Contempt Order at p. 3.

### C.     The MDL Court's Grant of Class Certification and Intervenors' Request for an Assessment of Class Damages

Following the issuance of the July 17, 2014 Contempt Order, Intervenors moved

for class certification against the Taishan Defendants.  Intervenors sought and were awarded

class certification with respect to a class defined as follows:

> All owners of real properties in the United States, who are named
> Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or
> *Wiltz* (*i.e.*, not an absent class member), asserting claims for
> remediated damages arising from, or otherwise related to Chinese
> Drywall manufactured, sold, distributed, supplied, marketed,
> inspected, imported or delivered by the Taishan Defendants.

*See In re Chinese Manufactured Drywall Products Liability Litig.*, 2014 WL 4809520, * 16

(E.D. La. September 26, 2014).

Page 8 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK
            AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT
            AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING
            MOTION TO INTERVENE

After Judge Fallon's certification of the above class, class counsel issued notice to class members[7] and submitted a motion requesting an assessment of class damages in the amount of $1,263,330,881.19. A copy of Intervenors' Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(b) and Request for Approval of Supplemental Notice is attached to the Declaration of Frederick S. Longer as Exhibit "D" (Rec.Doc. 59-4). The assessment of damages hearing is scheduled for February 12, 2015.

D.    **The Relationship Between the Taishan Defendants/Affiliates and SASAC's Participation in American Commerce**

In his ruling on Intervenors' motion for class certification, Judge Fallon made certain key findings with respect to the Taishan Defendants/affiliates. By way of example, Judge Fallon determined that BNBM, BNBM Group, CNBM, CNBM Group, and TTP are Taishan affiliates. *See In re Chinese Manufactured Drywall Products Liability Litig.*, 2014 WL 4809520, *1.

This finding by Judge Fallon is supported by the corporate structure of the Taishan Defendants/affiliates. Attached hereto as Exhibit "B" is a chart that outlines the corporate structure of the Taishan Defendants/affiliates.[8] As noted in the attached chart, CNBM Group is a 100% subsidiary of the Chinese State Owned Asset Supervision and Administration Commission of the State Counsel (hereafter "SASAC"). SASAC is a named defendant in the MDL proceedings (efforts to serve this defendant in accordance with the Hague Convention are currently underway). CNBM Group and its subsidiaries control 44.11% of CNBM, CNBM controls 52.4% of BNBM, and BNBM controls 65% of Taishan. Taishan controls 100% of TTP.

---

[7] A copy of the notice to class members is attached to the to the Declaration of Frederick S. Longer as Exhibit "C" (Rec.Doc. 59-3).

[8] This same chart was presented to Magistrate Judge Stewart at oral argument.

Page 9 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING MOTION TO INTERVENE

In addition, Plaintiff China National Building Materials Import and Export Corporation (identified on Exhibit A as "CNBM Trading") is a 100% subsidiary of CNBM Group.  Plaintiff CNBM Forest Products (Canada) Ltd. is a subsidiary of CNBM Forest Products, Ltd., which is a 100% subsidiary of CNBM Trading.  Both CNBM Trading and CNBM Forest Products (Canada) Ltd. have violated a multi-district Judge's Contempt Order, as discussed below.[9]  At the very least, the question whether such a violation has occurred can and should be answered before the plaintiffs remove themselves from this Court's reach and authority.

Notwithstanding the refusal of the Taishan Defendants/affiliates to participate in the MDL proceedings, SASAC oversees extensive operations in the United States.  Indeed, SASAC's footprints are to be found in various sectors of American commerce, including diverse investments ranging from the instant Plaintiffs' lumber operations to large banking institutions.  Thus, while the Taishan Defendants/affiliates refuse to participate in the MDL proceedings, their parent entity, SASAC, has elected to continue various for-profit ventures in the United States.  In short, SASAC is collecting profits from its American operations while disregarding any sense of corporate responsibility owed to American consumers.  This policy is perhaps best demonstrated by the recent decision of the Plaintiffs, Taishan affiliates, to disregard the sanctions imposed by Judge Fallon's Contempt Order.

## III.   ARGUMENT

Federal Rule of Civil Procedure 24(b), which governs permissive intervention, is to be given a liberal construction.  The Court, in the exercise of its sound discretion, must make a

---

[9] At the January 20, 2015 hearing some confusion persisted as to whether the chart identified China National Building Materials Import and Export Corporation.  As stated previously, this entity appears in the chart as "CNBM Trading."

thoughtful determination regarding the underlying policy of the Rule.  *See West Coast Seafood Processors Ass'n v. Natural Res. Def. Council, Inc.*, 643 F.3d 701, 710 (9th Cir. 2011).  Federal Rule of Civil Procedure 24(b)(1)(b) provides that intervention is permissible when an applicant "has a claim or defense that shares with the main action a common question of law or fact."  The court must also consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights."  Fed. R. Civ. P. 24(b)(3).  Here, the sanctions imposed on Taishan affiliates make it clear that the conducting of logging and judicial business by plaintiffs is an important issue common to both these proceedings and the Chinese Drywall MDL.  The question of prejudice to the litigants is to be weighed against the harm done to both the MDL claimants and the judicial system if these sanctions have been, or are being, ignored.

The court is generally required to make a *de novo* determination regarding those portions of the report or specified findings or recommendations as to which an objection is made. 28 U.S.C. § 636(b)(1)(C).  However, the court is not required to review, *de novo* or under any other standard, the factual and legal conclusions of the magistrate judge as to those portions of a report or specified findings or recommendations to which no objections are addressed.  *See Thomas v. Arn*, 474 U.S. 140, 149 (1985); *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003).  The court is free to accept, reject, or modify any part of the report or specified findings or recommendations.  28 U.S.C. § 636(b)(1)(C).

### A.  MAGISTRATE JUDGE STEWART CLEARLY ERRED BY BASING HER FINDINGS, IN PART, ON A DETERMINATION THAT THE SETTLEMENT DID NOT INCLUDE CONTINUING BUSINESS ACTIVITIES BY PLAINTIFFS WITHOUT FIRST REVIEWING THE SETTLEMENT AGREEMENT

It is respectfully submitted that Magistrate Judge Stewart clearly erred by not insisting that Plaintiffs produce a copy of their settlement agreement with the other parties to the

litigation.  She instead elected to rely upon the representation of counsel for purposes of

determining the Settlement Agreement did not contemplate any ongoing business activities.

Notwithstanding Magistrate Judge Stewart's reliance upon these counsel, CNBM Trading was

reluctant to describe the effect of the parties' settlement agreement as it related to ongoing

commercial activities during the January 20, 2015 hearing.  *Id*. at 39-40.  For this reason,

Magistrate Judge Stewart erred by failing to require the production of the settlement agreement.

Plaintiffs should be ordered to produce the settlement agreement for this Court to appropriately

evaluate the merits of the motion to intervene.

     **B.**     **MAGISTRATE JUDGE STEWART ERRED BY DETERMINING THE INTERVENORS' CLAIMS DO NOT SHARE ANY COMMON QUESTIONS OF LAW OR FACT WITH THE UNDERLYING LITIGATION**

     In determining that the Intervenors' claims do not share any common issues of law

or fact, Magistrate Judge Stewart rejected Intervenors' argument that the issue of whether CNBM

Trading and CNBM Canada conducted business in the United States was a common issue of fact

shared between the claims of the parties and the Intervenors.  Although a determination of

whether these entities engaged in such business is critical to determining whether they violated

Judge Fallon's Contempt Order, Magistrate Judge Stewart reasoned that all commercial activities

involving the parties' contractual dispute had ceased prior to the July 17, 2014 issuance of the

Contempt Order.  *See* Transcript at pp. 8-9.[10]  Employing this erroneous premise, Magistrate

Judge Stewart determined there were no overlapping factual issues between the parties'

contractual dispute and Intervenors' attempt to enforce the Contempt Order.  *Id*. at pp. 39-42.

---

[10] As noted above, this factual determination was improper without an examination of the parties' settlement agreement.

Page 12 -    EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING MOTION TO INTERVENE

Even assuming the parties to the underlying contractual dispute did not engage in any commercial logging activities following the issuance of the July 17, 2014 Contempt Order, Magistrate Judge Stewart erred by failing to account for CNBM Trading's and CNBM Canada's conducting business in the United States by engaging in commercial activity such as participation in the instant proceedings. Indeed, both Plaintiffs made judicial admissions that acknowledge their participation in business activities following the issuance of Judge Fallon's Contempt Order. *See* Plaintiffs' Memorandum in Opposition to Motion to Intervene at pp. 3-5 (Rec.Doc. 70). The prime example was the fact that these entities acknowledge that they negotiated a settlement of the underlying litigation and entered contractual settlement agreements with the other parties to the litigation. These judicial admissions are not only common facts between the claims of the Intervenors to enforce the Contempt Order and the parties to the instant litigation, but they also demonstrate that CNBM Trading and CNBM Canada are in violation of the Contempt Order.

In light of these overlapping factual issues, it is respectfully submitted that Magistrate Judge Stewart plainly erred by determining there were no common issues of law or fact.

### C.   MAGISTRATE JUDGE STEWART ERRED BY DETERMINING THE GRANTING OF INTERVENORS' MOTION TO INTERVENE WOULD RESULT IN PREJUDICE TO THE ORIGINAL PARTIES

In reaching her determination that granting Intervenors' motion to intervene would prejudice the parties to the underlying litigation, Magistrate Judge Stewart reasoned that the underlying litigation was essentially completed and that allowing the intervention could potentially upset the settlements that had been negotiated between the parties. It is respectfully submitted that Magistrate Judge Stewart erred by making this determination.

Page 13 -   EDUARDO AND CARMEN AMORIN, ALBERT AND BETSY BUTZER, JACK AND ANNA MCGINN, THOMAS AND VIRGINIA SPENCER, AND ELLIOT AND ANGELINA EVERARD'S OBJECTION TO MINUTE ENTRY DENYING MOTION TO INTERVENE

First, Intervenors' promptly filed their motion to intervene upon learning of the instant litigation.  Second, Intervenors are not trying to upset the settlements negotiated between the parties to the underlying contractual litigation but, rather, are seeking to enforce Judge Fallon's Contempt Order and to obtain comity for that ruling.  Because CNBM Trading and CNBM Canada have submitted to the jurisdiction of this Court (when their affiliates have stubbornly refused to do so in the MDL), Intervenors will be prejudiced if this Court does not overturn Magistrate Judge Stewart's order denying their motion to intervene. In stark contrast, CNBM Trading and CNBM Canada will not be prejudiced by the granting of the motion to intervene since contemnors are not prejudiced by having to obey federal court orders.

## IV.    CONCLUSION

Wherefore, for the reasons set forth above, Intervenors respectfully request that the Court  reject Magistrate Judge Stewart's order, and GRANT the motion to intervene.

DATED:  January 22, 2015.

TONKON TORP LLP

By /s/ Daniel H. Skerritt
    Daniel H. Skerritt, OSB #681519
      Direct Dial:  503.802.2024
      Direct Fax:  503.972.3724
      Email:  dan.skerritt@tonkon.com
    TONKON TORP LLP
    1600 Pioneer Tower
    888 SW Fifth Avenue
    Portland, OR 97204-2099
    Attorneys for Intervenors Eduardo and Carmen
    Amorin, Albert and Betsy Butzer, Jack and
    Anna McGinn, Thomas and Virginia Spencer,
    and Elliot and Angelina Everard

037668/00001/6168580v1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF OREGON

3                  PORTLAND DIVISION

4

    CHINA NATIONAL BUILDING          )
5   MATERIALS IMPORT AND EXPORT      )
    CORPORATION, a People's Republic )
6   of China corporation; and CNBM   ) Case No. 3:14-cv-00746-ST
    FOREST PRODUCTS (CANADA) LTD., a  )
7   Canadian corporation,            )
                                     )
8                                    ) January 20, 2015
                     Plaintiffs,     )
9                                    )
                  v.                 )
10                                   ) Portland, Oregon
    MURPHY OVERSEAS USA ASTORIA      )
11  FOREST PRODUCTS, LLC, an Oregon  )
    limited liability company;       )
12  MURPHY OVERSEAS U.S.A. TIMBER    )
    AND LAND DEVELOPMENT, LLC, an    )
13  Oregon limited liability company;)
    MURPHY OVERSEAS U.S.A. HOLDINGS, )
14  LLC,                             )
                                     )
15                   Defendants.     )
    _____)

16

17                  ORAL ARGUMENT

18            TRANSCRIPT OF PROCEEDINGS

19      BEFORE THE HONORABLE JANICE M. STEWART

20   UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

21

22

23

24

25

```
 1                          APPEARANCES

 2      FOR THE PLAINTIFF:    THOMAS C. SAND
                              Miller Nash Graham & Dunn, LLP
 3                            111 SW Fifth Avenue
                              Suite 3400
 4                            Portland, OR 97204

 5      FOR THE PLAINTIFF:    ELISA J. DOZONO
                              Miller Nash Graham & Dunn, LLP
 6                            111 SW Fifth Avenue
                              Suite 3400
 7                            Portland, OR 97204

 8      FOR THE PLAINTIFF:    BRIAN W. ESLER
                              Miller Nash Graham & Dunn, LLP
 9                            4400 Two Union Square
                              601 Union Street
10                            Seattle, WA 98101
                              (Appearing telephonically)
11

12      FOR THE DEFENDANT:    KIM T. BUCKLEY
                              Esler, Stephens & Buckley, LLP
13                            121 SW Morrison Street, Suite 700
                              Portland, OR 97204
14

15      FOR THE INTERVENORS:  FREDERICK S. LONGER
                              Levin Fishbein Sedran & Berman
16                            510 Walnut Street
                              Suite 500
17                            Philadelphia, PA 19106

18
        FOR THE INTERVENORS:  ARNOLD LEVIN
19                            Levin Fishbein Sedran & Berman
                              510 Walnut Street
20                            Suite 500
                              Philadelphia, PA 19106
21                            (Appearing telephonically)

22

23

24

25
```

```
1                        APPEARANCES

2    FOR THE INTERVENORS:   RUSS M. HERMAN
                            Herman, Herman & Katz, LLC
3                           820 O'Keefe Avenue
                            New Orleans, LA 70113
4

5    FOR THE INTERVENORS:   LEONARD A. DAVIS
                            Herman, Herman & Katz, LLC
6                           820 O'Keefe Avenue
                            New Orleans, LA 70113
7                           (Appearing telephonically)

8    FOR THE INTERVENORS:   DANIEL H. SKERRITT
                            Tonkon Torp LLP
9                           888 SW 5th Avenue
                            Suite 1600
10                          Portland, OR 97204

11   FOR THE INTERVENORS:   GERALD E. MEUNIER
                            Gainsburgh, Benjamin, David,
12                          Meunier & Warshauer, LLC
                            2800 Energy Centre
13                          1100 Poydras Street
                            New Orleans, LA 70163
14                          (Appearing telephonically)

15

16   COURT REPORTER:        Jill L. Erwin, CSR, RMR, RDR, CRR
                            Certified Shorthand Reporter
17                          Registered Merit Reporter
                            Registered Diplomate Reporter
18                          Certified Realtime Reporter

19                          United States District Courthouse
                            1000 SW Third Avenue, Room 301
20                          Portland, OR 97204
                            (503)326-8191
21

22                              *   *   *

23

24

25
```

```
 1                    TRANSCRIPT OF PROCEEDINGS

 2              DEPUTY COURTROOM CLERK:  This is the time set for

 3    oral argument in Civil Case No. 3:14-CV-00746-ST.  China

 4    National Building Materials Import and Export Corporation,

 5    et al. v. Murphy Overseas USA Astoria Forest Products, LLC, et

 6    al.

 7         Beginning with plaintiff, will counsel please state your

 8    name and who you represent, for the record.

 9              MR. SAND:  This is Tom Sand, with Elisa Dozono, from

10    Miller Nash Graham & Dunn, appearing for plaintiffs, China

11    National entities.

12              MR. ESLER:  And this is Brian Esler, also for the

13    China National plaintiffs, on the phone.

14              THE COURT:  Okay.  And for the defendant?

15              MR. BUCKLEY:  Kim Buckley, Your Honor.

16              THE COURT:  Anyone else for the defendant?

17              MR. BUCKLEY:  No.

18              THE COURT:  Who's appearing for the intervenors.

19              MR. SKERRITT:  Your Honor, Dan Skerritt, appearing

20    for the intervenor.  I have with me Fred Longer, who's from

21    Philadelphia.

22              MR. LONGER:  Good afternoon, Your Honor.

23              MR. SKERRITT:  And Russ Herman from New Orleans.

24    Both of them have been admitted pro hac.

25              MR. HERMAN:  Good afternoon.
```

1          THE COURT:  And they all wanted to make a plane

2    flight to Portland for this argument, I assume.

3       Do we have anyone else on the phone?  Okay.

4          MR. LEVIN:  Yes, Your Honor.  Arnold Levin for the

5    Plaintiffs' Steering Committee in the MDL, the drywall MDL.

6          MR. DAVIS:  And Leonard Davis for the PSC and the

7    MDL.

8          MR. MEUNIER:  And Gerald Meunier, PSC and MDL.

9          THE COURT:  All right.  Thank you.  Well, we have for

10   argument today a motion to intervene in this matter.  Just for

11   your information, although I don't have full consents in this

12   case, a motion to intervene in this district is generally

13   considered to be a nondispositive motion, meaning that I will

14   be making my ruling by an opinion and order or an order, and

15   you can all obviously still raise an objection with the

16   district judge, if you wish.  It's just a different standard

17   for review.  It would be a clearly erroneous standard for

18   review.

19      So I've read your submissions.  Although, I have quite a

20   few exhibits here, which, I admit, I have not reviewed.

21   Although, I think I have a pretty good idea of the issues, even

22   though I have not reviewed those particular exhibits.

23      I do understand, of course, that there is a proceeding

24   pending in Louisiana at the MDL and that there was a contempt

25   order issued July 17th, 2014, which gives rise to the current

1    motion to intervene, in an attempt to, as I understand it,

2    enforce that contempt order with respect to the settlement

3    that's been reached in this case and a pending motion to

4    disburse the $50,000 that's being held in the court's registry.

5        And I do understand that that $50,000 was initially

6    deposited July 11th, before any contempt order was entered in

7    the MDL case, that there was a TRO entered for which that cash

8    deposit was made.  That TRO subsequently dissolved.

9    Preliminary injunction motion denied, but there was a pending

10   action in state court, whereas, I understand it, that $50,000

11   was sort of kept in the court's registry as security for the

12   state proceeding.

13       We now, of course, have not only the -- the motion to

14   disburse, but we also have an attorney lien filed by the

15   plaintiffs' attorneys, as I understand it.  I have not seen the

16   settlement, but the terms of the settlement apparently allow

17   for this money that's on deposition with the Court to be

18   disbursed to the plaintiffs' attorneys.

19       That's how I understand the situation right now.

20       Now, the motion to intervene, of course, is one for

21   permissive intervention, so you first have to show that there's

22   a claim or defense that shares some sort of common question of

23   law or fact.

24       And then, of course, we have the exercise of the court's

25   discretion, taking into consideration whether this motion to

 1   intervene will unduly delay or prejudice the original parties's

 2   rights in this case, so that's what I need the attorneys to

 3   address initially with respect to the motion to intervene.

 4        So who's arguing the motion to intervene?

 5             MR. HERMAN:  May it please the Court, Russ Herman of

 6   New Orleans will argue for intervenors.

 7        Your Honor, may I argue from here, or would you prefer I

 8   argue from the podium?

 9             THE COURT:  You may stay where you wish.

10             MR. HERMAN:  Thank you.

11        Your Honor, first let me address the first question.  I

12   want to do that directly, and then I'd like to explain.

13        In document number 2, filed here, there's a disclosure

14   that CNBM is a parent of, which makes it an affiliate, and fits

15   squarely within, we believe, Judge Fallon's contempt order.

16        CNBM Trading admits conducting business here, at page 35

17   of its brief.  Again, we find that there's jurisdiction.

18   There's doing business here.  The business is being done after

19   the contempt order is issued.  So the question really is:  What

20   are the facts surrounding CNBM as an affiliate?  And it bears

21   both here and with regard to the contempt order.

22        The contempt order --

23             THE COURT:  Let me back up one moment.  When you say

24   "admits conducting business," what exactly are you referring

25   to?

1          MR. HERMAN:  I'm referring to the fact that at

2     page 35 of its brief it speaks -- that is, the opposition

3     brief -- speaks to the amount of business that he's doing

4     with -- according -- with -- in accord with certain wood

5     products and timber, and that certainly is doing business

6     within -- within -- within --

7          THE COURT:  Does it admit, though, conducting

8     business after the date of the contempt order?  July 17th,

9     2014.

10         MR. HERMAN:  Well, I'm not going to -- I can't answer

11    that question truthfully, because it's without date, which is

12    why we're not interested in relitigating any issue before

13    Your Honor.  We're really interested in a limited time to

14    conduct some discovery directed at CNBM as regards the

15    violation of the contempt order by an affiliate.

16         THE COURT:  The date of the memo you're referring to

17    is what?

18         MR. HERMAN:  It is -- it's filed January 16th of 2015

19    in Case No. 3:14-CV-00746.  Pages 3 to 5.  And we think it's

20    clear in those pages, 3 to 5, that there was business being

21    done with Westerlund Log Handlers.  We think it's clear, from

22    the papers that are filed, and particularly from document

23    number 2 in the record, that CNBM was and is and continues to

24    be an affiliate.

25         THE COURT:  All right.  So just so I'm understanding,

1    when you say there's an admission that -- and I call it China

2    National -- I guess you're calling it CNBM -- it's one in the

3    same -- conducting business, you're referring to the recitation

4    of facts about China National's business dealings with

5    Westerlund Log Handlers back in 2012.  The default, the

6    termination in January of 2013, leading to the litigation that

7    was filed in 2014.

8              MR. HERMAN:  Yes.

9              THE COURT:  There's no admission of conducting

10   business at or about the time of the contempt order.  Instead,

11   what this admits, if anything, is ongoing litigation at that

12   time between China National and Westerlund and Murphy; right?

13             MR. HERMAN:  Your Honor, there are other fact

14   matters, we believe.  One is following the contempt order there

15   was a flurry of activity by CNBM and others in this court.  We

16   don't know how they learned of the contempt order, or, indeed,

17   if they did, but their national counsel, who appeared in

18   New Orleans before Judge Fallon, certainly knew and knew of the

19   order regarding affiliates.

20       In addition, there have been two other issues, we think.

21   One is the filing of an attorney's lien, which shows that there

22   is still an issue before the Court.

23       That was, I believe, July 16 -- a stipulation -- I'm

24   sorry, January -- January 16th, I believe, and on January 13th,

25   a stipulation filed.  It was ongoing settlement discussions.

1      So we believe that there's certainly enough facts that --

2  that tie the issue of CNBM to permit us to at least do

3  discovery as to what they were doing and when they were doing

4  it.

5      Now, comity, we believe, relates directly to the contempt

6  order.

7      The confirmation of the default actually represented by

8  counsel who have attempted to withdraw from the federal court

9  litigation in New Orleans has been denied.  Privileged

10  documents have been read by the Court in camera, and they have

11  been ordered to be released.  The idea that you can spend a

12  million dollars on a default judgment in order to protect some

13  homeowners who are innocent and then have a contempt order for

14  a failure to appear at a judgment debtor hearing and the fact

15  that CNBM and the judgment debtor that did not appear are

16  affiliates, and I provided opposing counsel with a chart.

17      May I approach?

18          THE COURT:  Yes, you may.  You can hand it to my

19  clerk.

20          MR. HERMAN:  Your Honor, I think there is more than

21  sufficient evidence to show that the Chinese government,

22  through the SASAC, controls this operation.

23      China National Building Materials Group described itself

24  as a parent.  There's backup to that.  They, in effect,

25  significantly control CNBM and CNBM Forest Products, Ltd., and

1  CNBM Forest Products of Canada, Ltd.

2            THE COURT:  Okay.  Just so I'm clear here, you have a

3  chart you handed to me.  And on the chart is listed CNBM Forest

4  Products Canada, Ltd., which is a plaintiff in this case, and

5  you have that with a footnote number 13; right?

6            MR. HERMAN:  Correct.

7            THE COURT:  And the other plaintiffs in this case is

8  China National Building Materials Import and Export

9  Corporation, and where is that on your chart?

10           MR. HERMAN:  Well, we would need discovery, but we

11 believe China National Building Materials Company, Ltd., is a

12 direct affiliate in relationship to it, but we would need --

13           THE COURT:  Okay.  That's -- that's -- I'm seeing

14 with footnote number 8.

15           MR. HERMAN:  Correct.

16           THE COURT:  And you believe that China National

17 Building Materials Co., Ltd., is some way related to the

18 plaintiff in this case, which is designated as China National

19 Building Materials Import and Export Corporation?

20           MR. HERMAN:  Correct.

21           THE COURT:  And you don't have -- you don't have

22 any -- anything other than suspicion to show that it's related?

23           MR. HERMAN:  The China National Building Materials

24 Import and Export Corporation is wholly owned by CNBM Forest

25 Products Canada, and that's in disclosure --

1        THE COURT:  Well, wait a minute.  Wait a minute.  I

2   thought it was the other way around.  I thought Forest Products

3   Canada --

4        MR. HERMAN:  You may be right.

5        THE COURT:  -- is owned by Forest Products, Ltd.,

6   which is a wholly owned subsidiary of the import/export

7   company.  My question is how is the import/export company

8   related to any of the affiliates you have on this chart?

9        MR. HERMAN:  May I have one second?

10        THE COURT:  Sure.

11        MR. HERMAN:  Thank you.

12     The disclosures made, page 2 of document number 3,

13   paragraph 2, and I quote:  CNBM Forest Products of Canada,

14   Limited's, parent company is CNBM Forest Products, Ltd., which

15   is a wholly owned subsidiary of China National Building

16   Materials Import and Export Corporation.

17        THE COURT:  Yes.  And my question is how is that

18   import and export corporation related to any of these entities

19   on the chart you just handed me?

20        MR. HERMAN:  It is related to -- it is related to

21   China National Building Materials Import and Export, and it

22   is -- which is a named plaintiff in the action before

23   Your Honor, and CNBM Forest Products of Canada.

24        THE COURT:  I know that.  I'm trying to figure out

25   where the import and export corporation is on your chart and

1   how it's related to any of these entities.

2          MR. HERMAN:  It's not.  It's not on the chart.

3          THE COURT:  And how do you think it's related to any

4   of the entities on the chart?

5          MR. HERMAN:  Well, we believe that it is the wholly

6   owned subsidiary that CNBM Forest Products of Canada and CNBM

7   Forest Products, Ltd., are wholly owned subsidiaries of China

8   National Building Materials Import and Export Corporation.

9          THE COURT:  Yes.  Yes.  But where --

10          MR. HERMAN:  That's how they would be related.

11          THE COURT:  How is the import and export corporation

12   related to any of these entities?  According to your chart, if

13   I go up the line to Forest Products Canada, I go to Forest

14   Products, Ltd., I go up to CNBM Trading, I go over to BNBM

15   Group, and then I go up to the parent, China National Building

16   Materials Group Corporation.

17      So I can see how the one plaintiff you feel is related.  I

18   can't tell how you believe the other plaintiff, Import and

19   Export Corporation, is related.

20          MR. HERMAN:  We have no evidence that would allow us

21   firm evidence that we could put on the chart to cite it.  But

22   we do believe they're related because all the information that

23   we have is that CN Building Materials Group Corporation is a

24   parent of all of the CNBM entities, but we would need discovery

25   in order to flesh out that evidence.  And maybe we're wrong.

1    Maybe they're not.  But we ought to, under the circumstances,

2    at least be allowed to take discovery as to that issue.  That's

3    our position.

4         THE COURT:  All right.  So assuming you have an

5    affiliate of the Taishan Group here that is subject to the

6    contempt order and assuming that you have that entity or

7    entities conducting business in violation of the contempt

8    order, now take me to permissive intervention.  How do you have

9    a claim or defense that shares a common question of law or

10   fact, and how do you show no undue delay or prejudice?

11        MR. HERMAN:  Well, there's no question of fact or

12   law, per se.  There is a question of whether contempt, which is

13   a different underlying issue, has been violated in the course

14   of this litigation, and we believe that's sufficient.

15        Now, it may be that after some limited discovery we can

16   either show or not show that there is a basis in fact that

17   shows that the contempt order was violated.  What -- the only

18   other recourse would result in several years of delay in

19   issuing in accordance with The Hague for a hundred thousand

20   dollars, some independent complaint, going to China, serving

21   it, then having to come back and do discovery.  And we've

22   been -- we've been through that process.  That's an arduous

23   process.  We don't think that a short delay in this matter is

24   going to prejudice anybody.  It may very well clean this matter

25   up.

1    The fact at issue here is the nature and ownership and

2    whether CNBM, et al., are affiliates and is that a fact that in

3    the course of litigation here rose to some level?  No.  No.

4    That honest answer is no.

5    However, the fact at issue is here:  Was business

6    conducted in violation of a contempt order and was it -- was it

7    violated knowingly?

8    I don't -- let me say this --

9         THE COURT:  Well --

10        MR. HERMAN:  I don't --

11        THE COURT:  Go ahead.

12        MR. HERMAN:  I'm sorry.  I don't point the finger at

13   opposing counsel, by any means.  Whatever counsel opposite has

14   done, they've done professionally.  They've represented their

15   clients well.  They continue to do that.

16   But national counsel for these entities did have an

17   obligation to at least advise their clients, in whatever other

18   litigation there was, that there was a contempt order

19   outstanding.  If that had been done, everything would have been

20   stopped at that point.

21        THE COURT:  Well, the only thing I have evidence of

22   the plaintiffs doing in this case is settling the pending

23   litigation.  I take it you believe that settling pending

24   litigation is conducting business.

25        MR. HERMAN:  Yes, I do.  And I -- I --

1          THE COURT:  Do you have any authority for that, or is

2     that something that you simply believe should be presented to

3     the judge in Louisiana to decide?

4          MR. HERMAN:  Well, do I believe?  I believe it should

5     be submitted to Judge Fallon.  He's been with this case from

6     the beginning.  He's an MDL-appointed judge.  He has aegis in

7     this matter, and his -- his order has been violated now twice.

8          Now, negotiating settlement is certainly conducting

9     business.  I don't know what else we would -- I would be hard

10    pressed to describe it as not conducting business.  And the

11    idea that you can litigate in another jurisdiction,

12    negotiate -- I should say venue -- in another venue, negotiate

13    a settlement, attempt to take some action to resolve it, and

14    it -- it isn't really involved until after the intervention is

15    filed.  It's still not resolved.  And there is Supreme Court

16    authority that even if -- even if that case were resolved and

17    dismissed, that is the one before you, the contempt issue would

18    still survive.  It would still go on.

19         THE COURT:  You're seeking, apparently, to freeze

20    everything, knowing that there's $50,000 in the court's

21    registry that hasn't been disbursed.  Are you also trying to

22    freeze something else?  Is there some settlement payment you're

23    attempting to freeze?

24         MR. HERMAN:  No.  No, Your Honor.  There's no

25    settlement.  No settlement.  There have been no settlement

1    discussions.  In fact, the judgment debtor has refused to even

2    enter court.  It -- it -- we have settled with the German

3    manufacturer, who was manufacturing drywall out of the same

4    mine in China, and there were lengthy negotiations that lasted

5    more than a year.  But in every step of the way the Chinese

6    entities refused to participate, and they still do.

7            THE COURT:  Well, I understand that.  What are you

8    trying to do in this case?  Are you trying to get your hands on

9    the $50,000, or is there something more you want to get your

10   hands on?

11           MR. HERMAN:  We don't want to necessarily get our

12   hands on the $50,000, because Your Honor has raised a fund that

13   Your Honor hasn't yet issued an order on, as far as we know.

14   But what we are trying to do is to get some discovery in

15   connection with the contempt as to whether those entities who,

16   overlinking to attorneys, those entities that negotiated

17   settlement, those entities that transacted business, whether or

18   not they -- once we have more discovery than we have -- than

19   we're able to get now, whether or not they're in violation of

20   Judge Fallon's order.

21           THE COURT:  Well, if they are, are you trying to get

22   your hands on the $50,000?  Is that what you're trying to do?

23   Are you trying to come into this Court and get a ruling that

24   there's a violation of the contempt order and have the $50,000

25   paid over to the class of some sort of penalty in violation of

1   the contempt order.

2          MR. HERMAN:  No.  I don't think we had the power to

3   do that.  But, nevertheless, Judge Fallon's order puts forth

4   some substantive fines which may be assessed regarding these

5   affiliates if they're found to be affiliates.

6       We believe that they are.  We think we're entitled to

7   discovery.

8          THE COURT:  And if that's the case, are you

9   attempting to have those fines paid from the $50,000 that's in

10  the court's registry?

11         MR. HERMAN:  I think it would be up to Judge Fallon

12  who issued the order.  It would not be up to us.  We already

13  filed a motion for over a billion dollars of damages for 4,000

14  homeowners that were damaged by this drywall that are still out

15  there.  I don't think $50,000 will even pay -- pay the cost.

16         THE COURT:  Well, you have no enforceable judgment

17  against either of the plaintiffs in this case, do you?

18         MR. HERMAN:  That's correct.

19         THE COURT:  Okay.  So there's no judgment you can

20  attempt to enforce against these funds; instead, they could

21  only be used, if at all, apparently, in your view, to pay any

22  fine that may be assessed by Judge Fallon?  Yes?

23         MR. HERMAN:  I would -- I would say that if you

24  violate a court's order and a contempt order and a sanction

25  order of a federal court that's final and you know about it and

1    you're an affiliate, if it doesn't come from the $50,000, it's

2    going to come from somewhere.  I believe that federal courts,

3    sitting in comity, are going to assure that.

4         THE COURT:  Right now that money is supposed to go to

5    China National's attorneys; right?  It's not supposed to go to

6    China National.  And you are not blaming those attorneys for

7    doing anything wrong?

8         MR. HERMAN:  Under no circumstances have those

9    attorneys done something wrong; that is, the attorneys in

10   this -- in this venue, in this jurisdiction.

11        THE COURT:  And at this point they're claiming an

12   attorney's lien, which they are arguing is superior to anything

13   else that now exists and especially since there's no prior

14   judgment against these entities, and, as yet, there is no fine

15   assessed.  And if there should be in the future, they would

16   still have priority over that.  I think that's their argument.

17      Do you disagree?

18        MR. HERMAN:  I do disagree, yes.

19        THE COURT:  And why do you disagree?

20        MR. HERMAN:  Because I believe if you knowingly

21   violate a court's contempt order and a federal court's sanction

22   order and there are fines within that order, that you're going

23   to be obligated to pay them.

24        THE COURT:  So it's your view that once China

25   National knew there was a contempt order they should have just

1  stayed this case and done nothing and turned it over to the

2  MDL?

3          MR. HERMAN:  Should have advised its attorneys here

4  in this court.

5     I -- I -- I don't see how CNBM, group-wise, individually,

6  or affiliate-wise, can have knowledge and not advise its

7  lawyers here and not advise this Court.

8          THE COURT:  But what would have happened had that

9  advice been given?  What is your perception as to what would

10  have happened had the local lawyers been advised of this

11  contempt order?

12          MR. HERMAN:  I can't speak for what advice the local

13  lawyers would have given their client had that happened.  I can

14  only say that in candor to the Court and fairness to the

15  opposition would have required me to report it first to

16  Your Honor and then to the other parties.  And then, from then

17  on, then there would have been a discussion, hopefully, among

18  the federal judiciary, Your Honor, Judge Fallon, any other

19  judge, to determine what would happen in the future course.

20  That didn't happen here.  It should have happened.  That's my

21  view, and that's what I would have done.

22     But whether -- whether I can impose what I would have done

23  on other lawyers, that's a different story.

24     I think, in fairness, there's a lot more than the $50,000

25  settlement at issue here, and I feel very strongly that, you

1    know, even -- even in a short discovery schedule, that doesn't

2    prejudice or unduly delay anyone.

3             THE COURT:  It -- it certainly delays resolving this

4    case and two others.  Because there are two other cases that

5    are involved in this global settlement; right?

6             MR. HERMAN:  It certainly will delay, but it won't

7    unduly and shouldn't unduly delay those matters.  Those matters

8    had been reached in accord by all counsel and the only issue is

9    the ability to take discovery and --

10             THE COURT:  Well, let me back up.  Are you attempting

11    to undo the settlement that's been reached in these three

12    cases?  Are you attempting to go back to July 17, 2014, and

13    take all three cases back to that point in time and actually

14    unravel everything that's been down since then?

15             MR. HERMAN:  No.  No, Your Honor.

16             THE COURT:  What are you attempting to do?

17             MR. HERMAN:  What we're attempting to do is to get

18    some discovery to determine whether one or more of these

19    parties violated a contempt order.

20             THE COURT:  Well, you already told me you believe

21    that they have by engaging in the litigation.  That's all you

22    need.  You don't need to prove that they've been actually doing

23    anything with respect to drywall in the United States or

24    they've been importing or exporting logs or anything.  You just

25    told me it doesn't matter in your view.  Engaging in litigation

1    is conducting business.  Why do you need further discovery?

2    You know they've been engaging in litigation.

3              MR. HERMAN:  Because we need discovery to make sure

4    that the relationships that we've gathered information on prove

5    that they're affiliates.

6              THE COURT:  Well, you just provided to me what you

7    believe you can prove showing at least one of the plaintiffs is

8    related.  What more do you need?

9              MR. HERMAN:  Well, we have provided you with a chart

10   that we stand by, based upon information that we have, but

11   whether it will stand as -- as evidence, as final evidence of

12   the issues, is another question.

13             THE COURT:  You don't think you have enough evidence

14   to proceed on this?  I mean, if you go and claim there has been

15   a violation of the contempt order before Judge Fallon and you

16   present this evidence, it's going to be incumbent on the other

17   side to say, no, no, no, we're not related at all.  And then

18   you can ask, if necessary, for further discovery to disprove

19   them.

20        What do you need to do here?

21             MR. HERMAN:  Well, the financial relationship among

22   these affiliates, whether one supervises the other, to what

23   extent they were involved with Taishan, whether they learned --

24             THE COURT:  Does it matter?  Under the contempt order

25   it said affiliates and subsidiaries.  All you need to do is

1    show that there's some financial relationship here.  You don't

2    need to show anything more than that, do you?

3           MR. HERMAN:  Well, I don't know.  I'm not sure what a

4    federal court is going to require us to show.  I am sure that,

5    based on everything we know, the parties here are affiliates.

6    They were negotiating settlement.  They were conducting

7    business in the United States, and they did it after the

8    contempt order was issued.  When did they know about the

9    contempt order?  How did they know?  I can't answer that.

10   That, to me, is a fundamental question that discovery can

11   answer.  And that --

12          THE COURT:  Why aren't you filing something in the

13   MDL before Judge Fallon and say, "Look, there's this litigation

14   in Oregon by an entity we believe is an affiliate.  It's been

15   engaged in litigation there.  Issue your order immediately with

16   respect to that entity," and do what you're going to do?

17       Why are you intervening here in this case?

18          MR. HERMAN:  Well, we feel that if we do that and

19   these parties are no longer here and present, we are going to

20   have to serve them through The Hague.

21          THE COURT:  Why don't you just serve them today?  Why

22   didn't you just file whatever you needed to file with the MDL?

23   You know, you could have -- I just asked why you filed this,

24   but now I can see maybe you filed this so you could get them

25   here in court.  They're here.  Serve them with whatever you're

1    going to serve them with respect to the MDL.

2          MR. HERMAN:  Well, there is a body of law that says

3    when a party purposefully files something to get the other

4    parties there in order to serve them, then we're in bad faith

5    and we can be held in contempt.  That's why.  It wasn't our

6    intention to do that.  I wouldn't do that.  I don't think it's

7    fair.  And I also think it's prohibited.

8          THE COURT:  So your main concern is if you would have

9    pursued this in the MDL, that you would have been delayed

10   through all the --

11         MR. HERMAN:  If they will stipulate that they were

12   doing business after the contempt order and agree to accept

13   service, we can go home.

14         THE COURT:  Why would they stipulate to the form?

15   They might agree to accept service to contest the issue before

16   Judge Fallon, but why would they agree, "Yes, we violated the

17   contempt order"?

18      That's a little much to expect, isn't it?

19         MR. HERMAN:  Well, maybe I didn't state it as well as

20   I should have.  If they will stipulate that they were doing

21   business in the United States by -- or they don't have to say

22   "doing business," but conducting negotiations, entering

23   settlement in --

24         THE COURT:  Well, why are you asking them to admit

25   all that?  Isn't your main concern about getting service over

1    them in order to respond to Judge Fallon?  Now, if they agree,

2    "Yes, we will accept service for purpose of you filing

3    something in the MDL" --

4              MR. HERMAN:  We'll accept that.

5              THE COURT:  Then we don't need to --

6              MR. HERMAN:  We'll accept that right now.

7              THE COURT:  Then you don't need this proceeding, do

8    you?

9              MR. HERMAN:  Well, absent -- absent an agreement, we

10   do.

11      We'd have to go to The Hague and spend a hundred thousand

12   dollars to serve each one of these entities.

13             THE COURT:  No, no, no.  What I'm trying to do is to

14   avoid your service problem.  And if you avoid your service

15   problem, I'm asking you why you're here and not there.

16             MR. HERMAN:  We're here because we learned in

17   December that there was this ongoing litigation that was post

18   contempt order and we felt we had to act because the Eleventh

19   Circuit, the Ninth Circuit, and the Fifth Circuit all require,

20   as does the Code, that you act when you know.

21             THE COURT:  Yes.  I --

22             MR. HERMAN:  We couldn't sit on our hands.

23             THE COURT:  Well, no, I wasn't asking that.  I was

24   asking why didn't you pursue this with Judge Fallon immediately

25   as opposed to coming here and filing a motion to intervene?

1          The answer I thought I got was your concern about service

2     and trying to get your hands on these particular parties while

3     they're still here.

4               MR. HERMAN:  Right.  While they're still in the

5     United States, correct.

6               THE COURT:  But all I'm saying is if that's your

7     concern, getting service on them, if they agree to accept

8     service for proceedings before Judge Fallon --

9               MR. HERMAN:  We'll accept that.

10              THE COURT:  Would this become, then, a moot

11    proceeding?

12              MR. HERMAN:  Certainly, as far as we're concerned, if

13    they would accept either a transfer of that issue and an

14    agreement to accept service, that would be fine.

15              THE COURT:  That takes me back to the $50,000 and any

16    other monies that are being paid as part of the settlement.

17              MR. HERMAN:  If they're there before -- sorry, I

18    don't mean to interrupt.

19              THE COURT:  Do you have an objection if these parties

20    agree to accept service, transfer this contempt proceeding to

21    Judge Fallon, would you have any objection to disbursing the

22    funds in the registry of the court to the plaintiffs' attorneys

23    pursuant to the settlement agreement?

24              MR. HERMAN:  Absolutely not.  Because even though --

25    once they did that, then we're not concerned about the race.

1    We're only concerned about what proceedings happen.  And if

2    they are found to have violated the contempt, I'm sure that the

3    parties that have violated can be made to pay the sanctions.

4    I'm certainly never going to say that a lawyer shouldn't be

5    paid for work that they did.  That's not -- to me, that is --

6    to us, that's not the issue.

7              THE COURT:  Anything else, Mr. Herman?

8              MR. HERMAN:  I think I've said about --

9              THE COURT:  All right.  You'll get a chance for

10   rebuttal, but let me hear from the other parties involved in

11   this.

12      Mr. Sand?

13              MR. SAND:  Yes.  Thank you, Your Honor.  And I would

14   appreciate the Court's flexibility, when we come to it, that --

15   we have three lawyers here today who have tried to get through

16   the almost 6,000 pages of material that has come in recently

17   and there may be questions the Court has for which a better

18   answer could come from Mr. Esler or Ms. Dozono.  So if -- with

19   the Court's indulgence, we may need to turn to them.

20       I guess I would like to focus on a couple of things.  The

21   Court asked if -- about whether the issue is moot, and I think

22   it is moot because Rule 41, dismissals by stipulation, are

23   self-executing, and we cited the case law that supports that.

24   And the mere filing of the stipulation for dismissal, whether

25   it preceded the motion to intervene or not, is effective to

1    terminate the case.

2        These parties have litigated, as the Court mentioned,

3    three separate cases over the course of a full year, finally

4    arrived at a resolution, a global resolution, that they could

5    all live with.  And there are three prongs to that:  The

6    dismissal of the Clatsop County case, which has now been

7    effected; the dismissal of the case in front of Judge Hubel,

8    which has now been entered; and the dismissal in this case,

9    which we think was accomplished by operation of law.  But we

10   still need -- the clerk will need some comfort that it is

11   allowed to disburse the funds that are a refund of our deposit

12   from the bond.

13        THE COURT:  All right.  Let me just make sure I

14   understand.  What you actually filed was a motion for an order

15   dismissing this matter.  The parties, however, stipulated and

16   moved for an order dismissing this matter under a rule that

17   does require a court order for dismissal, but I understand you

18   to argue that before asking for that order the parties had

19   stipulated to dismissal, and it was simply a procedural

20   requirement that the Court enter an order of dismissal.

21        MR. SAND:  I think that's correct, Your Honor.  It

22   may not have been the most artful thing, but, in the interest

23   of efficiency, we asked -- we tried to do two things in one

24   document, which I don't think is prohibited, but we got a call

25   from the clerk's office that they wanted a separate motion for

1    the disbursement of the funds.  But the -- the original

2    document does contain the word "stipulate" and it does contain

3    the word "dismissal," and I think it would elevate form over

4    substance to say that that was not a stipulation of dismissal.

5         And then we did subsequently file a pure, clean, simple

6    stipulation of dismissal.  We think that was surplus, but we

7    thought that it clarified the record.  But there are also cases

8    that we cited in our memorandum that even though that was filed

9    after the motion to intervene was filed, the motion to

10   intervene does not take precedence over the dismissal of the

11   parties.

12        There's a circuit court case and a Massachusetts case,

13   District Court of Massachusetts case, that even -- when the

14   stipulation of dismissal was filed after a motion to intervene,

15   it's up to the parties to decide whether they're going to

16   dismiss their case.  And as long as it's stipulated by the

17   parties in this case, before intervention has been granted, the

18   parties get to control dismissal of their lawsuit.

19             THE COURT:  Do you actually have a written settlement

20   agreement between the parties?

21             MR. SAND:  We do.

22             THE COURT:  I assume that was entered into prior to

23   the stipulation you submitted to this court?

24             MR. SAND:  Yes.

25             THE COURT:  And pursuant to that settlement

1   agreement, the parties stipulate to the dismissal of all three

2   cases?

3        MR. SAND:  Of all three cases.

4        THE COURT:  I know that part of the settlement

5   required disbursement of the $50,000 held by this court and by

6   the state court to the parties's attorneys.  You haven't

7   disclosed any other terms of the settlement agreement.  Does it

8   involve other payment of monies?  If it were to be undone, are

9   there monies here that apparently are available for this fine

10  that the intervenors want to impose for a contempt order?

11       MR. SAND:  That is one of those questions I would

12  prefer to turn to Mr. Esler on, because he handled the

13  negotiations for the settlement primarily.  I do not have a

14  copy of the settlement agreement with me.

15      But my -- if the Court would allow, I would like to have

16  Mr. Esler respond to that.

17       MR. ESLER:  Sure.  Your Honor, this is Brian Esler,

18  not to be confused with Mike Esler, who's also a party -- or

19  counsel for a party in this case.  The parties entered into a

20  global settlement.  And, actually, I think we filed -- because

21  there was a receivership in state court, we actually had to

22  file something that was approved by the receiver, as well, to

23  get that all dismissed.  And, essentially, our client had logs

24  that were stuck at the Port of Astoria.  That's where this --

25  part of the impetus for this case was the fact that they had

1   about -- I think it was four million board feet of logs stuck

2   at the Port of Astoria that they could not get out of there.

3          THE COURT:  Yeah, I remember that now.

4          MR. ESLER:  So the parties entered into a stipulation

5   where the settlement generally was that everybody would

6   cooperate to get those logs out of there.  We had -- our

7   clients had a security interest in certain equipment that was

8   held by Westerlund Log Handlers or possibly by Murphy.  There

9   was some dispute over that.  Our client agreed that Murphy

10   could buy that, pay it -- I think it was 2.55 million for that

11   equipment.  The equipment, as far as I know, has been -- or at

12   least China National's interest in the equipment has been

13   transferred.

14     As far as I'm concerned or aware, the payment was made.

15   The logs have been shipped.  We believe the case is over.

16          THE COURT:  Okay.  So it sounds as if there's really

17   no money that exchanged hands except to -- except with respect

18   to this equipment that was being purchased and then, of course,

19   the shipping of the logs.  All right.  And -- and leaving these

20   two deposits to pay the attorneys?

21          MR. SAND:  Correct.

22          THE COURT:  Okay.

23          MR. SAND:  I'd also like to turn to the timeliness

24   issue.

25     Even if we don't interpret the case as having been

1    dismissed by operation of Rule 41, the -- the denial or the

2    grant of a motion to intervene is in the discretion of the

3    Court.  This is really late, because we've got the two other

4    cases already settled and dismissed.  The other funds have been

5    distributed.  The only thing that is left to be done here is to

6    distribute the $50,000 held in the registry of the court.  This

7    motion -- and, again, I thank counsel for his comments on it,

8    and I don't mean any criticism of counsel either, but this

9    motion could not have come later.  It's really the eleventh

10   hour and 59th minute of a case that is over.

11        And then that leads to the next element, which was

12   prejudice.  And the prejudice argument is -- is similar.  These

13   parties have litigated this case for over a year.  It was

14   difficult to reach this settlement.  They reached the

15   settlement, and they would be severely prejudiced if one leg of

16   the stool is now cut out from under it, because the other two

17   legs of the stool have been -- have been completed.

18        And I think the important thing to recognize is that all

19   of the parties in the case, as we stand here today, want this

20   case dismissed.

21        The next element is that there's a common issue of fact or

22   law, and I heard Mr. Herman acknowledge that there is no common

23   question of fact or law; rather, they want to use the vehicle

24   of this proceeding within which to conduct discovery on their

25   contempt allegation.

1          And contempt allegations are very serious.  I think we all

2     agree with that.  If Judge Fallon's order has been violated, it

3     seems appropriate that Judge Fallon should consider that.  And

4     they have the option of raising this issue in the case where it

5     was issued.  They have an option to initiate a new case in

6     Oregon if they think Oregon is the right place to conduct the

7     litigation, but it does not belong in this proceeding for the

8     reasons we've already discussed.

9          I do not intend to address the -- the corporate structure

10    issues.  We're happy to do that.  I think I would turn to

11    Ms. Dozono for that, because she's been looking into that

12    question.

13         But the first time any of us had ever heard of the name

14    Taishan was when this motion to intervene was filed.  We knew

15    nothing about the court order.  We do not know for certain what

16    the corporate structure and ownership is.  We can only go on

17    what the, as I think counsel said, were the suspicions of

18    counsel.

19         As the Court pointed out, the import/export is not

20    reflected on this chart.  I do believe I read in one of the

21    documents submitted over the weekend that there is a contention

22    that CNBM Trading and the import/export entity are the same or

23    similar.  But if that's the case, it only owns 4.22 percent of

24    the entities on the right side of the ledger.  And the nearest

25    we've been able to determine is that the -- the drywall gypsum

1   parties that are the offending parties in Louisiana, are, like,

2   four generations away from the common parent.  We think that

3   they -- we think that these are great grandchildren entities --

4   great great grandchildren entities, and so the piercing of the

5   corporate veil theory would really be turned on its head to get

6   at -- it's very difficult to get at a sister corporation unless

7   you can prove that the sister corporation was acting in concert

8   to aid and abet the violating corporation.

9       You can go after the parent if the parent is controlling

10  the offending entity, but to go after multiple generations in

11  what they call horizontal veil piercing or triangular veil

12  piercing, where you go up to the parent and then back down

13  through other generations of other entities, you have to show

14  control and you have to show offensive conduct.  And there's

15  nothing in the record here today that would let the Court come

16  to that conclusion.

17          THE COURT:  Well, of course the contempt order isn't

18  based on piercing the corporate veil theory.  It just simply

19  refers to all of the affiliates and subsidiaries.  So it's

20  really directed at the parent saying, "If you do anything

21  through any of your multiple corporations down there somewhere,

22  no matter how they're affiliated or related to you, you're

23  going to be liable."  So it's a little different situation.

24      Whether the Court has the power to do that, I mean, I

25  guess you could contest.

1          MR. SAND:  Yes.  I agree that it's sweepingly broad

2    in that -- in that respect, but we don't have evidence in this

3    courtroom today and there's no document before the Court today

4    that shows that these entities are those affiliates.  I

5    honestly don't know if they are affiliates within the

6    definition Judge Fallon had in mind.  And nobody here does.

7          THE COURT:  I know.  But problem is do we want to

8    allow the intervention to allow discovery to get to that point?

9          MR. SAND:  I think they should ask Judge Fallon that

10   question, Your Honor, with all due respect, because this -- it

11   does not make sense to keep that in this case.

12      I am looking at one of the documents submitted.  This is

13   Exhibit J to, I think, the Herman declaration, and it is an

14   order -- it is Judge Fallon's and Judge -- and

15   Magistrate Wilkinson's order.  Page 16 of that order -- page 16

16   of 142 -- indicates that the PSC -- I guess that's the

17   Plaintiffs' Steering Committee -- has preserved its right to

18   conduct discovery, because it was precluded from taking any

19   discovery from these entities, including CNBM.

20      So I think there's -- it's not clear that Judge Fallon did

21   intend his order to apply to all of the CN -- any entity that

22   had CNBM in its name.

23      Unless the Court has other questions, I think Mr. Buckley

24   might have comments on the -- the view of the case from the

25   Murphy entity's point of view.

1            THE COURT:  Anything to add?

2            MR. HERRINGTON:  Your Honor, Kim Buckley.  I don't

3    have much to say in addition to what Mr. Sand said.  I will add

4    something about the settlement agreement that Brian Esler

5    talked about briefly.  That was set up after quite a number of

6    days or weeks of -- well, months of negotiations.  And the way

7    it was set up was that Westerlund Log Handlers in Astoria had a

8    lot of equipment to handle logs.  China National Import and

9    Export Corporation had a security interest in those based on

10   money that China National had loaned Westerlund Log Handlers.

11        China National, as you know, in this case, sued Murphy for

12   tortious interference with a contract.  Murphy, in turn, had

13   some claims against China National.  And eventually there was a

14   settlement that was reached that involved Murphy agreeing to

15   pay $2,550,000 for the Westerlund equipment, but to make that

16   payment to China National Import and Export Corporation, and,

17   at the same time, Murphy would then facilitate the export of

18   about four million log feet of logs at the pier.

19        So it was a triangular settlement that involved Westerlund

20   Log Handlers, China National Import and Export Corporation, the

21   Canadian subsidiary of China National Import and Export

22   Corporation, Murphy Astoria Forest Products, and Westerlund Log

23   Handlers, as well as Westerlund Log Handlers's two owners.

24        So it's not a settlement that can be undone.  It's one

25   that's finished and over with.

1      This case, as a result of that settlement agreement, was

2   also finished and over with, as a result, first of all, by the

3   stipulated motion that was filed on December 24th for

4   disbursement of the funds and for an order of dismissal, but

5   then just to -- to make sure that the deed was done, a general

6   stipulation of dismissal was filed on January 13.  And then

7   according to the cases, both Mr. Sand, in his brief, and my

8   brief, that that ended the case.  This case is ended.  And as a

9   result of that being ended, there are no longer any questions

10  before the Court for which there could be any common ground

11  with claims in the Louisiana litigation.

12      And if there's no common claims, no common questions, then

13  that is one of the -- I mean, that means that this motion to

14  intervene should be denied.  That's the whole point of having a

15  motion to intervene.

16      Furthermore, I made the argument -- it was kind of a

17  throwaway argument, but there is a rule -- Rule 24(c) requires

18  that a pleading accompany the motion to intervene so that the

19  Court can see what it is, what claim or defense is for which

20  intervention is being sought.

21      No pleading accompanied the motion.  There was a reference

22  to the complaint in the Louisiana case that satisfied that

23  requirement, but it doesn't really satisfy the requirement at

24  all.  There's no claim alleged in the Louisiana litigation that

25  has anything in common whatsoever to do with any claims alleged

 1    here.  There isn't any complaint in the intervention.  There's

 2    no answer in the intervention.  There's no alignments either

 3    with the plaintiffs or with the defendants or against all of

 4    them in this case.  And so that is why we see that this motion

 5    for intervention should be denied.

 6         We'd like to see the case over with.

 7              THE COURT:  Okay.  Anyone else opposing the motion to

 8    intervene want to be heard?

 9         No?

10         Okay.  Mr. Herman?

11              MR. HERMAN:  I'd like point out two things.  First of

12    all, it was a reported decision, 2 -- 2014 Westlaw 4809520 --

13    2014 Westlaw 4809520.  At page 2, paragraph 14:  The Taishan

14    affiliates have also been held in default with respect to these

15    proceedings.  In *Wiltz, Gross*, and *Amorin*, on February 1st

16    2011, BNBM, BNBM Group, CNBM, and CNBM Group, were held in

17    default in the *Gross* proceedings.  See document number 7302.

18         These same entities were again held in default on *Gross*.

19    August 7, 2012.  See record document 15687.

20         On February 24, 2014, BNBM was held in default in the

21    *Wiltz* proceeding.  Document 7735.

22         On July 1st, 2014, Taishan, TTP, and CNBM were held in

23    default in the *Amorin* case.  See document 17814.

24         And on.

25         CNBM and its group have already been held in default.

1    They have refused to come forward.  There has been a contempt

2    order issued against their affiliate for failing to come to a

3    judgment debtor rule.

4         This is not a Louisiana case.  The plaintiffs are from the

5    Gulf states and Virginia.  Their homes were destroyed by a

6    hurricane and re-destroyed by defective drywall.

7         With all due respect to learned counsel, I didn't hear a

8    real answer to the question as to whether there's anything

9    else, other than the $50,000, to be paid.  I understand that

10   there was a receivership.  There was machinery transferred.  I

11   don't know what the settlement papers say.  I don't know when

12   they were confected.  And, most respectfully, again, if these

13   defendants will stipulate that the matter of contempt regarding

14   these default defendants and affiliates can be transferred to

15   Judge Fallon and there will be no service problem with regard

16   to their appearance for purposes of contempt contestation, I

17   think this matter can be put to bed.  It can be put to bed

18   where everyone's rights are preserved.  We can determine what

19   the settlement documents can say.  We can determine what

20   activities the affiliates did after they were held in default.

21   And we appreciate Your Honor giving us as much time as you have

22   on a short notice to appear before here and we appreciate

23   learned counsel's participation.

24             THE COURT:  I believe I heard Mr. Esler describe the

25   settlement as basically involving, perhaps, an exchange of

1    money; that Murphy was buying the equipment and I -- I presume

2    paying China National some money for that because of security

3    interest that China National had in the equipment, so there

4    appears to have been some money exchanged, but I don't hear

5    anyone saying there is any other money waiting to be paid,

6    other than the $50,000 in this court's registry.

7         Am I right, Mr. Esler, about that?

8         MR. ESLER:  Your Honor, we do have -- we believe the

9    case is over and all that's left to be done is to pay the

10   50,000.  Our clients, you know, ultimately they're in the

11   import/export log business.  The Murphy entities are in the

12   business of exporting logs.  You know, I can't represent that

13   they -- they will not try to do business with each other in the

14   future.  The Murphy entities sell logs, and, as I understand

15   it, that's what our clients do.  And I believe it's not only

16   here in Astoria.

17        But this case has been settled and is over.  We don't

18   believe the settlement of litigation and the payment of funds

19   pursuant to that settlement constitutes doing business.

20        I'm sure counsel from Louisiana will be monitoring what

21   goes on in Astoria.  That is -- whether those clients import

22   and export logs in the future is their business.  This case is

23   over.

24        MR. HERMAN:  Your Honor, most respectfully, I

25   don't -- our position is clear.  We don't think it's over.

1    But, nevertheless, without the settlement agreements and

2    knowing what stage they're in, we don't know whether there was

3    an agreement to do more business, whether there were other

4    assets.  It doesn't have to be cash.  And that -- those

5    questions, to me, still haven't been answered.

6         What -- let's do it this way:  What other considerations

7    are left, as among these parties, as a result of the settlement

8    that was reached, other than the $50,000 lien funds?

9              THE COURT:  I'm hearing none.  That's what I'm

10   hearing.

11        All right.  Well, I agree that the motion to intervene is

12   untimely, given the status of this case.  This case was, for

13   all intents and purposes, over before the motion to intervene

14   was filed.

15        Had there not been a procedural difficulty with the need

16   to have a separate order for the disbursement of funds, it

17   would have been dismissed by me before the motion to intervene

18   was filed.

19        There is authority to the effect that a stipulation for

20   dismissal between the parties, pursuant to Rule 41(a)(1),

21   basically ends a case.  And I think it did in this particular

22   case and terminates this case as of December 24 but for the

23   disbursement of the funds in the registry.

24        There also, I think, is extreme prejudice to the parties

25   in this case.  It has been litigated for more than a year.  It

1   did involve two other lawsuits.  Both of those cases have been

2   dismissed.  You've got a settlement that can't be unwound.

3   It's done.  If this case is not dismissed, it puts everything

4   into -- into jeopardy.  It's just a completed settlement.  And

5   to allow this motion to intervene is going to be very

6   prejudicial to the parties.

7       I also have trouble finding a common question of law or

8   fact.  I don't dispute the fact that a contempt violation is

9   very serious and needs to be prosecuted and enforced if it has

10  occurred.  This does not seem to be the right vehicle, to me,

11  to do that.

12      I don't have any common claims between the MDL proceedings

13  and this case, other than perhaps some affiliate continued

14  litigation after the contempt order was issued.  That's the

15  best you have.  I don't see any reason to grant the motion to

16  intervene just to allow you to conduct some discovery.

17      You need to pursue this contempt proceeding either with

18  the MDL case or filing a new case, but not by intervening in

19  this case.

20      So I am going to exercise my discretion and deny the

21  motion to intervene.

22      I didn't hear any objection to the $50,000 being paid

23  pursuant to the settlement to the attorneys, pursuant to the

24  settlement agreement.  It seems like it's going to have

25  priority, anyway, over anything that happens in any contempt

1   proceeding.

2       So I'm going to go ahead and sign the order to disburse

3   the funds.

4       As I indicated, regardless of my ruling today, you do have

5   the right to file an objection, have that heard by the district

6   judge, under a clearly erroneous standard.  So you're certainly

7   free to do that.

8       So I will issue -- this is my order.  I will issue a

9   docket entry, and then, if you want, you can file your

10  objections.  I'm not going to issue any opinion in writing.

11  You have a transcript of this hearing, should you wish to

12  present that to the district judge, with respect to the

13  arguments and my rulings with respect to those arguments.

14      All right.  So I don't have anything further.

15      Thank you, counsel.  We're in recess.

16                      (Hearing concluded.)

17

18

19

20

21

22

23

24

25

1                          C E R T I F I C A T E

2

3                China National Building Material, et al.

4                       v. Murphy Overseas, et al.

5                          3:14-cv-00746-ST

6                             ORAL ARGUMENT

7                          January 20, 2015

8

9             I certify, by signing below, that the foregoing is a

10   true and correct transcript of the record of proceedings in the

11   above-entitled cause.  A transcript without an original

12   signature, conformed signature, or digitally signed signature

13   is not certified.

14

15      /s/Jill L. Erwin, CSR, RMR, RDR, CRR

16      _____

17      Official Court Reporter              Date: January 22, 2015

18

19

20

21

22

23

24

25

**CORPORATE STRUCTURE OF THE TAISHAN DEFENDANTS/AFFILIATES**

# CORPORATE STRUCTURE OF THE
# TAISHAN DEFENDANTS/AFFILIATES

1. State Owned Asset Supervision and Administration Commission of the State Counsel.

2. *See* CNBM 2010 Annual Report, at pgs. 8 and 13, attached hereto as Exhibit "1".

3. Beijing New Building Materials Group Co., Ltd. *Id.* at pgs. 7 and 13.

4. China National Building Materials Import and Export Corporation. *Id.*

5. China Building Materials Academy. *Id.*

6. China CINDA Asset Management Co., Ltd. *Id.* at pgs. 8 and 13.

7. *Id.* at pgs. 13.

8. *Id.* at pgs. 8 and 13.

9. *Id.* at pgs. 7 and 13.

10. *Id.* at pgs. 11 and 13; Affidavit of Jia Tongchun dated September 16, 2010, at ¶ 3 (in 2007, Shandong Taihe Dongxin Co., Ltd. became Taishan Gypsum Co. Ltd.), attached hereto as Exhibit "2".

11. *See* Affidavit of Jia Tongchun dated September 16, 2010, at ¶ 26.

12. *See* Defendant CNBM Forest Products (Canada) Ltd's Corporate Disclosure Statement at ¶ 2, attached hereto as Exhibit "3".

13. *Id.*