EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-CV-23691-SEITZ-SIMONTON

PENINSULA II DEVELOPERS, INC., a Florida
corporation; GRYPHON CONSTRUCTION, LLC,
a Florida limited liability company;
and SKYLINE SYSTEMS, INC., a Florida corporation,

    Plaintiffs,

v.

WESTCHESTER FIRE INSURANCE COMPANY, a
New York corporation, and LANDMARK AMERICAN
INSURANCE COMPANY, an Oklahoma corporation,

    Defendants.
_____/

## PLAINTIFF GRYPHON CONSTRUCTION LLC'S MOTION FOR PARTIAL FINAL SUMMARY JUDGMENT AS TO COUNTS II AND III AGAINST DEFENDANT WESTCHESTER FIRE INSURANCE COMPANY AS TO LIABILITY

Plaintiff, Gryphon Construction, LLC ("Gryphon"), pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of Florida, hereby moves for partial final summary judgment against Defendant Westchester Fire Insurance Company ("Westchester") as to its claim for declaratory judgment re: duty to indemnify (Count II) and claim for breach of contract (Count III) as to liability and states:

### INTRODUCTION

In the instant action, Gryphon asserts against Westchester causes of action seeking declaratory relief and damages from Westchester, for Westchester's breach of its duties under an excess insurance policy, issued by Westchester identifying Gryphon as an insured. The Westchester policy is stacked on top of and follow form to a primary CGL policies issued by

American Home Assurance Company ("American Home"). The American Home policies have been exhausted, triggering Westchester's duty to indemnify, which Westchester has breached by Westchester's failure to indemnify Gryphon for its loss.

## MEMORANDUM OF LAW

### STANDARD OF REVIEW

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is "material" if it could affect the outcome of the suit under the governing substantive law. *Anderson*, 477 U.S. at 248. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* The basic issue before the court on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 252.

The party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. The burden shifts to the nonmoving party to establish, beyond the pleadings,

that there is a genuine issue for trial. *Id.* at 324. Interpretation of an insurance policy is "a particularly appropriate matter for summary judgment" when the issues pertain to the policy's interpretation. *Lawyers Title Ins. Corp. v. JDC (America) Corp.*, 818 F. Supp. 1543, 1545 (S.D. Fla. 1993).

Summary judgment as to Counts II and III of Gryphon's Amended Complaint should be granted in favor of Gryphon because there are no genuine issues as to any material fact that: (a) Westchester owes Gryphon a duty to indemnify; and (b) Westchester breached said duty by failing to indemnify Gryphon for Gryphon's loss.

## ARGUMENT

### I. California Law Regarding Interpretation of Insurance Contracts

Under California law, the interpretation of an insurance policy is a question of law. *Ameron Int'l. Corp. v. Ins. Co. of State of Pa.*, 242 P. 3d 1020, 1024 (Cal. 2010). The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. *Ameron Int'l. Corp.*, 242 P. 2d at 1024. The mutual intention of the parties at the time the contract is formed governs interpretation. *Id.* Such intent is inferred, if possible, solely from the written provisions of the contract. *Id.* The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage. *Id.* "Whereas coverage clauses are interpreted broadly as to afford the greatest possible protection to the insured, exclusionary clauses are interpreted narrowly against the insurer." *State Farm Mut. Auto. Ins. Co. v. Partridge*, 10 Cal. 3d 94, 101-02 (1973) (citations omitted).

An insurance policy provision is ambiguous when it is susceptible to two or more reasonable constructions. *Ameron Int'l. Corp.*, 242 P. 2d at 1024. If ambiguity exists, however, the courts must construe the provisions in the way the insurer believed the insured understood them at the time the policy was purchased. *Id.* In addition, if, after the court evaluates the policy's language and context, ambiguities still exist, the court must construe the ambiguous language against the insurer, who wrote the policy and is held "responsible" for the uncertainty. *Id.* Particularly, in the insurance context, ambiguities are resolved in favor of coverage so as to protect the insured's reasonable expectation of coverage. *Id.*

## II. <u>Gryphon is Entitled to Coverage under the Westchester Policy</u>

### A. Effect of Chinese Drywall Constitutes One Occurrence

In *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P. 2d 878 (Cal. 1995), the California Supreme Court held that where successive commercial general liability "policy periods are implicated, bodily injury and property damage which is continuous or progressively deteriorating throughout several policy periods is potentially covered by all policies in effect during those periods." 913 P. 2d at 904.

In 1996, "[i]n response to *Montrose* and those courts that have adopted it, the ISO … revised the standard CGL policy to exclude from coverage injury or damage that occurs in part before the policy begins" to "reduce the number of insurers deemed responsible to defend and indemnify an insured under the continuous trigger theory." *See USF Ins. Co. v. Clarendon Am. Ins. Co.*, 452 F. Supp. 2d 972, 990 (C.D. Cal. 2006), *quoting* David L. Leitner, Reagan W. Simpson, and John M. Bjorkman, 4 LAW & PRAC. OF INS. COVERAGE LITIG., § 46:21 (2005). *See also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 772 (1993) ("Insurance Services Office, Inc. (ISO), an association of approximately 1,400 domestic property and

casualty insurers ... is the almost exclusive source of support services in this country for CGL insurance. ISO develops standard policy forms and files or lodges them with each State's insurance regulators; most CGL insurance written in the United States is written on these forms.") (citations omitted).

One such revision is as follows: "The Policies also contain a 'deemer clause,' which provides: 'All property damage or bodily injury arising from, caused by or contributed to by, or in consequence of an occurrence shall be deemed to take place at the time of the first such damage, even though the nature and extent of such damage or injury may change and even though the damage may be continuous, progressive, cumulative, changing or evolving, and even though the occurrence causing such bodily injury or property damage may be continuous or repeated exposure to substantially the same general harm.'" *USF Ins. Co.*, 452 F. Supp. 2d at 987.

American Home's Primary Policies similarly contain a "deemer clause" defining "occurrence" as follows:

> 6. **SECTION V. DEFINITIONS, Paragraph 13. Occurrence is deleted in its entirety and replaced by the following:**
>
>> 13. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>>
>> In the event of continuing or progressive "bodily injury" or "property damage" over any length of time, such "bodily injury" or "property damage" shall be deemed to be one "occurrence", and shall be deemed to occur only when such "bodily injury" or "property damage" first commenced.

By defining "occurrence" to be "one 'occurrence,'" in the event of continuing or progressive "bodily injury" or "property damage" over any length of time, American Home's Primary Policies evince the mutual intention of the parties, as it existed at the time of contracting, to deem continuing or progressive bodily injury or property damage over any length of time to constitute one occurrence. American Home likely included its "deemer clause" to limit its

exposure to a single policy period in light of *Montrose*. Accordingly, this Court should deem the effect of Chinese Drywall as a single occurrence.

### B. The "Bodily Injury" and "Property Damage" Occurred After the City of Aventura issued its First Temporary Certificate of Occupancy on August 8, 2007 and Thus Occurred During the "Completed Operations Extension Owner Controlled Insurance Program"

California courts have long recognized that coverage in the context of a liability insurance policy is established at the time the complaining party was actually damaged. *Montrose Chem. Corp.*, 913 P. 2d at 890. "The general rule is that the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed, but the time when the complaining party was actually damaged." *Id.* This "formulation" distinguishes between "a wrongful act and the injurious result of that act," and holds that the triggering of liability coverage under a CGL policy is established at the time the complaining third party was actually damaged. *Id.*

Issuance of a Temporary Certificate of Occupancy establishes that no damage had occurred prior to that date. "A TCO [Temporary Certificate of Occupancy], by definition, is issued to properties that are substantially complete." *Pilato v. The Edge Investors, L.P.*, 609 F. Supp. 2d 1301, 1308 (S.D. Fla. 2009), *citing* Section 307.5(a) of the South Florida Building Code.

> A Temporary and/or Partial Certificate of Occupancy may be issued by the Building Official for the temporary use of a portion of a building, providing the portion of the Building to be occupied is clearly designated and all Code provisions ... relating to public safety have been met and approved by the Building Official.

*See* Section 307.5(a) of the South Florida Building Code. *See also Rosenstein v. The Edge Investors, L.P.*, No. 07-80903-Civ-Middlebrooks, 2009 WL 903806, * 8 (S.D. Fla. 2009).

"Substantial completion" is when construction is sufficiently complete in accordance with the contract documents, so the owner can occupy or utilize the work or designated portion thereof for the use for which it is intended. *J.M. Beeson Co. v. Sartori*, 553 So. 2d 180, 181 (Fla. 4th DCA 1989). The foregoing definition of "substantial completion" is similar to the well established doctrine of "substantial performance," and the terms are interchangeable. *J.M. Beeson*, 553 So. 2d at 182. "Substantial performance" is that performance of a contract which, while not full performance, is so nearly equivalent to what was bargained for that it would be unreasonable to deny the promise the full contract price subject to the promisor's right to recover whatever damages have been occasioned him by the promisee's failure to render full performance. *Id.*

As in *Pilato, supra*, and *Rosenstein, supra*, the City of Aventura has "adopted" the "South Florida Building Code" "as the regulation governing the construction of buildings and structures in the City." *See, e.g.*, CITY OF AVENTURA, FLA., CODE § 31-81(a). The City of Aventura's issuance of a Temporary Certificate of Occupancy on August 8, 2007 establishes that no "property damage" had occurred prior to that date, given the fact that no such certificate would have been issued had Chinese Drywall been discovered or caused "property damage." *See, e.g.*, CITY OF AVENTURA, FLA., CODE § 31-82(b) (*"Standards and review.* A certificate of occupancy shall be issued only after the premises have been inspected and found to comply with all applicable standards and requirements for the zoning district in which it is located, and that the use or structure conforms to the plans and specifications for which the building permit was issued") (emphasis in original). The lack of "property damage" is duly confirmed by the City of Aventura's issuance of a Final Certificate of Occupancy on April 25, 2008.

The date of the "property damage" and "occurrence" is after August 8, 2007, the date the City of Aventura, Florida issued the first Temporary Certificate of Occupancy. The "Completed Operations Extension Owner Controlled Insurance Program," found within American Home Primary Policies, expressly commences upon issuance of the Temporary Certificate of Occupancy on August 8, 2007, which provides:

> Completed Operations Coverage is extended for the project described in the above Schedule for a period of 5 years (Extended Completed Operations Period). The Extended Completed Operations Period will commence when that portion of the project is put to its intended use, or a temporary or permanent certificate of occupancy is issued. Failure to protect or maintain completed portions of the project by the owner or the contractor will invalidate coverage. The Extended Completed Operations limit of insurance is $4,000,000 per project and in the aggregate for the term of the project including the Extended Completed Operations Period. Coverage provided under this extension applies to the owner of the project notwithstanding paragraph a. of the definition of the products-completed operations hazard.
>
> All terms and conditions remain unchanged.

The Extended Completed Operations Period expires five (5) years after its commencement and thus the period will end on August 8, 2012.

The "effect" of the Chinese Drywall at the Project, as having occurred during the Completed Operations Extension, is accurately memorialized in a February 23, 2009, 558 Claim which states: "My client closed on the purchase of Unit 2005 on or about November, 2007. **Recently**, distinct black stains have begun to appear on the walls and ceiling of the unit." (emphasis added). Accordingly, the "property damage" "occurred" during the Extended Completed Operations Period.

### C. American Home's Primary Policies Have Been Exhausted

Based upon the "deemer clause" and the issuance of the TCO, the Chinese drywall damage occurred during the completed operations coverage period and thus the underlying

8

policies are exhausted by payment of $4,000,000.00 by the underlying insurer. The Westchester Policy specifically describes the underlying insurance:

| Named Insured | Penninsula II Developers, Inc. - OCIP (As Per Underlying Insurance) | | | Endorsement Number | |
|---|---|---|---|---|---|
| Policy Symbol | Policy Number | Policy Period | | Effective Date of Endorsement | |
| MLW | MLW787560001 | 05/15/2005 | TO 05/15/2007 | 05/15/2005 | |
| Insured By (Name of Insurance Company) Westchester Fire Insurance Company | | | | | |

### SCHEDULE A - SCHEDULE OF UNDERLYING INSURANCE

(A) COMMERCIAL GENERAL LIABILITY
- $2,000,000 EACH OCCURRENCE
- $4,000,000 GENERAL AGGREGATE
- ( ) PER PROJECT/LOCATION
- $4,000,000 PRODUCTS/COMPLETED OPERATIONS AGGREGATE
- $2,000,000 PERSONAL & ADVERTISING INJURY

AIG INSURANCE CO.
05-15--5/07

(B) FEDERAL TERRORISM RISK INSURANCE ACT OF 2002

TYPE OF POLICY

COMMERCIAL GENERAL LIABILITY
- $2,000,000 EACH OCCURRENCE

WHETHER INSURED OR SELF-INSURED
05-15-05/07

Pursuant to American Home's Completed Operations Extension, the Extended Completed Operations Limit of insurance is $4,000,000.00 per project and in the aggregate for the term of the project including the Extended Completed Operations Period. The Westchester Policy provide:

Stonester Fire Insurance Company

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## COMPLETED OPERATIONS EXTENSION - AGGREGATE LIMITATION ENDORSEMENT

It is agreed that with respect to the "Completed Operations Extension", the products-completed operations aggregate limit stated in Item 6 of the declarations applies one time for the entire "Completed Operations Extension" period. The products-completed operations aggregate stated in Item 6 of the Declarations does not apply separately to any annual period that is part of the "Completed Operations Extension" period.

"Completed Operations Extension" means the completed operations extension as provided by the underlying insurance described in the Declarations.

Excess insurers understand that excess coverage over a primary CGL policy with a "deemer clause," by limiting the primary insurer's liability to a particular policy period, delineates primary insurer exhaustion. Accordingly, in light of the "deemer clause," the property damage occurrence happening during the completed operations period and because American Home has indisputably paid in excess of $4,000,000.00, American Home exhausted its Primary Policies.

### D. Gryphon Defended one or more "Suit" relating to Chinese Drywall "Property Damage" causing it to become "Legally Obligated to Pay as Damages"

In *Foster-Gardner, Inc. v. Nat'l. Union Fire Ins. Co.*, 18 Cal. 4th 857 (1998), the California Supreme Court, when interpreting a pre-1986 CGL policy that did not define the word "suit," concluded that "suit" is a court proceeding initiated by the filing of a complaint. *See Foster-Gardner, Inc.*, 18 Cal. 4th at 864 n. 3. *But see Ameron Int'l. Corp. v. Ins. Co. of the State of Pa.*, 50 Cal. 4th 1370 (Cal. 2010) (administrative adjudicative proceeding was "suit" for purposes of duty to defend and potential coverage, despite policy not defining "suit").

10

In 1986, the standard insurance form was amended to define "suit" as "'a civil proceeding' in which damages because of 'bodily injury,' 'property damage' or 'advertising injury' to which this insurance applies are alleged. *Clarendon Am. Ins. Co. v. Starnet Ins. Co.*, 113 Cal. Rptr. 3d 585, 591 (4th Dist. 2010), *review granted*, 117 Cal. Rptr. 3d 613 (Cal. 2010), *review dismissed*, 121 Cal. Rptr. 3d 879 (Cal. 2011). In 1988, the standard insurance form definition of "suit" was expanded to cover alternate dispute resolution with the intent to "encourage the use of any type of alternate dispute resolution technique." *Clarendon Am. Ins. Co.*, 113 Cal. Rptr. 3d at 591. Defined as "a civil proceeding," a suit is broader than an action or lawsuit initiated by a complaint filed in court. *Id.*

In *Clarendon Am. Ins. Co.*, the California Supreme Court granted but then dismissed review (tacitly approving) of a lower appellate court's interpretation of the word "suit," when the CGL policy defined "suit" (almost identically as in the American Home Primary Policies) as:

> (1) a civil proceeding in which damages because of 'bodily injury[,]' 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged"; (2) "[a]n arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent"; or (3) "[a]ny other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent."

*Id.* at 590. The appellate court interpreted the term "civil proceeding" (and thus "suit") to include a mandatory pre-lawsuit process known as the Calderon Process, ultimately ordering an insurer to honor its duty to defend. *Id.* ("the term 'civil proceeding' encompasses the Calderon Process because it is a proceeding created by the Civil Code that is required before a common interest development association may file a complaint alleging construction or design defect damages").

By way of background, California's Calderon Act requires a common interest development association to satisfy certain dispute resolution requirements with respect to the builder, developer, or general contractor before the association may file a complaint in court for construction or design defects. CAL. CIVIL CODE § 1375.

In determining whether the Calderon Process was a "civil proceeding" in which "damages" are alleged, the court considered the Calderon Process in context as one part – the first step – in a continuous litigation process. *Clarendon Am. Ins. Co.*, 113 Cal. Rptr. 3d at 592. The court noted that the Calderon Process is tied directly and securely to an association's complaint for damages against a builder, developer, or general contractor based on construction or design defects and that the process is mandatory. *Id.*

Similarly, Chapter 558 of the Florida Statutes obligates a construction defect claimant, prior to instituting a civil action, to institute a civil alternative dispute resolution proceeding when alleging "damages" caused by "property damage." *See* Fla. Stat. § 558.001 *et seq.* Specifically, Section 558.001 of the Florida Statutes provides:

> **Legislative findings and declaration.**—The Legislature finds that it is beneficial to have an alternative method to resolve construction disputes that would reduce the need for litigation as well as protect the rights of property owners. An effective alternative dispute resolution mechanism in certain construction defect matters should involve the claimant filing a notice of claim with the contractor, subcontractor, supplier, or design professional that the claimant asserts is responsible for the defect, and should provide the contractor, subcontractor, supplier, or design professional with an opportunity to resolve the claim without resort to further legal process.

Fla. Stat. § 558.001. In fact, "[i]f a claimant files an action alleging a construction defect without first comply[ing] with the requirements of … chapter [558], on a timely motion by a party to the

action the court [must] stay the action, without prejudice, and the action may not proceed until the claimant has complied with such requirements." Fla. Stat. § 558.003.

American Home's Primary Polices define "suit" similarly to the definition in *Clarendon Am. Ins. Co.*; American Home's Primary Policies define "suit" to mean "a civil proceeding" which "includes" "[a]ny alternative dispute resolution proceeding in which such damages are claimed," stating as follows:

> 18. "Suit" means a civil proceeding in which damages because of "bodily injury", "property damage" or "personal and advertising injury" to which this insurance applies are alleged. "Suit" includes:
>    a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
>    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

Accordingly, each of the 558 Claims Gryphon received was a "suit" pursuant to American Home's Primary Policies because each was an "alternative dispute resolution proceeding" claiming damages.

### E. Pursuant to Each "Suit" Gryphon Defended, Gryphon Became "Legally Obligated to Pay as Damages Because of" Chinese Drywall "Property Damage" Certain "Sums"

Continuing its interpretation of CGL policies that do not define "suit," the California Supreme Court extended the "bright line rule" espoused in *Foster-Gardner, supra*, wherein the Court held that "suit" meant a civil action commenced by filing a complaint, in *Certain Underwriters at Lloyd's of London v. Superior Court*, 24 Cal. 4th 945 (Cal. 2001) (*Powerine I*),

limiting an insurer's duty to indemnify for all "sums" the insured was "legally obligated to pay as damages" to "sums" ordered by a court, as opposed to expenses required by an agency's cleanup order. *Ameron Int'l. Corp.*, 242 P. 3d at 1026, *citing Powerine I*, 24 Cal. 4th at 951. In *Powerine I*, the California Supreme Court deduced, by employing what has been coined as the "*Foster-Gardner* Syllogism," from two assumed propositions: (a) the duty to defend is broader than the duty to indemnify; and (b) the duty to defend is not broad enough to extend beyond a "suit," i.e., a civil action prosecuted in a court pursuant to *Foster-Gardner, supra*, but rather is limited thereto. *Powerine Oil Co., Inc. v. Superior Court*, 37 Cal. 4th 377, 393 (2005) (*Powerine II*), *citing Powerine I*, 24 Cal. 4th at 960. A fortiori, the duty to indemnify could not be enough to extend beyond "damages," i.e., money ordered by a court, but rather limited thereto. *Powerine II*, 37 Cal. 4th at 393, *citing Powerine I*, 24 Cal. 4th at 962. "Put another way, the insurer's obligation to indemnify for 'damages' is limited to 'money ordered by court' because the provisions in the standard CGL policy imposing both a duty to defend and a duty to indemnify on the insurer each 'link [] 'damages' to a suit,' i.e., a civil action prosecuted in a court." *Powerine II*, 37 Cal. 4th at 393, *citing Powerine I*, 24 Cal. 4th at 962.

It is axiomatic that, conversely, when the CGL policy expansively defines "suit" to include civil proceedings such as alternative dispute resolutions, then the duty to indemnify can be triggered without a court order, as the duty to defend was triggered by an alternative dispute resolution pursuant to an almost identical policy definition of "suit" in *Clarendon Am. Ins. Co. v. Starnet Ins. Co.*, 113 Cal. Rptr. 3d 585 (4th Dist. 2010), *review granted*, 117 Cal. Rptr. 3d 613 (Cal. 2010), *review dismissed*, 121 Cal. Rptr. 3d 879 (Cal. 2011). Moreover, a third-party excess

liability policy without a duty to defend does not implicate the *Foster-Gardner* syllogism. *County of San Diego v. Ace Prop. & Cas. Ins. Co.*, 37 Cal. 4th 406, 416 (2005).[1]

Under general insurance principles, the California Supreme Court interprets the phrase "legally obligated to pay as damages" in accordance with the ordinary and popular sense, not the legalistic, and erroneously premised, interpretation of the language urged by insurers. *Vandenberg v. Superior Court of Sacramento*, 21 Cal. 4th 815, 840 (1999). A reasonable lay person would certainly understand "legally obligated to pay' to refer to any obligation which is binding and enforceable under the law...." *Vandenberg*, 21 Cal. 4th at 840. For example, a reasonable layperson, cognizant that he or she is purchasing a "general liability" insurance policy, would not conclude such coverage term only refers to liability pled in tort, and thus entirely excludes liability pled on a theory of breach of contract. *Id.*[2]

---

[1] Westchester has taken the position in the instant suit that it owes no duty to defend to Gryphon.

[2] California's Civil Code enumerates California law concerning the interpretation of contracts. *Ameron Int'l. Corp.*, 242 P. 2d at 1024. A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful. CAL. CIVIL CODE § 1636. The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity. CAL. CIVIL CODE § 1638. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title. CAL. CIVIL CODE § 1639. The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. CAL. CIVIL CODE § 1641. Several contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together. CAL. CIVIL CODE § 1642. A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties. CAL. CIVIL CODE § 1643. A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates. CAL. CIVIL CODE § 1647. If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it. CAL. CIVIL CODE § 1649. Repugnancy in a contract must be reconciled, if possible, by such an interpretation as will give some effect to the repugnant clauses, subordinate to the general intent and purpose of the whole contract. CAL. CIVIL CODE § 1652. In cases of uncertainty not removed by the preceding rules, the language of a contract should be

The words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed. CAL. CIVIL CODE § 1644. In its ordinary sense, the function of the word "or" is to mark an alternative such as "either this or that." *Houge v. Ford*, 285 P. 2d 257, 260 (Cal. 1955).

Given that the definition of "suit" in American Home's Primary Policy means "a civil proceeding" including "[a]ny alternative dispute resolution proceeding in which such damages are claimed," American Home's Primary Policies clearly and explicitly manifest that American Home's indemnity obligation is not limited to money ordered by a court. Moreover, such a definition is binding upon Westchester, as the Westchester Policy follow form to the American Home Primary Policies.

Equally, the use of the word "or" in the Westchester Policy clearly and explicitly evidences the intent that the triggering of Westchester's indemnification obligation does not require a court order or judgment against Gryphon. Specifically, the Westchester Policy provides: "If the Company is obligated to indemnify the insured, the insured must make a definite claim for loss within twelve (12) months after the insured has paid any amount of excess loss, as stated in declaration 6; **or** after the insured's liability shall have been made certain by final judgment **or** by written agreement of the insured, the claimant, and the company." (emphasis added). An earlier version of the Westchester Policy manifests an identical intention: "The insured shall make a definite claim for loss, for which the company may be liable within twelve (12) months after the insured has paid any amount of excess loss, as stated in Declaration 6; **or** after the insured's liability shall have been made certain by final judgment after actual or

---

interpreted most strongly against the party who caused the uncertainty to exist. CAL. CIVIL CODE § 1654.

trial; **or** by written agreement of the insured, the claimant, and the company." (emphasis added). Consequently, when American Home's Primary Policies were exhausted and Gryphon became "legally obligated to pay as damages because of" "property damage" those damages alleged in the Chinese Drywall 558 Claims, Westchester's indemnification obligations were triggered despite the lack of court order or judgment against Gryphon.

Even if the foregoing provisions from the American Home and Westchester policy were unclear, which they are not, the doctrine of contra-proferentem, as codified by the California Civil Code, mandates interpreting "legally obligated to pay as damages" to the loss paid in response to 558 Claims.

Accordingly, upon receipt of the 558 Claims, Gryphon became "legally obligated to pay as damages" certain "sums" for "property damage" caused by Chinese Drywall, and after American Home exhausted the Primary Policies, Westchester breached its duty to indemnify when Westchester failed to indemnify Gryphon for its loss.

## CONCLUSION

For the foregoing reasons, the Court should grant Gryphon's Motion for Partial Final Summary Judgment.

WHEREFORE, Plaintiff Gryphon Construction Company respectfully requests entry of partial final summary judgment in its favor and against Defendant Westchester Fire Insurance Company as to Count II (Declaratory Judgment re: Duty to Indemnify) and Count III (Breach of Contract):

    A.    Declaring that Gryphon's loss related to Chinese Drywall are covered under the Westchester Policy;

  B. Declaring that Westchester is obligated to indemnify Gryphon for Gryphon's loss suffered as a consequence of Chinese Drywall;

  C. Declaring that Westchester has breached one or more contractual duties owed to Gryphon;

  D. Awarding to Gryphon and against Westchester, Gryphon's loss, including compensatory and consequential damages;

  E. Awarding to Gryphon and against Westchester attorneys' fees pursuant to the terms of the Westchester Policy and applicable law;

  F. Awarding to Gryphon and against Westchester costs of this action; and

  G. Granting such other relief deemed just and proper.

Date: January 13, 2012.

            Respectfully submitted,

            TAYLOR VEGA, P.A.
            *Counsel for Gryphon Construction, LLC*
            121 Alhambra Plaza, Suite 1604
            Coral Gables, Florida 33134-4512
            Telephone: (305) 443-2043
            Facsimile: (305) 443-2048

            By: /s/ Miguel A. Brizuela
              TIMOTHY S. TAYLOR
              Florida Bar No. 545015
              ttaylor@taylorvega.com
              MIGUEL A. BRIZUELA
              Florida Bar No. 21465
              mbrizuela@taylorvega.com

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 13, 2012, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

By: /s/ Miguel A. Brizuela
TIMOTHY S. TAYLOR
Florida Bar No. 545015
ttaylor@taylorvega.com
MIGUEL A. BRIZUELA
Florida Bar No. 21465
mbrizuela@taylorvega.com
