# EXHIBIT "G"

**Thomas C. Sand**, OSB No. 773322
tom.sand@millernash.com
**Elisa J. Dozono**, OSB No. 063150
elisa.dozono@millernash.com
**Brian W. Esler**
(*Pro Hac Vice application to be submitted*)
brian.esler@millernash.com
MILLER NASH LLP
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  (503) 224-5858
Facsimile:  (503) 224-0155

> Attorneys for Plaintiffs
> China National Building Materials Import
> and Export Corporation and
> CNBM Forest Products (Canada) Ltd.

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION**, a People's Republic of China corporation; and **CNBM FOREST PRODUCTS (CANADA) LTD.**, a Canadian corporation,<br><br>          Plaintiffs,<br><br>     v.<br><br>**MURPHY OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC,** an Oregon limited liability company; **MURPHY OVERSEAS U.S.A. TIMBER AND LAND DEVELOPMENT, LLC**, an Oregon limited liability company; **MURPHY OVERSEAS U.S.A. HOLDINGS, LLC**,<br><br>          Defendants. | Case No. 3:14-cv-00746-ST<br><br>**AMENDED COMPLAINT**<br><br>(Violation of UCC; Tortious Interference With Contract; Declaratory Judgment) |

Certificate of Service

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

For its complaint, plaintiffs, China National Building Materials Import and Export Corporation ("China National") and CNBM Forest Products (Canada) Ltd. ("CNBM Canada"), allege as follows:

## I. PARTIES

1.    China National is a foreign corporation established under the laws of the People's Republic of China, with its headquarters and principal place of business in Beijing, China.

2.    CNBM Canada is a foreign corporation established under the laws of Canada, with its headquarters and principal place of business in Vancouver, British Columbia.

3.    Defendant Murphy Overseas USA Astoria Forest Products, LLC ("Astoria Forest Products"), is an Oregon limited liability company whose headquarters and principal place of business are in Oregon, and whose members are all domiciled in Oregon. It did not come into existence until, at the earliest, about January 17, 2014.

4.    Defendant, Murphy Overseas U.S.A. Timber and Land Development, LLC ("Timber and Land"), is an Oregon limited liability company, whose members are all domiciled in Oregon. It is the sole member of Astoria Forest Products. It did not come into existence until, at the earliest, about May 21, 2013.

5.    Timber and Land's sole member and manager is Murphy Overseas U.S.A. Holdings, LLC ("Murphy Overseas"), which is also an Oregon limited liability company. Murphy Overseas' members are Dennis J. Murphy, Dennis J. Murphy, Jr., Jennifer D. Murphy, Trudy Gallagher, and Ed Morrissey, all of whom are domiciled in Oregon, and none of whom are residents of China or any other foreign jurisdiction. Murphy Overseas did not come into existence until, at the earliest, about May 21, 2013.

6.    All defendants will be referred to collectively as "Murphy" below.

Page 2 -    Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON 97204

## II.  JURISDICTION AND VENUE

7.     Jurisdiction in this Court is proper because China National is a foreign corporation (thus a citizen or subject of a foreign state) and Murphy comprises domestic LLCs whose members are all domiciled in Oregon and there is more than $75,000 at issue, such that diversity jurisdiction is established under 28 USC § 1332(a)(2).

8.     Venue is proper in this Court under 28 USC § 1391(b), since Murphy resides and does business in this district and a majority of the events giving rise to the causes of action stated below occurred in this district.

## III.  FACTS

9.     China National's principal business is the purchase of logs and other timber products for import into the People's Republic of China.  Thus, it had occasionally used Westerlund Handling, LLC ("Westerlund"), in 2011 and thereafter to process logs purchased in the Northwest.

10.     In 2012, Westerlund approached China National to seek China National's financial assistance because Westerlund had defaulted on its obligations to International Veneer Corporation ("International Veneer") and needed someone to provide refinancing quickly. Westerlund was desperate—it owed International Veneer over $3.5 million, and Westerlund would have to close its operations unless it could raise those funds immediately.  Westerlund had told International Veneer that Westerlund might declare bankruptcy.

11.     To induce China National to lend Westerlund money, Westerlund offered to do more than just pay back any loan.  If China National would bail out Westerlund, Westerlund would offer China National exclusive access to the facilities that Westerlund leased at the Port of Astoria, so that China National could be guaranteed a convenient location from which to ship overseas the logs that it purchased domestically.  Westerlund offered to act as China National's agent to purchase logs on China National's behalf, to use its local contacts in the logging industry to get China National the best logs at the best prices, and to help maximize the

Page 3 -     Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

number of logs that China National could purchase, process, and ship through Westerlund's leased facilities at the Port. By giving China National exclusive access to the Port facilities and maximizing log shipments through the Port, and by having China National use Westerlund to process logs at the Port (and pay Westerlund for those services), Westerlund would be able to pay off the loan by repaying China National at least $60,000 from the fees that China National would pay to Westerlund for processing each log shipment.

12.     Ultimately, China National agreed to Westerlund's proposed conditions, which were memorialized in a Pre-Payment Agreement and associated documents. A true and correct copy of the Pre-Payment Agreement (with addenda) is attached as <u>Exhibit 1</u>, and its terms are incorporated by reference. This contract was not terminable at will, but rather had an explicit term that was intended to continue until Westerlund had repaid the loan exclusively by doing business with China National.

13.     China National ultimately lent approximately $3.55 million to Westerlund. Westerlund also gave China National a Security Agreement, which secures, among other things, repayment of the loans. A true and correct copy of the Security Agreement is attached as <u>Exhibit 2</u>, and its terms are incorporated by reference.

14.     By a Second Amendment to the Pre-Payment Agreement (dated July 2, 2013), the parties added CNBM Canada as a party to that Agreement, with the same rights and responsibilities as China National. Hence, from that time onward, CNBM Canada had the same contract rights and business expectations as China National with respect to the Westerlund relationship. Unless the context indicates otherwise, all references to "China National" below include CNBM Canada.

15.     China National is unique in the log-buying industry because it often pays its log handlers for services before actually receiving services. Thus, in addition to lending China National sufficient funds to settle its debt with International Veneer, purchase new

Page 4 -     Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

equipment, pay salaries, and generally stay in business, China National would also prepay Westerlund for Westerlund's log-handling services for each shipment, as well as provide Westerlund with letters of credit that it could use to purchase logs on China National's behalf. For each log purchase, China National extended to Westerlund further credit to purchase logs on China National's behalf and to pay itself for the services that it would provide to China National in processing the logs for shipment. Then, once the logs had been loaded and shipped, Westerlund was to pay China National at least $60,000 for each shipment. Thus, China National had a reasonable expectation of buying over 60 shiploads of logs through Westerlund, which meant that China National had a reasonable expectation of doing business with Westerlund for many more years if there was no interference from outside parties.

16.     By way of example, China National prepaid Westerlund approximately $4.5 million in late 2013 for logs that should have been processed and shipped in mid-January 2014. Westerlund used approximately $3.5 million of that prepayment to purchase logs on China National's behalf. Westerlund should have used the other $1 million to pay Westerlund itself and any other contractors for processing and transporting the logs and other associated services. Westerlund should have then also repaid China National at least $60,000 after the logs shipped to pay down the $3.55 million originally lent by China National to Westerlund in 2011. As a result of Murphy's interference, as described further below, those logs are still sitting undelivered at the Port, and the loan remains unpaid.

17.     Once China National started to effectively utilize the Port facilities and increased the number of logs that it was shipping through the Port, others in the industry, including the Murphy defendants, realized the opportunity presented by that facility. Thus, upon information and belief, in the fall of 2013, Murphy set out to take control of Westerlund in such a way that it hoped to receive the benefits of Westerlund's services while ensuring that China National did not get repaid.

Page 5 -     Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

18.    Unbeknownst to China National, in about November of 2013, Dennis Murphy along with two others came to Westerlund's office to begin discussing ways that Westerlund could try to escape its agreement with China National, avoid repayment, and do business with Murphy.  Murphy did so with the express purpose of harming China National by interfering with its contracts and business expectancies with Westerlund.  Dennis Murphy and the others were acting on behalf of Murphy and were agents of Murphy.

19.    Upon information and belief, Murphy assisted Westerlund to abandon and breach its contract with China National, and to avoid repaying its debts to China National.  It did so in part by surreptitiously putting its own personnel at Westerlund, so that it could learn how China National had operated with Westerlund, how much China National paid for logs, and other information regarding the operations, which it then used to ensure that Westerlund abandoned and reneged on its contracts with China National.

20.    Upon information and belief, Murphy encouraged or caused Westerlund to cease communicating with China National about the January log shipment.  Ultimately, because China National could not get Westerlund to confirm that the logs purchased were available for pickup, China National had to divert the ship it had sent to pick up those logs—which logs are still sitting at the Port of Astoria.

21.    On or about January 13, 2014, Astoria Forest Products entered into a Log Handling Agreement with Westerlund.  A true and correct copy of the Log Handling Agreement is attached as Exhibit 3, and its terms are incorporated herein by reference.

22.    Soon thereafter, Murphy set up a separate Oregon corporation called "Westerlund Workout, LLC," which, upon information and belief, Murphy expected to use to cause assets to be transferred out of Westerlund once Westerlund had breached its contract with China National.  Murphy did this, and all its other alleged actions, with the intent of ensuring that China National's loan obligation would not be repaid and that Westerlund would not fulfill its contractual obligations to China National.

Page 6 -    Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

23.    On January 15, 2014—just two days after signing its new agreement with Murphy—Westerlund sent a letter to China National purporting to terminate all contracts with China National.

24.    But for Murphy's actions in interfering with China National's agreements and expectations with respect to Westerlund, China National would have continued utilizing Westerlund as its agent and continued shipping its logs out of Westerlund's leased Port facilities for many years to come.  Under the August 2012 Pre-Payment Agreement, by making only the minimum repayments of $300,000 per quarter, Westerlund would not have repaid its debt until sometime in 2015, and China National had a reasonable expectation of exclusive access to Westerlund's services and its leased Port facilities for at least that long.  But for Murphy's interference, China National would have continued to profit from its relationship with Westerlund.

25.    Westerlund's contract termination letter, along with its failure to make payments and other acts, constituted a default under the loan documents.  China National properly notified Westerlund of those defaults.  Westerlund failed to cure.  Instead, on the date that its period to cure expired, Westerlund filed a lawsuit in Clatsop County Circuit Court (*Westerlund Log Handlers, LLC v. China Nat. Bldg. Materials Imp. and Exp. Corp.*, No. 14-CV-00618).  Upon information and belief, Murphy not only assisted in the planning for this lawsuit for Westerlund, but also helped finance it.

26.    On about February 5, 2014, China National notified Astoria Forest Products that Westerlund was in default, and that all future payments to Westerlund should be paid directly to China National in accordance with China National's rights as a secured creditor of Westerlund.  A true and correct copy of the notice is attached as Exhibit 4, and its terms are incorporated herein by reference.

27.    Despite receiving that notice, Astoria Forest Products has continued to pay Westerlund.  Although the amount of damages will be proved at trial, China National believes

Page 7 -    Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

and therefore alleges that Murphy has paid Westerlund over $1 million since February 5, 2014, under the Log Handling Agreement or other agreements, and all these funds should have been paid directly to China National.

28.     Further, after it received the February 5, 2014, notice, Murphy engaged in further acts intended to interfere with China National's contractual rights.  In particular, it caused Astoria Forest Products to make filings in which Astoria Forest Products has alleged that it has a security interest in certain of Westerlund's assets, including a log debarker, when no underlying debt was owed to support any such security agreement.  These filings were intended solely to interfere with and cast doubt on China National's superior secured interest in the assets.  Despite requests from China National, Astoria Forest Products has not been able to produce any evidence of any valid debt owed to it by Westerlund.

29.     Further, Murphy also improperly induced the Port of Astoria to consent to an agreement whereby Murphy would "sublease" Port facilities from Westerlund.  Murphy did so by, in part, misinforming the Port about the status of China National's interests in all of Westerlund's assets, including the lease, by failing to inform the Port of ongoing litigation, and by failing to inform the Port of Murphy's intention to cause Westerlund to default on that lease. Murphy thereafter induced Westerlund to default on its lease with the Port so that Murphy could take over the lease, and thus ensure that China National would have no access to the facilities, and to try to impair China National's access to the logs it purchased that are still stored at that facility, in an effort to further impair its contractual rights and remedies.

30.     China National has been damaged by Murphy's actions in an amount to be determined at trial, but believed to be well over $3.55 million.

Page 8 -     Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## IV.  CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### (Failure to Pay Upon Notice—Astoria Forest Products)

31.     China National realleges all the allegations above.

32.     Astoria Forest Products is the holder of "accounts" with Westerlund, as that term is defined in the Security Agreement and the Uniform Commercial Code.

33.     Despite receiving a valid notice to pay, Astoria Forest Products has refused to honor Westerlund's assignment and continues to pay Westerlund, in violation of the provisions of the Uniform Commercial Code and the Security Agreement.

34.     Astoria Forest Products is liable to China National for the amount of all its payments to or on behalf of Westerlund since February 5, 2014.

### SECOND CLAIM FOR RELIEF
### (Tortious Interference With Contracts and Business Expectancies—All Defendants)

35.     China National realleges all the allegations above.

36.     Murphy knew of China National's contracts, business expectancies, and relationship with Westerlund, and tortiously sought to and did interfere with those contracts, expectancies and relationship.

37.     Murphy did so for an improper purpose and through improper means, as explained further above, and such other ways as discovery will show.

38.     But for Murphy's interference, China National would have realized the full value of its contract with Westerlund and had a valid expectation of continuing to do business with Westerlund through the Port of Astoria for many years.

39.     China National has been damaged in an amount to be proved at trial.

40.     After discovery, China National will seek leave to amend this Complaint to seek punitive damages.

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## THIRD CLAIM FOR RELIEF

### (Declaratory Judgment—Astoria Forest Products)

41.     China National realleges all the allegations above.

42.     There is an actual controversy between China National and Astoria Forest Products such that this Court may declare the rights or other legal relations of those parties pursuant to 28 U.S.C. § 2201.

43.     Astoria Forest Products claims a security interest in certain Westerlund assets, including a log debarker that Astoria Forest Products claims is a fixture rather than equipment.  China National has a competing security interest in those assets and in the debarker in particular.  The debarker is a valuable piece of equipment, and worth in excess of $75,000.

44.     China National seeks a declaration that (a) Astoria Forest Products has no valid security interest in any Westerlund assets and (b) the security interest of China National is superior to any interest that Astoria Forest Products may have in those assets.

## V.  RELIEF REQUESTED

Wherefore, China National and CNBM Canada request the following relief:

1.     A judgment for compensatory damages in an amount to be proved at trial.

2.     Recovery of all its reasonable costs, expenses, and attorney fees to be included in the judgment against all defendants.

3.     A declaration that Astoria Forest Products has no security interest in any assets of Westerlund and that China National's security interest is superior to any interest of any defendant in those assets.

/ / /

/ / /

/ / /

/ / /

Page 10 -    Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

4.      For all other relief, whether legal or equitable, that the Court may determine is appropriate.

DATED this 15th day of May, 2014.

MILLER NASH LLP


/s/ Thomas C. Sand
Thomas C. Sand, OSB No. 773322
tom.sand@millernash.com
Elisa J. Dozono, OSB No. 063150
elisa.dozono@millernash.com
3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon  97204
Telephone:  (503) 224-5858
Fax:  (503) 224-0155

Brian W. Esler, WSB No. 22168
(*Pro Hac Vice application to be submitted
and previously admitted Pro Hac Vice in
USDC, District of Oregon,
Case No. 3:14-cv-00176-BR*)
brian.esler@millernash.com
4400 Two Union Square
601 Union Street
Seattle, Washington  98101
Telephone:  (206) 622-8484
Fax:  (206) 622-7485

*Of Attorneys for Plaintiffs
China National Building Materials Import
and Export Corporation and
CNBM Forest Products (Canada) Ltd.*

SEADOCS:464672.4

Page 11 -   Amended Complaint

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing China National Building Materials

Import and Export Corporation's Amended Complaint on:

Michael J. Esler
Esler, Stephens & Buckley, LLP
121 S.W. Morrison Street, Suite 700
Portland, Oregon  97204-3183
E-Mail:  esler@eslerstephens.com

by the following indicated method or methods on the date set forth below:

☐  **CM/ECF system transmission.**

☒  **E-mail.**

☐  **Facsimile communication device.**

☒  **First-class mail, postage prepaid.**

☐  **Hand-delivery.**

☐  **Overnight courier, delivery prepaid.**

DATED this 15th day of May, 2014.

s/Thomas C. Sand
Thomas C. Sand, OSB No. 773322

*Attorneys for Defendant*
*China National Building Materials Import and*
*Export Corporation*

Certificate of Service

MILLER NASH LLP
ATTORNEYS AT LAW
TELEPHONE: (503) 224-5858
3400 U.S. BANCORP TOWER
111 S.W. FIFTH AVENUE
PORTLAND, OREGON  97204

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 1 of 21
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 1 of 21 Page ID#: 12
Case 2:09-md-02047-EEF-MBN Document 18305-2 Filed 02/10/15 Page 14 of 57

EXECUTION COPY

## PRE-PAYMENT AGREEMENT

THIS AGREEMENT is dated for reference the 10 day of August, 2012

BETWEEN:

> **CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION**, a corporation incorporated under the laws of People's Republic of China and having an office at Building 4, Interwest Business Centre, No. 9 Shou Ti South Road, Haidian District Beijing, China 100048
>
> (the "Purchaser")

AND:

> **WESTERLUND LOG HANDLERS, LLC**, a limited liability company organized under the laws of the State of Washington and having a registered office at Suite 200 – 3473 NW Lowell St., Silverdale, Washington, 98383
>
> (the "Vendor")

AND:

> **DAVID WESTERLUND**, of *Westerlund Log Handlers, LLC*;
>
> ("Westerlund")

AND:

> **ROGER NANCE, JR.**, of *Westerlund Log Handlers, LLC*;
>
> ("Nance")

(the Purchaser, the Vendor, Westerlund and Nance individually referred to herein as a "Party" and collectively as the "Parties")

WHEREAS:

A.  the Vendor is in the business of processing and exporting logs;

EXHIBIT 1
Page 1 of 21

PRE-PAYMENT AGREEMENT                                          Page 2 of 13

B.      the Purchaser is in the business of importing and exporting construction materials and various other forestry related businesses;

C.      the Purchaser has agreed to pre-pay the Vendor $3,100,000 for future log purchases in accordance with the following terms and conditions; and

D.      following the consummation of the transactions contemplated herein, Westerlund and Nance will be the sole members of the Vendor and will gain an indirect benefit as a result of the transactions contemplated in this Agreement.

NOW THEREFORE THIS AGREEMENT witnesses that in consideration of the premises and the mutual covenants and agreements herein contained, the Parties agree as follows:

1.          DEFINITIONS AND INTERPRETATION

1.1          **Accounting Terminology.** All accounting terms not defined in this Agreement shall have those meanings generally ascribed to them in accordance with International Financial Reporting Standards.

1.2          **Business Day.** "Business Day" means any day of the week except Saturday, Sunday or a "holiday" as that term is defined in the British Columbia *Interpretation Act*, and/or a Saturday, Sunday or a civic holiday in Washington, U.S.A. or People's Republic of China.

1.3          **Capital Cost Reimbursement.** "Capital Cost Reimbursement" means the amount calculated and payable by the Vendor to the Purchaser pursuant to clause 5 of this Agreement.

1.4          **Commencement Date.** The "Commencement Date" is August 10, 2012.

1.5          **Conflict with other Pre-payment Documents.** To the extent there is any conflict or inconsistency between the terms of this Agreement and the other Pre-payment Documents, the terms of this Agreement will prevail.

1.6          **Currency.** All references to dollars or currency in this Agreement are to the currency of the United States of America ("USD") unless otherwise specified.

1.7          **Event of Default.** "Event of Default" means the occurrence of an event enumerated in clause 10.1 of this Agreement.

1.8          **Headings.** The headings to the clauses of this Agreement are inserted for convenience only and shall not affect the construction hereof.

1.9          **Included Words.** Wherever the singular or the masculine is used herein the same shall be deemed to include the plural or the feminine or the body politic or corporate where the context or the Parties so require.

1.10          **Pre-payment.** "Pre-payment" means the sum of $3,100,000 which the Purchaser shall pay in full to the Vendor on the Commencement Date.

EXHIBIT 1
Page 2 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 3 of 21
Case 2:09-md-02047-EEF-MBN Document 18302-14 Filed 02/10/15 Page 16 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 3 of 21 Page ID#: 14

1.11      **Pre-payment Documents.** "Pre-payment Documents" means this Agreement, the General Security Agreement described in clause 3.2(a) of this Agreement, the Share Pledge Agreement described in clause 3.2(b) of this Agreement, the Option to Purchase Agreement described in clause 6.1 of this Agreement, and any and all other documents or instruments executed by the Vendor in connection with this Agreement and the Pre-payment.

1.12      **Purchase Credit.** "Purchase Credit" means the amount calculated and credited to the Purchaser on future purchases of log shipments pursuant to clause 4 of this Agreement.

1.13      **Term.** "Term" means the period of time beginning on the Commencement Date and ending on the date on which the cumulative total of Purchase Credits and Top Up Payments the Vendor has made to the Purchaser is equivalent to the Pre-payment.

1.14      **Top Up Payment.** "Top Up Payment" means the amount calculated and payable by the Vendor to the Purchaser pursuant to clause 4 of this Agreement.

2.        **REPRESENTATIONS AND WARRANTIES**

2.1       **Representations and Warranties.** The Vendor, Westerlund and Nance hereby each represent and warrant to the Purchaser, on a joint and several basis, regardless of any independent investigations that the Purchaser may make, as follows:

(a)   the Vendor is a limited liability company duly organized, in good standing, and validly existing under the laws of the State of Washington and is duly qualified to carry on business in the State of Washington and the State of Oregon;

(b)   the Vendor has filed with the Washington Secretary of State all returns and financial statements required to be sent under the *Washington Limited Liability Company Act*, R.C.W. title 25, c. 15. The Vendor is in good standing with the Corporations and Charities Division of the Washington Secretary of State and has made all necessary filings required pursuant to the *Washington Limited Liability Company Act*;

(c)   immediately prior to the transactions contemplated herein, David Westerlund holds a 30% ownership interest in the Vendor and is the President of the Vendor;

(d)   immediately prior to the transactions contemplated herein, Roger Nance, Jr. holds a 20% ownership interest in the Vendor and is the Vice President and Managing Director of the Vendor;

(e)   other than the option to purchase described in clause 6 of this Agreement, no person has any agreement or option, present or future, contingent, absolute or capable of becoming an agreement or option or which with the passage of time or the occurrence of any event could become an agreement or option to require the Vendor to issue any further or other interests in its membership structure or any other security convertible or exchangeable into interests in its membership structure or to convert or exchange any securities into or for interests in the membership structure of the Vendor;

EXHIBIT 1
Page 3 of 21

    (f)    the receipt of and provision of security for the Pre-payment and the Vendor's other obligations under the Pre-payment Documents have been or will be duly authorized by all necessary corporate action on the part of the Vendor;

    (g)    the Vendor is not party to, bound by or subject to any indenture, mortgage, lease, agreement, instrument, judgment or decree which would be violated or breached by, or under which default would occur or which could be terminated, cancelled or accelerated, in whole or in part, as a result of the execution and delivery of this Agreement or the consummation of any of the transactions provided for in this Agreement; and

    (h)    other than the debt owing to the International Veneer Company, Inc. ("IVC"), there are no debts, claims, judgments, arbitrations, actions or proceedings existing or pending, or to the Vendor's knowledge threatened in law or in equity whether before any governmental body or otherwise that would materially affect the Vendor's financial condition.

## 3.    PRE-PAYMENT AND SECURITY

3.1    **Agreement to make Pre-payment.** The Purchaser hereby agrees to advance to the Vendor the Pre-payment as defined herein on the Commencement Date.

3.2    **Security.** In consideration of and as security for the Purchaser making the Pre-payment to the Vendor,

    (a)    the Vendor shall execute a General Security Agreement in favour of the Purchaser in substantially the form attached hereto as Schedule A, and deliver the same to the Purchaser concurrently with the signing and delivery of this Agreement; and

    (b)    Westerlund and Nance shall execute a Share Pledge Agreement in favour of the Purchaser in substantially the form attached hereto as Schedule B, and deliver the same to the Purchaser concurrently with the signing and delivery of this Agreement.

## 4.    PURCHASE CREDITS AND TOP UP PAYMENTS

4.1    **Application of Purchase Credits and Top up Payments.** The Pre-payment shall be applied to future purchases of logs by the Purchaser from the Vendor as follows:

    (a)    The Purchaser shall receive a min. $60,000 credit (referred to herein as a "Purchase Credit") towards each log shipment the Vendor makes to the Purchaser on and from the Commencement Date;

    (b)    With the exception of the quarter ending September 30th, 2012 and the first quarter of every year during which the Chinese New Year falls in, where the application of Purchase Credits and Top up Payments and the payment of Capital Cost Reimbursement shall be negotiated in good faith and agreed upon between the Vendor and the Purchaser, if the total aggregate amount of Purchase Credits

EXHIBIT 1
Page 4 of 21

received by the Purchaser in any quarter (i.e. April 1st – June 30th, July$1^{st}$ - September 30th, October 1st – December 31st) during the Term is less than $300,000, then the Vendor shall within five (5) business days of the last day of such quarter, pay to the Purchaser an amount (referred to herein as an "Top Up Payment") equal to the difference between the total aggregate Purchase Credits received by the Purchaser and $300,000; and

(c)     Notwithstanding anything else in this clause 4.1, if the amount of any Purchase Credit or Top Up Payment, as the case may be, when combined with the aggregate sum of all previous Purchase Credits and Top Up Payments received by or paid to the Purchaser in accordance with this clause, shall be greater than the Pre-payment, then such Purchase Credit or Top Up Payment, as the case may be, will be reduced so that the total aggregate Purchase Credits and Top Up Payments received by or paid to the Purchaser in accordance with this clause shall equal the Pre-payment.

## 5.     CAPITAL COST REIMBURSEMENT

5.1     **Calculation and Payment of Capital Cost Reimbursement.** The Vendor shall reimburse the Purchaser on a quarterly basis for the ongoing capital costs incurred by the Purchaser with respect to the Pre-payment, which shall be calculated based on an annual interest rate of five and one half percent (5.5%). Accordingly, within five (5) business days of the last day of each quarter (i.e. January 1st – March 31st, April 1st – June 30th, July$1^{st}$ - September 30th, October 1st – December 31st) during the Term, the Vendor shall pay to the Purchaser, in addition to and immediately prior to any Top Up Payment that may be payable in accordance with clause 4 of this Agreement, an amount equal to 0.01375 multiplied by the amount obtained by subtracting from the Pre-payment the total aggregate Purchase Credits and Top Up Payments received by or paid to the Purchaser up to that time.

5.2     **Exceptions.** Notwithstanding clause 5.1 above, the Capital Cost Reimbursement for the quarter in which the Term begins shall be calculated by:

(a)     applying clause 5.1 to arrive at a provisional amount;

(b)     dividing the provisional amount reached in sub clause 5.2(a) above by the number of days in the quarter; and

(c)     multiplying the amount reached in sub clause 5.2(b) above by the number of days between and including the Commencement Date and the last day of the quarter.

## 6.     OPTION TO PURCHASE

6.1     As further consideration for the Purchaser paying the Pre-payment to the Vendor, the Vendor shall execute an Option to Purchase Agreement in favour of the Purchaser in substantially the form attached hereto as Schedule C, which will entitle to the Purchaser to purchase a fifty percent (50%) membership interest in the Vendor for an aggregate purchase price of $1.00, exercisable at any time prior to the one (1) year anniversary date of the expiration of the Term of this Agreement.

EXHIBIT 1
Page 5 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 6 of 21
Case 2:09-md-02047-EEF-MBN Document 18302-1 Filed 02/10/15 Page 19 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 6 of 21 Page ID#: 17

PRE-PAYMENT AGREEMENT                                           Page 6 of 13

**7.          CONDITIONS PRECEDENT**

7.1          The obligation of the Purchaser to advance the Pre-payment to the Vendor shall
be subject to the fulfilment, on or before the Commencement Date, of each of the following
conditions:

    (a)      The Vendor shall have performed and complied in all material respects with all of
the covenants, agreements, obligations and conditions required by this Agreement;

    (b)      The Purchaser shall have received an opinion of counsel to the Vendor in form
and substance satisfactory to the Purchaser's counsel;

    (c)      The Purchaser shall have received a certificate as to the legal existence and good
standing and status of the Vendor, issued by the Corporations and Charities
Division of the Washington Secretary of State;

    (d)      The Vendor shall execute, and the Purchaser shall have received executed copies
of, all of the Pre-payment Documents;

    (e)      The Purchaser shall have received certified copies of all action taken by the
Vendor, including resolutions of the managers and/or members and of the Vendor
authorizing the execution, delivery and performance of the Pre-payment
Documents;

    (f)      The Purchaser shall have received certificates of the appropriate public officials,
where available, as to the Vendor's qualification to do business and good standing
in each jurisdiction in which a failure to be so qualified would have a material
adverse effect on its financial condition or its ability to conduct business in the
manner now conducted and as hereafter intended to be conducted;

    (g)      The Purchaser shall have received such instructions to pay as may in the
Purchaser's opinion be necessary or advisable to give effect to this Agreement;

    (h)      The Purchaser shall have obtained such authorizations from the government of the
People's Republic of China with respect to the Pre-payment and this Agreement
as it deems necessary in its sole discretion; and

    (i)      The Vendor and the Purchaser shall enter into an Operating Agreement to the
satisfaction of the Purchaser, in its sole discretion, which, among other terms and
conditions, incorporates the following:

        (i)      grant to the Purchaser the exclusive right to source and purchase logs from
the Vendor;

        (ii)     grant the Purchaser exclusive access to the Astoria Port facilities in which
the Vendor holds a leasehold interest, such access to be unrestricted except
by the terms of the lease agreement applicable to each leasehold interest;
and

EXHIBIT 1
Page 6 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 7 of 21 of 57
Case 2:09-md-02047-EEF-MBN Document 18305-4 Filed 02/10/15 Page 20 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 7 of 21 Page ID#: 18

    (iii)    To charge the following rates for all log purchases made by the Purchaser (the log spec. is basing on SED average around 12''):

        (A)    $162/mbf based on one shipment of a 32k/33k logger or 5.0 mmbf/month;

        (B)    $153/mbf for volumes greater than one shipment or 5.0 mmbf/month but less than or equal to one and a half shipments or 7.2 mmbf/month; and

        (C)    $147/mbf for volumes greater than one and a half shipments or 7.2 mmbf/month;

The conditions set out in this clause 7 are for the exclusive benefit of the Purchaser and may be waived by the Purchaser in writing in whole or in part on or before the Commencement Date.

## 8.    POSITIVE COVENANTS

8.1    Immediately upon receipt of the Pre-payment, the Vendor shall repay the debt it owes to IVC. and shall arrange for the immediate cessation of IVC's ownership interest in the Vendor.

8.2    During the Term, the Vendor and, where applicable, Westerlund and Nance, shall:

    (a)    provide the Purchaser with annual review engagement financial statements for the Vendor within 90 days of its fiscal year end accompanied by a compliance certificate from the General Managers of the Vendor confirming that the Vendor has complied with all of the covenants, terms and conditions of this Agreement and that no Event of Default (as hereinafter defined) has occurred or is occurring;

    (b)    observe and comply in all material respect respects at all times with the provisions of all laws;

    (c)    provide such other information as the Purchaser may reasonably request from time to time;

    (d)    obtain the Purchaser's prior approval as to price and volume of the Vendor's purchases of logs and timber from its suppliers;

    (e)    obtain the Purchaser's prior written consent before carrying out any of the following actions:

        (i)    any direct or indirect disposition of the undertaking of the Vendor or any of its subsidiaries;

        (ii)    any change in the rights, powers, and duties of the members of the Vendor;

EXHIBIT 1
Page 7 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 8 of 21
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 21 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 8 of 21 Page ID#: 19

PRE-PAYMENT AGREEMENT

(iii)    any direct or indirect amalgamation of the Vendor with any other corporation, association, partnership or legal entity;

(iv)    any single capital expenditure of the Vendor in excess of $ 100,000;

(v)    any capital expenditure whereby such expenditure will render the total capital expenditures of the Vendor in that calendar year in excess of $ 500,000;

(vi)    any borrowing by the Vendor;

(vii)    any material change in the nature of the business of the Vendor, or any action taken which may lead to or result in such material change;

(viii)    direct or indirect loans or advances, guarantees, securities, or investments by the Vendor or any of its subsidiaries to any manager or member of the Vendor or to any other person or entity;

(ix)    any amendments to the Vendor's limited liability company agreement;

(x)    any transaction out of the ordinary course of business;

(xi)    any contract being agreed to between the Vendor and any manager or member of the Vendor or their affiliate;

(xii)    any change in the authorized signing officers in respect of any financial institution;

(xiii)    any amendment to any of the employment and/or management contracts made between the Vendor and any manager or member or any affiliate of a manager or member; or

(xiv)    the granting of any further membership interest (including options) in the Vendor or authorizing or allowing the transfer of any existing membership interest in the Vendor.

8.3    During the Term, the Vendor and the Purchaser shall work together in good faith to foster and develop business opportunities in the North American logging industry.

## 9.    NEGATIVE COVENANTS

9.1    During the Term, the Vendor shall not, without the prior written consent of the Purchaser;

(a)    Breach, terminate, or fail to renew, if renewable, any commercial or industrial site lease agreement to which it is a party;

(b)    take or omit to take any action, or do or fail to do anything, that would result in an impairment of the assets, income or capital of the Vendor, or an increase in the

EXHIBIT 1
Page 8 of 21

Case 3:14-cv-00746-ST    Document 12-1    Filed 05/15/14    Page 9 of 21
Case 3:09-md-02047-EEF-MBN    Document 18305    Filed 02/10/15    Page 22 of 57
Case 3:14-cv-00746-ST    Document 1-1    Filed 05/05/14    Page 9 of 21    Page ID#: 20

PRE-PAYMENT AGREEMENT                                    Page 9 of 13

liabilities or expenses of the Vendor, greater than 25% from the amount of such assets, income, capital, liabilities or expenses as shown on the most recent annual financial statements of the Vendor.

**10.     EVENTS OF DEFAULT**

10.1     **Events of Default.** The occurrence of any of the following events is an Event of Default:

    (a)     the Vendor defaults in the payment to the Purchaser of any amount when due under this Agreement;

    (b)     the Vendor is in default in the payment of any monies owing by it to anyone or is in default of any provision of a material contract;

    (c)     the Vendor becomes insolvent, makes a general assignment for the benefit of creditors or the Vendor admits the Vendor's inability to pay it's debts as they become due;

    (d)     an order for relief is entered against the Vendor under the *United States Code*, Title 11, or the Vendor is adjudicated a bankrupt or insolvent under or institutes any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt or similar proceeding relating to it under the laws of any jurisdiction;

    (e)     any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt or similar proceedings is instituted against the Vendor and remains undismissed for a period of sixty (60) days;

    (f)     the breach, inaccuracy or default of any representation or warranty made by the Vendor in this Agreement;

    (g)     the Vendor is in breach of this Agreement or the Pre-payment Documents.

10.2     **Remedies For Events of Default.** Upon the occurrence of an Event of Default, the Purchaser may:

    (a)     accelerate and forthwith declare due and payable an amount equal to the remaining Purchase Credits that would have been available to the Purchaser under the terms of this Agreement during the Term (i.e. an amount equal to the Pre-payment less all Purchase Credits and Top Up Payments paid by the Vendor to the Purchaser to date), together with all accrued but unpaid Capital Cost Reimbursements without presentment and without demand, protest or other notices of any kind, all of which are hereby expressly waived; and

    (b)     exercise any and all rights, powers, remedies and recourses available to the Purchaser under this Agreement or any Pre-Payment Documents, at law, in equity or otherwise.

EXHIBIT 1
Page 9 of 21

10.3    **Waiver of Default.** The Purchaser may by written instrument in its absolute discretion at any time and from time to time waive any Event of Default or other breach by the Vendor of any of the covenants herein.

10.4    **No Waiver.** No failure or delay on the part of the Purchaser in exercising any right, power or privilege under this Agreement will operate as a waiver thereof, and any single or partial exercise of any right, power or privilege under this Agreement will not preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly specified are cumulative and not exclusive of any rights or remedies which the Purchaser would otherwise have under this Agreement, at common law or in equity. The acceptance by the Purchaser of any further security or of any payment of or on account of the Purchase Credits, Top Up Payments, or Capital Cost Reimbursements after an Event of Default or of any payment on account of any partial default will not be construed to be a waiver of any right to take advantage of any future default or of any past default not completely cured thereby. The Purchaser may exercise any and all rights, powers, remedies and recourses available to it under this Agreement, any related agreements, or any other remedy available to them at law, concurrently or individually without the necessity of an election.

10.5    **Enforcement Costs.** The Vendor will be liable for any damages or expenses that the Purchaser incurs by reason of an Event of Default, including, without limitation, all unpaid amounts due hereunder and reasonable costs of enforcement and collection of same, including, without limitation, legal costs on a solicitor-client basis.

10.6    **Records of the Purchaser.** The records of the Purchaser as to payment of any money payable hereunder or any part thereof being in default or of any demand for payment having been made will be *prima facie* evidence of such fact.

## 11.    INDEMNITY

11.1    **Indemnification of Purchaser.** The Vendor, Westerlund and Nance each agrees, with the Purchaser to indemnify the Purchaser, on a joint and several basis, against all liabilities, claims, demands, actions, causes of action, damages, losses, costs or expenses (including legal fees on a solicitor and his own client basis) suffered or incurred by the Purchaser, directly or indirectly, by reason of or arising out of:

      (a)    any warranties or representations on the part of the Vendor set out in this Agreement being untrue; or

      (b)    a breach of any agreement, term or covenant on the part of the Vendor made or to be observed or performed pursuant to this Agreement.

## 12.    MISCELLANEOUS

12.1    **Notice.** The Purchaser may send any notice, demand or communication to the Vendor in respect of this Agreement by prepaid courier for delivery to: Suite 200 – 3473 NW Lowell St., Silverdale, Washington, 98383, or such other address in the State of Washington of which the Vendor may advise the Purchaser in writing. Such notice, demand or communication

EXHIBIT 1
Page 10 of 21

PRE-PAYMENT AGREEMENT                                    Page 11 of 13

will be deemed delivered if delivered before 4:00 p.m. PST on a business day; otherwise, it will be deemed delivered on the following business day. The Vendor may send any notice or communication to the Purchaser in respect of this Agreement by prepaid courier for delivery to: c/o Victor Tsao, Farris, Vaughan, Wills & Murphy LLP, 25th Floor, 700 West Georgia Street, Vancouver, British Columbia, Canada, V7Y 1B3, or such other address of which the Vendor may advise the Vendor in writing. Such notice, demand or communication will be deemed delivered if delivered before 4:00 p.m. PST on a business day; otherwise, it will be deemed delivered on the following business day.

12.2     **No Prejudice.** Nothing in this Agreement will prejudice or impair any other right or remedy which the Purchaser may otherwise have with respect to the Pre-payment advanced hereunder.

12.3     **Governing Law.** Despite choice of law or conflict of law legislation applicable in any jurisdiction to which the Parties are subject, the Parties agree that this Agreement will in all respects be governed by and will be construed and interpreted in accordance with the laws of British Columbia and the laws of Canada applicable therein, except for conflict of law or choice of law legislation applicable therein. The Parties irrevocably attorn to the jurisdiction of British Columbia courts and consent to the commencement of proceedings in such courts. This provision shall not be construed to affect the rights of any party to enforce a judgment or award outside said province, including the right to record and enforce a judgment or award in any other jurisdiction.

12.4     **Severability.** If any one or more of the provisions contained in this Agreement, or any portion or portions thereof, should be invalid, illegal or unenforceable in any respect in any jurisdiction, the validity, legality and enforceability of such provision or provisions or any portion or portions thereof will not in any way be affected or impaired thereby in any other jurisdiction, and the validity, legality and enforceability of the remainder of the provision or the Agreement, as the case may be, shall not in any way be affected or impaired thereby.

12.5     **Judgment Currency.** If, for the purpose of obtaining or enforcing judgment in any court in any jurisdiction, it becomes necessary to convert into the currency of the jurisdiction giving such judgment (the "Judgment Currency") an amount due under the Pre-Payment Documents in another currency (the "Original Currency"), then the date on which the rate of exchange for conversion is selected by the court is referred to herein as the "Conversion Date". If there is a change in the rate of exchange between the Judgement Currency and the Original Currency between the Conversion Date and the actual receipt by the Purchaser of the amount due to it under the Pre-payment Documents or the judgment, the Vendor will, notwithstanding the judgment, pay all such additional amounts as may be necessary to ensure that the amount received by the Purchaser in the Judgment Currency, when converted at the rate of exchange prevailing on the date of receipt, will produce the amount due in the Original Currency. This obligation is a separate and independent obligation of the Vendor and will not merge with any judgment or any partial payment or enforcement of payments due under the Pre-payment Documents.

12.6     **No Vendor Assignment.** The Vendor will have no right to assign or transfer its rights hereunder or any portion of the Pre-payment.

EXHIBIT 1
Page 11 of 21

PRE-PAYMENT AGREEMENT                                        Page 12 of 13

12.7        **Enurement.** This Agreement shall be binding upon and enure to the benefit of the Vendor and the Purchaser and their respective heirs, executors, administrators, receivers successors, and assigns.

12.8        **Interest.** All amounts payable by the Vendor to the Purchaser hereunder shall bear interest from the date payment is due until full payment is received at a rate of eighteen percent (18%), compounded monthly, both before and after default and judgment, with interest on overdue interest at the same rate as the principal sum.

12.9        **Type and Place of Payment.** All payments payable hereunder by the Vendor to the Purchaser, shall be made or delivered to the Purchaser at the following address:

> CHINA NATIONAL BUILDING MATERIALS AND EQUIPMENT IMPORT AND EXPORT CORP.
>
> FLOOR 17-21, BLOCK 4, INTERWEST BUSINESS CENTER, 9 SHOUTI SOUTH ROAD, HAIDIAN DISTRICT, BEIJING, CHINA

12.10       **Further Assurances.** The Parties shall with reasonable diligence do all such things and provide all such reasonable assurances as may be required to consummate the transactions contemplated by this Agreement, and each party shall provide such further documents or instruments required by the other party as may be reasonably necessary or desirable to effect the purpose of this Agreement and carry out its provisions.

12.11       **Time.** Time shall be of the essence of this Agreement.

12.12       **Counterparts.** This Agreement may be signed in as many counterparts as may be necessary, and may be signed by facsimile, e-mail, or other means of electronic communications producing a printed copy, each of which so signed will be deemed to be an effective original, and such counterparts together will constitute one and the same instrument and notwithstanding the date of execution will be deemed to bear the date set forth above.

AS EVIDENCE OF THEIR AGREEMENT the Parties hereto have caused this Agreement to be executed and delivered by their authorized officers as of the date first noted above.

EXHIBIT 1
Page 12 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 13 of 21
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 26 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 13 of 21 Page ID#: 24

PRE-PAYMENT AGREEMENT                                        Page 13 of 13

THE VENDOR:
**WESTERLUND LOG HANDLERS, LLC**

Per: _____
         Authorized Signatory


THE PURCHASER:
**CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT
CORPORATION**

Per: _____
         Authorized Signatory


WESTERLUND:
SIGNED, SEALED AND DELIVERED in                )
the presence of:                               )
                                               )
_DAVID K. WESTERLUND_                          )
Name                                           )
_33118 Douglas Lane_                           )    _David Westerlund_
Address                                        )    **DAVID WESTERLUND**
_Warrenton, OR 97146_                          )
                                               )
_Timber Industry_                              )
Occupation                                     )
                                               )
NANCE:                                         )
                                               )
SIGNED, SEALED AND DELIVERED in                )
the presence of:                               )
                                               )
_Roger A. Nance, Jr._                          )
Name                                           )
_#10 Pier 1, Suite 301_                        )    _____
Address                                        )    **ROGER NANCE, JR.**
_Astoria, OR 97103_                            )
                                               )
_Timber Industry_                              )
Occupation                                     )

EXHIBIT 1
Page 13 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 14 of 21
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 27 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 14 of 21 Page ID#: 25

## ADDENDUM TO PRE-PAYMENT AGREEMENT

THIS AGREEMENT is dated for reference the 15th day of August, 2012

BETWEEN:

> **CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION**, a corporation incorporated under the laws of People's Republic of China and having an office at Building 4, Interwest Business Centre, No. 9 Shou Ti South Road, Haidian District Beijing, China 100048
>
> (the "Purchaser")

AND:

> **WESTERLUND LOG HANDLERS, LLC**, a limited liability company organized under the laws of the State of Washington and having a registered office at Suite 200 – 3473 NW Lowell St., Silverdale, Washington, 98383
>
> (the "Vendor")

AND:

> **DAVID WESTERLUND**, of Westerlund Log Handlers, LLC;
>
> ("Westerlund")

AND:

> **ROGER NANCE, JR.**, of Westerlund Log Handlers, LLC;
>
> ("Nance")

(the Purchaser, the Vendor, Westerlund and Nance are individually referred to herein as a "Party" and collectively as the "Parties")

WHEREAS:

A.    under a pre-payment agreement dated August 10, 2012, between the Purchaser, the Vendor, Westerlund, and Nance (the "Pre-payment Agreement"), upon receiving and relying upon the representations and warranties made by the Vendor, Westerlund, and Nance, the Purchaser agreed to advance payment for future purchases of logs (the "Pre-payment"), the Vendor agreed to execute a General Security Agreement and an Option to Purchase Agreement in favour of the Purchaser, and Westerlund and Nance pledged their shares in the Vendor as additional security for the Pre-payment;

EXHIBIT 1
Page 14 of 21

Case 3:14-cv-00746-ST    Document 12-1    Filed 05/15/14    Page 15 of 21
Case 2:09-md-02047-EEF-MBN    Document 18302-5    Filed 02/10/15    Page 28 of 57
Case 3:14-cv-00746-ST    Document 1-1    Filed 05/05/14    Page 15 of 21    Page ID#: 26

ADDENDUM TO PRE-PAYMENT AGREEMENT                    Page 2 of 3

B.    the Parties have agreed to extend the Commencement Date as that term is defined and used in the Pre-payment Agreement from August 10, 2012 to August 18, 2012; and

C.    the Parties wish to otherwise ratify and confirm the Pre-payment Agreement.

NOW THEREFORE THIS AGREEMENT witnesses that in consideration of $1.00 USD, the mutual covenants and agreements contained in this Agreement and the Pre-Payment Agreement, and other good and valuable consideration the receipt and sufficiency of which the Parties acknowledge, the Parties covenant and agree as follows:

**1.        COMMENCEMENT DATE**

1.1        Clause 1.4 of the Pre-payment Agreement is hereby deleted and in its place the following is substituted:

>            "1.4        **Commencement Date.** The "Commencement Date" is August 18, 2012."

**2.        RATIFICATION AND INTERPRETATION**

2.1        Except as expressly amended by clause 1.1 of this Agreement, the Parties ratify and confirm the Pre-payment Agreement.

2.2        The Pre-payment Agreement and this Agreement shall be read and construed as one document. Provisions of the Pre-payment Agreement bearing on its interpretation shall also apply to and govern this Agreement.

**3.        MISCELLANEOUS**

3.1        Time shall remain of the essence of the Pre-payment Agreement.

3.2        This Agreement may be signed in as many counterparts as may be necessary, and may be delivered by facsimile, e-mail, or other means of electronic communications producing a printed copy, each of which so signed and delivered shall be deemed to be an effective original, and such counterparts together shall constitute one and the same instrument and notwithstanding the date of execution shall be deemed to bear the date set forth above.

AS EVIDENCE OF THEIR AGREEMENT the Parties hereto have caused this Agreement to be executed and delivered by their authorized officers as of the date first noted above.


THE VENDOR:
**WESTERLUND LOG HANDLERS, LLC**


Per:    _David Westerlund_
        Authorized Signatory

EXHIBIT 1
Page 15 of 21

Case 3:14-cv-00746-ST    Document 12-1    Filed 05/15/14    Page 16 of 21
Case 2:09-md-02047-EEF-MBN    Document 18302-8    Filed 02/10/15    Page 29 of 57
Case 3:14-cv-00746-ST    Document 1-1    Filed 05/05/14    Page 16 of 21    Page ID#: 27

ADDENDUM TO PRE-PAYMENT AGREEMENT                    Page 3 of 3

THE PURCHASER:
**CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT
CORPORATION**

Per:    _____
        Authorized Signatory

WESTERLUND:
SIGNED, SEALED AND DELIVERED in            )
the presence of:                           )
                                           )
_Kimberly K. Qualls_                       )
Name                                       )    _David Westerlund_
_3347 SE Salal Loop_                       )
Address                                    )    **DAVID WESTERLUND**
_Warrenton, OR 97146_                      )
                                           )
_Office Director_                          )
Occupation                                 )

NANCE:
SIGNED, SEALED AND DELIVERED in            )
the presence of:                           )
                                           )
_Kimberly K. Qualls_                       )
Name                                       )    _Roger Nance_
_3347 SE Salal Loop_                       )
Address                                    )    **ROGER NANCE, JR.**
_Warrenton, OR 97146_                      )
                                           )
_Office Director_                          )
Occupation                                 )

EXHIBIT 1
Page 16 of 21

Case 3:14-cv-00746-ST   Document 12-1   Filed 05/15/14   Page 17 of 21
Case 2:09-md-02047-EEF-MBN   Document 18302-3   Filed 02/10/15   Page 30 of 57
Case 3:14-cv-00746-ST   Document 1-1   Filed 05/05/14   Page 17 of 21   Page ID#: 28

## SECOND ADDENDUM TO PRE-PAYMENT AGREEMENT

THIS AGREEMENT (the "Second Addendum") is dated for reference the 2 day of July, 2013 (the "Effective Date")

BETWEEN:

> **CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION**, a corporation incorporated under the laws of People's Republic of China and having an office at Building 4, Interwest Business Centre, No. 9 Shou Ti South Road, Haidian District Beijing, China 100048
>
> (the "Purchaser")

AND:

> **CNBM FOREST PRODUCTS CANADA**, a corporation incorporated under the laws of Canada, having its records office at 25th Floor, 700 West Georgia Street, Vancouver, British Columbia, Canada V7Y 1B3
>
> ("CNBM Canada")
>
> (CNBM Canada and the Purchaser together, the "Purchasers")

AND:

> **WESTERLUND LOG HANDLERS, LLC**, a limited liability company organized under the laws of the State of Washington and having a registered office at Suite 200 – 3473 NW Lowell St., Silverdale, Washington, 98383
>
> (the "Vendor")

AND:

> **DAVID WESTERLUND**, of Westerlund Log Handlers, LLC;
>
> ("Westerlund")

AND:

> **ROGER NANCE, JR.**, of Westerlund Log Handlers, LLC;
>
> ("Nance")

EXHIBIT 1
Page 17 of 21

Case 3:14-cv-00746-ST Document 12-1 Filed 05/15/14 Page 18 of 21
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 31 of 57
Case 3:14-cv-00746-ST Document 1-1 Filed 05/05/14 Page 18 of 21 Page ID#: 29

SECOND ADDENDUM TO PRE-PAYMENT AGREEMENT          Page 2 of 5

(the Purchaser, CNBM Canada, the Purchasers, the Vendor, Westerlund and Nance are individually referred to herein as a "Party" and collectively as the "Parties")

WHEREAS:

A.    under a pre-payment agreement dated August 10, 2012, between the Purchaser, the Vendor, Westerlund, and Nance (the "Pre-payment Agreement"), as modified by an Addendum dated August 15, 2012 (the "First Addendum"), upon receiving and relying upon the representations and warranties made by the Vendor, Westerlund, and Nance, the Purchaser agreed to advance payment for future purchases of logs (the "Pre-payment"), the Vendor agreed to execute a General Security Agreement and an Option to Purchase Agreement in favour of the Purchaser, and Westerlund and Nance pledged their shares in the Vendor as additional security for the Pre-payment;

B.    the Vendor has defaulted (the "Default") in the payment of certain Top Up Payments, together with the Capital Cost Reimbursement due in connection therewith (the "Defaulted Payments"), to the Purchaser;

C.    the Purchasers wishes to forbear exercising its rights with respect to the Default and grant an extension of time for the Top Up Payment and Capital Cost Reimbursement due in connection therewith for the quarter ending June 30, 2013 (the "Extended Payment");

D.    the Purchasers has agreed to extend an additional Pre-Payment to the Vendor in the sum of $450,000 (the "Additional Pre-payment");

E.    the Parties wish to otherwise ratify and confirm the Pre-payment Agreement.

Capitalized terms used herein and not otherwise defined shall have the meanings assigned to them in the Pre-payment Agreement.

NOW THEREFORE THIS AGREEMENT witnesses that in consideration of $1.00 USD, the mutual covenants and agreements contained in this Agreement and the Pre-Payment Agreement, and other good and valuable consideration the receipt and sufficiency of which the Parties acknowledge, the Parties covenant and agree as follows:

1.         **ADDITIONAL PARTY**

1.1         The Parties agree to add CNBM Canada to the Pre-payment Agreement and any and all subsequent addendums and that CNBM Canada shall have the same rights and responsibilities as the Purchaser.

2.         **ADDITIONAL PREPAYMENT**

2.1         On the Effective Date, the Purchasers agrees to advance to the Vendor the Additional Pre-payment. The Additional Pre-payment shall be part of the Pre-payment for all purposes of the Pre-payment Documents.

EXHIBIT 1

Page 18 of 21

Case 3:14-cv-00746-ST    Document 12-1    Filed 05/15/14    Page 19 of 21
Case 2:09-md-02047-EEF-MBN    Document 18302-8    Filed 02/10/15    Page 32 of 57
Case 3:14-cv-00746-ST    Document 1-1    Filed 05/05/14    Page 19 of 21    Page ID#: 30

SECOND ADDENDUM TO PRE-PAYMENT AGREEMENT                    Page 3 of 5

**3.        COMMENCEMENT DATE**

3.1        Clause 1.10 of the Pre-payment Agreement is hereby deleted and in its place the following is substituted:

>        "1.10        **Pre-payment.** "Pre-payment" means the sum of $3,550,000 which has been advanced by the Purchasers to the Vendor.

**4.        PRE-PAYMENT AGREEMENT**

4.1        Each reference to the "Pre-payment Agreement" or "Prepayment Agreement" in each Pre-paymet Document shall be deemed to be a reference to the Pre-payment Agreement, as supplemented and amended by the First Addendum and this Second Addendum.

**5.        FORBEARANCE AND EXTENSION**

5.1        The Purchasers agrees that it shall not take any action to enforce the Pre-payment Documents in respect of the Default until September 30, 2013 (the "Extension Date") and agrees that there shall be no default under the Pre-payment Agreement to the extent the Extended Payment is made on or prior to the Extension Date.

5.2        The Vendor and the Purchasers shall negotiate in good faith to execute a further addendum (the "Extension Addendum") to the Pre-payment Agreement prior to the Extension Date. The Extension Addendum shall set forth a new schedule for future Top Up Payments and related Capital Cost Reimbursements, which shall result in an amount being payable to the Purchasers each month calculated based on not less than $5/MBF, whereas MBF is determined by each month's overall sale/processing quantity of the Vendor.

5.3        Upon execution of the Extension Addendum, all Defaulted Payments and the Extended Payment shall be due and payable as set forth in such Extension Addendum. If on the Extension Date, the Vendor and Purchasers are unable to reach agreement on an Extension Amendment satisfactory to the Purchasers in its sole discretion, all Defaulted Payments and the Extended Payment shall be immediately due and payable.

**6.        JOINT MANAGEMENT**

6.1        The Parties agree that the Purchasers shall be entitled to participate in the management of and jointly manage daily operations of the Vendor, and shall be entitled to receive the Vendor's financial reports and operation reports on a monthly and as requested basis.

6.2        The Parties agree that the Purchasers shall be entitled to audit the Vendor's financial and operating records and the Vendor shall promptly and fully comply with any such requests made by the Purchasers.

**7.        RATIFICATION AND INTERPRETATION**

7.1        Except as expressly amended by this Addendum, the Parties ratify and confirm the Pre-payment Agreement. The forbearance and extension granted hereby by the Purchasers

EXHIBIT 1
Page 19 of 21

Case 3:14-cv-00746-ST  Document 12-1  Filed 05/15/14  Page 20 of 21
Case 2:09-md-02047-EEF-MBN  Document 18302-8  Filed 02/10/15  Page 33 of 57
Case 3:14-cv-00746-ST  Document 1-1  Filed 05/05/14  Page 20 of 21  Page ID#: 31

SECOND ADDENDUM TO PRE-PAYMENT AGREEMENT                    Page 4 of 5

shall not operate as a waiver of any of the Purchasers' other rights under the Pre-payment Agreement nor as a waiver of any future default by the Vendor.

7.2      The Pre-payment Agreement and this Agreement shall be read and construed as one document. Provisions of the Pre-payment Agreement bearing on its interpretation shall also apply to and govern this Agreement.

**8.      MISCELLANEOUS**

8.1      Time shall remain of the essence of the Pre-payment Agreement.

8.2      This Agreement may be signed in as many counterparts as may be necessary, and may be delivered by facsimile, e-mail, or other means of electronic communications producing a printed copy, each of which so signed and delivered shall be deemed to be an effective original, and such counterparts together shall constitute one and the same instrument and notwithstanding the date of execution shall be deemed to bear the date set forth above.

AS EVIDENCE OF THEIR AGREEMENT the Parties hereto have caused this Agreement to be executed and delivered by their authorized officers as of the date first noted above.


THE VENDOR:
**WESTERLUND LOG HANDLERS, LLC**


Per: _____
        Authorized Signatory

THE PURCHASERS:
**CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION**


Per: _____
        Authorized Signatory


**CNBM FOREST PRODUCTS CANADA**


Per: _____
        Authorized Signatory

EXHIBIT 1
Page 20 of 21

Case 3:14-cv-00746-ST   Document 12-1   Filed 05/15/14   Page 21 of 21
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 34 of 57
Case 3:14-cv-00746-ST   Document 1-1   Filed 05/05/14   Page 21 of 21   Page ID#: 32

SECOND ADDENDUM TO PRE-PAYMENT AGREEMENT          Page 5 of 5

WESTERLUND:
SIGNED, SEALED AND DELIVERED in          )
the presence of:                         )
                                         )
_Kimberly K. Qualls_                     )
Name                                     )
_#10 Pier 1, STE 301_                    )     _David Westerlund_
Address                                  )     DAVID WESTERLUND
_Astoria, OR 97103_                      )
                                         )
_Tongue Exports_                         )
Occupation                              )

NANCE:
SIGNED, SEALED AND DELIVERED in          )
the presence of:                         )
                                         )
_Roger Nance_                            )
Name                                     )
_#10 Pier 1, STE 301_                    )     _Roger Nance_
Address                                  )     ROGER NANCE, JR.
_Astoria, OR 97103_                      )
                                         )
_Tongue Export_                          )
Occupation                              )



OFFICIAL SEAL
KIMBERLY K QUALLS
NOTARY PUBLIC - OREGON
COMMISSION NO. 466227
MY COMMISSION EXPIRES FEBRUARY 28, 2019

EXHIBIT 1
Page 21 of 21

Case 3:14-cv-00746-ST   Document 12-2   Filed 05/15/14   Page 1 of 15
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 35 of 57
Case 3:14-cv-00746-ST   Document 1-2   Filed 05/05/14   Page 1 of 15   Page ID#: 33

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement"), dated as of August 10, 2012, is made and given by WESTERLUND LOG HANDLERS, LLC, a limited liability company organized under the laws of the State of Washington (the "Grantor"), to CHINA NATIONAL BUILDING MATERIALS IMPORT AND EXPORT CORPORATION, a corporation incorporated under the laws of People's Republic of China (the "Secured Party").

## Recitals

A. Grantor, Secured Party, David Westerlund and Roger Nance, Jr. are party to that certain Pre-payment Agreement (the "Pre-payment Agreement") dated as of the date hereof, pursuant to which, among other things, Secured Party has agreed to make a pre-payment to Grantor in exchange for a Purchase Credit (as defined in the Pre-payment Agreement) towards each log shipment Grantor makes to Secured Party.

B. As a condition to entering into the Pre-payment Agreement, the Secured Party has required that Grantor enter into this Security Agreement to pledge all of its present and after acquired personal property to the Secured Party.

C. The Grantor finds it advantageous, desirable and in its best interests to comply with the requirement that it execute and deliver this Security Agreement to the Secured Party.

NOW, THEREFORE, in consideration of the premises and in order to induce the Secured Party to make the pre-payment to the Grantor, the Grantor hereby agrees with the Secured Party for the Secured Party's benefit as follows:

## 1. Defined Terms.

(a)     As used in this Agreement, the following terms shall have the meanings indicated:

"Account" shall mean the rights of the Grantor to payment for goods sold or leased or for services rendered which is not evidenced by an Instrument or Chattel Paper, whether or not such right has been earned by performance, all guaranties and security therefor, and all interests in the goods the sale or lease of which gave rise thereto, including the right to stop such goods in transit.

"Account Debtor" shall mean a Person who is obligated on or under any Account, Chattel Paper, Instrument or General Intangible.

"Capital Cost Reimbursement" shall have the meaning assigned to such term in the Pre-payment Agreement.

"Chattel Paper" shall mean a writing or writings which evidence both a monetary obligation and a security interest in or lease of specific goods; when a transaction is evidenced by both a security agreement or a lease and by an Instrument or a series of Instruments, the group of writings taken together constitutes Chattel Paper.

"Collateral" shall mean all property and rights in property now owned or hereafter at any time acquired by the Grantor in or upon which a Security Interest is granted to the Secured Party by the Grantor under this Agreement.

Case 3:14-cv-00746-ST Document 12-2 Filed 05/15/14 Page 2 of 15
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 36 of 57
Case 3:14-cv-00746-ST Document 1-2 Filed 05/05/14 Page 2 of 15 Page ID#: 34

- 2 -

"Document" shall mean any bill of lading, dock warrant, dock receipt, warehouse receipt or order for the delivery of goods, together with any other document or receipt which in the regular course of business or financing is treated as adequately evidencing that the Person in possession of it is entitled to receive, hold and dispose of the document and the goods it covers.

"Equipment" shall mean all machinery, equipment, motor vehicles, furniture, furnishings and fixtu es, including all accessions, accessories and attachments thereto, and any guaranties, warranties, indemnities and other agreements of manufacturers, vendors and others with respect to such Equipment.

"Event of Default" shall have the meaning given to such term in Section 19 hereof.

"Financing Statement" shall have the meaning given to such term in Section 4 hereof.

"General Intangibles" shall mean any personal property (other than goods, Accounts, Chattel Paper, Documents, Instruments and money) including choses in action, causes of action, contract rights, corporate and other business records, inventions, designs, patents, patent applications, service marks, trademarks, tradenames, trade secrets, internet domain names, engineering drawings, good will, registrations, copyrights, licenses, franchises, customer lists, tax refund claims, royalties, licensing and product rights, rights to the retrieval from third parties of electronically processed and recorded data and all rights to payment resulting from an order of any court.

"Instrument" shall mean a draft, check, certificate of deposit, note, bill of exchange, security or any other writing which evidences a right to the payment of money, and is not itself a security agreement or lease and is of a type which is transferred in the ordinary course of business by delivery with any necessary endorsement or assignment.

"Inventory" shall mean any and all goods owned or held by or for the account of the Grantor for sale or lease, or for furnishing under a contract of service, or as raw materials, work in process, materials incorpo ated in or consumed in the production of any of the foregoing and supplies, in each case wherever the same shall be located, whether in transit, on consignment, in retail outlets, warehouses, terminals or otherwise, and all property the sale, lease or other disposition of which has given rise to an Account and which has been returned to the Grantor or repossessed by the Grantor or stopped in transit.

"Lien" shall mean any security interest, mortgage, pledge, lien, charge, encumbrance, title retention agreement or analogous instrument or device (including the interest of the lessors under capitalized leases), in, of or on any assets or properties of the Person referred to.

"Obligations" shall mean (a) any and all obligations owing to the Secured Party under the Pre-payment Agreement (and any extension, renewal or replacement thereof) including, without limitation, all Purchase Credits, Top Up Payments and Capital Cost Reimbursements, (b) all liabilities of the Grantor under this Agreement.

"Person" shall mean any individual, corporation, partnership, limited partnership, limited liability company, joint venture, firm, association, trust, unincorporated organization, government or governmental agency or political subdivision or any other entity, whether acting in an individual, fiduciary or other capacity.

"Pre-payment Agreement" shall have the meaning indicated in Recital A.

Case 3:14-cv-00746-ST Document 12-2 Filed 05/15/14 Page 3 of 15
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 37 of 57
Case 3:14-cv-00746-ST Document 1-2 Filed 05/05/14 Page 3 of 15 Page ID#: 35

- 3 -

"Purchase Credits" shall have the meaning assigned to such term in the Pre-payment Agreement.

"Security Interest" shall have the meaning given such term in Section 2 hereof.

"Top Up Payments" shall have the meaning assigned to such term in the Pre-payment Agreement.

(b)     All other terms used in this Agreement which are not specifically defined herein shall have the meaning assigned to such terms in the Uniform Commercial Code in effect in the State of Washington as of the date of this Agreement to the extent such other terms are defined therein.

(c)     Unless the context of this Agreement otherwise clearly requires, references to the plural include the singular, the singular, the plural and "or" has the inclusive meaning represented by the phrase "and/or." The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The words "hereof," "herein," "hereunder" and similar terms in this Agreement refer to this Agreement as a whole and not to any particular provision of this Agreement. References to Sections are references to Sections in this Security Agreement unless otherwise provided.

## 2. Grant of Security Interest.

As security for the payment and performance of all of the Obligations, the Grantor hereby grants to the Secured Party a security interest (the "Security Interest") in all of the Grantor's right, title, and interest in and to the following, whether now or hereafter owned, existing, arising or acquired and wherever located:

(a) All Accounts.

(b) All Chattel Paper.

(c) All Documents.

(d) All Equipment.

(e) All General Intangibles.

(f) All Instruments.

(g) All Inventory.

(h) To the extent not otherwise included in the foregoing, (i) all other rights to the payment of money, including rents and other sums payable to the Grantor under leases, rental agreements and other Chattel Paper and insurance proceeds; (ii) all books, correspondence, credit files, records, invoices, bills of lading, and other documents relating to any of the foregoing, including, without limitation, all tapes, cards, disks, computer software, computer runs, and other papers and documents in the possession or control of the Grantor or any computer bureau from time to time acting for the Grantor; (iii) all rights in, to and under all policies insuring the life of any officer, director, stockholder or employee of the Grantor, the proceeds of which are payable to the Grantor; and (iv) all accessions and additions to, parts and appurtenances of, substitutions for and replacements of any of the foregoing.

(i) To the extent not otherwise included, all proceeds and products of any and all of the foregoing.

Case 3:14-cv-00746-ST    Document 12-2    Filed 05/15/14    Page 4 of 15
Case 2:09-md-02047-EEF-MBN    Document 18302-5    Filed 02/10/15    Page 38 of 57
Case 3:14-cv-00746-ST    Document 1-2    Filed 05/05/14    Page 4 of 15    Page ID#: 36

- 4 -

**3. Grantor Remains Liable.**

Anything herein to the contrary notwithstanding, (a) the Grantor shall remain liable under the Accounts, Chattel Paper, General Intangibles and other items included in the Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Secured Party of any of the rights hereunder shall not release the Grantor from any of its duties or obligations under any items included in the Collateral, and (c) the Secured Party shall have no obligation or liability under Accounts, Chattel Paper, General Intangibles and other items included in the Collateral by reason of this Agreement, nor shall the Secured Party be obligated to perform any of the obligations or duties of the Grantor thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

**4. Title to Collateral.**

The Grantor has (or will have at the time it acquires rights in Collateral hereafter acquired or arising) and will maintain so long as the Security Interest may remain outstanding, title to each item of Collateral (including the proceeds and products thereof), free and clear of all Liens except the Security Interest. The Grantor will defend the Collateral against all claims or demands of all Persons (other than the Secured Party) claiming the Collateral or any interest therein. As of the date of execution of this Security Agreement, no effective financing statement or other similar document used to perfect and preserve a security interest under the laws of any jurisdiction (a "Financing Statement") covering all or any part of the Collateral is on file in any recording office, except such as may have been filed in favor of the Secured Party relating to this Agreement.

**5. Disposition of Collateral.**

The Grantor will not sell, lease or otherwise dispose of, or discount or factor with or without recourse, any Collateral, except sales of items of Inventory in the ordinary course of business.

**6. Covenants**

The Grantor covenants with the Secured Party that at all times while this Agreement remains in effect the Grantor shall:

    (a) fully and effectually maintain and keep maintained the validity and effectiveness of the security interest created hereby;

    (b) maintain the Collateral in good order and repair;

    (c) forthwith discharge all security interests, charges, encumbrances, liens and claims that rank or could in any event rank in priority to the security interest created hereby, other than the charges or security interests, if any, consented to in writing by the Secured Party;

    (d) notify the Secured Party promptly of

        a. the details of any material acquisition of Collateral;

        b. any material loss or damage to the Collateral;

        c. any material default by any account debtor in payment or other performance of his or her obligations to the Grantor with respect to any Accounts;

Case 3:14-cv-00746-ST    Document 12-2    Filed 05/15/14    Page 5 of 15
Case 2:09-md-02047-EEF-MBN    Document 18302-8    Filed 02/10/15    Page 39 of 57
Case 3:14-cv-00746-ST    Document 1-2    Filed 05/05/14    Page 5 of 15    Page ID#: 37

- 5 -

    d.  the return to or repossession by the Grantor of the Collateral where such return or repossession of the Collateral is material in relation to the business of the Grantor; and

    e.  the details of any claims or litigation affecting the Grantor or the Collateral;

(e)  prevent the Collateral, other than Inventory sold, leased, or otherwise disposed of as permitted by this Agreement, from being or becoming an accession to other property not covered by this Agreement; and

(f)  carry on and conduct the business of the Grantor in a proper and efficient manner and so as to protect and preserve the Collateral and to keep, in accordance with generally accepted accounting principles, consistently applied, proper books of account for the Grantor's business as well as accurate and complete records concerning the Collateral;

(g)  where the Collateral is Investment Property, shall prevent any party other than the Secured Party from having control.

## 7.  Names, Offices, Locations.

The Grantor does business solely under its own name and the trade names and styles, if any, set forth on Schedule II hereto. Except as noted on said Schedule, no such trade names or styles and no trademarks or other similar marks owned by the Grantor are registered with any governmental unit. The chief place of business and chief executive office and the office where it keeps its books and records concerning the Accounts and General Intangibles and the originals of all Chattel Paper, Documents and Instruments are located at its address set forth on the signature page hereof. All items of Equipment and Inventory existing on the date of this Agreement are located at the places specified on Schedule I hereto. The Grantor will immediately notify the Secured Party of any additional state in which any item of Inventory or Equipment is hereafter located. The Grantor will from time to time at the request of the Secured Party provide the Secured Party with current lists as to the locations of the Equipment and Inventory. The Grantor will not permit any Inventory, Equipment, Chattel Paper or Documents or any records pertaining to Accounts and General Intangibles to be located in any state or area in which, in the event of such location, a financing statement covering such Collateral would be required to be, but has not in fact been, filed in order to perfect the Security Interest. The Grantor will not change its name or the location of its chief place of business and chief executive office unless the Secured Party has been given at least 30 days prior written notice thereof and the Grantor has executed and delivered to the Secured Party such Financing Statements and other instruments required or appropriate to continue the perfection of the Security Interest.

## 8.  Rights to Payment.

Except as the Grantor may otherwise advise the Secured Party in writing, each Account, Chattel Paper, Document, General Intangible and Instrument constituting or evidencing Collateral hereafter arising or issued will be when arising or issued the valid, genuine and legally enforceable obligation of the Account Debtor or other obligor named therein or in the Grantor's records pertaining thereto as being obligated to pay or perform such obligation. Without the Secured Party's prior written consent, the Grantor will not agree to any modifications, amendments, subordinations, cancellations or terminations of the obligations of any Account Debtors (or Account Debtors or other obligors in respect of such currently subsisting rights to payments) or other obligors except in the ordinary course of business and in amounts not exceeding $5,000 per Account Debtor or other obligor in any calendar year. The Grantor will perform and comply in all material respects with all its obligations under any items included in the Collateral and exercise promptly and diligently its rights thereunder.

EXHIBIT 2
Page 5 of 15

Case 3:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 40 of 57
Case 3:14-cv-00746-ST Document 12-2 Filed 05/15/14 Page 6 of 15
Case 3:14-cv-00746-ST Document 1-2 Filed 05/05/14 Page 6 of 15 Page ID#: 38

- 6 -

9. **Further Assurances; Attorney-in-Fact.**

    (a) The Grantor agrees that from time to time, at its expense, it will promptly execute and deliver all further instruments and documents, and take all further action, that may be necessary or that the Secured Party may reasonably request, in order to perfect and protect the Security Interest granted or purported to be granted hereby or to enable the Secured Party to exercise and enforce its rights and remedies hereunder with respect to any Collateral (but any failure to request or assure that the Grantor execute and deliver such instrument or documents or to take such action shall not affect or impair the validity, sufficiency or enforceability of this Agreement and the Security Interest, regardless of whether any such item was or was not executed and delivered or action taken in a similar context or on a prior occasion). Without limiting the generality of the foregoing, the Grantor will, promptly and from time to time at the request of the Secured Party: (i) mark, or permit the Secured Party to mark, conspicuously its books, records, and accounts showing or dealing with the Collateral, and each item of Chattel Paper included in the Collateral, with a legend, in form and substance satisfactory to the Secured Party, indicating that each such item of Collateral and each such item of Chattel Paper is subject to the Security Interest granted hereby; (ii) deliver and pledge to the Secured Party, all Instruments and Documents, duly indorsed or accompanied by duly executed instruments of transfer or assignment, with full recourse to the Grantor, all in form and substance satisfactory to the Secured Party; (iii) execute and file such Financing Statements or continuation statements in respect thereof, or amendments thereto, and such other instruments or notices (including fixture filings with any necessary legal descriptions as to any goods included in the Collateral which the Secured Party determines might be deemed to be fixtures, and instruments and notices with respect to vehicle titles), as may be necessary or desirable, or as the Secured Party may request, in order to perfect, preserve, and enhance the Security Interest granted or purported to be granted hereby; and (iv) obtain waivers, in form satisfactory to the Secured Party, of any claim to any Collateral from any landlords or mortgagees of any property where any Inventory or Equipment is located.

    (b) The Grantor hereby authorizes the Secured Party to file one or more Financing Statements or continuation statements in respect thereof, and amendments thereto, relating to all or any part of the Collateral without the signature of the Grantor where permitted by law. A photocopy or other reproduction of this Agreement or any Financing Statement covering the Collateral or any part thereof shall be sufficient as a Financing Statement where permitted by law.

    (c) The Grantor will furnish to the Secured Party from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Secured Party may reasonably request, all in reasonable detail and in form and substance reasonably satisfactory to the Secured Party.

    (d) In furtherance, and not in limitation, of the other rights, powers and remedies granted to the Secured Party in this Agreement, the Grantor hereby appoints the Secured Party the Grantor's attorney-in-fact, with full authority in the place and stead of Grantor and in the name of Grantor or otherwise, from time to time in the Secured Party's good faith discretion, to take any action (including the right to collect on any Collateral) and to execute any instrument that the Secured Party may reasonably believe is necessary or advisable to accomplish the purposes of this Agreement, in a manner consistent with the terms hereof.

10. **Taxes and Claims.**

The Grantor will promptly pay all taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest,

Case 3:14-cv-00746-ST   Document 12-2   Filed 05/15/14   Page 7 of 15
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 41 of 57
Case 3:14-cv-00746-ST   Document 1-2   Filed 05/05/14   Page 7 of 15   Page ID#: 39

- 7 -

as well as all other claims of any kind (including claims for labor, material and supplies) against or with respect to the Collateral, except to the extent (a) such taxes, charges or claims are being contested in good faith by appropriate proceedings, (b) such proceedings do not involve any material danger of the sale, forfeiture or loss of any of the Collateral or any interest therein, (c) such taxes, charges or claims are adequately reserved against on the Grantor's books in accordance with generally accepted accounting principles, and (d) to the extent such taxes, charges or claims are indemnified against by the Secured Party in the Pre-payment Agreement.

## 11. Books and Records.

The Grantor will keep and maintain at its own cost and expense satisfactory and complete records of the Collateral, including a record of all payments received and credits granted with respect to all Accounts , Chattel Paper and other items included in the Collateral.

## 12. Inspection, Reports, Verifications.

The Grantor will at all reasonable times permit the Secured Party or its representatives to examine or inspect any Collateral, any evidence of Collateral and the Grantor's books and records concerning the Collateral, wherever located. The Grantor will from time to time when requested by the Secured Party furnish to the Secured Party a report on its Accounts, Chattel Paper, General Intangibles and Instruments, naming the Account Debtors or other obligors thereon, the amount due and the aging thereof.

## 13. Notice of Loss.

The Grantor will promptly notify the Secured Party of any loss of or material damage to any material item of Collateral or of any substantial adverse change, known to Grantor, in any material item of Collateral or the prospect of payment or performance thereof.

## 14. Insurance.

The Grantor will keep the Inventory and Equipment insured against "all risks" for the full replacement cost thereof subject to a deductible not exceeding $[    ] and with an insurance company or companies satisfactory to the Secured Party, the policies to protect the Secured Party as its interests may appear, with such policies or certificates with respect thereto to be delivered to the Secured Party at its request. Each such policy or the certificate with respect thereto shall provide that such policy shall not be canceled or allowed to lapse unless at least 30 days prior written notice is given to the Secured Party.

## 15. Lawful Use; Fair Labor Standards Act.

The Grantor will use and keep the Collateral, and will require that others use and keep the Collateral, only for lawful purposes, without violation of any federal, state or local law, statute or ordinance. All Inventory of the Grantor hereafter produced by the Grantor or with respect to which the Grantor performs any manufacturing or assembly process will be produced by the Grantor in compliance in all material respects with all requirements of the Fair Labor Standards Act.

## 16. Action by the Secured Party.

If the Grantor at any time fails to perform or observe any of the foregoing agreements, the Secured Party shall have (and the Grantor hereby grants to the Secured Party) the right, power and authority (but not the duty) to perform or observe such agreement on behalf and in the name, place and stead of the Grantor (or, at the Secured Party's option, in the Secured Party's name) and to take any and all other actions which the

Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 42 of 57
Case 3:14-cv-00746-ST Document 12-2 Filed 05/15/14 Page 8 of 15
Case 3:14-cv-00746-ST Document 1-2 Filed 05/05/14 Page 8 of 15 Page ID#: 40

- 8 -

Secured Party may reasonably deem necessary to cure or correct such failure (including, without limitation, the payment of taxes, the satisfaction of Liens, the procurement and maintenance of insurance, the execution of assignments, security agreements and Financing Statements, and the indorsement of instruments); and the Grantor shall thereupon pay to the Secured Party on demand the amount of all monies expended and all costs and expenses (including reasonable attorneys' fees and legal expenses) incurred by the Secured Party in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Secured Party, together with interest thereon from the date expended or incurred at the highest lawful rate then applicable to any of the Obligations, and all such monies expended, costs and expenses and interest thereon shall be part of the Obligations secured by the Security Interest.

### 17. Insurance Claims.

As additional security for the payment and performance of the Obligations, the Grantor hereby assigns to the Secured Party any and all monies (including proceeds of insurance and refunds of unearned premiums) due or to become due under, and all other rights of the Grantor with respect to, any and all policies of insurance now or at any time hereafter covering the Collateral or any evidence thereof or any business records or valuable papers pertaining thereto. At any time, whether before or after the occurrence of any Event of Default, the Secured Party may (but need not), in the Secured Party's name or in Grantor's name, execute and deliver proofs of claim, receive all such monies, indorse checks and other instruments representing payment of such monies, and adjust, litigate, compromise or release any claim against the issuer of any such policy. Notwithstanding any of the foregoing, so long as no Event of Default exists the Grantor shall be entitled to all insurance proceeds with respect to Equipment or Inventory provided that such proceeds are applied to the cost of replacement Equipment or Inventory.

### 18. The Secured Party's Duties.

The powers conferred on the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon it to exercise any such powers. The Secured Party shall be deemed to have exercised reasonable care in the safekeeping of any Collateral in its possession if such Collateral is accorded treatment substantially equal to the safekeeping which the Secured Party accords its own property of like kind. Except for the safekeeping of any Collateral in its possession and the accounting for monies and for other properties actually received by it hereunder, the Secured Party shall have no duty, as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Secured Party has or is deemed to have knowledge of such matters, or as to the taking of any necessary steps to preserve rights against any Persons or any other rights pertaining to any Collateral. The Secured Party will take action in the nature of exchanges, conversions, redemptions, tenders and the like requested in writing by the Grantor with respect to the Collateral in the Secured Party's possession if the Secured Party in its reasonable judgment determines that such action will not impair the Security Interest or the value of the Collateral, but a failure of the Secured Party to comply with any such request shall not of itself be deemed a failure to exercise reasonable care.

### 19. Default.

Each of the following occurrences shall constitute an Event of Default under this Agreement: (a) the failure of the Grantor to pay when due any of the Obligations; (b) the failure of the Grantor to perform any agreement of its contained herein or in the Pre-payment Agreement; (c) any statement, representation or warranty of the Grantor made herein or at any time furnished to the Secured Party is untrue in any material respect as of the date made; (d) the entry of any judgment in excess of $[500,000] against the Grantor; (e) the Grantor becomes insolvent or is generally not paying its debts as they become due; (f) the

Case 3:14-cv-00746-ST   Document 12-2   Filed 05/15/14   Page 9 of 15
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 43 of 57
Case 3:14-cv-00746-ST   Document 1-2   Filed 05/05/14   Page 9 of 15   Page ID#: 41

- 9 -

appointment of or assignment to a custodian, as that term is defined in the United States Bankruptcy Code, for any property of the Grantor, or encumbrance, levy, seizure or attachment of any portion of the Collateral; (g) the commencement of any proceeding or the filing of a petition by or against the Grantor under the provisions of the United States Bankruptcy Code for liquidation, reorganization or adjustment of debts or under any insolvency law or other statute or law providing for the modification or adjustment of the rights of creditors; (h) dissolution, consolidation, or merger, or transfer of a substantial part of the property of the Grantor and (i) any Event of Default under the Pre-payment Agreement.

**20. Remedies on Default.**

If an Event of Default is not fully cured 14 calendar days following its occurrence, then at any time thereafter:

(a) The Secured Party may exercise and enforce any and all rights and remedies available upon default to a secured party under the Uniform Commercial Code.

(b) The Secured Party shall have the right to enter upon and into and take possession of all or such part or parts of the properties of the Grantor, including lands, plants, buildings, Equipment, Inventory and other property as may be necessary or appropriate in the judgment of the Secured Party to permit or enable the Secured Party to manufacture, produce, process, store or sell or complete the manufacture, production, processing, storing or sale of all or any part of the Collateral, as the Secured Party may elect, and to use and operate said properties for said purposes and for such length of time as the Secured Party may deem necessary or appropriate for said purposes without the payment of any compensation to Grantor therefor. The Secured Party may require the Grantor to, and the Grantor hereby agrees that it will, at its expense and upon request of the Secured Party forthwith, assemble all or part of the Collateral as directed by the Secured Party and make it available to the Secured Party at a place or places to be designated by the Secured Party.

(c) Any sale of Collateral may be in one or more parcels at public or private sale, at any of the Secured Party's offices or elsewhere, for cash, on credit, or for future delivery, and upon such other terms as the Secured Party may reasonably believe are commercially reasonable. The Secured Party shall not be obligated to make any sale of Collateral regardless of notice of sale having been given, and the Secured Party may adjourn any public or private sale from time to time by announcement made at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(d) The Secured Party is hereby granted a license or other right to use, without charge, all of the Grantor's property, including, without limitation, all of the Grantor's labels, trademarks, copyrights, patents and advertising matter, or any property of a similar nature, as it pertains to the Collateral, in completing production of, advertising for sale and selling any Collateral, and the Grantor's rights under all licenses and all franchise agreements shall inure to the Secured Party's benefit until the Obligations are paid in full.

(e) If notice to the Grantor of any intended disposition of Collateral or any other intended action is required by law in a particular instance, such notice shall be deemed commercially reasonable if given in the manner specified for the giving of notice in Section 25 hereof at least ten calendar days prior to the date of intended disposition or other action, and the Secured Party may exercise or enforce any and all other rights or remedies available by law or agreement against the Collateral, against the Grantor, or against any other Person or property.

EXHIBIT 2
Page 9 of 15

Case 3:14-cv-00746-ST Document 12-2 Filed 05/15/14 Page 10 of 15
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 44 of 57
Case 3:14-cv-00746-ST Document 1-2 Filed 05/05/14 Page 10 of 15 Page ID#: 42

- 10 -

**21. Remedies as to Certain Rights to Payment.**

Upon the occurrence of an Event of Default and at any time thereafter the Secured Party may notify any Account Debtor or other Person obligated on any Accounts or other Collateral that the same have been assigned or transferred to the Secured Party and that the same should be performed as requested by, or paid directly to, the Secured Party, as the case may be. The Grantor shall join in giving such notice, if the Secured Party so requests. The Secured Party may, in the Secured Party's name or in the Grantor's name, demand, sue for, collect or receive any money or property at any time payable or receivable on account of, or securing, any such Collateral or grant any extension to, make any compromise or settlement with or otherwise agree to waive, modify, amend or change the obligation of any such Account Debtor or other Person. If any payments on any such Collateral are received by the Grantor after an Event of Default has occurred, such payments shall be held in trust by the Grantor as the property of the Secured Party and shall not be commingled with any funds or property of the Grantor and shall be forthwith remitted to the Secured Party for application on the Obligations.

**22. Application of Proceeds.**

All cash proceeds received by the Secured Party in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Secured Party, be held by the Secured Party as collateral for, or then or at any time thereafter be applied in whole or in part by the Secured Party against, all or any part of the Obligations (including, without limitation, any expenses of the Secured Party payable pursuant to Section 23 hereof).

**23. Costs and Expenses; Indemnity.**

The Grantor will pay or reimburse the Secured Party on demand for all out-of-pocket expenses (including in each case all filing and recording fees and taxes and all reasonable fees and expenses of counsel and of any experts and agents) incurred by the Secured Party in connection with the foreclosure or enforcement of the Security Interest and the enforcement of this Agreement, and all such costs and expenses shall be part of the Obligations secured by the Security Interest. The Grantor shall indemnify and hold the Secured Party harmless from and against any and all claims, losses and liabilities (including reasonable attorneys' fees) growing out of or resulting from this Agreement and the Security Interest hereby created (including enforcement of this Agreement) or the Secured Party's actions pursuant hereto, except claims, losses or liabilities resulting from the Secured Party's gross negligence or willful misconduct as determined by a final judgment of a court of competent jurisdiction. Any liability of the Grantor to indemnify and hold the Secured Party harmless pursuant to the preceding sentence shall be part of the Obligations secured by the Security Interest. The obligations of the Grantor under this Section shall survive any termination of this Agreement.

**24. Waivers; Remedies; Marshalling.**

This Agreement can be waived, modified, amended, terminated or discharged, and the Security Interest can be released, only explicitly in a writing signed by the Secured Party. A waiver so signed shall be effective only in the specific instance and for the specific purpose given. Mere delay or failure to act shall not preclude the exercise or enforcement of any rights and remedies available to the Secured Party. All rights and remedies of the Secured Party shall be cumulative and may be exercised singly in any order or sequence, or concurrently, at the Secured Party's option, and the exercise or enforcement of any such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other. The Grantor hereby waives all requirements of law, if any, relating to the marshalling of assets which would be applicable in connection with the enforcement by the Secured Party of its remedies hereunder, absent this waiver.

Case 3:14-cv-00746-ST Document 12-2 Filed 05/15/14 Page 11 of 15
Case 2:09-md-02047-EEF-MBN Document 18302-8 Filed 02/10/15 Page 45 of 57
Case 3:14-cv-00746-ST Document 1-2 Filed 05/05/14 Page 11 of 15 Page ID#: 43

- 11 -

## 25. Notices.

Any notice or other communication to any party in connection with this Agreement shall be in writing and shall be sent by manual delivery, telegram, telex, facsimile transmission, overnight courier or United States mail (postage prepaid) addressed to such party at the address specified on the signature page hereof, or at such other address as such party shall have specified to the other party hereto in writing. All periods of notice shall be measured from the date of delivery thereof if manually delivered, from the date of sending thereof if sent by telegram, telex or facsimile transmission, from the first business day after the date of sending if sent by overnight courier, or from four days after the date of mailing if mailed.

## 26. Grantor Acknowledgments.

The Grantor hereby acknowledges that (a) it has been advised by counsel in the negotiation, execution and delivery of this Agreement, (b) the Secured Party has no fiduciary relationship to the Grantor, the relationship being solely that of debtor and creditor, and (c) no joint venture exists between the Grantor and the Secured Party.

## 27. Continuing Security Interest.

This Agreement shall (a) create a continuing security interest in the Collateral and shall remain in full force and effect until payment in full of the Obligations and the expiration of the obligations, if any, of the Secured Party to extend credit accommodations to the Grantor, (b) be binding upon the Grantor, its successors and assigns, and (c) inure to the benefit of, and be enforceable by, the Secured Party and its successors, transferees, and assigns.

## 28. Termination of Security Interest.

Upon payment in full of the Obligations and the expiration of any obligation of the Secured Party to extend credit accommodations to the Grantor, the Security Interest granted hereby shall terminate. Upon any such termination, the Secured Party will return to the Grantor such of the Collateral then in the possession of the Secured Party as shall not have been sold or otherwise applied pursuant to the terms hereof and execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination. Any reversion or return of Collateral upon termination of this Agreement and any instruments of transfer or termination shall be at the expense of the Grantor and shall be without warranty by, or recourse on, the Secured Party. As used in this Section, "Grantor" includes any assigns of Grantor, any Person holding a subordinate security interest in any of the Collateral or whoever else may be lawfully entitled to any part of the Collateral.

## 29. Governing Law and Construction.

**THE VALIDITY, CONSTRUCTION AND ENFORCEABILITY OF THIS AGREEMENT SHALL BE GOVERNED BY THE LAWS OF THE STATE OF WASHINGTON, WITHOUT GIVING EFFECT TO CONFLICT OF LAWS PRINCIPLES THEREOF, EXCEPT TO THE EXTENT THAT THE VALIDITY OR PERFECTION OF THE SECURITY INTEREST HEREUNDER, OR REMEDIES HEREUNDER, IN RESPECT OF ANY PARTICULAR COLLATERAL ARE MANDATORILY GOVERNED BY THE LAWS OF A JURISDICTION OTHER THAN THE STATE OF WASHINGTON.** Whenever possible, each provision of this Agreement and any other statement, instrument or transaction contemplated hereby or relating hereto shall be interpreted in such manner as to be effective and valid under such applicable law, but, if any provision of this Agreement or any other statement, instrument or transaction contemplated hereby or relating hereto shall be held to be prohibited or invalid under such applicable law, such provision shall be ineffective only to the extent of

Case 3:14-cv-00746-ST   Document 12-2   Filed 05/15/14   Page 12 of 15
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 46 of 57
Case 3:14-cv-00746-ST   Document 1-2   Filed 05/05/14   Page 12 of 15   Page ID#: 44

- 12 -

such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement or any other statement, instrument or transaction contemplated hereby or relating hereto.

### 30. Consent to Jurisdiction.

**THIS AGREEMENT MAY BE ENFORCED IN THE COURTS OF BRITISH COLUMBIA AND THE GRANTOR CONSENTS TO THE JURISDICTION AND VENUE OF ANY SUCH COURT AND WAIVES ANY ARGUMENT THAT VENUE IN SUCH FORUMS IS NOT CONVENIENT. IN THE EVENT THE GRANTOR COMMENCES ANY ACTION IN ANOTHER JURISDICTION OR VENUE UNDER ANY TORT OR CONTRACT THEORY ARISING DIRECTLY OR INDIRECTLY FROM THE RELATIONSHIP CREATED BY THIS AGREEMENT, THE SECURED PARTY AT ITS OPTION SHALL BE ENTITLED TO HAVE THE CASE TRANSFERRED TO ONE OF THE JURISDICTIONS AND VENUES ABOVE-DESCRIBED, OR IF SUCH TRANSFER CANNOT BE ACCOMPLISHED UNDER APPLICABLE LAW, TO HAVE SUCH CASE DISMISSED WITHOUT PREJUDICE.**

### 31. Waiver of Notice and Hearing.

**THE GRANTOR HEREBY WAIVES ALL RIGHTS TO A JUDICIAL HEARING OF ANY KIND PRIOR TO THE EXERCISE BY THE SECURED PARTY OF ITS RIGHTS TO POSSESSION OF THE COLLATERAL WITHOUT JUDICIAL PROCESS OR OF ITS RIGHTS TO REPLEVY, ATTACH, OR LEVY UPON THE COLLATERAL WITHOUT PRIOR NOTICE OR HEARING. THE GRANTOR ACKNOWLEDGES THAT IT HAS BEEN ADVISED BY COUNSEL OF ITS CHOICE WITH RESPECT TO THIS PROVISION AND THIS AGREEMENT.**

### 32. Waiver of Jury Trial.

**EACH OF THE GRANTOR AND THE SECURED PARTY, BY ITS ACCEPTANCE OF THIS AGREEMENT, IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

### 33. Counterparts.

This Agreement may be executed in any number of counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument.

### 34. General.

All representations and warranties contained in this Agreement or in any other agreement between the Grantor and the Secured Party shall survive the execution, delivery and performance of this Agreement and the creation and payment of the Obligations. The Grantor waives notice of the acceptance of this Agreement by the Secured Party. Captions in this Agreement are for reference and convenience only and shall not affect the interpretation or meaning of any provision of this Agreement.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

Case 3:14-cv-00746-ST   Document 12-2   Filed 05/15/14   Page 13 of 15
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 47 of 57
Case 3:14-cv-00746-ST   Document 1-2   Filed 05/05/14   Page 13 of 15   Page ID#: 45

IN WITNESS WHEREOF, the Grantor has caused this Security Agreement to be duly executed and delivered by its officer thereunto duly authorized as of the date first above written.

WESTERLUND LOG HANDLERS, LLC

By: _David Westerlund_

Name: _____

Title: _Pres._

Address for Grantor: ————→ No.10 Pier 1, Suite 301
Suite 200 – 3473 NW Lowell St.   Astoria, OR 97103
Silverdale, Washington, 98383
Fax [ ]

Grantor's Tax ID # [ ]

Address for the Secured Party:
c/o Victor Tsao
Farris, Vaughan, Wills & Murphy LLP
25th Floor, 700 West Georgia Street
Vancouver, British Columbia, Canada, V7Y 1B3
Fax (604) 661-9349

**SCHEDULE I**
**to**
**Security Agreement**
**Locations of Equipment and Inventory as of Date of Security Agreement**
[ ASTORIA, OR 97103 ]

| Assets - Equipment | Serial/VIN Number | Mkt Value |
|---|---|---|
| 1978 Mack Dump Truck RL600L | | 3,500.00 |
| 2001 Linkbelt Log Shovel | E631-5758 | 50,000.00 |
| Log Forks | | 1,100.00 |
| Debarker | | 1,200,000.00 |
| 16086 · Control & Power Container | | 126,601.74 |
| 16225 · Marathon 680 Generator | | 18,000.00 |
| 16001 · Ford F450 Utility Truck | 1FDLF47GXSEA52694 | 8,500.00 |
| 1601 · 2004 Cat 320CLL Log Shovel | SAH243 | 95,000.00 |
| 16025 · 2007 CAT 320FM Log Shovel | SAH01223 | 125,000.00 |
| 16030 · 2000 Komatsu PC-300 Log Shovel | A84014 | 95,000.00 |
| 16035 · 1993 Komatsu 600 Wheel Loader | A50052 | 100,000.00 |
| 16040 · 1998 Komatsu 600 Wheel Loader | A52087 | 125,000.00 |
| 16045 · 1997 Komatsu 600 Wheel Loader | A51052 | 125,000.00 |
| 16050 · 1991 Komatsu 600 Wheel Loader | A10286 | 95,000.00 |
| 16055 · 1992 Komatsu 600 Wheel Loader | A10314 | 95,000.00 |
| 16060 · 1993A Komatsu 600 Wheel Loader | A50002 | 95,000.00 |
| 16065 · 1992A Komatsu 600 Wheel Loader | A10337 | 95,000.00 |
| 16071 · 2003 CAT 325CFM Log Shovel | C53M00319L | 125,000.00 |
| 16075 · 2001 CAT 320C Log Shovel | BGB00341 | 75,000.00 |
| 16076 · 199? Komatsu 600 Wheel Loader | A11236 | 95,000.00 |
| 16090 · Log Bunks | | 33,000.00 |
| 16100 · 1987 Kenworth Fuel Truck | | 15,000.00 |
| 16101 · 1998 GMC - Little Red | 1GBJ7H1C9WJ112245 | 50,000.00 |
| 16111 · 2004 Cat 322C Log Shovel | ECR00297 | 95,000.00 |
| 16200 · Air Compressor | | 1,500.00 |
| 16205 · L&C Scale shack | | 6,523.00 |
| 16220 · 45KVA Generator | | 6,190.20 |
| 16230 · Trailer Loader | | 2,500.00 |
| 17010 · 2006 Ford F150 Pickup | 1FTPX14505FB30368 | 12,000.00 |
| 17112 · 2000 Peterbilt - Big Red | 2NPNHD7X8YM536937 | 65,000.00 |
| 17120 · Storage Container - Pier 1 | | 5,285.00 |
| 17121 · Trailer Loader - Hoh River | | 2,000.00 |
| 17122 · 2001 CAT 330B Log Shovel | 6DR041780 | 140,000.00 |
| 17123 · Welder | | 10,734.24 |
| Total | | 3,192,434.18 |

Landlord's name: [ PORT OF ASTORIA, LEWIS & CLARK OREGON
TIMBER, LLC ]

Case 3:14-cv-00746-ST   Document 12-2   Filed 05/15/14   Page 15 of 15
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 49 of 57
Case 3:14-cv-00746-ST   Document 1-2   Filed 05/05/14   Page 15 of 15   Page ID#: 47

**SCHEDULE II**

**to**

**Security Agreement**

**Trade Names and Trade Styles**

[   ]

Case 3:14-cv-00746-ST   Document 12-3   Filed 05/15/14   Page 1 of 6
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 50 of 57
Case 3:14-cv-00746-ST   Document 1-3   Filed 05/05/14   Page 1 of 6   Page ID#: 48

CONTRACT

THIS Agreement is entered into this _13th_ day of January, 2014, by and between WESTERLUND LOG HANDLERS, LLC, a Washington limited liability company ("WLH"), Roger Nance, Jr. ("Nance") and David Westerlund ("Westerlund") (collectively hereinafter sometimes referred to as "Guarantors") and MURPHY OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC, an Oregon limited liability company ("Astoria Forest Products").

RECITALS:

WHEREAS, WLH is in the business of sorting, grading, debarking, decking, storing and delivering to dockside, logs for export. It has leases on property suitable for storage and processing near Astoria, Oregon, and at the Port of Astoria adjacent to Pier One suited for these purposes and on which logs owned by its customers may be segregated and stored.

WHEREAS, Westerlund has expertise and an established reputation in the business of handling and preparing for shipment certain types of logs found in Northwestern Oregon and Southwestern Washington that makes his services unique and not easily replaceable.

WHEREAS, Astoria Forest Products is in the business of purchasing logs and reselling them in the overseas market [outside the USA]. It intends to purchase logs for export through the Port of Astoria and desires to engage the services of WLH and Westerlund.

WHEREAS, Astoria Forest Products desires to use WLH to transport, store, process and prepare for shipment logs that Astoria Forest Product purchases for shipment through the Port of Astoria;

NOW, THEREFORE, IT IS AGREED:

1.      From time to time Astoria Forest Products will have logs delivered to WLH at its log yard near Astoria, Oregon. The logs will be scaled by an independent, Pacific Rim Scaling Bureau or other certified scaling bureau acceptable to the parties and will be branded with unique bar code identifiers standard in the industry such as CT3 stapled to each log.

2.      WLH will off-load logs delivered for the account of Astoria Forest Products, record them as received, sort them by grades depending on the specifications submitted by Astoria Forest Products and its customers, store them, debark them and prepare them for export in a manner that meets customary and usual standards in the industry. WLH will maintain accurate records of the location of Astoria Forest Products logs at all times and will take reasonable precautions to make sure that the branding tags do not become detached.

Page 1 of 6 - CONTRACT

EXHIBIT 3
Page 1 of 6

Case 3:14-cv-00746-ST   Document 12-3   Filed 05/15/14   Page 2 of 6
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 51 of 57
Case 3:14-cv-00746-ST   Document 1-3   Filed 05/05/14   Page 2 of 6   Page ID#: 49

3.     After preparing the logs for shipment, WLH will deliver them to Pier One of the Port of Astoria within twelve (12) normal working hours of the request by Astoria Forest Products. The branding tags will be intact at the time of delivery by WLH.

4.     The logs owned by Astoria Forest Products will be stored by WLH in a segregated location at WLH's yards and will not be commingled with logs or forest products owned by WLH or by others. Promptly upon receipt and, thereafter in the event any of the logs are moved, WLH will inform Astoria Forest Products by the end of the next business day after receipt or movement. Upon receipt, WLH will inform Astoria Forest Products of the logs received, their unique identifiers and their location. WLH will clearly mark the areas in which Astoria Forest Products logs are stored with signage disclosing that the logs are owned by Astoria Forest Products. WLH will not hold itself out as having an ownership interest in Astoria Forest Products' logs.

5.     Astoria Forest Products will pay WLH $107 mbf ("MBF Payment") within ten (10) business days of receipt of the logs by WLH for its services hereunder. In addition, Astoria Forest Products will pay WLH 30% of the net profits, if any, calculated on a fully allocated tax basis, that are realized by Astoria Forest Products upon sale of the logs within ten (10) days of receipt of payment by Astoria Forest Products ("Percentage Payment"). In determining the Percentage Payment any profits of WLH, Guarantors, and Astoria Forest Products shall be included. The purchase and sale prices for the logs shall be determined at the sole discretion of Astoria Forest Products. Astoria Forest Products shall have no duty to WLH to obtain lower purchase prices or higher sale prices for the benefit of WLH. Without limiting other costs that may be deducted in determining the purchase price, letter of credit costs and financing costs will all be expenses to be offset against the Net profit shall be determined by Astoria Forest Product using generally-accepted accounting principles, consistent with its normal practices. Log profits shall be accounted for based on the actual cost and sale price of the logs. In the event of a dispute over the calculation of profits hereunder, the parties agree that the matter shall be determined by an accountant selected by Astoria Forest Products and WLH. If they cannot agree on an accountant, the parties will select a third accountant whose determination shall be binding on the parties.

6.     WLH waives any rights to possessory or nonpossessory liens on the logs, including any right to a landlord's lien, chattel lien under ORS 87.216 or any similar statute or at common law, stevedore's lien, logger's lien under ORS 87.222, or the any other statutory or common law lien that might be available or claimed to be available. WLH will not suffer any liens to be filed against Astoria Forest Products logs by others and will indemnify and hold Astoria Forest Products harmless from any such liens or encumbrances.

7.     The parities recognize that WLH is in a unique position to provide access to the Port of Astoria facilities and, accordingly WLH and Guarantors agree that they will not terminate this Agreement and the rights that inure to Astoria Forest Products hereunder in any event except a nonpayment of amounts due hereunder to WLH where

EXHIBIT 3
Page 2 of 6

Case 3:14-cv-00746-ST   Document 12-3   Filed 05/15/14   Page 3 of 6
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 52 of 57
Case 3:14-cv-00746-ST   Document 1-3   Filed 05/05/14   Page 3 of 6   Page ID#: 50

such nonpayment is material in amount and continues for a period of 60 days after written notice of such nonpayment delivered to Astoria Forest Products by certified mail at its offices and by email to each of the last known addresses ●f the principles and principal office of Astoria Forest Products. In the event there is a dispute about amounts claimed due to WLH for its services hereunder, Astoria Forest Products will not be in default if it is seeking a determination of the amounts due, if any, under Paragraph 5, above until there has been a final, binding determination and any payments found to be due have not been paid within 30 days of such final, binding determination. This Agreement will continue until terminated by Astoria Forest Products. Upon termination, Astoria Forest Products shall have all of the rights it would have if their was a default of this Agreement by WLH, including the rights provided in Paragraph 11, below. The MBF Payment may be adjusted by the parties quarterly in an amount equal to any increase in WLH's actual cost of processing or storing the Astoria Forest Products logs. In order to establish a right to such an increase, WLH will provide Astoria Forest Products with records, information and other support reasonable requested by Astoria Forest Products. Any dispute about whether WLH is entitled to an increase will be resolved in the manner provided in Paragraph 5, above.

8.      Guarantors shall guaranty full performance of each and every obligation of WLH hereunder. WLH and Guarantors each agree to indemnify and hold harmless Astoria Forest Products and its affiliates, managers, members and owners of the foregoing, of and from any and all claims, liabilities and damages, including reasonable attorneys fees, as a result of this agreement. In addition to all warranties that are implied at law, WLH and Guarantors represent and warrant to Astoria Forest Products that: (i) WLH has the power and authority to enter into this Agreement; (ii) the terms, conditions, undertakings and promises contained herein will not cause WLH or Guarantors to be in breach of any other agreement, promise, lease, mortgage, instrument, judgment, decree or undertaking each is subject to; (iii) WLH is now and shall remain during the term hereof a limited liability company in good standing under the laws of the State of Washington qualified to do business under the laws of the State of Oregon; (iv) WLH shall pay all taxes, assessments, and other charges imposed by any governmental authority promptly when due; and, (v) WLH will comply with all laws and regulations governing its operations and will not permit the discharge of any hazardous material and will promptly report and remediate any environmentally hazardous condition existing on property on which it operates or occurring as a result of its operations.

9.      This Agreement shall be governed by the laws of the State of Oregon and the Circuit Court for the County of Clatsop, State of Oregon, shall have exclusive jurisdiction to resolve any dispute arising hereunder or relating in any way to this Agreement.

10.     It is not the intent of the parties to create a partnership or joint venture hereunder and no party to this Agreement shall contend to the contrary. No party shall hold himself or itself out to any person as the agent of the other with authority to bind the ●ther.

Page 3 ●f 6 - CONTRACT

EXHIBIT 3
Page 3 of 6

Case 3:14-cv-00746-ST   Document 12-3   Filed 05/15/14   Page 4 of 6
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 53 of 57
Case 3:14-cv-00746-ST   Document 1-3   Filed 05/05/14   Page 4 of 6   Page ID#: 51

11.    Astoria Forest Products shall have the right to the immediate possession of logs delivered to WLH hereunder. Astoria Forest Products may file a UCC Financing statement and take other steps to put third parties on notice of its ownership interest in the logs delivered to WLH for Astoria Forest Products' account and WLH and Guarantors will reasonably cooperate in any such efforts. WLH and Guarantors will use their best efforts to have Astoria Forest Products added as an additional lessee with rights to continue the leases in the event of a default by WLH on any leases it has with the Port of Astoria, on terms reasonably acceptable to Astoria Forest Products.

12.    In the event Astoria Forest Products, at its sole and absolute discretion, deems itself insecure; or in the event of any default by WLH under this agreement; or in the event that guarantors are not in control of WLH; Astoria Forest products shall available to it all remedies provided for hereunder, or at law and in equity, including without limiting the generality of the foregoing: (i) the right to immediately access and secure its logs; (ii) the right to enter upon WLH's premises, even if locked; (iii) the right to seize logs owned by Astoria Forest Products; (iv) if not identifiable, the right to seize a quantity of logs of generally the same type and quantity as the Astoria Forest Products logs that were in WLH's custody; and (v) the right to use WLH equipment and employees to process, handle and transport Astoria Forest Products logs or substitute logs. WLH and Guarantors will cooperate with Astoria Forest Products rights hereunder, will not hinder the free exercise of those rights, will not seek judicial relief to interfere with or prevent Astoria Forest Products from enforcing its rights hereunder and hereby grants Astoria Forest Products a license to enter upon its premises, use its equipment and employees, and remove its logs.

13.    The parties hereto may amend, modify and supplement this Agreement in such manner as may be agreed upon by them in writing.

14.    Each party to this Agreement shall pay all of the expenses incurred by it in connection with this Agreement, including without limitation its legal and accounting fees and expenses, and the commission, fees and expenses of any person employed or retained by it to bring about, or to represent it in, the transactions contemplated hereby.

15.    This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that WHL may not assign its rights or delegate its duties hereunder without the prior written consent of Astoria Forest Products.

16.    This agreement contains the entire agreement of the parties hereto with respect to the Astoria Forest Products logs that WHL will receive, process, store and transport for Astoria Forest Products and supersedes all prior understandings and agreements of the parties with respect to the subject matter hereof. In the event of any inconsistency between this Agreement and any purchase order, confirmation or similar document or instrument of WHL, any WHL-Designated Purchaser, Authorized Recipient, or Astoria Forest Products, this Agreement shall govern.

Page 4 of 6 - CONTRACT

EXHIBIT 3
Page 4 of 6

Case 3:14-cv-00746-ST   Document 12-3   Filed 05/15/14   Page 5 of 6
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 54 of 57
Case 3:14-cv-00746-ST   Document 1-3   Filed 05/05/14   Page 5 of 6   Page ID#: 52

17.     This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

18.     Any notice, request, information or other document to be given hereunder shall be in writing. Any notice, request, information or the document shall be deemed duly given three business days after it is sent by registered or certified mail, postage prepaid, to the intended recipient, addressed as follows:

If to WHL, addressed to such party at the following address:

Westerlund Log Handlers, LLC
#10 Pier 1, Suite 301
Astoria, OR  97103

If to Astoria Forest Products, addressed as follows:

Murphy Overseas USA Astoria Forest Products, LLC
5319 SW Westgate Drive, Suite 211
Portland, OR  97221

with a copy to:

Michael J. Esler, Esq.
Esler, Stephens & Buckley, LLP
888 SW 5th Avenue, Suite 700
Portland, OR  97204-1510

Any party may send any notice, request, information or other document to be given hereunder using any other means (including personal delivery, courier, messenger service, fax or ordinary mail), but no such notice, request, information or other document shall be deemed duly given unless and until it is actually received by the party for whom it is intended. Any party may change the address to which notices hereunder are to be sent to it by giving written notice of such change of address in the manner herein provided for giving notice.

19.     In the event of a breach or threatened breach of any of the provisions above in this Agreement, the parties acknowledge and agree that the non-breaching party will not have an adequate remedy at law and therefore will be entitled to enforce any such provision by temporary or permanent injunctive or mandatory relief as a remedy for any such breach, and that such remedy shall not be deemed to be the exclusive remedy for any such breach but shall be in addition to all other remedies, subject, however, to the provisions of hereof.

20.     In no event shall either party hereto seek, or be liable to the other party hereto for, speculative, exemplary or punitive damages.

Page 5 of 6 - CONTRACT

EXHIBIT 3
Page 5 of 6

Case 3:14-cv-00746-ST    Document 12-3    Filed 05/15/14    Page 6 of 6
Case 2:09-md-02047-EEF-MBN    Document 18302-8    Filed 02/10/15    Page 55 of 57
Case 3:14-cv-00746-ST    Document 1-3    Filed 05/05/14    Page 6 of 6    Page ID#: 53

21.   No press release or other public or trade announcement or statement related to this Agreement or the transactions contemplated hereby (or the existence of any discussions or negotiations between the parties regarding any other possible transactions) will be issued, and no disclosure of this Agreement or the terms hereof will made, by either party hereto without the prior approval of the other party hereto.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the day and year first above written.

WESTERLUND LOG HANDLERS, LLC,
a Washington limited liability company

By: _David Westerlund_

Its: _CEO_

Dated: _1-13-14_

GUARANTORS

_David Westerlund_

David Westerlund

_Roger Nahee_

Roger Nahee

MURPHY OVERSEAS USA ASTORIA FOREST PRODUCTS, LLC,
an Oregon limited liability company

By: _Joe R. Phil_

Its: _President_

Dated: _1·13·14_

K:\Barbara\Murphy\Contract Westerlund draft 1-8-14.doc

Case 3:14-cv-00746-ST   Document 12-4   Filed 05/15/14   Page 1 of 2
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 56 of 57
Case 3:14-cv-00746-ST   Document 1-4   Filed 05/05/14   Page 1 of 2   Page ID#: 54



**MILLER NASH** LLP
ATTORNEYS AT LAW

PORTLAND, OREGON
SEATTLE, WASHINGTON
VANCOUVER, WASHINGTON
CENTRAL OREGON
WWW.MILLERNASH.COM

3400 U.S. Bancorp Tower
111 S.W. Fifth Avenue
Portland, Oregon 97204-3699
OFFICE 503.224.5858
FAX 503.224.0155

**Brian W. Esler, P.C.**
brian.esler@millernash.com
(206) 777-7415 direct line

February 5, 2014

**VIA FIRST CLASS AND
REGISTERED MAIL**

Murphy Overseas USA Astoria Forest Products, LLC
5319 S.W. Westgate Drive, Suite 211
Portland, Oregon 97221

Attention:    Accounts Payable Department

Subject:    Notice to Pay Over All Accounts Payable of Westerlund Log Handlers, LLC

Dear Sir or Madam:

We represent China National Building Materials Import and Export Corporation ("CBMIE"), who is the secured creditor of Westerlund Log Handlers, LLC ("Westerlund"). Westerlund granted CBMIE a security interest in all of Westerlund's accounts. Westerlund defaulted in its obligations to CBMIE and CBMIE is exercising its rights and remedies.

One of CBMIE's remedies is to require, under the applicable provisions of the Uniform Commercial Code, that payment on all of Westerlund's accounts be made to CBMIE or its designee.

You have a contract with Westerlund, pursuant to which you are obligated to make certain payments to Westerlund. We hereby notify you to begin immediately sending all further payments due or owing on your accounts with Westerlund directly to CBMIE through its designee. Such payments should be made by check payable to "CNBM Forest Products Canada, Ltd." and sent to:

CNBM Forest Products Canada, Ltd.
c/o Victor Tsao
Farris, Vaughan, Wills & Murphy LLP
25th Floor, 700 West Georgia Street
Vancouver, British Columbia, Canada V7Y 1B3

PDXDOCS:2026227.1

EXHIBIT 4
Page 1 of 2

Case 3:14-cv-00746-ST   Document 12-4   Filed 05/15/14   Page 2 of 2
Case 2:09-md-02047-EEF-MBN   Document 18302-8   Filed 02/10/15   Page 57 of 57
Case 3:14-cv-00746-ST   Document 1-4   Filed 05/05/14   Page 2 of 2   Page ID#: 55



PORTLAND, OREGON
SEATTLE, WASHINGTON
VANCOUVER, WASHINGTON
CENTRAL OREGON
WWW.MILLERNASH.COM

Murphy Overseas USA Astoria Forest Products, LLC
February 5, 2014
Page 2

       Please be advised that if you do not make your payments in the foregoing manner, and make any payment on the above account to any party other than CBMIE or its designee, you will remain liable to CBMIE for any such payments.  Should you have any questions regarding a payment or this account, please contact the undersigned.

Very truly yours,

Brian W. Esler

cc:    Mr. Mike Esler (via e-mail and first class mail)
       Mr. Gordon Carey (via e-mail and first class mail)

EXHIBIT 4
Page 2 of 2