# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br><br>SECTION: L |
| THIS DOCUMENT RELATES TO:<br><br>*Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 2:09-cv-6687 (E.D. La.) | JUDGE FALLON<br><br>MAG. JUDGE WILKINSON |

## SUBSTITUTED MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF-INTERVENORS AND THE PLAINTIFFS' STEERING COMMITTEE TO ENFORCE THE COURT'S JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION[1]

---

[1] The Plaintiff-Intervenors and the PSC substitute the instant pleading for the previously filed Memorandum of Law in Support of the Motion to Enforce the Court's July 17, 2014 Contempt Order and Injunction [Rec. Doc. No. 18302-1] originally filed on February 9, 2015, including the supplements thereto. *See* Rec. Doc. Nos. 18302, 18433, 18447, 18520, 18534.

# <u>TABLE OF CONTENTS</u>

Table of Authorities……………………………………………………………………………... iv

Index of Exhibits…………………………………………………………………………………vii

I.     INTRODUCTION ........................................................................... 1

II.    STATEMENT OF FACTS AND PROCEDURAL HISTORY............................................ 6

III.   THE ENTITIES IDENTIFIED IN ATTACHMENT 1 TO THE SUBSTITUTED PROPOSED ORDER ARE TAISHAN AFFILIATES AND/OR SUBSIDIARIES THAT WERE SUBJECT TO THE COURT'S INJUNCTION. .................................................... 16

IV.   THE TAISHAN AFFILIATES AND SUBSIDIARIES IDENTIFIED BELOW VIOLATED THE COURT'S JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION. ......................................................................................................... 34

    A.   Discovery Has Revealed that the Taishan Defendants Were Aware of this Court's Contempt Order and Injunction but Failed to Provide Notice of Same to Their Affiliates and Subsidiaries. .......................................................................... 35

    B.   Extensive Third-Party Discovery has Uncovered Substantial Business Conducted by Taishan Affiliates in the United States during the Contempt Period in Clear Violation of the Injunction Prong of the Court's July 17, 2014 Contempt Order and Injunction. ........................................................................................................ 38

        1.   CNBM's Business Dealings in Oregon with Westerlund Log Handlers and Murphy Overseas USA Astoria Forest Products. ............................................... 39

        2.   Taishan Affiliates Continued Conducting Business in the Lumber/Logging Industry in the U.S. During the Contempt Period in Direct Violation of This Court's July 17, 2014 Order............................................................................. 43

            i.   BNBM Group Purchased and Exported a Substantial Amount of Lumber from U.S. Companies During the Contempt Period. ................................ 44

            ii.   CNBM Forest Products and CNBM Forest (Canada) Purchased and Exported a Substantial Amount of Lumber from U.S. Companies During the Contempt Period That Was then Resold to Chinese Customers......... 48

        3.   CNBM Import & Export Likewise Conducted a Significant Amount of Business in the U.S. During the Period of Taishan's Contempt ....................................... 57

4.      Defendant and Taishan Affiliate United Suntech Maintained a Continuous
        Presence in the U.S. Market Throughout the Contempt Period........................ 58

5.      CTIEC Maintained an Extensive Business Presence in the U.S. Market During
        the Contempt Period. ........................................................................................ 61

        i.      CNBM's Dealings with NJIT and Toledo Engineering Co., Inc. Through
                its Subsidiary, CTIEC, During the Contempt Period............................... 61

        ii.     CTIEC's Extensive Business Dealings with Sunpin and Walmart in the
                U.S. during the Contempt Period............................................................. 65

        iii.    Business Conducted Through ATI – CTIEC's Joint Venture with Toledo
                Engineering Co. During the Contempt Period. ........................................ 68

6.      CNBM, through its Subsidiaries, CNBM International and CNBM USA
        Conducted a Significant Volume of Business in the U.S. During the Contempt
        Period. ............................................................................................................... 69

        i.      CNBM's Establishment of an E-Commerce Site for Sales of its Products
                to the U.S. .............................................................................................. 69

        ii.     CNBM's Agreement with IBM in September, 2014 for Cloud Computing
                Services to Enhance Its Sales Across the Globe and to America. ............ 73

        iii.    CNBM International Took Over CNBM USA's Business Dealings in the
                U.S. from 2013 to the Present. ................................................................ 75

7.      CNBM Entities Used the American Judicial System During the Contempt
        Period to Pursue Monetary Claims on Behalf of Its Alter Egos. ....................... 78

8.      Taishan Affiliates Maintained Alibaba.com Store Fronts and Derived Business
        and Profits from said Business Secured by Alibaba During the Contempt Period.
        ........................................................................................................................... 82

9.      Jushi USA Fiberglass Conducted Business in the United States During the
        Contempt Period in Clear Violation of the Court's Order. ................................ 84

10.     CNBM Derived Profits from U.S. Investors, Including Companies related to
        Morgan Stanley, JP Morgan Chase & Co. and Others, Purchase, Sale and/or
        Trade of A Shares in the Company During the Contempt Period. ..................... 87

11.     The Taishan Affiliates Maintained and Utilized United States Banks for
        Business Conducted in the United States During the Contempt Period in
        Violation of the Injunction. ............................................................................... 90

V.  LAW AND ARGUMENT ................................................................................. 91

    A.  The Court's Contempt Order and Injunction – Enjoining Taishan and Its Affiliates and Subsidiaries From Doing Business in the U.S. Until Taishan Complies, and Imposing a 25% Profits Penalty For Any Violation – Is Constitutional..................... 91

        1.  The Coercive Sanctions Imposed by the Court Were Well Within its Inherent and Express Authority ....................................................................... 93

        2.  The Issuance of the Contempt Order was Appropriate as to Taishan and May be Extended to its Affiliates. .............................................................. 96

        3.  The Injunction from Doing Business in the United States Unless/Until the Defendants Purge Themselves of Contempt Was Permissible. ......................... 99

    B.  The Court is Entitled to Enforce the Provisions of the July 17, 2014 Contempt Order and Injunction. ....................................................................... 100

    C.  The Legal Definition of "Affiliate" Includes the Taishan Entities on Attachment 2 to the Proposed Order Submitted Herewith. ................................................ 102

VI.  CONCLUSION ................................................................................. 106

iii

# TABLE OF AUTHORITIES

## Cases

*Am. Airlines, Inc. v. Allied Pilots Ass'n*,
228 F.3d 574 (5th Cir. 2000)...................................................................................... 95

*Braun v. Insurance Co. of North America*,
488 F.2d 1066 (5th Cir. 1974)........................................................................... 105, 106

*Cooke v. United States*,
267 U.S. 517 (1925)...................................................................................... 98, 99

*F.T.C. v. Kuykendall*,
371 F.3d 745 (10th Cir. 2004)...................................................................... 99, 101

*Florida Steel Corp. v. N.L.R.B.*,
648 F.2d 233 (5th Cir. 1981)...................................................................................... 95

*Hall v. Malone*,
2013-0315 (La. App. 4 Cir. 1/15/14), 133 So. 3d 91 ........................................... 105

*Harris v. United States*,
382 U.S. 162 (1965)................................................................................................ 100

*Hopkins v. Howard*,
930 So. 2d 999 (La. App. 4 Cir. 2006)............................................................. 104, 105

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
706 F. Supp. 2d 655 (E.D. La. 2010) .......................................................................... 7

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014) ............................................... passim

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
894 F. Supp. 2d 819 (E.D. La. 2012) .................................................... 2, 7, 8, 34

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
2014 WL 4809520 (E.D. La. Sept. 26, 2014) .......................................................... 7

*In re Oliver*,
333 U.S. 257 (1948) ................................................................................................ 101

*In re Terry*,
128 U.S. 289 (1888) .................................................................................................. 94

*Johanson v. Riverside County Select Groves,
Inc.*, 4 Cal.App.2d 114, 40 P.2d 530 ..................................................................... 105

*Leman v. Krentler–Arnold Hinge Last Co.*,
   284 U.S. 448 (1932) .................................................................................................. 95

*Lennar Homes, LLC v. Knauf GIPS, KG*,
   Case No. 09-07901, 2012 WL 3800187 .................................................................... 8

*Manhattan Industries v. Sweater Bee, Ltd.*,
   885 F.2d 1 (2d Cir. 1989) .................................................................................. 95, 97

*McCall v. Cameron Offshore Boats, Inc.*,
   93-787 (La. App. 3 Cir. 3/9/94), 635 So. 2d 263 .................................................. 104

*McComb v. Jacksonville Paper Co.*,
   336 U.S. 187 (1949) .................................................................................................. 95

*McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*,
   736 F.3d 375 (5th Cir. 2013) .................................................................................. 105

*Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*,
   2 F.3d 1397 (5th Cir. 1993) ...................................................................................... 93

*Ocean-Oil Expert Witness, Inc. v. O'Dwyer*,
   451 F. App'x 324 (5th Cir. 2011) ............................................................................ 101

*Pounders v. Watson*,
   521 U.S. 982 (1997) .................................................................................................. 98

*Reebok Int'l Ltd. v. McLaughlin*,
   827 F. Supp. 622 (S.D. Cal. 1993) .......................................................................... 100

*Regal Knitwear Co. v. N.L.R.B.*,
   324 U.S. 9, 65 S. Ct. 478, 89 L. Ed. 661 (1945) .................................................... 102

*Seven Arts Pictures, Inc. v. Jonesfilm*,
   512 F. App'x 419 (5th Cir. 2013) ............................................................................ 102

*Tegal Corp. v. Tokyo Electron Co.*,
   248 F.3d 1376 (Fed. Cir. 2001) ........................................................................ 99, 101

*Test Masters Educ. Servs., Inc. v. Singh*,
   428 F.3d 559 (5th Cir. 2005) .................................................................................... 94

*United States v. Hernandez*,
   771 F.3d 707 (10th Cir. 2014) .................................................................................. 98

*United States v. Hudson and Goodwin*,
   11 U.S. 32 (1812) ...................................................................................................... 94

v

*United States v. Onu*,
    730 F.2d 253 (5th Cir. 1984)..................................................................... 98, 99

*United States v. United Mine Workers of Am.*,
    330 U.S. 258, 67 S. Ct. 677, 91 L. Ed. 884 (1947) .................................. 95

*United States v. Voss*,
    82 F.3d 1521 (10th Cir. 1996)................................................................... 100

*Waffenschmidt v. MacKay*,
    763 F.2d 711 (5th Cir. 1985).................................................................... 102

*Young v. U.S. ex rel. Vuitton et Fils S.A.*,
    481 U.S. 787 (1987) ................................................................................. 94

## **<u>Statutes</u>**

18 U.S.C.A. § 401 ............................................................................................ 98

Ala. Code § 10A-1-1.03 ................................................................................... 103

Fla. Stat. Ann. § 607.0901 ............................................................................... 103

La. Code Civ. Proc. art. 2451............................................................................ 3

La. R.S. 12:1-1301(1) ...................................................................................... 103

La. R.S. 22:1379(3)(f)...................................................................................... 104

Miss. Code Ann. § 75-76-199 .......................................................................... 103

Miss. Code Ann. § 79-27-5 .............................................................................. 103

Tex. Bus. Orgs. Code Ann. § 1.002 ................................................................. 103

## **<u>Rules</u>**

Fed. R. Civ. P. 37 ................................................................................. 93, 95, 96

Fed. R. Civ. P. 37(b)(2)(A) .............................................................................. 93

Fed. R. Civ. P. 37(b)(2)(C) .............................................................................. 95

Fed. R. Civ. P. 37(d)(1)(A)(i) .......................................................................... 93

Fed. R. Civ. P. 37(d)(3)..................................................................................... 93

Fed. R. Civ. P. 65 ........................................................................................................... 101

Fed. R. Civ. P. 65(d)(2) ................................................................................................. 101

Fed. R. Civ. P. 69(a) ......................................................................................................... 3

Fed. R. Crim. P. 42 ......................................................................................................... 97

Fed. R. Crim. P. 42(a) ..................................................................................................... 98

Fed. R. Crim. P. 42(b) ............................................................................................. 98, 100

Fed. R. Evid. 1006 ........................................................................................................... 13

## INDEX OF EXHIBITS

**CONTEMPT
EX. NO.**          **DESCRIPTION OF EX.**

1          Transcript of MDL Status Conference, 1/22/2015 [Rec. Doc. No. 18276]

2          Statement on Implementing the Requirements from the Group Corporation's
           Meeting of the International Business Risk Prevention [Translation of
           BNBM(Group)-E-0000444-446] (Dep. Ex. 215[2])

3          7/18/2014 CNBM Voluntary Announcement on Development of Gypsum Board
           Litigation in the US [CNBMCO0000001-6] (Dep. Ex. 27)

4          7/18/2014 BNBM Voluntary Announcement on Development of Gypsum Board
           Litigation in the US [ALRMH-CNBM00005108R-5111R] (Dep. Ex. 26-R)

5          7/11/2014 CNBM Group Resolution No. 17 of the Third Session of the Board of
           Directors of CNBM Group [Translation of CNBMGRP00393000-002] (Dep. Ex.
           332)

6          Transcript of Proceedings, 7/17/2014

7          8/20/2014 CNBM Voluntary Announcement: Updates on Recent Development in
           the Gypsum Board Litigation in the US [CNBMCO0000021-24] (Dep. Ex. 29)

8          3/2015 Wire Transfers [TG-042315-0028886; 0028887; 0028888]

9          FRE 1006 Summary Chart of Taishan, BNBM, CNBM Officers and Directors and
           Supporting Documentation (Dep. Ex. 23-1)

10         Deposition of JIA Tongchun dated 9/17-18/2015

11         10/15/2015 Motion of Appellees to Dismiss Appeals [FILED UNDER SEAL]
           Dckt. 15-30804 (5th Cir.)

12         Taishan Affiliates and Subsidiaries Chart

13         2/10/2016 Affidavit of Yan Gao

14         State Owned Assets Supervision and Administration Commission's list of SOE's,
           (last visited on 2/10/2015) available at:
           http://www.sasac.gov.cn/n2963340/n2971121/n4956567/.

---

[2] Exhibits referenced as "Dep. Ex. [#]" are those that were introduced in depositions of Defendants and
related individuals; specific prefixes will be used for deposition exhibits not in the main set of deposition
exhibits.

15       SASAC Main Functions, (last visited on 12/15/2015) accessed at:
http://en.sasac.gov.cn/n1408028/n1408521/index.html

16       CNBM 2006 Global Offering Prospectus [ALRMH-CNBM00000001-643]

17       2005 BNBM Annual Report [BNBMPLC0000288-380]

18       2006 BNBM Annual Report [BNBMPLC0000489-605]

19       2007 BNBM Annual Report [BNBMPLC0000722-841]

20       2008 BNBM Annual Report [BNBMPLC0000961-1080]

21       2009 BNBM Annual Report [BNBMPLC0001229-1378]

22       2010 BNBM Annual Report [BNBMPLC0001542-1695]

23       2011 BNBM Annual Report [BNBMPLC0001862-2018]

24       2012 BNBM Annual Report [BNBMPLC0002273-2480]

25       2013 BNBM Annual Report [BNBMPLC0002743-2944]

26       2014 BNBM Annual Report [BNBMPLC0003164-3336]

27       Deposition of Curtis J. Milhaupt dated 2/3/2016

28       Deposition of BNBM Group (ZHAO Yanming) dated 7/15-17/2015

29       English Translation of CNBM Group's Member Enterprise Description

30       2014 CNBM Annual Report [ALRMH-CNBM00003662-3883]

31       Deposition of CNBM (CHANG Zhangli) dated 6/5-7/2015

32       Deposition of SONG Zhiping dated 9/14-15/2015

33       English Translation of China Building Materials Academy's Member Enterprise
Description

34       2006 CNBM Annual Report [ALRMH-CNBM00003662-3883]

35       English Translation of CNBM Import & Export's Subsidiaries and Overseas
Companies

36       Deposition of CNBM Import & Export  (LIHE Wang) dated 11/4/2015

37        CNBM Import & Export Corporate Disclosure Statement (Dkt. 3:14-cv-00746, D. Or.) (Dep. Ex. 417)

38        Deposition of CNBM Forest (Canada) (DENG Jianjun) dated 10/28/2015

39        CNBM Forest (Canada)'s Corporate Disclosure Statement (Dkt. 3:14-cv-00746, D. Or.) (Dep. Ex. 414)

40        2013 CNBM Forest Products, Ltd. Auditor's Report [Partial Translation of CNBMFP00045798 – 45839] (Dep. Ex. 454)

41        CNBM Forest Products Articles of Association [Partial Translation of CNBMFP00045790 – 45793] (Dep. Ex. 426)

42        Response to Request for Information Regarding CNBM Group [CNBMFP00149890-91] (Dep. Ex. 457)

43        Slide Show: CNBM Forest Products Trading, Ltd. [CNBMFP00148600-1468622] (Dep. Ex. 427)

44        CNBM Forest (Canada) Certificate of Incorporation [CNBMFP00005012] (Dep. Ex. 421)

45        CNBM International Company Description [CNBMUSA00003022] (Dep. Ex. 551)

46        CNBM International Basic Situations of Overseas Subsidiary Companies [Translation of CNBMUSA00011317] (Dep. Ex. 612)

47        2014 Investigation Report on CNBM International [Partial Translation of CBMIE00029535-29554] (Dep. Ex. 635)

48        CNBM (USA) Corp. Papers Relating to Incorporation from the State of California, Secretary of State (Dep. Ex. 599)

49        CNBM Group "Contact Us," USA Tab, (last visited on 2/8/2016) available at http://www.cnbm.com.cn/EN/c_0000001600050003/

50        Deposition of CNBM USA Corp. (ZHANG Shaojun) dated 11/3/2015

51        4/2/2007 CNBM USA "Building a Mutually Rewarding Partnership" PowerPoint

52        Defendant Affiliate/Subsidiary/Parent Manufacturers' Profile Form of China National Building Material & Equipment Import & Export Corp. (Dep. Ex. 287)

53        CNBM International Corporation "Company Profile" available at http://www.icnbm.com/en/info (last visited on 1/4/2016) (Dep. Ex. 81-2)

54          Deposition of Morgan Stanley (Terence Keyes) dated 11/13/2015

55          HKSE Rules Chapter 1 (Keyes Dep. Ex. 2)

56          2007 CNBM Annual Report [ALRMH-CNBM00000782-949]

57          2008 CNBM Annual Report [ALRMH-CNBM00001118-1315]

58          2009 CNBM Annual Report [ALRMH-CNBM00001514-1719]

59          2010 CNBM Annual Report [ALRMH-CNBM00001926-2139]

60          2011 CNBM Annual Report [ALRMH-CNBM00002354-2571]

61          2012 CNBM Annual Report [ALRMH-CNBM00002790-3007]

62          2013 CNBM Annual Report [ALRMH-CNBM00003226-3443]

63          2015 CNBM Interim Report [PSC00000001-102] (Dep. Ex. 334)

64          Deposition of Jushi USA Fiberglass Co., Ltd. (TANG Hsin Hua) dated
            11/18/2015

65          8/1/2011 Article: Jushi USA is Born," (last visited on 2/8/2016) accessed at
            http://jushiusa.com/content/jushi-usa-born

66          Deposition of CTIEC-TECO, American Technology, Inc. (Fred Paulsen) dated
            4/24/2015

67          3/30/2005 CTIEC-TECO, ATI Joint Venture Agreement [CTIEC-TECO
            0003225-3239] (Paulsen Dep. Ex. 3)

68          Notes of 2010 Annual Financial Report of CNBM Investment Co., Ltd.
            [Translation of CNBMCO00076251-76290] (Dep. Ex. 498)

69          11/1/2007 Modification Notice re: Name Change of BND Co., Ltd. to CNBM
            Investment Co., Ltd. [CBM000001] (Dep. Ex. 68)

70          "Investment Segment" – CNBM Web Page, (last visited on 10/22/15) accessed at:
            http://www.cnbmltd.com/en/ywbk/fzyw.jsp

71          3/4/2013 Email re: Notice on Registration of Retention of Company's Material
            Info [Translation of SUNTECH00000438-439] (Dep. Ex. 493)

72          9/16/2012 Application for Title Registration for United Suntech Craft, Inc.
            [Translation of SUNTECH00001001] (Dep. Ex. 432-1)

73          Deposition of United Suntech Craft (LIU Weishing) dated 10/27/2015

| 74 | CNBMIT "About Us" Tab, (last visited on 1/19/2016) available at http://www.cnbmit.com/en/about/index.aspx |
| 75 | CNBMI USA tab, CNBMIT Co. webpage, (last visited on 1/19/2016)available at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602 |
| 76 | 10/13/2015 CNBM Announcement: Disclosable Transaction, Connected Transaction, Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM |
| 77 | Deposition of CAO Jianglin dated 8/4-5/2015 |
| 78 | Deposition of  WANG Bing dated 8/27-27/2015 |
| 79 | Deposition of PENG Shou dated 9/16/2015 |
| 80 | 1/5/2016 Chart of Expedited Third-Party Depositions |
| 81 | China Nat'l Bldg. Materials Imp. and Exp. Corp., et al. v. Murphy Overseas USA Astoria Forest Products, LLC, et al., No. 14-cv-00746 (D. Ore.) (Dep. Ex. 508) |
| 82 | 7/2/2014 Confidential Mediation Submission of CNBM Import & Export and CNBM Forest (Canada) [CBMIE00065970-65978] (Dep. Ex. 456) |
| 83 | Westerlund Log Handlers, LLC, et al. v. China Nat'l Bldg. Materials Imp. & Exp. Corp., et al., No. 14-cv-00618 (Clatsop Cty. Cir. Ct. Ore.) (Dep. Ex. 507) |
| 84 | 4/25/2015 Declaration of Robert Moon with Exhibits (Dep. Ex. 44-1(F)) |
| 85 | 4/3/2015 Letter from counsel for Murphy/Astoria, 8/8/2014 Stipulation, 11/10/2014 Settlement Agreement, and related materials |
| 86 | 9/9/2014 Email from Jackie Wang to Huang Anzhong, Yingqun Zhu and wsh@cbmie.com (Chief Wu) reporting on developments in the Oregon litigation with Murphy Astoria [Partial Translation of CBMIE00036914-36918] (Dep. Ex. 422) |
| 87 | 2/6/2015 Email from DENG to ZHU Macy and ZHU Dan re: Risks of Doing Business with Murphy/Astoria in light of "high risks of conducting business related to the US" [Translation of CBMIE00039570–39571] (Dep. Ex. 458) |
| 88 | 8/19/2014 Email string re shipments under contract with Murphy/Astoria during the Contempt Period [Partial translation of CNBMFP00004927-4929] (Dep. Ex. 504) |
| 89 | Summary Chart of Transactions between Murphy/Astoria and CNBM Forest (Canada) with Supporting Documents |

90          Summary Chart of Transactions Between BNBM Group and Western Wood with Supporting Documents

91          Deposition of WH International (Jin Wooh) dated 5/21/2015

92          Summary Chart of Transactions between BNBM Group and WH International, Inc. with Supporting Documents

93          Summary Chart of Transactions between BNBM Group and Hull Forest Products, Inc. with  Supporting Documents

94          Summary Chart of Transactions between BNBM Group and Baillie Lumber Company with Supporting Documents

95          Job Profitability Summaries Produced by Western Wood Lumber Company with Respect to its Business with BNBM Group (Dep. Ex. 43-2(SS))

96          Deposition of Western Wood Lumber Company (John Salamanca) dated 5/21/2015

97          Transaction Information re: Documentary Credits dated 2/5/2015, 9/2/2014, 9/2/2014, 9/12/2014, and 10/22/2014 [WHI 000087-99] (Wooh Dep. Exs.8-12)

98          Baillie Web Page – "About Us," (last visited on 2/8/2016) available at: http://www.baillie.com/aboutus

99          Deposition of Baillie Lumber (Philip Fenwick) dated 5/28/2015

100         5/20/2015 & 5/27/2015 Wire Confirmations [Baillie0056, 57]

101         CNBM Import & Export Table of US Related Business in 2014 [Translation of CBMIE00025787] (Dep. Ex. 634)

102         2014 Introduction of CNBM Forest Products, Ltd. [Partial Translation of CNBMFP00045594-45596] (Dep. Ex. 510)

103         2014 CNBM Forest Products, Ltd. Contracts Status Check Spreadsheet [Partial Translation of CNBMFP00001663 (native spreadsheet)] (Dep. Ex. 511)

104         Deposition of Hampton Affiliates (Steven Zika) dated 5/18/2015

105         Hampton Affiliates and CNBM Group Memorandum of Understanding [HAMPTON020423-424] (Zika Dep. Ex. 4)

106         7/31/2014 Email from Devin Huang to Jim Tryer [HAMPTON014691-94] (Zika Dep. Ex. 7)

107      11/13/2014 Email from Devin Huang to Mark Porter [HAMPTON003319] (Zika Dep. Ex. 8)

108      Summary Chart of Transactions Between CNBM and Hampton Affiliates with Supporting Documents

109      Job Profitability Summaries Produced by Western Wood Lumber Company with Respect to its Business with CNBM Forest (Canada) (Dep. Ex. 43-1(A))

110      Collection of Contempt Period Invoices, Contracts and related shipping documents between CNBM Forest (Canada) and CNBM Forest Products with Western Wood (Produced by CNBM Forest (Canada) (Dep. Ex. 509)

111      Summary Chart of Transactions Between CNBM Forest (Canada) and Western Wood Lumber Co. with Supporting Documents

112      Summary Chart of Transactions Between CNBM Forest (Canada) and CNBM Forest Products with Millwood Timber, Inc. with Supporting Documents

113      CNBM Import & Export Co. Sorting of American Business [Translation of CBMIE00032577] (Dep. Ex. 538)

114      SYP Project Slides [CNBMFP0000046-68]  (Dep. Ex. 424-1)

115      3/13/2014 Meeting on Discussion of SYP Project [Partial Translation of CNBMFP00000152-157] (Dep. Ex. 424)

116      Summary Chart of Transactions between CNBM Forest (Canada) and CNBM Forest Products with SFP with Supporting Documents

117      8/2014 Email Chain re: Ongoing Business between CNBM Forest (Canada) and SFP [CNBMFP00010768-10796] (Dep. Ex. 502)

118      CNBM Forest Products, Ltd. 2015 Annual Business Plan [Partial Translation of CNBMFP00001753-1768] (Dep. Ex. 503)

119      Plum Creek, CNBM Group, and Sumitomo Forestry MOU (Dep. Ex. 44-1(G))

120      Chart SYP Cooperation Program [CNBMFP00007680] (Dep. Ex. 470)

121      Deposition of Plum Creek Timber (Rosemary Daszkiewicz) dated 4/16/2015

122      Summary Chart of CNBM Import & Export Contempt Period Contracts, Invoices and Shipping Documents with Supporting Documents

123      9/3/2003 United Suntech Craft Meeting Notes [Translation of SUNTECH00000042] (Dep. Ex. 479)

124        6/2/2008 Stock Purchase Agreement [SUNTECH00000033-36] (Dep. Ex. 434)

125        12/28/2007 Circular [CNBMCO00106238-79] (Dep. Ex. 447)

126        9/17/2014 Email re: Fund Application Report of US Company [Translation of SUNTECH00000212-213] (Dep. Ex. 489)

127        1/9/2015 Commission Agreement [SUNTECH00001262] (Dep. Ex. 433-1)

128        2/26/2013 NJIT News Room Announcement: NJIT Celebrates Growth of Solar Technology (Dep. Ex. 42-1(D))

129        2/21/2014 NJIT News Room Announcement: "Chinese Partnership Fuels NJIT's Solar Cell Research," available at: http://www.njit.edu/news/2014/2014-054.php (Sebastian Dep. Ex. 3)

130        2/30/2013 CNBM/CTIEC Announcement **"CNBM Sets up a Research Center at an American Public University," (last visited on 9/15/2015) available at: http://www.ctiec.net/news/en_news/2013/3/1/1362129261468.jsp  and http://www.cnbm.com.cn/EN/c_000000160001/d_25697.html

131        3/2013 Emails regarding $250,000 payment to NJIT [CTIEC-TECO0001521-1524] (Paulsen Dep. Ex. 8)

132        6/20/2014 email chain, "TECO Fund Update" [CTIEC-TECO 0002918-2924] (Paulsen Dep. Ex. 17)

133        9/15/2014 Email chain, "CTIEC Outstanding Invoices & Items Owed to TECO," with attachment [CTIEC-TECO 0002999-3005] (Paulsen Dep. Ex. 19)

134        5/6/2014 Email from Donald Sebastian to Wen He re: Payment Back to TECO [NJIT 01803-1839] (Sebastian Dep. Ex. 35)

135        4/8/2014 Emails between ATI and NJIT re: "Proposed CTIEC/TECO American Technology, Inc./NJIT Subcontract Agreement" [CTIEC-TECO 0002384-2385]

136        8/13-27/2014 Emails reflecting wire transfers from CTIEC to NJIT [NJIT 01169-1179] (Sebastian Dep. Ex. 40)

137        3/19/2015 Email from Joanne Branin, NJIT re: CTIEC wires [NJIT 03570] (Sebastian Dep. Ex. 34)

138        Deposition of New Jersey Institute of Technology (Donald Sebastian) dated 4/22/2015

139        Amendment I to PV Materials Technology Development Agreement [NJIT 02857-2860] (Sebastian Dep. Ex. 18)

140     12/14/2014 Email from Joanne Branin re: CTIEC Fee for Spring 2015 Semester [NJIT 01345-1348] (Sebastian Dep. Ex. 26)

141     3/30/2015 Email from Donald Sebastian re: 2015 R&D Application and Agreement, attaching amended versions of Application and Agreement pursuant to meeting in Shanghai with CTIEC on 1/ 29-30/2015 [CNBMCO00046744; 46745-58, 46759-815]

142     11/3/2014 NJIT and CTIEC EPC Framework Agreement (Dep. Ex. 42-1(H))

143     Deposition of Sunpin Solar Development, LLC (Steve Kim) dated 4/17/2015

144     11/26/2014 EPC Agreement for the Maryland Church Hill 7.344 MW Solar Power Project (Dep. Ex. 364)

145     11/26/2014 BOS Agreement for the Maryland Church Hill 7.344 MW Solar Power Project (Kim Dep. Ex. 4)

146     3/16/2015 Wire Transfer (Dep. Ex. 42-1(P))

147     3/16/2015 Wire Transfer (Dep. Ex. 402)

148     12/1/2014 and 1/22/2015 Wire Transfers from Sunpin to CTIEC (Dep. Exs. 42-1(L) and 42-1(M))

149     3/2/2015 CNBM News Center: "CTIEC signs Wal-Mart roof power plant project," (last visited on 5/16/2015) available at http://www.cnbm.com.cn/EN/c_000000160001/d_33428.html [ALRMH-CNBM0008813-14] (Dep. Ex. 82)

150     2/25/2015 EPC Short-Form Agreement between Sunpin Walmart Avon-North Oxford, LLC and CTIEC (Dep. Ex. 362)

151     CNBM Group Web page "Global Presence" Tab, (last visited on 4/13/2015) available at http://www.cnbm.com.cn/EN/c_0000001600030001

152     3/27/2015 Letter to Arnold Levin from Marshall A. Bennett, Jr. [CTIEC-TECO0003326-3335] (Paulsen Dep. Ex. 5)

153     2/7/2014 Email re: Notes from TECO meeting regarding ongoing projects of CTIEC in the United States with TECO and/or ATI [CTIEC-TECO 0003156-3159] (Paulsen Dep. Ex. 6)

154     7/10/2014 CNBM International Announcement "CNBM Group named to Fortune 500 for the Fourth Successive Time, Ranking the 267th," (last visited 6/15/2015) available at: http://www.cnbm.com.cn/EN/c_000000160001/d_15129.html [ALRMH-CNBM0008808-8809] (Dep. Ex. 81-1)

155     2/18/2011 CNBM Announcement "Congratulations on Okorder.com official launch," (last visited on 6/15/2015) available at http://www.cnbm.com.cn/EN/c_000000160001/d_15129.html [ALRMH-CNBM0008810-8812] (Dep. Ex. 81)

156     "Okorder.com: Cross-Border E-Commerce & Overseas Warehousing" [Partial Translation of CNBMUSA00027107-27151] (Dep. Ex. 579)

157     OKorder.com "Gypsum board drywall plaster board Taishan brand" (Dep. Ex. 609)

158     "Sales Force" tab on OKorder.com website, (last visited on 2/8/2016) available at http://www.okorder.com/service/sales.html

159     CNBM Import & Export and CNBM International 2014 Annual Work Report [Partial Translation of CBMIE00028128-28216] (Dep. Ex. 626)

160     CNBM International Breeder Material Dept. Jan. to Sept. Business Analysis Report  [Partial Translation of CNBMUSA00024907-24936] (Dep. Ex. 591)

161     CNBM International Adhesive Tape Dept. October Business Analysis Report [Partial Translation of CNBMUSA00024950-24961] (Dep. Ex. 592)

162     CNBM International Metal Engineering Department September 2014 Business Analysis Report [Partial Translation of CNBMUSA00024964-24977] (Dep. Ex. 593)

163     11/14/2014 CNBM International Photovoltaic Department 1 Business Analysis Report  [Partial Translation of CNBMUSA00024864-24888] (Dep. Ex. 590)

164     5/13/2015 CNBM International Announcement: "OKorder Manages Millions of Global Transactions with IBM" (last visited 10/28/2015) available at: http://www.cnbminternational.com/en/gsxw/xx.jsp?newsId=43381 (Dep. Ex. 513)

165     Investigation Report on CNBM International [Partial Translation of CBMIE00029535-29554] (Dep. Ex. 600)

166     OKorder.com news, "OKorder Joined Hands with IBM to Create cross-border e-commerce cloud era," (last visited 2/8/2016) available at: http://www.okorder.com/news/news_1.html

167     5/12/2015 Affidavit of Dody Lira

168     "Three-Year Rolling" Development Planning of CNBM International Corporation in 2015-2017 [Partial Translation of CNBMUSA00009676-9706] (Dep. Ex. 581)

169      Summary Chart of CNBM International Contempt Period Invoices, Contracts and Shipping Documents with Supporting Documents

170      12/7/2007 BNBM Announcement of Final Resolution of the 30th Interim Meeting of the 3rd Session of Board of Directors [BNBMPLC0004510-4512] (Part of Dep. Ex. 101)

171      2014 CNBM International Metal Engineering Department Work Summary [Partial Translation of CNBMUSA00009971-9990] (Dep. Ex. 583)

172      8/6/2014 Quotation from CNBM International to Global TDR, LLC [CNBMUSA00020079] (Dep. Ex. 566)

173      10/14/2014 Sales Confirmation for sale by CNBM International to Refractories, Inc. (TX) [CNBMUSA00018404-18408] (Dep. Ex. 557)

174      10/14/2014 Sales Confirmation for sale by CNBM International to Architectural Iron Products (OR) [CNBMUSA00028724-28725] (Dep. Ex. 570)

175      CNBM International 2014 Summary Work Report of Sales Manager  [Partial Translation of CNBMUSA00001509-1518] (Dep. Ex. 580)

176      1/5/2015 Active Minerals Contract entered into between CNBM International Corporation (Buyer) and Active Minerals Int'l, LLC (Seller) [CNBMUSA00015024-15030] (Dep. Ex. 556)

177      Deposition of Jeffrey J. Chang dated 5/20/2015.

178      Corporate Disclosure Statement in *CNBMI v. BNK Int'l*, No. 14-701 (W.D. Tex.)

179      Complaint and exhibits thereto in *CNBMI v. BNK Int'l*, No. 14-701 (W.D. Tex.) (Dep. Ex. 44-1(C))

180      BNBM's Alibaba.com Storefront, accessed at: http://bnbm.en.alibaba.com/company_profile.html#topnavbar (Dep. Ex. 163)

181      Taishan's Alibaba.com Storefront, accessed at: http://tsgbm.en.alibaba.com/contactinfo.html (Dep. Ex. 44-2(U))

182      CNBM Import & Export's  Alibaba.com Storefront, accessed at: http://lgh07211.fm.alibaba.com/ (Dep. Ex. 44-1(I))

183      CNBM International's Alibaba.com Storefront, accessed at: http://cnbm.en.alibaba.com/ (Dep. Ex. 44-1(J))

184      CNBM International Engineering Co., Ltd.'s Alibaba.com Storefront, accessed at: http://cnbmengineering.en.alibaba.com/ (Dep. Ex. 44-1(K))

xviii

185      Alibaba Group Holding's Description of Alibaba.com on "Our Businesses" site of their webpage, accessed at: http://www.alibabagroup.com/en/about/businesses

186      Income Statement for the 12 Periods Ended 12/31/2014 of Jushi USA Fiberglass Co., Ltd. [J-USA-0002461.0001-2461.00002] (TANG Dep. Ex. 28)

187      2/12/2015-3/2/2015 email from Ellie Shen to Alan Gardiner [J-USA-0002643.0001-2643.00003] (TANG Dep. Ex. 3)

188      7/22-24/2014 email from Howard Yan to Maybal Wong [J-USA-0000661.00001-661.00004] (TANG Dep. Ex. 18)

189      2014 Renewal Pricing and Loan Condition with Cathay Bank [J-USA-0000281] (TANG Dep. Ex. 22)

190      "Shareholding Disclosures of CNBM" for Contempt Period - Printout from Hong Kong Stock Exchange website, available at: http://sdinotice.hkex.com.hk/di/NSAllFormList.aspx?sa2=an&sid=50000259&corpn=China+National+Building+Material+Co.+Ltd.+-+H+Shares&sd=22/07/2014&ed=31/03/2015&sa1=cl&scsd=17%2f07%2f2014&sced=31%2f03%2f2015&sc=3323&src=MAIN&lang=EN&   (Keyes Dep. Ex. 28)

191      1/28/2014 Letter from Tony Liebo to Ken Kao re: CNBM Forest (Canada)'s new Account [CNBMFP00005011] (Dep. Ex. 465)

192      List of CNBM USA Bank Accounts [Translation of CNBMUSA00002341-2342] (Dep. Ex. 576)

193      10/30/2012 Director Resolution [SUNTECH00001656] (Dep. Ex. 445)

194      10/30/2015 Letter from the Embassy of the People's Republic of China to the U.S. Department of State [Rec. Doc. No. 19965-1].

**SUBSTITUTED MEMORANDUM OF LAW IN SUPPORT OF MOTION OF PLAINTIFF-INTERVENORS AND THE PLAINTIFFS' STEERING COMMITTEE TO ENFORCE THE COURT'S JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION[3]**

## I.  INTRODUCTION

More than 4,000 families living primarily in the Gulf Coast states of Louisiana, Florida, Alabama, Mississippi, and Texas, as well as in Virginia and elsewhere, suffered extensive damages as a result of defective Chinese Drywall manufactured by Taishan Gypsum Co. Ltd. ("Taishan") and/or its wholly-owned subsidiary and alter ego Tai'an Taishan Plasterboard Co., Ltd. ("TTP"), installed in their homes and properties.  In many cases, these were individuals who needed the drywall to rebuild their homes following the devastation of Hurricanes Katrina and Rita in 2005.  These families and individuals have been patiently awaiting redress since then.

Sadly, many of these "Taishan Plaintiffs" have been displaced from their homes while awaiting relief, incurring tremendous expense for alternative housing, and, unable to afford the significant costs required to remediate their properties, have undergone foreclosure or been forced to declare bankruptcy.  For those Taishan Plaintiffs remaining in their contaminated properties, their horrendous plight is made more intolerable because they have had to witness that many of their neighbors – who happen to have had Knauf Chinese Drywall installed in their homes – realized justice.  *In contrast to the actions* of the obstinate Chinese Taishan Defendants, the German Knauf Defendants honorably stepped up to the plate and established an uncapped settlement fund valued in excess of $1 billion to provide Knauf homeowners with complete

---

[3] Attached hereto as Exhibit "A" in support of the Substituted Motion of the Plaintiff-Intervenors and the Plaintiffs' Steering Committee's to Enforce the Court's July 17, 2014 Contempt Order and Injunction is the Affidavit of Russ M. Herman dated 2/10/2016, with Exhibits that are referred to herein as [CONTEMPT Ex. __].

remediation relief and other benefits.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 2013 WL 499474 (E.D. La. Feb. 7, 2013).

In pursuing the claims of these Taishan Plaintiffs, the Plaintiffs' Steering Committee ("PSC") has expended great effort and hundreds of thousands of dollars in litigation costs to execute service of complaints (pursuant to the Hague Convention) against Taishan, TTP, and their related entities.  Through further effort and expense, Plaintiff-Intervenors in the *Germano* case obtained a money judgment of $2,609,129.99 against Taishan in May 2010, based upon the results of evidentiary default proceedings [Rec. Doc. No. 2380].  Only after the default proceedings did Taishan appear to contest personal jurisdiction at the trial court level[4] and on appeal,[5] all the while using precious judicial resources.  Then, Taishan fired its counsel "immediately" upon affirmation of personal jurisdiction as to Taishan and TTP by the U.S. Fifth Circuit Court of Appeals, and in the meantime "discuss[ed] *how* to withdraw from the litigation internally" on June 22, 2014.[6]

---

[4] This required a significant commitment from the Court and its staff to oversee extensive jurisdictional discovery of Taishan and TTP, entailing months of depositions of numerous witnesses located on several continents.  Taishan's lack of forthrightness required the filing and adjudication of numerous motions to compel and for sanctions against Taishan.  Ultimately, due to conflicts between the parties' interpreters at the foreign depositions, the Court ordered that a second round of depositions of Taishan's witnesses would take place in Hong Kong under the Court's first-hand supervision, using a single court-appointed translator, to oversee witnesses bent on exaggeration and deception.  After extensive briefing, compilation of a monumental record, and an all-day evidentiary hearing in June, 2012, which was coordinated with related State-court proceedings, the Court determined in an epic 142-page opinion that Taishan and TTP were alter-egos subject to the Court's jurisdiction.  *See In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 834, 865, 892, 903 (E.D. La. 2012).

[5] Taishan filed four separate appeals of the Court's jurisdictional rulings.  The record on appeal in *Germano* alone contained more than 16,000 pages.  Two different appellate panels, along with the Court's staff, invested significant resources and energy affirming this Court's jurisdictional analysis and conclusions.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

[6] Rec. Doc. No. 18196 at 7 (*citing* Privilege Log Item 143).

Taishan and TTP have an extensive history in this litigation of using our judicial system in an effort to avoid having to pay money judgments awarded to homeowners as compensation for their defective products sold in the U.S., but walking away from the Court – "tak[ing] their ball and go[ing] home, so to speak" – "because they didn't get their way."[7]  As the Plaintiffs learned through discovery, the decision for Taishan "not to continue to participate in any of the gypsum board litigation brought against Taishan Gypsum in the US courts" was made and approved (via 11-0 vote) by China National Building Material Group Corporation's ("CNBM Group") board of directors in a July 11, 2014 meeting.[8]  As a result, Taishan Gypsum was a 'no show' at the July 17, 2014 Judgment Debtor Examination before this Honorable Court.

With few options left, on July 17, 2014, this Court entered an Order holding Defendant-Judgment Debtor Taishan in contempt of court, both criminally and civilly, for its refusal to appear in open court.   [Rec. Doc. No. 17869] ("Contempt Order" and/or "Injunction"). Taishan's Counsel confirmed that this Defendant had received actual notice of the Court's June 20, 2014 Order requiring Taishan to appear for this examination pursuant to Fed. R. Civ. P. 69(a) and La. Code Civ. Proc. Ann. art. 2451 [Rec. Doc. No. 17846], and that the Defendant nonetheless *refused* to appear and further participate in these proceedings.[9]  It was clear to the Court that the implications of Taishan's actions extended beyond the individual Plaintiffs seeking to discover Defendant's assets, and even beyond the multi-district litigation itself; for

---

[7] Transcript of MDL Status Conference, 1/22/2015 [Rec. Doc. No. 18276] [CONTEMPT EX. 1] at 20.

[8] *See* Statement on Implementing the Requirements from the Group Corporation's Meeting of the International Business Risk Prevention [CONTEMPT EX. 2].

[9] Rec. Doc. No. 17869 at 2 (*citing* statements by Taishan's Counsel in open court and in a brief filed with the Court [Rec. Doc. No. 17846]) (emphasis in original).

3

such flagrant "[d]isobedience of the Court's order harms both the many other parties in this case and the decorum of the Court."[10]

The Court imposed both monetary and injunctive sanctions for this contempt of judicial authority and, in addition, Taishan *and any of its affiliates or subsidiaries* were enjoined from "conducting any business in the United States until or unless it participate[d] in this judicial process." *Id*. Under the terms of the Contempt Order, any violation of the injunction would trigger "a further penalty of **25%** of the profits earned by the company or its affiliates who violate the order, for the year of the violation."[11] The Court entered the Injunction out of a very real concern that "if [the Court] merely held Taishan in contempt and required Taishan to pay damages, the Contempt Order alone would not stop Taishan from continuing to disregard the orders of the Court."[12]

If not for this Court's entry of the Contempt Order and Injunction, Taishan might never have reentered these proceedings, and Taishan's parent companies—CNBM Group, China National Building Material Co., Ltd. ("CNBM"), Beijing New Building Material (Group) Co., Ltd. ("BNBM Group"), and Beijing New Building Materials Public Limited Company ("BNBM")—might never have entered the litigation in the first place, leaving thousands of Taishan homeowners without redress. The CNBM and BNBM Entities and Taishan have deliberately and repeatedly ignored this Court's orders, because, in their view, there is no

---

[10] *Id.*

[11] *Id.*

[12] Rec. Doc. No. 19392 (Order and Reasons as to CNBM Entities' Motion to Clarify) at 3.

jurisdiction over them and the Court's orders are not enforceable in China.[13]   In fact, to ensure

their assets and funds were out of this Court's reach, orders were handed down by CNBM Group

to all subsidiaries advising them not to put money in any New York banks and not to use

company email accounts but rather only their personal emails when communicating overseas for

business purposes.[14]

It is imperative, therefore, that the resulting sanctions for what the Court found to be

Taishan's "direct contemptuous act" in this MDL, as well as an "affront to the Court's dignity,"[15]

and the penalties for violations of the Court's injunction now be made fully and effectively

enforceable by further Order of this Court.   Further, the enforcement of the Contempt Order is

also necessary to keep these Defendants in the litigation. As the Court has previously noted,

"[t]he Court retains jurisdiction to take any action necessary to enforce its contempt order, and

any other order discussed herein."[16]

Accordingly, through their Motion to Enforce the Contempt Order and Injunction, the

PSC and the Plaintiff-Intervenors are seeking an Order (1) identifying the "affiliates" and

---

[13] *See* 7/18/2014 CNBM Voluntary Announcement on Development of Gypsum Board Litigation in the US ("7/18/14 CNBM Announcement") [CONTEMPT EX. 3]; *see* 7/18/2014 BNBM Voluntary Announcement on Development of Gypsum Board Litigation in the US ("7/18/14 BNBM Announcement") [CONTEMPT EX. 4].

[14] *See* 7/11/2014 CNBM Group Resolution No. 17 of the Third Session of the Board of Directors of CNBM Group ("CNBM Group Resolution No. 17") [CONTEMPT EX. 5].

[15] Rec. Doc. No. 17869 at 2-3.

[16] Rec. Doc. No. 18493 at 3. As the facts of this case have demonstrated, the Taishan Defendants' litigation strategy has been orchestrated from the highest levels of CNBM Group.  The PSC is concerned that just as Taishan absented itself from the litigation, the BNBM and CNBM Entities, who were involved in the decision to have Taishan not appear at the Judgment Debtor Hearing, may adopt the same strategy. To avoid such an ill-considered consequence and to protect the interests and rights of the Plaintiffs, who have suffered for years with the calamity of the Taishan Defendants' defective products, an appropriate measure of security may need to be imposed to insure compliance with the Contempt Order.

"subsidiaries" of Taishan subject to the Court's July 17, 2014 Injunction prohibiting them from conducting any business in the United States for the period of Taishan's contempt (collectively, the "Taishan Affiliates and Subsidiaries"); (2) finding that the Taishan Affiliates and Subsidiaries identified herein violated the Court's Injunction; (3) setting a hearing to determine the penalty owed by Taishan and/or the Taishan Affiliates and Subsidiaries; and (4) awarding appropriate attorney's fees and costs associated with PSC's efforts undertaken in pursuit of enforcement of the Contempt Order and Injunction.

## II.  STATEMENT OF FACTS AND PROCEDURAL HISTORY

The PSC was appointed by this MDL Court in July, 2009, to represent all owners alleging damages resulting from the installation of Chinese-manufactured drywall ("Chinese Drywall") in their properties [Rec. Doc. No. 144-2].  Certain homeowners intervened in the above-captioned *Germano* class proceedings to pursue claims against Taishan as the manufacturer of the Chinese Drywall installed in their homes.  Plaintiff-Intervenors are Deborah and William Morgan; Jerry and Inez Baldwin; Joe and Cathy Leach; Robert and Lisa Orlando; Fred and Vanessa Michaux; Preston and Rachel McKellar; and Steven and Elizabeth Heischober.[17]

Rather than answer the claims filed against it, Taishan initially chose to ignore these proceedings for over a year and allowed multiple default judgments to be entered, not only in *Germano* [Rec. Doc. No. 487], but also in other purported class actions in this MDL, including *Mitchell*[18] and *Gross*.[19]  Like Taishan, its parent companies CNBM Group, CNBM,, BNBM

_____

[17] *See* Rec. Doc. No. 641.

[18] *The Mitchell Co., Inc. v. Knauf Gips KG, et al.*, Case No. 09-4115 (E.D. La.) [Rec. Doc. No. 277].

Group and BNBM, ignored complaints properly served through the Hague Convention and also allowed multiple default judgments to be entered against them.[20]

In February 2010, an evidentiary hearing on the default judgment in *Germano* against Taishan in default was conducted, establishing both a protocol for the remediation of the Plaintiff-Intervenors' properties and the appropriate measure of remediation damages per square foot.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 706 F. Supp. 2d 655 (E.D. La. 2010), *mot. to vacate denied*, 894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).  Thereafter, in an obvious effort to avoid having to satisfy the Plaintiff-Intervenors' $2.7 million judgment against Taishan in *Germano*, and limit its potential exposure for the class-wide damages caused by its defective Chinese Drywall, Taishan entered an appearance through counsel in the litigation the day before the period for an appeal of the *Germano* judgment expired [Rec. Doc. No. 3668].  Taishan then quickly filed an appeal to the Fifth Circuit to vacate the judgment [Rec. Doc. No. 3670; 5th Cir. Dkt. 10-30568].  In this appeal, the Defendant-Judgment Debtor argued, for the first time, that this Court lacked personal jurisdiction over it.

After the Fifth Circuit directed that a proper record be established for purposes of Taishan's post-judgment jurisdictional challenge, this Court invested significant judicial resources to oversee extensive jurisdictional discovery.  At issue were the nature and scope of both Taishan's and TTP's sales of more than $8.5 million of their defective Chinese Drywall in the United States.  The needed discovery entailed months of depositions of numerous witnesses

---

[19] *Gross v. Knauf Gips KG, et al.*, 2:09-cv-06690 (E.D. La.) [Rec. Doc. No. 7302].

[20] *See* Rec. Doc. Nos. 487, 3013, 17814, 17815 (Taishan defaults); *see also* Rec. Doc. Nos. 17814, 17815 (TTP defaults); *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 2014 WL 4809520, *2-*3 (E.D. La. Sept. 26, 2014) ("FOFCOL") (discussing default judgments against Taishan and its Affiliates and including chart of cases where these entities have been held in default).

located on several continents.  Numerous motions to compel, motions for sanctions and motions for protective orders were filed, briefed and argued.  Ultimately, due to conflicts between the parties' interpreters at the foreign depositions, the Court ordered that a second round of depositions of Taishan's witnesses would take place in Hong Kong under the Court's first-hand supervision, using a single Court-appointed translator.  That an MDL Judge found it necessary to travel to Hong Kong to personally supervise these depositions and rule on objections was extraordinary and no doubt unprecedented, but proved essential to establish the record required by Taishan's jurisdictional challenges.[21]  Taishan, in effect, fully invoked the privilege of being a litigant in the U.S. judicial system, and the system responded.

Taishan then pursued its motions to dismiss for lack of personal jurisdiction and motions to vacate the default judgments in *Germano* and *Mitchell*.[22]  Taishan and TTP also filed separate Rule 12(b)(2) motions in *Gross* and *Wiltz*.[23]  After extensive briefing and an evidentiary hearing in June, 2012, which was coordinated with related State-court proceedings in Florida,[24] the Court determined in a 142-page opinion that Taishan and TTP were alter-egos of one another and both were subject to the jurisdiction of this Court.  *Chinese Drywall*, 894 F. Supp. 2d 819.  Unwilling to capitulate, and further availing itself of the remedies and protections of our judicial system, Taishan filed four separate appeals of the Court's rulings to the Fifth Circuit.  The Court of

---

[21] *See* Transcript of Proceedings, 7/17/2014 [CONTEMPT Ex. 6] at 26.

[22] Rec. Doc. Nos. 13490, 13566.

[23] *Wiltz v. Beijing New Building Materials Public Ltd. Co., et al.*, Case No. 10-361 (E.D. La.) [Rec. Doc. Nos. 13590, 13591].

[24] *Lennar Homes, LLC v. Knauf GIPS, KG*, Case No. 09-07901, 2012 WL 3800187 (11th Jud. Cir. Ct. Miami-Dade Cty. Fla. Aug. 31, 2012) (Hon. Joseph P. Farina) [Rec. Doc. No. 15737], *aff'd, Taishan Gypsum Co., Ltd. v. Lennar Homes, LLC*, 123 So. 3d 637 (Fla. App. 2013) (per curiam).

Appeals affirmed this Court's jurisdictional analysis and conclusions.  *See Chinese Drywall*, 742 F.3d 576; *Chinese Drywall*, 753 F.3d 521.  The time for filing a Supreme Court petition for a writ of certiorari was allowed to expire, so that jurisdiction over these foreign Defendants is now established as the law of the case.

Having spent more than four years successfully litigating Taishan's jurisdictional challenges, the Plaintiff-Intervenors took the necessary action to recover the damages to which they were entitled from their final judgment in *Germano*:  they moved this Court for an Order to allow a judgment debtor examination of Taishan.[25] That Order was entered, and the date for the examination, and production of certain documents, was set.  Counsel appeared in open court at the time and on the date ordered by the Court.  Taishan did not.  Instead, despite having been notified of the Order to do so, it *refused* to appear in open court.  This prompted the Court to enter the Contempt Order and Injunction and summarily punish Taishan "to protect the sanctity of its decrees and the legal process."[26]

After this Court presided over and adjudicated Taishan's multiple challenges to the exercise of personal jurisdiction over it, after the exhaustion of multiple appeals by Taishan to the Fifth Circuit on the issue of jurisdiction, and after the Court ordered Taishan to appear for a judgment debtor examination, the Defendant blatantly *refused* to appear before this Court, fired its U.S. national and local counsel, and effectively declared its intention to no longer participate in these proceedings. It was that decision to cease active participation in this MDL that prompted

---

[25] Rec. Doc. No. 17760 (6/16/2014 PSC's Mot. to Examine J. Debtor).

[26] Contempt Order and Injunction at 3.

9

this Court's entry of the July 17, 2014 Contempt Order (Rec. Doc. No. 17869). The Order mandated:

> As a consequence of Taishan's refusal to appear at this Judgment Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order, the Court holds Taishan in contempt of court, both criminally and civilly. This refusal to appear is a direct contemptuous act occurring in open court after actual notice of the proceedings. Such disobedience of the Court's order harms both the many other parties in this case and the decorum of the Court… In this massive suit, the harm from Taishan's noncompliance is high and requires strong sanctions to coerce compliance and restore integrity to these proceedings. . .[27]

In addition to the monetary fines imposed ($15,000 in attorneys' fees and $40,000 as a contempt penalty), the Court enjoined Taishan and any of its affiliates or subsidiaries from conducting any business in the United States "until or unless it participate[d] in this judicial process."[28] If Taishan violated the injunction, it would be required to pay a penalty of 25% of the profits earned by the company "or its affiliates who violate[d] the order, for the year of the violation."[29]

Just one day after this Court entered its Contempt Order and Injunction, CNBM and BNBM publicly announced to their shareholders and the world that Taishan "decided not to continue to participate in any of the gypsum board litigation brought against Taishan Gypsum in the US courts" because "Taishan Gypsum does not agree that the US courts have jurisdiction."[30]

One month later, on August 20, 2014, while still refusing to enter their appearances in the litigation, CNBM and BNBM announced that "as a result of the refusal of Taishan Gypsum

---

[27] *Id.*

[28] *Id.*

[29] *Id.*

[30] 7/18/14 CNBM Announcement at 1.

Company Limited . . . to participate in a recent Judgment Debtor Examination held in the United States District Court of Eastern District of Louisiana . . . the US District Court held Taishan Gypsum in contempt of court, ordering it to pay certain amounts of penalty and the plaintiffs' attorney's fees, enjoining Taishan Gypsum and its affiliates or subsidiaries from conducting any business in the United States"[31] The Contempt Order was a reveille call to the Taishan Defendants.

On September 26, 2014, this Court held that "CNBM, CNBM Group, BNBM, and BNBM Group are affiliates of Taishan."[32]

Seven months after entry of the Contempt Order, Taishan's defaulted parent company BNBM suddenly appeared in the litigation on February 12, 2015.[33] The CNBM Entities and BNBM Group followed BNBM's lead and entered the litigation for the first time later in February and March 2015.[34]

Taishan re-entered the litigation on February 17, 2015.[35] Taishan eventually paid the *Germano* judgment plus penalties and attorneys' fees ordered by the Court.[36]

---

[31] 8/20/2014 CNBM Voluntary Announcement: Updates on Recent Development in the Gypsum Board Litigation in the US ("8/20/14 CNBM Announcement") [CONTEMPT Ex. 7] at 1.

[32] FOFCOL at *6, ¶ 28.

[33] *See* Rec. Doc. No. 18331.

[34] *See* Rec. Doc. No. 18428 (3/4/2015 BNBM Group Notice of Appearance: Dentons US LLP and Phelps Dunbar); *see also* Rec. Doc. No. 18444 (3/9/2015 CNBM Group and CNBM Notice of Appearance: Orrick, Herrington & Sutcliffe).

[35] *See* Rec. Doc. No. 18352 (2/17/2015 Taishan Notice of Appearance: B. Taylor, M. Kenney, and C. Dawson).

[36] *See* Rec. Doc. No. 18448.  *See also* 3/2015 Wire Transfers [CONTEMPT Ex. 8].

The Court ordered CNBM, CNBM Group, BNBM Group, BNBM, and Taishan to participate in expedited discovery relating to "the relationship between Taishan and BNBM/CNBM, including whether affiliate and/or alter ego status exists," since "neither Taishan nor BNBM/CNBM have demonstrated compliance with the injunction prong of the contempt order."[37]   The Court could not, at that time, without the benefit of such discovery, determine whether Taishan or any of its affiliates or subsidiaries had violated the Contempt Order and Injunction and were subject to the penalty of 25% profits during the Contempt Period.[38] The Court warned Defendants that "[i]f Taishan and/or BNBM/CNBM do not participate in discovery, the Court will act accordingly to ensure compliance with this and any Court order. The Court may, for example, strike defenses asserted by Taishan and BNBM/CNBM."[39]

On April 24, 2015, the Court explained to all parties that: "there are two tracks of these proceedings regarding which the Court has ordered the parties to focus discovery: (1) the Court's July 17, 2015 contempt order; and (2) class damages. For the former, the parties must focus the present discovery on (a) which, if any, entities constitute 'affiliates,' and (b) whether any such affiliate(s) conducted any business in the United States subsequent to the Court's July 17, 2015 order. For the latter, the parties must focus discovery on class damages."[40]

---

[37] Rec. Doc. No. 18493 (Minute Entry and Orders re PSC's Mot. to Preclude Taishan and Affiliates from Participation in Class Damages Proceeding) at 2.

[38] *Id.*

[39] *Id.* at 3.

[40] Rec. Doc. No. 18757 (4/24/2015 Status Conference Minute Entry) at 2.  Although the CNBM and BNBM Entities participated in alter ego/single business enterprise/class damages discovery related to Taishan's drywall installed in Plaintiffs' homes, the issue of class damages for the drywall manufactured by BNBM and exported to the U.S. by BNBM Group (both defaulted parties), which was installed in Plaintiffs' properties, has been left open.  Class liability for the BNBM drywall, as alleged in class complaints against these Defendants, will be addressed following adjudication of the BNBM Rule 12

Pursuant to the Court's directives, the PSC immediately served expedited deposition notices and document requests on Defendants, purported Taishan affiliates, and third-parties related to contempt violations in addition to alter ego issues. The PSC deposed the following Defendants and individuals related to said Defendants: Taishan (June 2-4, 2015), CNBM (June 5-7, 2015), CNBM Group (June 16-18, 2015), BNBM (July 8-11, 2015), BNBM Group (July 15-18, 2015); CAO Jianglin[41] (August 4-5, 2015); WANG Bing[42] (August 25-27, 2015); SONG Zhiping[43] (September 14-15, 2015); PENG Shou[44] (September 16, 2015); JIA Tongchun[45] (September 17-18, 2015);[46] United Suntech Craft, Inc. ("United Suntech") (October 27, 2015); CNBM Forest Products (Canada) Co., Ltd. ("CNBM Forest (Canada)") (October 28, 2015); CNBM USA (November 3, 2015); China National Building Material Group Import & Export

---

motions to dismiss for lack of personal jurisdiction.  This was the same procedure employed by the Court with respect to the Taishan drywall in *Germano*, *Mitchell*, *Gross*, and *Wiltz*.

[41] Mr. CAO is Chairman of the Supervisory Committee of BNBM PLC, President and Executive Director of CNBM, Chairman of the Supervisory Committee of BNBM Group, and General Manager and Director of CNBM Group. *See* FRE 1006 Summary Chart of Taishan, BNBM, CNBM Officers and Directors and Supporting Documentation ("Summary Chart of Officers and Directors") [CONTEMPT Ex. 9] at 2 and Exhibit 5 thereto.

[42] Mr. WANG is Chairman and Director of BNBM PLC, Director of Taishan since 2005, and Vice President of CNBM. *See* Summary Chart of Officers and Directors at 3 and Exhibits 4, 9 & 10 thereto.

[43] Mr. SONG is Chairman and Executive Director of CNBM, and Chairman of BNBM Group and CNBM Group.  *See* Summary Chart of Officers and Directors at 1 and Exhibit 1 thereto.

[44] Mr. PENG Shou is the Vice President and Executive Director of CNBM, and President and Chairman of China Triumph International Engineering, Co. *See* Summary Chart of Officers and Directors at 12 and Exhibits 5 & 30 thereto.

[45] JIA is Chairman and General Manager of Taishan. *See* Summary Chart of Officers and Directors at 3.

[46] Several members of the PSC were forced to travel to Hong Kong to take the Depositions of SONG Zhiping, PENG Shou, and JIA Tongchun, as none could be produced in the United States for various reasons.

Company ("CNBM Import & Export") (November 4, 2015); PENG Wenlong[47] (November 12-14, 2015); Jushi USA Fiberglass Co., Ltd. ("Jushi USA") (November 17, 2015); and HU Jinyu[48] (December 7, 2015).

Additionally, pursuant to the Court's orders, the PSC undertook discovery of numerous third-parties to determine whether any Defendant and/or Taishan affiliate violated the Contempt Order and Injunction. The PSC served subpoenas and notices of deposition on Plum Creek Timber Co., Inc. ("Plum Creek"), New Jersey Institute of Technology ("NJIT"), Sunpin Solar Development, LLC ("Sunpin"), Walmart Stores, Inc. ("Walmart"), Hampton Affiliates (Trans-Pacific Trading U.S.) and Hampton Investment Company (collectively, "Hampton Affiliates"), Westerlund Log Handlers, LLC ("Westerlund"), Murphy Overseas USA Astoria Forest Products ("Murphy"), CTIEC-TECO American Technology, Inc. ("ATI"), Hull Forest Products, Inc. ("Hull FP"), WH International, Inc. ("WH Int'l"), Steven J. Zika ("Zika"), Western Wood Lumber Co. ("Western Wood"), Baillie Lumber Co. ("Baillie"), JP Morgan Chase & Co. ("JP Morgan"), Morgan Stanley, International Business Machines, Corp. ("IBM"), BNK International, Inc., LLC ("BNK Int'l"), Jeffrey J. Chang, Great Western Building Materials ("Great Western"), Baoan International Investment Co., Ltd. ("Baoan"), EAC & Son's Corporation ("EAC"), Davis Construction Supply, LLC ("Davis Construction"), Triorient Trading, Inc. ("Triorient"), PABCO Building Products, LLC (d/b/a Pabco Gypsum) ("PABCO"),

---

[47] PENG Wenlong was the manager of Taishan's foreign trade department until March 2014; from March 2014 until early 2015, PENG Wenlong acted as a consultant to Taishan regarding this litigation. *See* Deposition of JIA Tongchun dated 9/17-18/2015 ("JIA Dep.") [CONTEMPT Ex. 10] at 86:14-22, 112:10-13.

[48] HU is the supervisor of BNBM and General Manager of the Audit Department of CNBM. *See* Summary Chart of Officers and Directors at 11 and Exhibits 11, 18, 24, 27, 28 & 36 thereto.

and Stepan Company ("Stepan").  As the transcripts reflect, Taishan, BNBM, BNBM Group, CNBM, and/or CNBM Group attended all third-party contempt depositions and received all documents resulting from that discovery.[49]

On July 9, 2015, **357 days** after this Court entered the July 17, 2014 Contempt Order and Injunction, the CNBM Entities (joined by the BNBM Entities) filed a motion to "clarify" or "vacate" the Order as it applied to them.[50] At the time the motion was filed, the contempt/alter ego discovery had not yet been completed. The CNBM and BNBM entities argued that the contempt order was inapplicable to them because the Court's motivation in entering the Order and imposition of sanctions was solely Taishan's inaction. They further argued that the Order was impermissibly vague and overbroad to the extent it purported to apply to them in that it neither defined "affiliate" nor specified the enjoined conduct.[51]  This Court denied Defendants' motion to vacate on August 17, 2015 (Rec. Doc. No. 19392). The Defendants thereafter appealed the Court's decision to the United States Court of Appeals for the Fifth Circuit.[52]  On October 15, 2015, the PSC filed a Motion to Dismiss the Taishan Defendants' appeal for lack of jurisdiction, as the Court's Order did not constitute a final, appealable ruling.[53]  On November

---

[49] *See generally*, Attorney Appearance Page on all Third Party Deposition Transcripts.

[50] *See* Rec. Doc. No. 19271 (CNBM Entities Mot. To Clarify); *see also* Rec. Doc. No. 19294 (BNBM Entities Mot. For Joinder in the CNBM Entities Mot. To Clarify).

[51] *See id.* The CNBM and BNBM Entities also argued that the Court lacked jurisdiction over them, and as such, the Contempt Order and Injunction was unenforceable and inapplicable as to those Defendants.

[52] *See* Rec. Doc. Nos. 19448 (CNBM Entities Not. Of Appeal); 19534 (BNBM Entities Not. Of Appeal).

[53] *See* 10/15/2015 Motion of Appellees to Dismiss Appeals [FILED UNDER SEAL] Dckt. 15-30804 (5th Cir.) [CONTEMPT Ex. 11].

15

17, 2015, a panel of the Fifth Circuit granted the PSC's motion and dismissed the appeals for lack of jurisdiction.[54]

The purpose of the instant Motion to Enforce is to identify the affiliates and subsidiaries of Taishan that were subject to the Court's July 17, 2014 Contempt Order and Injunction, and to determine whether any of those entities conducted business in the United States during the period of Taishan's contempt—July 17, 2014 through March 24, 2015 (the "Contempt Period")—in violation of the Order. As set forth herein, a number of Taishan, BNBM, and CNBM entities listed in Attachment 1 of the Proposed Order submitted herewith and on Exhibit 12 attached hereto have conducted business in the United States during the Contempt Period in direct violation of the injunctive provision of this Court's Contempt Order.

### III.   THE ENTITIES IDENTIFIED IN ATTACHMENT 1 TO THE SUBSTITUTED PROPOSED ORDER ARE TAISHAN AFFILIATES AND/OR SUBSIDIARIES THAT WERE SUBJECT TO THE COURT'S INJUNCTION.

The entities identified in Attachment 1 to the Substituted Proposed Order submitted herewith and on the Chart of Taishan Affiliates and Subsidiaries are Taishan Affiliates and/or subsidiaries, all of which were subject to the Court's Contempt Order and Injunction.  These companies operate as part of the CNBM Business Group, which is a single business enterprise:[55]

_____

[54] *See* Dckt. 15-30804, Rec. Doc. No. 00513275130 (5th Cir.).

[55] *See* Substituted List of Taishan Affiliates Subject to the Court's July 17, 2014 Contempt Order and Injunction (Attachment "1" to the Proposed Order submitted herewith); *see also* Taishan Affiliates and Subsidiaries Chart [CONTEMPT Ex. 12]; FOFCOL; "2/10/2016" Affidavit of Yan Gao ("2/10/16" Yan Gao Aff.") [CONTEMPT Ex. 13]; SASAC's list of State-Owned Entities ("SOE's") from its website [CONTEMPT Ex. 14]; 2/10/2016 Affidavit of Russ M. Herman (attached as Ex. "A" to the Motion to Substitute Memorandum of Law in Support of Motion of Plaintiff-Intervenors and the Plaintiffs' Steering Committee to Enforce the Court's July 17, 2014 Contempt Order and Injunction); The PSC's Omnibus Response in Opposition to Defendants' Motion to Dismiss – Filed Under Seal in its Entirety (1/22/2016) [Rec. Doc. Nos.19995 & 19999].

1.      State-owned Assets Supervision and Administration Commission of the State Council of the People's Republic of China ("SASAC") – controls the "plasterboard" manufacturing, exportation and certification industry.[56] SASAC performs investor's responsibilities, supervises and manages the State-owned assets of the enterprises engaged in drywall production, and exercises extensive control and influence over these entities, including Taishan and its affiliate companies.[57]   SASAC oversees and controls 150 large central SOEs, including CNBM Group.[58]   SASAC owns 100% of CNBM Group,[59] which is the ultimate controller of Taishan by virtue of its direct and indirect holdings in CNBM and BNBM.[60]  This Court has previously held that CNBM Group is a Taishan affiliate, and thus by virtue of its 100% ownership and control, so, too, is SASAC.[61]

2.      CNBM Group – is wholly-owned and controlled by SASAC.[62] Since 2005, this company has had complete control over BNBM Group, by directly and/or indirectly holding

---

[56] FOFCOL, *5 at ¶ 24.

[57] FOFCOL, *5 at ¶ 25; *see also* SASAC Main Functions [CONTEMPT Ex. 15], accessed at: http://en.sasac.gov.cn/n1408028/n1408521/index.html

[58] FOFCOL, *5 at ¶ 26.

[59] *See* 2006 CNBM Global Offering Prospectus ("Global Offering") [CONTEMPT Ex. 16]  at 27; *see also* 2005 BNBM Annual Report [CONTEMPT Ex. 17] at 11; 2006 BNBM Annual Report [CONTEMPT Ex. 18] at 11; 2007 BNBM Annual Report [CONTEMPT Ex. 19] at 11; 2008 BNBM Annual Report [CONTEMPT Ex. 20] at 11; 2009 BNBM Annual Report [CONTEMPT Ex. 21] at 10; 2010 BNBM Annual Report [CONTEMPT Ex. 22]at 9; 2011 BNBM Annual Report [CONTEMPT Ex. 23] at 10; 2012 BNBM Annual Report [CONTEMPT Ex. 24] at 50; 2013 BNBM Annual Report [CONTEMPT Ex. 25] at 54; 2014 BNBM Annual Report [CONTEMPT Ex. 26] at 53.

[60] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[61] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[62] FOFCOL, *5 at ¶ 26; *see also* Global Offering at 27; *see also* 2005 BNBM Annual Report at 11; 2006 BNBM Annual Report at 11; 2007 BNBM Annual Report at 11; 2008 BNBM Annual Report at 11; 2009

100% of BNBM Group's shares.[63] During the period of Taishan's contempt, CNBM Group, through direct and indirect ownership, held 44.10% equity interest in CNBM.[64]   In fact, from 2004 to the present, CNBM Group has remained the controlling shareholder of CNBM through direct and indirect ownership of its total share capital.[65] CNBM Group internally refers to itself as the "Big Group Corporation."  CNBM Group controls CNBM, BNBM Group, BNBM, and Taishan, and is a Taishan affiliate.[66]

      3.    <u>China Cinda Asset Management Co., Ltd.</u> ("Cinda") – is an asset management company established on January 4, 1999 under the laws of the People's Republic of China ("PRC"), which held a 5.25% equity interest in CNBM immediately prior to CNBM's global

---

BNBM Annual Report at 10; 2010 BNBM Annual Report at 9; 2011 BNBM Annual Report at 10; 2012 BNBM Annual Report at 50; 2013 BNBM Annual Report at 54; 2014 BNBM Annual Report at 53. Despite CNBM Group's contention based upon the Declaration of  CAO Jianglin [Rec. Doc. No. 19527-6] that it is wholly owned by the State, without any other indicia, BNBM continues to stand by its Annual Reports (cited above), issued pursuant to the Shenzhen Stock Exchange, that confirm SASAC's 100% ownership of CNBM Group.  Neither of the CNBM Entities or the BNBM Entities have ever sought to alter or correct this record.  Indeed, the BNBM Entities' counsel continues to recognize SASAC's 100% ownership of CNBM Group.  *See* Deposition of Curtis J. Milhaupt dated 2/3/2016 ("Milhaupt Dep.") [CONTEMPT Ex. 27] at 415:21 – 416:5 ("Q. Okay. Well, based on the facts that you saw, all of the materials provided to you by the PSC, can you name me one instance where SASAC, notwithstanding its 100 percent ownership in CNBM Group Corporation, has interfered in the affairs of Taishan, of BNBM PLC, of BNBM Group, of CNBM PLC, or of CNBM Group?").

[63] *See* Deposition of BNBM Group (ZHAO Yanming) dated 7/15-17/2015 ("ZHAO Dep.") [CONTEMPT Ex. 28] at 385:4-24 (Q: "This document refers to the 'big group corporation.' Do you know which corporation that is?" A: "CNBM Group."); *see also id.* at 386:1-9; 406:6-15.

[64] *See* Global Offering at 27; *see also* English Translation of CNBM Group's Member Enterprise Description ("CNBM Group's Member Enterprise Description") [CONTEMPT Ex. 29]; *see also* 2014 CNBM Annual Report [CONTEMPT Ex. 30] at 61.  CNBM Group's Chairman SONG Zhiping publicly proclaimed "…the Group's [CNBM and its subsidiaries] consolidated revenue amounted to RMB 122,011 million for the year of 2014." *Id.* at 3 & 18.

[65] *See* Deposition of CNBM (CHANG Zhangli) dated 6/5-7/2015 ("CHANG Dep.") [CONTEMPT Ex. 31] at 70:14-71:7; *see also* Deposition of SONG Zhiping dated 9/14-15/2015 ("SONG Dep.") [CONTEMPT Ex. 32] at 15:12-17.

[66] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

offering and was one of CNBM's promoters.[67]   As of 2014, and during the contempt period, Cinda directly held 2.56 % equity interest in CNBM.[68]

　　4.   <u>China Building Materials Academy</u> ("Building Materials Academy") – is a research institute established on May 24, 1954 under the laws of the PRC, and is a wholly-owned subsidiary of CNBM Group.[69]   During the contempt period, Building Materials Academy directly held 0.02% equity interest in CNBM and was a promoter of CNBM.[70]  CNBM Group "is deemed to own the shares [of CNBM] directly held by BNBM Group, CNBM Import & Export Company, and Building Materials Academy."[71]  The Court has held that CNBM Group controls Taishan and is a Taishan affiliate.[72]

　　5.   <u>BNBM Group</u> – is a joint stock limited company incorporated on May 30, 1997 under the laws of the PRC, and is a subsidiary of CNBM Group, in which CNBM Group has directly and indirectly held 100% equity interest since 2005.[73]   BNBM Group is the controlling

---

[67] *See* Global Offering at 20; *see also* 2014 CNBM Annual Report at 7 & 12.

[68] *See* 2014 CNBM Annual Report at 12.

[69] *See* Global Offering at p. 19.

[70] *See* Global Offering at 19; *see also* 2014 CNBM Annual Report at 8 & 12; *see also* CNBM Group's Member Enterprise Description; *see also* English Translation of China Building Materials Academy's Member Enterprise Description [CONTEMPT Ex. 33].

[71] *See* 2006 CNBM Annual Report [CONTEMPT Ex. 34] at 45 n.1.

[72] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.  *See* ZHAO Dep.at 385:4-24 (Q: "This document refers to the 'big group corporation.' Do you know which corporation that is?" A: "CNBM Group."); *see also id.* at 386:1-9; 406:6-15.

[73] *See* Global Offering at 18; *see also* 2014 CNBM Annual Report at 6 & 12; *see also* CNBM Group's Member Enterprise Description.

parent of Taishan and a subsidiary of CNBM Group.[74]  CNBM Group controls Taishan and is a

Taishan affiliate.[75]  The Court has held that BNBM Group is a Taishan affiliate.[76]

      6.    <u>CNBM Import & Export</u> – is a wholly-owned subsidiary of CNBM Group.[77]  At

the time of Taishan's Contempt, CNBM Import & Export directly held a 9.06% equity interest in

CNBM and was one of its promoters.[78]  Under the applicable rules and regulations of the Hong

Kong Stock Exchange ("HKSE"), and given the complete direct and/or indirect ownership

interests of CNBM Group in the shareholders of CNBM (*i.e.*, CNBM Import & Export, Building

Materials Academy, and BNBM Group[79]), CNBM Group "is deemed to own the shares directly

held by BNBM Group, CNBM Import & Export, and Building Materials Academy."[80] CNBM

Group is the ultimate controller of Taishan *via* direct and indirect ownership interests and, as

such, is a Taishan affiliate.[81]  Thus, as a wholly-owned subsidiary of CNBM Group, CNBM

Import & Export is also a Taishan affiliate.

---

[74] FOFCOL, *5 at ¶ 26, *6 at ¶ 29, *9 at ¶¶ 50-51.

[75] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[76] FOFCOL, *1 at ¶ 4, *6 at ¶ 28.

[77] *See* Global Offering at 20; *see also* 2014 CNBM Annual Report at 7 & 12; *see also* CNBM Group's Member Enterprise Description; *see also* English Translation of CNBM Import & Export's Subsidiaries and Overseas Companies  ("CNBM I&E's Subsidiaries and Overseas Companies") [CONTEMPT Ex. 35]; *see also* Deposition of CNBM Import & Export (LIHE Wang) dated 11/4/2015 ("LIHE Dep.") [CONTEMPT Ex. 36] at 96:3-5; *see also* CNBM Import & Export Corporate Disclosure Statement (Dkt. 3:14-cv-00746, D. Or.) [CONTEMPT Ex. 37].

[78] See id.

[79] *See* 2006 CNBM Annual Report at 10, 43-45.

[80] *See* 2006 CNBM Annual Report at 45 n.1.

[81] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

7.    <u>CNBM Forest Products, Ltd. ("CNBM Forest Products")</u>[82] – is a wholly-owned subsidiary of CNBM Import & Export,[83] which in turn is a wholly-owned subsidiary of CNBM Group through direct and indirect holdings therein.[84] CNBM Forest Products, as "a core subsidiary of CNBM Group,"[85] was established in November 2007 as a wood department in CNBM Import & Export and was later formally founded in August 2010. CNBM Forest Products has two main lines of business: (1) lumber and (2) logging—both of which mostly originate in the United States, which are then exported to China for re-sale to Chinese customers.[86] CNBM Group is the "ultimate controller" of CNBM Forest Products.[87] CNBM Group controls Taishan and is a Taishan affiliate.[88]  As such, CNBM Forest Products is also a Taishan affiliate.

---

[82] DENG Jianjun, the corporate representative for CNBM Forest (Canada) explained that "CNBM Forest Products Trading, Ltd." and "CNBM Forest Products, Ltd." refer to the same company. Presumptively, the difference in names is a result of Chinese to English translation. *See* Deposition of CNBM Forest (Canada) (DENG Jianjun) dated 10/28/2015 ("DENG Dep.") [CONTEMPT Ex. 38] at 12:23-13:5.

[83]  *See* CNBM Forest (Canada)'s Corporate Disclosure Statement (Dkt. 3:14-cv-00746, D. Or.) [CONTEMPT Ex. 39] *see also* 2013 CNBM Forest Products, Ltd. Auditor's Report ("2013 CNBM Forest Products Audit Rept.") [CONTEMPT Ex. 40] at 4; CNBM Forest Products Articles of Association [CONTEMPT Ex. 41] at 1; Response to Request for Information Regarding CNBM Group ("Response to Request for CNBMG Info.") [CONTEMPT Ex. 42] at 1; DENG Dep. at 51:12-52:13; LIHE Dep. at 34:20-35:4.

[84]  *See* CNBM Import & Export Corporate Disclosure Statement; *see also* CNBM I&E's Subsidiaries and Overseas Companies; 2013 CNBM Forest Products Audit Rept. at 1; DENG Dep. at 56:2-5717.

[85]  *See* Slide Show: CNBM Forest Products Trading, Ltd. [CONTEMPT Ex. 43] at 3; *see also* Response to Request for CNBMG Info. at 1.

[86]  *See also* Response to Request for CNBMG Info. at 1; DENG Dep. at 12:4-15; 53:4-20.

[87]  *See* 2013 CNBM Forest Products Audit Rept. at 1; *see also* Response to Request for CNBMG Info at 1; *see also* DENG Dep. at 57:18-25.

[88] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *9 at ¶¶ 50-51.

8.      CNBM Forest (Canada) – is a subsidiary of CNBM Forest Products[89] that was established in 2011.[90] Like its parent company, CNBM Forest (Canada) is in the business of purchasing, exporting and re-selling lumber and logs, largely originating from North America and in particular, the United States.[91] CNBM Forest (Canada)'s parent company (CNBM Forest Products) is a wholly-owned subsidiary of CNBM Import & Export,[92] which in turn is a wholly-owned subsidiary of CNBM Group through direct and indirect holdings therein.[93]  CNBM Group controls Taishan and is a Taishan affiliate.[94]  Thus, CNBM Forest (Canada) is also a Taishan affiliate.

9.      CNBM International Co., Ltd. ("CNBM International") – is a wholly-owned subsidiary of CNBM Import & Export, which acts as the main trading platform of CNBM Group.[95] CNBM International has subsidiaries and offices in 11 countries worldwide.[96] CNBM Import & Export is a wholly-owned subsidiary of CNBM Group.[97] During the contempt period,

---

[89] *See* CNBM Forest (Canada)'s Corporate Disclosure Statement; *see also* DENG Dep. at 50:25-51:8.

[90] *See also* CNBM Forest (Canada) Certificate of Incorporation [CONTEMPT Ex. 44].

[91] *See* DENG Dep. at 53:4-20.

[92] *See* CNBM Forest (Canada)'s Corporate Disclosure Statement; *see also* DENG Dep. at 51:12-52:13; 2013 CNBM Forest Products Audit Rept. at 1.

[93] *See* CNBM Import & Export Corporate Disclosure Statement; *see also* CNBM I&E's Subsidiaries and Overseas Companies; 2013 CNBM Forest Products Audit Rept. at 1; DENG Dep. at 56:2-5717.

[94] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[95] *See* CNBM International Company Description [CONTEMPT Ex. 45].

[96] *See* CNBM International Basic Situations of Overseas Subsidiary Companies [CONTEMPT Ex. 46].

[97] *See* 2014 Investigation Report on CNBM International [CONTEMPT Ex. 47] at 1.

CNBM Import & Export also held shares both directly and indirectly in CNBM.[98] CNBM Group is the ultimate controller of Taishan *via* direct and indirect ownership interests and, as such, is a Taishan affiliate.[99]

      10.    <u>CNBM USA, Co.</u> ("CNBM USA") – was established in 2006, as the U.S. branch of CNBM Group, and tasked with the mission to distribute CNBM-made products throughout the United States.[100]  In 2011, immediate ownership of CNBM USA was transferred to CNBM International, which shared offices with CNBM Import & Export.[101]  CNBM International is a wholly-owned subsidiary of CNBM Import & Export, which in turn is a wholly-owned subsidiary of CNBM Group.[102] CNBM Import & Export also holds shares both directly and indirectly in CNBM.[103] CNBM is a "Substantial Shareholder" of BNBM and BNBM is a

---

[98] *See* 2014 CNBM Annual Report at 6 & 12.

[99] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[100] *See* CNBM (USA) Corp. Papers Relating to Incorporation from the State of California, Secretary of State [CONTEMPT Ex. 48]; CNBM Group "Contact Us," USA Tab, available at http://www.cnbm.com.cn/EN/c_0000001600050003/ (last accessed February 8, 2016) [CONTEMPT Ex. 49].

[101] Deposition of CNBM USA Corp. (ZHANG Shaojun) dated 11/3/2015 ("ZHANG Dep.") [CONTEMPT Ex. 50] at 18:7-20:7, 63:21-64:20 & 82:9-84:3 (clarifying references to CNBM International); *see id.* at 105:12-106:19; *see, generally*, 4/2/2007 CNBM USA "Building a Mutually Rewarding Partnership" PowerPoint [CONTEMPT Ex. 51]; *see also* Defendant Affiliate/Subsidiary/Parent Manufacturers' Profile Form of China National Building Material & Equipment Import & Export Corp. [CONTEMPT Ex. 52] (listing office addresses for CNBM Import & Export and CNBM International as No. 9 Shouti South Road, Haidan District, Beijing, China).  CNBM USA continues to be listed as the U.S. operation for CNBM International.  *See* CNBM International Corporation "Company Profile" available at http://www.icnbm.com/en/info (last visited January 4, 2016) [CONTEMPT Ex. 53].

[102] *See* Global Offering at 20; *see also* 2014 CNBM Annual Report at 7 & 12; CNBM Group's Member Enterprise Description; CNBM I&E's Subsidiaries and Overseas Companies; LIHE Dep. at 96:3-5.

[103] *See* 2014 CNBM Annual Report at 7 & 12.

"Substantial Shareholder" of Taishan.[104] CNBM Group is the ultimate controller of Taishan <u>via</u> direct and indirect ownership interests and, as such, is a Taishan affiliate.[105]

11.   <u>CNBM</u> – is a joint stock limited company incorporated on March 28, 2005, under the laws of the PRC.  It is a controlling parent of Taishan and, as this Court has previously held, is a Taishan affiliate.[106] From 2005, through the present date, CNBM Group has remained CNBM's controlling shareholder by virtue of its direct and indirect holdings.[107]  CNBM, in turn, is a subsidiary of CNBM Group, in which it held 44.10% equity interest during the period of Taishan's contempt, through direct and indirect ownership of shares.[108]  By virtue of its direct and indirect percentage of ownership in CNBM's total share capital, and its indirect ownership in BNBM's total share capital, CNBM Group presently owns 15.81% of the available equity shares

---

[104] Deposition of Morgan Stanley (Terence Keyes) dated 11/13/2015 ("Keyes Dep.") [CONTEMPT Ex. 54] at 76:1-79:20.  HKSE Rules, Chapter 1, Section 1.01 defines "Substantial Shareholder" as "in relation to a company means a person (including a holder of depository receipts) who is entitled to exercise, or control the exercise of, 10% or more of the voting power at any general meeting of the company…." HKSE Rules, Chapter 1 [CONTEMPT Ex. 55].

[105] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[106] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *9 at ¶¶ 50-51; *see also* Global Offering, 2014 CNBM Annual Report at 20; CNBM Group's Member Enterprise Description.

[107] FOFCOL, *5 at ¶ 26; *see also* Keyes Dep. at 38:20-39:1; 2006 CNBM Annual Report at 10 & 43-45; 2006 BNBM Annual Report at 11; 2007 CNBM Annual Report  [CONTEMPT Ex. 56] at 10 & 43-45; 2007 BNBM Annual Report at 11; 2008 CNBM Annual Report [CONTEMPT Ex. 57] at 11; 2008 BNBM Annual Report at 11; 2009 CNBM Annual Report [CONTEMPT Ex. 58] at 13; 2009 BNBM Annual Report at 8-10; 2010 CNBM Annual Report [CONTEMPT Ex. 59] at 13 & 50; 2010 BNBM Annual Report at 9; 2011 CNBM Annual Report [CONTEMPT Ex. 60] at 12 & 55; 2011 BNBM Annual Report at 10; 2012 CNBM Annual Report [CONTEMPT Ex. 61] at 13 & 60-61; 2013 CNBM Annual Report [CONTEMPT Ex. 62] at 64; SONG Dep. at 15:12-17; 2014 CNBM Annual Report at 61.  CNBM Group's Chairman SONG Zhiping publicly proclaimed, "…the Group's [CNBM and its subsidiaries] consolidated revenue amounted to RMB 122,011 million for the year of 2014."  *Id*. at 3 & 18.

[108] FOFCOL, *5 at ¶ 26.

in Taishan.[109]  Through its direct and indirect holdings, CNBM Group the ultimate controller of

Taishan and, as such, is a Taishan affiliate.[110] CNBM Group also controls Taishan and is also a

Taishan affiliate.[111]

       12.    China Jushi Company, Limited (f/k/a China Fiberglass Co., Ltd.) ("China Jushi")

– is a joint stock limited company incorporated on April 16, 1997, under the laws of the PRC and

listed on the Shanghai Stock Exchange.[112]  CNBM directly holds 33.82% equity interest in China

Jushi, and thus, pursuant to the pertinent listing rules, CNBM is China Jushi's controlling

shareholder.[113]  Cao Jianglin, President and Executive Director of CNBM, also serves as the

Chairman of China Jushi.[114]  China Jushi is the holding company for CNBM's fiberglass

business operations, which operates primarily through its wholly-owned subsidiary Jushi

Group.[115]  In addition to its previous name, China Fiberglass Co., Ltd, China Jushi formerly went

by "China National Chemical Building Material Company Limited."[116]

---

[109] *See* 2015 CNBM Interim Report [CONTEMPT Ex. 63] at 12, 45; *see also* 10/13/2015 CNBM Announcement: Acquisition of Equity Interest in Taishan Gypsum Through Share Issuance of BNBM ("10/13/2015 CNBM Announcement") [CONTEMPT Ex. 76].

[110] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[111] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[112] *See* Global Offering at 19; *see also* Deposition of Jushi USA Fiberglass Co., Ltd. (TANG Hsin Hua) dated 11/18/2015 ("TANG Dep.") [CONTEMPT Ex. 64] at 62:19-20.

[113] *See* 2015 CNBM Interim Report at 12; *see also* TANG Dep. at 61:5-11; LIHE Dep. at 105:3-13.

[114] *See* TANG Dep. at 72:24-74:1.

[115] *See* Global Offering at 87.

[116] *See* 2015 CNBM Interim Report at 12, 45.

13.     <u>Jushi Group, Co., Ltd.</u> ("Jushi Group") – is a limited liability company incorporated on June 28, 2001, under the laws of the PRC.[117] Both presently and during the period of Taishan's contempt, Jushi Group has been a wholly-owned subsidiary of China Jushi.[118]  China Jushi operates its business primarily through this entity.[119]  China Jushi, in turn, is a subsidiary of CNBM, which, during the contempt period, directly held 33.82% of total share capital therein.[120]  CNBM is a controlling parent of Taishan and a Taishan affiliate.[121]  CNBM is a subsidiary of CNBM Group.[122]   CNBM Group also controls Taishan and is a Taishan affiliate.[123]

14.     <u>Jushi USA</u> – is a California company established in 2011, is a supplier of fiberglass reinforcements and fabrics to the reinforced plastics industry in the U.S.[124] Jushi USA is (and during the period of Taishan's contempt was) the wholly-owned subsidiary of Jushi

---

[117] *See* Global Offering at 24.

[118] *See* 2014 CNBM Annual Report at 13.

[119] *See* Global Offering at 87.

[120] *See* 2014 CNBM Annual Report at 13.

[121] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *9 at ¶¶ 50-51.

[122] FOFCOL, *5 at ¶ 26.

[123] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[124] *See* 8/1/2011 Article: Jushi USA is Born," accessed at http://jushiusa.com/content/jushiusaborn [CONTEMPT Ex. 65].

Group, a wholly-owned subsidiary of China Jushi.[125] China Jushi, in turn, is a subsidiary of CNBM, which, during the contempt period, directly held 33.82% of total share capital therein.[126]

15.  <u>China Triumph International Engineering Co., Ltd.</u> ("CTIEC") – is a limited liability company established on December 28, 1991, under the laws of the PRC, and is a subsidiary of CNBM, which directly holds 91% equity interest therein.[127]  CNBM carries out its engineering services through CTIEC, which was formerly known as "China New Building Material Property Development Company."[128]  CTIEC changed the scope of its business to the provision of engineering design and construction services in July of 2000.[129]  CTIEC's controlling shareholder CNBM, is a subsidiary of CNBM Group, in which it directly and indirectly held 44.10% equity interest during the period of Taishan's contempt.[130] CNBM is a controlling parent of Taishan through its controlling interest in BNBM, and thus, is a Taishan affiliate.[131]  CNBM Group also controls Taishan and is a Taishan affiliate.[132]

16.  <u>CTIEC-TECO, American Technology Incorporated</u> ("ATI") – is a joint enterprise formed in 2005 between CTIEC and Toledo Engineering Company, Inc. ("TECO") under the

---

[125] *See* Global Offering at 87.

[126] *See* 2014 CNBM Annual Report at 13.

[127] *See* Global Offering at 20; *see also* 2014 CNBM Annual Report at 12; 2015 CNBM Interim Report at 12.

[128] *See* Global Offering at 88.

[129] *See* Global Offering at 88.

[130] FOFCOL, *5 at ¶ 26.

[131] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *9 at ¶¶ 50-51.

[132] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

laws of the State of Ohio.[133] ATI is located at 3400 Executive Parkway, Toledo, Ohio 43606.[134]

The joint venture, which is 50% owned by each CTIEC and TECO, was formed for the purpose

of marketing, selling, and developing the technology and services of both entities in a mutually

beneficial manner, and to reach a higher level of production technique and technology to the two

companies.[135] Further, ATI's business scope includes marketing and sales of both CTIEC's and

TECO's products and services, along with post-sale services to the glass manufacturing

industry.[136]

       17.    <u>CNBM Investment Co., Ltd (f/k/a BND Co., Ltd.)</u> ("CNBM Investment") – is a

limited liability company incorporated on January 8, 2001 (in the name "BND Co., Limited"),

under the laws of the PRC, and is a wholly-owned subsidiary of CNBM.[137]  CNBM Investment

was jointly financed and established by BNBM, BNBM Group, China National Building

Material and Equipment Import and Export Zhujiang Company, and Shenzhen Zhujiang

Building Material Enterprise Company to operate CNBM's international trading business and

---

[133] *See* Deposition of CTIEC-TECO, American Technology, Inc. (Fred Paulsen) dated 4/24/2015 ("Paulsen Dep.") [CONTEMPT Ex. 66] at 33:14-16; *see also* 3/30/2005 CTIEC-TECO, ATI Joint Venture Agreement ("CTIEC-TECO ATI Joint Venture Agreement") [CONTEMPT Ex. 67].

[134] CTIEC-TECO, ATI Joint Venture Agreement at 2.

[135] CTIEC-TECO, ATI Joint Venture Agreement at 2.

[136] CTIEC-TECO, ATI Joint Venture Agreement at 2.

[137] *See* 2008 CNBM Annual Report at 59 ("Jushi Group, BNS and Huafu Property were associates of a connected person of the Company when the above agreements were entered into on 2 November 2007 as each of Jushi Group, BNS and Huafu Property was owned as to 51%, 95% and 30% respectively by China Fiberglass, which is a substantial shareholder of ***CNBM Investment (originally known as BND Co., Limited), a subsidiary of the [CNBM]***." (emphasis added); *see also* 2014 CNBM Annual Report at 7 & 12.

retail distribution business.[138]   On October 30, 2007, an application for modification was filed to change "BND Co., Ltd." to "CNBM Investment Co., Ltd." and, as part of the modification, its principle business scope became investment in entities, logistics, e-commerce services, domestic commerce, goods, and materials supply and marketing, import and export operations, and real estate development.[139]   CNBM Investment is "the core company for the investment of [CNBM]."[140]   Following several share transfers in the years following CNBM Investment's establishment, in December 2007, BNBM Group and China Jushi transferred their respective equity in the company to CNBM, making the company a wholly-owned subsidiary of CNBM.[141]   Thus, during the contempt period and today, CNBM holds 100% of CNBM Investment's equity,[142] and the actual controller of the company is CNBM Group.[143]   CNBM is a subsidiary of CNBM Group,[144] which in turn, is also the ultimate controller of Taishan and is a Taishan

---

[138] *See* Global Offering at 87; *see also* Notes of 2010 Annual Financial Report of CNBM Investment Co., Ltd. ("CNBM Investment 2010 Fin. Rept.") [CONTEMPT Ex. 68] at 1; *see also* Response to Request for CNBMG Info. at 1.

[139] *See* 11/1/2007 Modification Notice re: Name Change of BND Co., Ltd. to CNBM Investment Co., Ltd. ("Modification Notice") [CONTEMPT Ex. 69] at 1.

[140] *See* "Investment Segment" – CNBM Web Page [CONTEMPT Ex. 70] accessed at: http://www.cnbmltd.com/en/ywbk/fzyw.jsp.

[141] *See* CNBM Investment 2010 Fin. Rept. at 1.

[142] *See* 3/4/2013 Email re: Notice on Registration of Retention of Company's Material Info. ("3/4/13 Email re: Notice on Registration") [CONTEMPT Ex. 71] at 1.

[143] *See id.* at 2.

[144] FOFCOL, *5 at ¶ 26.

affiliate.[145]  By virtue of CNBM being the ultimate controlling parent of Taishan and a Taishan

affiliate,[146] so, too, is CNBM Investment.

18.  <u>United Suntech</u> – is a California corporation that was established in 1995 to

operate as a general importer and distributor and was acquired by CNBM Investment in 2003.[147]

United Suntech functions as CNBM's "overseas subsidiary"[148] as an importer and wholesaler of

building materials and hardware.[149]  United Suntech is the wholly-owned subsidiary of CNBM

Investment, which in turn is the wholly-owned subsidiary of CNBM.[150]  Thus, United Suntech is

considered a "tier-4 subsidiary of [CNBM Group],"[151] in that CNBM Investment is a wholly-

owned subsidiary of CNBM,[152] which in turn is a controlled subsidiary of CNBM Group.[153]

CNBM Group is also the ultimate controller of Taishan and is a Taishan affiliate.[154]

---

[145] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[146] FOFCOL, *1 at ¶ 4, *5 at ¶ 26, *6 at ¶¶ 28-29, *9 at ¶¶ 50-51.

[147] *See* 9/16/2012 Application for Title Registration for United Suntech Craft, Inc. ("9/6/12 United Suntech Application for Title Registration [CONTEMPT Ex. 72].

[148] *See* Deposition of United Suntech Craft (LIU Weishing) dated 10/27/2015 ("LIU Dep.") [CONTEMPT Ex. 73] at 37:21-20 & 55:25-56:2; 57:22-24; *see also* 9/6/12 United Suntech Application for Title Registration.

[149] *See* CNBM Investment 2010 Fin. Rept. at 4.

[150] *See* Global Offering at 87; *see also* CNBM Investment 2010 Fin. Rept. At 1.

[151] *See* 9/16/12 United Suntech Application for Title Registration.

[152] *See* LIU Dep. at 56:3-9.

[153] FOFCOL, *5 at ¶ 26; *see also* LIU Dep. at 56:10-14.

[154] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

19.     <u>CNBMIT, Co., Ltd.</u> ("CNBMIT") – is a wholly-owned subsidiary of CNBM

Investment,[155] whose shares in turn, are held 100% by CNBM, with the actual controller of the

company (*i.e.*, CNBM Investment) being CNBM Group.[156] CNBMIT, "a member of China

National Building Material Group Corporation,"[157] maintains offices in the United States for the

distribution of CNBM building products.[158]   CNBMIT "has *five business sections* including

*import & export agency, import & export*, domestic trade, bulk trade, and warehouse logistics

trade. *Six business departments* in the Company *focus on the import & export*, domestic trade, re-

export and bonded trade of *building materials*, hardware, chemical products, electronic products,

in-flight articles, coal and mineral resources and provide professional trading service such as

financing, customs declaration and clearance, storage and delivery."[159]   From its United States

location, CNBMIT "*promotes Chinese building materials* and machinery and establishes a

distribution network in North America. With a localized professional sales team and matured

sales channels, CNBMI USA has become an important supplier of building materials and

machinery in the USA and North American markets.[160]

_____

[155] *See* 3/4/13 Email re: Notice on Registration at 1.

[156] *See id*. at 2.

[157] *See* CNBMIT "About Us" Tab, available at http://www.cnbmit.com/en/about/index.aspx  (last visited 1/19/2016) [CONTEMPT Ex. 74].

[158]     *See*     CNBMI     USA     tab,     CNBMIT     Co.     webpage,     available     at http://www.cnbmit.com/en/overseas/Detail.aspx?MenuID=050602   (last accessed 1/19/2016) ("With a localized professional sales team and matured sales channels, CNBMI USA has become an important supplier of building materials and machinery in the USA and North American markets.") [CONTEMPT Ex. 75].

[159] *Id*. (emphasis added).

[160] *Id*. (emphasis added).

20. <u>BNBM</u> – is a joint stock limited company incorporated under the laws of the PRC, and a subsidiary of CNBM, in which CNBM held a 52.4% equity interest during the period of Taishan's contempt.[161] From 2005 to present, BNBM has been a controlled subsidiary of CNBM, which in turn is a controlled subsidiary of CNBM Group *via* direct and indirect equity interest.[162]  In fact, in each of BNBM's annual reports from 2005 through 2014, CNBM is defined as BNBM's controlling shareholder, and CNBM Group is defined as its "actual controller."[163]  CNBM operates its lightweight building material business through BNBM, a company whose shares have been listed on the Shenzhen Stock Exchange since 1997.[164]  BNBM is a controlling parent of Taishan, in which it held 65% equity interest during the contempt period.[165]  As of October 13, 2015, however, BNBM is in the process of acquiring the remainder of Taishan's available share capital and as a result, will be the sole shareholder of Taishan.[166]

---

[161] *See* Global Offering 18; *see also* 2014 CNBM Annual Report 6 & 12; *see also* 2014 BNBM Annual Report at 53.

[162] FOFCOL, *5 at ¶ 26; *see also* Keyes Dep. at 38:20-39:1; 2006 CNBM Annual Report at 10 & 43-45; 2006 BNBM Annual Report at 11; 2007 CNBM Annual Report at 10 & 43-45; 2007 BNBM Annual Report at 11; 2008 CNBM Annual Report at 11; 2008 BNBM Annual Report at 11; 2009 CNBM Annual Report at 13; 2009 BNBM Annual Report at 8-10; 2010 CNBM Annual Report at 13 & 50; 2010 BNBM Annual Report at 9; 2011 CNBM Annual Report at 12 & 55; 2011 BNBM Annual Report at 10; 2012 CNBM Annual Report at 13 & 60-61; 2013 CNBM Annual Report at 64; SONG Dep. at 15:12-17; 2014 CNBM Annual Report at 61.  CNBM Group's Chairman SONG Zhiping publicly proclaimed, "...the Group's [CNBM and its subsidiaries] consolidated revenue amounted to RMB 122,011 million for the year of 2014."  SONG Dep. at 3 & 18.

[163] *See* 2005 BNBM Annual Report at 7; 2006 BNBM Annual Report at 10-11; 2007 BNBM Annual Report at 10-11, 104; 2008 BNBM Annual Report at 10-11, 107; 2009 BNBM Annual Report at 9; 2010 BNBM Annual Report at 8; 2011 BNBM Annual Report at 9; 2012 BNBM Annual Report at 46-47; 2013 BNBM Annual Report at 53; 2014 BNBM Annual Report at 52; *see also* SONG Dep. at 124:23-125:18.

[164] *See* Global Offering at 87.

[165] *See* 2014 CNBM Annual Report at 6 & 12.

[166] *See* 10/13/15 CNBM Announcement.

BNBM's parent, CNBM, is a subsidiary of CNBM Group.[167]   CNBM Group also controls Taishan through direct and indirect holdings and is a Taishan affiliate.[168]  This Court has held that BNBM is a Taishan affiliate.[169]

21.   <u>Taishan</u> – is the Defendant Judgment Debtor found in contempt of court.  Taishan is a joint stock limited company and is controlled by BNBM, which in turn is controlled by CNBM, which in turn is controlled by CNBM Group, which is wholly-owned and controlled by SASAC.[170] From 2005 through present (which includes the entire period when Taishan's defective drywall was shipped to the United States), BNBM has been Taishan's controlling shareholder.[171]  As such, Taishan is considered to be controlled by CNBM because Taishan is the subsidiary of another CNBM subsidiary (*i.e.*, BNBM).[172]   As of October 13, 2015, however, Taishan is in the process of being acquired as a wholly-owned subsidiary of BNBM pursuant to a Framework Agreement between BNBM and Taishan's minority shareholders.[173] This Court has held that Taishan's affiliates include: CNBM Group; CNBM; BNBM Group; BNBM; and

---

[167] FOFCOL, *5 at ¶ 26, *6 at ¶ 29, *9 at ¶¶ 50-51.

[168] FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51.

[169] FOFCOL, *1 at ¶ 4, *6 at ¶ 28.

[170] *See* FOFCOL, *5 at ¶¶ 24-26, *6 at ¶¶ 29-32, *7 at ¶ 37, *8 at ¶ 47; s*ee also* CNBM 2006 Global Offering at 31.

[171] *See* CHANG Dep. at 206:11-207:18; 228:15-229:1; *see also* JIA Dep. at 213:4-6; 255:24-256:7.

[172] *See* CHANG Dep. at 206:11-207:18; 228:15-229:1; *see also* JIA Dep. at 213:4-6 255:24-256:7.

[173] *See* 10/13/15 CNBM Announcement.

TTP.[174] <u>TTP</u> – is a wholly-owned subsidiary of Taishan, and its alter ego.[175]  The Court has held

that TTP is an affiliate of Taishan.[176]

### IV.   THE TAISHAN AFFILIATES AND SUBSIDIARIES IDENTIFIED BELOW VIOLATED THE COURT'S JULY 17, 2014 CONTEMPT ORDER AND INJUNCTION.

In its denial of the Defendants' Motion to Vacate the July 17, 2014 Contempt Order at

issue herein, the Court firmly held:

> **The Contempt Order is clear; it clearly applies to Taishan's subsidiaries and affiliates**. If any of Taishan's affiliates or subsidiaries did business in the United States during the contempt period, it will have violated the Injunction and will be required to remit 25% of its earnings during that time. If Taishan did business in the United States during the contempt period, as an alter ego or by means of some common business enterprise, Taishan will be in violation of the Injunction and will be required to remit 25% of its profits. **What is not yet clear is what entities are affiliates and/or alter egos of Taishan.** These terms are not vague; rather, they are legal terms, requiring a legal determination. However, these legal determinations are factually pregnant. **The presence or absence of a subsidiary, affiliate, alter ego, or common business enterprise status or relationship with Taishan is enshrouded in facts**.[177]

As such, contrary to the Defendants' arguments otherwise, the only issue left to be determined

by this Court is "whether [Taishan] or any affiliates or subsidiaries did business in the United

States during the period that Taishan was in contempt."[178]   The PSC's contempt/alter ego

---

[174] FOFCOL, *1 at ¶ 4, *6 at ¶ 28.

[175] *Chinese Drywall*, 894 F. Supp. 2d at 872.

[176] FOFCOL, *1 at ¶ 4.

[177] Rec. Doc. No. 19392 at 4 (emphasis added).

[178] *Id*. at 3.

discovery efforts have uncovered numerous Taishan Affiliates that conducted business in the United States during Taishan's period of contempt, in clear violation of the injunction prong of this Court's July 17, 2014 Order.

    **A.**   **<u>Discovery Has Revealed that the Taishan Defendants Were Aware of this Court's Contempt Order and Injunction but Failed to Provide Notice of Same to Their Affiliates and Subsidiaries.</u>**

As could be expected of the Taishan Defendants in light of their long history in this litigation, willfully and repeatedly disobeying the Court's orders and refusing to acknowledge its exercise of jurisdiction, the CNBM and BNBM Entities, as well as Taishan, defied the Injunction issued by this Court in a calculated manner. There is substantial evidence that the CNBM and BNBM Entities monitored the litigation throughout the course of these proceedings, jointly hired foreign law firms, including Hogan Lovells, and as such, have been aware of the Orders entered by the Court, yet they have deliberately and repeatedly ignored such orders.

Despite their contentions otherwise, there is simply no evidence to demonstrate that although the Taishan Defendants were aware of the Court's July 17, 2014 Contempt Order and Injunction, no affirmative steps were taken to ensure compliance with the Court's directives. In fact, quite the opposite occurred. CNBM Group's only effort to communicate to its subsidiaries about the injunction on conducting business in the U.S. during the period of Taishan's Contempt was in a voluntary public announcement,[179] though the leaders of CNBM Group were neither confused by its meaning nor by its applicability.

Despite his power, as the General Manager of CNBM Group when the Contempt Order and Injunction were issued, to affect conduct of the Taishan affiliates including, but not limited

---

[179] CHANG Dep. at 114:10-17; *see also* 8/20/14 CNBM Announcement at 1-2.

to, CNBM Group, BNBM Group, CNBM, and BNBM,[180] CAO Jianglin admittedly knew of the Contempt Order and Injunction as early as August 2014, yet failed to provide any notice whatsoever of same to any business within the CNBM Group of companies.[181] Indeed, Mr. CAO, the Chairman of both BNBM and BNBM Group's Supervisory Committees, never met with any executives of BNBM or BNBM Group in 2014 to discuss this litigation.[182] Like Mr. CAO, both SONG Zhiping,[183] Chairman of CNBM, BNBM Group and CNBM Group, and WANG Bing,[184] of BNBM were aware of the Contempt Order and Injunction, yet failed to notify a single subsidiary or affiliate as to the conduct enjoined or the repercussions for violating the Order.[185] Neither Chairman SONG nor Mr. WANG provided any notice to or monitored the activities of their companies' affiliates, subsidiaries and/or related companies affected by the order, despite their knowledge as to the risks associated with violating the injunction.[186] These Defendants' calculated and deliberate conduct amounting to willful disobedience of this Court's clear orders

---

[180] CAO Jianglin, as of July 2014, was the Chairman of the Supervisory Committees of BNBM and BNBM Group, President and Executive Director of CNBM, and General Manager and Director of CNBM Group. *See* Summary Chart of Officers and Directors at 2.

[181] CAO Dep. at 44:3-11 and 111:15-2; 44:12-47:9 (no notification given to CNBM Investments a/k/a BND Company, China Jushi, CNBM, CNBM Group, BNBM Group, BNBM PLC, related companies of CNBM, related companies of CNBM Group, related companies of BNBM PLC), 49:2-24 (no notice sent to any companies in which CNBM held stock), and 51:7-10 (no notification given to any companies in which CNBM Group held stock).

[182] Deposition of CAO Jianglin dated 8/4-5/2015 ("CAO Dep.") [CONTEMPT Ex. 77] at 107:10-25.

[183] Chairman SONG is the Chairman and Executive Director of CNBM, and Chairman of CNBM Group and CNBM Group. *See* Summary Chart of Officers and Directors at 1 and Exhibit 1 thereto.

[184] Mr. WANG is the Chairman and a Director of BNBM, Vice President of CNBM, and Director of Taishan. *See* Summary Chart of Officers and Directors at 3 and Exhibits 4, 9 & 10 thereto.

[185] Deposition of WANG Bing, dated 8/25-27/2015 ("WANG Dep.") [CONTEMPT Ex. 78] at 59:13-15; 419:20-420:13; 253:7-22; *see also* SONG Dep. at 32:3-5; 32:15-33:11.

[186] *Id.*

36

enjoining specific conduct is yet another example of their complete and total lack of respect for the authority of this Court.

BNBM Group did not so much as bother to notify its key employees and executives that the inunction should be followed and business dealings in the U.S. should cease. In fact, ZHAO Yanming, Deputy General Manager of BNBM Group, only learned of the Contempt Order in preparing to testify as the corporate witness for the company.[187]

Except for Taishan's Chairman JIA Tongchun instructing his deputy general manager to "pass down the information," there is no question that the Taishan made no effort, whatsoever to take any affirmative steps to ensure compliance with this Court's Order.[188]  While Taishan might contend that Chairman JIA's instructions to notify the company's subsidiaries of the Injunction sufficed as notice sufficient to ensure Taishan subsidiaries complied with the Court's Order, such instruction was meaningless and ineffective as it took place over seven months *after* this Court issued the Contempt Order.[189]

Additional depositions of individual executives of the CNBM/BMBM Entities and Taishan revealed that, consistent with the leaders' complete refusal to provide notice to affected companies despite knowledge of the Order, some had never seen or heard of the Contempt Order until their depositions,[190] others heard of, but had not read or seen, the Contempt Order,[191] and some were aware of and may have discussed the Contempt Order with immediate colleagues.[192]

---

[187] ZHAO Dep. at 208:10-16.

[188] JIA Dep. at 227:24-228:13.

[189] JIA Dep. at 231:1-11.

[190] Deposition of PENG Shou dated 9/16/2015 ("PENG S. Dep.") [CONTEMPT Ex. 79] at 61:13-25.

Ultimately, the Taishan Defendants did nothing to inform the affected companies of their obligations and restraints on business activities under the Contempt Order. The limited awareness of the Contempt Order further stifled any potential for compliance with the Injunction against doing business in the United States during the Contempt Period. Again, these Defendants through their conduct, make clear they do not respect the authority of this Court as they have repeated, time and time again, in public announcements, their unwillingness to participate in the litigation was a calculated, deliberate effort on their part to limit the power of both the Court and the thousands of homeowners ability to reach some sort of resolution of this litigation. The numerous violations of the Contempt Order discussed below are hardly surprising given the Taishan Defendants' *calculated* disobedience of the Court's order and *refusal* to notify affected companies and to ensure compliance with the Injunction.

**B. <u>Extensive Third-Party Discovery has Uncovered Substantial Business Conducted by Taishan Affiliates in the United States during the Contempt Period in Clear Violation of the Injunction Prong of the Court's July 17, 2014 Contempt Order and Injunction.</u>**

The PSC has undertaken extensive discovery of third-party entities and Taishan Affiliates concerning violations of the Contempt Order and alter-ego relationships between and among the Taishan Defendants. Based on diligent research efforts, as well as a wide array of information made publically available, the PSC identified entities believed to have done business with or on behalf of Taishan affiliates during the Contempt Period.  As a result, discovery requests and 30(b)(6) deposition notices were served on the following third-party entities: Plum Creek, NJIT,

---

[191] WANG Dep. at 37:12-16 and 41:8-11.

[192] CAO Dep. at. 44:3-47:9, 49:2-24, 51:7-10, 52:5-53:14, 111:15-112:24; SONG Dep. at 32:3-5, 32:15-33:11, and 129:2-9.

Sunpin, Walmart, Hampton Affiliates, Westerlund, Murphy, ATI, Hull FP, WH Int'l, Zika, Western Wood, Baillie, JP Morgan, Morgan Stanley, IBM, BNK Int'l, Jeffrey J. Chang, Great Western, Baoan, EAC, Davis Construction, Triorient, PABCO, and Stepan.[193]   In addition to deposing Defendant entities and executives associated with those entities, discussed in Section IV.A., *supra*, the PSC also served discovery requests and took the 30(b)(6) depositions of the following Taishan Affiliates and related third-party entities: United Suntech; CNBM Import & Export; CNBM Forest (Canada); CNBM USA; and Jushi USA Fiberglass, Co. ("Jushi USA").

### 1. CNBM's Business Dealings in Oregon with Westerlund Log Handlers and Murphy Overseas USA Astoria Forest Products.

Two CNBM subsidiaries, CNBM Import & Export and CNBM Forest (Canada)[194] instituted a lawsuit in federal court in Oregon against Westerlund and Murphy/Astoria (as a third-party Defendant), in an attempt to recover monies allegedly owed from a series of business transactions dating back to 2011, involving the purchase and handling of logs in Oregon, which were intended for shipment to China.[195]   In related litigation in Oregon, these same CNBM Entities were named as defendants by the same American companies with whom they were doing business.[196]   Although the Oregon litigation was commenced prior to entry of the

---

[193] *See* Chart of Expedited Third-Party Depositions [CONTEMPT Ex. 80]; *see also* Rec. Doc. Nos. 18523, 18535, 18570 (orders approving expedited discovery).

[194] CNBM Forest (Canada) is a subsidiary of CNBM Forest Products, which is a wholly-owned subsidiary of CNBM Import & Export, which, in turn, is a subsidiary of CNBM Group [Rec. Doc. Nos. 18433-4, 18433-17, 18433-18].

[195] *See China Nat'l Bldg. Materials Imp. and Exp. Corp., et al. v. Murphy Overseas USA Astoria Forest Products, LLC, et al.*, No. 14-cv-00746 (D. Ore.) [CONTEMPT Ex. 81]; *see also* 7/2/2014 Confidential Mediation Submission of CNBM Import & Export and CNBM Forest (Canada) [CONTEMPT Ex. 82]

[196] *See* Murphy Overseas USA Astoria Forest Products, LLC v. China Nat'l Bldg. Materials Imp. & Exp. Corp., et al., No. 14-cv-00752 (D. Ore.); Westerlund Log Handlers, LLC, et al. v. China Nat'l Bldg. Materials Imp. & Exp. Corp., et al., No. 14-cv-00618 (Clatsop Cty. Cir. Ct. Ore.) [CONTEMPT Ex. 83].

Contempt Order, before July 17, 2014, the CNBM entities continued to litigate their claims in Oregon and to resolve those claims through the American legal system while the Contempt Order was in effect, after July 17, 2014 in violation of this Court's injunction.

Specifically, CNBM Import & Export and CNBM Forest (Canada) settled their dispute with Murphy/Astoria in August 2014, executing a stipulation and agreement to dismiss all three Oregon lawsuits in exchange for their cooperation in shipping approximately 15.4 million board feet of logs to China for CNBM and a payment of $2.55 million to the CNBM entities on November 7, 2015, among other things.[197]   In accordance with this settlement, Murphy/Astoria "participated in the sale and/or shipment of 3 ship loads of logs at the direction of the CNBM entities" in September, 2014, November, 2014, and March, 2015, respectively.[198]   Specifically, on November 17, 2014, Murphy/Astoria sold $2,901.240.00 worth of logs to the CNBM entities by letter of credit dated March 3, 2015.[199]

On September 9, 2014, WANG Jianwei ("Jackie"), Executive Director of CNBM Forest Products, in an email to HUANG Anzhong (Chairman of CNBM Import & Export and CNBM Group Vice President) and others, reported on the status of the litigation and business dealings with Murphy/Astoria in light of the settlement.  In the email, Ms. WANG refers to a trip made by Chief HUANG and others to Portland to meet with individuals with Murphy/Astoria to discuss

---

[197] *See* Joint Post-Hearing Memorandum of Clarification [3:14-cv-00746 Rec. Doc. No. 87] [Rec. Doc. No. 18302-9]; *see also* 4/25/2015 Declaration of Robert Moon with Exhibits ("4/25/15 Declaration of Robert Moon") [CONTEMPT Ex. 84] at ¶ 5.

[198] *See* 4/3/2015 Letter from counsel for Murphy/Astoria, 8/8/2014 Stipulation, 11/10/2014 Settlement Agreement, and related materials [CONTEMPT Ex. 85].

[199] *See* 4/25/15 Declaration of Robert Moon at ¶ 4.

the future of the business relationship between the two companies.[200]  In the email, Ms. WANG then goes on to present several options as to how the CNBM companies could proceed in their business with Murphy/Astoria and, even developing additional U.S. based export supply chains.[201]  Not surprisingly, at the same time these entities avoided and refused to participate in this MDL, CNBM Import & Export and CNBM Forest Products used the very same legal system they have consistently avoided solely when it benefitted their business endeavors. More importantly, these Taishan affiliates used the U.S. court system at a time when this Court specifically enjoined such conduct.[202]  Ms. WANG recommended that the companies "strongly push forward in the [Oregon] litigation, and establish in the federal court that Murphy[/Astoria] has disturbed our business operation. . . The ruling of the district court this time can provide certain support to the federal court."[203]  The omnipresent recalcitrant attitude of these Taishan affiliates to use the U.S. courts only when it is advantageous to them appears time and time again throughout the course of the contempt/alter-ego discovery track.

Even with knowledge of the Contempt Order and injunction, CNBM Forest Products and CNBM Forest (Canada) continued conducting business in the U.S. despite this Court's clear prohibition thereof.  On February 4, 2015, WANG Lihe, head of the enterprise management department of CNBM Import & Export, sent an email notifying the leaders of CNBM Import &

---

[200] 9/9/2014 Email from Jackie Wang to Huang Anzhong, Yingqun Zhu and wsh@cbmie.com (Chief Wu) reporting on developments in the Oregon litigation with Murphy Astoria ("9/9/14 Email re: Oregon Litigation") [CONTEMPT Ex. 86].

[201] See id.

[202] *See e.g*. Contempt Order and Injunction).

[203] 9/9/14 Email re: Oregon Litigation at 1.

Export subsidiaries to "cease their business in the United States" due to "the high risks of business related [thereto]."[204]   Ms. WANG advised that if the companies felt it necessary to conduct business in the U.S., the information relating to such business had to be reported to someone in the enterprise management department of CNBM Import & Export.[205]  In accordance with these instructions, on February 6, 2015, Mr. DENG of CNBM Forest (Canada) reported to his superiors on the January 2015 settlement agreement with Murphy/Astoria and executed a contract in connection therewith between the two for CNBM Forest (Canada)'s purchase and shipment of $3.34 million worth of logs from the U.S. to China.[206]   In connection with the transaction, CNBM Forest (Canada), as the buyer, loaded and chartered the ship for transportation of the logs, ultimately costing the company $800,000.00.[207]  Mr. DENG confirmed that the transaction, did in fact, occur, despite the high risk associated with conducting business in the U.S. in direct violation of this Court's order.[208]   As Mr. DENG explained, the company continued business as usual with the U.S. despite the injunction thereon "[b]ecause [the company did not] think the contempt order applie[d] to [CNBM Forest (Canada)]."[209]   Accordingly, despite the prohibition of such by the Court, the business with Murphy/Astoria was carried out as planned and CNBM Forest (Canada) purchased $3.54 million worth of logs from

---

[204] 2/6/2015 Email from DENG to ZHU Macy and ZHU Dan re: Risks of Doing Business with Murphy/Astoria in light of "high risks of conducting business related to the US" ("2/6/15 Email re: high risks of doing business with Murphy/Astoria") [CONTEMPT Ex. 87] at 2-3.

[205] *Id*.

[206] *Id*. at 1.

[207] *Id*.

[208] *See* DENG Dep. at 99:22-100:10.

[209] DENG Dep. at 102:11-12.

Murphy/Astoria, with the logs shipped in mid- to late-February 2015 and payment therefor made just before shipment.[210]  Ultimately, CNBM Forest (Canada) derived profits from this transaction as the goods were directly transferred and sold to TAIGA Building Materials, a Canada company for $2.8 million, which was completed on February 25, 2015 upon the final cargo transfer of title.[211]

Overall, CNBM Forest (Canada) and CNBM Import & Export, Taishan affiliates, purchased $6,301,240.36[212] worth of lumber and logs from Murphy/Astoria during the contempt period, contrary to the Court's prohibition of such business under the Injunction prong of the July 17, 2014 Order.

### 2. Taishan Affiliates Continued Conducting Business in the Lumber/Logging Industry in the U.S. During the Contempt Period in Direct Violation of This Court's July 17, 2014 Order.

The discovery efforts undertaken by the PSC have shown a significant volume of business conducted by the Taishan Affiliates in the United States during the Contempt Period with several logging/lumber entities, in violation of the Court's Order. Further deposition testimony confirmed that although these Taishan Affiliates were purchasing lumber from the U.S. entities identified below, they would, in turn, derive profits therefrom by immediate resale to Chinese customers.

---

[210] DENG Dep. at 100:1-15.

[211] 2/6/15 Email re: high risks of doing business with Murphy/Astoria at 1; *see also* 8/19/2014 Email string re shipments under contract with Murphy/Astoria during the Contempt Period [CONTEMPT Ex. 88].

[212] *See* Summary Chart of Transactions Between CNBM Forest (Canada) and Murphy/Astoria with Supporting Documents [CONTEMPT Ex. 89].

i.  **BNBM Group Purchased and Exported a Substantial Amount of Lumber from U.S. Companies During the Contempt Period.**

Despite the clear mandate from the Court enjoining such conduct, BNBM Group,[213] a Taishan Affiliate, transacted a large volume of business in the U.S. with several different lumber companies during the Contempt Period:

- **Western Wood**, a lumber wholesaler located in Buckley, Washington, conducted business with BNBM Group in the U.S. during the Contempt Period. Specifically, from July 14, 2014 through March 2015, BNBM Group contracted with Western Wood for the purchase of over $1.8 million worth of lumber from the United States to be prepared and exported to China.[214] John Salamanca, the corporate representative for Western Wood, explained that BNBM Group first began doing business with his company in 2011.[215] Since that time, Mr. Salamanca explained that BNBM Group has purchased logs from Western Wood on approximately twenty (20) different occasions.[216]

---

[213] Despite testimony that these entities did not know the difference between the BNBM entities, the addresses on sales records and testimony confirms that the company doing business with these lumber entities was BNBM Group. *See, e.g.*, Summary Chart of Transactions Between BNBM Group and Western Wood with Supporting Documents [CONTEMPT Ex. 90] at p. 75 (9/8/2014 Invoice No. YCH393185 [WW 000491]); Deposition of WH International (Jin Wooh) dated 5/21/2015 ("Wooh Dep.") [CONTEMPT Ex. 91] at 17:14-22; Summary Chart of Transactions Between BNBM Group and WH International with Supporting Documents [CONTEMPT Ex. 92] at p. 3 (8/13/2014 Contract No. WHI-140144 [BNBM(Group)0002846]); Summary Chart of Transactions Between BNBM Group and Hull Forest Products with Supporting Documents [CONTEMPT Ex. 93] at p. 3 (4/15/2014 Purchase Contract No. WS 0422 [HULL 0036]); Summary Chart of Transactions Between BNBM Group and Baillie Lumber Company with Supporting Documents [CONTEMPT Ex. 94] (8/25/2014 Acknowledgment PMF 48393 [BNBM(Group)0002850]).

[214] *See* Job Profitability Summaries Produced by Western Wood Lumber Company with Respect to its Business with BNBM Group [CONTEMPT Ex. 95]; *see also* Summary Chart of Transactions Between BNBM Group and Western Wood.

[215] *See* Deposition of Western Wood Lumber Company (John Salamanca) dated 5/21/2015 ("Salamanca Dep.") at 20:1-8 [CONTEMPT Ex. 96].

[216] *See id.* at 20:25-21:16.

- **WH Int'l** is in the business of exporting timber to Asia.[217] From August 13, 2014 through March 3, 2015, BNBM Group contracted with WH Int'l for the purchase of over $1 million worth of lumber from the United States to be prepared and exported to China.[218] For example, an August 15, 2014 contract provided for BNBM to buy $485,000.00 worth of Douglas Fir logs from WH Int'l, to be shipped from Tacoma/Seattle, Washington to BNBM in Shanghai, China.[219] This purchase was completed in three separate shipments on September 16, October 6, and October 22, 2014, the invoices for which totaled $498,114.40.[220] Moreover, BNBM obtained Letters of Credit from several banks in China to be transmitted to WH Int'l through U.S. Bank (Seattle International Department), each in the amount of the contracts for shipment of lumber to BNBM.[221] Overall, BNBM Group contracted with WH Int'l for the purchase of over $1 million from August 13, 2014 through March 3, 2015.[222]

- **Hull FP** from April, 2014 through September 3, 2014, BNBM Group conducted business with Hull FP totaling at least $832,389.75[223] worth of lumber purchased from the

---

[217] Wooh Dep. at 12:24-13:1.

[218] *See* Summary Chart of Transactions Between BNBM Group and Hull FP.

[219] *See* Summary Chart of Transactions Between BNBM Group and WH Int'l at p. 13 (8/15/2014 Contract No. WHI-140147).

[220] *Id.* at pp. 14, 22, and 31.

[221] Transaction Information re: Documentary Credits dated 2/5/2015, 9/2/2014, 9/2/2014, 9/12/2014, and 10/22/2014 [CONTEMPT Ex. 97].

[222] *See* Summary Chart of Transactions Between BNBM Group and WH International, Inc. with Supporting Documents.

[223] Because there are contracts and invoices without corresponding invoices and contracts, the total amount of business cannot be accurately calculated. The amount reflected here is the total value of invoices for shipments to BNBM Group. However, there are at least four (4) contracts for which invoices

United States and shipped to China.[224] For example, BNBM Group entered into at least one contract with Hull FP during the Contempt Period, for $23,200.00 worth of lumber.[225] Moreover, BNBM Group continued to conduct business under contracts entered prior to the Contempt Period.[226] The fulfillment during the Contempt Period of contracts that arose prior to the Contempt Period nonetheless constitutes additional violations of the Contempt Order as conducting business in the United States.[227] During the Contempt Period, BNBM Group contracted with Hull FP for the purchase of $784,100.00 worth of lumber, in direct violation of this Court's Injunction.[228]

- **Baillie** is one of North America's largest hardwood lumber manufacturers, distributors and exporters.[229]  From June 11, 2014 through March 23, 2015, BNBM contracted as

---

have not been produced, and thus are not included in this calculation. It should be noted that the invoice amounts do not always mirror the amount contemplated in the contract, as each contract calls for the sale of plus or minus 10% of the stated quantity and amount. *See, e.g.*, Summary Chart of Transactions Between BNBM Group and Hull FP at pp. 3-4 (4/15/2014 Purchase Contract No. WS0422 [HULL 0036-37]).

[224] *See* Summary Chart of Transactions Between BNBM Group and Hull FP.

[225] *See id.* at pp. 38-39 (8/15/2014 Purchase Contract No. Chen-bw-bwf-05 [BNBM(Group)0002847]).

[226] *See* Summary Chart of Transactions Between BNBM Group and Hull FP.

[227] With respect to the Chart of transactions with BNBM Group and Hull FP, the PSC has included pre-contempt contracts with invoices dated within the Contempt Period. Since certain invoices cannot be matched to specific contracts, the PSC has also included certain pre-contempt contracts even though the PSC has been unable to link invoices and shipments to such contracts.  As with the timing of invoices that do correspond to specific contracts, it is highly likely that the shipments and invoices under contracts entered into in May 2014 would have occurred during the Contempt Period.

[228] *See* Summary Chart of Transactions Between BNBM Group and Hull FP.

[229] *See* Baillie Web Page – "About Us," available at:  http://www.baillie.com/aboutus (last visited January 21, 2016) [CONTEMPT Ex. 98].

the "clearing agent"[230] for four Chinese companies with Baillie for the purchase of $675,273.16 worth of hardwood lumber from the United States to be prepared and exported to China.[231]  The lumber purchased by BNBM came from forests across the United States, including Pennsylvania, Kentucky, Ohio, New York, Wisconsin, North Carolina, Virginia and West Virginia.[232]  After Baillie was served with the PSC discovery requests and learned about the Contempt Order, it requested that its customers cease using BNBM as a "clearing agent."[233]  However, during the entire time BNBM did business with Baillie, including during the contempt period, wire payments were made from BNBM's Bank of China, New York account, among other accounts.[234]

Ultimately, BNBM Group derives substantial revenue and, in fact, profits from the lumber it purchased in the U.S. and exported to China during the contempt period. ZHAO Yanming, the corporate designee for BNBM Group, explained that in purchasing the lumber "BNBM G[roup] acts as an agent to import logs and its products from different countries and different companies."[235]  In acting as an agent for various Chinese customers, BNBM Group would pre-charge a guarantee deposit to its customers, issue a letter of credit to the U.S.

---

[230] A "clearing agent" holds an "import license" in China and acts as the contracting party makes all payment with the exporting company (Baillie) and picks the lumber up at the docks in China.  Deposition of Baillie Lumber (Philip Fenwick) dated 5/28/2015 ("Fenwick Dep.") [CONTEMPT Ex. 99] at 11:15-12:18, 52:1-2.

[231] *See* Summary Chart of Transactions Between BNBM Group and Baillie.

[232] *See* Fenwick Dep. at 39:22-40:2, 64:10-70:5.

[233] *See id.* at 75:1-2.

[234]  *See e.g.* 5/20/2015 and 5/27/2015 Wire Confirmations [CONTEMPT Ex. 100].

[235] *See* ZHAO Dep. at p. 357.

companies its customers dealt with, and upon arrival of the goods in China, BNBM Group would facilitate customs clearance.[236]   Ultimately, the Chinese customers of BNBM Group would pay the company for the goods in addition to an agency fee.   Upon payment of both, the goods are delivered to the customers and the transaction is complete.[237]

> ii. **CNBM Forest Products and CNBM Forest (Canada) Purchased and Exported a Substantial Amount of Lumber from U.S. Companies During the Contempt Period That Was then Resold to Chinese Customers.**

CNBM Forest (Canada) is an affiliate of CNBM Group.[238]   DENG Jianjun ("Daniel") the deputy manager of the overseas business department of CNBM Forest Products, who is also employed by CNBM Forest (Canada) (but without a title), conceded that CNBM Forest (Canada) did, in fact conduct business in the United States during the contempt period in direct violation of this Court's order.[239]   Further, its parent company, CNBM Forest Product, proudly boasted that by the end of 2014, the company constructed overseas log supply bases consecutively in Alabama and Oregon.[240]   The primary location of export for Southern Yellow Pine ("SYP") being Alabama and hemlock and Douglas logs being exported from Oregon.[241]   Overall, CNBM Forest Products, through its wholly-owned subsidiary CNBM Forest (Canada), conducted a large

---

[236] *See* ZHAO Dep. at p. 357.

[237] *See* ZHAO Dep. at p. 357.

[238] *See* 2014 CNBM Annual Report, at 13; *see also* CNBM Import & Export Disclosure Statement.

[239] *See* DENG Dep. at 15:2-4 & 21:9-22:12; *see also* CNBM Import & Export Table of US Related Business in 2014 ("Table of 2014 U.S. Business") [CONTEMPT Ex. 101].

[240] *See* 2014 Introduction of CNBM Forest Products, Ltd. [CONTEMPT Ex. 102] at 2.

[241] *Id*. at 2.

volume of business in the United States with several lumber companies.[242] As reflected in CNBM Import & Export's table of U.S. related business in 2014, CNBM Forest Products through its subsidiary CNBM Forest (Canada) purchased at least, $23.3597 million worth of lumber from Simpson Lumber Company, Hampton Affiliates, Murphy/Astoria, and others.[243]

- **Hampton Affiliates** is one of the nation's largest privately-held forest products companies. It is based in Oregon and harvests and mills lumber from Oregon, Washington and British Columbia for sale both domestically and overseas.[244] Hampton Affiliates sought out the business of CNBM in 2009 having heard it was the biggest player in the Chinese lumber market.[245] Hampton Affiliates and CNBM Group entered into a Memorandum of Understanding ("MOU") in 2011 whereby the two agreed to pursue possibilities for the expansion of sales of North American softwood lumber products in the Chinese market.[246] Notably, the MOU does not have an end date and the CNBM Group and Hampton Affiliates continued to do business pursuant to this MOU during the Contempt Period.[247] Though CNBM Group entered into the MOU, CNBM Import & Export and its wholly-owned subsidiary, CNBM Forest Products,

---

[242] *See* 2014 CNBM Forest Products, Ltd. Contracts Status Check Spreadsheet [CONTEMPT Ex. 103].

[243] *See* Table of 2014 U.S. Business at 1.

[244] *See* Deposition of Hampton Affiliates (Steven Zika) dated 5/18/2015 ("Zika Dep.") [CONTEMPT Ex. 104] at 10:13-21. Within the Hampton Companies, there are roughly 15 companies, all of which are encompassed within the business referred to as "Hampton Affiliates." As the CEO, Mr. Zika explained, "[they] go by Hampton Affiliates as kind of a d/b/a." Included in this group of companies is Trans-Pacific Trading U.S., which Hampton Affiliates acquired in 2012. *See* Zika Dep. at 10:3-10 & 16:8-17:14.

[245] *See* Zika Dep. at 11:18-12:4.

[246] *See* Zika Dep. at 19:20-20:7; *see also* Hampton Affiliates and CNBM Group Memorandum of Understanding ("Hampton/CNBMG MOU") [CONTEMPT Ex. 105].

[247] *See* Zika Dep. at 57:14-21; *see also* Hampton/CNBMG MOU.

49

actually conducted all business under the terms of the MOU with Hampton Affiliates during the Contempt Period.[248]  Since making its first purchase from Hampton Affiliates, individuals from CNBM affiliates have visited its U.S. facilities at least twice every year, including during the Contempt Period.[249] In fact, several executives from CNBM Forest Products visited Hampton's Portland office in November 2014 in connection with the two companies' business dealings.[250] At one time, CNBM Group, Hampton Affiliates' "largest Chinese" customer, purchased 100% of the production from the company's Tillamook, Oregon mill.[251]  Although during the Contempt Period, Mr. Zika explained, CNBM purchased less lumber from Hampton Affiliates, its total purchases constituted 12-15% of the Tillamook mill's production.[252]  From June 2014 through February 2015, CNBM Forest Products purchased at least $8,640,121.51 worth of lumber from the Hampton Affiliates in the United States to be prepared and exported to China.[253]

- **Western Wood**, a Washington-based lumber company, is in the business of selling lumber and logs.  In addition to the business discussed in section IV.B.2.i., *supra*, regarding Western Wood's transactions with BNBM Group during the Contempt Period, it also conducted substantial amount of business with CNBM Forest (Canada) during the Contempt

---

[248]  *See* 7/31/2014 Email from Devin Huang to Jim Tryer [CONTEMPT Ex. 106]; *see also* 11/13/2014 Email from Devin Huang to Mark Porter [CONTEMPT Ex. 107]; *see also* Summary Chart of Transactions Between CNBM and Hampton Affiliates with Supporting Documents [CONTEMPT Ex. 108] at pp. 6 (7/24/2014 Commercial Invoice No. 673481, identifying CNBM Forest Products, Ltd. at the "Customer"), 83 (8/11/2014 Sales Order to CNBM Forest Products Canada Ltd.).

[249] *See* Zika Dep. at 12:5-13:18, 58:11-15.

[250] *See* Zika Dep. at 28:20-30:18.

[251]  *See* Zika Dep. at18:13-21, 24:24-25:17.

[252]  *See* Zika Dep. at 5-17.

[253] *See* Summary Chart of Transactions Between CNBM and Hampton Affiliates.

Period. [254] Western Wood's business dealings with CNBM Forest (Canada) began in the third quarter of 2014.[255]  Alan Brunstad, a lumber broker in Washington State and former employee of Westerlund Log Handlers, acted as CNBM Forest (Canada)'s lumber broker in negotiating and securing most of its deals with Western Wood.[256]   Several of the deals, however, were not transacted through a broker, but instead were negotiated directly by Mr. Deng of CNBM Forest (Canada) with Western Wood.[257]  During the contempt period, Mr. Deng traveled from China to Washington State on at least two or three occasions to visit Western Wood for the purpose of conducting business on behalf of CNBM Forest (Canada).[258]  From July 17, 2014 through March 2015, CNBM Forest (Canada) contracted with Western Wood for the purchase of over $1.5 million worth of lumber from the United States to be prepared and exported to China.[259]

- **Millwood Timber Inc. ("Millwood")** is a timber company located in Washington State that owns various timber lands from which it derives and sells timber and lumber. During the Contempt Period, CNBM Forest (Canada) admittedly conducted business

---

[254] *See* DENG Dep. at 23:2-12.

[255] *See* Salamanca Dep. at 20:1-8.

[256] *See* Salamanca Dep. at 119:25-120:22, 159:18-162:25.

[257] *See* Salamanca Dep. at 118:15-120:22; 163:23-178:6.

[258] *See* Salamanca Dep. at 118:15-120:22, 159:18-162:25.

[259] *See* Job Profitability Summaries Produced by Western Wood Lumber Company with Respect to its Business with CNBM Forest (Canada)  [CONTEMPT Ex. 109]; *see also* Collection of Contempt Period Invoices, Contracts and related shipping documents between CNBM Forest (Canada) and CNBM Forest Products with Western Wood [CONTEMPT Ex. 110]; *see also* Summary Chart of Transactions Between CNBM Forest (Canada) and Western Wood Lumber Co. with Supporting Documents [CONTEMPT Ex. 111]; *see also* DENG Dep. at 23:10-12; 24:12-19; 35:6-36:6.

with Millwood in clear violation of this Court's Contempt Order and Injunction.[260] In fact, on August 29, 2014, CNBM Forest (Canada) entered into a contract with Millwood for the purchase of $50,076.00 worth of lumber from the U.S. for export to China (Contract No. 14MW-CNBM0829A).[261] On September 23, 2014, another contract between the two was executed pursuant to which CNBM Forest (Canada) would purchase $142,500.00 worth of lumber from Millwood (Contract No. 14MW-CNBM0932A),[262] and at the same time, CNBM Forest (Canada) prepaid $42,750.00 for 30 containers under the contract.[263]

Additionally, during the period of Taishan's contempt and in violation of the injunction provision of this Court's Order, CNBM Forest (Canada) made the following payments on contracts executed with Millwood prior to the Contempt Order: (1) $48,045.60 on August 7, 2014 (Invoice No. 14MW-CNBM0711A.01); and (2) $48,265.56 on September 13, 2014 (Invoice No. 14MW-CNBM0829A.01).[264]

Finally, CNBM Forest (Canada) was projected to purchase a total of $2,612,500.00 worth of lumber in 2015—50 containers per month for a total of ten months with 5MFB per container and $950.00 per MBF.[265]

---

[260] *See* Summary Chart of Transactions Between CNBM Forest (Canada) and CNBM Forest Products with Millwood Timber, Inc. with Supporting Documents [CONTEMPT Ex. 112]; *see also* DENG Dep. at 23:2-12; 24:20-12; 30:22-31:7; 33:24-35:4.

[261] *See* 2014 CNBM Forest Products Contracts Status Check Spreadsheet (Summary Tab on native spreadsheet) at 10.

[262] *Id.*

[263] See *id.* (Paying Details tab on native spreadsheet) at 11.

[264] *Id.*

[265] CNBM Import & Export Co. Sorting of American Business [CONTEMPT Ex. 113] at 1.

52

- **Simpson Lumber Company**, a forest products company in Tacoma, Washington, also conducted business with CNBM Forest (Canada), during the Contempt Period. Between July 29, 2014 and October 6, 2014 alone, CNBM Forest (Canada) purchased $513,220.63 worth of lumber from Simpson.[266]

- **CNBM Forest Products and CNBM Forest (Canada)'s Southern Yellow Pine Project ("SYP Project") in Louisiana:** In clear violation of the Court's Contempt Order and Injunction, CNBM entities not only conducted business in the United States during the Contempt Period, but, these entities specifically targeted their business endeavors in the State of Louisiana—the very forum they deliberately turned their backs on and consistently refused to appear in as active participants in this litigation.  CNBM Forest Products carried out a project called the SYP Project during the Contempt Period.[267]  Pursuant to this project, the "bulk carrier" part of the project was operated in the Port of New Orleans with Plum Creek acting as its supply channel.[268]  Logs would be transferred from the place of cutting to the Port of Natchez by truck and then loaded onto a barge and shipped to the Port of New Orleans.[269]  In connection with this project, CNBM Forest Products and CNBM Forest (Canada) used Southern Forest Products ("SFP") as the log container operator and log exporter.[270]  With respect to the containers, CNBM

---

[266] *See* CNBM Forest Products Contracts Status Check Spreadsheet at 11-12; *see also* Table of 2014 U.S. Business at 1.

[267] *See* SYP Project Slides [CONTEMPT Ex. 114].

[268] *See* 3/13/2014 Meeting on Discussion of SYP Project ("3/13/14 SYP Meeting") [CONTEMPT Ex. 115].

[269] *Id*. at 1.

[270] *Id*. at 2.

Forest (Canada) visited the Port of Savannah Georgia in early 2014 while researching the logistics for the SYP Project.[271]   Ultimately, CNBM Forest (Canada) decided to invest in stripping equipment with plans to do business out of this particular port at a later time due to the fact that one company, East Coast Terminal ("ECT"), the specialized operation terminal for export of southern pine logs in Savannah had entered into an exclusive agreement with another company, restricting CNBM Forest (Canada)'s work for a short period of time.[272]

- **SFP** – a lumber and timber business in Chalmette, Louisiana[273] conducted a substantial amount of business with CNBM Forest (Canada) during the Contempt Period.[274] SFP, through its inventory controller, Walker Osborne,[275] the largest local container treatment company, cooperated with CNBM Forest Products and CNBM Forest (Canada) in connection with the SYP Project.[276] Under the SYP Project, CNBM Forest (Canada) would sign a purchase agreement with SFP after negotiating pricing, payments made every two weeks, and SFP was in charge of the collection, storage, operation and other procedures of the goods purchased.[277] After SFP's role was concluded, Plum Creek's work began (*see* Plum Creek section, *infra*).

---

[271] *See id.* at 3.

[272] *Id*.

[273] SFP has since closed.

[274] *See* Summary Chart of Transactions between CNBM Forest (Canada) and CNBM FP with SFP with Supporting Documents [CONTEMPT Ex. 116]; DENG Dep. at 36:8-22; 39:2-18; 42:4-44:9.

[275] *See* 8/2014 Email Chain re: Ongoing Business between CNBM Forest (Canada) and SFP [CONTEMPT Ex. 117].

[276] *See* CNBM Forest Products, Ltd. 2015 Annual Business Plan ("CNBM Forest Products 2015 Bus. Plan") [CONTEMPT Ex. 118] at 4.

[277] *See* 3/13/14 SYP Meeting at 3.

CNBM Forest (Canada) admittedly did not modify or cease its business dealings with SFP as a result of this Court's Contempt Order and Injunction.[278] As of year-end 2014, in cooperation with SFP, CNBM Forest (Canada) had already completed 1,200 containers.[279] The goal for 2015 was to reach 400 containers per month.[280] Thus, despite the Taishan Defendants' and Affiliates' refusal to participate in this litigation at that time, these entities derived profits and carried out business in this very State through the purchase of lumber originating from, harvested and/or prepared for export in the State of Louisiana and other affected gulf states involved in this litigation.[281] CNBM Forest (Canada) entered into several contracts with SFP during the Contempt Period for the purchase of a substantial amount of lumber: (1) on July 22, 2014, CNBM Forest (Canada) contracted with SFP for the purchase of $735,000.00 worth of lumber (contract No. SFP-CNBM-14-03);[282] (2) on August 7, 2014, CNBM Forest (Canada) contracted with SFP for the purchase of $187,500.00 worth of lumber (Contract No. SFP-CNBM-14-04); (3) on August 14, 2014, CNBM Forest (Canada) contracted with SFP for the purchase of $562,500.00 worth of lumber (Contract No. SFP-CNBM-14-05); and (4) on September 17, 2014 CNBM Forest (Canada) contracted with SFP for the purchase of $1,290,000.00 worth of lumber (Contract No. SFP-CNBM-14-06).[283]

---

[278] DENG Dep. at 44:4-9.

[279] *See* CNBM Forest Products 2015 Bus. Plan at 4.

[280] See id.

[281] *See* Summary Chart of Transactions Between CNBM Forest (Canada) and CNBM FP with SFP; *see* DENG Dep. at 43:5-22.

[282] *See* 2014 CNBM Forest Products Contracts Status Check Spreadsheet (Summary Tab on native spreadsheet) at 10.

[283] *Id.*

In addition to the foregoing new contracts entered into with SFP during the contempt period, CNBM Forest (Canada) made payment on contracts entered into prior to the contempt period, with the shipments occurring during the Contempt Period (upon payment to the SFP).[284] Overall, from July 25, 2014 through September 18, 2014, CNBM Forest (Canada) paid $721,522.01 on contracts made with SFP for the purchase of various types of U.S. lumber to be prepared and exported to China.[285]

- **Plum Creek** - In September 2011, CNBM Group entered into an agreement with Plum Creek (a Seattle company) and Sumitomo Forestry Co. (a Japanese company) "for the expansion of sales of North American forestry products (logs, lumber products, etc.) in the Chinese market."[286]  This agreement has no end date and provides that the parties will cooperate to obtain logs from Oregon and Washington for sale to China.

Additionally, as discussed above, Plum Creek acted as the supply channel, an integral part of the SYP Project, in conjunction with CNBM Forest (Canada) and SFP.[287] Under the SYP project Plum Creek had two primary roles. First, Plum creek arranged and signed an FOB vessel agreement with CNBM Forest (Canada), an operation that was outsources to other companies by Plum Creek.[288]  As Plum Creek's corporate representative explained, it is generally the company's practice in exporting logs/lumber not to sell directly to a foreign buyer, but instead to

---

[284] *See id*. at 11-12.

[285] See id.

[286] *See* Plum Creek/CNBMG MOU [CONTEMPT Ex. 119].

[287] *See* Chart SYP Cooperation [CONTEMPT Ex. 120].

[288] *See* 3/13/14 SYP Meeting at 3.

a domestic entity that instead acts as the exporter.[289]   Additionally, Plum Creek's second role under the SYP program encompassed the sale of logs directly to CNBM Forest (Canada).[290] As the invoices produced reflect, at some later time, Plum Creek's role shifted and it sold product directly to CNBM Forest (Canada).[291]  In fact, from May 9, 2014 through June 8, 2014, CNBM Forest (Canada) paid a total of $206,706.12 under the SYP program directly to Plum Creek with some to Plum Creek and SFP.[292]

### 3. CNBM Import & Export Likewise Conducted a Significant Amount of Business in the U.S. During the Period of Taishan's Contempt

During the Contempt Period, CNBM Import & Export, a wholly owned subsidiary of CNBM Group that holds shares in CNBM, disregarded the Contempt Order and Injunction and carried on business as usual in the United States. In a table of U.S.-related business conducted by CNBM Import & Export and its wholly-owned subsidiaries, the company reports that in 2014 it purchased and imported from the U.S. a total of $43,453,100.00 worth of petroleum coke and U.S. thermal coal via letters of credit.[293]

---

[289] *See* Deposition of Plum Creek Timber (Rosemary Daszkiwicz) dated 4/16/2015 ("Daszkiwicz Dep.") [CONTEMPT Ex. 121] at 22:21-23:3.

[290] *See* 3/13/14 SYP Meeting at 3.

[291] *See* Summary Chart of CNBM Import & Export Contempt Period Contracts, Invoices and Shipping Documents with Supporting Documents ("Summary Chart of CNBM Import & Export Contempt Violations") [CONTEMPT Ex. 122] at 11.

[292] *See* 2014 CNBM Forest Products Contracts Status Check Spreadsheet at 11-12. Though these payments were made prior to the contempt period, work to be performed under the associated contracts occurred during the period of Taishan's contempt. Note that the above referenced payments made by CNBM Forest (Canada) to Plum Creek were for prepayment and related shipping charges. *See id.*

[293] *See* Table of 2014 U.S. Related Business at 1.

Invoices and contracts produced during the course of discovery have revealed that throughout the duration of Contempt Period CNBM Import & Export did $18,687,268.46 in business in the U.S. in clear violation of this Court's Order.[294]

Only one day after the Court's Order, CNBM Import & Export entered into several contracts with U.S. companies for the sale of various goods. On July 18, 2014, CNBM Import & Export contracted with (1) Liberty Pultrusions, a Pennsylvania company, for the sale of $20,020.00 worth of fiberglass products supplied by Jushi USA,[295] and (2) Orenco Systems, also a Pennsylvania company, for the sale of $95,550.00 worth of insulation.[296]

**4. Defendant and Taishan Affiliate United Suntech Maintained a Continuous Presence in the U.S. Market Throughout the Contempt Period.**

United Suntech is a California corporation established that was in 1995 to operate as a general importer and distributor.   Under the initiative of CNBM Group's then-General Manager Assistant, CAO Jianglin,[297] CNBM Investment (then known as BND Co. Ltd.) began acquisition of United Suntech, a wholesaler, in 2003.  CNBM Investment "was established in 2001, and is the core company for the investment business of CNBM . . . including import and export business about logistics, building materials, household electrical appliances, light industry,

---

[294] *See* Summary Chart of CNBM Import & Export Contempt Violations at 2.

[295] *See* Summary Chart of CNBM Import & Export Contempt Violations at 1, 16-17.

[296] *See id*. at 1; 12-14.

[297] *See* Summary Chart of Officers and Directors.

metals, etc., and developing retail chain business in domestic and foreign markets."[298]   CNBM

Investment acquired full ownership of United Suntech by 2008.[299]

Following CNBM's IPO in 2006, ownership of CNBM Investment (and with it, its

wholly-owned subsidiary, United Suntech) was transferred from BNBM to CNBM.[300]

Thereafter, CNBM declared the revenues of CNBM Investment as part of the "Lightweight

Building Material" segment, alongside Taishan.[301]   Ultimately, United Suntech's business was

CNBM Investment's U.S. business [302]   In addition to direct funding, United Suntech also

provided support to CNBMIT[303] in its lumber purchases in North America.[304]

On September 15, 2014, United Suntech applied for and received $60,000 from its

parent, CNBM International for purposes of funding its continuing business operations in the

U.S.[305]   In his application for this funding, Mr. LIU Weishing, General manager of United

Suntech, explained that despite United Suntech's best efforts to save money by limiting its

expense, it "still [could not] make both ends meet due to the poor income."[306]   Through CNBM

---

[298] *See* "Investment Segment" – CNBM Webpage; *see also* Global Offering at p. 118.

[299] *See* 9/3/2003 United Suntech Craft Meeting Notes ("9/23/03 Meeting Notes") [CONTEMPT Ex. 123]; 6/2/08 Stock Purchase Agreement [CONTEMPT Ex. 124].

[300] *See* 12/28/2007 Circular [CONTEMPT Ex. 125]; 2007 CNBM Annual Report at 62.

[301] *See*, *e.g.*, 2008 CNBM Annual Report at 29.

[302] *See* LIU Dep. at 57:22-24, 76:16-23, 81:5-82:16.

[303] *See* LIU Dep. at 26:24-27:12. CNBMIT is also referred to as CNBMI Trading.

[304] *See* LIU Dep. at 109:9-19.

[305] *See* 9/17/2014 Email re: Fund Application Report of US Company ("9/17/14 Email") [CONTEMPT Ex. 126] at 2; *see also* LIU Dep. at 116:8-12.

[306] *Id.*

59

Investment's funding United Suntech's U.S. operations in the last quarter of 2014, CNBM would eventually derive profits from business carried out in the U.S. by its tier-three subsidiary. This business, albeit indirect business carried at different tiered subsidiaries, was done in clear violation of this Court's July 17, 2014 Order.

Additionally, United Suntech maintained a continuous presence and participated in the U.S. market throughout the Contempt Period.[307]  By way of example, LIU Weisheng, United Suntech's general manager, travelled to the U.S. in January 2015 for an exhibition, and then again in August 2014, for a business tour of the Pacific Northwest and New York, with a loop through Montreal.[308]  During the business trip, both United Suntech and CNBM Investment's general managers stopped in various cities along the way to meet with potential clients, customers, and business associates.[309]

In connection with a cement purchase agreement entered into between CNBM Investment and an unrelated Chinese company, United Suntech, through its Canadian branch, negotiated and executed a Commission Agreement, pursuant to which Suntech would act as the receiver of monies for CNBM Investment (a wholly-owned subsidiary of CNBM).[310]  This Commission Agreement was executed on January 15, 2015, during the Contempt Period.[311]

---

[307] *See* LIU Dep. at 116:8-15; *see also* 9/17/14 Email.

[308]  *See* LIU Dep. at 99:2-7, 101:18-102:8, 106:11-19, 107:11-23, 110:20-111:13; 9/17/14 Email.

[309] *See* LIU Dep. at 99:2-7, 101:18-102:8, 106:11-19, 107:11-23, 110:20-111:13; 9/17/14 Email.

[310] *See* 2014 CNBM Annual Report at 13; *See* LIU Dep. at 119:18-121:6; *see also* 1/9/2015 Commission Agreement [CONTEMPT Ex. 127].

[311]  *See* 1/9/15 Commission Agreement.

Finally, as early as September 15, 2014, United Suntech began preparations to move the business offices from its California location to New York.[312]   In fact, in a report to his supervisor, Mr. Chen (also General Manager of CNBM Investment), Mr. LIU advised that he would contact a CPA in Los Angeles, California to "successfully move the U.S. Company to New York with the help of attorneys and other professionals," although the move would ultimately not take place.[313]

### 5.   CTIEC Maintained an Extensive Business Presence in the U.S. Market During the Contempt Period.

CNBM carries out its engineering services through CTIEC, which in turn has several subsidiaries.[314]   Despite this Court's clear mandate, CTIEC, a Taishan affiliate, conducted a substantial amount of business in the U.S. during the contempt period, through several different business ventures.

### i.   CNBM's Dealings with NJIT and Toledo Engineering Co., Inc. Through its Subsidiary, CTIEC, During the Contempt Period.

---

[312] *See* LIU Dep. at 111:24-113:20; 9/17/2014 Email.

[313] *See* 9/17/14 Email.

[314] *See* PENG S. Dep. at 30:22-25.

CNBM and its subsidiary CTIEC have been engaged in an on-going partnership with NJIT since February 2013, when CNBM established the "CNBM New Energy Materials Research Center"[315] of NJIT.[316]   CTIEC announced that:

> [O]n the morning of 18 February, the founding ceremony of CNBM PV Materials Research Center at NJIT was held.... Joe Bloom, president of NJIT, and Peng Shou, CEO & president of CTIEC, signed the cooperation agreement on behalf of both sides. In the name of Ministry of Science and Technology, Ye Dongbai, Science and Technology Counselor of the Consulate General of the People's Republic of China in New York, made a special trip to New Jersey Institute of Technology to witness this moment.... At the ceremony, Peng Shou said that the founding of the center was an important part of CNBM's efforts to promote its technological innovation activities to get closer to the international practice so as to emerge into the process of globalization by fully using international resources.[317]

On February 21, 2014, NJIT announced that:

> NJIT formalized an agreement with Chinese partners that will advance the university's research on thin-film solar cells.... With more than $650,000 from the Shanghai-based China National Building Materials Company (CNBM), one of the largest gypsum, cement, and fiberglass producers in the world, NJIT will innovate

---

[315] In the announcement of its rededication, NJIT referred to the research center as "the China National Building Materials Photovoltaic Materials Research Center." 2/26/2013 NJIT News Room Announcement: NJIT Celebrates Growth of Solar Technology [CONTEMPT Ex. 128]. As of February 21, 2014, NJIT referred to the research center as "CNBM New Energy Materials Research Center." 2/21/2014 NJIT News Room Announcement: "Chinese Partnership Fuels NJIT's Solar Cell Research," available at: http://www.njit.edu/news/2014/2014-054.php [CONTEMPT Ex. 129]. PENG Shou explained that "[a]t the time we names it China Building Materials PV Material Research Center. Originally it was called New Energy Research Center, but then I said just put this down." PENG S. Dep. at 95:3-6. The center will be referenced as the "Research Center" herein to avoid confusion.

[316] *See id*; *see also* 2/30/2013 CNBM/CTIEC Announcement "CNBM Sets up a Research Center at an American Public University" ("2/30/13 CNBM/CTIEC Announcement"), available at: http://www.ctiec.net/news/en_news/2013/3/1/1362129261468.jsp                                              and http://www.cnbm.com.cn/EN/c_000000160001/d_25697.html [CONTEMPT Ex. 130].

[317] *Id.*

> its solar cell research laboratory and build prototype equipment
> that will enable manufacturers to produce thin-film cells more cost
> effectively.    The university's CNBM New Energy Materials
> Research Center ... is focused on thin-film cells.[318]

This partnership between NJIT and CNBM/CTIEC dates back before the formal partnership was announced in February 2013.  As early as October 18, 2012, CTIEC hosted the president of NJIT, Dr. Joe Bloom, who was received by Mr. PENG Shou, Chairman of the Board of CTIEC.[319]  As the CTIEC announcement noted, "Dr. Joe Bloom agreed with Mr. Peng Shou and retained a keen interest in establishing all-around, high-level and ... cooperative relationship between NJIT and CTIEC."[320]

The PSC has uncovered at least one financial transaction related to the partnership between NJIT and CNBM/CTIEC.  In the response to a subpoena on ATI (a 50/50 joint venture between CTIEC and TECO, discussed in greater detail *infra* at Section IV.B.5.iii., *infra*, the PSC learned that CTIEC directed the CTIEC-TECO joint venture to loan CTIEC $250,000.00, making the payment of the proceeds to NJIT.[321]   According to ATI, NJIT repaid the loan in June, 2014, and payments of interest by NJIT continued at least through October, 2014.[322]

---

[318] 2/21/2014 NJIT Newsroom Announcement.

[319] *See* 2/30/2013 CNBM/CTIEC Announcement.

[320] *Id.*

[321] *See* 3/2013 Emails regarding $250,000 payment to NJIT [CONTEMPT Ex. 131].

[322] Paulsen Dep. at 128:16-25 ("Q. Do you know when finally ATI got repaid that money it had originally loaned to CTIEC? A. It was June or July that the New Jersey Institute of Technology somehow made a payment plus a portion of the interest. And then it was in October that CTIEC made the final interest payment to ATI. … Of 2014.") and 132:13-24 ("Q. Did – has that sum been paid by CTIEC? As of this date, has it been paid? A. All of the outstanding items have been paid … . So it was matched up at the time of the payment sometime in October. Q. October of 2014? A. Yes, sir."); 6/20/2014 email chain, "TECO Fund Update" [CONTEMPT Ex. 132] at p. 1;  9/15/2014 email chain, "CTIEC Outstanding

Interestingly, NJIT claims, in an email from the President of New Jersey Innovation Institute (an NJIT Corporation), that although "TECO believed the wire transfer [of $250,000.00] was a loan, … that [fact] was never communicated to [NJIT], there is no loan agreement, and the transaction was never run through the university business processes that would include Trustee review [and] approval for a transaction of that magnitude."[323] Further confusion, misunderstanding, and retroactive revision of the facts regarding this "loan" payment to NJIT and the relationships between and among CNBM's various entities doing business in the United States – CTIEC, TECO, and ATI – can be gleaned from emails between ATI and NJIT, wherein ATI (a/k/a CTAT) states:

> In March of 2013 – at CTIEC's behest and on CTIEC's behalf – CTAT wired $250,000 from its account to the New Jersey Institute of Technology ("NJIT"). In exchange for this payment, CTIEC promised CTAT to promptly reimburse it…. It is CTAT's understanding that this payment was made in connection with an agreement between CTIEC and NJIT…. CTAT has now been told that NJIT will be reimbursing CTAT rather than CTIEC…. In order to complete said payment [of $250,000.00], CTAT has been asked to complete a subcontract agreement with NJIT (even though no such relationship was contemplated in the original transaction).[324]

The continued operation of the partnership between NJIT and CNBM/CTIEC, in any event, constitutes a violation of this Court's Contempt Order. During the contempt period (specifically, between August 2014 and January 2015), CTIEC repeatedly wired funds to

---

Invoices & Items Owed to TECO," with attachment [CONTEMPT Ex. 133] (showing loan still had interest owing of $2,229.51).

[323] 5/6/2014 email from Donald Sebastian to Wen He re: Payment Back to TECO [CONTEMPT Ex. 134] at p. 11.

[324] 4/8/2014 Emails between ATI and NJIT re: "Proposed CTIEC/TECO American Technology, Inc./NJIT Subcontract Agreement" [CTIEC-TECO 0002384-2385] [CONTEMPT Ex. 135].

NJIT.[325] In August 2014, CTIEC wired NJIT $200,000.00 for "Phase II" (out of four "Phases") of the PV Materials Agreement.[326] Pursuant to the Amended PV Materials Agreement, NJIT will receive, in total, $1.126 million from CTIEC/CNBM.[327]  Pursuant to a Collaborative Graduate Certificate Program Agreement between NJIT and CTIEC, $20,400.00 was paid by CTIEC to the NJIT in January 2015 to pay for each of the six program participant's Spring 2014 tuition, room and board, and incidental expenses.[328] Moreover, CTIEC continued to negotiate modifications to and renewing the PV Materials Technology Agreement with NJIT during the Contempt Period.[329]

ii.   **CTIEC's Extensive Business Dealings with Sunpin and Walmart in the U.S. during the Contempt Period**

On November 3, 2014, during the Contempt Period, CTIEC and Sunpin, an Illinois company, entered into an Engineering, Procurement and Construction ("EPC") Framework Agreement, pursuant to which Sunpin undertook to develop and invest in various solar photovoltaic projects located in the U.S., for which CTIEC would provide EPC and financing

---

[325] See 8/13-27/2014 emails reflecting wire transfers from CTIEC to NJIT [CONTEMPT Ex. 136] at pp. 2-4 (NJIT 01170-72); 3/19/2015 email from Joanne Branin, NJIT regarding CTIEC wires [CONTEMPT Ex. 137].

[326] See Deposition of New Jersey Institute of Technology (Donald Sebastian) dated 4/22/2015 ("Sebastian Dep.") [CONTEMPT Ex. 138] at 231-232; see also 8/13-27/2014 emails reflecting wire transfers from CTIEC to NJIT at 2-4.

[327] See Sebastian Dep. at 156:14-161:9; Amendment I to PV Materials Technology Development Agreement [CONTEMPT Ex. 139] at 2-3.

[328] See Sebastian Dep. at 231-232; see also 12/14/2014 Email from Joanne Branin regarding CTIEC Fee for Spring 2015 Semester [CONTEMPT Ex. 140].

[329] 3/30/2015 email from Donald Sebastian re: 2015 R&D Application and Agreement, attaching amended versions of Application and Agreement pursuant to meeting in Shanghai with CTIEC on 1/29-30/2015 [CONTEMPT Ex. 141].

services.[330]  Pursuant to the EPC Framework Agreement, CTIEC and Church Hill Solar Farm,

LLC, a subsidiary of Sunpin,[331] entered into an EPC Agreement for the Maryland Church Hill

7.344 MW Solar Power Project ("Church Hill Project") on November 26, 2014.[332] On the same

day, CTIEC entered into a "BOS Agreement" with Sunpin Construction Management, under

which Sunpin is to provide general contracting services for the Church Hill Project.[333] The

purpose of the Church Hill Project was to construct a 7.3 megawatt solar panel on a piece of

land.[334] As of March 16, 2015, CTIEC had provided the first installment of their 80% of the EPC

financing and the first payment for the administrative fee for the Church Hill Project.[335] The

Church Hill Project is currently underway, and as such, CTIEC continues to perform its business

duties and derive profits pursuant to its Agreements with Sunpin in clear violation of the

---

[330] *See* 11/3/2014 NJIT and CTIEC EPC Framework Agreement ("NJIT/CTIEC EPC Framework Agreement") [CONTEMPT Ex. 142].

[331] Deposition of Sunpin Solar Development, LLC (Steve Kim) dated 4/17/2015 ("Kim Dep.") [CONTEMPT Ex. 143] at 61:14-18 (Church Hill Solar Farm LLC "is the company that Sunpin purchased to develop this project").

[332] *See* 11/26/2014 EPC Agreement for the Maryland Church Hill 7.344 MW Solar Power Project ("11/26/14 Church Hull EPC Agreement") [CONTEMPT Ex. 144].

[333] 11/26/2014 BOS Agreement for the Maryland Church Hill 7.344 MW Solar Power Project [CONTEMPT Ex. 145].

[334] 11/26/2014 Church Hill EPC Agreement.

[335] *See* Kim Dep. at 114:15-11116:17 (CTIEC made two wire transfers on 3/16/2015 for the initial installment of their 80% payment and the first payment for the administrative fee) and 118:11-14 (no other payments that Kim was aware of); 3/16/2015 Wire Transfer [CONTEMPT Ex. 146] (CTIEC transferred $871,703.60 to Sunpin Construction Management LLC); 3/16/2015 Wire Transfer [CONTEMPT Ex. 147] (CTIEC transferred $29,997 to Sunpin Holdings LLC). *See also* 11/26/2014 BOS Agreement for the Maryland Church Hill 7.344 MW Solar Power Project at 5 (Section 8: Payments, providing that "CTIEC shall pay an initial deposit of twenty (20%) percent of the Fixed Price value, in the amount of $871,703.60, upon within 30 days of execution of this contract by CTIEC. CTIEC shall pay Sunpin the balance of 80 percent of the Fixed Price upon the submission of requests for payment.").

66

Contempt Order and Injunction.[336]  Under the terms of both agreements, Sunpin has paid CTIEC over $16.7 million during the Contempt Period (specifically, between November 26, 2014 and March 16, 2015).[337]

After being told that Sunpin could do a few U.S. projects "such as Walmart roofs or power stations in such and such places because Walmart had approached them," PENG Shou, on behalf of CTIEC, supported such endeavors.[338]  Indeed, on February 26, 2015, during the Contempt Period, CTIEC signed a "cooperative contract" with Sunpin for the construction of 1,000 roof solar power plants for Wal-Mart supermarkets in North America.[339] PENG Shou, as president and chairman of CTIEC, traveled to New York to sign the agreement.[340]  On March 2, 2015, CNBM announced on its website that the "Wal-Mart roof power plant project … marks new major cooperation between the two sides after the initial cooperation in November 2014 and CTIEC's milestone in in-depth development of the US PV power station market, **laying a solid foundation for Triumph's new energy brand to develop in the US** and radiate the North American and South American PV power plant markets."[341]  According to CNBM, construction

---

[336] *See* Kim Dep. at 74-75.

[337] *See* 12/1/2014 and 1/22/2015 Wire Transfers from Sunpin to CTIEC [CONTEMPT Ex. 148]. Sunpin had not, at that time, been paid the remainder because the project was not yet complete.

[338] PENG S. Dep. at 115:17-21.

[339] 3/2/2015 CNBM News Center: "CTIEC signs Wal-Mart roof power plant project," available at http://www.cnbm.com.cn/EN/c_000000160001/d_33428.html [CONTEMPT Ex. 149].

[340] PENG S. Dep. at 114:11-116:15; 2/25/2015 EPC Short-Form Agreement between Sunpin Walmart Avon-North Oxford, LLC and CTIEC (Dep. Ex. 362) [CONTEMPT Ex. 150].

[341] *Id.* (emphasis added).

on the first two power plants involved in this cooperative CNBM project was to commence in April, 2015.[342]

### iii.   Business Conducted Through ATI – CTIEC's Joint Venture with Toledo Engineering Co. During the Contempt Period.

In addition to CTIEC's voluminous business dealings in the United States, it also does business by way of its joint-venture with Toledo Engineering Co., Inc. – ATI – which was created in 2005 and located in Toledo, Ohio.[343] In fact, on CNBM's website, ATI is listed as one of CNBM's overseas branches located in the United States (along with CNBM (USA) and United Suntech).[344]

As ATI's counsel explained, CTIEC and TECO formed ATI in 2005 "in order to market and sell the technology and services of CTIEC, and TECO in Chinese and other markets."  In December 2014, during the period of Taishan's contempt, CTIEC and TECO considered a business opportunity in the U.S. through ATI, which "involved a preliminary budget estimate issued by TECO to CTIEC on a project for a customer in South Carolina.[345]  Originally, CTIEC suggested the possibility of ATI pursuing the project.  TECO did not feel that this would be

---

[342] *Id*.

[343] *See* PENG S. Dep. at 66:18-67:2 & 70:23-71:7 (the legal address of the joint venture company is 3400 Executive Parkway, Toledo, Ohio 43606 USA).

[344] *See* CNBM Group Web page "Global Presence" Tab, available at http://www.cnbm.com.cn/EN/c_0000001600030001[CONTEMPT Ex. 151].

[345] *See* 3/27/2015 Letter to Arnold Levin from Marshall A. Bennett, Jr. [CONTEMPT Ex. 152]

feasible.  Hence, it issued a preliminary budget as a subcontractor to CTIEC)."[346]   This, too, constitutes a violation of the Court's Injunction.

## 6. CNBM, through its Subsidiaries, CNBM International and CNBM USA Conducted a Significant Volume of Business in the U.S. During the Contempt Period.

Despite the Contempt Order and Injunction clearly prohibiting the Taishan affiliates from conducting any business in the U.S., CNBM International and CNBM USA continued business as usual and derived substantial profits from their dealings with American companies from July 17, 2014 through the end of March 2015.

### i. CNBM's Establishment of an E-Commerce Site for Sales of its Products to the U.S.

On February 10, 2011, CNBM Group launched an e-commerce site – OKorder.com – to provide "a global direct selling platform for building materials … [w]ith the mission of 'making every order easy.'"[347]   CNBM has "commit[ted] itself to offer a brand-new selling channel for Chinese domestic manufacturers through diverse cooperation forms, and create convenient, rapid, low-cost purchasing platform for overseas customers."[348]   As CNBM explained: "OKorder.com is … being operated by CNBM International Corporation, an important

---

[346] *Id. See also* 2/7/2014 Email re: Notes from TECO meeting regarding ongoing projects of CTIEC in the United States with TECO and/or ATI [CONTEMPT Ex. 153]

[347] *See* 7/10/2014 CNBM International Announcement "CNBM Group named to Fortune 500 for the Fourth Successive Time, Ranking the 267th," available at: http://www.cnbm.com.cn/EN/c_000000160001/d_15129.html [CONTEMPT Ex. 154] ("OKorder.com is an e-commerce website founded by CNBM Group); *see also* 2/18/2011 CNBM Announcement "Congratulations on Okorder.com official launch," available at http://www.cnbm.com.cn/EN/c_000000160001/d_15129.html [CONTEMPT Ex. 155] ("OKORDER commits itself to offer a brand-new selling channel for Chinese domestic manufacturers through diverse cooperation forms, and create convenient, rapid, low-cost purchasing platform for overseas customers.")

[348] *Id.*

membership company of CNBM Group's logistic and trade sector."[349]   The United States (through CNBM USA) was one of the first locations that CNBM began development of its overseas bases and launched the "OKorder" program.[350]   In fact, Taishan brand drywall is available for purchase through OKorder.[351]

OKorder.com has numerous overseas branches, including in "America, UAE, Dubai, Russia, Saudi Arabia, India, Viet Nam, Germany, Indonesia, Ukraine, etc."[352]



OKorder.com "is [an] essential [platform] for the export. okorder.com shares resources on the supply chain to create new value for enterprises."[353]   One of the platform's advantages, CNBM

---

[349] *See* 2/18/11 CNBM Announcement.

[350] *See generally* "Okorder.com: Cross-Border E-Commerce & Overseas Warehousing" [CONTEMPT Ex. 156].

[351] *See* OKorder.com "Gypsum board drywall plaster board Taishan brand" [CONTEMPT Ex. 157].

[352] *See* "Sales Force" tab on OKorder.com website, showing USA on its global map of branches, available at http://www.okorder.com/service/sales.html [CONTEMPT Ex. 158].

[353] CNBM Import & Export and CNBM International 2014 Annual Work Report ("2014 CNBM Int'l Work Rept.") [CONTEMPT Ex. 159] at 6.

International explained, is to "improve brand awareness" for the CNBM Group "brand" with the hope to attain significant influence in the building materials and associated industries.[354]   The platform is a "one-stop integrated foreign trade services for manufacturers," and "provides full participation in foreign trade transactions and reviews strictly the qualifications and of overseas buyers to guarantee real and effective inquires and orders."[355]   Thus, unlike Alibaba.com (discussed in Section IV. B.8. *infra*), CNBM International's role in overseeing and directing business on Okorder.com is that of direct involvement.

During the Contempt Period, CNBM International actively maintained OKorder.com and derived a significant amount of business in the U.S. from the e-commerce platform. In fact, between January and September 2014, several departments of CNBM International received and responded to numerous inquiries made by U.S. companies looking to purchase different items from the company through OKorder.com.[356]

CNBM International's adhesive tape department received a total of 10 inquiries from OKorder.com during 2014.  One of the inquiries led to a deal and another was underway as of October 11, 2014.[357]  The company was successful in securing a sale of adhesive tape, LED light and, as of the date of the report (11/11/14), the terms of the sale were under negotiation as

---

[354] *Id*. at 7.

[355] *Id*. at 7.

[356] *See* CNBM International Breeder Material Dept. Jan. to Sept. Business Analysis Report ("2014 CNBM Int'l Breeder Dept. Rept.") [CONTEMPT Ex. 160]; *see also* CNBM International Adhesive Tape Dept. October Business Analysis Report ("Oct. 2014 CNBM Int'l Adhesive Tape Rept.") [CONTEMPT Ex. 161].

[357] *See* Oct. 2014 CNBM Int'l Adhesive Tape Rept. at 1.

payment for samples had been sent and the samples were in the process of being prepared for shipment to the United States.[358]

CNBM International's adhesive tape department responded to yet another inquiry on OKorder.com by a U.S. customer, named Brett, as to indoor LED Light Bulbs and Corn Lights, LED Modules, Wind-Solar Power Generator and Solar Cells.[359]  In response to the inquiry and as of October 11, 2014, CNBM International was able to locate suppliers for the client and samples of each requested product.[360]   Because potential client inquiries requested large quantities of samples from CNBM International, the company required the potential client to pay for the samples prior to production and shipment to the U.S.[361]

The company's breeder department also continued its business with its long-time client, Nyes Automotive, an Indiana company.[362]   Despite this Court's prohibition on such business, from January through September 2014, CNBM International sold 300 sets of GPS devices to Nyse for $32,000.00, with a profit rate around 37%.[363]

In September 2014, the metal engineering department of CNBM International began processing an order by Comet, a U.S. company, for the purchase of $2.58 million worth of

_____

[358] *Id*.

[359] *Id*.

[360] *Id*. at 1-2.

[361] *Id*.

[362] *See* 2014 CNBM Int'l Breeder Dept. Report at 1.

[363] *See* 2014 CNBM Int'l Breeder Dept. Report at 1.

aluminum foil for food packaging.[364]   Under the purchase agreement, Comet would purchase one cabinet of foil each month with a stable volume and specification.[365] The profit rate for the sale being between 4% and 5%.[366]

Finally, from January through October 2014, the photovoltaic department received a substantial amount of inquiries from customers the United States on OKorder.com.[367] The potential customers inquired into a range of products including solar cells, component and micro inverters and various other solar energy products.[368]

### ii.   CNBM's Agreement with IBM in September, 2014 for Cloud Computing Services to Enhance Its Sales Across the Globe and to America.

On September 26, 2014, during the Contempt Period, OKorder.com "jointly declared" with IBM that OKorder.com had "adopted IBM cloud computing service to start a domestic cross-border e-commerce cloud era."[369]   As explained by OKorder.com:

> With the assistance of IBM, OKorder combined the advanced world cloud computing service to create the online and offline integrated cross-border e-commerce platform that can be better used by the clients based on the innovative commercial mode of

---

[364] *See* CNBM International Metal Engineering Department September 2014 Business Analysis Report ("Sept. 2014 CNBM Int'l Metal Engineering Rept.")  [CONTEMPT Ex. 162] at 1.

[365] *Id.*

[366] *Id.*

[367] *See* 11/14/2014 CNBM International Photovoltaic Department 1 Business Analysis Report ("11/14/2014 CNBM Int'l Photovoltaic Rept.") [CONTEMPT Ex. 163] at 1.

[368] *Id.*

[369] *See* 5/13/15 CNBM International Announcement; *see also* 2014 CNBM International Work Rept. at 4; *see also* Investigation Report on CNBM International ("CNBM Int'l Investigation Rept.")  [CONTEMPT Ex. 164].

"cross-border e-commerce + overseas warehouse" (The commercial mode of "cross-border e-commerce + overseas warehouse" created initially by OKorder breaks through the traditional mode by information-based means. The overseas buyers can purchase the client's products online in virtue of OKorder's cross-border e-commerce platform and then convey and distribute the products by OKorder's local overseas warehouse and logistics systems within the world range). It could promote the industrial upgrade and transformation from Chinese manufacturing industry to the manufacturing service industry, accelerate the development of overseas market and expand the new online Silk Road.[370]

The joint venture between OKorder.com and IBM is intended to enhance promotion of CNBM's foreign trade around the globe generally, including in the United States:

Cloud deployment is set in the front end of OKorder's website in virtue of IBM's global cloud platform. OKorder has promoted the websites in Chinese, English, etc. for the different countries and regions and the cloud node of the websites in all versions is deployed on IBM's global cloud platform. The market promotion and operation can be realized by combining the search engine with promotion channel of different countries and regions.

IBM's cloud computing platform can ensure the safety of online transaction, reduce the costs of all links and improve the efficiency of transaction process. What is more important is that we can provide the clients around the world with better service and maintain our competitiveness. We expect the continuous and further cooperation with IBM and join hands to create the Silk Road in Internet era by the most advanced cloud computing technology to serve the development of China's foreign trade.[371]

This deal between IBM and CNBM's online e-commerce entity, designed to foster sales all over the world, including in the United States, was formed during the period of Taishan's contempt, in violation of the Court's Injunction. Consistent with its announcement, CNBM

---

[370] *See* OKorder.com news, available at http://www.okorder.com/news/news_1.html [CONTEMPT Ex. 165].

[371] *Id.* (emphasis added).

International Corporation contracted with a third-party, Beijing Qian Kun Tong Da Technology Co., Ltd., for purposes of acquiring access to an IP address assigned to IBM and its related companies.[372]   OKOrder.com is now associated with this same IP address.[373] Review of the invoices involving this IP address reflects that another IBM related company, Softlayer Dutch Holdings B.V., is the entity that contracted with Beijing Qian Kun Tong Da Technology Co., Ltd. for purposes of providing CNBM International access to the IP address assigned to IBM.[374] Thus, CNBM International acted in violation of this Court's Contempt Order by operating a website using an IP address assigned to an American Corporation.[375]

### iii.   CNBM International Took Over CNBM USA's Business Dealings in the U.S. from 2013 to the Present.

CNBM USA, a wholly-owned subsidiary of CNBM International, had personnel in its California office between 2006 and 2010.[376] From 2009 through 2013, until the time it ceased all business operations, CNBM USA was CNBM International's U.S. branch for sales of China's traditional building materials, construction machinery, metal building materials, steel, and coal.[377] In 2013, the business once carried out in the United States by CNBM USA was taken

---

[372] *See* 5/12/2015 Affidavit of Dody Lira [CONTEMPT Ex. 167] at ¶¶ II and X.

[373] *Id*. at ¶ X.

[374] *See* Invoices attached to the Affidavit of Dody Lira.

[375] *See* ZHANG Dep.  at 144:11-144:21.

[376] *See* ZHANG Dep. at 48:7-13.

[377] *See* "Three-Year Rolling" Development Planning of CNBM International Corporation in 2015-2017 [CONTEMPT Ex. 168] at 1.

over by its parent and Taishan affiliate, CNBM International.[378]   CNBM International proudly touted in its 2014 Annual Work report that in that year, the company "doubled its foreign trade business" and "established strategic partnership with over 100 manufacturers at home and founded food business relationship with more than 120 countries and regions overseas."[379] Overall, CNBM International's total business income in 2014 was $1,240,536.80[380] with RMB 32,962,400 derived from business conducted in the U.S.[381]   Further, based on documents produced by CNBM USA in response to the PSC's discovery requests, alone, CNBM International did $340,355.46 in sales during the Contempt Period in direct violation of the Injunction.[382]

Between January 1, 2014 and December 31, 2014, CNBM International's Metal Engineering Department sold $360,000.00 worth of foils to Comet Metals, Inc., an Ohio company.[383]   CNBM International maintained a profit margin of more than 4% in its sales to Comet.[384]

---

[378] *See* ZHANG Dep. at 50:12-16; *see also* Summary Chart of CNBM International Contempt Period Invoices, Contracts and Shipping Documents with Supporting Documents ("CNBM Int'l Contempt Sales") [CONTEMPT Ex. 169].

[379] 2014 CNBM Int'l Work Rept. at 4.

[380] 2014 CNBM Int'l Work Rept. at 5.

[381] *See* Table of 2014 U.S. Business at 3-15.

[382] *See* CNBM Int'l Contempt Sales.

[383] *See* 2014 CNBM International Metal Engineering Department Work Summary ("2014 CNBM Int'l Metal Engineering Dept.") [CONTEMPT Ex. 171] at 2.

[384] *Id.*

On August 6, 2014, CNBM International provided a quote to Global TDR, LLC, a Florida company, for the sale of $53,890.00 worth of aluminum coils.[385]  Signed by ZHANG Jinsong, general manager of CNBM International, the quotation provided that the goods to be sold by CNBM International to the Florida company would "be delivered to the loading port in 40 days after receiving [the buyer's] advance payment."[386]

On October 14, 2014, CNBM International finalized a sale of $20,958.84 worth of bricks to Refractories, Inc., a company located in Houston, Texas.[387]  Pursuant to the terms of the sales contract, CNBM International's production of the goods to be sold "would be completed within 60 days after 40% of payment"[388]—and thus, well within the period of Taishan's contempt.  Like the defective drywall forming the basis of this litigation, the bricks manufactured in China would be loaded at a port in China and delivered to a port in the U.S. (in this case, Houston).[389]  On the same date, CNBM International also finalized a sale of $2,060.00 worth of stainless steel cable to Architectural Iron Products, a company located in Portland Oregon.[390]  Pursuant to the terms of the sale, CNBM International was required to manufacture the goods within 20 days after the seller's deposit and shipping would occur 27 days thereafter.[391]

---

[385] *See* 8/6/2014 Quotation from CNBM International to Global TDR, LLC [CONTEMPT Ex. 172].

[386] *Id.*

[387] *See* 10/14/2014 Sales Confirmation for sale by CNBM International to Refractories, Inc. (TX) [CONTEMPT Ex. 173].

[388] *Id.*

[389] *Id.*

[390] *See* 10/14/2014 Sales Confirmation for sale by CNBM International to Architectural Iron Products (OR) [CONTEMPT Ex. 174].

[391] *Id.*

In December 2014, representatives of Engineered Products, a Seattle company that manufactures shelf columns, crossbeams, braces, partitions and other profiles for shelf systems, met with personnel of CNBM International to finalize a sale.[392]  During the visit, the technical details of the sale were discussed and finalized with the sales volume projected at $420,000.00.[393]

On January 5, 2015, CNBM International and Active Minerals Int'l, LLC entered into a contract for the purchase of clay.[394]  Pursuant to the terms of the contract, CNBM International would purchase 425 units of clay per month from Active Minerals, LLC for the term of one year.[395]  In each and every purchase made under the terms of this contract, CNBM International acted as a trade agent for another Chinese company, and in turn, derived profits therefrom.[396]

### 7.   CNBM Entities Used the American Judicial System During the Contempt Period to Pursue Monetary Claims on Behalf of Its Alter Egos.

In May 2004, BNK Int'l entered an agency agreement with CNBM Investment (then known as "BND Co., Ltd."), which was, at that time, a subsidiary of BNBM Group.[397]  The

---

[392] *See* CNBM International 2014 Summary Work Report of Sales Manager ("2014 CNBM Int'l Sales Mgr. Work Rept.") [CONTEMPT Ex. 175].

[393] *Id*.

[394] *See* 1/5/2015 Active Minerals Contract entered into between CNBM International Corporation (Buyer) and Active Minerals Int'l, LLC (Seller) [CONTEMPT Ex. 176].

[395] *Id*.

[396] See id.

[397] *See* Deposition of Jeffrey J. Chang dated 5/20/2015 ("J.J. Chang Dep.") [CONTEMPT Ex. 177] at 17:25-18:20.

agency agreement was for BNK Int'l to place orders with BND for resale to Lumber Liquidators and others in the United States.[398]   BND was aware that Lumber Liquidators was a national retailer and that the product it distributed through BNK Int'l would be sold throughout the United States.[399]   CAI Guobin, the president of BND, visited the United States and met with Jeffrey J. Chang, the president of BNK, Int'l, in 2006 with the primary focus being to meet with Lumber Liquidators.[400]   The business relationship between BNK Int'l and BND spanned from 2004 to 2007.[401]

In December 2007, Mr. Chang was notified that BND had changed its name to CNBM Investment.[402]   Mr. Chang explained that he believed CNBM Investment became a subsidiary of CNBM at that time.[403] However, even though BND changed its name to CNBM Investment and became a subsidiary of CNBM, there was no change in the personnel with which Mr. Chang interacted.[404]

CNBM Investment and BNK Int'l executed an addendum to their agreement in 2007 for purposes of beginning a cabinetry business in the United States.[405] Mr. Chang incorporated a

--------

[398] J.J. Chang Dep. at 20:2-22:25.

[399] J.J. Chang Dep. at 33:3-8

[400] J.J. Chang Dep. at 27:20-28:14.

[401] J.J. Chang Dep. at 31:24-32:32:5.

[402] J.J. Chang Dep. at 35:4-18.

[403] J.J. Chang Dep. at 39:12-16.

[404] J.J. Chang Dep. at 40:1-9.

[405] J.J. Chang Dep. at 37:6-21.

company in California, Crossroads Enterprises, for purposes of the cabinetry business.[406]   A dispute arose between CNBM Investment and BNK Int'l after CNBM Investment utilized knowledge imparted by BNK for purposes of selling cabinetry in the United States through one of its subsidiaries.[407] As part of his visit to the United States in 2006, Mr. CAI Guobin attempted to resolve the dispute between BNK Int'l and CNBM Investment.[408]

The relationship between BNK Int'l and CNBMI fell apart in 2008.[409]  CNBMI filed for a Hong Kong arbitration award in 2008.[410]  Mr. Chang paid $1.5 million to CNBMI in July 2010 in an effort to resolve the dispute and based on CNBMI's representation that it would invest money in Crossroads if the payment was made.[411]   In October of 2010, there was a settlement meeting in Austin, Texas between Mr. Chang and two attorneys representing CNBMI.[412] Not long after this meeting, in 2011, BNK Int'l filed for bankruptcy in the Western District of Texas.[413]   CNBMI entered an appearance in the bankruptcy proceedings and ultimately entered an asset purchase agreement for BNK Int'l on October 18, 2011.[414]   Amongst the assets purchased by CNBMI were BNK Int'l's right to pursue breach of fiduciary duty claims against

---

[406] J.J. Chang Dep. at 58:21-59:4.

[407] J.J. Chang Dep. at. 63:12-65:20.

[408] J.J. Chang Dep. at 58:2-20.

[409] J.J. Chang Dep. at 69:3-7.

[410] J.J. Chang Dep. at 69:8-19.

[411] J.J. Chang Dep. at 69:10-71:4.

[412] J.J. Chang Dep. at 71:6-23.

[413] J.J. Chang Dep. at 72:25-73:3.

[414] J.J. Chang Dep. at 73:4-16 & 75:12-24.

Mr. Chang and certain contractual rights involving contracts between BNK Int'l and Crossroads.[415]

On July 20, 2014, just days after the Court's Contempt Order was entered, CNBMI (a wholly-owned subsidiary of CNBM and an affiliate of Taishan)[416] filed a civil lawsuit in the United States District Court for the Western District of Texas (Austin Division), *China National Building Material Investment Co., Ltd. v. BNK International, LLC and Jeffrey Chang*, No. 14-701 (W.D. Tex.).[417] CNBMI's complaint alleges, among other things that:  (i) Defendant BNK Int'l - a Texas resident - was CNBMI's agent for sales of CNBMI products in the United States from 2004-2008; (ii) BNK owes CNBMI over $7.6 million in connection with their 2004-2008 agency relationship and U.S. sales; (iii) through BNK Int'l, CNBMI sold more than $20 million worth of product (to Lumber Liquidators) in the U.S.; and (iv) BNK Int'l is personally liable to CNBMI pursuant to theories of "alter ego" and "piercing the corporate veil."[418] Again, at the same time that CNBM is using American courts (in Texas and Oregon) to obtain monies they alleged are owing to them, in violation of the Court's injunction, CNBM is publishing

---

[415] J.J. Chang Dep. at 76:19-78:1.

[416] *See* J.J. Chang Dep. at 33:19-34:15; *see also* Corporate Disclosure Statement in *CNBMI v. BNK Int'l*, No. 14-701 (W.D. Tex.) ("Plaintiff China National Building Material Investment Co., Ltd. (f/k/a BND Co., Ltd.) is a corporation whose shares owned by China National Building Material Company Limited, a company whose shares are publicly traded on the Hong Kong Stock Exchange, stock code 3323, ticker CNBM.") [CONTEMPT Ex. 178].

[417] Complaint and exhibits thereto in *CNBMI v. BNK Int'l*, No. 14-701 (W.D. Tex.) [CONTEMPT Ex. 179].

[418] *Id.*

announcements that the Taishan Plaintiffs have no recourse against the Chinese Defendants due to problems enforcing judgments overseas.[419]

### 8.  Taishan Affiliates Maintained Alibaba.com Store Fronts and Derived Business and Profits from said Business Secured by Alibaba During the Contempt Period.

Throughout the contempt period, BNBM,[420] Taishan,[421] CNBM Import & Export,[422] CNBM International,[423] and CNBM International Engineering Co., Ltd.[424] each maintained "store-fronts" on Alibaba.com, an online English-language marketplace for global trade. Alibaba Holdings, LLC, Alibaba.com's parent company explains:

> The first business of Alibaba Group, Alibaba.com (www.alibaba.com) is the leading platform for global wholesale trade serving millions of buyers and suppliers around the world. Through Alibaba.com, small businesses can sell their products to companies in other countries. Sellers on Alibaba.com are typically manufacturers and distributors based in China and other manufacturing countries such as India, Pakistan, the United States and Thailand.[425]

---

[419] 7/18/2014 CNBM Announcement at 1.

[420]      *See*      BNBM's      Alibaba.com      Storefront,      accessed      at: http://bnbm.en.alibaba.com/company_profile.html#topnavbar [CONTEMPT Ex. 180]

[421] *See* Taishan's Alibaba.com Storefront, accessed at: http://tsgbm.en.alibaba.com/contactinfo.html [CONTEMPT Ex. 181].

[422] *See* CNBM Import & Export's Alibaba.com Storefront, accessed at: http://lgh07211.fm.alibaba.com/ [CONTEMPT Ex. 182].

[423] *See* CNBM International's Alibaba.com Storefront, accessed at: http://cnbm.en.alibaba.com/ [CONTEMPT Ex. 183].

[424] *See* CNBM International Engineering Co., Ltd.'s Alibaba.com Storefront, accessed at: http://cnbmengineering.en.alibaba.com/ [CONTEMPT Ex. 184]

[425] *See* Alibaba Group Holding's Description of Alibaba.com on "Our Businesses" site of their webpage, accessed at: http://www.alibabagroup.com/en/about/businesses [CONTEMPT Ex. 185]

As previously found in this litigation, Taishan's use of Alibaba to advertise its products proved effective, as it resulted in sales of Taishan's drywall to companies in the United States that found Taishan through the website.[426]

Alibaba is a Hong Kong company that operates a website linking buyers to the suppliers of various products. The company has operated successfully for years in the Asian market, and has now entered the U.S. market through the largest IPO (Initial Public Offering) in history.

During the domestic drywall shortage that followed the Hurricanes in 2005, it is a matter of record that certain U.S. customers used the Alibaba website to identify Taishan as a source of drywall. But, more pertinent for present purposes, a review of the Alibaba website reveals that the following entities currently post "storefront" profiles to advertise their products to potential buyers in the U.S. and elsewhere:

1)      Taishan;

2)      BNBM;

3)      CNBM;

4)      China National Building Material International Engineering Co., Ltd.; and

5)      China National Building Materials Import & Export.

Taishan and these affiliates, therefore, continue to use one of the world's largest and most successful internet services to promote and facilitate the sales of their products; and they clearly have done so with respect to potential or actual buyers in the U.S. since, and during, the

_____

[426] *See* Rec. Doc. 14215-2 (The PSC's Global Statement of Facts in Opposition to (1) Taishan's Renewed Motions to Vacate the Default Judgments and Dismiss the Complaints in *Germano* and *Mitchell* and (2) Taishan's Motions to Dismiss the Complaints in *Gross* and *Wiltz*) at p. 27; *See also In re: Chinese Manufactured Drywall products Liab. Litig.*, Doc. 00512636188 (5th Cir. 5/20/2014), at p. 21 ("Carn Construction Corporation, a Florida corporation, also contacted Taishan to purchase drywall after it discovered Taishan through Alibaba.com.")

injunction period initiated by the Court's Contempt Order of July 17, 2014. Mr. CHEN, the corporate representative of BNBM, openly admitted that the site was used by BNBM to promote and sell its products.[427]

### 9. Jushi USA Fiberglass Conducted Business in the United States During the Contempt Period in Clear Violation of the Court's Order.

During the contempt period, CNBM conducted business throughout the U.S. *via* its tier-four subsidiary, Jushi USA. In fact, Jushi USA's corporate representative openly conceded in his deposition testimony that China Jushi is, in fact, an affiliate of BNBM and as such, China Jushi and its affiliates, including Jushi USA, should not have been doing business in the U.S. during the period of Taishan's contempt.[428]   In 2014 alone, Jushi USA sold 70,000 tons of fiberglass in the United States and reported revenue of $104,684,510.51.[429] Jushi USA concedes, as it must, that it continued to do business (*i.e.* selling fiberglass) in the United States during the Contempt Period in clear violation of this Court's prohibition on such business.[430]   However, the income derived from Jushi USA's business in the U.S. is reported and noted as *Chinese* income on the company's parent, Jushi Group's, financial statements. Although the U.S. profits of the company are categorized as Chinese income, all of the profits are in fact, retained by Jushi USA.[431]

---

[427] ZHAO Dep. at 582-585.

[428] TANG Dep. at 245:12-246:20.

[429] TANG Dep. at 155:1-157:11; *see also* Income Statement for the 12 Periods Ended 12/31/2014 of Jushi USA Fiberglass Co., Ltd. [CONTEMPT Ex. 186]; see also 2014 Renewal Pricing and Loan Condition with Cathay Bank [CONTEMPT EX. 189].

[430] TANG Dep. at 155:1-157:11.

[431] TANG Dep. at 155:1-157:11.

Also during the Contempt Period, and in direct violation of the Injunction, Jushi USA operated distribution centers in South Carolina, Indiana, and California, from which substantial revenue was derived.[432]   In addition to the aforementioned distribution centers, approximately two to three years ago, Jushi USA's grandparent company and CNBM subsidiary, China Jushi, began the process of establishing yet another corporate entity in the U.S., Jushi USA South Carolina Fiberglass Company, Limited.[433]

Not surprisingly, all of the goods sold by Jushi USA are purchased directly from, none other than, its parent, Jushi Group.[434]   As such, Jushi Group too violated the Injunction in that all or most of the goods sold by Jushi USA in the U.S. during the contempt period were manufactured by Jushi Group, and as such, had to direct shipments to its U.S. subsidiary during the contempt period to be sold in one of Jushi USA's distribution centers.[435]

Finally, in addition to the large volume of business conducted by Jushi USA during the period of Taishan's contempt, the company also maintained and used U.S. banks (held a line of credit) solely for carrying out its business dealings here.[436]

---

[432] TANG Dep. at 224:22-225:1.

[433] TANG Dep. at 86:5-25 and 90:2-6.

[434] TANG Dep. at 116:11-25.  More discovery is required for purposes of confirming that these entities violated this Court's Contempt Order.  However, since neither China Jushi nor Jushi Group are named defendants in this litigation, the PSC has not yet pursued discovery from either entity.  The PSC awaits the Court's guidance on whether it should undertake to serve discovery on these entities under the Hague Convention.

[435] TANG Dep. at 117:1-15.

[436] Jushi USA has bank accounts at Cathay Bank and Bank of America.  *Id*. at 220:14-25.  Jushi USA also has a $20 million credit line at Cathay Bank.  TANG Dep. at 233:17-234:10.

The evidence uncovered throughout the course of discovery makes clear: Jushi USA is a "controlled subsidiary" of CNBM. Like the other Taishan Affiliates, CNBM exerts omnipresent control over Jushi USA through control of its intermediate subsidiaries, China Jushi and Jushi Group, Jushi USA's parent and grandparent entities, respectively.   CNBM directly holds 33.82% of China Jushi's total share capital, China Jushi holds 100% of Jushi Group's total share capital, and Jushi Group holds 100% of Jushi USA's total share capital.[437]   Thus, under the listing rules of the HKSE, CNBM is the controlling shareholder of China Jushi.[438]   CNBM exerts control over the downstream entities, Jushi Group and Jushi USA, by virtue of China Jushi's controlling ownership interest (direct and indirect) over the downstream entities.

In addition to CNBM's control over Jushi USA through its equity ownership, the general manager of CNBM, Mr. CAO, is also the chairman of the board of China Jushi.[439]   Furthermore, both the documents produced by Jushi USA and China Jushi's 2014 Annual Report confirm that CNBM is the controlling shareholder of China Jushi and Jushi Group.[440]   In fact, BNBM's 2014 Annual Report identifies China Jushi as its "*affiliate*"—a fact conceded by Mr. TANG, Jushi USA's corporate representative.[441]

---

[437] TANG Dep. at 44:25-45:2 and 49:6-21; *see also* 2014 CNBM Annual Report at 12.

[438] TANG Dep. at 49:22-51:8

[439] TANG Dep. at 119:13-18 and 125:11-15.

[440] *See* 2/12/2015-3/2/2015 email from Ellie Shen to Alan Gardiner ("the controlling shareholder of China Fiberglass is China National Building Materials Group Corporation (CNBM) …") [CONTEMPT Ex. 187] Ellie Shen is an employee of Jushi Group.  *See* TANG Dep. at. 62;4-14.  Alan Gardiner was the COO of Jushi USA.  *Id*. at 55:12-14; *see also* TANG Dep. at 76:13-77:5 and 79:19-23.

[441] TANG Dep. at 236:6-238:5, 241:12-19, and 245:12-246:4.

Furthermore, CNBM has and continues to exert such control over Jushi USA as it is a mere puppet of its parent and grandparent entities, China Jushi and Jushi Group, respectively. For instance, Jushi USA's Mr. TANG testified that Jushi USA follows the instructions of Jushi Group,[442] and that Jushi Group can direct Jushi USA to cut costs including layoffs and the selling of property.[443]  The deputy chairman of the board and the General Manager of China Jushi, Mr. ZHANG, is also on the board of Jushi USA.[444]  Mr. Zhang completely dominated the operations of Jushi USA through his position on the board and has taken active measures to ensure that all subsidiaries of China Jushi and Jushi Group act in a unified manner.[445]  Mr. ZHANG further had the ultimate say as to who would or would not be on Jushi USA's board of directors,[446] and similarly, has the same level of involvement in selecting the company's CEO, CFO, and COO.[447]

Based on the foregoing, it is clear that Jushi USA conducted business in the U.S. during the Contempt Period in clear violation of this Court's Injunction. Also indisputable is the fact that Jushi USA is a Taishan Affiliate who was subject to the July 17, 2014 Contempt Order and Injunction.

### 10. CNBM Derived Profits from U.S. Investors, Including Companies related to Morgan Stanley, JP Morgan Chase & Co. and Others, Purchase, Sale and/or Trade of A Shares in the Company During the Contempt Period.

---

[442] TANG Dep. at 104:19-105:2.

[443] TANG Dep. at 253:1-16.

[444] TANG Dep. at 106:11-20 and 275:20-25.

[445] TANG Dep. at 250:20-251:7

[446] TANG Dep. at 118:19-21.

[447] TANG Dep. at 118:22-24.

In 2006 CNBM, a publically held PRC corporation listed on the Hong Kong Stock Exchange ("HKSE"), hired Morgan Stanley Asia Ltd. to solicit investors on its behalf who would be interested in purchasing shares of CNBM stock.[448]   In acting as CNBM's agent, Morgan Stanley's duties mainly entailed soliciting shareholders and/or potential investors in the United States.[449]   As part of its work in the U.S. on CNBM's behalf, Morgan Stanley analysts solicited investors, together with CNBM representatives, arranged for and conducted meetings annually in Boston, New York, and San Francisco with these investors.[450]   As would be expected, the top officers and directors from the CNBM Group of companies, including but not limited to, Chairman SONG, Director CAO, and Mr. CHANG, attended the initial investment meetings arranged by Morgan Stanley in the U.S.[451] Also as part of this plan to secure U.S. investors, CNBM retained Davis & Polk as U.S. legal counsel to advise on U.S. legal matters for their Initial Public Offering ("IPO").[452]

The substantial shareholders for companies listed on the HKSE are a matter of public record pursuant to the HKSE listing rules.[453]   The following Morgan Stanley entities incorporated in the U.S. held shares in CNBM during the Contempt Period: (1) Morgan Stanley Tower, LLC; (2) Morgan Stanley Commercial Services, (3) MS Beta Holdings, (4) MS Alpha Holdings, (5) Morgan Stanley JV Holdings, (6) Morgan Stanley JV Holdings, LLC, (7) MS

---

[448] *See* Keyes Dep. at 13:20-24, 14:1-13.

[449] *See* Keyes Dep. at 137:8-19.

[450] *See* Keyes Dep. at 288:22-289:1

[451] *See* Keyes Dep. at 288:15-289:10

[452] *See* Keyes Dep. at 245:19-246:4.

[453] *See* Keyes Dep. at 372:7-16.

Gamma Holdings, and (8) Morgan Stanley Smith Barney Holdings.[454]  Likewise, JP Morgan, Citigroup, Inc., T. Rowe Price and BlackRock each held H shares in CNBM during the Contempt Period.[455] Though the number of shares each of the foregoing entities held during the period of Taishan's contempt vary, each either purchased, sold, or maintained the number of shares it held, ultimately inuring to the benefit of CNBM in one way or another.

As reflected on the HKSE website (http://sdinotice.hkex.com.hk) a search for all "relevant events"[456] occurring during the contempt period yields a list of *all* U.S. investors who either purchased, traded or sold CNBM H Shares (stock code 3323) during the time period in question.[457]  The pertinent stock transactions during the period of Taishan's contempt involve

---

[454] *See* Keyes Dep. at 344:3-345:7.

[455] *See* Keyes Dep. at 366:21-366:24, 331:5-331:24, 374:13-375:1

[456] Pursuant to Rule 2.7.1 of Part XV of the Securities and Futures Ordinance Disclosures of Interests, Relevant events include : (i) When you first become interested in 5% or more of the shares of a listed corporation (i.e. when you first acquire a notifiable interest); (ii) When your interest drops below 5% (i.e. you cease to have a notifiable interest); (iii) When there is an increase or decrease in the percentage figure of your holding that results in your interest crossing over a whole percentage number which is above 5% (e.g. your interest increases from 6.8% to 7.1% - crossing over 7% or it decreases from 8.1 to 7.8% crossing over 8%); (iv) When you have a notifiable interest and the nature of your interest in the shares changes; (v) When you have a notifiable interest and you come to have, or cease to have, a short position of more than 1% (e.g. you are already interested in 6.8% of the shares of a listed corporation and write, issue or become the holder of an equity derivative under which you have a short position of 1.9%); (vi)When you have a notifiable interest and there is an increase or decrease in the percentage figure of your short position that results in your short position crossing over a whole percentage number which is above 1%. (e.g. you are already interested in 6.8% of the shares of a listed corporation and increase your short position from 1.9% to 2.1% or decease it from 6.2% to 5.8%); (vii) If you have an interest in 5% or more of the shares of a corporation that is being listed, shares of a class that is being listed, or shares of a class which are being given full voting rights; (viii) If the 5% threshold is reduced (and you have a notifiable interest immediately after the reduction) or the 1 % threshold for short positions is reduced (and you have a notifiable interest and a short position that is notifiable immediately after the reduction). Available at:
 http://en-rules.sfc.hk/net_file_store/new_rulebooks/h/k/HKSFC3527_4511_VER20.pdf

[457] *See* "Shareholding Disclosures of CNBM" for Contempt Period - Printout from Hong Kong Stock Exchange                          website,                          available                          at:
 http://sdinotice.hkex.com.hk/di/NSAllFormList.aspx?sa2=an&sid=50000259&corpn=China+National+B

Citigroup, Inc., BlackRock, Inc. and J.P. Morgan Chase & Co., all of which are incorporated in the U.S.[458]  Through each of these transactions, CNBM derived profits from the aforementioned U.S. investors' purchase of its share capital. These purchases resulted from ongoing solicitation by CNBM of U.S. investors.  Again, CNBM, a Taishan affiliate[459] used the U.S. for its own business purposes during a period time when it consistently refused to participate in the instant litigation.

> ### 11. The Taishan Affiliates Maintained and Utilized United States Banks for Business Conducted in the United States During the Contempt Period in Violation of the Injunction.

Finally, CNBM Forest (Canada), CNBM International, CNBM USA and Jushi USA[460] maintained and used accounts in United States banks in connection with their business conducted here during the period of Taishan's Contempt. On January 28, 2014, CNBM Forest (Canada) opened a commercial checking account with Wells Fargo at the branch in San Francisco, California.[461] Since the date of opening, this account has been maintained by the company for its business dealings in the United States with a balance of as little as a few hundred US dollars and as much as $3.5 to $4 million.[462] CNBM Forest (Canada) used this bank account during the

---

uilding+Material+Co.+Ltd.+-
+H+Shares&sd=22/07/2014&ed=31/03/2015&sa1=cl&scsd=17%2f07%2f2014&sced=31%2f03%2f2015
&sc=3323&src=MAIN&lang=EN&   [CONTEMPT Ex. 190].

[458] *Id.*

[459] *See* FOFCOL, *1 at ¶ 4, *6 at ¶¶ 28-29, *8 at ¶ 47, *9 at ¶¶ 50-51

[460] *See* Section IV.B.9, *supra* (discussion of Jushi USA's American bank accounts).

[461] *See* 1/28/2014 Letter from Tony Liebo to Ken Kao re: CNBM Forest (Canada)'s new Account [CONTEMPT Ex. 191]; *see also* DENG Dep. at 107:10-21.

[462] DENG Dep. at 107:22-108:7.

Contempt Period both to deposit and withdraw[463] funds earned and spent in connection with its U.S. business operations.[464]

Since at least 2010, CNBM USA maintained at least three bank accounts in California.[465] Although CNBM USA ceased business operations sometime in 2013, and thus, no funds have been deposited in the accounts as a result thereof since that time, at least one of these accounts is still open today.[466]

Lastly, on October 30, 2012, United Suntech opened a bank account with Canadian Western Bank located in Richmond, Virginia.[467] However, only Liu Weisheng and Jiang Fei – officers of United Suntech—were and still are authorized to sign checks written from the account.

## V.     LAW AND ARGUMENT

### A.     The Court's Contempt Order and Injunction – Enjoining Taishan and Its Affiliates and Subsidiaries From Doing Business in the U.S. Until Taishan Complies, and Imposing a 25% Profits Penalty For Any Violation – Is Constitutional.

---

[463] If the amount being withdrawn or transferred from the account is over $300,000.00, approval must be obtained from both Dan Zhu (director of CNBM Forest Products) and Wu Xiang (Chairman of the board of directors of CNBM Forest Products). If the amount is less than $300,000.00, only Mr. Zhu's approval is necessary. DENG Dep. at 108:13-109:7.

[464] *See* DENG Dep. at 108:8-12.

[465] HSBC Bank USA Account maintained with the Alhambra Office at 590 West Main St., Alhambra, CA 91801, USA, an East West Bank account in Los Angeles at 135 N. Los Robles Ave., Suite 600, Pasadena, CA 91101; and an account with the Bank of China, Los Angeles Branch at 444 S. Flower Street, 39th Floor, Los Angeles, CA 91748, USA. *See* List of CNBM USA Bank Accounts  [CONTEMPT Ex. 192],

[466] *See* ZHANG Dep. at 152:22-153:8.

[467] *See* 10/30/2012 Director Resolution [CONTEMPT Ex. 193].

This Court has broad authority to summarily issue contempt orders when confronted with flagrant acts of contempt occurring in its presence in open court, *e.g.*, Taishan's willful refusal to appear, after having notice of the July 17, 2014 Judgment Debtor hearing.  Imbued with such power, this Court's Contempt Order does not violate the due process rights of Taishan or its affiliates (including the CNBM and BNBM Entities), already found by the Court to have been acting collectively as a single entity.[468]

It is well-settled that district courts have broad inherent authority to impose sanctions for both civil and criminal contempt of court. If the lawful orders issued by judges presiding over legal disputes are simply ignored by a litigant, the authority of the judicial system is necessarily called into question; and this is, by its nature, a question which goes far beyond the case at issue, and tests the very foundation of a nation which makes the law, not the will of individuals, supreme.[469]  In this regard, the Fifth Circuit has noted that the very existence of the judiciary requires that a judge have real-world power to not only enter, but enforce, the orders rendered in the course of litigation.  *See Nat. Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1407 (5th Cir. 1993), *cert. denied*, 510 U.S. 1073 (1994).

In addition to the Court's inherent authority to fashion and impose sanctions for contempt of court, Federal Rule of Civil Procedure 37 vests the Court with power to "treat[] as contempt of

---

[468] "Taishan, TTP, BNBM, BNBM Group, CNBM, and CNBM Group constitute a single business enterprise for purposes of piercing the corporate veil and holding each of these entities liable for the conduct of their affiliated entities."  *See* FOFCOL, *9 at ¶50; *see also* FOFCOL, *5 at ¶26, and *6 at ¶29; 2014 CNBM Annual Report at 13.

[469] In his work "Common Sense," Thomas Paine galvanized the American public with the thought that independence from a British monarch would be possible because the nation still would have a supreme ruler:  "But where, say some, is the King of America?...[T]hat we may not appear defective even in earthly honours, let a day be solemnly set apart for proclaiming the Charter, [and] let a crown be placed thereon, by which the world may know that, so far as we approve of monarchy,…in America the law is king."  T. Paine, "Common Sense" (1776) (emphasis added).

court the failure to obey any order." *See* Fed. R. Civ. P. 37(b)(2)(A).  Moreover, Rule 37(d)(3)

vests in the Court the authority to impose sanctions upon a "party or party's officer, director, or

managing agent – or person designated under Rule 30(b)(6)" who "fails, after being served with

proper notice, to appear." Fed. R. Civ. P. 37(d)(1)(A)(i).

As such, a district judge's inherent and express authority to impose sanctions in cases of

both civil and criminal contempt is an invaluable tool that has long been recognized in the

American judicial system. Over two centuries ago, with respect U.S. district courts, the Supreme

Court held from the very "nature of their institution," possess "the power to fine for contempt, to

imprison for contumacy, and to enforce the observance of orders, etc." *See United States v.*

*Hudson and Goodwin*, 11 U.S. 32, 34 (1812); *In re Terry*, 128 U.S. 289, 302-03 (1888); Notes,

*Permitting Private Initiation of Criminal Contempt Proceedings*, Harvard Law Rev., Vol.

124:1485, 1487 (2011) ("The power to issue punishments for contempt of court is an ancient

one, bound up in the very notion of the authority of the courts.") (*citing Young v. U.S. ex rel.*

*Vuitton et Fils S.A.*, 481 U.S. 787, 795 & n.7 (1987)).

    **1.**  <u>**The Coercive Sanctions Imposed by the Court Were Well Within its Inherent and Express Authority.**</u>

Similarly, the Taishan Defendants mistakenly challenge the Contempt Order's award of

25% of their profits as an unconstitutional criminal penalty, and beyond the Court's sanctioning

authority.[470]  Their challenge, however, mistakes the coercive and therefore civil nature of the

Contempt Order's injunction of "Taishan, and any of its affiliates or subsidiaries" from

conducting business in the United States "until or unless it participates in this judicial process,"

---

[470] *See* Rec. Doc. Nos. 18451 (Taishan's Opp. To Mot. To Enforce); 18872 (BNBM Entities' Opp. to Mot. to Enforce).

which afforded the Taishan Defendants the ability to avoid the penalty altogether simply by participating in the judicial process.

It is equally well-settled that upon a finding of contempt, a court has *broad* discretion in the imposition of sanctions "to protect the sanctity of its decrees and the legal process." *Test Masters Educ. Servs., Inc. v. Singh*, 428 F.3d 559, 582 (5th Cir. 2005) (citations omitted).  The "proper aim" of such sanctions "is full remedial relief."  *Florida Steel Corp. v. N.L.R.B.*, 648 F.2d 233, 239 (5th Cir. 1981) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193 (1949)).  Judicial sanctions in civil contempt proceedings may be employed for *either* or *both* of two purposes: (1) to coerce the defendant into compliance with the court's order, and/or (2) to compensate the complainant for losses sustained.  *Am. Airlines, Inc. v. Allied Pilots Ass'n*, 228 F.3d 574, 585 (5th Cir. 2000) (quoting *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303-04, 67 S. Ct. 677, 91 L. Ed. 884 (1947)).  The Supreme Court has long held that "the concept of compensatory relief" for the injured plaintiff may include profits derived by the contemnor in violation of a lawful court order.  *Leman v. Krentler–Arnold Hinge Last Co.*, 284 U.S. 448, 455-57 (1932) (civil contempt proceeding for violation of injunction in patent infringement suit).  Under the theory of unjust enrichment, "a contempt plaintiff is entitled to defendant's profits."  *Manhattan Industries v. Sweater Bee, Ltd.*, 885 F.2d 1, 6 (2d Cir. 1989).

Rule 37 also provides express authority for the imposition of sanctions for contemptuous conduct. Under subsection (b), the Court is vested with the express authority to "order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."  Fed. R. Civ. P. 37(b)(2)(C).  The

foregoing relief may be in addition to the various sanctions set forth in subsection (b)(2)(A) of the Rule.  *See id.*

Taishan deliberately refused to appear for its examination despite ample notice of the same, in flagrant violation of an express judicial mandate.[471] In fashioning an appropriate remedy, the severity and history of Taishan's conduct in this litigation could not be ignored. As the court explained:

> At the time it issued the Injunction, the Court was concerned that if it merely held Taishan in contempt and required Taishan to pay damages, the Contempt Order alone would not stop Taishan from continuing to disregard the orders of the Court. The Court felt it was necessary to issue an injunction in order to keep Taishan in the litigation and punish Taishan for its earlier refusal to cooperate.[472]

Thus, Taishan acted with utter disregard for judicial authority in its refusal to appear for its judgement debtor examination as ordered by the Court, particularly when viewed in conjunction with the egregious history of the case. An act which undoubtedly took place in open court. In light of the Court's experiences with Taishan in this litigation, and in the face of its disobedience of a Court Order, this Court acted within its broad discretion when it entered the July 17, 2014 Contempt Order and Injunction. Likewise, the Court clearly has ample authority to again apply the provisions of Fed. R. Civ. P. 37 and give further effect to the contempt sanctions imposed in that order.

---

[471] S*ee* Rec. Doc. No. 17869 at 2; *see also* Rec. Doc. No. 18276 (7/17/2014 Tr.) at 29 ("National counsel received communications from Taishan Gypsum that it would not attend or participate in the judgment debtor examination."); *See also* Rec. Doc. No. 17938 (Memo. in Support of Motion to Withdraw), at 2 ("TG has notified Counsel that it does not intend to participate in the judgment debtor exam").

[472] Rec. Doc. No. 19392 (Order and Reasons re: CNBM Entities' Mot. To Clarify the Contempt Order) at 2.

## 2. **The Issuance of the Contempt Order was Appropriate as to Taishan and May be Extended to its Affiliates.**

Defendants argue that the Contempt Order violates the due process rights of its affiliates, claiming no notice was given that a criminal sanction would issue.[473]  Even assuming Defendants are correct in arguing that the $40,000 fine and the award of $15,000 in attorneys' fees in the Contempt Order are criminal in nature, this argument fails at first blush – as the Taishan Defendants had notice.  Despite any testimony to the contrary, it is abundantly clear that CNBM Group, CNBM, BNBM Group, BNBM and Taishan together with its affiliates and subsidiaries were fully aware that the failure of Taishan to appear at the Judgment Debtor hearing could result in severe sanctions, including as to them.  How did Taishan, CNBM, CNBM Group, BNBM and BNBM Group obtain this knowledge?  Upon express advice of their former counsel, Hogan Lovells that a finding of contempt could result, and based on the inter-locking relationship between and among these entities, a relationship later determined by the Court to find these entities constituted a single business enterprise.[474]  Moreover, even after Taishan fired their counsel and withdrew from this litigation, word of the contempt order and injunction spread. In fact, merely one day after the order was entered, both CNBM and BNBM published an

---

[473] *See* Taishan Gypsum Co., Ltd.'s Response in Opposition to Plaintiff-Intervenors' and the PSC's Motion for an Expedited Hearing to Enforce the Court's July 17, 2014 Contempt Order and Injunction at 9-10, *citing*, Fed. R. Crim. P. 42 [Rec. Doc. No. 18451]; *see also* 18451; *see also* Rec. Doc. No. 19271 (CNBM Entities Mot. To Clarify); *see also* Rec. Doc. No. 19294 (BNBM Entities Mot. For Joinder in the CNBM Entities Mot. To Clarify).

[474] *See supra*, at Section II., *supra*; *see also* FOFCOL, ¶ 23.

announcement for their shareholders and affiliated entities discussing the order.[475] As is fully discussed in Section IV. A. *supra*, despite this knowledge, the Taishan Defendants did absolutely nothing to ensure compliance with the injunction. Therefore, it is respectfully submitted that the Court appropriately held Taishan in contempt and that the Contempt Order is properly extended to the Taishan Affiliates so far as they participated in Taishan's willful decision not to appear at the Judgment Debtor proceeding.

The law in the Fifth Circuit clearly finds that failure to appear may be grounds for summary contempt where the reason for the failure to appear are known to the Court. *See United States v. Onu*, 730 F.2d 253, 255 n.5 (5th Cir. 1984) (recognizing that the failure to appear for a hearing could be construed as a contempt in the presence of the court if the reason for the failure to appear before the court are known to the court. "In such instances, it may be that all the procedures [applying to indirect contempt] need not be followed."). *See also United States v. Hernandez*, 771 F.3d 707, 712 (10th Cir. 2014) (summarily sanctioning counsel for contempt under Fed. R. Crim. P. 42(b) for his willful failure to appear at a sentencing). As the Supreme Court acknowledged in *Cooke v. United States*, 267 U.S. 517 (1925):

> To preserve order in the court room for the proper conduct of business, *the court must act instantly to suppress ... disrespect to the court when occurring in open court*. There is no need of evidence or assistance of counsel before punishment, because the court has seen the offense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law and *the punishment imposed is due process of law*.

*Cooke*, 267 U.S. at 534 (emphasis added). More recently, the Supreme Court in *Pounders v. Watson*, 521 U.S. 982, 988 (1997), reiterated that "[w]here misconduct occurs in open court, the

---

[475] *See* 7/18/2014 CNBM Announcement; *see also* 7/18/2014 BNBM Announcement.

affront to the court's dignity is more widely observed, justifying summary vindication." *See also* Fed. R. Crim. P. 42(a); 18 U.S.C.A. § 401.

Taishan concedes, as it must, that this Court found that Taishan's failure to appear at the judgment debtor hearing occurred in the presence of the Court.[476] Thus, in order "[t]o preserve order in the court room for the proper conduct of business, the [C]ourt [acted] instantly to suppress . . . [Taishan's] disrespect to the [C]ourt . . . occurring in open court."   *Cooke*, 267 U.S. at 534. Moreover, it is respectfully submitted that Taishan's failure to appear at the Judgment Debtor hearing was open and willful based on Taishan's decision to terminate its counsel immediately prior to the July 17, 2014 Judgment Debtor hearing, with no attempt to hire new counsel for purposes of going forward with the proceedings.[477]   Taishan deliberately refused to appear at the hearing in direct violation of this Court's order requiring its appearance – making Taishan's conduct in this matter clearly worse than that involved in the *Onu* case.[478]  This Court, therefore, was well within its authority to summarily issue its Contempt Order.

In addition, so far as the Taishan Defendants contend that the Taishan Affiliates may not be held liable for a contempt by Taishan,[479] this argument should also be rejected because the jurisprudence is clear that affiliates and related parties may be held liable where they exercise control over a contemnor.   *See F.T.C. v. Kuykendall*, 371 F.3d 745, 759 (10th Cir. 2004) (affiliates and related corporate entities may be held vicariously in contempt where they engage

---

[476] *See* Rec. Doc. No. 18451 (Taishan's Opp. to Mot. to Enforce) at 3.

[477] *See* July 14, 2014 Motion to Withdraw as Counsel of Record [Rec. Doc. No. 17846].

[478] *Onu* involved the failure of counsel, as opposed to a party, to appear in open court.  In addition, counsel in *Onu* had engaged in repeated efforts to reschedule the trial in light of his duties as an active member of the Texas State Senate.

[479] *See* BNBM's Opposition at 12-13 [Rec. Doc. No. 18454].

in a "common enterprise" or could have controlled the activities of the contemnor); *Tegal Corp. v. Tokyo Electron Co.*, 248 F.3d 1376, 1379 (Fed. Cir. 2001) ("[C]ourts have held parties in contempt based on the conduct of others, but in that circumstance they have required proof that the party subject to contempt sanctions had control over those who engaged in the conduct proscribed by the injunction."); *see also Reebok Int'l Ltd. v. McLaughlin*, 827 F. Supp. 622, 625 (S.D. Cal. 1993) (holding that a non-party may be bound by injunction where it is proved that the nonparty participated in the contumacious act of the party), *rev'd on other grounds*, 49 F.3d 1387 (9th Cir. 1995); *United States v. Voss*, 82 F.3d 1521, 1527 (10th Cir. 1996) (individual that controlled organization that had access to requested records was properly convicted of criminal contempt where that individual was aware of court orders requiring organizations to respond to grand jury subpoenas the organizations failed to comply with the orders).

It is beyond dispute that the Taishan Affiliates exercised control over Taishan with respect to its decision to terminate its counsel and disregard this Court's order requiring its appearance at Judgment Debtor proceedings. Consequently, not only is the Contempt Order appropriate as to Taishan, but it was also well within this Court's authority to extend that Contempt Order to the Taishan Affiliates.

### 3. The Injunction from Doing Business in the United States Unless/Until the Defendants Purge Themselves of Contempt Was Permissible.

Taishan contends that this Court's Contempt Order impermissibly imposed a criminal penalty in the guise of the 25% of profits earned by the company or its affiliates or subsidiaries that violated the injunction on doing business in the United States. Taishan argues that only in

"exceptional circumstances" may a court impose such a penalty on a contemnor.[480]  But Fed. R.

Crim. P. 42(b) itself states that the court may "summarily punish a person who commits criminal

contempt in its presence."  As discussed above, this Court correctly found that Taishan's defiant

refusal to attend the Judgment Debtor Examination was in the Court's presence.  And, as also

discussed above, there is no doubt that Taishan's non-attendance was a deliberate, willful, and

orchestrated action plotted by the principals of Taishan, BNBM and CNBM, who were acting

collectively and in concert, and, therefore, punishable collectively.  *See Kuykendall*, 371 F.3d at

759; *Tegal Corp.*, 248 F.3d at 1379.  Therefore, the imposition of the coercive profit penalty

upon the Taishan Defendants was entirely within this Court's authority.  *See In re Oliver*, 333

U.S. 257, 275 (1948); *Ocean-Oil Expert Witness, Inc. v. O'Dwyer*, 451 F. App'x 324, 330 (5th

Cir. 2011).  In sum, Taishan's argument that this Court behaved unconstitutionally is completely

without merit.

### B. The Court is Entitled to Enforce the Provisions of the July 17, 2014 Contempt Order and Injunction.

In its July 17, 2014 Order of contempt, the Court ordered that

> "Taishan, and any of its affiliates or subsidiaries, is hereby ENJOINED from conducting any business in the United States until or unless it participates in this judicial process.  If Taishan violates this injunction, it must pay a further penalty of 25% of the profits earned by the company or its affiliates who violate the order, for the year of the violation."[481]

The Contempt Order is binding on not only Taishan, but also on all of its <u>Affiliates and</u>

<u>Subsidiaries</u>.  Under Federal Rule of Civil Procedure 65(d)(2), every order granting an injunction

"binds only the following who receive actual notice of it by personal service or otherwise:  (A)

---

[480] Taishan Opposition at p. 10 (citing *Harris v. United States*, 382 U.S. 162, 164 (1965)) [Rec. Doc. No. 18451].

[481] *See* Rec. Doc. No. 17869 (Contempt Order and Injunction).

the parties; (B) the parties' officers, agents, servants, employees, and attorneys; and (C) *other persons who are in active concert or participation with* anyone described in Rule 65(d)(2)(A) or (B)." Fed. R. Civ. P. 65 (Emphasis added).  Indeed, "[u]nder Rule 65, … orders bind persons 'in active concert,' irrespective of whether the court recites that specific language."  *Seven Arts Pictures, Inc. v. Jonesfilm*, 512 F. App'x 419, 426 (5th Cir. 2013).  A federal court's injunction runs nationwide, and "carries with it the concomitant power of the court to reach out to nonparties who knowingly violate its orders."  *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985).

This notion "is derived from the common law doctrine that a decree of injunction not only binds the party defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control. In essence it is that defendants may not nullify a decree by carrying out prohibited acts through aiders and abettors, although they were not parties to the original proceeding."  *Regal Knitwear Co. v. N.L.R.B.,* 324 U.S. 9, 14, 65 S. Ct. 478, 481, 89 L. Ed. 661 (1945).  Here, the Taishan Affiliates identified in Attachment 2 to the Proposed Order submitted herewith, and as fully detailed *supra*, are unquestionably subject to the same common control and thus, to allow their conduct in violation of the Inunction to go unpunished would constitute allowing the Taishan Defendants to nullify this Court's decree by conducting business in the U.S. through the Taishan Affiliates and Subsidiaries.   Thus, irrespective of whether any given Taishan affiliate or subsidiary or employee thereof is technically a party to the litigation because the Taishan Defendants were in active concert, the Court has the power to enforce its injunction and punish any violation by way of sanctions or contempt.

**C.  The Legal Definition of "Affiliate" Includes the Taishan Entities on Attachment 2 to the Proposed Order Submitted Herewith.**

The word "affiliate" is not one that has been subject to greatly varying interpretations or meanings.  Rather, it has been given fairly uniform meaning regardless of the context or jurisdiction in which it is used.  Black's Law Dictionary defines "affiliate" as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, a parent or a sibling corporation."  Black's Law Dictionary (9th ed. 2009) (emphasis added).  Statutory definitions of the term, are, for the most part, in line with the preceding Black's definition.[482]  As this Court has noted, "[t]hese terms are not vague; rather, they are legal terms requiring legal determination."[483]  With the benefit of the facts developed throughout the course of extensive discovery efforts undertaken by the PSC, the Court may now make these legal determinations as to which Taishan affiliates conducted business in the U.S. during the period of Taishan's contempt, in direct violation of the injunction prong of this Court's order.

In the Findings of Fact and Conclusions of Law issued by the Court on September 26, 2014 for the purposes of its class certification decision in this matter, reference was made to certain "affiliates" of Taishan Gypsum.[484]  Specifically, the Court defined "Taishan Affiliates" to include the following entities: (1) BNBM; (2) BNBM Group; (3) CNBM; (4) CNBM Group; and (5) TTP. This finding by the Court appropriately recognized that parent and other entities above

---

[482] *See* La. R.S. 12:1-1301(1) ("'Affiliate' means a person that directly or indirectly through one or more intermediaries controls, is controlled by, or is under common control with another person or is a senior executive thereof"); *see also* Tex. Bus. Orgs. Code Ann. § 1.002; Fla. Stat. Ann. § 607.0901; Ala. Code § 10A-1-1.03; Miss. Code Ann. § 75-76-199; Miss. Code Ann. § 79-27-5.

[483] Rec. Doc. No. 19392 (Order and Reasons re CNBM Entities' Mot. to Clarify) at 4.

[484] FOFCOL at ¶¶ 3-4.

Taishan Gypsum in a vertical line of corporate control, ownership and authority, squarely fall within the legal definition of "affiliates."  The same vertical line extends further to the State-owned Assets Supervision & Administration Commission ("SASAC"), as demonstrated in a corporate organizational chart previously made part of this record.[485]  Accordingly, SASAC also is an entity which should be considered one of the "Taishan Affiliates" by legal definition.

The additional question to be addressed is whether existing lines of horizontal relationships linking Taishan Gypsum to "sibling" or "cousin" entities sharing a common set of parents, likewise identify entities within the law's definition of "affiliates."  As discussed below, the governing jurisprudence, clearly characterizes such entities as "affiliates."

Courts regularly define "affiliate" broadly, using its general meaning. In *Hopkins v. Howard*, 930 So. 2d 999, 1004 (La. App. 4 Cir. 2006), for example, the court was tasked with interpretation of the 1999 version of La. R.S. 22:1379(3)(f), which contains the net worth exclusion to covered claims under the Louisiana Insurance Guarantee Association.  Specifically, the court considered which entities were included in the undefined term "affiliate."  The appellant advocated for a narrow interpretation to include only subsidiaries or sibling companies. The court held, however, that the term "affiliate" is not limited to those entities at the same and lower levels, but also includes parents.  Because the term was undefined in the statute, the court relied on its "common and approved usage" as reflected in both Black's Law Dictionary and Orian's Dictionary of the Law.  The court explained: "we find the term affiliate was intended to

---

[485] *See* Exhibit 130 to the Affidavit of Russ M. Herman dated 5/7/2012 ("Herman Aff."), filed as Exhibit A to the PSC's Global Statement of Facts in Opposition to Taishan's Jurisdictional Motions [Rec. Doc. Nos. 14215-3, 14215-4 & 14224],[485] (Q000955) (CNBM post-Global Offering corporate structure chart) & Exhibits K, L, M, and N to the PSC's Memo. in Opp. To Taishan's Mot. to Vacate Default Judgment [Rec. Doc. No. 6245-3 at 6-20] (attached hereto, collectively, as Exhibit "D"); *see also* Global Offering at 97.

have a broad meaning, which includes a parent company." *Hopkins*, 930 So. 2d at 1008

(emphasis added); *see also McCall v. Cameron Offshore Boats, Inc.*, 93-787 (La. App. 3 Cir.

3/9/94), 635 So. 2d 263 (*citing* Black's Law Dictionary to define "affiliate company" as used in a

compromise agreement to mean one that is "effectively controlled by another company. A

branch, division, or subsidiary....Corporations which are related as parent and subsidiary,

characterized by identity of ownership of capital stock.").

Likewise, in *Hall v. Malone*, 2013-0315 (La. App. 4 Cir. 1/15/14), 133 So. 3d 91, the

court addressed the meaning of the term "affiliate" as used the context of an indemnity provision

in a contract. Because the term was not defined in the contract, the court relied on the generally

prevailing meaning or use of the word:

> According to the dictionary, "affiliate" means "a condition of
> being united, being in close connection, allied, or attached as a
> member or branch." *Black's Law Dictionary* (Rev. 4th Ed.) (citing
> *Johanson v. Riverside County Select Groves, Inc.,* 4 Cal.App.2d
> 114, 40 P.2d 530, 534). . . . It is understood to be a "person or
> organization" with a close connection as a "member or branch" of
> another entity. *Merriam Webster's Collegiate Dictionary* (10th
> Ed.). *See also Hopkins v. Howard,* 05-0732, pp. 8-9 (La. App. 4
> Cir. 4/5/06), 930 So. 2d 999, 1004-05.

*Id*. at 95. *See also McLane Foodservice, Inc. v. Table Rock Restaurants, L.L.C.*, 736 F.3d 375,

378 (5th Cir. 2013) (*quoting* Black's Law Dictionary in defining the term "affiliate" as used in a

guarantee applicable to credit extended by "PFS and its affiliates," but finding no evidence of a

relationship of control, such as a subsidiary, parent, or sibling corporation).

In fact, the U.S. Fifth Circuit Court of Appeal in *Braun v. Insurance Co. of North

America*, 488 F.2d 1066, 1067-68 (5th Cir. 1974), specifically rejected a "restrictive downstream

definition" of the term "affiliate" as used in an insurance policy provision excluding coverage for

incidents in connection with travel in a company airplane, including an airplane owned or leased

104

by or on behalf of any subsidiary or affiliate of the company.  In its holding, the court explained: "[t]he word affiliate was not used grammatically but rather legally in the context of the present day corporation, most spectacularly represented by the conglomerate, in which connections between companies may be vertical, diagonal or horizontal and sometimes all the way around with occasional mixtures of any one or all of the four."  *Braun*, 488 F.2d at 1067.

Application of the jurisprudential principle articulated in *Braun* to the corporate structure and organization of the family of entities which include Taishan, leads to the conclusion that entities not only in a vertical line, but also in horizontal lines of relationship, should be considered "Taishan Affiliates." Importantly, in a letter from the Ministry of Foreign Affairs of the PRC commenting on this litigation, it is noted that "several U.S. plaintiffs instituted a lawsuit in the U.S. against SASAC, [CNBM Group] and ***five of its affiliates*** . . .."[486] These "affiliates" referred to in the letter, are none other than CNBM, BNBM Group, BNBM, United Suntech, and CNBM USA. These entities by the PRC's own recognition are therefore affiliates and, thus, so too are the others identified herein and on Attachment 1 to the proposed order submitted with this Motion.

Moreover, a public document generated by CNBM itself enables the Court to identify these entities by name.  On March 13, 2006, CNBM filed a "Global Offering Prospectus," a public record accessible online and cognizable by this Court.[487]  The corporate structure chart made part of the Global Offering names all entities that should be considered "affiliates" of Taishan, including both those in the vertical line of ownership and control and those related

---

[486] *See* 10/30/2015 Letter from the Embassy of the People's Republic of China to the U.S. Department of State [CONTEMPT EX. 194] at 4 (emphasis added).

[487] *See e.g.*, Global Offering.

horizontally.[488]  In every year following the 2006 Global Offering, CNBM has made publically available on both its website and the HKSE website, its annual reports in both Chinese and English, all of which include organizational structure charts for all entities within the CNBM Group of companies. Notably, however, over the years some entities change names, and/or stop appearing on the entity chart altogether and presumptively become subsumed with the "other entities" item beneath several of the CNBM Group Entities. These entities are listed by name on the document entitled "Taishan's Affiliates and Subsidiaries," which is made an attachment to the proposed Order submitted herewith.

## VI.   <u>CONCLUSION</u>

The Defendants have been targeting the United States market for their products well before either BNBM along with BNBM Group, and Taishan first began importing their defective drywall into the Gulf states and Virginia, and elsewhere, after they stopped selling drywall, and they have continued to maintain a presence in this country by conducting business here throughout the pendency of this litigation.   The lure of profits derived from the United States market was so great, not even this Court's Contempt Order could put a halt to their incessant commercial activity.  However, as demonstrated above, these defendants and their affiliates have contemptuously violated this Court's Contempt Order.

Accordingly, for the foregoing reasons, Plaintiff-Intervenors and the PSC pray that the Court enforce the July 17, 2014 Contempt Order and enter the proposed Order submitted

---

[488] The "Definitions" section (pp. 17-33) of CNBM's Global Offering identifies the complete corporate name for each entity appearing on the chart.  Notably, the list of "affiliates" might be longer than the one submitted herewith, given the fact that SASAC oversees and controls 150 large central state-owned enterprises ("SOEs").  *See* FOFCOL, at ¶ 26.  On July 29, 2014, the PSC filed an Omnibus Complaint (XIX) against SASAC [*see* Rec. Doc. Nos. 17905-3, 17906] and is in the processing of serving SASAC with the Complaint pursuant to the Hague Convention.

herewith, (1) identifying the "affiliates" and "subsidiaries" of Taishan subject to the Court's July 17, 2014 Injunction prohibiting them from conducting any business in the United States for the period of Taishan's contempt (collectively, the "Taishan Affiliates and Subsidiaries"); (2) finding that the Taishan Affiliates and Subsidiaries identified in the accompanying Memorandum of Law violated the Court's July 17, 2014 Injunction; (3) setting a hearing to determine the penalty owed by Taishan and/or any of the Taishan Affiliates and Subsidiaries; and (4) to determine an appropriate award of attorney's fees and costs associated with PSC's efforts undertaken in pursuit of enforcing the Contempt Order and Injunction.

Dated: February 10, 2016                    Respectfully Submitted,

BY:    */s/ Russ. M. Herman*
Russ M. Herman (Bar No. 6819) (On the Brief)
Leonard A. Davis (Bar No. 14190) (On the Brief)
Stephen J. Herman (Bar No. 23129)
Madelyn O. Breerwood (Bar No. 35538) (On the Brief)
Herman, Herman & Katz, LLC
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
ldavis@hhklawfirm.com
*Plaintiffs' Liaison Counsel*
*MDL 2047*

Arnold Levin (On the Brief)
Fred S. Longer (On the Brief)
Sandra L. Duggan (On the Brief)
Matthew Gaughan (On the Brief)
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215) 592-4663
alevin@lfsblaw.com

*Plaintiffs' Lead Counsel*
*MDL 2047*
Gerald E. Meunier (LA Bar No. 9471) (On the Brief)
Rachel A. Sternlieb (LA Bar No. 35338) (On the Brief)
Gainsburgh, Benjamin, David,
  Meunier & Warshauer, LLC
2800 Energy Centre
1100 Poydras Street
New Orleans, LA 70163-2800
Phone:  (504) 522-2304
Fax:  (504) 528-9973
gmeunier@gainsben.com

*Co-Counsel for Plaintiffs and PSC Member*

## PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com

Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com

Peter Prieto
Podhurst Orseck, PA
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com

Bruce William Steckler (On the Brief)
Steckler LLP
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-4041
bruce@stecklerlaw.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
  Echsner & Proctor, PA
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Ervin A. Gonzalez
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Coral Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Jerrold Seth Parker
Parker Waichman, LLP
3301 Bonita Beach Road
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com

Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Myers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com

James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com

Christopher Seeger (On the Brief)
Scott George (On the Brief)
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Victor M. Diaz, Jr.
V.M. Diaz and Partners, LLC
119 Washington Ave., Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

Richard J. Serpe
Law Offices of Richard J. Serpe
Crown Center, Suite 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W., Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Anthony D. Irpino (On the Brief)
Pearl A. Robertson (On the Brief)
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 10th day of February 2015.

Respectfully Submitted,

BY:  */s/ Leonard A. Davis*
      Russ M. Herman
      Leonard A. Davis
      Stephen J. Herman
      Madelyn O. Breerwood
      Herman, Herman & Katz, LLC
      820 O'Keefe Avenue
      New Orleans, LA 70113
      Phone: (504) 581-4892
      Fax: (504) 561-6024
      ldavis@hhklawfirm.com

      *Plaintiffs' Liaison Counsel*
      *MDL 2047*