**FILED BY:**   Bayou Title, Inc.
2626 N. ARNOULT ROAD SUITE 130
Metairie, Louisiana 70002
504-887-1780
FILE NUMBER MT091-12/Anderson

## ACT OF CASH SALE

**BE IT KNOWN**, that on this **27th day of July, 2012**, before me, the undersigned, a Notary Public, duly commissioned in the Parish of Jefferson and qualified for the State of Louisiana, and in the presence of the undersigned competent witnesses, personally came and appeared:

**BRAD ELLIOTT RICHARDSON**, (SSN XXX-XX-3808), a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana, who declared under oath unto me, Notary, that He is single and has never been married and is livng and residing at;

Mailing Address: 9315 Morrison Rd., New Orleans, LA 70127, (Vendor),

who, being by me first duly sworn, declared that Vendor does, by these presents grant, bargain, sell, convey, transfer, set over, assign, abandon and deliver, with all legal warranties and with full substitution and subrogation in and to all rights and actions of warranty which Vendor has or may have against all preceding owners and vendors, unto:

**PATRICIA A. ANDERSON**, (SSN XXX-XX-9044), a person of the full age of majority and a resident of the Parish of Orleans, State of Louisiana, who declared under oath unto me, Notary, that She is single and has never been married and is living and residing at;

Mailing Address: 7516 Primrose Drive, New Orleans, Louisiana 70126, (Purchaser),

here present and accepting, purchasing for Purchaser, Purchaser's successors, heirs and assigns, and acknowledging due delivery and possession thereof, all and singular the following described property, to-wit:

THAT PORTION OF GROUND, together with all the buildings and improvements thereon, and all the rights, ways, privileges, servitudes, appurtenances and advantages thereunto belonging or in anywise appertaining, situated in the THIRD DISTRICT OF THE CITY OF NEW ORLEANS, STATE OF LOUISIANA, in Ardyn Park Subdivision, in Square 4-A, said square being bounded by Ligustrum Drive, Curran Road, Primrose Drive and a crosswalk seperating squares number 4-A and 9-A, said portion being designated as Lot 15-A, said Lot commences at a distance of 441.53 feet from the corner of Primrose Drive and Curran Road and measures thence 55 feet front on Primrose Drive, same in width in rear, by a depth of 102.94 feet between equal and parallel lines. All as more fully shown on survey by Adloe Orr, Jr. & Associates dated May 19, 1972, a copy of which is annexed to an act passed before Shirley H. Kirkes, Notary Public, registered in COB 709, folio 603.

The improvements thereon bear the Municiapal Number: 7516 Primrose Drive, New Orleans, LA 70126

Being the same property acquired by Brad E. Richardson, by an Act of Cash Sale, dated Februay 7, 2007, and registered as CIN 08772, of the official records of Orleans Parish, Louisiana.

To have and to hold the Property unto Purchaser, Purchaser's successors, heirs and assigns forever.

This sale is made and accepted for and in consideration of the price and sum of **One Hundred Thirty-Four Thousand and 00/100 ($134,000.00) DOLLARS** cash, which Purchaser has well and truly paid, in ready and current money, to Vendor, who hereby acknowledges the sufficiency and receipt thereof and grants full acquittance and discharge therefor.

The Property is sold subject to any and all applicable covenants, conditions, restrictions, servitudes, rights of way, outstanding mineral interests and other matters which may appear in the chain of title of title or elsewhere in the public records of Orleans Parish, Louisiana, the reference to or enumeration of which shall not serve to interrupt or revive prescription thereon, recognize the validity thereof, or acknowledge, ratify or confirm same.

of New Orleans up to and including the taxes due and payable in the year 2012 have been paid and have been prorated through the date of this transaction. The responsibility for the adjustment of any tax proration is assumed by Vendor and Purchaser. The responsibility for the application for a homestead exemption and/or the payment of taxes due in the year 2013 and all future years is assumed by Purchaser.

Vendor and Purchaser acknowledge that the Conveyance and Mortgage Certificates are open, undated and unsigned and relieve and release Bayou Title, Inc., its members, managers, officers, agents and employees and the undersigned Notary Public from any and all responsibility in connection therewith.

Vendor and Purchaser acknowledge that a current survey has not been produced in connection with this transaction and relieve and release Bayou Title, Inc., its members, managers, officers, agents and employees and the undersigned Notary Public from any and all responsibility for fence misalignments, servitudes, rights of way, encroachments, discrepancies in dimensions, rights of parties in possession and any and all other matters which might be disclosed on a current survey.

Vendor and Purchaser covenant and agree that the Property and all improvements and component parts thereon, and plumbing, electrical systems, mechanical equipment, heating and air conditioning systems, built-in appliances and all other items located on or in the Property are conveyed by Vendor and accepted by Purchaser "AS IS, WHERE IS," and "WITH ALL FAULTS," without any warranty of any kind whatsoever, even as to metes and bounds, the operation or suitability of such property for the use intended by purchaser, and without regard to the presence of apparent or hidden defects and with purchaser's full and complete waiver of any and all rights for the return of all or any part of the purchase price by the reason of any such defects. Purchaser acknowledges and declares that neither vendor nor any party whomsoever, acting or purporting to act in any capacity whatsoever on behalf of vendor, has made any direct, indirect, explicit or implicit statement, representation or declaration, whether by written or oral statement or otherwise, and upon which purchaser has relied, concerning the existence or non-existence of any quality, characteristic or condition of the property. Without limiting the foregoing, purchaser acknowledges and declares that neither vendor nor any party whomsoever, acting or purporting to act in any capacity whatsoever on behalf of vendor, has made any representation or warranty as to, and purchaser expressly waives any warranty as to: (a) the quality, nature, adequacy or physical condition of the property including, but not limited to, the structural elements, foundation, roof, appurtenances, access, landscaping, parking facilities or the electrical, mechanical, hvac, plumbing, sewage or utility systems, facilities or appliances at the property, if any; (b) the quality, nature, adequacy or physical condition of soils, sub-surface support or ground water at the Property; (c) the existence, quality, nature, adequacy or physical conditions of any utilities serving the property, or access thereto; (d) the development potential of the Property or its habitability, marketability, fitness, suitability or adequacy for any particular purpose; (e) the zoning classification, use or other legal status of the Property; (f) the property's, or its operations' compliance with any applicable codes, laws, regulations, statutes, ordinances, covenants, setback requirements, conditions or restrictions of any governmental or quasi-governmental entity or of any other person or entity; (g) the quality of any labor or materials relating in any way to the property; or (h) the nature, status and extent of any right of way, servitude, lease, right of redemption, possession, lien, encumbrance, license, reservation, covenant, condition, restriction or any other matter affecting title to the Property. Purchaser has had full, complete and unlimited access to the property for all tests and inspections which Purchaser, in Purchaser sole discretion, deems sufficiently diligent for the protection of Purchaser's interests. Purchaser expressly waives the warranty of fitness and the warranty against redhibitory vices and defects, whether apparent or latent, imposed by LSA - C.C. art. 2475, any other applicable state or federal law and the jurisprudence thereunder. Purchaser also waives any rights it may have in redhibition or to a reduction of the purchase price pursuant to LSA - C.C. arts. 2520 through 2548, inclusive, in connection with the property. Purchaser declares and acknowledges that these waivers have been brought to Purchaser's attention and explained in detail and that Purchaser has voluntarily and knowingly consented to these waivers. By its signature, purchaser expressly acknowledges all such waivers. Without limiting the foregoing, purchaser releases Vendor from any and all claims, demands, causes of action, judgments, losses, damages, liabilities, costs and expenses (including attorney's fees whether suit is instituted or not), whether known or unknown, liquidated or contingent (claims) arising from or related to (a) any defects, errors or omissions in the design or construction of the property, whether the same are a result of negligence or otherwise; (b) other conditions (including environmental conditions) affecting the property, patent or latent, whether the same are as a result of negligence or otherwise; (c) Purchaser's ability or inability to obtain or maintain building permits, either temporary or final certificates of occupancy or other licenses for the use or operation of the property and/or certificates of compliance for the property; (d) the actual or potential income or profits to be derived from the Property; or (e) the real estate taxes or assessments now or hereafter payable thereon. The release set forth in this paragraph specifically includes any claims under any environmental laws, under the Americans with Disabilities Act of 1990 (42 U.S.C. §12101 et seq.), or with respect to any environmental risk. "Environmental laws" include without limitation, the Solid Waste Disposal Act, as amended by the Resource Conservation and Recovery Act (42 U.S.C §6901, et seq.), the Emergency Planning and Community Right to Know Act (42 U.S.C. §110, et seq.), the Clean Air Act (42 U.S.C. §7401, et seq.), the Clear Water Act (33 U.S.C. §1251 et seq.), the Toxic Substances Control Act (15 U.S.C. §260,1 et seq.), the Hazardous Materials Transportation Act (49 U. S. C. §1801, et seq.), the Occupational Safety and Health Act (29 U.S.C. §651, et seq.), the Federal Insecticide, Fungicide and Rodenticide Act (7 U.S.C. §136, et seq.), the Safe Drinking Water Act (42 U.S.C. §300, et seq.), the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601, et seq.), the Louisiana Environmental Quality Act (LSA -R. S. 30:2001, et seq.) and the Superfund Amendment and Reauthorization Act, as any of the same may be amended from time to time, and any state or local law dealing with environmental matters, and any regulation, order, rule, procedure, guideline and the like promulgated in connection therewith, regardless of whether the same are in existence on the date of this act. "Environmental risk" consists of any risk to persons or the environment, including without limitation (a) the presence of any friable, damaged asbestos upon the property; and/or (b) the release or discharge of any "hazardous substance" or "hazardous waste" (as defined by any environmental laws) onto or from the property of such a nature or to such an extent as to require clean-up under applicable law.

_____
Patricia A. Anderson

**THUS DONE AND PASSED** in my office in Orleans Parish, Louisiana, on the day, month and year herein above first written, in the presence of the undersigned competent witnesses, who hereunto sign their names with Vendor and Purchaser and me, Notary Public, after due reading of the whole.

WITNESSES:

PRINT NAME: Selena Carey

PRINT NAME: John Kendall Richardson

SELLER(S)

Brad Elliott Richardson

PURCHASER(S)

Patricia A. Anderson

NOTARY PUBLIC

Title Ins. Prod: Bayou Title, Inc.
Address: 1820 Belle Chasse Hwy., Suite 205, Gretna, Louisiana 70056
Prod. Lic. # 257049
Title Ins. Underwriter: COMMONWEALTH LAND TITLE INSURANCE COMPANY
Title Opinion By: MICHAEL P. BONO
LA Bar Roll #: 27970

**BRUNO & BRUNO**

JOSEPH M. BRUNO
STEPHEN P. BRUNO
ROBERT J. BRUNO
JOSEPH M. BRUNO, JR.

STEPHANIE MAY BRUNO
MELISSA A. DEBARBIERIS
DANIEL A. MEYER

OF COUNSEL
FRANK S. BRUNO
ROBERT D. REES

*Also Licensed To Practice In Texas*
*Also Licensed To Practice In Mississippi*

REPLY TO (PLEASE CHECK)
NEW ORLEANS ☑
COVINGTON

March 26, 2014

Patricia Anderson
7516 Primrose Drive
New Orleans, Louisiana 70126

RE: Your Chinese Drywall Claim

Dear Ms. Anderson:

The settlement administrator is requesting further information regarding your Chinese Drywall Claim. Failure to provide the items listed below will result in denial and/or possible dismissal of your claim. These items must be submitted to our office no later than Friday, April 18, 2014. Please give me a call at (504) 525-1335 ext. 149 if you have any questions.

Sincerely yours,

Sondleta B. Johnson
Legal Assistant to Joe Bruno

| | WHAT YOU NEED TO SUBMIT | EXPLANATION |
|---|---|---|
| 1. | Proof of Ownership | Documentation proving ownership of the Affected Property (such as a deed, mortgage statement, or tax record) |
| 2. | Proof of Chinese Drywall | Photographs, inspection reports or other documents demonstrating the presence of Chinese Drywall. |



# Corrosive Dry Wall Assessment of 7516 Primrose Dr. New Orleans, LA

Conducted By Industrial Safety & Health, Inc. (ISH, Inc.)
4713 Utica St. Metairie, LA 504-885-6391

Assessor: Julie Murphy, MS, BS
Indoor Air Quality Technician #55465388C86B1C090
EPA 608 Type 1 Technician #811C831FAFCD1C090



January 20, 2014

To whom it may concern:

Based on the CPSC and HUD identification method of Homes with Corrosion from Problematic Dry Wall, the residence located at 7516 Primrose Dr. New Orleans, LA contains problematic corrosive dry wall imported from China due to the observations from the inspection and laboratory results.

The inspection revealed corrosion and blackening of electrical wires, copper pipes, bathroom fixtures, and plumbing. The house was renovated between the years of 2005 to 2007, which is within the time frame that corrosive sheet rock was used.

Laboratory results for Elemental Sulfur analysis in dry wall samples were at 210 ppm (parts per million) for the hallway bathroom closet sampled. The analyzed sample contained elevated sulfur concentrations, greater than 10ppm, which is an indicator for problematic corrosive dry wall.

Julie Murphy

*Environmental Specialist*
**Industrial Safety & Health , Inc.**
*Office: 504 885 6391*
*Julie.M@ish1.com*
http://www.ish1.com/
http://www.ertrescue.com/

## 1.0   PROJECT DESCRIPTION AND OBJECTIVES

Industrial Safety & Health, an industrial hygiene and indoor air quality consulting firm, was contracted by Patricia Anderson to conduct a corrosion assessment for possible problematic sheetrock at 7516 Primrose Dr. New Orleans, LA. Patricia purchased the home approximately 1 year ago and began having problems with the HVAC system (heating, ventilation, and air conditioning). The approximately 1800 ft$^2$ slab based residential structure was comprised of wood framing, with interior walls constructed of gypsum wallboard.

### Background

In 2004, hurricane damage and flooding in the southeastern United States coupled with a nationwide home building boom created a strong demand for gypsum wallboard which outstripped domestic supplies. Drywall was, therefore, imported from China beginning as early as 1999; quantities increased dramatically between 2004 and 2007. Approximately 550 million pounds / 7 million sheets of drywall were imported, enough for 40,000 homes or more, if mixed with domestic drywall. Approximately 60% was delivered to Florida predominantly for new home construction and 11% to Louisiana for storm-related water damage. The rest is scattered across 35 other states including the District of Columbia and Puerto Rico. Years since its arrival in the United States, some of the drywall imported from China has caused corrosion of mechanical and electrical systems. Some of this drywall produces an unpleasant odor. The preferred descriptive term for this building material is "corrosive drywall" frequently abbreviated as "CDW."

Initially, the primary confirming factors for the presence of corrosive drywall in a residence were noticeable odor, corrosion attacking copper tubing on HVAC evaporator coils, premature coil failure with associated refrigerant leakage, visible black corrosion on un-insulated electrical wiring and Chinese factory markings on the back of installed gypsum wallboard.

Homeowners were encouraged to report drywall problems to their state department of health. As complaints, reports of problems and health effects continued to escalate, a revised case definition was released on December 18, 2009. This revision delineated a more rigorous set of criteria which included laboratory analysis of samples and investigative processes through which suspect drywall could be confirmed as corrosive, after having progressed through the staged categories of possible, probable and, finally, confirmed. By adding the necessity for specialized laboratory testing of samples and the associated development of a sampling plan, this revision also mandated participation of trained professionals to collect and analyze samples for case definition confirmation only.

The Consumer Product Safety Commission (CPSC) the Environmental Protection Agency (EPA), the Centers for Disease Control (CDC) and the Agency for Toxic Substances and Disease Registry (ATSDR) became involved in the direction and performance of basic scientific research into the chemical characteristics and human health effects related to CDW.

The first report describing results of the federal agencies' research were published at the end of November 2009. In addition to testing of drywall itself, the CPSC published results of residential indoor air testing and field corrosivity testing on 51 homes in 5 states. The CPSC database has approximately 2900 reports of contaminated drywall. Based on information gathered from all of the federal research, the CPSC and HUD (Housing and Urban Development) issued Interim Guidance – "Identification of Homes with Corrosion from Problem Drywall" January 28, 2010.

With or without insurance coverage, remediation activity has been stalled until the MDL decision due to the lack of satisfactory remediation guidance on how to move forward with confidence. Previously, on April 2, 2010, CPSC and HUD published remediation protocols. Federally-sanctioned MDL remediation guidelines have removed this reluctance to act. The National Association of Home Builders will also be issuing investigative and remediation guidance to its members soon.

## 2.0   ASSESSMENT STRATEGY AND METHODS

The following tools were used in the assessment.

| Instrument | Manufacture | Model |
|---|---|---|
| Thermometer/Humidity meter | Extech Instruments | 44550 |
| MultiRae Realtime air monitor | Rae | PGM 6500 |

A digital camera, in addition to intensive visual inspection for suspected corrosion amplification was used to conduct the assessment in the specified areas of the facility.

The Inspection includes examination of corrosion or blackening in the following areas:
- Appliances
- Plumbing
- Electrical fixtures
- A/C evaporator coils, refrigerant lines
- Coppers wires

## 3.0   INTERIOR LIVING SPACE

On June 20, 2013 a walk through inspection of 7516 Primrose Dr., was begun in the front room, kitchen, utility room, living room, bedrooms, bathrooms, and attic.

No pungent sulfur odor was detected during the inspection, but the current resident explained that an odor was detected on previous occurrences. The indoor environment was 79°F and 61% relative humidity. Humidity and temperature have been associated with worsened conditions by increasing the output of volatile emissions from defected dry wall.

Several electrical outlets and switches were inspected by first shutting off the power to isolate any electrical hazards followed by the removal of the wall plate and visually inspecting exposed copper wiring. Electrical outlets, light switches, bathroom fixtures, visible plumbing, and wires were inspected throughout the home. All inspected areas had the appearance of blackening or corrosion (See Picture 1-21).

The attic was accessed from the hallway for inspection. The HVAC coils were non accessible to check for signs of corrosion and blackening in color, however the refrigerant line was visible and had a blackened appearance (Picture 1, 2).

The accessible sheet rock was checked for a labeling source printed on the back side of the sheet rock. The accessible sheet rock in attic did not have any labeling with "Made in China", Chinese nomenclature, or Knauf Tianjun.

## 4.0　SAMPLING

During the time of inspection air sampling was conducted using a Multi Rae air monitor and the presence of Hydrogen Sulfide, Volatile Organic Compounds, Sulfur Dioxide, and Carbon Monoxide were not detected.

A sheetrock sample was taken from the hallway bathroom closet. Following proper sample collection protocol, a legal chain of custody was completed and samples were shipped to a certified laboratory. The sample was analyzed for Elemental Sulfur concentrations, which indicates if the drywall samples are associated with the emission of sulfur-based gases capable of producing corrosion.

## 5.0　RESULTS AND CONCLUSIONS

The residence located at 7516 Primrose Dr. New Orleans, LA appears to have possible corrosion issues due to contaminated sheetrock being the source. The inspection revealed corrosion and blackening of electrical wires, copper pipes, bathroom fixtures, and plumbing. The home owner has recently experienced problems with the HVAC system, which may be related to the contaminated sheet rock. The house was also renovated between the years of 2005 to 2007, which is within the time frame that corrosive sheet rock was used.

Laboratory results for Elemental Sulfur analysis in dry wall samples were at 210 ppm (parts per million) for the hallway bathroom closet sampled (See attached report). The sample analyzed contained elevated sulfur concentrations, greater than 10ppm, which is an indicator for problematic corrosive dry wall. Prior to any

actions of disturbing the sheetrock, a remediation protocol should be set up and followed per "HUD & CPSC issue guidance".

## References

SUMMARY OF IDENTIFICATION GUIDANCE FOR HOMES WITH CORROSION
FROM PROBLEM DRYWALL AS OF MARCH 18, 2011
http://www.cpsc.gov/info/drywall/IDguidance031811.pdf
HUD and CPSC Issue Guidance on Repairing Homes with Problem Drywall

www.cpsc.gov/info/drywall/hud10068.html

Questions regarding this report can be addressed to Industrial Safety & Health, Inc. 504.885.6391

Assessment and report by Julie Murphy, ISH, Inc.

# Lab report



EMSL Analytical, Inc. 200 Route 130 North, Cinnaminson, NJ 08077

---

**Order ID: 281300781**

| | | | |
|---|---|---|---|
| Attn: | Julie Murphy<br>Industrial Safety & Health<br>4713 Utica Street<br>Metairie, LA 70006 | Customer ID:<br>Customer PO:<br>Date Received: | INSH25<br><br>6/21/13 |
| Phone:<br>Project:<br>Report Date: | (504) 885-6391<br>7516 Primrose Dr. New Orleans, LA<br>7/8/13 R0<br>7/9/13 R1 Added Project Address | EMSL Order:<br>EMSL Project ID:<br>Date Analyzed: | 281300781<br><br>6/25/13 |

## Test Report – Elemental Sulfur Content of Gypsum Wallboard by Base / Neutral / Acid (BNA) Extraction Analyzed by Gas Chromatography / Electron Capture Detection (GC/ECD)

| Sample ID | Identification | Matrix | Compound | Sample Weight (g) | Detection Limit (ppm) | Sample Result (ppm) |
|---|---|---|---|---|---|---|
| 281300781-0001 | Hallway Bathroom Closet | Bulk Drywall | Elemental Sulfur | 2.6 | 2 | 210 |

*Notes:*
1. Samples were received in acceptable condition unless otherwise noted.
2. These results relate only to the samples tested.
3. The CPSC/HUD Chinese Drywall Interim Guidance is 10 ppm. Please consult this guidance.
4. Samples will be retained for an additional two weeks unless otherwise directed.

### Experimental

Approximately 2.5 gram samples were cut from the center of the sample, pulverized, and weighed. 5 ml of n-hexane were added, and the sample sonicated for 30 minutes. 1.0 ml of supernatant was then drawn off and placed in an autosampler vial for analysis. The extract was analyzed by Gas Chromatography with Electron Capture Detection using direct injection.

Digitally signed by Vincent M. Daliessio Jr., CIH
Date: 2013.07.09 12:16:10 -04'00'

**VMD**
*Analyst*

*Scott VanEtten, CIH- Lab Manager*
*Or other approved signatory*

*Page 1 of 1*

## Photos



| | |
|---|---|
| | Picture 1<br><br>Front room electrical outlet<br>Blackened copper |
| | Picture 2<br><br>Front room light switch<br>Blackened copper |
| | Picture 3<br><br>Kitchen light switch<br>Blackened copper |

| | |
|---|---|
|  | Picture 4<br><br>Laundry room light switch<br>Blackened copper |
|  | Picture 5<br><br>Laundry room sink<br>Black pitting and corrosion |
|  | Picture 6<br><br>Living room electrical outlet<br>Blackened copper |

| | |
|---|---|
|  | Picture 7<br><br>Master bedroom light switch<br>Blackened copper |
|  | Picture 8<br><br>Master bathroom sink<br>Blackened appearance |
|  | Picture 9<br><br>Master bathroom sink drain<br>Blackened appearance |



Picture 10

Master bathroom valve corrosion



Picture 11

Master bathroom shower knob
Black pitting



Picture 12

Master bathroom, bathtub drain
Corrosion, black beading



| | |
|---|---|
| | Picture 13<br><br>Master bathroom water spout<br>Black beading |
| | Picture 14<br><br>Master bathroom over flow drain<br>Black beading and corrosion |
| | Picture 15<br><br>Hallway bathroom sink<br>Blackened appearance |



| | |
|---|---|
| | Picture 16<br><br>Hallway bathroom drain<br>Blackened appearance |
| | Picture 17<br><br>Hallway bathroom valve<br>Corrosion |
| | Picture 18<br><br>Hallway bathroom shower knob<br>Black beading |

ASSESSMENT OF 7516 PRIMROSE DR. NEW ORLEANS, LA             12



| | |
|---|---|
| | Picture 19<br><br>Hallway bathroom water spout<br>Black beading and corrosion |
| | Picture 20<br><br>Copper line in attic<br>blackened |
| | Picture 21<br><br>Copper line in attic<br>blackened |