# EXHIBIT H

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:  
CHINESE MANUFACTURED DRYWALL  
PRODUCTS LIABILITY LITIGATION

MDL No. 2047  
Section: L

JUDGE FALLON  
MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:  
LEWIS, ETHEL AND LEWIS-PIERRE, LATOYA  
(Claimant No. 100241)

and

*Payton, et al. v. Knauf Gips KG, et al.*  
Case No. 2:09-cv-07628 (E.D. La.)  
*Gross, et al. v. Knauf Gips KG, et al.*  
Case No. 2:09-cv-06690 (E.D. La.)  
*Rogers, et al. v. Knauf Gips KG, et al.*  
Case No. 2:10-cv-00362 (E.D. La.)  
*Abreu, et al. v. Gebrueder Knauf Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-00252 (E.D. La.)  
*Block, et al. v. Gebrueder Knauf Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-2349 (E.D. La.)  
*Arndt, et al. v. Gebrueder Knauf Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-2349 (E.D. La.)  
*Cassidy, et al. v. Gebrueder Knauf Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-3023 (E.D. La.)  
*Vickers, et al. v. Knauf Gips KG, et al.*  
Case No. 2:09-cv-04117

## EXPERT AFFIDAVIT OF ERIC SIGLER

**STATE OF FLORIDA** )  
) SS  
**COUNTY OF MIAMI-DADE** )

**BEFORE ME,** the undersigned authority, personally appeared, Eric Sigler, who upon being first duly sworn, deposes and states, as follows:

1.  My name is Eric Sigler. I am over the age of 18, and the matters attested to in this Affidavit are from my own personal knowledge.

2.  I am a licensed realtor practicing throughout South Florida. My business address is 28 SE 23rd St., Pompano, FL 33062. I have been a licensed and working real estate professional in South Florida for over 15 years. My day-to-day duties involve the sale and leasing of real property in South Florida, including analyzing sales, pricing, and value of property. I have served as a realtor on hundreds of closed real property transactions in South Florida. I am familiar with the real estate market in South Florida and particularly Miami-Dade County from the years 2006 until the present. I consider myself an expert in the sale of real property and the real property market in South Florida, including in and around Homestead, Florida.

3.  I was asked to review a deal involving the June 27, 2011 sale ("the short sale") of the property located at 11321 SW 236 Lane, Miami, FL 33032 ("the subject property") and give an opinion on how Chinese drywall might have affected that transaction. Prior to forming the opinions I express in this Expert Affidavit, I reviewed the documents relating to this deal, including the contract for purchase and sale, all addendums and attachments, and all closing documents, as well as all relevant information associated with the deal, including analyzing the "comparables" in the relevant market and time period. I am confident that I am qualified and sufficiently informed to offer the opinions I express herein.

4.  The sellers in the short sale were Ethel Lewis and Latoya Lewis-Pierre, and the deal closed on June 27, 2011—in a "short sale"—with a sale price of $99,000.00. The Lewis family had purchased the subject property on January 9, 2007 for $327,638.00. Addendum No. 2 to the short sale purchase and sale contract, dated March 20, 2011, expressly states:

> **Due to the excessive amount of money needed to remedy the condition of the Chinese Drywall and any other unforeseen repairs that may arise not visible to the naked eye due to the Chinese Drywall in the above mentioned property the buyers are re-countering at their final and highest offer of $99,000.00.**

And indeed the short sale closed for that expressly reduced offer price of $99,000.00. This short sale, therefore, featured an express, significant price reduction expressly because of the known, disclosed presence of defective Chinese drywall in the property. The 2011 short sale price of $99,000.00 was a whopping $228,638.00 less than the 2007 original purchase price of

$327,638.00. It is my expert opinion that this *very extremely low* short sale price can easily be said to have been caused by the presence and disclosure of defective Chinese drywall, and cannot be blamed on the general dropoff in the real estate market during this timeframe.

5. Additionally, I have reviewed a sworn affidavit of Latoya Lewis-Pierre that I understand has been filed in this proceeding, in which she swears that the Lewis Family purchased the affected property to be their primary residence, not knowing that the affected property contained defective Chinese-manufactured drywall.

6. In my experience and in my professional expert opinion, as further detailed herein, the claimants would not have purchased the property *in the first place* had they known it contained defective Chinese-manufactured drywall. The "Chinese Drywall Problem" became well known in our industry in 2009, when it became national news. In fact, real estate deals in Florida now require a "Chinese Drywall Addendum" disclosing whether the seller knows that the property contains or used to contain Chinese drywall. Nobody had heard of a "Chinese drywall" problem in 2007, when the Lewis Family purchased the affected property.

7. It is my experience and professional, expert opinion that a home infected with Chinese-manufactured drywall is a *major*, extremely significant obstacle for a realtor trying to sell a home. In short, and to be as concise as I can be: people do not want to purchase, rent, or live in a home that contains Chinese drywall. It is my further opinion that not only does Chinese drywall present a *real* problem that clients can observe (the awful smell, burning eyes, runny nose, sneezing, nausea, headaches), there is also a "fear problem," because the Chinese drywall problem became a well-known issue in the South Florida market in 2009. Whether there are longterm health effects from living in a home infected with Chinese drywall or not, people *fear* that there might be, and as it regards to the value of real estate, perception matters. People do not want to buy or live in a home that has Chinese drywall, and the value of real estate is what people are willing to pay for it.

8. People have a fear that a home that contains Chinese drywall may cause significant health problems, even if the long-term effects of such exposure are not yet known. And the immediate short term effects—awful smell, runny nose, headaches, etc.—are readily apparent. What matters in a prospective buyer or renter of real property's mind is that person's subjective fear and feelings about a home, including their fear concerning health effects and effects on their children and families.

9. It is my further experience and professional, expert opinion that the only buyers of properties with homes known to contain Chinese drywall are "professional" or "entity" buyers, such as financial institutions and contractors, who buy at a *very deep* discount with the intention of paying to remediate the home. Regular folks who are looking to buy a home in which to live with their children are simply not interested in a home that has contained Chinese drywall. Even when I suggest to non-institutional clients (potential buyers who want to live in a home as a family) that they can purchase a home that contains Chinese drywall at a very deep discount and thereby save money in the end by fixing it up themselves, they uniformly reply: "not interested."

10. Like many of my colleagues in the real estate business, I do not even present houses with Chinese drywall to any clients other than professional contractors who are in the business of "flipping properties." I am forced to report, however, that I have not yet had *even a contractor client* buy a home damaged with Chinese drywall. I have, however, seen the papers associated with deals that did get closed involving houses infected with Chinese drywall, and I feel comfortable stating that $100,000.00 seems to be a common express price reduction when properties are sold with express disclosure of the presence of Chinese drywall. This number, in fact, fits just about in line with what appears to have happened regarding the deal concerning the affected property in the instant case.

11. The fact is, buyers do not want to deal with the cost and complications of remediating a Chinese drywall home. It is also well known in the industry that the General Contractor price for remediating an average 2,000 square-feet home is around $140,000.00 to $150,000.00. And again, putting money considerations aside, regular Floridians, *families, mothers, and fathers* do not want to live in a home with their young children if the home has Chinese drywall.

12. I have been informed, by reading the sworn affidavit of the claimant in the instant matter, that the Lewis Family effected a short sale and moved out of the affected home because of the presence of Chinese Drywall, and that they otherwise had the ability to maintain the mortgage and would have remained in the home.

13. My experience as a real estate professional also includes representing buyers and sellers in "short sales," generally. A short sale cannot close, of course, without the lender's approval. A short sale means the lender is agreeing to let the property be sold for less—often far less—than the amount owed on the Promissory Note. Lenders do not make this decision unless

they have no other option because doing so makes sense. In this case, the lender, Chase Bank, approved the short sale for only $99,000.00 after being in possession of the contract for purchase and sale and all addendums, which includes the Chinese Drywall reference and the explicit statement that the buyers would pay only $99,000.00 because of the presence of Chinese Drywall.

14. It is my professional, expert opinion that the short sale transaction concerning the subject property and the claimants in the instant legal proceeding was conducted as a short sale with lender approval because the property was known by all parties to contain a significant quantity of defective Chinese-manufactured drywall that caused the property to suffer from a severe "rotten egg" smell and also blackened and corroded all of the copper and other metals in the home, including electrical wiring, copper pipes, and the HVAC unit.

15. In summary, based on all of the above, my review of this matter, and my experience, the following are my expert opinions:

   a. The presence of defective Chinese-manufactured drywall is an extremely large obstacle to any realtor or seller attempting to persuade a would-be buyer to purchase a property;

   b. Not only does the presence of Chinese drywall present a real problem that clients can observe (the awful smell, corrosion of metals, and damage to appliances and the HVAC system in the home), there is also a "fear problem," because the Chinese drywall problem became a well-known issue in the South Florida market in 2009;

   c. Whether there are longterm health effects from living in a home infected with Chinese drywall or not, people *fear* that there might be, and perception matters. People do not want to buy or live in a home that has Chinese drywall;

   d. People have a fear that a home that contains Chinese drywall may cause significant health problems, even if the long-term effects of such exposure are not yet known. What matters in a prospective buyer or renter of real property's mind is that person's subjective fear and feelings about a home, including their fear concerning health effects and effects on their children and families;

   e. The only potential buyers of properties that contain Chinese drywall are contractors or financial institutions, who buy at an extremely deep discount;

f. Regular buyers who want to purchase a home in which to live with their children simply will not purchase a home that contains or contained Chinese drywall;

g. Even contractor would-be purchasers often balk at buying Chinese drywall homes, and deals that do get closed often have approximately a $100,000.00 price reduction when properties are sold with express disclosure of the presence of Chinese drywall. This number, in fact, fits just about in line with what appears to have happened regarding the deal concerning the affected property in the instant case;

h. The Lewis Family sold the subject property that is at issue in the instant legal proceeding, as a "short sale" with lender approval and express disclosure of the presence of Chinese drywall, because the property contained Chinese drywall; and

i. The subject property was sold at a steep price reduction because of the presence of Chinese drywall, which was expressly disclosed as part of the deal.

[This space intentionally left blank. Signature page follows.]

[This space intentionally left blank. Signature page follows.]

**FURTHER SAYETH AFFIANT NAUGHT**

_____
Eric Sigler

STATE OF FLORIDA )
) SS:
COUNTY OF Miami Dade )

SWORN TO and SUBSCRIBED before me by Eric Sigler, who is personally known to me or has produced  Fl drivers licen  as identification and who did take an oath and verified the foregoing Affidavit.

DATED this 27 day of Feb , 2015.

NOTARY PUBLIC, State of Florida

_____
Signature of Notary Public

[Notary Seal: STACEY GEORGE, NOTARY, My Comm. Expires October 15, 2018, No. FF 168918, STATE OF FLORIDA, PUBLIC]

Types or printed name of Notary Public

My commission expires:
Page of


# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE:  
CHINESE MANUFACTURED DRYWALL  
PRODUCTS LIABILITY LITIGATION

MDL No. 2047  
Section: L

JUDGE FALLON  
MAG. JUDGE WILKINSON

THIS DOCUMENT RELATES TO:  
LEWIS, ETHEL AND LEWIS-PIERRE, LATOYA  
(Claimant No. 100241)

and

*Payton, et al. v. Knauf Gips KG, et al.*  
Case No. 2:09-cv-07628 (E.D. La.)  
*Gross, et al. v. Knauf Gips KG, et al.*  
Case No. 2:09-cv-06690 (E.D. La.)  
*Rogers, et al. v. Knauf Gips KG, et al.*  
Case No. 2:10-cv-00362 (E.D. La.)  
*Abreu, et al. v. Gebrueder Knauf*  
*Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-00252 (E.D. La.)  
*Block, et al. v. Gebrueder Knauf*  
*Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-2349 (E.D. La.)  
*Arndt, et al. v. Gebrueder Knauf*  
*Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-2349 (E.D. La.)  
*Cassidy, et al. v. Gebrueder Knauf*  
*Verwaltungsgesellschaft KG, et al.*  
Case No. 2:11-cv-3023 (E.D. La.)  
*Vickers, et al. v. Knauf Gips KG, et al.*  
Case No. 2:09-cv-04117

/

## AFFIDAVIT OF LATOYA J. LEWIS-PIERRE

**STATE OF FLORIDA**         )  
                             ) SS  
**COUNTY OF MIAMI-DADE**     )

**BEFORE ME,** the undersigned authority, personally appeared, Latoya J. Lewis-Pierre, who upon being first duly sworn, deposes and states, as follows:

1.      My name is Latoya J. Lewis-Pierre. I am over the age of 18, and the matters attested to in this Affidavit are from my own personal knowledge.

2.      My mother, Ethel Lewis, and I were the owners of the property located at 11321 SW 236 Lane, Miami, FL 33032, which is the "affected property" that is the subject of this Chinese Drywall proceeding. We purchased the affected property for $327,638.00 on January 9, 2007. We sold the affected property in a "short sale," with lender approval, for $99,000.00 on June 27, 2011.

3.      I purchased the affected property to be my mother's primary residence, and indeed she moved in immediately upon closing on the purchase. Ethel Lewis lived in the affected property and made the mortgage payments for over three years, not knowing it was infected with defective Chinese Drywall. Although we did notice the awful "sulfur" or "metallic" smell, we were informed that it was "new home smell" that would eventually go away. We had no way to know of the "Chinese Drywall problem" until sometime in late 2009, when it became a problem that was covered on local news stories. As the affected property is in the Silver Palms development built by Lennar, many of our neighbors' homes also were built with defective, smelly Chinese-manufactured drywall. It was after talking to neighbors who had experienced similar problems that we did some research and consulted with an attorney.

4.      On January 12, 2010, we learned that the home was infected with defective Chinese Drywall after a professional inspector performed an inspection at our attorney's direction. Although we had a reasonable fear about our safety and personal health, Ethel Lewis continued to live in the home and make payments until October of 2010. Although no children lived in the affected property full time, there were visitors, and my mother's niece and I often spent her weekends there. Despite our concerns about the health effects of Chinese Drywall, we continued to maintain the mortgage for 10 months while we tried to decide what to do. Keeping the mortgage payments current and not getting behind on payments was extremely important to us, of course.

5.      After retaining counsel and researching the Chinese Drywall problem that swept our nation and especially Florida, we were placed in tremendous fear regarding the potential health effects that we had suffered for three years—while making every mortgage payment—and that we would continue to suffer if we stayed in the defective home.

6. We made the difficult decision that conducting a short sale was our only option because of the presence of defective Chinese-manufactured drywall in the home. Only after paying the mortgage for 10 months after being advised by our attorney that the home contained Chinese drywall did we make the difficult decision to stop making payments on what was essentially an uninhabitable home.

7. We respectfully suggest that it is patently unreasonable to expect a homeowner to make payments on a home infected with defective Chinese Drywall, which home is essentially valueless, because no person with a choice would choose to live in a home infected with smelly, potentially dangerous Chinese Drywall. Again, we bought the home to be the primary residence for Ethel Lewis, and she actually lived there for nearly four years while making all mortgage payments. As our expert witness has opined in a separate affidavit filed in our case, many would argue that a home infected with Chinese Drywall is literally uninhabitable (they would not live there with their family), yet we kept the mortgage current for nearly four years, including 10 months after learning that the home had Chinese drywall.

8. I unequivocally state that we had the ability and desire to continue making the mortgage payments on the affected property and we would have done so, and Ethel Lewis would be living in that home today, but for the presence of defective Chinese Drywall. We have uploaded the documentation showing nearly four years of mortgage payments to the BrownGreer settlement portal. In October of 2010 when we made the difficult decision to stop making mortgage payments on the home, nothing had changed in our family's financial situation. We had the ability to continue making the mortgage payments and Chinese Drywall is literally the reason that we stopped making payments and eventually conducted a short sale.

9. As the evidence on record shows, we purchased the affected property as "new construction," and we were proud and excited to be the home's first owners. Other than the Chinese drywall, we loved the home—it's design, layout, location, use of space, etc. As much as this term might have become cliché in modern lingo today, this home—but for the presence of smelly, defective Chinese drywall—really was our "dream home" for Ethel Lewis.

10. When we sold the affected property, as shown in the HUD-1 "Settlement Statement" and other documentation we have provided, it was sold as a "short sale," with lender approval, because the Chinese Drywall rendered the home with a value less than what we owed on it. We did not, therefore, receive any cash at closing.

11. This short sale transaction was conducted as a short sale with lender approval *because* the property was known by all parties to contain a significant quantity of defective Chinese-manufactured drywall that caused the property to suffer from a severe "rotten egg" or "metallic" smell, and also blackened and corroded all of the copper and other metals in the home, including electrical wiring, copper pipes, and the HVAC unit. We have provided sufficient photographic evidence and an inspection report from the expert inspector retained by our counsel, which proves that the Chinese Drywall symptoms were severe.

12. There was an express price reduction because of the presence of Chinese drywall in the home, as shown in Addendum No. 2 to the purchase and sale contract, which states:

> Due to the excessive amount of money needed to remedy the condition of the Chinese Drywall and any other unforeseen repairs that may arise not visible to the naked eye due to the Chinese Drywall in the above mentioned property the buyers are re-countering at their final and highest offer of $99,000.00.

Indeed, this "final offer" was the final sale price, which was approved by the lender and allowed to close as a short sale.

[This space intentionally left blank. Signature page follows.]

## FURTHER SAYETH AFFIANT NAUGHT

_____
Latoya J. Lewis-Pierre

STATE OF FLORIDA )
                 ) SS:
COUNTY OF Miami Dade )

SWORN TO and SUBSCRIBED before me by Latoya J. Lewis-Pierre, who is personally known to me or has produced ___Fla DL___ as identification and who did take an oath and verified the foregoing Affidavit.

DATED this 4 day of ___March___, 2015.

NOTARY PUBLIC, State of Florida

Signature of Notary Public

PUTEE BACHAN
MY COMMISSION # EE224997
EXPIRES August 14, 2016
FloridaNotaryService.com

Types or printed name of Notary Public
My commission expires: