**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

IN RE: CHINESE-MANUFACTURED DRYWALL     MDL DOCKET: 2047
     PRODUCTS LIABILITY LITIGATION

                                       SECTION:  L

THIS DOCUMENT RELATES TO:           JUDGE FALLON
                                         MAG. JUDGE WILKINSON

ALL CASES

_____/

**LENNAR CORPORATION'S MEMORANDUM OF LAW IN SUPPORT
OF ITS MOTION TO ENFORCE BAR ORDER AND TO ENJOIN
CLAIMS BROUGHT BY ARTHUR SIEGWARDT AND LINDA SIEGWARDT**

Lennar Corporation ("Lennar") files this Memorandum of Law in Support of its Motion to Enforce Bar Order and to Enjoin Claims Brought by Arthur Siegwardt and Linda Siegwardt ("Plaintiffs").

**I.**     **INTRODUCTION**

This Court issued an order enjoining and forever barring all Class Members who did not timely opt out of the Settlement Agreement in MDL No. 2047 Regarding Claims Involving Builders, Installers, Suppliers, and Participating Insurers (the "Global Settlement") from maintaining, continuing, prosecuting, and/or commencing claims arising from, concerning, or otherwise related to defective Chinese-manufactured drywall ("Chinese Drywall") against Settling Parties (the "Bar Order").  Lennar, by virtue of its participation in the Global Settlement, is a Settling Party and thereby entitled to the protections granted through the Bar Order.  Plaintiffs, who own a home that allegedly contains Chinese Drywall, did not opt out of the Global Settlement.  Nevertheless, these Plaintiffs have recently initiated a state court action against Lennar in the Twentieth Judicial Circuit, in and for Lee County, Florida, in the case captioned *Arthur Siegwardt*

*and Linda Siegwardt v. Lennar Corporation*, Case No. 14-CA-003347, in an effort to assert and maintain claims against Lennar relating to Chinese Drywall (the "State Court Action").  Because the Plaintiffs are subject to the Bar Order and, therefore, precluded from bringing and maintaining the State Court Action (or, for that matter, any other action or proceeding arising out of or related to Chinese Drywall), Lennar requests the Court to enforce its Bar Order enjoining and forever barring claims against Lennar by class members of the Global Settlement that have not opted out of that settlement, and to enjoin Plaintiffs from continuing to prosecute the State Court Action and any other claims against Lennar relating to Chinese Drywall.

## II.     FACTUAL BACKGROUND

### A.     MDL No. 2047 and the "Global Settlement"

On May 31, 2012, after several years of litigation, this Court entered an Order preliminarily approving four (4) class action settlement agreements involving Chinese Drywall, one of which was the Global Settlement.  *See* Preliminary Approval Order (Rec. Doc. 14562).  Lennar is unquestionably a "Participating Defendant" and "Settling Party" in the Global Settlement.  *See* Exhibit 1 to Global Settlement (Participating Defendants) (Rec. Doc. 17031-1), at p. 12.

The Global Settlement defines "Class Members" as "all persons . . . with claims, known or unknown, arising from or related to actual or alleged Chinese Drywall purchased, imported, supplied, distributed, marketed, installed, used, sold or in any way alleged to be within the legal responsibility of any Participating Defendant."  *See* Global Settlement (Rec. Doc. 15695-2), at § 1.1.1.   Because Lennar is a "Participating

Defendant," all homeowners with claims against Lennar arising from or related to Chinese Drywall—such as the Plaintiffs here—constitute Class Members.

The Global Settlement resolved all Class Members' claims related to Chinese Drywall against participating builders, installers, suppliers, and their insurers, and includes a complete release of these participating defendants from all homeowner claims "arising out of, or in any manner related to, Chinese Drywall" and any "alleged misconduct, omission, or wrongdoing of any kind, of whatever nature or source, known or unknown, related to any or all of the claims described . . . above." *See* Global Settlement, at § 5.1.

Class Members were afforded an opportunity to assert a claim in the Global Settlement for any purported damages relating to Chinese Drywall or, alternatively, to opt out of the Global Settlement and pursue any such claims through an independent action. *See* Global Settlement at § 1.23 ("'Settling Parties' shall mean all Class Members who do not opt-out of this Settlement.") and § 3.1 ("Except as to any Class Member who opts out of the Class in accordance with Section 8 . . . the Parties agree to settle and resolve all claims asserted by and amongst each other . . ., and this Settlement will settle and resolve with finality . . . the Released Claims . . . and any other claims that have been brought, could have been brought or could be brought now or at any time in the future . . . relating to or arising out of Chinese Drywall, whether based in law, equity or otherwise.").

The Global Settlement also required the entry of a Bar Order, pursuant to which the Court would permanently enjoin "any and all pending or future claims or lawsuits . . . by any and all Class Members who do not opt-out . . . against the Participating

Defendants . . . in connection with claims arising out of, or otherwise related to, Chinese

Drywall purchased, imported, supplied, distributed, marketed, installed, used, sold,

and/or delivered, or alleged in any way to be within the responsibility of any Participating

Defendant." *See* Global Settlement, at § 12.1.

On February 7, 2013, this Court issued an Order and Judgment granting final

approval to these various settlement agreements and certifying settlement classes. *See*

Order and Judgment: (1) Certifying the Inex, Banner, Knauf, L&W, and Global

Settlement Classes; and (2) Granting Final Approval to the Inex, Banner, Knauf, L&W,

and Global Settlements (the "Final Approval Order") (Rec. Doc. 16570). As part of the

Final Approval Order, the Court issued the following Bar Order:

> Any and all Global Settlement Class Members, including, but not limited
> to, those who have not properly opted out of the Global Settlement Class,
> are enjoined and forever barred from maintaining, continuing, prosecuting,
> and/or commencing the Litigation, CDW-Related Actions, Related Claims,
> or any action, pending or future, against the Settling Parties (but excluding
> any Reserved Claims) that arises from, concerns, or otherwise relates,
> directly or indirectly, to Chinese Drywall.

Final Approval Order, at ¶ 70.

The term "CDW-Related Actions" is defined in the Global Settlement as "any and

all state court, federal court, international tribunal, arbitration claims or other claims,

including any claim under Section 558 of the Florida Statutes or any similar statute in

any other state, against any Participating Defendant or Participating Insurer arising out

of or relating to Chinese Drywall." *See* Global Settlement, at § 1.4. Similarly, the term

"Related Claims" is defined as "any unlitigated claims, known or unknown, against any

Participating Defendant . . . related to or arising out of Chinese Drywall." *See* Global

Settlement, at § 1.17. Therefore, any claim or action from the Plaintiffs arising from,

concerning, or otherwise related to Chinese Drywall—whether in court, arbitration, or otherwise—is subject to the Bar Order.

**B.      Plaintiffs' Claims against Lennar and the State Court Action**

Lennar is a homebuilder that identified a small percentage of homes it sold in Florida in which independent subcontractors installed Chinese Drywall.  As this Court is aware, Lennar was at the forefront of addressing issues related to Chinese Drywall. Before this MDL was even created in 2009, Lennar developed an inspection protocol to identify homes that contained Chinese Drywall, and a repair program to remove and replace the Chinese Drywall and other affected materials and items in those homes. This inspection and repair protocol became the model for many other parties that were similarly impacted by Chinese Drywall.  Over a period of several years, Lennar repaired in excess of 1,000 homes pursuant to this inspection and repair program.

Plaintiffs allege that their home, which they purchased from one of Lennar's affiliates, contains Chinese Drywall.  *See* Plaintiffs' Petition in the State Court Action ("Petition"), a copy of which is attached hereto as Exhibit A, at ¶¶ 6-9.  In the Petition, Plaintiffs allege that they did not learn about the possible presence of Chinese Drywall in their Home until the summer of 2014, and became "formally aware of the Chinese Drywall issue" on September 28, 2014.  *See* Petition, at ¶ 6 and Exhibit "C" thereto. Lennar was no longer repairing homes containing Chinese Drywall in September 2014, by virtue of its decision to participate in the Global Settlement more than two (2) years earlier, and this Court's final approval of the Global Settlement more than one and a half years earlier.

Plaintiffs, as "Class Members," did not opt out of the Global Settlement and, therefore, are bound by its release and the Bar Order.  *See* Petition, at Exhibit "C." Nevertheless, on November 24, 2014, Plaintiffs initiated the State Court Action against Lennar, alleging that Plaintiffs' home was constructed with Chinese Drywall.  Lennar advised Plaintiffs that Lennar is a "Participating Defendant" in the Global Settlement and, therefore, the State Court Action, and the claims Plaintiffs attempt to assert through the Petition, had been released and are otherwise barred by the terms of the Global Settlement and the Court's Bar Order.  Nevertheless, Plaintiffs and their counsel refuse to dismiss their Petition against Lennar.

## III.   <u>ARGUMENT</u>

A Rule 23(b)(3) class action "bind[s] all class members save those who opt out." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 592 (1997); *Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) ("There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation."). Similarly, if a class member "fails to opt out by the deadline, he is bound by the court's actions concerning the class, including settlement and judgment." *Klein v. O'Neil, Inc.*, 3-CV-102, 2009 WL 1174638, at *2 (N.D. Tex. April 29, 2009) (citing *Amchem Prods., Inc. v. Windsor*, 521 U.S. at 592-93 and *Reppert v. Marvin Lumber & Cedar Co.*, 359 F.3d 53, 56-57 (1st Cir. 2004)).

This is true even if the class member learns about the class settlement after the period of time for filing claims in the settlement has elapsed.  *See In re Se. Milk Antitrust Litig.,* 2:08–MD–1000, 2012 WL 2050865, at *2 (E.D. Tenn. 2012) ("To allow class

members who receive actual notice of a class action after the opt out deadline to be given another opportunity to opt out, even though the class member received constructive notice before the deadline, would simply defeat the purpose of constructive notice by publication . . .."); *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 177 F.R.D. 216, 238 (D.N.J. 1997) (rejecting request for late opt out where each individual class member may not have received actual notice).  This Court approved a notice plan for the Global Settlement that required actual written notice by first-class mail to known, identifiable Class Members, as well as notice by publication and other means.  *See* Global Settlement, at § 7.1.1.  Under these circumstances, class members who are not easily ascertainable and, therefore, may not receive actual, individual mailed notice, are nevertheless bound by the terms of the class settlement.[1]   Therefore, all Class Members who did not opt-out of the Global Settlement, regardless of when they actually learned about the class settlement, are bound by the terms of the Global Settlement, and the Court's Bar Order.

---

[1] *See In re HealthSouth Corp. Securities Litigation*, 334 Fed.Appx. 248, 253 (11th Cir. 2009) (class member did not have good reason for failing to timely opt out where it received constructive notice of the settlement); *Carlough v. Amchem Products, Inc.*, 158 F.R.D. 314, 327 (E.D. Pa. 1993) ("[I]t is not necessary to send individual notices to an overinclusive group of people simply because that group contains some additional class members whose identifies [*sic*] are unknown."); *In re Domestic Air Transp. Antitrust Litig.*, 141 F.R.D. 534, 553 (N.D. Ga. 1992) (approving plan for notice by publication, rather than individual mailed notice, where identifiable list of class members could not be compiled through reasonable efforts); *In re Agent Orange Product Liability Litigation*, MDL No. 381, 818 F.2d 145, 169 (2d Cir. 1987) (concluding that individual mailed notice to all potential class members "would thus have been considerably overbroad" and "there is no assurance that such a list could have been compiled through reasonable efforts"); *Skelton v. Gen. Motors Corp.*, 79 C 1243, 1987 WL 6281, at *3 (N.D. Ill. Feb. 5, 1987) (Additional mailed notice was not required where plaintiffs "failed to demonstrate the likelihood that the proposal would yield any appreciable number of previously unidentified class members.")

These Plaintiffs are attempting to pursue claims against Lennar that arise from and relate to the alleged presence of Chinese Drywall in their home.  To be sure, the Plaintiffs clearly allege in the State Court Action that they identified a "Chinese Drywall issue" in their home, but "Lennar has refused to address this issue and take any corrective action."  *See* Petition at ¶¶ 9-10.  Because the Plaintiffs did not opt out of the Global Settlement, and their claim against Lennar "arises from, concerns, or otherwise relates, directly or indirectly, to Chinese Drywall," Plaintiffs are Class Members and bound by the terms of the Global Settlement, and the Court's Bar Order.

By commencing the State Court Action against Lennar, and continuing to prosecute and maintain the State Court Action against Lennar, Plaintiffs are violating the terms of the Global Settlement and the Court's Bar Order.

**IV.**   **CONCLUSION**

For the foregoing reasons, the Court should enforce its Bar Order enjoining and forever barring claims by Class Members of the Global Settlement that have not opted out of that settlement, and enjoin Plaintiffs from continuing to prosecute the State Court Action and any other claims against Lennar related to Chinese Drywall.

Dated: March 18, 2015                      Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
*Attorneys for Lennar Corporation*
333 S.E. 2nd Avenue, Suite 4400
Miami, Florida 33131
Telephone: (305) 579-0500
Facsimile: (305) 579-0717
Email: bassh@gtlaw.com
Email: salkym@gtlaw.com


By:      /s/ Hilarie Bass
          Hilarie Bass
          Florida Bar No. 334323
          Mark A. Salky
          Florida Bar No. 058221
          Adam M. Foslid
          Florida Bar No. 682284

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 18, 2015, this document has been served on Plaintiffs' Liaison Counsel, Russ Herman, Esq., and Defendants' Liaison Counsel, Kerry Miller, Esq., Homebuilders' Liaison Counsel, Dorothy Wimberly, Esq., and Insurer Defendants' Liaison Counsel, Judy Y. Barrasso, Esq., by U.S. mail and/or email or by hand delivery and I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and upon all parties by electronically uploading the same to File & Serve in accordance with Pretrial Order No. 6.

I HEREBY FURTHER CERTIFY that on March 18, 2015, a true and correct copy of the foregoing was served via electronic mail upon:  Kevin F. Jursinski, Esq., Law Office of Kevin F. Jursinski, P.A., 15701 South Tamiami Trail, Fort Myers, Florida 33908, to the following email address:  Kevin@KFJLaw.com.


/s/ Mark A. Salky_____
Mark A. Salky

# Exhibit A

IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR
LEE COUNTY, FLORIDA

ARTHUR SIEGWARDT and
LINDA SIEGWARDT,
     Plaintiffs,

vs.
                                    CASE: 14-CA-3347

LENNAR CORPORATION, a Florida
Foreign Corporation, as successor entity
to U.S. Homes Corporation.
     Defendant.              /

## MOTION TO INVOKE COURT'S JURISDICTION PURSUANT TO FLORIDA STATUTE 682.03 AND REQUEST FOR EXPEDITED HEARING ON PLAINTIFFS' PETITION TO COMPEL MEDIATION AND ARBITRATION

**PLAINTIFFS**, ARTHUR SIEGWARDT and LINDA SIEGWARDT, by and through

their undersigned attorney hereby moves this Honorable Court for an Order Compelling

Mediation and Arbitration as well as requesting the Court acknowledge that the Plaintiffs have

invoked the jurisdiction of this Court solely in accordance with Florida Statute 682.03 and

conjunction therewith, requests an expedited hearing on this Motion and states as follows:

      1.     Plaintiffs have initiated a request of this Court to Compel the Alternate Dispute

Resolution Provisions as specifically set forth in the agreement entered into between Plaintiffs

and Defendant.

      2.     Contemporaneous hereto, the Plaintiffs filed their Petition to Compel Mediation

and Arbitration and to Stay the Proceedings pursuant to a specific contractual documents entered

into between Plaintiff and Defendants.

      3.     Florida Statute 682.03(2) indicates as follows:

> **"On motion of a person alleging that an arbitration proceeding has been
> initiated or threatened but that there is no agreement to arbitrate, the court**

12.  It further cited in <u>Alexander L. Kaplan and Denise A. Kaplan vs. Kimball Hill Homes. Florida. Inc.</u>. 915 So.2d 755, 759 (Fla. 2d DCA 2005), and indicated that:

> **"Where an arbitration agreement provides for the arbitration of disputes relating to a contract, tort claims based on duties that are dependent upon the existence of the contractual relationship between the parties are normally arbitrable."** *Citim* <u>Stacy David. Inc. v. Consuegra.</u> 845 So. 2d 303, 306 (Fla. 2d DCA 2003).

13.  An arbitration clause and contract exists.

14.  In the instant case, a valid arbitration clause exists and such arbitration clause is an all-encompassing clause and encompasses the contract. The first requirement that has been met and as identified to this Court, is that valid written agreement exists and such Contract contains an arbitration clause.

**WHEREFORE,** Plaintiffs request the Court invoke jurisdiction over the parties pursuant to Florida Statute 682.03 and summarily expedite the hearing on the Petition to Compel Mediation and Arbitration.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** a true and correct copy of the foregoing was served contemporaneously with Plaintiffs' Petition in this action.

Dated: November 24TH 2014.

KEVIN F. JURSINSKI, P.A.
15701 South Tarniami Trail Fort
Myers, Florida 33908 (239)
337-1147 Telephone (239) 337-
5364 Facsimile

By: _____
        Kevin F. Jursinski, Esquire
        Florida Bar No: 318851

**IN THE CIRCUIT COURT OF THE TWENTIETH JUDICIAL CIRCUIT IN AND FOR LEE COUNTY, FLORIDA**

**ARTHUR SIEGWARDT and**
**LINDA SIEGWARDT,**
     Plaintiffs,

vs.                               **CASE:**

**LENNAR CORPORATION,** a Florida
Foreign Corporation, as successor entity
to U.S. Homes Corporation.
_____Defendant._____

## PETITION TO COMPEL MEDIATION AND ARBITRATION AND PETITION TO RETAIN JURISDICTION TO CONFIRM ARBITRATION AWARD (REQUEST FOR EVIDENTIARY HEARING)

     **COME NOW** Plaintiffs, ARTHUR SIEGARDT and LINDA SIEGWARDT, by and

through their undersigned attorney and hereby Petition the Court to Compel the Defendant,

LENNAR CORPORATION to Conduct Mediation and Arbitration and state as follows:

     1.     Plaintiffs, ARTHUR SIEGWARDT and LINDA SIEGWARDT

("SIEGWARDTS"), are residents of Lee County, Florida.

     2.     Defendant, LENNAR CORPORATION ("LENNAR") is a Florida Foreign

Corporation authorized to conduct business in the State of Florida and is the successor entity to

U.S. Home Corporation.

     3.     SIEGWARDTS purchased a single family home from U.S. Homes Corporation

pursuant to a certain Sales Agreement dated January 9, 2005 (Exhibit "A" hereto).

     4.     Defendant, LENNAR has succeeded in interest to all right, title, duties and

obligations of U.S. Homes Corporation as to all single family homes constructed or contractual

rights entered into.

1

5.  The Sales Agreement (Exhibit "A") and any obligations thereunder, as above set forth, has been assumed by Defendant, LENNAR, contained a specific provision for alternate dispute resolution, paragraph 19 which states in pertinent part as follows:

> **"ARBITRATION OF DISPUTE  The parties to this Agreement specifically agree that this transaction involves interstate commerce and that any dispute (whether contract, warranty, tort, statutory or otherwise), including, but not limited to, (a) any and all controversies, disputes or claims arising under, or related to, this Agreement, the property, or any dealings between the Buyer and Seller (with the exception of "consumer products" as defined by the Magnuson-Moss Warranty-Federal Trade Commission Act, 15 U.S.C. §2301 et seq., and the regulations promulgated thereunder); (b) any controversy, dispute or claim arising by virtue of any representations, promises or warranties alleged to have been made by Seller or Seller's representative; and (c) any personal injury or property damage alleged to have been sustained by Buyer on the property or in the subdivision, shall first be submitted to arbitration and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) <u>or, if applicable, by similar state statute</u>, and not by or in a court of law."** Emphasis Supplied

This is an all-encompassing alternate dispute resolution provision.

6.  In the Summer of 2014, SIEGWARDTS were notified by their HVAC company that there may be issues with the construction of their home and the home may contain "Chinese drywall."

7.  In response thereto, the SIEGWARDTS obtained an inspection report dated September 10, 2014, (received by Plaintiffs on September 28, 2014), were first put on notice that Chinese drywall was prevalent in their home (Exhibit "B" hereto).

8.  In fact, the SIEGWARDTS did not notice any of these issues until an HVAC inspector alerted them to the fact, which thereafter was confirmed by a specific test performed at the request of the SIEGWARDTS.

2

9.     The Chinese drywall issue was a "latent defect" existing in the home which was not readily observable nor discoverable by the Plaintiffs through due diligence until the Summery of 2014.

10.    SIEGWARDTS have reached out to LENNAR requesting that LENNAR recognize the defect in the home which was not otherwise discoverable through reasonable diligence by SIEGWARDTS, as Purchasers (Exhibit "C" hereto).

11.    LENNAR has refused to address this issue and take any corrective action in regard to the latent defect.

12.    SIEGWARDTS have initiated this suit solely to seek this Court to compel the Defendant, LENNAR to mediate and arbitrate and to retain jurisdiction over the parties to enforce such prospective mediation agreement or arbitration award.

**A.    Arbitration Favored as Alternate Dispute Resolution**

13.    The Florida Supreme Court has held that arbitration is a favored means of dispute resolution. Prudential Secs., Inc. v. Katz, 807 So. 2d 173, 174 (Fla. 3d DCA 2002) (quoting Roe v. Amica Mut. Ins. Co., 533 So. 2d 279, 281 (Fla. 1988)). In Florida, arbitration provisions are generally favored by the courts. Raymond James Fin. Servs., Inc. v. Saldukas, 896 So. 2d 707, 711 (Fla. 2005). Where possible, courts should resolve all doubts in favor of arbitration rather than against it. Katz, 807 So. 2d at 174.

14.    Florida courts will grant stays pending arbitration.  Miller & Solomon General Contractors, Inc. v. Brennan's Glass Co., Inc., 824 So. 2d 288 (Fla. 4th DCA 2002) (stating that any action or proceeding involving an issue subject to arbitration should be stayed if an application thereof has been made)..

3

**B.  Elements for Trial Court to Consider in Compelling Arbitration**

15.  When presented with a motion to compel arbitration or a motion to dismiss in favor of arbitration, the trial court must consider the following:

  a.  whether a valid written agreement exists which contains an arbitration clause;

  b.  whether an arbitral issue exists; and,

  c.  whether the right to arbitrate has been waived.

Seifert v. U.S. Home Corp., 750 So. 2d 633 (Fla. 1999); DFC Homes of Florida v. Lawrence, 8 So. 3d 1281 (Fla. 4th DCA 2009); Estate of Williams v. Manorcare Health Services, Inc., 923 So. 2d 615, 616 (Fla. 2d DCA 2006); and Pulte Home Corp. v. Smith, 823 So. 2d 305 (Fla. 2d DCA 2002).

**C.  All Encompassing Arbitration Clause**

16.  In Vacation Beach, Inc v. Charles Boyd Construction, Inc., 906 So. 2d 374 (Fla. 5th DCA 2005), the Court looked at an arbitration provision which provision indicated that "...all controversies, claims and other matters in question arising out of or related to this transaction or this contract or its breach..."

17.  It further cited in Alexander L. Kaplan and Denise A. Kaplan vs. Kimball Hill Homes, Florida, Inc., 915 So.2d 755, 759 ( Fla. 2d DCA 2005), and indicated that:

> **"Where an arbitration agreement provides for the arbitration of disputes relating to a contract, tort claims based on duties that are dependent upon the existence of the contractual relationship between the parties are normally arbitrable."** *Citing* Stacy David, Inc. v. Consuegra, 845 So. 2d 303, 306 (Fla. 2d DCA 2003).

4

**D.    An Arbitration Clause and Contract Exists**

18.    In the instant case, a valid arbitration clause exists.  Such arbitration clause is an all-encompassing clause and encompasses the construction disputes under the Contract.  The first requirement has been met which is a valid written agreement containing an arbitration clause.

**E.    An Arbitrable Issue Exists Which Should be Resolved in Arbitration**

19.    An arbitrable issue exists in the matter which should be resolved in arbitration. Specifically, the arbitrable issues is the latent defect in the home sold by Defendant which contains Chinese drywall.

20.    As identified in Kaplan v. Kimball, the Court indicated that the very issues which gave rise to the dispute were specifically mentioned in the contract.

21.    Clearly, the very issues which give rise to the Petition and which are encompassed hereinabove and identified within the Contract, are arbitrable agreements subject to arbitration per Kaplan.

**F.    No Denial of Arbitration**

22.    As cited in the Vacation Beach, Inc. vs. Charles Boyd Construction. Inc. case, a motion to compel issuance of an order to arbitrate a particular grievance, it should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible to interpretation that covers the asserted dispute. *citing* Beaver Coaches, Inc. v. Revels Nationwide R.V., 543 So. 2d 359, 361-62 (Fla. 1st DCA 1989), quoting AT&T Techs. Inc. v. Communs. Workers of Am., 475 U.S. 643 at 650:

> **"In the case of a particularly broad arbitration clause, only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."**

**G.    Presumption of Arbitrability**

23.    In the very same <u>Vacation Beach, Inc. vs. Charles Boyd Construction, Inc.</u> case, the Court addressed the presumption of arbitrability citing another Second DCA case arising out of a Twentieth Judicial Circuit Court, <u>Stinson-Head, Inc. vs. City of Sanibel</u>, 661, So.2d 119 (Fla. 2nd DCA 1995) which confirmed the presumption of arbitrability.

24.    Initially, there is no claim for punitive damages and, secondly, there is no provision contained in the agreement that severs out punitive damages from arbitration.

**H.    No Waiver of Arbitration**

25.    As such, arbitrable issues exist of which should be resolved in arbitration.  As identified in the Florida Supreme Court Case, <u>Seifert vs. U. S. Home Corporation</u>, 750 So. 2d 633 (Fla. 1999), in construing the enforcement of an arbitration clause, it is the agreement of the parties that determines the issues subject to arbitration.  In this case, the parties have agreed to resolve all of their disputes in arbitration.

26.    Plaintiffs have not waived their right to compel arbitration nor have they waived arbitration by any action seeking affirmative relief of this Court.

27.    The third component that the Court has to address is, in addition to finding that an arbitrable issue exists, is whether the Plaintiffs have waived their rights to arbitrate.

28.    Florida Courts have defined "waiver" as the voluntary and intentional relinquishment of a known right or conduct which implies the voluntary and intentional relinquishment of a known right.  *See* <u>Raymond James Financial Services, Inc. v. Saldukas</u>, 898 So. 2d 707, 711 (Fla. 2005).

29.    A party to an arbitration agreement waives the right to arbitration by active participation in litigation before asserting the right to arbitrate.  *See* <u>DFC Homes v. Lawrence</u>, 8

6

So. 3d 1281, 1283 (Fla. 4th DCA 2009).  A party's responses to litigation constitute active participation only when they are attacks on the merit. *See* Miller & Solomon Gen. Contractors, Inc. v. Brennan's Glass Co., Inc., 824 So. 2d 288, 291 (Fla. 4th DCA 2002).

30.     Plaintiffs have not sought any discovery nor any affirmative relief in this court other than to abate this action and compel the parties to the arbitration which the parties are obligated to do pursuant to the Contract (Exhibit "A").

31.     Plaintiffs have never undertaken any action or position, sought discovery or taken any affirmative act which would in any way waive the arbitration provision that was entered into between the parties.

32.     Further, in deciding whether the parties in Florida agreed to arbitrate a certain matter, the court should apply Florida state-law principals that govern the formation of contracts. BDO Seidman v. Bee, 970 So.2d at 874 (*citing* First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 944 (1995) and Global Travel Marketing, Inc. v. Shea, 908 So. 2d 392, 397 (Fla. 2005)).

33.     Florida courts have found that where a party's first substantive filing invokes an arbitration clause, there is no waiver of the right to arbitrate.  Price v. Fax Recovery Sys., 49 So. 3d 835, 837 (Fla. 4th DCA 2010).  Even when a motion to compel arbitration and a Petition are filed at the same time, without some other indication of waiver such as participating in discovery, a finding of waiver is not proper. *Id.*

**WHEREFORE** Plaintiffs demand that this Court takes jurisdiction over the parties, abate the action, compel the parties to submit to the alternate dispute resolution procedure of mediation and in the event that the matters are not resolved through mediation, thereafter compel the parties to binding arbitration in accordance with Florida Statute 682 et seq., and to retain

7

jurisdiction over the parties for purposes of enforcing the prospective mediation agreement or

Arbitration Award to be entered in arbitration.

Dated: __11/20/14__

> **LAW OFFICE OF KEVIN F. JURSINSKI, P.A.**
> 15701 South Tamiami Trail
> Fort Myers, Florida 33908
> (239) 337-1147 Telephone
> (239) 337-5364 Facsimile
>
> By:_____
>         Kevin F. Jursinski, Esquire
>         Florida Bar No: 318851

8

# US HOME CORPORATION
## SALES AGREEMENT

The undersigned **Arthur Siegwardt and Linda Siegwardt,**

whose address **12000 Sheridan St. Pembroke Pines, FL 33026 Phone (954) 436-5514** (the "Buyer") agrees to purchase, and **U.S. HOME CORPORATION** (the "Seller") agrees to sell, upon the terms and conditions of this Agreement, the following described real property:

Job **1603951 160394128** '

Lot(Unit) **28** Block **A4** Section/Tract/Filing **160394128** of **Stoneybrook at Gateway** Subdivision

Address **MUDDY CREEK LANE** City **Fort Myers** State **Florida** Zip **33913** County **Lee**

Model **0250 CANNONDALE FLEX** Elevation **CH00** Garage Orientation **Left**

with all improvements which have been or will be constructed on the land by Seller (with such improvements to be constructed substantially in accordance with the plans and specifications for the home which may not be identical to the model home), the land and the improvements collectively referred to in this Agreement as the "Property". The said residence for Seller's **Stoneybrook at Gateway** home, with all details of material and construction to be comparable to those used in the U.S. Home model homes in the region, except for such changes as set out in Addendum A to this Agreement and subdivision specifications. Plans and specs of this home are subject to any change necessitated by governmental regulations.

### 1. PURCHASE PRICE AND PAYMENT.

**PURCHASE PRICE:**

| | | |
|---|---|---|
| (a) Base price (as per price sheet dated **01/09/2005**) ........................................................ | $ | 337,990.00 |
| (b) Extras and adjustments (including floor premium) per attached Addenda A to contract ("ATC'S").............. | $ -3379.00 | |
| (c) Lot Premium ......................................................................................... | $ | 0.00 |
| (d) TOTAL PURCHASE PRICE ....................................................................... | $ | 334,611.00 |

**PAYMENTS:**

| | | |
|---|---|---|
| (d) Earnest money deposit received this date.......................................................... | $ | 16,000.00 |
| (e) Additional deposit (due ).............................................................................. | $ | 0.00 |
| (f) Balance of Purchase Price (in U.S. funds) payable by wire transfer to closing agent, or by certified check, due at closing ..................................................................... | $ | 318,611.00 |



**EXHIBIT A** (ALL-STATE LEGAL®)

### 2. FINANCING.

_____ ALL CASH. This is a cash sale; there is no financing contingency.

**X** MORTGAGE LOAN. If part of the purchase price is to be paid in the form of proceeds of an institutional first mortgage loan, Buyer shall, at Buyer's expense, make good faith effort to obtain a mortgage loan commitment, and shall make a good faith application for said commitment within three (3) business days of the effective date of the Purchase Agreement (the date the Purchase Agreement is executed by an authorized representative of Seller), and shall use reasonable diligence to obtain said loan commitment. If Buyer fails to obtain the loan commitment, Buyer may cancel and rescind the Purchase Agreement and shall be entitled to a refund of all deposit(s) paid, less expenses incurred by Seller for extras, options, upgrades or special items, by notifying Seller in writing of such failure within thirty (30) days of the effective date of the Purchase Agreement. If such written notice is not received by Seller within the aforementioned thirty (30) day period, Purchaser's failure to obtain a mortgage loan commitment shall not constitute grounds for cancellation and rescission of the Purchase Agreement, and shall not excuse Buyer's obligation to consummate the transaction and pay the purchase price.

### 3. DEPOSITS.

THE BUYER OF A ONE-FAMILY OR TWO-FAMILY RESIDENTIAL DWELLING UNIT HAS THE RIGHT TO HAVE ALL DEPOSIT FUNDS (UP TO 10% OF THE PURCHASE PRICE) DEPOSITED IN AN ESCROW ACCOUNT. THIS RIGHT MAY BE WAIVED, IN WRITING, BY THE BUYER. In the event the Buyer does not waive such right to an escrow account, Buyer acknowledges: (a) that the escrow account shall be with **North American Title Company** ("Escrow Agent"); (b) that such deposit shall be governed by the provisions of Section 501.1375, *Florida Statutes*; (c) that at the time of closing as provided in Section 501.1375, all accrued interest on the deposit shall belong to Seller and shall not be credited to Buyer or applied against the Purchase Price; and (d) that Buyer shall pay, upon the execution of this Agreement, that portion of Seller's master surety bond premium allocable to Buyer's deposit. Any funds paid by Buyer under the terms of this Agreement to Seller through a check are accepted by Seller subject to collection. Buyer acknowledges that Seller shall have the right to deposit such checks without such action being deemed acceptance of the Agreement. If any such checks are not paid by the bank after acceptance of this Agreement, Seller shall have the right to cancel this Agreement.

Buyer hereby waives Buyer's rights under this paragraph. Initialed: _____  Buyer _____ Buyer

Buyer _____
Buyer _____

**4. BUYER SELECTIONS.** The first ten (10) business days after Seller's acceptance of this Agreement is referred to as the ("Selection Period.") Buyer agrees to select, upon Seller's standard forms and at the location designated by Seller, all options for carpet, exterior colors, and any other items for which Buyer has a "selection". If Buyer fails to make the required selections within the Selection Period, Seller shall have the option (i) to declare Buyer in default hereunder, or (ii) charge the Buyer the amount of $100 per day to compensate Seller for its additional costs caused by Buyer's delay. Buyer shall have no right to change the choices after the Selection Period. Any changes, options, alterations and extras requested by Buyer, after the Selection Period will be at Seller's discretion and subject to current prices and availability. Any changes after the Preconstruction Meeting will bear an administrative charge of $200 for each individual change to be paid by Buyer in addition to the cost of the change before the change is made. Buyer understands and agrees that any changes, alterations or extras requested by Buyer will likely delay the completion of the home. Administrative charges will not be credited as earnest money at closing or refunded to Buyer under any circumstances. . Buyer acknowledges review of the options available on the home purchased from Seller.

**5. PROMOTIONAL DISPLAYS.** It is understood and agreed that furniture, draperies, rods, special painting and wallpaper, benches, outdoor garden lighting, pools, patios, fencing, or any other items used for sales promotional purposes in model homes are not included in the base price of paragraph 1(a) unless specifically identified as such.

**6. COMPLETION.** It is expressly agreed by Buyer that notwithstanding anything to the contrary specified herein or verbally represented (including but not limited to Seller's sales representative), any scheduled completion date is a good faith estimate and Seller makes no promises or representations concerning the date of completion. Buyer agrees that Buyer has not relied, and will not rely upon, any estimated completion date for any purpose whatsoever, including relocation of residence or lock-in financing, and Buyer agrees that Seller shall not be liable for any additional costs, expenses or damages whatsoever should the home not be completed by an estimated completion date. Notwithstanding the foregoing, improvements shall be completed within twelve (12) months from the Effective Date of this Agreement, but not later than two (2) years from the date Buyer signs this Agreement, subject to delays caused by acts of God, war, public violence, shortages of labor or material, federal, state or municipal restrictions or strikes, or other causes beyond the control of Seller, or acts of Buyer.

**7. CLOSING.** The closing of title on this sale (the "Closing") shall take place at the time and place specified by Seller, after notification to Buyer by Seller at least seven days before the date when the home is, in Seller's opinion, complete, as evidenced by the issuance of a certificate of occupancy. If Buyer fails, for any reason, to close at the date, time and place specified by Seller, Seller shall have the option of either declaring Buyer in default or charging Buyer $75 per day for each day after the date of closing specified by Seller until, and including, the date of actual closing. This sum shall be due and payable at closing. If closing is delayed by Buyer past the month originally set for closing, Buyer shall pay one percent of the total purchase price, which shall be payable at the time the extension is accepted by Seller. These sums are intended to be liquidated damages, and not a penalty, to reimburse Seller for all expenses, costs and damages it may incur due to Buyer's delay. It being agreed that in such case it would be impractical or extremely difficult to fix Seller's actual damages. Closing shall take place at the Seller's title company which is North American Title Company.

**8. CLOSING COSTS.** At the time of closing, Buyer shall pay the balance of the Purchase Price and all closing costs. The Developer will furnish an owner's policy of title insurance from a title company of its choosing. Buyer will pay all charges connected with the issuance of the owner's policy of title insurance, including without limitation any closing fees, all fees for title searches or title examination, intangibles taxes, and Final Survey fee. The Developer will reimburse to the Buyer the Developer's share of the actual of the actual real property taxes for the year of closing after the tax bill for that year is issued, and an affidavit to that effect will be issued to the Purchaser at the time of closing. Real estate taxes and assessments, both general and special, payable in the year within which the Closing occurs shall be prorated between Buyer and Seller as of the date of closing. Buyer shall pay for the documentary stamps on the deed and cost of recording the deed.

**9. TITLE.** Seller shall convey, or cause to be conveyed, title to the Property by special warranty deed, subject to taxes and assessments through the year of closing; recorded covenants, conditions, restrictions and matters appearing on the plat or otherwise common to the Subdivision, easements, limitations and mineral reservations; and zoning restrictions, prohibitions and other requirements of governmental authorities. If defects in title are discovered, Seller shall have thirty (30) days to cure such defects, and the closing shall be extended accordingly. If the defects are not cured by the extended closing date, (i) Buyer may elect to waive the uncured defects and complete the purchase without any adjustment in the Purchase Price, or (ii) the Payments made by Buyer to Seller shall be refunded to Buyer and this Agreement shall terminate and the parties shall have no further rights or obligations hereunder. It is understood that Buyer is purchasing a completed dwelling, and that Seller is not acting as a contractor for the Buyer in the construction of the dwelling and that the Buyer shall acquire no right, title or interest in the dwelling or the Property except the right and obligation to purchase the same in accordance with the terms of this Agreement upon its completion. Equitable title to the Property shall remain vested in Seller until delivery of the deed. Seller may not own title to the Property on the date of execution of this Agreement; however, Seller shall either (i) obtain title to the Property on or before the date of Closing, or (ii) cause title to the Property to be transferred to the Purchaser on the date of Closing.

**10. POSSESSION.** Possession of the Property shall be delivered to Buyer at closing and delivery of the deed. Buyer shall in no event take possession of the Property prior to the closing and delivery of the deed.

**11. SITE.** Buyer acknowledges that the lot to be conveyed herein may differ in size and configuration from sales drawings and from the lot on which Seller's model is situated, and that the home constructed on the lot may or may not be identical with the model house selected. Seller shall situate the home to conform with the requirements of applicable governmental authorities, the recommendations of Seller's engineer, the grade of the lot and opinion of Seller. Seller shall be entitled to construct the home in a "mirror image" and in the event the Property is a corner lot, Seller may face the house on either street. Seller shall remove such trees from the lot as it may deem necessary and it shall not be responsible for any damage to or destruction of the remaining trees during the process of construction.

**12. SUBSTITUTIONS.** The Seller shall have the right, at its discretion and without notice to or approval by Buyer, to substitute materials and equipment used in the construction of the home, including variations in color, brand, grade and dimensions, provided such substitutions are of equivalent quality and value and to make minor changes to the layout and dimensions of the home which do not substantially affect the value of the home.

**13. CASUALTY BEFORE CLOSING.** If the Property is damaged by fire or other casualty before Closing and cost of restoration does not exceed 3% of the Purchase Price and repairs will not delay Closing, Seller shall repair the damage and Closing shall proceed pursuant to the terms of this Agreement. If the cost of restoration exceeds 3% of the Purchase Price or the repairs would delay closing, Buyer shall have the option to: (i) terminate this Agreement and receive a refund of the payments made by Buyer to Seller, in which event both parties shall be released from all obligations under this Agreement, or (ii) have Seller repair the damage as soon as reasonably possible, and the closing shall be extended until such repair or rebuilding is complete. Notwithstanding the foregoing, if the Property is destroyed or the cost of restoration exceeds 50% of the Purchase Price, the option of remedies shall be at Seller's sole discretion.

Buyer 
Buyer

**14. PRE-CLOSING INSPECTION.** Upon substantial completion of the improvements, Buyer shall have the opportunity to attend a formal presentation of the premises with Seller's representative in which any incomplete work or defects shall be itemized and signed by Buyer. If Buyer is unable to personally inspect the dwelling, Buyer shall designate a person(s) to inspect the dwelling in his behalf. If Buyer or Buyer's designee does not inspect the dwelling prior to closing, Buyer shall have waived Buyer's right to such inspection. Thereafter, upon acceptance of the deed by Buyer, Buyer shall be deemed to have released Seller from liability for any incomplete work or visible defects not specifically noted. The correction of all items will be completed prior to closing unless agreed upon otherwise by Seller and Buyer. Seller shall have the option to refuse to close if Buyer has not executed Seller's "Purchasers Certificate" certifying satisfactory completion of all improvements.

**15. HOMEOWNER'S WARRANTY.** Buyer understands and agrees that Seller is making only those express limited warranties set forth in the homeowner's warranty in the form available for inspection in Seller's sales office and which shall be delivered to the Buyer at closing. THE EXPRESS LIMITED WARRANTY AND REMEDIES PROVIDED BY SELLER CONSTITUTE THE EXCLUSIVE WARRANTY AND REMEDIES TO BE MADE AVAILABLE BY SELLER AND, EXCEPT WHERE ADDITIONAL WARRANTIES ARE REQUIRED BY APPLICABLE LAW OR REGULATION, ARE IN PLACE OF ALL OTHER GUARANTIES OR WARRANITES, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO WARRANTIES OF WORKMANSHIP, MERCHANTABILITY, HABITABILITY, SUITABILITY AND FITNESS, WHICH ARE HEREBY DISCLAIMED BY SELLER AND WAIVED BY BUYER.

EXCEPT AS EXPRESSLY DISCLOSED IN ANY PUBLIC REPORT FURNISHED BUYER, SELLER HAS MADE NO GEOLOGICAL OR ENVIRONMENTAL TESTS OR SURVEYS OF THE PROPERTY AND MAKES NO REPRESENTATION OR WARRANTY CONCERNING GEOLOGICAL OR ENVIRONMENTAL MATTERS SUCH AS SINK HOLES OR RADON GAS AND SPECIFICALLY EXCLUDES SUCH GEOLOGICAL AND ENVIRONMENTAL MATTERS FROM ANY WARRANTIES GIVEN UNDER THIS AGREEMENT.

RADON GAS: RADON IS A NATURALLY OCCURING RADIOACTIVE GAS THAT, WHEN IT HAS ACCUMULATED IN A BUILDING IN SUFFICIENT QUANTITIES, MAY PRESENT HEALTH RISKS TO PERSONS WHO ARE EXPOSED TO IT OVER TIME. LEVELS OF RADON THAT EXCEED FEDERAL AND STATE GUIDELINES HAVE BEEN FOUND IN BUILDINGS IN FLORIDA. ADDITIONAL INFORMATION REGARDING RADON AND RADON TESTING MAY BE OBTAINED FROM YOUR COUNTY PUBLIC HEALTH UNIT.

Buyer acknowledges and understands the following with respect to the homeowner's warranty:

a) The pattern of grading and drainage for the Property is an approved grade and drain pattern. Any change in the grading, drainage or landscaping or vegetation within 4 feet of exterior walls or foundation could void the warranty. If Buyer changes the grade or drainage established by Seller, or by construction, additions or deletions causes the established grade and/or drainage patterns to be modified, then Seller shall be relieved of any liability for damages, if any, caused by such changes.

b) Seller makes no warranty or representation regarding shifting soils, unsettled soils, unusual rocks or subsurface conditions.

c) Seller's warranty does not include defects caused by normal wear and tear, insubstantial or immaterial variances or defects, the elements, natural disasters or faulty maintenance, operation or abusive use.

d) Under no circumstances shall Seller be liable for consequential or incidental damages.

**16. MASTER DEED RESTRICTIONS.** Seller has recorded in the Public Records of the county where the Property is located certain Master Deed Restrictions that grant to Seller the right to notice of any Claim (as defined therein) and the right of inspection and cure. The Master Deed Restrictions further require the arbitration of any Claim against Seller that can not be resolved informally.

**17. DEFAULT BY BUYER.** It is mutually understood between the parties hereto that the agreement of Buyer to purchase the Property is the sole inducement for Seller to construct improvements thereon and to hold the Property off the market. If Buyer fails to perform as required by this Agreement, (i) all payments made by Buyer shall be forfeited as liquidated damages and not as a penalty to reimburse Seller for all expenses, costs and damages it may incur, it being agreed that in such case it would be impractical or extremely difficult to fix Seller's actual damages, whereupon the obligations and liabilities of both parties under this Agreement shall terminate; or (ii) Seller, at Seller's option, may pursue specific performance of this Agreement under Paragraph 18 below.

**18. DEFAULT BY SELLER.** If Seller shall default in the performance of this Agreement for any reason other than Seller's obligation to provide marketable title, Buyer shall be entitled, as its exclusive remedies, (i) to a refund of all payments (excluding administrative charges) made by Buyer to Seller, in which event the obligations and liabilities of both parties under this Agreement shall terminate whereby Buyer specifically waives and relinquishes whatever legal and equitable remedies it may have under applicable law; or (ii) Buyer, at Buyer's option, may pursue specific performance of this Agreement in accordance with Paragraph 18. Notwithstanding the foregoing, if seller fails to complete improvements within two (2) years from the date Buyer signs this Agreement, Buyer may alternatively, pursue whatever legal and equitable remedies he may have under applicable law in accordance with paragraph 18.

**19. ARBITRATION OF DISPUTES.** The parties to this Agreement specifically agree that this transaction involves interstate commerce and that any dispute (whether contract, warranty, tort, statutory or otherwise), including, but not limited to, (a) any and all controversies, disputes or claims arising under, or related to, this Agreement, the property, or any dealings between the Buyer and Seller (with the exception of "consumer products" as defined by the Magnuson-Moss Warranty-Federal Trade Commission Act, 15 U.S.C. §2301 et seq., and the regulations promulgated thereunder); (b) any controversy, dispute or claim arising by virtue of any representations, promises or warranties alleged to have been made by Seller or Seller's representative; and (c) any personal injury or property damage alleged to have been sustained by Buyer on the property or in the subdivision, shall first be submitted to mediation and, if not settled during mediation, shall thereafter be submitted to binding arbitration as provided by the Federal Arbitration Act (9 U.S.C. §§1 et seq.) or, if inapplicable, by similar state statute, and not by or in a court of law. All decisions respecting the arbitrability of any dispute shall by decided by the arbitrator. The arbitrator shall have the right to award reasonable attorneys' fees and expenses, including those incurred in mediation, arbitration, trial or on appeal.

The mediation shall be conducted before the American Arbitration Association ("AAA") in accordance with the AAA's Commercial or Construction Industry Mediation Rules, as appropriate. If the dispute is not fully resolved by mediation, the dispute shall be submitted to binding arbitration before the AAA in accordance with the Commercial or Construction Industry Arbitration Rules, as appropriate, and judgement upon the award rendered by the arbitrator can be entered in and enforced by any court having jurisdiction over the matter. It is understood and agreed by the parties that in the event the Homeowner's Warranty provided by Seller does not provide for binding arbitration, a claim under, or covered by, the warranty will be administered as provided in the warranty prior to submission to binding arbitration.

Unless otherwise provided by law or the Homeowner's Warranty, the cost of mediation and arbitration shall be borne equally by Seller and Buyer. Buyer and Seller specifically agree that notwithstanding anything to the contrary, the rights and obligations set forth in this paragraph shall survive (1) the closing of the purchase of the property; (2) the termination of this Agreement by either party; or (3) the default of this Agreement by either party. The waiver or invalidity of any portion of this paragraph shall not affect the validity or enforceability of the remaining portions of this paragraph. Buyer and Seller further agree (1) that any


Buyer
Buyer

dispute involving Seller's directors, officers, employees and agents shall be resolved as set forth herein and not in a court of law; (2) that Seller shall have the option to include its subcontractors and suppliers as parties in the mediation and arbitration; and (3) that the mediation and arbitration will be limited to the disputes involving the parties specified herein, including any warranty company and insurer.

**20.  CREDIT REPORT.** Buyer authorizes any lender to disclose to Seller the information contained in any loan application, verifications of deposit, income and employment, and credit reports or credit related documentation on Buyer. Buyer authorizes Seller to order a credit report from a consumer reporting agency to be used in connection with this transaction whereby Buyer has applied for the extension of credit. The cost of said report is to be paid by Buyer. Buyer authorizes Seller to forward copies of all or any portion of said report without interpretation to any lender for use in connection with this transaction.

**21.  TIME OF ESSENCE.** Unless otherwise provided in this Agreement, time is of the essence hereof, and if any payment or condition hereof is not made, tendered or performed by either Seller or Buyer as herein provided, then this Agreement, at the option of the party who is not in default, may be terminated by such party. "Time is of the essence" means that performance under the terms of this Agreement is essential and that failure to meet any term contained herein is a breach of this Agreement, and grounds for a suit of specific performance and the loss of all deposits paid by Buyer under this Agreement.

**22.  DANGEROUS CONDITION; CONSTRUCTION WORK.**

(a)  Buyer understands and agrees that the Property is a construction site and that the Property and the improvements, equipment and supplies thereon constitute a danger to those who may enter on the Property. Buyer shall not enter onto the Property prior to closing and transfer of possession as provided in this Agreement unless authorized and accompanied by Seller's representative. Any unauthorized, unaccompanied entry by Buyer shall constitute a breach of this Agreement by Buyer, at Seller's election. However, any entry by Buyer onto the Property prior to closing shall be done at Buyer's own risk and in compliance with all federal, state and local safety laws and regulations. Buyer waives, releases and agrees to indemnify Seller, its officers, directors, employees, agents, subcontractors and suppliers from any and all claims, losses or damage suffered or incurred by Buyer, Buyer's family members or guests, as a direct or indirect result of any such unauthorized, unaccompanied entry onto the Property.

(b)  Buyer agrees that supervision and direction of the working forces, including, without limitation, all subcontractors, is to be done exclusively by Seller, and Buyer agrees not to issue any instruction to the working forces or otherwise hinder construction or installation of improvements on the Property. Buyer shall not do or have any work done on the Property, nor may Buyer store any possessions thereon, prior to closing and transfer of title to Buyer.

(c)  Buyer agrees that any and all controversies, disputes and claims arising under this Paragraph 21 shall be resolved through binding arbitration in accordance with Paragraph 18 of this Agreement.

**23.  DISCLOSURE OF AGENCY.** The Sales Representative in connection with this transaction is an employee of Seller. Therefore, no agency relationships are intended to be created or will be created between Seller's Sales Representative and Buyer or any real estate broker or agent that is employed on behalf of Buyer. Further, no sub-agency relationships are intended to be created or will be created between Seller and any real estate brokers or agent that is employed on behalf of Buyer in this transaction. See the Agency Disclosure form for information concerning the description of terms, agency relationships and the duties and obligations of agents.

**24.  HOMEOWNERS' ASSOCIATION.** Refer to Addendum H for schedule of fees.

**25.  SELLER'S REPRESENTATIONS.** Seller shall not be bound by any statement or representation unless specifically set forth in this Agreement. BUYER ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY SELLER, ITS AGENTS OR EMPLOYEES TO INDUCE BUYER TO ENTER INTO THIS AGREEMENT, OTHER THAN AS EXPRESSLY SET FORTH HEREIN. No representation is made by Seller with respect to views from the property or dwelling constructed.

**26.  MISCELLANEOUS.**

(a)  The invalidity of any provisions of this Agreement shall not affect the validity or enforceability of any other provisions set forth herein.

(b)  The parties to this Agreement mutually agree that it shall be binding upon them and each of their respective heirs, executors, administrators, successors and assigns; provided, however, that Buyer shall have no right to assign this Agreement without the prior written consent of Seller.

(c)  The terms and conditions of this Agreement shall survive the closing of the Property hereunder and the delivery of the deed.

(d)  The parties to this agreement hereby certify that this Agreement contains the entire agreement between the parties hereto and may not be modified except by a written agreement. The parties agree they shall not be bound by any terms, conditions, statements, warranties or representations, oral or written, not contained herein. There are no collateral understandings or agreements other than those contained herein.

(e)  Except where federal law applies, this Agreement shall be construed and interpreted in accordance with the laws of the state where the Property is located.

(f)  Notices required to be given to Seller by this Agreement shall be in writing and effective as of the date on which such notice is delivered to Seller at its principal place of business. Notices required to be given to Buyer by this Agreement shall also be in writing and effective either when delivered to Buyer or when mailed to Buyer's address as set forth above.

(g)  When so applicable, words in the masculine shall include feminine, words in the neuter shall include the masculine and feminine, and words in the singular shall include the plural.

(h)  In computing applicable time prescribed or allowed by any provision of the Agreement, the day of the act or event from which the designated period of time begins to run shall not be included. The last day of the period so computed shall be included, unless it is a Saturday, Sunday or legal holiday, in which event the period runs until the end of the next day that is not a Saturday, Sunday or legal holiday.

(i)  By providing your telephone and fax numbers, you hereby consent to receiving telephonic and fax communications, including advertisements, made or sent by or on behalf of **Stoneybrook at Gateway** and/or its affiliates.



Buyer
Buyer

**27. FUNDS.** All funds deposited with Seller pursuant to this Agreement shall be payable to Seller in U.S. Dollars and in cash, check, certified funds or wire transfer.

**28. SELLING BROKER.** Based solely on Buyer's representation that the broker named below was the procuring cause of Buyer's decision to purchase the Property from Seller as provided in this Agreement, if Broker is licensed in the State of Florida, then Seller shall pay a broker's commission which commission will be earned and paid only upon closing. If any other real estate broker or real estate agent claims any commission or fee in connection with this transaction, the party who bought such broker or agent into this transaction shall be solely responsible for any and all such claims, and shall indemnify and hold and save the other party harmless therefrom.

Broker or agent   None

Address
Phone

___ Seller's broker or agent          ___ Buyer's broker or agent          Federal Tax ID No./Social Security No

Firm Description:    ___ Corporation        ___ Partnership         ___ Proprietorship        ___ Limited Liability Company

**29.** In the event Seller does not commence construction within 90 days from the date of this Agreement, Seller may terminate this Agreement and Buyer(s) will be refunded all down payment monies, without further liability to Seller.

**30. ENERGY-EFFICIENCY RATING DISCLOSURE.** Florida law gives the Buyer the right to have the energy-efficient rating determined for any home. Should Buyer wish to have the home rated, Buyer must arrange to have the energy-efficiency rating determination performed at Buyer's expense. Buyer hereby states that Buyer [has] [has not] received a copy of the energy-efficiency rating information brochure prepared by the Department of Community Affairs.

**31. INSULATION DISCLOSURE.** As required by Federal Trade Commission Regulations, the insulation that is or will be installed in home is as follows and will, according to the manufacturer, yield the R-values stated:

| Location | Type | Thickness | R-Value |
|---|---|---|---|
| A/C Exterior Masonry Walls | FI FOIL | 0.00 | 4.1 |
| A/C Exterior Frame Walls | FIBERGLASS | 3.00 | 11 |
| A/C Interior Ceilings(Top Floors) | FIBERGLASS | 6.00 | 30 |
| | | | |
| | | | |

Fiberglass (also known as glass wool) is used for insulation in the home you are purchasing. The U.S. Department of Health and Human Services ("HHS") has listed fiberglass as a substance "which may be reasonably anticipated to be a carcinogen". This listing identifies substances selected for further study because of their potential carcinogenic risk but it is not an assessment by HHS that there is a causal connection between fiberglass and human cancer. The listing does not establish that fiberglass presents a risk to persons in their daily lives.

**32.** This Agreement consists of 6 pages and the following Addenda which are attached hereto and made a part of this Agreement:

| | |
|---|---|
| ___ Extras – Addendum A (ATC's) | ___ Start Procedure - Addendum G |
| ___ Real Estate Sales Disclosure – Addendum B | ___ Homeowners' Assoc. - Addendum H |
| ___ Agency Disclosure – Addendum C | ___ Swimming Pool Safety - Addendum I |
| ___ Notice of Consumer Rights – Addendum D | ___ Natural and Manmade Products - Addendum J |
| ___ Buyer Discounts – Addendum E | ___ Indoor Environmental Quality – Addendum K |
| ___ Affiliated Business Arrangement – Addendum F | ___ Adjacent Property – Addendum L |

**33. OFFER TO PURCHASE/EFFECTIVE DATE.** This Agreement is an offer by Buyer to purchase in accordance with the terms and conditions provided herein, and shall not be binding upon Seller until such time as a Division Officer of Seller has executed this Agreement. The date of such acceptance is the Effective Date of this Agreement.

**IF THE DISCLOSURE SUMMARY REQUIRED BY SECTION 689.26, FLORIDA STATUTES, HAS NOT BEEN PROVIDED TO THE PROSPECTIVE PURCHASER BEFORE EXECUTING THIS CONTRACT FOR SALE, THIS CONTRACT IS VOIDABLE BY BUYER BY DELIVERING TO SELLER OR SELLER'S AGENT WRITTEN NOTICE OF THE BUYER'S INTENTION TO CANCEL WITHIN 3 DAYS AFTER RECEIPT OF THE DISCLOSURE SUMMARY OR PRIOR TO CLOSING, WHICHEVER OCCURS FIRST. ANY PURPORTED WAIVER OF THIS VOIDABILITY HAS NO EFFECT. BUYER'S RIGHT TO VOID THIS CONTRACT SHALL TERMINATE AT CLOSING. BUYER SHOULD NOT EXECUTE THIS CONTRACT UNTIL BUYER HAS RECEIVED AND READ THIS DISCLOSURE.**

Buyer
Buyer

THE STONEYBROOK AT GATEWAY COMMUNITY DEVELOPMENT DISTRICT IMPOSES TAXES OR ASSESSMENTS, OR BOTH TAXES AND ASSESSMENTS, ON THIS PROPERTY. THESE TAXES AND ASSESSMENTS PAY THE CONSTRUCTION, OPERATION, AND MAINTENANCE COSTS OF CERTAIN PUBLIC FACILITIES OF THE DISTRICT AND ARE SET ANNUALLY BY THE GOVERNING BOARD OF THE DISTRICT, THESE TAXES AND ASSESSMENTS ARE IN ADDITION TO COUNTY AND OTHER LOCAL GOVERNMENTAL TAXES AND ASSESSMENTS AND ALL OTHER TAXES AND ASSESSMENTS PROVIDED FOR BY LAW.

PAYMENT MAY BE AVAILABLE FROM THE FLORIDA HOMEOWNERS' CONSTRUCTION RECOVERY FUND IF YOU LOSE MONEY ON A PROJECT PERFORMED UNDER AN AGREEMENT (CONTRACT), WHERE THE LOSS RESULTS FROM SPECIFIED VIOLATIONS OF FLORIDA LAW BY A LICENSED CONTRACTOR. FOR INFORMATION ABOUT THE RECOVERY FUND AND FILING A CLAIM, CONTACT THE FLORIDA CONSTRUCTION INDUSTRY LICENSING BOARD AT THE FOLLOWING TELEPHONE NUMBER AND ADDRESS: (850) 487-1395, 1940 N. MONROE ST., SUITE 60, TALLAHASSEE, FLORIDA 32399-2202.

FLORIDA STATUTES CONTAINS IMPORTANT REQUIREMENTS YOU MUST FOLLOW BEFORE YOU MAY BRING ANY LEGAL ACTION FOR AN ALLEGED CONSTRUCTION DEFECT IN YOUR HOME. SIXTY (60) DAYS BEFORE YOU BRING ANY LEGAL ACTION, YOU MUST DELIVER TO THE OTHER PARTY TO THIS AGREEMENT (CONTRACT) A WRITTEN NOTICE REFERRING TO CHAPTER 558 OF ANY CONSTRUCTION CONDITIONS YOU ALLEGE ARE DEFECTIVE AND PROVIDE SUCH PERSON THE OPPORTUNITY TO INSPECT THE ALLEGED CONSTRUCTION DEFECTS AND TO CONSIDER MAKING AN OFFER TO REPAIR OR PAY FOR THE ALLEGED CONSTRUCTION DEFECTS. YOU ARE NOT OBLIGATED TO ACCEPT ANY OFFER WHICH MAY BE MADE. THERE ARE STRICT DEADLINES AND PROCEDURES UNDER THIS FLORIDA LAW WHICH MUST BE MET AND FOLLOWED TO PROTECT YOUR INTERESTS.

OFFER EXECUTED IN MULTIPLE COPIES BY BUYER ON 01/09/2005.

ACKNOWLEDGEMENT OF THE RECEIPT OF PAYMENTS set forth in paragraph 1, subject to collection if paid by check.

_____
Sales Representative

ACCEPTANCE EXECUTED IN MULTIPLE COPIES BY SELLER

U.S. HOME CORPORATION

By: _____
Division Officer

Effective Date of Agreement 1/16/05

_____
Buyer

_____
Buyer

ACKNOWLEDGEMENT BY BROKER THAT BROKER WAS THE PROCURING SOURCE OF SALE.

_____
Selling Broker

Buyer _____
Buyer _____

**Addendum A 1**

Job Number 160394128                          01/09/2005                              Page:  3

## Purchase Agreement Summary

Buyer **Arthur and Linda Siegwardt**

Homesite Address **MUDDY CREEK LANE**          City **Fort Myers**          State **FL**   Zip **33913**

| | | | **Amount** | **Date** |
|---|---|---|---|---|
| Base Sales Price: | 337,990.00 | Additional Deposit | 0.00 | |
| | | Custom Feature Deposit: | 0.00 | |
| Homesite Premium: | 0.00 | Additional Custom Feature Deposit: | 0.00 | |
| | | Earnest Money Deposit: | 16,000.00 | |
| Custom Features: | | Check Number: | | |
| *Custom Features Incentive:* | 3,379.00 | | | |
| Total Sales Price | 334,611.00 | | | |

** Shaded Options Are Included in Base Price of Home

## ALL DEPOSITS (INCLUDING EARNEST MONEY) ARE NON-REFUNDABLE

This addendum is not binding on Seller until accepted below by an authorized Division Officer of Seller.

_____    1-9-05       _____    1/1/05
New Home Consultant         Date          Buyer                      Date

_____                 _____    11/11/05
Construction                Date          Buyer                      Date

_____    1/16/05       _____
Division Officer            Date          Buyer                      Date

Printed: 01/09/2005 10:21:38 AM by Julie Stanek

**Addendum A 1**

| Job Number 160394128 | **01/09/2005** | Page: 2 |
|---|---|---|

Information

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| | - SKSFG~Generic: | | | | | |
| STIN | STONEYBROOK USHM INCENTIVE | 1 | F | 0.00 | 01/09/2005 | Julie Stanek |
| | Universal American Mortgage Incentive Package: | | | Last Mod By: Julie Stanek | | |
| | GE GSS 22 WGM Refrigerator | | | | | |
| | GE JVM 1631 Microwave | | | | | |
| | GE WCXR 1070 Washer | | | | | |
| | GE DCL 333 EY Dryer | | | | | |
| | GE JBP 66 WB Glass-Top Range | | | | | |
| | - Customer Choice: | | | | | |

## REMAINDER OF THIS PAGE ABOVE SIGNATURE BLOCK IS INTENTIONALLY LEFT BLANK

Buyer Arthur and Linda Siegward

Division Officer Initials: _____

Printed: 01/09/2005 10:21:38 AM by Julie Stanek

Lot (Unit) 28      Plan CANNONDALE FLEX

Buyer Initials: _____

Buyer Initials: _____

| | **Addendum A 1** | |
|---|---|---|
| Job Number 160394128 | **01/09/2005** | Page: 1 |

The provisions of this addendum are part of the sales agreement dated <u>01/09/2005</u> between <u>U. S. Home</u>

as "Seller" and <u>Arthur and Linda Siegwardt</u> as "Buyer" for the following described property:

Lot (Unit)<u>28</u>   Block <u>A4</u>   Phase <u>01</u>   Section/Tract <u>0</u>   Filing

of <u>Stoneybrook at Gateway Manor Homes</u>

Address <u>MUDDY CREEK LANE</u>   City <u>Fort Myers</u>   State <u>FL</u>   Zip <u>33913</u>

Plan <u>CANNONDALE FLEX</u>   Elevation <u>CH00</u>   Garage   <u>Left</u>

Decorator ☐   Pre-Construction ☐   After-Start Change Order ☐   Sold Inventory ☐

## Elevations

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| CH00 | ELEVATION CH | 1 | F | 0.00 | 01/09/2005 | Julie Stanek |
| | | | | Last Mod By: Julie Stanek | | |
| | – Customer Choice: | | | | | |

## Information

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| SKSFG | STONEYBROOK AT GATEWAY MANOR HOMES STANDARD FEATURES | 1 | F | 0.00 | 01/09/2005 | Julie Stanek |
| | Standard Features: | | | Last Mod By: Julie Stanek | | |

Colored Concrete Roof Tile
Weiser Brilliance Series Hardware with Lever Handles
GSD 2230Z Dishwasher
Badger 1/2 HP Disposal
Double Bowl Stainless Steel Sink
Moen 7460 Crome Single-lever Faucet
European Kitchen Cabinets w/Mica Tops
6x6 Ceramic Wall Tile in all Bath and Shower Areas
Level 2 Tile Flooring in Standard Areas
Moen Single Lever Faucets
Prewired for Fans in all Bedrooms, Family Room and Den
TV Outlets in Bedrooms, Den and Family Room
Telephone Outlets in Bedrooms, Den and Family Room
(2) Exterior Weatherproof Outlets
(2) Exterior Coachlights Installed
Decora Style Switches Throughout
Prewired for Garage Door Opener
Floritam Sod
Fully Landscaped and Improved Homesite
Automatic Inground Sprinkler System
Concrete Driveway

Division Officer Initials:

Buyer Initials:

Buyer Initials:

Printed: 01/09/2005 10:21:38 AM by Julie Stanek

## ADDENDUM  B

### COMMUNITY Stoneybrook at Gateway
### REAL ESTATE SALES DISCLOSURE

**TO PROSPECTIVE BUYERS:**

Upon the conveyance of the sale of real property, additional cost shall be borne by you, the buyers.
These major cost may include the following:

1.  Real Estate Property Taxes to be prorated from the date of closing through the end of the tax year.  (In the event, the County has not assessed the property you are purchasing, then the taxes shall be prorated upon receipt of the tax billing.)

2.  Title Insurance premium for an owner's policy and title search and settlement fee charged by title company.

3.  Documentary stamps required for the warranty deed.

4.  Recordation of the deed.

5.  Final survey fee $275.00

Additional cost which shall be borne by you, the buyer, if you obtain a mortgage are as follows:

1.  Loan origination fees.
2.  Loan discount points.
3.  Appraisal fee and inspection fee.
4.  Credit report.
5.  Tax service.
6.  Document preparation.
7.  Application fee.
8.  Recording of mortgage.
9.  Documentary stamps on note.
10. Intangible tax on mortgage.
11. Mortgage title insurance premium, plus any endorsements the lender may require.
12. Fax copies or express fees.
13. Prepaid expenses if required by lender.
    A.  Interest from date of closing through end of month.
    B.  Mortgage insurance premium if required by lender.
  ❖ C.  Hazard insurance premium.
  ❖ D.  Flood insurance premium if property located within flood district.
    E.  Escrow for real estate property taxes, mortgage insurance, flood insurance, and hazard insurance, if required.

Prospective buyers who purchase a home or condominium within a homeowner's association or condominium association will be required to pay a prorated portion of the assessments up to the next billing period of the respective association from the date of closing.

Buyer acknowledges this instrument has been read and signed before any contract on real estate property has been completely read by the buyer and seller and has been executed this ___7___ day of _____Jan_____, 200_5_

Signed in the presence of:                                  BUYERS:

_____               _____

_____               _____

❖  Flood insurance and hazard insurance premiums may be included in the assessments paid for units purchased within a condominium association.

### IN THE EVENT THE BUYERS SIGN A CONTRACT FOR PURCHASE OF REAL PROPERTY
### WITH THE SELLER, THIS DISCLOSURE SHALL BECOME A PART OF THAT CONTRACT.

## ADDENDUM C
## AGENCY DISCLOSURE

Florida real-estate licensees are required to disclose which party they represent in a transaction and allow a party the right to choose or refuse among the various agency relationships.

The purpose of the AGENCY DISCLOSURE is to acknowledge that the disclosure occurred and that the consumer has been informed of the various agency relationships which are available in a real estate transaction. The following description of terms, agency relationships and the respective duties and obligations are based upon Florida Law (Chapter 475, Florida Statues).

### SELLER'S AGENT

A licensee who is engaged by and acts as the agent of the Seller only is know as a Seller's agent. A seller's agent has the following duties and obligations:

To The Seller:

a) The fiduciary duties of dealing honestly and fairly, loyalty, confidentiality, obedience, full disclosure, accounting for all funds and the duty to use skill, care and diligence in the transaction and to present all offers and counteroffers in a timely manner, unless a party has previously directed the licensee otherwise in writing.

To The Buyer:

(a) A duty of dealing honestly.

(b) A duty to disclose all facts known to the Seller's agent materially affecting the value of the property which are not know to, or readily observable to the buyer.

(c) Duty of accounting for all funds entrusted to Seller's Agent.

### AGENCY DISCLOSURE

### NOTICE OF NONREPRESENTATIONAL

**FLORIDA LAW REQUIRES THAT REAL ESTATE LICENSEES PROVIDE THIS NOTICE AT FIRST CONTACT TO ALL POTENTIAL SELLERS AND BUYERS OF REAL ESTATE.**

You are hereby notified that U.S. Home Corporation and I do not represent you in any capacity. You should not assume that any real estate broker or salesperson represent you unless you agree to engage a real estate licensee in an authorized brokerage relationship, either as a single agent or as a transaction broker. You are advised not to disclose any information you want to be held in confidence until you make a decision on representation. Your signature below acknowledges receipt of the form and does not establish a brokerage relationship.

U.S. HOME CORPORATION

By: _____
Sales Representative

_____
Date
1-9-05

_____
Buyer

_____
Buyer

_____
Date
1/11/05

## ADDENDUM D
## NOTICE OF CONSUMER RIGHTS

The provisions of this Addendum are hereby incorporated into the Sales Agreement dated 01/09/2005 between U.S. HOME CORPORATION as Seller Arthur Siegwardt and Linda Siegwardt as Buyer for the following described property:

Lot(Unit) 26 Block A4 Section/Tract/Filing 160394128 of Stoneybrook at Gateway Subdivision

Address MUDDY CREEK LANE City Fort Myers State FL Zip 33913

### NOTICE OF CONSUMER RIGHTS UNDER THE
### CONSTRUCTION INDUSTRIES RECOVERY FUND

Your have certain rights under Florida law if you have suffered damages caused by a state-licensed contractor or a construction company with whom you have signed a contract. State law requires that you be provided with this notice of your rights regarding the Construction Industries Recovery Fund, including how and where you can file a claim against the Fund for reimbursement of any damages you have suffered.

You may be eligible for reimbursement if you have suffered monetary loss due to certain acts (described below) by the contractor, financially responsible officer or business organization licensed under Chapter 489, Part I, Florida Statutes. The Fund is available only in cases where the contract was signed and the violation occurred on or after July 1, 1993.

#### Who is Eligible?

In order to seek compensation from the Construction Industries Recovery Fund, you must have:

1.  Entered into a written contract with a licensed contractor for Work on residential real property;
2.  Commenced legal action against the contractor, financially responsible officer or business organization; and
3.  Suffered a financial loss due to the contractor:

    a)  Knowingly violating applicable city, county or state building codes or laws;

    b)  Committing mismanagement or misconduct in the practice of contracting that causes financial harm to a customer;

    c)  Abandoning a construction project for more than 90 days; or

    d)  Signing a false statement claiming that the work is bonded, that all payments to subcontractors have been made, or claiming to have provided certain worker's compensation and insurance protection.

Florida laws provide specific definitions for determining whether a contractor's actions may constitute one of these violations. See §489.129(1)(d), (h), (k), (l), Fla. Stat. In addition, you must notify the Construction Industry Licensing Board (CILB) of your claim by certified mail at the time you commence legal action.

Filing a complaint against a contractor is not the same as filing a claim against the Fund. Even if you file a complaint against a contractor with the Department of Business and

Professional Regulation (DBPR), you still have to give the CILB notice of your claim and you will also be required to file a Construction Industries Recovery Fund Claim Form with the CILB.

To request a Construction Industries Recovery Fund Claim Form or to receive more information about the Fund, write to:

> Construction Industry Licensing Board
> 7960 Arlington Expressway
> Suite 300
> Jacksonville, Florida 32211-7467
> Phone (904) 359-6310

If you have questions and/or want to file a complaint with the DBPR against the contractor, the financially responsible officer and/or the business organization, please write to the Complaints Section, DBPR, 1940 North Monroe Street, Tallahassee, Florida 32399-0782.

#### Conditions for Recovery

In order to recover from the Fund, you must be an individual – not a company. The Recovery Fund is a last resort. Before you can receive any money from the Fund, you must have obtained a final judgement from a Florida court or a restitution order from the CILB based on the types of violations of law already mentioned. Both the violation of law and the signing of the construction contract must have occurred on or after July 1, 1993. Before the Fund will pay you any money, you must show that you have made every effort to determine if there are any assets which you can recover all or part of the money you are owed. If so, you must try to recover before you can collect from the Fund. You have to file a claim for recovery with the Fund within 2 years of the time of violation of law happens or within 2 years of the time you find out or should have found out about the violation of law. No claim can be made more than 4 years after the time the violation of law happened.

#### Payments From the Fund

The Fund does not pay post-judgement interest, punitive damages, or attorney fees. The Fund only pays what you have not yet collected for actual or compensatory damages. The Fund pays the lessor of up to $25,000 per claim, $25,000 per transaction, or $50,000 per contractor.

FOR MORE INFORMATION ABOUT THE FUND, SEE §§489.140 TO 489,143, FLA. STAT. AND RULES 61G4-21.001 TO 61G4-21.005, FLA. ADMIN. CODE

U.S. HOME CORPORATION

By: _____
    Sales Representative          1-9-05
_____
    Date

Buyer _____ Arthur Siegwardt
Buyer _____ Linda Siegwardt
      1/11/05
    Date

## ADDENDUM E
## BUYER DISCOUNTS

The provisions of this Addendum are hereby incorporated into the Sales Agreement dated __01/09/2005__ between U.S. HOME CORPORATION

as Seller and __Arthur Siegwardt and Linda Siegwardt__ as Buyer for the following described property:

Lot(Unit) __28__ Block __A4__ Section/Tract/Filing __160394128__ of __Stoneybrook at Gateway__ Subdivision

Address __MUDDY CREEK LANE__ City __Fort Myers__ State __FL__ Zip __33913__

Seller has agreed in Addendum A to offer certain specified sales promotions, marketing allowances, discounted options or upgrades, or other discounting of the Property (collectively, "Buyer Discounts") generally described as **Universal American Mortgage Company, UAMC and North American Title Incentives.**

Buyer agrees and understands that Seller's obligations to provide such Buyer Discounts is contingent upon, and Buyer will receive such Buyer Discounts only if, Universal American Mortgage Company originates and closes the loan and North American title is the Closing Agent for the home transaction to purchase the Property, or is cash.

**Universal American Mortgage Company, LLC Incentives consist of:**

| | |
|---|---|
| GSS22WGM GE Refrigerator | – $1,110.00 |
| JBP66WB GE Range | – $ 680.00 |
| JVM1631 GE Microwave Oven | – $ 330.00 |
| WCSE4160B GE Washer | – $ 380.00 |
| DBXR463EB GE Dryer | – $ 260.00 |

Total Value of Appliances included in contract price is $2,760

UAMC and, North American Title Promotional Discount on Base Price $ 3,379.00

This Addendum is an offer by Buyer and shall not be binding upon Seller until such time as a Division Officer of Seller has executed this Sales Agreement between the parties.

U.S. HOME CORPORATION

By_____
Sales Representative

_1–9–05_
Date

Buyer _ARTHUR SIEGWARDT_

Buyer _Linda Siegwardt_

_1/11/05_
Date

_IF80M8376.doc
USH Revised August 9, 2004

**Addendum F**
## AFFILIATED BUSINESS ARRANGEMENT
## DISCLOSURE STATEMENT

To:        **Arthur Siegwardt and Linda Siegwardt**
           Buyer(s) Name

Date:      **01/09/2005**

Property:  **MUDDY CREEK LANE,   Fort Myers, FL  33913**
           Street Address

This is to give notice that the following companies have business relationships with each other: Universal American Mortgage Company, LLC, North American Title Company, North American Title Insurance Corporation, Lennar Homes, d/b/a Classic American Homes, Inc. and Classic American Homes, U.S. Home Corporation, Rutenberg Homes and Universal American Insurance Agency, Inc. and each of these companies is, directly or indirectly, wholly owned by Lennar Corporation.  Because of such relationships, referral of services by the undersigned may provide a financial or other benefit.

Set forth below are the types of settlement services offered by these affiliated companies and the estimated charge or range of charges generally required by these companies for such settlement services. You are NOT required to use any of the companies listed above as a condition for purchase of the subject property.

**THERE ARE FREQUENTLY OTHER SETTLEMENT SERVICE PROVIDERS AVAILABLE WITH SIMILAR SERVICES. YOU ARE FREE TO SHOP AROUND TO DETERMINE THAT YOU ARE RECEIVING THE BEST SERVICES AND THE BEST RATE FOR THESE SERVICES.**

### Provider and Settlement Services/ Estimated Range of Charges

---

#### MORTGAGE

**Universal American Mortgage Corporation, LLC** arranges and makes mortgage loans and the following are estimated mortgage loan related charges or range of charges (**not all of the charges may apply**):

**Description of Fee**                                    **Range of Cost**

Loan Origination Fee.................................................... 0%    to  2% of the loan amount
Loan Discount Fee ......................................................0%    to  3% of the loan amount
Application Fee ...........................................................$335  -  $375 (Conventional loans only)
Underwriting Fee ........................................................$250  -  $350 (Conventional loans only)
Processing Fees..........................................................$250  -  $350 (Conventional loans only)
Document Preparation Fee ..........................................$250  -  $350 (Conventional loans only)
Appraisal Fee Paid to Appraiser...................................$200  -  $400  (Government loans only)
Credit Report Fee Paid to Outside Agency .....................$ 50  -  $ 75  (Government loans only)
Attorney Fee ..............................................................$100  -  $150
Other........................................................................$ 50  -  $100

The actual fees charged may vary within the above ranges based on the size of your loan, loan program and interest rate you choose. There also will be other third party charges. You will receive a Good Faith Estimate when you apply for your mortgage loan that will give you an estimate of all anticipated charges.

_1F80M87E8.doc USH August 18, 2004

## ·Affiliated Business Arrangement Disclosure Statement Cont'd.

### TITLE

**North American Title Company** provides closing services and title insurance through numerous underwriters, one of which is North American Title Insurance Corporation. The following are estimated charges or range of charges for the settlement services listed:

♦   **If your contract provides you with an owner's policy, your cost will be:**
  •   Mortgagee policy:   A maximum of $250

♦   **If your contract does not cover any of the cost for title insurance, your cost will be:**
  •   **Owner's policy:**      $575 for the first $100,000 of purchase price and $5 for every $1,000 over the first $100,000
  •   **Mortgagee policy:**   A maximum of $250

♦   **Closing Fee** ......................... $225
♦   **Search Fee** ......................... $100 - $425
♦   **Chain of Title Fee**................. $  50 - $100
♦   **Exam Fee** ........................... $100 - $185
♦   **Endorsements Fee**.............. $  25 - $500*
♦   **Wire Fee** ............................ $ 25 per wire
♦   **Shipping and Handling Fee** ... $ 50  - $100
♦   **Third Party Lender fee** ......... $150**

\* Charge depends on endorsement type and coverage required.
\**Charge only applies to second mortgages.

---

### INSURANCE

**Universal American Insurance Agency, Inc.** provides hazard insurance services through numerous underwriters. Homes sold by the Builders listed above in the area of the subject property typically have sales prices that range between $70,000 and $700,000.  The insurance premiums charged by Universal American Insurance Agency, Inc., for hazard insurance on homes in the area of the subject property with such sales prices range, approximately, between $300 and $4,000.**

**\**Premiums may vary based on a number of factors, including but not limited to the price and location of the home and the coverage requested. The estimates represent a range for many typical transactions.**

## Acknowledgement

I/we have read this notice and understand that Seller is referring me/us to purchase the above-described settlement services and may receive a financial or other benefit as a result of this referral.

| | | |
|---|---|---|
| _Buyer's Signature_ _Jzrwie Siguuges_ | 1/11/05 | US Home |
| **Buyer's Signature** | **Date** | **Printed Name of Seller** |
| _Linda Suewardt_ | 1/11/05 | |
| **Buyer's Signature** | **Date** | **Sales Associate's Signature**    **Date** |

# ADDENDUM G

## START PROCEDURE

The provisions of this Addendum are hereby incorporated into the Sales Agreement dated 01/09/2005 between U.S. HOME CORPORATION as Seller and **Arthur Siegwardt and Linda Siegwardt** as Buyer for the following described property:

Lot(Unit) 28 Block A4 Section/Tract/Filing 160394128 Stoneybrook at Gateway Subdivision

Address MUDDY CREEK LANE City Fort Myers State FL Zip 33913

**START PROCEDURE.** Within fifteen (15) days of the effective date of this agreement, Buyer will be asked to meet at the Design Center with an Interior Decorator to select colors. Following the color appointment, Buyer will be scheduled to meet with the Start Coordinator to finalize the plans and specifications for your dwelling. At this meeting, Buyer will also select the locations for telephone, fan, cable, and electrical outlets. Buyer should be prepared to make such decisions at the time of the meeting. In order to be of better service, Buyer's appointments are required to be made in advance.

At the conclusion of the Start Coordinator meeting, Buyer will be asked to sign an "ATC Sign-Off Form". This form confirms that you have made all changes on your future home. Plans cannot go any further until this process has been completed and the 10% deposit has been received.

U.S. Home will proceed with drafting only after the "ATC Sign-Off" form has been executed acknowledging the finalization of all changes.

*NO CHANGE TO YOUR HOME WILL BE PERMITTED*
*AFTER THE ATC SIGN-OFF.*

U.S. HOME CORPORATION

By _____
Sales Representative

Date _____1-9-05_____

Buyer _____

Buyer _____

Date _____1/11/05_____

**Addendum A 4**

Job Number **16039514128**

**06/15/2005**

COPIED TO: 6/22/05 Page: 1

TITLE CO.

PURCHASING

U.S. MORTGAGE

PROJECT OFFICE

BUILDER

ACCOUNTING

: provisions of this addendum are part of the sales agreement dated **01/09/2005**   between U.S. Home

'Seller' and **Arthur and Linda Siegwardt**                                     as "Buyer" for the following described property:

: (Unit)**28**   Block **A4**   Phase **01**                   Section/Tract   **0**

**Stoneybrook at Gateway Manor Homes**

dress **MUDDY CREEK LANE**          City **Fort Myers**          State **FL**

n **CANNONDALE FLEX**        Elevation **CH00**        Garage _____ Left

Decorator ☐   Pre-Construction ☐   After-Start Change Order ☐   Sold Inventory ☐

## Activity Summary Since Addendum A 3 on 03/07/2005

| ate | Type of Change | Category | Code | Description (Short) | Quantity | Mod. By |
|---|---|---|---|---|---|---|
| 5/15/2005 | Edited | Cabinetry | KPGRP2C | KITCHEN GOLD PKG LVL 2- RSD PNL | 1 | |
| 5/15/2005 | Edited | Electrical | RE03 | EXTERIOR GFI WEATHERPROOF RECEPTACLE | 1 | |
| 6/15/2005 | Edited | Electronics | LV13 | EXTRA KEYPAD-SECURITY SYS | 1 | |
| 6/15/2005 | Edited | Electronics | MI19 | SPEAKER PREWIRE PER OPENING | 1 | |
| 6/15/2005 | Edited | Exteriors | LANAI | ADDNL DECK INCL/FLOCRETE CONC FINISH & | 314 | |
| 6/15/2005 | Added | Information | 0002 | INFORMATION | 1 | |
| 3/08/2005 | Added | Light Fixtures | CUSTOM | LIGHT FIXTURE TO FOYER | 1 | |
| 6/15/2005 | Added | Plumbing/Bath | MM04 | SHOWER ENCLOSURE CLEAR GLASS-MBATH | 2 | |

**Appliances**

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| .000W | LEVEL 1-APPLIANCE PKG-WHITE | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |

GSD2200G-WW (Dishwasher)
JBP69WH-WW / WX9X35 (Range)
JVM1631WJ-WW (Microwave)
GSS22WGP-WW (Refrigerator)
WCSR4170D-WW (Washer)
DBXR463ED-WW / WX9X19 (Dryer)

Last Mod By: Christine Gilberti

- Customer Choice: WHITE

**Cabinetry**

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|

division Officer Initials: _____

Buyer Initials: _____

Buyer Initials: _____

rinted: 06/15/2005 10:27:39 AM by Christine Gilberti

**Addendum A 4**

| Job Number 16039514128 | 06/15/2005 | Page: 2 |
|---|---|---|

## abinetry

| de | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| .17 | RAISE BATH VANITY HGT TO 36" | 3 | F | 450.00 | 03/04/2005 | Christine Gilberti |
| | Raise Height of Bath Vanity Cabinets to 36" | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:Master Bath, Guest Bath and Pool Bath | | | | | |
| 3RP2C | BATH #3 CABINETS LVL 2- RSD PANEL/ COLLECTION SERIES | 1 | F | 140.00 | 03/04/2005 | Christine Gilberti |
| | Collection Series Bath #3 Cabinets Package Level 2 - Raised Panel (foil) | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:POOL BATH ANTIQUE WHITE W/ US9 Hardware | | | | | |
| 3RP2C | GBATH CABINETS LVL 2- RSD PNL COLLECTION SERIES | 1 | F | 270.00 | 03/04/2005 | Christine Gilberti |
| | Collection Series Guest Bath Cabinets Package Level 2 - Raised Panel (foil) | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:WHITE W/ US45 Hardware | | | | | |
| ?GRP2C | KITCHEN GOLD PKG LVL 2- RSD PNL COLLECTION SERIES | 1 | F | 4,290.00 | 06/15/2005 | Christine Gilberti |
| | Collection Series Kitchen Cabinets Gold Package Level 2 - Raised Panel (foil) Includes Pre-wire for Undercabinet Lighting w/ 2 switches. (*Light Fixtures NOT Included) | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:WHITE W/ US52 Hardware | | | | | |
| BRP2C | MBATH CABINETS LVL 2- RSD PNL COLLECTION SERIES | 1 | F | 590.00 | 03/04/2005 | Christine Gilberti |
| | Collection Series Master Bath Cabinets Package Level 2 - Raised Panel (foil) | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:ANTIQUE WHITE W/ US47 on Doors and US48 on Drawers | | | | | |

## Countertops

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| )09 | INFORMATION-COUNTERTOPS | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:Kitchen Counter top to be: MICA 4680-60 LODESTONE | | | | | |
| P05 | POOLBTH TOPS CULTURED MARBLE | 1 | F | 290.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:BISCUIT W/ WHITE | | | | | |
| T02 | G BATH TOPS- CULT MARBLE | 1 | F | 360.00 | 03/04/2005 | Christine Gilberti |
| | Guest Bath Tops - Cultured Marble | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:WHITE PARCHMENT | | | | | |
| IT02 | M BATH TOPS-CULT MARBLE | 1 | F | 490.00 | 03/04/2005 | Christine Gilberti |
| | Master Bath Countertops- Cultured Marble | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:BISCUIT W/ WHITE | | | | | |

---

| uyer Arthur and Linda Siegwardt | Lot (Unit) 28 | Plan CANNONDALE FLEX |
|---|---|---|

ivision Officer Initials: _____

Buyer Initials: _____

Buyer Initials: _____

**Addendum A 4**

Job Number 16039514128      06/15/2005      Page: 3

## ectrical

| de | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| 03 | EXTERIOR GFI WEATHERPROOF RECEPTACLE | 1 | F | 100.00 | 06/15/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | -Customer Choice:Add to Exterior Front Below Bay window (as per Plan) | | | | | |
| 07 | 220V OUTLET ON DEDICATED CIRCUIT | 1 | F | 280.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | -Customer Choice:Add to Back Extended Lanai (as per Plan) | | | | | |

## ectronics

| de | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| '01 | CABLE OUTLET | 1 | F | 70.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | -Customer Choice:Add to Loft (As per Plan) | | | | | |
| (19 | SPEAKER PREWIRE PER OPENING | 1 | F | 90.00 | 06/15/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | -Customer Choice:Add (4) to FAMILY ROOM (as per Plan) | | | | | |
| | Ceiling Drops | | | | | |
| /12 | SECURITY SYSTEM | 1 | F | 1,710.00 | 03/04/2005 | Christine Gilberti |
| | -Security System- | | | Last Mod By: Christine Gilberti | | |
| | 1 Panel, 2 Keypads, 1 Motion Detector, Sirens, Battery Backukp, Monitor Feed & Hookup, Magnetic Switches on all Operable Exterior Doors & Windows | | | | | |
| | -Customer Choice:Location of Motion Detector to be Determined at Pre Construction Meeting | | | | | |
| /13 | KEYPAD SECURITY SYS | 1 | F | 200.00 | 06/15/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | Customer Choice:Master Bedroom | | | | | |
| | Next existing switch plate behind master door. | | | | | |
| /16 | GLASS BREAK DETECTOR | 1 | F | 200.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | -Customer Choice: | | | | | |

## levations

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| H00 | ELEVATION CH | 1 | F | 0.00 | 01/09/2005 | Julie Stanek |
| | | | | Last Mod By: Julie Stanek | | |
| | -Customer Choice: | | | | | |

## nergy/HVAC

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| OOL | TECH SHIELD (KOOL PLY) | 1 | F | 1,210.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | -Customer Choice: | | | | | |

## xteriors

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|

uyer Arthur and Linda Siegwardt      Lot (Unit) 28      Plan CANNONDALE FLEX

vision Officer Initials: _____      Buyer Initials: _____

inted: 06/15/2005 10:27:39 AM by Christine Gilberti      Buyer Initials: _____

**Addendum A 4**
**06/15/2005**

Job Number 16039514128                                                                     Page: 4

**xteriors**

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| 15 | INFORMATION-EXTERIOR FINISHES | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

-Customer Choice:Home Color Scheme to be #E
Stucco and Gargae door to be: SW6100 PRACTICAL BEIGE

Banding and Front door to be: SW6099 SAND DOLLAR

Roof to be STANDARD NEW SOUTHERN BLEND

FLO-CRETE to be IRISH CREAM

Screen Cage to be BRONZE

Front Door Hardware and Interior Door Hardware to be STANDARD
SONOMA LO3 (Polished Brass) and DELTA US3 (Polished Brass)

| ANAI | ADDNL DECK INCL FLOCRETE CONC FINISH & SCREEN ENCL (PER SD) | 314 | F | 8,164.00 | 06/15/2005 | Christine Gilberti |
| | Additional Concrete Deck - Includes Flocrete Concrete Finish and Screen Enclosure | | | Last Mod By: Christine Gilberti | | |

-Customer Choice:Extend Lanai 4Ft and expand to Left 16 Ft (as per Plan)

A total of 314 Sq Ft

| USTOM | | 2 | F | 1,100.00 | 03/07/2005 | Christine Gilberti |
| | SIDELITES to be: SMOKED SERIES 3026SM (2) | | | Last Mod By: Christine Gilberti | | |
| USTOM | | 1 | F | 860.00 | 03/04/2005 | Christine Gilberti |
| | FRONT DOOR TO BE SMOKED SERIES 3948SM (Brass Caming) OVAL | | | Last Mod By: Christine Gilberti | | |
| L33|1 | 686 MB (6-8 SINGLE) | 1 | F | 400.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

-Customer Choice:Pool Bath Hall Door (Leading to Lanai)

| IGD2 | HORIZON INSULATED GARAGE DOOR 16X7 | 1 | F | 450.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

-Customer Choice:

**Flooring**

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| 029 | INFORMATION-CARPET | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

-0029-Generic:All Standard Carpeted Areas to be: GLORY DAYS RG238 #755 DOCKSIDE

Areas to be: Family Rm, Den, Living Room, Master Suit, Bedroom #2, Bedroom #3, and
Bedroom #4, Loft, Stairs and Halls Upstairs.

| USTOM | | 1326 | F | 663.00 | 03/04/2005 | Christine Gilberti |
| | Add Level 3 Padding to All Upstairs Carpeted Areas: 1326 Sq Ft | | | Last Mod By: Christine Gilberti | | |

uyer Arthur and Linda Siegwardt                                      Lot (Unit) 28          Plan CANNONDALE FLEX

ivision Officer Initials: H                                                                  Buyer Initials: _____

inted: 06/15/2005 10:27:39 AM by Christine Gilberti                                          Buyer Initials: _____

**Addendum A 4**

Job Number 16039514128     06/15/2005     Page: 5

=====

**looring**

| de | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| 26 | INFORMATION-TILE | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |

Last Mod By: Christine Gilberti

-Customer Choice:All Standard Tiled Areas (Except Master Bath and Guest Bath) To be:
TERRACE VIEW TAUPE 13x13 W3755 W/ #961 SANDSTONE BEIGE GROUT

Areas to be: Kitchen /Nook, Utility, Pool Bath, Pool Bath Hall,Foyer, Foyer Hall.

Master Bath: Bellini Beige W3070 12x12 With #906 Cornsilk Grout

Guest Bath to be: Bellini White W3069 12x12 W/ #988 Pearl Grout

| JSTOM | | 191 | F | 1,146.00 | 03/04/2005 | Christine Gilberti |
|---|---|---|---|---|---|---|

Last Mod By: Christine Gilberti

LEVEL II TILE to STANDARD CARPETED
AREAS:
Areas to be: DINING ROOM
Tile to be TERRACE VIEW TAUPE 13x13 W3755
with
#961 SANDSTONE BEIGE GROUT

| USTOM | | 1017 | F | 1,322.10 | 03/04/2005 | Christine Gilberti |
|---|---|---|---|---|---|---|

Last Mod By: Christine Gilberti

INFORMATIONAL to ALL tiled Areas:
Foyer, Foyer Hall, Kitchen/Nook, Utility, Pool
Bath, Pool Bath Hall, Master Bath, Guest bath and
Dining Room.

**nformation**

| de | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| )01 | INFORMATION | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |

Last Mod By: Christine Gilberti

-Customer Choice:CUSTOMER ACKOWLEDGES AND ACCEPTS THAT THERE IS A 15
DAY SIGN OFF PERIOD IN WHICH ANY AND ALL CHANGES CAN BE MADE.

THE 15 DAY SIGN OFF DATE IS MARCH 19, 2005.

CUSTOMER ACKOWLEDGES AND ACCEPTS THAT NO CHANGES CAN BE MADE
THEREAFTER.

| 002 | INFORMATION | 1 | F | 0.00 | 06/15/2005 | Christine Gilberti |
|---|---|---|---|---|---|---|

Last Mod By: Christine Gilberti

-Customer Choice:LANDSCAPE PACKAGE to be STANDARD Queen Palms

| KSFG | STONEYBROOK AT GATEWAY MANOR HOMES | 1 | F | 0.00 | 01/09/2005 | Julie Stanek |
|---|---|---|---|---|---|---|
| | STANDARD FEATURES | | | | | |

Last Mod By: Julie Stanek

Standard Features:
Colored Concrete Roof Tile
Weiser Brilliance Series Hardware with Lever
Handles
GSD 2230Z Dishwasher
Badger 1/2 HP Disposal
Double Bowl Stainless Steel Sink
Moen 7460 Crome Single-lever Faucet
European Kitchen Cabinets w/Mica Tops
6x6 Ceramic Wall Tile in all Bath and Shower Areas

| uyer Arthur and Linda Siegwardt | Lot (Unit) 28 | Plan CANNONDALE FLEX |
|---|---|---|

ivision Officer Initials: ___

Buyer Initials: ___

inted: 06/15/2005 10:27:40 AM by Christine Gilberti     Buyer Initials: ___

**Addendum A 4**

Job Number 16039514128                 **06/15/2005**                          Page:  6

Level 2 Tile Flooring in Standard Areas
Moen Single Lever Faucets
Prewired for Fans in all Bedrooms, Family Room and
Den
TV Outlets in Bedrooms, Den and Family Room
Telephone Outlets in Bedrooms, Den and Family
Room
(2) Exterior Weatherproof Outlets
(2) Exterior Coachlights Installed
Decora Style Switches Throughout
Prewired for Garage Door Opener
Floritam Sod
Fully Landscaped and Improved Homesite
Automatic Inground Sprinkler System
Concrete Driveway
- SKSFG~Generic:

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|------|-------------|----------|------|----------------|------|-----------|
| TIN | STONEYBROOK USHM INCENTIVE | 1 | F | 0.00 | 01/09/2005 | Julie Stanek |
| | Universal American Mortgage Incentive Package: | | | Last Mod By: Julie Stanek | | |

GE GSS 22 WGM Refrigerator
GE JVM 1631 Microwave
GE WCXR 1070 Washer
GE DCL 333 EY Dryer
GE JBP 66 WB Glass-Top Range
- Customer Choice:

## Interior Finishes

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|------|-------------|----------|------|----------------|------|-----------|
| 012 | INFORMATION-PAINT/DRYWALL | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

- Customer Choice:Walls, Ceilings and Trim to be Standard DOVER WHITE

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|------|-------------|----------|------|----------------|------|-----------|
| CUSTOM | | 123 | F | 1,020.90 | 03/07/2005 | Christine Gilberti |
| | CROWN FOYER,LIVING ROOM & DINING ROOM | | | Last Mod By: Christine Gilberti | | |

123 LINER FT

~~STAIR2~~ ~~STAIRWAY HANDRAIL-1ST UPGRADE WHITE~~ ~~1~~ ~~F~~ ~~0.00~~ ~~03/04/2005~~ ~~Christine Gilberti~~
~~HNDRAIL W/STD 1X1 WHITE BALLUSTERS~~ ~~Last Mod By: Christine Gilberti~~
~~1st Upgrade Stairway Handrail - White~~
~~Handrail with standard 1x1 white~~
~~ballusters~~

| STAIR3 | 2ND UPGRADE STAIR HANDRAIL-OAK "COLONIAL-STYLE"HANDRAIL W/WHITE"COLONIAL-STYLE" | 1 | F | 4,690.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

2nd Upgrade Stairway Handrail - Oak
"Colonial-Style" Handrail with White
"Colonial-Style" Ballusters
- Customer Choice:
- Customer Choice:Classic Cherry

## Light Fixtures

| Code | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|------|-------------|----------|------|----------------|------|-----------|

Buyer Arthur and Linda Siegwardt                Lot (Unit) 28      Plan CANNONDALE FLEX

Division Officer Initials: _H_ _____                    Buyer Initials: _____

                                    Buyer Initials: _____

**Addendum A 4**

Job Number 16039514128                              06/15/2005                                      Page: 7

---

## ght Fixtures

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| JSTOM | | 1 | F | 237.00 | 03/08/2005 | Christine Gilberti |
| | LIGHT FIXTURE TO FOYER | | | Last Mod By: Christine Gilberti | | |
| | P3542-86 Burnished Chestnut (Savannah Collection) | | | | | |

## lirrors/Medicine Cabinets

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| M01 | MIRROR-2"BEVELED BORDER FOR BATH | 3 | F | 660.00 | 03/04/2005 | Christine Gilberti |
| | 2" Beveled Border for Bath Mirrors. | | | Last Mod By: Christine Gilberti | | |
| | Specify Number of Mirrors and | | | | | |
| | Bathrooms in which to install. | | | | | |
| | -Customer Choice:Master Bath, Guest Bath and Pool Bath | | | | | |

## lumbing/Bath Accessories

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| 23 | INFORMATION-PLUMBING | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |

-Customer Choice:All Bathroom Faucets to be STANDARD CHROME

Master Bath and Pool Bath to have Chrome/Obscure Glass Doors for Showers

Master Bath and Pool Bath Wet and Dry Accessories to be BONE
Fixture Colors to be BONE
Master Tub to be BONE

Guest Bath wet and Dry Accessories to be WHITE
Fixture colors to be WHITE

Kitchen Faucet to be STANDARD CHROME

Kitchen Sink to be Standard 1/2x1/2 Stainless steel

| ode | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| /TGC1 | LVL 1 WALL TILE-GBATH | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | Wall Tile- Guest Bath- Level 1 | | | Last Mod By: Christine Gilberti | | |
| | Bath Wall-6x6 Gloss (White or Bone) | | | | | |
| | -Customer Choice:MERCURY WHITE W6201 with #910 Bright White Grout | | | | | |
| vTMC2 | LVL 2 WALL TILE-MBATH | 1 | F | 360.00 | 03/04/2005 | Christine Gilberti |
| | Wall Tile-Master Bath-Level 2 | | | Last Mod By: Christine Gilberti | | |
| | Bath Wall 6x6 Matte or 6x8 Shower Floor- 4x4 | | | | | |
| | Matte (White or Bone) | | | | | |
| | Accent- 1 Row of Mosaics # 5' AFF | | | | | |
| | -Customer Choice:Style to be ARTISTIC WHITE | | | | | |
| | Wall: 6x8 W9428 | | | | | |
| | Bullnose: 2x6 W9432 | | | | | |
| | Shower Floor: Mosaics Fawn Beige W8003 2x2 | | | | | |
| | Listello: Mosaics Sandy Beige W8094 3x3 | | | | | |
| | Grout: 931 Stand White | | | | | |

---

uyer Arthur and Linda Siegwardt                          Lot (Unit) 28          Plan CANNONDALE FLEX

ivision Officer Initials:                                                 Buyer Initials:

rinted: 06/15/2005 10:27:40 AM by Christine Gilberti                      Buyer Initials:

Job Number 16039514128

**Addendum A 4**
**06/15/2005**

Page: 8

**umbing/Bath Accessories**

| de | Description | Quantity | Type | Ext. Price ($) | Date | Associate |
|---|---|---|---|---|---|---|
| rPC1 | LVL 1 WALL TILE-POOL BATH | 1 | F | 0.00 | 03/04/2005 | Christine Gilberti |
| | Wall Tile-Pool Bath- Level 1 | | | Last Mod By: Christine Gilberti | | |
| | Bath Wall- 6x6 Gloss (White or Bone) | | | | | |
| | Shower Gloor-4x4 Matte (White or Bone) | | | | | |
| | - Customer Choice:Bone W6204 | | | | | |
| M04 | SHOWER ENCLOSURE CLEAR GLASS-MBATH | 2 | F | 280.00 | 06/15/2005 | Christine Gilberti |
| | | | | Last Mod By: Christine Gilberti | | |
| | - Customer Choice:Master Bath & Pool Bath | | | | | |

## REMAINDER OF THIS PAGE ABOVE SIGNATURE BLOCK IS INTENTIONALLY LEFT BLANK

uyer **Arthur and Linda Siegwardt**

Lot (Unit) 28      Plan **CANNONDALE FLEX**

ivision Officer Initials: _____

Buyer Initials: _____

inted: 06/15/2005 10:27:40 AM by Christine Gilberti

Buyer Initials: _____

**Addendum A 4**

Job Number 16039514128

**06/15/2005**

Page: 9

## Purchase Agreement Summary

Buyer **Arthur and Linda Siegwardt**

Homesite Address **MUDDY CREEK LANE**

City **Fort Myers**        State **FL**   Zip **33913**

| | | | Amount | Date |
|---|---|---|---|---|
| Base Sales Price: | 337,990.00 | Additional Deposit | 0.00 | |
| | | Custom Feature Deposit: | 0.00 | |
| Homesite Premium: | 0.00 | Additional Custom Feature Deposit: | 0.00 | |
| | | Earnest Money Deposit: | 16,000.00 | |
| Custom Features: | 32,093.00 | Check Number: | | |
| Custom Features Incentive: | 3,379.00 | | | |
| Total Sales Price | 366,704.00 | | | |

Shaded Options Are Included in Base Price of Home

### ALL DEPOSITS (INCLUDING EARNEST MONEY) ARE NON-REFUNDABLE

This addendum is not binding on Seller until accepted below by an authorized Division Officer of Seller.

_Delberts_  6/15/05  /  Date

New Home Consultant        /  Date

_____  /  Date

Construction        /  Date

_J. Hale_  16/20/05

Division Officer        /  Date

Buyer _____  16/./05  /  Date

_Linda Siegwardt_  16/15/05

Buyer        /  Date

Buyer        /  Date

Printed: 06/15/2005 10:27:40 AM by Christine Gilberti



**Greentree**
ENVIRONMENTAL SERVICES, INC

**Greentree Environmental Services, Inc.**
Toll-Free: (888) 584-5323
greentree@grntree.net
www.callgreentree.com

## Drywall Evaluation Report

September 10, 2014

Art Siegwardt
12390 Muddy Creek Lane
Fort Myers, FL 33913

**RE:**   **12390 Muddy Creek Lane**
**Fort Myers, FL 33913**

A drywall evaluation has been ordered for the above named address. The surface inspection was performed by inspector Daniel Deady on September 8, 2014 with licensed X-ray fluorescent (XRF) equipment, serial number XL3t-31052. The type of testing performed was a full inspection of all accessible walls and ceilings in the property.

*Evaluation/Testing information:*
Little is known currently about the health effects of imported or "defective" drywall. This evaluation is not designed to determine if any health effects exist, only to determine if the drywall being tested contains certain minerals in known increased amounts, specifically strontium, but may also include iron and sulfur. These minerals and the amounts contained in the imported drywall are in increased measurable amounts, detectable by x-ray fluorescence (XRF), a known and accepted evaluation technique. This mineral content measures notably higher in the defective or imported drywall. Any determinations are based on, but not limited to, interviews, visual inspection and XRF evaluation.

Drywall mineral content is compared to known US and defective drywall content to determine its point of origin. This is an opinion based only on known values exhibited by extensive XRF testing of both imported and domestic drywall. Confirmation lab testing is recommended prior to removal.

The United States Environmental Protection Agency (EPA) has conducted limited testing[1] with XRF analysis, in addition to further laboratory analysis, to identify the elemental material contained in several drywall samples. The sample drywall was taken from multiple known imported wallboards from Florida homes and multiple samples of U.S.-manufactured drywall. Additional testing was performed by Greentree and other sources not referenced herein, the results of which indicated that the drywall samples from Florida homes were significantly higher in strontium, which is the main identifying element in defective drywall. The iron levels varied from high to low. The Consumer Product Safety Commission (CPSC) considers any drywall sheet exceeding a strontium level of 1200 parts per million (ppm) as defective. Testing via indirect contact (i.e. through wallpaper, paint, or other surface coating) reduces the threshold level to approximately 600 to 800 ppm. Based on all available information, Greentree considers 800 ppm (.08) and above as a positive reading for indirect contact testing. Drywall tested at 600-799 ppm (.06-.0799) is close to the threshold limit and requires further bulk sampling and laboratory analysis. Drywall tested at 599 ppm (.0599) or below is considered a negative reading for indirect contact testing.

---

[1] US EPA Drywall Sampling Analysis, released 5/2009

**Corporate Office**
P. O. Box 2297 ◆ Portage, IN 46368
219.764.2828 ◆ Fax: 219.762.4946

**Florida Office**
824 SE 47th Street ◆ Cape Coral, FL 33904
239.322.8969 ◆ Fax: 239.549.6653



EXHIBIT
*B*
ALL-STATE LEGAL®

*Methodology*

The calibration of the Niton XL3t is done in accordance with the Performance Characteristic Sheet (PCS) for this instrument. The instrument is calibrated using the calibration standard set forth by the manufacturer. Calibration readings are taken frequently before and after each home is tested to ensure manufacturer's standards are met. If for any reason the instruments are not maintaining a consistent calibration reading within the manufacturer's standards for performance, the manufacturer's recommendations are used to bring the instrument into calibration. If the instrument cannot be brought back into calibration, it is taken off the site and sent back to the manufacturer for repair and/or recalibration.

*Visual Assessment and XRF Testing Results:*

Greentree inspectors meet or exceed inspection guidelines set forth by the CPSC[2]. The following inspection protocol is followed during every inspection: research revealing a structure built between 2001 and 2008, minimal visual survey for blackening of copper pipes, ac coils, etc.,[3] XRF testing of available drywall.[4]

The following table indicates the percentage of positive readings in this property:

| | |
|---|---|
| Number of Positives | 34 |
| Total number of Readings | 458 |
| Percent Positive | 7.42% |

**It is determined through limited XRF evaluation that this property DOES indicate the presence of defective "Chinese" drywall.**

*Please note:* Unless indicated within the body of this report, no surface samples were obtained through direct contact with exposed drywall. The only sample areas available were obtained through indirect contact (i.e. through wallpaper and paint). Based on these readings, the true element content found in the indirect contact readings is factored by approximately 40-50%. This factoring does create a margin of error; therefore, prior to the start of any remediation, further quantifiable laboratory testing is recommended.

Greentree does not recommend reliance on these results to determine the existence of any health hazards. Should any occupants believe themselves to be symptomatic, Greentree recommends evaluation by a licensed physician, providing the physician with the results of this evaluation. Symptoms may include, but are not limited to, joint and muscle pain, nausea, gastrointestinal problems, headaches, asthma attacks, congestion, bloody nose, difficulty breathing, cold-like symptoms, acne, coughing, and/or urinary tract infections. As these symptoms are common, it is not verifiable at this time whether they are caused by the presence of defective drywall. Leaving the property for a few days may improve the symptoms; however, only a licensed physician can provide the proper diagnosis and treatment. *Please note: these symptoms may also occur in pets.*

Thank you for allowing Greentree to assist you with your environmental concern.

John R. Casey
President

---

[2] CPSC "Interim Guidance—Identification of Homes with Corrosion from Problem Drywall" released 1/28/10. Further information may be found at www.drywallresponse.gov.
[3] These conditions can occur for other reasons or may not exist at all; however, the presence of such can be an identifying factor in defective drywall.
[4] Top and bottom sheets are tested on each wall, as well as all four corners of each ceiling.

# APPENDICES

**Appendix I**  **Photograph Log**
The photographs in this appendix represent the subject site and/or its drywall at the time of the inspection.

**Appendix II**  **Property Diagram/Site Sketch**
The site sketch in this appendix represents the property at the time of the inspection. Rooms are identified by expected use (i.e. bathroom, kitchen, etc.). Perimeter walls are identified as A, B, C, and D. Each room equivalent was oriented so that the "A Wall" corresponds directly with the main entrance wall and/or the main street. Each room equivalent's side identification follows the scheme in a clockwise direction for the whole housing unit. This diagram is used for identification of testing areas only and is not to scale. The testing data found in Appendix III corresponds to the room names/numbers identified below.

**Appendix III**  **XRF Data**
The information presented in this appendix is data collected directly from the XRF analyzer. The information found in either the MISC, NOTES or LOCATION columns indicates the location of the collected sample. (For example, "2 D" would refer to Room 2 wall D and "6 UA" would refer to Room 6 upper wall A.) The location markers change depending on the property, the number of rooms, the type of rooms, and the location of the collected samples. For more information, please reference the diagram included in Appendix II. The room numbers/names indicated on the diagram were used to determine the location markers in the collected data.

Appendix III(a): Positive Readings
The data listed in this section tested positive for defective "Chinese" drywall. Readings in the Strontium (Sr) column equivalent to or exceeding .08 are considered positive. Remediation is recommended in these areas.

Appendix III(b): Threshold Limit Readings
The data listed in this section tested just below the threshold limit of .08. These readings are optional and dependent on whether threshold readings existed at the time of the inspection. If no threshold readings existed at the time of the inspection, this section will read "N/A."

Appendix III(c): Complete Readings
This section is a comprehensive listing of all data collected from this property.

**Appendix IV**  **Company Certification**
This appendix includes any pertinent certification or licensing maintained by the Company and/or its inspectors.

*Appendix I*        **Photograph Log**



*Appendix II*        *Property Diagram/Site Sketch*



## *Appendix III*     *XRF Data*

### Appendix III(a): Positive Readings

| # | Time | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Sr | SrError | Fe | FeError |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 14 | 9/3/2014 9:18 | ALLOY | 13.28 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.092 | 0.005 | 1.203 | 0.087 |
| 19 | 9/3/2014 9:19 | ALLOY | 13.28 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.088 | 0.005 | 1.114 | 0.083 |
| 20 | 9/3/2014 9:20 | ALLOY | 12.21 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.068 | 0.008 | 1.034 | 0.091 |
| 26 | 9/3/2014 9:22 | ALLOY | 13.03 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ctd | 0.083 | 0.005 | 0.29 | 0.034 |
| 27 | 9/3/2014 9:22 | ALLOY | 10.04 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ctd | 0.114 | 0.008 | 0.26 | 0.044 |
| 28 | 9/3/2014 9:23 | ALLOY | 9.75 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ctd | 0.12 | 0.008 | 0.282 | 0.048 |
| 33 | 9/3/2014 9:27 | ALLOY | 9.73 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K1 A | 0.097 | 0.008 | 0.512 | 0.078 |
| 34 | 9/3/2014 9:27 | ALLOY | 9.03 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K1 A | 0.097 | 0.009 | 0.748 | 0.113 |
| 36 | 9/3/2014 9:28 | ALLOY | 6.2 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 A | 0.117 | 0.013 | 0.894 | 0.158 |
| 37 | 9/3/2014 9:29 | ALLOY | 9.04 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 B | 0.09 | 0.007 | 0.698 | 0.096 |
| 39 | 9/3/2014 9:31 | ALLOY | 7.07 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 B | 0.125 | 0.01 | 0.633 | 0.092 |
| 42 | 9/3/2014 9:31 | ALLOY | 9.35 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 B | 0.091 | 0.007 | 1.138 | 0.119 |
| 47 | 9/3/2014 9:32 | ALLOY | 6.68 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 B | 0.098 | 0.01 | 1.373 | 0.155 |
| 52 | 9/3/2014 9:35 | ALLOY | 9.33 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K1 C | 0.088 | 0.007 | 1.12 | 0.112 |
| 56 | 9/3/2014 9:37 | ALLOY | 7.34 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 D | 0.143 | 0.013 | 0.834 | 0.122 |
| 57 | 9/3/2014 9:37 | ALLOY | 6.93 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 D | 0.125 | 0.012 | 0.99 | 0.137 |
| 59 | 9/3/2014 9:38 | ALLOY | 6.03 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 D | 0.134 | 0.01 | 0.743 | 0.102 |
| 62 | 9/3/2014 9:39 | ALLOY | 6.02 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K3 Ctd | 0.11 | 0.011 | 0.254 | 0.066 |
| 72 | 9/3/2014 9:45 | ALLOY | 8.3 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.093 | 0.008 | 1.065 | 0.128 |
| 78 | 9/3/2014 9:48 | ALLOY | 13.45 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm2 C | 0.105 | 0.007 | 1.203 | 0.107 |
| 82 | 9/3/2014 9:50 | ALLOY | 11.1 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm2 D | 0.09 | 0.008 | 1.121 | 0.1 |
| 83 | 9/3/2014 9:50 | ALLOY | 7.22 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm2 D | 0.098 | 0.01 | 0.999 | 0.091 |
| 84 | 9/3/2014 9:52 | ALLOY | 13.8 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 A | 0.115 | 0.007 | 1.068 | 0.133 |
| 85 | 9/3/2014 9:52 | ALLOY | 8.63 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 A | 0.115 | 0.009 | 1.037 | 0.134 |
| 87 | 9/3/2014 9:52 | ALLOY | 7.69 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 B | 0.125 | 0.011 | 1.029 | 0.135 |
| 88 | 9/3/2014 9:53 | ALLOY | 9.03 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 C | 0.139 | 0.01 | 1.272 | 0.125 |
| 89 | 9/3/2014 9:53 | ALLOY | 7.68 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 C | 0.124 | 0.01 | 1.39 | 0.133 |
| 93 | 9/3/2014 9:55 | ALLOY | 13.39 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 Ceing | 0.119 | 0.007 | 0.302 | 0.042 |
| 94 | 9/3/2014 9:55 | ALLOY | 11.18 | % | First | 12390 Muddy CREEK Ln | D. DEADY | 6th Rm1 Ceing | 0.125 | 0.008 | 0.3 | 0.047 |
| 95 | 9/3/2014 9:57 | ALLOY | 13.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Hall 1A | 0.108 | 0.008 | 1.11 | 0.087 |
| 96 | 9/3/2014 9:57 | ALLOY | 7.33 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Hall 1B | 0.089 | 0.008 | 1.369 | 0.148 |
| 97 | 9/3/2014 9:57 | ALLOY | 8.01 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Hall 1B | 0.097 | 0.008 | 1.324 | 0.14 |
| 99 | 9/3/2014 9:58 | ALLOY | 6.18 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Hall 1D | 0.097 | 0.011 | 1.383 | 0.183 |
| 100 | 9/3/2014 9:58 | ALLOY | 9.39 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Hall 1D | 0.09 | 0.007 | 1.129 | 0.11 |

### Appendix III(b): Threshold Limit Readings*

| # | Time | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Sr | SrError | Fe | FeError |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 15 | 9/3/2014 9:18 | ALLOY | 10.41 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.074 | 0.006 | 1.051 | 0.101 |
| 16 | 9/3/2014 9:17 | ALLOY | 9.05 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 B | 0.071 | 0.006 | 1.139 | 0.118 |
| 18 | 9/3/2014 9:17 | ALLOY | 10.83 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 B | 0.062 | 0.005 | 1.339 | 0.112 |
| 21 | 9/3/2014 9:20 | ALLOY | 8.69 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.079 | 0.008 | 0.977 | 0.099 |
| 22 | 9/3/2014 9:20 | ALLOY | 9.72 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.067 | 0.006 | 1.217 | 0.109 |
| 55 | 9/3/2014 9:36 | ALLOY | 10.37 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K1 C | 0.072 | 0.005 | 1.247 | 0.105 |
| 60 | 9/3/2014 9:39 | ALLOY | 11.87 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K2 Ctd | 0.054 | 0.004 | 0.279 | 0.043 |
| 63 | 9/3/2014 9:39 | ALLOY | 11.49 | % | First | 12390 Muddy CREEK Ln | D. DEADY | K3 Ctd | 0.059 | 0.005 | 0.298 | 0.041 |
| 74 | 9/3/2014 9:46 | ALLOY | 12.13 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.062 | 0.004 | 1.099 | 0.091 |
| 75 | 9/3/2014 9:46 | ALLOY | 12.85 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.074 | 0.005 | 1.055 | 0.087 |
| 101 | 9/3/2014 9:59 | ALLOY | 14.04 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Hall 1Ceing | 0.064 | 0.004 | 0.277 | 0.038 |

*The readings listed above tested just below the threshold level for defective drywall. Although not required, further quantifiable laboratory testing is recommended in these areas.

### Appendix III(c): Complete Readings

| # | Time | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Sr | SrError | Fe | FeError |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 9/3/2014 9:10 | ALLOY | 6.56 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Gar C | 0.033 | 0.003 | 0.279 | 0.056 |
| 2 | 9/3/2014 9:11 | ALLOY | 9.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Gar C | 0.044 | 0.003 | 0.318 | 0.072 |
| 3 | 9/3/2014 9:11 | ALLOY | 9.34 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Gar C | 0.017 | 0.002 | 0.333 | 0.062 |

The table image is low-resolution; values reproduced to best reading.

| # | Time | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Sr | Sr Error | Pb | Pb Error |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4 | 9/3/2014 9:12 | ALLOY | 7.27 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar C | 0.01 | 0.002 | 0.329 | 0.063 |
| 5 | 9/3/2014 9:12 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar C | 0.015 | 0.002 | 0.306 | 0.058 |
| 6 | 9/3/2014 9:12 | ALLOY | 7.62 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar C | 0.01 | 0.002 | 0.282 | 0.062 |
| 7 | 9/3/2014 9:13 | ALLOY | 6.54 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar Ceing | 0.012 | 0.002 | 0.276 | 0.064 |
| 8 | 9/3/2014 9:13 | ALLOY | 6.52 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar Ceing | 0.009 | 0.002 | 0.233 | 0.057 |
| 9 | 9/3/2014 9:13 | ALLOY | 6.9 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar Ceing | 0.009 | 0.002 | 0.296 | 0.081 |
| 10 | 9/3/2014 9:13 | ALLOY | 6.98 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Gar Ceing | 0.012 | 0.002 | 0.249 | 0.063 |
| 11 | 9/3/2014 9:15 | ALLOY | 12.53 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.039 | 0.003 | 1.195 | 0.103 |
| 12 | 9/3/2014 9:15 | ALLOY | 13.98 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.054 | 0.003 | 0.653 | 0.67 |
| 13 | 9/3/2014 9:15 | ALLOY | 9.06 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.047 | 0.004 | 1.19 | 0.113 |
| 14 | 9/3/2014 9:13 | ALLOY | 13.26 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.052 | 0.005 | 1.308 | 0.067 |
| 15 | 9/3/2014 9:13 | ALLOY | 10.41 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 A | 0.074 | 0.006 | 1.051 | 0.101 |
| 16 | 9/3/2014 9:17 | ALLOY | 9.05 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm3 B | 0.071 | 0.006 | 1.139 | 0.118 |
| 17 | 9/3/2014 9:17 | ALLOY | 7.6 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm3 B | 0.014 | 0.002 | 1.159 | 0.13 |
| 18 | 9/3/2014 9:17 | ALLOY | 10.53 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm3 B | 0.052 | 0.005 | 1.336 | 0.112 |
| 19 | 9/3/2014 9:19 | ALLOY | 13.26 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.036 | 0.005 | 1.114 | 0.068 |
| 20 | 9/3/2014 9:20 | ALLOY | 12.31 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.036 | 0.003 | 1.084 | 0.091 |
| 21 | 9/3/2014 9:20 | ALLOY | 6.69 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.070 | 0.006 | 0.977 | 0.089 |
| 22 | 9/3/2014 9:20 | ALLOY | 9.72 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 C | 0.067 | 0.005 | 1.029 | 0.102 |
| 23 | 9/3/2014 9:20 | ALLOY | 11.61 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 D | 0.026 | 0.003 | 1.243 | 0.109 |
| 24 | 9/3/2014 9:21 | ALLOY | 7.59 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 D | 0.008 | 0.001 | 1.355 | 0.134 |
| 25 | 9/3/2014 9:21 | ALLOY | 6.13 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 D | 0.008 | 0.002 | 1.191 | 0.135 |
| 26 | 9/3/2014 9:22 | ALLOY | 15.03 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ctrl | 0.038 | 0.005 | 0.25 | 0.034 |
| 27 | 9/3/2014 9:22 | ALLOY | 10.04 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ctrl | 0.114 | 0.006 | 0.34 | 0.044 |
| 28 | 9/3/2014 9:23 | ALLOY | 9.75 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ctrl | 0.12 | 0.008 | 0.292 | 0.049 |
| 29 | 9/3/2014 9:23 | ALLOY | 6.63 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ceing | 0.035 | 0.004 | 0.292 | 0.085 |
| 30 | 9/3/2014 9:23 | ALLOY | 7.63 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm1 Ceing | 0.012 | 0.002 | 0.291 | 0.055 |
| 31 | 9/3/2014 9:25 | ALLOY | 6.13 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit A | 0.01 | 0.002 | 1.34 | 0.175 |
| 32 | 9/3/2014 9:26 | ALLOY | 7.6 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit A | 0.051 | 0.005 | 0.726 | 0.083 |
| 33 | 9/3/2014 9:27 | ALLOY | 0.73 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit A | 0.057 | 0.006 | 0.512 | 0.076 |
| 34 | 9/3/2014 9:27 | ALLOY | 6.93 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit A | 0.057 | 0.009 | 0.749 | 0.113 |
| 35 | 9/3/2014 9:28 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit A | 0.036 | 0.004 | 0.724 | 0.104 |
| 36 | 9/3/2014 9:28 | ALLOY | 6.2 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit A | 0.117 | 0.013 | 0.994 | 0.185 |
| 37 | 9/3/2014 9:29 | ALLOY | 6.04 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.09 | 0.007 | 0.806 | 0.093 |
| 38 | 9/3/2014 9:29 | ALLOY | 0.03 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.091 | 0.004 | 0.801 | 0.084 |
| 39 | 9/3/2014 9:29 | ALLOY | 7.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.125 | 0.01 | 0.688 | 0.092 |
| 40 | 9/3/2014 9:30 | ALLOY | 6.61 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.027 | 0.004 | 1.039 | 0.154 |
| 41 | 9/3/2014 9:30 | ALLOY | 9 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.046 | 0.004 | 0.99 | 0.032 |
| 42 | 9/3/2014 9:31 | ALLOY | 9.36 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.091 | 0.007 | 1.185 | 0.119 |
| 43 | 9/3/2014 9:31 | ALLOY | 6.9 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.05 | 0.004 | 1.076 | 0.106 |
| 44 | 9/3/2014 9:31 | ALLOY | 6.47 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.008 | 0.003 | 1.034 | 0.146 |
| 45 | 9/3/2014 9:31 | ALLOY | 7.34 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.01 | 0.002 | 0.935 | 0.131 |
| 46 | 9/3/2014 9:31 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.069 | 0.002 | 0.919 | 0.12 |
| 47 | 9/3/2014 9:32 | ALLOY | 6.63 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit B | 0.009 | 0.01 | 1.373 | 0.185 |
| 48 | 9/3/2014 9:33 | ALLOY | 10.39 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.056 | 0.004 | 1.042 | 0.096 |
| 49 | 9/3/2014 9:33 | ALLOY | 6.91 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.032 | 0.004 | 1.149 | 0.158 |
| 50 | 9/3/2014 9:34 | ALLOY | 7.06 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.011 | 0.002 | 0.779 | 0.032 |
| 51 | 9/3/2014 9:34 | ALLOY | 8.38 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.019 | 0.002 | 1.138 | 0.128 |
| 52 | 9/3/2014 9:35 | ALLOY | 0.33 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.009 | 0.007 | 1.12 | 0.112 |
| 53 | 9/3/2014 9:35 | ALLOY | 7.63 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.007 | 0.001 | 1.029 | 0.117 |
| 54 | 9/3/2014 9:36 | ALLOY | 6.35 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.04 | 0.004 | 1.125 | 0.112 |
| 55 | 9/3/2014 9:36 | ALLOY | 10.37 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit C | 0.072 | 0.005 | 1.217 | 0.109 |
| 56 | 9/3/2014 9:37 | ALLOY | 7.24 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit D | 0.143 | 0.013 | 0.894 | 0.122 |
| 57 | 9/3/2014 9:37 | ALLOY | 6.93 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit D | 0.125 | 0.012 | 0.99 | 0.137 |
| 58 | 9/3/2014 9:37 | ALLOY | 7.59 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit D | 0.009 | 0.002 | 0.655 | 0.111 |
| 59 | 9/3/2014 9:38 | ALLOY | 9.03 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit D | 0.134 | 0.01 | 0.743 | 0.089 |
| 60 | 9/3/2014 9:38 | ALLOY | 11.67 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ctrl | 0.064 | 0.004 | 0.279 | 0.043 |
| 61 | 9/3/2014 9:38 | ALLOY | 7.59 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ctrl | 0.021 | 0.002 | 0.26 | 0.055 |
| 62 | 9/3/2014 9:39 | ALLOY | 6.62 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ctrl | 0.11 | 0.011 | 0.254 | 0.065 |
| 63 | 9/3/2014 9:39 | ALLOY | 11.49 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ctrl | 0.089 | 0.005 | 0.205 | 0.041 |
| 64 | 9/3/2014 9:40 | ALLOY | 7.56 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ceing | 0.009 | 0.002 | 0.309 | 0.091 |
| 65 | 9/3/2014 9:40 | ALLOY | 10.59 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ceing | 0.012 | 0.001 | 0.291 | 0.047 |
| 66 | 9/3/2014 9:41 | ALLOY | 6.67 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ceing | 0.031 | 0.003 | 0.295 | 0.052 |
| 67 | 9/3/2014 9:41 | ALLOY | 7.53 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Kit Ceing | 0.031 | 0.002 | 0.309 | 0.058 |
| 68 | 9/3/2014 9:44 | ALLOY | 8.3 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.045 | 0.002 | 1.372 | 0.147 |
| 69 | 9/3/2014 9:44 | ALLOY | 6.13 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.009 | 0.002 | 1.29 | 0.175 |
| 70 | 9/3/2014 9:45 | ALLOY | 6.69 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.04 | 0.004 | 1.042 | 0.135 |
| 71 | 9/3/2014 9:45 | ALLOY | 6.92 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.039 | 0.004 | 1.083 | 0.125 |
| 72 | 9/3/2014 9:45 | ALLOY | 8.3 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.069 | 0.003 | 1.055 | 0.139 |
| 73 | 9/3/2014 9:46 | ALLOY | 14.73 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.048 | 0.003 | 1.106 | 0.084 |
| 74 | 9/3/2014 9:46 | ALLOY | 12.15 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.052 | 0.004 | 1.039 | 0.091 |

| # | Time | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Sr | Sr Error | Fe | Fe Error |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 75 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 A | 0.074 | 0.005 | [illegible] | [illegible] |
| 76 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 C | [illegible] | [illegible] | 1.175 | 0.124 |
| 77 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 C | [illegible] | [illegible] | [illegible] | [illegible] |
| 78 | [illegible] | ALLOY | 10.45 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 C | [illegible] | [illegible] | [illegible] | [illegible] |
| 79 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 C | 0.015 | [illegible] | 1.112 | [illegible] |
| 80 | [illegible] | ALLOY | 8.21 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 C | [illegible] | [illegible] | [illegible] | 0.115 |
| 81 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 D | [illegible] | [illegible] | [illegible] | 0.111 |
| 82 | [illegible] | ALLOY | 11.1 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 D | [illegible] | [illegible] | 1.121 | 0.1 |
| 83 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm2 D | [illegible] | 0.01 | [illegible] | 0.131 |
| 84 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 A | 0.115 | [illegible] | [illegible] | [illegible] |
| 85 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 A | 0.115 | [illegible] | [illegible] | [illegible] |
| 86 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 B | [illegible] | [illegible] | 0.949 | 0.123 |
| 87 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 B | [illegible] | 0.011 | [illegible] | [illegible] |
| 88 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 C | [illegible] | 0.01 | 1.272 | [illegible] |
| 89 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 C | 0.124 | 0.01 | [illegible] | [illegible] |
| 90 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 C | [illegible] | [illegible] | [illegible] | 0.14 |
| 91 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 D | [illegible] | [illegible] | [illegible] | [illegible] |
| 92 | [illegible] | ALLOY | 7.21 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 D | [illegible] | [illegible] | [illegible] | [illegible] |
| 93 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 Ceiling | [illegible] | [illegible] | [illegible] | [illegible] |
| 94 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | 5th Rm1 Ceiling | [illegible] | [illegible] | [illegible] | [illegible] |
| 95 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1A | [illegible] | [illegible] | 1.11 | [illegible] |
| 96 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1B | [illegible] | [illegible] | [illegible] | [illegible] |
| 97 | [illegible] | ALLOY | 8.01 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1B | [illegible] | [illegible] | [illegible] | 0.14 |
| 98 | [illegible] | ALLOY | 10.14 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1C | [illegible] | [illegible] | [illegible] | 0.113 |
| 99 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1D | [illegible] | 0.011 | [illegible] | [illegible] |
| 100 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1D | [illegible] | [illegible] | [illegible] | 0.11 |
| 101 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Hall 1Ceiling | [illegible] | [illegible] | [illegible] | [illegible] |
| 102 | [illegible] | ALLOY | 7.22 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 103 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 104 | [illegible] | ALLOY | 11.17 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 105 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | 0.011 | [illegible] | [illegible] | [illegible] |
| 106 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | 0.01 | [illegible] | [illegible] | [illegible] |
| 107 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] B | [illegible] | [illegible] | [illegible] | [illegible] |
| 108 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] B | 0.01 | [illegible] | [illegible] | [illegible] |
| 109 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] B | 0.01 | [illegible] | [illegible] | [illegible] |
| 110 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] B | 0.011 | [illegible] | [illegible] | [illegible] |
| 111 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] B | [illegible] | [illegible] | [illegible] | [illegible] |
| 112 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] B | 0.01 | [illegible] | 2.104 | [illegible] |
| 113 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | 0.01 | [illegible] | [illegible] | [illegible] |
| 114 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | [illegible] | [illegible] | [illegible] | [illegible] |
| 115 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | [illegible] | [illegible] | [illegible] | [illegible] |
| 116 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | 0.01 | [illegible] | [illegible] | [illegible] |
| 117 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | 0.011 | [illegible] | [illegible] | [illegible] |
| 118 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | [illegible] | [illegible] | [illegible] | [illegible] |
| 119 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] C | 0.01 | [illegible] | [illegible] | [illegible] |
| 120 | [illegible] | ALLOY | 7.21 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] D | [illegible] | [illegible] | [illegible] | [illegible] |
| 121 | [illegible] | ALLOY | 8.5 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] D | 0.01 | [illegible] | [illegible] | 0.22 |
| 122 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] D | [illegible] | [illegible] | [illegible] | [illegible] |
| 123 | [illegible] | ALLOY | 8.17 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] D | 0.014 | [illegible] | [illegible] | [illegible] |
| 124 | [illegible] | ALLOY | 8.9 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] D | [illegible] | [illegible] | [illegible] | [illegible] |
| 125 | [illegible] | ALLOY | 6.9 | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] D | [illegible] | [illegible] | [illegible] | [illegible] |
| 126 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] Ceiling | [illegible] | [illegible] | [illegible] | [illegible] |
| 127 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] Ceiling | [illegible] | [illegible] | [illegible] | [illegible] |
| 128 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] Ceiling | 0.011 | [illegible] | [illegible] | [illegible] |
| 129 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] Ceiling | 0.014 | [illegible] | [illegible] | [illegible] |
| 130 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 131 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 132 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 133 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 134 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 135 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 136 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 137 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 138 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 139 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 140 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 141 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 142 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 143 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 144 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | [illegible] | [illegible] |
| 145 | [illegible] | ALLOY | [illegible] | % | Final | 12300 Muddy CREEK Ln | D. DEADY | Rm[illegible] A | [illegible] | [illegible] | 1.21 | [illegible] |

| # | Time | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Sr | Sr Error | Fe | Fe Error |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 146 | 9/8/2014 10:14 | ALLOY | 7.95 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.011 | 0.002 | 1.024 | 0.12 |
| 147 | 9/8/2014 10:15 | ALLOY | 8.29 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.011 | 0.002 | 2.094 | 0.188 |
| 148 | 9/8/2014 10:15 | ALLOY | 7.24 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.01 | 0.002 | 2.071 | 0.203 |
| 149 | 9/8/2014 10:15 | ALLOY | 4.81 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.005 | 0.002 | 2.949 | 0.396 |
| 150 | 9/8/2014 10:16 | ALLOY | 9.04 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.008 | 0.001 | 1.108 | 0.118 |
| 151 | 9/8/2014 10:16 | ALLOY | 6.79 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.009 | 0.002 | 1.303 | 0.174 |
| 152 | 9/8/2014 10:16 | ALLOY | 7.93 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.013 | 0.002 | 1.307 | 0.143 |
| 153 | 9/8/2014 10:16 | ALLOY | 7.25 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 B | 0.013 | 0.002 | 1.37 | 0.169 |
| 154 | 9/8/2014 10:17 | ALLOY | 10.07 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 C | 0.008 | 0.001 | 1.181 | 0.111 |
| 155 | 9/8/2014 10:17 | ALLOY | 5.83 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 C | 0.008 | 0.002 | 2.171 | 0.255 |
| 156 | 9/8/2014 10:17 | ALLOY | 4.73 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 C | 0.006 | 0.002 | 2.098 | 0.319 |
| 157 | 9/8/2014 10:18 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 C | 0.009 | 0.002 | 2.138 | 0.261 |
| 158 | 9/8/2014 10:18 | ALLOY | 7.58 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 C | 0.011 | 0.002 | 2.747 | 0.234 |
| 159 | 9/8/2014 10:19 | ALLOY | 8.31 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 C | 0.011 | 0.002 | 2.597 | 0.228 |
| 160 | 9/8/2014 10:18 | ALLOY | 5.5 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.008 | 0.002 | 2.251 | 0.253 |
| 161 | 9/8/2014 10:18 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.009 | 0.002 | 2.378 | 0.271 |
| 162 | 9/8/2014 10:19 | ALLOY | 6.93 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.009 | 0.002 | 2.257 | 0.221 |
| 163 | 9/8/2014 10:19 | ALLOY | 6.15 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.008 | 0.002 | 2.433 | 0.269 |
| 164 | 9/8/2014 10:19 | ALLOY | 5.83 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.007 | 0.001 | 2.051 | 0.214 |
| 165 | 9/8/2014 10:19 | ALLOY | 7.53 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.008 | 0.001 | 2.145 | 0.206 |
| 166 | 9/8/2014 10:20 | ALLOY | 8.11 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.009 | 0.002 | 1.238 | 0.183 |
| 167 | 9/8/2014 10:20 | ALLOY | 8.52 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.008 | 0.001 | 1.148 | 0.135 |
| 168 | 9/8/2014 10:20 | ALLOY | 4.79 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.011 | 0.003 | 1.172 | 0.22 |
| 169 | 9/8/2014 10:20 | ALLOY | 3.74 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.006 | 0.003 | 0.986 | 0.278 |
| 170 | 9/8/2014 10:20 | ALLOY | 6.91 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.01 | 0.002 | 1.233 | 0.154 |
| 171 | 9/8/2014 10:21 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.012 | 0.002 | 1.19 | 0.188 |
| 172 | 9/8/2014 10:21 | ALLOY | 7.89 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 D | 0.01 | 0.002 | 0.924 | 0.112 |
| 173 | 9/8/2014 10:22 | ALLOY | 6.58 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Clst | 0.012 | 0.002 | 0.268 | 0.083 |
| 174 | 9/8/2014 10:22 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Clst | 0.015 | 0.002 | 0.328 | 0.075 |
| 175 | 9/8/2014 10:22 | ALLOY | 5.48 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Clst | 0.014 | 0.003 | 0.249 | 0.078 |
| 176 | 9/8/2014 10:22 | ALLOY | 5.84 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Clst | 0.012 | 0.002 | 0.523 | 0.083 |
| 177 | 9/8/2014 10:22 | ALLOY | 9 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Clst | 0.013 | 0.002 | 0.308 | 0.058 |
| 178 | 9/8/2014 10:23 | ALLOY | 6.61 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Celng | 0.013 | 0.002 | 0.269 | 0.068 |
| 179 | 9/8/2014 10:23 | ALLOY | 5.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Celng | 0.019 | 0.003 | 0.334 | 0.036 |
| 180 | 9/8/2014 10:23 | ALLOY | 6.58 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Celng | 0.01 | 0.002 | 0.29 | 0.069 |
| 181 | 9/8/2014 10:24 | ALLOY | 5.47 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Celng | 0.009 | 0.002 | 0.348 | 0.083 |
| 182 | 9/8/2014 10:24 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Celng | 0.008 | 0.002 | 0.35 | 0.089 |
| 183 | 9/8/2014 10:24 | ALLOY | 6.69 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm4 Celng | 0.012 | 0.002 | 0.27 | 0.065 |
| 184 | 9/8/2014 10:25 | ALLOY | 5.18 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.012 | 0.003 | 1.814 | 0.251 |
| 185 | 9/8/2014 10:25 | ALLOY | 3.72 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.01 | 0.003 | 1.233 | 0.268 |
| 186 | 9/8/2014 10:26 | ALLOY | 6.81 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.007 | 0.001 | 1.554 | 0.168 |
| 187 | 9/8/2014 10:26 | ALLOY | 7.34 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.014 | 0.002 | 1.533 | 0.158 |
| 188 | 9/8/2014 10:26 | ALLOY | 6.19 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.013 | 0.002 | 1.14 | 0.159 |
| 189 | 9/8/2014 10:26 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.009 | 0.002 | 1.137 | 0.187 |
| 190 | 9/8/2014 10:26 | ALLOY | 6.14 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 A | 0.012 | 0.002 | 1.532 | 0.198 |
| 191 | 9/8/2014 10:27 | ALLOY | 7.55 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.012 | 0.002 | 1.104 | 0.137 |
| 192 | 9/8/2014 10:27 | ALLOY | 6.68 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.01 | 0.002 | 1.153 | 0.147 |
| 193 | 9/8/2014 10:27 | ALLOY | 5.85 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.008 | 0.002 | 0.985 | 0.155 |
| 194 | 9/8/2014 10:28 | ALLOY | 6.88 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.008 | 0.002 | 1.001 | 0.131 |
| 195 | 9/8/2014 10:28 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.014 | 0.002 | 1.077 | 0.139 |
| 196 | 9/8/2014 10:28 | ALLOY | 4.84 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.01 | 0.003 | 1.288 | 0.234 |
| 197 | 9/8/2014 10:28 | ALLOY | 6.87 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.008 | 0.002 | 0.948 | 0.138 |
| 198 | 9/8/2014 10:28 | ALLOY | 10.09 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 B | 0.008 | 0.001 | 1.233 | 0.111 |
| 199 | 9/8/2014 10:29 | ALLOY | 8.89 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 C | 0.011 | 0.002 | 0.942 | 0.129 |
| 200 | 9/8/2014 10:29 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 C | 0.009 | 0.002 | 1.492 | 0.189 |
| 201 | 9/8/2014 10:29 | ALLOY | 4.77 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 C | 0.009 | 0.002 | 1.274 | 0.216 |
| 202 | 9/8/2014 10:29 | ALLOY | 6.87 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 C | 0.01 | 0.002 | 1.137 | 0.139 |
| 203 | 9/8/2014 10:30 | ALLOY | 6.88 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 C | 0.011 | 0.002 | 1.054 | 0.137 |
| 204 | 9/8/2014 10:30 | ALLOY | 6.19 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 D | 0.01 | 0.002 | 1.788 | 0.22 |
| 205 | 9/8/2014 10:30 | ALLOY | 5.82 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 D | 0.01 | 0.002 | 1.618 | 0.202 |
| 206 | 9/8/2014 10:30 | ALLOY | 9.01 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 D | 0.008 | 0.001 | 1.123 | 0.121 |
| 207 | 9/8/2014 10:31 | ALLOY | 6.81 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 Celng | 0.009 | 0.002 | 0.325 | 0.072 |
| 208 | 9/8/2014 10:31 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 Celng | 0.011 | 0.002 | 0.267 | 0.066 |
| 209 | 9/8/2014 10:31 | ALLOY | 5.49 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 Celng | 0.009 | 0.002 | 0.269 | 0.068 |
| 210 | 9/8/2014 10:31 | ALLOY | 8.67 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm5 Celng | 0.011 | 0.002 | 0.309 | 0.054 |
| 211 | 9/8/2014 10:34 | ALLOY | 6.88 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.008 | 0.001 | 1.051 | 0.129 |
| 212 | 9/8/2014 10:34 | ALLOY | 6.91 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.012 | 0.002 | 1.211 | 0.152 |
| 213 | 9/8/2014 10:34 | ALLOY | 5.85 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.008 | 0.002 | 1.229 | 0.176 |
| 214 | 9/8/2014 10:34 | ALLOY | 6.55 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.01 | 0.002 | 1.429 | 0.153 |
| 215 | 9/8/2014 10:34 | ALLOY | 6.94 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.011 | 0.002 | 1.211 | 0.15 |
| 216 | 9/8/2014 10:35 | ALLOY | 5.79 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.007 | 0.002 | 1.387 | 0.187 |

| # | Date | Type | Duration | Units | Sequence | LOCATION | INSPECTOR | MISC | Or | Or Error | Fe | Fe Error |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 217 | 9/8/2014 10:35 | ALLOY | 9.15 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.008 | 0.002 | 1.041 | 0.18 |
| 218 | 9/8/2014 10:35 | ALLOY | 8.22 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.01 | 0.002 | 1.083 | 0.139 |
| 219 | 9/8/2014 10:35 | ALLOY | 7.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.008 | 0.001 | 1.332 | 0.139 |
| 220 | 9/8/2014 10:35 | ALLOY | 7.19 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.012 | 0.002 | 0.623 | 0.118 |
| 221 | 9/8/2014 10:36 | ALLOY | 6.95 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.009 | 0.002 | 1.013 | 0.127 |
| 222 | 9/8/2014 10:36 | ALLOY | 4.79 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.01 | 0.003 | 0.839 | 0.181 |
| 223 | 9/8/2014 10:36 | ALLOY | 6.91 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.01 | 0.002 | 0.98 | 0.125 |
| 224 | 9/8/2014 10:36 | ALLOY | 8.94 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.011 | 0.003 | 0.98 | 0.154 |
| 225 | 9/8/2014 10:36 | ALLOY | 5.82 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.009 | 0.002 | 1.356 | 0.184 |
| 226 | 9/8/2014 10:37 | ALLOY | 6.54 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.007 | 0.001 | 1.083 | 0.129 |
| 227 | 9/8/2014 10:37 | ALLOY | 10.49 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.011 | 0.001 | 1.018 | 0.099 |
| 228 | 9/8/2014 10:38 | ALLOY | 10.06 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.012 | 0.002 | 1.384 | 0.123 |
| 229 | 9/8/2014 10:38 | ALLOY | 6.92 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.04 | 0.002 | 0.957 | 0.139 |
| 230 | 9/8/2014 10:38 | ALLOY | 8.27 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy | 0.01 | 0.002 | 1.309 | 0.136 |
| 231 | 9/8/2014 10:38 | ALLOY | 5.49 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy Cxfng | 0.008 | 0.002 | 0.259 | 0.071 |
| 232 | 9/8/2014 10:39 | ALLOY | 4.78 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy Cxfng | 0.007 | 0.002 | 0.384 | 0.092 |
| 233 | 9/8/2014 10:39 | ALLOY | 6.19 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy Cxfng | 0.009 | 0.002 | 0.307 | 0.073 |
| 234 | 9/8/2014 10:39 | ALLOY | 7.26 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Stwy Cxfng | 0.007 | 0.001 | 0.270 | 0.069 |
| 235 | 9/8/2014 10:43 | ALLOY | 8.83 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 A | 0.01 | 0.002 | 0.932 | 0.125 |
| 236 | 9/8/2014 10:43 | ALLOY | 4.78 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 A | 0.007 | 0.002 | 1.156 | 0.22 |
| 237 | 9/8/2014 10:44 | ALLOY | 4.71 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 A | 0.008 | 0.002 | 0.939 | 0.194 |
| 238 | 9/8/2014 10:44 | ALLOY | 4.74 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 A | 0.011 | 0.003 | 0.891 | 0.193 |
| 239 | 9/8/2014 10:44 | ALLOY | 6.17 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 A | 0.012 | 0.002 | 1.075 | 0.157 |
| 240 | 9/8/2014 10:44 | ALLOY | 7.36 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 B | 0.01 | 0.002 | 1.556 | 0.149 |
| 241 | 9/8/2014 10:45 | ALLOY | 6.62 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 B | 0.008 | 0.002 | 1.047 | 0.132 |
| 242 | 9/8/2014 10:45 | ALLOY | 4.77 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 B | 0.009 | 0.003 | 1.242 | 0.224 |
| 243 | 9/8/2014 10:45 | ALLOY | 5.81 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 B | 0.01 | 0.002 | 1.156 | 0.187 |
| 244 | 9/8/2014 10:45 | ALLOY | 5.86 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 B | 0.009 | 0.002 | 1.107 | 0.154 |
| 245 | 9/8/2014 10:45 | ALLOY | 6.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 B | 0.006 | 0.001 | 1.202 | 0.141 |
| 246 | 9/8/2014 10:46 | ALLOY | 4.73 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 C | 0.011 | 0.003 | 0.692 | 0.179 |
| 247 | 9/8/2014 10:46 | ALLOY | 6.12 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 C | 0.008 | 0.002 | 1.419 | 0.217 |
| 248 | 9/8/2014 10:46 | ALLOY | 4.78 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 C | 0.008 | 0.002 | 1.211 | 0.219 |
| 249 | 9/8/2014 10:46 | ALLOY | 8.2 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 C | 0.008 | 0.002 | 1.03 | 0.148 |
| 250 | 9/8/2014 10:46 | ALLOY | 8.21 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 C | 0.012 | 0.002 | 0.888 | 0.128 |
| 251 | 9/8/2014 10:47 | ALLOY | 6.92 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 D | 0.012 | 0.002 | 1.273 | 0.156 |
| 252 | 9/8/2014 10:47 | ALLOY | 4.78 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 D | 0.013 | 0.003 | 1.127 | 0.2 |
| 253 | 9/8/2014 10:47 | ALLOY | 7.93 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 D | 0.011 | 0.002 | 1.559 | 0.129 |
| 254 | 9/8/2014 10:48 | ALLOY | 7.91 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 UC | 0.017 | 0.002 | 0.32 | 0.032 |
| 255 | 9/8/2014 10:48 | ALLOY | 6.69 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 UC | 0.017 | 0.003 | 0.296 | 0.009 |
| 256 | 9/8/2014 10:48 | ALLOY | 6.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 UC | 0.014 | 0.002 | 0.308 | 0.059 |
| 257 | 9/8/2014 10:49 | ALLOY | 7.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 UC | 0.011 | 0.002 | 0.295 | 0.063 |
| 258 | 9/8/2014 10:49 | ALLOY | 4.44 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 UC | 0.007 | 0.002 | 0.358 | 0.102 |
| 259 | 9/8/2014 10:49 | ALLOY | 8.6 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 Cxfng | 0.012 | 0.002 | 0.269 | 0.081 |
| 260 | 9/8/2014 10:50 | ALLOY | 11.53 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 Cxfng | 0.007 | 0.001 | 0.288 | 0.041 |
| 261 | 9/8/2014 10:50 | ALLOY | 6.52 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 Cxfng | 0.012 | 0.002 | 0.360 | 0.069 |
| 262 | 9/8/2014 10:50 | ALLOY | 6.54 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm8 Cxfng | 0.012 | 0.002 | 0.32 | 0.072 |
| 263 | 9/8/2014 10:51 | ALLOY | 6.53 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 A | 0.009 | 0.002 | 0.188 | 0.068 |
| 264 | 9/8/2014 10:51 | ALLOY | 4.78 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 A | 0.012 | 0.003 | 0.215 | 0.09 |
| 265 | 9/8/2014 10:51 | ALLOY | 8.8 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 A | 0.007 | 0.002 | 0.253 | 0.089 |
| 266 | 9/8/2014 10:52 | ALLOY | 6.54 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 A | 0.007 | 0.001 | 0.232 | 0.057 |
| 267 | 9/8/2014 10:52 | ALLOY | 4.42 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 A | 0.007 | 0.002 | 0.245 | 0.089 |
| 268 | 9/8/2014 10:52 | ALLOY | 7.94 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 B | 0.012 | 0.002 | 0.238 | 0.09 |
| 269 | 9/8/2014 10:52 | ALLOY | 6.57 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 B | 0.011 | 0.002 | 0.177 | 0.05 |
| 270 | 9/8/2014 10:53 | ALLOY | 7.59 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 B | 0.011 | 0.002 | 0.248 | 0.059 |
| 271 | 9/8/2014 10:53 | ALLOY | 4.42 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 B | 0.012 | 0.003 | 0.275 | 0.1 |
| 272 | 9/8/2014 10:53 | ALLOY | 5.8 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 C | 0.008 | 0.002 | 0.168 | 0.077 |
| 273 | 9/8/2014 10:53 | ALLOY | 6.46 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 C | 0.011 | 0.002 | 0.208 | 0.057 |
| 274 | 9/8/2014 10:53 | ALLOY | 6.66 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 C | 0.01 | 0.001 | 0.259 | 0.05 |
| 275 | 9/8/2014 10:54 | ALLOY | 6.55 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 C | 0.011 | 0.002 | 0.228 | 0.059 |
| 276 | 9/8/2014 10:54 | ALLOY | 6.13 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 D | 0.009 | 0.002 | 0.195 | 0.08 |
| 277 | 9/8/2014 10:54 | ALLOY | 5.92 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 D | 0.007 | 0.002 | 0.246 | 0.069 |
| 278 | 9/8/2014 10:54 | ALLOY | 6.98 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 D | 0.011 | 0.002 | 0.26 | 0.062 |
| 279 | 9/8/2014 10:55 | ALLOY | 6.91 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 D | 0.01 | 0.002 | 0.33 | 0.069 |
| 280 | 9/8/2014 10:55 | ALLOY | 6.93 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 D | 0.008 | 0.002 | 0.28 | 0.073 |
| 281 | 9/8/2014 10:55 | ALLOY | 6.49 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Clst | 0.008 | 0.002 | 0.381 | 0.08 |
| 282 | 9/8/2014 10:55 | ALLOY | 6.11 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Clst | 0.01 | 0.002 | 0.325 | 0.076 |
| 283 | 9/8/2014 10:56 | ALLOY | 6.55 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Clst | 0.01 | 0.002 | 0.32 | 0.072 |
| 284 | 9/8/2014 10:56 | ALLOY | 6.93 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Clst | 0.012 | 0.002 | 0.297 | 0.068 |
| 285 | 9/8/2014 10:56 | ALLOY | 6.92 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Cxfng | 0.01 | 0.002 | 0.228 | 0.08 |
| 286 | 9/8/2014 10:56 | ALLOY | 6.54 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Cxfng | 0.011 | 0.002 | 0.305 | 0.07 |
| 287 | 9/8/2014 10:57 | ALLOY | 7.8 | % | First | 12390 Muddy CREEK Ln | D. DEADY | Rm7 Cxfng | 0.014 | 0.002 | 0.279 | 0.069 |

| # | Time | Type | Question | Units | Sequence | LOCATION | INSPECTOR | MISC | Gr | Sr Exr | Re | Re Exr |
|---|------|------|----------|-------|----------|----------|-----------|------|----|--------|----|--------|

| # | Time | Type | Reading | Units | Sequence | LOCATION | INSPECTOR | MISC | Sn | SnError | Pb | PbError |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 430 | 9/8/2014 11:39 | ALLOY | 5.49 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | 5th Rm3 Celng | 0.013 | 0.002 | 0.244 | 0.071 |
| 431 | 9/8/2014 11:39 | ALLOY | 7.94 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | 5th Rm3 Celng | 0.009 | 0.001 | 0.306 | 0.08 |
| 432 | 9/8/2014 11:40 | ALLOY | 6.64 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | 5th Rm3 Celng | 0.01 | 0.002 | 0.332 | 0.074 |
| 433 | 9/8/2014 11:40 | ALLOY | 6.52 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | 5th Rm3 Celng | 0.007 | 0.002 | 0.311 | 0.079 |
| 434 | 9/8/2014 11:40 | ALLOY | 6.57 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | 5th Rm3 Celng | 0.012 | 0.002 | 0.31 | 0.07 |
| 435 | 9/8/2014 11:41 | ALLOY | 6.07 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.01 | 0.002 | 1.318 | 0.191 |
| 436 | 9/8/2014 11:41 | ALLOY | 4.74 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.012 | 0.003 | 1.339 | 0.220 |
| 437 | 9/8/2014 11:41 | ALLOY | 6.03 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.011 | 0.003 | 1.497 | 0.25 |
| 438 | 9/8/2014 11:41 | ALLOY | 6.05 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.009 | 0.002 | 1.715 | 0.197 |
| 439 | 9/8/2014 11:42 | ALLOY | 6.05 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.011 | 0.002 | 1.113 | 0.185 |
| 440 | 9/8/2014 11:42 | ALLOY | 5.53 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.009 | 0.002 | 1.59 | 0.18 |
| 441 | 9/8/2014 11:42 | ALLOY | 7.24 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 A | 0.009 | 0.002 | 1.413 | 0.183 |
| 442 | 9/8/2014 11:42 | ALLOY | 5.94 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 B | 0.01 | 0.002 | 1.498 | 0.191 |
| 443 | 9/8/2014 11:43 | ALLOY | 4.4 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 B | 0.012 | 0.003 | 1.288 | 0.223 |
| 444 | 9/8/2014 11:43 | ALLOY | 6.47 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 B | 0.009 | 0.002 | 1.459 | 0.194 |
| 445 | 9/8/2014 11:43 | ALLOY | 6.3 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 B | 0.013 | 0.002 | 1.444 | 0.195 |
| 446 | 9/8/2014 11:43 | ALLOY | 6.19 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 C | 0.011 | 0.002 | 1.353 | 0.191 |
| 447 | 9/8/2014 11:44 | ALLOY | 4.78 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 C | 0.011 | 0.003 | 1.305 | 0.222 |
| 448 | 9/8/2014 11:44 | ALLOY | 6.03 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 C | 0.009 | 0.002 | 1.14 | 0.143 |
| 449 | 9/8/2014 11:44 | ALLOY | 7.93 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 C | 0.01 | 0.002 | 1.545 | 0.149 |
| 450 | 9/8/2014 11:44 | ALLOY | 7.95 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 C | 0.011 | 0.002 | 1.602 | 0.158 |
| 451 | 9/8/2014 11:45 | ALLOY | 6.89 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 D | 0.009 | 0.002 | 1.592 | 0.159 |
| 452 | 9/8/2014 11:45 | ALLOY | 5.1 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 D | 0.011 | 0.003 | 1.635 | 0.249 |
| 453 | 9/8/2014 11:45 | ALLOY | 6.63 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 D | 0.012 | 0.002 | 1.59 | 0.173 |
| 454 | 9/8/2014 11:45 | ALLOY | 5.61 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 D | 0.01 | 0.002 | 1.437 | 0.178 |
| 455 | 9/8/2014 11:46 | ALLOY | 6.62 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 Celng | 0.009 | 0.002 | 0.244 | 0.074 |
| 456 | 9/8/2014 11:46 | ALLOY | 6.9 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 Celng | 0.013 | 0.002 | 0.324 | 0.074 |
| 457 | 9/8/2014 11:46 | ALLOY | 7.61 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 Celng | 0.011 | 0.002 | 0.321 | 0.092 |
| 458 | 9/8/2014 11:46 | ALLOY | 7.63 | % | Final | 12390 Muddy CREEK Ln | D. DEADY | Rm10 Celng | 0.014 | 0.002 | 0.295 | 0.091 |
| 459 | 9/8/2014 11:46 | ALLOY | 55.94 | cps | Final | | | | | | | |

*Appendix IV*      *Company Certification*

# State of Florida
# Department of State

I certify from the records of this office that GREENTREE ENVIRONMENTAL
SVC INC. is an Indiana corporation authorized to transact business in the State
of Florida, qualified on June 19, 2009.

The document number of this corporation is F09000002494.

I further certify that said corporation has paid all fees due this office through
December 31, 2014, that its most recent annual report/uniform business report
was filed on January 3, 2014, and its status is active.

I further certify that said corporation has not filed a Certificate of Withdrawal.

<div align="right">

*Given under my hand and the
Great Seal of the State of Florida
at Tallahassee, the Capital, this
the Third day of January, 2014*

</div>



Ken Detzner

**Secretary of State**

Authentication ID: CC852831816

To authenticate this certificate, visit the following site, enter this
ID, and then follow the instructions displayed.

https://efile.sunbiz.org/certauth.ver.html

 **CITY OF CAPE CORAL CERTIFICATE OF USE**

| | | |
|---|---|---|
| **CU NUMBER:** | CU13-77174 | **PRINTED DATE: 1/13/2014** |
| **STRAP:** | 074524C4003530280 | |
| **BLOCK / LOT:** | 0363-028 | |
| **ZONING DISTRICT:** | SC | |
| **CLASSIFICATION:** | BUSINESS OFFICE | |
| | GROUP I | |
| | BUILDING INSPECTIONS | |
| **UNIT SQ FT:** | 600 | |
| **UNIT/SUITE NO:** | 81 | |
| **USE:** | CONTINUED | |
| **PARKING:** | 2 | |
| **BUSINESS NAME:** | GREENTREE ENVIRONMENTAL SERVICES INC | |
| **ADDRESS:** | 834 SE 9TH ST 81 | |
| | CAPE CORAL, FL 33904 | |
| **BUSINESS PHONE:** | (888) 888-8888 | |
| **OWNER NAME:** | CASEY JOHN | |
| **NOTES:** | | |

NAICS # 926150



IT SHALL BE UNLAWFUL TO OCCUPY ANY NEWLY ERECTED OR ALTERED STRUCTURE OR TO CHANGE THE USE OR OCCUPANCY OF ANY PREMISES EVEN THOUGH NO STRUCTURE WAS ERECTED OR ALTERED UNTIL THE ADMINISTRATIVE OFFICIAL HAS ISSUED A CERTIFICATE OF USE AUTHORIZING SUCH OCCUPANCY. SECTION 8.6.1

DATE OF APPROVAL: ___Jan 13, 2014___

_____
ADMINISTRATIVE OFFICIAL

**THIS CERTIFICATE MUST BE POSTED AND VISIBLE TO THE PUBLIC**



**LAW OFFICE OF**
# KEVIN F. JURSINSKI
**& ASSOCIATES**
Real Estate, Business, Construction and
Homeowner Association /Condominium Law

November 4, 2014

James Perry
Lennar
700 NW 107ᵗʰ Avenue
Miami, FL 33172
**Via Federal Express; certified: 7013 3020 0001 9170 0268
and regular U.S. mail**

      RE:    12390 Muddy Creek Lane, Fort Myers, FL 33913 (the "Home")

Dear Mr. Perry:

Our firm represents the interests of Arthur Siegwardt, the owner of the above captioned home. The Mr. Siegwardt entered into a contract to have this home constructed. Unbeknownst to my client, the house contains Chinese Drywall.

My client did notify you and on October 10, 2014, you responded (see attached letter). We appreciate that response.

However, your position in that case was that all parties that had a known claim had an obligation to join the class. My client did not become formally aware of the Chinese Drywall issue until an inspection was performed on his home on September 28, 2014, far after the class closed.

The position asserted on behalf of Lennar is that the judgment of the Court resolves all claims arising out of the Chinese Drywall, known or unknown and that as such there is no obligation to my client based upon the class action settlement.

Our position is that my client's rights are not precluded and we still retain our contractual rights because my client could not have participated in the class given the fact that there was at that time no knowledge of any potential claim. Further, the statute of limitations in Florida will allow my client to extend any warranty period out for a latent discovered defect. As such, the warranty claim on this house began to run on September 28, 2014.

My purpose for contacting you is to provide you with notice of inspection. Please be advised that my client will begin remediation of the Chinese Drywall with the company, Mustang Builders. The remediation will begin on November 10, 2014.

        **15701 S. Tamiami Trail, Fort Myers, Florida 33908**
**Phone 239-337-1147 • Fax 239-337-5364 • www.KFJlaw.com**

**EXHIBIT**

**C**

ALL-STATE LEGAL®

I wanted to again confirm the previous offer my client has given you that Lennar is invited to inspect the home to respond to our inquiry.  Your letter of October 10, 2014, to my client, clearly indicates that "as a result of the Global Settlement, Lennar is not in a position to inspect your Home or otherwise respond further to your inquiry".

I am again renewing, for the final time, the opportunity for Lennar to inspect the Home.  Once we begin remediation on November 10, 2014, portions of the Home may be saved for future litigation, but we are not going to preserve the entire demolition of the Home.  What I don't want to have is at some point in time after we demand mediation or arbitration, pursuant to section 19 of the contract that Lennar raises the issue of spoliation of evidence.

As such, we are again renewing our notification to you of the opportunity to inspect and also renewing our demand that Lennar engage in resolution of this through the contractual provision provided for in our contract.

I look forward to speaking to you and I will make arrangements with my client and the builder to allow your inspector to visit the site at any point in time before demolition starts or in fact afterwards.

I am sending this letter to you regular mail, certified mail and Federal Express in order to be sure that you are aware of our position and the legal rights we are reporting you for inspection.


Sincerely,

*Kevin F. Jursinski*

Kevin F. Jursinski, Esquire
KFJ/maw/nsf
enclosure
F:\LawOffice\Clients\Siegwardt, Arthur\Correspondence\Letter to Perry 11.3.14.doc

# LENNAR

October 10, 2014

Arthur Siegwardt
12390 Muddy Creek Lane
Fort Myers, FL 33913

Re:    12390 Muddy Creek Lane, Fort Myers, FL 33913 (the "Home")

Dear Mr. Siegwardt:

I am James Perry, Customer Care Manager for Lennar's Corporate division. You recently contacted Lennar with concerns that your Home may contain defective Chinese-manufactured drywall ("Chinese Drywall").

On March 9, 2012, following years of inspecting and repairing over 1,000 homes that contained Chinese Drywall, Lennar elected to participate in a national court settlement to resolve all remaining claims involving Chinese Drywall by paying significant funds to resolve future claims of homes not yet identified and repaired. That settlement, titled the Settlement Agreement in MDL No. 2047 Regarding Claims Involving Builders, Installers, Suppliers and Participating Insurers (the "Global Settlement"), was coordinated by the Office of the Court-Appointed Mediator under the direction of United States District Court Judge Eldon E. Fallon, who is presiding over the *In re: Chinese Manufactured Drywall Products Liability Litigation*, MDL No. 2047 (the "MDL"), pending in the Eastern District of Louisiana. The purpose of the Global Settlement to resolve all claims arising out of Chinese Drywall. To learn more about the MDL and the Global Settlement, you may visit the MDL Court's website at: http://www.laed.uscourts.gov/drywall/Drywall.htm.

By virtue of participating in the Global Settlement, Lennar has been released from any and all claims, known or unknown, arising out of or related in any way to Chinese Drywall, including any claims related to the potential presence of Chinese Drywall in your Home. This took place only after many years of inspections and repairs in which all affected homeowners had a reasonable time to discover the problems and make a claim. We are sorry that you did not make a timely claim, but as a result of the Global Settlement, Lennar is not in a position to inspect your Home or otherwise respond further to your inquiry. The website address listed above outlines any rights you may have as a result of having a home containing Chinese Drywall.

Thank you for your understanding.

Sincerely,

James Perry

700 N.W. 107th Avenue • Miami, FL 33172 • 305-229-6400

**LENNAR.COM**

11/4/2014                                         FedEx Ship Manager - Print Your Label(s)

From: *(239) 337-1147          Origin ID: FMYA     **FedEx**        Ship Date: 04NOV14
Nicole Frei                                          Express         ActWgt: 0.5 LB
Law Office of Kevin Jursinski                                        CAD: 100372801/INET3550
15701 South Tamiami Trail
                                                                     Delivery Address Bar Code
Fort Myers, FL 33908

                                          **E**

                                    J14221409230Ssv

SHIP TO: (305) 229-6400              BILL SENDER     Ref #      siegwardt
**James Perry**                                      Invoice #
**Lennar Corporation**                               PO #
**700 NW 107th Avenue**                              Dept #

**MIAMI, FL 33172**

                                                                    **WED - 05 NOV 10:30A**
                                                                    **PRIORITY OVERNIGHT**

                                          TRK#
                                          0201    **7717 2995 6751**            **33172**
                                                                                 FL-US
                                          **3C ATUA**                            **MIA**



                                                    522G1816C6AC9

**After printing this label:**
1. Use the 'Print' button on this page to print your label to your laser or inkjet printer.
2. Fold the printed page along the horizontal line.
3. Place label in shipping pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.

**Warning:** Use only the printed original label for shipping. Using a photocopy of this label for shipping purposes is fraudulent and could result in additional billing charges, along with the cancellation of your FedEx account number.
Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com.FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery,misdelivery,or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim.Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental,consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss.Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our ServiceGuide. Written claims must be filed within strict time limits, see current FedEx Service Guide.



**U.S. Postal Service™**
**CERTIFIED MAIL™ RECEIPT**
*(Domestic Mail Only; No Insurance Coverage Provided)*

For delivery information visit our website at www.usps.com™

**OFFICIAL USE**

Postage | $
Certified Fee
Return Receipt Fee
(Endorsement Required)
Restricted Delivery Fee
(Endorsement Required)

Total P

Sent To
James Perry
Lennar

Street, Apt. No.
or PO Box No.
700 NW 107th Avenue

City, State, ZIP+4
Miami, FL 33172

PS Form 3800, August 2006     See Reverse for Instructions

7013 3050 0001 9170 0268