UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 |
| | SECTION: L |
| THIS DOCUMENT RELATES TO: 11-1395 *(Amorin)* | JUDGE FALLON MAG. JUDGE WILKINSON |

**MEMORANDUM IN SUPPORT OF DEFENDANT ORIENT INTERNATIONAL HOLDING SHANGHAI FOREIGN TRADE CO., LTD.'S MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1)**

**TO THE HONORABLE DISTRICT COURT:**

Defendant Orient International Holding Shanghai Foreign Trade Co., Ltd. ("SFTC") respectfully submits this motion to dismiss Plaintiffs' Class Action Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because this suit is barred by the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602–1611 (the "FSIA" or "Act").

<u>PRELIMINARY STATEMENT</u>

According to the U.S. Supreme Court, "foreign sovereign immunity is a matter of grace and comity on the part of the United States." *Verlinden B.V. v. Cent. Bank of Nig.*, 461 U.S. 480, 486 (1983). The *Verlinden* Court noted that the United States generally granted sovereigns complete immunity from lawsuits until the mid-Twentieth Century when the State Department adopted a "'restrictive' theory of foreign sovereign immunity" under what is referred to as the Tate Letter. *Id.* at 486-87. That policy "proved troublesome" for the State Department for a variety of reasons, causing inconsistent results, and so, in 1976, Congress passed the FSIA. *Id.* at 487-88. Congress's stated purpose was "to free the Government from . . . case-by-case

diplomatic pressures," and to assure litigants that decisions are made on consistent legal grounds. *Id.* at 488; *see also* 28 U.S.C. § 1602. The Act provides that in "the interests of justice" and in order to "protect the rights of both foreign states and litigants," a foreign state is entitled immunity from jurisdiction of U.S. courts, subject to certain exceptions. 28 U.S.C. §§ 1602, 1603.

SFTC is immune from Plaintiffs' lawsuit under the FSIA because SFTC is a "foreign state" as defined under the Act and relevant caselaw. Furthermore, this lawsuit undermines the Act's stated goals by potentially creating the type of inconsistent rulings that Congress sought to avoid. *See Transatlantic Shiff Ahrtskontor GMBH v. Shanghai Foreign Trade Corporation*, 204 F.3d 384 (2d Cir. 2000), *cert. denied*, 532 U.S. 904 (2001) (directing the district court to dismiss SFTC on sovereign immunity grounds). Plaintiffs' Class Action Complaint is devoid of any allegation that SFTC, a Chinese government agency, engaged in any act that falls within one of the FSIA's exceptions. Therefore, the Complaint must be dismissed as a matter of law.

## LEGAL STANDARD

### I. STANDARD OF REVIEW FOR DISMISSING PLAINTIFFS' COMPLAINT UNDER FEDERAL RULE 12(b)(1)

"The burden of proof on a 12(b)(1) motion to dismiss is on the party asserting jurisdiction." *Pan-American Life Ins. Co. v. Bergeron*, 82 Fed. App'x 388, 390 (5th Cir. 2003) (citing *Ramming v. United States*, 281 F.3d 158, 159 (5th Cir. 1996)). "Accordingly, the plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming*, 281 F.3d at 161. A court may consider matters that in are dispute, and may base its decision on the complaint alone, the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Id. See also Pan-American Life Ins. Co.*, 82 Fed. App'x at 390. In considering a motion to dismiss

for lack of subject matter jurisdiction under Rule 12(b)(1), dismissal is proper when it appears certain that the plaintiffs cannot prove any set of facts in support of their claim that would entitle them to relief. *Id.*

## II.     IMMUNITY UNDER FSIA IS PRESUMED AND ITS EXCEPTIONS ARE NARROWLY CONSTRUED

The FSIA is the "sole basis for obtaining jurisdiction over a foreign state." *See Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993). Foreign states are *presumed* to be immune under the FSIA. *Id.* Section 1603(a) defines a "foreign state" as "an agency or instrumentality of a foreign state as defined in subsection (b)." Subsection (b) then defines "an agency or instrumentality" as "any entity . . . which is an organ of a foreign state or political subdivision thereof . . . ." 28 U.S.C. § 1603(b)(2).

A federal court lacks subject matter jurisdiction in any action brought against a foreign state unless the activities of the foreign state fall within six exceptions specified in 28 U.S.C. § 1605.[1] "[T]he plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." *Kern v. Jeppesen Sanderson, Inc.*, 867 F. Supp. 525, 531 (D. Tex. 1994) (citing *Baglab Ltd. V. Johnson Matthey Bankers, Ltd.*, 665 F. Supp. 289, 293-294 (S.D.N.Y. 1987)). One commonly analyzed exception to FSIA is for "commercial activity" carried out by a foreign state. 28 U.S.C. § 1605(a)(2). The "commercial activity" exception, however, was intended to be interpreted narrowly, because it is considered "in derogation of common law [and] not to be read broadly by courts." *Haven v Rzeczpospolita Polska*, 215 F.3d 727 (7th Cir. 2000), *cert. denied*, 531 U.S. 1014 (2000). "[O]nly those commercial activities with a sufficient 'jurisdictional nexus' to the United States fall within the exception." *Arriba, Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533-34 (5th Cir. 1992)

---

[1] 28 U.S.C. §§ 1605A (terrorism) and 1607 (counterclaims) provide additional exceptions to immunity under the Act that are irrelevant to this case.

(reversing district court for, among other things, allowing jurisdictional discovery where plaintiff failed to allege a "jurisdictional nexus" in its complaint).

## FACTUAL BACKGROUND

### I.   THE MULTI-DISTRICT LITIGATION

This action is part of the consolidated Multi-District Litigation ("MDL") currently pending before the Court concerning Chinese-manufactured drywall. "The present litigation arises from alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states." Case No. 09-md-2047, Docket Entry 15755 at 5. As the Court noted in its September 4, 2012 Order, "[t]he Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates, and has proceeded on separate tracks for the claims against each group. . . ." *Id.* at 6.

### II.   PLAINTIFFS' SINGLE ALLEGATION AGAINST SFTC

Plaintiffs' factual allegation against SFTC is confined to a single paragraph in their Class Action Complaint:

> Defendant, Orient International Holding Shanghai Foreign Trade Co., Ltd., is a foreign corporation that works collaboratively with Taishan that purchases and/or sells Taishan wallboard products with product markings written in English designed for sale or resale in the United States.

Case No. 11-cv-1395, Docket Entry 1 at 23, ¶ 68. Based on this allegation alone, Plaintiffs brought suit under ten causes of action: Negligence; Negligence Per Se; Strict Liability; Breach of Express and/or Implied Warranties; Redhibition; Louisiana Products Liability Act; Private Nuisance; Unjust Enrichment; Violation of Consumer Protection Acts; and, Equitable and

Injunctive Relief and Medical Monitoring.  Plaintiffs do not allege any injury or damage caused by the act of exporting drywall.

### III.     SFTC PROVIDES NECESSARY FUNCTIONS FOR INTERNATIONAL TRADE TO THE PEOPLE'S REPUBLIC OF CHINA AND THE SHANGHAI

SFTC was founded as "a State-Owned Enterprise" on January 1, 1988, and its founding name was Shanghai Foreign Trade Co.  See Declaration of Lan Zhe at ¶ 5, Exhibit C (Certified Translation of Zheng Yi Affidavit One, dated December 16, 2014 (hereinafter, "Yi Affidavit One") at ¶ II)).  In the second half of 1996, SFTC was merged into Orient International Holding Co., Inc. ("OIHC") as a wholly-owned subsidiary, and from that time, OIHC has always been the sole parent company of SFTC.  Yi Affidavit One at ¶ II.  At the same time, the company name was changed to Orient International Holding Shanghai Foreign Trade Co., Ltd., which is the current company name.  *Id.*  The application materials of SFTC which were submitted to and got accepted and approved by the government registration authority showed that SFTC's company type was "Company with Limited Liability (Exclusively State-Funded)" at that time.  *Id.*  In May 2006, SFTC submitted the application for changing its company type from "Company with Limited Liability (Exclusively State-Funded)" to "Company with Limited Liability and One-Person Authority (Exclusively Legal-Representative- Funded)" to the government registration authority, and this application was approved by the government registration authority.  *Id.* Orient International Holding Co., Inc. became the sole shareholder of SFTC at that time.  *Id.* OIHC is a wholly state-funded limited-liability company administered by the State-owned Asset Supervision and Administration Commission of the Shanghai Municipal Government ("SH-SASAC").  *Id.*  Therefore, since May 2006, SFTC has been a wholly-owned subsidiary of the Orient International Holding Co. Inc., while Orient International Holding Co. Inc. is exclusively funded and owned by SH-SASAC (Shanghai Municipal Government).  *Id.*

SFTC is managed by its Business Decision Committee, which is composed of four to five committee members, including the company's executive director, SFTC's general manager, the secretary of the Communist Party committee, and the related department head(s) from Orient International Holding Co., Inc.  Yi Affidavit One at ¶ III.  All the committee members are appointed or reassigned by Orient International Holding Co., Inc.  *Id.*  SFTC's Business Decision Committee is appointed by Orient International Holding Co., Inc., and Orient International Holding Co., Inc. is controlled and managed by SH-SASAC.  *Id.* at ¶ IV.  The executive director of SFTC is appointed and supervised by Orient International Holding Co., Inc.  *Id.*  The executive director and the Business Decision Committee have actual control, power and influence over the operation of SFTC.  *Id.*  However, Orient International Holding Co., Inc. is the only shareholder of SFTC, and OIHC is a state-owned enterprise with limited liability, so SFTC is actually managed by SH-SASAC.  *Id.*

SFTC is obligated to limit its business activities to export activities in accordance with the laws of the People's Republic of China.  *Id.* at ¶ V.  Orient International Holding Co., Inc. and SH-SASAC directly or indirectly lead and instruct SFTC in its activities based on need and demand.  *Id.*  SFTC is an organization of the Shanghai Municipal Government and the government of the People's Republic of China.  *Id.* at ¶ VII.  It is an entity which is supervised and guided by Orient International Holding Co., Inc. and SH-SASAC to abide by the export laws of China.  *Id.*

In the process of charging fees and tariffs relevant to exporting made-in-China products according to the laws and regulations of China, SFTC plays a quasi-government role by managing the export of Chinese products.  *Id.* at ¶ VIII.  Specifically speaking, the Interim Provisions on Foreign Trade Agency System ("Interim Provisions") was issued and put into

effect on August 29, 1991. *Id.* Article 2 of Interim Provisions states that companies, enterprises, institutions or individuals with no foreign trade operation rights (an entrusting entity), when they need to import or export merchandise (including goods and technology), they have to entrust companies or enterprises which have the foreign trade operation rights for that specific type of merchandise (the entrusted entity) to handle affairs according to the related regulations of China. SFTC was such an "entrusted entity" under those regulations in 2006. *Id.* These regulations were abolished in 2008. *Id.*

According to Interim Provisions, when the transaction involved in this case was done in 2006, organizations such as SFTC were required to play a role in the export process. *Id.* at ¶ IX. Companies like Tain Taishan Plasterboard, Company, Ltd. and Metro of Southfield, Michigan, U.S.A. had to go through companies or organizations such as SFTC to import and export goods. *Id.*

SFTC does not have ownership or control power over Tain Taishan Plasterboard, Company, Ltd, nor does Tain Taishan Plasterboard, Company, Ltd own or control SFTC. *Id.* at ¶ IX. SFTC does not have ownership or control power over Metro of Southfield, Michigan, U.S.A., nor does Metro own or control SFTC. *Id.*

## IV. THE EXPORTATION OF GYPSUM PLASTERBOARD TO THE UNITED STATES REQUIRED SFTC'S PARTICIPATION

On April 12, 2006, SFTC agreed to assist in the export and sale to Metro of two sizes of gypsum plasterboard manufactured by Taishan: 1/2 in (12.7mm) x 4 ft (1220mm) x 12 ft (3660mm), and 1/2 in (12.7mm) x 4 ft (1220mm) x 8 ft (2440mm). See Declaration of Lan Zhe at ¶ 6, Exhibit E (Certified Translation of Zheng Yi Affidavit Two, dated December 16, 2014 (hereinafter, "Yi Affidavit Two") at ¶ II)). This request was proposed by Metro, and Metro introduced SFTC to Taishan. SFTC is solely an export company, and it does not manufacture

gypsum plasterboard.  Yi Affidavit Two at ¶ II.  The purchased gypsum plasterboard met the specification required by Metro, and it was packaged for transport.  *Id.* It was delivered to Qingdao, China in order to be transported by Taishan.  *Id.*

SFTC made the arrangements representing Metro for the purchase of gypsum plasterboard from the manufacturer Taishan.  *Id.* at ¶ III.  These plasterboards were specifically ordered for export.  *Id.*  They had the following specifications:

> A. The gypsum plasterboard was manufactured according to the Inspection Report No. 062019 issued by the Quality Supervision and Inspection Center of National Building Materials Industry for Decoration and Finishing Building Materials. It was required to meet the ASTM C1396 Standard. This report certified that the plaster wall met the ASTM C-473-03 Standard after being tested, and it could be exported to the U.S.A.
>
> B. The manufactured goods did not contain asbestos, and there were no damp, moldy or damaged goods being packaged.
>
> C. The goods were labeled "Made in China" and "Meets or exceeds the ASTM C1396-04 Standard" by Taishan, and also taped with "Taishan" tape.
>
> D. The goods were packaged in containers on pallets by Taishan to be transported by sea.
>
> E. The goods were delivered to the Port of Qingdao, China by Taishan. The goods also contained inspection certificates and valid value-added tax receipts.
>
> F. The goods were manufactured according to two sizes: 1/2 in (12.7mm) x 4 ft (1220mm) x 12 ft (3660mm), and 1/2 in (12.7mm) x 4 ft (1220mm) x 8 ft (2440mm).

*Id.*

SFTC never took physical possession of the gypsum plasterboard.  *Id.* at ¶ IV.  These plasterboards were packaged in the factory of Taishan and were directly placed into containers to be delivered to the Port of Qingdao, China for transport.  *Id.*  SFTC never physically inspected

the individual goods.  *Id.*  These goods were placed into containers to be transported by sea. *Id.* Furthermore, SFTC never independently inspected or altered the gypsum plasterboard, nor repackaged or relabeled the gypsum plasterboard.  *Id.*  Since SFTC is an export company, according to Article 8 of the Interim Provisions on Foreign Trade Agency System ("Interim Provisions"), SFTC was required to purchase, export and resell the gypsum plasterboard.  *Id.*  In 2006, in accordance with the export regulations, all contracts were signed in the name of the foreign trade company SFTC.  *Id.*

The Quality Supervision and Inspection Center of National Building Materials Industry for Decoration and Finishing Building Materials provided SFTC with an inspection report of the gypsum plasterboard on February 16, 2006.  *Id.* at ¶ V.  This inspection report showed that the gypsum plasterboard manufactured by Taishan was tested according to ASTM C473-3, and it met the standards of ASTM C1396-C and C1396-M-04 after being tested.  *Id.*

The gypsum plasterboard was transported by land by Taishan to the Port of Qingdao, China to be transported to Port Everglades, Florida, U.S.A. to be delivered to Metro.  *Id.* at ¶ VI. On April 27, 2006, the gypsum plasterboard weighing 208,000 kg (gross weight) shipped from Qingdao destined for Metro was to be delivered to Port Everglades, Florida, U.S.A.  *Id.*  On May 7, 2006, the gypsum plasterboard weighing 208,000 kg (gross weight) shipped from Qingdao, China destined for Metro was delivered to Port Everglades, Florida, U.S.A.  *Id.* at ¶ VII.  On May 28, 2006, the gypsum plasterboard weighing 260,000 kg (gross weight) shipped from Qingdao, China destined for Metro was delivered to Port Everglades, Florida, U.S.A.  *Id.* at ¶ VIII.  On June 4th, 2006, the gypsum plasterboard weighing 156,000 kg destined for Metro was delivered to Port Everglades, Florida, U.S.A.  *Id.* at ¶ IX.  The total export value and quantity of the shipped gypsum plasterboard was 26,880 pieces and 832,000 kg (gross weight).  *Id.* at ¶ X.

The records showed that Metro paid SFTC with two payments; each payment was USD $38,571.20, and the total amount was USD $77,142.20.  *Id.* at ¶ XI.  This included the payment for the goods and the transport expenses.  *Id.*

SFTC did not learn of any complaint, dissatisfaction or dispute related to the transport or export of the gypsum plasterboard delivered in 2006.  *Id.* at ¶ XII.  There was no damage to the gypsum plasterboard in the process of transport and delivery, and SFTC never received any complaint, notice of damaged goods, notice of any refusal to accept the goods, nor any dissatisfaction with the condition of the goods.  *Id.*  Metro made timely payments to SFTC for the goods in accordance with the agreement between the two parties, and no unexpected events occurred.  *Id.* at ¶ XIII.  Metro did not express any dissatisfaction with the export process, the transaction or the condition of the goods at that time.  *Id.*

At no time prior to SFTC's involvement with the transaction of exporting and selling gypsum plasterboard to Metro did SFTC learn in any way of any dissatisfaction with the quality or safety of the gypsum plasterboard manufactured by Taishan.  *Id.* at ¶ XIV.  SFTC is an exporter, not a manufacturer or an inspection organization.  *Id.*  Therefore, according to Interim Provisions, SFTC's involvement with this transaction was limited only to the export of the plasterboard. SFTC has not conducted any activities such as the design, production, labeling or inspection of gypsum plasterboard at any time.  *Id.*

## ARGUMENT

### I.    SFTC IS A "FOREIGN STATE" ENTITLED TO IMMUNITY UNDER THE FSIA

The affidavits submitted by Zheng Yi, which are cited above, provide ample evidence that SFTC is entitled to immunity as a "foreign state" under the FSIA.  *See Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 847 (5th Cir. 2000); *Kern v. Jeppesen Sanderson, Inc.*, 867 F. Supp. 525, 531 (S.D. Tex. 1994) ("Once the defendant presents a prima facie case that it is a foreign sovereign, the plaintiff has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted.")  *Pan-American Life Ins. Co.*, 82 Fed. App'x at 390 (the court may base its decision the complaint supplemented by undisputed facts plus the court's resolution of disputed facts).   Under the FSIA's definition of a "foreign state," SFTC is "an agency or instrumentality of a foreign state," 28 U.S.C. § 1603(a), because it is "an organ of a foreign state," 28 U.S.C. § 1603(b)(2).

In *Kelly*, the Fifth Circuit adopted five probative factors to consider when determining whether a defendant is an "organ of a foreign state:"

> (1) whether the foreign state created the entity for a national purpose; (2) whether the foreign state actively supervises the entity; (3) whether the foreign state requires the hiring of public employees and pays their salaries; (4) whether the entity holds exclusive rights to some right in the [foreign] country; and (5) how the entity is treated under foreign state law.

*Kelly*, 213 F.3d at 846-47.  The Fifth Circuit held that these factors require a balancing test rather than rigid application of every factor.  *Id.* at 847 ("although the Supra factors provide a helpful framework, we will not apply them mechanically or require that all five support an organ-determination.")  SFTC easily qualifies as an organ of the Chinese government under all of these factors.  First, SFTC was created as "a State-Owned Enterprise," and exists as an entity to comply with Chinese export laws.  Yi Affidavit One at ¶¶ II, V, VII.  To fulfill its regulatory

obligations under the Interim Provision on Foreign Trade Agency System, no companies or individuals are permitted to conduct foreign trade unless conducted through companies like SFTC.  *Id.* at ¶¶ VIII, IX.  SFTC performs a quasi-governmental function by managing trade products and collecting fees and tariffs associated with the export of Chinese manufactured products pursuant to Chinese regulations.  *Id.* at ¶ VIII.  Given that SFTC's primary function is collecting taxes, which is an inherently governmental function, SFTC was created, quite clearly, to perform a national purpose.

Second, SFTC is actively supervised by the Chinese government.  Its management is appointed by the Shanghai Municipal Government, and includes the Secretary of the Communist Party committee and other department leaders.  *Id.* at ¶¶ II-IV.  SHTC's activities are controlled by the People's Republic of China, pursuant to the regulations under the *Interim Provision on Foreign Trade Agency System* ("Interim Provisions").  *Id.* at ¶¶ V-VIII.

Third, SFTC is a wholly-owned subsidiary of the Chinese government.  *Id.* at ¶ II.  "[S]ince May 2006, SFTC has been a wholly-owned subsidiary of the Orient International Holding Co. Inc., while Orient International Holding Co. Inc. is exclusively funded and owned by SH-SASAC (Shanghai Municipal Government)."  *Id.*

Fourth, the Chinese government requires SFTC to be involved in the export chain.  *Id.* at IX.  Companies that are exporting goods to other countries are required to export (and import goods) through entities like SFTC.  *Id.*

Fifth, SFTC is treated as quasi-governmental agency under Chinese law.  For example, it must comply with the Interim Provisions, and it must participate in the exportation of Chinese manufactured goods.  *Id.* at ¶¶ VIII, IX.  Its activities may or may not be limited or restricted by the government, and it is treated as a state-funded and state-owned enterprise.  *Id.* at ¶¶ II, V.

In *Transatlantic Shiffahrtskontor*, the Second Circuit held that SFTC was immune from suit in U.S. courts under the FSIA.  204 F.3d at 386, 392 (SFTC is "an instrumentality of the People's Republic of China").  To render a decision that is different than *Transatlantic Shiffahrtskontor* would undermine the FSIA's stated policy goals.  *See Verlinden B.V.*, 461 U.S. at 487-88 (noting uniform application as a reason for enacting the FSIA).  Moreover, SFTC's "foreign state" status is similar to that of a defendant declared a "foreign state" by this Court in *First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd. of People's Republic of China*, 858 F. Supp. 2d 658 (E.D. La. 2012), *aff'd sub nom.* 703 F.3d 742 (5th Cir. 2012).  In *Fujian*, the plaintiff failed to overcome the presumption that a Chinese state-owned entity was a juridical entity separate and distinct from China.  *Id.* at 671.  Similar to the defendant in *Fujian*, SFTC falls within the definition of a "foreign state" as an "agency or instrumentality of a foreign state."  *Id.* (quoting 28 U.S.C. § 1603(b)).

The same reasoning in *Fujian* and *Transatlantic Shiffahrtskontor* apply here.  SFTC is a separate legal entity that is an organ of a foreign state, and that is neither a citizen of a State of the United States, nor created under the laws of any third country.  28 U.S.C. § 1603(b).  Therefore, SFTC qualifies as an agent or instrumentality of the People's Republic of China and is immune from suit in U.S. courts.

## II.   THE FSIA'S "COMMERCIAL ACTIVITY" EXCEPTION IS INAPPLICABLE

SFTC has no obligation to affirmatively eliminate all possible exceptions to sovereign immunity.  *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.C.*, 923 F.2d 380, 390 n. 14 (5th Cir. 1991).  Once a defendant demonstrates that it is a "foreign state" entitled to immunity under the FSIA, the burden shifts to the plaintiff to raise an exception to the

presumption of immunity. *Id.* Plaintiffs' single allegation against SFTC is legally insufficient to set aside immunity even under the "commercial activity" exception because the Complaint is not "based upon" any performance by SFTC.

It is not enough that the case have "a mere connection with, or relation to, commercial activity," as the Plaintiffs have attempted to allege. *Saudi Arabia v. Nelson*, 507 U.S. 349, 358 (1993). Rather, the suit must be "based upon" such commercial activity. 28 U.S.C. § 1605(a)(2). This requires that "a significant nexus exist between the commercial activity in this country upon which the exception is based and a plaintiff's cause of action." *NYSA-ILA Pension Trust Fund v. Indonesia*, 7 F.3d 35, 38 (2d Cir. 1993). There is no nexus between SFTC's management of the exportation of goods on behalf of the Chinese government, and Plaintiffs' cause of action for what the Court previously described as "alleged property damage and personal injuries sustained as a result of the presence of Chinese-manufactured drywall in homes and other buildings in a number of states." Case No. 09-md-2047, Docket Entry 15755 at 5. *See Transatlantic Shiffahrtskontor*, 204 F.3d at 390 ("closeness [required] between the acts giving rise to the cause of action and those needed to establish jurisdiction [] is considerably greater than common law causation requirements.")

The relevant facts in this case do not fall within the definition of "commercial activity" under the Act:

- SFTC was the 'shipper of record' for two shipments of Taishan drywall from China into the United States in 2006.

- SFTC did not design, manufacture or ever take physical possession of the goods at any point during the transaction.

- SFTC served only as an intermediary between the supplier, Taishan, and the buyer, Metro, as required by the Interim Provisions.

*See* Yi Affidavit One at ¶¶ VIII, IX; Yi Affidavit Two at ¶¶ II-IV, XIV.  "[T]he commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit was based."  *Arriba, Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992).  But, Plaintiffs have failed to describe "with precision" how the above activity has any "casual connection with the suit."  *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1391 (5th Cir. 1985).  Indeed, Plaintiffs' shotgun approach to naming every possible entity in the chain of exporting plasterboard to the U.S. renders their Complaint insufficient under Federal Rule 12(b)(1) and the FSIA.  *See Joseph v. Office of the Consulate General*, 830 F.2d 1018, 1023 (9th Cir. 1987) (the court must focus only on those specific acts that form the basis of the suit).  Put another way, the commercial activity that provides the jurisdictional nexus with the United States must also be the activity on which the lawsuit is based.  *Stena Rederi AB*, 923 F.2d at 386.  Here, Plaintiffs' lawsuit is based on liability for alleged product defects – not exporting.

The sole issue before the Court is whether Plaintiffs' claims are "based upon" the specific commercial activity at issue.  None of Plaintiffs' allegations or causes of action relate to the exportation of the drywall from China to the United States.  The essence of Plaintiffs' claims is that damages were caused by defective drywall as installed; this is a products liability case.  SFTC played no part in the manufacture or design of the drywall.  *See* Yi Affidavit Two at ¶ II.  SFTC did not inspect, modify, package, or re-label the drywall in any way.  *Id.* at ¶ IV.  SFTC never had physical possession of the drywall.  *Id.*  SFTC was simply an exporter in the transaction.  *Id.* at ¶¶ IV-XI, XIV.  Plaintiffs' causes of action have no nexus to SFTC's exporting functions, and, in fact, lack even a "casual connection with the suit."  *De Sanchez*, 770

F.2d at 1391.[2]  Plaintiffs' claims, which revolve around damage due to allegedly defective drywall, are not based upon SFTC's involvement of shipping and exporting the drywall at issue. Thus, the commercial activity exception is not applicable in this matter.

## CONCLUSION

The Foreign Sovereign Immunities Act must be construed narrowly so that U.S. courts will not "be turned into small 'international courts of claims[,]' . . . [open] . . . to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world." *Verlinden B.V.*, 461 U.S. at 490 (quoting Testimony of Bruno A. Ristau, Hearings on H.R. 11315, at 31).  SFTC is a state-owned import and export-oriented trading enterprise of the Peoples Republic of China, which makes it an agent or instrumentality of a foreign state within the meaning of FSIA, and it is therefore immune from Plaintiffs' lawsuit.  Further, none of the FSIA exceptions apply in this case.  Therefore, SFTC respectfully requests that the Court dismiss Plaintiffs' claims asserted in their Class Action Complaint against SFTC for lack of subject matter jurisdiction pursuant to the Foreign Sovereign Immunities Act.

---

[2] Louisiana Products Liability Act ("LPLA") provides additional support for finding that SFTC cannot be held liable for an allegedly defective product it only exported.  The LPLA, La. R.S. 9:2800.51, defines a manufacturer not only as one who literally manufactures a product but also one who labels the product as his own or holds himself to be the manufacturer or who exercises control over the design, construction or quality of the product.  *Matthews v. Wal-Mart Stores, Inc.*, 97-0449 (La. App. 4 Cir. 3/11/98), 708 So. 2d 1248, 1249, *writ denied sub nom.*, 98-0965 (La. 6/5/98), 720 So. 2d 681.  None of these factors apply to this case.  Further, the LPLA, La. R.S. 9:2800.53(1)(d), also defines a manufacturer as the seller of a product of an alien manufacturer if the seller is in the business of importing or distributing the product for resale and the seller is the alter ego of the alien manufacturer.  *Id.*  The statute provides that the alter ego determination is based upon whether the seller has common ownership of or control over the alien manufacturer, whether the seller is involved with the warranty obligation of the manufacturer, whether the seller modifies the product, "or any other relevant evidence."  *Id.*  In the present case there is no evidence at all to support the conclusion or even an inference that SFTC under this statute is the alter ego of Taishan in any respect.

Respectfully submitted,

FRILOT L.L.C.

/S/ Bruce A. Cranner
BRUCE A. CRANNER, T.A. (Bar No. 1796)
KRYSTLE M. FERBOS (Bar No. 33548)
1100 Poydras Street, Suite 3700
New Orleans, LA 70163
Telephone: (504) 599-8000
Facsimile: (504) 599-8100
E-Mail: bcranner@frilot.com
E-Mail: kferbos@frilot.com

DAVID S. OSTERMAN (Bar No. 040091988)
GOLDBERG SEGALLA
902 Carnegie Center, Suite 100
Princeton, NJ 08540
Telephone: (609) 986-1310
Facsimile: (609) 986-1301
Email: dosterman@goldbergsegalla.com

ORIENT INTERNATIONAL HOLDING
SHANGHAI FOREIGN TRADE CO., LTD

## CERTIFICATE OF SERVICE

I hereby certify that I have on this 20th day of March, 2015, electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record who are CM/ECF participants.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to all counsel of record who are non-CM/ECF participants.

/S/ Bruce A. Cranner