UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


*****************************************************************

In Re:  CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY          CIVIL DOCKET NO. 09-MD-2047
LITIGATION,                         SECTION L
                                    NEW ORLEANS, LOUISIANA
                                    Thursday, March 26, 2015


*****************************************************************


STATUS CONFERENCE PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


OFFICIAL
COURT REPORTER:    TERRI A. HOURIGAN, CRR, RPR
                   CERTIFIED REALTIME REPORTER
                   REGISTERED PROFESSIONAL REPORTER
                   500 POYDRAS STREET, ROOM B-279
                   NEW ORLEANS, LOUISIANA  70130
                   (504) 589-7775
                   Terri Hourigan@laed.uscourts.gov


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.

```
 1    APPEARANCES:

 2

 3    FOR THE PLAINTIFF:         HERMAN, HERMAN & KATZ, LLC
      PLAINTIFFS' STEERING      BY:  RUSS M. HERMAN, ESQ.
 4    COMMITTEE                      LEONARD A. DAVIS, ESQ.
                                820 O'Keefe Avenue
 5                              New Orleans, Louisiana

 6

 7    FOR PLAINTIFFS:            THE LAMBERT FIRM
                                BY:  HUGH P. LAMBERT, ESQ.
      701 Magazine Street
 8                              New Orleans, Louisiana  70130

 9

10    FOR THE DEFENDANT:        STONE, PIGMAN, WALTHER,
      HOMEBUILDERS AND          WITTMANN, LLC
      STEERING COMMITTEE        BY:  PHILLIP A. WITTMAN, ESQ.
11                              546 Carondelet Street
                                New Orleans, Louisiana  70130
12

13    FOR DEFENDANT:            BARRASSO, USDIN, KUPPERMAN,
      INSURER STEERING          FREEMAN & SARVER, LLC
14    COMMITTEE                 BY:  JUDY Y. BARRASSO, ESQ.
                                909 Poydras Street, Suite 2400
15                              New Orleans, Louisiana  70112

16
      DEFENDANT:                BAKER DONELSON BEARMAN
17    DEFENSE HEARING           CALDWELL & BERKOWITZ
      COMMITTEE AND KNAUF       BY:  KERRY J. MILLER, ESQ.
18                              201 St. Charles Avenue, Suite 3600
                                New Orleans, Louisiana  70170
19

20    SPECIAL MASTER:           BROWNGREER PLC
                                BY:  JACOB WOODY, ESQ.
21                              250 Rocketts Way
                                Richmond, Virgina  23231
22

23    DEFENDANT:                ALSTON & BIRD, LLP
      TAISHAN AND TTP           BY:  BERNARD TAYLOR, ESQ.
24                              1201 West Peachtree Street NW
                                Suite 4200
25                              Atlanta, Georgia  30309
```

```
 1    APPEARANCES:   (Continued)

 2    DEFENDANT:                  STANLEY, REUTER, ROSS,
                                  THORNTON & ALFORD, LLC
 3    TAISHAN AND TTP             BY:  THOMAS P. OWEN, JR., ESQ.
                                  909 Poydras Street, Suite 2500
 4                                New Orleans, Louisiana  70130

 5
      ARBITRATOR:                 LAW OFFICES OF ROBERT M. JOHNSTON
 6    PRO SE CURATOR              BY:  ROBERT M. JOHNSTON, ESQ.
                                  400 Poydras Street, Suite 2450
 7                                New Orleans, Louisiana  70130

 8
      STATE LIAISON COUNSEL:      BARRIOS KINGSDORF & CASTEIX, LLP
 9                                BY:  DAWN BARRIOS, ESQ.
                                  701 Poydras Street Suite 3650
10                                New Orleans, Louisiana 70139

11
      DEFENDANT:                  LEVIN, FISHBEN,
12                                SEDRAN & BERMAN
                                  BY:  ARNOLD LEVIN, ESQ.
13                                     FRED S. LONGER, ESQ.
                                  510 Walnut Street, Suite 500
14                                Philadelphia, Pennsylvania

15
      DEFENDANT:                  JACKSON & CAMPBELL
16    AMERICAN HOME INSURANCE     BY:  WARREN LUTZ, ESQ.
                                  1120 20th Street NW, Suite 300S
17                                Washington, DC 20036

18    DEFENDANT:                  COZEN & O'CONNOR
      WESTCHESTER FIRE            BY:  JOSEPH ZIEMIANSKI, ESQ.
19    INSURANCE COMPANY           1230 Peachtree Street, NE
                                  Suite 400
20                                Atlanta, Georgia 30309

21
      OFFICE OF ATTORNEY          OFFICE OF ATTORNEY GENERAL
22    GENERAL:                    BY:  DUANE BLACK, ESQ.
                                  1885 N. Third Street
23                                Baton Rouge, Louisiana 70802

24
      ALSO PRESENT:               JODY FERCHAUD
25
```

1                **P-R-O-C-E-E-D-I-N-G-S**

2                M O R N I N G   S E S S I O N

3                       March 26, 2015

4                  (COURT CALLED TO ORDER)

5

6        THE CASE MANAGER:  All rise.

7        THE COURT:  Be seated, please.  Good morning, ladies

8    and gentlemen.

9            We are here today for -- call the case, sorry.

10       THE CASE MANAGER:  MDL No. 2047, *In Re:*

11   *Chinese-Manufactured Drywall Products Liability Litigation.*

12       THE COURT:  Will counsel make their appearances for the

13   record, please.

14       MR. MILLER:  Thank you, Mr. Herman.

15           Good morning, Your Honor.  It is Kerry Miller on behalf

16   of the Defense Hearing Committee and Knauf.

17       MR. TAYLOR:  Your Honor, Bernard Taylor on behalf of

18   Taishan and TTP.

19       THE COURT:  Okay.  Mr. Taylor, welcome to the Court.  I

20   appreciate your being here.

21       MR. TAYLOR:  Thank you, Your Honor.

22       MR. HERMAN:  If it please the Court, good morning,

23   Judge Fallon, Russ Herman on behalf of the Plaintiffs' Steering

24   Committee.

25           THE COURT:  Okay.  We're here today for our

1    annual -- monthly status conference.

2          I met with liaison and lead counsel a moment ago to

3    discuss the agenda with him.  I will take it in the order in

4    which they have proposed.

5          First, pretrial orders, is there anything on that?

6          MR. MILLER:  Your Honor, if you don't mind, I would

7    like to respond to this point.

8          We do have something new for the first time in quite

9    awhile.  It is Pretrial Order 1J, Your Honor, which pertains to

10   a recent amendment the Court has entered to Pretrial Order 1B

11   which governs evidence preservation as it relates to

12   Homebuilders only.

13         THE COURT:  Okay.  Why don't you tell me about that.

14         MR. MILLER:  Your Honor, as the Court is aware since

15   2009, Homebuilders were involved in the repair of homes.

16         Your Honor, in June of 2009, we received this MDL --

17   entered PTO No. 1 -- which required general evidence

18   preservation of tangible things.

19         That order was later specified in the fall of 2009,

20   with Pretrial Order 1B, which spoke generally, Your Honor,

21   about what the parties that repaired Chinese drywall homes,

22   both homeowners and homebuilders, needed to preserve.

23         Your Honor, that order generally applied to drywall

24   samples; it applied to appliances; it applied to HVAC

25   components.

1          Your Honor, as the Court is aware, some of these

2    components are large and heavy and expensive to store.

3          Pursuant to Pretrial Order 1B, these items have been in

4    storage for quite some time with parties incurring costs.

5          What Pretrial Order 1J does, Your Honor, given where

6    this litigation is at with respect to the repair of those

7    homes, it alleviates the burden of preserving and continuing to

8    preserve these appliances and other heavy and large components,

9    while at the same time maintaining photographs and other

10   evidence of the information.

11         MR. DAVIS:  If I may, Your Honor, Leonard Davis on

12   behalf of Plaintiffs' Liaison.

13         Just so that it's clear, and in particular for those

14   who may be on the phone, PTO 1J was negotiated with the

15   Homebuilders, that is correct, but it applies to all parties

16   and it also applies to the individual plaintiffs/claimants and

17   their obligations to preserve going forward.

18         I just wanted to make sure it was clear.

19         THE COURT:  Yes.  One of the things in this case, I

20   wanted to preserve evidence to give folks an opportunity to

21   look at it and to use it in their trials.  But there comes a

22   time where we don't have that issue anymore and to just keep

23   spending money -- we have had several warehouses full of this

24   material, and it's costly to maintain that.  Some of it we have

25   had to maintain in warehouses, have air conditioning and things

1    of that sort to stop deterioration, and that is the problem.

2         So to me, it looked to me like it was time to try to

3    remove those costs, and so I issued the 1J for that reason.

4         Are there any state court trial settings?

5         MR. HERMAN:  Ms. Barrios is here and she will report on

6    that, and the issue of coordination, Your Honor.

7         MS. BARRIOS:  Thank you, Mr. Herman.  Good morning,

8    Your Honor.  Dawn Barrios, State Liaison Counsel.

9         The three cases that are set in Norfolk are still set,

10    and I would also like to make a report on III and XI.

11         THE COURT:  Okay.

12         MS. BARRIOS:  The Garretson Resolution Group is the

13    settlement administrator for the Virginia settlement.

14         They filed yesterday a status report on their

15    settlements and asked me just to bring to the Court's attention

16    and to those on the phone the highlights of that settlement.

17         They have paid out $9,072,000 for 262 real property

18    claims.  They have now evaluated the other loss claims and will

19    be sending a notice of determination of those claims by

20    April 1st.  And they hope to, within the next 60 to 90 days,

21    have the entire matter wrapped up and ready for the Court.

22         THE COURT:  That is in the Virginia claims?

23         MS. BARRIOS:  Yes, Your Honor.  Thank you.

24         THE COURT:  Thank you very much.

25         Judge Hall, in Virginia, has been doing a great job

1   there.  I appreciate working with her and the cooperation that

2   I have received from her.  I'm obliged to her for that.

3          MR. HERMAN:  Judge Fallon, Items No. 4 and 5 on the

4   class action complaints, and in the class action complaint,

5   there is nothing new.

6          With respect to Item No. 6, plaintiffs' motions to

7   establish plaintiffs' litigation fee and expense fund, there is

8   nothing new.  And we anticipate once the Taishan funds arrive

9   and are deposited, we will be coming in with something in

10  regards to a QSF for those funds so that the Court can make its

11  determinations.

12         THE COURT:  What about remediation?

13         MR. HERMAN:  We can hear from Mr. Miller on that.

14         MR. MILLER:  Kerry Miller, again, Your Honor.  With

15  respect to Item No. 7 on the agenda remediation program, that

16  is an aspect of the Knauf PSA settlement.

17         Judge, it continues to be in what I call the wind-down

18  phase.

19         Your Honor, yesterday I had meetings with Jake Woody

20  from BrownGreer, and as you know, he will give his report

21  shortly.

22         But in terms of an overall Knauf settlement process, we

23  think, Your Honor, it may be appropriate at the April or May

24  status conferences, prior to the status conferences, to present

25  Your Honor with certain types of orders that may be entered

that provide only a limited amount of time to submit additional paperwork; for example, Your Honor, if someone is in the remediation program or applied for the remediation program but have not submitted their work authorization or submitted some paperwork that is necessary to get it going.

As part of the wrap-up of this, Your Honor, we would like to get some orders in to get a final deadline to get paperwork in to keep it going forward or not going forward with the claims.

As we have indicated before, Your Honor, it's Knauf's intention to wrap up its performance obligations under this settlement by the end of this year.  It's not very many at all, Your Honor.  It may only be a handful.

THE COURT:  Okay.  My main concern is that those individuals get adequate notice and have enough time to make a decision.

People move on with their lives, and I recognize that. If they don't wish to pursue it, that is their right, but I do want them, at least, to think about it and have notice.

I have also, in these matters, asked a representative from Moss to be present, so if anyone in the audience has any issues that they need to talk about specifically with the builder, with the restorer, with the remediator, they have access directly to them.

I have also appointed an ombudsman, somebody who is

1    skilled in that area, who is neutral.  He can communicate by

2    and between the parties, and that's worked very well, too.

3           MR. MILLER:  Your Honor, on the issue that I brought up

4    -- and I agree, the program has worked very well with the work

5    of Moss and with the ombudsman, really with all involved, lots

6    of cooperation.

7           On the issue that I brought up, and that is these

8    handful of claims that seem to be in some kind of limbo.  There

9    may be the right application, but haven't been able to get all

10   the right paperwork in.

11          What I will do, I will work with BrownGreer and PSC

12   over the coming weeks in the next few status conferences to try

13   to create a list, provide notice, and follow up with Your Honor

14   on those claims.

15          THE COURT:  All right.  Thank you very much.

16          Our next thing, the Global settlements?

17          MR. HERMAN:  No. 8, Your Honor.  I have given it to

18   Mr. Woody to report.

19          THE COURT:  Okay.

20          MR. WOODY:  Give me one second, Your Honor.

21          THE COURT:  Sure.

22          MR. WOODY:  Good morning, Your Honor.  My name is Jake

23   Woody.  I'm from BrownGreer in Richmond, Virginia, here to give

24   the March status report.

25          Over the last few months, the settlement program has

1    moved largely from a claims processing program into more of a

2    payment program.  So I thought I would start and talk about the

3    payments we have issued so far.

4         We have issued a total of $70,979,559 to claimants so

5    far.  Eighty-two percent of that has been for Global, Banner,

6    INEX, repair and relocation claims, which are claims for repair

7    and relocation damages against three settlements, the Global

8    settlement, the Banner settlement, and the INEX settlement.

9         We have paid $57,923,953 for those claims and that is a

10   *pro rata* distribution based on the square footage of the

11   eligible properties.

12        The other 18 percent has been other loss payments.

13   Other loss claims and payments are for a variety of other claim

14   types.  These are largely, four large claim types:

15   Foreclosure, short sale, bodily injury claims, loss of rent use

16   and sales, and pre-remediation alternative living expenses.

17        We have paid $13,055,605 to those claimants.

18        Global, Banner, and INEX constitutes the largest of all

19   of our claim types.  To date, we have paid 8,937 claims which

20   is 91 percent of all of the eligible claims.

21        We do have 868 claims that we haven't paid yet.  Those

22   claims fit into three main categories:  One category is claims

23   submitted by Knauf pursuant to an assignment they have

24   received.  And there is a large chunk of those claims where

25   remediation is in progress.  They may not have a release yet.

1    So we know eventually they will receive those funds, but it's

2    not quite ready to issue yet.

3         The other category is claimants that are eligible but

4    haven't submitted a W9 form and the verification of claims

5    form.  We need those two documents before we can issue

6    payment.  They are available on our website and I will give

7    that out at the end of this presentation.

8         The final category is claims where we received

9    conflicting claims for one property or multiple claims for one

10   property.  We are reconciling those.  Every day we have worked

11   through those, and when we are able to determine who has the

12   rights to the claim, we will pay that claim and deny the other

13   claims.  And that process is ongoing.

14        I also wanted to report on the status of our

15   disbursements from these settlement funds.  There are three

16   settlement funds.

17        This chart shows -- it's yellow on the screen and green

18   on mine, but the yellow portion is the amounts we have paid

19   out, and the red portions are amounts that we haven't paid out

20   yet.

21        You can see from the total bar at the bottom the screen

22   that we have paid out about 75 percent of all of the funds we

23   have.

24        And the reason that -- I told you a minute ago that we

25   had 90 percent of the claims left, and now I'm telling you we

1    have 75 percent of the funds gone, so we have 25 percent left.

2         The reason for the difference between the number of

3    claims left and the money left is that when we set this up, we

4    did a three-percent holdback.  And we did not -- that money is

5    included in the amount we haven't paid.

6         And we have also found as we have gone through the

7    process, that claims that we thought we would have to pay,

8    we're not paying.

9         And part of the reason, as I mentioned a minute ago, is

10   there are multiple claims for properties.  We're able to deny

11   claims and that money stays in the pot.

12        So even when we reached 100 percent GBI payment there

13   will still be some funds remaining, and when we are able to

14   figure out exactly how much, we will work with the Court and

15   the parties to make a second distribution or to figure out what

16   to do with those funds.

17        THE COURT:  Okay.  Yeah, that is something that I want

18   some input on from everyone to at least talk about it.  We will

19   be dealing with that.

20        MR. WOODY:  I'd like to quickly turn to our other loss

21   payments.

22        Loss rent use and sales, we have paid $4,172,163.  That

23   is 32 percent of the total payments.

24        Pre-remediation alternative living expenses which we

25   abbreviate to "Prale" here, we have paid $4.6 million, 35

1    percent as the total payments.

2           Bodily injury we have paid $74,000, as one percent.

3           Foreclosure and short sale, we have paid 4.1 million,

4    which is 32 percent of the total.

5           So you can see that the payments are pretty evenly

6    distributed among the three claim types with a much smaller

7    amount going towards bodily injury.

8           THE COURT:  What is the -- what is the main one in

9    pre- --

10          MR. WOODY:  Pre-mediation?

11          THE COURT:  Yeah.

12          MR. WOODY:  That's -- that is a variety of claims.

13   It's really -- it's really a claim for money spent to move out,

14   obtain a new residence before remediation took place.

15          During remediation, there is money available through

16   the Knauf pilot program, but that only covers the time period

17   during remediation, so this covers the other time periods.

18          THE COURT:  Okay.  With bodily injury, what is the

19   predominant injury?

20          MR. WOODY:  Mostly asthma, skin irritation, things of

21   that nature.

22          THE COURT:  Okay.

23          MR. WOODY:  This chart just shows what I showed you in

24   table form.

25          The only new information I wanted to point out here is

1    the number of payments we've issued.  Across all the payments

2    we've issued 16,170 individual checks, and I think this process

3    is well on its way and working well.

4         I did want to touch, also, on the other loss claims

5    review, mainly because of what you see in Row 4 here, which is

6    miscellaneous claims.  We are working through those claims.

7         Miscellaneous claims are claims submitted for a variety

8    of reasons, mostly personal property damage, HVAC repair,

9    refrigerators, TVs, and things of that nature.  We received a

10   very large number of those.  We've reviewed 2,306.  I think we

11   received just one under 4,000.

12        Of the ones we have reviewed, we have seen 912 that we

13   think are eligible, 1,126 are incomplete, and 268 have been

14   denied.

15        The only claims we have denied are claims submitted for

16   excluded claims.  There are certain claims that are excluded,

17   things like stigma, mental anguish, attorney's fees, and when

18   we see a claim for that in the miscellaneous category, we issue

19   a denial notice.

20        The incompleteness process is just like the other

21   claims.  If we are missing some key points of data, proof of

22   drywall, proof of expenses, anything like that, we issue a

23   incompleteness notice, and people have 30 days to respond to it

24   with the missing documents.

25        I also wanted to talk quickly about the other loss

1   offer process.  PTO 29, the Court issued it in early January.

2   It sets forth the process by which we resolved the other loss

3   claims.  It allows us to offer a set amount for each claim

4   type.

5           For bodily injury that said amount is $1,000.

6           Foreclosure and short sale, it's $10,000.

7           For loss of rents, use, and sales, it's also 10,000 or

8   three months of the verified lost rent for the affected

9   property.

10          And for pre-remediation, it's $14,400.

11          We began issuing eligibility notices with these offers

12  in January.  So far we have issued 2,476, and we have received

13  responses to almost 100 percent of those.

14          There are 27 where the eligibility notice has been

15  issued and there is still time for the claimant to respond.

16  That is less than one percent of the total we've issued.

17          We will issue eligibility notices for the 928 claims I

18  mentioned earlier.  We expect to do that in next week or so.

19          In terms of what people are doing with these offers, we

20  have received 2,115 acceptances, that's an 85 percent

21  acceptance rate.  Those people that have accepted have, in

22  large part, been paid, as I mentioned earlier.

23          PTO 29 does allow people to make what we call a Special

24  Master award request.  People who are unhappy with the offer

25  can request an additional amount from the Special Master.

1   So far we have received 335 of those requests, which is

2   15 percent.  About half of those are foreclosure and short sale

3   claims.

4   And I have talked extensively with Special Master, Dan

5   Balhoff about how to handle those 335.  We expect to have the

6   process in place fairly soon to start dealing with those

7   requests.

8   THE COURT:  Let me know about the process.  I'd like to

9   hear from you and see whether or not I need any input on that.

10   MR. WOODY:  We will, Your Honor.  And I expect that

11   there is a provision in the Knauf settlement agreement that

12   allows people to appeal directly to you from any Special Master

13   decision.

14   THE COURT:  All right.

15   MR. WOODY:  With that, I will give out our contact

16   information, as always.

17   Our web portal is www3.BrownGreer.com/drywall.  That is

18   where the people can get the W9 form and verification of claims

19   form as well as check the status of their claims and things of

20   that nature.

21   Our e-mail address is:  Cewquestions@BrownGreer.com,

22   and our phone number is (866) 866-1729.

23   THE COURT:  Okay.  The challenge in this case, as in

24   many of the MDLs that I have been involved in, there's been one

25   or two defendants.  In this particular case, in addition to

1    about 26,000 or so claimants, there is 1,000 defendants, which

2    is a difficult situation to deal with.

3            So we've had to deal with that by having multiple

4    settlement funds and also have some relationship between those

5    funds.

6            And that's why there has been some discussion on the

7    various settlement funds.

8            I think sometimes it's difficult for claimants, too.

9    They may get multiple checks, and so they get one check and

10   they say, "Is that all?"  And when they either write me or

11   write someone else, and I get notice of it, I have them call

12   our counsel for people who don't have lawyers or who are

13   appointed counsel or someone to deal with that issue, but

14   hopefully, that will be cleared up.

15           I do understand the individuals who have some concern

16   that they have only gotten a portion of the amount and perhaps

17   another check is coming, so they should find that out.

18           Thank you very much.  I appreciate your report.

19           MR. HERMAN:  Your Honor, Mr. Levin will address us.

20           May it please the Court, the next item, Taishan

21   defendants, for the folks on the phone and in the courtroom if

22   you want to review the history, pages 14 to 27 of the status

23   conference report has the history of where we are right now.

24           Your Honor, I have handed to your law clerk the new

25   plaintiff profile forms for Taishan and other defendants.

1    They'll be distributed.

2         And now Mr. Levin will address us regarding these

3    issues.

4         THE COURT:  Fine, the people on the phone -- we have

5    about 200 people on the phone -- so please use the microphone.

6         MR. LEVIN:  Good morning, Your Honor.  A lot has been

7    discussed with new counsel for CNBM, BNBM and Taishan.

8         A lot of what has been discussed, obviously, should be

9    kept between the parties at this early stage of the litigation,

10   so, I won't direct my attention to the contempt proceedings

11   because they are Your Honor's proceedings, and they are just in

12   place.

13        As to class damage, there is now the motions to be

14   heard on the 28th of April and the structure of that proceeding

15   will become evident as we go through other proceedings here and

16   communicate with the Court and get the Court's views.

17        The bill of costs has been entered by the clerk's

18   office in excess of $400,000.  And I understand that will be

19   paid.

20        The Oregon actions for intervention and declaratory

21   judgment, the intervention has been dismissed as being

22   untimely.  The declaratory judgment action has been moved to

23   this Court by the panel.

24        But at this point, I think it's important for those on

25   the phone and those that will be communicating to discuss the

1    third-party discovery, which was filed by the plaintiffs.

2         We have agreements as to timing of discovery responses

3    both pre-March 17th and subsequent to March 17th with the

4    defendants.

5         But with regard to third parties, there's two sets of

6    discovery.  One was discovery that we filed against third

7    parties to find contacts, assets, and activities in the United

8    States against the various banks who are transacting business

9    with CNBM, BNBM, Taishan, and SASAC entities, and those will

10   continue.  As to those, we did not ask for expedited

11   proceedings; it was prior to the 17th, when Your Honor gave us

12   your marching orders with regard to discovery.

13        We filed a status report pursuant to Your Honor's

14   request, and unartfully said that this is the situation which

15   we would treat it as a motion to compel; well, we didn't mean

16   that.  That was unartful.  We would treat it as a motion to

17   compel if we filed the motion to compel.

18        So we will correct that with a memo and an order that

19   we will submit to you early next week, so that everybody's

20   third-party rights are preserved if they are objecting.  It may

21   be advisable to handle all of those objections in one

22   proceeding.

23        They require -- there is banking institutions, and

24   there is commercial activity such as Wal-Mart, Amazon, getting

25   products in cargo, want to know whose cargo it is, how the

1    cargo is delivered, who owns the vessels, because we were

2    involved in an enforcement action with regard to the contempt.

3    We were also involved in looking at the activities of the

4    Taishan defendants, the Taishan affiliates, their appearance,

5    CNBM, BNBM, and SASAC in the United States.  Because although

6    there is default judgments and nothing has been done on the

7    default judgments, they are raising personal jurisdiction which

8    we think is not an issue in the case because we already have

9    personal jurisdiction three times, Your Honor, and twice by the

10   Fifth Circuit Court of Appeal as to Taishan.  But, we can

11   resolve that.

12       But, the post-March 17th discovery as against third

13   parties, Your Honor, in each of our requests, except one that

14   was filed last night, has granted an expedited proceeding

15   because that is part of getting all of this discovery done in

16   the next five weeks, or now, it's four weeks.  It was five

17   weeks last week.

18       I understand that the Morgan Brothers are here, JP

19   Morgan and Morgan Stanley, they are not part of the expedited

20   discovery.  So, for whatever reason, I have just told them, we

21   would be pleased to meet with them with regard to all when Your

22   Honor takes the break before the motions.

23       That's basically where we are today.  Obviously, we

24   filed an agenda with the Court that is on the Court's docket.

25   It lists the witnesses that we want from Taishan, and lists a

1    lot of other things that Your Honor will rule on in due course,

2    if you haven't ruled on them already.

3            Does Your Honor have any questions?

4            THE COURT:  No, I don't.  Anything from Taishan?

5            MR. TAYLOR:  Your Honor, Bernard Taylor.  The only

6    thing from Taishan is we will work diligently with the PSC to

7    accomplish this discovery.  And where there are some disputes,

8    we will raise with them and then with the Court.

9            But as we have raised with the Court, it may be

10   difficult to get it all done in five weeks, and we will let the

11   Court know about that issue as it becomes clear.

12           THE COURT:  Okay.  Meet and confer and see what you can

13   do.  If both of you all have an issue with it, generally I can

14   deal with it over the phone.  If you tell me what the issue is,

15   I will have a court reporter, and we will talk about it and you

16   can -- I can hear your view and then the plaintiffs' view, and

17   then I will rule, accordingly, and you all can deal with it.

18           MR. TAYLOR:  Thank you, Your Honor.

19           THE COURT:  Okay.  Thank you very much.

20           MR. HERMAN:  Your Honor, there are three other comments

21   on that section.  It won't take long.

22           With regard to the profile forms for CNBM and BNBM, we

23   will ask Your Honor to set a date for responses.

24           Yesterday I received e-mails and phone calls from

25   attorneys for Amazon.  They objected to our filings on

1    subpoenas and depositions.  They were correct.  They weren't

2    proper.

3             I advised them that no later than Monday, we would be

4    withdrawing those, and we would reserve our right to submit

5    proper documents.

6             As Arnold Levin mentioned, I was introduced to

7    attorneys from Morgan Stanley and JP Morgan.  They are in the

8    room.  We will meet with them afterwards.  They have a concern

9    about when the depositions are scheduled.  We will revolve it

10   today.

11            THE COURT:  All right.  And with regard to -- not

12   Amazon, but Ali Baba had indicated that they complied with the

13   Court's order and I appreciate that.

14            MR. LEVIN:  Your Honor, Amazon will be taken care of,

15   will be -- receive the pleadings that we filed that -- which

16   will satisfy them as to the actual impropriety of not having

17   noticed them of the motion that was to being filed -- the

18   non-motion that was being filed that could be characterized as

19   a motion.  So that will be taken care of in our pleadings that

20   we file on Monday.

21            THE COURT:  All right.  What about Venture Supply and

22   Porter Blane, is there anything?  It is the next item on your

23   agenda.

24            MR. HERMAN:  The most-frequently-asked questions,

25   additions, the matters that were set for hearing following the

1   current status conference, we advised the Court we'll not

2   object to the motion that Mr. Owen filed.

3        And I understand that Mr. Miller has a matter.

4        THE COURT:  Yeah, we have several matters.  What about

5   *pro se* claimants, have they filed anything?

6        MR. HERMAN:  Mr. Bob Johnston, he will speak with

7   regard to that matter.

8        THE COURT:  In these matters, for those new in the

9   case, oftentimes, we find that in the consumer area individuals

10  either can't or won't get lawyers, and they have questions

11  about things.  They don't understand legalese and things of

12  that sort.  So I have appointed Bob Johnston to at least be

13  available to them to explain any issues that they may have and

14  to see if he can assist them.

15       You have been doing great work and I appreciate it.

16       Let me hear your report, please.

17       MR. JOHNSTON:  Thank you, Your Honor.  Bob Johnston,

18  Curator for *pro se* plaintiffs.

19       As I do every month, I provided the Court with my 37th

20  status report.  The last portion of which advised the Court

21  that there were ongoing discussions with Kerry Miller, counsel

22  for Knauf, that related to somewhere approximately 60 to 62

23  *pro se* claims that entered into this litigation by contacting

24  my office.  And the Court is aware of the various steps over a

25  very long period of time.

1          With regard to those, they break down into three

2     categories:  One is approximately 50 claims of *pro se*

3     plaintiffs, who, based upon the information provided, allege

4     that they were not aware that their property, their own

5     property, contained Knauf drywall until after the previous

6     deadlines had passed for asserting claims.

7          The next group is a group of eight, which are what I

8     have termed "self-remediation claims."

9          And then the last two are loss of sales value claims.

10    Jake Woody had up in one of the pie charts, the information

11    relating to that.

12         Last month when we were here, the discussions were, to

13    some degree, in flux.  I met after that with Kerry Miller and

14    associate counsel for Knauf.  And I'm pleased to notify the

15    Court that with regard to the bulk of these claims, the

16    approximately 50, Knauf has agreed to the remediation process,

17    which as with every one of these claims, requires the

18    individual to basically show that the property contains Knauf

19    drywall and he or she did not know when it was purchased.  That

20    is ongoing.

21         I have been notified in the last two or three days that

22    there's already been some confirmatory inspections by

23    inspectors retained by Knauf.  That's a very positive

24    development in terms of the bulk of these claims.

25         Now with regard to the eight self-remediation claims,

1    because of the fact that that was not part of the *Beane*

2    settlement, what has been going on is the fact that up until

3    just the last few days it was unresolved as to whether the

4    cutoff would go forward.

5         I received communication from Knauf counsel, which I

6    just was reviewing.

7         Essentially, I can inform the Court that with regard to

8    those few self-remediation claims, that Knauf has agreed to

9    review it on what it terms a, quote, "case-by-case basis."

10        I was provided with a seven-page owner disclosure

11   affidavit requiring and requesting significant -- not only

12   information -- but documentation.  And the request by counsel

13   for Knauf was simply that I pass that on to these individuals

14   with the request that they deal directly with Baker Donelson.

15   That is going on, and I think that's a very positive

16   development.

17        The only thing left are two loss of sales value claims.

18   My notification was that Knauf, as it has in the past, did not

19   include that in the settlement, and so I have notified those

20   two individuals that it's sort of the end of the road for them

21   in terms of participation.

22        But as the Court has directed in the initial order

23   appointing me as curator, I am taking some steps to try to

24   assist them in seeing if they can locate counsel to prosecute a

25   claim.

1          THE COURT:  Right.

2          MR. JOHNSTON:  And with that, that really is the most

3    important thing I wanted to provide the Court.

4          And I end it, again, by telling you I think that there

5    has been positive movement here.

6          I really appreciate the dealings that Kerry Miller has

7    had with me, and I stand ready to continue to try to do what I

8    always do, which is to assist these individuals.  Thank you.

9          THE COURT:  Thank you.  Thank you for your help and

10   work.

11         Okay.  We have talked about the physical evidence

12   preservation already.

13         MR. HERMAN:  With Your Honor's permission, we can

14   remove the old PTO 15 from the report.

15         With the entry of preliminary defaults, there is

16   nothing new.

17         With regard to already remediated homes, Mr. Miller has

18   that report.

19         MR. MILLER:  Thank you, Russ.  Again, Kerry Miller on

20   behalf of Knauf.

21         Your Honor, a different aspect of the Knauf settlement

22   is "already remediated homes," and it is what Mr. Johnston

23   generally referred to as "self-remediated homes," but in the

24   Knauf settlement agreement, it's referred to as "already

25   remediated homes."

1        Your Honor, we have been able to settle about 300 of

2   those, including a recent uptick in the last month or so.

3        Your Honor, I reported at the last status conference

4   that I would have Knauf representatives here in the U.S., so we

5   spent almost a week in Florida two weeks ago.

6        Your Honor, generally we were able to resolve almost

7   all of the Colson and Hicks already remediated homes, and

8   Patrick Montoya was very helpful in producing his clients and

9   producing documentation at those hearings -- at those sessions

10  to allow for some good outcomes.

11       Your Honor, Mr. Lambert is also in the courtroom and we

12  were able to meet with his remaining clients by phone while we

13  were in Miami, basically on the same time zones.  We were able

14  to completely resolve all of Mr. Lambert's inventory.

15       So, Your Honor, what we were able to do as we make

16  these resolutions, the day we make the resolution or the day

17  after, we send counsel settlement agreements, and they sign it

18  right away.  We were able to pay those settlements, Your Honor,

19  in a week.  So that's the way we are doing things.

20       However, Your Honor, I mentioned in chambers in a

21  pre-meeting, we are at a transition point.  We have pretty much

22  settled almost all of the ones that we can settle.

23       What we have left approximately, 100, Your Honor, or 25

24  percent of the inventory, really don't have adequate

25  documentation such that we can even make a settlement offer on.

1          So for those, Your Honor, we're going to pick up the

2     activity and filing motions to dismiss.  We will set up a

3     process where we meet with a PSE representative, give them

4     notice, let them know what we plan to do with those particular

5     claims.

6          But again, it's probably time to wrap up this phase.

7     It may involve some increased activity by Mr. Balhoff.  Some of

8     these may get mediated.  But at any rate, Your Honor, we have

9     made great progress.

10         Your Honor, while I'm up here, I would like to credit,

11    I think the reasons why we made such great progress.  I'm

12    graced to have three representatives of Knauf in New Orleans

13    this week working with us.  They are here in Court today, and

14    I'd like to acknowledge them before Your Honor.

15         Your Honor, we have Ellen Campbell from Knauf, Theresa

16    Michel from Knauf, and Laura Nadal.

17         THE COURT:  Would you all stand up please.

18         MR. MILLER:  And then, Your Honor, we are pleased to

19    have them.  They have done all of the detail work.

20         THE COURT:  The Court appreciates it, and I know the

21    individuals appreciate it.  This has been a real difficult

22    thing for them.  It affected their homes, and many of them

23    didn't have any other place to live.  Some were living, as you

24    know, in the backyard while they were there because they

25    couldn't abandon their home because the insurance would be --

1    the fire insurance would be discontinued.  So some families

2    told me that they had to pitch a tent in their backyard so they

3    and their kids would have someplace to stay and they used the

4    facilities inside.

5         So you've done good work, and I appreciate it, I am

6    letting you know the Court appreciates it.

7         MR. MILLER:  They have been very dedicated and

8    committed, Your Honor, and are a big part of the success of the

9    Knauf settlement program.

10        THE COURT:  You may sit down.  Thank you.

11        What about the Attorney General, the Louisiana Attorney

12   General, do you have anything that you have to report?

13        MR. BLACK:  Duane Black for the State of Louisiana.

14        I have nothing specific to report.

15        I might just point out just for the benefit of those

16   new to the litigation, that one of the state agencies has been

17   changing out homes, the agency that administers the Road Home

18   Loan programs.  Road Home loans were given to the people who

19   were victims of the hurricanes.

20        Among the homes that are being changed out are homes

21   that have Taishan drywall.  The state maintains its claims

22   against the Taishan entitles as well as the Knauf entitles for

23   its claims.

24        THE COURT:  Okay.  Let's make sure you keep a record of

25   that so that that will be available.

1          MR. BLACK:  Thank you.

2          THE COURT:  Thank you very much.

3          All right.  Folks, is there anything else from anybody

4     in the audience that needs to speak?

5          Yes, ma'am.  Would you come forward please.

6          MS. FERCHAUD:  Your Honor, my name is Jody Ferchaud,

7     and I live in the State of Hawaii.

8          I have been here in the City of New Orleans for

9     approximately three months.  I was brought here when Moss

10    Construction said there was a code violation against my home

11    and they shut down the remediation on my job.

12         The city inspected my house five days later and said

13    there was no violation.  That began my plight.

14         I'm asking that the Court consider having Moss

15    Construction removed from the job.  I have serious substandard

16    work.

17         I have burnt wiring that was discovered by one of my

18    inspectors that could cause me serious problems down the line.

19         I have burnt PVC pipe.

20         I have issues with plumbing, leaky pipes, and

21    unsoldered pipes, and the list goes on.

22         The last day and today I have had a mechanical

23    inspection by David C. Flettrich that will, you know, disclose

24    a lot more errors that are substandard with materials, cinching

25    of ducts -- all sort of problems that I'm having.  I have had

1   to fight to get the house back the way it was.

2          I wasn't on the ground when it started, but I'm very

3   familiar with the home because my son reconstructed the home

4   after Katrina.

5          I'm at a complete impasse with Moss.

6          I took the home off hold -- I put it on hold and asked

7   them to respond to some of the defects that Donny Nate

8   [phonetic] had found in the HVAC system before I took it off

9   hold.  They refused.

10          Instead, they have come on to the property

11   clandestinely, when it's on hold, and not assuming any

12   responsibility for it.

13          I am in a position to completely and utterly remediate

14   the house myself.  I'm in the business.  It's what I do for a

15   living.

16          So I beg the Court to please consider me asking this.

17   And if I could meet with you privately to show you some of the

18   pictures and the e-mails that have transpired, I would love to

19   do so.

20          THE COURT:  Well, I'm not able to meet with a person

21   without the presence of the opposing counsel, so I'm not able

22   to do that.

23          But I do think that there may be -- we ought to see

24   whether or not there is some way of resolving this one way or

25   the other.

1          You, you know, still have an opportunity to pursue the

2    matter, but maybe some mediation might be helpful.

3          MS. FERCHAUD:  I have asked for that repeatedly through

4    my attorneys and have been denied to meet with -- I have asked

5    to speak to you and the Special Master.  I have asked to speak

6    to Lewis Valez -- anyone I could get to so I could have some

7    resolution, because at this time I don't feel or remain

8    confident that this company can fix my home properly meeting

9    IRC standards.

10         THE COURT:  All right.  Are you represented by counsel?

11         MR. FERCHAUD:  At this point, no.  I released the

12   Becnel firm yesterday because they're not helping me.

13         THE COURT:  All right.  It's easier when you do have

14   counsel to deal with, and you've had other counsel, too?

15         MS. FERCHAUD:  Lenny Davis released me because he had a

16   conflict of interest since he acted as liaison between the

17   Court and you.

18         THE COURT:  Right.  Mr. Balhoff?

19         MR. BALHOFF:  Yes, Your Honor.

20         THE COURT:  Could you get involved in this to get the

21   parties together and listen to each side and give me some

22   report on that, see whether or not it can be resolved?  I'd

23   like your input on it.

24         MR. BALHOFF:  Yes, Your Honor.  If I can meet

25   outside --

1          THE COURT:  Right.

2          MR. BALHOFF:  -- and we'll exchange information.

3          THE COURT:  Yeah, if you could do that.  Let's see

4     whether or not this matter can be mediated by him.  He's been

5     doing really good work.  I would like him to at least look at

6     it and give you some input on it.

7          MS. FERCHAUD:  Okay.  Thank you, Your Honor.

8          THE COURT:  Okay.  Thank you, Tom.

9          Anything else?

10          All right.  Folks, the next status conference, as you

11     know, will be April the 17th and the following one will be May

12     the 20th -- May the 20th.

13          MR. MILLER:  Your Honor, are you going to take a break?

14          THE COURT:  I'm going to take a break and then come

15     back.

16          We will take a five-minute break.

17          THE CASE MANAGER:  All rise.

18                         (Recess taken.)

19          THE COURT:  Be seated, please.  We have several motions

20     to discuss.

21          One is a motion to withdraw.

22          MR. TAYLOR:  May I raise a point?

23          THE COURT:  Sure.

24          MR. TAYLOR:  I'm pleased to announce, Your Honor, that

25     the money to fund the *Germano* judgment has now arrived in the

1    U.S.  We have it, and we are working with the PSC to make sure
2    the money is transferred to them and all of the payments can be
3    paid.
4         THE COURT:  Let's make sure we get that as quickly as
5    we can to the plaintiffs in the case.  They have waited so long
6    for this, so do what you can.
7         MR. HERMAN:  As soon as we leave here, we're going to
8    set up a completely separate trust account for these funds, and
9    we will be filing hopefully by Monday, either some motions or
10   matters that we need the Court to determine.
11        THE COURT:  Sure, okay.
12        All right.  Thank you very much.  I appreciate
13   everybody's help on that.
14        Okay.  The motion to withdraw.
15        Tom, are you here?
16        Tell us what it's about.
17        MR. OWEN:  Tom Owen, counsel of record for Taishan
18   Gypsum and TTP.
19        We have filed -- the firms, Hogan Lovells, and Reuter,
20   Ross, Thornton & Alford have filed motions to withdraw last
21   July after we had been discharged by Taishan Gypsum and TTP as
22   their counsel.
23        The motions have been pending.  We've responded on some
24   discovery requests and now substitute counsel has appeared on
25   behalf of TG and TTP.

1            We request that the Court resolve and decide the

2       motions to withdraw, and we think with the presence of

3       substitute counsel, who are actively participating in the case,

4       representing the clients, communicating with the clients that

5       there is no basis -- one, that there is good cause for the

6       withdrawal, and that there is no concerns about any severe

7       prejudice to the litigation with the presence of substitute

8       counsel to our withdrawal from the case.

9            THE COURT:  Anything from opposing counsel?

10           MR. HERMAN:  Your Honor, first, immediately, the PSC

11      has no objection.

12           We want to thank Mr. Owen, who is not only

13      extraordinary counsel, but practices with the highest order of

14      professionalism.  We've been on opposite sides of this

15      litigation, and we have great respect for him.

16           THE COURT:  Okay.  I have heard the motion.  I

17      understand it.  I think it's well-taken, and I will sign the

18      order granting the motion.

19           I do appreciate the work that you've done and your

20      co-counsel.  You have represented your clients very

21      effectively, and I appreciate your hard work on it while you

22      were in the case.

23           MR. OWEN:  Thank you, Your Honor.

24           Also, I think we are planning on submitting a motion to

25      have us removed as the attorneys for service of process.

1        THE COURT:  Right.  That would go along with it, so put

2   that in the same motion.

3        MR. OWEN:  Okay.  Thank you, Your Honor.

4        THE COURT:  Okay.  The next motion is a motion to amend

5   by interlineation.

6        Do you want to help me on that, Fred?

7        MR. LONGER:  Good morning, Your Honor.  Fred Longer on

8   behalf of the PSC.

9        Your Honor, this is a motion that was filed by the

10  Podhurst firm on behalf of the individual plaintiff, Damien

11  Querol, which is spelled Q-u-e-r-o-l.

12        Mr. Querol, in the papers, was written as being a

13  member of Subclass 7.  He's actually a member of Subclass 6.

14  That was a typographical error and that should be corrected.

15        But the motion was filed because this is in the *Amato*

16  action which is the insurance cases that we have filed.  It's

17  an anomaly complaint dealing with insurance.

18        There is direct filing claims against the insurance

19  companies.

20        The motion was filed in January 14th, 2015.

21        Your Honor ordered that the matter be disseminated to

22  parties.

23        Mr. Davis, here, on January 21, pursuant to Your

24  Honor's order presented the order to counsel of record on the

25  docket here in the MDL.  Her name was Anaysa Gallardo Stutzman.

1    Her e-mail address which was used was agallardo@cozen.com.

2    Apparently they didn't get the e-mail, or at least, that's

3    their contention that they didn't get it.

4        It really is of no moment because Your Honor had

5    originally scheduled this hearing for February.  It's now been

6    postponed to this hearing.  There has been briefing.  There has

7    been briefing even as recently as the 24th.  So there is really

8    no prejudice in terms of procedure.

9        Your Honor, in terms of substance, this is a matter

10   that we believe what we're trying to do, or what the Podhurst

11   firm is trying to do, is substitute the primary carrier who has

12   exhausted its policy coverage with the excess carrier.

13       So American Home is the primary.  Westchester is the

14   excess.  To the extent that there are any issues with regard to

15   the substantive matters that have been raised in opposition to

16   the motion, we defer that to Mr. Lutz who is here on behalf of

17   American Home, and he can present the substantive arguments

18   which we joined in and which the Podhurst firm joined in, in

19   its papers.

20       THE COURT:  Okay.  Let me hear from American Home.

21       MR. LUTZ:  Good morning, Your Honor.  Warren Lutz

22   appearing for defendant, American Home.

23       I appreciate the opportunity to appear before the Court

24   to provide argument in support of a plaintiffs' motion to amend

25   the *Amato* complaint which would attempt to do two things:

1       First, it would dismiss American Home, the primary

2  carrier, which, as Mr. Longer mentions, paid its $4 million

3  policy limits, exhausting those limits, and replacing it or

4  substituting in the excess carrier, Westchester.

5       THE COURT:  There was some issue as to whether or not

6  there was $1- or $3- or $4-million amounts and the Judge in

7  Florida held that it was only one, so you paid that.

8       MR. LUTZ:  That is correct.  The payment is undisputed.

9  So as we stand here today, my client contends it has exhausted

10  by that payment.

11       The insureds, under the policy, Pentu [phonetic] and

12  Griffin -- Griffin is the defendant of *Amato* -- also agree that

13  American Home paid and exhausted.

14       The plaintiffs in *Amato*, that seek the amended agreed

15  that we have exhausted, and then we have Judge Seitz, who

16  issued a 20-page decision appended to the plaintiffs' motion,

17  that sets forth her rationale and reasoning.

18       So we believe that with respect to the first part, the

19  dismissal of American Home, that can be supported on several

20  independent grounds under 41(a).

21       Under 41(a)(1) the plaintiffs, made by notice,

22  dismissed without Court order so long as the defendant has not

23  filed an answer or a motion for summary judgment.

24       We have done neither.  We have neither served an answer

25  or a motion for summary judgment.  And you can confer -- or

1    infer from the motion for leave to amend, the plaintiffs'

2    intent to dismiss us.

3          In the case law in the Fifth Circuit on papers that we

4    have submitted, the *Harvey Specialty* decision, Fifth Circuit,

5    you may infer that intention from the plaintiff.

6          Separately under Rule 41(a)(2), Your Honor may, by

7    order, dismiss at the request of the plaintiffs.

8          They have, in essence, requested this be their motion

9    for leave to amend, and that that should be freely granted

10   unless the dismissal would cause some legal prejudice to my

11   client.

12         There would be no prejudice, in fact, we join in and

13   seek that dismissal.

14         The only prejudice would be if we had to remain in the

15   *Amato* case having exhausted our limits and having all of the

16   insureds and the plaintiffs also agree with us, but we're done,

17   and should be moving on.

18         So I don't really think the dismissal of American Home

19   is so much the issue.

20         There is an issue, and Western District has thoroughly

21   briefed this matter, they filed, by the way an *ex-parte* motion

22   and had to file a serve reply.  We have no objection if Your

23   Honor were to grant that and consider that as well in your

24   taking.

25         But with respect to Westchester's argument, they raise

1   a variety of grounds to preclude the amendment to add them,

2   which in our judgment, do not comport the legal amendment

3   standards under Rule 15.

4        The case law interpreting Rule 15, cited in our papers,

5   indicate that there must be a substantial reason to deny the

6   amendment.  That flows from the *Jameson* decision in the Fifth

7   Circuit.

8        Westchester has seized upon the futility of the

9   amendment argument as one such substantial reason, but we

10  believe that argument is misplaced.

11       A futility argument under Rule 15, involves a pleading

12  that cannot withstand a 12(b)(6) motion, failure to state a

13  claim.  That is set forth in the *Marucci Sports* and the

14  *Stripling*, Fifth Circuit decisions that we cite in our reply

15  and Footnote 18.

16       So it has to go to a 12(b)(6) motion to compel.

17       What Westchester is really arguing is that there is no

18  right of direct action, here.  This is a Florida matter

19  involving policies issued in Florida.  The plaintiff in *Amato*,

20  is a Florida resident.  They do not fall within the ambit of

21  the Louisiana Direct Action Statute.

22       So in fact, the way the *Amato* complaint is framed, they

23  have a Louisiana direct action subclass for those individuals

24  who are in Louisiana or had policies issued delivered here,

25  versus the other groups of subclasses which are everyone else

1    around the United States.

2         And with respect to their challenge, Westchester argues

3    there is no case or controversy, here, because of the inability

4    to bring that direct action.

5         A case with controversy challenge is 12(b)(1).  It may

6    still be a meritorious challenge, but it's not a 12(b)(6)

7    argument that would render it futile for purposes of amendment.

8         So, again, they may have a meritorious argument

9    ultimately, but at this stage -- in this stage, it's not

10   sufficient.

11        Westchester argues several other points.  One is the

12   first filed matter, which again, we have argued in our papers

13   first filed is not one of the legal challenges that the case

14   law has recognized as a substantial reason to deny an amendment

15   to a pleading.

16        First of all, it may also not apply, if for no other

17   reason, that plaintiff, *Querol*, in the *Amato* case is not a

18   plaintiff in the coverage action in Florida.  The Florida Court

19   will not be adjudicating Mr. Querol's rights or claims against

20   Westchester.

21        Where that may come into play, Your Honor, is if you

22   add Westchester to the *Amato* case, and if Westchester and the

23   insured, Griffin, assert claims against each other, then there

24   would be, in my view, some application for first filed, which

25   under Your Honor's discretion, you can stay that portion of the

1   claim until Judge Seitz resolves any coverage issues there.

2         There is also another argument by Westchester that

3   Mr. Querol has assigned his property damage claims, and has

4   submitted some documentation that in order to effectuate the

5   remediation of his unit -- and by the way, let me pause with

6   some good news, the Peninsula II Condo building was fully

7   remediated several years ago, so that's no longer an issue.

8         To the extent he has assigned his claims, it's limited

9   clearly to a property damage claim.

10        To the extent he has any bodily injury claim or medical

11   monitoring claim, those were not assigned, and therefore, there

12   may still be a viable claim.

13        So in short, Your Honor, we would submit that under

14   41(a), Your Honor may dismiss American Home for the several

15   reasons that we have indicated.

16        We honored our policy obligations.  We paid the

17   $4 million aggregate.  That's not disputed.  We are joined by

18   the plaintiffs.  We are joined by the insureds in taking that

19   position, and we would ask for the dismissal of American Home

20   and for the addition of Westchester.

21        Mr. Longer has made the housekeeping typo correction to

22   note that Paragraph 647 of the *Amato* complaint should reference

23   Subclass 6, American Home Assurance Company, not as currently

24   drafted, Subclass 7, which is American Insurance Company.

25        Finally, Your Honor, I would like to express my

1    appreciation on the record to the cooperation and assistance of

2    the PSC and the plaintiffs' liaison counsel, who put me in

3    touch, then, with Mr. Amato's counsel, who asked good

4    questions, asked for information which we provided before he,

5    then, reached the conclusion that he did, that we were

6    exhausted, and it was time to move on to the excess carrier.

7         THE COURT:  Is there any issue as to Westchester Fire

8    being the excess insurer?

9         MR. LUTZ:  I don't believe so.

10        Their counsel, Mr. Ziemianski, is present in the

11   courtroom.  They are -- they may very well have independent

12   coverage defenses.  But I don't think there is any dispute that

13   American Home was the primary and the Westchester Fire was the

14   excess carrier.

15        THE COURT:  Right.  That's what I was asking, but let

16   me hear your view, counsel.

17        MR. ZIEMIANSKI:  Thank you, Your Honor.  I am Joseph

18   Ziemianski on behalf of Westchester Fire Insurance Company.

19        First of all, let me say that after looking at this a

20   bit further, we really have no objection to American Home being

21   released from the lawsuit.

22        We are the excess insurer.  In fact, American Home,

23   back in 2011, filed a 12(b)(1) motion, it's Docket No. 8357

24   with the supporting brief at 83571, on the very grounds that

25   what we're dealing with here is a Florida resident, ultimately

1   seeking coverage as a claimant under an insurance policy issued

2   to a Florida insured.

3          So there is no basis, in law or in fact, for Mr. Querol

4   to take advantage of Louisiana Direct Action Statute.

5          So we have no objection to American Home being

6   released.  We agree with their motion that they shouldn't be

7   here.  They probably should have never been here for purposes

8   of Mr. Querol, in any event.

9          And what we're saying is essentially the same thing

10  with regard to standing, which is a jurisdictional basis, and

11  if we are added, and we need to file a 12(b)(1) motion as

12  opposed to opposing this motion, so be it, we can do so.  That

13  seems to me to be putting form over substance where no one

14  disputes the facts that I just articulated.

15         Also, I just want the Court to be aware that the order

16  upon which American Home applies is interlocutory.

17         The coverage case that's going on in Florida has been

18  stayed by Judge Seitz, who issued that ruling.

19         Pending the outcome of a separate lawsuit that

20  Peninsula II filed against Griffin and Skyline -- Skyline was

21  the contractor who put up the drywall, so that case has been

22  stayed, it is far from over.

23         Her Honor's order, while we certainly respect it, will

24  be the subject of an appeal, if and when that case is appealed.

25         Also, I just want to let the Court know that the action

1    in Florida before Judge Seitz was filed before this action.

2    Discovery in that case is complete.

3           We had a trial date.  We were rapidly approaching the

4    trial date, when the Court, in addressing summary judgment

5    motions, said, "You know what, it's premature to have a trial

6    until liability is determined between Peninsula II, Griffin and

7    Skyline, or among those three.

8           So here, we think that where you have a situation

9    involving a Florida resident who has assigned his property

10   damage claims to Peninsula II, who is seeking recovery for

11   those expenses in Florida in the first filed case, that it

12   simply doesn't make sense to bring us -- to bring Westchester

13   into this lawsuit to run the risk of having to litigate those

14   same issues.  And we think that, under these circumstances, it

15   would be futile to do so.

16          THE COURT:  Okay.  One issue always is the relationship

17   1407.  Most of these cases, you know, I didn't have one case --

18   not one drywall case, and now I have got them all.  So they

19   send them here, even though they're filed other places.

20          So it's not unusual for me to apply the applicable law

21   of the parties wherever they are.  It's not necessarily going

22   to be Louisiana law.  In some instances, it's the law of the

23   state that it was filed in.

24          But we have got to get you here so you can make

25   whatever arguments you will make.  You are, at this point,

 1   making an argument and you are not even in the litigation, so

 2   that's rather difficult.

 3        I'm going to allow American Home to withdraw.  I'm

 4   going to substitute Westchester and give you an opportunity to

 5   argue 12(b)(1) or 12(b)(6) or whatever it is.  The fact you

 6   can, doesn't mean that you're stuck here, and doesn't mean that

 7   any liability has been imposed upon you, but you've got to be

 8   before the Court before you can deal with these issues.

 9        I will write something to give you some comfort on it,

10   but that is basically where I'm going with it.

11        MR. LUTZ:  Thank you, Your Honor.

12        THE COURT:  Thank you very much.

13        All right.  The next motion is to extinguish filed by

14   Mr. Miller.

15        MR. MILLER:  Thank you, Your Honor.  Kerry Miller,

16   again, on behalf of Knauf.

17        Your Honor, this motion pertains to the section of the

18   Knauf settlement on already remediated homes.

19        Your Honor, in connection with already remediated

20   homes, the settlement sets forth certain requirements on the

21   homeowner to submit documentation to support their claim.

22        Those requirements included submitting an affidavit or

23   disclosure affidavit, as well as submitting evidence that

24   comports with Pretrial Order 1B, the information on the drywall

25   before pictures, after pictures, and obviously, Your Honor, it

1  includes an obligation on the homeowner to provide all of its

2  construction costs information.

3         So, Your Honor, we processed many of these claims, and

4  reported earlier on about the settlements.

5         The instant motion, Your Honor, pertains to six claims

6  where homeowners have received numerous notifications from --

7  initially from the PSC, as a result of meetings I had with

8  Lenny over a year ago to file notices I would send.

9         And finally, Your Honor, the culmination was the filing

10  of the motion and the notice of the motion with the attached

11  list of affected homes sent last certified mail and other means

12  to the six homeowners at issue.

13         Your Honor, with respect to those six homeowners, from

14  five, we have heard nothing.  No response.  We would ask that

15  those claims or those obligations that Knauf would have be

16  extinguished with respect to those.

17         Your Honor, with respect to one of the names on the

18  list, the Jasper homeowner.  That particular homeowner was

19  listed in our records as *pro se*.  We sent it to a *pro se*

20  address.  Certified mail came back to me on that, so it was not

21  delivered to him at the *pro se* address.

22         But apparently, Your Honor, this person had previously

23  been represented by the Diaz Law Firm.  We were contacted by

24  the Diaz Law Firm with other contact information that they

25  believe is effective for Mr. Jasper.

1           So, if it's permissible to the Court, what I would like

2   to do this afternoon submit a revised order to Duncan that

3   contains the five homes.  It doesn't include Jasper.  What we

4   will do with Jasper, is we will re-notice him by way of

5   certified mail because we will have a group for the next

6   month's status conference as well.  Perhaps his issue will be

7   included.  He will either respond or it will be taken off the

8   list, or it will be included in May -- I'm sorry, at the April

9   status conference after being noticed by certified mail under a

10  new contact address.

11          THE COURT:  Okay.  I'm going to grant the order as to

12  the five people.

13          As I mentioned, I take it -- I don't take it lightly.

14  I try to give them notice.  They have to comply with the Court

15  order.  They have to supply certain information.  I expect them

16  to do that.

17          If they don't do it, I give them notice to do it.  I

18  give them several notices, and then eventually a motion is

19  filed to dismiss their lawsuit.  I give them notice of that, at

20  least, once, if not twice.

21          When I don't even hear from them, I have no alternative

22  but to dismiss their case.

23          And I respect that.  As I say, people want to move on

24  with their lives.  They want to get this behind them.  They are

25  not interested in pursuing it.  They have a right not to pursue

1    a claim, so I will grant the motion.

2            MR. MILLER:  Thank you, Judge.

3            THE COURT:  Thank you very much.  Thank you all.  I

4    will see you all at the next status conference.

5            THE CASE MANAGER:  All rise.

6            (Whereupon, the proceedings were concluded at

7    10:22 a.m.)

8                              *    *    *

9

10                       REPORTER'S CERTIFICATE

11           I, Terri A. Hourigan, Certified Realtime Reporter,

12    Official Court Reporter for the United States District Court,

13    Eastern District of Louisiana, do hereby certify that the

14    foregoing is a true and correct transcript to the best of my

15    ability and understanding from the record of the proceedings in

16    the above-entitled and numbered matter.

17

18

19                              *s/Terri A. Hourigan*
                             _____

20                              Terri A. Hourigan, CRR, RPR
                              Certified Realtime Reporter
21                              Registered Professional Reporter
                              Official Court Reporter
22                              United States District Court
                              Terri_Hourigan@laed.uscourts.gov

23

24

25