# EXHIBIT A

1                            *W A R N I N G*

2

3                    *This transcript is being delivered unedited*

4        *and uncertified.*

5                         *The realtime unedited transcript shall not be*

6        *relied upon for purposes of verbatim citation of the record or*

7        *used for any purpose that requires a certified transcript of a*

8        *proceeding.*

9                         *The realtime transcript has not been edited,*

10       *proofread, or corrected.  It is a draft transcript and not*

11       *certified to be true.  It may contain computer-generated*

12       *mistranslations of stenotype code or electronic transmission*

13       *errors, resulting in inaccurate or nonsensical word*

14       *combinations, or untranslated stenotype code symbols which*

15       *cannot be deciphered by nonstenotypists.*

16                         *The realtime unedited transcript may differ from*

17       *a certified transcript of the same proceedings in content, page*

18       *and line numbers, punctuation, and formatting.  The realtime*

19       *unedited transcript contains no appearance page, index, or*

20       *certification page.*

21                         *       *       *

22

23

24

25

**R O U G H   D R A F T**

1

2

3

4

5

6

7

09:10:51 8          THE COURT:  Be seated, please.  Good morning, ladies
09:10:51 9 and gentlemen.
09:10:51 10          VOICES:  Good morning, Your Honor.
09:10:52 11          THE COURT:  Call the case, please.
09:10:54 12          THE DEPUTY CLERK:  MDL 2047, *Chinese-Manufactured*
09:10:59 13 *Drywall Products Liability Litigation*.
09:11:01 14          THE COURT:  Counsel, make your appearance for the
09:11:03 15 record, liaison.  MR. HERMAN:  May it please the Court.  Good
09:11:08 16 morning, Judge Fallon.  Russ Herman for plaintiffs.
09:11:13 17          MR. MILLER:  Good morning, Russ.
09:11:14 18             Good morning, Judge Fallon.  Kerry Miller, on
09:11:18 19 behalf of the Defense Steering Committee and Knauf.
09:11:18 20          THE COURT:  Somebody from -- Bernard, you want to make
09:11:21 21 your appearance?
09:11:21 22          MR. TAYLOR:  Good morning, Your Honor.  Bernard Taylor
09:11:23 23 and Christy Eikhoff on behalf of Taishan.
09:11:29 24          MR. FENTON:  Good morning, Your Honor.  Rick Fenton on
09:11:32 25 behalf of BNBM Group and BNBM PLC.

                         **R O U G H   D R A F T**

| | | |
|---|---|---|
| 09:11:41 | 1 | THE COURT:  Okay.  Welcome, BNBM, to this litigation. |
| 09:11:43 | 2 | I met with counsel a moment ago, lead and |
| 09:11:49 | 3 | liaison, just to discuss some of the issues.  After hearing |
| 09:11:54 | 4 | from them, I moved the hearing from 10 days from now until |
| 09:12:02 | 5 | June the 9th, to give the parties an opportunity to discover |
| 09:12:08 | 6 | the matter and exchange documents. |
| 09:12:11 | 7 | Now, I did that, but I need counsel to meet and |
| 09:12:17 | 8 | confer on getting together a scheduling order, so that we don't |
| 09:12:22 | 9 | have any misunderstandings.  I do expect good faith from both |
| 09:12:26 | 10 | sides to deliver the documents that you need to deliver without |
| 09:12:32 | 11 | any making people jump through hoops that are not necessary. |
| 09:12:36 | 12 | So I look to the good faith of the parties, and because of the |
| 09:12:41 | 13 | quality of counsel, I know I will receive that. |
| 09:12:44 | 14 | I also mentioned to them that I see that we're |
| 09:12:50 | 15 | presently on two tracks in this aspect of the case.  The first |
| 09:12:54 | 16 | track is the contempt of court track, and the second track is |
| 09:13:00 | 17 | the damage track. |
| 09:13:01 | 18 | Now, with contempt of court, as we all know, I |
| 09:13:07 | 19 | held Taishan in contempt of court on July 17th of 2014, after |
| 09:13:16 | 20 | trying, on a number of occasions, to get them to participate. |
| 09:13:21 | 21 | They didn't, and so I had no alternative but to hold them in |
| 09:13:26 | 22 | contempt of court. |
| 09:13:26 | 23 | In my contempt order, I provided three things: |
| 09:13:30 | 24 | One, I ordered them to pay $15,000 attorneys' fees; I ordered |
| 09:13:35 | 25 | them to pay $40,000 penalty; and, I also enjoined Taishan and |

**R O U G H   D R A F T**

09:13:43  1   any of its affiliates or subsidiaries from doing business in
09:13:47  2   the United States during the period of time that they were in
09:13:51  3   contempt.
09:13:52  4              On March 9th, Taishan paid the $40,000 penalty,
09:14:01  5   and around that same time, they paid $15,000 attorneys' fees.
09:14:07  6   Shortly thereafter, a week or two later, they paid the entire
09:14:12  7   judgment, court costs and interest, some $3 million, or
09:14:17  8   thereabouts.  But the third aspect was not dealt with, namely,
09:14:26  9   whether or not they were doing business, either they, their
09:14:31 10   subsidiaries or affiliates, in the United States, and, if so,
09:14:33 11   how much did they earn.
09:14:35 12              So it seemed to me that, with that aspect of the
09:14:38 13   contempt order, it was fair to allow the plaintiffs to discover
09:14:41 14   that.  I'm not interested in whether Taishan has any money --
09:14:48 15   they've paid their money at this point, their judgment -- but
09:14:51 16   I'm interested in knowing whether either they or their
09:14:54 17   affiliates did business in the United States during that period
09:14:57 18   of time, namely between July 17, 2014, and at least March 9th
09:15:05 19   of 2015.  So that's the focus and needs to be the focus of the
09:15:12 20   discovery on the contempt order.
09:15:17 21              The other aspects of the discovery, we're not
09:15:21 22   there yet.  What I assume would happen, if neither Taishan nor
09:15:26 23   any of its affiliates did business in the United States, then
09:15:30 24   that ends it.
09:15:30 25              If they did do business in the United States,

**R O U G H   D R A F T**

09:15:33  1    then it's a question of who they are and how much did they earn

09:15:40  2    during that period of time.

09:15:42  3            At that point, I would issue a judgment against

09:15:44  4    those individuals to pay the amount.  Then, I assume that the

09:15:53  5    plaintiffs will either execute on that judgment or have a

09:15:58  6    judgment debtor rule to find out what these affiliates have and

09:16:02  7    where they have it, and then followed by some seizure.  That's

09:16:06  8    generally the way it works.  So I assume that would be the

09:16:11  9    course of the day.

09:16:14 10            But, at the same time that we're dealing with

09:16:18 11    that, we're also dealing with a damage trial.  From the damage

09:16:23 12    trial standpoint, I would assume that, for the most part, the

09:16:29 13    defendants will have interest in obtaining discovery.

09:16:35 14            I assume they may have an expert.  If they have

09:16:37 15    an expert, then I would assume the plaintiffs will have an

09:16:41 16    interest in finding out what that expert says before the

09:16:45 17    hearing, before the trial.

09:16:46 18            So that's the discovery relating to the damage

09:16:52 19    case, but it's separate and distinct from the other part of it;

09:17:00 20    but, because of that, it just seemed to me that that could not

09:17:03 21    be done within 10 days.

09:17:05 22            I also am looking to Taishan and its affiliates

09:17:09 23    to voluntarily participate, because if they don't voluntarily

09:17:15 24    participate, then I'm going to have a hard time allowing them

09:17:18 25    to participate in the damage case.

**R O U G H   D R A F T**

09:17:21 1            You can't pick and choose.  You either have to

09:17:23 2   participate in litigation or not participate in litigation.

09:17:26 3   You can't participate in the part of the litigation that you're

09:17:30 4   interested in and not participate in the other litigation.

09:17:35 5            So that's why I think carrying these two things

09:17:38 6   together makes a lot of sense to me.  So on July 9th, we'll

09:17:46 7   deal with both of those issues -- June, I'm sorry, June 9th,

09:17:51 8   excuse me.

09:17:51 9            Let me then take the proposed agenda.  Any

09:17:59 10  pretrial orders?

09:18:00 11       MR. HERMAN:  Yes, Your Honor.  As a matter of

09:18:02 12  professional courtesy, we note that the attorneys for CNBM and

09:18:07 13  its group is in the courtroom and have not yet been introduced

09:18:11 14  in these proceedings today.  They may want to step up and at

09:18:15 15  least identify themselves.

09:18:17 16           I have this morning served on CNBM, BNBM, and

09:18:24 17  Taishan, in English, all of the CNBM reports and public

09:18:29 18  offerings since 2006 through date.  So, counsel may want to

09:18:32 19  step up and identify himself.

09:18:37 20       MR. STENGEL:  Good morning, Your Honor.  Jim Stengel,

09:18:39 21  from Orrick, Herrington, for CNBM Group and Ltd.

09:18:39 22       THE COURT REPORTER:  Please speak into the microphone.

09:18:39 23  There are people on the phone.

09:18:45 24       MR. STENGEL:  Jim Stengel, from Orrick, Herrington, for

09:18:51 25  the CNBM Group and Limited.  With me today is Chris Vejnoska,

**R O U G H   D R A F T**

09:18:51 1   my partner, also at Orrick, Herrington.

09:18:54 2           Good morning.

09:18:54 3       THE COURT:  Welcome to both of you all.  We're

09:18:56 4   delighted to have you.

09:18:57 5           The reason for speaking into the microphone, we

09:18:59 6   have 250 people listening, so it's helpful if we keep them

09:19:02 7   advised.  Thank you very much.

09:19:06 8       MR. HERMAN:  May it please the Court.

09:19:09 9           Judge Fallon, with respect to the schedule for

09:19:13 10  today, there are no additional pretrial orders.

09:19:17 11          Again, we invite all folks in the courtroom and

09:19:22 12  on the phone to the Court's website, which lists the various

09:19:27 13  status reports and transcripts of status reports, as well as

09:19:32 14  these pretrial orders.

09:19:32 15          State court settings, Ms. Barrios is here.  I

09:19:38 16  understand that there are none, but you may want to have a

09:19:41 17  report on the state/federal coordination.

09:19:44 18      THE COURT:  Okay.

09:19:47 19      MS. BARRIOS:  Thank you, Mr. Herman.

09:19:50 20          Judge, as the joint report indicates, there are

09:19:53 21  no more trial settings.

09:19:55 22          I did want to state for the record that Virginia

09:19:58 23  is officially finished.

09:19:58 24      THE COURT:  Right.

09:20:00 25      MS. BARRIOS:  The only thing that is left to do is just

**R O U G H   D R A F T**

09:20:02  1    cleaning up the docket.

09:20:03  2            Mr. Bower, from Garretson Resolution Group, is

09:20:07  3    here to make his report on the settlement status, but that's

09:20:11  4    Roman numeral XI.

09:20:12  5            Thank you, Your Honor.

09:20:13  6        THE COURT:  All right.  Fine.  Thanks very much.

09:20:14  7            The state court judge in that case did a great

09:20:17  8    job, and I enjoyed working with her on it.  I'm glad that that

09:20:22  9    aspect of the case has been resolved.

09:20:23 10            Anything on omnibus class actions?

09:20:26 11        MR. HERMAN:  Nothing, new, Your Honor.  It's Item

09:20:29 12    Roman numeral IV on the status report.  We'll bring folks on

09:20:35 13    the phone and in the courtroom up to date as to where they are.

09:20:42 14            With respect to Item Number V, class action

09:20:44 15    complaints, there is nothing new.

09:20:47 16            With respect to plaintiffs' motions to establish

09:20:50 17    a plaintiffs' litigation fee and expense fund, there are

09:20:54 18    additional deposits which are being made, as appropriate.

09:21:01 19            With respect to remediation, Number VII,

09:21:02 20    Kerry Miller is here and will speak to that issue.

09:21:10 21        MR. MILLER:  Good morning again, Judge.  Kerry Miller.

09:21:16 22            Real briefly, on Item Number VII, remediation,

09:21:19 23    as I reported in the prior conferences this year, the program

09:21:22 24    is in the wind-down phase.

09:21:26 25            Phil Adams from Moss is here, as he has been at

**R O U G H   D R A F T**

09:21:27  1    the monthly status conferences.  Phil was informing me

09:21:30  2    yesterday, Your Honor, in fact, there are only 32 homes under

09:21:33  3    construction right now.  We now have moved into the last group,

09:21:38  4    the *pro se* group, that Bob Johnston had been maintaining.  They

09:21:42  5    are now moving into remediation.  So it looks like the

09:21:45  6    remediation program will wrap up in 2015.

09:21:49  7         THE COURT:  That's great.  As mentioned all the time,

09:21:52  8    we have a Moss representative here, so that if any litigants

09:21:58  9    who happen to be in the courtroom or the attorneys for

09:22:01 10    litigants have a problem with the remediation program, they can

09:22:05 11    speak with Moss in person.  So I appreciate Phil Adams being

09:22:12 12    with us throughout this period.

09:22:14 13         MR. HERMAN:  I might indicate that Moss, Phil and the

09:22:20 14    ombudsmen -- have been working very, very hard these last four

09:22:24 15    or five weeks, and what they have left are some recurrent

09:22:28 16    issues that they are actively resolving.

09:22:33 17              At this point, Your Honor, it may be appropriate

09:22:38 18    to hear from BrownGreer, through Mr. Jacob Woody, as to his

09:22:44 19    usual report and also as to the updated plaintiff profile

09:22:50 20    forms.

09:22:50 21         THE COURT:  Okay.

09:22:51 22         MR. WOODY:  Good morning, Your Honor.  My name is Jake

09:23:04 23    Woody.

09:23:04 24         THE COURT:  Good morning, Jake.

09:23:06 25         MR. WOODY:  I'm here from BrownGreer, in Richmond,

**R O U G H   D R A F T**

09:23:08  1    Virginia, to give the monthly status report for the settlement
09:23:11  2    program.
09:23:11  3              Over the last few months, we've transitioned
09:23:14  4    from processing and reviewing claims to largely paying claims.
09:23:18  5    To date, we've paid $72,235,059.  Eighty percent of that amount
09:23:26  6    has gone to Global, Banner, InEx repair and relocation claims.
09:23:31  7    Those are pro rata claims for portions of three separate
09:23:36  8    settlement funds, the Global fund, the Banner fund and the InEx
09:23:41  9    fund.  Distributions are based on the amount of square footage
09:23:44  10   in each property.  That was, by far, our largest claim type,
09:23:48  11   and it makes up the bulk of our distribution so far.
09:23:51  12             The other payments we've made are for other loss
09:23:54  13   claims.  Those are a variety of claims.  We've paid $14,126,825
09:24:00  14   for those claims, which is 20 percent of the total we've paid.
09:24:04  15   I'll go through each claim in just a minute and discuss what
09:24:08  16   those are for.
09:24:10  17             As far as our progress, in concluding the
09:24:14  18   Global, Banner, InEx payment process, we've paid 92 percent of
09:24:17  19   all the eligible claims, 8,975.
09:24:21  20             We have not paid 824 eligible claims, which is
09:24:25  21   8 percent of the total.  The reason we haven't paid those is
09:24:27  22   either the claimant has not submitted required documentation, a
09:24:32  23   W-9 and a verification of claims form, or that the claims are
09:24:37  24   duplicative, where we received a claim for the same property
09:24:41  25   from two separate claimants, and we're working on reconciling

**R O U G H   D R A F T**

| | | |
|---|---|---|
| 09:24:43 | 1 | those.  This number is dwindling as we work through those. |
| 09:24:49 | 2 | This slide shows the amount we've paid from each |
| 09:24:52 | 3 | fund and how much is left.  The total is down at the bottom. |
| 09:24:56 | 4 | As I mentioned, we've paid 58 million from all these funds.  We |
| 09:25:00 | 5 | have just over $18 million left to disburse. |
| 09:25:04 | 6 | The bulk of that money will go to the 824 claims |
| 09:25:07 | 7 | that I mentioned previously, once they submit those documents |
| 09:25:12 | 8 | or we reconcile the claims. |
| 09:25:14 | 9 | There will be some money remaining, and we will |
| 09:25:16 | 10 | talk about how to disburse that once we have a better idea of |
| 09:25:20 | 11 | how much it is.  I expect to know that within the next several |
| 09:25:23 | 12 | weeks or months. |
| 09:25:23 | 13 | The other loss claims I've mentioned -- well, |
| 09:25:30 | 14 | there are five separate other loss claims:  Foreclosure and |
| 09:25:33 | 15 | short sales claims; lost rent, use and sales claims; |
| 09:25:38 | 16 | miscellaneous claims; pre-remediation alternative living |
| 09:25:41 | 17 | expenses, which we abbreviate as PRALE here; and, bodily injury |
| 09:25:45 | 18 | claims. |
| 09:25:46 | 19 | The bulk of the money we've paid has gone to |
| 09:25:48 | 20 | three of those claims, foreclosure, lost rent, and PRALE |
| 09:25:53 | 21 | claims; 31 percent to foreclosure, 32 percent to lost rent, use |
| 09:25:56 | 22 | and sales; and, 35 to PRALE. |
| 09:25:59 | 23 | Then, the new addition to this chart since the |
| 09:26:00 | 24 | last conference are the miscellaneous payments.  So far, we've |
| 09:26:04 | 25 | paid $255,000 to those claims.  They're capped at $2,500 each. |

**R O U G H   D R A F T**

09:26:08 1   We make that offer.  Many claimants have accepted it, and we've

09:26:13 2   issued payment for those.  That's about two percent of the

09:26:15 3   total.

09:26:16 4         Then the smallest claim type is bodily injury

09:26:18 5   claims.  We've paid $80,000 for all those claims, which is

09:26:24 6   .57 percent of the total we've issued.

09:26:29 7         This slide just shows the payments we've made

09:26:31 8   for each claim type in each fund.  There is nothing new on this

09:26:35 9   slide other than the number of payments we've made.  We've

09:26:38 10  issued 16,390 checks to eligible claimants to cover all of

09:26:43 11  those, all the claims I've mentioned before.

09:26:45 12        We are still reviewing miscellaneous claims.  We

09:26:51 13  have completed review on all the other loss claims other than

09:26:55 14  miscellaneous.  So far -- miscellaneous is listed in row four,

09:26:59 15  and so far we've reviewed 3,432 of those claims out of roughly

09:27:04 16  4,000.  I expect to complete those reviews next week.

09:27:08 17        Of those, 1,772 are eligible -- generally,

09:27:13 18  miscellaneous -- eligible miscellaneous claims are for HVAC

09:27:18 19  repair, appliances, TV's, things of that nature, and those are

09:27:24 20  the eligible claims -- 1,271 are incomplete, and 389 are

09:27:31 21  denied.

09:27:31 22        At this point, the denials we've made are for

09:27:34 23  claims submitted for things that are excluded or contemplated

09:27:38 24  by another claim type.  The incompletes are claims where they

09:27:42 25  haven't -- the claimant has not provided us with some key piece

**R O U G H   D R A F T**

09:27:45 1    of evidence that we need, and we can't make a determination

09:27:48 2    until we receive it.

09:27:49 3                    Finally, the other loss offers we're making, the

09:27:57 4    Court entered PTO 29 in January of this year.  PTO 29

09:28:01 5    authorizes us to make offers on the other loss claims.  We do

09:28:05 6    that by issuing an eligibility notice to the claimant.  The

09:28:09 7    claimant can either accept the offer and receive payment, or,

09:28:12 8    if a claimant is unhappy with the offer, can request that the

09:28:15 9    Special Master review the claim and determine the amount of

09:28:18 10   damages available.

09:28:20 11                   So far, we've issued 2,889 eligibility notices.

09:28:25 12   Of those, 175 remain open, which means the claimant still has

09:28:30 13   time to respond to us, either by accepting or making a request

09:28:33 14   to the Special Master.  Of those 175, 166 are miscellaneous.

09:28:38 15   So the other four claim types are largely complete.

09:28:41 16                   There are a few stragglers who still have some

09:28:44 17   time to respond.  I expect that those deadlines will run before

09:28:47 18   the next status conference, and we'll be able to close those

09:28:50 19   claim types.

09:28:50 20        THE COURT:  How does all of this interface with the

09:28:54 21   Knauf settlement?

09:28:56 22        MR. WOODY:  The claimants who have received remediation

09:28:59 23   from Knauf generally sign a release, and that assigns their

09:29:05 24   Global, Banner, InEx claims to Knauf, but it reserves, largely

09:29:08 25   reserves the other loss claims.

**R O U G H   D R A F T**

09:29:11 1          So claimants who have received Knauf remediation

09:29:15 2     generally are eligible to make claims against the other loss

09:29:18 3     fund and, in many cases, have.

09:29:20 4          There are some Knauf remediation claims where

09:29:22 5     the entire claims are assigned; but, in large part, claimants

09:29:27 6     still have the chance to make these other loss claims, and many

09:29:29 7     have.

09:29:32 8          THE COURT:  With Knauf remediation, of course, the

09:29:33 9     claimant was entitled to receive their entire home -- whatever

09:29:38 10    the remediation is, they got their home remediated according to

09:29:43 11    a program that was devised or developed from the various cases

09:29:47 12    that I tried that assisted me in developing the protocol; so

09:29:53 13    that they got their homes taken care of, they also had their

09:29:57 14    attorneys' fees paid, and then they had the opportunity to

09:30:02 15    participate in these settlements.

09:30:05 16         MR. WOODY:  That's correct, Your Honor.

09:30:06 17         THE COURT:  The total amount looks to be maybe about a

09:30:10 18    billion or thereabouts.

09:30:11 19         MR. WOODY:  Yes.

09:30:12 20         The last thing I want to mention is the

09:30:14 21    acceptance rate on our other loss claims.  We have an

09:30:17 22    82 percent acceptance rate.  Most people are taking the offers

09:30:20 23    we're making.  12 percent, or 350, have requested that the

09:30:24 24    Special Master review their claims.

09:30:27 25         Finally, Your Honor, I'll just give out our

**R O U G H   D R A F T**

| | |
|---|---|
| 09:30:30 | 1 |
| 09:30:32 | 2 |
| 09:30:43 | 3 |
| 09:30:44 | 4 |
| 09:30:48 | 5 |
| 09:30:50 | 6 |
| 09:30:54 | 7 |
| 09:30:59 | 8 |
| 09:31:05 | 9 |
| 09:31:08 | 10 |
| 09:31:11 | 11 |
| 09:31:14 | 12 |
| 09:31:17 | 13 |
| 09:31:22 | 14 |
| 09:31:27 | 15 |
| 09:31:31 | 16 |
| 09:31:31 | 17 |
| 09:31:36 | 18 |
| 09:31:36 | 19 |
| 09:31:39 | 20 |
| 09:31:44 | 21 |
| 09:31:47 | 22 |
| 09:31:51 | 23 |
| 09:31:57 | 24 |
| 09:31:59 | 25 |

contact information for anyone that doesn't have it at this point.  Our website is at www3.BrownGreer.com/drywall.  You can e-mail us at CDWquestions@BrownGreer.com.  If you need to call us, our number is 866-866-1729.

          Mr. Herman asked me to comment briefly on the supplemental profile forms that we have been collecting.  Last week, we made available on our portal an online form for claimants to fill out a supplemental form if they have Taishan drywall.  We did that.  The form asks for a variety of information, including square footage.

          We've collected to date 3,201 of those forms. The total square footage listed by all the claimants is just over 5 million.  Mr. Herman has asked me to produce that data to all of the defendants here today, and I will do that as soon as I can, probably today, or Monday at the latest.

          Thank you, Your Honor.

          THE COURT:  Thank you very much.

          Who's next?

     MR. HERMAN:  Judge Fallon, there is no more material on shared costs, but I do want to thank the members of the PSC for expediting these profile forms.

          The claimants and the plaintiffs' lawyers have been notifying on a daily basis, and we appreciate, as usual, BrownGreer's administration.

          With respect to the other issues, from the

                    R O U G H    D R A F T

09:32:08  1    plaintiffs' point of view, from my point of vantage,

09:32:14  2    Your Honor, we can deal with that with the argument that will

09:32:17  3    be made afterwards.

09:32:19  4             You've directed us as to a new hearing date,

09:32:25  5    June --

09:32:25  6             THE COURT:  9.

09:32:26  7             MR. HERMAN:  -- 9.  We'll be meeting as soon as this

09:32:31  8    conference is over and arguments are over to attempt to resolve

09:32:34  9    issues in a meet and confer.

09:32:38 10             As I understand it, not only will Taishan and

09:32:43 11    BNBM participate, but also CNBM.

09:32:48 12             You've also directed us, Your Honor, with

09:32:53 13    respect to the contempt issues that are outstanding, and

09:32:58 14    plaintiffs and defendants will proceed to discuss this

09:33:03 15    afternoon dates for the additional discovery.

09:33:10 16             At page 20 of the status conference report, for

09:33:18 17    those on the phone who wish to access our Court's website, they

09:33:27 18    list a number of individuals and issues related to potential

09:33:36 19    third parties and business done in the United States by alleged

09:33:39 20    affiliates.  It continues at page 21.  There are 42 listed so

09:33:47 21    far.

09:33:49 22             The remainder of that section, Your Honor, deals

09:33:53 23    with various activities.

09:33:58 24             There is nothing new on the next issue, which is

09:34:02 25    Venture Supply and Porter Blaine defendants, except we have

**R O U G H   D R A F T**

09:34:09  1    endeavored, with respect to Taishan materials delivered to

09:34:14  2    Venture Supply and Porter Blaine, to already provide the

09:34:19  3    defendants with those materials.  If there are any additional

09:34:24  4    materials which they need, we certainly will provide.

09:34:31  5            Item Number XII, plaintiff and defendant profile

09:34:33  6    forms, although we find and will not make an issue today of the

09:34:38  7    profile forms we have been provided by defendants, based upon

09:34:44  8    materials which we've able to access, we'll be asking for

09:34:48  9    supplements.

09:34:48 10            In terms of plaintiff profile forms, Mr. Woody,

09:34:53 11    of BrownGreer, has already reported, and the defendants will be

09:34:56 12    receiving all Taishan updated profile forms.

09:35:03 13            There are no frequently asked questions at

09:35:07 14    Item XIII.

09:35:08 15            Matters set for hearing after the conference

09:35:11 16    today are a couple of matters, one of which is lifting the

09:35:18 17    highly confidential nature of privileged documents, which we

09:35:25 18    generically refer to as Hogan Lovells documents.

09:35:30 19            *Pro se* claimants, I don't believe I've seen

09:35:38 20    anybody from Bob Johnston's office, but we are endeavoring now

09:35:46 21    to handle those *pro se* claims and questions as they come

09:35:50 22    through, and referring them to attorneys in their own venue, in

09:35:54 23    their own jurisdiction, who are familiar with Chinese drywall

09:36:02 24    issues.

09:36:02 25            Your Honor issued a physical evidence

**R O U G H   D R A F T**

09:36:05 1    preservation order recently.  We haven't had any further

09:36:14 2    questions regarding that for today.

09:36:21 3              With respect to the entry of preliminary

09:36:31 4    default, Arnold, do you want to discuss that?  It's page 33,

09:36:35 5    Item XVII.

09:36:39 6         MR. LEVIN:  Good morning, Your Honor.

09:36:43 7              We've given the Court charts over and over again

09:36:47 8    as to the defaults.  There is no reason to go over it again.

09:36:50 9              We did file a paper with the Court indicating

09:36:54 10   what we believe to be the effects of the default, and we're

09:36:59 11   proceeding in the damage trial under that jurisprudence.

09:37:05 12        THE COURT:  Next, Louisiana Attorney General.  Does the

09:37:09 13   Attorney General have any comments?

09:37:12 14        UNIDENTIFIED SPEAKER:  No, Your Honor.

09:37:13 15        THE COURT:  Thank you.

09:37:14 16             I'll be back in a moment to discuss the motions,

09:37:16 17   but there are a couple of motions that I do not need oral

09:37:19 18   argument on.  Lennar Corporation's motion to enforce --

09:37:23 19             Yes.

09:37:26 20        MR. TAYLOR:  Your Honor, I'm sorry to interrupt, but

09:37:28 21   counsel for PSC went through the various issues on the agenda

09:37:32 22   fairly quickly, and there are a couple of those issues that we

09:37:35 23   would like to be heard on.

09:37:35 24        THE COURT:  Sure.

09:37:38 25        MR. TAYLOR:  In regards to X, the empirical claimant

**R O U G H   D R A F T**

09:37:41  1    and remediation data, we would like to discuss that with the

09:37:44  2    Court; and, in regards to Number XII, the profile form issues,

09:37:50  3    we'd want to discuss that with the Court.

09:37:51  4              My colleague, Christy Eikhoff, is prepared to

09:37:54  5    have that discussion, Your Honor.

09:37:57  6         THE COURT:  No, I was going to take that at the end of

09:37:59  7    this matter, so that those who are not interested in it don't

09:38:02  8    have to remain.

09:38:04  9         MR. LEVIN:  Mr. Herman designated June 9th for the

09:38:08 10    damage trial.

09:38:08 11         THE COURT:  Right.

09:38:08 12         MR. LEVIN:  Your Honor, the liaison committee gave us a

09:38:12 13    new status conference in June, and you may want to put that on.

09:38:15 14    It's June 23rd.

09:38:17 15         THE COURT:  The next meeting is May 20th, and the

09:38:25 16    following one is June 23rd.

09:38:29 17              I'll be back with the motions that are pending,

09:38:32 18    but the ones that are unopposed, Lennar Corporation's motion to

09:38:37 19    enforce the bar order, that's unopposed, I'm going to grant

09:38:41 20    that motion.

09:38:41 21              Knauf's motion to dismiss the settlement

09:38:43 22    obligations, I understand that you're going to give me another

09:38:48 23    order on that, proposed order, and I will grant that.  It's

09:38:53 24    unopposed.

09:38:53 25              We have several motions, the plaintiffs' motion

**R O U G H   D R A F T**

09:38:59  1    to strike highly confidential issues, the motion to reconsider

09:39:03  2    alternate service, we have some motions to compel.

09:39:08  3              I understand the T. Rowe Price motion to quash

09:39:14  4    is moot; is that --

09:39:14  5         MR. LEVIN:  I guess it should be deferred because the

09:39:18  6    depositions were deferred.

09:39:20  7         THE COURT:  Deferred, yes.  Right.

09:39:20  8              Okay.  I'll be back in a moment on those

09:39:23  9    motions.

09:39:24 10         THE DEPUTY CLERK:  All rise.

09:39:26 11         THE COURT:  The Court will stand in recess.

09:46:13 12         (WHEREUPON, at 9:46 a.m., the Court took a recess.)

09:46:16 13         THE DEPUTY CLERK:  All rise.

09:46:23 14         THE COURT:  Be seated, please.

09:46:23 15              The first motion we have is the Motion to Strike

09:46:36 16    the Highly Confidential Matter.  Taishan says that the Court

09:46:41 17    has ruled that the privilege is removed, but they feel that

09:46:47 18    there is a distinction between confidential and

09:46:51 19    nonconfidential, and would like to keep some of them not open

09:46:58 20    to the public.

09:47:00 21         MR. HERMAN:  May I approach, Your Honor?

09:47:01 22         THE COURT:  Yes.

09:47:17 23         MR. HERMAN:  I have a copy of this bench book that I'm

09:47:20 24    going to argue from for each of the defense firms, BNBM,

09:47:29 25    Taishan, and CNBM.

                          R O U G H   D R A F T

09:47:33 1          May it please the Court, Russ Herman for
09:47:37 2     plaintiffs on this issue.
09:47:39 3          The issue really is whether or not documents
09:47:44 4     which indicate an exception to privilege under crime fraud
09:47:50 5     should be made public.
09:47:53 6          Preliminarily, we note that in the past China
09:47:58 7     has brought into the United States defective toys that are lead
09:48:02 8     based, defective built, defective pet supplies, defective
09:48:05 9     drywall and, recently, defective flooring.
09:48:08 10         We believe that there is no reason why these
09:48:12 11    documents should not be made public, so I'm going to address
09:48:15 12    them by number in the bench book.
09:48:18 13         If we turn first to Item 21, Your Honor, we see
09:48:31 14    that BNBM and Taishan, as we look there, knew before they
09:48:46 15    shipped substantial defective drywall to the United States it
09:48:51 16    was defective.  They sent it to a lab, and on May 11, 2006, it
09:48:59 17    was reported that USG said the board had a sulfuric smell to
09:49:03 18    it, and the lab said that both types of board had a very
09:49:08 19    distinct sulfur smell to them.
09:49:11 20         This was between an exclusive agent appointed in
09:49:18 21    the United States and BNBM.  You'll see the BNBM cards attached
09:49:26 22    to this communication.
09:49:30 23         This is in spite of the fact that Taishan denied
09:49:35 24    in depositions in Hong Kong that they knew in advance that the
09:49:39 25    drywall was defective.

                         R O U G H   D R A F T

09:49:41  1          Then, if we look at item 22, we look at the

09:49:53  2     states where the drywall was brought into the United States,

09:49:58  3     the Gulf States primarily and North Carolina and Virginia.  As

09:50:03  4     we turn the pages, we see that after 2006, substantial

09:50:09  5     shipments were made by Taishan of board which they knew was

09:50:14  6     defective.

09:50:17  7          That brings us to, Your Honor, the Hogan Lovells

09:50:32  8     e-mail.  Now, the defendants -- I've put in their bench book

09:50:35  9     these e-mails.  I know that they are under seal.  I know they

09:50:38 10     are marked highly confidential.  But there has already been an

09:50:42 11     ego, alter ego, single enterprise finding, and so these are, in

09:50:49 12     fact, their documents.  Therefore, whatever was released to us

09:50:57 13     has been given today to defense counsel for Taishan, BNBM and

09:51:06 14     CNBM.

09:51:08 15          If we look at page 26, we see -- I'm sorry,

09:51:15 16     Item 26, we see several things that CNBM and BNBM were notified

09:51:26 17     about the litigation, and they were determined to withdraw from

09:51:30 18     it.  We believe that these some-odd three thousand people who

09:51:37 19     have been victimized since 2006 deserve to know that.

09:51:42 20          The next page says that Chairman Jia of Taishan

09:51:48 21     is not able to make a decision, it's got to be made higher up.

09:51:53 22     And who are the higher-ups, BNBM and CNBM.

09:51:59 23          There are other e-mails.  The next one relates

09:52:04 24     to CNBM, BNBM and SASAC.

09:52:12 25          Then it follows that Your Honor's contempt order

**R O U G H   D R A F T**

09:52:19  1    and the injunction was reported up the line to CNBM and BNBM by

09:52:29  2    Taishan.

09:52:30  3                    Now, we looked at the actual relationships among

09:52:38  4    these folks who are defendants before Your Honor.  If we look

09:52:44  5    at pages 2 through 11 -- Items 2 through 11 -- and I'm not

09:52:52  6    going to go through all of them, I'll just take the 2010

09:52:55  7    report -- you'll note that it has a BNBM logo.  It shows that

09:53:04  8    March 17, 2011, the 2010 annual report of BNBM makes reference

09:53:15  9    not only to the lawsuit, but the amount of attorneys' fees that

09:53:21 10    BNBM and Taishan Gypsum are expending in defense of the case.

09:53:29 11    They total some -- I'll round it off -- $4,300,000 as of that

09:53:37 12    date.

09:53:39 13                    Further on, it says, "This company and our

09:53:43 14    subsidiaries, Taishan Gypsum Company," so it's clear, in all of

09:53:48 15    these reports.  We've put the ones we've been able to discover

09:53:53 16    and interpret in this binder through 2014.

09:53:59 17                    I'll just turn to 2014.  Under material

09:54:05 18    litigation, we find that BNBM, again, is reporting

09:54:16 19    Taishan Gypsum litigation as of that date.

09:54:20 20                    The next set of documents, Your Honor, that I

09:54:25 21    would like to address is the documents numbered 12 through

09:54:33 22    20 -- again, I'm not going to labor the Court with an argument

09:54:38 23    that could last several hours -- that show directly that CNBM

09:54:44 24    and CNBM Group are the puppeteers and masters of BNBM and

09:54:51 25    Taishan.

**R O U G H   D R A F T**

09:54:52 1          Indeed, the annual report, tab 13, of CNBM makes
09:55:01 2   certain admissions, including a chart, which I think Your Honor
09:55:07 3   will find interesting, at page 10, because it shows the parent,
09:55:15 4   it shows then the BNBM and the CNBM, and then the company which
09:55:23 5   controls.  If we go down to lightweight building materials, and
09:55:32 6   we see Taihe, Shandong Taihe, as we do for every year.
09:55:39 7          The only thing that's added are more affiliates
09:55:41 8   and controls.  We note on the page before that it has, that is,
09:55:48 9   CNBM has the same executive committee virtually for every year
09:55:54 10  from 2007 through 2014.  As discovery goes forward on other
09:56:04 11  issues, we intend to pursue that.
09:56:10 12         Under tab 14, Your Honor, the company profile,
09:56:16 13  at page 2, lists the largest gypsum board producer in Asia.
09:56:23 14  When you get to 2014, the statement is that CNBM is the largest
09:56:30 15  in the world.
09:56:35 16         You can follow as they add affiliates year by
09:56:38 17  year, but always Taishan and BNBM appear.
09:56:47 18         It's interesting that there is some admissions
09:56:49 19  against interest in which CNBM admits that it controls Taishan
09:56:55 20  through its subsidiary BNBM.
09:57:01 21         So here is the question, Your Honor.  I don't
09:57:04 22  doubt -- I'm often in error, but never in doubt -- but I really
09:57:13 23  do not doubt that we are going to show the affiliates, at some
09:57:16 24  point when we're allowed to, and that at the present time and
09:57:18 25  in 2006, at the time that Taishan and BNBM knew that they had

**R O U G H   D R A F T**

09:57:26  1    defective drywall and determined that they would export it to

09:57:31  2    the United States, particularly to the Gulf States and Virginia

09:57:34  3    and North Carolina, that CNBM was aware, BNBM was aware, and

09:57:43  4    that CNBM and BNBM were the people upstairs that Taishan had to

09:57:50  5    report to that they weren't going to participate in this case.

09:57:53  6              Now, that brings down to what is equitable.  Is

09:57:59  7    the public, and particularly those folks that have been

09:58:03  8    endangered by this drywall, some of them have been foreclosed

09:58:07  9    upon, some of them have lived in deplorable conditions, some of

09:58:12 10    them have had to sell properties for much less than value, are

09:58:17 11    they entitled at least to know that Taishan and their Chinese

09:58:26 12    puppeteers, CNBM and BNBM, knew that they were shipping

09:58:32 13    material to the United States that would cause them substantial

09:58:37 14    damage, and they did it anyway.  Why is that not of public

09:58:40 15    interest that outrides any highly confidential documents

09:58:47 16    revealed in the Taishan documents.

09:58:49 17              The last thing I want to say about it is we took

09:58:54 18    depositions in Hong Kong.  Had to take them twice, Your Honor

09:58:57 19    will recall.  It would have been of some interest to the Court,

09:59:13 20    to the public, and to counsel if this information had come

09:59:17 21    forward in the Taishan depositions in Hong Kong.

09:59:24 22              We note now that, unfortunately, the two chief

09:59:30 23    individuals at Taishan, one doesn't work there anymore, his

09:59:33 24    whereabouts are unknown, and the other is ill and can't

09:59:36 25    testify.  At that time, the information, had it come forward in

R O U G H   D R A F T

09:59:44 1   their deposition, would have been public.  There would have

09:59:47 2   been no reason to hide it.

09:59:50 3               Most respectfully, Your Honor, in this

09:59:53 4   situation, we don't see how these documents should be highly

09:59:59 5   confidential.  There is a straight linkage, they're relevant,

10:00:04 6   and they will give at least some balm to those folks, those

10:00:11 7   3,000-plus folks who now have updated plaintiff profile forms,

10:00:14 8   as to what really happened here.

10:00:17 9               Thank you, Your Honor, for the opportunity.

10:00:20 10         THE COURT:  Thank you very much.  Thank you.

10:00:22 11               Since you're just seeing this document, too,

10:00:24 12   I'll give you an opportunity to write a reply, if you need it.

10:00:29 13         MS. EIKHOFF:  Thank you, Your Honor.  I appreciate

10:00:30 14   that.

10:00:30 15               The bench book that we have just been handed, we

10:00:35 16   haven't had a chance to review it.

10:00:35 17         THE COURT:  Right.

10:00:37 18         MS. EIKHOFF:  It's the first we're seeing it.  It

10:00:38 19   contains a lot of documents that were not produced by Taishan

10:00:42 20   and seem to come from other sources, and we're going to need a

10:00:45 21   chance to digest that and review it.

10:00:46 22               Based on counsel's arguments, however, it seems

10:00:50 23   that this bench book is being used as a platform to make alter

10:00:56 24   ego arguments that the plaintiffs want to make, and otherwise

10:00:59 25   to cast aspersions on Taishan.

**R O U G H   D R A F T**

10:01:02  1          We understand that's their position.  There is
10:01:05  2     going to be a time and a place for those arguments to be made.
10:01:09  3     It does not strike us that -- on a motion to de-designate
10:01:15  4     confidentiality notations on certain documents under the
10:01:21  5     Court's standing protective order does not seem to be the time
10:01:24  6     and the place to be making such broader allegations and
10:01:29  7     arguments.
10:01:29  8          Now, just to be clear, these documents that are
10:01:35  9     actually at issue in the motion to de-designate are the
10:01:39 10     documents that were produced by Hogan Lovells.  Those documents
10:01:44 11     are discovery materials that are now available for everyone in
10:01:48 12     the case.  All counsel of record get them.
10:01:51 13          So in terms of redaction and, you know, whether
10:01:54 14     other defendants can see them or not, of course, we understand
10:01:58 15     that, under the PTO, this Court's PTO 16, that these are
10:02:03 16     discovery materials that can be used for discovery in this
10:02:06 17     case.  There is no argument about that.
10:02:08 18          We also understand, Your Honor, that you have
10:02:13 19     ruled that certain content of those documents are not
10:02:18 20     privileged.  The privilege, any privilege that may have
10:02:21 21     protected them has been removed by this Court's ruling, and we
10:02:25 22     absolutely understand that.
10:02:27 23          It does not follow, however, Your Honor, that
10:02:31 24     just because they are no longer privileged for purposes of this
10:02:33 25     litigation, that they no longer have any confidentiality

**R O U G H   D R A F T**

10:02:37  1    protection under PTO 16 and under Rule 26(c).

10:02:41  2                Rule 26(c) and your protective order,

10:02:46  3    Your Honor, recognize that there is a difference between

10:02:49  4    privilege and confidentiality.  Of course, the parties may

10:02:54  5    designate certain documents as confidential that are not

10:02:57  6    privileged documents.

10:02:59  7                When these documents were produced by

10:03:01  8    Hogan Lovells, they were deemed by Hogan to be designated as

10:03:06  9    highly confidential, and they were so designated.

10:03:10 10                The PSC has moved, the plaintiffs have moved to

10:03:14 11    remove that -- have moved to have that highly confidential

10:03:19 12    designation removed, and we object to that because we do

10:03:23 13    believe that these are documents that, although they can be

10:03:27 14    freely used for purposes of this litigation among counsel and

10:03:30 15    among parties, that they are discovery materials that do have

10:03:35 16    confidential and proprietary information, business

10:03:39 17    communications, communications made with attorneys with an

10:03:43 18    expectation of confidentiality, and for those reasons we

10:03:47 19    believe that they were properly designated.

10:03:49 20                Now, I would like to direct the Court's

10:03:53 21    attention to the Supreme Court case *Seattle Times v. Rhinehart*,

10:03:59 22    which is 467 US 20.  In that case, the Supreme Court has ruled

10:04:05 23    that discovery materials are a horse of a different color from

10:04:10 24    other materials that are subject to open courts and

10:04:14 25    First Amendment issues.

**R O U G H    D R A F T**

10:04:15 1          Just because a document is produced in discovery

10:04:20 2     does not mean that it becomes automatically a public record,

10:04:23 3     which is what the plaintiffs are arguing.

10:04:27 4          So those are generally our arguments and our

10:04:30 5     position on keeping the designation as it is currently

10:04:33 6     designated, which we think creates no restriction on the use --

10:04:37 7     would create no restriction on use for depositions, but simply

10:04:41 8     just prevents it from becoming a document that is a public

10:04:45 9     document and could be widely disseminated through the press or

10:04:49 10    otherwise.

10:04:49 11         THE COURT:  You want these documents kept under seal,

10:04:51 12    is that it?

10:04:53 13         MS. EIKHOFF:  Yes, Your Honor, because once they are

10:04:55 14    filed in PACER, it essentially does become a public document.

10:04:55 15         THE COURT:  Right.

10:05:00 16         MS. EIKHOFF:  So we understand that the documents are

10:05:02 17    being used for purposes of this litigation.  We received from

10:05:07 18    the parties, the other side, the unredacted versions, and we

10:05:12 19    can deal with that.  The Court receives unredacted.

10:05:12 20         THE COURT:  Right.

10:05:16 21         MS. EIKHOFF:  But for what gets published on the web,

10:05:18 22    that would be protected from public consumption.

10:05:21 23         THE COURT:  Now, what happens if a deposition is taken,

10:05:23 24    and the document is used in a deposition; or, if a trial

10:05:26 25    proceeds, and the document is used in trial?  What would you

**R O U G H   D R A F T**

10:05:32  1    say to that?  Keep the trial private, too?

10:05:38  2         MS. EIKHOFF:  Well, Your Honor, the PTO does address

10:05:40  3    that, Your Honor, and so we would follow the procedures that

10:05:42  4    are set forth in the PTO.

10:05:44  5         Respectfully, we'll cross that bridge when we

10:05:47  6    come to it.  I mean, I understand that that does change the

10:05:50  7    analysis; but, to date, they have not been introduced into any

10:05:57  8    trial.

10:05:57  9         Really, the motion that we're dealing with is a

10:06:01 10    motion to say these documents are not entitled to any

10:06:05 11    confidentiality protection for any purposes.  Since they've

10:06:11 12    been produced in discovery, they must become public documents,

10:06:14 13    and we don't believe that's appropriate.

10:06:16 14         THE COURT:  Okay, I understand your argument.

10:06:19 15         MR. HERMAN:  A short rebuttal.

10:06:20 16         May it please the Court, I don't think a highly

10:06:23 17    confidential designation can cover up a fraud.

10:06:26 18         Secondly, I don't think embarrassment by what

10:06:29 19    you've done is enough to assert something is highly

10:06:35 20    confidential and nonprivileged.

10:06:35 21         Lastly, most of these documents were published

10:06:40 22    in English and circulated by these parties.  For example, in

10:06:48 23    2006, CNBM had a public offering in -- that was published, and,

10:06:58 24    indeed, they attracted shareholders, potential shareholders.

10:07:05 25         This isn't a question of discovery.  It's a

R O U G H   D R A F T

10:07:09  1   question of notice.  Who knew, when did they know, and how were
10:07:14  2   they related to a decision, number one, to distribute defective
10:07:22  3   drywall that they knew was defective in the United States,
10:07:26  4   which was not previously disclosed, and is not a privileged --
10:07:30  5   or deprivileged document; and, when did -- when did they make a
10:07:40  6   determination that they were going to ignore, on the basis of
10:07:44  7   some legal counsel, that United States law, judgments of this
10:07:53  8   Court would not apply.
10:07:56  9           There is a bigger issue here that extends beyond
10:07:59 10   the case, and that is the fact that a United States
10:08:05 11   manufacturer is held to a defective product balancing the
10:08:14 12   books, but a Chinese manufacturer is not.  I think, to keep
10:08:19 13   that document -- or those documents that are Hogan Lovells'
10:08:26 14   deprivileged documents because they may prove embarrassment or
10:08:31 15   because they contradict what Taishan was saying is just not
10:08:37 16   proper, Your Honor.  Thank you.
10:08:38 17           THE COURT:  I understand your argument, both sides.
10:08:42 18           MR. FENTON:  May I say something?
10:08:43 19           THE COURT:  I'll give you an opportunity, too, as I
10:08:46 20   said, to supplement your brief because you've just seen these
10:08:50 21   documents.
10:08:50 22           MR. FENTON:  Rick Fenton, Your Honor, on behalf of
10:08:53 23   BNBM.
10:08:53 24           I had not planned on addressing this motion this
10:08:56 25   morning, but Mr. Herman did make a couple of remarks in his

**R O U G H   D R A F T**

10:08:59  1    opening statements that I think I do need to address.

10:09:02  2           I would like to direct the Court's attention to

10:09:04  3    tab 21, which is the document that Mr. Herman said evidences

10:09:10  4    some core knowledge of BNBM -- I'm not sure which BNBM entity

10:09:18  5    he's talking about because they are very different entities --

10:09:20  6    about the problems with the drywall.

10:09:22  7           As I was looking at the document, Your Honor, it

10:09:26  8    was produced by Guardian Building Products.  There is a mention

10:09:31  9    of ASTM testing, but neither of the substantive e-mails are

10:09:38 10    shown, unless I'm missing something, as having gone to BNBM or

10:09:43 11    any of the other Chinese companies.

10:09:45 12           The other thing that caught my eye is that at

10:09:50 13    the very end -- and Mr. Herman referred to the business card of

10:09:53 14    a person at BNBM Company, Ltd, but I noticed that on the Bates

10:10:02 15    numbering, that business card is entirely out of sequence with

10:10:07 16    the other documents, the e-mails that were referenced.

10:10:11 17           Specifically, the first two e-mails, which did

10:10:15 18    not go to anybody at BNBM, they are Bates number of GBT 925 and

10:10:22 19    924, respectively, the Bates number on the business card is GPT

10:10:29 20    7912.

10:10:30 21           Now, I don't know how these documents got

10:10:35 22    arranged in this order, but I think it is -- and the next

10:10:37 23    business card is 7914 -- but I think it's fair to say that it

10:10:43 24    raises some questions about the statement that this is somehow

10:10:47 25    evidence of prior knowledge by BNBM.

                              R O U G H   D R A F T

10:10:50 1               I wanted to make that very clear.  This is the

10:10:53 2  first time I've seen these documents, Your Honor.

10:10:54 3        THE COURT:  No, I appreciate it.

10:10:55 4               Well, in your argument, then, you wouldn't have

10:10:56 5  any objection to 924 and 925 being removed as confidential,

10:11:02 6  since they don't apply to you?

10:11:04 7        MR. FENTON:  Your Honor, these are not the Hogan

10:11:08 8  documents, I don't believe.  These are -- were, I believe, in

10:11:11 9  the notebook.

10:11:12 10             I think the point that Mr. Herman was trying to

10:11:14 11  make is that, based on what he said was the foreknowledge of

10:11:20 12  these companies, the public has a right to know.  I'm saying

10:11:22 13  I'm taking some issue, at least based on these documents, with

10:11:26 14  that assertion.

10:11:26 15        THE COURT:  No, I understand.  Yes.

10:11:27 16             So these may not be -- no one may mind these

10:11:35 17  being removed from confidential since they don't apply to --

10:11:43 18        MR. FENTON:  Your Honor, I really don't know what these

10:11:46 19  documents are, and I don't know whether they are still

10:11:47 20  confidential.  I just don't know.

10:11:49 21        THE COURT:  I understand.  All right.  Okay.

10:11:49 22        MR. FENTON:  Thank you, Your Honor.

10:11:52 23        THE COURT:  I got it.

10:11:53 24             I will take this under advisement.  I'll give

10:11:57 25  you five days to do that, and two days for response, if

**R O U G H   D R A F T**

| | | |
|---|---|---|
| 10:12:00 | 1 | plaintiffs need it. |
| 10:12:03 | 2 | Another argument that I have, too, is the |
| 10:12:10 | 3 | alternate service that's being made. |
| 10:12:18 | 4 | MS. DUGGAN: Good morning, Your Honor. Sandra Duggan |
| 10:12:21 | 5 | for the Plaintiffs' Steering Committee. |
| 10:12:23 | 6 | Nine months ago, the Plaintiffs' Steering |
| 10:12:25 | 7 | Committee filed its Complaint Omnibus 19, and the defendant in |
| 10:12:29 | 8 | that complaint, the principal defendant is the State-Owned |
| 10:12:32 | 9 | Assets Supervision and Administration Commission for the |
| 10:12:35 | 10 | People's Republic of China, which we refer to as SASAC. |
| 10:12:41 | 11 | We proceeded to serve SASAC under the |
| 10:12:43 | 12 | Hague Convention. The steps that we took are set forth in the |
| 10:12:48 | 13 | affidavit of our agent, APS International. It took us about |
| 10:12:51 | 14 | six months, until February 3rd of 2015, for the Ministry of |
| 10:12:58 | 15 | Justice over in China to reject service. The Ministry invoked |
| 10:13:02 | 16 | Article 13 of the Hague, said it would infringe on the |
| 10:13:06 | 17 | sovereignty of China, and also told us that SASAC is an agent |
| 10:13:09 | 18 | of the government. |
| 10:13:10 | 19 | So based on that statement, we sought the |
| 10:13:14 | 20 | Court's intervention to use the service provisions of the |
| 10:13:17 | 21 | Foreign Sovereign Immunities Act at Section 1608, 28 USC |
| 10:13:17 | 22 | Section 1608(b). |
| 10:13:24 | 23 | Now, we understand that CNBM has objected and |
| 10:13:29 | 24 | said we should have proceeded under 1608(a). |
| 10:13:33 | 25 | Whether SASAC is a foreign state or an agent of |

**R O U G H   D R A F T**

10:13:35 1   a foreign state really doesn't matter at this point because the

10:13:38 2   statute sets forth a hierarchy of steps that must be followed.

10:13:42 3        Step one is, if there's a special arrangement

10:13:44 4   between a plaintiff and the defendant, we follow that.  We

10:13:46 5   don't have any special arrangement.

10:13:46 6        THE COURT:  Right.

10:13:48 7        MS. DUGGAN:  Step two is you proceed under the

10:13:49 8   Hague Convention.  We've done that.

10:13:51 9        We're interested in strictly complying with the

10:13:53 10  statute.  So now we're at Step 3.  Step 3, if they are a

10:13:57 11  foreign state, would suggest that the Clerk of the Court can

10:14:02 12  dispatch notice of the suit, which the Fifth Circuit has said

10:14:05 13  is a brief paragraph explaining what the suit is about, by any

10:14:09 14  form of mail that requires a signed receipt upon the Ministry

10:14:13 15  of Foreign Affairs.

10:14:14 16       We don't think that's the subsection that we

10:14:17 17  should be proceeding under, but, at this point, we're willing

10:14:20 18  to do both.

10:14:21 19       If SASAC is an agent, which they've told us they

10:14:25 20  are, then we need to proceed under any forum that is designed

10:14:31 21  to give them actual notice.  That could be the Clerk of the

10:14:34 22  Court dispatching the summons and the complaint by any form of

10:14:38 23  mail that would give us a signed receipt.

10:14:40 24       THE COURT:  How about if they are the government?

10:14:44 25       MS. DUGGAN:  If they are the government, then 28 USC

**R O U G H   D R A F T**

10:14:47  1    1608(a) would apply.

10:14:48  2         THE COURT:  Would they have immunity if they are the

10:14:51  3    government?

10:14:51  4         MS. DUGGAN:  Well, we're going to argue that they don't

10:14:54  5    because, under the exception to the Foreign Sovereign

10:14:56  6    Immunities Act, our argument is that a foreign state shall not

10:14:59  7    be immune from the jurisdiction of the Courts of the

10:15:01  8    United States or of the states in any case in which the action

10:15:05  9    is based upon an act outside the territory of the United States

10:15:08 10    in connection with a commercial activity of the foreign state

10:15:12 11    elsewhere that causes a direct effect in the United States.

10:15:16 12    That's at 28 USC 1605(a)(2).

10:15:19 13         The statute defines commercial activity as

10:15:22 14    either a regular course of commercial conduct or a particular

10:15:26 15    commercial transaction or act, and that's at 1603(d).

10:15:30 16         The allegations in our complaint suggest that

10:15:35 17    this is a commercial activity that has had a direct impact on

10:15:41 18    4,000 plaintiffs with Taishan drywall on their property.

10:15:44 19         THE COURT:  Let me hear from the respondent.  Any

10:15:49 20    argument on the other side?

10:15:54 21         MR. TAYLOR:  Not from us.

10:15:58 22         MR. STENGEL:  No, Your Honor.  As the motion was

10:15:58 23    originally styled, they were seeking to serve SASAC through us,

10:16:01 24    counsel for CNBM.  As I understand where the PSC is now, they

10:16:07 25    have abandoned or withdrawn that aspect, so we have no interest

**R O U G H   D R A F T**

10:16:09 1    in the resolution of this issue.

10:16:11 2          MS. DUGGAN:  I just want to point out, Your Honor, in

10:16:13 3    our surreply that the Court granted us permission to file, at

10:16:17 4    Rec Doc 18679-3, we submitted a revised proposed order that

10:16:22 5    would use both prongs of the statute, (a) and (b), as a means

10:16:26 6    to achieve service at this point.

10:16:29 7          THE COURT:  Yes.  We're talking about service, we're

10:16:31 8    not really talking about the substance of it.  It seems that

10:16:35 9    the two -- the fact that they are served doesn't mean that they

10:16:41 10   are engaged in a commercial activity or not engaged in a

10:16:45 11   commercial activity, but it seems to me that the service, we've

10:16:50 12   got to allow service to get them here.  That was my thinking

10:16:53 13   originally.  So I deny any opposition to it.  Go with the

10:17:00 14   service.

10:17:01 15         MS. DUGGAN:  Thank you so much, Your Honor.  We will

10:17:03 16   provide all the proper documents to the Clerk of Court.

10:17:05 17         THE COURT:  As a courtesy to counsel, give counsel --

10:17:08 18   not that it means anything, but at least a courtesy copy of

10:17:11 19   whatever you're going to do.

10:17:13 20         MS. DUGGAN:  We will do that.

10:17:15 21         THE COURT:  You can give it to Taishan, so they can do

10:17:17 22   it, so that there is no issue of accepting something and

10:17:22 23   violating any responsibility to your client.

10:17:31 24         MR. HERMAN:  May it please the Court.

10:17:31 25         THE COURT:  Yes.

**R O U G H   D R A F T**

| | |
|---|---|
| 10:17:32 1 | MR. HERMAN:  I was advised after the first part of the |
| 10:17:34 2 | status conference that a Garretson representative was here to |
| 10:17:39 3 | report on the Virginia settlements.  If Your Honor would |
| 10:17:47 4 | entertain that, I don't think it will take much time. |
| 10:17:49 5 | THE COURT:  Sure.  Okay. |
| 10:17:52 6 | MS. BARRIOS:  Good morning, again, Your Honor. |
| 10:17:56 7 | Dawn Barrios, on behalf of Garretson Resolution Group. |
| 10:18:00 8 | Mr. Bower was here.  He had to leave to catch |
| 10:18:02 9 | his plane.  He asked me just to give you a brief summary of his |
| 10:18:06 10 | report. |
| 10:18:06 11 | The real property damage portion of their |
| 10:18:10 12 | settlements, out, paid, everything done. |
| 10:18:13 13 | The other loss determinations have gone out in |
| 10:18:16 14 | the mail, and they expect to have everything wrapped up within |
| 10:18:20 15 | 90, 120 days, depending on if there is any appeals. |
| 10:18:23 16 | THE COURT:  How many residences are we talking about? |
| 10:18:27 17 | MS. BARRIOS:  Between three and four hundred. |
| 10:18:29 18 | THE COURT:  Thank you. |
| 10:18:32 19 | Okay.  Those are the cases that we tried.  They |
| 10:18:37 20 | were very helpful to us in the whole litigation.  I'm glad that |
| 10:18:44 21 | the Virginia matters, at least at this level, were taken care |
| 10:18:46 22 | of.  I know they have some other issues that are still |
| 10:18:48 23 | outstanding, but we'll have to deal with those. |
| 10:18:51 24 | I also understand that we have a claimant in the |
| 10:18:56 25 | audience.  Do you wish to say something, ma'am?  Come forward. |

**R O U G H   D R A F T**

10:19:02  1          One of the things I do, in having these open

10:19:08  2     court matters, is that I put all of this on my website, so that

10:19:14  3     all of the litigants, as well as their lawyers, know that they

10:19:17  4     have access to the Court.

10:19:19  5          So this is --

10:19:20  6          MS. FERCHAUD:  Yes, Your Honor.  My name is

10:19:21  7     Jodi Ferchaud.  I spoke with you last month.

10:19:21  8          THE COURT:  Right.

10:19:25  9          MS. FERCHAUD:  Since that last meeting, I have met with

10:19:29 10     Phil Adams and also Tim Harris of Moss Construction, and we

10:19:34 11     have made progress, serious progress in remedying the problems.

10:19:40 12          We're not completely finished.  Nothing is in

10:19:42 13     writing and signed off on, but we're continuing to work out the

10:19:46 14     details.

10:19:46 15          What I'm here for today is I'm here to plead

10:19:49 16     with the Court for lost rents or some sort of form of financial

10:19:54 17     relief.  I've been here since December 15th.  I haven't

10:19:59 18     received rents on the right side of the property since January

10:20:03 19     of 2014; and, the left side, the tenant -- one tenant moved

10:20:09 20     out, like right before the kickoff party.

10:20:12 21          I thought that I qualified for lost rents.  I

10:20:16 22     filled out everything that I was supposed to fill out.  Then, I

10:20:20 23     was told that I signed a release.  I'm not exactly sure or I

10:20:25 24     wasn't familiar with the nuances of that settlement agreement,

10:20:29 25     but if I signed a release to negate what I thought I was

**R O U G H   D R A F T**

10:20:37 1  actually qualified for, it was my mistake.

10:20:41 2           So I'm asking the Court to consider that, you

10:20:44 3  know, I haven't received the rents.

10:20:47 4           I haven't been home -- I live in Hawaii.  I

10:20:50 5  haven't been home, I haven't seen my daughter in four months.

10:20:53 6  I'm hoping that we can resolve all of the issues, but --

10:20:57 7           THE COURT:  You're still in the discussion phase.

10:21:01 8           Mr. Balhoff, if you want to say anything about

10:21:05 9  this one.  Are you all talking and working toward some

10:21:07 10 resolution?

10:21:07 11          I know he has his mediator hat on at this time.

10:21:09 12          MR. BALHOFF:  Yes, Your Honor.

10:21:15 13          My name is Dan Balhoff.  I'm the Court-appointed

10:21:22 14 mediator and also the Special Master.  As Your Honor said, for

10:21:25 15 the time being I have my mediator hat on.

10:21:29 16          I've explained to Ms. Ferchaud that I'm trying

10:21:32 17 to mediate this matter for the time being.  If it doesn't

10:21:35 18 succeed, I will put my Special Master hat on and make any

10:21:40 19 decisions that are called upon -- that I'm called upon to make.

10:21:43 20          The parties have been working together.  I've

10:21:46 21 been speaking with the parties.  I spoke to them, as a matter

10:21:50 22 of fact, outside the courtroom just now.

10:21:53 23          As I understand it, Ms. Ferchaud is asking for

10:21:56 24 something beyond what she is discussing with Moss.  She's

10:22:00 25 asking for a remedy from the Court of some monetary figure.  I

**R O U G H   D R A F T**

10:22:06   1   told her that, until called upon as Special Master, I'm in no

10:22:13   2   position to award her any money.

10:22:14   3        THE COURT:  Yes.  We have a process, ma'am, of doing

10:22:19   4   this.  You make a claim, and the Special Master looks at it and

10:22:24   5   discusses it and then rules on it, and then it comes to me, but

10:22:27   6   we've got to go through the process.

10:22:29   7             But I'm glad that you're able, at least, to work

10:22:31   8   out some -- I understand, it's been reported to me that you all

10:22:36   9   have made progress with Moss.

10:22:36  10        MS. FERCHAUD:  Yes, sir.

10:22:38  11        THE COURT:  I appreciate Moss' work, and I appreciate

10:22:41  12   yours, too.

10:22:41  13        MS. FERCHAUD:  Thank you.

10:22:41  14        THE COURT:  Thank you very much for bringing it to my

10:22:54  15   attention.

10:22:54  16             Anything else from anyone?

10:23:01  17        MS. EIKHOFF:  Yes, Your Honor.

10:23:03  18        THE COURT:  Yes.

10:23:04  19        MS. EIKHOFF:  Your Honor, on behalf of Taishan, I

10:23:12  20   wanted to seek clarification from the Court on a minute entry

10:23:18  21   that was entered for the April 7th discovery telephonic

10:23:25  22   conference that we had.

10:23:26  23             For about two weeks now, Your Honor, we have

10:23:29  24   been asking for -- for purposes of the damages discovery and

10:23:34  25   getting ready for the damages hearing, we have been asking for

**R O U G H   D R A F T**

10:23:39  1   raw data and information from BrownGreer and the Garretson
10:23:45  2   Group, which we believe are highly relevant to damages, that
10:23:48  3   includes actual remediation information from Moss & Associates,
10:23:54  4   results of inspections, including identification of which
10:23:58  5   claimants had Taishan drywall, supporting claim information for
10:24:01  6   claimants that are currently identified as being part of the
10:24:04  7   class, and amounts of compensation already received.
10:24:08  8              To be clear, we are not seeking any thoughts,
10:24:11  9   mental impressions, analysis, from any attorneys or from these
10:24:17 10   groups.  We're really just seeking raw data.
10:24:20 11              We filed a Motion to Compel.  We had a hearing
10:24:22 12   on that Motion to Compel.  Your Honor held that that
10:24:26 13   information was discoverable for purposes of damages, but made
10:24:30 14   a notation to say that at this time that Knauf's proprietary
10:24:38 15   information was not discoverable.
10:24:40 16              We've reached out to Mr. Miller.  Knauf did file
10:24:47 17   a paper after we had that conference, and we reviewed it.  The
10:24:50 18   essence of the paper was that it's all proprietary, and
10:24:53 19   therefore Taishan should not be able to get any of it.
10:24:57 20              We have been trying to work this out with
10:25:00 21   Mr. Miller for the last several days.  We have been in pretty
10:25:04 22   frequent communication.  As it stands now, Your Honor, we're
10:25:11 23   almost there, but we have one hurdle that we haven't been able
10:25:14 24   to overcome, and that is a condition that Knauf has placed on
10:25:18 25   their consent to us getting that information.

**R O U G H   D R A F T**

10:25:22  1          We have already agreed that we will pay

10:25:24  2   BrownGreer's and Garretson Group's time and expense associated

10:25:30  3   with gathering this information and sending it to us.  That is

10:25:32  4   not an issue.

10:25:33  5          Knauf has also said that they will refuse to

10:25:35  6   allow us to have any access to this raw data unless Taishan

10:25:40  7   agrees to pay BrownGreer's travel expenses, starting today,

10:25:46  8   related to them coming to the Court to give their presentation

10:25:50  9   to the Court about the status of the Knauf settlement.

10:25:56 10          That strikes us as completely unrelated and not

10:26:00 11   an issue that should be raised as an obstacle to us getting

10:26:05 12   data that every other party in this case has.  From our

10:26:09 13   discussions with the PSC, we have been told that they are

10:26:12 14   working actively with BrownGreer to get these updated plaintiff

10:26:18 15   profile forms, to have that information aggregated and

10:26:21 16   presented to them.  We're the only ones that are locked out of

10:26:25 17   getting this raw data that we need in order to analyze the

10:26:30 18   damages and to prepare our defenses on damages.

10:26:34 19      THE COURT:  Okay.  Just to put this matter in

10:26:39 20   perspective, there was a motion made.  As I try to do, as soon

10:26:44 21   as a motion is made, I try to deal with it immediately.  So I

10:26:46 22   got counsel on the line for the parties that seemed to be

10:26:51 23   involved in this case.

10:26:52 24          Now, oftentimes, in cases of this sort, I just

10:26:55 25   have two sides, the plaintiff and one defendant.  In this case,

**R O U G H    D R A F T**

10:27:00 1    the difficulty is I have 1,000 defendants in this case, in

10:27:05 2    addition to the regular plaintiffs.

10:27:06 3            So when I get people on the line, it's hard for

10:27:09 4    me to get 1,000 defendants.  Many of them have absolutely

10:27:13 5    nothing to do with this issue.  They are installers, they are

10:27:17 6    mom and pop outfits, things of that sort.  They are not even

10:27:20 7    available to talk to the Court.  So -- and many of them don't

10:27:24 8    have attorneys even.

10:27:25 9            So I have to make a judgment and call the

10:27:29 10   people -- I always get two sides to it.  One makes a motion,

10:27:32 11   the other responds to it.  Whoever responds in writing or moves

10:27:37 12   in writing, those are the individuals that I generally get in

10:27:41 13   front of me or on the phone, they talk to me, and I hear from

10:27:45 14   each of them, I have a court reporter there, and I rule

10:27:48 15   immediately.  That's what I did in this situation.

10:27:50 16           But during the argument, it was mentioned to me

10:27:54 17   that Knauf may have some interest in this.  Knauf wasn't on the

10:27:57 18   phone.  So I said, if Knauf has an interest in this, I'm not

10:28:02 19   going to make any decision until I hear from Knauf, to hear

10:28:06 20   what their side of the story is.  So anything that deals with

10:28:12 21   Knauf, I'm going to except from the order.  That's what we're

10:28:17 22   here today for.

10:28:20 23           MR. MILLER:  Thank you, Judge.  Kerry Miller for Knauf.

10:28:22 24           As you pointed out, we actually put in an

10:28:23 25   opposition, I think, as the phone conference was occurring that

**R O U G H   D R A F T**

10:28:26  1   afternoon.  I think it was last week on Monday, maybe.

10:28:29  2        Your Honor, to clarify Knauf's position, first

10:28:32  3   of all, we don't have any problem at all with Garretson

10:28:37  4   providing Taishan and BNBM and CNBM data for Virginia.

10:28:44  5        The reason for that, Your Honor, is because

10:28:45  6   Knauf wasn't involved in Virginia.  We didn't pay for

10:28:49  7   Garretson, we didn't have any homes.  So if Taishan and the

10:28:52  8   plaintiffs can work out an arrangement with Garretson, I don't

10:28:56  9   have any issue with that at all.

10:28:57 10        Secondly, Your Honor, with respect to raw data,

10:29:02 11   which, in my mind, is Taishan plaintiff profile forms that were

10:29:07 12   collected in this MDL, BrownGreer became the central

10:29:12 13   clearinghouse for that collection.  I don't have any problem,

10:29:14 14   as long as Taishan pays for it, with BrownGreer sending Taishan

10:29:20 15   all of the profile forms, the actual pieces of paper.  I think

10:29:23 16   we covered that last time.  No problem with that.

10:29:24 17        Third, I heard Mr. Herman in chambers mention

10:29:28 18   that total square foot data of Taishan claimants had been

10:29:33 19   provided to Taishan.  Again, no problem with that at all.

10:29:38 20        Here are my issues, Your Honor, is when it comes

10:29:42 21   down to BrownGreer, as the administrator of the Knauf

10:29:47 22   settlement and of the settlements that are related to Knauf,

10:29:50 23   the Banner, the InEx and the Global builder and installer

10:29:56 24   settlement -- Your Honor is very familiar as to how they all

10:29:58 25   work together -- the agreement was, with respect to all those

**R O U G H   D R A F T**

10:30:01  1    settlements -- and I think you asked a question when Jake Woody

10:30:05  2    was giving his presentation as to the relationship -- because

10:30:08  3    Knauf receives assignments from homeowners, we have rights to

10:30:11  4    certain of the GBI -- Global, Banner and InEx claims.

10:30:16  5              As part of the negotiation of all those

10:30:18  6    settlements, with all the lawyers who were involved in all the

10:30:21  7    settlements with the PSC, Knauf agreed to pay all the

10:30:26  8    administrative costs of all of those settlements,

10:30:29  9    administrative costs being BrownGreer in this particular

10:30:32 10    instance.

10:30:33 11              So we paid for BrownGreer not only to administer

10:30:36 12    the remediation program, which is more specific to Knauf, but

10:30:42 13    all of the payouts from Banner, from InEx, and from the

10:30:46 14    builders and installers that participated in the settlements.

10:30:51 15    We paid for everything, including the payments to homeowners

10:30:53 16    who made Banner claims and InEx claims and Globals claims who

10:30:58 17    have no Knauf, who have Taishan.  We paid for BrownGreer to cut

10:31:00 18    those checks and process those claims, even though we have no

10:31:04 19    role in those claims at all.  These are participants in GBI who

10:31:08 20    have Taishan.

10:31:09 21              Certainly Knauf is reviewing and analyzing its

10:31:12 22    own claim against Taishan and BNBM and CNBM.  One portion of

10:31:18 23    that claim would be reimbursement of what we've spent, what

10:31:21 24    we've incurred in connection with the administration of

10:31:23 25    Taishan-related claims and damages.

                              R O U G H   D R A F T

10:31:26 1            It would have been terrific if Taishan joined us

10:31:29 2    back in 2010.  We could have worked this out.  We'd pay for the

10:31:33 3    Knauf share, they'd pay for Taishan share.  It would have been

10:31:36 4    easy, but it didn't happen that way.

10:31:39 5            So where I have a problem is when Taishan talks

10:31:41 6    about raw data that BrownGreer possesses, and they spoke

10:31:48 7    specifically about remediation data, they spoke specifically

10:31:50 8    about inspections, the remediation data starts with Moss doing

10:31:54 9    an estimate.  We pay for Moss to do the estimate.  Nobody else

10:31:57 10   pays for Moss to do the estimate.

10:32:00 11           The inspections, there are separate inspection

10:32:02 12   companies that go out and inspect the homes to see what kind of

10:32:05 13   drywall they have in it after they provide qualifying material

10:32:09 14   to Mr. Levin.  We pay the independent inspectors.  We pay the

10:32:14 15   independent inspectors regardless of whether or not it's a

10:32:16 16   Taishan home or a Knauf home or a mixed home.  We pay for that.

10:32:21 17           Opposing counsel made a reference to the other

10:32:23 18   side has the information.  Well, there is a reason why the

10:32:26 19   other side has the information.  We have a contract with the

10:32:28 20   other side to share that information with them.

10:32:32 21           Taishan doesn't have a contract with me.  The

10:32:35 22   only reason the plaintiffs have it is because of the settlement

10:32:38 23   agreement, the contractual relationship.  The negotiations that

10:32:42 24   Knauf had with them is part of a very complicated negotiation,

10:32:47 25   where there was give and take on both sides.

                        R O U G H   D R A F T

10:32:49  1          The proprietary argument that I have,

10:32:53  2   Your Honor, is when you get into -- let me say what else that

10:32:59  3   I'm -- BrownGreer can run summary reports on averages, even on

10:33:03  4   the Knauf side.  What's the average size of a Knauf home that's

10:33:08  5   been remediated, what's the average cost, what are the averages

10:33:12  6   in Florida, what are the averages in Mississippi, what are the

10:33:15  7   averages in Louisiana.

10:33:17  8          I don't have a problem with BrownGreer running

10:33:20  9   that report and giving it to Taishan, if Taishan pays for it,

10:33:24 10   which would give them the useful data I think they are looking

10:33:27 11   for.

10:33:27 12          Where I have a problem, Your Honor, is, is when

10:33:29 13   you look at the 4,000 or so Knauf homes that have been settled

10:33:33 14   in the BrownGreer database, what they told me they wanted when

10:33:37 15   they explained what raw or empirical data meant, they want

10:33:42 16   every piece of information, line by line, homeowner by

10:33:46 17   homeowner, on all those claims.

10:33:48 18          Your Honor, it's inaccurate to say that even the

10:33:52 19   plaintiffs have that information, because the way the

10:33:54 20   BrownGreer portal is set up is one plaintiff lawyer can only

10:33:58 21   look at his clients' claims.  So, Mr. Davis can't look at

10:34:02 22   Mr. Seeger's clients, and Mr. Seeger can't look at Mr. Davis'

10:34:06 23   clients, at that level of detail, because -- Your Honor has

10:34:11 24   worked on these cases for a long time -- what BrownGreer has is

10:34:16 25   it has every piece of information about that homeowner's claim,

10:34:20 1   how much was paid to do this, were there any change orders, how

10:34:24 2   much did they get for rent and relocation, how long did it

10:34:28 3   take, you know, so on and so forth.

10:34:30 4          So what we didn't want to have happen is we have

10:34:32 5   one guy on the street, hey, so how much did your house cost?

10:34:36 6   Well, mine cost $132,000.  The guy down the street, well, it

10:34:41 7   was $104,000.  So that's why only the plaintiff lawyer himself,

10:34:46 8   the way BrownGreer has it set up, can look at the portal of

10:34:48 9   information.

10:34:49 10         What Taishan has specified it wants is it wants

10:34:52 11  the keys to everything.  It wants a line item with 20 or 30

10:34:57 12  fields of data, by address and by home.  That's all been paid

10:35:01 13  for by Knauf, and it's all been handled as proprietary

10:35:04 14  information between the parties to that contract, that

10:35:06 15  individual release, Knauf and that homeowner, and Knauf and

10:35:10 16  that homeowner's counsel.

10:35:12 17         So, like I say, if they want summary

10:35:16 18  information, that's fine, if they pay for it; but, to get the

10:35:18 19  information, line by line, and make that part of the public

10:35:21 20  record, part of what they are doing -- the PSC has made some

10:35:26 21  relevancy objections, I don't think it's relevant either

10:35:28 22  because it's a different set of circumstances -- that's what my

10:35:30 23  -- that's what I mean by proprietary, not my mental

10:35:34 24  impressions, but the consultants that we've paid for, pursuant

10:35:36 25  to a contract with the PSC, that built this machine on a

**R O U G H   D R A F T**

10:35:39  1    line-by-line basis, that's my objection.

10:35:42  2            THE COURT:  I understand.  I understand the issues.

10:35:46  3                    With regard to the Taishan homes, let's provide

10:35:53  4    the Taishan-only homes information.  That's relevant to them.

10:35:56  5                    With regard to the -- and they'll pay for it.

10:36:02  6                    With regard to the mixed homes or the -- I'm

10:36:07  7    mainly concerned about the Knauf homes -- give them the summary

10:36:12  8    information.  Let them pay for that.  Let's get that

10:36:16  9    information first, and see where you are with it.

10:36:19  10                    I'll listen to you.  We're talking about

10:36:21  11   amounts, we're talking about money, and I can deal with money.

10:36:26  12                    Also, let's get together -- do you know the

10:36:32  13   total cost of all of that?

10:36:34  14           MR. MILLER:  Yeah, I think that BrownGreer can tally up

10:36:36  15   what that total cost is.

10:36:37  16           THE COURT:  All right.  Well, we'll get together that,

10:36:38  17   and I'll decide who pays it.  You may well have to pay it.  If

10:36:42  18   you want it, you may have to pay it.  You probably ought to

10:36:46  19   know whether it's $10 or $10 million before you make that

10:36:48  20   decision.

10:36:48  21           MR. MILLER:  The total cost of what Knauf has paid

10:36:49  22   BrownGreer and the others, Your Honor?

10:36:49  23           THE COURT:  Yes.

10:36:51  24           MR. MILLER:  Yes.  I mean, that's what the issue is,

10:36:52  25   and that's why, at one point, I made the request, really before

**R O U G H   D R A F T**

10:36:54  1   I understood what the data request was, was for these services,

10:36:59  2   Knauf and BrownGreer entered into a fixed rate contract for

10:37:03  3   fees.  So it's set.  BrownGreer has reached that amount of

10:37:08  4   work.  It's $2.5 million, Your Honor, is what we've paid just

10:37:12  5   for BrownGreer, but then they are talking about Moss, then they

10:37:15  6   are talking about the inspection companies, so that's on top of

10:37:18  7   that.

10:37:20  8        The ombudsman, the *pro se* cure, I mean, you

10:37:22  9   know, the list goes on and on and on and on and on.  All that

10:37:25 10   data is captured by BrownGreer because they are the central

10:37:29 11   clearinghouse.  So there's more than that --

10:37:29 12        THE COURT:  Well, some of it may not be necessary.  I

10:37:32 13   mean, it doesn't seem to me to be necessary.  If you've got the

10:37:35 14   square footage, if you've got the general average, if you've

10:37:39 15   got all of the Taishan homes -- you know, if you need any

10:37:45 16   additional information after you get all of that, I'll talk

10:37:51 17   with you about it, and I'll see who bears the cost for that.

10:37:57 18        MR. MILLER:  Thank you, Judge.

10:37:58 19        THE COURT:  All right.  Thank you both.

10:37:58 20        Anything else?

10:37:59 21        All right.  Folks, thank you very much.  I'll

10:38:01 22   see you next time.

10:38:03 23        THE DEPUTY CLERK:  All rise.

         24        (WHEREUPON, at 1:27 p.m., the hearing was concluded.)

         25

                         R O U G H   D R A F T

 1                          Warning!

 2          This realtime ROUGH DRAFT of proceedings is produced in

 3     instant form.  There will be discrepancies in this form and the

 4     final form because the instant form has not been edited,

 5     proofread, corrected, finalized, certified, indexed, or bound.

 6     There will also be a discrepancy in page and line numbers

 7     appearing on the instant ROUGH DRAFT and the edited, proofread,

 8     corrected, finalized, certified, indexed, and bound transcript.

 9

10                          Agreement

11          I agree on behalf of myself, my law firm and client

12     that purchase, acceptance and/or use of the first-pass ROUGH

13     DRAFT constitutes acceptance of this agreement.

14          I further agree on behalf of my law firm and client to

15     use the instant form of the proceedings only as lawyer's notes,

16     not to be cited as a reporter's edited, proofread, corrected,

17     certified transcript of proceedings.

18          I further agree on behalf of my law firm and client not

19     to give, share, copy, fax, scan or in any way whatsoever

20     distribute the instant form of the proceedings.

21                    _____

22                    _____

23                    _____

24                    _____

25                    _____

                    **R O U G H   D R A F T**

1                          Warning!

2           This realtime ROUGH DRAFT of proceedings is produced in

3    instant form.  There will be discrepancies in this form and the

4    final form because the instant form has not been edited,

5    proofread, corrected, finalized, certified, indexed, or bound.

6    There will also be a discrepancy in page and line numbers

7    appearing on the instant ROUGH DRAFT and the edited, proofread,

8    corrected, finalized, certified, indexed, and bound transcript.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25