IN THE CIRCUIT COURT OF THE 11 JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

LORENZO ALVAREZ and
his wife, FRANSISCA SALAS

     Plaintiffs,

v.

MANDY'S DRYWALL & STUCCO CORPORATION,
A Florida corporation, BANNER SUPPLY CO,
A Florida corporation.

     Defendants.

_____/

CIVIL DIVISION 12-35021CA 20

CASE NUMBER:

## COMPLAINT AND ACTION FOR DAMAGES

COMES NOW the Plaintiff Lorenzo Alvarez, and his Wife Fransisca Salas by and through the undersigned counsel and files this as their Complaint and Action for Damages. As grounds therefore it is alleged:

1.    This is a Complaint and Action for Damages for a sum in excess of Fifteen Thousand Dollars ($15,000.00) and within the jurisdiction of this Honorable Court.

2.    The Plaintiff Lorenzo Alvarez and his Wife Fransisca Salas are the owners of 172 NW 17th Street, Homestead, Florida.

3.    All transactions and occurrences which are the subject matter of this cause of action relate to the property located at 172 NW 17th Street, Homestead, Florida.

4.    The Defendants are Florida corporations doing business in South Florida and are known as follows:

        A.    The Defendant Mandy's Drywall & Stucco Inc. is a Florida corporation authorized and licensed to do drywall and stucco work in Miami-Dade

County, Florida where it maintains its principal place of business. Civil litigation in other matters has demonstrated it acquired the Chinese drywall in issue from the Co Defendant named below.

    B.    The Defendant Banner Supply Co. Is a Florida corporation authorized and licensed to sell building materials in Miami Dade County, Florida.

5.    Defendants' drywall used in Plaintiff's above described home was inherently defective because it emits various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors, and causes corrosion ("the Defect") of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

6.    The Plaintiffs contracted and hired the Defendant Mandy's Drywall & Stucco Inc. to acquire and to install drywall for walls and ceilings in their property located in Homestead, Florida.

7.    Upon recent discovery, the Defendant Mandy's Drywall & Stucco Inc., used as its supplier Banner Supply Co. and was found to have acted jointly with Mandy's so as to cause the installation of drywall as described in Exhibit A attached hereto and commonly known as "Chinese Drywall."

8.    These below described Defects are latent and existed in Defendants' drywall at the time of installation regardless of the way the product was installed, maintained, and/or painted.  There is no repair that will correct the defect.

9.    Upon recent discovery and confirmed belief, the subject drywall installed by Defendant Mandy's Drywall & Stucco Inc. is a deleterious and hazardous material

particularly when installed in a residential home such as when it was installed in the Plaintiff's above home in Miami-Dade County, Florida.

10.     At all times material, the Plaintiffs were informed that the drywall which the Plaintiff hired the Defendant Mandy's Drywall & Stucco Inc. to install was proven and reliable as a base for walls and ceilings in residential properties.

11.     Upon knowledge and confirmed belief, the drywall installed by Mandy's Drywall & Stucco Inc. is as described, inspected tested and as set forth in Exhibit A.

12.     The Plaintiffs are of the belief that Mandy's Drywall & Stucco Inc. purchased the materials set forth and described in Exhibit B from Banner Supply Co.

13.     Defendant Banner Supply is a Florida corporation with its principal place of business located in Florida at 7195 N.W. 30th Street, Miami-Dade County, Florida 33122.

14.     The Plaintiffs purchased drywall from this Defendant for the purpose of finishing the interior walls and ceilings of their new home located at 16705 S.W. 300 Street Homestead, Florida.

15.     The Defendant Mandy's Drywall & Stucco Inc. was the vendor who while in privity with the Plaintiff, sold drywall product which the Defendant selected for installation in the Plaintiff's home.

16.     The particular product had a latent design or manufacturing defect unknown to the Plaintiffs which rendered the drywall such as to not be fit and proper for interior installation in a residential home such as Plaintiff's home..

17.     Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, Sheetrock, Gyproc, or simply board.

18.     A drywall panel is made of a paper liner wrapped around an inner core made

primarily from hardened gypsum plaster.

19.    Drywall is typically available in 4 ft (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process.

20.    The most commonly used drywall is one-half-inch thick but can range from one quarter (6.35 mm) to one inch (25.4 mm) thick.

21.    The core material of drywall, gypsum, is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade.

22.    Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown, or pink.

23.    Synthetic gypsum is generally manufactured with byproducts of coal-fired powerplants.

24.    Coal combustion byproducts ("CCBs" or "CCPs") are the inorganic residues that remain after pulverized coal is burned.

25.    The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

26.    In order to meet emission standards, many utilities have installed flue-gas-desulfurization (FGD) equipment.  Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning powerplants.

27.    As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

28.    In order to form drywall, gypsum must be "calcined," or partially dehydrated by heating.

29.    When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

30.    The gypsum powder is then mixed with water to form a paste or slurry.

31.    While the hemihydrate gypsum plaster is in slurry form, it is poured between two paper layers to make drywall.

32.    Drywall is formed by sandwiching a core of wet gypsum between two sheets of heavy paper or fiberglass mats.  When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

33.    The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

34.    Drywall may consist of two other materials with sulfur content:  alkyl ethoxy sulfates as foaming agents and lignin or napthalene sulfonates as dispersing agents.  The Defective Drywall Emits Noxious and Corrosive Levels of Sulfur.

35.    Upon information and belief, Defendants' drywall contained naturally mined gypsum and synthetic gypsum manufactured from CCBs.

36.    When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

37.    The problem of sulfide emissions from drywall is well-understood in the drywall industry and has been studied for many years.

38.    The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.  The product sold and installed by Mandy's Drywall & Stucco Inc. as sold by Banner Supply Co had these dangerous and deleterious substances and conditions.

## COUNT 1 - CLAIM FOR STRICT PRODUCT LIABILITY AGAINST MANDY'S DRYWALL & STUCCO INC.

39.    The plaintiffs reaver and reallege the allegations in paragraphs 1 through 38.

40.    As a direct and proximate result of the Defendant Mandy's Drywall & Stucco Inc. selling to the Plaintiffs an unreliable product which was not fit for the ultimate purpose, the Plaintiffs suffered injuries, damages and claims as follows:

A.    Cost of removal of drywall;

B.    Cost of replacement of drywall with proper drywall;

C.    Removal of air conditioning equipment and ducts;

D.    Removal of all other interior products as would have sustained damage as shown in Exhibit A.

E.    Loss of use and depreciation of the home;

F.    Reconstruction cost which exceeds the initial construction cost as the previously installed components must be removed;

G.    Cost of upkeep of a home which the Plaintiff is unable to inhabit and the cost of insurance, real estate taxes, mortgage and maintenance of the property which is unfit for habitability;

H.    Personal injury to the Plaintiff and/or his family from inhaling the deleterious substances set forth in Exhibits A and B.

41.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

42.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

43.     Defendants knew or should ha ve known that their wrongful acts and omissions would result in economic, incidental, and consequential damages in the manner set forth herein.

44.     The aforementioned damages, loss of use, construction and reconstruction cost would not have occurred but for the Defendant having sold the Plaintiff a defective product, i.e. Chinese drywall for which there is strict liability.

Wherefore the Plaintiffs prays for a trial by jury, damages, court costs and such other relief as this Court deems just.

## COUNT 2 - CLAIM AGAINST MANDY'S DRYWALL & STUCCO INC. FOR BREACH OF CONTRACT

45.     The Plaintiffs reaver and reallege the allegations in paragraphs 1 through 38.

46.     When the Defendant took on construction and installation of drywall, the Defendant took on the contractual duty to install drywall as would be fit for the particular purpose, and would be installed with a proper product in a workmanlike manner.

47.     This Defendant did not install a proper drywall product which had a reliable performance record and in the alternative, installed the Chinese drywall described in Exhibits A and B above.

48.     This Defendant charged the Plaintiffs and the Plaintiffs paid this Defendant for proper installation of drywall which was to have been but was not fit for the particular purpose.

49.     The installation effected by the Defendant herein was not only at substantial cost to the Plaintiff, but was also utterly worthless and additionally caused damage to the Plaintiff's home described above.

51.     The above described damages would not have occurred but for the Defendant herein having installed defective Chinese drywall described above.  That installation was a breach of contractual duties and proximately caused the damages described above.

Wherefore the Plaintiff prays for a trial by jury, damages, court costs, and such other relief as this Court deems just.

### COUNT 3 - CLAIM AGAINST BANNER SUPPLY CO.

52.     The Plaintiff reavers and realleges the allegations in paragraphs 1 through 38.

53.     Defendant Banner Supply exported, imported, distributed, delivered,

supplied, inspected, marketed, and/or sold defective drywall in the State of Florida. Directly or indirectly through agents, affiliates or co-conspirators, Defendant Banner Supply's acts or omissions related to defective Drywall have injured Plaintiffs as alleged herein.

54.    At all times relevant hereto, Defendants were in the business of exporting, importing, distributing, delivering, supplying, inspecting, marketing, and/or selling drywall for sale to the general public.

55.    The drywall, including that installed in the home of Plaintiffs, were placed by Defendants in the stream of commerce.

56.    Defendants knew that the subject drywall would be used without inspection for defects by consumers.

57.    Defendants intended that the drywall reach the ultimateconsumer, such as Plaintiffs. This deleterious product  was installed in their home.

58.    When installed in the Plaintiffs home, the drywall was in substantially the same condition it was when Defendants distributed, supplied, sold, and/or delivered it.

59.    At all times relevant hereto, the subject drywall was used in a manner consistent with the uses intended by, or known to Defendants, and in accordance with the Defendants' directions and instructions.

60.    The subject drywall was not misused or altered by any third parties, or Plaintiffs.

61.    The drywall was defectively manufactured, designed, inspected, tested, marketed, distributed, delivered, and/or sold.

62.    The design defect was in designing drywall that allowed high levels of sulfur

and/or other chemicals to emit through off-gassing and damage Plaintiffs' property that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property") and potential health hazards.

63.    The manufacturing defect was in improperly selecting, testing, inspecting, mining, making, assembling, and using, gypsum for drywall with levels of sulfur that were too high and emitted various sulfide gases and/or other chemicals through "off-gassing" that creates noxious, "rotten egg-like" odors for drywall that caused corrosion of air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items ("Other Property").

64.    The drywall was also defective because it was improperly exported, imported, distributed, delivered, supplied, inspected, marketed, and/or sold in a defective condition, as described above.

65.    The defective manufacturing, designing, inspecting, testing, marketing, distributing, and selling of the drywall rendered it unsafe and unreasonably dangerous for its intended use and to the Plaintiffs.

66.    The drywall is also defective and unreasonably dangerous because Defendants failed to adequately warn and instruct the Plaintiffs of the design, inspection, testing, manufacturing, marketing, and selling of the drywall.

67.    Plaintiffs  were unaware of the unreasonably dangerous propensities and defective condition of the-drywall, nor could Plaintiffs acting as a reasonably prudent

people discover that Defendants' drywall was defective, as set forth herein, or perceive its danger.

68.     Defendants' defective drywall was much more dangerous and harmful than expected by the average consumer and by Plaintiffs.

69.     Defendants' defective drywall benefit to Plaintiffs if any, was greatly outweighed by the risk of harm and danger to them.

70.     The defects in the drywall, as well as Defendants' failure to adequately warn the Plaintiffs of the defects rendered the drywall unreasonably dangerous and was the direct and proximate cause of damages to Plaintiffs.

71.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, furnishings, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

72.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while homes are being repaired; renting of comparable housing during the duration of the repairs; the cost of repair or replacement of the homes; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

WHEREFORE, Plaintiffs demand a trial by jury of all issues triable as a matter of right by jury, compensatory damages, court costs and such other relief as the Court deems just.

## COUNT 4 - VIOLATION OE THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT AGAINST BANNER SUPPLY CO.

73.     This is an action for relief under section 501.201, et. seq., Florida Statutes (The Florida Deceptive and Unfair Trade Practices Act).  The Plaintiffs reaver and reallege the allegations in paragraphs 1 through 38.

74.     Section 501.203(7), Florida Statutes defines "Consumer", as "an individual; child, by and through its parent or legal guardian; fi rm; association; joint venture; partnership; estate; trust; business trust; syndicate; fiduciary; corporation; or any other group or combination." Plaintiffs and Class Members are "Consumers" within the meaning of §501.203(7), Florida Statutes.

75.     Section 501.203(8), Florida Statutes defines "Trade or Commerce" as: [T]he advertising, soliciting, providing, offering, or distributing, whether by sale, rental, or otherwise, of any good or service, or any property, whether tangible or intangible, or any other article, commodity,  or thing of value,  wherever  situated.   "Trade or. Commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity.

The advertising, soliciting, providing, offering, or distributing of drywall by Defendants to Plaintiffs engaged with this Defendant "Trade or Commerce" within the meaning of section 501.203(8),Florida Statutes.

76.     Section 501.204(1) provides that: "[u]nfair methods of competition,

unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." The Defendants' acts and omissions as well as their failure to use reasonable care in this matter as alleged in this Complaint equals unconscionable acts or practices, as well as deceptive and unfair acts or practices in the conduct of Defendants' trade or commerce pursuant to section 501.204, Florida Statutes.

77.     The unconscionable, illegal, unfair and deceptive acts and practices of Defendants violate the provisions of Florida's Deceptive and Unfair Trade Practices Act. Plaintiffs and Class Members have suffered actual damage for which they are entitled to relief pursuant to section 501.211(2), Florida Statutes.

78.     Plaintiffs are entitled to recover their reasonable attorneys' fees pursuant to section 501.2105, Florida Statutes upon prevailing in this matter.

79.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs have incurred economic damages and are entitled to recover monetary damages for: replacement/repair of their homes; the removal and replacement of all of the drywall contained in their homes; the replacement of Other Property (air-conditioner and refrigerator coils, microwaves, faucets, utensils, copper tubing, electrical wiring, computer wiring, personal property, electronic appliances, and other metal surfaces and household items); and the repair and/or replacement of any materials contaminated or corroded by the drywall.

80.     As a direct and proximate cause of Defendants' acts and omissions, Plaintiffs have incurred or will incur incidental and consequential damages for the costs of moving while their home are being repaired; renting of comparable housing during the duration of

the repairs; the loss of use and enjoyment of real property; the loss in value of the home due to the stigma attached to having defective drywall in the home; and other related expenses.

Wherefore the Plaintiffs pray for a trial by jury, damages, court costs, compensatory damages as set forth herein and statutory attorney fees.

Respectfully submitted,

SUTTON LAW GROUP, P.A.
Attorneys for Plaintiff
7721 S.W. 62nd Ave., Ste. 101
South Miami, Florida  33143
Tele:  (305) 667-4481
Fax: (305) 666-2118
E-Mail: jrsuttonlaw@yahoo.com


By: _____
JOHN R. SUTTON, ESQ.
Fla. Bar No. 149411



The inspector will provide the following services to client:

1. Visually inspect the subject property, checking for Chinese Drywall Corrosion. In doing such visual inspection, the inspector will use, when applicable, a fiber optic camera.
2. Provide Chinese drywall tests described above through an independent and certified laboratory, whose results will be directly available to the client.
3. Provide a written report of the inspector's visual observations and an explanation of the laboratory results.

The inspection and testing shall be performed in accordance with generally accepted standards of Chinese drywall inspection and remediation.

This inspection is not a Building Code Inspection, title examination, home inspection for problems other than Chinese drywall, or a by-law compliance inspection. The Inspector does not offer an opinion as to: (a) the advisability or inadvisability of the purchase, sale or repair or replacement of the property or its components such as, but not limited to, appliances, carpeting, heating, ventilation, and air conditioning equipment and ducts; (b) the property's value; or (c) the property's potential use.

The Inspection and Testing fee, and any report based on the inspection and testing conducted, is based on a single visit to the property. Additional fees may be charged for any subsequent visits required by the client. If the Inspector is called upon to prepare for litigation or give testimony as a result of the inspection and testing, additional fees shall be charged the inspector's current fees for any time spent, including but not limited to, research, consultation, additional inspection and testing time, additional laboratory test fees, preparation of reports, travel, time waiting to testify and court appearances or depositions.

The inspection and testing report is based on the condition of the subject property existing and apparent on the precise time and exact date of the inspection.

Phone: 305-344-3050        Email: david.rodil@live.com



EXHIBIT

A

Not all conditions may be apparent on the inspection and testing date due to weather conditions, inoperable systems, inaccessibility of areas of the subject property, or for other reasons.

The client understands and agrees that the inspector's inspection and testing can report only; (1) Chinese drywall problems in existence on the date of the inspection and testing; and (2) Chinese drywall problems physically present in the precise and exact subject property locations that are actually inspected.

Inspector and its employees are limited in liability to the fee paid for the inspection and testing services and report in the event that client or any third party claims that inspector is in any way liable for negligently performing the inspection and testing, or in preparing the inspection and testing report or any other reason or claim that inspector has no fully satisfied all its obligations hereunder. Client hereby agrees to indemnify, defend and hold harmless the inspector if any third party brings a claim against the inspector relating to the inspection and testing or Inspecting and Testing Report.

This agreement is governed by the laws and jurisdiction of the State of Florida        . Any controversy or claim between the parties hereto, arising directly or indirectly our of, connected with, or relation to the interpretation of the agreement, the scope of the services, the actual inspection and testing services rendered by Inspector, the Inspection and Testing Report provided to the client by Inspector, or any other matters of any kind involving any act or omission performed under this agreement, or promises, shall be submitted to arbitration in accordance with the applicable rules of the American Arbitration Association. The parties shall mutually appoint an arbitrator who is knowledgeable and familiar with the mold inspection and mold testing industry. Judgment on any award may be entered in any court having jurisdiction, and the arbitration decision shall be binding on all parties. Secondary or consequential damages are specifically excluded.

In the event that any dispute arises out of the Inspection, Testing or Report and proceedings are commenced by the client, if the client is unsuccessful in maintaining the claim in arbitration or elsewhere, then the client shall be liable to the inspector for all charges, expenses, costs and legal fees incurred by the inspector on a complete indemnity basis, including a reasonable fee for all the time spent by the inspector pr inspector's personnel in investigating, research, preparation for, and attendance at arbitration or court hearings and examinations.

Any claims must be presented to the inspector in hand by certified U.S mail or suitable proof of delivery within one year from the date of the inspection. Inspector shall have no liability for any claims presented one year the date of the inspection and testing. Client guarantees inspector a right to examine the subject matter and area of any claim and offer a resolution prior to the client's performance of remedial measures (except in the event of an emergency, or to protect for personal safety, or to reduce or avoid damage to property). This is a condition precedent to client's claim.

Phone: 305-344-3050        Email: david.rodil@live.com

This agreement and the documents referred to herein constitute the entire agreement between the parties hereto, and supersede and all prior representations, discussions, or agreements, whether written or oral. No amendment, change or variance from this agreement shall be binding on either party unless mutually agreed to, in writing and signed by the parties hereto.  If any provision of this agreement is held invalid or unenforceable by any court of final jurisdiction, it is the intent of the parties and all other provisions of this agreement are construed to remain fully valid, enforceable and binding on the parties.

THE INSPECTION, TESTING AND REPORT DO NOT CONSTITUTE A WARRANTY, GUARANTEE OR INSURANCE POLICY OF ANY KIND.  There are no warranties, guarantees or insurance available or provided by the inspector.

Having read and fully understood this Agreement, I (we) hereby authorize the inspection and testing of the subject property.


_____          _____
Client Signature                           Spouse's Signature

David Rodil_____          Jul 09, 2012
Inspector Signature


Phone: 305-344-3050          Email: david.rodil@live.com

VISUAL FINDINGS

1. Strong odor of sulfur noticed as you walk into property.

2. Opened A/C unit to look at copper wiring and coils noticed copper turned black this is Indicative of Chinese drywalls presents in property.(See picture).

3. Opened all electrical outlets to also look at copper wiring, also noticed copper turned black due to presents of Chinese drywall.

4. I also cut a sample piece of drywall from bedroom closet, manufacturer name on back read as made in CHINA. (See picture).

5. As per lab report- There is presents of (Calcium Sulfate) Chinese drywall in property. (See lab report)

Phone: 305-344-3050          Email: david.rodil@live.com

SCOPE OF WORK

1. All Chinese drywall in home needs to be discarded and disposed of properly then scope and adjust accordingly.

2. All copper wiring in home needs to be changed.

3. A/C units need to be changed.

4. Entire home needs to be heap vacuumed and Bio washed.

Phone: 305-344-3050          Email: david.rodil@live.com

SUMMARY

First all work should be done by a licensed and insured MOLD REMIDIATOR
And property should be re-tested for Final Clearance

Chinese Drywall present at 172 NW 17 ST Homestead, FL 33030

Phone: 305-344-3050        Email: david.rodil@live.com

## PHOTOS



Phone: 305-344-3050          Email: david.rodil@live.com



Dade Mold Inspectors
8033 SW 133 place
Miami, FL 33183
Office: (855) 255-6653
drodil@dademoldinspectors.com
LICENSED # MRSA1058
INSURED  # 0401806
CMI       # 79566

# Customer Invoice/Chinese Drywall

| | |
|---|---|
| Customer: Lorenzo Alvarez | Invoice Date: Jul 09, 2012 |
| Phone (Day): 786-201-6231 | SERVICES:  Visual inspection / Chinese Drywall |
| Phone (Evening): | Chinese Drywall Testing. |
| Email: davidp082002@yahoo.com | |
| Fax: | |
| Mailing Address: 172 NW 17 ST | |
| Homestead, FL 33030 | |

| | |
|---|---|
| RESULTS: FAILED / POSITIVE<br>For Chinese drywall | Property Information: Size: 1500/2500 SQ. FT.<br>Room:3-4<br>Bath:2-3<br>Garage:2 |

| Service Performed | Quantity | Unit Price | Line Total |
|---|---|---|---|
| Chinese Drywall Visual | | 150 Per Inspection | |
| Chinese Drywall Sample | | 350 Per Sample | |
| | | Order Subtotal: | $ 500.00 |
| | | Sales Tax: | |
| | | Order Total: | $ 500.00 |

Phone: 305-344-3050          Email: david.rodil@live.com

# Dademoldinspectors, Inc.

8033 SW 133 PL
Miami, Florida 33183
Phone 855-255-6653

**DATE:** Jul 09, 2012
**INVOICE #** 2222
**FOR:** *Limited IAQ site evaluation*

**Bill To:**
Lorenzo Alvarez
786-201-6231
davidp082002@yahoo.com

**Project address**
**172 NW 17 ST**
**Homestead, FL 33030**

| DESCRIPTION | AMOUNT |
|---|---|
| Jul 09, 2012<br>Limited Indoor Air Quality inspection at single family apartment residence Evaluation of bedroom and living areas, inspection of mechanical equipment, and collection of air and surface samples.<br><br>Indoor Air Quality sampling and quantitative analysis for airborne microbial spore's Two air samples @ $100.00/sample and one surface sample at $100.00/sample. (Supplies and analytical report fees included) | 500.00 |
| **TOTAL DUE** | $ 500.00 |

**Payment is due upon receipt of this invoice.**

*Please make all checks payable to: Dademoldinspectors, Inc. and remit to 8033 SW 133 Place Miami, FL 33183. *

If you have any questions concerning this invoice, contact Dademoldinspectors,Inc @ 786-344-3050, or drodil@dademoldinspectors.com

# Dademoldinspectors, Inc.

8033 SW 133 PL
Miami, Florida 33183
Phone 855-255-6653

| | |
|---|---|
| **DATE:** | Jul 09, 2012 |
| **INVOICE #** | 2222 |
| **FOR:** | *Limited IAQ site evaluation* |

**Bill To:**
Lorenzo Alvarez
786-201-6231
davidp082002@yahoo.com

**Project address**
**172 NW 17 ST**
**Homestead, FL 33030**

| DESCRIPTION | AMOUNT |
|---|---|
| Jul 09, 2012<br><br>Limited Indoor Air Quality inspection at single family apartment residence Evaluation of bedroom and living areas, inspection of mechanical equipment, and collection of air and surface samples.<br><br>Indoor Air Quality sampling and quantitative analysis for airborne microbial spore's Two air samples @ $100.00/sample and one surface sample at $100.00/sample. (Supplies and analytical report fees included) | 500.00 |
| **TOTAL DUE** | $ 500.00 |

**Payment is due upon receipt of this invoice.**

*Please make all checks payable to: <u>Dademoldinspectors, Inc</u>. and remit to <u>8033 SW 133 Place Miami, FL 33183</u>. *

If you have any questions concerning this invoice, contact Dademoldinspectors,Inc @ 786-344-3050, or drodil@dademoldinspectors.com

REVIEWED
By Dr. Edward Sobek at 10:54 am, Jul 09, 2012



**Suspect Chinese Drywall Analysis**
**Fourier Transform Infrared Spectroscopy (Mid-Infrared)**

**assuredbio**

228 Midway Lane, Suite B
Oak Ridge, TN  37830

Phone: (865) 813-1700
Fax: (865) 813-1705

www.assuredbio.com

| | | | |
|---|---|---|---|
| **Inspector:** | David Rodil | **Project Date:** | 7/5/2012 |
| **Project:** | Lorenzo Alvarez | **Received:** | 7/9/2012 |
| **Job #:** | 172 NW 17st | **Reported:** | 7/9/2012 |
| **ABID:** | DR070912-1 | **Analyst:** | K. Lathrop |

**Sample Number:**  DR070912-1-1 (1)
**Sample ID:**  A/C Closet
**Results:**  Congruent    The FTIR spectrum of the sample is consistent with the spectral characteristics and peaks identified in contaminated Chinese drywall reference materials.



**Figure.** Spectral Fingerprint of sample. Each spectral fingerprint is generated from 34,010 data points. The data points are used to determine spectral congruency with known Chinese drywall reference materials. Please note that the above figure is a condensed graphical representation of the averaged data scans and not intended for intersample comparisons.

1 of 4

## Reference Spectra

Gypsum (Calcium Sulfate)



American Drywall Reference Material









assuredbio

**Ship To:**
228 Midway Lane, Suite B
Oak Ridge, TN 37830
www.assuredbio.com
info@assuredbio.com
(865)813-1700

**Chain of Custody for Suspect Chinese Drywall**

AB Identifier (internal use): DR0709/2-1

Project Name: LORENZO ALVAREZ

Project Number: 172 NW 17 ST

Project Date: 7/5/12

Inspector Name: DAVID RODIL

Address: 8033 SW 133 PL
Miami, FL 33183

Phone: 786-344-7050

E-mail: DAVID.RODIL.LIVE.COM

| Sample ID | Description/Location | Total Volume/Area | Comments | FT-IR | Strontium | Corrosion |
|---|---|---|---|---|---|---|
| 1 | A/C CLOSET | — | — | X | | |

Relinquished By: [signature] Date: 7/5/12

Received By: [signature] Date: 7-5-12

**Sampling Protocol:**
1. Survey the home for Chinese drywall. Chinese drywall may be marked with blue and yellow side joint paper (Figure 1; Below) and/or the manufacturer name Knauf (Figure 2; below).
2. Collect samples from any drywall that meets the above criteria. However, not all Chinese drywall is marked or the markings are not visible. In such cases collect several sample throughout the home.
3. To collect a sample, find a discreet area and cover it with a 2"x2" piece of masking tape. This will prevent it from shredding during cutting.
4. Cut out the 2"x2" piece of dry wall using a dry wall saw.
5. Carefully remove the sample from the wall and place it in a ziplock freezer bag. Use a high quality ziplock that won't tear or puncture.
6. Label the ziplock with a permanent marker with the sample name (i.e. north wall, living room).
7. Use one ziplock per drywall sample.
8. Complete the chain of custody form. Be sure to include each sample and all contact information.
9. Enclose the chain of custody form and the sample in a study pack and ship to the laboratory. The shipment does not have to be overnight. Standard ground shipping is fine, but please pack well.
10. Payment may be by check enclosed in package or call in a credit card number.

**Indications of Chinese Drywall**

Blue and Yellow
Side Tape

Printing on back
of drywall

4 of 4

Mandy Drywall, Inc.

13751 S.W. 143rd Court
Unit #7
Miami,, FL 33186

# Invoice

| Date | Invoice # |
|------|-----------|
| 3/24/2006 | 273 |

| Bill To |
|---------|
| Jesus Anaya |

| Ship To |
|---------|
| Res.for Mr. & Mrs. Leonardo Alvarez<br>Lot 3/ Block 7<br>172 NW 17 St Homestead |

| Lot/Block | | | | |
|-----------|-------------|--------------|----------|--------|
| Item | Description | % Completion | Job Cost | Amount |
| Partial Drywall<br>Partial Drywall | For Res. @ 172 NW 17 St<br>PAID With Check 168 $ 4350.00 | 0.5 | 10,000.00<br>-4,350.00 | 5,000.00<br>-4,350.00 |

PAID CK # 102  $450

EXHIBIT

B

IN THE CIRCUIT COURT OF THE 11 JUDICIAL
CIRCUIT IN AND FOR MIAMI-DADE COUNTY,
FLORIDA

LORENZO ALVAREZ and
his wife, FRANSISCA SALAS

    Plaintiffs,                    CIVIL DIVISION

v.                                     CASE NUMBER:

MANDY'S DRYWALL & STUCCO CORPORATION,
A Florida corporation,
BANNER SUPPLY CO,
A Florida corporation.

    Defendants.
_____/

## MOTION FOR QUALIFICATION AS MDL CLAIM AND CONFIRM STANDING AS CLASS ACTION MEMBER AND/OR MOTION TO GRANT OR DENY ABATEMENT

COMES NOW the Plaintiffs by and through the undersigned counsel and file this as their "Motion for Qualification as MDL Claim and Confirm Standing as Class Action Member and/or Motion to Grant or Deny Abatement." As grounds therefore it is alleged:

1.    The Plaintiffs newly built home suffers from Chinese Drywall installed by Mandy's.

2.    Upon knowledge and belief after discussions with counsel at Colson, Hicks & Eidson, Mandy's obtained its drywall from Banner Supply.

3.    Upon knowledge and belief, the Plaintiffs' claim should qualify them as "Multi District Litigation" claimants within the Mandy's & Banner Supply Fund.

4.    Plaintiffs undersigned counsel attaches as Exhibit A a certain order dated June 4, 2012 entered by Honorable U.S. District Judge Eldon E. Fallen which would establish certain guidelines for inclusion within the Fund or option out of the Fund.

5.    The Plaintiffs have had extensive discussion with the undersigned counsel and wish to be included within the Mandy's & Banner Supply Fund.

6.    The Plaintiffs and their counsel are concerned with the passage of time and their

formal inclusion within the "accepted class members. This is an announcement that Plaintiffs apply to be included as class members and do not wish to "opt out" of the class action.

7.     The Plaintiffs announce that they have no intent to violate the "stay" order but note that there are certain exceptions and further note that they are unclear if they have been or will be accepted to qualify as class members.

8.     The Plaintiffs have filed this action only to memorialize the existence of their claim and to timely submit their claim so as not to be excluded or barred under theories of statute of limitations, laches or theories of untimeliness while they are applying for class membership.

Wherefore, the Plaintiffs pray that the Court find subject matter jurisdiction, and/or transfer this claim to the MDL pending New Orleans, Louisiana litigation. The Plaintiffs also pray that either with this Court's jurisdiction and/or after transfer the Court of competent jurisdiction qualify them as class members, and/or Defendants and/or MDL counsel, accept the Plaintiffs as class members, and further request that the Court abate this action in compliance with the MDL Order attached as Exhibit A.

Respectfully submitted,

SUTTON LAW GROUP, P.A.
Attorneys for Plaintiff
7721 S.W. 62nd Ave., Ste. 101
South Miami, Florida 33143
Tele: (305) 667-4481
Fax: (305) 666-2118
E-Mail: jrsuttonlaw@yahoo.com


By: _____
JOHN R. SUTTON, ESQ.
Fla. Bar No. 149411



Jun 4 2012
4:28PM

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br><br>ALL CASES | |

### ORDER (1) SETTING CONSOLIDATED FAIRNESS HEARING, (2) ESTABLISHING COORDINATED OPT OUT, OBJECTION AND BRIEFING DEADLINES, AND (3) ENTERING LITIGATION STAY IN FAVOR OF SETTLING PARTIES

**I.      BACKGROUND**

The Plaintiffs' Steering Committee ("PSC") has been engaged in ongoing negotiations with the a large number of defendants to globally resolve as much of the Chinese Drywall litigation as possible. These discussions have resulted in a series of proposed class action settlements which have received preliminary approval from the Court, allowing notice to go forward in each:

1. The Court granted preliminary approval to a proposed class action settlement between the PSC and Interior/Exterior Building Supply, L.P. ("InEx") and its primary insurers on May 13, 2011 (the "InEx Settlement").

2. The Court granted preliminary approval to a proposed class action settlement between the PSC and Banner Supply Co. ("Banner"), other Banner entities and their insurers on August

1



EXHIBIT
A

11, 2011 (the "Banner Settlement").

     3.  The Court granted preliminary approval to a proposed class action settlement between the PSC and the Knauf defendants on January 10, 2012 (the "Knauf Settlement").

     4.  The Court granted preliminary approval to a proposed class action settlement between the PSC, L&W Supply Corporation ("L&W"), USG Corporation and the Knauf defendants on April 26, 2012 (the "L&W Settlement").

     5.  The Court granted preliminary approval to a proposed class action settlement between PSC and Participating Suppliers, Builders and Installers and Participating Insurers on May 31, 2012 (the "Global Settlement").

     None of the proposed class action settlements have received final approval, the Court having reserved decision pending submissions by the settling parties and any objectors.

     All of the proposed class action settlements are inter-related, and therefore (1) decisions on whether to opt out or object to any particular settlement should be made in light of the existence of *all* of the proposed settlements; (2) all of the settlements are properly considered together in determining whether they are fair, adequate and reasonable; and (3) there should be a consolidated fairness hearing with respect to all of the proposed class action settlements, and coordinated opt out, objection and briefing deadlines, in order to promote judicial economy.

     IT IS THEREFORE ORDERED ADJUDGED AND DECREED THAT:

     1.  There will be a formal Joint Fairness Hearing with respect to the InEx Settlement, the Banner Settlement, the Knauf Settlement, the L&W Settlement, and the Global Settlement.  The Joint Fairness Hearing shall take place on November 13, 2012, beginning at 9 o'clock in the a.m., and continuing to November 14, 2012, if necessary, in order to consider comments on and

objections to the proposed settlements and to consider whether (a) to approve thereafter the class settlements as fair, reasonable and adequate pursuant to Rule 23 of the Federal Rules of Civil Procedure, (b) to finally certify the settlement classes, and (c) to enter the orders and judgments provided for in each of the class settlements.

2. Any class member wishing to opt out of any of the above referenced class action settlements must notify the persons specified in the preliminary approval orders for those particular settlements, in writing.  Any such opt out notice must be postmarked no later than September 28, 2012.  Unless a timely opt out notice has already been filed, and in order to assure that class members have adequate time to consider all of the proposed class action settlements together, no opt-out will be effective if filed earlier than August 29, 2012.  To be effective, the opt-out notice must set forth the full name and current address of the person electing to opt out, the address of the property allegedly damaged by Chinese Drywall and/or the address of the property from which the class member alleges injurious exposure to Chinese Drywall, to the best of the class member's knowledge, the identities or every supplier, installer, builder, developer and its/their insurers, and any other defendant and insurer against which the Class Member intends to pursue his, or her, or its claims, and a sentence stating:  "The undersigned hereby opts out from [insert each of the settlements that apply]."  The opt-out notice must be signed by the individual class member.

3. Any class member who has already opted out of any of the proposed class action settlements referenced above will have the opportunity to opt back into those settlements in light of later filed settlements.  The parties shall submit a proposed notice or notices to the Court for approval advising the prior opt outs of their right to reconsider their opt out decision in light of

later filed settlements. Prior opt outs shall have until September 28, 2012 to reconsider their opt

out decision. A class member may withdraw their prior opt out notice by notifying, in writing,

the persons specified to receive an opt out notice in the preliminary approval order for that

particular settlement. The withdrawal of the opt out notice must be postmarked no later than

September 28, 2012 to be effective. A class member who has already opted out of a proposed

class action settlement does not have to opt out a second time in order to preserve their opt out

status. However, in order to permit adequate time for reconsideration in light of the later filed

settlements, all prior opt out notices shall be deemed suspended until the earliest effective date

for opt outs specified in paragraph 3, i.e., until August 29, 2012.

    4. All objections to any of the proposed class action settlements that are the subject of the

Joint Fairness Hearing shall be mailed to the persons designated in the approved notices for those

settlements, in writing, postmarked no later than sixty (60) days after the last date to provide

notice to Class Members who may be eligible to participate in the Global Settlement, *i.e.*,

postmarked no later than September 28, 2012, or they will be deemed waived. All objections

must be signed by the individual Class Member and by his or her counsel, if any.

    5. The Court hereby establishes the following briefing schedule with respect to the

proposed class action settlements to be considered at the Joint Fairness Hearing:

        a. The PSC and other proponents of the proposed class action settlements shall

file a motion for an order finally approving the settlement agreements and requesting certification

of the settlement classes by or before September 3, 2012;

        b. Any objections to the above motion shall be filed on or before September 28,

2012; and

4

c. The PSC and other proponents of the proposed class action settlements shall file a reply in support of its motion for an order finally approving the settlement agreements and requesting certification of the settlement classes by or before October 29, 2012.

6.  Pending the settlement proceedings and further Orders of the Court, the Court hereby stays and enjoins prosecution of all claims relating to Chinese Drywall by (a) a class member in any of the proposed class action settlements against a settling defendant or its insurers in any of the proposed class action settlements, and (b) a claim by any party in the supply chain or its insurers against a settling defendant or its insurers.

7.  The stay and injunction set forth in paragraph 6 shall not apply to:

a.  Claims against non-settling defendants;

b.  Reserved claims, as defined in the Global Settlement agreement;

c.  Any other claim exempted from the stay or injunction by specific court order.

8.  The stay and injunction set forth in paragraph 6 is without prejudice to any party's contention as to whether the Court has jurisdiction, or if it has jurisdiction whether it is proper, to enter a non-consensual stay or injunction of state court cases involving class members who validly opt out of a particular class action settlement.  All parties' positions as to that issue are expressly preserved.  If and when the issue is presented, the Court will determine the issue de novo based on the submissions of the parties.

9.  Any party may move to expand, limit, modify or terminate the stay set forth in paragraph 6 for good cause shown.

This __4th__ day of ___June___, 2012, at New Orleans, Louisiana

ELDON E. FALLON
United States District Court Judge