**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: | |

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 09-6687 (E.D. Va.);**

*Gross v. Knauf Gips, KG*, **Case No. 09-6690 (E.D. La.);**

*Wiltz v. Beijing New Building Materials Public Limited Co.,* **Case No. 10-361 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1672 (S.D. Fl.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1395 (E.D. La.); and**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1673 (E.D. Va.).**

**TAISHAN'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES**

## I.      INTRODUCTION

The Court should deny Plaintiff's request for a lump sum of more than a billion dollars in aggregate damages for two elementary reasons.  *First*, as a matter of law, settled Fifth Circuit authority prohibits lump-sum mass tort awards, extrapolated damages calculations, and damages formulas based on averages that ignore property-specific differences.  *See In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998); *Corley v. Orangefield Indep. School Dist.*, 152 F. App'x 350 (5th Cir. 2005).

*Second*, as a factual matter, Plaintiffs lack sufficient evidence to answer the core damages questions of 1) Who is owed; and 2) How much is each property owner owed. Plaintiff's newly designated expert, George Inglis, contrives a single, lump-sum damages figure by assuming that 3,736 building owners are all entitled to recover damages in this class proceeding.[1]  That assumption is unwarranted.  Plaintiffs and Mr. Inglis ignore their own data showing that huge numbers of identified claimants do not belong in this class.  More than a thousand claimants do not own their properties as required by the class definition.  Hundreds of properties are owned by corporate entities that are not entitled to all claimed damages.  And many claims are duplicates for the same property—according to the claimants' own lawyers.

On the question of how much Taishan may owe each claimant, the three damages components either lack any evidence (loss of use and enjoyment) or are based on a designated expert who is unqualified (alternative living expenses ("ALE")) and whose methodology is

---

[1] By the Plaintiffs' own estimates class membership is a moving target.  Plaintiffs' Motion for Assessment of Class Damages identifies "3,852 properties" based on the Affidavit of Ronald Wright.  (Dkt. No. 18086-1) at 7.  Plaintiffs have now substituted Wright's colleague George Inglis to give new opinions about (1) the number of claimants and buildings in the class, (2) the methodology for calculating damages, and (3) the amount of requested damages.  Plaintiffs have refused to amend their Class Damages Motion.

fatally unreliable (remediation costs).  In addition, Plaintiffs' proposed model does not account for the many factual and state law disparities that directly affect property damage recovery.

Taishan opposes the improper scheme that Plaintiffs have presented for resolution. Taishan also opposes Plaintiffs' attempts to treat mass tort damages on a class basis and to impose a preclusive effect from prior proceedings.  Taishan now submits four sets of pleadings:

1.  This opposition to Plaintiffs' motion for assessment of class damages;

2.  A motion to decertify the class under Rule 23(c)(1)(C);

3.  A memorandum on the lack of issue preclusion; and

4.  An opposition to Plaintiffs' second revised trial plan.

After Mr. Inglis's deposition, Taishan also will file a Rule 702 motion to exclude his irrelevant, unqualified and unreliable affidavit and testimony.  Collectively, those pleadings will show that Plaintiffs' damages plan does not comport with Fifth Circuit law, the Federal Rules of Evidence, applicable state law and due process.

Plaintiffs must prove who does Taishan owe and how much does it owe them.  Plaintiffs' Motion for Assessment of Class Damages does not come close to answering those questions.

## II.   PROCEDURAL BACKGROUND

This litigation arose from property damage to houses and other buildings in several states allegedly caused by drywall imported from China.  Owners sued in both state and federal courts the entities involved in the chain of distribution, including installers, homebuilders, suppliers, importers, exporters, and manufacturers, as well as their insurers and sureties.  In 2009, the Judicial Panel on Multidistrict Litigation created an MDL and transferred certain drywall-related lawsuits to this Court.

A.      The *Germano* Lawsuit

In one lawsuit, Michelle Germano and four other Virginia homeowners filed a putative class action against Taishan and three U.S. drywall suppliers.  Taishan did not initially appear.

On November 18, 2009, Plaintiffs moved for a default judgment against Taishan.  That same day, Plaintiffs filed a Second Amended Complaint ("SAC") to make the putative class nationwide.  Two days later, without having certified any class in *Germano*, the Court entered a default judgment against Taishan on November 20, 2009.  (Dkt. No. 487 ("Preliminary Default")).  Plaintiffs did not serve Taishan with the SAC prior to Preliminary Default.  The Court then permitted the intervention of 14 individual plaintiffs ("Intervenors") and scheduled a Rule 55(b) hearing on the Intervenors' claimed damages.  On December 4, 2009, the Court issued an Order to clarify that "the result of the hearing will only have a preclusive effect on those properties which are the subject of the hearing."  (Dkt. No. 576).

At the damages hearing, Intervenors presented unrebutted evidence specific to each property.  To prove the presence of Taishan drywall, Intervenors proffered drywall supplier invoices and testimony from an expert who had conducted a site inspection and testing.  For remediation costs, expert witness Ronald Wright based his testimony on property-specific estimates from two local contractors.  Mr. Wright acknowledged that "on a true bid," he would "at least get" three contractor estimates, but he used only two in *Germano* because of "the timing aspect" of completing his expert report.  February 9, 2010 Deposition of Ronald E. Wright at 234:18-235:5, excerpts attached as Exhibit 1.  Mr. Wright acknowledged at the hearing that "individual characteristics . . . create some of the variations that we see in the square-foot price" among homes.  *See* (Dkt. No. 2191 at 119:6-120:9 (explaining why the Heischober residence, with an elevator, more custom cabinetry, and better quality flooring had a higher per-square-foot remediation estimate)).  For ALE, the Court received individual Intervenor testimony about the

3

"hardship" of temporary relocation during remediation.  (*See, e.g.*, Dkt. No. 2380 ("*Germano* FOFCOL") at 77 and 92).  For loss of use and enjoyment, the Court considered specific testimony from each set of plaintiffs and from expert witnesses.

Consistent with the property-specific evidence presented, the Court's *Germano* FOFCOL focused on facts specific to each set of Intervenors and their particular property.  Based on the developed evidentiary record for each set of Intervenors, the Court made individualized damages determinations and awarded the costs of remediating each specific property along with damages for ALE and loss of use and enjoyment.  *Id.*  Although immaterial to those case-specific findings, the Court reached "the conclusion that the average cost per square foot to repair the *Germano* homes is \$86."  *Id.* at 57.  That "average cost" was based on "the average of independent quotes from two local reputable Virginia contractors."  *Id.*  The Court did not make any findings about class-wide damages, nor were those issues before the Court.  The Court commented that the "homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes," but did not base that finding on any statistical analysis or data, and none was presented.  *Id.* at 62.

### B.    The *Hernandez* Lawsuit

On September 1, 2009, Tatum and Charlene Hernandez filed a similar individual action against Chinese drywall manufacturer Knauf Plasterboard Tianjin Co., Ltd. ("Knauf").  The matter culminated in a bench trial that concluded on March 19, 2010.  Unlike *Germano*, the *Hernandez* trial was adversarial, and several issues were contested.  But as in *Germano*, the Court's damage award turned on property-specific proof.

Both sides presented property-specific remediation estimates derived from detailed inspections of the property.  *See Hernandez* Findings of Fact and Conclusions of Law (the "*Hernandez* FOFCOL") (Dkt. No. 2713 at 37 ("Plaintiffs' expert . . . performed a room-by-room

analysis")); March 18, 2010 *Hernandez* Trial Transcript (vol. 4) (Dkt. No. 3169) at 746 (defense expert "did a visual inspection of the house").  Plaintiffs' expert supplemented his site inspection with a unit-cost pricing software program.  (Dkt. No. 3169 at 746).  Defendants' expert did it "the old-fashioned way," obtaining estimates from local contractors.  *Id.* at 763-64.  The Court primarily relied for its remediation award on the "actual estimates from local contractors," which the Court identified as "the most accurate estimates for work."  *Hernandez* FOFCOL at 38.  The Court also based its ALE award on plaintiff-specific estimates from other designated experts who testified regarding local rental rates for alternative housing.  *Id.* at 41-42.

### C.    Entry of Default and Class Certification

Following entry of the Final Default Judgment in *Germano* (Dkt. No. 3013), Taishan appeared and appealed the entry of default to the Fifth Circuit Court of Appeals based on lack of personal jurisdiction.  The Fifth Circuit remanded for jurisdictional discovery but ultimately affirmed both this Court's personal jurisdiction over Taishan and the Germano Default Judgment.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 580 (5th Cir. 2014).  In 2014, counsel for Intervenors commenced post-judgment discovery.

The Court ordered a Taishan representative to appear for a judgment debtor examination on July 17, 2014.  (Dkt. No. 17774).  Taishan did not appear, and the Court entered a contempt Order.  (Dkt. No. 17869 at 2).  A few days later, Plaintiffs served Taishan with Requests for Admission with questions directed to the corporate relationships between Taishan and other entities.  (Dkt. No. 17993).  Because Taishan did not object or respond to the Requests for Admission, they were deemed admitted under Rule 36(a)(3).  (Dkt. No. 18028).

Plaintiffs then moved for class certification.  Taishan did not appear or oppose the motion, and the Court granted class certification for a class defined as "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints]

asserting claims for remediated damages arising from, or otherwise related to" Taishan drywall. (Dkt. No. 18028 ("Class Cert. Order") at 34-35).

    **D.**    **Plaintiffs' Motion for Class Damages**

    Thereafter, Plaintiffs moved the Court to award a single lump sum of $1,263,330,881.19 as damages for the entire class, comprised of three components—remediation costs, ALE and loss of use and enjoyment.  (Dkt. No. 18086) (Plaintiffs' "Motion for Class Damages" or "Motion").  For the first two items, Plaintiffs' Motion explicitly depended on the purported expert testimony of Ronald Wright.[2]  Mr. Wright's remediation estimation method used an average-based, cost-per-square-foot formula, which assumed away *all* variations among the class members' properties other than square footage.  Mr. Wright's method started with *Germano*, where he had taken the average of two property-specific, local-contractor estimates to repair each of six houses plus a wine cellar (near Norfolk, Virginia).  He combined the total averaged cost estimates, and divided by the total square footage of the seven properties to generate a per-square-foot cost average of $86.  For his class damages opinion four years later, Mr. Wright inflated $86 to get a 2014 figure of $96.06/sq. ft.  He then added additional amounts for post-remediation certification (6%) and ALE ($12.38/sq. ft.) to get a total cost multiplier of $114.21/sq. ft.  Although Mr. Wright did not have square footage data for approximately 34% of the class properties, he nevertheless extrapolated his total remediation cost figure to his proposed aggregated square footage for the entire class.  He reached a single lump-sum figure of $878 million as "the property damages to the class of Taishan drywall homeowners of the 3,852 residential units."  Affidavit of Ronald E. Wright, P.E. (Dkt. 18086-3) at ¶10.

---

[2] Plaintiffs submitted no evidence at all to support their request for $385 million for loss of use and enjoyment.

Plaintiffs later withdrew Mr. Wright and substituted George J. Inglis. Mr. Inglis addressed "property damages to the class of 3,739 buildings"—113 fewer than Mr. Wright—but arrived at a similar figure: $879 million. April 27, 2016 Affidavit of George J. Inglis at ¶ 9, attached as Exhibit 2.[3] Although Mr. Inglis did not mention his predecessor, Mr. Inglis adopted Mr. Wright's basic cost-per-square-foot methodology—with a few tweaks, which involve stepping up Mr. Wright's figures to a "National Average Cost" and then stepping that back down to an average cost per square foot for each zip code.

Claiming Mr. Wright's $86 *Germano* average cost as his own "determination," Exhibit 2 at ¶ 3, Mr. Inglis began his calculations from Mr. Wright's 2014 average remediation cost of $96.06/sq. ft. Mr. Inglis undertook to "convert" that average cost from Norfolk houses by applying the RS Means adjustment factor for Norfolk to get a "National Average Cost." *Id.* at ¶ 7. Mr. Inglis then inflated that to 2015 dollars and added the same 6% certification cost to get a total "2015 National Average" of $118.89/sq. ft. *Id.* Mr. Inglis then "adjusted for location" his National Average by multiplying it by the RS Means location factor for each zip code with a class property. *Id.* He then multiplied the adjusted average cost by the square footage of each property. Like Mr. Wright, Mr. Inglis (inexplicably) lacked square footage data for 497 class properties. Substituting expediency for diligence, he filled in the missing numbers by supplying the average of known square footages for class properties in the respective states.

Mr. Inglis uses the same improper method as Mr. Wright for calculating aggregate ALE. Both men calculated a per-square foot average, assuming that ALE is somehow an exact function of remediated-house square footage. Logic aside, Mr. Wright used as his baseline the rental costs associated with one South Florida condominium. Mr. Inglis adds ALE from *Hernandez*

---

[3] Mr. Inglis miscounted the number of properties in his spreadsheet, which is 3736.

and from *Germano* to get a figure of $11.86/sq. ft., which he extrapolates to dozens of local rental markets in 19 states.

Without relying on any evidence, Plaintiffs arbitrarily assign a flat rate of $100,000 for loss of use and enjoyment for each property. Their Motion seeks a lump-sum total class damages request of $1,263,330,881.19.

## III.   ARGUMENT

### A.   Plaintiffs' Omnibus Damages Plan Is Fatally Flawed on the Law.

#### 1.   Settled Fifth Circuit Law Precludes Aggregate Tort Damages

Plaintiffs' aggregate mass torts damages request cannot stand because it violates established Fifth Circuit law. *See In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990); *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998). In an unbroken line of cases spanning the last 25 years, the Fifth Circuit has made clear that trial courts may not award aggregated damages by lump sum or formula, but must assess tort damages for "individuals, not groups." *Fibreboard*, 893 F.2d at 711. Regardless of how other issues in a tort case are adjudicated, tort damages must be treated individually. *Robertson v. Monsanto Co.*, 287 F. App'x 354, 361-62 (5th Cir. 2008) (reversing class certification where liability had already been decided on a class-wide basis because damages determinations were "highly individualized, and thus would not be well-served by a class action"); s*ee also In re Deepwater Horizon*, 739 F.3d 790, 814 (5th Cir. 2014) (recognizing in economic loss litigation "that the class members' damages 'would have to be decided on an individual basis were the cases not being settled'").

In mass tort cases, Fifth Circuit law unequivocally precludes approaches that "focus . . . upon the 'total picture'" using alleged "proof of omnibus damages." *Fibreboard*, 893 F.2d at 709-710. The "core problem" with such "innovative" approaches is that they are "beyond the scope of federal judicial authority." *Id.* at 711. An aggregated damages plan like the one

8

proposed here "infringes upon the dictates of *Erie* . . . and upon the separation of powers between the judicial and legislative branches" by ignoring substantive state law requirements to prove individual damages. *Id.* "Ultimately, these concerns find expression in defendants' right to due process." *Id.*

Invoking those bedrock principles, the Fifth Circuit has repeatedly rejected plans like the one Plaintiffs propose here. In *Fibreboard*, the Fifth Circuit issued a mandamus to block a district court's multi-phase plan to use damage awards for 41 individual asbestos plaintiffs to determine the "total damages suffered by the remaining 2,990 class members." *Id.* at 709. Under that plan, the jury was "to determine actual damages in a lump sum," rather than fix the damages for each individual plaintiff. *Id.* Thus, the plan failed to account for the factual "disparities among 'class' members." *Id.* at 710. The lump-sum plan also permitted situations in which "there will inevitably be individual class members whose recovery will be greater or lesser than it would have been if tried alone," including recovery by "persons who would have had their claims rejected." *Id.* at 709.

Expressing "a profound disquiet," the Fifth Circuit reversed the "omnibus damages" plan because it violated basic state tort law requiring individual proof of damages. *Id.* at 710-11. The court held that the proposed plan improperly "restate[d] the dimension of tort liability." *Id.* at 711. The court held that such "changes in 'procedure' involving the mode of proof" altered "the liability of the defendants in fundamental ways." *Id.* The aggregated plan was "beyond the scope of federal judiciary authority" because it infringed "upon the dictates of *Erie*" that courts "remain faithful" to the applicable state law, including the state law requirement to prove "individual" damages, which "requirements of proof define the duty of the manufacturers." *Id.* Abstract, aggregated damages models violate state law and due process because "[c]ommonality

among class members on issues of . . . damages can be achieved only by lifting the description of the claims to a level of generality that tears them from their substantively required moorings to . . . discrete injury." *Id*. at 712.

Eight years later, the Fifth Circuit extended its disapproval of innovative tort damages schemes by rejecting the post-remand "modified trial plan" for awarding damages in the same litigation.  *See Cimino*, 151 F.3d at 299.  That new plan contemplated trying 160 sample cases and then awarding each of the remaining 2,128 plaintiffs "an amount of actual damages equal to the *average* of the awards made in" the sample cases.  *Id.* at 319 (emphasis added).  The Fifth Circuit decisively rejected that extrapolation plan, finding no "legally valid ground on which the . . . damages suffered by one person may be determined . . . solely on the basis of the average of awards made to other persons in similar cases."  *Cimino*, 151 F.3d at 321, n.51.  The court held that the damages plan for the so-called "extrapolation cases" was "fatally defective" and "plainly contravenes *Fibreboard*'s holding" that damages are permissibly recoverable only to the extent "suffered by each of the several particular plaintiffs as 'individuals, not groups.'"  *Id.* at 319-20 (quoting *Fibreboard*).   In short, "permitt[ing] recoverable tort damages to be determined in a lump sum for the entire class" is "simply contrary to *Fibreboard*."  151 F.3d at 319.

Similarly relying on "the necessity of individualized damage calculations" as "the most important factor," the Fifth Circuit in *Corley* rejected a one-size-fits-all formula for real property economic loss (without personal injury).  152 F. App'x at 355.  The Fifth Circuit affirmed the denial of a class of homeowners in three states who claimed that damages for unauthorized data transmission in wires crossing their land "may be calculated based on a per-foot extrapolation." *Id.*  The court rejected that formulaic "model for damages" because it failed to consider that "the injury to the landowners varies in substantial ways, depending on the value, character and

location of the property." *Id.* Moreover, "geographic variations would render some parcels more valuable than others, thus precluding any mechanical calculation of damages." *Id.* The *Corley* court confirmed that a formula based on "an average" is improper because it "would *necessarily* yield a windfall to some landowners at the expense of others." *Id.* (emphasis added).

### 2. The Plaintiffs' Aggregated, Lump-Sum Tort Damages Plan Violates Fifth Circuit Law

#### a. Fifth Circuit Authority Applies Precisely to this Case

Governing Fifth Circuit law in *Fibreboard*, *Cimino*, and *Corley* bars Plaintiffs' proposed damages approach, which suffers from all the same problems and more. In *Fibreboard*, the Fifth Circuit rejected a plan to permit a jury to "determine actual damages in a lump sum . . . for all plaintiffs in the class." 893 F.2d at 709. That plan proposed to use "opinions of experts . . . regarding the total damage award." *Id.* The *Fibreboard* plan was to be based on "41 cases plus the data supporting the calculation of the experts regarding total damages suffered by the remaining 2,990 class members." *Id.* Nearly identically, these Plaintiffs seek "class-wide damages . . . on an aggregate basis." Motion at 4. Plaintiffs rely on the terse opinion of a single purported expert (formerly Mr. Wright, now Mr. Inglis) for "the cost of remediation for all class members." Motion at 5. And, as in *Fibreboard*, Plaintiffs' plan relies on the results of a small set (seven cases) plus additional data for a "calculation of aggregate damages" for a much larger set numbering in the thousands (3,739). Motion at 5.

Plaintiffs' plan also contains additional flaws that were fatal to the damages models in *Cimino* and *Corley*. The rejected *Cimino* plan proposed to base damages on "the average of awards" in sample cases. 151 F.3d at 304. Here, Mr. Inglis uses an "average cost of remediation" from the *Germano* hearing and then—after various inflations and deflations—multiplies that by square-footage amounts that in many cases are based on "an averaging

11

calculation." Exhibit 2 at ¶ 3 and ¶ 2. And in *Corley*, the rejected plan called for use of a "per-foot extrapolation" formula based on "an average." 152 F. App'x at 355. Here, Mr. Inglis uses a class damages "formula [that] establishes total property damages, costs and, fees at a national average of $130.75 per square foot." Exhibit 2 at ¶ 9.

Taishan's experts in construction, alternative living, and statistics, confirm that average-based approaches obscure and distort the individualized nature of Plaintiffs' damages claims:

- David Pogorilich, CGC, MBA: "No two properties, even tract houses, are the same. Therefore, an accurate remediation cost estimate can only be achieved by individual inspection and analysis of each property." Pogorilich Dec. ¶ 2, Exhibit 3.

- R. Bruce Gamble, MBA: Alternative living costs depend on "local and individual factors." Gamble Dec. ¶ 3, Exhibit 4.

- M. Laurentius Marais, PhD: "Using such averages is a source of gross errors at the level of individual class properties." Marais Dec. ¶ 28, Exhibit 5.

### b. Plaintiffs' Aggregated Damages Plan Fails to Honor State Law Requirements

Even more than in *Fibreboard* and *Cimino* (which involved only one state's law), Plaintiffs' aggregated, formula-based class damages plan ignores *Erie* concerns and is "beyond the scope of federal judicial authority" because it runs roughshod over the differing property damage laws of 19 states. *Fibreboard*, 893 F.2d at 711. This Court recognized that it must apply to each claim the substantive damages law of the state in which the property is "situated." *Hernandez* FOFCOL at 44. But Plaintiffs fail to abide by the property damages law of any state by proposing a plan that cites no state law standards for property damage, includes no property-specific facts (other than alleged square footage), and makes no allowance for Taishan's case-specific defenses under each state's law.

At the most basic level, Plaintiffs' plan that runs afoul of state law requirements to award property damages on the individual facts of each case. *See, e.g.*, *Roman Catholic Church v.*

*Louisiana Gas Co.*, 618 So.2d 874, 877 (La. 1993) ("every case must rest on its own facts and circumstances.") (citation omitted); *Bell v. First Columbus Nat. Bank*, 493 So.2d 964, 970 (Miss. 1986) (holding that "the mode and amount of proof must be adapted to the facts of each case") (citation omitted); *Adams v. Star Enterp.*, 851 F. Supp. 770, 773 (E.D. Va. 1994) (holding that property damages "must depend upon the facts and circumstances of each particular case") (quoting *Bragg v. Ives*, 140 S.E. 656 (Va. 1927)).

Plaintiffs' plan also ignores all of the varying and often conflicting measures of property damage. *See Castano v. Am. Tobacco Co.*, 84 F.3d 734, 743 (5th Cir. 1996) (highlighting that plaintiffs' materials "failed to discuss, in any meaningful way, how the court could deal with variations in state law"). In Mississippi "depending on the facts of each case, either diminution in value or cost of repair" can be "the appropriate measure" of real property damages. *Bell*, 493 So.2d at 970 (citations omitted). Each plaintiff can "elect" a measure, but "if the defendant disagrees," it has the right to prove that "the alternative measure is more appropriate." *Id.* Plaintiffs' Trial by Formula plan unconstitutionally denies Taishan's right to litigate that alternative measure defense for individual Mississippi properties. *See Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2012).

Louisiana law, however, looks primarily to "cost of restoring the property" as the measure of damage. *See Roman Catholic Church*, 618 So.2d at 879. Louisiana law does not permit the Plaintiffs' repair estimates proof for those properties that have already been remediated. *See Volkswagen of Am., Inc. v. Robertson*, 713 F.2d 1151, 1169-71 (5th Cir. 1983)

(citing Louisiana law).[4]  On the other hand, Virginia courts reject use of repair costs because "[d]iminution in market value is the proper measure of damages for real property . . . ." *MFC P'ship v. Foster*, 1986 WL 740398, *6 (Va. Circ. Ct. July 16, 1986) (citing *Younger v. APCO*, 202 S.E.2d 866 (Va. 1974) ("When diminution in market value can be reasonably ascertained, that is the appropriate measure of damages.").

Mr. Inglis' damages testimony also is insufficient under various states' laws.  His cost-per-square-foot methodology is insufficient for the 952 properties in Louisiana, which has declared that replacement cost testimony based on a "dollar per square foot" estimate without additional "concrete evidence" is "insufficient information in the record to make a realistic determination on the cost to repair/restore" a property.  *Mossy Motors, Inc., v. Sewerage and Water Board*, 753 So.2d 269, 280-81 (La. Ct. App. 1999).  Similarly, Mr. Inglis cannot prove repair costs under Mississippi law because his affidavit lacks the required testimony for each of the 206 Mississippi properties "(1) that the repairs were necessary as the result of the wrongful act, and (2) that the cost was reasonable."  *Thomas v. Global Boat Builders and Repairmen, Inc.*, 482 So.2d 1112, 1115 (Miss.1986) (affirming directed verdict absent proof that repairs were reasonably necessary).

As a final example, Plaintiffs' plan ignores whether the projected remediation cost would exceed the diminution in value of any individual property, which most states prohibit under the economic waste doctrine.  *See, e.g.*, *Poffenbarger v. Merit Energy Co.*, 972 So.2d 792, 801-02 (Ala. 2007); *Grossman Holdings Ltd. v. Hourihan*, 414 So.2d 1037, 1039-40 (Fla. 1982);

---

[4] This Court must honor state law requirement regarding methods for proving property damages. *See Cimino*, 151 F.3d at 311 (holding that state substantive law includes "the burdens of going forward with evidence and of persuasion thereon").

*Johnson v. Black Brothers, Inc.*, 879 So.2d 525, 528 (Miss. Ct. App. 2004); *7-Eleven, Inc. v. Department of Environmental Quality*, 590 S.E.2d 84, 101-02 (Va. Ct. App. 2003).

Under governing Fifth Circuit law, this Court lacks the authority to adopt a plan that does not consider the impact of state law on individual class members' damages claims.

### B.    Plaintiffs' Damages Plan Fails Because It Is Fatally Flawed On its Face

#### 1.    Plaintiffs' Omnibus Damages Plan Fails To Account For Numerous Disparities Among Class Members

The Fifth Circuit rejects class-wide tort damages schemes where there "are too many disparities among the various plaintiffs for their common concerns to predominate." *Fibreboard*, 893 F.2d at 712.  Plaintiffs may not use a damages formula "that makes no effort to adjust for the variegated nature" of the class members.  *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 307 (5th Cir. 2003).  Such a plan is "clearly inadequate."  *Id.*

Plaintiffs propose a lump-sum class-wide aggregate model that depends on a one-size-fits-all formula and makes no distinctions among 3,736 property damage claims.  But as the district court pointed out in *Corley*, "each landowner is entitled to damages based on the specific characteristics of his or her land," and thus "[i]t strains credibility to suggest that the property damages . . . can be measured by one measure."  *Corley v. Entergy Corp.*, 220 F.R.D. 478, 486 (E.D. Tex. 2004) (citations omitted), *aff'd* 152 F. App'x 350 (5th Cir. 2005).  As in *Corley*, *Fibreboard*, *Bell Atlantic*, and many other Fifth Circuit cases, Plaintiffs ask the Court to ignore a significant number of variations affecting the amount of damages to which the individual class members may be entitled.[5]  "This is the inevitable consequence of treating discrete claims as fungible claims."  *Fibreboard*, 893 F.2d at 712.  Examples of the disregarded variations include:

---

[5]  In *Fibreboard*, the Fifth Circuit identified eight specific factual "disparities among class members" that precluded a class-wide, formulaic determination of damages.  893 F.2d at 711.

- **Different quality of building materials:**  Plaintiffs' plan uses a single baseline cost/square foot that ignores the range of class properties from Habitat for Humanity houses to mansions.  In *Germano*, each property had its own cost per square foot based, *inter alia*, on the quality of the materials in the house.  Mr. Wright explained that "individual characteristics . . . create some of the variations that we see in the square-foot price" among properties.  (Dkt. No. 2191 at 119:6-120:9).

- **Different Building Types:**  Many of the class properties are not houses.  The class buildings include condominium developments and churches, which have very different construction parameters and costs.

- **Different ownership statuses:**  Over 1,000 claimants are not property owners and thus not members of the defined class.  Many other properties are owned by non-resident corporate entities that will have varying abilities to seek loss of use and enjoyment and alternative living expenses.[6]

- **Different remediation times:**  **E**ach remediation will not take five months.  In *Germano*, Plaintiffs' expert conceded that the remediation time for those properties could vary by 50%.  (Dkt. No. 2191 at 95:25-96:11).  BrownGreer data show that the median remediation time is three months.  *See* Exhibit 6.

## 2.    Plaintiffs Have No Competent Evidence for their Proposed Aggregated Damages

Plaintiffs' plan is also "clearly inadequate" because, on its face, the plan cannot reliably answer who is owed and how much they are owed.

First, and most obvious, Plaintiffs' plan proposes no proof whatsoever to support more than $370 million for loss of use and enjoyment damages.  Mr. Inglis does not address that element of damages, and the list of additional "evidence" in Plaintiffs' "trial plan" contains nothing relevant.  By contrast, the *Germano* plaintiffs presented property-specific lay and expert evidence that permitted the Court to make detailed findings on loss of use and enjoyment for each property owner consistent with Virginia law.  *See, e.g.*, *Germano* FOFCOL at 15-16, 71-75 (describing that Orlando family had "essentially abandoned their second story").  But these

---

[6] Corporate plaintiffs cannot recover under distinct theories relevant to corporate owners that were not sufficiently alleged in the omnibus complaints.  *See Wooten v. McDonald Transit Associates, Inc.*, 775 F.3d 689 (5th Cir. 2015).

Plaintiffs eschew evidence in favor of asking merely that the *Germano* findings "be employed here." Damages Motion at 7. Fifth Circuit law bars that request because there is no "legally valid ground on which the . . . damages suffered by one person may be determined, without any evidence, solely on the basis of the average of awards made to other persons in similar cases." *Cimino*, 151 F.3d at 321 n.51.[7]

Second, Plaintiffs' only ALE proof—Mr. Inglis' class-wide formula of $11.86 per square footage—fails most states' laws, under which a plaintiff must prove ALE as reasonable rental value based on "comparable" or "similar" property. *See, e.g.*, *Gonzalez v. Barrenechea*, --- So. 3d ---, 2015 WL 1940784, **2-4 (Fla. Dist. Ct. App. April 29, 2015); *Chriss v. Manchester Insurance & Indemnity Co.*, 308 So.2d 803, 805–06 (La. Ct. App. 1975) ("rental value of similar property"). Mr. Inglis' formulaic method also diverges from Mr. Wright's, who previously testified that he would "determine the comparable alternative living costs in Florida and Louisiana by surveying local moving and rental prices." Second Supp. Dec. of Ronald Wright, P.E. (Dkt. No. 8276 at ¶7). In addition, Mr. Inglis simply is not qualified to testify on rental rates or otherwise determine ALE. Mr. Inglis is an engineer who works at the same firm as his fellow engineer, Mr. Wright. In the *Germano* hearing, Plaintiffs did not rely on Mr. Wright's testimony to prove ALE, but separately called an accountant (Tuthill) to testify about ALE based on actual rental receipts and similar plaintiff-specific information.

---

[7] Moreover, loss of use and enjoyment is inherently individualized and not subject to mathematical calculation. *See Hernandez* FOFCOL at 46 (identifying loss of use and enjoyment as a form of "non-pecuniary loss"); *see also* May 16, 2011 Deposition of Ronald Wright, at 130:22-131:23 (identifying loss of enjoyment as "dependent upon each person, so it would not been [sic] a classwide cost"), excerpts attached as Exhibit 7.

Third, Mr. Inglis' affidavit is so obviously defective that it cannot possibly provide evidence on who is owed remediation damages and how much.[8]  "[T]he errors and analytical fallacies in" Mr. Inglis's approach make "it impossible to rely on any of his conclusions." *EEOC v. Freeman*, 778 F.3d 463, 466 (4th Cir. 2015).  "The sheer number of mistakes and omissions in [Mr. Inglis's] analysis renders it 'outside the range where experts might reasonably differ.'"  *Id.* at 467 (citations omitted).  Those fatal errors include:

- No square footage for more than 13% of the class properties;

- Use of square footage that is inconsistent with the square footage in public records, with original plaintiff profile forms and recently updated plaintiff profile forms;

- Inclusion of improper claimants in Mr. Inglis' spreadsheet, including:

    - The *Germano* Intervenors whom Taishan has already compensated;[9]

    - Over 1,000 claimants—including class representatives Eduardo and Carmen Amorin—who no longer own their drywall-related property;[10]

    - At least 12 duplicate addresses;[11]

    - Claimants who have previously opted out of the class;[12]

---

[8] These glaring problems and many more will be explored at Mr. Inglis' May 19 deposition and in Taishan's subsequent Rule 702 motion to exclude his testimony.

[9] *See* Exhibit 8 (Affidavit of George J. Inglis, Exhibit 10), at rows VAv-1 (Leach); VAv-33 (McKellar); VAv-84 (Michaux); VAv-98 (Baldwin); VAv-116 (Heischober); VAv-127 (Orlando); and VAv-147 (Morgan).   [The labeling convention for Inglis Ex. 10 is (STATE)(v=verified  square footage, uv=unverified)-(row)].

[10] *See* Exhibit 9 (spreadsheet of data extracted from the BrownGreer and showing those claimants listed as no longer owning the claimed property); *see also* Exhibit 8 at row FLv-611 (listing Magdelena Gardens Condo Association as owner of 240 W. End Ave. Unit 721); Exhibit 10 (property records showing that Eduardo and Carmen Amorin no longer own 240 W. End Ave. Unit 721).

[11] *See* Exhibit 8 at rows FLv-611 and FLv-614; FLv-617 and FLv-618; FLv-241 and FLuv-207; FLv-251 and FLv-252; FLv-825 and FLv-827; FLv-477-FLv-490; FLv-1011 and FLv-1012; ALv-33 and ALuv-45; ALv-142 and ALuv-19; MSv-37 and MSv-38; MSuv-15 and MSuv-16; LAv-2 and LAv-42; LAv-246 and LAv-247; LAv-300 and LAv-301; LAv-460 and LAuv-48.

    o  Claimants who have dismissed all of their claims because "the drywall in their home is not defective and/or was manufactured domestically";[13]

    o  At least 25 claimants who participated in the Knauf pilot program, which by its terms involved only properties with no Taishan drywall;[14]

    o  Claimants who lack evidence of Taishan drywall or who identified only non-Taishan drywall in their properties.[15]

Simply put, Plaintiffs' damages model is full of errors and is grossly unreliable.

### C.    In the Face of Governing Fifth Circuit Law, No Argument Can Save Plaintiffs' Improper Damages Plan

No argument that Plaintiffs have or could raise avoids the Fifth Circuit bar to the proposed aggregated damages plan.

#### 1.    *Turner v. Murphy Oil* Does Not Authorize Plaintiffs' Damages Model

This Court's certification of a property damage class nine years ago in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D.597 (E.D. La. 2006), does not justify this lump-sum damages plan. The Fifth Circuit has warned that district court decisions "cannot be reflexively applied" and that a court should not "substitute case-specific analysis with a generalized reference" to an "inapposite" decision. *Castano*, 84 F.3d at 743 n.16, 744. The required case-specific analysis of *Turner* reveals several independent ways in which that decision does not apply here.

First, nothing in the *Turner* district court decision can overrule governing Fifth Circuit authority in *Fibreboard*, *Cimino*, and *Corley*, which preclude Plaintiffs' plan.

---

[12] *See* Exhibit 11 (requests for exclusion from the class for claimants on Exhibit 8 at rows ALv-146 (Ward) and ALv-211 (Moon)).

[13] *See* Exhibit 12 (motions to dismiss).

[14] *See* Exhibit 13 (list of Knauf pilot program properties).

[15] *See* Exhibit 14 (plaintiff profile forms); *see also Wooten*, 775 F.3d at 695.

Second, *Turner* on its terms does not authorize an aggregate damages plan that ignores individual property differences.  Just the opposite.  In certifying a property owner class, this Court singled out the issue of individual damages, noting that "the only individual inquiry would relate to the amount of Plaintiffs' damages."  *Turner*, 234 F.R.D. at 608.  The Court's certification depended in part on a proposed three-phase trial plan that provided for "bifurcation of the issues of liability and damages," and thus addressed the defendants' "concern that individualized inquiries will be needed to determine damage amounts in these cases." *Turner*, 234 F.R.D. at 606.

Third, *Turner* does not stand for the proposition that the absence of personal injury claims permits aggregated class treatment where property damage is individualized.  The Supreme Court has explained that personal injury and property damage are "treated alike" in the products liability context.  *East River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 866-67 (1986).  No Fifth Circuit case draws a distinction for aggregated formulaic damages or for class certification.  As discussed above, *Corley* disproves any relevant distinction.  Other Fifth Circuit decisions confirm.  *See O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 744 (5th Cir. 2003) (reversing class certification of economic loss claims solely because "individualized calculations of damages predominate"); *In re Wilborn*, 609 F.3d 748, 755 (5th Cir. 2010) (vacating class certification because of individual damages issues).

 Fourth, *Turner* has no persuasive authority because it did not cite *Fibreboard* or address the bar on aggregated mass tort damages plans that ignore state law requirements.  *See Cimino*, 151 F.3d at 319 (subsequent appellate panel not bound by language in prior Fifth Circuit decision that "does not even cite *Fibreboard*").

Fifth, the *Turner* class certification was never tested on appeal because the litigation settled soon after certification.  *See Turner v. Murphy Oil USA Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007) (approving class settlement).  To the limited extent that the Fifth Circuit has discussed *Turner*, it has cited the proposed phased trial plan that "'address[ed] the Defendant's concern that individualized inquiries will be needed to determine damage amounts in these cases.'" *Madison v. Chalmette Refining, L.L.C.*, 637 F.3d 551, 556 (5th Cir. 2011) (quoting *Turner*).

Finally, the Court's 2006 *Turner* decision must be re-examined through the lens of subsequent decisions that have significantly altered the class action landscape.  *See, e.g.*, *Wal-Mart Stores*, 131 S. Ct. at 2551; *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1434-45 (2013). *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011) (holding that class certification requires "judging the persuasiveness of the [expert] evidence presented"); *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 816 (7th Cir. 2010) ("[T]he district court must perform a full *Dauber*t analysis before certifying the class if the situation warrants.").  In short, *Turner* provides no cover from the klieg lights of Fifth Circuit authority revealing the forbidden nature of Plaintiffs' damages plan.

### 2.    Rule 23 Does Not Authorize Class Treatment of Individual Tort Damages

The Court's class certification does not justify Plaintiffs' proposed aggregated damages model.[16]  As *Cimino* confirmed, "[e]ven in the context of a class action, . . . individual damages must still be proved individually."  151 F.3d at 319 (citations omitted).  *Cimino* also explained that "use of Rule 23(b)(3) or 42(a) does not alter" the *Fibreboard* principles that bar aggregate tort damages, and "the rules enabling act, 28 U.S.C. § 2072, likewise mandates that conclusion."

---

[16] The class certification itself was improper.  *See* Taishan's Motion to Decertify.

*Id.* at 312.   Where requested damages are to be awarded in a lump sum to thousands of claimants, those claimants are not "actually before the court under [Rules] 23 and 42(b) in any more than a fictional sense," thus raising profound due process "concerns."   *Fibreboard*, 893 F.2d at 711.   Awarding lump-sum class damages with a formula based on sample class members can be accomplished "only by reworking the substantive duty owed by the manufacturers," and "the enabling acts prevent that reading."   *Id.* at 712; *accord Wal-Mart Stores*, 131 S. Ct. at 2561 (disapproving "novel project" of "Trial by Formula" for class recovery "[b]ecause the Rules Enabling Act forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right'").

Rule 23 cannot serve as a talisman for group damages here because, as explained in Taishan's Motion to Decertify, mass torts are generally inappropriate for class treatment on any issue, but especially damages.   *See Steering Committee v. Exxon Mobil Corp.*, 461 F.3d 598, 604 (2006) (denying class certification due to, *inter alia*, predominance of individual issues relating to damages).   Even in the few (much older) tort cases in which the Fifth Circuit has permitted class treatment, the assessment of class member damages was bifurcated for individual determination.   *See id.* at 603 (discussing examples of mass tort class actions in which "individualized damages issues [would] have to be determined on an individual basis'); *see also Deepwater Horizon*, 739 F.3d at 806, n.5 ("This court has previously approved mass tort and mass accident class actions . . . when the district court . . . bifurcat[ed] class-wide liability issues and issues of individual damages.") (quotations and citations omitted).

In the face of the solid body of Fifth Circuit mass tort case law, Plaintiffs cannot rely on legally and factually inapposite class action decisions.   Plaintiffs cite a single Fifth Circuit class case—*Monumental Life Insurance Company*, 365 F.3d 408 (5th Cir. 2004)—but it does not support their aggregated damages request for several reasons.   First, that civil rights case

22

involving discriminatory life insurance practices addressed class damages issues under Rule 23(b)(2), a different standard from Rule 23(b)(3) predominance applicable here. Second, *Monumental Life*'s holding on Rule 23(b)(2) damages is likely not good law after the Supreme Court's rejection of such equitable damages in *Wal-Mart Stores*. 131 S. Ct. at 2557 (rejecting argument that "claims for monetary relief may be certified under that provision"). Third, *Monumental Life* did not involve mass tort damages with inherent individualized characteristics, and the Fifth Circuit found that "none of the[] variables [for calculating damages] is unique to particular plaintiffs." 365 F.3d at 419. Instead, damages were indeed a "virtually mechanical task" because they could be measured by calculating the "difference between what [an African-American] and a [Caucasian] paid for the same policy." *Id.* 419-20.

### 3. *In re Chevron* Does Not Authorize Treating the *Germano* Plaintiffs as "Bellwethers" for Damages Extrapolation

Plaintiffs cannot claim the seven *Germano* cases as "bellwethers" to authorize an award of class wide damages in the manner proposed. The Fifth Circuit has specifically rejected that approach, highlighting "substantive due process concerns . . . based on the lack of fundamental fairness in a system that permits . . . the imposition of liability in 3,000 cases based upon results of a trial of a non-representative sample of plaintiffs." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997). Plaintiffs have not shown by "competent, scientific, statistical evidence" that "the cases tried are representative of the larger group of cases or claims." *Id.* Indeed, they have made no attempt at all to show representativeness.[17]

*Chevron* cannot support Plaintiffs' extrapolated damages plan. *Cimino* explicitly held that any suggestion in *Chevron* "that representative bellwether verdicts could properly be used to

---

[17] *See* Exhibit 5, Marais Dec.

determine individual causation and damages for other plaintiffs" was "dicta." *Cimino*, 151 F.3d at 318.  It has no persuasive authority given that *Chevron* "does not even mention *Fibreboard*. *Id.* at 319.  Moreover, *Chevron* addressed using bellwethers only on liability and causation, and thus could not support aggregated or extrapolated damages.  *Id.* at 318.

### 4.      Plaintiffs' May Not Rely on Irrelevant Antitrust Cases

Plaintiffs present the Court with no authority approving lump-sum damages in a tort case. Instead, they rely on two out-of-circuit antitrust district court decisions that cannot overcome the governing Fifth Circuit law.  Motion at 4.  The *Fibreboard* court specifically rejected reliance on other kinds of litigation to justify a proposed aggregated *tort* damages plan.  893 F.2d at 710 ("We find little comfort in such cases.").

The class certification orders in *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 698 (S.D. Fla. 2004), and *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 526 (S.D.N.Y. 1996), similarly provide no comfort here because those decisions explicitly depended on an antitrust-specific standard less rigorous than that applied to mass tort cases.   *In re Terazosin*, 220 F.R.D. at 698.  The Fifth Circuit also applies "a more relaxed burden of proof" for antitrust damages "than would justify an award in other civil cases."  *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 206-207 (5th Cir. 2000).  The class damages models in *Terazosin* and *NASDAQ* explicitly did not consider "the computation of aggregate damages on a class-wide basis."  *In re Terazosin*, 220 F.R.D. at 699.

To the extent the Court looks to antitrust cases, it must of course rely on governing Fifth Circuit authority such as *Bell Atlantic*, in which the Fifth Circuit found "vast differences" among the class members and rejected a damages formula based on "averages" that made "no effort to adjust for the variegated nature" of the class members.  339 F.3d at 307.  That is precisely what Plaintiffs propose here, and thus the Court should reject it.

## IV.   CONCLUSION

The Court should deny Plaintiffs' Motion for Assessment of Class Damages.

Respectfully submitted,

Dated:  May 8, 2015

/s Michael P. Kenny
Bernard Taylor, Esq.
Georgia Bar No. 669625
Michael P. Kenny, Esq.
Georgia Bar No. 415064
Christina Hull Eikhoff, Esq.
Georgia Bar No. 242539
David Venderbush, Esq.
New York Bar No. 2920817
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
mike.kenny@alston.com
*Counsel for Taishan Gypsum Co., Ltd. and Tai'an
Taishan Plasterboard Co., Ltd.*

Alan Dean Weinberger
LA Bar No. 13331
HANGARTNER, RYDBERG & TERRELL, LLC
One Shell Square
701 Poydras St., Suite 310
New Orleans, Louisiana  70179
Phone:  (504) 434-6815
Fax: (504) 522-5689
aweinberger@hanrylaw.com
*Local Counsel for Taishan Gypsum Co., Ltd. and
Tai'an Taishan Plasterboard Co., Ltd.*

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 8th day of May, 2015.

/s Michael P. Kenny
Michael P. Kenny, Esq.
Georgia Bar No. 415064
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
mike.kenny@alston.com
*Counsel for Taishan*