# Exhibit 4

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 09-6687 (E.D. La.);<br><br>*Gross v. Knauf Gips, KG*, Case No. 09-6690 (E.D. La.);<br><br>*Wiltz v. Beijing New Building Materials Public Limited Co.*, Case No. 10-361 (E.D. La.);<br><br>*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1672 (E.D. La.);<br><br>*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1395 (E.D. La.); and<br><br>*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, Case No. 11-1673 (E.D. La.). | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |

### DECLARATION OF R. BRUCE GAMBLE

I, R. Bruce Gamble, declare as follows:

    1.    My name is R. Bruce Gamble. I received my undergraduate degree in Mathematics from The College of Wooster and my M.B.A. from the Wharton School of Business at the University of Pennsylvania. I have in excess of 33 years of real estate experience, advising clients and providing dispute resolution assistance on a broad range of real estate issues including relocation, investment analysis, market studies, rental pricing, valuation, development, real estate operations,

1

real estate finance, and acquisition due diligence. I have experience with virtually all real estate product types including for-sale residential, large-scale land development, and for-rent residential on projects throughout the United States. I am currently employed by Navigant Consulting, Inc. My curriculum vitae is attached as Exhibit I. My hourly rate for services rendered on this matter is $500 per hour.

2. Summary of Opinions

- Mr. Inglis does not use standard or recognized real estate industry methodology to calculate costs for rent and associated alternative living expenses.

- Mr. Inglis's use of an average, based on limited outdated data does not accurately reflect the alternative living expenses that individuals remediating properties would realistically incur across the dozens of local real estate markets that are spread across the 19 states where the properties in this Class are located.[1]

- Mr. Inglis's method depends on the inaccurate assumption that alternative living costs uniformly have a direct linear relationship between the size of the property to be remediated and rent and other associated costs, regardless of the nature or location of the property.

- Mr. Inglis's method includes a series of assumptions which are not realistic or reasonable, or are contradicted by available data.

Overview of Mr. Inglis's Methodology

3. Mr. Inglis does not use standard methodology for calculating alternative living expenses. Standard real estate methodology for developing the components of alternative living expenses is based on an individual property analysis grounded on where a particular property is located, among other local and individual factors. Comparable real estate pricing is completely dependent on local

---

[1] Mr. Inglis's Affidavit references Class members across 18 states. Upon examination of his materials, one property located in New Mexico is incorrectly identified as being located in Mississippi.

2

markets. Alternative living expenses are based on location, location, location. In projecting rental rates or other real estate related costs, real estate professionals utilize comparable market data from relevant local markets. This is because real estate prices, including rental rates, are inherently local. They fluctuate from state-to-state, city-to-city, and often within neighborhoods. Accordingly, failure to utilize local market data will result in irrelevant and inaccurate cost projections.

4. Mr. Inglis does not incorporate current local real estate data into his calculation. Instead, Mr. Inglis averages limited, dated information from three sources and assumes that the average of these figures equates to what thousands of Class members would incur in dozens of real estate markets. Mr. Inglis fails to use current local real estate data in estimating Class alternative living expenses. Specifically, Mr. Inglis uses: (1) cost data from the *Germano* Plaintiff Intervenors from Virginia, (2) 2010 cost data from *Hernandez* for Louisiana, and (3) 2010 Berman & Wright data for Villa Lago properties located in Florida to calculate alternative living expenses. Mr. Inglis escalates the alternative living expenses from these three states from 2010 to 2015 costs.

5. Mr. Inglis then averages the three data points referenced above to calculate an average national alternative living expense of $11.86 per SqFt. Mr. Inglis applies this alleged SqFt cost to the entire universe of 3,739 units, covering 7,641,635 SqFt. Mr. Inglis's methodology is inappropriate and unreliable because it fails to account for local cost differences.

6. Mr. Inglis's method also incorrectly assumes a constant, perfect correlation between square footage of one's property and one's alternative living expenses. He provides no basis for that assumption, which is often incorrect. For example, with respect to rental costs, smaller properties in more desirable areas will often have a higher per SqFt cost than those in less desirable areas, but Mr. Inglis assumes that the per SqFt cost will be the same. Real estate professionals do not reasonably assume that they or their clients will pay the same per SqFt cost no matter where they are renting.

3

### Using an Average Obscures Individual Variances in Cost

7. Mr. Inglis's average-based method generates unrealistic and inaccurate alternative living expenses. For example, using Mr. Inglis's alternative living cost average of $11.86 per SqFt for the *Germano's* Heischober property, which consists of 3,055 SqFt, results in an alternative living expense of $36,232. The stated alternative living expense amount for the Heischober's in *Germano*, as reflected in Mr. Inglis's Exhibit 11, is only $21,941 ($23,762 in 2015 dollars when escalated at the change in the CPI-U.) This illustrates how the application of an average to individual cases results in inaccurate estimates for individuals who are not at the average.

8. Focusing further on the alternative living expenses for the *Germano* Plaintiff Intervenors, using Mr. Inglis's restricted universe of five units, costs vary up to 244% for non-recurring costs and as much as 178% for recurring cost on a SqFt basis[2]. Using a formula with a uniform per SqFt cost masks these significant differences.

9. One-third of Mr. Inglis's calculation is based on the alternative living expenses at Villa Lago. Focusing on the apartment rental component, Mr. Inglis uses $1,186 per month as the monthly rental rate in 2010. This equates to approximately $1,338 per month in 2015. The Villa Lago Condominiums are located in Boynton Beach, Florida, which is part of the Miami-Fort Lauderdale-West Palm Beach Florida Metropolitan Statistical Area (MSA). The following Table illustrates mean and median apartment rental rates for eleven (11) MSAs where virtually all of the units in the Class are located. The information is extracted from REIS which is a widely used and well-regarded source of real estate market information that is a standard in the real estate industry.

---

[2] Non-recurring costs for Baldwin total $7,895 ($2.70/SqFt) and for McKellar total $19,623 ($9.28/SqFt). Recurring costs for Heischober total $10,935 ($3.58/SqFt) and for Baldwin total $29,070 ($9.95/SqFt).

4

| MSA | Monthly Asking Rent | |
|---|---|---|
| | Mean | Median |
| Birmingham-Hoover, AL | $ 802 | $ 783 |
| Cape Coral-Fort Myers, FL | $ 848 | $ 818 |
| Gulfport-Biloxi-Pascagoula, MS | $ 764 | $ 745 |
| Miami-Fort Lauderdale-West Palm Beach, FL [1] | $ 1,244 | $ 1,194 |
| Mobile-Daphne-Fairhope, AL | $ 663 | $ 633 |
| New Orleans-Metairie-Hammond, LA-MS | $ 930 | $ 838 |
| North Port-Sarasota-Bradenton, FL | $ 969 | $ 953 |
| Pensacola-Ferry Pass-Brent, FL | $ 733 | $ 700 |
| Port St. Lucie, FL [2] | $ 878 | $ 871 |
| Tampa-St. Petersburg-Clearwater, FL | $ 917 | $ 876 |
| Virginia Beach-Norfolk-Newport News, VA-NC | $ 961 | $ 932 |

10. As this chart illustrates, using the apartment rental cost for Villa Lago drives an overstatement of alternative living expenses for the Class overall as all of the other markets have substantially lower apartment rental rates. Real estate rates are local within communities, so one cannot necessarily utilize an MSA-wide rental rate to estimate precisely what any particular individual may reasonably pay for rent in their local community, but these data show the problem with using generalized averages as Mr. Inglis does.

Mr. Inglis's Methodology Depends on a Series of Unreliable Assumptions

11. To calculate alternative living expenses, Mr. Inglis makes the empirically inaccurate assumptions that every class member is a resident homeowner and will need to vacate the residential property for a period of approximately five months during remediation. However, some class properties are commercial or other non-residential space; others are owned by corporations, not resident plaintiffs. According to the Supplemental Profile Form data from BrownGreer, approximately 1,100 of the claimants no longer own the properties at issue, and will not need to vacate a property they presumably no longer reside in during remediation. Thus, Mr. Inglis's assumption that every property will require uninform rent, property storage, and moving expenses on a square foot basis is inconsistent with the nature of many properties.

5

12. He also assumes, contrary to available data, that every property will uniformly require an average of five months of alternative living expenses. Some may require more, and others less, as reflected in the Knauf remediation data.

13. Mr. Inglis deviates from standard industry practice by applying estimates to costs for which actuals exists. Furthermore, Mr. Inglis does not use actual cost for remediated units within this Class to validate his assumptions. The Supplemental Profile Form Data received from BrownGreer indicates that approximately 781 units are already remediated. The 781 units total approximately 1.3 million square feet across eight states. Since the units have been remediated, actual costs should be available and relied upon. These actual costs, as well as available data from the Knauf remediation program, should also be benchmarked against Mr. Inglis's calculations to test his methodology as he extends to non-remediated properties.

14. As noted above, Mr. Inglis assumes a linear relationship between square footage of property and alternative living expenses. Mr. Inglis does not support this assumption, which is inaccurate in many cases.

15. Mr. Inglis includes an estimate to determine the square footage of 497 units included in the Class that are reported by BrownGreer as having unknown square footage amounts. An average of units for which the square footage is determined is applied to the unverified units on a state-by-state basis. This type of calculation, which has no empirical support, causes extreme fluctuation in amounts given the variance in property sizes within this Class. Alternative living expenses based on this assumption are speculative.

<u>Mr. Inglis's Calculation of Average Alternative Living Expenses per Square Foot</u>

16. Mr. Inglis's calculation of average alternative living expenses per square foot biases the sum upwards as applied to Florida, where most of the class properties are located. Mr. Inglis states that

6

the majority of units in Mr. Inglis's Exhibit 10 are located in Florida, Louisiana, and Virginia. Mr. Inglis determines that this cost of $11.86 per square foot is "consistent" with the alternative living expenses as determined by the court for the property owners in *Germano* (Virginia residents) at an average of $11.79 per square foot (escalated to 2015 costs), and *Hernandez* (Louisiana resident) at an average of $13.97 per square foot (escalated to 2015 costs). However, Mr. Inglis does not acknowledge that the average for the three states is $2.04 per SqFt higher (17%) than the alternative living expense in Florida ($9.82 per square foot (escalated to 2015 costs)). This is significant considering that over 50% of the units included in the Class are located in the state of Florida. This biases the alternative living costs for Florida residents upward from where they would be if based solely his Florida data.

<u>Mr. Inglis's Basis for Adjusting from 2010 to 2015 Dollars</u>

17. Mr. Inglis does not provide a source and methodology for his escalation factor to adjust alternative living expenses from the 2010 base amounts to 2015 dollars. However, his colleague Mr. Wright's original Affidavit used RSMeans, and Mr. Inglis does not say that he used a different metric. RSMeans is not a correct index for comparison due to its limitation of changes in construction costs (materials, equipment and labor), not housing and related living costs. Given the types of damages included here, Mr. Inglis should have used a relevant measure of the change in cost.

18. The most commonly used measure of inflation in the U.S. is The Consumer Price Index-All Urban Consumers (CPI-U) published by the Bureau of Labor Statistics (BLS.) It is released every month and measures changes in price levels for a broader basket of goods such as those included in

7

Mr. Inglis's analysis. Contrary to the approximately 12.75% utilized by Mr. Inglis, CPI-U increases by 8.30% from 2010 to 2015[3]. This results in an increase in claimed damages of $3.6 million.

19. <u>Retention of Navigant Consulting, Inc.</u>

Navigant Consulting, Inc. [NCI] and I were retained by Taishan Gypsum Taishan Ltd. [Taishan] as represented by Alston & Bird, LLP [Counsel] principally to evaluate the claimed aggregate cost of living expense damages methods and calculations used by the plaintiffs and their designated experts, in particular George J. Inglis, in the matter regarding *Chinese Manufactured Drywall Products Liability Class Action Litigation* being heard before the Honorable Judge Fallon in US District Court Eastern District of Louisiana. A summary of some of my principal tasks include:

- Opine upon the accuracy and reasonableness of the Mr. Inglis methodology in determination of alternative living expense damages for the Class.
- Evaluate the reliability of the data relied upon by Mr. Inglis on behalf of the class.
- Determine to what extent there may have been, or presently is, better and more accurate data for Mr. Inglis to have relied upon.
- Identify to what extent errors and limitations may exist in the method, data and assumptions Mr. Inglis relied upon.

Accordingly, all findings and opinions expressed in this Declaration are based on a review and analysis of various limited case documentation, requested by and provided to NCI and me, as generally expected in the analysis of Construction, Real Estate and Economic Damage disputes similar to this matter. This documentation reasonably includes legal pleadings and findings of fact, affidavits and materials of Mr. Inglis, real estate industry costing criteria, research regarding various specific properties, and other related materials more fully described below in, "*Documents Relied Upon.*"

As additional facts may emerge through the provision of further requested documentation, any specific site investigations of related properties, document production and testimony up through trial,

---

[3] CPI-U Index as of 2/2015 (234.722) divided by CPI-U index as of 2/1/2010 (216.741) minus one (1).

NCI and I reserve our right to amend any findings and opinions as stated herewith, as further facts may emerge.

20. Documents Relied Upon

Included below is a summary of the documents received and reviewed by NCI and me over the course of this evaluation leading to the preparation of this Expert Summary Disclosure. Through this process, NCI has evaluated limited available Project records and other data necessary to perform its analysis and render the opinions included herewith. In summary, the documentation NCI principally relied upon as the basis of our opinions includes, but is not limited to:

> A. Findings of Fact and Conclusions of Law in *Germano* and *Hernandez*
> B. Plaintiffs' Motion for Assessment of Class Damages and Memorandum in Support and related exhibits including:
> C. Exhibit B - Affidavit of Ronald E. Wright, PE
> D. Exhibit C - A. Dwellings with Taishan drywall quantity reported
> E. Exhibit C - B. Dwellings with Taishan drywall without quantity reported
> F. Exhibit 2 - Taishan Class Square Footage Summary – October 20, 2014
> G. Exhibit 7 - Taishan Class Updating Cost per Square Foot…Calculated in 2010 for Germano Trial
> H. Consumer Price Indices for Inflation Published by the Bureau of Labor Statistics
> I. Testimony/Deposition Transcripts in the matter of *Germano* and *Hernandez*
> J. REIS, Inc. Apartment Market Report - 4th Quarter 2014, Metro: Birmingham, AL, p 14.; Fort Myers, FL p 1.; Biloxi-Gulfport, MS, p 1.; Average of values reported for Miami (p 16), Fort Lauderdale (p 16) and Palm Beach (p 15); Mobile, AL, p 1.; New Orleans, LA, p 1.; Sarasota, FL, p 1.; Pensacola, FL, p 1.; Fort Pierce, FL, p 1.; Tampa - St. Petersburg, FL, p 16.; Norfolk/Hampton Roads, VA, p 14.
> K. Affidavit of George J. Inglis, P.E. dated April 27, 2015
> L. BrownGreer Court Administrator Verification of Square Footage

The documents relied upon and otherwise reviewed in our analysis and preparation of this Declaration will be made available for inspection as necessary in accordance with the applicable rules of the Court.

This Declaration includes various referenced source documents which, in addition to the entire universe of documentation reviewed and relied upon by NCI and me, form the basis of our analysis

9

and opinions included herewith. It shall not, however, be interpreted that the inclusion or exclusion herewith of any singular example source document may limit the basis and grounds of our opinions to any individual document, as NCI and I have relied upon the universe of those documents made available to us thus far in development of these opinions.

It should be noted that document requests are still on-going and in-progress at the time of the issuance of this Summary Disclosure and NCI and I therefore reserve the right to amend its opinions accordingly should additional, pertinent information come to light through that process up through and including the time of trial.

I am over twenty-one years of age, am of sound mind, have never been convicted of a felony, and am otherwise competent to make this declaration. I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 8, 2015

_____
R. Bruce Gamble, MBA

# Exhibit I



# R. Bruce Gamble

**R. Bruce Gamble**
Managing Director

**Navigant Consulting, Inc.**
1200 19th Street NW
Suite 700
Washington, DC  20036

(202) 973-4541 Tel
(202) 973-2401 Fax

bruce.gamble@navigant.com

### Professional History
- Navigant Consulting, Inc.
- Alvarez & Marsal Real Estate Advisory Services, LLC
- Deloitte & Touche, LLP
- Arthur Andersen, LLP

### Education
- B.A., Mathematics, The College of Wooster, Phi Beta Kappa
- M.B.A., The Wharton School of the University of Pennsylvania

### Professional Associations
- Research Sponsor, The Zell/Lurie Real Estate Center at the Wharton School of The University of Pennsylvania
- Pension Real Estate Association (PREA)

Bruce Gamble is a Managing Director of Navigant Consulting, Inc. with extensive experience advising clients on a broad range of real estate issues.

Mr. Gamble has more than 33 years of experience in the real estate industry covering due diligence, real estate development, real estate operations, real estate finance, real estate investment analysis, transaction negotiating/structuring, and workouts/restructurings.

Mr. Gamble has experience with virtually all product types including office, retail, industrial/distribution, for-rent residential, for-sale residential, large-scale land development, hospitality, resorts, healthcare, and various special use facilities. He has worked in virtually every state in the US and in many foreign countries.

His clients have included major owners, including REITS, private firms, and investment advisors.  He has represented many of types of real estate capital providers, both in initially evaluating a loan or an investment and also in understanding an investment's performance throughout its life and determining how to restructure an investment, if necessary.  He has represented and advised very large owners of real estate assets that are not traditional real estate firms and large users of real estate, often publicly held corporations or government or quasi-governmental bodies.

Prior to joining Navigant, Mr. Gamble was a Managing Director with Alvarez & Marsal Real Estate Advisory Services, a Principal at Deloitte, and a Partner at Arthur Andersen.



R. Bruce Gamble

Throughout his career, Mr. Gamble has represented the interests of real estate developers, institutional investors, REITS, private equity funds, and lenders including the following matters:

**Financial Advisory**

- Financial advisor to the non-profit government sponsored corporation that owns one of the major festival/tourist retail and transit-related developments in Washington DC. Analyzed the financial relationship with the developer/operator, developed a comprehensive financial model showing the results to both parties and made recommendations for altering the arrangement under both a status quo and under potential redevelopment scenarios.

- Financial advisor to one of the premier hotel owner/operators in London. The private company had a fast approaching debt maturity and significant complications in the ownership and control structure including ongoing law suits among elements in the ownership group. There was value in excess of £1.0 billion with an outstanding debt of £ 660 million. Identified a lending group that was willing to refinance the debt on attractive terms that provided the Company sufficient time to work through their disagreements.

- Financial advisor to a financial institution in Greece. Work entailed reviewing their real estate loan book to prepare them for an upcoming EU stress test.

- Financial advisor to a Caribbean-based financial institution that had recently received an equity investment from a US private equity firm. The private equity firm asked us to review the largest real estate loans to provide independent judgments on the likely level of recovery and whether the special asset department was appropriately handling the credits.

- Financial advisor to one or the largest developers of distribution and logistics space in the US. The group was launching their first fund raising monies directly from institutional investors and wanted a second opinion of their financials and the underlying real estate thesis. We reviewed the proposed financials, analyzed the existing assets to be seeded in the fund, and evaluated the future market prospects for this type of product.

- Financial advisor to Washington DC based land developer exploring development opportunities in Vietnam. Developed a comprehensive development model and advised on critical market and financial factors to ensure success.

- Financial advisor to several entities that consolidated and converted to a REIT, including one of the first UPREITS. Work included asset-level and company-level level financial analysis, allocation of proceeds among the various owners and generally interfacing with the all the constituencies in the process.

- Advised several other companies, on the issues involved with going public and the pros and cons of the process and the outcome.



R. Bruce Gamble

### Financial Advisory/Restructuring

- Advisor to a healthcare REIT concerning interpretation of a purchase option in three long-term hospital leases. After our analysis and detailed financial and accounting work, the parties agreed to a consensual restructuring of the leases, which was a significant victory as when we began the parties were several hundred million dollars apart on the valuation of the properties.

- Financial advisor to major US commercial bank acting as agent concerning a $160 million credit facility secured by 33 properties located across the US. The borrower had declared bankruptcy and was attempting to force an unattractive reorganization on the lender group. Throughout the three-year case, we monitored the real property collateral, provided various appraisal services, monitored and reviewed the monthly cash collateral budgets, and reviewed/approved significant tenant leases. We were deeply involved in numerous attempts to reach a negotiated outcome, including detailed financial analysis of many alternatives. We provided expert reports and depositions on the several topics, including appropriate interest rate; appropriate management fee; and feasibility of several difference reorganization plans. Finally, we guided the parties to an eventual consensual deal that provided certainty of exit for the lenders and an immediate 92% cash collection and a deficiency note for the remainder.

- Financial advisor to the Official Committee of Unsecured Creditors ("UCC") in the Capmark Financial bankruptcy. At the time of its filing, Capmark had in excess of $15 billion of real estate assets in a combination of direct loans, REO, direct and joint venture investments, and loans in its Utah industrial bank. We monitored and reviewed operations throughout the case. We interfaced between the Company, the UCC and various other constituencies. As part of the assignment, we opined on all real estate decisions made by Capmark and recommended more aggressive disposition programs that led to greatly increased recoveries for the creditors.

- Financial advisor to non-profit foundation regarding its significant investment in a luxury hotel and resort in the Caribbean. We analyzed all aspects of the operation, including the hotel, condominiums, golf and other amenities, restaurants, and significant land development operation. The project could not service its third party debt, let alone provide a return on the significant sub debt and equity investment of our client. We assisted in the restructuring of the project alongside of an opportunity fund that bought into the debt stack in a loan to own transaction. In addition, we performed significant forensic work, as there were questions on whether the developer misappropriated monies or did not clearly identify or appropriately handle conflicts of interest.



R. Bruce Gamble

- Financial advisor to the US office of a major European commercial bank concerning their loan to a CDO that had filed for bankruptcy. The CDO owned a variety of unusual asset types, including a diverse group of real estate assets that, in many cases, needed to be restructured in many cases. We evaluated each real estate asset and provided a short and long term outlook and disposition program for each.

- Financial advisor to a super-regional bank concerning its credit facility to the developer and owner of 6 high-end residential communities in North and South Carolina. The projects were in various states of construction and sellout and consisted of a total of nearly 10,000 lots, "big-name" designer golf courses, fitness facilities and other amenities. We evaluated the collateral and initially assisted the bank in restructuring the credit facility. Following that, we assisted the bank in finding a buyer for the loan and assisting them in closing the loan-sale transaction before a year-end deadline.

- Financial advisor to the developer of one of the premier second home projects in Georgia, consisting of over 6,000 developed lots, 5 golf courses, a full complement of additional amenities, and separately financed luxury hotel and additional development land. Initial work entailed a detailed analysis of the project including capital budgets and the operations of all amenities. This led to a restructuring of the main loan facility that was secured by the project. Following that we restructured the credit facilities on the five-star hotel and nearby undeveloped land owned by the sponsors. Finally, we assisted one of the principals with loans secured by luxury properties and other assets located across the US.

- Financial advisor to large owner and operator of hospital facilities in the United Kingdom. The company had been purchased by a group of private equity firms several years ago and then was split into an OPCO and a PROPCO, separating the real estate assets from the operating business. The PROPCO was heavily leveraged and had significant short term-debt maturities. Our assignment was to put in place separate "management" at the PROPCO level to prepare them for restructuring their debt.

- As part of larger restructuring assignments, we looked at real estate issues for multiple restaurant groups, ranging from for a casual quick service through white table cloth restaurants. We would evaluate unit-by-unit profitability and make recommendations on which outlets should be considered for closure. We would evaluate the ownership/lease structure to determine the amount of flexibility to close units and/or dispose of them. This included the evaluation of complicated sale/leaseback structures. In some cases, we used the information to negotiate rent reductions or other concessions from landlords.

- Financial advisor to a major commercial bank concerning a failed garden condominium project in Florida. Advised on issues related to valuation, additional investment, construction and mold risk, and legal issues involved in securing title to the project. The developer had filed for bankruptcy and the guarantor had reportedly committed suicide in a foreign country, creating a complicated back drop.



R. Bruce Gamble

- Financial advisor to a major commercial bank concerning its credits to a Florida hotel operator and land developer that had filed for bankruptcy. Our client's exposure was in excess of $150 million and all lenders were owed in excess of $600 million. Since our client was the "lead lender", we analyzed the overall operation and helped develop the concept that eventually was the framework of the plan used to exit bankruptcy.

- Financial advisor to a major commercial bank concerning its loan secured by a portion of one of the premier resorts on the southeast coast. The developer and operator of the project had filed for bankruptcy, but our client had only specific collateral and was not part of the overall entity-level lending group. We analyzed our client's collateral in detail. We made recommendations concerning the short and long tern potential, the ability to separate this collateral from the other resort assets and strategies to increase recovery.

- Financial advisor to a major commercial bank concerning its 20 credit facilities to the largest private land developer and land banker in the east coast. Our client's exposure was over $500 million with total indebtedness in excess of $1.8 billion. As financial advisor for the lead lender, we played a role for all lenders and provided overall cash flow analysis for all lenders. We developed exit strategies for each or our 20 assets, including development budgets. Secured agreement with borrower on activities to be undertaken, monitored cash requests, and monitored performance against the plan.

**Public Private Partnerships**

- Triangle Transit Authority, Raleigh/Durham, NC. Developed strategic and tactical plan to encourage transit oriented development around a new transit system. Assisted in the negotiations with proposed master developer.

- Metropolitan Atlanta Rapid Transit Authority ("MARTA"), Atlanta, GA. Acted as principal outside real estate financial advisor for nearly 10 years. Scope of work included evaluating project opportunities, overseeing the developer solicitation and selection process and assisting in negotiating the business relationship with the selected developer. Worked on multiple projects over the period representing a total of over 10 million SF of development potential.



R. Bruce Gamble

- The Architect of the Capitol, Washington, DC. The Architect of the Capitol, the custodian and manager of the US Capitol grounds, controlled a vacant site to the east of Washington Union Station that was being considered for the new headquarters for the Administrative Office of the United States Court system. The first phase of the assignment was a market, physical and financial analysis to determine what uses were supportable and appropriate for the site. Ultimately a building containing a total of 1.0 million SF with nearly 700,000 SF of office above grade was suggested. We led the effort to get buy-in from a diverse group of constituents, including nearby neighborhoods and two Congressional Committees. Next, we led a two-stage selection process of developer/architect teams. The team of Boston Properties and Edward Larrabee Barnes was selected and produced an award winning and financially successful project.

**Litigation**

- As part of a restructuring/bankruptcy assignment, Mr. Gamble was retained to prepare expert reports on the appropriate "cram down" interest rate, the appropriate level on management fees and on the feasibility of the Debtors proposed plan of reorganization. [Security National Properties Funding III et al United States Bankruptcy Court for the District of Delaware Case : 11- 13277 (KG)]

- Advisor to overseas group that invested in one of the largest non-gaming projects in Las Vegas. Work involved analyzing the investments to date, future prospects, forensic analysis to understand the flow of funds among various legal entities, and determining the adequacy of various notices provided. Work included review of a significant number of documents and preparation for potential testimony. [NAMA Holdings, LLC v. World Market Center Venture, LLC; Delaware Court of Chancery C.A. No. 2756-VCL, 2007]