**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

THIS DOCUMENT RELATES TO:

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:11-cv-01673**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:11-cv-01395**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:11-cv-01672**

*Wiltz et al. v. Beijing New Building Material Public Limited Company et al.,* **Case No. 2:10-cv-00361**

*Gross et al. v. Knauf Gips KG et al.,* **Case No. 2:09-cv-06690**

*Germano et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:09-cv-06687**

**MEMORANDUM OF LAW**
**OF BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY**
**AND BEIJING NEW BUILDING MATERIAL (GROUP) CO., LTD. IN OPPOSITION**
**TO PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES**

Subject to and without waiver of pending motions objecting to personal jurisdiction, Beijing New Building Materials Public Limited Company ("BNBM PLC") and Beijing New Building Material (Group) Co., Ltd. ("BNBM Group," collectively the "BNBM companies") respectfully submit this memorandum of law in opposition to Plaintiffs' Steering Committee's Motion For Assessment of Class Damages (Rec. Doc. 18086, hereinafter "Damages Motion"). Defendants Taishan and CNBM Group have also submitted memoranda of law in opposition to Plaintiffs' Damages Motion, which further discuss the many problems with Plaintiffs' request and Mr. Inglis' damages calculation.  BNBM PLC and BNBM Group join in those oppositions as well, and specifically incorporate all arguments and authority set forth in those briefs as if stated herein.

## PRELIMINARY STATEMENT

As an initial matter, Plaintiffs' Damages Motion must be denied with respect to both BNBM PLC and BNBM Group, because this Court lacks personal jurisdiction over those entities.[1]  However, even if jurisdiction over either BNBM PLC or BNBM Group existed, Plaintiffs' motion—which requests over $1.25 billion in aggregate, class wide damages—must still be denied as a matter of law as Plaintiffs' request is unsupported by case precedent and the factual record as it pertains to the BNBM companies.

The Court certified the following class for adjudicating damages in this case:

> All owners of real properties in the United States, who are named Plaintiffs on the complaints in *Amorin, Germano, Gross,* and/or *Wiltz* (*i.e.*, not an absent class member), asserting claims for ***remediated damages*** arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

---

[1] On April 29, 2015, BNBM PLC and BNBM Group each filed Motions to Dismiss for Lack of Personal Jurisdiction pursuant to Rule 12(b)(2) and 12(b)(5).  (Rec. Docs. 18849 and 18841 respectively.)

(Rec. Doc. 18028, Class FOFCOL[2] ¶ 79 (emphasis added).)  Accordingly, by definition, all class members are before the Court in this litigation, have repaired damages, and the remediation costs are known amounts.  Indeed, in finding class treatment appropriate, the Court specifically contemplated damages would be calculated using *actual* remediation costs available from remediations that had already been performed.  (*Id.* at ¶ 75 ("The Court can likewise determine the cost of remediation . . . for remediation costs generally (*i.e.,* empirical evidence concerning the cost or remediation ***performed*** by Moss & Associates under the Knauf settlement program") (emphasis added).)

Notwithstanding the express direction that actual, available remediation cost information be used, Plaintiffs request damages for more than 3,700 properties purportedly included in the class and located in 18 different states.  This request is not based on the actual costs incurred, but based on an oversimplified extrapolation of a handful of outdated *estimates* from 2009 that were prepared by two small contractors for damages sustained by a self-selected and non-representative group of plaintiffs all located within a 60-mile radius in Southeastern Virginia.  Awarding damages on such an insufficient showing ignores the necessary individualized inquiries, is contrary to governing Fifth Circuit precedent, and is factually unsupported.

Plaintiffs' new expert, George J. Inglis, P.E., a licensed civil engineer with no expertise in applied mathematical and statistical analysis, fails to offer anything that approaches a statistically sound damages model, nor frankly is he qualified to do so.[3]  Instead, Mr. Inglis

---

[2]  "Class FOFCOL" refers to the Court's September 26, 2014 Findings of Fact and Conclusions of Law With Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3).

[3]  Plaintiffs' expert and his expert testimony is based on an improper damages framework and is inadmissible under the standards established under *Daubert*.  *Moore v. Ashland Chem. Co*., 151 F.3d 269, 276 (5th Cir. 1998.)  Defendants intend to file a motion to exclude Mr. Inglis on May 29, 2015 as set forth in the parties' Stipulated and Agreed Scheduling Order for June 9, 2015

offers only a simplistic aggregated *estimate* of damages extrapolated from other *estimates* of damages from a non-representative selection of properties.  His calculation provides:  estimated cost of remediation per square foot, multiplied by estimated aggregate square footage of the class members' property.  This so-called "methodology" is fundamentally infirm as it fails to account for a myriad of individual, distinguishing characteristics of the more than 3,700 properties that purportedly comprise the class.  Moreover, even if the methodology were otherwise appropriate, both of the variables used by Mr. Inglis -- i.e., cost per square foot and actual square footage -- are based on statistically unsupported assumptions.

These deficiencies are addressed in the Declaration of M. Laurentius Marais Ph.D ("Marais Exp. Decl."), submitted herewith as **Exhibit A**.  Dr. Marias is a well-published statistician who has served on the faculties of both Stanford and the University of Chicago.  (*Id.* ¶ 2-3.)  As Dr. Marais explains, Mr. Inglis' "purported calculations of class-wide remediation costs [and alternative living expenses] do not comport with well established principles for obtaining statistically and scientifically valid extrapolations from samples and, therefore, cannot be relied upon to estimate class-wide damages, or damages for individual class members."  (*Id.* ¶ 9.)

The first variable in Mr. Inglis' formula—estimated cost of remediation per square foot— is based entirely on the estimated remediation costs from the seven *Germano* homes calculated in 2010.  But *Germano* was a factually-intensive, individualized assessment of the specific circumstances of the particular homes.  The very nature of the careful analysis undertaken by the Court to determine damages for those Virginia homeowners illustrates just how unsound Plaintiffs' plan to rely upon a blanket, general assessment for entire class here is.  Deriving "one size fits all" square foot remediation costs for thousands of properties located in different regions

Class Damages Hearing.  (*See* Rec. Doc. 18771-1.)

of the country from seven, non-representative, non-randomly selected homes from a single location is legally and factually unsupported, and well-beyond Mr. Inglis' field of expertise.

The second variable—square feet of the class members' property—is a pure guess for more than 10% of the class. (Damages Motion, at 6 n.7.) For hundreds of the class members, Mr. Inglis simply supplies unsupported assumptions regarding *both* multipliers in his equation. With respect to these properties, Mr. Inglis' work is little better than a back of the napkin estimate—far short of any legally supportable damages formulation.

Mr. Inglis' method of calculating alternative living expense ("ALE") is equally unsophisticated, and wholly arbitrary. Mr. Inglis, with absolutely no statistical analysis, assumes that there is a perfect correlation between the square footage of the affected property and the ALE that the owner(s) will incur,[4] and then purports to calculate an ALE cost based on the square footage of the affected property. Mr. Inglis derives this per-square foot ALE cost from just three data points (the *Germano* intervenors, the *Hernandez* plaintiff, and one condominium development in Boynton, Florida), and further assumes all property owners will need to move out of their homes for five months and move all of their belongings in and out of storage at rates that he seemingly invents. There is no explanation as to how he arrived at an ALE per square foot value, nor is there any basis for how such a calculation could even come close to approximating actual damages suffered by individual class members. Overall, his failure to provide any statistical basis for any of his conclusions about class-wide damages requires that this Court deny Plaintiffs' request. (*See* Marais Exp. Decl., ¶ 8 (explaining that Mr. Inglis fails

---

[4] The notion that one's square footage will somehow be a perfect predictor of ALE makes no sense. A family of significant means and a lavish lifestyle living in a smaller home in an exclusive area might have significantly greater ALE than a family of more modest means who lives in a larger home located in a less desirable neighborhood. But under Mr. Inglis' analysis, the latter family would be awarded more ALE than the former. And Mr. Inglis' analysis does not take into account other factors that might affect ALE, such as the number of persons in the household, whether it is a primary residence or a second home, etc.

to provide "any basis for measuring, let alone any actual calculation of, the degrees of potential error in his extrapolations, *i.e*., the likely degrees of discrepancy between the true values of the quantities he claims to measure and the results of his purported calculations.")

Plaintiffs also seek a uniform loss of use award of more than $370 million. As a threshold matter, Plaintiffs' request is inappropriate as the Court only certified claims for remediated damages, *i.e.*, repaired property damage, for class treatment. Moreover, even if the Court had certified loss of use claims for class treatment—which it did not—Plaintiffs present no evidence, facts or methodology supporting an award of damage, to say nothing of the $100,000 amount, for each class member.

With respect to Plaintiffs' request for damages from BNBM PLC and BNBM Group specifically, there are additional reasons why the Court must deny Plaintiffs' motion: First, Plaintiffs have not identified, nor has the Court determined, that any drywall manufactured or sold by one of the BNBM companies (as opposed to the Taishan companies) was defective or has caused any class member harm. Indeed, the only government testing of Chinese drywall found that BNBM's drywall was not defective, and Plaintiffs have offered no expert testing to the contrary. Second, based on a review of profile forms supplied by class members, less than 2% of the class plaintiffs have identified one of the BNBM companies as the manufacturer of the drywall in their property. Third, there is no factual basis to support a finding that BNBM PLC and BNBM Group constitute a "single business enterprise" with the defaulted Taishan defendants or should otherwise be held jointly liable for any damages assessed against them.[5]

---

[5] Contemporaneously with this filing, BNBM PLC and BNBM Group have filed a Response to the PSC's Memorandum Regarding Effects of Default and Issue Preclusion in April 28, 2015 Class-Wide Damages Trial as well as a Motion to Vacate the Court's Alter Ego Findings in the Court's September 26, 2014 Findings of Fact and Conclusions of Law With Respect to Plaintiffs' Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3) which address these issues in greater detail. *See also* BNBM PLC's 12(b)(2) Memorandum,

Plaintiffs' request for a $1.2 billion aggregate award is without factual or legal support. As a matter of law, Plaintiffs' Damages Motion must be denied.

### ADDITIONAL FACTUAL BACKGROUND WITH RESPECT TO BNBM PLC AND BNBM GROUP[6]

#### A.     The Parties

BNBM PLC and BNBM Group are Chinese companies involved in the building materials industry.  Neither BNBM PLC nor BNBM Group were parties to the *Germano* litigation that serves as the centerpiece of Plaintiffs' request for damages.  *See Germano v. Taishan Gypsum Co. Ltd.*, No. 2:09-cv-06687.  Nor were they parties to the *Hernandez* case Plaintiffs and Mr. Inglis also cite.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-6050, 2010 WL 1710434, at *24 (E.D. La. Apr. 27, 2010).

In its September 26, 2014, Class FOFCOL this Court determined that Taishan, BNBM PLC, BNBM Group and others constitute "a single business enterprise for purposes of. . . holding each of these entities liable for the conduct of their affiliated entities." (Rec. Doc. 18028, Class FOFCOL, ¶ 50.)  That holding was made on an uncontested record and was based solely on Rule 36 admissions that were deemed admitted by Taishan when it failed to respond to them. (*Id.* ¶¶ 28-48.)  Those requests were not directed toward, or served on, BNBM PLC or BNBM Group, and under clear Fifth Circuit law, the resultant admissions cannot be used against the BNBM companies.[7]  But relying on those deemed admissions, the Court certified the damages

---

Rec. Doc. 18849-1; BNBM Group's 12(b)(2) Memorandum, Rec. Doc. 18841-1; and Motion to Vacate Memorandum, Rec. Doc. 18851-1.

[6] For purposes of the Court's convenience, BNBM PLC and BNBM Group do not restate much of the factual background and procedural history relating to *Germano*, *Hernandez* and the events leading up to Plaintiffs' Damages Motion and refer to Taishan's Memorandum in Opposition to Plaintiffs' Motion for Assessment of Class Damages.

[7] *Becerra v. Asher*, 921 F. Supp. 1538, 1544 (S.D. Tex. 1996), *aff'd,* 105 F.3d 1042, 1048 (5th

class set forth above as against BNBM PLC and BNBM Group, as well as the other Chinese

defendants.

**B.**      **The Certified Class and Plaintiffs' Demand**

On October 29, 2014, Plaintiffs filed their Damages Motion requesting

$1,263,330,881.19 in aggregate damages to the certified class.  (Rec. Doc. 18086.)  In support of

their request, Plaintiffs relied upon an Affidavit submitted by their expert Ronald Wright.  (Rec.

Doc. 18086-3.)  Mr. Wright proposed a damages formula to award the "3,852 residential units"

that comprised the class.  (*Id.*)  Utilizing Mr. Wright's "one-size fits all" formula, Plaintiffs

sought $878,130,881 in remediation and ALE costs.  (*Id.*)  In addition, Plaintiffs sought an

additional $100,000.00 for each property for "loss of use and enjoyment."  (Damages Motion, at

7.)

Recently, Plaintiffs have substituted Mr. Wright with a new expert -- Mr. Inglis.  Mr.

Inglis' proposed damages formula makes some slight changes to his predecessor's model, but

still relies on the same fundamentally unsupported and oversimplified assumptions.

Notwithstanding the unexplained change to the size of the identified class[8] and the fact that their

new expert identifies a handful of additional considerations, Plaintiffs did not file an amended

damages request with the Court.  Instead, they chose to rely upon their prior, outdated, Damages

Motion and memoranda of law.  Using the calculations set forth in Mr. Inglis' affidavit and the

---

Cir. 1997) (deemed admissions of one party cannot be used against a co-party); *Riberglass, Inc.
v. Techni-Glass Indus., Inc*., 811 F.2d 565, 566-67 (11th Cir. 1987) (deemed admissions of co-
defendants could not bind defendant who did respond to requests); *Earl Realty, Inc. v. Leonetti
(In re Leonetti)*, 28 B.R. 1003, 1009 (E.D. Pa. 1983) (affirmative admission of one defendant not
admissible against co-defendant); *see also* Rec. Doc. 18454, BNBM PLC and BNBM Group's
Memorandum in Opposition to Plaintiffs' Motion to Preclude, at  7, 13; BNBM PLC and BNBM
Group's Motion to Vacate the Alter Ego Findings.

[8] Plaintiffs' new expert calculates damages for a class that has 113 less properties for a total of
"3,739 buildings."  (Inglis Aff. ¶ 2.)

requests previously identified in the Damages Motion, Plaintiffs' request for damages now includes: (1) Remediation costs (including inspection and certification); (2) Alternative Living Expenses (including move-in/move-out and storage) together totaling $879, 261, 476 (Inglis Aff. ¶ 9); and (3) an additional $100,000.00 for each property for "loss of use and enjoyment." (Damages Motion, at 7.)  The combined total of these amounts is $1,253,161,476.

With respect to property damage claims for remediation costs, Plaintiffs' request is based on the unverified assertion that there are 3,739 properties that are owned or were owned by class members and that remediation costs are owed on each of those listed properties.  (Damages Motion, at 6 n.7, Ex. C; Inglis Aff. ¶ 2, Ex. 10.)  Even without the benefit of conducting any discovery, the purported roster of properties is obviously flawed and includes considerable error. For example, the listing of 3,739 properties includes properties of claimants who can not be part of the class, such as the *Germano* plaintiff-intervenors.  (*See* Inglis Aff., at Ex. 10, at Virginia Rows 147 (Morgan residence), 33 (McKellar Residence), 84 (Michaux Residence), 98 (Baldwin Residence), 116 (Heischober Residence), 127 (Orlando Residence).)  Moreover, given Plaintiffs' admission that there are nearly 500 properties where no information is known regarding the property, there appears to be no factual basis to support any claim that these properties have remediated damages as required by the class definition.  (*See* Inglis Aff. at ¶ 2.)  In addition to errors in the membership of class properties identified, the listing consists of an extraordinary variety of properties, as would be expected from a list of thousands of properties spread across 18 states.  For those properties where the square footage has been purportedly verified, the properties range from less than 750 square feet to more than 14,000 square feet.  These properties range from Habitat for Humanity homes, to moderate single family homes, to large mansions.  At the same time, Plaintiffs' class includes both commercial and residential properties

8

as well as a number of multi-unit properties including as many as 71 units.  By way of contrast, the seven homes at issue in *Germano* were all single family homes that ranged from 2,115 to 3,245 square feet.  (Rec. Doc. 2380, *Germano* FOFCOL, at 69-102.)

In recent days, Defendants have obtained updated information about the class member properties identified in Mr. Inglis' affidavit.  This information demonstrates some of the most significant facts about Plaintiffs' request: (1) the majority of the properties have already been repaired and there is information available about the actual costs of those repairs; (2) there is a significant portion of the purported class who may not have repaired their properties and are thus excluded from Plaintiffs' definition of "owners of real properties. . . asserting claims for remediated damages;" and (3) less than 2% of the class members had drywall manufactured by either of the BNBM companies.  *See* Taylor Decl. ¶¶ 7-9.[9]  Beyond the many issues presented by Plaintiffs' demand as requested initially, these developments are fatal to the award sought for the proposed class here.

## ARGUMENT

I.    **PLAINTIFFS' REQUEST THAT THE COURT EXTRAPOLATE AN AGGREGATE CLASS-WIDE DAMAGE AWARD OF $1.2 BILLION IS AN INVITATION TO ERROR.**

Even if liability had been properly established in this case, Plaintiffs' request for a lump sum of $1,253,161,476 in aggregate, class-wide damages is contrary to settled principles of law of this Circuit and the United States Supreme Court.  There is no Fifth Circuit precedent[10] nor

---

[9] "Taylor Decl." refers to the Declaration of Carolyn F. Taylor in Support of the Federal Rule of Evidence 1006 Summary of the 65 Plaintiffs Identifying BNBM or Dragon Brand Drywall in the 23,057 Original Profile Forms Produced by BrownGreer PLC, attached hereto as **Exhibit B**.

[10] This Court has previously referred to the Fifth Circuit's approval of *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D.597 (E.D. La. 2006) in connection with the damages sought here.  The Court's certification of a class in that matter however, does not justify the lump sum damages award Plaintiffs request in their Damages Motion.  In fact, when certifying the *Turner* class the

any authority cited by Plaintiffs that supports that type of award, particularly in the manner they

suggest it be calculated.[11]

Liability and damages require separate and equally "rigorous analysis." *Comcast Corp. v.*

*Behrend*, 133 S. Ct. 1426, 1433 (2013); *In re Chinese-Manufactured Drywall Products Liab.*

*Litig.*, MDL No. 2047, 2014 WL 4809520, at *10 (E.D. La. Sept. 26, 2014) (Rule 23's

requirements "are not waived or admitted by the default" and "the Court will engage in rigorous

analysis of Rule 23's prerequisites").  While "the procedural device of the class action permitted

the court initially to assess the defendant's potential liability for its conduct without regard to the

individual components of each plaintiff's injuries," from that "point forward, it became the

---

Court specifically acknowledged that "the only individualized inquiry would relate to the amount
of Plaintiffs' damages."  *Id*. at 608.  While the *Turner* settlement included property damage
claims, the Fifth Circuit's consideration of issues raised in the settlement had no relationship to
the propriety of aggregate damages awards.

[11] Rather than address the relevant aggregate damages decisions from this Circuit, Plaintiffs cite
federal antitrust class action certification opinions where there is "a more relaxed burden of
proof." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 206-07 (5th Cir.
2000).  "Antitrust plaintiffs have a limited burden with respect to showing that individual
damages issues do not predominate" and "do not need to supply a precise damage formula at the
certification stage of an antitrust action."  *In re Terazosin Hydrochloride Antitrust Litig.*, 220
F.R.D. 672, 698-99 (S.D. Fla. 2004); *see also In re NASDAQ Mkt-Makers Antitrust Litig.*, 169
F.R.D. 493, 521-23 (S.D.N.Y. 1996) (certification may be appropriate "with respect to proof of
injury, *even though individualized inquiry may be necessary on the quantum of damages.*"
(emphasis added)).
        Even in the antitrust context, however, the kind of unscientific, untethered, and unreliable
methodology proffered here would not pass muster.  Where, as here, "[t]he plaintiffs' proposed
damages formula instead attempts to project a measure of damages, for all the class members,
that in no way accounts for the vast differences among those class members," certification will
be denied.  *Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 304-06 (5th Cir. 2003) (proposed
damages formula for antitrust class action improperly "utilized a nationwide average cost of
labor"; held, "any adequate estimation of actual damages suffered would require consideration of
the variegated nature of" the class members); *Eleven Line*, 213 F.3d at 207-09 (plaintiff's
"damage proof cannot be reconciled with even the lenient standard approved by antitrust law"
where formula was based on average of rates of return of similar businesses, and failed to
account, *inter alia*, for differences in location and size between various businesses used to
calculate the average).

10

responsibility of each individual plaintiff to show that his or her specific injuries or damages" were caused by defendant. *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 317 (5th Cir. 1998) (quoting *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988)).[12]

"We cannot emphasize this point strongly enough because *generalized proofs will not suffice to prove individual damages* . . . Although many common issues of fact and law will be capable of resolution on a group basis, *individual particularized damages still must be proved on an individual basis*." *Sterling*, 855 F.2d at 1200 (emphasis added). In keeping with this fundamental tenet, the Fifth Circuit has repeatedly held that class-wide aggregated damage awards that ignore the extent of individual plaintiffs' injuries are unsustainable. Plaintiffs' Damages Motion disregards this well-established precedent.

###### A.     Controlling Authority Rejects Plaintiffs' Attempt To Substitute Extrapolated Figures For Necessarily Individualized Damage Inquiries.

In *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), the Court noted that, under Title VII, "a district court must usually conduct additional proceedings . . . to determine the scope of individual relief" for employment discrimination, but instead of those individualized proceedings, the class plaintiffs proposed, similar to Plaintiffs here, that "[a] sample set of the class members would be selected" and the validity of their claims determined by a master; "[t]he percentage of claims determined to be valid would then be applied to the entire remaining class, and the number of (presumptively) valid claims thus derived would be multiplied by the average backpay award in the sample set to arrive at the entire class recovery—without further individualized proceedings." *Id.* at 2561. The Supreme Court unequivocally "disapprove[d] that

---

[12]  *See also O'Sullivan v. Countrywide Home Loans, Inc*., 319 F.3d 732,744-45 (5th Cir. 2003) (even though liability for violating Texas statute prohibiting unauthorized practice of law could be established on a class wide basis, the extent of the practices varied by transaction, and plaintiffs were entitled to refund only for those practices that violated the statute; thus, each transaction had to be dissected to determine the extent of liability and damages).

novel project" as violative of the Rules Enabling Act, which "forbids interpreting Rule 23 to 'abridge, enlarge or modify any substantive right. . . .'" *Id.* (citing 28 U.S.C. § 2072(b) (2012)).[13]

Plaintiffs' attempted short circuit of a necessarily individualized damage inquiry here, based on equally formulaic use of a "sample set," should likewise be disapproved. *See, e.g.*, *MP Vista, Inc. v. Motiva Enterps., LLC*, 286 F.R.D. 299, 309-10, 312 (E.D. La. 2012) (in putative class action by gas stations against providers of contaminated gas, there was no "formulaic way to calculate damages" where such determination "will require analyzing the specific circumstances for every class member on an individualized basis"; denying certification motion in which plaintiffs proposed "sample trials" and determination of damages "for individual plaintiffs based on calculations derived from" expert's report).

Even in the class action context, "plaintiff's injury by defendant's product and plaintiff's resultant damages must be determined as to 'individuals, not groups.'" *Cimino*, 151 F.3d at 313; *see also id.* at 312 (Rules Enabling Act mandates that "use of Rule 23(b)(3) . . . does not alter the required elements which must be found to impose liability and fix damages"); *Sterling*, 855 F.2d at 1200.[14] That essential precept would be violated by permitting Plaintiffs to substitute their extrapolated, hypothesized damage figures for individualized proof of tort damages.

---

[13]  *See also Jimenez v. Allstate Ins. Co*., 765 F.3d 1161, 1167-69 (9th Cir. 2014) (since *Dukes*, "courts including this one have consistently held that statistical sampling and representative testimony are acceptable ways to determine liability so long as the use of these techniques is not expanded into the realm of damages"; upholding certification where district court "preserved the rights of Allstate to present its damages defenses on an individual basis").

[14]  *See also Hickory Sec. Ltd., v. Republic of Argentina*, 493 F. App'x 156, 159, 160 n.2 (2d Cir. 2012) ("aggregate calculations that result in inflated damage figures that do not accurately reflect the . . . amount of economic harm actually caused . . . violate the Rules Enabling Act"; vacating award of aggregated class damages against the Republic of Argentina, court explicitly rejected the notion of entering inflated judgments and leaving it to a claims process to make the individual allocations) (citing *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215*,* 231 (2d Cir.

A pair of Fifth Circuit decisions in an asbestos products liability action—*In re Fibreboard Corp.*, 893 F.2d 706 (5th Cir. 1990), and *Cimino v. Raymark Industries*—foreclose just such a demand.  There, plaintiffs' proposed trial plan contemplated full trials on liability and damages for 41 class members' claims, plus expert testimony regarding the total damage award for the entire, approximately 3,000-member class.  The jury—after liability was conclusively established—would thereafter determine actual damages in a lump sum for each disease category for all plaintiffs in the class.  The Fifth Circuit rejected that plan because, *inter alia*, the "level of generality" was unmoored from each plaintiff's actual "discrete injury."  *Fibreboard*, 893 F.2d at 712.[15]

After the district court modified the trial plan on remand, and the cases were tried to judgment, the Fifth Circuit *again* reversed, in the *Cimino* case, holding that the district court had violated defendant's rights to have distinct actual damages determined for each plaintiff.  *Cimino*, 151 F.3d at 317-21.  Just like the *Germano* and *Hernandez* trials on which Plaintiffs rely here, the only trials in *Cimino* "that spoke to actual damages" involved "evidence only of the damages to the particular plaintiffs before them"; these trials only determined those "particular plaintiffs' actual damages individually and severally (not on any kind of a group basis)" and "did not determine or purport to determine, the damages of any other plaintiffs or group of plaintiffs."

---

2008), *abrogated on other grounds* ("Roughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability")).

[15]  *See also Kemp v. Metabolife Int'l, Inc.*, No. 00–cv–13, 2002 WL 113894, *3 (E.D. La. Jan. 25, 2002) (following *Fibreboard* for proposition that class treatment of product liability claims is generally improper, because "damages . . . for instance, must be determined individually"); s*ee also In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) (recognizing in mass tort litigation "that the class members' damages 'would have to be decided on an individual basis were the cases not being settled'").

*Id.* at 320. "*Even in the context of a class action . . . individual damages must still be proved individually.*" *Id.* at 319 (citations omitted; emphasis added).

*Cimino* also rejected plaintiffs' argument that a prior decision, *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997), approved "the use of bellwether verdicts when shown to be statistically representative"; the court noted that any suggestion in *Chevron* "that representative bellwether verdicts could properly be used to determine individual causation and damages for other plaintiffs" was *dicta*, and that in *Chevron* itself the individual damages issues would *not* have been "controlled by" the bellwether verdicts. *Cimino*, 151 F.3d at 318.

Furthermore, even if the *Chevron* court *had* authorized the use of "bellwether" or "sample set" trials to determine damages for other plaintiffs (and assuming such a procedure would be tenable post-*Wal-Mart v. Dukes*), that case only further establishes why the class-wide damage award Plaintiffs propose here is fundamentally flawed and cannot stand. *Chevron* was a mass action of 3,000-plus plaintiffs seeking damages from alleged ground contamination. The district court's trial plan contemplated that 30 plaintiffs would be chosen by the parties for a joint trial that would determine general liability and causation as well as individual damage issues. The Fifth Circuit rejected that plan, holding:

> Before a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected. Typically such finding must be based on competent, scientific, statistical evidence that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect the results that would be obtained from trials of the whole.

*Chevron,* 109 F.3d at 1020.

The damage award Plaintiffs seek clearly runs afoul of *Chevron*'s *dictum*:  Plaintiffs propose extrapolating the findings from seven plaintiffs in a single state to yield a massive, class-wide lump sum damage figure—*without any showing that those plaintiffs are representative of the class.*  Certainly, there is no "competent, scientific, statistical evidence that identifies the variables" necessary to establish that the *Germano* plaintiffs' claims were representative of anything other than their own unique circumstances.  *Id.; see also* Marais Exp. Decl. ¶ 10 (noting that Mr. Inglis' extrapolations from the *Germano* homes "is fundamentally flawed because he provides no basis for assuming that this small sampling of seven class properties is validly representative of the great majority of 3,732.").[16]

*Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770 (7th Cir. 2013) is also instructive; there, the Court of Appeals affirmed decertification of a putative class action alleging that defendant employer violated wage and overtime laws.  It held that plaintiffs' proposed trial plan was infeasible due to variance in damages across class members; "[t]he plaintiffs proposed to get around the problem of variance by presenting testimony at trial from 42 'representative' members of the class" but there was "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses. . . ." *Id.* at 774.  Further, "even if the 42, though not a random sample, turned out by pure happenstance to be representative," the court held "this would not enable the damages of any members of the class other than the 42 to be calculated.  To extrapolate from the experience of the 42 to that of the 2,341 would require that all 2341 have done roughly the same amount of

---

[16]  Notably, Dr. Marais further opines that "because plaintiffs have disclosed no valid random sample of class properties, they possess no apparent basis for *any* statistically valid extrapolation concerning the entire population of class properties."  Marais Exp. Decl. ¶ 10.

work, including the same amount of overtime work, and had been paid the same wage," and "[n]o one thinks there was such uniformity." *Id.*[17]

Precisely the same is true here; "evidence of the experience of a small, unrepresentative sample" of claimants cannot establish damages for the whole class. *Id.* at 775. Only when "it appear[s] that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program," can the district court properly award class-wide relief. *Id.* at 773. As shown *infra*, "[n]othing like that is possible here." *Id.*

## II.   *GERMANO* CANNOT SUBSTITUTE FOR INDIVIDUALIZED CONSIDERATIONS.

Plaintiffs and Mr. Inglis wrongly *assume* that damages for thousands of class members nationwide can be extrapolated from the average of the estimated damages awarded to the seven property owners in Virginia in 2010. In doing so, Plaintiffs have not presented the sort of "competent, scientific, statistical evidence that identifies the variables" necessary to establish that the claims of the homeowners in the *Germano* hearings are representative of the entire class, as *Chevron* contemplates. (*See also* Marais Exp. Decl. ¶10 ("Mr. Inglis' far-reaching extrapolation to the entire class of estimated costs from the seven *Germano* Properties, an unscientific, improvised sampling of class properties in Virginia is fundamentally flawed[.]"); *id.* at ¶ 22 (noting that reliance on the *Germano* properties is improper because Mr. Inglis "has provided no basis for assuming that these properties are properly representative of the entire class.").) Indeed, as discussed below, Mr. Inglis' analysis is based on oversimplistic, unproven,

---

[17]  *See also In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*, 984 F. Supp. 2d 1021, 1040 (C.D. Cal. 2013) (granting defendants' motion to exclude expert testimony regarding methodology for proposed statistical sampling of loans supporting mortgage-based securities; "the underlying data is insufficient and the sampling methodology cannot be reliably applied due to systematic error resulting from use of the litigated loans as the primary source of underlying data").

and unreliable assumptions at every level.

### A.   Neither Plaintiffs Nor Mr. Inglis Make Any Effort to Calculate Actual Damages.

At the outset, Mr. Inglis' reliance on five-year old *estimates* of repair costs for seven claimants' homes as the benchmark for Plaintiffs' aggregated damages demand for more than 3700 properties is insufficient because the *actual* costs for a significant portion of those repairs are available.[18]   Property owners who have not already remediated and have no actual cost information are not in Plaintiffs' defined class.  The Court certified a class of "owners of real property . . . asserting claims for *remediated* damaged arising from . . . Chinese  Drywall."  (Rec. Doc. 18028, Class FOFCOL, at 34-35 (emphasis added).)  Said differently, the class member **must**, by definition, have already incurred the remediated costs to be a class member.  The Court further required that any class damages calculation be based on "empirical evidence concerning the cost of remediation *performed* by [the Program Contractor] under the *Knauf* settlement program."  (*Id.* at 32 (emphasis added).)  Nonetheless, both Plaintiffs and Mr. Inglis have ignored the *actual* repair cost information available for class members' homes in favor of drawing mathematical derivations based on  a handful of outdated *estimates*.[19]   This alone is a fatal defect in Mr. Inglis' "methodology."

---

[18] While the BNBM parties have yet to receive or analyze the many thousands of pages of underlying documentation Plaintiffs and their expert had available to them, BrownGreer has identified hundreds, if not thousands of documents that identify the actual costs property owners have incurred in the process of remediating their homes.

[19] Mr. Inglis' opinion is based, in part, on his review of "a square footage database of the 3,739 buildings in the Taishan Chinese Drywall class," presumably made available to him from *Knauf* Settlement Administrator BrownGreer PLC, as referenced in the Class FOFCOL (Rec. Doc. 18028 at 33).  (Inglis Aff ¶ 4.)  If true, Mr. Inglis could have also accessed other information available through that database, including for example, the Owner Disclosure Affidavits wherein claimants were requested to provide, *inter alia*, storage expenses paid; moving expenses paid; alternative living expenses paid; and total cost of construction paid.  (Rec. Doc. 12061-7 at Ex. A-1.)  Yet Mr. Inglis either completely overlooked or deliberately ignored this actual cost data.

As the Fifth Circuit explained, "[d]amages may be predicated on the basis of estimates only when the loss has not been repaired.  If the damaged property has been restored to its former condition by repair, the proper basis for assessing the damage is the repair bill." *Volkswagen of Am., Inc. v. Robertson*, 713 F.2d 1151, 1169 (5th Cir. 1983) (quoting *Lambert v. Allstate Ins. Co.*, 195 So.2d 698, 700-01 (La. App. 1st Cir. 1967) (internal citations omitted)); *accord Lacroix v. State Farm Fire & Cas. Co.*, No. 09–cv–0609, 2010 WL 2265577, at *4 (E.D. La. June 2, 2010).  As the *Volkswagen* court further discussed, "Plaintiff must produce the best evidence available in support of his claim. . . . Where invoices, statements, or records of accounts expended in the repair of damages are in the possession of plaintiff or are available or attainable, such records constitute the best evidence and should be offered in proof of plaintiff's claim." 713 F.2d at 1169.  Here Plaintiffs ignore this standard in order to promote their oversimplistic "one size fits all" approach.

To state it plainly, "[o]ne cannot rely on estimates when the actual data is readily available." *CSC Holdings, Inc. v. Redisi*, 309 F.3d 988, 995 (7th Cir. 2002).  That is common sense, and reflects the "cardinal rule of evidence that plaintiff must produce the best evidence available to prove his claim." *Sutherlin Sales Co. v. United Most Worshipful St. John's Grand Lodge of Ancient Free & Accepted Masons*, 127 So.2d 253, 259 (La. App. 4th Cir. 1961).[20] While use of estimated costs may have been appropriate years ago, before the properties were

---

[20]  This is a common, hornbook principle.  *See, e.g.*, Bruner and O'Connor on Construction Law § 19:80 (owner has burden of proving "cost to repair" to a "reasonable certainty"; "for repairs already completed at time of trial, 'cost to repair' is proven by actual incurred costs—the best evidence of such damages"); *Barile Excavating & Pipeline Co. v. Kendall Props., Inc.*, 462 So.2d 1129, 1130 (Fla. Dist. Ct. App. 1984) (since "actual cost figures were available, we conclude that error occurred when the trial court based its judgment on the estimated cost of completion"); *Arnett v. Helvie*, 267 N.E.2d 864, 872 (Ind. App. 1971) ("best evidence" of income from farm "would have been to have called the farmers sitting in the courtroom who had farmed the land during the time in question"; excluding expert's testimony based on "a study of court house records, other farms, and his knowledge of farm operations").

remediated, Plaintiffs cannot now simply ignore the reality that actual repair cost data is available, nor may the Court disregard Plaintiffs' duty to present the best evidence available in support of their damage request today.

The fundamental principle expressed in the foregoing cases is also grounds for exclusion of an expert's testimony under Federal Rule of Evidence 702 and *Daubert*.  Courts in this district have consistently excluded expert testimony where, as here, the purported expert relied on estimates and failed to consider the repair costs actually incurred in restoring properties.  *See, e.g.*, *Trujillo v. State Farm Fire & Cas. Ins. Co.*, No. 09–cv–8, 2011 WL 162883, at *3 (E.D. La. Jan. 19, 2011) ("the court will *not* allow Mr. Kotter to testify regarding his estimate of repairs if actual repairs were substantially performed or actual repair costs were incurred . . . and he failed to take into account the actual repairs or the repair costs") (emphasis in original).[21]  Here, of course, Mr. Inglis made no effort to determine the actual cost of remediation (or alternative living expenses)—not for the seven Virginia claimants[22] or any other class member.

Plaintiffs' attempt to extrapolate their massive aggregate award—before even reaching the lack of any valid statistical basis—fails because the use of estimates when actual cost data exists is fundamentally improper as a matter of law.

**B.    Mr. Inglis' Scope of Remediation Assumes, Without Support, Maximum Damage for Every Class Member.**

First, Mr. Inglis' damages calculation wrongly assumes every class members' residence required full replacement of, *inter alia*, all drywall, wiring, copper pipes, HVAC systems,

---

[21]  *Accord Lombardo v. State Farm Fire & Cas. Ins. Co.*, No. 09–cv–512, 2010 WL 2399350 (E.D. La. June 8, 2010); *Lightell v. State Farm Fire & Cas. Co.*, Nos. 08–cv–4393, 09-1696, 2009 WL 5217087 (E.D. La. Dec. 31, 2009); *Tardo v. State Farm Fire & Cas. Co.*, No. 08–cv–1165, 2009 WL 1804766 (E.D. La. June 22, 2009).

[22]  Additionally, Plaintiffs' prior expert, Ronald Wright, was personally involved in the inspection of the *Germano* homes.  This is not true of newly proposed expert Mr. Inglis.

19

carpeting, cabinets and insulation throughout the residence, regardless of the amount of purportedly defective drywall installed—essentially gutting the home to the studs and rebuilding it. The assumption of maximum damage without regard to any of the individualized facts of each class member is unsupported and patently improper. (*See* Marais Exp. Decl. ¶ 21.) Indeed, the *Germano* case—the underpinning of Mr. Inglis' entire opinion—included the Hernandez home, where the Court found that Mr. Inglis' proposed scope of remediation would have been unnecessary.

C.      **Mr. Inglis' Remediation Cost Estimates are Based on Seven Virginia Residences That Have Not Been Shown to Be Reflective or Representative of the Class Members' Properties.**

Mr. Inglis' $118.89 sq/ft estimated remediation cost (minus any reduction for local cost factors) ignores that remediation costs will vary depending on, *inter alia*, the prior condition and value of the property, the quantity of drywall to be replaced, the length of time the drywall was in the house, and the amount of time necessary to remediate. (*See* Marais Exp. Decl. ¶ 21.) Instead, his calculation is based solely on the seven homes inspected in Southeast Virginia in 2009. There is no statistical evidence to support Mr. Inglis' apparent assumption that the properties at issue in *Germano* are reflective or representative of the broader class members' properties, which are located in 18 different states. (*See* Marais Exp. Decl. ¶ 10.) Nothing in the record suggests that Mr. Inglis made any effort, or was even qualified, to determine with any statistical confidence or within any acceptable margin of error that the cost per sq/ft to remediate the Virginia homes is representative of the various types of properties in the 18 different states in which the class members class reside. (*See id*. ¶ 18.) For example, there is nothing in the record similar to the evidence provided in *Germano* from the "local reputable Virginia contractors" who confirmed that the cost estimates offered provided an appropriate foundation for the pricing

estimate.[23]

### D. Estimated Per Square Foot ALE Costs Have Not Been Shown to be Reflective of Class Members' Damage.

Mr. Inglis purports to calculate ALE based on a dollar-per-square-foot basis, but provides no statistical support for his assumption that there is any correlation, let alone a perfect one, between a class members' square footage and any alternative living expenses they may incur. (*See* Marais Exp. Decl. ¶ 34 ("Whether the correlation Mr. Inglis simply *assumes* actually *exists* throughout the class is an empirical question . . . . Mr. Inglis proffers no such data or analysis, however; he simply assumes the answer and relies on it."))  The concept is absurd on its face.  A family of significant means and a lavish lifestyle living in a smaller home in an exclusive area might have significantly greater ALE than a family of more modest means who lives in a larger home located in a less desirable neighborhood.  But under Mr. Inglis' analysis, the latter family would be awarded more ALE than the former.

Beyond that, Mr. Inglis' award ($11.86 per sq/ft for each property) is based solely on the rental and property storage costs from *Germano*, *Hernandez*, and for a single condominium complex, "Villa Lago" Condominiums, plus an additional unsupported assessment for personal property losses.  (*See* Inglis Aff. at 7.)  However, there is no explanation as to why the *Germano* or *Hernandez* properties, or the Villa Lago Condos (apparently located in Boynton Beach, Florida), with monthly rental costs of $1,186/month plus property storage of $239/month, are

---

[23] Contrary to Plaintiffs assertions, the damages awarded in *Germano* were not based upon a square foot methodology.  Each of the seven *Germano* plaintiffs were awarded actual estimated costs.  With respect to each plaintiff, two independent remediation estimates were averaged to assess the projected remediation costs and the estimated square footage of each property.  The average remediation costs were then added and divided by the aggregated average square footage amounts to arrive at $86 per square foot.  That rate does not reflect the damages awarded to *any* of the *Germano* plaintiffs.  Similarly, in the *Hernandez* case, which was a Louisiana individual action, the award amounted to $81 per sq/ft, almost $5 per sq/ft less than the remediation award in *Germano*.  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-6050, 2010 WL 1710434, at *19-20 (E.D. La. Apr. 27, 2010).

fairly representative of pricing in all 18 states or the alternative living expenses that would vary widely depending on the class members' specific circumstances and standard of living.  (*See* Marais Exp. Decl. ¶ 34.)

Mr. Inglis also fails to provide any basis—statistical or otherwise—for why any of these estimates are representative of or applicable to every class member.  For example, he calculates 5 months of alternative living expenses; however, the *Hernandez* findings only provided for 4 months, and data collected by BrownGreer (and in possession of Plaintiffs' counsel) indicates that the average time to remediate a home is much closer to 3 months.[24]  And even in *Germano* one of the homes was an example where "localized use of Chinese drywall" could be repaired as a "stand-alone unit of the home, without removing all drywall in the home"—in that instance, the homeowners' damages were calculated by the Court to be less than 10% of any of the other homes analyzed by the Court.  (Rec. Doc. 2380, *Germano* FOFCOL, at 82-83.)  Mr. Inglis' numbers, and Plaintiffs' corresponding demand, assume that remediation is *always* so significant that every single class member will need to move out of their home—there has been *no* showing that such additional costs will be required or were actually incurred by all class members.

Mr. Inglis also simply assumes that every class member would be entitled to ALE.  By way of example, only six of the seven *Germano* homeowners had to replace Chinese drywall in their primary (or sole) residence.  Mr. Inglis does not address the scenario where the home is not the class member's primary residence—something that may be a significant factor given that at least a portion of the homes in the class are likely second homes or vacation homes.  If the home is not the primary residence, then ALE is not owed or are at least mitigated.  By the same token,

---

[24] Recently, BrownGreer PLC provided some information on remediation costs and duration. According to a summary table provided, property remediation lasted on average of 3.49 months. The summary table is attached hereto as **Exhibit 1** to the Transmittal Declaration of Matthew Nickel in Support of BNBM PLC's and BNBM Group's Opposition to Plaintiffs' Motion for Assessment of Damages ("Nickel Decl.," attached as **Exhibit C**).

an empty nester couple living in a five bedroom home might incur significantly less ALE than a family of five living in a similarly sized home.  Moreover, the hundreds of properties in the class that are corporate owned (*see, e.g.*, Inglis Aff., at Ex. 10, Alabama Rows 11-14 (Keith Hall Properties, Inc.), Florida Rows 50-79 (H. Harris Investments, Inc.), 118-127, 229-238, 258-65, 482-489 (RCH Holdings II, LLC)) will not have anywhere near the same costs as a private homeowner.  But Mr. Inglis' formula takes none of this into account.

Finally, Mr. Inglis also applies an "RS Means" conversion factor of 130% to covert the 2010 rates into 2015 dollars.  As Mr. Inglis's colleague, Mr. Ronald Wright, has previously testified, RS Means "compiles costs and labor information from contractors, from vendors [and from] subcontractors" relating to *construction costs.*  (Rec. Doc. 2191, *Germano* 2/22/10 AM Hr'g Tr., at 112:25-113:8.)  There is no support showing that rental/storage rates have matched the rate of construction costs.  In short, this calculation for alternative living expenses is entirely unsupported.  (*See* Marais Decl. ¶ 35.)

### E.   The Court Did Not Certify a Loss of Use Damages Claim, Nor is There Any Support for a Finding That Every Class Member Has Suffered $100,000 in Loss of Use.

Plaintiffs do not actually provide any support for their request of $100,000 per class member for loss of enjoyment and only vaguely suggest that the amount is "consistent with" the *Germano* findings.  (*See* Damages Motion, at 7 (citing *Germano*, 706 F. Supp. 2d at 712).)  As a threshold issue, the Court did not even certify a "loss of use" damages claim.  (Rec. Doc. 18028, Class FOFCOL, at 34.)  The certified class is limited to "claims for remediated damages. . . ." (*Id.*)  The Court's entire certification analysis assessed whether the "property damage" remediation claim met Rule 23 requirements.  (*Id.* at 27 ("[t]he property damage claims . . . are typical of, if not identical in nature to, those of the class members"); *id.* at 33 (Plaintiffs can "determine class-wide property damages as required by the Rule 23(b)(3) predominance

requirement").)  There is simply no finding that assessment of classwide damages on loss of use

meets the requirements of Fed. R. Civ. P. 23(b)(3).

However, even if such claims were certified, there is no support for Plaintiffs' claim that

*every* class member has suffered any loss of use, not to mention the magnitude of $100,000.

Moreover, the undifferentiated award of $100,000 for every class member is not, in fact,

consistent with the findings in *Germano* as suggested by Plaintiff.  In *Germano*, the Court

undertook a factually intensive and very case specific analysis into the specific circumstances of

*each* of the seven homeowners, going to great lengths to discuss the reasons why each one of

them suffered as a result of the drywall in their homes.  *See Germano*, 706 F. Supp. 2d at 693-

713.  As a result, the Court awarded $100,000 to six of the seven homeowners; one homeowner

was awarded $30,000.  At the same time, in *Hernandez* there was no award of any kind for

pecuniary "loss of use" damage.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig*., No.

09-6050, 2010 WL 1710434, at *24 (E.D. La. Apr. 27, 2010).  Thus, it cannot be true, even

assuming the Court's prior determinations were somehow controlling on this particular request,

that a blanket award of $100,000 per class member is appropriate.

In *Germano*, the Court also analyzed Virginia law finding it permitted the "recovery of

damages for loss of use and enjoyment of residential property."  *See Germano*, 760 F. Supp. 2d

at 693 (citing *Bowers v. Westvaco Corp*., 244 Va. 139 (1992)).  Plaintiffs do not provide any

authority that would support the award of such damages in any of the other 17 states.[25]  And to

---

[25]  Indeed, the caselaw is clear that several states in which class members reside do not permit
such "enjoyment" damages absent additional circumstances not alleged by Plaintiffs.  *See*, *e.g*.,
*Birmingham Coal & Coke Co. v. Johnson*, 10 So. 3d 993, 1000 (Ala. 2008) ("[D]amages for
mental anguish and emotional distress are proper only in tort cases in which plaintiff is in the
'zone of danger.'"); *Dooley v. Richland Mem. Hosp*., 322 S.E.2d 669, 671 (S.C. 1984) (reversing
award of damages for negligent infliction of emotional distress because plaintiffs "failed to make
any showing of physical injury [to the plaintiffs] to support their claim").  Similarly, because
Louisiana law prohibits these types of damages in this action, *see Chriss v. Manchester Ins. &*

the extent that loss of use and enjoyment includes compensation for the need to find alternative

living quarters, it is essentially a double-count of the ALE request.

## III.   METHODOLOGY ASIDE, AN AWARD OF CLASS WIDE DAMAGES AGAINST BNBM GROUP OR BNBM PLC WOULD BE IMPROPER.

Plaintiffs' only argument for assessing class-wide damages against BNBM Group and

BNBM PLC is to rely on the Court's prior finding that those entities, along with Taishan and

others, constitute a "single business enterprise for purposes of. . . holding each of these entities

liable." (Rec. Doc. 18028, Class FOFCOL, ¶ 50; *see also* Rec. Doc. 18086-1 at 2 n.2 (listing

"Taishan Defendants" for which damages assessed).)  But as explained above, and in more detail

in BNBM Group's and BNBM PLC's Motion to Vacate Entries of Preliminary Default (Rec.

Doc. 18851), that prior finding cannot stand because it was based entirely on deemed admissions

against a co-defendant.  *See Becerra v. Asher*, 921 F. Supp. 1538, 1544 (S.D. Tex. 1996), *aff'd*,

105 F.3d 1042, 1048 (5th Cir. 1997) (deemed admissions of one party cannot be used against a

co-party); *see also Riberglass, Inc. v. Techni-Glass Indus., Inc*., 811 F.2d 565, 566-67 (11th Cir.

1987) (deemed admissions of co-defendants could not bind defendant who did respond to

requests).[26]  As established by the facts set forth in the affidavits that have been submitted to the

---

*Indem. Co.*, 308 So. 2d 803, 805 (La. Ct. App. 1975), the parties in *Hernandez* stipulated that the plaintiffs there were "not entitled" to any non-pecuniary damages, including damages for "loss of use and enjoyment."  *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, No. 09-6050, 2010 WL 1710434, at *24 (E.D. La. Apr. 27, 2010).

[26]  Even if Plaintiffs could treat BNBM Group, BNBM PLC, and Taishan as a "single business enterprise" Plaintiffs have still not presented sufficient evidence to establish that defective drywall from this "single enterprise" caused the alleged damages based on the factual allegations in the record.  The class consists of "named Plaintiffs on the complaints in *Amorin, Germano, Gross,* and/or *Wiltz*."  (Rec. Doc. 18028, Class FOFCOL ¶ 79.)  And Plaintiffs rely on the entries of preliminary default in those cases to establish the liability of the "single enterprise" for the class-wide damages it now assesses.  (Rec. Doc. 18086-1 ("Liability has already been established for the proposed class in light of the various default judgments against the Taishan Defendants.").)  Even if the allegations in each of those complaints are accepted as true by virtue of default, however, those allegations still do not establish the source of the harmful drywall as to

Court, BNBM PLC, BNBM Group, and Taishan are not alter egos.  (*See* the analysis and cited exhibits discussed in BNBM PLC's 12(b)(2) Memorandum., Rec. Doc. 18849-1, at 29-30; BNBM Group's 12(b)(2) Memorandum, Rec. Doc. 18841-1, at 17-18; and Motion to Vacate Memorandum, Rec. Doc. 18851-1, at 9-12, which are incorporated by reference as if fully set forth here).  As discussed in detail in the prior submissions, there has been no commingling of funds between the entities, statutory formalities for incorporating corporate affairs are followed, they are not undercapitalized, the bank accounts are separate, bookkeeping records are separate, and regular shareholder and director meetings are held.  *See id.*  In short, there is no evidence that would support a determination that the companies constitute a "single business enterprise" or that piercing the corporate veil would be appropriate.  *See id.*

As a result, to establish the liability of BNBM Group or BNBM PLC, Plaintiffs must connect the actions of those entities directly to the class-wide harm alleged.[27]  Put another way, Plaintiffs must show BNBM Group or BNBM PLC manufactured and sold defective drywall to the class members and that that drywall caused the alleged harm.  Plaintiffs have not satisfied this burden and thus cannot seek the assessed damages from either BNBM Group or BNBM PLC.

Indeed, the current factual record shows just the opposite.  BNBM Group did not manufacture drywall at all.  (*See* Declaration of Xianfeng Yu, attached as Exhibit 2 to BNBM Group's Memorandum in Support of its Motion to Dismiss Pursuant to Rule 12(b)(2) and

---

the class as a whole or as to any class member in particular.  *See Wooten v. McDonald Transit Associates, Inc*. 775 F.3d 689 (5th Cir. 2015).

[27] At the same time, under the applicable state laws of the Plaintiffs' claims causation against the BNBM companies cannot be established through default.  *See, e.g.*, *Talucci v. Matthews*, 960 So. 2d 9, 10 (Fla. 4th DCA 2007) ("The right to contest unliquidated damages in any negligence action encompasses the right to challenge the causal relationship between the damages claimed and the liability established by the default.").

12(b)(5) (Rec. Doc. 18851-5.))  And the only testing of a sample of BNBM PLC manufactured drywall found in the U.S. found that the sample was not defective.  Pursuant to their commission from The U.S. Consumer Products Safety Commission (CPSC), the Lawrence Berkley National Laboratory tested 30 brands of imported drywall used in the U.S. market for reactive sulfur gas emissions and found BNBM PLC drywall showed that the hydrogen sulfide emissions of the 2006 sample were on par with North American drywall.[28]  The testing also showed that the BNBM PLC drywall had sulfur dioxide emissions consistent with North American drywall.  (*Id.*) And the CPSC specifically noted that certain "Chinese drywall samples had low or no detectable emissions of hydrogen sulfide [including] Dragon Brand, Beijing New Building Materials Co. Ltd.: (2006) China."[29]  Importantly, the CPSC's investigation into problematic drywall was both credible and thorough.  The investigation to help affected homeowners began in early 2009 and involved significant agency resources.  The testing conducted was driven by sound science and included the Department of Housing and Urban Development (HUD), the U.S. Centers for Disease Control and Prevention (CDC) and the U.S. Environmental Protection Agency (EPA) as members of the Federal Interagency Task Force on Problem Drywall.  As discussed in the published findings, the CPSC and HUD met with deeply-impacted homeowners, used the best national laboratories to research and test drywall, visited Chinese manufacturers and plants, and

---

[28]  *See* Memorandum from Joanna Matheson, Ph.D., Toxicologist, Directorate for Health Sciences (Jan. 3, 2011), http://www.cpsc.gov/PageFiles/99196/lblreport.pdf (attached as **Exhibit 2** to Nickel Decl.).  The relevant sample on this chart is 09-810-7078.  *See* Draft Emission Factor Results (µg/m²/h) from Lawrence Berkeley National Laboratories Chamber Testing (May 27, 2010), http://www.cpsc.gov//PageFiles/114656/LBNLsulfur.pdf (attached as **Exhibit 3** to Nickel Decl.).

[29]  *See* CPSC Identifies Manufacturers of Problem Drywall Made in China, CPSC Release No. 10-243 (May 25, 2010), http://www.cpsc.gov/en/Newsroom/News-Releases/2010/CPSC-Identifies-Manufacturers-of-Problem-Drywall-Made-in-China/ (attached as **Exhibit 4** to Nickel Decl.).

devoted thousands of staff hours and millions of dollars to these activities.  Based on this testing, there is no basis to believe American homeowners were damaged by BNBM PLC drywall.

Plaintiffs have adduced no evidence that drywall manufactured by BNBM PLC was defective.  The only expert identified by the plaintiffs in any of the cases who tested the sulfur content of *any* drywall is Dr. Lori Streit.  But Dr. Streit's report, written well prior to the CPSC investigation, shows that she tested only Taishan drywall taken from eight houses, apparently all in Newport News or the adjoining city of Virginia Beach, Virginia.[30]  From these Taishan samples she extrapolated conclusions about "Chinese drywall."[31]  Dr. Streit has provided no testing or analysis of BNBM PLC drywall.  While Dr. Streit relied on a dozen or more papers and reports, none of them reflect that their authors tested BNBM PLC drywall either.[32]

Dr. Streit's flawed methodology and baseless extrapolations are exposed by the CPSC testing, which demonstrated dramatic differences between emissions from different samples of drywall manufactured in China.[33]  As HUD reported to Congress, "not all drywall from China is problematic."[34]  Based on "information from the CPSC, a problem is associated with about 43 percent of drywall imported from China."[35]  Less than half of Chinese drywall distributed in America in 2005 and 2006 was defective -- and the sample of BNBM PLC manufactured drywall

---

[30]  Pls.' Trial Ex. P1.2023, *Germano et al. v. Taishan Gypsum Co., et al.* (09-6687), Expert Report of Dr. Lori Streit, Ph.D. (Dec. 28, 2009), at 8-9 & App. III.

[31]  *Id.* at 11.

[32]  *Id.* at 8-9, 13.

[33]  *Id.* at Exhibit 3.

[34]  United States Department of Housing and Urban Development, *Study of the Possible Effect of Problem Drywall Presence on Foreclosures, Report to Congress* (July 17, 2012), at 4, http://cpsc.gov/PageFiles/161357/StudyofthePossibleEffectofProblemDrywallPresenceonForeclosures.pdf (attached as **Exhibit 5** to Nickel Decl.).

[35] *Id.* at 9.

tested by the CPSC was not in the defective minority.

To be clear, Plaintiffs have confirmed that they have performed no testing of BNBM PLC drywall that found the drywall to be defective.  BNBM PLC sought discovery of all documents relating to the testing of BNBM PLC drywall.  In response, Plaintiffs answered that the "request seeks information in the public domain and in Court records, such as reports from the Consumer Product Safety Commission and expert opinions."[36]  Neither the CPSC report nor the report filed by Plaintiffs' expert witness found the BNBM PLC drywall defective, nor have we found anything else in the "public domain" that does so.

Given these test results, it should come as no surprise that the number of class members who identified BNBM PLC drywall in their homes was strikingly low.  In fact, a review of the more than 23,000 plaintiff profile forms produced to the Defendants revealed that less than 70 property owners identified "BNBM" or "Dragon Brand" drywall in their home -- defective or otherwise.[37]  Stated another way, the PSC is seeking over $1.2 billion in class-wide damages from two companies that supplied drywall to approximately 2% of the certified class, none of which has been found defective.  Such an award is completely without justification and cannot be sustained.

## CONCLUSION

For all of these reasons, BNBM PLC and BNBM Group respectfully request that the Court deny Plaintiffs' Motion For Damages, and provide BNBM PLC and BNBM Group all such further relief that it deems just and proper.

---

[36]   A copy of the Plaintiffs' Responses is attached as **Exhibit 6** to Nickel Decl.  The response in question is the response to Request No. 2, at page 3.  *See also* Plaintiffs' response to Request No. 4.

[37] *See* Exh. B.

Dated:  May 8, 2015

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
michael.barr@dentons.com
justin.kattan@dentons.com

- AND -

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 7800
Chicago, IL  60606-6306
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com

- AND -

C. Michael Moore
Texas Bar No. 14323600
Gene R. Besen
Texas Bar No. 24045491
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
mike.moore@dentons.com
gene.besen@dentons.com

**- AND -**

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130
harry.rosenberg@phelps.com

*Attorneys for Beijing New Building*
*Material (Group) Co., Ltd. and Beijing*
*New Building Materials Public Limited*
*Company*

31

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing Memorandum of Law of Beijing New Building Materials Public Limited Company and Beijing New Building Material (Group) Co., Ltd. in Opposition to Plaintiffs' Motion For Assessment of Class Damages has been served on Plaintiffs' Liaison Counsel, Leonard Davis, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 8th day of May, 2015.


                                        */s/      Michael H. Barr*