IN THE CIRCUIT COURT OF THE FIRST JUDICIAL DISTRICT OF
HARRISON COUNTY, MISSISSIPPI

KYLE E. NEWMAN AND
DENISE G. NEWMAN                                                    PLAINTIFFS

V.                                              NO. A2401-12-244

USG CORPORATION; L&W SUPPLY CORPORATION, D/B/A SEACOAST;
INDEPENDENT BUILDERS SUPPLY ASSOCIATION;
INTERIOR/EXTERIOR BUILDING SUPPLY; BAILEY LUMBER
& SUPPLY CO.; CERTAINTEED GYPSUM INC.;
and FICTITIOUS PARTIES A-G                                          DEFENDANTS



COMPLAINT
(Jury Trial Demanded)

Plaintiffs, KYLE E. NEWMAN AND DENISE G. NEWMAN, (hereinafter referred to as

"Plaintiffs"), bring this action against, Defendants, USG Corporation; L&W Supply Corporation

d/b/a Seacoast; Independent Builders Supply Association; Interior / Exterior Building Supply;

Bailey Lumber & Supply Co.; CertainTeed Gypsum Inc.; and Fictitious Parties A-G, and in

support thereof would show unto the Court the following:

1.      Plaintiff, Kyle E. Newman, is an adult resident citizen of Hancock County,

Mississippi who resides at his address of 7333 Atti Drive, Diamondhead, Mississippi 39525.

2.      Plaintiff, Denise G. Newman, is an adult resident citizen of Hancock County,

Mississippi who resides at her address of 7333 Atti Drive, Diamondhead, Mississippi 39525.

3.      Defendant, USG Corporation is a Delaware corporation with its principal place of

business located at 550 W Adams Street, Chicago, Illinois, 60661, and at all material times, was

authorized to do and was doing business in the State of Mississippi. USG, together with its various affiliates, including Defendant Seacoast, is the nation's largest distributor of drywall and related building products. USG Corporation is doing business in the State of Mississippi by virtue of the fact that it has products distributed in the State of Mississippi against residents of the State of Mississippi and as a result thereof is doing business in the State of Mississippi and may be served with process pursuant to the Mississippi Rules of Civil Procedure.

4.      Defendant, L&W Supply Corporation d/b/a/ Seacoast Supply ("Seacoast"), is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661, and at all times material, was authorized to and conducted business in the State of Mississippi.  Defendant Seacoast has numerous supply centers in the State of Mississippi. Defendant Seacoast is a subsidiary of Defendant USG.  Seacoast is doing business in the State of Mississippi by virtue of the fact that it has products distributed in the State of Mississippi; by virtue of the fact that it has committed a tort in whole or in part in the State of Mississippi against residents of the State of Mississippi and may be served with process pursuant to the Mississippi Rules of Civil Procedure.

5.      Defendant, Independent Builders Supply Association ("IBSA"), is a member owned buying organization with its principal place of business located at 1801 Wal-Pat Road Smithfield, NC 27577, and is authorized to do and doing business in the State of Mississippi. IBSA is doing business in the State of Mississippi by virtue of the fact that it has products distributed in the State of Mississippi by virtue of the fact that it has committed a tort in whole

2

the Mississippi Rules of Civil Procedure.

6. Defendant, Interior / Exterior Building Supply, is a corporation organized and existing under and by virtue of the laws of the State of Louisiana, which has its principal place of business located at 12111 Intraplex Parkway, Gulfport, Mississippi 39503. Interior / Exterior Building Supply is doing business in the State of Mississippi and has appointed C.T. Corporation System as its registered agent for service of process. Interior / Exterior Building Supply may be served with process of this Court by serving C.T. Corporation System at its address of 645 Lakeland East Drive, Suite 101, Flowood, MS 39232.

7. Defendant, Bailey Lumber & Supply Co. ("Bailey Lumber"), is a corporation organized and existing under and by virtue of the laws of the State of Mississippi. Bailey Lumber & Supply Co. has its principal place of business located at 813 E. Pass Road, Gulfport, Mississippi 39507. Bailey Lumber & Supply Co. has registered to do business in the State of Mississippi, is doing business in the State of Mississippi and has appointed John Howard Shows as its registered agent for service of process. Bailey Lumber & Supply Co., may be served with process of this Court by serving John Howard Shows at his address of 2950 Layfair Drive, Suite 101, Flowood, MS 39232.

8. Defendant, CertainTeed Gypsum Inc., ("CertainTeed"), is a Delaware Corporation with its principal place of business located at 4300 West Cypress Street, Suite 500, Tampa, Florida 33607-4157. CertainTeed at all times, was authorized to do and was doing business in the State of Mississippi. CertainTeed is doing business in the State of Mississippi by

or in part in the State of Mississippi against residents of the State of Mississippi and as a result thereof is doing business in the State of Mississippi and may be served with process pursuant to

virtue of the fact that it has products distributed in the State of Mississippi; by virtue of the fact that it has committed a tort in whole or in part in the State of Mississippi against residents of the State of Mississippi and as a result thereof is doing business in the State of Mississippi and may be served with process pursuant to the Mississippi Rules of Civil Procedure.

9.     Fictitious Parties A–G are individuals, corporations, LLC's, or other legal entities whose identities are not known at this time who are doing business within the State of Mississippi and committed a tort in whole or in part in the State of Mississippi by manufacturing, selling, developing, inspecting, maintaining, converting services, repairing, overhauling, rebuilding, designing, and engineering drywall as alleged in other portions of this Complaint. Said Defendants are guilty of breach of legal duties to the Plaintiffs herein which proximately caused or proximately contributed to the injuries and damages as set forth in Count I through XIII of the Complaint.

## COUNT I

10.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint, the same as though specifically set out herein.

11.     Plaintiffs, Kyle E. Newman and Denise G. Newman, bring this action as owners and/or occupants of a home located at 7333 Atti Drive, Diamondhead, Mississippi 39525, in Hancock County, Mississippi, which was built or rebuilt after Hurricane Katrina with building materials, including, but not limited to, toxic drywall.

12.     The drywall used and sold by the Defendants was installed in Plaintiffs' home, was and is inherently defective and not suitable for its intended uses because it emitted various sulfide gases and/or other toxic chemicals through "off-gassing" that created noxious, "rotten

4

egg-like" odors, and caused damage and corrosion ("the Defect") to the home structure, air-conditioner and refrigerator coils, copper tubing, faucets, metal surfaces, electrical wiring, computer wiring, and various mechanical systems such as microwaves, utensils, electronic appliances, jewelry, and other household items. The compounds emitted by the drywall at issue caused damage to the health of the Plaintiffs because of the prolonged exposure. These chemical compounds caused dangerous health consequences to the Plaintiffs, including, but not limited to, respiratory problems, sinus problems, eye irritation and nosebleeds.

13.    This Defect was and is latent and existed in Defendants' drywall at the time of installation without regards as to the way the product was installed, maintained, and/or painted.

14.    The toxic drywall cannot be repaired and the toxic gases and emissions cannot be neutralized or prevented. The only solution is the total removal and replacement of the toxic drywall.

15.    Defendant, USG Corporation, exported, imported, manufactured, distributed, delivered, supplied, inspected, marketed and/or sold defective drywall in the State of Mississippi, directly or indirectly through agents, affiliates or co-conspirators, Defendant's, USG Corporation, acts or omissions related to defective drywall have injured Plaintiffs in the State of Mississippi.

16.    Defendant, L&W Supply Corporation d/b/a Seacoast Supply ("Seacoast") is a Delaware corporation with its principal place of business located at 550 W. Adams Street, Chicago, Illinois 60661, and at all times material, was authorized to and conducted business in the State of Mississippi. Defendant Seacoast has numerous supply centers in the State of Mississippi. Defendant, Seacoast, is a subsidiary of Defendant, USG. Seacoast is doing

business in the State of Mississippi by virtue of the fact that it has products distributed in the State of Mississippi; by virtue of the fact that it has committed a tort in whole or in part in the State of Mississippi against residents of the State of Mississippi and as a result thereof is doing business in the State of Mississippi and may be served with process pursuant to the Mississippi Rules of Civil Procedure.

17.     Defendant, Independent Builders Supply Association, ("IBSA") is a member owned buying organization with its principal place of business located at 1801 Wal-Pat Road Smithfield, NC 27577, and is authorized to do and doing business in the State of Mississippi. IBSA is doing business in the State of Mississippi by virtue of the fact that it has products distributed in the State of Mississippi; by virtue of the fact that it has committed a tort in whole or in part in the State of Mississippi against residents of the State of Mississippi and as a result thereof is doing business in the State of Mississippi and may be served with process pursuant to the Mississippi Rules of Civil Procedure.

18.     Defendant, CertainTeed, directly or through its agents, systematically and continuously exported, imported, manufactured, distributed, delivered, supplied, inspected, marketed, sold, and/or placed substantial quantities of defective drywall in the stream of commerce. This defective drywall was shipped to purchasers in the State of Mississippi, and was installed in numerous Mississippi homes, including the Plaintiffs' home.

19.     Defendants' actions directly or indirectly through agents or affiliates have injured Plaintiffs. Defendants also failed to provide adequate warnings regarding the hazardous and defective nature of their defective drywall to residents of the State of Mississippi.

20.     This Court has personal jurisdiction over Defendant, CertainTeed, because it is engaged in substantial business in the State of Mississippi and the business is not isolated activity within State of Mississippi.  Additionally, Plaintiffs' causes of action arise from Defendant's, CertainTeed, actions individually or through its agents, causing injury to property and health of property owners within the State of Mississippi. The Plaintiffs, at the time of the injury, used the products, materials, or things manufactured by Defendant, CertainTeed, in the State of Mississippi and in the ordinary course of commerce, trade or use.

21.     Defendants, Bailey Lumber and Supply and Interior/Exterior Building Supply, have directly or indirectly sold and/or delivered drywall to residents in Hancock and Harrison Counties, Mississippi including, but not limited to, the Plaintiffs.

22.     Defendant, CertainTeed, has directly or through its agents, systematically and continuously exported, imported, manufactured, distributed, delivered, supplied, inspected, marketed, sold, and/or placed substantial quantities of defective drywall in the stream of commerce.  This defective drywall was shipped to purchasers in the State of Mississippi, and was installed in numerous Mississippi homes, including the Plaintiffs' home.

23.     Upon information and belief, millions of square feet of defective drywall was used in the construction of United States homes, including Plaintiffs', and the defective drywall was used because of a shortage of traditional construction materials from a booming housing market and massive damage in the United States in 2005 caused by Hurricanes Katrina, Rita, and Wilma.  Domestic builders, suppliers and importers using the defective drywall including significant stocks of foreign manufactured drywall into Mississippi and the United States.

24.    Drywall is also commonly known as gypsum board, wallboard, plasterboard, rock lath, sheetrock, gyproc or simply board. A drywall panel is made of a paper liner wrapped around an inner core made primarily from hardened gypsum plaster.

25.    Drywall is typically available in 4 feet (1219 mm) wide sheets of various lengths. Newly formed sheets are cut from a belt, the result of a continuous manufacturing process. The most commonly used drywall is ½ inch thick but can range from 1/4 inch (6.35 mm) to one inch (25.4 mm) thick.

26.    The core material of drywall is available in two forms, pure gypsum, which is naturally occurring, and synthetic gypsum, which is manmade. Pure gypsum is a white to transparent mineral, but sometimes impurities color it grey, brown or pink. Synthetic gypsum is generally manufactured with byproducts of coal-fired power plants.

27.    Coal combustion byproducts ("CCBs") or coal combustion products ("CCPs") are the inorganic residues that remain after pulverized coal is burned. The primary CCBs used in drywall are byproducts resulting from a utility's attempts to remove sulfur from flue gases.

28.    In order to meet emission standards, many utilities have installed flue gas desulfurization ("FGD") equipment. Flue gas desulfurization is a chemical process to remove sulfur oxides from the flue gas at coal-burning power plants. Various FGD methods have been developed that chemically combine the sulfur gases released in coal combustion by reacting them with a sorbent, such as limestone or lime. As the flue gas comes in contact with the slurry of calcium salts, sulfur dioxide reacts with the calcium to form hydrous calcium sulfate, otherwise known as gypsum.

29.  In order to form drywall, gypsum must be "calcined", or partially dehydrated by heating.  When gypsum is heated, it loses about three quarters of its water and becomes hemihydrate gypsum, which is soft and can be easily ground to a powder called hemihydrate gypsum plaster.

30.  The gypsum powder is then mixed with water to form a paste or slurry.  The paste or slurry is typically mixed with fiber (usually paper and/or fiberglass), plasticizer, foaming agent, potash as an accelerator, starch or other chelate as a retarder, various additives that increase mildew and fire resistance (fiberglass or vermiculite), and water.

31.  The defective drywall consists of two other materials with sulfur content:  alkyl ethoxy sulfates as foaming agents and lignin or naphthalene sulfonates as dispersing agents.

32.  While the hemihydrate gypsum plaster is in slurry form, it is sandwiched between two layers of heavy paper or fiberglass mats to make drywall.  When the core sets and is dried in a large drying chamber, the "sandwich" becomes rigid and strong enough for use as a building material.

33.  Upon information and belief, Defendants' drywall contained naturally mined gypsum and synthetic gypsum manufactured from CCB's.

34.  When gypsum, mined or synthetic, is subjected to certain environmental conditions, the product breaks down into sulfate ions, which in turn can be chemically transformed into hydrogen sulfide gas and other sulfide gases.

35.  The Defendants were aware and knew of the problems of sulfide emissions from drywall since it is well documented in the drywall industry since it has been studied for many years.

9

36.     The level of sulfides emitted from drywall may depend, in part, on contamination of the drywall with sulfur materials or the use of contaminated gypsum materials.

37.     The drywall is so dangerous because of sulfide emissions that many landfills refuse to accept drywall or place strict limitations on the amounts of and/or the ways in which drywall can be disposed.

38.     The Defendants are liable for Plaintiffs' damages because the combination of sulfide gases (which causes corrosion of the coils and the substances found in Plaintiffs' home) are well known to cause corrosion.

39.     Defendants tortiously manufactured, exported, imported, distributed, delivered, supplied, inspected, installed, marketed, and/or sold defective drywall, which was unreasonably dangerous in its expected use since that the drywall caused corrosion and damage to the structures, wiring, pipes and mechanical systems in Plaintiffs' home, and caused medical ailments, including allergic reactions, coughing, sinus and throat infection, eye irritation, breathing disorders, and other health problems for the Plaintiffs, and to incur medical expenses and disabilities, and they are likely to incur additional damages of these types in the future.

40.     As a direct and proximate result of Defendants' actions and omissions, Plaintiffs' home and bodies have been exposed to Defendants' drywall and the corrosive and harmful effects of the sulfide gases and other chemicals being released from these proven hazardous substances.

41.     The Defendants acted with intentional indifference to the safety of the Plaintiffs and with reckless disregard for the safety of the Plaintiffs and as a result of the Defendants acts or omissions which constitute gross negligence the Plaintiffs are entitled to an award of punitive

10

damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

42.    As a direct and proximate result of Defendants' defective drywall and the corrosive effects of the sulfide gases and other chemicals being released from these products, the Plaintiffs have suffered, and continue to suffer damages, including but not limited to costs of inspection and the costs and expenses necessary to remedy, replace and remove the defective drywall, adjoining components, electrical wiring, personal property, and other property that has been affected.

43.    As a result of Defendants'' defective drywall, Plaintiffs will be forced to remove all defective drywall; perform extensive remedial repairs to their home; and repair the damaged property made visible during the performance of these repairs.

44.    As a further result of Defendants' defective drywall, the Plaintiffs will sustain substantial diminution in the value of the Plaintiffs' home and health consequences such as respiratory problems, sinus problems, eye irritation and nosebleeds, in addition to the creation of noxious odors.

45.    The running of any statute of limitations has been tolled due to Defendants' fraudulent concealment, since by failing to disclose known defects to Plaintiffs, and misrepresenting the nature of their products as safe for their intended uses, Defendants actively concealed from Plaintiffs the true risks associated with their drywall. The Plaintiffs could not have discovered the existence of the defect in the drywall until press reports about the defects were released in December 2008.

46.     Plaintiffs could not have reasonably known or have learned of the manufacturing defects alleged herein and that those risks were a direct and proximate result of Defendants' acts and omissions.

47.     Furthermore, Defendants are estopped form relying on any statutes of limitations because of their fraudulent concealment of the defective nature of their drywall. Defendants were under a duty to disclose the true character, quality, and nature of their products because this was non-public information over which the Defendants had, and continue to have, exclusive control and because Defendants knew that this information was not available to the Plaintiffs. In addition, the Defendants are estopped from relying on any statutes of limitations because of their concealment of these facts.

48.     Plaintiffs had no knowledge that Defendants were engaged in the wrongdoing alleged herein. Because of the fraudulent acts of concealment of wrongdoing by the Defendants, Plaintiffs could not have reasonably discovered the wrongdoing at any time prior to December 2008. The Plaintiffs did not discover that the defective drywall was installed in their residence until the summer of 2010.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

COUNT II

49.    Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

50.    After Hurricane Katrina the Plaintiffs and/or their agents, inquired about purchasing drywall for their home. After reviewing the information provided to them by the Defendants concerning the drywall, after being assured by the Defendants that the drywall was not defective; was free from defects in material and workmanship, and was not dangerous, the Plaintiffs entered into contracts for the purchase of drywall that they thought to be the standard dryboard used in the industry. Pursuant to the contracts the Defendants sold the drywall to the Plaintiffs and represented to the Plaintiffs that the drywall was designed, engineered, manufactured and sold in accordance with good engineering, designing and manufacturing practices.

51.    Plaintiffs, after consulting with the Defendants, entered into contracts with the Defendants for good and valuable consideration for the purchase of drywall that they thought to be safe and not defective. In furtherance of their contract with the Plaintiffs, the Defendants contract agreement led the Plaintiffs to believe that the drywall was safe, free from defects in workmanship and material and free from sulphur.

52.    Plaintiffs paid full consideration for the purchase of the drywall but the Defendants breached their contracts with the Plaintiffs. As a direct and proximate result of the breaches of contracts and agreements, Plaintiffs have incurred and continue to incur substantial monetary damages including, but not limited to total loss of use of their house; loss of their house; loss of their household furniture and furnishings; loss of their fixtures; and damages to Plaintiffs' health.

53.     Plaintiffs performed all of the terms of the agreements to be performed on their part but the Defendants breached their contracts with the Plaintiffs by failing to provide safe and not defective toxic drywall.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

COUNT III

54.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

55.     At all relevant times, Defendants were in the business of building, developing, inspecting, maintaining, converting, servicing, repairing, overhauling, rebuilding, designing, engineering, manufacturing, and selling drywall. The Defendants held themselves out to be specialists in their respective fields by advertising and representing that they had special knowledge and expertise in developing, building, engineering, inspecting, maintaining, manufacturing, designing and selling drywall. The Plaintiffs, based upon the representations made to them by the Defendants, purchased the drywall for use in the rebuilding and repair of their home. The Plaintiffs relied upon the representations made by the Defendants and entered into contracts for the purchase of drywall.

14

56.     At all times herein mentioned the Defendants were in the business of doing the things herein above alleged for the purposes of developing, engineering, inspecting, maintaining, manufacturing, designing, and selling drywall for residential use.

57.     At all relevant times, the Plaintiffs considered the representations made by the Defendants, including, but not limited to the following: (1) the Defendants had special expertise and specialized knowledge in developing, engineering, manufacturing, designing, constructing and selling drywall; (2) that the drywall for their residential home would be in new condition, free from defects, safe and not dangerous; and (3) that the drywall would be free from sulphur and other toxic materials.  The Plaintiffs relied upon the representations made by the Defendants and paid the Defendants the requested purchase price of the drywall.  The Plaintiffs, in purchasing the drywall relied upon the aforesaid certifications and representations made by the Defendants.

58.     Some of the Defendants corporations are sham or shell corporations which are set up, established or used by the other Defendants in an attempt to shield their individual liability.  As a result of the Defendants' fraudulently setting up shell or sham corporations to shield their individual liability, the Defendants are responsible individually for their willful, wanton and grossly negligent conduct and the willful, wanton and grossly negligent actions of their Co-Defendants.

59.     On the occasions in question, the Plaintiffs believed the representations and promises made by the Defendants and relied upon the promises, misrepresentations and fraudulent representations made by the Defendants to their detriment.  The Plaintiffs detrimentally relied upon the false and fraudulent representations made to them by the

Defendants and as a result of their detrimental reliance the Plaintiffs have suffered damages in the amount of $2,500,000.00 each.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

## COUNT IV

60.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

61.     The Defendants, at all times, were in the business of designing, manufacturing, testing, processing, engineering, inspecting, servicing, distributing, supplying, maintaining, selling, delivering, building, and developing building supplies and materials, including, but not limited to, drywall. At all times herein mentioned, the Defendants were in the business of doing the things herein above alleged for the purposes of designing, manufacturing, testing, processing, engineering, inspecting, servicing, distributing, supplying, maintaining, selling, delivering, building, and developing drywall and building materials for the Plaintiffs' home.

62.     The Defendants failed to properly plan, approve, inspect, and construct the drywall with a degree of skill and workmanship possessed by those of others in the manufacturing, designing, engineering, and selling drywall industry and/or building or construction industry.  The Defendants as agents of each other, constantly assured and represented to the Plaintiffs that the drywall was properly engineered, designed, manufactured,

16

and sold in accordance with normal procedures in the drywall manufacturing and distributing industry. The Plaintiffs, (after being assured by the Defendants that the drywall was in new condition; was in safe condition; was not defective; was engineered, designed, manufactured and sold in a workmanlike manner), recently discovered that their drywall was engineered, designed, manufactured and sold in a negligent manner and that Plaintiffs' home had deadly and toxic sulfur and other toxic materials. As a direct and proximate result of the negligence of the Defendants, including but not limited to Defendants' failure to properly inspect, design, construct, manufacture, engineer and sell the drywall the Plaintiffs have sustained serious damages.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

COUNT V

63.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

64.     The Plaintiffs contacted the Defendants about purchasing drywall for their home. After reviewing the information provided to them by the Defendants, concerning the drywall, the Defendants assured the Plaintiffs that the drywall had been used in other homes and that the drywall was safe, not defective and not unreasonably dangerous. The Plaintiffs purchased the drywall for their home after being assured by the Defendants that the drywall was safe, was free

17

from sulphur, was free of defects in material and workmanship and was not unreasonably dangerous. The Plaintiffs entered into contracts with the Defendants to purchase drywall to be used in their home and represented to the Plaintiffs that their drywall was engineered, constructed, manufactured or sold in accordance with good engineering, design and manufacturing practices.

65.     The Plaintiffs, after consulting with the Defendants, entered into contracts with the Defendants for good and valuable consideration for drywall, which was free from sulphur, free from defects in material and workmanship, and free from toxic materials. In furtherance of their contracts with the Plaintiffs, the Defendants contracted, agreed and led the Plaintiffs to believe that their drywall was safe, free from defects in material and workmanship, free from toxic materials, free from Sulphur and in all regards would be safe to use in their home and their home would be habitable.

66.     The Plaintiffs paid full consideration for the purchase of the drywall. The Defendants breached their contracts with the Plaintiffs. As a direct and proximate result of the breaches of contract and agreements, the Plaintiffs have incurred and continue to incur substantial monetary damages, including, but not limited to, total loss of their houses, total loss of use of their houses and fixtures, total loss of household furniture and furnishings, total loss of household pictures and memorabilia, and damages to their health. The Plaintiffs performed all the terms of the agreements to be performed on their part but the Defendants breached their contracts with the Plaintiffs.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five

Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

## COUNT VI

67.   Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

68.   The drywall used in Plaintiffs' residence was defective and was in unreasonably dangerous condition.

69.   The drywall used in Plaintiffs' home was not reasonably safe for its intended purposes and uses; was defective; was unreasonably dangerous; was unsafe, defective and unreasonably dangerous when the drywall left the places of business of the designing, engineering, developing, manufacturing and selling businesses.  The drywall sold to the Plaintiffs was defective and unsafe without warning to the users and consumers of Plaintiffs' home.  The Plaintiffs weren't aware of the defective and unreasonably dangerous condition of the drywall at the time of purchase.

70.   The Defendants breached their duties by placing the toxic drywall on the market for use in Plaintiffs' home in conditions that were not safe for their intended purposes and uses. The Defendants sold the toxic drywall to the Plaintiffs and the toxic drywall was expected to and did reach Plaintiffs without substantial change in the condition from the time the drywall left the control of the Defendants, the manufacturers, builders and/or sellers and was placed on the market and sold.  The toxic drywall was used in the construction of the Plaintiffs' home, was

used by the Plaintiffs in the manner and for the purposes for which it was intended, manufactured, and sold.

70.    The Defendants are strictly liable in tort for Plaintiffs' damages all of which are in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

COUNT VII

71.    Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

72.    The Defendants represented by the approval, advertisement inspection, and sale of the drywall for use in the Plaintiffs' home that the drywall was safe, not defective, not unreasonably dangerous, of merchantable quality, fit for the purposes for which it was manufactured, engineered, designed, intended and sold.  The Defendants, breached implied and express warranties and their breaches were a contributing proximate cause of Plaintiffs' damages.

73.     As a result of Defendants breaches of implied and express warranties, Plaintiffs have suffered damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) each.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

COUNT VIII

74.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

75.     The Defendants represented by the sale of the drywall that the drywall was fit for the purposes for which it was sold and fit for use in Plaintiffs' home.  The Defendants breached warranties with the Plaintiffs and their breaches were the contributing proximate cause of the Plaintiffs' damages.

76.     The Defendants represented by the sale and delivery of the drywall that the drywall was suitable to make the Plaintiffs' home habitable and fit for the uses and purposes for which it was sold.  The Defendants' breaches of warranties and breaches of contract were a contributing proximate cause of Plaintiffs' damages.

77.     As a result of the Defendants' breaches of warranties and breaches of contract the Plaintiffs suffered damages in the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00) each.  The Defendants acted with intentional indifference to the safety of the

Plaintiffs and in reckless disregard for the safety of the Plaintiffs. The Defendants' acts and omissions constitute gross negligence and entitle the Plaintiffs to their actual damages and an award of punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

## COUNT IX

78. Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

79. Plaintiffs purchased drywall from various Defendants in a lawful and proper manner and were not aware that the drywall was toxic and/or could cause damages to them including total losses of their home.

80. The Plaintiffs installed in the residence toxic drywall which was manufactured by one or more of the drywall manufacturing Defendants. Prior to the installation of the drywall in Plaintiffs' residence, the Defendants were in the business of manufacturing, engineering, designing, testing, processing, inspecting, servicing, installing, distributing, maintaining, selling and delivering drywall which not only, was not safe, but was unreasonably dangerous. The drywall manufacturing Defendants sold, drywall to the public when said Defendants knew that their drywall would be installed in residential homes like that of the Plaintiffs. The Defendants

knew that it was extremely dangerous for the drywall to be installed in Plaintiffs' home and it was dangerous to the health of the Plaintiffs.

81.     The drywall manufacturing, shipping, and selling Defendants knew that the drywall manufactured by the drywall manufacturing, distributing and selling Defendants was defective and was unreasonably dangerous and was being used by builders because of the lack of safe drywall products.  The drywall manufacturing Defendants manufactured, engineered, designed, distributed, and sold defective drywall without placing their manufacturing identifying logos or seals on the drywall so that some of the drywall manufacturing Defendants could avoid detection and could avoid suits by customers such as the Plaintiffs.  The drywall manufacturing Defendants are liable under concert of activity, alternative liability, and enterprise liability for manufacturing, distributing, and selling defective drywall and placed the drywall on the market in a defective, unreasonably dangerous condition with the intention to deceive the public as to the name of the manufacturer, distributor, and seller of the product.

82.     The drywall was manufactured, distributed and sold by one or more of the drywall manufacturer, distributing and selling Defendants and the drywall was defective, unreasonably dangerous and known to be defective and unreasonably dangerous when it was placed on the market and sold.  The drywall was unreasonably dangerous and defective and caused the Plaintiffs' total losses of their home and health damages to the Plaintiffs.

83.     The drywall manufactured by the drywall manufacturing, distributing and selling Defendants was manufactured, engineered, designed, tested, processed, serviced, inspected, installed, distributed, maintained, sold and delivered by said Defendants to the public.  The Defendants sold the drywall in question with the knowledge that the drywall would be used as

expected and used by the Plaintiffs as drywall in their home. The drywall manufacturing, distributing and selling Defendants violated good engineering practices and negligently manufactured, engineered, tested, designed, processed, serviced, inspected, installed, maintained, sold and delivered drywall in question that was not safe, was unreasonably dangerous and was defective. In spite of their duty to the Plaintiffs the drywall manufacturing, distributing and selling Defendants placed on the market drywall, which they knew was defective and unreasonably dangerous. The drywall manufacturing, distributing and selling Defendants breached their duties by placing the defective unsafe drywall on the market in conditions that were not reasonably safe for the intended purposes and uses. The drywall in question was put on the market by the drywall manufacturing, distributing and selling Defendants, was expected to and did reach the Plaintiffs without substantial changes in the condition from the time it left the manufacturers, distributors and sellers and the time it was placed on the market and sold. The drywall in question was used by the Plaintiffs in the manner and purposes for which it was intended, manufactured and sold.

84.     The drywall was defective and unreasonably dangerous and the dangerous defective condition of the drywall was the contributing proximate cause of the injuries and damages sustained by the Plaintiffs.

85.     The Plaintiffs have incurred substantial injuries and damages as a contributing proximate result of the negligence of the drywall manufacturing, distributing and selling Defendants in failing to properly design, engineer, manufacture, test, process, install, inspect, maintain, service, sell and deliver the drywall and failing to warn the Plaintiffs of said negligence and said negligence was a contributing proximate cause of the Plaintiffs' damages.

24

86.     The negligence of the drywall manufacturing, distributing and selling Defendants, their employees, agents, representatives, and distributors proximately contributed to Plaintiffs' injuries and damages and as a result thereof, the Plaintiffs have suffered and will in the future continue to suffer damages. Plaintiffs' damages, as a result of the negligence of the drywall manufacturing, distributing and selling Defendants as aforesaid in the amount of at least Two Million Five Hundred Thousand Dollars ($2, 500,000.00) each.

87.     The Plaintiffs were unaware of the defective and unreasonably dangerous condition and hazards created by the use of the drywall in question. The drywall manufacturing, distributing and selling Defendants are strictly liable in tort for the Plaintiffs' injuries and damages which are in the amount of at least Two Million Five Hundred Thousand Dollars ($2, 500,000.00) each.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

COUNT X

88.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

89.     The Defendants were at all relevant times in the business of designing, engineering, testing, inspecting, servicing, providing, distributing, maintaining, engineering,

25

developing, supplying, building, creating and selling drywall for residential homes, structures and substructures of residential homes.

90.    After the Plaintiffs moved into their new home or rebuilt their home, the Plaintiffs became ill requiring the Plaintiffs to incur substantial medical bills.  The Plaintiffs' past, present and future medical problems are a direct result of, or caused by, the toxic drywall that the Defendants negligently caused to exist in Plaintiffs' home.  It has subsequently been determined that toxic drywall was installed in the residence of the Plaintiffs and the home became contaminated with sulfur and other materials which grossly exceeded safe or acceptable levels.  The toxic drywall rendered Plaintiffs' home unsafe for habitation, caused the home to be unreasonably dangerous, caused the ultimate evacuation of the houses by the Plaintiffs and caused illness and damages to the Plaintiffs.

91.    The Plaintiffs lived in their residential home for the period of time beginning in the late summer and fall of 2005 until 2010 when they discovered for the first time that toxic drywall was used in their residence.  The Defendants' failed to make the premises safe and the Defendants' failed to warn the Plaintiffs of the unsafe condition.  As a result of the Defendants' failures and negligence, the Plaintiffs have suffered severe injuries and damages including various physical ailments, mental anguish and emotional distress.

92.    The Defendants, on all occasions, failed to warn the Plaintiffs of the potential dangers in their home, the unsafe and dangerous conditions in their home, the unsafe and dangerous use of toxic drywall, and the negligent construction of Plaintiffs' home.

93.    As a direct result of the negligence of the Defendants, the Plaintiffs have suffered medical problems and their home has become uninhabitable.  As a result of the negligence, as

26

aforesaid, the formulation and accumulation of sulphur and other toxic materials have caused the home of the Plaintiffs to be uninhabitable, unsafe and unreasonably dangerous and the Plaintiffs were forced to evacuate their home. The formulation and use of toxic drywall and other toxic materials have rendered the Plaintiffs' home, furniture, fixtures, and worldly goods useless and worthless.

94.     The actions of the Defendants were willful, wanton, gross and reckless and their acts constitute intentional infliction of emotional distress and were intended to inflict damages and harm on the Plaintiffs. The acts of the Defendants constitute intentional infliction of emotional distress, fraud and gross and willful negligence and the Plaintiffs each are entitled to their actual property damages in the sum of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future.

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

## COUNT XI

95.     Plaintiffs adopt by reference and reallege each and every allegation of all paragraphs of this Complaint the same as though specifically set out herein.

96.     The Defendants, in all respects, failed to properly manufacture, design, construct, and sell the toxic drywall that was installed in the Plaintiffs' residence and failed to manufacture,

design, construct, and sell the toxic drywall with the degree of skill and workmanship possessed by those in the drywall manufacturing and distributing business. Defendants, as agents of each other, constantly assured the Plaintiffs that their drywall was prepared in accordance with normal procedures in the home building industry; that the drywall was standard in the industry; and that the drywall was properly manufactured, designed, and sold.

97.    The Plaintiffs, after being assured by the Defendants that the drywall had been properly designed, engineered, manufactured and sold discovered that the drywall in their home was actually toxic drywall that had been improperly designed, engineered, manufactured and sold. As a direct and proximate result of the negligence of the Defendants, the Plaintiffs sustained damages as follows:

|  |  |
|---|---|
| KYLE E. NEWMAN | $2,500,000.00 |
| DENISE G. NEWMAN | $2,500,000.00 |

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

AD DAMNUM

WHEREFORE PREMISES CONSIDERED, Plaintiffs each demand Judgment of and from the Defendants, jointly and severally, for their damages in the amount of Two Million Five Hundred Thousand Dollars ($2,500,000.00) plus punitive damages in an amount sufficient to

28

punish the Defendants and deter the Defendants from such reckless and oppressive conduct in the future, prejudgment interest, post judgment interest and all costs.

Respectfully submitted, this the 31st day of August, 2012.

By: _____
W. WAYNE E. FERRELL, JR.

Wayne E. Ferrell, Jr., Esq.
Mississippi Bar No. 5182
Attorney at Law
405 Tombigbee Street
Post Office Box 24448
Jackson, Mississippi 39225-4448
(601) 969-4700

John L. Hunter, Esq.
Mississippi Bar No. 2913
Cumbest Cumbest Hunter & McCormick
P. O. Drawer 1287
Pascagoula, MS 39568-1287
(228) 762-5422