# EXHIBIT "5"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

IN RE:  CHINESE MANUFACTURED DRYWALL      MDL-2047
         PRODUCTS LIABILITY LITIGATION      Section "L"
                                            New Orleans, Louisiana
                                            February 19, 2010

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**THIS DOCUMENT RELATES TO**:

Michelle Germano, et al

         versus

Taishan Gypsum Co., Ltd., f/k/a
Shandong Taihe Dongxin Co., Ltd.,
et al

Case No. 09-CV-6687

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*


                    VOLUME I - MORNING SESSION
               TRANSCRIPT OF DEFAULT HEARING PROCEEDINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PLAINTIFF:              HERMAN, HERMAN, KATZ & COTLAR
                                BY:  RUSS M. HERMAN, ESQ.
                                     STEPHEN J. HERMAN, ESQ.
                                820 O'Keefe Avenue
                                New Orleans, LA 70113


                                SEEGER WEISS
                                BY:  CHRISTOPHER A. SEEGER, ESQ.
                                One William Street
                                New York, NY 10004

```
 1   APPEARANCES CONTINUED:

 2                                  LAW OFFICES OF RICHARD J. SERPE
                                    BY:  RICHARD J. SERPE, ESQ.
 3                                  Crown Center, Suite 310
                                    580 East Main Street
 4                                  Norfolk, VA 23510-2322

 5
                                    GAINSBURGH, BENJAMIN, DAVID,
 6                                  MEUNIER & WARSHAUER
                                    BY:  GERALD E. MEUNIER, ESQ.
 7                                  2800 Energy Centre
                                    1100 Poydras Street
 8                                  New Orleans, LA 70163-2800

 9
                                    LEWIS & ROBERTS, PLLC
10                                  BY:  DANIEL K. BRYSON, ESQ.
                                    3700 Glenwood Avenue, Suite 410
11                                  Raleigh, NC 27612

12
     FOR MITCHELL COMPANY, INC.:    CUNNINGHAM BOUNDS, LLC
13                                  BY:  STEVEN L. NICHOLAS, ESQ.
                                    1601 Dauphin St.
14                                  Mobile, AL 36604

15

16   FOR KNAUF PLASTERBOARD
     TIANJIN CO., LTD.:             BAKER & MCKENZIE, LLP
17                                  BY:  DONALD HAYDEN, ESQ.
                                    Mellon Financial Center
18                                  1111 Brickell Avenue, Suite 1700
                                    Miami, FL 33131
19

20
     Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
21                                  500 Poydras Street, Room HB-406
                                    New Orleans, Louisiana 70130
22                                  (504) 589-7776

23


24
        Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

DAILY COPY

1                    P R O C E E D I N G S

2                  (FRIDAY, FEBRUARY 19, 2010)

3                      (MORNING SESSION)

4

5      (OPEN COURT.)

6           THE COURT:  Be seated, please.  Good morning, ladies and

7      gentlemen.  Call the case, please.

8           THE DEPUTY CLERK:  MDL-2047, *in re:  Chinese Drywall.*

9           THE COURT:  Counsel, make their appearance for the

10     record.

11          MR. SEEGER:  Good morning, your Honor, Chris Seeger for

12     the plaintiff.

13          MR. MEUNIER:  Jerry Meunier for the plaintiffs.

14          MR. SERPE:  Richard Serpe, also for the plaintiffs, your

15     Honor.

16          MR. HERMAN:  May it please the court, good morning, Judge

17     Fallon, Russ Herman for plaintiffs.

18          MR. NICHOLS:  Good morning, your Honor, Steve Nichols for

19     the Mitchell Company.

20          THE COURT:  Okay.  Let me put the matter in perspective

21     by making some preliminary comments.  As you all know, in the

22     aftermath of Hurricane Katrina and Rita in 2005, rebuilding put a

23     strain on the U.S. building supplies, including drywall.  As a

24     result, drywall manufactured in China was brought into the United

25     States and used in the construction and refurbishing of homes

1   throughout the United States, notably, the Gulf Coast and the east

2   coast.

3          Sometime after the installation of the Chinese drywall,

4   homeowners began to complain about the emission of smelly gases,

5   the corrosion and blackening of metal wire, surfaces, objects and

6   breaking down of appliances in their homes.  Many of these

7   homeowners also began complaining of various physical afflictions

8   believed to have been caused by the Chinese drywall.  Accordingly,

9   these homeowners began to file suits in various states, as well as

10  in federal courts throughout the country, against home builders,

11  developers, installers and manufacturers who were involved in the

12  Chinese drywall.

13         Because of the commonality of facts in all of these

14  cases, litigation was designated as multidistrict litigation.  And

15  pursuant to a transfer order by the United States Judicial Panel on

16  Multidistrict Litigation, on June 15th of 2009, this court was

17  designated as a transferee court, and all federal cases were

18  ordered transferred to this court.

19         In the present matter, the plaintiffs, on behalf of

20  themselves and all others similarly situated, owners and tenants

21  brought what's called a class action against defendant Taishan

22  Gypsum Company and others.  Taishan is a manufacturer of the

23  drywall contained in these homes.  The plaintiffs' cases, these

24  cases were originally filed in the Eastern District of Virginia.

25  The cases pursuant to the transfer order was transferred to this

1    court as the transferee court.

2          Taishan didn't respond to pleadings, to the complaints.

3    I gave notice that they needed to respond, but notwithstanding

4    that, they failed to respond.  So after due notice, I granted or I

5    had to grant a preliminary default against Taishan.  This was

6    granted on November the 20th of 2009.

7          On November the 25th, 2009, the court issued a scheduling

8    order setting a hearing to address the scope and the extent of the

9    appropriate remediation.  Pursuant to the court's scheduling order,

10   interested parties were permitted to intervene in the proceeding.

11   A motion to intervene was filed by William and Debra Morgan,

12   Preston and Rachael McKellar, Frederick and Vannessa Michaux, Jerry

13   and Inez Baldwin, Joseph and Kathy Leach, Robert and Lea Orlando,

14   Steven and Elizabeth Heischober, these parties are known as the

15   plaintiff intervenors.

16         Knauf and the Mitchell Company also moved to intervene,

17   and they were granted the right to intervene.

18         Vigorous discovery proceeded.  Each side prepared witness

19   lists that were submitted to the other side, a number of

20   depositions were taken.  I heard many motions in the discovery

21   aspect of the case, including what we call *DAUBERT* motions, which

22   give me an opportunity to satisfy the responsibility that the court

23   imposes on the trial court to vet various expert witnesses, and I

24   heard their testimony and made some decisions regarding whether or

25   not they could testify.  And if so, the nature and scope of their

1    testimony.

2         After the discovery was completed, Knauf and Mitchell

3    Company, I understood, voluntarily withdrew.  Is Mitchell Company

4    still in the case?

5         MR. NICHOLS:  Your Honor, Steve Nicholas for the Mitchell

6    Company.  I didn't file anything officially withdrawing, I was

7    going to explain to your Honor that we aren't going to present

8    anything today, so in effect we've withdrawn.

9         THE COURT:  So Mitchell Company and Knauf are not going

10   to participate in this proceeding, other than to monitor it.

11        The plaintiff intervenors, as I mentioned, are the owners

12   of the homes.  These homes represent a cross section of the

13   Virginia home construction, ranging from modest homes to high-end

14   and custom homes.  The seven homes represent a spectrum of the

15   drywall usage.  The hearing today will focus on the nature and

16   extent of the damage and the scope and the cost of the remediation.

17   After this hearing, the court will then issue a finding of fact and

18   conclusions of law and we'll go to the next stage of this

19   proceeding.

20        When we're finished with this proceeding, next month, in

21   several weeks, the court will start another trial, the *Hernandez*

22   trial.  In that regard, before we hear opening statements on the

23   present situation, the parties want to present something on the

24   *Hernandez* case.

25        MR. STEPHEN HERMAN:  Yes, your Honor, thank you.  Steve

```
1   Herman from Herman, Herman, Katz & Cotlar for the PSC, the
2   plaintiffs.
3            The defendant Knauf and Tianjin and the plaintiffs have
4   reached a stipulation, which I wanted to present to the court, on
5   various liability issues that we have resolved in anticipation of
6   trial.
7            THE COURT:  All right.  Okay.  Could you just shortcut
8   some of that, I mean, you don't need to read it all, but what's the
9   gist of it?
10           MR. HERMAN:  The gist of it, your Honor, is that Knauf
11  has agreed that, for the purposes of this trial and only this
12  trial, the Hernandez trial, that Knauf drywall contains redhibitory
13  vices, the LPLA claims will not be pursued, and that there will be
14  no arguments as to any third party fault, at least for this trial
15  or a contribution or indemnity or anything of that nature for this
16  trial.  And we've also waived a jury and agreed to go with a bench
17  trial.
18           THE COURT:  Now, when you're talking about this trial,
19  you mean the next trial, which is the Hernandez trial.
20           MR. HERMAN:  The Hernandez trial in March, yes, your
21  Honor.
22           THE COURT:  Is that also your understanding?
23           MR. HAYDEN:  Don Hayden on behalf of Knauf Plasterboard,
24  Inc.
25           THE COURT:  Okay.  Well, the court will receive that
```

```
 1    stipulation and make it a part of the record.

 2              MR. HERMAN:  Thank you very much.

 3              THE COURT:  At this point let me return back to the

 4    present matter, and I'll hear opening statements from the

 5    plaintiffs.

 6              MR. SEEGER:  Your Honor, before we do that, if I may, we

 7    have exhibits that we're going to ask the court to move into

 8    evidence.  We've provided the court with the documents as well as a

 9    master list of the exhibits, and I am not going to take up the

10    court's time to read them all into the record, but I would just

11    like to note that we are going to be moving in Exhibits P1.0017

12    through P1.2053.  We have a number of learned treatises, but we

13    will just be using those as we go and we'll mark them for

14    identification.

15              We will also be moving into evidence, your Honor,

16    documents P3.0179 through P3.0635, and there was one addition that

17    we gave to the court, it's on the list but we will be working off

18    this master list.

19              THE COURT:  Okay.  I'll admit those exhibits.

20              MR. SEEGER:  At this time Russ Herman is going to address

21    the court.

22              THE COURT:  All right.

23              MR. HERMAN:  May it please the court, good morning, Judge

24    Fallon, my name is Russ Herman of Herman, Herman Katz & Cotlar in

25    New Orleans, and I am the court's appointed liaison counsel for
```

1    plaintiffs in this matter.

2         First of all, your Honor, as a matter of courtesy, your

3    Honor, our clients who have traveled from Virginia here and on

4    whose behalf we're presenting this case are seated in the jury box.

5    And I do want to acknowledge their presence.  And also Ms. Barrios

6    as part of our team, who has worked diligently to assist these

7    folks to get here and liaisoned with them.

8         THE COURT:  I appreciate your attendance here today.

9         MR. HERMAN:  May it please the court, your Honor, we've

10   offered in evidence P3-0629-1000, which is an affidavit from me

11   based on due diligence, dated today, February 19th, with attached

12   exhibits.

13        Your Honor, first let me say that because the defendant

14   Taishan has not seen fit to respond to service on it, we have not

15   been, had the opportunity to do formal discovery, but we have done

16   due diligence by retaining more than five months ago an interpreter

17   who is not only admitted to the bar of China but also received an

18   LLM degree from an outstanding university in the United States, who

19   I'll refer to as Mr. Pang for identification purposes.  The full

20   curriculum vitae has been submitted to the court in camera.

21        The information obtained about Taishan and the People's

22   Republic of China is prolix and difficult; however, through

23   published web sites in China, in both English and Chinese, which

24   have been interpreted, we are able to say and we will demonstrate

25   that the Republic of China, although it has made some efforts at

```
 1    capitalism, actually controls the plasterboard industry as a
 2    governmental control and would fit the alter ego principles such as
 3    we know them in the United States, both for jurisdiction purposes
 4    and for alter ego liability purposes.
 5         My effort will be in 15 minutes to explain how the
 6    Chinese drywall got to the United States, where it was sold and how
 7    it ended up in our clients' homes.  And to show and demonstrate
 8    that the defendant, Taishan Gypsum Company, Ltd., is actually a
 9    governmentally-controlled creature, and not only is it
10    governmentally controlled, but unlike the United States and most
11    European companies, the government-owned testing facilities do not
12    provide independent testing, for example, of fire proofing,
13    quality, et cetera, they issue their own certificates.
14         And I want to begin with a power point presentation that
15    will shorten my presentation so your Honor may get on with the
16    other evidence of witnesses.
17         On November 9th, 2005, scarcely three months after
18    Hurricane Rita, one month -- I'm sorry, Hurricane Katrina, one
19    month after Hurricane Rita, as your Honor indicated, there was a,
20    supply in the United States was very meager of drywall, and
21    Shandong Taihe Dongxin Company, Ltd., which later changed its name
22    to Taishan Gypsum Company, a letter of credit was issued by Venture
23    Supply in Virginia, and that original letter of credit required
24    that the buyer specifications meet applicable USA ASTM rating and
25    fire rating standards, and 120,000 sheets of drywall, which is
```

1    standard drywall or gypsum board, was ordered in November 2005 from

2    China.

3             May I have the next slide, please.

4             Venture Supply required that on the reverse side of all

5    plasterboard, which it received from Shandong Taihe, have the words

6    Venture Supply, Inc. on the back of the drywall, as well as the

7    manufacturer.  So we know that wherever Venture Supply, Inc. is

8    stamped on drywall, it's Chinese drywall that was manufactured,

9    marketed and shipped to the United States to Venture Supply.  The

10   plywood -- excuse me, the drywall in United States terms was 4 feet

11   by 12 feet by one-half inch gypsum board.

12            Could I have the next slide.

13            Now, Frank Clem, C-L-E-M, was the manager who was in

14   charge of exporting Chinese drywall, and this document on November

15   14th indicates that Frank Clem, the manager, he didn't understand

16   what the ASTM rating was and they're not clear on requirements for

17   fire rating and request Venture Supply to give them a pass using a

18   Chinese fire rating.

19            Could I have the next slide.

20            So Sam Porter for Venture Supply, he was the CEO, amended

21   the letter of credit, deleted the ASTM requirements, not just for

22   fire but for other purposes, and indicated that they have test

23   results.  It's interesting because the test results they received

24   were test results performed by companies in China that are actually

25   authorized, augmented and supervised by the government of China,

 1    which, as we'll show, owns a controlling interest in all of the

 2    plasterboard entities providing plasterboard.

 3              Could we get to the next slide.

 4              Here is actually the signed authorization, saying, hey,

 5    we'll remove, remove all applicable specs and U.S.A. fire rating

 6    standards from the letter of credit, which relieved China, Venture

 7    relieved China of providing those specs.

 8              Could I go to the next one.

 9              Now, on December 13th, 2005, your Honor, Shandong Taihe

10    was contracted and they were going to ship 100,000 sheets of

11    drywall -- originally there was supposed to be 120,000 sheets -- on

12    2,000 pallets, and some, more in excess of $400,000 eventually was

13    paid for two shipments.  This is the first shipment.

14              Could we go to the next slide.

15              Now, CNBM U.S.A. Corporation, it's interesting, is also

16    controlled in China but is registered in the United States, and

17    it's to market in the United States and in North and South America.

18    Mission to provide warehousing, transportation, and after-sale

19    service.  It's located in the City of Industry, California.  We

20    present it here to show that there is a direct link in the United

21    States to the Chinese-controlled entities.

22              Could I see the next slide, please.

23              The bill of lading shows that the vessel GLYKOFILOUSSA

24    was to take on board and it did take on board the 2,000 pallets of

25    Chinese drywall from Taihe and loaded -- unloaded the drywall in

 1    Norfolk, Virginia, this bill of lading is December 25th, 2005.

 2            Could I go to the next slide.

 3            Between December 2005 and February 2006, the first

 4    shipment was unloaded in Norfolk.  Then there was a second shipment

 5    on the *Atlantic Fortune*, the M/V *Atlantic Fortune,* which was less

 6    than 60,000 sheets of drywall and it was supposed to be, to go to

 7    Norfolk but instead of Norfolk was unloaded in New Jersey.  This

 8    bill of lading is July 9, 2006.  So we have two shipments of

 9    Taishan Chinese drywall from China to ports in the United States,

10    ordered and paid for by Venture Supply.

11            Next slide, please.

12            This shows the actual number of sheets, 53,912 sheets on

13    586 pallets from Shandong Taihe to Venture Supply on June 18th,

14    2006.

15            Could we go to the next.

16            Now, your Honor, we note that all of the Chinese drywall

17    shipped to Venture Supply, which eventually ended up in our

18    clients' homes, hit the United States ports and was thereafter

19    distributed beginning in 2006 from the -- beginning in February

20    2006 and onward.

21            Now, this is a Chinese test report.  Your Honor, the

22    English translation at the top shows that this test report and the

23    other test reports were actually done by the Inspection Center of

24    National Building Materials Industry for Decorating and Finishing

25    Building Materials, which is a government-owned-directed entity.

1             Let's go to the next slide.

2             This was supposedly a test report which we had, which was

3     interpreted, it again comes from a national center controlled by

4     the Republic of China.  How does that differ, one might ask, from

5     the United States?  We have watch dogs organized by Congress, the

6     FDA, the CPSC, et cetera.  Well, the difference is, the United

7     States does not own the manufactured product, does not have an

8     interest in the profit, sale of the manufactured product, and our

9     watch dog agencies have no relationship to ownership in those

10    products that they're examining for defects.  But here any of these

11    test reports, the ASTM reports actually hadn't been eliminated

12    really show, at best, a conflict in interest between the People's

13    Republic of China and the inspection and testing of the drywall.

14            Next, please.

15            Your Honor, this is a rather arcane and prolix structure,

16    corporate structure, and may be the most important document that

17    I'd like to explore.  It's 00 page 113 of the exhibit, which we

18    offered in evidence P3-0629.  SASAC, that's a government controlled

19    by the Republic of China, owns 100 percent of CNBMGC.  CNBMG

20    Corporation, then owns 75 percent of BNBM Group, Ltd., 100 percent

21    of CNBM Import and Export Company, and 100 percent of the China

22    Building Materials Academy, which also does testing.  Taken

23    together, China National Building Material Group owns 56 percent of

24    China National Building Material Company, Ltd., and that owns 52

25    percent of Beijing New Building Material Company, Ltd.

1          In effect, the government of China controls everything

2     that has a BNBM label, and where you see BNBM in web sites and

3     published materials, sometimes those web sites and publications do

4     not distinguish as to whether they're talking about BNBM Company,

5     Ltd., BNBM Material Group Company and -- but, we will get to the

6     ownership of Taishan in just a minute.

7          But you can see, your Honor, that if we look at page 113

8     of the exhibit, there's not going to be much debate as to the

9     Republic of China's ownership.

10          Could I go to the next one.

11          The State-owned Assets Supervision and Administration

12     Commission of the State Council, the People's Republic of China,

13     that's what SASAC stands for, State-owned Assets Supervision and

14     Administration Commission.

15          Now, let's go to the next -- excuse me, they oversee 150

16     central state-owned enterprises, SOEs, and you'll see this

17     throughout the materials in the exhibit.  We did due diligence,

18     there are more than 600 pages of material in the exhibit, and SOEs

19     appear to be the acronym that the Republic of China uses to

20     describe their state-owned enterprises.

21          Let's go to the next slide.

22          Now, your Honor, I will not argue the law, but I do want

23     to say parenthetically that when one is familiar with the Fifth

24     Circuit's requirements for alter ego jurisdiction, as well as alter

25     ego liability, that these functions and responsibilities of SASAC,

1    the State-owned Assets Supervision and Administration Commission of

2    the People's Republic of China, fit the requisites, they perform

3    the responsibility as the investor on behalf of the state;

4    supervise and manage state-owned assets of the enterprises;

5    supervise value preservation; guide and push forward the reform and

6    restructuring of SOEs; appoints and removes the top executives of

7    SOEs; is responsible for organizing SOEs to turn gains; where do

8    the gains go, over to the state.  Is responsible for urging SOEs to

9    carry out laws and regulations for safety production; directs and

10   supervises the management work of local state-owned assets; and

11   undertakes other tasks assigned by the state council.  That's 00115

12   of the exhibit.

13           Next, please.

14           CNBM, if you'll look at this logo up in the left corner,

15   it has eight sides, it's an octagon, they say they have eight

16   platforms.  And this CNBM group has some, has had some shares

17   listed publicly.  The important thing is, however, that more than

18   59 percent of even the, what they say is publicly traded, is still

19   controlled by organizations in which the People's Republic of China

20   has direct control.

21           Next slide.

22           To clear up immediately, this is from the 2007 annual

23   report of BNBM, Shandong Taihe Dongxin Company, Ltd., the company

24   that manufactured, marketed and exported the drywall to Venture

25   Supply, which is in our clients' homes, changed its name to Taishan

1   Gypsum Company, Ltd. on September 10th, 2007, and BNBM owned 65

2   percent of Taihe and was its largest shareholder.

3        Let's go to the next slide.

4        Again, the change of the name to Taishan Gypsum Company,

5   Ltd., and Taishan Gypsum Company, Ltd. has 100 percent of the

6   ownership in the present defendant.

7        Your Honor, to conclude, I think that's my last slide,

8   what is evident here is that the product was manufactured in China

9   by Shandong and Taishan Gypsum Company, its successor; it was

10  shipped to the United States without being tested independently;

11  the letters of credit were required by Taishan to eliminate various

12  ASTM tests; the product arrived, was distributed by Venture to

13  Porter-Blaine and others, it was installed in our clients' homes,

14  and it was absolutely defective.

15       And further, the People's Republic of China is

16  responsible for the management, direction and principle ownership

17  of all of the entities that resulted in Taishan Gypsum Company

18  being named as a defendant in this case.

19       Your Honor, I thank you for the opportunity to appear

20  before you.  And again, the affidavit and the exhibits attached are

21  P3-0629-1000.  Thank you

22       THE COURT:  Okay.  Thank you.  Anything further by way of

23  opening?

24       MR. SERPE:  Yes, your Honor, may it please the court.

25  Richard Serpe from Norfolk, Virginia.  It's my privilege to

```
 1    represent the Plaintiff Steering Committee in today's hearing.

 2            Your Honor, I would like to lay out what we believe is

 3    the appropriate remedy that should be provided to these homeowners

 4    today.  It's my privilege to represent the Germano class as well as

 5    these families, all of whom will be here, your Honor, some are at

 6    the airport on their way in.  But this morning, we have Bob and Lea

 7    Orlando here.  Lea, can you stand up.  Lea has put up with me

 8    calling her Lisa for six months.  They have been very generous with

 9    their time, your Honor, since November when this case was selected

10    for the first bellwether.

11            We have been in these family's homes hundreds of hours

12    with people taking samples and engineers traipsing through, not

13    only our experts but of course the Knauf experts and the other

14    early intervenors.

15            Liz Heischober is here, Steve is home with the dogs I

16    assume at this point.  And the Baldwins -- thank you.  The Baldwins

17    are here.

18            MR. BALDWIN:  Good morning, your Honor.

19            MR. SERPE:  We're very grateful for them having brought

20    our only tangible exhibit that the plaintiffs have brought, we're

21    going to explain the importance of that lamp that's sitting over

22    here on the table.

23            Bill and Debra Morgan are also from Williamsburg,

24    Virginia.  Bill will be our first live witness in the hearing

25    today.  Thank you very much for coming.
```

1           Your Honor, I pick up where Mr. Herman left off with the

2   shipments of this drywall coming into the United States, and as

3   Russ mentioned, the boards were all stamped Venture Supply, Inc.

4   and made in Taihe, China.  Over 100 times now, closing in on 200

5   times, families in Virginia who are finding, been struggling with

6   what's wrong with their air conditioners, what is that smell, that

7   are becoming aware through one mechanism or another of the problem

8   with Chinese drywall are going in their attics and looking in

9   places, and when they see this, this is the card that they're not

10  looking for, this is the indication that they do have the Chinese

11  drywall in their house.  This sample was taken from Michelle

12  Germano's house, she is our lead class representative.

13          Venture Supply, once these shipments that Mr. Herman

14  explained to the court arrived here at their warehouse, had ramped

15  up and had bought a number of these large trucks for delivery of

16  heavy volumes of this Chinese drywall, not only in Virginia, your

17  Honor, but the evidence will ultimately show that it was

18  distributed throughout a number of states, but they had a very

19  extensive distribution capability.

20          The seven intervenors, who will be here before the court

21  over the next two days, are listed here, and we provided a column

22  with respect to the number of boards that the shipment records

23  indicate were delivered to their houses.  So, for example, Bill

24  Morgan's house has an indication of having the highest number of

25  boards -- I apologize, I'll try and use the microphone more

1   effectively.  Bill Morgan's house is, has the highest number of

2   boards at 212.

3           Your Honor, these are 4-foot by 12-foot, and they're

4   half-inch.  There will be some evidence concerning 5/8 inch board

5   that was used in some areas, most notably the garages.  Venture

6   Supply did not bring in any 5/8 inch board.  I haven't seen them

7   bring in any 4x8 sheets, it was all 4-foot by 12-foot.  We've

8   indicated here the type of home construction in our efforts to

9   demonstrate a representative cross section, and we've also

10  indicated whether or not the families are still occupied in their

11  house or not.

12          Your Honor, we've also indicated with my client's

13  indulgence the purchase price for the house, somewhat personal

14  information, but we needed to demonstrate to the court that we have

15  a representative cross section here of modest construction in

16  townhomes to high-end construction duplex in Virginia Beach.

17          Your Honor, when the drywall came from China into the

18  United States, it landed in Venture Supply's warehouse in Norfolk,

19  Virginia.  We selected homes in three different communities in

20  Virginia:  In Virginia Beach, in Newport News, Virginia, and in

21  Williamsburg, Virginia, so that we picked up a cross section of

22  different areas within the region to demonstrate the representative

23  nature across a coastal area, as well as an inland area of

24  Virginia.

25          The first house that I am highlighting here is in

1   Virginia Beach, it's maybe 20 miles from Venture Supply's

2   warehouse.  Steve and Liz Heischober purchased this house, it's a

3   beautiful house, your Honor, right here by the Atlantic Ocean, you

4   can see the breakers, they have this beautiful large state park

5   right behind their house, they're out of that house, your Honor,

6   paying the mortgage but also paying rent somewhere else.

7           We go to Newport News, Virginia, for a community called

8   Hollymeade.  It's a very tight-knit community of townhomes, there's

9   about 50 homes in this community lined up, 40 of the homes, your

10  Honor, have Chinese drywall.  Most of those families are out.  Two

11  of the plaintiffs are here, the Michaux's and the McKellar's,

12  they're actually at the airport on their way down.  The McKellar's

13  just had a baby.

14          The yellow house is a control house, your Honor, one of

15  the families opened the doors on 15 occasions to our scientists to

16  go in and study a house that did not have Chinese drywall, that was

17  built a little bit earlier than the first shipment.

18          Your honor, the final neighborhood is in Williamsburg,

19  Virginia, and a number of the plaintiffs live here.  Bill Morgan,

20  the Baldwins, the Orlandos and Kathy Leach, who is not here yet but

21  will be here on Monday, live in this neighborhood.  Once again,

22  your Honor, we had a family throw open its doors, the McKinnis

23  family, and allowed us to take multiple samples of the various

24  media, the drywall, the wires.  They actually took an evaporator

25  coil out of one of these houses to show what does a house that does

1  not have Chinese drywall look like in comparison to the houses in

2  the neighborhood that do have Chinese drywall.

3        So, your Honor, I would like to briefly discuss the

4  situation for the Morgans.  They bought their dream house July of

5  2006.  The family had had some problems with a previous house which

6  had been flooded, they had actually lived in a FEMA trailer for

7  some time period before they were able to move into this home in

8  July of 2006.  It was a very happy day for them.  They're out of

9  the house now, your Honor, you can see that by November 12th of

10 2009 they had vacated the home.

11       The shipment records when we obtained them from Venture

12 Supply indicated that 212 sheets of drywall, half-inch, 4x12 had

13 been delivered to their house.  Your Honor, we find that these

14 records are generally accurate.  If it indicates that drywall was

15 delivered to the house, we're finding that the drywall is there.

16 But we've seen a number of instances where the records are sketchy,

17 that there's no firm indication that drywall was delivered to a

18 house as part of the corporate records, but nonetheless, we see

19 it's there, we can take boards down, Venture Supply, Inc., made in

20 Taihe, China, is written on the boards.

21       But in this instance, we have no reason to believe that

22 212 would be an inaccurate number as Mr. Morgan's house, which was

23 extensively studied by the scientists, and here we're seeing an

24 animation, which we have for your Honor along with our other videos

25 on a compact disc, that the 212 sheets released corrosive gases.

1   Now, you cannot see these corrosive gases.  For the purposes of the

2   animation, we added a very slight color that your Honor will see to

3   be able to demonstrate the movement of the gases into the home.

4          Are these homes representative of other homes?  What

5   about Louisiana?  What about Florida?  In this case, your Honor,

6   before Knauf withdrew their intervention, they hired an expert

7   named Dr. Matthew Pericone, he wrote an extensive report based upon

8   laboratory analysis, they were in the home, they took samples.

9   And, your Honor, he concluded that the chemical and physical

10  properties of Chinese drywall in Virginia houses are not

11  substantially different than the chemical and physical properties

12  of other Chinese drywall except Virginia's got a higher amount of

13  elemental sulphur.

14         Now, elemental sulphur is a very bad actor.  Dr. Scully

15  from the university of virginia will explain that to your Honor

16  later in the day.  So, if anything, the Virginia homes are a little

17  worse in elemental sulphur.

18         But by and large, the physical properties, the chemical

19  properties, there's no difference between a house in Florida, a

20  house in Louisiana, and a house in Virginia, and I think the record

21  will be established as this litigation unfolds.  But there's no

22  substantial differences regionally in that the remedy that has to

23  be implemented is the same.

24         So, your Honor, the question becomes for these families,

25  let's start with the Morgans, how do you repair that house?  What

1   has to be done in order to restore the morgans to a home that could

2   be lived in?  In order to get the answer to that question, the

3   Plaintiffs Steering Committee took two basic approaches.  First, we

4   wanted to see practically what are people doing in the real world,

5   we wanted to see what are the big builders in Florida, the major

6   builders in Florida doing in order to deal with this problem that

7   they've been dealing with now for about a year.  And we educated

8   ourselves with respect to the people with the most experience in

9   Florida in terms of how to deal with Chinese drywall from a

10  practical standpoint.

11         The second approach was to go to the highest level of

12  scientific investigation available and to educate ourselves, what

13  are these corrosive gases, what kind of corrosion is happening to

14  the wires and the HVAC systems and the other components, what can

15  science teach us about this problem?  And we put them together,

16  your Honor, to come up with a remediation or a repair plan for

17  these homes, to take the practical as well as the scientific

18  together to design a remedy.

19         So when it comes to the practical, what's actually

20  happening in Florida, we can see here a photograph of an inspector

21  whose job it is to monitor the removal of drywall from a home.  And

22  at the end of the day, that environmental company will issue a

23  clean bill of health that all of the drywall has been removed and

24  that the house has been decontaminated, so that even though there

25  may be some residual concept that this house was once a Chinese

1   drywall house, that the owner will at least have the peace of mind

2   and the security of a written guarantee from a national

3   environmental company that the house has been cleaned.  At a

4   minimum, your Honor, we want to get these families to the point

5   that they can get the certification on this level.

6           This gentleman is working in a Florida home that was

7   built by Beazer homes.  We have two representatives from Beazer

8   here today, they're here in the courtroom.  They will be testifying

9   after Mr. Morgan concerning their approach to dealing with Chinese

10  drywall.

11          Your Honor, their scope of work agreement, this copy is a

12  little faint, I just want to highlight one point, and I think that

13  it's legible.  When they lay out the scope of work and Mr. Meunier

14  with these Beazer witnesses will go systemically through Beazer's

15  scope of work, exactly what they're doing to these homes.  But a

16  first and very important point, your Honor, is that they're

17  removing and replacing all drywall in homes, not some drywall, not

18  drywall that has a logo or drywall that smells, they're getting in

19  and replacing all of the drywall in the homes.

20          We attended four days of remediation or repair efforts to

21  these homes and watched very carefully the Beazer system, which has

22  been unfolding for a year, to see how the drywall process actually

23  is conducted; and we were amazed, your Honor, at how efficient a

24  system this is.  From the time that these workers go into the homes

25  and begin removing this drywall, they're able, in very short order,

1    to strip all of the drywall out of the house.

2              I would like to point out, your Honor, that there was a

3    seam there, a 9-foot ceiling, you can't make it up with two sheets

4    of 4-foot drywall, this was just over 9-foot, the CEILING, SO you

5    always need an additional strip.  We're going to have evidence,

6    your Honor, on how hard it would be to try and find where are these

7    seams in a wall, if someone was going to attempt to selectively

8    identify and take out some drywall and leave others.

9              Your Honor, we also learned that this process of removing

10   the drywall generates a tremendous amount of debris and dust that

11   gets into all kinds of nooks and crannies and insulation, which has

12   profound implications for what are you going to do once the drywall

13   is out of the house.

14             On the topic of, "can you take out some drywall and leave

15   others?  What about if it's in one area of a house versus another

16   area of a house?  It was very eye opening for us, your Honor, to

17   see in a house that they had already remediated and now they're

18   getting ready to put it back together again, that the drywall

19   mechanics had already been in the house and they had not yet

20   painted.

21             And we walked by and looked at it and we said, look at

22   all of the pieces.  I count, your Honor, 14 different segments that

23   are here just in one corner of this room.

24             When you need a small piece for an area, these drywall

25   mechanics are efficient.  When they cut larger sheets, they lay the

1    smaller piece that was cut off of it aside.  If they get to a

2    corner and they say, look, I need a small slice here, hey, we have

3    one upstairs that's like that.  So if the pallet of Chinese in a

4    mixed-drywall house is put in one corner, it's very likely, your

5    Honor, that the boards are scattered, and we've seen this over and

6    over again, and that it's very difficult to discern where is the

7    Chinese drywall in a house once it's been installed.

8           Now, we went back to this house a few days later and we

9    took a picture of the same corner once it was painted, and to make

10   the point here, your Honor, that the 14 boards, which you could,

11   can see here, and theoretically, if you had a mechanism that could

12   check each of those 14 segments to find the Chinese versus not,

13   once you paint it, it becomes largely invisible.  A good drywall

14   taper and mechanic, once it's painted it's invisible, you cannot

15   find where those seams are.

16          One of our experts, Mr. Bailey here, is demonstrating,

17   once again when you put these strips in to make up a 9-foot ceiling

18   and then you blend them in, it's very difficult to see, where are

19   these segments, where this is a separate board than the one below

20   or above.  With multiple sheets of drywall disseminated through the

21   house, it's impossible from a practical standpoint to determine

22   where were the boards originally because once they're painted,

23   those segments disappear, you have no idea where you need to look

24   to be able to distinguish.

25          So from Bill Morgan's 212 sheets that it started out as

 1    4-FOOT BY 12-FOOT, as the drywall mechanics are CUTTING and slicing

 2    and placing them in the home, the records indicate that some amount

 3    of domestic board also went in there.  Could you ever get to the

 4    point where you could distinguish a domestic piece from a Chinese

 5    piece on this type of an actual installation pattern, and we

 6    believe, your Honor, that the answer is a resounding no.

 7            These are homes, he is cutting out all of the wires, all

 8    of the junction boxes, all of the switches, all of the receptacles.

 9            Your Honor, here is a close-up shot of one receptacle

10    that's already been cut, they've cut the plug, the receptacle that

11    you put your plugs into, out.  There was some suggestion, an expert

12    testimony that was proffered by former intervenors in this case

13    that it's possible to just reuse these wires.  Now, you've got two

14    live wires, a hot and neutral, and everybody has a ground wire,

15    which is a life safety device.  If the circuit is somehow

16    interrupted, this is what's going to save someone's life.

17            Your Honor, this should be copper like a penny, the

18    familiar reddish brown color.  You can see that it's corroded, that

19    it's braided, that it goes all the way into where that wire was

20    loaded into the junction box and came in from up top here

21    (INDICATING).

22            Your Honor, we submit that there's no way that these

23    corroded wires could be cleaned, that they could be reused in a

24    home safely, and that Beazer, as part of their practical response

25    in this situation, has ripped all of these wires out.

1          There's been some suggestion, your Honor, that you can

2     clip and strip and get yourself a fresh, new connection.  And we'll

3     present evidence in this case that the building code requires six

4     inches of wire coming out of the box.  If you clipped off the

5     corroded ends, your Honor, and then needed six inches out of the

6     box, you would have one wire box down here, you would have another

7     one up here, you would be forced under code to put a junction box

8     in-between.

9          We've got a demonstrative here, your Honor, that we'll

10    wheel out with the appropriate witness, and it will demonstrate to

11    the court what a wall would look like when you take a normal amount

12    of switches and receptacles and start having to cut it up to make

13    junction boxes so that the code could be met.

14         The Florida code officials, first off, your Honor, told

15    Beazer, you can't use it; if the wire is corroded, you're not

16    putting it back in, get it out of there.

17         Number two, on junction boxes, if you have any more than

18    a handful, we are not going to pass you on inspection.  So the

19    world of a practical builder says, get those wires out of there

20    efficiently, don't worry about trying to clip them and strip them,

21    don't worry about trying to clean them, we are going to take all of

22    the wires out of the house.

23         Your Honor, one of the more profound visual images going

24    to these homes that were being repaired by Beazer were the

25    discarding of all appliances, washers, dryers, stoves, microwaves,

1    refrigerators.  In this house, they're all taken out to the garage.

2    These are not being reused by Beazer, it's all being thrown out.

3           In this next shot, where the workers are removing the

4    drywall, you can see out on the back porch, in the rain, you have a

5    refrigerator and a stove; and when I walked in the first time, we

6    looked at these and said, aren't you going to cover those, are they

7    coming back?  And the answer that we learned way back in November

8    is, no, every appliance is being thrown out.

9           As the scientists educated us about what's happening to

10   appliances and circuit boards, we understood why the practical

11   decision that was made by the builders is scientifically

12   demonstrable.  But every appliance in the house is being replaced

13   as part of the Beazer remediation.

14          And they're cleaning.  Very thoroughly.  Here you see a

15   high-powered air filtration system.  Mr. Meunier will work with the

16   Beazer witnesses to demonstrate the extensive efforts that they're

17   going through to repair the house, where this is a

18   post-drywall-removal home, and the debris that is distributed

19   through the removal has been thoroughly cleaned up.  This is a

20   clean house, your Honor.  It doesn't smell anymore, all of the

21   drywall is out.  It's ready to be put back together again.

22   And we're getting the certification from the national environmental

23   company that the house is clean.

24          So, your Honor, we go from the Beazer homes and see that

25   this extensive scope of work that was done, and now we turn to

1   these seven families and we begin to look at their houses, bringing

2   in metallurgists, bringing in building engineers, bringing in

3   electrical engineers, bringing in circuitry experts.  And the first

4   question we asked ourselves is, can you save the house?  Are the

5   studs damaged, are the nails damaged, do we need to get the

6   bulldozer out on these houses?

7         A year ago in February and March when this thing was

8   hitting homeowners initially, there was a conventional wisdom that

9   it had impregnated the cement and the studs and that you'll never

10  get it out and that you're going to need to bulldoze these Chinese

11  drywall houses.  On behalf of these families and the other scores

12  of families that I represent, retired families, families with young

13  children, families with newborns, we took a hard look at this, your

14  Honor, we didn't want to go through some process where we knew we

15  had gotten the drywall out but left a time bomb ticking that the

16  nails were corroded and that the house was going to fail, or that

17  the cement had been contaminated and would stink forever.

18        So we harvested samples, these were actually cut out of

19  Mr. McKellar's house, where we saved the fasteners and the wood as

20  these things were joined, we sent them to metallurgists, we

21  sectioned the nails, we put the wood into chambers to see are there

22  gases that are being released.  And we satisfied ourselves that the

23  cement can be saved, that the studs could be saved, that the nails

24  could be saved.  The exterior skin of the house could be saved, the

25  roof could be saved.  We are not asking for a new house, your

1   Honor, we are asking for a remedy informed by the practical side of

2   Beazer of stripping it to the studs and repairing them.

3          Dr. John Scully is going to talk about the corrosion in

4   these families' homes.  I put up this slide, your Honor, which came

5   from one of his previous power points, when our nation experienced

6   the tragedy of a space shuttle disintegrating, and the nation

7   called together the most premier scientists in the country to study

8   what happened, what are the alternative possible questions as to

9   what was the failure of that space shuttle.  Dr. John Scully from

10  the University of Virginia was put in charge of studying potential

11  corrosion implications for those metal air frames because he is --

12  has frequently worked with the Department of Defense on all types

13  of military craft studying corrosion for them.  I believe, your

14  Honor, it would be a fair statement that Dr. Scully is one of the

15  top, if not the top, corrosion expert in the world.

16          We got him components from these houses, including the

17  air conditioner coils that people have been talking about for a

18  year, these air conditioning coils that are failing over and over

19  again.  As one of the indications, the canary in the coal mine,

20  early for these homes.  And we went into the houses.  Here is

21  Mr. McKellar's house, we go up on the ladder, we pull the coils

22  out, we send them to the laboratory at the University of Virginia

23  where they're cross-sectioned, here is a section of one of the

24  pipes, and subject to analysis under electron microscopes and

25  energy dispersive techniques that Dr. Scully will explain, and we

```
 1    see over and over again spikes showing copper sulfide.  That's a
 2    tell-tale sign of sulphur or a sulphur gas that's attacked copper.
 3            And the evidence presented by our experts in this case
 4    will demonstrate that the Chinese wall board copiously delivers
 5    these sulphur gases into the environment and that when you look at
 6    the items that are in the houses and study the corrosion that's
 7    there that you can characterize these houses as having had a
 8    severely corrosive environment.
 9            Now, it's not just our experts that are reaching these
10    conclusions, this is a picture from the Sandia National
11    Laboratories, I believe we discussed this briefly in the DAUBERT
12    hearing, your Honor, but here they've taken a grounding wire and to
13    characterize the corrosion that's in the homes, and this is the
14    actual what should be the smooth surface of a wire under
15    magnification demonstrating that these wires are being eaten by the
16    corrosive gases that are in the home.  We are going to set forth
17    this afternoon with Dr. Scully the mechanism on how that happens
18    and how that leads to actual failures of equipment, including this
19    crack in a cross section of a pipe that led to the failure of an
20    air conditioning system.
21            HVAC systems, your Honor, people have talked about these
22    coils failing and there was some suggestion in the expert reports
23    of the intervenors that you could just replace the coil and that,
24    because that's the vulnerable point, that that system could then be
25    put back into service.  We're going to present evidence, your
```

Honor, that the entire HVAC system is an integrated system starting

with the thermostat where you change the temperature.  The wires

that connect the circuit boards inside of the air handler unit that

transmit the information as to whether it should run or not, the

coils, the copper pipes that connect the systems, the outside

compressor, and the ductwork, everything in an HVAC system is

greatly compromised by these sulphur gases that are attacked.

And we're not asking for one more set of coils and leave

the rest of the system in place, we're asking to be done, what's

being done by Beazer in Florida, that the entire integrated system,

every component that's up there is being replaced new.

So, for example, the thermostat here, your Honor, has a

wire that's delivering information to a circuit board.  You can see

that the wire, once it comes through is being supplied into some

contacts, and here, your Honor, we can see a tremendous amount of

what the corrosion experts will refer to as loose nodular black

corrosion, that's pathognomonic or diagnostic of a copper sulfide

attack, sulphur gases attacking copper.  This yellow wire, here,

your Honor, was then taken out and studied under laboratory

techniques and applied corrosion science standards.

Dr. Scully will explain to the court today that this wire

can easily be predicted to fail, that this wire cannot sustain a

normal service life for a wire.  And because of that, it should be

replaced before it fails.

The HVAC system also has circuit boards and copper lines,

1    which supply the freon or refrigerant inside and outside to the

2    outside compressor.  Our evidence will be that the corrosion of the

3    sulphur gases is eating holes right through these copper pipes,

4    that the pits have these sulphur compounds in them, that even if

5    you took the drywall out, that these pits will continue to grow

6    until these pipes fail.  These circuit boards we will show you

7    through a circuitry expert have a significant amount of corrosion

8    and that the corrosion will continue, until the circuits fail.

9          Beazer Homes from a practical standpoint says, look, once

10   we have all of the drywall out, we're going to put a new line set

11   in, we're going to put a new circuit board in, it's all going to be

12   new, we are not going to do this a second time.  We are not going

13   to leave these copper lines, which run from the attic, down a wall,

14   through a ceiling, down an interior wall and outside to the

15   compressor, we are not going to leave those in place hoping that

16   the pitting won't lead to a failure.  Get them out and we're going

17   to start fresh.

18         This pipe was cut off and sent to the laboratory, we will

19   present the results.  That's what it should look like, your Honor.

20   This is before, after.

21         On behalf of the plaintiffs, your Honor, we would like

22   these homes to have their copper mechanical lines restored to where

23   they were before these corrosive attacks, and that's an element of

24   our repair plan for their homes.

25         In order to demonstrate that this isn't just something

1    that happens to these lines, that they don't just turn black

2    themselves over time and that it's benign, we went into the

3    Sullivan house, here was their sets of evaporator coils, we hired

4    an air conditioning company to come get them, pull them out of a

5    control house, no Chinese drywall, we sent them to the University

6    of Virginia and will demonstrate the results from those coils, that

7    they have no copper sulfide, that there are no pits, that there's

8    no thicknesses that are getting ready to cause a failure, that the

9    Sullivan's have an air conditioning system that could be expected

10   to live its normal life expectancy to deliver cool air to the

11   house, in contrast to these families, where the Heischobers, for

12   example, have lost six sets of evaporator coils in their house

13   since 2006.  So that's HVAC, your Honor, we want a whole new HVAC

14   system for the house.

15          We believe that the entire electrical system needs to be

16   replaced as well.  We showed you the practical evidence, that's

17   what Beazer is doing.  We're going to offer you the scientific

18   proof on why they're right.  That every wire that's in a house,

19   again, your Honor, from a layman or a naive standpoint, I thought

20   of it all as this heavy gauge of wire, the romex that you run heavy

21   current through, that's all that's there in the houses.

22          But when we got into the Beazer houses where the drywall

23   was removed, we were surprised to see that you have phone wires,

24   you have CAT 5 wires for these computer systems in the modern

25   houses, speaker wires, you've got lamp cords that they use to hang

1   breakfast lights down, that there are all different types of wires

2   that are in the wall.  Each of them have a different sort of an

3   installation jacket.  Even the intervenor experts acknowledge that

4   those jackets have different permeability, the gases can get

5   through, some of them clearly, and we'll demonstrate that here in a

6   minute.  So the point becomes that all of the different wires of

7   different gauges in the house.

8           In addition, switches that turn the light switches on and

9   off, receptacles and ground-fault interrupters, an important life

10  safety item, all are significantly compromised, we will offer

11  experts that will demonstrate to your Honor over the next two days

12  where those failures are going to occur.  This is what their wires

13  should look like under magnification, the drawn copper that was in

14  the wire, you can see the machine marks on here, the nice, smooth

15  surface.  This is a Chinese drywall wire where we're seeing the

16  copper sulfide build up, it's cracking, it's pitting, the corrosive

17  gases are getting through the cracks and pits and eating the wires

18  away.

19          Here is a phone wire from Bill Morgan's kitchen -- Deb,

20  I'm sorry, I keep calling it Bill's, I know it's your kitchen, too.

21  This white wire, your Honor, we striped it back like a banana peel

22  off of the wire to see what it looks like underneath these

23  insulation jackets and this is that same wire, where we can

24  demonstrate corrosion all the way up the wire, even though there

25  was an insulation jacket covering it.

1          Your Honor, perhaps the most startling observation that

2    we made when we were conducting these initial investigations of the

3    home back in November was the, Deb Morgan's breakfast light.  Which

4    we have marked as BDM-5 in this case.  When we took a close look at

5    light, and I believe it was my cocounsel, Mr. Gordon, that spotted

6    this, we noticed that there was a black appearance to this wire

7    that was holding the breakfast light up.  This light was out in the

8    middle of the room, it was not by any drywall, that you can see

9    this gentleman is standing between the lamp and that far wall and

10   then some distance even from the ceiling.  And so the question

11   became, well, was that wire black to begin with or was it somehow

12   corroded while it was hanging there in the room?

13         We took a close look at where the lamp connected to the

14   wire and we noticed that there was a grommet here holding it up,

15   and we said, well, let's take it apart.  I say we, the scientists

16   that were there, the metallurgists, the building material

17   specialists, the engineers.  And when they did, they saw, your

18   Honor, that the pristine wire, which was protected by a grommet and

19   protected from air flow in the room, was a nice, bright, shiny

20   copper, and that where above it was hanging and exposed to the air,

21   that the Chinese drywall gas had permeated right through the

22   sheathing and were corroding those wires from the inside out.

23         Your Honor, in a recent photograph, one of the experts

24   noted that the Baldwin house, where we were looking at their office

25   room, that he noticed that lamp appeared to have this same sort of

1    effect and we asked the Baldwins to ship the lamp down to us, it

2    came in yesterday, when they're on the stand, your Honor, we would

3    like to demonstrate what one of these same gauges of wires looks

4    like when you hold it up close.  So it's black and the question

5    becomes, so what, that the wire changes color, will that have a

6    material impact on the wire?

7            Close up, your Honor, showing how black this wire has

8    become out in the middle of the room.  We sliced it, the experts

9    sliced it, and we're seeing corrosion product that's peeling off of

10   these wires.  They slice it a different way and you see, your

11   Honor, that the corrosion has peeled off with the jacket of the

12   wire from these wires that were exposed.  So we've got corrosion

13   that's occurring through the installation jacket to these wires, we

14   then sectioned the wire and subjected it to laboratory analysis to

15   see what's happening to these individual wires, and we see a 35.4

16   micron pit.

17           Your Honor will hear some significant discussions about

18   the implication of pit depths over the next two days.  But one of

19   the individual strands here is being eaten from the inside out in a

20   wire that was hanging in the middle of a room.

21           On behalf of the families, your Honor, we want every wire

22   in the house taken out, we don't want to leave wires behind that

23   are subject to permeation and corrosion from the inside out.

24           Part of our animation, your Honor, demonstrates how we

25   believe the corrosive gases are getting into the wire and the

1    mechanism by which the copper is corroding.  I've cut another

2    segment out of the animation, which, for the Morgan house, runs

3    about 14 minutes, we are not going to use the court's time this

4    morning with that.  But for each of the components that we believe

5    are subject to attack, the HVAC, the electrical, et cetera, we've

6    put together not only the scientific evidence of what's happened,

7    but then we've asked the scientists to prepare these animations to

8    demonstrate the effect.

9          Your Honor, this is a drywall house.  This should be a

10   nice, bright, shinny copper connection.  This is the screw that's

11   holding that connection down, and it's obvious to see that this

12   screw head itself and the wire are heavily corroded here.  This is

13   a life safety issue.  The wires should look like this.  This is

14   from one of the control houses, nice, clean copper surface, a safe

15   connection, no corrosion going on, life safety is going to be

16   protected by having a wire that's fastened to a switch or

17   receptacle appropriately.

18         Over and over again we saw that that's not happening in

19   Chinese drywall houses and that every receptacle, every switch in

20   the house needs to be replaced.

21         And so, your Honor, we get to the point where we're

22   saying all drywall comes out, the whole HVAC system, the whole

23   electrical, and the question becomes, is that the same remedy for

24   every one of these seven houses, is there any discernible

25   difference in the houses, depending on whether it had 12 sheets or

1    45 sheets or 212 sheets of Chinese drywall?  And we found an

2    instance where it does make a difference, and it turned out to be

3    an after-construction repair, a modification to a house.

4           The original owner on the house, not Joe and Kathy Leach

5    who will be here on Monday, but the original owner decided that

6    there was a corner of the basement that would be great for what

7    they conceived of as a wine room.  Joe and Kathy Leach are not wine

8    room kind of people, he's in special forces and she has a couple of

9    young kids at home and works as well.  They've never built it out,

10   there hasn't been a bottle of wine in that room ever.  But the

11   so-called wine room in the Leach house ended up as an alteration

12   with eight sheets of Chinese drywall in a $400,000 Home.

13        The WINE room Has climate control, so there was no air

14   circulating between that room and the rest of the house.  We went

15   to the HVAC SYSTEM for that floor, WE opened it up, and there was

16   no corrosion whatsoever on the HVAC Coils.  We are not asking for

17   the Leach house to be stripped to the studs all over again, all new

18   wires, all new everything, what we will propose to your Honor that

19   there were limited circumstances with highly-localized use of

20   Chinese drywall where you can do a localized repair.  But when you

21   move from that, your Honor, to new-home construction, where pallets

22   of drywall are delivered, the least number of boards that was

23   delivered to one of these houses was Fred and Vannessa Michaux, one

24   pallet, 45 4-FOOT BY 12-FOOT boards.

25           We will demonstrate, your Honor, it's on all three floors

DAILY COPY

1    scattered around.  Using the defendants' experts' evidence, OR the

2    former INTERVENORS' evidence, only 45 sheets, it's everywhere.

3            The Baldwin house for Jerry and INEZ.  The delivery

4    records indicate that all of the drywall went onto the first floor,

5    that there's none up on the second floor, and the question becomes,

6    well, why don't you just do the drywall there on the first floor?

7    We believe this is a significant point for the Baldwins.  In

8    new-home construction where boards are scattered with unreliable

9    records, you can't take the risk.

10            First, you're not going to get an environmental company

11   to sign off that every single board was removed on the basis of

12   unreliable installation records.  On the basis of the observed

13   scattering of boards throughout the house.

14            On Monday, Mr. Rutila will demonstrate that in a house

15   with identical sort of delivery records, no drywall on the second

16   floor, according to the delivery records, that we can demonstrate

17   that there are multiple sheets of drywall, it's not the Baldwin

18   house, it's another family, but it demonstrates this scatter

19   effect, where boards end up in odd places.  We didn't take the

20   second floor drywall down of the Baldwin house to see is there

21   Chinese board in the bathroom or the room over the garage or the

22   other bedroom because that would destroy their house, this is one

23   of the few families that's trying to hang in there because they

24   can't afford and don't want to go down the foreclosure and

25   bankruptcy route that other clients have done.

1          But the HVAC system in the Baldwin house on the second

2    floor that supposedly has no Chinese drywall, and even the defense

3    expert or the intervenor expert, Mr. Pericone, he opened it up and

4    he looked at the coils and they were so corroded on the second

5    floor, where only air from the second floor was going into those

6    coils, that he said, I don't even need to test it, that's Chinese

7    drywall corrosion on a second floor set of coils where there was

8    supposedly no drywall removed.

9          For Jerry and Inez, we are not going to propose that in a

10   house that had drywall delivered and scattered that they only get

11   half of their house fixed, we're asking your Honor for a house as

12   part of new construction, where any significant amount of Chinese

13   drywall was delivered, and we are not going to try and find it,

14   we're going to do what Beazer did and have a single repair strategy

15   that removes all of the drywall and the HVAC and the electrical.

16         Appliances.  What do our scientists tell us is the

17   scientific underpinnings or evidence that supports what Beazer is

18   doing in tossing all of the appliances?  It's McKellar 's

19   refrigerator.  And we peeled back the back of that refrigerator to

20   take a look and we see a copper line, and it's corroded.  It turns

21   out that these refrigerators have copper lines just like the air

22   conditioners do with refrigerant and fans to cool the air that's

23   being supplied into the refrigerator, and there was significant

24   corrosion on the copper components in refrigerators such that these

25   line sets or the things that are delivering the refrigerant have

1    deep pits that are imminently going to fail, and the decision to

2    get them out of there and not try and replace parts and remedy a

3    broken refrigerator made a lot of sense from a scientific

4    standpoint compared to Beazer's decision to get them out of there.

5           So, your Honor, we came up with a repair protocol that

6    stipulated the effect in chambers one day, I recall, that the

7    observation was made, well, sure, the plaintiff's system, the

8    Plaintiff Steering Committee would work, but we believe that it's

9    excessive.  We don't think so, your Honor.  First off, we've

10   written it down, we've provided it for peer review, it's been gone

11   over thoroughly, it's been subject to *DAUBERT* attack.  Ours is

12   written down, there is no protocol from either Knauf or anyone else

13   in the country, your Honor, that's been proposed as a method where

14   you could do something less than this.

15          Ours has been stipulated to be effective, not so for

16   Knauf or any other source.  Major builders in the United States are

17   using an identical protocol, not so for these antidotal stories of

18   a small builder here or a homeowner there who has tried to do it

19   less aggressively.  We get a written guarantee, we definitely meet

20   every electrical code.  We'll present testimony, your Honor, from

21   an electrical engineer who specializes in life safety codes, fire

22   code, electrical code.  The national electrical code says you can't

23   use wires that have any residual corrosion on them whatsoever.  Our

24   plan will satisfy that.

25          Who can do this work to remove the drywall?  We'll get it

1    out in an hour and a half to two hours using laborers.  The system

2    that was proposed to selectively leave some drywall versus other

3    involved people color coding outlets, where we're pulling it out,

4    and you have to have trained people looking at individual wires to

5    say that's dark, that's not too dark, somebody needs to put that

6    together with even the whole home use of this X-ray gun, and then

7    put all of this information together to draw a conclusion after

8    hours of work, that maybe we'll leave some boards and take others

9    out.  A very inefficient system where they would use XRF

10   technicians and electricians and engineers to find a few boards

11   that can be saved in a house as opposed to us stripping a house of

12   drywall in a couple of hours.

13          Your Honor, the builders are not using anything unproven,

14   these are laborers, it's drywall mechanics.  The Knauf or other

15   intervenor systems were relying on color-coding systems, coupled

16   with shipment records, coupled with X-ray guns, somehow or other

17   being jumbled up into an unwritten way to say, oh, we now know how

18   we can replace some drywall and not others, is unproven -- it's

19   unwritten, it's unproven, and we would request, your Honor, on

20   behalf of the intervenor plaintiffs and the Germano plaintiffs that

21   we not end up with a result where we're going to try and isolate

22   some drywall versus others.

23          Our system does not leave corroded wires in place, no

24   corroded contacts, no corroded switches, no lamp cords that are

25   getting eaten from the inside out, it's all out, and the

1    plaintiffs' house will have a fresh start.

2         Your Honor, you're going to hear some evidence about

3    copper coupons.  Much of what was being happening for the last 30

4    days while we were dealing with the intervenors' experts centered

5    on a suggestion that these copper coupons were able to predict the

6    benign environment, that there's really no Chinese drywall to worry

7    about.  There are other technologies showing that, gee, I think

8    this room is really safe and has no problems with Chinese drywall.

9         And we took ceilings down, this is Orlando's house, they

10   were kind enough to let us take the ceiling down, and were able to

11   demonstrate that the Chinese drywall is in rooms with the, where

12   the technology and the unproven method would have suggested that it

13   stays behind.

14        The coupon system for predicting that these houses are

15   really okay, that there's no problem, because when we looked at

16   these things after they were there for 30 days in the middle of the

17   winter, that we don't see much problem with these surrogates that

18   are supposed to be representing reality, therefore, you can leave

19   these wires behind.  Your Honor, we suggest it has no currency,

20   that they're ignoring the real wires and that the intervenors had

21   attempted to suggest that we don't want to look at the real world,

22   that we should look at a surrogate and make a decision that it's

23   okay to leave wires behind.

24        Finally, your Honor, when it comes to once the drywall is

25   removed and the ductwork is removed so that the owner that's

1    impregnated itself into the ductwork is out of there, we try to get

2    quotes from contractors in Virginia that would provide a quote to

3    clean these things out, we couldn't get one of these companies to

4    even quote the remedy.  We wanted to provide alternatives, we went

5    to two major builders in Virginia, one is a $100 million builder

6    Virtexco, the other is a custom home builder that does eight, ten

7    homes a year, high-end homes, VB Homes, we had them price out every

8    step.  We looked at the alternatives, well, what if you leave the

9    ductwork behind and just clean it, they couldn't get anyone to give

10   them a quote on cleaning ductwork.

11          Insulation, small items like this, your Honor, we've

12   priced it, fresh insulation for these houses, we've priced an

13   aggressive cleanup system that's very similar to what Beazer is

14   doing to get the houses pristine.  We don't want to leave this

15   insulation in the house with the toxic drywall, which has been

16   turned into dust, shot into the layers of the insulation.  One of

17   the intervenors' experts, Mr. Morse, had suggested that you can

18   vacuum this out and that you would then leave the drywall behind,

19   cutting a corner on the repair strategy to make it cheap.

20          Your Honor, we believe that these families and what

21   they've been through are entitled to have items that have been

22   impregnated with toxic dust taken out of their house, and they're

23   entitled to have it all thrown out, they're entitled to have their

24   house thoroughly cleaned and wiped down so that all of the dust and

25   debris that results from the removal of the drywall is out of there

1    so that their studs are in a pristine shape.  They're entitled to

2    let that house air out for a couple of three weeks to a month, so

3    they get to the point where they go in there and they don't smell

4    anything, which is what the Florida builders are telling us from a

5    practical standpoint it'll take.  Well, the crews have to stand

6    down for three weeks, it's expensive, the intervenor expert said,

7    just go ahead and start putting the drywall back up there.  Our

8    plan calls for an air-out period so the houses don't smell anymore

9    before they're put back together again.

10          Your Honor, we're asking on behalf of these families for

11   a repair remedy like the Beazer remedy, stripped to the stud, new

12   HVAC, new electrical, new appliances, clean it thoroughly and get a

13   letter for these families saying that their house is certified to

14   be free of the toxic substances.

15          At the end of this case, your Honor, we will ask the

16   court to actually enter a judgment on behalf of these families,

17   against the Chinese company that has not seen fit to show up in

18   these proceedings, despite due process having been served, we will

19   ask for an award against this company to let these families get

20   their homes back together and their lives back together.  Thank you

21   very much.

22          THE COURT:  All right.  Thank you very much.  We will

23   take a 15 minute break here and come back and start the evidence.

24   The court will stand in recess.

25          THE DEPUTY CLERK:  Everyone rise.

```
 1        (WHEREUPON, A RECESS WAS TAKEN.)

 2        (OPEN COURT.)

 3              THE COURT:  Be seated, please.  Call your first witness.

 4              MR. SERPE:  May it please the court, Richard Serpe for

 5   the PSC.  We would like to call Bill Morgan to the stand.

 6              THE COURT:  Mr. Morgan, come forward, please.

 7              THE DEPUTY CLERK:  Would you step into the witness box,

 8   please.  And would you raise your right hand.

 9        (WHEREUPON, BILL MORGAN, WAS SWORN IN AND TESTIFIED AS

10        FOLLOWS:)

11              THE DEPUTY CLERK:  Please be seated.  And if you would

12   use that microphone there in front of you, would you state your

13   name for the record.

14              THE WITNESS:  Bill Morgan.

15                        DIRECT EXAMINATION

16   BY MR. SERPE:

17   Q.  Bill, who is that sitting next to you in the jury box?

18   A.  My wife Debbie.

19   Q.  How many years you guys married?

20   A.  Twenty-seven.

21   Q.  Kids?

22   A.  Yes, two daughters.

23   Q.  Any grandkids yet?

24   A.  One on the way.

25   Q.  Can I get a picture of the house, please.  Is this your Chinese
```

1  drywall house?

2  A.  Yes, sir, it is.

3  Q.  We've labeled it 8495 Ashington Way, is that the address of the

4  home you purchased in Williamsburg?

5  A.  Yes, sir.

6       MR. SERPE:  Your Honor, we've already offered into

7  evidence P3-0398, a photograph of the home, it contains the address

8  of the home.

9       THE COURT:  Okay.

10  BY MR. SERPE:

11  Q.  What's your current occupation?

12  A.  I am a security manager.

13  Q.  Where do you work?

14  A.  Williamsburg.

15  Q.  What facility at Williamsburg?

16  A.  Camp Perry.

17  Q.  Camp Perry for the benefit of the people not from the Tidewater

18  area, what type of a facility?

19  A.  A training facility.

20  Q.  So what was your occupation for the main part of your life?

21  A.  I was a police officer.

22  Q.  For how many years?

23  A.  Twenty-four years.

24  Q.  And where were you a police officer?

25  A.  Newport News, Virginia.

1   Q.  And what grade did you retire from the police force at?

2   A.  Master police detective.

3   Q.  What about Deb, what's her occupation?

4   A.  She is an instructional coach for the public school system in

5   Newport News.  She teaches the teachers.

6   Q.  And not to brag on her, but has she gotten some recognition

7   with respect to her teaching credentials?

8   A.  Yes, sir.  Over the time of her career she's been teacher of

9   the year three years in Newport News.

10  Q.  You bought that house in July of 2006?

11  A.  Yes.

12  Q.  What did you pay for it?

13  A.  $383,000.

14          MR. SERPE:  Your Honor, we've already offered into

15  evidence the deed where the Morgans acquired this home, it's in the

16  record at P3-0419.  And also reflects the purchase price for the

17  home.

18  BY MR. SERPE:

19  Q.  Have you and Deb owned the homes that you've lived in over the

20  last 20 years?

21  A.  Yes, sir.

22  Q.  And I mentioned to the court the issue of a FEMA trailer.

23  Would you tell the court what happened there?

24  A.  Yes, sir.  Back in 2003 Hurricane Isabel came through, we were

25  living in a small town called Pocosin, Virginia close to the water,

1    and we got flooded out.  And as a result of that, like a lot of

2    people, we had to do the rebuilding, we had to raise our house.  A

3    month after we got flooded out my oldest daughter was diagnosed

4    with cancer, so we were dealing with that at the same time.

5              Lived in the FEMA trailer and kind of half and half

6    between the FEMA trailer and the house as we got the house, parts

7    of it working again, back and forth.

8    Q.  It wasn't this house, it was the house just before this?

9    A.  Correct, yes, sir.

10   Q.  But you finally got that one in Pocosin back together again?

11   A.  Yes, sir.

12   Q.  What led you to buy a different house?

13   A.  We wanted to move basically to higher ground, we didn't want to

14   go through a flood or any kind of a natural disaster again, we

15   wanted to move away from the water more inland and found this

16   neighborhood.

17   Q.  Did you and Deb get into this house and fall in love with it,

18   was it love at first sight?

19   A.  We did.

20   Q.  Tell us about that.

21   A.  While it was under construction we would probably go up there

22   two or three times a week, I would go through the windows once it

23   was dried in looking at it.  I mean, we loved it.  I mean, this is

24   the best home, the nicest home we've ever owned or probably ever

25   will own; and it was our dream house, it really was.  It looks like

1   an average house, but to us it was the best.

2          MR. SERPE:  Your Honor, we put into evidence the floor

3   plan for the Morgan's house, 401 -- P3-401.

4   BY MR. SERPE:

5   Q.  Give the court an idea of what the floor plan was like, two

6   story, give him a little walk around on the inside of your house.

7   A.  Walk into the home to right is like a living room area, to the

8   left was like an office area; and the main thing that we liked

9   about the house, that Debbie really liked was the whole back of the

10  house was just basically one room, the dining room opened up to the

11  kitchen, the kitchen into the family room, and that for us was the

12  big selling point of that house, we liked the way it was laid out

13  downstairs.

14         MR. SERPE:  Do we have a picture of the breakfast light

15  available?

16  BY MR. SERPE:

17  Q.  Is that your light?

18  A.  Yes, sir.

19  Q.  That we showed to the court here.  That hung in this large open

20  area that your family spent its time?

21  A.  Right in the kitchen in the middle between the dining room and

22  the family room.

23  Q.  Did it smell in there, Bill?

24  A.  Yes, sir.

25  Q.  And how would you guys describe the smell that was in there?

1   A.  We just called it just a rotten chemical smell, just -- it's

2   hard to describe other than it just stunk.

3   Q.  When did you guys first start noticing this smell or other

4   problems with the house?

5   A.  Debbie noticed it from day one.  I had noticed it if we would

6   go away for a weekend and come back and just have that smell, but I

7   guess I got used to it, it went away.  And then 2008, the first

8   thing I can remember is the hot water heater failed in the house,

9   and we had only been in that house for two years.

10          Initially they tried to replace the electronic control

11  box for the water heater, that didn't work; a couple of days later

12  they came back and replaced the entire hot water heater.

13  Q.  So in addition to the hot water heater, you then ran into

14  problems with the mechanical system on the house as well?

15          THE COURT:  Let's get a date as to when he moved in.

16  BY MR. SERPE:

17  Q.  I'm sorry.  When did you move in, Bill?

18  A.  I think it was July 13th or 14th, 2006.

19  Q.  And I think that's accurate, your Honor, from our records as

20  well, July of 2006.

21  A.  Right.

22  Q.  Water heater problems in 2008?

23  A.  Yeah, I want to say probably the fall of 2008, summer or fall

24  of 2008.  So we hadn't been in there maybe just barely two years

25  and the water heater failed.

1    Q.  Put a book end on the end, how many months or years were you in

2    the house before you moved out?

3    A.  We were just shy of three years by one month, we moved out in

4    July of 2009 -- I mean, June of 2009.

5    Q.  Last June you moved out of that house?

6    A.  Yes, sir.

7    Q.  In addition to the problems with the water heater, what other

8    problems were you having with the mechanical systems in the house?

9    A.  Electrical wiring upstairs that we had something -- one of the

10   outlets failed, it tripped a circuit breaker, they came out and

11   fixed that, couldn't offer an explanation.  And then subsequently

12   two outlets in two different rooms failed upstairs but did not trip

13   a circuit breaker.

14         The air conditioning system we had an electrical short.

15   I was upstairs watching TV and I smelled a burning smell and it was

16   coming out of the heat vent.  And so I turned off the heater for

17   awhile, it went away; and I turned it back on and the burning smell

18   came back.  We turned it off for the night, slept without heat that

19   night, and the next day the people came out and found a couple of

20   wires in the upstairs air conditioning, the HVAC unit and they

21   couldn't offer an explanation.

22         They put a load test on it, did this, the kid that fixed

23   it said it looks like, well, maybe they just weren't taped together

24   tight enough and that's what caused them to short out.  They had

25   actually burned through the wire nut holding these wires together.

1   And then after that, more problems with the HVAC system --

2   Q.  Let me cut you off for just a second.  You told Deb that the

3   wire nut had been burned through?

4   A.  Yes, sir.

5   Q.  What was her reaction?

6   A.  Debbie is scared to death of fire, it's just -- that's a big

7   thing with her.  It's just -- it was just bad.  So we had a real

8   concern about that.  So she wanted another person to come out from

9   the company and check it, because it was a younger man that did it

10  and we called whenever it was and said, listen, can you send out an

11  older, more experienced person just to make sure, just to double

12  check what the young man had told us.

13          And this gentleman came out and checked everything and he

14  was the one that started noticing problems, that we had a leak in

15  the system and then that required several more visits, ultimately

16  replaced the coils in March or April of 2009.

17  Q.  And before we get back to the coils just for a second, because

18  of Deb's particular sensitivity to fire issues, did you go out and

19  get any additional safety equipment?

20  A.  I went out to a home store and bought two fire extinguishers,

21  one for upstairs and one for downstairs.  And I didn't have a

22  problem with that because when the outlets quit working and didn't

23  trip a circuit breaker, I mean, just before we moved out we were

24  thinking I am going to sleep at night wonder is my house going to

25  catch on fire.

1    Q.  We talked about the electrical system, the water heater

2    problems with the HVAC system failing.  Were you guys experiencing

3    any sort of problems physically that you were concerned about?

4    A.  Well, what all started this, what got us on this road is Debbie

5    had been having nose bleeds for awhile.  And she got on the

6    internet and Googled nose bleeds to see what might be causing it.

7    And she thought it was just old age or whatever, she wasn't sure,

8    and she came across an article of a young boy, I want to say it was

9    Florida or Louisiana, that had been experiencing nose bleeds and he

10   was living in a home with Chinese drywall.  And that was our first

11   inkling of what Chinese drywall was, and she started doing research

12   and seeing the problems they were having, the problems we were

13   having and she put two and two together.  I thought she was crazy,

14   no such thing as Chinese drywall, and here we sit.

15   Q.  So let me predict that the "old age" and "crazy" comments are

16   going to come back to haunt you later today?

17   A.  Every day, every day.

18   Q.  Did she send you up in the attic to look for the Chinese label?

19   A.  Yep.  I went up there, pushed the insulation aside looking for

20   the stampings and the markings, didn't see any right then, I

21   thought life is good.  And I am coming back down the attic and go

22   to replace the panel, the access panel and on piece of that drywall

23   is a Venture Supply label.

24   Q.  And what did you say?

25   A.  Oh, shit.

1   Q.  So from this time period where Deb picks up on the internet and

2   you see the Venture label, how much longer were you guys in the

3   house for?

4   A.  This is March or April, we moved out the end of June, June 23rd

5   we moved out.  Once we had it confirmed.

6   Q.  So I want to ask you about other electronic type things in the

7   house, thermostats and things like that.  Any problems with that

8   sort of stuff?

9   A.  Our smoke detector system quit working, it probably stopped

10  working probably a year ago.  We had one smoke detector that was

11  part of the security system, so we relied on that and the fire

12  extinguishers but they couldn't determine a cause for that.  We

13  lost a couple of computers, a TV, the control panel for our

14  security system, it went out and had to be replaced.

15          MR. SERPE:  Can I see Bill's television set?

16  BY MR. SERPE:

17  Q.  Is that what your TV looked like when you gave it to us?

18  A.  No, sir.

19  Q.  But you do understand though that we took your television and

20  we sent it off for laboratory analysis?

21  A.  Yes, sir.

22  Q.  And we've shared with you the results -- can I see the next

23  one -- of the corrosion that was on your television?

24  A.  Yes, sir.

25  Q.  Is it part of your case today that you're asking the court to

1  reimburse you for your electronic equipment in your house,

2  including your computers and your television?

3  A.  Yes, sir.

4  Q.  When you moved out of the house, where did you go?

5  A.  We rented another home in Williamsburg.

6  Q.  What was the rent payment on the new house?

7  A.  $1,900 a month.

8  Q.  What was the mortgage on the Chinese drywall house?

9  A.  $2,835 a month.

10 Q.  Could you afford both?

11 A.  No, sir.

12 Q.  What did you do?

13 A.  We filed bankruptcy.

14 Q.  How hard of a decision was that for you?

15 A.  It was hard.

16 Q.  How long did you go before you filed the bankruptcy after you

17 were out of the house?

18 A.  That following month we weren't going to stay in the house and

19 not make mortgage payments, we've always paid our bills on time.  I

20 mean we're the type people we were afraid if our mortgage was a day

21 late they would take the house, so we always paid that stuff on

22 time.

23        And once -- I just knew our house wasn't safe to live in,

24 we were going to sleep at night wondering if it was going to catch

25 on fire.  I'm a cancer survivor, our oldest daughter is a cancer

1   survivor, we still have a teenage daughter living with us, we don't

2   want to subject her to this anymore, all we can do is hope that

3   there's no health effects down the road, we don't know.

4   Q.  Tell the court how you felt when you didn't make that first

5   mortgage payment.

6   A.  Terrible.  I mean, that's just -- to sit there and not do that,

7   it just feels terrible.

8   Q.  And you're in bankruptcy now?

9   A.  Yes, sir.

10  Q.  Did you come out of pocket for the lawyers up there to get you

11  into a bankruptcy proceeding?

12  A.  Yes, sir.

13  Q.  What about the title to the house, what's going on with the

14  ownership of the house?

15  A.  We just got a letter from the bankruptcy trustee where they

16  granted a relief, allowing the mortgage company to go forward with

17  the foreclosure; so that is being done now, probably within the

18  next couple of weeks it won't be ours.

19  Q.  Unless the bank decides that they really don't want the house.

20  A.  Correct.

21  Q.  Bill, would you confirm for Judge Fallon that you spent a lot

22  of time with people that came into your house to assess all of your

23  electronic equipment and to work with them to provide receipts, et

24  cetera, for the expenses that you have been through?

25  A.  Yes, sir, very much so.  Every couple of weeks or somebody was

1  coming wanting to take samples or items.  Been a very busy time.

2  Q.  They also specifically went through all of your damaged

3  possessions and worked with you to obtain estimates on what the

4  replacement costs would be for those things?

5  A.  Yes, sir; yes, sir.

6  Q.  And you worked and reviewed a summary of that that was prepared

7  by an economist or a CPA here in New Orleans?

8  A.  That's correct.

9       MR. SERPE:  And, your Honor, we have previously entered

10  into evidence on behalf of Mr. Morgan P3-0622.

11  BY MR. SERPE:

12  Q.  Bill, this is the summary of the expenses, including the

13  estimated repair costs for the house, the expenses associated with

14  you being out of your house, the bankruptcy lawyers, your damaged

15  goods.  You've had a chance to review this summary very carefully?

16  A.  Yes, sir.

17  Q.  And are you telling the court under oath that this is a fair

18  and accurate statement with respect to your out of pocket damages

19  from having had a Chinese drywall house?

20  A.  Yes, sir, very much so.

21       MR. SERPE:  I don't know if the court has any additional

22  questions for Mr. Morgan?

23       THE COURT:  No, I don't.

24       MR. SERPE:  Just a moment, your Honor.  Thank you, Bill.

25       THE COURT:  Okay.

```
 1              THE WITNESS:  Thank you very much.

 2              THE COURT:  Call your next witness, please.

 3              MR. MEUNIER:  May it please the court, we call Ray

 4    Phillips.

 5              THE DEPUTY CLERK:  Please step into the witness box.

 6    Would you raise your right hand.

 7         (WHEREUPON, RAY PHILLIPS, WAS SWORN IN AND TESTIFIED AS

 8         FOLLOWS:)

 9              THE DEPUTY CLERK:  Please be seated, and use the

10    microphone, would you state your name for the record.

11              THE WITNESS:  My name is Ray Phillips.

12              THE DEPUTY CLERK:  You can push it back a little from you

13    a little bit.  That's great, thanks.

14    BY MR. MEUNIER:

15    Q.  Good morning, Mr. Phillips.  What is your address?

16    A.  Home address?

17    Q.  Yes.

18    A.  1537 Eagles Nest Circle, Winter Springs, Florida.

19    Q.  And what is your occupation?

20    A.  I am vice-president of operations for the state of Florida for

21    Beazer Homes.

22    Q.  What is your duty and responsibility as vice-president?

23    A.  Operations for four cities in the state of Florida:

24    Jacksonville, Orlando, Tampa and Fort Myers.  So it's fairly broad,

25    I don't really know how to answer the question.
```

```
 1   Q.  Let me ask you this.  How many years have you been with Beazer?
 2   A.  Just over seven years.
 3   Q.  What is the nature of the business conducted by Beazer Homes?
 4   A.  We build homes and communities across the nation, actually
 5   across the world.
 6   Q.  And is drywall one of the materials used by Beazer in the
 7   construction of new homes?
 8   A.  Yes, in every home.
 9   Q.  How does Beazer obtain its drywall?
10   A.  For the most part it's done turnkey through a drywall supplier,
11   drywall subcontractor.
12              THE WITNESS:  Is that better?
13              THE DEPUTY CLERK:  Yes.
14   BY MR. MEUNIER:
15   Q.  And then how does Beazer arrange for the installation of the
16   drywall once it's supplied?
17   A.  Again, done through the subcontractor that we would for the
18   most part hire a subcontractor that would obtain a turnkey process
19   that they would obtain their own drywall and deliver it to our
20   sites and furnishing the labor as well.
21   Q.  How long has Beazer been in the business of new home
22   construction?
23   A.  Since the 1700s in England, and I think came to the U.S. in
24   1984.
25   Q.  And in how many states does Beazer conduct new home
```

1   construction activity?

2   A.  I am not sure of the accuracy of that.  Less than 20, more than

3   15, I think.  I am not positive of the answer.

4   Q.  And how many years of experience have you had in the

5   construction business?

6   A.  In the construction industry, 32 years; in national home

7   building, 22 years.

8   Q.  When did you first become aware, Mr. Phillips, of concerns

9   about Chinese manufactured drywall in Beazer built homes?

10  A.  March a year ago, March 2009 -- February, March, somewhere in

11  there.

12  Q.  How did you become aware of the problem?

13  A.  My recall it started with news media and starting to hear more

14  and more, and then later Beazer started getting some calls from our

15  national warranty center; and we were still hopeful that we had no

16  issue, but that's when we started to investigate and start our

17  education.

18  Q.  When you say the national warranty center, explain to the court

19  what you mean.

20  A.  For Beazer Homes as a nation, we have one call center, one hub

21  that takes all of the calls from across the nation, it's in

22  Phoenix, Arizona; so that's how any need that our homeowners would

23  have, they would call the warranty center and it's disbursed out to

24  the various division.

25  Q.  So these were owners of homes built by Beazer calling to

1   complain about possible Chinese drywall in their house?

2   A.  Yes, that's correct.

3   Q.  Did you ultimately determine where Chinese drywall was located

4   in Beazer Homes?

5   A.  Yes.  Now, we've had calls and concerns from many states and in

6   many different communities.  And a year later, a little over a year

7   later since our first being aware that Chinese drywall existed, we

8   have been limited to two communities across the nation, both in

9   Florida, one community called Magnolia Lakes in Fort Myers, the

10  other one called Hampton Lakes in Tampa.  So both are limited to

11  Florida.

12  Q.  And describe the types of homes that are in the Tampa and Fort

13  Myers locations?

14  A.  The Tampa is townhome construction, two story, two and three

15  story, ranging 7, 8 and 10 string units put together.  And in Fort

16  Myers, Magnolia Lakes, single family dwellings, one and two story,

17  probably averaging the 2,000 square foot range, 2,200 square foot

18  range.

19  Q.  And how old are these homes where Chinese drywall has been

20  found?

21  A.  Right around four years, four or five years.

22  Q.  How many total homes, taking both Tampa and Fort Myers

23  together, have you confirmed the presence of Chinese drywall in?

24  A.  For both cities combined we're at total of 42, although four of

25  those are a grand suite on top of a garage, it's not the entire

1    house that it's been isolated to, of the 42 units, 38 that are the

2    entire unit.

3    Q.  And how does that number divide between Tampa and Fort Myers?

4    A.  Fort Myers is, I believe the number is 20; and in Tampa, I

5    believe the number is 22.

6    Q.  Do you know how many homes Beazer has actually investigated for

7    Chinese drywall?

8    A.  No.  I think we're somewhere around 70 in Magnolia.  There's a

9    total of 116 homes that were built there and I believe we've

10   investigated about 70.  I am not sure of the number in Tampa at

11   Hampton Lakes.

12   Q.  Is your investigation continuing?

13   A.  Yes.

14   Q.  So as of now the count is roughly 40, it could increase?

15   A.  Yes.  We both take the calls that come in for our national

16   center as well we've been somewhat assertive once we learned these

17   communities had it that we solicited to be able to get in and

18   inspect as many as possible.

19   Q.  When you say solicit, you've actually written letters to the

20   owner of Beazer Homes suggesting that you come in --

21   A.  Some which two or three times, like if they don't live there

22   anymore, they have a tenant and we don't get a response to it.

23   We've made effort because we want to see our full exposure.

24   Q.  In the cases where you have determined there's Chinese drywall,

25   are these homes a mixture of both Chinese manufactured and domestic

```
1   drywall?
2   A.  Yes.  I don't know if it's more than you want, but when we go
3   in and start to do the demo process, we also identify all of the
4   boards and come up with a percent of how much board is Chinese and
5   how much is domestic.  So we do find mixed in all.
6   Q.  And which Chinese manufacturers are involved in the Beazer
7   Homes where you've confirmed the presence of Chinese drywall?
8   A.  The two that I am recalling right now are both Taishan and
9   Knauf, as well as domestic board.
10  Q.  So you have Taishan and Knauf board, not in the same home, but
11  different homes have Knauf and different homes have Taishan?
12  A.  Correct.
13  Q.  With a mixture of domestic?
14  A.  Correct.
15  Q.  Jerry Smith is an employee of Beazer?
16  A.  Yes, he is.
17  Q.  And he is here today, isn't he?
18  A.  Yes, he is.
19  Q.  And he is in a better position than you to actually take us
20  through the actual steps of investigating and confirming the
21  drywall?
22  A.  He is on the ground in the field every day with it.
23  Q.  Now, these Beazer Homes as you've indicated are built under a
24  warranty agreement?
25  A.  Correct.
```

1   Q.  And it's on the basis of those warranty agreements that Beazer

2   has now undertaken repairs necessitated by Chinese drywall?

3   A.  That's correct.

4   Q.  And in how many homes are these repairs currently underway?

5   A.  I don't know.  I would say somewhere around 15, maybe more.  I

6   really don't know the exact number.

7   Q.  Now, in your capacity as the vice-president of Beazer's Florida

8   division, were you given the authority to determine the scope and

9   cost of the repair in the Florida locations where Chinese drywall

10  was present?

11  A.  That is correct.

12  Q.  Please tell Judge Fallon what your primary objectives were as a

13  Beazer official in determining the scope and cost of these repairs.

14  A.  Yes.  If I can clarify, it was not my decision, it was a CEO at

15  a corporate level making the decision that we were definitely going

16  to be standing behind our warranty.  From there it came to me to

17  define the scope and how much it would be.

18          Our first was to honor our warranty, that was the first

19  protocol.  My second challenge was to see how the least amount we

20  could spend to make our buyers, our customers whole.  So the

21  objective was try to spend as little as possible.

22  Q.  So you under the warranty want to make your owners whole,

23  correct?

24  A.  Correct.

25  Q.  But you also want to do that in the way that's the most cost

1   efficient way possible for Beazer?

2   A.  Correct.

3   Q.  In your decision making on the scope and cost of these repairs,

4   Mr. Phillips, what outside resource, that is outside of Beazer, did

5   you consult?

6   A.  We had a professional environmental company that gave us some

7   education about the corrosive properties, and that's the majority

8   of any outside input.

9   Q.  And you also had complaints from owners that guided you in this

10  process?

11  A.  Yes.  I mean, that's how we began our investigation in trying

12  to identify if we had exposure.

13  Q.  Did you consult with other builders?

14  A.  Yes.

15  Q.  Which builders?

16  A.  I know, with Lennar, Lennar Homes.  If you're asking me

17  personally, the answer is actually no.

18  Q.  Do you know that Beazer consulted with other builders?

19  A.  Correct, yes.  Lennar is the only one that I am sure of.

20  Q.  Lennar is a large builder of homes in Florida and elsewhere?

21  A.  Very large, yes.

22  Q.  Well, even though you did consult with and get input from the

23  environmental company and you've heard owners and you listened to

24  other builders on this, the ultimate decision of how far to go and

25  what to spend in order to make these owners whole was yours?

1  A.  Yes.

2  Q.  Was the same scope of repair protocol used by Beazer for all of

3  its properties that were affected in both Tampa and Fort Myers?

4  A.  Yes, same protocol.

5  Q.  Do you know of any reason, Mr. Phillips, why a different

6  protocol would be applicable depending on the geographic location

7  of a home?

8  A.  Ask that again, I am not sure I understand the question.

9  Q.  Do you have any reason why the scope of repair for a Chinese

10  drywall problem would vary depending on the geographic location of

11  the home?

12  A.  No.  There would be absolutely no difference.  There could be

13  construction assemblies that vary, but the protocol would not vary.

14  Q.  And why is that?

15  A.  From what we've seen and experienced in going to look at it,

16  it's very consistent, this is something -- two things we noted, it

17  doesn't hide and it's extremely easy to verify.  You know, once

18  you've understood the sign, probably anyone in here could get ten

19  minutes of training and be able to identify in their house, if you

20  want to go further than that.  But I am just saying, it does not

21  hide, it shows itself.

22       So whether there's corrosion in one state, one city, just

23  like our examples two different cities, there's absolutely no

24  difference.

25  Q.  So you would use the same Beazer protocol for all of the

1    different states where Beazer properties would be affected by

2    Chinese drywall?

3    A.  We would although we are only in one state with the problem;

4    but, yes, it would be the same protocol.

5    Q.  And you would use the same protocol, for example, if there were

6    a home in Virginia that was affected by Chinese drywall?

7    A.  Absolutely.  As well as the warranty service calls that we've

8    gotten from other states, we go and investigate the same way; it's

9    just they've all been negative, the only positive has been in

10   Florida.

11   Q.  Has your repair protocol remained static and unchanged from the

12   time it was established or has it evolved?

13   A.  There are four or five things that have evolved.  For the most

14   part it's held true, but through the learning process we've altered

15   and actually have or doing more than what we originally hoped.

16   Q.  So when you started out there were some areas where you were

17   hoping to do less?

18   A.  We were hoping to save some materials, yes.

19   Q.  And you found that in some cases it actually costs you more to

20   do less?

21   A.  Yes, in many cases.  As well as very logistically impractical

22   to save material for like a granite top from breaking apart, that

23   type of thing.

24   Q.  Let's look at the work authorization agreement, which is

25   888-0001.  Do you understand this document to be the work

```
 1   authorization agreement that owners signed with Beazer once they

 2   agreed to have Beazer conduct Chinese drywall repair in their

 3   homes?

 4   A.  That's correct.

 5   Q.  And in fairness, this agreement does release the owner's claims

 6   against Beazer for property damage, true?

 7   A.  That is correct.

 8   Q.  They preserve their personal injury claims, don't they?

 9   A.  That is correct.

10   Q.  And in fairness, this agreement also assigns to Beazer the

11   right to recover its costs from any other parties responsible for

12   the Chinese drywall?

13   A.  That is correct.

14   Q.  Does the fact that you've got that assignment of legal claims

15   influence in any way your decision as the official for Beazer to

16   decide what to do and what to spend on this problem?

17   A.  No.

18   Q.  Why not?

19   A.  We've already come to terms with what we're going to do.  This

20   is just to allow us to move forward and to make sure we've

21   communicated clear with the buyer of what we're going to do.

22   Q.  Now, in this agreement, I think it's at page 4, there is a

23   provision for a monthly stipend.  You actually pay the owner?

24   A.  Correct.  Once they move out.

25   Q.  Once they move out.
```

1    A.  Yes.

2    Q.  And I haven't asked you this.  What's the average length of

3    time you project to conduct a complete scope of repair for Beazer

4    in these homes?

5    A.  Longer than we hoped.  I would say the average time is right

6    around six months.

7    Q.  Six months.  And under the work authorization agreement, which

8    we're looking at, you pay the owner family $3,200 a month in living

9    expenses for as long as they're out of the house?

10   A.  That's correct.

11   Q.  How does that fact influence your motivation to do the job as

12   efficiently as possible?

13   A.  Jerry hears from me to speed up.  He is the next guy that

14   you're going to talk to.

15   Q.  Time is money.

16   A.  Time is big money.

17   Q.  Let's then go to page 3 of this agreement, Mr. Phillips.  And

18   if we could focus more in on section -- paragraph 7 of this page --

19   I'm sorry, it's page 3.  Paragraph 2 on page 3.

20         This is the -- in the work authorization agreement, page

21   3, Section 2, these are the bullet points that summarize the Beazer

22   scope of Chinese drywall remediation, true?

23   A.  That's correct.

24   Q.  So I would like to use this with you and the court to have you

25   briefly explain each component.  The first thing Beazer proposes to

1    do is remove all -- remove and replace all drywall in the home,

2    including ceilings.

3    A.   That's correct.

4    Q.   You've already told us that these homes invariably have a

5    mixture of Chinese manufactured and domestic drywall.  True?

6    A.   True.

7    Q.   And on the assumption that there's nothing wrong with the

8    domestic boards, explain to the court why trying to be cost

9    efficient, Beazer nonetheless decides to replace all of the drywall

10   in the home?

11   A.   There are a couple of things, especially now that we've gotten

12   more involved and have learned more.  First of which air

13   circulation has become very obvious that air movement passes the

14   gases, just like, I know it's not what you're asking, but like on a

15   refrigerator coil where it's blowing, where there's a blower and

16   there's some copper there, you'll find much more corrosion, which

17   is why I think we're seeing the most common symptom is the coils in

18   the HVAC is because of the air movement.

19         So even if there is a couple of sections that have

20   domestic board, the air is still circulating.  That's one.

21         The other is pretty much the impossibility of finishing

22   drywall, nothing to do with the air movement.  Like if you were

23   trying to save the ceiling but remove the walls, that has a texture

24   on it, how do you put a new board up, put tape, smear mud on it,

25   and refinish it to a new state?  We thought logistically

1    impossible.

2            But the main reason was just the air still circulating

3    once there's bad board in there.

4    Q.  On the air circulating issue then, the air spaces behind

5    drywall are not airtight in a home?

6    A.  No, they're not.

7    Q.  So that where there is the defective Chinese drywall, the air

8    passes over that and circulates throughout the entire home?

9    A.  Correct.

10   Q.  And on the issue of the impracticality of removing only some of

11   the boards, has Beazer actually explored a cost-effective way to do

12   that?

13   A.  Well, I don't want to sound too large, I've been in the

14   business for many years, as well as several other of us that have

15   sat around and talked about it, and it's not overly difficult to

16   think that that's impossible.  It's like a sci-fi thing to think

17   you can try to do that as presented earlier, you can't know where

18   the seams are, nor can you control that the air only passed by that

19   one bad board.

20           So we came to the conclusion pretty early that, actually

21   our word is that it was ludicrous to think that you could do that.

22   Q.  And that's true from a practical cost standpoint?

23   A.  Correct.  We wanted to save everything.  I mean, we wanted to.

24   Q.  You wanted to be as efficient on costs as possible?

25   A.  Correct.

1   Q.  But the most efficient thing to do cost wise is remove all of

2   the drywall?

3   A.  Right.

4   Q.  Second thing you do is remove and replace all affected HVAC

5   systems, and there's been comment in opening statement about what

6   an HVAC system consists of.  Perhaps you can summarize that for the

7   court.

8   A.  The heating and cool -- heating, venting and air condition I

9   think is what it stands for.  That's the, would be two main

10  components would be the air handler that's on the inside, the

11  condenser that's on the outside, they communicate to each other and

12  they're also connected by line sets, copper that brings the

13  refrigerant to and from each of the units.  As well as at the air

14  handlers were a plenum, which is like a junction box, that a bunch

15  of vents peel off of and most of the time through the attic, and

16  that's how distribution of heat or air is done.

17          One thing that I've heard from others that we are

18  slightly different of what our protocol has been is we are saving

19  our condensers.  We're replacing everything on the inside, we're

20  not replacing the condensers on the outside.  One of the reasons

21  that's made that different for us than some of the others I am

22  aware of is we had already at the time I think in 2006, somewhere

23  in that time, had upgraded to the new energy codes.  So some of the

24  others of which owned condensers to now replace them, they no

25  longer meet code where our units and our freon was already upgraded

1    to the new code so we've been able to salvage the condensers.

2    Q.  So the entirety of the system, all of the wiring, all of the

3    connections, the line set as you mentioned, all of that is removed?

4    A.  Yes.  Everything except the condenser.

5    Q.  You also remove and replace all smoke detectors.  Why is that?

6    A.  Because of the wiring.  One of which once you've concluded that

7    all of the drywall comes off, a couple of things, one it has wiring

8    in it; another is it's not an overly expensive item, you know,

9    where do you put these things and save and store and that type of

10   thing.  It just made sense to get rid of them.

11   Q.  In fact, on both the HVAC and smoke detector, just as an

12   example, it would cost you more, wouldn't it, to try to salvage and

13   store components of those things as opposed to a complete removal

14   and replacement?

15   A.  Yes.  Yes, it would.  And the point I think is interesting is

16   it was very obvious that the HVAC was very susceptible to the

17   damage, whereas cabinets would be a very good example where you

18   didn't see any damage.  And then we studied saving the cabinets and

19   the storage of the cabinets costs more than the cabinets did

20   themselves.  So we even elected to get rid of cabinets.

21   Q.  You replaced all of the hot water heaters?

22   A.  Yes.  Same reason.  The copper fittings and wiring.

23   Q.  You remove and replace all of the ductwork.  Explain what that

24   is.

25   A.  Yes.  Of the HVAC system is probably one of the lesser

1    expensive parts.  I would think it's almost impossible to clean.

2    We saw some pictures earlier that were pretty good, but to go into

3    a house that's been demoed, it's incredible of how much dust there

4    is, it permeates into every little crack, crevice, pore you can

5    see, so it just was impractical to try to save it.

6    Q.  So once you commit to the demolition and removal of all of the

7    drywall, including the defective Chinese drywall, there's no

8    practical way to clean and save the ductwork, is there?

9    A.  No.

10   Q.  Because of all of the particles?

11   A.  And it costs more.  It's cheaper to replace it.

12   Q.  Cheaper to replace it.  Same with insulation, which is behind

13   the wall?

14   A.  Yeah, that's impossible.  And if you're trying to clean it,

15   technically speaking, if you distort the insulation, if you

16   compress it, then you're losing the value of what the insulation is

17   there for.  And how you vacuum and clean without tearing it apart,

18   I think is impossible.

19   Q.  The most cost-effective way is to remove and replace?

20   A.  Absolutely.  Then you had to get to what's underneath it to

21   clean.  So even if you could clean the insulation, you still have

22   to take it down and clean it so that you can clean what's behind it

23   because the cost goes everywhere.

24   Q.  The labor on that would be ludicrous?

25   A.  Ludicrous, yes.

1   Q.  What about carpets, is that affected by the defective drywall,

2   is that why you take that out?

3   A.  Good question.  I think it may can be proven, I certainly don't

4   know.  But when you're doing the demo and the amount of fragments

5   and particles that are floating around, there was no way to try to

6   protect the carpet.  And again, carpet is not a largely expensive

7   item and it's faster, talking about time is money, it's faster to

8   get in and get the carpet out and rock and roll than trying to be

9   delicate with everything where you end up spending more money

10  trying to be delicate.

11  Q.  If you had to roll it up with the pad, store it, bring it back,

12  that's actually more expensive than the replacement?

13  A.  Yeah.  And re-rolling and stretching already used carpet.

14  Q.  Now, you remove and replace all electrical wiring, including

15  low-voltage wiring, switches and receptacles in the house?

16  A.  Correct.

17  Q.  Tell the court why that is part of Beazer's protocol.

18  A.  Well, for one thing it's one of the items that's a tell tale

19  sign that you have a problem, it show s up on copper and just about

20  all homes are copper today, aluminum is a bit rare.

21          So -- ask the question again, I'm sorry.

22  Q.  Tell the court why you take all of the wiring out of the house.

23  A.  Because we've seen the corrosion throughout the house.  Once

24  you identify you have it in a house, you can go to just about every

25  room and find the symptoms.

1          The other is we contemplated the concept of cleaning --

2    and I won't go into it unless you want me to -- but you have the

3    one part if you were to cut and snip you're short on wire and

4    you're into junction boxes and that type of thing.

5          Another that we've since learned is we're finding some

6    contamination on the wiring further in the wall.  So not only can

7    you not cut and snip because the wire is too short and you can't

8    get by code, the corrosion is inside the jacket further, which was

9    a surprise.  It was more a confirmation that we're doing the right

10   thing.

11   Q.  At the end of this process when you restore these owners to

12   their home, there has to be a certification that the house is safe

13   and clean, true?

14   A.  Correct.

15   Q.  Would there be any way that you know of to get any electrical

16   official, code official, to sign off on a home where you have

17   preserved certain wires, snipped, attempted to clean, et cetera?

18   A.  I can't image you can find someone.  Actually the jurisdiction

19   we deal with in Magnolia Lakes, Fort Myers, Lee County, have told

20   us if anyone tried to do that, you would have to have an engineer

21   sign off.  And I can't imagine you can find someone willing to do

22   that.  And sober.

23   Q.  And even so, the cost of simply stripping out all of the wiring

24   and putting in new wiring is actually less than going through

25   clipping and cleaning and certification by an engineer, true?

1    A.  Yes.  We actually were studying just to understand it, I think

2    it was around 15, 20 percent of the cost is just the wiring.  So

3    it's a small part of the entire system.  It's much more labor

4    intensive, and to do cut, snip, add additional junction boxes,

5    which you're not going to get past code, but if you could, I would

6    say it would be double the labor of just pulling new wire.

7    Q.  The next item is to remove and replace all affected plumbing

8    components.  What do you mean by affected plumbing components?

9    A.  Well, when we wrote this protocol we were just getting started,

10   and we wanted to say that if we found the plumbing fixtures to be

11   at fault that we would replace them as well.  And it's pretty much

12   100 percent across the board that they're all defective.  So I

13   don't know, maybe that was trying to leave ourselves a way out, but

14   the truth is they're all bad and we're replacing them 100 percent.

15   Q.  You remove and replace all affected original appliances?

16   A.  And as well, yes, we're doing every appliance that's in the

17   home.

18   Q.  Now, when you say every appliance, are you referring to the

19   appliances that were put in the new home by Beazer at the time of

20   construction?

21   A.  That was the original thought, but as well for appliances, if

22   someone did it after market were either replacing the most

23   comparable model that we can or compensating them for the model

24   that they purchased and let them buy another:  Washer, dryer,

25   range, microwave, dishwasher, refrigerator.

1   Q.  Hot water heater?

2   A.  Hot water heater, yes.  As of now we've seen no signs as far as

3   electronics, you know, and that type of thing, TVs --

4   Q.  So televisions, computers are not included in this?

5   A.  We've seen no evidence to date.

6   Q.  So by appliances here you mean hot water heaters,

7   refrigerators, stoves, ovens?

8   A.  Microwave, washer and dryer.

9   Q.  You finish and repaint all of the new drywall?

10  A.  Correct.

11  Q.  Then this next item you say you will repair and replace as

12  necessary all materials affected by the repair process, which may

13  include, and then you list:  Tile, cabinets, countertops, et

14  cetera.  Explain what this component of the process refers to.  And

15  what you actually do in this category.

16  A.  Right.  A lot of it is on the practical logistic side of once

17  you're tearing drywall out is we made efforts of what we could

18  save, studied what we could save.  And our first one we even, we

19  had made the decision that we were going to try to save wall tile

20  in the bathrooms as well as shower enclosures.

21          And the very first one there was damage and you damage

22  tile for the most part that's a couple of years old, there's no

23  longer a matching -- you can't go buy a tile that's going to match.

24  There's different dye lots.  So that was one that we were hopeful

25  that we could save that we finally determined that it was cheaper

```
 1    and much faster just to go ahead and replace it.

 2           That was after, if you can picture if you had wall tile,

 3    you first have to take the drywall off on the other side to look at

 4    the back of it to make sure that it's not any contaminated or

 5    Chinese drywall, as well as impractical to finish that at the top

 6    of the tile line on the shower there's drywall.  So if you pulled

 7    the drywall off to it, if you were lucky, that behind the tile was

 8    no Chinese drywall, above it was and you removed it, it would be

 9    impossible to finish drywall to tile because you have nothing to

10    mud or tape to.

11    Q.  So you had hoped to save tile, but as a practical matter it

12    will cost you more to try to do that than to simply replace?

13    A.  Correct.  Same thing with cabinets.  I think I said earlier we

14    were going to store them and found out that storage costs more.

15    And the storage we were looking at was going to be in a secure pod

16    in the driveway.  So we also became concerned about it being in the

17    humidity in Florida, that even if it wasn't more expensive that the

18    joints may start to open up and then now we're giving them a

19    cabinet that's not what they bought.  Not even what was what we

20    pulled out, that it developed other problems.

21           Countertops is another one, the majority just about all

22    in both communities, even the townhomes, actually in the town homes

23    granite was standard at the time.

24    Q.  You wanted to save those, didn't you?

25    A.  We definitely wanted to save those, it's a big ticket item.
```

1    Q.  Tell the court why you couldn't do that.

2    A.  Well, granite tops come out to the field and the holes are cut

3    on the job.  So one of the things, you have the counter top and

4    then you have a splash, a splash guard.  And in the splash guard a

5    lot of them are only like about four inches tall that just wrap

6    around the wall.  Within there there's receptacles and switches,

7    like the switch for the garbage disposal or a plug to plug

8    countertop appliances in.

9              So now you've cut a hole in something that's four

10   inches, you cut a two inch hole in it, so we tried one and actually

11   were able to get it out complete, bubble wrapped it, put cardboard

12   around it, shipped it to a warehouse to store; and when we looked

13   at it, it was in hundreds of pieces.  It didn't survive transport

14   and it was well padded.  So we changed our minds there, too and

15   said, well, we can't save those either.

16   Q.  And cost wise then, it ends up being cheaper or less expensive

17   to replace counter tops than to try to save the old, store, bubble

18   wrap, bring back without breakage, et cetera?

19   A.  Yeah, we tried and couldn't do it.

20   Q.  How about sinks, toilets, bathtubs, shower enclosures, those

21   things that are in the bathroom area?

22   A.  We're replacing them all, most of which is the storage issue,

23   those are not very expensive items, for the most part.  They're not

24   very expensive items.

25              Two exceptions I see in that list.  Bathtubs we are

1    saving, they stay in place and they're covered and that's working

2    well.  Bathtubs are early on in construction anyway that either

3    survive or there's repair protocol to fix if you were to scratch a

4    tub.  So that's kind of normal construction, whereas a sink and a

5    toilet come in at the final, at the very final stage.  So storage

6    and all did not make sense.  So we're saving tubs --

7    Q.  You can save tubs because the drywall demolition doesn't affect

8    the tub itself?

9    A.  And it doesn't go behind it.

10   Q.  Doesn't go behind the tub?

11   A.  Yes.  More so because it doesn't go behind it.

12   Q.  But not so with respect to other things in the bathroom where

13   the drywall actually goes behind them?

14   A.  Every trim piece -- drywall goes in before any finish trim

15   comes in.  So for the most part, drywall is behind everything

16   except a tub.  A tub comes into construction during frame stage

17   before drywall, so there's nothing behind it.

18         The only other thing we're saving that I thought, I saw

19   up there was tile in general.  We found we were not able to save

20   wall tile but we are saving floor tile and having very good

21   success.  The rubber matting that has interlocking pieces, so we go

22   in and put the rubber matting throughout over the tile floor.  And

23   again we're having success in saving the tile.

24   Q.  I think we will actually see a picture of it later in the video

25   but this is rubber?

1    A.  Yes, that's it.

2    Q.  So you can protect tile flooring?

3    A.  Yes.  On the containe, in Fort -- excuse me, in Tampa, Hampton

4    Lakes, Tampa, they're predominantly wood floors and we are not

5    saving those.

6    Q.  Why can't you save the wood floor?

7    A.  One, tile is somewhat difficult to scratch; wood, is somewhat

8    easy to scratch.  So how do you protect it?  Any little particle,

9    sand, or whatever gets under this rubber mat, you're going to have

10   some scratching.  That was the reason.

11          The main reason is just like putting the cabinets out in

12   a pod in the driveway to leave, because once you're gutting this

13   the HVAC out, now the inside of the house is whatever is going on

14   on the outside of the house.  And flooring done correctly even

15   should come to a house and acclimate two, three, four days before

16   installed.  So to leave wood floor exposed to the Florida humidity

17   for six months, is a problem.  Not to mention we didn't think we

18   could protect it well enough.  And that was a hard decision, we

19   really wanted to save the flooring.

20   Q.  Now, mirrors, lighting fixtures, ceiling fans?

21   A.  Those were a given because the symptoms were in those.  Mirror

22   has a nickel silvering, I think is what it is, that gives it to the

23   reflective properties, that's one of the symptoms around mirror

24   edges you will see it turning black or delaminated.

25   Q.  One of the symptoms of defective Chinese drywall?

```
1    A.  Correct, only in the Chinese drywall.  Wiring that's all a
2    wiring issue.  The trim and molding because of it being
3    impractical, even or on casing around doors, all of those, the wood
4    trim, molding, and casing, drywall is behind it.  So you get to a
5    point that it's, you can't do it but if you were -- more better
6    said, it's much cheaper just to throw it away and bring in new.
7    Q.  You use HEPA vacuuming to remove all of the construction dust,
8    and I believe Jerry Smith will be giving us more detail about the
9    clean-up phase --
10   A.  Right.
11   Q.  -- but tell the court just generally what HEPA vacuuming refers
12   to.
13   A.  Well, I think -- and hopefully Jerry knows more than I -- it
14   has an additional filtering system that brings the level of
15   cleanliness to very small particles, it's taking out a lot.  You
16   asked earlier did your protocol stay stagnant I think is the way
17   you said it.
18   Q.  Static.  I would never refer to it as stagnant.
19   A.  Static, okay.  This is one area that did change.  We still do
20   this, we still do the two week waiting period, but what we've added
21   is pressure washing, both simultaneously extracting water and I
22   think Jerry can speak better to it, but we're pressure washing, I'm
23   talking up in the attic, all the way, every floor, every crack.
24   Because what we found as we were demoing these houses, actually way
25   past demo getting them all cleaned and even clean you still had
```

1   some dust like on the top of the bottom cord of the truss, that it

2   had floated up there and is staying there; and you still had a hint

3   of the smell and the board was 100 percent out, it had been

4   vacuumed, and many cases wiped down and the smell still resided and

5   you could still see dust.

6          The pressure washing, there are two or three that I've

7   personally been in now, and I am very sensitive, my nose works

8   well, I can pick up the smell now, I've got it registered in the

9   brain, with the pressure washing there's absolutely no hint, it's

10  gone.  As well as the dust.

11  Q.  So Beazer has concluded that in defective Chinese drywall homes

12  that it has built most cost efficient way to make the owners whole

13  is to strip the house back to studies?

14  A.  Yes.

15  Q.  And what's left is, are the metal or wooden studs of the house,

16  the exterior walls, the roof, the foundation?

17  A.  And windows.

18  Q.  And windows and tile floors?

19  A.  Correct.  And landscape.

20  Q.  And landscape.  You actually have in your protocol a provision

21  to damage -- to repair damaged bushes, plants, et cetera, during

22  that occur in demolition?

23  A.  It's one difference between the two cities, it's a very small

24  amount in Magnolia, the single family homes in Fort Myers we have

25  zero.  Because single family homes it's easy to get in and out with

1   all of the trash and debris to the dumpster, so we are not having

2   to traipse through the yard.

3          On the townhomes, the units are much closer and you have

4   only ten feet or so from the door to the dumpster and it's a skinny

5   path.  So, you know, we're -- I think we've got like 200 bucks in

6   there for a unit, so it's a small amount.

7   Q.  The final element is cleaning and restoring a home to its

8   pre-repair condition.  It's not specified here, but do you pay for

9   a technical environmental expert sign-off certification, if you

10  will, of the home, once it's back to studs?

11  A.  Yes.  And two points there, the cleaning and restoring now

12  having gone through the entire process, is cleaner than a new home.

13  And it's because of the pressure washing, so I mean the house is

14  spic and span so it's cleaner than a new home.

15         The other -- I had another point, clean and restoring,

16  you're asking do we pay someone.  They actually come in six times,

17  so not only are they signing off at end, they're watching the

18  process, they're verifying that we're removing all of the board,

19  they're actually instrumental in determining the percent of Chinese

20  board versus domestic board by -- they're there the whole time

21  going and pulling a board off of every room and identifying what

22  the board is.

23         So they're there through the whole produce and then the

24  final one would be for final sign off, that, yes, Beazer 100

25  percent removed the board and put domestic board back in.

1    Q.  What is it costing Beazer to have that environmental

2    certification, if you will, on a per home basis, do you know?

3    A.  I think the number, it's like 10, 12 grand, somewhere in there.

4    That's also, I think part of that's what we call bag and tagging,

5    so just collecting stuff and holding on to it.

6    Q.  You were present earlier this month on February 1st and 2nd

7    when counsel for the plaintiff intervenors came to these Beazer

8    properties in Fort Myers and Tampa?

9    A.  Is that you guys?

10   Q.  Yes.

11   A.  Yes.

12   Q.  And you were present when we had videotape filming and

13   photograph taking of the process?

14   A.  Yes, I was.

15   Q.  You have reviewed the segments of that video and those

16   photographs with me before testifying?

17   A.  That's correct.

18   Q.  Can you verify for the court that the segments in the film

19   we're about to see accurately depict the Beazer activity and repair

20   protocol activity that we saw on that visit?

21   A.  Yes.

22           MR. MEUNIER:  Your Honor, I have a video segment which I

23   would like to run as I continue to question Mr. Phillips.  It's

24   approximately seven minutes in duration.  It begins with the

25   drywall demolition activity of the walls.

1        (WHEREUPON, THE VIDEO WAS STARTED.)

2    BY MR. MEUNIER:

3    Q.  Can you identify this as a second floor of one of the two story

4    Beazer Homes we visited or --

5    A.  I think that looks like a first floor.

6    Q.  Why is -- it's a little dark here, but why is a hammer being

7    used by these men to begin the process of tearing the wall away,

8    the drywall?

9    A.  It's the fastest way to get it down.

10   Q.  It gives you a grip?

11   A.  A little hand hole, as well as it's just the quickest way.

12   It's coming down so there's no need to take a utility knife or

13   sawzall, it's just faster.  It does create hand holes but it's

14   mostly for speed.

15   Q.  For speed.  And how is the drywall actually attached to the

16   boards behind the wall?

17   A.  Around the perimeter of the board is nailed on, so when they

18   hold the board up, they nail it and hold it on.  Then they come

19   back with a screw gun and do the field, so all of the center of the

20   board is done with screws.

21   Q.  So that's why you have to pull it away to remove it as these

22   men are doing?

23   A.  Correct.  It'll break in parts.  They'll get lucky and get a

24   whole sheet here and there, but most of them break apart.  As well

25   as they're identifying, once this comes down, they're identifying

1   where the board is, who the manufacturer is.

2   Q.  We see here one of the workers pulling on what appears to be a

3   larger piece of the board.  Is it customary though for it to break

4   and crumble?

5   A.  You see what they did right there, the centerpiece, I think

6   someone was just explaining earlier, that's a 9'4" ceiling height

7   and then you have two four foot pieces, eight foot, you have to put

8   four left, that was that centerpiece that he just took off.

9   Q.  You don't know where the seams are obviously before you begin

10  this process?

11  A.  No.  Not after its textured.

12  Q.  And it's done right --

13  A.  Actually painted too.

14  Q.  If it's done right, textured and painted the correct way, you

15  would not see the seams?

16  A.  And all of ours are done right.

17  Q.  In this case, you can see a seam appear after the demolition,

18  and then you will pull it away and in most cases that creates

19  breakage and debris and dust as a necessary part of this

20  demolition.

21  A.  It's incredible.

22  Q.  The Taishan board, as well as the Knauf board, comes in 4x12

23  pieces?

24  A.  That's correct.

25  Q.  It's installed, however, in different shapes and sizes

1   throughout the house as we'll see?

2   A.  Correct.  Which is industry standard anywhere.  That would be

3   an industry standard.  Unless everybody designed their houses to be

4   precise 12 foot lengths.

5   Q.  Right.  Here is a worker hammering away to get a board in a

6   smaller area around a window.  The only way to get it out is to do

7   what he is doing it here, the fastest way to get it out?

8   A.  Correct.  I think the house is only about a half a day to

9   strip.

10  Q.  The entire house?

11  A.  Yeah.

12  Q.  And then you have this debris, in this case from the upstairs

13  of the house, you have to obviously remove it, shovel it away and

14  carry it away, true?

15  A.  Yes.  And actually carry it away to a special landfill that's

16  not required but recommended for contaminated material.  So that's

17  additional cost as well.

18  Q.  We can proceed.  This next scene is a removal of drywall from

19  the ceiling area, true?

20  A.  Yes.

21  Q.  And you can see in this room that the wall, the drywall on the

22  wall has already been taken away exposing insulation and stud?

23  A.  Correct.

24  Q.  Likewise, when you take it off the ceiling it's going to break

25  and crumble as it's torn?

1   A.   Right.

2   Q.   And what is above the drywall in the ceiling typically?

3   A.   All of the mechanicals, so you have lights, you could have

4   plumbing, HVAC, any low voltage, so any of the mechanicals are

5   through there.  That looks like a floor system there.

6   Q.   Why is this worker who is pulling it down from the ceiling

7   wearing a mask?

8   A.   The dust is just is heavy.

9   Q.   How would you describe the dust, is it fine powdery or coarse?

10  A.   It's fine.  It's very lofty and stays airborne for awhile.  You

11  can blow -- it's like powder, I would call it powder.

12  Q.   Now again a little dark, but is this worker using his hammer to

13  remove nails?

14  A.   Screws and nails because you have to get it back down to the

15  stud before -- and it's part of his scope is to get it all removed

16  down to the stud so when we're ready to put drywall back up that's

17  all clean.

18  Q.   And these are the nails that were previously holding the

19  drywall against the studs?

20  A.   That's correct.

21        MR. MEUNIER:  Can we pause for a second, Scott.

22      (WHEREUPON, THE VIDEO WAS PAUSED.)

23  BY MR. MEUNIER:

24  Q.   In a room this size, a little hard to see the darkness of this,

25  the monitor may be better, your Honor, but in a room this size

1  where we've just seen the demolition from the ceiling and the walls

2  having been taken down, can you give us a rough idea of how long it

3  would take an average size Beazer crew to take out all of the

4  drywall in that room?

5  A.  That room?

6  Q.  Yes.

7  A.  An hour.

8  Q.  Do you have any idea how long it would take a crew to remove --

9  to locate and remove only certain sections of drywall from a room

10  that size?

11  A.  I don't know how you determine -- assuming that you can

12  determine which section needs to come out?

13  Q.  Yes.

14  A.  Four times that.

15  Q.  More costly?

16  A.  Well, I'm speaking time, but, yeah, time would be money.  About

17  four hours, yeah.

18       (WHEREUPON, THE VIDEO WAS RESUMED.)

19  BY MR. MEUNIER:

20  Q.  Again, we see here the removal of the debris from the floor and

21  dust settles, doesn't it, on all of the surfaces in a home that's

22  being demolished?

23  A.  Correct.  Even in this particular case if you were upstairs,

24  even in the attic it just floats.

25  Q.  And you've indicated, there wasn't any effective way to protect

1    and save wood floors, carpet, pads, that sort of thing?

2    A.  And that makes it easier to understand why.

3    Q.  Here is someone in an area around a window using a hammer and

4    chisel to remove drywall.

5    A.  Because it's smaller pieces and solid wood behind it, so you

6    can't just take a hammer and knock a hole in it for a hand hole and

7    pull it down.  So he is having to get to all of the screws or nails

8    that's holding it up on the raft.

9    Q.  What does that do to the trim that frames a window or door, is

10   it possible to preserve and save that?

11   A.  Well, your question is probably more applicable to a door,

12   there is no trim here.  So I am not sure how to answer the

13   question.

14   Q.  It's destructive of whatever is around?

15   A.  Oh, yeah.  Yeah, like if you were at a door and it had casing

16   and trim around it, if you were trying to do that, it would

17   demolish it.

18   Q.  We are seeing hear the dumpster that was set up to receive all

19   of the demolished pieces of drywall?

20   A.  Yes.

21   Q.  You indicated that there's a special dump site that you have to

22   take this material to?

23   A.  Yeah.  And because it's certified, they can validate that

24   you're bringing the board there.  I don't know the percent, it's a

25   bit more costly than the regular landfill.

```
 1        (WHEREUPON, THE VIDEO WAS CONCLUDED.)
 2   Q.  Let me now show you some photos, Mr. Phillips, that will
 3   continue to tell the story of Beazer's remediation.
 4        This gentleman with the pink colored mask and the
 5   clipboard, is he a Beazer employee?
 6   A.  No.  He is with our environmental company.  He is the
 7   technician that's documenting what the board is as the team is
 8   going around and pulling the board off for him.
 9   Q.  And so he actually comes in during the demolition to record --
10   A.  Correct, every room, every wall.
11   Q.  Every wall, what kind of drywall is found where?
12   A.  Correct.  And he documents it.
13   Q.  Next picture shows a stairway, and I just want to illustrate
14   for the court, this is wood molding or trim that --
15   A.  Strip board.
16   Q.  And as you indicated earlier, the drywall sits behind that?
17   A.  Correct, the drywall was in first.
18   Q.  Therefore when you have to remove the drywall there is no way
19   cost efficiently to save this?
20   A.  Yes, your question earlier when we were looking at the window,
21   there would be a good example that you would absolutely destroy
22   that trim piece.
23   Q.  The picture here shows a cornering where two seams of abutting
24   boards would meet?
25   A.  That's correct.
```

1   Q.  And again, if you sought to remove this piece and not the

2   other, what would be the practical effect of trying to restore the

3   owner to what the owner had before?

4   A.  Good question.  That is really the same answer I was talking

5   about earlier.  If we tried to save the ceiling and not the wall,

6   same thing.  That if the piece on the right had to go and the piece

7   on the left you were going to save, if you could do that, that

8   where your light just was, the left side has texture on it.  So

9   when you bring in the new board, now you have to put tape, paper or

10  fiber tape over the joint, then you put mud on both sides to

11  feather it and cover it up.

12          So now it becomes very difficult, not that it can't be

13  done, but you're getting past a mechanic to an artist.  And if

14  you're doing that several times throughout the house, then

15  obviously it's probably -- or obviously it's a fraction of the cost

16  of trying to be artistic.

17  Q.  Closer view here.

18  A.  Same thing, you can see the texture a little bit, so you would

19  mess that up once you start bringing new mud in.

20  Q.  Now, I know you're removing the insulation and we've talked a

21  bit about the impracticality of cleaning it.  Does this picture

22  show how insulation has been affected by drywall dust once the

23  demolition of the drywall has occurred?

24  A.  Absolutely.  And what I was talking about earlier about

25  compression, first you have to take it down so now it's probably

1    just going to be cheaper to replace it.  But if you would vacuum

2    it, you can see -- well, even there you can see one part is pushed

3    in so you're losing -- if there's any compression then you're not

4    getting what you paid for.

5    Q.  Is there any practical cost efficient way to clean the fibers

6    of insulation from this drywall dust?

7    A.  No.

8    Q.  In fact --

9    A.  There's how fine it is there.

10   Q.  This picture shows how fine and embedded the drywall dust is in

11   the insulation once you demolish the drywall?

12   A.  Right.  If there really was a cost effective -- not

13   cost-effective, if there was a way to do it, you have to have a

14   little bitty vacuum cleaner and do it a particle at a time to

15   prevent destroying the insulation.  If you do a regular shop vac,

16   you're going to pull half the insulation in addition to the dust.

17   Q.  Even if you can make the owner whole, it's not cost-effective

18   to consider that?

19   A.  No.

20   Q.  Next we see ductwork that's been removed from the ceiling area

21   in this and it's on the floor.  And again, your testimony earlier

22   is that there is no cost-effective way to clean the interior spaces

23   of that ductwork?

24   A.  Less expensive to replace.  Just the cost of the material is

25   less expensive.  Even more so the time you're saving.  To spend

1  time trying to clean that rather than quickly throwing it in the

2  dumpster and bring in new is substantially cheaper.

3  Q.  Let's go to some pictures about wiring.  And this is a junction

4  box that is actually up against a concrete portion of the wall

5  between studs?

6  A.  Yes.

7  Q.  We talked before about the fact that behind the drywall and

8  behind the insulation, no home is airtight, true?

9  A.  Correct.

10 Q.  There's been reference to a wine cellular in this case that

11 might be an exception; but in most cases, in a home the air is

12 circulating freely behind the insulation?

13 A.  That's correct.

14 Q.  Here, I think the next picture shows it even more clearly, does

15 this appear to be a hole that's been drilled in concrete to allow

16 wiring to come through?

17 A.  Yes, it's part of the doorbell would be my guess.

18 Q.  A doorbell?

19 A.  I'm guessing, yes.

20 Q.  Even in places where there's concrete between studs, you don't

21 have airtightness, you have air flow?

22 A.  Correct.

23 Q.  Let's go to the next picture.  What is this?

24 A.  That's a receptacle or outlet box.

25 Q.  And what type of wiring?

1  A.  That's probably a 14 gauge romex.

2  Q.  Romex refers to the type of insulation material?

3  A.  Yes.  It has two wires, probably a black and white wire and a

4  ground wire; the black and white would probably be with a plastic

5  jacket, the ground wire with paper, and then additional romex coat

6  that goes over all three.

7  Q.  And it's inside these types of receptacles where the visible

8  corrosion of copper wiring has been found as a symptom of the

9  defective drywall, true?

10  A.  Correct.

11  Q.  Let's go to the next picture.  This is how romex wiring is

12  typically attached to the stud of a home?

13  A.  By code.  You have to.

14  Q.  By code?

15  A.  Yeah.

16  Q.  So there's no slack typically, not a lot of slack in the wiring

17  that goes to these different connecting points, true?

18  A.  If there were, the subcontractor wasted a lot of money; so, no,

19  there's no slack.

20         THE COURT:  Let's not lead him, counsel.

21         MR. MEUNIER:  Yes, Judge.  Let's go to the next.

22  BY MR. MEUNIER:

23  Q.  What is being demonstrated in this picture, Mr. Phillips?

24  A.  Showing that once you cut the wires, if you knew that the

25  corrosion was contained at the end and you snip them off, once you

1   go inside the box, once you put the wire inside the box you have to

2   have at least six inches of wire inside the box.  So this I think

3   is showing that once you snip it, you're no longer going to have

4   that six inches after you get into the box.

5   Q.  Why do you have to have six inches of slack inside the box?

6   A.  That's for the code, that's to be able to make up the junction

7   and to be able to put either an outlet or switch, I think that's a

8   switch box there, you have to have room to be able to pull it out

9   and work with screws.  So it's a practical code.

10  Q.  Is that a code that applies to all states that you're familiar

11  with?

12  A.  I don't know the answer.  I would imagine.

13  Q.  This is the back, the rear view of that box?

14  A.  Correct.

15  Q.  So you would have to have six inches of slack inside of that

16  box?

17  A.  Correct.

18  Q.  Next picture, please.  Who is this guy?

19  A.  That's me.

20  Q.  What are you demonstrating here?

21  A.  I was trying to explain to you guys that once you snip the wire

22  that you no longer have the six inches that are coming in the box.

23  So if there were a remedy for that, it would be to add a junction

24  box.  So I have my hand there saying, okay.  If you put a junction

25  box here to be able to put additional wire so that now you have the

 1   six inches that you would end up with those junction boxes all over

 2   the house.  And in code prohibits or at least a lot of

 3   jurisdictions will resist putting junction boxes.

 4            And junction boxes have to be exposed, you can't bury

 5   them.  So you would have a house with plates all over the place,

 6   just a blank plate.

 7   Q.  That would be the outcome if you attempted to preserve wire

 8   except for snipping the ends?

 9   A.  Correct.

10   Q.  Next please.  This indicates that normal condition in terms of

11   slack of wiring behind the drywall?

12   A.  Yes.  And another good example where you see the switch, up

13   higher, that's the switch there and then go back to the one you

14   just did is the outlet.  So you can see the wire coming down to it,

15   and then another one going from there to another outlet.  Once you

16   snip them, now you're six inches short on all of them, so you would

17   have to put the box in at a different height now and add junction

18   boxes.  So it's kind of a good example to say that it's pretty much

19   impossible to do.

20   Q.  Aside from the aesthetics of what it would look like to the

21   owner, what is the cost impact of that effort versus stripping all

22   of the wiring out?

23   A.  Much more expensive.

24   Q.  Go to the next picture.  What is this?

25   A.  That is off -- that's the control panel, I guess the

```
 1    motherboard kind of thing on an air handler.
 2    Q.  And this would be another --
 3    A.  It's another picture of it.
 4    Q.  So what are the electrical connections for things like this in
 5    a home, are they made of copper, silver?
 6    A.  Yes, yes.
 7    Q.  Copper?
 8    A.  Copper.
 9    Q.  Have you found corrosion on this wire?
10    A.  Yes, yes.
11    Q.  Next please.  What is this?
12    A.  That is like a structured wiring box for bringing cable TVs and
13    CAT 5s into one place.
14    Q.  All of this is removed under the Beazer protocol?
15    A.  Correct.
16    Q.  Why is that?
17    A.  One is it has corrosion, another is it's cheaper to do the
18    demo, get out and start coming back in.
19    Q.  Next please.  What are we seeing in this picture?
20    A.  Corrosion.  I think that's a blow up of the same mother or
21    control panel.  You see that on the right -- well, it's better on
22    my monitor than your screen, but further to the right that red
23    wire, right there, you can see it's very black coming in there.
24    And then if you go up to the one above it, it's very black and so
25    on.  So there's corrosion throughout on this board.
```

1   Q.  And what would be served or serviced by this type of board in a

2   home?

3   A.  This is for the air handler, for the HVAC system.

4   Q.  Next please.  And what do we see?

5   A.  Same thing, just my monitor is better than your screen, the one

6   you're pointing to is a very good example; as well as the one that

7   looks like a U shape, it's pretty evident how much corrosion there

8   is.

9   Q.  Those are copper wires?

10  A.  Correct.

11  Q.  Next picture.  I think we're done.

12          And we'll discuss clean up with your colleague.  But in

13  sum, Mr. Phillips, are you satisfied that the Beazer protocol

14  restores these owners under warranty to the condition they were in

15  prior to the discovery of the defective drywall?

16  A.  Yes.

17  Q.  Are you satisfied that you accomplish this in the most cost

18  efficient way possible?

19  A.  Yes.

20  Q.  Now, you have developed a budget, a cost budget for these

21  repairs?

22  A.  Correct.

23  Q.  I would like to show you a document, it's the trade sheet.  We

24  can get a closer view.  Do you recognize this document?

25  A.  Yes.

1  Q.  Tell the court what it is and how you use it.

2  A.  It's a list of all of the trades that are required to execute

3  the repair, so it's the various trades.  As well both for

4  scheduling purposes, as well as establishing budget and cost.

5  Q.  And this trade sheet is used by you to decide what will be

6  spent in the remediation?

7  A.  Correct.

8  Q.  And you will use it to arrive at a cost per square foot for

9  Beazer?

10  A.  I have done that.

11  Q.  Is that the standard way Beazer approaches projects and budgets

12  for projects?

13  A.  Yes.

14  Q.  Does the cost to Beazer per square foot to implement this scope

15  of defective drywall repair equate to what an owner would have to

16  spend per square foot in hiring a builder to carry out the same

17  activity?

18  A.  No.

19  Q.  Explain why not.

20  A.  Well, we're a fairly large builder and at least like to think

21  that we have more buying power than a small company, let alone a

22  homeowner.  So we're going to be able to negotiate contracts at a

23  better price than the average homeowner or small contractor.

24  Q.  What types of economies can a builder take advantage of that an

25  owner seeking to do this work would not have available?

1   A.  Are you asking like how much more would -- yeah.  If you want

2   to stay on the conservative side, a good 10 percent more or builder

3   getting at least 10 percent better than what a homeowner would be.

4   Could be 20, 25 percent I don't know in various trades, but I would

5   say 10 percent would be conservative.

6   Q.  Let me get into some specific numbers with you.  First of all,

7   your cost per square foot for these Beazer Homes that are being

8   remediated varies from home to home; is that true?

9   A.  It does because of, one, different size home; another,

10  different options that were picked.

11          Actually, if I could make one other point.  When you

12  asked your question and I said that ten percent more, I am using

13  that as the difference of us being able to buy on a national level.

14          Additionally, we're doing this as warranty, so the

15  numbers that I've studied have no markups because it's warranty, we

16  are not trying to make a profit, or we can't make a profit.  So

17  that would make the spread even larger.

18  Q.  I am going to get into more specifics in just a minute before

19  we finish.  But your cost per square foot budget for these repairs

20  does vary from home to home?

21  A.  That is correct.

22  Q.  Tell the court what the range of cost per square foot has been

23  to date for Beazer in the remediation of defective Chinese drywall?

24  A.  I believe the number is somewhere in the 46, $47 range to the

25  52, $53 range.

1  Q.  If we took 50 as the square foot number just for calculation

2  purposes --

3  A.  That's fair.

4  Q.  -- can you for the court in effect translate that number, based

5  on what you know, based on your experience, into what an owner on

6  the open market would have to pay a builder to accomplish the same

7  work?

8  A.  Staying on the conservative side?

9  Q.  Yes, sir.

10  A.  So if you're at 50, I would add 10 percent because of not

11  having buying power.

12  Q.  So you're now at 55 and let's stop there.  When you say not

13  buying power, let's make sure the court understands what you mean

14  by that 10 percent difference.

15  A.  That means we're a large company working with the

16  subcontractors every day that we're going to get a better price

17  than what a small contractor or homeowner is going to be able to

18  do.

19  Q.  So we're now at 55, so what is the next change?

20  A.  Well, one of the differences I mentioned earlier because we had

21  already upgraded to energy code and refrigerants is we're saving

22  the condenser; a two-story unit gets two systems and that's around

23  $3,000; whereas, probably most areas that already are not upgraded

24  to the energy are going to be spending that money that we're not.

25  So figure 3,000 on a couple thousand square foot home, you're

1   another buck, buck 50, maybe two bucks a square foot.

2   Q.  So that's $2 a square foot additional for the owner because of

3   the fact that you're not including the outside compressor in your

4   number?

5   A.  Correct.

6   Q.  So now we're at 57 a square foot.  What's the next change?

7   A.  The next would be your overhead.  And again, on the

8   conservative side for somewhat of an industry standard it's

9   probably a 10 percent number.

10  Q.  Now, are you saying that Beazer obviously in its budget is not

11  paying for corporate home office overhead?

12  A.  That's not in the $50 a square foot number.

13  Q.  But the owner on the open market would do so?

14  A.  It would have no choice, yeah.

15  Q.  So from 57 we now go up another 10 percent for home office

16  overhead?

17  A.  Correct.

18  Q.  What is that?

19  A.  570 on 55, 62.70, somebody needs to check me on that.

20  Q.  62.75.

21  A.  Give or take a nickel.

22  Q.  Is there any further addition that an owner has to experience?

23  A.  They would be paying a GC profit as well, and a conservative

24  industry standard would be 15 percent.

25  Q.  Now, when you say GC profit, let's make sure we know what that

1    refers to.  Is that general contractor?

2    A.  Yes.

3    Q.  Beazer doesn't have to pay for that?

4    A.  No.

5    Q.  Because you are your own general contractor?

6    A.  Correct.

7    Q.  These owners will have to pay that?

8    A.  Yes.

9    Q.  So from 62.75 adding 15 percent, what do we end up with?

10   A.  56, 9, 70, 173, somewhere in there.  Somebody got a calculator?

11   Q.  I see Serpe raising his hand, he has the answer.  Does $72.15

12   sound about right?

13   A.  Yes.

14   Q.  The point of this is that when you tell the court Beazer on

15   average may spend 50 a square foot, we know that's not what an

16   owner would spend, true?

17   A.  That's correct.

18   Q.  And that that same number for an owner would be a little over

19   $72 a square foot?

20   A.  Yes.

21          MR. MEUNIER:  May I have a minute, your Honor?  No

22   further questions.  Thank you.

23          THE COURT:  We will take a break at this time and return

24   at 1:30.  The court will stand in recess until 1:30.

25          THE DEPUTY CLERK:  Everyone rise.

1          (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

2

3                              *  *  *  *  *  *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1               UNITED STATES DISTRICT COURT

2               EASTERN DISTRICT OF LOUISIANA

3


4
   IN RE:   CHINESE MANUFACTURED DRYWALL    *
5            PRODUCTS LIABILITY LITIGATION  *
                                            *
6                                           *
   **THIS DOCUMENT RELATES TO:**              *  MDL No. 2047
7                                           *
   Michelle Germano, *et al*                 *  Section L
8                                           *
           versus                           *  New Orleans, Louisiana
9                                           *
   Taishan Gypsum Co., Ltd., f/k/a          *  February 19, 2010
10  Shandong Taihe Dongxin Co., Ltd.,        *
   *et al*                                    *
11                                          *
   Case No. 09-CV-6687                      *
12                                          *
   * * * * * * * * * * * * * * * * * * * *  *
13


14                VOLUME I - AFTERNOON SESSION
15                 PROCEEDINGS BEFORE THE
                  HONORABLE ELDON E. FALLON
16               UNITED STATES DISTRICT JUDGE

17


18  <u>APPEARANCES</u>:

19
   For Plaintiffs and          Herman, Herman, Katz & Cotlar, LLP
20  Intervenors:               BY:  RUSS M. HERMAN, ESQ.
                                    STEPHEN J. HERMAN, ESQ.
21                             820 O'Keefe Avenue
                               New Orleans, Louisiana 70113
22

23  For Plaintiffs and          Gainsburgh Benjamin David
   Intervenors:                  Meunier & Warshauer
24                             BY:  GERALD E. MEUNIER, ESQ.
                               1100 Poydras Street, Suite 2800
25                             New Orleans, Louisiana 70163



                            DAILY COPY

1    <u>APPEARANCES</u>:

2

3    For Plaintiffs and          Law Offices of Richard J. Serpe, PC
     Intervenors:                BY:  RICHARD J. SERPE, ESQ.
                                 580 East Main Street, Suite 310
4                                Norfolk, Virginia 23510

5

6    For Plaintiffs and          Seeger Weiss
     Intervenors:                BY:  CHRISTOPHER A. SEEGER, ESQ.
                                 One William Street
7                                New York, New York 10004

8

9    For Plaintiffs and          Lewis & Roberts, PLLC
     Intervenors:                BY:  DANIEL K. BRYSON, ESQ.
                                 3700 Glenwood Avenue, Suite 410
10                               Raleigh, North Carolina 27612

11

12   For Mitchell Company,       Cunningham Bounds, LLC
     Inc.:                       BY:  STEVEN L. NICHOLAS, ESQ.
                                 1601 Dauphin Street
13                               Mobile, Alabama 36604

14

15   For Knauf Plasterboard      Baker & McKenzie, LLP
     Tianjin Co., Ltd.:          BY:  DONALD HAYDEN, ESQ.
                                 1111 Brickell Avenue, Suite 1700
16                               Miami, Florida 33131

17

18   Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                                 500 Poydras Street, Room HB-406
                                 New Orleans, Louisiana 70130
19                               (504) 589-7778

20

21

22   Proceedings recorded by mechanical stenography, transcript
     produced by computer.

23

24

25

1                          **I N D E X**

2                                                          <u>PAGE</u>

3     Jerry Smith
           Direct Examination                              4
4
      John Scully
5          Voir Dire                                       39
           Direct Examination                              47
6
      Preston McKellar
7          Direct Examination                             113

8     Donald Galler
           Voir Dire                                      122
9          Direct Examination                             128

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                              DAILY COPY

| | |
|---|---|
| 1 | **<u>AFTERNOON SESSION</u>** |
| 2 | **(February 19, 2010)** |
| 3 | **THE DEPUTY CLERK:**  Everyone rise. |
| 4 | **THE COURT:**  Be seated, please.  Call your next |
| 5 | witness, please. |
| 6 | **MR. MEUNIER:**  Thank you, Your Honor.  The plaintiff |
| 7 | intervenors call Jerry Smith. |
| 8 | **THE COURT:**  We had originally scheduled to continue |
| 9 | this hearing on Saturday.  Because of the circumstances, we are |
| 10 | moving fairly fast, and we are going to cancel Saturday and do |
| 11 | Monday instead.  We should be able to finish up by Monday, so |
| 12 | there will be no court on Saturday. |
| 13 | (WHEREUPON **Jerry Smith**, having been duly sworn, |
| 14 | testified as follows.) |
| 15 | **THE DEPUTY CLERK:**  Please state your full name and |
| 16 | correct spelling for the record. |
| 17 | **THE WITNESS:**  Jerry Smith. |
| 18 | **THE COURT:**  You are going to have to get a little |
| 19 | closer and speak up, please. |
| 20 | **THE WITNESS:**  Jerry Smith. |
| 21 | **DIRECT EXAMINATION** |
| 22 | BY MR. MEUNIER: |
| 23 | **Q.**   Mr. Smith, where are you from? |
| 24 | **A.**   Fort Myers, Florida. |
| 25 | **Q.**   What do you do for a living? |

DAILY COPY

1  **A.**   I am a builder in the Fort Myers division for Beazer

2  Homes.

3  **Q.**   How long have you worked for Beazer?

4  **A.**   I've been with Beazer for about six-and-a-half years now.

5          **THE COURT:**  Would you try to speak up a little bit,

6  sir, because we have to hear you in the back.

7          **THE WITNESS:**  It sounds like it's not on.

8  BY MR. MEUNIER:

9  **Q.**   What are your job duties and responsibilities for Beazer?

10  **A.**   Pretty much anything related to the construction in the

11  Fort Myers division.

12  **Q.**   How many years' experience do you have in the construction

13  business?

14  **A.**   I've been in the construction industry for about 18 years

15  now, the majority of which was with a custom builder and now

16  with Beazer Homes.

17  **Q.**   When and how did you first become aware of concerns about

18  Chinese drywall in Beazer Homes?

19  **A.**   In Beazer Homes, we started receiving telephone calls from

20  homeowners in early March of 2009 primarily related to failing

21  AC systems.

22  **Q.**   What were the ages of the homes?

23  **A.**   They were all built between February of -- January of 2006

24  and March of 2007.

25  **Q.**   Based on that age of construction, would you have expected

DAILY COPY

1    calls about HVAC failures as early as March of 2009?

2    **A.**    No.

3    **Q.**    What did you do on Beazer's half, Mr. Smith, to

4    investigate these concerns?

5    **A.**    At that time, it was fairly new.  We had heard about

6    different builders experiencing, you know, the Chinese drywall

7    in the news.  At that point, since we had not received any

8    inquiries, we hadn't done really much research other than

9    listening to the news; but once we started getting calls from

10   homeowners on the failing AC systems, then we started to do

11   some research and try to educate ourselves and, most of all,

12   try to determine what type of symptoms we were looking for to

13   make the connection.

14   **Q.**    What did you personally do to look further into whether

15   there were problems in the Beazer Homes in Fort Myers?

16   **A.**    Initially, we brought in a company of an industrial

17   hygienist out of Tampa to try to help us determine through

18   taking samples of the drywall through a home, the initial home,

19   to see if they could determine if it was Chinese drywall.  We

20   were kind of using them to educate us and help us, you know,

21   make that determination.

22   **Q.**    Did you question installers or look at installation

23   records to try to figure out where you might have a problem

24   because of defective Chinese drywall?

25   **A.**    Yes.  That was the other thing.  I had our subcontractor,

1   you know, in my office asking him questions about if he knew
2   how to identify the Chinese drywall; whether they had used
3   Chinese drywall to his knowledge; whether he had any kind of
4   records that we could look at to make a determination that way.
5   They were helpful but not very knowledgeable as far as
6   determining whether it was or wasn't.
7   **Q.**   What about installation records, did those prove helpful
8   or accurate to you to locate the problem?
9   **A.**   Not really because it's all related to size and type of
10  material and not related to anything else specific other than
11  that.
12  **Q.**   Ultimately, did you decide upon steps that you would take
13  in Fort Myers to go into a home to make a preliminary
14  determination whether there was defective Chinese drywall?
15  **A.**   Yes, we did.  We brought in what we thought was the
16  leading industrial hygienist group, a group that was out of
17  Tampa also, that was working with the Florida state department
18  of health and other agencies to try to get a grip on this whole
19  issue.  We brought them down not only to educate us but to
20  actually show us how to inspect a home and determine if they
21  had symptoms of Chinese drywall in a particular home.
22  **Q.**   So what did you actually do in follow-up -- tell the
23  Judge -- when you went into a home in Fort Myers, a Beazer
24  home, to make a preliminary determination whether it had
25  defective Chinese drywall?

```
 1   A.   It's a little bit of a ritual.  The first thing I do, you
 2   know, I set up the appointment with the folks.  I go in there
 3   and I will -- if it's a two-story, I will take a look -- I'll
 4   go right to the air handlers and pull the faceplate off the air
 5   handler and take a look at the coils.  That almost always tells
 6   me if I should look further.
 7          Or even the degree of corrosion kind of helps me
 8   determine, you know, where to go from there.  A lot of times, I
 9   can have blackened coils on what would be the upstairs unit and
10   not the downstairs unit, so I know to concentrate my search,
11   you know, upstairs.  You can tell a lot by looking at the AC
12   coils themselves because that's circulating the air from, you
13   know, whatever floor you're talking about.
14          From there I go into a number of outlets or switch
15   plates.  I look at the ground wires in each and every room,
16   sometimes multiple outlets, and that kind of gives me also a
17   feel for where it might be concentrated.  That does tell me a
18   lot.  I look at the mirrors to see if the corners have been
19   desilvered.
20   Q.   Before you leave the wiring, what do you look for on
21   wiring to tell you one way or another whether there's drywall?
22   A.   The blackened ground wire.
23   Q.   Blackened ground wire?
24   A.   Yes.
25   Q.   So after the AC coils --
```

1    A.    It's very black and white.  It's very clear.

2    Q.    Okay.  After the AC coils, after the ground wire, what's

3    the next thing you look for?

4    A.    I would look at the mirrors.  I don't normally go by odor.

5    Even if I detect a little bit of odor, I don't think that's a

6    real good determining factor.  I don't know.  They could have

7    been cooking something recently, you know, so that -- you know,

8    sometimes it's hard to distinguish.  In some homes, I can

9    detect no odor whatsoever, so I don't really use that as a

10   determination as far as determining whether the house has the

11   symptoms, yes or no.

12   Q.    Once you make a determination, at least on a preliminary

13   basis, that there might be defective drywall in a home, what's

14   the next step that Beazer takes toward remediation?

15   A.    I make a determination, you know, positive or negative.

16   My next step would be to bring in the industrial hygienist

17   group, schedule an appointment with them to come down and

18   verify my determination on that house.

19   Q.    This group, is it Environ?

20   A.    It's Environ.

21   Q.    They actually come in and will do some soft demolition to

22   look behind boards?

23   A.    At that point, they will take scrapings, but they don't

24   really do any demo.  They will pull an outlet plate out and

25   just take some drywall and scrape things from the edge of the

1  drywall so that they can put it back together without doing any

2  damage.

3  **Q.**    In all cases, Mr. Smith, where you have made the

4  preliminary determination that defective Chinese drywall is

5  present, has that been confirmed by the follow-up work of

6  Environ?

7  **A.**    Every one.

8  **Q.**    In those cases, is the drywall in the home a mixture of

9  domestic as well as defective Chinese?

10 **A.**    Yes.

11 **Q.**    In those cases, have you determined the manufacturers of

12 the defective Chinese drywall?

13 **A.**    Yes.  That's two steps down the line, but yes, we do

14 eventually make a determination of who the drywall manufacturer

15 is.

16 **Q.**    When you say "two steps down the line," you mean, after

17 the Environ group does that scraping, they will come back and

18 look behind boards?

19 **A.**    Yeah.  They give us a report and, you know, that's

20 verified.

21        The actual next step is to bring Environ back once

22 more, and we do what we call a mechanical recovery.  I bring in

23 all the trades and -- for instance, the -- well, it's actually

24 a videographer, also, but they do a lot of documentation.  But

25 they will pull all the outlets out of the wall.  They will take

1    the plumbing fixtures, faucets.

2          Almost all the plumbing fixtures, the faucets, have a

3    copper lead-in wire.  Anything related to copper that they

4    might want to take a little sample of the copper at the

5    air-handler unit, pretty much whatever Environ wants to

6    document, my plumbers, electricians, and air-conditioning

7    people are there to pull it or cut it or whatever Environ needs

8    to document it.

9          Then the next step is what we call a soft demo, and

10   that's where we are documenting, going through wall by wall,

11   room by room, and pulling down sheets and looking for labels

12   and trying to identify the manufacturer of the drywall, and

13   that's all documented by Environ also.

14   **Q.**   Which manufacturers have been identified for the defective

15   Chinese drywall in Beazer Homes?

16   **A.**   To date, four of the 20 homes have been Knauf, and the

17   rest have been Taishan.

18   **Q.**   When Knauf is identified as the manufacturer, is it part

19   of Beazer's protocol to contact a representative of Knauf to

20   come to the property?

21   **A.**   It is.  We send a letter to not only Knauf but also to the

22   subcontractor to give them the opportunity to look at a home

23   that we have verified as having Chinese drywall.

24   **Q.**   To your knowledge, has Knauf ever visited one of the

25   properties in response to that invitation?

1    **A.**    No, they haven't.  The subcontractor has had

2    representation, but not Knauf.

3    **Q.**    Now, the dimensions of these defective Chinese drywall

4    boards are 4-by-12 feet; is that true?

5    **A.**    Yes.

6    **Q.**    When boards like that are stacked at a home construction

7    site, tell the Court the typical way in which those boards are

8    used and they become part of the installed wall for the house.

9    **A.**    A two-story home is the best example.  We will stock the

10   upstairs and the downstairs.  What the installers do is they

11   try to do all the lids first.  In other words, they want to do

12   all the ceilings first, get all the lids up, you know,

13   throughout the house.  That creates a lot of cuts.

14          Our trusses are usually pretty complicated, and you

15   have to have the end of the drywall, you know, end up on a

16   truss.  So, you know, you do end up with a lot of cuts:  Big,

17   small, you know, different sizes.

18          When they go to run the walls, they will obviously

19   use, you know, as many full sheets as they possibly can,

20   although it's rare that you end up with full sheets.  Their

21   next step is to use as many of the cuts that they have done,

22   that they have used before, to get them up on the walls.

23   **Q.**    Mr. Smith, is there any way that you know of, given this

24   use of the boards and installation, to identify, after a home

25   is built, where each original 4-by-12 board or section of board

1    ended up in a house?

2    A.    Virtually impossible.

3    Q.    You were present, weren't you, in Fort Myers when

4    plaintiffs' counsel, including me, and some videographers and

5    photographers appeared to inspect Beazer homes?

6    A.    Yes.

7    Q.    You reviewed with me the video segments and photographs

8    prior to testifying today?

9    A.    Yes.

10   Q.    Would you verify for the Court that the video segments and

11   photos you have looked at are accurate depictions of what we

12   saw on that visit.

13   A.    They are.

14   Q.    Let me show you the video first of this home.  Now, this

15   is a Beazer home after the old defective boards are out and the

16   new boards are up; correct?

17   A.    Right.  This is putting it back together.

18   Q.    What is this showing us in terms of where and how drywall

19   pieces and segments end up being placed in a house?

20   A.    Well, it's pretty much, you know, like I explained in

21   that, you know, the ceilings go first, and then you use as many

22   full boards on the side, and then you will see a lot of, you

23   know, little cuts and parts, you know, to try to utilize, you

24   know, as much of the drywall as possible.

25           At this point, it does look like there's a lot of

DAILY COPY

14

1    pieces.  I know that one had -- one ceiling, we counted 11

2    different pieces, you know, on one ceiling.  I mean, if you

3    were just to walk in there and look at it before the drywall

4    was up, you probably would say, well, that might just take

5    three pieces, but it actually took 11.

6    Q.    Now, let me stop here.  Pause for a moment, please.   In

7    this new home, there is a receptacle here with wiring in it;

8    right?

9    A.    Uh-huh.

10   Q.    An outlet.  If we just roll this a bit further and pause,

11   what does this demonstrate in terms of what the code in

12   Florida, at least, requires for installed wiring in one of

13   these locations such as this?

14   A.    It just shows the flex, the six inches of flex that we've,

15   you know, reinstalled into that particular box.

16   Q.    And that's required?

17   A.    Yes.

18   Q.    Behind that wall, then, is one of those junction boxes;

19   correct?

20   A.    No.

21   Q.    Or just a receptacle would be --

22   A.    That's just a receptacle box --

23   Q.    A box.

24   A.    -- the wires enter into, yes.

25   Q.    The whole six inches of slack would have to be pushed into

DAILY COPY

1  that area?

2  **A.**   Into the box.

3  **Q.**   Let's continue with the video.  This is a closet area.

4  Would you have to cut 4-by-12 sections to accommodate angles

5  and spaces such as this?

6  **A.**   Yeah.  You would probably have more cuts in the closets

7  than anywhere.  That's where, typically, a good installer will

8  try to put as many of the small pieces in the closet as

9  possible.

10  **Q.**   These white lines, of course, are where one board seam

11  joins another; is that true?

12  **A.**   Correct.

13  **Q.**   This is an upstairs room.  Do you remember visiting this

14  room with us?

15  **A.**   Yes.

16  **Q.**   What's the approximate size of that room?  Do you recall?

17  **A.**   You know, I think it was -- I know it was 13-foot wide

18  because it was -- we couldn't cover it with three boards.  I

19  believe it was probably close to 20 feet long.

20  **Q.**   Now, in a room that size, counting the number of boards

21  that look like they were used, ceiling and wall, how many

22  boards do you estimate just for that one room?

23  **A.**   If I didn't have to do any cutting?

24  **Q.**   No.  How many different boards would have to have been

25  used?

1   A.   Different boards, oh.  I would say at least 30.

2   Q.   That's just for one room?

3   A.   That's for the master bedroom.

4   Q.   You were present in court when Mr. Ray Phillips testified?

5   A.   Yes.

6   Q.   Do you recall page 3 of the work authorization agreement

7   we looked at that outlined the Beazer scope of remediation?

8   A.   Uh-huh.

9   Q.   Do you use that written documentation of scope in the work

10  that you do?

11  A.   Not per se because, once we have passed the work

12  agreement, we have a -- I follow the protocol.  I follow the

13  repair protocol which, you know, we have established in stone.

14  Q.   Do you have to get certain permits for the work that you

15  do?

16  A.   Yes, I do.  And that scope of work actually is one of the

17  requirements by the municipality that I'm in that they stamp

18  and approve by the plans examiner -- they want to know the full

19  scope of the work and the repair that you're going to be doing,

20  so I submit that same scope-of-work form.

21  Q.   Now, you were here when we watched the video of the

22  demolition of drywall from walls and ceilings in that Beazer

23  home?

24  A.   Yeah.

25  Q.   How long do you estimate it would take an average size

1    Beazer crew to take all the drywall off of all the wall and
2    ceiling surfaces in that room shown on that video?
3    **A.**    In that room?  You know, once they get going, they are
4    pretty efficient.  I would say that they could do that room in
5    30 minutes.
6    **Q.**    30 minutes?
7    **A.**    Yeah.
8    **Q.**    If they were asked to go in and leave some boards up,
9    forgetting for a moment about how many, just remove some and
10   leave some up, what would the likely labor time increase to?
11   **A.**    That would change their whole method.  It would slow them
12   down considerably.  I thought that Ray's estimate of four times
13   as long would be real conservative.
14   **Q.**    You said it would change their method.  I think it's
15   obvious, but how would their method be different?
16   **A.**    They couldn't use a hammer; they would have to use a blade
17   of some type.  And it would just change the whole method of
18   removing drywall rather than just pulling it down in whatever
19   size -- in the biggest sizes that they could possibly get down.
20   **Q.**    Can you comment on what the implications of that would be
21   on the finished wall surface, that is, if some of the original
22   boards were left in a room but others were removed and
23   replaced.
24   **A.**    It wouldn't look very good.  In my mind, it would not be
25   returning the home the way that the homeowners received it.

DAILY COPY

1    It's nearly impossible to do even a small patch when you have

2    textured walls because what happens is, if you were to take a

3    spray can and spray-paint your vehicle, it might match in the

4    center, but there would be some hazy flash around the spray

5    paint.  The same thing happens with drywall texture.  It leaves

6    a flash around the edges, and you can -- there's always an

7    angle that it shows up and it looks like a repair.

8    **Q.**    Now, the Beazer protocol, as we know, calls for the

9    removal of all the HVAC systems; correct?

10   **A.**    Yes.

11   **Q.**    Let me show you a photo now of -- is this an HVAC coil?

12   **A.**    Yes, it is.  It's one of the homes in Fort Myers.

13   **Q.**    Is this consistent with the type of corrosion you have

14   observed on HVAC coils of these Beazer homes with defective

15   Chinese drywall?

16   **A.**    Yeah.  It's actually very typical.

17   **Q.**    Based on your experience in the construction business,

18   have you ever seen corrosion this extensive on HVAC coils?

19   **A.**    I have not seen this type of corrosion.  I mean, you know,

20   typically, being in Florida, you can look at coils and there

21   might be some corrosion just because there's so much

22   condensation involved in these units, especially in the

23   upstairs units.  But it's your typical copper corrosion, the

24   green-colored copper corrosion, you know, that you would

25   associate with copper, and not the black.

DAILY COPY

1   **Q.**   Under the Beazer protocol, we know that appliances are
2   being replaced.  Let me show you the next picture.  Do you
3   recognize this, with the panel removed, as the rear lower side
4   of one of the refrigerators in these Beazer homes with
5   defective drywall?
6   **A.**   Yeah.  In particular, on the far right-hand side -- it
7   shows up pretty good on the monitor, but that's where the fan
8   motor is circulating the air for the refrigerator, and that
9   copper line is extremely corroded, especially down at the
10  bottom.  That's a prime candidate for failure.
11  **Q.**   When you say this fan motor is circulating the air, where
12  is the air coming from?
13  **A.**   It's just kind of pulling it from the bottom because the
14  bottom is open and it's cooling.  It's a cooling method.
15  **Q.**   So have you seen this type of corrosion on copper lines
16  near this area of the backs of refrigerators in these homes
17  with Chinese drywall?
18  **A.**   Pretty much every one.  That's why we open up the back of
19  the refrigerators on every home when we are doing our
20  documentation because it's pretty consistent.
21  **Q.**   Now, the protocol of Beazer calls for the replacement of
22  trim and cabinets and countertops.  Mr. Phillips covered this,
23  but could you just briefly discuss with the Court the practical
24  difficulties of trying to preserve those things -- wood trim,
25  cabinets, countertops -- when you are demolishing the drywall

1    in a home.

2    **A.**    I will say that, on the first two homes that I went in to

3    demo, I tried to save the doors.  That was one of the things

4    that I wanted to save.  The problem is that the doors that we

5    get are prehung doors that already have the casing installed on

6    one side, and then we install the casing on the other side.  So

7    we would have to remove the casing to get the door out, to get

8    the drywall off.

9            And, you know, my trim carpenter was basically

10   telling me that to delicately remove casing and then store the

11   doors so that they didn't warp and then put everything back

12   together would be more time-consuming than just purchasing the

13   new doors outright because that's a pretty fast procedure

14   because, you know, most of the work is done at the factory.

15   And that holds true pretty much for all the trim.

16           The kitchen cabinets, I think Ray, you know,

17   explained that pretty well.  My initial intent -- not so much

18   because I thought it was going to be a good thing but because I

19   thought it was going to be more cost-effective -- was to try to

20   save the cabinets and put them in storage, but the storage is

21   just unbelievably expensive, and then the climate control

22   issue.

23           The other thing that kind of entered into it a little

24   bit is that, you know, invariably -- I mean, you know, we are

25   trying to put these homes back together, you know, the way the

1   homeowners purchased them.  And to try to take cabinets apart
2   and then put them all back together, I just knew that we were
3   going to get homeowners who were going to say, you know, "Well,
4   that scratch wasn't there," or "That wasn't exactly the way it
5   was," you know.  So it just -- I could see this lasting
6   forever.
7   Q.   What is a line set?
8   A.   That's the line that runs from the AC exterior compressor
9   to the air handler.  It's refrigerant lines, return, and
10  supply.
11  Q.   What is a line set made of, what kind of material?
12  A.   It is continuous copper.  By code, the copper line that
13  runs from the outside air compressor to the air handler needs
14  to be continuous, with no joints.  That's why they use the
15  rolled coil copper.
16  Q.   Were you present with us when we videotaped a section of
17  line set in one of the Beazer homes that was being remediated?
18  A.   Yes.
19  Q.   I would like to show this very brief video and have you
20  discuss it with the Court.  Is this the line set we're looking
21  at now in this --
22  A.   Yes.  This is a corroded one.
23  Q.   It has a black foam insulation?
24  A.   Yeah.  It's like a -- I don't know if that's foam
25  insulation.  It's primarily to -- it does a lot to control

1  condensation because, you know, the refrigerant's in there.
2  But it doesn't seem protected as far as the corrosion, and the
3  corrosion still works its way underneath the ArmorFlex.
4  **Q.**   Well, actually, as the film just showed, we cut a piece of
5  that foam away to look underneath.
6  **A.**   Right.
7  **Q.**   You have done that before, haven't you?
8  **A.**   Yes.
9  **Q.**   When you do that and remove the foam insulation on the
10 line set, do you still see evidence of the black corrosion?
11 **A.**   The foam insulation doesn't really even seem to be a
12 factor.  It will corrode.
13          Typically, almost every home that we have done so far
14 and we have taken a look at, these lines start to corrode near
15 or at where they start to bend up and extend towards the air
16 handler.  It's pretty consistent.
17 **Q.**   We'll just play the rest.  It's a very brief video.
18 **A.**   It doesn't really matter if the ArmorFlex is there or not.
19 It's kind of a location situation, where they all start to
20 corrode about the same area.
21 **Q.**   Tell the Court what we are seeing and where this line set
22 by construction is being run in this house.
23 **A.**   This is actually the line set running up through the
24 subfloor into the second-floor area.  Quite often, we will set
25 both air handlers in the laundry room closet or in a laundry

1   room closet.  That's where we run these lines.

2   **Q.**   Eventually, this line -- this is a single line with no

3   junction spots; is that true?

4   **A.**   That's right.  It has to be continuous.

5   **Q.**   Eventually --

6   **A.**   The white line that you see right along with it is

7   actually the drain line that runs out to the same area.

8   **Q.**   All right.  We are seeing now the exterior of that same

9   home?

10  **A.**   Yeah.  We run that line quite often out of the floor joist

11  area.  It runs down the side of the building, and we put it in

12  a chaise like that to protect it.

13  **Q.**   So that continuous copper line set is going to run in this

14  case from an upstairs connection place to the outside, on the

15  ground floor, through walls and ceilings?

16  **A.**   Yes.

17  **Q.**   Would there be any way to remove that line set, if

18  corroded, without removing all of the drywall and insulation

19  that is between you and the line set?

20  **A.**   Not really, especially if it runs through the floor

21  trusses, for a couple of reasons.  There's not a whole lot of

22  room for running through those floor trusses.  And it also is

23  the very first line that goes into a house when you are

24  roughing the house, or one of the first ones, so all your

25  trades follow up behind that.  So you have got all your wiring

24

1    under there, all your plumbing under there.  It ends up getting

2    pretty bearing because it is one of the first things that go

3    in.

4    Q.   Let's look at a photo or two just to follow up and finish

5    this point.  Is this what a new copper line set would look

6    like?

7    A.   That's what they should look like when they penetrate

8    through to the platform ready to hook up to the air handler.

9    Q.   Is this a picture of what we were just showing on the

10   video?

11   A.   Yeah.  That's a picture of the platform of that closet in

12   the laundry room.  That actually gets boxed out with insulation

13   board down below.  You can see a little bit of it with the

14   yellow board, but that's where it makes the penetrations

15   through the subfloor and then comes up into the platform.

16   Q.   Is this a close-up photograph of the corrosion on the line

17   set?

18   A.   Yes.

19   Q.   I think we can move on.  The protocol of Beazer calls for

20   the removal and replacement of all the electrical wiring in a

21   home; is that true?

22   A.   Yes.

23   Q.   I would like to show you some photographs and have you

24   discuss some of the photographs with the Court.  First, what

25   are we looking at in this picture, Mr. Smith?

1   **A.**   This would just be a double switch box, but I think what
2   we are showing there is just the fact that, you know, we have
3   got lines coming in the top and the bottom.  You know, once
4   again, if you're going to clip and try to save wires, it does
5   create problems.
6   **Q.**   Where is the ground wire in this picture?  Is it visible?
7   **A.**   Yep.  It's flipped up to the top there, yeah.
8   **Q.**   Go to the next picture.
9           **THE COURT:**  Why can't you splice it to get 6 inches
10  more?
11          **THE WITNESS:**  It's against code.  It has to go in a
12  junction box.
13  **BY MR. MEUNIER:**
14  **Q.**   Let's just look at this picture.  In this picture, the
15  wirings that come into this box, have they already been
16  clipped?
17  **A.**   Yeah.  I'm going to say that -- I mean, this is just an
18  example that -- you're not just talking about, you know,
19  electrical Romex brand.  Quite often, you know, if -- I think
20  this probably was near where the TV might be located, but you
21  would have -- you might have speaker wires.  You might have
22  local wires, telephone wires, cable wires.  More and more
23  people, you know, with the equipment are doing things with, you
24  know, the low voltage.  Sometimes it gets pretty complicated.
25  **Q.**   All of them would come into this area, this box?

1  A.   Into that area, yeah.

2  Q.   Is the 6-inch slack requirement applicable to all types of

3  wiring?

4  A.   Not low voltage.  Not low voltage.

5  Q.   Let's go to the next picture.  What are we seeing in this

6  picture?

7  A.   This is actually a box that has been opened up and it's

8  been clipped.  It's been clipped to remove the two switches

9  that Environ would have tagged in the recovery, but it does

10 show the corroded double-twisted ground wire in the center

11 there.

12 Q.   Assuming this is corroded, this ground wire in this box,

13 why couldn't you just clip off the area of visible corrosion

14 and just resplice, rewire, and keep this box where it is and

15 all the connections to the box where they are?

16 A.   That's a difficult thing because it is a code issue.  I

17 mean, you would have to have it in a junction box, you know,

18 and Ray covered that.  You know, you would have junction boxes

19 all over the place.

20         But you are also limited by code.  I wish I could

21 tell you what it was, but you are limited as far as how many

22 junction boxes you can actually have.  I mean, you might only

23 get part of a home done and you are at your limit on junction

24 boxes.

25 Q.   So if I wanted to splice, I would have to pull wire into

1   this box to create a 6-inch slack?

2   **A.**   That's correct.

3   **Q.**   I would have to pull it either from the top or the bottom?

4   **A.**   Yeah.  There's no other way.

5   **Q.**   When I pulled the slack in, I would have to move the box?

6   **A.**   No.  If you were, you know, to theoretically splice, you

7   wouldn't have to move the box.

8   **Q.**   But if there's not sufficient slack on the outside -- and

9   we are going to see some pictures later on this -- you have to

10  move the box up or down to create the slack?

11  **A.**   That would be the other option.

12  **Q.**   I mean, forgetting about code, forgetting about 6-inch

13  slack, how much electrician time would be needed to cut and

14  splice all of these corroded wire endings and compare that to

15  the time it takes to strip out and replace all the wire?

16  **A.**   That's a tough one because if it's just a single outlet or

17  a single switch, which I think everybody is kind of visualizing

18  just a single switch or a switch single outlet, that's really

19  not the case, you know, with us.  I mean, we do have them, but

20  we also have a lot of multiple gang boxes.

21          You know, we have multiple, you know, four or five

22  switches at the front, you know, in a dining room and kitchen.

23  Those become real difficult because you really have got some

24  serious unraveling to do in order to be able to even, you know,

25  clean them or get close to cleaning them.  Plus, when they are

1  large like that, they just naturally collect more paint

2  overspray and texture spray.  It's kind of a mess in there.

3  **Q.**   Right now I'm just talking about the time it would take.

4  **A.**   I know.

5  **Q.**   My question is assuming you took on the job --

6  **A.**   Yeah.

7  **Q.**   -- splicing, relocating boxes, as opposed to keeping the

8  boxes where they are and removing all the wiring.

9  **A.**   I do know my demo group, they initially had tried to --

10  they initially tried to clean -- the first five homes that they

11  had demoed, they tried to clean wires on the first five.  He

12  had crews in there for two full days.  Those homes were

13  approximately half the size of the homes that we are dealing

14  with.  So, you know, four days would be a fair time period.

15  **Q.**   Let's go to the next picture.  On the subject of cleaning,

16  what are we looking at in this close-up?

17  **A.**   That's a good example of another item that would make

18  cleaning -- because the wire is not always solid copper core.

19  It could be stranded wire like this one here.  I don't know how

20  you would clean a stranded wire.  You would have to, I guess,

21  individually unwrap every one of those little strands.

22  **Q.**   Would that be the job of a laborer, or would you have to

23  have some electrical specialist involved?

24  **A.**   Well, you would have labor do it because, you know, what

25  the county is saying is that, you know, you could potentially

1    do that, but you better have a certified letter from an

2    engineer stating that he has approved that cleaning process.

3    **Q.**   So after the laborer cleans off all these strands, you

4    have to bring in the electrical engineer to inspect and

5    approve?

6    **A.**   Yeah.

7    **Q.**   And again --

8    **A.**   If you wanted to do that.

9    **Q.**   If you want to do that.  Can you give the Judge some idea

10   of time and cost of that approach with the cleaning,

11   supervision, approval by an electrical engineer, versus replace

12   all the wire?

13   **A.**   Number one -- Ray hit it right on the head because I have

14   talked to my electrician about this.  The wire itself, because

15   of the way they purchase it -- and they buy it in bulk.  The

16   way that they purchase their wire, the actual material cost is

17   fairly low.  So, I mean, to me, why would you even try to go

18   the route of cleaning when there would still be a risk involved

19   in it?  You know, if it wasn't entirely clear, then you would

20   have to get an engineer involved.  I think you're talking twice

21   the cost to try to clean it if you are really going to be

22   thorough, which you would have to be.

23   **Q.**   To demonstrate these issues of the practicality or

24   impracticality of attempting to clean corrosion off wires, did

25   I ask you to bring from one of the Beazer homes with defective

DAILY COPY

1   Chinese drywall a junction box with the wiring still in it?

2   **A.**   I have a 3-gang box, and it's an excellent example.

3   **Q.**   Would you please take it out so the Judge can see it.

4   **A.**   This all has to be unwrapped.  It shows the corrosion, all

5   the spray.  The black stuff is the actual corrosion.  The white

6   stuff is the paint overspray.  This is actually copper wiring.

7   I just clipped it to get it out of there.

8           But just out of curiosity, I took a look at what was

9   underneath the jacket, and this is corroded way up into the

10  jacket.  So how would you know where to clip it?

11  **Q.**   Mr. Smith, perhaps speaking into the microphone, if you

12  wouldn't mind summarizing what you have just been able to

13  explain to Judge Fallon by looking at that.

14          **MR. MEUNIER:**  The junction box, Your Honor, we would

15  identify for the record as Exhibit P1.1891.

16          **THE DEPUTY CLERK:**  It's already in, Judge.

17          **THE COURT:**  It's already in.

18          **THE WITNESS:**  Basically, what I was saying -- this is

19  what I was talking about unraveling, you know, the wires; and

20  that the ground wires in this particular one are twisted

21  together with a coupler, so you would have to take all that

22  apart.  Not to mention that you can see where, you know, it's a

23  fairly big box, so it naturally collects a lot more paint

24  overspray and texture overspray.  It's kind of a project to be

25  able to clean that.

1            It also shows how, basically, easy it is for me

2  to determine the corrosion on the ground wires when I'm doing

3  my initial inspection because they're black.  Just out of

4  curiosity, when I clipped it out, just to get it out, I just

5  sliced back the insulation jacket to look at it.  On the end

6  here, this particular ground wire inside this jacket and inside

7  the insulation is corroded.  So you really wouldn't know how

8  far that carries up inside the insulation.

9  BY MR. MEUNIER:

10  Q.   Just so the record is clear, when you removed it, you

11  weren't doing this in order to try to look for or find

12  corrosion on the --

13  A.   No.  It was just a curiosity thing on my part.

14  Q.   Would you, with this red pen, mark on the insulation, so

15  it's clear for the record, the wire that you found under the

16  insulation coming into that box which shows corrosion.

17  A.   Uh-huh.

18  Q.   That section of wire corroded under the insulation would

19  have been behind the wall?

20  A.   Yes.

21  Q.   Let me go to the next photograph, and we get now to what a

22  home will look like stripped back to studs by Beazer.  We did

23  ask that, in this case, the wiring be left in; true?

24  A.   For attorneys.

25  Q.   It's got to come out under the Beazer protocol, but it was

DAILY COPY

1  left in at our request?

2  **A.**    Yeah.

3  **Q.**    Once you have the old wiring exposed like this, tell the

4  Court how difficult or easy it is labor-wise to just remove all

5  this wiring and replace it with new wire.

6  **A.**    I have had, out of the first nine homes that I have

7  demoed, the electricians -- I have sent two crews over to do

8  that little project.  Seven of those might have been

9  two-stories.  They can do two a day.  They can basically --

10  strip out a home of wiring, they can do two a day, so half a

11  day.

12  **Q.**    Half a day?

13  **A.**    Yep.

14  **Q.**    If we instead went about the business of clipping,

15  snipping, trying to clean, supervise the cleaning, get approval

16  from an electrical engineer, etc., is there any doubt in your

17  mind it would be much more costly and time-consuming?

18  **A.**    No doubt in my mind.

19  **Q.**    Finally, Mr. Smith, let's talk about the cleanup phase of

20  Beazer's protocol.  Let me go forward a couple photographs.

21  **A.**    Having gone through this and seen what I have seen with

22  these initial homes, I consider the cleaning portion of it

23  absolutely critical.  You know, you can talk about wires and

24  everything all you want.  The cleaning, it does a lot of things

25  because -- well, this is just an example of the fact of how

1    detailed you need to be when you're trying to clean a home.  I

2    mean, you've just got little parts and pieces, you know, all

3    over.  It's kind of a project, you know, to get it completely

4    clean.

5    Q.   Right.  The drywall dust is pretty fine.

6    A.   The drywall dust is very fine.

7    Q.   We have seen pictures of it being shoveled and swept and

8    hauled out to dumpsters.

9    A.   Yeah.

10   Q.   Tell the Court what is next done, after you have got the

11   major pieces removed, to try to get the home fully clean.

12   A.   According to the protocol, it would be to HEPA-vac as many

13   as three times per home, whatever it takes.  It's hard to go

14   around and, you know, just get all these little pieces and the

15   dust.  So they do a pretty thorough job of HEPA-vac'ing

16   throughout the home and, you know, it's clean of debris when

17   they walk out.

18   Q.   Are these fine pieces that are left from the demolition

19   addressed in the HEPA-vacuuming?

20   A.   It should be, yes.

21   Q.   It's H-E-P-A.  What does it stand for?

22   A.   I don't know.  It's just an advanced filter vacuuming is

23   all that is.

24   Q.   It's good at getting up fine particles like this?

25   A.   Yeah, without throwing all the dust back into the building

1   is basically what it's supposed to do.

2   **Q.**   It keeps it from going airborne again?

3   **A.**   Correct.

4   **Q.**   If we go to the next picture, with the HEPA-vacuuming of

5   surfaces such as we just saw, what is done with respect to the

6   now exposed original wooden studs or metal studs in the home?

7   **A.**   Yeah, there are occasions we use the wood studs for

8   certain reasons.

9            This is actually -- this led to a little bit of

10   change in the protocol because, you know, we were HEPA-vac'ing.

11   Initially, the next step in the protocol would have been to let

12   the home off-gas for a period of time before we even brought

13   any trades in and started putting it back together.  After the

14   initial off-gassing period on the first two homes, I could walk

15   in and I could still smell it.  I attributed it to the fact

16   that dust had just, you know, settled over everything and the

17   homes were just dusty.

18   **Q.**   Is this a close-up picture of the surface of a wooden

19   stud?

20   **A.**   Yeah.

21   **Q.**   That stud is showing the fine dust?

22   **A.**   That's showing the dust, yeah.

23   **Q.**   Here again, we see fine drywall dust.

24   **A.**   The same thing.

25   **Q.**   So you found that you would smell an odor from the

DAILY COPY

1    drywall, even when the home was this clean, because of this
2    dust?
3    **A.**    You have removed all the drywall.  You have done your --
4    you know, you've done your cleaning.  I mean, essentially, at
5    this point, it's even cleaner than what it would be under
6    normal construction, you know, circumstances.  But, yes, I
7    could still smell the odor walking in, and so I halted, you
8    know, the first two as far as even attempting to put anything
9    back in there.
10   **Q.**    So this next picture shows us some Beazer crewmen doing
11   what?
12   **A.**    This is what I had eventually found out that some other
13   builders were doing and we tried it.  This is, I'm convinced,
14   the way to go, and that is the steam-cleaning crew.
15            It's usually a two-man crew.  One man goes in with
16   his wand, and he is spraying absolutely everything, all the
17   trusses, you know, starting at the top and running down the
18   walls, and spraying everything.  What that is doing is knocking
19   the dust particles off of any surface that it might have been
20   accumulated or even in any little corner or niche.  So it's
21   knocking it down.  The second guy follows behind, and he is
22   vacuuming up that excess water, which is taking all of the dust
23   particles out of the home.  That's why they look so sparkling
24   clean when they get done.
25            **MR. MEUNIER:**  Next picture, Scott.

1   BY MR. MEUNIER:

2   **Q.**   What is the piece of equipment, the red piece of

3   equipment, we see in this picture?

4   **A.**   Once they go through and they pressure-wash, we will set

5   up a commercial-grade dehumidifier for a two-day period

6   minimum.   It's nice if we can do it late in the week, then run

7   over the weekend.   But because there's water involved and, you

8   know, we are thoroughly washing out the home, we are just

9   taking the moisture out of the air so that it can go into the

10   off-gas period in a dry state.

11              **MR. MEUNIER:**   Next picture, Scott.

12   BY MR. MEUNIER:

13   **Q.**   What is this piece of equipment?

14   **A.**   That's nothing more than just an extractor, and so you're

15   pulling with it -- the dehumidifier is pulling moisture out of

16   the air, and this is discharging it so it doesn't have to be

17   attended.   It can just run continuous.

18   **Q.**   After you do the HEPA-vacuuming, the manual wipe, the

19   pressure-wash, the dehumidifying, and extracting, what's the

20   next step?   Airing it out?

21   **A.**   The off-gas period.

22   **Q.**   Off-gas.

23   **A.**   Yeah.

24   **Q.**   How long does Beazer off-gas or air out the homes?

25   **A.**   14 days.

DAILY COPY

1   **Q.**   Why that long?  Is that based on experience?

2   **A.**   Based on experience.  In fact, we had to kind of follow

3   our industrial hygienist's recommendations on this.  They

4   suggested 10 days and we said 14.  While we are going to wait

5   10, we might as well, you know, wait 14 full days.  That's what

6   we have been doing.

7   **Q.**   Now, you are the guy who interacts with the owners during

8   this process; true?

9   **A.**   Right.

10  **Q.**   You actually bring them into the house at some point

11  before the new drywall is put up?

12  **A.**   I have offered to let the homeowners -- to meet with the

13  homeowners on every home that I have gone into the off-gas

14  period but preferably, you know, after the trades have been

15  back in.  I think that the cleaning process -- and that's

16  another reason why I'm so adamant about the cleaning.

17          The cleaning process has made all the difference in

18  the world to the homeowners, to have them walk in there and see

19  that home, you know, completely free of any Chinese drywall,

20  for one thing, any dust and any odor.  Every one of them have

21  made comments, you know, along the line of relief, you know,

22  that they believe that we have done what we need to do to get

23  it gone.

24  **Q.**   You have had no complaints?

25  **A.**   None.

1    **Q.**    You have satisfied customers?

2    **A.**    You know, a lot of concern up to that point, you know,

3    because obviously they are worried, worried that the odor will

4    still be there, that some of the symptoms will still be there.

5    But once they walk in and they see the home looking like that,

6    then it sets their mind at ease.

7                **MR. MEUNIER:**  Thank you very much, Mr. Smith.  I have

8    no further questions.

9                **THE COURT:**  Thank you, sir.

10               Call your next witness.

11               **MR. SERPE:**  Your Honor, before I call the next

12   witness, I would like to do two housekeeping matters.  First, I

13   would like to introduce Reverend Fred Michaux and his wife

14   Vannessa, who have made it in from the airport.  Preston

15   McKellar has also made it in from Newport News.  They both came

16   in from Newport News this morning.

17               One final housekeeping matter.  Your Honor, we

18   have three witnesses who have travel arrangements and

19   obligations that absolutely prevent them from rolling forward

20   to Monday.  Our next witness is going to be Dr. John Scully.

21   Mr. McKellar has got a newborn at home, and we'll get him on.

22   Mr. Donald Galler from Boston, Massachusetts, is also going to

23   be testifying.  We anticipate about two-and-a-half hours of

24   work there, Your Honor.

25               **THE COURT:**  That's fine.

1    THE WITNESS:  We will try and keep things moving
2    along.
3    THE COURT:  Okay.
4    (WHEREUPON **John Scully**, having been duly sworn,
5    testified as follows.)
6    THE DEPUTY CLERK:  Please state your full name and
7    correct spelling for the record.
8    THE WITNESS:  Dr. John R. Scully.
9    **VOIR DIRE**
10   BY MR. SERPE:
11   Q.   Dr. Scully, where are you employed?
12   A.   University of Virginia.
13   Q.   Would you tell the Court about your educational
14   background, please.
15   A.   I have a bachelor's, master's, and PhD all in materials
16   science and engineering, which used to be metallurgy.  Now
17   material science is a broad field, encompassing a lot of
18   subfields of materials, including metals, obviously.  And they
19   are all from the Johns Hopkins University.  And then I have
20   some other courses in corrosion coatings and surface science.
21   Q.   Would you give the Court a brief overview of your
22   professional experience.
23   A.   Just briefly, I have worked at the Naval Surface Warfare
24   Center and Sandia National Laboratories, AT&T Bell
25   Laboratories.

1          And then since about 1990, I have been a professor at

2    the University of Virginia and now codirect the Center for

3    Electrical Science and Engineering, which is primarily

4    interested in corrosion of metals, although we do other things

5    like electroplating.  And I am the Charles Henderson professor

6    of materials science and also, on occasion, called upon by the

7    U.S. government to be a U.S. government employee such as for

8    the office of the Undersecretary of Defense.

9    **Q.**   Dr. Scully, the University of Virginia's program in

10   metallurgy and corrosion, would you briefly describe it for the

11   Court.

12   **A.**   Our program in metallurgy is -- the materials science --

13   well, the materials science department is about 25 members.

14   Our center is the largest center that deals with corrosion in

15   the United States and possibly the world.

16          There's one at the University of Manchester in the

17   UK, and we teach classes at the undergraduate, master's, and

18   PhD levels.  We're probably the leading supplier of people

19   educated at the master's and PhD with a specialty in corrosion

20   in the United States because -- quite proud of it, actually,

21   that we are the supplier of the people that work at places like

22   Sandia National Labs.  In fact, two of my students work now at

23   Sandia National Labs.  I haven't worked there, obviously, since

24   1990.

25   **Q.**   Now, it turns out that some of these homes are an hour up

1   the road from the University of Virginia, but does your work in

2   the fields of metallurgy and corrosion take you to other

3   corners of the world?

4   **A.**   Quite a few.  Quite a few.

5          I do work with the Max Planck Institute in Germany.

6   I do work with the National Institute for Materials Science in

7   Tsukuba City, Japan.  I even worked with the Chinese National

8   Academy of Sciences.

9   **Q.**   Would you give the Court just one or two examples of some

10  of your professional organizations that you have participated

11  in, some of the --

12  **A.**   Yes.  Just briefly, all my organizations are affiliated

13  with metals and corrosion.  I guess notable to today's

14  discussions is I was the past chair of ASTM.  That stands for

15  American Society for Testing and Materials, Subcommittee G1.

16         G1, Your Honor, deals with corrosion of metals.

17  G1.11 is a specific subcommittee within G1 which handles all

18  the standards in ASTM for corrosion of metallic materials.

19         I'm also on the editorial board of two journals:

20  *Corrosion*, which is the National Association of Corrosion

21  Engineers; and a German journal out of Germany called *Materials*

22  *and Corrosion*.  So that involves getting papers almost every

23  week and then deciding whether those papers have the proper

24  methodology and have the proper statistical treatment of

25  results, and the conclusions agree with the results, in order

1    to publish those papers.  The editor is sort of like the judge
2    who decides whether that paper gets published or not.
3    Q.   When it comes to judging papers and applications, are you
4    also one of the principal editors of this book?
5    A.   Yes.
6    Q.   Let me see if I can get it to show up.  What is this book?
7    A.   That book is the *Corrosion Tests and Standards,*
8    *Application and Interpretation*, book that summarizes, goes over
9    the purpose and scope and limitations of all the corrosion
10   standards that are governed by the ASTM, American Society for
11   Testing and Materials.
12   Q.   Are you the John R. Scully who is mentioned as one of the
13   four editors of this book?
14   A.   That's me.
15   Q.   I don't want you to read the PowerPoint here, but can you
16   give us just an overview of some of the distinctions and honors
17   in the field of corrosion that you have achieved.
18   A.   I don't know.  Maybe the one that's pertinent today is the
19   ASTM Frank LaQue award, which is the highest award for work in
20   corrosion science leading to standardization development.  It
21   doesn't mean I developed all the standards, but it means I did
22   some of the work that leads to the standards.
23   Q.   What work have you done for the United States in terms of
24   researching corrosion issues faced today?
25   A.   A professor's job is kind of funny because you teach in

1    the classroom.  You do research and you try to do a lot of

2    citizenship and service, both in your field and outside of your

3    field.  Some of it involves being called to national duty when

4    you are asked to -- and a couple of those include advisory

5    boards and nuclear waste repository, the federal waste

6    repository at -- proposed at Yucca Mountain.

7              You know, one of the ones here was the *Columbia*

8    Accident Investigation Board for the *Columbia* accident, which

9    all of you are aware of what happened to it upon reentry.

10   There was a concern that one of the alternate mechanisms for

11   failure was the corrosion mechanism, and so they asked me to

12   look into the possibility that that was the cause of the

13   *Columbia* accident.

14   Q.   Did you accept that assignment?

15   A.   Yes, I did.

16   Q.   And you were recognized for your accomplishments there and

17   your contribution --

18   A.   Yes.  By Admiral Gehman, who headed up that commission,

19   and you can see there.

20   Q.   Again, selecting just one or perhaps two real-world

21   examples of relevant investigations that you have done in the

22   past.

23   A.   I can't -- I won't go over the list and bore everybody,

24   but as a metals specialist, you get involved in a lot of issues

25   with materials corrosion that are from a diverse set of

DAILY COPY

1    situations.

2            The one at the bottom I think is interesting because

3    there's a chance of -- you know, all of you are aware of the

4    problems with stainless-steel surfaces in hospital, that

5    E. coli and strep and rhino virus and things of this nature,

6    and H1N1, that are on stainless-steel surfaces.

7            Copper is interesting because copper offers the

8    possibility of antimicrobial efficacy; in other words, it can

9    kill bugs.  The problem with copper is it can tarnish in

10   certain environments.  So the focus of that by the Copper

11   Development Association is to develop copper-based alloys that

12   do not tarnish, what's called anti-tarnishing or

13   color-resistant copper-based alloys.

14   **Q.**   You were selected because of your expertise on corrosion

15   and in copper?

16   **A.**   Yes.

17   **Q.**   What's the goal of developing this particular type of

18   copper?

19   **A.**   Well, the goal is to develop a copper -- well, they clean

20   hospital surfaces every day, but the goal is to develop a

21   color-resistant or color-stable alloy that can also deliver the

22   copper ions needed to -- basically, to destroy biological life

23   forms.

24           So there are some alloys right now that are resistant

25   to even, like, the slight browning that a penny gets, a copper

1    penny gets, but those alloys don't kill.  They don't have
2    efficacy for antimicrobials.  So it's sort of having your cake
3    and eating it too.  Copper material doesn't corrode but yet, at
4    the same time, has antimicrobial capability.
5    **Q.**   Projections made on how many lives could be saved by that
6    type of a development?
7    **A.**   Well, I'm forever optimistic, but obviously you know the
8    problem with hospitals.  So it has the potential, if it was
9    wildly successful, for saving 100 million lives.
10   **Q.**   Finally, in terms of qualifications, what type of
11   extrapolations have you made regarding corrosion that have
12   pointed to a time frame that a particular application could be
13   expected to endure?
14   **A.**   You know, just -- you know some of my job experience, so I
15   just won't -- I won't try to spend a lot of time here.  But
16   when we dealt with ships, the lifetime is 25 to 40 years.  Of
17   course, the *Iowa* class battleship, as you know, during the
18   Reagan Administration -- yes, I was there at that time, and
19   they were taking it out of retirement.  So that was the 1940s
20   until the 1990s or 1980s.
21          A nuclear weapons stockpile is 15 to 30 years.  Those
22   they are not building anymore, so we need to keep the stockpile
23   viable.
24          And, you know, aging aircraft.  I don't know if any
25   of you knew, but the KC-135 refueling tank for the B-52, they

1    want to fly those for 100 years.  The KC-135, which is the
2    airborne refueling plane, was built around 1960, and they want
3    to fly those until about 2040.  So you deal -- when you are in
4    corrosion, you deal with these types of issues.
5            Probably the one thing that's the most challenging
6    one was this nuclear waste repository because there in order --
7    the main issue with the waste repository, although I know it's
8    dormant this year because of funding, as you all know, but one
9    of the main issues with the waste repository is the engineered
10   waste barrier, and corrosion is the number one issue which will
11   keep radionuclides from being -- not having corrosion will --
12   it will be what will keep the radionuclides from being
13   released.
14           And that's quite challenging because the lifetime
15   there for the half-lives of some of those radionuclides go out
16   to thousands of years.  So that's where the thousands of years
17   come from.  So you won't be able to check out your -- it's very
18   challenging, let me just leave it at that.
19           **MR. SERPE:**  Your Honor, in light of Dr. Scully's
20   testimony, we would tender Dr. Scully to the Court as an expert
21   in the fields of corrosion and metallurgy and materials
22   science.
23           **THE COURT:**  The Court will accept him as an expert
24   under 702 in the proposed areas.
25

DAILY COPY

1                        **DIRECT EXAMINATION**

2    **BY MR. SERPE:**

3    **Q.**   Dr. Scully, what was your assignment, as you understood

4    it, when you were contacted by the plaintiffs' steering

5    committee with respect to the Chinese drywall litigation?

6    **A.**   The main goal, of course, was to evaluate the impact of

7    corrosive gases from Chinese drywall on materials, metals in

8    homes.

9    **Q.**   Dr. Scully, I know we are both trying to move this

10   information along.  I think you're doing fine, but if you could

11   just slow down a tad for the court reporter.

12              In order to conduct your investigation of the impact

13   of these corrosive gases, what were the elements or scope of

14   the investigation that you performed?

15   **A.**   As you can see on the overhead, there were six things and

16   then a summary.  Two are linked, the upper left-hand corner and

17   the bottom, were to look at the corrosion of some mechanical

18   and electrical components, harvest it from Virginia Chinese

19   drywall homes, I will call it, or homes that are positive for

20   Chinese drywall, compare those to Virginia homes that did not

21   have Chinese drywall -- I call those controls.

22              And then the other parts of it were to look at the

23   corrosion literature on the subject of the gases that might be

24   present, review all the other evaluations from other

25   investigators, regardless of who it was, whether it was

1    plaintiff or whether it was defendant.  And, of course, we

2    wanted to review any of the state, any government information.

3    That are couple of government agencies that did reports.  Then

4    we wanted to look at the standards for classifying the

5    corrosivity of an indoor environment.  And then taking all that

6    information together, integrating the whole thing, considering

7    everything together, try to estimate the likelihood of risk of

8    electrical failures due to corrosion.

9    **Q.**   Dr. Scully, this last point here, classifying the

10   corrosivity of the Chinese drywall homes to establish a

11   classification scheme, we are going to spend some time on that

12   today, but the -- you know, following from, for example, my

13   initial instinct that this was a very dense and arcane field,

14   would you help the Court understand the importance of the

15   process of establishing a classification for the corrosivity of

16   the drywall.

17   **A.**   Well, it's important because once you establish, once --

18   if you take an environment and classify it, then that is

19   directly correlated through years of work with risk of failure.

20           So the correlated damage -- and we'll get into it,

21   talking about electrical components, what kind of damage that

22   would be, but that's been -- it's not an indirect correlation.

23   It's a direct link with performance of materials that's been

24   made.

25           These standards have started over the years and,

DAILY COPY

1   really, in the 1930s was switching gear when telephones first
2   came out.  People started working towards all the information
3   that came into developing these standards.  Some of the
4   standards weren't written -- and they are living documents;
5   they're still being written.  But some of the standards weren't
6   written until more recently, and we'll talk about that.
7   Q.   Let's take a look at some of the investigation.  What was
8   the first step or the first thing you did in terms of the
9   investigation for this case?
10  A.   The first thing I wanted to do was, of course, to look at
11  the components that had been harvested from a Virginia home
12  with Chinese drywall, and the first thing that we looked at, as
13  you can see here, was called SLH27, was the labeling system for
14  that, was of the Heischober home in Virginia Beach.
15  Q.   What sort of steps were taken with respect to the
16  investigation of this particular air conditioner coil which
17  came out of the Heischober home?
18  A.   Well, first what we wanted to do, of course, was ascertain
19  where it had been and how old it was.  My understanding was
20  that this unit was installed and serviced around 8-15-2008 and
21  was removed in August of 2009, so it was about one year in
22  service.  We also documented where it was stored before we got
23  it last December.
24          Then to do a materials characterization like I have
25  done so many times, you take something and photograph it.  You,

1    of course, document it.  It's stored of course, in a benign

2    environment.  Then we began our overview, looking at the

3    components here.  Then we document, as the blue lines indicate,

4    where we are going to cut.  We cut and do a microscopic

5    examination.

6            Our mantra is to really understand metal-degradation

7    processes.  Whether it's corrosion or cracking, we need to do

8    this micro -- get in there and do this microscopic, detailed

9    evaluation by several techniques.

10           Here you can see where we cut components, and what

11   you see is the blackened surface on the outside.  Then, if you

12   look at these bright copper surfaces, those are the inside of

13   the components.  Whereas the manifold here and the subpipes

14   that are dark -- sorry the colors aren't very good -- those are

15   the exterior surfaces.  It's very striking, in fact.  The

16   interior surfaces you can see here, where I have the green

17   cursor, and then the exterior surfaces.

18           We sectioned these, as you can see, and then we are

19   going to mount them to a standard -- what's called an ASTM E3

20   metallographic preparation.  So after we have labeled them

21   all -- you can see different ones that we labeled, and we keep

22   that labeling straight and put them in different plastic bags,

23   etc.  Before I talk about the --

24   Q.   Well, let me first ask you this:  As you were cutting and

25   sectioning and you made observations with respect to the

1    surface of these copper pipes, what did you see?  What was

2    important to you about that?

3    **A.**   Well, the copper pipes on the exterior, the color is a

4    little bit better there.  It's sort of a gray-blue-black

5    appearance.  You could scrape a lot of the -- of what was on

6    the surface -- I won't even call it a corrosion product yet

7    because we do detailed examination and confirm everything we

8    see.  But you could scrape some of it off with your hand.  It

9    was very loose in adhering.

10           If you take the inside surfaces, for instance, the

11   bright copper appearance here, or even if you take a penny or

12   some of these anti-tarnishing alloys, you can scrape it with

13   your fingernail.  It has a very compact, thin, oxide film.

14   Just to use an analogy, for a stainless-steel sink, you know,

15   you can't see the oxide film on a stainless-steel sink.  If you

16   scrape it with your fingernail, nothing comes off.

17           So the first thing was this porous, friable, kind of

18   cracked nature of this black exterior film that we wanted to

19   look at in detail microscopically.

20   **Q.**   Doctor, the word *corrosion* has been thrown around loosely

21   here today, but let's get a precise definition from you.  What

22   is corrosion?

23   **A.**   I think we need to go to this ASTM standard, and I want to

24   say a few more things about it.  So this is the ASTM called, as

25   you can see, the standard terminology relating to corrosion

1    testing.  And while you're getting that up, I'll start
2    describing what it is.
3            Corrosion is the chemical or electrochemical reaction
4    between a material -- usually a metal -- and its environment
5    that produces deterioration of the material and its properties.
6            And I want to say something else.  What you're
7    doing -- think of it this way -- you are taking the material
8    and you're converting it into a corrosion product or it's
9    dissolved right into the aqueous solution.  It's gone.  It's
10   dissolved.
11           All right.  So that reaction has two consequences.
12   Well, they're could be some other modes, or it could even be
13   cracking, but not in this instance.  You either convert the
14   metal from -- it's functioning metal, I'm going to call it --
15   to a corrosion product; or you just dissolve it away, and it's
16   eaten away.
17   Q.   Have we got some photographs to illustrate this?
18   A.   Sure.  So this is one of the subtubes from the SLH27 HVAC
19   evaporator coil.  This was exposed in a home with Chinese
20   drywall in Virginia for about a year, as I mentioned.  What
21   you're seeing here is a metallurgical cross-section.
22           So what this is -- let me try to orient everyone,
23   make sure we are on the same page.  This was the original
24   surface of the tube out here.  We are taking a slice.  If you
25   can imagine slicing through a cake and looking at the side of

53

 1    the cake, you get to see the icing on top, and you get to see

 2    in cross-section this surface.

 3           This is the copper metal down here, and this material

 4    here is the corrosion product.  That's the black material that

 5    we observed before that we want to look at microscopically.  So

 6    I hope everyone can see that what the cross-section gives

 7    you -- it's like cross-sectioning in biology; although when we

 8    do it in materials science, we have to us an opaque microscope

 9    so the light's reflected back or the electron signal comes

10    back.  It's not a transmission microscope like you use in

11    biology.

12           When you blow that up, what you can see is this was

13    the original copper metal, and this is the corrosion product on

14    top of it.  That was the black-gray corrosion product that you

15    would see when you looked at this visually, only now we are

16    looking at microscopic -- at high magnification.

17    Q.   Dr. Scully, the term *cracking* was used in your report and

18    some of this literature.  Do we see any cracking concepts here

19    on this particular slide?

20    A.   What you see is this is the metal, and then this is the

21    mounting material that we mount it in, which is an innocuous

22    mounting material.  It doesn't have any sulfur in it, for

23    instance.  And this is -- this is the corrosion product, and

24    then here are the cracks in the corrosion product.

25           You can see this is cracked all the way along this

 1    interface.  It's not very -- as I said, it -- if you looked at
 2    a passive film on copper, the bright red, shiny copper, you
 3    would hardly even notice -- you wouldn't be able to see where
 4    that interface was.  Then, like I said, scratch your kitchen
 5    sink or your copper penny.  In this case, you could scratch it
 6    off with your fingers, as you recall me saying.
 7            Now, you can see this submicroscopically how this has
 8    cracks.  It's kind of fractured.  I use the word *spall*
 9    sometimes too.  Sometimes we will see some stuff that looks
10    porous.  I'll describe that for you in a minute.
11    Q.    Dr. Scully --
12    A.    Can you go back just one -- oh, I'm sorry.  Go ahead.
13    It's your question.  I just wanted to point out what this was.
14    Q.    Yes.
15    A.    So we looked at this surface.  Again, this is the top
16    surface.  This is the copper metal.  There's a pit into this
17    surface.  This pit's about 30 micrometers deep, which is
18    greater than the tolerance for this tube.
19            I want to mention, by the way, that this tube is
20    pretty thin.  I'll bring this up again.  This tube, just to
21    reference you -- you can look at the specs for each
22    manufacturer, like Ruud or Trane or Carrier, but the thickness
23    of this tube is less than a millimeter.  It's about that
24    amount.  It's about a 32nd of an inch.  All of you are familiar
25    with rulers, what a 16th of an inch is.  So this pit's about 30

55

1    microns.  The tolerance for that is less -- is less than that.

2            And then we can deal with chemical analysis of this.

3    So this is taken into a scanning electron microscope -- and I'm

4    sorry you can't see the micron marker very well, but this is

5    our scanning electron microscope.  That is because electrons

6    can see smaller than we -- can focus better than we can

7    optically.  That's a two-sentence lecture on electron

8    microscopes.

9            And then what we see when we do chemical analysis, we

10   see:  Carbon, which is sort of dark carbon you see on most

11   things; oxygen; copper; and sulfur.  So we see a sulfur peak

12   there.  This particular peak, you have plenty of cases on the

13   surface, which you will see in a minute, but this is inside

14   this pit.  This is a corrosion pit.

15   Q.   What's the importance to you of seeing both copper and

16   sulfur in these peaks on this test?

17   A.   Well, that indicates we think this is copper and a copper

18   sulfide or a copper sulfur type corrosion product as opposed to

19   a case where you don't have any sulfur around, you only see

20   copper and oxygen.

21   Q.   Through additional testing that was performed, were you

22   able to confirm that the material on the top was, in fact,

23   copper sulfide?

24   A.   We did.  In addition to this analysis, which tells you the

25   chemical identity, we did what's called X-ray diffraction, and

DAILY COPY

1   the X-ray diffraction indicates crystallographically the

2   structure falls into a structure of certain copper sulfides,

3   and there are different ones.  There are quite a number of

4   copper sulfides.  We see mainly what's a copper 9, sulfur 5.

5   **Q.**   So what's the importance of a copper pipe or copper wire

6   that's being eaten away and it's turning into copper sulfide?

7   What can you learn from the observation of copper sulfide?

8   **A.**   Well, it's not protected, and that's one of the key

9   concerns here.  Copper is -- we teach these things that I won't

10  get into called potential pH diagrams, but copper is very

11  stable in aqueous environment.  Of course, a thin copper film,

12  the film stops growing and it's very stable.

13          So it's happier as a copper sulfide.  It's kind of

14  like mineralogy, happier as a copper sulfide than as solid

15  copper.  And so it's very -- it's turned from, say, practical

16  gold into a much more vulnerable metal when it forms a copper

17  sulfide.  So that's sort of -- from a corrosion metallurgy

18  standpoint, that's a bad indication.

19  **Q.**   What conclusion do you draw about the type of sulfur that

20  is conducting this type of corrosion?

21  **A.**   Well, usually, that kind of -- when you get a copper

22  sulfide, the big thing -- and it's been seen industrial in a

23  number of places, but the big thing is it's reduced --

24  elemental reduced sulfur gases.

25          So, you know, one of the concerns is that, when you

1   see something like that, you're starting with the material.

2   You let the material tell you what the story is.  I'm not

3   making any speculations here.  You can see it's copper sulfide.

4   One of the things that will do that are these reactive sulfur

5   gases, as you see here.

6               This is a little partial list of some of the sulfide

7   gases, but one of the main ones is hydrogen sulfide, and this

8   is carbonyl sulfide, carbon disulfide, and then elemental

9   sulfur can also do this, if you have elemental sulfur.

10  **Q.**   Would it be appropriate to refer to those first three as a

11  *reactive sulfur gas*?

12  **A.**   Yes.

13  **Q.**   And what does that term mean?

14  **A.**   Well, those sulfur gases -- first, the hydrogen sulfide,

15  you rarely get the sulfide ion, which is what people call the

16  reduced sulfide species.  And then you can also get them in

17  certain circumstances like water from this carbonyl sulfide.

18  They're sort of free radicals that can react with various

19  metals.

20  **Q.**   Dr. Scully, in addition to your work, you reviewed the

21  work of other investigators in this case?

22  **A.**   Yes.

23  **Q.**   You saw the work of Dr. Streit, whose deposition will be

24  presented to the Court.  She reported finding copper -- I'm

25  sorry, carbon disulfide, did she not?

1    A.    Yes.  Well, she -- it was a number of carbonyl sulfide.

2    Q.    Carbonyl sulfide.

3    A.    Yes.

4    Q.    COS?

5    A.    Carbonyl sulfide is COS.  Carbon disulfide is $CS_2$.

6    Q.    $CS_2$.  Both have been reported in Chinese drywall?

7    A.    Yes.

8    Q.    As has hydrogen sulfide?

9    A.    Yes.

10   Q.    So --

11   A.    In those reports.

12   Q.    -- from the reports of the investigators and the

13   government and other investigators in this case, each of these

14   three reactive sulfur gases has been found to be off-gassing

15   from Chinese drywall?

16   A.    Yes.

17   Q.    Have you seen --

18   A.    From the reports that I have read.

19   Q.    Have you seen data that elemental sulfur is also contained

20   in and available to be released from Chinese drywall reactive

21   substances?

22   A.    I've seen reports that detect elemental sulfur.  And then

23   from my own work and the work in my field, I know that

24   elemental sulfur is very volatile.

25   Q.    Obviously, this chart is indicating that both copper and

1  silver are vulnerable to this full sweep of the sulfur,
2  offending sulfur substances?
3  A.   Yes.  It's mainly when you get the sulfur of the sulfide,
4  but copper and silver are both very vulnerable.  It's
5  interesting because copper and silver are very
6  corrosion-resistant materials, but they happen to be very
7  vulnerable.  This is like their Achilles' heel.
8       There are other -- not that gold is -- there are
9  other -- I can tell you, for gold, you actually have some
10  things that you can make gold corrode.  But this in particular,
11  for copper and sulfur, it just so happens they are very
12  corrosive agents.
13  Q.   This would be the Kryptonite for copper.
14       The footnote at the bottom, "more corrosion with
15  increased temperature and humidity," can you walk us through
16  that a little bit, please.
17  A.   Temperature, particularly for copper, it's very much a
18  function of humidity, less so for silver.  It seems that the
19  literature reports that silver is less of a function of
20  humidity.  Copper is independent of humidity.  In other words,
21  copper is very susceptible to humidity.
22       Temperature usually raises corrosion rates.  You have
23  to be careful here because if the temperature is so high that
24  it dries off the surface, so it actually lowers the humidity,
25  then temperature can be beneficial and -- but I don't want to

1    confuse.  I just want to say that normally processes,

2    electrochemical processes, are accelerated by temperature.

3    There are rate processes that go faster if you raise the

4    temperature.

5    **Q.**   Humidity, can you give us an idea of, as humidity

6    increases, how dramatically that can increase the corrosive

7    nature of these gases on copper.

8    **A.**   Well, humidity, you know, has an effect overall on

9    corrosion.  Humidity, I mean, the water -- carbonyl sulfide can

10   hydrolyze in water.  That's a chemical reaction that reduces

11   the sulfide.  And so, you know, water is a key agent, and a lot

12   of surfaces -- you know, typically above a certain percent

13   relative humidity, it really depends on the conditions -- have

14   water on the surfaces.

15          Also, I want to mention that there are sort of

16   additive or synergistic effects with mixed gases, mixed flowing

17   gases, including some stuff that isn't listed, that can kind of

18   make a cocktail that can be corrosive.  It may not always be,

19   but in some cases, it can be very corrosive.

20   **Q.**   *Synergistic*, help us understand.  What does this word

21   mean?

22   **A.**   What *synergistic* is meant to mean is for -- if you take

23   gas A, B, and C and add them together, it's not just the added

24   effect of A, B, C.  *Synergistic* anything is that it's greater

25   than the sum of its individual parts.

1   Q.   You mentioned a minute ago that a moisture on a particular

2   copper surface -- Jerry Smith told us a minute ago that this

3   line set was a copper pipe that, even with that ArmorFlex, has

4   condensation on it.  Is that the sort of environment that would

5   be particularly vulnerable to a corrosive agent like this?

6   A.   Yes.  What you worry about -- I mean, with -- what you

7   worry about with copper and silver is you worry about getting

8   some condensation or hydroscopic salts.  So you don't need a

9   bucket of water.

10          You know, you worry about, like, in the line set

11   example, that this is the sweaty glass of iced tea that you

12   have on the table in the summertime.  You condense water when

13   the temperature of the surface is below the dewpoint.  And

14   that's what happens with those line sets and on the HVAC

15   evaporator coils.

16          The people from Trane or whatnot would tell you they

17   stay wet -- it depends on how the air conditioner runs, but

18   they stay wet a lot of the time in hot, humid Virginia in the

19   summer.  Even in Charlottesville.  So those surfaces get wet,

20   and wet -- when you have wet surface with sulfide and oxygen,

21   then the reactions can run fast.

22   Q.   This sort of corrosion eating the copper pipes and turning

23   it into copper sulfide that we saw a minute ago?

24   A.   Right.  It's converting it into copper sulfide, and that

25   is what's happening in the corrosion process.

1   **Q.**   Dr. Scully, I want to set up a dichotomy or ask you about

2   two different particular views of a corrosive environment:

3   One, by looking at the environment and measuring the air,

4   trying to determine what's there; versus number two, looking at

5   items that are there in the environment and studying them.

6   Would you help the Court understand, in the field of corrosion

7   science and investigation, the relative roles of studying the

8   air versus studying direct measurements and observations of

9   corroded objects.

10  **A.**   Well, people look at both.  I mean, there are people that

11  look at the corrosive gases in the environment.

12          The trouble with corrosion is -- and as I said, it's

13  not just the synergistic effects, but even if you have a

14  mixture -- is that often the characterization of the

15  environment alone is missing something.  There's either

16  something that you are not able to measure or not able to

17  measure accurately enough; or the measurement device only

18  measures an integrated sum, like a dosimeter that you come back

19  a month later and measure what it is.

20          And it might be that a transient increase is what

21  triggers corrosion and so the -- and so you can't pick up all

22  the transients and so -- and then you might be missing some

23  crucial ingredient like the humidity.  So some people advocate

24  sampling the gases, but the most direct evidence which

25  integrates all those effects into one is a material itself.

1          And then, of course, the gold standard would be the
2    component itself.  So if you can look at corrosion on the
3    component of the material, what else can be more direct than
4    that?
5    Q.   When it comes to looking at the corrosion on the material,
6    is the gold-standard method for looking at the material itself
7    the cross-sectional study we saw earlier?
8    A.   Yes.  Cross-sectional -- there are a variety of ways that
9    people study surfaces, but what's nice about cross-sectioning
10   is that it's very noncontroversial.  It's not prone to error.
11   You can do different things, and people can debate the
12   technique.  But, you know, if you -- just like when you slice
13   your cake, you can tell what the icing thickness is.
14          So, I mean, it's not -- it's covered by ASTM
15   procedures, and it's a tried and true method.  People have used
16   it for a long time.
17   Q.   Let's talk about looking at the layer of icing on some of
18   these objects.  Is this an example of a measurement of the
19   thickness that you conducted at the University of Virginia?
20   A.   Yes.  What we did is this is -- this is back to SLH27,
21   which is the first HVAC unit that we looked at, and that's just
22   an overview, just to remind you, in the upper right, of the
23   HVAC unit before we cut some of these copper tubes here.
24          And then what we do is we take this tube.  You can
25   see this.  It's a little dark.  That's the tube mounted

1    metallographically.  So that's covered by an ASTM procedure.

2    Very routine.  And then what we can do is we can polish this

3    and look at high magnification and look at that corrosion

4    product on that surface.

5              So just to orient you, this is the outside of the

6    tube, and you see the interior of the tube in the middle there.

7    Q.   What are we looking at here?

8    A.   So what we are looking at here is the copper metal.  The

9    black is the mounting material.  That's an epoxy that we mount.

10   That's the copper.  So this is a cross-section.

11             The tube comes down like this, and we are looking at

12   a small part of it.  And then you can see this corrosion

13   product on the surface here, and then the red arrows indicate

14   how thick it is.  It's about, well, 1.4 to 2.6 micrometers

15   thick.

16   Q.   What was the importance to you of seeing things in the

17   tube micron thickness as corrosion product on these pipes?

18   A.    Well, later on we are going to talk about that, but

19   that's -- this is a significant corrosion product, especially

20   if you find out that the identity is this copper sulfide.  You

21   can start to compare this to the standards that rate corrosion

22   classifications, how corrosive an indoor environment is based

23   on the thickness of these films.  So the thickness of these

24   films is a fairly important thing to do.  This method is really

25   noncontroversial.

65

1   **Q.**   So when we talked earlier, in the beginning of your

2   investigation, where I isolated that corner, we are heading in

3   the direction, ultimately, of drawing conclusions about the

4   environment.  Measuring these thicknesses is an important

5   aspect of that, being able to do those classifications?

6   **A.**   Yes.  And that's direct evidence or a component, and we

7   are going to -- we are going to relate that to the -- try to

8   ascertain what the corrosivity of the environment is.

9   **Q.**   In addition to thicknesses, did you look for pits on the

10  copper pipes from the Heischober's air conditioners?

11  **A.**   We did.  We found some pits.  And again, in the

12  cross-sectioning, the same sort of thing that we talked about

13  before.  This is the mounting, this is the copper, this is the

14  surface with the corrosion product, and this is the pit

15  30-micron deep.  We also looked inside this pit, as I mentioned

16  a minute ago, and saw the sulfur was detected.

17          So when this -- this HVAC evaporator coil gets wet,

18  and there's a transition from surface corrosion product

19  formation, there's a transition in corrosion mode, if you will,

20  into a pitting-type phenomena, which is a severe form of

21  localized corrosion.

22          Why that's significant, again, is each -- remember

23  what I said about the tube thickness, a 32nd of an inch.  And

24  corrosion that's pitting is a very localized corrosion confined

25  to a corner, as you can see here, and so that can penetrate

1   down through this material.

2   Q.    All right.  So here we are looking at an indication of

3   30 microns in depth.  Were all the pits that you saw the same

4   depth on this evaporator coil?

5   A.    No.  I mean, well, there's pitting.  Because pits initiate

6   at slightly different times and they grow at slightly different

7   rates, when you have surfaces that are pitted, there's a

8   distribution of pit sizes and pit depths that you get on any

9   material I have ever looked at.

10  Q.    Does this particular ASTM talk to or speak to this concept

11  of distribution of pit depths?

12  A.    Yes.  And I want to point this out that this is called

13  a -- okay.  This is ASTM G46, Standard Guide for Examination

14  and Evaluation of Pitting Corrosion.  I just want to point out

15  to the Court that nobody is trying to be unfair here about pit

16  depths.  Everybody recognizes you get -- because pits

17  initiate -- they all don't start at the same time or at the

18  same rates that you get this distribution of pit sizes.  And

19  people deal with that, engineers deal with that, all the time.

20          And this section, 6.4.3.3, talks about -- I'm sorry.

21  That's -- I'm not sure that's the right one.  It's the one

22  above that.

23  Q.    Above it?

24  A.    Right where you were.  Thank you.

25          So there's a dependence of pit size on the area

1    that's used to do the analysis.  You know, picture this.  Just
2    to make it simple for the Court, if I had pits this far apart
3    and I sectioned a very small area this big, I wouldn't see any
4    pits.  All right?  So the bigger the area that you section, the
5    more you have a chance of seeing what this distribution really
6    is.  And that's been codified, as you can see, in this
7    standard, where they say that in some analyses.
8            Now, remember there's many linear feet of these
9    evaporator coils and these line sets, etc., and wiring; but if
10   you would evaluate more and more and more area, and the
11   conditions were substantially similar, that is, if you had some
12   moisture and some sulfur, then this analysis tells you -- in
13   fact, they even give equations for getting -- for predicting
14   that you would get bigger pits.
15   Q.   Do they tell you where you would see it on the extreme
16   based upon these formulas?
17   A.   Yeah, and that's the thing.  So once you get a
18   distribution of pits, it's sort of like -- picture, like, a
19   Gaussian distribution, like your bell-shaped curve.  You have
20   an average-sized pit, you have a couple of large ones, a couple
21   of small ones, and that's where people start using statistics
22   to look at pit size.
23           From that kind of analysis, you can predict that
24   probably the pit that you sectioned -- it would be very
25   unreasonable to assume -- back to your pit that we looked at,

DAILY COPY

1   it's kind of unreasonable to assume that the first pit that you

2   find is the biggest pit.  All right?  What's the chance of

3   that?  The chance of that is actually pretty rare.  So the pit

4   that you find is somewhere on that bell curve.

5   Q.    So what's the significance of seeing an average-sized pit

6   and we having more extreme values with much larger pits in that

7   distribution?

8   A.    You can do a rigorous -- instead of just saying, "Oh,

9   well, there's a pit two miles long," you can do a rigorous

10  analysis that there's likelihood of bigger pits.  So that's the

11  kind of analysis done, but rigorous statistics are done to look

12  at deeper pits.

13  Q.    All right.  So --

14  A.    It's very highly likely that there are deeper pits than

15  the few that we saw on this first analysis.

16  Q.    So in trying to get my arms around this concept, for me

17  the visualization of a salami going through a meat slicer was

18  helpful.  If you sliced it thin enough and looked on the

19  surface for the depth of the pit, the depths of the pit could

20  vary over the length of the salami.  Would that be a fair

21  statement?

22  A.    That's a fair statement.  So picture a distribution of

23  pits, and then you view your slices.  If you had only a very

24  small section, you might only get one pit, and it's very -- not

25  likely that that's the biggest pit.

1   Q.   Why are deeper pits more important than less shallow pits
2   when it comes to copper pipes like this?
3   A.   Well, in a situation like this, you're comparing the pit
4   depth to the component dimensions.  And so in every type of
5   analysis you can do, you're looking at a pit depth, A, above --
6   you know, beyond the surface roughness, beyond the tolerance of
7   the material.  Because we're not going to focus on the little
8   1-micron pits and make a big deal out of it, and you're going
9   to compare it to the size of the wall.
10           And I've pointed out already that the wall thickness
11   is very small.  If you like metric units -- around a 32nd of an
12   inch.  If you think in metric units, around a millimeter, the
13   thickness of these.
14   Q.   Have other investigators discussed the pits that they have
15   observed when looking at HVAC pipes in the Chinese drywall
16   environment?
17   A.   Yeah.  A number of investigators have looked besides the
18   work that we did at UVA, and this one is from Freeman, and also
19   Krantz has done some work.
20           And this particular case shows a pit here.  And
21   again, this is the mounting material on the block.  This is the
22   copper here.  The pit you can see in this image here.  Just
23   very briefly, this is the sulfur peak.  They also did something
24   along the lines of what we did, found sulfur in the peak.
25   These other peaks are for copper.

 1          Then I just want to point out here this peak is about
 2    50 micrometers deep.  That's a 50-micron bar here.  That bar is
 3    about 50 microns.  So if you line that up, if you take that
 4    over there, then that's about 50 microns deep.
 5          This far, I know you can't see it -- and I apologize
 6    for how blurry it is -- but that's a 200-micron marker bar.
 7    What microscopies do is you might -- you might think about
 8    hearing about things in magnifications, but because we can put
 9    stuff on screens and print stuff on different size paper, you
10    don't actually use magnifications.  We actually use micron
11    marker bars because that gets stretched as the image gets
12    stretched and reprocessed.  There's no error here.
13          You can see here that this particular tube is only
14    about 500 micrometers thick.  All right?  So that's only
15    about -- from the outside to the inside is about 500 microns,
16    and then that gets about 50 microns.  So that's about
17    one-tenth.
18          **THE COURT:**  Why are some pits deeper than other pits
19    if they are all exposed to the same gases?
20          **THE WITNESS:**  Because, as I said, they don't start --
21    picture a nucleation phenomena, but they don't start at the
22    same point in time.  There's an incubation time, particularly
23    in this tarnishing process.  There's an incubation time in all
24    pitting process.  So one starts at this point in time and
25    grows, and one starts at this point in time, and one starts

1 right before a section.  So that's a really little pit, and

2 then you've got a couple of really big pits.

3        **THE COURT:**  If you remove the gas from the pit, once

4 they start, do they still keep going or do they stop?

5        **THE WITNESS:**  Well, we are going to talk about that

6 later, you know, the pros and cons of that.  That's certainly a

7 question.

8        **MR. SERPE:**  With the Court's indulgence, can I hold

9 off on that area of inquiry?

10        **THE COURT:**  Yes.

11 **BY MR. SERPE:**

12 **Q.**  Is the biggest pit the weakest link in the chain?

13 **A.**  Well, in the case of this application where you are going

14 to leak and then you're going to lose pressure, so this

15 particular application, the function is the containment of

16 freon, although I'm not -- so, in this case, the deepest pit is

17 the one that you're worried about, not the shallowest pit or

18 not averaging the pits together.

19        That's why the ASTM standard covers this extreme

20 guide notion, because you're not interested in the average pit

21 depth and you're not interested in the most shallow pit.  In

22 this case, you're interested in the deepest pit because that

23 can produce the leak.

24 **Q.**  And speaking of producing a leak, did you review work by

25 Mr. Krantz with respect to his investigation of air-conditioner

1   coils?

2   **A.**   Mr. Krantz works for a company called CTL, or Corrosion

3   Testing Lab, and they issued several reports.  As I mentioned,

4   as the scope of my work, I reviewed the literature and reviewed

5   all the reports that I could from any party, and this is the --

6   his work, again, it's an HVAC coil.  It's from a Virginia home,

7   not the coil that I looked at.

8        If you look at this picture here, we can just see

9   that there is -- this is where -- this sort of nipple comes

10   out, this is the manifold copper.  The manifold comes out.

11   It's copper.  Then the subtube that comes off here is braised

12   onto this, and so this is a braised joint.  You can see a

13   little bit of the joint there and then this is -- they did a

14   pressure test with bubbles and they found -- a soap test, and

15   they found a leak at this site.

16        And this is the good way to do cross-sectional

17   analysis, is a cross-section of that and look at what happened

18   at that site.  So that's a direct examination of a component

19   that failed.

20   **Q.**   Did he also cross-section it to look at it?

21   **A.**   I'm sorry.  Yes, that's what I was trying to indicate by

22   waving my green light-stick here was that they

23   cross-sectioned -- you're looking at a cross-section like I did

24   in green, so that's kind of this way, and now you can see the

25   components of this tube.  So this part caught up, comes up

DAILY COPY

1    here.

2            And this braised material -- the two braised

3    materials that are typically used in this industry, one is a

4    copper phosphorus braise, one is a silver -- it's a pretty

5    complex silver braise.  But then you remember we talked about

6    the gases that -- copper and silver, in particular, are

7    susceptible to sulfides.

8            So then you can see -- perhaps we could blow this up

9    so we look at -- well, there's another one.  I don't know if

10   you want to look at that one or the other one.  Either one.

11   Maybe we should look at the top for a second.

12           So here you see the tarnish.  That's the copper

13   sulfide.  And then we have some corrosion here, and the

14   corrosion is going along this interface.

15           These bubbles are not corrosion, actually.  This is

16   the mount.  This is the copper.  This is the braise in gray.

17   This is corrosion penetrating along here.  This is corrosion

18   product.  It's lifted up there, and you can see there it's kind

19   of cracked or spalled.

20           The porosity here is not corrosion product.  What

21   happens is that to -- they add -- I won't give you a metallurgy

22   lecture, but they add a melting point depressant to the braise,

23   and that comes out in gas form and make these little bubbles.

24           So the corrosion is here, and you can see this leaks.

25   But why that leaked -- because that goes all the way through to

74

1    the inside.

2    Q.   All right.  So we have been looking at air-conditioner

3    coils from coils that came out of these families' houses, but

4    the Michauxes and the McKellars have a neighbor who also

5    donated a control coil.  Why was that important?

6    A.   Well, whenever I do an investigation of corrosion, I have

7    to look at controls, control materials.  I look at materials

8    that were in a house and -- with no Chinese drywall as well as

9    a store-bought -- what I call a store-bought or a brand-new

10   component.  So in just about any investigation that I proceeded

11   in, I want to look at what the control -- what we call the

12   control, what that's -- even in the Space Shuttle *Columbia*, we

13   got information on other orbiters that did not --

14            So we always do that.  We always want to look and

15   say:  What's different?  What's the same?  Is this typical?

16   You know, to be fair, is this a typical corrosion pattern that

17   you just see on all evaporator coils, you know, whether in a

18   Chinese drywall home or not?

19            So that's how we do it.  So we do the same

20   cross-sectioning analysis, try to be as rigorous as we can.

21   Q.   And you did that on a coil that came from the Sullivan

22   house?

23   A.   Yes.  We received a coil from the Sullivan home, which is

24   shown here.  The Sullivan home did not have Chinese drywall.

25   And you can see that this has got the evaporator coils here and

1    then this similar type of manifold type of thing.

2              And we did sectioning.  We labeled these.  We bag

3    them.  Of course, they keep it separate from our coil from a

4    Chinese drywall home.  In fact, we kept it in separate rooms.

5    Then we sectioned these and did similar type of analysis.

6    **Q.**   So what's the patina that we are seeing in the bottom

7    right corner here?  Was that determined, what this particular

8    patina was here?

9    **A.**   We did.  We looked at that.  In fact, we looked at some of

10   the worst spots, as you will see in a minute.  But this has the

11   copperish appearance, not the black-blue-gray appearance.

12             And then we have this greenish -- a corrosion product

13   without sulfur for copper.  This is a very wet device.  We have

14   talked about how there's a lot of condensation on this.  And so

15   it is a very corrosive situation, but you form this green

16   corrosion product.

17   **Q.**   Was that this loose black nodular corrosion that you saw

18   on the Chinese drywall houses?

19   **A.**   No.  It's different.  We looked at that microscopically.

20   **Q.**   Are we going to see a microscopic image here?

21   **A.**   Let' see.

22   **Q.**   This is, once again, what you observed when looking at the

23   Heischober's coils, is the familiar 30-micron pit?

24   **A.**   That's SLH27 with the Chinese drywall.

25   **Q.**   Let's take a look at the cross-sectioning.

1   A.   Blow up the top just for a second so everyone in the court
2   can see.
3   Q.   This far, or do you want to go down --
4   A.   Do the next -- do them all together, those three, yes.
5   Q.   All right.
6   A.   So you can see this is not corrosion-free, and we look at
7   this.  This has got this green corrosion product, and there are
8   a lot of -- you know, roofing material gets this green patina.
9            I mean -- and not to go the mineralogy route, but
10  these are typically bronchantite, malachite, atacamite.  They
11  form these mineral scales, and some people think they are very
12  decorative for roofs.  It is corrosion, though.  If you go to
13  the cross-section, we'll see that.
14           You can blow that up with a -- thank you.  Right.
15           So here we see the scale is pretty thick, actually.
16  And one of the reasons for that is the atacamite is a -- has a
17  very low density.  So when you get any corrosion at all, you
18  get a thick scale, but the surface here is very smooth.  This
19  is, again, the mounting material up here.  This is green scale
20  you were looking at before from the top, and this is the
21  copper.  Very smooth interface, no pitting here.
22           And if you look at this scale, there's -- that's
23  silicon.  There's no sulfide in this.  That's copper, carbon,
24  oxygen, and so that's consistent with my argument that this is
25  malachite.  Malachite is a copper carbonate type of film.

1    That's what you see on roofs of houses with copper.

2    **Q.**   Did you observe the fitting on the Sullivans' coil?

3    **A.**   No.  As you can see that we see a very smooth interface,

4    not even little pits.  You know, back to our statistical

5    argument, we don't see little pits.

6    **Q.**   Dr. Scully, I want to leave the HVAC systems behind and

7    turn the attention to the wires that were in the home and ask

8    you if you also had the opportunity to consider investigation

9    that's been done in the field of Chinese drywall homes but with

10   respect to wires.

11   **A.**   Yes.

12   **Q.**   Did you find a publication from Sandia National

13   Laboratories?

14   **A.**   Yes.  As I mentioned in my opening, we looked at

15   everyone's reports, including three different government

16   laboratories that did reports:  The Consumer Products

17   Protection Agency; Sandia National Labs; and some work was also

18   done by NIST, which is National Institute -- sorry for all the

19   acronyms.  It's National Institute of Standards and Technology.

20   **Q.**   Let's talk a little more about Sandia.  We saw it listed

21   as one of the locations as part of your professional tenures,

22   but would you explain to the Court the nature of Sandia's

23   mission and what's going on there.

24   **A.**   Well, Sandia National Labs was a part of the Manhattan

25   Project that started in the 1940s.  It's a Department of Energy

78

1    laboratory, and it's responsible for a lot of things today, but

2    its historical mission was for the nuclear stockpile and the

3    reliability of the nuclear stockpile.  And that's where I

4    worked, in Albuquerque, New Mexico.

5    **Q.**   Would it be a fair statement that it's one of the most

6    premier scientific arms of the United States government?

7    **A.**   Very tough place to get a job in engineering and very --

8    very high standards.  Really, again, they do the stockpile

9    reliability so their materials reliability people are very

10   good.  I would say the best.

11   **Q.**   Did they look at materials from the Chinese drywall

12   houses?

13   **A.**   Yes.

14   **Q.**   Did they prepare a table of the sorts of things that they

15   pulled out of those houses?

16   **A.**   Yes.  The Consumer Products Protection Agency harvested

17   something like 167 components, and they gave some to the

18   National Institute of Standards and Technology and some to

19   Sandia National Laboratories.

20           I believe that Sandia National Laboratories got 38

21   components.  I think you can see here in this list 38

22   receptacles for electrical wiring and the houses from the

23   states indicated there.  And then Sandia down-selected, and I

24   think they looked at -- of that 38, they looked at six of

25   those.

79

1    **Q.**   But Sandia also specifically had components that came

2    right from Chesapeake, Virginia, just up the road from these

3    families' houses.

4            Rob Sorrenson was one of the listed authors at

5    Sandia.  Do you know Dr. Sorrenson?

6    **A.**   I do.  I have known him for about 25 years.

7    **Q.**   Have you reviewed his findings with respect to the

8    investigation conducted on these electrical components?

9    **A.**   Yes.

10   **Q.**   Was the scope of the investigation published in this

11   report?

12   **A.**   Yes.

13   **Q.**   The sorts of investigations that they conducted in terms

14   of cross-sectioning, EDS, XRD, the sort of things we've been

15   talking about, was that what happened out at Sandia, as well,

16   the same sort of scientific techniques?

17   **A.**   Yes.  They used the same -- largely the same techniques

18   that we used at the University of Virginia.  They used

19   sectioning and did X-ray diffraction.

20           They happened to look at the -- like I said, the

21   receptacles that they received either from Virginia or from

22   Consumer Products.  They also looked at the plates that were a

23   part of those and the -- the little bit of -- the screws where

24   you bolt down.

25   **Q.**   The contact --

1    A.    Contact plates and contact screws.

2    Q.    They also looked at wires?

3    A.    They certainly looked at wires.

4    Q.    Let me ask you to focus on this particular diagram that

5    was done at Sandia National Laboratories and ask you if you can

6    walk through for us what the significant findings were on this

7    particular investigative technique.

8    A.    Well, what's interesting here -- let me orient you again

9    as to what this is.  This is like our metallographic

10   cross-section only a little bit fancier.

11          So this is the copper tubing, and this is -- the

12   copper tubing down here kind of runs along, as I show with my

13   green arrow.  This is outside of the copper wire -- excuse me,

14   not tubing.  This is outside of the copper wire, and this is

15   corrosion product at very high magnification.  You can see it

16   has this cauliflower-type appearance.

17          This is into the metal, and what they have done

18   here -- this is called a focused I-beam section.  And with a

19   focused I-beam, you can actually dig out this little trench.

20   Think of it as an atomic scale scalpel.  And so what you're

21   looking at is a cross-section into the copper wire.  This is

22   the original interface, roughly, where the copper surface was

23   originally before the corrosion, and then it corrodes, and then

24   you see corrosion down here into the copper wire and corrosion

25   product up above it.

1          So I hope everybody is oriented, but that's -- this

2     is the remaining copper wire down below here.  These little

3     features, those are the grains, what are called the

4     crystallographic grains of the copper.

5          And then this is a pit that's formed into the copper.

6     The wire is actually pitting.  In an application where it's

7     used in a receptacle, we see it pit.  And then we see this

8     corrosion product growing up here.

9     Q.   What's this term, *spongiform texture*?  What's that mean?

10    A.   Well, the original intact metal -- so we form this pit,

11    and this forms down here, and they call it a spongiform.  It's

12    basically a corrosion product.

13         This is nonload-bearing or non -- this is not

14    functional material anymore, and what has happened here is this

15    is actually -- if you look at the chemical analysis, this is

16    actually corrosion product that consists of copper and sulfur

17    and oxygen.

18         This is copper sulfide up here.  This cauliflower --

19    they use the word *cauliflower*.  You can see where we get the

20    word *nodule* comes up here, and that's all corrosion product.

21         **MR. SERPE:**  Your Honor, I believe I can get to an

22    excellent breaking point in about three minutes.

23         **THE COURT:**  That's good.

24    BY MR. SERPE:

25    Q.   Dr. Scully, I'm going to ask you to bear with me when I

1   fast-forward through some slides.  I'm not going to show them,
2   but we talked on the HVAC about thicknesses being measured on
3   the HVAC.  Did Sandia go through the process of measuring
4   thicknesses on wires and other electrical components?
5   A.   Yes, they did.  They measured thicknesses.  As you can see
6   here, there's a micron marker here.  It probably can't be read
7   very well.  That's 10 micrometers.  And so that if you put this
8   up, they had thicknesses, and they summarized up to 18, 20
9   micrometers.  On some of these -- and not just in this spot but
10  at other locations as well.  They did, like I said, about six
11  of them.
12  Q.   Not just in this spot but in other locations, did they
13  look at the depths of the pits that they were observing?
14  A.   Not so much.
15  Q.   Did they demonstrate any of the corrosion pitting of up to
16  20 microns?  I believe the reference is at page 23 of Sandia.
17  A.   Right.  They document their pits of 20-micron depth.  You
18  see that's about a 10-micron marker there, and that pit comes
19  down like this.  So it's about 20 microns in depth.  It's hard
20  to see with the shadow.
21  Q.   Let's just take a look, in summary, at what Sandia
22  National Laboratories found about wires, and then perhaps we
23  will take a break.
24  A.   Right.  The Sandia findings, in short, were that the wires
25  contained copper sulfide corrosion products.  That was the

1  cauliflower corrosion product.  The corrosion product thickness
2  is measured greater than 10 microns.  I say that.  They
3  measured up to, say, 18, 20, but they measure a lot above
4  10 microns.
5        They observed the 20 pits in wires.  They observed
6  20-micron pits.  So that's into the wire.  That's one of these
7  focused corrosion sites.
8        They also took those thicknesses on real components,
9  and they did a classification according to a classification
10  scheme that came out of Battelle that is now the basis for some
11  standards, and that's called Battelle Class III or IV, which is
12  a severely corrosive class.  To see that much tarnish, you can
13  see is a severely corrosive class according to their tarnished
14  thicknesses.
15  Q.   So this whole concept that was in that bottom corner of
16  the summary of the investigation, looking at the classes,
17  drawing conclusions from it, Sandia actually reached a
18  conclusion with respect to the classification of the corrosion
19  that they observed as well?
20  A.   Yes.  What they did is, to put that into maybe a little
21  bit more understandable form, they said we have these wires, we
22  get this tarnish that's so thick that you could never get a
23  tarnish that thick under normal circumstances.  You have to
24  have this Class III or IV environment.
25  Q.   Dr. Scully, there was some suggestion by expert reports

1   provided by intervenor Knauf in this case that you could wipe

2   away the corrosion and just clean this stuff off of copper

3   wires.  Do you believe that the wiping or cleaning of the wire

4   would be able to eliminate the copper sulfide corrosion from

5   pits in other areas of electrical wires?

6   **A.**   You can see that would be hard to do, particularly with a

7   wire.  We do a lot of polishing of metals in our laboratory,

8   mainly flat surfaces, but -- you could maybe take some of this

9   tarnish off, but to get that out of the pit, as I mentioned

10  previously, that had copper and sulfur in their chemical

11  analysis would be extremely difficult.

12          **THE COURT:**  Is this a good time?  Let's take a

13  15-minute break.

14          **THE DEPUTY CLERK:**  Everyone rise.

15          (WHEREUPON the Court took a brief recess.)

16          **THE DEPUTY CLERK:**  Everyone rise.

17          **THE COURT:**  You are still under oath.

18  **BY MR. SERPE:**

19  **Q.**   Dr. Scully, if you remove the source of the sulfur gases,

20  the Chinese drywall, from the home and leave the copper sulfide

21  on pipes and wires, would you expect the corrosion to continue?

22  Having asked you this question last night and having understood

23  that perhaps being able to use the easel board to diagram this

24  might be helpful, if it would assist you, please feel free to

25  step down.

 1  **A.**   The answer to the question is:  There are conditions where

 2  removing the -- Your Honor, the reduced sulfur gases, but

 3  leaving copper sulfide on there, it's well known in the

 4  literature that copper sulfide is -- it catalyzes, a key

 5  electric chemical reaction in corrosion.

 6           May I go to the board and show this thing?

 7           **THE COURT:**  Yes.

 8           **THE WITNESS:**  My first diagram is about --

 9           **THE COURT:**  Talk a little louder for the court

10  reporter.

11           **THE WITNESS:**  They say I'm loud in the classroom.  I

12  could probably just speak loudly.  I'm sorry.  Can everyone

13  hear me now?

14           **THE COURT:**  Yes.

15           **THE WITNESS:**  So if we have a copper surface -- this

16  is our copper surface, say, the wire.  We have on this surface

17  copper sulfide, and that's our copper sulfide.  We have above

18  that an aqueous solution.  We get rid of the Chinese drywall,

19  so there's no more reduced sulfide joining this solution.

20           The problem is one of our key cathodic reactions

21  that accelerates copper in the presence of copper sulfide is

22  called the oxygen reduction reaction.  That reaction is

23  catalyzed by copper sulfide.  I included some of the references

24  in there.  So what you have happening is copper corroding, no

25  sulfur coming in, and you can have this reaction for oxygen

1    reduction occurs on the copper sulfide.

2              Edwards did experiments where they exposed the

3    samples to the solutions with reduced sulfides for nine months

4    through a copper sulfide film, then took the samples out of

5    that environment and put it in an environment with no sulfides

6    in the solutions, and the corrosion rate remained accelerated.

7              When they cleaned the copper sulfide off the

8    surface, it took seven weeks.  The corrosion rate went back --

9    they said it went back to the original corrosion rate with no

10   copper sulfide when they cleaned it off.  But when they left

11   the copper sulfide on and put it into an environment that did

12   not contain copper sulfide, the corrosion rate continued at a

13   high rate.

14             I believe the connection to the Chinese drywall

15   would be that if you took out the source of the sulfide gases,

16   Your Honor, and the copper sulfide was on there, there's no

17   reason to believe that this mechanism could not operate.

18             Now, one difference is that in the Chinese

19   drywall situation with the wire, we might have copper sulfide,

20   but we don't have a continuous bulk water.  But if you have,

21   let's say, a water droplet -- and it depends on the conditions.

22   You have to have the conditions like an air handler and a cold

23   unit or a receptacle in a shower or in a bathroom or in a

24   kitchen -- there's no fundamental reason why this exact same

25   mechanism can't operate just like I've shown at the top, where

DAILY COPY

 1   the oxygen comes in.  In fact, it's well known that oxygen, in

 2   the presence of the copper sulfide, makes this reaction occur

 3   quickly.

 4                So I, looking at this, say that the conditions

 5   are such that if water gets on these surfaces, then the

 6   corrosion continues at a high rate.  I called Mark Edwards and

 7   asked him the question.  He believes it's the same thing.  This

 8   is the professor at Virginia Tech.

 9           THE COURT:  What happens if you also control or

10   eliminate the problem with the heat and humidity, you eliminate

11   or control humidity and reduce or control temperature?  Does

12   that have any effect on the continuation or noncontinuation of

13   the corrosive process?

14           THE WITNESS:  Well, if you eliminated this droplet,

15   then I don't believe this reaction could operate.  However, the

16   conditions for doing that, we do a lot of atmospheric corrosion

17   at the University of Virginia, and we do a lot of putting dust

18   and particles on surfaces.  We actually use a dot-matrix

19   printer to print out patterns of things on surfaces.  What we

20   find is that when you have dusty surfaces and hygroscopic

21   salts, it's surprisingly easy for surfaces to get wet.  It

22   isn't much water.  Obviously, it's not like a full-immersion

23   case.  But that's my honest -- that's a legitimate answer to

24   this.

25           THE COURT:  So theoretically it would stop it; but as

  1    a practical matter, it's hard to envision an atmosphere that
  2    you can control and live in?
  3              THE WITNESS:  We find from our atmospheric corrosion
  4    studies, the connection to Chinese drywall is this:  We find
  5    that surfaces are wet.  Even in textbooks, people talk about
  6    one or two layers of water, but water tends to bead up.
  7              In fact, we have trouble in our experiments
  8    because our students are trying to study some corrosion as a
  9    function of a couple of layers of water that we can't get
 10    layers.  Instead, we get droplets.  And that's what I'm trying
 11    to --
 12              THE COURT:  How about if you control the environment,
 13    though?  Would that reduce the process?
 14              THE WITNESS:  Certainly.  There's going to be some
 15    reduction.  The question in material science is:  Is it enough
 16    reduction?  But if you kept the temperature control, lowered
 17    the relevant humidity, took out the Chinese drywall, left the
 18    sulfide present, if you got the droplet small enough, perhaps
 19    you could shut this down.  I don't know what that is, though.
 20              MR. SERPE:  Your Honor, in connection with
 21    Dr. Scully's testimony, we'd like to mark this as P1.2055 and
 22    ask that it also be received in evidence.
 23              THE COURT:  All right.  Let it be received.
 24    BY MR. SERPE:
 25    Q.    Dr. Scully, I'd like to ask you two questions before we

                            DAILY COPY

1    move on.  With respect to the wires, do you observe corrosive

2    residue on wires and in the pits on the wires?

3    **A.**   Most certainly a 10 micrometer or several micrometer

4    copper sulfide thickness would qualify as a residue.  We see

5    corrosion products in pits, and that's been seen by Sandia,

6    University of Virginia, by other testing labs such as Corrosion

7    Testing Labs.  So the answer is:  Yes.

8    **Q.**   Is there evidence of components that are deteriorated by

9    corrosion?

10   **A.**   Well, in order to answer that question, we'd have to -- of

11   course, there's deterioration.  The question always in

12   corrosion is that -- because the first atoms -- some form of --

13   is the corrosion above some threshold, or that gives you some

14   concern over the deterioration.

15   **Q.**   Do you have concern about the level of deterioration

16   that's observed on these electrical components?

17   **A.**   Yes, I have concern.

18   **Q.**   Doctor, I'd like to --

19            **THE COURT:**  What's the concern?  What are you

20   concerned about?

21            **THE WITNESS:**  Well, in the electrical components,

22   when you get the tarnish, then you will get an increased -- the

23   oxide films are semiconductors -- sometimes insulators;

24   sometimes semiconductors.  They add electrical resistance that

25   can increase contact resistance.

90

1          The other thing is that electrical contact is

2     often made in disparities, or points on the surfaces, and so

3     when you have that corrosion debris in there and it's no

4     longer -- copper's chosen because it's one of the best

5     metallic -- copper and silver are two of the best metallic

6     conductors known to man other than gold.  Obviously, gold's

7     impractical to use.

8          So when you put the tarnish on the surface,

9     there's a direct link.  It's not some indirect thing.  You're

10    increasing the contact resistance to the point where you start

11    to have problems with electrical conduction.  And there will be

12    a distribution of tarnish thicknesses, and there will be a

13    distribution of contact resistances.  And then, of course, how

14    tight a screw is screwed down or electrical contact is made,

15    that also varies in a house.

16         So there have been -- people have thought about

17    this for a long time, especially since the '70s, when

18    electronics became miniaturized, that they got a lot of

19    failures from indoor environments and they became pretty

20    much -- began to understand that the weak link in connectors

21    and contacts was the formation of these tarnishes that would

22    start to give them electrical failures.  That's the basis for

23    my saying that.

24         MR. SERPE:  Your Honor, I just wanted to make sure,

25    before we move off of the topic of continuing after the removal

DAILY COPY

1   of the drywall, if there's any additional information that's

2   required.

3            **THE COURT:**  That's fine.

4   **BY MR. SERPE:**

5   **Q.**   Dr. Scully, we talked about the concerns and began to talk

6   about why are we concerned, what are the issues, but I'd like

7   to turn to this classification system now -- when you said

8   beginning in the '70s this has been researched -- and ask you

9   if the Battelle environmental classification system was one

10  effort to address in both qualitative and quantitative terms

11  what are we seeing and what does it mean?

12  **A.**   One of the most mature classifications came out of

13  Battelle, and a couple standards have followed from this really

14  basically using the Battelle data, and that's the ISA 71.04

15  standard that largely follows this.

16            As I said, it came out of connectors, concerns that

17  connectors would tarnish and that the tarnish would increase

18  the electrical resistance, and then it would -- they had a

19  direct correlation.  They actually did actual components and

20  they would get failures, and so the -- shall I go over the

21  criteria?

22  **Q.**   Sure.

23  **A.**   On the left-hand side, this is the Battelle environmental

24  classification done with really hundreds of components,

25  probably thousands.  There was a Western Electric facility that

 1    had connectors in Columbus, Ohio, where Battelle's located.
 2    Battelle's a nonprofit laboratory.
 3              In the qualitative, if you read this, it says no
 4    significant corrosion.  That means you form this skin, and the
 5    skin just stops.  That's like your kitchen sink, as I
 6    mentioned, or a copper penny; yes, it might get a little dull,
 7    but the thickness of the oxide is generally less than
 8    300 angstroms.  In a certain period of time, we'll talk about
 9    that in a minute, say, like according to this criteria in a
10    year.
11              So what happens here is you have a well-controlled
12    environment, that's Class I, and the film just stops growing,
13    basically.  Class II is where you end up with a little bit
14    thicker tarnish; up to .1 micron in one year.  That's a
15    reference point.  Hold on to that point, .1 micron, which
16    is also -- sorry for the units, but that's also equal to 1,000
17    angstroms in one year.  That's what's called Class II.
18              Class II is when some corrosion begins on contacts.
19    Like I said, they studied hundreds, if not thousands, of
20    contacts.  Corrosion begins to occur on contacts and
21    reliability is affected.  So Bill Abbott, who developed this,
22    had many, many samples where he measured tarnish thickness and
23    he measured reliability of electrical equipment.  It began to
24    affect the contact resistance, but the copper contains only
25    oxides and chlorides.

1           Class III, I want to point out to the Court, was what

2    they call a moderately severe environment.  That's when you go

3    above -- it's the same number here.  That's where you go above

4    this .1 micron.  So that's your tarnish thickness after one

5    year of wear.

6           Think of that, Your Honor.  That .1 micron is a

7    number to hold on to.  .1 micron means -- .1 -- a micron is a

8    millionth of a meter.  Let's hold onto that number there.

9           The upper bound for Class II is the lower bound for

10   Class III.  So Class III is where -- between II and III is

11   where the failures really jump up in electrical components.

12   Your Honor, the component failures really jump up when the

13   tarnish thickness gets around 1,000 angstroms or goes above

14   1,000 angstroms, which, as I said, was .1 micron.

15          Here is where you see qualitatively, according to the

16   qualitative criteria, that you form copper sulfides.  So the

17   qualitative side is the identity of the oxide -- copper oxides

18   here, thin copper oxide here, copper sulfides here, very rich

19   in copper sulfides here.  So on the qualitative side, when you

20   get a tarnish which says it's got copper sulfides in it -- this

21   is what Sandia National Labs did:  They said, we have a concern

22   for failure.  This is the same thing we did.

23          Then when you go over here on the quantitative side,

24   you can say that when the tarnish thickness gets above

25   .1 microns, you start having concern for failures.  So they did

1     this one-for-one correlation.  Now, this has become generally

2     accepted to use this criteria, as you can see, by a number of

3     different people.  And as I mentioned, there are some other

4     standards that are based on this classification system.

5                **THE COURT:**  Could you measure what we're talking

6     about in material that you looked at?

7                **THE WITNESS:**  Yes, sir.  As you can see, we

8     measured -- and so did Sandia National Labs, and so did some

9     other laboratories.  We measured both the -- or measured and

10    detected both the identity of the oxides -- so on the

11    qualitative scale, we measured the detected sulfides.  So we

12    started with that from the beginning.

13                     I'm long-winded, I guess.  So we skipped over

14    some stuff, but we showed copper sulfide on wires.  I think

15    we -- in the interest of time.  But we did show copper sulfide

16    on wires.  Sandia showed copper sulfide on wires, the

17    cauliflower.  And with these cross-sections, people measured

18    the thickness of those tarnishes.  I don't know if you

19    remember -- we'll show it again -- but they're thicker than

20    several microns.  The criteria is .1 micron.

21    **BY MR. SERPE:**

22    **Q.**   So you measured thicknesses well in excess of the

23    quantitative guidelines here for corrosive environments?

24    **A.**   Yes, sir.  So if you hold onto the .1 micron in one year

25    is the criteria between Class II and III, where the failure

95

1    rates really jump up, we measured several microns after three

2    years.  We'll talk about that, but if you just took a linear

3    rate of growth after three years having several microns -- so

4    where is the magnitude of all this .1 micron threshold that's

5    held out in the standard.

6    **Q.**   You've actually prepared a summary table for us that

7    captures the actual thicknesses you measured and where they

8    would fall on this scale?

9    **A.**   Yes, I have.  So what I'd like to show is -- I'd like to

10   show this is an objective criteria for risk.  So, again, this

11   is after one year.  It's .1 micron.  So even a linear rate of

12   growth, if it grows linearly for year two and year three, it

13   would be .3 microns per year -- I'm sorry, .3 microns after

14   three years.

15          Now, since most of these homes with harvested

16   components are about three years old -- some are a little

17   older; some are a little bit less older.  Let's compare that

18   number right there, the .1 micron, to the tarnished thickness

19   that you actually observed after three years.

20   **Q.**   With the Court's indulgence, I also have a copy for the

21   Court and the witness.  It's an exhibit that was previously

22   admitted into evidence as P1.2053, page 1.  Would you explain

23   to us what we're looking at here.

24   **A.**   That is a list of components of wiring, electrical wiring,

25   from homes in Virginia.  The code just indicates different

 1   homes, different homeowners in Virginia.  You can see where the

 2   wire is a brown wire or the black or white wire.  These are

 3   mainly the Romex-type wires that the gentleman that preceded me

 4   spoke of.

 5              These are tarnish thicknesses measured unambiguously

 6   by cross-section.  The only thing is they're after three years.

 7   So now we need to compare this to the standard, but the

 8   standard was .1 micron after one year.  Here, we have three

 9   years.  Not bad in terms of one compared to three.  If you

10   remember kind of the corrosion problems the corrosion

11   community's confronted with, one to three years is not a bad

12   comparison.

13              So what would the standard be after three years?

14   Well, it's down here.  .173 to .3 microns is what you would

15   have to exceed, as far as the tarnish thickness, in order to

16   move into Battelle Class III, which gives you a high risk for

17   failure.

18   Q.   Stop there for a second.  So the one-year standard is

19   .1 micron?

20   A.   Yes, sir.

21   Q.   The three-year standard, initially here we see at .3,

22   which that's three times -- .1 times 3 is .3?

23   A.   If you use a linear rate, it would just be three times

24   larger.

25   Q.   But there's other possible ways of looking at this,

1  including a different growth rate that would yield a different

2  standard?

3  A.   Right.  So to be fair, I just want to point out some

4  people say, "Well, this tarnish doesn't grow that fast.  It's

5  doesn't grow linearly."  Let's say it grows by what's called

6  parabolical.  Then after three years, the tarnish would only be

7  .173 microns.  So essentially that's the three-year threshold

8  for Battelle Class III, which -- if you can follow -- involves

9  the risk of failure.

10         So if you can convert their one-year .1 micron to

11  three-year, even by a parabolical, we get .173 micrometers.  So

12  that's your objective criteria for Battelle Class III.

13  Q.   Using the thicker threshold, that would be less predictive

14  of failure --

15  A.   If you use the thicker threshold, some people would say

16  that -- if you can follow it, some people would say that

17  linear -- it doesn't grow linearly; it slows down in growth.

18  However, if we assume linear, we get a higher threshold.  Let's

19  use a higher threshold and see if we exceed it.

20  Q.   Did you actually give us a calculation on exceedances

21  based upon this threshold?

22  A.   If you can read -- I know it's hard for the Court to

23  read this, but if you these numbers -- I'll read some of them.

24  13.9 -- I don't know if you want to blow these up.  But anyway,

25  you can see that they're all on the order -- here's the lowest

1   one at 2.  Here's 7.5.  12.2.

2          Your Honor, I know you have a copy of this so you can

3   see this.

4          Here's one at 7.9.  Here's one a little bit lower at

5   5.1.  But here's the number of multiples that it exceeds the

6   threshold, and the range there is including both of these

7   three-year threshold equivalents.  So what we see is that these

8   actual tarnishes on actual components exceed the Battelle

9   threshold for Class II to III by sometimes as much as a factor

10  of 100.

11  Q.   Let's break these multiples over failure thresholds into

12  the two different components and pick a wire.  Would you tell

13  us which wire would be good to illustrate this .3 versus the

14  .13, if we can just break down these concepts a little finer.

15  So would you isolate one of these measurements here so that we

16  could look at an individual failure threshold for the .3 system

17  linear versus the parabolic.

18  A.   I'm not sure I understand the question.

19          THE COURT:  Do the less and the greatest.

20          THE WITNESS:  Here's the lowest one.  The lowest one,

21  Your Honor, is just 2 microns of tarnish.  The exceedance of

22  the number of times that's over the threshold is 7 to 12 times

23  greater.

24          THE COURT:  That's under the insulation?  The wire.

25          THE WITNESS:  Your Honor, the exposed tip -- when he

DAILY COPY

1    moves his hand away, you can see the exposed wire was

2    12.2 microns in point of fact, and that under the insulation,

3    6 inches from the exposed end, is 2 microns.  So the exposed

4    tip at 12.2 exceeds by 41 to 70.  That -- I thought since

5    that's a low tarnish thickness -- you can see everything else

6    is bigger than that.  In fact, some are -- this cracks and

7    spalls.  But I double-checked with these guys and said make

8    sure you're not measuring liftoff distances, the actual tarnish

9    thickness, and they did.  They measured the actual tarnish

10   thickness.

11              You can see here -- take the bottom one, 69, the

12   amount by which it exceeds the threshold is enormous, which is

13   what puts it into the Battelle Class IV, which is the same

14   thing that I'm saying and the same thing that Sandia National

15   Labs said.

16              **THE COURT:**  Is there any significance to the fact

17   that that's on a ground wire?

18              **THE WITNESS:**  I think that there's a little

19   microclimate and so, you know, there can be variations.  That's

20   why another question might be why -- I can't say for sure, sir,

21   whether or not a ground wire as opposed to an exposed end on a

22   hot wire or a black or white wire -- I think the difference

23   relies on the microclimate, the airflow, whether it's near an

24   air handler, whether it's near this issue we talked about with

25   cold air from an air conditioner and the humid air.  Maybe

1    someone likes to open the windows at night and so everything --

2           THE COURT:  Environmental issues.

3           MR. SERPE:  Your Honor, from a grounding standpoint,

4    the implication of what a grounding wire does in a house,

5    Dean Rutila, who's a building science engineer, will be putting

6    that into context.

7    BY MR. SERPE:

8    Q.    Let me ask you about one last wire here, PRM-9, the ground

9    wire from this bedroom.  "PRM," that would be Preston and

10   Rachael McKellar.

11          MR. SERPE:  We've had two more plaintiffs that have

12   filled in, Your Honor.  I'm sorry I forgot to introduce them.

13   Joe and Kathy Leach, would you say "good afternoon" to

14   Your Honor.

15          THE COURT:  Good afternoon.

16   BY MR. SERPE:

17   Q.    This wire came out of the McKellars' house.  If the

18   failure threshold is somewhere between .1 and .3 and we're

19   measuring a 51-micron actual corrosion thickness on the ground

20   wire from Preston's second-floor bedroom, what does that tell

21   us about how many times over the threshold for predicting

22   failure we are?

23   A.    We can see at 51.8 microns after three years, comparing

24   that to our threshold converted to three years, that we exceed

25   it by 173 to 299 times.  Really, you know, you see this over

DAILY COPY

 1    and over again -- and Sandia's done it, and this is Krantz's

 2    data that we've analyzed, and we have our own data on wires.

 3    You see this over and over again.  It's really not subject to

 4    any sort of way that you did the calculation.  It's clearly

 5    over the limit by, as you can see here, a factor of 173.

 6    **Q.**   In layman's terms, for Preston's grounding wires, what can

 7    we say about their life expectancy?  What does it say about

 8    failures of these wires in his house?

 9    **A.**   Well, you know, just -- if you put that, which you clearly

10    are, in Battelle Class III and IV, all of the work, many, many

11    electrical devices that fall into Class III or Class IV exceed

12    the failure rate.  Does that mean -- failure in the materials

13    business -- and there's a distribution of failures and failure

14    times.  Everything doesn't go along and fail all of a sudden.

15    What you see is -- you're going to see that's what this

16    predicts.

17    **Q.**   I'm just seeing if we can compress.  We introduced during

18    the opening statements the concept of these copper coupons that

19    were deployed in Bob and Lisa Orlando's house.  I introduced

20    the concept at that time that we were going to talk about the

21    usefulness of copper coupons.  Have certain investigators done

22    copper coupon deployment in Chinese drywall houses?  Have you

23    had a chance to look at that data?

24    **A.**   Yes.  Yes, there have been some exposures of copper

25    coupons, and the tarnish thickness can be measured in various

 1  ways on the copper coupons.

 2  **Q.**   In fact, did experts hired by Knauf in this case tabulate

 3  findings with respect to coupons that they put in Florida

 4  homes, in Louisiana homes, and in Virginia homes?

 5  **A.**   Yes.  Yes, I've reviewed that data.

 6          **MR. SERPE:**  I'd like to hand the witness an exhibit

 7  that we're going to mark as P1.2056, which we'll identify as

 8  the Federal Rule of Evidence 1006 summary of evidence regarding

 9  the findings of coupons that were deployed by Knauf experts in

10  Florida and Louisiana and Virginia.

11  **BY MR. SERPE:**

12  **Q.**   Dr. Scully, would you walk us through what information you

13  gleaned from the reports as were reported by the Knauf experts

14  in this case.

15  **A.**   Yes.  Well, if you look at the first -- what we have is a

16  table here that gives you coupon number, location in a house,

17  the dates of exposures of the coupon.  30 days was typically

18  used for coupon exposures.  This is how thick the tarnish is in

19  angstroms after 30 days, and this is the equivalent thickness

20  after one year.  So this we can compare directly to what we

21  were just talking about.

22          This is in microns.  So your point of reference here

23  for Battelle Class III is .1 microns.  When it's above

24  .1 microns, it's Battelle Class III, and there's an elevated

25  risk of failure of electrical components.  We can talk about

1  this if you want to, but this number here was converted to this

2  number by the folks that did this analysis, much in the same

3  way that I did the conversion a minute ago.

4           So they've converted this number, and it

5  mathematically checks right into this number.  This is the

6  one-year value.  We can compare it to the Battelle threshold of

7  .1 micron.  You can see here for this Florida positive

8  control -- means a house with Chinese drywall, of course -- and

9  Louisiana positive control, that all these coupons exceed the

10  Battelle threshold for Class III, which is, again, .1 micron.

11  Q.   These numbers that we're seeing both in angstroms, microns

12  per year, was this data that was taken directly from the

13  R.J. Lee report that was put together by Dr. Matthew Perricone

14  on behalf of Knauf in this case?

15  A.   Yes, that's correct.  That's where that data came from.

16  Q.   Did you independently verify that the information as

17  reported in these charts in our summary in the front is

18  represented by the angstroms and the microns per year as

19  they're represented here on the table?

20  A.   Yes, I did.  You can see the first -- the entries here are

21  the same entries as the one for the Florida home that were the

22  top entries.  Those are the same numbers there.  That's the

23  Florida home.  What you just showed highlighted in yellow is

24  the same number here.

25           MR. SERPE:  So, Your Honor, the data supporting this

1    FRE 1006 chart is provided as an appendix to the summary.

2    **BY MR. SERPE:**

3    **Q.**   Dr. Scully, would the first sample there at .76 be 7.5

4    times over the predictive failure standard memorialized in

5    Battelle?

6    **A.**   Yes.  Again, the standard in Battelle is .1, and that's

7    .76.  So that's right; it would be 7.6 times greater.

8    **Q.**   So in both Florida and Louisiana, whether it was on a wall

9    or out in the middle of the room, coupons that were deployed by

10   the defendants in those houses with Chinese drywall were all

11   predictive of electrical system failures in those homes?

12   **A.**   That's correct.

13   **Q.**   Using the Battelle scale?

14   **A.**   That is correct.

15          **THE COURT:**  How do you explain the control in Florida

16   being .6, .64?  What is that?

17          **MR. SERPE:**  They're positive controls.

18          **THE WITNESS:**  "Positive control" means that it has

19   Chinese drywall.  So a Florida home with Chinese drywall had a

20   tarnish that grew over the length of exposure in the house to

21   .64, and then above .1 is Battelle Class III.

22   **BY MR. SERPE:**

23   **Q.**   This is part of the ECS study.  They wanted to see how a

24   house that did not have an ECS would compare to a control house

25   that did have Chinese drywall and no ECS, which is where that

1  nomenclature comes from.

2          Virginia, one set of coupons deployed for 30 days,

3  all of them under the 300-angstrom level, did you review that

4  data?

5  **A.**   Yes, I did.

6  **Q.**   That came from, again, Bob and Lisa Orlando's home.  Did

7  you see any problems with respect to the methodology that was

8  employed in the deployment of the coupons for the Orlando

9  house?

10  **A.**   The first thing, let's discuss the data.  So we have a

11  Virginia positive control -- that means it has Chinese

12  drywall -- and it was exposed for 30 days, and it's below 300

13  angstroms in 30 days.  The same thing as the .1 micron here, or

14  1,000 angstroms, which is the same thing, it's equivalent to a

15  30-day value of 300.  So you can -- as your point of reference,

16  exceeding 300 -- which this one does, this one does, this one

17  does.  Exceeding 300, which these do, exceeds the threshold.

18          The one from the Orlando house does not exceed the

19  threshold.  It's below the threshold, as you can see here.  So

20  I just want to orient you it's below 300 and it doesn't exceed

21  the Battelle Class III threshold.

22  **Q.**   With respect to the time of year that the coupons were

23  deployed in the Orlando house, did it have any implications for

24  the test results, in your opinion?

25  **A.**   The time of year was in the wintertime.  And, again, the

1  dewpoint, for instance, is lower.  It's really 10 degrees

2  Fahrenheit lower in a typical house in the wintertime.  So the

3  time period is very short.

4          If you look at the standards, also, they would say

5  that when you think you have benign conditions that you should

6  test for up to 90 days or longer.  So there were a number of

7  reasons.

8          The proximity to the Chinese drywall, I don't know

9  where these coupons were relative to the Chinese drywall.  We

10 have a short exposure time.  It's seasonal variations.  Those

11 things are question marks about the coupon test.  We don't know

12 where it was relative to an air handler or where it was

13 relative to a bathroom or kitchen.

14         I think what's interesting there is that we do have a

15 harvested component from this Virginia positive control house.

16 And the Orlando house has some materials that were taken out of

17 service.  I believe it was a wire.  So I think it would be

18 instructive for the Court to compare an actual component that

19 had been in the Orlando house for three years in this

20 situation.  The one in the Orlando house goes by the code

21 "BLO."

22         And, Rich, you can highlight it perhaps.  I can't see

23 that screen from here.

24 Q.  Not much better, I'm afraid.  Can you read that from here?

25 A.  I can read it from my screen.  That house is a ground wire

DAILY COPY

1   from the ceiling light fixture, the kitchen, first floor, in

2   the Orlando home, Your Honor and these are the thicknesses.

3   There are two numbers there.  One is the tarnish thickness,

4   which is listed at 25.9 micrometers.

5            Now, keep in mind -- sorry for changing units, but

6   the 300 angstroms -- below 300 angstroms is .03 micrometers,

7   and that's 25.9 micrometers.  Then there's a pit there, this

8   11.3. I wonder if, for the Court, we can show an actual

9   photograph of this?

10            You see, the actual component has been there for

11  three years -- in the summertime, the wintertime -- and it is

12  in the kitchen, but it shows an interesting story.  These are,

13  again, the cross-sections; not from my laboratory, but from

14  another laboratory called CTL.

15            So what this is, is this is the copper here.  This is

16  the black mounting compound that I told you about.  This is the

17  pit.  This gray is the tarnish here.  Then the yellow markers

18  tell what the micron thickness was there.  You can see again

19  that these tarnish thicknesses are on the order of microns.

20  **Q.**   So, Dr. Scully, is --

21  **A.**   Is that -- I'm sorry.

22  **Q.**   Were you done with your answer?

23  **A.**   I was going to say this entry here is 7.9 microns for the

24  tarnish, and that's the tarnish film there.  Then there's a pit

25  on a wire, which is 11.3.

DAILY COPY

1  **Q.**    7.9.  We're going to see if you're as good at math as

2  Mr. Phillips, who was here earlier.  How many times over a .3

3  standard would we be at a --

4  **A.**    .3 or .1?

5  **Q.**    .1.  How about a .1 standard?

6  **A.**    .3 is right, yeah.

7  **Q.**    .3 because this would be a three-year measurement based

8  upon the fact that the Orlandos were in their house about three

9  years before this --

10  **A.**    About 24 times.

11  **Q.**    24 times.

12          **THE COURT:**  Are you offering 2056?

13          **MR. SERPE:**  Yes.  I'd like to offer that into

14  evidence.

15          **THE COURT:**  Admitted.

16  **BY MR. SERPE:**

17  **Q.**    Dr. Scully, comparing the availability of a coupon that's

18  available for only 30 days in the dead of winter to an actual

19  copper component that's been in the house for three years, from

20  a material science, a corrosion, a metallurgist's standpoint,

21  which is a preferable thing to look at in order to reach the

22  conclusion about thicknesses and pathways to failure?

23  **A.**    The gold standard always is the actual material if you can

24  harvest it, if you can get the material, which clearly in this

25  case, you can.

 1          And the other thing -- you know, I'll just say that

 2   if you had wires that were in ten different houses -- I did

 3   work with the Air Force, sir.  And if you have a B-52 that's at

 4   Hickham and it's at Kadena, which is in Okinawa, okay, you

 5   don't know what the environmental corrosivity is.  But this

 6   wire, to the best of my knowledge, has been in one house only

 7   for three years and is clearly the best indicator of any

 8   corrosion you could have.

 9          When we work for the Navy or whoever, Sandia National

10   Labs, we always use the real component because that integrates

11   the full effect of -- I don't know -- going on vacation and

12   leaving the air conditioning off or what not, whatever was done

13   in that house, and it reflects the corrosiveness of the

14   environment.

15          In my case -- we skipped through it, but I have

16   control wires like the HVAC.  I did control wires and wires

17   from homes.  Control, in my case -- so it's misleading when you

18   say "positive control."  I mean a control like no Chinese

19   drywall, "negative control" we call it, and that doesn't have a

20   tarnish like this.

21          MR. SERPE:  Your Honor, photo micrographs of control

22   wires are part of the report that's been made part of the

23   record.  In the efforts of expediency, we've eliminated those.

24   BY MR. SERPE:

25   Q.   Just one cleanup question, then we'll move to conclusions.

1   Dr. Scully, the water that would be necessary to drive the

2   continuation of the corrosion process, even in the absence of

3   additional Chinese drywall, did that include moisture that's

4   not visible to the naked eye?

5   **A.**   Yes.  Yes, that could include moisture.  In fact, to get

6   corrosion like this, that you see here, we can debate if you

7   get a really small drop, it can't support this.  But just to

8   get that, you've got to have some water.  So that's indirect

9   evidence.

10  **Q.**   In summary, would you recap for us the laboratories we've

11  concluded or found thicknesses on electrical components

12  predictive of passing a failure threshold.

13  **A.**   This plot is just a summary of a lot of the stuff that

14  I've told the Court this afternoon.  So, again, I remind you

15  that we're going to measure tarnish thicknesses.  We're going

16  to compare them to the Battelle threshold.  Certain thickness,

17  if you exceed that in a certain period of time, then it's a

18  situation of concern as specified by Battelle Class II and III.

19          Sandia National Labs did that.  They did it on

20  components.  We did that before the break.  They did that on

21  wires.  Corrosion Testing Labs did that.  They did wires, also

22  components, we say, electrical wires, Romex, and receptacle

23  wires.

24          University of Virginia, we did wires.  SGH also did

25  some wires, actual components.  MeadWestvaco, who we just

DAILY COPY

1    talked about, they did coupons.  They found, for the Orlando

2    home, they did not exceed the threshold.  But for two other

3    homes, they did:  One in Florida; one in Louisiana.  Also, the

4    Consumer Products Agency did coupons for 30 days, and they also

5    found thicknesses exceeding this threshold.

6    **Q.**   The threshold for predicting premature failure of

7    electrical systems?

8    **A.**   Yes, the threshold for predicting premature failure for

9    electrical and electronic equipment according to the Battelle

10   classification.

11   **Q.**   Could you summarize your conclusions for us based upon all

12   of the investigation that we've discussed so far.

13   **A.**   Yes.  My conclusions, you can see here -- and I'll just --

14   I won't read every single word, but there are corrosive gases

15   emitted by Chinese drywall as evident from actual components

16   and positive versus negative controls, I'll say, houses that

17   are right across the street that don't have Chinese drywall,

18   such as the Sullivan home that I did.  There are copper sulfide

19   and silver sulfide corrosion products and mechanical and

20   electrical components.  There are pits on components, including

21   wires, certainly HVAC coils, and substantial copper sulfide

22   thicknesses.

23           If we compare that to -- we skipped over it, but we

24   have negative control homes for wires also.  If we look at the

25   mechanical and electrical equipment in these control homes, we

1    mentioned HVACs as very corrosive, but they do not have

2    tarnishes like this, and they do not have sulfide films.

3              All these standards, you're so many times over the

4    threshold, as that one table showed, being 10, 100, 200 times

5    over the threshold, that I also want to point out it doesn't

6    really matter which standard you use.  Battelle is the one that

7    did the correlation of the corrosion product thickness to

8    failure.  That's why I've used Battelle.

9              But these would also be a severe or harsh environment

10   according to this ISA standard, which stands for Instrument

11   Society of America; this IEC standard, and this ISO standard.

12   ISO is the International Standards Organization.  They are a

13   sister organization to ASTM.  So you would be in a harsh,

14   severe environment based on all those standards.  It's not

15   really an issue of what standard you pick.

16   **Q.**   You hold all of these opinions to a reasonable degree of

17   scientific certainty?

18   **A.**   Yes, I do.

19              **MR. SERPE:**  Your Honor, no further questions.

20                   Thank you, Dr. Scully.

21              **THE COURT:**  Thank you very much.

22              **MR. SERPE:**  Nothing further.

23              **THE COURT:**  Thank you very much.

24              **MR. SERPE:**  The plaintiff would call Preston

25   McKellar.

```
 1              (WHEREUPON Preston McKellar, having been duly sworn,
 2    testified as follows.)
 3              THE DEPUTY CLERK:  Please state your full name and
 4    correct spelling for the record.
 5              THE WITNESS:  Preston McKellar, M-C-K-E-L-L-A-R.
 6                        DIRECT EXAMINATION
 7    BY MR. SERPE:
 8    Q.    Good afternoon, Mr. McKellar.  Do you own a Chinese
 9    drywall house?
10    A.    Yes, sir.
11    Q.    What's the address of that house?
12    A.    1008 Hollymeade Circle.
13    Q.    What city is that in?
14    A.    Newport News, Virginia.
15              MR. SERPE:  Scott, could you put up P3.311.
16    BY MR. SERPE:
17    Q.    Is that your house?
18    A.    Yes, sir.
19    Q.    Are you living in that house at this point?
20    A.    No, sir.
21    Q.    Who were you living originally in this house with?
22    A.    I was living there with my wife, and my son eventually
23    came along.  My wife and my son.
24    Q.    What's your son's name?
25    A.    My son's name is William.  She just had another one, and
```

1    his name is Gabriel.

2    **Q.**    Let me see if I can -- how old is Gabriel at this point?

3    **A.**    He is four weeks old.

4    **Q.**    Four weeks old.  Congratulations.

5    **A.**    Thank you.

6    **Q.**    Did Gabriel come home from the hospital to the Chinese

7    drywall house?

8    **A.**    No, sir.  I could not let that happen.

9    **Q.**    How long were you out of the house for?

10   **A.**    We moved out about --

11   **Q.**    The best of your recollection.

12   **A.**    About a month or two after we found out, as soon as I

13   could do so.

14   **Q.**    What do you do for a living?

15   **A.**    I'm a middle-school teacher.

16   **Q.**    What do you teach?

17   **A.**    I teach science and social studies.

18   **Q.**    Your wife's name is Rachael?

19   **A.**    Yes, sir.

20   **Q.**    Is she employed outside the home?

21   **A.**    She was a pediatric nurse.  Right now, she's been a

22   housewife for -- after William was born, she became a

23   housewife.

24   **Q.**    Turning to a summary chart that we had put up earlier, do

25   you recall having spent -- well, first, let me ask you:  What

DAILY COPY

1  did you buy your townhome for, sir?

2  **A.**    $197,000.

3  **Q.**    Is it your understanding as this case has unfolded that

4  you have Venture Supply Chinese drywall in your house?

5  **A.**    Most definitely.

6  **Q.**    When was the first time you saw a Venture Supply label in

7  your house?

8  **A.**    The first time I saw that was when -- my neighborhood is

9  very close-knit, and we had heard rumors of Chinese drywall.

10  We got a letter saying that we might have it, asking us to

11  check.  We asked our builder about it.  They assured us that we

12  do not have Chinese drywall.

13          We kept having AC problems, electrical problems.  And

14  when I crawled into the attic and moved some insulation aside,

15  I saw "Venture Supply."  That was the same day that Richard was

16  sending an inspector to the community.

17          Shortly before he came in, I crawled up into the

18  attic for the first time.  I don't usually do that too often.

19  I moved some insulation aside and I saw "Venture Supply."  And

20  then Richard's inspector came in.  He did a lot more extensive

21  tests and confirmed for sure that it was Chinese drywall, along

22  with a whole lot of scientists and lawyers.

23  **Q.**    Preston, you're doing great.  Are you a little nervous at

24  this point?  Would that be a fair statement?

25  **A.**    Yes, sir.

1  **Q.**   We'll get you through this.  I promise.  Tell the Judge

2  about your floor plan.  How many floors and what's the basic

3  layout of your house?

4  **A.**   I have three floors.  It's a townhouse.  I have a neighbor

5  on the left and the right.  It's 1,800-square-foot.  I liked it

6  a lot at one point.

7  **Q.**   When did you move in?

8  **A.**   I moved in in August of 2006.  It was my first house.

9  **Q.**   First house that you owned?

10  **A.**   Yes, sir.

11  **Q.**   You moved out in, what, you told me 2009?  So you were in

12  the house about three years before you moved out?

13  **A.**   Yes, sir.

14  **Q.**   When did you first notice problems with the house that you

15  are now associating with Chinese drywall?

16  **A.**   Within the first month, we had 30 days to make a punch

17  list, and a lot of the problems that are associated with

18  Chinese drywall are on my 30-day punch list.

19  **Q.**   Your fireplace was malfunctioning, the electrical system

20  for the fireplace?

21  **A.**   Yes, sir.

22  **Q.**   Never got that right?

23  **A.**   No, sir.

24  **Q.**   Tell the Judge about problems you had with your HVAC

25  system in the house.

117

1   **A.**   Almost immediately, we had equipment failure.  It would be

2   a miracle if we would go a month without there being an AC or a

3   heating problem.

4   **Q.**   What kind of problems were the technician guys who were

5   coming out to repair the units telling you?

6   **A.**   They were getting frustrated with having to keep coming

7   back out over and over again themselves, and they were making

8   excuses.  Only through persistence did I eventually get them to

9   change something called the coil that I had never heard of.

10   **Q.**   Did that solve the problem for you, or did you continue to

11   have HVAC problems?

12   **A.**   We continued to have HVAC problems.

13   **Q.**   The community, the Hollymeade community, give the Judge a

14   basic idea of the layout and how it's put together.

15   **A.**   The community is a close-knit group of individuals.  We

16   have an advisory board.  I serve on that with Fred Michaux and

17   three other homeowners, and we keep in contact about things

18   that are going on.  We noticed that we all had the same similar

19   complaints about our homes.

20   **Q.**   What kind of complaints were those; the HVAC problems?

21   Anything else?

22   **A.**   We all thought we had a bad batch of coils.

23   **Q.**   That was the first thing everybody in the neighborhood was

24   talking about, the coils going out?

25   **A.**   Yes, sir.

1   **Q.**   What led you to the decision to move out of the house?

2   **A.**   The main thing was the health of my wife and children.  My

3   son William -- Gabriel wasn't born at that time -- in his

4   nursery, I had noticed before I knew we had Chinese drywall, at

5   night, he was having trouble -- like he couldn't breathe at

6   all.  Then when we found out we had Chinese drywall for sure,

7   that was like a horrible feeling.  Every time I would bring him

8   to his nursery to put him down for a nap or either bedtime at

9   the end of the day, I felt horrible.

10              We all slept on the second floor.  We had a master on

11  the bottom floor, but we chose to use the guest room so we

12  would be on the same floor as the nursery.  My wife was having

13  constant headaches.  I myself had congestion.  I couldn't

14  hardly breathe.  Once we found out, I said we have to get out

15  as soon as we can.

16  **Q.**   I pointed at you when Dr. Scully was talking about these

17  grounding wires on the second floor of your house.  Who slept

18  on the second floor of your house?

19  **A.**   On the second floor was my son and then we -- at that

20  time, my wife and I slept on the second floor.  But the first

21  time, beforehand, William in the nursery.  That was traumatic

22  when I saw that number, 51.  Fred tapped me and said, "Look at

23  that number."  It makes me feel pretty bad.

24  **Q.**   That was your son's nursery?

25  **A.**   Yes, sir.

1   Q.   Where are you and Rachael and the boys living now?

2   A.   Right now, we are in an apartment, Featherstone

3   Apartments, which is in Newport News.

4   Q.   How long a lease were you able to get?

5   A.   We got an eight-month lease from Featherstone.

6   Q.   How many bedrooms in the place?

7   A.   Three small bedrooms, but we can breathe.

8   Q.   You can breathe.  Eight months, do you think you'll be

9   back in this house in eight months, Preston?

10  A.   No, sir.

11  Q.   How are you getting by?  Are you still paying the mortgage

12  on this place?

13  A.   We are getting by with loans and assistance from family

14  and friends, and eventually I got a moratorium.

15  Q.   What's a moratorium?

16  A.   A moratorium is where you don't have to pay your mortgage;

17  however, the interest will accrue.  It's a six-month

18  moratorium.  At the end of that six months, I will go back and

19  try to get an extension on that.  But, also, we still have to

20  pay the association dues and moving expenses.  I have a second

21  mortgage that's attached to this home that -- before I moved

22  out, I had not calculated in the -- in calculating that

23  payment, the savings is almost gone for that -- due to the

24  expenses due with the Chinese drywall.

25  Q.   The bank gave you a six-month moratorium on writing checks

1   for the mortgage?

2   A.   Yes, sir, but interest --

3   Q.   The interest is rolling during that time period?

4   A.   Yes, sir.

5   Q.   How long has that six-month clock been running?

6   A.   Since January.

7   Q.   You have four months left before you'll have to go back

8   and ask for another deferral or start paying your mortgage

9   again?

10  A.   Yes, sir.

11  Q.   Can you pay the mortgage and the rent at the same time?

12  A.   No, sir.

13  Q.   Have you looked at bankruptcy?

14  A.   Extensively.  I've done a lot of research and looked into

15  that, but I don't want to do that.

16  Q.   So before all of this happened and you moved out, was

17  bankruptcy something that you were extensively looking into?

18  A.   No, sir.  I always prided myself on being able to pay my

19  bills and support my family.  It was something that I never

20  thought in my life that I would have to even think about

21  bankruptcy.

22  Q.   So you went into a beautiful new house in 2006, and now

23  you're thinking about bankruptcy and getting dragged down by a

24  Chinese drywall house.  Would that be a fair recap of where you

25  find yourself now, Preston?

1   A.   Yes, sir.

2   Q.   Did you get a second job?

3   A.   Yes, sir.

4   Q.   You're working extra hours?

5   A.   Yes, sir.

6   Q.   Taking you away from Rachael and your young sons?

7   A.   Yes, sir.

8        MR. SERPE:  Your Honor, the record reflects the deed

9   and has already been admitted into evidence.  We've also

10  admitted into evidence a statement of the damages,

11  out-of-pocket damages claim.

12  BY MR. SERPE:

13  Q.   Preston, did you work hard with inspectors and

14  investigators that came in to look at your personal possessions

15  and figure out what damage was done and to try and come up with

16  some of the cost estimates for the damage that you had

17  sustained?

18  A.   Yes, sir.  Extensively.

19  Q.   You reviewed the summaries that were prepared by the

20  certified public accountant, Ms. Tuttle, to see what the recap

21  were of these numbers?

22  A.   Yes, sir.

23  Q.   Are you telling the Court that the damages that you've

24  incurred -- relocation, repair to your house, the damage to

25  your goods -- that this is a fair and accurate recap of what

1   you reviewed of your damages?

2   **A.**   Yes, sir.

3          **MR. SERPE:**   Your Honor, we have no further questions

4   for Mr. McKellar.

5          **THE COURT:**   Thank you.   I have none.   Call your next

6   witness.

7                Thank you, sir.

8          **MR. BRYSON:**   Dan Bryson on behalf of the intervenors

9   and PSC.   Our next witness is Donald Galler.

10         (WHEREUPON **Donald Galler**, having been duly sworn,

11  testified as follows.)

12         **THE DEPUTY CLERK:**   Please state your full name and

13  correct spelling for the record.

14         **THE WITNESS:**   My name is Donald Galler.

15                        **VOIR DIRE**

16  **BY MR. BRYSON:**

17  **Q.**   Good afternoon, Mr. Galler.   Where do you live?

18  **A.**   I live in Bedford, Massachusetts.

19  **Q.**   Are you an engineer?

20  **A.**   I am.

21  **Q.**   Where do you work?

22  **A.**   I work at Massachusetts Institute of Technology in

23  Cambridge, Massachusetts.

24  **Q.**   How long have you worked there?

25  **A.**   Since '95.

123

1          **MR. BRYSON:**  I'd like to ask that your CV be placed
2  up on the screen, P1.2020-0035.
3  **BY MR. BRYSON:**
4  **Q.**   Can you explain to the Court your area of specialization.
5  **A.**   Yes.  I specialize in failure of electrical and electronic
6  equipment.
7  **Q.**   What is your educational background, Mr. Galler?
8  **A.**   I have a bachelor's degree in electrical engineering from
9  Northeastern University in Boston, 1976, a master's degree in
10  electrical engineering from the University of Connecticut in
11  1979.  That's the end of my formal degree list.
12  **Q.**   Can you explain to the Court your work experience.
13  **A.**   I've been working for companies for about 25 or 30 years,
14  primarily in the investigation of electrical and electronic
15  equipment failures.  I started working for a small consulting
16  company in the Boston area.  I then worked for an international
17  company at the time called Failure Analysis Associates.  Now
18  the company is known as Exponents.  It's a very large forensic
19  firm.
20          Around 1994, I had a one-year stint somewhere, and
21  then since then I've been at MIT in Cambridge, Massachusetts.
22  **Q.**   What are your job responsibilities at MIT?
23  **A.**   I'm in charge of laboratory equipment in a research
24  laboratory.  One of the pieces of equipment that I take care of
25  and train people on the use of is a scanning electron

DAILY COPY

1   microscope.

2   **Q.**   During the course of your work history, have you obtained

3   experience examining switches or circuit boards?

4   **A.**   Yes.  I have lots of experience in those two areas.

5   **Q.**   What is unique about those items?

6   **A.**   Well, primarily the switches and circuit boards have two

7   major materials, some of which have been mentioned here today,

8   copper and silver.  Although the electronic components have

9   lots of other materials, circuit boards certainly have lots of

10  copper in them.

11  **Q.**   So the focus of your testimony today is going to be

12  primarily on the silver aspect of these components?

13  **A.**   That's up to you.

14  **Q.**   During the course of your career, have you been involved

15  in various publications?

16            **MR. BRYSON:**  If we could scroll forward a couple of

17  pages.  One more.  One more.

18  **BY MR. BRYSON:**

19  **Q.**   Are these some of your publications, Mr. Galler?

20  **A.**   Yes, they are.

21  **Q.**   During the course of your career, have you been involved

22  in any major publications that relate to the kind of work that

23  you have done with electronics, switches, and circuit board

24  failures?

25  **A.**   Yes.  Item 21 there, I think, is a handbook published by

DAILY COPY

 1   McGraw-Hill.  I contributed to four chapters in that handbook.
 2   It's probably fair to say I was the original author of those
 3   four chapters, and then they got expanded.  Those chapters deal
 4   with printed circuit boards, switches, and circuit breakers,
 5   wiring, and electronic compounds.
 6   Q.   This is a copy of that handbook?
 7   A.   That's right.
 8   Q.   I believe you were indicating to the Court that you were a
 9   primary author of some of the chapters within this handbook?
10   A.   That's correct.
11   Q.   Let me pull up chapter 14.  Is chapter 14 entitled
12   "Failure Analysis of Printed Wiring Assemblies"?
13   A.   I can't see it.  If you tell me that's what 14 is -- yes,
14   that's right.  I have it here on the list.
15   Q.   We do have chapter 15, P2.02-001.  What was the title of
16   that chapter?
17   A.   "Wires and Cables."
18   Q.   Chapter 16?
19   A.   "Switches and Relays."
20   Q.   You're also listed as the primary author or one of the
21   authors of that paper?
22   A.   Correct.
23   Q.   Chapter 18?
24   A.   "Failure Analysis of Components."
25   Q.   Can you briefly explain to the Court a few of your

 1    relevant work investigations.

 2    A.   Well, many.  I work on circuit board failures, electronic

 3    component failures, product failures.  A couple recent examples

 4    include a failure on a circuit board, which is being made by a

 5    major manufacturer of chargers for a satellite radio device.

 6    This was actually not a litigation event; this was a

 7    manufacturer trying to troubleshoot customer reports of

 8    overheating in the chargers.  That involved microscopic

 9    analysis and scanning electron microscopy of a portion of the

10    circuit board.

11    Q.   What about a refrigerator?

12    A.   There was a recent investigation I conducted on a fire

13    involving a refrigerator.  The refrigerator -- up until

14    recently -- and I think even recent ones -- refrigerators have

15    a compressor.  There's a relay on the compressor, which starts

16    the compressor.  It opens and closes and generates a small

17    amount of sparking every time it opens and closes.

18              The fire was started by the dispersion of oil from

19    the compressor.  There was a leak in the compressor.  It

20    sprayed the oil onto the relay contacts.  That involved a

21    microscopic analysis and scanning electron microscopy of the

22    relay contacts.

23    Q.   Smoke or fire alarms, any experience with those?

24    A.   I've investigated the failure of smoke detectors and

25    carbon monoxide detectors.  My investigation of those mostly

1   has to do with the annunciator device, which is the thing that
2   actually makes the noise that you hear that wakes you up at
3   night.
4   Q.   So would it be fair to say that, through the years, you've
5   had hundreds of investigations with various products with
6   electrical or electric issues?
7   A.   Yes.
8   Q.   With these investigations, are there some typical tests
9   that are performed?  I believe you've already mentioned a few
10  of those.
11  A.   Yes.  I think that there's probably several categories of
12  these tests.  One of the things that's fairly common is to look
13  at the components.  When I say "components," some of these
14  things are smaller than an inch across.  We look at those in an
15  optical microscope, look for indications of any abnormalities
16  in the structure or the materials of the component.  Then to
17  determine what some unusual components or materials might be,
18  we frequently do scanning electron microscopy work.
19          Those are sort of the microscopic analysis,
20  frequently, that's part of developing a theory as to why a
21  part -- something failed.  Frequently, that's followed up by
22  trying to replicate that failure by taking the product and
23  trying to simulate a failure.
24  Q.   Mr. Galler, you are a registered engineer?
25  A.   In the state of Massachusetts.

DAILY COPY

1    Q.    What type of engineer?

2    A.    Electrical.

3              MR. BRYSON:  Your Honor, we'd like to tender

4    Mr. Galler in the fields of electrical engineering, power

5    electronics, electrical machinery, and failure analysis.

6              THE COURT:  The Court will accept him in those

7    designated fields.

8              MR. BRYSON:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10   BY MR. BRYSON:

11   Q.   Mr. Galler, can you explain to the Court the role of

12   silver in switches and electronics.

13   A.   Silver is the material of choice for electrical contacts

14   in practically every device that carries current where there's

15   a switching operation.  So the contacts in a circuit breaker,

16   in your circuit breaker panel in your basement, the contacts on

17   the wall switches and the lights, for the lights in this room,

18   have silver contacts.  If you have a switch on your

19   coffeemaker, it has silver contacts.  If you have a thermostat

20   device that's hidden, that you can't see, that's in your dryer

21   to make sure it doesn't overheat, it has silver contacts.  So

22   the use of silver is very prolific in appliances and in

23   electrical products in -- I would say beyond residential, in

24   commercial and residential equipment.

25   Q.   In computers?

1   A.   Anything that has a button generally has silver contacts.

2   In addition to that, there are places where electronic

3   components have a certain amount of silver, silver plating on

4   the leads, and that sort of thing.  So it shows up in a variety

5   of different ways.

6   Q.   Televisions?

7   A.   In television sets, there are switches and components with

8   silver in them, yes.

9   Q.   Can silver corrode?

10  A.   Certainly.  It actually was originally chosen, like

11  copper -- and I think Dr. Scully alluded to this, that silver

12  and copper generally are corrosion resistant except they have,

13  as he said, an Achilles heel:  They're very sensitive to

14  sulfur.  So sulfur vapors of any kind will corrode, both copper

15  and silver, quite dramatically.

16  Q.   What, if any, problems can occur from silver corrosion?

17  A.   Well, if you imagine a couple of pieces of metal that are

18  supposed to touch and there are electrical contacts in a

19  switch, if you look at these, you would expect to see shiny,

20  silver-looking metal.  If you cover that with something that's

21  black and granular, or black and fuzzy, what's going to happen

22  is, instead of having metal to metal touching, you have a

23  nonconductive corrosion product that's touching.  So that

24  develops a resistance in the electrical connection.  Generally,

25  that's problematic.  It means the switch is either not going to

1    work or it's likely to develop an additional heating from the

2    flow of the electric current through it.

3    **Q.**   What can happen as a result of this corrosion and this

4    increased resistance?

5    **A.**   Well, in things like light switches and circuit breakers

6    or switches that are in a device like, say, a switch that's

7    supposed to open when your dryer exceeds a certain

8    temperature -- it's a safety device -- the problem is that if

9    you develop a lot of corrosion between those contacts, the

10   combination of that electrical resistance caused by the

11   corrosion product and the current through it causes heating so

12   that, actually, the contacts could overheat.  I've investigated

13   a number of fires as a result of debris and corrosion on

14   contacts.

15   **Q.**   Can corrosion lead to failure of the device or product?

16   **A.**   Yes.

17   **Q.**   Can you explain to the Court how you became involved in

18   this matter.

19   **A.**   I was contacted by an engineer named Dean Rutila.  He

20   works for Simpson Gumpertz & Heger.  I work in Cambridge.

21   Their office is in Waltham. I know them fairly well.

22            Mr. Rutila contacted me and said:  "I have this

23   Chinese drywall case that I'm working on."

24            I said to him:  "Okay.  Why does that interest me?"

25            He said:  "Well, they're having lots of trouble with

1   the wires and other things."

2          I said:  "Oh, okay.  I'll come over to your office,

3   and let me take a look at some of the samples.  I'll see if I

4   can get involved in this."

5          That's how my work started.  That was around

6   December 12, 2009.

7   **Q.**   Did you receive some samples?

8   **A.**   I did.  At that time, I received four samples from him.

9   **Q.**   Did you perform your standard tests on these samples?

10  **A.**   I did.

11  **Q.**   Did you prepare a report?

12  **A.**   I did.

13  **Q.**   If we can show P1.2020-001, is that the cover page of your

14  report?

15  **A.**   Yes.

16  **Q.**   Let's talk about receptacles.  That's the thing that you

17  plug things into; right?

18  **A.**   That's it.

19  **Q.**   Did you take some pictures of a new receptacle to show the

20  Court before we show you the ones from the house?

21  **A.**   I did.

22  **Q.**   If we could see those.  If you could explain to the Court

23  what we're looking at.  Is this the actual receptacle or outlet

24  that you disassembled for these pictures?

25  **A.**   I can't see any writing on it from here.  But if it's what

DAILY COPY

1   I handed you last night, it's the same one.

2   **Q.**   It is.  It is.

3         **MR. BRYSON:**  Show the pictures, socket photos, Scott.

4   **BY MR. BRYSON:**

5   **Q.**   If you could just narrate this.  Just tell Scott when

6   you're ready to go to the next picture.

7   **A.**   I'm looking for the magic laser pointer.

8   **Q.**   We can go through these fairly swiftly.

9   **A.**   This first photograph is a picture of the receptacle

10  before I disassembled it.  The next photograph -- I'd like to

11  see the next photograph.

12        **THE COURT:**  Where did you get this receptacle?

13        **THE WITNESS:**  That's a good question.

14        **THE COURT:**  Is that from a house?

15        **THE WITNESS:**  Actually, I got it at -- it was handed

16  to me at a lawyer's office yesterday.  I don't know where they

17  got it from.

18        **MR. BRYSON:**  One of the engineers on the case

19  purchased it.  It's a new, just off the shelf, standard

20  receptacle.

21        **THE WITNESS:**  My understanding, it was new, but I

22  don't know where it originated.

23             The white plastic part, sometimes called a

24  faceplate, was taken off.  Inside, you can see some of the

25  electrical connection parts.  This receptacle has a strap on

DAILY COPY

1   one side, which picks up some of the plug blades.  So there's a

2   slot for a plug blade up here and a slot for a plug blade

3   down -- and those blades -- we'll show you these parts in a

4   little more detail.

5               There's a part of the socket on this side, a

6   part of the socket on this side.  The thing in the middle is

7   what is used to make a connection with those long pins, the

8   ground pins, on a plug.

9   **Q.**   Next photo.

10  **A.**   This is a closeup of one of the connections, or I guess I

11  would call a part of the strap.  So what happens is, to make a

12  connection, a socket has to have, generally, a three-wire

13  connection.  It has a black wire, which is usually called the

14  hot wire, a white wire usually called the neutral wire, and

15  then the ground wire.

16              If this is the hot side, you can make a connection to

17  this from -- that is a wire connection either by wrapping a

18  wire around one of these screws or by poking a wire -- and

19  we'll show this area a little bit closer in a minute -- into

20  one of these holes, and then there's sort of a catch area

21  that's accessed by pushing the wire in from the back.

22  **Q.**   Next photo.

23  **A.**   This is that same part taken out of the socket.

24  **Q.**   Next photo.

25  **A.**   Now, if we look a little bit closer, you'll see that

1   there's a piece of this brass assembly that has kind of a notch

2   in it and a space.  So if a wire -- if this is wired by pushing

3   a wire into the back of a socket -- let's see that.

4   **Q.**   Next photo.

5   **A.**   What happens is the wire gets pushed in and it bends that

6   brass piece with the notch.  If we look a little closer, you'll

7   see how it fits into the pieces.  So here's the copper wire,

8   and it's sort of pinched between this part that flexes, with

9   the notch in it, and the stationary part on the right side.

10  **Q.**   The next photo.

11  **A.**   Just a closer picture of the same thing:  Copper wire

12  caught between two brass pieces.

13  **Q.**   Next photo.

14  **A.**   Same thing.

15  **Q.**   All right.  So did you actually look at one of the

16  receptacles from one of the houses at issue?

17  **A.**   I did.

18          **MR. BRYSON:**  If we could show the next photo.  One

19  more.  That's still not it.  Go to P1.2020-008.  Next picture.

20  Next page.  That's not it.  2020-0009.  Zoom in on that.

21  **BY MR. BRYSON:**

22  **Q.**   Can you explain to the Court what we're looking at now.

23  **A.**   Yes.  The photo that I showed before, where there was a

24  shiny piece of copper wire sticking into the catch area, that's

25  this item here.  It looks like a black cylinder.  That's the

1   front end of the copper wire protruding into the receptacle.

2   The brass is this sort of yellowish material on the side here.

3   **Q.**   This is BDM12 from Bill and Deborah Morgan's house?

4   **A.**   Correct.

5   **Q.**   This is the first step, the optical microscope?

6   **A.**   That's right.

7   **Q.**   Can we go to the next photo.  Can you explain to the Court

8   what we're looking at now.

9   **A.**   The first step, just without going back to the photo but

10  thinking about it, we see a wire that's supposed to be copper

11  colored, but instead it's covered with a black, sort of dark

12  corrosion product.

13          The next step is to perform some scanning electron

14  microscopy.  The reason we don't do this SEM work with a light

15  microscope is because we can't get to the same magnification.

16  We can't get as high a magnification.

17          The first photo shows the end of the wire sticking

18  up.  The thing on the left is that piece of brass that catches

19  it.  The bottom photo shows sort of the upper left-hand corner

20  of the wire sort of at the 11:00 position, a magnified view.

21  That's at about 100 times magnification.

22  **Q.**   Next photo, 2020-0011.  While we're waiting for him to

23  pull up the picture, this corrosion that you're seeing on these

24  wires, can that be wiped off?

25  **A.**   It does wipe off.  If you wipe it with a cloth or brush it

1   with your fingers, it appears to come off.  I'm not convinced

2   it comes off microscopically, but it comes off.  It looks like

3   a black dust.

4   **Q.**   Is there still a problem with the wire, though?

5   **A.**   The wire has been attacked by this corrosion product.  So

6   the surface of the wire really is never smooth like a new wire

7   because it's been attacked and, as Dr. Scully observed, there's

8   pitting on the surface of the copper wire.

9   **Q.**   Is this the next picture of the wire at the next

10  magnification?

11  **A.**   Yes.  The three pictures are just at higher

12  magnifications.  I know that this is a little bit dark on the

13  screen, so let me just try to -- if you can get the bottom one,

14  I'm just trying to read a scale bar.

15          These things that look like cauliflower are what

16  makes the black appearance on the surface of the wire.

17  Usually, this is called a nodular formation.  The scale bar

18  here, which is 20 microns -- so 20 micrometers.  I'll use the

19  term *microns*.  It's the same thing.  So this is 20 microns

20  across.  These are nodules -- they're saying layers of them.

21  So there's a pile of stuff and a pile of stuff.  This one

22  happens to be about 20 microns in diameter.

23          So that gives you some sense -- gives me some sense

24  of what the diameter or the size is.  Keep in mind that when we

25  were talking about -- or when Dr. Scully was talking about the

DAILY COPY

137

1   problems, they were much smaller than this.

2   Q.   Let's move to the next picture, please.  We've got a

3   number of samples.  Let's make sure we get them in the record.

4   Let's go to next picture.  Next page.

5          Can you explain very briefly to the Court what we're

6   looking at here, because I believe Dr. Scully already explained

7   this in some detail.

8   A.   This is the same area analyzed by a technique called

9   energy disperser spectroscopy.  The energy disperser

10  spectroscopy shows peaks, in the spectrum below the picture, of

11  copper and sulfur.  The analysis below that shows that these

12  nodules have a composition which is like one of the copper

13  sulfide compositions that have been -- one of the standard

14  copper sulfide compositions; namely, it looks approximately

15  equivalent to what would be called $Cu_2S$.  In other words,

16  there's two copper atoms for every sulfur atom, approximately.

17  Q.   Let's move to circuit boards, if we could.  We have a wall

18  mock-up we've constructed with a sample HVAC thermostat on it.

19  Could you go and retrieve that thermostat and bring it back to

20  the witness chair, please.

21  A.   Sure.

22  Q.   Can you explain to the Court what you have in your hand.

23  A.   This is a thermostat.  In the old days, the thermostat was

24  just an electromechanical device, but those days are gone.  So

25  these days, everything has a little bit of intelligence to it.

1    So now we have a circuit board.

2    **Q.**    You can show that to the Judge.

3    **A.**    When I say "circuit board," I should probably explain the

4    structure.  A circuit board is a -- generally, it's a

5    fiberglass structure usually on the order of a 16th of an inch

6    thick.  It has electronic components mounted on it; sometimes

7    on both sides.  This one happens to be single-sided.  So

8    there's components on one side and no components on the other

9    side.  There are layers of very thin copper foil, which make

10   the connections between the components.

11          If you were to look, you'd say, "Well, I don't see

12   any copper."  That's because it's covered with a green varnish.

13   That's part of the manufacturing process.  But there is an area

14   where, if I would scrape off the varnish, you could see metal

15   underneath.  This is basically the structure of all the circuit

16   boards in every electronic thing in your house, including your

17   computer, your cell phone, your PalmPilot, your BlackBerry,

18   usually much more complicated than that.

19          The thing that's interesting about this is the copper

20   is about -- I know these units are a little bit off.  Standard

21   copper coating is kind of an industry standard way of doing

22   things.  So if you're a manufacturer and you buy a circuit

23   board, you're going to get a certain kind of copper thickness.

24   That copper thickness is about 35 microns.

25   **Q.**    Silver on it as well?

1    **A.**   There are silver on -- almost all the switches will have

2    silver contacts.  In isolated places of some of the circuits,

3    there will be silver as well.

4    **Q.**   Did you look at an example of a thermostat from one of the

5    homes at issue?

6    **A.**   I did.

7           **MR. BRYSON:**  Can we put up the next slide, please,

8    P1.2020-0013.  If we could go to the next page.

9    **BY MR. BRYSON:**

10   **Q.**   This is a thermostat from BDM24 from Mr. Morgan's home

11   again.  Can you explain to the Court what we're looking at.

12   **A.**   Yes.  This thermostat has a display on it, and it's got a

13   light-emitting diode, an LED, to light up the display so you

14   can see it at night.  The device that's there is -- the diode

15   is the part that lights up the display.

16          When I first examined this in an optical microscope,

17   which is the first picture, I noticed there was a kind of an

18   unusual appearance to the connections.  The connections are

19   made by leads which stick out on the right and left side.  They

20   would normally just be a smooth, shiny metal made of an

21   electrical solder.  So I put that in a scanning electron

22   microscope, which is the picture shown on the bottom.  I know

23   it's kind of dark.

24          If we go to next picture, what you'll see is that the

25   dark thing in the middle is where the component was, and here

 1   are the leads on each side.  These leads -- and I'm not sure

 2   why the manufacturer chose to do this, but the leads have a

 3   silver portion to them.  The silver has turned into -- I may

 4   use the term *black*.  The SEM picture does not show the same

 5   color as a visual light.

 6          This is actually -- to your eye or in an optical

 7   microscope, what appears is an area of black crystals.  The

 8   crystals analyzed using the same techniques I described before

 9   turn out to be a silver sulfide.  So this is a part that's

10   being corroded by sulfur vapor.

11          MR. BRYSON:  Can we go to the next slide, the next

12   picture.

13   BY MR. BRYSON:

14   Q.   Can you explain to the Court what this is.

15   A.   There are several buttons, push buttons, on the circuit

16   board for the thermostat.  I disassembled one of the push

17   buttons.  Even though this is a very, very small switch, as I

18   said earlier, the common material for contacts and switches is

19   silver.  This one is silver also.  There's a silver disk.  In

20   the top picture -- if you could just blow that up a little bit,

21   and I'll try to point to that.

22          There's a silver disk, and it doesn't look like a

23   silver disk anymore.  It looks like a silver disk with kind of

24   a funny black halo around the outside.  So I was interested in

25   determining what the black material was because I recognized

1   that as not normal for a switch.  So I put this into a scanning

2   electron microscope, and I have some analysis showing that.

3   **Q.**   Was this push-button contact closed up?

4   **A.**   Yes, it was.  I had to disassemble the switch to get to

5   those parts.

6   **Q.**   That's when you saw the corrosion?

7   **A.**   Right.

8   **Q.**   Next picture.  Explain to the Court what we're looking at.

9   **A.**   The disk in the scanning electron microscope is in the top

10  picture and, really, it's the same disk, but an edge -- and I

11  want to try a higher magnification.  What's unusual about it is

12  we would expect this to be a clean metallic edge.  What we see

13  is some kind of crystalline growth on the surface around the

14  outside.

15  **Q.**   Is the corrosion consuming the silver?

16  **A.**   It is.

17  **Q.**   Go to the next picture.  What did you find from the EDS on

18  this particular corrosion?  What type is it?

19  **A.**   The contact surface, in that area where it's blackened, is

20  covered with silver sulfide.

21  **Q.**   Let's talk a little bit about wall light switches.

22           **MR. BRYSON:**  We'd like to run a part of the

23  animation, Your Honor.

24  **BY MR. BRYSON:**

25  **Q.**   Mr. Galler, you can narrate.  On a typical wall light

1   switch, explain to the Court how they operate, please.

2   **A.**   This is a cross-section kind of looking in the side of a

3   switch.  A light switch in your house has a couple of moving

4   parts.  The important parts are two pieces of silver contact

5   material.  There are brass parts, but there are silver parts

6   mounted on the brass parts.

7            So if you look at those two shiny white pieces, those

8   are silver; silver contacts mounted on brass movable arms.  I

9   know the animation is a little bit ahead of my analysis.  But

10  the silver turns black from the formation of the silver

11  sulfide.

12           Now, what's supposed to happen is you're supposed to

13  have electrical conduction through those silver surfaces as

14  they touch together that's impeded by the formation of the

15  silver sulfide.  Now, you have an electrical product in your

16  house carrying -- I don't want to say carrying 120-volt

17  current.  That would be incorrect.  What I mean is, utility

18  current that's now not working the way it's supposed to.

19  Here's an SEM image.

20  **Q.**   Did you actually look at a wall switch from one of the

21  houses, I believe the Heischober house?  If you could show

22  P1.2020-0022.  Next page, please.

23           Could you explain to the Court your analysis of the

24  contacts in the wall switch.

25  **A.**   The silver contact is a button, so it should be a circular

1   device or a circular feature.  On this image, it's mounted on a

2   brass arm.  When I took the switch apart, instead of a silver

3   appearance, I found this black, fuzzy appearance on the surface

4   of the contact.

5   **Q.**   Go to the next page.

6   **A.**   These are just higher magnifications and then SEM

7   pictures.

8   **Q.**   Next page.  I'm sorry.  Go ahead.

9   **A.**   This is not supposed to look like chocolate cake.

10   Dr. Scully used the chocolate cake analogy.  This one is not

11   supposed to look like chocolate cake.

12   **Q.**   Can you go to the next page.

13   **A.**   These are crystals growing on the edge and the surface of

14   the contact.

15   **Q.**   Next page.  What was your final analysis?

16   **A.**   The crystals on the edge, silver sulfide.

17   **Q.**   Is this a problem like all the others?

18   **A.**   Yes, that's right.  The reference materials on electrical

19   contacts says that the silver sulfide has an electrical

20   resistance that's much higher than silver, much higher, 100,000

21   times higher than the resistance of the silver.

22            So here we've chosen a material so that it has ideal

23   properties, it doesn't tarnish, and it has very high electrical

24   resistivity, and now it's covered with something that has an

25   electrical resistance 100,000 times higher.  Not a very good

1   situation.

2   **Q.**   Did you perform a comparison of switches that you'd like

3   to show to the Court?

4   **A.**   Yes, I did.

5         **MR. BRYSON:**   If you could pull up P1.1892.

6   **BY MR. BRYSON:**

7   **Q.**   Explain this to the Court, please.

8   **A.**   These are optical microscope pictures of switch contacts.

9   The one on the top is a new switch.  So there's that silver

10   circle I suggested should be seen in a normal switch.  The

11   middle one is a switch I took out of my house.  That switch has

12   some sort of a gray stuff around the outside; but as you can

13   see in the middle, you'll see some active sort of silver area.

14   Then the one that we were looking at before is completely

15   covered with a black, sort of crystalline material.

16   **Q.**   Next page.

17   **A.**   These are SEM images of the same three contacts.  Here's

18   the new one.  See, this one doesn't look too bad.  Then there's

19   the bottom one which looks like the fuzzy chocolate cake.

20   **Q.**   The next page.  Can you explain the differences now on the

21   EDS shots for each of these?

22   **A.**   Yeah.  The top one corresponds to the new contact.  It

23   shows that when I analyzed for silver and sulfur in all of

24   these, that there's essentially no silver on the surface of the

25   new one.  The one I took out of my house -- and I did this all

1   on the edges where the material looked the worst.  There's

2   about -- I guess, in anatomic percentages, it's 6 percent.

3   **Q.**   The top one is silver; correct?

4   **A.**   The top one is essentially pure silver.  It looks like

5   silver with a small amount of copper in it.

6   **Q.**   Then the 45-year-old one?

7   **A.**   The 45-year-old one is essentially pure silver, small

8   amount of sulfur.

9   **Q.**   What happens on the one that's only a few years old?

10  **A.**   On the one that's a few years old that's the sample, it

11  looks like it has a silver-to-sulfur ratio of 75 percent

12  silver, 25 percent sulfur.  That's an enormous amount of

13  sulfur.

14  **Q.**   What, if any, problems would result from this type of

15  corrosion?

16  **A.**   Well, with the resistance of the switch that high, there's

17  a couple possibilities:  One, it stops working, so it doesn't

18  turn appliances on and off when you plug something into the

19  switch, the outlet that it's attached to; and the other thing

20  is it's going to overheat.

21  **Q.**   Did you also look at a component in the HVAC air-handling

22  unit?

23          **MR. BRYSON:**  There's going to be more evidence,

24  Your Honor, on the HVAC air-handling units, how this ties in.

25  Mr. Galler looked at a component from one, P1.2020-0028, also

1    from the Heischober house, SLH31.  Can you explain to the

2    Court, what is an air-handling contacts?

3    A.    In the air-handling unit, there's a relay that turns on --

4    basically turns the system on and off.  So every time the unit

5    is called for heat or cooling, this relay closes.  And it's

6    kind of like a switch, like a wall switch, except that it's

7    electrically operated.  So there's a mechanism that makes the

8    contacts move, and these are the contacts.

9    Q.    Can you go to the next page.

10   A.    They would normally be pure silver just like the light

11   switch.  I examined the contacts from the air handler,

12   air-handling contacts.  They had a sort of dark gray, blackish

13   appearance around the outside.  I performed the SEM work as in

14   the past, on the other examples, and I found a granular

15   material on the surface which was not supposed to be there.

16   Q.    We're not talking about the coils, are we?

17   A.    No, this is not the coils.  This is the electrical device

18   that sort of activates the whole thing.

19   Q.    The next page.  Go to the EDS.  What did you find?

20   A.    This got about 20 percent sulfur on the surface on an

21   atomic basis.  So that's, again, indications of a very large

22   sulfur corrosion product on the surface of the contacts, which

23   degrades the electrical performance of the contactor.

24   Q.    That's a problem?

25   A.    Correct.

1  **Q.**   Did you also look at a smoke detector?

2  **A.**   I did.

3  **Q.**   I believe this one's from Mr. Morgan's house.  Can you

4  pull up P4.0002-0056.

5          **MR. BRYSON:**  Your Honor, there's a series of about

6  three here that are P4.  We'd like to move all those into

7  evidence.

8          **THE COURT:**  I'll admit it.

9          **MR. BRYSON:**  It's P4.0002 through 0056, but we're

10  only going to talk about certain samples here.

11  **BY MR. BRYSON:**

12  **Q.**   Can you explain to the Court what BDM30, this smoke

13  detector, is.

14  **A.**   It's a smoke detector.  When the sample was provided to

15  me, I believe they told me it wasn't working anymore.  The test

16  button didn't seem to work.  I took the smoke detector cover

17  off.  The two devices that are on the bottom, inside the smoke

18  detector, one is the thing that actually detects smoke.  The

19  thing on the left-hand side, with the tan plastic, is the part

20  that acts like the annunciator; in other words, the thing that

21  makes the beeping sound which you hear.  I took that off the

22  circuit board.  In other words, I took the circuit board out of

23  this plastic enclosure, unsoldered the annunciator, and

24  examined it.

25  **Q.**   Next picture, please.

1   A.    Back side of the annunciator.  That's actually the thing

2   that makes the noise.  It vibrates kind of like a speakerphone.

3   There are three contacts.  You can actually see two of them.

4   There's a plastic arm -- sorry, a metal arm and a metal arm,

5   and they're supposed to contact two silver areas on this green

6   inner circle.  Instead of what I saw immediately -- instead of

7   seeing silver areas, I see something that looks like black

8   velvet here.

9            On the same page, you could see this.  Almost without

10  requiring any microscopy, you can see there's a black, fuzzy

11  appearance to this material, which is supposed to be a silver

12  coating.

13  Q.    Next page.

14  A.    This is an SEM picture at higher magnification of what --

15  why that surface appears to be fuzzy and black.  It's fuzzy

16  because there's a whole bunch of needle-like crystals growing

17  on it.  They're actually fairly long.  I know these scales are

18  a little bit confusing, but 200 microns is -- that's a 10th of

19  a millimeter.  That's like whiskers.  If you were to shave in

20  the morning, you can see those with your eye.  That's how big

21  they are.  So this is an incredibly large growth of silver

22  sulfide crystals.

23  Q.    On all of these samples that we've looked at, how thick

24  typically is the corrosion that you're observing?

25  A.    I don't think I saw anything less than 30 microns in any

1  case.

2  **Q.**   That would be how many angstroms?

3  **A.**   30 microns is 300,000 angstroms.  So at one point when we

4  were looking at things that said you might have a problem at

5  1,000 angstroms, 300,000, 200,000, those are the kinds of

6  scales that I saw.

7  **Q.**   Next picture, please.  Is this the picture of the control

8  on this?

9  **A.**   A normal annunciator looks like what is photographed in

10  the top picture.  The shiny white areas are what the contacts

11  are supposed to look like.  So these arms have a tab which

12  solders into the circuit board, and these arms are supposed to

13  contact the silver area on the device.  So that silver area has

14  been turned into silver sulfide.

15  **Q.**   Next picture.

16  **A.**   That's a comparison of a good one and a corroded one.

17  **Q.**   Go to the next page, please.  I believe you've already

18  shown the silver sulfide; correct?

19  **A.**   Correct.

20  **Q.**   Next page.  I believe did you also examine part of the

21  Morgan television set that Mr. Serpe showed in his opening this

22  morning?  Or when he did his direct examination of Mr. Morgan,

23  did you look at a part of the television set?

24  **A.**   Yes.

25  **Q.**   This is BDM67.  Can you explain what you saw in the

1    television set.

2    **A.**    This is the circuit board for the television set.  We

3    should -- just to be clear, this is the old-fashioned kind of a

4    television set, not a flat-panel type.  It makes a difference

5    because the technology inside is completely different.

6             The circuit board that I examined didn't really have

7    very much corrosion on it.  In fact, I had trouble seeing it

8    except in one isolated part.  So if we look at the pictures in

9    sequence, what we'll find is that there's a part --

10   **Q.**    Go to the next page.

11   **A.**    -- there's a part, and I'll point to it, which looks kind

12   of unusual to me, knowing what these things are supposed to

13   look like.  This part is a -- basically, it's a glass sphere

14   with two electrical leads on it.  The black, fuzzy stuff that's

15   growing around is a very unusual appearance.  It's really -- on

16   this board is the only place I saw this, so I took the part

17   out.  If we take a look at next picture --

18   **Q.**    Next page, please.

19   **A.**    -- these are just optical microscope pictures of the part

20   after it's removed from the circuit board.

21   **Q.**    Next page.

22   **A.**    This is a sample.  This part is called a diode.  It's made

23   of a glass body.  It's got a device inside, which I won't get

24   into, but the device inside has two connections:  A lead on

25   each side.  So here's kind of what this should look like,

1  except this one -- I didn't have one of the spherical types

2  handy.

3         So now, if you imagine this being a nice, clean, gray

4  sphere with two leads on it, that's what it should look like.

5  These leads should go right up to the body of the device

6  without any black, mystery product.  We know it's a corrosion

7  product now, but I didn't at the time.

8  **Q.**   Next page.

9  **A.**   I put the diode in a scanning electron microscope.

10  Scanning electron microscopes are interesting because they do a

11  couple of different things depending on how you use them.  In

12  this particular mode, the SEM was sensitive to the conductivity

13  of the device that I was imaging.  What I mean by that is, if I

14  had something that was just glass, it would glow like crazy and

15  cause all kinds of problems.  The reason it's not glowing in

16  these giant areas here is because the corrosion product that's

17  been deposited onto the part is conductive.  In fact, the only

18  part that's not conductive is this little space here, where the

19  white, glowing area is.

20         Before we move on, the problem with the television

21  set was, as I understood it, that you could make the TV set go

22  on, but you could not get a picture.  A CRT-type television set

23  requires a high voltage source inside, and this part's job is

24  to help develop that high-voltage source, meaning on a color

25  television set it's about 30,000 volts.

1        This part had a number on it.  I looked up the part

2   number.  The part is rated for 1,500 volts.  So this part is

3   probably going to have a number of voltage across it, most of

4   the time, on the order of 1,000 volts or so, allowing for a

5   margin in its rating.  If it's glass and if you look at the

6   scale, you see this thing is only 2 millimeters across.  We've

7   taken all but maybe 5 or 10 percent of that and covered it with

8   a conductive material.  So this part can't work properly

9   anymore covered with conductive material.

10  **Q.**   Are diodes common in various electrical/electronic things

11  within a house?

12  **A.**   All over the place.

13       **MR. BRYSON:**  Can we go to the next picture, please.

14  **BY MR. BRYSON:**

15  **Q.**   Is this the final SEM shot of that?  The bottom picture,

16  if you could blow that up, what are we looking at?

17  **A.**   This is the corrosion material essentially growing on the

18  lead of the part.  So as you can see, there's sort of a

19  metallic lead here.  What we see is -- actually, I think -- can

20  we back up one before I misspeak?  This may be the body.

21       Edge of the glass body, so it's this area here.

22  **Q.**   This was what type of corrosion again?  Silver sulfide?

23  **A.**   This is actually copper sulfide, and it's coming from --

24  the leads on almost all electronic products are made out of

25  copper.  So the sulfer vapor is reacting with the copper in the

 1   lead to form copper sulfide.

 2   **Q.**   Did you look at a circuit board from an HVAC air handler?

 3   **A.**   Yes.

 4              **MR. BRYSON:**   Can we go to P4.0002-0075.  I also move

 5   this into evidence.

 6              **THE COURT:**   Admitted.

 7   **BY MR. BRYSON:**

 8   **Q.**   Can you explain to the Court what we're looking at on this

 9   in the series of photographs very quickly.

10   **A.**   Yes.  This is a push-button switch on the HVAC control

11   board.

12   **Q.**   This is in the air-handling units; is that correct?

13   **A.**   Yes, that's right.

14   **Q.**   What did you do to the box?

15   **A.**   So this is just optical microscope pictures of the switch

16   itself.

17   **Q.**   Go to the next page, please.

18   **A.**   What I did was I disassembled the switch.  There's two

19   areas of the switch that are troublesome.  One was the exterior

20   leads are covered with a black material.  Also, if we go to the

21   next -- there's a silver -- inside the switch, there's a silver

22   button.  In the optical microscope images, we can see that

23   there's a black corrosion product developing around the edge of

24   the button.

25   **Q.**   Go to the next page.

1  **A.**   This is that same button, just more optical microscope

2  pictures at higher magnification.

3  **Q.**   Next page.

4  **A.**   SEM image of what's growing on the edge.  So in the

5  optical microscope picture, we saw something that was black.

6  The SEM, as I explained, doesn't respond to color, so it looks

7  whitish here.

8  **Q.**   Again, similar problems as you've been describing?

9  **A.**   That's correct.

10 **Q.**   What problem is that?

11 **A.**   Corrosion from sulfur attack.

12       **MR. BRYSON:**  Can we go to P1.1866-003.

13 **BY MR. BRYSON:**

14 **Q.**   This is from the circuit board of Mr. Morgan's house.

15 We'll have another witness show other pictures of that.  But I

16 believe, Mr. Galler, you looked at this one particular thing.

17 Is this a similar-type corrosion that you saw on the diodes

18 from the earlier one that we looked at?

19 **A.**   Yes.

20 **Q.**   If we could zoom in on one of those from this circuit

21 board, from Mr. Morgan's HVAC circuit board, another example of

22 the prevalence of diodes.

23 **A.**   Actually, that's not a diode; that's a resister.  But

24 basically, it's the attack of the -- the lead is shiny and

25 doesn't look like copper, but it's basically a copper lead with

1   a tin coating on it.  The reaction is a copper -- the

2   underlying copper is being corroded by the sulfur vapor.

3   **Q.**   P4, the last one, 0002-0082, this is a light switch from

4   Mr. McKellar's house.  If we could just very quickly just scan

5   through those.  Is this a similar type thing?

6   **A.**   Yes.  Black appearance of the otherwise silver contact

7   covered with a silver sulfide deposit.

8                **MR. BRYSON:**  Scan through to the next one, a couple

9   more.

10  **BY MR. BRYSON:**

11  **Q.**   Mr. Galler, for all of these photos that we've been

12  looking at, all of these various receptacles and switches and

13  smoke detectors and televisions, diodes, resisters, are all the

14  techniques you've described such as the SEM and the EDS -- is

15  there anything new or novel about any of those test methods

16  within your field of expertise?

17  **A.**   No.  Standard procedures for electronic failure analysis.

18  **Q.**   They're all generally accepted procedures?

19  **A.**   That's right.

20  **Q.**   Now, Mr. Galler, if you take the Chinese drywall out of

21  the house, can you leave any of these items?  Should you leave

22  any of these items?

23  **A.**   No.

24  **Q.**   Within a reasonable degree of engineering certainty, have

25  these items been exposed to a corrosive environment?

1  A.   Absolutely.

2  Q.   Within a reasonable degree of engineering certainty, would

3  you expect to find similar problems with other devices that

4  contain silver contacts in all of these homes?

5  A.   Silver contacts, copper wire, all the same.

6  Q.   Light switches, circuit boards, appliances, TVs,

7  computers, thermostats, air-handling, security system, anything

8  with a circuit board or a silver contact?

9  A.   That's correct.

10  Q.   Within a reasonable degree of engineering certainty, what

11  is your opinion about the life span of these electrical and

12  electronic devices and equipment in these things?

13  A.   That it's been greatly diminished.

14  Q.   How much, in your opinion?

15  A.   Well, that's hard to say.  I wouldn't be surprised if the

16  life span has been decreased to a tenth to a quarter of what

17  you would normally expect.

18  Q.   In your opinion, should these items be replaced now?

19  A.   Yes.

20  Q.   Now, is moisture typical in any of these components?

21  A.   Is moisture typical in the components?  I'm not sure what

22  you mean.  The components themselves don't have any moisture in

23  them.

24  Q.   Excuse me.  Can you do any sort of splicing to fix any of

25  these problems?

1    A.    You mean splicing of the wires?

2    Q.    Mr. Galler, have you reviewed any relevant literature

3    which you believe supports your opinions?

4    A.    Yes, I have.

5    Q.    If we could pull up P2.0202-001.  Can you identify that

6    particular article.

7    A.    Yes.  I like to call it the Chudnovsky paper.

8    Q.    Is this a learned treatise, in your opinion?

9    A.    Yes.  It appeared in proceedings of one of the conferences

10   for the IEEE, which is the electrical engineering professional

11   society.

12   Q.    Can you read into the record the highlighted portion.

13   A.    "Silver shows good resistance to oxidation and tarnishing

14   except in the presence of sulfur.  Sulfur-containing

15   atmospheres will produce silver sulfide that increases contact

16   resistance."

17   Q.    You agree with that, I assume?

18   A.    Absolutely.

19   Q.    Can we go to the next highlighted area in this article.

20   Can you read that into the record, please.

21   A.    That will be difficult.  "However, since electrical

22   resistivity of silver sulfide ($Ag_2S$) is approximately 100,000

23   times higher than that of silver (15 to 20 micro ohm

24   centimeters for" --

25   Q.    You can just read the sentence part.

1  **A.**   Skip the important stuff?  "Its presence reduces the
2  surface conductivity of the silver even if a very thin film is
3  formed."
4  **Q.**   I think we understand that, but can you explain to the
5  Court very briefly what that means.
6  **A.**   It means that the silver sulfide has an electrical
7  property that makes it basically worse than silver by a factor
8  of 100,000 times.  So if there's a very thin layer of -- even a
9  very thin layer of silver sulfide on the contacts, it will
10 degrade the contact performance.
11 **Q.**   The last highlighted point of this article, can you read
12 that into the record, please.
13 **A.**   "Tests examining the electrical conductivity of silver
14 seem to indicate that 200 angstroms would be a reasonably
15 conservative estimate of the thickness at which electrical
16 properties begin to deteriorate."
17 **Q.**   I take it you would agree with that?
18 **A.**   Absolutely.
19 **Q.**   As you've testified, you have seen thicknesses that were
20 greatly in excess of that?
21 **A.**   Correct.
22 **Q.**   The very last article, if we could pull that up, and then
23 we'll be concluded.  This particular article, "Atmospheric
24 Corrosion of Control Equipment," Publication No. 38.
25        **MR. BRYSON:**  Your Honor, it's at P2.0195, and we'll

DAILY COPY

1    go look at pages 0027 and 0028.

2    **BY MR. BRYSON:**

3    **Q.**   Mr. Galler, if you could very briefly explain to the Court

4    what we're seeing in these particular graphs.

5    **A.**   Sure.  This graph shows that -- and let's focus on the

6    silver line, which is over on the right-hand side of the graph.

7    It shows the relationship between the thickness of a film and

8    the resistance of the contacts.

9           What it basically is showing is that if you take a

10   film thickness of 1,000 angstroms, which is -- that's 10 to the

11   third, so it's 1,000 angstroms -- you have a contact resistance

12   that's down here.  We might read that number as -- let's forget

13   about the units for now.  Let's just call that 2 if it's in

14   milliohms.  If that's the ideal condition, let's say -- it may

15   not be -- but if that's the ideal condition, when we go from

16   1,000 angstroms -- this would be 2,000 angstroms, 3,000, 4,000,

17   5,000 -- we've increased the contact resistance by a factor of

18   100.

19          What it's basically showing is that these very small

20   changes and very small thicknesses of films on the silver

21   contacts will have a very dramatic increase in the resistance

22   of the connection, the electrical resistance of the connection.

23   **Q.**   Can we go to the next graph, please.  Could you explain to

24   the Court the significance of this graph from the Abbott paper.

25   **A.**   The numbers here, the categories I, II, and III, refer to

DAILY COPY

1    the Battelle corrosion categories.

2    **Q.**    I believe Dr. Scully testified about it earlier.

3    **A.**    Correct.  What the graph shows is that when you go from

4    the very sort of modest corrosive environment even to a

5    Category II, that you expect an increase in failure rates of

6    components by a factor of nearly 100.  As he pointed out, the

7    corrosion environment that we have would suggest that we're

8    actually somewhere beyond Level III out into somewhere between

9    III and IV.

10   **Q.**    With regard to relative humidity, what effect does

11   relative humidity have on silver corrosion?

12   **A.**    The literature suggests that -- well, actually, it doesn't

13   suggest it.  The literature says that silver is relatively

14   unaffected by the relative humidity, whereas copper corrosion

15   rates seem to go up a lot when the relative humidity goes up.

16   Silver seems to be unaffected by it.  So the silver corrosion

17   seems to happen whether the humidity is 10 percent or

18   80 percent.

19   **Q.**    There's a paper by, I believe, Mr. Rice, in a learned

20   treatise that you've seen?

21   **A.**    That's correct.

22   **Q.**    Mr. Galler, are all of your opinions within a reasonable

23   degree of engineering certainty?

24   **A.**    They are.

25            **MR. BRYSON:**  One second, Your Honor.

DAILY COPY

1             THE COURT:  We'll stop after this witness.

2             MR. BRYSON:  Thank you, Your Honor.  No further

3     questions.

4             THE COURT:  I have none.

5             THE WITNESS:  We will stop there.  I'll see you all

6     on Monday at 9:00.  I'll see you at 8:30, the lawyers.

7             THE DEPUTY CLERK:   Everyone rise.

8             (WHEREUPON the Court was in recess for the evening.)

9                             * * *

10                          **CERTIFICATE**

11            I, Toni Doyle Tusa, CCR, FCRR, Official Court

12     Reporter for the United States District Court, Eastern District

13     of Louisiana, do hereby certify that the foregoing is a true

14     and correct daily copy transcript, to the best of my ability

15     and understanding, from the record of the proceedings in the

16     above-entitled and numbered matter.

17

18

19                                   s/ Toni Doyle Tusa
                                     Toni Doyle Tusa, CCR, FCRR
20                                   Official Court Reporter

21

22

23

24

25

                             DAILY COPY

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


*********************************************************************

IN RE:  CHINESE MANUFACTURED DRYWALL      MDL-2047
         PRODUCTS LIABILITY LITIGATION     Section "L"
                                           New Orleans, Louisiana
                                           Monday, February 22, 2010


*********************************************************************
***THIS DOCUMENT RELATES TO***:

Michelle Germano, et al

        versus

Taishan Gypsum Co., Ltd., f/k/a
Shandong Taihe Dongxin Co., Ltd.,
et al

Case No. 09-CV-6687

*********************************************************************


                    VOLUME II - MORNING SESSION
                TRANSCRIPT OF DEFAULT HEARING PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:              HERMAN, HERMAN, KATZ & COTLAR
                                BY:  RUSS M. HERMAN, ESQ.
                                     STEPHEN J. HERMAN, ESQ.
                                820 O'Keefe Avenue
                                New Orleans, LA 70113


                                SEEGER WEISS
                                BY:  CHRISTOPHER A. SEEGER, ESQ.
                                One William Street
                                New York, NY 10004

                        ──DAILY COPY──

```
 1   APPEARANCES CONTINUED:

 2                                  LAW OFFICES OF RICHARD J. SERPE
                                    BY:  RICHARD J. SERPE, ESQ.
 3                                  Crown Center, Suite 310
                                    580 East Main Street
 4                                  Norfolk, VA 23510-2322

 5
                                    GAINSBURGH, BENJAMIN, DAVID,
 6                                  MEUNIER & WARSHAUER
                                    BY:  GERALD E. MEUNIER, ESQ.
 7                                  2800 Energy Centre
                                    1100 Poydras Street
 8                                  New Orleans, LA 70163-2800

 9
                                    LEWIS & ROBERTS, PLLC
10                                  BY:  DANIEL K. BRYSON, ESQ.
                                    3700 Glenwood Avenue, Suite 410
11                                  Raleigh, NC 27612

12
                                    HAUSFELD
13                                  BY:  RICHARD S. LEWIS, ESQ.
                                    1700 K Street, NW Suite 650
14                                  Washington, D.C. 20006

15
     FOR MITCHELL COMPANY, INC.:    CUNNINGHAM BOUNDS, LLC
16                                  BY:  STEVEN L. NICHOLAS, ESQ.
                                    1601 Dauphin St.
17                                  Mobile, AL 36604

18
     FOR KNAUF PLASTERBOARD
19   TIANJIN CO., LTD.:             BAKER & MCKENZIE, LLP
                                    BY:  DONALD HAYDEN, ESQ.
20                                  Mellon Financial Center
                                    1111 Brickell Avenue, Suite 1700
21                                  Miami, FL 33131

22
     Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR
23                                  500 Poydras Street, Room HB-406
                                    New Orleans, Louisiana 70130
24                                  (504) 589-7776

25     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
```

DAILY COPY

<u>P R O C E E D I N G S</u>

(MONDAY, FEBRUARY 22, 2010)

(MORNING SESSION)


    (OPEN COURT.)

        THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.  Call the case, please.

        THE DEPUTY CLERK:  MDL-2047, *in re: Chinese drywall*.

        THE COURT:  We're here for the second day of a hearing. You may begin, let's call your witness.

        MR. ECUYER:  Good morning, your honor.  Before we begin, Michael Ecuyer on behalf of these Virginia plaintiffs and the PSC, we have a little matter of housekeeping.

        THE COURT:  All right.

        MR. ECUYER:  Your Honor, we would move to strike exhibits that were inadvertently placed into our exhibit list, specifically, Exhibits P1.2045, P1.2046, P1.2047, P1.2048 and P3.0631 and P3.0632.

        THE COURT:  Okay.  Let that be done.

        MR. ECUYER:  And, your Honor, we would offer, file and introduce the following exhibits into the record, designated P1.2054, P1.2057, 2058, 2059, 2060, P1.2062, P3.0626, and P4.0003, P4.0007 and P4.008, your Honor.

        THE COURT:  Okay.  Let those be admitted into the record.

        MR. ECUYER:  Thank you.

4

```
 1              THE COURT:  Thank you.

 2              MR. SERPE:  Good morning, your Honor, Richard Serpe for

 3    the PSC and the Germano plaintiffs.  We would call Vannessa Michaux

 4    to the stand.

 5              THE COURT:  Come forward, please, ma'am.

 6              THE DEPUTY CLERK:  Please step into the witness box.

 7         (WHEREUPON, VANNESSA MICHAUX, WAS SWORN IN AND TESTIFIED AS

 8         FOLLOWS:)

 9                        DIRECT EXAMINATION

10    BY MR. SERPE:

11    Q.  Would you state your full name for the record, please.

12    A.  Vannessa Michaux.

13    Q.  What's your current address?

14    A.  My current address?

15    Q.  Yes.

16    A.  341 James Baldwin Street, Newport News.

17    Q.  And do you own another home that has Chinese drywall?

18    A.  Yes, sir.

19    Q.  What's the address of that home?

20    A.  901 Eastfield Lane, and that's Newport News as well.

21    Q.  Vannessa Michaux, is your husband Fred here?

22    A.  Yes, he is in the courtroom.

23              MR. SERPE:  If Fred will stand up.  Good morning, Fred.

24              THE COURT:  Thank you.

25    BY MR. SERPE:
```

```
 1    Q.   When did you purchase the house on Eastfield Lane?

 2    A.   November 1st of 2007.

 3    Q.   And does the purchase price 267,500 look accurate to you?

 4    A.   Yes, sir.

 5    Q.   45, we don't see the column heading here, but is it your

 6    understanding that the delivery records from Venture Supply show

 7    that 45 boards of 4-foot by 12-foot of Chinese drywall were

 8    delivered to your home on Eastfield Lane?

 9    A.   Yes.

10    Q.   Next slide, please, sir.  Is this a picture of your home?

11    A.   Yes, it is.

12    Q.   Would you describe the layout to the court, please?

13    A.   Yes, it's a three-story, 2,200 square foot townhome.  Do you

14    want more details than that?

15    Q.   Please.

16    A.   On the first floor is my husband's office, which is like a

17    large living room area.  There's A half bath, a laundry room and a

18    garage, two-car garage.  The second floor is the main living space

19    with a living room, half bath, dining room and then a great room,

20    kitchen, TV room connected.  The third floor is three bedrooms and

21    two full baths, the master bath, two individual bedrooms, and then

22    another full bath in the hall.

23    Q.   Is this a walkout porch that you guys --

24    A.   Yes, that's a balcony off the front living room.

25    Q.   And what do you look out at when you're out on that balcony?
```

```
 1   A.  You look into a ravine and then into the rest of the
 2   neighborhood, like a water ravine.
 3   Q.  This is the Same neighborhood that Mr. McKellar lives at?
 4   A.  Yes, Hollymeade.
 5   Q.  Just remind us, how many families live in that subdivision?
 6   A.  I believe there are 67 townhome units.
 7   Q.  And what's your understanding of how many of those townhomes
 8   have Chinese drywall, approximately?
 9   A.  Approximately 37, I think; 36 or 37 is what the last count that
10   I remember.
11   Q.  Has that had a major impact, obviously, on your community?
12   A.  Yes, yes.  Many of those homeowners have moved out, so it's
13   slowly over the last few months, since we found out in September
14   it's becoming vacant or maybe half filled, half occupied.
15   Q.  Next shot, please.  Who are we looking at here?
16   A.  Those are my precious children.  Derrick is nine years old,
17   Ethan is seven, and Claire is five.
18   Q.  And this is your other kid over here (INDICATING)?
19   A.  Yeah.
20   Q.  What does Fred do for a living?
21   A.  Yes.  He is a pastor, we pastor the City Life Church in Newport
22   News, we just celebrated four years.  We moved to Newport News when
23   we bought the home two years ago.
24   Q.  Does City Life Church have a church building at this point?
25   A.  No, actually we rent for our corporate meetings and then during
```

1   the week we have a lot of other types of meetings, small group,

2   leadership team meetings, and that happens in our home.

3   Q.  So was one of the reasons you bought the home that we just

4   looked at the need to have church meetings in the home?

5   A.  Yeah.  A couple of the things that we loved about the townhome

6   were the fact that it was new construction, but then the fact that

7   my husband would be officing from home and people could come.

8   Because of the kind of work that we do, we do marriage counselling,

9   we often meet with people in crisis, and they were able to enter

10  our home and have some sense of privacy because the office was on

11  the ground floor.  They didn't have to interact with the whole

12  family, so it was an ideal situation.

13          We also had just a fabulous floor plan on the second

14  floor to host meetings with 20 or 25 people and the space was

15  conducive to that, which we do probably twice a week.

16  Q.  Are you guys also home schooling the children in the house?

17  A.  Yes, uh-huh.  My children are in kindergarten, second and

18  fourth grade this year.

19  Q.  So the family life, the church life and the school life were

20  all there within that same building?

21  A.  Yes, that is definitely true of our home.  It wasn't just a

22  place that we come home to, but certainly really the hub of our

23  life happens there, both vocationally, and then for my children,

24  they don't leave the home during the day to be educated, we educate

25  them at home.

1   Q.  Vannessa, I would like you to focus on one aspect of having a

2   Chinese drywall house and that's the smell.

3   A.  Yes.

4   Q.  Would you tell the court about your dealing with the smell, how

5   it had manifested itself in your daily life?

6   A.  Sure.  When we moved into the home, since we never owned a new

7   construction, we just assumed that the distinct odor was from

8   the -- was from new construction, the fibers in the carpet, the

9   glue, the paint.  And really noticed it when we would come home

10  from vacations, when the home was, you know, closed up for a number

11  of days.  Again, we just never connected it with something being

12  wrong but just something that we would hope that would fade as time

13  passed.

14          And it actually continued to get stronger.  And one of

15  the things that we realized at the end of the summer when we went

16  to the very first informational meeting was that we had this

17  pervasive smell.  And really confirmed when we vacated the home,

18  which we did within two days of finding out that our home was built

19  with toxic drywall, because of our children.

20          But anyway, that smell has lingered and it's in my

21  children's home school books, it's in our clothing, it's in our

22  linens, and in some cases we've, you know, obviously had to get rid

23  of items because we can't get rid of the smell.

24  Q.  That was a mouthful.  Let me break down a couple of pieces

25  there.

1    A.  Yes, absolutely.

2    Q.  When did you move out of the house?

3    A.  We moved out, I believe it was September 5th of this year.

4    Q.  So we're going on six months --

5    A.  Yes.

6    Q.  -- since you've been moved out?

7    A.  Yes.

8    Q.  Is it your testimony to the court that that smell of the

9    Chinese drywall is still lingering in clothes and books and other

10   items that you guys have possession of?

11   A.  Absolutely.  And we've had to prioritize which items to

12   replace, obviously for financial reasons.  So some items like

13   mattresses that my children sleep on for ten hours a day, we, you

14   know, doesn't matter, we just got new ones.  And then other items

15   we've had to choose to still keep because we can't afford to

16   replace them right now.

17   Q.  Another thing you mentioned was the decision to move out in two

18   days.  Tell the court how that decision was made and why it was

19   done with such dispatch.

20   A.  Yes.  We were suspicious over the summer with the failure of

21   our air conditioner, we had only lived in our home for 19 months at

22   the time, and so we went to an informational meeting.  Mr. Serpe

23   conducted that meeting with our neighbors, and we came home and we

24   knew that we had many of the indicators; so that night we turned

25   off the power to our home and at midnight with flashlights when the

```
 1    kids were in bed and we pulled all of the wires and we saw that all
 2    of our copper ground wires were black, just like you had indicated
 3    would be a sign.
 4         We had already experienced the air conditioning failure
 5    with the evaporator coil, and we had already experienced many small
 6    electronic failures, which, of course, we had not linked with our
 7    home, we just thought they were electronic failures that were
 8    random.  And then we began to realize that there were some health
 9    things going on with our children, so it was for that reason,
10    really the health of our children that within just a couple of
11    days, like two or three days, we secured a small apartment and
12    immediately moved out of our home.
13    Q.  Did you get mortgage deferral from your bank?
14    A.  We did, starting in January.  So September through January we
15    were paying for our mortgage and the rent on this apartment that we
16    moved into.
17    Q.  Did that cause a hardship for your family?
18    A.  Yeah, absolutely.
19    Q.  And the deferral that you now have from the mortgage company,
20    is it accruing interest and building interest up that will have to
21    be paid off at the end, back end?
22    A.  Yes, that's exactly right.  So we have a pause on payment but
23    the interest is continuing to accrue, and I believe our mortgage
24    schedule will be reassessed at the end and we will have that tagged
25    on.
```

1    Q.  And you worked with an accountant and Ms. Barrios to look at

2    some of those numbers.  Do you believe that the increased interest

3    expense of interest bearing up is going to be a hardship on your

4    family as well?

5    A.  Yes.  Because at this point, to survive these last five months

6    we have, you know, in trying to save our credit, which to that

7    point was stellar, we've had to go through emergency savings, we've

8    had to cash in stock, we've had to do what any family would do to

9    try to keep our credit the way that it is now.

10            Of course the bank will only commit to us for 90 days at

11   a time, so at this point it's in good faith that the bank will keep

12   working with us.  We have no guarantee from them, and it may be

13   that we still have to walk away from our home or something much

14   worse.  We've met with a bankruptcy attorney and we're just

15   believing that this trial is going to be part of us being able to

16   keep our credit and be able to, you know, restore some of the

17   things that have been lost to us.

18   Q.  And in the way of trying to save money and keep your resources

19   together, tell the court how you were able to move out of the

20   Chinese drywall house into the smaller rental.

21   A.  Yeah.  When we found out, it was obviously very alarming.  For

22   me as a mom it was very emotional.  The home that, you know, we

23   thought we would spend the next many years in, which represented so

24   much.  It didn't look different, I think that was one of the

25   challenges, Richard, for us psychologically was, it's not as if a

1    fire had ripped through our home and it looked damaged, it looked

2    beautiful, yet we realized it was aggravating us with our health,

3    my son's eczema, his allergies -- and I know that we're not going

4    to go far down the health ramp -- but those were the reasons and my

5    husband's chronic and growing pain in his back.  And so for us, we

6    decided we had to get out.

7              We actually had a vacation, a family vacation scheduled.

8    And so our church was amazing.  They found out about it, and while

9    we were gone, I put sticky notes on furniture that would fit into

10   our apartment because it was much smaller than our home, and while

11   we were gone to Florida, they actually came in and took the

12   furniture with sticky notes and moved it into our apartment so that

13   when we returned from vacation, our family didn't have to sleep

14   there anymore.

15   Q.  So the house on Eastfield was now vacant?

16   A.  Yes.

17   Q.  Over the next couple of months, one expert after another after

18   another, both people that were hired by the Plaintiff Steering

19   Committee, as well as Knauf came into your home?

20   A.  Yes.

21   Q.  And took samples of all kinds of things?

22   A.  Yes, it looks fabulous right now.  We've got Sharpie all over

23   the walls and holes in the ceiling.

24   Q.  And some of those results have been shared with you.  Have you

25   come to find that there's Chinese drywall located on the first

```
 1   floor of your house?
 2   A.  Yes, there is.
 3   Q.  Is there Chinese drywall on the second floor of your house?
 4   A.  Yes, there is.
 5   Q.  And is there Chinese drywall on the third floor of your house?
 6   A.  Yes, all three.
 7   Q.  And, but you were the lowest number of sheets at 45 sheets,
 8   would it be your request to this court that some partial repair be
 9   done of just 45 sheets or what is it that your request would be
10   when it comes to the remediational repair of your home?
11   A.  Yes.  Your Honor, we are asking that our home would be restored
12   to the condition in which we bought it.  We think that that's
13   what's equitable, that's what would be fair.  It certainly would
14   help us to recover the $40,000 down payment that it took us ten
15   years to accrue; and at this point the home is of no value to us,
16   and we would like it to be restored to what we thought we were
17   buying when we signed on the dotted line on November 1st of 2007.
18   Q.  Vannessa, did you work carefully with appraisers and
19   accountants, Ms. Barrios, to come up with a summary of your
20   damages, both in terms of repairing your home as well as these
21   other expenses that you have incurred?
22   A.  Yes, we did.
23   Q.  And you've had a chance to review this?
24   A.  Yes.
25   Q.  And you believe it's a fair and accurate statement of the
```

```
 1   economic losses that you sustained in this case?
 2   A.  Yes, we do.
 3            MR. SERPE:  Your Honor, we have already provided this to
 4   the record and introduced it as P3.0622, and the page number is
 5   0010.
 6            No further questions, your Honor, thank you.
 7            THE COURT:  Thank you, very much.
 8            THE WITNESS:  Thank you.
 9            THE COURT:  Call your next witness, please.
10            MR. SEEGER:  Your Honor, we're going to go to television
11   at this point, we have A 54-minute video of an expert that's been
12   deposed in the litigation, Dr. Lori Streit, S-T-R-E-I-T.  Thank
13   you.
14        (WHEREUPON, THE VIDEO DEPOSITION WAS PLAYED AS FOLLOWS:)
15
16   18            Q.    Dr. Streit, this portion of
17   19       your testimony is going to be used by
18   20       Judge Fallon in the hearing that we're going
19   21       to be starting on Friday, just so you know,
20   22       okay?
21
22
23
24    5       you have.  Talk to us about your educational
25    6       background.
```

7      A.      I have a Bachelor of Science

8      degree in chemistry from Trenton State

9      college, which is now the College of

10     New Jersey; and then I went to Arizona State

11     University in Tempe, Arizona and worked

12     straight through, skipping my master's to get

13     my Ph.D. in four years.

14          Q.      Okay.

15          A.      My Ph.D. is in analytical

16     chemistry, materials analysis.

17          Q.      And when did you get your

18     Ph.D.?

19          A.      1987.

20          Q.      Okay.  In the earlier part of

21     your discovery deposition, I heard you use

22     the term "forensic chemist."  Is that

23     something that you'd go by?

24          A.      People in my field consider


1      themselves to be forensic scientists or a

2      forensic investigator, using the term

3      "forensic" not in the sense of that you would

4      see on, you know, the TV shows where you're

5      looking at blood and hair and fingerprints

6      and all those nasty things.

7        Q.      Like on CSI?

8        A.      Yeah.  We use it as a generic

9   term which involves doing an investigation,

10  potentially on site and then back in the

11  laboratory, and you're trying to solve a

12  problem, hence the term "forensics."

6        Q.      Okay.  And let's talk about

7   your full-time analytical job.  Who are you

8   employed by?

9        A.      Currently, I am employed by

10  Unified Engineering, and that is a scientific

11  and engineering consulting firm located in

12  Aurora, Illinois.

13       Q.      Okay.  Are you a principal of

14  that company?

15       A.      I am.  I am currently president

16  of that company.

24  professional time.  Do you do work on behalf

1    of companies?  Do you do investigative work?

2         A.    I do.  I would say probably 50

3    to 60% of what I do is what I would call

4    industrial consulting, meaning that companies

5    come to me, homeowners come to me, government

6    agencies, insurance companies, and they have

7    a specific problem which has some chemistry

8    or materials analysis aspect to it that

9    they're asking me to help them with.

10        Q.    Okay.  And what are the names

11   of some of the companies you've been retained

12   by to give opinions in chemistry?

13        A.    You know, I work for a wide

14   gamut.  It could be like, for example, I do a

15   lot of work for First Alert that makes smoke

16   alarms.  Along those lines, I do work for

17   Kidde.  I do work for Coleman.

                  Anyway, companies I've worked

     for, you know, again, First Alert, Sunbeam,

     Coleman.  I do a lot of work for automotive

     manufacturers, people that make automotive

     contacts and airbags, things of that nature.

10          I mean, it can be small

11    companies.  It can be large companies.  It

12    can be local companies.  It can be nationally

13    known companies.

14          Q.    In the course of your

15    engagement by some of these companies, have

16    you been asked to look at corrosion-type

17    issues?

18          A.    Very often I look at

19    corrosion-type issues, yes.

20          Q.    And talk to us about some of

21    the engagements you've had with regard to --

22    outside of this litigation, by doing forensic

23    chemistry with regard to corrosion issues.

24          A.    I can think of examples where


1    I'm looking at the smallest of components on

2    a circuit board, could be wires on a circuit

3    board, capacitors, could be contacts, and

4    going through corrosion on metal components

5    as a result of a fire, and then, you know,

6    all the way up to building supports, cranes,

7    pieces of cars, frames, things of that

8    nature.

9          Q.    Would some of your work be --

10    would it be involved in looking at doing like

11    a failure analysis?

12         A.    I do failure analysis in the

13    sense that, yes, I look at the corrosion

14    deposits.  I try to identify, sometimes, what

15    the corrosion deposits are, as far as what

16    the phases are, what's the impurities that

17    are in the corrosion.

18              I'm often called on to prepare

19    metallurgical samples, and so I'll do

20    cross-sections through the corrosion to see

21    whether the plating is still there to protect

22    it, how large the pits are, you know, whether

23    the corrosion goes actually all the way

24    through the metal, so you have a complete

1     failure penetration.  Could be a weld.  It

2     could be a fracture.

6          Q.    And what type of -- in the

7     course of doing that type of work, that

8     forensic chemistry looking at corrosion, what

9     type of tests would you do, would you employ?

10          A.     For me, I typically start, and

11     most of what I do within my laboratory, would

12     be using optical microscopes of different

13     types to look at samples at various

14     magnifications.

15               And then to do elemental

16     analysis and higher-magnification work, I

17     have a scanning electron microscope, which

18     allows me to do a more in-depth study.

19               And then I have a network of

20     colleagues that I work with and laboratories

21     that I work with, and we work back and forth,

22     so that none of us has an over -- a financial

23     burden due to acquisition of equipment.  So




3               So I use a variety of

4     analytical techniques, and it really depends

5     on what you're looking at.  If you're looking

6     at organic materials, you'll choose an

7     infrared technique.  If you're looking

8     at inorganics, you'll choose SEM with an EDS

9     detector.

10               If you're looking at gases, you

11    do gas chromatography.  If you're looking at

12    liquids, you do liquid chromatography and so

13    on.  PH testing.

14              And then there are specialized

15    tests that sometimes I'll recommend that I

16    don't necessarily do on a daily basis, but

17    they're part of my training and education and

18    experience, and so I pick those because I

19    think they are the best tests used for that

20    particular purpose.

21        Q.    One of the tests that you

22    mentioned was SEM.  Just for the judge's

23    convenience, what is an SEM?

24        A.    An SEM is an abbreviation for a

1     scanning electron microscope, and that is

2     something actually often used in the court

3     system as a way to look at metals and

4     inclusions and particles and to get an

5     elemental analysis of what you're doing.

6               It's essentially a larger piece

7     of equipment where you place the sample in a

8     chamber and you pull down a vacuum on it and

9     then you hit the sample with an electron beam

10    and you look at the energy of what's coming

11     off the sample.

12              So each energy represents a

13     specific element, and you'll get a spectrum

14     where you can say, "Okay, this sample

15     contains sulfur, calcium, oxygen," which

16     would be consistent with gypsum, or it has a

17     strontium particle or an elemental sulfur

18     particle, based on the analysis that you do.

19        Q.     Okay.  And is that -- the SEM,

20     is that the type of testing that you did in

21     this litigation in the course of rendering

22     your opinions?

23        A.     It was one of the tests that I

24     did, yes.


1         Q.     And just talk to us about some

2      of the other tests you did in this

3      litigation.

4         A.     There's a -- the optical

5      microscopy test that I had talked about where

6      you're using a light microscope, different

7      types of light microscopes, depending on what

8      you're doing, to get an assessment of what's

9      in the sample.

10              In this case, I was looking for

```
 1   11   elemental sulfur particles, so they have a

 2   12   certain characteristic that you look for.

 3

 4

 5

 6   19        Q.     And is that a method that you

 7   20   would employ whether you were hired by an

 8   21   insurance company to look at an issue for

 9   22   them as -- you know, is it a new type of

10   23   test, or is it something you always do?

11   24        A.     No, who employs me has no

12

13    1   impact, as far as I'm concerned, on what

14    2   tests I choose.  I choose the tests that I

15    3   think are appropriate to solve the problem.

16    4        Q.     Have you been -- prior to your

17    5   work here with regard to Chinese drywall, had

18    6   you been engaged by any companies to look at

19    7   any type of drywall issues?

20    8        A.     Yes, I have in the past.

21    9        Q.     Can you tell us a little bit

22   10   about that?

23   11        A.     The -- I have done work for

24   12   drywall companies, but actually, I've done

25   13   more work for another engineering firm which
```

14    goes by the name of Packer Engineering, which

15    is a place that I was formerly employed.

16              And they came to me and said,

17    "We're having some analytical needs that we

18    think you have better expertise to take care

19    of, and so we would like you to help us with

20    this project," and most of it was on domestic

21    drywall.

22        Q.    Okay.  And how long have you

23    been doing this for, you know, acting as a

24    forensic chemist?

1    A.    Since 1987.

2    Q.    Okay.

3    A.    So 23 years, I guess.

6              Before you were retained by the

7    plaintiffs' committee in this litigation, had

8    you had any experience with Chinese drywall?

9        A.    My experience with Chinese

10    drywall and this particular issue of the

11    odors and corrosive questions actually

12    started with a contact from David Krause from

13   the Florida Department of Health.

14            David and I have worked

15   together in the past on, actually, many

16   analytical projects; and, in fact, I met

17   David and was working with him while he was

18   still doing his thesis and was somewhat of a

19   mentor figure for him, to guide him through

20   his thesis work.  And then it's just kind of,

21   you know, progressed from there.  It's a

22   back-and-forth colleague relationship.

23       Q.    So David Krause from the

24   Florida Department of Health called you about

1   Chinese drywall.  Tell us what he called you

2   for.

3       A.      He called and he said, "Explain

4   to me" -- the Florida homeowners were

5   experiencing odors coming out of their home

6   and that they suspected that the drywall was

7   potentially a source, and that they were also

8   experiencing corrosion issues, and he knows

9   that I've done work on corrosion.

10            And so he said, "Can I send you

11   some samples?  I'd like you to take a look at

12   them and see if you can see what you see.

13      What are the major differences that are

14      jumping out at you?"

19          A.     He sent me four samples.  One

20      of them was marked -- although he has his own

21      identifications, one of them had a Knauf

22      marking; one of them said, "Made in China";

23      one of them was unmarked; and then one of

24      them, I believe, was Grid Marks, which is a

 1      National Gypsum product.

19          Q.     All right.  Dr. Streit, what

20      I'm going to mark and show you -- for the

21      record, what I've just marked as Streit

22      Exhibit 1, could you please describe what

23      that is?

24          A.     This is a -- this is a copy of

 1      the report that I issued to Dr. David Krause

 2      of the Florida Department of Health, dated

| | | |
|---|---|---|
| 1 | 3 | March 17th, 2009. |
| 2 | 4 | Q.     Okay.  And what does -- what do |
| 3 | 5 | you have in that report?  What does it show? |
| 4 | 6 | Does it show testing that you did on behalf |
| 5 | 7 | of the Florida Department of Health? |
| 6 | 8 | A.     Yes.  This is a report on the |
| 7 | 9 | initial study of the four samples that David |
| 8 | 10 | sent to me and asked me to characterize. |
| 9 | 11 | Q.     Okay.  And tell us what you |
| 10 | 12 | found. |
| 11 | 13 | A.     Basically, what we were finding |
| 12 | 14 | that stood out in this report -- and I should |
| 13 | 15 | go back.  I'm sorry. |
| 14 | 16 | In addition, he did send me a |
| 15 | 17 | piece of copper tubing that had blackened on |
| 16 | 18 | the surface. |
| 17 | 19 | Q.     Okay. |
| 18 | 20 | A.     So we can start with that.  We |
| 19 | 21 | took a sample of that off with what's called |
| 20 | 22 | a tungsten needle.  It's a very fine point, |
| 21 | 23 | so you can scrape material off.  And we did |
| 22 | 24 | an SEM/EDS of that material and determined |
| 23 | | |
| 24 | 1 | that that was rich in sulfur and in copper -- |
| 25 | 2 | Q.     Okay. |

3        A.      -- with a just a trace of

4   oxygen.  And so it was pretty clear at that

5   point that because of the lack of oxygen, it

6   would be a sulfide, and it's also black, as

7   opposed to green.

8              But just to confirm, we sent it

9   for, which is an x-ray diffraction

10  technique, and that technique is designed to

11  give you the actual chemical composition; in

12  other words, that it's a sulfide or a sulfate

13  or whatever it happens to be, so --

14       Q.     And XRD, is that a type of test

15  that chemists regularly employ to --

16       A.     For that type of purpose, yes.

17       Q.     Okay.

18       A.     So it's confirmatory of what we

19  actually saw by SEM.

20       Q.     Okay.

21       A.     Then we went on, and with

22  respect to the drywall, we did determine that

23  as a result of the testing, we were seeing

24  differences in the domestic product, which

1   was the Grid Marks product, versus the

2   Chinese product.

3          We saw strontium inclusions,

4     which are particles that were in the gypsum

5     of the Chinese products, as opposed to the

6     American products or domestically produced

7     products.

14          But it was clear that there was

15     a difference in strontium; and actually

16     subsequently to that, we did ICP and

17     confirmed that the strontium levels were

18     higher in the Chinese-made product as opposed

19     to the domestic product.

20          Q.     Okay.  Now, you used the term

21     "ICP."  Again, just for Judge Fallon's

22     benefit, what does that mean?

23          A.     "ICP" stands for inductively

24     coupled plasma.  And it's just a fancy term

1     for heating the sample up in a plasma

2     environment and then it emits a signal, which

3     you then detect using a mass spectrometer;

4     and each element has a distinct weight, so

5     it's separated by its mass.

```
1    6         Q.     And this test, is this a test
2    7    that's generally accepted by chemists to be
3    8    used for that type of purpose?
4    9         A.     Yes, it's used for the purpose
5   10    of looking at trace elements, specifically
6   11    metals --
7   12         Q.     Okay.
8   13         A.     -- and various substrates.
9   14         Q.     Now, Dr. Krause, at some point,
10  15    had published a poster at a conference.  Are
11  16    you aware of that?
12  17         A.     Yes, he did.
13
14
15
16  24         A.     The poster that I believe
17
18   1    you're referring to was presented at a
19   2    technical conference that occurred in
20   3    November in Tampa, Florida, where scientists
21   4    were invited to submit an abstract with
22   5    regard to their work on the Chinese
23   6    problematic drywall situation; and a panel
24   7    from the university of Florida then reviewed
25   8    all of the abstracts and selected the ones
```

1    9      that they thought were appropriate to be

2    10     presented at the conference.

3

4

5

6    14              So the posters and

7    15     presentations that were presented at the

8    16     conference, were they reviewed -- they were

9    17     independently reviewed, you're saying?

10   18        A.    They were independently

11   19     reviewed by the University of Florida,

12   20     members of the staff, so professors at the

13   21     University of Florida.

14   22        Q.    Would people in your field

15   23     consider that a peer-review process?

16   24        A.    To some extent, yes.  I mean,

17

18   1      they are our peers, obviously.  And there was

19   2      a review process that went on, and there were

20   3      some -- my understanding from talking with

21   4      David is some of them were rejected, and then

22   5      others were accepted and allowed to present.

23

24

25

22          Q.    All right.  Dr. Streit, let me

23    show you what I've marked as Exhibit 2,

24    Streit Exhibit 2.  And for the record, I just

1    have to put the exhibit number, the actual

2    trial exhibit number.  It's --

3                And can you identify for

4    Judge Fallon what this is that we've just

5    marked as Exhibit 2?

6          A.    In my understanding of what

7    this is, is this is David Krause's

8    presentation, poster presentation, at that

9    conference.  And what he had done was he sent

10    samples to three different laboratories, one

11    of which was our laboratory, Unified

12    Engineering, and he asked for a

13    characterization of the drywall.

14                And he was comparing the

15    various methods to see whether everyone that

16    looked at it came up with the identifications

17    that were consistent, whether it was domestic

18    or whether it was a Chinese-made product.

20      Q.    And, Dr. Streit, do you see the

21  name of your company listed anywhere on this

22  poster?

23      A.    In "Participating

24  Laboratories," we're listed as Laboratory C.

11      Q.    Okay.  And have you reviewed

12  any of the presentations, other than

13  Dr. Krause's, that were made at the Tampa

14  conference?

15      By the way, just for the

16  record, when was that conference?  I don't

17  know if you said the date.

18      A.    It was in November of last

19  year.

20      Q.    Of 2009?

21      A.    2009.

22      Q.    Okay.  And had you reviewed any

23  of the other presentations that were made at

24  that conference?

1      A.    I have.

2      MR. SEEGER:  Okay.  I'll just

1    3             mark a few.

2

3

4

5   12         Q.    All right.  Let me start

6   13   handing these to you.

7   14           Dr. Streit, what we've marked

8   15   as Exhibit 3 is a presentation done by a

9   16   Thomas Gauthier, Ph.D., and the title is

10   17   "Proposed Mechanism for the Release of

11   18   Reduced Sulfur Compounds from Corrosive

12   19   Imported Drywall."  Also, for the record, its

13   20   trial exhibit number is.

14

15

16

17   13         Q.    And let me also -- what I'm

18   14   handing to you, which has been marked as

19   15   Streit Exhibit 4, is a presentation by Robert

20   16   DeMott, who's a PhD, "Corrosive Imported

21   17   Wallboard, Investigating Emissions."  I'll

22   18   hand that to you.

23

24

25

| | | |
|---|---|---|
| 1 | 2 | Q.    Streit Exhibit 5, and the trial |
| 2 | 3 | exhibit number is P2.0091-0001, is a |
| 3 | 4 | presentation by Tony Worthan, MPH, "Chemical |
| 4 | 5 | Emissions Including Sulfur Compounds from |
| 5 | 6 | Chinese Produced Drywall." |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | 15 | Q.    And then Exhibit 6, Streit |
| 10 | 16 | Exhibit 6, which is trial-stamped |
| 11 | 17 | , is Michael Tuday and others |
| 12 | 18 | from Columbia Analytical Services.  The title |
| 13 | 19 | is "Measurement of Corrosive, Odorous and |
| 14 | 20 | Potentially Harmful Gases from Imported and |
| 15 | 21 | Domestic Wallboard." |
| 16 | 22 | All right.  Do you have all |
| 17 | 23 | four of those? |
| 18 | 24 | A.    I do. |
| 19 | | |
| 20 | 1 | Q.    Let me just start by asking |
| 21 | 2 | you, Dr. Streit:  Have you seen these |
| 22 | 3 | presentations? |
| 23 | 4 | A.    I have reviewed all of these |
| 24 | 5 | presentations. |
| 25 | 6 | Q.    And are these materials that |

1   7    you've relied upon in giving opinions in this

2   8    case?

3   9         A.    They are.

4

5

6

7   13         Let me ask you this with regard

8   14   to your experience with Chinese drywall:  How

9   15   many samples of drywall, Chinese drywall and

10   16   other drywall, in the context of looking at

11   17   problems of Chinese drywall, have you looked

12   18   at since you've been introduced to this by

13   19   Dr. Krause?

14   20         A.    Probably five to 600 total.

15   21         Q.    Okay.  And out of the five to

16   22   600, do you have any idea of how many of

17   23   those were identified as Chinese drywall

18   24   versus domestic drywall?

19

20

21

22   3         A.    I'd have to go through the

23   4   list, but I did provide a table; and if I

24   5   knew what the source was, I listed that in

25   6   the table.  So without sitting here and

7     counting them up, I really am not sure, but

8     my estimate would be probably 50 to 70 or so.

9     BY MR. SEEGER:

10         Q.     Okay.  And these samples have

11    been sent to you from various sources; is

12    that fair to say?

13         A.     I have received homeowners --

14    samples from homeowners, samples from other

15    industrial hygienists, samples from

16    remediation companies, samples from various

17    attorneys, from various government agencies.

18    Basically, I think I've gotten samples from

19    every aspect of people who would be exposed

20    to this problem.

9          Q.     Now, tell us -- before we move

10    into the specific opinions in this case, tell

11    us what the results of your testing for the

12    Florida Department of Health resulted in.

13    What did it show you?  What did you see?

14         A.     I'm seeing differences that I

15    thought were real and should be explored

16    further.

17        Q.      Differences, you mean, between

18    the Chinese drywall --

19        A.      And the domestic product.

22        A.      And so at that point, I wound

23    up getting in a discussion and conversation

24    with the EPA, the CPSC, the Department of

1    Florida.  There were representatives from the

2    drywall manufacturers also on the conference

3    call, and we had a one-and-a-half-to-two-hour

4    conference call about the findings.  And

5    where do you go from there, you know?

6        Q.      Did you present your findings

7    on that conference call?

8        A.      I did talk to them about --

9    they were all familiar with it because they'd

10    already read the report.  They had specific

11    questions, which I answered for them.

12            And then we started to talk

13    about, you know, what direction should we go

14    in?  They were asking questions about further

15    testing, and so I gave them ideas on, you

16     know, where -- what I thought they should do.

23          Q.     Have you been involved in any

24     testing that's been used by the CPSC?

1          A.     Yeah, there's -- some of the

2     testing that I have done, which was actually

3     done, commissioned by the CPSC, but they

4     hired a facilitator, if you will; and they

5     said, "Okay, you know, we want you to

6     coordinate all the testing from different

7     laboratories," and so I was sent samples, and

8     sent results back.

9          Q.     Dr. Streit, let me ask you

10    this:  So before anybody in this case had

11    sent you any samples related to the Germano

12    homes that we're going to be talking about,

13    what conclusions had you reached about

14    Chinese drywall in connection with the work

15    you were doing for the Florida Department of

16    Health and the CPSC, in your own testing?

17         A.     From my testing, I was seeing

18    sulfur gas emissions, meaning that I was

19    seeing hydrogen sulfide, I was seeing

20    carbonyl sulfide, and I was seeing carbon

21    disulfide in the samples that were sent to

22    me.  So I think that needed to be explored

23    further.

24                And then I was also seeing a

1    difference in the strontium, which drew up a

2    flag for me, and I was looking further,

3    really, at that.  Those are the two main

4    tests out of the initial report that I was

5    somewhat focusing on.

12       A.    I continued to look at

13    corrosion deposits on metals for clients as

14    well.

15       Q.    And so the client -- were these

16    metals being sent to you -- who were they

17    being sent to you by?

18       A.    Sometimes, the manufacturer of

19    the HVAC equipment.  Sometimes, they were

20    sent by investigators that would go out in

21    the field and cut out a piece of the coil or

22     a piece of wiring and send it to me.

23          Q.     And did the CPSC ultimately

24     make available results of testing that they

1     had done?

2          A.     I think they've done that

3     several times.

12          Q.     All right.  Dr. Streit, let me

13     show you what we've just marked as Exhibit 7,

14     and it's the trial exhibit number

15     P1.019-0001.

16               And can you identify what that

17     is for Judge Fallon, please?

18          A.     Yes.  This is the CPSC's

19     report -- or part of the report that was put

20     out on November 23rd of last year.  And it

21     looks like this is the particular report

22     section that deals with the chemical analysis

23     portion, and I have to go through and see.

24               It doesn't look like the

1     corrosion part is in here, so this is more of

the chemical sampling part of the report.

Q.     And have you reviewed this?

A.     I have reviewed it, yes.

Q.     And are the findings with regard to Chinese drywall that you found and what's in this report consistent, in your opinion?

A.     Yeah, they're consistent.  I tended to find that these strontium levels were a little bit higher than they're saying. Their value apparently goes down to 1200 ppm strontium, and most of what I'm seeing was above 1800 or so, although there are outliers.  I do see some that are below 1200.

But from a consistent point of view, I think the important thing is that there's a difference in the strontium levels, being that it's elevated in the Chinese drywall and not elevated in the domestically produced product.

Q.     And that difference, is that also -- is your finding of that difference in the strontium levels -- is that consistent

with what you've seen published by the

1    2    Florida Department of Health as well?

2    3         A.    Yes.  They were finding the

3    4    same thing, as were many people who presented

4    5    at the conference.

5    6         Q.    And what about -- now going

6    7    back to the CPSC report that you have in your

7    8    hand, marked as Exhibit 7, what about with

8    9    regard to off-gassing?

9    10        A.    With regard to off-gassing,

10   11   they're saying that they find hydrogen

11   12   sulfide, that they measure in the homes by

12   13   the use of a passive sampler, meaning that

13   14   they're taking an average over a two-week

14   15   span, as to opposed a -- they did do grab

15   16   samples, but apparently they've abandoned

16   17   that.  They don't even really mention it in

17   18   their summary.

18

19

20

21   19        Q.    Okay.  I'm going to hand you

22   20   what we've just marked as Streit Exhibit 9,

23   21   which is trial-marked P1.1804-0001.

24

25

7          Q.     Can you identify for

8   Judge Fallon what I've just handed you and

9   marked as Streit Exhibit 9?

10          A.     This is a summary of work that

11   was released by the interagency task force

12   studying the -- the government task force

13   studying the drywall on October 29th of 2009,

14   so it predates the 50-home -- 51-home study.

15              This one is indoor air testing

16   of ten homes from the Florida and Louisiana

17   area, and then they actually allude to the

18   fact that they're going to be releasing a

19   more comprehensive 50-home study at that

20   time.

21          Q.     Okay.  And is this something

22   you reviewed?

23          A.     I did review it, yes.

24          Q.     And both with regard to Streit

1   Exhibit 8, which is the CPSC study, and

2   Exhibit 9, which is the Florida Department of

3   Health study, have you relied upon both of

4   those in rendering your opinions in this

5   case?

6        A.      Again, this is something that

7    I've looked at, and yes, I have relied upon

8    it.  It's consistent with what I've seen in

9    my own testing.

1        Q.      So you've looked at both of

2    these, and you've relied on these in

3    connection with rendering your opinions in

4    that case; is that fair?

5        A.      I have.

6    you this, Dr. Streit:  With regard to the

7    Germano homes that are the subject of this

8    hearing that Judge Fallon is presiding over,

9    what were you asked to do by the plaintiffs'

10   lawyers in this case?

11       A.      I was asked to visit the home,

12   and then I was asked to analyze samples that

13   were harvested from the homes and determine

14   if, in fact -- the testing that I would

15   normally run on these samples at that point,

16    whether I was seeing elevated levels of

17    strontium, whether I was seeing strontium

18    inclusions, whether I could analyze the black

19    deposits and determine whether that was

20    copper sulfide or copper oxide, looking at

21    off-gassing to see whether the samplers were

22    going to admit the hydrogen sulfide, carbonyl

23    sulfide and carbon disulfide that we were

24    essentially seeing; and then to also, in

1    conjunction with reviewing other materials,

2    draw conclusions, based on my work and review

3    of others.

4         Q.    Okay.  Let me start with your

5    conclusions here.  What did you see with

6    regard to elevated strontium off-gassing and

7    corrosion in the homes you visited in the

8    Germano litigation?

10         A.    With respect to off-gassing,

11    when I walked into the three houses that

12    contained suspected drywall that was produced

13    in China, the homes have a very distinct and

14    noticeable odor.

15              It's -- it was something that

16    in certain areas the home was stronger than

17    in others, and as the day progressed,

18    actually somewhat became a little irritating

19    to my eyes and was causing me to cough a

20    little bit, which subsequently, as I got more

21    fresh air, was better.

22              I then went into what was

23    considered to be a control home, where there

24    was no drywall manufactured from China; and I

1     looked at the copper surfaces in that home,

2     the wiring and the bathroom plumbing and so

3     on, and determined that I didn't see any

4     visible sign of corrosion, nor did I perceive

5     an odor in that home.

9     I mean, did you -- those were sort of your

10    visual observations.  What about your testing

11    analysis?

12              A.    Those samples were tested in a

13    humidified environment, just like many of the

14    other samples have done, where you take a

15    piece of the drywall, you take off the paper,

16    and then you place the sample in a humidified

17    environment for a period of time, typically

18    48 hours, and then you measure the gases

19    which come out of that drywall to determine

20    what they are.  Are they hydrogen sulfide?

21    Are they carbonyl sulfide?  Are they carbon

22    disulfide?  Are they another sulfur gas, or

23    are they something else?

24          Q.      And what did you find?


1          A.      When the samples are

2     humidified, what we tend to see is carbonyl

3     sulfide and carbon disulfide at elevated

4     levels, because the hydrogen sulfide, as it

5     turns out, is absorbed by the moisture as a

6     result of the way the test is run.

7                And so when we went back and

8     ran those dry, you get a hydrogen sulfide

9     emission, which you miss if you run the

10    samples humidified.  So you see all three

11    gases that will be given off by the Chinese

12    drywall that -- the hydrogen sulfide, we

13    don't see coming out of the domestic product

```
 1   14    at all.  There are a couple of instances

 2   15    where you may see carbonyl sulfide in

 3   16    domestic product, but it's at pretty low

 4   17    levels.

 5

 6

 7

 8   20    what type of tests did you do with regard to

 9   21    off-gassing?

10   22          A.    This is a GC mass spec test.

11   23    That stands for gas chromatography, and it's

12   24    a mass spectrometry detector.

13

14

15

16    6         Q.    All right.  Let me ask you

17    7    this:  With regard to the testing for

18    8    off-gassing, the method that you used, do you

19    9    have an opinion as to whether that is a more

20   10    reliable method for measuring off-gassing

21   11    than, let's say, certain indoor air quality

22   12    tests?

23

24

25
```

15          A.     Well, they're ASTM tests that

16     are designed to measure the off-gassing under

17     a controlled set of conditions, so that you

18     are essentially putting a piece of drywall in

19     a container and you are trapping the gases

20     that come out, so you can actually measure

21     them, as opposed to taking air samples in a

22     house, where, quite frankly, it's really

23     hit-or-miss.

24          You know, if you talk to the

1     homeowners, sometimes they smell something,

2     sometimes they don't, so when do you take

3     your sample?  Do you wait until the

4     homeowners smell something, or, you know,

5     what do you do?

6          And I think that that was my

7     initial criticism of air sampling, and the

8     reason why I had expressed that opinion to

9     the CPSC and David, that I really didn't

10     think the air sampling was very productive.

11          I really thought it would be

12     better, if you want to find out if the

13     drywall is a problem, you have to control the

14     test better.

15      BY MR. SEEGER:

16          Q.     Now, when you say this is the

17      opinion you gave to David, you're saying this

18      is what you had said to David Krause at the

19      Florida Department of Health, just to be

20      clear?

21          A.     Right.  That is correct.

22          Q.     Let's talk some about what you

23      observed in the Germano homes that have

24      Chinese drywall and the control home there


1       with regard to corrosion.

2           A.     The Germano homes have

3       corrosion that are pretty widespread.  When

4       you go in the home, if you look at the copper

5       tubing in the bathrooms, the water lines,

6       they're black.

7                  If you open up the back of the

8       refrigerator and you look at all of the

9       associated tubing and wiring that's in the

10      back of the refrigerator, that was all back.

11                 In one case, the lamp wire

12      going up all the way to the ceiling, you

13      could see that the wires were black

14      underneath; and, in fact, we later analyzed

15    those samples.

16              You saw it when we looked at

17    the alarm systems, and you took the cover off

18    the alarm system.  You could see darkening of

19    the wires on the alarm systems.

20              Then we went up and looked at

21    the air-conditioning coils.  And in the one

22    home, I think it was the McKellar home, the

23    coil had only been in there for two months,

24    and it was black.


1              Q.    The HVAC coil?

2              A.    The HVAC coil.

3              And then, of course, we'd look

4    at the outlet covers and take the outlet

5    covers off and look at the wires, and they

6    were blackened.  There were picture frames

7    which showed some blackening.

8              If you looked at the

9    chrome-plated fixtures in the bathroom, they

10   were all blackened.  The mirror backing was

11   affected.  It was actually pretty pervasive

12   in the entire house.

15    corrosion on metals.  What is the

16    significance of you seeing black on the

17    metals that you observed in the Germano

18    homes?

19          A.    It's different than what you

20    would consider normal aging or, you know,

21    aging corrosion as a result of being in an

22    oxidizing environment, in the air.

23                What we're seeing are deposits

24    of black material on the surface, actually,

1     you know, physical deposits on the surface,

2     so -- and that's the formation of the

3     sulfide, which then was corroding the metal

4     underneath.

5                 And visually, it appears

6     different.  It's not a thin discoloration

7     layer.  It's actually a material on the

8     surface that you can scrape and analyze,

9     whereas oxidation, it's very difficult to do

10    that.  You wind up analyzing the entire

11    substrate.

12          Q.    Well, do you have an opinion as

13    to whether this is the kind of corrosion that

14    you can just kind of wipe off the wires?

15         A.    The corrosion, you can't wipe

16    off.  And even the black material, some of it

17    you can wipe off -- you know, we're doing

18    that to collect samples -- but not all of it.

19    And, in fact, some of it is held on quite

20    tightly.  Other material, you can poke at it,

21    and then it will flake off.

22              And then in some places, you

23    can't get it off at all because it's held on

24    by the corrosion pits, if you will.  So, you

1     know, you're not going to be able to just

2     wipe it off.

6         Q.    Well, do you have experience

7     doing -- you know, looking at corrosive

8     metals, metals that have corrosion on them?

9         A.    Very often I look at problems

10    involving corrosion and oxidation of the

11    surface, deposits on the surface.  I look at

12    the extent of corrosion, pitting, whether

13    it's penetrated through the metal, whether

14    it's, quote/unquote, "formicary," so it's

15    tunneling in.

16         It really -- and those samples

17    are something that I get quite frequently

18    because that's a pretty large problem in the

19    world we live in, with exposure to chemicals

20    and thing.

21        Q.    And is that a large part of

22    what you do generally in connection with

23    you -- the work you do for industry, is

24    looking at corrosion and telling your clients

1     in that case the cause or the extent of the

2     corrosion?

3         A.    Sure.  What's in the corrosion

4     deposit, what I believe is causing it, and

5     then sometimes we talk about how to fix the

6     problem.  But typically, they come to me

7     because they need the analysis done.

9     know, how long have you been working on

10    identifying corrosion problems and the extent

11    of corrosion for anybody who's ever hired you

```
 1   12     to do it?
 2   13          A.     I've been doing that for my
 3   14     entire professional career.
 4
 5
 6
 7   23          Q.     Dr. Streit, I'd like to mark
 8   24     for you the report that you gave in December
 9
10    1     on behalf of the Germano plaintiffs, and your
11    2     supplemental report that you did in January.
12    3     For the record, what I'm marking as Streit-8
13    4     is Trial Exhibit P1.2023-0001.
14    5               And is that a start of your
15    6     report that I've marked as Streit-8?
16    7          A.     Without counting up all the
17    8     pages, it does appear to be a copy of my
18    9     report.
19
20
21
22   16          Q.     Okay.  And then I've also
23   17     marked as Streit-10 -- sorry we went out of
24   18     order -- your supplemental report.  Would you
25   19     please take a look and confirm -- ooh, let me
```

```
 1    20    just read for the record.  It's Trial

 2    21    Exhibit No. P1.2025-0001?

 3    22              Is that your supplemental

 4    23    report?

 5    24         A.    Yes, it is.

 6

 7     1         Q.    Okay.  Now, Dr. Streit, take

 8     2    your report from December please, and

 9     3    consistent with what we've been discussing on

10     4    corrosion, you've included some photographs;

11     5    is that correct?

12     6         A.    I have.

13

14

15

16    12              But I want to start with the

17    13    photos on page -- actually, if you look at

18    14    the last four numbers, you see where it's got

19    15    a P number?

20    16         A.    Yes, sir.

21    17         Q.    It's dash 0050, if you can go

22    18    to that page.

23    19         A.    Okay.

24    20         Q.    So assuming that we'll have

25    21    this page up in front of Judge Fallon, could
```

1    22    you please tell the judge what is here?

2    23        A.    This was the air-conditioning

3    24    coil that was taken out of the McKellar home

4

5    1    after I had visited that home in November.

6    2        Q.    Okay.  All four of these photos

7    3    show that?

8    4        A.    Yes.  All -- well, no, one,

9    5    two, three.

10

11

12

13    10        Q.    Okay.  Let's start with the

14    11    upper left-hand corner, and please tell

15    12    Judge Fallon what that shows.

16    13        A.    This is a picture of the end of

17    14    the A/C coil where the installation date was

18    15    noted as September 6th of '09.

19    16        Q.    Okay.

20    17        A.    And what it's showing is the

21    18    ends of the copper coils which would normally

22    19    be a copper color, may not necessarily be

23    20    shiny, but they're a copper color.  And as

24    21    you can see, they've been blackened, and they

25    22    have deposits on them; as well as the upper

1    23    right-hand one, which is the extension of the

2    24    copper tube from the end of the

3

4    1     air-conditioning coil.

5    2            Q.     Now, is the upper right-hand

6    3     photo a good example of the blackening that

7    4     you saw?

8    5            A.     It shows up much better in that

9    6     photograph than it does in the prior

10   7     photograph.

11   8            Q.     Okay.  And then if you could

12   9     tell us what the lower left-hand photo

13   10    demonstrates.

14   11           A.     That's a documentation of the

15   12    area where I scraped off the black material

16   13    and then did an SEM/EDS analysis to confirm

17   14    that, in fact -- or identify that it was

18   15    copper and sulfur.

19   16           Q.     Okay.  And what is the

20   17    significance of finding copper and sulfur on

21   18    that HVAC coil right there?

22   19           A.     That it's a copper sulfide, and

23   20    sulfides form from exposure to sulfide gases.

24   21           Q.     Okay.  And the sulfide gases

25   22    that you've identified in your testing are

1    23    hydrogen sulfide?

2    24          A.     Not only myself, but the CPSC

3

4    1    and many others have identified hydrogen

5    2    sulfide, carbonyl sulfide and carbon

6    3    disulfide.

7

8

9

10    3          Now, what are the significance

11    4    of these three compounds in your opinion with

12    5    regard to corrosion in the home?

13

14

15

16    8         A.     They are reduced sulfur gases,

17    9    meaning that they will corrode metal and they

18    10    will leave an odor and they will leave --

19    11    react with the metal in order to form the

20    12    metal sulfide.

21    13    BY MR. SEEGER:

22    14         Q.     Is this new chemistry you've

23    15    invented, or has this been around?

24    16         A.     It's been around forever.

25    17         Q.     Okay.  Now, take a look at the

```
 1   18      photos on page 0036 of your report.  All

 2

 3

 4

 5   22      starting from the upper left, could you tell

 6   23      us what these show?

 7   24              A.      This is an outlet that was

 8

 9    1      taken from the Heischober house.

10    2              Q.      Okay.

11    3              A.      Hence the initials "SLH."

12    4              Q.      Okay.

13    5              A.      And the close-up that you see

14    6      on the upper right is a digital camera

15    7      photograph of the blackened surface of the

16    8      ground wire that is attached to the outlet.

17    9              Q.      Okay.

18   10              A.      And then the lower right-hand

19   11      corner is a 40x microscopic image of the

20   12      blackened surface of the copper wire.

21   13              Q.      Let me just correct one thing.

22   14      You said -- that's the lower left-hand

23   15      corner.

24   16              A.      Did I say "right"?

25   17              Q.      Yeah.
```

```
 1   18          A.     I'm sorry, the lower left.

 2

 3

 4

 5    3          A.     And that is basically just a

 6    4    close-up of the wire, the ground wire that's

 7    5    shown in the upper photographs.  So we're

 8    6    going progressively from an overall shot so

 9    7    you can see where it came from, to a closer

10    8    macro shot of just the wire, to the actual

11    9    blackened surface to show you what it looks

12   10    like.

13   11          Q.     Okay.  Again, just looking at

14   12    the surface, tell us the significance of this

15   13    photograph.  What does it show?

16   14          A.     It shows black deposits on the

17   15    surface of the wire, and when you remove

18   16    them, they are confirmed to be copper

19   17    sulfide.

20   18          Q.     Okay.  Is copper sulfide

21   19    corrosive?

22

23

24

25   22          A.     It is the -- I'm sorry.  It is
```

23    the corrosion by-product of the reaction with

24    a sulfur-reducing gas.


1         Q.    Okay.  That's what gets left

2     behind?

3         A.    Yes.  It's the reaction of the

4     corrosion product -- of the corrosion with

5     the metal, and it forms the corrosion

6     product, which is what you see on the

7     surface.

8         Q.    Can you go to page 0077.  Now,

9     one of the things you had mentioned earlier

10    when I asked you about your visual

11    observations is I think you talked about a

12    lamp cord?

13        A.    Yes.  This is a piece of a wire

14    that was going up from the lamp to the

15    ceiling.

16        Q.    Okay.  So tell us again on

17    this, going from, you know, left to right,

18    down, left to right, what you have here.

19        A.    The left is just the

20    documentation of the sample.  It's from the

21    Morgan residence --

22        Q.    Okay.

23        A.        -- Sample 5.  This is the

24    section that I received of the wire.


1         Q.        To the right of that, on top?

2         A.        To the right of that on the

3    top.

4              The lower left, what I did was

5    I took a razor blade, and I sectioned across

6    the sample, so you're looking at a

7    cross-section.  And you can see where some of

8    the strands of the wire in the lower right

9    portion are actually still in, stuck to the

10    polymer.  They didn't come out with the rest

11    of the wire.  And then on the inside surface

12    of the wire that was bound so tightly that

13    you actually got the wire impressions, you

14    see black material.

15              And those black deposits were

16    later identified as copper sulfide, and then

17    the corresponding wires that came out of that

18    wire are shown on the lower right, where you

19    can see some of the black material continues

20    to stick to the surface of the copper.

21        Q.        Now, the ground wire photo we

22    looked at, the ground wire was exposed.  It

| | | |
|---|---|---|
| 1 | 23 | didn't have any plastic on it or anything, |
| 2 | 24 | right? |
| 3 | | |
| 4 | 1 | A.    That is correct. |
| 5 | 2 | Q.    Okay.  What is the significance |
| 6 | 3 | of this -- of these photos? |
| 7 | 4 | A.    This is significant because the |
| 8 | 5 | corrosive gases have actually penetrated |
| 9 | 6 | through the plastic. |
| 10 | 7 | Q.    Okay.  And then if you could |
| 11 | 8 | also go to page 0083, Dr. Streit, and could |
| 12 | 9 | you please explain to us the significance of |
| 13 | 10 | these four photos? |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | 22 | It is labeled "Receptacle End" |
| 18 | 23 | because this portion of the wire was related |
| 19 | 24 | to a receptacle which was further over on the |
| 20 | | |
| 21 | 1 | wall, so that was the only way they could |
| 22 | 2 | describe it. |
| 23 | 3 | Q.    Just for the record, you didn't |
| 24 | 4 | harvest these yourself? |
| 25 | 5 | A.    I did not harvest them.  My |

6    understanding was that this was taken from

7    inside the wall but not at the receptacle.

7         Q.    Okay.  Just, again, assuming

8    that Judge Fallon is trying to follow along,

9    tell us what photo you're looking at.

10         A.    I'm sorry.  I'm looking at the

11   upper right-hand photo, which is photo 13.

12         Q.    What does that show?

13         A.    That's the actual piece of the

14   Romex that came out.

15              And then if you look at

16   photo 16, which is in the lower left, those

17   are the three components that are within the

18   Romex.  So if you remove the outer jacket of

19   the Romex, you get a white wire, a black

20   wire, and the ground wire.

21         Q.    Okay.

22         A.    I then stripped out the end of

23   the insulation, so I could look at the metal

24   underneath, and obviously the ground wire was

1    covered with paper, which is shown in

1   2   photo 15.  They've got backwards on this

2   3   scheme of things.

3   4           Q.      Okay.

4   5           A.      And then I looked at the

5   6   surfaces under examination, and --

6   7           Q.      So now we're back to page 0083?

7   8           A.      Right.  And the actual wire

8   9   that -- the only one that actually showed

9   10  blackening is the ground wire, so you see the

10  11  wire in photograph 1352, and then you see it

11  12  up close in photograph 1353.

12  13          Q.      So 1352 is the upper left, and

13  14  then the upper right?

14  15          A.      And then closer up, it's at 40x

15  16  magnification, you can see the black deposits

16  17  on the surface which were later confirmed by

17  18  SEM/EDS to be copper sulfide.

18  19          Q.      Okay.  Now, did you do any

19  20  testing of the wire coatings in both the lamp

20  21  cord and the Romex cord?

21  22          A.      The testing that I did was to

22  23  see whether the polymers themselves

23  24  incorporated sulfur in their structure.  So

24

25  1   if there was bulk sulfur in the polymer, I

1    2    was looking for that.

2    3         Q.    Okay.  And what did you find?

3    4         A.    I didn't see any sulfur

4    5    incorporated within the plastic itself to

5    6    indicate to me that it was a sulfonated

6    7    polymer, so my conclusion from that is that

7    8    the sulfur had to come from outside in.

8    9         Q.    Okay.  So was it your

9    10   conclusion that it actually permeated through

10   11   the outer coating?

11   12        A.    It permeates through and

12   13   attacks the copper metal underneath.

13   14        Q.    Okay.  Now, did you do any of

14   15   this type of testing -- well, let me ask it

15   16   to you this way.

16   17             What did you do in the control

17   18   homes with regard to corrosion?  Did you

18   19   observe any?

19   20        A.    In the control home, there were

20   21   samples of wiring harvested.  I recall a

21   22   switch specifically and the ground wire; and

22   23   I did examine that, and I didn't find any

23   24   black deposits on the surface.

24

25   1         Q.    Dr. Streit, do you have an

1    2    opinion as to whether the homes, the Germano

2    3    homes, that you visited and did testing in

3    4    with Chinese drywall are a corrosive

4    5    environment for wires and HVAC coils?

5

6

7

8    8         A.    I think that it's been clearly

9    9    shown that sulfur gases come out of the

10   10   drywall that's incorporated in the Germano

11   11   homes.  There's sulfide gases.  The deposits

12   12   on the surface are copper sulfide, which

13   13   would be the result of interaction with

14   14   sulfide-containing gases, and, you know,

15   15   those are clearly corrosion deposits which

16   16   have been observed on wires and appliances

17   17   and the A/C, HVAC coils in those homes.

18   18   BY MR. SEEGER:

19   19        Q.    Okay.  Is that -- your

20   20   conclusion there, is that consistent with

21   21   what you've seen published by the CPSC and

22   22   the Florida Department of Health?

23   23        A.    I think, yes, the CPSC, the

24   24   Florida Department of Health and other

25

1    investigators for various agencies or

2    various -- hired by various people, whether

3    it be other environmental firms or, you know,

4    whomever.

5         The data is very consistent,

6    that sulfur gases are being emitted by the

7    Chinese drywall, and the corrosion that's on

8    the surface of the metals is copper sulfide

9    which results from the interaction with those

10   sulfur gases.

11        Q.    And is that finding consistent

12   with the presentation made by Robert DeMott

13   from Environ at the Tampa conference?

16        A.    I believe it is.  As I'm going

17   through it, he talks about the differences

18   between reduced sulfur gases and other types

19   of oxide which we don't see on these samples.

20   These are caused by reduced sulfur gases as

21   evidenced by my report, the CPSC, you know,

22   his findings and many others.

23        Q.    Is it possible for you to say,

24   sitting here now, which of these sulfur gases

1

1     is causing the corrosion or if it's a

2     combination of the sulfur gases?

3          A.     I really don't think that

4     anyone knows exactly which one specifically

5     is responsible for the corrosion or whether

6     it's a mixture of all three.

7               I think that at this point

8     everyone is convinced that those are -- the

9     three gases that I've already mentioned are

10     the main players.  But, you know, this is

11     ongoing, and it's still being investigated,

12     and I haven't seen anyone who's come out and

13     given a definitive yes, it's this.  And I'm

14     in that ballpark as well.  We're still

15     looking at the problem to try to isolate, if

16     we can isolate, which one it is, or if it

17     isn't, maybe it is a combination.

18               MR. SEEGER:  You know, let me

19          mark another exhibit just for the next

20          couple of questions we have, the data.

5          Q.     Okay.  Dr. Streit, we've just

1   6   marked for the record as Streit-11.  It has

2   7   the trial stamp P1.1849-0001.  And not -- you

3   8   don't have to go into specifics, but can you

4   9   generally describe what we've just marked as

5   10   Streit-11?

6   11         A.     These are samples that were

7   12   received on January 20th.  They are samples

8   13   from the Orlando home of pieces of drywall

9   14   that were subsequently analyzed.

10   15         Q.     Right.  And I need to make one

11   16   correction.  For the record, Streit-11

12   17   consists of several trial exhibits.  The

13   18   first one is P1.1849-0001 and P1.1850-0001 --

14

15

16

17   20   system -- and P1.1851-0001.

18

19

20

21   4   have in front of you, is what did you

22   5   discover in the Germano homes in regard to

23   6   the strontium levels?

24   7         A.     Well, the strontium levels in

25   8   the Germano homes as evidenced by not only

9       the Exhibit 1849, but also incorporated in

10      other data, show that the Germano samples

11      tend to be pretty high in the strontium.

12      They're in either the upper 2,000s or in the

13      3,000s part per million, milligrams per

14      kilogram of strontium.  So they're on the

15      higher side of what is generally accepted as

16      being the levels in Chinese-produced board.

20              Do you have an opinion as to

21      whether the off-gassing accelerates with the

22      increase in heat and humidity?

23      A.      I think that it's been shown

24      that it accelerates and different gases tend

1       to come out when it's humidified, whereas in

2       a less humidified situation you tend to get

3       more of the hydrogen sulfide.  In the

4       humidity studies, at least in the controlled

5       environments, you tend to get more of the

6       other two because the hydrogen sulfide is

7       readily absorbed by water.

8               So what will happen is the

9      hydrogen sulfide will absorb in the water and

10     form an acidic environment, and that's

11     ultimately what's causing much of the

12     corrosion or related to the corrosion,

13     specifically on the HVAC coils which are

14     moist all the time.  That's why you're

15     getting six failures in three years.  It's

16     because of the accumulation of the sulfide

17     gases dissolved in the water.

18          Q.     Now, let's just pause on that

19     with regard to HVAC coils.

20               Have you seen coil failures in

21     shortened periods of time because of

22     corrosion?

23          A.     I have, yes.

24          Q.     And what is a normal life of,

1      let's say, an HVAC coil?

2          A.     According to the manufacturers,

3      which many of which are my clients and I've

4      looked at their failed coils as well, we've

5      had that discussion, because I thought it was

6      odd that you'd get that many failures.  I've

7      never seen that kind of failure rate.

8               And what their technical people

9       have reported to me is that the typical life

10      would be anywhere from 10 to 20 years, you

11      know, 20 being on the extreme side if you

12      were wonderful homeowner and you did all of

13      your maintenance on a regular schedule, which

14      in reality probably doesn't happen very much,

15      and ten years on the other side, where you

16      may have some other factors that are

17      potentially causing a problem like exposure

18      to chemicals, you know, seawaters,

19      fertilizers and things like that --

20              Q.      And what --

21              A.      -- but typically ten years is

22      the shortest.

23              Q.      What have you seen in homes

24      with Chinese drywall?


1               A.      You know, many of these homes

2       have multiple failures.  The McKellar home

3       that you were looking at, that

4       air-conditioning coil had only been in for

5       two months, and it was already black.

6                       And I think there was one

7       home -- and, excuse me, I don't remember the

8       homeowner's name -- but six coils in three

```
 1   9    years.  That's outrageous.  That's an
 2   10   unbelievably fast failure rate.
 3   11        Q.     Had you ever seen anything like
 4   12   that?
 5   13        A.     No, I have not.
 6
 7
 8
 9   23        Q.     Now, do you have an opinion to
10   24   a reasonable degree of scientific certainty
11
12   1    as to whether that off-gassing causing the
13   2    corrosion is coming from Chinese drywall?
14   3        A.     Well, I don't think there's any
15   4    doubt that the drywall is releasing corrosive
16   5    gases and those gases are attacking the metal
17   6    and forming corrosion products.  That's very
18   7    clear.
19
20
21
22   11        Q.     Dr. Streit, the opinions that
23   12   you've expressed here in this examination, do
24   13   you hold them to a reasonable degree of
25   14   scientific certainty?
```

```
 1   15        A.     I do.

 2   16        Q.     All of the opinions you've

 3   17   expressed in this case?

 4   18        A.     Yes, sir.

 5        (WHEREUPON, THE VIDEO DEPOSITION WAS CONCLUDED.)

 6

 7        MR. ECUYER:  The only housekeeping, I didn't want to

 8   interrupt the video, but we would like to offer Dr. Streit,

 9   obviously, an expert in chemistry and metal failure analysis.

10        THE COURT:  Yes, okay.  The court will accept her, and we

11   will take a 15-minute break at this time.

12        THE DEPUTY CLERK:  Everyone rise.

13        (WHEREUPON, A RECESS WAS TAKEN.)

14        THE COURT:  Be seated, please.  Call your next witness.

15        MR. ECUYER:  Your Honor, just one bit of housekeeping

16   again --

17        MR. SEEGER:  I'm sorry, I misspoke.  When I offered

18   Dr. Streit as a chemistry, I said metals, I should have said

19   materials failure analysis expert, just for the record.  Thank you.

20        MR. ECUYER:  Your Honor, one matter.  In reviewing our

21   list, we would also like to strike previously-admitted Exhibits

22   P1.1889 and P1.1890, and in my EXCITEMENT this morning I misspoke.

23   The one we added this morning was P3.0636, your Honor, not 26.

24   Thank you.

25        THE DEPUTY CLERK:  P3 what?
```

```
 1            MR. ECUYER:  0636.

 2            THE DEPUTY CLERK:  So, Judge, you're striking those first

 3   two and then admitting?

 4            MR. SERPE:  Yes.

 5            THE COURT:  Let's call your next witness, please.

 6            MR. SERPE:  Your Honor, we call Liz Heischober.

 7            THE DEPUTY CLERK:  Please raise your right hand.

 8        (WHEREUPON, ELIZABETH HEISCHOBER, WAS SWORN IN AND TESTIFIED

 9        AS FOLLOWS:)

10            THE DEPUTY CLERK:  Please be seated, and would you state

11   your name for the record.

12            THE WITNESS:  Yes.  My name is Elizabeth Heischober.

13            THE DEPUTY CLERK:  Would you spell the last name.

14            THE WITNESS:  Yes, H-E-I-S-C-H-O-B-E-R.

15            THE DEPUTY CLERK:  Thank you.

16                        DIRECT EXAMINATION

17   BY MR. SERPE:

18   Q.  Good morning, Liz.

19   A.  Good morning.

20   Q.  Are you ready?

21   A.  Yes.

22   Q.  Let's start with the summary slide that we've been doing with

23   the other families.  And you're the third line down?

24   A.  Correct.

25   Q.  Would you verify for the court what your, the address of the
```

1   Chinese drywall home is?

2   A.   The address is 214A 80th Street, Virginia Beach, Virginia.

3   Q.   And when did you and Steve buy the house on 80th Street?

4   A.   We closed and moved into it on November the 10th, 2006.

5   Q.   And it's your understanding that your home was built with just

6   about 200 sheets of Chinese drywall, 4-foot by 12-foot?

7   A.   Yes, 198.

8   Q.   Can we see a picture of the Heischober's house, Scott.

9        Is this the home that you and Steve live in?

10  A.   Yes, this is our home with the Chinese drywall.  And this home

11  is a duplex, so there's a common wall in the back of it, and

12  adjoining it is another home exactly like it in the back, which

13  also has Chinese drywall.

14  Q.   Liz, we'll talk about the neighbor as part of the duplex a

15  little later.

16        And I can't recall if you were here when I did the Google

17  map thing where you were able to see your house's proximity, were

18  you here for that?

19  A.   Right, yes.

20  Q.   Would you share with the court where your house is nestled

21  between and what kind of quality of life that meant for you and

22  Steve.

23  A.   I will.  I've lived in Virginia Beach for 35 years and I've

24  always lived in this neighborhood, and it's a neighborhood that is

25  close to the beach, we're a block and a half from the Atlantic

```
 1    Ocean, and just to the west of us is a state park, which we have an

 2    entrance to on our street, on 80th Street, where we can go hiking

 3    and for long walks, take the dogs to run free, and the same on the

 4    beach as well.  It's within biking distance to restaurants,

 5    festivals and things that they have down at the beach in the

 6    summertime.  It's just a really great community to live in.

 7    Q.  And is that your rag top over here in the corner?

 8    A.  Yes.

 9    Q.  The license plate of that car is Sandy Paws; is that RIGHT?

10    A.  Yes, that's correct.

11    Q.  And is that Steve's car or is that --

12    A.  That's my car.  Steve's car has our first dog that we ever

13    owned, his name Shobey (PHONETIC) is on that car.

14    Q.  You guys are big animal people, are they part of the --

15    A.  Yes.  We are big dog lovers, we have always had dogs since

16    we've been married.  We are on our fourth and fifth dogs now.

17    Q.  Can I see the picture of Steve -- is this Steve Heischober

18    here?

19    A.  Yes, this is my husband and our daughter Allison, she is a

20    senior at James Madison University.

21    Q.  And so she is out of the house now and it's you and Steve

22    living in the house?

23    A.  Yes, she is -- we are currently not living in the house, we

24    moved out on August the 28th, about six weeks after we found out

25    that we had the Chinese drywall.  And fortunately, I feel, when we
```

1  moved into the house, she was away at school and she has been

2  pretty much away at school for the whole time, except for summer

3  vacations and holidays.

4       But I will say for the short time that she has been

5  there, she has experienced some of the physical symptoms that have

6  been associated with Chinese drywall.  She's had rashes and

7  respiratory issues.

8  Q.  Tell the court about the, how you and Steve built the house and

9  what your view was about how long you would be living in it.

10  A.  We built this house when you -- when we had our house on the

11  market, we had lived there for 20 years and we were -- we were

12  looking at making a substantial, you know, amount of money on the

13  sale of our house and we were looking for something that was

14  something we could retire in, that we would not have to, in our

15  later years, move out and go to a retirement home because that's

16  not something that either one of us wanted to do.

17       So for about a year we searched for a home that would be

18  in the same neighborhood but that would have a first-floor bedroom

19  or an elevator, and we found this home, which had both, it had two

20  first-floor bedrooms and an elevator, it's three levels, and it was

21  just the perfect setup for us.  It had very little yard work, it

22  was close to all of the things that we loved, and it was going to

23  suit us well into our later years.

24  Q.  And then you started experiencing problems, which included

25  significant problems with your air conditioning system?

1  A.  Right.  We moved in in November and closed -- of 2006, and the

2  following year, I want to say it was like about ten months later,

3  it was in June we had to have the transformer replaced.  And then

4  after that it was the, we had problems with both coils.

5       We have two units in our home, upstairs and downstairs,

6  and we had problems with both of those and then we had to have a

7  coil replaced.  And in all, we have replaced seven coils in this

8  home in less than three years.

9  Q.  And we went through the paperwork before the court this morning

10  with respect to all of the seven coils that you've replaced in your

11  house?

12  A.  Yes.

13       MR. SERPE:  Your Honor, we've previously marked them and

14  introduced them to the record, they begin at P3.0267-001, a summary

15  of the air conditioner failures for not only the Heischobers, but

16  also the other plaintiffs, will be presented in evidence by

17  Mr. Rutila when he testifies later today.

18  BY MR. SERPE:

19  Q.  Liz, how frequently were these evaporator coils going out, and

20  when did you figure out that maybe Chinese drywall was playing a

21  role?

22  A.  The first one was at about probably nine or ten months, and

23  then it just seemed like it was one thing after another.  It was a

24  coil, then my computer monitor went, then the hard drive crashed.

25  In the spring of the next year, we had to have our TV taken out and

1    all of the electrical panels replaced.  We had a switch in our

2    master bedroom closet that went.

3            And then the coils became more frequent.  One of the last

4    coils, the sixth coil that we had put in in August right after we

5    found out that we had the Chinese drywall, was black in two months.

6    And the seventh coil I think went in December, we were not living

7    there but we did not replace it, we just put it on emergency heat.

8    Q.  And that was the SLH 27 or the coil that Dr. Scully testified

9    having been delivered --

10   A.  Yes.

11   Q.  -- to Charlottesville?

12   A.  Yes.

13   Q.  I want to focus on another one of your plug-in appliances, a

14   clothes dryer.  Is this a picture of your dryer?

15   A.  Yes.

16   Q.  And the dryer's not in your house anymore?

17   A.  No, it isn't.

18   Q.  Where did it head off to?

19   A.  I think maybe it went to MIT, I am not sure where it went, I

20   know it went out to be tested.

21   Q.  Up there by one of those guys in the Massachusetts, Boston

22   area?

23   A.  Yeah, right, scientists.

24   Q.  And you understand that it's been taken apart and you're not

25   going to be seeing the dryer anymore?

1  A.  Correct.

2  Q.  Was that dryer giving you any trouble in any way before you

3  gave the thing up?

4  A.  Whenever I dried clothes, they came out smelling like Chinese

5  drywall.

6  Q.  And you understand now that that clothes dryer has been sent

7  off for testing, and the results came back that there was corrosion

8  on the inside of that dryer?

9  A.  Yes, I understand that.

10  Q.  And part of the damages that you're seeking are for replacement

11  of appliances such as your clothes dryer in this case?

12  A.  Yes, we are seeking for all of our appliances to be replaced.

13  Q.  Liz, you mentioned early that your home is a duplex, what

14  additional concerns do you have with respect to repairing your home

15  in light of the fact that both the front half of the duplex and the

16  back half of the duplex have Chinese drywall?

17  A.  One of my biggest concerns is that in remediation I am very

18  uncomfortable with remediating our side and then the other side not

19  being remediated, because we have this common wall between us and

20  sometimes the common wall can be made of stacked drywall, and if we

21  remediate our side and then he doesn't remediate his until later

22  down the road, we have all of that dust and debris that could come

23  through, and I am just really uncomfortable with investing that

24  much money into it.

25        I mean, when we bought our home, we put $345,000 down on

1   it, that is huge investment for us.  Our home, that was, you know,

2   that's our dream home and we put a major investment into it, and I

3   just can't -- I am really uncomfortable doing this remediation

4   unless his is done at the same time.

5   Q.  You guys are out of the house now since?

6   A.  We moved out August 28th.

7   Q.  And no plans, obviously, to move back in?

8   A.  No.  I will not move back in there.

9   Q.  Did you look into the possibility of getting it repaired, talk

10  to contractors about that?

11  A.  Yes.  When we first found out, we were like adamant that we,

12  because we're kind of like take-charge people, and so we wanted to

13  get it fixed.  We wanted to get out there, get estimates, we did

14  all of that.  And the amounts were kind of staggering, and we went

15  to the bank to borrow the money, and the amount that we were going

16  to need to borrow was more than the percentage that they allow you

17  to borrow, you know, in the overall figures for borrowing money,

18  you can only borrow I think 80 percent of the value of your home, I

19  am not sure on that amount, but it's something like that and we

20  were way over that.

21          So we couldn't do that, but we wanted to fix it.  So we

22  went out and got estimates and tried to do everything.  And then we

23  also felt like we needed to wait until a protocol was set.  We did

24  not want to do, rush into it and do something wrong and not

25  correctly do it.  So we wanted to wait until some more findings

1  were set.

2  Q.  Let's talk about the value of your home.  You mentioned

3  mortgage and the ratio of the value of the home.  The city of

4  Virginia Beach does assessments of the value of the homes in the

5  neighborhood, do they not?

6  A.  Yes.

7  Q.  Tell the court what value the city of Virginia Beach places

8  upon your home at this point.

9  A.  Right now our home is assessed at $100.  The physical structure

10  is $100.  The land still has the same value but, in essence, right

11  now it's worth nothing to us.

12  Q.  And how much did you pay for this house?

13  A.  $795,000.

14  Q.  And you put 360 --

15  A.  $345,000.

16  Q.  $345,000 down on it.  It's assessed at 100?

17  A.  Right.

18  Q.  Liz, did you work, as the other plaintiffs did, with Dawn

19  Barrios and accountant Tuthill to get an accurate assessment of the

20  damages, both what would be necessary to repair your home, as well

21  as for the additional damages to your goods and financial burden

22  that Chinese drywall has placed upon your house?

23  A.  Yes, I did.

24  Q.  And you've had an opportunity to review the summary that was

25  previously prepared?

1    A.  Yes, I did.

2    Q.  And it's accurate and complete as far as you can tell?

3    A.  Yes.

4            MR. SERPE:  Your Honor, in connection with the witness's

5    testimony, as with the other witnesses, we would direct the court's

6    attention to a previously-admitted exhibit, P3.0622, beginning at

7    page two.  I don't have any further questions.

8            THE COURT:  Thank you.

9            THE WITNESS:  Can I just say one thing?  I just want to

10   say, I have worked hard my whole life since I was 15 years old, and

11   I do not want to be faced with bankruptcy or foreclosure.  And so I

12   am really hoping that we get some kind of positive outcome from

13   this because this is terrible what's happened to all of these

14   families.

15           MR. SERPE:  Thank you, Liz.

16   BY MR. SERPE:

17   Q.  And I'm glad you point that out.  Is there anything else that

18   I --

19   A.  No, that's all.  Thank you, your Honor.

20           THE COURT:  Thank you.

21           Call your next witness.

22           MR. BRYSON:  Good morning, your Honor, Dan Bryson on

23   behalf of the plaintiffs and the PSC.  In the interest of time, we

24   would like to briefly describe and orient the court to the

25   testimony of a very important witness, Jonathan Barnett.  The trial

 1    preservation transcript will be submitted as part of the record,

 2    your Honor, and it's not lengthy.  We also have a highlighted

 3    version of this transcript we would like to present to the court.

 4    Again, the witness is Dr. Jonathan Barnett.

 5            Dr. Barnett, if I could have the slide, please.  Your

 6    Honor, Dr. Barnett is a fire safety engineer, he works at Simpson

 7    Gumpertz & Heger, today as the head of their fire safety department

 8    in Massachusetts.  His engineering job is to protect people from

 9    fires.  He was a professor in fire protection engineering for 28

10    years at Worcester Polytechnical Institute in Massachusetts.  He

11    has taught masters and Ph.D. students fire safety, he has taught

12    them how to investigate fires of electrical origin, he also

13    testified that he has taught applicable building codes for many,

14    many years.  Due to his expertise in fire safety, he was called to

15    testify before Congress on the role of fire following 9/11.

16            Your Honor, so we would like to tender Jonathan Barnett

17    as an expert in fire safety and applicable codes.  And his resumé

18    is in the transcript along with the attached exhibits.

19            THE COURT:  I have reviewed his resumé and the court will

20    accept him as such.

21            MR. BRYSON:  Your honor, just briefly again, to orient

22    the court to his testimony.  He testifies at pages 19 and 20 that

23    the building code IS for life safety and it sets a minimum level of

24    safety, it is prescribed, it is not discretionary.  He testified

25    starting at page 43 that if the code is violated, the violation

1    must be remedied completely.

2            He also testifies that the building code was violated in

3    several respects.  In particular, the electrical code does not

4    allow corrosive residues.  You will hear more about this from

5    witness Ron Wright, who will testify live later today, your Honor.

6            Dr. Barnett also testified about ASTM B-3, which is

7    incorporated by the code, and it states that copper wire, and I

8    quote, "shall be free of all imperfections."  Not some, but all.

9            With life safety, he testified, you don't take a chance

10   that wiring may be okay.  Dr. Barnett reviewed the expert reports

11   in this matter, he examined numerous samples, over 44 samples from

12   these homes, your Honor, and he believes that the corrosion will

13   increase resistance at loose connections.  It is undisputed by

14   consensus fire safety data, and he cites to the report in his

15   deposition, that loose connections at switches, receptacles or

16   other devices are a fire risk.  And that loose connections do

17   happen in residential construction.  The increased resistance from

18   the corrosion increases heat, which increases the fire risk.  He

19   cites the various peer-reviewed literature within his deposition,

20   which discusses the problem at pages 44, 49 and 50, he talks about

21   a number of papers in this regard.

22           He cites to NFPA 921, the Guide for Fire and Explosion

23   Investigations, he cites to Glowing Connections article; he cites

24   to corrosion of electrical conductors and pulp and paper industrial

25   applications, which describes the problem with increased resistance

1    from corrosion, and he also cites to the Abbott paper, which has

2    been discussed already in these proceedings.

3         I would like to point out a quote from his deposition,

4    your Honor, page 59, lines 1 through 7, in which Dr. Barnett

5    testified. "This phenomena is still fairly new. The houses are

6    fairly new. Will we start to have fires five, ten, twenty years

7    down the line? I'm afraid so. And in that case people will die.

8    Well, that's why I'm sitting here today. I'm worried about this

9    problem." Again, this is the man who testified before Congress

10   after 9/11.

11        I would also like to read to the court a quote at the

12   conclusion of his deposition, on PAGE 129, and I asked the question

13   during the trial preservation deposition, "And have you observed

14   sulfide film thicknesses on numerous actual parts in these houses,

15   wiring and receptacles? Yes, I have. And what is the concern that

16   you have? That we have sulfide films that exist in a few samples

17   out of thousands that must be out there, and I am worried that we

18   have some loose connections where these films exist, and we are

19   more likely than not going to have an unwarranted fire if the

20   situation is allowed to continue."

21        My question, "And you have that opinion within a

22   reasonable degree of engineering certainty? A. Yes, I do." And it

23   was like no further questions.

24        Thank you, your Honor. We hope that you will review this

25   transcript in its entirety.

```
 1              THE COURT:  Okay.  I have it and I will do so.

 2              Call your next witness.

 3              MR. LEWIS:  Thank you, your Honor.  Rich Lewis for the

 4    PSC, and the plaintiff'S call Dean Rutila.

 5              THE DEPUTY CLERK:  Please raise your right hand.

 6         (WHEREUPON, DEAN RUTILA, WAS SWORN IN AND TESTIFIED AS

 7         FOLLOWS:)

 8              THE DEPUTY CLERK:  Please be seated.  And would you state

 9    your name for the record.

10              THE WITNESS:  Dean A. RUTILA.

11              MR. SERPE:  Your Honor, a moment for a technical hiccup.

12              THE COURT:  How do you spell your last name?

13              THE WITNESS:  R-U-T-I-L-A.

14              MR. LEWIS:  Your honor, may I proceed?

15              THE COURT:  Yes.

16              MR. Lewis:  Thank you, your Honor.

17                         DIRECT EXAMINATION

18    BY MR. LEWIS:

19    Q.  Good morning, Mr. Rutila.

20    A.  Good morning.

21    Q.  Can you state your name for the record and your business

22    address?

23    A.  Dean A. Rutila, 243 Seyon Street, Waltham, Massachusetts.

24    Q.  And is that the address for your place of employment?

25    A.  That is.
```

1    Q.  And what is the name of that company?

2    A.  Simpson Gumpertz & Heger.

3    Q.  And very briefly, can you explain to the court what that

4    company does and the scope of their work?

5    A.  We are a nationwide multidisciplinary firm of engineers and

6    scientists.  We work on buildings and structures of all types,

7    above ground, buried, et cetera, solving problems, designing them,

8    helping in their construction and maintenance.

9    Q.  Thank you.  Can you explain to the court your own educational

10   training and your licensure?

11   A.  Yes.  I have, as you can read, a bachelor of science in civil

12   engineering from the University of Michigan, 1978, and a master's

13   in science and civil engineering in 1979.  I first was licensed as

14   a professional engineer in 1982.  I am currently licensed in 22

15   states, they're listed there.  It's worth noting that all 22 states

16   require a few key elements:  First, practice in our competence,

17   areas of competency, and that our primary responsibility is to the

18   safety and welfare of the public.

19   Q.  Thank you.  Can you explain to the court briefly your

20   employment history?

21   A.  Yes.  I actually go back to my childhood because I grew up on a

22   contractor's knee.  I've been involved with construction since I

23   was eight, ten years old, and have been involved ever since, well

24   over 40 years now.  I paid for my own college working in the

25   engineering and construction industry, both in general residential

 1  construction, construction of a large power plant, land surveying,

 2  drafting, construction inspection.

 3          Since graduating in '78, I've worked eight years with a

 4  Michigan structural engineering firm, I was a group leader and

 5  design of new buildings and investigation of failures.  Worked on a

 6  major project, licensed nuclear power plant in the Detroit area.

 7          Since 1987 I joined Simpson Gumpertz & Heger.  We're a

 8  400-person firm, I am a senior principal, senior principal is one

 9  of the primary owners of the firm, and I am on the board of

10  directors overseeing the operations of the firm.

11  Q.  Can you explain your present responsibilities at Simpson

12  Gumpertz & Heger and any present teaching responsibilities that you

13  have?

14  A.  As a senior principal, I am responsible for projects.  I am

15  responsible both to the shareholders of the firm, folks like

16  myself; I am responsible to the public, both for their proper

17  execution technically as well as a business.

18          As a professional engineer, I am responsible to code

19  officials and the public for the designs that I create and the

20  solutions and investigations that I perform.  One of the duties of

21  a professional engineer, particularly with a job like mine, is to

22  teach back to the profession.  Once we discover things, we don't

23  hold them as trade secrets, my discoveries I teach back to the

24  public.  And I lecture annually at Harvard University, as well as

25  the University of Wisconsin, and am routinely invited by

1    engineering firms, construction firms, architectural firms and

2    manufacturers to teach them what I have learned as part of my

3    practice.

4    Q.  Mr. Rutila, we've talked about this concept of

5    multidisciplinary problem or a multidisciplinary team.  By

6    referring to some of the work that you've done in the past, can you

7    explain that concept as it relates to your work as an engineer?

8    A.  Yes.  As a building investigator, very seldom is it one skill

9    set, and very seldom is there one person with all of the knowledge

10   and experience.  And I list here a dozen or so on two slides of

11   projects, I'll just pick off the first one, this is the National

12   Audiovisual Conservation Center owned by the Library of Congress in

13   Virginia.  And they had a catastrophic failure during construction

14   of a buried roof structure, and that investigation required looking

15   at the concrete, so I had concrete scientists; it required looking

16   at the geotechnical, the soil; required looking at the polymers and

17   the plastics; there was a viscoelastic behavior to the failure,

18   required a polymer chemist; and those are the kinds of things that

19   I had to bring into that investigation to solve that problem for

20   them.

21          Each of these has its own multidisciplinary

22   characteristic.  I'll pick off one more on this.  The First Church

23   of Christ, scientist, Mary Baker Eddy Library in Boston, I

24   discovered that the building was built in the '30s with seaweed as

25   insulation, and just evaluating seaweed as an insulation material

1  requires not the skill set of any one person, we really had to look

2  at a material that we can't even find in the literature.  And

3  that's the sort of thing that you have to do as a multidisciplinary

4  building investigator.

5          There's a few more on the other page.  I guess I should

6  say on the residential home part that I skipped over there, I've

7  been the responsible engineer for the design and repair of

8  thousands of residential homes, not a few hundred but thousands of

9  people's homes, that I have designed repairs for.

10          MR. LEWIS:  Your Honor, with your permission, I'd like to

11  use the acronym SGH for the engineering firm that Mr. Rutila is at,

12  Simpson Gumpertz & Heger.

13          THE COURT:  Fine.

14  BY MR. LEWIS:

15  Q.  Did Simpson Gumpertz & Heger determine that their Chinese

16  drywall investigation required multidisciplinary resources?

17  A.  Yes, it did.  As soon as I became involved, the phone call from

18  Mr. Bryson, that's how it immediately became apparent that this had

19  to involve many different skill sets, chemistry, material science,

20  metallurgy, fire engineering, that's why I brought Mr. Barnett in,

21  et cetera.  It was very obvious that we needed many skills.

22          MR. LEWIS:  Your Honor, I ask that Mr. Rutila be accepted

23  as an expert in multidisciplinary investigation of building and

24  construction problems.

25          THE COURT:  The court will accept him in that field.

1          MR. LEWIS:  Thank you, your Honor.

2    BY MR. LEWIS:

3    Q.  Mr. Rutila, what was your assignment in this case, and please

4    refer to the slide that you prepared for us that will assist your

5    testimony?

6    A.  Fine.  First and foremost, to inspect the seven Virginia homes

7    and two control homes in nearby neighborhoods, control homes being

8    homes that had no evidence of Chinese drywall, evaluate the damage

9    to the building components in those homes caused by the corrosive

10   sulfur gases, collect samples of building components for analysis

11   in our laboratories and analysis of laboratories of others, and

12   then utilize our multidisciplinary expertise that we brought

13   together and the attorneys brought together, including metallurgy,

14   material science, thermal dynamics, the study of moisture and heat

15   flow, failure analysis, life safety, chemistry, engineering and

16   construction principles, to develop repair protocols.

17   Q.  Mr. Rutila, about how many professional engineers assisted you

18   from SGH in this work?

19   A.  At least a dozen within our firm of professional engineers of

20   all different skill sets.

21   Q.  In terms of analyzing samples from the seven homes and the two

22   control homes, can you give us a rough estimate of how many were

23   evaluated at the SGH laboratory?

24   A.  We evaluated nearly 300, I believe it was 283 is the number of

25   samples, some of which we evaluated initially and then passed on to

 1   other consultants.  But well over 200 samples.

 2   Q.  Mr. Rutila, was part of the SGH investigation to make field

 3   visits to Florida to observe and interview representatives from

 4   Beazer Homes and Lennar Homes in terms of what kind of work they

 5   were doing on remediating Chinese drywall homes?

 6   A.  Yes, that was a task that we took on when it became an option,

 7   very critical task that we took on.

 8   Q.  And did you send engineers from SGH to do that work and report

 9   back to you?

10   A.  Yes, I did.  I sent Peter Nelson, who is another senior

11   principal, and another licensed engineer, Scott Tomlinson, to do

12   that work in December of 2009.

13   Q.  The court has heard significant testimony from Beazer Homes but

14   not from Lennar, so I would like to focus the next set of questions

15   on what you learned from the visit to the Lennar remediation.

16   A.  Okay.

17   Q.  Can you give the court an idea of the scope of your visit in

18   terms of interviews or observations; what was involved in your work

19   in Florida?

20   A.  Yes.  The Lennar folks were very accommodating, arranging for

21   us to spend some time with senior executive, as well as line

22   supervisors of the work.  We went to three properties, one property

23   that they had identified scientifically as having Chinese drywall

24   and had yet not started to repair it.  So it was, the people had

25   moved out, they knew it was Chinese drywall, it was on their list

1    to fix, they hadn't started.

2            Another home that we visited was a home that had been

3    completely repaired by their protocol, which I'll get to in a

4    minute.  That home was ready for move-in, they were just going

5    through the final inspection process with the homeowners before

6    they moved back in.

7            And the third home was one where they were in the process

8    of remediating it, they had removed all of the Chinese drywall,

9    they removed all of the drywall, they removed all of the electrical

10   wiring, they removed all of the HVAC equipment, they had removed

11   all copper plumbing components and were in the process of putting

12   it back together again at that point in time.

13   Q.  So as a general matter, was what you just described the scope

14   of remediation that you learned Lennar was using across the

15   spectrum of their homes in Florida?

16   A.  That's correct.  That was the -- that was just a very broad

17   summary of their scope.  But removing all of the drywall, removing

18   all of the electrical system, both low voltage and distribution

19   system, removing all of the mechanical HVAC systems, including the

20   outside compressor, and then removing all copper plumbing

21   components.

22   Q.  Let's just stop at that outside compressor for a moment.  Can

23   you explain to the court what Lennar indicated was the reason to

24   remove the outside compressor?

25   A.  They, unlike Beazer, had found that their outside compressors

1    were failing due to short cycling, that's where the compressor has

2    to work extra hard and repeatedly because of the failures of the

3    inside evaporator coil units.  So they found that their units were

4    failing, and they made the decision that they had to replace the

5    outside compressor component as well.

6    Q.  Going back to the broad scope of the Lennar remediation

7    approach, including replacement of all drywall, wire and HVAC, were

8    you able to discuss with Lennar the rationale for their scope of

9    remediation?

10    A.  Yes.  They were doing it, really, as a construction business

11    decision.  They knew they had to get the Chinese drywall out, they

12    knew that many components were damaged, and it was just the

13    practical way of eliminating the cause of the problem, eliminating

14    the damaged elements and then putting the house back together.

15    Really a practical business decision.

16    Q.  And can you characterize for the court or compare for the court

17    the general scope of the Lennar remedy compared to the PSC remedy

18    that's being recommended in your report and in the expert reports

19    of other plaintiff witnesses?

20    A.  We, of course, knew what Lennar and Beazer were doing when we

21    developed our recommendations in the PSC.  And for practical

22    purposes, they are the same.

23           THE COURT:  Is there any difference between Beazer and

24    Lennar?

25           THE WITNESS:  There are subtle differences.  Lennar, for

1   example, chooses to try to salvage hardwood floors, and they told

2   us sometimes they succeed and sometimes they don't.  They choose to

3   try to salvage more of the cabinetry in the kitchen, sometimes they

4   succeed and sometimes they don't.  So they faced, really, all of

5   the same decisions we heard about from Beazer and have adopted

6   slight variations in their approach and are facing the challenges

7   that, you know, Beazer predicted they would, in a manner of

8   speaking.

9   BY MR. LEWIS:

10   Q.  Mr. Rutila, have you summarized your observations, interviews

11   with Lennar and your observation as to their remediation protocol

12   in your expert report in this case?

13   A.  Yes.  In our December 2009 report, it is summarized therein.

14           MR. LEWIS:  Your Honor, for the record, the summary of

15   the Lennar work is in Mr. Rutila's December report at P1.2016-0103

16   through page 0108.

17   BY MR. LEWIS:

18   Q.  Mr. Rutila, have you had a chance to develop a teaching tool in

19   terms of animation to help explain your expert opinions in court

20   today?

21   A.  Yes.  We worked with the attorneys and the animators to develop

22   segments that you'll see today.

23           MR. LEWIS:  Your Honor, with the court's permission, we

24   have abbreviated and cut segments of this rather than show the

25   whole thing, and we'll use this throughout this witness's

1    testimony.  Thank you.

2    BY MR. LEWIS:

3    Q.  I'd like to start with the Morgan home, and if you can explain

4    to the court your approach to a home inspection as you walk in the

5    front door.

6    A.  Very good.  As you'll see in just a few seconds, the animation

7    acts as if you were walking in the home and, presumably, you walk

8    in and it's actually, the first thing I did in every home that I

9    went into -- it looks like we're rebooting -- the first thing I did

10   in every home I visited was to pause inside the front door, close

11   the door and just form an impression of the home, and that's what I

12   did, more or less as you see in the animation, walk in and close

13   it, immediately the impression was one of a sulfur odor,

14   immediately reflecting, to me it was like a burnt smell, you can

15   stop it there.

16           To me it was like a burnt match smell, that's how I

17   reacted to it.  And then as I spent some time in the home, it

18   started to irritate, for me personally, my tongue, but others it

19   irritated in different ways.

20   Q.  And at this point in the animation we've seen the movement of

21   white, a white cloud and arrows, can you explain to the court what

22   we are attempting to depict with that part of the animation?

23   A.  Yes.  The atmosphere in the home is colorless, just like the

24   atmosphere in this room, and so you can't see the gases that are

25   creating the odor and that create the corrosive atmosphere, so the

1   animation endeavors to depict that with the cloud-like illustration

2   there.

3          What's important in the illustration is, it's moving,

4   it's moving because of the ventilation system, it moves because of

5   differences in heat.  Warm air rises, as we all understand that

6   adage, and it's nonuniform because the house is not in a uniform

7   static condition.  That's what we're attempting to illustrate here.

8   And, of course, this particular illustration shows it being

9   returned or drawn back into a louver, which will recycle the air

10  from the house back to the air-handling unit, where it'll be

11  conditioned once more and then redistributed.

12  Q.  How is the movement of air or the movement of gases in a house

13  relevant to the subject of damage from corrosion?

14  A.  It's very important because, as we look at damage in the house,

15  it is not uniform.  Even in one particular house, such as this one,

16  the Morgan residence, as you look at the corrosion, the film

17  thickness varies from receptacle to receptacle, and the tests in

18  the laboratory all demonstrate that.

19         And this has been demonstrated by the Consumer Product

20  Safety Commission work on the 51 homes study, where their coupons

21  showed something in the neighborhood of three to 400 angstroms of

22  corrosion in the 30-day period away from registerers and something

23  in the 12, 1,400 range of angstroms in 30 days near registers.

24         So they showed in their study, as we find in our

25  observations, that it's a nonuniform corrosion simply because the

1  conditions of the house are nonuniform, as we talk later about

2  moisture and temperature and air flows.

3  Q.  You talked about the movement of gases and the effect that that

4  has on corrosion.  What is the relevance of moisture, you just

5  mentioned that?

6  A.  Moisture is critical to the corrosion, and as we've heard from

7  Dr. Streit just a few minutes ago, it's even critical to which

8  gases are formed.  But the moisture is not uniform in the house,

9  for lots of different reasons.  First off, because of the human

10  behavior, do you take a shower, do you cook, do you run the

11  upstairs colder, the downstairs warmer?  Also because of the

12  nonuniform nature of air and filtration, outside air in Virginia in

13  the summertime is above the dew point of the inside air, and so as

14  the outside air leaks in and contacts certain cold surfaces, then

15  you form moisture.  So the moisture is critical to the corrosion

16  and it's critical to its distribution throughout the homes.

17  Q.  Now, Mr. Rutila, when you're referring to moisture, are we

18  talking about steam or puddles or pooled water on the floor?  Is it

19  always visible moisture?

20  A.  No, it's probably seldom visible moisture.  The places where it

21  would be visible is when you condense on a cold water pipe in a

22  bathroom or on a line set returning from an evaporator coil, those

23  will be cold pipes and the moisture will condense and be visibly,

24  visible water droplets on those.

25          But for the most part, it's just moisture, such as in

1    this room, that when it reaches a cold enough surface and there are

2    many cold enough surfaces, microscopic droplets of water form on

3    those surfaces.  And that's really the critical corrosion for the

4    things like copper wire and computers and circuit boards.

5    Q.  And have you prepared some photographs to demonstrate where

6    these conditions can occur in a home?

7    A.  Yes, we have.

8    Q.  All right.  Let's go through those one at a time.  Maybe you

9    can orient the court as to where we are here.

10   A.  This is the Morgan garage and the air handler in the Morgan

11   garage.  Before we move on, I want to point out, the line set is a

12   little bit difficult to see but it leaves the air handler, this is

13   the line set that we talk about right here (INDICATING).  It's

14   bringing the coolant to and from the outside condenser unit.

15   Q.  What is a line set made out of?

16   A.  It's copper tube.  As you heard, it cannot have any joints in

17   it, it has to be a continuous run between the devices to carry that

18   coolant.  And then on the top we have, we've got an evaporator coil

19   and a -- evaporator coil in this region, and we have a fan and

20   control unit up in the top region.  So that's just a basic

21   description of an air handler in the Morgan house.

22   Q.  All right.  Next slide, please.

23          And can you explain the relevance of this to the question

24   of moisture and corrosion?

25   A.  This is a crawl space.  I crawled in under these homes, and

1    it's a critical part of the investigation to understand how this

2    crawl space interacts with the homes.  This air in the crawl space

3    is atmospheric outside air, and as such, the entire perimeter of

4    the building is surrounded by atmospheric air, unlike homes in some

5    places; in New England we have basements, in Florida they're built

6    slab on ground typically.  These homes were built with crawl spaces

7    in the one neighborhood.

8            So this is atmospheric air, this is a line set returning

9    from the second floor air handler down through the crawl space

10   under the house.  And the line set under here is not corroded

11   because it's exposed to atmospheric conditions, not to sulfur gas

12   conditions.  But it continues down underneath the home and then

13   goes up through the first floor, through the second floor into the

14   attic of the home, where it reaches the air handler, and it's

15   corroded in-between those.  And that's the, when we were listening

16   to testimony about line set that has to be replaced, that's the

17   sort of line set that we have in mind.

18   Q.  Next slide, please.

19           And how is this relevant to the question of corrosion?

20   A.  This is a breakfast area, I would call it, of the Morgan home.

21   There used to be a hanging light from the ceiling here, which we'll

22   get to.  But what's important is that this is a diffuser that

23   supplies air to this space, and that air in the summertime is going

24   to be in the 50- to 55-degree range and the outside air dew point

25   is going to be in the 60-degree range.  So any outside air that

1   comes in contact with the surface cooled by that diffuser is going

2   to condense.

3           And so those are electrical receptacles right there.  So

4   if that diffuser blows air on that receptacle, which it will, then

5   in summertime, if there's any air leakage from the outside to that

6   receptacle, which is very commonplace, then you will get

7   condensation on those wires.  It will be microscopic, it won't make

8   a puddle or anything like that, but it will cause that corrosion.

9   And then the same thing when we get to the light fixture up there,

10  we will see the results of that same moisture on that light

11  fixture.  Excuse me.

12  Q.  Next slide, please.

13  A.  This is a second-floor bedroom in the house.  In this instance,

14  the diffuser is up at the ceiling because you'll remember that the

15  air handler is up in the attic of that home.  So this is blowing

16  air down.  Now, the receptacles aren't as close to it, but what

17  will happen is, the cool air will blow on the wall and that creates

18  moisture or microscopic condensation on the drywall from that same

19  outside air.

20          So we can expect moisture here, and we know that moisture

21  and temperature create the conditions that cause the off-gassing.

22  And if there's any furniture located in front of these devices, and

23  the air blows behind that furniture, you will get condensation even

24  at devices like this.  And this is the sort of thing that is a very

25  common source of condensation in residential-type dwellings that we

1    see.

2    Q.  Next slide.

3    A.  This is a slide to orient a little bit more about the HVAC

4    system, has less to do with the condensation other than the fact

5    that this is where air is drawn back into the second floor air

6    handler and then brought, you know, brought into the air handler,

7    brought to the air handler, where it's cooled down, and then it's

8    redistributed into the spaces as that 50- TO 55-degree air.

9           And then it's worth noting when we later on talk about

10   thermostats and devices, that's a location where thermostat devices

11   for the second floor were located.  They had been removed at the

12   time I took this photograph.

13          MR. LEWIS:  Your Honor, for the record, the exhibit

14   numbers for the photographs having to do with condensation that Mr.

15   Rutila has reviewed are P1.1848-007, 008, 012, 031 and 032.

16          And also for the record, the CPSC 51 home study

17   observation that Mr. Rutila made is at that report at P1.0019.0129.

18          THE DEPUTY CLERK:  These have been admitted already?

19          MR. LEWIS:  Yes, they have, I'm sorry, they've all been

20   admitted.

21          Can we advance in the animation to the kitchen sink.

22          THE WITNESS:  Okay.  The animation is as if we're looking

23   underneath the kitchen sink, that was directly to the left of the

24   breakfast area that we saw just a few moments ago.  What we're

25   looking at here are plastic domestic water supply lines, the white

1    are plastic lines, how they were done in this particular house.

2              This is the hot water, it's distributed up through the

3    top here to the sink and down through the bottom through this

4    device, which I'll get to in a moment, to the dishwasher, and then

5    that's a cold waterline.

6              And what we see are copper elements in that.  Even though

7    it's plastic distribution piping, there are copper elements as

8    connectors.  This is a surge device so you don't get that water

9    hammer banging that you get often in old homes, and these are

10   copper and that's what we're seeing here.

11   BY MR. LEWIS:

12   Q.  Mr. Rutila, were you able to evaluate copper plumbing

13   components from these homes in the SGH laboratories?

14   A.  Yes, we did.  And we included several photographs in our

15   reports of these.

16   Q.  I would like to turn to those from your report at P1.2016.0421,

17   22 and 24, and ask you to explain the relevance of this evaluation

18   to the court.

19   A.  Good.  Before we zoom in, this is a shower assembly, hot water,

20   cold water come in and then get pushed out through the top to the

21   showerhead.  And this is another one of those copper surge devices

22   so you don't get the water hammer banging in your plumbing.  And

23   this is a copper assembly that we look at, and I think we can see

24   it here, this corrosion and the solder that we'll look at in a few

25   moments, there's problems.  But what we found when we look at this

1    is, we find pitting corrosion and copper sulfide on these copper

2    devices.

3         I think we can go to the next page now.  You might want

4    to zoom in on the top one or two images.  This is a sink assembly,

5    shop assembled with brazes, which we'll look at a braze in a

6    minute, and this is a pit on such an assembly.  And this is the

7    type of corrosion that is of concern to us.

8         We can go to the next page.  This is a braze and what we

9    found in examination is there's a deep pit at that braze, and that

10   braze is rich in silver and the corrosion went deep into that

11   silver, and I don't remember if we have the next page or not, but

12   if we do it will be worth looking at.

13   Q.  I think we do.

14   A.  Yeah.  Zoom in on this bottom image, if you could.  Thank you.

15        This is an electron microscope image of that deep pit,

16   and you're looking down into that deep canyon, and that's the type

17   of pit that we found in that silver braze on that particular

18   device.  And these, of course, are the type of findings that lead

19   us to the conclusion and that have led others to the conclusion

20   that these copper assemblies have to be removed from the homes.

21   Q.  I would like to move away from the copper pipes in the kitchen

22   to the HVAC system.  And there's been a lot of discussion of coils,

23   and if you could explain to the court, is coils the only concern

24   when you and your engineering group look at HVAC in Chinese drywall

25   homes?

1    A.  No, it wasn't.  It was important to understand the coils, but

2    it was also important to understand the rest of the assembly,

3    because the coils are right below the image here, and if the only

4    thing damaged was the coils, then it would be reasonable to replace

5    the coils and not replace all of this other equipment.

6           What we're looking at here is part of an assembly,

7    really, an integrated assembly.  This is a fan, draws the air from

8    the homes up through the cooling coils and then pushes it back out

9    after it's been cooled to the assembly.  You'll notice the

10   extensive copper wiring in the assembly.  Right where I am pointing

11   with the green arrow is a circuit board, printed circuit board, and

12   a critical device for the control and operation (INDICATING).

13          And then up at the top, you heard Mr. Galler talk about a

14   controller, and that's a controller.  It has, as you learned, it's

15   essentially a higher voltage switch than we have of a light switch

16   that's operated with relays.  And those are key elements, the

17   wiring, the coils, the circuit board, and the line set, as I

18   pointed out earlier, is off here to the side, all of these are key

19   elements.  And this wiring, of course, some of this wiring is

20   control wiring that goes back through the house, through the

21   corrosive atmosphere to the thermostat, which is another element.

22   Q.  All right.  I would like to go through these components of the

23   integrated HVAC system and focus on each one in some detail, if we

24   could have the next slide.

25          Let's start with the coils.  Can you explain to the court

1    whether the multidisciplinary team in this case, in this case

2    corrosion testing labs, was able to do an actual failure analysis

3    of an HVAC coil?

4    A.   Right.   This particular coil was removed, pressure tested, a

5    leak was, a leak location was identified through that pressure

6    testing and then sectioned, and in the section, we find that there

7    is a corrosion pathway right through that silver braze, that is the

8    cause of that particular leak failure on that particular assembly.

9    Q.   And just for the record, that's P1.2001-0057.

10   A.   That's right.   And you can see there.   That's the leak path

11   that was found during the pressure testing of the assembly.

12   Q.   And in your investigation of the seven Virginia homes, were you

13   able to evaluate reports of failed coils in all of the homes?

14   A.   That's right.   We have summarized the fact that all of the

15   seven homes have coil failures, have reported coil failures, and

16   the two control homes have no coil failures.

17   Q.   Could we have the next slide, please.

18            MR. LEWIS:   And, your Honor, for the record, P3.0625,

19   Federal Rules of Evidence 1006 summary, is on the screen.

20   BY MR. LEWIS:

21   Q.   Is this the summary that you're referring to?

22   A.   Yes.   This is the summary of the reports of the failures from

23   the homeowners of the seven Virginia homes.   There's a second page,

24   I don't know if you have it, but a second page with the control

25   homes.   Exactly.   With no similar reported failure.

1   Q.  And in terms of the control homes, were those homes of a

2   similar nature, similar age of construction, similar neighborhoods,

3   to the homes where you studied and documented the failed coils?

4   A.  Yes.  The one at 254 Loch Haven is in the same neighborhood as

5   the Morgan home and the Leach home and several other homes in

6   Williamsburg.  Built at the same time, reportedly by the same

7   builder.  Just without the Chinese drywall.

8           And the Sullivan home, the second home, is literally

9   across the street, it is right across the street from the McKellar

10  home that, and we heard Mr. McKellar testify on Friday.

11  Q.  Looking in more detail at the other components in the coil.

12          THE DEPUTY CLERK:  I don't have these admitted.

13          MR. LEWIS:  I'm sorry, your Honor?

14          THE DEPUTY CLERK:  I don't have these admitted.

15          MR. LEWIS:  All right.  We will correct that after this

16  witness testifies and provide that exhibit to you.

17          THE DEPUTY CLERK:  Are you moving it in?

18          MR. LEWIS:  Yes, we are.

19          MR. SERPE:  May it please the court, I believe 635

20  Mr. Ecuyer is advised me that --

21          THE DEPUTY CLERK:  He said this was 25?

22          MR. SERPE:  We had an earlier version of 625.  We put the

23  wrong version into power point, the exhibit number is P3.635.

24          THE DEPUTY clerk:  What is the correct number of this

25  one?

```
1              MR. SERPE:  The correct number is P3.0635.

2              THE DEPUTY CLERK:  So it's all ready in?

3              MR. SERPE:  It's in.

4              MR. LEWIS:  Thank you, your Honor.

5              THE COURT:  All right.  Thank you.

6    BY MR. LEWIS:

7    Q.  I want to move to the specific components that you reviewed in

8    general for the court and look at the analysis that's been done.

9    You talked about an air-handling contactor switch at sample No. SGH

10   31.  And if you could explain what a contactor switch is, what it

11   does, and what observations were made in terms of corrosion.

12   A.  I'm happy to.  I actually have the switch with me, your Honor,

13   if it would help to see the device.  I'll step down and grab the

14   box.

15             MR. LEWIS:  Your Honor, for the record, we will ask that

16   that be labeled as Exhibit P1.2063, and during the next break I

17   will put a sticker on that.

18             THE DEPUTY CLERK:  Judge, are we taking this or a photo

19   at the end?

20             THE COURT:  Eventually we will have to have a photo so

21   that we can deal with it by the record.

22             MR. LEWIS:  Your Honor, may we supplement the record with

23   a photo?  Thank You.

24             THE COURT:  Yes.

25             THE WITNESS:  I thought it would be useful to bring this
```

1    device because it's a name that we're not familiar with.  It looks

2    a lot like a circuit breaker, it's been disassembled, and there are

3    plungers at the top that push on these switches.  And if I hand it

4    to you, you will be able to see, looking down in this location,

5    these same switches, and that's what we refer to as a contactor.

6    It's a name for a switch.

7    BY MR. LEWIS:

8    Q.  In looking at the big screen, did your investigation with

9    Mr. Galler identify corrosion on those switches?

10   A.  That's correct.

11   Q.  All right.  I want to move to the next part of the integrated

12   HVAC system, the circuit board.  And can you explain to the court

13   what is the function here and what findings have been made in terms

14   of corrosion?

15   A.  Yes.  I lost my pointer, excuse me.  This is a resister on a

16   circuit board from the Morgan house, and this has silver -- excuse

17   me, copper sulfide corrosion deposit on a resister, and that's just

18   one example on this particular circuit board.  I actually brought

19   that circuit board as well, because it's, again, the size and shape

20   of it is obscure sometimes.  The actual resister is this tiny thing

21   right here (INDICATING).  That's the actual resister.  And then you

22   can look at the top end as it's facing away and you can see the

23   same corrosion on that wire up at the top of it.

24          The corrosion product in the photograph has been knocked

25   off as part of our investigation, taken off for, as part of the

1    analysis.  But that same circuit board also had a, also has a

2    relay, this is a relay, which is another name for a switch, and it,

3    too, has silver corrosion, just not shown in that particular

4    photograph.  So the particular circuit board from the Morgan house

5    has corrosion on both silver and copper components.

6              MR. LEWIS:  Your Honor, we would like to mark that device

7    as P1.2064 with the court's permission.

8              THE COURT:  All right.

9    BY MR. LEWIS:

10   Q.  Mr. Rutila, I want to talk about the wires and the thermostat

11   for the HVAC and if you were able to obtain laboratory information

12   about the condition of those wires, if we could click ahead to

13   the --

14   A.  That's obviously a connection point for wires, that is a wire

15   from a thermostat and in the laboratory determined that that is

16   copper sulfide.

17   Q.  If we could highlight BDM 16.  This is a sample from the Krantz

18   report.  And could you discuss the relevance of this finding to the

19   integrated HVAC system?

20   A.  Right.  This is the corrosion thickness on the wire near the

21   fixture.  It was clamped in and then a few inches away, 10.2

22   micrometers of corrosion product.  And we note that the standard of

23   one -- excuse me -- point one micrometer per year or .3 micrometers

24   in three years is instructive in terms of predicting failures.  And

25   this particular table is Dr. Scully's table, where he used this to

1    predict the failure of devices.  And clearly, this thermostat wire

2    is in excess of that prediction for failure.

3    Q.  All right.  And BDM, do you recognize that as the Morgan

4    household?

5    A.  That's right.  That's the second floor thermostat, I pointed

6    out the location where it had been removed from.  That's the second

7    floor thermostat from the Morgan household.

8    Q.  The next slide on the line set, please.

9          The last component, second to the last to this integrated

10   HVAC system I want to talk about is the line set and ask you to

11   explain what findings have been made in regards to corrosion on the

12   line set.

13   A.  It would be instructive to zoom in on this top left photograph.

14   Because although it's upside down, the important number is the

15   corrosion product thickness of 14.9 micrometers.  That's the

16   corrosion on the line set and it's, again, demonstrating to us the

17   corrosive environment.  Now, the line sets as Mr. Smith testified

18   and as we know, are typically wet because they're cold surfaces and

19   condensation occurs on them.  So this shows that that copper line

20   set was in a corrosive environment and well in excess of the .3

21   micrometers that might have been predicted in some, for some

22   materials.

23   Q.  And the last component of the HVAC that I would like to ask you

24   to explain to the court in terms of how it has operated in Chinese

25   drywall homes is the outdoor compressor.

1   A.  Well, this is an image of an outside compressor unit, and we

2   see the line set coming into the unit and exiting the unit.  And

3   the -- one of the copper tubes is uninsulated because it's warm and

4   the other one is insulated because it is cold.  And the gases cycle

5   through the compressor, compressed cooled somewhat and then pushed

6   back to the inside garage or attic air handler.

7          And this is the device that Lennar, we find, is

8   replacing, because they are learning that these units are as if

9   they are 20 years old, in their words.  They're replacing them

10  because of the short cycling that occurs when the inside air

11  handler fails.

12  Q.  Thank you.  Can we go back to the animation to the outlet

13  segment.

14  A.  This is in the first floor of the Morgan house, not far from

15  the front door.  You can stop it there.  This is an electrical

16  receptacle, we also might call it an outlet.

17          It is worth noting a few elements here.  This particular

18  receptacle has a black or hot coming in and then a black going out,

19  so this is bringing power to the receptacle and then taking power

20  to and another device, likely another receptacle.  And then the

21  same thing, the white wires, the continuity wires, are doing the

22  same thing, one is coming in with the hot and one is taking the

23  power back to another device.

24          And then the ground, the bare ground, and we can see how

25  and we illustrate here the fact that you've got to stuff that six

1   inches of wire in there.

2          And then the gases.  Could you back that up, I should

3   have been pointing out what that was doing.  That's too far, I'm

4   sorry.  When we get the animation there, we can see that it is

5   illustrating as if the gas is going into the receptacle.  But the

6   gas is actually in the cavity, in the space.  And depending on air

7   flow pressures, sometimes it'll be coming in, sometimes it'll be

8   coming in through the cable leads, sometimes it'll be coming

9   in-between the box and the drywall and the cover plate.

10          So it all depends on how the space happens to be

11   pressurized at the precise moment you're imaging it in an

12   animation, but the air flow, we can be sure, comes in from

13   different ways at different times as the building pressure changes.

14          Now, if you run the animation, we will see the corrosion

15   develop.  But we should look at this particular cable right here

16   (INDICATING).  As it corrodes, we imagine that that cable is not as

17   well seated as the one below.  You can see how the cable below is,

18   the head of the screw is, covers much more of the copper than the

19   head of this screw.  This is the type of situation that Dr. Barnett

20   is concerned about, where this corrosion interferes with the

21   continuity of this.

22          Now, this is a white wire, and it's more likely to be a

23   problem if it's a black or hot wire.  But if we've got a hot wire

24   that has this type of corrosion and this imperfection, and these

25   imperfections happen which is why we do things like have ground

1    wires, these imperfections happen, and this sort of imperfection

2    the corrosion added is what leads to the risk of the run-away

3    heating, fire and/or shock.  So, but that's what needed to be

4    pointed out there, both the gas is in the cavity coming from both

5    ways and in the corrosion on a conductor.

6    Q.  And you talked about a ground wire in your discussion.  Can you

7    explain to the court what a ground wire is and what your

8    investigation showed in terms of corrosion on ground wires?

9    A.  Primary purpose of the ground wire is to protect us from

10   electrical shock.  If the hot wire comes disconnected or otherwise

11   forms a short, that ground wire will conduct that current back to

12   the -- or if the white forms a short, the ground wire will conduct

13   that current back to the breaker, that breaker will sense the

14   overload and stop the current.

15          So the ground wire is critical for safety.  If we don't

16   have a ground wire and we get certain shorts, then the power will

17   be there ready for someone like myself to touch the receptacle and

18   then get a shock.  And that shock can be fatal, and that's really

19   the primary purpose of a ground wire is to protect us from that

20   electrical shock.

21   Q.  And what is the relevance to your analysis of corrosion when it

22   is seen or observed on a ground wire?

23   A.  Well, the concern and the risk with the ground wire corrosion

24   is that it creates an increased risk that the ground wire will not

25   function as intended.  And so that when we need a ground to protect

1    us from a shock, we'll have too much resistance there, and either

2    the ground wire with too much resistance will increase the heating

3    and create a greater risk of fire or will fail to protect us from

4    that electrical shock.

5    Q.  Mr. Rutila, in the Virginia homes that you inspected, did you

6    determine if the ground wire was covered by a sheathing or plastic?

7    A.  Inside the receptacles, this is an accurate representation,

8    inside the receptacles it is not covered and this is normal for

9    type NM cable; outside the receptacle we can see at the top of the

10   image where the PVC jacket of the cable enters the box and then

11   gets stripped away.  So it's covered outside the box with that PVC

12   outer jacket.  Inside the receptacle it's not covered.

13   Q.  And did you bring an example of that type of jacket that you

14   could explain to the court today?

15   A.  I did.  I brought two, we don't need both of them, but I just

16   wanted to explain that some are yellow and some are white.  And the

17   color doesn't matter.  The yellow is a particular type of plastic

18   that is more slippery and easier for the workers to pull through

19   the studs.  The more common wire -- it's tangled now -- the more

20   common wire is this, this happens to be a Romex brand.  Romex is

21   like Kleenex, it's a name brand.  This one happens to carry that

22   name brand.

23           And it carries in it, as we've seen from photographs, a

24   white conductor, a black conductor and a copper ground that is

25   covered with paper but not the plastic inside.  And then this outer

1  PVC jacket.  And we can see reading it, it tells us the important

2  information, this particular is a 14 gauge ground, 14 gauge wire

3  with ground, and it's a type NM cable, and that's all embossed into

4  it.  If you please.

5          THE COURT:  Thank you.

6          MR. LEWIS:  Your Honor, I ask that we can mark that as

7  P1.2065.

8          THE COURT:  All right.  But this is a demonstrative, it's

9  not going to be part of the record.

10          MR. LEWIS:  All right.  Thank you.

11          THE COURT:  Okay.

12  BY MR. LEWIS:

13  Q.  Mr. Rutila, in the SGH laboratory, were you able to look under

14  that Romex cable and determine if there was corrosion under the

15  jacket on the ground wire?

16  A.  Yes.  A sample from the Morgan house in-between two

17  receptacles, the receptacles about ten feet apart or so,

18  in-between, a section of the cable was removed and the outer PVC

19  jacket stripped away and the copper ground wire underneath that

20  showed the corrosion, the copper sulfide corrosion.

21  Q.  I would like to talk about the other kind of wires, other than

22  the Romex that you were able to evaluate in the home.

23          MR. LEWIS:  Your Honor, with the court's permission, I

24  would like to hand the Baldwin lamp to the witness and ask him to

25  explain other kinds of wire.

1             THE COURT:  Okay.

2             MR. LEWIS:  Thank you.

3             THE COURT:  Counsel, we have to stop at 12 o'clock, so

4    let's get to a point where you're comfortable.

5             MR. LEWIS:  All right.  Thank you, your Honor.  Your

6    Honor, may I ask Mr. Baldwin at this point to identify this is his

7    lamp, this lamp which is subject to his testimony this afternoon

8    will be confirmed.

9             THE COURT:  All right.

10            MR. LEWIS:  Mr. Baldwin, is this a lamp from your home?

11            MR. BALDWIN:  It is.

12            MR. LEWIS:  And where was it located in the home?

13            MR. BALDWIN:  First floor room that we call our office.

14            MR. LEWIS:  Thank you.

15   BY MR. LEWIS:

16   Q.  Mr. Rutila, in terms of an evaluation of corrosion on wires,

17   can you explain to the court using this demonstrative what

18   questions you would ask when presented with this and how you would

19   evaluate it in the laboratory?

20   A.  Yes.  Nothing unusual about the lamp in general, but from our

21   experience with these homes, quickly go to and look at this cable.

22   And we can see the wire has a black appearance underneath the

23   plastic jacket, it's a translucent, semi-transparent jacket.  And

24   we can also see that the wire has striping on it.  So it has a

25   strong appearance of corrosion.

— DAILY COPY —

1    In and of itself, that's not proof of corrosion but it

2  has the appearance.  The other thing that we do is, looking in the

3  bottom, we can see that the wire inside the ceramic base has no

4  apparent corrosion on it.

5    THE COURT:  Let me see.

6    THE WITNESS:  SO you can see both the striping -- so that

7  examination visually creates a strong hypothesis that this is

8  corrosion, knowing that it's from a house with Chinese drywall,

9  where we've seen and verified other copper sulfide corrosion, it

10  would be, the next thing would be to take it to our laboratory or

11  take it to a laboratory if someone else were to do it, section the

12  wire, look at the corrosion product, both in terms of the thickness

13  of corrosion product, and also then confirm that the corrosion

14  product is copper sulfide, that's what we would do.

15  BY MR. LEWIS:

16  Q.  Thank you.

17    The court has seen an explanation of the lamp in the

18  Baldwin home, in the Morgan home, BDM-5, which is on the screen.

19  Is this a similar type of wire to the wire that you've just handed

20  and explained to the judge what the issues are?

21  A.  Yes.  It's a very similar wire, plastic jacket that's somewhat

22  transparent with a multiple strand, two-conductor cable.  And we've

23  seen the corrosion on that has been verified, this one hasn't yet

24  been taken apart.

25  Q.  Mr. Rutila, you mentioned that the NM cable was a type of wire,

1    I believe under the Romex, that you observed in these homes, is

2    that type of wire adequate for an industrial corrosive environment?

3    A.   Type NM is not adequate for a corrosive environment.  Now, I

4    want to clarify a bit of your question, though.  This entire

5    assembly is type NM wire.  It's not the copper underneath or

6    anything else, it's the entire assembly.  The corrosive environment

7    wire has a plastic jacket, which is intended to provide greater

8    corrosion resistance.  So it's the entire assembly is the type NM

9    cable.

10   Q.  And is that assembly adequate for severe industrial environment

11   in terms of a corrosion classification?

12   A.   Type NM cable is not appropriate for a corrosive environment,

13   in this instance, an environment that would be classified as a

14   severe corrosive industrial environment.  Those are obviously

15   homes.

16   Q.  And when you say it's not adequate for that environment, based

17   on what in terms of, is it a code section, is it an industry

18   standard, how do you evaluate that?

19   A.   Sure.  The building code is very clear that type NM cable is

20   not suited for a corrosive environment.  And these are corrosive

21   environments, and that is the, that's why it's not suitable.  It is

22   subject to the damage that we see, and as such, all of the years of

23   experience that we have with electrical wiring in single-family

24   homes doesn't take into account what happens with improper cable in

25   a corrosive environment in a residential home.  We have no

1   experience with that.  That's why it's not suitable.

2   Q.  In terms of your evaluation of the ground wires and the

3   lamp-type wires, did you look at the question of whether these

4   corrosive materials on the wires could be cleaned and these, this

5   electrical equipment could be back -- I'm sorry.  And this

6   electrical equipment could be put back into service after cleaning?

7   A.  Well, it certainly in theory can be cleaned.  The method of

8   cleaning hasn't been established by myself or anyone else.  But

9   clearly, the surface corrosion deposit can be removed.  The real

10  problems with cleaning, though, are cleaning out the pits, we don't

11  know how to do that, I'm convinced that technologically we could

12  figure out a way, and then dealing with the fact that the cable

13  itself is damaged.  And that part, we can't undo that damage, and

14  that's the part that, it doesn't matter if you can clean it

15  superficially, you still have the stuff in the pits which we don't

16  know how to clean yet and don't know if there's a practical method.

17  And we have the damage, which is not tolerable.

18  Q.  In terms of the corrosive residues that Dr. Barnett testified,

19  is there any code section that gives guidance that corrosive

20  residues on wire in homes can be cleaned and put back into service

21  in homes?

22  A.  No.  Such an operation is simply not contemplated by the code.

23  The code simply would require it to be replaced.

24          MR. LEWIS:  Your Honor, this would be a good time to

25  break.

1          THE COURT:  Okay.  We'll break here and come back at

2     1:45.  The court will stand in recess until 1:45.

3          THE DEPUTY CLERK:  Everyone rise.

4        (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

5

6                         *  *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              UNITED STATES DISTRICT COURT

2              EASTERN DISTRICT OF LOUISIANA

3

4
       IN RE:  CHINESE MANUFACTURED DRYWALL     *
5              PRODUCTS LIABILITY LITIGATION    *
                                                *
6                                               *
       **THIS DOCUMENT RELATES TO:**            *  MDL No. 2047
7                                               *
       Michelle Germano, *et al*                *  Section L
8                                               *
               versus                           *  New Orleans, Louisiana
9                                               *
       Taishan Gypsum Co., Ltd., f/k/a          *  February 22, 2010
10     Shandong Taihe Dongxin Co., Ltd.,        *
       *et al*                                  *
11                                              *
       Case No. 09-CV-6687                      *
12                                              *
       *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
13

14
                  VOLUME II - AFTERNOON SESSION
15                  PROCEEDINGS BEFORE THE
                    HONORABLE ELDON E. FALLON
16                UNITED STATES DISTRICT JUDGE

17

18     <u>APPEARANCES:</u>

19
       For Plaintiffs and          Herman, Herman, Katz & Cotlar, LLP
20     Intervenors:                BY:  RUSS M. HERMAN, ESQ.
                                        STEPHEN J. HERMAN, ESQ.
21                                 820 O'Keefe Avenue
                                   New Orleans, Louisiana 70113
22

23     For Plaintiffs and          Gainsburgh Benjamin David
24     Intervenors:                  Meunier & Warshauer
                                   BY:  GERALD E. MEUNIER, ESQ.
25                                      MICHAEL J. ECUYER, ESQ.
                                   1100 Poydras Street, Suite 2800
                                   New Orleans, Louisiana 70163


                          DAILY COPY

1   <u>APPEARANCES</u>:

2
    For Plaintiffs and            Law Offices of Richard J. Serpe, PC
3   Intervenors:                  BY:  RICHARD J. SERPE, ESQ.
                                   580 East Main Street, Suite 310
4                                  Norfolk, Virginia 23510

5
    For Plaintiffs and            Seeger Weiss
6   Intervenors:                  BY:  CHRISTOPHER A. SEEGER, ESQ.
                                   One William Street
7                                  New York, New York 10004

8
    For Plaintiffs and            Lewis & Roberts, PLLC
9   Intervenors:                  BY:  DANIEL K. BRYSON, ESQ.
                                   3700 Glenwood Avenue, Suite 410
10                                 Raleigh, North Carolina 27612

11  For Plaintiffs and            Hausfeld, LLP
    Intervenors:                  BY:  RICHARD S. LEWIS, ESQ.
12                                 1700 K Street N.W., Suite 650
                                   Washington, DC 20006
13

14  For Mitchell Company,         Cunningham Bounds, LLC
    Inc.:                         BY:   STEVEN L. NICHOLAS, ESQ.
15                                 1601 Dauphin Street
                                   Mobile, Alabama 36604
16

17  For Knauf Plasterboard        Baker & McKenzie, LLP
    Tianjin Co., Ltd.:            BY:  DONALD HAYDEN, ESQ.
18                                 1111 Brickell Avenue, Suite 1700
                                   Miami, Florida 33131
19

20  Official Court Reporter:      Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room HB-406
21                                 New Orleans, Louisiana 70130
                                   (504) 589-7778
22

23

24
    Proceedings recorded by mechanical stenography, transcript
25  produced by computer.

DAILY COPY

1                        <u>I N D E X</u>

2                                                    <u>PAGE</u>

3

    Dean Rutila
4        Direct Examination                          4

5

    Jerry Baldwin
6        Direct Examination                          31

7

    Sandy Sharp (Deposition Excerpt)                 39

8

9   Cathy Leach
         Direct Examination                          43

10

11  Joseph Leach
         Direct Examination                          43

12

13  Lisa Orlando
         Direct Examination                          53

14

15  Ronald Wright
         Voir Dire                                   62
16       Direct Examination                          65

17

18

19

20

21

22

23

24

25

                        DAILY COPY

1          **<u>AFTERNOON SESSION</u>**

2          **(February 22, 2010)**

3          **THE DEPUTY CLERK:**  Everyone rise.

4          **THE COURT:**  Be seated, please.

5              You're still under oath, sir.  You may proceed,

6      Counsel.

7              (WHEREUPON **Dean Rutila**, having been duly sworn,

8      testified as follows.)

9                    **DIRECT EXAMINATION**

10     BY MR. LEWIS:

11     **Q.**   Good afternoon, Mr. Rutila.

12     **A.**   Good afternoon.

13     **Q.**   Mr. Rutila, this morning I asked you if the wire with a

14     corrosive residue could be cleaned.  Do you recall that

15     question?

16     **A.**   I do.

17     **Q.**   Counsel has asked me to ask you to further explain your

18     answer.  I didn't follow up.  Could you explain your answer to

19     that question, please.

20     **A.**   The wire in the home, there's no practical way to clean it

21     in the home, and that's really the answer I should have given.

22     I did not say it as clearly as that.

23     **Q.**   Thank you.  I would like to proceed with P1.1841.001.

24     Mr. Rutila, in your work in this case, did you consider

25     government documents relating to the Chinese drywall problem

                          DAILY COPY

5

1    such as the State of Florida health department case definition
2    for drywall-associated corrosion in residences?
3    A.    Yes, we did.
4    Q.    Did you review the criteria that are set forth in that
5    document?
6    A.    Yes.
7    Q.    Can you review briefly for the Court the nature of the
8    criteria and the nature of the use of the criteria.
9    A.    There's two criteria.  On really a screening criteria,
10   Florida calls it sentinel indicators as a screening device.
11   Then there's also the criteria for scientific proof.  We, of
12   course, considered both of them in our work.
13   Q.    When you applied those criteria to the seven homes in
14   Virginia that you were able to inspect and do laboratory work
15   on samples from, what conclusion did you reach?
16   A.    That the seven homes meet the criteria by the Florida
17   definition for having Chinese drywall problems.
18   Q.    What is the unit of study or the unit of analysis that the
19   Florida case definition is directed to?
20          Let me try that again.  Is the purpose of the Florida
21   case definition to make a determination about a house, a group
22   of houses, a room in the house?  What is the unit of
23   determination?
24   A.    I see.  The Florida criteria is intended to define whether
25   a home has Chinese drywall problems.  That's the unit.  The

1    unit is a home, a building.

2              THE COURT:  Is it one sheet or more than one sheet?

3              THE WITNESS:  The case definition does not

4    distinguish.  It is a "yes" or "no," you have problems in this

5    home due to Chinese drywall or you do not.

6    BY MR. LEWIS:

7    Q.   Did you also review the recent Consumer Product Safety

8    Commission criteria for making these types of judgments?

9    A.   I did.

10             MR. LEWIS:  Could we have that slide, please.

11   BY MR. LEWIS:

12   Q.   Now, the Consumer Product Safety Commission -- if we can

13   blow up the top half -- published a document called "The

14   Interim Guidance identification of Homes with Corrosion from

15   Problem Drywall."  Have you had a chance to review that?

16   A.   I have.

17   Q.   Can you explain to the Court what this is.

18   A.   Similar to the Florida document, it is a document intended

19   to provide guidance for identifying when there is problems in a

20   home, particularly corrosion problems, as a result of drywall.

21             It really has two steps:  First off, an indicator

22   that you likely have problems, and that includes some visual;

23   and then scientific evidence for demonstrating that it is

24   there.  They use the word *threshold* and *corroborating*.

25   Q.   Were you able to apply these criteria from the CPSC

DAILY COPY

1    interim guidance document to the data on the seven homes in
2    Virginia; and if so, what did you conclude?
3    A.    Yes.  They have six criteria that they call corroborating
4    evidence in step 2, and four of them have to be met.  The homes
5    in Virginia meet all six of them.
6    Q.    All right.  I would like to focus on the threshold
7    inspection criteria for the CPSC.  Does the CPSC consider
8    visual inspection, not inspection with a microscope but visual
9    inspection, of corrosion on wires in their interim guidance
10   protocol?
11   A.    Yes.  Only in the threshold stage, not in the second
12   stage.  In the first stage of the threshold stage, they
13   considered visual inspection.
14   Q.    So when the CPSC looks at confirmatory or corroborating
15   evidence, do they say anything about visual inspection with the
16   naked eye of a corroded wire?
17   A.    No.  It's a laboratory confirmation.
18   Q.    Going back to that description of the visual inspection
19   for a threshold criteria, is there anywhere in the CPSC
20   guidance where the CPSC indicates it would be appropriate to
21   use that threshold visual look at a wire for the purpose of
22   deciding what boards in the home are Chinese drywall on a
23   board-by-board basis?
24   A.    No.  That's completely outside of the scope of the intent
25   of the document.  The document is intended to identify a home

 1   with the problem.

 2   Q.    All right.  If we can go back to the Florida document, I

 3   really have a similar question.  The Florida document does

 4   mention in their screening criteria the use of -- we need to go

 5   back -- a visual look, without a microscope, at corrosion on a

 6   wire in their first criteria, No. 3.  Do you see that?

 7   A.    I do.  They call that sentinel indicators.

 8   Q.    They do talk about looking at a wire or an HVAC and seeing

 9   corrosion; correct?

10   A.    That's correct.

11   Q.    Now, is there anything in the Florida case definition that

12   says that that tool, using the naked eye to look at a wire, is

13   a tool that can be used for the purpose of selectively

14   identifying Chinese drywall on a board-by-board basis?

15   A.    No.  It's not the intent of the document.  The document is

16   intended to identify a home with a problem, and it couldn't

17   work that way.

18         THE COURT:  Well, isn't the purpose of it, though, to

19   identify the effects of drywall and not the presence of

20   drywall?  I mean, isn't that what you're looking for with

21   inspection?  I mean, you're looking for the effects of drywall,

22   aren't you?

23         THE WITNESS:  That's correct.  You're looking for

24   confirmatory evidence that there is a problem induced by the

25   drywall.

BY MR. LEWIS:

**Q.**    Mr. Rutila, have you prepared a slide to summarize your opinions about the potential use of a visual corrosion grading scale for the purpose of selectively identifying Chinese drywall boards?

**A.**    Yes, I have.  It's six opinions that you just put up.

**Q.**    Can you, as succinctly as possible, review those for the Court, please.

**A.**    First off, the CPSC and FDOH intend it as a screening tool for the house, not for a board-by-board determination.  There is no government or peer-reviewed method endorsed for a board-by-board method of the criteria or any criteria.

There was a visual identification would assume incorrectly that there are only local effects of the corrosive gases, and that's not the case.  The gases are dispersive.  They don't just affect locally to a board.

There's no available receptacle hole in so many of the walls.  We think of closets we saw, ceilings, or just many boards up near the ceiling.  They don't have receptacles that would allow you to use a local method even if one existed.

It's impractical to determine where the boards are without taking the house apart.  Fundamentally, you can't guarantee, as a designer or as a builder, that you have removed the problem by a board-by-board method.  The same thing is true of a representation to a building code official that you have,

 1   in fact, remedied the problem, and you can't do it by that

 2   method.

 3   **Q.**   Mr. Rutila, in your investigation and review of documents

 4   in this case, other than the seven homes that you inspected in

 5   Virginia and the two control homes, have you had occasion to

 6   review other data about homes with Taishan drywall in Virginia?

 7   **A.**   Yes.  There are approximately 60 homes, including the

 8   seven represented here today, that we have reviewed documents

 9   relative to.

10   **Q.**   Have you reviewed a summary of the information from

11   inspection of those homes in terms of putting it forward in a

12   summary slide?

13   **A.**   Yes.  Yes, I have.

14        **MR. LEWIS:**  Can I have that demonstrative, please.

15   If you could just blow up the top of it.

16   **BY MR. LEWIS:**

17   **Q.**   If you could explain to the Court the nature of the

18   information that you have summarized here and what it tells you

19   about these other Virginia homes that have Chinese drywall.

20   **A.**   This is a list of 60 homes:  Seven of whom are represented

21   here in person today, three other homes that we have visited,

22   and then the balance.

23        This is a screening having been done by the PSC and

24   their scientists to first go through a step-by-step process

25   getting to the point of being able to confirm that these homes

1   have Chinese drywall.  Because of the way it's cut and pasted

2   here, it's a little difficult to follow, but it starts with an

3   inspector noting just odor; taking photographic evidence of the

4   AC coil, photographic evidence of electrical corrosion; then a

5   laboratory confirmation of the corrosion, laboratory

6   confirmation both on the HVAC coil and the electrical;

7   laboratory confirmation that the drywall has elevated

8   strontium -- that's not a field test, that's a laboratory

9   test -- record confirmation that the Venture Taishan drywall

10  was delivered, the number of sheets from those records; and

11  then the aging test results is an off-gassing study of putting

12  a sample of metal in a container with the drywall and

13  confirming that the corrosion exists, that corrosion is caused

14  by that.

15         So all of those things have been for these 60 homes.

16  Most of the testing has been done.  You can see some of them

17  still say "pending," but it demonstrates that -- in addition to

18  the seven homes of the homeowners here today, this is a list of

19  60 total in the Virginia area with a similar problem.

20  Q.   I would like to look at the evaluation that SGH did of

21  appliances and consumer electronics in their work in this case,

22  and I have put up Appendix 1 from your December 30 report.

23  Could you explain to the Court what kind of evaluation SGH did

24  of appliances, consumer electronics, and the issue of corrosion

25  damage.

1  A.   Yes.  The slide presented shows a list of, again, what the
2  homeowners reported in terms of what failed.  It's difficult to
3  read from where anybody sits, but a microwave oven, a
4  refrigerator, a computer, clothes dryer, television, more
5  computers, dehumidifiers, failed devices in these homes.
6          These devices we did not examine, but we did collect
7  other devices from these homeowners and did examine them,
8  dozens and dozens of devices.  We took apart computers,
9  hairdryers, coffee makers, virtually any kind of appliance you
10 would imagine -- the dryer that we heard about earlier today --
11 and examined them and identified the same corrosion and the
12 same silver sulfide or copper sulfide corrosion on these
13 devices.
14 Q.   Did you present the results from that investigation in
15 your supplemental report of January 18, Appendix 3?
16 A.   That's correct.  That's correct.  That is information
17 presented therein.
18 Q.   Thank you.  I would like to look at one example of that
19 analysis, and that would be certain parts of the refrigerator
20 in the McKellar home compared to the control home across the
21 street, the Sullivan home, and ask you to explain that
22 evaluation to the Court.
23 A.   Okay.  The images you see are general.  If we just go down
24 to the bottom, we can get right to the bottom of it.  These are
25 images of components taken out of the refrigerator, and you can

1    see the corrosion in that image, particularly near that braise

2    where there is a great deal of corrosion on it, as well as at

3    the arrow there where there's copper sulfide corrosion.  So

4    this is the kind of condition that we found in the laboratory.

5            The next page shows, before the laboratory analysis,

6    more general views of the McKellar one right in the middle, if

7    we can go there.  This is before it's disassembled.  Again, you

8    can see the black silver sulfide on the copper tubes as part of

9    the refrigerator.

10           Now, if you illustrate both the bottom two images at

11   the same time, this is a comparison with the refrigerator from

12   McKellar before it was disassembled, and you can see the same

13   image.

14           Then directly below it is the Sullivan refrigerator,

15   exact same make and model, right across the street, built about

16   the same time and occupied about the same time, and the

17   difference between the copper tubing on the two refrigerators

18   is remarkable.  We stood in more or less the same spot relative

19   to the device and took the two photographs, and the one is what

20   you would expect:  Nice, bright, shiny copper in the Sullivan

21   house across the street; and then the corroded copper at the

22   McKellar house.

23           **THE COURT:**  Let me ask you.  In your inspections in

24   the houses where you have the drywall, as opposed to the houses

25   without the drywall, are the only effects the effects on copper

DAILY COPY

14

1     and silver?  I mean, I'm not talking about the smell or the

2     odor.  Copper and silver.

3               **THE WITNESS:**  It's a great question.  In general, the

4     answer is yes.  Besides the odor, you know, we looked at wood

5     because sulfur gases are known to deteriorate wood.  We looked

6     at the studs.  We looked at galvanized steel.  We looked at the

7     nails and the screws that are used to hold the building

8     together.  We looked at the plywood.  We looked at all these

9     elements.  We looked at the concrete foundation.  Because if

10    those things were damaged by the sulfur gases, then the houses

11    would be unrepairable.  It was a critical question, and the

12    things that we found damaged are the copper-bearing elements

13    and the silver.

14    **BY MR. LEWIS:**

15    **Q.**   Can we click to the --

16    **A.**   The next page, please.

17    **Q.**   -- final slide on the comparison.

18    **A.**   Right, just the bottom two images on that one.

19              Another area of the same two devices, again photo 7

20    and photo 8, top and bottom, comparing the McKellar

21    refrigerator and the Sullivan refrigerator.  Again,

22    night-and-day stark differences for two devices in otherwise

23    nearly identical homes, nearly identical construction, nearly

24    identical time.

25              These are just examples.  Most of the other things in

DAILY COPY

1  the appendix referred to a few minutes ago are electrical

2  examples, but this is pretty remarkable.

3          THE COURT:  Just following up on what you said about

4  the copper and the silver, your concern about those two metals

5  is that you're finding corrosive effects on it, and you're

6  attributing that to silver sulfide and copper sulfide?

7          THE WITNESS:  The silver sulfide and copper sulfide

8  are the corrosion product.  You attribute the damage to the

9  sulfur gases, exactly, and that's what's causing those

10 deposits.

11 BY MR. LEWIS:

12 Q.   Mr. Rutila, was there any evaluation, in your lab or in

13 other labs among the multidisciplinary team, of sorbent

14 materials or of PVC piping that you had a chance to review from

15 Chinese drywall houses?

16 A.   Yes, we did.  PVC plumbing is a common one.  The PVC wire

17 is another one.  So we did some work, and others did as well.

18 Q.   Did you determine if the sulfur gases had any effect on

19 those materials?

20 A.   The only one that we found an effect on is the copper

21 electrical wiring, where there was enough penetration through

22 the PVC to actually corrode the ground wire, but that was the

23 only effect.

24         THE COURT:  The PVC will not inhibit it, but it will

25 not deteriorate as a result of exposure?

16

1          **THE WITNESS:**  The PVC electrical wire is permeable

2  enough.  It hasn't been proven one way or another whether PVC

3  drainpipe would allow it to pass or not, but there's been no

4  ill effects associated with it.

5  **BY MR. LEWIS:**

6  **Q.**   In the analysis, was it determined that the sulfur gases

7  can penetrate the PVC material and, when that material is

8  covering a wire, reach the wire and cause corrosion?

9  **A.**   That's correct.  That's exactly my point.

10  **Q.**   I'd like to turn to this concept of a mixed home.  You

11  have used that word in explaining some of the problems to us.

12  If you could explain that concept to the Court, please.

13  **A.**   Many homes have a mixture of Chinese and domestic drywall.

14  Some of the homes, the mixture is very defined to the garage as

15  being domestic and the rest of the house being Chinese.

16          Some homes, it's not so clear; homes have a mixture

17  throughout them, either primarily on one floor or primarily on

18  another floor, with occasionally intermittent pieces.  Those

19  have been a challenge for us to understand those and understand

20  the damage in those homes.

21  **Q.**   I would like to ask you, using as an example the Baldwin

22  home, to let -- to ask you to evaluate the kinds of information

23  available to you to determine whether or not a home is a mixed

24  home; and, if so, if there's any way to understand where the

25  Chinese drywall is in the home.

1          I would like to start with P1.2028-0047, 0048, two

2   pages.  If we could highlight the relevant section of this, if

3   you can explain to the Court the information in this record

4   that bears on the question of a mixed home.

5   **A.**   Very well.  This is the delivery record from Venture, and

6   it tells us quite a few things.  What's been highlighted is the

7   record that 77 pieces of 1/2-inch, 4-foot-by-12-foot Chinese

8   drywall was delivered, according to this record, to the Baldwin

9   home.  The sheet right above that, where it says, "Drywall:

10  Gold Bond," that's domestic drywall.

11         So, in that instance, the record shows 151 of

12  domestic and 77 of the Chinese, and then the record goes on

13  with other pieces of drywall as well.

14              **THE COURT:**  Did you test the domestic?

15              **THE WITNESS:**  Yes, sir.

16              **THE COURT:**  And you tested the Chinese drywall?

17              **THE WITNESS:**  Yes, sir.

18              **THE COURT:**  What's the component in each of them?

19  Are you having gypsum in both of them?

20              **THE WITNESS:**  Yes, both of them are gypsum.

21              The significant difference that we see is that

22  the Venture drywall has a fairly significant percentage of a

23  very fine limestone sand in it, almost dust-like sand.  That

24  sand, when we look at it -- and this is all presented in our

25  December report.  When you look at that sand, you find that

1   there's elemental sulfur, just little pieces -- again, the dust

2   is small, but elemental sulfur in that limestone sand.  That's

3   what we see in our laboratory.

4               Then what we also get from other investigators

5   is that they find chemically that there is this sulfur in the

6   drywall.  The two observations, the chemistry and the

7   microscopic observation, correspond with each other; they make

8   sense.

9               **THE COURT:**  Do you have any sulfur in the domestic?

10              **THE WITNESS:**  Well, gypsum is, of course, composed

11  with a lot of chemically bound sulfur, but we don't find that

12  same either chemically -- the chemical research finds none of

13  that elemental sulfur in it that's not bound with the calcium.

14  Then, microscopically, we don't find that sand, and any sand

15  that we do have doesn't have the elemental sulfur.

16              So that's what we see as the significant

17  difference, and that's, I think, why the CPSC and others use

18  the test for elemental sulfur as one of the important criteria.

19  **BY MR. LEWIS:**

20  **Q.**   Mr. Rutila, as part of the multidisciplinary team, did you

21  have occasion to meet with and review data with Dr. Lori

22  Streit, one of the chemists in the case?

23  **A.**   Yes, I did.  We didn't meet face-to-face.  We met over the

24  telephone many times.

25  **Q.**   All right.  Are you familiar with her data where she

DAILY COPY

1    showed off-gassing in the Chinese drywall and was able to

2    compare it -- off-gassing of hydrogen sulfide, carbonyl

3    sulfide, and was able to compare it with non-Chinese drywall?

4    A.   Yes.  We also reviewed that data and refer to it in our

5    December reports.

6    Q.   Now, in terms of this installation record, can we go to

7    the second page and look at the information in this record

8    relevant to where in the house this record indicates the

9    Chinese drywall is used.

10   A.   Right.  This record you have illuminated with the yellow

11   indicates that the 77 boards are put on the first floor, the 77

12   Chinese drywall are on the first floor; and that the second

13   floor has 86 boards of domestic, the Gold Bond.  The "GB"

14   stands for the domestic drywall.

15           That's what the record shows here.  What this is is a

16   stocking record so that when the delivery man brings out the

17   truck, he or she might know that the drywall is supposed to go

18   to different places.  That's what this is.

19   Q.   Now, based on your evaluation of these homes, were you

20   able to determine if this kind of a delivery record is a

21   reliable tool for the purpose of knowing specifically where in

22   the home the Chinese drywall is used?

23   A.   No, it's not a reliable tool.  It seems to be useful in

24   determining whether there is a mix of boards, but it's not

25   reliable in terms of determining where the corrosion will

1    occur.  We haven't had the luxury of taking a home and taking

2    every piece out to know that -- you know, what kind of errors

3    there are in this, but what we do know is that we find errors

4    and that we find corrosion even where there is no Chinese

5    drywall listed on the records.

6    **Q.**   So in this particular home, the Baldwin home, where the

7    installation record indicates no Chinese drywall on the second

8    floor, were you able to evaluate that second floor, for

9    example, for effects of corrosion?

10   **A.**   Yes, we did.  We did evaluate it.  The attic air handler

11   that services the second floor is severely corroded.  We found

12   corrosion in light switches on the second floor.

13           We did look at the drywall.  We did not find a

14   Chinese board on the second floor, but we didn't examine every

15   board either.

16           **MR. LEWIS:**  Can we enlarge the HVAC system from the

17   second-floor attic of the Baldwin home.

18   **BY MR. LEWIS:**

19   **Q.**   This is from the Perricone report, this particular

20   photograph.  What does this show?

21   **A.**   Yes, I have reviewed that report, and this shows the coil

22   on the second floor.  This is the coil.  It's just two

23   different images of the same coil that is severely corroded.

24   These are copper tubes that are severely corroded in the coil.

25           This air comes from the recirculation of air from the

1  second floor up into this unit, where it's cooled and then
2  pushed back in.  This copper sulfide corrosion demonstrates
3  that there are sulfur gases getting to this unit.
4  **Q.**   You talked about light switches.  I would like to start
5  out with a diagram of the second floor and ask you to orient
6  the Court.  Explain to the Court what this is and how this can
7  be used in evaluating certain electrical equipment from the
8  second floor.
9  **A.**   This is a second-floor plan.  We have overlaid on the
10  second floor the HVAC unit and ductwork.  That's what these
11  various lines that I am highlighting there are, and we will see
12  a little bit more about that in an animation perhaps.
13      There's the stairway down to the first floor.  Then I
14  identify two switches:  JIB23, which is at the top of the
15  stairs; and JIB24, which is in this room that has a water
16  closet and a bathtub.  That small room has a switch.  In those
17  two, we found corrosion on the light switches.
18  **Q.**   All right.  If we could go to the next slide in terms of
19  the sample.  If you could just explain to the Court what we are
20  looking at.
21  **A.**   This is JIB24 from the light switch in that small room, in
22  the bathroom.  I think that's Andrew's hand, if I'm not
23  mistaken, my staff's hand.  He has taken this out, cut the
24  wires, and bagged the sample to bring it back to our
25  laboratory.

1    **Q.**    What floor is the sample JIB24 taken from?

2    **A.**    That's from the second floor in that bathroom.

3    **Q.**    Second floor of the Baldwin home?

4    **A.**    Of the Baldwin home, that's correct.

5    **Q.**    We have the laboratory microphotograph on the next slide.

6    If you can explain that to the Court, please.

7    **A.**    Sure.  This is the contact arm from that light switch.

8    This is the -- one arm is fixed and the other one is movable.

9           This is silver sulfide that has corrosion deposits

10   that have coated the silver that is supposed to be the

11   electrical contact in that switch.  So when you throw the

12   switch, the electricity is supposed to pass through that.  Now

13   the silver sulfide is there, and that is the type of corrosion

14   that is of great concern in terms of creating additional

15   resistance and heating.

16   **Q.**   Have you brought that switch and a switch from a control

17   home with you to explain your opinions today?

18   **A.**   I did.

19           **MR. LEWIS:**  Your Honor, with your permission, it's

20   quite tiny what Mr. Rutila needs to show you.  Can he reach

21   over and point out the features of this sample that are

22   important?

23           **THE COURT:**  Sure.

24           **THE WITNESS:**  So I have just disassembled this and

25   taken the cover off and the rocker switch, and this is what's

1    exposed.  This is the fixed part of the arm.  Then this is the
2    part that moves with the switch.  This is what's in the
3    photograph.  I call your attention to the discoloration.  That
4    should be -- look like a piece of silver.  Instead, it looks
5    like black.
6              Then, by comparison, I brought another switch
7    from the Sullivan home, the so-called control home.  This is a
8    three-way switch, so it has some extra hardware, but you will
9    see that it has, again, the same sort of fixed device -- I've
10   got to take this piece off first -- and then the moving arm.
11   You can see that is what the silver looks like uncorroded.
12   Then, by comparison, it's fairly easy to see side by side the
13   difference between a corroded silver contact and a noncorroded
14   silver contact.
15   **BY MR. LEWIS:**
16   **Q.**   Mr. Rutila, what do you learn from an evaluation of the
17   HVAC on the second floor and the silver switch which is
18   depicted in the photograph from the second floor of the Baldwin
19   home?
20   **A.**   That there are sufficient sulfur gases from Chinese
21   drywall on the second floor to cause corrosion and that the
22   problems that need to be repaired exist there; that is,
23   corroded electrical components, corroded HVAC.  So the line
24   set, for example, from that unit and the wire are corroded in
25   there and need to be remediated.

DAILY COPY

24

1  Q.   I would like to ask you to explain to the Judge the data
2  we obtained from the defense -- I'm sorry, from intervenor
3  Knauf regarding the use of a color scale on grading corrosion
4  on the second floor of the Baldwin home, and that would be
5  P1.2003-3686.
6  A.   This is a floor plan of the second floor of the Baldwin
7  house, very similar to what we showed, and they have -- if you
8  zoom in -- let me give you a good point.  That's a good slot.
9  Thank you.
10         If you zoom in, you can see, using their scheme, that
11  1 is a lesser level of corrosion and 2 is a greater level of
12  corrosion.  So they have gone through and identified -- I would
13  have to see the rest of the document to remember what their
14  scale is, but they have identified on the second floor -- so 1
15  is no visible tarnishing and 2 is sporadic visible tarnishing.
16  So their record shows there is corrosion occurring on the
17  second floor of the Baldwin house.  That's what we can see from
18  this.
19  Q.   All right.  I would like to ask you to show a short part
20  of the animation on the Baldwin second floor and ask you to
21  integrate for the Court the HVAC information, the silver switch
22  information, and the color-grading information as it relates to
23  understanding what is happening on the second floor of the
24  Baldwin home as you think about it in terms of repair.
25  A.   Very good.  We know that sulfur gases are getting drawn up

25

1    into the air handler through this return air vent.  Whether
2    they come from the second floor or the first floor, at this
3    point we don't know with any certainty.  What we do know is the
4    gases are there.  The HVAC unit proves that.
5         The gases come up through these return air vents, and
6    then I don't know if it's not running or not, but then they
7    get -- there they go.  The gases get drawn by the fan into the
8    cooling coils and then pushed back out into the rooms.  So any
9    gases get redistributed throughout the house, into the spaces
10   with the, for example, electrical switches.
11        That's what we see from that, and that's what leads
12   us to conclude that, whether there is Chinese drywall on the
13   second floor of Baldwin or not, we have the damage that still
14   requires the removal of the wallboard, the wiring, and the HVAC
15   equipment on that second floor.
16   Q.   Mr. Rutila, would you consider excluding the second floor
17   from the repair that you would recommend for the Chinese
18   drywall problems in the Baldwin home?
19   A.   No, sir.  That would be completely irresponsible.
20   Q.   I want to return briefly to the utility of the delivery
21   records and ask you to look at a different set of records in a
22   different home, and that would be the Nguyen home --
23        **MR. LEWIS:**  Also a Virginia plaintiff but,
24   Your Honor, not one of the seven before the Court.  There was a
25   particular point of information that Mr. Rutila could rely on

1   this record to demonstrate the utility of the delivery record.

2   BY MR. LEWIS:

3   Q.   First, if you could quickly review what this delivery

4   record tells us about the Nguyen home in Virginia.

5   A.   It's very similar to the Baldwin; coincidentally, the same

6   77 number.  Drywall:  Venture Supply boards.  So those are

7   Chinese boards.  They say "4-by-2," but they should be 4-by-12.

8   That must just be a typo.  So 77 Chinese drywall boards are

9   shown on this record as being delivered.

10          The second page is where, as we know, the stocking

11  information is.  That's right, the stocking information right

12  there.  It shows the 77 boards for stocking purposes were to go

13  on the first floor.  The second floor, all 140 boards were to

14  be not the Venture Supply boards.  That's what the "VS" stands

15  for right there.

16          So that was what they intended based on this record.

17  That's what this record shows us.

18  Q.   That's a similar type of record that you reviewed in the

19  Baldwin case; correct?

20  A.   Very much so.

21  Q.   Were you able to instruct your engineering staff to look

22  at the second floor of this home and determine if they could

23  obtain any information about the presence of Chinese drywall on

24  the second floor?

25  A.   Yes.  Andrew Jeffrey, an engineer on my staff, went to the

1   home and did, in fact, remove drywall and did, in fact, find

2   Chinese drywall on the second floor in that closet.

3   **Q.**   What was the first way that you were able to determine

4   that the wallboard on the second floor in the closet was, in

5   fact, Chinese?

6   **A.**   By cutting it and removing it.

7   **Q.**   If we could blow up what you can see when you removed that

8   board.

9   **A.**   Venture Supply.  That's what we found in that closet when

10  Andrew had that drywall cut and removed.

11  **Q.**   This is in the Nguyen home where the installation record

12  indicated no Chinese drywall on the second floor; is that

13  correct?

14  **A.**   It's not an installation record.  It's a delivery stocking

15  record, and it just plain is wrong.

16  **Q.**   Were you able to send the sample of the Venture board off

17  to Dr. Streit for analysis to determine if she could gain

18  information about whether it was Chinese and whether it was

19  off-gassing corrosive sulfur gases?

20  **A.**   Yes, we did.  And she did, in fact, test that board.

21  **Q.**   Did she report her results to you?

22  **A.**   Yes, she did.  She found this elemental sulfur and the

23  off-gassing corrosion.

24  **Q.**   I would like to ask you a final question regarding your

25  opinions in this case and ask you to summarize your conclusions

28

1    based on the SGH investigation of Chinese drywall in the

2    Virginia homes.

3    **A.**    I put them on this slide.  The Chinese drywall houses have

4    offensive odor and a corrosive environment.  The Chinese

5    drywall houses have excessive corrosion of copper and silver

6    components.  The corrosion is unacceptable from the perspective

7    of life safety and the building code, the mechanical failure of

8    HVAC equipment, and from electrical failure of devices, of

9    consumer devices as well as electrical distribution system.

10   Significant repair and remediation is required.  For practical

11   and scientific reasons, the repair requires the replacement of

12   all drywall, electrical equipment, and all copper and silver

13   components in the houses.

14   **Q.**    Mr. Rutila, I would like to focus on your fifth conclusion

15   and ask you to specifically relate that to what you learned

16   from your experience with interviewing and making observations

17   at the Lennar remediations?

18   **A.**    That's exactly what Lennar is doing at the homes that they

19   were repairing that we visited and that they told us they are

20   doing.

21   **Q.**    In terms of your testimony today and all of the opinions

22   you have expressed, have you expressed those opinions to a

23   reasonable degree of scientific certainty within your field of

24   expertise?

25   **A.**    Yes, I have.

DAILY COPY

29

1          **MR. LEWIS:**  Thank you, Mr. Rutila.

2              Your Honor, any further questions?

3          **THE COURT:**  You mentioned the presence of strontium,

4     high levels of strontium, in the Chinese drywall.  What effect

5     does that have?

6          **THE WITNESS:**  We don't believe that it is anything

7     other than a mining or manufacturing artifact; that is, the

8     sources of materials that are used in manufacturing the Chinese

9     drywall leave that as an artifact, that it's not actually the

10    cause of the problem.  That's what all the research that I have

11    read indicates to us today.  It's a useful fingerprint, if you

12    will, put on by a manufacturing process, but it is not the

13    cause of the sulfur off-gassing or the corrosion in the homes.

14         **THE COURT:**  Do you have any opinion as to whether the

15    sulfur was in the gypsum as it was mined, or did it deteriorate

16    in transit or deteriorate after installation or what?

17         **THE WITNESS:**  It's my opinion that it was introduced

18    in the raw materials as in the manufacturing process.  Without

19    knowing anything about the mining process and what that raw

20    material stream is, I can't have any further opinion than that.

21         **THE COURT:**  Is it in the gypsum or is it in the paper

22    covering?

23         **THE WITNESS:**  It's within the gypsum matrix.  It's

24    not related to the paper.  It's within that matrix of the

25    gypsum body.  That's where the sulfur is contained.

DAILY COPY

30

 1        **MR. LEWIS:**  I'm sorry, Your Honor.  If I could ask

 2   one more question.  Thank you.

 3   **BY MR. LEWIS:**

 4   **Q.**   I failed to ask you if, in comparing the remedy that you

 5   are recommending to Lennar, you have compared the

 6   recommendations as to the entire HVAC system and electronics in

 7   the home?

 8   **A.**   Yes, I have.  In terms of the HVAC, they are replacing the

 9   entire assembly, including the outside compressor, all the

10   ductwork, all the line sets, all the wiring.

11        In terms of electrical, they are removing all the

12   electrical wiring, all the switches, low-voltage wiring, in

13   precisely the same way.

14        **MR. LEWIS:**  Thank you, Mr. Rutila.  No further

15   questions.

16        **THE COURT:**  Why would they have to replace the

17   outside compressor if it's not in the environment?

18        **THE WITNESS:**  When the inside air handler

19   malfunctions, the outside compressor tries to work.  It doesn't

20   know that the inside unit is malfunctioning, so it works

21   harder.  It essentially wears itself out trying to compress a

22   weakened gas in making the assembly work.  That's really why.

23   It wears itself out because of the failure on the inside.

24        **MR. LEWIS:**  Anything further?

25        Thank you very much, Mr. Rutila.  Thank you,

DAILY COPY

```
 1    Your Honor.
 2              MR. SERPE:  Plaintiff would call Jerry Baldwin.
 3              (WHEREUPON Jerry Baldwin, having been duly sworn,
 4    testified as follows.)
 5              THE DEPUTY CLERK:  Please state your full name and
 6    correct spelling for the record.
 7              THE WITNESS:  My name is Jerry Baldwin,
 8    B-A-L-D-W-I-N.
 9                         DIRECT EXAMINATION
10    BY MR. SERPE:
11    Q.   Good morning.  Good afternoon, Mr. Baldwin.
12    A.   Good afternoon, Mr. Serpe.
13    Q.   Would you tell the Court the address of the home that you
14    live in that has Chinese drywall.
15    A.   Sure.  My wife and I live at 4020 Dunbarton Circle in
16    Williamsburg, Virginia.
17    Q.   It's a single-family home.  Is that an accurate
18    representation of when you moved in and what your approximate
19    purchase price of your home was?
20    A.   That's correct, that's accurate.
21              MR. SERPE:  Can we see a picture of the Baldwin's
22    home, please, Scott.
23    BY MR. SERPE:
24    Q.   Mr. Baldwin, is this a fair picture of your home?
25    A.   Yes, sir, that's our home.
```

1  Q.   Mr. Baldwin, you just heard Mr. Rutila describing the

2  problems with the second floor of your house with corrosion.

3  He didn't spend a great deal of time about the first floor.

4  Would you share with the Court what kind of problems you have

5  run into on the first floor that has the Chinese drywall.

6  A.   Sure.  We are on our third set of air-conditioner coils

7  that are in the air handler that's in the garage.  We have had

8  a microwave fail.  We have had our refrigerator fail.  We have

9  had the thermostat fail.  We are on our third computer.  We

10 moved in in late November of 2006.

11 Q.   You-guys are still in the house at this point?

12 A.   We are still in the house primarily because we can't

13 afford to move out and continue to pay our mortgage and also to

14 pay rent if we were to move out.

15 Q.   Jerry, tell the Court the circumstances under which you

16 and Inez bought this house.

17 A.   In 2006, we were living in Lawrenceville, Georgia.  It's a

18 suburb of Atlanta.  I accepted a position from my employer to

19 work on a special project in Newport News, Virginia.

20      At the time, my mother-in-law lived with us.  When

21 Inez and I came to the peninsular to look for a home, we had a

22 concern about my mom-in-law living with us.  To try to make it

23 convenient for her and easy for her to live with us, we found

24 this home that has a full bathroom on the first floor and what

25 could have been a full bedroom attached to that full downstairs

1    bathroom.

2              So, gee, what a great find.  Mom-in-law can live with

3    us, and it will -- you know, Inez and I can have upstairs; she

4    can have downstairs.  It will be hassle-free.

5              Unfortunately, we signed the contract for the home in

6    August.  We moved in in November.  In October, my mother-in-law

7    passed away.

8    Q.   So at the time you bought this house, tell the Court what

9    kind of down payment you-all invested in this property.

10   A.   We had in excess of $12,000 in nonrefundable upgrade

11   money.  Using 20/20 hindsight, I would gladly trade that

12   $12,000 today for the problems that we have.

13   Q.   What kind of a down payment on the house?

14   A.   $100,000.  For us to be able to afford the mortgage -- we

15   were totally upside down, moving from Georgia to Williamsburg,

16   on our home.  For us to afford the mortgage, we put $100,000

17   down.

18   Q.   Jerry, you talked about these computers that went out.

19   Where were most of those pieces of equipment located?

20   A.   They were in our downstairs, first floor, what would have

21   been my mother-in-law's bedroom.  It's now called -- we now

22   call it our office, and we have a couple of desks in there.

23   It's where we kept our -- that lamp was in that room, and

24   that's where we kept our computers.

25   Q.   So the lamp that Mr. Rutila talked about, could you

34

1   identify it for us.  Just for the record, would you identify
2   that as --
3   A.   That's the lamp that was in the downstairs, first-floor
4   office.
5   Q.   You understand you're not going to be seeing this lamp
6   anymore?
7   A.   I told Inez I think we've seen the last of that lamp.
8   Q.   Among all of the people that came into the house to take
9   samples, you're aware that they came in and did various
10  sampling in that office room, are you not?
11  A.   Yes, sir.
12  Q.   And that, one, it was reported that the ceiling in that
13  room was domestic drywall, according to the various techniques
14  that Knauf's experts had employed?
15  A.   That's what our understanding was, yes.
16  Q.   At some point did people from Mr. Rutila's firm come back
17  into that office room?
18  A.   Yes, they did.
19  Q.   What did they do in there?
20  A.   They drilled core samples in three corners of the room.
21  Q.   It's your understanding that those results have come back?
22  A.   Yes, sir.
23  Q.   And that the ceiling that was predicted to have been U.S.
24  drywall was, in fact, Venture Supply Chinese drywall?
25  A.   That's correct.

DAILY COPY

1    **Q.**    And was releasing corrosive gases?

2    **A.**    Yes, sir.

3    **Q.**    The computers, when they went out, did you lose any data?

4    **A.**    Yeah.  We lost a lot of -- you know, shame on us, we

5    didn't back up enough, but we lost a lot of personal

6    photography.  Inez kept her recipe file on there.  We lost

7    that.  We lost a lot of documents we stored on the computer,

8    and they were irretrievable.

9    **Q.**    Jerry, some discussion today about the second floor of the

10   house.  We just asked about the first floor.  Would you and

11   Inez be comfortable with a repair plan that would leave the

12   second floor of your house as is, intact?

13   **A.**    We absolutely believe the Chinese drywall has affected the

14   second floor of our home.  We had dozens of people through our

15   house inspecting it.  Every one that looked at the air handler

16   on the second floor told us the same thing:  These coils are

17   black and they're ready to go.  We would ask the Court to fully

18   remediate our home.

19   **Q.**    Jerry, when it comes time for the remediation to take

20   place, you and Inez will have to be out of the house for some

21   period of time.  Is that going to work a hardship on you?

22   **A.**    That's going to be a hardship.

23   **Q.**    Did you look into getting a mortgage deferral on your

24   house?

25   **A.**    Through Senator Mark Warner's office, Senator Mark Warner

1  of Virginia, we provided his office with our mortgage lender

2  information.  I was contacted by my mortgage company and

3  offered forbearance.  They called me up at work one day --

4  unbeknownst to me, called me up at work and offered me

5  something called forbearance.

6        I said, "Huh?  You know, I don't know what that is.

7  Could you please explain that to me."

8        "Well, what that means is that we will suspend your

9  mortgage payments for a period of three months.  In that time,

10 you can take that money that you don't have to pay your

11 mortgage with and you can fix your house."

12        I said, "Well, gee, I'm not sure you really

13 understand the problem that I have with my house.  It's

14 certainly going to take more than the $6,000 that would be

15 represented by three months of mortgage payments.  What happens

16 with my interest?"

17        "Well, your interest continues to accrue, as well,

18 and then that interest is due at the end of that three months.

19 But we might look again at the end of three months and extend

20 that forbearance period for you."

21        I said, "Gee, I'm not really sure I understand how

22 that works to my advantage if you're going to continue to

23 accrue my interest and I'm going to have to ultimately pay that

24 back."  I said, "At this point in time, thank you, but no thank

25 you."

1  **Q.**   So you took a pass on the mortgage forbearance.  Had you

2  previously made an effort to look into a refinance on the

3  house?

4  **A.**   Yeah, we were hoping to -- as I'm sure the Court knows,

5  interest rates were very, very low.  When we bought in 2006,

6  our rate was 5-7/8, which at the time was a pretty good rate.

7  Rates were -- refi's were below 4 percent.  We thought, "Gee,

8  this is a great opportunity."  Once you fall below 1 percent

9  under your current rate, it probably makes sense to refi it, of

10  course, knowing fully well that no one was going to come and

11  lend us money on a house with Chinese drywall in it, so it

12  became impossible to refinance.

13  **Q.**   Jerry, what were you and Inez's plans for the future, how

14  many more years of work and where did you see your lives taking

15  you?

16  **A.**   Well, we love living in Williamsburg.  I'll be 60 years

17  old.  As a lot of Baby Boomers know, at 66 Social Security

18  takes a little bump, so I had planned to work for six more

19  years.

20          We had hoped that this home would represent a major

21  portion of our retirement.  We have $100,000 in the house today

22  that's virtually worthless.  If the bank were to come -- if we

23  were to walk away from the home and the bank came after us for

24  the $265,000 that we still owe on the balance of the mortgage,

25  it would take away virtually all of our savings and everything

1   that we have spent 40 years working towards.

2   **Q.**   So as the plaintiffs that are closest to representing

3   people nearing retirement, what's the impact on your outlook on

4   retirement from having had a Chinese-drywall house?

5   **A.**   Well, you know, a retirement that looked six years away

6   now looks a lot farther away.

7   **Q.**   You worked with the accountants and Ms. Barrios, you

8   verified that these are accurate, and you're requesting that

9   the Court award the damages both for the repair and the other

10  economic losses reflected in Exhibit P3.0622; is that accurate,

11  sir?

12  **A.**   That's accurate.  I would just further say that I -- you

13  know, I worry about Inez and I staying in this house.  I worry

14  about my wife's health.  I worry about my health.  I worry

15  about the health of my grandchildren when they come to visit

16  us.  Our son is 33 years old.  He doesn't live with us.  If I

17  were like some of these other folks with children, we would

18  have been out of there a long time ago.

19          Maybe we are just of a generation that believes in

20  trying to do the right thing, which is that you pay your bills,

21  you pay your mortgage.  You know, for 40 years, Inez and I --

22  in August we'll be married 40 years, and we never missed a

23  mortgage payment.  This is an extremely difficult decision that

24  we are faced with making, and I'm also worried about the

25  financial implication that that could have on our lives.

1              **MR. SERPE:**  No further questions.

2              **THE COURT:**  Thank you, sir.

3              **MR. SERPE:**  Your Honor, because of the extraordinary

4    importance of the electrical wiring question and the prediction

5    of failures in the homes, we would like to introduce the entire

6    deposition transcript of the defense expert that most spoke to

7    electrical wires and the propensity for them to fail.  We have

8    prepared a very short excerpt of that deposition.  With the

9    Court's indulgence, we would like to play a short excerpt of

10   the deposition to highlight the importance of electrical system

11   and electrical system failures.  This from Mr. Sandy Sharp, who

12   is a defense expert that was retained by Knauf in this matter.

13              (WHEREUPON the following excerpt from the deposition

14   of **Sandy Sharp** was read out loud.)

15              "Question:  So something has to be done about homes

16        with Chinese drywall to prevent failures of equipment.

17              "Answer:  To prevent failures that are caused by

18        atmospheric tarnishing, because there are other reasons

19        that electronics fail.  New equipment tends to have a

20        higher failure rate and then older equipment tends to have

21        a higher failure rate.  But what we're talking about here

22        is failures due to corrosion and we have a parameter that

23        will indicate its likelihood.  And that parameter, if

24        applied to these data, indicates that there is a

25        likelihood of failure of electronic equipment at some

DAILY COPY

1 point in the future if this environment is maintained.

2  "Question:  And since we're talking about failures

3 due to corrosion and the likelihood of the failure of

4 electronic equipment, you believe something needs to be

5 done to correct the environment in houses with Chinese

6 drywall.

7  "Answer:  I said that if the environment is not

8 changed in those houses, we will have failures of

9 electronic equipment at some point in the future.

10  "Question:  Which is unacceptable.

11  "Answer:  We don't want to have failures of

12 electronic equipment, yes.

13  "Question:  And since we don't want to have failures

14 of electronic equipment, the environments are

15 unacceptable.

16  "Answer:  They need to be changed to eliminate the

17 conditions that cause corrosion failures of electronic

18 equipment.  I could say -- I could emphasize not of

19 electrical equipment, but we're -- in this instance we're

20 talking specifically about electronic equipment.

21  "Question:  Well, let's talk about electronic

22 equipment.

23  "Answer:  Yes.  Okay.

24  "Question:  Your standard as you told me earlier was

25 1434 angstroms.

1        "Answer:  That's correct.

2        "Question:  In the walls of this bedroom in Florida,

3    the angstrom thicknesses were 2179 angstroms, were they

4    not?

5        "Answer:  That is correct.

6        "Question:  That's higher than your limit of 1434

7    angstroms for electrical failures, isn't it?

8        "Answer:  It is a little higher.

9        "Question:  So you're predicting that at some point

10    in time we're going to have electrical failures in homes

11    with Chinese drywall if something isn't done about the

12    environment.

13        "Answer:  At some point in the future.

14        "Question:  And that's unacceptable.

15        "Answer:  To avoid those kinds of problems, we need

16    to change the environment.

17        "Question:  Let's address this 'at some point in the

18    future.'  Do you have an opinion as to what the expected

19    life of a home is?

20        "Answer:  I would say approximately similar to the

21    expected life of a factory.

22        "Question:  And what's that?

23        "Answer:  Maybe 50, 100 years.

24        "Question:  So if we want to protect the electrical

25    equipment in a house for 50 to 100 years, you're going to

DAILY COPY

1    have to do something about the Chinese drywall in these
2    houses, aren't you?
3         "Answer:  As I said already, these environments need
4    to be changed to avoid the possibility of future failures.
5         "Question:  In fact, your own data indicates that you
6    expect to see electrical failures at contacts and wires in
7    as short as three years at a 1434-angstrom thickness,
8    aren't you?
9         "Answer:  Those were rheostats in electrical
10   circuits, yes.
11        "Question:  And three years is obviously
12   significantly shorter than an expected normal use or
13   lifetime for an electrical system in a house.
14        "Answer:  That is correct."
15        **MR. SERPE:**  Your Honor, we will provide a copy of
16   Mr. Sharp's deposition to the Court marked as Exhibit P1.2066.
17        **THE COURT:**  We'll make it a part of the transcript.
18   The depositions are part of the transcripts.
19        **MR. SERPE:**  Your Honor, the plaintiff would call
20   Cathy Leach.
21        (WHEREUPON **Cathy Leach**, having been duly sworn,
22   testified as follows.)
23        **THE DEPUTY CLERK:**  Please state your full name and
24   correct spelling for the record.
25        **THE WITNESS:**  Cathy Leach.

DAILY COPY

1                        DIRECT EXAMINATION
2    BY MR. SERPE:
3    Q.   Are you nervous?
4    A.   I'm just upset.
5    Q.   Take a deep breath.  We are going to get you a glass of
6    water too.
7             MR. SERPE:  Your Honor, would it be possible to
8    switch plaintiffs?
9             THE COURT:  Yes, let's do that.
10            (WHEREUPON **Joseph Leach**, having been duly sworn,
11   testified as follows.)
12            THE DEPUTY CLERK:  Please state your full name and
13   correct spelling for the record.
14            THE WITNESS:  Joseph Leach.
15                       DIRECT EXAMINATION
16   BY MR. SERPE:
17   Q.   You're not Cathy Leach.  Joe, tell the Court what you do
18   for a living.
19   A.   I work for the Department of Defense.
20   Q.   What do you do for the Department of Defense?
21   A.   Military officer.
22   Q.   Within the guidelines that you're permitted to, can you
23   give us a little bit of an idea what you do as a military
24   officer for the Department of Defense.
25   A.   I work on special operations projects.

                          DAILY COPY

1    **Q.**   This is your wife Cathy, who we met very briefly?

2    **A.**   Yes, sir.  She just wanted to get up and say hi to

3    everybody.

4    **Q.**   Let's take a look at the chart.  We see you and Cathy

5    here.  You're a single-family home in Williamsburg.  Is that

6    4043 Dunbarton Circle?

7    **A.**   That's correct.

8    **Q.**   When did you-guys acquire that house?

9    **A.**   July of 2008, sir.

10   **Q.**   What was the purchase price?

11   **A.**   Around $475,000, sir.

12   **Q.**   We have got you down here.  We talked about how the

13   Michauxes only had 45 boards of Chinese drywall, but we have

14   got you down here with an approximate number of only eight

15   sheets of Chinese drywall.  Is that your understanding as to

16   approximately how much drywall has been found in your house?

17   **A.**   Yes, sir.

18   **Q.**   Can we see a picture of the home, please.  Who is this out

19   front here?

20   **A.**   That's Murphy.

21   **Q.**   Would you explain to the Court what the general layout of

22   your house is.

23   **A.**   It's a ranch with a full basement, equal size of the

24   upstairs, and then there's a bonus room above the garage.  The

25   main level is three bedrooms, the dining room, the kitchen,

1  living room.  Then the basement has my office, an entertainment

2  room, and another full master suite.

3  Q.   It's kind of hard to tell here, but the property drops off

4  very quickly in the back?

5  A.   Yes, sir.  It's on a hill.

6  Q.   So the lower level of the house, actually across the whole

7  back of the house, has glass, and there's a lot of light that

8  comes in, not so much of a basement as a second story?

9  A.   Yeah.  It's basically like a two-level.  The basement is

10  fully redone.

11  Q.   You live at the house currently with your wife, Cathy.

12  Who else lives at the house there with you?

13  A.   Murphy, and then my kids:  Joseph and Sarah.

14  Q.   Can we see your kids who are living there?  There's

15  Joseph.  Before we move off of Joseph, was he having a

16  particular problem with a lot of nosebleeds?

17  A.   Yeah.  My in-laws were living with us down in the full

18  suite in the basement for a while.  Obviously, he is very close

19  to his grandparents, and he would always go downstairs.  That's

20  where we found the eight sheets of drywall, specifically in one

21  area downstairs.

22          Every time he would go downstairs, we would notice he

23  was getting nosebleeds, so we forbade him from going

24  downstairs -- like an unscientific test -- for two weeks, and

25  then he stopped.  And then he snuck down the stairs again one

1    day, and they immediately started again.

2    **Q.**   So there's been some conversation loosely thrown around

3    about the wine cellar house.  Let's get this right out.  Is

4    there a bottle of wine in the wine cellar at this point?

5    **A.**   No.

6    **Q.**   Have you ever had a bottle of wine in the wine cellar?

7    **A.**   No.

8    **Q.**   No racks on the walls?  I'm sorry we don't have a picture.

9         So describe what the physical layout of this room is

10   like.

11   **A.**   Basically, it was a room that was added onto by the person

12   we bought the house from as a means to maximize space.  So,

13   basically, like, the front porch, where the foundation would

14   usually be a solid wall, they have cut into it, and they

15   finished off the underpart of the porch.

16   **Q.**   So how big a room are we talking about that they kind of

17   cut in and finished it?

18   **A.**   10-by-10 probably.

19   **Q.**   So you weren't the original owner of this house; somebody

20   else had built this house.  Is that right?

21   **A.**   Yes, sir.

22   **Q.**   To the best of your understanding, this wine room was the

23   area -- or the room that was going to be a wine room is the

24   area where the Chinese drywall ended up?

25   **A.**   Yes.  And there's a small little bar area in the back.

1    The previous owners had intended it, I think, for a wine room,

2    but they obviously drank more wine than I do.

3    Q.    All right.  In addition to Joe, can we see Joe's sister.

4    Who is this little girl?

5    A.    That's Sarah.

6    Q.    So are Sarah and Joe going down the staircase at all into

7    the second floor of your house at this point?

8    A.    No.  Once we realized the problem, and especially with

9    Joseph's nosebleeds, we stopped going down there.  The in-laws

10   moved away from the house.  Then I just basically abandoned my

11   office and bought another computer and we just stay upstairs.

12   Q.    So where were the in-laws staying?

13   A.    Downstairs there's a master bedroom and bath, so they were

14   just staying down there.

15   Q.    So Cathy's dad's name is?

16   A.    Walter Young.

17   Q.    Walter and then --

18   A.    Sharon.

19   Q.    They were downstairs actually living on that first floor

20   of that house?

21   A.    Yes, sir.

22   Q.    So they are not there anymore?

23   A.    No, sir.  They moved back to Florida.

24   Q.    What led to them deciding to move out of the house?

25   A.    Well, when we found Chinese drywall, they decided to move

1    away.  Cathy's father, Walter, was having respiratory issues.
2    It just exacerbated some of the problems he was always having,
3    so they decided to move back to Florida.
4    Q.    So they moved out.  At that point, you shut off the first
5    floor of the house?
6    A.    Yeah.  I mean, the door, there's no physical -- there's a
7    door that prevents -- as you're going down the stairs.  We just
8    keep that shut.
9    Q.    Approximately how much of your house did you lose access
10   to when you kept that door closed and abandoned your office,
11   the playroom, etc.?  What percentage of the house is now lost
12   to you?
13   A.    I think the downstairs is about 2,400 square feet or so.
14   Q.    When Walter, your father-in-law, moved out, did that have
15   an impact on the fabric of your family's life, the day-to-day
16   activities around the house?
17   A.    Oh, yeah.  Of course, just the nature of my job, I'm gone
18   a lot, and so Cathy is with -- her parents, you know, help her
19   a lot with things, especially through, you know, when I go
20   away.  So with them leaving, it kind of jolted her world a
21   little bit.
22   Q.    Cathy works outside the home as well as inside the home;
23   right?
24   A.    That's correct.
25   Q.    So what's her day job?

1  A.   She works for an insurance company in Richmond.

2  Q.   So was losing her dad and step-mom a major impact in terms

3  of childcare and things like that for your family?

4  A.   Yeah.  Especially it was kind of -- it was kind of abrupt

5  too.  I mean, once we found out, her parents left pretty

6  quickly.  We stopped using the downstairs.  Then I was

7  immediately going away, and they had -- she had to, you know,

8  rush to get the day care and things set up for the kids,

9  before- and after-school care and things like that.

10 Q.   So, Joe, would it be a fair statement, with only eight

11 sheets of Chinese drywall, that this problem has done a fair

12 job of turning your family's life upside down?

13 A.   Yes, that's a fair assessment, sir.

14 Q.   Joe, did you have an idea early that there might be a

15 quick path just to take these sheets down and be done with this

16 problem, maybe try and get a contractor to do the work?

17 A.   Yeah.  I talked to the builder and tried to work out --

18 you know, I mean, we didn't know the extent of the other

19 problems.  We just wanted to remediate it ourself and then try

20 to work something out with the builder and have it done

21 quickly.

22 Q.   That didn't happen?

23 A.   No, sir.

24 Q.   It's still there?

25 A.   Yes, sir.

50

1   **Q.**   Now, your understanding that as part of the repair that's

2   been suggested for your house that they are talking about

3   running new electrical wires from that room all the way back to

4   the electrical panel?

5   **A.**   Yes, sir.

6   **Q.**   And that the repair work, even for your house with just

7   eight sheets, is still a very extensive project that's being

8   done?

9   **A.**   Unfortunately, that's correct.

10  **Q.**   Joe, did you try and get a refi on this house?

11  **A.**   We did, sir.  And as previously stated, I think it was

12  Senator Warner's letter to all the people affected mortgage

13  companies for forbearance.  We didn't take the forbearance

14  because we were still staying there.  Because they were aware

15  of it, when we went to refinance when the rates dropped about

16  2 percent in our case, they wouldn't let us because we had

17  Chinese drywall.

18  **Q.**   So without the ability to refi and with the Chinese

19  drywall in your house, do you have concerns about, being in

20  special operations, having to be transferred and having

21  difficulty selling this house or moving this house?

22  **A.**   Yes, sir.  Just the refinance was about $600 a month that

23  changed, we could have got.  And then I have already lost a

24  couple of opportunities where -- jobs that I couldn't take

25  because it would force me to move, and we would have to sell

1    the house quickly.  Obviously, we couldn't do that.

2    **Q.**    So having the Chinese-drywall house has had a dramatic

3    impact on your ability to earn a living for your family as

4    well?

5    **A.**    Life-altering.

6    **Q.**    Joe, the Exhibit P3.0622, page 4, is a recap of the cost

7    of repairing your home as well as the other damages that your

8    family has sustained.  You and Cathy have worked carefully with

9    the accountant and reviewed this carefully and are asking the

10   Court to award damages in the amount reflected by this exhibit?

11   **A.**    Yes, sir.

12   **Q.**    Joe, does it smell bad in that room?

13   **A.**    It will knock you down if you open the door.

14   **Q.**    There's a door that you can close the room off, I guess,

15   where they were planning on keeping it cool or whatever.  With

16   that door closed, there's no HVAC vents in there, etc., so the

17   air doesn't circulate when that door is closed; is that a fair

18   recap?

19   **A.**    That's correct.

20   **Q.**    So you obviously keep it closed?

21   **A.**    Right.  The previous owners kept a dehumidifier going the

22   whole time and they would keep it open more.  But like I said,

23   the dehumidifier went out, and we just keep it closed and don't

24   even -- we don't go downstairs at all anymore, but the room

25   stays shut off.

1  **Q.**  Importantly, there's no return air or register that

2  circulates air from this room into the house, generally, is

3  there?

4  **A.**  No, not unless the door is open.

5  **Q.**  You're keeping the door closed?

6  **A.**  Yes, sir.

7  **Q.**  When you open it, describe the smell for the Court.

8  **A.**  Oh, it's pungent.  I don't know.  It's like a swamp gas.

9  That's kind of what we thought.  That's what initially drove us

10  to inspecting it.  We thought it was some kind of water damage,

11  some kind of sewer-type smell.  So now we just, obviously, keep

12  the door shut.  But if you do open the door, the smell lasts.

13  You know, it stays down there for a while.

14       **MR. SERPE:**  Joe, I appreciate you substituting for

15  Cathy here.  Thank you very much.

16            No further questions, Your Honor.  Thank you.

17       **THE COURT:**  You're excused, sir.  Thank you.

18       **MR. SERPE:**  Your Honor, we call Lisa Orlando.

19       (WHEREUPON **Lisa Orlando**, having been duly sworn,

20  testified as follows.)

21       **THE DEPUTY CLERK:**  Please state your full name and

22  correct spelling for the record.

23       **THE WITNESS:**  My name is Lisa Marie Orlando.

24

25

**DIRECT EXAMINATION**

1

2   BY MR. SERPE:

3   **Q.**   Good afternoon, Lisa.

4   **A.**   Good afternoon, Richard.

5   **Q.**   Let's do the last line on the chart.  Last but not least,

6   you-guys are on 4091 Dunbarton Circle?

7   **A.**   Yes, we were.

8   **Q.**   That's a single-family home in Williamsburg.

9   **A.**   Uh-huh.

10  **Q.**   You-guys moved in in June of last year?

11  **A.**   Yes, sir.

12  **Q.**   Is that a fair recap of your purchase price, $369,500?

13  **A.**   Yes, sir.

14  **Q.**   From this chart, Lisa, we see 163 4-foot-by-12-foot boards

15  of Venture Supply drywall having been, according to the

16  records, delivered to your home?

17  **A.**   Yes.

18  **Q.**   The home that it was delivered to, we've got a picture of.

19  Is this a fair picture of your house?

20  **A.**   Yes.

21  **Q.**   Lisa, the date of June 9 of last year, that's just last

22  year.  That's much later than any of the other dates that are

23  here.  Would you explain to the Court the circumstances that

24  led to you-guys moving into a house with Chinese drywall in

25  June of last year.

54

1   **A.**   Certainly.  My husband accepted a new job with a new

2   company.  We promised the kids it would be a fun, good move,

3   and we moved from New York State, Upstate New York.

4   **Q.**   Do we have a picture of the kids?  Who do we have here?

5   **A.**   On the far right is Ryan and on the far left is Nathan.

6   They are twins.  They are going to be 18 in a week.

7           In the red shirt is Mason, and he is 13.

8           And, of course, the cement of our family, Bob.

9   **Q.**   Bob.  So the move from New York down here, was that a

10  major move for the family, the boys, and for you?

11  **A.**   Major.  The boys missed out on their senior year with all

12  their friends.

13  **Q.**   Were you-guys looking forward to moving specifically into

14  this house?  Was that something you were looking forward to?

15  **A.**   Yes, we were.

16  **Q.**   Tell us a little bit about that.  What was it about this

17  house that was going to be fun for the boys?

18  **A.**   Well, the yard itself, and we were planning to put in an

19  inground pool as soon as we closed.

20  **Q.**   You closed?

21  **A.**   Yes.

22  **Q.**   And then you put in an inground pool?

23  **A.**   $50,000 of an inground pool, yes.

24  **Q.**   The landscaping was no sooner done on your new home and

25  your new $50,000 pool and you found out you had Chinese drywall

1    in your house?

2    A.    Yes.  Yes, sir.

3    Q.    Well, tell the Court what that experience was like for you

4    and your family.

5    A.    Well, we were in the house about four weeks, and we got a

6    letter from the builder saying that we could have possibly 172

7    sheets of drywall, Chinese drywall.

8              At first glance at the letter, not really knowing

9    what that meant -- had no idea -- we did a little research.

10   And we received a visitor at our door about a week after we got

11   the letter, who actually was Bill Morgan, and he had noticed

12   that all of the windows in the house were opened a crack and it

13   was 90 degrees outside.  He came and introduced himself and

14   asked, "Why are the windows open when it's so hot?"  And I told

15   him, and that's how we got going.

16   Q.    Have you-guys as a neighborhood, particularly the families

17   of Chinese drywall, gotten to know each other pretty well over

18   the last six months?

19   A.    Yes.  Yes, sir.

20   Q.    Tell the Court what kind of a down payment that you and

21   Bob put down for this house.

22   A.    We put $150,000 down, everything that we had, all the

23   equity, besides for the pool, that we had in our house.

24   Everything.

25   Q.    Just a hair under half of the purchase price of the house

```
 1    you put down in cash on this place?
 2    A.    Correct.
 3    Q.    The pool was on top of that?
 4    A.    Yes.
 5    Q.    It was a $200,000 investment, the biggest investment, bar
 6    none, that your family had ever made?
 7    A.    Yes, sir.
 8    Q.    Does your house smell?
 9    A.    Yeah, it did.
10    Q.    What does it smell like to you?
11    A.    Right now, what it smells like to me is --
12    Q.    Well, let's start at the beginning.  What was it that you
13    noticed and what did you do about it?
14    A.    When we were looking at the house, it had a smell to it,
15    and we thought that the smell was because they had two young
16    children in diapers.  We thought it was just diaper/baby smell.
17    We thought that, after we moved in, we would have all the
18    carpets cleaned and it would go away.  We did that and it
19    hasn't gone away.  It's gotten progressively worse.
20          It smells to me like firecrackers when you -- after
21    you -- like, little firecrackers when they pop, that burnt kind
22    of smell.
23    Q.    The water heater went bad on you?
24    A.    I'm sorry?
25    Q.    You had a hot-water heater that went out?
```

1   A.   Yes, sir.

2   Q.   Two sets of evaporator coils on your air conditioner?

3   A.   From our understanding, yes, from the previous owner, in

4   three years, they went out two times.

5        We had a problem with our HVAC unit this summer, and

6   we had a man come in and look at it.  He showed us the pits

7   that were in the coils and couldn't believe that it was only a

8   year old.  He thought it was much, much older by the condition

9   of it.

10  Q.   Lisa, how long did you and Bob and the boys stay in the

11  house, after you moved in June 9, before you had moved out?

12  A.   Give me a second here.  About seven months.

13  Q.   How hard of a decision was it for you to abandon your

14  house and move out?

15  A.   Well, that wasn't hard.  We would have left right away if

16  we could have.  You know, my thing is, if it's putting pits in

17  metal, what's it doing to my babies?  But we had to be smart

18  about it and figure out how we could, you know, do this and not

19  kill our credit.

20  Q.   So did you make, like, changes on sleeping arrangements

21  and things to try to work around this?

22  A.   Oh, absolutely.

23  Q.   Tell the Court about that.

24  A.   There seemed to be more Chinese drywall upstairs than

25  downstairs, so we brought mattresses downstairs and placed them

1    in the study, in the master bedroom that was downstairs, and we
2    put a -- I put a curtain across the top of the stairs to try to
3    keep the air and gases and the smell upstairs.
4    Q.    So where did people end up sleeping at this point?
5    A.    On a mattress on the floor in the study, and then the rest
6    of us in the master suite downstairs.
7             My son, Nathan, is really all bent out of shape.  He
8    is, you know, 17 and a senior, and his parents are sleeping
9    with him, and he's in a new town.  So he's not too happy with
10   us.
11   Q.    Lisa, what's the impact for you and Bob and the boys now
12   of being out of the house?  Give the Court an idea how upside
13   down your life has been turned by this.
14   A.    We are having to start all over again.  Our rent is higher
15   than our mortgage.  We are just really happy to be out of the
16   house and, hopefully, detoxifying.
17   Q.    Lisa, Jerry Baldwin talked about the Knauf people saying
18   that the ceiling was fine in his office.  Did you guys go
19   through a similar experience where, in the bedroom and in the
20   living room and the opposite corner of the house, that with all
21   of the tests and etc. that they did, their report indicated
22   that there was no Chinese drywall in the ceilings of those two
23   rooms?
24   A.    Correct.
25   Q.    Jerry and Inez are still living there, so we just cut the

1   core samples and sent them to the laboratory.  Would you tell

2   the Court what you-guys were gracious enough to allow us to do

3   in the two rooms that were supposedly U.S. drywall ceilings.

4   **A.**   The entire ceilings are cut out.

5   **Q.**   We cut the entire ceilings down?

6   **A.**   Yes.

7   **Q.**   What labels were on the back of those boards?

8   **A.**   Venture Supply.

9   **Q.**   Chinese drywall?

10  **A.**   Chinese drywall.  Taishan.

11  **Q.**   Lisa, is it your and Bob's request that your house receive

12  the stripped-to-the-studs -- complete drywall, complete

13  mechanical, complete electrical -- described by the Court today

14  and by those gentlemen from Beazer yesterday?

15  **A.**   Yes, please.  Please.

16  **Q.**   Lisa, I'm going to hold up the summary exhibit.  Yours is

17  numbered P3.0622, page 14.  You worked with the appraisers.

18  You worked with the accountant.  You worked with Mr. Barrios.

19  You made sure that this was an accurate statement of your

20  repair expenses as well as the other damages that you and Bob

21  had occurred.  Is that a fair statement so far?

22  **A.**   Yes, sir.

23  **Q.**   Is this the amount of damages for your financial losses

24  that you are asking the Court to award?

25  **A.**   Yes, sir.

1       **MR. SERPE:**  Your Honor, this is already admitted of
2    that record, P3.0622-0014.  Thank you very much.  No further
3    questions.
4            **THE COURT:**  Thank you very much.  We will stop here
5    and come back at 3:45.  Court will stand in recess.
6            **THE DEPUTY CLERK:**  Everyone rise.
7            (WHEREUPON the Court took a brief recess.)
8            **THE DEPUTY CLERK:  Everyone rise.**
9            **THE COURT:**  Be seated.  Let me mention that I told
10   the plaintiffs' committee that it was brought to my attention
11   that someone reported that a recording of my voice was played
12   on the radio this morning or yesterday.  That poses a little
13   problem that I ask cooperation on.
14           I've allowed everybody to bring in laptops and
15   personal equipment, but if that becomes a problem, then I'm
16   going to have to restrict that use also.  The reason is that
17   what I say is on the record, so I'm not concerned about that,
18   but we have a rule in federal court, as well as the
19   Fifth Circuit, of course, that we don't broadcast proceedings.
20           We're not there yet.  We may be there in the
21   future, but we're not there yet.  We don't have television or
22   radio, instantaneous presentation of proceedings.  For that
23   reason, I'd ask that if anybody has done it, please cease from
24   doing it in the future.
25           What were you saying?

1          **MR. ECUYER:**  If I may, Your Honor, Michael Ecuyer.

2    Your Honor, at this time, we'd like to enter into the record

3    several witnesses by way of deposition, some of whom who have

4    been referred to throughout the proceedings thus far.

5               Briefly, we would like to offer J.C. Tuthill,

6    CPA, an expert in accounting, who quantified the plaintiffs'

7    economic damages.  Next, we have physical engineer Edward Lyon,

8    Your Honor.  Next, we have Dr. Jack Caravanos, who discussed

9    XRF and its use.  Next, we have Dr. Jonathan Barnett, a fire

10   safety expert, who you heard excerpts referenced earlier today.

11   Next, we have Kenneth Acks, who addresses the valuation

12   concerns with regard to the specific Virginia seven properties.

13               Dr. Lori Streit.  Your Honor, you heard

14   reference to Dr. Streit, who was tendered earlier as an expert.

15   Then we also have the deposition of Samuel Porter as a

16   representative for Venture Supply and Porter-Blaine.  That is a

17   two-volume deposition, Your Honor.  Finally, just a moment ago,

18   you heard reference to KPT's expert, William Broom Alexander,

19   also known as Sandy Sharp, Dr. Sandy Sharp.  We have that

20   deposition.

21          **THE COURT:**  I'll make that part of the record.

22               Just for the litigants who may not be familiar

23   with this proceeding, witnesses can be called either live in

24   court or they can be deposed, and their deposition is admitted

25   in lieu of their live testimony.  Both are acceptable.

DAILY COPY

1          In this particular case, during the course of

2    the proceeding, there was an adverse proceeding going on;

3    namely, they had the plaintiffs and on the other side were

4    intervenors, who had some common interests.  So they all

5    appeared at the testimony.  The witnesses were sworn and

6    questions were asked and transcripts were made of these

7    depositions.

8          It's both economical, as well as efficient, to

9    oftentimes introduce the depositions in lieu of having the

10   witnesses incur expenses, travel expenses and otherwise.

11   That's what counsel has done now.  He's introduced that

12   testimony by way of depositions.  So I'll make it a part of the

13   transcript, and it will be just as if those witnesses were

14   called in person.

15          You may proceed, Counsel.

16          **MR. MEUNIER:**  May it please the Court.  The

17   plaintiffs call Ronald Wright.

18          (WHEREUPON **Ronald Wright**, having been duly sworn,

19   testified as follows.)

20          **THE DEPUTY CLERK:**  Please state your full name and

21   correct spelling for the record.

22          **THE WITNESS:**  Ronald E. Wright, W-R-I-G-H-T.

23                              **VOIR DIRE**

24   BY MR. MEUNIER:

25   **Q.**   Good afternoon, Mr. Wright.  What is your address, sir?

DAILY COPY

1   A.    It's 2512 Independence Boulevard, Wilmington,
2   North Carolina.
3   Q.    What is your occupation?
4   A.    Professional engineer with construction consultant.
5   Q.    By whom are you employed?
6   A.    R.V. Buric Construction Consultants.
7   Q.    What is the nature of Buric's business?
8   A.    We perform a variety of different construction --
9   consultant for both delay claims and for CPM scheduling, but
10  primarily what I do is for building diagnostics.
11  Q.    What percentage of Buric's work deals with residential
12  structures and residential construction?
13  A.    I would say about 30 percent of the work would be towards
14  residential-type structures.
15  Q.    What is your title with Buric?
16  A.    Chief operating officer.
17  Q.    What's the extent of your formal education, Mr. Wright?
18  A.    I have a bachelor's of science in civil engineering and a
19  master's in business administration.
20  Q.    How many years of experience do you have in the
21  construction industry?
22  A.    Over 30 years.
23  Q.    In how many states have you performed project or
24  consultant work as a civil engineer?
25  A.    More than 30 different states.

1  **Q.**   Did you work in the New Orleans area after Hurricane
2  Katrina?
3  **A.**   Yes.
4  **Q.**   What did you do here?
5  **A.**   Primarily with some of the different insurance claims that
6  were being submitted, we did evaluations of buildings and
7  structures for the types of damages that had occurred.
8  **Q.**   You did that on behalf of insurers?
9  **A.**   That's correct.
10  **Q.**   Are you professionally licensed and registered as a civil
11  engineer in the state of Virginia?
12  **A.**   Yes.
13  **Q.**   In what other states are you registered?
14  **A.**   In North Carolina, South Carolina, Ohio, Maryland, and
15  New Jersey.
16  **Q.**   What is the American Society of Testing and Materials or
17  ASTM?
18  **A.**   They're a body of professionals from either consulting,
19  manufacturers, any kind of design professionals that come
20  together and make consensus for standards and guides on how to
21  use materials, how to test materials.
22  **Q.**   Are you a member of ASTM?
23  **A.**   Yes.
24  **Q.**   Are you a member of the American Society of Civil
25  Engineers?

1    A.    Yes.

2    Q.    Over the course of your career, have you been retained

3    previously as an expert in legal proceedings?

4    A.    Yes.

5    Q.    Estimate for the Court the number of occasions on which

6    you have been accepted and allowed to testify in court as an

7    expert in civil engineering.

8    A.    I believe 27 times.

9    Q.    Does your expertise include opinions as to the application

10   of building code provisions and requirements?

11   A.    Yes.

12   Q.    Does your expertise encompass opinions as to the required

13   scope and cost of property damage repair and remediation?

14   A.    Yes.

15            MR. MEUNIER:  Your Honor, at this time, I would

16   tender Mr. Wright as an expert in civil engineering.

17            THE COURT:  The Court will accept him as such.

18                        DIRECT EXAMINATION

19   BY MR. MEUNIER:

20   Q.    When and by whom were you first contacted to serve as an

21   expert in this case?

22   A.    By Dan Bryson on behalf of the plaintiffs' steering

23   committee.

24   Q.    When was that?

25   A.    That was in early November of 2009.

1  **Q.**    What were you asked to do?

2  **A.**    I was asked to evaluate building code issues that may

3  apply to Chinese drywall, the use of that in homes, and also to

4  look at and help establish or evaluate what the scope of repair

5  would be, and then from that what kind of costs would be for

6  that repair.

7  **Q.**    So you are prepared to offer opinions as to both the scope

8  and cost of the required remediation for these seven Virginia

9  homes?

10  **A.**    That's correct.

11  **Q.**    Did you visit and inspect the Virginia properties?

12  **A.**    Yes.

13  **Q.**    Did you prepare diagrams and sketches of those properties?

14  **A.**    For some of those.  Some were done in conjunction with

15  others at that time.

16  **Q.**    Did you interview owners?

17  **A.**    Yes.

18  **Q.**    Have you reviewed the data and analysis of other experts

19  retained by the plaintiffs in this case?

20  **A.**    Yes.

21  **Q.**    You've also been present in court both today and on Friday

22  to hear the testimony offered?

23  **A.**    Yes.

24  **Q.**    You specifically listened to the scientific testimony from

25  Dean Rutila, Lori Streit by video, John Scully last week, etc.?

1   A.   That's correct.

2   Q.   As well as Mr. Galler?

3   A.   Yes.  Yes.

4   Q.   What basic principles, Mr. Wright, did you apply in your

5   engineering assessment of the proper scope of property damage

6   remediation in this case?

7   A.   It was to go through and -- basically, I've developed the

8   slide that's shown for three different principles:

9          The first is to determine the causes and the sources

10  of the damages.  You have to find out what's going wrong or

11  causing the problems to address it.

12         After you've done that, then you also define what

13  components have been damaged by that.

14         Once you have those first two items, then you have to

15  find out the scope or define the scope that would address both

16  those items and restore it to the prior condition before any of

17  the damages or the causes and sources have begun.

18  Q.   Now, are these basic principles generally recognized in

19  your field?

20  A.   Yes.

21  Q.   Are they also discussed in the peer-reviewed literature?

22  A.   Yes, they are.

23  Q.   For example, can you cite the Court to a peer-reviewed

24  article that supports the idea that the removal of the sources

25  of damage is important to restore a property to its prior

1    condition?

2    **A.**    Yes.  I had seen an article that Christopher Muller had

3    written that dealt especially with corrosive gases and the way

4    to address those.

5    **Q.**    The title of this article is, in particular, "Control of

6    Corrosive Gases to Avoid Electrical Equipment Failure."

7    Correct?

8    **A.**    That's correct.

9    **Q.**    Tell the Court what this particular provision in

10   Mr. Muller's article tells us about the importance of removing

11   the source of contamination.

12   **A.**    First and foremost, the article says that the source

13   control should be the first strategy examined.  In other words,

14   get rid of the source so that there's no further damages.

15   **Q.**    What, in addition, does it tell us?

16   **A.**    It says, to do that, you have to remove those sources of

17   contaminants to prevent them from becoming a problem in the

18   first place.

19            **MR. MEUNIER:**  Your Honor, since this is a learned

20   treatise, it is not offered into evidence, but it has been

21   identified as P2.0239.  The witness has read an excerpt, but we

22   make the full article available to the Court as you need.

23            **THE COURT:**  Under 804(18), it's not admissible into

24   evidence, but it is able to be read, portions of it.  The

25   witness has done so.

DAILY COPY

1  **BY MR. MEUNIER:**

2  **Q.**    Now, in applying these principles that you mentioned to

3  determine the scope of remediation, are you informed by

4  science, by practicality, or by both?

5  **A.**    By both.  You have to have both to really evaluate what

6  all needs to be repaired because some issues are going to be

7  governed by what the science is telling you that you have to do

8  to address the issue.  Then once you get past that, there's so

9  many constructability issues that are going to be required to

10  be done so you can even accomplish the repair work.

11  **Q.**    For a given step in the remediation, does the weight given

12  science and the weight given practicality differ or vary

13  depending on the specific component of the remediation

14  protocol?

15  **A.**    Well, the science part you have to address, so that would

16  definitely have a very high weight.  But in terms of trying to

17  evaluate what you're going to do for the repair, they're of

18  equal need because you have to have both to be able to have a

19  finite scope of repair.

20  **Q.**    Have you prepared, at our request, Mr. Wright, a written

21  statement or summary for the scope of remediation which you

22  feel is necessary and appropriate in this case?

23  **A.**    Yes, I have.

24  **Q.**    This has been marked as P1.2058.  I'd like you to go down

25  this list, beginning with the first, and tell us, first of all,

1   what "R&R" stands for.

2   **A.**   That stands for remove and replace.

3   **Q.**   Why is it, in your view, necessary to remove and replace

4   drywall on walls and ceilings?

5   **A.**   One particular reason, of course, would be the science

6   base that you have, the Chinese drywall.  So to remove the

7   source that we were talking about earlier, that would have to

8   be done to address that issue.

9   **Q.**   Are you referring to all of the drywall in a home where

10  some Chinese drywall has been confirmed as being present?

11  **A.**   Yes.

12  **Q.**   Why do you remove all of the drywall even though there's

13  only some Chinese drywall?

14  **A.**   Well, the practicality side of it comes into -- on the

15  construction side of it that you have to remove all of it

16  because it's a much more cost-effective way, and it would also

17  make sure that you're catching all Chinese drywall.

18          **THE COURT:**  Theoretically, you could test each sheet

19  with an electron microscope and determine whether or not it's

20  Chinese drywall, but what you're saying is it's not practical

21  to do that?

22          **THE WITNESS:**  That's correct, with the cost you'd

23  have for doing that testing of each and every sheet, and then

24  there's also some examples we're going to show where -- trying

25  to even determine where sheets are to be able to decide that it

 1   is one to test.
 2   **BY MR. MEUNIER:**
 3   **Q.**   You accompanied us on our visit to Fort Myers and Tampa,
 4   Florida to view the Beazer homes; correct?
 5   **A.**   That's correct.
 6   **Q.**   You were present in court when we played the video of that
 7   Beazer home room or area where installed drywall is taped in?
 8   **A.**   That's correct.
 9   **Q.**   Did you actually, at that same Beazer home where that
10   video was taken, do a sketch and count of how many different
11   drywall pieces were in a different area?
12   **A.**   Yes.
13             **MR. MEUNIER:**  Let's go to that next slide, Scott.
14   **BY MR. MEUNIER:**
15   **Q.**   As we can see at the bottom, this refers to the Beazer
16   home in Fort Myers, Florida; correct?
17   **A.**   Yes.
18   **Q.**   What does this sketch of yours tell us about this
19   particular area, which is the master bedroom ceiling layout?
20   **A.**   In the video that had been shown with one of the Beazer
21   witnesses, he had counted the drywall on the walls.  This is of
22   that same room, but it's showing the ceiling and the number of
23   pieces that would have been involved in just applying the
24   drywall to that ceiling.
25             Even though it's 4-by-12 sheets, they have a lot of

1   different joints they have to introduce, so there's a lot of

2   pieces that are used.  That particular ceiling had 11 pieces by

3   itself.

4   Q.   So in order just to look at the ceiling in this one room,

5   if we wanted to make sure we were identifying Chinese drywall

6   on a piece-by-piece basis, you'd have that many different

7   pieces to account for?

8   A.   That's correct.  You'd have to define each one of those to

9   be able to even know they're located there.

10  Q.   That would be a time-consuming process?

11  A.   Yes.  I'm not aware of any foolproof way to actually

12  establish what the perimeter is for each one of those.

13  Q.   Let's go to the next slide.  This is a closet, just a

14  closet in that same home?

15  A.   That's correct.

16  Q.   In the closet alone, how many total pieces of drywall did

17  you count?

18  A.   There were 11 pieces between what was on the walls and

19  what was on the ceiling.  So, again, you would have to define

20  each and every one of those pieces.

21  Q.   Drywall comes in a certain size; we've established

22  4-by-12.

23  A.   That's correct.

24  Q.   But in the construction business, you know that it is cut

25  up into different pieces to be installed.

DAILY COPY

1    A.    Yes.

2    Q.    Is it scattered through a home in that process?

3    A.    Yes.  What happens is a lot of times they'll have a full

4    sheet, but they don't need it on one particular area, so

5    they'll cut off an end of it.  They'll save that piece to be

6    able to use it in other areas where maybe smaller pieces could

7    be used.

8    Q.    Let's go to the final sketch you made of the Beazer home.

9    This is the entry area of that home?

10   A.    Yes.  There was a small hallway, and it was only about a

11   3-foot-by-6-foot hall.  But within that, between the ceiling

12   and all the door openings and the configuration, there were 14

13   pieces just in that one small area.

14   Q.    Mr. Wright, is the practical mission of trying to identify

15   separate pieces of drywall once they've been installed and

16   painted in complicated by the fact that you cannot see the

17   seams once it's behind the painted wall?

18   A.    That's correct.  They would disappear with the finishing

19   work, and then especially once a wall finish, the paint or --

20   Q.    We have a couple of photographs I'd like you to discuss

21   with the Court briefly.  Is this a photograph showing you

22   removing a section of drywall?

23   A.    Yes.

24   Q.    From one of the Beazer homes in Florida?

25   A.    That's correct.

1    **Q.**   What are you attempting to demonstrate here?

2    **A.**   This is just even in the walls that there may be a

3    4-foot-by-12 piece that starts from the top.  Usually, they

4    work from the ceiling down.  So you would have a 4-foot-by-12.

5    Then they would put a small piece, which is what this is

6    showing, about a 16-inch-wide horizontal strip, because the

7    ceiling was 9-foot-4 height.  So they had to put in this strip

8    to be able to then have the bottom 4-foot continue the rest of

9    the wall.

10   **Q.**   Of course, before you removed and creased it, these seam

11   lines would not be visible?

12   **A.**   That's correct.  With the finished wall, you didn't even

13   notice where that may appear on the wall.

14              **MR. MEUNIER:**  Let's look at the next slide, Scott.

15   **BY MR. MEUNIER:**

16   **Q.**   You've now turned that piece over.

17   **A.**   Yes.

18   **Q.**   What do we learn here about this particular piece?

19   **A.**   It told us the size of it, and I believe it does say

20   "Taishan" on it.

21   **Q.**   It's a 4-by-12 piece.  The seams are shown in this photo,

22   top and bottom?

23   **A.**   That's correct.  It shows that middle piece that they

24   actually introduced into the wall.

25   **Q.**   Now, let's go back to your scope of remediation and look

1   at the next component on it.

2          **THE WITNESS:**  One further thing on the drywall

3   aspect.  You had asked, Your Honor, about the fact if you could

4   find a piece.  But if you did the operation of trying to do

5   just an individual piece, the cost of being able to remove that

6   is about five times more costly than if you did that wall.

7          **THE COURT:**  That's the way the practicality would

8   also come into play?

9          **THE WITNESS:**  Definitely.

10  **BY MR. MEUNIER:**

11  **Q.**   Back to the scope of remediation, which is P1.2058.  The

12  second step or the second element is the removal and

13  replacement of electrical wiring, low-voltage wiring, devices,

14  fixtures, controls, sensors, and main panel components;

15  correct?

16  **A.**   Yes.

17  **Q.**   Tell the Court why that's consistent with the principles

18  you followed and whether both science and practicality inform

19  that recommendation.

20  **A.**   That is based heavily on the science side, what's been

21  said today and on Friday, with the corrosion that's occurred,

22  that the only option's to take that out.  That's further

23  supported by the electrical code that would have been in place

24  for the homes that were constructed in Virginia.  And then

25  there's also a significant part of it on a practicality side.

1   That's even if you were to try to address just a spot repair at

2   where the wiring terminated into a device box.

3   **Q.**   In regard to this element of your protocol, Mr. Wright,

4   have you looked at provisions in the building code?

5   **A.**   Yes.

6   **Q.**   What is the International Residential Code?

7   **A.**   The State of Virginia adopts the Virginia Uniform

8   Statewide Building Code, which in turn brings in the

9   International Residential Code.  That now has become the code

10   used across the United States in virtually all states for

11   residential application.  So within the residential code,

12   there's specific sections that deal with all types of things

13   for construction, but it has electrical as a part of that code

14   also.

15   **Q.**   Let's look at the first section of that code, and this is

16   section E3304.6.  Tell the Court:  What is it about this

17   provision that you think is relevant to your recommendation for

18   the removal of all electrical wiring, etc., in the homes?

19   **A.**   Through that section, it talks about basically all parts

20   of the electrical system, that it shall not be damaged.  If you

21   go right in that area, it says:  Shall not be damaged or

22   contaminated by foreign materials such as paint, plaster,

23   cleaners, abrasives and corrosive residues.  So it tells you

24   specifically you cannot use wiring that's been damaged by any

25   of those components.

1    **Q.**    It also tells us that the wiring in a home cannot be
2    deteriorated by corrosion; correct?
3    **A.**    That's correct.  It shall not be used if there's any
4    damaged parts that are adversely affected, the safe operation
5    or mechanical strength of equipment, such as parts that are
6    broken, bent, cut, deteriorated by corrosion, chemical action,
7    or overheating.
8    **Q.**    So in these seven Virginia homes, Mr. Wright, where
9    defective Chinese drywall has been found, would this provision
10   of the housing code, this electrical provision, require the
11   removal of any wiring terminal or wiring surface that had
12   corrosive residue?
13   **A.**    Yes.
14   **Q.**    Have you seen in this case actual physical evidence of
15   corrosive residue not just on exposed wire endings but also on
16   wire surfaces that were covered with insulation or even behind
17   walls?
18   **A.**    Yes.
19   **Q.**    Were you present at the beginning of the case when
20   Mr. Serpe showed the photograph of a lamp cord from which a
21   lamp was suspended in one of the Virginia homes?
22   **A.**    Yes.  I was present when that was discovered.
23   **Q.**    Did you actually look at that lamp cord at the time it was
24   inspected and photographed?
25   **A.**    Yes, I did.

DAILY COPY

1  **Q.**   What did you find?

2  **A.**   I saw that the wiring from the ceiling down to the fixture

3  itself, all the exposed wiring inside of the plastic covering,

4  had become discolored and black.

5  **Q.**   Were you also in court today when the lamp of

6  Mr. Baldwin's house was discussed that's sitting over here on

7  the table?

8  **A.**   Yes.

9  **Q.**   Have you looked at that lamp?

10 **A.**   Yes, I have.

11 **Q.**   What's significant about what you found?

12 **A.**   It matches identically to the way in which that lamp at

13 the Morgan residence was, that it has the black interior of

14 that plastic cover.

15 **Q.**   Were you here when Mr. Smith showed Judge Fallon the

16 sample light switch, three-switch box, from one of the Beazer

17 homes?

18 **A.**   Yes.

19         **MR. MEUNIER:**  Your Honor, may I approach?

20         **THE COURT:**  Yes.

21 **BY MR. MEUNIER:**

22 **Q.**   This is Exhibit P1.1891.  Would you look at that,

23 Mr. Wright, and tell us whether you agree with Jerry Smith's

24 testimony that there is visible corrosion on the ground wire

25 coming from that box, which would have been under insulation

79

1  and behind the wall of that home.

2  **A.**   Yes.  The location of that would have been in the wall

3  cavity, not in the box itself, and it was behind the Romex

4  sheathing that was on that.

5  **Q.**   So the significance of this is that, in the case at hand,

6  you know there's evidence of actual corrosion on covered wiring

7  behind the wall?

8  **A.**   That's correct.

9  **Q.**   Why is that important to support your proposal that all

10  wiring, per the code requirements, in these homes should be

11  removed?

12  **A.**   Well, to get to it, you would have to get the drywall out

13  of the place, but it would mean that you would have to

14  definitely take care of this because that means any of the

15  wiring that may be in the cavity of the wall could have this

16  type of damage on it.

17  **Q.**   We've talked in this case about junction boxes and

18  receptacles.  Could you give the Court just a good working

19  definition of *junction box* and *receptacle*.

20  **A.**   A junction box is a place where you would have the wiring

21  come into and do a splice.  A receptacle is a device that

22  actually could go into a box, then you wire it, and it becomes

23  fixed into that box to be able to plug in and out of.  Much

24  like a light switch; that's a device that goes into a box so

25  that you can have the wiring behind that device.  So a junction

1    box is basically an open box, but you can have the wiring

2    within it for a splice.  It could be where the devices go to.

3    **Q.**   We've heard reference in this case to the requirement of

4    6 inches of slack inside of a box.

5    **A.**   Yes.

6    **Q.**   That is actually a requirement of the building code?

7    **A.**   That's correct.

8              **MR. MEUNIER:**  If we can look at the next slide,

9    please, Scott.

10   **BY MR. MEUNIER:**

11   **Q.**   I want to look at code provision E3306.10.3.  Is this the

12   requirement that there be a minimum length of 6 inches of free

13   conductor at every outlet, junction, or switch point?

14   **A.**   Yes.

15   **Q.**   What is meant by "free conductor"?  Explain that to the

16   Court.

17   **A.**   What they mean by "free conductor," this box here means

18   that you would have to have -- where this cable enters into the

19   box, you'd have to have 6 inches extend past that point, once

20   it enters into the box, of unobstructed length of wiring so

21   that you can then hook your device up to that length of wiring.

22   **Q.**   This provision of the code actually said this required

23   length of 6 inches shall be measured from the point in the box

24   where the conductor emerges from its raceway or cable sheath --

25   meaning the back of the box where the wall is?

1    A.    That's correct, where then it would become -- 6 inches

2    from that point it comes into that box.

3    Q.    So if you wanted to cut away visibly corroded wiring

4    inside a box and splice new wire onto the ending, would this

5    code requirement mean you'd first have to pull at least

6    6 inches of free wire out from behind the box to be available

7    before you did any splicing?

8    A.    That would be what you would try to do.  But with the way

9    construction is, you would never be able to get an additional

10   6 inches, once you've cut it off, back to where that box --

11   where it enters the box, if you're cutting back to that point,

12   what I understand you're saying is if you could then pull that

13   wiring back through to get another 6 inches.  That's what you

14   would be needing by this code, but there would never be

15   6 inches you'd have available to be able to pull into that box.

16   Q.    Why not?

17   A.    With the way an electrician does the wiring, he runs it to

18   that box and it's stapled to the framing inside of the wall

19   cavity.  It runs all the way back to the panel box.  There's no

20   slack provided in that because, one, for the cost, but it's

21   also -- it would get in the way of trying to perform your

22   activity of wiring that box up.

23   Q.    We have prepared a couple of mockups here, Mr. Wright.

24   A.    Yes.

25   Q.    Would it help you to further explain at this point to the

1   Judge if you could step down and use these mockups?

2   **A.**   I think it would.

3   **Q.**   Okay.

4   **A.**   This would be an example of the 6 inches coming in the

5   box, that you would have that length coming out to the actual

6   device.  In this case, it's a light switch.  So you'd actually

7   have the switch, and each one of the wires within the Romex has

8   to have 6 inches out.  The purpose of that is so you can see

9   how you can pull it out and actually do the wiring onto that

10  switch and to make sure you have enough length so you can do

11  that during the actual operation of putting this in.

12          **THE COURT:**  Can you splice into that 6 inches?

13          **THE WITNESS:**  You cannot splice onto this 6 inches --

14  well, you've got the 6 inches.  That would be what you need.

15  If you cut this back at the edge, you no longer have the

16  6 inches.  So you can't just put 6 inches onto that wiring

17  because that's not -- the code contemplates you can't have

18  another set of wiring inside of this box.  It's only for this

19  device.

20              So if we can show the backside of this, it

21  actually shows how the wiring would typically be done.  In this

22  switch, you'd have wiring that's coming from the panel box --

23  this would be coming down the wall, and you have staples that

24  would go to it.  They run the wiring into the box.  At that

25  point is where you have the 6 inches, once it goes into this

83

 1   box.  On a switch -- this is an example of a switch that runs

 2   an outlet box like -- houses are required to have that, one in

 3   every room.  You would have this wire go to the device, which

 4   would be the switch.  Then it comes back from the switch and it

 5   goes down the wall.  So now you've got this wiring that has to

 6   come over to this junction box, which has the receptacle in it

 7   over here.

 8              This is an example of the others.  This is a

 9   switch for a light itself.  So you've got the power line coming

10   into it, then the line that comes back out up to the ceiling

11   over to the light fixture in the ceiling itself.

12              These are examples of what they call

13   daisy-chained receptacles.  You've got a wire that's running

14   through the wall, and it basically connects a series of

15   outlets, receptacles, together.  It comes into this receptacle.

16   It comes back out.  It goes across.

17              In this case, it's going to another receptacle

18   here, just to show an example of how you would have two

19   connected to the same wiring.  So this would be examples of --

20   basically, this is a 4-foot-by-4-foot, but it would be

21   representative of what may be on a wall 12-foot long and 8-foot

22   high.

23   **BY MR. MEUNIER:**

24   **Q.**   So, Mr. Wright, just to finish this point, what kind of

25   chain reaction, as a practical construction matter, is set off

1  once you go down the path of not removing all wiring but

2  clipping off what's in the box and trying to create the

3  6 inches of slack in the box required by code?

4  **A.**   What happens in the case of this switch that we were

5  looking at first, if you clip the wiring here, then to maintain

6  this switch location, you have to extend the wiring.  Well, by

7  code, the only way to do that is you put in a junction box and

8  actually do that splice inside of that box, and then come back

9  where you have 6 inches for the line coming into the junction

10  box, 6 inches for the line going out of it down to this new

11  switch, then 6 inches inside the switch box.

12          We've got another example wall of how it would look

13  with that kind of condition.

14          **THE COURT:**  How about the junction boxes; do they

15  need to be replaced, in your opinion?

16          **THE WITNESS:**  The box itself would not have to be

17  replaced, no.  It's a plastic.  I don't believe it would have

18  an issue as far as leaving that in place.

19          **THE COURT:**  What about the insides of the box?

20          **THE WITNESS:**  Everything in there would need to go

21  because it's wiring and then it's a switch or receptacle, which

22  have all found corrosion on those.

23          This is the exact same layout as that wall was.

24  All of these blank cover plates are locations where a splice

25  has been done, and that's because of the fact that the

DAILY COPY

85

1    6 inches, now not being available for this switch to stay

2    there, you have to put in one to run wiring into this, with

3    6-inch from the power line coming in, another 6-inch for the

4    one that's going out to the switch, 6 inches in for the switch,

5    6 inches off that switch, down to another junction box, to go

6    over to the outlet that was controlled by this switch.

7              So this would be how your wall would look on the

8    front face now because you'd have to have access to every

9    junction box.  You can't cover it over with the drywall.  So

10   you'd have to have these cover plates in place to be able to

11   get in where that splice would be.

12   BY MR. MEUNIER:

13   Q.   Is the multiplication of cover plates on a wall, which

14   wasn't there before, consistent with the principle of restoring

15   a home to its condition prior to Chinese drywall?

16   A.   No.  It would be very aesthetically unpleasing.  In

17   addition to that, each of these now creates a new hotspot where

18   the wiring itself, you created with just that splice on that

19   circuit so many more points.  Here you've got one, two, three,

20   four -- five on just that circuit, where before it was just two

21   points.

22             So you've got a lot more resistance that's built up

23   on each of these areas, where you have more opportunity that

24   fire could occur through that, and it doesn't trigger circuit

25   breakers to go if -- in these boxes where you have the wiring

DAILY COPY

1    with just a splice, those most likely would not trigger a short
2    that would trip a breaker.  It would heat up and you'd have
3    more chance for a fire.
4    Q.    So there are new potential points for electrical failure?
5    A.    That's correct.
6    Q.    There's an increase of fire risk?
7    A.    Yes.
8    Q.    So in addition to the aesthetics, the owner is not being
9    restored on the basis of risk and function?
10   A.    That's correct.  It would definitely increase risks of
11   problems with the electrical system.
12               This just shows in terms of how many more boxes would
13   be needing to be installed.  From a constructability issue,
14   too, the cost of having to add all of these new junction boxes,
15   with the wiring inside of those, that would take about a half
16   hour each.  So by the time you would go through the process of
17   all these additional junction boxes, it's going to exceed the
18   cost of just taking the wiring out back to the panel and
19   putting in a new line.
20               Part of the problem with having that approach, also,
21   you definitely have the safety issue with all these increased
22   junction boxes, but you've got the cost of the time factor of
23   having to go back and put all of these in compared to what it
24   would take time-wise to do just one run.
25   Q.    When you're doing electrical work in a home, on a

1   percentage basis, what portion generally falls under material

2   cost and what portion falls under labor cost for electrical

3   work?

4   **A.**   It would probably be about 25 percent on the material,

5   75 percent on the labor.

6   **Q.**   So if I'm removing all the wiring, that's obviously

7   removing more material, but the tradeoff on labor is what if

8   I'm going to remove all versus do this multiple-splicing

9   junction box approach?

10   **A.**   You would increase the labor dramatically.

11   **Q.**   You'd increase the cost?

12   **A.**   And it would increase costs, that's correct.

13   **Q.**   Let's go back to your scope of work document, which is

14   2058.  We'll move quickly.  Your third element is to remove and

15   replace air-handler units, compressor units, and ductwork.

16   **A.**   Yes.

17   **Q.**   Again, why is that consistent with the principles you

18   follow, and how is that supported both by science and

19   practicality?

20   **A.**   The science side, as far as what's been discussed, with

21   all the corrosion that's been occurring to the coils, the

22   electronic components within those, that would all be

23   definitely on the science side.

24          Somewhat to the science side, also, on the compressor

25   units, one thing I know Mr. Rutila had discussed dealt with the

1  fact of the overuse of the compressor with the fact the
2  coils -- with any leakage, it's going to make it have short
3  cycling and burn it out quicker.
4            Another issue is that a number of the homes have been
5  built in a time period where the refrigerant that was used
6  within the HVAC system is no longer allowed to be used, and
7  there would be a mismatch between the compressor unit and the
8  air-handler units, that you would not be able to just replace
9  the air handler without having to also change out the
10  compressor because you would not have a matched system that
11  would work.
12  Q.   Why remove the ductwork?
13  A.   The ductwork would be one that's more practicality.  It
14  would have a science side, in fact, if there's dust within it
15  and it would absorb the sulfur smell.  So you would have
16  off-gassing that could occur over time.
17            But the constructability side is that as you take the
18  drywall down, most of the ductwork's going to be coming with
19  it.  You would have it dangling down out of the ceiling.  It
20  would be in the way of the repair efforts that would be going
21  on.  It's a very cheap cost to actually take that duct out, and
22  it would be more costly to try to salvage it as compared to
23  just throw it away.
24  Q.   Next you say we remove and replace appliances.  Which
25  appliances are you referring to there, Mr. Wright?

1    **A.**    Those would be appliances that would be typical for a

2    contractor including in their pricing, which would be the major

3    appliances like all kitchen appliances:  A microwave, oven, the

4    dishwasher, refrigerator.  Then you would have your washer and

5    dryer.  Those would be the major components that I'm discussing

6    in this.  Contractors, generally, they won't include any of the

7    costs for the personal items that a homeowner may have like a

8    TV or a radio, those types of things.

9    **Q.**    Your scope is referring to builder-supplied or

10   contractor-supplied appliances?

11   **A.**    That's correct.

12   **Q.**    Washer, dryer, dishwasher, refrigerator, microwave,

13   hot-water heater, oven, stove?

14   **A.**    Yes, the hot-water heater also.

15   **Q.**    Things like televisions, computers, what is your position,

16   if any, with respect to the need to replace those electronic

17   equipment?

18   **A.**    Based on what has been found through science testing of

19   those components with the electronic circuit boards, wiring

20   within those, those would need to be replaced also.

21   **Q.**    In fairness -- and we'll get to your numbers -- in your

22   cost estimate, you have not provided for the cost of things

23   like televisions and computers?

24   **A.**    That's correct.  It would only be towards what a

25   contractor would supply.

1  **Q.**   Item 5 is to remove and replace plumbing lines and

2  fixtures.  Now, are you dealing here only with metal surface

3  lines and fixtures or also PVC?

4  **A.**   Also PVC.  This, again, has both components of the science

5  side and also the practicality side.  The science side, a lot

6  of the plumbing would have copper or brass parts to them:

7  Faucets, shower mixing boxes.  All of those would have things

8  that would be attacked, again, by the corrosive sulfur.  So you

9  would have to remove those for that component.

10            But a fair share also comes from the constructability

11  side.  To get the drywall out and access to get the drywall

12  out, you'd have to remove everything in front of it.  So

13  toilets would be in the way.  The sinks would be in the way.

14  So all of that plumbing would have to come out to be able to

15  get those items off the wall.

16  **Q.**   PVC, though, is not metal.  Is there a practical

17  construction-related reason why you're removing all of that?

18  **A.**   Again, that would be on the constructability side.  It's

19  one where you'd have most of the PVC comes into areas where

20  you're going to have to get it out of the way to do the drywall

21  removal.  To get it out of the way means you basically cut it

22  back to the floor line.  By doing that, then you have access to

23  get the drywall both out and back on as you do your new work.

24  **Q.**   Would it be cost efficient or construction smart to try to

25  save pieces of PVC, store them, and bring them back later?

DAILY COPY

1    **A.**    No.   Again, the material cost would be very, very small

2    compared to the labor part, especially if you're trying to do

3    the labor as a salvage operation versus being able to demo it

4    and come back in with just a plumber doing the original

5    installation.

6    **Q.**    Your sixth item is to remove and replace building

7    components to access items above.  Is PVC one of those that you

8    just mentioned, or are there other components here?

9    **A.**    That would be somewhat the same line of thinking, but the

10   building components would be more like cabinetry:  Your wall

11   cabinets, your base cabinets, your vanities in your bathrooms,

12   anything that's been basically mounted to the wall or over the

13   drywall.  So all of your trim around windows, doors, when you

14   get to the floor line, your wall base, if they have crown

15   molding, all of those things would have to come off to be able

16   to get the drywall off.

17   **Q.**    You're aware that Beazer -- and Mr. Phillips testified

18   about this -- actually at first thought they could salvage and

19   store and save cabinets?

20   **A.**    Yes.

21   **Q.**    When you started out in your analysis, were you thinking

22   the same thing?

23   **A.**    Yes.  Actually, we had looked at -- and when we get to

24   cost later, we had done an alternate to even evaluate on a cost

25   side which made more sense:  To salvage or to leave or

1    basically demo it out and put all new in.

2            At that point in time when I had authored my report

3    initially, I had thought it would be something you could

4    salvage.  But in discussions with the contractors we were

5    working with for costs, with Beazer, discussions found that the

6    practicality side of it, it really would be most costly to go

7    forward with trying to salvage the cabinets.

8    Q.   The seventh item is to remove and replace flooring

9    materials but protect hard tile.  Explain that to the Court.

10   A.   The flooring materials -- almost all the carpeting, vinyl,

11   wood flooring -- all of those are very easy to damage, and they

12   also would become very easy to have the dust from the drywall

13   removal operation get impregnated into or cause scratching or

14   damaging to it as you do the removal of the drywall.  So to

15   take care of that, it would be best just to take those out and

16   completely replace those.

17           The quarry tile or hard tile is something that it

18   won't absorb the dust; it is pretty resistant to any kind of

19   damage from working on the surface of it, so those were items

20   that we believed you could salvage that and just use it again

21   in the new repair.

22   Q.   You next recommend the removal and replacement of all

23   ceiling and wall insulation material?

24   A.   Yes.

25   Q.   Why is that, sir?

1   **A.**   That's one primarily on constructability; that as you

2   remove the drywall, the insulation in the walls is definitely

3   going to get dust all throughout it.  It also is one that when

4   you have that insulation, it gets compressed.  I believe

5   someone from Beazer had already mentioned that.  It's going to

6   lose it's R-value because you no longer have the full depth of

7   that insulation.  So all of those factors makes the wall

8   insulation one.

9           The ceiling insulation is one where you take the

10  drywall off the ceiling, it's going to already come out because

11  it's going to be just laid on the drywall, so you're going to

12  lose that insulation through that process.

13  **Q.**   You next call for the disposal of demolished items,

14  cleaning, HEPA-vacuum and wet-wipe clean all surfaces.  The

15  disposal, we saw a film during the Beazer demolition, is the

16  cost of a dumpster to take away the material, etc.?

17  **A.**   Yes.  Basically, it's to put it into something that you

18  can then haul off to dispose of properly.  So then after you've

19  got everything removed from all the items above, you have to go

20  back in and clean out the rest of the dust and debris that's

21  been left through that process.

22          So you have a rough cleaning, which would be

23  basically broom or shovel out all the particles you can.  Then

24  you would put the HEPA vacuum so that you can suck up all the

25  rest and not make dust go back throughout the building.  And

94

1    then the wet-wipe actually will then finish off making sure you

2    get dust particles that are touching other surfaces and the

3    HEPA vacuum can't even suck it off of those.

4    **Q.**    What is a HEPA vacuum?

5    **A.**    It basically has a spatial filtration in it that will

6    capture very small particles.  So by having that vacuum, you

7    don't make the dust go back throughout the whole building.

8    **Q.**    You heard Mr. Phillips and Mr. Smith at Beazer talk about

9    pressure-washing as a component of the cleanup phase; true?

10   **A.**    Yes.

11   **Q.**    Pressure-washing the wood, studs, etc.?

12   **A.**    That's correct.

13   **Q.**    You don't call for that in your remediation?

14   **A.**    No.  Primarily, with the concern -- in the Florida homes

15   that Beazer's remediating, there's a lot of concrete-block

16   walls and steel-stud framing, so the water's not going to get

17   absorbed into that.  It will be something that they can vacuum

18   back out.

19             I like the approach, and I think it probably is a

20   much more thorough cleaning and would like to do that.  But

21   with all the wood that's involved in the homes, especially in

22   the Virginia homes, that would be something where you'd have a

23   lot of water that could get absorbed into all the different

24   crevices and places that the wood framing would have.  I think

25   it would be something that would be a tradeoff to use the wet

1  wipe only because then you can control how much moisture might

2  be introduced into the wood as compared to using the,

3  basically, wet-vacuum approach that Beazer was.

4  **Q.**   Your final step is to restore the residence to its

5  original finish level.  What does that mean?

6  **A.**   That basically would be that once you're putting

7  everything back, then you would do the final painting.  You

8  would have the carpeting.  You would do everything so that it

9  restores that house back to the state it should have been from

10 the original time it was purchased.

11 **Q.**   Is your scope of repair and remediation generally

12 consistent with that of the Beazer approach?

13 **A.**   Yes.  The only issue that I would say is different was the

14 wet-vacuuming.  And then what I heard was they did not do the

15 compressor for the HVAC because of it already being on the new

16 refrigerant, so there was not going to be a mismatch on terms

17 of just doing the interior HVAC components.

18 **Q.**   Just for the record, if we could look at the Beazer

19 remediation scope one moment.  This is P1.1888.  You've

20 reviewed this, Mr. Wright?

21 **A.**   Yes, I have.

22 **Q.**   Except for the difference perhaps on pressure-washing, you

23 essentially agree with the Beazer scope of remediation?

24 **A.**   That's correct.

25 **Q.**   What do you estimate to be the total length of time on

DAILY COPY

1    average it would take to complete your proposed scope of

2    remediation for these Virginia properties?

3    **A.**   It would depend on the size of the home.  But in general,

4    I'd say it'd be in the four- to six-month range.  A smaller

5    home could be four months.  The larger or more detailed it is,

6    it could take up to six months.

7    **Q.**   Let's go back to 2058.  So you think a four- to six-month

8    period, but that would not apply to one of the homes; correct?

9    **A.**   That's correct.

10   **Q.**   That would be the Leach property?

11   **A.**   Yes.

12   **Q.**   In fairness, which of the components of your remediation

13   would not be applicable to that add-on room that's being

14   remediated in the case of Mr. and Mrs. Leach?

15   **A.**   What I recall, there were no appliances, no HVAC directly

16   within that room, and so 3 and 4 would not be, 5 would not be,

17   and there were no flooring materials, so 7 would not be.

18   **Q.**   So for six of the seven properties, you're recommending

19   steps 1 through 10 on your statement of scope; and in the case

20   of Mr. and Mrs. Leach, you would exclude items 3, 4, 5, and 7?

21   **A.**   That's correct.  I believe in 3 there was mention of a

22   dehumidifier.  It was priced out within the repair scope, and

23   that was included as part of what would be considered an HVAC

24   system even though it's just a dehumidifier.

25   **Q.**   Now, I believe you were here when there was testimony

1   about the role of Environ, the environmental specialist with

2   the Beazer company?

3   **A.**   Yes.

4   **Q.**   You heard testimony that at the end of that remediation by

5   Beazer, Environ will come in and sign off technically and

6   environmentally on the fullness and completeness of the work?

7   **A.**   That's correct.

8   **Q.**   Have you provided for that additional cost in your scope

9   or your assessment?

10  **A.**   No, I have not.  That would be something -- there are

11  going to be inspections by local code people, albeit that may

12  not be something that would go to the detail of this type of

13  repair to say that they really checked out and warranted that

14  all evidence of Chinese drywall is gone.

15  **Q.**   You would understand how, at the end of this, an owner

16  would want some certification that the Chinese drywall problem

17  has been fully taken care of?

18  **A.**   That's correct.

19  **Q.**   You're suggesting it could be done by government officials

20  locally who would be inspectors and perform that on the

21  taxpayer basis?

22  **A.**   Yes.  They would have inspections.  I don't know that it

23  would necessarily give a free clearance, but it would say that

24  it's returned back to being habitable.

25  **Q.**   The alternative to that would be to actually pay for

1   something like a technical specialist to come in and sign off

2   on the Chinese drywall work that's been done?

3   A.   That's correct.

4   Q.   Which is what Beazer is calling for?

5   A.   Yes.  That was one thing, in discussions with Beazer, I

6   found out that they did have that, where they included that

7   final step of having a clearance testing done to make sure that

8   it was free of Chinese drywall or any effects from Chinese

9   drywall.

10          MR. MEUNIER:  I believe, for the record, Your Honor,

11  we've added that in J.C. Tuthill's analysis as a $12,500 cost

12  per unit based on the Beazer testimony.  It's not included in

13  the numbers we're about to review with Mr. Wright.

14  BY MR. MEUNIER:

15  Q.   So let's talk about the costs associated with your

16  recommended scope of remediation.  I want to begin first,

17  Mr. Wright, by having you explain to the Judge what the basic

18  steps are that are followed to develop a cost estimate for work

19  such as this.

20  A.   Okay.  Basically, I had a four-step approach.  The slide

21  shows what those four are.  It's basically we developed -- what

22  we just went through was the basic scope of remediation work

23  that's necessary.  That's a very, very summary description.

24  Now you would have to define what each of those steps means,

25  which is a thorough, detailed explanation in terms of a

1    spreadsheet or an estimate sheet, where you put out every line

2    item of work that has to be done to accomplish that work.  So

3    that's what detail the scope of remediation work would involve.

4            Then from that, you would go into doing your quantity

5    takeoffs.  That's basically, in a given room, how much square

6    footage of drywall is there on the walls, how much is on the

7    ceiling.  You would take the measurements and actually

8    determine how much is in each room, each location of everything

9    in the house.

10            Once you've got those quantity takeoffs, now you have

11   to apply your unit pricing.  You're establishing now, okay,

12   what is the cost to do that specific task that you're doing.

13   And at the end of that, then you summarize and you have some

14   finalizing with markups of overhead, profit, general

15   conditions, what's it going to take to do that job now that you

16   know what your scope is.

17   Q.   Are these steps well established and generally recognized

18   by professionals in your field?

19   A.   Yes.

20   Q.   Are they found in the peer-reviewed literature?

21   A.   Yes, they are.

22   Q.   Let's talk about that detailed scope step that you

23   mentioned.  We've seen your summary statement, but we're

24   talking about something in much greater detail in order to put

25   numbers on this; true?

1   A.    That's true.

2   Q.    Attached to your report -- and this is in evidence as

3   P1.2027 -- you actually created a format to demonstrate the

4   kind of detail that contractors would have to have to follow

5   this scope of work?

6   A.    That's correct.  The scope of work -- we could have given

7   them the summary that we just went through, but in doing that

8   it would not have given them enough direction, what you're

9   really wanting them to accomplish.  This form was provided to

10  the contractors that we did utilize to get bids for the repair

11  to the seven homes.  This basically gave them a footprint or a

12  blueprint of:  Okay.  What is it we're supposed to provide in

13  this bid we're going to give to you?  So it went through and it

14  listed out the types of items that were needed to be addressed.

15  Q.    For example, here we see that you have to detail the

16  drywall that's being installed in ceilings, behind walls, both

17  wet and ceramic walls; true?

18  A.    That's correct.

19  Q.    You have to actually have something in this column under

20  "Unit."  What does "SF" and "EA" mean?

21  A.    The "SF" would stand for square feet because that's how

22  you typically price drywall is by the square foot.  Dining

23  room, it says a premium.  So you'd have one dining room, and

24  you may have an upgrade cost for that.

25              So the "EA" stands for each, meaning you have that to

DAILY COPY

1  be able to take care of it.  There's other kind of little unit
2  abbreviations that you would use such as square yards for
3  carpeting, lineal feet, those types of unit costs.
4  **Q.**    Then the contractor who's submitting the bids can actually
5  enter numbers in this column on the cost?
6  **A.**    That's correct.
7  **Q.**    That would be the unit cost entry?
8  **A.**    Yes.  You would have your quantity times your unit cost
9  will give you your final cost.
10  **Q.**    Now, you actually submitted this proposed scope of work to
11  two Virginia builders?
12  **A.**    That's correct.
13  **Q.**    Two companies in Virginia?
14  **A.**    Yes.
15  **Q.**    Did you find that this detail that you had formatted in
16  your report was sufficient and detailed for their purposes?
17  **A.**    No.  This basically gave them enough information to go
18  forward in developing their full estimate, but this is an
19  example of what one of the contractors had as their tabulation
20  on a room-by-room basis just for the drywall work.
21          So what we're looking at here is, the first part of
22  it at the top, you see "gypsum drywall work."  So as you go
23  down, it has a summary for how much gypsum there is on the
24  ceilings, how much gypsum there is in the partitions, which
25  would be walls.  And then you would have how much taping and

1  finishing work there would be to finish that actual action of

2  putting the drywall compound and tape on all the joints that

3  you have within the drywall.  So you would get -- those numbers

4  that are there are actually being developed below what's been

5  highlighted.  From "gypsum ceiling takeoff," that's a

6  room-by-room of how much drywall each ceiling within the house

7  has.

8  Q.   Let's go to the next page just to show how this sheet ends

9  from this particular contractor.

10 A.   This page deals completely with just the amount of drywall

11 that's on each wall in each room throughout the house.  It

12 would tell you in the garage that you have 86.2 -- I'm sorry,

13 853.28 square feet of drywall on the walls in the garage.

14 Q.   Even with this much detail, the builder needs to figure

15 the cost of something, you then have got subcontractors who

16 have their own numbers to insert in the process; true?

17 A.   That's correct.  In this particular case, the contractor

18 had developed how many square feet there were.  They had gone

19 in, done physical measurements of each room in each of the

20 seven homes.  They provided that square footage to a

21 subcontractor for them to price out and give them back a quote

22 of how much it would be to do that particular work item.

23         In this case, on the drywall, the exhibit shown now,

24 this was the subcontractor that that general contractor had

25 provided that information to.  He received back how much that

1    subcontractor said he would do that drywall work for.

2    Q.    Let's talk about the bids that you received.  Which were

3    the two Virginia companies selected to submit independent bids

4    in this case?

5    A.    The two names were V.B. Homes and then Virtexco,

6    V-I-R-T-E-X-C-O.

7    Q.    What was it about V.B. Homes and Virtexco that you thought

8    made them appropriate choices to independently submit bids?

9    A.    V.B. Homes is what I would term a smaller local contractor

10   that has done remodeling and has done some new-home

11   construction, but they do quite a bit of this type of work,

12   where they would come into a house, do repairs, basically on a

13   scope, and put the house back to a new condition.  They've been

14   well established within the Virginia Beach area.  They are a

15   quality contractor.  They've been there for 20 years.  They

16   have a good reputation and are going to be there to make sure

17   there's personal attention done to the house.  That would be

18   the type of people you would want for this kind of repair work

19   so that you make sure they're going to perform the work.

20            Virtexco is a larger contractor that does more

21   multifamily-type construction, or commercial and industrial.

22   They perform work on condominiums or townhouse complexes much

23   like the McKellar or Michaux residences are located in.  We

24   wanted to get a pricing from them, also, for the fact of that.

25   They did price all seven homes out for us, but they are much

1    larger, again, a very quality contractor that's been well
2    established and is going to be there to make sure -- their
3    reputation's on the line.  They're going to do the work
4    correctly.
5    Q.   Let's make this clear.  In the bidding process, V.B. Homes
6    and Virtexco were working separately and apart?
7    A.   That's correct.
8    Q.   They followed the four steps that you mentioned of the
9    detailing of the scope of work, the quantity takeoffs, the unit
10   pricing, then the finalization of markups?  They followed those
11   four steps?
12   A.   That's correct.
13   Q.   Independent of one another?
14   A.   Yes.  Each of them bid independently and followed the
15   steps in developing their own independent bids.
16   Q.   They had to go visit these homes?
17   A.   Yes.  Each of them visited all seven homes.
18   Q.   They did it separate and apart from one another, not
19   conversing with one another or communicating in any way?
20   A.   That's correct.
21   Q.   I want to next show you a spreadsheet which you prepared.
22   There's a lot of information on here.  We're not going to go
23   through all of it, but I want you to explain to the Court the
24   format.  We have V.B. Homes and we have Virtexco with entries
25   under each; true?

1   A.   That's correct.

2   Q.   Under each, we have the seven plaintiff families:  Morgan,

3   Baldwin, Orlando, Leach, Michaux, McKellar, Heischober.  It's

4   repeated again under Virtexco?

5   A.   Yes.

6   Q.   What do these columns reflect?

7   A.   I developed the spreadsheet basically to summarize the

8   cost that each contractor provided in each of what I would term

9   the 16-division breakdown.  You have standards that have been

10  established in construction where divisions are basically the

11  breakdowns.

12       So division 9, within that you'd have for gypsum,

13  there's also painting, those different things that are

14  individually line-itemed out, and the contractors provided

15  pricing that way.  So I did it just to see how,

16  comparison-wise, they were doing against what each of them put

17  in for pricing on each home.

18       This spreadsheet was to do that summary, to be able

19  to see for V.B. Homes, for the Morgan residence, what did they

20  have for cost for each of these 16 divisional items' breakdown.

21  I did the same for Virtexco.  This basically give me a quick

22  summary sheet to be able to see all the numbers that way.

23  Q.   Now, you have at the left-hand bottom of this certain

24  alternatives, 1 through 5.  Tell the Court what those are.

25  A.   During the course of determining what the scope would be,

1   I was trying to explore -- and this was primarily more on the

2   constructability side of it -- if we were to try to do the

3   salvaging of the existing wiring, where -- basically the

4   examples we just went through with the mockup walls, going from

5   the one that showed the original to the new with all the

6   junction boxes, what the cost would be if a contractor

7   attempted to do that.  That's regardless of the fact that I

8   don't believe, with the code and all the other things, that

9   would allow that, but what was the cost for that.

10          Alternate 2 was to salvage the existing carpeting to

11  see if we could actually do that and what the cost would be to

12  try and salvage the carpeting.

13          Number 3 was if we were trying to take the HVAC ducts

14  down, clean them, and then put them back up for reuse.

15  Q.   Let me just stop you there.  You got totals from both the

16  smaller company, V.B. Homes, and the larger company, Virtexco,

17  to accomplish these alternative work?

18  A.   Yes.  Each of them priced out every one of the alternates.

19  Q.   Your conclusion was, with respect to both builders'

20  numbers on alternatives 1 through 3, that they should not be

21  included?

22  A.   That's correct.

23  Q.   Why is that?

24  A.   The cost for that was -- the cost differential for trying

25  to do that was so little compared to the problems of what you

1   may have for future problems on the electrical, what you might

2   have with the carpeting, it just made no economical sense to

3   really try to use those alternates.

4   **Q.**   What about alternatives 4 and 5?

5   **A.**   Alternatives 4 and 5 were, once again -- the replaced

6   cabinetry was to see about -- in the original bid, we had it

7   for taking the cabinetry down, carefully taking it out of the

8   house, storing it in a conditioned space, being able to then

9   see whether we could -- I'm sorry.  That one was one where we

10  had it to take it out.  I'm mixing myself up.

11         The original bid was to take it out altogether and

12  then put it back in.  You would store it, carefully take it

13  out, bring it back in.

14         Alternate 4 was, instead of doing that, you just take

15  it out, get rid of it, and put new cabinetry in.  When we did

16  the pricing on that, we saw that the cabinetry cost may be high

17  enough that we should try to go ahead and salvage and do that

18  action, where we just take it out, store it, put it back in

19  place.

20         But as we further discussed with the contractors that

21  we had the bids from, and also once we talked to Beazer and

22  they had tried that process, and the cost it would be to really

23  store it in a climate-controlled environment, the care that was

24  taken to do that, it was actually costing more.  Even though

25  what we had in our original alternate here appeared that it

1   would be a cost savings, it ended up it would be better

2   economically just to replace it.

3   **Q.**   How about the wood flooring, alternate 5?

4   **A.**   The wood flooring, basically the same.  The original bid

5   was to keep the wood flooring in place in the house and protect

6   it.  But it became apparent that there was also the concern

7   because we would have a four-month time period where there

8   would be no conditioning of the air in that space and because

9   of the -- whether warm temperatures, cold temperatures,

10   humidity, that there would be a problem with the floor becoming

11   damaged during that time period.

12          And also the fact of trying to protect it, whether

13   you could actually keep the drywall dust out from being in

14   there and ground into the surface, or that when you tried to

15   remove the drywall you're not going to disturb the whole,

16   entire perimeter edge because the wood would be tight up

17   against the drywall and the wood base would be over that, that

18   you would tear it up already in doing that.

19   **Q.**   So in your final table on the numbers from these two

20   builders, you brought up the costs of alternatives 4 and 5 into

21   the main body of the table?

22   **A.**   Yes.

23   **Q.**   Then we have a revised table, which includes those numbers

24   for the alternatives on cabinets and wood floors.  This, then,

25   P1.2060, represents the V.B. Homes and Virtexco numbers for the

1  scope of remediation you think is appropriate for each of these

2  homes?

3  A.   That's correct.  These would be, now, the adjusted numbers

4  with -- not including the -- including alternate 4 and 5 into

5  the body of these numbers.

6  Q.   Now, across the top there's an entry for the square

7  footage of each home; true?

8  A.   Yes.

9  Q.   For V.B. Homes, it's 3,079 for Morgan, 2,922 for Baldwin,

10  etc.

11  A.   That's correct.

12  Q.   When we look over to the entries for Virtexco, some seem

13  to match.  For example, the Morgan and Baldwin numbers match.

14  Orlando, though, is shown to be 3,485 as opposed to 3,005 with

15  V.B. Homes.  Can you explain why two different builders

16  measuring the same property could come up with some variance in

17  square footage?

18  A.   I would say it's not unusual at all to have variances like

19  that because who measures it, it could depend on how they went

20  about measuring the house.  Some people, they may not measure

21  all the way to the wall and forget to add in for the cabinetry

22  that's in the way.  They may try to run through from room to

23  room with the longer dimension, where somebody maybe went wall

24  to wall within a room.  It would result in some square-foot

25  differences between them.

1          I would be more shocked when they're exact because

2     that's pretty difficult on a large house, but they did have

3     quite a few numbers that were exact and some that were very

4     close in the total dimensions that they ended up with.

5     Q.    Now, when you totaled up the costs -- and this is at the

6     bottom of the chart -- you have a line here for the total

7     direct costs, and then below that an addition for overhead and

8     profit.

9     A.    Yes.

10    Q.    Explain that.

11    A.    The total direct cost would be if the contractor just

12    hired the people and, in essence, didn't have to do anything

13    else on the project.  That's what the cost would be to do that

14    work.  But that contractor's in business, so he has to have

15    overhead, which would be his home office, where he's got rent

16    for his office space.  He's got staff there like a bookkeeper,

17    the president, anybody else that may work in the office,

18    project manager that oversees several projects.  Those are all

19    home-office costs that he has to pay, but he's got to recover

20    that some way from the projects.

21          A large contractor has more projects to divvy that

22    out among, so he may have a smaller percentage of recovery

23    needed to cover those home-office costs, where a small

24    contractor may have very few projects ongoing, so he's having

25    to recover more of those costs.  He would have a smaller amount

1    of costs in total, but he still would have to get it from a

2    smaller subset of projects.

3            That home-office overhead is generally done by a

4    markup, where that contractor knows on an annual basis how much

5    is his total cost for having the office, the people in the

6    office, all of those types of costs, and then knowing, okay,

7    I've got to assign each project 10 percent, 15 percent, or

8    20 percent to cover those costs.  That's what he would do to

9    figure out a home-office amount.

10           Then after that he's got profit, which basically he

11   wants to make money.  So he's got money that he can give out in

12   bonuses to people, for his own self, capital things that he

13   wants to have funds that he develops to be able to do things in

14   the future.  That's his profit margin.  Again, he applies a

15   percentage of what he knows he wants to try to achieve for the

16   long term.

17   Q.   So, for the record, Mr. Wright, let's go back to the

18   larger view.  The V.B. Homes bid for the remediation of the

19   Morgan home was $254,135?

20   A.   Yes.

21   Q.   The Virtexco bid for the Morgan home was $210,846?

22   A.   That's correct.

23   Q.   We don't need to read each number, but that's how the

24   Judge will see which company bid was total for each home.

25   There was a difference between the two?

1    **A.**    That's correct.

2    **Q.**    Tell us whether you saw, between the independent bids of

3    V.B. Homes and Virtexco, a surprising difference.

4    **A.**    I would say not a surprising difference.  It would be

5    something I would anticipate, again, primarily with the

6    different structure each of those contractors had, where one

7    was a larger, regional-type contractor, he would have lower

8    costs.  He would have somewhat buying power that the small sub

9    would not have, so he could have lower costs on different

10   items, where the smaller contractor would have higher costs on

11   those same things and definitely would have a higher overhead

12   and profit margin that he would need to put to the project.

13   **Q.**    So the numbers were compatible?

14   **A.**    But overall I'd say they were compatible.  As I looked

15   especially line item by line item in comparison of the two,

16   there were very minor differences between what I would expect

17   for the contractors to provide.

18   **Q.**    Did you perform a cross-check of these contractor cost

19   estimates using an outside reference source?

20   **A.**    Yes.

21   **Q.**    Which source did you use?

22   **A.**    I used RSMeans.

23   **Q.**    This is an RSMeans book?

24   **A.**    Yes, that is.

25   **Q.**    Tell the Court what RSMeans is.

1   A.   It's a large organization that compiles costs and labor

2   information by getting information from contractors, from

3   vendors, from subcontractors, compiles all that information and

4   puts it into a manual that then you would have unit costs to be

5   able to figure out and apply to what you may come up to a

6   quantity.  It basically is an organization that every year they

7   go through that process of getting new information of what the

8   current costs are so that you can keep up-to-date.

9         It's something that -- when I first began in

10  construction, I worked as a design engineer for a large

11  manufacturing company.  In their design and engineering group,

12  we did cost estimates for what repairs would be to different

13  structures.  So we used RSMeans for pricing out at that time,

14  so I've used it for well over almost 30 years now.

15  Q.   Let's look at a brief overview of RSMeans.  It's a

16  national publication for construction costs data?

17  A.   Yes.

18  Q.   It's utilized by contractors, design and construction

19  professionals?

20  A.   Yes.

21  Q.   On a national basis?

22  A.   Yes.  People use it because they know that the pricing and

23  the labor is all current so that it can be giving you very

24  accurate data up to the time.

25  Q.   In fact, do you know it was used as a reference by one of

1    the Knauf experts in this case?

2    **A.**   Yes.

3    **Q.**   Which one?

4    **A.**   It was used by Morse.

5    **Q.**   Roger Morse?

6    **A.**   Yes.

7    **Q.**   It provides a description of common construction cost

8    items?

9    **A.**   Yes.

10   **Q.**   It defines the process to develop construction estimates?

11   **A.**   It goes through and defines actually the same four steps

12   that I talked about earlier as to how to go about doing an

13   estimate.

14   **Q.**   Actually provides unit rates and square-foot costs for

15   labor, materials, and equipment?

16   **A.**   Yes.

17   **Q.**   Doesn't that vary from one community or location to

18   another?

19   **A.**   Yes, it does.

20   **Q.**   How does the RSMeans source account for that variation?

21   **A.**   They basically -- in their process of gathering all the

22   data, they see and track how much difference there may be in

23   materials purchased in one region of the country compared to

24   another, and so they develop that into what they call city or

25   location cost factors.  Number 7 on the list is basically that

1   item.  They actually have tables in the back of the book -- if

2   you want to show the back of that book, it actually has those

3   in the very back of it as to all the different types of

4   indexes.

5          **THE COURT:**  So you either subtract or you add?

6          **THE WITNESS:**  Yes.  It's got a factor.  You multiply

7   it times your number to get it to that region.

8   **BY MR. MEUNIER:**

9   **Q.**   For example, do you remember the percentages for Norfolk?

10  **A.**   Yeah.  For Norfolk, it was 87.2 percent.

11         What Means has for their original data is collective

12  average of 30 major cities across the United States, so that's

13  100 percent.  On the regional factors, they tell you what

14  percent to adjust.  So 87.2 percent would mean that Norfolk's

15  going to be at 87.2 percent of what the Means number is.

16  **Q.**   How about Fort Myers; did you look that up?

17  **A.**   Fort Myers was 87 percent.

18  **Q.**   So Fort Myers and Norfolk ends up being --

19  **A.**   Basically the same.

20  **Q.**   Yeah.  We didn't talk about unit time trackers for labor,

21  but that, too, is provided in RSMeans and adjusted for

22  location?

23  **A.**   Yes.  They go through and actually develop how much time a

24  crew should take to do each individual type of item like

25  hanging drywall or doing the electrical work.  The half hour

DAILY COPY

 1    that I mentioned earlier, I confirmed it in RSMeans.  That does

 2    tell you in there it takes .55 hours to wire up one device,

 3    which would be the half hour.

 4    Q.    So how did you use RSMeans to cross-check the V.B. Homes

 5    and Virtexco bids in this case?

 6    A.    I did some spot checks of the different line items.  Where

 7    I had the 16-divisional breakdown, I had gone through, I had

 8    looked at the gypsum, and just went to RSMeans, based on the

 9    square footages that were put in, say, Virtexco had for their

10    square footage of drywall to see what I would get for a number

11    with RSMeans.

12          I did that for multiple things just to spot-check

13    what their costs were compared to what RSMeans had to make sure

14    I didn't see anything that was really out far, that was not

15    close to what would be the normal.

16    Q.    So both independent bidding contractors were in line with

17    unit costs with RSMeans?

18    A.    Yes.

19    Q.    Did you also cross-check for overhead and profit?

20    A.    Yes.  RSMeans has what the typical ranges that contractors

21    would use for their overhead and profit.  The very bottom of

22    this page is directly out of the RSMeans and it shows -- again,

23    they do it to tell you on different size projects.  The item

24    where it says 100,000 to 500,000 --

25    Q.    Which is what the range we're talking about for these

1  cases?

2  **A.**   That's correct.  These are in that range.  So it says that

3  the overhead and profit in general should be at a 25 percent.

4  **Q.**   Was that in the range of what V.B. Homes and Virtexco

5  submitted?

6  **A.**   Yes.  I think V.B. Homes used 28 percent, and Virtexco

7  used 21 percent.

8  **Q.**   With the smaller company, with the higher profit, you just

9  get more attention?  Is that essentially the difference?

10  **A.**   They would have more individual attention.  The larger

11  company, it's not like they don't show up on the project, but

12  they have multiple things going, so they're not quite as

13  personal attention as what a smaller contractor would do.

14  **Q.**   Did we ask you, Mr. Wright, to prepare a summary chart

15  that set forth the remediation estimate averages for each of

16  these seven homes?

17  **A.**   Yes.

18  **Q.**   You are taking the two numbers -- one from V.B. Homes, one

19  from Virtexco -- for each property, and you're simply adding

20  those and dividing by two?

21  **A.**   That's correct.

22  **Q.**   The average, if you took those two, in the case of

23  Mr. Morgan's property is $232,491 for this work?

24  **A.**   That's correct.

25  **Q.**   For the Baldwin property, it's $257,730?

1    A.    Yes.

2    Q.    For the Orlando property, $249,140?

3    A.    Yes.

4    Q.    For the Leach add-on room, it's $14,957?

5    A.    That's correct.

6    Q.    For the Michaux property, $198,142?

7    A.    Yep.

8    Q.    For the McKellar home, $194,720?

9    A.    That's correct.

10   Q.    Finally, for the Heischober home, it's $312,755?

11   A.    Yes.

12   Q.    So pretermitting the question whether a given homeowner

13   wants to ask Judge Fallon to remediate from the V.B. Homes

14   number or Virtexco's number, choosing between the two, these at

15   least are the averages of those two numbers in each case?

16   A.    That's correct.

17   Q.    You've entered the square footage of each of the seven

18   homes, again taking the average between the measurements of the

19   two bidders because there is in some cases a discrepancy?

20   A.    Yes.  I took the two different ones and just added them,

21   divided by two.

22   Q.    Then in the final column, on the right, you have dollar

23   per square foot.  Tell us what that sets forth.

24   A.    In the case of Morgan, it would be the $232,491 divided by

25   the square feet of 3,079 to get it basically in a square foot

1   of plan area, the amount of area by floor total that's in that

2   house.

3   Q.   Each of the properties, I would say, has a different

4   amount per square foot for the needed remediation?

5   A.   That's correct.

6   Q.   Can you just briefly comment on why different homes -- and

7   these are proposed as representative of a spread of homes, but

8   why different homes would have this variability on a

9   per-square-foot basis when you talk about the same scope of

10  remediation.

11  A.   Some of that deals with the fact that in some homes

12  there's a larger amount of cabinetry or wall tile.  In the case

13  of the Baldwin residence, there was a significant amount more

14  of some cabinets and also in the wall tile that was used in

15  bathrooms and in other areas.  So that drove that price up

16  higher.

17        The Leach residence, with it being one small room,

18  you have a lot more costs for small square footage.  So it's

19  just the economies of scale on that particular one.

20        The Michaux and McKellar, those two are higher

21  because of the smaller square footage.  You basically have

22  quite a bit of the same work you have in a larger-square-foot

23  residence.  So you have all of the cabinets going out, you have

24  all the flooring, all the drywall.  All of those costs aren't

25  spread out over a bigger floor plan area, so that drives their

1    costs up.  Usually the smaller you go, it could make the

2    square-foot price higher.

3             Then on the Heischober, they have an elevator, and

4    they had the only one with real wood flooring.  So those,

5    again, would help drive that cost up, plus there were

6    significant more amounts of cabinetry within their house as

7    compared to the others.  So the individual characteristics of

8    those homes helped create some of the variations that we see in

9    the square-foot price.

10   **Q.**   If we look at the homes as a profile of representative

11   homes, the overall cost for the remediation you recommend is

12   $208,562.  For a square-foot average of 2,414 square feet, your

13   cost-per-square-foot average is $86.41; correct?

14   **A.**   That's correct.

15   **Q.**   I want to recall you to the testimony of Mr. Ray Phillips.

16   You were here for that testimony?

17   **A.**   Yes.

18   **Q.**   You heard him tell the Judge that the Beazer cost -- it's

19   a moving target, but at present it's roughly $50 a square foot

20   at the upper end for remediation that's essentially consistent

21   with yours?

22   **A.**   That's correct.

23   **Q.**   You were here when Mr. Phillips, then, was asked to

24   convert that builder cost into an owner cost, putting in

25   overhead and things that the builder doesn't factor in?

1    A.    That's correct.

2    Q.    His owner cost relationship figure was $72 a square foot,

3    more or less?

4    A.    Yes.

5    Q.    Can you explain why Mr. Phillips would have $72 in his

6    analysis for the owner and why the average here is $86.41?

7    A.    Yes.

8    Q.    Could you do that.

9    A.    Because once Mr. Phillips said that, I was curious to

10   figure out how there was a difference, so I went back to look

11   at the different items that he had included as his way of going

12   from the $50 to the $72.  I believe there are some other

13   additional items that would not be included within what

14   Beazer's costs were that would be incurred by someone having an

15   individual contractor come to do that work as compared to

16   somebody doing it like Beazer is, where it's a house they had

17   already constructed and came back basically at no cost to try

18   to adjust or change that house back to not having Chinese

19   drywall.

20   Q.    Why don't you step through those calculations quickly with

21   the Court.

22   A.    What I had found was -- I know Mr. Phillips had said about

23   a 10-percent minimum for the concessions that they would have

24   ability to get from vendors and subcontractors as to their not

25   being individual, small contractors getting those costs.

1   Beazer would have buying power basically is what it comes down
2   to.
3           I adjusted that just to go to a 15 percent, believing
4   that V.B. Homes could be as high as 20 percent that they would
5   lose, in essence, of that buying power capability.  Virtexco
6   possibly could be 10 percent, but I would think they would be a
7   little higher, too, because they're not of the same scale like
8   Beazer.  So I went from doing a 10-percent minimum Mr. Phillips
9   suggested to 15 percent, and that made an additional $7.50 to
10  the $50 starting point.
11          Then I looked at the HVAC.  He had said $2 a square
12  foot.  I would agree that would probably be the same because
13  they did not have to do anything with their exterior compressor
14  unit since they already had the refrigerant that was being
15  required.  So I said that would probably be about the same in
16  costs.
17          Then one element that I believe would not be included
18  is supervision.  Beazer has -- such as Jerry Smith, he's
19  involved looking after could be upwards of ten homes at one
20  time, where he's splitting his time across all of those,
21  whereas V.B. Homes would be more specific to one home only.
22          Again, Virtexco could possibly have more than that,
23  but they would have dedicated personnel directly to a home.  So
24  I said there would be some cost that they would have to provide
25  for supervision, overseeing a job in the field, and that was

1    $7.95 a square foot for that supervision for a four-month

2    duration.

3              The overhead and profit, using the same markups that

4    Mr. Phillips gave of the 10 percent for overhead, 15 percent

5    for the profit, or 25 percent, adding those numbers together,

6    that overhead and profit would be an additional $6.74 with the

7    previous amounts I gave.  The 15 percent for profit would be

8    $11.13.  When I added those together, it came to $85.32 a

9    square foot.

10             So I believe what they would be starting with, the

11   $50, in applying it to the situation that V.B. Homes or

12   Virtexco would be doing this repair work in the field, theirs

13   would, again, be in the $85- to $86-per-square-foot range.

14   **Q.**   So the way you look at the Beazer testimony about their

15   cost per square foot and the conversion to owner cost, it

16   really comes out to be consistent with $86.41, the average you

17   came to?

18   **A.**   That's correct.

19   **Q.**   Again, I want to make clear, your numbers here for

20   remediation do not include the $12,500 cost per home that we

21   heard is being spent by Beazer to have Environ come in at the

22   end and sign off on Chinese drywall remediation; true?

23   **A.**   That's correct.

24   **Q.**   Although we've talked about local inspectors and

25   government officials doing that as an alternative, do you

DAILY COPY

124

1   believe that, in terms of restoring these owners to the proper

2   value of their homes for future sale purposes, it would be

3   essential to get someone who's versed in Chinese drywall, who

4   can sign off that that Chinese drywall remediation has

5   occurred?

6   A.   Absolutely.  I would definitely get a letter of clearance

7   from somebody that would sign off as a professional.

8   Q.   I'm talking not just about some inspector in Virginia, but

9   someone specializing in Chinese drywall?

10  A.   That's correct.

11  Q.   So, Mr. Wright, in summary, having decided on the

12  appropriate scope of remediation, having received bids

13  independently from two builders which you regard as compatible,

14  having cross-checked those numbers using RSMeans, is it your

15  expert testimony and opinion that these averages set forth on

16  this document for the total cost of remediation are fair and

17  reasonable for each of these seven plaintiff owners?

18  A.   Yes.

19  Q.   Is it your opinion that this overall average cost of

20  $86.41 a square foot also is a fair and reasonable average

21  looking at these as representative homes in Virginia?

22  A.   Yes.

23          MR. MEUNIER:  Your Honor, I have no further

24  questions.

25                  It turns out I do.  Sorry.

DAILY COPY

BY MR. MEUNIER:

**Q.**   Are those opinions held by you to a reasonable degree of scientific certainty?

**A.**   Yes.

**Q.**   Do you agree that the $12,500 charge that Beazer includes in its costs for the Environ certification of the remediation at the end is a reasonable amount for that service?

**A.**   Yes.

       **MR. MEUNIER:**  I'm being told I'm now done, Judge. Thank you.

       **THE COURT:**  Thank you very much.

            Any more witnesses?

       **MR. MEUNIER:**  Your Honor, that concludes the plaintiffs' presentation of evidence in this hearing.  We certainly appreciate the Court's indulgence and time that you've given us here.  We intend to submit to Your Honor at the end of this week proposed findings of fact and conclusions of law.

       **THE COURT:**  I'll mark it submitted.  I'm going to have some work to do with regard to reading the depositions that have been submitted today.  I've made the appropriate notes for the testimony that I have heard over the last several days, and I will be drafting my findings of fact and conclusions of law as fast as I reasonably can.  Court will stand in recess.

                    DAILY COPY

1              **THE DEPUTY CLERK:**  Everyone rise.

2              **MR. HERMAN:**  Excuse me, Your Honor, may I confer?  I

3    think we may need to put something else on the record.

4                   Thank you, Your Honor.

5              (WHEREUPON the Court was in recess.)

6                        * * *

7                      **CERTIFICATE**

8              I, Toni Doyle Tusa, CCR, FCRR, Official Court

9    Reporter for the United States District Court, Eastern District

10   of Louisiana, do hereby certify that the foregoing is a true

11   and correct transcript, to the best of my ability and

12   understanding, from the record of the proceedings in the

13   above-entitled and numbered matter.

14

15

16                                  s/ Toni Doyle Tusa
                                    Toni Doyle Tusa, CCR, FCRR
17                                  Official Court Reporter

18

19

20

21

22

23

24

25

                          DAILY COPY