# EXHIBIT "7"

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY

DOCKET NO. 09-MD-2047
NEW ORLEANS, LOUISIANA
MONDAY, MARCH 15, 2010

THIS DOCUMENT RELATES TO:
CASE NO. 09-CV-6050

TATUM B. HERNANDEZ, ET AL
V.
KNAUF PLASTERBOARD (TIANJIN) CO., LTD., ET AL

*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME I - MORNING SESSION

APPEARANCES:

FOR THE PLAINTIFF:

HERMAN, HERMAN, KATZ & COTLAR
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'KEEFE AVENUE
NEW ORLEANS, LA 70130

GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 POYDRAS STREET, SUITE 2800
NEW ORLEANS, LOUISIANA 70163

SEEGER WEISS
BY: CHRISTOPHER A. SEEGER, ESQ.
ONE WILLIAM STREET
NEW YORK, NEW YORK 10004

LEWIS & ROBERTS, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 GLENWOOD AVENUE, SUITE 410
RALEIGH, NORTH CAROLINA 27612

FOR THE DEFENDANT:

FRILOT L.L.C.
BY: KERRY J. MILER, ESQ.
ENERGY CENTRE - SUITE 3700
1100 POYDRAS STREET
NEW ORLEANS, LA 70163-3700

BAKER MCKENZIE
BY: DONALD HAYDEN, ESQ.
1111 BRICKELL AVENUE, SUITE 1700
MIAMI, FLORIDA 33131

BAKER MCKENZIE
BY: DOUGLAS B. SANDERS, ESQ.
ERIN M. MAUS, ESQ.
KYLE P. OLSON, ESQ.
130 E. RANDOLPH DRIVE
CHICAGO, ILLINOIS 60601

OFFICIAL COURT REPORTER:

KAREN A. IBOS, CCR, RPR, CRR
500 POYDRAS STREET, ROOM HB-406
NEW ORLEANS, LOUISIANA 70130
(504) 589-7776

PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY, TRANSCRIPT PRODUCED BY COMPUTER.

I N D E X

WITNESSES FOR THE PLAINTIFF: PAGE/LINE:

DEAN A. RUTILA

VOIR DIRE EXAMINATION BY MR. SEEGER 25/2

DIRECT EXAMINATION BY MR. SEEGER 33/18

CROSS-EXAMINATION BY MR. SANDERS 79/1

REDIRECT EXAMINATION BY MR. SEEGER 95/13

RAY PHILLIPS

DIRECT EXAMINATION BY MR. MEUNIER 98/16

P R O C E E D I N G S

(MONDAY, MARCH 15, 2010)

(MORNING SESSION)

(OPEN COURT.)

THE COURT: BE SEATED, PLEASE. GOOD MORNING, LADIES AND GENTLEMEN. CALL THE CASE, PLEASE.

THE DEPUTY CLERK: MDL NO. 2047, IN RE: CHINESE DRYWALL, REFERENCE CIVIL ACTION 09-6050, TATUM HERNANDEZ, ET AL., V. KNAUF PLASTERBOARD TIANJIN, LTD.

THE COURT: COUNSEL, MAKE YOUR APPEARANCE FOR THE RECORD AND INDICATE WHETHER YOU'RE READY TO PROCEED.

MR. SEEGER: GOOD MORNING, YOUR HONOR, CHRIS SEEGER ON BEHALF OF THE HERNANDEZ FAMILY, AND WE ARE READY.

MR. MEUNIER: JERRY MEUNIER FOR THE PLAINTIFFS, YOUR HONOR.

MR. BRYSON: DAN BRYSON.

MR. HERMAN: STEVE HERMAN FOR THE PLAINTIFFS.

MR. RUSS HERMAN: AND RUSS HERMAN FOR THE PLAINTIFFS.

MR. HAYDEN: YOUR HONOR, DON HAYDEN ON BEHALF OF KNAUF PLASTERBOARD TIANJIN AND WE ARE PREPARED. WITH ME IS DOUG SANDERS, ERIN MOSS, KYLE OLSON AND, OF COURSE, KERRY MILLER.

THE COURT: THANK YOU VERY MUCH.

THE PRESENT MATTER INVOLVES A CLAIM FOR PROPERTY DAMAGE. THE PLAINTIFFS, TATUM B. HERNANDEZ AND CHARLENE HERNANDEZ'S HOME.

IT BEGAN IN JANUARY OF 2005 WHEN THE PLAINTIFF PURCHASED A LOT IN MANDEVILLE, LOUISIANA, AND SHORTLY THEREAFTER BEGAN THE CONSTRUCTION OF THEIR HOME. PLAINTIFFS MOVED INTO THEIR HOME WHEN IT WAS COMPLETED IN AUGUST OF 2006. THEIR HOME IS A ONE-BEDROOM -- ONE-STORY, THREE-BEDROOM, TWO-BATH, SINGLE-FAMILY DWELLING WITH APPROXIMATELY 1,688 SQUARE FEET OF LIVING SPACE.

IN THE EARLY PART OF 2009, THE PLAINTIFFS BEGAN TO SUSPECT THAT THEIR HOME CONTAINED CONTAMINATED CHINESE DRYWALL AFTER WATCHING A LOCAL NEWS PROGRAM ON THE ISSUE BECAUSE OF A NOXIOUS SMELL IN THEIR HOME, THE PROBLEMS THEY HAD EXPERIENCED WITH THE AIR CONDITIONING SYSTEM AND OTHER APPLIANCES, AND THEIR IDENTIFICATION OF DRYWALL IN THEIR HOME AS "MADE IN CHINA".

ON SEPTEMBER THE 1ST OF 2009, THE PLAINTIFFS FILED A LAWSUIT IN THE EASTERN DISTRICT OF LOUISIANA, ALLEGING THAT CHINESE DRYWALL INSTALLED IN THEIR HOME WAS DEFECTIVE AND EMITTED LEVELS OF SULPHUR, METHANE, OR OTHER VOLATILE ORGANIC CHEMICAL COMPOUNDS THAT CAUSE CORROSION OF HVAC COILS AND REFRIGERATOR UNITS, CERTAIN ELECTRICAL WIRING, PLUMBING COMPONENTS AND OTHER HOUSEHOLD ITEMS, AS WELL AS CREATING SOME NOXIOUS ODORS.

THE PLAINTIFFS CLAIM THAT THE DEFENDANTS, KNAUF PLASTERBOARD TIANJIN COMPANY, LTD., KPT, MANUFACTURED, SOLD, DISTRIBUTED, MARKETED AND PLACED IN THE STREAM OF COMMERCE CHINESE DRYWALL WITH THE EXPECTATION THAT SUCH DRYWALL WOULD BE PURCHASED BY CONSUMERS IN THE UNITED STATES. THE PLAINTIFFS BROUGHT THIS LAWSUIT AGAINST KPT. KPT DOES NOT DISPUTE IN THIS CASE THAT

TARNISHING OF CERTAIN METALLIC SURFACES AND ODORS ARE PRESENT IN THE HERNANDEZ HOUSE OR THAT SUCH EFFECTS ARE CAUSED BY OFF-GASSING FROM THE CHINESE DRYWALL. THE ISSUE IN THIS CASE IS THE NATURE AND SCOPE OF THE REMEDY AND THE COST OF THE REPAIRS.

I'LL HEAR FROM THE PARTIES BY WAY OF A BRIEF OPENING STATEMENT, AND THEN WE'LL HEAR THE EVIDENCE.

MR. SEEGER: GOOD MORNING, YOUR HONOR. CHRIS SEEGER ON BEHALF OF THE HERNANDEZ FAMILY.

YOUR HONOR, THERE'S PROBABLY NOTHING MORE IMPORTANT OR SACRED TO AN AMERICAN FAMILY THAN HOMEOWNERSHIP, WHERE WE RAISE OUR FAMILIES, WE LIVE AND WE BUILD A HOME. SHORT OF A REAL HEALTH PROBLEM, I CAN'T THINK OF ANYTHING MORE TROUBLING TO A HOMEOWNER THAN TO HAVE A SICK HOME, AND THE HERNANDEZES HAVE A SICK HOME, AND THAT'S WHAT WE'RE HERE TO REMEDY TODAY.

TATUM AND CHARLENE GREW UP IN HOUMA, NOT TOO FAR AWAY FROM HERE. BEGAN DATING IN COLLEGE, GOT MARRIED, AND IN 2005 DECIDED TO FIND A NICE HOME TO RAISE THEIR FAMILY IN. TATUM'S, I BELIEVE IT WAS AN UNCLE, KNEW AN OWNER OF A LOT IN MANDEVILLE. THE LOT WAS OWNED BY A GUY WHO ALSO WAS A BUILDER, SO THEY DECIDED TO PURCHASE THAT LOT AND BUILD THEIR DREAM HOME. IT HAD A LOT OF ADVANTAGES, ONE IS IT WAS VERY CLOSE TO NEW ORLEANS, THEY BOTH WORK IN NEW ORLEANS, TATUM IS WITH THE PASSPORT SERVICES AND CHARLENE IS WITH OCHSNER. AND IT WAS, AS YOU SAW FROM THE SITE VISIT THAT WE ALL TOOK, THE PROPERTY IS BEAUTIFUL. IT'S A PERFECT PLACE TO RAISE A FAMILY, PLENTY OF OPEN SPACE.

TATUM'S UNCLE WAS AN ARCHITECT, SO THEY ALL GOT TOGETHER AND DESIGNED WHAT THEY THOUGHT WAS GOING TO BE THEIR DREAM HOME, THE ONE HOME THEY WOULD LIVE IN, RAISE THEIR FAMILY, AND THAT'S WHERE THEY'D BE. BUT THEIR DREAM OF HOMEOWNERSHIP HAS REALLY TURNED INTO A NIGHTMARE FOR THEM. THE HOUSE, THEY'RE REMINDED EVERY SINGLE DAY THEY WAKE UP IN THAT HOME OF THE PROBLEM WITH CHINESE DRYWALL. THEY SMELL THE ODOR AND THE PROBLEM WITH THE ODOR, AND ALTHOUGH IT'S NOT MAYBE THE KIND OF ODOR WHEN YOU WALK THROUGH THE DOOR THAT HITS YOU IN THE FACE, IT'S THERE, IT'S CONSTANT, IT'S AFFECTED THEIR CLOTHING. THEIR FAMILY MEMBERS DON'T REALLY WANT TO COME AND SPEND THE NIGHT OR SPEND TOO MUCH TIME IN THE HOME, ESPECIALLY IF THEY HAVE CHILDREN BECAUSE THEY'RE CONCERNED ABOUT THIS CHEMICAL SMELL.

AND THE CORROSION HAS BEEN A NIGHTMARE FOR THEM. THEY'VE REPLACED REFRIGERATORS, MICROWAVE OVENS, TOASTERS, HVAC COILS, COMPRESSORS. I MEAN, THE COMPRESSOR THAT WE ALL SAW AT THE SITE VISIT WHICH LOOKED NICE OUTSIDE THE HOME WAS JUST REPLACED IN JANUARY. THIS WAS MAYBE A FOOTNOTE TO WHAT WE'LL BE DOING HERE TODAY, JUDGE, BUT WHEN WE TALK ABOUT THE REMEDY AT THE END OF THE DAY WHEN THE COURT ENTERS ITS JUDGMENT ON THIS, TIMING IS A BIG ISSUE. THAT COMPRESSOR THAT LOOKED PRETTY GOOD THAT WE LOOKED AT, IF THAT SITS THERE THROUGH THE SUMMER AND GOES INTO AUGUST OR SEPTEMBER, IT'S NOT GOING TO LOOK LIKE THAT BECAUSE IT'S GOING TO CONTINUE TO BE EXPOSED TO HUMIDITY, TEMPERATURE AND THE CORROSIVE GASES FROM THE CHINESE DRYWALL.

SO WHAT WE NEED TO DO HERE, BECAUSE THIS IS A BIG LITIGATION AND, YOU KNOW, NOTHING FOCUSES A LITIGATION BETTER THAN ONE TRIAL OF ONE HOME, ONE HOUSE, THAN THIS WILL, IS WE NEED TO COME UP WITH A SCOPE AND A PLAN THAT DOESN'T CUT CORNERS, AND I WOULD SUGGEST TO THIS COURT AND YOUR HONOR THAT THE PLAN PROPOSED BY KNAUF, ALTHOUGH IT SEEMS REASONABLE WHEN YOU LOOK AT THE FACT THAT THEY'RE WILLING TO REPLACE THE DRYWALL, CUTS CORNERS. AND NOTHING WILL HIGHLIGHT THAT I THINK TO THIS COURT BETTER THAN WHEN YOU REALLY START HEARING THE TESTIMONY FROM THE CONSTRUCTION EXPERTS, LIKE THE EXPERT THAT WE HAVE BROUGHT, AL MALLET WHO IS A REPUTABLE LOCAL CONTRACTOR, WE'LL TALK TO YOUR HONOR ABOUT THAT, AS OPPOSED TO FINDING SOMEBODY THAT WILL JUST GET YOU THE ROCK-BOTTOM PRICES AND DO THE MINIMAL AMOUNT NECESSARY.

ANOTHER POINT THAT JUST EASILY HIGHLIGHTS THIS IS THE ELECTRICAL. YOU LOOK AT THE TWO REPORTS THAT WE SUBMITTED FROM CONTRACTORS. AL MALLET HAS A PRICE IN THERE OF ABOUT 12 OR $13,000 FOR ELECTRICITY. RIPPING EVERYTHING OUT. THEY HAVE A CONTRACTOR THAT'S GOING TO TELL THIS COURT THAT HE CAN DO THAT JOB FOR $2,200. NOW, HERE IS WHERE THE COMMON SENSE PART OF THIS FITS IN AND WHERE THIS JUST DOESN'T MAKE ANY SENSE. I AM NOT DRAWING UPON PERSONAL EXPERIENCE, I THINK IF ANY OF US HAVE EVER DEALT WITH AN ELECTRICIAN, WE KNOW THAT TO GET AN ELECTRICIAN TO REPLACE 139 OUTLETS AND SWITCHES FOR $2,200, I REMEMBER THE FIRST TIME I SAW THAT I THINK I CHUCKLED AT IT, AND I THINK YOU'RE GOING TO CHUCKLE, YOUR HONOR, WHEN WE ASK MR. KRUGER QUESTIONS ABOUT HOW HE GOT TO

THAT PRICE.

SO WHAT'S THE APPROPRIATE REMEDY FOR THE HERNANDEZ FAMILY? IT'S GOING TO BE: OPEN UP THOSE WALLS, TAKE ALL OF THE DRYWALL OFF, TAKE ALL OF THE ELECTRICITY OUT, AND THERE'S A COUPLE OF REASONS WHY WE WILL DO THAT AND I AM GOING TO GET TO THAT IN A MINUTE, YOUR HONOR. TAKE OUT THE COPPER PIPES BECAUSE ALL OF THESE THINGS SHOW TARNISH AND CORROSION. WHAT YOU WILL HEAR FROM OUR SCIENTISTS IN THIS CASE IS THAT THE CORROSION IS GOING TO CONTINUE BECAUSE IT'S DEEP DOWN IN MICROSCOPIC PITS, THE PRODUCT OF THE CORROSION IS SOMETHING CALLED COPPER SULFIDE, WHICH IS ABOVE MY PAY GRADE, BUT THE EXPERTS WILL TALK ABOUT, AND ALL YOU NEED TO DO TO KEEP THAT PROCESS MOVING IS ADD A LITTLE BIT OF MOISTURE. AND WE DON'T MEAN WATER, YOU DON'T NEED TO HAVE RAINDROPS ON IT, MICROSCOPIC MOISTURE WILL KEEP THAT PROCESS GOING. SO IF YOU LEAVE IT BEHIND AND WE TURN OUT TO BE WRONG HERE, YOUR HONOR, FOR SOME REASON YOU THINK THAT THE DEFENDANT'S PLAN MAKES SOME SENSE AND WE'RE WRONG, WE'RE GOING TO BE OPENING UP THAT HOUSE AGAIN IN A FEW YEARS, BECAUSE THOSE SYSTEMS ARE GOING TO CONTINUE TO FAIL, THE ELECTRICAL SWITCHES WON'T WORK AND THERE IS A POTENTIAL FOR PROBLEMS EVEN GREATER THAN THAT.

SO WHAT AREN'T WE FIGHTING ABOUT, JUST TO SORT OF FRAME THE ISSUES IN THE CASE? WHAT WE'RE NOT GOING TO BE ARGUING ABOUT, YOUR HONOR, IS THE DRYWALL BECAUSE WE'VE STIPULATED TO SEVERAL THINGS WHICH ARE VERY IMPORTANT, AND I BELIEVE THE COURT HAS THE STIPULATION, AND WE WILL BE REFERRING TO IT OVER THE NEXT TWO OR

THREE DAYS.

THE DRYWALL IN THE HERNANDEZ HOME, IT'S MADE BY KNAUF, NO BATTLE OVER THAT. THE DRYWALL EMITS REDUCED SULPHUR GASES AND THE DRYWALL EMITS AN ODOR, WE'VE STIPULATED TO THAT, THERE IS NO DISPUTE ON THAT POINT. THE DRYWALL IS NOT FIT FOR THE ORDINARY AND INTENDED PURPOSES THAT IT'S SUPPOSED TO BE USED FOR. THAT WE'VE STIPULATED TO, SO YOUR HONOR DOESN'T HAVE TO DECIDE THAT ISSUE.

WHAT DO YOU HAVE TO DECIDE? THERE ARE TWO WAYS TO REALLY GET TO THE PROPOSAL THAT THE PLAINTIFFS MAKE TO THE COURT, TWO WAYS, AND I BELIEVE THAT OUR, THAT THE JUDGMENT AT END OF THE DAY WILL REFLECT OUR SCOPE OF REMEDIATION AND OUR PRICES.

THE FIRST WAY IS THAT YOU'RE GOING TO HEAR FROM OUR SCIENTIST THAT THE CORROSION IS GOING TO CONTINUE, THAT'S PLAN ONE, AND WE BELIEVE THAT THE COURT WILL FIND THAT TESTIMONY VERY COMPELLING AND SUPPORT FOR IT. PLAN TWO IS, IT'S JUST PRACTICAL. YOU WILL HEAR FROM BEAZER, AND YOU WILL HEAR TESTIMONY ABOUT WHAT LENNAR, THE BUILDERS, THE BIG BUILDERS IN THE COUNTRY ARE DOING ABOUT THIS. THEY ARE NOT DOING THIS OUT OF THE KINDNESS OF THEIR HEART, YOUR HONOR. IT MAKES SENSE THAT WHEN YOU RIP THOSE WALLS OPEN, IF YOU HAVE ANY DOUBT ABOUT WHAT'S GOING ON WITH THE ELECTRICAL SYSTEM OR THE PLUMBING, THAT'S THE TIME TO RIP IT OUT AND REPLACE IT, IT'S NOT THAT MUCH, IT'S NOT THAT EXPENSIVE TO DO ONCE THE HOUSE IS ALREADY OPENED UP.

THIS PLAN ABOUT SORT OF SNIPPING AND CUTTING AND LEAVING WIRES BEHIND AND LEAVING PLUMBING BEHIND AND, OH, THAT PIECE LOOKS

GOOD BUT ANOTHER PIECE HAS A LITTLE TARNISH ON IT, THAT'S JUST CUTTING CORNERS, AND WE WOULD RECOMMEND THAT THE COURT NOT ADOPT THAT.

SO THE TWO WAYS TO GET THE PLAINTIFFS IS, YOU'LL HEAR IT ON THE SCIENCE BUT AT END OF THE DAY IT'S JUST PRACTICAL TO DO.

THE WITNESSES YOU'LL HEAR FROM, YOUR HONOR, WHO WILL GIVE YOU VERY COMPELLING TESTIMONY. THE FIRST ONE YOU'RE GOING TO HEAR FROM IS MR. RUTILA FROM SGH, WHO IS AN EXPERIENCED ENGINEER WHO IS GOING TO TALK TO YOU ABOUT THE PROPER SCOPE OF REMEDIATION, HIS EXTENSIVE EXPERIENCE ALREADY WITH CHINESE DRYWALL, SOMETHING WE BELIEVE IS LACKING IN THE PLAINTIFF'S EXPERTS -- I'M SORRY, IN THE DEFENDANT'S EXPERTS, AND WHY THE BUILDING SYSTEMS NEED TO BE REPLACED AND HOW THE CORROSIVE ENVIRONMENT AND THE SULPHUR GASES WILL CONTINUE TO AFFECT THE SYSTEMS EVEN AFTER THE DRYWALL IS GONE.

THEN YOU WILL HEAR FROM MR. PHILLIPS FROM BEAZER, AND HE IS GOING TO TELL YOU, HE IS A NONPARTY IN THIS CASE, IT'S VERY COMPELLING TESTIMONY, HE IS GOING TO TELL YOU WHAT A MAJOR BUILDER IS DOING TO REMEDY THIS PROBLEM. AND AGAIN, THEY ARE NOT DOING THIS OUT OF THE KINDNESS OF THEIR HEART, IT IS JUST THE MOST EFFICIENT WAY TO REMEDY THE PROBLEM OF CHINESE DRYWALL; THAT IS, TO TEAR OUT EVERYTHING AND START OVER AGAIN.

MR. KRANTZ, WHO IS OUR CORROSION EXPERT, WILL TALK TO YOU ABOUT COPPER SULFIDE CORROSION THAT'S CAUSED BY THE REDUCED SULPHUR GASES, HOW IT WILL CONTINUE AFTER THE DRYWALL IS GONE, WHY THE CORROSION NEEDS TO BE RIPPED OUT AND REPLACED AND THAT IT CANNOT BE

WIPED CLEAN. THERE IS NO METHOD, THERE IS NO ACCEPTABLE METHOD FOR CLEANING IT; AND EVEN IF YOU TRIED TO, IT'S STILL GOING TO BE THERE. AND THEIR FAILURE RATES FOR ELECTRICAL SYSTEMS AND THEIR COMPONENTS, IF YOU LEAVE THE TARNISH AND THE CORROSION ON THERE.

MR. GALLER WILL TALK TO YOU ABOUT THE APPLIANCES AND HOW THAT HAPPENS, AND FINALLY, YOUR YOU'LL HEAR FROM MR. MALLET IN THIS CASE.

YOUR HONOR, AT THE END THE PLAINTIFFS ARE GOING TO ASK THIS COURT TO ENTER A JUDGMENT, ADOPTING THE PLAINTIFF'S SCOPE OF REMEDIATION AND THE PRICING SYSTEM THAT WE'VE SUBMITTED TO YOUR HONOR AND YOU'LL HEAR THROUGH TESTIMONY. THANK YOU FOR YOUR TIME.

THE COURT: THANK YOU. LET'S HEAR FROM THE DEFENDANTS, PLEASE.

MR. HAYDEN: CERTAINLY, YOUR HONOR. DON HAYDEN ON BEHALF OF KNAUF PLASTERBOARD TIANJIN. I'VE ALREADY INTRODUCED THE REST OF OUR TEAM, AND WE APPRECIATE THE OPPORTUNITY TO BE BEFORE YOU.

WE ALSO WANTED TO THANK THE PLAINTIFFS FOR THEIR COOPERATION IN GETTING THIS TRIAL READY FOR TRIAL IN FRONT OF YOU. WE HAVE WORKED HARD OVER WEEKENDS AND OVER THE LAST FEW WEEKS GETTING THE DEPOSITIONS DONE SO THAT WE COULD BE BEFORE YOU ON THIS EXPEDITED BASIS.

WE RECOGNIZE THAT THE END GOAL OF THE COURT IS TO GET SOME HOMES FIXED, TO GET THE HOUSES REPAIRED AND GET THE PEOPLE BACK IN THEM, AND MY CLIENT IS CERTAINLY CONSCIOUS OF THAT. AND WE THANK THE COURT FOR ITS PATIENCE TODAY AND ITS CONTINUED PATIENCE

AS WE MOVE FORWARD ON THIS EXPEDITED TRACK.

THE MANAGEMENT OF KPT CERTAINLY UNDERSTANDS THE CONCERNS OF THE HERNANDEZES AND SOME OF THE OTHER HOMEOWNERS THAT WE HAVE HERE IN THE UNITED STATES THAT ARE EXPERIENCING THE IMPACTS OF CHINESE DRYWALL. AND WE UNDERSTAND AND WANT TO PROVIDE ASSISTANCE IN GETTING THEIR HOMES BACK WHERE THEY SHOULD BE IN THESE SITUATIONS WHERE MY CLIENT'S PRODUCT IS INVOLVED.

BUT WE ALSO ASK THAT YOU PUT YOURSELVES IN THE SHOES OF MY CLIENT, WHO HAS BEEN HAULED INTO THIS COURT HALFWAY ACROSS THE GLOBE. WE'RE THE ONLY MANUFACTURER WHO BRANDED OUR PRODUCT AND WERE THE CENTER OF THE CONTROVERSY HERE FOR MANY, MANY MONTHS. WHILE OTHERS SIT IN THE SIDELINES.

WE BELIEVE THAT WE'VE PROVIDED AND WILL PROVIDE TO THE COURT A REASONABLE AND EFFICIENT COST REPAIR FOR THE HERNANDEZ HOME AND FOR OTHER HOMES THAT WILL BE BEFORE THE COURT.

THINGS THAT YOU NEED TO KEEP IN FOCUS AS WE GO FORWARD: THE HERNANDEZ HOME IS ABOUT 1,900 SQUARE FEET; WITH THE GARAGE, I THINK IT'S 2,000 SQUARE FEET. AND 90 PERCENT OF THE HOME IS KPT BOARD, IS MY CLIENT'S BOARD, WE ADMIT TO THAT. THERE'S SOME DOMESTIC BOARD IN THERE MAYBE IN THE KITCHEN OR IN THE BATHROOM. AND THE PARTIES HAVE AGREED TO THE JOINT STIPULATION THAT MY OPPOSING COUNSEL HAS DISCUSSED, THE NARROWING OF THIS CASE TO A VIOLATION OF THE LOUISIANA STATUTE ON REDHIBITION, AND WE'VE ADMITTED THAT THE DRYWALL IN THE HOME UNITS REDUCE CERTAIN SULPHUR GASES.

WE'RE TALKING ABOUT ONE OR TWO PARTS PER BILLION AT BEST, WELL BELOW ANY CONCERNS FOR HEALTH ISSUES FROM THE STANDARDS THAT WE HAVE OUT FROM THE GOVERNMENT AGENCIES AND OTHER STANDARDS. WE HAVE ADMITTED THAT GIVEN THE ODOR AND THIS SULPHUR EMISSIONS THAT THE PRODUCT WAS NOT FIT FOR ITS PARTICULAR PURPOSE.

AND WE'RE GOING TO FOCUS ON, REALLY, WHAT'S THE APPROPRIATE REMEDY HERE, WHAT IS IT GOING TO COST TO REPAIR THE HOUSE. AND I GUESS DRAWING FROM PLAINTIFF'S PLAY BOOK, YOUR HONOR, SCIENCE GUIDES US. WE AGREE WITH THE PLAINTIFFS THAT WE MUST FIRST LOOK TO SCIENCE, AND WE'VE BROUGHT IN SOME VERY RECOGNIZED SCIENTISTS FROM ACROSS THE COUNTRY IN THEIR PARTICULAR SPECIALTY AREAS. YOU'RE GOING TO HEAR FROM DR. PERRICONE. DR. PERRICONE, IF YOU COULD GO BACK, DR. PERRICONE IS A MATERIAL SCIENTIST; YOU'RE GOING TO HEAR FROM DR. LEE. DR. LEE IS THE FOUNDER OF RJ LEE GROUP, A VERY RESPECTED CONSULTING GROUP HERE IN THE UNITED STATES, LOOKING AT ISSUES WITH REGARD TO CONTAMINATION, WITH REGARD TO REMEDIATION, WAS VERY INVOLVED IN THE ISSUES WITH REGARD TO CONTAMINATION, THE PROBLEMS AFTER 9/11.

YOU'RE GOING TO HEAR FROM CRAIG BEYLER, OUR FIRE SAFETY ENGINEER, WHO WILL TALK TO YOU ABOUT DIFFERENT TESTING THAT HE DID ON ELECTRICAL WIRES AND ELECTRICAL DEVICES IN THE HERNANDEZ HOME AND THAT THE SYSTEM IS IN COMPLIANCE WITH UL STANDARDS, THE UNITED LABORATORY STANDARDS, WHICH IS, REALLY, THE STANDARD THAT WE LOOK TO IN THAT AREA.

AND WE ALSO HAVE, IN THE EVENT THAT WE HAVE TO GO INTO

HEALTH ISSUES, THEN BY STIPULATION WE HAVE HOPED TO KEEP IT OUTSIDE OF THE HEALTH ISSUES AND JUST FOCUS ON THE PROPERTY DAMAGE. BUT TO THE EXTENT THAT THERE IS SOME GRAY AREA AND WE NEED TO GO THERE, DR. GOAD HAS BEEN WITH US FOR MANY MONTHS BECAUSE HEALTH WAS OUR FIRST CONCERN, AND WE BELIEVE THAT THERE ARE NO SHORT OR LONG TERM HEALTH IMPACTS AND WE WILL BE LOOKING AT THE PROPERTY DAMAGE HERE AND HOW TO FIX IT.

LET'S LOOK AT DR. PERRICONE. THE THREE THINGS THAT, MOST IMPORTANT THINGS THAT YOU SHOULD COME AWAY WITH FROM DR. PERRICONE IS THAT THE TARNISHED FILM ON THE UNPROTECTED COPPER WIRE DOES NOT COMPROMISE THE STRUCTURAL INTEGRITY OF THE COMPONENTS. WHAT DO I MEAN THERE IS THE COPPER WIRE THAT IS UNINSULATED AT THE CONNECTIONS WILL SHOW A BLACK TARNISH, THAT'S ONE OF THE PRIMARY SYMPTOMS UNDER THE FLORIDA DEPARTMENT OF HEALTH FOR DETERMINING IF THERE IS CHINESE DRYWALL IN THE HOME. BUT AS WE WILL SHOW, THAT TARNISH DOES NOT COMPROMISE THE INTEGRITY OF THE SYSTEM OR THAT CONNECTION.

PROTECTED WIRE, THE METAL-TO-METAL CONTACTS WHERE THE CONNECTION, WHERE THE ELECTRICAL CIRCUIT ACTUALLY PASSES, ARE UNCOMPROMISED. YOU'RE GOING TO SEE PICTURES OF BRIGHT, SHINY METAL WHEN THE INSULATED WIRE IS PEELED BACK. YOU'RE GOING TO SEE PICTURES OF BRIGHT, SHINY COPPER WHERE THE CONNECTION WAS MADE WITH THE COPPER WIRE AT THE SWITCHES AND RECEPTACLES.

WE'RE ALSO GOING TO BE TALKING ABOUT THE IMPACT ON PLUMBING. WE BELIEVE THAT WHILE THERE WILL BE A BLACK TARNISH ON

PLUMBING, IT'S SUPERFICIAL, IT'S NOT GOING TO IMPACT AND COMPROMISE THE STRUCTURAL INTEGRITY OF THOSE COMPONENTS.

AND YOU'RE GOING TO SEE A LOT OF PHOTOGRAPHIC EVIDENCE, YOU'RE GOING TO SEE PIPES AND WIRES THAT YOU CAN HOLD IN YOUR HAND, AND YOU'RE GOING TO SEE PIPES AND WIRES AT 1,000 TIMES MAGNIFIED. HERE IS AN EXAMPLE OF WHAT THE WIRES LOOK LIKE IN MAGNIFIED CONTEXT, THIS IS UNDER THE SEM, YOU'RE GOING TO HEAR A LITTLE BIT ABOUT SEM, I BELIEVE IN THE PRIOR TRIAL THAT YOU HAD YOU HEARD A LITTLE BIT ABOUT THAT.

ON YOUR LEFT, THIS IS A WIRE THAT WAS PULLED FROM THE HERNANDEZ HOUSE. ON THE LEFT IS AN AFFECTED OR IMPACTED GROUND WIRE, AND YOU'LL HEAR A LOT ABOUT THE HOT AND NEUTRAL WIRES AND ALSO ABOUT THE GROUND WIRE. ON THE LEFT IS THE GROUND WIRE THAT WAS TAKEN FROM THE HERNANDEZ HOUSE AND ON THE RIGHT IS THE NEW WIRE. AND THERE WILL BE SOME TESTIMONY ABOUT WHETHER, ON A CROSS-SECTIONAL BASIS, THERE HAS BEEN SUFFICIENT IMPACT TO CAUSE AN IMPACT ON THE FUNCTIONAL INTEGRITY OF THAT WIRE AND THE ELECTRICAL SYSTEM.

AND AS YOU'LL SEE, THERE IS -- THERE'S NOT MUCH DIFFERENCE BETWEEN THE IMPACTED WIRE AND THE NEW WIRE, AS YOU LOOK AT THEM UP CLOSE. AND CERTAINLY IT DOES NOT REACH THE LEVEL THAT WOULD REQUIRE SOME IMPACT ON FUNCTIONALITY.

IF WE GO TO THE NEXT SLIDE, LIVE AND NEUTRAL WIRES IN THE HERNANDEZ HOUSE ARE NOT IMPACTED. YOUR HONOR, IF I COULD, HERE IS A SWITCH, AND YOU'LL SEE THE VARIOUS WIRES THAT GO OUT OF THAT

SWITCH AND THE VARIOUS CONNECTIONS THAT YOU HAVE, THE GROUND WIRES, AND WHAT WE'VE DONE, YOUR HONOR, IS TO SHOW YOU, IF ON THE LEFT HERE IS THE WIRES BEFORE THE INSULATION HAS BEEN REMOVED. IF YOU GO TO THE RIGHT, YOU'LL SEE AFTER THE INSULATION HAS BEEN REMOVED WHERE YOU MIGHT SEE THE BLACKENING, THE TARNISH AS WE CALL IT, OTHERS CALL IT CORROSION, YOU'RE GOING TO SEE THE BRIGHT, SHINY COPPER UNDERNEATH THE WIRES. MR. BEYLER, MR. LEE, MR. PERRICONE, WILL ALL TESTIFY THAT THE SYSTEM WILL NOT BE IMPACTED, THERE WILL NOT BE A LACK OF FUNCTIONALITY IN THE ELECTRICAL SYSTEM, AND THAT THE BLACKENING THAT YOU SEE WITH THE UNINSULATED COPPER IS NOT SOMETHING THAT WILL FOLLOW-UP THROUGHOUT THE INSULATED WIRE.

NOW, YOU'LL SEE SOME LAMP CORD, I THINK YOU MAY HAVE SEEN IT IN THE LAST TRIAL, THAT'S A DIFFERENT CIRCUMSTANCE AND WE WILL TALK A LITTLE BIT ABOUT THAT, IT DOESN'T HAVE THE TRUE PROTECTION THAT YOU WOULD SEE WITH THE HARD PLASTIC SHEATHING THAT YOU HAVE HERE.

IF WE GO TO THE NEXT SLIDE. THIS HAS TO DO WITH THE PLUMBING. ONCE AGAIN, THERE'S BEEN SOME QUESTIONS RAISED ABOUT WHETHER OR NOT THERE IS AN IMPACT, SOME PITTING, SOME CORROSION OF THE PIPES SUCH THAT THOSE WOULD BE IMPACTED. YOUR HONOR, THIS IS THE COLD WATER PIPE THAT CAME ACTUALLY OUT OF THE HERNANDEZ HOUSE. YOU'LL NOTICE WHAT APPEARS TO BE SOME PITTING, CORROSION IN THE INNER DIAMETER OF A PIPE THERE, THAT'S INSIDE THE PIPE. THAT'S NOT SOMETHING THAT HAS TO DO WITH SULPHUR EMISSIONS (INDICATING).

ACTUALLY ON THE SAME PIPE WE HAVE THE OUTER DIAMETER,

WHICH IS EXPOSED TO THE SULPHUR EMISSIONS IN THE HOUSE, AND YOU'RE NOT SEEING ANY CORROSION, ANY IMPACT. ONCE AGAIN, THE PIPE WALL IS NOT BEING COMPROMISED, CERTAINLY NOT, AND THESE ARE LEVELS OF HIGH MICROSCOPY. AND YOU'LL SEE, ONCE AGAIN, THIS IS AN INTERIOR EXAMPLE AND YOU SEE THAT THERE IS, SO YOU'RE ACTUALLY SEEING CORROSION INSIDE OF THE PIPE WALL, NOT ON THE OUTSIDE WHERE THE SULPHUR GASES ARE LOCATED.

MR. SEEGER: EXCUSE ME, YOUR HONOR, I HATE TO INTERRUPT COUNSEL DURING HIS OPENING, BUT I THINK I HAVE TO MAKE TWO QUICK OBJECTIONS AT THIS POINT. THE COURT HAD ASKED US TO EXCHANGE, I THOUGHT, PHOTOS AND THINGS LIKE THAT IN THE OPENING. WE DIDN'T USE ANY, BUT WE NEVER RECEIVED THESE, BUT I HAVE TO PUT IT ON THE RECORD, AND THEN THE OTHER PART OF IT IS.

I BELIEVE THAT THIS IS REALLY ARGUMENT IN THE OPENING STATEMENT, YOUR HONOR.

MR. HAYDEN: YOUR HONOR, THAT'S THE LAST OF THE PHOTOS, I JUST WANTED TO GIVE YOU AN IDEA OF WHERE THE SCIENCE IS TAKING US WITH REGARD TO MR. PERRICONE.

DR. LEE IS GOING TO FOCUS MORE ON THE REMEDIATION AND WHAT THE APPROPRIATE REMEDIATION IS THAT WILL ELIMINATE THE CAUSE OF THE SULPHUR-RELATED TARNISHING, THE CORROSION AND THE ODOR.

AND THEN WE HAVE DR. BEYLER, AND BEYLER IS FOCUSED ON FIRE SAFETY AND LOOKING AT INCREASES IN TEMPERATURE RISE BY TESTING THE WIRES AND THE DEVICES THAT ARE USED IN THE ELECTRICAL SYSTEM. HE TESTED THE SAMPLES TO MEASURE TEMPERATURE RISES, DID NOT FIND

ANYTHING THAT WOULD INDICATE THAT THE RECEPTACLES AND CONNECTIONS WERE NOT MEETING UL LISTING STANDARDS FOR NEW DEVICES.

I THINK YOU'LL HEAR SOME TESTIMONY FROM DR. KRANTZ AND OTHERS ABOUT TESTING THAT THEY DID THAT DID NOT SHOW ANY COMPROMISES AS WELL. HE DID SOME OTHER TESTING WITH REGARD TO THE NEUTRAL AND HOT WIRES BEING ATTACHED TO THE SWITCHES AND THEN THERE IS ALSO THE NEUTRAL GROUND WIRE. AND YOU'LL HEAR TESTIMONY ABOUT HOW A GROUND WIRE UNDER ROMEX CORD, WHICH IS A ROMEX SHEATHING, WHICH IS A LOOSE SHEATHING THAT IS PUT AROUND THE WIRES, THAT THERE IS SOME TARNISHING OF THE GROUND WIRE. ONCE AGAIN, WE'LL HAVE EVIDENCE THAT THE ELECTRICAL SYSTEM IS NOT IMPACTED BY THAT.

SO WE'VE LOOKED AT THE SCIENCE, BUT I THINK IT'S IMPORTANT TO NOT ONLY TO LOOK AT THE SCIENCE BUT TO LOOK AT THE PRACTICALITIES, AND WHAT WE TRIED TO DO FOR THE COURT TODAY AND WILL PROVIDE OVER THE COURSE OF THE TRIAL IS LOOKING AT IT FROM THE FOLKS THAT ARE IN THE FIELD, THE TRADESMEN. THE PEOPLE THAT HAVE THEIR BOOTS ON THE GROUND AND HAVE DEALT WITH ISSUES OF CORROSION, THEY'VE DEALT WITH THE AFTERMATH OF KATRINA, THEY WERE HERE WHEN THIS CITY WAS FLOODED, HOMES WERE FLOODED WITH BRACKISH CORROSIVE TOXIC WATERS FOR DAYS, WEEKS, MONTHS, AND THEY WERE THE ONES THAT WERE OUT THERE RESOLVING THOSE ISSUES.

YOU'RE GOING TO HEAR FROM ROY CARUBBA, HE IS A LICENSED CIVIL ENGINEER AND HE IS A GENERAL CONTRACTOR HERE IN THE METROPOLITAN NEW ORLEANS AREA. HE'LL TESTIFY ABOUT HIS EXPERIENCES, HIS BACKGROUND, HOW HE HAS DONE MANY OF THESE TYPES OF

RENOVATIONS AND REPAIRS OF HOMES. HE WAS VERY INVOLVED IN REPAIRING HOMES AFTER KATRINA. BEHIND HIM IS MARK HARTENSTEIN, AN ELECTRICIAN AND A PLUMBER. SO WE'VE GOT JOE PLUMBER, WE'VE GOT JOE THE ELECTRICIAN, AND WE'VE GOT RAY CANZONERI, WHO IS AN ELECTRICAL ENGINEER WHO WILL TALK A LITTLE BIT ABOUT THE CODE AND HOW IT APPLIES.

IF YOU WERE TO LISTEN TO THE PLAINTIFFS, YOUR HONOR, THIS CASE IS ALL ABOUT SIX INCHES, SIX INCHES. YOU'RE GOING TO HEAR A LOT ABOUT THE SIX-INCH RULE AND YOU'RE GOING TO HEAR A LOT ABOUT DUST AND YOU'RE GOING TO HEAR ABOUT A POSSIBILITY THAT THERE MIGHT BE SOME FUTURE FAILURE ANALYSIS, SOMETHING MIGHT HAPPEN IN THE FUTURE.

NOW, WE'VE GOT TRADESMEN THAT KNOW WHAT TO DO WITH SIX INCHES, THEY'RE OUT IN THE FIELD, THEY KNOW WHY THE SIX INCHES IS PUT IN THE BOXES, IT'S FOR THIS VERY PURPOSE, FOR THEN WHEN YOU ARE REPLACING AND REPAIRING, THAT YOU HAVE SIX INCHES OF AVAILABLE WIRE TO APPROPRIATELY PUT IN THIS SWITCH OR RECEPTACLE. BUT WHAT PLAINTIFFS ARE SUGGESTING IS BECAUSE OF THE SIX-INCH RULE, THE WHOLE HOUSE HAS TO BE REPLACED, AND YOUR HONOR, I SUBMIT THAT YOU HAVE TO LOOK AT THE PRACTICALITIES, YOU HAVE TO GO TO THE TRADESMEN, YOU HAVE TO UNDERSTAND WHAT THEY DO IN THE FIELD.

I THINK THAT YOU'LL FIND THAT BOTH SCIENCE AND THE PRACTICALITIES AGREE THAT TEARING THE HERNANDEZ HOUSE UP IS NOT NECESSARY, THE SCOPE OF WORK THAT THEY'RE -- THEY WANT TO BE ADOPTED BY THIS COURT IS ONE THAT IS NOT GROUNDED IN SCIENCE AND IS

GROUNDED IN UNCERTAINTY AND ON POSSIBILITIES.

THE PLAINTIFF'S REMEDIES IS OVERREACHING FOR SEVERAL REASONS: IT'S EXCESSIVE IN SCOPE. LET'S BE CLEAR. THE HERNANDEZ ELECTRICAL SYSTEM HAS NOT FAILED, LIFE SAFETY SYSTEMS HAVE NOT FAILED, ALTHOUGH WE INTEND TO REPLACE THE FIRE ALARM AND WE INTEND TO REPLACE ANY OTHER LIFE SAFETY ALARMS IN THE HERNANDEZ HOUSE. THE PIPES HAVE NOT LEAKED. THEY'RE SUGGESTING THE REMOVAL OF NONIMPACTED MATERIALS AND COMPONENTS WITHOUT JUSTIFICATION OR BASED UPON SOME JUST AMORPHIC COST BENEFIT ANALYSIS.

I BELIEVE THAT YOU'RE ALSO GOING TO HEAR A LOT FROM THEIR SCIENTISTS ABOUT THE RISK OF FUTURE FAILURE, BUT NO ONE IS GOING TO OFFER YOU ANY EVIDENCE OF FAILURES THAT HAVE EXISTED THAT CAN BE CAUSALLY RELATED TO THE SULPHUR EMISSIONS, AND I BELIEVE THAT WE HAVE TO LOOK AT AND I BELIEVE THE STANDARDS THAT THE COURT HAS TO LOOK AT IS PROBABILITY, NOT POSSIBILITY. NO ONE HAS ESTABLISHED THAT THE FAILURE OF PERSONAL ELECTRONICS OR APPLIANCES IN THE HERNANDEZ HOUSE IS RELATED TO THE CHINESE DRYWALL INSULATION.

HERE IS WHERE WE COME DOWN. THE ELECTRICAL SYSTEM SHOULD REMAIN. ONCE THE DRYWALL IS REMOVED, THE SOURCE, THE SULPHUR EMISSIONS ARE GONE. ANY TARNISHING OR PITTING OF THE WIRES, THE WIRE CONNECTION, THE GROUND WIRES, WILL END WITH NO MATERIAL IMPACT ON THE FUNCTIONALITY. THE REMOVAL SHOULD SOLVE THE PROBLEM. THERE'S NO EVIDENCE THAT THE FUNCTIONALITY WILL BE IMPACTED AT A LATER DATE. THERE IS NO EVIDENCE THAT THE PITTING THAT IS BEING CLAIMED BY THE PLAINTIFFS, AND I'M TALKING ABOUT PITTING ON THE

ELECTRICAL WIRING AND THE ELECTRICAL SYSTEMS, WILL CONTINUE. THE PITTING THAT IS TALKED ABOUT IS NOT SELF-SUSTAINING, AND WE'LL TALK A LITTLE BIT MORE ABOUT THAT IN THE NEXT SLIDE WHEN WE'RE LOOKING AT WHY PIPES SHOULD REMAIN.

THE PRESENCE OF THE TARNISH ON THE PIPES, IT DOESN'T CAUSE CONTINUED OR ACCELERATED CORROSION. ONCE WE REMOVE THE SOURCE, ONCE WE GET RID OF THE DRYWALL, THE PITTING STOPS, THE TARNISHING STOPS. PITS THAT WERE OBSERVED ARE NOT SELF-SUSTAINING. NOW, YOU'RE GOING TO HEAR SOME TESTIMONY ABOUT, WELL, THERE'S A POSSIBILITY THAT THEY CAN SUSTAIN, COULD BE SELF-SUSTAINING.

NOW -- AND THE LEARNED TREATISES OR THE REPORTS OF PRIOR EXPERTS, DR. SCULLY I BELIEVE, ARE BASED UPON INSTANCES WHERE THEY WERE DOING STUDIES OF ELECTRICAL DEVICES AND EQUIPMENT THAT ARE SUBMERGED IN WATER. I SUBMIT TO THE COURT THE HERNANDEZ HOUSE IS NOT SUBMERGED IN WATER. THE HERNANDEZ'S HOUSE IS NOT AN AQUEOUS ENVIRONMENT, THERE IS NO EVIDENCE THAT THERE IS A SITUATION WHERE THERE WOULD BE CONTINUED PITTING AND THE ELECTRICAL SYSTEM OR THE PLUMBING WOULD IN ANY WAY, SHAPE, OR FORM MALFUNCTION AFTER WE'VE REMOVED THE DRYWALL.

THE HVAC SYSTEM IS A DIFFERENT SITUATION, THE HVAC COPPER COILS. THEY OPERATE IN A VERY UNIQUE ENVIRONMENT, BECAUSE THERE WAS SOME DISCUSSION, I BELIEVE, THE LAST TIME YOU HAD SOME EXPERTS IN FRONT OF YOU, IT'S AN INAQUEOUS ENVIRONMENT, IT'S IN A SITUATION WHERE YOU HAVE THESE COPPER COILS, WHICH HAVE COOL FREON PASSING THROUGH THEM, YOU HAVE AIR BLOWING ON THEM WHICH DEVELOPS

CONDENSATION ON THOSE COILS, WHICH ACCELERATES THE REACTION BETWEEN THE COPPER AND THE SULFIDE GASES AND RESULTS IN PITTING AND RESULTS IN THE FAILURES THAT WE'VE SEEN IN SOME OF THESE CHINESE DRYWALL HOUSES OF THE HVAC SYSTEMS, BUT THAT'S SEPARATE AND APART FROM ANY OF THE OTHER SITUATIONS. IF YOU HAVE WATER ON ELECTRICAL CONNECTIONS, YOU HAVE FAR GREATER PROBLEMS HERE. THERE IS NO WATER, IT IS NOT SELF-SUSTAINING AND THE DRYWALL CAN BE REMOVED.

FINALLY, YOUR HONOR, I WOULD ASK THAT, WE WILL BE TALKING ABOUT WHY THEIR TEARDOWN IS INFLATED. THE TEARDOWN THAT IS BEING SUGGESTED BY THEIR EXPERT, MR. MALLET, IS FOUR TIMES THAT OF THE TEARDOWN THAT WAS PROPOSED BY OUR GENERAL CONTRACTOR. FOUR TIMES WHAT HE PROPOSED. AND WE'LL GO THROUGH A FEW OF THE LINE ITEMS AND SEE WHERE HE MAY HAVE MISCALCULATED, WHERE THERE'S EXAGGERATION, WHERE THERE IS ELEMENTS THAT REALLY AREN'T A PART OF AN APPROPRIATE CONSTRUCTION REPAIR PROJECT.

THIS IS NOT AN ASBESTOS ABATEMENT CASE, THIS IS NOT A SITUATION WHERE THERE IS SUFFICIENT EVIDENCE TO SAY THAT WE HAVE TO GO INTO THIS HOUSE IN BIG, OLD WHITE SPACE SUITS. THIS IS YOUR TYPICAL CONSTRUCTION PROJECT. IT'S A CONSTRUCTION PROJECT, IF DONE APPROPRIATELY, AND UNDER THE NORMAL AND ORDINARY PRACTICE, WHERE DUST CAN BE CONTAINED, YOU WILL HAVE AN EFFECTIVE, A COST-EFFECTIVE AND EFFICIENT REMEDIATION OF THIS HOUSE IN 60 DAYS ACCORDING TO MR. CARUBBA. ACTUALLY, TO SORT OF VALIDATE THAT, THE COST THAT IS BEING SUGGESTED FAR EXCEEDS THE ACTUAL COST OF BUILDING THIS HOUSE.

AND FINALLY, YOU'RE GOING TO HEAR FROM MR. PHILLIPS.

MR. PHILLIPS FROM BEAZER HOMES, HE DOES HAVE SOME HISTORY WITH REMEDIATING HOMES. I BELIEVE THEY ARE IN THE PROCESS OF REMEDIATING IN VARIOUS STAGES 15 HOMES OR THEREABOUTS. THEY'VE MOVED ALONG ON FOUR TO SIX, I BELIEVE FOUR TO SIX ARE NEAR COMPLETION. TWO OF THEIR PROPERTIES, ACTUALLY THE FAMILIES ARE GOING TO GET IN IN THE NEXT FEW WEEKS. BUT I AM GOING TO QUESTION MR. PHILLIPS ON THE COSTS THAT THEY INCURRED AND I AM -- AND WE WILL MAKE AN APPLES-TO-APPLES COMPARISON, I AM GOING TO SHOW, I BELIEVE, THAT THE COSTS THAT BEAZER HAS INCURRED IN IMPLEMENTING THE VERY SAME PROTOCOL THAT THEY WANT TO USE HERE WAS LESS THAN HALF OF WHAT THE PLAINTIFFS ARE PROPOSING HERE.

AND WITH THAT, YOUR HONOR, I'D ASK THAT WE MOVE FORWARD WITH THE EVIDENCE IN FRONT OF YOU. THANK YOU.

THE COURT: ALL RIGHT. THANK YOU VERY MUCH. LET'S HEAR FROM THE PLAINTIFF, PUT ON YOUR EVIDENCE, PLEASE.

MR. SEEGER: YOUR HONOR, WE CALL MR. DEAN RUTILA.

THE DEPUTY CLERK: WOULD YOU RAISE YOUR RIGHT HAND.

(WHEREUPON, DEAN A. RUTILA, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK: PLEASE BE SEATED. AND WOULD YOU STATE YOUR NAME FOR THE RECORD.

THE WITNESS: DEAN A. RUTILA.

THE DEPUTY CLERK: WOULD YOU SPELL THE LAST NAME.

THE WITNESS: R-U-T-I-L-A.

THE DEPUTY CLERK: THANK YOU.

VOIR DIRE EXAMINATION

BY MR. SEEGER:

Q. GOOD MORNING, MR. RUTILA.

A. GOOD MORNING.

Q. LET'S START WITH A LITTLE BIT OF YOUR BACKGROUND SO THAT THE COURT GETS A SENSE OF WHAT YOUR EXPERTISE IS AND WHAT THIS IS ABOUT, OKAY?

A. FAIR ENOUGH.

Q. WHERE DO YOU WORK?

A. I WORK AT SIMPSON, GUMPERTZ AND HEGER, WE ARE A 400-PLUS PERSON MULTIDISCIPLINARY ENGINEERING FIRM, SCIENTISTS AND ENGINEERS THAT WORK ON BUILDINGS AND STRUCTURES OF NEARLY ALL TYPES.

Q. AND WHAT IS YOUR POSITION AT THAT FIRM?

A. I AM A SENIOR PRINCIPAL AND A DIRECTOR OF THE FIRM.

Q. NOW, WHAT TYPE OF PROJECTS DO YOU FOLKS AT SGH -- DO YOU MIND IF I REFER TO IT AS SGH?

A. THAT'S FINE.

Q. WHAT TYPE OF PROJECTS DO YOU FOLKS TAKE ON THERE?

A. WE REALLY WORK ON ALL MANNERS OF BUILDINGS AND MOST STRUCTURES THAT WE HAVE IN THIS COUNTRY, BRIDGES, RADIO TELESCOPES, TUNNELS, PIPES, AND VIRTUALLY ANYTHING YOU CAN IMAGINE ON A BUILDING.

Q. AND DO YOU WORK ON RESIDENCES?

A. OH, YES, I WORK ON MANY RESIDENCES MYSELF; SOME OF THE GUYS THAT DO RADIO TELESCOPES DON'T DO MANY.

Q. WELL, WHEN YOU SAY MANY, WHY DON'T YOU QUANTIFY THAT FOR US A

LITTLE BIT.

A. I'VE PERSONALLY WORKED ON THOUSANDS OF INDIVIDUAL RESIDENCES OVER THE 30 YEARS OF MY CAREER.

Q. AND COULD YOU GIVE THE COURT JUST WHAT YOUR EDUCATIONAL BACKGROUND IS?

A. I HAVE A BACHELOR'S DEGREE AND MASTER'S DEGREE IN CIVIL ENGINEERING FROM THE UNIVERSITY OF MICHIGAN, THE MASTER'S DEGREE I RECEIVED IN 1979. AND THAT'S MY FORMAL EDUCATION.

Q. AND, MR. RUTILA, ARE YOU LICENSED IN ANY STATES?

A. YES. I AM LICENSED IN, A LICENSED PROFESSIONAL ENGINEER IN 23 STATES, INCLUDING LOUISIANA.

Q. AND TALK TO US A LITTLE BIT ABOUT YOUR WORK HISTORY, HOW DID YOU GET INTO THIS FIELD?

A. WELL, I GREW UP ON A CONTRACTOR'S KNEE, I'VE BEEN ON CONSTRUCTION SITES VIRTUALLY ALL OF MY LIFE, CERTAINLY SINCE I WAS EIGHT. I USED TO DRIVE THE CREW WITH MY YOUNGER BROTHER. AND I PAID FOR MY COLLEGE WORKING IN VARIOUS CONSTRUCTION ACTIVITIES, FROM ACTUALLY BUILDING HOMES TO WORKING ON POWER PLANTS, SURVEYING, DRAFTING, MANY OF THE ACTIVITIES IN THE ENGINEERING PROFESSION.

AFTER GRADUATING WITH A MASTER'S DEGREE, I'VE BEEN 30 YEARS NOW DESIGNING, INVESTIGATING, PARTICIPATING IN RENOVATION AND CONSTRUCTION OF VIRTUALLY ALL TYPES OF BUILDINGS THAT WE CAN IMAGINE.

Q. AND GETTING INTO THAT A LITTLE BIT, CAN YOU TALK TO THE COURT A LITTLE BIT ABOUT WHAT TYPE OF PROJECTS YOU'VE BEEN INVOLVED IN THAT

ROUND OUT YOUR EXPERIENCE FOR GIVING OPINIONS IN COURT?
A. THE PROJECT LIST IS VERY, VERY LONG, BUT PARTICULARLY FOCUSED ON MULTIDISCIPLINARY PROJECTS, WHICH IS REALLY THE CHARACTERISTIC OF THE CHINESE DRYWALL WORK, WHERE I HAVE TO BRING IN AND WORK WITH SCIENTISTS AND ENGINEERS WITH A BROAD RANGE.

AND WE CAN JUST START LOOKING AT EXAMPLES OF THAT, ONE MIGHT BE THE POLK COUNTY COURTHOUSE IN BARTOW, FLORIDA. I FIRST SAW IT WHEN IT WAS ABOUT A YEAR OLD, BRAND-NEW BUILDING, ABOUT 20-SOME MILLION DOLLARS TO BUILD IT, AND WE SPENT MORE MONEY TO FIX IT. AND PART OF THE INVESTIGATION, REALLY, AS I DUG INTO THE BUILDING, INVOLVED VIRTUALLY ANYTHING THAT YOU CAN GO INTO A BUILDING, FROM FIRE SAFETY TO HVAC TO THERMAL DYNAMICS OF MOISTURE, THERMAL DYNAMICS OF MOISTURE EVERY MORNING ON A MONDAY THEY'D COME IN AND THE CEILING TILES IN THE COURTROOM HAD COLLAPSED JUST FROM TOO MUCH HUMIDITY. AND THAT REALLY BECAME AN AIR LEAKAGE AND MOISTURE MANAGEMENT PROBLEM.

WE EVOLVED WITH BRICK MASONRY, STONE MASONRY, STRUCTURAL STEEL, HAD AN INTERESTING ROOFING SYSTEM OF FOAM, PLASTIC, A FIBER MATERIAL AND PLYWOOD. SO ALL OF THOSE KIND OF MATERIALS HAD TO BE BROUGHT INTO AND ALL OF THOSE KIND OF EXPERTISE HAD TO BE BROUGHT INTO THAT INVESTIGATION. FAIRLY CHARACTERISTIC OF THE KINDS OF THINGS THAT I GET INVOLVED WITH.
Q. DO YOU OFTEN GO INTO, GET INVOLVED IN PROJECTS WHERE YOU'RE NOT REALLY QUITE SURE WHAT MIGHT BE THE CAUSE OF THE PROBLEM AND YOU HAVE TO DO FORENSIC-TYPE WORK?

A. IT'S VERY COMMON. VIRTUALLY ALL OF THE TIME, WHEN YOU'RE DESCRIBED A PROBLEM, WHEN A PROBLEM IS DESCRIBED TO ME, I OBVIOUSLY WANT TO UNDERSTAND THAT PROBLEM; BUT YOU HAVE TO LOOK BEYOND, AND GIVE YOU AN EXAMPLE OF A BUILDING AT THE UNIVERSITY OF ALABAMA WHERE THEY THOUGHT THEY HAD A ROOF LEAK, AND THEY SURE ENOUGH DID. BUT AFTER MANY, MANY PEOPLE TRIED TO REPAIR THE ROOF LEAK, I INVESTIGATED IT AND ACTUALLY REALIZED THAT IT WAS A STRUCTURAL PROBLEM BETWEEN AN UNUSUAL ROOF DECK, AN UNUSUAL STRUCTURE AND LITERALLY HAD TO CONDEMN THE BUILDING -- NOT LITERALLY, I CONDEMNED THE BUILDING UNTIL IT COULD BE REPAIRED BECAUSE THE STRUCTURE WAS LITERALLY GOING TO FALL DOWN.

AND THAT'S ONE OF THE CHARACTERISTICS OF BEING AN INVESTIGATOR OF BUILDINGS OF, THAT I DO, THAT YOU HAVE TO REALLY UNDERSTAND THE BUILDING, NOT JUST THE MANIFESTATION OF THE PROBLEM FIRST DESCRIBED TO YOU.

Q. MR. RUTILA, JUST BRIEFLY TO ROUND OUT YOUR EXPERTISE, YOU'VE ALSO DONE SOME WORK, I BELIEVE, FOR THE PENTAGON AND THE HANGER THAT HOUSES AIR FORCE ONE; IS THAT CORRECT?

A. I HAVE, I MEAN, A LOT OF HIGH-PROFILE WORK LIKE THAT. THE PENTAGON, IT WAS REALLY TO HELP THE ARMY CORPS OF ENGINEERS EXPLAIN TO THE DEPARTMENT OF DEFENSE WHY THE WORK HAD TO BE DONE, AND IT REALLY INVOLVED EXCAVATING PART OF AN UNDERGROUND STRUCTURE THAT IS THE PENTAGON.

AM I DOING SOMETHING WRONG?

THE DEPUTY CLERK: IF YOU'LL JUST BACK AWAY FROM IT A

LITTLE BIT. THAT'S FINE.

THE WITNESS: OKAY. I'M SORRY.

THE DEPUTY CLERK: THAT'S GOOD.

THE WITNESS: AND IT REALLY INVOLVED EXCAVATING THIS DEEP STRUCTURE AND DOING BOTH MATERIAL SAMPLING OF CONCRETE AND WATERPROOFING MATERIALS. AND REALLY PREDICTING THE FUTURE OF A WATERPROOFING MATERIAL, AND THAT REALLY BROUGHT IN THAT KIND OF EXPERTISE OF BRINGING ALL OF THE MATERIAL SCIENCE OF THOSE PARTICULAR PRODUCTS. THAT'S THE KIND OF THING THAT WE HAVE TO DO.

THE HANGER AT THE ANDREWS AIR FORCE BASE WAS A WIND FAILURE, BUT INVESTIGATING IT REQUIRED WIND TUNNEL STUDY, WEATHER STUDIES, AIR LEAKAGE STUDIES, AS WELL AS MATERIALS OF THE PLASTICS AND ADHESIVE THAT WE USED, THAT WE USE MODERNLY IN BUILDINGS. AND SO YOU HAVE TO BRING ALL OF THOSE DIFFERENT EXPERTISE INTO SUCH AN INVESTIGATION.

BY MR. SEEGER:

Q. AND CAN YOU TELL US A LITTLE BIT ABOUT WHAT YOUR BACKGROUND IS AND YOUR EXPERIENCE WITH COPPER SULFIDE CORROSION?

A. AS A PERSON THAT DOES A LOT OF WORK WITH BUILDINGS, ONE OF THE THINGS THAT I SEE FROM TIME TO TIME ARE COPPER USED IN EXTERIOR BUILDINGS, YOU IMAGINE A COPPER ROOF OR THE LIKE, AND ONE OF THE CHARACTERISTIC FAILURES OF THAT WILL BE A PITTING FAILURE DUE TO LOCAL COMBUSTION NEARBY, OFTEN IN THE SAME BUILDING, OF NO. 6 BUNKER OIL AS A HEATING PLANT.

A LOT OF INSTITUTIONS AND COMMERCIAL ESTABLISHMENTS WILL

BUILD -- WILL BURN THAT TYPE OF OIL FOR HEATING AND COOLING, AND THE SULPHUR GASES FROM THAT WILL THEN GET DEPOSITED ONTO THE COPPER AND CAUSE PITTING. AND THAT'S SOMETHING I'VE SEEN ON QUITE A FEW BUILDINGS. SYMPHONY HALL IN BOSTON IS AN EXAMPLE OF A BUILDING WHERE THEY BURNED THE NO. 6 OIL AND DESTROYED THEIR OWN ROOFING SYSTEM.

Q. AND HOW MANY HOMES WOULD YOU SAY YOU'VE EXAMINED IN YOUR CAREER WHERE YOU'VE HAD BUILDING PROBLEMS?

A. WELL, IT'S WHAT I DO IN TERMS OF EXAMINING BUILDINGS AND CERTAINLY THOUSANDS OF THEM IN TERMS OF RESIDENTIAL DWELLINGS, SOMETIMES SINGLE-FAMILY, SOMETIMES MULTI-FAMILY BUILDINGS. BUT CERTAINLY THOUSANDS.

Q. AND HOW DOES THAT COMPARE, IN YOUR EXPERIENCE OPENING UP THOUSANDS OF HOMES TO LOOK AT BUILDING PROBLEMS, HOW DOES THAT COMPARE WITH WHAT YOU'VE OBSERVED IN HOMES HAVING CHINESE DRYWALL?

A. THERE'S A LOT TO LEARN AND DRAW FROM IT, OF COURSE, BECAUSE AS AN INVESTIGATOR OF RESIDENTIAL CONSTRUCTION, IT'S VERY COMMON TO HAVE TO DISASSEMBLE TO UNDERSTAND WHAT'S WRONG. USUALLY IT'S A MOISTURE PROBLEM, EITHER FROM ATMOSPHERIC MOISTURE INSIDE, ATMOSPHERIC MOISTURE OUTSIDE, WATER LEAKAGE, BUT WE'RE ALWAYS FINDING -- NOT ALWAYS, BUT QUITE OFTEN FINDING DAMAGE FROM THAT MOISTURE IN THESE DWELLINGS.

AND THE VERY IMPORTANT DIFFERENCE, THOUGH, IS IN ALL OF THESE HOMES, VERY, VERY RARE TO FIND ANYTHING OF SIGNIFICANT, IN TERMS OF DETERIORATION, TO THE ELECTRICAL SYSTEM. SOMETIMES YOU'LL

FIND A RECEPTACLE BOX OR A GALVANIZED CONDUIT THAT'S CORRODED DUE TO A PROPERTY WITH A SIGNIFICANT MOISTURE PROBLEM, BUT VERY, VERY RARE TO FIND ANYTHING WRONG WITH THE ELECTRICAL SYSTEM, THAT'S WHY SEEING THE TYPE OF CORROSION THAT WE'RE SEEING HERE IS VERY, VERY UNUSUAL IN RESIDENCES TO HAVE OTHER MAJOR, MAJOR ISSUES.

AND ONE OF THE THINGS THAT I OFTEN DO WHEN I FIRST COME TO SUCH A RESIDENTIAL BUILDING IS JUST TAKE OFF A RECEPTACLE PLATE BECAUSE I CAN SEE AROUND AND SEE INSIDE AND GET A GOOD WINDOW INTO JUST HOW THE BUILDING WAS BUILT AND WHAT'S BEHIND THE DRYWALL BEFORE I START CUTTING IT.  AND FOR THAT REASON, YOU KNOW, I'M ALWAYS LOOKING INTO RECEPTACLE BOXES AND SEEING NOTHING LIKE WE'RE SEEING HERE.

SO ALL I CAN SAY ABOUT THE COMPARISON IS, THE EXPERIENCE IS VERY USEFUL BUT THE MANIFESTATION OF THE PROBLEM IS UNPRECEDENTED.

Q.  MR. RUTILA, COULD YOU TELL THE COURT A LITTLE BIT ABOUT WHAT YOUR EXPERIENCE TODAY HAS BEEN WITH CHINESE DRYWALL, HOW MANY SAMPLES YOU'VE LOOKED AT, HOMES YOU'VE LOOKED AT, THINGS OF THAT NATURE?

A.  OF COURSE I'VE BEEN TO AND LOOKED AT THE HERNANDEZ HOME.  I LOOKED AT PERSONALLY SIX HOMES IN VIRGINIA, AND A SEVENTH HOME THAT WAS A NEGATIVE CONTROL HOME IN VIRGINIA.  MY STAFF HAS GONE TO ANOTHER SIX HOMES, CHINESE DRYWALL HOMES, IN VIRGINIA.  AND ALSO HAVE GONE TO HOMES BEING REPAIRED BY LENNAR AND BY BEAZER IN FLORIDA, AND IN TERMS OF SAMPLES IN OUR LABORATORY, WE HAVE

EXAMINED DOZENS AND DOZENS OF SAMPLES FROM VIRGINIA, FROM FLORIDA AND CERTAINLY FROM THE HERNANDEZ HOME.

Q. AND FINALLY, THE SAMPLES HAVE INCLUDED WHAT, COPPER, WIRES, DRYWALL, JUST TO GIVE THE JUDGE A BACKGROUND?

A. THEY'VE INCLUDED DRYWALL, WE LOOK AT THOSE PETROGRAPHICALLY AND CHEMICALLY; WIRES AND ELECTRICAL DEVICES, RECEPTACLES, SWITCHES -- WHICH WE'VE TAKEN APART AND EXAMINED -- CERTAINLY WIRES IN SECTIONING THEM, SIMILAR TO WHAT WE SAW JUST A MOMENT AGO.

IN TERMS OF PLUMBING, LOOKING AT PLUMBING COMPONENTS, BRAZES, FOR EXAMPLE, WHICH I THINK MAYBE WE'LL SEE IN A BIT IN PLUMBING COMPONENTS, HVAC COMPONENTS, BOTH CONSUMER-TYPE ELECTRONICS, AS WELL AS ELECTRONICS FROM DEVICES SUCH AS HVAC EQUIPMENT, BROADLY, ALL OF THE TYPES OF COMPONENTS THAT WE THINK BOTH CAUSE THE DAMAGE AND ARE BEING DAMAGED BY THE SULPHUR GASES.

MR. SEEGER: YOUR HONOR, AT THIS POINT WE WOULD OFFER MR. RUTILA AS AN EXPERT IN MATERIAL SCIENCES, BUILDING AND CONSTRUCTION PROBLEMS AND REMEDIATION.

THE COURT: ANY QUESTIONS?

MR. SANDERS: YOUR HONOR, JUST FOR THE RECORD, WE UNDERSTAND HIS TESTIMONY, HIS EXPERIENCE IN THE MULTIDISCIPLINARY APPROACH OF BUILDING INVESTIGATIONS AND I WILL OBVIOUSLY ASK SOME QUESTIONS ON CROSS, BUT WE WOULD OPPOSE ANY ADMISSION OR QUALIFICATION AS A MATERIAL SCIENTIST OR ENGINEER, ELECTRICAL ENGINEER, OR CORROSION EXPERT. AND ASK THAT HE NOT BE QUALIFIED FOR THOSE TYPES OF THINGS.

THE COURT: YOU'RE NOT QUALIFYING HIM AS A CORROSION EXPERT, ARE YOU?

MR. SEEGER: NO, YOUR HONOR, THAT'S MR. KRANTZ. WE ARE NOT QUALIFYING MR. RUTILA IN THAT AREA.

THE COURT: WHAT IS HE AN EXPERT IN MATERIAL WHAT?

MR. SEEGER: WHAT WE HAD PROPOSED IS MATERIAL SCIENCES. IN COUNSEL FEELS MORE COMFORTABLE WITH MULTIDISCIPLINARY INVESTIGATIONS, THAT'S FINE WITH US, YOUR HONOR, RATHER THAN QUIBBLE OVER WORDS.

MR. SANDERS: YEAH, WE WILL BE FINE WITH THAT AS LONG AS HIS TESTIMONY IS RELATED TO THE ACTUAL INVESTIGATIONS AND NOT OPINIONS ABOUT THINGS THAT CROSS OVER INTO MORE SUBSTANTIVE TYPES OF THINGS.

THE COURT: WE'LL TAKE THAT ON CROSS, BUT I'LL QUALIFY HIM AND ACCEPT HIM IN MULTIDISCIPLINARY INVESTIGATIONS.

MR. SEEGER: THANK YOU, YOUR HONOR. WE MOVE FORWARD.

DIRECT EXAMINATION

BY MR. SEEGER:

Q. MR. RUTILA, YOU SPOKE TO THE COURT A LITTLE BIT ABOUT YOUR EXPERIENCE WITH CHINESE DRYWALL. TELL US ABOUT YOUR OBSERVATIONS SPECIFICALLY WITH REGARD TO THE HERNANDEZ HOUSE, WHAT YOU DID AND WHAT YOU SAW.

A. I VISITED THE HOME AND BY THE TIME I HAD ARRIVED, MORE THAN A DOZEN PEOPLE HAD ARRIVED BEFORE ME. AND THAT'S IMPORTANT IN TERMS OF MY OBSERVATIONS. I ENTERED -- AS YOU KNOW, YOU ENTER INTO A

LIVING AREA, THAT INCLUDES A LIVING ROOM, DINING ROOM, KITCHEN.

I IMMEDIATELY WENT TO THE LEFT WING, IF YOU WILL, WHERE THERE ARE TWO CHILDREN'S BEDROOMS AND A BATHROOM. AND IN THE TWO CHILDREN'S BEDROOMS I OBSERVED APPARENT SULPHUR ODORS. I DID NOT OBSERVE THOSE ODORS IN THE LIVING ROOM WHEN I FIRST ENTERED.

AND THEN I WENT SHORTLY THEREAFTER TO THE RIGHT-HAND WING, IF YOU WILL, WHICH IS THE MASTER SUITE, THERE'S A PLAY AREA, A LAUNDRY ROOM, MASTER BEDROOM, CLOSET AND BATHROOM, AND IN THOSE AREAS I DID NOT PERSONALLY DETECT SULPHUR ODORS.

AND THEN IN TERMS OF MY WORK THERE, I LOOKED AT DEVICES, WENT IN THE ATTIC. AS YOU KNOW, IT'S A SINGLE-STORY HOME, BUILT ABOUT 48 INCHES OFF THE GROUND ON PIERS, AND I DID GO INTO THE ATTIC AND LOOKED AT COMPONENTS AND MATERIALS WITHIN THE HOME.

Q. AND YOU MADE A REFERENCE BEFORE TO APPARENT SULPHUR ODORS WHEN YOU CAME INTO THE HOUSE AND YOU WENT TO THE LEFT WHERE THE CHILDREN'S ROOMS WERE. JUST SO WE'RE CLEAR, HOW WOULD YOU DESCRIBE THE ODOR?

A. I DIDN'T -- IT WASN'T RIGHT WHEN I ENTERED THE HOME. WHEN I ENTERED THE LIVING ROOM, I PAUSED AND DID NOT DETECT ANYTHING MYSELF. BUT IN THE CHILDREN'S ROOMS, THE ODOR TO ME IS OF A STALE, BURNT MATCH, THAT'S HOW IT APPEARED TO ME AT THE HERNANDEZ HOME, AS IF THERE WAS A WET -- A MATCH THAT HAD BEEN IGNITED, PUT OUT AND ALLOWED TO SIT THERE. THAT'S HOW I CHARACTERIZE IT TO MYSELF.

Q. MR. RUTILA, YOU HAD SELECTED SOME PHOTOS THAT I HAVE HERE THAT WE WOULD USE TO SHOW THE COURT, IF THEY WILL BE HELPFUL TO YOU TO

TESTIFY, WOULD THAT BE HELPFUL?

A. IT WOULD BE.

MR. SEEGER: YOUR HONOR, WITH YOUR PERMISSION?

THE COURT: YES.

MR. SEEGER: COULD WE START, SCOTT, WITH THE FIRST PHOTO, WHICH IS HERNANDEZ 599.

YOUR HONOR, CAN I JUST, POINT OF ORDER, HOW WOULD YOU LIKE TO GO ABOUT, AND THE COUNSEL FOR THE DEFENSE CAN TELL ME, HOW DO YOU WANT TO GO ABOUT MOVING THESE INTO EVIDENCE? CAN I DO IT AT THE END? IF YOU HAVE AN OBJECTION, RAISE IT.

MR. SANDERS: WE NOTICED SOME PHOTOS WHEN I WAS GOING THROUGH THOSE THAT SEEM TO BE SORT OF SUPPLIED TO US THIS WEEKEND, SO I CAN OBJECT.

MR. SEEGER: AT THE TIME I USE THEM?

MR. SANDERS: OR AT THE END, WHATEVER YOU PREFER.

MR. SEEGER: IS THAT OKAY WITH YOU, YOUR HONOR?

THE COURT: THAT'S FINE.

BY MR. SEEGER:

Q. MR. RUTILA, TELL US WHAT YOU'RE OBSERVING HERE IN THIS PHOTOGRAPH AND WHY YOU SELECTED THIS.

A. THIS IS A DEVICE FROM THE PLUMBING. AT THE LEFT IN THE PHOTOGRAPH THE SILVER LIGHT IS A VALVE AND, THAT'S PART OF A VALVE, AND AT THE RIGHT IS THE WHITE IS A FLEXIBLE TUBE THAT WOULD FIT UP TO A FAUCET, AND THE COPPER AND BRASS ELEMENTS AT THE TOP ARE PART OF THE FITTINGS.

THE COURT: WHY DON'T YOU OFFER THAT INTO EVIDENCE, THEN, BEFORE YOU GET INTO HIS TESTIMONY. ONCE HE IDENTIFIES IT, LET'S GET INTO EVIDENCE.

MR. SEEGER: OKAY, YOUR HONOR, WE WILL DO THAT. SO AT THIS POINT PLAINTIFFS WILL MOVE IN HERNANDEZ 599.

THE COURT: ANY OBJECTION?

MR. SANDERS: NO, SIR.

THE COURT: LET IT BE ADMITTED.

MR. SEEGER: SCOTT, CAN YOU PLEASE PULL UP HERNANDEZ 603.

BY MR. SEEGER:

Q. MR. RUTILA, WOULD YOU PLEASE EXPLAIN TO US WHAT THIS SHOWS?

A. YES. THIS IS THE, THAT WAS IN THE PREVIOUS PHOTOGRAPH WAS THE TOP END AND WHAT YOU SEE IN A CLOSER-UP VIEW IS COPPER AT THE LOWER LEFT, THAT'S COPPER PIPE, AND THEN IT'S BRAZED INTO A FITTING THAT IS THEN CONNECTED IN TURN TO THE PLASTIC TUBING. AND WHAT'S, OF COURSE, OF INTEREST HERE IS THE APPARENT CORROSION ON THE COPPER, SOME OF IT IS THE BRONZE COLOR WE EXPECT COPPER PIPE TO BE AND SOME OF IT IS BLACK.

AND WHAT'S IMPORTANT ABOUT BLACK LIKE THIS IS THAT SOMETIMES IT CAN BE CAUSED BY THE FLUX MATERIAL USED IN MAKING COPPER FITTINGS, AND SOME OF IT, WE'LL SEE, IS THE COPPER SULFIDE, WHICH WE KNOW IS FROM THE CORROSIVE GASES.

AND YOU'LL SEE RIGHT AT THE LOWER RED ARROW, JUST ABOVE THAT, IS THE BRAZING THAT'S OF INTEREST BECAUSE WE HAVE SEEN, AND WE DIDN'T SEE PITTING IN THIS PARTICULAR BRAZE, BUT THAT'S AN

EXAMPLE OF THE TYPE OF BRAZING THAT WE'VE SEEN PITTING IN, IN CHINESE DRYWALL HOMES AND IS OF PARTICULAR CONCERN IF THAT WERE TO BE, ENDEAVORED TO BE CLEANED OR LEFT IN PLACE.

MR. SEEGER: YOUR HONOR, WE WOULD MOVE IN PHOTO HERNANDEZ 603 INTO EVIDENCE.

THE COURT: OKAY. I'LL ADMIT IT BECAUSE IT'S THE SAME PHOTOGRAPH. BUT COUNSEL, WE'RE GOING TO HAVE TO DO IT A LITTLE DIFFERENTLY. YOU'RE GOING TO HAVE TO SHOW HIM THE PHOTOGRAPHS AT THE WITNESS STAND, LET HIM LOOK AT IT, HE RECOGNIZES THE PHOTOS, THEY'RE PHOTOS OF MATERIAL TAKEN FROM THE HERNANDEZ HOUSE. AND IF THERE'S ANY OBJECTION, I'LL HEAR THEM. IF NOT, THEN I'LL ADMIT THEM ALL AND THEN YOU CAN GO THROUGH, BECAUSE IF YOU SHOW HIM ONE AT A TIME AND THEN HE TESTIFIES TO IT, IT'S GOING TO BE A PROBLEM.

MR. SEEGER: SO I'LL PROBABLY INTERRUPT YOU AFTER YOU IDENTIFY IT AND THEN WE'LL MOVE IT IN AND THEN YOU'LL GIVE AN OPINION ON IT.

THE WITNESS: I UNDERSTAND, I APOLOGIZE.

MR. SEEGER: SO WE MOVE THIS, THAT'S THE SAME PHOTOGRAPH.

THE COURT: THAT'S THE SAME PHOTO.

MR. SEEGER: RIGHT.

MR. SEEGER:

Q. MR. RUTILA, TELL US THE SIGNIFICANCE IN YOUR OPINION OF WHAT WE'RE SEEING HERE.

A. THE COPPER, AS YOU CAN SEE, HAS PORTIONS OF IT THAT ARE VERY MUCH BRONZE, AS WE'D EXPECT, AND THEN PORTIONS OF IT THAT HAVE

BLACK CORROSION ON IT. AND IN THE ELECTRON MICROSCOPE, WE FIND THAT SOME OF THAT BLACK IS COPPER SULFIDE CORROSION, AND IN OTHER SAMPLES, WE DID NOT SECTION THIS ONE OR CLEAN THE MATERIAL OFF FOR PITTING, BUT WE FIND PITS UNDERNEATH IT. AND THIS GOES, THE PITS ARE EVERYTHING IN THIS DISCUSSION OF COPPER PLUMBING BECAUSE AS YOU HEARD EARLIER --

MR. SANDERS: YOUR HONOR, I DIDN'T THINK HE WAS A CORROSION EXPERT, WE SEEM TO BE GETTING INTO SOME CORROSION ISSUES ON PITTING AND OTHER THINGS. DESCRIBING WHAT HE SAW ON THESE ITEMS IS OKAY.

THE COURT: TO THE EXTENT THAT THAT'S AN OBJECTION, I'LL OVERRULE THE OBJECTION.

MR. SEEGER: THANK YOU, YOUR HONOR. AND WE ARE NOT GOING TO ASK HIM QUESTIONS ABOUT WHETHER IT CONTINUES OR ANY QUESTIONS OF THAT NATURE.

THE COURT: I MEAN, IT IS WHAT IT IS, YOU CAN SEE IT.

MR. SEEGER: RIGHT.

BY MR. SEEGER:

Q. MR. RUTILA, IS IT PART OF YOUR WORK TO EXAMINE AND SORT OF DIAGNOSE WHETHER YOU SEE A CORROSION PROBLEM AND WHAT THE CAUSE OF THE CORROSION IS, IS THAT WHAT YOU'RE DOING?

A. THAT'S RIGHT. AND FOR THE CORROSION, I USE MY LABORATORY STAFF AND ENGINEERS AT SIMPSON, GUMPERTZ AND HEGER WHO ARE SKILLED AND QUALIFIED TO IDENTIFY WHAT THESE MATERIALS ARE AND TO DO THE METALLURGY QUESTIONS THAT I ASK THEM TO DO. THAT'S HOW I

INVESTIGATE A DEVICE LIKE THIS AND FORM AN OPINION ON WHAT NEEDS TO BE DONE, WHICH IS REALLY ONE OF THE MAIN REASONS WHY I AM HERE TODAY.

Q. OKAY. THANK YOU. SCOTT, CAN YOU PULL UP HERNANDEZ 621, AND MR. RUTILA CAN YOU JUST IDENTIFY THE PHOTOGRAPH FOR HIS HONOR.

A. THIS IS A VALVE ASSEMBLY FROM AN HVAC UNIT THAT WAS TAKEN FROM A FAILED HVAC UNIT, NOT BY MYSELF, AND TAKEN BY MECHANICS AND THEN PROVIDED TO US WHEN THAT HVAC UNIT WAS REPLACED, THAT'S WHAT THIS IS.

MR. SEEGER: YOUR HONOR, WE WOULD MOVE THIS PHOTO INTO EVIDENCE.

THE COURT: WHAT'S THE NUMBER?

MR. SEEGER: IT'S HERNANDEZ 621.

MR. SANDERS: JUST OBJECT ON FOUNDATION, WHETHER IT'S THE HERNANDEZ HOUSE.

THE COURT: ASK HIM IF IT WAS FROM THE HERNANDEZ HOUSE.

BY MR. SEEGER:

Q. MR. RUTILA, IS IT FROM THE HERNANDEZ HOUSE?

A. IT IS. I DID NOT PERSONALLY TAKE IT, BUT IT'S BEEN IDENTIFIED TO ME AS A VALVE FROM THE HERNANDEZ HOUSE.

THE COURT: ALL RIGHT. I'LL ADMIT IT.

BY MR. SEEGER:

Q. NOW, YOU CAN TESTIFY AS TO THE SIGNIFICANCE OF WHAT YOU SEE IN THIS PHOTO FOR THE COURT.

A. YES. SIMILAR TO THE OTHER DEVICE, IT WAS A BRONZE BODY RIGHT

IN THE CENTER THERE, THE LARGE MASS, COPPER TUBING GOING OFF AND COILED UP TO THE UPPER LEFT. AND OF PARTICULAR INTEREST IS THE COPPER TUBING AND WHERE THE COPPER TUBING JOINS THE BRONZE BODY AT THAT BRAZE FITTING IN THERE. AND THAT'S WHAT WE EXAMINED AND FOUND COPPER SULFIDE CORROSION IN THAT LOCATION.

Q. LET ME SHOW YOU THE NEXT PHOTO BECAUSE IF YOU WANT TO FOCUS ON THAT PIECE, WE'LL DO THAT. SCOTT, PULL UP HERNANDEZ 624, PLEASE. AND JUST IDENTIFY WHAT THIS PHOTO IS FOR THE RECORD, PLEASE.

A. THIS IS ANOTHER VIEW OF THE SAME DEVICE, AND I'LL EXPLAIN THE ANGLE AND SO ON LATER, BUT THAT'S WHAT THIS IS.

THE COURT: I'LL ADMIT IT. WHAT'S THE NUMBER?

MR. SEEGER: IT'S HERNANDEZ 624.

BY MR. SEEGER:

Q. NOW, MR. RUTILA, THAT'S THE AREA YOU FOCUSED ON IN THE LAST PHOTO. TELL US WHAT THE SIGNIFICANCE OF THIS IS.

A. THAT'S RIGHT. YOU MIGHT ZOOM IN TO WHERE THE COPPER TUBE -- I DON'T HAVE A POINTER TO HELP YOU, RIGHT THERE, YOU'VE GOT IT -- RIGHT IN THERE IS THE AREA THAT WE EXAMINED IN OUR LABORATORY FOR CORROSION AND IDENTIFIED COPPER SULFIDE CORROSION OF THE TUBING AT THAT LOCATION.

Q. AND WHAT IS THE SIGNIFICANCE OF THAT?

A. AGAIN, FROM OUR EXAMINATION OF OTHER BRAZES AND TUBING, THAT'S A LOCATION WHERE WE HAVE FOUND DEEP PITS AND DUE TO CORROSION.

Q. MR. RUTILA, WE'RE GOING TO PULL UP THE NEXT PHOTO, SCOTT, CAN YOU PLEASE PULL UP HERNANDEZ 611.

AND, MR. RUTILA, PLEASE IDENTIFY THIS PHOTO FOR US.

A. THIS IS A VALVE, A DIFFERENT ONE THAN WE SAW EARLIER, BUT A VALVE FOR A WATER DISTRIBUTION SYSTEM FOR THE HERNANDEZ HOME.

MR. SEEGER: YOUR HONOR, WE WOULD MOVE HERNANDEZ 611 INTO EVIDENCE.

THE COURT: ANY OBJECTION TO THAT? THAT WILL BE ADMITTED.

BY MR. SEEGER:

Q. PLEASE TELL US WHAT THE SIGNIFICANCE OF THIS PHOTO IS, MR. RUTILA.

A. FROM THIS ANGLE YOU SEE AT THE FAR UPPER RIGHT THE SHORT PIECE OF COPPER COMING OUT OF THE DEVICE, AND THAT IS WHAT WE WERE PARTICULARLY INTERESTED IN WITH THIS PARTICULAR ELEMENT.

MR. SEEGER: ALL RIGHT. AND THEN WE WILL PULL UP THE NEXT PHOTO WHICH I THINK HIGHLIGHTS THAT AREA A LITTLE BETTER. SCOTT, PLEASE PULL UP HERNANDEZ 609. AND IF CAN YOU PLEASE JUST IDENTIFY THIS AND, YOUR HONOR, IT'S JUST ANOTHER ANGLE.

THE COURT: I CAN SEE IT, IT'S A BLOWUP OF A PORTION OF THE PRIOR EXHIBIT. I'LL ADMIT IT.

MR. SEEGER: OKAY. THANK YOU, YOUR HONOR, THAT'S HERNANDEZ 609.

BY MR. SEEGER:

Q. WOULD YOU PLEASE TELL US THE SIGNIFICANCE OF WHAT YOU'RE SEEING HERE?

A. AGAIN, WE LOOKED AT THAT COPPER, FOUND COPPER SULFIDE CORROSION

ON THE COPPER. THERE'S ALSO SOME GREEN, WHICH IS COPPER OXIDE, BUT WE FOUND COPPER SULFIDE CORROSION ON THAT COPPER PIECE.

THE COURT: WHY DON'T YOU DESCRIBE IT FOR THE RECORD, WHAT ABOUT THAT LOOKS LIKE IT'S CORROSION TO YOU?

THE WITNESS: FAIR ENOUGH. THE COPPER ITSELF HAS A DARKER BLACK CHARACTER THAN YOU WOULD EXPECT ON IN-SERVICE COPPER PIPING AFTER --

BY MR. SEEGER:

Q. LET ME INTERRUPT JUST SO WE'RE CLEAR. WHEN YOU'RE SAYING COPPER, YOU'RE TALKING ABOUT THIS PIECE RIGHT HERE, RIGHT?

A. I AM. I AM. I'M TALKING ABOUT THE SHORT LENGTH OF PIPE WHERE THE ARROWS ARE POINTING MORE OR LESS AT. THAT'S A PIECE OF COPPER PIPE. IT'S BEEN CUT OFF AND SO THAT YOU CAN HAVE THE SECTION AND THE VALVE. AND THE COLOR OF THAT THAT YOU SEE, IS A FAIR COLOR, IT'S A BLACKER COLOR THAN YOU WOULD EXPECT COPPER PIPE IN SERVICE TO BE. AND THE BLACK, WHEN EXAMINED IN OUR LABORATORY UNDER ELECTRON MICROSCOPE, SHOWS COPPER SULFIDE CRYSTALS.

THE OTHER THING IS, YOU CAN SEE SOME GREEN SPOTS NEAR THE RED ARROW THERE, AND THAT'S NOT COPPER SULFIDE CORROSION, THAT'S A MIXTURE OF COPPER OXIDE AND PROBABLY, IT'S PROBABLY THE FLUX USED WHEN MAKING SOLDER JOINTS.

BY MR. SEEGER:

Q. LET ME ASK YOU THIS, MR. RUTILA. WITH THE PHOTOS THAT WE'VE JUST LOOKED AT INVOLVING COPPER PIPES, IS IT CONSISTENT OR INCONSISTENT WITH YOUR OBSERVATIONS FROM OTHER HOMES THAT HAVE HAD

CHINESE DRYWALL OTHER THAN THE HERNANDEZ HOUSE?

A. YES. AND AS THESE PHOTOGRAPHS SHOW, THERE IS VARIATION IN THE PIPES, BUT THESE ARE CONSISTENT WITH WHAT WE'VE SEEN.

Q. AND, MR. RUTILA, WE'RE GOING TO MOVE ON TO ELECTRICAL WIRES, OKAY, AND WE HAVE A NUMBER OF PHOTOGRAPHS HERE.

SCOTT, IF WE COULD PULL UP CDW 24-0116. AND COULD YOU IDENTIFY FOR THE RECORD WHAT THESE ITEMS ARE?

A. THAT'S THREE PHOTOGRAPHS OF A SWITCH AND THEN SOME OF THE ELECTRICAL CONNECTIONS ON THAT SWITCH FROM THE HERNANDEZ HOMES KNOWN TO US AS TCH 02, JUST SAMPLE NO. 2.

MR. SEEGER: AND, YOUR HONOR, AT THIS POINT WE WOULD MOVE THE THREE PHOTOS THAT ARE REFLECTED ON THIS ONE PAGE INTO EVIDENCE.

THE DEPUTY CLERK: HOW IS IT MARKED?

MR. SEEGER: IT'S CDW 24-0116.

MR. SANDERS: NO OBJECTION.

THE COURT: THAT WILL BE ADMITTED.

MR. SANDERS: IS THERE AN EXHIBIT NUMBER?

MR. SEEGER: YEAH, THERE ARE THREE DIFFERENT EXHIBIT NUMBERS, DO YOU WANT ALL THREE?

MR. SANDERS: YES.

MR. SEEGER: THE TOP PHOTO IS HERNANDEZ 275, THE MIDDLE PHOTO IS HERNANDEZ 276, AND THE BOTTOM PHOTO IS HERNANDEZ 277.

BY MR. SEEGER:

Q. MR. RUTILA, WOULD YOU PLEASE EXPLAIN TO US THE SIGNIFICANCE OF THESE PHOTOGRAPHS AND WHAT YOU SEE HERE. DO YOU WANT TO BLOW UP

THE TOP ONE FIRST?

A. I'LL DO THE GENERAL. THE TOP IMAGE IS OF THE SWITCH SAMPLE AS WE RECEIVED IT. AND IF YOU LOOK AT THE GROUND WIRE CONNECTION AT THE RIGHT AND RIGHT WHERE YOUR DOT IS THERE.

Q. ALL RIGHT, HOLD ON, LET US ENLARGE IT SO EVERYBODY CAN SEE. FOR THE RECORD, WE ARE LOOKING AT HERNANDEZ 275.

A. THAT'S WHERE THE GROUND WIRE, WHERE THE BLUE ARROW IS, WHERE THE GROUND WIRE WAS CONNECTED TO THE SWITCHING DEVICE. AND THEN THE SUBSEQUENT PHOTOGRAPHS GO INTO THAT IN A BIT MORE DETAIL IN TERMS OF HOW THE WIRE WAS ACTUALLY ENGAGED, AND THE CENTER PHOTOGRAPH OR THE TOP PHOTOGRAPH NOW WITH THE 6, YOU CAN SEE THE WAY IN WHICH THE WIRE BINDING SCREW IS BROUGHT OVER A LOOP IN THE WIRE AND YOU CAN SEE THE CORROSION, PARTICULARLY OF INTEREST, THE BLUE ARROW IS OF SOME INTEREST, BUT ANOTHER INTEREST AREA IS RIGHT WHERE THE WIRE ENTERS BELOW THE WIRE BINDING SCREW, RIGHT WHERE YOUR DOT IS EXACTLY.

AND ALSO THE CORROSION RIGHT AT THAT INTERFACE WITH THE WIRE BINDING SCREW. THAT'S WHAT'S PARTICULARLY OF INTEREST, AND WITH THE ELECTRON MICROSCOPE WE'VE CONFIRMED THAT THAT'S COPPER SULFIDE CORROSION ON THAT WIRE. AND OF INTEREST HAS BEEN THE CORROSION AT THESE CONTACT POINTS.

Q. NOW, JUST TO PAUSE FOR ONE SECOND. WHEN WE WERE QUALIFYING YOU AND ASKED YOU A QUESTION ABOUT THE NUMBER OF HOMES YOU'VE LOOKED AT. IN ALL OF THE HOMES YOU'VE LOOKED AT, CHINESE DRYWALL, NO CHINESE DRYWALL, IS IT COMMON TO SEE THAT TYPE OF CORROSION WHERE

THAT IS?
A. NO, IT'S UNPRECEDENTED. IN TERMS OF NON-CHINESE DRYWALL HOMES. IN TERMS OF CHINESE DRYWALL HOMES, IT'S A FAIRLY COMMON OCCURRENCE. AND THAT WIRE IS FAIRLY CHARACTERISTIC, SOMETIMES THEY'RE BLACK THE FULL LENGTH, SOMETIMES THE BLACKENING IS INTERMITTENT. AND THE BLACKENING IS CHARACTERISTIC OF WHERE WE HAD THE RIGHT CONDITIONS OF TEMPERATURE TO LET THERE BE MICROSCOPIC MOISTURE AND SULPHUR GASES TO INDUCE THE CORROSION.
BUT SOMETIMES YOU'LL SEE IT FULLY BLACKENED AND SOMETIMES YOU'LL FIND A WIRE ON A DEVICE EVEN IN A CHINESE DRYWALL HOME THAT HAS ONLY VERY SMALL SPOTS, AND EVERYTHING IN-BETWEEN.
Q. AND THOSE VERY SMALL SPOTS YOU JUST DESCRIBED, WOULD YOU DESCRIBE THAT AS CORROSION AS WELL?
A. YES. WE LOOK AT THOSE SPOTS UNDER ELECTRON MICROSCOPE AND IDENTIFY COPPER SULFIDE CRYSTALS, AT MANY OF THOSE, AT MANY OF THOSE VERY SMALL SPOTS WHEN WE SEE IT ON THE WIRE.
Q. MR. RUTILA, LET'S GO TO THE NEXT PHOTO. SCOTT, CAN YOU PULL UP HERNANDEZ 605.
AND JUST PLEASE IDENTIFY THIS PHOTO FOR HIS HONOR.
A. THIS IS ANOTHER CONNECTION OF A COPPER WIRE ON A DEVICE, I DON'T REMEMBER WHAT THE DEVICE NUMBER IS FROM THE PHOTOGRAPH, BUT I RECOGNIZE THE PHOTOGRAPH AS OUR OWN. AND AS A SAMPLE OF A DEVICE FROM THE HERNANDEZ HOME.
MR. SEEGER: AND, YOUR HONOR, WE WOULD AT THIS TIME MOVE IN HERNANDEZ 605.

THE COURT: OKAY. LET IT BE ADMITTED.

MR. SEEGER:

Q. MR. RUTILA, CAN YOU TELL US WHAT YOU SEE IN THIS PHOTOGRAPH HERE?

A. YES. THIS IS A WIRE ENGAGED IN BINDING SCREW, AND OF PARTICULAR INTEREST, THE WIRE HAS THE BLACK COPPER SULFIDE CORROSION IN MANY LOCATIONS, BUT PARTICULAR INTEREST IS THIS WHERE WE EVEN SEE, A LITTLE BIT HARD TO SEE IN THE PHOTO YOU HAVE, BUT RIGHT IN THERE YOU CAN EVEN SEE THE CRYSTALS GROWING OUT FEATHER LIKE. THAT ROUGHNESS THAT YOU SEE THERE, RIGHT IN THERE, YEAH, THERE YOU SEE THEM (INDICATING). YOU CAN SEE THE COPPER SULFIDE CRYSTALS COMING RIGHT OFF OF THE CORRODED WIRE.

Q. AND JUST TO GO BACK TO THE FULL PHOTO. CAN YOU JUST ORIENT US TO WHAT WE'RE SEEING HERE, WHAT IS THIS RIGHT HERE (INDICATING)?

A. THAT'S A CONNECTION OF A COPPER WIRE INTO A DEVICE AND THE WIRE JUST COMES IN, BENDS AROUND AND GETS ATTACHED, AS IS CHARACTERISTIC OF MANY ELECTRICAL CONNECTIONS.

MR. SEEGER: AND I BELIEVE, SCOTT, IF YOU CAN PULL UP HERNANDEZ 606, THIS IS ANOTHER VIEW OF THIS. AND, YOUR HONOR, IT'S ANOTHER VIEW OF WHAT WE WERE JUST LOOKING AT. WE'D MOVE IN 606?

THE COURT: OKAY, ADMITTED.

THE WITNESS: RIGHT, THAT'S JUST A DIFFERENT ANGLE, THE SAME DEVICE.

BY MR. SEEGER:

Q. AGAIN, HOW WOULD YOU DESCRIBE WHAT'S GOING ON HERE?

A. WELL, THIS ONE GIVES YOU A DIFFERENT VIEW OF THIS WIRE. YOU CAN STILL SEE ON THE LEFT-HAND SIDE THOSE CRYSTALS. ON THE RIGHT-HAND SIDE YOU JUST SEE A MUCH MORE BLOTCHY APPEARANCE BECAUSE OF OTHER MATERIALS CONTAMINATING THE SURFACE BESIDES COPPER SULFIDE, A LITTLE GYPSUM JOINT COMPOUND OR THINGS LIKE THAT WE SEE OCCASIONALLY ON THESE WIRES.

Q. AND THE OTHER MATERIALS THAT WE'RE REFERRING TO OTHER THAN THE COPPER SULFIDE, IS IT COMMON TO SEE THAT?

A. YES, IT IS, BECAUSE THEY DO THE ROUGH WIRING AND THEN THEY DO THE PLASTER AND SOMETIMES THEY GET A BIT ON THE WIRE. IT'S NOT SUPPOSED TO BE THERE, IT'S AGAINST CODE, BUT THERE IT IS.

Q. LET'S MOVE ON TO, THEN, THE NEXT SET OF PHOTOS WE HAVE WITH REGARD TO THE ELECTRICAL WIRES. SCOTT, CAN YOU PLEASE PULL UP HERNANDEZ 575-0001.

AND CAN YOU JUST IDENTIFY FOR US WHAT WE'RE LOOKING AT HERE. HOLD ON A SECOND, SCOTT. COULD YOU IDENTIFY WHAT WE'RE SEEING HERE, MR. RUTILA?

A. THIS IS A RECEPTACLE, EXCUSE ME, A LIGHT SWITCH BOX FROM THE HERNANDEZ HOME AT THE WALL BETWEEN THE LIVING ROOM, DINING ROOM. THERE'S THREE SWITCHES AND THE WIRES. AND WHEN IT WAS REMOVED, THE ENTIRE RECEPTACLE BOX AS WELL AS ALL OF THE WIRES ENTERING THE BOX, AS WELL AS THE SWITCHES, WERE ALL COLLECTED TOGETHER.

MR. SEEGER: WE'D OFFER THIS INTO EVIDENCE, YOUR HONOR.

MR. SANDERS: THE ONLY OBJECTION WITH THIS AND THE NEXT I THINK FOLLOWING EXHIBITS IS IT INCLUDES, I THINK THIS WAS ALL

RECEIVED AFTER OUR DEPOSITION AND PRODUCED TO US OVER THE WEEKEND. WE DID NOT HAVE A CHANCE, I AM NOT SURE HOW FAR YOU'RE GOING TO GO BEYOND THE PICTURES, TO --

MR. SEEGER: WELL, WE'RE GOING TO GO, WE'RE GOING TO DO PRETTY MUCH WHAT WE'VE DONE WITH THE LAST 20.

MR. SANDERS: THERE IS SOME ANALYSES AND OTHER THINGS INCLUDED THAT WE HAVEN'T HAD A CHANCE TO QUESTION DR. RUTILA ABOUT.

MR. SEEGER: YOUR HONOR, THERE ARE NO NEW OPINIONS ON THIS.

THE COURT: YEAH, I DON'T THINK THAT THIS IS A PROBLEM FROM THE STANDPOINT OF EXAMINATION, IT'S REALLY IDENTIFICATION. I'LL OVERRULE THE OBJECTION AND ALLOW IT.

MR. SEEGER: OKAY.

BY MR. SEEGER:

Q. NOW, MR. RUTILA, WHAT IS THE PURPOSE OF THIS PHOTO, WHAT DOES IT SHOW?

A. THE PURPOSE OF IT IS GENERALLY TO ORIENT US, ORIENT THE COURT, AND THEN ALSO TO ILLUSTRATE A FEW, A FEW POINTS. ONE OF WHICH IS THAT THE PHOTO, AS IT'S SHOWN HERE, BUT LET'S ZOOM IN AND MAYBE WE CAN SEE IT A LITTLE BIT BETTER, THE TELEVISION SCREENS SHOW IT BETTER, THAT THE BOX HAS A LOT OF WIRES IN IT, AND ONE OF THE IMPORTANT THINGS IS A LOT OF THOSE WIRES DON'T GO RIGHT INTO THE SWITCHES BUT GET JOINED TOGETHER UNDER WIRE NUTS. AND IT'S AN APPROPRIATE AND NECESSARY WAY OF PUTTING TOGETHER ELECTRICAL DEVICES.

AND THEN INSIDE THE BOXES, AS WE'LL SEE, THERE IS CORROSION ON THE GROUND, WHICH IS FAIRLY CHARACTERISTIC, BUT IT ALSO GIVES A BIT OF A SENSE OF THE BOX THAT IS EXISTING, WELL, UNTIL THIS WAS REMOVED, WAS EXISTING IN THE HERNANDEZ HOME AND THAT IS BECOMES PART OF THE CHALLENGES IN TERMS OF WHAT DO WE DO WHEN THE HOME IS REPAIRED.

Q. RIGHT. AND IF WE MOVE ON TO THE NEXT PHOTO, WHICH IS ANOTHER ANGLE HERE, IT'S HERNANDEZ 579-001, SCOTT. AND, YOUR HONOR, FOR THE RECORD, THIS IS JUST PULLING OUT THE SWITCH OUT OF THE BOX WE WERE JUST LOOKING AT.

THE COURT: I'LL ADMIT IT.

BY MR. SEEGER:

Q. MR. RUTILA, CAN YOU PLEASE DESCRIBE IN A LITTLE BIT MORE DETAIL WHAT WE'RE SEEING HERE?

A. IN THESE PHOTOS, TWO OF THE SWITCHES HAVE BEEN PULLED OUT OF THE BOX, AND YOU CAN SEE THE VARIOUS WIRES COMING OFF OF THEM. THIS PARTICULAR SWITCH IN THE FOREGROUND HAS TWO BLACK WIRES COMING OFF OF IT. BECAUSE OF ITS PURPOSE, THAT'S NOT UNCOMMON.

YOU CAN SEE BOTH OF THE BLACK WIRES HAVE CORROSION ON THE EXPOSED COPPER, AND THEN YOU CAN ALSO SEE THAT BECAUSE OF THE BENDING, THE NECK OF THE INSULATION AT THESE TWO COPPER WIRES IS ACTUALLY OPEN JUST A BIT. AND THEN WE EXAMINED THOSE WIRES IN A BIT MORE DETAIL. SO THIS IS TO ORIENT YOU WITH THE SAMPLES.

MR. SEEGER: AND I APOLOGIZE FOR INTERRUPTING. SCOTT, CAN YOU PULL UP HERNANDEZ 577-0001. AND, YOUR HONOR, THIS IS JUST

A CLOSE-UP OF WHAT WE'VE BEEN LOOKING AT. WE MOVE THIS INTO EVIDENCE.

THE COURT: YES, I'LL ADMIT IT.

BY MR. SEEGER:

Q. MR. RUTILA, CAN YOU EXPLAIN IT?

A. THIS IS, JUST AS YOU SAID, A CLOSE-UP OF ONE OF THOSE BLACK WIRES WHERE IT'S BEEN REMOVED FROM THE WIRE BINDING SCREW, AND NOW WE CAN SEE THE BLACK INSULATION JACKET AND WE CAN SEE HOW, BECAUSE OF THE BENDING OF THE WIRE IN ORDER TO MAKE THE ASSEMBLY WORK IN THE BOX, THE INSULATION HAS BEEN GAPPED OPEN A LITTLE BIT INSIDE OF THE BOX.

Q. AND, MR. RUTILA, I AM GOING TO MOVE ON, THEN, TO THE NEXT SERIES OF PHOTOS REGARDING ELECTRICAL WIRE.

SCOTT, CAN YOU PULL UP HERNANDEZ 580-0001, AND CAN YOU IDENTIFY FOR THE COURT WHAT THIS IS?

A. THIS IS THAT SAME WIRE HAVING BEEN DISCONNECTED AND THEN SOME OF THE BLACK INSULATION. YOU CAN SEE THE HOOK AT TOP --

MR. SEEGER: HOLD ON BEFORE YOU DESCRIBE TOO MUCH.

THE WITNESS: I APOLOGIZE. IT'S THE SAME WIRE DISCONNECTED AND SOME OF THE INSULATION STRIPPED.

MR. SEEGER: YOUR HONOR, WE'D MOVE THIS INTO EVIDENCE.

THE COURT: LET IT BE ADMITTED.

BY MR. SEEGER:

Q. ALL RIGHT, MR. RUTILA, CAN YOU PLEASE EXPLAIN YOUR OBSERVATIONS HERE?

A. SO WE STRIPPED THE BLACK INSULATION BACK FROM WHERE IT WAS NECKED AND THEN LOOK DOWN THE WIRE AND, ALTHOUGH THE IMAGE DOESN'T DO IT JUSTICE PRESENTED THERE, THERE ARE A SERIES OF, ALMOST FORMING A LINE, BUT A SERIES OF BLACK SPOTS ON THE WIRE UNDERNEATH THE INSULATION, AND IT GOES, WE SELECTED A SPOT, AN INCH AND SEVEN-EIGHTHS DOWN THE WIRE, AND CONFIRMED THAT IT'S COPPER SULFIDE CORROSION, AND AN INCH AND SEVEN-EIGHTHS DOWN THE WIRE FROM THAT OPEN END OF THE INSULATION.

Q. NOW, AT THIS VIEW, WOULD YOU INTERPRET WHAT YOU SEE THERE AS, WITHOUT MAGNIFYING IT, JUST LOOKING AT IT JUST AS IT IS THERE, WOULD YOU INTERPRET THAT AS BEING SHINY COPPER?

A. SOME OF THE COPPER IS SHINY, AND IT'S SHINY EXCEPT FOR WHERE THOSE BLACK SPOTS ARE.

Q. AND THEN, SCOTT, WOULD YOU PULL UP HERNANDEZ 581-0001.

AND JUST IDENTIFY FOR THE COURT WHAT THIS IS BEFORE YOU DESCRIBE IT.

A. THIS IS A LABORATORY ELECTRON MICROSCOPE IMAGE AND EDS PLOT FROM THAT IMAGE.

MR. SEEGER: AND, YOUR HONOR, WE REALLY WOULD USE THIS MORE BY WAY OF A DEMONSTRATIVE IF THAT'S OKAY WITH THE COURT.

MR. SANDERS: SAME OBJECTION WE HAD BEFORE, THAT IT WAS JUST RECENTLY RECEIVED.

THE COURT: ALL RIGHT.

BY MR. SEEGER:

Q. WOULD YOU PLEASE DESCRIBE FOR THE COURT WHAT THIS SHOWS?

A. THIS SHOWS SEVERAL THINGS. THE LOWER IMAGE SHOWS CRYSTALS THAT ARE -- THAT'S CRYSTALS AT ONE OF THOSE BLACK SPOTS.
Q. NOW, JUST TO BE CLEAR, WE'RE LOOKING AT THE WIRE THAT WE JUST SAW IN THE LAST PHOTO --
A. THAT'S RIGHT.
Q. -- THAT APPEARED A LITTLE SHINIER.
A. THAT'S RIGHT, THAT'S RIGHT. THAT'S THAT WIRE THAT WAS MOSTLY SHINY WITH THE LINE OF BLACK SPOTS UNDERNEATH THE INSULATION.
THIS PARTICULAR CRYSTAL IS AN INCH AND SEVEN-EIGHTHS FROM THE OPEN END OF THAT INSULATION, WE STRIPPED IT BACK, PUT THAT BLACK SPOT UNDER THE ELECTRON MICROSCOPE AND TOOK THIS IMAGE OF THE CRYSTALS. AND THEN WE HAVE TO GO BACK TO THE UPPER LEFT OF THE EDS, A PLOT OF THAT, WHICH DR. SCHEINER, OUR CHEMIST AT SGH, CONFIRMS DEMONSTRATES THAT THOSE ARE COPPER SULFIDE CRYSTALS.
Q. AND THE TEST YOU REFERRED TO, EDS, CAN YOU JUST TELL US WHAT THAT IS AND WHAT THAT DOES?
A. I RELY HEAVILY ON DR. SCHEINER, BUT THE ESSENCE OF IT IS, THE ELECTRON MICROSCOPE HAS A DETECTOR THAT COLLECTS THE REFLECTING PARTICLES OR BEAM FROM THE MICROSCOPE AND THEN ANALYZES THOSE FOR ELEMENTAL COMPONENT S. SO IT'S A DETECTOR THAT ALLOWS THE ELECTRON MICROSCOPE TO DETERMINE WHAT ACTUAL ELEMENTS ARE AT THE BEAM.
Q. AT THIS POINT LET'S MOVE ON TO THE NEXT GROUP OF PHOTOS WE HAVE REGARDING CIRCUIT BOARDS AND THINGS LIKE THAT.
THE COURT: AND AFTER WE GET THAT IN WE'LL TAKE A BREAK.
MR. SEEGER: OH, SURE. DO YOU WANT ME TO GO THROUGH THAT

FIRST, YOUR HONOR?

THE COURT: YES.

MR. SEEGER: SCOTT, WOULD YOU PULL UP CDW 24-0120.

THE DEPUTY CLERK: ARE YOU GOING TO USE THE HERNANDEZ?

MR. SEEGER: YEAH, I AM GOING TO USE, I'M GOING TO ACTUALLY SHOW THIS FIRST AND HAVE HIM DESCRIBE IT AND THEN WE'LL DO EACH PHOTO IF THAT'S OKAY. WE HAVE THREE ON ONE PAGE.

THE DEPUTY CLERK: WITH THE HERNANDEZ NUMBERS?

MR. SEEGER: YES. FOR THE RECORD, I'LL JUST IDENTIFY THE PHOTOS. IT'S TOP ONE IS HERNANDEZ 285, MIDDLE PHOTO IS HERNANDEZ 286, AND THE BOTTOM PHOTO IS HERNANDEZ 287.

BY MR. SEEGER:

Q. AND COULD YOU JUST TELL US WHAT THESE ARE, IDENTIFY THESE PHOTOS FIRST, PLEASE, MR. RUTILA?

A. THESE ARE THREE IMAGES AT DIFFERENT MAGNIFICATION, IF YOU WILL, OF A THERMOSTAT FROM THE HERNANDEZ HOME.

THE COURT: YOU OFFER THOSE AND I'LL ADMIT THEM.

MR. SEEGER: YES, THANK YOU, YOUR HONOR.

BY MR. SEEGER:

Q. ALL RIGHT. NOW, TELL US A LITTLE BIT MORE ABOUT WHAT THESE SHOW AND WHY WE'RE CONCERNED ABOUT THESE PHOTOS.

A. THE TOP IMAGE IS REALLY JUST TO SET THE STAGE, YOU DON'T NEED TO BLOW IT UP. IT JUST SHOWS THE OPENING UP OF THE THERMOSTAT TO EXPOSE THE PRINTED CIRCUIT BOARD ON THE INSIDE. THE MIDDLE IMAGE IS THE CIRCUIT BOARD AND THAT'S WORTH GOING IN A BIT.

MR. SEEGER: LET'S BLOW THAT UP A BIT. THANK YOU, SCOTT.

THE WITNESS: THE CIRCUIT BOARD HAS MOUNTED ON IT, THE CIRCUIT BOARD HAS MOUNTED ON IT THIS LITTLE SWITCHING DEVICE, AND IT'S ACTUALLY GOT A SLIDE SWITCH THERE THAT ALLOWS YOU TO POSITION FROM HOT, COLD, FAN ONLY, AND OFF. AND THAT'S HOW THE HOMEOWNER WOULD CONTROL THE DEVICE.

THE NEXT IMAGE IS WHAT'S UNDERNEATH THAT. THE SWITCHING DEVICE CONSISTS OF A SERIES OF --

BY MR. SEEGER:

Q. JUST TO BE CLEAR, YOU POPPED OFF THE TOP OF THAT?

A. WE'VE TAKEN OFF THE PLASTIC COVER, WE'VE TAKEN OFF THE ACTUAL SLIDE SWITCH AND, TO REVEAL WHAT'S MOUNTED ON THE CIRCUIT BOARD, AND THIS IS THE MULTI-POSITION SWITCH ON THE CIRCUIT BOARD. THESE VARIOUS SLOTS LINE UP OR DON'T LINE UP. AND AS YOU MOVE THE SWITCH BACK AND FORTH, YOU GET DIFFERENT POSITIONS FOR CONTROLLING WHETHER THE DEVICE IS ON, OFF, OR HEAT OR COOL OR FAN ONLY.

AND THEN WHAT WE'RE LOOKING AT IS THE SWITCHING DEVICE, METAL BARS THAT FORM THE SWITCH WHERE THE ARROW IS AND THE CORROSION ON THOSE BARS.

Q. AND THEN LET'S GO TO THE NEXT SET OF PHOTOS, SCOTT, IF YOU COULD PULL THE PAGE --

A. BEFORE YOU GO, I'M SORRY, I WASN'T DONE, I SHOULD HAVE MENTIONED. SO WE DID EXAMINE THAT UNDER THE ELECTRON MICROSCOPE AND DETERMINED THAT THAT'S COPPER SULFIDE CORROSION ON THOSE SWITCH -- ON THAT SWITCH.

MR. SEEGER: AND, SCOTT, CAN YOU PULL UP CDW 24-0121. YOU DON'T HAVE THAT? CAN YOU THROW THE ELMO ON? CAN WE GET ALL THREE OF THOSE IN FOCUS A LITTLE BETTER?

AND, YOUR HONOR, FOR THE RECORD, AND I'LL IDENTIFY THESE, THESE ARE JUST MAGNIFICATIONS OF THE LAST PAGE WE WERE LOOKING AT. THE TOP PHOTO IS HERNANDEZ 288, MIDDLE PHOTO IS HERNANDEZ 289, AND THE BOTTOM IS HERNANDEZ 290, AND WE WOULD MOVE THESE IN AS WELL, YOUR HONOR.

THE COURT: I'LL ADMIT THEM.

MR. SEEGER:

Q. MR. RUTILA, CAN YOU PLEASE DESCRIBE WHAT WE'RE LOOKING AT AT THE TOP?

A. WELL, I'LL IDENTIFY THEM FIRST, THESE ARE --

Q. YOU DON'T NEED TO IDENTIFY THEM, THEY'RE ALREADY IN.

A. OH, I'M SORRY. THE TOP IS JUST A CLOSER VIEW OF THAT SAME SWITCH BAR, CLOSER VIEW OF THAT SAME SWITCH BAR, AND THE COPPER SULFIDE CORROSION ON THE SWITCH BAR.

Q. THE SWITCH BAR IS RIGHT HERE, THIS PIECE RIGHT HERE (INDICATING)?

A. THAT'S ONE OF THEM, THERE'S A WHOLE SERIES FROM THE PREVIOUS PHOTOGRAPHS, YOU WOULD'VE KNOWN, THERE'S ABOUT MAYBE 20 OF THOSE INTERMITTENT PIECES OF COPPER THAT COMPRISE THE ACTUAL SWITCHING, SO THAT IF YOU MOVE THE SLIDE SWITCH YOU GET DIFFERENT CONTACT POINTS.

Q. AND IF THE COPPER SULFIDE WERE NOT THERE, WHAT WOULD THAT

SURFACE LOOK LIKE?
A. IT WOULD LOOK BRIGHT AND SHINY COPPER.
Q. AND CAN WE GO TO THE NEXT PHOTO, HERNANDEZ 289. AND TELL US, WHAT'S THE SIGNIFICANCE OF THIS?
A. THIS IS, THIS IS ANOTHER VIEW OF THE SAME DEVICE, AND -- IS IT THE SAME DEVICE? YES, THIS IS ANOTHER VIEW OF THE SAME DEVICE, AND WE'RE GOING TO LOOK AT SOME CLOSER-UP IMAGES AT THE GREEN ARROW, EXCUSE ME, THE BLUE ARROW, WHERE WE FOUND CORROSION ON SOME COMPONENTS.
Q. RIGHT. AND, SCOTT, IF YOU COULD PULL UP HERNANDEZ 290. AND BLOW THAT UP. THANK YOU.
IS THAT THE AREA THAT YOU WERE TALKING ABOUT?
A. THAT'S CORRECT. BETWEEN MR. GALLER AND OUR STAFF, THEY IDENTIFIED THOSE AS RECTIFIERS, AND THIS IS COPPER SULFIDE CORROSION ON THE TIN LEAD, SO THEY TAKE THE COPPER WIRE AND THEY PUT SOME TIN ON IT, AND THAT'S COPPER SULFIDE CORROSION ON THOSE WIRES, REALLY, FOR THOSE RECTIFIERS.
Q. OKAY. AND JUST A COUPLE MORE PHOTOS TO DEMONSTRATE THIS. SCOTT, CAN YOU GO TO PAGE, WHICH IS MARKED CDW 24-0133.
AND JUST IDENTIFY FOR THE COURT WHAT WE'RE LOOKING AT HERE.
A. THESE ARE IMAGE S OF A WINDOW AIR CONDITIONER FROM THE HERNANDEZ HOME.
MR. SEEGER: WE MOVE THIS INTO EVIDENCE, YOUR HONOR.
THE DEPUTY CLERK: DOES IT HAVE HERNANDEZ NUMBERS?

MR. SEEGER: YES, THE TOP PHOTO IS HERNANDEZ 320 AND THE ONE BELOW THAT IS HERNANDEZ 321.

THE COURT: LET IT BE ADMITTED.

BY MR. SEEGER:

Q. PLEASE TELL US, WHAT'S THE SIGNIFICANCE OF THESE PHOTOS?

A. THE TOP VIEW IS SIMPLY TO ORIENT US. THIS IS THE SIDE OF THE AIR CONDITIONER THAT WOULD FACE THE HOMEOWNER, YOU CAN SEE THE CONTROL PANEL UP AT THE BLACK, AND THEN YOU CAN SEE THE COILS IN THE SHADOW WHERE THE RED ARROW IS.

Q. NOW, HERNANDEZ 321, THE NEXT PHOTO IS, BLOWS THAT UP A LITTLE BIT, RIGHT?

A. THAT'S CORRECT. SO THAT IS COPPER SULFIDE CORROSION WE'VE IDENTIFIED ON THE COILS IN THAT. WE ARE TOLD THAT THIS DEVICE HAD STOPPED WORKING, WE FOUND THAT THE COILS STILL HAD THE PRESSURE, THEY STILL HAD THE R-22 GAS AND WEREN'T LEAKING, BUT WE DID DETERMINE THAT'S COPPER SULFIDE CORROSION. SO FROM THAT I CONCLUDE THAT THAT'S NOT THE CAUSE OF THE NOT WORKING, IT WAS ELECTRICAL IS WHAT I CONCLUDED.

MR. SEEGER: AND, SCOTT, IF YOU CAN PULL UP THE NEXT THREE PHOTOS, WHICH IS CDW 24-0134.

THE COURT: LET'S GET TO A BREAKING POINT, COUNSEL.

MR. SEEGER: YOUR HONOR, THIS IS JUST ANOTHER VIEW OF THE AIR CONDITIONER.

THE COURT: WHAT'S THE NUMBER?

MR. SEEGER: HERNANDEZ 322.

THE COURT: OKAY. LET IT BE ADMITTED.

MR. SEEGER: SCOTT, GO TO THE NEXT TWO SO WE CAN JUST GET THEM ADMITTED AND WE'LL TAKE A BREAK.

THIS IS HERNANDEZ 323, WHICH IS A CIRCUIT BOARD IN THE AIR CONDITIONER, YOUR HONOR.

THE COURT: LET IT BE ADMITTED.

MR. SEEGER: AND THE FINAL ONE IS HERNANDEZ 324, WHICH IS A BLOWUP OF THAT. AND, YOUR HONOR, WE CAN TAKE A BREAK RIGHT HERE.

THE COURT: ALL RIGHT. LET'S TAKE A BREAK. 15 MINUTES WE'LL STAND IN RECESS.

THE MARSHAL: ALL RISE.

(WHEREUPON, A RECESS WAS TAKEN.)

(OPEN COURT.)

THE COURT: BE SEATED, PLEASE. YOU'RE STILL UNDER OATH, SIR.

MR. SEEGER: MAY I CONTINUE?

THE COURT: YES.

BY MR. SEEGER:

Q. SO, SCOTT, LET'S GO TO HERNANDEZ 323. AND WE WERE TALKING ABOUT THE AIR CONDITIONING UNIT BEFORE JUST TO REORIENT US. WHAT IS THIS AGAIN IN THIS PHOTOGRAPH THAT WE'RE LOOKING AT?

A. THIS IS A PRINTED CIRCUIT BOARD FROM THAT WINDOW AIR CONDITIONING UNIT. AND I CALL YOUR ATTENTION, AMONG OTHER THINGS, TO THESE SWITCHES. A LOT OF THESE DEVICES WHEN YOU HAVE A PANEL ON THE FRONT YOU'LL HAVE AN ON/OFF SWITCH, YOU'LL SEE THE ONE THAT

SAYS POWER, ON/OFF SWITCH AND SO ON. THAT'S WHAT THEY LOOK LIKE UNDERNEATH THE FACEPLATE.

Q. AND IF WE CAN MOVE ON, SCOTT, TO HERNANDEZ 324. IS THAT A BETTER EXAMPLE OF WHAT YOU'RE TALKING ABOUT?

A. THAT'S RIGHT. WE'RE JUST LOOKING IN CLOSER AT THAT POWER SWITCH.

Q. NOW, WHAT ARE WE OBSERVING HERE ON THE SURFACE OF THAT SWITCH?

A. THAT'S BEEN DISASSEMBLED AND WHAT WE'RE SEEING IS SILVER SULFIDE CORROSION ON THE SURFACE OF THE SWITCH.

Q. AND WHAT COLOR SHOULD THAT BE?

A. IT WOULD BE A SHINNY SILVER LIKE COLOR.

THE COURT: WE TALKED ABOUT COPPER BEFORE, WHAT METAL IS THAT?

THE WITNESS: IT'S SILVER SULFIDE SO THE UNDERLYING SWITCH IS SILVER AND THEN THE CORROSION, THE BLACK CORROSION IS SILVER SULFIDE.

BY MR. SEEGER:

Q. MR. RUTILA, JUST TO FOLLOW-UP ON THAT, WHAT IS ABOUT COPPER AND SILVER AND SULFUR GASES, CAN YOU EXPLAIN TO US WHAT THE RELATION IS THERE?

A. WELL, AS YOU'LL BE HEARING FROM MR. GALLER, THOSE METALS ARE SELECTED BECAUSE THEY'RE HIGHLY RESISTANT TO CORROSION IN THE EVERY DAY ATMOSPHERE AROUND US, AND THE SULPHUR GASES UNFORTUNATELY ARE HIGHLY CORROSIVE TO THOSE PARTICULAR METALS. SO METALS SELECTED BECAUSE THEY DON'T CORRODE IN THE ORDINARY ATMOSPHERE OF A HOME,

FOR EXAMPLE, ARE GREATLY AFFECTED BY THE SULPHUR CORROSIVE GASES PRODUCED BY THE CHINESE DRYWALL.

Q. AND LET ME JUST PAUSE HERE ALSO FOR A SECOND BEFORE WE GO ON WITH THE PHOTOS, AND ASK YOU A QUESTION ABOUT THE ROLE OF MOISTURE IN CORROSION. CAN YOU TELL US WHAT ROLE MOISTURE PLAYS WITH CORROSION?

A. IN ADDITION TO THE SULPHUR GASES OR ANY OTHER CORROSIVE AGENT YOU NEED MOISTURE.

Q. HOW MUCH MOISTURE ARE WE TALKING ABOUT, A RAIN DROP, LESS, MORE?

A. IT DOES NOT HAVE TO BE VISIBLE. IT IS UNLIKELY --

THE COURT: WAIT, THERE'S AN OBJECTION. I SUSTAIN THE OBJECTION, HE IS GOING TOO FAR INTO THE AREA OF CORROSION, I SUSTAIN THE OBJECTION.

MR. SEEGER: ALL RIGHT. LET'S GO TO, SCOTT, HERNANDEZ 612.

BY MR. MEUNIER:

Q. AND IF YOU COULD IDENTIFY FOR US WHAT THIS IS, PLEASE, MR. RUTILA.

A. THIS IS A CIRCUIT BOARD FROM A TELEVISION SET, 13 INCH TELEVISION SET FROM THE HERNANDEZ HOME.

MR. SEEGER: AND SCOTT -- YOUR HONOR, I'M SORRY, WE IDENTIFIED THAT, CAN I MOVE THAT INTO EVIDENCE PLEASE, IT'S HERNANDEZ 612.

THE COURT: LET IT BE ADMITTED.

MR. SEEGER: AND I WOULD LIKE TO TAKE ANOTHER PHOTO WITH THIS, SCOTT, PULL UP 614, PLEASE.

BY MR. SEEGER:

Q. JUST TELL US WHAT THAT IS, MR. RUTILA.

A. THIS IS A COLLECTION OF COMPONENTS THAT I REMOVED FROM THAT CIRCUIT BOARD, SWITCHES, RESISTERS -- THAT'S A RESISTER (INDICATING) -- THIS IS A SIMILAR SWITCH TO WHAT WE SAW BEFORE AND ANOTHER DEVICE, I ACTUALLY DON'T RECOLLECT WHAT THE DEVICE IS, THAT WE REMOVED THAT HAD CORROSION ON THEM (INDICATING).

Q. THIS CIRCUIT BOARD YOU SAID EARLIER IS FROM THE TELEVISION SET, RIGHT?

A. THAT'S CORRECT.

Q. DO COMMON APPLIANCES AND DEVICES IN THE HOME ALL HAVE CIRCUIT BOARDS LIKE THIS?

A. OF THE DOZENS AND DOZENS OF DEVICES I'VE LOOKED AT IN CHINESE DRYWALL HOMES, ALL OF THEM HAVE A PRINTED CIRCUIT BOARD IN ONE WAY, SHAPE, OR FORM, AND THAT ONE THE TELEVISION IS MUCH LARGER, SOME OF THEM ARE QUITE SMALL.

Q. AND WHAT ARE YOUR OBSERVATIONS WITH REGARD TO HERNANDEZ 614?

THE COURT: IS THAT IN EVIDENCE, COUNSEL?

MR. SEEGER: JUDGE, I'M SORRY.

THE COURT: LET IT BE ADMITTED INTO EVIDENCE.

MR. SEEGER: THANK YOU.

BY MR. SEEGER:

Q. WHAT ABOUT YOUR OBSERVATIONS WITH REGARD TO THIS PHOTOGRAPH?

A. THIS IS A COLLECTION OF DEVICES THAT WE FOUND COPPER SULFIDE OR SILVER SULFIDE, THE SWITCH HAD SILVER SULFIDE, THE OTHERS ALL HAD COPPER SULFIDE CORROSION ON THEM.

MR. SEEGER: AND, SCOTT, IF YOU PULL UP HERNANDEZ 615.

AND, YOUR HONOR, THIS IS JUST A BLOW UP OF ONE OF THESE PIECES WE'RE MOVING INTO EVIDENCE.

THE COURT: LET IT BE ADMITTED.

BY MR. SEEGER:

Q. TELL US SPECIFICALLY WHAT YOU SEE HERE?

A. THE PHOTO DOESN'T DO IT JUSTICE, BUT THIS IS RIGHT BY THE POWER SOURCE FOR THE TELEVISION. THIS HOLDS A SMALL FUSE AND THE FUSE HAS BEEN REMOVED, AND YOU CAN SEE THE FUSE SLIPPED INTO THIS BODY ON EITHER SIDE OF THESE FLANGES, AND YOU CAN SEE THE CORROSION OF THAT FUSE RETAINER, AND EVEN UNDERNEATH WHERE THE FUSE CONTACT POINTS ARE, THERE IS CORROSION.

Q. I WANT TO MOVE AHEAD A LITTLE BIT, MR. RUTILA. YOU HAVE HAD AN OPPORTUNITY IN ADDITION TO THE ELECTRONIC DEVICES, YOU'VE HAD AN OPPORTUNITY TO LOOK AT OTHER ITEMS IN THE HOUSE, PICTURE FRAMES, LAMPS, THINGS LIKE THAT?

A. I LOOKED IN THE BACK OF THE REFRIGERATOR AND THE COPPER TUBING IN THE BACK OF THE REFRIGERATOR WERE CORRODED, AND I LOOKED AT HOUSEHOLD ITEMS AROUND THE HOME AS WELL.

Q. AND YOUR OBSERVATIONS WITH REGARD TO THOSE ITEMS LIKE THE REFRIGERATOR AND THINGS LIKE THAT, ARE THEY CONSISTENT WITH WHAT WE'RE SEEING IN THESE PHOTOGRAPHS?

A. YES. MANY OF THE ITEMS SHOW CORROSION THAT ARE SURPRISING TO ME AS AN INVESTIGATOR.

Q. WELL, LET ME JUST BACK UP.

MR. SEEGER: I DON'T KNOW IF WE HAVE A NUMBER FOR THIS ONE, DO WE?

YOUR HONOR, JUST TO MARK FOR IDENTIFICATION WHAT I AM JUST GOING TO SHOW THE WITNESS AS A DEMONSTRATIVE, IF IT'S OKAY, IS HERNANDEZ 651.

THE COURT: ARE YOU ADMITTING IT? YOU'RE NOT ADMITTING IT? IF YOU ADMIT IT LET'S SUBSTITUTE A PHOTOGRAPH.

MR. SEEGER: OKAY. YOUR HONOR, THAT'S WHAT WE'LL DO, WE'LL SUBSTITUTE A PHOTOGRAPH.

THE DEPUTY CLERK: YOU'RE ADMITTING IT THEN. JUDGE?

THE COURT: YES, I WILL ADMIT IT IN THE FORM OF A PHOTOGRAPH.

MR. SEEGER: THANK YOU, YOUR HONOR. MAY I APPROACH THE WITNESS JUST TO SHOW IT TO HIM?

THE COURT: YES.

MR. SEEGER: YOUR HONOR, LATER WHEN THE HERNANDEZES TAKE THE STAND WE WILL HAVE THEM TESTIFY THAT THAT'S THEIR LAMP.

BY MR. SEEGER:

Q. MR. RUTILA, WHAT ARE YOUR OBSERVATIONS WITH REGARD TO THIS LAMP?

A. WHEN I FIRST SAW THE LAMP IN THE LIVING ROOM RIGHT NEAR THE FRONT DOOR, I LOOKED AT IT TOP TO BOTTOM, AND THE FIRST SIGNIFICANT

OBSERVATION I SAW WAS THE CLEAR PLASTIC CORD HAS A SILVER LOOKING WIRE UNDERNEATH THE YELLOW INSULATION; AND IT'S A BRAIDED CORD, A BRAIDED WIRE, AND THE BRAIDED WIRE HAS A BLACK STRIPPING ON IT. AND THAT WAS THE SIGNIFICANT OBSERVATION THAT I DID, AND I SUSPECT IT'S COPPER SULFIDE CORROSION, I HAVEN'T TAKEN IT APART, BUT IT'S VERY SIMILAR TO THE SIMILAR WIRES THAT MR. KRANTZ HAS DONE PREVIOUSLY AND IDENTIFIED COPPER SULFIDE CORROSION ON THE WIRE.

Q. AND YOU'VE OBVIOUSLY SEEN LAMP CORDS LIKE THAT IN YOUR EXPERIENCE; IS THAT FAIR TO SAY?

A. YES.

Q. AND WHAT COLOR WOULD YOU EXPECT THAT TO BE IF THAT DIDN'T HAVE COPPER SULFIDE ON IT?

A. THE YELLOW I BELIEVE IS JUST HOW THE MANUFACTURER CHOSE IN TERMS OF THE PLASTIC INSULATION. BUT THE WIRE WOULD HAVE A SILVER LOOKING APPEARANCE.

Q. AND, SCOTT, CAN YOU PULL UP HERNANDEZ, IT'S A PHOTOGRAPH, HERNANDEZ 272, PLEASE. AND, MR. RUTILA, CAN YOU JUST IDENTIFY WHAT THIS IS?

A. THAT IS A PICTURE FRAME WHICH, FROM THE HERNANDEZ HOME THAT I SAW THERE.

MR. SEEGER: AND, YOUR HONOR, WE WOULD MOVE THIS INTO EVIDENCE, THE PHOTO HERNANDEZ 272.

THE COURT: LET IT BE ADMITTED.

MR. SEEGER: ALSO, YOUR HONOR, WE HAVE THE ACTUAL PICTURE FRAME. MAY I HAND THIS TO THE WITNESS?

THE COURT: YES.

BY MR. MEUNIER:

Q. MR. RUTILA, WOULD YOU PLEASE TELL US WHAT YOUR OBSERVATIONS ARE WITH REGARD TO THIS PICTURE FRAME?

A. YES. THE FRAME HAS, AS YOU CAN SEE IN THE PHOTOGRAPH, THESE BLACK BLOTCHES IN MANY PLACES ON IT. I'VE BEEN TOLD THAT THIS IS SILVER, BUT WHAT I SEE IS THE SILVER-LIKE MATERIAL APPEARS TO BE COATED WITH SOMETHING, POSSIBLY A PLASTIC. AND THEN UNDERNEATH THAT COATING, WHATEVER THE UNDERLYING MATERIAL IS, IS CORRODING. I CAN'T, WITHOUT TAKING IT APART, DEMONSTRATE WHAT THE ACTUAL MECHANISM IS OF SILVER CORROSION OR SOMETHING ELSE. BUT THAT'S WHAT I CAN SEE FROM THIS. AND IT'S THE SORT OF THING THAT DEMONSTRATES THAT UNDERNEATH THAT PLASTIC COATING SOME DETERIORATION IS OCCURRING.

Q. OKAY. AND, MR. RUTILA, YOU HAVE ALSO LOOKED AT ITEMS AT THE HOUSE AND EXAMINED THEM LIKE HAIR DRYERS; IS THAT FAIR?

A. YES.

Q. RATHER THAN CONTINUE TO JUST SHOW PHOTOS FOR THE NEXT HOUR, WE CAN GO ON FOREVER WITH MILLIONS OF PHOTOS IN THIS CASE, TELL THE COURT WHAT YOUR OBSERVATIONS ARE WITH REGARD TO THE HAIR DRYER, TOASTERS, OR OTHER APPLIANCES THAT YOU'VE TAKEN APART AND LOOKED AT. IS IT CONSISTENT WITH WHAT WE'VE SEEN IN THE PHOTOGRAPHS TODAY?

A. YES. WE'VE TAKEN APART DOZENS OF ITEMS FROM THE HERNANDEZ HOME, AND SOME OF THEM YOU FIND ONLY ONE OR TWO PARTS ON A PRINTED

CIRCUIT BOARD WITH CORROSION, SOME OF THEM YOU HAVE TO TAKE APART A SWITCH BEFORE YOU FIND THE CORROSION, SOME OF THEM THE CORROSION IS VERY EVIDENT AS SOON AS YOU OPEN UP THE CASING. BUT IN EACH INSTANCE OF THE ELECTRONIC DEVICES, WE FIND CORROSION OF COMPONENTS IN PRINTED CIRCUIT BOARDS OR ON SWITCHES, CONFIRMED ELECTRON MICROSCOPE AND EDS AS COPPER SULFIDE OR SILVER SULFIDE CORROSION.

OF OTHER DEVICES, NON-ELECTRONIC DEVICES, DOORKNOBS, DOOR STRIKE PLATES, THERE IS ALL OF THESE ARE A BRASS MATERIAL AND INTENTIONALLY IN THE HERNANDEZ HOME AS PART OF THE MANUFACTURING PROCESS GIVE IT A DARK PATINA SO THEY'RE ACTUALLY DARKENED ON PURPOSE AND THEN AS PART OF THE ARCHITECTURE OF THE HOME. BUT EVEN THAT DARK PATINA HAS A BLOTCHINESS TO IT THAT, FOR EXAMPLE, STRIKE PLATE FROM THE DOOR WE CONFIRMED WITH ELECTRON MICROSCOPE AS COPPER SULFIDE CORROSION.

SAME THING WITH A WINE RACK, THERE WAS A WINE RACK FROM THE HOME THAT HAD BLOTCHINESS TO IT. AND AGAIN, UNDER THE ELECTRON MICROSCOPE CONFIRMED THAT IT'S BEING CORRODED, IT'S GOT COPPER SULFIDE CORROSION ON IT.

Q. ACTUALLY LET ME JUST SHOW YOU ONE PHOTO I THINK WHICH DEMONSTRATES WHAT YOU'RE TALKING ABOUT. SCOTT, CAN YOU PLEASE PULL UP HERNANDEZ 534. COULD YOU JUST IDENTIFY FOR THE COURT WHAT THIS IS?

A. THAT'S A DOORKNOB. AND WHAT'S IMPORTANT ABOUT IT -- EXCUSE ME, IDENTIFY IT.

MR. SEEGER: YOUR HONOR, WE WOULD MOVE 534 INTO EVIDENCE.

THE COURT: LET IT BE ADMITTED.

THE WITNESS: PARDON ME.

BY MR. SEEGER:

Q. GO AHEAD AND DESCRIBE IT.

A. THIS BLACK THAT YOU SEE IS AN INTENTIONAL PART OF THE DOORKNOB, IT'S INTENTIONALLY BLACK. THIS BLOTCHINESS THOUGH IS THE CORROSION, AND I DIDN'T PUT THIS PARTICULAR DEVICE UNDER THE ELECTRON MICROSCOPE BUT THERE'S A MATCHING STRIKE PLATE THAT GOES WITH IT THAT HAS THE SAME INTENTIONAL BLACK PATINA AND CONFIRMED THAT THAT IS COPPER SULFIDE CORROSION ON THE STRIKE PLATE LOOKS JUST LIKE THAT.

Q. NOW, MR. RUTILA, LET'S MOVE ON TO THE QUESTIONS ABOUT THE SCOPE OF REMEDIATION. DO YOU HAVE OPINIONS ON WHAT WOULD BE THE APPROPRIATE SCOPE OF REMEDIATION FOR THE HERNANDEZ HOUSE?

A. I DO.

Q. AND COULD YOU PLEASE TELL US WHAT YOU BELIEVE SHOULD BE DONE TO REMEDY THE PROBLEM HERE?

A. YES. AS WE ALREADY KNOW, THE CHINESE DRYWALL HAS TO GO, THAT'S BEEN AGREED UPON. IN TERMS OF WHEN THAT'S DONE THE CELLULOSE INSULATION, THE BLOWN-IN INSULATION IS GOING TO -- NEEDS TO GO, IT'S GOING TO FALL OUT ANYWAY, I BELIEVE THAT'S BEEN AGREED UPON.

THE CABINETS, MOST OF THE FIXTURES, THE FIXTURES IN THE CABINET, FOR EXAMPLE THE SINKS, THE TOILETS, THOSE DEVICES ALL NEED TO BE REMOVED IN ORDER TO TAKE OUT THE DRYWALL. THE TRIM IN THE HOUSE AROUND THE WINDOWS AND AT THE BASE OF THE WALLS, AROUND THE

DOORS ALL NEEDS TO BE REMOVED IN ORDER TO TAKE OUT THE CHINESE DRYWALL.

Q. LET ME PAUSE YOU ON THAT. IS THERE ANY WAY TO LEAVE THE TRIM AND THESE FIXTURES IN PLACE AND STILL REMOVE THE DRYWALL?

A. SOME OF THE TRIM YOU COULD PROBABLY GET A TOOL AND GOUGE THE DRYWALL BEHIND IT, BUT THEN YOU'VE GOT TO REMOVE THE NAILS AND GET THE NEW DRYWALL BACK BEHIND IT SO NOT PRACTICALLY. IF I HAD TO SCRATCH OUT A LITTLE DRYWALL, I PROBABLY COULD FIGURE OUT A WAY BEHIND A PIECE OF TRIM, BUT IT'S NOT PRACTICAL.

Q. DO YOU HAVE AN OPINION AS TO IF YOU PULL THE TRIM OUT AND THE CABINETS AND THE FIXTURES OUT, WHAT THE LIKELIHOOD OF THEM BEING DAMAGED IS?

A. IT SIMPLY DEPENDS ON THE CARE OF THE WORKER. MY FATHER WAS A FINISH CARPENTER AND WE WOULD TAKE AMAZING THINGS APART SOMETIMES AND IN SPITE OF THE BEST CARE, SOMETIMES YOU BREAK THEM AND SOMETIMES YOU DON'T. SO WITH EXTREME CARE, A LOT OF THESE ITEMS COULD BE TAKEN APART AND SALVAGED. YOU'LL BREAK SOME, INEVITABLY, I CAN TELL YOU FROM THAT EXPERIENCE.

AND THEN THE QUESTION IS ARE YOU GOING TO HAVE SOMEONE WITH THAT SKILL SET, LITERALLY A CABINETMAKER TAKING APART STUFF. AND IF YOU DO, YOU'LL GET MOST OF IT IN ONE PIECE. BUT IF YOU'RE GOING TO USE OTHERWISE SKILLED CONSTRUCTION WORKERS, CARPENTERS THAT WOULD NORMALLY INSTALL THE STUFF, YOU'RE GOING TO BREAK A LOT OF IT.

Q. WITH REGARD TO ELECTRIC WIRES, COPPER WIRES, AND THE COPPER

PIPES, WHAT'S YOUR OPINION THERE ON THE SCOPE OF REMEDIATION?

A. IN TERMS OF THE ELECTRICAL WIRES, WE KNOW THAT THE SWITCHES AND THE RECEPTACLES, LOW VOLTAGE DEVICES, SMOKE ALARMS AND THE LIKE HAVE BEEN AGREED UPON TO BE REMOVED HERE. THE COPPER WIRE THOUGH WE KNOW THAT WE HAVE FOUND CORROSION UNDER THE ROMEX JACKET OF THE GROUND CONCEALED IN THE WALL, WE KNOW ON ANOTHER HOUSE. WE KNOW THAT ON THIS HOUSE WE FIND CORROSION UNDERNEATH THE INSULATION ON THE HOT WIRE ON TWO DEVICES.

WHAT WE DON'T KNOW IS HOW FAR THAT CORROSION GOES. WHAT WE DON'T KNOW IS FORGETTING ABOUT THE BEHAVIOR OF THAT WIRE TODAY WHAT ITS FUTURE PERFORMANCE IS GOING TO BE. AND SO BECAUSE THAT WIRE WAS NEVER INTENDED FOR USE IN A CORROSIVE ATMOSPHERE, THE PRUDENT COURSE OF ACTION IS TO REMOVE THAT WIRE.

Q. WHEN YOU SAY NEVER INTEND FOR A CORROSIVE ATMOSPHERE, PLEASE EXPLAIN TO THE COURT WHAT YOU'RE TALKING ABOUT.

A. IT'S TYPE NM WIRE, NON-METALLIC JACKETED, AND IT'S NOT INTENDED FOR USE IN A CORROSIVE ATMOSPHERE. AND THE PARTICULAR ISSUE IS THE GROUND WIRE IN AN NMC CABLE HAS BY INTENT OF THE UNDERWRITERS LABORATORY INSULATION ON THE GROUND WIRE, AND THAT'S NOT THERE.

Q. SO I JUST WANT TO ALSO BE CLEAR, AND I'M SORRY IF I'M BEATING THIS HORSE, BUT WHEN YOU SAY NOT INTEND FOR A CORROSIVE ENVIRONMENT, DO YOU MEAN FOR ANY PERIOD OF TIME? CAN IT BE IN A CORROSIVE ENVIRONMENT AND THEN YOU REMOVE THE CORROSIVE ENVIRONMENT AND JUST STILL LEAVE IT THERE IN YOUR OPINION?

MR. SANDERS: OBJECTION, THIS CALLS FOR AN OPINION ON

CORROSION.

MR. SEEGER: I DON'T THINK IT DOES, YOUR HONOR, I THINK --

THE COURT: LET'S REFRAME THE QUESTION.

BY MR. SEEGER:

Q. THE NM WIRE, WHEN YOU SAY IT WASN'T INTENDED TO BE IN A CORROSIVE ENVIRONMENT --

THE COURT: WHAT DO YOU MEAN BY THAT?

MR. SEEGER: YES, WHAT DO YOU MEAN BY THAT?

THE WITNESS: WE KNOW FROM THE BUILDING CODE THAT NM WIRE IS NOT INTENDED FOR USE IN A CORROSIVE ATMOSPHERE. THE PARTICULAR DEFINITIONS OF CORROSIVE ATMOSPHERE ARE NOT THAT WELL DEFINED. BUT WHAT WE DO KNOW IS THAT, FOR EXAMPLE, UNDERWRITERS LABORATORY WITH THE FLOOD, WITH THE FLOODING AS A RESULT OF HURRICANE KATRINA HAS ADVISED THAT THE SAFE THING TO DO IS TO REMOVE THE WIRE BECAUSE THE USE OF NM WIRE IN A CORROSIVE ATMOSPHERE SIMPLY IS NOT UNDERSTOOD, IT'S NOT BEEN STUDIED, AND IT IS GUESSWORK AS FAR AS THE FUTURE. AND IT'S AN INCREASED RISK OF WHAT'S GOING TO HAPPEN AS A RESULT OF THAT CORROSION UNDERNEATH THE JACKET AND UNDERNEATH THE INSULATION THAT CREATES A RISK THAT IS NOT STUDIED.

BY MR. SEEGER:

Q. WHAT ABOUT, WHAT ARE YOUR OPINIONS ON SCOPE WITH REGARD TO THE HVAC SYSTEM?

A. YOU ASKED ABOUT THE PLUMBING, I DIDN'T ANSWER, ALL I DID WAS THE HVAC. NOW' I'LL COME BACK TO THE PLUMBING BECAUSE I FORGOT.

Q. NO, LET'S DO THE PLUMING, I'M SORRY. YOU'RE RIGHT, THANK YOU FOR THE CORRECTION.

WHAT ARE YOUR OPINIONS WITH REGARD TO THE COPPER PIPES AND THE PLUMBING?

A. THE COPPER PIPES HAVE CORROSION, THEY HAVE PITS, THE PITS ARE SMALL COMPARED TO THE THICKNESS OF THE TUBES; BUT OF MOST IMPORTANCE ARE THE PITS THAT WE'VE SEEN AT BRAZES, SO WE KNOW SOME ELEMENTS OF THE COPPER PIPING SYSTEM ARE COMPROMISED AND HAVE TO BE REPLACED. AND FOR THAT REASON, THE ITEMS WITH RESPECT TO FUTURE CORROSION THAT WE'LL BE HEARING ABOUT LEAD ME TO THE CONCLUSION THAT IT SHOULD BE REMOVED.

THE HOT WATER HEATER IS AN INTERESTING QUESTION AT THE HERNANDEZES, IT'S UP IN THE ATTIC. DOWN LOW IN THE ATTIC THE CHINESE DRYWALL IS THERE WITH INSULATION AND NO VAPOR AIR BARRIER THERE, SO AT LEAST IN THE AREA OF THE INSULATION WE KNOW IT'S A CORROSIVE ENVIRONMENT. UP HIGH ON THE HOT WATER HEATER WE SEE MUCH LESS CORROSION.

THE ONLY WAY I CAN MAKE A CERTAIN DETERMINATION OF THE HOT WATER HEATER IS TO TAKE IT APART AND LOOK AT IT IN MORE DETAIL IN THE LABORATORY, DISASSEMBLE IT. AND FOR THE HOT WATER HEATER UNDER THAT CIRCUMSTANCE, INSTEAD OF TAKING IT APART AND DISASSEMBLING IT, I ADVISE TO REPLACE IT.

Q. OKAY. LET'S MOVE ON TO THE HVAC SYSTEM, MR. RUTILA. WHAT ARE YOUR OPINIONS THERE?

A. THE HERNANDEZ HVAC SYSTEM, AS I UNDERSTAND IT, THE KNAUF HAS

AGREED TO REPLACE THE FLEXIBLE DUCTWORK. IF YOU GO UP IN THE ATTIC YOU'LL SEE LITERALLY A SPIDER LEGS LIKE DUCTWORK COMING OFF OF THE CABINET, THOSE DO NEED TO BE REPLACED AND THAT'S THE RIGHT THING TO DO.

THE CABINET UP IN THE ATTIC HAS A LOT OF NEW COMPONENTS, I HAVEN'T ACTUALLY BEEN ABLE TO FIGURE OUT IF IT'S A NEW CABINET OR NOT. BUT THAT GOES TO THE QUESTION OF WHEN DOES IT GET REPLACED. THOSE COPPER TUBES WERE RECENTLY INSTALLED, THE CIRCUIT BOARD I DON'T SEE CORROSION ON IT, I'D HAVE TO TAKE IT APART AS WE'VE LEARNED TO SEE IF IT HAS CORROSION ON IT. SO THE CIRCUIT BOARD I WOULD REPLACE BECAUSE OF THAT, SAME THING WITH THE CONTRACTOR, YOU HAVE TO TAKE IT APART TO KNOW WHETHER IT'S BEEN DAMAGED OR NOT.

IF YOU DO THE REPAIRS RIGHT AWAY, PROBABLY THAT UNIT HAS A LOT -- EXCUSE ME, THAT UNIT HAS A LOT LESS RISK. IF YOU WAIT THROUGH THE SUMMER, THAT UNIT HAS A LOT MORE RISK TO IT. SO DEPENDING ON WHEN IT IS, I ADVISE TO REPLACE THE UNIT ON THE ROOF -- EXCUSE ME, THE UNIT IN THE ATTIC.

NOW, WITH RESPECT TO THE UNIT OUTSIDE, IT WAS VERY RECENTLY REPLACED --

Q. YOU'RE REFERRING TO THE COMPRESSOR?

A. THE COMPRESSOR. VERY RECENTLY REPLACED. HAS NOT GONE THROUGH A SIGNIFICANT HEATING/COOLING SEASON SINCE IT'S BEEN REPLACED. IF THE ASSEMBLY, THE REST OF THE ASSEMBLY GETS REPLACED, PROBABLY NOT MUCH RISK IN KEEPING IT. IF YOU GO THROUGH THE SUMMER FROM WHAT WE LEARNED OF COMPRESSOR FAILURES, PROBABLY QUITE A BIT OF RISK OF

DOING IT. SO I THINK THAT WOULD BE INSTRUCTIVE IN TERMS OF REPLACING THE COMPRESSOR OR NOT.

Q. LET ME ASK YOU ABOUT WOOD FLOORING. NOBODY IS CONTENDING THAT THE CORROSION AFFECTS WOOD FLOORING, CORRECT?

A. THAT'S CORRECT.

Q. SO WHY WOULD YOU TAKE OUT THE WOOD FLOORING?

A. THE ONLY REASON TO TAKE IT OUT IS THE PRACTICAL MANAGEMENT OF THE RISK BY THE CONTRACTOR. THE RISKS THAT NEED TO BE MANAGED BY THE CONTRACTOR ABOUT DAMAGING IT FROM WORKERS WALKING ON IT AND OBVIOUSLY YOU CAN PUT PROTECTION ON IT, SO IT MIGHT GET DAMAGED BY THAT.

THE OTHER ONE IS IT WILL GET DAMAGED DEPENDING ON THE TIME OF THE YEAR AND THE TEMPERATURE AND HUMIDITY CYCLES. THAT WOULD LEFT TO THE LOUISIANA ATMOSPHERE THAT IS NOT IN A CONDITIONED HOME IS GOING TO CYCLE SEASONALLY BETWEEN EIGHT AND 14, 12, 14 PERCENT MOISTURE CONTENT. AND THAT CYCLING OF THE MOISTURE CAUSES IT TO SWELL AND SHRINK AND WILL DAMAGE -- WHAT IT'LL DO IS OPEN UP THE JOINTS IN THE WOOD.

SO CONTRACTOR REALLY HAS TWO CHOICES: ONE IS TO CONDITION THE HOME DURING THE RENOVATION OR TO REMOVE IT AND REPLACE IT. AND I EXPECT THAT THE EXPERIENCES OF MOST CONTRACTORS, AND I BELIEVE -- IT'S WHAT WE HEARD FROM BEAZER IS THAT THEIR JUDGMENT IS TO REPLACE IT. BUT SIMPLY BECAUSE PROVIDING TEMPORARY AIR CONDITIONING IN THAT ENVIRONMENT WOULD BE PRETTY DIFFICULT

Q. PUTTING ASIDE BEAZER, HAVE YOU HAD AN OPPORTUNITY TO REVIEW THE

REMEDIATION PROTOCOLS OR REMEDIATION BY ANY BUILDERS WHO ARE RIGHT NOW REMEDIATING CHINESE DRYWALL PROBLEMS?

A. BEAZER, LENNAR, AND ONE IN VIRGINIA WHOSE NAME IS ESCAPING ME. IT'LL COME TO ME. I DON'T REMEMBER THE VIRGINIA CONTRACTOR'S NAME.

Q. AND WHAT DID YOU NOTICE WITH REGARD TO LENNAR AND BEAZER, WHAT DID YOU NOTICE THEY WERE DOING WITH REGARD TO WOOD FLOOR?

A. ONE WAS ENDEAVORING TO KEEP IT AND ONE WAS REPLACING IT. AND I BELIEVE IT'S LENNAR WHO WAS ENDEAVORING TO REPLACE -- KEEP IT AND HAVING MIXED SUCCESS, SOMETIMES SUCCEEDING AND SOMETIMES NOT. AND ABSORBING THE RISK OF THAT DECISION.

Q. NOW, LET ME ASK YOU THIS QUESTION. WHEN YOU TEAR OUT DRYWALL, COULD YOU EXPLAIN WHAT THAT ENVIRONMENT IS LIKE WITH REGARD TO DUST AND THE MESS INVOLVED IN TEARING OUT DRYWALL TO THE COURT?

MR. SANDERS: OBJECT TO FOUNDATION. WITH RESPECT TO THIS DRYWALL OR ANY DRYWALL OR HIS EXPERIENCE?

MR. SEEGER: MY FIRST QUESTION WAS ANY DRYWALL, AND I CAN ASK ABOUT CHINESE DRYWALL SPECIFICALLY IF YOU WOULD LIKE.

BY MR. SEEGER:

Q. DO YOU HAVE EXPERIENCE -- WHAT EXPERIENCE DO YOU HAVE WITH REMEDIATIONS WHERE DRYWALL IS TORN OUT?

A. I HAVE EXTENSIVE REMEDIATION EXPERIENCE WITH DRYWALL. FIRST OFF, AS WELL AS DURING INVESTIGATIONS IT'S VERY COMMON, I NEED TO DIRECT WORKERS TO REMOVE DRYWALL DURING INVESTIGATIONS. BUT THEN DURING REMEDIATION IT OFTEN HAS TO BE REMOVED FOR EITHER PRACTICAL REASONS OR BECAUSE IT'S DAMAGED.

Q. SO YOU HAVE EXPERIENCE ACTUALLY VIEWING IT AND SEEING IT AND EXPERIENCE WITH WHATEVER ENVIRONMENT CREATED BY THAT TEAR OUT?

A. YES, SPECIFYING THE WORK AND DIRECTING REPAIRS, I HAVE QUITE A BIT OF EXPERIENCE IN ALL OF THAT.

Q. CAN YOU DESCRIBE FOR US WHAT THAT ENVIRONMENT LOOKS LIKE WHEN YOU'RE TEARING DRYWALL OUT IN A HOUSE, ESPECIALLY WHEN IT'S A COMPLETE GUT AND ALL OF THE DRYWALL COMES OUT?

A. SURE. UNLESS YOU WERE ACTUALLY TO UNSCREW OR UNNAIL EACH BOARD, YOU'RE GOING TO BREAK OUT THE DRYWALL INTO PIECES. AND EVEN IF YOU TRIED TO, AS I TRIED MANY TIMES TO MANAGE THE DUST IN INVESTIGATION, TRY TO REMOVE A BOARD BY UNSCREWING IT, YOU STILL END UP CUTTING THE JOINT COMPOUND, THE GYPSUM THAT'S PUT OVER JOINTS, OR ELSE YOU END UP CUTTING THE SHEATH WITH SOME SORT OF A KNIFE OR SAW. ANY OF THOSE CUTTING ACTIVITIES CREATE A FINE POWDER WHICH, IF YOU DON'T CONTROL THAT POWDER, JUST GOES EVERYWHERE, JUST BECOMES AIR BORNE AND THEN FLOATS IN WHATEVER AIR CURRENTS HAPPEN TO BE IN THE HOUSE.

SO THE BEST YOU CAN DO IS TO HAVE THAT FINE POWDER, YOU CAN SUCK IT UP AS MUCH AS YOU CAN -- WHICH WE DO IN INVESTIGATIONS -- AND YOU STILL END UP FINDING THAT EVERY SURFACE WHEN YOU'RE DONE HAS A FINE POWDER. IF YOU DO IT MORE PRACTICALLY FROM A DEMOLITION STANDPOINT, YOU TEAR IT OUT AS FAST AS YOU CAN, GET THE DIRTY WORK OVER AS FAST AS YOU CAN, AND YOU MAKE QUITE A MESS.

Q. AND WHAT'S YOUR RECOMMENDATION AS TO HOW TO CONTROL THAT DUST

OR CLEAN THAT DUST AFTER THAT TYPE OF WORK HAS BEEN DONE WHERE DRYWALL HAS BEEN TORN OUT?

A. BECAUSE YOU CAN'T ELIMINATE THE GENERATION OF DUST DURING THE REMOVAL, YOU HAVE TO CLEAN IT UP. AND IT'S A FINE DUST. IF YOU JUST TAKE A SHOP VAC AND SHOP VACUUM BY BASEMENT, YOU'LL STILL CLEAN OUT MOST OF IT BUT YOU'LL STILL LEAVE THAT FINE DUST. AND YOU HAVE TO HAVE A METHOD OF EITHER USING DAMPNESS OR BETTER VACUUMS TO REMOVE IT ALL.

AND IT SHOULD BE REMOVED WITH GOOD FILTERED VACUUM, SO-CALLED HEPA FILTERS THAT REMOVE 99 PERCENT OF THE DUST, AND THEN CERTAIN KINDS OF SURFACES WILL HAVE TO EITHER BE DAMPED WIPED OR WE'VE HEARD THE METHOD OF WASHING WHICH I DON'T THINK I WOULD DO.

Q. LET'S PAUSE ON THAT. WHY WOULDN'T YOU DO THE WASHING BECAUSE THAT IS A PROPOSAL BY THE OTHER SIDE THAT YOU'VE SEEN, CORRECT?

A. IT IS.

Q. WHY WOULDN'T YOU DO THAT?

A. THE WAY IN WHICH LENNAR DOES THE WASHING, THEY WASH AND VACUUM RIGHT THERE, AND THAT SEEMS TO FOR THEM TO MANAGE THE RISK FAIRLY WELL, BUT THE CONCERN WITH MOISTURE IS INTRODUCING THE MOISTURE IS THAT YOU RUN THE RISK OF CAUSING SOME OTHER PROBLEM, PARTICULARLY MOISTURE PROBLEMS EITHER CAUSING THINGS TO SWELL OR CAUSING THINGS TO HAVE AMPLIFIED MOLD ON THEM. AND THAT'S THE CONCERN WE ALWAYS HAVE ABOUT INTRODUCING MOISTURE IN ANY CLEAN UP IS JUST TURNING ONE PROBLEM FOR ANOTHER ONE.

Q. NOW, YOU ALSO IN ONE OF YOUR PROTOCOLS CALL FOR AN AIR OUT

PERIOD. CAN YOU EXPLAIN TO THE COURT WHAT THE AIR OUT PERIOD IS AND WHY YOU BELIEVE THAT'S NEEDED?

A. IN ANY SORT OF WORK LIKE THIS, EXPERIENCE TEACHES US THAT YOU WANT TO RECONDITION THE SPACE BEFORE PUTTING IT BACK. I DON'T HAVE ANY SCIENTIFIC BASIS THAT SAYS THAT THERE WILL BE RESIDUAL ODORS IN THE HOUSE. BUT THE AIR OUT PURPOSE IS TO ALLOW, IF THERE IS ANY OF THAT RESIDUAL ODOR, TO BE EVACUATED. AND SECOND OFF, TO ALLOW THE HOUSE TO BE CONDITIONED AFTER THE ANY SPILLAGE OR ANYTHING THAT HAPPENS DURING THE DEMOLITION BEFORE YOU PUT IT BACK TOGETHER AGAIN.

Q. WELL, YOU STARTED YOUR ANSWER BY SAYING EXPERIENCE TEACHES US. THIS IDEA OF AIRING OUT, THIS ISN'T SOMETHING NEW THAT YOU INVENTED FOR CHINESE DRYWALL; IS THAT FAIR TO SAY?

A. NO, THAT'S CORRECT. VIRTUALLY ANY NEW CONSTRUCTION TODAY INCLUDES PERIODS OF AIR OUT BETWEEN EITHER DEMOLITION OR DIFFERENT COMPONENT INSTALLATION PHASES. IT'S JUST THAT WE LEARNED THAT IF YOU BUILD THEM TOO FAST OR WORK TOO FAST THAT THESE, THE LACK OF AN AIR-OUT PERIOD CAUSES UNANTICIPATED PROBLEMS.

Q. I JUST HAVE TWO, THREE MORE QUESTIONS. WHAT ABOUT APPLIANCES, WHAT WOULD YOU DO WITH THOSE?

A. THE TYPICAL HOUSEHOLD APPLIANCES -- REFRIGERATOR, RANGE, OVEN, MICROWAVE -- THEY ALL HAVE PRINTED CIRCUIT BOARDS IN THEM, SOME OF THEM HAVE COULD COPPER TUBING, THOSE -- THEY'RE ALL GOING TO BE COMPROMISED BY IT AND YOU CAN EXPECT PREMATURE PROBLEMS WITH THEM. SO IT'S PRUDENT TO REPLACE THEM SO YOU'RE BACK TO SQUARE 1.

OTHERWISE YOU'RE HAVING A REFRIGERATOR IN A BRAND NEW HOUSE GO IN A COUPLE OF YEARS AND THAT'S WHAT I WOULD EXPECT.

Q. DO YOU HAVE AN OPINION AS TO WHETHER HOMEOWNERS THAT ARE HAVING CHINESE DRYWALL AND THE PROBLEMS REMEDIATED SHOULD HAVE AN ENVIRONMENTAL CONSULTANT SIGN OFF ON THE WORK ONCE IT'S DONE?

A. I BELIEVE THEY SHOULD FOR THE SIMPLE REASON THAT SOMEBODY HAS TO BE RESPONSIBLE FOR THE WORK THROUGHOUT AND MUCH OF THE WORK CAN BE DONE UNDER THE RESPONSIBILITY OF A GENERAL CONTRACTOR AS I'VE OUTLINED IT. ANYTHING THAT STAYS BEHIND THOUGH IS OF PARTICULAR INTEREST FROM A RESPONSIBILITY STANDPOINT.

SO OBVIOUSLY THE HOUSE STAYS BEHIND, THE SHELL OF THE HOUSE STAYS BEHIND. SO THE QUESTION IS WHO IS QUALIFIED TO EXERCISE RESPONSIBILITY AND TELL THE HERNANDEZ THAT THIS HOUSE IS, IN FACT, READY TO BE PUT BACK TOGETHER AGAIN. AND THAT REALLY ISN'T SOMETHING THAT THE GENERAL CONTRACTOR DOES, IT'S A FOX WATCHING THE HEN HOUSE, IF YOU WILL; IT'S SOMETHING THAT AN ENVIRONMENTAL CONSULTANT IS THE RIGHT SKILL SET FOR MAKING THAT DETERMINATION.

Q. MR. RUTILA, THE OPINIONS THAT YOU'VE EXPRESSED TO THIS COURT TODAY, DO YOU HOLD THOSE A REASONABLE DEGREE OF CERTAINTY AS AN EXPERT IN THE FIELDS THAT YOU'VE BEEN QUALIFIED?

A. I DO.

MR. HERMAN: OKAY. YOUR HONOR, I'LL SAVE FOR REDIRECT.

THE COURT: OKAY. CROSS. I'LL GO TO ABOUT 12:30 TODAY.

CROSS-EXAMINATION

BY MR. SANDERS:

Q. GOOD MORNING, MR. RUTILA.

A. GOOD MORNING.

Q. I THINK AS YOU SAID, YOUR COMPANY SORT OF BRINGS A MULTI-DISCIPLINARY APPROACH TO THE WHOLE REMEDIATION EFFORT, CORRECT?

A. BOTH TO THE REMEDIATION AS WELL AS THE INVESTIGATION.

Q. AND YOU RECOGNIZE, I GUESS AS SOON AS YOU BECAME INVOLVED THAT THAT WAS SOMETHING YOU HAD TO DO IN THIS CASE?

A. YES.

Q. AND SO YOU INCLUDED OTHER PEOPLE WHO HAVE EXPERIENCE AND SCIENTIFIC BACKGROUND IN CHEMISTRY AND METALLURGY AND MATERIAL SCIENCE?

A. CORRECT.

Q. AND I THINK FROM LOOKING AT YOUR REPORTS AND LISTENING TO YOU BEFORE, YOU'VE HAD AS MANY AS A DOZEN OTHER PEOPLE WORKING ON THIS MATTER FROM YOUR COMPANY?

A. THERE'S MORE THAN A DOZEN, YES.

Q. AND YOU YOURSELF, YOU'RE NOT A CHEMICAL ENGINEER?

A. I AM NOT.

Q. AND YOU'RE NOT A MATERIAL SCIENTIST?

A. I AM AN ENGINEER AND I USE MATERIAL SCIENCE EVERY DAY, BUT I DO NOT CALL MYSELF A MATERIAL SCIENTIST.

Q. AND YOU DON'T HAVE A DEGREE IN ANY MATERIAL SCIENCE?

A. ANY CIVIL ENGINEERING DEGREE INCLUDES WORK IN MATERIAL SCIENCE

BUT IS NOT A DEGREE IN MATERIAL SCIENCE.
Q. AND YOU'RE ALSO NOT A METALLURGIST?
A. I AM NOT.
Q. AND PRIOR TO THIS, YOU DON'T RECALL ANY PARTICULAR EXPERIENCE WITH CORROSION TO ELECTRICAL WIRING OR COMPONENTS?
A. AS PART OF MY WORK, NO.
Q. WHEN YOU PREPARED YOUR SCOPE OF REMEDIATION FOR THE HERNANDEZ HOUSE AND YOU SUBMITTED THAT ON FEBRUARY 12TH, YOU HADN'T VISITED THE HERNANDEZ HOUSE YET, HAD YOU?
A. THAT'S CORRECT, I HAD NOT.
Q. AND THERE WERE NO REAL DIFFERENCES BETWEEN THE SCOPE YOU PREPARED FOR OTHER HOUSES AND THE HERNANDEZ HOUSE, IS THERE?
A. THAT'S CORRECT.
Q. YOU DID ACTUALLY INSPECT THE HOUSE ON FEBRUARY 23RD AT THE END OF FEBRUARY?
A. 23RD OF FEBRUARY, YES, SIR.
Q. AND AFTER YOU VISITED THE HOUSE, WERE THERE ANY SCOPE CHANGES OR DID YOU MAKE ANY CHANGES TO YOUR REPAIR PLAN?
A. NO, I DID NOT.
Q. YOU ALSO HAVE INDICATED THAT YOU'VE BEEN ABLE TO TALK TO LENNAR, FOR EXAMPLE, ABOUT THEIR APPROACH TO REMEDIATION?
A. THAT'S CORRECT.
Q. AND THE REASON THAT THEY WERE DOING WHAT THEY WERE DOING WITH THEIR PLAN IS BECAUSE OF BUSINESS CONSTRUCTION DECISION, CORRECT?
MR. SEEGER: YOUR HONOR, I JUST OBJECT, HE WOULDN'T KNOW

WHAT'S IN THE HEAD OF THE BUSINESS PEOPLE.

THE COURT: LET'S REFRAME THAT, HIS UNDERSTANDING.

BY MR. SANDERS:

Q. IT'S YOUR UNDERSTANDING THAT THE REASON THEY WERE DOING WHAT THEY WERE DOING IS BECAUSE OF BUSINESS CONSTRUCTION DECISION?

A. THAT'S MY INTERPRETATION OF WHAT THEY'RE DOING, THEY NEVER TOLD ME BUT THAT'S HOW I VIEW IT.

Q. AND I THINK AS YOU'VE INDICATED FOR ALL PRACTICAL PURPOSES, THE LENNAR AND BEAZER SCOPE OF REMEDY AND REPAIR IS THE SAME AS THE ONE YOU'RE PROPOSING?

A. IN MOST WAYS. THERE ARE SUBTLE DIFFERENCES BETWEEN THOSE TWO, BUT IN MOST WAYS THEY'RE THE SAME.

Q. AND I THINK YOU WERE TALKING ABOUT RISKS JUST A MOMENT AGO AND THE FACT THAT AN INDIVIDUAL JOB MIGHT DEPEND ON A CONTRACTOR, GENERAL CONTRACTOR'S COMFORT WITH RISK WHEN HE IS PROPOSING THE SCOPE OF REPAIR?

A. THAT'S CORRECT. AND COMFORT IN HOW HE'S GOING TO PAY FOR THAT RISK.

Q. SO THERE'S CERTAIN CHOICES AND CERTAIN THINGS IN A HOME THAT WILL MAKE A SCOPE OF REPAIR DIFFERENT, FOR EXAMPLE, SMALL THINGS LIKE FASTENS ON THE CABINET THAT PUT TOGETHER?

A. IF I UNDERSTAND THE QUESTION, HOW THE CABINET WAS INITIALLY FASTENED WOULD AFFECT YOUR EVALUATION OR ANY WORKER'S EVALUATION OF HOW TO TAKE IT APART AND THE RISK OF TAKING IT APART, IF I UNDERSTAND YOU CORRECTLY.

Q. YES. AND YOU MENTIONED THE WOOD FLOORS AS ANOTHER EXAMPLE WHERE A CONTRACT IS GOING TO HAVE TO ASSESS THE ACTUAL HOUSE, LOOK AT THE HOUSE AND MAKE A DETERMINATION AS TO WHETHER HE WANTS TO PRESERVE THAT FLOOR OR TAKE IT OUT.

A. THAT'S CORRECT. AND HOW HE ASSESSES THE RISK IN TERMS OF WHO IS GOING TO PAY IF HE GETS IT WRONG AND SO ON.

Q. SO REMEDIATION, THE CHOICE OF REPAIR IS ACTUALLY AT SOME LEVEL GOING TO BE A LOCAL THING THAT'S DECIDE BY A CONTRACTOR WHO INTENDS TO DO THE WORK IN A PARTICULAR HOUSE?

A. YES. EVEN IF I WERE IN CHARGE OF HIRING A CONTRACTOR, I WOULD EXPECT ANY CONTRACTOR TO COME TO ME WITH IDEAS, THAT'S WHAT CONTRACTORS DO, AND ANY CONTRACTOR WITH IDEAS WILL BE DIFFERENT THAN THE NEXT. THEY ALL WILL LOOK AT IT SLIGHTLY DIFFERENTLY.

Q. AND I WANT TO TALK ABOUT SOME OF THE THINGS THAT YOU OBSERVED WHILE YOU WERE AT THE HOUSE. YOU DID GO UP INTO THE ATTIC AND LOOK AT EQUIPMENT, THE WATER HEATER, AND OTHER THINGS IN THE ATTIC?

A. I DID. I DID MORE THAN THAT, BUT, YES, I DID THOSE THING.

Q. COULD YOU PUT UP EXHIBIT DX-235. THIS IS A PICTURE ACTUALLY FROM YOU, IF YOU RECOGNIZE IT, IT'S PICTURE NO. 3077 ON RELIANCE MATERIALS THAT YOU GAVE US. DO YOU RECOGNIZE THAT OR DO I HAVE TO SHOW YOU THE BOOK AND BINDER WITH THOSE IN THERE?

A. I KNOW I TOOK A PHOTOGRAPH JUST LIKE IT, SO IF YOU REPRESENT TO ME IT'S THAT PHOTOGRAPH I WILL ACCEPT THAT.

MR. SANDERS: OKAY. I'D LIKE TO MOVE DX-235 IN.

THE COURT: LET IT BE ADMITTED.

BY MR. SANDERS:

Q. YOU WERE DESCRIBING THE WATER HEATER, FOR EXAMPLE, WHICH IS UP IN THE ATTIC, CORRECT?

A. THAT'S CORRECT.

Q. AND I THINK YOU INDICATED THAT, AND THESE ARE PICTURES OF SOME OF THE PIPES THAT FOR MOST PURPOSES LOOK FAIRLY SHINNY AND UNCORRODE, CORRECT?

A. THAT'S RIGHT. THEY, LIKE SOME OF THE OTHER THINGS WE LOOKED AT, THE REFLECTION OF THE FLASH IS INACCURATE THAT IT'S A SHINY MATERIAL. THERE ARE SOME BLACK SPOTS ON IT, BUT FOR THE MOST PART IT IS SHINNY COPPER OR SLIGHTLY BROWN COPPER THAT WE WOULD EXPECT.

Q. AND TO BE FAIR, I THINK SOME OF THOSE UPPER PIECES WERE ACTUALLY SALVAGED BY PEOPLE DURING THIS WHOLE THING, BUT THE REST OF THE COPPER, EVEN THE PIPING, THE HORIZONTAL PIPING ALSO LOOKS FAIRLY UNAFFECTED?

A. THAT'S CORRECT.

Q. AND THIS IS AN ENVIRONMENT WHERE FROM WHAT YOU UNDERSTAND THE FLOOR OF THE CEILING OR THE FLOOR OF THE ATTIC OR THE CEILING FROM THE ROOM BELOW IS ALL KPT BOARD, CORRECT?

A. THAT'S RIGHT. THE ASSEMBLY THAT YOU MIGHT STAND ON CONSISTS OF, FROM THE BOTTOM CHINESE DRYWALL, THE WOOD FRAMING THAT'S FILLED IN WITH CELLULOSE INSULATION AND WIRES AND THE LIKE LAYS UNDER THAT CELLULOSE INSULATION. AND THEN SOME PLACES THERE'S A PANELLING THAT YOU CAN WALK ON, OTHER PLACES YOU SEE THE INSULATION AND THIS SITS UP ON TOP OF THAT.

Q. AND IN ANOTHER PICTURE, IF WE COULD GO TO DEFENSE EXHIBIT 232. THIS ALSO IS PICTURE NO. 387 FROM YOUR CAMERA THAT YOU TOOK. WOULD YOU AGREE WITH THAT REPRESENTATION?

A. THAT'S CORRECT. IT'S NOT MY HAND, SOMEBODY'S HELPING ME HOLD THE JACKET WHILE I TAKE THE PHOTOGRAPH.

MR. SANDERS: AND I WOULD LIKE TO MOVE THIS INTO EVIDENCE.

THE COURT: LET IT BE ADMITTED.

BY MR. SANDERS:

Q. THIS IS THE LINE SET, CORRECT, THAT GOES FROM THE OUTSIDE COMPRESSOR TO THE HVAC UNIT?

A. THAT'S CORRECT. THE SET MEANS, IF YOU WILL, THE PAIR, THE SMALL TUBE IS UP ABOVE AND YOU CAN JUST BARELY SEE IT, AND THEN THE LARGER TUBE IS WRAPPED IN THE INSULATION THERE, THAT'S THE SET (INDICATING).

Q. AND THIS IS THE -- THE SMALLER TUBE IS THE ONE -- WHICH WAY DOES THAT ONE GO, BACK OR TO THE HVAC UNIT?

A. THAT HAS COMPRESSED GAS, IT'S GOING TO THE AIR HANDLER.

Q. AND THE ONE COMING BACK IS THE WIDER TUBE WHICH AT TIMES HAS COLDER GAS OR COLDER LIQUID IN IT?

A. THAT'S CORRECT.

Q. AND I GUESS HERE YOU'RE OPENING OR SOMEONE FOR YOU IS OPENING UP THE INSTALLATION THERE?

A. THAT'S RIGHT. SOMEONE ELSE HAD CUT THE INSULATION, PRESUMABLY TO MAKE A SIMILAR EXAMINATION, AND I ASKED SOMEBODY TO HOLD THAT

OPEN WHILE I TOOK A PICTURE.

Q. AND THE LINE SET, AT LEAST HERE IN THE ATTIC, LOOKS VERY SHINNY AND MUCH LIKE REGULAR COPPER?

A. FOR THE MOST PART. IT DOES HAVE, AS I SAID EARLIER ON SOME OF THE WIRES, IT DOES HAVE SOME BLACK SPOTS ON IT; BUT IT'S FOR THE MOST PART A BRONZE COLOR WHICH I WOULD EXPECT OF A LINE SET TUBE.

Q. IF WE COULD GO TO DEFENSE EXHIBIT 234. AND THIS IS A PICTURE -- IT MAY ACTUALLY BE SIDEWAYS --

A. IT IS.

Q. -- BUT I THINK FOR OUR PURPOSES IT'S PROBABLY OKAY. THIS IS PICTURE NO. 461 FROM YOUR CAMERA, AND IT'S A PICTURE OF A CIRCUIT BREAKER IN THE HERNANDEZ HOUSE, CORRECT?

A. IT'S UPSIDE DOWN RIGHT NOW BUT THAT'S TRUE.

MR. SANDERS: I WOULD LIKE TO MOVE THIS INTO EVIDENCE, YOUR HONOR.

THE COURT: LET IT BE ADMITTED.

BY MR. SANDERS:

Q. AND AGAIN, THE COPPER WIRING IN THIS CIRCUIT BREAKER ON THE SIDE THERE LOOKS FAIRLY UNTARNISHED, CORRECT?

A. THAT'S CORRECT. IT'S, AGAIN, YOU CAN SEE THE REFLECTION FROM MY CAMERA FLASH, IT WAS ENERGIZED SO I DIDN'T GET CLOSE ENOUGH TO SEE IF THERE WERE SPOTS OR NOT TO BE FRAMED. BUT FROM WHERE I STOOD, IT LOOKED UNCORRODED.

Q. AND THIS CIRCUIT BREAKER BOX IS ACTUALLY INSIDE THE HOUSE IN THE LAUNDRY ROOM, RIGHT?

A. IT IS. THIS IS IN THE LAUNDRY ROOM, WHICH IS OFF TO THE RIGHT AS YOU ENTER.

Q. LOOKING AT SOME OF THE PICTURES YOU SHOWED US EARLIER, CONNIE, IF YOU COULD FIND PLAINTIFF'S EXHIBIT 276. AND THIS WAS, OR IS FROM THE HERNANDEZ HOUSE, A CLOSE-UP OF A TYPICAL CONNECTION BETWEEN A WIRE, GROUND WIRE IT LOOKS LIKE IN THIS CASE, AND A RECEPTACLE OR A SWITCH, CORRECT?

A. YEAH. CAREFUL WITH THE WORD TYPICAL. IT IS FROM THE HERNANDEZ HOUSE, IT IS A CONNECTION BETWEEN A COPPER WIRE AND A DEVICE, I DON'T REMEMBER WHAT 02 IS, IF IT WAS A SWITCH, I THINK IT WAS.

THE TYPICAL PART YOU HAVE TO BE MORE CAREFUL ABOUT BECAUSE THE ATTACHMENT OF THE WIRE UNDER THE SCREW VARIES BROADLY AND THIS IS CERTAINLY WITHIN THAT VARIATION.

Q. AND WHEN YOU WERE POINTING OUT CORROSION AND OTHER PRODUCTS ON THIS SCREW ASSEMBLY, IT'S YOUR UNDERSTANDING THAT KPT AS PART OF ITS REMEDY IS GOING TO PROVIDE NEW RECEPTACLES AND SWITCHES, CORRECT?

A. THAT'S CORRECT.

Q. AND WHAT'S THE WHITE POWDER, IS THAT GYPSUM POWDER OR PAINT ON THE GROUND WIRES UP THERE, THAT'S NOT A CORROSION PRODUCT, IS IT (INDICATING)?

A. IF YOU'RE REFERRING TO THIS WHITE AND THAT WHITE, I DON'T REMEMBER WHETHER IT'S PAINT OR JOINT COMPOUND, BUT IT'S A FOREIGN MATERIAL THAT IS ON THE WIRE, THAT IS NOT A CORROSION.

Q. IT'S NOT COPPER SULFIDE AT LEAST?

A. IT IS NOT COPPER SULFIDE.

Q. AND IN A WIRE IN A HOUSE, YOU ALSO MIGHT EXPECT TO FIND OR AT LEAST SEE THAT THERE'S COPPER OXIDE ON THE WIRES AS WELL, CORRECT?

A. THAT'S CORRECT. WE CAN BE SURE THERE'S COPPER OXIDE ON THAT WIRE IN THESE BRONZE AREAS (INDICATING).

Q. AND COPPER OXIDE IS ALSO A CORROSION OR TYPE OF CORROSION?

A. IT IS.

Q. IF WE COULD GO TO HERNANDEZ OR PLAINTIFF 609. YOU HAD LOOKED AT THIS AND I GUESS YOU POINTED OUT IN THIS SAMPLE BLOTCHES OF COPPER OXIDE AS WELL AS THE BLACK SORT OF COPPER SULFIDE LAYERS?

A. I DID. THE GREEN IS MORE THAN JUST COPPER OXIDE BUT THERE'S COPPER OXIDE IN THERE, THAT'S RIGHT.

Q. DID YOU DO ANYTHING TO DETERMINE WHETHER OR NOT OR WHAT THE THICKNESS LAYERS WERE OF EITHER OF THOSE COMPOUNDS, COPPER OXIDE VERSUS COPPER SULFIDE?

A. NOT IN THIS SAMPLE, NO.

Q. AND IT'S MY UNDERSTANDING THAT YOU'RE NOT DOING ANY, YOU'RE NOT PROVIDING ANY OPINIONS ABOUT FUTURE CORROSION OR CORROSION OF FUTURE RISK, RIGHT?

A. I AM AND I HAVE PROVIDED AN OPINION ABOUT FUTURE RISKS, BUT NOT OPINION ABOUT THE FUTURE CORROSION, FOR EXAMPLE, OF THIS DEVICE.

Q. YOU HAVEN'T DONE ANY SAMPLING OR ANY TESTING OF ELECTRICAL WIRING OR DEVICES WITH RESPECT TO RESISTIVITY, FOR EXAMPLE?

A. NO, WE HAVE NOT.

Q. AND HAVE YOU DONE ANYTHING TO MEASURE TEMPERATURE RISES

PURSUANT TO UL OR OTHER STANDARD THAT MIGHT DETERMINE WHETHER THE DEVICE ACTUALLY OPERATING STILL WITH THE CORROSION ON IT?

A. NO, WE HAVE NOT.

Q. YOU'RE AWARE THAT SANDIA LABS DID DO RESISTIVITY TESTING ON A HANDFUL OF DEVICES?

A. I AM AWARE OF THEIR TESTS.

Q. AND THAT SANDIA CONCLUDED THAT THOSE DEVICES THEY ASSESSED WERE OPERATING NORMALLY?

A. THAT'S CORRECT. THEY DID, BY THE WAY, THOUGH, INCLUDE IN THE REPORT THAT FURTHER TESTING WAS NEEDED OF THE PORTIONS OF DEVICES THAT THEY HAD NOT TESTED YET.

Q. I UNDERSTAND THEY HAVE ONGOING TESTING. BUT WITH THE RESPECT TO THE RESISTIVITY TESTS THAT THEY DID, THOSE DEVICES WERE WORKING NORMALLY?

A. THAT'S CORRECT.

Q. AND IF YOU COULD GO TO HERNANDEZ 577. HOW MANY SAMPLES HAVE YOU SEEN IN THIS INVESTIGATION WITH THE INSULATION SORT OF PULLED AWAY LIKE THAT?

A. I HAVEN'T COUNTED, BUT IN TWO BOXES THAT WE CALL 45 AND 46 WE SAW SEVERAL OF THEM. THERE'S A WIRE NUT IN ANOTHER SAMPLE 45 WHERE BLACK WIRES WERE BROUGHT TOGETHER AND THEY ALSO HAD THAT SEPARATION LIKE THAT. I'VE SEEN IT ON SOME AND NOT ON OTHERS.

Q. AND THOSE TWO BOXES THAT YOU'RE JUST DESCRIBING, THOSE WERE IN THE HERNANDEZ HOUSE AND WERE COLLECTED AS PART OF THE INVESTIGATION OF THE HOUSE?

A. THAT'S CORRECT.

Q. OTHER THAN IN THESE SAMPLES, I BELIEVE YOU'VE SAID YOU LOOKED AT HUNDREDS OF WIRES, AND YOU AND OTHERS HAVE LOOKED AT INSULATION COVERING OF HOT AND NEUTRAL WIRES OR LIVE AND NEUTRAL WIRES IN ELECTRICAL DISTRIBUTION SYSTEMS, CORRECT?

A. THAT'S CORRECT.

Q. AND NORMALLY WHERE THERE'S A TIGHT CONNECTION, THERE'S NOT THIS GAP HERE, WHEN YOU PEEL THAT OPEN THERE'S BARE COPPER THERE WITHOUT CORROSION, CORRECT?

A. WHERE WE'VE DONE THAT WE HAVEN'T SEEN THE CORROSION THAT WE SAW, FOR EXAMPLE, IN THIS ONE. WE'VE DONE IT ON A HANDFUL.

Q. AND IF WE GO TO HERNANDEZ 580. WHEN YOU LOOKED AT THIS AND THAT STRIPE THAT'S COMING DOWN, IS THAT CONSISTENT WITH AIR INFILTRATING FROM THE EDGE OF THAT OPENING THERE?

A. WE CAN'T BE SURE. IT'S NOT -- I DON'T CONSIDER IT ENTIRELY COINCIDENTAL THAT AIR COMING DOWN EITHER CAUSED OR CONTRIBUTED TO IT. WE'RE JUST NOT SURE.

Q. BUT ALL OF THE OTHER SAMPLES THAT YOU'VE SEEN WHERE THERE'S A TIGHT INSULATOR YOU HAVEN'T SEEN CORROSION WHEN YOU'VE LIFTED THAT UP AND LOOKED AT IT?

A. THAT'S CORRECT IN TERMS OF THE INSULATION UNDER HOT AND NEUTRAL WIRES, THAT SECOND LAYER OF INSULATION. I AM NOT REFERRING TO THE CORROSION OF GROUND UNDERNEATH THE OUTER JACKET.

Q. YOU DISCUSSED IN REFERENCE SEVERAL ELECTRICAL DEVICES AND APPLIANCES THAT YOU ASSESSED IN YOUR INVESTIGATION?

A. THAT'S CORRECT.
Q. AND YOU LOOKED AT THOSE DEVICES AND I THINK YOU SAID YOU DETERMINED THAT THERE WAS COPPER SULFIDE ON SOME COMPONENTS OF THOSE DEVICES?
A. OR SILVER SULFIDE AS THE CASE MAY BE, THAT'S CORRECT.
Q. BUT FOR THOSE DEVICES THAT YOU LOOKED AT, YOU WERE NOT ACTUALLY ABLE TO IDENTIFY A LINK BETWEEN THE COPPER SULFIDE AND SILVER SULFIDE AND THE CORROSION PRODUCT AND THE FAILURE?
A. NOT CERTAINLY, FOR EXAMPLE, ON THE HAIR DRYER THERE WERE THREE COMPONENTS WITH CORROSION, ALL OF WHICH MIGHT HAVE. BUT WE DID NOT REVERSE ENGINEER THE PROCESS TO FIGURE OUT WHAT WAS GOING ON.
Q. AND THAT WOULD BE THE SAME FOR THE OTHER DEVICES THAT YOU TALKED ABOUT TODAY?
A. THAT'S CORRECT.
Q. ARE YOU AWARE OF THE HOME BUILDERS PROTOCOL WITH RESPECT TO THE REPLACEMENT OF PROPERTY AND WHAT THEY ACTUALLY REPLACE?
A. ARE YOU REFERRING TO, FOR EXAMPLE, BEAZER AND LENNAR?
Q. I AM.
A. I AM AWARE.
Q. AND I THINK THEY REPLACE -- THEY DON'T REPLACE THINGS THAT AREN'T NORMAL FOR THEM TO REPLACE OTHER THAN WHEN THEY BUILD OR CONSTRUCT THE BUILDINGS, CORRECT?
A. THAT'S CORRECT. WHAT BEAZER TESTIFIED AS TO THE ELEMENTS THEY ARE INCLUDING IN THEIR REPLACEMENT PROTOCOL WERE THOSE THAT THEY PROVIDED, REFRIGERATOR, RANGE, MICROWAVE OVEN, OVEN. I FRANKLY

DON'T REMEMBER IF THERE WERE OTHERS.
Q. BUT IT'S NOT OTHER HOUSEHOLD GOODS OR OTHER ELECTRICAL DEVICES OR OTHER EQUIPMENT IN THE HOUSE?
A. THAT'S CORRECT. THEY'VE NOT DESCRIBED REPLACING THOSE ITEMS AS PART OF THE PROTOCOL.
Q. AND YOU DON'T -- WELL, STRIKE THAT.
I THINK AS YOU'VE INDICATED WITH RESPECT TO THE WIRES AND PLUMBINGS AND THE OTHER COPPER OR SILVER COPPER DEVICES IN WALLS THAT MIGHT BE LEFT THERE BY KPT'S PROTOCOL, AT THIS TIME YOU JUST DON'T KNOW, YOU DON'T HAVE AN OPINION ABOUT WHEN THOSE THINGS WILL FAIL?
A. THAT'S CORRECT. IT'S UNCHARTERED WATER, REALLY.
Q. SO YOU CAN'T PROVIDE AN OPINION AS TO THE ULTIMATE TIME OR SOME KIND OF A DEFINITIVE RISK AS TO WHEN THOSE WILL FAIL?
A. NO. WE KNOW THAT BOTH COPPER PIPES AND ELECTRICAL WIRES ARE COMMONLY USED 50 YEARS. WE DON'T KNOW WHAT THIS WILL DO TO THAT LONG-TERM PERFORMANCE.
Q. AND YOU ALSO I THINK DISCUSSED THE CLEANING PROTOCOL OR THE CLEANING METHOD THAT YOU RECOMMEND AND THE HIRING OF AN ENVIRONMENTAL CONSULTANT, FOR EXAMPLE, CORRECT?
A. THAT'S CORRECT.
Q. BUT AT THIS TIME YOU DON'T HAVE A SPECIFIC STANDARD OR YOU'RE NOT AWARE OF A SPECIFIC STANDARD THAT ENVIRONMENTAL CONSULTANT WOULD APPLY IN ORDER TO DETERMINE WHEN EVERYTHING IS CLEAN?
A. WELL, THAT'S CORRECT. THERE IS NO STANDARD FOR CLEANING

CHINESE DRYWALL HOMES. AND MY EXPERIENCE HAS BEEN WHEN WE COME IN TO SUCH UNCHARTERED WATER, WE APPLY A STANDARD AS THE MOST COMMON ONE IS THE EPA NEW YORK CITY MOLD REMEDIATION STANDARD. BUT THE ENVIRONMENTAL CONSULTANT CAN DETERMINE FOR HIM OR HERSELF WHAT WOULD BE THE APPROPRIATE STANDARD.

Q. SO YOU'RE NOT PROPOSING, YOU DON'T HAVE IN MIND A PARTICULAR STANDARD TO APPLY TO THE HERNANDEZ'S HOUSE AFTER IT'S REMEDIATED AND CLEANED TO SAY, OKAY. THIS HOUSE IS CLEAN NOW?

A. I HAVE IN MY MIND A GREAT DEAL OF EXPERIENCE, AND I WOULD BE SURPRISED IF, AGAIN I WERE IN CHARGE OF THE REMEDIATION, OF A PROTOCOL THAT VARIED SUBSTANTIALLY FROM THE ONE I DESCRIBED. BUT I CERTAINLY WOULD BE VERY INTERESTED AND INFORMED BY AN OPINION OF THE APPROPRIATELY SKILLED ENVIRONMENTAL CONSULTANT.

Q. AND WHAT MOST COMPANIES DO, EXCEPT FOR BEAZER, IS THEY GO IN WITH A HEPA VACUUM OR SOME SORT OF VACUUM AND THEY VACUUM UP ALL OF THE DUST, CORRECT?

A. WELL, THAT WOULD BE THE CLEANING PROTOCOL THAT THEY WOULD REQUIRE. THE ENVIRONMENTAL CONSULTANT DOESN'T DO THE CLEANING, JUST DETERMINES THAT IT'S BEEN DONE SUFFICIENTLY.

Q. I'M SORRY, LET ME BACK UP. ACTUALLY TALKING ABOUT WHAT LENNAR DOES RIGHT NOW OR WHAT I THINK YOU PROPOSED IN YOUR PROPOSAL, THAT'S TO USE A HEPA VACUUM OR SOME KIND OF VACUUM, AND YOURS IS A HEPA VACUUM, AND ACTUALLY TRY TO GET OR GET ALL OF THE DUST THAT YOU CAN, CORRECT?

A. GET THE DUST THAT CAN BE COLLECTED BY SUCH A DEVICE, EXACTLY.

Q. AND THEN USE SOME SORT OF WET OR DAMP WIPING METHOD AS WELL?

A. THE DAMP WIPING ON CERTAIN SURFACES WOULD BE A GOOD IDEA. ON OTHER SURFACES IT WOULD NOT BE USEFUL, CERTAIN ROUGH SOURCES CERTAINLY NOT PARTICULARLY USEFUL.

Q. BUT YOU'RE NOT PROPOSING ANYTHING LIKE THE WET SCRUBBING METHOD, FOR EXAMPLE, BEAZER HAS TALKED ABOUT?

A. I AM INTRIGUED BY IT AND I CAN SEE ITS VALUE, I AM JUST CONCERNED ABOUT THE GREATER RISK OF SPILLAGE. SO AT THIS POINT IN TIME I WOULDN'T DO IT.

Q. AND IF YOU WERE TO HIRE OR LOOK FOR AN ENVIRONMENTAL CONSULTANT WHO COULD SORT OF SIGN OFF ON THIS JOB, WHAT QUALIFICATIONS WOULD THEY HAVE?

A. I WOULD LOOK FOR EXPERIENCE IN DOING VARIOUS REMEDIATIONS, COMMON REMEDIATIONS THAT I WOULD BE INTERESTED IN WOULD BE ASBESTOS MOLD REMEDIATION BECAUSE OF THE TREMENDOUS EXPERIENCE THAT THE CONSTRUCTION INDUSTRY HAS DEVELOPED, CONTRACTORS KNOW HOW TO DO THOSE KIND OF PROTOCOLS. AND SO YOU'RE NOT ASKING SOMEBODY TO DO SOMETHING THEY HAVEN'T DONE BEFORE.

AND I WOULD LOOK FOR EXPERIENCE BOTH IN DESIGNING PROTOCOLS FOR THAT TYPE OF WORK AND THEN PROVIDING OVERSIGHT AND CLEARANCE, THAT IS MAKING THE DECISION THAT, YES, THE SPACE IS CLEAN TO MY PROTOCOL, THE CONSULTANT'S PROTOCOL AND READY FOR RECONSTRUCTION

Q. AND YOU ALSO INDICATED THAT THE WIRE BECAUSE IT'S JUST AN NM CABLE SHOULDN'T BE IN THE HOUSES.

A. IT SHOULDN'T BE LEFT IN THE HOUSES, THAT'S CORRECT. WHAT I SAID WAS THAT THE NM CABLE HAS BEEN EXPOSED TO A CORROSIVE ENVIRONMENT WHICH IT WAS NEVER INTENDED TO BE EXPOSED TO AND SHOULD NOT BE LEFT THERE.

Q. AND THE BUILDING CODES AND THE ELECTRICAL CODE THAT YOU CITE TO SAY THAT THE NM CABLE SHOULD NOT BE, IS IT YOUR TESTIMONY THAT THEY SHOULD NOT BE IN A CORROSIVE ENVIRONMENT?

A. THAT'S CORRECT.

Q. AND OBVIOUSLY AFTER THE DRYWALL IS REMOVED IT'S NO LONGER A CORROSIVE ENVIRONMENT?

A. THAT'S CORRECT.

Q. YOUR RECOMMENDATION TO REMOVE WIRES AND PLUMBING, AND I KNOW YOU'RE NOT GIVING THIS OPINION, BUT IS THAT BASED ON THE RISKS THAT THE CORROSION COULD CONTINUE EVEN WHEN THE SOURCE IS REMOVED?

A. THAT'S CORRECT. BECAUSE OF THE COMBINATION OF WHAT IS THERE AND FUTURE MOISTURE SOURCES WHICH WE KNOW ARE THERE THAT IT WILL CONTINUE.

Q. AND TO CONFIRM A COUPLE MORE THINGS THAT YOU'RE NOT TAKING OUT. YOU DON'T HAVE ANY TECHNICAL NEED OR YOU DON'T SEE ANY NEED TO TAKE OUT THE PVC OR POLYETHYLENE PIPING, FOR EXAMPLE?

A. IN TERMS OF PVC TYPICALLY SANITARY WASTE PIPING, NO, FROM A TECHNICAL STANDPOINT. IN TERMS OF POLYETHYLENE PIPING, IN HERNANDEZ IT MIGHT BE LIMITED TO THE FINAL CONNECTION TO CERTAIN DEVICES.

SO ONCE YOU'RE TAKING OUT THE CABINET AND THE SINK AND

THE OTHER MATERIALS, YOU'RE GOING TO TAKE OFF THAT AS WELL. BUT IF THERE WERE -- AND I HAVEN'T SEEN BEHIND THE WALLS -- POLYETHYLENE DISTRIBUTION PIPING, NO REASON TO BELIEVE FROM A TECHNICAL STANDPOINT THAT THAT HAS TO BE REMOVED, OF COURSE ALL OF THE COPPER CONNECTIONS WITHIN IT ARE A PROBLEM.

Q. AND BY TECHNICAL WHAT I AM ASKING IS, THERE'S NO EVIDENCE THAT THERE'S CROSS CONTAMINATION OR ANY KIND OF FUNCTIONAL PROBLEM WITH THE PIPING ITSELF?

A. THAT'S CORRECT.

MR. SANDERS: WE'RE GOOD FOR NOW. THANKS.

THE COURT: ANY REDIRECT?

REDIRECT EXAMINATION

BY MR. SEEGER:

Q. LET ME ASK YOU THESE QUESTIONS AND TRY TO ELIMINATE SOME OF THIS. YOU WERE ASKED QUESTIONS ABOUT COPPER OXIDE, CORRECT, SIR?

A. YES.

Q. IS THE PROBLEM IN HOMES THAT YOU'VE LOOKED AT WITH CHINESE DRYWALL, IS THAT PROBLEM WITH COPPER OXIDE?

A. NO. THE COPPER OXIDE IS ORDINARY, WE SEE IT ALL THE TIME.

Q. SO WHEN YOU TESTIFIED EARLIER ABOUT YOUR EXPERIENCE IN OPENING UP WALLS AND LOOKING AT CORROSION, IS COPPER OXIDE SOMETHING YOU WOULD EXPECT TO SEE IN ANY HOME ON COPPER?

A. THAT'S CORRECT.

Q. AND THE PROBLEM WITH CHINESE DRYWALL IS COPPER SULFIDE; IS THAT RIGHT?

A. IN TERMS OF CORROSION OF COPPER, THAT'S THE CORROSION PRODUCT THAT IS OF INTEREST.

Q. YOU WERE ASKED QUESTIONS ABOUT WHETHER YOU BELIEVE OR WHEN YOU BELIEVE THE WIRING OR THE COPPER PIPES COULD FAIL IN THE HOUSE, DO YOU RECALL A COUPLE OF QUESTIONS ASKED BY MR. SANDERS?

A. I DO.

Q. YOU TESTIFIED EARLIER ON DIRECT ABOUT SOMETHING CALLED UL STANDARDS. WHAT IS UL?

A. IT'S UNDERWRITERS LABORATORY.

Q. AND DO YOU RECALL TELLING THE JUDGE ABOUT WHAT UL HAD RECOMMENDED IN HOMES THAT WERE AFFECTED BY WATER AFTER KATRINA?

A. YES. UL PUBLISHED A RECOMMENDATION IN TERMS OF DEALING WITH HOMES THAT HAVE SUFFERED FLOODING, SPECIFICALLY IN RESPONSE TO KATRINA, BUT NOT ONLY IN RESPONSE TO KATRINA. AND THEIR RECOMMENDATION IS THAT SINCE YOU DON'T KNOW WHAT'S IN THE WATER, YOU DON'T KNOW WHAT CORROSIVE MATERIALS ARE IN THE WATER, AND THEY DON'T KNOW WHAT THE DAMAGE DUE TO THOSE MATERIALS WILL DO TO THE NM CABLE, THEY SAY THE SAFEST THING TO DO IS REPLACE IT.

Q. AND SPECIFIC CASES OR ALL CASES?

A. IN ALL CASES OF THE FLOODING.

Q. YOU WERE ALSO ASKED SOME QUESTIONS ABOUT A PHOTOGRAPH THAT WE LOOKED AT EARLIER. JUST TO SAVE TIME, SCOTT, COULD YOU TURN ON THE ELMO.

FOR THE RECORD I AM LOOKING AT HERNANDEZ 577. AND THIS IS THE EXACT WIRE THAT YOU PEELED THE JACKET BACK ON THAT YOU

LOOKED AT WITH MR. SANDERS, RIGHT?
A. THAT'S CORRECT.
Q. SO HERNANDEZ 580 THAT WE'RE LOOKING AT RIGHT NOW, THAT'S THE SAME WIRE THAT HE ASKED YOU QUESTIONS ABOUT, RIGHT?
A. THAT'S CORRECT.
Q. MR. RUTILA, IN YOUR OPINION DO YOU CARE WHETHER THE CORROSION ON THAT WIRE COMES IN THROUGH THE OPEN JACKET OR ANY OTHER WAY AS AN EXPERT IN THIS FIELD?
A. I AM INTERESTED IN IT, BUT THE CRITICAL THING IS THAT IT'S CORRODED, THAT'S WHAT'S IMPORTANT TO ME.
Q. IN YOUR OPINION BASED ON THE PROTOCOL PROPOSED BY KNAUF WHICH WOULD HAVE BEEN CLIPPING THE GROUND WIRES AND PUTTING IN JUST RECEPTACLES AND SWITCHES, WOULD THAT CORROSION HAVE BEEN LEFT BEHIND?
A. YES, IT WOULD.
Q. YOU WERE ASKED QUESTIONS ABOUT SANDIA ANALYSIS THAT WAS DONE ON HOMES WITH CHINESE DRYWALL, RIGHT?
A. YES.
Q. DO YOU KNOW HOW MANY RECEPTACLES THEY LOOKED AT IN THAT STUDY?
A. I DON'T REMEMBER THE PRECISE NUMBER, IT WAS A HANDFUL, FIVE OR SIX, I DON'T REMEMBER THE PRECISE -- MIGHT HAVE BEEN EIGHT, I THINK EIGHT STICKS IN MY MIND AS I'M SITTING HERE.
Q. AND HOW MANY RECEPTACLES IN THE COURSE OF THE WORK THAT YOU'VE DONE WITH CHINESE DRYWALL, IN THIS LITIGATION AND ELSEWHERE, HOW MANY RECEPTACLES, OUTLETS, SWITCHES HAVE YOU LOOKED AT?

A. HUNDREDS.

MR. SEEGER: YOUR HONOR, THAT'S ALL I HAVE.

THE COURT: ALL RIGHT. YOU'RE EXCUSED. THANK YOU, SIR. LET'S SEE IF WE CAN START ANOTHER WITNESS UNTIL 12:30.

MR. MEUNIER: YES, YOUR HONOR, THE PLAINTIFFS CALL RAY PHILLIPS.

THE COURT: MR. PHILLIPS.

THE DEPUTY CLERK: MR. PHILLIP, PLEASE STEP INTO THE WITNESS BOX. WOULD YOU RAISE YOUR RIGHT HAND.

(WHEREUPON, RAY PHILLIPS, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK: PLEASE BE SEATED. AND WOULD YOU STATE YOUR NAME FOR THE RECORD.

THE WITNESS: MY NAME IS RAY PHILLIPS.

DIRECT EXAMINATION

BY MR. MEUNIER:

Q. GOOD MORNING, MR. PHILLIPS, WHAT IS YOUR ADDRESS, SIR?

A. 1537 EAGLE NEST CIRCLE, WINTER SPRINGS, FLORIDA.

Q. WHAT IS YOUR OCCUPATION?

A. I WORK FOR A NATIONAL HOME BUILDER, I AM VICE-PRESIDENT OF OPERATIONS FOR THE FLORIDA DIVISION.

Q. WHICH HOME BUILDER IS THAT?

A. BEAZER HOMES.

Q. WHAT ARE YOUR DUTIES AND RESPONSIBILITIES AS THE VICE-PRESIDENT FOR THE FLORIDA OPERATIONS OF BEAZER?

A. IT'S ALL WITHIN THE OPERATIONAL SIDE, PREDOMINANTLY I AM IN CHARGE OF ALL CONSTRUCTION, ALL OF WARRANTY, AND THE CUSTOMER SERVICE AND LEGAL MATTERS WITH BOTH OF THOSE.

Q. NOW, YOU HAVE AGREED TO APPEAR HERE VOLUNTARILY AS A WITNESS?

A. THAT'S RIGHT.

Q. BUT IN FAIRNESS, YOU HAVE BEEN WILLING TO MEET WITH COUNSEL FOR BOTH KNAUF AND PLAINTIFFS PRIOR TO YOUR TESTIMONY?

A. THAT'S CORRECT.

Q. HOW MANY YEARS EXPERIENCE DO YOU HAVE IN THE CONSTRUCTION BUSINESS?

A. IN THE INDUSTRY I'VE GOT 32 YEARS, IN NATIONAL HOME BUILDING I HAVE 22 YEARS.

Q. HOW MUCH OF YOUR CURRENT WORK HAS BEEN RESIDENTIAL AS OPPOSED TO OTHER TYPES OF CONSTRUCTION?

A. OF THE CURRENT WORK? IT'S 100 PERCENT.

Q. 100 PERCENT. AND HOW MUCH EXPERIENCE BEFORE BEAZER DID YOU HAVE WITH RESIDENTIAL CONSTRUCTION?

A. THE MAJORITY OF THE PREVIOUS TEN YEARS, I DON'T KNOW, SIX, SEVEN YEARS OF TEN. I DID GROCERY STORES PRIOR.

Q. AND IN YOUR WORK WITH RESIDENTIAL CONSTRUCTION, MR. PHILLIPS, YOU HAVE EXPERIENCE ESTIMATING THE COST AND SCOPE OF REPAIR WORK?

A. YES.

Q. HOW MANY STATES DOES BEAZER OPERATE IN?

A. I DON'T KNOW THE NUMBER, IT'S IN THE TEENS. I THINK IT'S AROUND 17, 18 STATES.

Q. AND DRYWALL IS ONE OF THE MATERIALS THAT BEAZER USES IN ITS CONSTRUCTION?

A. IN ALL HOUSES.

Q. TELL THE COURT TYPICALLY HOW BEAZER OBTAINS AND THEN INSTALLS DRYWALL FOR RESIDENTIAL PROJECTS.

A. MAY BE EXCLUSIVE, BUT FOR THE MOST PART WE WOULD CONTRACT THROUGH A SUBCONTRACTOR, A VENDOR WHO WOULD TURN AS A TURNKEY OPERATION, MEANING HE PURCHASES HIS OWN DRYWALL, HAS IT DELIVERED TO THE JOB AND THAT'S HOW WE WOULD CONTRACT.

Q. HOW DID BEAZER FIRST BECOME AWARE OF CONCERNS REGARDING CHINESE DRYWALL IN THE HOMES THAT IT HAD CONSTRUCTED?

A. FIRST WAS, MY RECALL, WAS THE BEGINNING OF THE MEDIA, A LITTLE OVER A YEAR AGO, MAYBE ABOUT THIS TIME, FEBRUARY, MARCH '09, IT STARTED HITTING THE TV IN OUR FORT MYERS AREA, SO THAT WAS THE BEGINNING.

Q. AND IN WHICH BEAZER DEVELOPMENTS OR COMMUNITIES WAS CHINESE MANUFACTURED DRYWALL FOUND TO HAVE EXISTED?

A. SEVERAL STATES HAVE BEEN -- WE'VE HAD INQUIRIES IN SEVERAL STATES, BUT THUS FAR IT'S BEEN OUT OF TWO, I DON'T KNOW, 300 OR SO CALLS THAT WE RECEIVED, IT'S ALL BEEN LIMITED TO TWO COMMUNITIES IN FLORIDA. ONE OF WHICH IS IN FORT MYERS, THE OTHER IS IN TAMPA.

Q. WHAT IS THE NAME OF THE FORT MYERS COMMUNITY?

A. THAT'S MAGNOLIA LAKES.

Q. AND THE NAME OF THE TAMPA COMMUNITY?

A. THAT IS HAMPTON LAKES.

Q. CAN YOU JUST GENERALLY DESCRIBE THE TYPES OF COMMUNITIES THESE ARE WHERE HOMES HAVE BEEN BUILT BY BEAZER?

A. THE LATTER, TAMPA, HAMPTON LAKES IS A RATHER HIGH-END TOWN HOME COMPLEX, IT'S A STRING OF TOWN HOME, SEVEN, EIGHT AND TEN UNIT CONFIGURATIONS PUT TOGETHER, TWO AND THREE STORY, MOSTLY TWO STORY. OF THE THREE STORY, THE FIRST FLOOR IS ZONED AS A COMMERCIAL WHERE THEY CAN LIVE IN THE TOP TWO FLOORS AND GET A COMMERCIAL SPACE THEY CAN DO ON THE FIRST FLOOR.

AND FORT MYERS, MAGNOLIA, THAT IS SINGLE FAMILY HOMES, BOTH ONE AND TWO STORY; AND PROBABLY I AM GOING TO GUESS 1,900 TO THE MID HIGH, 3,000 SQUARE FOOT SIZE.

Q. WHERE WERE THESE HOMES BUILT, WHAT PERIOD OF TIME?

A. '05, '06.

Q. AND HAS BEAZER UNDERTAKEN AN INVESTIGATION TO DETERMINE THE EXTENT TO WHICH THE HOMES IN THESE TWO COMMUNITIES ARE INFLUENCED OR AFFECTED BY CHINESE DRYWALL?

A. YES.

Q. WHAT HAS BEAZER DONE?

A. FOR DISCOVERY?

Q. IN ORDER TO INVESTIGATE THE EXTENT OF THE DRYWALL PROBLEM.

A. WELL, I SAY THE BEGINNING WE WERE, WE BENEFITED FROM THE EDUCATION AND INSIGHT FROM LENNAR HOMES WHO HAD ALREADY DISCOVERED I THINK IN THEIR HOMES AND WAS SOMEWHAT FREE TO SHARE AS WE WERE ALL EXPLORING AND TRYING TO UNDERSTAND THINGS, BUT THEY WERE KIND OF LEADERS OF THE PACK IN THEIR EDUCATION, AND AS WELL HELPED US

GET IN CONTACT WITH THE PROFESSIONAL ENVIRON FOR THE SCIENTIFIC SIDE. SO THAT'S HOW WE BEGAN.

Q. HOW MANY HOMES IN THE FORT MYERS COMMUNITY OF MAGNOLIA LAKES HAVE NOW BEEN CONFIRMED, HOW MANY BEAZER HOMES HAVE BEEN CONFIRMED TO HAVE CHINESE MANUFACTURED DRYWALL?

A. WE'RE NOW AT 21.

Q. AND THAT IS OUT OF A TOTAL OF HOW MANY HOMES IN THAT COMMUNITY?

A. IN MAGNOLIA, I THINK IT'S 116.

Q. SO 21 TO DATE HAVE BEEN CONFIRMED TO HAVE CHINESE DRYWALL?

A. THAT'S CORRECT.

Q. YOUR INVESTIGATION IS CONTINUING?

A. YEAH. I THINK WE'VE BEEN IN ABOUT 70 OR SO.

Q. AND IN THE TAMPA COMMUNITY OF HAMPTON LAKES, HOW MANY BEAZER HOMES HAVE BEEN CONFIRMED TO HAVE CHINESE MANUFACTURED DRYWALL?

A. THERE'S AN EXCEPTION THERE, BUT WE'RE AT 23 OUT OF 108. FOUR OF THOSE 23 ARE A STUDIO OR GRANNY FLAT ON TOP OF THE GARAGE THAT IT'S ONLY THAT SPACE ABOVE THE GARAGE, AND THESE GARAGES ARE DETACHED FROM THE MAIN BUILDING, THE MAIN PART OF THE BUILDING IS NOT BEEN POSITIVE.

Q. SO TO DATE THAT MEANS 44 HOMES HAVE BEEN AFFECTED BY CHINESE DRYWALL THAT WERE BUILT BY BEAZER?

A. THAT'S CORRECT.

Q. AND WHAT IS BEAZER'S PLAN NOW TO CONCLUDE OR TO COMPLETE ITS INVESTIGATION OF THE EXTENT OF YOUR CHINESE DRYWALL? WHAT METHOD WILL YOU USE TO FINISH YOUR INVESTIGATION?

A. WELL, THE BEGINNING, IF I AM UNDERSTANDING THE QUESTION, HELP ME IF I AM NOT ANSWERING RIGHT, THE BEGINNING WE GOT A LOT OF CALLS THROUGH THE NATIONAL CALL CENTER, WHICH HAS GOTTEN LESS AND LESS THROUGH THIS PAST YEAR. AND SO WE BEGAN SOLICITING THOSE TWO COMMUNITIES ONCE WE DISCOVERED OUR FULL EXPOSURE HAD BEEN IN THOSE TWO COMMUNITIES, WE STARTED SENDING OUT LETTERS TO THE OTHER BUYERS TRYING TO GET ACCESS TO GO IN AND INSPECT THEIR HOME. IS THAT WHAT YOU'RE ASKING?

Q. YES. SO USING A CALL CENTER AND ALSO SOME LETTERS OF SOLICITATION?

A. CORRECT.

Q. NOW, HAVE YOU BEEN ABLE TO IDENTIFY THE MANUFACTURERS OF THE CHINESE DRYWALL THAT HAVE BEEN FOUND IN THESE 44 HOMES TO DATE?

A. YES. WE DO THAT AS WE START TAKING THE BOARD DOWN, KNAUF, TAISHAN, AND I THINK ANOTHER ONE WE FOUND SOME IS TAIHE OR SOMETHING CLOSE TO THAT.

Q. KNAUF, TAISHAN AND --

A. TAIHE.

Q. TAIHE?

A. YEAH.

Q. WHEN YOU DETERMINE THAT IT IS A PARTICULAR MANUFACTURER INVOLVED, DOES YOUR PROTOCOL CALL FOR YOU TO CONTACT THAT MANUFACTURER?

A. WE GIVE NOTICE TO THEM, TO THE DISTRIBUTOR AND TO THE INSTALLER THAT WE CONTRACTED WITH.

Q. IN THE BEAZER HOMES WHERE YOU HAVE FOUND KNAUF CHINESE DRYWALL, HAS KNAUF BEEN CONTACTED?

MR. HAYDEN: OBJECTION, RELEVANCE.

THE COURT: WHERE ARE WE GOING WITH THE QUESTION?

MR. MEUNIER: JUST BACKGROUND INFORMATION, JUDGE. THE NEXT QUESTION MIGHT BE MORE PERTINENT, YOUR HONOR.

BY MR. MEUNIER:

Q. HAS KNAUF INSPECTED ANY OF THE BEAZER HOMES?

MR. HAYDEN: OBJECTION, RELEVANCE.

THE COURT: I'LL OVERRULE IT. TO YOUR KNOWLEDGE.

BY MR. MEUNIER:

Q. HAS KNAUF INSPECTED ANY OF THE BEAZER HOMES THAT YOU IDENTIFIED?

A. I DIDN'T THINK SO. TO BE HONEST, I DON'T KNOW THE ANSWER.

Q. NOW, DOES BEAZER HAVE NEW CONSTRUCTION WARRANTY AGREEMENTS WITH THE OWNERS OF THESE HOMES IN FORT MYERS AND TAMPA?

A. YES.

Q. AND HAS BEAZER UNDERTAKEN REPAIRS IN THESE HOMES, THESE CHINESE DRYWALL HOMES PURSUANT TO THESE AGREEMENTS?

A. CORRECT.

Q. AT THIS TIME, MR. PHILLIPS, HOW MANY REMEDIATION JOBS HAVE ACTUALLY BEEN COMPLETED BY BEAZER?

A. NONE HAVE BEEN COMPLETED.

Q. HOW MANY ARE UNDERWAY AT THIS POINT?

A. IT'S IN THE LOW 20S, I DON'T KNOW THE CURRENT NUMBER. I AM

TALKING FOR BOTH CITIES, IT'S PROBABLY 23, 24 ARE UNDERWAY. WE'VE GOT TWO THAT WILL BE COMPLETED IN THE NEXT TWO, MAYBE THREE WEEKS. AND THEN THERE'S SIX -- ABOUT ANOTHER FOUR, IN ABOUT FOUR MORE WEEKS THERE IS AN ADDITIONAL SIX THAT WILL BE COMPLETED. SO WE ARE COMING UP ON OUR FIRST COMPLETED. AND OF THOSE 44 TOTAL, IT'S IN THE LOW 30S, 31, 32, THAT WE HAVE PERMISSION TO FOLLOW THROUGH AND PUT THEIR HOUSE BACK.

Q. CAN YOU TELL ME, CAN YOU TELL THE COURT HOW MANY CASES ARE THERE IN WHICH THE REMOVAL OF THE DRYWALL HAS BEEN ACCOMPLISHED?

A. IT'S GOING TO BE CLOSE TO THAT 20 NUMBER. I DON'T KNOW THE NUMBER.

Q. NOW IN YOUR CAPACITY AS THE VICE-PRESIDENT FOR FLORIDA OPERATIONS OF BEAZER, WERE YOU GIVEN AUTHORITY TO DETERMINE THE SCOPE AND COST OF APPROPRIATE REPAIRS FOR THESE CHINESE DRYWALL HOMES?

A. I WAS.

Q. AND IN MAKING THIS DETERMINATION FOR THE COMPANY, TELL THE COURT WHAT YOUR PRIMARY OBJECTIVES WERE.

A. THE MAIN ONE WAS TO HONOR OUR WARRANTY AND TO GET OUR CUSTOMER, OUR HOMEOWNER WHOLE. SECOND, BUT A CLOSE SECOND, WAS TO DO IT AT THE LEAST EXPENSE POSSIBLE, WHICH WHAT CAN WE SAY.

Q. WHEN YOU SAY MAKE THE OWNER WHOLE, WHAT DO YOU MEAN BY THAT?

A. PUT THE HOUSE BACK TO THE WAY THEY THOUGHT THEY WERE BUYING IT FROM US AS.

Q. BEFORE IT HAD CHINESE DRYWALL?

A. CORRECT.

Q. AND WHEN YOU SAY DO IT IN THE MOST COST EFFICIENT WAY, WHAT DO YOU MEAN BY THAT?

A. THAT MEANS TRYING TO MAKE DECISIONS ON WHAT'S NECESSARY TO DISCARD AND WHAT CAN BE SALVAGED.

Q. WOULD YOU STATE FOR THE COURT WHAT ROLE, IF ANY, PUBLIC RELATIONS OR CUSTOMER RELATIONS PLAYED IN YOUR DECISION MAKING AS TO SCOPE AND COST OF REPAIR?

A. THAT WOULD BE UNRELATED.

Q. AND WHY IS THAT?

A. IT'S JUST THAT'S NOT A POINT THAT CAME INTO PLAY TO FIGURE OUT WHAT TO DO, ESPECIALLY AFTER DETERMINING HOW MUCH AND HOW EXPENSIVE IT IS TO MAKE THEM WHOLE, I DON'T WANT TO SOUND BAD BUT I DON'T KNOW THAT WE WOULD SPEND THAT KIND OF MONEY FOR CUSTOMER RELATION.

Q. NOW, YOU MENTIONED THAT BEAZER CONTACTED LENNAR ABOUT CHINESE DRYWALL REMEDIATION?

A. WE WERE INVOLVED WITH DISCUSSIONS WITH LENNAR. I DON'T KNOW WHICH WAY IT STARTED, I DON'T KNOW WITH BEAZER WHO CONTACTED LENNAR.

Q. AND DID YOU --

A. I DON'T KNOW IF IT WAS JERRY OUR SUPERINTENDENT IN THE FIELD, SO I AM NOT SURE.

Q. THAT WOULD BE JERRY SMITH?

A. CORRECT.

Q. WERE THERE ANY OTHER BUILDERS BESIDES LENNAR WHO COMMUNICATED

WITH BEAZER ABOUT THE CHINESE DRYWALL REMEDIATION ISSUE?

A. I AM NOT AWARE. I BECAME VERY INVOLVED WHEN WE STARTED MEETING WITH OUR ENVIRONMENTALISTS OR ENVIRON, IS THE NAME OF THE COMPANY, WHERE WE WERE TRYING TO ASSESS A PROTOCOL AND UNDERSTAND THE COST.

Q. WELL, YOU MENTIONED ENVIRON, TELL THE COURT WHAT ROLE ENVIRON PLAYED IN YOUR ANALYSIS?

A. MY UNDERSTANDING WAS THAT SCIENTIFIC SIDE OF, YOU KNOW, WHAT WAS GOING ON, THIS CORROSION; ANOTHER WAS HOW TO IDENTIFY THE SYMPTOMS IN A HOUSE, THEY'RE THE ONES THAT EDUCATED US HOW TO GO INTO A HOUSE AND DETERMINE POSITIVE OR NEGATIVE. AS WELL AS GIVING ADVICE ON WHAT THEY THOUGHT THE PROPERTIES OF THIS CORROSION WOULD BE AND WHETHER IT STOPS, HOW FAR IT GOES AND THAT TYPE OF THING.

Q. WAS THE ULTIMATE DECISION THOUGH OF HOW FAR TO GO IN THE SCOPE OF REPAIR WORK YOUR DECISION?

A. IT WAS MINE.

Q. HAS THE SAME CHINESE DRYWALL REPAIR PROTOCOL FOR BEAZER BEEN USED IN BOTH COMMUNITIES, BOTH FORT MYERS AND TAMPA?

A. YES.

Q. AND HAS IT BEEN USED IN CASES WHERE THERE IS BOTH KNAUF CHINESE DRYWALL AND OTHER TYPES OF CHINESE DRYWALL?

A. THE CORROSION IS THE SAME. WE WOULD ALREADY BEGIN THE PROTOCOL WITHOUT KNOWING WHOSE BOARD IS WHOSE. THAT'S PART OF THE DISCOVERY AFTER YOU START DOING THE REPAIR, SO WE WOULDN'T KNOW WHO THE BOARD IS. BUT YOUR ANSWER, YES, IT WOULD BE THE SAME SCOPE.

Q. THE SAME SCOPE IS USED REGARDLESS OF WHICH MANUFACTURER?

A. CORRECT.
Q. DO YOU KNOW OF ANY REASON WHY THIS PROTOCOL WOULD BE GEOGRAPHICALLY LIMITED TO THESE TWO COMMUNITIES AS OPPOSED TO OTHER COMMUNITIES WHERE BEAZER MIGHT FIND CHINESE DRYWALL?
A. NO, THE CORROSION WOULD BE THE SAME NO MATTER WHAT CITY IT'S IN.
Q. WHY WOULD THE REMEDIATION ACTIVITIES NOT VARY WITH GEOGRAPHIC LOCATION?
A. I THOUGHT I JUST ANSWERED -- I DON'T GET THE QUESTION.
Q. WHY WOULD YOU NOT HAVE TO CHANGE THE SCOPE OF WHAT YOU DO FROM LOCATION TO LOCATION?
A. THERE'S NO DIFFERENCE. I MEAN, IF THERE'S CORROSION WHETHER IT'S IN FORT MYERS OR WHETHER IT'S IN TAMPA, OUR UNDERSTANDING OF HOW TO TAKE CARE OF THAT WOULD NOT CHANGE BECAUSE IT'S A DIFFERENT ZIP CODE.
Q. LET ME SHOW YOU A DOCUMENT, MR. PHILLIPS, THAT'S BEEN PREVIOUSLY MARKED AS HERNANDEZ EXHIBIT 50 (SIC), AND ASK YOU IF YOU RECOGNIZE THIS DOCUMENT?
A. YES.
Q. WHAT IS IT?
A. IT'S OUR RELEASE AGREEMENT.
Q. FOR THE CHINESE DRYWALL REMEDIATION?
A. CORRECT.
MR. MEUNIER: YOUR HONOR, I WOULD OFFER INTO EVIDENCE AS HERNANDEZ 50 (SIC) THE WORK AUTHORIZATION AGREEMENT FOR BEAZER

HOMES?

THE COURT: ANY OBJECTION?

MR. HAYDEN: NO OBJECTION.

THE COURT: LET IT ME ADMITTED.

MR. MEUNIER: DID I SAY 50? I'M SORRY, HERNANDEZ EXHIBIT 150.

THE COURT: 150.

BY MR. MEUNIER:

Q. NOW, IN SIGNING THIS AGREEMENT WITH BEAZER, DOES THE OWNER RELEASE ALL CLAIMS AGAINST BEAZER DEALING WITH CHINESE DRYWALL?

A. NO, NOT PERSONAL EFFECTS, PERSONAL INJURY.

Q. SO THOSE CLAIMS ARE NOT AFFECTED BY THIS?

A. CORRECT.

Q. CAN WE LOOK AT PAGE 8, PLEASE. THERE'S A SECTION HERE ENTITLED ASSIGNMENT OF CLAIMS, DO YOU SEE THAT, MR. PHILLIPS?

A. YES.

Q. TELL THE COURT WHAT THIS ASSIGNMENT OF CLAIMS PROVISION CALLS FOR.

A. WELL, WE HAD NO CLUE AT THE TIME, BUT AT SUCH POINT LATER ON IF WE WERE ABLE TO GET OTHER SUPPORT FOR THE OTHERS THAT ARE INVOLVED THAT, YOU KNOW, WE WANTED TO HAVE ACCESS TO THAT RATHER THAN THE HOMEOWNERS SINCE WE'RE MAKING THEM WHOLE ON OUR OWN.

Q. HAS THE OWNER'S ASSIGNMENT OF CLAIMS TO BEAZER UNDER THIS AGREEMENT INFLUENCED YOUR DECISION ABOUT THE APPROPRIATE SCOPE OR COST OF CHINESE DRYWALL CASES?

A. NO, IT DOESN'T.
Q. WHY NOT?
A. WE'VE ALREADY DETERMINED HOW WE'RE GOING TO FIX THE HOUSE AND WE'RE GOING TO FIX THE HOUSE, BUT WE'RE GOING -- WE ARE REQUIRING THEM TO RELEASE -- I GUESS IN THAT SENSE WE'RE NOT GOING TO DO IT IF THEY DON'T GIVE US A RELEASE, THAT WOULD BE THE ONLY EXCEPTION. I DON'T KNOW IF THAT ANSWERS THE QUESTION.
Q. LET'S GO TO PAGE 4. AND IN PARAGRAPH 5 THERE'S REFERENCE TO A MONTHLY STIPEND, CORRECT?
A. YES.
Q. SO HOW MUCH DOES BEAZER UNDER THIS AGREEMENT PAY AN OWNER DURING THE PERIOD THE OWNER IS DISPLACED FROM THE HOME?
A. WE DO IT FOR THE ENTIRE TIME THAT THEY'RE DISPLACED ON A MONTHLY BASIS.
Q. AND HOW MUCH DO YOU PAY?
A. 3,200.
Q. HOW, IF AT ALL, DOES THIS PROVISION INFLUENCE YOU IN DETERMINING AND PURSUING THE APPROPRIATE REPAIRS?
A. JUST TIME IS OF THE ESSENCE. THE QUICKER, I MEAN, OUR FIRST PREDICTION WAS WE THOUGHT WE WERE GOING TO DO IT IN FOUR AND A HALF MONTHS. THESE FIRST TWO ARE LOOKING LIKE SIX, MAYBE A TAD MORE. WE'RE HOPING TO GET A LITTLE MORE EFFICIENT AS WE'RE DOING THESE NEW ONES, BECAUSE OF THE MONEYS THAT WE'RE PAYING IN ADDITION TO ALL OF THE REPAIR, WE'RE ANXIOUS TO GET THEM BACK IN.
Q. LET ME LOOK WITH YOU NOW AT PAGE 3 OF THE AGREEMENT. DOES THIS

PAGE SET FORTH IN SUMMARY FASHION THE SCOPE OF CHINESE DRYWALL REMEDIATION THAT BEAZER IS PURSUING?

A. YES, IT DOES.

Q. AND BECAUSE OF THE STIPULATION IN THIS CASE, MR. PHILLIPS, IT WILL NOT BE NECESSARY FOR ME TO REVIEW EACH AND EVERY ITEM, I WILL JUST STATE THE PERTINENT PART OF THE STIPULATION AT THIS POINT, YOUR HONOR.

IT'S STIPULATED IN THIS CASE THAT WITH RESPECT TO THE APPROPRIATE SCOPE OF REMEDIATION FOR THE HERNANDEZ HOME, THE PARTIES AGREE THAT, EXCEPT WITH RESPECT TO THE POSSIBILITY OF MAINTAINING CERTAIN GREEN BOARD IN THE BATHROOMS, ALL DRYWALL IN THE HOME, BOTH CHINESE MANUFACTURED AND DOMESTIC, WILL BE REMOVED AND REPLACED, AS WELL AS ALL INSULATION, ALL FLEXIBLE DUCTWORK, ALL SWITCHES, ALL RECEPTACLES, ALL MOLDING, AND THE COUNTERTOPS.

SO LET ME FIRST REVIEW WITH YOU THE SECOND ITEM ON THIS PROTOCOL, MR. PHILLIPS, WHICH IS THE REMOVAL AND REPLACEMENT OF ALL AFFECTED HVAC SYSTEMS. FIRST, WHAT IS MEANT BY THE HVAC SYSTEM?

A. I THINK IT'S HEATING, VENTING AND AIR CONDITION, THE AIR HANDLER ON THE INSIDE; CONDENSER, COMPRESSOR ON THE OUTSIDE; A PLENUM AND DUCT WORK, SO IT'S WHAT HEATS AND COOLS THE HOUSE.

Q. DOES IT INCLUDE THE LINE SET?

A. YES.

Q. WHAT IS A LINE SET?

A. I AM NOT AN EXPERT IN HVAC, BUT THAT'S THE FREON BEING TRANSPORTED TO AND FROM THE AIR HANDLER AND THE COMPRESSOR. SO

IT'S A COPPER LINE, WE SAW SOME PICTURES EARLIER.

Q. HAS BEAZER EVER CONSIDERED PRESERVING OR NOT REPLACING ANY PART OF THE HVAC SYSTEM?

A. CONSIDERED THEM ALL AND DETERMINED TO REPLACE THEM ALL EXCEPT THE CONDENSER. WITH THE COMMUNITIES THAT WE WERE DOING, WE HAD ALREADY UPGRADED TO THE NEW ENERGY CODE, AS WELL AS THE NEW REQUIREMENT OF FREON THAT WE DIDN'T HAVE TO REPLACE. WE WERE AWARE SOME OTHERS HAD BEEN REPLACING THEM, BUT SINCE THE FIRST TIME THEY WERE PUT IN TO THE DATE THAT THEY'RE BEING REPLACED NOW, THE CODE HAD CHANGED, SO WE ELECTED NOT TO REPLACE THE CONDENSER ON THE OUTSIDE.

Q. THAT'S THE OUTSIDE COMPRESSOR?

A. CORRECT.

Q. THAT'S NOT EXPOSED TO THE CORROSIVE ENVIRONMENT?

A. CORRECT. BUT WE WOULD BE REPLACING THE LINE SET ALL THE WAY TO IT.

Q. ALL THE WAY TO IT. NEXT YOU REMOVE AND REPLACE ALL SMOKE DETECTORS. AND WHY IS THAT?

A. WELL, I MEAN, THE EASY ANSWER TRYING TO KEEP UP AND SAVE IS WOULD BE A CHALLENGE, IT'S NOT HAVE A VERY EXPENSIVE ITEM; BUT MORE BECAUSE OF THE CORROSION IN THE WIRING.

Q. YOU REMOVE AND REPLACE ALL HOT WATER HEATERS?

A. SAME REASONING, BOTH FOR COPPER FITTINGS AS WELL AS WIRING.

Q. YOU REMOVE AND REPLACE ALL DUCTWORK?

A. YES.

Q. NOW, IS THERE BOTH FLEXIBLE AND NON-FLEXIBLE DUCTWORK?

A. I THINK TECHNICALLY SPEAKING THE ANSWER WOULD BE YES, BUT WE, WE'RE LIKE 95 PERCENT FLEXIBLE DUCTWORK. SO THE PLENUM WOULD BE MADE UP OUT OF BOARD AND THEN THERE MAY BE A BOX HERE AND THERE IN AN ATTIC THAT OTHER FLEX PIPE WOULD VENT OFF ON, BUT WE DON'T DO ANY RUNS WITH DUCT BOARD. SO IT'S ALL FLEX.

Q. WHAT ROLE DID THE PRESENCE OF DRYWALL DUST PLAY IN YOUR DECISION ON DUCTWORK REMOVAL?

A. A LOT. TO US IT SEEMED VERY HARD THAT WE WOULD BE ABLE TO CLEAN THE INSIDE OF THE DUCT, AS WELL IT'S NOT A VERY EXPENSIVE ITEM; SO IT'S EASIER TO GO IN AND GET IT OUT SO YOU CAN START MAKING THE REPAIR.

Q. YOU CAN SKIP INSULATION AND GO TO THE REMOVAL AND REPLACEMENT OF ALL CARPET. TELL THE COURT WHY THAT DECISION WAS MADE.

A. WELL, IT'S NOT HARD TO IMAGINE BUT ESPECIALLY IF YOU'VE BEEN IN A HOUSE UNDER THIS KIND OF CONSTRUCTION, I DON'T KNOW OF ANY WAY THAT YOU CAN POSSIBLY PROTECT THE CARPET; SO THE NEXT THING WOULD BE WHETHER YOU PULL IT UP, THE FOAM WOULD BE WASTED BECAUSE THEY PUT AN ADHESIVE DOWN THAT THE FOAM STICKS TO THE CONCRETE SO IT'S GOING TO RIP AND TEAR. BUT THE CARPET COULD COME UP, BUT NOW YOU'VE GOT SOME CARPET -- AND NOT A VERY EXPENSIVE ITEM AS WELL.

BUT IT'S BEEN INSTALLED FOR A FEW YEARS AND THEN YOU'RE GOING TO GO BACK AND START STRETCHING IT, SO WHERE IT'S BEEN TAPED AND PUT TOGETHER BEFORE AT THE SEAMS, YOU'RE RUNNING THE RISK OF HAVING PROBLEMS WITH THAT. IF YOU TRIED, YOU'RE PROBABLY GOING TO

END UP WASTING MONEY DOING IT AND THEN PULLING IT OUT AND GOING TO BUY THE NEW INSTEAD OF JUST DOING IT UPFRONT.

Q. NOW, I DON'T SEE A REFERENCE SPECIFICALLY TO UNCARPETED AREA SUCH AS HARDWOOD FLOORS. DO YOU HAVE HARDWOOD FLOORS IN THE BEAZER HOMES?

A. WE DO IN THE TOWN HOMES IN THE HAMPTONS.

Q. AND WHAT HAS BEEN THE DECISION WITH RESPECT TO THOSE FLOORS?

A. TO TAKE THEM OUT. WE ORIGINALLY WAS HOPING NOT TO DO THAT -- WE ARE SAVING TILE FLOORS, BUT EVEN THE PREVIOUS TESTIMONY WAS THE SAME REASON, RATIONALE WITH US. FIRST, WE THOUGHT IT WOULD BE ALMOST IMPOSSIBLE TO PROTECT THEM DURING CONSTRUCTION, BUT MORE SO WE WERE, YOU KNOW, ONCE CONSTRUCTION STARTS AND THE POWER IS KILLED, THE HVAC COMES OUT, IT'S NOW EXPOSED TO THE WEATHER AND ELEMENTS, THE HUMIDITY, ESPECIALLY IN FLORIDA, AND WE WERE WORRIED ABOUT JOINTS OPENING UP. AS WELL AS IF YOU'VE EVER SEEN MOISTURE, THE EDGE AROUND THE JOINTS CAN CURL UP A TAD. AND SO I ENDED UP DECIDING TO GET RID OF IT.

Q. NOW, BEAZER REMOVES AND REPLACES ALL ELECTRICAL WIRING, INCLUDING LOW VOLTAGE WIRING IN THE HOME. CORRECT?

A. YES.

Q. WOULD YOU PLEASE EXPLAIN THAT DECISION TO THE COURT.

A. WELL, THE MAIN REASON, ONE OF THE PREDOMINANT AREAS WERE THE SYMPTOMS SHOW THEMSELVES, AND IN ALL OF OUR CASES IT'S THROUGHOUT THE HOUSE, YOU CAN GO TO EVERY ROOM AND FIND THAT THE CORROSION IS THERE.

Q. BE MORE SPECIFIC, WHEN YOU SAY YOU GO TO EVERY ROOM AND FIND IT, WHAT ARE YOU LOOKING AT?

A. WELL, FIRST LIKE GOING IN AND INSPECTING A HOME, WE WOULD BE TAKING A COVER PLATE OFF, WHETHER IT'S AN OUTLET OR A SWITCH, AND PULLING IT OUT. AND THE EASIEST IS TO LOOK AT THE GROUND WIRE BECAUSE IT'S STRIPPED IN ITS ENTIRETY, SO IT'S NOT IN A JACKET, IT'S FULLY EXPOSED, YOU SIMPLY CAN SEE IT FIRST. AND WITHOUT A FLASHLIGHT. WHEREAS THE PART OF THE ENERGIZED PART, THE HOT PART, THE BLACK AND THE WHITE WIRE, THEY'RE CURLED AROUND A SCREW, YOU CAN STILL FIND IT JUST AS DOMINANT AS ON THE GROUND WIRE BUT YOU HAVE TO LOOK HARDER.

SO THAT'S WHAT YOU'RE LOOKING FOR. SO SAYING WE GO TO EVERY ROOM AND PULL OUT ONE OR TWO AND CHECK.

Q. WELL, WHAT IF CHINESE DRYWALL WERE IN A HOME AND YOU ONLY SAW OBSERVABLE OR VISIBLE BLACKENING OR CORROSION ON THE GROUND WIRE IN ONE RECEPTACLE BUT DIDN'T IN ANOTHER, WHY WOULDN'T YOU JUST SAVE SOME OF THE WIRING AND TAKE OUT ONLY WHAT THE CORRODED PART WOULD SHOW?

A. I DON'T KNOW HOW YOU WOULD MANAGE THAT. BUT IN OUR CASES, WE WERE FINDING IT THROUGHOUT. IT DOESN'T MEAN EVERY SINGLE ONE, BUT THE MAJORITY ARE CORRODED. AND IN OUR HOUSES, I DON'T KNOW THAT WE'VE HAD ANY THAT'S 100 PERCENT CHINESE BOARD, BUT YET THERE ARE STILL OUTLETS THROUGHOUT THE HOUSE THAT ARE CORRODED.

THEN FROM THERE, I MEAN, WE LOOKED AT WHAT'S BEEN TALKED HERE, THE SNIP AND CLIP, THE CLEAN, AND IT SEEMED IMPRACTICAL, IT

STARTED TO SEEM AS THOUGH YOU'RE GOING TO SPEND MORE IN LABOR TO ACHIEVE THAT TO JUST SIMPLY PULL IT OUT. WE FOUND OUT THE WIRING IS ABOUT 15 PERCENT OF THE OVERALL ELECTRICAL COSTS, SO IT'S NOT A HUGE NUMBER ONCE YOU'VE GONE THAT FAR.

YOU HAVE THE UNKNOWN OF WHETHER YOU FIXED IT OR NOT. IF YOU DIDN'T, THEN YOU'RE LEAVING A HOMEOWNER POSSIBLY A FIRE, I DON'T KNOW, FIRES; AND ANOTHER FOR BUSINESS, IF IT WERE TO BE A PROBLEM LATER WE'RE GOING TO SPEND THIS TWICE. WE'RE SPENDING CLOSE TO 100 GRAND. SO IF WE SAVE BIG NUMBERS, 10 GRAND, 20 GRAND AND THEN WE HAVE TO GO BACK A YEAR, TWO YEARS, THREE YEARS FROM NOW AND SPEND 100 GRAND AGAIN, IT JUST DIDN'T MAKE SENSE.

THE SNIPING AND CUTTING AS I UNDERSTOOD IT, I DON'T KNOW HOW YOU CAN ACHIEVE THAT WITH THE AMOUNT OF WIRE THAT'S IN A HOUSE. THE MAIN ONE -- I'VE HEARD, I AM AWARE OF THIS DISCUSSION AND I GET CLIPPING THE BLACK AND THE WHITE WIRE AND THAT YOU COULD REMAKE UP IF IT'S TOO SHORT, YOU CAN REMAKE THAT UP. A COUPLE OF THINGS, I COULD SEE YOU GETTING BY WITH THIS, IT WOULD MEET CODE, BUT YOU START TO RUN OUT OF ROOM IN THE BOX IF NOW YOU'RE GOING TO DOUBLE UP A WIRE NUT NEXT TO WIRING, THAT COULD BE A PROBLEM.

THE ONE THAT I'M STRUGGLING WITH IS THE GROUND WIRE IS NAKED ALL THE WAY TO THE BACK OF THE BOX, IT'S NOT JUST FIVE EIGHTHS OR THREE QUARTERS OF AN INCH, SO I DON'T KNOW HOW YOU DO THAT. SO NOW YOU'RE BACK TO THE WIRE IS TOO SHORT AND YOU'RE GOING TO BE ADDING JUNCTION BOXES.

Q. AND I THINK WE'LL SEE SOME PICTURES LATER THAT TALK ABOUT THIS.

A. YES.
Q. SO BEAZER HAS CONSIDERED ALTERNATIVES FOR REMOVAL AND REPLACEMENT OF ALL WIRING?
A. YES.
Q. AND YOU HAVE FOUND AS A PRACTICAL MATTER THIS IS A MORE COST EFFICIENT MANNER?
A. YES. AND IT'S ABSOLUTE, YOU'RE ELIMINATING RISKS. SO.
Q. AND WE HAVE AN AGREEMENT HERE ON SWITCHES AND RECEPTACLES, I'LL SKIP THAT.
PLUMBING COMPONENTS, YOU REMOVE AND REPLACE ALL AFFECTED PLUMBING COMPONENTS. TELL US WHAT YOU MEAN BY ALL AFFECTED PLUMBING COMPONENTS.
A. THAT'S TALKING ABOUT THE FIXTURES AND AS WELL THE FITTINGS. IN BOTH OF OUR COMMUNITIES WE ARE NOT USING, IN OUR AFFECTED COMMUNITIES, WE'RE NOT USING COPPER PIPING. I BELIEVE IT'S IN TAMPA, HAMPTON LAKES WE USE PVC AND IN THE FORT MYERS WE WERE USING PEX, WHICH IS SOME KIND OF POLYVINYL OR POLYCHLORIDE, I'M NOT SURE WHAT IT IS, BUT IT'S MORE OF A PLASTIC. SO ON THE PEX THEY ARE CONNECTED BY COPPER FITTINGS AND A COPPER FLANGE AND WE ARE TAKING THOSE OFF AND REPLACING THEM.
Q. WHY ARE YOU DOING THAT?
A. BECAUSE THEY'RE AFFECTED BY THE CORROSION, WHEREAS THE PIPING ITSELF WE'RE NOT REPLACING, WE'RE LEAVING IT IN THE HOME.
Q. THE PVC OR PEX?
A. CORRECT. THEN ON THE FIXTURES, BOTH SUPPLY TUBES BRINGING THE

WATER UP FROM AN ANGLE STOP, WE'LL START WITH THE ANGLE STOP. THE ANGLE STOP IS -- AND AGAIN, I AM NOT A SCIENTIST -- BUT IT'S CHROME, WHATEVER CHROME IS MADE OUT OF, I'VE HEARD NICKEL OR SILVER, I DON'T KNOW, BUT IT'S ONE OF THE SIGNS, LIKE A SHOWER ARM, A SHOWER HEAD, A DISCUSSION PLATE, AND THE ANGLE STOP ITSELF YOU SEE THE PITTING AND THE CURLING UP OF THE CHROME LIKE YOU WOULD --

MR. HAYDEN: OBJECTION, YOUR HONOR, HE CAN GIVE VISUAL OBSERVATIONS, BUT TO THE EXTENT HE IS GIVING OPINIONS ON CORROSION, I OBJECT.

THE COURT: HE'S GIVING -- I AM JUST UNDERSTANDING WHAT HE'S SEEN, HE DOESN'T KNOW WHY IT'S HAPPENING, JUST THAT IT'S HAPPENING.

THE WITNESS: WHAT I AM DESCRIBING IS NOT IN THE HOUSES THAT DON'T HAVE CHINESE DRYWALL. IT'S MORE OF WHAT YOU WOULD SEE OF A FIXTURE INSTALLED IN THE WOODS AND ALL OF THE WEATHER AND THE ELEMENTS AND ALL THAT KIND OF THING, YOU WOULD SEE IT JUST STARTING TO DELAMINATE AND PEEL AND THAT KIND OF THING. SO IT WAS POINTED OUT BY ENVIRON THAT IT'S ONE OF THE SYMPTOMS TO LOOK FOR.

BY MR. MEUNIER:

Q. SO THE REMOVAL OF ALL AFFECTED PLUMBING MEANS COPPER CONNECTIONS --

A. CORRECT.

Q. -- FITTINGS, AS WELL AS THE CHROME --

A. THE FIXTURES THEMSELVES, BOTH THE COPPER THAT'S COMING UP FROM BELOW, IF IT'S INTEGRAL, IT HAS THE CORROSION, AS WELL AS THE

FINISH ON THE FIXTURE ITSELF.

Q. NOW, BEAZER AGREES TO REMOVE AND REPLACE ALL AFFECTED ORIGINAL APPLIANCES. WOULD YOU PLEASE EXPLAIN WHAT IS MEANT BY THAT.

A. YEAH. THE EASIEST ONE TO TELL THERE IS THE REFRIGERATOR BECAUSE I GUESS IT HAS A CONDENSER, CERTAINLY HAS A BLOWER, AND I THINK EVERY SINGLE CASE THE REFRIGERATOR, YOU ROLL IT OUT, YOU SAW THE CORROSION. IN OUR CASE IN BOTH COMMUNITIES BISQUE WAS A VERY COMMON COLOR SELECTED AT THE TIME, THAT'S DISCONTINUED. SO, ONE, WE COULDN'T MATCH THEM, AS WELL AS WE REMAINED CONCERNED THAT THE OTHER APPLIANCES HAD THE WIRING IN THE COMPONENTS, TOO, SO WE ELECTED TO REPLACE THOSE.

THE LIST WOULD BE LIKE A REFRIGERATOR, A DRYER, WASHER, A MICROWAVE, A RANGE, A DISHWASHER, AND THAT'S WHETHER WE PROVIDED IT OR THE HOMEOWNER BOUGHT IT AFTERMARKET; LIKE IF WE DIDN'T GIVE THEM A WASHER AND DRYER, THEN WE WOULD EITHER GET THEM THE CLOSEST MODEL TO WHAT THEY HAD OR COMPENSATE THEM FOR THE WASHER AND DRYER.

Q. AND THAT WAS ON THE BASIS THAT EVEN THOSE APPLIANCES THAT YOU HAD NOT ORIGINALLY SUPPLIED HAD BEEN EXPOSED TO THE DRYWALL?

A. CORRECT.

Q. WHAT ABOUT ELECTRONIC APPLIANCES, SUCH AS TELEVISIONS AND COMPUTERS, THOSE TYPES OF THINGS?

A. YOU KNOW, WE'VE BEEN ASKED ABOUT THEM AS WE'RE GETTING READY TO START THE CONSTRUCTION, WE'RE NOT EXCLUDING THOSE AND WE'VE TOLD OUR CUSTOMERS THAT IF SOMEONE CAN SHOW US THAT WE CERTAINLY WOULD STILL CONSIDER IT, BUT TO DATE WE HAVEN'T SEEN ANY OURSELVES.

MR. MEUNIER: YOUR HONOR, THIS MIGHT BE A GOOD TIME TO TAKE A BREAK.

THE COURT: WE'LL STOP HERE AND COME BACK AT 1:45. THE COURT WILL STAND IN RECESS UNTIL 1:45.

(WHEREUPON, A LUNCH RECESS WAS TAKEN.)

* * * * * *

REPORTER'S CERTIFICATE

I, KAREN A. IBOS, CCR, OFFICIAL COURT REPORTER, UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF LOUISIANA, DO HEREBY CERTIFY THAT THE FOREGOING IS A TRUE AND CORRECT TRANSCRIPT, TO THE BEST OF MY ABILITY AND UNDERSTANDING, FROM THE RECORD OF THE PROCEEDINGS IN THE ABOVE-ENTITLED AND NUMBERED MATTER.

KAREN A. IBOS, CCR, RPR, CRR
OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION *

THIS DOCUMENT RELATES TO: * MDL No. 2047

Tatum B. Hernandez, et al * Section L

versus * New Orleans, Louisiana

Knauf Plasterboard (Tianjin) Co., Ltd., et al * March 15, 2010

* 1:45 p.m.

Case No. 09-CV-6050 *

* * * * * * * * * * * * * * * * * * * * *

VOLUME I - AFTERNOON SESSION
PROCEEDINGS BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Tatum and Charlene Hernandez: Herman, Herman, Katz & Cotlar, LLP
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, Louisiana 70113

For Tatum and Charlene Hernandez: Gainsburgh Benjamin David Meunier & Warshauer
BY: GERALD E. MEUNIER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

APPEARANCES:

For Tatum and Charlene Hernandez: Seeger Weiss
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

For Tatum and Charlene Hernandez: Lewis & Roberts, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

For Knauf Plasterboard (Tianjin) Co., Ltd: Frilot, LLC
BY: KERRY MILLER, ESQ.
KYLE A. SPAULDING
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DOUGLAS B. SANDERS, ESQ.
KYLE P. OLSON, ESQ.
ERIN M. MAUS, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter: Toni Doyle Tusa, CCR, FCRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7778

Proceedings recorded by mechanical stenography, transcript produced by computer.

I N D E X

PAGE

Ray Phillips

Direct Examination 124

Cross-Examination 168

Redirect Examination 193

Brad Krantz

Voir Dire Examination 198

Direct Examination 206

AFTERNOON SESSION

(March 15, 2010)

THE DEPUTY CLERK: Everyone rise.

Be seated, please. Good afternoon, ladies and gentlemen.

You're still under oath, sir.

You may proceed, Counsel.

MR. MEUNIER: Thank you, Your Honor.

(WHEREUPON Ray Phillips, having been duly sworn, testified as follows.)

DIRECT EXAMINATION

BY MR. MEUNIER:

Q. Mr. Phillips, we were discussing the Beazer scope of Chinese drywall remediation. I believe we had come down to the component where you say you were repairing the place as necessary, and then you began to list certain specific items, some of which, as you heard in the stipulation, are not in dispute. So I want to focus just on the ones that are the subject of dispute.

You mentioned something about tile already. What is Beazer's position on tile material?

A. On flooring -- can you hear me? I can't hear myself.

Q. Yes. You're fine.

A. On flooring, we have been able and have been successful saving it, putting a rubber interlocking mat down, and it's

working very well. We tried the first house on wall tile and were skeptical even trying, but we -- again, we're trying to save everything we could.

One of the problems is when you're cutting the drywall down to where the tile terminates, there's no way to refinish it back. You do that before the tile goes back up. Plus, we broke a tile on the first one we tried. Most of the time, the dye lots are no longer going to match. So it became more difficult trying to work around it rather than get it out of there. So wall tile, we are getting rid of; floor tile, we are saving.

Q. How about cabinets?

A. Cabinets, that was one we -- at the very beginning, I guess, hindsight, a little naive, we thought we could save those. I started doing a study with putting a POD, a steel POD, in the driveways for storage. At that time, I was only figuring, I think, four-and-a-half, five months, and now we're six, maybe a tad better, so it would have been a worse scenario. But the cost of the delivery, rental, and pickup of the POD was more expensive than the cabinets. I probably should have made that point with appliances as well.

Q. With what? I'm sorry.

A. With appliances. I was talking about appliances, other reasons we came, but -- the storage I had mentioned, you know, where you had to take care, put it somewhere. In addition to

the cabinets, not only the POD was more expensive, that's talking about putting it on the driveway. So, again, we became concerned, just like wood floors, that the weather elements, humidity, could cause the joints and the cabinets to start to open up and separate. Then that was too expensive. Then you're, like, do you start taking all this stuff to an air-conditioned space, which is even more money? So it's really a cost-ineffective method, so we get rid of cabinets.

Q. So all cabinets are being removed and replaced with new cabinets?

A. Correct.

Q. Because that's more cost-efficient than trying to save the cabinet?

A. Correct.

Q. The next thing to talk about on this list would be mirrors. What is Beazer doing with respect to mirrors in these homes?

A. We are discarding. That actually is one of the telltale signs of identifying you've got positive Chinese drywall in the house, in addition to copper wiring. It's not like we have seen this in every bathroom of every house, but it's very predominant. It desilvers around the edges, as well as the medicine cabinets; you see the same thing. Go to a house that's negative, and you don't see that delamination.

Q. I think we talked about plumbing fixtures already.

A. We did.
Q. We covered that already.
A. We did.
Q. That brings us, then, to the cleaning aspects of the protocol, beginning with HEPA-vacuuming. Tell the Judge what HEPA-vacuuming is.
A. My understanding is it's just a deeper filtering that takes smaller and smaller particles out in cleaning out the house than just a typical vacuum.
And as previous testimony, I don't know if they had it backwards or if Lennar is also doing it. We also pressure-wash. I think previous testimony was saying Lennar is doing that. I don't know what Lennar's doing, but we are doing it. I don't think they are.
Q. So the HEPA-vacuuming you say here is to remove all construction dust. Let me ask you first: What is the nature of dust from drywall that's being pulled away in one of these homes?
A. I heard it earlier, but I've described it as it's -- excuse me. It's like powder. I mean, it's extremely fine. It just floats. You can blow it like baby powder. Obviously, it's heavier than baby powder, but it's powder.
Q. Has Beazer found it possible with the HEPA-vacuuming alone to remove all of the drywall dust?
A. All is the big word. It is effective. Pressure-washing

is not in our protocol. It was recommended by the professionals, that HEPA-vac, and the wiping down is adequate. And, you know, so to literally go around with a rag and get up into the trusses, all through the attic and be wiping every crook and crevice -- you know, I mean, you can get all the dust that would just be laying on something flat, but up in the crevices, it didn't seem good enough to us. It wasn't -- it was not the protocol, though.

THE COURT: Just ask him if you can minimize the dust during the process.

MR. MEUNIER: That's what we're going to get to next, Judge.

BY MR. MEUNIER:

Q. Just to finish on cleaning, after the HEPA-vacuuming, you do a wipe-down, and you have gone to pressure-washing?

A. And we pressure-wash, vacuuming simultaneously and extracting the water that we're putting down, which would be less water than constructing during rainy season. We don't leave the water sitting there, so we're not concerned for any absorption into the wood.

THE COURT: How do you do that? How do you wash it and not get the water into the wood?

THE WITNESS: I'm not saying it doesn't get water into the wood. I'm saying it doesn't stay there, that it airs out, and we don't allow it to puddle. Just like during

construction in a rainy season, the house gets wet before it gets roofed, but we would sweep off the deck. The standing water is what, in our experience, causes the damages.

So, yes, moisture does go in, but we're extracting and vacuuming the water so we're not leaving any puddles, plus it airs from there. That begins the airing-out process.

BY MR. MEUNIER:

Q. How long do you air out these homes?

A. We air out 14 days.

Q. Now, you mentioned the time period. Let me just confirm this before we move to some videos. The total time you find needed to complete this remediation protocol, including the air-out period, from move-out date by the owner to move-in date, is what?

A. A couple weeks from that being a complete answer, but it's around six months, probably a little bit over six months.

Q. Now, Mr. Phillips, you were present in Florida, in Tampa Bay and in Fort Myers, in February this year when plaintiffs' counsel visited some of these Beazer Homes?

A. I was.

Q. You were present when we took photographs and had video taken of the activity there?

A. Yes, I was.

Q. Have you reviewed this video with me prior to your

testimony today?

A. Yes, I have.

Q. And you can verify that it's an accurate depiction of what was filmed at the time?

A. Yes.

MR. MEUNIER: For the record, Your Honor, this has been marked as Hernandez Exhibit 144. It's a video segment of a drywall demolition from wall areas.

THE COURT: Are you going to introduce it?

MR. MEUNIER: I will introduce it. I'd like to offer it.

THE COURT: It's admitted.

BY MR. MEUNIER:

Q. Tell us just what we're seeing here in terms of the demolition technique being used by Beazer.

A. This is going in and taking samples off of every wall, and then there's one of the environmentalists that will record and look at the back in trying to identify whose board it is.

Q. How is the drywall attached to the studs?

A. You've got the edges of a board, and then you've got all the inside. The inside is called the field. When they lay a board up on the wall, they use nails around the edges, and then they come back with a screw gun and put the right amount in the field, you know, up and down on the studs. So it's screwed and nailed.

Q. Now, I notice these men are using a hammer to begin the process of removing a section from the wall.
A. Right.
Q. Why not just go in with a knife and just very deliberately cut where you need to cut to remove the drywall? Why do it this way?
A. You can see how fast that is. So, one, time. A knife is going to take a lot longer. Maybe a saw would be just as fast, but then you're creating even more dust than what you're doing here. So it's just speed, as well as they can knock holes -- we're not seeing it on this one. They knock holes just to get their hands in there so they can -- like a hand-hold to try to pull the drywall down.
Q. Is there any way to avoid breakage of pieces or sections when they get removed from the wall?
A. When they get removed from the walls?
Q. These are 4-by-12 sections?
A. Correct.
Q. Has it been your experience that you can remove these sections, even when they're large and available such as this, without breaking the section?
A. No. The video's a good one there. That's a middle section. That's a 4-foot board on the top. Where you've got that straight line, that's a 4-foot board on the bottom. Then they're filling up more in the center there. You can see how

it's breaking apart there. They're getting lucky there. They're getting almost a full sheet there, almost, maybe two.

Q. Where there's tearing of the drywall, do you see dust being created?

A. Oh, absolutely. Yeah.

MR. MEUNIER: Can we go to the video, the next segment, please.

Your Honor, for the record, this has been marked as Hernandez Exhibit 143, and we would offer it into evidence.

THE COURT: Let it be admitted.

BY MR. MEUNIER:

Q. This section shows the removal from ceilings. The drywall is in the ceiling as well as the walls?

A. Correct.

Q. Likewise, has it been your experience that it's possible to remove sections of drywall from the ceiling without tearing sections apart?

A. No, it's not been the experience. You couldn't do it without doing precise cuts prior to pulling. Even then, you couldn't do it because you're going to have screws going up and down the studs that you don't know where they are.

I don't know how you could do it without, I mean, quadruple the time. For us, this is a money decision. It's, like, what's the fastest way to get in and out of there and --

Q. Wouldn't you save money on the cleanup end if you didn't

create so much dust and did this in a much more deliberate and careful manner?

A. No.

Q. Why not?

A. Well, them gutting this -- this is a different place. This looks like it's up in Hamptons. It's a townhome. This is like a half a day; two, three, four hours that they've got this drywall totally gutted.

Q. All of it, ceiling and wall?

A. Yeah. They're still cleaning up and taking some pieces out, but if you were trying to be delicate, you know, a half a day is a week. It's just going to grow.

Q. Did Beazer ever consider putting up visqueen or other coverings in order to minimize the amount of dust that got on surfaces during demolition?

A. You'd be spending a lot of time there resetting up a blanket or a screen. I don't know you how would do that except a little space at a time in visqueen. I've done that on a small remodel job, where you're just isolating one little room and you do a screen, but it's very impractical to try to do a whole house where you'd be going and -- I don't know what you'd visqueen except one little containment at a time, you know, moving around the house.

Q. Let me now move to some photographs that were taken on the same visit in Florida. First, I'd like to look at Hernandez

Exhibit 66.

Do you recognize this as one of the photographs taken in the Beazer homes that were being remediated?

A. Yeah. One of the coils.

MR. MEUNIER: I would offer this, Judge, as Hernandez 66.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. What do we see in this picture, Mr. Phillips?

A. You can see the coil ends, the U's, they're all corroded.

Q. Is this typical of what you have seen in the Beazer homes --

A. Yes.

Q. -- with respect to the HVAC coil?

A. Yes. Actually, it's the first place we go. If we were to get another call, the very first place we go is the coil.

Q. Let's look at the next picture, please.

MR. MEUNIER: Your Honor, this is Hernandez Exhibit 67, which we would offer into evidence.

THE COURT: Let it be admitted.

THE WITNESS: You can see, like, the bottom right corner.

BY MR. MEUNIER:

Q. Tell us what the picture shows first.

A. Well, corrosion on the copper. I don't know what that

line is, but it's a copper line. It's right where the blower is. It seems the more that there's air movement, the more there's corrosion. That's a layman talking. I don't know that as a scientist. But it just seems like where there's air movement you see higher levels of corrosion.

Q. Is this the back of one of the refrigerators in one of the homes?

A. Yes, it is.

Q. This here is the blower that you were talking about --

A. Yes.

Q. -- that moves air?

A. Yes.

Q. Is this the corroded line we were referring to?

A. The arrow is pointing to it, but the arrow should be closer, but that is it. That's it. Yeah, that's it.

Q. Again, I'll ask you --

THE COURT: Does that affect the use, the efficiency of the refrigerator, or not?

THE WITNESS: I don't know that. We're just identifying it, that it has corrosion on it, and part of our protocol is to eradicate.

BY MR. MEUNIER:

Q. Now, we have discussed a line set. I'd like to show you a brief video segment on the line-set issue.

MR. MEUNIER: It's been marked as Hernandez

Exhibit 141, which we would offer into evidence, Your Honor.

THE COURT: Let it be admitted.

BY MR. MEUNIER:

Q. Tell us what we see in this picture, please.

A. This is a line set coming up to the air handler, and you're pulling the -- I forget the name of the foam -- the insulation foam, showing that the corrosion is further down than just the part that was exposed.

I don't know if this video shows it. It'll run down through the platform. It looks like it may show. That's one of the line sets.

Q. This section of line set is not in an attic, is it?

A. No. This is on the second floor. It's a platform in the middle of the second floor. The platform is like a wood table that the air handler is sitting on top of. Then you can see that both the condensate line and that black line, the black foam has the line set inside of it, and now it's going down into the floor. Now we're going back the other way.

Q. Where will this line set ultimately run?

A. It'll go to the -- continuously to the outside compressor.

Q. Does it run through both the ceiling and the wall?

A. On this particular one, no. It runs in the floor and the wall.

Q. The floor and the wall?

A. But, yeah, others will go through the ceiling and the

wall.

Q. What do we see in this part over here?

A. That's the other side of it out to the condenser.

Q. This is where it connects to the outside condenser?

A. Correct.

Q. Is that a continuous section of copper or does it have --

A. No. It's one piece whole, and it's only soldered at each end.

Q. I'd like to show you just a couple series of photographs to finish on this. Could we go to 78, please, first.

MR. MEUNIER: This is Exhibit 78, Your Honor, which we'd offer into evidence.

THE COURT: Admitted.

THE WITNESS: I think that's what we just saw the video of.

BY MR. MEUNIER:

Q. I was going to ask. Does this show --

A. Yeah, I think it's identical. It's the same unit.

Q. So this is the line set?

A. Correct.

Q. Is that Armaflex that covers the line set?

A. Yes, actually, it is.

Q. How would you describe the nature of that material? Is it dense? Course?

A. Foam, very soft, spongy.

Q. This line set would have been connecting to what inside of this house?

A. The air handler on this side. It's soldered into the air handler.

Q. It goes down in through this area, which would be the --

A. That's the floor --

Q. -- floor.

A. -- subfloor, because this is a two-story house, or two-story townhome.

Q. Then it would extend out into the wall and outside?

A. After running down the floor. It would run down the floor first, then down the wall and out to the condenser.

MR. MEUNIER: Let me see the next picture, please.

BY MR. MEUNIER:

Q. Do you recognize this as one of the pictures of the line set under the insulation?

A. Yes.

MR. MEUNIER: This has been marked, Your Honor, as Exhibit Hernandez 79, which we offer into evidence.

THE COURT: Let it be admitted.

BY MR. MEUNIER:

Q. What do we see on the copper surface?

A. More corrosion.

Q. Let's, finally, go to the next picture on this series. Do you recognize this as a line set running through the house?

A. Yes. I can't remember if this was the same one that we were just looking at. I'm not sure. It seemed like the purpose of this was showing how difficult it would be to pull a continuous line out where you can't solder or join it, and it's just showing the complexity of where it's snaking and running through the platform, then the floor, then the wall, that it would be impossible to pull it and run new in without taking the drywall out.

MR. MEUNIER: Your Honor, that's been marked as Hernandez Exhibit 80, which we will offer into evidence.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Let me next discuss a bit more with you, Mr. Phillips, electrical wiring and switch and junction boxes. First, tell the Court generally what kinds of different electrical wiring you find in homes.

A. Typically, low voltage -- well, regular electrical and low voltage like a phone, a doorbell, and then cable for TV. I'm sure there's something else, but like smoke detectors and -- but low voltage type things.

Q. How are these typically insulated in homes or covered? How are they covered?

A. Some form of jacket. I think the electrical -- I think it's called a Romex. I think the Romex is the outside jacket. But the hot wires also have a jacket, a black and a white

jacket. The ground is exposed. All the others have some -- even the small, low voltage have some small jacket on them as well.

Q. What about ground wires? How are they covered?

A. They are within the Romex, if we're talking on electrical wires. It's the third wire. It's in the Romex, and it's in paper, but it's not encased, you know, with the plastic or whatever it's made out of.

Q. The Beazer protocol is to remove all of that electrical wiring in the house; is that true?

A. Correct.

Q. Let me look at a photo with you which has been marked as Hernandez Exhibit 81. Do you recognize this from one of the Beazer photos that we took?

A. Yes. It's one we've -- I think the switches have already been snipped off to save. That black wire going through the hole I think is going to the doorbell. I believe that's what this one is. That one --

Q. Is this the Romex wiring that you were talking about?

A. Yes. Yes. Yes, it is.

Q. What kind of service would this kind of box provide? What would be the function of this?

A. This looks like a four-gang switch box. Well, it is a four-gang switch box. So four switches would be in there controlling four different places.

MR. MEUNIER: I'll marking this and offer it, Judge, as Hernandez Exhibit 81.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Let's next look at 83, please. Do you recognize this picture as well?

A. Yes.

MR. MEUNIER: I'll offer it as 83, Your Honor.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Tell us what we see here.

A. I believe that one is an outlet. I know at one time there were two or three pictures. I don't know what we're getting ready to look at. This was showing that the wire is stapled to the stud, that there's no slack. So if we were like that, where we cut the wires, then we're not going to have the same length to be able to -- without putting junction boxes in to repair it.

Q. Is this typical to see Romex wiring running through drilled holes in wood studs such as this?

A. Yes. Yes.

Q. Is it typical to see Romex wiring stapled such as this?

A. Yes.

Q. I think in the next shot we see a close-up of that.

MR. MEUNIER: This has been marked as Hernandez

Exhibit 84, Your Honor, and I would offer this as well.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. This shows the stapling of a Romex wire?

A. Uh-huh.

Q. We talked earlier about the drywall dust, the fine, powdery-like dust. Have you observed it to be on wood stud surfaces such as this after the removal of drywall?

A. Yes, absolutely, especially on the horizontal pieces, you know, where it starts to settle. It would land more like on the top of this than it would on the vertical piece. We're looking at vertical there.

Q. Have you observed the drywall dust following removal of the drywall to be on Romex wiring surfaces?

A. Yes.

Q. You take out all the wiring before you attempt any cleanup; correct?

A. Correct. We take everything out down to the studs before we start cleanup.

Q. We see the next picture, which is 86. Who is this gentleman? Do you recognize him?

A. That's me.

MR. MEUNIER: Your Honor, I'll offer Hernandez 86 into evidence.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. What are you demonstrating here?

A. I was explaining to you guys, like, if you were to cut this wire in the box below that you'd be moving the box up to where my hand is, and then a lot of the -- that one at least has a switch going to turn on -- I mean, that is a switch going to turn on a light at the top. I don't know about this particular one, but several of which has another one going down to an outlet. So if I move the box up because the wire's too short, now it's going to be too short on the bottom side.

Q. Let's look at the next picture, please, which has been marked as Hernandez Exhibit 85.

A. Yeah, they're -- the one --

Q. Let's look at this one first.

A. I'm sorry.

Q. What is being demonstrated in this picture?

A. That's showing that once you snip it you don't have enough wire to rejoin the switches.

MR. MEUNIER: I'll mark this, Your Honor as Hernandez Exhibit 85.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. What is significant about the measurement that is being shown here?

A. My understanding is that that's code.

Q. What is code?

A. The portion that you strip -- the portion that's inside the box, it's to give a minimal amount that an electrician can make up the switches and make up the outlets. So the code is saying that you've got to have 6 inches that come into the box. And the Romex, that white jacket, will go into the box too. Whatever the Romex is stripped, the white will go into the box and not be left on the outside.

Q. You have to have 6 inches of wire inside the box?

A. Correct.

Q. In this case, from above and below? You'd have to take the 6 inches from below as well as above?

A. Correct.

Q. Well, what would be wrong with snipping off what's in the box and then adding new wire by splicing it to create the 6 inches?

A. Well, this is me. The point I was making earlier this morning, if you could do that on the hot, the black and the white wire, and you snip it and if that works and you're rejoining it at some point, especially like that four-gang box we just saw a few slides back, you're going to be having so many wire nuts in addition to what's already there. And I've not tried it. I don't even know if you can even get it in the box.

To me, the bigger point is the ground wire, where --

if the point of snipping is to snip off corrosion and get it back to clean, then the ground wire you'd be snipping all the way to the back of the box, so there's nothing left to make up. Now you're outside of the box. Because with code, you've got to be in a box. You've got to be in an accessible box. If you could make it up inside this box, that would meet code. But with the ground wire on the outside, you're back to having to add junction boxes to be able to splice on and give it more wire. So you'd have junction boxes all through the house.

Q. Let's next go to photograph 92, please. This is a picture you also recognize from the series we took?

A. Yes.

MR. MEUNIER: I'd offer it, Judge, as Hernandez Exhibit 92.

THE COURT: Admitted.

THE WITNESS: Here's a good example of what I was just talking about. You can see the three -- the black wire -- not the one in the center, but the far right wire, that's a black wire. Then you see the three white ones twisted together? Yes, those three. To the left of that is two more -- believe it or not, they're black wires. They have some -- that's black plastic that has either paint or drywall sprayed on it, it's the reason it's white, but they're black. So you have three whites and three blacks there. The center one sticking out the furthest, that's just copper.

There's no jacket on that at all.

BY MR. MEUNIER:

Q. That's the ground wire?

A. That's the ground wire. When I first saw this, I felt that was the black hot, but that's actually the ground wire. This is the point I'm making: That's a naked wire, which is typical. It's how you would normally see it. But if you're going to reach way back into the box back there where that pointer is to snip it, you no longer have any wire to make up the run. The ground wire is the problem with trying to do that.

Q. I understand. Did Beazer ever consider cleaning these visibly corroded copper wires as opposed to removing them?

A. Five minutes of consideration. One -- I don't remember if we have a picture here, but --

Q. Let's go to picture 93.

A. That's a braided wire. How do you clean that?

Even just the ones we just were looking at, where it's just one little wire, how much time does it take to go and clean, and that's believing that it's clean, that you really got it clean. Let's assume you did. You're back to it's more cost-effective to replace it than taking the time to clean that.

MR. MEUNIER: Your Honor, I'll mark this photo as Hernandez Exhibit 93 and offer it into evidence.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Who is Jerry Smith?

A. Jerry Smith is the superintendent on the job in Fort Myers.

Q. Did both you and Mr. Smith appear in this court as witnesses earlier this year in the Germano case?

A. Yes, we did.

Q. What physical object did you and Mr. Smith bring with you to court on that occasion?

A. A similar -- either a three- or four-gang box with switches still in tow like we were looking at earlier.

Q. Did it come from one of the Beazer homes with Chinese drywall that was being remediated?

A. Yes, it did.

MR. MEUNIER: For the record, Your Honor, I'm showing the witness an electrical box that was previously marked and entered into evidence in the Germano proceedings as Exhibit P1.1891. We will take pictures of it for this record, but this is the actual exhibit from that record.

BY MR. MEUNIER:

Q. Can you identify and show the Court what that box is, please.

A. It's like the one we were just looking at except this is a three-gang, so it holds three switches; one, two, three. You

can see the center wire, these little red ones here, that should be shiny copper. That's all corroded. That's all the way up. You can see the entire part of it.

A surprise to us when we did this -- you know, we were looking at a slide earlier that was showing the jacket was pulled back and it was an inch and, I think, seven-eighths up where it was black. This one right here, this was up in the wall. Actually, it's coming off of it. That's about 8 inches back.

Q. Is that a ground wire?

A. That is the ground wire.

Q. Inside of a paper sheath which, in turn, would be inside the Romex?

A. Yes. It's inside paper. It's inside this piece of paper that's been pulled out and then inside this white jacket. It's not under a jacket like the hot wires have.

Q. What was important to you in discovering this aspect of this particular box that was removed from the Beazer home?

A. Well, it's an after-the-fact. It has nothing to do with the protocol and how we got to we're replacing all the wire. Actually, we pulled this one out because you wanted a physical one at the last trial. So this is just, by chance, a discovery. So it was a surprise to see that corrosion was up in the jacket up inside the wall and not just what was exposed inside the box.

Q. So --
A. It was a surprise. It validated we made the right choice; it didn't get us to the choice.
Q. Made the right choice to do what?
A. To get rid of all of the wire.
Q. All wire?
A. Yes.
Q. If you had tried to clip that ground wire and that box back to the rear of the box and then somehow splice onto it, would that corroded section have been left in the home?
A. Yes. Yes.

MR. MEUNIER: May I see photo 151, please.

BY MR. MEUNIER:

Q. Do you recognize this as a photograph, Mr. Phillips, of the object that you're holding?
A. Yes.

MR. MEUNIER: Your Honor, we will mark this photograph as Hernandez 151 and offer it into evidence.

THE COURT: Let it be admitted.

MR. MEUNIER: That's 151-0001.

May we see the next picture, please.

BY MR. MEUNIER:

Q. Do you recognize this as a picture of the same object from the back side?
A. Yes.

MR. MEUNIER: Your Honor, we'll mark this and offer it as Hernandez 151-0002.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Let me next finish up our discussion about your cleanup protocol, Mr. Phillips. I'd like to look with you at photo 94. Do you recognize this picture?

A. Yes.

Q. What does it show?

A. This is one of the houses that we've cleaned. It's one that we knew you guys were coming down to look at and so, for just this one, we've left the wiring in for you to be able to see before we took it out. This has already been cleaned as well as pressure-washed. This house is several times cleaner than a regular construction home.

Q. You saved the original tile flooring in this case?

A. Yes. You can see it looks pristine. The homeowner couldn't believe it.

MR. MEUNIER: Your Honor, I'll offer this as Hernandez 94.

THE COURT: Admitted.

MR. MEUNIER: Next photo, please.

BY MR. MEUNIER:

Q. Do you recognize this?

A. Yes. Same house. More of the same.

MR. MEUNIER: Your Honor, I'll offer this as Hernandez Exhibit 95.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. The wiring, as you say, was left in at our request even though the house has been otherwise remediated and cleaned?

A. Right.

Q. Can you compare what you would believe the time it would take a Beazer crew to remove and replace all of this visible wiring that's shown in this area -- if we could back up to the larger picture. Compare that time taken to what you believe it would take a Beazer crew to go to each junction box and snip and splice and use wire nuts to save wire. What would the time comparison be?

MR. HAYDEN: Objection: Foundation.

BY MR. MEUNIER:

Q. Based on your years of experience in the construction field, do you know what it takes electrical workers to do things like wiring and splicing?

A. Wiring and splicing, no, because we haven't done it until we got the Chinese drywall. We haven't had that experience. I would guess, you know, you're looking at a couple of hours to rip --

MR. HAYDEN: Objection.

THE COURT: Sustained.

How long would it take them to remove and replace it?

BY MR. MEUNIER:

Q. How long to remove and replace the wiring that's shown in this picture?

A. Remove, a couple hours; replace, half a day, six hours on this. This is a one-story house.

Q. You're talking about the entire house?

A. Yes. That's probably a three-man crew.

Q. Do you know how electrical wiring work breaks down as between materials and labor from your experience in doing cost estimations?

A. Our understanding from the sub that we're using, his copper -- the wiring is about 15 percent of his overall cost.

Q. The rest, the other 85 percent, would be labor?

A. Be labor, yes.

Q. Now, does Beazer remove all circuit or control boards in the home?

A. Yes.

MR. MEUNIER: May we see photo 88, please.

BY MR. MEUNIER:

Q. What is in this picture? Tell us what this is.

A. That is out of an air handler. That's like the circuit board out of an air handler.

MR. MEUNIER: I'll offer that, Your Honor, as

Hernandez Exhibit 88.

THE COURT: Admitted.

MR. MEUNIER: May we see 89.

THE WITNESS: The same thing.

BY MR. MEUNIER:

Q. That's the same board, a closer view --

A. Yes.

Q. -- of all the wiring and attachments?

MR. MEUNIER: I'll offer that as Exhibit 89, Your Honor.

THE COURT: Admitted.

MR. MEUNIER: May we see 90.

BY MR. MEUNIER:

Q. Do you recognize this as a closeup photograph of that circuit board?

A. Yes.

MR. MEUNIER: I'll offer this as Exhibit 90, Your Honor.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Is there copper wiring and what you have observed to be corrosion on this circuit board?

A. Yes. You can see the wiring going into the -- I forget what you -- the thing toward the right, that big black thing, it's like a terminal, a post-connect. Then you see the red on

the far right all to the edge of the picture -- up a tad. Oh, I'm sorry. I was looking at my screen. I wasn't looking at your laser. Yes, right there. That's very corroded below the red jacket.

Then skip above all the colored wires and go up to the top. Well, same picture, but the other one was better. So if you go up higher above the long red wire, those two coming in are also corroded.

MR. MEUNIER: May we look at the next picture, which is 91.

BY MR. MEUNIER:

Q. Do you recognize this as a picture of that same area of the circuit board from a different angle?

A. Go back. Now go back. I meant back forward. This doesn't look like the exact same one.

Q. Is it another circuit board from a Beazer home?

A. Yeah. Yeah, because there was a blue wire. There's no blue wire in this picture.

MR. MEUNIER: Let me offer this as Hernandez Exhibit 91, Your Honor.

THE COURT: Admitted.

THE WITNESS: You can see the orange one coming in, and it's very corroded. Then it's what I'd call a little jumper. It's like a U-shaped wire going into one post set to another post set. Those ends are very tarnished. Actually,

every one of them. The one that looks least tarnished is the green one, although it's got the corrosion. The others are very corroded.

BY MR. MEUNIER:

Q. Had you hoped at one point in your protocol to preserve circuit boards?

A. No. We weren't going to dismantle -- once we decided that we were going to get rid of the air handler as a component -- I mean as a complete component.

Q. Now let's go to photograph 96, and this is the last series of pictures we'll show. Do you recognize this picture as taken at the house with the wiring?

A. Yes. It's just showing the cleaning, that we have to go and get additional crumbs, just where the mud goes everywhere.

MR. MEUNIER: I'll mark this, Your Honor, as Exhibit 96 and offer it into evidence.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. What do we see in this photograph in the center section?

A. Well, that's just a soleplate. It's what the studs attach to in construction, the bottom plate or soleplate. It's just showing the drywall dust and where it got wet that, you know, we've got to go in and clean more inside that soleplate, as well as it's showing little crumbs around the PVC drain.

Q. So this is drywall dust from the removal of the boards?

A. Correct.

MR. MEUNIER: Next photograph, please.

BY MR. MEUNIER:

Q. Does this show part of the cleanup process?

A. Yes.

MR. MEUNIER: Your Honor, I'll mark --

THE WITNESS: It's part of the wipe-down.

MR. MEUNIER: Excuse me. I'll mark it and offer it as Hernandez 101.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. So you have a manual wipe-down of surfaces?

A. Yes.

Q. Why do you do that?

A. That's part of the protocol.

Q. What do you --

A. We're getting rid of all the dust. It was to take the dust out, HEPA-vac, and go in and wipe down everything. Then we've additionally added some pressure-washing, which seems to get even more dust.

Q. Don't you think if you had been more careful in taking away boards and if you had put up visqueen, you could have avoided this step?

A. No. No, I don't think you could have avoided it. You may have made it less, but you'd have spent more money getting

there.

Q. You still feel you would have had to do the manual wipe-down?

A. Yeah. Yeah.

Q. The final photo is 102.

A. Same thing. It's just going in and wiping down additional spaces.

MR. MEUNIER: Your Honor, I'll mark and offer it as Hernandez Exhibit 102, this last photograph.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. Now, Mr. Phillips, I'd like to talk with you about the cost of these Beazer repair activities in Florida. Did you establish a budget for the repairs at each of the Chinese drywall homes in Fort Myers and in Tampa?

A. Yes.

Q. Would you explain to the Court how, generally, you go about doing that.

A. Well, the very initial one was pulling numbers from two, three years back, when we originally built the house. With the change in the economy, we were hopeful that we would get better pricings two, three years later. So we would go out and get estimates.

So that spreadsheet is just going through all the trades or cost codes and putting dollar numbers of how much

does it take to do plumbing, how much is electrical, HVAC, all the different components to put the house together to come up with, you know, how much is it going to cost to repair this house and make them whole.

MR. MEUNIER: May we see Defense Exhibit DX0055-0001, Borkowski.

BY MR. MEUNIER:

Q. Do you recognize this document?

A. Yes, I do.

MR. MEUNIER: Your Honor, it's been marked as a defense exhibit, but I'd like to make an offer of it into evidence at this time.

THE DEPUTY CLERK: Would you give us the number again, please.

MR. MEUNIER: DX0055-0001.

THE WITNESS: I thought this was our exhibit.

BY MR. MEUNIER:

Q. It's actually been marked by the defendants.

A. Or our spreadsheet, I meant to say.

THE COURT: Admitted.

BY MR. MEUNIER:

Q. You recognize the document as your trade sheet, if you will, for budgeting these repairs?

A. Yes. Yes. Yes. Yes.

Q. Are these numbers shown on this trade sheet the actual

budgeted costs for these different items of Chinese drywall repair for this particular property?

A. These are now past budgeted. These are actuals.

Q. These are actual costs?

A. Yeah.

Q. Okay.

A. We've now got the bids in, so these are actual numbers on this.

Q. What does the designation at the top tell us?

A. The name of our homeowner, the lot number in the community, the address, the plan number, and name. "Windor" -- I shouldn't have said it was mine -- is Windsor. It's missing an "S." The 1890 plan number, actually, in this community is the square footage.

Q. So this home is 1,890 square feet?

A. Correct.

Q. Is that living space?

A. Yes, it's living space.

Q. If we could look at the total document again at the bottom, what was the total cost for this remediation?

A. Just under 97 grand.

Q. Has this remediation now been completed at this cost?

A. This is one of the ones within a couple weeks will be completed.

Q. You're not going to spend any more money in the next

couple weeks on this job?

A. If we get them moved in and don't have to pay more stipends.

Q. So for the square footage of 1,890 square feet, what did this job cost Beazer on a per-square-foot basis? If you'd like, I have a calculator.

A. Yeah. I don't want to try to impress you.

MR. MEUNIER: May I --

THE WITNESS: That one would be $51.29. $51.

BY MR. MEUNIER:

Q. What type of construction is the Borkowski home?

A. This is a block construction. I can't remember. That would be a one-story, so the first floor is block. Metal studs if it's not a bearing wall, wood studs if it is a bearing wall, wood trusses, and tile roof.

Q. There have been other projects where you have arrived at the point of being able to list actual costs and a total for the remediation; correct?

A. Correct.

Q. You've seen those? I think Knauf's counsel has shown them to you.

A. Correct.

Q. There are several others?

A. Yes.

Q. Did the cost per square foot in these cases vary?

A. Yes.
Q. So even though you're doing the same scope of remediation, you have a different cost per square foot?
A. That's correct.
Q. Why is that?
A. A couple reasons. One will be different amenities or different options and selections, color selections, grades of cabinet, countertops. So just what a buyer chose to put in the house will vary. One puts more in than another.
The other, which is typical -- it's not an absolute, but it almost is -- is the larger the house, the lower the square footage because you're dividing by a larger square-foot number. So, typically, a larger house is going to show -- you're going to spend more money, but the price per square foot is going to be a lower number.
Q. So among the several jobs where, like Borkowski, you've arrived at a point of being able to state costs like this, what is the range from low to high in square-foot cost?
A. I think the low to high on all of them -- there's four that I've seen recently -- is like 38, 39 -- I think 39 to 52, 53, somewhere in there.
Q. Is it true that the lower cost, the 39, is for a larger home; the higher cost for a home more this size?
A. I believe that's correct.
Q. If I told you that the Hernandez home had approximately

1,700 square feet of living space, would it be true that the Hernandez home in size is most equivalent to the Borkowski?
A. Yes. Of what we would have, that's the most comparable. It's pretty close.
Q. It would be smaller than Borkowski with 1,700 square feet of living space?
A. Correct.
Q. In fairness, I'll tell you that there's a garage also being remediated, which is --
A. Around 400, yeah.
Q. -- 469 square feet. Does that change the fact that the size of the square footage in the Hernandez remediation would be most equivalent to this job among the Beazer jobs that have reached this point?
A. Yes.
Q. So does the $51-per-square-foot cost to Beazer for this work at this home represent what an owner in the same community would have to pay a builder to accomplish the same work?
A. No.
MR. HAYDEN: Objection, Your Honor.
BY MR. MEUNIER:
Q. Why not?
THE COURT: Well, let's see. I'll overrule the objection.
Why?

BY MR. MEUNIER:

Q. Why not?

A. It threw me off. Do the question again.

Q. Does the cost to Beazer of $51 a square foot for this work represent what an owner in this same community would have to pay a builder to do the same work for the same type of cost?

A. No. The first reason is this is warranty for Beazer, so there's no markup and there's no profit added to these numbers. We're simply restoring something. It's not starting from new and hoping to make profit on it. So the warranty is the main difference.

The other would be we're -- I don't know of late what the actual number is, but we're around the eighth largest in the nation. So we're a large company and we have a better buying power than a typical contractor, to a certain degree, even a large general contractor, because we're dealing in thousands of homes, where a large contractor may do 50 or 100. So there's national deals on appliances and some of the fixtures that we get that we're going to buy at a much better rate than a homeowner is.

The other is subcontractors are going to give better prices even on labor because they're hoping they're going to get 20 homes to do for us, 100 homes, 500, whatever the jurisdiction or area you're talking about. Whereas a homeowner on their own are going to be one house, and the guy's got to

make it or not on that one house. So those are the main differences.

Q. From your knowledge and experience in costing jobs and knowing about the cost of construction, can you estimate in percentage terms what those various differences would be between a cost to a builder such as Beazer and a cost to an owner?

A. Yes. That's going not just in current day but through past experiences and stuff when I did estimating and, you know, that type of thing. So there's some industry standard or typical numbers that would be used.

Q. The first difference you mentioned, buying power --

A. Yeah.

Q. -- tell the Court what you think a fair percentage difference would be between a builder cost and an owner paying for the same work based on that buying power difference.

A. Well, as I said in the previous trial --

MR. HAYDEN: Your Honor, objection. I don't --

THE COURT: Just answer rather than explain where you said what you said.

THE WITNESS: I'm sorry. 10 to 25 percent.

BY MR. MEUNIER:

Q. What would be a fair middle percentage difference?

A. Split it.

Q. Which would be what?

A. 18, 17, 17.5.

Q. That's buying power. I'll just put "BP."

What's the next difference that you mentioned?

A. The next would be overhead.

Q. What is a standard percentage difference for overhead?

A. 10 percent. That's one that doesn't vary as much, but 10 percent is still conservative but a hard-to-dispute number.

Q. What would the next difference be?

A. The next would be profit.

Q. What would you consider to be an industry-based profit percentage in your community if we're talking about what an owner there would have to pay for?

A. Again, I would say conservative, but I would say 15 percent.

Q. Just to be clear, is the $51-a-square-foot difference that you calculated for this Borkowski work exclusive of that 17.5 percent buying power add-on for the owner? It does not reflect that, does it?

A. Correct.

Q. Is it also true that the $51-a-square-foot number for Borkowski does not reflect or include the overhead factor?

A. One thing that I saw that I haven't seen before is, within the budget, we have like a management repair number, which would really -- would be overhead, would be a portion of the overhead.

Q. Where is that?

A. Scroll down. Keep going. It would be towards the bottom. Repair management, that 8,085 number, that would really be overhead.

Q. What is that $8,085 being spent on?

A. That is primarily the superintendent in the field, as well as we have another gentleman that is the one that meets with the homeowners and goes over the release agreement and what all their options are, trying to figure out when they're going to move and how they're moving, where they're moving. So the cost of him, as well, is making up that number.

Q. You're saying that would normally be something within this 10 percent overhead difference?

A. Correct. Correct. If you were going to do it this way, then you should take that out.

Q. What's the total of the Borkowski again? Can we see the bottom, please. 96,932.26. With your calculator, why don't you subtract 8,085, and we'll work with a different total.

A. That would be 88,847.

Q. So if we took out that overhead item and worked with the smaller total that you just gave, what would the cost per square foot be to Beazer?

A. 47 even.

Q. So now we're excluding all these factors of buying power, overhead, and profit; correct?

A. Correct.
Q. What it cost Beazer for this job, 47 a square foot --
A. Right.
Q. -- can you convert that number, using your percentages, to what an owner would pay for the same work.
A. You want to do the total or do you want to do them as we go?
Q. Why don't we do it one step at a time.
A. Without buying power, they'd be at 55.23. Overhead would take it to 60.76. It would be 69.87.
Q. So if you were to convert or translate the Beazer cost as a builder for this job to an owner cost, it would convert from 47 a square foot to 69.87 a square foot?
A. That's how I would do it.
Q. Let me, on overhead, ask if there is reference to just corporate office, home office, as well as project specific overhead on these jobs?
A. No.
Q. So when you talk about overhead at 10 percent, you're including both the home office of Beazer --
A. No.
Q. You're not?
A. No.
Q. What are you including?
A. I'm including if I was a general contractor and was hiring

a superintendent and put him on a job like a homeowner, that's what kind of overhead --

Q. The owner would have to pay?

A. Right.

Q. You don't think the owner would have to pay for health-care benefits back at the home office in Atlanta?

A. Yeah, you would.

MR. HAYDEN: Objection: Speculation.

THE COURT: Sustained.

MR. MEUNIER: No further questions.

THE COURT: Any cross?

CROSS-EXAMINATION

BY MR. HAYDEN:

Q. Good afternoon, Mr. Phillips.

A. Hi.

Q. How are you doing?

A. Good.

Q. You've been with Beazer as vice president of operations in Florida for seven years; is that right?

A. I've been with Beazer for seven years. I've been vice president of operations for two.

Q. Your company got involved in the Chinese drywall issue probably in about March or April of last year?

A. Of last year. I think it was March.

Q. Your involvement has been limited to two developments, if

I got that correct?
A. We've only had exposure positive in two communities.
Q. One in Fort Myers and one in Tampa --
A. Correct.
Q. -- is that right?
A. Yeah.
Q. I believe you talked about the Tampa property being primarily townhomes?
A. Correct.
Q. And Fort Myers was the Magnolia Lakes property; correct?
A. That's correct. Single-family.
Q. The property that we were just looking at, the Borkowski property, that's a single-family stand-alone in Fort Myers?
A. Correct.
Q. If I recall correctly, you have three other properties that are close to completion in that development; is that right?
A. That's correct.
Q. You provided actual cost documents for those four properties; is that right?
A. Correct.
Q. Counsel, I believe, referenced you to Defense Exhibit 55.
MR. HAYDEN: Your Honor, I'm not sure if it was put into evidence or not, but I think he established a foundation previously.

MR. MEUNIER: I had offered it, Your Honor. I do not object if it's offered now.

THE COURT: Admitted.

BY MR. HAYDEN:

Q. You indicated that of the properties that are involved in your program, you're putting two families back into the homes in a few weeks; is that right?

A. In a couple weeks, yeah. Six more about four weeks behind that.

Q. If I remember correctly, you have about 22 impacted properties in Magnolia Lakes; is that right?

A. I think it's 21, but close.

Q. You began your program there in August of last year; is that about right?

A. I think so.

Q. As we sit here today, none of the properties have been fully completed and the families have moved back in; correct?

A. That's correct. So that's eight months, I guess.

Q. You're about six months into the program; you have two houses ready to return to owners and four more you think will be ready in a few weeks?

A. Yes.

Q. Defense Exhibit 55, those are the actual general ledgers of costs for those properties?

A. Yes.

Q. The first is the Borkowski property that we looked at; correct?
A. Correct.
Q. The second on the second page would be the Batteau property?
A. Correct.
Q. Third is the --
A. Ciaffone.
Q. -- Ciaffone. The fourth is the turnkey; is that right?
A. Yes.
Q. You recall that we met yesterday?
A. Yes.
Q. I provided you with some summaries of that cost data that you have?
A. Yes. Yes.
Q. Did you have an opportunity to look at those summaries?
A. I did. I actually footed them. The first page I did, I didn't the back page. But this morning I went through all four, and they're accurate.
Q. So the summaries that I provided to you -- and I'll reference you first to Defense Exhibit 47.

THE COURT: Are you offering 47?

MR. HAYDEN: Yes, Your Honor, I'm offering 47.

THE COURT: Admitted.

MR. MEUNIER: Your Honor, if the witness verifies the

numbers on Exhibit 47, we have no objection.

THE COURT: All right. I'll admit it.

BY MR. HAYDEN:

Q. That has to do with the turnkey property; correct?

A. Correct.

Q. I'd ask that you now go to Exhibit 48. Defense Exhibit 48 has to do with the Batteau property; correct?

THE COURT: You're offering that, and I will admit it.

BY MR. HAYDEN:

Q. The next property is Defense Exhibit 49, and that has to do with the Borkowski property; correct?

A. Yes, it did. And just where I showed I did study today, that's lot 111, where this one's showing lot 116.

Q. Other than that, were the numbers on that exhibit correct?

A. Yes, they were. Yes.

MR. HAYDEN: With that exception, Your Honor, I move it into evidence.

THE COURT: Admitted.

BY MR. HAYDEN:

Q. Mr. Phillips, now I'd ask that you look at Exhibit 50. That's the Ciaffone property?

A. Yes.

Q. Does that summary truly and accurately set forth your actual costs for the repair of that home?

A. Yes.

THE COURT: Admitted.

THE WITNESS: I don't know what I just answered. You're talking the total cost at the top or the total cost on the bottom?

BY MR. HAYDEN:

Q. The total cost, 115,105.

A. Yes. Yes.

Q. All these properties, they're all in Magnolia Lakes and they're all on Little Gem Circle?

A. Yes.

Q. They're all single-families that were built at or around the 2006 time frame?

A. Yes.

Q. Now, counsel took you to the Borkowski, which I believe is Exhibit 49. Why don't we work from that. You'll see I broke this down a little differently than in your cost sheet.

A. Right.

Q. I combined some things that might go together like painting or cabinets or, with regard to demolition, rather than four dumpster items, I collected those and indicated that that was a trash disposal.

A. Right.

Q. You followed how we summarized those different line items in this summary; correct?

A. Yes. This is the part that I studied this morning, is this page, where I footed our total, and then the way you have it broken out on those other two numbers, that it does tie together with our numbers.
Q. Sir, if you can see, the first line item is No. 1, removal and repair of interior walls and drywall. That's indicated to be $6,000?
A. Yes, I believe so.
Q. Now, let's go down to the bottom of the page. You'll see that I've broken it into two different types of costs. Do you see that?
A. Yes.
Q. I call them A and I call them B.
A. Yes.
Q. Now, with regard to the costs in B, why don't we walk through that. The temporary accommodations reference, would you agree that if you were doing an actual -- now, that has to do with the accommodations for the individuals that are being relocated?
A. That's correct.
Q. If you were a general contractor who was undertaking a cost estimate for repairing a house, that number would not be included in your cost estimate; correct?
A. In the actual construction of the house?
Q. Yes.

A. No, it would not.
Q. Generally, the contractor isn't responsible for relocation of the folks, are they, in a repair?
A. In a small guy? No, I wouldn't think so.
Q. The next has to do with management fee, and I believe there was some discussion of that.
A. Correct.
Q. That has to do with Jerry Smith, and is it Glenn Davis?
A. Glenn Davis, yes.
Q. Jerry Smith is the individual who is your project manager for the repair program, at least in the Fort Myers area?
A. Correct.
Q. Glenn Davis is the individual who is responsible for helping the homeowners relocate, things of that nature; correct?
A. Yes, in both communities.
Q. So those are costs that you pro rata out to the various properties; correct?
A. Correct.
Q. The next is technical consulting. Do you see that?
A. Yes.
Q. Now, that has to do with the hiring of Environ?
A. That's correct.
Q. Environ's the technical consultant that you've retained for purposes of testing for defective drywall?

A. Uh-huh.
Q. Is that right?
A. Yes.
Q. And for undertaking preservation of evidence; is that right?
A. Yes.
Q. And for determining product identification; is that right?
A. That is correct.
Q. They were out at the property on numerous occasions?
A. Six.
Q. Six different occasions; is that right?
A. Correct.
Q. They draft different reports for you. They also preserve the evidence pursuant to the Court's pretrial order on preserving evidence; is that right?
A. That's correct.
Q. They charge you for storing that evidence at a certain location; is that right?
A. We're assuming. I don't think the storage costs are actually in these yet, but yes.
Q. But that's a number that if you were to be doing it, undertaking a normal repair, you would not be hiring an environmental consultant; right?
MR. MEUNIER: Objection, Your Honor, only because we're not dealing with that, and there's a technical consulting

element in our cost list, so it's not pertinent to this.

THE COURT: I'll let you cover that. He's under cross. I overrule the objection.

THE WITNESS: Will you ask me again.

BY MR. HAYDEN:

Q. In a normal repair situation, you wouldn't be hiring an environmental consultant, would you?

A. In a normal repair? Yeah, we actually do frequently.

Q. The environmental consultant cost would not be at the levels that we're seeing here, 12,500?

A. No. They would have no preservation. It would be coming in and giving a protocol and then maybe do an air test or some other, like on mold remediation, different than this.

Q. Something separate and apart. In this situation, you have Environ, who's coming in and first doing their phase 1 determination, whether or not there is affected Chinese drywall?

A. That's right.

Q. Then they're coming in and trying to determine what components are impacted; correct?

A. Correct.

Q. Then they're coming in and trying to determine what manufacturer may be involved?

A. Correct.

Q. Then before the demolition they do what you call, I

believe, bag and tag?

A. Yes.

Q. They actually go through the house and they pull drywall, they bag it and tag it, as well as pull samples of certain components of the house; correct?

A. They take plumbing fixtures, electrical outlet switches, they clip some of the U's off of the coil, as well as drywall samples.

Q. They actually go through room by room and give you a percentage of the different manufacturers' drywall that's in that house?

A. That's correct.

Q. It's a pretty labor-intensive project; correct?

A. A decent amount.

Q. Would you agree that a majority of that is for litigation purposes?

A. Yes.

Q. It's to sue my client or someone else at the end of the day; correct?

A. Right.

Q. That's not part of the normal repair program, is it?

A. No.

Q. The total of that, the B costs, in this case is $46,024. Do you see that?

A. Uh-huh.

Q. If we could go up to the A costs, that number is $50,908.26; correct?
A. That's what's left over.
Q. If we can go up to the top, then. If we're looking at the A costs for this home, the actual cost per square foot for the A costs would be $26.94; right?
A. Yes.
Q. This, you said, is probably, of the three, the most comparable home of the four homes that you are close to completion on?
A. Correct.
Q. If we could go quickly to Exhibit 47. If we could just go to the top of the page again, that summarizes the different costs that are the A costs and the B costs. Once again, the cost per square foot for the A costs is $26.10; right?
A. Yes.
Q. We can go now to Exhibit 48. If we could look at this once again, this is a little bit larger home; correct?
A. Right. Uh-huh.
Q. Once again, the cost per square foot for the A costs would be $29.16 a square foot; right?
A. Yes.
Q. Then you have the additional B costs of $49,435?
A. Correct.
Q. If we could go down to the bottom of the page. Once

again, you're seeing a large moving and storing cost?
A. Yes.
Q. That's for moving and storing the --
A. Personal property.
Q. Would it be fair to say that moving personal property is not something that a general contractor's generally responsible for in giving a cost estimate for the repair of a home?
A. Yes.
Q. Would it be fair to say that, again, you're not responsible -- the general contractor, when giving a cost estimate, doesn't factor in relocation of individuals in the cost estimate, do they?
A. No, not unless they did the original work.
Q. But in the case of the Hernandez, that would not factor in; correct?
A. I would be unfamiliar.
Q. Again, there's a management fee, which has to do with Jerry Smith and Glenn Davis?
A. Correct.
Q. That would be considered some type of overhead of Beazer; correct?
A. Correct.
Q. The technical consulting, again, is with Environ?
A. Correct.
Q. Now, what was the price range for the four homes that are

involved here, that we have cost items for, when you sold them back in 2006?

A. Oh, wow. Just a general number, these were in the 300,000 to 400,000 range two, three years ago -- three, four years ago.

Q. 3,000 to 4,000?

A. Three to four years ago, 300 to 400 grand.

Q. 300 to 400 grand.

Do you know what their fair market value is at the present time or what you're listing them for?

A. Well, we're complete in the community. It's got to be in the mid 200s; mid, high 200s.

Q. Now, we talked a little bit about Environ and the retention of Environ. In the repair program, you suggested that you use an airing out period of 14 days?

A. Uh-huh.

Q. Actually, Environ recommended an airing out of 10 days; is that right?

A. Correct.

Q. You just decided that you wanted to increase it to 14?

A. Right.

Q. You haven't had an opportunity to view the Hernandez house, have you?

A. No, I have not.

Q. Yesterday, did you have an opportunity to see the Mallet cost estimate?

A. What do you mean?
Q. The cost estimate that has been provided by the expert in this case on behalf of the plaintiffs.
A. Yes.
Q. If we could go to Plaintiffs' 477, page 32.
THE COURT: Has that been admitted?
MR. HAYDEN: It has not yet, Your Honor.
THE COURT: Do you want to offer it? Get him to identify it.
BY MR. HAYDEN:
Q. Sir, is that the cost estimate that you reviewed yesterday with me? And I refer you specifically to the recap sheet.
A. Thank you. Will you scroll the entirety of the one page.
Yes, that's the sheet you showed me.
THE COURT: What is it? A cost estimate for what?
BY MR. HAYDEN:
Q. This is a cost estimate for the repair of the Hernandez home, as far as you understand?
A. I have very little understanding on this sheet, but it is one that you showed me yesterday. I'm not sure I'm thorough of knowing where it comes from or who did it.
THE COURT: Is that a plaintiff exhibit?
MR. MEUNIER: It's part of the report of Mr. Mallet, but I don't think there's a foundation for questioning this witness about numbers that Mr. Mallet is proposing for a home.

MR. HAYDEN: Your Honor, they have suggested that this gentleman's cost numbers would be something that would assist the Court in determining appropriate costs for repairing the Hernandez home. I'd like to just compare what Mr. Mallet, their expert, has to say about what the costs should be versus what Mr. Phillips has.

THE COURT: Is he going to testify?

MR. MEUNIER: Mr. Mallet is going to testify, Judge.

Can I be clear about my objection? This is an invited comparison between what Mr. Mallet says an owner is going to have to pay for these items as opposed to the numbers that this gentleman has, which is strictly what Beazer, the builder, might have as a cost. So I don't know if we're now going to do some attempt to convert and translate, but it's a comparison of apples and oranges. I don't think he's in a position to know --

THE COURT: I understand the objection. He's under cross, so I'll let him go. Let's see.

If you can answer, fine; if you can't, just say you can't.

MR. HAYDEN: Thank you, Your Honor.

BY MR. HAYDEN:

Q. If you could look at this -- first, why don't we look at the bottom of this cost estimate. You'll see that --

THE COURT: First, let's see. Do you agree that it's

admissible?

MR. MEUNIER: Your Honor, it's part of the report of the expert. We were not planning to admit the narrative report of an expert. He's going to be here to testify.

THE COURT: I don't know whether I'm going to be admitting it or not, then. Let's see where we go with this.

BY MR. HAYDEN:

Q. Mr. Phillips, do you see where Mr. Mallet has added a 10 percent overhead and a 10 percent profit? Do you see that?

A. Uh-huh.

Q. You're suggesting that you would add 15 percent profit.

A. Yeah. Both of ours are conservative. His is more than mine.

Q. Then he also adds a material sales tax and equipment sales tax. Do you see that?

A. Yes.

Q. Is it your testimony that those numbers would generally -- the sales tax numbers would be included in the numbers that you would get from your subcontractors?

A. They would be in the individual breakdown of the trades unless we were buying the material directly. But we were buying them from a sub, so they would take care of the taxes themselves.

Q. Those numbers would be reflected in your numbers in Section A of my summaries?

A. In the line item of my spread -- I think we're saying the same thing. It's --

Q. Is it appropriate to add material sales tax and equipment sales tax onto the cost that you sustained from the labor and equipment that subcontractors are providing to you?

A. No. We don't do that.

MR. HAYDEN: If we could go to the Borkowski summary, please. I believe it's 49.

BY MR. HAYDEN:

Q. Now, in the Borkowski summary, you indicated first -- I believe, as Mr. Meunier put it on the board, you helped him with a calculator and determined some additional numbers you would add on if you were a general contractor rather than doing warranty work here at Beazer.

A. Correct. Correct.

Q. I believe you believed that you, as a national company, would be getting some discounting that a custom builder would not have; correct?

A. Correct.

Q. Do you recall testifying in the trial in the Germano matter?

A. Yes.

Q. Do you recall testifying at that time that the discount that you would see as a national builder would be 10 percent?

A. Actually, in the transcript, it's 10, 20, and 25 is what I

said, and then we chose to go with the conservative.

Q. The conservative being?

A. 10.

Q. 10 percent. So --

A. At this time, he was asking -- I said 10, 20, 25. He said where would it fit, and I said split it. It's like page 93 or 94.

Q. Actually, if I could go to the --

MR. HAYDEN: Can you blow up page 108.

BY MR. HAYDEN:

Q. I'm showing you the questions and answers that were posed to you in this courtroom in the Germano matter, and I believe it is clear here that you were asked the question.

"Answer: So if you're at 50, I would add 10 percent because of not having buying power."

Is that what you answered?

A. That particular time, yes, but earlier I said 10, 20, or 25.

MR. MEUNIER: Objection for lack of completeness, Your Honor.

BY MR. HAYDEN:

Q. If we could go back to the Borkowski summary. Now, sir, if we start at the assumption that the cost per square foot is 26.94 -- do you see that?

A. Yes.

Q. If you added the 17.5 percent that you believe you're entitled to because of discounting, could you help me with the numbers.

A. Yes. That would change it to 31.65.

Q. If you added a 10 percent discount or 10 percent overhead onto that, what would you get?

A. That would be 34.82.

Q. If you added the 15 percent profit onto that, what would you get?

A. That would be 40.04.

Q. Would it be fair to say that if we are just looking at the hard costs separate and apart from the costs that I've segregated out in Exhibit B, the cost per square foot for the four homes that you are nearly completed on ranges from $26.10 to $29.16 before adding on the discount, the overhead, and the profit?

A. Yes.

Q. In the same way, the other three properties, if you went through that same process, you would be able to estimate what the cost per square foot would be for you to repair those four homes in the same manner following the Beazer protocol?

A. Without preservation and such?

Q. Yes.

A. Yes.

THE COURT: By "such," you mean the things he put in

B?

THE WITNESS: Correct. Correct.

BY MR. HAYDEN:

Q. Just so I'm clear, the things that I put in B was the management fees; correct?

A. Yes. Yes. The bottom square down there.

Q. Okay.

A. Yeah.

Q. If you're getting overhead over here, that should be deducted; correct?

A. He did that. The answer is: Yes. And this math here, that was deducted.

Q. It was deducted in the math that you just did with me; correct?

A. Before the math I just did with you.

Q. Okay.

A. They took the 8,000 off before he did all this math.

Q. Now, the technical consultant is the Environ work?

A. Correct.

Q. The moving and storage, do you know if the moving and storage amount was included in the Mallet estimate for the Hernandez home?

A. No, I do not know.

Q. You've indicated that you get better prices because you're a national builder than a custom builder would get; correct?

A. Right.

Q. So you would expect that your costs, some of your line items for these particular homes, should come in cheaper than the costs for subcontractors or for materials that are set forth in the Mallet report; correct?

A. I'm not familiar with the Mallet report, but I'm pretty certain that we would be getting better prices than what a small contractor would get.

Q. Just so I understand, the work you're doing is warranty work; right?

A. Yes.

Q. The product that you, Beazer Homes, sells is a home. It's a home that you can walk into and move into; right?

A. That's right.

Q. You're not selling individual components; right?

A. Correct.

Q. Your warranty would apply to all the fixtures and to the appliances; right?

A. The whole house.

Q. So if the stove broke three weeks later, you'd go in and either repair or replace the stove?

A. Yes.

Q. If a pipe broke and it impacted on other components, you'd go in and repair and replace any damaged goods; correct?

A. That's correct.

Q. Would you say that you're in a unique position to other defendants in this lawsuit because you have a contractual obligation to the homeowners?
A. Give me an example of another defendant. What do you mean?
Q. The manufacturer.
A. So am I in an unusual position? I'm sorry.
Q. Let me step back.
A. Okay.
Q. Beazer Homes is a defendant in the multidistrict class-action litigation before this Court; right?
A. I don't know that. I'm sure. I don't know.
Q. Beazer, like other home builders, continues to sell homes in the Tampa and Fort Myers areas; correct?
A. In the Tampa area. We've pulled out of Fort Myers.
Q. You continue to sell a lot of homes on a national basis; right?
A. Oh, absolutely, yes.
Q. You have a brand to protect; correct?
A. Yes.
Q. You're proud of your brand; right?
A. Yes.
Q. Part of your goal, in undertaking the repair program, was to keep that brand untarnished; right?
A. Yes.

Q. Another part of the reason for a repair program by a home builder here is to avoid litigation; would that be fair?

A. Yes.

Q. You wanted to assure your homeowners that you'd stand behind your product; is that right?

A. Yes.

Q. You wanted to give your homeowners some comfort that you had solved the entire issue; right?

A. Yes.

Q. If that meant airing out the house for 30 days, you aired out the house for 30 days?

A. Yes.

Q. The airing out of the house for 30 days or 14 days, that's not based on science, is it?

A. 10 days was based on science. I say "science." It was based on our specialist that said 10. We just thought we'd go ahead a full two weeks.

Q. Just so I understand, the appliances that you're replacing, those haven't failed in the Beazer homes, have they?

A. Not that I'm aware of.

Q. I think that Mr. Meunier may have touched on this. In your agreement with the homeowners, you don't make any provision for payment for personal property?

A. We don't ask them to give up their rights to pursue later. It comes up often in signing the agreement. And we've said if

a homeowner can show us something that they're concerned, that we would consider it, but to date that hasn't happened.
Q. In the 31 homes -- 31 or so homeowners, is that how many you've signed up for your program?
A. Yes.
Q. You have not received any claims, any formal claims, for personal property; correct?
A. That's correct.
Q. Just so I understand, your program started in August of last year; right?
A. I think so.
Q. Lennar had already been in the business of repairing homes back in February or March of last year; is that right?
A. I'd be speculating.
Q. You indicated that they were the leaders of the pack and they were the ones you went to; correct?
A. Yes. Yes.
Q. You looked to them to determine what you would do with regard to what you had to do in repairing houses?
A. I'd say more we looked to the consultant that they discovered.
Q. That was Environ; right?
A. Yes.
Q. So you're using the same consultant?
A. Yes.

Q. At the time you started your program, Lennar was at least six months into their program?

A. Correct.

Q. They had been doing certain things for their homeowners that it would be hard for you to do less than what they had offered; correct?

A. Yes and no. If they were doing something that we felt was outlandish, we wouldn't do it just because they started it. So not fully.

Q. If they were replacing appliances, it would be very difficult for you not to replace appliances?

A. It would offer an additional challenge. The truth is I don't know if they're replacing appliances or not.

MR. HAYDEN: That's all I have. Thank you, Your Honor.

THE COURT: Any redirect?

REDIRECT EXAMINATION

BY MR. MEUNIER:

Q. On appliances, Mr. Phillips, if an owner comes to you in one of these homes and makes a case for replacement of appliances based on corrosion, you'll take care of it?

A. It's already part of our protocol. We're doing it anyway.

Q. I think counsel used the word normal, so I'll use it. Do you consider Chinese drywall remediation projects to be normal projects?

A. No. It's the first in my history.

MR. MEUNIER: Could I see Defense Exhibit 55 with the B costs. I'm sorry. It was the last exhibit up.

MR. HAYDEN: 49.

BY MR. MEUNIER:

Q. You've indicated this is not your normal project.

A. Correct.

Q. It's a Chinese drywall remediation project.

A. Correct.

Q. In the context of doing a Chinese drywall remediation, would Beazer consider there to be any basis for not expending the costs that counsel has listed in B; specifically, moving and storage, temporary accommodations, technical consulting?

A. No.

Q. Were you aware that, at the technical consulting, Mr. Mallet actually includes a number higher than $12,500; namely, $15,000?

A. No.

Q. Would you do without environmental consulting in a project like this that's not a normal project but a Chinese drywall project?

A. No.

Q. Why not?

A. Well, it's the scientific expertise we don't have, just like we would bring them in on like a mold remediation. You

bring in the specialists.

Q. Moving and storage will be a cost to the owner, won't it?

A. Yes.

Q. Temporary accommodations will be a cost to the owner?

A. Yes.

Q. In being cost-effective, have you been influenced by protection of your brand name?

A. Not in the sense of how we figured out what the protocol would be.

Q. Or the costs?

A. Well, protocol gets to costs of what you're going to do. You're evaluating costs as well. So, no, brand or marketing or advertising had nothing to do with us figuring out what we thought was the right thing to do.

Q. In being cost-effective, have you been influenced by litigation concerns?

A. No, by the evidence of what we're spending.

Q. You don't include in your cost list, your trade sheet, things like permits, drawings, etc.; correct?

A. We should have a permit in there. Drawings, we don't need because the house is already built.

Q. I didn't see for Borkowski --

MR. MEUNIER: Could we put up --

THE WITNESS: I can't remember. Yeah, I think we have a permit number. It's a low number because it's like

a four or five -- there's one right -- well, huh. Yeah, we're paying something, but it's nothing -- we don't repay impact fees. Thanks for pointing that out, because we'll start to figure that.

BY MR. MEUNIER:

Q. Just tell Beazer, "You're welcome."

A. It is nominal. I mean, it's like $500 or less. It's not like 14,000, 15,000, with impact fees and such.

Q. Does that same markup percentage apply to a permit fee that an owner would have to pay?

A. Yes. Yes.

Q. To make the owner whole, to be cost-efficient, is it still your testimony that for the Borkowski job, 1,890 square feet, the $47 cost to Beazer translates to 69.87 for the owner per square foot?

A. Yes, it is.

THE COURT: Thank you, sir. You're excused.

We'll stop here for 15 minutes. The Court will stand in recess for 15 minutes.

THE DEPUTY CLERK: Everyone rise.

(WHEREUPON the Court took a brief recess.)

THE DEPUTY CLERK: Everyone rise.

Be seated, please.

THE COURT: Call your next witness.

MR. BRYSON: Thank you, Your Honor. The plaintiffs

call Brad Krantz.

I met with Mr. Sanders prior to this examination, and we have been able to come to an agreement on a number of exhibits. With the Court's permission, we would tell you the numbers and have those moved into evidence at this time.

THE COURT: Okay.

MR. BRYSON: That would be exhibit numbers 109; 134; 389; 590; 591 after blacking out the right-hand column of that exhibit pursuant to the Court's ruling this morning; 592; 593; 594; 595; 596; 597; 598; and 600. We would move that all those exhibits be received into evidence.

THE COURT: I understand it's without objection. The Court will admit them.

MR. SANDERS: There's one that had some writing. It's hearsay from the report. The pictures and the test results are fine. I can't remember which one. It may be 596, but --

MR. BRYSON: Whichever one may have had a few sentences, we will make sure that's blacked out.

THE COURT: Let them be admitted.

MR. BRYSON: Thank you, Your Honor. There are two exhibits that we have he has objection to, and at the appropriate spot in the examination I will bring that to the Court's attention.

(WHEREUPON Brad Krantz, having been duly sworn, testified as follows.)

THE DEPUTY CLERK: Please state your full name and correct spelling for the record.

THE WITNESS: Brad Krantz.

VOIR DIRE

BY MR. BRYSON:

Q. Good afternoon, Mr. Krantz. Can you explain to the Court where you work.

A. Corrosion Testing Laboratories in Newark, Delaware.

MR. BRYSON: We would ask that Hernandez 389 be brought up on the screen, page 1.

BY MR. BRYSON:

Q. Can you explain to the Court your position with Corrosion Testing Laboratories.

A. I'm the director of laboratory services.

Q. Move that microphone, if you could, a little bit closer in.

A. All right.

Q. In your position as director of laboratory services, can you explain to the Court what your job responsibilities are.

A. I'm responsible for the daily operations of the laboratory. That would include corrosion testing and failure analysis, as well as a minor amount of chemical analysis.

Q. We'll talk more about each of those in a few minutes. Can

you explain to the Court your educational background.
A. I have a bachelor's of science from Iowa State University, and I'm a NACE-certified materials selection/design specialist.
Q. What is a NACE-certified specialist? Can you explain to the Court in detail what that is.
A. Yes. It's part of the NACE recognition program of continuing education to --
Q. Well, what does "NACE" stand for?
A. "NACE" stands for National Association of Corrosion Engineers. It's a program that they have to ensure that their members are well-educated and recognized by their peers as understanding corrosion and being qualified to work in that area.
There's various levels, starting at corrosion technician up to several types of corrosion specialists. Each category, you are required to have a certain amount of experience, education, as well as passing a certification exam and providing references from other corrosion specialists.
Q. Can you explain to the Court each step that you have been through and how much experience you had to have and what type of tests you had to take.
A. As a corrosion technician, you're required to have two years' experience, and you take a test that covers the basics of corrosion. It's a two-hour exam, and you're required to provide at least two references.

Q. Did you pass that step?
A. Yes, I did. I passed it on the first try.
Q. When did you pass that?
A. I believe in '91 or '92.
Q. What's the next step?
A. The next step is corrosion technologist, which requires, I believe, five years' experience and again another exam. I believe it's a four-hour exam. You're required to provide the references again.
Q. What type of experience were the five years to be?
A. In corrosion under -- yeah, corrosion experience directly with -- dealing with corrosion in one form or another.
Q. You passed that exam as well?
A. Yes, I did.
Q. What's the next step?
A. The next step was a senior corrosion technologist. You're required to have eight years' experience and pass another exam. This exam is an eight-hour test, much more thorough examination; and again references.
Q. Again, did you have the requisite experience and pass that examination?
A. Yes, I did.
Q. Then what's the next step?
A. Then the next step was the specialist, and I chose the materials selection/design category, which again requires the

same eight years minimum experience; another exam that deals specifically with materials and design; and references from corrosion specialists.

Q. That's your current position today, is materials selection/design specialist?

A. Yes.

Q. Can you explain to the Court what materials selection means.

A. It means selecting materials that will be compatible with expected exposure, whether it's atmospheric, immersion, assisting the designers of equipment so that they can choose the right materials.

Q. What about design specialist?

A. Helping the designers of those things design their vessels and whatnot so that they don't build in corrosion problems such as crevices or stress-rising situations.

Q. Are you a member of any professional organizations?

A. Yes. I'm a member of NACE and ASTM.

Q. As part of your work experience in corrosion and failure analysis, can you explain to the Court what that typically involves in your day-to-day activities.

A. On the corrosion testing side, we do various types of corrosion testing, from standardized ASTM and NACE standard tests to other recognized standards. We do customized testing to assist our clients to solve specific problems. We'll do

process simulations. There may be some very simple tests to very complicated tests.

On the failure analysis side, we will get samples from our clients, and they want to know what caused the corrosion, what's caused the failure. We'll collect information. We'll do optical and microscopic analysis. Typically, we will do some electron beam analysis in a scanning electron microscope, chemical analysis through EDS. We may also do metallographic cross-sections to look at the type of corrosion that's occurred and, if there's pitting, what type of pitting has occurred; if there were material defects that could have led to the corrosion.

Q. As the director of laboratory services at CTL, do you supervise other employees?

A. Yes, I do.

Q. Can you explain that to the Court a little bit.

A. We have seven employees now. We have a metallurgical engineer, a mechanical engineer, and three technicians, and a receptionist. I'm aware of the projects they're working on, and I assist each of them with solving the particular issues that they have before them.

Q. Have these employees assisted you in the work that you, hopefully, intend to testify about today?

A. Yes, they have.

Q. Over the course of your career, how many samples would you

say you have analyzed for issues related to corrosion?

A. Thousands.

Q. How many samples would you say you have investigated with regard to failure analysis?

A. Hundreds.

Q. Do you have any experience with regard to sulfur gas corrosion, specifically?

A. Yes.

Q. Can you explain those instances to the Court.

A. We have had experience with sulfide corrosion of shipboard heat exchangers when they were being built in a polluted bay. They were exposed to sulfide. When they went out to sea, the sulfide was removed from the exposure, but the heat exchangers continued to corrode to failure.

We have had experience with testing of electrical contacts in an acceptance test using hydrogen sulfide. These were gold-plated copper contacts, where the contact resistance is measured over time, and then the results were supplied to our client.

We have done testing of hydrogen sulfide exposure to communication boxes that would go on the outside of a home, the cable box or telephone box, to determine if the enclosures were adequately protected, adequately sealed, to protect the circuit boards inside.

We have also done high-temperature testing of sulfide

gases for gas desulfurization. We do testing of dissolved hydrogen sulfide in a corrosive environment for steel that's used in the oil and gas industry. We have done, I'm sure, several other projects.

Q. Any for museums?

A. Yes. We did some work with the National Park Service of evaluating the effects of various atmospheric pollutants on museum artifacts: Lead, copper, silver.

Q. So, of this experience, some of these involved copper and copper alloys and other types of metals?

A. Yes.

Q. Now, prior to being retained as an expert by the Plaintiffs Steering Committee, had you had any exposure to Chinese drywall?

A. Yes, we had.

Q. Can you explain those situations to the Court.

A. My first exposure was working with an air-conditioning manufacturer. I was at their site on a separate matter, and they brought in a coil that had come from a Florida home. It was -- the exposed copper was black and had a dark black scale that was flaking off, and they asked me to take a sample of that and analyze it to see if it was indeed caused by sulfur corrosion.

Q. Any other examples of exposure to Chinese drywall prior to being retained as an expert by the plaintiffs?

A. The next instance was another air-conditioning coil manufacturer who sent us samples of failed tubes from an air-conditioning coil. They had marked spots where they were leaking and asked us to cross-section to determine the type of failure.

Q. Did you analyze those samples?

A. Yes, we did.

Q. We'll talk more about them in a bit. Any other examples of Chinese drywall that you have been involved with at CTL?

A. Yes. That same manufacturer then sent us some small quantities of drywall and asked us to replicate a test that was on the Internet using FTIR, Fourier transform infrared. We did those tests, compared it to the results that were posted on the Internet, and got similar results.

Q. Any others?

A. We also did some exposure testing for this same client. They wanted to see if hydrogen sulfide, carbon disulfide, and carbonyl sulfide would corrode copper in the manner that we had seen in the failed tubes.

Q. Have you done any work for any agency of the government related to Chinese drywall?

A. We did a small amount of work for EHE in the 51-home study that was published by CPSC. We analyzed some of the test specimens that were exposed in the homes to determine the corrosion products and deposits that were on the surface.

Q. Do you have some publications in the fields of corrosion and failure analysis?

A. Yes. There's several publications. Most of them deal with electrochemical testing to replicate specific environments. The first few are coauthored papers dealing with biologically influenced corrosion. The other papers have to deal with, you know, galvanic corrosion. One paper has to deal with protective finishes that were applied to silver for atmospheric corrosion. The application there would have been for museum artifacts.

MR. BRYSON: Your Honor, we would like to tender Mr. Krantz as an expert in the field of corrosion and failure analysis.

THE COURT: Any questions on his expertise?

MR. SANDERS: No, Your Honor.

THE COURT: The Court will accept him in the tendered fields.

DIRECT EXAMINATION

BY MR. BRYSON:

Q. Can you define corrosion for the Court. And I would ask that Hernandez 134, page 2, be put on the screen.

A. Yes. This is the ASTM definition of corrosion: The chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the material and its properties.

Q. Mr. Krantz, in your position of evaluating corrosion, can you explain to the Court what standard methodologies you use in examining items that are sent to you for analysis.

A. Yeah. When we are doing failure analysis, the first thing that we are going to do is, when it comes in, we're going to look at it, collect as much background information surrounding the failure as is available or can be shared with us. We'll look at it under the microscope, both optical and electron beam, if necessary.

Depending on what we see, we may choose one of several different types of tests to perform. Typically, it would involve some energy dispersive spectroscopy elemental analysis of corrosion products. If it's a fracture, use the SEM to look at the fracture faces. If there's pitting, we may make cross-sections to determine the type of pitting that's occurred, how deep the pits have gone.

Q. Mr. Krantz, what is pitting as defined by the ASTM? If we can go to page 4.

A. Pitting is corrosion of a metal surface confined to a point or small area that takes the form of cavities.

Q. Make sure the Court is clear. How do you measure pits?

A. There's several ways to measure pits. If you follow ASTM G46, you can make a cross-section and measure the depth using a calibrated scale under microscope.

Q. With regard to taking photos, using scanning electron

microscopes, and doing cross-sections to determine film thickness and pit depths, is that something that you've done throughout the course of your career?

A. Yes, we have.

Q. Is that the same type of procedure you used on the samples that we're going to talk about today?

A. Yes.

Q. Are you familiar with the Battelle classification system?

A. Yes.

MR. BRYSON: If I might approach, Your Honor?

THE COURT: Yes.

BY MR. BRYSON:

Q. Has the CPSC described the Battelle classification system in their November 2009 report?

A. Yes, they have.

Q. Would that assist you in your description of that standard to the Court?

A. Yes.

Q. I have handed you what we have marked as Exhibits 59 and Hernandez 60. Can you identify that document to the Court, please.

A. Yes. It's the interim report on the status of the analysis of electrical components installed in homes with Chinese drywall prepared by the Consumer Products Safety Commission in November of 2009.

MR. BRYSON: Your Honor, we would move that exhibit into evidence.

MR. SANDERS: Your Honor, we object on the grounds that these reports are all preliminary. They're actually stamped "Draft: Do Not Cite," I think, on many of them.

While, obviously, experts can rely on them in providing their opinions and assisting them in providing opinions, the documents themselves are not reliable enough or authenticated that they would meet the government records exception.

MR. BRYSON: Your Honor, if I might respond. Mr. Sanders actually made reference to this report earlier in the day. We would assert that this falls under hearsay exception 803(8) under the public records, reports, statements, or data compilations in any form, the rule states, of public offices or agencies setting forth the activities of the office or agency or matters observed.

It's directly from the rule. We think it would fall into that category and should be admitted.

THE COURT: I think that 803(8) is applicable in this particular case as the records, reports, statements, or data compilation -- it says "in any form" -- of public offices or agencies setting forth, among other things, matters observed pursuant to a duty imposed by law as to which matters there was a duty to report. This is in civil cases, of course.

It's labeled as a preliminary report, as a draft, but it is "in any form," and it is not excluded. There is a provision that sometimes it can be excluded. We see that in Coast Guard records oftentimes in their reports of collisions. And that, of course, is excluded specifically by statute. This is not excluded by statute, so I see it as governed by 803(8). I will overrule the objection and admit it.

THE DEPUTY CLERK: 59 and 60?

MR. BRYSON: 59 and 60, which is the CPSC report, and the attached appendix is the Sandia National Laboratories report.

BY MR. BRYSON:

Q. If you go to Hernandez 59, page 12.

THE COURT: The Court has also reviewed the report. The report is a work in progress, as is said, but I'll take it as such.

MR. BRYSON: Thank you, Your Honor.

BY MR. BRYSON:

Q. Mr. Krantz, the Battelle classification system, did it exist outside the CPSC report?

A. Yes.

Q. Can you explain the Battelle classification system that's set forth in the CPSC report to the Court, please.

A. What they have here is they describe it as -- this is for

copper. Class I is where no significant corrosion has been observed. Class II, corrosion product on unprotected copper contains primarily oxides and chlorides. Class III, corrosion product on unprotected copper is rich in sulfide and oxide. The most severe, Class IV, corrosion product on copper, is primarily a sulfide film with some oxides present.

Q. Mr. Krantz, are there corrosion thicknesses that are also associated with this standard?

A. Yes, there is.

Q. Would learned treatise 195 assist you in explaining that to the Court?

A. Yes.

Q. Can you identify that document for the Court, please.

A. Yes. It's Atmospheric Corrosion of Control Equipment. It's a paper prepared by Mr. Abbott for MTI and published under the MTI jurisdiction.

Q. If we could go to page 66 of that learned treatise. Who is Mr. Abbott?

A. He is a well-respected corrosion expert, particularly in the area of atmospheric corrosion.

Q. Is he cited in the CPSC Sandia report?

A. I believe he is.

Q. Thank you. Can you explain to the Court the thicknesses that are associated with corrosion with regard to the Battelle classification standard.

A. In Class III, what they cite is that thicknesses that range between .1 to .3 microns after a year fall into that class. In Class IV, thicknesses that are in excess of .3 microns would fall into severe/industrial environment.

Q. So if you are looking at an item after three years, what thickness would you use?

A. The minimum thickness would be .3 microns.

Q. Most of the items you looked at in the Hernandez house are how old?

A. Approximately three years, as I understand.

Q. So .3 after three years, with regard to the Battelle classification system, what would that mean? .3 microns.

A. What that means is it would classify this in a moderately severe environment and that it predicts failure in the future.

We would expect to see copper sulfide films. In plated devices, we would expect to see pore corrosion with creep occurring.

Q. So if we see thicknesses on samples that are in excess of .3 microns after three years, what would that indicate?

A. That would indicate that they have been exposed to a moderately severe environment and that the thicknesses at that level are predictive of failure.

Q. What is pore corrosion and creep?

A. In any plated device, you're going to have small pores where -- say, like a typical plated device on copper is going

to be gold plating on nickel over copper on a contact. There will be small pores within those coatings, and the copper will corrode at those pores. When you get creep, what it is is the corrosion products are spreading from that area and cover more than just the opening of the pore.

Q. Now, you testified that, if you fall into these categories, it's predictive of failure. Do you know when an item is going to fail if it has a thickness of .3 microns after three years or higher?

A. No, we don't. We just know that there's a higher risk, a higher probability that failure is going to occur at some point in the future.

Q. Now, does the corrosion associated with sulfur gas exposure increase or grow over time?

A. It grows over time.

Q. Now, can you explain to the Court how sulfur gas corrosion grows.

A. Yes. Initially, it grows rapidly as it reacts with the copper oxide surface on the copper. There will be defects in that surface where the sulfide will initiate. It will slowly spread to cover the surface. Once the surface becomes covered, then the growth rate will decrease as the corrodents have to diffuse through that layer.

The layer will continue to grow. When it reaches a critical thickness, which in the literature has been reported

to be approximately 1 micron, then that layer will crack or spall off, exposing fresh copper, and the process starts over. At that point, the corrosion rate tends to become -- it becomes accelerated and approaches a linear function.

Q. So it goes up and then it plateaus off?

A. It increases and then it kind of plateaus. It doesn't really stop, but it slows dramatically, and then it reaches a point where it starts to accelerate again.

Q. Kind of in a stair-step fashion?

A. Yes.

THE COURT: What is the mechanism of failure caused by corrosion?

THE WITNESS: Well, in this instance with copper --

THE COURT: With copper and silver.

THE WITNESS: Right. With copper and silver, the primary purposes in this instance is electrical conductivity, and corrosion products typically are less conductive than the metal underneath. As these products grow, then any connection that they invade a connection or on switches where they contact one another, then that film is going to create a higher resistance. They will either cease to function or, in an extreme case, you can get overheating.

THE COURT: Is it necessary for the wire to actually break for that to happen?

THE WITNESS: No, it's not necessary for the wire to

break.

MR. BRYSON: If I might approach, Your Honor?

THE COURT: Yes.

BY MR. BRYSON:

Q. What I'm handing you, is this a learned treatise article that also explains how corrosion grows in a stair-step fashion?

A. Yes, it is.

Q. This is learned treatise 205, page 1. If we can put that on the screen.

Can you identify this document to the Court.

A. Yes. It's the atmospheric corrosion of copper by hydrogen sulfide in underground conditions by Tran and others.

Q. Corrosion Science, what is that?

A. That's a highly respected journal in the field of corrosion.

Q. What you just explained, if we go to page 15, under "Conclusion," does the conclusion set forth the corrosion growth mechanism that you just talked about?

A. Yes, it does.

Q. So to be clear, with this type of corrosion, it will continue; it will not level off over time. Is that correct?

A. That's correct.

THE COURT: Is it dependent upon the continuous exposure to the corrosive element?

THE WITNESS: What he is talking about here is based

on continuous exposure to both hydrogen sulfide and humidity.

BY MR. BRYSON:

Q. If you take out the corrosive environment, will the corrosion continue?

A. In my opinion, the corrosion will still continue, maybe at a different rate, but another literature citing will suggest that the corrosion will continue.

MR. BRYSON: We have some literature about that. We can discuss that now, if Your Honor likes, or we can do it later.

THE COURT: Whatever you prefer. You are asking the questions.

BY MR. BRYSON:

Q. Now, let's talk a little bit more about Chinese drywall, then, and your exposure to it. You had mentioned in your qualifications that some HVAC manufacturers had sent you some things. Can you explain to the Court, now, what you looked at and what you tested for and what you found.

A. On those particular ones?

Q. Yes.

A. Well, on the first ones, we said -- well, specifically, we were allowed to take just samples of deposits, and we put them in the electron microscope and did an elemental analysis and determined that it was primarily copper, sulfur, with some oxides and carbon.

On the second set, we had two failures that we cross-sectioned. We found that the failures had an appearance of what's commonly called "formicary corrosion." It's a directional type of pitting that's somewhat unique to copper. There was also sulfide film on the surface. We concluded that the failures were due to a synergistic effect of the formicary and sulfide corrosion.

Q. Had you looked at HVAC coils prior to receiving these?

A. Yes. We have looked at hundreds over the years.

Q. Had you ever seen a problem like this before?

A. No, we had not seen this particular type of problem.

Q. At that time, did you know they had been exposed or in an environment of Chinese drywall?

A. Yes. That's what we were told.

Q. What work did you do, again, for the government on the 51-home study?

A. We looked at some of the copper and silver coupons that had been exposed in the homes. We were asked to do surface analysis of the deposits, which was done by, again, the electron microscope and the EDS elemental composition.

Q. What did you find?

A. We found that, on the silver, there was silver and sulfur; on the copper, there was copper and sulfur. What was surprising was that the copper coupons came back after -- I think it was a 14-day exposure. They still appeared

bright-colored and yet you could discern in the electron microscope that a film had formed, and that film was high in copper and sulfur.

Q. Now, you have looked at some houses up in Virginia in addition to the Hernandez house; correct?

A. That's correct.

Q. Now, back to the CPSC Sandia report. Is there information in that report that was instructive in your investigation of these houses?

A. Yes, there was.

MR. BRYSON: If we could put up Hernandez 59, page 9.

BY MR. BRYSON:

Q. Can you indicate to the Court what was instructive for you in that sentence.

A. What they are saying here is that the corrosion that they observed on the electrical components, particularly the wiring, is of significance. It shows significant corrosion present.

Q. Okay. Page 10. The top paragraph first. What was instructive from that?

A. What they say, there's, you know, a review of the interim report by SNL, which is the Sandia National Laboratory. Conversations with SNL staff suggests that copper wiring is the most susceptible electrical component to the effects of the corrosive gases.

Q. The next page, or the bottom paragraph, what does that, in

general, say? You don't have to read it.

A. In general, it describes a similar growth of the copper film, and it talks about how they saw a corrosive thickness that varied from, basically, zero to 20-thousandths of a millimeter. Then they saw what they call "microcavities" -- what we call "pits" -- underneath these deposits.

Q. 20-thousandths of a millimeter, how many microns is that?

A. I'm sorry. 20 microns.

Q. If we could go to page 13 or the next page. Can we focus in on that page there, that diagram. What was instructive and significant about that to you?

A. This is a cross-section of one of the wires that they had --

Q. What type of wire? Ground wire?

A. I believe it was a ground wire.

Q. It says that.

A. Okay. Yeah.

Q. Can you explain what we are looking at.

A. Yeah. What they used to create this was a focused ion beam instrument that focuses an electron beam onto the surface, makes a very nice cross-section into it like a scalpel, very high-tech way of doing the metallographic cross-sections that we do. The advantage here is they can do it without disturbing the deposits.

Q. Do you have this type of fancy equipment in your lab?

A. No, we don't. That's limited, typically, to universities and national laboratories.

Q. What was the corrosion thickness?

A. If you look at the -- they have got a micron bar, calibration bar, down here, and it appears that that would be about 20-thousandths thick.

Q. 20 microns?

A. 20 microns. I'm sorry.

Q. What is this area right here?

A. That would be a pit, what they are calling a "spongiform" texture, and it appears to be about 10 microns deep.

Q. If we could go to page 13, what was instructive to you on this?

A. They believe the Battelle corrosive environments that the copper wiring has been exposed to could be as severe as either Class III or Class IV.

Q. Go to page 23. Again, is this a description of that particular copper ground wire we just looked at?

A. Yes. It's a picture -- they're referring to that picture.

Q. Is this from Sandia National Labs?

A. I believe this is the Sandia. In their report, it was figure 13. The image clearly show a 20-micron thick sulfide with a cauliflower-like morphology. The thickness exceeds the expected for a Class II corrosion environment and suggests that the actual environment is likely a Class III or higher.

Q. Class III or higher is what micron thickness?
A. The .1 and higher.
Q. After three years, it would be --
A. After three years, it would be .3.
Q. What we are seeing here on this ground wire is --
A. 20 microns.
Q. How many? That's -- I can't --
A. Several times higher.
Q. I can't do the math, but what --

MR. SANDERS: Your Honor, this is exactly the type of testimony that I was objecting to.

MR. BRYSON: We are moving on.

THE COURT: Let's move on.

BY MR. BRYSON:

Q. Have you examined any samples from the Hernandez home?
A. Yes, I have.
Q. If we could go to 597-11. Can you identify for the Court what we are looking at.
A. Yes. This is a ground wire and switch. In the upper left there, that's how we received it. There was a separate bag, where the ground wire was in a separate bag. We unbagged them. This is what we had. This is the ground wire.

As you can see, there's some white stuff there that's probably paint, and there's some black discoloration that is typical of the sulfide corrosion.

Q. Explain to the Court what this is.

A. The top picture is a cross-section of that wire. We cross-sectioned the wire in the area of where the loop was made at the connection.

The top picture shows the pitting that we observed. That's the deepest pit. There were several pits along the surface that we could see. This is the deepest one.

Q. How deep is the pit?

A. 22.5 microns.

Q. How thick was the corrosion thickness?

A. The next picture then shows the corrosion thickness, which we measure to be 37, almost 38 microns. 37.7.

Q. What is this?

A. This is SEM images of the surface of that wire, showing the deposits on the surface; and an EDS analysis showing the elemental composition of copper, sulfur, and a little bit of oxygen.

Q. Would you explain that to the Court.

A. Yeah. Like you said, this is the EDS. You have copper that shows up in three locations on the spectrum. Sulfur shows up here. You've got a little bit of oxygen there. This is consistent with what we have seen with copper sulfide.

Q. Now, have you looked at a number of other wires from the house where you used these same three steps: Picture, cross-section, EDS?

A. Yes. Uh-huh.

Q. Let's run through these pretty swiftly if we can. If we can go to TCH -- do you know what "TCH" stands for?

A. Yes. It's a reference to the Hernandez home.

Q. If we can go to 597-12. What is that?

A. That's a receptacle and, again, a ground wire that we received. Again, the upper left is how we received it and as we unpackaged it. The bottom right there is the ground wire showing black deposits and paint residues.

Q. Next picture. What is this?

A. Again, this is the maximum pit depth and the thickness of the corrosion layer.

Q. What's the depth of the pit?

A. Again, 22.5 microns and 19-micron depth of the deposit, thickness of the deposit.

Q. If we could go to TCH-13, which is 597-13.

A. Again, the --

Q. Oh, excuse me. Go back one. Yeah. I'm sorry. The SEM.

A. Yes. That's the SEM images of the surface. Again, we see the copper and sulfur. We see a trace amount of chlorides in this one, as well as some calcium, suggesting there's some drywall dust in this as well. The source of the chloride was not determined.

Q. Did you perform the same analysis on TCH-13, TCH-24, and TCH-36?

A. Yes, we did.

Q. Do you have a summary chart on all of these samples which show the thicknesses and --

A. Yes.

Q. Did all of those samples show -- what did they show with regard to the EDS?

A. They showed very similar, that there was copper and sulfur present. Occasionally, we would see some chloride present as well. There may have been small amounts of calcium present.

Q. Can we go to Hernandez 597-14. I don't think we need to go through three more of those. Can we go to 597-14. Can you explain to the Court what this sample is.

A. Yes. The top one is an insulated wire and -- two insulated wires we received. The bottom one is a braided wire. It's hard to --

Q. Can we focus in on --

A. I believe that came from the alarm panel. Yeah, that came from an alarm panel. The TCH is the sample number that was supplied to us, and the CTL is our internal sample number.

Q. Is this a low voltage wire?

A. Yes, that would be a low voltage wire.

Q. Could we go to 597-6. The low voltage wire, what did the cross-section show?

A. This shows where -- here in this top picture, you see a pit that is underneath the tinplating of that wire. I think

these wires were tinplated. You have got pores where corrosion has occurred underneath. And then you can see that not only do you have deposits at the pore site, but you have creep occurring out from there.

Similar is down here. You can see the corrosion occurs, undermining type of corrosion, underneath that plating. We have pit depths of 25 microns and tarnish thicknesses of 17.5 to 19 microns.

Q. Explain to the Court again what creep is.

A. Creep is exactly what you see here, where you have got the corrosion products that are moving away from the pore openings. So just being right at the pore openings, and that's suggesting that you have this type of corrosion occurring underneath that is undermining the plating.

Q. If we can go to 597-15, what is this sample?

A. These are some low voltage wires and a ground wire that we received. Again, you can see at the exposed tips, where they're darkened, there's black deposits on them.

Q. 597-07, what is this?

A. This is a cross-section of the ground wire and looks like the -- yeah, that's the pit, 38 microns deep. You have a scale thickness of about 30 microns.

Q. Go to 592-0001. Can you explain to the Court what sort of summary exhibit we are looking at.

A. Yeah. What we did here is we took -- somehow that box got

moved, but we took this wire right here and we cross-sectioned it, which is in the picture to the right. We did a longitudinal cross-section so we could see the pitting as it occurs along the length of the wire.

You can see where the insulation is. In this area here outside the wire, the surface look is typical of what we see with the copper sulfide deposits. Elemental analysis confirms that it's copper and sulfur, and we have got pits in the area of about 13 microns and about a 14-micron deposit layer.

Q. Did you strip off the insulation?

A. We did not strip off the insulation. In the cross-section --

MR. SANDERS: Objection to the leading nature.

THE COURT: Yes.

BY MR. BRYSON:

Q. I'm sorry, Mr. Krantz. What did you do next?

A. Next we looked at the area again underneath the insulation, and we found that corrosion was present all along underneath the insulation. The deepest pit was in this area, about 3/10ths of an inch from the end of the insulation. The pit was about 5 microns deep.

Q. What type of corrosion product underneath was it?

A. It was copper sulfide there as well.

Q. Did you look at any controls?

A. Yes, we did.

Q. Can we go to Hernandez 597, page 30. Can you explain to the Court what we are looking at.

A. Yes. This is sample received from a control home in Virginia. This is a switch as it was in the wall. This is how we received it in this bag. As we disassembled it, you can see here the ground wire, and it's a ground wire removed from the switch.

Q. What is this white substance on the ground wire?

A. The white stuff is most likely paint. Occasionally, you know, it's a mix of paint and maybe drywall dust.

Q. Can you go to 597-29. What are we looking at now?

A. This is a cross-section we made of that wire in the area of the loop, and you can see that there's been no deterioration on the surface.

Q. To your knowledge, did this home have Chinese drywall?

A. To my knowledge, it did not.

Q. Are there any pits on this particular cross-section?

A. There were no pits or corrosion deposits on this wire.

Q. Can we go to an SEM of it, which is 597-31.

A. These were some of deposits that we saw on the outside of the wire. The top there is the white deposit which, if you can blow that up a little, we see titanium and calcium, chloride. It's consistent with paint.

Q. On any of the EDS you did, was there copper sulfide that

you saw of any significant amount?

A. No, we didn't. We looked at -- there was some small area that had some deposits that had a morphology similar to copper sulfide, but again we found that it was most likely drywall dust. Calcium and sulfur are very similar.

Q. Have you prepared a chart which summarizes all the Hernandez wire samples that you looked at?

A. Yes, we did.

Q. Show 591-1.

A. This is a summary of the deepest pits that we found --

Q. I'm sorry. Not pits.

A. I'm sorry. Corrosion thickness. My apology.

After three years of exposure, these all far exceed the .1-micron criteria as established by Battelle.

Q. What would the Battelle standard be after three years?

A. After three years would be .3. You can see that some of these would exceed that by several hundred times.

Q. Have you prepared a summary chart which indicates the pit depths?

A. Yes, we have.

Q. Can we go to 590-001 and, really, just with regard to his column.

A. Yes.

Q. What is this column?

A. This column is the maximum pit depths that we measured.

We can see that they are of similar depth as what was seen in the CPSC, and some of them are much deeper. They talk about a 10-micron pit, and ours varied from 5 to 38 microns deep.
Q. Have you looked at other examples of wires similar to this on other homes containing Chinese drywall?
A. Yes, we have.
Q. These are in the Virginia homes?
A. Yes.
Q. If we can pull up Hernandez 594-1. If you can explain to the Court again what we are looking at.
A. This was a foam wire that was removed from the kitchen of that home. When the phone cable comes in, there's several twisted pairs. This was a pair that was unused, and so it had just been snipped off at this end. So this end had been exposed to the atmosphere, and this end was unexposed and was where we had cut it from the cable.
Q. What did you find?
A. What we found is, when we stripped the insulation back, we found that the wire at the snipped end, which was 6 inches from the exposed end, had black deposits on it. When we cross-sectioned it, we found pitting present there as well. Those pits were 5.6 microns deep.
Q. So is the corrosion that you found on this telephone wire, low voltage wire, similar or consistent to the corrosion you found on the low voltage alarm wire in the Hernandez house?

A. Yes. Very similar.
Q. With regard to the other homes that you have looked at and examined, did you prepare a summary chart of those tarnish thicknesses and pit depth measurements?
A. Yes, we did.
Q. Can we see Hernandez 596-001. Just in general -- I don't want you to read every category -- are these tarnish thicknesses and pit depths and --
A. Yeah. We have got the thicknesses, the maximum thicknesses that we measured on these samples that were primarily ground wires and a few low voltage wires.

The next column is the maximum pit depths. Some of these were on the AC coil as well. But we have got pit depths that, you know, range from 7 microns up to 29, 13, 16.5.
Q. I believe right there, that one, as Mr. Sanders pointed out in your deposition, is an error; right?
A. Yes, that was an error. We went back and remeasured that, and it measured 23.6.
Q. Now, have you done more investigation and prepared yet another summary chart of corrosion thicknesses and pitting depths on even more samples?
A. Yes, we did.
Q. Can we pull up 598-001. Now, what is different about this one?
A. In this one, we were supplied ground wires from the boxes,

and they were supposedly snipped off at the end, back of the box, and so we looked at -- we made a cross-section of the tip and somewhere in the middle, approximately the middle of that wire, and then at the very end of the wire where it exited the electrical box.

What we found on many of these is that the pits continued along the length of the wire. There may have been some areas where there was discontinuous corrosion, but we still observed deep pitting at the very end, where it exits the electrical box.

Q. Make sure we're clear on this. Right where the ground wire comes out the receptacle box, that would be identified as what?

A. The end.

Q. And then it would be the middle, I guess, is the middle?

A. The middle.

Q. And then the tip would be --

A. The tip would be where it was connected to the electrical fixture.

Q. With regard to that top one, if we could go to Hernandez 598-0004. Can you explain to the Court what we are looking at.

A. This is the corrosion that was observed at the tip of that wire. These are the pits that were present. The deepest one there is 16.4 microns. The next picture to the right is the area where there was --

Q. That one's also the tip?

A. Yeah.

Q. We're going to go to the middle.

A. Corrosion thickness 13 microns. Below it is in the middle. We see, again, we have got pitting, corrosion scale, and we see a pit that's 17.2 microns deep.

Q. Go to the next page, 5. What does the end of the wire -- this would be the part, I believe you testified, closest to the receptacle box?

A. Yes, that would be the part closest to the receptacle box. And, again, you see deep pits, 10 microns, and scale in areas that are, you know, 14 microns thick.

Q. If we can go back to 598-0001. We won't go through any others in the interest of time, but did you do that for other houses, the same kind of drill?

A. Yes. There were several from the Virginia homes that we did.

Q. Tip, middle, end? Tip, middle, end?

A. Tip, middle, end. Tip, middle, end. And we got similar results.

Q. Now, have you also looked at any line sets?

A. Yes, we did.

Q. Can we go to 598-0007. What do you see on this particular line set?

A. On this line set, we see pits that are 26.5 microns deep,

and we have got corrosion scale that's about 8 microns thick.

Q. Did you look at a line set from the Hernandez house?

A. No, we did not.

Q. Do you have an understanding of what a line set is?

A. Yes.

Q. What is that?

A. It's the copper tubes that run from the inside coil to the outside compressor.

Q. Is that a continuous run of metal?

A. Yes. Yeah, they are continuous, with no breaks in the middle.

Q. So if you cut it, do you know what you have to do?

A. If you cut it, then generally I think they recommend that you replace the whole line set because it's intended not to have joints. Otherwise, the risk of leaks.

Q. Now, let's shift gears, if we can, to talking about, Mr. Krantz, what happens if the Chinese drywall is removed. Do you have any opinion about whether the corrosion will continue if the Chinese drywall is removed?

A. Yes, I do. I believe corrosion could continue.

Q. Do you have any experience in your background with regard to corrosion that was occurring and the source of the corrosion was removed?

A. Yes. Earlier, when we talked about the shipboard heat exchangers, they had been fitted up in a bay that was known to

contain polluted waters.

Q. What bay?

A. Prudhoe Bay up in Canada.

Q. So what was happening?

A. What was happening is that the ships were in for refit and the heat exchangers, which are used in the air-conditioning systems, were being replaced. They take in outside water, run it through an air-conditioning coil, similar to what's in a home except they are using the cold water as opposed to freon. They weren't supposed to be used during fit-up because it was known that it could cause corrosion problems. However, they were used anyway.

Q. What type of corrosion was in the water?

A. There were sulfides in the water, which initiated sulfide corrosion. These heat exchangers were made out of copper alloys, various copper alloys. When they went out to sea, the units were still functioning, and clean water was flushed through the systems to clean everything out. However, the corrosion continued until these units ultimately failed.

Q. That's something that you looked at?

A. Yes. We had an opportunity to look at those and assist with the failure analysis of those items.

THE COURT: Is the presence of moisture necessary for corrosion to continue when the corrosive element is removed or the factor is removed?

THE WITNESS: Corrosion requires moisture. It's an aqueous process. In this instance, you know, we see there's pitting that's occurring, which is indicative that moisture is present on these components.

THE COURT: What degree of moisture?

THE WITNESS: It wouldn't be such that, necessarily, that it gets wet, visibly wet, but it would be -- in a humid environment, you get monolayers of water that form on the surface. As the humidity rises and the number of monolayers increases, you reach a point where it will behave like bulk water, and the reactions that occur in bulk water apply to this environment.

BY MR. BRYSON:

Q. For us laymen in the crowd, what's a monolayer?

A. It would be a one, you know, molecule layer of water.

Q. Microscopic?

A. Microscopic, yes.

Q. Is that type of water, in your opinion, present in the walls of the Hernandez house?

A. It would be present most everywhere.

Q. Okay. Thank you.

Now, you had talked about a situation you have been involved in where there was corrosion with these shipboard heat exchangers and then, when they went out to sea, the corrosion continued. Do you have any other experience in this area of

the corrosive environment being removed and the corrosion continuing?

A. Yes. When you clean out commercial heat exchangers, air-conditioning units, you know, they may use river water or whatnot as a coolant, and deposits will build up within those units and allow the corrodents -- chloride, sulfur, or whatnot -- to accumulate under these deposits.

Periodically, they will go in and clean these things. If they don't do a thorough job of cleaning, they are leaving the concentrated corrodents behind, and the issues that they're trying to remove by cleaning continue.

Another example would be the chloride pitting of stainless steels, where the chlorides get down into the pits. If they have to do any repair work, they have to grind out all that metal to get rid of the chlorides because it's almost impossible to remove those from the pits that form. Left in place, they would continue to eat through the metal there.

THE COURT: Is the presence of pits necessary for the corrosion to continue once the corrodent is removed?

THE WITNESS: No, not necessarily. The pits provide a place for the corrosion products to get trapped and makes it difficult to clean.

MR. BRYSON: Can I approach, Your Honor?

THE COURT: Yes.

BY MR. BRYSON:

Q. Mr. Krantz, are you aware of any learned treatise articles that discuss sulfide corrosion continuing on copper even after the corrosive environment is removed?

A. Yes. There's a paper by Jacobs and Edwards.

MR. BRYSON: If we could show LT (learned treatise) 241, page 1, and focus in on the top.

BY MR. BRYSON:

Q. Where was this particular paper published and by who?

A. It doesn't say on the -- the publishing company is a British publishing company. At the end of the paper --

Q. Speak more into the microphone, please.

A. At the end of the paper, on LT 241-0010, there's an acknowledgment that this was supported by a fellowship from the National Science Foundation.

Q. If we could go to 241, page 6. Can you explain in general what happened in this particular learned treatise.

A. Yeah. What he did is he ran some tests where he took some copper coupons, put them into a sulfide environment. It was an immersion surface. They were wetted and exposed for several months under a couple different conditions, and he grew a sulfide corrosion film.

After seven or eight months of exposure, he then transferred those coupons to a nonsulfide environment, and he observed that the corrosion continued even after removal of the

sulfide environment.

Q. Go to the next page.

A. He determined, based on those results, that the elevated corrosion rate could not be attributed to the sulfides in solution but must be due to the scale formed when the sulfides are present.

Q. What was the final opinion with regard to the items that were being studied? If we could go to page 08. 241-08.

A. The result of his work, he predicted that pipelines that have sulfides, exposed to sulfide corrosion, their lifetime will be decreased to one to three years as opposed to maybe as high as 400 years.

Q. Now, these particular samples of this experiment, it was in an aqueous environment?

A. Yes, it was.

Q. To make sure that we're clear on this, in your opinion, what would be the source of the water in a house for the corrosion to continue if the Chinese drywall is removed?

A. Humidity is adequate to put several monolayers of water moisture on the surface. If you're to get enough to form that would cover a pit, then that would be adequate for corrosion to reinitiate within that pit.

Q. Mr. Krantz, let's take it a step farther. Let's say you removed the Chinese drywall, and then you take a Scotch-Brite pad, which has been proposed by KPT. If you take a

Scotch-Brite pad and try to clean it, could you remove all the corrosion?

A. No, I don't believe you could.

Q. What, if any, experiment have you performed in that regard?

A. We took a ground wire from the Hernandez home, and we cleaned it with Scotch-Brite until it appeared to be bright copper. Then we looked in the SEM to see if -- optically and in the SEM to see if there was any evidence of pitting or sulfide deposits left.

Q. Can we see 593-0001. Can you explain to the Court what we're looking at.

A. Yes. The top picture is the wire that we used for the cleaning. This is a picture from the --

Q. From the Hernandez house?

A. From the Hernandez house, yes.

Q. Was this the worst one?

A. It was the only one we had left.

Q. When you had wires, were there any that were darker than that?

A. Yes. There were some that were much worse than this.

Q. Okay.

A. This is the typical appearance of this wire. There was scattered black deposits, you know, paint present as well.

We took the Scotch-Brite and abraded the surface

until it looked like clean, fresh copper. This is at about 32X, and you can see the small black spots that are indicative that pits are still present.

When we went into the SEM at those spots, you can see these white, light-colored deposits, which we later analyzed to contain sulfur, indicative that the copper sulfide was still present.

Q. This was a wire that you had in your hand --

A. Yes.

Q. -- when you cleaned it?

A. Yes. I have it right here.

Q. Can you show that to the Court.

MR. BRYSON: We are not offering that into evidence, Your Honor. It's just for demonstrative purposes. This is in evidence, though. If I might approach.

BY MR. BRYSON:

Q. Does the ASTM provide any guidance with regard to any standards for cleaning of corrosion?

A. Yes. There are standards for cleaning corrosion test specimens in the laboratory.

Q. Can we go to Hernandez 109-0001. What is this document entitled?

A. It's ASTM G46, the standard guide for examination and evaluation of pitting corrosion.

Q. Just this part right here.

A. "To expose the pits fully, use recommended cleaning procedures to remove the corrosion products and avoid solutions that attack the base metal excessively. See practice G1."

Q. What does it say about trying to scrub with a stiff-bristle brush?

A. That will often enlarge pit openings sufficiently to removal --

Q. It will actually undercut the metal?

A. Yeah, undercut the metal and make the pits easier to evaluate.

Q. With regard to practice G1, what does it say about cleaning. If we can go to 600-0001. What is this standard?

A. It's the ASTM G1 standard practice for preparing, cleaning, and evaluating corrosion test specimens.

Q. Can we go to 0002, just this second paragraph. The second paragraph, 7.1.1.

A. "An ideal procedure should remove only corrosion products and not" --

THE COURT: Closer to the microphone, please.

THE WITNESS: I'm sorry. "An ideal procedure should remove only corrosion products and not result in removal of any base metal."

BY MR. BRYSON:

Q. 0003.

A. "Repeated treatments may be required to complete removal

of corrosion products. Removal can often be confirmed by examination with a low power microscope (for example, 7 to 30X). This is particularly useful with pitted surfaces when corrosion products may accumulate in pits."

Q. Does the standard provide a chemical method of trying to remove corrosion products?

A. Yes, they do.

Q. If we can go to the next page, 0005. If we can focus in on this section. Can you explain to the Court what we are --

A. Yeah. These are cleaning methods for cleaning copper. Here it says a particular solution removes copper sulfide corrosion products that may not be removed by hydrochloric acid treatment.

Typically, when we are trying to clean copper, we will use a hydrochloric acid solution. Here it gives some hints that if that doesn't completely remove the sulfide, then to try a sodium cyanide solution.

Q. In your experience, Mr. Krantz, what kind of chemical do you need to completely removal the corrosion product from wire?

A. These are some pretty nasty, aggressive chemicals, hydrochloride acid and sodium cyanide, which you would not want to use at the same time in the field.

Q. Can you use a Scotch-Brite pad to get rid of all the corrosion without these chemicals?

A. No, we were not able to do so. Well, if you scrub long

enough, you probably could, but you don't know where you are at until you do a microscopic examination.

Q. That would be out in the field?

A. Yes.

Q. Mr. Krantz, can you summarize your opinions for the Court.

A. Yes. It's our opinion that the wires have been aggressively attacked. There are corrosion failures that exceed the Battelle criteria of .1-micron per year. We have pit depths that are 10 microns and deeper that are similar to, deeper to, than those reported in the CPSC and Sandia reports.

Scotch-Brite is not an adequate cleaning method for the wires. We observed corrosion deposits underneath insulation on low voltage wires and observed them on the high voltage wires.

Q. In all of these, what is the cause of the copper sulfide corrosion, in your opinion?

A. In our opinion, it's coming from the Chinese drywall.

Q. What is your opinion with regard to what should be done with all of the wiring in the house?

A. It's our opinion that the wire should be removed.

Q. That would include the low voltage and the high voltage?

A. Yes, including the low voltage and high voltage wires.

Q. Do you hold all of these opinions within a reasonable degree of scientific certainty?

A. Yes, I do.

MR. BRYSON: Your Honor, could I have just one second?

THE COURT: Yes.

MR. BRYSON: Thank you, Mr. Krantz.

THE WITNESS: No further questions.

THE COURT: Let me see counsel for both sides just on logistics, please. I don't need this on the record.

(WHEREUPON there was a conference at the bench outside the presence of the court reporter.)

THE COURT: We'll stop here and start tomorrow at 8:30.

Mr. Krantz, I don't want you to talk to anybody tonight about your testimony because I'm interrupting it. We are finished with the direct, and you are subject to cross-examination. I don't want you to talk to anyone.

THE WITNESS: Okay.

THE COURT: The Court will stand in recess until 8:30 in the morning.

THE DEPUTY CLERK: Everyone rise.

(WHEREUPON the Court was in recess for the evening.)

* * *

CERTIFICATE

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

s/ Toni Doyle Tusa

Toni Doyle Tusa, CCR, FCRR

Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY

Docket No. 09-MD-2047
New Orleans, Louisiana
Tuesday, March 16, 2010

**THIS DOCUMENT RELATES TO:**
Case No. 09-CV-6050

Tatum B. Hernandez, et al
v.
Knauf Plasterboard (Tianjin) Co., Ltd., et al

*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME II - MORNING SESSION

APPEARANCES:

FOR THE PLAINTIFF:

HERMAN, HERMAN, KATZ & COTLAR
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, LA 70130

GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

SEEGER WEISS
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

LEWIS & ROBERTS, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

FOR THE DEFENDANT:

FRILOT L.L.C.
BY: KERRY J. MILER, ESQ.
Energy Centre - Suite 3700
1100 Poydras Street
New Orleans, LA 70163-3700

BAKER McKENZIE
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

BAKER McKENZIE
BY: DOUGLAS B. SANDERS, ESQ.
ERIN M. MAUS, ESQ.
KYLE P. OLSON, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter:

Karen A. Ibos, CCR, RPR, CRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7776

Proceedings recorded by mechanical stenography, transcript produced by computer.

08:10:20

# **INDEX**

**WITNESSES FOR THE PLAINTIFF:** **PAGE/LINE:**

**DANIEL KRANTZ**

Cross-Examination by Mr. Sanders 250/5

Redirect Examination by Mr. Bryson 274/22

**TATUM B. HERNANDEZ**

Direct Examination by Mr. Stephen Herman 283/23

Redirect Examination by Mr. Hayden 294/9

**DONALD GALLER**

Voir Dire Examination by Mr. Seeger 301/13

Direct Examination by Mr. Seeger 309/2

Cross-Examination by Mr. Sanders 334/23

Redirect Examination by Mr. Seeger 344/18

**Ronald B. Bailey**

Voir Dire Examination by Mr. Seeger 346/15

Direct Examination by Mr. Seeger 349/24

Cross-Examination by Mr. Hayden 374/15

Redirect Examination by Mr. Seeger 389/12

P R O C E E D I N G S

(TUESDAY, MARCH 16, 2010

(MORNING SESSION)

08:41:07 (OPEN COURT.)

08:41:07 THE COURT: Be seated, please. Good morning, ladies and

08:41:10 gentlemen. Do we have a witness?

08:41:11 MR. ECUYER: Your Honor, a bit of housekeeping before we

08:41:14 begin this morning, if I may.

08:41:15 THE COURT: Okay, sure.

08:41:16 MR. ECUYER: Your honor, we would like to introduce by

08:41:17 way of trial deposition David J. Maloney, Jr., and we would like to

08:41:24 offer and file and introduce two exhibits, Hernandez 103 and 104,

08:41:28 in conjunction with Mr. Maloney's deposition testimony.

08:41:31 THE COURT: Okay, I'll admit the exhibits, and I'll make

08:41:33 the deposition a part of the record.

08:41:35 MR. ECUYER: Thank you, your Honor.

08:41:37 THE COURT: Thank you.

08:41:37 As you know, we're continuing our ides of March trial,

08:41:43 and Mr. Witness, would you come forward, please, and take the

08:41:49 stand. You will recall that we finished, that the plaintiffs

08:41:53 finished the direct examination and now we're beginning the

08:41:58 cross-examination.

08:42:00 You're still under oath, sir.

08:42:02 THE WITNESS: Yes.

08:42:03 THE COURT: Pull that microphone a little bit closer to you. You my proceed, counsel.
08:42:09 MR. SANDERS: Good morning, your Honor.
08:42:09 THE COURT: Good morning.
08:42:10 CROSS-EXAMINATION
08:42:10 BY MR. SANDERS:
08:42:11 Q. Good morning, Mr. Krantz.
08:42:13 A. Good morning.
08:42:14 Q. We went through a lot of tarnish film pictures and showed a table with different measurements of tarnish film yesterday, and I believe that was at least in part of support of your assessment under the Battelle standard as to the corrosivity of the environment; is that correct?
08:42:36 A. Yes.
08:42:37 Q. And the material you were measuring, the copper sulfide, is fairly friable, correct?
08:42:41 A. Yes.
08:42:42 Q. And it flakes off pretty easily with touch or with movement?
08:42:46 A. Yes.
08:42:47 Q. And you determined film thickness by looking at areas where there's continuity between the film thickness and the copper substrate, correct?
08:42:58 A. As much as we could, yes.
08:43:00 Q. And the idea is to measure that film thickness right on top of the copper substrate?

A. Yes.

Q. Could we look at page 9 of 13 of Dr. Krantz's February 12th report. And actually, if we could blow up the bottom image. This is a little easier to see on the screen. But this is one of your film thickness measurements, correct?

A. Yes.

Q. On page 9. And over here what we seem to see is a flake that you've measured at 108, which appears to be floating out there in space away from the copper substrate?

A. Yes.

Q. And if you back up a little bit and go to the right, there's another flake that also seems to be turned up here?

A. That one is, you know, there is deposits underneath that that connect that to the copper.

Q. But in your opinion, you've used these measurements to form the basis of your opinions that that's the proper film thickness?

A. Yes.

Q. Including that 108 that's floating out there?

A. Yeah, we used that. You know, we measured this other one also because we realized that that 108 was not attached.

Q. The Battelle standard that you were talking about, that's a standard that's used to classify corrosive environments?

A. Yes.

Q. And it's typically used in an industrial environment?

A. That's where it was originally derived from, yes.

08:44:43 Q. And in an industrial environment, you're normally process rooms or pulp and paper plants or things like that, you're normally subject to a constant level of corrosion?

08:44:51 A. Yeah. It was applied to control rooms within those plants, yes.

08:44:56 Q. And the analyses and the data that are backing that up assume some level of corrosion over the time period which you're measuring, correct?

08:45:05 A. Yes.

08:45:06 Q. Once we remove the drywall from the house you agree that the source of corrosive gases will be gone?

08:45:13 A. Yes.

08:45:14 Q. Are you also familiar with other standards such as ISA?

08:45:20 A. Yes, I am familiar with that one as well.

08:45:23 Q. And it's a similar categorical standard in that it measures corrosive environments, and I think they use different terms, G1, G2, but they're similar to the Battelle standards?

08:45:35 A. Very similar, yes.

08:45:37 Q. And what they're measuring is the film thickness over a certain period of time, correct?

08:45:44 A. Yes.

08:45:45 Q. Could we put up Plaintiff 62, please.

08:45:58 And this is the ISA S71.04 standard that I was talking about?

08:46:03 A. Yes.

08:46:04 Q. If you turn to page 14 and blow up the table there. This is a similar table, the G1, G2, G3, as it is to the Battelle standards, correct?
08:46:35 A. Yes, similar.
08:46:36 Q. And under the ISA standard, the way they measure the film thickness is by a copper reactivity coupon, correct?
08:46:45 A. That's a method that they mention, yes.
08:46:49 Q. And if we turn to page 19 of Plaintiff 62, and if you look at actually paragraph C.3, that's the sample analysis, that's the method that they use to actually measure the film thickness, correct?
08:47:12 A. Yes.
08:47:13 Q. And in these standards, similar to Battelle, well, in this classification standard, they say that the film thickness should be determined by cathodic reduction using the method of W.E. Campbell and U.B. Thomas, correct?
08:47:30 A. Yes, when you have test specimens, that would be a method that would be used.
08:47:34 Q. Can you describe what the cathodic reduction method is?
08:47:38 A. Yeah, basically you're taking a, before you expose it you're polishing a piece of copper or silver, you're exposing it to the environment for a period of time. When you remove it from that environment, then you take it to a laboratory, you hook it up to an electrochemical testing apparatus, you IMMERSE it in a specified test solution, you then run an electrochemical test and it reduces

08:48:04 the deposits, the film on the surface of the test specimen, and based on the recorded current and voltage you can determine what species are potentially present and integrate the current to determine the thickness.

08:48:20 Q. And are you also familiar with the IEC 654-4 standard?
08:48:28 A. I have read that one, yes.
08:48:30 Q. Can we show Plaintiff's Exhibit 61.

08:48:41 This is an alternating French-English standard, so I am going to try to get the pages correct here. But similar to ISA or similar to Battelle, this is another way to classify corrosive environments, correct?
08:48:54 A. Yes.
08:48:58 Q. And if you turn to appendix B, which is 61-29. This again indicates that by using copper reactivity coupons you can measure corrosivity in an environment over a period of time, correct?
08:49:40 A. Yes.
08:49:41 Q. If you go down to table B-1, much like the ISA or the Battelle standard, while they only have three classes here, they're measuring film formation over a period of time?
08:49:51 A. Yes.
08:49:52 Q. And you relied on Abbott's paper in applying the Battelle method to your sampling?
08:50:02 A. Yes, that was one of them.
08:50:03 Q. Can we go to LT 195, please. And if we turn to page 12, Abbott also discusses ways to measure the corrosivity environment,

correct?
A. Yes.
Q. And if you could read that third bullet point for ME.
A. "Direct measurement of relevant corrosion is the single best descriptor of an operating environment. The term direct measurement refers specifically to the technology of coupon or reactivity monitoring."
Q. What you did is you took tarnish films on actual copper wires and compared them to the Battelle standard, correct?
A. Yes.
Q. You didn't do any cathodic reduction to film to determine film thickness?
A. No, we did not, they were too thick for that.
Q. And I think in the Sandia report when they were discussing the Battelle classifications, they indicated that the measurements were 20 microns or so in the samples that they were using?
A. Yes.
Q. And they compared that to a Battelle Class III?
A. Yes.
Q. And if we turn to, I think it's page LT 26, or in this document 195-26. That's the Battelle standard there and the three, and what's the thickness range in microns for a year according to the Battelle standard?
A. .1 micron after one year for Battelle Class II.
Q. And for III, what's the range, do you know?

08:52:06 A. Let's see. It says .1 TO .4 micron after one year.
08:52:17 Q. So in four years, that would be a .4 to a 1.6 microns if you assume linear --
08:52:24 A. Yes.
08:52:26 Q. -- which would be an aggressive rate of growth, correct?
08:52:28 A. Correct.
08:52:29 Q. And Sandia was comparing a 20-micron growth on a copper wire and putting it in a category of around 3, which is a .4 to a 1.6 category according to Battelle?
08:52:40 A. I believe they said a three or higher.
08:52:42 Q. Did you do a similar conversion in comparing your film thicknesses to the Battelle standard?
08:52:48 A. Yes, we did.
08:52:49 Q. So you compared the 20 microns that you had of 30 microns back to the Battelle standard?
08:52:57 A. Yes.
08:53:02 Q. You had also talked about continuing corrosion, and you're obviously aware, as we talked about, that KPT intends to remove all of the drywall.
08:53:13 A. Yes.
08:53:13 Q. And so the source of corrosive gases will be gone.
08:53:16 A. Yes.
08:53:17 Q. And despite there being no further source of sulfide, reduce sulphur gases, it's your opinion that the potential remains for corrosion to continue on copper?

08:53:28 A. Yes.
08:53:30 Q. And you base that opinion primarily on Dr. Scully?
08:53:34 A. Dr. Scully and the paper presented by Dr. Edwards, and experience. The literature talks about sulfide corrosion continuing in sea water environments. Dr., the Edwards paper was, the first I had seen that was not in a sea water environment, he used potable water, and in discussions with Dr. Scully who had talked to Dr. Edwards, they were, he was convinced that this could continue in atmospheric environment as well.
08:54:14 Q. And in preparing your February 12th, 2010, report, you didn't rely on any of Dr. Scully's reports?
08:54:23 A. I had read them, but at that time I was under the impression that he would be testifying and that I did not need to address those things.
08:54:31 Q. And so the reports that you prepared were based only on your findings of your testing?
08:54:37 A. Yes.
08:54:37 Q. And you did indicate in your deposition that you intended to offer some opinions that Dr. Scully's opinions were valid?
08:54:47 A. Yes.
08:54:47 Q. But you didn't issue any supplemental report or anything outlining how you used those opinions?
08:54:54 A. No, we did not.
08:54:55 Q. Have you spoken to Dr. Scully since your March 5th deposition?
08:54:58 A. Yes, I have.

08:54:59 Q. At the time when I asked you how you could explain the mechanism, you directed me to Dr. Scully.
08:55:13 A. Yes.
08:55:15 MR. SANDERS: I am in a bit of a bind here, your Honor, to get into the methods of his testimony from yesterday since he spoke to Dr. Scully since his deposition, and I guess I would move to strike his opinions with respect to the reliance on Dr. Scully.
08:55:30 THE COURT: I am going to deny that. You can go into whatever you think you need to go into.
08:55:38 BY MR. SANDERS:
08:55:39 Q. Your opinion is that the reaction occurs because moisture is present?
08:55:43 A. Yes.
08:55:44 Q. And you base that on the Edwards article, as you indicated?
08:55:47 A. Yes.
08:55:48 Q. Could we show Plaintiffs 241. And if we, sort of hard to see here, but if we look at the second, top of the second paragraph where it starts, do sulfides play a similar role in the corrosion of pure copper tubes and potable water, that's the question that this paper was designed to answer?
08:56:11 A. Yes, it was.
08:56:12 Q. So we're talking about an environment here, where the metal is in contact with water?
08:56:20 A. Yes, it's immersed.
08:56:21 Q. Completely immersed?

A. Completely immersed.

Q. Unlike the wires or the outside of the copper plumbing or anything we're going to see in the Hernandez house?

A. Correct, the wires do not get completely, do not get immersed in water.

Q. And if we turn to page, the next page, and again, they're trying to mimic here what's found in potable water, right?

A. I believe so.

Q. And if you look at the solutions that they use in the first paragraph and you compare their samples, they also include, if you look in the first paragraph in the second sentence, chloride?

A. Yes.

Q. Sulfate?

A. Yes.

Q. And bicarbonate?

A. Yes.

Q. It's not just sulfide that's in there?

A. Correct.

Q. And in your past experience, I think you testified yesterday was sea water and the heat exchangers that you were talking about?

A. Yes.

Q. You indicated that in that instance chloride and sulfate or sulphur were part of the corrosive process?

A. Yes.

Q. And that's what kept the corrosion going once you tried to

clean it or remove the source?

A. Well, what keeps the corrosion going was the sulfide. The materials that are used are considered reasonably resistant to chloride, hence, they're using sea water applications, and it was the corrosion caused by the sulfide that essentially poisoned the protective nature, protective film that forms on the copper alloys.

Q. And in that context yesterday you said sulphur?

A. It was sulphur -- it was sulfide.

Q. Other than the Edwards article and the sea water example, you also, I think, have cited to the reaction on stainless steel of chloride as a basis for this?

A. Yes, as an example of another situation where corrosion can continue.

Q. Because chlorides are fairly bad actors and need to be completely removed?

A. You know, if they're resulted in pitting of stainless steels, yes, you want to get them out to stop the pitting.

Q. And you've testified that you're not sure whether anyone is providing an adequate answer as to what level of humidity you need?

A. There's discussions in the literature that suggests that at room temperature you can have several monolayers of water present that would be adequate to represent bulk water reactions.

Q. But at least when I deposed you, you weren't sure what level of humidity was necessary?

A. No, I am not.

Q. And the mechanism, I think, that we're talking about here, according to Dr. Scully and yourself, is that copper sulfide will somehow catalyze the reaction?
A. Yes.
Q. Copper sulfide itself in the film is fairly non-soluble?
A. That's correct, it doesn't, in neutral water it does not dissolve.
Q. And in order for the reaction to occur, you need a source of sulfide?
A. For the sulfidation of copper to continue, you would need a source of sulfide.
Q. Mixed with air or moisture?
A. Air, moisture.
Q. And you haven't done any kind of testing actually on any copper plumbing or pipes or wires to determine whether, in a moderate humidity environment or non-aqueous environment the reaction will continue?
A. No, we haven't. In the Edwards paper, the test that he performed took several months. We've not had that time available and haven't been able to perform those tests.
Q. You haven't been asked to come up with a test for that?
A. Have not at this point.
Q. And other than the Edwards paper and Dr. Scully opinion, you're not aware of any tests that would confirm that copper sulfide continues to corrode?

A. In this situation, I am not aware that anyone has addressed that issue.

Q. And you don't have any idea or answer as to the likelihood or actual likelihood of that risk?

A. No, we don't. We know that it's, it can occur. We see in other environments that corrosion can continue. The Edwards paper, you know, demonstrates that this reaction, that a reaction can continue, corrosion rates can remain elevated even though the sulfide is removed. Granted, in an atmospheric environment, the rate of that corrosion we would expect to be less, but again, we don't know.

Q. And there's no data to support or deny with a reasonable degree of scientific certainty that it'll happen or not?

A. Other than the Edwards paper, no.

Q. Essentially this is based on a theory by Dr. Scully and the Edwards paper that it'll happen under these conditions?

A. It's based on the science that, you know, it's been shown to happen in bulk water, and other atmospheric experts have said that at room temperature enough bulk water can be absorbed on the surface, enough water absorbed on the surface of copper to have the same influence as bulk water.

Q. And again, that assumption in there is that you have the copper sulfide acting as some sort of catalyst to the mechanism?

A. Yes.

Q. You've done a lot of sampling on insulated live or neutral

09:02:23 wires, correct?
09:02:24 A. Yes.
09:02:24 Q. And I guess we saw the one sample of where there was some breaking away or pulling away of the insulation yesterday. But you haven't seen in your samples significant evidence that there's corrosion underneath that insulated portion?
09:02:43 A. Correct. Samples we had the corrosion seemed to diminish within the first millimeter or so on the black and neutral wire.
09:02:53 Q. Can we show F-5 of 14 from the 12/28 report.
09:03:03 And this is one of the samples you've done from a home in Virginia, correct?
09:03:04 A. Yes.
09:03:05 Q. And obviously, there's the tarnishing around the outside edge of the wire here?
09:03:10 A. Uh-huh.
09:03:10 Q. And then where the connection is made it's fairly clean copper?
09:03:17 A. Yes.
09:03:18 Q. And if we turn the page to the next page, you strip down a portion here of the insulation fairly close to where the edge was?
09:03:30 A. Yes.
09:03:30 Q. And you actually did EDS testing, both of the area where the tarnish was and then the area underneath the insulation, correct?
09:03:42 A. Yes.
09:03:42 Q. And this EDS testing shows that there's no sulphur peak there?
09:03:46 A. That's correct.

09:03:47 Q. And again, EDS testing, while it shows sulphur, it doesn't actually tell whether it's a sulfide or a sulfate, correct?

09:03:55 A. Correct, by itself it does not tell in what form any element is present.

09:03:59 Q. But at least there's supporting data from, you've done XRS?

09:04:05 A. XRD.

09:04:06 Q. XRD?

09:04:06 A. X-ray diffraction.

09:04:06 Q. And determined that?

09:04:07 A. Yes.

09:04:10 Q. And many of the other samples that you've done have shown the same thing, that underneath insulated wires where the coating is tight there's no sulphur?

09:04:20 A. Yes, on the high-voltage conductors.

09:04:24 Q. I think you said you relied on ASTM G46 to conduct your pit measurement depths?

09:04:34 A. Yes.

09:04:38 Q. And that section that you relied on essentially was how you did the, what is it, metallography?

09:04:45 A. Metallographic cross section, yes.

09:04:47 Q. And so you do that and then you get an image and you can try to measure with the microscope the depth of the pits?

09:04:52 A. Yes.

09:04:53 Q. You indicated that yesterday you had gone back and corrected the 41?

A. Yes.

Q. Micron pit?

A. Uh-huh.

Q. Did you correct any others when you went back and reviewed that?

A. No. The others seemed to be appropriate.

Q. If we could pull up Plaintiff's 108 -- nope, wrong one, I'm sorry. The G46 standard has a second section to it, Section 6, which discusses how you might go about doing an analysis to determine the potential for pitting on a copper surface, correct?

A. I believe so.

Q. That actually includes a statistical analysis or potential for a statistical analysis, correct?

A. Yes, uh-huh.

Q. And in this case, you had plotted some of the pits that you had come up with, but you didn't have enough to come up with a statistical analysis?

A. We did not do a statistical analysis, no.

Q. So when we've seen all of the pitting depths, there's no statistical basis to say that those depths are going to happen in other copper, other forms of copper?

A. Other than, you know, the fact that we found it on every sample that we looked at.

Q. But you don't have any statistical basis to say that it's more likely or there's going to be a certain rate of growth?

09:06:18 A. No, you can't ascribe a rate of growth to a measurement that's made of one point in time, you need to make measurements over time. I think the statistical analysis there also points to method to determine if you've measured the deepest pit. When you're doing metallography, it's understood that you may not have sectioned that pit at its deepest point or you may not have found the deepest pit because you're looking at a very small area relative.

09:06:50 Q. And it also comments that there are variations depending on, for example, the level of corrosivity?

09:07:00 A. I'm sorry?

09:07:01 Q. Based on the corrosive gases, the levels of corrosive gases that they're exposed to?

09:07:07 A. Yeah. There would be, you know, wires are potentially exposed to different environments, slightly different environments in each home.

09:07:15 Q. And so the different samples you've taken, you've taken samples, for example, of copper pipes from plumbing?

09:07:24 A. I did not have a lot of copper pipes from plumbing.

09:07:27 Q. And you've taken samples of wires?

09:07:29 A. Taken samples of, plenty of samples of wires.

09:07:31 Q. Both low-voltage and high-voltage?

09:07:33 A. Yes.

09:07:34 Q. And those are all in different locations of houses?

09:07:36 A. Yes.

09:07:37 Q. And in different houses in different climates?

09:07:39 A. In different houses, different climates, yes.
09:07:45 Q. In your report, you cited to an API standard in a discussion of fitness of service or failure analysis, correct?
09:07:55 A. We use that as an example.
09:07:57 Q. And in that example, you had sort of a hypothetical chart of how you might go about the example?
09:08:05 A. As I would apply to a vessel, yes.
09:08:07 Q. But you didn't actually do any fitness of service calculations with respect to any of the samples that you've assessed?
09:08:16 A. No, not from mechanical integrity.
09:08:19 Q. And in order to do that sort of sample, one of the things you need is, to know is the remaining thickness of the wire or whatever you're actually trying to assess, correct?
09:08:31 A. Yes.
09:08:32 Q. And my understanding of the API is that it essentially determines the thickness and then essentially you have an acceptable level of corrosion or diminishment over time that you're comparing it to, correct?
09:08:49 A. Yes.
09:08:49 Q. And you indicated the remaining thickness of the wire would only impact its functionality electronically if there was enough attack where it was being completely consumed and would break?
09:09:08 A. No. What we're concerned about is that if you get enough -- yeah, that is one concern, is that if it were to break. The other concern would be the generation of corrosion products that could

result in high resistance measurements.

Q. So as we sit here, you're telling me that wire would only impact its functionality -- are you saying that you don't agree that it would only impact its functionality if it was completely consumed?

A. That would certainly impact its functionality, but corrosion will also, you know, generates corrosion products that are not as conductive as the base metal. And if those were to get into a contact or a connection could cause a problem.

Q. Do you remember I deposed you on March 5th?

A. Yes.

Q. And you were under oath at that time?

A. Yes.

Q. And I asked you on page 143, line 8, "Would the remaining thickness of the wire impact its functionality electronically?" And you answered, "Only if there was -- if there was enough attack where it was being completely consumed and would break."

A. Okay. I don't have that in front of me.

Q. You were under oath, though, when you said that in your deposition?

A. Okay.

THE COURT: Wait. Do you want to see that? Show it to him, please.

MR. SANDERS: I can show him. May I approach?

THE COURT: Yes.

BY MR. SANDERS:

Q. Did I read that accurately?

THE COURT: What page and line?

MR. SANDERS: Page 143, line 8.

MR. BRYSON: Your Honor, objection, can I see what he is showing the witness?

THE COURT: Yes.

THE WITNESS: In this discussion, we're talking about remaining thicknesses.

MR. SANDERS: Right.

BY MR. SANDERS:

Q. And I asked you, today you said that there were other concerns or that -- I'd actually have to probably read it back. You said, I think you said that the thickness, that it wouldn't have to be completely consumed in order to effect its attack.

A. Well, yes. We say here, you asked the question, "Will the remaining thickness of the wire impact its functionality electronically? And only if there was -- if there was enough attack where it was being completely consumed and would break. So what is your concern about --" your question, "So what is your concern about electrical functionality then?" My answer, "Electrical functionality on wire is typically, one, is to conduct current into its termination point where there is a connection so that contact resistance -- "

Q. And I am actually going to get there next.

09:13:10 A. All right.
09:13:10 Q. And the contact resistance point, you did resistance measurements on some wire or in some implements of wiring, correct?
09:13:16 A. Yes, we did.
09:13:17 Q. And that was very low resistance levels?
09:13:20 A. Yes.
09:13:20 Q. Similar to the resistance testing that Sandia did?
09:13:24 A. Yes.
09:13:25 Q. So at least with respect to the samples that you tested and the samples Sandia has tested, resistivity is low?
09:13:34 A. Yes, at the point in time that we measured it.
09:13:37 Q. Which was in December, I believe?
09:13:39 A. Yes.
09:13:39 Q. And you haven't done any other resistivity testing?
09:13:42 A. No, we haven't.
09:13:43 Q. You haven't tested any of the other electronics, low voltage or high voltage, that you have seen?
09:13:50 A. We tested a couple of the low-voltage wires that were attached to a thermostat and got similar results.
09:13:56 Q. Have you visited the Hernandez house?
09:14:05 A. No, I have not.
09:14:06 Q. And you went through some line sets the other day and showed corrosion on those line sets?
09:14:12 A. Yes.
09:14:13 Q. Those weren't based on any sampling from the Hernandez house?

A. No. I believe we looked at two line sets, one was from a home in Florida and one a home in Virginia.
Q. Did you see the picture I showed, I think it was DX 232, of the line set from the Hernandez house?
A. Okay.
Q. And obviously, you haven't done any testing, but that's fairly shiny copper there?
A. It looks like a typical copper tube.
Q. And you mentioned formicary corrosion yesterday, but I want to be clear. You haven't seen any formicary corrosion in an HVAC coil, have you, based in Chinese drywall?
A. Not in the coil that we analyzed from the Virginia home.
Q. And you haven't seen any formicary corrosion on any other samples of wiring or --
A. I have not seen it on wire, no.
Q. You also discussed yesterday cleaning and you had an example, I believe it's Plaintiff 593, of cleaning off the wire?
A. Yes.
Q. And I guess prior when I, you hadn't cleaned or tried to clean anything when I deposed you on March 5th.
A. That's correct.
Q. So this was prepared, I guess, sometime in the last week?
A. Yes.
Q. Do you know whether KPT's plan, they intend to actually use Scotch-Brite pads or brillo pads?

09:15:43 A. I haven't seen a written procedure of how they intend to do it. This was something that was mentioned in conversation, so we gave it a try.
09:15:52 Q. You haven't actually seen KPT's repair plan or what they intend to do?
09:16:00 A. I may have seen it, but I never received a copy for my possession.
09:16:05 Q. And in this example, you've obviously cleaned it off and then you go down, I think, and are you focussing on one of the, what appear to be a dark area there?
09:16:17 A. It would be one of the lighter areas that we focused on, yes.
09:16:21 Q. And then you go down and to your left you see there that you have, I guess, a spot of copper sulfide?
09:16:27 A. Yes.
09:16:27 Q. And the scale on that, I think to the right, is 100 microns, and then you're looking at a bar on the left there of ten microns?
09:16:36 A. Yes.
09:16:36 Q. So that's about 70 or 80 microns wide?
09:16:40 A. Yeah, it's small.
09:16:41 Q. The standard you used that you were referring to about removing metals, removing corrosion from copper, I think it was Plaintiff's Exhibit 600. That's a standard that's used to clean copper surfaces in order to do testing on them, correct?
09:17:02 A. It's intended for use in the laboratory when you're evaluating a specimen and procedures you can use that will completely remove

the corrosion products without damaging the base metal.

Q. And again, in a lab context, I think you mentioned yesterday some, what you would call some pretty nasty chemicals. But those are being used in a lab context to assess a sample?

A. Correct.

Q. Do you have Plaintiff's 600? And if you look at the significance and use in 4.1, these procedures are designed to remove corrosion products without significant removal of base metal, as you said. And the purpose of that is to allow accurate determination of the mass loss of the metal or alloy that occurred during exposure to corrosive environment, correct?

A. Yes, in a laboratory in a test specimen, yes.

Q. So that's a method you can use if you wanted to know how much was lost to the tarnish mechanism or the corrosive mechanism, right?

A. Yeah, that would be the ideal use for it, yeah, the intended use.

Q. Did you actually measure how much was lost according to the standards of any of the samples?

A. No, because we didn't have any preexposure weights to base that on.

Q. Which is what you would need?

A. You would need that, yes.

Q. So you would use the tarnish film thicknesses that you saw?

A. Yes, uh-huh.

Q. If we could go to page C-1 of the December 28th report.

This is another sample of an outlet you assessed, and I think you've seen this before. There is paint and other things on the copper wiring and the ground wiring?

A. Yes.

Q. And paint obviously isn't a conductive component?

A. Correct.

Q. And you're not an expert in building codes, are you?

A. No, I am not.

Q. You don't know whether it would be allowable for paint to be on wires?

A. No, I don't. I mean, I wouldn't want it there.

Q. But in a lot of the samples you saw, obviously there was paint on ground wires and on other wires?

A. Yes.

MR. SANDERS: I'm done, your Honor. Thank you, Mr. Krantz.

THE WITNESS: Okay.

THE COURT: Any redirect?

MR. BRYSON: Yes, your Honor.

REDIRECT EXAMINATION

BY MR. BRYSON:

Q. Good morning, your Honor. Good morning, Mr. Krantz.

A. Good morning.

Q. Mr. Krantz, what is preferable in your line of work, looking at

the actual corroded item or looking at a coupon?

A. It's always preferred to have the actual corroded item.

Q. Why?

A. It tells you far more information than what a coupon would, the actual item has been exposed to the entire environment for the period of time that's being concerned, where coupon exposures typically are a snapshot of what's occurring.

Q. And what is the field of failure analysis again?

A. It's the study of materials that have failed, and primarily what we get are failures that have occurred as a result of corrosion.

Q. And when you look at an item that has failed, do you look at the -- and with regard to pits, what type of pit do you look at when you're analyzing those?

A. We will look at the deepest pit, we'll look at the -- we may look at the severity of the pitting as far as pitting density, but primary concern is going to be the deepest pit.

Q. Now, Mr. Sanders showed you a couple of other standards. If we could pull up Hernandez 62 on page 14. And if we could highlight this particular standard that he showed to you. And did the CPSC, to your knowledge, did they utilize this particular standard in their analysis?

A. This is the --

Q. The ISA standard.

A. -- ISA. They referred to the Battelle.

09:21:44 Q. And this is not the Battelle, is it?
09:21:46 A. This is not the Battelle standard.
09:21:47 Q. And to utilize this standard that Mr. Sanders brought up to you, what does it say with regard to doing the test, what the relative humidity should be?
09:21:57 A. These are, it says in that paragraph there, 50 percent, less than 50 percent.
09:22:01 Q. And do you know if the relative humidity of the Hernandez house in the summer, would it be in your opinion below or above 50 percent?
09:22:10 A. I would expect it to be above 50 percent.
09:22:16 Q. So would you find this standard to be applicable with regard to the Hernandez house?
09:22:20 A. As far as the criteria there, it's applicable in the fact that the next sentence says that for 10 percent increases in relative humidity, let's see, how's it -- for a given severity, level can be expected to be increased by one level for each 10 percent increase in relative humidity.
09:22:47 Q. But if we don't know what their humidity levels are, would this standard be applicable?
09:22:52 A. No. Based on that.
09:22:54 Q. And he also showed you to the Abbott paper, can we pull up LT 195. And go to page 12, which is what Mr. Sanders showed to you. LT 195, page 12, he showed this particular page to you. What is the difference -- is there a difference between environmental

09:23:21 monitoring and failure analysis?
09:23:23 A. Well, you would do, you may do environmental monitoring as part of failure analysis. In and of itself it's not necessarily considered failure analysis.
09:23:36 Q. Okay. And I believe, and we'll go to page 26 of this same document. And it talks about the rate of corrosion after one year. Are you aware of any coupon studies from the Hernandez house or any house with regard to Chinese drywall exposure that showed corrosion rates after one year of exposure with coupons?
09:24:04 A. No, to my knowledge, there were no exposures that were done for that length of time.
09:24:08 Q. That's not been done?
09:24:09 A. Correct.
09:24:09 Q. And so what we do have is we have the actual items to look at, correct?
09:24:14 A. Yes. Yes, we do.
09:24:15 Q. In fact, if you'll turn to page 13 of this same document that Mr. Sanders showed you, can you read this sentence to the court, where it starts off by?
09:24:28 A. "By the time relevant corrosion can be detected visually, the equipment may already be in an advanced state of degradation."
09:24:37 Q. And has that been your experience, Mr. Krantz?
09:24:40 A. Yes.
09:24:41 Q. AND so if we look at the standard that the government used, and which standard was that again?

09:24:47 A. It was the Battelle standard.
09:24:49 Q. And if we could go to Hernandez 59, page 12. And how is Class III or Class IV described?
09:25:07 A. Class IV is corrosion product on copper is primarily a sulfide film with some oxide.
09:25:10 Q. And of all of the dozens and dozens of wire samples that you've examined, both on this house and other houses, what was the corrosion product primarily?
09:25:18 A. Primarily sulfide with some oxide.
09:25:30 Q. Now, Mr. Sanders asked you some questions about, you know, if you remove the corrosive environment does the corrosion continue. Again, can you remind the court very briefly what has been your experience prior to even being involved with Chinese drywall on removing the corrosive environment and whether or not the corrosion will continue?
09:25:50 A. It's been our experience that if you remove a corrosive environment, that in many instances corrosion may continue. Again, the example of the shipboard heat exchangers, where you've got materials that are copper alloys that are used that are resistant to sea water, but once those materials have been exposed to sulfide the protective film that forms on those alloys is poisoned, and such that even though oxides may continually -- may continue to form, the sulfide poisons that so it's not fully protective. So when another corrosive agent is present, in that case sea water, corrosion will continue at an accelerated rate.

In the case with stainless steels, when you've got pitting corrosion, you may have an environment that doesn't have an overly high level of chloride, but maybe something has changed in the process temporarily and allowed pitting to initiate. That pitting will continue unless you're able to remove all of those chlorides from that pit.

In the case of tube and sheath heat exchangers where you've got deposits built up and you form crevices and you can get concentration of corrodents to occur, sulfates, chlorides, which all can be corrosive to copper, where just the typical water flowing through by itself won't corrode the copper, but as these corrodents concentrate, they can cause pitting and other types of corrosion.

So when it's discovered, common practice is to, if failure of the tubes hasn't occurred, is to go in and clean those tubes, but you have to get them as clean as possible, back to new-like condition, otherwise the corrosion will continue under those deposits.

Q. On this Jacobson Edwards paper, I believe Mr. Sanders pointed out that the corrosion continued, but it was in an aqueous environment, correct?

A. Yes.

Q. And I believe you testified to the court what is your opinion with regard to whether or not there would be sufficient water for the corrosion to continue in the Hernandez house?

A. There would be sufficient -- and what we see on these wires is you've got pitting, which is, occurs which requires water to be present, so we know that these wires are in situations where water is present on these wires in sufficient amount to sustain a pitting reaction.

So you remove the sulfide gas, which is a good thing to do, but you still have these corrosion products there and you've got pits. And if there's enough moisture, then you're going to catalyze a corrosion reaction that, according to the Edwards paper, is going to continue.

THE COURT: Is it your position that with the pits, the corrosive element infiltrates the pits and remains there?

THE WITNESS: What Edwards says is that they took the, sulfide doesn't dissolve, redissolve in the water, as long as it remains a neutral pH. What can occur is that water gets in it, it continues to catalyze the reaction so that the copper is dissolved into the water. And as you dissolve more copper, you're creating hydrogen ions, and those hydrogen ions can then depress the pH within that pit, and at lower pHs, somewhere probably in the range of three to four, you can dissolve the sulfide and release the sulfide and create a sulfidation reaction again, which would then further accelerate the corrosion.

BY MR. BRYSON:

Q. But, Mr. Krantz, is it your opinion that the corrosion product gets into the pits and can that be cleaned out?

09:29:54 A. The corrosion products, as you've seen in many of the cross sections, are in the pits, and the attempt at cleaning them that we performed did not, was not successful at completely removing the deposits, even though on the surface to the unaided eye it appeared that there was clean wire.

09:30:13 Q. And I believe we referred to -- did you refer to the ASTM standard from the laboratory on how it indicated -- what did it indicate you had to do to clean all of the corrosion product out of the pit?

09:30:26 A. In ASTM G46, it says that you need to go and look under a microscope to ensure that you've cleaned those pits out.

09:30:32 Q. And how do you clean the pit out pursuant to the ASTM, what's the only full-proof method?

09:30:38 A. Well, you can either -- they talk about chemical removal, they also mention mechanical removal. You could either go back and do more mechanical removal until you, you basically sand it down through all of those pits. The chemical removal, like we talked before, uses some very harsh chemicals that would be, you would only want to use in the laboratory environment.

09:31:04 Q. And indeed, you tried to use the Scotch-Brite pad, which we'll represent to you, Mr. Perricone, Knauf's expert, is indicating as a method for cleaning.

09:31:14 A. Okay.

09:31:14 Q. And you used the Scotch-Brite pad, and were you able to clean out all of the corrosion?

09:31:20 A. No, we were not.

09:31:21 Q. We'll put up 59-10. And just focus in on that paragraph. Can you read that paragraph or that sentence to the court?

09:31:34 A. "A review of the INTERIM report by SNL (Tab A) and conversations with SNL staff suggests that copper wiring is the most susceptible electrical component to the effects of the corrosive gases."

09:31:46 Q. And in your opinion, had the wires from the multiple samples you've reviewed been damaged by the corrosive gases?

09:31:55 A. Yes, when you compare those to wires from a home that has not been exposed to Chinese drywall, there is significant damage.

09:32:02 Q. And have you ever seen any type of damage like that in all of your years in corrosion with regard to copper wiring?

09:32:08 A. No, I have not.

09:32:17 MR. BRYSON: One second, your Honor. No further questions.

09:32:22 THE COURT: All right. You're excused. Thank you, sir.

09:32:24 Let's call your next witness, please.

09:32:27 MR. HERMAN: Good morning, your Honor, very briefly before we call our next witness. There's some exhibits that Knauf had had objections to, we've conferred with them and we would now like to offer, file and introduce some exhibits to which there are no objections.

09:32:40 THE COURT: All right.

09:32:41 MR. HERMAN: And that would be Hernandez Exhibits 13, 14,

32, 33, 34, 35, 36, 38, 39, 40, 41, 42, 46, 50 and 428. And I would just like to, we'd offer, file and introduce those.

THE COURT: Okay. Any objection to that, to those?

MR. HAYDEN: No objection.

THE COURT: All right. Let them be admitted then.

MR. HERMAN: And then I would just like to point out on the record briefly that with respect to Hernandez Exhibits 48 and 448, Knauf has relevance objections but advises that they have no hearsay or other foundational or authenticity objections.

THE COURT: All right.

MR. HERMAN: And we would like to call Tatum Hernandez to the stand.

THE COURT: With 48 and 448 when you get to putting them in, I'll hear the objections.

MR. HERMAN: Yes, your Honor. Tatum Hernandez.

THE DEPUTY CLERK: Please raise your right hand.

(WHEREUPON, TATUM B. HERNANDEZ, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK: Please be seated, and would you state your name for the record.

THE WITNESS: Tatum Brian Hernandez.

DIRECT EXAMINATION

BY MR. HERMAN:

Q. Can you tell the court a little bit about yourself?

A. Yes. I was born in Houma, 1980, and I grew up in Chauvin, and

09:34:15 since that time I've been raised in south Louisiana.
09:34:18 Q. Where do you live now?
09:34:19 A. We live in Mandeville.
09:34:21 Q. What's the address?
09:34:22 A. 68034 Marion Street.
09:34:26 Q. Where are you employed?
09:34:27 A. I work for the U.S. Department of State with the New Orleans passport center.
09:34:31 Q. Can you tell Judge Fallon a little bit about what you do on day-to-day basis?
09:34:36 A. Yes. I supervise eight passport specialists, and we determine citizenship and prevent passport fraud and identity theft.
09:34:44 Q. Tell us a little bit about your family.
09:34:45 A. I've been married for almost ten years. I have two children, Grant who is four, and Amelia who is two.
09:34:52 Q. How did you come to live at the house on Marion Road?
09:34:56 A. Well, when I was going to college, one semester I commuted from Mandeville to Delgado, I lived with my aunt at that time in Mandeville, which she actually lives next door. And so I liked the city of Mandeville and just the area and the rural environment and the atmosphere.

09:35:18 And a friend of theirs, their sons played baseball together and he actually owned the empty lot on the side of the house, and his son, he was going to build a house for his son but his son backed out. So when he backed out, he told my aunt about

09:35:31 the property and she knew that Charlene was graduating from nursing school and that we wanted to start a family and eventually settle on the north shore, so it was a good opportunity.

Q. Why did you want to live there in particular?

A. Well, first of all, you know, I just found that the city was very family oriented. They have great parks, great public schools, it was safe. It reminded me a lot of some of the areas where I grew up where I could go play in the woods and just have a lot of property, and also, my aunt has four kids and when I was a teenager I used to spend the summers with her when they lived in Metairie and now her children could help us with ours.

Q. How did you go about designing the house?

A. My uncle who lives next door is an architect, and along with the contractor, we picked out some plans that we liked and we curtailed them and changed them a little bit, and so together Marino actually drew the plans, but we worked on them together.

Q. When you drew those designs, did you have any future planning in mind?

A. Yes.

Q. Can you tell the court a little bit about that?

A. Our house has a very high-peaked roof, so we built and paid extra structurally to make it into a second story and also to either add on to the side or to the back and just have a lot of room to grow with our family if we wanted to.

Q. What, if any, experience do you have with home construction?

A. I don't have any.

Q. When did you move into this house?

A. We moved in around the first week of August in 2006.

Q. And how did the AC system work?

A. Well, it worked fine until the summer of 2007, and it started to fail.

Q. Can you tell the court a little bit about the problems that you've had with your AC system in the house?

A. Yes. Well, we've had several failed evaporator coils, I believe five or six total. But the first time the freon was leaking we called the builder, he called the AC technician to come out, the one who installed it. And he said it was low on freon and that apparently there was a leak. So he refilled it and days later it went out completely.

So they thought that where he was detecting the leak that there was maybe a hole in the copper in the wall. So grant was probably about a year and a half old at that time. So they went to his room and had to rip out the wall and found what they thought was the leak. And, you know, take out all of the insulation, patch it back up. And it turned out that it was the evaporator coil that failed.

Q. How many coils have you had in the house in the three and a half years that you've been there?

A. I believe we're on our sixth coil at this time.

Q. In terms of window units, have you tried to use any window

units?

A. Yes.

Q. Please tell the court a little bit about that.

A. It just depends on what time of the year, the AC would go out. So if it was in the fall or the early spring, we could manage for a few days until the AC was repaired. But most recently when it went out it was June or July, it was unbearable, so we, I believe we spent a couple of nights at my aunt's house with the two kids and then we borrowed an AC unit from a relative in Houma and then two friends in Mandeville.

So we would strategically, I would take the time to put them in the best places, I would put -- then I bought another unit from Wal-Mart, put it in our bedroom, took Grant's toddler bed, we kind of camped out in our room, had a small window unit for Amelia's room, and we had that for about two, three months, so we were either hot or freezing cold, and it was very damp inside the house.

Q. So how many window units have you had total in the house that you can remember?

A. I believe four.

Q. And of those four, how many are still functioning properly?

A. Well, one broke just a few weeks later, another one that we borrowed wasn't working as efficiently by the time we got our AC fixed, and all of them have black coils that I've seen.

Q. You heard Mr. Rutila testify yesterday?

A. Yes, sir.
Q. And he talked about a window unit that he had taken a look at. Do you know which window unit that is?
A. Yes, that was the largest one that we probably ran the most, it was in the center portion of the house near the dining room.
Q. And how was that working when we sent it off to Mr. Rutila, to the best of your perception?
A. It just wasn't cooling as efficiently.
Q. Have you had any trouble with your thermostat in your AC unit?
A. Yes. In January Charlene called me, and we had the whole unit replaced and about a year ago, so she called me, and here it is the coldest part of the year and the heater is going out. Even on emergency heat the thermostat is going on and off, on and off, the system is going crazy.
So I came home, called our AC repairman who by that time knew us very well, and came over about 7 P.M. that night to try to, he said the thermostat failed and he replaced it.
Q. What, if any, problems have you had with the outside compressor unit?
A. Right around the same time the compressor also failed.
Q. And that was earlier this year?
A. Yeah, in January.
Q. Tell us about your experiences, if any, with problems, at least based on your perception with other electrical appliances in the home in the three and a half years that you've been there.

09:41:11 A. Well, less than a year after we moved into the home, our refrigerator went out, so we had to, you know, get in contact with Sears, try to get it replaced under warranty, they didn't have the same model, we had a dorm refrigerator. Charlene was pregnant and Grant was probably two years old at the time.

09:41:33 Q. So you have a new refrigerator now since you moved in?

09:41:36 A. Yes.

09:41:36 Q. And how does that work?

09:41:37 A. It's been functioning fine. But I saw some copper pieces on the back are black, and I was told they should be, they should be copper.

09:41:48 Q. Do you have any other experience -- I'll let you get some water. Have you had any other problems, at least based on your perception, with electrical appliances in the home since you moved in in August of 2006?

09:42:09 A. Yes. I know we had a toaster that went out.

09:42:15 Q. When was that, to the best of your --

09:42:16 A. It was somewhere around, probably less than a year after we moved into the home, around the same time as the refrigerator.

09:42:24 Q. Anything else that you can remember?

09:42:25 A. My mom had moved and given us a TV that, a small TV to put in the kids' playroom for them to watch videos and stuff. And that just, it worked for a few months and then it just randomly went out.

09:42:38 Q. Okay. Anything else?

A.  Not off the top of my head.  I'm sure there are some other things that I can't remember.

Q.  Can you tell the court a little bit about all of the different inspections that you've had at your house?

A.  We've had a ton of inspections.  And not just inspections but experts, scientists, electricians, plumbers, so many.  I was shocked, I was like, well, surely this will be the last one and then five more would come the next day.  And I tried to balance it out with trying not to take off of work too much unless I absolutely had to.  So my wife was home and did a great job of handling those inspectors.

Q.  Did the government have an opportunity to inspect your house?

A.  Yes.  The Consumer Products Safety Commission came at least three occasions along with defendants' inspectors, our attorneys' inspectors, court inspectors.  And it wasn't just, typically wasn't just an in-and-out type of thing.  It was an all-day affair from morning till late evening, and at one point I just told my wife that at this point let's just leave the back door unlocked and they can come and go as they want because it was almost like our home wasn't ours anymore.

Q.  Can you tell the court a little bit about how you came to discover that you had Chinese drywall in your house in the first place?

A.  We, March of last year we had just gotten back from a great vacation with the kids, and a few days later Charlene called me

09:44:25 from work and she said that she seen a news report about this couple in Pearl River who had Chinese drywall. And they said that there were other homes affected by this Chinese drywall, this defective drywall, built around the same time, and our home was built in that window. And she said that I need to go look in the attic, and I thought, well, surely it's not going to happen to us, just that poor couple, I feel really bad for them.

A couple of days later I put the kids to bed, Charlene was still at work, and I went into the attic and I saw, moved some of the insulation and saw the K-N-A-U-F. I called her and she said, well, there should be some other letters, and sure enough, T-I-A-J-I-N, and the light went off in my head and I just almost wanted to fall through the attic.

Q. What, if anything, have you done in connection with this litigation to try to ascertain what it might cost to rent a comparable home if you move out while the remediation is going on or for any other reason?

A. Charlene's friend is a real estate agent so we contacted her, and she was kind enough to help us get some listings of comparable homes in the Mandeville area. So we've talked to her about that.

Q. And what did you do with that information?

A. Well, we passed it on to J.C. Tuthill. Unfortunately, we weren't able to move because of the price of these homes and it just wasn't in our budget.

Q. Can you afford to pay your mortgage and pay a mortgage on a

second house?
A. No. And that's the biggest predicament and that's what's really difficult is so often, you know, people, I don't think they mean it intentionally but that they know in the situation we're in, they say, well, you're not still in the house, are you? And it's just crushing because I take pride in protecting my family and it's just, it's tough, the finances, the financial part of it is tough.
Q. You mentioned somebody named J.C. Tuthill, she is an accountant?
A. Yes.
Q. And you provided her with some information in connection with the litigation?
A. Yes, we provided Ms. Tuthill with a ton of financial documents, including receipts for repairs. We put a lot of work into this and going back and researching all of these things. Luckily, we kept pretty good records.
And in addition, we had someone give us an estimate on moving from the house into a rental house, out of the rental house, back into our home. Rental insurance, deposits, loss of work, loss of hours in pay.
Q. You said something to me yesterday about, something about your career. Could you tell the court about that?
A. Well, I work in passport services under the state department, and right now the whole passport services is growing by leaps and bounds. And here in New Orleans it's a fairly small agency, so the

opportunity for growth and career advancement is limited and very

competitive.  And I was able to move up a little bit, but there's

job postings that come out all the time across the United States,

Hawaii, New York, everywhere you can imagine, and I can't even

consider applying to further my career and to make more money to

provide for my family because this house is just a financial

burden.  I just can't even consider it even if I wanted to.

Q.  What information, if any, in connection with litigation did you

provide to the personal property appraiser, I think his name is

Mr. Maloney?

A.  We went through the house and we looked at all of the items

that couldn't be easily cleaned, such as couches and mattresses and

so forth, and we estimated when we, I gave an idea of when we got

the items and how much we thought they were valued at.

Q.  I know you've read a bunch of pleadings and legal things and

stuff like that.  But could you just tell the court in your own

words what you're hoping to get out of this trial?

A.  We're just hoping that we could have our home repaired and

repaired beyond a doubt that it's going to be a safe place, that we

can drive up at home like we used to before March of last year and

take a deep breath and say, oh, we're home and this is our safe

place.

        And right now our home, you know, it looks beautiful from

the outside but it's lost a lot of value to us emotionally, and

it's kind of put on hold the plans we had.  Right before we found

out we had the drywall we finally saved up enough money to do the landscaping and pave the driveway and just really improve the value of it and make it look good, and we're just not even willing to put in one more dollar into this house.

MR. HERMAN: Thank you. No further questions, your Honor.

THE COURT: Thank you. Cross.

CROSS-EXAMINATION

BY MR. HAYDEN:

Q. Good morning, Mr. Hernandez.

A. Good morning.

Q. I just have a few questions for you, just some clarification. It's my understanding that you originally purchased the property on which your home was built; is that right?

A. That's correct.

Q. And you bought it for about $30,000?

A. Yes.

Q. And then the way I understand it is, you then resold it to Mr. Marino, who then entered into a real estate contract to purchase or to construct the home for you on that site?

A. Yes.

Q. And the original contract was in March of 2005; is that right?

A. I believe so.

Q. And at the end of March of 2005, I believe the contract was a contract for $195,000; is that right?

09:50:33 A. The original contract, yes.
09:50:34 Q. And that was for both the land and for building the house on the land, correct?
09:50:41 A. Yes.
09:50:43 Q. And there were some delays in getting the home built, right?
09:50:48 A. Yes.
09:50:49 Q. And then Katrina hit and there were further delays; is that right?
09:50:56 A. Yes.
09:50:56 Q. And you subsequently entered into another contract with Mr. Marino in, I believe, the end of November of that same year?
09:51:04 A. Yes.
09:51:05 Q. And in that second contract, Mr. Marino indicated that there were some additional costs and he asked that you split the difference and increased the purchase price for the construction of the house to $205,000; is that right?
09:51:24 A. Right.
09:51:25 Q. And if you were to back out the land, the value of the land, the value to construct that house back then was about $175,000?
09:51:38 A. Yes.
09:51:39 Q. And you were supposed to move in in March of the following year?
09:51:45 A. Of what year?
09:51:48 Q. 2006.
09:51:50 A. Yes.

Q. But you didn't end up moving in until August of that year, right?
A. That's correct.
Q. And that was because of some delays with Mr. Marino's construction?
A. Yes.
Q. Did Mr. Mallet indicate how long it would take to repair your home?
A. He didn't indicate to me specifically. But from the reports I've read, I believe it says anywhere from four to six months.
Q. So it's your understanding that it's going to take about four to six months to repair your home?
A. Yes.
Q. Before Mr. Mallet came out to your home to investigate it and to give a cost estimate, you hadn't obtained any estimates to repair the house from anyone else, had you?
A. No, we did not.
Q. So the only -- and Mr. Mallet was retained by your attorneys, wasn't he?
A. Yes.
Q. So prior to that you hadn't gone out and tried to find estimates to repair your house?
A. No, we --
Q. Before the attorneys got involved?
A. We didn't have any, we don't have any money to do it, so I

09:53:11 never sought estimates.

09:53:13 Q. And I think you testified that your wife Charlene first heard about Chinese drywall from watching Fox news in March of last year?

09:53:24 A. Yes.

09:53:24 Q. And then I think a few days later you went up in the attic and you saw that there were some markings that were indicative of Chinese drywall; is that right?

09:53:33 A. Yes, yes.

09:53:37 Q. You have a stand-alone garage; is that right?

09:53:48 A. It's a detached garage, there's a covered walkway in-between the garage and the house.

09:53:52 Q. Now, that garage, does that have the same trim, baseboard and casings as you do in the house?

09:54:02 A. I am really not sure. I don't think it has the, like crown molding in the garage.

09:54:13 Q. It doesn't have, it doesn't have crown moldings or baseboards, does it?

09:54:17 A. It may have baseboards.

09:54:19 Q. Does it have the same trim that you would find inside the house?

09:54:25 A. In regards to trim, what specifically are you talking about?

09:54:33 Q. Chair rail or any type of moldings, both at the ceiling or at the base of the wall.

09:54:42 A. I believe they have moldings, floor moldings, and there's a ledge on the window.

Q. Does it have the same amount of electricity that you would have in the house?
A. I am not an electrician or a contractor.
Q. I appreciate that.
Now, you mentioned that there were certain products in your home that you testified to that had failed since you've moved in.
A. Yes.
Q. I think you talked about a toaster and maybe a TV?
A. Yes.
Q. And as you sit here today, you can't, you cannot relate the failure of the TV or the toaster to the Chinese drywall, can you?
A. Not scientifically.
Q. Is that the same for the microwave and the refrigerator?
A. No.
Q. You can't determine, you -- you're not a scientist, you can't determine if the failure of those was caused by the Chinese drywall or was caused by some product failure?
A. No, I can't.
Q. Would the same hold true for the thermostat and the smoke detector?
A. I can't, but I saw visually corrosion on all of those items.
Q. But as you sit here today, can you -- you're not qualified to say that those products failed because of the Chinese drywall.
A. I can't.

MR. HAYDEN: That's all I have.

THE COURT: Thank you. Any redirect?

MR. HERMAN: No redirect, your Honor.

THE COURT: Okay. You're excused. Thank you, sir. Who is the next one?

MR. SEEGER: YOUR HONOR, at this point we call Donald Galler.

THE COURT: Why don't we take a break at this time, 15 minutes, and we'll get back. The court will stand in recess.

THE DEPUTY CLERK: Everyone rise.

THE MARSHALL: All rise.

(WHEREUPON, A RECESS WAS TAKEN.)

(OPEN COURT.)

THE COURT: Be seated, please. Let's call your next witness.

MR. ECUYER: Your Honor, a little bit of housekeeping again. Mike Ecuyer on behalf of the Hernandezes. Your Honor, we've reached agreement with opposing counsel on several exhibits and we would like to get them into the record at this time. I apologize for the length of this list but they are voluminous. Hernandez Exhibits 7, 9, 10, 11, 17, 18, 19, 20, 21, 23, 26, 27, 28, 30, 31, 37, 43, 51, 379, 388, 398, 408, 409, 411, 412, 413, and a string from 415 through 426, 429 through 435, and 437 through 447, and finally Exhibits 481 and 482. And those last two items, your Honor, are the expert report of J.C. Tuthill and her affidavit

10:17:50 in lieu of her live testimony, your Honor.

10:17:52 Additionally, we have the following exhibits, which we would offer subject to defendant's objections as to relevancy, and those would be: 399 through 407. And they have no objection as to the foundation or hearsay, just simply the relevance, and those are wage documents of the Hernandezes.

10:18:20 THE COURT: I will reserve ruling on 399 through 407 and allow all of the other ones in at this time. The defense has a few at this time.

10:18:31 MR. HAYDEN: Your Honor, before I forgot even though I should probably wait until our case in chief, but there's an agreement to put in Defendant's Exhibit 192, 193, and 195.

10:18:44 THE COURT: Okay. Do you want me to admit them now?

10:18:46 MR. HAYDEN: And Exhibits 209 and 221, which are the Roddewig declaration and affidavit, similar to the Tuthill that was just put in.

10:18:56 THE COURT: And you're be moving that they be admitted at this time and I'll admit them.

10:19:00 MR. HAYDEN: Yes, your Honor. Thank you.

10:19:02 THE COURT: Okay. Thank you.

10:19:04 MR. SEEGER: Judge, at this time we'll call Mr. Donald Galler.

10:19:06 THE DEPUTY CLERK: Mr. Galler, please step into the witness box. Would you raise your right hand.

10:19:06 (WHEREUPON, DONALD GALLER, WAS CALLED AS A WITNESS AND

TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK: Please be seated and state your name for the record.

THE WITNESS: My name is Donald Galler.

THE COURT: How do you spell that, sir?

THE WITNESS: G-A-L-L-E-R.

THE DEPUTY CLERK: You can back away from the mike just a little bit.

THE WITNESS: Okay.

MR. SEEGER: May I proceed, your Honor?

THE COURT: Yes, you may proceed.

VOIR DIRE EXAMINATION

BY MR. SEEGER:

Q. Mr. Galler, please tell the judge a little bit about your educational background and your work experience.

A. I have a bachelor's degree in electrical engineering from Northeastern in 1976, I have a master's degree in electrical engineering from the University of Connecticut in 1979. At that time I started to work for a small consulting company in the Boston area. Around 1988 that company was purchased by a company called Failure Analysis Associates. And both of these companies I was involved in the investigating the failure of electrical and electronic equipment.

I worked for Failure Analysis Associates, which changed its name at some point to a company called Exponent, and it's a

national investigating firm. I left there in about 1995 and went to work part-time at the Massachusetts Institute of Technology in Cambridge, Massachusetts. And since '80 I've been involved, since 1980 I've been involved to some extent in pretty much specializing in the failure of electrical and electronic equipment.

Q. This may sound pretty obvious, but when an electrician or electrical engineer talks about the failure of the electronic equipment, what specifically are you talking about?

A. Well, what I do is I look at equipment that's failed, either as a fire investigation matter or an electric shock matter, I take electronic stuff apart, try to figure out what the cause of the failure was. I frequently do a lot of optical and scanning electron microscopy on parts. I also test equipment to simulate failure modes to see if something I've observed by doing the optical or scanning electron microscopy can be repeated or replicated in a laboratory. So that's a thumbnail sketch of what I do.

Q. Do you have experience with these electrical components and devices and corrosion as a cause of failure?

A. Actually we don't see too much corrosion in the electronic business, basically because the whole industry is geared towards avoiding corrosion. I do see contaminants on electronic equipment frequently, so, for example, I will occasionally see oil deposits or other foreign material on electrical contacts or on circuit boards. And those things are usually things we look for but don't

find quite as dramatically as we did in the Chinese drywall investigation.

Q. And how much of your time let's say over the last 20 years have you spent looking at circuit boards, contact, switches, things like that?

A. Eighty percent of it probably.

Q. Now, Mr. Galler, I want to put something up. All right. Can you tell the court what is this book that I just put up?

A. This is a handbook that I contributed to. There are four chapters that I would say authored say 80 percent of the material in each of those four chapters. And they cover things like wiring, circuit boards, switches and relays and electronic components.

Q. Now, we see at the top that the book is published by McCraw Hill. Who would read this book?

A. It doesn't make very good bedtime reading. Electrical engineers who --

Q. I have to tell you, some of this stuff puts most of us to sleep.

A. Sorry about that. The electrical engineers who are looking at equipment that's failed and they want to familiarize themself with some of the basic techniques, the analysis techniques, some of which I mentioned, the optical microscopies, scan electron microscopy, X-ray analysis. There's a whole host of techniques.

Q. And on the list of contributors, is that you?

A. That is. And if you tell me which chapter that is I can tell

10:24:16 you why I am down so far on the list generally.

10:24:20 Q. Actually it looks alphabetical in all fairness to you, you shouldn't feel too bad.

10:24:26 Let's talk a little built and very quickly about the chapters that you contributed to in this book. Does that look like one of them?

10:24:36 A. Yes.

10:24:36 Q. Is that your name at the top?

10:24:38 A. Yes.

10:24:38 Q. And why don't you tell us a little bit, quickly, like 30 seconds, on what this chapter is about.

10:24:44 A. The wire and cable that frequently or wiring is frequently involved in electrical accidents, automobile accidents, a fire in a house. And so one has to know a little bit about the structure of the wire, what the wire is made out of, what the insulation material is made out of, what some of the failure modes are, and that's basically what this chapter covers.

10:25:09 Q. And that was Chapter 15, now we're looking at Chapter 16 which is also one you've contributed to. Is that your name right there?

10:25:17 A. Yes.

10:25:18 Q. Just another 30 seconds about what this is about, switches and relays?

10:25:23 A. Switching devices which handle electric power are frequently the topic of investigation in failure of equipment, if they're fundamental component. So this chapter covers the construction of

10:25:40 the switches and some of the analysis modes to try to figure out why they failed.

10:25:44 Q. And Chapter 18, there you are at the top. And that's entitled Failure Analysis of Components, another 30 seconds on this, please.

10:25:58 A. Electronic components, little things we see on circuit boards, we're not all students of circuit boards, electronic components, capacitors, transistors, resistors those kind of things all have failure modes. Some of the investigating tools like X-ray, looking at an optical microscope, looking at a scanning electron microscope, those are common analysis tools. The chapters cover some of the failure modes and some of the analysis methods.

10:26:23 Q. I just realized from my list and I forgot to bring it up. You also are a contributor to Chapter 14 in this book which is entitled Failure Analysis of Printed Wiring Assemblies; is that correct?

10:26:34 A. That's right.

10:26:35 Q. Thirty seconds on that.

10:26:37 A. That's sort of a more formal industry title for something we normally call circuit boards, so printed wire assembly is a different name for a circuit board, and a circuit board are found in our computers, cell phones, pretty much electronic thing we own. And there's a variety of failure modes and analysis methods, so that's what the chapter covers.

10:27:00 Q. And could you just spend a little time telling us from your work experience the types of project you've worked on where you have to bring to your bear your expertise and failure analysis of

components and things like that?

A. I've worked on many, I try to make a mental list probably, 20 of these failure modes investigations, some of those are from manufacturers who are simply having a production problem, others are investigations of circuit boards that may have failed and caused an accident or a possess of equipment to malfunction. An example of one is a circuit board from a charger for a portable radio device, and the circuit board was causing an overheating problem and the manufacturer was trying to get to the bottom of why the circuit board was overheating. And on that circuit board I found a contamination left over from the manufacturing process which then allowed basically a short or intermittent short to develop between the two points on the circuit board.

Q. Mr. Galler, are you -- would it be fair to say that you are brought in to find out the cause of why thins are failing?

A. That's right.

Q. That's what you do?

A. That's what I do.

Q. And talk to us a little bit that in the course of doing what you do, what type of tests you employ to get to the bottom of the cause of certain failures?

A. Primarily looking at these, the samples that were given to me with optical microscopy and scanning electron microscopy.

Q. Explain what those are?

A. Electron microscopy is something that looks like people

10:28:44 sometimes think of these as a monocular device, a little thing you put one eye in, but the failure analysis people and the metallurgist tend to use a stereo microscope, so this is a microscope that has a binocular pair of eye pieces that you look in.

10:29:00 And the benefit of that is that you can essentially see in sort of three dimensions like you do when you're looking around the room. And the magnifications of that are really limited to about 500 or 1,000X. Typically we don't go above about 500 times magnification in an optical microscope of that type.

10:29:21 That is pretty good at showing you what the shape of a part is or what its color is structurally; but beyond those magnification levels, we frequently use a scanning electron microscope. And a scanning electron microscope is a different kind of a device entirely, a scanning electron microscope you actually don't see color, it's a gray scale image typically and the magnification can be much higher. I don't think in any of the investigations I've done, I did in this I didn't go to about two to 000 time the magnification, that's kind of on the low scale of SEM work, scanning electron microscopy work.

10:30:13 But the real feature that I've used a lot in this case, I know a lot of the experts have been doing this, the SEM has typically a subsystem associated with it where you can look at an image, draw a box around part of the image, and as part of the machine's operation it will tell you what elements are present in

10:30:32 that image area. So not only can you tell a little bit about the structure of what you're looking at but you can tell a little, tell something about its composition as well.

10:30:40 Q. And, Mr. Galler, tell us a little bit about how you got involved in the Chinese drywall type corrosion?

10:30:45 A. I was contacted by Mr. Rutila at Simpson, Gumpertz and Heger, and this was originally around December 12th or so, and he asked me to get involved in this investigation. And it was not clear that I would have time in my schedule to get involved. He said I have some very interesting samples, why don't you come over and take a look at them. So I went to his office, which is near where I work in Cambridge, got some samples from him, and then began taking the samples apart and doing microscopy on them, standard procedure.

10:31:29 Q. And I don't want you to go into your opinion, I just want to at this point before we qualify you let the judge know how got involved, how you got involved?

10:31:37 A. That's how I got involved.

10:31:39 MR. SEEGER: Your Honor, at this point we would tender Mr. Galler as an expert electrical engineering, power electronics, electrical machinery and failure analysis.

10:31:46 THE COURT: Any questions?

10:31:50 MR. SANDERS: No, your Honor.

10:31:50 THE COURT: The court will accept him in the tendered fields.

10:31:53 MR. SEEGER: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. SEEGER:

Q.  Mr. Galler, you have been in the courtroom for a little bit today, right?

A.  Yes.

Q.  I want to start off your direct with a question that was asked of a prior witness.  Mr. Hernandez was asked if he could tie the corrosion on his appliances and electrical equipment to the Chinese drywall.  Were you here when that question was asked?

A.  Yes.

Q.  Do you have an opinion on that?

A.  Yes.

Q.  Could you please tell the court what your answer for that question would be?

A.  The corrosion is a direct consequence of the vapors from the Chinese drywall.

Q.  What are those vapors?

A.  Well, there's a couple that I am aware of.  I didn't analyze the vapors but the vapors have sulphur in them, and I know that from the scanning electron microscopy that I've done that I found sulphur corrosive compounds on both the copper wiring and the silver contacts.

Q.  And talk to us a little bit about, your give us an overview of what the relationship between sulphur and the components in these electrical equipment, you know, what the relationship is between

those things.

A. Well, in electronic equipment copper and sulphur are very prevalent -- copper and silver are very prevalent, and those materials were really chosen so that because they resist corrosion generally, but one of their weaknesses is sulphur. And so in my examination I observed sulphur compounds on both the copper and the silver in the course of looking at the compounds.

Q. And let me ask you, are you familiar with an article that was written by Dr. Bella Chudnovsky?

A. Well, tell me which article, but yes.

Q. It's actually if we could just put it up on the screen, Scott, it's LT 202. Didn't occur to me that she might more than one, I apologize. The article we're looking at is Corrosion of Electrical Conductors in Pulp and Paper Industrial Applications. Do you see that?

A. Yes.

Q. Is this an article that you've reviewed?

A. Yes.

Q. Is it something you rely upon in giving opinions here to the court?

A. Yes.

Q. Let me ask you just consistent with something that you were just talking about, if you could, Scott, if you could show the full page, please, and if you could blow up the top part of this paragraph (INDICATING). Right here where it starts silver, Scott,

and, Mr. Galler, if you could read along with me, it says: "Silver and copper are probably the most widely used contact materials available." Do you agree with that statement?
A. Yes.
Q. Could you explain why that is?
A. Two reasons: The silver, copper and gold have the highest electrical conductivity of the pure elements, that's the principle reason. And it turns out that silver being a noble metal, like silver and gold it resists combinations -- excuse me, it resists forming chemical compounds with other materials generally. So that's why silver is used for silver contacts and copper is used because it's very available on the earth as a metal and it has very high electrical conductivity.
Q. And Scott, if you could show that entire page again, just one other area. From the middle down. And the sentence right here, Mr. Galler, where it says: "Silver shows good resistance to oxidation and tarnishing except in the presence of sulphur." Is that consistent with what you were just testifying about?
A. Yes.
Q. And could you tell us a little bit more about that?
A. Well, in ordinary industrial environments and home environments, there is not a widespread occurrence, it's a very rare occurrence that we have sulphur vapors, and so for most applications I would say 99.5 percent of the world's contact applications silver works very well and avoids corrosion. But

10:36:10 silver has an Achilles tendon, or Achilles heel is the expression, it's sulphur, except in the presence of sulphur, that's what the problem is.

10:36:21 Q. And that next sentence says: "Sulphur containing atmosphere will produce silver sulfide that increases contact resistance." Do you see that?

10:36:27 A. Yes.

10:36:28 Q. What's the problem with -- what is silver sulfide and then what is the issue with regard to silver contacts?

10:36:36 A. Silver sulfide is a chemical compound formed of silver and sulphur, and because it's essentially a chemical compound it's no longer pure silver, and as I said earlier, silver is chosen because of its high electrical conductive. The silver sulfide is not electrically conductive to the extent that silver is, and there's been a big discussion about what that extent change is, but just to sort of make it clear, the silver sulfide isn't half as bad as silver, it's 100,000 times worse than silver. So it's from an electrical engineering standpoint, silver sulfide is not a conductor, it's not a useful conductor. In other words, you can't stretch it out and connect it between two points and make an electrical connection with it in any fashion.

10:37:21 Q. Are you saying it interferes with the connection?

10:37:23 A. It interferes with it, that's right.

10:37:24 Q. And Scott, if you could go to page 3, please, of this article. And if you could blow up the bottom half of the top photograph.

This last sentence that stars, however, if you could highlight that whole thing from there down.

Mr. Galler, it says -- I am going to let you read that because there are words in there I'll never be able to say. So what does that say?

A. Well, I think leaving out the formulas and the various unit discussions in parenthesis, basically what this says is that electrical resistivity of silver sulfide is about 1,000 times higher than that of silver, so that means it's 100,000 times worse than silver as an electrical conductor.

Q. Is there an example of that you can give us, when you say it's 100,000 times worse?

A. Well, let's just say if you put a thin film of silver sulfide between the layers of a switch, you might expect the switch to not work at all.

Q. Now, silver -- you can take that down, Scott. Spent a lot of time talking about silver and copper. How prevalent is silver in electrical components?

A. It's very prevalent, silver is the material of choice for electrical contacts and switches, so it's found in light switches on the wall, it's found in circuit breakers in our electric service panels. But those are the two sort of big applications what most people don't realize because they don't take things apart for a living like I do is that there are silver contacts in various switching devices in practically every appliances in somebody's

home.

So, for example, if you have a dryer, the dryer typically has two thermostats in it, one makes the dryer operate at about the right temperature and one is the protective device to make sure it doesn't go above a certain temperature if the first thermostat fails. And those two are thermostatic devices where contacts open and close, and those contacts are silver.

The contacts on a light switch hanging down from the ceiling, if it's got a switch on it, those are silver contacts. Contacts on a switch on a coffee maker, toaster, blender, pretty much everything that has a switch in it that's sort of a visible button-type switch is going to have silver contacts.

Q. When we say switch, we kind of I think we visualize a wall switch where you flick it. There are different types of switches?

A. That's right. I mean, visually what I am saying is the pendant type switch that hangs down from a kitchen ceiling like where there's a little knob and you roll the little knob between your fingers, the operating mechanism will have silver contacts.

In a toaster when the toast goes up and down and shuts the power off to the toaster automatically that will have silver contacts. So there's silver contacts built into pretty much every appliances that we have, refrigerators as well.

Q. Thank you, Mr. Galler. We have some photos that we are going to spend a little time going through relatively quickly. Be helpful to you in explaining to the court some of your opinions?

A. Absolutely.

Q. Scott, if we could start with Hernandez 264. And there are three pages of this that we're going to go through, 264-001, 002 and 003. Can you identify, just at this point identify for his honor what we're looking at here.

A. This is a wall switch, the kind you have on your wall to turn the lights on and off with. So the top photo basically I have taken the wall switch apart and the bottom photo is looking into the working assembly, the guts if you will, and there is a couple of shiny strips of metal. On the ends of the strips of metal if we go to the next photo we'll see that there's --

MR. SEEGER: Pause right there. Let's go back. And, your Honor, we move Hernandez 264-001 into evidence?

THE COURT: Admitted.

BY MR. SEEGER:

Q. And would you like to go to the next photo?

A. Yes.

MR. SEEGER: And, your Honor, just for the record, we would move this into evidence as well, it's just another angle.

THE COURT: All right. Admitted.

BY MR. SEEGER:

Q. Tell us what you did here.

A. Looking again into the internal mechanism, this is two views of the electrical contact assembly. And so the way this switch works is there's a stationary contact and a movable contact --

Q. Do you have a pointer up there? It might help move along, I think we put one up there for you.

A. Oh, great. They're a little hard to see in the photos, so there's a metal arm, there's a contact assembly here and another one at the bottom of the arm. And when the switch is on, the arm is up and these two contacts sort of touch -- they don't sort of touch, they touch.

One is connected to this big screw on the outside and the other arm is connected to another big screw which would be further down in the picture. So the external electrical connections are made to the two part, one is the stationery contact and one is the arm that is the movable contact.

This is another view of the lower photograph, it's just another view, so there's a brass arm and it moves up and down. And there's another smaller brass arm, both of these arms have silver contacts. Just to be clear what we're not seeing here is actually the mating surface between the two contacts. It's the lower surface under my pointer on the top one and the top surface of a sort of a disc that's at the extreme right hand end of this movable arm (INDICATING).

Q. On the mechanics of this, the movable arm that you're talking about, that's connected to the actual switch that you throw up and down?

A. That's right. The plastic part that's the switch that sticks out, or the lever that sticks out, it moves against this arm. And

basically what happens is when it moves this way, it sticks a little further into the body of the switch. It pushes the arm down and that separates the contact.

MR. SEEGER: And Scott, if we can go to the next one, 003. And, your Honor, it's just another, a magnification of the same thing, we would move it into evidence.

THE COURT: Okay. Admitted.

BY MR. SEEGER:

Q. Mr. Galler, would you please tell the judge what you're looking at here.

A. This is one of the contacts and what we're seeing normally here would be something that would look like a quarter, in other words, it will be shiny, silvery looking metal and it's attached to a brass arm, so the part that's going up toward the upper left-hand corner is brass and the circular area that's partially covered with this gray stuff, white spots on it is a silver contact.

Q. And by the way, this switch we're looking at, where is this from?

A. This is from the Hernandez house.

Q. And what is the -- what is this black stuff here (INDICATING)?

A. The black stuff is a combination of corrosive agents, mostly it's silver sulfide.

Q. And, Scott, if we could go to Hernandez 494. And could you just identify for us what this is?

A. That's a scanning electron microscope image of the edge of the

10:45:10 contact button.

10:45:11 Q. Of what we were just looking at?

10:45:13 A. What we just looked at. So the button part at a much higher
10:45:17 magnification --

10:45:19 MR. SEEGER: I have to stop you there. Your Honor, we
10:45:20 would like to move into evidence Hernandez 494.

10:45:23 THE COURT: Admitted.

10:45:25 BY MR. SEEGER:

10:45:25 Q. Go ahead, Mr. Galler.

10:45:26 A. So this curve edge is the edge of the button part and this
10:45:29 curved edge down here is the edge of the brass that it's sitting
10:45:32 on. So we're looking at an edge area.

10:45:35 Q. Besides what we're looking at, tell us what's on there, why you
10:45:38 did this and hat it means?

10:45:40 A. I put this in a scanning electron microscope to look a little
10:45:46 closer at the structure, the black material and also determine its
10:45:50 composition.

10:45:50 Q. What is the composition?

10:45:52 A. And the composition of the black material, well the black
10:45:56 material has a significant part of it is sulphur, so this is a
10:46:01 sulphur corrosive product.

10:46:04 Q. Is that sulphur corrosion product, is that a problem for that
10:46:07 contact?

10:46:08 A. Yes, it is.

10:46:08 Q. And why is that? And I know you spoke about it a little bit

before, but just briefly why is that?

A. Well, the normal appearance of this would be shiny white metal with essentially nothing else on it, pure silver because that's what the contact material is designed as. And the sulphur forms a corrosion product and the corrosion products are all non-conductive, silver sulfide, any other chemical compounds that are on the surface of the contract, those are non-conductive. So they interfere with the connection between the two contacts.

Q. And, Scott, if you could go to Hernandez 495. And, Mr. Galler, if you could identify for the court, don't blow it up yet, please, just identify for the court what this is.

A. This is an analysis that was done from the previous image, so the previous image there were two boxes and this is the results of what is called energy dispersive spectroscopy, it's a technique for analyzing the amount of the elements in a scanning electron microscope, and in particular in this case it's the images I had marked on the previous slide.

MR. SEEGER: Your Honor, at this point we would move in Hernandez 495.

THE WITNESS: Admitted.

BY MR. SEEGER:

Q. Go ahead and explain what this says to the judge.

A. Well, there's two areas, there was a shiny spot on the contact, so I was trying to verify that the contacts basically were silver and that's sort of the bigger box, I should point to these, that's

this area here (INDICATING). And basically this graph shows the elemental, the elements that are in this sample. And the box below it shows composition of the material. And it shows that this is 99 percent silver.

So here in the area where there was a little bit of silver space in the middle of the contact, that's essentially pure silver, just trying to establish what the base composition of the material is. And the graph below it, if we could see the graph below it, that's this little area here where the black deposits were, that has about two percent by weight sulphur in it (INDICATING). So that black fuzzy stuff is a sulphur -- is the result of a sulphur compound.

MR. SEEGER: And, Scott, if you can go to Hernandez 496. Your Honor, we would move this into evidence, it's a magnification of what we were looking at.

THE COURT: Admitted.

BY MR. SEEGER:

Q. Mr. Galler, tell us what this is.

A. That image is just another scanning electron microscope image of the black deposit on the edge of the contact, but this time I was trying to see what the structure of that material was, and I see this sort of granular material that's visible at 1,000 times magnification.

Q. And what's the significance of that?

A. Well, what we would expect to see is smooth silver and the

10:49:25 purpose of taking the picture was to show that there's a material there that's sort of a granular chemical compound as opposed to a smooth pure metal.

10:49:33 Q. Now, Mr. Galler, we are going to move on to a circuit breaker that you looked at. Okay?

10:49:39 A. Okay.

10:49:40 Q. Scott, if you could pull up Hernandez 265. And can you just identify at this point what this shows, this photo?

10:49:53 A. This is a contact from a circuit breaker that was removed from the Hernandez house.

10:49:57 Q. Now, if you could just take a second and just orient us to what a circuit breaker it, its function in the house?

10:50:04 A. The electric power comes into the house and there's usually a panel in the basement -- I say basement, I shouldn't say that. There's a panel somewhere where you have a series of things that looks like -- look like switches. But they're called circuit breakers --

10:50:21 THE COURT: Move this a little further from you.

10:50:25 THE WITNESS: I am doing a little bit of popping here, sorry.

10:50:28 So the purpose of the circuit breaker is really it's got two purposes, it does act as a way of disconnecting things so that if you have to have your house serviced you can disconnect the power to a particular area. And the other thing that it does, and it's sort of a safety related function, is if there's a short in an

10:50:49 appliances or wiring in your house, the circuit breaker detects the very high levels of current that occur and then interrupts the circuit, that is shuts the power off automatically.

So if you're using your hedge trimmers and you cut the extension cord to your hedge trimmers by mistake, you'll get a short and the circuit breaker will trip. If the circuit breaker wasn't there what probably would have is the extension cords would overheat and you would have a fire. So they're sort of there -- they're there to protect the wiring and appliances in your house.

Q. Now, if you can just tell us what we're looking at here in this photo, you identified it but tell us what the significance of it is.

A. This is a contact assembly taken out of a circuit breaker from the Hernandez house. And I was examining this and doing some microscopy to determine whether there was any evidence of silver corrosion on knowing that the contacts were essentially going to be silver.

Q. What did you find?

A. I found that the contacts were a silver tungsten alloy, and I found deposits of silver sulfide on the surface of the contacts.

MR. SEEGER: And, Scott, if you could go to Hernandez 265-002.

Your Honor, this is just an enhancement of what we were looking at, move it into evidence.

THE COURT: Admitted.

BY MR. SEEGER:

Q.  Go ahead, Mr. Galler, tell us what we see here.

A.  This is actually the circuit breaker before I removed the contacts out.  So this lever is what you would see sticking out of the panel, the electrical panel in your house.  And the contacts are --

Q.  That's the switch?

A.  That's the switch, right.  As I said earlier, you can operate the switch to disconnect the power to a particular circuit in your house for servicing, but also the reason the thing looks so complicated inside is that there's a mechanism which detects the current and sort of makes the contacts open automatically.

        The contacts are actually in the lower left-hand corner down here, and I think the next picture shows them a little bit better.  So there's sort of two brackets holding the contacts and the contacts are touching.  So there's a brass looking bracket on the right with a silver button, circular silver button, and another silver circular button on a bracket fixed on the left side.  The contacts are now in a closed position, so that would be the power on.

Q.  Mr. Galler, did you take another close-up of those contacts right there to determine if they were silver sulfide on them?

A.  I performed some scanning electron microscopy to determine whether they were silver sulfide.

Q.  Scott, can you put up Hernandez 498.  Does this picture reflect

the scanning SEM that you did?

A. Yes.

MR. SEEGER: Your Honor, we would move this into evidence.

THE COURT: Admitted.

BY MR. SEEGER:

Q. Go ahead, Mr. Galler, tell us what you found.

A. So you actually can't see much in this example. What I was looking for was the basic composition of the silver contacts and the bracket that it was mounted on. So you do see a granular appearance but at this magnification you really can't tell what it is. So there's a subsequent analysis, we should go to the next.

Q. That's what I'm about to do. Scott, if you could pull up Hernandez 499-001. And what is this, Mr. Galler?

A. That's an SEM analysis or EDS analysis of the contact.

MR. SEEGER: Your Honor, we move Hernandez 499.

THE COURT: Let it be admitted.

MR. SEEGER: Scott, can we go to split screen and show both of those.

BY MR. SEEGER:

Q. Mr. Galler, tell us what your analysis of this contact showed.

A. First in the top part of the analysis which corresponds to the larger box, I see that the contact is made out of silver and tungsten, so this is a silver tungsten alloy. And there's a small amount, a small amount of sulphur detected at this point.

The next part of the analysis is the box down here, and here we see -- actually I think this is two, so it's the smaller area here where we now start to see slightly higher levels of sulphur in particular areas. And there may be a third one.

Q. I am going to go to that. And, Scott, if we could pull up Hernandez 500. Is this the third one -- it doesn't say 500. Is that it? Yes, that's it.

Mr. Galler, just identify what this is before I move it, so I can move it into evidence.

A. This is a scanning electron microscope photo at higher magnification of the contact and the corresponding EDS analysis.

Q. It's the same contact we've been looking at, right?

A. Yes.

MR. SEEGER: Your Honor, we move in Hernandez 500.

THE COURT: Admitted.

BY MR. SEEGER:

Q. Mr. Galler, please tell us what this shows.

A. At higher magnification we see chunks of material. This sort of -- at the magnification 1,000 times on a contact surface like this, the sort of flat uniform gray surface material was what we would expect to see. Anything that looks like a chunk or sort of distinct deposit sitting above the surface is something that's not part of the native contact material.

So I was interested in seeing what it was, did the standard thing making a little box appear on that chunk of

10:56:48 material, and the chunk of material turns out to be a silver
10:56:53 sulfide compound. So there's sulphur in that structure.
10:57:00 Q. In looking at contacts and switches and things like this, have
10:57:07 your findings been consistent with the photographs we're looking at
10:57:10 here, silver sulfide on the contacts?
10:57:12 A. I found, consistently found silver sulfide on pretty much all
10:57:19 of the samples that I looked at with respect to this case.
10:57:21 Q. And what about the copper samples you looked at?
10:57:24 A. Comer samples all had copper sulfide on them to some extent,
10:57:29 varying degrees but all with copper sulfide.
10:57:31 Q. And copper sulfide to copper, is that the same what silver
10:57:35 sulfide is to silver?
10:57:36 A. Pretty much the same relationship that sulphur compounds are
10:57:41 non-conductive materials, basically non-conductive materials which
10:57:45 interfere with the electrical process the metal is intended for.
10:57:52 Q. Briefly I want to go through a handful of other photos. Scott,
10:58:01 could you please pull up Hernandez 323.
10:58:01 MR. SEEGER: Your Honor, this is already in evidence.
10:58:02 THE COURT: All right.
10:58:03 BY MR. SEEGER:
10:58:05 Q. Mr. Galler, this is I'll represent we have a prior photo, is a
10:58:09 circuit board from a window air conditioning unit. Is that
10:58:13 something that you looked at?
10:58:15 A. Yes -- excuse me. I don't think I've seen this sample myself
10:58:21 physically.

Q. I meant the photo, I'm sorry, you're right, not the sample itself, you didn't actually have the physical circuit board in your hand?

A. Correct.

Q. The photo. Have you looked at this photo?

A. I have.

Q. And, Scott, if you could also pull up a blowup of this which is Hernandez 324, and your Honor this is already in evidence.

What is that item right there that says power underneath it, what is that?

A. That's a button on the circuit board so basically it's a switch.

Q. Is that button supposed to look like that?

A. It's exterior appearance that's about what it's supposed to look like. When we take it apart is when we find things that are unusual.

Q. Right. What about the surface, what color should that be?

A. The switch is in this box, what's unusual is the copper traces at the edges seem to be discolored.

Q. And Scott, if you could go to Hernandez 300. Also can you -- actually, can you pull up the whole page, it's CDW 24-0126. There you go.

MR. SEEGER: For the record, your Honor, I just want to identify these. The top one the toaster is Hernandez 300, the middle photo is Hernandez 301, and the bottom photo is Hernandez

302.

BY MR. SEEGER:

Q. Mr. Galler, can you identify, other than the toaster at the top which I think speaks for itself, the middle photo and the bottom photo?

A. The middle photo is a circuit board in the toaster which controls the -- it basically shuts the power off to the toaster when the toast is done.

Q. And the bottom photo?

A. And the middle photo is a circuit board that has a couple of switch contacts on it, and the lower switch contact in the red circle, in the red circle is shown at a higher magnification in the bottom photograph.

Q. And in the middle photo where the red circle is, that contact, can you describe what you see there?

THE COURT: Are those in evidence already?

MR. SEEGER: Your Honor, they're not, I apologize. I would like to move in at this point Hernandez 300, 301 and 302.

THE COURT: And you represent that's from the Hernandez house?

MR. SEEGER: Yes, your Honor.

THE COURT: Let it be admitted.

THE WITNESS: The middle photograph, now the top, has two sets of contacts. Each pair has a movable arm, which is mounted on the circuit board on a strip of metal and then a stationery

contact. So the two contacts open and close by this upper arm moving down to meet the stationary contact.

And what's noticeable sort of remarkable about this is that there's a distinct burn mark on the circuit board. So this upper contact appears, you can see the background of material of the circuit board has this sort of like tan color, here it's been discolored by overheating in the contact system below.

Q. Now, I want to ask you a question about that specifically. Is there a concern in your opinion with regard to either a failure analysis or any safety issues when you see that?

A. Yes. The toaster is probably going to fail fairly soon because these contacts are clearly not operating properly, and another sort of observation about they're not operating properly is that when they open and close normally they would not overheat the circuit board. So they're causing a breakdown of the insulating material on the circuit board, plus they're just not, they're probably not mating properly when the circuit is closed.

Q. And before when we discussed circuit breakers in the home, do you have concerns with regard to safety and the corrosion that you observed there?

A. Yes.

Q. Why is that?

A. Yes. The circuit breakers are designed to provide that second function which I described where they interrupt the current when there's a short circuit in the house. And the design of those is

11:03:02 intended, their design is made so that they don't have any kind of contamination in them. They have to withstand a significant amount of electrical activity or like an arc essentially during a short period of time when the contact is open when there's a short circuit.

And so the concern is that if there's any contamination that they may not be able to operate properly when the contact's open in a short circuit condition and that's sort of their safety related function.

Q. It's to shutdown the current?

A. Correct.

Q. Mr. Galler, I believe this has been used a couple of times, I just wanted to get your opinion on an article that I would like to show, it's LT 0195, Scott, can you pull that up. Is this an article that you've looked at?

A. Yes.

Q. And relied upon in giving your opinions here in this court?

A. Yes.

Q. And the title of this article for the record is Atmospheric Corrosion of Control Equipment. Scott, if we could go to page 5, which for the record is P2.0195-0013.

MR. SEEGER: I thought I identified it, but if I didn't it's LT 0195 is the document, your Honor.

BY MR. SEEGER:

Q. And could we blow up the highlighted area. Do you see the

language there, Mr. Galler, it says: "By the time relevant corrosion can be detected visually, the equipment may already be in an advanced state of degradation." Do you see that with that?

A. Yes.

Q. And why is that?

A. My experience in failure analysis and my familiarity with the requirements for producing new electronic equipment. Generally visible corrosion on anything that's in the electronics industry that's being checked for quality control or being packaged for delivery to a customer, any kind of a visibly, a visible corrosion product or discoloration is considered grounds for rejecting the equipment. And at that point if you can see it, it's considered pretty severe.

Q. Rejecting meaning that equipment wouldn't even make it out the door?

A. Correct.

Q. Mr. Galler, with regard to doing the remediation of an environment where Chinese drywall, would you recommend leaving any appliances or electrical components behind that had visual corrosion?

A. No.

Q. And do you have an opinion with regard to failure rates on appliances that have visible corrosion on them?

A. I could say that they would fail a lot more than uncorroded products; but to tell you exactly what the failure rates would be,

I can't.

Q. Would you expect it to live out its useful life?

A. Not at all. I think sort of in general terms it looks to me like the corrosion rates we're seeing are probably ten times faster than they would ordinarily be. So I would expect the reduction in the life of the equipment. It could be 20 times, it could be five times, but it's pretty significant reduction in the life of the equipment.

Q. And, Scott, if you can go to page 23 of this article, which is 0027 okay. Can you blow up this graph.

Mr. Galler, this is a graph you identified for me that you wanted to explain. Would you please tell the court what this shows.

A. This graph shows the relationship between the electrical resistance of a switch and the amount of a corrosive deposit or the deposit on the surface of the switch contacts. And the axis, the horizontal axis is sort of odd units, angstroms -- so an angstrom has actually got to do with light wave length, but they use it here because it's convenient, it's a convenient sort of reference. 1,000 angstrom where it says ten to three is what people generally consider as a coating thickness that you would be able to see. In other words, if you had a glass slide and you put a coating of metal on it and it was 100 angstroms thick, you could hold that slide up to the light and see light through it even though there's a coating of metal on it. When it gets to be about 500 and

typically around 1,000, if you deposited metal on a clear slide and then held it up to the light, you would notice a significant darkening of the glass or maybe it would be opaque at that point.

So that relatively thin layer is the threshold at which the deposits on a contact surface begin to affect the electrical performance of the contact.

Q. What have you observed in looking at devices that have been in Chinese drywall environment?

A. Well, the silver and sulphur deposits that I observe in various shapes were in most cases at least I think the smallest I ever observed was ten microns and I'll translate that that ten microns, one micron is 10,000 angstroms. So ten microns is 100,000 angstroms.

Q. Where is that on this chart?

A. It's not on the chart.

Q. So it's off the chart?

A. It's off the chart. Ten to the fourth would be 10,000 angstroms which is only really one micron.

Q. We would have to have the chart go out up around here (INDICATING)?

A. That's right. So at levels that are portrayed on this chart, one micron coating isn't even quite on the chart, and basically the chart is showing that the increase in electrical resistance is 1,000 times greater than it would normally be with just the one micron coating and we're coating particles of copper and sulphur

that are at least, I think the smallest I saw was ten microns on the circuit breaker contacts. And in most cases the deposits are piles of 20 micron nodules or things even much larger than that.

Q. Let me ask you this. All of the things we've talked about circuit boards, switches, contacts, can these be cleaned?

A. Well, some of them you could try to clean and you may even get to a point where visually they look like they're clean, but it's not clear that the corrosion that's taken place doesn't detrimentally already affect things.

So, for example, the circuit boards that are corroded and damaged, you can't clean those, they're already damaged. Wires and contacts with sulphur on them, those either don't work -- the cleaning processes either don't work well or just impractical. So it would be impractical to clean every light switch, the contacts on every light switch in the house.

Q. Mr. Galler, all of the opinions you've expressed to this court, do you hold those to a reasonable degree of certainty as an expert in your field?

A. I do.

MR. SEEGER: Your Honor, that's all I have for now.

THE COURT: All right. Any cross?

CROSS-EXAMINATION

BY MR. SANDERS:

Q. Good morning, Mr. Galler.

A. Good morning, Mr. Sanders.

11:10:40 Q. I want to clarify something just so I know what we're talking about. When we had talked a couple of weeks ago you had indicated that the only device that you thought might have failed because of sulphur gas was a cathode ray TV that you had observed; is that true?

11:11:05 A. I don't think that's how it was represented. I don't think that's what I said.

11:11:15 Q. So you stated today that you're aware of other devices that you've actually examined and found a root cause as a result of sulfide gas failure?

11:11:29 A. Well, I think you asked me whether I was aware of things having failed as a result of the sulphur contamination in your first question, and your second question was about root cause analysis; so let's -- if you want to ask me what I did root cause analysis on myself, then that's one question.

11:11:49 Q. Root cause analysis of sulfide is different than general sulphur gases, correct?

11:11:56 A. Well, the materials that, the materials and equipment that failed I believe were caused by the sulphur corrosion and we have lots of evidence that there is sulphur corrosion. That's different than did I do a root cause analysis on a particular item.

11:12:21 Q. What items did you do that analysis on?

11:12:24 A. I'm sorry, could you please --

11:12:26 Q. What items did you do that root cause analysis on?

11:12:30 A. I only did the root cause analysis on the television set, so I

think that's what you were discussing.
Q. Yes. So with respect to -- and I believe it was a cathode ray TV?
A. That's correct.
Q. And you looked at that TV set, and just for everybody's benefit, that's an older TV that has a tube in it, correct?
A. Correct.
Q. And it's different than, not everybody has them obviously, the flat screen panels and panels like we have here?
A. Correct.
Q. And in that one TV set you focused a diode, right?
A. That's right.
Q. And the diode has a magnetic function that it goes through?
A. An electric function, not a magnetic function.
Q. Sorry. That's the piece of the TV you thought might have failed because of copper sulfide, correct?
A. That's right.
Q. Do these TVs have diodes in them?
A. These TVs, what are you pointing?
Q. Like an LCD or flat panel?
A. They all have diodes in them to some extent, a diode is very common electronic component. The thing that's peculiar about the cathode ray tube set was that it has a high voltage system, the diode that I was looking at was in the high voltage system. So these things that we're looking at here on flat displays on

computers and flat TV screens don't have a high voltage system.
Q. So is that a high voltage diode that you were looking at in that case?
A. Correct.
Q. And that's the only item or device that you actually did a cause analysis of?
A. Actually there was another, there was another product which I did not remember during my deposition which I have since been reminded of, which was a hair dryer which I believe was also from the Hernandez house.
Q. And do you know whether that hair dryer had actually failed?
A. Yes, it had.
Q. So it didn't work when you turned it on?
A. Correct, didn't work.
Q. And what did you determine about that hair dryer?
A. There was a switch which was basically in its on state but not conducting. I disassembled the switch and found the copper sulfide deposits on the switch contact.
Q. Did you do any EDS to measure the thickness of those deposits?
A. I don't think the deposits were in a condition where one could reliably measure thickness as in the context of thickness of coatings on wires; in other words, it was -- there were piles of material mixed with other debris.
Q. What were the other debris?
A. There was some kind of a grease I believe also in the switch.

11:15:12 Q. Because the switch is a point where somebody's finger or thumb turns it up and down and turns it on and off?
11:15:19 A. Correct.
11:15:20 Q. Other than the hair dryer and the cathode ray TV, there aren't any other devices which you did a cause analysis of?
11:15:29 A. The root cause analysis meaning what exactly?
11:15:36 Q. Meaning a determination that this specific device failed and how it failed as a result of sulphur gases.
11:15:44 A. To pinpoint the sulphur deposits on this particular component, that will be correct, just those two.
11:15:47 Q. And in your discussion of silver thicknesses, you didn't do any kind of film measurement or cross-sections or anything to measure the actual silver sulfide thickness?
11:16:04 A. I did not.
11:16:05 Q. Could we take a look at circuit breaker picture, which I believe is 500, Plaintiff's 500. If you could blow up the picture a little bit. That's I guess based on the scale there, we're talking about a less than ten micron piece of silver sulfide?
11:16:40 A. Correct.
11:16:41 Q. And that's -- that piece being there or others like it is part of the bases of your opinion that the circuit breaker may fail in the future?
11:16:53 A. That's correct.
11:16:54 Q. And you don't know when or have any way of knowing when that might happen, do you?

A. No, I don't. Sooner than normal.

Q. And the ten micron particle we see there is different than some of the other analyses you did of other switches, like light switches in the Hernandez house, in that there's a lot more in the light switches?

A. I am not sure what your question is.

Q. That ten micron particle is a lot smaller and different than the analyses you did of the switches, the light switches?

A. Generally that's correct.

Q. The pictures we saw of the light switches where you identified the sulfide, that's on the edges of the light switches you were focussing on?

A. Well, it's on the contact surface. It seems that the silver sulfide likes to grow on edges, the crystal form seems to grow on edges more prevalent. But -- in a more prevalent way. But it was also on the surfaces as well.

Q. And I think when we looked at that chart the percentage on the surface, the contact where it actually made it was significantly less than on the edges, correct?

A. Well, there was a -- part of the analysis I was doing was to confirm that the base metal was silver, so I had intentionally aimed the beam at a clean spot on the contacts just to confirm that we were looking at a contact which in its sort of purest state would be basically pure silver as opposed to some alloy or something like that. I was just trying to get the base composition

at that point.

Q. And that's what you fund on that contact point?

A. Yes.

Q. You didn't do or you haven't have any done resistance measurements on these contacts or switches?

A. No, I have not.

Q. So you haven't determined what resistance in ohms or anything might result from the sulfide deposits that are on the switches?

A. No, I have not. And I am not sure that resistance measurements alone tell the story anyway.

Q. Quite obviously that's a fairly common way of measuring resistance in a switch or another electrical component, correct?

A. It is.

Q. That's what Sandia did when they were looking at the receptacle --

A. I am not saying they did it right either. I am saying they did it, but the real story, the real story is not just told by the resistance alone. So the resistance measured by itself is not, is not it my opinion a complete picture of the problem.

Q. But this is at least one of the steps that the government agency which has been charged with investigating this has done?

A. Correct. That's a step they used.

Q. You discussed the smaller switches that are in many of the microprocessors or circuit boards that you find in appliances?

A. Correct.

Q. And the mechanism by which, I'm sure you'll correct me, that something might happen there is if there was enough of a silver buildup inside that switch to, there's a couple of ways I think: One, bridge between the contact that pushes down and the actual stable silver contact beneath it, right?
A. That's one mechanism.
Q. And then the way those switches work is that they go down and there's posts that come up and that's how they make the connection, right?
A. Correct.
Q. So another mechanism might be a bridging between the posts and the contact itself on the base, correct?
A. Correct.
Q. And you haven't seen that result in any actual failures?
A. Let me answer the question this way. The several of the circuit boards that I examined that had switches that had silver sulfide contamination were handed to me from known locations where a homeowner had said this circuit isn't working anymore; for example, the circuit board of a thermostat, the homeowner said it doesn't work anymore. So I know there was a failure on the board.
Q. But I am talking about the actual switch mechanism itself. And in your investigation switches that you've opened up and you've looked for that bridging of silver, you haven't seen any connection between silver sulfide and those components?
A. I don't think I observed that directly, no.

11:21:44 Q. Is silver sulfide soluble?
11:21:54 A. Is it soluble in what?
11:21:56 Q. In water.
11:21:58 A. In water? Actually it doesn't matter what the solvent is, I
11:22:01 don't know the answer.
11:22:02 Q. You don't know whether silver sulfide is soluble? In water?
11:22:07 A. I don't know whether it's soluble in water.
11:22:09 Q. You don't know whether copper sulfide is soluble in water?
11:22:14 A. No, I don't.
11:22:15 Q. If we could go to what's been marked I believe LT 195. I
11:22:54 believe I believe it's page 8. Might be LT 195-A, I don't have a
11:23:01 marked copy. It's page 7 of the actual document itself.
11:23:09 And if you go to the bottom paragraph, that example that
11:23:13 you saw in that chart in figure 1. That table you were looking at
11:23:19 doesn't provide information on either the rate at which films will
11:23:23 form or the environments in which they will develop, that's what
11:23:26 this states here, correct?
11:23:28 A. The diagram we were looking at on the following page?
11:23:34 Q. Figure 1.
11:23:36 A. Figure 1?
11:23:36 Q. If we go to that back page was identified as figure 1.
11:23:42 A. I think your question was -- could you repeat the question,
11:23:46 please?
11:23:46 Q. Sure. If you go to page 7 again. The article itself notes
11:23:51 that that diagram doesn't provide any information with either the

rate at which films will form or the environments in which they form. Correct?
A. I think that's correct.
Q. So by the environments in which they form there's no indication in that table what the composition of that silver tarnish film is?
A. Not in the -- I am not sure that the graph itself has any information about the composition.
Q. Whether it's silver sulfide or some other film tarnish?
A. That's right. But, but if you read the paper, you read the entire article they are talking about sulphur being the dominant corrosion product on silver contact.
Q. I understand that. But this article points out in this table that it's unknown whether or not what the actual environment once these measures were taken, correct?
A. That's what it says.
Q. And you were going on the X axis below and pointing out that ten to the third, is that 1,000 angstroms? If we could pull it --
A. No, an angstrom, one angstrom is ten to the fourth -- I'm sorry, one micron is 10,000 angstroms, so it's ten to the 4th.
Q. The ten to the third number there is 1,000?
A. That's correct.
Q. And the ten to the fourth is one micron?
A. Is one micron, that's right.
Q. And obviously indicated if we went out to the next, one more step it would be ten microns?

A. Correct.
Q. And on the left side, with contact resistance, what scale is it measuring that in?
A. It's in milliohms.
Q. It starts at one milliohm?
A. Correct.
Q. And my understanding is that it's 1,000 milliohms to an ohm?
A. Correct.
Q. So the top of the chart is 1,000 is one ohm?
A. That's correct.
Q. So again, if you went up another bar presumably you would be at ten ohms, 100 ohms, and so on?
A. Correct.
MR. SANDERS: Thank you, your Honor.
THE COURT: Okay. Any redirect?
MR. SEEGER: Just a couple of questions, your Honor.

REDIRECT EXAMINATION

BY MR. SEEGER:
Q. Mr. Galler, you were asked if you measured resistance, and the question you gave Mr. Sanders was not sure that tells the story either. Could you explain for the court what you mean by that?
A. The resistance of contacts when they're corroded is only one electrical measurement, and the problem with that electrical measurement in this particular case, and I am thinking now on things like switches that handle electric power like a wall switch

or a circuit breaker, is that in addition to having a certain resistance, the switch has to be able to withstand a certain amount of thermal power and watts and that is when the switch opens and there is an arc for a circuit breaker it has to absorb a certain amount of heat.

And its ability to absorb heat isn't measured just by the resistance and really the best way to do it would be to operate the switches under load to see what they do. So we're trying to use a particular -- we meaning we experts and the laboratories are trying to use that resistance measurement as an indication of how is this switch going to behave in the future as if it's okay or it's not okay. And I think that's generally -- I think that's not a good idea, I don't think that by itself tells the whole story.

Q. And, Mr. Galler, just one other thing. In the chapter that Mr. Sanders refer to the Abbott paper, which, Scott, is LT 195 and if you could put up page 7 of that document Mr. Sanders was on.

If we could just blowup this section right here (INDICATING). Right here at the beginning, right here at the beginning of this report, Mr. Galler, do you see where it says: "For the purpose of this report, the most important conclusions are that: Extremely thin films may produce significant electrical degradation; and, the thickness of film that may produce failure is often well below the limit of visual detection." Do you agree with that?

A. Yes.

MR. SEEGER: Nothing further.

THE COURT: Okay. You're excused. Thank you, sir. Call your next witness, please.

MR. SEEGER: Your Honor, at this point we would call Ron Bailey.

THE DEPUTY CLERK: Please raise your right hand.

(WHEREUPON, RON BAILEY, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK: Please be seated. Would you state your name for the record.

THE WITNESS: Ronald Brian Bailey.

MR. SEEGER: May I proceed, your Honor?

THE COURT: Yes, please.

VOIR DIRE EXAMINATION

BY MR. SEEGER:

Q. Mr. Bailey, would you please tell the court a little bit about your background, your educational background and your work experience?

A. I am a licensed mechanical engineer. My educational background is I have a bachelor of science in mechanical engineering from Rochester Institute of Technology. I've been in the practice of consulting engineering since 1972 working for different firms up until 1979 when I started my own firm as a consulting engineering firm.

Q. Go ahead, Mr. Bailey, I'm sorry, I didn't mean to cut you off.

11:30:02 A. Basically what we do is mechanical engineering. We also do building science work, we do a lot of investigation and remediation when it comes to mold, water intrusion related functions.

11:30:20 Q. When you say building science, could you just tell us what building science work is?

11:30:24 A. Building science is the materials and the way they work within the building environment. It has anything to do with the properties of structurally staying together, the way they service within the industry, the way they allow moisture to go in and out through vapor pressure. It's a very diverse area.

11:30:47 Q. And do you have any licensing with regard to either your engineering license or other things that you do?

11:30:54 A. I have a license in the state of Florida and the State of Louisiana as a licensed professional engineer.

11:31:00 Q. Do you have experience with indoor air quality?

11:31:05 A. I do. I hold certifications in indoor air quality, three different certifications: One is the CIAQP, Certified Indoor Air Quality Professional, it's given through the Association of Energy Engineers; I have the certified indoor environmental consultant through the American Indoor Air Quality Association, and a certified microbial remediator that's also through the AmIAQ.

11:31:35 Q. And do you have -- I don't know if you mentioned it, if you did I'm sorry, I zoned out for a second. Do you have any certifications in indoor environmental consulting?

11:31:48 A. Those were the certifications in the indoor environmental

11:31:51 consulting.

11:31:53 Q. And what about HVAC air conditioning -- what does HVAC stand for actually?

11:31:59 A. Heating, ventilation, and air conditioning.

11:32:02 Q. Do you have experience in the design and observation in HVAC systems?

11:32:06 A. We have substantial experience in the design of HVAC systems in residential, commercial and industrial environments.

11:32:15 Q. Have you actually conducted investigations with regard to indoor air quality?

11:32:20 A. I have.

11:32:20 Q. Could you tell us a little bit about what some of these investigations were for?

11:32:24 A. Well, it varies quite a bit. But, you know, some of them are investigations for odor, some are investigations because of water intrusion or mold. Of recent the Chinese drywall.

11:32:40 Q. And you mentioned mold. Can you talk to us, have you been involved in mold remediations?

11:32:46 A. I have. I've personally been involved in over, well over 200 projects in mold remediation where I myself have been on the site. And our firm has done hundreds of mold remediation consultants where we generated the remediation plan, overseen the removal, and basically certified the environment after it's been done.

11:33:11 Q. And in those remediations have they involved tearing out drywall and things like that?

11:33:18 A. They have.
11:33:23 Q. And how far back does your experience go, when did you first get involved, let me ask you this way, with dry Chinese drywall?
11:33:32 A. It was sometime around the vicinity of August, September I believe of 2008 when we first heard about the Chinese drywall through a list server that we're on, and from there we caught our interest, started investigating that and started getting reports of coil failures, odors in homes, and it went from there.
11:34:04 Q. And prior to meeting any of the lawyers in this specific case, did you have opinions on appropriate, the appropriate scope of remediation for homes with Chinese drywall?
11:34:15 A. We did. As a group of individuals because of some of the feedback we were getting for the lack of -- any kind of a standard removal protocol, we sat down with a group of individuals and wrote a protocol.
11:34:33 MR. SEEGER: Your Honor, at this point we would tender Mr. Bailey as an expert in HVAC, building science and remediation.
11:34:40 THE COURT: Any questions on his qualifications?
11:34:46 MR. HAYDEN: Your Honor, no objection.
11:34:46 THE COURT: Okay. I'll admit him in those fields, building science and remediation.
11:34:51 MR. SEEGER: Thank you, your Honor.
11:34:55 DIRECT EXAMINATION
11:34:56 BY MR. SEEGER:
11:34:56 Q. Could you give us a little bit more specifics about your

experience in the area of demolition, we're going to talk a little bit about today about your opinions and how to demolish Chinese drywall and how to go about doing this. Okay?

A. We've been involved in several different types of projects, some of them just renovated projects where the drywall is taken out due the fact that walls are being removed and areas are being changed.

But more than that we've been involved in the microbial remediation area where it's more surgically removed. Where you go in and demolish under some controlled conditions for some very specific reasons of release of dust and that type of thing, you're actually looking to not have the, whatever is on the board in mold go airborne. You can't prevent it, but you try to limit it the best you can.

And you're working in limited areas, you're not doing generally a whole demolition of a whole house.

Q. Do you think of mold, let's focus on mold for a second, as an environmental contaminant?

A. It is an environmental contaminant and basically is treated as such.

Q. Do you have an opinion as to whether Chinese drywall is an environmental contaminant and should be treated as such?

A. I do. And basically that opinion is that what we've seen with the reports is that it is a problem with the materials within the drywall and that basically in its removal you need to remove not

11:36:33 only the drywall but the pieces and dust that's from it to assure that you're going to get the majority of the dust that's in the house and remove it so that you have negligible amounts of dust in the home.

11:36:49 Q. And would it make sense to you to do a remediation to leaving more dust behind than necessary?

11:36:56 A. No, no. There's a couple of ways you can do the remediation, but none of it's going to be dust free. And so basically in your demolition one of the requirements is going to be to clean up the dust. And the way that we focus on that is we look at doing a gross clean up of the heavy materials first, swept off the floors and get it out --

11:37:21 Q. When you say the heavy materials, you mean the big piece of drywall that comes off the wall?

11:37:30 A. The big pieces and chunks.

11:37:30 Q. Let me ask you this. Scott, can we go to Hernandez 460. And can you just identify at this point what this photo shows?

11:37:38 A. This was a demolition that we attended in south Florida where the basically the drywall was just torn off the walls.

11:37:53 MR. SEEGER: Your Honor, at this point we would like to move Hernandez 460 into evidence.

11:38:00 MR. HAYDEN: Was the witness present?

11:38:01 MR. SEEGER: I think he just testified to that.

11:38:02 THE WITNESS: I was present during that demolition.

11:38:04 THE COURT: All right. Okay. Admitted.

BY MR. SEEGER:

Q. And this photo here, does this accurately reflect when you were talking about removing the big pieces, does this help demonstrate that?

A. Well, no. This is fairly uncontrolled and not cleaned up during the demolition. This is a lot of debris, we would like to see it a little bit more controlled than what you see here.

Q. In your experience though putting aside the environmental contamination situation, does this look like a typical sort of tear out of drywall to you?

A. It's typical to what we see. One of the problems that we have in the drywall tear out is getting the pieces down. In this particular case, this is a condominium where the debris has to be taken out through an elevator, has to be put in containers, breaking it into smaller pieces has its advantage in being able to wrap it up, get it into bags, get it into containers and get it out.

Q. This doesn't -- this picture doesn't necessarily show it well, but how would you describe the dust that's generated by drywall, is it fine?

A. It's a fine dust and the haze you see in the air here is a fine dust, it's still present after the tear out.

Q. And, Scott, can you go to Hernandez 470. Mr. Bailey, just at this point can you identify what this photo is?

A. That's the bottom of my boot on a home in West Palm Beach where

the -- basically the area had been broom swept.

Q. Hold off on that.

MR. SEEGER: So, your Honor, at this point we would move 470 into evidence.

THE COURT: I'll admit it.

BY MR. SEEGER:

Q. Go ahead and tell us what it shows.

A. This one had been broom swept clean and this is the state of the drywall dust that was remaining on the floors that we objected to when we were looking over this for the owner of the home.

Q. And what's on the bottom there, if you would run your finger across it, how fine would that be, could you compare it to like a baby powder or something like that?

A. It's a fine powder, maybe not as fine as talcum, but it is a fine powder.

Q. Have you had an opportunity to review the demolition plan that is proposed by the contractor working for the defense lawyers?

A. I attended a demolition that they conducted in Louisiana here, yes.

Q. And tell us a little bit about what your understanding of what that demolition was supposed to show, what was it supposed to demonstrate?

A. Well, my understanding was it was supposed to demonstrate a fairly clean removal and controlled removal of drywall.

MR. HAYDEN: Objection, your Honor. He can give his

11:41:13 understanding, but it was --

11:41:17 THE COURT: That's what he just said, what his understanding was. Go ahead.

11:41:21 MR. SEEGER: That's all I have on that. That was the only question.

11:41:24 THE COURT: All right.

11:41:25 BY MR. SEEGER:

11:41:25 Q. Mr. Bailey, did you have an opportunity to shoot video of the demolition that you observed that was done by the contractor hired by the defense lawyers?

11:41:36 A. I didn't shoot a video, A.J. Valenti was there and shot the video for me.

11:41:40 Q. Have you had an opportunity to look at it?

11:41:42 A. I have.

11:41:42 Q. Would it be helpful for you to describe some of your opinions on that process if we showed some of that video to the court?

11:41:48 A. It could help.

11:41:50 Q. So, Scott, do we have Hernandez 654 ready to go?

11:41:57 MR. SEEGER: Your Honor, I believe these are all relatively short, if you lose any patience we'll move on, I just want to show you.

11:42:04 THE COURT: Let's just make sure they accurately reflect what he saw.

11:42:11 BY MR. SEEGER:

11:42:11 Q. This first clip Hernandez 654 from the first day it shows a

stairway, you've had an opportunity to look at that video yourself?
A. I have and I actually saw that.
Q. And you were actually present when this was going on as well, right?
A. That's correct.
Q. If we could show that, Scott. And if you could just talk us through what you're seeing here.
(WHEREUPON, THE VIDEO WAS PLAYED.)
THE WITNESS: Basically what you see here is the protection on the stairs that had been laid down was not properly laid down, it isn't secured properly, it was a trip hazard. As you see, the worker's coming down the steps here, he's carrying a couple of long boards, he is not concentrating on walking down these steps and looking at loose materials.
So the individual that removed that from the bottom protection did the proper thing. Later on after a few minutes they put that back on and they tied it back down better. But that type of thing is the thing that you really need to pay close attention to for workers safety.
(WHEREUPON, THE VIDEO WAS CONCLUDED.)
BY MR. SEEGER:
Q. And the next clip that we have, which is Hernandez 652. I don't think we need volume on this. Do we need volume on this, Mr. Bailey, so we can have you talk us through it?
(WHEREUPON, THE VIDEO WAS PLAYED.)

A. We don't need it. That's the front of the place, and this is an individual removing a baseboard carefully, trying to preserve the baseboard. This is just him trying to take it out. The amount of time it's taking him to try and preserve that baseboard.
Q. The baseboard right there, do you have an opinion --
A. Hold that video.
(WHEREUPON, THE VIDEO WAS PAUSED.)
Q. Is that a unique or very expensive baseboard as far as your experience?
A. No. That's a fairly inexpensive baseboard, it's not an advanced grade, it's inexpensive.
MR. HAYDEN: Your Honor, we've stipulated to removing baseboards. I don't know what the relevance is.
MR. SEEGER: I just have a question or two on it, that's all.
THE COURT: All right.
BY MR. SEEGER:
Q. How much time did he spend working on that piece did you observe?
A. I didn't time him. It took him awhile to get it off. But it took awhile to get it off and it came off and it was rough, and in some cases they fractured the base moldings and the moldings that came off of the door.
Q. And the Sheetrock, just to be clear, goes down behind that baseboard all the way to the floor, right?

11:44:46 A. It does and the baseboard has to be removed in order to remove all of the drywall.

11:44:51 Q. Okay. You can go ahead, Scott.

11:44:53 (WHEREUPON, THE VIDEO WAS RESUMED.)

11:44:53 A. This is an individual starting to take the drywall off, this is the first piece they got off. They're trying to take it off in as big of pieces they can, and what you see here is a very slow, methodical process of trying to break it away and get it away in as large of chunks as they can. Basically the removal of drywall, it's a material that breaks pretty easily and it's fairly hard to get off.

11:45:22 Q. So the workers here, your understanding is the workers here are employed by a contractor that was hired by the defendants to do this demolition, right?

11:45:32 A. That was my understanding.

11:45:34 Q. Okay. You can keep going.

11:45:35 A. As they work here, what you see was the number of pieces that come off. That's showing the insulation in the wall that's behind which is a soft surface, makes it hard for them to pry against.

11:45:51 You'll notice they did make a cut across the wall, but when you get to the edge of the wall there's no vertical cut and that's because there is a plaster stop in there that you cannot cut through with a drywall knife.

11:46:03 Q. And was it generally your observation that what we're seeing here, the drywall broke into pieces, is that pretty much what you

11:46:08 observed?

11:46:09 A. That's pretty much what we observed throughout the project.

11:46:11 Q. What's that that he's touching in the wall there, he's touching something?

11:46:15 A. That's the wall insulation, it's a blown-in insulation that's blown in and compacted into the wall.

11:46:23 And as you continue to watch, you'll see that this does not come off in large pieces and over time you watch the debris build up on the floor. It is not a clean process.

11:46:33 Q. Now, the room that was being demolished that day, how big was it? Was it a whole house?

11:46:39 A. No, it was maybe 14 by 16 feet.

11:46:42 Q. So this was a demolition of just one room?

11:46:45 A. This was a demolition of just one room with one closet and a hallway.

11:46:49 Q. In the state where they were attempting to be careful and cutting it, what was your observations with regard to dust and mess?

11:46:57 A. They did keep the airborne dust down to a very light degree. They still had a lot of pieces on the floor and there was still dust on the floor. But it wasn't airborne like in the pictures that you saw in the other demolition previously.

11:47:15 THE COURT: What does he have on his face?

11:47:19 THE WITNESS: The one individual has, that's called a P95 respirator, it filters out 95 percent of the fines. The other

individual doesn't have anything on his face.

One of the things that they did is after pulling this for about, oh, about this point in time right here is when they opened the windows to the space to air it out.

And again, you're looking here at the debris that shows you no matter whether it's controlled or uncontrolled, you're going to have a lot of debris on the floors. Here they've left the carpet in place.

If you could hold that video there for one second.

(WHEREUPON, THE VIDEO WAS PAUSED.)

THE WITNESS: You have the carpet in place, and that in itself is going to give some problems later on as we see in the video. Normally what you would like is to have a flat hard surface, but they left the carpet in place to catch some of the fines.

Go ahead and continue on.

(WHEREUPON, THE VIDEO WAS RESUMED.)

Again, as he tries to take that off, you can see that it's just impossible to get large pieces. You see the Beazer video that was presented the other day that it showed if you break hand holds into this thing and you have two guys teaming together you can break it off in pretty good chunks. They were having a hard time with their techniques in getting this off in a controlled fashion. They didn't hold down the dust in the space, but the space regardless still has to be cleaned in the same manner whether

11:49:02 it's cleaned this way.

11:49:02 BY MR. SEEGER:

11:49:02 Q. And you're not saying there was no dust, right?

11:49:04 A. Oh, no, there was dust.

11:49:10 Q. With regard to the amount of dust you saw, what would be your recommendation as to how that dust is cleaned up?

11:49:15 A. Well, if wouldn't matter whether it was this controlled demolition or it was a demolition where --

11:49:23 Q. Actually I think that's a better question, I'd like to ask that. Does it matter to you, with regard to the cleanup that follows the tear out, whether they do it in this so-called controlled environment which is slow or methodical or the Beazer approach?

11:49:35 A. It wouldn't. And the reason being is that -- if you hold that video there, too, please.

11:49:40 (WHEREUPON, THE VIDEO WAS PAUSED.)

11:49:45 THE WITNESS: The problem is you have to clean up the dust, and the process is to try to get out all of the dust that you possibly can within reason. And using what is in the industry for both asbestos, mold remediation and just general indoor air quality cleaning, basically what you're going to do is you're going to gross vacuum the space, take all of the bulks and heavier fines out. Then you're going to touch the surface a second time with a HEPA vacuum, vacuuming the spaces and getting some of the lighter dust out. And third you go back and wipe the surfaces down.

11:50:31 Now, it's important that you start high and work to low.
11:50:31 BY MR. SEEGER:
11:50:35 Q. Pause on that for one second, Mr. Bailey, because I think it's important we talk about the way you think it should be done and that the court understands what they did.
11:50:43 So I want to move on now to the cleanup part. Would that be in the next video?
11:50:47 A. That would be in the next video, yes.
11:50:49 Q. So, Scott, if we could go ahead with Hernandez 653.
11:50:49 (WHEREUPON, THE VIDEO WAS PLAYED.)
11:50:55 Now, how many days -- just pause that one second, Scott.
11:50:58 How many days were you there?
11:51:00 A. Pardon?
11:51:00 Q. How long were you there?
11:51:01 A. I was there the one day. The second day during the cleanup I wasn't present at the cleanup. I viewed the video from the cleanup.
11:51:10 Q. Is it your understanding that for the one room that they demolished that that was a two-day process to tear out and clean up the Sheetrock?
11:51:22 A. By the clock times that you see on the video, it was a two-day process. The first day that I recall they had four workers and a supervisor worked on their home all day to demolish it. The second day if you count the number of workers that show up, you had five workers and one supervisor, all of them working to clean it up.

11:51:43 And the video ends at approximately six hours, but they still hadn't finished the entire cleanup.

11:51:51 THE COURT: Just a moment. Go ahead.

11:51:52 MR. HAYDEN: Your Honor, I have no objection to this witness talking about his visual observations the first day. We're now on the second day and he was not present.

11:52:01 THE COURT: He wasn't there, right. That's fair.

11:52:04 MR. SEEGER: Well, your Honor, I think that the film here would just demonstrate the defendant's proposal for how they're going to clean up because this is what they say they're going to do and get Mr. Bailey's opinions.

11:52:16 MR. HAYDEN: Your Honor, that totally mischaracterizes what the intention of this was.

11:52:20 THE COURT: Okay. I will let him testify when he was there, but when he was not there for him to look at a video.

11:52:28 MR. SEEGER: Even if he saw the video of what happened the second day, your Honor, as an expert he can still see and rely on, right?

11:52:34 MR. HAYDEN: Your Honor, it's the second day, he wasn't there, he can't say that that truly and accurately portrays what was going on.

11:52:41 MR. SEEGER: That's a disingenuous objection, that's a video of what happened. We can call -- in this case are we going to call everybody that took a photograph?

11:52:51 THE COURT: The problem that I am faced with, if there's

an agreement that that's the video of what's happened and it's accurate as to what's happened, he can testify as to whether or not it was done properly. But if you question whether or not the video is accurate, then that's a problem from an evidentiary standpoint.

MR. SEEGER: I can -- to have him testify about this subject to connect them, I'll be happy to bring the videographer in and put him up there for two minutes.

THE COURT: What's your position, do you want to consult with counsel?

MR. HAYDEN: Your Honor, we had our own videographer, if he wants to play this video, this gentleman just can't comment as to what's going on in the video, he wasn't there.

THE COURT: I understand, you can make that argument or you can make that point on cross-examination. But the way I see it is if the video was taken during the time these individuals did the work, then I think, I mean, it's authentic. If you tell me that the video was spliced or if there's an argument that it's inaccurate or it wasn't taken at that time or that it's a different house, then it goes to the authenticity. But if there's an agreement that it's authentic, then I'll let him see it and testify as to it.

MR. HAYDEN: Your Honor, actually, I don't have a problem with him playing it, he has no personal knowledge of it. And it is a spliced video and no one from their side was present at the time of the final cleanup. This gentleman can't comment on how clean

the site was at the time we were completed.

So with those objections, I don't know what it's used for.

THE COURT: All right. Okay. Look. This is what I'll do. From a standpoint, I'll let him look at the video and let him testify as to his opinion as to how they're doing, but I think counsel is right as to whether or not it was clean or not, that's something beyond his approach.

MR. SEEGER: And, your Honor, I did not intend to ask that question.

THE COURT: Okay.

MR. SEEGER: So if we can go ahead, Scott, and roll this video.

(WHEREUPON, THE VIDEO WAS PLAYED.)

BY MR. SEEGER:

Q. Mr. Bailey, from the video, what are they doing here, can you tell?

A. What they're doing here is brushing down the different components, just brushing the dust down onto the floor. And you've got a guy working high and right here you've got a guy working low brushing off some areas. So what you have is basically they're cleaning the debris off the different pieces. You can see some of the dust coming off here and here the individual is vacuuming high.

Q. Is that a HEPA vacuum by the way?

A. That is not, that's a shop vac.

11:55:57 Q. What do you mean by a shop vac, is that basically a common vacuum?
11:56:01 A. It's a common vacuum, has a pretty good filter on it, bought it's basically a vacuum that you use to clean up wood dust and not necessarily fines and indoor quality cleaning.
11:56:14 Q. Now, in your opinion when you have done, you know, mold remediations let's say, what type of vacuum have you used in those instances?
11:56:24 A. In any kind of indoor air quality clean you're using what's called a HEPA vacuum. If you could hold that video for a minute.
11:56:34 (WHEREUPON, THE VIDEO WAS PAUSED.)
11:56:36 THE WITNESS: The HEPA vacuum basically is a vacuum that with a filter that's designed to minimize any re-entrainment of the dust into the atmosphere.
11:56:47 BY MR. SEEGER:
11:56:47 Q. So with regard, just generally, regular vacuum versus a HEPA vacuum, which one is going to get a lot more of the dust?
11:56:55 A. Well, a HEPA vacuum is going to get a lot more of the dust and give you a higher assurance that the dust isn't going to be re-entrained back into the space.
11:57:05 Q. All right. And can we continue with the video.
11:57:05 (WHEREUPON, THE VIDEO WAS RESUMED.)
11:57:05 Q. All right. And can we continue with the video?
11:57:08 A. Here again we have a guy that's now brushing and spraying a liquid above an area that was brushed off before. He is spraying a

chlorinated water solution based on some --

MR. HAYDEN: Your Honor, the narrative, I object, he wasn't there. We can see what it is.

THE COURT: Yeah, just tell us what you see as opposed to, because I don't see anything there that would tell me that it's chlorinated.

THE WITNESS: Okay. Basically, he's brushing a surface, spraying it and brushing it.

Here you have an individual that starts to clean the plumbing. Could you freeze that there for one second.

(WHEREUPON, THE VIDEO WAS PAUSED.)

THE WITNESS: He's starting to clean the plumbing that's behind the bathroom of the wall that backs up to there. And you'll notice the time is about 10:19. If you go ahead and run the rest of that.

(WHEREUPON, THE VIDEO WAS RESUMED.)

What you see is this individual cleans this plumbing. He puts a lot of effort into cleaning.

BY MR. SEEGER:

Q. When you say cleaning, he is trying to wipe off the tarnish; is that fair?

A. He is trying to wipe off the black deposit that's on the pipe. And through this video he works for about 17, 18 minutes --

MR. HAYDEN: Your Honor, we don't know what went on in that 17 minutes, this gentleman wasn't there and we're now just

assuming that because time is passed on a video that's been spliced that we can say that it went for 17 minutes. I'm sorry, this is getting --

THE COURT: Yeah, no, that's a fair objection. Let's move on.

MR. SEEGER: We don't even need the video, your Honor, we'll get rid of it. Pull the video down.

THE COURT: Let's move on.

BY MR. SEEGER:

Q. So do you have opinions, Mr. Bailey, on what the proper scope of the demolition and cleanup process would look like in a Chinese drywall remediation?

A. The proper scope is to remove the materials out of the home. And whether you try to do it controlled or uncontrolled, just like you saw in the Beazer video, but in the Beazer video you can see they were getting larger pieces off and their methodology, they were using a hammer to do it.

Q. Can I ask you a question about that? Sorry, Mr. Bailey, but I think it's important. The question I'm asking is, Beazer video that you saw, the way they were taking the drywall down?

A. Yes.

Q. Now, you've been involved -- have you been involved on construction sites before?

A. Yes, I have.

Q. And in terms of normal and customary way of taking down

11:59:40 drywall, is that more consistent with the Beazer approach, would you say?

11:59:43 A. Well, it is. You've got to get hand holes into the drywall and you've got to pull the drywall off the surface.

11:59:51 Q. So you kind of go in there and they punch out holes?

11:59:54 A. Yeah, you don't take it off -- as controlled as they were doing it on the first day, we do do some controlled demolition in the mold remediation, but that's basically to confine, you're doing surgical cuts across the wall and you're pulling just small portions of the wall down. You're not remediating an entire home, you're just doing small areas that are contained.

12:00:24 Q. Now, if you can continue telling us your opinions on what the proper clean up would be after the drywall is off.

12:00:31 A. The proper clean up is to work in a room from high to low. You would take and start with vacuuming with a standard vacuum, shop vac, construction vacuum, to get the big material so that you don't load the finer HEPA filtration devices. Then you come back and contact that surface a second time with a HEPA vacuum to get the fine dust up off of that surface.

12:00:59 And then, thirdly, you come back and contact it for a third time. We use, have the contractors use a dampened rag to pick the debris up off of the surfaces, rinse the rag frequently so that they keep it clean, and basically work again top to bottom so that you don't have debris falling on surfaces that you already have cleaned.

The one thing that we noted in the tear out of this home is they left the carpet in place. The carpet when it's removed is going to kick up different materials on the surfaces that you've already cleaned and you've got to reclean them, it's inefficient. The other thing that some contractors like to use is a rolling scaffold when they're doing the cleaning, which basically gives them --

MR. HAYDEN: Your Honor, he wasn't present on the second day when they --

MR. SEEGER: He's not testifying about the second day.

THE COURT: Yeah, I didn't understand him testifying about that. Go ahead.

THE WITNESS: It gives you a hard surface for the casters to roll on, and it's easier to roll along and get your surfaces and do continuous cleanings so you're not climbing up and down off a ladder, which is stressing the workers. And it's also hoping that they don't stretch out to try and get a surface clean, it just gives you a lot better methodology to assure the cleanliness of the space.

BY MR. SEEGER:

Q. I want to move on from that. Does that encompass all of your opinions on the cleanup process?

A. It does, yes.

Q. I want to talk to you about the HVAC system. Could you please explain to the court briefly the components, all of the components

that are known as the HVAC system in the house?

A. In these homes you have an outside, what's called a condenser and compressor. Then you have a line set that runs from the compressor condenser to the air handling unit. That air handling unit is generally either located in a closet in the home or it's located in the attic, as it is in the Hernandez home.

In that air handler is an evaporator coil that does the cooling, you have a fan that moves the air from the house, from a return placed in the house out through ductwork in places it back in the home.

Q. Okay. Do you have an opinion as to whether the HVAC system should be -- well, first of all, let me ask you this: Have you been to the Hernandez house?

A. Yes, I have.

Q. Have you had an opportunity to look at the HVAC system?

A. I have.

Q. Do you have an opinion as to whether that system should or should not remain in the context of a remediation of the drywall?

A. I have an opinion of that, and my opinion is the air handling unit should be replaced in that home.

Q. And why is that?

A. There are several reasons, and we've seen it in the testimony that's been given here about the effects on the control boards and on the electronics that are within them, the wires, the motors and the coil. Even though the Hernandez unit has got a coated coil

installed now, we have had experience now on one particular project where we have had three coated coils fail and we, in talking with David Krause of the Department of Toxicology, there are reports that other coated coils have failed.

MR. HAYDEN: Objection, your Honor.

THE COURT: Sustained.

BY MR. SEEGER:

Q. Go ahead. Just ignore the part about your discussion with David Krause, but you can continue.

A. So additionally, inside the air handling unit are fiberglass materials, and those fiberglass materials should be removed and replaced, basically making that that you're rebuilding that air handler. It would be like having a car that's in an accident, you're basically rebuilding that thing from parts. And by the time you get through rebuilding from parts, the cost of the parts, the air handling unit gets very expensive because you're parts add up.

Q. So let me ask you the question this way, and I don't want to know about any specifics with conversations with anybody, but have you, have you communicated with certain government entities about what their opinions are and whether HVAC coils should or should not be replaced, even coated coils?

MR. HAYDEN: Objection, your Honor, that will be hearsay.

THE COURT: Well, he's just asking him whether he's communicated, not what they said.

MR. SEEGER: Exactly.

THE WITNESS: I have.

BY MR. SEEGER:

Q. And have you relied upon those discussions and communications in forming your opinions?

A. Though it's helped support our opinions, basically the experience we've had with the coating coils failing, to me, the ones that we've seen, they show that basically the coated coils are failing for some reason. We have not had the opportunity to analyze them, we've just gotten another case with them.

Q. Mr. Bailey, when we went to look at the house, some of us saw outside compressor unit that our understanding is is relatively new, I think it was installed in January. Do you have that understanding?

A. Well, there's an outside condenser unit and inside that condensing unit is a compressor. And the only thing that's been renewed in there is the compressor portion. The compressor failed and has been replaced, it is new in that unit.

Q. And is it still your opinion that that unit with the compressor and the condenser should be replaced as well?

A. Well, the problem comes in the fact that, as of January 1st, the rules on making equipment have changed. Basically because of the Montreal protocol, R-22 is no longer produced for use --

Q. You have to tell us what R-22 is.

A. R-22 is the refrigerant that is used in that particular condenser at the Hernandez home. R-22 is the number that's given

to that particular refrigerant. That refrigerant has certain bans on it and they can no longer make new equipment as of January 1st. Because of that, they're going to have to buy an air handling unit that's adapted to another refrigerant.

It has not been tested through the normal DOE procedures of the procedures of AHRI, which is a certifying agency for them for capacity and energy efficiency. And once you change that air handling unit, in order to assure that you have the original energy efficiency and capacity of that unit, you would have to change the outside unit also.

Q. Just a couple of more questions, Mr. Bailey. In your experience as a building scientist and in remediation, have you had experience with electrical code issues?

A. I have. And as a consulting engineer in the normal portion of our practice, and on some of the code boards that I sit on, we have to make judgments on that, yes.

Q. And I just want to ask you because there's been some testimony on it, but with regard to the cutting out and replacing of an outlet or a light switch in a home, do you have an opinion as to whether the code requires six inches, less or more, of the ground wire to be available in that box?

MR. HAYDEN: Objection, your Honor. Foundation, he's not been established as an electrical engineer or an electrician.

MR. SEEGER: Your Honor, I believe he's been qualified as an expert in building --

THE COURT: I think we're -- well, but we're going outside of it. But I do understand the area.

MR. SEEGER: Okay.

THE COURT: I've heard other witnesses on it.

BY MR. SEEGER:

Q. And the opinions that you've given this court this morning, Mr. Bailey, do you hold those to a reasonable degree of certainty in your fields of expertise?

A. I do.

MR. SEEGER: That's all I have, your Honor.

THE COURT: Let's go to 12:30. You may cross-examine, counsel.

MR. HAYDEN: Thank you, your Honor.

CROSS-EXAMINATION

BY MR. HAYDEN:

Q. Good afternoon, Mr. Bailey, how are you?

A. Very good.

Q. Just to clarify with regard to your attendance at this tear out of drywall in one room in a townhouse in Mandeville that you discussed and we saw some video of?

A. Yes.

Q. Can I take you back there? Actually -- I don't want that. With regard --

MR. SEEGER: Do you want to use the video now?

MR. HAYDEN: Yes, I want to use the video now, Judge.

MR. SEEGER: I got yelled at for using it.

MR. HAYDEN: Actually, put that up, why don't we go back to that first picture.

BY MR. HAYDEN:

Q. Now, this is a picture that you testified about, and it's a site that you were also at in Florida, correct?

A. That is correct.

Q. And that's the Beazer site, correct?

A. No, it is not.

Q. That's just another site that you were at?

A. That is Peninsula II site.

Q. So that's a condominium that's located in Adventura, Florida?

A. That is correct.

Q. And this shows the drywall, how drywall was removed by one demolition group, correct?

A. That is correct.

Q. And as you testified, I think that appears to be a pretty uncontrolled demolition, would that be fair to say?

A. It was -- there were a couple of crews in there just breaking it into pieces and getting it on the floor and then cleaning it up, yes.

Q. Were you actually present during that demolition?

A. I was.

Q. And so there was plenty of dust, wasn't there?

A. I'm sorry?

12:10:37 Q. There was plenty of dust from that uncontrolled demolition.
12:10:39 A. There was plenty of dust, yes.
12:10:40 Q. And were you present at another demolition by Beazer over in
12:10:47 Fort Myers?
12:10:48 A. I was not. I've only seen portions of the video.
12:10:51 Q. So you saw portions of the videos. I believe there were other
12:10:56 plaintiffs' experts that were present at that, Mr. Wright possibly?
12:10:59 A. Ron Wright is my understanding, and somebody from SGH.
12:11:04 Q. And the portions of the video that you saw of that Beazer
12:11:08 demolition, that was, in your mind also, an uncontrolled
12:11:13 demolition, correct?
12:11:14 A. Well, from my understanding --
12:11:17 Q. From what you could see.
12:11:18 MR. SEEGER: I object, your Honor, what's good for the
12:11:20 goose, you know, he wasn't there. I've been sitting here quietly
12:11:25 for a day and a half, but he wasn't there. Objection.
12:11:30 THE COURT: All right.
12:11:31 MR. HAYDEN: The tap of the shoulder was appreciated by
12:11:34 my honored colleague.
12:11:37 BY MR. HAYDEN:
12:11:37 Q. You mentioned that you did see those videos, sir?
12:11:40 A. I saw it here yesterday in the courtroom.
12:11:43 Q. Oh, okay. And did that appear to be a controlled or
12:11:46 uncontrolled demolition?
12:11:48 A. I guess I would look at that as a semi-controlled. It actually

12:11:53 came off in big chunks, and the handlers were smashing through the drywall to get the hand holes. We would like to see a little bit more controlled, but that was effective. It got it out in a hurry.

12:12:08 Q. They were using hammers and picks, right?

12:12:10 A. Hammers and hands.

12:12:11 Q. Hammers and hands. And I believe that Beazer has indicated that they could get the demolition done in half a day for a single family home; is that about right?

12:12:23 A. That's what was indicated the other day, yes.

12:12:26 Q. There is another method to tearing out the drywall; you could do it with knives, correct?

12:12:34 A. You could do it with knives, but when you're doing it with knives, first of all, knives do not cut through drywall, knives are made to score drywall and break them. Cutting through with knives is tedious and, at best, inefficient and not effective. Usually what you'll see somebody do is do it with a saw.

12:12:56 Q. On February 25th when you were out there, they were doing it with knives, trying to cut out the board with knives, correct?

12:13:04 A. Well, they did some knifing of it. The knifing had very little effect, the guys were putting a lot of pressure on those knives to try to get down through the board, but they weren't getting all the way through the board before they would pull on it and break it off.

12:13:24 Q. And it was kind of difficult to work with knives in, it would be difficult to work with knives in a lot when you had several

people observing you, correct?
A. No. You're working with a knife placed directly against the material and pulling it down. There was nobody within the direct vicinity of them that would have stopped them from using that knife effectively.
Q. Just so I am clear. On the 25th, this was a teardown of drywall in a room about 12 by 14 feet?
A. 12 by 14, maybe a foot or so larger, yeah.
Q. A foot or so larger, 12 by 12; is that right?
A. 12 by 14, a foot or so larger makes it 13 by 15.
Q. Whatever it may be, you were present, correct?
A. I was.
Q. Mr. Rutila was present, right?
A. No.
Q. Mr. Mallet was present?
A. Yes.
Q. Mr. Lambert was present, correct?
A. For a while, yes.
Q. Yes. And I believe a few lawyers were present from the, from my side as well, correct?
A. There may have been one or two there, yes.
Q. And was there an individual from CTEH present?
A. There was one or two individuals there from CTEH.
Q. And CTEH is a consultant for us, correct?
A. That's my understanding.

12:14:49 Q. And at least for a time, Mr. Carubba was present?
12:14:53 A. For a very short brief times, yes.
12:14:59 Q. So with a bunch of lawyers and a bunch of experts, would you say that it wasn't really a real-life demolition situation?
12:15:10 A. Well --
12:15:12 Q. Would you agree with me?
12:15:13 A. I don't agree with you. I think it was a real-life demolition situation. If you're asking if it inhibited them or slowed them down, yeah, it slowed them down slightly. When you look at five guys to tear out one room for a full day, it didn't inhibit them a half a day's worth of time.
12:15:33 Q. Oh, I'm sorry, I forgot about the two videographers, they were also in the room, weren't they?
12:15:34 A. Yes, there were two videographers, yes.
12:15:36 Q. And weren't they taking pictures after each one of the pieces was taken off and each of the experts went in and examined the different components of the home after the removal of the drywall?
12:15:47 A. Well, there was pictures being taken, and the guys, as they pulled it off, sometimes turned around and displayed the board, the markings on the back of the board, before they were carried out of the room.
12:16:00 Q. Wouldn't you agree that if greater care is given in the removal of the drywall that there would be less dust from the drywall removal?
12:16:12 A. There would be less dust. But you cannot eliminate the dust in

any kind of a drywall situation, even, especially when you're knifing the drywall because the knifing process is cutting through it and creating the fines in and of itself.

Q. And just so I understand, you were there on this first day, but on the second day they actually undertook the cleaning of the site, correct?

A. That is correct.

Q. Or that's what you understood because you weren't there.

A. That is correct.

Q. So you never looked at how the studs of the walls looked after they were done cleaning?

A. That is correct.

Q. And you didn't look at the electrical outlets to see if there was any drywall particles after they were done cleaning?

A. We did not.

Q. And when you say we, the plaintiffs did not?

A. Well, myself. I did not.

Q. Now, you talked about HEPA vacuuming. On this site they used shop vacs with drywall bags. Is that your understanding?

A. That is not my understanding. There was no bag in that vacuum. I did see the vacuum taken apart several times, and there was no drywall bag in there.

Q. If you put a dry -- there are drywall bags on the market that can, that are, their very purpose is to collect drywall dust.

A. That is correct.

Q. And in your mind, would a shop vac with a drywall bag in it be sufficient to collect the dust in a drywall demolition?

A. No. Not when you're dealing with a contaminant, reactive dust, and in my mind or it is my opinion that basically to get that reactive dust out, you should go to the extent of what the industry has for taking contamination out and that is HEPA vacuum.

Q. Now you're calling it a contaminant. Usually a contaminant would be where there's VOCs, do you know what I'm talking about?

A. Well, that can be one of the contaminates.

Q. Now, that's volatile organic compounds?

A. That is correct.

Q. And where volatile organic compounds are involved, you've considered that to be a contaminant?

A. That can be a contaminant within a space, it can be an odor within a space, but it is a contaminant. But we're not talking about volatile organic compounds, we're talking about particulate.

Q. No, we're not. And the only reason that you consider it a contaminant is because of what you believe is the reactivity of the boards, correct?

A. Well, it's not what I believe, it's basically what, what the industry has come to know is that the board is what is creating the corrosion within the space and the odors within the space, and that is within the material of the drywall. And so it is prudent to remove all of that material out of that space.

Q. But you're not called here today to give an opinion on

causation, are you?

A. No, I am not. But I am called here today to say what is reasonable to get the dust out of that space, and if a part of that dust is what's causing part of that problem, then basically what I am looking at and what my opinion is is that HEPA vacuuming is the appropriate method and means to take it out.

Q. And as you sit here today, you can't quantify how much dust would be sufficient to cause the odor to continue in a home?

A. Though I can't quantify that, we have had some experience in a couple of remediations where until the fine cleaning was done, the odor did not go away. And it took the fine cleaning in order for it to disappear.

Q. And I believe you testified about that in your deposition, there were one or two occasions where you were acting as a consultant, where you observed insufficient cleaning and an uncontrolled demolition of the drywall in a Chinese drywall home, correct?

A. Well, one of them was somewhat uncontrolled, yes. It was where I was not the consultant for the tear out. We were the consultant just hired by the owner to oversee it. And when they were done with it and they said they were done, which is one of the pictures we looked at before of the bottom of my shoe, they indicated that they were done and they were ready to go back with the materials but yet the odor wasn't gone. The house sat for over 45 days and then was finally cleaned, and once it was cleaned the odor went

away.

Q. But if you did the vacuuming, an appropriate cleaning and a wipe down, you wouldn't have that problem, would you?

A. If you did an appropriate cleaning and a wipe down, it appears in the couple of jobs that we have been involved in that the, you don't have that problem.

Q. And as you sit here today, you can't say how many particulates of drywall dust would be necessary to result in continued odor or sulphur emissions, can you?

A. Not specifically, no. There's no data in the industry based on this particular problem, it's new, and that we're aware of, nobody has done those studies.

Q. And you would agree that if the drywall, the Chinese drywall, was removed, you would be removing the source of the problem?

A. Removing the drywall removes the source of the problem. But you also have to remove all of the dust from it, yes.

Q. But you can't say how much dust is too much dust?

A. We know that if you don't do the fine cleaning, that basically your odor doesn't go away, so that is too much dust.

Q. But the fine cleaning can be done with a wipe down, correct?

A. Well, it can be done with a process that is standard in the industry for that type of cleaning, has been proved to be effective to give you negligible residue or negligible dust within a home.

Q. When you say it's established in the industry, you can't mean with regard to Chinese drywall because this is a new phenomena,

correct?

A. It's a new phenomenon, but what we are doing is applying proven techniques to the new phenomenon that is basically used out there in both indoor air quality cleaning, just cleaning dust and allergens out of the home and cleaning asbestos and in cleaning microbials.

Q. Well, sir, you've never been involved in asbestos abatement, have you?

A. We have not been involved in asbestos, we don't do asbestos abatement.

Q. So when you say applying established protocols, you would mean in, with regard to removing dust and allergens from the air after demolition, correct?

A. Well, the techniques that are used both in cleaning allergens out of the air and cleaning up mold, both of those were basically the protocols that were in the asbestos industry that came over and were applied to those types of situations.

Q. Sir, but this isn't asbestos, is it?

A. Though it's not asbestos, asbestos is .7 to 90 microns in diameter, anything below ten microns is deemed destroyable. Same thing with mold, mold is 3 to 30. When you're dealing with allergens, you're dealing with stuff in those capacities or size ranges, and this is absolutely the technique that's used to assure that you have negligible dust.

Q. You have no reason to believe that the drywall dust stays

airborne and would cause problems as you have in asbestos, correct?
A. You have airborne drywall dust that gets onto surfaces, we are just looking to effectively remove it all just as they are in looking at removing effectively all of the asbestos.
Q. It falls to the surfaces, it doesn't remain airborne as you might find in asbestos, correct?
A. Asbestos will settle out after awhile, it's just that these things, any kind of fines such as drywall dust or asbestos are easily re-entrained into the air, and so you want to get those contaminants out of the air.
Q. And to do that you recommend hand cleaning of the joists and the frames?
A. We do.
Q. And that cleaning could also be done with tackified towels, could it not?
A. It could be done with tackified towels. The problem that you have is basically quality control in the space. The workers are more apt to rinse a cloth than they are to continue to look at the tackified cloth as to when it gets loaded.
Q. If you actually left the electrical in the unit after the demolition, the drywall demolition, you don't have a problem with a wet wipe if the electrical was still left in the unit, correct?
A. Well, I have a problem with leaving the electrical in. But the electrical wiring and boxes left in are just an additional obstacle to clean around. You have to contact them, again with the vacuum,

12:26:16 to get the heavy debris off. You've got your wires to work around inside a box and clean inside the box, not only to vacuum inside the box but to hand wipe inside the box. So it just becomes a more time-consuming process.

12:26:32 Q. But if the court were to assume that the electrical could stay in, you could still implement your protocol of a wet wipe, correct?

12:26:39 A. You could vacuum and wet wipe the wires, you have some restraints that would have to be cut in order to do it. They usually use wire ties to bind blocks of wire together to be able to clean them efficiently. You would have to clip those restraints and rub down the wires and then put the restraints back on.

12:27:01 Q. Sir, weren't you -- as the course of your business, Bailey Engineering Corporation, you advertise on the internet, don't you?

12:27:14 A. We have a web site, yes.

12:27:16 Q. And you advertise for providing Chinese drywall investigations and inspections, correct?

12:27:25 A. We have information on there about Chinese drywall. I don't know that we advertise those services on there.

12:27:32 Q. Part of your protocol indicates that there should be an environmental consultant involved?

12:27:40 A. That is correct.

12:27:41 Q. And would you consider yourself such an environmental consultant?

12:27:46 A. We would, yes.

12:27:47 Q. And I think you said that you would charge for drafting a

protocol for the cleaning of the house and the like, approximately 1,200 to $1,500; is that right?

A. I don't recall. Generally it's going to be between 1,500 and 2,500, I would think. The thing is, we have to make a site visit to the house to get an understanding of the constraints of the house, whether it's a condo or whether it's a single family, whether it's within a townhouse complex, a controlled residential facility, because that all changes a lot of the means and methods of taking dumpsters in and out of the site, getting worker access, working within the confines of the space. So you have to visit the site, you have to write an adaptive protocol specifically to the project.

Q. And I believe your protocol indicates that you would have a final letter from the environmental consultant indicating that the drywall had been removed?

A. Yes. We would do that, it would be an additional service that we would charge for, to go to the site, look at the site, the cleanliness, and again, write a letter indicating that the materials had been removed per our protocol.

Q. And you would do a nasal test and a visual observation; is that right?

A. Basically, that's what we're looking at right now is a definition to see, is just check for cleanliness and check for odor.

Q. And that cost, I believe you testified to, would be between

$650 and $1,200, correct?

A. That's approximately correct. Again, I don't do the pricing in my firm, and there's reasons for that, I'm usually low. But that is what I quoted in my deposition, I believe.

THE COURT: Let's get to a point where you can stop.

MR. HAYDEN: And I have one or two more questions, your Honor, and I think we're ready to go.

THE COURT: Okay, that's fine.

BY MR. HAYDEN:

Q. Now, part of your protocol is an airing out of the property, correct?

A. That is correct.

Q. And you recommend -- you indicated that the odor goes away in about seven to ten days; is that right?

A. That's what we're experiencing, is the odor, once it's cleaned, will go away in seven to ten days. Now, that's in very specific humid conditions, closing up the house and dehumidifying during the evenings.

Q. And you're aware of at least one home builder in Florida, GL Homes, that airs it out for seven to ten days; is that right?

A. They have, there's indications that they have found the same thing, seven to ten days to air it out, yes.

MR. HAYDEN: I believe that's all I have, your Honor, thank you.

THE COURT: Do you have a lot for redirect?

MR. SEEGER: I have probably three minutes. Do you want me to go now?

THE COURT: Okay, let's do it.

MR. SEEGER: Your Honor, just a couple of things because there were questions about odors and sulphur gases and stuff. Just want to remind the court that in the stipulation entered by the parties, we've stipulated that the drywall in the plaintiff's home emits certain, produces sulphur gases and that the drywall emits an odor.

THE COURT: Right.

REDIRECT EXAMINATION

BY MR. SEEGER:

Q. And just quickly if I can have the ELMO up here.

This photograph that's in evidence, Mr. Bailey, you said you identified that site as Peninsula II in Adventura, Florida; is that correct?

A. That is correct.

Q. And whose drywall is that on the floor?

A. Well, it's a mixture of seven different manufacturers, including KPT and a couple of other manufacturers.

Q. KPT, the defendant here, right?

A. Yes.

Q. Another couple of quick questions. Can I have, Scott, up on the board Hernandez 395.

Are you aware of a report submitted in this case by

Drs. Perricone and Lee?

A. I am.

Q. Have you had an opportunity to take a look at that?

A. I have.

Q. Can you go to page 10, please, Scott.

You were asked questions about the HEPA vac. Do you recall that?

A. Yes.

Q. I would like to just ask you if you agree with Drs. Perricone and Lee on page 10 of this report. Scott, if you could blow up the last paragraph.

I don't have my pointer, it says the removal. "The removal can be effectively performed using conventional abatement methodologies. For example, covering floors and non-impacted surfaces, placing barriers, doorways, over paths for dust movement, followed by HEPA vacuuming, damp wiping and visual inspection has been shown to reduce the residual dust mass concentrations to negligible concentrations." Did I pretty much read that correctly?

A. You did.

Q. They are recommending HEPA vacuuming just like you are, right?

A. Yes, they were.

Q. Now, can you show footnote 6 at the bottom, please, Scott. Blow up the footnote there where we got that site from. National Institute of Building Sciences, guidance manual, Asbestos Operations and Maintenance Work Practices, Second Edition.

So it looks like Drs. Perricone and Lee are relying on asbestos for an example for HEPA vacuuming, correct?

A. That appears that way to me, yes.

Q. There's a couple of others.

MR. SEEGER: Your Honor, I just want to know if this opened the door to a follow-up question on electrical code, because Mr. Hayden asked a question about leaving the wiring in place and cleaning around it. Would you allow me a follow-up or have you had enough on that?

THE COURT: Yeah, no.

MR. SEEGER: I want to keep you happy, Judge.

And then, let's see, I think I had one more question.

BY MR. SEEGER:

Q. You have actually done Chinese -- you have actually designed a protocol for the remediation of homes with Chinese drywall, correct?

A. That is correct.

Q. And you did that prior to being hired by any of the lawyers in this case for the Hernandez family; is that fair?

A. That is correct.

Q. Have you seen, have you actually observed Chinese drywall remediations?

A. I have.

Q. And in your experience, the plan that you've attached to your report, we don't have to go into it, save time, the Judge has it,

12:34:12 have your opinions changed or do you still stand by that protocol that's attached to your report?

12:34:17 A. We do, yes.

12:34:18 MR. SEEGER: That's all I have, your Honor.

12:34:19 THE COURT: Thank you, you're excused, sir.

12:34:21 We'll come back at 1:45. The court will stand in recess until 1:45.

12:34:27 (WHEREUPON, A LUNCH RECESS WAS TAKEN.)

* * * * * *

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

_______________________________

Karen A. Ibos, CCR, RPR, CRR
Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION *

**THIS DOCUMENT RELATES TO:** * MDL No. 2047

Tatum B. Hernandez, *et al* * Section L

versus * New Orleans, Louisiana

Knauf Plasterboard (Tianjin) Co., Ltd., *et al* * March 16, 2010

Case No. 09-CV-6050 *

* * * * * * * * * * * * * * * * * * * * *

VOLUME II - AFTERNOON SESSION
PROCEEDINGS BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Tatum and Charlene Hernandez: Herman, Herman, Katz & Cotlar, LLP
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, Louisiana 70113

For Tatum and Charlene Hernandez: Gainsburgh Benjamin David Meunier & Warshauer
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

APPEARANCES:

For Tatum and Charlene Hernandez: Seeger Weiss
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

For Tatum and Charlene Hernandez: Lewis & Roberts, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

For Knauf Plasterboard (Tianjin) Co., Ltd: Frilot, LLC
BY: KERRY MILLER, ESQ.
KYLE A. SPAULDING
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DOUGLAS B. SANDERS, ESQ.
KYLE P. OLSON, ESQ.
ERIN M. MAUS, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter: Toni Doyle Tusa, CCR, FCRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7778

Proceedings recorded by mechanical stenography, transcript produced by computer.

# I N D E X

| | PAGE |
|---|---|
| Alexis Mallet Jr. | |
| Voir Dire | 397 |
| Direct Examination | 402 |
| Cross-Examination | 462 |
| Redirect Examination | 497 |
| Charlene Hernandez | |
| Direct Examination | 505 |

**AFTERNOON SESSION**

**(March 16, 2010)**

**THE DEPUTY CLERK:** Everyone rise.

**THE COURT:** Be seated, please.

Good afternoon, ladies and gentlemen.

Call your next witness, please.

**MR. ECUYER:** Your Honor, Michael Ecuyer. I'm here on behalf of the Hernandezes. At this time, we'd like to move into evidence Dr. Lori Streit, PhD. We've spoken with defense counsel. With regard to her deposition, there are edits that are being made by both sides. We will submit those cuts.

In addition, several exhibits to her deposition were objected to, and those have been removed through mutual agreement. The exhibits to the deposition that will be coming in are Exhibit 1, 7, 8, 9, 10, and 11.

**THE DEPUTY CLERK:** Would you spell her last name, please.

**MR. ECUYER:** Sure. S-T-R-E-I-T.

Dr. Streit has previously been tendered as an expert in her field during the *Germano* case, Your Honor.

**THE COURT:** Okay. I'll admit the exhibits and make the deposition a part of the record.

Who's your next witness, Counsel?

**MR. MEUNIER:** Your Honor, plaintiffs call Al Mallet.

(WHEREUPON **Alexis Mallet Jr.**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Would you state your name for the record.

**THE WITNESS:** Alexis Mallet Jr.

**THE DEPUTY CLERK:** Would you spell the last name.

**THE WITNESS:** M-A-L-L-E-T.

**VOIR DIRE**

**BY MR. MEUNIER:**

**Q.** Mr. Mallet, what's your address?

**A.** 103 Bradbury Crossing, Lafayette, Louisiana.

**Q.** Your occupation?

**A.** General contractor and construction consultant.

**Q.** By whom are you employed?

**A.** First General Services is the company that I own.

**Q.** What is the nature of the business of First General Services?

**A.** That company performs insurance restoration work and consultant services, construction consulting services.

**MR. MEUNIER:** May we see the curriculum vitae, which is 383-001.

**BY MR. MEUNIER:**

**Q.** Do you recognize this as your curriculum vitae, Mr. Mallet?

**A.** Yes.

**Q.** Is it correct and up-to-date in all respects?
**A.** There may be a deposition or two that's not on there since the last time we produced it.
**MR. MEUNIER:** Your Honor, we would offer into evidence as Hernandez 383-0001 the curriculum vitae of Mr. Mallet.
**THE COURT:** With the understanding that if you were called to testify and would testify substantially the same as the curriculum vitae, I'll admit it into evidence.
**MR. MEUNIER:** Thank you, Your Honor.
**BY MR. MEUNIER:**
**Q.** Let's look at page 5 of this document. Mr. Mallet, what is the extent of your formal education?
**A.** I have a bachelor's degree from the University of Louisiana in political science.
**Q.** You are a Louisiana state-licensed general contractor?
**A.** Yes, sir. I'm also a state-licensed residential contractor, state-licensed mold-remediation contractor, real estate agent, licensed as to manufactured housing installation contractor, and I have numerous certifications.
**Q.** Sir, you don't have to go into it. The record will speak for itself. Tell us about being a certified restorer for the National Institute of Disaster Restoration.
**A.** A certified restorer is the highest certification you can achieve in that organization. It deals with restoring damaged

buildings through various insurance-type losses dealing with contents, structure, cleaning, remediation.

**MR. MEUNIER:** May we see page 6.

**BY MR. MEUNIER:**

**Q.** Mr. Mallet, does page 6 reflect the various areas in which you have had continuing education in your field?

**A.** Yes. End of page 5 and 6 is general areas of continuing education.

**Q.** Your continuing education includes costing and estimating?

**A.** Yes, sir.

**Q.** It includes building codes and building standards?

**A.** Yes, sir.

**Q.** And it includes indoor environmental cleaning and management of buildings?

**A.** Yes, sir.

**Q.** I think in the next paragraph after that listing you mentioned that you have been involved in the construction, estimating, inspection, testing, and analysis of thousands of commercial, industrial, and residential projects. Counting residential alone, over all of your years of experience, how many such projects have you been involved with?

**A.** Well over 1,000 to 2,000.

**Q.** How many years total experience in that do you have?

**A.** Since I've started my own business, 36 years.

**MR. MEUNIER:** May we see page 9.

**BY MR. MEUNIER:**

**Q.** This lists your business affiliations. It actually indicates that you were the president of three different companies; is that correct?

**A.** Yes, sir.

**Q.** What is the nature of the business of all of these companies generally?

**A.** Construction, different types of construction.

**Q.** You are an advisory board member of the Investigative Engineers Association. Would you tell the judge what that professional organization is.

**A.** That's a group of engineers, International Organization of Engineers, involved in the investigation, forensics work, identifying problems, areas usually dealing with some sort of an insurance claim.

**MR. MEUNIER:** May we see page 10.

**BY MR. MEUNIER:**

**Q.** This lists your recognitions and awards. I note that you have been listed in the top 500 remodelers in the United States. Is that true?

**A.** Yes, sir.

**Q.** I also see that you've received a Phoenix Award for international recognition for innovations in reconstruction from the National Institute for Disaster Reconstruction.

**A.** Yes, sir.

**Q.** What was that award based on?
**A.** The design and execution of a jacking and support system for a theater within a shopping center that was affected by tornadic winds. We had to remove the exterior wall system but at the same time keep the roof supported for both keeping it from collapsing and from uplift from future winds while the construction work was in progress.
**Q.** The last listed award you have is from the Investigative Engineers Association. You received an Instructor Excellence Award for Chinese drywall and other material defects. Tell the Court what that award is for.
**A.** I gave a presentation in November in Las Vegas to the Investigative Engineers Association dealing with defective materials as they relate to building construction, and part of that dealt with Chinese drywall issues.
**Q.** Mr. Mallet, have you been qualified in various courts, including federal courts, in the area of general contracting and cost estimation and assessment of property damage?
**A.** Yes, sir.

**MR. MEUNIER:** Your Honor, at this time, I will tender the witness under Rule 702 as a general contractor with expertise in assessing the scope and estimating the cost of construction damages and repairs.

**THE COURT:** Any questions?

**MR. HAYDEN:** No objection, Your Honor, with regard to

general contracting and cost estimating.

**THE COURT:** The Court will accept him in the tendered fields.

**DIRECT EXAMINATION**

**BY MR. MEUNIER:**

**Q.** Mr. Mallet, when were you first contacted to serve as an expert in this case?

**A.** Just after January 1 of this year -- of 2009.

**Q.** What were you asked to do by the plaintiffs?

**A.** I was asked to meet and perform an inspection on the home of Mr. and Mrs. Hernandez to develop a scope of remediation and to provide a cost estimate for that scope.

**Q.** What, if any, involvement did you have prior to being retained in this case with respect to the effects of Chinese drywall or Chinese drywall remediations?

**A.** We previously had performed inspections on at least one residence prior to, but since sometimes -- maybe spring to summertime of 2009 began doing research into the problems of Chinese drywall, issues with the corrosion, potential mitigation or remediation protocols, and began developing a protocol for the remediation of Chinese drywall in buildings.

**Q.** Why was it important to you, as a general contractor, to conduct that independent research?

**A.** Well, first of all, as a general contractor, having done work subsequent to Hurricanes Andrew -- sorry. Katrina and

Rita. We were concerned if any of that material was in our properties or on our projects and what to expect to look for if we were called to investigate that.

And also doing work for insurance companies and consulting work, it was almost inevitable that one of our clients would call and ask us to become involved in reviewing, estimating, or analyzing the buildings potentially with Chinese drywall.

**Q.** So is it true that before you came into this particular case involving the Hernandez home, you had already developed some idea about remediation issues dealing with Chinese drywall?

**A.** Yes, sir.

**Q.** Tell the Court, then, what steps you took in this case to familiarize yourself with the Hernandez property and with the needed scope and cost of repairs.

**A.** After having reviewed other protocols and having developed a general protocol ourselves, I reviewed the property with Mr. and Mrs. Hernandez, listened to the issues that they had with appliances and air-conditioning system problems, the testing that was performed on the house, and that Chinese drywall had been identified in the home, and from that point began photographing, measuring, and writing a scope of action that would be necessary to remove the Chinese drywall and any of the components of that residence that may be corroded from

the Chinese drywall.

**Q.** On how many occasions have you visited and inspected the Hernandez home?

**A.** Personally, three.

**Q.** All right.

**A.** I've had people there on more occasions than that, but I've been on that site three times.

**Q.** You took measurements and photographs on those visits?

**A.** Yes, sir.

**Q.** What observations pertinent to Chinese drywall remediation did you make on these visits to the Hernandez property?

**A.** One was corrosion in the building, in the home, content items that the Hernandezes showed to me that indicated corrosion: Hardware in the house such as doorknobs, hinges, cabinet components, light-fixture receptacles, just various items that they showed to me.

**Q.** Did you engage the services of an electrical engineer as part of your analysis?

**A.** Yes, sir. In our consulting work, we have a team of engineers that come and testing companies that I work with on a regular basis, and I incorporated the services of our electrical engineer, Darrell Hicks.

**Q.** Is it customary in your field and in your work as a general contractor to consult with and rely on the input of an electrical engineer when electrical issues are involved in a

case?

**A.** Whether it's consulting or construction, we will generally have our engineers review -- especially if we're doing a design build, or just a project, we'll have our engineers review the proposals that we are putting together to see if they meet the applicable design standards.

**Q.** Now, you mentioned that you have done research in the area of Chinese drywall remediation. Have you continued to stay current with that research, particularly with announcements from governmental agencies?

**A.** Yes, sir, I have.

**Q.** Have there been any recent announcements or statements from government agencies which have been relevant in your analysis of the scope and cost issues in this case?

**A.** Yes, sir.

**MR. MEUNIER:** Your Honor, I believe the next two exhibits which follow that are the subject of objection. I can show them to the Court and then --

**THE COURT:** That's fine.

**MR. MEUNIER:** If I may approach the bench?

**THE COURT:** Sure.

**MR. MEUNIER:** Your Honor, for the record -- and I know counsel has an objection. Just to identify those documents, one is a letter from the State of Florida Division of Emergency Management to FEMA. The other is a Consumer

Products Safety Commission alert to fire safety professionals.

We are not offering either document for the truth of any matter asserted therein, but merely as a demonstration of the support that this witness has continued to seek and receive in his research. To the extent that they are hearsay, we think they fall within the 803 exception to hearsay.

**MR. HAYDEN:** Your Honor, I don't believe they fall within 803. I think it's merely an attempt to put into the record some recent hearsay that has come up in the last few days.

**THE DEPUTY CLERK:** It would help if they would identify them, Judge.

**THE COURT:** Okay. One is a letter of March 10 from the Division of Emergency Management. The other one --

**THE DEPUTY CLERK:** Is there a number on them, though?

**MR. MEUNIER:** For the record, Judge, they've been given numbers, although obviously not yet offered. The letter from the State of Florida Division of Emergency Management has been marked as Hernandez Exhibit 647. The CPSC alert to fire safety professionals has been marked as Hernandez Exhibit 539. We would like the witness to be able to identify them, Your Honor, and then offer them into evidence.

**THE COURT:** With regard to the letter, the Division of Emergency Management, I'm going to go ahead and exclude that

one. With regard to the other one, 539, I won't make it a part of the record, but I would let the witness look at it and say that he's received it and is aware of it.

**MR. MEUNIER:** Thank you, Your Honor.

May we put up, then, Hernandez Exhibit 539?

**THE COURT:** Yes.

**BY MR. MEUNIER:**

**Q.** Mr. Mallet, do you recognize this document as one that you received in your continuing research of Chinese drywall issues?

**A.** Yes, sir.

**THE COURT:** Try to keep your voice up, Mr. Mallet, please.

**BY MR. MEUNIER:**

**Q.** Would you just briefly tell the Court what was relevant or significant to you in support of your assessment in this case in light of this document.

**A.** Part of our concern in remediation and the corrosion issues within the home is the potential for fire. The CPSC alerting professionals to report any fires that potentially were attached to or part of some Chinese drywall project somewhat supported my position of how we go about our remediation protocol.

**Q.** Mr. Mallet, as a general contractor, whether or not a risk such as a fire risk ultimately proves to be supported by the weight of scientific evidence, once a federal agency announces

to fire safety professionals that it is investigating that risk with respect to Chinese drywall, how does that influence you in deciding the proper scope of Chinese drywall repair?

**A.** While that is an issue and an issue that's being looked at, it concerns us as to what goes into our scope, what will we address and why will we address it. Things such as wiring, appliances, electrical or electronic items have to be looked at carefully before we decide to leave it in a building or a home for obvious reasons. One is safety of the occupants; secondly, the safety of the building.

**Q.** Now, would you tell the Judge how you went about, in terms of your methodology, arriving at the appropriate scope of Chinese drywall repairs that was needed at the Hernandez home.

**A.** In addition to researching other protocols and whatever information that became available to us through the Indoor Air Quality Association, through the restoration industry publications that were sent to us, Internet research, review of research done by the Florida Department of Health, taking those elements and having inspected at least one house prior to being asked to review the Hernandez house and physically looking at wiring, air conditioning, the cleaning that was performed on that particular house, I formulated my own protocol based on that information.

I then went about the identification of various rooms of the home, various quality of items in the home through

photographs; took measurements in a methodical way, my usual method of left to right, front to back, height; and then itemization of each and every item from the floors, walls to ceilings; and documenting what has to be done to effect the removal and replacement of, in this case, the drywall, what items I felt could be salvaged, thought could be salvaged, what items were not practical to salvage because of time or cost issues, and wrote the scope.

Then from there, we inputted that information into a computerized pricing system called Xactimate. It's a unit cost pricing system that's used by contractors, insurance companies, and restoration companies throughout the United States, England, Canada, and Australia and New Zealand, at least, and it's internationally recognized. We produced the estimate from the scope of work that I wrote on site, then from there, after it was produced, reviewed it, edited it, and then produced the final estimate.

**MR. MEUNIER:** Your Honor, Mr. Mallet has prepared a PowerPoint with photographs and some other materials that we have shown to Knauf's counsel. I do not believe there are any objections to the exhibits that are made part of this PowerPoint, so I'd like to offer them now in advance so we don't have to stop as we proceed.

For the record, Judge, the exhibit numbers are Hernandez 560 through and including 573; Hernandez 382-0003;

Hernandez 542 through and including 555; Hernandez 556-0001 through 0007; Hernandez 477-0029, 30, and 31; and Hernandez 557-001 through 003. I'll offer those into evidence at this time.

**THE COURT:** Hearing no objection, I'll admit it.

**MR. HAYDEN:** I think we're fine.

**BY MR. MEUNIER:**

**Q.** So we're ready to proceed with the PowerPoint. I think you have the control of this, Mr. Mallet. So as we go, please allow the questions to finish, and then we'll go to the next slide.

What is the first picture, which has been marked 560-001?

**A.** This is the identification photograph we take at the beginning of our inspection to identify the location of the home. It goes into a series of exterior photographs so that we have a document if questions are raised as to the types of materials or construction methods or design of the home.

**Q.** This is the front of the home?

**A.** This is the front elevation.

**Q.** What's the next picture?

**A.** This is the rear elevation of the home. The two doors on the decking goes into the living room area between the fireplace. The part of the home that's at a lower elevation but connected by the roofline is the garage area.

**Q.** What's the total square footage for living space in this house?
**A.** 1,706 square feet according to the drawings.
**Q.** That does not include the space in the garage?
**A.** It does not include the garage, nor the porch area.
**Q.** How is the garage connected to the home?
**A.** By the roofline.
**Q.** There's no walk-through into the garage?
**A.** There's no walk-through. There's a walk between the home and the garage, and the roofs are connected.
**Q.** How would you describe this type of construction?
**A.** It's a pier-and-beam foundation with a wood-stud and siding exterior, shingle roof.
**Q.** Let's look at the next picture. What do we see here?
**A.** This is the master bedroom of the home. Again, it's to give me an indication and to document what's in each of the rooms in case we need to refer back for note purposes or some questioning that we may have.
**Q.** Next picture.
**THE COURT:** Let's designate the pictures when you say "next picture."
**BY MR. MEUNIER:**
**Q.** I'm sorry. Let's back up. I think we designated the front picture. The next picture, the rear of the house, is 561-0001. The next is Hernandez 562. That's the bedroom.

I think we're about to go to the next picture. This is 563. What does Hernandez 563 show?

**A.** It indicates the type of casing that was placed around the doors in the home, millwork in the house.

**Q.** In terms of quality construction, what does this picture tell you about the construction of the Hernandez home?

**A.** It's a better quality of material, more expensive because it has to be milled with different types of blades rather than just the plain wedge casing, 2-and-a-quarter-inch or 2-and-an-eighth-inch wedge casing. This is a larger piece of molding, a little bit thicker, and with more design.

**Q.** Next picture. This is Hernandez 564. What does it show?

**A.** That shows the crown molding in the home. Usually, you'll see 1-inch-and-three-eights to 2-inch crown molding in homes. This was about 4, 4-and-a-half-inch crown molding.

**Q.** Again, a little bit higher quality than a lot of homes you see?

**A.** Yes, a higher quality, and a little bit more expensive.

**Q.** Let's go to the next picture, please. This is Hernandez 565. What do we see in this picture?

**A.** This is a partial view of the master bathroom. That's the whirlpool tub straight ahead with the vanity to the right.

**Q.** There's been, in the stipulation with Knauf, an agreement that all drywall comes out of the home except for certain green boards in the bathroom areas. Does this picture show us where

green boards would be located?

**A.** It gives me an indication where it would be located, and that's around the perimeter of the whirlpool tub.

**Q.** What are green boards?

**A.** It's a type of Sheetrock drywall with a water-resistant paper that's used in wet areas in homes.

**Q.** Would that not be Chinese-manufactured drywall?

**A.** I don't know.

**Q.** You don't know. Is there a way, in your remediation proposal, to save or reuse green boards that would be situated around this tub?

**A.** Not really. The perimeter of the tub has a tile application. To remove the tub and the upper parts of the wall, that's going to damage that Sheetrock paper in taking it off. Trying to repair that would be more expensive than replacing those three sheets of Sheetrock.

**Q.** Will you keep the tile flooring in this house?

**A.** Yes, sir. The ceramic tile floors are scheduled to remain, and they're to receive a protective film on top of them.

**MR. MEUNIER:** May we see the next photo.

**BY MR. MEUNIER:**

**Q.** This is Hernandez 566. What does it show?

**A.** This shows the type of baseboard. It's a colonial-type molding with a shoe molding butting up to the casing and the

raised-panel Masonite doors. It also indicates the flooring in the living room and hall that connects the children's bedroom. It's a laminated, glue-down floor.

**Q.** In your protocol, do you recommend, as Knauf does, protecting and keeping this floor?

**A.** No, sir, I do not.

**Q.** Why not?

**A.** Well, several reasons. In review of information, one of the contractors that has been performing remediation, Beazer Homes, has been removing their wood floors. Another contractor, Lennar, has tried to salvage wood floors, but with limited success.

Secondly, the protection of the floors during the demolition and reconstruction presents a few different problems. One, it should be covered with a sealed material to prevent dust from going into the cracks and crevices of the floors themselves, the grooves, but that presents a problem because then we're placing a vapor barrier on those floors on the wrong side of the floor system.

Because we live in such a hot, humid climate, vapor barriers should be placed on the outside, the warm side of the building system or the warm side. That prevents moisture from penetrating into the building. So if I put a sealant on top of that wood floor, it encapsulates the moisture and will be detrimental to that wood floor.

Secondly, to prevent other types of damage from occurring, we would have to cover that floor with either a cardboard roll-out material, tape and seal it, or some other type of protective method to help prevent damage to those floors from tools being dropped or being scratched.

We also have another issue when we take the baseboards and the shoe molding away from the walls. These floors are not installed all the way to the base plate of the wood framing, the stud framing. They're typically three-quarters to one inch away from the walls, so preventing Sheetrock dust from getting underneath the wood edges will be somewhat difficult.

**Q.** This is a laminate-surface wood floor?

**A.** Yes. Yes. It has a thin layer of laminated -- I think this is oak.

**Q.** Say someone drops a tool or some mark is made on a laminate floor. Can you just sand that out like you can with a normal wood floor?

**A.** Not typically. Usually, the thickness of that laminate -- in real wood floors, the oak is normally three-quarters of an inch to an inch thick. We probably have maybe an eighth of an inch of laminated oak on the top of these floors, so sanding, removing even a sixteenth of an inch from these floors makes that oak finish paper-thin.

**Q.** During the demolition phase, there will be no electrical

power in the house?
**A.** That's correct.
**Q.** If you keep even a laminated wooden floor in a hot, humid environment without climate control, does that affect the floor?
**A.** It will affect all the wood products in the house: Framing, wood floors, any cellulose-type material left in that house.
**Q.** So your remediation protocol would be it's more cost-effective and practical to replace this floor with a like laminate wood floor?
**A.** Correct.
**Q.** Let's go to the next picture, please. This is Hernandez 567. What do we see in this picture?
**A.** This is the granite countertop in the kitchen. There's a 2-foot-wide countertop. There's a backsplash. Then for the majority of the run between the kitchen and living area, there's a countertop, or snack bar, which is also granite.
**Q.** Now -- I'm sorry.
**A.** That's okay. I was just going to point out a few things. There are penetrations in the granite, such as electrical outlets that we can see here and here, and the sink that all have to be cut out in the placement of the granite.
**Q.** The defendants agree all countertops are to be replaced. Do you find that they have measured the same amount of granite

countertop in this house as you have?

**A.** No, sir.

**Q.** Does it appear that they have taken into account, for example, the backsplash areas?

**A.** It appears that there's a lack of either splash, snack-bar top or, in addition, cabinet tops on the other side of the kitchen next to the cabinet.

**Q.** The defendants do propose to not replace but maintain these cabinets. Is there a problem, in your view, with doing that in the area where they adjoin the granite countertops?

**A.** Yes. The granite countertops are usually glued very well to the tops of the cabinets. When the painter is caulking and painting, he will caulk the bottom joint between the top of the cabinet and the bottom of the granite in this area here, all along this area. On the flip side, the same thing on the other side of that snack bar. In removing the countertop, we've encountered the problem of cutting the caulking away to detach the granite from the cabinet base that won't cause a splitting of the materials, the wood materials the cabinets are made of.

Secondly, with that, if we pull wood particles away from the cabinet facing, or just in having to redo the caulk and paint line, we have to sand and refinish that to build it back up to the thickness of the rest of the cabinet face.

**Q.** Let's look at the next picture, which has been marked as Hernandez 568. This is the tile floor that will be kept in the

house according to both Knauf and your protocol?

**A.** That's correct. This is the sitting area. The tile floor continues from the sitting area into the kitchen and laundry.

**Q.** Did you notice this object when you visited the house?

**A.** Yes, sir. That's one of two dehumidifiers that the Hernandezes have running in the home.

**Q.** Let's look at the next picture, please. This is Hernandez 569. What does it depict?

**A.** This is the laundry room. There's wire shelving in the laundry, and this is the main breaker panel for the electrical system.

**Q.** Now, you recommend the removal of the breaker system?

**A.** Not the box, but the bus bar and the breakers, yes, sir.

**Q.** Why is that, sir?

**A.** Well, several reasons. Indications from the information that I've researched state that the corrosion occurs in these areas --

**MR. HAYDEN:** Objection, Your Honor. He's not being called as a corrosion expert or an electrical engineer.

**MR. MEUNIER:** Judge, he's saying what he relied upon in order to reach his conclusion about this breaker.

**THE COURT:** I'm listening to him. I overrule the objection.

**THE WITNESS:** Information that we researched indicates that the components within the breaker panel are

materials that will corrode. We have removed breakers from this panel and sent them off to be analyzed. I think some of the pictures that were shown in court earlier today are of electrical breakers that came out of this panel.

**BY MR. MEUNIER:**

**Q.** Let me ask this question. You've got a debate about this. You've got some scientists say the breakers are fine; some scientists say it's a corrosion problem. You're the general contractor. In the real world, what would a reputable contractor do when there is such a debate going on about whether or not there's corrosion in a breaker box?

**A.** Well, because the liability will rest on my shoulders to properly produce an adequate and proper scope of remediation, we listen to one side and they say it's got corrosion and it has to come out; the other side says it's corrosion, but it's not to the level of failure. But there are no documents that give me any kind of clear indication that those components are proper to leave in the house and that no problems will occur as a result of that, of leaving those components in that house.

So without a clear-cut indication from those powers that be or from some governmental issue that this is not a problem, we cannot take the liability and the risk of leaving materials in a house that we know is corroded and we don't know what the end result of leaving them in the house is going to be.

**Q.** Let's go to the next picture please, which is Hernandez 570. What does it show?

**A.** That's the security system, the main box for the security system in the home. It's in the laundry room.

**Q.** Does your scope of remediation include the removal of the security system, the alarm box, etc.?

**A.** Yes, sir, it does.

**Q.** Would your reason for that be the same as what you've just been talking about with the circuit breaker?

**A.** Yes.

**Q.** Let's go to the next picture, which has been marked as Hernandez 571. Tell us what this shows.

**A.** This is the area underneath the kitchen sink. This is the disposal system. These are water lines that we have changed out and sent some of these parts to be analyzed. This is PVC drain lines that are connected to the sink area, and the valves that control those lines, those water lines.

**Q.** Your recommendation, Mr. Mallet, is to remove all plumbing in the house?

**A.** To remove the copper, but especially the areas below sinks and lavatories. Whether we were performing a Chinese drywall remediation or any other type of construction, we would have to remove these items to remove and replace or remove and reinstall sinks and cabinetry or walls behind the cabinetry.

**Q.** Is your recommendation to remove and replace all the

plumbing fixtures and copper plumbing in the house?

**A.** All of the copper plumbing and some of the fixtures.

**Q.** Would there be difficulty in leaving the copper plumbing lines in place and proceed with the demolition and cleanup with it in place?

**A.** Not so much in the demolition. But in reinstalling cabinetry without removing the valves, the stems, the traps, and the lines, there's no way to put the new cabinets back in place and up to the walls without removing those items.

**Q.** Let's go to the next picture, please, which is Hernandez 572. What does it show?

**A.** It shows the air-handling unit here, the long box. It shows the plenum, supply plenum.

**Q.** "Plenum" is what this is called?

**A.** Yes, sir.

**Q.** P-L-E-N-U-M?

**A.** P-L-E-N-U-M. The air blows from the air-handling unit into the plenum and into the branched ductwork that goes to the individual rooms. The plenum is made out of a duct board, which is just an outside-lined, aluminum-type, scrim-faced foil material with insulation on the inside. The ductwork is flexible duct that is externally wrapped.

**Q.** I believe both Knauf and plaintiffs agree that all the flexible ductwork is to be removed and replaced.

Let's talk about the HVAC system that is shown in

this picture. You're aware that the HVAC coils in the Hernandez home, which would be inside this air-handling box, have been recently replaced and coated with -- I think it's called Bronz-Glow, or some material that's supposed to be prevention of corrosion?

**A.** That's my understanding, yes, sir.

**Q.** So knowing that, what is your recommendation with respect to the HVAC system?

**A.** Well, the other components in the HVAC system have corrosion. The expansion valve, the wiring, the circuitry was removed from this unit and sent off for testing of the corrosives. We took the new materials, such as the expansion valves and tubes that were installed in this unit, and put them side by side and photographed them so that you could see the significant difference between those items of new and old.

In addition, the interior of this air-handling system is internally lined with insulation. The box would have to be taken apart, the insulation removed, new insulation placed on the inside of the metal lining or box, and then reinstalled. It's a significant amount of work.

We have, in the past, looked at the efficiency of cost versus replacement in other non-Chinese drywall issues that were not even in litigation, and it is simply easier and just about as cost-effective to replace the air handler.

**Q.** Even if the coils are now coated and not themselves a

problem, you believe it makes cost sense to remove the whole system?

**A.** Well, by the time you replace all of the various corroded components and all of the insulation that's inside the unit, the motor and any affected corroded components, you're probably spending more money than changing out the air handler.

**Q.** Now, there's a line set that connects this air-handling system to the outside condenser and compressor; true?

**A.** Yes, sir.

**Q.** What is your recommendation, first, with respect to the outside condenser and compressor?

**A.** Originally, I estimated to change the outside compressor because that was just my understanding of what was done on other projects, but I wasn't quite grounded in the reasoning for changing it out. So I contacted one of our team members, a mechanical engineer, and asked him to look into the necessity for changing the outside unit.

**MR. HAYDEN:** Your Honor, hearsay.

**MR. MEUNIER:** Are you sure you want to object to this?

I think this helps the defendant, Judge. He was explaining why he's going to keep the outside compressor, but if we --

**MR. HAYDEN:** Sorry, Judge. I'm still in law school.

**THE COURT:** Just tell us what you decided.

**THE WITNESS:** I'm going to keep the compressor.

**BY MR. MEUNIER:**

**Q.** Keep the compressor.

Now, let's talk about the line set. First of all, tell the Judge again: What is the line set that connects the outside compressor to this attic air handler?

**A.** It is a continuous copper tubing line that goes from the outside compressor to the inside air-handling unit. It carries the refrigerants from the inside to the outside.

**Q.** Are you going to replace that entire line set?

**A.** Yes, sir.

**Q.** Aren't you aware that there's been a picture shown where the Armaflex is taken away and there's a section of line set in the attic that looks shiny and copper?

**A.** Yes, sir, I am.

**Q.** So why are you going to replace the line set?

**A.** Well, what I haven't been shown is all of the concealed areas of that line set in the wall system itself that's in the area of the Sheetrock or encapsulated in the insulation behind the Sheetrock. Based on all of the other copper items that we have looked at in the house, I can't imagine that that is not affected, that hasn't been corroded also.

**Q.** Let's look at the next photograph, which is Hernandez 573. What does this show?

**A.** It's a light in the attic. It shows an indication of the

fasteners that are used in installing electrical lines in homes. Code requires the lines to be fastened, maximum, every 4-and-a-half feet or within 12 inches of any outlet or penetration.

**Q.** So behind the drywall in the Hernandez home in areas we cannot see like we can see in the attic, you would think there would be the same stapled Romex wiring occurring every so often?

**A.** That's correct. A little bit later on, we'll have some photographs showing the typical installation of the wiring.

**Q.** You're aware, aren't you, Mr. Mallet, that in contrast to your proposal to remove all the electrical wiring and replace it all, Knauf is proposing in this home to keep the wiring and splice it within boxes?

**A.** Yes, sir.

**Q.** You mentioned yesterday Mr. Hicks, who is your electrical engineer on staff.

**A.** Consultant engineer.

**MR. MEUNIER:** Let's look at the next picture, which is, Your Honor, not being marked or offered into evidence as an exhibit, but it's simply being shown to corroborate the witness' testimony.

**BY MR. MEUNIER:**

**Q.** Do you recognize this as part of Mr. Hicks' report to you?

**MR. HAYDEN:** Your Honor, before we go on, this is

 still trying to get another expert report in through this witness. It's having to do with electrical issues by an electrical engineer. It's hearsay.

**MR. MEUNIER:** Your Honor, experts, under Rule 703, can and do rely on material that is not in and of itself admissible.

**THE COURT:** Let's see where we go with it. Let's just get him to make the conclusion.

**MR. MEUNIER:** Okay.

**THE COURT:** Why he did it is another issue.

**BY MR. MEUNIER:**

**Q.** What conclusion did you make from the input given to you by Mr. Hicks in this report pertinent to whether you should remove all wiring or attempt to keep wiring in place?

**A.** That the wiring should be removed throughout the house.

**Q.** What was it about Mr. Hicks' input that helped persuade you to that conclusion?

**MR. HAYDEN:** Your Honor, may I have a continuing objection to this?

**THE COURT:** Yes. Go ahead.

**THE WITNESS:** Mr. Hicks calculated the amount of net free space in the receptacle that electricians for, I think, Knauf went to the home, removed light switches, cut the wiring, and spliced wiring to that conductor coming into the box.

**MR. MEUNIER:** We have some pictures of that. If we

could show Hernandez 382.

**THE WITNESS:** Yes, sir.

**BY MR. MEUNIER:**

**Q.** Tell the Court what this slide shows.

**A.** This is one of the children's bedrooms. This is a two-gang or two-switch box that the wires were cut, spliced, and wire nuts were placed on those splices.

Each electrical box has a certain cubic inch of space in that box, and the code requires a net free area for the air passage in these boxes so that temperatures do not elevate and damage to the insulators occur.

**THE COURT:** Just a moment.

**MR. HAYDEN:** Once again, Your Honor, I'd move to strike all this. He's now going into not what he did, but he's testifying about whatever Hicks' opinions are.

**MR. MEUNIER:** Your Honor, I think under Rule 703, though, he's allowed to rely on, among other things, what Hicks --

**THE COURT:** Yes, he is, but why don't you just get to the bottom line.

What did you do?

**THE WITNESS:** Well, the bottom line is that there's more wiring in the box than the code allows to have in a box by splicing.

**THE COURT:** Got it.

**BY MR. MEUNIER:**

**Q.** To complete the picture, the pictures on the top, the top two pictures, as well as the bottom picture on the left, are all of the box after the Knauf folks had done their splicing and --

**A.** Yes, sir.

**Q.** What is the picture on the bottom right?

**A.** The electrical engineer instructed our electrician to bring the box back into code compliance. To do that, another junction box had to be set below the switch box to make that connection and extend the wire into the switch boxes. So we have a junction box now with a blank faceplate below the switch box.

**Q.** Why do you need another junction box here? What is your understanding of why that's needed?

**MR. HAYDEN:** Your Honor, a continuing objection.

**THE COURT:** Except he's been offered as an expert in code and costs, so --

**MR. HAYDEN:** No, Your Honor, not on code. Cost estimation, general contracting.

**THE COURT:** You're right. Cost and scope.

**MR. MEUNIER:** Your Honor, I simply submit that in order to make decisions on cost and scope, he has to know what codes provide.

**THE COURT:** I agree. Overruled.

**BY MR. MEUNIER:**

**Q.** What was your understanding of why another hole in the wall had to be cut here for another junction box in order to make the kids' junction box here compliant with code and not overcrowded?

**A.** Because, from knowledge, we cannot have a concealed junction box in a wall or ceiling or floor system. You have to have access to that junction for servicing purposes.

**Q.** Is there a code requirement that you're aware of that there be 6 inches of free conductor inside a junction box?

**A.** Yes, sir.

**Q.** Is it your understanding that it's 6 inches of unspliced wire?

**A.** Unspliced wire.

**Q.** Now, Mr. Mallet, you were present, weren't you, for the Knauf demolition demonstration at the other home, the control home in Mandeville?

**A.** Yes, sir.

**Q.** You've got in your PowerPoint certain pictures that you think are relevant to discuss that were taken at that time?

**A.** Yes, sir.

**Q.** Let's look at the next picture, which is Hernandez 542. What is that this?

**A.** That's the identification photograph of 209 Rue Esplanade in Mandeville, the control house.

**Q.** Next picture, 543, what does this show?
**A.** This is an overview of the rear wall of the second-floor middle bedroom. This is the area they began removal of the Sheetrock from the walls.
**Q.** What were they using to remove the Sheetrock in this picture?
**A.** They were using a knife to cut the Sheetrock in sort of a methodological way to remove that in sections from the wall system.
**Q.** You've seen the Beazer method: Make a hand-hold with a hammer and pull the drywall away? You've seen that?
**A.** Yes, sir.
**Q.** You've seen this method of cutting it with a knife?
**A.** Yes, sir.
**Q.** What method do you think is the most appropriate and cost-efficient to use in the Hernandez remediation?
**A.** Something in the middle.
**Q.** What is that?
**A.** Well, we would remove -- and there's no way really to remove Sheetrock that's installed and properly installed in whole sections. The studs are 16 inches apart. If it's fastened correctly, it's screwed every 6 inches around the perimeter, 12 inches in the center-stud areas, so it's going to come out in pieces no matter how careful we do our work.
We wouldn't just go in and just break it apart to

take it out. We would actually make it somewhat harder to clean up afterwards, but to take it out in as large a piece as is physically possible, as the Sheetrock would allow you to release.

**Q.** How would you do that? How would you cut into the wall to pull out large pieces?

**A.** Well, we'd initially have to break into the wall or cut open in a corner somewheres and begin at a logical point, such as a door opening, a window opening, where we have an edge, a natural edge, and then start pulling away from those areas.

**Q.** With your hands?

**A.** Well, you would need a pry bar, hammer, and hands.

**Q.** Would you expect the Sheetrock to break?

**A.** It's going to break.

**Q.** Would you expect it to create dust?

**A.** It's going to create dust.

**Q.** Do you think there's any way to take off Sheetrock without creating drywall dust?

**A.** I haven't figured that out in 36 years.

**Q.** The next picture is Hernandez 544.

**A.** Yes, sir.

**Q.** What is the relevance of this picture, and what does it show?

**A.** Even with the careful removal of the trim and Sheetrock in the room, the molding still broke. It still created issues

with matching, and it also created issues with the caulk and paint lines against other wood materials in the home.

**MR. HAYDEN:** Your Honor, for the record, we're not disputing the trim as an issue. We're replacing trim.

**MR. MEUNIER:** I was about to just make that clear, Judge.

**BY MR. MEUNIER:**

**Q.** The molding and trim is coming out, according to Knauf's protocol, but what was important to you about these pictures nonetheless?

**A.** Well, it's my understanding that while some of the trim is coming out of the -- or the proposal is to take out the trim, the casing around doors, the proposal does not include, to my understanding, the replacement of the jambs, the material that the casings are attached to.

In these photographs, we see where the removal of the trim has left the caulking and the painting, and also it has split the wood materials and left gouges in the jamb, causing a condition to have to replace it regardless.

It also gives indication of no matter how careful we are with removing the cabinets, at the joints and seams we're going to have this very same condition to deal with: Caulking in the joints, paint in the joints that are going to have to be scraped out and cleaned. If it pops when you're taking those components apart and out of the home, then you've got a

finishing issue to deal with.

**Q.** Let's look at the next picture, which is Hernandez 545.

**A.** Right. Just indications of the caulking causing the trim material to split when you're pulling it away.

**Q.** That's a fairly small damage, though, isn't it?

**A.** That is.

**Q.** Why shouldn't the Hernandez family be able to tolerate small damage like that to wood components that are pulled away?

**A.** Well, the real small piece we might be able to put back together; however, it makes it difficult. Split moldings generally are not what you find in a house, in the home. You only put whole pieces of material. If they're split when you're putting it up, it should be taken down and a nondamaged piece installed.

**Q.** Let's look at the next picture, which is 546.

**A.** That's a door jamb that the casing was removed. And in this area here, that jamb was split and part of that wooden member was pulled away. We see the caulking and painting still remaining. So even if we did salvage this, we'd have to scrape by hand all of the caulking and paint in this area, and then sand it down smoothly to receive the new casing.

**Q.** These pictures were taken at the demonstration house after this careful effort was made by Knauf's people to remove the drywall?

**A.** That's correct.

**MR. HAYDEN:** Objection, Your Honor: Argumentative.

**BY MR. MEUNIER:**

**Q.** Let's look at the next picture, and let me ask the question first. What kind of insulation is in the Hernandez house?

**A.** It's a blown-in insulation.

**Q.** This picture, Hernandez 547, is what?

**A.** This is the control house that has similar insulation blown in the wall system. I think we have a slide later that shows the insulation attached to the studs and in the boxes.

**Q.** So when the drywall is taken out of the Hernandez home, the first thing you will see will be this blown-in insulation material?

**A.** That's correct.

**Q.** Describe the material to the Judge. Is this hard? Is it flexible? Soft?

**A.** No, it's slightly rigid because it's put in slightly wet, and then it dries and it dries in place. All of these are just a whole bunch of particles that are just held together with a glue mechanism. When we take that out, it will be all over the place.

**Q.** Let's look at the next photo, please, which is Hernandez 548. What does this show?

**A.** This shows the attachment of that blown insulation onto the studs, framing member. The exterior wall, which typically

 is an OSB board -- which is just wood chips and glue -- it's a rough finish, and the insulation sticks to it. And we have wiring, electrical wiring, and a low voltage wire for the alarm system that runs through the studs. Cleaning out those areas will be difficult, if at all possible, with the wiring in the walls.

**Q.** So if you take out and scrape away the insulation and leave the wiring, will cleanup be possible?

**A.** Not total cleanup.

**Q.** Why is that?

**A.** Well, because I can't get in these penetrations in the framing members to clean that area out because the wiring is run in it.

**Q.** Let's look at the next picture, which is Hernandez 549. What are we showing here?

**A.** This is typical of what we would see in a wall: The wiring running from one receptacle to the next, down the wall. The wiring penetrates the studs. You can also do the same thing to the ceiling joists or the floor joists, making cleaning in those openings next to impossible.

**Q.** When you say "cleaning," you're talking about the fine dust from drywall demolition?

**A.** And the insulation.

**Q.** Let's look at the next photo, which is Hernandez 550. What does this show?

**A.** When we looked at the picture of the light fixture in the attic, we saw the attachment to the studs. Here's where the wire penetrates the fire blocking, and there's a fastener within 12 inches of the fire blocking above and below. There's also another wire running right parallel to it, and the staples have those wires attached firmly to the framing members, to the studs.

**Q.** In cleaning the drywall dust, why do you think you'd have to get in the space between the wood stud and the stapled wire?

**A.** Well, we couldn't perform a thorough cleaning of the drywall dust or insulation with that wiring attached to the stud. We couldn't clean behind this area.

**Q.** Let's look at the next picture, which is 551. I think we've already discussed enough of the wiring issue.

Let's go to 552. What does this photograph show, Mr. Mallet?

**A.** One of the issues in removing the drywall from around windows is the damage that it's going to cause to the flashing material that captures any water leakage through the window, around the perimeter of the window, and drains it out of the building.

We can see that there was damage to the flashing in various areas. So in putting the home back together, we will have to address that flashing and rewrapping that Sheetrock opening with it and not impervious material.

**Q.** This damaged to the flashing was seen after Knauf's method of removing the drywall?

**A.** Correct.

**Q.** Why is it important to you, in bidding a job, to become aware of issues like this, like this damaged window flashing?

**A.** Well, if it's a fixed bid, anything that we don't place in the bid will have to come out of our pocket to replace or repair. If this were an insurance repair job, if it wasn't included on our scope, we would merely call the adjuster and say, "Hey, there was flashing behind the trim that was damaged when we took it off. We need a supplement." He would come out, photograph it, and say, "Send your supplement in," and issue an additional payment for it.

**Q.** If there's a need for the Hernandezes to receive a certain amount to hire you to do this job, these types of things are going to be reflected in your bid?

**A.** Yes, sir, they are.

**Q.** Let's look at the next picture, which is Hernandez 553. What does this show?

**A.** This is a copper water line that's running in the plate of the floor. The copper water line has the black indicative material, and it's running through the floor area.

**Q.** Now, Knauf proposes to keep such copper plumbing in place and then try to clean up the drywall dust. Do you think that's practical?

**A.** It's not only not practical, it's not possible in some areas.
**Q.** Why do you say that?
**A.** Well, everywhere it penetrates, such as these areas here, I could neither clean this pipe nor adequately clean the hole that penetrates the framing member.
**Q.** Let's look at the next photos, which is Hernandez 554. What does this photo depict?
**A.** It indicates Sheetrock that was left in some of the wall cavities in the house in the area downstairs.
**Q.** So this is debris down an opening in a closet that's from the original construction of this home?
**A.** Yes, sir.
**Q.** Is it typical to find debris like this in spaces like this in home construction?
**A.** If it's not properly cleaned before you finalize your work, yes.
**Q.** What's the relevance of noting this debris?
**A.** Well, that those are issues that we have to deal with in the final cleanup or in the remediation work that we're performing. If it's got Chinese drywall and there's penetrations of anything in these areas, it has to be addressed.
**Q.** Let's look at the next photo, which is 555. What does this show?

**A.** More of the same of the previous photograph.

**Q.** So in the remediation of this home, if you find any debris that is left over from the earlier construction, particularly drywall debris, it's your proposal to thoroughly clean that?

**A.** Correct. Usually, we'll find on the studs, you see further down here, Sheetrock compound that has to be dealt with.

The other issue is where the studs will meet the exterior sheathing, any separations between those areas will have to be hand cleaned with brushes and can't just be simply wiped down.

**Q.** Let's next move to your cost estimate. Before we do that, Mr. Mallet, I want to return and wrap up the discussion about electrical wiring.

Could you summarize for the Court all of the key reasons you have for recommending to him that all of the wiring be removed and replaced in this home as opposed to maintaining it and splicing it within boxes.

**A.** Yes, sir. One of the first issues is dealing with the code. It's our understanding that the code does not allow the splicing within 6 inches of the penetration of the box. So any splicing that's performed cannot be within 6 inches of that entry from the back of the box.

Secondly, if the box, after it's spliced, is overfilled and doesn't have the proper air space for heat

 disbursement, that, in addition, won't meet the code.

Thirdly, in remediating, if we're able to cut wiring and splice back, if the damage gets too close to the back end of the box, where the wire penetrates through, we may not have enough wire left to perform that splice.

In the cleaning of the home, any particulate that's in between the stud and the receptacle boxes or, as we looked at earlier, the attachments of the wiring to the walls won't be able to be properly cleaned unless they're removed, cleaned down, and put back in place.

And in removing the wiring, those staples tightly fasten around the wire. Removing that staple from around that wire is very -- it's highly possible to damage the coating of that wiring in removing the staples in our attempt to clean the framing and wiring.

**Q.** So we've got code. We've got cleaning. Any other reasons?

**A.** We have the corrosion issues. We really don't know -- nobody has examined each and every outlet, each and every switch box, each and every light penetration to tell us how far back that each wire has to be cut back, and will we have enough wire to create that splice in that junction box.

In addition, the cleaning issue of we really don't have any idea when we're cleaning if we've cleaned it adequately enough.

**Q.** Well, Mr. Mallet, you've heard experts from Knauf say the corrosion does not exist into the walls; it's not going to continue after the drywall is out. You've heard that testimony?

**A.** Yes, sir.

**Q.** Why doesn't that satisfy you, as a general contractor, that the Hernandez family, once they receive remediation costs, should be able to go out in the real world and hire someone like you to leave wire in the house? Why wouldn't it be enough that Knauf's experts say: No Chinese drywall, no corrosion?

**MR. HAYDEN:** Which question, Your Honor?

**BY MR. MEUNIER:**

**Q.** Why wouldn't you be satisfied to hear that there are experts on Knauf's side who say the corrosion won't continue once the drywall's out, as a general contractor?

**A.** Well, one reason is that there's probably the equal number of experts on the other side that say it has to come out and corrosion potential is still there in the house. There's no cut-and-dry directive as to whether or not that corrosion, one, has thoroughly been removed, that everything that we saw is going to be removed, and just the liability of keeping that wiring in there if there's a problem that occurs.

**Q.** In the real world, based on your experience, do you think a reputable general contractor, knowing that there is a legitimate debate and risk about corrosion, will propose to

 leave wiring in this house and sign a deal with these people to do that?

**MR. HAYDEN:** Objection, Your Honor: Argumentative.

**THE COURT:** I'll overrule the objection. Can you answer that?

**THE WITNESS:** Yes, sir. I would think not. I can't imagine, knowing that there's an issue in the house already, that the contractor would want to take that liability upon himself.

**BY MR. MEUNIER:**

**Q.** Is there any other reason besides the code issues, the cleaning issues, and the corrosion issues that you have for proposing to this Court that all wiring be removed and replaced?

**A.** We have one more C, the cost. The cost of actually standing there skinning wire pieces at a time to see how far back you have corrosion in that wiring, and then getting towards the back side of the box with enough room to work, it's a labor-intensive -- it's not just walking in and somebody said to take 3 inches of wire out of every outlet box or switch box where you go in and measure and cut 3 inches.

Somebody's going to have to direct that electrical contractor how far back each one of those wires need to be, have the protective membrane removed, and that it's satisfactorily been removed to splice those outlets.

**Q.** Now, you mentioned, in doing your cost estimate, that you have used a program or software program for that; is that true?
**A.** Yes, sir.
**Q.** What is the program?
**A.** Xactimate.
**Q.** That's X-A-C-T-I-M-A-T-E? Xactimate?
**A.** Yes, sir.
**Q.** Tell the Judge what that is.
**A.** That's a computer program that, among other things, is used by contractors and insurance companies. We enter the dimensions of a room and the scope by code. It takes and applies unit costs on an item-by-item basis, and those unit costs are updated on a quarterly basis but for that specific geographical area, not a region. Our estimate is for Mandeville prices, average cost prices in the Mandeville area, and those prices are updated quarterly. Our estimate uses the January 2010 pricing guide.
**Q.** Is the Xactimate method of costing construction jobs one that is used throughout the United States?
**A.** And other parts of the world as well, yes.
**Q.** How long has your company or your companies been using Xactimate?
**A.** Since the late 1980s.
**Q.** Does the insurance industry use Xactimate?
**A.** They use it and recognize it, yes, sir.

**Q.** Now, let's look at the next slide in your display. This has been marked as Hernandez 556-0001 and 2. This is 0001. What is this form?

**A.** This is what's called a tick sheet. It's a general form.

**Q.** Let's focus just on the top section. We can show the Court better what it is.

**A.** It gives us places to input the data for each room, room name, room sizes, any missing walls, by that meaning if there's a large opening between -- for instance, at the Hernandez house, between the kitchen and the living area, we subtract that area from our estimate. It's called a missing wall. We'll tell the person in our office that is inputting the data into the computer that she needs to put that missing wall data so we don't pick up Sheetrock or trim molding, painting, so forth. It's the actual area of work.

Then from there we go down into the other areas that gives us general items typically found in a residence that we have to look at addressing. Whether it's a remove and replace, remove and reset, it's a guideline that we use. It helps us to not overlook things in the production of our scope on site. I will generally handwrite my scope, but use this as a general overview to make sure that I've picked up everything that I have to address within a room.

**Q.** Have you gone through every room in the Hernandez house and used the Xactimate software program to price this job?

**A.** Yes, sir.

**Q.** Have you prepared several slides just to illustrate what you've done in the Hernandez house?

**A.** Yes, sir.

**Q.** Let's go to Hernandez 556-0003. Zoom in a little bit on this.

**A.** This is a segment of the program that if we have a question as to what type of materials or what kind of action is included in that unit cost price, we can go to this price list item by code and it gives us a description of what is inclusive in that code. It gives us an average life, if we need to perform depreciation. This happens to be a heater light in the bathroom. It's 100 cubic feet per minute of exhaust, and also what it includes. That's the labor, material, and removal, which is further up at the top, if we go back up to the top.

This is the labor to install it. It gives us the component, the unit cost, the waste factor, because every function on a job has waste, whether it's in material, in worker slippage. There's a calculated average waste for that function. The yield per hour and the extended cost. The materials, the same thing; the average price of the materials, the waste, the extended cost, and the cost to remove those particular items.

Then it gives us a labor burden to attach to that, that when totaled up gives us the unit cost that is shown in

the estimate.

**Q.** For this job, bathroom ventilation, fan light, and heater replacement, you're going to bid 68.70 for labor and 246.07 for materials?

**A.** Yes, sir.

**Q.** Let's just show one more thing. Let's look at 556-0004 on cabinetry. This is the replacement; not to store and reinstall, but to replace cabinets in the house?

**A.** Yes, sir, it is. The same scenario. We have the labor, the carpentry labor, finish carpentry labor to install, and how many feet of cabinetry can be installed in an hour as an average, the slippage percentage or the waste percentage, and the extended cost of that per foot item.

Here, you have the material cost that's extended out and the cost to remove, along with the labor burden and the total price per linear foot to remove and replace that item of cabinetry at the bottom, along with the description of that cabinet material. So we can get real detailed in what our estimates include and how we arrive at those numbers if we need to.

**Q.** You supplied all those details for every room in this house?

**A.** Yes, sir.

**Q.** You prepared a cost estimate that, I believe, is 31 pages long; is that true?

**A.** Yes.

**Q.** I think we have, in your slide show, the summary page, which is page 29, if we could see that, which is Hernandez 477-0029. It should be the next one after that. If we could enlarge this area.

While we're waiting, tell the Judge what this page of your estimate sets forth.

**A.** After all of the items are inputted into the computer, it produces a subtotal of the line items, and then it applies material and equipment sales tax, and then it applies an industry standard overhead and profit percentage of 10 and 10 percent: 10 percent overhead and 10 percent profit. But that is not the entire picture of the profit and overhead.

There are also items inclusive within unit cost that cover for either soft or hard costs directly for that project. And then the price percentage for the permitting is added. The total of the entire estimate is produced at the bottom.

**Q.** So the total cost estimate to complete the proposed remediation work at the Hernandez home is, in your view, $200,218.09; is that correct?

**A.** Yes, sir.

**MR. MEUNIER:** I think there were two other pages after this; one of which, Your Honor, we already looked at, I think, when counsel for Knauf was questioning a witness, and we'll show those. This is recap by room, which we should mark

as Hernandez 477-0030.

**BY MR. MEUNIER:**

**Q.** Tell the Judge what the recap by room is, Mr. Mallet.

**A.** One of the breakdowns we're able to look at is the cost on a room-by-room basis in our review of the data.

**Q.** And the next and final page --

**THE COURT:** The percent there is the percentage per square footage --

**MR. MEUNIER:** The right-hand column --

**THE COURT:** -- that the room is?

**THE WITNESS:** Yes, sir. That's the percentage of the estimate for that particular room.

**THE COURT:** Okay.

**THE WITNESS:** For instance, the master bedroom, $11,000 is 7.2 percent of the estimate.

**THE COURT:** I got it.

**BY MR. MEUNIER:**

**Q.** All right, sir. Let's look at the final page of your cost estimate we're going to see here, which is Hernandez 477-0031, and this is recap by category. What does that mean?

**A.** Correct. Then here we can look at the cost by category: Cabinetry, cleaning, demolition, drywall, and so forth. It's an accumulation of costs for each one of these functions.

**Q.** Mr. Mallet, you mentioned profit, and I believe you have in your slides a couple of narrative slides here now to take

the Judge through your explanation of what is meant in the construction business, in your business, by gross profit. Would you please explain.

**A.** Yes. There's basically four areas that make up the cost of producing our construction projects, or any construction project. One is the direct job cost; how much does the labor cost us directly, and how much does the material cost us directly.

Then on top of that, we have a burden of workers' comp, liability, unemployment insurance, federal and state, and any other type of health benefits, vacation benefits that is applied to the overall cost and added to the hard cost of the employee's wages.

From there, the general overhead of the company is applied to the estimate to cover home-office overhead, other insurances such as liability that is not directly job related, cost of fuel, vehicles, and so forth, tools that are not directly related to the project, and then, of course, the markup, the contractor's profit.

It's what keeps us in business and what keeps us available to our clients in case there's issues that arise after the project is finished, to be able to go back and address warranty issues, especially if a subcontractor or a supplier does not come back and take care of the issue if it's his responsibility or liability. So we have to have enough

markup in every project to be able to continually serve our customers year after year after year.

**Q.** You heard Mr. Ray Phillips' testimony in this court about a 15 percent profit number if you were going to convert builder costs to owner costs. How does that compare to the profit percentages that you are discussing here?

**A.** Well, the builder profit, first of all, wasn't identified as to whether it was gross or net, and I'm not sure. It could be either. 15 percent would be out of the general realm of markup or profit that general contractors traditionally make, and it is too low to cover all of the general contractor's overhead.

Traditionally, a company producing about $1 million of work a year will have an overhead amount of about 40 percent, or $400,000, on $1 million of work production. So while there may be a separate line item broken out for some sort of a markup, or an overhead markup, there still has to be within the various units within that estimate to take care of the direct costs for that project.

**Q.** Let's go to the next slide. You talk about the item of burden. I think you mentioned this. What you mean by *burden* is what?

**A.** Things such as taxes applied, unemployment taxes, insurances, vacation pay, holiday pay, vehicle allowances, any indirect cost of having employees work and giving benefits to

those employees to retain them.

**Q.** That's built into the gross profit that you'll charge a family for a restoration job like this?

**A.** Correct, or any project.

**Q.** What's the next component, job cost?

**A.** Yes, the job cost. We talked about it earlier. It's the direct cost of employee labor, the materials, the subcontractors, the fees, disposal, and anything necessary to physically produce or reproduce that job.

**Q.** Then, finally, you have a slide here on overhead.

**A.** The overhead is, again, the indirect cost that's applied to every -- every company has. Whether it's a telephone, an insurance, rent, lights, water, they have an overhead to apply to their operation.

**Q.** Now, Mr. Mallet, did you see the cost estimates received from the Knauf expert in this litigation, Mr. Carubba?

**A.** Yes, sir.

**Q.** Did you also see the cost estimate furnished, I believe, through Mr. Carubba from a company called Benchmark Custom Builders?

**A.** Yes, sir.

**Q.** Did you prepare a table of comparison showing by different category and by total the differences between your cost estimation and that of both Carubba and Benchmark Custom Builders?

**A.** Yes, sir, I did.

**Q.** If we look at the next slide, please, which is Hernandez 557-0001, the first series of numbers on the left, the columns on the left, would be your estimates for First General Services?

**A.** Yes, sir.

**Q.** The middle columns would be Carubba? That's the defendant's, Knauf's construction expert?

**A.** Yes, sir.

**Q.** The third set of columns is Benchmark Custom Builders, which is also being submitted in this case on behalf of Knauf; true?

**A.** Yes, sir. That's my understanding.

**MR. MEUNIER:** This is going to be in evidence. This is a three-page document, Your Honor, which I would just like to point out a couple things on with the witness, and then conclude.

**BY MR. MEUNIER:**

**Q.** Let's just look first at demolition, which is the very first entry, if we could enlarge that. Your demolition total cost is $12,626.71; correct?

**A.** Yes, sir, that's correct.

**Q.** Mr. Carubba's, if we go to the right, is $6,300?

**A.** Yes, sir.

**Q.** If we go further to the right, the Benchmark Homes number

is $5,300?

**A.** Yes, sir. $5,003.

**Q.** $5,003. I'm sorry.

What is your analysis about the difference in those numbers?

**A.** Well, if we take the standard labor costs as identified in Xactimate as the labor rates for the Mandeville area and apply those to a similar crew as was used in the Knauf house and apply those to the charges here, our figure is -- to have all of the demolition taken care of would take approximately six-and-a-half days of work.

Now, that includes us walking in cold into this house. Only the furniture is removed. We have to begin removing cabinetry, flooring, light fixtures, plumbing fixtures, tile on the walls, showers, whirlpools, shutters, and package those shutters for storage, all of the base trim, shoe molding, crown molding, so forth, granites, taking all of that out of the house and disposing of it properly. It's time-consuming.

Even with a large crew, you're walking into a building with having to set up scaffolding, set up ladders, taking tools out, and there's a loss of time in the demolition. Depending on the time of the year, the loss of time on a project, by the OSHA standards that we work by, especially in buildings without air conditioning, the hotter it gets, the

less time our people can stay in those buildings working on a continuous basis without giving them breaks for rest and drinks. So there's a lot more than just walking into the building to start taking Sheetrock out and throwing it into a dumpster.

**Q.** Knowing what you know, based on your experience, do you think it is reasonable to expect that Mr. and Mrs. Hernandez could accomplish the needed demolition in this case for either $5,003 or $6,300 as proposed by Knauf?

**A.** Not based on the average cost of and the time factors that are assembled by Xactimate.

**Q.** Let's look at cleanup, which is the third item down. I'm sorry. I meant the one above that.

You have cleanup postdemolition, joists, studs, walls, shutters, and the Xactimate number or the number that you propose is $4,593.85?

**A.** Yes, sir.

**Q.** The numbers proposed by Mr. Carubba and then Benchmark is either $2,800 or $2,400?

**A.** Yes, sir.

**Q.** Please reflect for us the difference in those numbers to do the cleanup needed postdemolition.

**A.** The cleanup entails the ceiling joists, the studs, plates, the plywood floors that are left, or the ceramic floors that are left in place, a thorough clean-down of all of those areas.

We have just over 2,000 square feet of area, about 2,200 square feet of area that has to be addressed in the cleaning. The cleanup is just quite time-consuming.

**Q.** You have a separate line item in your comparison table for dehumidifiers, HEPA-vacuuming, negative air fans, and PPE for cleanup. What is PPE?

**A.** Personal protection equipment.

**Q.** Your proposal is that this item will cost $16,209.75. You did not see any numbers for this from the Carubba or Benchmark Homes submission?

**A.** No, sir, I did not.

**Q.** We saw some cleanup numbers from the earlier line we looked at. Assume that they are going to say they can do all the vacuuming and everything for those cleanup numbers of $2,800 or $2,400. Do you think that's possible?

**A.** Not based on my knowledge of restoration cleaning.

**Q.** What about HEPA-vacuuming? We've heard reference to Shop-Vac and special filters for Shop-Vac. What is your proposal on the use of HEPA-vacuuming?

**A.** I have seen a number of protocols or data in reviewing our initial preparation of a protocol, long before we became involved in the Hernandez house, and the use of HEPA-vacuuming, which is high-efficiency particulate filters that will capture dust and mold particles down to 4 microns in diameter. Basically, that's what we're looking at with the drywall

demolition, is very fine particulate that we need to remove from surfaces and from the air.

**Q.** Let's drop down to the bottom of the first page, which is painting walls and ceilings. Your proposal for painting walls and ceilings is $10,085.82, which is roughly twice what the painting proposal is from Carubba, $5,088, or Benchmark Custom, $4,240. How do you explain that?

**A.** The unit cost price I used, using even other sources other than Xactimate, such as RSMeans, that's the application of one coat of paint on all of the new Sheetrock, trim work, and all the new materials in the house. That is not impossible, but that's not the proper method of painting.

Typically, we'll have a first coat of primer paint so that the finish coats can adhere to that primer, and then two top coats of finish paint on walls, ceilings, door trims, baseboards, shoe moldings, crown moldings, cabinetry, so forth.

**Q.** Is that normally the layer of paint you get when you get a new-home construction?

**A.** That is the typical application, yes.

**Q.** To put this family back where they were with respect to painting, you propose the same number of coats?

**A.** That is correct.

**Q.** Let's look at the next page, and let's go to the carpet, which is this item here. For carpet, you measured 684 square feet of carpet; correct?

**A.** Yes, sir. The actual room size is 525.57 between the master bedroom, the master closet, and the two children's rooms and closets.
**Q.** To replace all that carpet, you have a cost of $2,338.40?
**A.** Yes, sir.
**Q.** What were the costs and amount of carpeting that you saw in the proposals from Carubba and Benchmark?
**A.** In Benchmark was $1,076, and Mr. Carubba had $820.75.
**Q.** These measurements of 245 square feet in the case of Carubba and 28 square yards in the case of Benchmark, how does that compare to the amount of carpet that you measured?
**A.** That amount of carpet in the other two estimates is basically in the two children's bedrooms and omits the master bedroom, the master closet area, as far as a rough overview of the difference of carpeting.
**Q.** So you don't believe the other bids measured all the carpeting?
**A.** They don't include it. Whether they measured it or not, I don't know, but it couldn't include it.
**Q.** Let's go to granite countertops, which is this item. There's an agreement that granite countertops have to be replaced. You measured the square footage to be 55.46 square feet for a replacement cost of $4,599.85; correct?
**A.** Yes, sir.
**Q.** Now, in the original bid from Mr. Carubba, he proposed

that he would replace 20 square feet of granite countertop as opposed to 55.46; correct?

**A.** Yes, sir.

**Q.** Then last night about 11:00 p.m., we got a new number, didn't we?

**A.** Yes, sir.

**Q.** What is the new square footage number?

**A.** 40 square feet of granite.

**Q.** Is he still short?

**A.** Yes, sir, still about a third short.

**Q.** Did you measure not just the countertop but the backsplash as well?

**A.** And the snack bar top, yes, sir.

**Q.** Then the bid from whoever at Benchmark Custom is still apparently 20 square feet as opposed to your 55.46; correct?

**A.** Yes, sir. Right.

Also, the differences in cost. We took the average cost of granite that ranges from around $55 or $60 a square foot on the low end to around $125 or so a square foot on the high end. We took what the system says is the average cost of granite at $80 a square foot versus the $65 on the very low end of the granite cost and thicknesses.

**Q.** Are you endeavoring to match the quality of the countertop that's in the Hernandez home today?

**A.** Yes, sir.

**Q.** The final item I'll look at with you, Mr. Mallet, before we finish is the electrical, which is on the last page, Hernandez 557-0003. You have a proposed bid of $15,192 to remove and replace all the wiring in the house?
**A.** Yes, sir. In addition to switches, fixtures, the lighting, the low voltage alarm system, and the bus bar and breakers in the main distribution panel.
**Q.** That was based upon Xactimate numbers?
**A.** Yes, sir, it is.
**Q.** Standardized but adjusted to this community in Mandeville?
**A.** Yes, sir.
**Q.** The Carubba number for the proposed electrical remediation work in this case is -- well, it was until 11:00 last night $2,200; correct?
**A.** Yes, sir.
**Q.** It changed, didn't it?
**A.** Yes, sir.
**Q.** What does Mr. Carubba come up to now?
**A.** $3,400.
**Q.** $3,400. Do you know why he changed?
**A.** No, sir.
**Q.** Do you have any idea?
**A.** No, sir. I don't know what's even inclusive in any one of these prices to begin with, so I don't know what they changed it to or what reason.

**Q.** You've not seen any Xactimate-type detailing on their calculations?

**A.** No detailing, whether it's hand calculations for labor and materials or anything of that nature.

**Q.** Now, the Benchmark Custom folks, they're at $1,597 for this, and they've stayed there apparently; correct?

**A.** Yes, sir. That appears just to address -- at the 139 each, that's the number of electrical outlets and switches and light openings in the house.

**Q.** Now, you told the Judge earlier that one of your four C's for the proposal to remove and replace all of the electrical wiring was cost?

**A.** Yes, sir.

**Q.** And yet you're going to ask Mr. and Mrs. Hernandez to spend $15,192.02 to perform electrical remediation, whereas Mr. Carubba is only going to charge them $3,400 to keep the wiring in place and do this splicing. Do you think, first of all, that it's realistic for a contractor in this house to accomplish a splicing job such as Knauf has described for $3,400?

**A.** No, sir.

**MR. HAYDEN:** Objection: Argumentative.

**THE COURT:** He has answered it. Let's move on.

**BY MR. MEUNIER:**

**Q.** Do you think that's a realistic number?

**A.** No, sir.

**Q.** Why not?

**A.** Because of the work that has to be effected and that I described earlier and the type of splicing and inspection that would have to be done by an engineer or some inspector approving that work as it went.

**Q.** How about the Benchmark number of $1,597? Do you think that's realistic to accomplish that work?

**A.** Just off the top, it appears not to address removal and replacement of any light fixtures, of any contacts on doors and windows for the alarm system. Even if they're not changing that, it's still going to have to be attached and reset when you take the Sheetrock or the door jambs and casings off. And it's just a number of items within the electrical that doesn't appear to have been addressed other than the switches and receptacles.

**Q.** Finally, Mr. Mallet, do you believe that your proposal of $200,218.09 in today's market will accomplish the proper and complete Chinese drywall remediation of the home of Mr. and Mrs. Hernandez?

**A.** That should put them back whole, as though the Chinese drywall had not been installed in the home.

**MR. MEUNIER:** Thank you, sir.

**THE COURT:** We'll stop here for 15 minutes. Court will stand in recess.

**THE DEPUTY CLERK:** Everyone rise.

(WHEREUPON the Court took a brief recess.)

**THE DEPUTY CLERK:** Everyone rise.

**THE COURT:** Be seated, please.

You are still under oath, sir.

You may cross-examine, Counsel.

**CROSS-EXAMINATION**

**BY MR. HAYDEN:**

**Q.** Thank you, Your Honor. Good afternoon, Mr. Mallet. How are you today?

**A.** Fine. Thank you.

**Q.** Sir, would it be fair to say you've never previously repaired Chinese drywall in a home?

**A.** Repaired, yes, correct.

**Q.** That is correct?

**A.** Yes, that's correct.

**Q.** Have you ever repaired a home in St. Tammany Parish?

**A.** Oh, yes.

**Q.** When was the last time you did so?

**A.** Katrina.

**Q.** Back at the time of Katrina. Since Katrina, have you done any renovation work in St. Tammany Parish?

**A.** No, sir.

**Q.** But you've been in the general contracting business for a number of years; almost 30 years, I believe you testified?

**A.** 36.

**Q.** Would you agree that it's not unusual in the Louisiana environment to have some tarnishing on copper, given oxidation and the like?

**A.** Copper naturally oxidizes, but not in the manner that we see it in the Hernandez house.

**Q.** So you've seen oxidation of metals here in Louisiana prior to first going into your first Chinese drywall home; correct?

**A.** Yes. I see oxidation regularly.

**Q.** So it's not unusual to see some copper oxidation, some type of material on copper pipes; right?

**A.** That's correct. Typical oxidation will look green and brown on copper.

**Q.** When you went into your first Chinese drywall home in the fall of last year, the material that you saw on the copper was black, not brown or green; right?

**A.** That's correct.

**Q.** So it was a little different, but it was a tarnishing of some sort; correct?

**A.** Yes. More of almost like a soot material that comes off on your hands real easily, as opposed to the tarnishing or the oxidation normally seen on copper.

**Q.** The oxidation or tarnishing that you normally see is sort of like a -- can be like a rusty material?

**A.** No. It's more in the -- it's almost more in the finish --

color of the finish that it turns versus what we've seen in the Chinese drywall houses, that it's more like a soot that's attached to the copper membrane.

**Q.** Right. Where with the normal copper oxidation, it's almost like -- some people call it a patina?

**A.** Patina.

**Q.** Sometimes you have copper roofs and they put the patina on it so it turns a greenish color?

**A.** The patina is a natural reaction to atmospheric conditions. It's not applied to the copper.

**Q.** In the Chinese drywall homes, what you're finding, you're saying, is like soot that comes off in your hand easily; correct?

**A.** Yes, sir.

**Q.** That's what you saw in the first Chinese drywall home that you went to sometime in the fall of last year. I believe it was the Blue residence.

**A.** Yes, sir.

**Q.** That was in the Lakeside neighborhood?

**A.** Yes, sir. Lakeview maybe.

**Q.** Lakeview neighborhood?

**A.** Lakeview, yes, sir.

**Q.** I'm not familiar to the geography around here. Was that the only Chinese drywall home that you'd been into before you went to the Hernandez home in February of this year?

**A.** Yes, that's the first that I physically encountered.
**Q.** That's the only home, Chinese drywall home, that you were in before you were in the Hernandez home; correct?
**A.** That's correct, but it's not the only information that I've gathered prior to going into that home.
**Q.** Sure. I believe you testified that you did some research on the Internet and you looked into it, as you would a developer, because you were concerned that homes that you may have built might have Chinese drywall in it; correct?
**A.** Also from the consulting end. I figured it was just inevitable. For instance, when the situations with exterior buildings came about, we began doing research into that. When the PEX piping conditions began to occur in homes, we began doing research into that so we could be prepared for when our clients called.
**Q.** So that you could provide them with expert consulting work in the event that there was litigation in the future; correct?
**A.** Not necessarily litigation but just insurance claims.
**Q.** In the event there were insurance claims, you could go and investigate those claims for insurance companies; correct?
**A.** Correct, and give the adequate information to our clients.
**Q.** Actually, you were a speaker in November of last year in Las Vegas on the Chinese drywall issue to a group of insurance investigators; correct?
**A.** Investigative engineers, yes, sir.

**Q.** Now, is it your standard practice and procedure, as a general contractor here in Louisiana, when removing drywall to vacuum and to do a wet wipe-down?
**A.** It depends on the conditions and what the circumstances are. If it's strictly a remodeling job, we may not do the wipe-down. More than likely, we'll do the HEPA-vacuuming. Certainly, if it's a mold remediation or a fire restoration job, then both of those functions will occur.
**Q.** Just so I understand it, with your normal renovation, would you leave drywall dust and drywall remnants in the cavities of the property?
**A.** No, we will not because it will typically show up under some either wind event or negative air event that occurs in the house. It will find its way under the baseboards or shoe molding into the interior portions of the house.
**Q.** The concern you have there is, with additional dust, fine dust like that, it would get in the air and could cause problems with allergies and other problems for the people that live there?
**A.** Just that and general cleaning problems and aggravated clients.
**Q.** I believe you testified that before you did your cost proposal that you were out on the Hernandez site on two occasions, on January 8 and January 17; is that right?
**A.** I think those are the correct dates.

**Q.** On January 8, you went out and talked to Mr. and Mrs. Hernandez and some of the attorneys?
**A.** Yes, sir.
**Q.** Then the next time that you went out to the site on January 17 that you went out with a friend, and essentially what you did was you measured each of the rooms for purposes of determining your scope of work?
**A.** Well, it assisted me in that I measured and then wrote down the details of each of the items in the room that I would have to address in the removal and replacement of the Sheetrock.
**MR. HAYDEN:** Could I get the overhead.
**BY MR. HAYDEN:**
**Q.** Sir, I'm showing you what is an exhibit from your deposition. Do you recall these notes? Are these your handwritten notes from January 17 of this year?
**A.** Yes, sir, they are.
**Q.** This is the first page of five pages of notes. If we'll just look at this first page, is this how you would write down your scope of work for purposes of your cost estimation?
**A.** That would be my scope, yes.
**Q.** "R&R" means remove and replace; is that right?
**A.** Yes, sir.
**Q.** Then "R & Reset" is to remove and reset?
**A.** Yes, sir.

**Q.** This was your original scope of work; you just handwrote what you felt needed to be done in each of the rooms?

**A.** Yes, sir.

**Q.** Then you also took some measurements for each of the rooms; is that right?

**A.** Yes, sir.

**Q.** You had a friend of yours that was with you that was assisting you in that regard?

**A.** Taking some measurements, yes.

**Q.** That took approximately the whole day just to collect those measurements?

**A.** Yes, sir.

**Q.** Would it be fair to say that after you collected those measurements and that site visit, you were able to take that information and give it to your sister, Charlene?

**A.** Yes, sir.

**Q.** And then she inputted it into the computer for you; correct?

**A.** Yes, sir.

**Q.** And that's when Xactimate does its work; correct?

**A.** Yes, sir.

**Q.** Essentially, you put in the measurements of the room and whether you're replacing the different components of the room and the activities that you're undertaking with regard to each room, and then the computer spits out numbers for each of those

assigned activities or pieces of material?

**A.** Yes, sir.

**Q.** That's how we ended up with your first cost estimate; is that right?

**A.** Yes, sir.

**Q.** That was the cost estimate that was provided to us with your report on or about February 12 of this year; is that right?

**A.** Yes, sir.

**Q.** Then there were some changes to your report after February 12 of this year, weren't there?

**A.** Yes, sir.

**Q.** Now, those were provided to me shortly before your deposition, I believe, on March 9 of this year; is that right?

**A.** Yes, sir.

**Q.** You made changes to your cost estimate, just like Mr. Carubba made some changes to his cost estimate, because you noticed some things had to be changed after you reviewed your report and cost estimate; correct?

**A.** I think the main item was adding the garage to the estimate.

**Q.** Okay. And that resulted in you having to go back out to the house on or about February 25; is that right?

**A.** Yes, sir. It was the same day we observed the control house, whatever date that was.

**Q.** So your first report that you provided to us, the first cost estimate, did not include the garage, did it?
**A.** That's correct.
**Q.** And then you made some changes and you provided us with a new report?
**A.** Yes, sir.
**Q.** Sir, in your report, you included appliances in your cost estimate. Do you recall that?
**A.** Yes, sir.
**Q.** Doesn't Mr. Maloney include a cost for the appliances in his report that's been provided to the Court?
**A.** As an appraisal, yes, sir.
**Q.** So if the Court were to include Mr. Maloney's cost for the appliances and your cost for the appliances, then there'd be some double-dipping; correct?
**A.** That's correct.
**Q.** For purposes of the Court understanding, the Court should not include both your appliance line item and the numbers that are provided by Mr. Maloney with regard to the appliances in the home; correct?
**A.** To the extent that that appraisal was for cost estimating of contents, we only dealt with the appliances, so I'm not sure what the rest of the report is involving. If the Court is taking both my estimate and Mr. Maloney's estimate into consideration of the costs, then, yes, the appliances would be

in both reports.

**Q.** Originally, you had some other numbers for appliances, but I believe that you changed your report to reflect the appliance numbers that are set forth in the Maloney report; is that right?

**A.** Yes, sir. They were slightly different. Because the Maloney report was being offered and the numbers were close, we just matched his numbers.

**Q.** In your report, you indicate that all the appliances should be replaced, and you give a cost estimate for that.

**A.** Yes, sir.

**Q.** That's not because the appliances were failing; correct?

**A.** Well, that's partly true, partly not true.

**Q.** Did anyone indicate that any of the kitchen appliances were failing?

**A.** Yes, sir.

**Q.** Who indicated that?

**A.** I didn't recall this at the time of my deposition, but Mr. Hernandez told us that the refrigerator that was originally in the house was replaced. And then we had guys go over and take the microwave and stove hood, ventilation hood, out because they were malfunctioning. A television set and -- I guess it's called a small appliance, the toaster, had to be sent off for examination.

**Q.** I guess I wasn't clear. With regard to major appliances,

the kitchen appliances --

**A.** Yes, sir.

**Q.** -- at the time of your cost estimate, all of the kitchen appliances in the Hernandez home were operating; correct?

**A.** I don't remember if we took those, microwave and hood vent, out before or after the report.

**Q.** So you don't know, as you sit here today, of any failed appliances that are included in your report?

**A.** Well, the microwave and hood vent.

**Q.** When were those reported malfunctioning?

**A.** I don't know when they were reported. We were just asked to go in and take those apart and send them off to -- I don't know if it was a corrosion specialist or some other company.

**Q.** Other than taking them apart and sending them to someone, you didn't do any failure analysis with regard to those appliances; right?

**A.** No, we did not.

**Q.** Is it true that prior to this litigation, you did not do a scope of work for the repair of a Chinese drywall house?

**A.** That is not quite accurate. Scope of repairs? In the Blue house, we gave a verbal report to Mr. Lambert and his client regarding what items we thought needed to be replaced, or we recommended replacing, and the issues on additional cleaning.

**Q.** You did not provide a written scope of work to Mr. Lambert

or his clients, did you?

**A.** No. It was verbal.

**Q.** Actually, hadn't the demolition of that house already occurred by the time you got involved?

**A.** The Sheetrock and cabinets and trim were out, but not the mechanical systems, not the electrical systems, and not the doors.

**Q.** You were not asked to move forward with any formal written scope of work in that matter, were you?

**A.** No, we were not. I think the homeowner was performing the work himself, and the attorneys needed to know what additional actions needed to occur.

**Q.** Sir, you're not an electrician; correct?

**A.** No, I am not a licensed electrician.

**Q.** You're not an electrical engineer; correct?

**A.** I'm not. However, I employ electricians and electrical engineers on a regular basis to work with me.

**Q.** And a Mr. Hicks that's been referenced, he's not employed by you, is he?

**A.** He is not, but he works for me on an ongoing basis.

**Q.** He's an independent contractor?

**A.** He is.

**Q.** He was not retained in this matter until on or about February 25; isn't that right?

**A.** Yes, that's correct, in the *Hernandez* matter. However, he

had been working with me developing the protocol for Chinese drywall and had inspected the Blue project with me also.
**Q.** With regard to the Hernandez matter, he was not retained until on or about February 25; correct?
**A.** I think that's correct.
**Q.** He gave a report on March 5?
**A.** Correct.
**Q.** So that was after your report of February 12; correct?
**A.** That's correct.
**Q.** That's after you provided counsel and Knauf/KPT with your report and scope of work here; correct?
**A.** That's correct.
**Q.** And that's after you gave your cost estimate here; correct?
**A.** That's correct.
**Q.** He was only brought in after an electrician had harvested certain switches from the Hernandez house on or about February 25; correct?
**A.** That's correct.
**Q.** Sir, you testified about going to the drywall demolition that occurred at a townhouse in Mandeville on or about February 25?
**A.** Yes, sir.
**Q.** You indicated that you had certain observations, and we looked at certain pictures from that event. Do you recall that

from Mr. Meunier's direct?

**A.** Yes, sir.

**Q.** You didn't attend the second day of that event, did you?

**A.** No, sir. It was my understanding the only thing they were going to do on the second day was remove the carpeting, so I didn't think it was necessary for me to watch them remove carpeting, but obviously there was much more work done after that.

**Q.** You didn't see the cleanup after they were done removing the drywall, did you?

**A.** No, sir.

**Q.** You don't know if it would have met, I think as you call it, the white-glove test that you wanted to see in the Blue house; is that correct?

**A.** I have no idea what the condition was.

**Q.** So, as you sit here today, you can't say one way or another whether there were still drywall particles in the Mandeville townhouse room that had been demolished after they were done?

**A.** No, sir. Neither have I seen a report that gave clearance to the work that was performed, whether it was cleaned adequately, and whether anybody would sign off -- any environmental engineer or environmental hygienist would sign off on the cleaning of that project.

**Q.** Just so the Court understands, the day you were there,

where they took the drywall down, there were approximately nine people at the event in this 12-by-12-foot room; correct?

**A.** It was 14-by-16 and there were people in and out of the room, as we mentioned in my report, a few attorneys who were sort of not necessary, but --

**Q.** We like to think we're necessary.

**A.** Not in a construction situation. They were in the way.

**THE COURT:** They get in the way.

**THE WITNESS:** They're in the way, sir.

**BY MR. HAYDEN:**

**Q.** Would it be fair to say that the lawyers got in the way for the workmen that day, as they always do?

**A.** Well, in all joking aside, there were a number of people in the room, and there's no doubt that there was some interference or slowing of the work that was performed.

**Q.** Part of your scope of work requires that there be HEPA-vacuuming and a wet wipe-down after the drywall demolition in the Hernandez house; correct?

**A.** Yes, sir.

**Q.** That's based upon what others have told you about the possibilities with regard to the dust particles from Chinese drywall; correct?

**A.** Actually, it's based upon the absence of information telling me that there is a specific quantity of drywall dust that can be left in the home and not be problematic.

**Q.** You were here earlier today when Mr. Bailey testified, weren't you?

**A.** Yes, sir.

**Q.** Mr. Bailey said he couldn't quantify the amount of drywall dust that would cause problems with regard to odor or sulfur emissions; correct?

**A.** That's correct.

**Q.** No one who's testified, that you've heard from, has indicated that a small amount of drywall dust is sufficient to cause odors and continued problems with corrosion?

**A.** That's correct. Actually, I've not heard from or read any reports or testimony from anybody that's given any indication about how much drywall dust left in a house would be acceptable.

**Q.** You haven't heard one way or another?

**A.** That's correct. So in the absence of any direct information, we have to remediate the house in a manner that gives us the most assurance that we are removing the contaminants within the house so that we don't have problems with that project and the homeowners don't have problems with that project.

**Q.** Just so I understand, you used an Xactimate software to determine the cost estimate?

**A.** That was the basis for our cost. It wasn't entirely used, but it is by far the majority of the items in the costing.

**Q.** Would you say that 99 percent of your cost estimate is determined by Xactimate?

**A.** Probably.

**Q.** What that involves is you taking the measurements that you did on or about January 17 and inputting that into the computer software, and the computer software spits out some cost estimates; correct?

**A.** That's correct, but that's not where it stops. Then the estimate and my notes are sent back to me with my photographs, and then I review the scope in its entirety, both scope, quantity, and unit cost price, to see if there's, one, a misapplication of a code because they misunderstood what I was writing, or if a code was just inaccurately inputted.

And because there's no cost system that can possibly contain the hundreds of thousands of components and work actions that are involved in all of the incredibly wide variety of projects that we work on, we utilize more than one cost system, and sometimes we just have to go out and get with our people and put together a unit cost price on something.

**Q.** If I could ask you to look at Plaintiffs' Exhibit 477, and if we could go back to the first page. This is a summary sheet.

**MR. HAYDEN:** If I could go back to the first page. Highlight that.

**THE COURT:** Do you want some water?

**THE WITNESS:** Thank you.

**BY MR. HAYDEN:**

**Q.** Is this the first page of your cost estimate?

**A.** Yes, sir, it is.

**Q.** It indicates that the date assigned -- do you see that? Was that the date that you were engaged?

**A.** On or about, yes, sir. It would have been the date we filled out the data sheet on the project.

**Q.** The date entered, is that the date that the information was entered in the computer?

**A.** Yes, sir.

**Q.** The operator, Charlene, that's your sister?

**A.** Yes, sir. She taught me how to turn my computer off and on.

**Q.** And the price list, it looks like what appears to be a computer format. Is that the Xactimate software that's used?

**A.** Yes, sir. "LA" represents Louisiana; "MA" represents Mandeville; "5" is the version of the software; "B" represents both contents and building materials; and "January 10" is the year and date of the last revision of the price sheet, of the cost estimate.

**Q.** Before providing this cost estimate, would you also consider this document to be your scope of work?

**A.** My initial scope is my written. But, yes, that would be the scope that we would follow in the project.

**Q.** Your initial handwritten notes were from walking the site and taking the measurements and indicating on handwritten notes what's to be replaced or stored?
**A.** Generally. And then when I sit down with my notes, photographs, and then the first version of the estimate, then I'll make any changes or corrections at that time.
**Q.** At the time you gave us your report of cost estimate, had you looked at the Beazer scope of work?
**A.** Yes, sir. I had looked at a number of protocols earlier in 2009, a number of different protocols.
**Q.** Is it fair to say that your protocol is consistent with the Beazer protocol?
**A.** That I can remember, I think that's correct. I think they parallel.
**Q.** If I could take you to the last page of your scope of work and cost estimate, page 31. Do you see that?
**A.** Yes, sir.
**Q.** Now, is that a recap of the total costs that you believe are required to repair the Hernandez house?
**A.** Yes, sir.
**MR. HAYDEN:** Now, I'd ask if we could put that side by side with Exhibit 48. I'm sorry. 49. I'm making your life difficult.
**BY MR. HAYDEN:**
**Q.** Sir, I'm showing you both your recap sheet as well as the

recap of the costs that were incurred by a Beazer home with approximately the same square footage. Specifically, if we could look at your painting. First, why don't we look at your price to the total costs under A.

**MR. MEUNIER:** Your Honor, could we, just for the record, confirm that this is counsel's recap? Mr. Phillips did say the numbers were correctly transposed, but I think counsel will agree that he did his own categorization of numbers.

**THE COURT:** A and B?

**MR. MEUNIER:** Not only that, Judge, the recap of the numbers. Counsel took numbers from a Beazer document, and he himself added them and put them into his categories. So I want the witness to be clear that this document was not generated by Beazer or by Ray Phillips.

**THE COURT:** Do you understand that?

**THE WITNESS:** Yes, sir.

**BY MR. HAYDEN:**

**Q.** Given that, there's an appreciable difference between the costs on the Beazer homes versus the costs that you believe it will take the repair the Hernandez home; correct?

**A.** That's correct. I believe I went into that scenario in my deposition as to part of why the differences are so far apart.

**Q.** If you could look at their costs for painting versus your costs for painting. You have a cost of $17,000 for the painting of the Hernandez home, where the Beazer indicates that

the painting of the interior would be $2,241. Any explanation for the difference between the two?

**A.** My first question is: What all is included in that price? Is it just Sheetrock painting? Is it trim? Is it cabinetry? Did they buy prefinished cabinetry? Did they buy prefinished trim? Are the doors prefinished? Is it textured? Are the textures similar? How many coats of paint did they put? Did they put the general three coats of primer and two finish coats? Unless you can tell me that, I couldn't --

**Q.** Sir, you --

**THE COURT:** Wait, wait, wait.

**MR. MEUNIER:** Your Honor, may I just interpose another objection? I can make it continuing. But as counsel knows, he is comparing cost figures that Beazer incurs, not that an owner would incur. The bid that this gentleman has given is what Mr. and Mrs. Hernandez have to pay a contractor to do the work. Counsel is showing numbers that a national builder spends on a project, and it's apples and oranges. I'll make that continuing.

**THE COURT:** You can cover that on redirect. I'll overrule the objection.

**BY MR. HAYDEN:**

**Q.** Is it your understanding under the Beazer protocol that they are replacing cabinetry? Correct?

**A.** That's correct. It doesn't state what type of cabinets.

It also doesn't state if they're prefinished or not.

**Q.** Do you think that the Hernandez home is a higher quality home than the Beazer homes?

**A.** I don't know what it is. I've never seen the specifications on the Beazer homes. All I can testify to is what is in the Hernandez home. The Hernandez home has shop-built cabinets rather than a purchased cabinet out of, say, Home Depot or Lowe's, and it has wood components rather than a particle board with laminated finishes on it.

**Q.** First, let's go to the Beazer summary just briefly. If we could look at the price per square foot they would charge. Do you see that? With all costs in, their number is $51.29; correct?

**A.** Say it again, please.

**Q.** With all costs included, their number is $51.29; correct?

**A.** Yes, sir. That's their hard costs.

**Q.** Your cost per square foot would be about $100 a square foot; correct?

**A.** That's correct. Because as we discussed in my deposition at length, Beazer's providing and producing this at their hard costs. They're not making a profit redoing their own projects. There's no soft costs, indirect or direct overhead. There's no profit. Any of the built-in costs that we talked about earlier, if you remember the screen, showed -- and I discussed earlier that the general indirect overhead on the project is

40 percent. So if you take that price and divide it by .60 to give you the 40 percent markup that the industry states contractors typically make, that price is going to be significantly higher and very close to the price that I have quoted.

**Q.** Sir, if you could look at just -- and then we can move on. If you look at their plumbing cost versus your plumbing cost, is it fair to say that yours is approximately three times the cost of the cost of plumbing with the Beazer home?

**A.** That would be correct. It would also depend on several things: Whether they used mostly PVC pipe for water, how much copper they used. It would also depend on the quality of the plumbing fixtures. And also, this is hard cost, once again, without any supervision, any markup, any direct or indirect job costing. So once again, if you take their price, divide it by .60, you'd have a significantly different price than what you're looking at here.

**Q.** Sir, why don't we go back to your cost estimate, your recap sheet. If we could focus on some of these line items. In particular, the last line item in the recap before overhead and profit are added on is water extraction and remediation. Do you see that?

**A.** Yes, sir.

**Q.** That's 8 percent of the cost; is that correct?

**A.** Yes, sir.

**Q.** That involves dehumidification of the job site?

**A.** That is dehumidification and air monitoring, air cleaning, and HEPA-vacuuming.

**Q.** The dehumidification -- you're dehumidifying a job even though you're taking up the wood floors; correct?

**A.** Oh, absolutely, yes. What we're doing is taking a house and doing it backwards. Originally, if we had built this house, we would have started from ground up. By the time we blacked this house in and dried it in, there would have been a significant amount of time that would have elapsed between the dry-in and the installation of the Sheetrock, insulation, and floor and finishing materials. So in that time period, the house is dehumidifying itself, or it is forced to dehumidify until the wood-related equivalent moisture content of the materials and the wood is at or near 12 to 14 percent relative humidity on moisture content.

Here, we're doing it backwards. We have a house that's been under climate control for four years. We're taking it out of climate control. There's nothing to control the humidity or the temperature in the house, so the wood and all the wood products in the house are hygroscopic; they're going to absorb the humidity as it rises within the house. We typically have humidities between 60 and 90-plus percent here in Louisiana.

**Q.** What's the humidity at the present time here today?

**A.** Today, I don't know.
**Q.** It's not 60 or 90 percent, is it?
**A.** I said typically.
**Q.** That's in the summer months; right?
**A.** No. That's for the majority of the year. Actually, in the summer months, it is quite high, and we have our own climate designation as hot and humid, temperature zone, here in the New Orleans area.

We're undoing the house. This house was under climate control for four years. It's acclimated. All the products in it have acclimated to something between 40 and 60 percent relative humidity, approximately. That's the design criteria for the interior living space. So when we release these materials to the atmosphere, uncontrolled atmosphere, they're going to begin absorbing the relative humidity that is in the ambient air.
**Q.** So how long do you think the house is going to be left open?
**A.** Well, un-air-conditioned will be for several months.
**Q.** How long do you think this job is going to take?
**A.** Approximately four months.
**Q.** Of the four months, when are you going to close up the building?
**A.** Well, the building will be closed -- the doors will be closed immediately. However, you're taking all of the

insulation out of the walls, all of the insulation out of the ceilings. This building will have no walls or ceilings that will help encapsulate -- put the climate zone and encapsulate a dry, cool area. So we have all of the inside of the building open to the attic, which is open to the outside because it's vented to the outside. So the relative humidity is going to, by nature of diffusion, move from the outside to the inside because it's dryer and cooler on the inside.

**Q.** So when do you intend to put the dehumidifiers in the house?

**A.** About the time we finish with the demolition.

**Q.** How far into the construction project do you intend to finish the demolition?

**A.** How far? I think it's within three or so weeks.

**Q.** Just so I understand, sir, you're replacing cabinetry; correct?

**A.** Yes. Correct.

**Q.** You're replacing the woodwork?

**A.** Yes, sir.

**Q.** You're removing all of the drywall?

**A.** Yes, sir.

**Q.** The only thing you're keeping with regard to the flooring is the tile; correct?

**A.** Yes, sir.

**Q.** Now, you indicate that the cleaning of the house is going

to take approximately 4 people 10 to 12 days; is that right?

**A.** No. I think we indicated -- yeah, five people about -- yes.

**Q.** Is that correct?

**A.** That's correct.

**Q.** You're also estimating that it's going to take 16 days to air out the building?

**A.** Well, that, and as it's being aired out, the cleaning that's going to be occurring at the same time. So it's not total air-out in that time frame.

**Q.** What is the total air-out time?

**A.** I think the allocation was around three weeks for air-out and cleaning.

**Q.** That's not based upon any science; correct?

**A.** No. Unfortunately, there's no science available to us to give us much guidance other than what's happened in other conditions or other projects.

**Q.** Now, your cost estimate also indicates a substantial amount for an environmental consultant; is that right?

**A.** That's correct.

**Q.** I believe it's $15,000 that would be under permits and fees?

**A.** That's correct.

**Q.** You were here when Mr. Bailey testified; correct?

**A.** That's correct.

**Q.** He's considered an environmental consultant under the protocol; correct?
**A.** I guess. I don't know.
**Q.** Did you hear him testify in that regard?
**A.** Yes.
**Q.** Do you recall him testifying that he would charge about $1,200 for a letter indicating that the drywall had been removed?
**A.** Yes, sir.
**Q.** Would you revise your cost estimate given that Mr. Bailey's number is substantially less than $15,000?
**A.** No, sir.
**Q.** Why are you indicating that it's going to cost $15,000?
**A.** Well, I'm not sure all what Mr. Bailey was going to provide in those services. However, I believe one of the builders has an environmental contractor or environmental person who inspects and tests during the process, and their number is $12,500.

What the environmental engineer is proposing to do is to document the work as it goes and to oversee, photograph, and test -- whatever test needs to be done -- during and at the conclusion of the demolition and prior to the reinstallation of the new materials, also that the environment inside is controlled. Because as we talked about a few minutes ago, we're taking this house apart; we're exposing the house to the

elements. Before we can put new materials back in, we have to acclimate or keep that house acclimated to around 12 to 14 percent humidity, moisture content, in the studs, in the plywood floors, in the ceiling joists, and any other wood materials that are left in that house. He would verify prior to the reconstruction that the cleaning has been performed and that the environment is proper for the reentry of new building materials and components.

**Q.** Sir, did you have an environmental consultant bid this out?

**A.** Yes, I did.

**Q.** Who was that?

**A.** Ritter Consulting Engineers.

**Q.** Did they indicate that it would cost $15,000 to undertake the work here?

**A.** Yes, sir. That's the quote from them. Mr. Ritter, aside from an environmental engineer, also teaches environmental science at LSU.

**Q.** Would part of the work that he would undertake there also be involved in litigation, preservation of evidence?

**A.** Repeat again, please.

**Q.** This bid, it sounds like it also includes testing and preservation of evidence.

**A.** Evidence? No. It would be to verify the clean environment and that the work we performed was performed

correctly. And at the end, he could produce a written report of what was done with photographs and signing off on the project in his written report to give to the Hernandezes so that they could produce that -- in case they should decide to sell the home, they could show that the work was performed and performed under the guidance and oversight of an environmental engineer and signed off on.

**Q.** Well, why don't we compare your cost estimate to that of Mr. Carubba's. It's Exhibit 237. Appearing first, let's look at the demolition. Would you agree that the demolition costs are double what Mr. Carubba indicates? Correct?

**A.** That's correct.

**Q.** You're disposal costs, your cleanup costs, are three times as much; is that correct?

**A.** That's correct.

**Q.** Your drywall costs are twice as much; is that correct?

**A.** That's correct.

**Q.** The painting that you're requiring is two times as much; correct?

**A.** Over two times as much.

**Q.** The bathroom cabinets, I believe, are 10 times as much; is that correct?

**A.** I would have to go into the estimate to tell you, but part of the problem is that we have no idea what's inclusive in this estimate. There's no detail to anything, and quantities vary

significantly. There's no backup to the estimate, none was provided to me, as to how any of these numbers were arrived -- how he arrived at any of these numbers.

**Q.** Why don't we go to Hernandez Exhibit 557, please.

**A.** When I checked his numbers against other nationally recognized cost-estimating sources such as RSMeans, his costs didn't come near the published prices for those pricing guides either. So I'm not sure where these numbers come from.

**Q.** If we can go to page 2 of Hernandez 557, which was shown earlier in the direct examination. If you look to the installation of bathroom cabinets, would you agree that the installation of bathroom cabinets is 10 times -- your charge is 10 times that of Mr. Carubba's?

**A.** Let's see. Where are we? Can you tell me where we are?

**Q.** Page 2, install bathroom cabinets.

**A.** Yes. Okay. Yes, sir. Just think about he's charging $16.50 a foot for cabinets, but Benchmark is charging over $5 a foot just for baseboards, almost $5 a foot for baseboards. How can you even begin to equate that you can build a cabinet for $16.50 a foot when the cost of baseboards is almost a third of that?

**Q.** With regard to kitchen cabinets, your installation cost for the lower cabinet is 10 times more than that of Mr. Carubba's; correct?

**A.** That's correct.

**Q.** With the installation of the upper kitchen cabinets, it's eight times more?

**A.** Well, that's correct, except his numbers are not correct. His quantities are wrong. Once again, he's charging $16.50 for cabinets. You couldn't buy a door for that, not a single door.

**Q.** Sir, let's look at some of those bathroom cabinets.

**A.** Yes, sir.

**Q.** If we can go to Plaintiffs' 457. Sir, during the course of visiting the home, you took pictures while you were going through the home. Do you recall that?

**A.** Yes, sir.

**Q.** You attached those to your report?

**A.** Yes, sir.

**Q.** I'd like to show you some of those pictures just so we have a fair understanding of what we're talking about.

**A.** Sure.

**Q.** Are those the kitchen cabinets that you would be replacing?

**A.** Bathroom?

**Q.** Bathroom.

**A.** Yes, sir. That's the master bathroom.

**Q.** Just so I understand, those are the cabinets that you'd be replacing; correct?

**A.** That is correct. It has raised-panel doors.

**Q.** Sir, you answered my question. Thank you.

 **MR. MEUNIER:** Your Honor, I'd like the witness to be able to explain his answers.

**THE COURT:** Do you need to explain it?

**THE WITNESS:** Well, he's asking me about the disparaging cost differences. The only way I know how to do that is to explain what's all inclusive in our estimate, and I have no idea what's included in the $16.50.

**MR. HAYDEN:** At this point in time, Your Honor, all I'm trying to do is just identify the different cabinetry, and then we can move on.

**THE COURT:** Okay. I'll let you cover it on redirect.

**BY MR. HAYDEN:**

**Q.** If we could go to 128. Is this the cabinets that you are replacing?

**A.** That's a portion of the kitchen cabinets, yes, sir.

**Q.** That's the top of the kitchen cabinets?

**A.** That's a portion of the tops of the kitchen cabinets.

**Q.** If we could go to 155, please. Are those the types of light fixtures that you're replacing?

**A.** Some of them. Some of them are recessed lights. There's, I think, two chandelier-type lights. There's hanging fans with lights.

**Q.** If we can go to 167, please. Is that one of the fan light fixtures that you'd be replacing?

**A.** Yes, sir.

**Q.** If we could go to 173. That's the mantel that you're going to be replacing; correct?

**A.** The what?

**Q.** The mantel.

**A.** Yes, the mantel. Also, the ceramic surround for that mantel and the hearth and seat below that is all part of removing the fireplace system.

**Q.** Sir, at the beginning of your testimony, I believe there was some discussion about some recent pronouncement by the CPSC. Do you recall that?

**A.** Yes, sir.

**Q.** And that asks if anyone had any evidence of any fires relating to Chinese drywall; correct?

**A.** Yes, sir.

**Q.** Just so we're all clear, the document indicates that no fires have been corroborated to date relating to Chinese drywall; correct?

**A.** That's correct. My interpretation of that bulletin was that they suspect the possibility of fires occurring because of corrosion and corrosion of electrical systems, and they want that to be reported to them so that they can document it.

**Q.** There's been no fires corroborated to date relating to Chinese drywall according to the CPSC; correct?

**A.** That is correct.

**Q.** That's by their statement of March 10; correct?

**A.** That is correct. However, the conditions are conducive for fires to occur because of the corrosion.
**Q.** Sir, you're indicating that the electrical and the plumbing should be replaced because of the possibility of failure; is that right?
**A.** Well, the electrical we know has failed in some instances, or the electronic portions of the house have failed, and we know we have corrosion. There's no directive from anyone, from any governmental agency, from any authority, that says that leaving this in will not create an issue, a problem, or a malfunction with the home's systems. We know we have corrosion in the electrical panels. We know the breakers are corroded. We know that the --
**Q.** Sir, in the Hernandez home, there's no evidence that the breakers have failed; correct?
**A.** What's your definition of *failure*?
**Q.** Do you have any basis or any evidence of product failure in the Hernandez house related to Chinese drywall?
**A.** Well, it's my understanding from earlier testimony that the breakers have corroded and contact points have corroded to a point that just because the failure hasn't manifested in a problem that the corrosion is, in fact, the failure.
**Q.** Sir, you're not a corrosion expert, are you?
**A.** I'm not, but I've done a fair amount of research and written papers, one paper and two articles, I think it is, on

corrosion of components in electrical systems in homes.

**Q.** Before this, before your involvement with the Chinese drywall home in November and then again with the Hernandez home, you had no involvement whatsoever with the impact of sulfur gases on copper; correct?

**A.** No, sir, but I've had experience with electrolysis in copper systems in homes and the recurrence of the problems if they're not addressed properly and insurance companies who have had to pay twice for the same claims because the corrosion remained and the electrolysis wasn't eliminated.

**Q.** Prior to this case or the Blue home that you inspected, you had no involvement, no experience whatsoever with sulfurization of copper; correct?

**A.** That is correct.

**MR. HAYDEN:** That's all I have.

**THE COURT:** Any redirect?

**MR. MEUNIER:** Just briefly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. MEUNIER:**

**Q.** Mr. Mallet, you visited the Hernandez home three times?

**A.** Yes, I did.

**Q.** On which date or dates did you take the photographs that we have put in evidence?

**A.** They've been taken over a course of time. The ones I took were taken on maybe the 17th of January and on the 25th of

 February. Those photographs that are in my report and that I have submitted have been taken along the course of time between my second inspection and through this last weekend.

**Q.** Counsel pointed out that your entry of data into the Xactimate program was on January 20, 2010; correct?

**A.** Yes, sir.

**Q.** But the date of your final cost estimate was March 10, 2010, wasn't it?

**A.** Yes, sir.

**Q.** Your finalization of the data printed out by that program took approximately two months?

**A.** Yes, sir. I didn't just stop at that scope.

**MR. MEUNIER:** Your Honor, we earlier offered as Hernandez 477 only pages 29, 30, and 31 of the cost estimate, but I would now like to make our offer of Hernandez 477 with respect to all 31 pages of the cost estimate. That's pages 1 through 31.

**MR. HAYDEN:** No objection.

**THE COURT:** Let it be admitted.

**BY MR. MEUNIER:**

**Q.** Let me clarify the appliances for the record, if we can. Let's go to page 31 of the cost estimate, 477. Counsel used the word *double-dipping*, and I want to make sure we're clear about this. You have for total dollars for appliance replacement $4,560.05?

**A.** Yes, sir.
**Q.** To what extent did you take numbers from the appliance estimates of plaintiffs' expert David Maloney?
**A.** Whatever items he had included in his report; I think the refrigerator, washer and dryer, maybe the freezer. I think that might have been all.
**Q.** If Mr. Maloney's total for appliances came to $3,871, is it fair to say that you have additional appliances included in your remediation?
**A.** Well, what we have is the cost of installation of appliances. We can't just pick up the phone and order a 17- or 18-foot refrigerator and have it magically appear and connected in the home. We have to either pick it up or have it delivered. The cost of delivery is not included. The taxes are not included. The installation of water lines for the icemaker is not included, nor is the unpacking of the unit, cleaning of the unit, and putting it in place, with the refrigerator included.
**Q.** So if the Court had Mr. Maloney's itemization on personal property and took out just the appliance items in Maloney's report and considered included in your number, they would be with the added costs of installation?
**A.** Yes, sir. If they took just the difference and left it in, that would be accurate.
**Q.** The replacement of wiring that you recommend is not based

only on the corrosion risk, as we've discussed; correct?

**A.** No, sir, it's not.

**Q.** But how in the real world does a legitimate risk of corrosion or failure influence, in your experience, the bidding of a job by a general contractor involving electrical systems?

**A.** We have, in the past, when we've done just bid work, been directed to replace damaged X, whether it's wiring, whether it's Sheetrock. I was writing a report for another case in federal court here dealing with damaged Sheetrock in fire stations in Terrebonne Parish. The architect's directive to the contractors was to replace all damaged Sheetrock. No quantities, no directives as to which rooms, how high, anything of that nature. So the contractor is going to make his assessment as to what needs to be changed and why he's going to change it and then bid accordingly.

In our case, based on my knowledge and experience of problems with electrical wiring, problems with corrosion, the problems with just effecting the repairs by splicing and trying to piecemeal this together doesn't make sense from a time-wise and an estimating -- but then I'm taking the risk away from everybody else and placing it on my shoulders if I don't do what's prudent.

There's no science to say that there is or there isn't definitive directions as to what to do. None. So if I don't replace that wiring or electrical components that we know

is corroded -- it's not a question of whether or not they're corroded, but there's no definitive statement from any source that says there's not going to be a problem with that -- then I'm taking the liability away from everyone.

And when everybody walks out of this courtroom and the courtroom doors are locked and I perform that job, if something goes wrong, it's me that has to take care of it. It will be on my shoulders to repair it or to face the owners for what hasn't been done properly, or God forbid something happens to the homeowners and I have to deal with that.

**Q.** Based on your experience, is it your view that it is more likely than not that the Hernandezes will need enough money to pay any legitimate contractor to cover that risk?

**A.** That's correct.

**Q.** Now, the Beazer home that counsel referred you to had 1,890 square feet with a cost to Beazer of $51 a square foot; correct?

**A.** Yes, sir.

**Q.** The living space of square feet in the Hernandez home is less than 1,890; is that true?

**A.** Living, yes, sir.

**Q.** Is it generally true that the same work done in a smaller home in a larger home, you're going to have a larger cost per square foot in the smaller home?

**A.** Absolutely. Your costs are concentrated. And it also

depends on what materials you're using, location. The state or the locality is going to have somewhat of an impact on how much the cost of that project is because your insurance and tax structures are going to be different from one locale to the next, from one state to the next.

We pay exorbitant workers' comp and liability insurance rates here in Louisiana. It's a fact of life. They have to be factored into the cost of a project. Other states don't necessarily have -- as we well know, don't have the high insurance costs that we have here to deal with.

**Q.** So you don't see that cost to Beazer of $51 a square foot as being inconsistent with the cost per square foot the Hernandezes would pay you under your scope of remediation?

**A.** It's not. And the testimony that I remember from whomever it was from Beazer cleared that matter up, that none of their overhead costs or profits or any of that was inclusive, aside from the fact that this is an international construction company. What they can buy materials and get labor for is going to be a difference. In some cases, it may be significantly different from what we can buy products at locally.

**Q.** Let me ask you about the length of this job. You've indicated it's about a four-month time for doing the actual work?

**A.** Approximately, yes, sir.

**Q.** You've also indicated that there will be a period of cleaning and airing out. What do you expect to be the total time out of the home that will have to be experienced by Mr. and Mrs. Hernandez from move-out to move-in date?
**A.** That number is about 17 weeks if everything goes --
**Q.** If everything goes well?
**A.** As we put it on the paper, just like the estimates, if everything goes like we wrote it, then this is what it will be.
**Q.** Finally, you talked about the environmental consultant report you built into your remediation plan and how that will give the Hernandez family some document for possible resale. Have you heard the testimony from Beazer about the walk-through that they do with owners, where the house is stripped to studs before they put the new drywall in?
**A.** Yes, sir.
**Q.** Will that be part of your remediation plan as well?
**A.** Yes, sir. In our other type of remediation jobs, for instance, in mold, widespread mold, and fire with a lot of soot, there's something called "psychological odor" that we don't want to have to deal with, that people think they smell what they think they smell.

To the extent that you show them how well you've cleaned and the efforts you've made to remove, in this case, the Chinese drywall contaminants and the particulate from that, it gives them the peace of mind, and they can walk through it

and tell you whether they think anything needs to be done. They have a visual of what's going on.

It is not an encapsulated wall and ceiling system that they walk back into the home after everything is completed and have the thoughts: Did they take everything out? Did they clean it properly? Am I going to have problems with this in the future?

So it's a psychological matter, and it's classified as "psychological odor" in the restoration business. It's a prudent thing for us, as contractors, to do, is to walk through and ask them if they see anything, do we need to address anything, do they have any concerns, should we do anything that we haven't addressed in the way of their concerns.

**MR. MEUNIER:** Thank you. No more questions.

**THE COURT:** You're excused. Thank you, sir.

We have one more witness?

**MR. SEEGER:** May we approach?

**THE COURT:** Let me see counsel.

(WHEREUPON there was a conference at the bench outside the presence of the court reporter.)

**THE COURT:** Let's call your next witness, please.

**MR. STEVE HERMAN:** Plaintiffs call Charlene Hernandez.

(WHEREUPON **Charlene Hernandez**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please be seated. Would you state your name for the record.

**THE WITNESS:** Charlene Hernandez.

**DIRECT EXAMINATION**

**BY MR. STEVE HERMAN:**

**Q.** Are you nervous?

**A.** (NODS HEAD)

**Q.** It's okay. Are you all right?

**A.** Yeah.

**Q.** Take your time.

**A.** I just have to make sure I have Kleenex.

**Q.** Take your time. Can you tell Court a little bit about yourself.

**A.** I was born in 1980 in Houma. I lived my whole childhood there in Houma. I went to LSU. I went to LSU, then went to LSU Health Sciences Center and graduated. I'm a registered nurse.

**Q.** Where are you employed?

**A.** At Ochsner. I'm actually a labor-and-delivery nurse.

**Q.** We heard a little bit from Tatum, but why did you in particular want to live in this house?

**A.** Well, I was finishing up nursing school. I was going to graduate in May 2005. We were thinking about starting a family

and we knew we wanted to be in a home. We love the North Shore. We love the church that we go to and the great schools, safe atmosphere, but we also wanted to be near family.

Tatum's aunt and uncle live in Mandeville, and she called us one day and said, "The lot that's across the creek from me, someone told me that it was going up for sale." So we decided that would be great since we wanted to live on the North Shore and we really wanted to be near family.

**Q.** How did it feel when you first moved into the house?

**A.** We were excited. It was our first house. We just were elated. We were thinking about things that we wanted to do with the house and future expansion one day. We were excited.

**Q.** I know it's kind of subjective, but could you just tell the Court from your perception what the odor's like that you experienced.

**A.** From the time we moved in, I told Tatum and I would tell his aunt: "Something smells funny in this house."

I thought: "Well, it's new. It's new, new everything, so maybe that's it," but the odor never went away.

I would clean, mop, dust, vacuum. As a mother, my kids were playing on the floor, and I would say: "What smells in this house?"

I thought I wasn't doing what I needed to do, so I would clean more, buy candles. I could never get it out. It's like a chemical smell, sometimes like a terrible burnt-match

smell.

**Q.** Just for the Court's benefit, when is the last time, to your recollection, that you used the fireplace in your house?

**A.** It's been several weeks. I believe it was the closing ceremonies of the Olympics. We were watching the Olympics and we had the fireplace going.

**Q.** Do you want to take a minute?

**A.** I think I'm good.

**Q.** What, if anything, have you done to try to reduce the odors or the gases in the home in terms of a dehumidifier or something like that?

**A.** We air out the house as much as we can. When it's nice outside, we'll open up the windows and doors and let fresh air in. We borrowed two large dehumidifiers, one on each side of the house, and we run those because we've heard that with less humidity that the odor is less. We try and do that.

**Q.** How, at least based on your perception, does the drywall affect your clothes?

**A.** All our clothes smell no matter what we do. I can smell it on my sweater right now. It's on my children's clothes.

**Q.** What attempts have you made to try to clean them to try to get the smell out?

**A.** I mean, just normal washing, drying, dryer sheets, dry cleaning, but it's just there. It's just a strong, strong smell.

**Q.** Could you tell the Court a little bit about what happened when you tried to sell some of your kids' old clothes.

**A.** I was going through closets and, you know, kids grow quickly, so they grow out of their clothes very quickly. We have a consignment shop in Mandeville. It's a popular place. People bring their nice children's clothes and the place will buy them back and then sell them, put them on the rack and sell them. I brought I think it was eight large bags of clothes, and the girl called me the next day. I could tell she was nervous on the phone.

She didn't know exactly how to say it, but she said: "The clothes you brought in were very nice. We really like them, but they have a strange smell. I don't know exactly what it is, but I can't sell them smelling like that."

**Q.** Are you all right?

**A.** (NODS HEAD)

**Q.** Have you made any effort to try to clean other items in your home like carpets or couches or anything like that? Take your time.

**A.** I have. We had Stanley Steemer come out to do -- we had a wool area rug in our living room, and the twin mattress in my son's room. They came out and they steam cleaned it really well.

He said: "Ma'am, I cleaned it as well as I can, but the smell doesn't come out."

 He even wrote it on the paper that, as well as he cleaned it, the smell wouldn't come out. He said, from his experience, that strong smells won't come out of thick things like mattresses.

**Q.** We talked a little bit about some of the electrical components and appliances with Tatum. Is there anything that he forgot that you remember?

**A.** I don't know if he talked about the microwave. I guess about a year after we moved in, it started to malfunction. The noises wouldn't work. You didn't know when your food was cooked.

Friday night, actually, we were cooking and making hamburgers and french fries for the kids, and when I plugged in the FryDaddy to get the grease hot to try to fry the french fries, there was a blue spark that shot out of the outlet. I had to jump back.

I'm sorry.

**Q.** It's okay. Take your time.

Have you had any other problems with light switches or outlets or sockets, anything like that?

**A.** I did, actually, on one side of the house. A lot of the lights weren't working on one side of the house and the outlets weren't working. I would go to plug in the vacuum and that didn't work, so we called an electrician.

He came out and he said one of the -- I don't

understand anything about electricity, but he said that one of the switches was very corroded and it was causing the ones further down to fail. So he had to fix it. I think it was 11 switches and lights that didn't work.

**Q.** In preparation for the trial, did you work on a list of electrical appliances and components in the house that, at least based on your perception, you had problems with?

**A.** Yes.

**MR. STEVE HERMAN:** Can we bring up Hernandez 558, please.

**BY MR. STEVE HERMAN:**

**Q.** Is this the list that you put together with Tatum?

**A.** Yes, sir, it is.

**Q.** Is it true and accurate to the best of your knowledge, recollection, and belief?

**A.** Yes. We worked on it and everything, we think, is as accurate as possible.

**MR. STEVE HERMAN:** Your Honor, we'd like to offer, file, and introduce 558.

**THE COURT:** I'll admit it.

**BY MR. STEVE HERMAN:**

**Q.** We talked about some of the samples that have been taken. Some of the experts, you've heard their testimony. Some of the things that are on this list, have they all been provided to various different experts for testing and stuff?

**A.** A lot of them have gone for testing. I think everything went except like the refrigerator couldn't go because the Sears people took that, but mostly everything else.

**Q.** Some of the stuff you had problems with maybe went back before you knew that you had Chinese drywall; is that fair?

**A.** Yeah. Some of the stuff was 2007 and 2008, when we had no idea. We don't know why things were failing. We just thought we had a lot of things going wrong.

**Q.** Did you provide other documents and information to some of the experts in the case?

**A.** Ms. Tuthill, we provided a lot of receipts, loss of wages, receipts for repairs, estimates to move out of our house, estimates of how much a comparable house would be in our area.

**Q.** Have you brought anything with you that you'd like to show the Judge?

**A.** I do, actually. Do you know where the box is?

**Q.** I think one of the former witnesses talked about this.

**MR. STEVE HERMAN:** May I approach, Your Honor?

**THE COURT:** Yes.

**BY MR. STEVE HERMAN:**

**Q.** If you could just tell the Court what that is.

**A.** This is a lamp that's sitting in our living room, but what we noticed about it is the -- just underneath the plastic, you see that the wiring is black. I don't know anything about wiring, but I don't think it's supposed to be black.

**MR. STEVE HERMAN:** I think, for the record, Your Honor, that was admitted as Hernandez 651.

**THE COURT:** Right.

**BY MR. STEVE HERMAN:**

**Q.** What else did you bring?

**A.** A garbage can.

**Q.** A garbage can? Is this what you were referring to?

**A.** Yes.

**MR. STEVE HERMAN:** May I approach, Your Honor?

**THE COURT:** Yes.

**THE WITNESS:** This one -- I can't remember if I bought it in August or September of '06, right after we moved in -- and you can see it's turned black. There's pits and spots and corrosion that kind of comes off on your fingers.

I had two like this, and so they sent one for testing. So I actually went to Target just to replace one of my garbage cans. I needed another one. They actually had the same kind at Target just in January. You can see the difference, what it's supposed to look like and what it looks like after three years in my house.

Actually, this one is just from January, but it's already turned darker than it was when I bought it, and you can already start to see the corrosion.

**MR. STEVE HERMAN:** Your Honor, we have a photo of the two trashcans, which is Hernandez 219.

**THE COURT:** All right.

**MR. STEVE HERMAN:** We'd like to offer, file, and introduce the photograph.

**THE COURT:** Admitted.

**BY MR. STEVE HERMAN:**

**Q.** Is there anything else you brought to show the Judge or asked me to bring?

**A.** There's two more things. One is a picture frame.

**Q.** A picture frame. The Judge has seen this.

**MR. STEVE HERMAN:** May I approach, Your Honor?

**THE COURT:** Yes. It's kind of a show-and-tell.

**BY MR. STEVE HERMAN:**

**Q.** What would you like to tell the Court about that?

**A.** This is a picture frame from our wedding. That's our wedding invitation in the middle, and a picture of Tatum when he was a baby, and myself. We had this in our apartment before we moved into our home. It was silver and shiny. It was fine.

After we moved in, I guess months after we moved in, we started to notice black spots and flaking, and so I just -- I took the picture frame down and I put it in a closet. Then one day, when I was cleaning out the closet, I pulled it out, and this is what it looked like.

**MR. STEVE HERMAN:** Your Honor, a photograph of the frame has been admitted already as Hernandez 272.

**BY MR. STEVE HERMAN:**

**Q.** Finally, we have one last item.

**A.** It's a doorstop.

**MR. STEVE HERMAN:** May I approach, Your Honor?

**THE COURT:** Yes.

**THE WITNESS:** Thank you. This is a doorstop taken -- I think it's from my children's bathroom, and you can see that it's totally black and corroded. It used to be like an antique bronze color. If you touch it with your hands, your fingers will turn black and you'll get the markings all over. This is what all of my doorstops look like, and my knobs, and all my hardware in my house.

**MR. STEVE HERMAN:** Your Honor, if we could just take the photograph and introduce it as Hernandez 658, if that's all right.

**THE COURT:** Admitted.

**BY MR. STEVE HERMAN:**

**Q.** Are you all right?

**A.** Uh-huh.

**Q.** Okay. What, if any, efforts did you-guys undertake to see if you could maybe move out of the house?

**A.** Well, I have a friend that's a real estate agent, so she emailed me some listings of rental homes in the Mandeville area that are comparable to our house. We saw the homes and we saw the price, and we can't afford our mortgage and rent.

 I have another friend who's a friend from church. Her dad is a pastor and he said: "I have a FEMA trailer if you want to put that on your property and live in that."

So we went out to see it. I went out to see it with my friend. We had pictures of it. So I went up the stairs and walked in, and the smell -- there's another smell in the FEMA trailer. And then with the controversy with the formaldehyde, I didn't want to put my family in something that maybe is worse. I don't know.

Also, it is extremely small for four people. There's no bathtub. So my kids, I'd have to hose them down. My daughter is only two, so there's no crib or any place for her to sleep.

**Q.** It's okay.

**A.** You can go on.

**Q.** Are you all right?

**A.** Yeah.

**Q.** Did you do any investigation with your mortgage company to see if they could work you with on your mortgage?

**A.** We did. We contacted our mortgage company. They called us or sent us a letter -- I can't remember -- and they said, "We'll offer you a 90-day moratorium," which meant for three months we wouldn't have to pay our mortgage, but on the 91st day the total amount was due. So that means for those 90 days, we would have to be saving the money to pay on the 91st day, so

we didn't see how that would be very helpful.

**Q.** What, if anything, did the builder offer to do for you-guys?

**A.** He had some properties. He had one house in specific that was on the market that he couldn't sell.

He said: "Well, I have this house that you can move into, but as soon as I get a buyer you have to move out."

So we were trying to clarify: "Well, does that mean we have a couple months before you sell it?"

"No. As soon as I sell it, you have to get out."

So that means if he sold it in two weeks, we would have to move again and not know where we were going to go. We would probably just end up having to move back into our home.

**Q.** What are your current plans?

**A.** Well, we're hoping for some kind of resolution to this.

**Q.** I understand.

**A.** But if it doesn't come soon, we're going to have to move out. I don't know how financially we can afford it. Maybe I can borrow money from somebody or something, but that's it. This is my option. That's why I'm sitting here.

**MR. STEVE HERMAN:** No further questions.

**THE COURT:** Any cross?

**MR. HAYDEN:** No.

**THE COURT:** You're excused. Thank you, ma'am.

We'll stop here and come back tomorrow at 8:45.

The Court will stand in recess until then.

**MR. SEEGER:** As far as resting our case, you want us just to take care of that in the morning, whatever's left over?

**THE COURT:** Yes. Let's make sure you've got all the exhibits in the form and fashion that you need them in.

**THE DEPUTY CLERK:** Everyone rise.

(WHEREUPON the Court was in recess for the evening.)

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

s/ Toni Doyle Tusa
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY

Docket No. 09-MD-2047
New Orleans, Louisiana
Wednesday, March 17, 2010

**THIS DOCUMENT RELATES TO:**
Case No. 09-CV-6050

Tatum B. Hernandez, et al
v.
Knauf Plasterboard (Tianjin) Co., Ltd., et al

*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME III - MORNING SESSION

APPEARANCES:

FOR THE PLAINTIFF:

HERMAN, HERMAN, KATZ & COTLAR
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, LA 70130

GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

SEEGER WEISS
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

LEWIS & ROBERTS, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

FOR THE DEFENDANT:

FRILOT L.L.C.
BY: KERRY J. MILER, ESQ.
Energy Centre - Suite 3700
1100 Poydras Street
New Orleans, LA 70163-3700

BAKER McKENZIE
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

BAKER McKENZIE
BY: DOUGLAS B. SANDERS, ESQ.
ERIN M. MAUS, ESQ.
KYLE P. OLSON, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter:

Karen A. Ibos, CCR, RPR, CRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7776

Proceedings recorded by mechanical stenography, transcript produced by computer.

# I N D E X

**WITNESS FOR THE DEFENDANT:** **PAGE/LINE:**

**RICHARD J. LEE**

Voir Dire Examination by Mr. Sanders 534/14
Direct Examination by Mr. Sanders 545/16
Cross-Examination by Mr. Seeger 566/5
Redirect Examination by Mr. Sanders 597/2

**VIDEO DEPOSITION OF CRAIG BEYLER** 599/13

P R O C E E D I N G S

(WEDNESDAY, MARCH 17, 2010)

(MORNING SESSION)

(OPEN COURT.)

08:46:32 THE COURT: Be seated, please. Good morning, ladies and gentlemen. We're here today. Are there any further witnesses from the plaintiff?

08:46:41 MR. SEEGER: Your Honor, we do not have any further witnesses, I just want to make sure, do we have all of the exhibits in?

08:46:49 MR. MEUNIER: Your Honor, just to be clear about a couple of exhibits, Judge, good morning, Jerry Meunier for the plaintiffs.

08:46:54 In connection with the deposition, I'm sorry, the testimony of Al Mallet, I want to be sure that we offered Hernandez Exhibit 383 in its entirety, that's his CV; and also with respect to Hernandez 557, we're offering pages 1, 2 and 3 of 557, which is the cost comparison table.

08:47:19 THE COURT: Okay. Those are admitted.

08:47:22 MR. MEUNIER: Thank you.

08:47:24 THE COURT: So the plaintiff rests, is that it?

08:47:26 MR. SEEGER: Yes, your Honor, plaintiff rests.

08:47:28 THE COURT: Subject to checking the exhibits. Check the exhibits before we close the record whenever we do it and make sure they're in the form and fashion.

MR. SEEGER: Your Honor, I'm sorry, Russ just reminded me, it is also subject, we have to work out with you the issue of attorneys fees and costs, so it's just subject to that.

THE COURT: Let me hear from the defendants.

MR. SANDERS: Yes, your Honor. Before we go forward with our first witness, I believe Mr. Bryson wanted to deal with an issue with our second witness.

THE COURT: Sure.

MR. SANDERS: I understand they're bringing a *Daubert* challenge.

MR. BRYSON: Good morning, your Honor. Dan Bryson for the plaintiffs. Your Honor, we have an objection to portions of the testimony of Craig Beyler, he is KPT's fire safety expert, we do not question his credentials, only his methodology.

The trial preservation deposition was taken on Friday, March 12th. We agreed to preserve all objections until the witness was offered. We understand that he is the second witness and it's on videotape, and trying to save the court some time I think it will be a couple of hours of videotape that they're offering. It's a technical argument. We thought that it would be best to do this orally rather than try to set it forth in a written motion.

THE COURT: Sure.

MR. BRYSON: Our particular objection, your Honor, is with regard to his Exhibit 2 and all testimony associated with Exhibit 2.

08:49:00 THE COURT: Is this Exhibit 2 (INDICATING)?

08:49:03 MR. BRYSON: That is -- no, your Honor, Exhibit 2, and we have asked this morning -- we brought up and handed to you Exhibit 2, which is appendix C.

08:49:13 THE COURT: I have it, C, this is it?

08:49:16 MR. BRYSON: Yeah, Appendix C, that's their Exhibit 2, which is DX 0009-0024. And what he did, it's entitled Temperature Test, and what he did is fairly simple to explain, their expert did temperature tests with some wires. Your Honor, he hooked wires up to receptacles and then he measured the temperature of the wire at the connection point on a receptacle or at the screw, at the contact point. Your Honor's heard a lot of testimony about that.

08:49:46 He testified that if the temperature at this connection point was greater than 30 degrees centigrade, at that point you violated the standard. And if it's less than 30 degrees centigrade, you're within the standard. So quite simply, you look at his tables and if you see numbers above 30, you're in violation of the standard, and if you see numbers below 30 on all of his tables, you know everything is okay and the wires are okay and there's not a fire safety risk. Not surprisingly, there's not many 30s on his tables.

08:50:16 He has five tables with variations that I want to briefly tell you about, your Honor, but they all hinge on that 30 number. Now, Mr. Beyler testified that he performed these tests pursuant to UL 498, that's Underwriters Laboratory test, and here is a full

08:50:35 copy of that manual, but we have given the relevant pages to you this morning. And we pulled out the four pages that he's relying upon.

08:50:45 If we can pull up Beyler 7001. This is the standard that Mr. Beyler testified that he performed these tests to. And that is without dispute. If you look at his deposition, we've given you a copy of his trial preservation deposition, your Honor, page 24, at lines 21 through 24. Without dispute this is the standard. And he testified that he did his temperature test pursuant to Section 112, which is Beyler 7-129.

08:51:13 This is the temperature test, and 112.1.1 indicates that anything above 30 degrees celsius you have an issue on this temperature test. So this particular section is what he performed his tests in.

08:51:27 Now, there are various steps, your Honor, on performing this test. And a critical first step on this test, this temperature test, it's not that long, is 112.1.3. If we could go to the next page. And at the top of 112.1.3, if you could highlight that, it says the temperature test is to be made following the overload test on the devices. The temperature test is to be made following the overload test.

08:52:00 Now, the UL standard defines the overload test, the overload test, it's Section 106.3, states that the receptacle is to be cause to make and break 150 percent of rated current for 100 cycles of operation. So the standard says before you start doing

temperature test on a receptacle, you have to run that receptacle 100 times at 150 times its rated amperage, like if it's a 20 amp receptacle, you run it at 30 amps for 100 cycles and then you start running these temperature tests to see if you have any sort of overheating problem with the receptacle.

Your Honor, it is without dispute, without dispute, Mr. Beyler skipped this part of the test. He did not do it, not surprising, because if you run this test, it kind of gives you more of a real-life situation with regard to the receptacle. He did not run the overload test on any of his tables on any of his receptacles that he did.

There's also another step with this, and you can see we've given you the temperature test steps that you're supposed to do, Section 112.1.7, if you could go to the next page. There is a particular gauge that you're supposed to use, it's called a thermocouple, you hook the thermocouple on and it measures your temperature reading, and it explains the type of thermocouple that you're supposed to use. It is without dispute that he did not use the type of thermocouple device that you're supposed to use to measure this temperature.

And this is key. He didn't use it, and amazingly, a lot of his temperatures are just below 30. But he didn't use the right device, as clearly set forth in the standard. The manual here from Mr. Sanders has a Ph.D. from Harvard and he has these steps that are conveniently omitted.

08:53:47 And I've cited to your Honor, I've tabbed the pages of the spots without dispute where he did not do, "Did you do the overload test? No. Did you use this type of thermocouple? No." That's on page 78 of his deposition.

08:54:01 Now, this same methodology or lack of methodology was followed on every single one of his tests, Tables 2, 3, 4, 5 and 6. He has five tables, they start at Table 2.

08:54:13 Now, let's talk very briefly about each table. Within each table, your Honor, there are some things that are very unreliable. On Table 2, if we could pull that up, DX 0009-0029. And if you could pull up right in the middle. Your Honor, what he did here on Table 2 and you're going to hear as you listen to all of this videotape, unless we exclude it, Mr. Beyler had Mr. Lee and Mr. Perricone send him some wires.

08:54:40 And they took some copper wires at RJ Lee and they exposed them for one day, three days and seven days to 10.3 parts per million of $H_2S$ hydrogen sulfide gas. Wow, that's an interesting experiment. How did you determine the duration exposure? Mr. Beyler, I don't know. Was there any standard that the exposure was linked to? I don't know. What about the amount of gas, what was that limited, what standard did that follow? I don't know. So you just got some wires from RJ Lee that had turned black after that exposure and you hooked them up under some screws to start measuring the temperature differential? That's right.

08:55:21 And that's what it was. You have wires that were sent

08:55:25 that were pursuant to no standard and they're measuring, if we could go to Table 2, which is the next page, and you can see we've got all of these numbers that are less than 30 on a bunch of wires that were exposed for one, three and seven days on a standard or methodology that they just made up. And they're going to say that this is something that should be presented to this court.

08:55:48 And again, no overload test, used the wrong thermocouple to do this test.

08:55:53 If we could go to Table 3. Table 3, this is where they tested -- go to the next page, Scott, if you could. On Table 3, this is another table and we looked at this table and if you -- and this is where they tested some corroded ground wires, actual corroded ground wires from some of the receptacles. And you can see outlets, some of these outlets are actually from the Hernandez house. And you see the column that's T max, Scott, that fourth column that says T max, if you could highlight that column straight down. These are some temperature tests of some actual wires they hooked up to a contact point. And you see a few that are at 30, so this is a table I am real interested in.

08:56:38 And then on the next column it says T max after cleaning, and you can highlight that column, Scott. And you see some numbers there, look at the 67.1, where it says they cleaned the wire, they hooked it up for testing and they started testing it. And now it's showing 67, which is well over 30. I said, well, wow, that's a good result. And he goes, oh, actually that column, when we say

after cleaning, we actually didn't clean it.

So all of the numbers on top, 23.9, 25.3, 28.7, on that T max after cleaning, even though he is in a trial preservation deposition and taking his discovery deposition for the first time, all of those numbers now he says are not after cleaning and that's without dispute. It makes absolutely no sense and is not reliable.

And then on Tables 4 -- and again, no overload test, used the wrong thermocouple, and look, a lot of those readings are close to the 30 mark, which he says is a problem.

And then the last three tables, your Honor, is Tables 4, 5, and 6. What he did with these tests, your Honor, is, Mr. Beyler, he took a length of wire and he hooked each end up to a receptacle and then he took a temperature test right in the middle of the wire. And I said -- and then he took some measurements, you know, is it greater than 30 or not.

I said, well, that's an interesting test you performed, is that pursuant to any sort of standard, you know, measuring in the middle of a wire? He said, no, no, it's just something that I, you know, that I made up. It sounds cool to measure the temperature in the middle of the wire, but there's absolutely no standard or accepted testing protocol for that. And on page 91 of his deposition, your Honor, he admits that he didn't follow any accepted testing protocol in doing this.

So in summary, your Honor, what do these numbers mean that they intend to show you in about an hour and a half worth of

video? They don't mean anything. They're absolutely unreliable on this particular exhibit. And I don't need to tell your Honor about their burden on this, but it's critical, the focus, and I quote from your Honor's opinion from Germano ON *Daubert*, the focus is not on the result or on conclusion, but on the methodology. The proponent need not prove that the expert's testimony is correct but must prove by a preponderance of the evidence that the methodology used by the expert was proper.

This methodology was not proper, it is without dispute that it was not proper. We should not be using the court's time with this, and we would ask that this exhibit in its entirety be stricken and all testimony associated with it be stricken.

And in the alternative, this Appendix C, you can see, your Honor, that except for the tables, it contains a great deal of opinion testimony, which they try to say is test procedures and approach. But if you read it, it has a lot of commentary in it such that pages C-1, C-2, C-3, C-4, C-5, C-6, should be excluded as impermissible opinion. C-8, C-10 and C-11 should all be excluded as impermissible opinion testimony from that exhibit.

Thank you, your Honor.

THE COURT: Any response?

MR. SANDERS: Good morning, your Honor. Appendix, I think it's Appendix 2 or C to the report, and it's -- it was a trial Exhibit 2, are the test results that Dr. Beyler relies on. And while Mr. Bryson indicated that he is not challenging

Mr. Beyler's credentials and he's not challenging the actual results, that's really what he's doing here. You just heard about how the results shouldn't matter, and apparently how somebody who does have a Ph.D. in engineering science, an M.S. in mechanical engineering, an MSc in fire safety engineering, can't design a PROPER test procedure or methods, which are all set out in that appendices, to run a test that's relevant here.

Yesterday Mr. Seeger asked Mr. Galler whether or not, other than resistance measurements there is something that he was curious about, that he wanted to know, and what he said was, I am curious about the impact on these, on this equipment of heat, of temperature, and he was talking about, I think, switches and he was talking about circuit breakers. But another issue in this case or another way of looking at this is to measure temperature as a function of resistivity. And that's what this is, these are test results that do that.

And the standard that Dr. Beyler uses here is based on the UL 498 standard, which they've excerpted four pages of, but it's a fairly lengthy document describing how and what you would need to do to list the switch to be new, to sell it on the market. And that was the sort of conservative Basis, as Dr. Beyler explains, that he used to set up his test protocol.

Within this standard is a method to do temperature testing on the connections. And that's what Dr. Beyler was asked to do and that's what he's concerned about. What is the impact of

corrosion on wires on connections to receptacles and switches such that if you were to hook them up again or do some cleaning on them, would that violate the standard 30-degree temperature standard, which is a new standard, meaning that that's a conservative standard to say that if a device or a receptacle meets that 30-degree standard, then you can market it as new, and he based it on this. I actually asked him in his redirect on pages 112 of the trial transcript whether or not, with respect to the standard that Mr. Bryson was talking about, whether he considered that in designing his experiment, and of course he said he did. And in his determination that was not the purpose of what his test was, which was to focus on the connections.

As he indicated in his cross to Mr. Bryson, there's a lot of tests in here that would go to all different components of the receptacle if the purpose was to say, this is a new receptacle which we're going to sell. But that wasn't the purpose, the purpose was to design an experiment to which you can measure the contact resistance where the wires are hooked up, and that's what that particular temperature test goes to.

With respect to the wires, again on page 53 of his trial deposition, I asked Mr. Beyler how he did the, starting at page 53, what his basis was for extending the 498 standard to actually measure the wires and the temperature rise in the wires. And he indicated that there isn't a UL test on wires, the wires usual test is on insulation. But the only difference here was that he was

09:03:45 measuring the test differential, he was measuring the temperature of the wires with corrosion on them and trying to get an idea of whether or not there were temperature raises in those wires.

With respect to wires and insulation, the test is actually from a different standard 90 degrees. And the idea was to see, does it get to that point.

All of these are based on the standard here and there are modifications to the standard. What Mr. Bryson has raised, if there's issue with, did you use the right thermocouple, it was a modification proper, well, our expert has testified that he believes it is, and he explains or could've explained how the modification worked. If Mr. Bryson wanted to get into it more in the deposition and wanted to elicit testimony that might discredit or put doubt on his results, he had an opportunity to do that.

But the method here is fundamentally sound based on a well-recognized method and a portion of that method. And we believe it survives, should survive a *Daubert* challenge.

THE COURT: Okay. Any response?

MR. BRYSON: Your Honor, just a very, very brief response. Your Honor, Mr. Sanders just basically just said he designed the test for purposes of litigation. He testified that he was supposed to follow Section 112, the temperature test, he admitted that in his testimony. This test has steps that he omitted. There is -- he has no evidence that there are other experts who have ever used or followed this type of test. He said

this was the first time he had ever done it, this was the first time he had ever pulled out receptacles and done this type of test.

There is no evidence of peer-reviewed literature that supports the method in which Dr. Beyler did it, and they have the burden to show those things and they have not met that burden, they have developed the test for litigation purposes only and it should be excluded. Thank you.

THE COURT: All right. I do understand the issues involved. It has to do with *Daubert*, it has to do with methodology, and of course with methodology that's what we do with *Daubert.* It comes rather late in the game, but that's neither here nor there. The court is required to serve as a gatekeeper in these matters.

I'll reserve ruling on the exhibits, but I will allow the testimony. And the points that the plaintiffs raise are valid points, but I think that they can go, he can make those in cross-examination in any other areas, including rebuttal testimony, if that's necessary to attack what this witness's conclusions show, that this witness's conclusions are inaccurate because he misapplied certain things. But I'll let the testimony in. So I'll deny the motion.

MR. SANDERS: Thank you, your Honor.

THE COURT: Let's call your first witness, please. I understand that you've made motions for judgment as a matter of law, I note that you vigorously present that question and raise all

of the issues that you've raised. I'll take it under consideration and I'll deny the motion. So let's present your testimony.

MR. SANDERS: I would like to call Dr. Richard Lee.

THE COURT: Come forward, please, sir.

THE DEPUTY CLERK: Sir, please step into the witness box. Would you raise your right hand.

(WHEREUPON, DR. RICHARD J. LEE, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

THE DEPUTY CLERK: Please be seated, and would you state your name for the record.

THE WITNESS: My name is Richard J. Lee.

THE COURT: You may proceed, counsel.

VOIR DIRE EXAMINATION

BY MR. SANDERS:

Q. Good morning, Dr. Lee. What is your current position and who do you work for?

A. I am chief executive officer of the RJ Lee Group.

Q. And if you could tell us, what is the RJ Lee Group?

A. We are a company that is involved in scientific innovation, testing and computer software.

Q. And if you could tell us a little bit about your education and sort of your roots.

A. I grew up on a farm in northern North Dakota, which is just about as far from New Orleans as you can get. And I went to the University of North Dakota in 1962, where I graduated with a double

major in physics and mathematics. I then went to Colorado State University, where I got a Ph.D. in theoretical solid state physics and mathematics.

Q. Could you explain for me what theoretical solid state physics is?

A. Theoretical solid state physics is the branch of science in which you imagine the universe and how it is put together and the way it works and develop theories, mathematical theories, to express the behavior of properties, systems in the universe.

Q. So where did that degree take you next?

A. That degree took me to a regional campus of Purdue University for three years, where I taught undergraduate and graduate physics, undergraduate, primarily for engineers, and premed, pre-law and graduate physics for graduate semi-conducted physics.

Q. And here we actually have the front page of Mr. Lee's résumé, just to sort of follow along. Did you do anything outside of teaching while you were at Purdue?

A. While I was at Purdue, I got involved with SC Johnson and Company in designing the transparent toothpaste, which was the goal of a bunch of the commercial manufacturers of toothpaste at that time, and then I got involved with Chrysler Corporation in designing and developing the automotive catalyst system that, the EPA had just mandated a reduction in NOX, carbon monoxide -- NOX nitrous oxides and carbon monoxide, and Chrysler brought me in to help design the catalyst system and the substrate for them.

09:11:27 Q. And what is that, what is the catalyst system and the substrate, what were you actually doing?
09:11:33 A. The catalyst system is a porous gamma alumina, which is a form of alumina, with a very fine, relatively poor crystal microstructure, and you deposit either on that or in that compounds which lower the amount of energy required to convert, reduce nitrous oxides or carbon monoxide.
09:12:01 Q. And after your time at Purdue, where did you go next?
09:12:06 A. After three years at Purdue, I went to the United States Steel Research Center in Monroeville, Pennsylvania.
09:12:15 Q. And how long were you at U.S. Steel?
09:12:18 A. I was at U.S. Steel 12 years and a few days.
09:12:22 Q. And what were you hired to do when you first got to U.S. Steel?
09:12:26 A. At U.S. Steel I was hired to be in the fundamental research department, which was charged with looking at problems. We did not -- we don't -- I'll put it in the past tense I guess, we didn't know how to solve at the time and figuring out what the issue was and what could be done with it.
09:12:51 Then we worked with product development and engineers, so we ranged from the mining, at the time we were a large exploration and mining company, through the processing of iron ore, copper, nickel and the other things, to the blast furnace, to the products, and then followed that out into the product strip.
09:13:22 So if you bought a refrigerator from a company and the paint didn't adhere, it ultimately came back to us. And our

09:13:33 question was threefold: Was this a materials problem, was it a usage problem, did it have stuff sitting, weight sitting on it that you shouldn't have, was it an adhesion problem, or was it a design problem? So our role was to characterize the material and work with the engineers to either solve the problem, resolve the customer issue, or identify an area where additional development had to be done.

Q. And when you first went to U.S. Steel, what was your specific role in that process?

A. I was a research engineer in charge of scanning electron microscopy.

Q. We've heard a little bit about SEM here. If you could just kind of tell me just briefly what that meant and what types of things you did?

A. At that time scanning electron microscopy on a commercial sense was about four years old, and it represented the first major opportunity for evaluation of materials that had come along, really, three major steps: One was the optical microscope and the understanding of phases and identification of ores and ore minerals. The next was in the early '40s, late '30s, early '40s, the development of the transmission microscope. But this tool gave you the opportunity to look at surfaces, to look at the chemistry on an extremely small scale of that surface and then look at the way that chemistry behaved.

So you look across things, over things, through things,

and determine the relationship between the chemical behavior, the physical property you were evaluating. At that time it was a revolutionary tool.

Q. And for a while there, you were involved in doing just that, looking at things and cross-sections and other --

A. I did that at U.S. Steel and I've done that, including the design and development of the first computer-controlled electron microscope after I formed RJ Lee Group.

Q. And I guess at some point you moved up a little bit in the group. What did you become?

A. Well, I like to say I moved up, but at that time the steel industry was in a great recession, so to some extent it was a little bit like sitting in a lake, with the water going down and you came out of the lake, because if you survived, you were higher in the corporation than you were before. But eventually I became head of the physics, surface science and electron microscopy division.

Q. And what areas did you focus on as the head of that group?

A. I really had three areas in that group. We were the lead surface group or problem solving, whether at the plants, in Oramac or at the customer level, that was like about the third.

We worked with people involved in product development, and so there we were looking at failure analysis trying to decide whether the failure was, like I described on the refrigerator, was it a mechanical problem, a design problem or an environmental

problem, typically was the world we worked in.

Then in the early '70s we really came with the first environmental awareness. The awareness that you had to -- what we were doing industrially and the environment we were creating wasn't acceptable for the long-term. So I was at the threshold of sort of environmental science from one of the major polluters at that time in the country, and that was about a third of my work.

And then developing new techniques and methods to solve the problems that we didn't -- hadn't addressed.

Q. And in your assessment of products and failure analysis, did you address or work with corrosion issues?

A. Corrosion was one of the leading issues in the steel industry. There's two branches, sort of a physics that are sort of the fourth and fifth branches, and that's corrosion and wear, and they're still extremely important today.

But in corrosion we were trying to design systems which would last 50 years in many circumstances, and to do that we had to protect the steel from the environment because -- in some cases, like we have something called corten steel, which is a passivated oxide film on the surface of the steel, which gives it a very attractive brownish color, but it really doesn't flake off and peel, so it limits the corrosion.

Then we had our products, our galvanized products, our tin-plated products, all of which the coating was there basically for sacrificial purposes to protect the steel. So you would coat

09:19:17 it, a turn plate, you put a lead zinc coating, lead tin, and that would be corroded in place of the steel. So it would protect the steel, assuming it was adhering and well put on to pretty severe environments.

Q. Can you provide me an example of a project you worked on for U.S. Steel involving corrosion?

A. Yeah. Probably one of the most interesting ones was we had, we provided the cable, the steel cable, for the Golden Gate Bridge. People started reporting corrosion phenomena going on on the cable. And it was an extremely interesting problem, solving that problem, so that we didn't have to replace all of the cable in the bridge or have to -- have catastrophic failures. It was an extremely interesting challenge.

Q. And obviously did you succeed?

A. It's still there.

Q. How did you end up at RJ Lee or, I guess, founding RJ Lee?

A. Two things happened: One, we had shrunk so much in research, we started with 2,200 people in research and we were sort of the Bell Labs of the metallurgical industry and we had shrunk to about 400 people, and I said to my boss the next time, don't ask me to cut more people, just fire me and the group and we'll go out and start up on our own.

Q. And that's what happened, I guess?

A. That's what happened.

Q. One of the other areas you had mentioned that you were at U.S.

steel was sort of the environmental area. What did you do or what was your responsibility with respect to environmental issues?
A. At the time, it was in the early '70s, '73, '74, '75. The whole issue of asbestos had just really become an issue, and so there were cases involving Lake Superior and cases involving our iron ore mines in Quebec and Labrador and Newfoundland, where we had minerals which were, in some cases were asbestos and some cases looked like asbestos. And so our job was, we worked with the agencies, we worked with everybody from the unions, to say is there a problem, how much is the problem, and what do you do about the problem.
Q. And what did you do or what was your involvement in determining what you do about the problem?
A. Well, at that time, if you grabbed a particle out of the air and had a totally unknown particle, there was no way of telling whether or not it was asbestos or some other. I developed automated procedures to identify those particles and then count them, and so in the process of doing that I ended up writing the standards for asbestos and it became a significant component of the business of RJ Lee Group.
Q. And RJ Lee Group, could you tell me what the focus has been for RJ Lee Group, and particularly your own focus?
A. We're very much like the old industrial research laboratories. We have a broad scale of scientists and probably something around 350 people today. In that group, we have 20, 25 Ph.D.s, 30 or 40

bachelor's degrees and maybe 75 to 100 bachelor's degrees, and then a lot of trained technicians, plus your ordinary kinds of support staff, accountants, secretaries and facilities people and the like.

Q. And what's your role in working on projects that you work on with RJ Lee?

A. I have a management team that does most of the day-to-day. I tend to be involved, like to be involved in project oversight and program design and sort of when and where I can, a lot more than it used to be in the old days than now, hands on, particularly electron microscopy, I love that.

Q. And can you give me some examples of any corrosion projects that you've been involved in at RJ Lee in the last couple of years?

A. Recently the, in the fairly recent past, there was a large chlorine spill in South Carolina, right near the Savannah River Plant, Savannah River Georgia plant, I forget the name of the town. But we were brought in to assess how far the chlorine gas went.

It was pretty significant, actually. Killed eight people because they got, once the spill happened they ducked down on the ground, which was exactly the wrong thing to do because chlorine gas is heavier than air and it killed them. And it killed the animals, cats and dogs.

But we were charged with figuring out where did that plume go, what did it impact, how corrosive was it, did people's homes and furnishings, were they affected, and so on. And as well as the industrial impact on a textile mill, that was Avondale

Mill's textile mill.

Q. And how were you involved in that project?

A. I and my staff designed the program, walked the grounds in the first days, here is the assessment process, then we managed the damage process for the client, Norfolk Southern. So people would call up and say, hey, I think my home was impacted by this chlorine spill, we set up a process which was a field inspection, field testing and then sending samples if it was, both positive and negative samples to the laboratory for confirmatory analysis.

Q. So as Part of that project, you actually assessed and measured whether or not things were corroded?

A. Whether they were corroded and whether it was superficial or whether it was, you know, fundamentally, whether or not it should be replaced. Either, or either because it was damaged or because it was less expensive to replace it than it was to clean it.

Q. And what about -- any other examples in the recent past?

A. We were the lead environmental team in about ten of the buildings affected by the World Trade Center event. And we had the old Federal Reserve Bank, which was immediately south of The World Trade Center 2 and when the building went over, when The World Trade Center 2 came down, it cut a 17-story gash in the side of our building, and then the pressure brought all of the pulverized contaminants and fire, we called it a cocktail that really had never been seen before.

And the building, since we act like a vacuum cleaner, it

was lower pressure than the pressure wave of stuff that came out, so it filled every nook and cranny. And then to a lesser extent, the other buildings around the area, buildings behind it. And then later on we looked at sort of the second wave of issues related to buildings which hadn't been able to be cleaned the first time but suffered some other kind of damage, in assessing whether or not there was related to the World Trade Center event.

Q. What were the problems or the issues that you were looking at and how they impacted the building specifically?

A. There were three or four really major issues, depending on the building you were in. But one was structural because we had fires, which were pretty hot. So assessing the impact of that, of the fires on the steel and on the other materials.

The second was environmental. How do you design the cleanup process that would be effective, that would not be putting people at risk after the fact from a health perspective or the materials at risk for ongoing corrosion.

The third was the kind of long-term environmental assessment. Were the concentrations of airborne pollutants high enough and what was near long-term risks to the population, which was, people that were exposed that day weren't exactly there expecting to be, have a building come down.

Q. And with respect to the corrosion issues specifically, what issues were you addressing, if you could give some examples?

A. We did much the same. We worked with engineers. One of the

major issues was concrete, concrete and steel. There was a lot of issues relative and, depending on the building. Some buildings were, you couldn't -- we ended up saying you couldn't really repair them, some buildings we ended up saying they can be repaired and here is what you're going to have to do.

MR. SANDERS: Your Honor, I would like to tender Dr. Lee as an expert in investigation of physics and corrosion, material science failure analysis and repair.

MR. SEEGER: I was all prepared to yell no objection until I heard physics of corrosion, your Honor. You know what, I'll save it for cross.

THE COURT: All right. The court will accept him in the designated fields.

MR. SANDERS: Thank you, your Honor.

DIRECT EXAMINATION

BY MR. SANDERS:

Q. Dr. Lee, could you explain your involvement in this investigation and in the Hernandez case?

A. I have not had any steady day-to-day involvement, but I've been involved in, probably in the beginning and near the end of 2008 in addressing, in sort of the experimental design, working with my scientists, Dr. Perricone, I'll probably slip and call him Matt during the -- Rickabaugh, Wagner AND LAVINE and other people who worked on this problem in terms of oversight. But I kind of call it connecting the dots.

Q. And have you seen or been to houses with Chinese drywall in them?
A. Yes, I have.
Q. Where have you seen it?
A. In Florida and in Mandeville, Louisiana.
Q. And during the course of your oversight in the project, were you involved in the preparation of all of the reports?
A. Yes. I reviewed the reports and I drafted sections of the last report. I tend to serve as the technical editor.
Q. And what is your specific opinion in this case?
A. The specific opinion is that removal of the drywall will eliminate -- removal of the drywall is an effective means of remediating the source of the corrosive gases and arresting the corrosion; therefore, it's an effective remediation procedure.
Q. And you mentioned arresting corrosion. Is that one of the bases of your opinion, that it's an effective remedy?
A. Yes.
Q. Can you explain what you mean by arresting the corrosion?
A. By arresting the corrosion process, or it's been described variously as tarnishing or corrosion, but it's a reduction of oxidation reaction. The arresting, that means that stopping it so that it returns to a state that would not be different than what it would be had this source or had the hydrogen sulfide and other gases in combination never been there.
Q. And is it your opinion that once the drywall is removed the

corrosion will continue or could continue? The sulfide corrosion.
A. It will -- I think you have to be careful with the use of terms here. The corrosion relating to, that is being affected or impacted by the presence of reactive materials in the drywall is the cause will stop. But we live in a world where there is -- so if you call that sulfidization or reduced sulphur corrosion or whatever, or drywall corrosion, I don't care, but that will stop. What will not stop is the normal tarnishing behavior that you see in any home or in any material. So...
Q. Can you explain to the court and for us what the basic mechanism right now is of the corrosion with the drywall in the house?
A. In the case of the drywall, the driving force is the production of hydrogen sulfide gas. That gas, as it approaches the wires in the vicinity of the, let's take the wires, approaches the wire, interacts either at the surface or in the atmosphere near the surface of the wire. It's pretty much a gas-based reaction, but it's close to -- it would most likely take place in some kind of association with some kind of condensed moisture on the surface, even though -- and it will produce associate hydrogen sulfide creating sulfide ions, which then give the copper in the wire the opportunity to say, I can get to a state of what we call lower free energy but a more relaxed state if I jump out of this lattice and interact with that pipe. It's like the copper gives up an electron, it's released into the environment and is grabbed by the

sulphur. And that film builds up.

What isn't completely clear and you see some different, different is this film building from the top, is it building by migration of the copper through the air or is it building like you lift blocks, so is it building by reacting underneath the surface. And very likely there's some of each going on.

Q. What do you mean by the copper wanting to relax or join with the sulphur?

A. Well, if you think about, if you think about how we make metal today, we take ore out of the ground that's been oxidized and is stable, it's going to stay there basically forever, it's in a state of, in physics we'd say is the lowest free energy. It's kind of like, kind of like my stomach when I was 17, it was pretty flat and it took a lot of energy to keep that way. When I'm 65, it's relaxed.

So to make a metal we take this ore out of the ground, we clean up all of the crud around it, and then we put it in a furnace where we impart a lot of energy, heat it up, and then we let it cool under controlled conditions, and we add various bits and pieces of alloy metals and the result is a nice, rigid metal structure. But it's sitting there and it holds itself together, but if you give it a little bit of energy, break one of those bonds, it would like to go back to that state that it was in the ground. And that's really the relaxation.

In physics we call it going to a lower state of free

energy. In chemistry they call it, they rate things by the electrochemical potential, electronegativity and/or the amount of energy required to disassociate the copper versus disassociate, so you have -- in corrosion engineering they call it cathodic and anodic reactions.

Q. So what's the low state of energy here, what do we end up with?

A. The low state of energy in this case, in the presence of a hydrogen sulfide gas, and something to help it disassociate is copper sulfide, $Cu_2S$.

Q. And that's the film we find on the wires and the pipes and the other materials?

A. That's what you find on the wires and the pipes.

Q. And will that film, you said it's in a low state of energy, what does that mean, will it react again with water or other --

A. No, it doesn't like water. It's a fairly open structure, so water in the form of -- water in the form of vapor tends to penetrate it, but it doesn't like water. You put a drop of water on it it'll bead up. It has a very high surface tension. So water isn't going to wet it.

So once it's in that copper sulfide state, it basically will not engage in further reaction.

Q. I think you were here for Mr. Krantz's testimony, and if you could put up LT 241, please, Connie.

We've heard about the Edwards paper and its supporting kind of a continuous reaction of -- well, the continuous reaction

09:40:55 when you remove the source. Are you familiar with this paper?
09:40:58 A. Yes.
09:41:02 Q. What is this paper designed to look at?
09:41:04 A. This paper is designed to look at a problem that's been being chased for a long time, and that's the corrosion of copper piping in water supplies. Originally, it started out with the sea water problem, but in this paper they're trying to design an experiment, they did design an experiment, which looked at basically what amounts to a soft water corrosion and how that is enhanced or modified, accelerated by the presence of soluble sulfides.
09:41:56 Q. And if we go to page 2, I think the second full paragraph, it describes how the experiment design is set up and what they put into the water. If you remember, if you could do that or we can refer.
09:42:15 A. Fundamentally, they added some carbonation, they added some sulfate or sulfide, and they added some chloride to give you kind of a typical mix of what you might expect in a potable soft water supply. And then they ran that, they used the carbonate basically as a buffer so they could create a near-neutral pH and a high pH, pH around 6, 6.5 or 7 and a pH of around 9. And then they circulated that water past the interior of this pipe when it was charged with sulfide.
09:43:00 Q. And that's representative of the environment, I guess, in drinking water, but is that representative of an environment in homes around wires and copper?

A. Not around the outside, in the inside the, you know, you have water flowing through with certain ions and you have the problems with corrosion on the inside that's caused by simply either hard water, soft water or the chemistry of ions in it.

Q. And the Jacobs Edwards report indicates or I think concludes that when they take it out of the, sulfide out, the reaction still continues. Can you explain what's happening there?

A. No. As I read that paper, they do not describe the reaction continuing. What they do is say when you take that system out of the sulfide, maybe a little bit more, they mixed up two batches of water, one where they added the sulfide the other where they didn't. So in both cases -- so they have a four by four experiment.

After they ran this thing for nine months or something like that, on the sulfide side, they put it in the water that's similar to the water in the other side, the normal water. So they said, now what happens, after I've built up this sulfide film, what happens if I put that back in sulfide free water? And what they found was that in comparison to normal corrosion of copper in water, it was accelerated anywhere from five to 15 fold.

Q. What's the specific reaction that's happening there, is that a sulphur or sulfidation reaction?

A. That's not a sulfidation reaction, that's a, that's one of a number of reactions with general oxidation forming copper oxide, cuprous oxide. It depends on the hydrogen ion concentration and

09:45:15 the various ions that are present.
09:45:17 Q. Can you explain for me what's happening in that sulfide free now water with the sulfide, I guess, scale they have on them?
09:45:26 A. Well, I think what's happening, you have the pipe that is basically virgin copper, you then have a copper sulfide layer on it. And out here -- in here on the side, but if you imagine there's a big surface, out here you have water and that water is circulating by.
09:45:52 So the water provides a source of oxide or chloride ions. And up to the surface the copper sulfide acts like a semiconductor, you get transfer of electron hole pairs between the copper and the water, and it enables the copper ions to come out in an anodic fashion and go into the water where they tend to either, depending on the level, they'll either sit there as positive ions balancing the negative ion concentration or they will react with one of the species of copper oxide starting off generally and precipitate out. They prevented the precipitating out by replacing the water. Every month they'd change the water, so they kept a constant source of new ions.
09:46:48 Q. And you're talking about ions, I guess, and maybe it doesn't matter, but what you're talking about in this water example, they're not sulfide ions that are forming?
09:47:00 A. Not after -- in the continuation, in part B of the experiment, they're not sulfide ions, they're not talking about continued sulfidization.

09:47:10 Q. So how does that relate, then, back to our example of pipes and wires and houses with a sulfide layer on it? Why won't that reaction occur in that context or why won't a sulfidation reaction occur?

09:47:27 A. Well, first of all, sulfidation reaction, I don't think anybody claims, although in the testimony yesterday, at least for me, it was a little bit confusing, because as long as your copper sulfide is stable, there's no real claim that the, in the sense of a chloride ion reaction, which is, you know, you can get a self-catalyzing reaction. There's really no suggestion that the sulfidization is going to continue, that your sulfate, that your iron copper sulfide is going to form, to resolve, recreate ions, and you have a circuit going.

09:48:14 What will happen in the absence of the $H_2S$, part B of our experiment, okay, well, you'll have moisture in the air, especially if you have a wetting or increasing, wherever it's changing you'll have a tendency to increase, create some disassociation, extract a few ions, but then you've got maybe five to ten atomic layers of moisture, and maybe it's over 150-angstrom, 200-angstrom, so you have a total of maybe 3 or 400 water molecules and some oxygen. Copper item comes out, the water starts to evaporate, what do you get, you get a copper oxide. So to the extent you can pacificate copper, you'll pacificate it.

09:49:16 So, in effect, you went from a small anode and a large cathode, which pulls the ions away, to a large anode and a small

cathode, where the reaction takes place and there's nowhere for it to go.

Q. So what do you end up with there, it's, say, copper oxide, is that the same process that happens on wires normally?

A. At that point it will be the same process that happens on a wire normally.

Q. And there's no impact or -- with the sulfide there, will there be any impact or acceleration of that process?

A. Well, it's a rate-limiting step. It might happen a little faster but it won't, it's got the same -- it can only go to the same place, so initially you might get a little faster rate, but it has the same rate limit.

Q. So if I understand it, unlike the example on the pipe where the water takes away the copper oxide or the copper ions, those stay on the pipe?

A. Yeah. If you think about this from an atmospheric versus an aqueous corrosion phenomena, an aqueous corrosion, we tend to lose mass, you measure the corrosion by measuring how much material you lost. In atmospheric corrosion, you tend to gain mass because the ions are not transported away.

Q. Can we look at DX 158, please.

This is from your report. Could you explain what we're looking at here?

A. This is a water pipe taken out of one of the units, I guess in this case it's the Hernandez unit, 68034, in Mandeville, and the

inside -- in a sense, this represents a real version of the Edwards experiment because on the inside surface you see the corrosion rate that's due to the water flowing through the pipe and the reaction of the copper with the water.

On the outside surface, and you can see the layer of copper oxide that's formed there, there's probably a little carbonate. If you look at the grayer, if you go to the right hand, upper right-hand picture. Upper right-hand.

Q. This is on the inner?

A. Yeah, right there. If you look at that, you can see that there's a, that there's a pretty continuous corrosion layer right along the surface. You also see this is not a -- this water does not contain sulfide. There is no second layer, which would represent the sulfide component.

Q. Just to be clear, what's happening here inside of this pipe has nothing to do with the sulphur gases outside of the Chinese drywall?

A. No. This is water supply from Mandeville coming into the house and reacting on the inside of the pipe.

Q. And how does that compare to the outer layer --

A. Well, I think this is probably one of the best examples you can have where it shows that the comparison of the rate of attack inside the pipe and the outside attack of the pipe you've got is a relatively minor continuous corrosion on the outside of the pipe, somewhat more aggressive, maybe two or three or four or five times

as much on the inside of the pipe.

Q. Is this the layer of sulfide tarnish --

A. Well, that's the sulfide layer where intersects with the unaffected material.

Q. So these are the, I guess, same pipe in the same magnification?

A. Yeah. If you take the, we took a ring of the pipe, cut it in a transverse manner and mounted it in a manner that would preserve the film, and compared the surface on the inside of the pipe and outside the pipe.

Q. I think Mr. Krantz had talked about some experience with heat exchangers and saltwater. Is that the same thing that's happening up there or similar?

A. Related. You know, one of the problems with heat exchangers is that you tend to get more pitting corrosion than this sort of semi-continuous corrosion that you're seeing here. But it's the same kind of thing, you have a metal with -- to make that heat exchanger work you don't want that corrosion layer on the inside of that pipe.

Q. And with respect to this layer of sulfide film that's there on the copper pipe, it's your opinion that that won't continue to grow once the sulphur, that sulfide layer will not continue once the sulphur source is gone?

MR. SEEGER: Objection, leading.

THE COURT: Sustained.

BY MR. SANDERS:

09:54:50 Q. What is your opinion with respect to the continuation of the growth of the sulfide layer after the sulphur source is gone?
09:54:57 A. Once you have no sulphur source, you will have some modicum of continued atmospheric corrosion due to the normal environmental way pipes function. That rate will become, that rate will effectively terminate. It takes hundreds of years to effectively build up any significant corrosion on the material.
09:55:32 Q. And what is that, that's the copper oxide corrosion, what does that look like?
09:55:37 A. Primarily copper oxide. That's going to depend, the form is going to depend on the precise composition of the chemistry. And that's really more of a kinetic thing, it's really more Dr. Perricone.
09:55:56 Q. And if we could turn now to, and I guess that would be the same, what's your opinion with respect to continued growth on wires and other copper?
09:56:02 A. It's the same.
09:56:02 Q. Would that also apply to what we've talked a little bit about silver, as well in the formation of silver sulfide?
09:56:13 A. Yes.
09:56:14 Q. So it's the same reaction?
09:56:19 A. Physically, almost identical reaction. Silver is a little further down in terms of the -- it's a little easier to create a reaction than copper. But if you take a piece of silverware out of your drawer, at least out of my mother's drawer and my wife's

09:56:46 drawer, maybe not my kids, but it'll be tarnished, you'll go to clean it, and that will have that silver sulfide on it, one of the forms.

Q. But that will be from the, what's that, would that be from the --

A. Normal atmospheric.

Q. Is that from a silver sulfide layer that's already there from the drywall?

MR. SEEGER: Objection.

THE WITNESS: It's a slower process than what we're seeing here, but it's kind of the normal effect.

BY MR. SANDERS:

Q. Do you express the opinions you have just provided with a reasonable degree of scientific certainty?

A. Yes.

Q. What other opinions do you have in support of the remedy with respect to the functionality of the wiring and the pipes?

A. Basically, if you don't, if your wire and your pipes, if you remove the source, it will eliminate the corrosion. The corrosion as it exists, or tarnishing, is superficial in nature, hasn't affected either the performance, electrical or mechanical performance of the wire. It pretty much is semi-continuous or continuous corrosion phenomenon. So it's not the kind that are going to make a material change in cross-section to the point where you can, where you expect significant change in properties.

Q. Can we look at DX 137. And what is DX 137?
A. That's called a distorted wire.
Q. Is that because of our picture possibly?
A. That's a comparison of a ground wire, and you can see that the bit of tarnishing, sort of the irregular surface. On the right-hand side you can see the original, what would be a new wire. You see there's some discontinuity surface imperfection because this is an extrusion or wire-drying process, which these wires are formed, so you leave some mechanical irregularities on the surface of a wire.
Q. Is there anything about the tarnish film around this wire that concerns you?
A. You mean in terms of a performance?
Q. Yes.
A. No.
Q. Why not?
A. Well, for the purposes of electrical properties, copper is used, copper is copper. It's used because it's a unique material. It's almost like, it's close to zero resistance outside of the semi-conductor or super conductor, as you can get. It's basically the most conductive material.

And then we have the benefit of Ohm's law, and that's that resistance, okay. Current takes the path of least resistance, so that, in effect, when you put this tarnish layer on the surface of the wire, you've created a parallel circuit. The current says,

10:00:10 well, why would I go travel out in that outer layer because it takes more energy to get through, I'll go on the inner. And so you get effectively no change in the electrical properties.

10:00:23 And obviously, this doesn't come anywheres close to, say, a 30 percent reduction or whatever that would affect the mechanical property.

10:00:40 Q. I think in your assessment of this obviously, and we've seen this all throughout the case, we've seen pictures of ground wires or hot or neutral wires that have this layer on them, what's your opinion with respect to their operation because of this tarnish layer?

10:00:57 A. Operationally, they're fine. They've had no impact on -- what I think you need to -- it's worth understanding that this corrosion is, several things have to take place in order for it to happen: You have to have some temperature or relative humidity cycling, you have to have the source, and that creates a very superficial. So when you go into the contained spaces, you effectively, if you don't have those things going on, it's an insignificant. In this kind of A case, it's materially insignificant, but functionally, you know, it's not aesthetically pleasing.

10:01:59 Q. And we've obviously been talking about wires, but would the same opinion apply to copper plumbing and pipes?

10:02:10 A. Right, sure. There's no significant, no scientifically- or materially-significant interaction of the pipes with the corrosive gases.

10:02:31 Q. And have you also reviewed Dr. Galler's report with respect to the formation of silver sulfide in circuit breakers?
10:02:41 A. Yes.
10:02:42 Q. And are you aware of the, I don't think you were here, but the pictures and the mapping of silver sulfide on the surface of those?
10:02:51 A. Yes.
10:02:52 Q. And what's your opinion with respect to the impact of silver sulfide on the surface?
10:02:56 A. That he observes spotty, localized sulfide. We looked at a circuit breaker and the contact zone is clean. It won't affect the performance.
10:03:12 Q. Why not?
10:03:14 A. Well, first of all, you need a physical layer of some kind, you don't need all that thick of a physical layer, but it has to be a physical layer. The way contacts are made, basically by the high spots on the wire, high spots on the mating surfaces, those would come across and that's where your current is connected.
10:03:43 So you fundamentally have to cover those guys up with enough thickness that you impede or you cause some kind of arcing or something like that in the circuit breaker system. They don't satisfy the requirement that you've got this changing environment.
10:04:09 Q. And you also, I think, provided some opinions about KPT's proposed cleanup. What's your familiarity with what KPT's proposing to do to clean up the drywall and clean up the areas afterwards?

10:04:30 A. Basically, vacuuming, use a procedure that minimizes the dust generation from a construction point of view. And use a conventional cleanup method, post cleanup, to what I have described as a no-visible-dust standard.

10:04:54 Q. And we've heard about, I think, HEPA vacuums or HEPA filters. What is a HEPA filter?

10:05:04 A. A HEPA filter is a filter which is designed to improve the efficiency of dust collection. So you bring, from a vacuum cleaner you bring dust in and it comes up against the fabric. A HEPA filter has got a finer fabric, so it's more efficient. In order to compensate because it has a little better resistance, you use a higher power -- so that, that basically, it's like an industrial vacuum cleaner but with a more efficient filter.

10:05:55 Q. And what if someone used a conventional shop vac, either just a shop vac or with a drywall bag or something like that, what's the difference?

10:06:03 A. Well, with a conventional machine, when you first start out, it's not as efficient. Then the oscillator builds up and it becomes more efficient. But you end up, at least my opinion and I think by our experience, that with an ordinary industrial versus a, you get the same effect, it might take a little more effort.

10:06:30 In the case of a drywall, if you're reducing the dust generation -- the issue is just fine dust, if you reduce the fine dust generation through work practice, there's no reason you can't. Either one is an effective method.

Q. And you mentioned a visually clean standard. What does that mean?
A. What that means is, you look at a surface and it looks clean, it is clean.
Q. And have you done anything or what's the bases of that?
A. Well, beginning with the whole range -- the thing in environmental science, to develop methods to more efficiently clean up, to eliminate contamination, we've done a lot of studies, we and lots of other people have done a lot of studies, related to, related to, how do you clean dust up, and starting with asbestos but chemicals.
In the case of the World Trade Center, because of the insurance requirements, the insurance requirements said bring the material back to the state it would have been in before the event. So it wasn't -- so you had to understand that. So what we did was go out in buildings around the country and look at surfaces which were regularly cleaned, surfaces which were occasionally cleaned and surfaces that were never cleaned and evaluate cleaning techniques and dust loadings on those surfaces. And from that you fundamentally conclude that if you've got a semi-porous to non-porous surface and it looks clean, it is.
Q. Now, just to go back and just to make sure there's a finish on the copper sulfide and some of the other issues, what about the issue of solubility with copper sulfide?
A. It's insoluble. That means that it will not rerelease sulfide

10:08:54 ions.

10:08:56 Q. What about in the presence of water or monolayers of water?

10:09:01 A. Presence of water, you need a very acidic environment in order

10:09:11 to disassociate it.

10:09:12 Q. So the film that's on the, the copper sulfide film, that won't

10:09:17 keep growing?

10:09:19 A. No.

10:09:23 Q. And that won't happen or won't keep happening -- what about the

10:09:26 copper pits, we've heard about pits for example, what about copper

10:09:29 sulfide and the pits?

10:09:33 A. Well, I think the, if you leave copper sulfide -- I don't call

10:09:36 them pits. If you look at this from a corrosion environment,

10:09:44 pitting corrosion, typically within the arc, it refers to a surface

10:09:51 which has got a passive film on it, and somewhere you have a break

10:09:56 or something like that and corrosion at that point, so you get a

10:10:00 relatively large void underneath, it can be a variety of shapes,

10:10:06 but the rest of the surfaces aren't.

10:10:06 You're pretty much the surface is uniformly affected, but

10:10:10 we're seeing these cups and, I mean, it's fair to call them pits,

10:10:15 it's fair to call them whatever, but they don't represent a pitting

10:10:19 mechanism, they represent basically some kind of imperfection,

10:10:25 which is rounding out faster or exposed to more surface area to the

10:10:34 event.

10:10:34 If you leave copper sulfide in those and you put a little

10:10:42 bit of moisture on top of one of those, you're going to get a

little bit of passivation of the copper film, and then a copper substrate and then you're done for all practical purposes.

Q. And if that happens, WHAT are you getting actually when that happens, are you getting more copper sulfide forming?

A. No, it's atmospheric copper corrosion in the absence of sulfide.

Q. And what do you end up with, the product?

A. Typical product is cuprous or cupric, and there's a whole bunch of mineral names, but that's a local kind of chemical, kinetic phenomenon.

Q. And will that continue forming or do any damage to the pipes?

A. No.

Q. And all of the opinions you've expressed here today, do you hold them with a reasonable degree of scientific certainty?

A. I do.

MR. SANDERS: I'd also like to move into evidence the pictures we looked at, DX 137 and DX 158, from the Hernandez house and the comparison of the wires.

THE COURT: Okay. I'll admit them.

MR. SEEGER: No objection.

THE COURT: We'll take a break here. The court will stand in recess for 15 minutes.

THE MARSHAL: All rise.

(WHEREUPON, A RECESS WAS TAKEN.)

(OPEN COURT.)

THE COURT: Be seated, please. You're still under oath, sir. You may cross-examine now.

MR. SEEGER: All right. Your Honor, thank you very much.

CROSS-EXAMINATION

BY MR. SEEGER:

Q. Dr. Lee, when we ended off one of the things I heard you say is in the context of cleaning wire, I want to make sure I quote you correctly, "if it looks clean, it is clean," that was your testimony, right?

A. I'm sorry, if --

Q. "If it looks clean, it is clean." Did you say that?

A. Not with respect to wiring. But with respect to dust.

Q. So with respect to dust, I mean, we could throw out all of the microscopes in this case, right?

A. Pardon?

Q. We should throw out all of the microscopes in this case, right, we don't need the scientists to tell us that, do we?

A. No, I don't think we need to throw out the microscopes at all. I think it's the microscopes that have provided the basis for the work and the understanding of what's required.

Q. Now, Mr. Lee -- Dr. Lee, I apologize, you're not a chemist, right?

A. Nope.

Q. And you don't have a degree in chemistry, do you, sir?

A. Do I what?

10:36:48 Q. You don't have a degree in chemistry, do you?
10:36:50 A. No.
10:36:50 Q. And the process whereby corrosion is created, fair to characterize that as a chemical process?
10:36:58 A. Well, you know, I think that's an age old argument. If you're a physicist, you say it's a physical process which amounts to a change in the energy states, change in the electrodynamic energy of the system. If you're a chemist you describe it in terms of entropy and the heat of reaction. They are fundamentally different ways of describing the same process.
10:37:31 Q. Let me ask you a question. We were talking about corrosion on things like contacts and things like that. Do you recall your testimony?
10:37:39 A. Pardon?
10:37:40 Q. Do you recall your testimony about corrosion on circuit boards, contacts, appliances, things like that?
10:37:47 A. In the deposition?
10:37:48 Q. No, this morning.
10:37:51 A. Circuit boards --
10:37:53 Q. You testified that there wasn't enough corrosion to interfere with the resistivity of any of the electrical processes going on in the house, do you recall that?
10:38:01 A. Specifically with respect to the wires, yeah, that's correct.
10:38:04 Q. With respect to the wires. What about --
10:38:07 A. With respect to the contacts I did not say that there's not

enough going on. I said that if your contact is an environment where there are changes in gas concentration, changes in relative humidity, or those factors which accelerate corrosion, then it's different than if it's in a stable environment.

Q. You're aware in this case, you're generally aware of the facts in the Hernandez case, right, sir, of what's going on in the house with appliances and corrosion?

A. Within reason.

Q. So you're aware there are a number of appliances and electronic devices in the home that have failed due to the corrosive environment, you're okay with that?

A. Well, I'm okay with the fact that there's a number of appliances that have failed. For example, I believe -- I am not sure if Dr. Krantz forwarded them to us or whatever, but we looked at a refrigerator, circuit board on the front panel, and that had failed. But it had not failed from a corrosive environment resulting from hydrogen sulfide.

Q. What else did you look at? I mean, I think we're in agreement in the refrigerator, it's a short circuit?

A. Right. But as I understood you said I was aware that that were failure of corrosive environment, I simply pointed out to the extent that our failures have been investigated, there are some but like the thermostat I think where it gets in the right environment, you're getting a temperature change, you're getting humidity, it's got the silver. But if you go look in the circuit breaker, it's

10:40:04 not been affected.

10:40:05 Q. Did you look at a circuit breaker?

10:40:07 A. Yes.

10:40:07 Q. You went into the home and looked at a circuit breaker?

10:40:10 A. No. I had my guys go into a microscope and look at the circuit
10:40:15 breaker.

10:40:16 Q. Is that in your report that you looked at a circuit breaker?

10:40:20 A. No. We actually got the parts after the report had been
10:40:28 published.

10:40:28 Q. Well, I also deposed you. Did you tell me in your deposition
10:40:29 that you looked at a circuit breaker?

10:40:31 A. I don't remember.

10:40:35 Q. Let me ask you this. Are you aware of an organization called
10:40:39 ASTM?

10:40:40 A. Yes.

10:40:41 Q. What is ASTM?

10:40:42 A. American Society for Testing and Materials.

10:40:45 Q. Respected society, do you follow their rules and guidelines?

10:40:48 A. Well, it's a -- well, it's a respected society that develops
10:40:53 consensus standards, bringing together all of the parties that are
10:40:59 involved, all of the stake holders.

10:41:00 Q. Consensus standards you said?

10:41:03 A. Yes.

10:41:04 Q. Dr. Lee, let me just show you what I am about to read from, you
10:41:19 see that, it says ASTM at the top, standard terminology relating --

10:41:26 A. I'm sorry, my ears are a little plugged up with my cold and maybe it's age, but I am having a little bit of trouble hearing you.

10:41:29 Q. No problem, I have no problem speaking up. Do you see what I'm looking at here, do you see this document, it's an ASTM document, do you agree with that?

10:41:36 A. Yes.

10:41:37 Q. The title there is Standard Terminology Relating to Corrosion and Corrosion Testing.

10:41:41 A. Yes.

10:41:42 Q. Let's go to the definition of corrosion because I asked you a question about whether it was a chemical or a physics process, do you recall that?

10:41:49 A. Yes.

10:41:50 Q. Let's read this together. "Corrosion, the chemical or electrochemical reaction between a material, usually a metal, and its environment that produces a deterioration of the material and its properties." Did I read that correctly?

10:42:10 A. Yes, you did.

10:42:11 Q. You disagree with that definition?

10:42:13 A. No.

10:42:14 Q. Any mention of physics in that definition?

10:42:22 A. You have to understand the means underlying which a chemical reaction takes place involves the physical structure and an electronegativity of the bonding states in the atom.

So the reaction kinetics, I think I said on direct, are really driven by the chemistry. The reaction, the thermodynamic side of it is really driven by the physics.

Q. Let's talk a little bit about your background in corrosion. Almost all of your background in corrosion has been regarding galvanized steel; isn't that right?

A. Certainly the dominant part. But we're an industrial problem solving group, as I mentioned. The first or second problem that I got faced with at U.S. Steel was a heat exchanger, heat exchanger problem. We solve those kind of problems throughout, we're even solving them today. They've never been totally solved. It's an ongoing challenge to the industry in terms of water composition, reactivity of metals, the state.

Q. And, Dr. Lee, I am going to try to get through this a little quickly, so if you can answer my question yes or no, let me know; and if you can't, let me know that.

A. Certainly.

Q. Thank you, Doctor.

I want to ask you about some of the work you've done. You've got a pretty big CV, you have a lot of items on there, a lot of publications, right? Is that fair?

A. Yes.

Q. How many of those --

A. I'll accept the description.

Q. Let's take the last 20 years. How many of the publications,

anything that you published that deal with corrosion in the last 20 years?

A. Primarily -- none specifically, but primarily dealt with the -- the ones that most relate in the last 20 years, it's too far to remember. Let's take the last five to ten years. Most of what I've been involved in publication personally have been related to the physical reactions taking place in concrete, most of which are relating to the corrosive state of caused by carbonation and sulfide, sulfate, chlorine.

And so I haven't dealt with the effects. What I deal with is what's the state of the material, how long is it for the effect to take place. In terms of the engineer corrosion, those are generally other people's problems.

Q. And you pretty much deal with what's under the microscope, right, wasn't that your testimony at your deposition, I look at what's under the microscope, not so much the process with regard to corrosion?

A. I think yes, that's pretty fair. The part of the equation that -- I'm sorry, that's a yes question.

Q. Let me ask you this. One of your opinions is that the corrosion, whatever is there, the tarnish, the corrosion that's in the house of the Hernandez family, you're saying it's okay once you remove the drywall to go ahead and leave that in the wall, is that your testimony?

A. The wiring?

Q. Yes.

A. Yes.

Q. Okay. Have you contacted the CPSC to share your opinion with them?

A. No. We've talked to the CPSC but I have not contacted them and shared that opinion, no, sir.

Q. You have talked to the CPSC?

A. I have not personally but my guys have.

MR. SANDERS: Objection. Your Honor, some of the discussions that we have the governmental agencies are protected, so I'll let him talk about the contacts; but both from the CPSC standpoint and our standpoint, what we actually talked about with them is subject to their investigative privilege.

THE COURT: I understand. Just back away a little from the microphone.

MR. SEEGER: What we're talking about right now is clearly not privileged, I am asking about what he's saying.

THE COURT: Right.

BY MR. SEEGER:

Q. So you personally have not --

A. I have not.

Q. You Dr. Lee have not talked to?

A. I have not talked to or been contacted by CPSC.

Q. You'd agree that -- don't you think you ought to contact them with your conclusion that everything is safe in the wall, you go

10:46:36 ahead and close it up, leave it in there and put new drywall up?
10:46:43 A. Well, my answer to that is no, it's not my responsibility or
10:46:45 appropriate for me.
10:46:46 Q. Well, it's a big problem that's been created by the company
10:46:49 you're working with, isn't it, this Chinese drywall is a problem,
10:46:52 isn't it?
10:46:53 MR. SANDERS: This is argumentative, your Honor.
10:46:54 THE COURT: Well, he is under cross.
10:46:58 THE WITNESS: Well, I think it is a significant problem,
10:47:01 it's unfortunate that it occurred or is occurring. I think that
10:47:09 there's many facets, but what is really important is that competent
10:47:18 scientists sit down and look at the problem, not in say what is the
10:47:24 state of the material and what should be done about it.
10:47:28 BY MR. SEEGER:
10:47:28 Q. Let me follow-up on that but I really want to close out this
10:47:31 one point.
10:47:32 Your conclusion that it's okay to leave the tarnished and
10:47:35 corroded wire in the wall, don't you think?
10:47:36 A. But --
10:47:40 Q. Okay. Go ahead.
10:47:40 A. First of all, I don't want you to walk away with the impression
10:47:44 that the tarnish and corroded wires is throughout the wall. There
10:47:49 is at the ends of the hot and cold, there's tarnish on the exposed
10:47:57 and there's tarnish to some extent in the ground wire.
10:48:02 Q. Okay. And you looked at all of the other wiring in the house?

10:48:06 Did you look at any other wire, did you strip back jackets on the wiring and look at it under a microscope?

10:48:14 A. We're talking about Hernandez?

10:48:16 Q. Yes.

10:48:17 A. Okay. Yes, we did.

10:48:19 Q. And where is that in your report?

10:48:21 A. Pardon?

10:48:22 Q. Did you include that in your report?

10:48:24 A. The --

10:48:25 Q. Was that the photo that you showed the court, the image with the wire that looked like --

10:48:30 A. No. I think if you look at appendix A2 of the report, the wires that were examined visually and with the wire stripped back. This is really Dr. Perricone's --

10:48:45 Q. That's what I was about to ask you.

10:48:47 A. Okay.

10:48:47 Q. That's not your part of the report?

10:48:50 A. Pardon?

10:48:50 Q. That's not your part of the report, is it?

10:48:51 A. Well, it's my report but in terms of the work, specific work that was done, you know, I don't want -- I have an area that I am testifying about, Dr. Perricone has an area he is going to testify about.

10:49:07 Q. So let me ask you this, I just want to follow this up. With the CPSC and Sandia you're aware that the government right now is

10:49:13 spending a lot of money to look at whether there are any type of safety, fire, you know, problems related to the wire caused by Chinese drywall. You're aware that investigation is going on right now as we speak, right?

A. I am aware, I don't know about the CPSC, I am aware that Sandia's investigation investigated a number of -- they filed an initial report and as I understand it, although I haven't seen any recent updates, their investigation is continuing.

Q. And so do you intend to contact them and share your opinion that it's okay, other than snipping and cutting outlet it's okay to leave wires in the wall?

MR. SANDERS: What Mr. Lee does on behalf of our company --

THE COURT: Not only that but let's move on, counsel, I've heard enough of that.

BY MR. SEEGER:

Q. Dr. Lee, what are the gases that are involved in the corrosive involved, what are the gases being emitted from Chinese drywall?

A. The principal one that has been observed is hydrogen sulfide.

Q. What are the others?

A. There's probably some carbonyl sulfide and some carbon disulfide. There may be some other low, very low concentrations. I think if you go to Dr. Goad's report you'll see a list of the gases that have been detected, also CPSC.

Q. All right. Now let me ask you this. Do you agree that the

10:50:43 pitting that has created by the corrosion in the Chinese drywall environment cannot be cleaned off the wire?

10:50:48 A. Well, I think that answer is no but I think the efficiency with which you get the wire clean can depend on the methodology.

10:51:04 Q. Okay. But the pitting cannot be cleaned off the wire, is that your answer?

10:51:08 A. Well, let me rephrase your question. I'll try to get an answer that makes sense. I don't think you're asking can the pitting be cleaned off. I think you're asking if the sulfide, at least if I understand it, the sulfide that's in the corrosion zone, in the depth of the corrosion zone that people have referred to as pitting, can be cleaned up. The answer is yes or a combination. Is it going to be 100 percent, probably not.

10:51:47 Q. So you're acknowledging that at least some of the copper sulfide would be left in the pits?

10:51:53 A. Could be.

10:51:56 Q. So I'd like to now ask you some questions about the Edwards article that you testified about. Do you recall talking about that a little bit?

10:52:02 A. Yes, I do.

10:52:04 Q. Now, what support do you have for your opinion that once the copper sulfide is in the pit s that the corrosion will not continue, do you have literature support for that?

10:52:24 A. What kind of corrosion are you talking about?

10:52:27 Q. Copper sulfide corrosion.

A. That the copper sulfide -- that the corrosion resulting from copper sulfide -- hydrogen sulfide gas?
Q. Right.
A. If you don't have a sulfide --
Q. No, literature support, sir. I'm sorry.
A. Pardon?
Q. Literature support.
A. Oh, literature support is go look up the thermodynamics of copper sulfide, you'll find that it's insoluble. That's fundamentally if you form a thermodynamically stable compound, it will not re-release the sulfide. So if you stop the source or arrest the source, the corrosion related to the sulfide will cease.
Q. Okay. Scott, can you put up LT 241 and go to page 0006. The language I would like to specifically focus on, Dr. Lee, is at the bottom. I want to start at the bottom of this paragraph.
Do you see where it says: "Because the corrosion rates remain accelerated after a long absence of soluble sulfides, the elevated corrosion rate cannot be attributed to the sulfides in the solution but must be due to the scale formed when the sulfides are present." Did I read that correctly?
A. You read it correctly. And they're correct.
Q. Okay. And let's go to 0010. And blowup this conclusion right here -- I'm sorry, the third one. "The accelerated corrosion can be produced by a catalytic layer of sulfide scale on pipe. When the scale is removed and the copper metal is placed in water

without sulfides, the corrosion rate returns to normal levels. When this scale is smeared on a fresh copper pipe surface, the resulting corrosion rate in water without sulfides is immediately comparable to that obtained after months of exposure to soluble sulfides." Do you agree with that?

A. This is --

Q. Do you agree with it?

A. Well, this is an answer that I'm either going to have to explain or we're going to spend a lot of time.

Q. Let's start with do you agree or disagree?

A. The answer is, yes, I agree with it but, and that's a very significant but. When they're talking about the corrosion rate after removal of the sulfides, they're talking about the corrosion rate that went on in the water which never seen sulfides.

And so the issue is not that they've discovered something that is physically impossible, the issue is that this layer of sulfide material acts as a semiconductor, and that means that it facilitates the transfer of electron hole pairs and it takes the -- allows the ions that are in the water a place to capture -- accelerates the rate at which copper can be moved into the water.

It is not talking -- when you say the corrosion rate returns to normal levels, they're not talking about sulfide --

Q. Just for the record, I didn't say that.

A. Pardon?

Q. I didn't say that, sir. You said when I say, I didn't say

that.

A. No, right there, you read it.

Q. Right. Okay. Now, let me ask you this. What assurance do you have that the corrosion products -- I am going back to cleaning, this theory that the corrosion can be cleaned off -- what assurance do you have, you, Dr. Lee, and your report and the work you've done in this case, that the corrosion products have been removed from the pits of the copper from the cleaning process that you recommend?

A. Well, it depends on the process that you use.

Q. What process did you use?

A. Well, we've used a number of processes and you can -- we've used a number of processes that include the Brasso, including Scotch-Brite, just a number of different series of applications.

Q. Let me ask you this. Once you did that, did you go -- did you do this -- I'd like to know your knowledge of this. Did you do a test where you looked at cross-sections of the copper pipe after it was cleaned in multiple locations?

A. No, I did not. I looked at the surface, not the cross-sections.

Q. Now, I want to talk to you a little bit about your opinions in your report about leaving the copper wire in the wall after the Chinese drywall has been replaced, okay, I want to focus you on that. Have you reviewed the CPSC report on that?

A. If you have a particular -- I have but if you have a particular

10:58:07 section, you would have to show it to me.
10:58:08 Q. Okay. Sir, I want to ask you generally. Are you familiar with the CPSC and the Sandia report?
10:58:14 A. In general, but I don't keep it in my head.
10:58:16 Q. But you've reviewed them?
10:58:17 A. Yes.
10:58:18 Q. You're aware that the CPSC has raised numerous concerns about leaving wire that's been exposed to Chinese drywall behind in the wall after a remediation, are you?
10:58:30 A. Well, not as I read it, no. CPSC concluded that they had not had any failures.
10:58:41 Q. That's failure, that's different from what I am saying they're concerned. You are aware that they are concerned about this problem and looking at it right now, the fire and safety problems with leaving the corroded wire behind, correct?
10:58:53 A. Yeah. But I don't think it's CPSC, as I understand it, maybe CPSC is doing something I don't know about, but Sandia is examining the question.
10:59:02 Q. I'm sorry, Sandia, you're aware that they are looking at this issue and concerned about it, are you not?
10:59:07 A. Yes, they're addressing it.
10:59:10 Q. Can we go to 59 and then go to 0006. It's Hernandez 59. And if we could start -- I'm sorry, could you get that lead in sentence right above. This is from the report.
10:59:43 "The objective is to determine what extent the electrical

10:59:46 and fire safety components are being corroded and what effect the corrosion could have on their safe operation. Excessive corrosion could create hazards in the following areas:" And then there's a number of them, do you see that, under fire? Do you agree with all of that? Excessive corrosion --

A. That's what we examined, those are the same issues.

Q. But I am asking you about the report, Dr. Lee. Do you agree that excessive corrosion could create hazards in the following areas: Deterioration of wiring connections -- these are fire hazards listed, so I am not going to read them all. Do you agree with that?

A. Yes.

Q. And if you could go to 12, please, Scott -- oh, I'm sorry, 13, at the top here. "Based on the degree of corrosion observed --" this is Sandia, right, we're still in the same place together, Dr. Lee, Sandia?

A. Yes.

Q. "Based on the degree of corrosion observed on all of the samples provided to SNL, as well as the presence of corrosion products that are creeping into inert surfaces, SNL staff believe that the Battelle corrosive environments that the copper wiring has been exposed to could be as severe as either Class III or Class IV." Do you agree with that?

A. In terms of the microns per year defined in the Battelle classes, yes. At certain locations, particularly in the

connectors.
Q. Now, you've done some measurements of pitting depths in your report, right, Dr. Lee?
A. Yes. In terms of observation.
Q. And your measurements in your report go anywhere from 10 to 20 microns deep; is that fair?
A. Yes.
Q. Have you looked at the work done by Mr. Krantz in this case?
A. Yes.
Q. And have you looked at his measurements, his micron depths of the corrosion pits that he's measured and looked at?
A. Yeah. They're generally the same order. He's got some issues related to how the samples were prepared and how he made the measurements. But generally, I don't think there's -- there's sort of a uniform corrosion which has resulted in sort of two to five micron loss of cross section what people are describing as pitting, which is in the range of 10 to 20 microns.
Q. Would you call a 20 micron pit superficial?
A. Yes.
Q. Would you call a 30 micron pit superficial?
A. Yes.
Q. Do you know anybody else, is there any published literature, books, anything you can refer us to that agrees that 30 micron pit is superficial?
A. Well, I think essentially if you're talking -- this is

something that depends on the dimension of the object that's being corroded relative to the dimension of the corrosion. If you're talking about 100 micron diameter wire, which really doesn't exist, in very fine circuits, a 20 micron pit is pretty significant.
Q. What about a wire in the Hernandez house?
A. Pardon me?
Q. What about the wires in the Hernandez house?
A. Oh, the wires in the Hernandez house are sort of in-between the one and two millimeter thickness.
Q. So my question --
A. In this case the corrosion is superficial.
Q. So my question to you, is there anybody other than Dr. Lee that you can point to, anything published that agrees that a 20 or 30 micron pit is superficial?
A. Well, I really can't point to something because I don't think this question has been addressed. But when you look at corrosion phenomena, you deal with corrosion; so there's lots of published literature, like G46 or something like that, where you're looking at corroding, you're talking about corrosion as a function of cross section. And superficial as generally taken could be less than a few percent. Probably go to an ASM, ASM standards kind of in terms of and find --
Q. But you can't point to one right now, sir?
A. I can't point to one.
Q. Okay. Let me ask you this. So if the wiring is left in the

11:04:54 Hernandez house, under your remediation plan, the pitting on the wires whatever exists would remain, correct, yes or no?

11:05:06 A. Well, the wires need to be cleaned or they can be peeled back and cut and then there's no -- no pit -- no cut beyond the tarnish and reconnected.

11:05:16 Q. But whatever is there would remain in the wall --

11:05:19 A. Whatever is behind that. There's nothing there except untarnished wire.

11:05:23 Q. You've acknowledged that at least in some of these pits there would be some copper sulfide, correct?

11:05:28 A. If you clean the wires there may be some pits with some trace amounts of copper sulfide left.

11:05:35 Q. And our position is, our experts' position is that if there's copper sulfide in the pit, the corrosion can continue. You disagree with that, right?

11:05:45 A. Would you repeat that again?

11:05:47 Q. Our experts believe, Mr. Krantz and the experts that have testified for this court, that if there's copper sulfide in the pits, in the corrosion pits, it's a catalyst for future corrosion. I understand you disagree but you understand that's our experts' opinions?

11:06:03 A. I think this is a time when you need to be precise in terms of your language.

11:06:10 Q. Okay.

11:06:10 A. If you say your experts say that in the event copper sulfide is

left in a pit that the sulfide corrosion will continue. I disagree with that.

Q. Okay.

A. It's just physically not right. If you say --

Q. Go ahead.

A. -- that in copper sulfide that the normal environmental corrosion will occur, then that answer is yes. Physically there's some low level of tarnish that goes on, but it's not going on under the covering, it's going on in the exposed areas.

Q. Let me ask you a question, okay. So whatever pits are there remains, whatever copper sulfide is in the pits remains; the question I have to you is this, do you agree that when the Hernandez family built the house that none of those conditions existed at that time on that wire?

A. The copper sulfide did not exist on that wire. There were surface imperfections.

Q. Now, how many examples of sheath wire, wire that's covered in the wall did you look at, did you personally look at to determine if there was corrosion underneath?

A. Of the wire in the wall?

Q. Yeah.

A. I would guess it's between our reports --

Q. I am asking about you.

A. I'm saying personally I am trying to give you an answer.

Q. Okay. I apologize.

A. Our report I take half a dozen wires from the Hernandez home that were peeled back. From other people it's probably more than that but I forget.
Q. All right. Let me refresh your memory. Here is a page from your report in this case. This is from page 9 of your report, sir. You looked at three samples, does that help refresh your recollection?
A. Okay.
Q. And based on that -- now, how many miles of wire --
A. It says three outlets, right.
Q. Okay.
A. Okay. So there's a hot and a cold on each outlet. We peeled back, if you go to the figures, we peeled back the wire on the hot and the cold, I think that's six, that's what I said was a half a dozen.
Q. What am I doing, am I reading this wrong? Three samples, Outlet 2, Outlet 62 and Outlet 44 were selected for additional evaluation. Are you saying there's three others?
A. No. I'm saying there's two wires, there's a hot and cold on each outlet.
Q. Okay. But there are three samples that you looked at, that's the language that I took right from your report, three samples, right?
A. Three outlets.
Q. Okay. And based on that you concluded -- let me ask you this.

How many miles of wire do you think are in that house?
A. I don't know.
Q. So based on those three outlets, those three samples, you've concluded that there's no corrosion under the wires anywhere in the house, right?
A. That would be correct.
Q. I want to talk to you a little bit about your resistivity testing. Now just be really clear, when you say resistivity that's the ability of two things that are supposed to conduct electricity and something getting in the way of that conduction, is that a fair characterization of that process?
A. The simple answer is no, so let me help you.
Q. Help me.
A. Resistivity is the measure of the energy required to transport current. And in the case of the way you were describing it, contact resistance is what you were describing. Resistivity is an intrinsic property of the wire.
Q. Are you familiar with ASTM standards that tell you exactly how to test the resistivity of wires, are you familiar with them?
A. In general. It depends on whether you're measuring resistivity or contact resistance.
Q. All right. Let me see if I can help with that. How about Standard Test Method for Resistivity of Electrical Conductor Materials, you're aware of that ASTM guideline for doing that type of testing?

11:10:47 A. I would have to see it.
11:10:50 Q. Can you put up Hernandez 450. Do you recognize it?
11:11:06 A. (WITNESS REVIEWS DOCUMENT.) Not specifically, but, yes.
11:11:20 Q. And, Dr. Lee, in all fairness, you didn't do any resistivity testing for the conclusions that went into your report, right?
11:11:28 A. No. But you can calculate the resistivity just because we know that, we know the resistivity of copper.
11:11:35 Q. Now -- oh, by the way on this I just want to come back to the ASTM point, you sit on the ASTM committees, don't you?
11:11:44 A. Various committees.
11:11:46 Q. Various ASTM committees?
11:11:47 A. Yeah.
11:11:47 Q. So, I mean, you would think that if you were going to do certain types of tests, you would want to know what the organization on whose committees you sit on how they recommend doing it, wouldn't you?
11:11:59 A. Well, I think the answer to that is in general yes. The question is whether you're looking at something that's specifically addressed in the standard.
11:12:11 Q. And, Dr. Lee, you recognize what I just put up as Hernandez 450, you recognize that, don't you, as the Suggested Method for Testing Resistivity of Electrical Conductor Materials, fair enough?
11:12:23 A. Yes.
11:12:24 MR. SEEGER: Your Honor, can we move this into evidence?
11:12:27 MR. SANDERS: I mean, I don't know if there's any

foundation for him having looked at it or not looked at or considered it in his report, if he knows that.

THE COURT: I'll admit it.

BY MR. SEEGER:

Q. So now tell us how you tested resistivity and came to your conclusions and you put those in the report, tell us what tests you did.

A. We did not determine resistivity, we looked at the resistivity of copper wire. We evaluated the change in cross section, which is the change in -- which translates -- the resistivity does not change in these wires. The resistivity is an intrinsic property which is a function of the copper and the copper alloy that's in question. The resistance of a wire which, if you look at this equation, and it's actually better on the screen, if you can blowup 3.2.

Q. 3.2 right here (INDICATING)?

A. Yes. That equation under there. The resistivity is expressed as þ -- the resistivity times the cross-sectional area of the wire over the length of the wire being examined.

Q. That's a good lead in, so here are my questions about the test. Did you follow these guidelines, what this says, this document, did you follow what this, how this recommends testing resistivity when you tested resistivity of wiring in the Hernandez home?

A. We did not test the resistivity.

Q. What did you test?

A. We estimated the change in resistance so we could look at the change in power consumption. If you're dealing with this wire, there's two things that are important: One is the current carrying capacity; and, two, is when you get to a point where the resistance is affected enough that you'll start generating heat. So in a practical sense resistivity is not affected of the copper by an external corrosion process.

Q. And you -- so this test you're telling me that we have up on the board here, Scott, if you can go back to the front page where it says Standard Test for Resistivity of Electrical Conductor Materials, the test and procedure in this document you say do not apply to what you do, is that your testimony? I am just trying to find out.

A. I am trying to think of how to explain it to you in a manner you understand.

Q. Can you just answer that question?

MR. SEEGER: Your Honor, I would just like a yes or no, did he follow the procedures in this document.

MR. SANDERS: That's not the question you asked.

THE COURT: Yes, let's restate the question. He wants to know that question, did you and why? You can explain why.

THE WITNESS: The answer is we did not measure resistivity of the conductor material because the resistivity of copper is known. It's specified as a part of the electrical codes.

BY MR. SEEGER:

11:15:45 Q. And with regard to having anything that may interfere with resistivity, is that a test that would be prescribed by these guidelines that we just looked at?
11:15:58 A. Well, the simple material, if I understand the question, is no.
11:16:11 Q. Now, I asked you questions about the procedures used to test wires in the Hernandez house for resistivity. Do you recall me asking you some questions about that in your deposition?
11:16:19 A. Yes.
11:16:20 Q. I'm sorry, Dr. Lee, can I back up to the resistivity point because maybe I can do a better job of asking the questions this time.
11:16:36 This is page 11 from your report which is marked as Hernandez 395. Do you see the part I just flagged right there where it says: "Current carrying capacity is determined by the ability of a material to carry current," and you defined it as resistivity there, "and the amount of material available to do so." Correct?
11:17:03 A. That's very precise and it's right.
11:17:07 Q. So now if corrosion were to eat up the material available to do so, would that interfere with resistivity?
11:17:17 A. No. In fact, that sentence goes right to the point that I've been trying to express and does it better and clearer than I've been. There's two parts, one is the ability of a material to carry current (resistivity). The second is the amount of material available to do so, and that's the cross-sectional area. So

resistance is determined basically by the combination of the resistivity times the amount of material available to carry the current.

So when you look at change, the issue with the copper sulfide film is has it reduced the cross-sectional area, it does not reduce the resistivity.

Q. And my question to you is, what specific tests did you do to test resistivity on the wires in the Hernandez home? Can you just layout what they are?

A. We did not measure resistivity in the wires in the Hernandez home.

Q. All right. So the issue of whether the corrosion at any point in their wiring system interferes with resistivity is not a question you looked at?

A. No, because it doesn't.

Q. Okay. Do you agree that if there's enough corrosion on a contact switch, let's say in an appliance, in a wall switch or something like that, that you can interfere with the operation of the circuit with the conductivity of that switch?

A. Yes.

Q. And what testing did you do on electrical contacts and switches in the Hernandez home?

A. We looked at -- we mentioned earlier we looked at the one refrigerator component -- we got these things very late, just before I came down here -- and we looked at a circuit breaker, took

that apart and looked at the contact area. And I forget, I think that may be it, there may be some other.
Q. You actually remembered more than when I asked you the exact same question in your deposition, Dr. Lee.
A. Oh, okay. All right.
Q. Because in your deposition I asked you what test you did, and you said you didn't remember and you did not, that Dr. Perricone did them. So now your testimony has changed? And I deposed you last week.
A. Now I remember.
Q. I don't either.
A. No, I said now I remember.
Q. Oh, now you remember, okay.
A. The circuit breaker, this stuff is in progress, okay, because of the lateness from which we received the materials.
Q. When I deposed you last Thursday you had everything, right?
A. When you deposed -- I think yeah, yeah, we were examining the parts while we were doing it.
Q. Are you familiar with an ASTM standard that measures contact resistance, or am I getting that question wrong?
A. In general I would have to refer to specifically the standard. I forget, there's two standard s, one is 250 and the other is 500 or something.
Q. We're looking at what is marked as Hernandez 132. Again, that's -- do you see that it's got the trademark of the ASTM in the

11:21:13 upper left-hand corner?
11:21:16 A. That's 539?
11:21:17 Q. Right.
11:21:18 A. Contact resistance.
11:21:19 Q. And you see the title Standard Test Methods for Measuring Resistance of Electrical Connections (static contacts). Is that the right test that we'd use?
11:21:29 A. For contacts that's the test that we would use.
11:21:31 Q. Do you know if Dr. Perricone followed this standard when he did the testing for contact resistance?
11:21:38 A. I think I told you in the deposition he did not measure contact resistance.
11:21:42 Q. I don't have that.
11:21:42 A. We use a test -- there's another test which is 250 or 279 or something like that, which is a test for measuring film --
11:21:57 Q. Is that the test you did?
11:21:58 A. -- insulator.
11:21:59 Q. That's the test you did?
11:22:00 A. Yes.
11:22:01 Q. That's an ASTM guideline?
11:22:03 A. Not a guideline, it's a standard.
11:22:10 Q. Dr. Lee, when I asked you what testing did you do on electrical contacts in receptacles and switches at the Hernandez house, your answer was: "I don't -- we've examined the switches, you'd have to ask Matt or Dr. Perricone whether or not there was any resistance,

I don't recall seeing resistance measurements, contact resistance." That was your answer, right?

A. That's true for the contact. The resistance test we did were measured the resistance of the sulfide film on a coupon in order to evaluate the film thickness. We did not make contact resistance measurements, that I am aware of as I testified.

Q. Just a couple more questions. Do you agree that even a thin layer of tarnish can diminish a contact's capacity to carry current?

A. Depending on the nature of the contact. But as a general proposition, a layer of tarnish will affect contact resistance.

Q. And sulfide gases on silver create what type of reaction?

A. They create a reaction which silver sulfide is forming.

Q. Do you agree with this statement: "By the time relevant corrosion can be detected visually, the equipment may already be in an advanced state of degradation." Do you agree or disagree with that?

A. That's -- in general that's true, but not from a forensics perspective.

MR. SEEGER: Your Honor, if I could just have ten seconds to look at what I've got here, I think I've covered it.

THE COURT: All right.

MR. SEEGER: That's all I have.

THE COURT: Any redirect?

MR. SANDERS: Quickly.

REDIRECT EXAMINATION

BY MR. SANDERS:

Q.  Just very quickly and this whole wire resistance issue.  What you did or didn't do is part of your opinion.  How were you talking about resistance and the ability of wires to capture current?

A.  Resistance is basically the current carrying capacity.  Resistivity is a fundamental property of the material.  When you -- Ohm's law basically says the resistance is the resistivity, that symbol þ, which is a Greek symbol, times the length over the area.  Þ is measured in centimeter.

Q.  What do you illustrate here by this chart and how is it relevant to the wires here?

A.  For the purposes of looking at these wires and asking the question:  What's the loss in cross section and how does that affect the resistance, which then in turn will affect heat production, I just did the -- calculate the resistance, calculate the change in resistance and calculated the power as a function of loss of cross section.

        We are -- the individual points on that graph are at units of 20 micron increments of corrosion lost.  So the first point for a gauge 12 is a 20 micron, how much cross section did you lose at 20 microns.  If you drop your -- I don't know if I have the ability here -- if you drop your -- take the lowest point of the black curve furthest to the left, that's sort of the upper limit of what we've observed in tarnish related to these cases right there

11:26:09 (INDICATING).

11:26:14 At that point, the change in power used to carry the current is about .08, .05 watts. If you think about it in a half amp, if you put a lamp at the end of a -- plug it into an outlet, you might be carrying something like a half amp in order to produce the power. That half amp produces about a quarter of a watt of heat in a meter of wire. The change in that in the resulting from the corrosion is about .01, so it's about one hundredth of a percent.

11:27:02 Q. At what point along this, and I guess this is measuring the area lost here, what point along this graph does that become a problem with respect to generating heat or resistance?

11:27:14 A. What this graph really shows is you don't arrive ultimately until you lose a very major part of the cross section, you really don't affect the current carrying capacity. But somewhere between, around the order of 50 percent and depends on what the safety margins you want to allow, you get into a situation where you're actually going to start affecting the mechanical problems. They will be affected first.

11:27:39 Q. And with respect to, just to be clear on the discussion of the Edwards article and the reaction that's occurring, why is what Mr. Krantz described in the Edwards article and the accelerated corrosion that was described there, why wouldn't that occur on the wires or copper plumbing?

11:28:02 A. In the wires make modest changes in humidity like you do in a

house, there's going to be little bits of water put on the wire, that will cause release of a few ions. Those ions don't have anywhere to go, there's only a little bit of water so that automatically extinguishes it. That water will get evaporated somewhere else or get another little bit of water, and it's just what's going on in the development of copper corrosion in the atmosphere anyway.

MR. SANDERS: That's all I have.

THE COURT: All right. You're excused, sir. Thank you. Let's go to the next witness, please. Call your next witness.

MR. SANDERS: We have the Beyler video, we can do that.

THE COURT: All right.

(WHEREUPON, THE VIDEO DEPOSITION OF CRAIG BEYLER WAS PLAYED.)

(WHEREUPON, THE VIDEO DEPOSITION OF CRAIG BEYLER WAS PAUSED.)

THE COURT: We'll stop here. You had no further questions as I see.

MR. SANDERS: No.

THE COURT: All right. We'll stop here then and return at 1:45.

MR. SEEGER: Your Honor, we have like a two-minute issue. Would you rather deal with it after lunch or do you want us to approach and talk to you about it?

THE COURT: Yes, why don't you come on up.

(WHEREUPON, A DISCUSSION WAS HELD OFF THE RECORD AND A LUNCH RECESS WAS TAKEN.)

12:38:35

* * * * * *

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

____________________________________

Karen A. Ibos, CCR, RPR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION *

**THIS DOCUMENT RELATES TO:** * MDL No. 2047

Tatum B. Hernandez, *et al* * Section L

versus * New Orleans, Louisiana

Knauf Plasterboard (Tianjin) Co., Ltd., *et al* * March 17, 2010

Case No. 09-CV-6050 *

* * * * * * * * * * * * * * * * * * * * *

VOLUME III - AFTERNOON SESSION
PROCEEDINGS BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Tatum and Charlene Hernandez: Herman, Herman, Katz & Cotlar, LLP
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, Louisiana 70113

For Tatum and Charlene Hernandez: Gainsburgh Benjamin David Meunier & Warshauer
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

APPEARANCES:

For Tatum and Charlene Hernandez: Seeger Weiss
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

For Tatum and Charlene Hernandez: Lewis & Roberts, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

For Knauf Plasterboard (Tianjin) Co., Ltd: Frilot, LLC
BY: KERRY MILLER, ESQ.
KYLE A. SPAULDING
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DOUGLAS B. SANDERS, ESQ.
KYLE P. OLSON, ESQ.
ERIN M. MAUS, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter: Toni Doyle Tusa, CCR, FCRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7778

Proceedings recorded by mechanical stenography, transcript produced by computer.

**I N D E X**

| | PAGE |
|---|---|
| Craig Beyler (Video Deposition) | 604 |
| Raymond Canzoneri | |
| Voir Dire | 607 |
| Direct Examination | 614 |
| Cross-Examination | 633 |
| Redirect Examination | 673 |
| Mark Hartenstein | |
| Voir Dire | 676 |
| Direct Examination | 678 |
| Cross-Examination | 685 |
| Redirect Examination | 700 |
| Bruce Fuselier | |
| Voir Dire | 702 |
| Direct Examination | 704 |
| Cross-Examination | 712 |
| Redirect Examination | 720 |

**AFTERNOON SESSION**

**(March 17, 2010)**

**THE DEPUTY CLERK:** Everyone rise.

**THE COURT:** Be seated, please. We've got another 60 pages. It looks like we've about another hour in this.

Let me mention that the exhibits that you all are marking, in order for them to become trial exhibits at the end of this deposition, let's offer, introduce, and file in evidence the exhibits. Give them a number so that we have it. Give me some logistical situation. What's our --

**MR. SANDERS:** I'm done with the direct. We have cross. Then we have some exhibits, which I can just indicate their numbers.

**THE COURT:** Let's do that at the end because I want to hear from --

**MR. BRYSON:** Your Honor, for the cross-examination, we've edited that down to a little bit over 30 minutes, so it won't be an hour, I assure you.

**THE COURT:** I had it starting at page 64. What is the situation with the other witnesses? How long do you anticipate?

**MR. HAYDEN:** Your Honor, we hope to have all of the witnesses other than Dr. Perricone done today.

**THE COURT:** Let's roll, then.

(WHEREUPON **Craig Beyler** testified by video

 deposition.)

**THE COURT:** Stop here?

**MR. SANDERS:** Your Honor, if I may, we went over some of it anyways in the *Daubert* issue earlier. I think, with agreement, I'd like to just -- can we submit the transcript for evidence, put my redirect in the transcript and not play it here?

**THE COURT:** I'm sorry. What do you want to do?

**MR. SANDERS:** There's a small portion of redirect, some of which I actually pointed you to when we were arguing the *Daubert* issue earlier.

**THE COURT:** Right.

**MR. SANDERS:** I'd rather just submit that as part of the actual record and not have to --

**THE COURT:** It's attached, isn't it, as part of this?

**MR. SANDERS:** It will be.

**THE COURT:** I'll have that as part of the record. Offer, introduce, and file into evidence your exhibits.

**MR. BRYSON:** We'd like to move into evidence some of these exhibits. Beyler 6 from the trial transcript is actually now marked Hernandez 369. Beyler 7 from the video is Hernandez 660. Beyler 8 is Hernandez 650. Beyler 9 is Hernandez 112. We'd like to move all those into evidence, Your Honor, and renew our objection to their Exhibit 2.

**THE COURT:** I'll admit those.

**MR. SANDERS:** Obviously, they rested. We're not arguing about these exhibits in this case.

Our trial dep. Exhibit 1, which was the CV, is DX207. We'd move for that to be admitted. The testing report itself, not his expert report, is DX009-C.

**MR. BRYSON:** That's the one that we have the objection to for our arguments this morning, Your Honor.

**THE COURT:** I'm going to admit that.

**MR. SANDERS:** Exhibit 3 was the picture of, I think -- I can't remember. I'll have to go back and look -- one of the outlets that's up there. That's DX218. Another picture was DX17. Then the outlet itself is DX236. I can't remember which one, but one of those is the picture, if you'd rather just have that in the record.

**THE COURT:** Yes.

**MR. SANDERS:** Then we also have three standards which were referenced in his report that we need to urge. DX23, which is the UL 498 --

**MR. BRYSON:** We brought that into evidence as well. It's quite lengthy. It's 200 or 300 pages.

**MR. SANDERS:** Never mind. We're fine.

DX24 is UL 719.

**THE COURT:** There was an objection on that one. I'll overrule the objection and allow it into evidence, and the others too.

**MR. HAYDEN:** Your Honor, should we call our next witness?

**THE COURT:** Yes, please.

**MR. HAYDEN:** Your Honor, we call Raymond Canzoneri.

(WHEREUPON **Raymond Canzoneri**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please be seated. Would you state your name for the record.

**THE WITNESS:** My name is Raymond Canzoneri.

**THE DEPUTY CLERK:** Would you spell the last name.

**THE WITNESS:** It's C-A-N-Z-O-N-E-R-I.

**VOIR DIRE**

**BY MR. HAYDEN:**

**Q.** Mr. Canzoneri, what is your educational background?

**A.** I have a bachelor's degree in electrical engineering, 1972, from Louisiana State University, Baton Rouge.

**Q.** Sir, is that your résumé?

**A.** Let me put my glasses on here. Yes, it is.

**Q.** Are you a certified professional engineer?

**A.** I am.

**Q.** In what fields?

**A.** Electrical engineering.

**Q.** Could you briefly describe for the Court your employment background and professional background.

**A.** I have a vast background in electrical engineering,

working for many electrical contractors throughout the years, working for myself as an electrical contractor, and then specifically having an inspection department directly after Katrina, and doing design engineering on buildings, high-rise apartment complexes, low-rise apartment complexes, supermarkets, drugstores, etc., etc.

**Q.** Does the résumé truly and accurately set forth your background and employment history?

**A.** It does.

**Q.** Are you a certified electrical contractor?

**A.** Absolutely certified.

**Q.** Can you explain what an electrical contractor does.

**A.** An electrical contractor builds what has been designed in most cases. Sometimes it's not designed; it's up to him to do that. He installs the electrical raceway, that is to say, for the cable to be put into to be protected. He installs the conduit boxes, the receptacle boxes in the case where the NM cable is used, installs the electrical service for the building or for the edifice. He also completes the motor-control centers. He sets them. He sets the different breakers inside of them. I can go on and on what the function of the --

**Q.** You're presently licensed?

**A.** Absolutely licensed, and I'm licensed in like 23 states.

**Q.** You've been an electrical contractor for how long?

**A.** The electrical contractor, the first time I examined was

like 1982 or 1983.

**Q.** You run your own business since 2005, Canzoneri & Associates?

**A.** Raymond Canzoneri & Associates, Inc.

**Q.** Are you also a certified electrical inspector?

**A.** Absolutely. The International Residential Code, or the IRC, in particular related to the International Code Council, gives three examinations: One called an E1; one called an E2; and one that's called E3 as well.

E1 is the residential section. E2 is the commercial section. E3 allows you to produce prints -- I mean it allows you to accept prints, you know, in their correct form and okay them.

**Q.** Are you certified under those different subsections?

**A.** On E1 and E2, I definitely am. E3, I utilize my own professional engineering to do that on my own. I do not certify prints that somebody would bring me.

**Q.** You are certified under both E1 and E2; correct?

**A.** Absolutely, yes.

**Q.** What does an electrical inspector do?

**A.** An electrical inspector visually comes to the job -- comes to the job site and does a visual inspection of the component parts that are placed by the electrician such as the cable, the wiring, the boxes, the switches, the receptacle installation, the service entity as far as the size of the service is

concerned, and any related activity that goes along with the electrical construction. He doesn't supervise it; he witnesses it.

**Q.** Then inspects it and determines that it's in conformance with code?

**A.** He passes that on and he allows the city entity, or the specific entity or the utility, to turn the -- control the power being turned on or turned off for that particular edifice.

**Q.** You're an electrical inspector in how many states?

**A.** The electrical inspection, as far as E1 and E2 is concerned, whenever the states recognize that possibility, which I think is throughout the United States, having the electrical contracting licenses, they go hand in hand.

Let me interject something here. In Louisiana, if you go to a specific site that is not controlled -- let's say in the city of New Orleans that is controlled by the state, you have, as the electrical engineer, the -- you have the authority and you must witness that job as far as the installation is concerned, and you have the ability to turn the power off or turn the power on once it's finished.

**Q.** How long have you been doing electrical inspections?

**A.** Specifically, throughout my life as an electrical contractor. But in actuality, when we did the storm effort and I started my electrical engineering company, it was right after

Katrina, so I'd say right just before Katrina and definitely afterwards, and that was in 2005.

**Q.** In the wake of Katrina, did you do a number of electrical inspections?

**A.** Absolutely did.

**Q.** How many?

**A.** It was in the thousands, particularly around 30,000.

**Q.** How many residential inspections?

**A.** Oh, it was over 25,000.

**Q.** Are you a member of any electrical-inspector professional organizations?

**A.** I belong to the International Association of Electrical Inspectors, and that's the IAEI.

**Q.** Does your work as an electrical inspector require you to be familiar with the electrical codes that would apply here in the state of Louisiana?

**A.** Absolutely, yes, sir.

**Q.** What code is applicable here?

**A.** The International Residential Code is the acceptable standard by Louisiana. It incorporates NFPA 70, which is the National Electric Code. And in this case, 2008, at this time.

**MR. HAYDEN:** If you could show Defense Exhibit 240.

**BY MR. HAYDEN:**

**Q.** Sir, I'm showing you the cover of this document. Do you recognize it?

 **A.** Absolutely. It's what we refer to as the code. It's the NEC, 2008, NFPA 70.

**MR. HAYDEN:** If we could go to Exhibit 239.

**THE WITNESS:** You can see at the top, too, it says: "National Electrical Code." It says: "International Electrical Code Series." So it's part of the IRC.

**BY MR. HAYDEN:**

**Q.** Now, next to that, I'm showing you another document. Do you recognize that?

**A.** Absolutely do.

**Q.** What is that?

**A.** That's the International Residential Code in its entirety for the electrical, and they have some other things, but specifically for the electrical, and it includes NEC. It's adopted the NEC into it in its entirety.

**Q.** Are these the codes that you rely on as an electrical inspector here in the state of Louisiana?

**A.** Absolutely, yes, sir.

**Q.** Do you feel you're knowledgeable about the code and its application in St. Tammany Parish?

**A.** In particular, yes.

**Q.** Why is that?

**A.** Because of the E1 and E2 status that I have through the International Residential Code. That is the code that they use.

**Q.** Have you applied these codes in your work as an electrical inspector?

**A.** Yes, as well as in work as an electrical engineer as well.

**Q.** To continue to be licensed and certified as an electrical inspector, do you take continuing education courses?

**A.** Absolutely do.

**Q.** How often?

**A.** It varies from state to state, but I can tell you Texas, New Mexico, Oklahoma, Colorado, Montana, Nebraska, Ohio, Kentucky, North Carolina, Florida, and Georgia. I don't think I've left too many out.

**Q.** Do any of these continuing education courses revolve around the codes?

**A.** They absolutely do, and specifically they coordinate the changes, specifically maybe an eight-hour course that does that, and they show you the changes in 2008 as compared to the previous 2005 code.

**Q.** Do you consider yourself an expert in the codes that apply to electrical systems in the state of Louisiana?

**A.** Absolutely, yes, sir.

**MR. HAYDEN:** Your Honor, I'd tender the witness as an expert in the applicable electrical codes and electrical engineering.

**MR. STEVE HERMAN:** No objection.

**THE COURT:** The Court will accept him as such.

**DIRECT EXAMINATION**

**BY MR. HAYDEN:**

**Q.** Mr. Canzoneri, do you have an opinion as to whether, pursuant to the code, electrical wiring in the Hernandez home needs to be replaced?

**A.** I don't think the wiring does, yes. That's my opinion: It does not.

**Q.** What's that opinion based on?

**A.** It's based on my knowledge of the code, the fact that I've been to a residence that had specific Chinese drywall. Also, I've been conferring with the electrician who's actually gone to the house in Mandeville, the Hernandez home. I've seen pictures of the receptacle outlets, the switch outlets. I know that the Chinese drywall is still up in that home. I've actually held the receptacles in my hand. I've physically looked at the connection, tried to smell if I smelled any residue whatsoever in it.

So I think I have really good knowledge. I've seen hundreds of pictures, specifically in the reports, the Beyler report, and I've read documentation in that regard. So I believe I have a really good knowledge.

**Q.** Have you been able to observe wire from the Hernandez home?

**A.** Absolutely. They cut a specific sample out. I didn't note that earlier. But, yes, I did. I saw the ends of the

wiring. I saw the tarnishment on the ends.

**Q.** What did you observe?

**A.** I saw the tarnishment on the ends of the wires.

**Q.** When you say the "ends of the wire," what do you mean?

**A.** Meaning the part that was in the receptacle itself, the part that was exposed.

**Q.** Can you describe this tarnishing.

**A.** It was black in nature, easily removed. It's very -- it's a film. It's easily taken off.

**Q.** Were you able to examine whether there was any tarnishing on the insulated portions of the wire?

**A.** Absolutely no tarnishing on the insulated parts of the wiring.

**Q.** That is both the live, or hot, and neutral wires?

**A.** The hots and neutral only at its ends, and specifically the ground at, you know, a ways up on that conductor. It also has -- I'm going to tell you like it is. That paper insulation that goes on -- it is an insulation. It's not a thermoplastic, but it is an insulation that goes on that end of the cable.

**Q.** That would be with regard to which wire?

**A.** To the ground wire.

**Q.** With regard to the ground wire, what did you observe?

**A.** It was tarnished. It was tarnished because I saw that they had removed the paper, so -- maybe a foot or two up, and I had seen the tarnish on that specific one.

**Q.** Was it the same tarnish that you saw on the hot and neutral wires?
**A.** Absolutely.
**Q.** Anything different you observed with regard to the ground wire?
**A.** No difference. No difference.
**Q.** Now, did you have occasion to be in any other homes, any homes in which there was Chinese drywall installed?
**A.** I did go to the 209 Rue Esplanade home that had the walls removed from the Chinese drywall, and I actually saw Mark Hartenstein remove the ends of those wires and make up new receptacles and new switches in that house. I was able to see a condition that was there that should be prevalent in all of those homes.
**Q.** Who's Mark Hartenstein?
**A.** Mark Hartenstein is an electrical contractor who I've known for at least 20 years.
**Q.** Have you worked with Mr. Hartenstein before?
**A.** Yes, I have.
**Q.** So you were both at the Rue Esplanade home?
**A.** That is correct.
**Q.** You had an opportunity to examine receptacles and switches that were in place in that home?
**A.** That is correct, yes, sir.
**Q.** What observations did you have at that home?

**A.** That only the particular ends of those cables were tarnished just where the copper wire was exposed. There had been -- even if you peeled it back a little bit, it was pristine.
**Q.** When you say "pristine," what do you mean?
**A.** Nice, shiny copper coating.
**Q.** Now, you indicated that you examined samples of the Hernandez home wire?
**A.** Yes, I did.
**Q.** You reviewed samples of the receptacles and switches?
**A.** Absolutely.
**Q.** Did you see photos of the electrical system?
**A.** Definitely.
**Q.** What photos did you see?
**A.** In the Hernandez home specifically, a switch box, a couple switches in it; receptacles that were already made up or pulled out, as well, pulled out to the fact that you could see the wiring that was behind it; and closeup pictures in the reports, in the Beyler report, that showed the tarnishment on the ends of the wires themselves, on the ends of the cable.
**Q.** Were you able to see anything from Chinese drywall homes from other locations?
**A.** Those were the only two that were observed.
**Q.** Okay. Did you have any conversations with Mr. Hartenstein regarding what he saw at the home?

**A.** Mr. Hartenstein called me, as a matter of fact, from the Hernandez home. When he had a question about splicing wire in the box or replacing that receptacle, he was informed by several other people that were there that he shouldn't be doing that.

**Q.** We'll get to that conversation later.

Did you review any reports of any of the experts in this matter?

**A.** Yes, I did.

**Q.** Whose reports did you review?

**A.** Dr. Lee was here this morning. The Lee Perricone report as well as Dr. Beyler.

**Q.** You've been in court today, so you also observed their testimony?

**A.** Yes, sir.

**Q.** Do you have any opinions as to whether the clipping of the ends of live and neutral wires and reconnecting them to the new switches and outlets, as KPT is suggesting, their protocol, would be in violation of either code?

**A.** I don't think the -- I don't think it is at all. The cross-sectional area is not damaged to the point that -- you can just see the film on it. It's infinitesimal. I mean, 20 microns, good Lord.

**Q.** Can you explain what you mean. What is 20 microns?

**A.** 20 microns is 20 ten-thousandths of a millimeter. It's

almost imperceptible. You can see the blackness on the end of it and you can wipe it off with your finger.

**Q.** Now, have you heard what's been referred to in this -- have you ever heard of a rule called the 6-inch rule?

**A.** I've been examining that rule. I've heard that the 6-inch rule is existing in the National Electric Code. But in the same paragraph with that particular sentence is one that says if the opening to your box is 8 inches or less, all you need is 3 inches outside that box.

So I don't know -- most of the boxes that we're concerned with, the receptacle boxes and the switch boxes, are like two-and-an-eighth of an inch. They come in from the top or the bottom. So specifically when you have enough slack to make up that new connection or the old connection, you don't have that 6 inches to deal with.

The only time that that comes into play is when an inspector has a very large box, maybe he's going to put up a chandelier or something, maybe that electrical contractor's going to put up a chandelier and needs a lot of room to work in, he'll utilize that 6 inches. He needs it. I don't know of anyone -- and I've done thousands of inspections, and I never called anybody down for having less than 6 inches in a box so long as they had enough to make a -- so I'd refer to the 6-inch rule as not bogus, but I'd perform the 3-inch rule, not the 6-inch rule.

**Q.** Sir, have you ever denied an inspection because of the 6-inch rule application?
**A.** Absolutely not.
**Q.** How many inspections have you done of residential properties here in the state of Louisiana?
**A.** In Louisiana specifically, over 25,000.
**Q.** Sir, if we could, why don't we put up the specific reference to the 6-inch rule in the International Residential Code. If we could go to section 3906.10.3.
**A.** It says: Where conductors are to be spliced, terminated, or connected to fixtures or devices, a minimum length of 6 inches of free conductor shall be provided at each outlet, junction, or switch point. The required length shall be measured from the point in the box where the conductor emerges from its raceway or cable sheath. Where the opening to an outlet junction or switch point is less than 8 inches in any dimension, each conductor shall be long enough to extend at least 3 inches outside of such opening.
So you just can't read the first sentence and call it a day at only 6 inches.
**Q.** With regard to this exception for where the opening to an outlet, junction, or switch is less than 8 inches, would that apply in a residential setting?
**A.** Absolutely. If we saw a common receptacle box in this room, it probably would only be like two by two-and-an-eighth,

something to that dimension, maybe 3 inches tall at the worst.

**Q.** So that would fall within the second sentence of this rule?

**A.** Absolutely. That's where I'm going with that.

**Q.** This is a code provision that applies to the length of free wire; right?

**A.** Absolutely.

**Q.** In practice, how is this rule applied here in the state of Louisiana, parish of St. Tammany?

**A.** Again, an electrician for the first time is putting in his -- he's running his cable, putting up his boxes. They have what they call a closed wall inspection, which allows the rest of the walls to be closed up. The electrical inspector, for the first time, witnesses this, sees that there's enough conductor in the box. He goes about his merry way, absolutely asks them to close up the walls. And then an electrician -- the same one or another one from a different company -- comes there and makes his connection up. So he has the slack that he needs to make up that wire at this particular point.

**Q.** As someone who's an expert in the applicable electrical code, what's your understanding of what the 6-inch rule is for?

**A.** The 6-inch rule is for large installations where you need enough conductor to splice from one area to another inside that box if the box opening was greater than 8 inches.

**Q.** What's the purpose for having this slack?

**A.** The slack is actually for the electrician to take his wire, take off the insulation enough to make a curl to go on the screw or to stab into the back of the device as they're implemented, and that's what it's for. It's for ease of working, not necessarily for safety's sake.
**Q.** It's to make it more convenient for the electrician?
**A.** Absolutely.
**Q.** So he'll have enough area in which to work?
**A.** Right. Precisely.
**Q.** Would that be in a renovation or repair situation?
**A.** It makes no difference. Particularly, this code applies to first time. Now, you know, you'd want enough in case you ever wanted to do some kind of renovation so it would be nice for the guy to come after you. Yes, specifically, a couple inches will do you.
**Q.** As a certified electrical inspector, do you feel it's your obligation to ensure the safety and reasonableness of the electrical system for the homeowners?
**A.** The code actually provides for that aspect. There's a code section that deals with the authority having jurisdiction. If that person relies on his ability to be reasonable and safety conscious, he should utilize that aspect of being the authority having jurisdiction and granting whether or not that particular installation is well within reason.
**Q.** In your experience as an electrical inspector, do you have

occasion to speak with other electrical inspectors in the field?

**A.** Absolutely. The International Association of Electrical Inspectors is just for that purpose. There's many electricians who attend it. All of the electrical building officials from New Orleans, Jefferson Parish, even sometimes from St. Bernard congregate, and you're encouraged to discuss those kind of things.

**Q.** In your career as a certified electrical inspector, have you ever heard of an electrical system being rejected because of the 6-inch rule?

**A.** In my lifetime and throughout the United States and like I mentioned earlier, I don't think -- I think that this would be acceptable -- I know it's acceptable in all of those states that I mentioned earlier, particularly Florida and Virginia.

**Q.** Now, in the course of preparing for your testimony, did you have occasion to see some pictures with regard to a three-switch gang box and a two-switch gang box in the Hernandez home?

**A.** That's correct, I have. I saw that in the report by Beyler. I saw those pictures in there.

**Q.** With regard to those pictures, would those indicate that the first sentence or the second sentence of this section would apply?

**A.** I would have to say that that box is not 8 inches in its

opening, so I think 3 inches is plenty.

**Q.** As a certified electrical inspector here in the state of Louisiana, do you think that's sufficient?

**A.** Absolutely. And when I did see that, it definitely had at least 3 inches on the outside.

**Q.** In your professional opinion, would it be reasonable to remove the existing wiring in the situation with the Chinese drywall, make some clips --

**A.** I think it would be ridiculous to remove the cable. I think that the -- I know that it would be wasteful. You'd be throwing away good money. Just leaving that conductor like it is is perfectly okay.

**Q.** Just so we're clear, you understand that the KPT protocol suggests changing out switches and receptacles in the Hernandez home?

**A.** I absolutely do.

**Q.** How would they go about replacing out those switches and receptacles?

**A.** I understand that the electrician involved would take off or clip off that area that is exposed, that's blackened, remove a small bit of insulation, make his termination up at that particular point, and go on -- he'd clean up his connection, which is good workmanship anyway, even if it was a brand-new cable. Any cable that an electrician does, he should clean up that cable.

**Q.** Why is that?
**A.** Just to make the good connection, just to ensure there's a good connection.
**Q.** What about the ground wire?
**A.** The same thing applies there. Same thing. I would duly note that I would -- I think -- you know, I understand that the infinitesimal amount of film that's on this cable is not -- it doesn't decrease the cross-sectional area. It doesn't impair the current flow. You know, once you make up the connection, you don't even have to remove that. As a measure of just good workmanship, you'd remove that little cursory part there.
**Q.** From your personal observations, have you been able to remove the film?
**A.** Absolutely, yeah. Sure.
**Q.** Now, you've heard testimony and you've seen reports which indicate that the plaintiffs are suggesting that all the electrical wiring in the home should be removed because of the 6-inch rule. Do you believe that's right?
**A.** I believe that to be ludicrous because it doesn't have 6 inches and going back on this rule where you really -- I mean, it's a good 3-inches extension. You could make up the -- I think it would be ludicrous to take all the cable out just to get 6 inches in the box.
**Q.** Sir, if we were to comply with the first sentence of this -- which I believe your testimony is that for the boxes

that we have, that is not the applicable sentence; correct?

**A.** That is correct.

**Q.** To assure that we are meeting the 6-inch rule, as it's been called, do you have any opinion how you could meet the 6-inch rule?

**A.** Yes, I certainly do. That box that you're putting your receptacle in, or your switch, allows for a splice to happen. So if you needed by circumstances that you go to the box and you only have a few inches in there to begin with, you could easily put a wire nut on there, which doesn't make you exceed the volumetric capacity of that box. You could add a few inches of wire on there and thus necessitate, if you have to, put 6 inches or 3 inches on there and make up your device at that particular point.

**Q.** For the Court and record, what do you mean by *splice*?

**A.** *Splice* means the joining of two wires. Generally, they're twisted together and a component part called -- a part that is approved for the purpose -- we commonly refer to it as a wire nut, and it's placed over it. It has an insulating value equal to or more than the conductor's insulation that's on that conductor already. You securely fasten that new NM cable in its pristine condition back into that box as if it never happened.

**MR. HAYDEN:** If we could go to 3906.10 -- 3306.10. I apologize. No. Right above it. Splices.

**THE WITNESS:** I think that's what we just talked about: The conductors shall be spliced or joined with splicing devices listed for the purpose. Splices and joints and the free ends of the conductors shall be covered with an insulation equivalent to the conductors or with an insulating device listed for the purpose.

The device that I called out before, as I commonly refer to it as a wire nut, is a wire connector.

The second-to-last sentence: Wire connectors or splicing means installed on conductors for a different purpose, for direct burial, shall be listed for such use.

We're not talking about direct burial cables in this case. We're talking about the common house wiring that we saw earlier as referred to as NM cable. Its conductors can be spliced in those boxes.

**BY MR. HAYDEN:**

**Q.** You're aware of the fact that Mr. Hartenstein did some harvesting of some switches and receptacles out of the Hernandez home; correct?

**A.** He absolutely did, yes.

**Q.** Do you have an opinion as to whether or not he appropriately spliced at those boxes?

**A.** The way he went about his business is absolutely correct. He used the approved devices that were listed for the purpose. If he had to add a piece of wiring in there, that's what he

did; he spliced in the box. He certainly replaced the connection properly on that device. So, yes.

**Q.** Now, could you explain for the Court the difference between a ground wire and a hot and neutral wire.

**A.** A ground wire is simply a bonding wire. What I mean by that is it creates an equal potential throughout the electrical system. It's a redundancy of the neutral. The neutral carries the source current from the hot through whatever it's working back to the circuit breaker that is giving the current to the situation.

If for some strange reason that wire, that neutral wire, is broken, then that ground wire becomes its backup wire for all intents and purposes for this conversation, it never, unless there's a short circuit, carries any current. But in case it does, it carries a fault current back to the source, and no alternate parallel situation should occur so that the circuit breaker can work. It doesn't go to ground as such. It goes back to the source.

**Q.** So would it be fair to say that the ground wire generally doesn't have a continuous current?

**A.** That's correct.

**Q.** It only kicks in if the neutral wire fails?

**A.** That's precisely correct.

**MR. HAYDEN:** If we could go to IRC 3808.4.

**BY MR. HAYDEN:**

**Q.** Do you see that? We can blow it up.

**A.** Yeah. It's called the effective ground current path.

**Q.** What is that provision?

**A.** That's just what I had talked about earlier. Every metal connection in the home, particularly at that switch, particularly at that receptacle, that ground wire is landed there and brought back to the source voltage at that circuit breaker in that circuit breaker panel, and it's connected to ground. At that particular point, that ground is also connected, and only there is connected to the neutral bus bar that's in that system. So if you lose the neutral and you don't want to become part of that return path to ground, that ground wire carries that if that neutral stops working.

**Q.** Mr. Canzoneri, a few other questions in that regard. Do you have any opinion whether the tarnish that is left on the ground wire under the KPT proposal would violate any of the provisions of the code?

**A.** I don't think it -- I know it doesn't. I really understand the system, and the fact of the matter is it does not. It does not do that.

**Q.** Why is that?

**A.** It doesn't -- it is a -- being a semiconductor, okay, there is some current that could be generated through it. It's not what I'd call totally resistive. The film that's on there

 is almost infinitesimal. It's 20 microns at the biggest point.

**Q.** Would it impact the functionality of the ground wire?

**A.** It will not impact the functionality of the ground wire.

**Q.** You're aware of the fact that the KPT proposal suggests that the Chinese drywall is removed?

**A.** Absolutely, thus necessitating the ending of the exposure to the gases.

**Q.** Is there any point in time where you'd say a ground wire should be removed due to corrosion?

**A.** Well, I mean, if it's grossly -- if the wire's about to break, there's no mechanical or little mechanical connection, that could be a place where that is involved, yes.

**Q.** Did you see any ground wires here which showed a corrosion that would cause you to remove the ground wire?

**A.** Not at all.

**MR. HAYDEN:** If we could look at 3808.17.

**BY MR. HAYDEN:**

**Q.** Sir, do you recognize that provision of the code?

**A.** Absolutely. We talked about it earlier, about cleaning the surface area of the wires that they exist now. Many, many pictures that I saw in these reports that I told you about earlier, the Beyler and the Lee, showed me many, many places where the drywall spray and/or paint was on the particular ends of the cable and the insulation. I think that's detrimental to the source current, and I think that could become a hazard.

That's why this provision is in there, that that kind of stuff, those kind of things, since they are on conductors, need to be removed from the cable.

**Q.** Are those the types of things that you see in thousands of inspections that you've been involved with in residences?

**A.** Unfortunately, that's part of the industry, that overspray. I've seen many guys take, you know, cardboard to try to minimize the overspray aspect of it, yes.

**Q.** How would you recommend that this be removed?

**A.** I'd simply have my knife handy, a fingernail, just some abrasive, a Scotch-Brite pad that they talked about earlier, take that off of there.

**Q.** Would this provision apply to the tarnish at issue, the copper sulfide?

**A.** Copper sulfide -- again, I'll go back to a circumstance when I was much younger where we did a cathodic protection survey in the city of New Orleans. The city gas piping is metal since God knows when, and they do an anticorrosive with sinking anodes. They actually use a copper sulfate solution onto a bar with a cylinder that has a membrane on it, and they place it into the ground somewhat, and they measure what could be left as the anode. If it's still plating off, they can actually tell. They go to the hand-hold, they open up the wire that's there, and they connect that copper sulfate solution and rod to see if that exists. So, yeah.

**Q.** Would the tarnish be considered conductive or nonconductive?
**A.** I think it's conductive. Not "I think." It is conductive.
**Q.** So that would be in contrast to the paint or lacquer that you might find?
**A.** It is in direct contrast because the paint or lacquer enamel that's on there or any other -- like the drywall, it's an insulator. It should be removed.
**Q.** In your opinion, does the tarnished ground wire need to be cleaned along its entire length?
**A.** No. The cross-sectional area, or the surface area, doesn't impede those amperes. I read that also in the Beyler report. The heat constraint is where you would see that element arise, and it doesn't.
**Q.** In your opinion, does the tarnished ground wire need to be cleaned at the connection points?
**A.** I really don't think it does. But showing good workmanship, I think that I'd probably insist on it.
**Q.** We've talked a little bit about the scope of the KPT proposal for the electrical system.
**A.** Uh-huh.
**Q.** Is it your professional opinion that the electrical work that KPT is proposing would be within code?
**A.** Absolutely, yes, sir.

**Q.** Does it follow industrial standards?

**A.** It does. If you remove the element, simply clip off the ends, remove that part of it, reconnect it, there's no problem with determination.

**Q.** With regard to doing the splicing in the boxes, would there be any problems with that with regard to the volume in the box?

**A.** Again, the code specifically enhances that method. It does tell you to do that, that you can splice in those boxes.

**Q.** In your opinion, the work that Mr. Hartenstein did at the Hernandez home with regard to harvesting those receptacles and switches, did that comply with the code?

**A.** Absolutely. I think beyond a shadow of a doubt he did an excellent job in replacing those receptacles and switches.

**MR. HAYDEN:** Your Honor, we'd move into evidence Defense Exhibits 239, 240, and Defense Exhibit 37.

**THE COURT:** What is that?

**MR. STEVE HERMAN:** No objection.

**THE COURT:** Let it be admitted.

**MR. HAYDEN:** Thank you, Your Honor.

**THE COURT:** That's it?

Any cross?

**CROSS-EXAMINATION**

**BY MR. STEVE HERMAN:**

**Q.** Good afternoon.

**A.** How are you doing?
**Q.** Okay. I think you mentioned very early on that an electrical inspector has to personally come to the home and personally visually inspect the house, doesn't supervise it, but is there himself or herself; is that right?
**A.** That's correct.
**Q.** That's not what you did in this case; correct?
**A.** That I did not do in the Hernandez house. I did it at the other edifice, 209 Rue Esplanade. All I did was simply be asked to witness those pictures and not become the authority of the jurisdiction at that particular house.
**Q.** You never actually went to the Hernandez home; correct?
**A.** I did not, but I saw those pictures. I saw hundreds of pictures. I saw pictures with the drywall on, with the boxes, you know, with the components hanging out of them. I virtually -- and I actually held those samples in my hand, as I told you earlier.
**Q.** One sample?
**A.** No. It was five, six of them.
**Q.** Well, we'll get to your deposition testimony about that later.
**A.** Okay.
**Q.** Not only did you not go to the Hernandez home, you never sent a certified inspector to the Hernandez home; correct?
**A.** No, I didn't. I don't think it was my job at that

particular point to do that.

**Q.** Other than going to the Rue Esplanade home, do you have any experience with Chinese drywall?

**A.** Only the things that I've seen and the reports that I have seen. No, there's no other experience about that aspect of it. But my 30 years of experience with everything else that I've done, I think it's surely related to what I did at this particular place.

**Q.** You have no firsthand real-world experience with Chinese drywall remediation; is that correct?

**A.** That's correct.

**Q.** You have performed no studies ever on sulfur corrosion of copper versus other types of copper corrosion or oxidation; correct?

**A.** That's not my field. I don't do those kind of scientific aspects that you're talking about.

**Q.** I think you mentioned in your deposition in the late '60s you had some experience with a copper sulfate solution or something?

**A.** Yes.

**Q.** Is that what you were referring to earlier?

**A.** That's what I was referring to, yes.

**Q.** Other than that, you have no real-world experience in dealing with copper sulfide corrosion or tarnishing as opposed to other oxidation; correct?

**A.** Absolutely correct.

**Q.** You haven't conducted or reviewed any studies to try to determine whether, when they take the Chinese drywall out of the environment, the corrosion continues; correct?

**A.** The only things that I've done -- and I'm telling you, Counselor, that I read those copious reports, Beyler, I listened to the testimony today, and I believe they said several times that if you remove the drywall, you remove the source, and the conductivity of the wires are still there. So that's the things that I've accomplished in this research.

**Q.** The video we just saw a few minutes ago --

**A.** Uh-huh.

**Q.** -- you didn't see that when you served your report, though; correct?

**A.** That's correct.

**Q.** You didn't see that video before I took your deposition last week; correct?

**A.** No, sir.

**Q.** You have no experience with silver sulfide; correct?

**A.** Not at all. I don't believe I have one iota of that.

**Q.** You've done no laboratory analysis in this case?

**A.** That's correct, Counselor.

**Q.** Are you familiar with the Battelle classifications?

**A.** You had showed me during my deposition an 8-1/2-by-11 floor plan, and you had 1, 2, 3, and 4 on there. Those were

never explained to me, and I never bothered to do any more research on that.

**Q.** In all of your experience, you've never come across any real-world experience with Battelle classifications; correct?

**A.** That's correct.

**Q.** You're not a metallurgist?

**A.** I am not a metallurgist.

**Q.** Not a materials expert?

**A.** Not a materials expert.

**Q.** Not a corrosion expert?

**A.** No, sir.

**Q.** You haven't been asked to look at or give an opinion on the low voltage wiring within the Hernandez home?

**A.** The low voltage wiring was not of my concern. I was only asked to take a look at the electrical wiring of the 15- and 20-amp variety.

**Q.** You didn't look at or give an opinion about the electrical appliances within the home; correct?

**A.** No, sir, I did not.

**Q.** Or the circuit boards?

**A.** No, sir. That's correct.

**MR. STEVE HERMAN:** Could we look at Hernandez 451, please.

**BY MR. STEVE HERMAN:**

**Q.** Is this what you just referred to?

**A.** That, Counselor, you showed me for the first time in my deposition.

**Q.** Do you remember looking at it in your deposition?

**A.** Yes, sir.

**Q.** Do you know what that is?

**A.** No, sir, I don't. I know it's a floor plan and it's got numbers on it, and I know that it's a family room, a garage, master bedroom, couple other bedrooms.

**Q.** Do you see all those 3s and 4s?

**A.** Absolutely.

**Q.** You see "CTEH" up in the left?

**A.** Yeah. Center for Toxicology and Environmental Health.

**Q.** Are you familiar with CTEH classifications from 1 to 4?

**A.** That's not my forte, Counselor.

**Q.** Do you know whether the Battelle classifications are the same as or different from the CTEH classifications?

**A.** No, sir, I sure don't.

**Q.** In coming here today and giving your conclusion that, in your opinion, the existing electrical wiring in the Hernandez house is sufficient, you weren't provided with this analysis by Knauf's own experts; correct?

**A.** I hadn't seen it. I don't recall it. It could have been in there, but I don't recall.

**Q.** You really don't have any knowledge or opinion about the corrosive level of the environment within the Hernandez home;

correct?

**A.** Only what -- you know, seeing the ends of the cable that I witnessed and those connections. That's the only thing.

**Q.** You pointed out either in your expert report or your direct, or both, that you had inspected 30,000 homes in New Orleans after Katrina; is that right?

**A.** That's correct, yes.

**Q.** After Katrina, any wiring that you determined had been underwater had to be removed and replaced; correct?

**A.** That's correct.

**Q.** You didn't know whether it had been underwater for an hour or 24 hours or 2 weeks; correct?

**A.** You could only suppose. You could jump to those conclusions real quick. That is not a good analogy as to what happened in these homes.

**Q.** Okay. Even if you didn't see tarnish or corrosion on those wires, you took it out; correct?

**A.** We knew the waterline was above that system, above that cabling, and the insulation was abraded by this terrible toxic soup that was there.

**Q.** The theory was, in that circumstance, that since the wiring was exposed to a corrosive environment, it was safer to just go ahead and take it out; correct?

**A.** That specifically was it because of the corrosiveness of that. The ends of those wires that I saw in the Hernandez

home, as well as in the samples in the other home, is not corrosion. It is, in my opinion, tarnishment.

**Q.** Are you going to testify here today in this courtroom that of the 30,000 inspections that you went on after Katrina, every single wire that you removed or authorized being removed, you visibly confirmed that there was tarnish and corrosion?

**A.** That is not a correct assumption.

**Q.** Let's talk about the code a little bit. As I understand it, if you're going to do work or certify someone else's work at the Hernandez home in Mandeville, you have to comply with the CABO code; correct?

**A.** It was recognized at one particular time. Now the International Residential Code is the acceptable standard.

**Q.** You cite the CABO in your report; correct?

**A.** I did. I absolutely did.

**Q.** It's applicable to St. Tammany, as far as you know; correct?

**A.** Correct.

**Q.** And the NEC, which is NFPA 70; correct?

**A.** Correct.

**Q.** And the IRC, which is what you've been talking about; correct?

**A.** Correct.

**MR. STEVE HERMAN:** Could you pull up Hernandez 155.

**BY MR. STEVE HERMAN:**

**Q.** This is the 2003 version of the code; correct?

**A.** That's correct.

**Q.** We looked at this during your deposition; is that right?

**A.** Yes. I had the 2006 with me, which probably only --

**Q.** It's easier to look at this one since we already have it loaded up. And I think you told me in your deposition that there's no differences or material differences, at least as it relates to your opinion in this case, between the 2000 code, the 2003 code, and the 2006 code that you brought here with you. Correct?

**A.** Very slight differences.

**Q.** So if we look at the 2003 code, we should be okay?

**A.** I think so, yes.

**Q.** If not, let me know. Okay?

**A.** Yes.

**Q.** Thank you. In your expert report, you said that the 6-inch requirement only applied to new construction and not renovations or repairs; is that right?

**A.** At the time, yes, that is correct. We didn't read on, at that particular day, the second or third sentence in that paragraph.

**Q.** The one you pointed out to the Court today?

**A.** The one that I pointed out to the Court today.

**Q.** When you gave us your report, you had a completely

different theory; right?

**A.** No. No.

**Q.** Okay.

**A.** Yeah, we were talking about the 6-inch rule, but we never went on to say about the boxes that are the receptacle variety that are less than 8 inches in any direction and you can only have 3 inches. So I was agreeing to you on the 6 inches of a box that is not of that variety. It's much larger.

**Q.** The second sentence that you looked at on direct, that's something you came up with after your deposition; right?

**A.** Because we never addressed it, yes.

**Q.** Let's take this down for a second. Let's look at Exhibit Hernandez 392, if we could.

**MR. STEVE HERMAN:** Your Honor, it may be easier for the witness. This is his report. If I could approach, I could give him a paper copy if that's easier for him to flip through.

**THE COURT:** Okay.

**BY MR. STEVE HERMAN:**

**Q.** Is that your report in this case, sir?

**A.** That is my report.

**MR. STEVE HERMAN:** Can we go to page 2 of this, Scott.

**BY MR. STEVE HERMAN:**

**Q.** Do you see this bullet point right here?

**A.** Yeah.

**Q.** That's what you submitted in this case originally with your report; right?

**A.** That's correct, yes.

**Q.** Your reasoning or contention in this report was that the 6-inch rule didn't apply because it only applies to newly constructed homes and not renovation; correct?

**A.** Yes, that is correct. The fact of the matter is that an electrical inspector will come in, observe that there is enough wire. I've never seen it happen where the guy flips out a rule and sees that you have 6 inches. I've never had a house fail because of that. I've never failed any because of that. But, yes, my statement says that.

**Q.** You've been proffered here today as an expert on the code; correct?

**A.** Yes.

**Q.** And what the code means; correct?

**A.** Right.

**Q.** What you told us a couple weeks ago was that the code only applied to new construction and not renovations; correct?

**A.** In this particular instance, that's what it does. It does apply to the fact that the inspector's coming in for the first time, they're about to close the walls on the edifice so they can do the next part of it, and that when somebody comes back in after him, puts a screwdriver to the device, has enough cable to make the connection and go about his business, that's

the applied intent of this rule.

**Q.** Okay. Thank you.

**MR. STEVE HERMAN:** If we could go back to Exhibit 155. If we could go to, Scott, page 2 of that, the electronic version, and go to section E3301.4, which I think is down here.

**BY MR. STEVE HERMAN:**

**Q.** Do you see where it talks about additions and alterations?

**A.** Uh-huh. Yes.

**Q.** It says: Any addition or alteration to an existing electrical system shall be made in conformity with the provisions of Chapters 33 through 42.

Do you see that?

**A.** Yes, sir, I do.

**Q.** You agreed with me last week that what Mr. Carubba wants to do -- or what Mr. Hartenstein intends to do at the Hernandez house, the KPT protocol, is an addition or alteration to an existing electrical system; correct?

**A.** Yes.

**Q.** So the code would apply fully to this alteration just as it would to new construction; correct?

**A.** I said that, that's true, and it is true.

**Q.** So what you said in your expert report was wrong; correct?

**A.** I don't want to say I was wrong. We just didn't go any further with it. Okay, Counselor?

**Q.** Okay. If we could zoom out a little bit. Let's go to the bottom right. There's a section on inspection required. Do you see that? 3303.2.

**A.** Right.

**Q.** What does that say?

**A.** New electrical work and parts of existing systems affected by new work or alterations shall be inspected by the building official to ensure compliance with the requirements of 33 through 42.

**Q.** Is the work that KPT proposes to do on the Hernandez house new electrical work to an existing system?

**A.** It's an alteration.

**Q.** So this further indicates that what KPT wants to do with their house would be applicable to the code; correct?

**A.** Absolutely, yes, sir.

**Q.** You're not a controlling authority in Mandeville; correct?

**A.** No, but -- no, I'm not.

**Q.** Mr. Hartenstein is not a controlling authority in Mandeville; correct?

**A.** That is correct.

**Q.** An electrician does not have the authority to violate the code, does he?

**A.** Absolutely not.

**Q.** Does an electrical engineer have authority to violate the code?

**A.** No, sir, he doesn't.
**Q.** Does Mr. Carubba have authority to violate the code?
**A.** Does not.
**Q.** You're not aware of any permit process, with respect to their home on Marion Road, where someone that you would recognize as a controlling authority has opined about what is or isn't required under the code; correct?
**A.** To my knowledge, that has not happened, no.
**Q.** Are you familiar with the alternate means and methods provisions of the code?
**A.** Counselor, I'm not sure I understand that aspect.
**Q.** It's too broad of a question?
**A.** It is a very broad question. I guess if you wanted to deviate from that, we'd have to go to some board or something. That's what you're telling me, huh?
**Q.** I didn't ask a very good question. I apologize. If you wanted to deviate from what's in the IRC, there's a process for that; right? It's an alternate means and methods process?
**A.** I believe there is, yes.
**Q.** That process requires you to get a certification in writing from a governing authority; correct?
**A.** That's correct.
**Q.** Are you aware of KPT or anyone going through that process with respect to what KPT wants to do to the Hernandez home?
**A.** Not to my knowledge at this particular time. When the

time comes, I'm sure that the electrician who works on that job will get a certificate to do just what you're asking me.

**Q.** Now, you spoke to someone in the New Orleans permitting department; correct?

**A.** Correct.

**Q.** Someone who does not have jurisdictional authority in St. Tammany?

**A.** That's absolutely correct.

**Q.** You're paying this person $50 an hour on behalf of Knauf; correct?

**A.** I want to make a correction to that. The guy normally charges $150. He charges me $100, yes.

**Q.** On behalf of Knauf?

**A.** Sir?

**Q.** You hired him in this case on behalf of Knauf?

**A.** No -- yes. I hired him on behalf of myself in relationship to this project, yes.

**Q.** To give you advice; correct?

**A.** Yes.

**Q.** Even he said that you can't violate the code and the 6-inches rule applies; correct?

**A.** We're not violating the 6-inch rule. We're doing the 3-inch rule. Okay?

**Q.** Are you going to testify here today that this consultant that you've hired in New Orleans, who's not a controlling

authority in Mandeville, has approved of this 3-inch rule that you're introducing?

**A.** I never said that once whatsoever.

**Q.** Have you ever consulted -- I think his name was Chan or Chen or something. Have you consulted with him about the 3-inch rule?

**A.** Larry Chan. I have consulted with him in regards to the opening of that box and the 3 inches that sticks out, and he's perfectly fine with that.

**Q.** When did this conversation take place?

**A.** Counselor, I'm not sure I remember the exact date of it, but it has happened in the past.

**Q.** Before your deposition?

**A.** No. No.

**Q.** Since your deposition?

**A.** Since my deposition.

**MR. STEVE HERMAN:** Let's look at Hernandez 155. Scott, for you, it's page 3. Let's look at IRC section E3304.6, which I think is in the left middle. Here you are.

**BY MR. STEVE HERMAN:**

**Q.** You mentioned this provision in your report; correct, sir?

**A.** Yes, I did. I sure did.

**Q.** What was the significance of this section in your report?

**A.** The significance of this section was with regard to elements that don't conduct electricity at the particular ends

of those cables or throughout the cable. For example, if you had drywall spray, overspray, or paint on that wire, then I think that would adversely affect the operation, safe operation of that wire, and needs to be cleaned. That's what I was referring to.

**Q.** What about corrosive residues?

**A.** Again, if you're talking about a real corrosion that is not of this variety -- because I told you already in the past that that film that's on there is just that; it is a tarnishment and doesn't provide any corrosive residues on those cables. That's my contention.

**Q.** Is that what you said in your report?

**A.** Yeah.

**Q.** Do you still have your report in front of you?

**A.** Uh-huh.

**MR. STEVE HERMAN:** Scott, could we put back up Hernandez 392, page 3, the first bullet point.

**BY MR. STEVE HERMAN:**

**Q.** What did you say about section 3904.6 of the code?

**A.** I said: Tarnishing of the copper ground wire does not impact the ground wire's intended function and does not affect the electrical system as a whole. Section 3904.6 of the code is not typically applied to wires but to electrical equipment with internal parts, such as switches, receptacles, which according to Roy Carubba's scope of work are being replaced

and, therefore, are not at issue.

**Q.** So your original point, contrary to what you just testified to a couple minutes ago, is that 3304.6, which says you've got to get the corrosive residues off, the original point was that doesn't apply because this isn't equipment; right?

**A.** Well, it's not equipment. Wire is not equipment. Your devices are.

**Q.** So even though you're supposed to get corrosive residue off equipment, in your opinion, that doesn't include wires?

**A.** Like I said before, if you want to include wiring in this and you're calling this a corrosive element, it's not. It's tarnishment. I don't think that you have to remove it, right.

**Q.** In your report, you didn't say this section doesn't apply because this isn't a corrosive residue; you said this section doesn't apply because it's not equipment?

**A.** Because it's not equipment. You're trying to cross-correlate it to something that I never said.

**Q.** Well, I apologize. I didn't mean to do that.

**MR. STEVE HERMAN:** Can we look at the definition of *equipment*, Hernandez 155, page 6. It's at kind of the bottom left.

**BY MR. STEVE HERMAN:**

**Q.** What's the definition of *equipment*?

**A.** As you read it here, it says that it's a general term

including material, fittings, devices, appliances, luminaires, apparatus, and the like used as a part of or in connection with an electrical installation.

We're talking about a panel board. We're talking about light fixtures. We're talking about anything else but wiring. Okay? Like a receptacle maybe. Okay? Not wires.

**Q.** A general term including material that's part of or in connection with electrical installation, in your professional opinion as an expert on the code, doesn't include wiring?

**A.** Does not.

**Q.** Okay. Whatever the code requires, you admit that if the wire is corroded, it can't stay in the house; right?

**A.** If the wire is corroded -- and I'm not admitting that this wire is corroded.

**Q.** I understand.

**A.** It can't stay in the house, yes, that's correct.

**Q.** Even just the ground wire?

**A.** Even just the ground wire.

**Q.** Tarnish can stay, but corrosion's got to go; right?

**A.** Exactly.

**Q.** How many microns of copper sulfide tarnish constitutes corrosion?

**A.** I don't know the answer to that question. In this case, the only evidence that I have that it's 20 microns is not a significant -- it's infinitesimal. It's barely measurable.

**Q.** How many angstroms of copper sulfide tarnish would you say constitutes corrosion?
**A.** Again, I don't know the answer to that question. I'm not sure, relatively speaking, what an angstrom unit is. It's a unit of light, but I'm not positive of how big that is.
**Q.** Do you have an opinion that if you get to an eighth of an inch of tarnish that that's what constitutes corrosion?
**A.** I did say that at one particular point. Tarnish, you know, it would be corrosion to my layman's terms at that particular point, yes.
**Q.** You told me that last week; right?
**A.** Yes, I did.
**Q.** Right. You would have to get an eight of an inch before it constitutes --
**A.** I was of that opinion, that's correct.
**Q.** An entire 12-gauge wire is an eighth of an inch; right?
**A.** That's correct.
**Q.** So unless it's eating through the entire wire, it's not corrosion?
**A.** If you want to play on words like that, go right ahead. I don't think that that's correct.
**Q.** You haven't conducted or reviewed any studies to try to determine whether the copper sulfide tarnish continues when the drywall is removed from the environment; correct?
**A.** The only things that I've read are in various reports, and

it says that when you remove the element, you remove the source, and it doesn't continue after that.

**Q.** You looked at one sample from the Hernandez house that, in your opinion, was tarnished and not corroded; correct?

**A.** That's correct, yes.

**Q.** The sample that you looked at was tarnished on the hot, the neutral, and the ground; right?

**A.** The sample being the length of cable at the time that we were talking. Subsequently, I've seen receptacles and wires connected to those receptacles that had that tarnishment on it.

**Q.** Subsequent to your deposition?

**A.** Yes, sir.

**Q.** So when you gave your report, you'd only seen one sample?

**A.** That's correct.

**Q.** It was tarnished?

**A.** That's correct.

**Q.** When you gave your deposition, you'd only seen one sample, and it was tarnished?

**A.** That's correct.

**Q.** Now you've seen a whole bunch of samples and they're tarnished?

**A.** They're tarnished.

**Q.** You're relying on Mr. Hartenstein's observation that the wire under the insulation looked okay to him?

**A.** In one case, and in another cases I've actually peeled it

 back and taken a look at it and seen that it was, as I said earlier, pristine copper, shiny copper.

**Q.** Visual inspection?

**A.** Yes, sir.

**MR. STEVE HERMAN:** Let's look at the MTI publication 38, which is LT195 at page 13.

**BY MR. STEVE HERMAN:**

**Q.** I know the Judge has seen this, so I don't want to belabor the point, but it says: By the time relevant corrosion can be detected visually, the equipment may already be in an advanced state of degradation.

Do you agree or disagree with that?

**A.** I'm not sure where this comes from, the context of this. It could be written about almost anything. I'm not sure it has any effect on me in relationship to this cable that's in place, that's being questioned.

**MR. STEVE HERMAN:** Could we go to page 15 of the paper.

**BY MR. STEVE HERMAN:**

**Q.** I'm not sure if Judge Fallon has seen this: The thickness of films that may produce failure is often well below the limits of visual detection.

Do you disagree with that?

**A.** Again, I don't know what -- I understand the words that I'm reading. I don't particularly agree with that. It looks

like somebody's opinion.

**MR. STEVE HERMAN:** Let's go to the graph on page 27, please.

**BY MR. STEVE HERMAN:**

**Q.** Do you remember how we were trying to figure out a few minutes ago the distinction between tarnish and corrosion?

**A.** I understand what you're saying, yes.

**Q.** I think you said it was measured, at least in your opinion, in inches, not microns or angstroms; correct?

**A.** When I said an eighth of an inch, that's what I meant. I understand the particular film that I'm seeing, this tarnishment, is less than or equal to 20 microns.

**Q.** Do you see that little A there with a little degree sign? Does that mean angstroms, as far as you know?

**A.** That could mean anything. I don't know what that means.

**Q.** Do you know what *contact resistance* means?

**A.** I have a feeling I know what *contact resistance* means.

**Q.** What do you feel it means?

**A.** The resistance of that when it rests against some other source; metal or wood or anything else that we would talk about.

**Q.** You didn't do any contact resistance on any of the materials from the Hernandez home; correct?

**A.** I have no earthly idea about that, no.

**Q.** Before you saw the video a few minutes ago, you didn't

know anything about what Mr. Beyler did; correct?

**A.** That's correct.

**Q.** You see in this graph the spike in contact resistance at the micron level or at the angstrom level?

**A.** I'm not sure which one you're looking at here. I see two sets -- I see one -- two graphs -- three actually, three here, and I'm not sure -- I saw the nickel alloys up here. I'm reading silver over here. So what's your question?

**Q.** Okay. No. I was just pointing to the --

**A.** I can read this.

**Q.** You see how it says "$10^3$"? Do you know how many microns $10^3$ angstroms is?

**A.** I have no earthly idea.

**Q.** Fair enough.

**MR. STEVE HERMAN:** You can take that down, Scott. Thanks.

**BY MR. STEVE HERMAN:**

**Q.** You didn't review any of the plaintiffs' expert reports in this case; correct?

**A.** I'm not sure I understand what you mean by that. I saw Beyler's report and I saw Lee's report. That's the two reports that I saw.

**Q.** Did you see anything from Mr. Krantz?

**A.** I believe that -- this is the first time I'm hearing about Krantz. I could be mistaken, but I don't recall.

**Q.** It's your opinion, based on your knowledge of the Hernandez home, that there's no tarnishment or corrosion underneath any insulated wire? Would you say that?

**A.** That's my complete assumption, yes, that that's correct. I don't believe there's any tarnishment below those.

**MR. STEVE HERMAN:** Can we pull up Hernandez 188, please.

**BY MR. STEVE HERMAN:**

**Q.** Have you ever seen this before?

**A.** Unless it was in those other documents that I told you about earlier, right offhand, I'm going to say, no, I haven't seen it.

**Q.** You weren't in the courtroom when Mr. Krantz testified?

**A.** Was that very early this morning?

**Q.** No. It was a couple days ago.

**A.** At this particular time, no, I don't think I have.

**Q.** You see that second-to-last row?

**A.** Uh-huh.

**Q.** Insulated low voltage wire under insulation, tarnish thickness and pit depth --

**A.** Okay.

**Q.** -- do you know what that means?

**A.** 22.5 um. Is that micrometers? I'm not sure what the U stands for.

**MR. HAYDEN:** Your Honor, I object. It's improper

impeachment. The gentleman's never seen the document before. I'm not sure really where we're going.

**THE WITNESS:** I could read it, but I don't know what it means.

**BY MR. STEVE HERMAN:**

**Q.** We'll move on to the next one. Did you look at any other recent analysis that was done after Mr. Hartenstein changed out some of the outlets and switches in the Hernandez home?

**A.** I have read the Beyler report. Actually -- yes. I mean, the Beyler report and the Lee -- I can't remember the last guy's name, but the Lee report and the -- that's the only two that I've read.

**Q.** You're intimately familiar with the work that Mr. Hartenstein did at the Hernandez home; correct?

**A.** You can say that, yes. I'm more familiar with the work -- I know that he did the work. He called me from the residence while he was doing the work. I've seen the pictures of the before, and I've actually seen the work done at the Rue Esplanade. Why it would be anything different -- I have no earthly idea why it would be different.

**Q.** Let's look at Hernandez 575. That's what we call a three-gang box; right?

**A.** That's correct.

**Q.** Is that one of the boxes that Mr. Hartenstein looked at in the Hernandez house?

**A.** I'd have to say right offhand that if that was in the report, I saw this photograph before, and it could very well be what we're talking about, yes.
**Q.** Let's assume hypothetically that it is.
**A.** Okay.
**Q.** Mr. Hartenstein said, based on his visual inspection, to the naked eye there's no corrosion, correct, when he peeled back the insulation?
**A.** That's correct, yes.
**Q.** You're relying on him to conclude that the existing wiring in the Hernandez home is okay; correct?
**A.** I actually saw a sample of maybe one of these, 25, 35 feet of it. So I looked at both ends and we -- we really did. We saw a sample from the Hernandez home. Okay? We're talking about the Hernandez home; right?
**Q.** Yeah.
**A.** I saw a sample of the cable that they brought out of that home.
**Q.** 25, 30 feet?
**A.** Yeah, probably. It was a good loop, three or four times. It might have been 12, 15 feet. Okay?
**Q.** Okay.
**A.** But it certainly had the tarnishment on each end. When we looked back under the insulation, it was pure.
**Q.** Now let's go to Hernandez 580. That black wire is a hot

wire; right? Or is it a neutral wire? I can't remember.
**A.** It could be a traveler. It could be a switch length. But go ahead.
**Q.** Well, if it's --
**A.** For all intents and purposes, it could be either/or.
**Q.** Let's assume that it's from the three-gang box that we just looked at. It's not a ground; right?
**A.** I don't know.
**Q.** You don't know?
**A.** I would think it --
**Q.** Would ground wire be insulated with a black wire?
**A.** Yeah, sure. Sure. It should be green, according to the code, but it could have a black on it and you could put tape over it. Okay?
**Q.** Do you see how it's stripped back like Mr. Hartenstein said he did?
**A.** Yes.
**Q.** About an inch and five-eighths, an inch and three-fourths?
**A.** Uh-huh.
**Q.** Do you see any corrosion there?
**A.** It's really tough to see. I see a black line that goes along maybe -- what is that -- less than 2 inches, possibly, on the photograph. That could be anything. That could be a piece of that black insulation being peeled off as it goes along.
**Q.** If you looked at that, you'd say that's okay, that can

stay in the house because that's not corroded; right? That's your opinion?

**A.** That's my opinion.

**Q.** Let's go to Hernandez 581. Do you see how that shows that there's copper sulfide beneath that insulation where you thought it was clear?

**A.** Okay. If that's the case in this case.

**Q.** You have no way of disputing that; correct?

**A.** I have no way of disputing it or agreeing to it, in essence.

**Q.** Even though it looks good to the naked eye, underneath the insulation there could still be copper sulfide corrosion; correct?

**A.** That's the point that you made before. That's not the conclusion that I've made.

**Q.** Let's go back to the code. Let's go to the part you were talking about.

**MR. STEVE HERMAN:** This is Hernandez 155, Scott, page 4. I think it's over here.

**BY MR. STEVE HERMAN:**

**Q.** You were looking at a different version of some code, but it's the same language; right?

**A.** In this case, it's the NEC, and it's the one that we referred to before. We talked about the 6 inches, talked about the 3 inches, and that's what I say. That's what I contend.

Those outlet boxes don't have 8 inches from any point. And I tell you that the 3 inches is perfectly all right to make up that device in that box.

**Q.** It says: Where conductors are to be spliced, terminated, or connected to fixtures or devices, a minimum length of 6 inches of free conductor shall be provided at each outlet, junction, or switch point.

Do you see that?

**A.** Okay.

**Q.** Do you see where it says "free"?

**A.** I see that.

**Q.** That means that if you're going to make a splice, you need to have 6 inches of free conductor before you make that splice; correct?

**A.** It doesn't mean that at all.

**Q.** Does it suggest that?

**A.** No, it does not. You're reading words into it. You could have 6 inches in there if you want to. If you splice onto it, you'll have 6 inches of free space in there.

**Q.** Do you recall me reading this provision to you during your deposition?

**A.** Yes, I did.

**Q.** Do you recall when I asked you:

"So when you're going to make a splice, you have to have 6 inches before that splice of free conductor before you

make the splice; right?"

**A.** I agreed with you, but we did not read on in there when we knew that 3 inches -- you were alluding to the fact that you needed -- absolutely needed 6 inches in that box. I'm telling you right here, right now, and again that you only need 3 inches in those outlet boxes.

**Q.** You were wrong a week ago?

**A.** I was wrong in the fact that I told you, I gave up on you, that I gave you 6 inches, and that I didn't go on to say that you can have 6 inches when you're splicing that box. You kept on beating on the fact that you needed 6 inches and I said, "Yeah, you need 6 inches."

**Q.** Let's look at the last sentence that you were just directing the Court's attention to a few minutes ago, the 8-inch provision, I call it, this last sentence.

Now, first of all, I think we established a couple minutes ago that you didn't say anything about that in your expert report; right?

**A.** That's correct.

**Q.** Second of all, you have absolutely no idea how many boxes or receptacles or switches or anything else in the Hernandez home falls under this provision; correct?

**A.** I have a real good idea.

**Q.** You've never been to the home; right?

**A.** I didn't have to go to the home.

**Q.** You never looked at any of the boxes?
**A.** I did look at them. I looked at them on pictures.
**Q.** Okay.
**A.** The drywall was still up. Their guy saw it as well as I did.
**Q.** It's your testimony that by looking at the photographs, you can tell whether there's 8 inches in each box that's in the Hernandez home as it sits today?
**A.** No. 8 inches meaning the opening of the box being 8 inches.
**Q.** What does that mean?
**A.** That means that I know what a three-gang box looks like in this case, and it's not 8 inches in any direction. So it's less than 8 inches. So you could have 3 inches sticking out of the box to make up your device on.
**Q.** Let me ask you something. Where it says that each conductor shall be long enough to extend at least 3 inches outside of such opening, that means the opening front part of the box; right?
**A.** That's correct.
**Q.** So you have to extend it out behind the front of the box; correct?
**A.** No.
**Q.** Past the opening of the box?
**A.** You have to extend it beyond the opening of the box.

**Q.** So it has to go from the back of the box to the front of the box; right?
**A.** No. No. It could come -- no. It just has to stick out past the front of the box for the 3 inches.
**Q.** Okay.
**A.** Wherever the wire is coming from, let's assume -- or let's take a box, for example, that I don't have here with me. Go to your house; go to that house. It's probably two-and-an-eighth inches, in reality, the depth of that box. So where could the wire come in from? Maybe the back of the box, the top of the box, the bottom of the box, the side of the box. So you're going to have whatever length that is plus those 3 inches. That's what they're getting at: 3 inches, enough to make up the device and shove it back in there.
**Q.** So you need to have 3 inches plus the area in the box; correct?
**A.** If it comes from the back of the box, because that's what I'm saying. If it comes from the side or the top or the bottom, then you'll have just that much more.
**Q.** Well --
**A.** If you had more than that, if you had the 6 inches that you were talking about, you'd never get those devices back in the box. That's the real world.

**MR. STEVE HERMAN:** Let's look at the whole paragraph, if we could, Scott.

**BY MR. STEVE HERMAN:**

**Q.** If I understand you correctly, it's your testimony as an expert on code interpretation, as an expert electrical engineer, that the last sentence in that provision is an exception to the first sentence in that provision; correct?

**A.** It is also in that paragraph. It's not an exception.

**Q.** It's an additional provision; right?

**A.** It's a provision.

**Q.** You have to have 6 inches before the splice and, in addition --

**A.** No.

**Q.** -- where the opening to an outlet is less than 8 inches, you need to have 3 inches past the front of the box; right?

**A.** That's your interpretation. It's not mine.

**Q.** There's two requirements there, not one?

**A.** No. No, it's not.

**Q.** Okay. Remember I asked you in your deposition if you talked to anybody at NFPA about this?

**A.** I did.

**Q.** And you said --

**A.** Anything in the NFPA in regards to drywall, and it's no. I said no.

**Q.** You said you talked to Mr. Chan?

**A.** Then I qualified that. He's on Code-Making Panel 18.

**Q.** The guy who you paid?

**A.** The guy who I paid.
**Q.** Even he said you couldn't violate the 6-inch rule; right?
**A.** I never said he said that.
**Q.** Okay. Well, I didn't want to have to do this, but let me try to find this.
**MR. STEVE HERMAN:** I apologize to the Court for the delay.
**THE WITNESS:** If you're saying -- go ahead.
**BY MR. STEVE HERMAN:**
**Q.** Did I give you your deposition?
**A.** I have it right here, Counselor.
**Q.** I'm sorry. That's your report.
**A.** I don't have my deposition.
**MR. STEVE HERMAN:** May I approach, Your Honor?
**THE COURT:** Absolutely.
**BY MR. STEVE HERMAN:**
**Q.** If you turn to page 60, do you remember when I asked you the question at line 6:
"Would it be a fair characterization to say that he, meaning Mr. Chan, agrees that the code requires 6 inches, but in his opinion it's okay for people to violate that provision of the code?"
Do you remember when I asked you that?
**A.** I remember. And I said, you know, he wouldn't let you violate the code. However, there is a standing specific in

that code that the authority having jurisdiction can, with reasonableness in regards to safety, not make that happen. Okay?

**Q.** Just so the record's clear, that's something you just added a second ago. That's not what you said in your deposition; right?

**A.** Okay.

**Q.** Can you read for the Court your answer at line 12, please.

**A.** That's true. "He wouldn't say that." Is that what you're referring to?

**Q.** Yes. "He wouldn't say that. He wouldn't say that. He wouldn't say *violate*." Correct?

**A.** Right.

**Q.** What's the next question I asked you?

**A.** "Well, what would he say based on your conversations with him?"

**Q.** What was your answer?

**A.** I said, "We'll go back and say that the 6-inch rule applies throughout."

**Q.** That's what you said at your deposition; right?

**A.** Okay. That's right.

**Q.** No ifs, ands, or buts?

**A.** In that regard, if you're talking about that specific 6-inch free conductor at that particular point, no regards to the second part of that paragraph where we're talking about an

opening being less than 8 inches and having 3 inches, you're right.

**THE COURT:** Counsel, do you have much more on this?

**MR. STEVE HERMAN:** No, Your Honor.

**BY MR. STEVE HERMAN:**

**Q.** I do have one last point. I'm going to skip to the last point that doesn't have anything to do with the code.

It's your opinion, as I understand it, that the existing wires in the Hernandez house are sufficient; is that correct?

**A.** That's correct.

**Q.** You never went to the Hernandez property?

**A.** I'm going to qualify it again. I didn't have to.

**Q.** You never sent a certified inspector to the Hernandez property?

**A.** No, I did not.

**Q.** You relied solely on the observations of Mr. Hartenstein; correct?

**A.** And my physical observations of that cable, the existing wiring that was done there by virtue of the samples that were given to me or the receptacles and the wiring that I saw. And the answer is I think it should -- I think it's very well done that way.

**Q.** At the time of your report and at the time of your deposition, you'd only seen one sample, correct, from the

Hernandez house?

**A.** At the time of that, that's correct.

**Q.** That sample was corroded; correct?

**A.** That sample had tarnishment on the ends of those wires.

**Q.** Within the Romex, it was corroded, correct, or tarnished, if you like your word better?

**A.** I like my word better because it's more representative of the issue that's going on. It was only tarnished on the very ends of that cable and somewhat of the ground wire. Infinitesimal.

**Q.** Didn't you tell me in your deposition it was also tarnished under the Romex?

**A.** Counselor, I don't remember saying that.

**Q.** Well, you don't know exactly where that one sample was taken from; correct?

**A.** No, sir, I don't.

**Q.** You don't know when that wiring had been installed or replaced in the home?

**A.** That's correct.

**Q.** Or how long it had been in that environment?

**A.** No.

**Q.** You conducted no laboratory analysis?

**A.** Absolutely did not, sir.

**Q.** Sitting here today, can you tell the Court what is the condition of the wiring in the Hernandez kitchen?

**A.** I have not seen that kitchen. I've only seen boxes that were taken photographs of, and I do not know the condition of the kitchen.

**Q.** Can you tell the Court, sitting here today, what's the condition of the wiring in the laundry room in the Hernandez home?

**A.** Again, Counselor, I haven't been to that room, so I couldn't tell you.

**Q.** We noted in your deposition that you didn't put your little engineering stamp on your report; right?

**A.** It's irrelevant, I think. When I sign my name "Raymond Canzoneri, PE," why would I ever think that putting the seal on that particular letter happens to be -- it happens to be the same thing.

**Q.** As a professional engineer, you would not put your stamp on a document certifying that it wasn't necessary to remove and replace existing electrical wiring without actually reviewing the existing electrical wiring; correct?

**A.** That's not what I said. That's not what I said, not at all.

**Q.** You would put your stamp on that?

**A.** I'd put my stamp on it. I signed my name with "PE" on it, didn't I? I told you it was the same thing.

**Q.** Do you still have your deposition?

**A.** Right here.

**Q.** Do you recall me asking you, page 14, line 24 of your deposition:

"As a professional engineer, would you put your stamp on a document certifying in your professional opinion that it wasn't necessary to remove and replace existing electrical wiring without actually reviewing the existing electrical wiring?"

Do you remember me asking you that?

**A.** I did. You did say that. Okay? And, you know, if it's out of context at this particular point -- you know, I think it's out of context.

**THE COURT:** Well, what's the answer first?

**BY MR. STEVE HERMAN:**

**Q.** What's the answer?

**A.** The answer is without -- I did have knowledge of the cable and I saw that, and I saw those --

**THE COURT:** Wait, wait, wait. What's the answer?

**THE WITNESS:** Would you ask the question again.

**BY MR. STEVE HERMAN:**

**Q.** What was your answer at page 15, line 6 in the deposition?

**A.** Okay. I'll read it to you.

**Q.** Thank you.

**A.** "You know, I noticed the one thing that you didn't" --

Is that the same place? No.

**Q.** Page 15.

**A.** Page 15, line 13?

**Q.** No. Page 15, line 6.

**A.** Line 6: "On that particular house, no."

**MR. STEVE HERMAN:** Thank you. No further questions. We would like to, if it hasn't already been admitted, offer, file, and introduce Exhibit Hernandez 155.

**THE WITNESS:** Can I add something further to that?

**THE COURT:** Yes, you can.

**THE WITNESS:** Your Honor, I was confused at the time. I was actually talking about -- they were asking questions about the Hernandez house, and I was thinking about the house that I had been to. So in that regard, if you ask me the question about being -- you know, physically being there, would I stamp that, no, because I was over at the other house at that particular time.

**THE COURT:** Any redirect?

**THE DEPUTY CLERK:** Judge, he's offered --

**THE COURT:** I've admitted it.

**MR. HAYDEN:** Real quickly, Your Honor.

**REDIRECT EXAMINATION**

**BY MR. HAYDEN:**

**Q.** Mr. Canzoneri, there was some question about whether or not the inspector for the parish of St. Tammany had approved the electrical system being proposed by KPT. Do you recall that?

**A.** I do recall that.
**Q.** They haven't approved it because no plans have been put forward as of yet; correct?
**A.** No, nothing has been --
**Q.** No permit has been requested?
**A.** To my knowledge, no, there has not been.
**Q.** Do you have any opinion as to whether it would be approved under the applicable codes?
**A.** I believe it would be, sure. Yes.
**Q.** One other point of clarification. I believe you may have indicated that before hearing Mr. Beyler today, you hadn't heard or seen anything about his opinions. You did read his report; correct?
**A.** I did read his report. Maybe at the time that I was being deposed I didn't realize that I had read it.

**MR. HAYDEN:** That's all I have.

**THE COURT:** You're excused. Thank you, sir.

We'll come back in 15 minutes, 4:20.

**THE DEPUTY CLERK:** Everyone rise.

(WHEREUPON the Court took a brief recess.)

**THE DEPUTY CLERK:** Everyone rise.

**THE COURT:** Be seated, please.

**MR. ECUYER:** Michael Ecuyer. Briefly, without objection, we have an exhibit discussed this morning during Dr. Lee's testimony, Hernandez 132.

**MR. SANDERS:** No objection.

**THE COURT:** Admitted.

**MR. SANDERS:** I probably mumbled. I'd like to withdraw what was DX17 and introduce DX217.

**THE COURT:** Let that be admitted.

Let's just talk logistics first. As I understand, Counsel, you're going to call two witnesses this afternoon, and then one witness in the morning. Who's in the morning?

**MR. HAYDEN:** Roy Carubba, the general contractor.

**THE COURT:** Then because of some personal problems with the witness, the last witness will be on Friday morning at what time?

**THE DEPUTY CLERK:** 9:30.

**THE COURT:** Then I'll hear closing arguments after that and the case will be submitted. I'm not going to dictate my opinion from the bench. I sometimes do, but I'm not going to do it this time, so give me a closing argument. If you need to supplement the closing argument with a short brief, we'll do it, but I need your findings of fact and conclusions of law. I'll talk with you about that from the standpoint of timing.

**MR. HAYDEN:** Thank you, Your Honor.

**THE COURT:** Call your next witness.

**MR. HAYDEN:** Mark Hartenstein.

(WHEREUPON **Mark Hartenstein**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please be seated. Would you state your name for the record.

**THE WITNESS:** Mark Hartenstein.

**THE DEPUTY CLERK:** Would you spell the last name.

**THE WITNESS:** H-A-R-T-E-N-S-T-E-I-N.

**THE COURT:** You may proceed, Counsel.

**VOIR DIRE**

**BY MR. HAYDEN:**

**Q.** Mr. Hartenstein, what's your educational background?

**A.** I graduated high school, and then I got three years of school at Delgado Community College.

**Q.** You're presently employed?

**A.** Yes.

**Q.** What's your profession?

**A.** Electrical contractor.

**Q.** How long have you been an electrical contractor?

**A.** I went into business in 1995.

**Q.** How many residential electrical wiring jobs have you worked on in the New Orleans area?

**A.** I've been in the industry since 1982. I've probably been on -- it's a hard number to come up with. Several hundred.

**Q.** Can you explain what a typical residential electrical wiring job entails.

**A.** When you have the main service, which includes the outside meter stem, meter pan, electrical panel, circuit breakers, and all your inside wiring, light fixtures.

**Q.** Have you been involved in residential renovations and repairs?

**A.** Yes.

**Q.** Is that common for you to be involved with residential renovations?

**A.** Yes.

**Q.** Who's your current employer?

**A.** One of the owners of Graci Hart Electric.

**Q.** What's your position with Graci Hart?

**A.** Co-owner.

**Q.** How long have you been with Graci Hart?

**A.** We formed Graci Hart in 2001.

**Q.** The business of Graci Hart is undertaking electrical contracting; correct?

**A.** Yes. Residential and commercial.

**MR. HAYDEN:** Your Honor, I'd tender him as an expert electrician.

**MR. STEVE HERMAN:** No objection.

**THE COURT:** Let him be admitted. I'll recognize him in that field as an expert.

**DIRECT EXAMINATION**

**BY MR. HAYDEN:**

**Q.** How did you become involved in this case?

**A.** I was contacted by Carubba Engineering several weeks ago. They asked me to come look at a home that had Chinese Sheetrock.

**Q.** Who from Carubba Engineering called you?

**A.** I believe Dan Olivier.

**Q.** What did they ask you to do?

**A.** They asked me to come out to the Hernandez home to remove some outlets and switches.

**Q.** Is it typical for a contractor like Carubba to subcontract electrical services for renovation projects?

**A.** Yes.

**Q.** And have you worked with them before?

**A.** No.

**Q.** Is it typical for an electrical subcontractor to provide a general contractor with an opinion on the necessary scope of electrical work in a renovation or repair job?

**A.** At times, yes.

**Q.** That's what you did in this instance?

**A.** Yes.

**Q.** How did you go about coming to determining what the scope of work was for the electrical system?

**A.** We met at the Frilot law firm previously, I think, and

then discussed going to the home, said that they wanted to harvest some switches and outlets for a metal expert to review them.

**Q.** Then did you go to the home?

**A.** Yes.

**Q.** When did you go to the Hernandez home?

**A.** I don't recall the date we went. Sometime in March.

**Q.** At or about that time, did you remove some switches and receptacles?

**A.** Yes.

**Q.** Where were they located?

**A.** Master bedroom, two other bedrooms, I believe in the den area, and we removed a smoke alarm in the hall.

**Q.** At that time, did you have any observations with regard to the electrical system in the home?

**A.** We noticed the tarnishing, the black film on the ends of the wires.

**Q.** Have you seen anything like that before?

**A.** No.

**Q.** Did you attempt to strip the wires that were located at the receptacles and switches?

**A.** Yes. The ones that we harvested for the metal expert, we cut those back, we stripped them and installed new switches and outlets.

**Q.** When you stripped the wires, did they appear normal?

**A.** Yes.

**Q.** When I say "normal," what do you understand that to be?

**A.** Well, when we cut them back, we cut the exposed copper off the ends, stripped them back about a quarter to a half inch, and the copper was clean in appearance, shiny.

**Q.** At the connections, what did the copper appear to look like?

**A.** Before or after?

**Q.** Before.

**A.** Before, they were dark.

**Q.** Can you describe for the Court what you mean by "dark."

**A.** It was pretty dark, black in color, had like just a small -- a light film on them.

**Q.** Did you do anything with the harvested switches and receptacles after you removed them?

**A.** Well, before we took some of the outlets and switches off, we had rubbed some of the black off out of curiosity what the stuff was.

**Q.** Were you able to remove it?

**A.** Most of it, yes.

**Q.** How did you remove it?

**A.** We just used our fingers.

**Q.** Do you have any opinion, based on your professional experience, whether the existing electrical wiring can be used in the Hernandez home?

**A.** From my opinion, you can reuse the stuff, but that was from me calling different people and asking their opinions of it. I had called Ray Canzoneri during the process when I was there at the Hernandez home and described what was going on. I had told him: "Most of the stuff is coming off in our hands, and I don't feel any pitting or rough surface on it."
**Q.** Now, you looked at how many switches and receptacles in that home?
**A.** I had two employees with me that day. We probably -- combined, we probably took out, if I remember right, 10, 12, outlets and switches. We put back some of them, but we also harvested some for the metal expert to take with him.
**Q.** You said you saw what appeared to be some black on the ends of the uninsulated wire?
**A.** On the ground wire, yes.
**Q.** Did you also see it on the hot and neutral wire?
**A.** Yes, on the exposed hot and neutral, before we stripped the wire.
**Q.** That's what you saw. You also attempted to feel those wire connections?
**A.** Yes.
**Q.** You also felt the ground wire?
**A.** Yes.
**Q.** When you felt it, what did you feel?
**A.** As I said a minute ago, it still felt smooth in its

makeup, and most of the black came off when you were rubbing on it.

**Q.** Now, based upon your review of the Hernandez house and evaluating what the cost would be, did you make a proposal for undertaking the electrical work that was to be undertaken at the Hernandez house?

**A.** Yes.

**Q.** What work does that proposal include?

**A.** We proposed to take all the light fixtures down, package them up, leave them on site; remove all the outlets and switches; and then after they re-Sheetrock the home, install new outlets and switches and reinstall the existing light fixtures.

**Q.** At the switches and receptacles, what did you intend to do with the live and neutral wires?

**A.** Upon reinstalling the new ones, we were going to just strip back the new copper wire.

**Q.** So you would clip the wires?

**A.** Clip the wires on the end.

**Q.** Did you perform any testing on the wires at the Hernandez home?

**A.** We used our basic voltage meters while we were there and tested to see if we had voltage on each device that we fooled with.

**Q.** What did you find?

**A.** We found 120 volts at each location.

**Q.** Is that normal?

**A.** Yes.

**Q.** Did you test if the equipment wires were reattached to new receptacles, whether you would have the required voltage?

**A.** Well, we tested them before we took them apart. They had 120.

**Q.** Did you test them after?

**A.** I think a couple of them we did test afterwards, and it had 120 volts.

**Q.** Were the results the same?

**A.** Yes.

**Q.** You already mentioned Mr. Canzoneri. You were here when he testified?

**A.** Yes.

**Q.** Have you worked with Mr. Canzoneri before?

**A.** Yes.

**Q.** Do you look to him to provide you with information with regard to compliance with code?

**A.** Code and engineering questions.

**Q.** Have you worked with Mr. Canzoneri before?

**A.** Yes.

**Q.** Let me show you what's been marked as Defense Exhibit 214. 215. I'm sorry.

**MR. HAYDEN:** Your Honor, may I approach the witness?

**THE COURT:** Yes.

**BY MR. HAYDEN:**

**Q.** Sir, I'm showing you what eventually will be up, but I believe it's Defense Exhibit 215. Have you seen that before?

**A.** Yes.

**Q.** What is that?

**A.** This was a minor inspection report we turned in after looking at the home.

**Q.** Did you provide that report?

**A.** Yes.

**Q.** Then after reviewing the house, did you give a cost estimate with regard to what the cost would be for undertaking this scope of work?

**A.** Yes.

**Q.** What was that?

**A.** I believe it was $3,400.

**MR. HAYDEN:** That's all I have. I'll move that into evidence.

**THE COURT:** Let it be admitted into evidence.

Let me just ask one question. If you had to take out all the wire and put in all new wire, what would you charge?

**THE WITNESS:** I'd probably have to revisit the house, Your Honor, and do some measurements.

**THE COURT:** I understand. That's fair.

CROSS-EXAMINATION

BY MR. STEVE HERMAN:

**Q.** On the inspection report that we just looked at, it notes that you observed black residue on the copper wire; is that right?

**A.** Yes.

**Q.** So just so we're clear, that includes the hot wires where there's no insulation, the neutral wires where there's no insulation, and the ground wires pretty much everywhere; right?

**A.** Yes.

**Q.** You talked about how you removed 10 or 12 switches, but you put most of them back. You only actually harvested a couple; correct?

**A.** Correct.

**Q.** Most of them you just pulled out, looked at them, put them back in; right?

**A.** Correct.

**Q.** The switches and the wires that you looked at, you don't know how long they had been exposed to the drywall; right?

**A.** No.

**Q.** You don't know when they were installed or replaced?

**A.** No.

**Q.** Do you know how long the circuit breaker was involved in that environment or exposed to that environment?

**A.** No.

**Q.** Now, you looked at around 20 wires under the insulation by the naked eye, I think you told last week. Does that sound about right?
**A.** That sounds about right.
**Q.** Just so we're clear, that's not wires from 20 different receptacles. That's just 20 individual wires; right?
**A.** That's correct.
**Q.** You did no laboratory analysis?
**A.** No.
**Q.** No metal analysis?
**A.** No.
**Q.** You didn't review any lab analysis or metal analysis from any of the other experts in the case?
**A.** I had said in my deposition that I didn't, and I believe I made a mistake. I think I read -- I believe it might have been Mr. Beyler's report before that deposition.
**Q.** Did that have an influence on your opinion?
**A.** I don't know if it did or didn't, but I'm not the one -- early on, I'd say -- I can't say if you can save the wire or not without a metal expert saying you can.
**Q.** That's not within your expertise?
**A.** No, sir.
**Q.** You realize that Mr. Canzoneri, who you were relying on, he was relying on you to say that the wiring under the insulation was okay, huh?

**A.** That's my opinion. When you strip back the wire, it looks good.

**Q.** He was relying on you and you were relying on him, huh?

**A.** (NO RESPONSE)

**Q.** In any event, you talked about this voltage testing a little bit. You didn't compare the voltage -- when you cleaned the wires, you didn't compare voltage precleaning to postcleaning; right?

**A.** When we first took the switches out in the kids' bedroom, I remember us putting our tester on there and testing voltage.

**Q.** Just to make that sure it worked?

**A.** In both bedrooms.

**Q.** Did you tell me about that during the deposition?

**A.** I don't remember.

**Q.** You certainly did no formal conductivity testing or resistance testing that's been discussed earlier in the day?

**A.** No.

**Q.** Nothing according to, like, ASTM standards or anything like that?

**A.** No. I wouldn't be familiar with that.

**Q.** What does *box fill* or *box volume* mean?

**A.** I think we're referring to the cubic-inch capacity of the box.

**Q.** Just for the Court's benefit, what does that mean?

**A.** The end result is how many wires, how many conductors you

can put in a box.

**Q.** There's a limit on that?

**A.** Yes.

**Q.** Is that a code issue, to your knowledge?

**A.** Yes.

**Q.** When you were at the Hernandez home, you actually took samples from two different boxes; right?

**A.** Yes.

**Q.** You made new splices in those boxes?

**A.** One of the bedrooms, I know we made splices in the box.

**Q.** For one of the boxes, you did a box fill calculation; right?

**A.** I believe we did.

**Q.** For the other one, at least as far as you could recall in your deposition, you didn't; right?

**A.** I don't think -- I know we did at least one there on site.

**Q.** Okay.

**A.** It was just kind of talking back and forth.

**MR. STEVE HERMAN:** If we could look at Defense Exhibit 212. Do we have that in our system?

**BY MR. STEVE HERMAN:**

**Q.** If we look at the electrical here, do you know what this is, Mr. Carubba's original estimate?

**A.** Okay.

**Q.** We looked at this during your deposition?

**A.** Yes.

**Q.** You see where it says: Electrical, $2,200?

**A.** Yes.

**Q.** That wasn't the bid that you gave to Mr. Carubba, was it?

**A.** No. I believe my bid was around $3,400.

**Q.** Let's look at Defense Exhibit 214, please. Do you know what this is, this Benchmark estimate?

**A.** I believe you showed me this during the deposition.

**Q.** That's another estimate that came from Mr. Carubba, as far as you know at least? Where does it say it's for electrical? I think it's down here somewhere. "139 each," do you know what that means?

**A.** I'm guessing he's counting devices, outlets, fixtures. The total count of everything is 139 items.

**Q.** It says whoever this was apparently is going to do it for $11.49 each for a total price of $1,597.11. Do you see that?

**A.** Yes.

**Q.** That's certainly not a bid that you gave to Mr. Carubba, is it?

**A.** No.

**Q.** Or to Benchmark?

**A.** No.

**MR. STEVE HERMAN:** Could we look at Hernandez 454, please.

**BY MR. STEVE HERMAN:**

**Q.** Do you remember looking at this photo or one like it during your deposition?

**A.** Yes.

**Q.** You recognize this as a two-gang box in one of the bedrooms at the Hernandez home?

**A.** I said it could be a box from the Hernandez home.

**Q.** It's not inconsistent with your recollection, is it?

**A.** Excuse me?

**Q.** It's not inconsistent with your recollection? There's nothing that would make you think, "Oh, this is definitely not it"?

**A.** It could be; it could not be.

**Q.** Let's just assume that it is. You see how there's corrosion or tarnish or whatever you want to call it on ground wires, huh? It's pointing to the Romex?

**A.** Yes. It appears to be, yes.

**Q.** So if there's tarnish that goes into the Romex, you're just going to leave that there?

**A.** Yes.

**Q.** If we go to Hernandez 455, this is actually after you-guys did your work, huh? The same two-gang switch?

**A.** If that's the box, yes.

**Q.** You have a shiny, new copper ground wire somewhere in there; right?

**A.** Yes.
**Q.** You have that spliced into the old, corroded black ground wire; right?
**A.** To the old wiring, yes.
**Q.** You just left it in there; correct?
**A.** Yes.
**Q.** We talked about the Romex. This is just plain NM cable; right?
**A.** Romex, yes.
**Q.** It's not NM-C?
**A.** I've got to tell you. I've never heard of -- I've heard of NM-B but not NM-C.
**Q.** Other than Mr. Canzoneri, is there any authority you can cite for the proposition that it's okay to leave tarnished or corroded ground wires in a house?
**A.** There's nobody else I consulted besides Mr. Beyler's report.
**Q.** There's nothing you can cite us to other than Mr. Beyler's report, as we sit here today?
**A.** No.
**Q.** Is there any authority that you can cite to that it's okay to leave regular NM cable that's been exposed to a corrosive environment in a house?
**A.** If we got involved in something like this, we'd probably go to a local authority. We do a lot of work in New Orleans

and Metairie. If there was a flood like there was in 1995, New Orleans inspectors and Jefferson inspectors said because it was rising water and not floodwater from lakes or rivers, they allowed them to just leave the wire and reuse it.

**Q.** Was that wiring corroded with sulfur compounds and sulfur corrosion?

**A.** Not that I know of.

**Q.** You've never dealt with sulfur corrosion, to your knowledge?

**A.** Not my knowledge.

**Q.** Do you have any authority for the proposition that it's okay to just clip and snip tarnished or corroded wires?

**A.** I don't have that authority.

**Q.** Do you have the authority that you don't need to have 6 inches before the splice?

**A.** I don't have the authority to make that decision.

**Q.** Let's look at Hernandez 453, please. This is a junction box that you-guys looked at at the Hernandez home; right?

**A.** No. I don't recognize -- you showed me this box in the deposition.

**Q.** Okay. You didn't recognize it there?

**A.** We did not see this box at the Hernandez home. This is out of the wall. Someone cut off all the conductors.

**Q.** Well, let's assume hypothetically that you were going to do the work in the bid that you gave to Mr. Carubba. Okay?

**A.** Uh-huh.
**Q.** Would you expect to find a three-gang box like this in the Hernandez home if you came to do that work?
**A.** Sure.
**Q.** Why is that called a three-gang box?
**A.** You can put three devices in it.
**Q.** I think you testified that it takes you or one of your men 10 or 12 or 13 minutes to change out one of those three-gang boxes; right?
**A.** Change out the devices in the three-gang boxes.
**Q.** You've already removed the plates; right?
**A.** Yes.
**Q.** You have to remove the plates, and you're going to clean the ground wires?
**A.** If that's what we're directed to do, yes.
**Q.** What are you going to clean the ground wires with?
**A.** Whatever product they come up with.
**Q.** Did you tell me in the deposition you weren't going to clean them; you were going to snip them to wherever you snipped the hot and neutral wires just for consistency purposes?
**A.** That's correct.
**Q.** You didn't say anything about cleaning in your deposition?
**A.** I don't remember.
**Q.** Were you here when one of the experts testified, from an ASTM standard, that to clean this type of corrosion you have to

use hydrochloric acid or sodium cyanide?
**A.** No, I don't remember hearing that.
**Q.** Are those types of products that you commonly work with?
**A.** No.
**Q.** In any case, you either clean or snip or do something with the ground wires; right?
**A.** Yes.
**Q.** Then you'd have to unscrew the hots, one at each switch; right?
**A.** Yes.
**Q.** You'd have to unscrew the neutrals, one at each switch; right?
**A.** All your neutrals are tapped together and pushed to the back of the box.
**Q.** Okay.
**A.** They don't physically attach to the switches.
**Q.** So you don't have to fool with them at all?
**A.** Well, if we're going to go in and change the devices in there, because of the tarnishing on the ends, we'd probably strip those back and retap them.
**Q.** So you're going to clip the neutrals and retap them?
**A.** Yes.
**Q.** One for each switch, or one for each Romex cable?
**A.** Typically, yes.
**Q.** You're going to splice in the new hot wires, one for each

switch?

**A.** If the hot wires aren't long enough, we'd splice on an additional piece.

**Q.** You're going to put wire nuts on all those splices; is that right?

**A.** However many you need.

**Q.** You're going to screw the hots back onto the outlets; right?

**A.** Yes. Correct.

**Q.** You're going to shove all that back in the box, assuming that it fits; right?

**A.** Yes.

**Q.** You're going to do your box fill calculations?

**A.** Yes.

**Q.** Do you know, sitting here, what the acceptable box volume is for that box?

**A.** No.

**Q.** You'd have to look on the box and find that out; right?

**A.** Yes.

**Q.** Then figure it out; right?

**A.** Correct.

**Q.** Then you'd have to go to somebody like Mr. Canzoneri to make sure that it's all done to code; right?

**A.** No.

**Q.** You don't have to make sure that what you've done is with

code?

**A.** We would have an inspection, but I'm not going to call Mr. Canzoneri and ask him how to figure the box fill in a box.

**Q.** But everything I just went through, you're going to do all that in 10 minutes?

**A.** Yes.

**Q.** We talked about your bid for the job. If we could look at Hernandez 46.

**A.** Can I make a comment about this box?

**Q.** Yeah, sure.

**A.** You've got seven wires in that box.

**Q.** Okay.

**A.** That's poor workmanship. A decent electrician's going to bring a feed in, feed out, which is your hot coming in, your hot leaving, and it's going to have three cables leaving, one for each switch. He's not going to put seven wires in there. It makes his job very difficult to come trim this box out.

**Q.** If you came to this box and saw this box like this, there's a bunch more stuff that you'd have to do to make it work right; right?

**A.** On this poor workmanship, yes. Most electricians don't do this.

**Q.** If you went to a job and it was messed up, you'd fix it; right?

**A.** Yes.

**Q.** That would take time; right?
**A.** Yes.
**Q.** Now, if we go to Hernandez 486, would that change your bid?
**A.** On that box, probably.
**Q.** Okay.
**A.** If it's one or two boxes in the whole house, no, we're not going to bother with that. If there's several like that, we'd have to get back with the contractor and discuss the options.
**Q.** I know you don't recognize it, but assuming that that's a box from the house, that's something that you obviously didn't notice when you were there; right?
**A.** Right.
**Q.** Now, is this your bid that you made, that you gave to Mr. Carubba?
**A.** Yes.
**Q.** It was for $3,400? This is the bid that you gave to Mr. Carubba; right?
**A.** Yes.
**Q.** It says somewhere on there -- I don't know if we really have to blow it up, but it says that you're not responsible for damaged light fixtures and missing fixture parts; is that correct?
**A.** Correct.
**Q.** It says that you're leaving the panel and the breakers as

is; correct?
**A.** Yes.
**Q.** So you're not doing that; right?
**A.** Correct.
**Q.** Then somewhere in there -- let me see if I can find it. I think it's right here. It says, "We will extend wire as needed to meet code." What does that mean?
**A.** Well, everybody -- when we were on site that day, I believe his name was Skip, or you, kept making comments about you need 6 inches in a box.
**Q.** Uh-huh.
**A.** So I told him on site, I said, "If we need more wire, we'll add more on with a wire nut."
**Q.** Okay. So assuming that you need the 6 inches, that's something else that you have to do as part of your bid; right?
**A.** If you need more wire -- like we went back to the Esplanade house one day to reinstall everything. Some of the wires were short, probably two or three of them out of the six to eight devices I fooled with, so I just tapped on additional wire. But it's not every box.
**Q.** If somebody from NFPA or an electrical engineer indicated to you that you had to have 6 inches before the splice, that would make the job a lot more complicated, huh?
**A.** It would add more work to it.
**Q.** Would it change the bid?

**A.** It could.

**Q.** Now, did you bill Knauf for what you did at the Hernandez house the day that you were there?

**A.** We billed them for our time there.

**MR. STEVE HERMAN:** Can we pull up Hernandez 540, please.

**BY MR. STEVE HERMAN:**

**Q.** Do you recognize that as your bill?

**A.** Yes.

**Q.** That's your bill for the day that you were there; right?

**A.** Yes.

**Q.** You were just there for a couple hours, huh?

**A.** Travel time and everything. It says it right here in the bill: Two men, three hours; one man, six hours.

**Q.** All you did that day, you pulled some stuff out, put it back in, you changed out a few switches; right?

**A.** That day's not a typical day. I'm not going to walk in a house with 20 attorneys and a cameraman and pictures and chitchat. We're going to come in and do our job and leave.

**Q.** I understand, but I'm not sure you answered my question. That day, all you did was you went in, you pulled some stuff out, put it back in, looked at it, and changed out a few switches; right?

**A.** Yes.

**Q.** Your bill was for over $1,100; right?

**A.** Yes.

**MR. STEVE HERMAN:** No further questions, Your Honor. We would offer, file, and introduce Defense Exhibits 212 and 214 and Plaintiffs' Exhibits Hernandez 540 and 543, 544, and 545.

I apologize. I need some help. 454, 453, 455, and 46.

**THE COURT:** What do you have?

**MR. HAYDEN:** With regard to 212, I believe it's the earlier estimate, and we put forward a revised estimate.

**THE COURT:** For completeness sake, I understand that, but I'll admit it.

**REDIRECT EXAMINATION**

**BY MR. HAYDEN:**

**Q.** Sir, on that day that you were out at the Hernandez house, did you look at the circuit breakers?

**A.** Yes.

**Q.** Did you see any problems there?

**A.** They appeared normal.

**Q.** In your experience, is the 6-inch rule applied to the free length of wire in a box?

**MR. STEVE HERMAN:** Objection. I think it's outside his scope.

**THE COURT:** He didn't even cover the 6-inch rule. That was the last witness.

**MR. HAYDEN:** I'm mixing them up, Your Honor, but I think he raised it in cross.

**MR. STEVE HERMAN:** I think it's outside his expertise.

**THE WITNESS:** I don't know if I'm answering your question. I believe the code says you're supposed to have 6 inches.

**BY MR. HAYDEN:**

**Q.** Have you ever had an experience where an inspector has not certified your job?

**A.** Never, no. I want to say something. Orleans Parish has some of the hardest inspectors in the state. I've never been turned down or commented against how much wiring we have in a box. Too many wires might have came up. But the 6-inch rule, this is almost going back to Ohm's law. When you're in school, we spent a whole semester on Ohm's law, and we've never used it in the field. This is something that we just don't use.

**THE COURT:** I don't think we've covered Ohm's law. Anything else?

**MR. HAYDEN:** No more on the 6-inch rule, Your Honor.

**THE COURT:** You're excused. Thank you.

Any other witnesses?

**MR. SANDERS:** One more.

(WHEREUPON **Bruce Fuselier**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** State your name for the record.

**THE WITNESS:** Bruce Fuselier.

**THE DEPUTY CLERK:** Would you spell the last name.

**THE WITNESS:** F-U-S-E-L-I-E-R.

**VOIR DIRE**

**BY MR. SANDERS:**

**Q.** Mr. Fuselier, could you please tell us what your education and background is.

**A.** I'm a licensed master plumber, a licensed master gas fitter, and a licensed master mechanical contractor. I've been in business for 30 years doing commercial and residential.

**Q.** Have you always had those licenses the entire time, those 30 years, or did you have to do something to earn those?

**A.** No. In order to open a plumbing business, you have to have -- my plumbing license and my gas license I got 30 years ago. My mechanical license I got approximately five years later.

**Q.** As a plumber, are you always both a plumber and an HVAC specialist, or is that just something you decided to do?

**A.** I'm sorry?

**Q.** As a plumber, do you both always, HVAC and plumbing?

**A.** No, I don't always do it. It was more when I was doing larger jobs that you do both the plumbing and the mechanical.

**Q.** How many plumbing jobs have you done in New Orleans or the New Orleans area in those 30 years?
**A.** Oh, thousands upon thousands, since I was -- before I opened my business. I've been doing it since I was 14.
**Q.** What's your current business?
**A.** It's a plumbing company and air conditioning.
**Q.** Are you the owner?
**A.** Yes, I am.
**Q.** How long have you had your own business?
**A.** I've had it since I was 23, which is 29 years.
**Q.** How many HVAC installations or modifications have you made during those 30 years?
**A.** I've done not quite as much as plumbing, but commercial I've done hundred-ton chillers, I've done large, huge, 5, 10, 15-ton systems on a regular basis. A couple hundred probably. Residential systems after Katrina, maybe 300.
**Q.** Was that something obviously particular to Katrina that you were involved in in the residential area?
**A.** Well, yeah, because it was so hard to get people that, when we went in, they just let me do both. It was easier for the contractor to deal with one person.
**Q.** What kind of conditions did you find in the plumbing and the HVAC systems in Katrina?
**A.** In the plumbing system, we relatively didn't find a whole lot of problems. Most of the problems in the plumbing system

was just already old cast iron. Once they ripped the walls out, that was fine. There was no damage from the water. There was no damage of the copper from the water. But on the gas side, the black steel from the water was starting to rust profusely, and we replaced any gas piping that was submerged underwater.

Air condition-wise, the only thing we replaced were the condensers that went underwater, or the air handlers if they were under the house and went underwater, or in the house and went underwater. If they were in the attic, 9 out of 10 times we used the same one, but we replaced the ductwork because of mold.

**MR. SANDERS:** I would like to tender Mr. Fuselier here as an expert in plumbing.

**MR. STEVE HERMAN:** No objection.

**THE COURT:** The Court will accept him as an expert in plumbing.

**DIRECT EXAMINATION**

**BY MR. SANDERS:**

**Q.** Obviously, you said you also perform residential plumbing and HVAC jobs?

**A.** Correct.

**Q.** How did you become involved in this matter?

**A.** I do work for Roy Carubba for his construction company. I do his plumbing and air-conditioning projects.

**Q.** Why did he call you? Do you know? What did he ask you to do?
**A.** He asked me if I would mind going and taking a look at this house and giving him my opinion of what kind of condition the air-conditioning system was in and what kind of condition the plumbing was in.
**Q.** Did you have a chance to do that?
**A.** Yes, sir, I did.
**Q.** Do you remember when you did that?
**A.** It was in February, but I don't have the date on me. I apologize. But it's the same date that, you know, I met all the attorneys and everyone else was there. Mr. Hartenstein was there.
**Q.** Could you tell me what you saw with respect to the plumbing and HVAC system.
**A.** None of the walls were really open. There was very, very little stuff we could see in the walls of the house because they obviously didn't tear the Sheetrock out. Underneath the cabinets, they told me that the supply lines going from the stop valves to the faucets had already been harvested by somebody else, but that the copper coming out of the wall under the cabinets was original. That copper showed no sign of any black tarnish. The stop valves were still chrome and shiny. The physical plumbing fixtures still seemed to be intact, as I'm assuming they were installed.

**Q.** Did you see any signs of black tarnish on anything when you were in the house?

**A.** Yes. When we went into the attic, it was brought to my attention that we could see the black tarnish on the copper plumbing pipes on the water heater, in which it was very lightly tarnished, and that's where we harvested copper for both sides to send off and have tested.

**Q.** What else was up in the attic? Was the HVAC --

**A.** The air handler for the air-conditioning unit was also in the attic. We opened it up. We looked at the coils. We looked at the blower motor. We looked at the electrical contactors.

Unfortunately, the coils had already been changed, so I haven't seen the coils, the old coils. I haven't seen any reports on the coils. All I've seen is that the manufacturer took them back and gave them new ones for that.

The blower motor was in good working order, no signs of any debris on it. The electrical connectors, the electrical contactors, breakers were completely clean. There was no tarnish on any of the wires in that because that box is a separate box from the air handler.

**Q.** What do you mean it's a separate box?

**A.** The air handler was split up into three sections: The section that holds the coil; the section that holds the blower motor; the section that holds the electrical stuff. And they

deliberately seal off the electrical components from the blower motor in the event that something would happen, the wire would start smoldering, that the air didn't pull the smoke into the house and feed the fire. So it's sealed between the two units by a sheet-metal wall.

**MR. SANDERS:** Can we put up DX213.

**BY MR. SANDERS:**

**Q.** What is that?

**A.** That was my report of what I looked at and what I found at the Hernandez house.

**Q.** Was this the proposed scope of work that you turned in to Mr. Carubba?

**A.** Yes. This is what I was asked to look at and proposed, that this is what we were going to propose to do to put the house back in proper working order.

**Q.** If you could, just outline your proposal for us.

**A.** All right. Well, to start with, it says that the only black residue I found on the copper pipes were in the attic. That copper residue wiped off relatively easy with a damp rag to visually having nothing on it at all.

I don't think that the copper pipes need to be replaced. The basis upon why I think that is I've been in atmospheres where muriatic acid and chlorine was stored in places that had copper plumbing, and it does exactly what this is doing. It starts to leave residue on the pipes. So we

immediately -- once we evacuate the stuff out of the room, clean the pipes, we don't have any more problems. That's why I feel just wiping them down would be more than enough.

**Q.** Do you feel that you need to wipe them down?

**A.** I don't think it's necessary because most items like this, once you remove the source, once you move a gallon of muriatic acid out of something, it stops. If you don't keep feeding it, it doesn't continue.

**Q.** You didn't seen any functional problems with the pipes that you observed, at least in here?

**A.** No. I'm just saying since you're opening all the walls up, just as a courtesy, just to ease somebody's mind, just to wipe them off. You're going through all this work, it would be stupid not to do five minutes more of work.

**Q.** What else do you propose to do?

**A.** The flex ducts would be very difficult to clean because of the ribs in them, so we proposed to replace all of the flex ducts for the air-conditioning system, but leaving the boxes and using the same grilles that could be wiped off and cleaned.

At the time, we were going to pull the coils out, clean them, and put them back in. But as that turned out later, since it already has new coils, they decided that that didn't have to happen on this one.

**Q.** Did you have an opportunity to look at the line set that goes to the HVAC system?

**A.** Yes. We cut the insulation on the suction side, which is the side that gets cold and sweats. We cut the insulation in two spots and peeled it open and took pictures of it, and there was no sign of any residue of any tarnish or anything on it.

**Q.** What do you mean by "sweats"? Why would that line sweat?

**A.** Well, the way an air-condition system works is when you compress freon, it's hot. After the compressor compresses the freon, the hot freon runs through the coils outside. It tries to cool it off as much as it can.

It goes up in the attic with the smaller of the two copper lines; normally a three-eighths-inch line or a half-inch line. It goes up, and it's hot, so it never sweats. It goes into the coils.

Once the expansion valve turns it into a gas, it becomes ice-cold. That's why your coils sweat. You're running hot air over ice-cold. It creates sweat. The balance of the freon obviously is not hot yet, so it goes down the suction line from the air condition, from the air handler, to the compressor to go through the cycle again. So if you didn't insulate it, then obviously it would just constantly drip the sweat and condensate just like the coils because it's hot inside of the attic.

**Q.** What does the insulation do? Does it still sweat under the insulation?

**A.** No. Well, no, because the insulation makes up -- the only

time you can have condensation is if you mix hot and cold direct. Rubatex insulation keeps the cold in, keeps the hot out. There's never any contact. So the line set literally -- when we were there, when we cut it open, you saw for yourself that it wasn't -- you know what I mean. It wasn't wet. It wasn't, you know --

**Q.** Why are you worried about there being condensation on that line set?

**A.** Well, because it would literally drip through the ceiling. It would literally ruin -- you'd have mold in your attic. It would literally make puddles of water. Not just a little bit; puddles and puddles of water.

**Q.** So is that insulated all the way down through the whole thing?

**A.** It's insulated from where it comes out of the coils, all the way down to the compressor.

**Q.** What about copper pipes in general in the house; is there a lot of condensation on them in your experience?

**A.** Under very, very, very extreme circumstances, you might get a little bit, but it's very rare because normally the copper pipes that are in the wall, there's insulation around them already, and the cold water that runs through them is normally cold inside of the house or hot inside of the house, one way or the other, and there's very, very little.

Once in a while, mainly on commercial buildings,

where there's long lines running in an empty space, you will get some condensation. But in a residential house, you very rarely have that. It comes out of the bottom of the slab, comes up, makes a loop, goes right to the plumbing fixture, and you just don't have that condensation problem.

**Q.** I think you said earlier that you're going to take the flex duct out, but what about the other -- is it a fiberglass box or any other ductwork?

**A.** Right. The duct-board plenums you can clean. There's no, you know -- and there's nothing -- I mean, there's nothing there. Anything that very well could have gotten -- could have been in there will obviously be neutralized once all the drywall's gone.

**Q.** So the scope of work we just described here, is that the only work you think that needs to be done in the Hernandez house?

**A.** Yes, in the Hernandez house, correct.

**Q.** What did you charge or what's your cost, if you recall, for this work? Do you remember what your bid was?

**A.** For what I did or what needs to be done?

**Q.** For what we've just discussed here, the scope of work.

**A.** For what needs to be done was $4,500 to remove all of the plumbing fixtures and put them all together and pack them in storage provided by the contractor and replace the flex ducts.

In my original proposal, I have removing the coils,

and then I was told later that we were not going to remove the coils on this application since they were already replaced.

**Q.** Were there any other adjustments that Mr. Carubba made with respect to the work that you're doing or what work would be shared between you two?

**A.** Not to my knowledge.

**MR. SANDERS:** That's all I have.

**THE COURT:** Cross.

**MR. STEVE HERMAN:** Thank you. If you can put up Defense Exhibit 213. Thanks.

**CROSS-EXAMINATION**

**BY MR. STEVE HERMAN:**

**Q.** Could you just read these two sentences right here, please. You might be able the read them better on your screen.

**A.** I inspected all exposed copper water piping, plumbing fixtures, and connections. I found that the copper had black residue on it, but did not have to -- but did not harm pipe and can be wiped right off with a damp cloth.

**Q.** You didn't write anything actually in your report saying that you only saw it in the attic; right?

**A.** I didn't write it in my report. I said the only place that I was able to look at it was in the attic, with the exception of underneath the kitchen sink and underneath the lavatories, where it was exposed, because there were no walls cut open where there was plumbing behind it.

**Q.** You don't know, sitting here today, whether what you saw was copper sulfide corrosion as opposed to some other type of oxidation or corrosion; correct?
**A.** No, I do not.
**Q.** Other than going to the Hernandez house and the Rue Esplanade house, you have no experience with Chinese drywall; correct?
**A.** No, sir.
**Q.** You mentioned something about muriatic acid, I think.
**A.** Right, which is a step below sulfuric acid.
**Q.** Okay.
**A.** Which emits very similar fumes, but --
**Q.** You don't have any actual experience with hydrogen sulfide or copper sulfide corrosion; correct?
**A.** Not directly. I've worked in some plants that it might have been present that might have been the problem. Most acid conditions I've found leaves a light black residue just like this.
**Q.** You were making an analogy from muriatic acid and your experience with that to sulfuric acid or hydrogen sulfide?
**A.** They told me there was acid in the drywall. I had no real bet on what's in the drywall and what's not. I was making a comparison because it looked very similar. I assumed that the people that are actually doing all the analysis would give me the proper terminology of what was causing what.

**Q.** At the Hernandez house, you didn't look at the compressor outside, did you?
**A.** I didn't open it up. I went outside and visually looked at the outside; but, no, we did not open the compressor.
**Q.** You didn't look at any of the plumbing behind the walls, obviously?
**A.** I didn't see any of the plumbing in the walls because none of the walls were open and we weren't allowed to cut any walls at that time.
**Q.** The line set, you saw a part of the line set in the attic where it was ventilated, but you didn't see any line set behind the wall; correct?
**A.** I didn't see any line set in the wall. I did see it outside by the air conditioner, and I did see it where it came out of the wall in the attic and went across the attic to the air compressor.
**Q.** You didn't look at any of the pipes under a microscope; right?
**A.** No. No. Absolutely not.
**Q.** Or do any chemical analysis?
**A.** No.
**Q.** Or laboratory analysis?
**A.** No. I just harvested the pipes for y'all to send to the experts to do that.
**Q.** Did you review any of the testimony by any of the

 contractors or builders that are actually doing remediation in Florida?

**A.** Oh, no.

**Q.** Like Mr. Phillips, you didn't see his testimony the other day?

**A.** No. Well, I saw whatever you showed me at the deposition from Benchmark, if that constitutes what you're asking me. I saw that quote, but I saw no reports. I saw no --

**Q.** Okay. That's something else, but thanks.

The pipe that you did take from the attic, you don't know how long it had been there; correct?

**A.** Well, it looked to have been there since the house was built. The reason why I'm saying that is because most of the fittings and most of the stuff there all kind of matched. They all were soldered the same way. They all used the same flux. So I'm just assuming that the section I cut out of was there from the original installation when the house was built.

**Q.** You submitted a bid to Mr. Carubba?

**A.** Yes, I did.

**Q.** In fact, you submitted two bids; right?

**A.** Yeah. I submitted a bid with two parts, correct.

**MR. STEVE HERMAN:** Could we see Exhibit 43, please, Hernandez 43.

**THE WITNESS:** That's it. That's the bid.

**MR. STEVE HERMAN:** If we can try and kind of blow up

the top part.

**BY MR. STEVE HERMAN:**

**Q.** This is what you were just mentioning, the $4,500?

**A.** Yes.

**Q.** That's because in order to take out the drywall, you've got to take out toilets?

**A.** Take all the fixtures out, correct.

**Q.** You're going to take that out and put that back for $4,500?

**A.** Right.

**Q.** That doesn't include storage; correct?

**A.** No.

**Q.** Let's talk about the other part of the quote, which is for the HVAC system; right?

**A.** Right.

**Q.** That was originally for $1,800?

**A.** $1,800.

**Q.** With the coils, first you were told that you were going to replace the coils, right, with new coils?

**A.** Well, what I was told when I came in -- and, again, I had no briefing before we came to this house, so it's not like we had a bunch of meetings talking about it.

**Q.** Okay.

**A.** I immediately went in, and the talk in the house was air-condition coils have to be replaced.

**Q.** Okay.

**A.** It wasn't until after that I found out those had been replaced. All right. But then they also said that on this house, because of whatever coils they put in there, they didn't even want me to take them out, clean them, and put them back in. They wanted me to just leave it just like it was.

**Q.** First, you were going to replace them, then you were going to clean them and not replace, then you were going to do nothing with them?

**A.** Yeah. Now we're going to do absolutely nothing.

**Q.** You didn't make any of those decisions; correct?

**A.** No. I was told that at different times that, no, this is not what we're doing. I don't know who was making them. I don't know where it was coming from. I just tried to adjust my prices verbally as we went.

**Q.** For you, those instructions came from Mr. Carubba; right?

**A.** Oh, I'm sorry. Yes, sir. Yes, sir. I apologize.

**Q.** So he wasn't relying on you to tell him what to do with the HVAC system; he was telling you what to do?

**A.** No, not on this one. You see, we have extenuating circumstances again.

**Q.** Okay.

**A.** The coil was sent back to the factory. I've never, ever in my life seen a factory honor the warranty on a coil that wasn't their problem. Never. They, for some reason, honored

this one, and I find it awfully strange. That's why I was looking for a report. I have yet to see any reports on that.

**Q.** Well, for this bid that you submitted to Mr. Carubba, you were going to replace all the flex duct and you were going to clean but not replace the coils?

**A.** Right.

**Q.** That was going to cost $1,800?

**A.** $1,800.

**Q.** So your total bid to Mr. Carubba was $6,300; correct?

**A.** Correct.

**Q.** Then he beat you down a couple thousand; right?

**A.** Well, he took the coils out of it. That's $1,000 because you have to vacuum the freon down or it's a $10,000 fine. And then from there, he asked me if he used his laborers to physically transport the fixtures, pack them, and he would be responsible for them, we dropped the labor down another $600, if my memory serves me correct, but I don't have the paper in front of me.

**Q.** Let's look at Defense Exhibit 212. This is the original Carubba estimate? Do you even know?

**A.** I'll tell you in a minute.

Yes, that's the original Carubba estimate.

**Q.** So you gave him $6,300 originally, and by not changing the -- by not cleaning the coils and then asking you to work with him, he kind of beat you down --

**A.** Took off $1,000. And since he figured he was going to have laborers there already, he was going to do that, and he was going to wipe down any exposed pipes in the walls also. He was taking that out of my scope.
**Q.** So he said, "Can you work with me on the price?" and he got you down to $4,800; right?
**A.** Right.
**Q.** Let's look at Defense Exhibit 214. Do you know what this is?
**A.** The first time I saw this was at the deposition, and I had not seen it before. I have not a clue who Benchmark is.
**Q.** I think if we go down a little bit, we can see where they have -- see the plumbing fixtures?
**A.** Yeah. He's got $1,800 to remove and reinstall.
**Q.** You didn't give him that price, did you?
**A.** Absolutely not.
**Q.** You can't do it for that price, can you?
**A.** No, I cannot.
**Q.** Let's see Hernandez 484. What is this? I didn't have this during your deposition, did I?
**A.** That was if we -- that was if we replaced -- that was if we literally replaced everything, everything in the home. That was if we literally cut all the plumbing out, cut all the air condition out, threw it in the garbage can, brought in a new air-condition system, all new plumbing, water pipes, drain

pipes, which is ridiculous. Obviously, there's nothing wrong with any plastic, but I was just asked to -- what would I do if we were going to stack this house out, how much would it be, and that's where that figure came from.

**Q.** Mr. Carubba asked you to do this?

**A.** Yes.

**Q.** You put this together for a total of $23,000; right?

**A.** Right.

**MR. STEVE HERMAN:** No further questions.

**THE COURT:** Any redirect?

**MR. SANDERS:** Just two points.

**REDIRECT EXAMINATION**

**BY MR. SANDERS:**

**Q.** Mr. Herman asked you about another house on 209 Rue Esplanade. Did you also look at that house?

**A.** Yes, I did.

**Q.** What did you see there, very quickly?

**A.** There we saw the same tarnish on the water pipes that were in the walls where they removed the Chinese drywall from.

**Q.** Did you do anything to try to wipe or did you brush off the tarnish?

**A.** Well, unfortunately, I made the mistake, after I took one of the pieces out, of holding it in my hand too long and all the black tarnish was gone, so I had to go back and do it another -- do two more because if you just held it too long,

you wiped it all off. So I did it again so that way everyone would have samples that had some black tarnish on it.

**MR. STEVE HERMAN:** What was that exhibit?

**MR. SANDERS:** It's 484. No, it was the Benchmark one. Sorry.

**MR. STEVE HERMAN:** Defense Exhibit either 212 or 214.

**MR. SANDERS:** 214.

**BY MR. SANDERS:**

**Q.** If you blow that up, on the bottom there, there's a plumbing fixture remove-and-reinstall number, $1,700, and then there's an HVAC flex duct and coil number for 21, and then another number for 16. That number, if you add all those up together, isn't that much different than the original bid you gave for all that work?

**A.** Right.

**MR. SANDERS:** Nothing else.

**THE COURT:** You're excused. Thank you, sir.

We'll come back tomorrow at 8:45. Court will stand in recess until 8:45.

**THE DEPUTY CLERK:** All rise.

(WHEREUPON the Court was in recess for the evening.)

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

s/ Toni Doyle Tusa
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY

Docket No. 09-MD-2047
New Orleans, Louisiana
Thursday, March 18, 2010

**THIS DOCUMENT RELATES TO:**
Case No. 09-CV-6050

Tatum B. Hernandez, et al
v.
Knauf Plasterboard (Tianjin) Co., Ltd., et al

*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME IV - MORNING SESSION

APPEARANCES:

FOR THE PLAINTIFF:

HERMAN, HERMAN, KATZ & COTLAR
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, LA 70130

GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

SEEGER WEISS
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

LEWIS & ROBERTS, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

FOR THE DEFENDANT:

FRILOT L.L.C.
BY: KERRY J. MILER, ESQ.
Energy Centre - Suite 3700
1100 Poydras Street
New Orleans, LA 70163-3700

BAKER McKENZIE
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

BAKER McKENZIE
BY: DOUGLAS B. SANDERS, ESQ.
ERIN M. MAUS, ESQ.
KYLE P. OLSON, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter:

Karen A. Ibos, CCR, RPR, CRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7776

Proceedings recorded by mechanical stenography, transcript produced by computer.

08:30:26

# I N D E X

**WITNESSES FOR THE DEFENDANT:** **PAGE/LINE:**

**ROY M. CARUBBA**

| | |
|---|---|
| Voir Dire Examination by Mr. Hayden | 726/25 |
| Direct Examination by Mr. Hayden | 736/8 |
| Cross-Examination by Mr. Seeger | 773/6 |
| Redirect Examination by Mr. Hayden | 800/10 |

P R O C E E D I N G S

(THURSDAY, MARCH 18, 2010)

(MORNING SESSION)

08:31:40 (OPEN COURT.)

08:51:01 THE COURT: Be seated, please. Good morning, ladies and gentlemen. Our schedule today, as you know, is the second to last witness. I understand the next witness, due to some personal problems, can't make it today, so I've extended his time until tomorrow. We'll finish up tomorrow and then have oral argument following that witness's presentation.

08:51:29 Let's call your witness, please.

08:51:31 MR. HAYDEN: Yes, your Honor. We'd call Roy Carubba.

08:51:36 THE COURT: Come forward, please, sir.

08:51:51 THE DEPUTY CLERK: Would you raise your right hand.

08:51:53 (WHEREUPON, ROY M. CARUBBA, WAS SWORN IN AND TESTIFIED AS FOLLOWS:)

08:51:57 THE DEPUTY CLERK: Please be seated and would you state your name for the record.

08:52:00 THE WITNESS: Roy Carubba.

08:52:02 THE DEPUTY CLERK: Would you spell the last name.

08:52:03 THE WITNESS: C-A-R-U-B-B-A.

08:52:06 THE DEPUTY CLERK: Thank you.

08:52:08 VOIR DIRE EXAMINATION

08:52:08 BY MR. HAYDEN:

Q. Good morning, Mr. Carubba.
A. Good morning.
Q. What is your trade or profession?
A. I am a licensed civil engineer.
Q. And what's your level of education?
A. I have a bachelor of science in civil engineering from the University of New Orleans, 1986.
Q. And are you a licensed professional engineer?
A. Yes.
Q. And where are you licensed?
A. Louisiana, Mississippi, Texas, Florida, Alabama, Georgia. It's on my résumé, some of it, some of it's not listed.
Q. Has your license in any of those jurisdictions ever been revoked or suspended?
A. No.
Q. In addition to practicing as a licensed civil engineer, are you also a general contractor?
A. Yes, I have licenses in residential and commercial building construction.
Q. And how long have you had those?
A. Ten years, approximately, each.
Q. Could you briefly describe for the court your employment history after leaving the University of New Orleans?
A. Yes. I actually started working prior to graduation for a company called River Consulting from 1985 to 1987. After River

08:53:20 Consulting, URS Group 1987, then Barnes Engineering, and then after Barnes, Wink Engineering until 1993, and in 1993 I started my own company and have been employed as the president since.

08:53:33 Q. And why did you start your own company?

08:53:40 A. Well, the short version of that is, I just had difficulty working for other people so I wanted to be on my own.

08:53:49 Q. And what company is that?

08:53:51 A. Carubba Engineering.

08:53:53 Q. And are you the sole proprietor of that company?

08:53:57 A. Yes.

08:53:57 Q. And you've been in business for how long?

08:54:01 A. Seventeen years.

08:54:03 Q. Could you give the court some idea of the types of projects that you've been involved in in those years?

08:54:10 A. Yes. Primarily my company is involved in commercial, residential and industrial buildings. We also do some specialty types of engineering, marine structures, retaining walls, just anything, really, structural; and in addition to the structural portion of our practice, we do what we call civil projects, which are water, sewer, drainage, roadways, municipal-type projects.

08:54:35 Really, the only thing we don't do in the discipline of civil engineering is environmental work.

08:54:39 Q. Could you highlight some of the major projects that you've worked on in the last ten years?

08:54:48 A. Certainly. Probably most notable, we were fortunate enough to

work on the Superdome after Katrina, we did a roof analysis, as it were, for the corrosion of some of the roof members, and in addition to the corrosion on the roofing members, we also analyzed all of the structural equipment that held up the audiovisual equipment for the dome to make sure that it was going to perform pursuant to being exposed to the winds and water of Katrina. We worked on the arena next door. I've worked on --

Q. What did you do at the arena?

A. We did some analysis on the mechanical platforms during construction. There was an accident that occurred during erection of those platforms and they hired our firm to do some forensic analysis of those mechanical platforms, and in doing so, we ended up getting involved in some other structural aspects of that project.

Q. Have you ever worked for Hilton?

A. I've done many buildings for Hilton, the most notable of which was a 14-story high-rise in Shreveport before Katrina, and it actually got finished after Katrina.

And I've done, in the city, I mean, we've done multitudes of multi-family projects, probably the closest one geographically would be the Saulet Apartments, which is located in downtown New Orleans. After Katrina, we were part of the design team where we reskinned the entire set of buildings for water damage, so we opened up every single building, every exterior wall and replaced it. I've done --

Q. How many units was that?
A. It was a lot, it was probably three or 400 units. It was a big development.
We're working on a 35-million-dollar school project right now for the archdiocese of New Orleans in New Orleans East. It's comprised of seven buildings, all steel construction, deep foundations with some interesting architectural features, big project. We're working on some libraries for the city of New Orleans right now.
We've really done -- our cross-section of residential and commercial work is extensive. I've been involved in my career in probably 5,000 projects.
Q. Besides these larger projects, have you been involved in residential projects?
A. Many.
Q. And have you been involved in residential renovation or repair projects?
A. Yes.
Q. Could you give us some examples of some repair or renovation projects that you were involved in?
A. I mean, I've done everything from 500-square-foot additions to the backs of people's single-family residences to multi-million-dollar renovations. Most notably, after Katrina, we worked on several homes in Old Metairie on Bayou St. John, where we had to go in and gut the affected areas from the flood waters and

remodel those homes with very exquisite finishes and equipment in the houses, not just regular construction.

And I guess in regards to Katrina, we were fortunate enough after Katrina to be involved in literally hundreds of building inspections, where we looked at every type of damage, ranging from minor wind damage to total inundation from flood waters. And my construction company after Katrina renovated probably 25 single-family residences.

Q. And in those renovations, would you evaluate the electrical and plumbing and determine whether they needed to be replaced?

A. Well, as a general contractor, my function would be to call the appropriate subcontractors and have them go in and make their evaluations, and as a general contractor, I would certainly rely on their expertise to give me scope and magnitude of what those repairs needed to be.

Q. Could you briefly describe some of those projects that you were involved in and what your role was after Katrina in those repairs?

A. As an engineer or a contractor?

Q. As an engineer and contractor.

A. Well, I guess in addition, I am very fortunate to wear two hats. As an engineer, we would go in and evaluate and we would -- now, my discipline is civil engineering, so my expertise would be in the structural aspects of those houses. We would go in and evaluate the overall structural condition and make sure that that house could be renovated. And in some cases we would recommend

08:59:16 renovation and some cases we would recommend demolition and reconstruction.

So in addition to that, we would certainly call the appropriate subconsultants to go in and evaluate the mechanical and electrical aspects of that work.

As a contractor, we would kind of do the same thing on the flip side, we would go in and perform the work that needed to be done pursuant to some evaluation, and that work would be including demolition of -- selective demolition, taking out drywall, insulation, very similar to what we're talking about here. Of course with the caveat that there was no Chinese drywall, to my knowledge, when we were doing those renovations. However, in scope and magnitude, our work was very similar.

And we would rely on our subconsultants and subcontractors to give us determinations as to whether or not plumbing would need to be replaced, electrical components would need to be replaced. Very similar to what my subs testified to yesterday.

Q. Now, when you made the determination as to whether or not a certain component of the home had to be replaced, did you take on that risk?

A. Well, you have to remember, I wear two hats, so you're asking me as an engineer or a contractor?

Q. First, as an engineer.

A. Let me clear it up. Because when Mr. Mallet testified the

other day, he made this big deal about explaining how, his words I believe were something about shouldering the responsibility of making decisions as to whether components stay in the house. That's not a general contractor's responsibility.

There are two elements to construction, there's the mental and the physical creation. The mental is the why and the construction is the how. So the mental part, the intellectual part, is done by an engineer or a design professional, and he gives instructions to a contractor. And to be blunt and candid, contractors don't get paid to think, they get paid to do. And they rely on us to do the brain work.

So it is not the general contractor's responsibility to determine the adequacy of a component. Now, it is his responsibility to bring up a concern that he may see in the field, but it is ultimately up to a design professional, i.e., a professional engineer or an architect, to decide what stays in a house or what goes or what the scope of work is that ultimately gets dictated to that contractor.

Q. Fair enough. After Katrina, you indicated you were involved with residential projects, both as an inspector and as a general contractor.

A. As an engineer and a contractor, yes.

Q. And as an engineer, how many homes were you involved with?

A. Five to 600. The exact number escapes me. A bunch.

Q. What experiences from those homes could assist in rendering

your opinions today?

A. Well, I am going to qualify my comments. I am a professional engineer and a contractor, I am not a material scientist, I am not a mold expert, I am not any of those things that have been brought up during this testimony. My experience is, during Katrina, what we faced during Katrina on a daily basis, where we would go in people's houses that had mold and/or water intrusion, and what we would do as a matter of course in our work is we would go in, we would rip out the drywall, get rid of all those materials that held water, and we would dry the house out using dehumidifiers for a nominal period of time, 24 hours, 48 hours maybe. Because you have to be careful with drying stuff out.

People get carried away with that, and what happens is, houses are made of organic materials like wood, and wood from an engineering standpoint derives it strength directly from how much water is in the wood. If it's too dry it gets weak, if it's too wet it gets weak. So you have to be careful when you go in there dehumidifying things because you can get carried away.

So, long story short, we would go in, dry everything out and then simply proceed with our reconstruction at that point. And at no point, whether it was a 500-square-foot house or a $2 million house in Old Metairie did we ever undertake any what I would consider extraordinary means and methods to dry these houses out and/or -- I don't know how to say it. We didn't take any extraordinary measures when we were undertaking these renovations.

Now, what we did do is, when I finished drying out a house, I would go in with a little moisture meter and check the studs and make sure that they were the proper moisture content. You have a few percentage points, but normally southern yellow pine needs to be about 19 percent. And then if the homeowner had a concern about mold, if they requested it, we would get a mold person to come in and do an air quality test. But I have to tell you, of all of the renovations we did, I didn't do that very often. And even in the gutting and the limited demolition work that we did, we didn't do a lot of that. We used what I would call normal means and methods to effect our work.

Q. During the course of your evaluation of these post Katrina homes, did you evaluate electrical systems, plumbing and other home components that had been in a corrosive environment for an extended period?

A. Through my subconsultants and subcontractors, yes.

Q. And on those occasions, did you come to conclusions as to whether or not to keep the electrical or plumbing?

A. Of course.

THE COURT: Are you going to tender him?

MR. HAYDEN: Yes, your Honor. I would tender him as an expert in the area of general accounting, cost estimation and civil engineering -- cost estimating, cost estimating.

MR. SEEGER: Not accounting, right?

MR. HAYDEN: Right. Cost estimation.

MR. SEEGER: No objection.

THE COURT: Cost estimation and civil engineering.

The court will accept him in those fields.

MR. HAYDEN: Your Honor, it was cost estimation, general contracting and as a civil engineer.

MR. SEEGER: No objection.

DIRECT EXAMINATION

BY MR. HAYDEN:

Q. Have you been involved in cost estimation for residential properties impacted by corrosion in their electrical or wiring systems?

A. Yes.

Q. On how many occasions?

A. Hundreds, on a limited basis.

Q. Did there come a point in time where you were retained by the Frilot firm, by Kerry Miller from the Frilot firm, to work in this matter?

A. Yes.

Q. And when was that?

A. On or about the second week in February.

Q. And you're being paid for your services here today --

A. Yes.

Q. -- and in this engagement? And you've been -- you've invoiced for your time and costs, correct?

A. Some of it, yes.

09:06:24 Q. Prior to your engagement here, had you been offered as an expert in the State of Louisiana?

09:06:29 A. Yes.

09:06:35 Q. Mr. Carubba, let me refer you to your report that you provided to Kerry Miller on or about March 2nd. I think it's Defendant's 35. And if we could just highlight the bottom portion of the page.

09:07:03 Does your report set forth the tasks that you performed or were asked to perform?

09:07:08 A. Yes.

09:07:09 Q. Did you visit the property?

09:07:10 A. Yes.

09:07:11 Q. Who was the team of tradesmen that you retained to work with you on the assignment?

09:07:18 A. Bruce Fuselier, Bruce's Plumbing; Mark Hartenstein, GraciHart Electric; I had a carpenter named Ismael Jimenez (PHONETIC) -- please don't ask me to spell it -- he is a carpenter that I brought in to look at some of the architectural cosmetic features of the house; one of my employees, Dan Olivier who assists me in my work; and then I had a gentleman from my engineering company named David Workman who came in to take physical measurements for the purposes of doing quantity calculations for the purposes of producing our cost estimate.

09:07:55 Q. Mr. Fuselier you saw testify yesterday?

09:07:58 A. Yes.

09:07:59 Q. And you've worked with him before?

A. Yes.
Q. And is he someone you would rely upon for his data on plumbing costs?
A. Yes.
Q. Mr. Hartenstein, you heard him testify yesterday?
A. Yes.
Q. And he is an electrical -- electrician?
A. Yes.
Q. And is he someone you would rely on to provide you with an appropriate cost estimate for the electrical work that needed to be done?
A. Yes.
Q. When did you go out to the Hernandez property?
A. I believe it was February 24th of this year.
Q. And what did you do at the property?
A. Well, my function was to make sure Bruce and Mark and David and Danny and Ismael did their respective tasks to assist me in producing the report that you have before you. And my function was also to observe and get an idea of what our potential scope and magnitude would be for the renovation and the removal of this Chinese drywall and the reconstruction of the home.
Q. And what did you observe at the property?
A. Well, in general, it's -- certainly when I walked in the house I could smell the odor that emanates from the hydrogen sulfide gas. I observed the fixture s, the finishes, the overall general layout

of the house. I watched periodically what the electrician and the plumber were doing, most notably I was able to observe Mark pull a couple of sockets and switches, and he peeled back the sheathing so I could look at the tarnish and the non-tarnished portions of those wires.

Bruce took me outside and showed me -- not outside, he took me and showed me a couple of the copper piping elements and things that would support his work. And then I walked around the house with Danny and Ismael to get an idea of what we would have to do architecturally to remove and reconstruct the home in its present condition.

And in doing so -- by the way, that house is a typical middle American house, and quite candidly, the finishes in that house and the workmanship is mediocre, it's not anything to get really excited about. So I think that once it gets renovated, if a good contractor does the work, these people are going to end up getting a better product because what they have right now is not that great.

Q. Now, just so I understand for the record, Mr. Hartenstein was there and Mr. Fuselier was there; is that right?

A. Yes.

Q. Mr. Jimenez was there?

A. Yes.

Q. And you had some other workers there?

A. Just Danny and David.

Q. Okay. And you mentioned first you observed the fixtures in the home. What did you observe about the fixtures?

A. I mean, for the visible portions of the fixtures, I.E., the plumbing faucets and the light fixtures, in my opinion, they looked, they appeared to be normal to me. I didn't observe anything, there's been a lot of discussion the last couple of days about pitting and things like that. And although I'm not a material scientist or a toxicologist or any of these other experts that you've employed, I do have 25 years in the construction business. I didn't see anything that would throw a red flag to me that these things were in dire need of repair from my visual observation of them.

Q. And so with regard to the plumbing, you saw nothing that would indicate that the structural integrity or functionality of the plumbing system had been compromised?

MR. SEEGER: Objection. The witness just disqualified himself as an expert and then tried to qualify himself as an expert, your Honor, on this point.

THE COURT: Just ask him what he saw.

BY MR. HAYDEN:

Q. Did you see anything that was out of the ordinary from the thousands of homes that you've been, residential homes that you've inspected with the plumbing system?

A. No.

Q. Did you inspect the air conditioning system?

A. I was going to go up in the attic and then Bruce came down and told me that the coil was new. And my appreciation of what was going to happen in the remediation was the coil was going to be removed, so I didn't go look at coil. I relied on Bruce's observation.

And the other parts of the mechanical system, the insides of the ductwork, you can't, I mean, you're not able to see them, so I didn't make the effort to go look at those.

Q. Now, you mentioned that you looked at the electrical system. Mark showed you parts of the electrical system?

A. Parts of the electrical system.

Q. What did he show you?

A. I followed him and his crew around sporadically, and they took the faceplates off the wall and pulled back the receptacles and the light switches and showed me where the connections were and where those exposed tarnished portions of the wire were, and then I asked Mark to peel back some of the sheathing so I could observe what the unexposed wire portions looked like.

Q. And what did you see?

A. Well, in my opinion, based on my visual observation, there were certainly tarnish on the exposed portions. The unexposed portions appeared to be new to me. I didn't see anything that would have raised a red flag on the unexposed portions that were peeled back for me to look at.

Q. With regard to the exposed portions, could you describe for the

09:13:32 court what that looked or felt like?
09:13:36 A. I actually rubbed it with my thumb, it just looked like tarnish, very similar -- somebody in the course of this testimony a couple of days ago described what happens when you take your silver out and it gets tarnished from being in, it's the same thing, it was a very light film of brown or black tarnish that was on the surface of the copper wire.
09:13:55 Q. Did you actually touch it?
09:13:56 A. I did.
09:13:57 Q. And did you observe anything when you touched it?
09:14:00 A. It came right off. And if you touched it with enough force, one could almost match the surface of the untarnished portion of the wire. It appeared new once you removed the tarnish.
09:14:16 Q. Now, I believe you said that Bruce took you around and showed you some of the copper elements?
09:14:20 A. Yes.
09:14:21 Q. And did you observe anything there?
09:14:23 A. As I sit here today, I don't remember seeing the tarnish on the copper. There may have been, but I can't sit here and recall it as I sit here today.
09:14:35 Q. After you were done with your inspection, what did you do?
09:14:38 A. After we left the Hernandez residence on Marion Drive, we went over to the town home where we were going to do our controlled drywall removal, simply to just look around so I could tell my subs where to go the next day and kind of marshal them and get them

organized to do that work the following day.

Q. Did you have -- did there come a point in time where you had a conversation with any of the consultants, the experts that have testified here, about -- from Knauf, KPT?

A. We had a conference call at my office on the afternoon of the 26th, which was a Friday. And in that conference call -- and I need to state for the record that during my deposition I didn't recall at the time that I did have -- I didn't remember who was on the conference call, so I was reminded of that by you guys after, and I guess, truth be told, y'all have a much deeper understanding of the case than I do. So unfortunately, my short-term memory is not that good, which I said in my deposition.

Well anyway, long story short, we had a conference call, I believe that Perricone was in that conference call and I believe that Mr. Locay was on that conference call, where we discussed specific aspects of what we were --

MR. SEEGER: Objection, your Honor. Can we approach on this for one second?

THE COURT: Sure.

(WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD.)

MR. SEEGER: I think I've been very quiet with the objections, your Honor. We've deposed these witnesses, and they continue to march in this courtroom after their depositions with new-found memories. This witness specifically testified he never had a discussion with him, I'll show you his testimony. Now he

walks in and tells the court, you know, that he was reminded by the lawyers after. I have to object to that because I don't have an opportunity to deal with that today.

MR. HAYDEN: Why not?

MR. SEEGER: Because he testified in his deposition just last week, just last week.

MR. HAYDEN: You can cross him on that.

MR. SEEGER: Your Honor, it's every witness. It's Mr. Lee who has a different memory, they all say one thing that happened days ago.

THE COURT: It goes to credibility and I've noted that.

MR. SEEGER: That's good enough for us. Thank you, your Honor.

(OPEN COURT.)

BY MR. HAYDEN:

Q. Sir, you mentioned an Alex Locay. What is your understanding of who Mr. Locay is?

A. He is a general contractor in Florida.

Q. Did you do anything else, did you review any documents before reaching your conclusions?

A. Before rendering my report? Yes.

Q. What documents did you review?

A. I reviewed -- I'd like to look at my report and see if I specifically made reference, I mean, if not, I am going to do it from memory recall.

09:17:57 Q. Okay.
09:17:58 A. Can we go back up to my scope of work? Go back.
09:18:01 THE COURT: Can you give him a copy of the report. Do you have a copy?
09:18:06 THE WITNESS: It's electronic, although I can't manipulate it and flip through it.
09:18:12 THE COURT: All right.
09:18:16 THE WITNESS: I need to get something where I can see my report and see what documents I reviewed.
09:18:18 MR. HAYDEN: May I approach, your Honor?
09:18:18 THE COURT: Sure.
09:18:36 THE WITNESS: I have in my report that I reviewed the documents including -- by Perricone and Mr. Beyler, is that the correct, Beyler or Beyler?
09:18:37 BY MR. HAYDEN:
09:18:42 Q. Did you see a gentleman testify yesterday?
09:18:44 A. Yes, it was the guy that was on the video testimony.
09:18:47 Q. Did you actually review those reports?
09:18:52 A. I have it in my report that I reviewed them prior to production of this report.
09:18:55 Q. Did they impact your decision?
09:18:57 A. Well, as I stated earlier in my testimony, I am not a material scientist or an expert in other areas, so I relied on those experts to help formulate my opinion, which subsequently helped me formulate my scope and magnitude of the renovation costs of this

09:19:10 house.

09:19:11 Q. What else did you do in order to come to your opinions today?

09:19:15 A. I mean, I reviewed the documents, I did a visual inspection of 09:19:22 the house, I did the necessary cost estimating and mental 09:19:27 gymnastics to come to that estimate to arrive at my scope and 09:19:30 magnitude.

09:19:31 Q. Did you look at anything to validate the cost numbers that you 09:19:34 were provided?

09:19:35 A. If you'll look at my report, I included Mr. Locay's estimate 09:19:39 simply to validate and confirm my scope and magnitude of my 09:19:43 estimate.

09:19:48 Q. Prior to the report you also, you mentioned that you went to a 09:19:50 Mandeville townhouse; do you recall that?

09:19:52 A. Yes.

09:19:53 Q. And what was the purpose of going to the Mandeville townhouse?

09:19:55 A. The purpose of going to the townhouse was to set up for a 09:20:02 drywall removal to determine through normal means and methods, in 09:20:09 my opinion, what the dust would be by taking out drywall in a room. 09:20:15 A controlled environment to take out drywall to see what dust was 09:20:19 kicked up during the demolition.

09:20:24 Q. And did you undertake that drywall demolition exercise?

09:20:28 A. Well, my crew did, yes.

09:20:30 Q. And when was that?

09:20:31 A. We started on the morning of the 25th and finished on the 09:20:34 afternoon of the 26th.

09:20:38 Q. And were you present during the course of that exercise?
A. Intermittently, yes.
Q. Were you supervised in the activities of your workmen?
A. Intermittently, yes. Danny's the guy in my construction company who kind of rides herd on the crews, so I rely on him for the day-to-day, hour-to-hour, blow-by-blow stuff. I came in at the beginning, during and at the end, to observe what was going on and just look at the finished product.
Q. Did you evaluate the videotape that was taken of the work that was being done by the workmen?
A. Yes.
Q. And were they following the scope of work that you were proposing and are proposing that KPT follow for the drywall demolition?
A. Yes.
Q. Did you have an opportunity to review the videotape and the excerpts that have been put together for the court, to assist the court on the type of drywall demolition that you are suggesting?
A. Yes.
Q. And does it truly and accurately portray the drywall demolition as you believe it should be undertaken?
A. Yes.
MR. HAYDEN: Your Honor, I'd ask that we move that exhibit into evidence.
THE COURT: What exhibit is that?

MR. HAYDEN: I don't know what he did with 190.

MR. SEEGER: It's okay for him to put it up and then I'll look at it.

THE COURT: All right. And what is this a video of?

MR. HAYDEN: This is a video of the drywall demolition. I think you saw work, or some drywall in the plaintiff's case of this drywall demolition exercise that we did at the Mandeville home, where we invited the plaintiffs to come in and look at it, what the workmen are doing, and I can have the witness testify to it. It is following the protocol that he is suggesting.

THE COURT: All right. This is not the Hernandez house?

MR. HAYDEN: This is not the Hernandez house.

BY MR. HAYDEN:

Q. This is the one room where they were cutting drywall where they were --

A. This is the video of the still photographs that Mr. Mallet had as part of his report. Same house.

CONNIE: It's better on a small screen.

THE WITNESS: Yeah, it's much better on a small screen.

BY MR. HAYDEN:

Q. Could you, Mr. Carubba, just explain what was going on?

A. It's very simple. I mean, the drywall crew is removing the drywall from the walls by using utility knives and physical force to take out sections at a time.

Q. And why do you think that's important?

A. Well, there's been a lot of discussion about means and methods of how to efficiently and adequately demolish the drywall without producing inordinate amounts of dust. Drywall is a very brittle material, so there's no way to escape the dust that's going to be kicked out when the demolition starts. This is a normal means and methods for taking drywall out, and after Katrina when we gutted houses, this is how we did it.

Now admittedly, in this video, this isn't the most efficient way because there was so many people in the room. And by the way, for the record, the room was 13 by 14, it wasn't 12 by 12 or 14 by 16, it was 13 by 14, I checked my drawings this morning, I think.

So anyway, it doesn't matter. There was this big monitoring thing in the middle of the room, so there was this obstruction, and then of course there were people all over the place, so this exercise was merely to see using what I would call normal means and methods what production of dust would occur in the home. And that's what you're witnessing here, your Honor, they are taking out chunks and pieces by hand pursuant to them using a utility knife to make surgical cuts in it, where they could find a way to grab onto the drywall and take it out.

Q. Now, this is a different method than the hammer wielding method of tearing down the drywall that was being proposed by others?

A. Yes.

Q. Do you think this is a more efficient method?

A. I do.
Q. And why is that?
A. Well, I mean, the hammer method, it's ironic that since we're all talking about dust here, it's ironic that somebody would recommend that you go in there and wield the hammer, which is a more dynamic force, if you will, than the static force of a knife, you're guaranteed to kick up dust when you smack drywall with a hammer because it's a very brittle material.
So you can certainly do it that way, but at the end of the day, being a little bit more surgical about it, I don't think you're going to lose any efficiency in doing so --
Q. I hate to interrupt you --
A. Go ahead.
Q. -- but what were those workmen doing right there?
A. There were wiping the wooden members down after removal of the drywall.
MR. HAYDEN: Your Honor, could we just note for the record, because it's not on the videotape, there's no way to measure how much time any of these things are, just so the court's aware of that.
THE COURT: All right.
THE WITNESS: Well, that's okay, I mean, this wasn't a time-dependent function from the standpoint of cost, we do this as a dust-mitigation exercise. So certainly, I mean, we could sit here for 15 hours and watch it if you wanted a realtime display,

but the major highlights are caught on this video efficiently.

BY MR. HAYDEN:

Q. And the amount of time that was spent in this home doing this work, would that be consistent with the real time it would take to do it in the Hernandez home?

A. Of course not.

Q. And why is that?

A. Well, because we were in a confined space, number one; number two, there was this monitoring device that if you know what you're looking for in this video you'll see it, it's sitting right smack dab in the middle of the room; and then, of course, there were the multitude of non-construction personnel that were in the room monitoring all of this stuff. So, I mean, literally --

Q. Were there lawyers there?

A. Huh?

Q. Where there lawyers there?

A. Well, that was my way of saying lawyers.

But look, at the end of the day, it wasn't a very efficient means -- it wasn't a very efficient way from a time standpoint, but that wasn't the mission here. The mission here was to see, using normal means and methods, what type of dust we would kick up during this demolition.

And, in fact, I got a call from Danny that evening complaining that Ismael was complaining that every time they took something down, or not every time, but they had to stop and show it

to somebody, it wasn't an efficient -- from a pure construction standpoint it wasn't an efficient operation as it were.
Q. But it does fairly and accurately show how you would clean the Hernandez house?
A. Yes.
Q. Okay. Now we're looking at the studs?
A. The studs, the blocking, the ceiling joists, all the components of the structural portions of that building.
Q. And under your cost estimate, this is how you would leave the home after you're done with demolition?
A. Yes.
Q. And that would be with the wire and plumbing still in?
A. Yes.
Q. And is the vacuum that they're using, what kind of vacuum are they using there?
A. A shop vac.
Q. Okay. It's not a Hepa vac?
A. No.
Q. Would you use a HEPA vac?
A. I mean, you could, it's just the HEPA vac may be a little bit more efficient, but you can get the same result with the shop vac, you just have to do it a little bit more.
Q. And this was done with a -- using a shop vac?
A. Yes.
Q. Now, after doing that dust containment exercise, did you do

anything else before coming to, putting together your scope of work for this Hernandez job?
A. I mean, I did my cost estimate, and I can explain to you how I did that if you'd like. I mean, my way of estimating, your Honor, is, I consider it to be very pragmatic, and it's certainly kept me out of trouble through the years. It starts off --
Q. Before you jump into the cost estimate, let's talk about the cost of this scope of work.
A. Well, the scope of work was --
Q. Why don't we put that up on the screen.
A. Okay.
Q. 211. This is the repair protocol for the Hernandez home. Is that a document that you authored?
A. Yes.
Q. And what is it?
A. That's part of our report where we set forth the scope of work and how we came up with it.
09:31:45 Q. And this is what you determined needed to be repaired or
09:31:45 replaced in the home?
09:31:46 A. Yes.
09:31:46 Q. And is this your opinion to a reasonable degree of certainty?
09:31:54 A. Yes.
09:31:58 Q. And how did you come up with this protocol?
09:32:00 A. Well, I relied on the other experts, I mean, the whole
09:32:01 discussion the last couple of days about the electrical and

09:32:02 plumbing, so I certainly deferred to my subs on what their recommendations would be and also took into consideration what the experts were recommending about the removal of the electrical and plumbing systems, since they're two very large components of all of this.

09:32:15 So my scope of work is essentially removing the fixtures in the home that can be saved, it is removing the cabinets and saving them, and any other object that's not drywall, certainly we're going to take out the drywall, the insulation, we're going to clean the house much in the same manner as in the video you just observed, and then we're going to put everything back better than we found it, as it were.

09:32:44 Q. What about light fixtures?

09:32:47 A. We're going to save the light fixtures.

09:32:49 Q. What about the granite countertop?

09:32:54 A. We are not going to -- you can't save the granite, it's very difficult to remove it without cracking it.

09:32:59 Q. So you're replacing the granite?

09:33:01 A. We're going to replace the granite.

09:33:03 Q. What about taking out switches and receptacles?

09:33:06 A. We're going to take them out and put new switches and receptacles.

09:33:09 Q. What about with the HVAC system, does your scope of work include replacement of the HVAC system?

09:33:17 A. Not the entire system. We're going to replace the flexible

09:33:20 ductwork and in most cases we would replace the coil, but I believe, as Bruce testified yesterday, that the coil has been recently replaced. So in this particular case, we probably wouldn't take it out. And I think his estimate reflects that.

Q. And did this particular coil, do you know if it had any coating on it?

A. I think Bruce testified that it was coated.

Q. You heard Mr. Mallet testify about -- Mallet testify about the cleaning that he believed needed to be undertaken?

A. Yes.

Q. Do you agree with that?

A. No, grossly overstated.

Q. Why is that?

A. Well, I mean, first off, you take his line item of $15,000 for an environmental engineer. Now that engineer, if he is a P.E., he'll go for about $150 an hour. That means that guy has got to spend 100 hours at that house, that's two and a half weeks full-time. I have no clue what that guy is going to do for two and a half weeks.

During Katrina when we had issues with mold and we had to bring out a mold person or an environmental, somebody, which I didn't have to do, by the way, but I knew people that did it, these people would come out for four or five hours at the most, do whatever -- they were giving out these mold certificates or whatever it was.

And I never had to do it, but I just think that Mr. Mallet's magnitude of the things he is proposing in his estimate, that's the one that pops into my mind first, is grossly overstated.

And I'm sorry, he has in his résumé that he's an investigative engineer, I don't know of any license from the national registration board or any state that I am licensed in that has that designation as an investigative engineer. So I don't know what particularly qualifies him to make that assertion, but $15,000 for an environmental person to me is excessive.

Q. Are you licensed as an inspector?

A. I am licensed as a chief building official.

Q. And what's that mean?

A. That just means that I am able to interpret the code and make decisions in code-related matters.

Q. And so you're able to evaluate the various codes that would apply here?

A. Some of them. I would not evaluate electrical or plumbing codes. My expertise is in building construction and our business, because of the specialized nature of plumbing, HVAC and electrical, those are deferred to other codes and other code officials.

Q. And so you defer to other officials like Mr. Canzoneri?

A. Yes.

Q. With regard to doors, fixtures and cabinetry, are you replacing that or keeping that?

09:36:05 A. Doors, we're going to take the doors out, store them, put them back in; cabinets we're going to take out; fixtures we're going to take out and put back in. The only thing we're not saving is the granite and, of course, you know, the drywall and the carpet, you can't save stuff like that. We're going to save the hardwood floors and the tile floors, protect them during demolition and construction and then put it all back in.

09:36:31 Q. Sir, where are you going to store the fixtures and cabinetry?

09:36:38 A. In this house, we're going to use the garage as our storage unit.

09:36:44 Q. And are you concerned that that area will not be climate controlled?

09:36:50 A. No, we're going to put dehumidifiers in it and keep it at a reasonable level of humidity.

09:36:58 By the way, Mr. Mallet also testified that he went through this long-winded explanation about how you can't save the wood floors because you're reversing the humidity in the house. Can I tell you how many houses I've seen that were built before air conditioning that have hardwood floors that are in perfect condition, because it's not a function of air conditioning and pulling the moisture out, it's a function of controlling the humidity. And a dehumidifier -- the best control for humidity is just ventilation.

09:37:25 But forget about the ventilation. If you put dehumidifiers in and you're able to control the moisture contents,

then there's no reason that the elements of this house that have already been exposed to climate-controlled conditions, as Mr. Mallet said, cannot be preserved effectively and put back in.

I did it during Katrina routinely. We would go into people's homes, take the doors out, take some things out, put it in the garage, put dehumidifiers in, go about our business, put them back in and we're done.

THE COURT: Counsel, let's ask him questions so that he can focus on what you're talking about.

BY MR. HAYDEN:

Q. Do you intend to remove moldings and trim?

A. Yes.

Q. Is there a reason why you're not trying to save those?

A. They're very delicate and the means and methods of taking them out are going to lend them to being destroyed. You can't save them.

Q. Sir, you heard testimony that -- under the Mallet proposal that the house would not be, would not have electricity for a period of time. Do you recall that?

A. I do.

Q. Under your scope of work, how long would the house be without electricity?

A. We would take the existing electrical service and extend temporary power through the permanent pole outside for whatever our needs were during renovation. We would not let that house go

09:38:53 without electricity.
09:38:54 Q. So the air conditioning could be running?
09:38:56 A. Well, you could until it's time to change it. You could let
09:38:59 the "old" air conditioner run with the damaged ductwork until it's
09:39:04 time to get to the point of construction where you can't let it
09:39:07 run.
09:39:11 Q. Do you have any opinion on how long it would take to complete
09:39:14 your job?
09:39:15 A. Yes.
09:39:15 Q. And how long is that?
09:39:16 A. Sixty days minimum.
09:39:18 Q. Did you hear testimony over the last few days about airing out
09:39:24 the job?
09:39:25 A. Yes.
09:39:26 Q. Do you have an opinion as to whether the job needs to be aired
09:39:36 out?
09:39:36 A. Yes, it doesn't need to be aired out for the time period that
09:39:36 Mr. Mallet prescribed.
09:39:36 Q. Why is that?
09:39:36 A. Because it just doesn't. I mean, I am not an expert in the
09:39:39 other areas, but in my experience, mostly with Katrina, we didn't
09:39:43 go through any extraordinary means and methods to air out houses
09:39:47 that had prolonged exposure to water and/or mold in them. The
09:39:51 compelling thing is, is to get that stuff out. Once it's out and
09:39:56 you clean it and you make sure that the wooden components of the

house are at their proper moisture content, i.e., through dehumidification and testing, it's my opinion you can go about your business and proceed with the renovation.

Q. During the course of your evaluation of this house, did you notice certain defects in the materials and workmanship of the house that you referenced in your report?

A. Yeah. I mean, I wouldn't call them defects. As I said earlier, some of the quality of the finishes is, I used the word mediocre. And certainly when we, if we were allowed to do the work, when we put those finishes back in, they're going to be better than what's in there now.

Q. Okay.

A. With no extra effort, by the way. That was just sloppy work on the part of whoever built the house. And it was built right after Katrina, so I would believe that, the way the labor markets were and the pace at which people, some people were working.

Q. And improving those areas of workmanship, would you be charging extra for that?

A. No, we wouldn't.

Q. Now, you said you came to a cost estimate. What is that?

A. Can we pull it up?

Q. Yeah.

A. This estimate in total is $54,142.43 -- wait, you changed it on me. That's the updated, okay. This is the most current.

Q. And you made certain changes to your estimate recently.

A. I did.
Q. And why is that?
A. Well, I had some mistakes in it that I didn't correct before I got here.
MR. SEEGER: Objection. When was that corrected? I am not asking the witness, I'm asking counsel, when was it corrected? The change, before or after his deposition?
MR. HAYDEN: Why don't I ask him.
MR. SEEGER: Before or after his deposition?
MR. HAYDEN: It was after his deposition and after Mr. Mallet's.
MR. SEEGER: Objection.
THE COURT: The court notes that the witness gave a deposition, had material, had this estimate and now has changed it after the deposition before his testimony here today.
BY MR. HAYDEN:
Q. When was your deposition? Was it less than a week ago?
A. I don't remember the exact date. It was pretty close.
Q. Things have been moving along pretty fast here, right?
A. Yeah. We got involved in the middle of February, and we've been ripping and running, and I apologize for the errors in my estimate, it's just a function of, you know, we're human and I made some mistake.
And by the way, there's nothing in the ethics of how we're governed as engineers or contractors that require that we're

09:42:36 perfect. Unfortunately, we're not perfect and we make mistakes. But, you know, it's not a mistake unless you correct it. So I corrected it at the earliest possible time in good faith and submitted it to this court in good faith, and I am here to talk about it, so let's talk about it.

09:42:51 Q. And actually that increased the estimate of the cost, correct?

09:42:54 A. It did, by three dollars a square foot.

09:42:57 Q. So why don't we go to those changes that you made.

09:43:03 A. Okay.

09:43:06 Q. What's the first change?

09:43:07 A. Well, we left out re-installing the doors, and it's somewhere on here. Let's see, whoever is manipulating that just go slow.

09:43:12 Q. It's right there.

09:43:19 A. Install doors, $75 each, 15 doors, $1,125.

09:43:27 Q. What's the next change?

09:43:31 A. We inputted Mr. Hartenstein's electrical estimate incorrectly, it was $2,200, the correct number is 3,400.

09:43:39 Q. And then the next was with regard to countertops?

09:43:45 A. Yeah, we busted the square footage on the granite. It's actually -- it's actually still 15 square feet too short, so there's a little money left on the granite.

09:44:01 Q. Okay. Now, do you believe that this fairly and accurately indicates the costs to repair the Hernandez home?

09:44:07 A. Yes.

09:44:08 Q. And why is that?

09:44:09 A. Well, because I am comfortable with my scope and magnitude.
09:44:16 Q. How did you come about these numbers?
09:44:19 A. Well, for the specialty items, as I stated earlier, we relied on Bruce's Plumbing and GraciHart Electric to give us those plumbing, HVAC, and electrical numbers. And then for the other items, the cosmetic-type stuff is what I call it, CEI Construction is going to self-perform that work.
09:44:40 So in the course of estimating it, Danny and I together called various material suppliers and got our unit costs and extended them for materials and labor into our estimate.
09:44:54 Q. Sir, you heard Mr. Mallet talk about the Xactimate software program that he used. Did you use any software program like that?
09:45:00 A. No.
09:45:00 Q. How did you go about determining your numbers?
09:45:04 A. We did it, what I would call, the old-fashioned way. We pick up the phone, call suppliers, got real numbers on materials and then, of course, you know, we self-perform some of that work, so it was a simple matter of talking to the people that were going to physically do the work, get those numbers and extend them into our estimate.
09:45:25 Q. Do you feel that, actually talking to the actual workers and subcontractors and getting estimates from them is a better way of determining costs than putting it into a computer and getting some numbers punched up?
09:45:40 A. Well, I certainly think that computers have their function in

the way estimates are done, but of course I am going to say my way is better. But the Xactimate program, I think it's been stated in here, that's an insurance company program that's used mostly for adjustment.

I've been doing this a long time. I don't know one contractor that uses Xactimate when they give estimates to clients. I don't. They use what's called a CSI formatted estimate, which is a fancy word for breaking things down by component. Whether it's electrical, mechanical, architectural, structural, that's the way it's normally done in our industry.

Q. Sir, I noticed that you put in for a 10 percent number for overhead and a 10 percent for profit. Is that standard in the industry?

A. Pretty much. It varies a little bit but that's about right. For a small job like this.

Q. Do you include a material sales tax and equipment sales tax in your estimate?

A. No.

Q. Why is that?

A. It's included in the individual line items above.

Q. And is that standard in the industry?

A. Yes.

Q. So you saw Mr. Mallet's estimate that, in addition to the individual items that he had, he also had a line item for material sales tax and equipment sales tax?

A. Yes.
Q. And those were put in before he did overhead and profit?
A. Yes.
Q. Is that something that is done in the normal course by a general contractor?
A. No.
Q. Why is that?
A. Well, as I stated earlier, Xactimate is not a program that's used in our industry to do detailed cost estimates or hard bids for clients. It's done in a CSI formatted -- CSI is Construction Specifications Institute, and they have line items or different items that are very clearly spelled out in divisions, so Xactimate is not normally used.
Q. And is it the subcontractor's, do they usually include in their bids the material sales tax and equipment sales tax?
A. Yes.
Q. So that would be reflected above the line?
A. Well, let me put it to you this way: It's their -- if they buy materials for the job, they have to pay sales tax. I hope they put it in their estimate. That's not reflected back to the general contractor in any way, shape or form in our general conditions. So although I don't ever go to a sub and go, hey, by the way, did you put your sales tax in there, I would think if they're in business they know to do that.

But at the end of the day, it's not a line item in the

general contractor's bid and it shouldn't be there.

Q. And the general contractor would include it in overhead or profit?

A. If it applied to us, in most cases it doesn't, but if it were, it would be included in the overhead portion of our bid.

Q. Now, in your report, if you could go to the top of the cost estimate, you'll see on certain line items you have PN, what does that refer to?

A. Plaintiff's numbers.

Q. Now, you indicated that you also talked to a Mr. Locay.

A. Yes.

Q. And why did you talk to Mr. Locay?

A. I had a short discussion with him simply to just talk about the scope and magnitude of each of our estimates and use it for purposes of validation and confirmation of my numbers.

Q. And why did you use Mr. Locay's numbers?

A. Well, I didn't use his numbers. I just simply talked to him and looked at the scope and magnitude and it was, I mean, all construction companies have their own ways of estimating, but at the end of the day, our scopes and magnitudes were very similar.

Q. Did you look at his report before you did your cost estimate?

A. No.

Q. Do you know if he has any experience in Chinese drywall?

A. As I appreciate it, he's done some renovations in Florida, which I didn't know at the time I did my work.

09:49:57 Q. If you could go to the Mallet report.

09:49:57 A. Mallet.

09:50:32 Q. Mallet. If you could go to the last page, the cost -- I believe it's 29. If we could blow that up.

09:51:18 Sir, this is the recap of the cost estimate by Mr. Mallet. Have you seen that before?

09:51:31 A. Yes.

09:51:31 Q. And you heard him testify about that report?

09:51:31 A. Yes.

09:51:31 Q. Do you have problems with the numbers that he's indicated for each of the line items?

09:51:36 A. I do.

09:51:37 Q. And could you go through quickly with the court the areas of concern that you have?

09:51:44 A. Well, first off, his overall number is more money than it cost to build this house, including the land, first, as a general. This house was built for 175,000 without the land, directly after Katrina when material and labor prices were inflated.

09:52:01 Now, in the worst construction economy where labor is plentiful, he's got a number of 200,000 to renovate it, assuming that the foundation, the frame and the roof is intact, which is probably $25 a square foot by itself. So the entire estimate in my opinion is grossly overstated, both in scope and magnitude.

09:52:24 Q. If you could go to the cabinetry.

09:52:29 A. Okay.

09:52:31 Q. Well, first you'll notice that he has a line item for appliances. Are you replacing appliances?
09:52:37 A. No.
09:52:38 Q. Then with regard to cabinetry, do you feel that that's an appropriate cost?
09:52:43 A. It's expensive.
09:52:44 Q. And have you seen the cabinetry that's in the Hernandez home?
09:52:48 A. Yes.
09:52:51 Q. And it's your opinion that this is an expensive cost for replacing it?
09:52:56 A. In my opinion, it's an upgrade.
09:52:58 Q. With regard -- what's the next line item that you have concern with?
09:53:03 A. Well, his demolition cost is over double what mine is, which I find quite curious because he went through this long-winded explanation about how meticulous we did it and how inefficient it was, and then his is double what mine is. He's wielding a hammer.
09:53:20 Q. After hearing his testimony, do you have any reason to change your cost estimates?
09:53:23 A. No.
09:53:24 Q. And why is that?
09:53:25 A. Well, because I am comfortable with it.
09:53:27 By the way, after Katrina we were getting three dollars a square foot to demolish in that Katrina market. It's now four years later, and I probably could beat that 6,300 if I had time to

shop it a little bit more. So I am quite comfortable with the 6,300.

Q. What's the next line item that you have significant concern with?

A. His drywall number is pretty high.

Q. What about his painting number?

A. I just -- I have no clue where he got that paining number. That's $17,000 to repaint a 2,000-square-foot house with nine-foot ceilings. It just doesn't cost that much.

Q. How much should it cost?

A. I think -- I have to look at my estimate, but I believe it's 60 cents a square foot and there's 8,480 square feet, do the math, it's $5,000 and some pennies. That's all day long you can get painters to work for under a dollar a square foot. That's a primer coat and two finish coats, which is what you put in new construction. So I don't know where he got the, what is it, fifteen-nine to paint that house.

Q. Actually, if you'll look to the painting line item.

A. Oh, sorry, 17, I was looking at drywall -- I mean, demolition.

Q. And you believe it, it says 60 cents a square foot?

A. I would have to look at my estimate, I'm pretty sure it's around 60 cents a square foot.

Q. Did you do anything to verify that that number is a valid number, 60 cents a square foot?

A. I talked to my painter.

Q. Are you familiar with RSMeans?
A. I am.
Q. Do you use that on occasion?
A. No.
Q. Why not?
A. Because I don't like it. Well, I don't like it because I find it to be cumbersome, number one; and I am pretty simple-minded, I like to do things simply. But, number two, RSMeans is constantly updating these unit costs and they attempt, bless their hearts, to do it geographically; but the truth of it is, by the time you navigate through RSMeans, it's just a lot easier to pick up the phone and call somebody that does it every day.
Q. The old-fashion way?
A. The old-fashion way, it works every time.
Q. And you feel the old-fashioned way gets you a valid, more valid and accurate cost estimate?
A. No, I don't feel, I know. It really is a better way of doing it. On a simple project like this, where the scope and magnitude is very definable, in my opinion, going to something like Means or Xactimate is not only not prudent, it doesn't produce an accurate portrayal of what the cost is. It's just a lot easier to do it the old-fashioned way.
Q. What about the -- any of the other line items that you have significant problem with?
A. Wait, slow down. He's got twelve-five for permits. I don't

know where that came from. The permit is normally one to two percent of the construction costs, which is under $1,000 in this case.

Q. Did you hear him testify about an environmental consultant?

A. Yeah, that's the guy -- maybe I said 15,000 erroneously. Is that lumped into this?

Q. Assuming that's lumped into that.

A. Yeah, okay. Well, that explains where he got it.

Q. Is that appropriate?

A. I don't think it's appropriate at all, having an environmental guy spend 20, 30 hours out there, but it's in his estimate.

Q. You've been involved in repair work where environmental people are involved, haven't you?

A. Yes.

Q. Would you expect a charge of 12 or $15,000 to just go out and evaluate a property?

A. Well, let me just, I mean, I've never done any Chinese drywall stuff, so, but in general, you would bring an environmental person out if there's, you know, asbestos or something. My experience is, you mostly get these environmental people when you have commercial projects. For whatever the reason. And it's not really my area of expertise, but in my observation in residential work, it's not normal or customary to see something like this.

Q. And are you, as you sit here today, are you comfortable with the cost estimate that you provided to the court?

09:57:30 A. Yes.
09:57:31 Q. And do you believe to a reasonable degree of certainty in your field that that cost is the cost it would take to repair this home?
09:57:42 A. Yes.
09:57:44 Q. And you've reviewed your scope of work, you believe the scope of work that you put forward is the appropriate scope of work to a reasonable degree of certainty?
09:57:54 A. Yes.
09:57:58 Q. And why are you so sure about that?
09:57:59 A. I mean, 25 years of experience, I have a degree in engineering and I hold licenses in general contracting, and I -- I've just been involved in a lot of projects. This is a fairly simple project in scope, to be able to quantify it is not difficult. It's very definable.
09:58:18 Q. If you were offered this job today, would you sign the contract under this scope of work and with the limitations of these costs?
09:58:27 A. Yes.
09:58:29 MR. HAYDEN: I don't have any other questions.
09:58:30 THE COURT: Let's take a break here, 15 minutes. The court will stand in recess.
09:58:34 THE DEPUTY CLERK: Everyone rise.
09:58:37 (WHEREUPON, A RECESS WAS TAKEN.)
10:31:11 (OPEN COURT.)
10:31:25 THE COURT: Be seated, please. You're still under oath, sir.

THE WITNESS: Yes.

THE COURT: Cross-examine.

MR. SEEGER: May I proceed, your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. SEEGER:

Q. Mr. Carubba, you testified today that you spoke with Alex Locay, that's your testimony now?

A. Yes.

Q. Benchmark Builders?

A. Yes.

Q. Do you remember I asked you a bunch of questions about Benchmark Builders and Alex Locay last Thursday, March 11th?

A. Yes.

Q. So we didn't miss that topic in your deposition, you and I, we had a lot of time to talk about that, didn't we?

A. We talked about it.

Q. Let me show you your deposition testimony and the questions you were asked and the answer you gave in your deposition, okay, sir?

A. Yes.

(WHEREUPON, A VIDEO CLIP WAS PLAYED.)

"Q. Okay. Now, let me ask you this. Does Benchmark Custom Builders -- I forgot the name of the guy who owns this. What's the guy's name?

A. I have no idea who you're talking about. Who's Benchmark

Custom Builders?

Q. You tell me, you included it in your --

A. Oh, that's the guy --

MR. THIBODEAUX: Is that what you're referring to?

THE WITNESS: Yeah, that's the guy in Florida.

MR. THIBODEAUX: That's Exhibit B.

THE WITNESS: Yeah.

BY MR. SEEGER:

Q. Do you know who he is?

A. My understanding is that guy did an estimate simultaneously with mine.

Q. Who hired him?

A. I don't know. Somebody on our side, I guess.

Q. How did he wind up in your expert report?

A. I just put it in there as a pure comparison to mine in scope and magnitude.

Q. Did you have any conversations with this guy?

A. Nope. In fact, I didn't even know he did the report until after I finished mine.

Q. And then why did you see it necessary to include it?

A. Well, I just said I put it in there as a matter of reference just to substantiate and compare it to what I did.

And coincidentally, the order of magnitude of his renovation is very close to mine.

Q. We're going to talk about that in a second.

10:32:58 A. Okay.
10:32:59 Q. I mean, can you answer questions about where he got his
10:33:01 prices from?
10:33:03 A. No, because I never talked to him. I did a cursory review
10:33:06 only of his report. I just looked at the bottom line.
10:33:09 Q. But my question to you is, before you included this man's
10:33:12 pricing in your sworn declaration here, did you think you
10:33:15 should talk to him and ask him a little bit about his numbers,
10:33:18 or no?
10:33:19 A. What sworn declaration?
10:33:21 Q. Well, this report. You signed it.
10:33:22 A. Okay.
10:33:23 Q. And your word is good, I take it?
10:33:25 A. Of course.
10:33:25 Q. Okay. So, did you make an effort to contact him?
10:33:28 A. No. It was my --"
10:33:28 (WHEREUPON, THE VIDEO CLIP WAS CONCLUDED.)
10:33:32 BY MR. SEEGER:
10:33:32 Q. That was your testimony just one week ago from today, right?
10:33:39 A. Yes.
10:33:39 Q. Mr. Carubba, let me ask you this. Can we see Hernandez 393.
10:33:44 What's that document, do you recognize it? It's your report,
10:33:48 right?
10:33:48 A. Yes.
10:33:49 Q. Let's go to your report on page 2. And, Scott, if you could

pull up, actually this is the paragraph right here I would like to have nice and large so the witness can see it (INDICATING).

This is from your report and the date of your report is March 2nd, 2010, right, Mr. Carubba?

A. Yes.

Q. You signed this report?

A. Yes.

Q. You read it?

A. Yes.

Q. You stand by it?

A. Yes.

Q. In your report you say you reviewed the costs of repair and discussion regarding the cost of repair with Alex Locay, Benchmark Custom Builders, another experienced general contractor who has experience in repairing Chinese drywall houses in Florida and who reviewed, who reviewed my scope of work and assumptions and further validated those amounts based upon his experiences and accepted pricing guidelines and provided me with a comparable cost estimate. Now, that was what you wrote in your report on March 2nd, right?

A. Yes.

Q. So we have three versions now and I want to ask you to tell us what the final version is. Version 1, you never spoke to him when you did your report; Version 2 is what you said in the deposition, that you never spoke to him at the time of the report -- I'm sorry, Version 2 is what's in your report; and Version 3 is what you're

10:35:05 telling us now today. So which one do you want to pick?
10:35:08 A. Mr. Locay was on a conference call on February 26th --
10:35:12 Q. My question to you is which of those three, it's in your report
10:35:15 on March 2nd you spoke to him --
10:35:17 MR. HAYDEN: Objection, argumentative.
10:35:19 THE COURT: He is under cross, I overrule the objection,
10:35:21 go ahead.
10:35:22 BY MR. SEEGER:
10:35:22 Q. I am going to make my question really clear because this is
10:35:25 important. You agree it's important what we're doing here today,
10:35:27 right?
10:35:28 A. Of course.
10:35:28 Q. You have to be honest, you know that, right?
10:35:29 A. Of course.
10:35:30 Q. So Version 1: It's in your report on March 2nd that you spoke
10:35:34 to him.
10:35:34 A. Yes.
10:35:35 Q. Version 2: Your deposition says I never spoke to him.
10:35:38 Version 3 is: Yes, I spoke to him, the lawyers reminded me. Which
10:35:42 one? Please pick one.
10:35:43 A. I spoke to Mr. Locay on our conference call on February 26th at
10:35:48 my office. At the time of my deposition unfortunately I didn't
10:35:56 recall that he was on that conference call, and unfortunately in
10:35:56 the riggers of getting our work done on the pace we had to work
10:35:59 under -- and I think I even stated to you, with all due respect, in

my deposition that my short-term memory is not good.

Q. We just --

A. No --

Q. How about your long-term memory, is that good?

A. I do the best I can.

Q. Mr. Carubba --

A. And at no point did I intentionally with any malice aforethought or any intention to deceive say anything intentionally that wasn't accurate. The truth of the matter is I did speak to Mr. Locay, I didn't recall it at the time of my deposition, I am very sorry for that.

As I sit here today, my version is I spoke to Mr. Locay, he did produce his estimate simultaneous with mine, I did not rely on it, simply put it in as a means of validation and confirmation of my scope and magnitude.

And, yes, I had subsequent conversations with the attorneys in the case --

Q. And they reminded you?

A. They did.

Q. Okay. Now, Mr. Carubba, when I asked you the questions and I played it for everybody -- and this is my last question on this point, I am not going to beat it -- I asked you the question about your conversations with Mr. Locay six different times in six different ways that day; is that fair, do you agree with that?

A. Certainly.

10:37:04 Q. So here is my next question: You described the Hernandez home is mediocre and then what they have right now is not great. That was your testimony earlier, right?
10:37:13 A. Yes.
10:37:13 Q. What they have right now is the home with Chinese drywall and wires corroding; is that right?
10:37:19 A. It certainly has Chinese drywall in it, yes.
10:37:22 Q. And you also made a comment before about your way of estimating has kept you out of trouble. It hasn't kept you from being sued a lot though, right, Mr. Carubba?
10:37:31 A. Yes.
10:37:32 Q. You've been sued a lot?
10:37:33 A. If you say so.
10:37:34 Q. You've been sued a lot. How many times do you think you've been sued?
10:37:39 A. I think we discussed it in my deposition, and my recall is not that good, but let's say 20 --
10:37:43 Q. Twenty times?
10:37:44 A. -- in that many years.
10:37:46 Q. You're being sued currently, right, aren't you involved in a lawsuit right now involving a company called Jay's Body Shop versus you?
10:37:53 A. Yes.
10:37:55 Q. What did they say you did wrong there?
10:37:56 A. We designed the foundation for a body shop in Kenner and the

owner had some hairline cracks, and unfortunately he's asserting that those cracks are the result of some structural deficiencies in the design.

Q. Right. Okay. You have a number of lawsuits like that, especially involving foundations, right?

A. Yes.

Q. And, Mr. Carubba, I also asked you at your deposition if you had any citations or problems regarding dishonest business practices or your ethics, do you recall me asking you about that?

A. I don't recall the exact words you used. If you used dishonest and ethics, I guess I have to trust that you said it. I believe you.

Q. And you cited to me four times where you had been cited for or at least taken up -- I'll talk to one where you actually said you did it -- but at least four times where you've been cited for dishonest and unethical conduct, right?

A. I don't know that I'd use the word dishonest.

Q. Would you like me to find the deposition?

A. You can.

Q. Scott, pull up from the transcript, you don't have to pull up the video, page 129, line 4 through 23.

MR. HAYDEN: What page again?

MR. SEEGER: Page 129, lines 4 through 23.

BY MR. SEEGER:

Q. I'm sorry, do you have the question before that? I thought I

had it. All right. Skip it. If you can find -- Jeff, if you can find that cite and put it up.

So here is my question I'm going to do. You testified in one of those instances where you pled guilty to being -- a dishonest business conduct or an ethical charge involved a claim in 1998 you said, right, where somebody used your license; is that right?

A. Yes.

Q. Now, have you had an opportunity to talk to the lawyers and think about that testimony a little bit before -- since the deposition?

A. No.

Q. And you still stand by the fact that that was in 1998?

A. To the best of my recollection.

Q. Could I have the overhead projector. Do you see your name up there?

A. Yes.

Q. Hold on, let me get you the first page which has the date -- I'm sorry, at the top. Do you see at the top it says July 2003?

A. Yes.

Q. And underneath that it says Roy Carubba, that's you, right?

A. Yes.

Q. "Allegation: Allowing license to be used by unlicensed contractor to perform work in an amount in excess of $50,000." Do you see that?

10:40:51 A. Yes.
10:40:51 Q. It says here you pled guilty and your settlement offer was
10:40:54 accepted. Is that true?
10:40:55 A. Yes. That's not the same license that I was referring to in
10:41:01 1998.
10:41:02 Q. Anything untrue about that?
10:41:08 A. Hold on, it's not funny. In 1998, the thing that I described
10:41:09 here in my deposition was for my engineering license. In July of
10:41:13 2003, that's my contractor's license.
10:41:14 Q. Oh, okay.
10:41:15 A. They're different licenses.
10:41:17 Q. Did you make that clear to me when I asked you about dishonest
10:41:20 or unethical conduct that you had, in fact -- so this is in
10:41:24 addition to the four you talked to me about in your deposition; is
10:41:27 that right?
10:41:27 A. Well, I thought when you were asking me those questions you
10:41:29 were asking me about my engineering license. I didn't know --
10:41:31 Q. So you have four --
10:41:32 A. I didn't know that you were specifically referring to my
10:41:35 contractor license.
10:41:36 Q. You have four under your engineering license and this is in
10:41:39 addition, this is under your contract's license?
10:41:40 A. Yes.
10:41:40 Q. So this is five?
10:41:41 A. Yes.

10:41:42 Q. Thank you. And you talked about, you talked about -- in your testimony earlier you talked about your discussions with your plumber, I'm sorry, his name is Fuselier?
10:41:52 A. Fuselier.
10:41:53 Q. And your testimony here in this court today was that the subs tell you what needs to be replaced. Right, the subs tell you what needs to be replaced, that's your testimony, right? With regard to coils and wires -- I'm sorry, my question wasn't clear. I am talking about the plumber, Fuselier, and he does HVAC and plumbing, right?
10:42:15 A. Yes.
10:42:16 Q. And your testimony in response to Mr. Hayden's question was that the plumbers, the electricians, they tell you what needs to be replaced in the house, isn't that your testimony?
10:42:25 A. Yes.
10:42:26 Q. Did you listen to Mr. Fuselier when he testified in that seat yesterday?
10:42:30 A. Yes.
10:42:31 Q. You're aware of what he said about the HVAC coils?
10:42:36 A. In general, yes.
10:42:38 Q. In general, are you aware of the fact --
10:42:40 A. Are you going to ask me specific questions I am going to ask you to recall whatever it is you're going to ask me so I can speak specifically to it.
10:42:47 Q. That's fair.

A. Okay.

Q. Okay. So I am going to ask you a specific question. Did you hear him when he said that when he went to replace -- he was going to give you a price on the HVAC coils, you told him not to replace the coils. Was he lying or are you off about that? I just want to know who told who that the coils don't get replaced?

A. My recollection was that he came to me and said that the coils had recently been replaced and that we weren't going to replace them.

Of course the conversation between a sub and a general is, Bruce isn't going to say as a sub that he told me to replace them. He defers the final decision to me. Now maybe his wording wasn't as eloquent as it could have been, but the way the communication would have happened, he would have come to me and said, look, I think these coils need to be replaced and then I as a general would say, okay, go ahead and replacement.

So in that light, yes, I told him to replace them or not replace them because the decision falls with the general contractor.

Q. Let's take a look at this testimony, okay, Mr. Carubba?

A. Sure.

Q. He was asked by Mr. Herman:

"Q. With the coils, first you were told that you were going to replace the coils, right, with the new coils?

A. Well, what I was told when I came in -- and again, I had

no briefing before we came to this house, so it's not like we had a bunch of meetings talking about it.

Q. Okay.

A. I immediately went in, and the talk in the house was air-condition coils have be replaced.

Q. Okay." Said Mr. Herman.

"A. It wasn't until after that I found out those had been replaced.

Q. All right.

A. But then he also said that on this house, because of whatever coils they put in there, they didn't even want me to take them out, clean them, and put them back in. They wanted me to just leave it like it was."

So Mr. Herman says:

"Q. First, you were going to replace them."

Then -- whatever, I am going to skip a little bit. And he says:

Q. You didn't make any of those decisions -- here is the important part where Mr. Herman says to Mr. Fuselier:

"Q. You didn't make any of those decisions, correct?

A. No. I was told that at different times that, no, this is not what we are doing. I don't know who was making them. I don't know where it was coming from. I just tried to adjust my prices verbally as we went.

Q. For you, those instructions came from Mr. Carubba; right?

A. Oh, I'm sorry. Yes, sir. Yes, sir. I apologize."
BY MR. SEEGER:
Q. Does that refresh your recollection about the discussion you had with Mr. Fuselier about the HVAC coils?
A. Yes.
Q. Now, when I deposed you I asked you if you had reviewed any of the defendant's expert reports. Do you remember the answer you gave me one week ago?
A. I don't. I'm sure you're going to refresh me.
Q. I am. The answer was, no, I didn't review any of the expert reports. And what did you say today in response to Mr. Hayden questions in front of the judge about reviewing expert reports at the time you did your report?
A. Beyler and Perricone.
Q. And who reminded you of those since last Thursday?
A. I don't recall.
Q. And you also during your deposition testified that the scope of the work that you were told to do came from the lawyers. Is that still your testimony today or are you going to change that?
A. I am going to stay with that.
Q. You're going to stay with that, okay. Save me some questions.
Now, you also testified today that you saw no evidence of pitting or corrosion at the house, do you remember that?
A. Yes.
Q. Can I see Hernandez 532. How many times have you been to the

Hernandez house, Mr. Carubba, once, right?
A. Yes.
Q. Okay. In that one time you went did you notice that?
A. I don't recall seeing that.
Q. Did you look in the bathrooms?
A. I did.
Q. Did you look at the fixtures around the sink and things like that?
A. I did.
Q. So you didn't see that when you walked through the house, right?
A. No.
Q. Okay. Well, let me ask you this. How about Hernandez 534. Did you turn any doorknobs when you were in the house?
A. I did.
Q. Did you notice that corrosion and pitting?
A. I did not.
Q. Okay. How about Hernandez 218. Did you look at any pictures that were sitting around, sort of open and obvious for everyone to look at when you walked through the house?
A. I didn't.
Q. So you didn't notice that picture frame right there and the corrosion on that as well, did you?
A. No.
Q. Okay. Now, just a few questions on your pricing. There's been

10:47:29 a lot of testimony on this already. There's two standardized
10:47:32 guidelines for pricing construction jobs, one is RSMeans, right,
10:47:37 you agree?
10:47:38 A. No.
10:47:38 Q. You don't agree that that's a standardized guideline?
10:47:41 A. I think Means is a standardized reference material.
10:47:44 Q. Standardized reference material. And the other standardized
10:47:49 reference material is Xactimate, you've heard of that, right?
10:47:51 A. Yes.
10:47:52 Q. And RSMeans is a national guide, isn't it, it covers all areas
10:47:55 of the country?
10:47:56 A. Yes.
10:47:57 Q. It even makes adjustments for places like Louisiana where the
10:48:06 prices might be a little different because that's what they do,
10:48:06 right?
10:48:06 A. Yes.
10:48:06 Q. And Xactimate, that's widely used by most insurance companies,
10:48:07 fair enough?
10:48:08 A. Yes.
10:48:08 Q. And that also makes adjustments based on local customs and
10:48:12 practices, doesn't it?
10:48:13 A. Yes.
10:48:14 Q. But the Roy Carubba method isn't to follow either one of those
10:48:17 guidelines, is it?
10:48:18 A. It's not the Roy Carubba method, it is a tried and true method

in construction that when one has to provide a price because we hire subcontractors, it is usual and customary for us to consult with those subcontractors during our pricing and not relegate it to a computer program that may or may not be current in its updates.

Q. Let me just --

A. So it's not a process that I invented, it's something that contractors use. And as I stated earlier in my deposition, I don't know of any general contractor that estimates with Xactimate. Now maybe some of them use RSMeans because RSMeans is a more appropriate means and methods of estimates. But at the end of the day, it certainly is a more prudent way of estimating in my opinion to just pick up the phone and call suppliers and subs to get real world realtime prices.

Q. Right. But at the end of the day we've got, you're in a courtroom testifying to a judge about these people's homes and we're trying to find a price for what the proper price should be for fixing their house. And you've got two standard methods, they're also indisputable, you have RSMeans and Xactimate, and you chose the Roy Carubba method. And by the way, which one is cheaper?

A. Mine is more accurate in my opinion.

Q. Which one is cheaper?

A. Xactimate or RSMeans, which one are you asking?

Q. Who gave the cheapest prices here between you --

A. I did.

10:49:45 Q. Mr. Mallet testified, and I don't have to repeat his testimony, he said he used Xactimate. Whose price is cheaper here?
10:49:51 A. Mine.
10:49:52 Q. Now, by the way, this RSMeans guideline, it gets updated every year, doesn't it?
10:49:57 A. I think it's actually more than annually, I believe they may update it quarterly, I am not sure.
10:50:01 Q. And it's actually online if you don't want to put the books in your office, you can go online and check these prices, can't you?
10:50:07 A. I would certainly think so, yes.
10:50:13 Q. But you don't even have that, do you, because when you needed a painting price you had to make some phone calls to a friend to get the RSMeans quote, you didn't even check if yourself, did you?
10:50:18 A. Well, Mr. Seeger --
10:50:19 Q. It's an easy question.
10:50:21 A. It is. There is no reason for me to do that because I believe it's more reliable and I stand behind the method that I used to estimate the cost of renovating this home. It's more accurate in my opinion to call a subcontractor and get a real price than to relegate it to a reference book.
10:50:38 Q. Let's focus on painting. You didn't do that. You called somebody to give you the RSMeans price for the painting number, didn't you?
10:50:45 A. Yes.
10:50:45 Q. You didn't even take the book yourself, open it up, find the

10:50:50 painting column, and come up with a price, you called somebody?
10:50:53 A. Yes.
10:50:58 Q. And you actually -- I asked you this question also in your
10:51:05 deposition. You have an expectation of doing a lot of remediation
10:51:09 work for KPT in this case, don't you? I mean, not just the
10:51:13 Hernandez house, you're hoping to get other work in this, aren't
10:51:15 you?
10:51:15 A. I would have to defer back to my deposition because I don't
10:51:18 remember what I answered.
10:51:19 MR. SEEGER: Okay. Can you put up page 73, line 21,
10:51:25 Scott, through 74, line 3.
10:51:25 (WHEREUPON, A VIDEO CLIP WAS PLAYED.)
10:51:50 "Q. What were you told to do?
10:51:52 A. I was asked to come up with a construction cost estimate
10:51:56 to renovate the homes that were constructed with KPT, Chinese
10:52:00 drywall.
10:52:02 Q. Were you told it was going to be potentially more than one
10:52:05 home, many homes?
10:52:07 A. Yes. And yes."
10:52:07 (WHEREUPON, THE VIDEO CLIP WAS CONCLUDED.)
10:52:09 BY MR. SEEGER:
10:52:09 Q. Does that refresh your recollection?
10:52:10 A. Yes.
10:52:11 Q. Now, let's spend a little bit more time on pricing and I'm
10:52:16 almost done. I want to talk about how you got some of these prices

10:52:21 so low.
10:52:21 So when I deposed you, we had your report and we had
10:52:26 Exhibit B to your report. Which at the time is what we were
10:52:30 thinking was your cost estimate, correct?
10:52:33 A. Yes.
10:52:36 Q. So can we go to Hernandez 393 and go to Exhibit B, Scott. Yes,
10:52:45 yeah, I'm sorry, Exhibit B. That's page 0008.
10:52:51 And that's what we had on March 2nd, this is the scope of
10:52:54 everything you gave us, right?
10:52:56 A. Yes.
10:52:56 Q. And then after your deposition a couple of days ago you updated
10:53:09 that, right, we got DX 237. Is it possible to show that
10:53:10 side-by-side?
10:53:21 So let's find electric on the original Exhibit B, the
10:53:24 first one attached to your report, down toward the bottom. And
10:53:33 that's your price of $2,200, right, that's the price you had in
10:53:36 there?
10:53:36 A. Yes.
10:53:37 Q. And then sometime around your deposition, I can't remember if
10:53:42 it was before or after, Mr. Hartenstein was deposed by Mr. Herman,
10:53:46 right?
10:53:46 A. I assume so, I didn't keep up with his schedule with the
10:53:49 attorneys.
10:53:49 Q. And Mr. Hartenstein's deposition testimony, as well as his
10:53:52 trial testimony was, he didn't send you a bid for $2,200, he sent

you a bid for $3,400, right?
A. That's correct.
Q. Do you want to explain how the wrong number got put in there?
A. It was just a simple error in producing the report.
Q. Okay. Now, let's talk a little bit about that electrical price. So now the number is $3,400, that's the new number, you stand by that one, right?
A. It was always 3,400 for Mark, I just inputted it incorrectly in my initial estimate.
Q. Okay. So for $3,400, the scope of Mr. Hartenstein's work is to replace 139 outlets and switches in their home, right? Clean the corrosion off the ground wires, take out the old, and put in 139 outlets and switches throughout the home, that's the price, right?
A. I would have to certainly look at his estimate, I believe you if you tell me that's what it is.
Q. You have your report in front of you, if you would like to satisfy yourself there's 139 outlets and switches.
A. I don't know that my report has his renovation estimate. I certainly --
Q. Mr. Carubba, I'll represent to you and make it easy, it's 139 outlets and switches.
A. Okay.
Q. Here is my question. $3,400 to replace 139 outlets and switches and yet Mr. Hartenstein had to go to the property to harvest some samples for the lawyers to look at, right?

10:55:24 A. Yes.
10:55:24 Q. And he harvested, what did he harvest, let's take a look, ten switches and eight receptacles. Do you dispute that?
10:55:32 A. No.
10:55:33 Q. Ten switches, eight receptacles, so 18. And he took a smoke detector and he took a circuit breaker. Okay. Any dispute about that?
10:55:41 A. No.
10:55:42 Q. And he sent you a bill for that too, didn't he?
10:55:50 A. Yes.
10:55:50 Q. Because this bill says it went to you. Can we have Hernandez 540, please. Sorry Scott, I don't mean to make you jump around.
10:55:59 So for the pricing of harvesting 18 outlets and switches, one smoke detector -- which is popping it off and taking it down -- and a circuit breaker, he sends a price for $1,144, that's his bill, isn't it?
10:56:13 A. Yes.
10:56:14 Q. So he is going to, for $3,400 he is going to replace 139 switches and outlets, right?
10:56:19 A. Yes. You're comparing apples to oranges. Well, because Mr. Hartenstein when he made the initial visit to the Hernandez's home, once again, very similarly to what we did at the town home, there were attorneys present and people, he couldn't efficiently do his work.
10:56:36 Q. I understand. I understand.

A. I'm hoping you do because it's not a fair comparison to use that number and try to extrapolate it into a hard bid number where he can get in without resistance, get there early in the morning so that travel cost is spread over eight work hours, not two, and it dramatically increases the efficiency. So it's not a fair comparison.

Q. Did you sit in the courtroom when Mr. Hartenstein also testified and he was critical somewhat of the way the electric was done in some of the electrical boxes in the Hernandez home, did you hear him when he testified that if he is required to do it the right way, that's going to be more than $3,400 as well. Did you hear that testimony?

A. I did. If he encounters such elements in the house, yes.

Q. Which he saw in the box in one picture we showed him, he said there is a problem with that, I would have to fix that. Right?

A. He also said if it was isolated he wouldn't charge anymore money to do it.

Q. Okay. So let's go back to the split screen, if we can, of the two estimates. Now, you came up with a new line item on DX 237, which was the exhibit you produced to us after your deposition, and that was to install doors, right?

A. Yes.

Q. That wasn't even there on your original pricing, was it?

A. That's correct.

Q. The only reason it's there, let's be fair, is I asked you

questions about where is your price to install the doors and you didn't have an answer at your deposition, right?
A. That's correct.
Q. Okay. And the granite countertops, sitting here today you're still not sure if you got that measurement right, are you?
A. I know what the correct measurement is, it's still misrepresented inadvertently on my estimate.
Q. Would you like to start this all over again, do you want to reprice this job?
A. No.
Q. Let me ask you this. You testified that the granite countertops need to be replaced. We're in agreement on that, right?
A. Yes.
Q. You testified that the reason for that is they're likely to break, that's your testimony, right?
A. Yes.
Q. You testified that the wood trim and molding needs to be replaced, right, because they're delicate and likely to break?
A. Yes.
Q. Yet you think you can save their cabinets, their kitchen cabinets, right?
A. Yes.
Q. Now, you testified that the switches and receptacles should be replaced in the house, right?

A. Yes.
Q. And that the smoke detector should be replaced in the house, right?
A. Yes.
Q. Because they have corroded electrical components, right?
A. Yes.
Q. Yet you think it's okay to leave, take the right fixtures and put those back in the house, don't you?
A. Yes.
Q. Now let's talk about the demolition a little bit. You heard Mr. Bailey testify who had been qualified as an expert like you, in this court, that the normal and customary method for ripping out drywall is to break holes with a hammer and rip it off the wall, and you disagree with him, right?
A. Yes.
Q. And you heard the Beazer guy testify, Mr. Phillips, that that's the way Beazer does it and you disagree with him as well, right?
A. Yes.
Q. And the Beazer company is a really big construction company, aren't they?
A. If you say so. I am not familiar with their firm.
Q. So you did this demo job on another home, it's not on the Hernandez's home, you did a demo job where you demoed one room, right?
A. Yes.

11:00:00 Q. Using the method that you showed to this court in your direct testimony, right, of cutting the drywall, right?
11:00:06 A. Yes.
11:00:06 Q. How long did it take to remove the drywall?
11:00:09 A. A day.
11:00:10 Q. A day. Well, in your deposition testimony you said a day and a half, so which is it?
11:00:13 A. Okay.
11:00:14 Q. Which is it?
11:00:15 A. A day and a half.
11:00:15 Q. Thank you. How long did it take to clean?
11:00:20 A. We were there a total of two days so by mathematics a half day to clean it.
11:00:25 Q. One room?
11:00:25 A. One room.
11:00:26 Q. Did you hear Mr. Phillips from Beazer testify that it takes a half a day to remove the drywall in a house? Did you hear that?
11:00:35 A. I'm sure I heard it, I don't recall it as I sit here today.
11:00:37 Q. Now, how much did Mr. Jimenez, that's who you testified did the demo work in the demo house, how much did he charge would you for the two days?
11:00:50 A. I would have to have his bill.
11:00:50 Q. Can he have Hernandez 649.
11:00:51 A. I think maybe a couple of thousand dollars, something like that in that order of magnitude.

11:00:57 Q. For two days work Mr. Jimenez charged you $2,035 for a 200 square foot room, right?
11:01:06 A. Yes.
11:01:08 Q. Do you know what Mr. Mallet's price is for the entire house?
11:01:13 A. $15,000, something like that.
11:01:14 Q. Twelve, $13,000?
11:01:16 A. Okay.
11:01:16 Q. So if you extrapolate 2,000 to -- I'm sorry, if you extrapolate $2,000 to demo a 200 square foot room to a 2,000 square foot house, looks like Mr. Mallet got the price right there as well, doesn't it?
11:01:32 A. It's not a fair comparison. Because as I stated earlier in my testimony, there were many people in that room and the exercise was simply for dust control and not for the efficiency of construction.
11:01:42 Q. Last question --
11:01:44 A. So although your analysis is, I believe to be oversimplified, I stand by the 6,300 that we have in our estimate for the reasons I described herein.
11:01:54 Q. Okay. Last question. Removing the dust after the demo. It's your testimony that you can use a vacuum, a shop vac vacuum, correct?
11:02:03 A. Yes.
11:02:04 Q. In those reports, now you're saying today to the court that you read Mr. -- Dr. Perricone's report, that's your new testimony, right, that you read his report?

11:02:14 A. Yes.
11:02:14 Q. Did you see what Dr. Perricone and Dr. Lee recommend to clean the dust in the house? What did they recommend?
11:02:21 A. I would have to ask you to show it to me, which I'm sure you would be happy to do if I don't recall it.
11:02:26 Q. How about a HEPA vac?
11:02:28 A. Okay.
11:02:28 Q. So you're disregarding their advice on this as well, correct?
11:02:31 A. Well, your words are strong. I would make my own decision, and my experience the shop vac is adequate to remove the dust. I believe Dr. Lee said in his testimony that you could use a shop vac, it would just take more passes than a HEPA vac.
11:02:44 MR. SEEGER: That's what he said in his testimony in the court. Thank you very much.
11:02:50 Oh, your Honor, can I offer in Hernandez 532 and 218? Are you guys okay with that?
11:02:59 MR. HAYDEN: Yes, that's fine.
11:03:06 THE COURT: Let them be admitted.

REDIRECT EXAMINATION

BY MR. HAYDEN:
11:03:06 Q. Mr. Carubba, I just want to clear up a few things. First with regard to Mr. Hartenstein, you saw an invoice for work that he did at the Hernandez house that counsel just put up on the screen --
11:03:19 A. Yes.
11:03:20 Q. -- do you recall that? And that had to do with harvesting of

switches and outlets?
A. Yes.
Q. It was for both the Hernandez house and the townhouse, correct?
A. I would have to look at the invoice and see if he specified it; but if you tell me that that's what it is, I believe you.
Q. So it was actually two properties and it was the harvesting of evidence for the lawyers, right?
A. Yes.
Q. And that's not -- would they follow the same protocol as they would when they were removing the switches and receptacles in a scope of work protocol that you're suggesting?
A. No.
Q. And when they were doing it they had several lawyers breathing down their backs, didn't they, you were there?
A. Yes.
Q. And actually the harvesting of the switches and receptacles --
MR. SEEGER: Your Honor, can we just stop the leading?
MR. HAYDEN: That's fine.
THE COURT: Sustain the objection.
BY MR. HAYDEN:
Q. Did they do anything else that day? Was that the same day as the inspection?
A. Mr. Hartenstein is an electrician and he has a means and method of doing his work, the purpose of doing this work was to facilitate the processes of this legal matter. So he didn't operate, he and

his crew, with the normal efficiency that they would do, he had to start and stop his work, just like the drywall people did when he took the drywall out of the townhouse.

So comparing his bill to what he would do in a hard bid construction job where he has the time and not the restrictions of this being a legal matter but a pure construction project, his efficiency is going to go way up.

Q. How many people were in that Hernandez house that day?

A. I mean, I had my people there and there were several attorneys on both sides of this case, a lot. And the attorneys were following everybody around. So there's no way that Mark or Bruce or Ismael in the demolition of the drywall could operate in a normal means and methods manner of doing construction. It's impossible.

That wasn't the purpose in doing all of this. The purpose was to provide information for this legal matter.

Q. Now, sir, let's go back to these claims of complaints that opposing counsel referenced at the beginning of his cross-examination. Could you tell, could you explain to the court, those were complaints to what body?

A. I have an engineer's license and a contractor's license. Okay. Mr. Seeger brought up a complaint in 2003 from my contracting license, and I got -- I did a job in Baton Rouge and I was out of town and I had my bookkeeper cut a check. And in her ignorance, she cut it to a subcontractor instead of -- she didn't follow the

proper procedure.

There are certain ways you have to pay people, and it was just a simple error and coincidentally somebody complained to the board and I was guilty of that error. But it was just -- Mr. Seeger used words like dishonest and unethical. And in a black and white world, it could certainly be construed that way. But the truth of it is, it was a battlefield mistake.

Q. And it was to a board?

A. It was to the contracting board, which is different from my engineering board.

Now, I thought when Mr. Seeger was asking me those questions he was asking me specifically about my engineering license. At no time did I attempt to deceive or conceal what he brought up today.

Q. And let's talk about with regard to your contracting license -- or that was with regard to your contracting license?

A. Yes.

Q. Okay. And then he raised some issues with complaints with regard to your engineering license. Do you recall that?

A. Yes.

Q. Why don't you walk through for the court what we're really talking about here.

A. Your Honor, I've been involved in thousands of projects, and we live unfortunately in a very litigious society. I can't control when people want to sue my company. Now, there are several --

there were several instances where it was my responsibility and they became legal matters, and I addressed them and stood up for them and fixed those problems.

Q. Let's explain them. Why don't you walk through each one of those.

A. The first one was shortly after I started my practice in the early '90s, I did a set of house plans for somebody and I neglected to affix my company logo on the drawing, just ignorance, I was a new business owner and I just neglected to do that one detail. So I got reported to the engineering board. They fined me $50 and made me take an ethics exam.

Q. How much?

A. It was some nominal amount of money.

The second complaint came shortly thereafter. I did a set of plans for a gentleman and his driveway cracked. Well, they said it was my fault. Come to find out this guy was unloading engines --

MR. SEEGER: Objection. Foundation for what this guy was doing or anybody was doing.

THE WITNESS: Well, I do remember. This guy was --

MR. SEEGER: I have to address it to the judge, sorry.

THE COURT: The question is how does he know, so he is objecting.

THE WITNESS: I'm sorry, did I say something wrong?

BY MR. HAYDEN:

Q. How do you know that?

A. How do I know what?

Q. About what you were about to say?

A. I remember the guy lodged a complaint because his driveway cracked, and I rode by his house to go look at it and there he was unloading engines with a dual axle truck. Come to find out, he was unloading engines and that heavy axled vehicle is what cracked his driveway. So it wasn't my fault. However in the world we live in people are able to lodge complaints and he lodged a complaint. That was in the early '90s right after I started my practice.

Q. Did you pay a fine there?

A. I don't remember paying anything for that one.

The third one was in 1998 where one of my employees was using my stamp behind my back. He was, in my ignorance again being a young business owner, I didn't lock my stamp up and he was using it behind my back. And long story short, this particular homeowner had a problem with his house. So I went out to look at it because he called my office requesting that I come look at his foundation. Well, the foundation was in Pass Christian, Mississippi and it had a Louisiana stamp on my foundation drawing. Well, I'm sorry, I wouldn't have stamped something in Mississippi with a Louisiana stamp.

So upon further investigation I found out that this person in my office was stamping -- he was drawing plans for people and using my stamp.

So long story short, the board got wind of it because I went to the home owner and I told him the truth, and I said Mr. -- I don't remember his name -- that's not my work, he reported me for being honest to him. And that's a very egregious thing in our business to not have supervision over your stamp. So I guess in hindsight I should have kept it under lock and key, it's not my nature to do that, but that's the way in practiced in 1998.

So I got fined $5,000 for that offense because I was honest and told the truth. They published it in the periodical magazine, our monthly publication, and that was that.

Now, the last one was a guy in Baton Rouge where I designed a bulkhead for him to lower his boat in the water. And he was not happy with what I did so he reported me to the board. Nothing came of it, but I still got reported to the --

Can I tell you something? I don't know how you exist in business and not have people -- you can't make everybody happy. But at no time in my practice have I ever endeavored, to use Mr. Seeger's words, dishonest or unethical behavior, never. I get up every day and try to do the right thing. Unfortunately the world we live in people sue and they can make gray items appear black and white, which is why we're all in this room today.

Q. Is that the extent of the complaints that you recall to the board?

A. To my recollection, yes.

Q. And that's after -- that's the extent of your complaints over

how many years have you been in business?
A. Tomorrow makes 17 years, 6 years prior for other employers.
Q. And I believe you testified, how many different properties have you been involved with?
A. Over 5,000.
Q. So you're familiar with folks working in the parish of St. Tammany?
A. Yes.
Q. And the contractors who work there and the engineers?
A. Some, yes.
Q. Have you ever heard of Mr. Mallet or --
A. Mallet.
MR. SEEGER: Objection, your Honor.
BY MR. HAYDEN:
Q. -- working in the parish of St. Tammany?
A. No.
Q. Ever hear of Mr. Hicks ever working in the parish of St. Tammany?
A. No.
MR. HAYDEN: I think that's all I have.
THE COURT: All right. Thank you, you're excused, sir.
MR. HERMAN: Your Honor, before we recess, I wanted to clear up a few things with the exhibits.
I've spoken to defense counsel and they have no objection to the admission of Hernandez 483 and Hernandez 484, which were

from Mr. Fuselier's testimony yesterday. Also there are two ASTM standards to which there are no objection on the spreadsheet, which are Hernandez Exhibits 128 and 129. We would like to offer, file and introduce them.

MR. SANDERS: I don't remember how they were used, but.

THE COURT: I'll admit them.

MR. HERMAN: Hernandez 452, your Honor may recall is the Crawford TIP inspection report. There is an objection to it on their spreadsheet, but your Honor may recall that when we went to the visual inspection of the Hernandez home that was provided to the court, and I don't think defense counsel objected to it at the time, and we just thought for completeness of the record that should be admitted.

THE COURT: Okay. Any objection?

MR. SANDERS: We object as it's not relevant, but if it comes in it's not a problem.

THE COURT: Right. I'll admit it, I find it relevant.

MR. HERMAN: Thank you, your Honor.

MR. SANDERS: One thing for us from yesterday, is defense Exhibit 213, which is the scope of work for the plumber.

MR. SEEGER: We're okay.

THE DEFENDANT: Let it be admitted. Let's make sure we have it.

MR. HAYDEN: Your Honor, I believe these are the exhibits for Mr. Carubba. Could I check with the clerk, have we moved in

defendant's Exhibit 237 and 211.

THE DEPUTY CLERK: No.

MR. HAYDEN: 237 is the revised cost estimate.

MR. SEEGER: It's part of his report, your Honor, so it wouldn't be admitted into evidence.

MR. HAYDEN: The cost estimate was separate and apart, and the scope of work which was an exhibit.

MR. SEEGER: The division of Exhibit B is part of his report so it wouldn't be moved into evidence, right?

MR. HAYDEN: It's a cost estimate just like Mr. Mallet's cost estimate.

MR. SEEGER: They didn't move Mr. Mallet's report into evidence. You did?

MR. HAYDEN: You also did the attachments.

THE DEPUTY CLERK: What number is it?

MR. SEEGER: We did, fine, I'm sorry, your Honor.

THE DEPUTY CLERK: I thought you did.

MR. HAYDEN: We're not actually moving the reports.

THE COURT: Right, putting in the estimate.

THE DEPUTY CLERK: 211 and 237.

MR. HAYDEN: Yes.

THE COURT: Those are the attachments to the report.

Okay. Both sides check with Gaylyn to make sure you have the exhibits and then tomorrow, what time tomorrow?

THE DEPUTY CLERK: 9:30 tomorrow we'll hear from the last

witness, and then I'll hear closing arguments from the parties.

MR. SEEGER: Thank you.

THE COURT: The court will stand in recess.

THE DEPUTY CLERK: Everyone rise.

(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

* * * * * *

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

______________________________

Karen A. Ibos, CCR, RPR, CRR

Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION *

**THIS DOCUMENT RELATES TO:** * MDL No. 2047

Tatum B. Hernandez, *et al* * Section L

versus * New Orleans, Louisiana

Knauf Plasterboard (Tianjin) Co., Ltd., *et al* * March 19, 2010

Case No. 09-CV-6050 *

* * * * * * * * * * * * * * * * * * * * *

VOLUME V - MORNING SESSION
PROCEEDINGS BEFORE THE
HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For Tatum and Charlene Hernandez: Herman, Herman, Katz & Cotlar, LLP
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, Louisiana 70113

For Tatum and Charlene Hernandez: Gainsburgh Benjamin David Meunier & Warshauer
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

APPEARANCES:

For Tatum and Charlene Hernandez: Seeger Weiss
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

For Tatum and Charlene Hernandez: Lewis & Roberts, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

For Knauf Plasterboard (Tianjin) Co., Ltd: Frilot, LLC
BY: KERRY MILLER, ESQ.
KYLE A. SPAULDING
1100 Poydras Street, Suite 3700
New Orleans, Louisiana 70163

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

For Knauf Plasterboard (Tianjin) Co., Ltd.: Baker & McKenzie, LLP
BY: DOUGLAS B. SANDERS, ESQ.
KYLE P. OLSON, ESQ.
ERIN M. MAUS, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter: Toni Doyle Tusa, CCR, FCRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7778

Proceedings recorded by mechanical stenography, transcript produced by computer.

# I N D E X

| | PAGE |
|---|---|
| Matthew J. Perricone | |
| Voir Dire | 817 |
| Direct Examination | 824 |
| Cross-Examination | 884 |
| Redirect Examination | 913 |

**MORNING SESSION**

**(March 19, 2010)**

**THE DEPUTY CLERK:** Everyone rise.

**THE COURT:** Be seated, please. Good morning, ladies and gentlemen.

**MR. SEEGER:** Your Honor, we have a motion this morning.

**THE COURT:** All right.

**MR. SEEGER:** The Court's pretty much aware of the issues involving Dr. Perricone. Last night, we had an opportunity to depose him about his testimony today. Your Honor, we really have to move for his exclusion for a few reasons that we believe the Court will -- and we hope you will agree.

Here is the report, Your Honor, that was served by Dr. Perricone and Dr. Lee. They were both on this report, so they didn't serve separate reports. It's not like, you know, one guys does appliances and one guy does copper. They are both on this report. They're both signatories to the report.

Your Honor heard from Dr. Lee. Dr. Lee gave the opinion to this Court that the plaintiffs are all washed up and the corrosion stops once the drywall is removed. Dr. Perricone was asked this question in his deposition last night, putting aside the issue of whether he should have been reviewing the

transcripts and all that because he came in late. I asked him:

"Question: Have you reviewed Dr. Lee's testimony in this case that he just gave I think it was yesterday?

"Answer: Yes, I have.

"Question: Did he get anything wrong in his answers regarding the removal -- removing the source of the corrosion and that the corrosion would not continue?

"Answer: My reading of Dr. Lee's testimony is that it was a fair assessment and accurate."

Judge, why do you need to hear that twice? Is that really fair to these people right here that they bring in duplicate witnesses on the very same issue?

That's not the only thing: Tarnishing doesn't exist under the jacket on the copper wires. Judge, you heard that from Dr. Lee. I crossed him on it. This witness has now had an opportunity to see my cross on those points.

I wish I could say I've got a brand-new cross for Your Honor, but the cross-points are the cross-points. I could go after this witness' qualifications. We don't think he's really qualified. Again, I've been in this situation in personal injury cases where you have like a cardiologist and a physiologist and they're talking about the heart condition from different aspects, same opinions with different aspects. This is identical. We have a chart, if Your Honor's interested in it, comparing exactly the points that Dr. Lee made and you're

going to hear again today.

Your Honor, that's our motion.

**THE COURT:** The issue is really not a *Daubert* issue. The issue is a cumulative issue, whether or not the testimony is cumulative, and I don't know whether it is cumulative until I hear it. Let's, both sides, be conscious of that. I don't want to have two witnesses, three witnesses saying the same thing as the first witness. So be conscious of that and deal with it.

Oftentimes, witnesses look at things from different vantage points and they look at the same issue from different vantage points. We see that oftentimes in medical issues and things of that nature. I don't want him to just restate everything that the other witnesses said.

**MR. SEEGER:** Thank you, Your Honor.

**THE COURT:** Thank you.

Another thing. Let me make a comment about the opportunity to review the testimony. The person that's being called is an expert witness. Expert witnesses are allowed by the courts to sit in the courtroom while other expert witnesses testify because they can give an opinion, unlike fact witnesses. So fact witnesses we excluded because fact witnesses, we want them to tell us what they saw, what they heard, what they observed, and not any opinion on any other witnesses. That is not the case with experts.

Experts are individuals who can only give opinions. Basically, they don't have eyewitness information, so they are allowed to sit in on testimony. So he could have sat in on the testimony as opposed to reading it. I don't see any prejudice by the fact that it was taken a day later.

**MR. SEEGER:** I 100 percent agree with that. We do it all the time. The only reason I think in this case it's different is because it's the exact same testimony.

**THE COURT:** Sure. Let's call the witness.

**MR. SANDERS:** Dr. Perricone.

(WHEREUPON **Matthew J. Perricone**, having been duly sworn, testified as follows.)

**THE DEPUTY CLERK:** Please be seated. Would you state your name for the record.

**THE WITNESS:** My name is Matthew J. Perricone.

**THE COURT:** Dr. Perricone, you've heard what I said. I'm interested in your opinions, not reinforcing anybody else's opinions in the case. Do you understand that, sir?

**THE WITNESS:** Yes, Your Honor.

**THE COURT:** You may proceed, Counsel.

**VOIR DIRE**

**BY MR. SANDERS:**

**Q.** Good morning, Dr. Perricone.

**A.** Good morning.

**Q.** Where do you live?

**A.** I live in Pittsburgh, Pennsylvania.
**Q.** Who are you currently employed with?
**A.** I'm employed by RJ Lee Group.
**Q.** What is RJ Lee Group?
**A.** RJ Lee Group is a materials characterization and consulting firm complete with a laboratory.
**Q.** What is your educational background?
**A.** I hold a bachelor's, master's, and PhD in materials science and engineering from Lehigh University.
**Q.** Did you have any particular focus when you were going through and getting your master's and your PhD?
**A.** My focus during that time was on controlling the corrosion resistance of welds made on stainless steel alloys.
**Q.** So what exactly were you looking at there or examining?
**A.** In that material system, particularly interested in controlling the distribution of alloying elements in stainless steels that provide their corrosion resistance, looking specifically at how to control how those alloying elements are distributed when fusion welds are made.
**Q.** While you were in school there, were you involved in any other projects with respect to corrosion?
**A.** I was involved in multiple projects and contributed in some part to work that was being done in the high-temperature corrosion of sulfur onto iron-based alloys in fossil-fired boilers.

**Q.** After you graduated, where did you go?
**A.** After I graduated, I was hired by Sandia National Laboratories in Albuquerque, New Mexico.
**Q.** Is that the same Sandia Laboratories that's investigating corrosion in this case on behalf of the CPSC?
**A.** Yes, it's the same laboratory.
**Q.** Were you a postdoc there, or did you have a full-time job?
**A.** I was hired as a full-time employee.
**Q.** What did you do at Sandia?
**A.** At Sandia, I worked in the joining and coatings department and the materials science and engineering center and continued work on control of microstructure of stainless steel welds as well as, obviously, numerous different projects over the course of my time of employment.
**Q.** With respect to corrosion, were you doing anything relating to corrosion still?
**A.** The extent of my research continued regarding the control of distribution of alloying elements and the fusions of welds. Yes, my work included that type of corrosion control.
**Q.** How long were you at Sandia?
**A.** A little bit shy of two years.
**Q.** Where did you go after that?
**A.** I was hired by RJ Lee Group in Pittsburgh -- actually, Monroeville, Pennsylvania.
**Q.** We've heard a lot about sort of some of the techniques

that a materials scientist or others use. Are you familiar with SEM and EDS and other sort of testing techniques?

**A.** Yes, I am.

**Q.** Just briefly, could you explain what those are.

**A.** Sure. SEM stands for scanning electron microscopy. It's a useful technique in order to look at materials at very high magnifications. EDS refers to energy dispersive spectroscopy, which allows us to look at the chemistry, the local chemistry, in those locations at high magnification.

**Q.** If you're looking at -- well, how many SEM images have you looked at in your career?

**A.** Thousands.

**Q.** What about with respect to this case?

**A.** Hundreds, certainly, in this case.

**Q.** Is using part of those techniques part of your job day-to-day as a materials scientist?

**A.** Yes, it is.

**Q.** Can you tell me what type of projects you have worked on at RJ Lee.

**A.** As a materials characterization and consulting firm, I've worked on projects that have served a wide variety of clientele, from industrial to governmental. Those works have included work in the medical device industry, have included work in the manufacturing industry, as well, and dealing with environmental impact issues that would deal with corrosion.

**Q.** Have you been involved in any failure analysis work?
**A.** Failure analysis is a routine and frequent part of my job at RJ Lee Group.
**Q.** What type of projects? Can you give us one or two that you've been involved in.
**A.** I've worked on failure analyses that could range on things that are fairly small, things like a medical implant that has failed while in a patient, up to very large, industrial-sized things like wind turbines for energy generation.
**Q.** When you're looking at something like that, what is your specific purpose, or what are you doing in that project?
**A.** In those projects, the goals are to determine the cause of failure, and that routinely involves the characterization and investigation of the materials at issue to see how those materials have either been impacted or behaved that may have led to failure.
**Q.** What about corrosion? Have you worked on any corrosion-related projects other than this at RJ Lee?
**A.** Yes. I've worked on several corrosion-related projects.
**Q.** Could you describe a couple in the recent past.
**A.** In the recent past, I've worked on projects that have dealt with piping that have had corrosion issues to actually performing laboratory tests to impose certain environments on materials as part of either alloy development or probably more specifically product development work.

**Q.** Are there any particular cases in the recent last couple of years that you've worked on that have dealt with corrosion issues?

**A.** There have been a couple what I would consider larger-scale projects that I've worked on, one of which involved a train derailment in South Carolina that involved a spill of chlorine from a tank. Another was the work that I did in association with impacts from the World Trade Center dust distribution.

**Q.** What with respect to the train derailment that you were talking about related to corrosion and how were you involved?

**A.** The issues there related to dispersion of chlorine gas that had been dispersed from a ruptured tank that was caused by the trail derailment. RJ Lee Group was involved in assessing the town in which the derailment occurred and looking for material impacts that may have been related to the dispersion of that chlorine gas. My involvement was kind of at a higher level, looking at -- understanding the type of material impacts one would expect from chlorine on these various materials.

**Q.** What about the World Trade Center work? What were you doing there?

**A.** The World Trade Center work that I did was involving some structural or perceived structural damage on a building near the World Trade Center site. I was particularly involved in looking at aluminum and steel materials to see what impacts, if

any, could be determined from the presence of the World Trade Center dust that may have become entrained in those locations.

**Q.** How did you assess the impacts on those materials?

**A.** Those materials use various types of characterization techniques, including optical microscopy and electron microscopy, looking at how material may have been impacted, and then determining whether or not that material needed either to be replaced or remediated in some fashion.

**Q.** Do you hold any positions with any professional associations?

**A.** Yes, I do.

**Q.** What's that?

**A.** Currently, I serve as the District 10 representative on the chapter council of ASM International, which is the professional society of materials scientists and engineers. I also serve on the handbook committee and the American Welding Society.

**Q.** This is what we've been seeing here as Exhibit DX205. Dr. Perricone, could you just confirm, if you've been reading along, that this is a true and correct copy of your résumé, or your CV.

**A.** Yes, it is.

**MR. SANDERS:** I'd move that DX205 be admitted.

**THE COURT:** It will be admitted.

**MR. SANDERS:** I'd also tender Dr. Perricone as an

expert in the fields of materials science and corrosion.

**MR. SEEGER:** No objection, Your Honor.

**THE COURT:** The Court will accept him as an expert in materials science and corrosion.

**DIRECT EXAMINATION**

**BY MR. SANDERS:**

**Q.** Dr. Perricone, how long have you been working on the Chinese drywall project?

**A.** I've been working on issues related to Chinese drywall for about the last 15 months or so.

**Q.** What has the purpose of your work been?

**A.** The primary purpose of my work has been to evaluate various materials within residences that contain Chinese drywall, to determine what issues are present, particularly initially taking a look at HVAC coils which had been reported to be failing in houses containing Chinese drywall.

**Q.** What's your role been in this project?

**A.** My role at RJ Lee Group as it pertains to this project has been team leader.

**Q.** As a team leader, what are your responsibilities, and what work have you performed?

**A.** As team leader, primarily as a technical leadership in terms of determining what type of testing would need to be done, determining what samples to collect, how to analyze them, and then interpretation of the results in the larger context of

the project, not just the individual samples.
**Q.** In that context -- we've heard a mention by the plaintiffs this morning -- what role did Dr. Lee play?
**A.** Dr. Lee was involved in the project. He provided, I would say, guidance over the course of the project and participated in the generation of the reports.
**Q.** In the last 15 months, what percentage of your time has been devoted to this?
**A.** That certainly has varied from month to month. The project has lasted for 15 months. Generally speaking, that varied anywhere from 50 percent to 100 percent of my time; in some cases, 100 percent of my time most recently.
**Q.** How many people do you have working for you on this at RJ Lee?
**A.** RJ Lee Group employs a wide variety of people. We have a full-service laboratory in association with our company. So, therefore, I would estimate that there has been about 30 different employees, roughly, that have contributed to this work either in terms of actual testing of samples at a technician level all the way up through doing sample preparation and collection of things like microscopy results.
**Q.** Is your job to coordinate and oversee all of those people?
**A.** Yes, to coordinate all of that and interpret results.
**Q.** Are there multiple disciplines involved at RJ Lee in putting together this effort?

**A.** Yes, there are.

**MR. SEEGER:** Objection, Your Honor, just to avoid the leading.

**BY MR. SANDERS:**

**Q.** What disciplines are involved at RJ Lee in the effort on behalf of KPT?

**A.** There are multiple scientific disciplines, including chemistry, physics, materials science, corrosion, and industrial hygiene.

**Q.** Moving on to your specific work, how many homes with Chinese drywall have you inspected?

**A.** I have personally inspected approximately 20 to 25 homes.

**Q.** Where have those homes been located?

**A.** Those homes have been located in Louisiana, Florida, and Virginia.

**Q.** Does that also include the Hernandez house?

**A.** Yes, it does.

**Q.** Do you remember when you were at the Hernandez house, approximately?

**A.** As I recall, it was early January of this year.

**Q.** In how many of those houses have you collected some samples or done some sort of testing?

**A.** My recollection is we've done testing or sample collection in approximately 15 of those houses.

**Q.** What was the focus of the sample collection or testing?

**A.** The focus of the sample collection involved multiple facets of the investigation. As I had mentioned previously, initial focus was on looking at HVAC coils which had been reportedly failing at an accelerated rate. Examination of those coils led to the conclusion that the copper in those coils was what was being affected. So looking at other copper-containing components in a household included things like wiring and plumbing that was investigated further.

**Q.** In each of those cases, did you take samples to review and assess the components you were mentioning?

**A.** A range of different types of samples were collected from various addresses.

**Q.** What in particular did you observe with regard to the HVAC coils?

**A.** I observed that the HVAC coils showed a particular susceptibility towards pitting corrosion of the copper tubing. While there is a lot of black discoloration of that copper, the copper certainly shows pitting that has compromised significant portions of the wall thickness. That is due to the fact that it can be differentiated from other environments in the house, such that HVAC sees a much different environment during its normal operation than you would experience in the living space of the house.

**Q.** Could you explain that a little bit more. What are the differences between an HVAC coil and the other copper

components of the house?

**A.** Yes. There are two distinctly important characteristics of the environment that an HVAC coil operates. Number one is the significant amount of condensation that is frequently and routinely generated through the operation of the coils, such that the copper coils are often dripping with water during the course of their operation. That's something that I have personally observed, as well as general knowledge of their operation.

The other aspect of an HVAC coil is the high amount of airflow that the HVAC coil sees. Obviously, air is pulled from the living space of the house and pulled across the coil in order to provide air conditioning; and, because of that, the delivery of molecules in the air that may exist in very low concentrations in the living space, for example, the cumulative effect of a large amount of air passing over the coil can cause the coil to see a lot more of those molecules than would normally be seen in other environments.

**Q.** Have you done any testing to sort of confirm that that actually is happening?

**A.** Yes. In fact, the work that was done in a number of different houses involved the placement of copper reactivity coupons. These are coupons of pure copper that were placed in multiple environments within the house for a specific period of time, and then they were then collected and analyzed in the

laboratory to determine the nature and thickness of the tarnish film that had developed on those coupons. Based on a comparison, then, of those observations as a function of duration of exposure and the location within the house, we were able to learn things about the different environments in the house.

**Q.** What standards did you use to conduct the tests or do those measurements?

**A.** Well, we relied on a couple of standards in terms of the application of the use of coupons as well as the actual analysis of those coupons. We relied on an ISA standard on the assessment of environments, which calls for the placement of copper coupons. It specifies a duration of exposure in order to assess the environment and to rate the corrosivity of that environment.

Then in terms of the characterization of those coupons, we relied on a standby SEMI that distinguishes how to use a technique called ESCA, which is a very surface-sensitive technique. It allows us to perform a depth profile through the tarnish film and actually measure the thickness in that manner.

**Q.** Before we talk about the differences in the coupon measurements, was there another set of coupons at some point that KPT was using and getting from another lab?

**A.** Yes. There were some coupons that were provided by another laboratory and analyzed by another laboratory by a

different method.

**Q.** What are the primary differences in the methods that were used?

**A.** The method that RJ Lee Group used, I termed it ESCA, which is electron spectroscopy for chemical analysis. The are placed in a vacuum chamber and the depth or the thickness of the tarnish film is measured directly by basically milling through the tarnish film and measuring atomic profile so that you can actually directly measure how thick the film is before you get down to the bare copper.

In the other case, we used a method known as stripping voltammetry. That involves taking the coupon and immersing it in a solution, and then driving the tarnish film off electrochemically, and then, in essence, counting the atoms as they come off the surface, and then calculating what the thickness would have been with knowledge of the surface area of that coupon.

**Q.** In the actual calculation, were there some differences between yours and their results based on what you thought was the actual metal or the actual species you were detecting?

**A.** Yes. The ESCA analysis that we performed not only provides the ability to depth profile, but it also provides information about the chemical species, which told us that it was copper(I) sulfide, commonly referred to as $Cu_2S$. The recorded values from the stripping voltammetry method refer to

the sulfide film that was formed as CuS, which is a different compound.

**Q.** Did you make some adjustments to try to correlate those two measurements?

**A.** Well, in looking at the data that we had collected using the ESCA measurements and trying to understand the differences between the coupons that were, in essence, put side by side in the same environments, taking the species information we knew was $Cu_2S$, I took a look at that stripping voltammetry data within the context of if the atoms that were being sputtered off were treated as $Cu_2S$, which we knew existed but were not as reported in the stripping voltammetry data.

**Q.** Despite those differences with respect to your opinion on the difference in the HVAC environment, do they both support the difference in the HVAC and the regular house?

**A.** Yes, they do.

**Q.** Could you explain how that is.

**A.** Sure. Any difference that would be made in interpreting the stripping voltammetry results in terms of looking at whether it's $Cu_2S$ or CuS, the end result is basically a shift in the thickness results across the board. So there's not a difference in the relative difference from location to location.

So if you look at just the stripping voltammetry data, it's clear that the HVAC location had a very

significantly thicker tarnish film thickness regardless of whether you measured it using stripping voltammetry or whether you examined it using ESCA. In fact, both methods showed approximately about five times difference in thickness in terms of what was sitting in the HVAC coil versus what we would see out in the living space.

**THE COURT:** But you're dealing with thickness as opposed to absence? I mean there's presence of corrosion in each of those environments; one is thicker than the other?

**THE WITNESS:** That's correct, Your Honor. In both cases, there were sulfides present regardless of location.

**THE COURT:** The $Cu_2S$ was there in both?

**THE WITNESS:** That's correct, Your Honor.

**BY MR. SANDERS:**

**Q.** Just to clarify, were these tests performed in houses that had Chinese drywall?

**A.** Yes, they were.

**Q.** The ISA standards have some classifications that are used to explain the environmental -- or the measurements you get from these results?

**A.** Yes. So the ISA standard sets out the type of testing that should be done to characterize environments. Then based on the film thickness results, they have a ranking of the different environments in terms of the corrosive nature of those environments and how they might impact the reliability --

specifically, in the ISA standard, the reliability of electronic equipment, which is known to be sensitive to these types of environments.

**Q.** We've heard a lot about the Battelle standard. Is that similar to the ISA standard?

**A.** It is similar, particularly in terms of the use of coupons in order to assess environments. Generally speaking, the ranking or characterization of those different environments parallel each other quite a bit.

**Q.** In what context are those standards typically applied?

**A.** Those standards are typically applied in industrial environments where the corrosive environments are going to persist, so you take a look at the data and get a feel for the reliability of that equipment if it exists in that environment and continues to operate in that environment.

**Q.** So what happens if you take away the source of corrosive gases and there's no more corrosion? To your measurements under the standard.

**A.** The measurements on the standard then no longer apply once the equipment has been taken out of that environment and the environment has significantly been altered.

**Q.** What would you expect to get if you didn't have a source anymore under either of the standards?

**A.** I would expect to have the lowest rating or, for example, in the ISA standard, the G1, that says that there's no

influence of corrosion on the reliability of electronic equipment.

**Q.** Were you able to collect samples and examine some of them in the Hernandez house?

**A.** Yes, I was.

**Q.** What type of samples did you collect?

**A.** RJ Lee Group got multiple types of samples from the Hernandez residence. Those included wires that were attached to outlets and switches, were sections of copper plumbing taken from underneath the kitchen sink, as well as copper plumbing taken from the hot-water heater. We also received samples of architectural hardware: Doorknobs, door stops. Those are the samples that were collected of actual materials.

**Q.** What sort of analyses on the pipes and wiring did you perform?

**A.** Well, the type of tests that were done on both the wiring and the plumbing were really materials impact assessments. They were governed by metallurgical principles, taking a look at cross-sections of the material to see to what extent either wall thickness may have been compromised or intruded upon by a reaction at the surface, and similarly looking at wires to see to what extent those cross-sections of the wires may have changed, looking for things like surface reactions and so forth.

**Q.** In your analysis and assessment about the Hernandez house,

did you rely on testing from other homes with Chinese drywall?

**A.** In terms of looking at kind of the overall picture in terms of my experience in examining houses with Chinese drywall and those samples taken from those locations, the results that I found from analysis from the Hernandez residence was not substantially different from any of those other wires or plumbing that I've seen.

**Q.** Did you perform the same tests you did on the Hernandez samples as you did at those other residences?

**A.** Yes, I did.

**Q.** Taken together, do the samples from the Hernandez house and other residences with Chinese drywall, including KPT drywall, support or form the basis of your opinion?

**A.** Yes, that information forms the basis of my opinion.

**Q.** Just to go through and look at some of the samples you collected, would it help if we went through some pictures?

**A.** Yes, it would.

**MR. SANDERS:** Connie, if we could go to DX134.

Your Honor, I'd like to let him point things out rather than me move around.

**THE COURT:** That's fine.

**BY MR. SANDERS:**

**Q.** Could you tell us what we're looking at here. First, identify what we're looking at.

**A.** Yes. These are wires that were removed from one of the

outlets that had been collected from the Hernandez residence. The wires had been --

**MR. SANDERS:** Before we go to that, I'd like to move DX134 into evidence.

**THE COURT:** The Court will admit it.

**THE WITNESS:** These wires had been sectioned in the field at this end location. You can see where they're curved here where the electrical connections have been made. What we're showing in this image is that when the sheathing has been pulled back from where it initially existed here at these locations, you can see that untarnished copper exists underneath those sheath locations.

There's one exception to that, as you can see, that in this area there was some evidence of tarnishing that did not immediately stop here where the insulation appeared to end. However, on inspection of this location, we found that a piece of the inner insulation -- there are basically two materials wrapped around these wires. One is the outer sheath that we can see, which is the white and the black. There's also an interior, I believe, a nylon material that is wrapped around. That nylon material was missing and so, therefore, there was a looser connection between the wire and insulation up until about this point, where we then see that the tarnishing has ceased where you had intact insulation. That is consistent with what we've seen in other locations.

**BY MR. SANDERS:**

**Q.** To put this into context, how many samples of wires, approximately, have you looked at in this case?

**A.** In this case, we've looked at probably a total of 230 wires, roughly, to form the basis of my opinion. Specifically for the Hernandez house, I believe we looked at 10 different wires.

**Q.** Have you seen this tarnishing, out of those 230 samples or so, before underneath the insulation?

**A.** This was the first time that I had observed this type of phenomenon, but it could be explained by the lack of a nylon sheath or a tearing of that nylon sheath. The reasons for that are unclear, but that was an obvious difference.

**MR. SANDERS:** If we could move to DX152.

**BY MR. SANDERS:**

**Q.** What are we looking at here? If you could just identify it.

**A.** Yes. This is a photo of an outlet removed from a house in Mandeville containing Chinese drywall.

**MR. SANDERS:** Your Honor, I'd move Exhibit DX152 be admitted.

**THE COURT:** Let it be admitted.

**BY MR. SANDERS:**

**Q.** If you could please explain what we're looking at or what you're showing here.

**A.** The purpose of this is simply to demonstrate that here, in an outlet where you have the connections plugged into the back of the outlet rather than wrapped around these terminals -- again, we pulled the sheathing back, and this is a good example of the sheathed wires -- the tarnish does not exist underneath the sheathing. It's another example.

**MR. SANDERS:** If we could go to Exhibit 153.

**BY MR. SANDERS:**

**Q.** Again, what is this exhibit?

**A.** Similarly, this is an exhibit of an outlet removed from a house with Chinese drywall in Mandeville, Louisiana.

**Q.** Is that actually the same outlet, just on the other side?

**A.** I would have to go back previously.

**Q.** I believe they're both labeled "outlet 67."

**A.** If they're both labeled "outlet 67," then, yes, it's simply the neutral wire side, whereas the other side we have the hot wire.

**MR. SANDERS:** I'd also like to move 153 in.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** Are your observations consistent with observations from others with respect to the insulation and what we've seen under the wires?

**A.** Yes, they are.

**Q.** What about any governmental agencies; have they seen that?

**A.** Specifically, the analysis by Sandia National Laboratories demonstrated and pointed out the absence of tarnish film underneath the insulation of the wires that they had observed and reported on in their report.

**MR. SEEGER:** Your Honor, I'm sorry to interrupt. I just realized this. The photos that we just looked at -- I don't know if you made it clear; if you did, I apologize -- are from another house in Mandeville. It's not the Hernandezes'.

**MR. SANDERS:** We'll have a few from different houses and, please, Dr. Perricone, if you could, point it out.

**THE COURT:** The fact of the matter is that those photographs, the last two or three, were from other houses?

**THE WITNESS:** That's correct, Your Honor.

**MR. SEEGER:** If counsel could just make that really clear when he puts them up, then I'll know whether to object.

**MR. SANDERS:** If we could look at Plaintiffs' 60, the Sandia report. This has been previously admitted into evidence by plaintiffs.

**BY MR. SANDERS:**

**Q.** If you could point out what Sandia concluded with respect to insulated wires.

**A.** Specifically, they use this set of images in figure 12 to demonstrate the differences that they saw. Where you had a bare wire, they show the presence of a tarnish film on the surface of the copper. Then they show what they observed under

loose insulation, where largely the tarnish film was absent, or maybe there was some evidence here of some tarnish. Under tight insulation, they demonstrated that there was an absence of tarnish film. I believe they reported that there was an absence of the tarnish film approximately 1 millimeter into where the insulation existed.

**Q.** Well, actually, if you could read that last sentence there above the pictures, what do they say their observations indicate?

**A.** Yes. They state: "These observations indicate that the electrical insulation acts as a barrier to the corrosive gases and protects the underlying copper."

**MR. SANDERS:** If we could go to Defense Exhibit 136.

**BY MR. SANDERS:**

**Q.** If you could just identify it for us before discussing what this is.

**A.** Yes. This is a cross-section of a wire removed from the Hernandez residence.

**MR. SANDERS:** Your Honor, I'd move that Defense Exhibit 136 be admitted.

**THE COURT:** Let it be admitted.

**BY MR. SANDERS:**

**Q.** What are you trying to show here with this image?

**A.** This is an example of an image of a cross-section of a wire that appears visibly tarnished on the surface, but

demonstrates the fact that any type of impact on the surface is very, very small relative to the overall cross-section of the material.

**MR. SANDERS:** If we could go to Defense Exhibit 138.

**BY MR. SANDERS:**

**Q.** And if you could just briefly identify this and describe what this is.

**A.** Yes. This is an image of a cross-section of the wire removed from the Hernandez residence compared to a new wire of the same gauge.

**MR. SANDERS:** Your Honor, I'd move that Defense Exhibit 138 be admitted.

**THE COURT:** Be admitted.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** I would initially focus your attention on the image in the lower-left portion. This is the wire as received. Clearly, we see evidence of a lot of black tarnish over the surface. This was cross-sectioned through an area of the dark tarnish, and the cross-section was observed as shown here in the upper left.

What's being shown here is the lack of significant ingress of any of that tarnish film that exists on the surface of the material into the actual cross-section of the material. That is particularly shown when you look at a brand-new wire that has never been installed of the same gauge, and comparison

of those two demonstrates the lack of impact of that tarnish film on the cross-section of the wire.

**Q.** Now, with respect to this, just so we're clear, have you done any precise measuring of the cross-sections?

**A.** As it pertains to an analysis or a tabulation of diameters, for example, we have not. We have compared these images to cross-sections of exemplar new wires that had never been exposed to Chinese drywall.

**Q.** Based on this comparison, is it your opinion that there's no significant corrosion damage to these wires?

**A.** Yes. As I stated previously, this shows the lack of impact of the tarnish film on those wires.

**MR. SANDERS:** If we could go to Defense Exhibit 142, please.

**BY MR. SANDERS:**

**Q.** If you could identify again what we're looking at here.

**A.** This is a different cross-section of a different wire also collected from the Hernandez residence, along with a picture of a new wire.

**MR. SANDERS:** I'd like to move DX142 into evidence, Your Honor.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** Where are you taking these cross-sections, just to tell us?

**A.** Routinely, these cross-sections would be made outside of the bend here, in an area where you have a significant dark discoloration, so wanting to cross-section through an area that had the dark tarnishing.

**Q.** Again, what do you see when you go back up and you look at the wiring in the Hernandez house versus a new wire?

**A.** Well, again, we see a lack of ingress of any of the tarnish film that does exist at the surface of the copper and the lack of ingress at the surface. When compared to a new wire, there really is no significant difference that we see. These are slightly smaller cross-sections simply because they are a different gauge than the previous exhibit that we looked at.

**THE COURT:** Did you make any tests on the contact points in the bend portion of the wires in any of your --

**THE WITNESS:** RJ Lee Group did not perform contact on the actual wires of the samples that were removed, Your Honor.

**BY MR. SANDERS:**

**Q.** In your overall sort of opinions, have you relied on other experts' opinions with respect to contacts in the wires?

**A.** Yes. I've relied on the work done by Dr. Beyler, who examined the performance of these wires that were removed from the field.

**MR. SANDERS:** If I could go to DX144.

**BY MR. SANDERS:**

**Q.** If you could indicate what this is and where it's from.

**A.** This is a set of cross-sections; again, one from a house with Chinese drywall. In this case, this was from a house in Virginia and compared to a new wire sample.

**Q.** These examples that you had from this house in Virginia, were they similar to the examples you were seeing in the Hernandez house?

**A.** Yes, the impacts were similar to what I was observing in the Hernandez house.

**MR. SANDERS:** Your Honor, I'd like to move to be admitted Defense Exhibit 144.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** Again, could you explain what we're looking at here.

**A.** Yes. We're looking at a cross-section on the left of a wire that was exposed to Chinese drywall. Here is the tarnished appearance of the wire as received. Here is another example of a new wire, the same gauge, demonstrating how similar those cross-sections are.

**MR. SANDERS:** I'd like to move to Defense Exhibit 143.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** These are examples of wires that were removed from a house

containing Chinese drywall from Williamsburg, Virginia.

**Q.** Was the condition of those wires, when you saw them originally, similar to the condition of the wires in the Hernandez house?

**A.** Yes. The image shown in the upper left shows, in essence, the as-received condition of those wires as they were attached to an outlet showing areas of tarnishing discoloration similar to what was observed in the Hernandez residence.

**MR. SANDERS:** Your Honor, I'd move that Defense Exhibit 143 be admitted.

**THE COURT:** Be admitted.

**BY MR. SANDERS:**

**Q.** You've got a picture on the left that says wires before cleaning and then cleaned wires. Could you explain what you did here.

**A.** This was a simple application of the -- manual application of a Scotch-Brite pad in order to mechanically remove from the surface the black tarnish that was observed in these locations. So this image here is the same set of wires after they had been cleaned using a Scotch-Brite pad. These images here are cross-sections of these same wires after cleaning.

**Q.** Why did you pick a Scotch-Brite pad?

**A.** Well, the use of a Scotch-Brite pad was -- the thought was to come up with some type of simple cleaning solution that could be readily applied in the field without the use of

chemicals or special training in order to apply.

**Q.** So there's no standard that you're using here when you're just cleaning the wires?

**A.** No. It's an application of a common household cleaning technique in order to abrade the surface enough to remove the tarnish.

**MR. SANDERS:** If we could look at Plaintiffs' Exhibit 149.

**BY MR. SANDERS:**

**Q.** If you could identify what we're looking at here.

**A.** This is a set of cross-sections of 14-gauge wire, demonstrating what a new wire looks like, the cleaned wires I believe we had just previously looked at, and then an as-received wire taken from a house containing Chinese drywall.

**Q.** Just to make it clear, I believe the upper right is from 1008 Hollymeade Circle, which we looked at before. These other two ones were also not from the Hernandez house but wires we looked at before.

**A.** That's correct, these are not from the Hernandez residence.

**MR. SANDERS:** Your Honor, I move that, Exhibit 149.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are you showing here?

**A.** This is another demonstration of comparison of wires that

have been exposed to Chinese drywall, how their cross-sections are the same as the cross-sections of a new wire that had never been exposed to Chinese drywall, both before and after the type of cleaning processes. This is simply to demonstrate that the use of a Scotch-Brite pad is not removing a significant amount of copper material as you might apply it in the field.

**MR. SANDERS:** If I could go to Plaintiffs' Exhibit 593.

**BY MR. SANDERS:**

**Q.** I showed you this last night when you came in, and I indicated to you that this is an exhibit prepared by Mr. Krantz. It's an as-received wire and then a wire that's been cleaned by Scotch-Brite. What are your observations about this exhibit?

**A.** What I can observe is, number one, a significant difference in the overall appearance of the surface after Scotch-Brite cleaning. The type of increased brightness of the copper and the return of a coppery color is similar to the images that were shown in the previous exhibit after cleaning by RJ Lee Group.

What I do notice is that at this higher magnification, not with just the naked eye, you do see some evidence of some spots where there appears to be some black tarnish that may remain. And I observed here that there are what appear to be scanning electron microscope images that show

that surface at an even higher magnification than what's shown here.

**Q.** Can you see the magnification bar and tell me what magnification we're looking at, that copper sulfide, or that image there? Which image would you like to look at?

**A.** Well, the important thing to look at here is what these scale bars are because, obviously, the magnification, we're now projecting this up into a large screen. So to just kind of get our bearings here, in the light optical image, we're dealing with the scale bar being half a millimeter in length.

Here down below at the electron microscope images, if we could zoom up on that, these magnifications here, this is now 100 microns, or one-tenth of a millimeter. Here is 10 microns at one-hundredth of a millimeter.

**Q.** Backing up, what does the image on the left show of the graph? What is that?

**A.** This appears to be a spectrum that would have been collected by EDS in order to determine the chemical elements that are present in those locations.

**Q.** So do you think that even after the clean samples you were looking at from those other houses, it's likely that there's some copper sulfide material left on the wires?

**A.** There appears to be a small amount of copper sulfide that remains even after the application of the Scotch-Brite, as shown here.

**Q.** Does that surprise you?
**A.** It does not. The tarnish film would not have been absolutely and completely removed 100 percent. It doesn't surprise me.
**Q.** Is that a problem with respect to putting these wires back into operation?
**A.** In my opinion, it is not.
**Q.** Why not?
**A.** There are two important reasons why, placing them back in operation, that it's not an issue: One involves what, if any, impact it would have on any type of continuing reaction; the other involves what impact the presence of a small amount of copper sulfide would have on the actual operation.
On the latter part, the impact on the operation, I would --
**MR. SEEGER:** Objection. Your Honor, just for the record, I want to note this exact issue was testified to by Dr. Lee at page 590, lines 8 through 13 of his trial testimony.
**THE COURT:** I'll let him testify. I overrule the objection.
**BY MR. SANDERS:**
**Q.** Continue, please.
**A.** In the case of the operation of the wires, I rely on Dr. Beyler's testing that demonstrated a lack of impact even when the wires were completely tarnished, either from the field

or intentionally tarnished from the laboratory, showing no impact on the operation of the wires at contact points even when that tarnish film completely coats the surface. So the fact that there's a small amount of material left over, there's no reason to expect that that would have any material impact on its operation.

**Q.** What about the operational -- we were looking at the cross-sections. Do those also tell you something about the tarnish film and whether there's any operational impact to the wires?

**A.** Yes. Looking at the cross-sections are important to examine whether or not the current-carrying capacity of the wires have been impacted or if the mechanical integrity of the wires are impacted. You'd be concerned about if the cross-sections had been significantly reduced or you had ingress of the tarnish film through enough of the cross-section to cause breakage. Clearly, that would be an issue in terms of operation.

In terms of the amount of material that's present, that is available to actually carry the current for which these wires are rated, the cross-sectional area is important. That's why we would compare cross-sections of wires exposed to Chinese drywall to brand-new wires that have never been in service.

**Q.** Again, based on those comparisons, what have you concluded?

**A.** I've concluded that there is no expected impact on the current-carrying capacity of the wires, nor is there a concern regarding mechanical breakage of the wires.

**Q.** The other point you obviously mentioned is continuing corrosion. Very briefly, if you could explain why that's not an issue.

**A.** Well, continuing corrosion is not an issue because, in moving forward, we're dealing with a situation that after the wires have been cleaned and put back into service, they're going into service in a condition where Chinese drywall is no longer present and, therefore, a source of continuing sulfidation or growth of copper sulfide no longer exists.

**Q.** What if that little spot of copper sulfide was sitting in a pit, though, would that continue to grow?

**MR. SEEGER:** Objection. Just for the record again, Your Honor, testified to by Dr. Lee at page 546 of his trial testimony.

**THE COURT:** I understand. I'll overrule it and allow him to testify.

**THE WITNESS:** No. You would not expect the copper sulfide to react. Copper sulfide is an insoluble material in water, so the presence of water is not going to cause the copper sulfide to somehow dissolve and further react. It's stable at room temperature and pressure. So it's sitting there as the result of a corrosion reaction and it is, therefore, not

going to further react because it's not going to dissolve.

**BY MR. SANDERS:**

**Q.** I think, citing to the Edwards paper, Mr. Krantz in his testimony describes copper sulfide as a poison. Do you agree with that?

**A.** No, I don't.

**THE COURT:** Why would you clean the wires, then, if you feel that way?

**THE WITNESS:** The cleaning of the wires is simply intended to be a method in order to ensure -- give peace of mind in terms of making a good electrical connection. It is not intended to clean in order to somehow mitigate a further reaction from taking place as much as it is, at the contact points, you're simply wanting to provide an option to give an electrician the peace of mind in making that connection a good connection.

**BY MR. SANDERS:**

**Q.** Why don't you agree that the copper sulfide can be a poison or impact the functionality of the wires?

**A.** The copper sulfide is -- as has been shown, the copper sulfide sits on the surface once formed. It hasn't ingressed into the wires. In any type of continuing corrosion reaction, corrosion occurs because you have reactive species that will react and form a product or a different kind of species. That is the corrosion reaction that takes place. In the absence of

a source of a hydrogen sulfide, there is no way for more copper sulfide to form. What's sitting there has already formed and it's not going to somehow continue to propagate.

**Q.** Before we move away, actually, let's look once more back at wires at Defense Exhibit 156.

**THE COURT:** While that's being pulled up, do you have an opinion as to whether the corrosive element will remain? Would corrosion continue as long as the corrosive element is there?

**THE WITNESS:** Yes, I have an opinion, Your Honor. The presence of hydrogen sulfide-type corrodents has shown to be readily reactive with copper and, therefore, you would expect the potential for hydrogen sulfide to react if it was still present or being emitted in the presence of Chinese drywall without some remediation.

**THE COURT:** Would it react to the point where the mechanical integrity of the wire would be compromised?

**THE WITNESS:** Your Honor, I've seen no evidence of where I would have any concern regarding the mechanical integrity of the wires. As we've shown in the cross-sections, the tarnish film basically is sitting at the surface. It is really very much almost a superficial, surficial-type film that doesn't compromise the cross-section at all.

**THE COURT:** If the corrosive element would remain for an extended period of time, what would happen? Do you have an

 opinion on that, I should say?

**THE WITNESS:** Yes, Your Honor. A persistent source of hydrogen sulfide would allow a reaction to continue to occur such that tarnish film thickness would continue to thicken. You may continue to have situations where the tarnish film, because it's brittle, would just fall off and allow fresh copper to be exposed and allow the reaction to continue.

With the presence of the corrosive species, because the copper reacts so readily with it, there will be a reaction. But the kinetics of the rate of which that reaction takes place is going to be dependent on a number of different factors, including environmental, specifically humidity, and the ability for ions to diffuse through that film. Oftentimes, that is a rate-limiting step, and it's not simply just a dose reaction.

**BY MR. SANDERS:**

**Q.** Following up on one question, why won't moisture -- I think you had mentioned humidity. Why won't humidity continue the reaction with copper sulfide when you remove the source?

**A.** The presence of humidity is but one part of the overall equation, if you will, in terms of how the sulfide reaction will take place. You still need that corrosive species to be present. It's not just sulfur, because sulfur is present in the sulfide, therefore, the reaction will take place. It has to be present as a hydrogen sulfide ion in order for the

reaction to take place. The sulfur in the sulfide is already tied up and is not available for further reaction simply in the presence of no water.

**Q.** If you could explain what we're looking at here.

**A.** This is a set of images, primary images from Mr. Krantz' supplemental report, I believe, in the *Germano* matter.

**Q.** Do you know what house this was taken from, or what type of wiring this is?

**A.** This wiring is stranded wire that was taken from a lighting fixture -- I believe it was a chandelier -- in one of the houses containing Chinese drywall in the state of Virginia.

**MR. SANDERS:** Your Honor, I'd move that Defense Exhibit 156 be admitted.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are you showing here? What did you do to make these images?

**A.** Well, what's shown here is -- this is simply the image taken directly out of Mr. Krantz' report. What's shown here on the right used a piece of imaging software that simply allows you to basically assign colors to the different pixels that make up the copper components. So that's what the red is here.

If all the copper was circular as, you know, there was no evidence of any type of tarnish ingress as is shown here and here and has been pointed out by the plaintiffs' experts,

 you would have a total area of what the copper would have been absent any of those voids.

You can then do the same thing with the copper that remains. So when you subtract the copper that remains from the copper that would have been originally present, you get, in essence, what the void space would be.

Looking at that, we can take a look at that the area of the voids over the total cross-sectional area is less than 1 percent of the cross-section.

**MR. SEEGER:** Your Honor, I have to object. I'm sorry. The way this was described is an image from our expert's report. It's not. The image on the left is. Therefore, it's a demonstrative, and it's not properly admitted. If I don't see these in advance, it's hard for me to make that call. I'm sorry to make a late objection.

**MR. SANDERS:** They're part of our exhibits.

**MR. SEEGER:** That doesn't mean it gets admitted.

**MR. SANDERS:** He's explaining what he did and why it's relevant.

**THE COURT:** The image on the left is the plaintiffs'. What's the image on the right, 1 and 2?

**THE WITNESS:** The images on the right are exactly the same image except that there have been thresholding done in order to basically count the number of pixels. Here in the yellow are the number of pixels that are here, the coppery

color in this image. The red is the coppery color plus what the void space is. It's simply a matter of assessing this in using image characterization to determine how much is void space, Your Honor.

**THE COURT:** What do you seek to demonstrate by that?

**THE WITNESS:** Rather than looking solely on individual strands of this overall bundle, you can see that in this report the plaintiffs pointed out a couple of these, showed some amount of what they called pits into the surface. This was a way to assess how those pits factored into the overall cross-section of the bundle as would be needed for carrying the current for which it was intended, Your Honor.

**THE COURT:** I'll admit it.

**BY MR. SANDERS:**

**Q.** What did you ultimately conclude?

**THE DEPUTY CLERK:** How was that marked?

**MR. SANDERS:** It's marked Defense Exhibit 156.

**BY MR. SANDERS:**

**Q.** What did you find by doing this analysis?

**A.** The end result is that the area of the voids made up less than 1 percent of the overall cross-section -- original cross-section that was available for the current carrying for those wires.

**THE COURT:** Just so that I'm following you, you feel that that shows that there's no insult to the integrity, but it

doesn't remove the pits?

**THE WITNESS:** It does not remove the pits, Your Honor. The intent here was to put the pits in the context of the overall --

**THE COURT:** Mechanical integrity?

**THE WITNESS:** And the current-carrying capacity, yes.

**THE COURT:** Right. The same.

**THE WITNESS:** Yes, Your Honor.

**BY MR. SANDERS:**

**Q.** Dr. Perricone, I guess, as you concluded, that's less than 1 percent of the cross-section?

**A.** Yes, that was the conclusion.

**Q.** Is that important, that 1 percent?

**A.** The 1 percent is not important, particularly when put in the context, in general, of the manufacturing tolerances for wires, which allow a 1 percent variation in diameter. That variation in diameter equates for an even larger variation in cross-sectional area, definitely larger than the less than 1 percent we're showing here.

**Q.** Which standard are you referring to?

**A.** What I would be referring to there would not specifically be for stranded wires; would be for the solid wire that we were observing in the electrical systems within a house.

**Q.** Let's move on to some of the piping and plumbing that you looked at.

**MR. SANDERS:** If we could go to Defense Exhibit 157.

**BY MR. SANDERS:**

**Q.** If you could identify this for us.

**A.** Yes. This is a section of the cold-water supply pipe taken from underneath the kitchen sink in the Hernandez residence.

**MR. SANDERS:** I'd like to move Defense Exhibit 157 into evidence.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** Here we're simply demonstrating the presence -- or the appearance of the section of copper plumbing that was being analyzed. Here is a light optical microscope image at a higher magnification of what this surface looks like.

**Q.** Do you know whether there was any significant tarnishing or blackening of this pipe?

**A.** The tarnishing that was observed was observed in a small amount of location here and maybe a little bit here in the back and the back of this image in particular. And then here, where the joint exists, there was obvious black discoloration.

**Q.** Did you do a cross-section of this pipe?

**A.** Yes, we did.

**Q.** Where did you do that cross-section?

**A.** That cross-section -- I believe we did two. I believe we

did a transverse cross-section through this portion of the pipe, and then we also did cross-sections through the brazed joint in order to assess the condition.

**Q.** Do you have a sample of that pipe actually with you, behind you to your left?

**A.** Let me take a look. I don't believe I have a sample of that specific pipe with me. I have a sample of a similar type of plumbing taken from a different house.

**Q.** We'll get there.

**MR. SANDERS:** If I could move to Defense Exhibit 158, please. I think this might have been admitted with Dr. Lee.

**THE DEPUTY CLERK:** Yes, it is.

**BY MR. SANDERS:**

**Q.** Just briefly because he touched on it, this is the cross-section from that last pipe we were looking at?

**A.** That's correct.

**Q.** If you could just quickly point out to the Court what we're looking at here.

**A.** Yes. These are --

**MR. SEEGER:** I'll just object. He can speak quickly if he wants, but it's the same testimony. He acknowledged that by acknowledging the exhibit. Go ahead.

**THE COURT:** Go ahead.

**THE WITNESS:** This is just a series of images of different parts of that cross-section. These are all at the

 same magnification. These are all the outer diameter here, the center and the bottom three, the outer diameter where the tarnish film exists.

These two are the inner diameter that actually carries the water in the cold-water supply and demonstrates the difference of appearance at the surface of the inner diameter versus the lack of impact on the outer diameter.

**MR. SANDERS:** Let's move on to Defense Exhibit 159.

**BY MR. SANDERS:**

**Q.** If you could identify this for me.

**A.** Yes. This is a similar cross-section, I believe, of the same pipe and the outer diameter of the copper pipe from that pipe removed from the Hernandez residence.

**MR. SANDERS:** Your Honor, I'd move that Defense Exhibit 159 be admitted.

**THE COURT:** Be admitted.

**BY MR. SANDERS:**

**Q.** What are we looking at here? First of all, on the left, what are we looking at?

**A.** We see on the left is a scanning electron microscope image. This is a location where we're actually able to find something other than a tarnish film sitting at the surface. These show some ingress of the surface material into the pipe wall thickness. I would note that the scale bar here is around 10 microns, so we're dealing with something around 10 microns

or less, roughly, in these two locations.

**Q.** Would you describe those as pitting corrosion?

**A.** Morphologically, I would describe those appear to be like pits. But in terms of pitting corrosion as it would exist in terms of something that would continue on its own, I don't see evidence of that.

**Q.** Why not?

**A.** The fact that the pits contain oxygen and sulfur, particularly the sulfur is consistent with the type of sulfide reactions that we've consistently seen in houses with Chinese drywall and have shown that and will not continue if there's not a continuing source of hydrogen sulfide to cause a reaction to occur.

**Q.** Even if there was a continuing source, would you expect there to be some aggressive pitting going on?

**A.** As has been seen in other locations -- and I would point out that this amount of ingress in a copper pipe is significantly less than some of the things that have been reported on wires, for example. I wouldn't expect that these would grow any more aggressively than anything else that we've seen either on pipes or on wires.

**Q.** You were looking at the images on the right. What are those? How did you generate those images?

**A.** These are a way of presenting a large amount of the type of EDS chemical data that we've seen in some of the previous

exhibits, as you may recall, where we show the spectrum of maybe either a single point or the average of a whole area, a view showing what elements were present based on what peaks were present.

These are maps containing a lot more information in that you have EDS spectra corresponding to basically each pixel of these images. You have a map of where the oxygen exists at the highest concentrations, where the sulfur exists at the highest concentration relative to this image here, so that you can see where the sulfur and oxygen also can coexist. So it gives us an opportunity to look at a wider field of view and see how the elements are distributed to get a feel for what reactions are occurring.

**Q.** What does this show you, that the sulfur and the oxygen combined are --

**A.** This shows that we have a combination of sulfide forming and oxide forming. Based on experience, we've seen the type of reactions you can observe when both oxide and sulfide have been found to form due to exposure to drywall and just residential environment.

**MR. SANDERS:** If we could move to Defense Exhibit 160.

**BY MR. SANDERS:**

**Q.** If you could identify what we're looking at, first.

**A.** Yes. This would an interior diameter of that same pipe

we've been discussing from the Hernandez residence.

**MR. SANDERS:** I'd move Defense Exhibit 160 in.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are you showing with this image?

**A.** This is shown to be in contrast with the previous image, where we were looking at the outer diameter where the tarnish film exists. Again, we're taking a look at the scanning electron microscope image on the left. I would draw your attention to the fact that now this scale bar is not 10 microns, as it was previously, but it's actually 50 microns.

We observe ingress into the material. Again, this is where the water is actually transported. We see ingress in material of about maybe 40 to 50 microns. That's significantly more than what would be expected on the outside surface. This clearly is where the water is transported as part of the operation of the pipe.

**MR. SANDERS:** If we could back up.

**BY MR. SANDERS:**

**Q.** What are you looking at again on the right side?

**A.** So, again, we're looking at distribution of where the elements exist in this. So it gives us information as a function of position, demonstrating that the deposits on the surface are phosphorus and iron and that oxygen is present. Likely an oxide is responsible for this location here, as shown

in this.

**Q.** Is there any sulfur or sulfide in this?

**A.** Sulfur is not shown because it was not found to be present in this.

**Q.** This is inside the pipe. What's causing this reaction?

**A.** This would be reaction with whatever species would be present in the water supply that's being transported through the pipe during its operation.

**Q.** That's just an everyday sort of occurrence?

**A.** Yes. I have no reason to believe that its use would be in any way different from any other pipe.

**MR. SANDERS:** If we could move on to Defense Exhibit 161.

**BY MR. SANDERS:**

**Q.** What are we showing here?

**A.** This is a cross-section now through the brazed connection in that same cold-water supply pipe from the Hernandez residence that we've been discussing to this point.

**MR. SANDERS:** Your Honor, I'd like to move Defense Exhibit 161 into the record.

**THE WITNESS:** Admitted.

**BY MR. SANDERS:**

**Q.** If you could describe what this is and what we're looking at.

**A.** What these series of images are presented to show is the

condition of the brazed joint shown here. To orient you, we're dealing with -- here's the copper plumbing that's coming down. Here's the brass fitting that it's being connected to. This material is added in order to provide a good seal between these two components. This type of joining process, the brazing process, is meant to melt this material and provide basically a good joint, a good paste or connection between the two, but doesn't melt the copper or the brass.

What this is intended to show is, as we showed previously, in the area of the joint was where there was a lot of black discoloration. We don't see any evidence of intrusion of that tarnish film in any way compromising the structural integrity of the joint. These images shown here, where you have these large voids, these are characteristics of porosity, which routinely will form during the joining process.

**Q.** The holes that you see here, they don't have anything to do with Chinese drywall; it's just part of the way it works?

**A.** The subsurface voids that are observed here have everything to do with the way the pipes were joined. There's no evidence that there's any relationship at all to exposure to Chinese drywall.

**Q.** What are we looking at on the pictures on the right?

**A.** When this joint is made, you can see it goes from very thick, where this is where you're getting the strength of your joint here, where most the material is, but this will flow up

and out until it gets very thin at the top part of the copper, and then all the way out here to the tail, where you're all the way out onto the brass. There is simply trying to show the total joint.

**Q.** Did you do any additional work? Did you observe any copper sulfide or sulfide materials on this joint? Do you recall?

**A.** We did look at this under the electron microscope to see what we could find in terms of the presence of sulfide on the surface. As I recall, there was no intrusion into the material. Any sulfides that were present stayed at the surface of the material, were superficial.

**MR. SANDERS:** I'd like to move to Defense Exhibit 164.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** This is a hot-water heater pipe collected from a house in Bradenton, Florida, containing Chinese drywall.

**Q.** Is this representative of samples you've seen that have been impacted by Chinese drywall?

**A.** Yes. This type of dark black appearance is similar to what we've seen in pipes that have been tarnished.

**MR. SANDERS:** I'd like to move Defense Exhibit 164 into evidence, Your Honor.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** So what are we looking at?

**A.** That is a copper pipe complete with -- you can see the kind of silvery areas are where the brazed joints were, but you see that the copper no longer has a coppery appearance but has a very tarnished appearance. This is sitting out in a garage, I believe, in a house in Bradenton, Florida.

**MR. SANDERS:** If we could move to Defense Exhibit 165.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** This is a section of that same pipe we just looked at removed from the house in Bradenton, Florida.

**MR. SANDERS:** This is Defense Exhibit 165.

**THE COURT:** You're admitting that? The Court will admit it.

**BY MR. SANDERS:**

**Q.** What are you showing with this?

**A.** This simply demonstrates where cross-sections would be made in order to take a look at the wall thickness and the structural integrity of that pipe.

**MR. SANDERS:** If we could move to Defense Exhibit 166.

**BY MR. SANDERS:**

**Q.** What are we showing here?

**A.** These are cross-sections of that same pipe we were just looking at.

**MR. SANDERS:** Your Honor, I move that this be admitted.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** Can you describe what we're looking at here.

**A.** Yes. All these images are looking at the same magnification, I believe, showing multiple fields of view of that same cross-section, demonstrating that again this would be the outer diameter, where we saw the black tarnish film. This would be the inner diameter, where water service actually took place. You can actually see, at least at this low magnification, some presence of some type of surface scale on the inner diameter. It's difficult to see even on this magnification on the outer diameter even though it was visibly black.

**Q.** Do you have, actually, a sample of this pipe?

**A.** Yes, I do.

**Q.** Could you take it out and show it to the Court.

**MR. SANDERS:** I don't know if you want to examine it, Your Honor.

**THE COURT:** Yes.

**BY MR. SANDERS:**

**Q.** Maybe you could explain what he's looking at.

**THE WITNESS:** Your Honor, this is a section of that pipe. The cross-section that you're looking at on the screen now is right at the cut end that you're looking at.

**THE COURT:** What's inside of it? Do you know?

**THE WITNESS:** What's inside appears to be some type of surface deposit likely from the operation of this. This had been in operation, but I don't know specifically what that is.

**BY MR. SANDERS:**

**Q.** Is there an exhibit number on that?

**A.** The exhibit number on this is DX0125B.

**MR. SEEGER:** I just haven't seen it.

**MR. SANDERS:** I move that that be admitted as well.

**THE COURT:** Let it be admitted.

**MR. SANDERS:** If we could go to Defense Exhibit 168.

**BY MR. SANDERS:**

**Q.** Could you tell me what we're looking at here.

**A.** This is called type K plumbing from that same house in Bradenton, Florida. This would be the type of plumbing that would be under a faucet, similar to what was removed from the Hernandez residence.

**Q.** What was the other type plumbing we used, type L?

**A.** I believe it was type L, yes.

**Q.** Where is that usually used?

**A.** As was shown before in the type of hot-water heater application is a good example of it.

**Q.** Do we have a physical sample of this as well?
**A.** Yes, we do.
**Q.** Could you please take it out and help me with the exhibit number.
**A.** The exhibit number is DX0125A.
**MR. SANDERS:** Your Honor, if you'd like to look at it.
**THE COURT:** Yes. What's the environment that the hot-water heater is exposed to?
**THE WITNESS:** The hot-water heater will be exposed to maybe slightly different environments depending on where they are located in the house. In this case, it's sitting in a garage, which is an un-air-conditioned space. I've also seen them present in attics and utility rooms. So it can vary from residence to residence. The conditioning of the environment could have a different impact on the reactivity of those.
**MR. SANDERS:** I'd like to move 168 and 125A into evidence.
**THE COURT:** Let it be admitted.
**MR. SANDERS:** If we could move on to Defense Exhibit 169.
**BY MR. SANDERS:**
**Q.** What are we showing here?
**A.** This is a higher-magnification image of that same pipe. The cut section that does not contain the fitting is what is

the physical sample that was just placed into evidence.

**MR. SANDERS:** I would like to move Defense Exhibit 169 into evidence.

**THE COURT:** Admitted.

**MR. SANDERS:** Can we move to Defense Exhibit 170.

**BY MR. SANDERS:**

**Q.** What are we looking at here, Dr. Perricone?

**A.** This is cross-sections of that same pipe we were just discussing, demonstrating again that the wall thicknesses are generally uniform or unimpacted. Even though the presence of the tarnish film is here at the outer surface, there's no visible sign, at least this magnification, of ingress into the wall thickness.

**MR. SANDERS:** I'd like to move Defense Exhibit 170 into evidence.

**MR. SEEGER:** Your Honor, I'm just concerned that when somebody's reading these transcripts, they're not going to know that that's a Florida house. So if counsel could just identify in advance where the --

**THE COURT:** Sure. That's fair enough. That's fair enough.

**BY MR. SANDERS:**

**Q.** Just to be clear, Exhibits 164, 165, 166, 168, 169, and now 170 are from a house in Bradenton, Florida; is that correct, Dr. Perricone?

**A.** Yes, that's correct.

**Q.** 125A and B, the physical samples, are also from that Bradenton house?

**A.** Yes, that's correct.

**Q.** The corrosion that you've seen and the tarnishing on the outside of these samples, are they similar to the tarnishing that you observed in the Hernandez house?

**A.** Yes, they are.

**MR. SANDERS:** If we could move on to Defense Exhibit 171, which is also from the same Bradenton house.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** This is a higher-magnification image of the same cross-sections of the type K plumbing, demonstrating here where the sulfide layer exists, the tarnish film exists, that there's no ingress into the material beyond surface irregularities, as is shown in these images.

**MR. SANDERS:** I'd like to move Defense Exhibit 171 into evidence.

**THE COURT:** Admitted.

**MR. SANDERS:** If we could go to Defense Exhibit 174.

**BY MR. SANDERS:**

**Q.** Could you tell me what we're looking at here.

**A.** Yes. This is a cross-section of what's titled "new plumbing," or plumbing that has not been put into service, of

similar type K copper that we were just discussing.

**Q.** So this was from the store, not in a house with Chinese drywall or any other house?

**A.** That's correct.

**MR. SANDERS:** Your Honor, I'd like to move Defense Exhibit 174 into evidence.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** If we go to Defense Exhibit 175, what are we looking at here?

**A.** These are cross-sections at higher magnification of that same new plumbing. They're shown specifically to show the type of surface irregularities that are simply commonly occurring during the manufacture of this type of product, showing the type of surface irregularities.

**MR. SANDERS:** I move 175 into the record.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** So how does that compare to what you see on a pipe that's been impacted by copper sulfide?

**A.** Well, what is particularly interesting is when these are compared to the same images shown previously for the type K plumbing from the house in Bradenton that contained Chinese drywall, that the surface condition, as shown in the underlying copper, shows the same type of irregularities; shows, you know,

an absence of anything significantly different, because of the presence of the tarnish film, and are reminiscent of the type of surface irregularities that are seen in other components where there's some reported intrusion of tarnish film into the underlying copper.

**Q.** In the samples that you reviewed, have you seen any evidence of pinhole leaks or anything in copper plumbing?

**A.** I have not seen any evidence of that, no.

**Q.** What about significant pits that might damage the functionality of the plumbing?

**A.** No, I have not.

**Q.** If we could go to Defense Exhibit 177 and identify this for the Court.

**A.** Yes. This is new plumbing for type L. This is the larger of the two types of plumbing that we've taken a look at, that we looked at previously. This has never been placed into service. It has never been exposed to Chinese drywall.

**MR. SANDERS:** I'd like to move Defense Exhibit 177 into evidence.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** These are optical microscope images of the surface, demonstrating that there are a lot of surface irregularities that occur due to the manufacture of the material as the copper

is deformed to mold it into shape. You can see a lot of nicks and scratches and folds in the material that result in a not completely smooth surface.

**THE COURT:** Do you have any feeling as to whether that makes cleaning difficult or impacts cleaning in any way?

**THE WITNESS:** Your Honor, yes, I do. The presence of these types of surface defects, as it were, would have a similar impact to -- as would any type of surface irregularity. Tarnish film hugs the surface, as we've seen it do. If it's not boldly exposed on the surface, there could be an avenue for a sulfide to be left behind.

**THE COURT:** What's the significance of that, though, if it is?

**THE WITNESS:** There is no significance in leaving behind sulfide in terms of the source of continuing corrosion, Your Honor.

**BY MR. SANDERS:**

**Q.** Do you hold that opinion with a reasonable degree of scientific certainty?

**A.** Yes, I do.

**Q.** If we could move on to a completely different type of component, Defense Exhibit 184. If you could identify this for the Court.

**A.** Yes. This was a refrigerator control board that was received as removed from the Hernandez residence.

**MR. SANDERS:** I'd like to move Defense Exhibit 184 into the record.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are we looking at here, Dr. Perricone?

**A.** This is a control board taken from a refrigerator that had reportedly failed in the circuit board. There are clear signs of overheating of the circuit board, the black discoloration shown in this area and had deposited here on both sides of the plastic shell, indicating that maybe some type of high-temperature event had occurred during the event of the failure.

**Q.** Did you do any additional analysis of this circuit board?

**A.** Yes, we did.

**MR. SANDERS:** If I could go to Defense Exhibit 187.

I don't think that's 187.

**BY MR. SANDERS:**

**Q.** Can you just identify what this is.

**A.** Yes. This is a scanning electron microscope image and the corresponding spectrum from what is titled "The Burnout Site" on that refrigerator control board from the Hernandez residence.

**MR. SANDERS:** I'd like to move Defense Exhibit 187 into the record.

**THE COURT:** Admitted.

**BY MR. SANDERS:**

**Q.** What are we looking at here?

**A.** The assessment of the refrigerator control board to clearly show that it was in a failed condition. Examination of the components, particularly in the area where the black soot was present, the highest quantity, revealed that there were a couple of pin connectors in that board where the power comes into the board that had melted. There was a lot of melting around this area. It was consistent with a high-temperature event. This spectrum shows right in this immediate vicinity of that location the absence of sulfur, which has typically been a marker for determining whether material has been impacted by exposure to Chinese drywall.

**Q.** Did you do anything else to confirm whether or not this type of board had an issue or problem?

**A.** We performed a general survey of the board using a scanning electron microscope looking for evidence of sulfur specifically in other locations and did not find them in the area that the failure had occurred.

**Q.** In coming to form your opinions, did you look at the tarnish film data and the pit measurements of Mr. Krantz?

**A.** Yes. I reviewed Mr. Krantz' data, yes.

**Q.** Have you considered the film thicknesses that he measured in giving your opinions here that there's no damage to copper wires or plumbing?

A. I've reviewed his data and I'm aware of the measurements he has made in terms of forming my opinions.

**MR. SANDERS:** Can I go to what's page 9 of Mr. Krantz' February 12 report.

**BY MR. SANDERS:**

Q. If you could look at the bottom image. I think you've indicated you've performed a lot of metallography; is that right?

A. Yes.

Q. What is that again?

A. Metallography is the preparation of typically metallic specimens in cross-section most frequently in order to observe either the microstructure or surface characteristics, as is shown here.

Q. What is the goal in performing that? What are you trying to do?

A. Well, in performing a cross-section, you're typically trying to assess what the condition of the material is. In the case where we're dealing with the tarnish film, we're particularly interested in seeing how much material is involved in the reaction, and so we focus on the surface appearance of the material.

Q. What are your observations of this metallographic sample?

A. This metallographic sample appears to be a copper component -- it's labeled "black wire" -- where there sees some

sign of what appears to be tarnish film; some that is close to the surface, others that have clearly broken off and have become embedded in the epoxy in which this is mounted. In order to prepare the specimen, you don't just simply cut the piece of metal and try to prepare it by hand. We typically mount it in a polymer in order to make it easier for handling preparation.

**Q.** Would you consider the measurements here to be accurate measurements of film thickness?

**A.** No, I would not.

**Q.** Why not?

**A.** The measurements that are displayed here may be accurate measurements of the actual dimensions of what's being shown in the image. But as they relate to how those features existed on the surface of the material, it's impossible to tell once it has been completely detached from the underlying material, particularly something in the example shown to the left of the image, where you have clearly an elongated portion of tarnish and you have no idea how that sat on the surface, whether it grew straight up or was somehow angled. So relating that to how the film thickness existed on the surface, these measurements don't accurately depict that.

**MR. SANDERS:** If we could move to Krantz page 5 of 13 from the February 12 report and look at the bottom image again.

**BY MR. SANDERS:**

**Q.** What are your observations about this sample?

**A.** This sample shows clear evidence of delamination of the tarnish film from the surface of the material, or separation of the tarnish film from the surface of the material. So a measurement from the surface material out to this, quote/unquote, "highest point" does not appear to be an actual description of what the actual film thickness was as it was adhered to the material.

**Q.** That was a reported 37.7 microns?

**A.** That's what it says on the image, yes.

**MR. SANDERS:** If we could move to page 7 of 13 and the bottom image again.

**BY MR. SANDERS:**

**Q.** What are your observations about this sample, for example?

**A.** Well, there are a number of things. One is that the tarnish film appears very irregular. And it's unclear, based on this image, what feature is actually being measured here as tarnish film.

It also appears that the mounting material being used is significantly different in this case as was previously used in terms of epoxy, so the type of mounting that would have been done. If, in fact, this is like a Bakelite structure, there's a lot more pressure and heat applied to the sample upon sample preparation that wouldn't exist in the other epoxy mounts.

 **Q.** Why do you think that might have been what happened here?
**A.** The appearance of what I believe is a mounting material -- it's hard to tell from this image and this magnification, but it's clear there's a lot of disruption at the surface. And it's unclear what here is related to mounting material and what here is related to tarnish film. This is an uninsulated wire, so I'm not entirely sure what we're looking at beyond that.
**Q.** Dr. Perricone, the assessments and testing you've done, the wire assessments for the Hernandez house and other locations, some of which we've looked at here, are they contained in appendix A1 of your report?
**A.** Yes, I believe they are.
**MR. SANDERS:** We've marked that as DX1A1, and I move that that be admitted into evidence.
**MR. SEEGER:** Judge, could we look at it and do it at the end?
**THE COURT:** Sure.
**MR. SANDERS:** I'm going to do the same for A2, which is the Hernandez house assessment plumbing that we looked through, as well as other pictures.
**THE COURT:** I reserve ruling until the plaintiffs have an opportunity look at it.
**MR. SANDERS:** Great.
**BY MR. SANDERS:**
**Q.** Do you have an opinion to a reasonable degree of

scientific certainty, based on this data and your report, whether or not the wires in the Hernandez house can remain after the Chinese drywall is removed?

**A.** Yes, I have an opinion.

**Q.** What is that?

**A.** That the wiring does not need to be removed once the Chinese drywall has been removed from the residence.

**Q.** Similarly, do you have an opinion with respect to the copper plumbing we were looking at in the Hernandez house, whether that needs to be removed after the source is removed?

**A.** Yes, I do.

**Q.** What is that opinion?

**A.** That the plumbing does not need to be removed once the Chinese drywall has been removed from the residence.

**Q.** That's with a reasonable degree of scientific certainty?

**A.** Yes, it is.

**MR. SANDERS:** We have some standards and things that we'd like to move in that I think are unopposed, but we'll just wait until the end.

**THE COURT:** Just a question: Do you have any view as to whether or not the wiring or the plumbing needs to be cleaned or should be cleaned?

**THE WITNESS:** Your Honor, you refer to the exposed portions that have been tarnished?

**THE COURT:** Yes.

**THE WITNESS:** Yes. My opinion would be that there's no reason to remove the tarnish film in terms of concerns about continued operation of those components.

**THE COURT:** Have you made any tests regarding odor?

**THE WITNESS:** I have not performed any tests regarding odor, Your Honor.

**THE COURT:** We'll take a break here, a 15-minute break.

**THE DEPUTY CLERK:** Everyone rise.

(WHEREUPON the Court took a brief recess.)

**THE DEPUTY CLERK:** Everyone rise.

**THE COURT:** You're still under oath.

**CROSS-EXAMINATION**

**BY MR. SEEGER:**

**Q.** Dr. Perricone, you're 31 years old; right?

**A.** Yes, that's correct.

**Q.** You've been a PhD for less than five years; right?

**A.** Yes. I graduated in July of '05, I believe.

**Q.** You've never published corrosion research in a peer-reviewed journal, have you?

**A.** As it pertains to corrosion-related research, I have published in an area describing the general impact of metallurgy on stainless steels. On corrosion specifically as it relates to reactions, the answer is no.

**Q.** Are you teaching any courses in any colleges on corrosion

and corrosion processes?

**A.** I am not currently teaching, no.

**Q.** Have you written any textbook chapters on corrosion or the corrosion processes?

**A.** I have written a section of the American Welding Society handbook scheduled to come out shortly relating the welding of super-austenitic stainless steels, where one of the major concerns in terms of the welding of those types of alloys is the maintenance of corrosion resistance in those welds. That's my involvement on that handbook committee in the American Welding Society.

**Q.** Did you send that article to be published?

**A.** That article has not yet been published.

**Q.** Are you a member of the National Association of Corrosion Engineers?

**A.** I am not.

**Q.** The articles that are on your CV, they mostly relate to welding and stainless steel; isn't that right?

**A.** They largely relate to welding, yes.

**Q.** Your experience at Sandia, that relates to welding and stainless steel as well, doesn't it?

**A.** A lot of the work that was done at Sandia was in reference to welding of stainless steel but was not exclusively limited to that.

**Q.** You are a member of the American Welding Society; right?

**A.** Yes, I am a member.

**Q.** Now, when were you retained by KPT to be their expert in this case?

**A.** My understanding is that RJ Lee Group was retained in, I believe, July of 2008.

**Q.** Now, prior to that, Dr. Perricone, you never really held yourself out as having any particular corrosion experience, did you?

**A.** In terms of holding myself out, certainly I have done work in the area of corrosion. This would be my first testimony regarding corrosion as an expert.

**Q.** Mr. Krantz, for example, do you know the name of the company he works for?

**A.** If memory serves, I believe it's Corrosion Technology Laboratories.

**Q.** The first word: Corrosion Technology Laboratories; right?

**A.** (NO RESPONSE)

**Q.** So let me ask you this: On your CV, which we have -- actually, we have a couple versions of your CV; isn't that right, Dr. Perricone?

**A.** I'm not clear what versions that you're referring to.

**Q.** Well, you were deposed in the *Germano* litigation, which is a case before this; right?

**A.** Yes, that's correct, I was.

**Q.** You had a CV that was in use by you prior to ever being

retained by the defendants to give corrosion opinions regarding Chinese drywall; right?

**A.** Yes. I have a CV that I would routinely update.

**MR. SEEGER:** Actually, could we go to the overhead projector, please.

**BY MR. SEEGER:**

**Q.** I want to just focus your attention. That's you at the top. Right, Dr. Perricone?

**A.** Yes, it is.

**Q.** RJ Lee Group, that's your employer right here. I want to focus you right around this section of your CV. Are you looking at that?

**A.** Yes.

**Q.** The first item is: Project management and analysis, root cause failure analysis, extensive experience in the areas of solidification and microstructural analysis.

Let me show you the CV that you began using after you were retained by KPT in this litigation. Okay? What's that? What's that entry right there, Dr. Perricone?

**A.** That entry is the -- refers to conducting studies of corrosion impact on a variety of materials, including impact of World Trade Center dust on building components.

**Q.** I'm from New York, so I know the answer to this question, but when was the World Trade Center disaster? 2001; right?

**A.** That's correct.

**Q.** So the work you did was sometime before 2008 on the World Trade Center; isn't that right?
**A.** I believe either prior to 2008 or in 2008 itself.
**Q.** You were working on that project before you were retained by KPT. Isn't that what you testified to in your deposition?
**A.** I believe that's correct, yes.
**Q.** That was added for the purposes of this litigation, wasn't it?
**A.** That section was added as part of a routine update of CVs that we would go through as part of the normal course of doing business. As I get more experience on various aspects, particularly working in a consulting firm, where we have a wide variety of clients, the need to update CVs with relevant experience is common practice.
**Q.** Any of the lawyers suggest to you it was good idea to add that for the purposes of this litigation, to add your new corrosion experience?
**A.** I have no recollection that any such instruction or suggestion was given.
**Q.** You spent a little time talking about a refrigerator circuit board. Do you recall those photographs that Mr. Sanders was showing you?
**A.** I do recall those.
**Q.** Do you understand, sitting here today, that there's no dispute that that was a short circuit that caused that -- that

that's not really in dispute that that's a corrosion-related incident? Are you aware of that?

**A.** I am not sure I understood your question.

**Q.** Is there any dispute between the experts in this case about what the cause of that short circuit was with the circuit board you were talking about?

**A.** To my knowledge, I don't know that any expert has asserted that that circuit board failed as -- that was caused by exposure to Chinese drywall.

**Q.** I want to talk to you also about one of the exhibits. I don't know if I remember the exhibit number. It was one of the defense exhibits that Mr. Sanders put up where it showed a cross-section of the wire and it was a really nice, perfect circle. Do you recall talking about that?

There we go. That photo right there that you were talking about, now that's where you took a wire and you took a slice; right? You cut the wire and you looked at it from an angle; right?

**A.** That's correct. That's what those cross-sections represent.

**MR. SEEGER:** Can we go to the overhead.

**BY MR. SEEGER:**

**Q.** Let me make sure I drew this correctly. So what Dr. Perricone did is you took the wire and you sliced it like that; right? And then you looked at it from this direction, or

this direction, whatever; right?

**A.** That's correct.

**Q.** What did Mr. Krantz do? Mr. Krantz took the wire, laid it on its side, and he cross-sectioned it all the way down, didn't he?

**A.** I'm not aware that that was exactly how it was done, but --

**Q.** You're not aware of that sitting here right now?

**A.** I don't know that I would have made that distinction that that's how those wires were prepared, no.

**Q.** Did you read his report?

**A.** Yes, I did. Yes, I did.

**Q.** If you want to really see if there's pitting or problems with the wire, don't you think the method of slicing it down the middle and getting a look at it is better than what you did?

**A.** No, I don't.

**Q.** What did you do? Did you pick the shiniest spot to cut it at?

**A.** No. Actually, the intent was to cut through a portion of the wire that showed particularly dark tarnishing to see what evidence there would be of ingress into the material.

**Q.** Right. Okay.

**A.** The orientation that you refer to with Mr. Krantz, the reason why there could be issues with that is, in particular

with these wires that have been in service, obviously, they've been bent in terms of part of their installation. In terms of metallographically preparing a cross-section such that you would need to polish the centerline of that wire is very difficult to do even in a straight specimen. So to do that in a situation where the wire could be bent in a number of different planes -- keep in mind, in any of these cross-sections, you're looking at a two-dimensional representation of a three-dimensional part. The distortions of being in and out of plane, particularly in a longitudinal section, as you described, could be fraught with difficulties in terms of the sample preparation process that wouldn't immediately be evident just looking at those cross-sections.

**Q.** I no idea what you just said, but that's fine.

Dr. Perricone, you're aware that KPT had another expert in this case by the name of Dr. Sandy Sharp in the *Germano* litigation; right?

**A.** Yes, I'm aware of that.

**Q.** "Yes" or "no," if you can tell me. Dr. Sharp had a problem with some calculations that you did in *Germano*, didn't he? He disagreed with you on some calculations?

**A.** My understanding is, yes, his testimony was that he disagreed with me.

**Q.** Where is Dr. Sharp in the *Hernandez* litigation? Is he testifying?

**A.** To my knowledge, he is not.
**Q.** Was he fired? Do you know?
**A.** I don't know how he was retained or --
**MR. SANDERS:** Objection, Your Honor, as to foundation or what he knows about this.
**MR. SEEGER:** I'll withdraw the question.
**BY MR. SEEGER:**
**Q.** You testified earlier on some questions from Mr. Sanders about some ISA standards. Do you recall that?
**A.** Yes, I do.
**Q.** You used those standards to make coupon measurements; right?
**A.** I used those standards as the basis for using coupons in order to assess environments.
**Q.** Now, let's be clear. Just so the Court's clear on this, when you're talking about measuring tarnish and corrosion -- by the way, you like the word *tarnish* better than you like the word *corrosion*, don't you?
**A.** I don't have a particular affinity for one term or another.
**Q.** How come you don't say *corrosion*, I mean, like in the Sandia report? They use the word *corrosion*, don't they?
**A.** I believe they do use the term *corrosion*.
**Q.** Why won't you?
**A.** I believe I have referred to corrosion in various aspects.

I have typically made the distinction in terms of conversing about the various impacts seen in residential environments to distinguish corrosion as it may occur in an aqueous environment versus tarnishing, which is commonly referred to in terms of sphere corrosion processes.

Particularly, tarnishing is associated with a type of discoloration of a metal at its surface. Corrosion typically denotes a connotation of metal loss or damage to materials. So I've just been making the distinction to make the distinction between those types of conditions.

**Q.** Dr. Perricone, in these ISA tests, when you were measuring corrosion on coupons, the point I wanted to make is this: When you're looking at tarnishing coupons, that's a surrogate method. That's another way of looking at what might be going on on pipes, but it's not looking at the pipes. It's looking at a piece of copper that you installed in the house for testing purposes. Right?

**A.** The use of a copper coupon is intended to characterize the environment, not to assess the condition of any one component in the house.

**Q.** So when you did the testing on the copper coupons, did you measure relative humidity at the time? I looked in your report and I couldn't find that.

**A.** I believe relative humidity measurements were made and would have been presented in a parallel report, I believe, by

Dr. Goad.

**Q.** But in your report, the testing that you testified to the Court to, was that done by Dr. Goad or by you, the coupon testing?

**A.** The coupon testing was performed by me, by RJ Lee Group.

**Q.** Did you check to see what the relative humidity was at the time that the testing was done on the coupons?

**A.** Yes, I've reviewed data that's been presented about the relative humidity in the houses that that testing occurred in.

**Q.** What was it?

**A.** My recollection, that the humidity varied significantly from time of day and time of year and depending, obviously, on what location the house was in that testing was being done.

**Q.** I'm sorry. I didn't hear the last part of what you said.

**A.** The actual location of the house, geographic location of the house in which the testing or assessment was being done.

**Q.** Right. What was the relative humidity at the time of testing?

**A.** As I recall, it was on the order of -- it would vary between 50 and 80 percent relative humidity --

**Q.** Okay.

**A.** -- if memory serves.

**Q.** Did you actually read the ISA standard that you cited to earlier with regard to environmental conditions for process measurement and control systems?

**A.** Yes.

**Q.** Did you take note of this table?

**MR. SEEGER:** Could I have the overhead.

For the record, I'm looking at Hernandez 62.

**BY MR. SEEGER:**

**Q.** Do you see that top part? It says: "The gas concentration levels shown below are provided for reference purposes. They're believed to approximate the copper reactivity levels stated below provided the relative humidity is less than 50 percent."

That's from the ISA guideline that you used; right?

**A.** Yes, that's correct.

**Q.** Let me stay on coupons for a second. When did you do the coupon testing? What time of year? What period of time was that?

**A.** Coupon testing --

**Q.** At the Hernandez house. I apologize.

**A.** Coupon testing was performed in the Hernandez residence, I believe, during the month of January into February of 2009.

**Q.** Right.

**A.** Or 2010. I apologize.

**Q.** You understand that that's not -- I'm not saying there isn't humidity all the time, but that's not a particularly humid time of year in Louisiana. Would you agree with that?

**A.** Yes. I would expect the humidity in winter, for example,

 relative humidity to be less than, say, the heat of summer.

**Q.** You acknowledge there's a reaction between the sulfur gases coming off of the drywall, the KPT drywall, and humidity? There's a relationship there, right, in terms of causing corrosion?

**A.** Yes, on copper. Particularly, copper demonstrates a sensitivity to humidity.

**Q.** The table in your report at appendix 2 -- do you see that right there at the top? These are the test results you got. Do you see where it says the sulfide thickness in angstroms? Relatively low numbers; wouldn't you agree with me?

**A.** Yes.

**Q.** That's measuring the thickness of corrosion; right?

**A.** The tarnish film thickness on the -- yes.

**Q.** You can call it tarnish. You call it "tomato." I call it "tomato."

Let's go to another piece of your report, though. You also did testing in a house in Florida, didn't you, back in June, June of 2009? Right? You're involved in that? You're aware of that, aren't you?

**A.** Yes, I did.

**Q.** You got much higher readings during that humid -- you would acknowledge that in June in Florida, it's pretty humid; right?

**A.** Yes, I would acknowledge that.

**Q.** You got much higher readings here, didn't you, in this table?
**A.** Yes, we did.
**Q.** Now, are you familiar with ASTM guidelines?
**A.** As a general sense, yes.
**Q.** Well, your partner, Dr. Lee, sits on many ASTM committees; right?
**A.** Yes, he does.
**Q.** Are you familiar with the guideline for conducting atmospheric corrosion tests on metals? Did you ever read that?
**A.** I believe I have.

**MR. SEEGER:** For the record, it's Hernandez 129.

**BY MR. SEEGER:**
**Q.** At the top, you can see the ASTM logo; right, Dr. Perricone?
**A.** Yes.

**MR. SEEGER:** Your Honor, we'd move this into evidence.

**THE DEPUTY CLERK:** It's already in.

**MR. SEEGER:** I'm sorry.

**BY MR. SEEGER:**
**Q.** Let's read this together. Let's start right down here in section 3. Do you see where it says: "Because of the variability and complexity of weather effects and the industrial and natural factors influencing the atmospheric

corrosivity of a test site, a multiyear exposure period should be considered to minimize their influence."

Did I read that correctly?

**A.** Yes, you did.

**Q.** "Also, as corrosivity may vary at a site from season to season, exposure should be made either at the same time of the year to minimize variability or these differences should be established by multiple exposures."

Did I read that correctly?

**A.** Yes.

**Q.** You agree with that, don't you?

**A.** Yes. We see variability from time to time, from year to year, on location to location. I think the data, as presented, demonstrates that that variability can occur, and the reactivity of the copper will be affected by those changes in atmospheric conditions.

**Q.** Do you recall talking about tarnishing under insulation with Mr. Sanders? One of the things you said about missing vinyl mesh on the wire that showed corrosion underneath -- do you recall that? That was the reason why you're saying that's how the corrosion got underneath the wire?

**A.** Yes. That was a visible defect in that particular location and it corresponded to the tarnish.

**Q.** Is that opinion in your report anywhere, the mesh is missing?

**A.** I don't have a specific recollection of whether or not that is.

**MR. SANDERS:** Why don't you show him the particular opinion. He can confirm or deny it.

**MR. SEEGER:** Excuse me?

**MR. SANDERS:** Do you want to show him the opinion?

**MR. SEEGER:** No. I'm asking if the opinion is in his report. He said "no." But thank you for clarifying that.

**BY MR. SEEGER:**

**Q.** I have a few more topics. Let me just take a second to look at it because I only got to depose you last night.

**MR. SEEGER:** Can we have Exhibit 60.

**BY MR. SEEGER:**

**Q.** You recognize what this document is; right?

**A.** Yes, I do.

**Q.** That's the Sandia report on corrosion in Chinese drywall; right?

**A.** Yes, that's correct.

**Q.** Now, when you're talking about -- I believe it was in the context of the wire where you peeled back the jackets. You did a visual inspection of the wire underneath; right?

**A.** Yes, that was a visual inspection of the wire underneath.

**Q.** You're a scientist. You have microscopes and things like that in your office, don't you?

**A.** Yes. I have access to those, certainly.

**Q.** This report that you read, on page 36, which is 0036 --

**MR. SEEGER:** If you could blow up the bottom section. If I can find a pointer. Right there.

**BY MR. SEEGER:**

**Q.** Do you see where it says -- well, first, it says: "Further observation and analysis of receptacles and other harvested components could provide results that vary from the results obtained to date."

They say that future work is expected to include it, and you've got all these tests. Did you do any of those on the wire under the jackets?

**A.** I don't have a specific recollection of performing analysis on the wire surfaces. The SEM and EDS analysis was done in locations of cross-sections but not on actual wire surfaces.

**Q.** To date, your company has billed about $2 million in expert fees to KPT to give opinions in this litigation; isn't that fair?

**A.** Any billing -- which I am not in charge of the billing aspect, but any billing would include fees for labor, as you suggest. We also have a full-service laboratory.

**Q.** Well, how about just answering the first part. It's about $2 million?

**A.** It very well could be that amount.

**Q.** Has anybody cut your budget back and said don't perform --

have you been told by the lawyers not to perform certain tests?

**A.** I've performed the investigation to the extent that I felt I needed to in order to reach the conclusions that I have.

**Q.** You've looked at six outlets from six homes; right?

**A.** I don't believe that's -- I have an immediate recollection of three from the Hernandez location.

**Q.** Right.

**A.** I'd have to go back and look through a report to see how many outlets were actually presented in my report in order to determine that.

**Q.** Do you recall your testimony about this slide?

**A.** Yes, I do.

**Q.** Just to cut to the chase on this, you do acknowledge there's copper sulfide left behind; right?

**A.** It certainly appears to -- the EDS spectrum shows a small peak of sulfur. I'm not entirely sure where on that image the spectrum was taken, whether that's an average or not. So there does show to be some sulfur present. How that's distributed across that cross-section is unclear, but there appears to be sulfur.

**Q.** Here's my question: When the Hernandez family built this house with brand-new wire, did it come like that?

**A.** I have not observed the new wires that we've presented having that type of product on its surface.

**Q.** By the way, you hold the opinion that as to HVAC coils and

pipes, that they cannot be fully cleaned with the Scotch-Brite pad; right?

**A.** Could you clarify. When you say "coils and pipes," are you talking about the pipes as it relates to the HVAC coil?

**Q.** HVAC coils and copper pipes in the house cannot be adequately cleaned? You can't clean off all the copper sulfide, can you?

**A.** From what I've observed, 100 percent removal simply with a Scotch-Brite pad appears to not be consistently achievable. Whether that is adequate for the purposes of remediation or ensuring that the continued function will be possible, actual cleaning for the plumbing and so forth, as I've stated previously, would not appear to have an impact on its continued performance. So cleaning of just a pipe sitting in the wall is not necessary.

**Q.** I'm not asking you that. I'm just asking you: Can you clean all the copper sulfide off the pipes and HVAC coils in their home with Scotch-Brite pads?

**A.** The removal of some of the sulfide scale certainly is possible; but as is shown in this exhibit, there can be some left behind at a microscopic level.

**Q.** That's a Scotch-Brite pad; right?

**A.** Yes.

**Q.** This is the scientific method that we're going to propose to this family to clean off their wires, HVAC coils, and copper

pipes? That's what you're saying, that's okay?

**A.** The method that's being offered is one that could be easily applied in the field to remove the bulk of the tarnish film in order to establish good electrical contact by an electrician.

**Q.** What ASTM standard supports what you just said?

**A.** I'm not aware of an ASTM standard specifically governing the use or application of Scotch-Brite pads. Instead, it was considered as a common, easily applied field technique that could be used without extensive technical training in order to achieve the results that you've shown here in this exhibit.

**Q.** Does 3M recommend you use Scotch-Brite pads for the cleaning of copper sulfide off pipes and HVAC coils?

**A.** I'm not aware of such a recommendation.

**Q.** Have you even read the package on a Scotch-Brite pad?

**A.** I'm sure I have at one point.

**Q.** Your opinion that corrosion stops when you remove the Chinese drywall, tell the Court one -- just one -- study other than the study that we propose, the Edwards article, that supports your opinion that the corrosion stops.

**A.** There is very common knowledge regarding basic corrosion processes.

**Q.** Oh, that's it? Just common knowledge?

**A.** Common technical knowledge for those who are materials scientists and who work in field of corrosion failure analysis,

that in order for a corrosion reaction to occur you actually have to have chemical species available for those reactions to occur. If you remove the species part, the reactant part of the equation, you're not going to generate the same products.

**Q.** I gave you a heads-up on this question last night because I asked you the exact same question at 7:30 in their office. Have you come up with one literature reference that the Court can go look at that supports what you just said? Tell us where to go. We have computers.

**A.** Again, the basic literature in the *ASM Handbook* would be a good general reference for corrosion and discussion of the type of reactions that can occur.

**Q.** Okay.

**A.** That really is why you go to all the trouble of assessing environments to determine what materials would be good to use in a given environment because you need to know what species are present and what reactions can occur in order to determine the right material, determine the right conditions that the material needs to be put in, and what the appropriate performance would be.

**Q.** Let's go back to Sandia for a second. You're aware that in the Sandia report they say that visual inspection of pipes shows severe corrosion? Would you agree with that?

**A.** I don't have a specific recollection of that section. I could take a look at the report. I'd be happy to do so.

**Q.** Let me ask you this to save a little time. You're aware that in the Sandia report they classify the Chinese drywall environment in a home as a Class III or Class IV in terms of Battelle classifications? You're aware of that; right?

**A.** I don't believe that's exactly what the Sandia report concluded. In fact, they refer to the Battelle Class III and IV as their assessment of the samples that they received suggested that the components had been exposed to that environment, to those types of environments. But I don't believe they asserted that the environment was, in fact, characterized as a Class III or Class IV.

**Q.** I'm going to look at Hernandez 65 [*sic*]. Do you see where it says, "Based on the degree of corrosion observed on all of the samples provided to SNL" -- that's Sandia Labs, right, SNL?

**A.** Yes. That's a common designation.

**Q.** ". . . as well as the presence of corrosion products that are creeping onto the inert surfaces, SNL staff believe the Battelle corrosive environments that the copper wiring has been exposed to could be as severe as either Class III or Class IV."

That's what it says; right?

**A.** Yes. I'd actually point specifically, though, to that last sentence, where they were, I believe, careful to include "could be as severe as," which is based on the assessment of the actual components at issue but is not an actual characterization of the environment, which generally the

Battelle standards on which they refer to, the use of a copper coupon would be used to classify the --

**Q.** Do you think there's some logical relationship between the environment being corrosive and the samples that they've seen exhibiting corrosion that's consistent with a Class III or Class IV environment? There's some connection there; right?

**A.** Certainly, in terms of -- previously in that same report, they describe the type of corrosion products one would expect in those various classes. Those were not based on film thicknesses per se, but rather whether sulfides were present, whether oxides were present. In that regard, that, I believe, is one of the main reasons why they made that designation.

**Q.** Now, this photo that we're looking at is also from the Sandia report; right?

**A.** Yes, I recognize it as such.

**Q.** Do you recognize that being a piece of copper electric wire?

**A.** Yes. The caption says it's surface corrosion on a ground wire.

**Q.** On a ground wire. Based on that scale of 10 microns in the lower right-hand corner there, how deep would you say this is based on that scale? About 20-microns? 15, 20 microns?

**A.** Based on this scale, I would view this area of ingress into the copper as approximately 10 microns or so --

**Q.** You're aware that we --

**A.** -- from what I can see here.

**Q.** You're aware we have measurements in this case, some from you, some from Mr. Krantz, that go as deep as 30 microns into wiring; correct?

**A.** Yes, I'm aware of those measurements.

**MR. SEEGER:** Excuse me one second. I'm sorry. I'm actually cutting things away.

**BY MR. SEEGER:**

**Q.** The capacity to carry current, let's just talk about that for a second. Now, did you perform a test on a wire from the Hernandez house to test its capacity to carry current?

**A.** No. My assessment of wires from the Hernandez house was focused on looking at cross-sections of those wires as it would pertain to carrying current.

**Q.** Did you reach a conclusion as to the capacity of the wires in the Hernandez house to carry current?

**A.** Yes, that there was no impact of the tarnishing to the underlying wire that would impair its ability to carry the current for which it is rated.

**Q.** Right. Your protocol was to take a single cross-section from each wire and measure its circumference; isn't that right?

**A.** The focus was to look at the cross-sections of the wires, and they were compared to exemplars of new wire of the same gauge and shown not to be different in cross-sections.

**Q.** I just want to make sure I got an answer to that question.

The test you did was to take a cross-section of the wire and measure across the wire; isn't that right?

**A.** The test we did was looking at a cross-section of the wire and examining the surface of the wire both at low and at high magnifications. We showed a number of different exhibits to see if there was any evidence of ingress into the copper wire or whether the original surface could still be visible. In many cases, aside from the pits that have been pointed out by the plaintiffs and by the data that we've provided, there was not intrusion into the surface of those or that original surface, in many cases, was still present --

**Q.** Dr. Perricone, I get lost in all that. I'm just trying to ask you a simple question, so if you can answer "yes" or "no." Did you just take a cross-section and measure across the wire? That was your test; right?

**A.** The test was do the cross-section and compare it to a new wire.

**Q.** Okay. Fine. What standard or guideline supports that as a testing method for the current-carrying capacity of a wire? Tell me where to look.

**A.** That assessment was done based on a metallurgical evaluation that I would do in the normal course of an assessment of either a failure analysis or materials impact analysis as part of more of a scientific investigation based on my common knowledge and experience in my field and not a

specific ASTM standard, for example, that would specifically deal with current-carrying capacity.

**Q.** That's Dr. Perricone's test that you came up with based on what you thought made sense? That's what you did; right?

**A.** Actually, it's more than that. If you take a look at just the common description, common textbook description of *current-carrying capacity*, where it specifically states that the two major portions of a material that determine current-carrying capacity are the resistivity of that material, which is an inherent materials property, and then the amount of material that's present.

That's routinely expressed as a function of them, of the resistence and the cross-section area. So measurement of the cross-sectional area or assessment of the cross-sectional area was a straightforward way to assess the current-carrying capacity based on that basic definition.

**Q.** Dr. Perricone, this is your transcript from last night. Page 56, do you see that at the top? Here's a question I asked you last night:

"Question: And so I'm just asking just to close out my questioning here, did you, when you thought you were doing this -- I understand you did tests which made sense to you as a scientist. Did you go and see if there were sort of of standardized tests that someone else might do to test the same thing?"

**MR. SANDERS:** I'm still going to object to the form of that question.

**MR. SEEGER:** That was good.

**BY MR. SEEGER:**

**Q.** Continuing:

"Answer: In terms of assessing the current-carrying capacity --

"Question: Yes.

"Answer: -- I applied what the -- basically, the definition of the current -- the ability for a wire to carry current and assessed those parameters accordingly. The extent that there were other methods different than what I used, I can't say at this point."

**MR. SANDERS:** I don't think that's even impeaching. That's what he just testified to.

**BY MR. SEEGER:**

**Q.** That was your answer last night; right?

**A.** Yes. I believe it was consistent with what I just said in terms of --

**Q.** Where did you mention the textbook, though, the textbook you just mentioned now? Did you mention a textbook to me I could go look at last night?

**A.** I referred to just a basic textbook definition, a general textbook definition. There are several textbooks I could look up and point you to.

**Q.** As part of your general knowledge, that's what you're referring to; right?

**A.** Yes.

**Q.** By the way, you're aware, sitting here today, that Sandia is still looking at the issue of whether there's a fire or safety hazard with regard to wires that have been exposed to a Chinese drywall environment? You are aware that research is under way; correct?

**A.** I'm aware that research in general is ongoing. To what extent Sandia specifically is addressing fire-related issues, for example, I don't know.

**Q.** You don't know. You don't claim that the corrosion material can be cleaned from low voltage wires -- where's that lamp -- like this lamp right here; right? You're not saying that we can clean the corrosion off these wires?

**MR. SANDERS:** Which wire, low voltage?

**BY MR. SEEGER:**

**Q.** Well, this wire on this lamp. Are you claiming that?

**A.** In order to clean that surface --

**Q.** Clean off the corrosion.

**A.** -- you would have to remove the sheathing in order to access it. In essence, you would have to fix that. So replacing the cord, for example, would be, I think, more reasonable in that example rather than to do a cleaning.

**Q.** Replacing the cord. You didn't attempt to clean any low

voltage wiring or contacts with regard to appliances or anything like that, did you?

**A.** No. The only focus was on wires specifically.

**Q.** Did you conduct any testing on low voltage wire or silver contacts other than the one refrigerated circuit board that shorted out?

**A.** No, we did not perform testing on silver contacts.

**Q.** You did look at one item, which was a toaster, from the Hernandez house; right?

**A.** Yes.

**Q.** Mr. Galler looked at the toaster, and you agree with Mr. Galler that there's sulfide corrosion on the contacts; right?

**A.** Yes, that his analysis showed that there was sulfide present.

**MR. SEEGER:** Your Honor, that's all I have for now. I guess that's all I have.

**THE COURT:** Any redirect?

**MR. SEEGER:** Wait. I'm sorry. I need to move into evidence Hernandez 62 and 65.

65 is the Sandia report; right? Somebody tell me what it is.

We'll come back to this, Your Honor.

**THE COURT:** 62 is what?

**MR. SANDERS:** 62, we've already moved that in.

**MR. SEEGER:** We'll move it in too.

**THE COURT:** Admitted. Any redirect?

**MR. SANDERS:** If you can turn the ELMO back on.

**REDIRECT EXAMINATION**

**BY MR. SANDERS:**

**Q.** Dr. Perricone, when was your expert report due in this case, if you recall?

**A.** I honestly can't recall. I believe it was late February.

**Q.** So if you wanted to include any copper reactivity measurements in your report, when would you have had to do those measurements?

**A.** I believe we were given access to the Hernandez residence in early January 2010 was the first opportunity that I was given.

**Q.** The measurements you received from those, which were low, did they weigh one way or another in your opinions that you don't need to remove the copper wiring or the copper plumbing once the source is removed?

**A.** No. They don't have bearing on those opinions, no.

**Q.** Mr. Seeger asked you about pits and whether or not a 30-micron pit or a 20-micron pit, or let's say a 50-micron pit, would bear on your opinion that the cross-sectional portion of the wire is impacted. How does that, if at all?

**A.** I think that was exactly why we went to showing that exhibit and walking through the exhibits at the magnifications

 that were done. Looking at the entire cross-section of the wire is so informative because it puts into the larger context the size of those pits that are being described are so very small relative to the overall cross-section of the material.

I mean, I point out, for example, 30 microns for a pit, the average width of a human hair is about 70 microns. So you're talking about very, very small depth of penetration for any of these pits even though they look particularly -- well, at high magnification, they can appear to be larger.

**Q.** For the stranded wire -- first of all, is this low voltage wiring or high voltage wiring, if you know?

**A.** I don't know that I would specifically characterize it as one or the other. I would tend to characterize that simply as sheathed stranded wire, which is different than the solid wire that is typically used to carry a current to plugs in your house.

**Q.** Have you seen any cross-sections or any examination of the wire from this lamp?

**A.** No, I have not.

**Q.** Are you aware of plaintiffs having done any?

**A.** I'm not aware of such analysis.

**Q.** You saw cross-sections that Mr. Krantz did from a similar strand of wire in a Virginia house; correct?

**A.** Yes, that's correct.

**Q.** What's your opinion about whether or not --

**MR. SEEGER:** Objection to the leading.

**BY MR. SANDERS:**

**Q.** What's your opinion about whether or not there's any impact in functionality of that stranded wire?

**A.** As we showed previously, the impact of the loss of cross-section was less than 1 percent of the total cross-section of the material. I would have no basis for considering that other similar types of wires in a house with Chinese drywall would be substantially different than that analysis or would be impacted to any greater extent than what was shown.

**Q.** What would happen to any of the sulfide corrosion or tarnishing in that wire once the source was removed?

**A.** There's no expectation that continued growth would occur once the source is removed.

**Q.** You mentioned, I think -- well, first of all, what is the only article that plaintiffs have cited in support of their argument that corrosion is going to continue?

**A.** In my review, their reports have demonstrated that they relied on an article by Edwards regarding continued corrosion as it relates to copper sulfide.

**Q.** In your opinion, does that have any bearing on continued sulfur corrosion?

**A.** It does not.

**Q.** Why is that?

**A.** There are several reasons why that paper is not applicable to houses with Chinese drywall. First and foremost, I point out that the whole point of that article and that study was to examine what's going on inside copper pipes, where water is being distributed, as opposed to on the surface of copper pipes, where you're dealing with an atmospheric not an aqueous corrosion solution.

There was also no discussion in those reports regarding continued growth of any type of the sulfide layer. It just talked about metal loss, which is typically not what we would see in an atmospheric corrosion setting where you're looking at weight gain versus weight loss in an aqueous setting.

**Q.** In the Edwards' paper, why was there metal loss? What was happening there, actually?

**A.** Well, one of the things that was in the Edwards paper, aside from simply being a fully immersed type of test, they would periodically, over the long duration of the test, flow water through the chamber. So there would be a flow component that would sweep away any metal that may have gone into solution. When I say "gone into solution," that would have been dissolved and would leave behind a gap in the underlying metal.

When you have flow of the water, you will physically sweep away those ions. Whereas in the case of an atmospheric

corrosion situation, those ions aren't going to be swept away by a flow. They're sitting on a surface, and as the water dissipates, the ions are still going to be present there in that location.

**Q.** I think you mentioned in response to Mr. Seeger's cross -- and it's in your report -- relying on ASM standards?

**A.** Yes. I relied on *ASM Handbook* information, yes.

**Q.** What is the *ASM Handbook*?

**A.** *ASM Handbook* is a publication of ASM International, which is, I believe, the largest professional society for materials scientists and engineers. It's a very large, multi-volume resource for materials information. It is peer-reviewed, and it's data that has been generated by leading materials scientists.

**Q.** What specific section or sections did you rely on?

**A.** There were multiple sections of Volume 13 of *ASM Handbook*, which refers to corrosion issues. I specifically relied on Volumes A and B, one of which -- I believe in B -- contained a section on copper and copper alloys.

**Q.** This we've marked for identification as DX241. What section of the *ASM Handbook* is that?

**A.** I believe that's out of Section 13B of the *ASM Handbook*.

**Q.** What does it deal with?

**A.** Corrosion of copper and copper alloys.

**Q.** Did you rely on that in forming your opinions?

**A.** Yes, I did.

**Q.** I'd like to show you a specific page of this section, page 15. If you could close in on this paragraph here. If you could read that first sentence there starting with "Atmospheric Testing."

**A.** Yes. It states: "Atmospheric Testing: In a variety of applications, such as electrical and architectural components, the behavior of copper alloys when fully immersed in solution is not relevant with regard to their performance under various atmospheric conditions."

**Q.** What was the status of copper alloys in the Edwards paper?

**A.** They were fully immersed.

**MR. SEEGER:** For completeness, can you just read the next sentence.

**THE COURT:** 106, I'll allow the next sentence to be read.

**THE WITNESS:** The next sentence is: "Constant humidity and temperature chambers are used to evaluate the relevant atmospheric behavior of the materials."

**MR. SANDERS:** We have, I believe, some exhibits to move in that are not objected to. They're standards that Dr. Perricone relied on: DX223, DX224, DX225, DX226, DX227, DX230. I don't believe those were objected to.

**MR. SEEGER:** Your Honor, they're attempting to move in some learned treatises. We'd have to look at them. They

 wouldn't be admissible.

**MR. SANDERS:** Your Honor, they're ASTM standards. They could read them all.

**THE COURT:** I understand.

**MR. ECUYER:** We did agree to the ones Mr. Sanders just read out. The only three we reserve objection to are Defense Exhibits 228, 229, and 241, as learned treatises, Your Honor.

**MR. SANDERS:** Which I'm not moving in.

**THE COURT:** I'll allow those with the exception of the ones that were objected to as being the treatises.

**MR. SANDERS:** We had a cleanup, and I'm sorry to belabor this point about the appendices, which are the actual sampling data that Dr. Perricone and his report relied upon. We would move these appendices into evidence, which is DX1A1.

**THE COURT:** What's your position on the appendices?

**MR. SEEGER:** They're part of an expert record. They all contain narratives, which would otherwise be inadmissible. The photos, we've separated out. I'm okay if he wants to put photos in, but the tables that are interpretive, the demonstratives, the narratives would not be ordinarily admitted.

**MR. SANDERS:** Your Honor, our position, if we look at this, it's similar to some of the materials that came in with Dr. Krantz. What these are are descriptions of figures, and

maybe if we can take some time over the break I can agree to black out some things.

**THE COURT:** I'll let you do that. I'll reserve ruling on that.

**MR. SANDERS:** Thank you, Your Honor.

**THE COURT:** Anything further?

**MR. SANDERS:** No, your Honor.

**THE COURT:** You're excused. Thank you, sir.

We'll come back, then, at 1:45 and I'll hear oral argument on that. Court will stand in recess until 1:45.

**THE DEPUTY CLERK:** Everyone rise.

**(LUNCHEON RECESS)**

* * *

**CERTIFICATE**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

s/ Toni Doyle Tusa
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
*******************************************************************

IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY

Docket No. 09-MD-2047
New Orleans, Louisiana
Friday, March 19, 2010

**THIS DOCUMENT RELATES TO:**
Case No. 09-CV-6050

Tatum B. Hernandez, et al
v.
Knauf Plasterboard (Tianjin) Co., Ltd., et al
*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME V - AFTERNOON SESSION

APPEARANCES:

FOR THE PLAINTIFF:

HERMAN, HERMAN, KATZ & COTLAR
BY: RUSS M. HERMAN, ESQ.
STEPHEN J. HERMAN, ESQ.
820 O'Keefe Avenue
New Orleans, LA 70130

GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER
BY: GERALD E. MEUNIER, ESQ.
MICHAEL J. ECUYER, ESQ.
1100 Poydras Street, Suite 2800
New Orleans, Louisiana 70163

SEEGER WEISS
BY: CHRISTOPHER A. SEEGER, ESQ.
One William Street
New York, New York 10004

LEWIS & ROBERTS, PLLC
BY: DANIEL K. BRYSON, ESQ.
3700 Glenwood Avenue, Suite 410
Raleigh, North Carolina 27612

FOR THE DEFENDANT:

FRILOT L.L.C.
BY: KERRY J. MILER, ESQ.
Energy Centre - Suite 3700
1100 Poydras Street
New Orleans, LA 70163-3700

BAKER McKENZIE
BY: DONALD HAYDEN, ESQ.
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131

BAKER McKENZIE
BY: DOUGLAS B. SANDERS, ESQ.
ERIN M. MAUS, ESQ.
KYLE P. OLSON, ESQ.
130 E. Randolph Drive
Chicago, Illinois 60601

Official Court Reporter:

Karen A. Ibos, CCR, RPR, CRR
500 Poydras Street, Room HB-406
New Orleans, Louisiana 70130
(504) 589-7776

Proceedings recorded by mechanical stenography, transcript produced by computer.

01:25:22

**I N D E X**

| **CLOSING ARGUMENTS OF:** | **PAGE/LINE:** |
| --- | --- |
| By Mr. Seeger | 924/15 |
| By Mr. Hayden | 937/16 |
| Rebuttal by Mr. Seeger | 955/16 |

P R O C E E D I N G S

(FRIDAY, MARCH 19, 2010)

(AFTERNOON SESSION)

01:46:06 THE COURT: Be seated, please. We're at the point now where I mentioned the evidence is in and I would like each side to make sure that I have the evidence in the form and fashion that they wish me to have it. So check with Gaylyn before you leave today.

01:46:20 We're at the point where I can profit from some observations in the form of summation or oral arguments, so I'll hear from the parties at this time.

01:46:34 MR. SEEGER: May I proceed, your Honor?

01:46:36 THE COURT: You may proceed.

01:46:37 MR. SEEGER: Thank you. Judge, this trial, like any trial, is about the parties here, and we've had the Hernandezes sitting in this courtroom for a week now, listening to everybody discuss them. But as you know, your Honor, it's not about the lawyers, it's ultimately about them and about KPT.

01:46:57 KPT doesn't have anybody here, they chose not to be here. Mr. Hayden wanted us to be appreciative of the fact that they're here in the first place, but they've chosen to avail themselves of the U.S. markets, and their product has actually shattered the dreams of many people, which I am hoping we're going to get to remedy today.

01:47:14 I think for me, maybe one of most telling moments watching the trial is not so much watching the witnesses but watching the Hernandezes testify knowing that they have two little children in this house and watching Mr. Hernandez say to himself that really what he wants to be able to do is protect his family. And I am hoping that we come out of this with a remedy where these people can leave here feeling like they protected their family and that he's done all he can.

01:47:39 Now, what is there, ultimately, what is the proposal that we are being, that's being put on the table by KPT? One, I would like to remind the court of the stipulation, that's where we started, we're kind of coming back to where we started. They've acknowledged that their product is not fit for intended use, and it emits sulphur gases and its odorous.

01:47:58 Now, Judge, I ask you to think about this in looking at the evidence of this case. Why do they get to come in now and tell us what the scope and the cost of the remedy should be? You've seen the witnesses, we've heard the testimony.

01:48:10 You know, Mr. Mallet put in a price to renovate this home that concededly, nobody is disputing the fact that it's probably close to what they paid to build it in the first place. That's no surprise to anybody, that a renovation is going to cost almost as much as the original project because anybody who has ever done a renovation in their home knows that renovations are more expensive than new construction, so there is no real surprise there.

01:48:34 And I'm going to get to talking about the experts toward the end of my closing statement, and I think when you really do the comparison, I think the weight is clearly in favor of the plaintiffs on every level.

01:48:43 We started the case talking about that there are two ways to get to the remedy that we proposed to your Honor. One is, you listen to the science and you conclude whatever you conclude what we hope is on our side on the corrosion issue, that it will continue. You've heard Mr. Krantz, I mean, the man works for a company called Corrosion Testing Labs, and then we heard from Dr. Perricone and Dr. Lee. You know, the one man who is basically an asbestos expert for the defense, and the other one who is, really, almost like he is a 31-year-old welding expert, he's had no experience prior to coming to this court. His résumé up until the Time that he was deposed didn't even reflect corrosion experience until, I guess, he got the idea that maybe he should put that World Trade Center experience on there. So let's get to the heart of what we're really here about.

01:49:33 What does KPT say should be done? Well, this is what they want to leave behind in the homes of these people: They want to leave the dust because that's how fine it is, it's like Johnson's baby powder, there is no way you're going to get that out unless you follow the protocol that we've proposed to your Honor, I'm looking at Hernandez 470 for the record.

01:49:55 The switches, we've been through all of this, your Honor,

they want to leave -- well, the switches they're going to replace, but the contacts, they want to leave contacts that are in appliances and things like that with sulphur -- silver sulfide on them. They want to leave plumbing fixtures with corrosion that we've shown your Honor, not just through the experts, but under microscopes and SEM analysis showing there's copper sulfide in there. They want to leave this behind in the walls.

Now, this is not what they paid for. When they built their dream house, they didn't pay for damaged copper. They paid for new copper. How is the copper in wires damaged? By their product. See, it should come out.

Here is a wire, taking their solution of cleaning, taking a Scotch-Brite pad and trying to clean the wiring. We did that here. We took their solution, we gave it to our scientists, they tried to clean it, and what happened, it leaves behind copper sulfide.

Now, the only evidence you've heard in this case, the only testimony you really heard about, corrosion progressing, came from our experts. They haven't really proposed anything. That ASM manual that Mr. Sanders spent so much time redirecting on, his witness didn't even discuss it last night. He gave us no references, he said, well, my answer is in the ASM manual, and all of a sudden he walks in here today and he has chapter and verse of where the court should look; and I think the court should look there, because we've looked at it, it doesn't support what they

say.

The only thing in this case that supports it are two things: It's the Edwards article, and we haven't made any bones about this, there is not a ton of evidence and there's not a ton of science on it, but the science that supports it is a peer-reviewed journal article by Edwards that shows that the corrosion will continue. It explains how the testing was done and that when they took the copper out of the aqueous environment and put the scales, the corrosion scales back on it, it continued to corrode.

Well, that's what we're leaving behind in their home. We are going to leave copper sulfide. If we leave these pipes in the wall, we're going to leave copper sulfide in the pipes and it's going to continue to corrode. They don't want to replace the appliances or wiring, this is what they want to leave behind.

And we really haven't even talked about things like soap dishes and doorknobs and all of the other things that are in that house that are corroded. Picture frames. Circuit boards with corrosion.

So going back to our corrosion point, we brought you Mr. Krantz, who not only gave you testimony in this case, your Honor, about the Edwards article, but I would reference -- when you're looking at the record here, I would reference his trial testimony, where he explains to the court in response to the court's questions about the importance of the presence of moisture and the copper sulfide that's left behind and how will that

continue when you remove the corrosive environment.

And he says corrosion requires moisture. Now, I would like to just, one of those common sense points of the trial, your Honor, I would like to kind of focus you on because something they say makes no sense. Their experts have come in here and they said a couple of things, they said, well, if you take copper, if you take sulfide gases or you take sulfide and you mix it with copper in water, you're going to see this accelerated corrosion. But if you take the copper out of the water.

And then they say something else, they say, well, Mr. Lee and Dr. Perricone said that copper sulfide is not soluble in water. I mean, you can't have it both ways, you can't say, on one hand, it doesn't react to water, and the on the other hand, water accelerates the process. You can't have it both ways and that's exactly the kind of science they brought you.

As you thumb through the evidence in the case and you thumb through their expert reports, pay very close attention, please, your Honor, to their footnotes and their literature cites, because there are none, there are none. Their literature cites are -- the full extent of their literature cites are, go look at this book or go look at volume 13. Like you're going to sit there and read the entire volume trying to find maybe the one piece that supports their argument. It isn't -- the specific cites aren't there because they don't exist.

What did Mr. Krantz tell you? He says the corrosion

requires moisture. It's an acquiesce process but that the acquiesce process, just so there's no confusion, that water can be microscopic. He talked about monolayers, that's like, it's microscopic, you would have to look at a monolayer under a microscope to even see it. Moisture, humidity, anything of those things is enough to create the acquiesce environment necessary for the copper sulfide to continue the corrosion.

And if you look at, you compare Mr. Krantz's CV against Dr. Perricone's, I think there's nothing you can conclude there, but one man's really got corrosion experience and the other guy's got a lot of time with welding.

You asked Mr. Krantz, what degree of moisture, he said it wouldn't be that much, doesn't have to be visibly wet, he went on to explain it. But one important part in the transcript, which is on page 235 of his trial testimony, where he says in response to Mr. Bryson's questions, he says, Mr. Krantz's response, now, you talked about a situation, he was asking about his experience with corrosion continuing, he talked about a situation you've been involved with where the corrosion with the shipboard heat exchangers and when they're out to sea the corrosion continued.

I would ask the court to pay particularly close attention because his analysis goes on for a while. And it's not -- it really links up the importance of the Edwards article and his own personal experience with corrosion on shipboard heat exchangers, where he has actually seen it, where they've removed the sulphur

gases but they have moisture because the ship is out to sea and the corrosion continues. I would ask the court to pay particularly close attention to that.

I'd also ask the court to focus on Mr. Galler's testimony, which is really unrebutted in this case. They've got no evidence to say that the appliances, that what's going on with the appliances isn't exactly what we say is going on. In fact, in the one instance in the one question that I just asked their last witness, he agreed with Mr. Galler that the silver sulfide corrosion is on the contacts that he observed on the toasters.

Well, there's no reason to believe that the toaster is the only appliance being affected by the silver -- it's got to be all of the silver is being, all of the silver contacts are being affected by the silver sulfide.

Mr. Galler testified to his honor that the corrosion he's witnessed in this case is the worst he's seen in 30 years. The worst corrosion he's seen in 30 years.

We also would like to focus the court on the Abbott article because we think this is critical and it says something very important and that's, if you could pull up LT 0195. And go to page 0013. I just want to remind the court of this language because it's worth looking at. LT 0195, page 0013. This isn't our expert saying this, this is in a peered-reviewed paper. "By the time relevant corrosion can be detected visually, the equipment may already be in an advanced state of degradation."

01:57:02 Well, we know the corrosion can be seen visually, I mean, that's all over the CPSC papers, that's all over the Sandia papers. The discussion that they're having, most of the discussion there is the visual observations of corrosion, not only on appliances but on the copper wires and on the copper pipes. We know it's there, we see it.

We've seen evidence in this case where it's tried to be, where we tried to clean it off and we can't. It remains behind. And that's not what the Hernandez family purchased. They purchased good, clean copper wires and copper pipes. That has been damaged by their drywall.

The Sandia report we referenced to your Honor, all over this report are the concerns. Now, I am not stating that their conclusions but their concerns about fire and safety concerns. They talk about their visual inspections and corrosion, and they talk about the Battelle classifications. Rating the corrosive environment and the product that they seen from this corrosive environment in the highest classifications for corrosion.

Let's talk a little bit about the contractors. One thing very significant, I mean, it's almost, you can almost look to just the witnesses of the defendant and give us the remedy we're looking for in this case, your Honor. Their own witness, Mr. Canzoneri, although we had some very funny moments about whether it was the six inch rule or the three inch rule, there's a couple of things that's very important, I think, to remember from that.

One is, their own witness, the person they chose to call into this courtroom who is their electrical inspector, said if the wire is corroded it cannot remain. And the transcript reference is PAGE 651. Mr. Herman asked him, whatever the code requires, you admit that if wire is corroded it can't stay in the house, right? He said if the wire is corroded, and I'm not admitting it is, he had no idea, Mr. Herman says, I understand, it can't stay in the house, yes, that's correct. That's their witness, they chose to call him, that was their decision.

And on the six inch rule it's almost comical, but I think I need to spend 30 seconds on this. I am not sure that anybody said that, you know, if you're five and 11/12 inches, that some code inspector is going to walk in and say you did something wrong. I am not sure that if you're at five and a half inches, some code inspector is going to make a big deal about it.

The bottom line is, Judge, that there is a guideline, and the guideline says you need six inches from the back of the box. Now, if it's five and a half, five and three-quarters, six inches, that's something that the inspectors can take care of. But if we're going to remedy this problem, you're going to go in and snip outlets, I mean, if that's the remedy you adopt, and we ask you not to, to adopt our remedy by taking it all out, why not do it right, why even allow them to cut corners there? I just don't think that's something that we can take a chance with.

And Mr. Mallet and Mr. Carubba, you know, the credibility

of witnesses in this court is really up to your Honor to decide. I can give you my impressions of what you should keep in mind. I mean, again, you know, the defendants at the end of the day chose to call who they chose to call. Why they chose Mr. Carubba, I have no idea. But I can tell you this, on behalf of this family, they wouldn't hire Mr. Carubba to do work in their house.

I don't know on who would want to hire Mr. Carubba if they really knew about his background, if they knew about his ethical violations, which he acknowledged. I missed one, he told me, he reminded us all that he had a fifth under a different license. You know, he sitting in this court didn't have his numbers right. He still doesn't know the final measurement for the granite tops. He never -- he still to this day, I mean, to the time he walked in, after his deposition, by the time he took the stand didn't have a number for installing the doors, he added that after his deposition. He was making changes to his proposal almost right up to the time he was sitting in that chair, he was changing his mind on things.

Mr. Mallet, on the other hand, has come up with a proposal that you can check. We can't check Mr. Carubba's prices because that's a Roy Carubba pricing method. There is no standard way to check it. But, Judge, you can check Mr. Mallet's prices. It's Xactimate. It is exactly the system that the insurance companies use. And what is Xactimate based on? It's very much like another standardized guideline that contractors use called

02:01:12 RSMeans. Only the Xactimate version is cheaper. That's why the insurance companies like it, no secret there.

02:01:17 But we can't go and check Mr. Carubba's prices because every time we asked him a question about where he got a price from, he didn't know, somebody else did it, somebody else he called. Even in the one instance where he needed an RSMeans price, he called somebody to give it to him, he didn't even check the book for himself. I still sitting here today don't know what Mr. Carubba's final prices are on those items.

02:01:39 And Mr. Mallet stands by his numbers, he did them once and they stand up.

02:01:50 So my concluded remarks at this point, I would like to obviously come up and rebut points that may be raised by my colleague here, I think the question that we have to ask ourselves is, you know, what if we're wrong here, what if the mistake goes the wrong way? What if, for some reason, Judge, you think, okay, let's go with the KPT, KPT's proposal seems reasonable, seems logical, we'll just cut out where we see the corrosion, you know. What if we're wrong and the corrosion is behind those walls, and we're back here or they're in the situation by themselves, you know, a few years down the road where that stuff has to be ripped out, why make that mistake when the evidence that you've seen is in the few instances when we did peel back that wire, we have been able to show your Honor that there is corrosion under that wire. We've been able to show that to you. Their proposal doesn't

resolve that.

In the instance, what they would like to do is, they would like to just snip the end of the ground wire and re-hook up the outlets. They're not going to peel back the jacket. I don't care if it's six inches, 12 inches, I think their expert said they went several inches back and they saw tiger striping. Even accepting their version of it, they acknowledge that if you adopt their proposal, you'll be leaving corrosion behind in their house. And that's why their proposal just doesn't stand up.

So where are we? There's two ways to get here, one is to accept the overwhelming evidence on the corrosion, that it will continue. We brought you credible experts on that point from Mr. Galler, Mr. Krantz and their science.

They've really brought you nothing but theories, nothing that you can look to, you won't be able to leave this courtroom, your Honor, and open up a book and say defendants are right. They're not. And there's another reason why all of these, you know, government entities, the CPSC and Sandia are still looking at these issues is because they want to get this right.

But the other part of it is, it's just practical. If we're going to rip the walls open and we're going to take all of the sheetrock off, why take the chance at this point with that huge expense and all that's going on there to just clip and leave that corroded wire behind? Let's take it out, the walls are bare, that's the best time to fix the problem, and it's not what they

bought. Whatever is there, the corrosion that is there has been caused by one thing, not by them. We haven't heard evidence that copper oxide is the problem, that's the natural process by which copper patinas or oxidates. That's not what we're talking about, we're talking about a copper sulfide corrosion caused by KPT board that emits sulphur gases. So it's a problem caused by them.

So, Judge, what we ask you to do is to give the Hernandez family what they paid for, give them the house they thought they bought, don't make it any better, let's not give them the upgrades that Mr. Carubba talked about, let's not do them any favors, let's just give them the house that they paid for, that they built, that they thought they had, until they installed the defective Chinese drywall. Thank you.

THE COURT: Thank you, counsel. Let's hear from the defendant, please.

MR. HAYDEN: Good afternoon, your Honor. First I'd like to thank the court for giving us the opportunity to be before you. I commend the court's energy, fortitude and pushing us forward to get this matter at issue and us dealing with the issue of how to repair this home.

I also commend opposing counsel. We've worked hard on a very expedited basis, they've acted very professional, and we all were working toward the final end of presenting to you two alternative views of how this home could be repaired.

And I can't forget Mr. and Mrs. Hernandez, I thank them

for coming in here, given the fact that they have probably had just about everyone in the last year through their house, I think, from the CPSC to the Chinese government to individuals from the manufacturer to the plaintiff's lawyers and to consultants and our lawyers and consultants, and I realize that they've been through a lot in the last year since they discovered that they had Chinese drywall in their home.

We're here today because my client and the plaintiffs in some ways are in some agreement. We're in agreement that this home should be repaired. The question is how it has to be prepared -- or how it has to be repaired. And I'll remind -- opposing counsel asks why we get to talk about the repair, how the plaintiffs should repair it. And that's because we forget that -- and I want to remind the court that the plaintiffs still have the burden of proof, we did agree to a stipulation.

The stipulation clearly indicated that we would go forward under a one count, the redhibition statute, and under the Louisiana redhibition statute, plaintiffs still must prove actual damages by a preponderance of evidence.

Now, there's been an attempt, maybe made implicitly or implied during the course of the testimony that there should be some burden shifting, that somehow we have the burden of determining that our repair proposal is the appropriate one. And I submit that Louisiana law is still the same. Plaintiff has the burden of proving actual damages by a preponderance of the

evidence. Possibility is not preponderance of evidence. Possibility of damage at an undefined time and of an indefinite amount does not constitute the probability that is necessary under Louisiana law.

Louisiana courts go on to say that they're only entitled to repair the house, repair the house that may be reasonably incurred. They're not entitled to damages far beyond what is reasonable in scope, as well as cost. It doesn't mean that we have to remove a tarnish film, which has been established doesn't impact upon the functionality of the electrical system and the plumbing.

And they're not entitled to costs that go beyond what's necessary to restore the property to its original condition.

Your Honor, we submit that you don't have to pull out the wires and you don't have to pull out the plumbing in this house. I'd ask that we look at, really, what the plaintiffs want. What the plaintiffs want is a repair of their house that their expert says will cost over $200,000 for a house that was built for $175,000 back in 2006. They're asking to tear down the house, down to the studs, they're asking for removal of an HVAC system, where the coils have been coated to protect against corrosion and the condenser has just been replaced. One of their experts even suggested that the condenser did not need to be replaced. One of their experts said something else. It's really unclear but they want it all.

They want a removal of the electrical and the plumbing,

where the functionality of those systems are not impacted. They're also looking for relocation and storage costs, they're looking for some replacement of appliances. I believe in the record is a listing of various appliances and how much they cost on the market, whether at Best Buy or however they determined it, but none of those electronics have been established to have failed.

They also ask for some incidental damages, including lost wages, that I don't believe are recoverable under the statute. And, your Honor, we have to look at what is really recoverable under the statute.

In my opening and at the beginning of my case, we started with science. And at the end of our case, we ended with science. We heard from Dr. Perricone this morning, and I think Dr. Perricone's testimony was very compelling. I hope the court now understands why we felt it important that we put forward the depth of the analysis that Dr. Perricone's undertaken over the last 15 months.

The functionality of the electrical wires and the plumbing lines has not been impacted. We heard that from our experts; when pushed, we heard it from some of their experts. The tarnish film does not compromise the structural or the mechanical integrity of either the electrical system or the plumbing system. It doesn't impact the ground wires, we had a lot of discussion about ground wires. The tarnishing to the plumbing lines is superficial and when the drywall is removed, and we're

suggesting -- we're removing that drywall, when that source is gone, no corrosion will continue, no tarnishing will continue. The source is gone, the sulfide -- the copper sulfide will not continue to grow.

If we could look at some of the testimony or some of the exhibits. This was discussed with several of the exhibits, but these are wires out of the Hernandez home. Here is the wires before the sheathing is pulled back and here it is, you'll see it's bright and shiny, I think you even had some of it in your hands, your Honor. You'll see an instance where, on occasion, it will go an inch in, a half inch in, with a stripe; but for the most part, once it's pulled back it's clean and shiny.

And we heard the testimony about the cross-section, about the wire itself. Here is a cross-section of the ground wire. We talked a lot about ground wires. That's what the ground wire, the impacted ground wire looks like.

If we could go to the next slide. That also is another cross-section of the ground wire. And you'll see that the damage is not significant. It does not impact the cross-sectional diameter. The one percent necessary.

Here we have more pictures, this one is a cross-section of ground wire, and once again, let's remember that the connections, where the connections are made, the testimony is, underneath those connections it's clean and shiny.

Here is some more wires, both, we talked about cleaning.

02:13:53 And you asked some questions of Dr. Perricone, do you really need cleaning. I think there was some other questions asked earlier about cleaning, is cleaning really necessary. Your Honor, quite honestly, I think the testimony is that it's not necessary. But for, to give the plaintiffs some comfort, we are undertaking some cleaning. Here is what the wires looked like before cleaning, here is what the wires look like after cleaning.

And here is what the wires look like, here is a new wire, here is a wire out of a Chinese drywall home, here are some clean wires. And I'd submit, if I took the captions off and I mixed them all up, I would have a hard time determining which one is the tarnished wire and which one is the new wire.

If we go to the next. We've also looked at the plumbing lines. The line that we've talked the most about is the cold water supply because with cold water the argument would be that there could be some sweating somewhere along the way. Here is a cold water supply line out of the Mandeville home, and I'd ask the court to look at this. This is really an interesting diagram, I think that's pretty powerful. And if we could, this shows, that same line under SEM, and both sides talked about SEM, when you blow it up and you can go to 100 times, 50 times, down to just microns.

And you'll see both the inner diameter and the outer diameter of the pipe. And if we could focus just on these two and compare. Let's just look at these two and compare. The inner diameter. What we're talking about, this inner diameter, that's

02:15:57 not on our watch, that has nothing to do with copper sulfide. That has to do with what's happening with the pipe in the inside wall.

What we're talking about is the outer diameter here (INDICATING). And the distinction between this and -- this is a normal pipe with some problems or some issues in the inside of the pipe. At that level it looks pretty nasty, but really, the functionality is still there. And I remind the court, this has nothing to do with us, we're talking about the outer diameter. And this is with the tarnish on the outer diameter of the pipe.

If we go to the next slide. This isn't a very clear slide, hopefully it's a little clearer on the court's monitor, but this is Dr. Rutila's hand and that Dr. Rutila's pulling back the sweat insulation around the line set that goes in the air conditioning in the Hernandez home. And when you pull back this covering, what he saw was clean, shiny copper that was not impacted. The functionality of the plumbing system, the functionality of the electrical wiring in this house has not been impacted, and we submit that they do not have to be removed.

There's no reason for -- there's been no evidence of pinhole leaks, you heard that from Mr. Perricone this morning, there is no evidence of pitting that would compromise the integrity of the plumbing. There was some other examples in the exhibits of the ten micron pit versus the 50 micron pit. We're talking about ten microns, your Honor. An issue that would not impact the functional integrity of the plumbing lines.

What does the science tell us? It tells us once you remove the drywall, you remove the source of these sulphur emissions and the sulphur tarnishing will stop. And we also know that adequate cleaning after demolition, we heard from our experts, we heard from Mr. Mallet, we heard from Mr. Bailey, but adequate cleaning whether it be with a shop vac or HEPA vac, we heard from Dr. Lee, whether you use the shop vac or HEPA vac it means whether you have to vacuum more times across the floor. Well, one or the other, that will be sufficient with a wet clean to pick up any dust particles that might cause odor.

There is no scientific basis for the airing out that's being suggested. They're talking about 30 days of airing out. Your Honor, the tradesman, they went through Katrina, there was no airing out for 30 days. Your Honor, I don't believe that the science shows that this airing out period is necessary if the appropriate cleaning is undertaken during the demolition. And we showed a mechanism to teardown the drywall to avoid additional dust. I think the dust issue is another red herring that's being raised by the plaintiffs' experts.

Let's see the plaintiffs' experts really have admitted to. There's no data to support the proposition that the copper corrosion would continue in the house once the drywall is removed.

They point to one article, the Edwards article, and I want the court to look closely at the Edwards article, I think Dr. Perricone explained it pretty well today. It only applies in

an acquiesce environment. And the most telling part of it is that it assumes that sulfide is the cause of the copper weight loss when, if you think about it, if copper sulfide was forming it would result in weight gain.

This article has nothing to do with the Chinese drywall situation. Plaintiffs' experts have presented no testing that would establish that copper sulfide continues in a non-aqueous setting once you remove the source. And we stand here, and we stood here at the beginning of the trial telling you we're ready to remove that source.

With regard to the silver sulfide, there's absolutely no testimony that silver sulfide corrosion would continue after the source is removed. They don't even have an Edwards article with regard to the silver sulfide because the source is gone, the sulphur emissions no longer will cause this tarnishing, whether it be a copper tarnishing or silver tarnishing that was experienced.

If we could go now to what the plaintiffs have said. I believe this is from Dr. Krantz. And you can read it yourself, your Honor, this is out of the trial testimony: "And you don't have any kind of testing actually on any copper plumbing or pipes or wires to determine whether, in a moderate humidity environment or non-aqueous environment the reaction will continue? No, we haven't. And the Edwards paper, the tests that he performed for several months, did not have that time available, haven't been able to perform those tests. You haven't been asked to come up with a

test for that? Not at this point. Other than the Edwards paper and Dr. Scully's opinion, you're not aware of any tests that would confirm that copper sulfide continues to corrode? I am not aware that anyone has addressed that issue. And you don't have any idea or answer as to the likelihood or actual likelihood of that risk? No, we don't." That's what we said.

And they talk about Dr. Scully. Opposing counsel referenced in his cross-examination of Dr. Perricone where Sandy Sharp was, Dr. Sharp who was the witness that we disclosed when we were involved in the *Germano* manner. I submit where is Dr. Scully? Dr. Scully, if you'll recall, when you heard testimony in the *Germano* matter, he was their expert on corrosion. Where is he today? He is the one who was able to talk about self-sustaining corrosion after removal. But I submit that Dr. Scully's not here because Dr. Scully was unwilling to go the extra mile and go beyond what the Edwards article says. And they have no testimony or basis for saying that the corrosion will continue after we remove the drywall.

The next thing the plaintiffs admit: No corrosion on wires with intact insulation. If we could go to the next. And once again: "And there's no data to support or deny with a reasonable degree of scientific certainty that it'll happen or not? Other than the Edwards paper, no. There's no evidence once again, there's no evidence to causally link the failure of the electronics from the Hernandez house to the silver sulfides? There's no

evidence of silver or copper sulfide deposits causing failure in the switches, the circuit boards, or plumbing in the Hernandez house."

You heard some testimony of Dr. Galler about there be being some corrosion, but he was not able to link any of the corrosion to a failure in any of the electronics or any of the other devices that are set forth in Hernandez, I believe it's Hernandez 558, the summary of the things that the Hernandezes claim have failed. Those things very well may have failed, but there's no causal connection to those failures and the Chinese drywall.

There was some reference to the HVAC system and albeit we will agree that the HVAC system was a unique environment, it's an aqueous setting and those coils were failing because of the aqueous setting, the unique environment, that was discussed by the witnesses.

But with regard to these other products, there's no basis for that at all.

If we could go to some of Mr. Rutila's testimony. Dr. Rutila's testimony. And it's page 90, line 6 to 90, 14: "But for the devices that you looked at, you were not actually able to identify a link between the copper sulfide and the silver sulfide and the corrosion product and the failure? Not certainly. And that would be the same for the other devices that you talked about today? That's correct."

If we go to 91, 7 and 91, 12: "With respect to the wires

and plumbing and other copper or silver copper devices in the walls that might be left there by KPT's protocol, at this time you just don't know, you don't have an opinion about whether those things will fail? That's correct. It's unchartered water, really." That's not preponderance of the evidence. That's not probability, that's just possibility and speculation.

After the drywall is removed there is no longer a corrosive environment. No scientific evidence to support that. This drywall dust issue is a red herring, your Honor. I reference to Bailey, page 383. At 7, if you could move back a little so I can -- "And as you sit here today, you can't say how many particulates of drywall dust would be necessary to result in continued odor or sulphur emissions, can you? Not specifically, no. There's no data in the industry based on this particular problem, it's new, and that we're aware of nobody whose done these studies. And you would agree that if the drywall, the Chinese drywall was removed, you would be removing the source of the problem. Removing the drywall removes the source of the problem."

Let's go to Mallet -- Mallet, Mallet, I am not sure, your Honor, I am not good at pronunciations.

"Mr. Bailey said he couldn't quantify the amount of drywall dust that would cause problems with regard to odor or sulphur emission, correct? That's correct. No one who's testified, that you've heard from, has indicated that a small amount of drywall dust is sufficient to cause odors and continued

problems with corrosion? That's correct. Actually, I've not heard from or read any reports or testimony from anybody that's given any indication about how much drywall dust left in a house would be acceptable. You haven't heard one way or another? That's correct."

The plaintiffs have a burden of proof, your Honor, and I submit that the drywall dust is a red herring. We've submitted the protocol where we're wiping it clean, you saw that demonstrative where we did that drywall demolition, where we were able to wipe clean and show surfaces, the framing, the studs that were clean, no evidence of dust.

I think that the next thing the plaintiffs have to admit is that testing the materials to new product standards is an appropriate evaluation of product performance. We heard that from Dr. Galler and I reference the citation. This confirms what Dr. Beyler, our expert from Harvard on fire safety and on the engineer from Hughes Associates said with regard to his testing of new wires and connections. It confirms RJ Lee's comparisons of cross-sections of exposed wiring and plumbing to new manufacturing tolerances. We're looking at new wire compared to the existing wire. We were looking at UL standards, which are the standards that are for quality control before a product goes out to the market, and under those standards, our experts found that there was no impact on the functionality.

Plaintiffs' experts agree that the testing devices in

real world scenarios, such as operating wires and connections under load, what Dr. Beyler did is the preferred method of testing those.

Your Honor, if we could go now, we've learned what the science says, let's hear what the tradesmen say.

THE DEPUTY CLERK: Mr. Hayden, you have 15 minutes.

MR. HAYDEN: Thank you.

The boots on the ground tradesmen. They talked about a scope of work. A scope of work necessary to repair the Hernandez home, and it doesn't require removing of electrical or plumbing. These are the guys who do it every day. They say that any concerns about dust are alleviated through careful demolition. You saw the video, you saw how they were doing it. Now, they wanted to extrapolate the time that it took them with eight lawyers and ten consultants or -- and two videographers and two photographers in a whether it be a 12 by 14 or 14 by 16 room, that just ain't right.

But it does indicate that it can be done. And our people are willing to do it. And it does indicate that to the extent that we have to do cleaning of the ends of the wires, of the ground wires, it can be done with traditional cleaning methods. Opposing counsel has Scotch-Brite pads, it could be done or use something like that so a general tradesman understands and can undertake it in the field. Let's go to the next slide.

I said at the beginning that this case would all be about some six inch rule, that opposing counsel would be talking about six inches. And I was kind of amazed that in a federal court for

an afternoon we would be talking about whether or not six inches would require us to tear out the entire electrical system in a house. That just isn't practical. We brought in the code experts, we brought in the engineers, we brought in the general contractors who do it in the field, they've never seen that, that's not a reason to tear out an entire house. That's just not the real world application, your Honor.

The next thing, your Honor, is with regard to cost estimates. Xactimate. Xactimate. Mr. Mallet says that 99 percent of his estimate was determined by Xactimate. It's computer software. He punches -- he goes in and measures a room and he takes it to his sister and she inputs it into a computer and out spits a cost estimate. That isn't really real world.

Whether you like Mr. Carubba or not, your Honor, Mr. Carubba is real world. He got on the phone, he called the tradesmen that do the work and he found out what they would charge. That's how it's done in the real world. And we had guys who have been through post Katrina, they went through situations where they were repairing a lot of homes with corrosion, mold, toxic -- what did they call it, toxic soup. And that just doesn't justify that this should have a much higher repair protocol than what we used in the Katrina situation.

If we could go to the next slide. Here is the real important thing for your Honor because beginning of the trial the plaintiffs offered someone from, that's not a party to this case,

it's somebody from the home builders. And, your Honor, they testified that, he testified that he followed a certain protocol and plaintiffs will submit that that's the protocol that they're using and that's the protocol that should be implemented by the court.

And when we do an apples to apples comparison, Beazer was able to confirm that this thing is a lot cheaper to repair than what's being submitted by the plaintiffs. It shows the plaintiffs overreaching. If you look at it just with the hard costs as I did, attest 23 to $29 a square foot. Let's agree with Mr. Phillips about the fact that they, because they're a national home builder are entitled to a 10 percent discount, that should be added on, 10 percent overhead. 17.5 percent profit which is 7.5 percent more than either of the other contractors have suggested.

But that only leaves -- these are in comparable homes, four comparable homes. Beazer has completed four Chinese drywall homes, 32.50 to 40.58 a square foot, and that's after adding in what needs to be added in.

The Mallet estimate is 60 to 70 percent more than the Beazer actual costs with all of this added in. The actual costs, even when adjusted for what a homeowner would pay.

That's why I believe the plaintiffs really are overreaching, that's really what should be telling for the court.

The teardown proposal is more than the cost of the construction of the house. The teardown proposal is more than

02:35:16 double what Beazer who has implemented their own protocol took to finish these houses, they're done with the houses.

02:35:25 This computer generated estimate is not real world. The tradesmen, they were the ones who can tell you what real world costs to repair this house is.

02:35:35 And I am going to end with science again. There's no basis for this teardown proposal in the science.

02:35:44 Your Honor, I do feel for Mr. and Mrs. Hernandez, but I'd ask that, you know, they should be able to take some comfort from what they heard today from Dr. Perricone and from Dr. Lee and from Dr. Beyler and others. Unlike the plaintiffs who brought in their consultants in November or December of last year, RJ Lee has been on this for 15 months, I'll submit it might have even been longer.

02:36:16 And I'll submit counsel made a big deal out of it. We spent a lot of money, KPT spent a lot of money on this. We've analyzed it to try to find a fix to try and find the best way to fix these houses. And how to fix in particular the Hernandez house.

02:36:33 The amount that was stated is not an amount that was on the investigation of the Hernandez house obviously, it's on our investigation over many months when we were first made aware of this issue here.

02:36:50 I'll acknowledge that we've brought in the best and brightest scientists and looking how to best repair the houses. We're not ashamed of that, we're not ashamed of our commitment to

come into this jurisdiction, and we're not ashamed of the fact that we're here with the court. Let's not forget that KPT's come forward with their experts here today and their science and we've made it available to you, to the government agencies that want to hear from us, to anyone, to the plaintiffs, whoever wants to see it, even though the CPSC hasn't completed their investigation, the Florida Department of Health isn't done with their investigation; EPA, HUD, they're all still undertaking this, these huge investigations that have been described as the largest that they've ever undertaken.

Let's not forget that my client agreed to a waiver of service back in October or November, a waiver of a right they have under an international treaty, a time-honored treaty so that claimants, like the Hernandezes and others, could be before you and so that we could move forward, your Honor, on an expedited basis so that we can try and fix the homes.

Let's not forget that we agreed to a stipulation with regard to the redhibition statute so that we could move forward, cut to the chase as to what really needs to be done. And what we have -- what we have to do to fix this. KPT stands ready to repair the houses, but at a reasonable cost and based on the science that we have.

You heard from Mr. Phillips from Beazer, we're all concerned about costs. But we have to listen to the science. And based on the science, and I'd ask the claimants listen to the

science, there should be some comfort that their health and safety will not be compromised, we will remove that drywall and we believe that we can adequately repair that home and that home can be repaired according to the estimates as stated.

Your Honor, we will indicate, if we could put this on the -- there's the numbers. There's Mr. Carubba's cost estimate with the changes that were reflected on the stand. That's the cost to repair this house. We'd ask the court to reference the affidavit of Mr. Roddewig that we put forward, he was going to be one of our consultants, and it's been submitted that he would -- that the temporary housing for the 60 days that Mr. Carubba said it would take to fix it would be $3,600. That's the amount it takes to repair the house. And, your Honor, we stand ready to move forward. Thank you.

THE COURT: Thank you, counsel. Let's hear rebuttal.

MR. SEEGER: Yes, your Honor. I guess we should thank KPT for showing up and answering the lawsuit of the Hernandez family. They really sound like they've been victimized by that. What's wrong here, I think if anyone's been victimized, it's the Hernandez family by drywall they acknowledge is defective.

Judge, they have a right to their own opinions, they don't have a right to their own facts. If they're going to put the testimony up of our experts, they have to get it right. So let's just correct this for the record. This is Mr. Galler testifying: "Do you have an opinion with regard to failure rates on appliances

that have visible corrosion on them? I could say that they would fail a lot more than uncorroded products; but to tell you exactly what the failure rate would be, I can't. Would you expect it to live out its useful life? Not at all. I think sort of in general terms it looks to me like the corrosion rates we're seeing are probably ten times faster than they would ordinarily be, so I would expect the reduction in the life of the equipment. It could be 20 times, it could be five times, but it's pretty significant, it's a pretty significant reduction in the life of the equipment."

Your Honor, that's damage. That's the damages right there. You know, what do we need to prove here to this court? That it's more likely than not. What is it more likely than not? It's more likely than not that the corrosion is going to continue because we've given you literature proof of that and we've given you an expert that actually has expertise in this area who is actually competent to testify.

What else is more likely than not? We've also shown you that it's more likely than not that the product as it exists in the house, the wire and the copper pipes that we're talking about is today as we speak damaged. And that it will fail if left alone and it will fail at a rate faster than its useful life, faster than it's supposed to fail.

So there are the damages right there. There's nothing speculative about that, and we're not asking for repair costs beyond what's necessary to restore. They damaged their wires.

Under what other circumstance in a lawsuit do you get the right to go in and damage somebody else's property with your defective material and property and then say I am not responsible for it? I mean, isn't it a reasonable consequence, we know it's a foreseeable consequence of corrosion on wires because you've heard more science than you probably care to hear about sulphur gases and copper and silver, it corrodes it. And that's the problem that we're dealing with.

We're not asking them for any upgrades, we're not asking for anything -- as far as Mr. Carubba's price of sixty something thousand dollars, it's just laughable, it really is just laughable. I mean, it's unfortunate that KPT may have to spend almost the cost of building a new home to renovate and cure their problem. But it is a problem that they created.

There isn't anybody in this court that has come in the entire week and said that the Hernandezes have had anything to do with the defective drywall in this house or the corrosion that's going to be left behind in their walls based on their proposal, it's a problem they've created, your Honor. They've created with their defective drywall that they chose to ship. And that they acknowledge is defective.

Right now there are pits and corrosion in the wire. We can't leave that behind, they didn't pay for that. That's not what the law gives them, the law gives them back what they're entitled to.

Now, the one point that they seem to love in their questioning of the builders, you know, it took a lot of courage for an independent builder to come in here. You know, they've crossed them -- the implication is there could be some discussions going on or maybe they've got a lawsuit against KPT, I have no idea. All I know is it takes a lot of courage for somebody independent to come into court, raise his hand under oath, and do what Mr. Phillips did and what Beazer allowed him to do in this courtroom.

They were very clear on a couple of points in questioning by Mr. Meunier: Their price is around 40, $50 a square foot, but it doesn't include overhead, it doesn't include the markups for things like their back office costs; but more importantly, more importantly and the real take away from that testimony was that they have efficiencies that the Hernandezes do not have.

If they pick up the phone and call Mr. Mallet, they're going to get market prices that go to a homeowner. They pick up the call and call ABC Construction they're going to get those prices. Beazer has a warehouse of equipment, they've got a fleet of workers, they have efficiencies and these people can't take advantage of it.

And by the way, that's not being offered by KPT. KPT isn't saying we'll do the remediations, we will supply the builder. They're going to have a judgment from this court and sufficient money to fix the problem they've created, and they've got to go out in the marketplace and pay the rates that home owners pay, not that

builders pay. So that's a big distinction. I am not even sure it's worth them harping on. I don't think it helps them.

My understanding of the law of redhibition is that you get what you paid for. They paid for a new house with shiny copper wire. Mr. Hayden loves putting that picture up of shiny copper wire and he must forget what went on in this courtroom, that that wire has been peeled back and it has been shown to have corrosion under it. It doesn't matter if it looks shiny to the eye. Under a microscope it has black sulfide deposits.

If it had anything else, we wouldn't even be having this discussion with the court. We know that black sulfide deposits came from their Sheetrock. There is no other source of it in the house, they haven't even introduced that type of evidence yet, they haven't even tried to give you an alternative cause, they haven't said it's in the atmosphere, it's growing from a rock, it's coming from under the house. They acknowledge it's from them.

But they want to be able to get to pick what the scope is and what they want to pay. It's unfortunate that they've caused a lot of damage and they have to pay for it. At the end of the day that's a problem they created. I think the only thing they are we're focused today is what puts them back in their house, what turns their house from a sick house with bad drywall to a healthy house with healthy wiring and healthy plumbing. To them and their children.

You know, this talk about experts and whether -- where's

Dr. Scully. Dr. Scully's opinions have been adopted wholesale by Mr. Krantz. All experts aren't available to come to trial. The point that was being made in case it was dismissed by Dr. Perricone is that they had an expert in the prior litigation that criticized his calculations and he disappeared. I don't know why he disappeared but he is gone.

I don't know why we haven't heard from a KPT witness. Their whole case is based on expert testimony. Where is somebody from the home office that can tell us exactly what happened? Where is somebody from the home office that says, hey, we understand the problem, we're going to take responsibility for it and we're going to do the right thing. Instead of sending a team of lawyers to go and do their bidding for them, which is what we do, we're doing their bidding. But our client is sitting here in this courtroom. They sat here all week and they listened to this case. Where is their client?

And maybe he is hiding in the back, I don't know. I don't see anybody sitting here and they haven't been introduced to us.

There's no evidence, they claim no evidence of silver or copper sulfide. You would have to ignore the testimony, you would have to really ignore the testimony in the case, your Honor, to come to that conclusion. We've proven that it's more likely than not that the wiring in the house, the corrosion on the wires and on the pipes is more likely than not to cause failure. It is damaged

02:47:33 as it sits there today.

02:47:35 And it's more probable than not that the cost of the Hernandez family will be what Mr. Mallet determined the costs will be using a standardized pricing guideline, prices that you can check as opposed to Mr. Carubba whose entire testimony I would submit was made up for the purpose of this case.

02:47:51 Thank you, your Honor.

02:47:52 THE COURT: Okay. Thank you very much. Both of you.

02:47:54 Let me make just a couple of general comments first. I will give counsel an opportunity to speak. First, both counsel mentioned that I had put this case on an expedited track, and they're right, I have. And the reason for that is obvious to me. Both sides agree that the drywall emits gases which contain sulphur, which contaminates or causes problems whether it's corrosion, whether you call it corrosion or something else, it affects copper and it affects silver.

02:48:31 Both sides agree that it has to be taken out. So whatever affect it has produced, it's going to get worse if it stays in. The longer it stays in, it's obvious the problem is going to get worse. So I think we've got to deal with it and we have to deal with it as fast as possible.

02:48:53 Secondly, these cases, MDL cases are difficult to handle because of just the sheer numbers of the cases. They're able to be done, however, because the cases because of their numbers, because of the gravity of the problems, the best of the best attorneys

handle these matters. And it's because of their work and their effort and their ability that the courts are able to focus on the problems. And I've seen that in this case as well. We have a good counsel group who focused the court on the issues, the significant issues.

I hope the other aspect of the case can be focused on, too. It's one thing to theoretically think about a case or theoretically analyze a case, but there's nothing like putting it before a court, a jury, Judge, and advocating the position. And I think when you do that, after you do that, both sides have to take a look at this matter and these problems and focus on whether or not you've learned enough from this experience to take a global look at the problem to see whether or not the whole matter can be resolved in a much quicker way.

But I do see this as an urgent issue and I'll be working on it with dispatch, I'll be beginning in a couple of moments on the case. And I'll be issuing any opinions as quickly as I can, I'll reasonably issue it.

So I do appreciate the work that the parties have given to me and have given to me volumes of material, and I ask that you once again make sure that I have all of the exhibits in the form and fashion that you wish them to be in.

Finally, on a total different matter, I've been presented by counsel for both sides with the newspaper today, and there's I know a concern on each of both or at least one aspect, one side of

the case with this matter, and I'll ask them if you have any comments on it at this time.

MR. RUSS HERMAN: May it please the court, good afternoon, Judge Fallon. I want to thank you for the opportunity to address on the record an issue which is critical for my friends the Hernandez and 6,000 other families we know about.

I first want to thank defense counsel who have handled themselves very professionally. This matter could not have been expeditiously brought into a court of law without counsel on both sides acting in the highest level of professionalism.

For 65 years, and we're now in our third generation, we have always believed that a court in the United States of America is a temple of justice and that when facts and law are weighed in a crucible of adversary chemistry, when you have lawyers who are the finest in the United States representing a corporate entity that they feel very strongly about or a family such as the Knauf family, they're willing to spend as much resources and as much time as it takes to present a case.

And facing those Goliaths, our Davids spending whatever we can for the folks we represent, like the Hernandezes, out of that crucible comes the best opportunity for justice because your Honor, and a jury that sometimes sits in that box (INDICATING), you are the safety valve of the Constitution. Without these courts, we would be in the streets. And we will accept whatever your Honor's verdict is, and I am not going to talk about the facts or the law

in this case.

But I am going to talk, and forgive me for my passion, the FDA, the CPSC, the EPA who are supposed to be watch dogs for these people, and this gentleman is employed by the United States of America, how ironic it is, when the watch dogs that are supposed to protect us deny us access because it's true that certain defendants in this drywall litigation have full-time lobbyists in D.C. dealing with the CPSC, the EPA, and we are denied access.

When the CPSC went to China, God forbid if I wanted to go to Beijing or my colleagues did, we would go to Tatum. We would give him a driver's license, a birth certificate, he'd issue something in 24 hours saying an American citizen can go to Beijing or Shanghai. But when the CPSC goes to investigate under the rule and the foot of the Chinese government and its pawns who during the same period of time, 2005, 2006 to 2008 distributed in this country 17 different products during the same time directed at our children, everything from Bat Mobiles with led paint to little girls doll dresses, and they refused to come into this court and we are denied, as advocates for our folks, the opportunity to go with the CPSC to confront the Chinese and the CPS doesn't go to every mine, every gypsum mine, it doesn't go to every factory, it goes to some negotiated narrowed view of what the Chinese tell them is the Chinese version. That's not adversary. That's not the crucible of justice in an American court.

So are we to accept for the Hernandez family a watch

dog -- I'm sure the CPSC is like -- is doing the best it can, it's always underfunded, but what is the rule that keeps the consumer advocates from the doorstep of the watch dog that's supposed to watch them?

Am I angry about it, you bet, because I learned last night from Kerry Miller, who I think is one of the finest lawyers in the country, and he's always fair, he's always ethical, and I don't like to do battle with him because he's extraordinarily competent, that the CPSC in a couple of weeks is going to issue its rulings on what should happen to the Hernandez and 6,000 other families. Where are they? Is there a CPSC representative in this courtroom? Have they heard the direct and cross-examination of experts? No. They want expert reports of Mr. Carubba. They want expert reports of an engineer that's -- well, I am not going to comment on the evidence, but the CPSC is going to issue its rulings without listening to one moment of cross-examination, without observing one witness.

And we will accept what your Honor rules. We believe you've heard whatever can be heard, but we will not on their behalf of the 6,000 people we represent accept findings that are not full remediation. If they come from a watch dog agency in which defendants have been allowed access for months before we were even able to get a FOIA request answered.

Now, I want to talk about the home builders. In this morning's newspaper, and this really emphasizes the point. I don't

know whether -- you know, we took our clients to dinner the other night, I wanted them to see how we act when we're not in the courtroom. I think it was a revelation for them to find out we're human.

MR. SEEGER: I think it just frightened them.

THE COURT: Let's begin summing up, Mr. Herman.

MR. HERMAN: Let me finish by reading just one sentence from the newspaper, these are the home builders. "From a builder's perspective, when the NAHB says this is the way you ought to do it, then this is the way we will do it." Well, from an advocate's perspective for consumers, we will accept your Honor's ruling. Not what the home builders think ought to be done and not what the CPSC thinks ought to be done.

Thank you, your Honor.

THE COURT: Anything from the other side?

MR. HAYDEN: Yes, your Honor, just briefly. Kerry Miller. I appreciate Mr. Herman's passion, I just want to make sure that the post closing presentation is not part of the evidence in the case.

THE COURT: It's not part of the evidence at all, that's the whole point that I make to both of you all. I've heard the evidence, anything subsequent to my hearing the evidence has nothing to do with the facts of this case. I am confined to the facts of this case and the evidence presented by both of you in this case. And that's all. And the inspection that I made of the

home at the request of both parties, everybody needs to know that the court went to the house and saw all of the material that they pointed out to me.

MR. MILLER: And again, appreciative of his passion and presentation, your Honor, I just want to make sure the record is clear that I have not spoken directly to the CPSC, I made a comment to Mr. Herman and to the court in chambers that I had heard and the source of my information was the news media in the course of questioning me. So I want to make sure that that information is understood.

THE COURT: I didn't interpret anything that was said that you said.

MR. HAYDEN: That I have no direct information from any federal agency about anything that they are doing.

THE COURT: I understand that. One moment. There are a couple, just for housekeeping matters, there are a couple of rulings that I reserved, H-48, H-448, H-399-407, I understand that these have to do with the scope of the law applicable to the case, and I ask counsel in their findings of fact to address those particular items and I'll deal with.

I'll make the case submitted and I'll start my opinion immediately. The court will stand in recess.

THE DEPUTY CLERK: Judge, just a minute. We have another matter.

MR. SANDERS: 1-A1, 1-A2, 1-A3, 1-AB.

THE DEPUTY CLERK: You need to put it on the record.

MR. SANDERS: Excuse me, your Honor, we were trying to clean up some of these exhibits before lunch. And I have some tabs marked by the plaintiffs which we'll redact and remove. But except for these redactions, we move into the record Exhibit 1-A1, 1-A2, 1-A3, 1-B, 1-D, 1-C, and I think that's it actually.

MR. ECUYER: For ease of reference that is the entire appendicis to Dr. Perricone's report when you go back and look at the transcript, with the four redactions.

THE COURT: And what is that, you're offering that into evidence?

MR. SANDERS: I am offering that.

THE COURT: What's your position on that, what's the plaintiff's position?

MR. ECUYER: We have no objection, your Honor, save the four paragraphs that we are going to redact before it comes into evidence.

THE COURT: Okay. I'll move those into evidence with the understanding you will remove those paragraphs.

MR. SANDERS: And then there's two more standards that were agreed DX-63 and DX-65.

MR. ECUYER: No objection, your Honor.

THE COURT: Okay. I will admit those into evidence.

MR. HERMAN: Your Honor, just one last clarifying thing for the record. I think everybody is on the same page about this.

It's our understanding that the proposed findings of fact will only include, if anything, the right of the plaintiffs to an attorney fee award, but the attorney's fee issue will be dealt with in some type of subsequent proceeding.

THE COURT: Yes, I am going to sever that aspect of the case out and I will talk with you all after I've issued an opinion, I will have a status conference and we'll get you in court on the best way of dealing with that. I can do it -- most of the time I do it on paper, but if we need any particular evidence, I'll discuss it with you and I will set something up. I will sever that, the attorneys fee, the scope of the attorneys fee out of the case, I'll just deal with whether or not there is a potential.

MR. HERMAN: Thank you, Judge.

MR. HAYDEN: Your Honor, a point of clarification, I think it was discussed but when do you want the proposed findings of fact?

THE COURT: Give me some input from both of you all.

MR. SEEGER: We picked the 29th.

MR. MEUNIER: March 29th, Judge, that's two weeks.

THE COURT: I would like them both at the same time, all I need is one response. That's about ten days from now.

MR. SEEGER: Yes, your Honor.

THE COURT: Are you okay with that, both sides?

MR. SEEGER: We'll do it.

MR. HAYDEN: Okay.

THE COURT: We'll do it then. That's fine. Thanks again for your help.

MR. MEUNIER: Thanks, your Honor.

(WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

* * * * * *

REPORTER'S CERTIFICATE

I, Karen A. Ibos, CCR, Official Court Reporter, United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of the proceedings in the above-entitled and numbered matter.

___________________________

Karen A. Ibos, CCR, RPR, CRR

Official Court Reporter