# EXHIBIT "22"

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |

* * * * * * * * * * * * * * * *

**DEFENDANT, KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S
MOTION IN *LIMINE* (NO. 1) TO EXCLUDE TESTIMONY THAT CHINESE
DRYWALL, EMISSIONS OR ODORS FROM CHINESE DRYWALL ARE HARMFUL
TO, OR OTHERWISE IMPACT, HEALTH, ARE TOXIC OR NOXIOUS**

NOW COMES Defendant, Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT"), who moves

this Honorable Court for an Order granting KPT's Motion in *Limine* (No. 1) to Exclude

Testimony That Chinese Drywall, Emissions or Odors From Chinese Drywall are Harmful To,

Or Otherwise Impact, Health, Are Toxic or Noxious on the grounds more fully set forth in the

supporting Memorandum attached hereto.

Respectfully submitted,


BY:s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (Fla. Bar No. 0097136)
BAKER & McKENZIE LLP
MELLON Financial Center
1111 Brickell Avenue Suite 1700
Miami, FL 33131
Telephone: (305) 789-8966
Facsimile: (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone: (312) 861-8075
Facsimile: (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## **CERTIFICATE**

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * *

THIS DOCUMENT RELATES TO: *Hernandez, et al. v. Knauf Gips KG et al.*, Case No. 2:09-cv-6050 (E.D.La.)

## INTERVENOR KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S MEMORANDUM IN SUPPORT OF MOTION IN *LIMINE* (No. 1) TO EXCLUDE TESTIMONY THAT CHINESE DRYWALL, EMISSIONS OR ODORS FROM CHINESE DRYWALL ARE HARMFUL TO, OR OTHERWISE IMPACT, HEALTH, ARE TOXIC OR NOXIOUS

The parties to this case have agreed that the case is about property damages, not personal injuries. Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT") remains concerned, however, based on experts' reports and depositions that testimony relating to health and potential health impacts from Chinese drywall will, nonetheless, be presented. KPT requests that this Court bar any references during the trial to health impacts or symptoms from Chinese drywall, including KPT's, any references to alleged emissions or odors, being toxic, noxious or harmful and any testimony with respect to alleged health problems or symptoms resulting from exposure to the drywall.

In particular, some of the plaintiffs' experts repeatedly used the word "noxious," which is a not-so-veiled reference to health-based impacts, as indicated by its primary definition from Merriam-Webster's online dictionary: "physically harmful or destructive to living beings." (*See*

Merriam-Webster, http://www.merriam-webster.com/dictionary/noxious.)   Such references do not have any place in a property-damage only cased based on the agreement of the parties.

To the extent any of the plaintiffs' witnesses testify that the Chinese drywall, emissions or odors are harmful, toxic, noxious or any other statements that imply the drywall is harmful to the health of the Hernandez's or generally, including symptoms and injuries resulting from the drywall, or that KPT's proposed repair is not sufficient because it does not address potential harm to humans (or pets), KPT requests that it be allowed to present the opinions of Dr. Goad – *i.e.* that there are no health risks to those living in houses with Chinese drywall or to anyone repairing the houses.

Respectfully submitted,

BY: /s/ Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile:  (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL  33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS

(IL Bar No. 6256621)
RICHARD M. FRANKLIN
(IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

On behalf of *Intervenor Knauf Plasterboard (Tianjin) Co., Ltd.*

## <u>CERTIFICATE</u>

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

<u>s/Douglas B. Sanders</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * *

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Defendant, Knauf Plasterboard (Tianjin) Co., Ltd., appearing through undersigned counsel, will bring the foregoing Motion in *Limine* (No. 1) to Exclude Testimony That Chinese Drywall, Emissions or Odors From Chinese Drywall are Harmful To, Or Otherwise Impact, Health, Are Toxic or Noxious on for hearing before the Honorable Eldon E. Fallon, Section "E," of the United States District Court, Eastern District of Louisiana, located at 500 Poydras Street, New Orleans, Louisiana on the 15th day of March, 2010 beginning at 9:00 o'clock, a.m. or as soon thereafter as counsel can be heard.

Respectfully submitted,

BY: s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:     (305) 789-8966
Facsimile:     (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:     (312) 861-8075
Facsimile:     (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
|     DRYWALL PRODUCTS | * | |
|     LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**DEFENDANT, KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S
MOTION IN *LIMINE* (No. 2) TO EXCLUDE THE
TESTIMONY AND REPORTS OF DR. JOHN SCULLY**

NOW COMES Defendant, Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT"), who moves

this Honorable Court for an Order granting KPT's Motion in *Limine* to Exclude the reports,

opinions, prior testimony and rports of Dr. John Scully on the grounds more fully set forth in the

supporting Memorandum attached hereto.

Respectfully submitted,


BY: s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile:  (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (Fla. Bar No. 0097136)
BAKER & McKENZIE LLP
MELLON Financial Center
1111 Brickell Avenue Suite 1700
Miami, FL  33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL  60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO:** *Hernandez, et al. v. Knauf Gips KG et al.*, Case No. 2:09-cv-6050 (E.D.La.)

---

**INTERVENOR KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S
MEMORANDUM IN SUPPORT OF MOTION IN *LIMINE* (No. 2)
TO EXCLUDE REPORTS AND TESTIMONY OF JOHN SCULLY, Ph.D.**

---

On March 2, 2010, plaintiffs submitted an affidavit of Dr. John Scully adopting his reports, opinions and testimony in the *Germano* case, as his opinions in the *Hernandez* case. Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT") requested the deposition of Dr. Scully prior to his testimony at trial in order to question him regarding the application of his opinions to the Hernandez's house, KPT's *Hernandez*-specific repair plan and additional opinions he had provided at the *Germano* trial, but not raised in his reports.

On March 7, 2010, KPT's counsel asked plaintiffs to confirm that they will not be calling or introducing any testimony or reports by Dr. Scully. Plaintiffs informed KPT that they will not be using Dr. Scully in the *Hernandez* case. (*See* Communication between S. Herman and D. Sanders, dated March 7, 2010, attached as Ex. 1.) Because plaintiffs are not calling him as a witness and KPT has not had an opportunity to depose him regarding new and *Hernandez*-specific issues, KPT requests that this Court exclude Dr. Scully's reports, opinions, prior

deposition or trial testimony in the *Hernandez* trial.

Respectfully submitted,

BY: /s/ Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS
(IL Bar No. 6256621)
RICHARD M. FRANKLIN
(IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

On behalf of *Intervenor Knauf Plasterboard
(Tianjin) Co., Ltd.*

## **CERTIFICATE**

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

## Sanders, Douglas B

**From:** Steve Herman [SHERMAN@hhkc.com]
**Sent:** Sunday, March 07, 2010 7:18 PM
**To:** Sanders, Douglas B
**Subject:** Chinese Drywall - Hernandez - Scully / Barnett

Doug -

Can confirm that we are not using Scully in *Hernandez.* I think we were trying to see if a perpetuation depo could be set up re Barnett; but I need to check with Chris and Dan and get back to you.

Thanks, - Steve

---

**From:** Sanders, Douglas B [mailto:Douglas.B.Sanders@BakerNet.com]
**Sent:** Sunday, March 07, 2010 6:56 PM
**To:** Steve Herman; Miller, Kerry J.; Hayden, Donald J
**Cc:** Seeger, Chris; Daniel K. Bryson; mecuyer@gainsben.com; jgrand@seegerweiss.com
**Subject:** RE: Chinese Drywall - Hernandez - SGH Materials

Thanks, Steve. I will take a look at it and see whether it is what I received in Boston.

Please confirm that you are not calling or introducing any testimony or reports by Scully and Barnett, as you have not provided deposition dates for them.

Doug

---

**From:** Steve Herman [mailto:SHERMAN@hhkc.com]
**Sent:** Sunday, March 07, 2010 6:25 PM
**To:** Sanders, Douglas B; Miller, Kerry J.; Hayden, Donald J
**Cc:** Seeger, Chris; Daniel K. Bryson; mecuyer@gainsben.com; jgrand@seegerweiss.com
**Subject:** Chinese Drywall - Hernandez - SGH Materials

Doug / Kerry / Don -

Also - I understand that some additional SGH Materials have been uploaded.

---

**From:** Steve Herman
**Sent:** Sunday, March 07, 2010 6:22 PM
**To:** 'Sanders, Douglas B'; Miller, Kerry J.; Donald Hayden
**Cc:** Gerald E. Meunier; mecuyer@gainsben.com; 'Hugh Lambert'
**Subject:** Chinese Drywall - Hernandez - Mallet

Doug / Kerry / Don -

I believe that these materials have been uploaded to the FTP Site referenced yesterday. Just making sure you have them, out of abundance of caution.

Thanks, - Steve

3/8/2010

Pursuant to requirements related to practice before the Internal Revenue Service, any tax advice contained in this communication (including any attachments) is not intended to be used, and cannot be used, for the purposes of (i) avoiding penalties imposed under the United States Internal Revenue Code or (ii) promoting, marketing or recommending to another person any tax-related matter.

This message may contain confidential and privileged information. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message. Please visit www.bakermckenzie.com/disclaimers for other important information concerning this message.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

In re:  CHINESE-MANUFACTURED      *      MDL Docket No. 2047
       DRYWALL PRODUCTS            *
       LIABILITY LITIGATION        *      SECTION L
                               *
                               *      JUDGE FALLON
                               *
THIS APPLIES TO:  *Hernandez (09-6050)* *      MAG. JUDGE WILKINSON
                               *
                               *
                               *
* * * * * * * * * * * * * * * * *

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Defendant, Knauf Plasterboard (Tianjin) Co., Ltd., appearing through undersigned counsel, will bring the foregoing Motion in *Limine* (No. 2) To Exclude The Reports And Testimony of Dr. John Scully for hearing before the Honorable Eldon E. Fallon, Section "E," of the United States District Court, Eastern District of Louisiana, located at 500 Poydras Street, New Orleans, Louisiana on the 15th day of March, 2010 beginning at 9:00 o'clock, a.m. or as soon thereafter as counsel can be heard.

Respectfully submitted,

BY:  s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile:  (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL  33131
Telephone:      (305) 789-8966
Facsimile:      (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL  60601
Telephone:      (312) 861-8075
Facsimile:      (312) 698-2375
Email:  douglas.b.sanders@bakernet.com

**<u>CERTIFICATE</u>**

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

<u>s/Douglas B. Sanders</u>

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |

* * * * * * * * * * * * * * * *

**DEFENDANT, KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S
MOTION IN *LIMINE* (No. 3) TO BAR DAVID MALONEY FROM TESTIFYING
ABOUT HIS OBSERVATIONS OR OPINIONS WITH RESPECT TO PURPORTED
DAMAGE TO PLAINTIFFS' PERSONAL PROPERTY**

NOW COMES Defendant, Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT"), who moves

this Honorable Court for an Order granting KPT's Motion in *Limine* to Bar David Maloney From

Testifying About His Observations Or Opinions With Respect To Purported Damage To

Plaintiffs' Personal Property on the grounds more fully set forth in the supporting Memorandum

attached hereto.

Respectfully submitted,


BY:s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (Fla. Bar No. 0097136)
BAKER & McKENZIE LLP
MELLON Financial Center
1111 Brickell Avenue Suite 1700
Miami, FL 33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## **CERTIFICATE**

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | §<br>§<br>§<br>§ | MDL No. 2047<br><br>SECTION: L |
| | §<br>§ | JUDGE FALLON |
| This Document Relates to: | §<br>§ | MAG. JUDGE WILKINSON |
| *Hernandez v. Knauf*, Case No. 09-6050 (E.D.La.) | §<br>§<br>§<br>§ | |

KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S MEMORANDUM IN SUPPORT OF MOTION IN *LIMINE* (NO. 3) TO BAR DAVID MALONEY FROM TESTIFYING ABOUT HIS OBSERVATIONS OR OPINIONS WITH RESPECT TO PURPORTED DAMAGE TO PLAINTIFFS' PERSONAL PROPERTY

Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT") submits this Memorandum in Support of its Motion *In Limine* to Bar Certain Observations or Opinions expressed by David Maloney during his trial deposition. Plaintiffs retained Mr. Maloney to appraise the replacement cost of specified personal property. Mr. Maloney admits that this direction by the plaintiffs prevents him from considering other potential value measurements. Nevertheless, Mr. Maloney testifies to the extraordinary assumption that exposure to drywall may have damaged some of the personal property.

Because Mr. Maloney admits that his property damage assumption is unrelated to his valuation determination, is irrelevant, and is not grounded in an analysis of the actual condition of the personal property, pursuant to FRE 403 and 702, any opinions regarding damage to personal property, such as perceived odors or the ability to adequately repair the property, should be barred.

## I. Background.

Mr. Maloney is a personal property appraiser. Plaintiffs retained him to testify as to the value of personal property that the Hernandez's allege to have been damaged by drywall. Importantly, Mr. Maloney was not asked to devise a methodology for the value determination. Rather, Plaintiffs instructed him to simply determine the cost to replace forty (40) articles, including appliances, televisions, toasters and other common household items. (*See* Maloney Deposition, attached as Exhibit A, at 22-23, 56.) Mr. Maloney determined their replacement cost by searching the internet websites of stores like Wal-Mart, Home Depot, Lowe's, Target, etc. (Maloney Dep. at 47.)

Mr. Maloney's report and his proposed trial testimony offers superfluous, "extraordinary assumptions" regarding purported property damage that are unrelated to the value determination and should be excluded:

- That prior to the installation of Chinese drywall, all mechanical, electrical and electronic items of property were in good working order, and the fabric home furnishings did not have a strong, abnormal smell. These assumptions are supported by statements made by the owners.

- That subsequent to exposure to Chinese drywall, the mechanical, electrical and electronic condition of some of the items of property may have become compromised, and some fabric home furnishings have a strong, abnormal smell. These assumptions are supported by my personal observations as well as statements made by the owners.

(Report, dated Feb. 12, 2010 at 2, attached as Ex. B.)

## II. Argument.

Mr. Maloney was not retained to provide opinions regarding the extent of damage to Plaintiffs' personal property, but to provide a simple valuation of replacement cost by surfing the internet for the current prices of select objects. More specifically, as Mr. Maloney admitted in his deposition, no analysis of personal property damage was even

necessary, because Plaintiffs instructed that he use replacement value (new) to appraise the items selected by Plaintiffs:

> Q:    Were you instructed to use replacement value (new) as the criteria of the appraisal of these items?
>
> A:    Yes, I was.
>
> Q:    Were you also instructed on exactly what items to appraise?
>
> A:    Yes, I was.

(Maloney Dep. at 23:9-15.)

Similarly, Mr. Maloney admitted that he did not perform any analysis to support opinions regarding purported property damage, and is not qualified to offer such opinions.    (Maloney Dep. at 65:7-11.)    Rather, in developing his extraordinary assumptions and opinions regarding purported property damage, Mr. Maloney simply relied on his discussions with the Plaintiffs:

> Q:    You're not providing an opinion in this case that these items are actually corroded or failed, correct?
>
> A:    No, I am not.
>
>         *      *      *
>
> Q:    Did you seek out or ask for any kind of opinions or sort of a comprehensive review of whether or not the—these materials are compromised?
>
> A:    No, I didn't; just my discussions with the [Plaintiffs].
>
> Q:    So in a sense, your opinions obviously go to the value of replacement, not whether the items actually need to be replaced?
>
> A:    That was my task, yes.

(Maloney Dep. at 65:3-6 & 68:13-23.)  Mr. Maloney was not asked to and should not provide opinions reading Plaintiffs' alleged property damage beyond the request

replacement cost (new) valuation. His observations are merely redundant of the Hernandez's and plaintiffs' other experts and are not relevant to the case.

Moreover, on direct examination and cross-examination, Mr. Maloney admitted that the "extraordinary assumptions" he reached are "irrelevant" and have "have no impact on the replacement value (new) of the 40 items." (Maloney Dep. at 33-35). Instead, Mr. Maloney described the extraordinary assumptions as merely "informative":

> Q: ... these extraordinary assumptions are informative, but your assignment was to calculate the replacement value new?
>
> A: That's correct.
>
> Q: And so they're not relevant to the numbers that you came up with for replacement value new?
>
> A: That's correct. They're just supportive of --- of the understandability of the report.

(Maloney Dep. at 66:15 – 67:2.)

For the foregoing reasons, KPT respectfully requests that any opinions or testimony of Mr. Maloney regarding actual damage to Plaintiffs' personal property, such as perceived odors or the ability to adequately repair the personal property, be barred pursuant to FRE 403 and 702.

Respectfully submitted,

BY:s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145

Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (Fla. Bar No. 0097136)
BAKER & McKENZIE LLP
MELLON Financial Center
1111 Brickell Avenue Suite 1700
Miami, FL 33131
Telephone:     (305) 789-8966
Facsimile:     (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:     (312) 861-8075
Facsimile:     (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

Confidential - Subject to Further Confidentiality Review

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
|  | § | MDL NO. 2047 |
| IN RE: | § |  |
| CHINESE-MANUFACTURED | § | SECTION: L |
| DRYWALL PRODUCTS | § |  |
| LIABILITY LITIGATION | § | JUDGE FALLON |
|  | § | MAG. JUDGE WILKINSON |

- - -

WEDNESDAY, MARCH 3, 2010
- CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

TRIAL TESTIMONY

- - -

Videotaped deposition of DAVID J.
MALONEY, JR., held at the Law Offices of
Herman Herman Katz & Cotlar, 820 O'Keefe
Road, New Orleans, Louisiana, commencing at
10:59 a.m., on the above date, before Kari J.
Behan, Certified Court Reporter, Certified
Shorthand Reporter.

- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com


EXHIBIT

Golkow Technologies, Inc. - 1.877.370.DEPS

Page 22

1    Plaintiffs' Steering Committee.

2          Q.      And what was the assignment

3    that you were given in the Hernandez case?

4          A.      I was requested to personally

5    inspect certain items of property in the

6    Hernandez home, and which I did, in the

7    presence of Mr. and Mrs. Hernandez, as well

8    as yourself.  I was asked to consult

9    with the homeowners to determine which items

10   would be listed in my appraisal, and then to

11   eventually assign values or, rather, develop

12   opinions of values regarding those items.

13              Those items were to fall into

14   two categories, as they did in the seven

15   homes that I appraised in Germano.  And those

16   two categories are this:  The first category

17   was to be of materials or of -- of property

18   which was made of materials or constructed of

19   materials which were absorbing in nature,

20   such as fabrics; and the second category was

21   to appraise items which consisted of

22   electrical appliances and electronic

23   equipment.

24              That list was compiled as I

Page 23

```
 1    went through the house by myself and Mr. and
 2    Mrs. Hernandez.  Once the list was compiled,
 3    the photographs were taken, notations were
 4    made, I returned to the office to prepare my
 5    appraisal report and do my research.
 6          Q.     Okay.  Let's stop there and
 7    let's break that down into smaller chunks of
 8    information.
 9                 Were you instructed to use
10    replacement value new as the criteria of the
11    appraisal of these items?
12          A.     Yes, I was.
13          Q.     Were you also instructed on
14    exactly what items to appraise?
15          A.     Yes, I was.
16          Q.     Could you define for the Court
17    what replacement value new means?
18          A.     As indicated in my report, and
19    which is required by USPAP, I note that my
20    type and -- my type of value used as
21    replacement cost and the definition is as
22    follows, taken from my 3rd -- the copy --
23    the 3rd copy of my book Appraising Personal
24    Property:  Principles and Methodology.
```

1    reader to better understand the report, then

2    that information has to be included within

3    the appraisal report.  My feeling is that my

4    involvement with the Germano case, combined

5    with my consultations with the homeowners,

6    combined with my personal observations compel

7    me to make a comment regarding this

8    assignment condition of what appeared to me

9    to be exposure to Chinese drywall, which then

10    would support an assumption of mine that

11    because of this exposure, that the items are

12    going to be worthless or are going to

13    be worth less.  And that's indicated in my

14    report.

15                    Having said that, that wasn't

16    the assigned scope of work.  My scope of work

17    was to determine replacement cost new and

18    the -- whether or not the property had been

19    exposed is not going to have an impact on my

20    determination of replacement cost new.

21    Although, it has a relevancy to the report

22    itself, thus the inclusion of my comments

23    regarding applicable assignment conditions

24    and extraordinary assumptions, which, in my

Page 34

1  opinion, makes this report more

2  understandable in the context of the intended

3  use, which is for litigation purposes.  And

4  that's an important issue that the appraisal

5  needs to be understood within the con- --

6  within the construct of how the appraisal is

7  going to be used.  This is not an appraisal

8  for replacement purposes for acquiring

9  insurance coverage; it's a replacement -- or

10  it's an appraisal being done with the --

11  with the intended use of litigation.

12      Q.    Okay, Mr. Maloney, let me ask

13  you to break those concepts down in smaller

14  bites for us.

15            As I understand, the

16  extraordinary assumptions was required to be

17  placed in your report by USPAP regulations?

18      A.    USPAP requires that -- that all

19  information is properly described and that

20  sufficient information is included so that

21  the report is understandable.  USPAP doesn't

22  require that -- that extraordinary

23  assumptions be included in any report, but if

24  they are made, then they have to be

Page 35

1    disclosed.   That's what USPAP requires.

2         Q.      And you included the

3    extraordinary assumptions here to give the

4    fuller picture of the conclusion that you

5    made in your report?

6         A.      I in- -- that's correct.   I

7    included the extraordinary assumptions here

8    in order to give the bigger picture to make

9    the report understandable and to support the

10   first paragraph of our market analysis for

11   contaminated property, which -- which goes to

12   the fact that, in my opinion, that this --

13   the subject property is -- because of this

14   extraordinary assumption of exposure to

15   Chinese drywall is now deemed non-marketable

16   and because of that, worthless.

17        Q.      But what effect does the

18   extraordinary assumptions have on the $11,907

19   opinion that you rendered regarding the

20   replacement value new of these 40 items?

21        A.      Well, the extraordinary

22   assumptions might make the report more

23   understandable to the reader.   They have no

24   impact on the replacement value new of the 40

Page 47

1    new values by reference to websites?

2         A.       Yes, it is.

3         Q.       And could you describe to the

4    Court, just generally, the most common

5    websites that you would use in order to

6    ascertain your replacement cost new?

7         A.       For -- well, for mattresses --

8    I have a specific list of websites.  Do -- do

9    you have that in that Reliance rather than --

10        Q.       (Tenders document to witness.)

11        A.       Thank you.

12                 I used several that I -- I

13   would personally shop at; for instance,

14   Wal-Mart, Lowe's, Target, K-Mart, Home Depot.

15   Mattresses, Sleep Happens, Pottery Barn.

16   Toshiba for the Laptops, Amazon, Sears.

17   Those are pretty common, well-known brick and

18   mortar shops, as well as online shops, so the

19   individual can locate the item on the web and

20   go on sites to pick it up off of.

21        Q.       With reference to your schedule

22   that I've marked as Hernandez 104 through 0

23   -- I'm sorry -- 104-0001 through 6, could you

24   describe to the Court the various columns

Page 56

1      A.      And my Reliance, yes.

2      Q.      I think, as you testified

3  earlier, you were directed to prepare your

4  report by giving the value as replacement

5  cost new?

6      A.      Let me clear that up.

7  Technically, it's replacement value new, and

8  there are different pathways to get to

9  replacement value:  One is replacement cost

10  new; one is replacement cost comparable.  I

11  note that in my -- on page 1.  But I like to

12  use the term replacement value new, yeah.

13     Q.      And so you were directed by the

14  plaintiffs to -- and by the -- by your client

15  to form an opinion on what the replacement

16  value new was?

17     A.      That's correct.

18     Q.      Okay.  And they also determined

19  that you would use, let's say, replacement

20  cost new as opposed to replacement cost

21  comparable?

22     A.      No.  While I am

23  compelled to communicate with them to

24  determine the type and definition of

Case 2:09-md-02047-EEF-MBN Document 18965-29 Filed 05/08/15 Page 39 of 155
Confidential - Subject to Further Confidentiality Review

Page 65

1    expert yourself?

2         A.     No, sir, I'm not.

3         Q.     You're not providing an opinion

4    in this case that these items are actually

5    corroded or failed, correct?

6         A.     No, I am not.

7         Q.     And while you said you observed

8    some odors, you're not an environmental

9    consultant or an industrial hygienist who

10   investigates chemical contaminants or things

11   like that, correct?

12        A.     That's correct, I am not.

13        Q.     You discussed some of, I think,

14   Dr. Galler's, in particular, testimony in the

15   Germano trial, but at the time of issuing

16   this report under USPAP, you hadn't -- you

17   hadn't heard that testimony?

18        A.     You are correct.

19        Q.     And that's not a part of this

20   report or your opinions in this report?

21        A.     No, it isn't.  No.

22        Q.     And that informative

23   information that we were talking about that

24   you described to Mrs. Barrios, you also

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 40 of 155
Case 2:09-md-02047-EEF-MBN Document 18886-29 Filed 05/08/15 Page 40 of 155
Confidential - Subject to Further Confidentiality Review

Page 66

1    testified that that has no impact on your

2    your assignment which was to calculate

3    the --

4         A.      -- replacement --

5         Q.      -- new replacement value?

6         A.      Replacement value.

7              MS. BARRIOS:  Wait --

8    BY MR. SANDERS:

9         Q.      -- replacement value of

10   the property, correct?

11             MS. BARRIOS:  Objection as to

12        form.

13             THE WITNESS:  Say that again.

14   BY MR. SANDERS:

15        Q.      I think you said before, and

16   I'm sure you'll correct me, that your --

17   these extraordinary assumptions are

18   informative, but your assignment was to

19   calculate the replacement value new?

20        A.      That's correct.

21        Q.      And so they're not relevant to

22   the numbers that you came up with for

23   replacement value new?

24        A.      That is correct.  They're just

Confidential - Subject to Further Confidentiality Review

Page 67

1    supportive of the understandability of

2    the report.

3        Q.    Would -- if there was other

4    information out there that these items

5    weren't compromised and the owners could be

6    corrected, would that be something that

7    might be informative and that you would

8    want to know?

9        A.    My task was not to opine on

10   whether or not the items can be cleaned or

11   whether they can be restored or what their

12   loss of value would be if they were restored,

13   which, by the way, would require

14   post-restoration examination  to

15   determine.  That was not my opinion or

16   that was not my task.  That was not involved

17   in my charge; therefore, the -- I think the

18   answer would be no to your question, then, it

19   wouldn't have an impact on what I did in this

20   report.

21       Q.    But those items wouldn't even

22   be informative to your opinion as far as

23   your extraordinary assumptions and what

24   you said formed the bases or contributed

Confidential - Subject to Further Confidentiality Review

Page 68

1    to?

2                 MS. BARRIOS:   Objection as to

3         form.

4                 THE WITNESS:   Would they

5         support -- would they all --

6         would they affect my value

7         conclusions?  No, they wouldn't.

8         Would they affect my disclosure of

9         supportive information that would

10        better help understand this

11        assignment, yes, I would include that.

12   BY MR. SANDERS:

13        Q.     Did you seek out or ask for any

14   kind of opinions or sort of a comprehensive

15   review of whether or not the -- these

16   materials are compromised?

17        A.     No, I didn't; just my

18   discussions with the client.

19        Q.     So in a sense, your opinions

20   obviously go to the value of replacement, not

21   whether the items actually need to be

22   replaced?

23        A.     That was my task, yes.

24        Q.     Are you aware of any USPAP

# Frederick Appraisal, Claims & Estate Services

The Personal Property Specialists
Antiques, Collectibles, Residential Contents, Business/Office Equipment, Vehicles
P.O. Box 2049
Frederick, MD 21702-1049
phone 301-228-2279
fax 240-436-6044
dave@maloney.com    http://www.davidmaloney.com

David J. Maloney, Jr., AOA CM                    Certified Member                    Association of Online Appraisers

February 12, 2010

Plaintiffs Steering Committee
c/o Ms. Dawn M. Barrios, Esq.
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street
New Orleans, LA 70139

Re: Chinese-Manufactured Drywall Products Liability Litigation, MDL No. 2047, Hernandez
v. Knauf, Case No. 09-6050 on the docket of the Eastern District of Louisiana

Dear Plaintiffs Steering Committee:

Here is the personal property appraisal report you requested regarding property belonging to Mr. & Mrs.
Tatum Hernandez. The valuation section of this report is enclosed as Exhibit 2. In summary, the
replacement value (new) of the items listed totals $11,907.

## Intended Use of the Appraisal

The intended use of this appraisal report is to establish values for the purpose of replacing the subject
properties with new items when the home is remediated. Any other use of this appraisal report renders it
null and void.

## Client and Other Intended Users

This report is intended for use only by you, my client, and by intended users Tatum and Charlene
Hernandez.

I am aware that this report will be used in the above referenced litigation, and particularly will be shared
with other parties, witnesses and the Court.

## Type and Definition of Value Used

For this assignment, replacement value (new) was developed for each of the subject items. Replacement
value (new) is measured by the cost to replace the subject property with a suitable new item, i.e., on its
replacement cost (new).

Replacement cost (new) is defined in Appraising Personal Property: Principles and Methodology – 3rd
Ed. (Appraisers Press, 2009) as the cost necessary to replace the item being appraised with a brand new
item of like kind, quality and utility or with a new upgraded item if the original model is out of production.
This definition assumes that a suitable new substitute (or the upgraded model) can be found for the
property being appraised. Replacement cost (new) applies to depreciable property for which exact or
suitably-acceptable new substitutes can be obtained. In other words, it is used for items that are still being
manufactured and/or are still available new on the open market. Examples include general household

EXHIBIT
13

contents such as lawn mowers, TVs, and sterling silver flatware, china or crystal in patterns that are still being manufactured.

Values do not include costs commonly associated with replacement including but not limited to the cost of warranties, sales tax, delivery, installation, or costs associated with the removal and/or disposal of the items being replaced.

## Relevant Dates

Value opinions are effective as the date of my inspection and interview with Mr. and Mrs. Hernandez which was January 25, 2010. This report was prepared and signed this date, February 12, 2010.

## Applicable Assignment Conditions

**Exposure to Chinese Drywall:** The strong smell I detected in the affected residence as well as on some items made of fabric combined with statements made by the owners, caused me to make the assumption that all in situ items had been exposed to Chinese drywall. (The strong smell was similar to that detected in the below-mentioned Virginia case, and the statements made by Mr. & Mrs. Hernandez were similar to those made by the Virginia case property owners.) Such exposure requires me to make extraordinary assumptions as indicated below.

**Limiting Conditions:** No limiting conditions were encountered during this assignment.

## Extraordinary Assumptions

**Extraordinary Assumptions:** In a manner similar to that of my appraisal reports dated December 30, 2009 in which I appraised personal property in seven Virginia homes for *Chinese Manufactured Drywall MDL- 2047- Germano Seven Trial Plaintiffs*, I made the following extraordinary assumption regarding the subject property:

- That prior to the installation of Chinese drywall, all mechanical, electrical and electronic items of property were in good working order, and the fabric home furnishings did not have a strong, abnormal smell. These assumptions are supported by statements made by the owners.

- That subsequent to exposure to Chinese drywall, the mechanical, electrical and electronic condition of some of the items of property may have become compromised, and some fabric home furnishings have a strong, abnormal smell. These assumptions are supported by my personal observations as well as statements made by the owners.

## Report Option Used

In accordance with the *Uniform Standards of Professional Appraisal Practice* (USPAP), this appraisal report makes use of the Summary report option.

## Scope of Work

On January 25, 2010 I conducted an appraisal inspection of personal property belonging to Mr. & Mrs, Tatum Hernandez at 68034 Marion St., Mandeville, LA 70471 and interview with Mr. and Mrs. Hernandez. The owners of the property as well as Ms. Dawn Barrios, Esq, other attorneys and inspectors were present during my inspection.

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |
| | * | |

* * * * * * * * * * * * * * * *

## NOTICE OF HEARING

PLEASE TAKE NOTICE that Defendant, Knauf Plasterboard (Tianjin) Co., Ltd., appearing through undersigned counsel, will bring the foregoing Motion in *Limine* (No. 3) To Bar David Maloney From Testifying About His Observations Or Opinions With Respect To Purported Damage To Plaintiffs' Personal Property for hearing before the Honorable Eldon E. Fallon, Section "E," of the United States District Court, Eastern District of Louisiana, located at 500 Poydras Street, New Orleans, Louisiana on the 15th day of March, 2010 beginning at 9:00 o'clock, a.m. or as soon thereafter as counsel can be heard.

Respectfully submitted,

BY: s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:     (305) 789-8966
Facsimile:     (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:     (312) 861-8075
Facsimile:     (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED | * | MDL Docket No. 2047 |
| DRYWALL PRODUCTS | * | |
| LIABILITY LITIGATION | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| | * | |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### DEFENDANT, KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S MOTION IN *LIMINE* (No. 4) TO EXCLUDE DR. LORI STREIT'S TESTIMONY BECAUSE IT RELATES SOLELY TO LIABILITY AND IS CUMULATIVE

NOW COMES Defendant, Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT"), who moves this Honorable Court for an Order granting KPT's Motion in *Limine* to Exclude Dr. Lori Streit's Testimony Because It Relates Solely To Liability And Is Cumulative on the grounds more fully set forth in the supporting Memorandum attached hereto.

Respectfully submitted,


BY:/s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (Fla. Bar No. 0097136)
BAKER & McKENZIE LLP
MELLON Financial Center
1111 Brickell Avenue Suite 1700
Miami, FL 33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * * * * * * | MDL Docket No. 2047 SECTION L JUDGE FALLON MAG. JUDGE WILKINSON |

* * * * * * * * * * * * * * * * *

THIS DOCUMENT RELATES TO: *Hernandez, et al. v. Knauf Gips KG et al.*, Case No. 2:09-cv-6050 (E.D.La.)

---

**KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S MEMORANDUM IN SUPPORT OF MOTION IN *LIMINE* (No. 4) TO EXCLUDE DR. LORI STREIT'S TESTIMONY BECAUSE IT RELATES SOLELY TO LIABILITY AND IS CUMULATIVE**

---

The parties to this case have stipulated to liability under Louisiana's Redhibition Statute, La. Civ. Code Articles 2520, *et seq.* (*See* Joint Stipulation, attached as Ex. 1.) As part of that stipulation, the parties agreed, for purposes of this case, that KPT manufactured the drywall in plaintiffs' house, KPT drywall emits certain reduced sulfur gases and an odor. (*Id.*, ¶¶ 8-9.) As such, Dr. Streit's trial deposition testimony in *Germano* with respect to identification of Chinese drywall as compared to domestic drywall, emissions from the drywall and the formation of copper sulfide on materials in the house is unnecessary to the plaintiffs' damages case and duplicative of testimony offered by Plaintiffs' other experts, including Bradley Krantz and Dean Rutila. Dr. Streit's trial deposition primarily focuses on her investigation into identification of Chinese drywall, emissions of Chinese drywall, and a black, copper sulfide corrosion product on copper components in houses. (*See* Germano Tr., February 22, 2010 at 26-77, attached as Ex. 2.) This Court should exclude her testimony as unnecessary and cumulative.

KPT is not challenging that its drywall is in the house, and its repair protocol calls for the removal of all drywall in the house (with the possible exception of non-standard drywall or green board around tubs that is not Chinese drywall). (*See* Carruba Report, Scope of Repair, attached as Ex. 3.) Her testimony with respect to identification of Chinese drywall as compared to domestic is not relevant to the issues in this case.

Similarly, Dr. Streit's testimony regarding the emissions of drywall from KPT and other Chinese drywall is irrelevant. KPT has admitted that "certain reduced sulfur gases" are emitted from the drywall for purposes of this trial. The nature and type of emissions are covered by the CPSC in their studies, which are cited to and relied upon by all parties experts and are proposed as exhibits by both parties. The emissions themselves will cease when the source drywall is removed, which both parties contemplate in their competing repair protocols.

Finally, Dr. Streit testifies to the identification of the corrosion product as copper sulfide based on some tests performed by her as well as Mr. Krantz. Mr. Krantz has submitted three separate reports between *Germano* and *Hernandez* detailing multiple analyses of the corrosion product, including addition work that Dr. Streit did not perform, such as cross-sections. Plaintiffs are calling him as a witness to testify live before the Court.

Dr. Streit's testimony is obviated by both the stipulations and the cumulative testimony by plaintiffs' live witnesses and should be excluded from this damages-only trial.

Respectfully submitted,

BY: /s/ Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street

Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile:  (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL  33131
Telephone:     (305) 789-8966
Facsimile:     (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS
(IL Bar No. 6256621)
RICHARD M. FRANKLIN
(IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL  60601
Telephone:     (312) 861-8075
Facsimile:     (312) 698-2375
Email: douglas.b.sanders@bakernet.com

On behalf of *Intervenor Knauf Plasterboard (Tianjin) Co., Ltd.*

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

Mar 1 2010
2:48PM

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: *Hernandez v. Knauf, et al.*, Case No. 2:09-cv-09-6050 (E.D. La.) | |

### ORDER

The Court has reviewed the following Joint Stipulation. IT IS ORDERED that the Stipulation be entered into the record.

New Orleans, Louisiana, this 24th day of February, 2010.

United States District Court Judge

### JOINT STIPULATION

Plaintiffs, Tatum B. Hernandez and Charlene M. Hernandez ("Plaintiffs"), and Defendant, Knauf Plasterboard Co. (Tianjin), Ltd. ("KPT"), in light of the evidence presented against Taishan Gypsum Co., Ltd., in the evidentiary default hearing in the *Germano* case, stipulate as follows:

(1) The parties stipulate that jurisdiction is vested in this Honorable Court under 28 U.S.C. §1332(a)(2), as plaintiffs allege more than $75,000 in controversy, (exclusive of interest and costs), in a dispute between citizens of the State of Louisiana and subjects of China. The parties further stipulate that in addition, or in the alternative, jurisdiction may be founded upon 28 U.S.C. §1367.

(2) The parties stipulate to venue as alleged by Plaintiffs in paragraph VI of the Amended and Restated Complaint.


EXHIBIT 1

(3) This stipulation shall only apply to the redhibition and fitness for ordinary use claims and associated defenses asserted by Plaintiffs in *Hernandez v. Knauf, et al.* (Case No. 09-6050). This stipulation shall not apply to any other claims or defenses which have been asserted or which may be asserted in the future by Plaintiffs, KPT, or any other party in any other matter. KPT expressly reserves, and does not waive, any of its defenses. KPT, nevertheless, stipulates in the *Hernandez* case, and only the *Hernandez* case, that it will not assert certain defenses, including comparative fault, contribution and/or reduction in KPT's legal responsibility to Plaintiffs as a result of any alleged conduct or fault of any other party, person or entity, in the *Hernandez* case, (and only in the *Hernandez* case). KPT expressly reserves and does not waive any other defenses in this or any other case. KPT and Plaintiffs do not intend that this stipulation, or any of its terms, or any adjudication of any matter in this case, be used for purposes of collateral estoppel or issue preclusion or as an evidentiary admission in any other case.

(4) The parties stipulate that Plaintiffs will dismiss and not pursue any claims in this matter against KPT other than their claims in redhibition and fitness for ordinary use pursuant to La. Civil Code Articles 2520, *et seq.*

(5) The parties stipulate that the damages sought by Plaintiffs in the Amended and Restated Complaint are not precluded under the exclusivity provisions of the Louisiana Products Liability Act.

(6) The parties stipulate that Plaintiffs' redhibition and fitness for ordinary use claims have not prescribed in accordance with La. Civ. Code art. 2534.

(7) The parties stipulate that KPT manufactured and sold drywall contained in Plaintiffs' house.

(8) The parties stipulate that Plaintiffs bought certain KPT drywall.

(9) The parties stipulate that the drywall in Plaintiffs' home emits certain reduced sulfur gases and that the drywall emits an odor.

(10) The parties stipulate pursuant to La. Civ. Code art. 2524 that the drywall in Plaintiffs' home is not fit for its ordinary and/or intended purpose and is so useless and/or inconvenient that it must be presumed that Plaintiffs would not have purchased the drywall had they known about the emissions of reduced sulfur gases and odors at the time of sale.

(11) The parties stipulate that reduced sulfur gases from the drywall were hidden, non-apparent, and unknown to Plaintiffs at the time of delivery in accordance with La. Civ. Code art. 2530.

(12) The parties stipulate that Plaintiffs gave sufficient and timely notice to KPT.

(13) The parties stipulate that Plaintiffs' redhibition and fitness for ordinary use claims are not subject to an exclusion or limitation of warranty.

(14) The parties stipulate that Plaintiffs will not depose any KPT employees either in their corporate or individual capacity in the *Hernandez* matter.

(15) The parties stipulate to waive their rights to a trial by jury, and stipulate to a bench trial in the *Hernandez* matter.

Respectfully submitted,

/s/ Stephen J. Herman
Russ M. Herman, *Liaison Counsel*
Leonard A. Davis, Esq.
Stephen J. Herman, T.A.
HERMAN, HERMAN, KATZ & COTLAR, LLP
820 O'Keefe Avenue
New Orleans, Louisiana 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
sherman@hhkc.com

/s/ Kerry Miller
Kerry Miller (LA Bar No. 24562)
Kyle A. Spaulding (LA Bar No. 29000)
FRILOT L.L.C.
1100 Poydras Street
Suite 3700
New Orleans, Louisiana 70163
Telephone:   (504) 599-8194
Facsimile:    (504) 599-8145
kmiller@frilot.com

Arnold Levin
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
alevin@lfsblaw.com
*Plaintiffs' Lead Counsel*

Christopher Seeger
Seeger Weiss, LLP
One William Street
New York, NY 10004
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com

*Attorneys for Plaintiffs,*
*Tatum and Charlene Hernandez.*

Richard M. Franklin
Douglas B. Sanders
BAKER & McKENZIE LLP
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:  (312) 861-8075
Facsimile:  (312) 698-2375
douglas.b.sanders@bakermckenzie.com

Donald J. Hayden
BAKER & McKENZIE LLP
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:  (305) 789-8966
Facsimile:  (305) 789-8953
donald.j.hayden@bakermckenzie.com
*Attorneys for Defendant KPT*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that the above and foregoing has been served on Plaintiffs'

Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S.

Mail and e-mail or by hand delivery and e-mail and upon all parties by electronically

uploading the same to Lexis Nexis File & Serve in accordance with pretrial Order No. 6,

which will send a notice of electronic filing in accordance with the procedures established in

MDL 2047, on this 24th day of February, 2010.

/s/ Donald J. Hayden

Page 1

```
 1              UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
 2

 3   **********************************************************

 4   IN RE:  CHINESE MANUFACTURED DRYWALL     MDL-2047
             PRODUCTS LIABILITY LITIGATION    SECTION "L"
 5                                            NEW ORLEANS, LOUISIANA
                                              MONDAY, FEBRUARY 22, 2010
 6

 7   **********************************************************

     THIS DOCUMENT RELATES TO:
 8

     MICHELLE GERMANO, ET AL
 9
             VERSUS
10

     TAISHAN GYPSUM CO., LTD., F/K/A
11   SHANDONG TAIHE DONGXIN CO., LTD.,
     ET AL
12
     CASE NO. 09-CV-6687
13

     **********************************************************
14
15                 VOLUME II - MORNING SESSION
           TRANSCRIPT OF DEFAULT HEARING PROCEEDINGS
16        HEARD BEFORE THE HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE
17
18

     APPEARANCES:
19
     FOR THE PLAINTIFF:        HERMAN, HERMAN, KATZ & COTLAR
20                             BY:  RUSS M. HERMAN, ESQ.
                                    STEPHEN J. HERMAN, ESQ.
21                             820 O'KEEFE AVENUE
                               NEW ORLEANS, LA 70113
22
23                             SEEGER WEISS
                               BY:  CHRISTOPHER A. SEEGER, ESQ.
24                             ONE WILLIAM STREET
                               NEW YORK, NY 10004
25
```



DAILY COPY

| 1 | 13 | WHAT ARE THE MAJOR DIFFERENCES THAT ARE |
| 2 | 14 | JUMPING OUT AT YOU?" |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | 19 | A.    HE SENT ME FOUR SAMPLES.  ONE |
| 7 | 20 | OF THEM WAS MARKED -- ALTHOUGH HE HAS HIS OWN |
| 8 | 21 | IDENTIFICATIONS, ONE OF THEM HAD A KNAUF |
| 9 | 22 | MARKING; ONE OF THEM SAID, "MADE IN CHINA"; |
| 10 | 23 | ONE OF THEM WAS UNMARKED; AND THEN ONE OF |
| 11 | 24 | THEM, I BELIEVE, WAS GRID MARKS, WHICH IS A |
| 12 | | |
| 13 | 1 | NATIONAL GYPSUM PRODUCT. |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | 19 | Q.    ALL RIGHT.  DR. STREIT, WHAT |
| 18 | 20 | I'M GOING TO MARK AND SHOW YOU -- FOR THE |
| 19 | 21 | RECORD, WHAT I'VE JUST MARKED AS STREIT |
| 20 | 22 | EXHIBIT 1, COULD YOU PLEASE DESCRIBE WHAT |
| 21 | 23 | THAT IS? |
| 22 | 24 | A.    THIS IS A -- THIS IS A COPY OF |
| 23 | | |
| 24 | 1 | THE REPORT THAT I ISSUED TO DR. DAVID KRAUSE |
| 25 | 2 | OF THE FLORIDA DEPARTMENT OF HEALTH, DATED |

1    3    MARCH 17TH, 2009.

2    4         Q.     OKAY.  AND WHAT DOES -- WHAT DO

3    5    YOU HAVE IN THAT REPORT?  WHAT DOES IT SHOW?

4    6    DOES IT SHOW TESTING THAT YOU DID ON BEHALF

5    7    OF THE FLORIDA DEPARTMENT OF HEALTH?

6    8         A.     YES.  THIS IS A REPORT ON THE

7    9    INITIAL STUDY OF THE FOUR SAMPLES THAT DAVID

8    10   SENT TO ME AND ASKED ME TO CHARACTERIZE.

9    11        Q.     OKAY.  AND TELL US WHAT YOU

10   12   FOUND.

11   13        A.     BASICALLY, WHAT WE WERE FINDING

12   14   THAT STOOD OUT IN THIS REPORT -- AND I SHOULD

13   15   GO BACK.  I'M SORRY.

14   16            IN ADDITION, HE DID SEND ME A

15   17   PIECE OF COPPER TUBING THAT HAD BLACKENED ON

16   18   THE SURFACE.

17   19        Q.     OKAY.

18   20        A.     SO WE CAN START WITH THAT.  WE

19   21   TOOK A SAMPLE OF THAT OFF WITH WHAT'S CALLED

20   22   A TUNGSTEN NEEDLE.  IT'S A VERY FINE POINT,

21   23   SO YOU CAN SCRAPE MATERIAL OFF.  AND WE DID

22   24   AN SEM/EDS OF THAT MATERIAL AND DETERMINED

23

24   1    THAT THAT WAS RICH IN SULFUR AND IN COPPER --

25   2         Q.     OKAY.

Page 28

```
1    3          A.      -- WITH A JUST A TRACE OF

2    4    OXYGEN.  AND SO IT WAS PRETTY CLEAR AT THAT

3    5    POINT THAT BECAUSE OF THE LACK OF OXYGEN, IT

4    6    WOULD BE A SULFIDE, AND IT'S ALSO BLACK, AS

5    7    OPPOSED TO GREEN.

6    8              BUT JUST TO CONFIRM, WE SENT IT

7    9    FOR, WHICH IS AN X-RAY DIFFRACTION

8   10    TECHNIQUE, AND THAT TECHNIQUE IS DESIGNED TO

9   11    GIVE YOU THE ACTUAL CHEMICAL COMPOSITION; IN

10  12    OTHER WORDS, THAT IT'S A SULFIDE OR A SULFATE

11  13    OR WHATEVER IT HAPPENS TO BE, SO --

12  14          Q.      AND XRD, IS THAT A TYPE OF TEST

13  15    THAT CHEMISTS REGULARLY EMPLOY TO --

14  16          A.      FOR THAT TYPE OF PURPOSE, YES.

15  17          Q.      OKAY.

16  18          A.      SO IT'S CONFIRMATORY OF WHAT WE

17  19    ACTUALLY SAW BY SEM.

18  20          Q.      OKAY.

19  21          A.      THEN WE WENT ON, AND WITH

20  22    RESPECT TO THE DRYWALL, WE DID DETERMINE THAT

21  23    AS A RESULT OF THE TESTING, WE WERE SEEING

22  24    DIFFERENCES IN THE DOMESTIC PRODUCT, WHICH

23

24   1    WAS THE GRID MARKS PRODUCT, VERSUS THE

25   2    CHINESE PRODUCT.
```

1     3                  WE SAW STRONTIUM INCLUSIONS,

2     4    WHICH ARE PARTICLES THAT WERE IN THE GYPSUM

3     5    OF THE CHINESE PRODUCTS, AS OPPOSED TO THE

4     6    AMERICAN PRODUCTS OR DOMESTICALLY PRODUCED

5     7    PRODUCTS.

6

7

8

9     14              BUT IT WAS CLEAR THAT THERE WAS

10    15    A DIFFERENCE IN STRONTIUM; AND ACTUALLY

11    16    SUBSEQUENTLY TO THAT, WE DID ICP AND

12    17    CONFIRMED THAT THE STRONTIUM LEVELS WERE

13    18    HIGHER IN THE CHINESE-MADE PRODUCT AS OPPOSED

14    19    TO THE DOMESTIC PRODUCT.

15    20        Q.      OKAY.   NOW, YOU USED THE TERM

16    21    "ICP." AGAIN, JUST FOR JUDGE FALLON'S

17    22    BENEFIT, WHAT DOES THAT MEAN?

18    23        A.      "ICP" STANDS FOR INDUCTIVELY

19    24    COUPLED PLASMA. AND IT'S JUST A FANCY TERM

20

21    1    FOR HEATING THE SAMPLE UP IN A PLASMA

22    2    ENVIRONMENT AND THEN IT EMITS A SIGNAL, WHICH

23    3    YOU THEN DETECT USING A MASS SPECTROMETER;

24    4    AND EACH ELEMENT HAS A DISTINCT WEIGHT, SO

25    5    IT'S SEPARATED BY ITS MASS.

Page 30

| | | |
|---|---|---|
| 1 | 6 | Q.    AND THIS TEST, IS THIS A TEST |
| 2 | 7 | THAT'S GENERALLY ACCEPTED BY CHEMISTS TO BE |
| 3 | 8 | USED FOR THAT TYPE OF PURPOSE? |
| 4 | 9 | A.    YES, IT'S USED FOR THE PURPOSE |
| 5 | 10 | OF LOOKING AT TRACE ELEMENTS, SPECIFICALLY |
| 6 | 11 | METALS -- |
| 7 | 12 | Q.    OKAY. |
| 8 | 13 | A.    -- AND VARIOUS SUBSTRATES. |
| 9 | 14 | Q.    NOW, DR. KRAUSE, AT SOME POINT, |
| 10 | 15 | HAD PUBLISHED A POSTER AT A CONFERENCE.  ARE |
| 11 | 16 | YOU AWARE OF THAT? |
| 12 | 17 | A.    YES, HE DID. |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | 24 | A.    THE POSTER THAT I BELIEVE |
| 17 | | |
| 18 | 1 | YOU'RE REFERRING TO WAS PRESENTED AT A |
| 19 | 2 | TECHNICAL CONFERENCE THAT OCCURRED IN |
| 20 | 3 | NOVEMBER IN TAMPA, FLORIDA, WHERE SCIENTISTS |
| 21 | 4 | WERE INVITED TO SUBMIT AN ABSTRACT WITH |
| 22 | 5 | REGARD TO THEIR WORK ON THE CHINESE |
| 23 | 6 | PROBLEMATIC DRYWALL SITUATION; AND A PANEL |
| 24 | 7 | FROM THE UNIVERSITY OF FLORIDA THEN REVIEWED |
| 25 | 8 | ALL OF THE ABSTRACTS AND SELECTED THE ONES |

1    9    THAT THEY THOUGHT WERE APPROPRIATE TO BE

2    10   PRESENTED AT THE CONFERENCE.

3

4

5

6    14              SO THE POSTERS AND

7    15   PRESENTATIONS THAT WERE PRESENTED AT THE

8    16   CONFERENCE, WERE THEY REVIEWED -- THEY WERE

9    17   INDEPENDENTLY REVIEWED, YOU'RE SAYING?

10   18        A.    THEY WERE INDEPENDENTLY

11   19   REVIEWED BY THE UNIVERSITY OF FLORIDA,

12   20   MEMBERS OF THE STAFF, SO PROFESSORS AT THE

13   21   UNIVERSITY OF FLORIDA.

14   22        Q.    WOULD PEOPLE IN YOUR FIELD

15   23   CONSIDER THAT A PEER-REVIEW PROCESS?

16   24        A.    TO SOME EXTENT, YES.  I MEAN,

17

18   1    THEY ARE OUR PEERS, OBVIOUSLY.  AND THERE WAS

19   2    A REVIEW PROCESS THAT WENT ON, AND THERE WERE

20   3    SOME -- MY UNDERSTANDING FROM TALKING WITH

21   4    DAVID IS SOME OF THEM WERE REJECTED, AND THEN

22   5    OTHERS WERE ACCEPTED AND ALLOWED TO PRESENT.

23

24

25

22    Q.    ALL RIGHT.  DR. STREIT, LET ME

23  SHOW YOU WHAT I'VE MARKED AS EXHIBIT 2,

24  STREIT EXHIBIT 2.  AND FOR THE RECORD, I JUST

1  HAVE TO PUT THE EXHIBIT NUMBER, THE ACTUAL

2  TRIAL EXHIBIT NUMBER.  IT'S --

3          AND CAN YOU IDENTIFY FOR

4  JUDGE FALLON WHAT THIS IS THAT WE'VE JUST

5  MARKED AS EXHIBIT 2?

6    A.    IN MY UNDERSTANDING OF WHAT

7  THIS IS, IS THIS IS DAVID KRAUSE'S

8  PRESENTATION, POSTER PRESENTATION, AT THAT

9  CONFERENCE.  AND WHAT HE HAD DONE WAS HE SENT

10  SAMPLES TO THREE DIFFERENT LABORATORIES, ONE

11  OF WHICH WAS OUR LABORATORY, UNIFIED

12  ENGINEERING, AND HE ASKED FOR A

13  CHARACTERIZATION OF THE DRYWALL.

14          AND HE WAS COMPARING THE

15  VARIOUS METHODS TO SEE WHETHER EVERYONE THAT

16  LOOKED AT IT CAME UP WITH THE IDENTIFICATIONS

17  THAT WERE CONSISTENT, WHETHER IT WAS DOMESTIC

18  OR WHETHER IT WAS A CHINESE-MADE PRODUCT.

```
 1   20          Q.      AND, DR. STREIT, DO YOU SEE THE
 2   21    NAME OF YOUR COMPANY LISTED ANYWHERE ON THIS
 3   22    POSTER?
 4   23          A.      IN "PARTICIPATING
 5   24    LABORATORIES," WE'RE LISTED AS LABORATORY C.
 6
 7
 8
 9   11          Q.      OKAY.  AND HAVE YOU REVIEWED
10   12    ANY OF THE PRESENTATIONS, OTHER THAN
11   13    DR. KRAUSE'S, THAT WERE MADE AT THE TAMPA
12   14    CONFERENCE?
13   15                  BY THE WAY, JUST FOR THE
14   16    RECORD, WHEN WAS THAT CONFERENCE?  I DON'T
15   17    KNOW IF YOU SAID THE DATE.
16   18          A.      IT WAS IN NOVEMBER OF LAST
17   19    YEAR.
18   20          Q.      OF 2009?
19   21          A.      2009.
20   22          Q.      OKAY.  AND HAD YOU REVIEWED ANY
21   23    OF THE OTHER PRESENTATIONS THAT WERE MADE AT
22   24    THAT CONFERENCE?
23
24    1          A.      I HAVE.
25    2                  MR. SEEGER:  OKAY.  I'LL JUST
```

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 68 of 155
Case 2:09-md-02047-EEF-MBN Document 18869-29 Filed 05/08/15 Page 16 of 55

Page 34

```
 1    3              MARK A FEW.

 2

 3

 4

 5   12              Q.    ALL RIGHT.  LET ME START

 6   13       HANDING THESE TO YOU.

 7   14              DR. STREIT, WHAT WE'VE MARKED

 8   15       AS EXHIBIT 3 IS A PRESENTATION DONE BY A

 9   16       THOMAS GAUTHIER, PH.D., AND THE TITLE IS

10   17       "PROPOSED MECHANISM FOR THE RELEASE OF

11   18       REDUCED SULFUR COMPOUNDS FROM CORROSIVE

12   19       IMPORTED DRYWALL."  ALSO, FOR THE RECORD, ITS

13   20       TRIAL EXHIBIT NUMBER IS.

14

15

16

17   13              Q.    AND LET ME ALSO -- WHAT I'M

18   14       HANDING TO YOU, WHICH HAS BEEN MARKED AS

19   15       STREIT EXHIBIT 4, IS A PRESENTATION BY ROBERT

20   16       DEMOTT, WHO'S A PHD, "CORROSIVE IMPORTED

21   17       WALLBOARD, INVESTIGATING EMISSIONS."  I'LL

22   18       HAND THAT TO YOU.

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/32/15 Page 69 of 155
Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/08/15 Page 19 of 55

Page 35

```
 1     2            Q.      STREIT EXHIBIT 5, AND THE TRIAL

 2     3      EXHIBIT NUMBER IS P2.0091-0001, IS A

 3     4      PRESENTATION BY TONY WORTHAN, MPH, "CHEMICAL

 4     5      EMISSIONS INCLUDING SULFUR COMPOUNDS FROM

 5     6      CHINESE PRODUCED DRYWALL."

 6

 7

 8

 9    15            Q.      AND THEN EXHIBIT 6, STREIT

10    16      EXHIBIT 6, WHICH IS TRIAL-STAMPED

11    17      , IS MICHAEL TUDAY AND OTHERS

12    18      FROM COLUMBIA ANALYTICAL SERVICES.  THE TITLE

13    19      IS "MEASUREMENT OF CORROSIVE, ODOROUS AND

14    20      POTENTIALLY HARMFUL GASES FROM IMPORTED AND

15    21      DOMESTIC WALLBOARD."

16    22                    ALL RIGHT.  DO YOU HAVE ALL

17    23      FOUR OF THOSE?

18    24            A.      I DO.

19

20     1            Q.      LET ME JUST START BY ASKING

21     2      YOU, DR. STREIT:  HAVE YOU SEEN THESE

22     3      PRESENTATIONS?

23     4            A.      I HAVE REVIEWED ALL OF THESE

24     5      PRESENTATIONS.

25     6            Q.      AND ARE THESE MATERIALS THAT
```

Page 36

| | | |
|---|---|---|
| 1 | 7 | YOU'VE RELIED UPON IN GIVING OPINIONS IN THIS |
| 2 | 8 | CASE? |
| 3 | 9 | A.    THEY ARE. |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | 13 | LET ME ASK YOU THIS WITH REGARD |
| 8 | 14 | TO YOUR EXPERIENCE WITH CHINESE DRYWALL:  HOW |
| 9 | 15 | MANY SAMPLES OF DRYWALL, CHINESE DRYWALL AND |
| 10 | 16 | OTHER DRYWALL, IN THE CONTEXT OF LOOKING AT |
| 11 | 17 | PROBLEMS OF CHINESE DRYWALL, HAVE YOU LOOKED |
| 12 | 18 | AT SINCE YOU'VE BEEN INTRODUCED TO THIS BY |
| 13 | 19 | DR. KRAUSE? |
| 14 | 20 | A.    PROBABLY FIVE TO 600 TOTAL. |
| 15 | 21 | Q.    OKAY.  AND OUT OF THE FIVE TO |
| 16 | 22 | 600, DO YOU HAVE ANY IDEA OF HOW MANY OF |
| 17 | 23 | THOSE WERE IDENTIFIED AS CHINESE DRYWALL |
| 18 | 24 | VERSUS DOMESTIC DRYWALL? |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | 3 | A.    I'D HAVE TO GO THROUGH THE |
| 23 | 4 | LIST, BUT I DID PROVIDE A TABLE; AND IF I |
| 24 | 5 | KNEW WHAT THE SOURCE WAS, I LISTED THAT IN |
| 25 | 6 | THE TABLE.  SO WITHOUT SITTING HERE AND |

| | | |
|---|---|---|
| 1 | 7 | COUNTING THEM UP, I REALLY AM NOT SURE, BUT |
| 2 | 8 | MY ESTIMATE WOULD BE PROBABLY 50 TO 70 OR SO. |
| 3 | 9 | BY MR. SEEGER: |
| 4 | 10 | Q.    OKAY.  AND THESE SAMPLES HAVE |
| 5 | 11 | BEEN SENT TO YOU FROM VARIOUS SOURCES; IS |
| 6 | 12 | THAT FAIR TO SAY? |
| 7 | 13 | A.    I HAVE RECEIVED HOMEOWNERS -- |
| 8 | 14 | SAMPLES FROM HOMEOWNERS, SAMPLES FROM OTHER |
| 9 | 15 | INDUSTRIAL HYGIENISTS, SAMPLES FROM |
| 10 | 16 | REMEDIATION COMPANIES, SAMPLES FROM VARIOUS |
| 11 | 17 | ATTORNEYS, FROM VARIOUS GOVERNMENT AGENCIES. |
| 12 | 18 | BASICALLY, I THINK I'VE GOTTEN SAMPLES FROM |
| 13 | 19 | EVERY ASPECT OF PEOPLE WHO WOULD BE EXPOSED |
| 14 | 20 | TO THIS PROBLEM. |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | 9 | Q.    NOW, TELL US -- BEFORE WE MOVE |
| 19 | 10 | INTO THE SPECIFIC OPINIONS IN THIS CASE, TELL |
| 20 | 11 | US WHAT THE RESULTS OF YOUR TESTING FOR THE |
| 21 | 12 | FLORIDA DEPARTMENT OF HEALTH RESULTED IN. |
| 22 | 13 | WHAT DID IT SHOW YOU?  WHAT DID YOU SEE? |
| 23 | 14 | A.    I'M SEEING DIFFERENCES THAT I |
| 24 | 15 | THOUGHT WERE REAL AND SHOULD BE EXPLORED |
| 25 | 16 | FURTHER. |

1 17     Q.   DIFFERENCES, YOU MEAN, BETWEEN

2 18 THE CHINESE DRYWALL --

3 19     A.   AND THE DOMESTIC PRODUCT.

4

5

6

7 22     A.   AND SO AT THAT POINT, I WOUND

8 23 UP GETTING IN A DISCUSSION AND CONVERSATION

9 24 WITH THE EPA, THE CPSC, THE DEPARTMENT OF

10

11 1 FLORIDA. THERE WERE REPRESENTATIVES FROM THE

12 2 DRYWALL MANUFACTURERS ALSO ON THE CONFERENCE

13 3 CALL, AND WE HAD A ONE-AND-A-HALF-TO-TWO-HOUR

14 4 CONFERENCE CALL ABOUT THE FINDINGS. AND

15 5 WHERE DO YOU GO FROM THERE, YOU KNOW?

16 6     Q.   DID YOU PRESENT YOUR FINDINGS

17 7 ON THAT CONFERENCE CALL?

18 8     A.   I DID TALK TO THEM ABOUT --

19 9 THEY WERE ALL FAMILIAR WITH IT BECAUSE THEY'D

20 10 ALREADY READ THE REPORT. THEY HAD SPECIFIC

21 11 QUESTIONS, WHICH I ANSWERED FOR THEM.

22 12     AND THEN WE STARTED TO TALK

23 13 ABOUT, YOU KNOW, WHAT DIRECTION SHOULD WE GO

24 14 IN? THEY WERE ASKING QUESTIONS ABOUT FURTHER

25 15 TESTING, AND SO I GAVE THEM IDEAS ON, YOU

1   16      KNOW, WHERE -- WHAT I THOUGHT THEY SHOULD DO.

2

3

4

5   23          Q.     HAVE YOU BEEN INVOLVED IN ANY

6   24      TESTING THAT'S BEEN USED BY THE CPSC?

7

8    1          A.     YEAH, THERE'S -- SOME OF THE

9    2      TESTING THAT I HAVE DONE, WHICH WAS ACTUALLY

10   3      DONE, COMMISSIONED BY THE CPSC, BUT THEY

11   4      HIRED A FACILITATOR, IF YOU WILL; AND THEY

12   5      SAID, "OKAY, YOU KNOW, WE WANT YOU TO

13   6      COORDINATE ALL THE TESTING FROM DIFFERENT

14   7      LABORATORIES," AND SO I WAS SENT SAMPLES, AND

15   8      SENT RESULTS BACK.

16   9          Q.     DR. STREIT, LET ME ASK YOU

17   10     THIS:  SO BEFORE ANYBODY IN THIS CASE HAD

18   11     SENT YOU ANY SAMPLES RELATED TO THE GERMANO

19   12     HOMES THAT WE'RE GOING TO BE TALKING ABOUT,

20   13     WHAT CONCLUSIONS HAD YOU REACHED ABOUT

21   14     CHINESE DRYWALL IN CONNECTION WITH THE WORK

22   15     YOU WERE DOING FOR THE FLORIDA DEPARTMENT OF

23   16     HEALTH AND THE CPSC, IN YOUR OWN TESTING?

24   17         A.     FROM MY TESTING, I WAS SEEING

25   18     SULFUR GAS EMISSIONS, MEANING THAT I WAS

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 74 of 155
Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/08/15 Page 16 of 55
Page 40

1    19    SEEING HYDROGEN SULFIDE, I WAS SEEING

2    20    CARBONYL SULFIDE, AND I WAS SEEING CARBON

3    21    DISULFIDE IN THE SAMPLES THAT WERE SENT TO

4    22    ME.  SO I THINK THAT NEEDED TO BE EXPLORED

5    23    FURTHER.

6    24              AND THEN I WAS ALSO SEEING A

7

8    1     DIFFERENCE IN THE STRONTIUM, WHICH DREW UP A

9    2     FLAG FOR ME, AND I WAS LOOKING FURTHER,

10   3     REALLY, AT THAT.  THOSE ARE THE TWO MAIN

11   4     TESTS OUT OF THE INITIAL REPORT THAT I WAS

12   5     SOMEWHAT FOCUSING ON.

13

14

15

16   12              A.    I CONTINUED TO LOOK AT

17   13    CORROSION DEPOSITS ON METALS FOR CLIENTS AS

18   14    WELL.

19   15              Q.    AND SO THE CLIENT -- WERE THESE

20   16    METALS BEING SENT TO YOU -- WHO WERE THEY

21   17    BEING SENT TO YOU BY?

22   18              A.    SOMETIMES, THE MANUFACTURER OF

23   19    THE HVAC EQUIPMENT.  SOMETIMES, THEY WERE

24   20    SENT BY INVESTIGATORS THAT WOULD GO OUT IN

25   21    THE FIELD AND CUT OUT A PIECE OF THE COIL OR

| | | |
|---|---|---|
| 1 | 22 | A PIECE OF WIRING AND SEND IT TO ME. |
| 2 | 23 | Q.    AND DID THE CPSC ULTIMATELY |
| 3 | 24 | MAKE AVAILABLE RESULTS OF TESTING THAT THEY |
| 4 | | |
| 5 | 1 | HAD DONE? |
| 6 | 2 | A.    I THINK THEY'VE DONE THAT |
| 7 | 3 | SEVERAL TIMES. |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | 12 | Q.    ALL RIGHT.  DR. STREIT, LET ME |
| 12 | 13 | SHOW YOU WHAT WE'VE JUST MARKED AS EXHIBIT 7, |
| 13 | 14 | AND IT'S THE TRIAL EXHIBIT NUMBER |
| 14 | 15 | P1.019-0001. |
| 15 | 16 | AND CAN YOU IDENTIFY WHAT THAT |
| 16 | 17 | IS FOR JUDGE FALLON, PLEASE? |
| 17 | 18 | A.    YES.  THIS IS THE CPSC'S |
| 18 | 19 | REPORT -- OR PART OF THE REPORT THAT WAS PUT |
| 19 | 20 | OUT ON NOVEMBER 23RD OF LAST YEAR.  AND IT |
| 20 | 21 | LOOKS LIKE THIS IS THE PARTICULAR REPORT |
| 21 | 22 | SECTION THAT DEALS WITH THE CHEMICAL ANALYSIS |
| 22 | 23 | PORTION, AND I HAVE TO GO THROUGH AND SEE. |
| 23 | 24 | IT DOESN'T LOOK LIKE THE |
| 24 | | |
| 25 | 1 | CORROSION PART IS IN HERE, SO THIS IS MORE OF |

| 1 | 2 | THE CHEMICAL SAMPLING PART OF THE REPORT. |

1   2   THE CHEMICAL SAMPLING PART OF THE REPORT.

2   3   Q.   AND HAVE YOU REVIEWED THIS?

3   4   A.   I HAVE REVIEWED IT, YES.

4   5   Q.   AND ARE THE FINDINGS WITH

5   6   REGARD TO CHINESE DRYWALL THAT YOU FOUND AND

6   7   WHAT'S IN THIS REPORT CONSISTENT, IN YOUR

7   8   OPINION?

8   9   A.   YEAH, THEY'RE CONSISTENT. I

9   10   TENDED TO FIND THAT THESE STRONTIUM LEVELS

10   11   WERE A LITTLE BIT HIGHER THAN THEY'RE SAYING.

11   12   THEIR VALUE APPARENTLY GOES DOWN TO 1200 PPM

12   13   STRONTIUM, AND MOST OF WHAT I'M SEEING WAS

13   14   ABOVE 1800 OR SO, ALTHOUGH THERE ARE

14   15   OUTLIERS. I DO SEE SOME THAT ARE BELOW 1200.

15   16   BUT FROM A CONSISTENT POINT OF

16   17   VIEW, I THINK THE IMPORTANT THING IS THAT

17   18   THERE'S A DIFFERENCE IN THE STRONTIUM LEVELS,

18   19   BEING THAT IT'S ELEVATED IN THE CHINESE

19   20   DRYWALL AND NOT ELEVATED IN THE DOMESTICALLY

20   21   PRODUCED PRODUCT.

21   22   Q.   AND THAT DIFFERENCE, IS THAT

22   23   ALSO -- IS YOUR FINDING OF THAT DIFFERENCE IN

23   24   THE STRONTIUM LEVELS -- IS THAT CONSISTENT

24

25   1   WITH WHAT YOU'VE SEEN PUBLISHED BY THE

Page 43

```
1    2    FLORIDA DEPARTMENT OF HEALTH AS WELL?

2    3         A.    YES.  THEY WERE FINDING THE

3    4    SAME THING, AS WERE MANY PEOPLE WHO PRESENTED

4    5    AT THE CONFERENCE.

5    6         Q.    AND WHAT ABOUT -- NOW GOING

6    7    BACK TO THE CPSC REPORT THAT YOU HAVE IN YOUR

7    8    HAND, MARKED AS EXHIBIT 7, WHAT ABOUT WITH

8    9    REGARD TO OFF-GASSING?

9   10         A.    WITH REGARD TO OFF-GASSING,

10  11    THEY'RE SAYING THAT THEY FIND HYDROGEN

11  12    SULFIDE, THAT THEY MEASURE IN THE HOMES BY

12  13    THE USE OF A PASSIVE SAMPLER, MEANING THAT

13  14    THEY'RE TAKING AN AVERAGE OVER A TWO-WEEK

14  15    SPAN, AS TO OPPOSED A -- THEY DID DO GRAB

15  16    SAMPLES, BUT APPARENTLY THEY'VE ABANDONED

16  17    THAT.  THEY DON'T EVEN REALLY MENTION IT IN

17  18    THEIR SUMMARY.

18

19

20

21  19         Q.    OKAY.  I'M GOING TO HAND YOU

22  20    WHAT WE'VE JUST MARKED AS STREIT EXHIBIT 9,

23  21    WHICH IS TRIAL-MARKED P1.1804-0001.

24

25
```

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 78 of 155
Case 2:09-md-02047-EEF-MBN Document 18899-29 Filed 05/08/15 Page 26 of 55

Page 44

```
 1
 2    7         Q.      CAN YOU IDENTIFY FOR
 3    8    JUDGE FALLON WHAT I'VE JUST HANDED YOU AND
 4    9    MARKED AS STREIT EXHIBIT 9?
 5   10         A.      THIS IS A SUMMARY OF WORK THAT
 6   11    WAS RELEASED BY THE INTERAGENCY TASK FORCE
 7   12    STUDYING THE -- THE GOVERNMENT TASK FORCE
 8   13    STUDYING THE DRYWALL ON OCTOBER 29TH OF 2009,
 9   14    SO IT PREDATES THE 50-HOME -- 51-HOME STUDY.
10   15              THIS ONE IS INDOOR AIR TESTING
11   16    OF TEN HOMES FROM THE FLORIDA AND LOUISIANA
12   17    AREA, AND THEN THEY ACTUALLY ALLUDE TO THE
13   18    FACT THAT THEY'RE GOING TO BE RELEASING A
14   19    MORE COMPREHENSIVE 50-HOME STUDY AT THAT
15   20    TIME.
16   21         Q.      OKAY.  AND IS THIS SOMETHING
17   22    YOU REVIEWED?
18   23         A.      I DID REVIEW IT, YES.
19   24         Q.      AND BOTH WITH REGARD TO STREIT
20
21    1    EXHIBIT 8, WHICH IS THE CPSC STUDY, AND
22    2    EXHIBIT 9, WHICH IS THE FLORIDA DEPARTMENT OF
23    3    HEALTH STUDY, HAVE YOU RELIED UPON BOTH OF
24    4    THOSE IN RENDERING YOUR OPINIONS IN THIS
25    5    CASE?
```

1    6         A.    AGAIN, THIS IS SOMETHING THAT

2    7    I'VE LOOKED AT, AND YES, I HAVE RELIED UPON

3    8    IT.  IT'S CONSISTENT WITH WHAT I'VE SEEN IN

4    9    MY OWN TESTING.

5

6

7

8    1         Q.    SO YOU'VE LOOKED AT BOTH OF

9    2    THESE, AND YOU'VE RELIED ON THESE IN

10   3    CONNECTION WITH RENDERING YOUR OPINIONS IN

11   4    THAT CASE; IS THAT FAIR?

12   5         A.    I HAVE.

13

14

15

16   6    YOU THIS, DR. STREIT:  WITH REGARD TO THE

17   7    GERMANO HOMES THAT ARE THE SUBJECT OF THIS

18   8    HEARING THAT JUDGE FALLON IS PRESIDING OVER,

19   9    WHAT WERE YOU ASKED TO DO BY THE PLAINTIFFS'

20   10   LAWYERS IN THIS CASE?

21   11        A.    I WAS ASKED TO VISIT THE HOME,

22   12   AND THEN I WAS ASKED TO ANALYZE SAMPLES THAT

23   13   WERE HARVESTED FROM THE HOMES AND DETERMINE

24   14   IF, IN FACT -- THE TESTING THAT I WOULD

25   15   NORMALLY RUN ON THESE SAMPLES AT THAT POINT,

| | | |
|---|---|---|
| 1 | 16 | WHETHER I WAS SEEING ELEVATED LEVELS OF |
| 2 | 17 | STRONTIUM, WHETHER I WAS SEEING STRONTIUM |
| 3 | 18 | INCLUSIONS, WHETHER I COULD ANALYZE THE BLACK |
| 4 | 19 | DEPOSITS AND DETERMINE WHETHER THAT WAS |
| 5 | 20 | COPPER SULFIDE OR COPPER OXIDE, LOOKING AT |
| 6 | 21 | OFF-GASSING TO SEE WHETHER THE SAMPLERS WERE |
| 7 | 22 | GOING TO ADMIT THE HYDROGEN SULFIDE, CARBONYL |
| 8 | 23 | SULFIDE AND CARBON DISULFIDE THAT WE WERE |
| 9 | 24 | ESSENTIALLY SEEING; AND THEN TO ALSO, IN |
| 10 | | |
| 11 | 1 | CONJUNCTION WITH REVIEWING OTHER MATERIALS, |
| 12 | 2 | DRAW CONCLUSIONS, BASED ON MY WORK AND REVIEW |
| 13 | 3 | OF OTHERS. |
| 14 | 4 | Q.    OKAY.  LET ME START WITH YOUR |
| 15 | 5 | CONCLUSIONS HERE.  WHAT DID YOU SEE WITH |
| 16 | 6 | REGARD TO ELEVATED STRONTIUM OFF-GASSING AND |
| 17 | 7 | CORROSION IN THE HOMES YOU VISITED IN THE |
| 18 | 8 | GERMANO LITIGATION? |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | 10 | A.    WITH RESPECT TO OFF-GASSING, |
| 23 | 11 | WHEN I WALKED INTO THE THREE HOUSES THAT |
| 24 | 12 | CONTAINED SUSPECTED DRYWALL THAT WAS PRODUCED |
| 25 | 13 | IN CHINA, THE HOMES HAVE A VERY DISTINCT AND |

1  14    NOTICEABLE ODOR.

2  15         IT'S -- IT WAS SOMETHING THAT

3  16    IN CERTAIN AREAS THE HOME WAS STRONGER THAN

4  17    IN OTHERS, AND AS THE DAY PROGRESSED,

5  18    ACTUALLY SOMEWHAT BECAME A LITTLE IRRITATING

6  19    TO MY EYES AND WAS CAUSING ME TO COUGH A

7  20    LITTLE BIT, WHICH SUBSEQUENTLY, AS I GOT MORE

8  21    FRESH AIR, WAS BETTER.

9  22         I THEN WENT INTO WHAT WAS

10 23    CONSIDERED TO BE A CONTROL HOME, WHERE THERE

11 24    WAS NO DRYWALL MANUFACTURED FROM CHINA; AND I

12

13  1    LOOKED AT THE COPPER SURFACES IN THAT HOME,

14  2    THE WIRING AND THE BATHROOM PLUMBING AND SO

15  3    ON, AND DETERMINED THAT I DIDN'T SEE ANY

16  4    VISIBLE SIGN OF CORROSION, NOR DID I PERCEIVE

17  5    AN ODOR IN THAT HOME.

18

19

20

21  9    I MEAN, DID YOU -- THOSE WERE SORT OF YOUR

22 10    VISUAL OBSERVATIONS.  WHAT ABOUT YOUR TESTING

23 11    ANALYSIS?

24 12         A.    THOSE SAMPLES WERE TESTED IN A

25 13    HUMIDIFIED ENVIRONMENT, JUST LIKE MANY OF THE

1    14    OTHER SAMPLES HAVE DONE, WHERE YOU TAKE A

2    15    PIECE OF THE DRYWALL, YOU TAKE OFF THE PAPER,

3    16    AND THEN YOU PLACE THE SAMPLE IN A HUMIDIFIED

4    17    ENVIRONMENT FOR A PERIOD OF TIME, TYPICALLY

5    18    48 HOURS, AND THEN YOU MEASURE THE GASES

6    19    WHICH COME OUT OF THAT DRYWALL TO DETERMINE

7    20    WHAT THEY ARE.  ARE THEY HYDROGEN SULFIDE?

8    21    ARE THEY CARBONYL SULFIDE?  ARE THEY CARBON

9    22    DISULFIDE?  ARE THEY ANOTHER SULFUR GAS, OR

10   23    ARE THEY SOMETHING ELSE?

11   24        Q.    AND WHAT DID YOU FIND?

12

13    1        A.    WHEN THE SAMPLES ARE

14    2    HUMIDIFIED, WHAT WE TEND TO SEE IS CARBONYL

15    3    SULFIDE AND CARBON DISULFIDE AT ELEVATED

16    4    LEVELS, BECAUSE THE HYDROGEN SULFIDE, AS IT

17    5    TURNS OUT, IS ABSORBED BY THE MOISTURE AS A

18    6    RESULT OF THE WAY THE TEST IS RUN.

19    7            AND SO WHEN WE WENT BACK AND

20    8    RAN THOSE DRY, YOU GET A HYDROGEN SULFIDE

21    9    EMISSION, WHICH YOU MISS IF YOU RUN THE

22   10    SAMPLES HUMIDIFIED.  SO YOU SEE ALL THREE

23   11    GASES THAT WILL BE GIVEN OFF BY THE CHINESE

24   12    DRYWALL THAT -- THE HYDROGEN SULFIDE, WE

25   13    DON'T SEE COMING OUT OF THE DOMESTIC PRODUCT

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 83 of 155
Case 2:09-md-02047-EEF-MBN Document 18869-29 Filed 05/08/15 Page 23 of 55

Page 49

```
 1   14      AT ALL.   THERE ARE A COUPLE OF INSTANCES

 2   15      WHERE YOU MAY SEE CARBONYL SULFIDE IN

 3   16      DOMESTIC PRODUCT, BUT IT'S AT PRETTY LOW

 4   17      LEVELS.

 5         .

 6

 7

 8   20      WHAT TYPE OF TESTS DID YOU DO WITH REGARD TO

 9   21      OFF-GASSING?

10   22           A.     THIS IS A GC MASS SPEC TEST.

11   23      THAT STANDS FOR GAS CHROMATOGRAPHY, AND IT'S

12   24      A MASS SPECTROMETRY DETECTOR.

13

14

15

16    6           Q.     ALL RIGHT.   LET ME ASK YOU

17    7      THIS:  WITH REGARD TO THE TESTING FOR

18    8      OFF-GASSING, THE METHOD THAT YOU USED, DO YOU

19    9      HAVE AN OPINION AS TO WHETHER THAT IS A MORE

20   10      RELIABLE METHOD FOR MEASURING OFF-GASSING

21   11      THAN, LET'S SAY, CERTAIN INDOOR AIR QUALITY

22   12      TESTS?

23

24

25
```

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 84 of 155
Case 2:09-md-02047-EEF-MBN Document 1889-29 Filed 03/08/10 Page 84 of 155

Page 50

| 1  | 15 | A.    WELL, THEY'RE ASTM TESTS THAT |
|----|----|---|
| 2  | 16 | ARE DESIGNED TO MEASURE THE OFF-GASSING UNDER |
| 3  | 17 | A CONTROLLED SET OF CONDITIONS, SO THAT YOU |
| 4  | 18 | ARE ESSENTIALLY PUTTING A PIECE OF DRYWALL IN |
| 5  | 19 | A CONTAINER AND YOU ARE TRAPPING THE GASES |
| 6  | 20 | THAT COME OUT, SO YOU CAN ACTUALLY MEASURE |
| 7  | 21 | THEM, AS OPPOSED TO TAKING AIR SAMPLES IN A |
| 8  | 22 | HOUSE, WHERE, QUITE FRANKLY, IT'S REALLY |
| 9  | 23 | HIT-OR-MISS. |
| 10 | 24 | YOU KNOW, IF YOU TALK TO THE |
| 11 |    | |
| 12 | 1  | HOMEOWNERS, SOMETIMES THEY SMELL SOMETHING, |
| 13 | 2  | SOMETIMES THEY DON'T, SO WHEN DO YOU TAKE |
| 14 | 3  | YOUR SAMPLE?  DO YOU WAIT UNTIL THE |
| 15 | 4  | HOMEOWNERS SMELL SOMETHING, OR, YOU KNOW, |
| 16 | 5  | WHAT DO YOU DO? |
| 17 | 6  | AND I THINK THAT THAT WAS MY |
| 18 | 7  | INITIAL CRITICISM OF AIR SAMPLING, AND THE |
| 19 | 8  | REASON WHY I HAD EXPRESSED THAT OPINION TO |
| 20 | 9  | THE CPSC AND DAVID, THAT I REALLY DIDN'T |
| 21 | 10 | THINK THE AIR SAMPLING WAS VERY PRODUCTIVE. |
| 22 | 11 | I REALLY THOUGHT IT WOULD BE |
| 23 | 12 | BETTER, IF YOU WANT TO FIND OUT IF THE |
| 24 | 13 | DRYWALL IS A PROBLEM, YOU HAVE TO CONTROL THE |
| 25 | 14 | TEST BETTER. |

BY MR. SEEGER:

  Q.  NOW, WHEN YOU SAY THIS IS THE OPINION YOU GAVE TO DAVID, YOU'RE SAYING THIS IS WHAT YOU HAD SAID TO DAVID KRAUSE AT THE FLORIDA DEPARTMENT OF HEALTH, JUST TO BE CLEAR?

  A.  RIGHT. THAT IS CORRECT.

  Q.  LET'S TALK SOME ABOUT WHAT YOU OBSERVED IN THE GERMANO HOMES THAT HAVE CHINESE DRYWALL AND THE CONTROL HOME THERE

WITH REGARD TO CORROSION.

  A.  THE GERMANO HOMES HAVE CORROSION THAT ARE PRETTY WIDESPREAD. WHEN YOU GO IN THE HOME, IF YOU LOOK AT THE COPPER TUBING IN THE BATHROOMS, THE WATER LINES, THEY'RE BLACK.

   IF YOU OPEN UP THE BACK OF THE REFRIGERATOR AND YOU LOOK AT ALL OF THE ASSOCIATED TUBING AND WIRING THAT'S IN THE BACK OF THE REFRIGERATOR, THAT WAS ALL BACK.

   IN ONE CASE, THE LAMP WIRE GOING UP ALL THE WAY TO THE CEILING, YOU COULD SEE THAT THE WIRES WERE BLACK UNDERNEATH; AND, IN FACT, WE LATER ANALYZED

```
 1    15      THOSE SAMPLES.
 2    16              YOU SAW IT WHEN WE LOOKED AT
 3    17      THE ALARM SYSTEMS, AND YOU TOOK THE COVER OFF
 4    18      THE ALARM SYSTEM.  YOU COULD SEE DARKENING OF
 5    19      THE WIRES ON THE ALARM SYSTEMS.
 6    20              THEN WE WENT UP AND LOOKED AT
 7    21      THE AIR-CONDITIONING COILS.  AND IN THE ONE
 8    22      HOME, I THINK IT WAS THE MCKELLAR HOME, THE
 9    23      COIL HAD ONLY BEEN IN THERE FOR TWO MONTHS,
10    24      AND IT WAS BLACK.
11
12     1              Q.     THE HVAC COIL?
13     2              A.     THE HVAC COIL.
14     3              AND THEN, OF COURSE, WE'D LOOK
15     4      AT THE OUTLET COVERS AND TAKE THE OUTLET
16     5      COVERS OFF AND LOOK AT THE WIRES, AND THEY
17     6      WERE BLACKENED.  THERE WERE PICTURE FRAMES
18     7      WHICH SHOWED SOME BLACKENING.
19     8              IF YOU LOOKED AT THE
20     9      CHROME-PLATED FIXTURES IN THE BATHROOM, THEY
21    10      WERE ALL BLACKENED.  THE MIRROR BACKING WAS
22    11      AFFECTED.  IT WAS ACTUALLY PRETTY PERVASIVE
23    12      IN THE ENTIRE HOUSE.
24
25
```

```
 1
 2    15    CORROSION ON METALS.  WHAT IS THE
 3    16    SIGNIFICANCE OF YOU SEEING BLACK ON THE
 4    17    METALS THAT YOU OBSERVED IN THE GERMANO
 5    18    HOMES?
 6    19         A.    IT'S DIFFERENT THAN WHAT YOU
 7    20    WOULD CONSIDER NORMAL AGING OR, YOU KNOW,
 8    21    AGING CORROSION AS A RESULT OF BEING IN AN
 9    22    OXIDIZING ENVIRONMENT, IN THE AIR.
10    23              WHAT WE'RE SEEING ARE DEPOSITS
11    24    OF BLACK MATERIAL ON THE SURFACE, ACTUALLY,
12
13     1    YOU KNOW, PHYSICAL DEPOSITS ON THE SURFACE,
14     2    SO -- AND THAT'S THE FORMATION OF THE
15     3    SULFIDE, WHICH THEN WAS CORRODING THE METAL
16     4    UNDERNEATH.
17     5              AND VISUALLY, IT APPEARS
18     6    DIFFERENT.  IT'S NOT A THIN DISCOLORATION
19     7    LAYER.  IT'S ACTUALLY A MATERIAL ON THE
20     8    SURFACE THAT YOU CAN SCRAPE AND ANALYZE,
21     9    WHEREAS OXIDATION, IT'S VERY DIFFICULT TO DO
22    10    THAT.  YOU WIND UP ANALYZING THE ENTIRE
23    11    SUBSTRATE.
24    12         Q.    WELL, DO YOU HAVE AN OPINION AS
25    13    TO WHETHER THIS IS THE KIND OF CORROSION THAT
```

Case 2:09-md-02047-EEF-MBN Document 18869-29 Filed 05/08/15 Page 38 of 55

Page 54

| | | |
|---|---|---|
| 1 | 14 | YOU CAN JUST KIND OF WIPE OFF THE WIRES? |
| 2 | 15 | A. THE CORROSION, YOU CAN'T WIPE |
| 3 | 16 | OFF. AND EVEN THE BLACK MATERIAL, SOME OF IT |
| 4 | 17 | YOU CAN WIPE OFF -- YOU KNOW, WE'RE DOING |
| 5 | 18 | THAT TO COLLECT SAMPLES -- BUT NOT ALL OF IT. |
| 6 | 19 | AND, IN FACT, SOME OF IT IS HELD ON QUITE |
| 7 | 20 | TIGHTLY. OTHER MATERIAL, YOU CAN POKE AT IT, |
| 8 | 21 | AND THEN IT WILL FLAKE OFF. |
| 9 | 22 | AND THEN IN SOME PLACES, YOU |
| 10 | 23 | CAN'T GET IT OFF AT ALL BECAUSE IT'S HELD ON |
| 11 | 24 | BY THE CORROSION PITS, IF YOU WILL. SO, YOU |
| 12 | | |
| 13 | 1 | KNOW, YOU'RE NOT GOING TO BE ABLE TO JUST |
| 14 | 2 | WIPE IT OFF. |
| 15 | | |
| 16 | | |
| 17 | | |
| 18 | 6 | Q. WELL, DO YOU HAVE EXPERIENCE |
| 19 | 7 | DOING -- YOU KNOW, LOOKING AT CORROSIVE |
| 20 | 8 | METALS, METALS THAT HAVE CORROSION ON THEM? |
| 21 | 9 | A. VERY OFTEN I LOOK AT PROBLEMS |
| 22 | 10 | INVOLVING CORROSION AND OXIDATION OF THE |
| 23 | 11 | SURFACE, DEPOSITS ON THE SURFACE. I LOOK AT |
| 24 | 12 | THE EXTENT OF CORROSION, PITTING, WHETHER |
| 25 | 13 | IT'S PENETRATED THROUGH THE METAL, WHETHER |

Page 55

1   14      IT'S, QUOTE/UNQUOTE, "FORMICARY," SO IT'S

2   15      TUNNELING IN.

3   16              IT REALLY -- AND THOSE SAMPLES

4   17      ARE SOMETHING THAT I GET QUITE FREQUENTLY

5   18      BECAUSE THAT'S A PRETTY LARGE PROBLEM IN THE

6   19      WORLD WE LIVE IN, WITH EXPOSURE TO CHEMICALS

7   20      AND THING.

8   21          Q.      AND IS THAT A LARGE PART OF

9   22      WHAT YOU DO GENERALLY IN CONNECTION WITH

10  23      YOU -- THE WORK YOU DO FOR INDUSTRY, IS

11  24      LOOKING AT CORROSION AND TELLING YOUR CLIENTS

12

13   1      IN THAT CASE THE CAUSE OR THE EXTENT OF THE

14   2      CORROSION?

15   3          A.      SURE.  WHAT'S IN THE CORROSION

16   4      DEPOSIT, WHAT I BELIEVE IS CAUSING IT, AND

17   5      THEN SOMETIMES WE TALK ABOUT HOW TO FIX THE

18   6      PROBLEM.  BUT TYPICALLY, THEY COME TO ME

19   7      BECAUSE THEY NEED THE ANALYSIS DONE.

20

21

22

23   9      KNOW, HOW LONG HAVE YOU BEEN WORKING ON

24  10      IDENTIFYING CORROSION PROBLEMS AND THE EXTENT

25  11      OF CORROSION FOR ANYBODY WHO'S EVER HIRED YOU

1    12     TO DO IT?

2    13         A.     I'VE BEEN DOING THAT FOR MY

3    14     ENTIRE PROFESSIONAL CAREER.

4

5

6

7    23         Q.     DR. STREIT, I'D LIKE TO MARK

8    24     FOR YOU THE REPORT THAT YOU GAVE IN DECEMBER

9

10    1     ON BEHALF OF THE GERMANO PLAINTIFFS, AND YOUR

11    2     SUPPLEMENTAL REPORT THAT YOU DID IN JANUARY.

12    3     FOR THE RECORD, WHAT I'M MARKING AS STREIT-8

13    4     IS TRIAL EXHIBIT P1.2023-0001.

14    5         AND IS THAT A START OF YOUR

15    6     REPORT THAT I'VE MARKED AS STREIT-8?

16    7         A.     WITHOUT COUNTING UP ALL THE

17    8     PAGES, IT DOES APPEAR TO BE A COPY OF MY

18    9     REPORT.

19

20

21

22    16         Q.     OKAY.  AND THEN I'VE ALSO

23    17     MARKED AS STREIT-10 -- SORRY WE WENT OUT OF

24    18     ORDER -- YOUR SUPPLEMENTAL REPORT.  WOULD YOU

25    19     PLEASE TAKE A LOOK AND CONFIRM -- OOH, LET ME

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 31 of 55
Case 2:09-md-02047-EEF-MBN Document 18869-29 Filed 05/08/15 Page 31 of 55

Page 57

| 1 | 20 | JUST READ FOR THE RECORD.  IT'S TRIAL |
| 2 | 21 | EXHIBIT NO. P1.2025-0001? |
| 3 | 22 | IS THAT YOUR SUPPLEMENTAL |
| 4 | 23 | REPORT? |
| 5 | 24 | A.     YES, IT IS. |
| 6 | | |
| 7 | 1 | Q.     OKAY.  NOW, DR. STREIT, TAKE |
| 8 | 2 | YOUR REPORT FROM DECEMBER PLEASE, AND |
| 9 | 3 | CONSISTENT WITH WHAT WE'VE BEEN DISCUSSING ON |
| 10 | 4 | CORROSION, YOU'VE INCLUDED SOME PHOTOGRAPHS; |
| 11 | 5 | IS THAT CORRECT? |
| 12 | 6 | A.     I HAVE. |
| 13 | | |
| 14 | | |
| 15 | | |
| 16 | 12 | BUT I WANT TO START WITH THE |
| 17 | 13 | PHOTOS ON PAGE -- ACTUALLY, IF YOU LOOK AT |
| 18 | 14 | THE LAST FOUR NUMBERS, YOU SEE WHERE IT'S GOT |
| 19 | 15 | A P NUMBER? |
| 20 | 16 | A.     YES, SIR. |
| 21 | 17 | Q.     IT'S DASH 0050, IF YOU CAN GO |
| 22 | 18 | TO THAT PAGE. |
| 23 | 19 | A.     OKAY. |
| 24 | 20 | Q.     SO ASSUMING THAT WE'LL HAVE |
| 25 | 21 | THIS PAGE UP IN FRONT OF JUDGE FALLON, COULD |

1   22    YOU PLEASE TELL THE JUDGE WHAT IS HERE?

2   23          A.      THIS WAS THE AIR-CONDITIONING

3   24    COIL THAT WAS TAKEN OUT OF THE MCKELLAR HOME

4

5    1    AFTER I HAD VISITED THAT HOME IN NOVEMBER.

6    2          Q.      OKAY.  ALL FOUR OF THESE PHOTOS

7    3    SHOW THAT?

8    4          A.      YES.  ALL -- WELL, NO, ONE,

9    5    TWO, THREE.

10

11

12

13   10         Q.      OKAY.  LET'S START WITH THE

14   11    UPPER LEFT-HAND CORNER, AND PLEASE TELL

15   12    JUDGE FALLON WHAT THAT SHOWS.

16   13         A.      THIS IS A PICTURE OF THE END OF

17   14    THE A/C COIL WHERE THE INSTALLATION DATE WAS

18   15    NOTED AS SEPTEMBER 6TH OF '09.

19   16         Q.      OKAY.

20   17         A.      AND WHAT IT'S SHOWING IS THE

21   18    ENDS OF THE COPPER COILS WHICH WOULD NORMALLY

22   19    BE A COPPER COLOR, MAY NOT NECESSARILY BE

23   20    SHINY, BUT THEY'RE A COPPER COLOR.  AND AS

24   21    YOU CAN SEE, THEY'VE BEEN BLACKENED, AND THEY

25   22    HAVE DEPOSITS ON THEM; AS WELL AS THE UPPER

1   23   RIGHT-HAND ONE, WHICH IS THE EXTENSION OF THE

2   24   COPPER TUBE FROM THE END OF THE

3

4    1   AIR-CONDITIONING COIL.

5    2       Q.     NOW, IS THE UPPER RIGHT-HAND

6    3   PHOTO A GOOD EXAMPLE OF THE BLACKENING THAT

7    4   YOU SAW?

8    5       A.     IT SHOWS UP MUCH BETTER IN THAT

9    6   PHOTOGRAPH THAN IT DOES IN THE PRIOR

10   7   PHOTOGRAPH.

11   8       Q.    OKAY.  AND THEN IF YOU COULD

12   9   TELL US WHAT THE LOWER LEFT-HAND PHOTO

13  10   DEMONSTRATES.

14  11       A.    THAT'S A DOCUMENTATION OF THE

15  12   AREA WHERE I SCRAPED OFF THE BLACK MATERIAL

16  13   AND THEN DID AN SEM/EDS ANALYSIS TO CONFIRM

17  14   THAT, IN FACT -- OR IDENTIFY THAT IT WAS

18  15   COPPER AND SULFUR.

19  16       Q.    OKAY.  AND WHAT IS THE

20  17   SIGNIFICANCE OF FINDING COPPER AND SULFUR ON

21  18   THAT HVAC COIL RIGHT THERE?

22  19       A.    THAT IT'S A COPPER SULFIDE, AND

23  20   SULFIDES FORM FROM EXPOSURE TO SULFIDE GASES.

24  21       Q.    OKAY.  AND THE SULFIDE GASES

25  22   THAT YOU'VE IDENTIFIED IN YOUR TESTING ARE

Case 2:09-md-02047-EEF-MBN Document 18986-29 Filed 05/22/15 Page 34 of 55
Case 2:09-md-02047-EEF-MBN Document 18869-29 Filed 05/08/15 Page 36 of 55

Page 60

1    23    HYDROGEN SULFIDE?

2    24        A.    NOT ONLY MYSELF, BUT THE CPSC

3

4    1    AND MANY OTHERS HAVE IDENTIFIED HYDROGEN

5    2    SULFIDE, CARBONYL SULFIDE AND CARBON

6    3    DISULFIDE.

7

8

9

10   3            NOW, WHAT ARE THE SIGNIFICANCE

11   4    OF THESE THREE COMPOUNDS IN YOUR OPINION WITH

12   5    REGARD TO CORROSION IN THE HOME?

13

14

15

16   8        A.    THEY ARE REDUCED SULFUR GASES,

17   9    MEANING THAT THEY WILL CORRODE METAL AND THEY

18   10   WILL LEAVE AN ODOR AND THEY WILL LEAVE --

19   11   REACT WITH THE METAL IN ORDER TO FORM THE

20   12   METAL SULFIDE.

21   13   BY MR. SEEGER:

22   14       Q.    IS THIS NEW CHEMISTRY YOU'VE

23   15   INVENTED, OR HAS THIS BEEN AROUND?

24   16       A.    IT'S BEEN AROUND FOREVER.

25   17       Q.    OKAY.  NOW, TAKE A LOOK AT THE

| 1 | 18 | PHOTOS ON PAGE 0036 OF YOUR REPORT.  ALL |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | 22 | STARTING FROM THE UPPER LEFT, COULD YOU TELL |
| 6 | 23 | US WHAT THESE SHOW? |
| 7 | 24 | A.     THIS IS AN OUTLET THAT WAS |
| 8 | | |
| 9 | 1 | TAKEN FROM THE HEISCHOBER HOUSE. |
| 10 | 2 | Q.     OKAY. |
| 11 | 3 | A.     HENCE THE INITIALS "SLH." |
| 12 | 4 | Q.     OKAY. |
| 13 | 5 | A.     AND THE CLOSE-UP THAT YOU SEE |
| 14 | 6 | ON THE UPPER RIGHT IS A DIGITAL CAMERA |
| 15 | 7 | PHOTOGRAPH OF THE BLACKENED SURFACE OF THE |
| 16 | 8 | GROUND WIRE THAT IS ATTACHED TO THE OUTLET. |
| 17 | 9 | Q.     OKAY. |
| 18 | 10 | A.     AND THEN THE LOWER RIGHT-HAND |
| 19 | 11 | CORNER IS A 40X MICROSCOPIC IMAGE OF THE |
| 20 | 12 | BLACKENED SURFACE OF THE COPPER WIRE. |
| 21 | 13 | Q.     LET ME JUST CORRECT ONE THING. |
| 22 | 14 | YOU SAID -- THAT'S THE LOWER LEFT-HAND |
| 23 | 15 | CORNER. |
| 24 | 16 | A.     DID I SAY "RIGHT"? |
| 25 | 17 | Q.     YEAH. |

Page 62

1    18        A.        I'M SORRY, THE LOWER LEFT.

2

3

4

5    3         A.        AND THAT IS BASICALLY JUST A

6    4    CLOSE-UP OF THE WIRE, THE GROUND WIRE THAT'S

7    5    SHOWN IN THE UPPER PHOTOGRAPHS.  SO WE'RE

8    6    GOING PROGRESSIVELY FROM AN OVERALL SHOT SO

9    7    YOU CAN SEE WHERE IT CAME FROM, TO A CLOSER

10   8    MACRO SHOT OF JUST THE WIRE, TO THE ACTUAL

11   9    BLACKENED SURFACE TO SHOW YOU WHAT IT LOOKS

12   10   LIKE.

13   11        Q.        OKAY.  AGAIN, JUST LOOKING AT

14   12   THE SURFACE, TELL US THE SIGNIFICANCE OF THIS

15   13   PHOTOGRAPH.  WHAT DOES IT SHOW?

16   14        A.        IT SHOWS BLACK DEPOSITS ON THE

17   15   SURFACE OF THE WIRE, AND WHEN YOU REMOVE

18   16   THEM, THEY ARE CONFIRMED TO BE COPPER

19   17   SULFIDE.

20   18        Q.        OKAY.  IS COPPER SULFIDE

21   19   CORROSIVE?

22

23

24

25   22        A.        IT IS THE -- I'M SORRY.  IT IS

1   23   THE CORROSION BY-PRODUCT OF THE REACTION WITH

2   24   A SULFUR-REDUCING GAS.

3

4   1          Q.     OKAY.  THAT'S WHAT GETS LEFT

5   2   BEHIND?

6   3          A.     YES.  IT'S THE REACTION OF THE

7   4   CORROSION PRODUCT -- OF THE CORROSION WITH

8   5   THE METAL, AND IT FORMS THE CORROSION

9   6   PRODUCT, WHICH IS WHAT YOU SEE ON THE

10  7   SURFACE.

11  8          Q.     CAN YOU GO TO PAGE 0077.  NOW,

12  9   ONE OF THE THINGS YOU HAD MENTIONED EARLIER

13  10  WHEN I ASKED YOU ABOUT YOUR VISUAL

14  11  OBSERVATIONS IS I THINK YOU TALKED ABOUT A

15  12  LAMP CORD?

16  13         A.     YES.  THIS IS A PIECE OF A WIRE

17  14  THAT WAS GOING UP FROM THE LAMP TO THE

18  15  CEILING.

19  16         Q.     OKAY.  SO TELL US AGAIN ON

20  17  THIS, GOING FROM, YOU KNOW, LEFT TO RIGHT,

21  18  DOWN, LEFT TO RIGHT, WHAT YOU HAVE HERE.

22  19         A.     THE LEFT IS JUST THE

23  20  DOCUMENTATION OF THE SAMPLE.  IT'S FROM THE

24  21  MORGAN RESIDENCE --

25  22         Q.     OKAY.

1    23        A.      -- SAMPLE 5.  THIS IS THE

2    24    SECTION THAT I RECEIVED OF THE WIRE.

3

4    1         Q.      TO THE RIGHT OF THAT, ON TOP?

5    2         A.      TO THE RIGHT OF THAT ON THE

6    3    TOP.

7    4             THE LOWER LEFT, WHAT I DID WAS

8    5    I TOOK A RAZOR BLADE, AND I SECTIONED ACROSS

9    6    THE SAMPLE, SO YOU'RE LOOKING AT A

10   7    CROSS-SECTION.  AND YOU CAN SEE WHERE SOME OF

11   8    THE STRANDS OF THE WIRE IN THE LOWER RIGHT

12   9    PORTION ARE ACTUALLY STILL IN, STUCK TO THE

13   10   POLYMER.  THEY DIDN'T COME OUT WITH THE REST

14   11   OF THE WIRE.  AND THEN ON THE INSIDE SURFACE

15   12   OF THE WIRE THAT WAS BOUND SO TIGHTLY THAT

16   13   YOU ACTUALLY GOT THE WIRE IMPRESSIONS, YOU

17   14   SEE BLACK MATERIAL.

18   15             AND THOSE BLACK DEPOSITS WERE

19   16   LATER IDENTIFIED AS COPPER SULFIDE, AND THEN

20   17   THE CORRESPONDING WIRES THAT CAME OUT OF THAT

21   18   WIRE ARE SHOWN ON THE LOWER RIGHT, WHERE YOU

22   19   CAN SEE SOME OF THE BLACK MATERIAL CONTINUES

23   20   TO STICK TO THE SURFACE OF THE COPPER.

24   21        Q.      NOW, THE GROUND WIRE PHOTO WE

25   22   LOOKED AT, THE GROUND WIRE WAS EXPOSED.  IT

| | | |
|---|---|---|
| 1 | 23 | DIDN'T HAVE ANY PLASTIC ON IT OR ANYTHING, |
| 2 | 24 | RIGHT? |
| 3 | | |
| 4 | 1 | A.     THAT IS CORRECT. |
| 5 | 2 | Q.     OKAY.  WHAT IS THE SIGNIFICANCE |
| 6 | 3 | OF THIS -- OF THESE PHOTOS? |
| 7 | 4 | A.     THIS IS SIGNIFICANT BECAUSE THE |
| 8 | 5 | CORROSIVE GASES HAVE ACTUALLY PENETRATED |
| 9 | 6 | THROUGH THE PLASTIC. |
| 10 | 7 | Q.     OKAY.  AND THEN IF YOU COULD |
| 11 | 8 | ALSO GO TO PAGE 0083, DR. STREIT, AND COULD |
| 12 | 9 | YOU PLEASE EXPLAIN TO US THE SIGNIFICANCE OF |
| 13 | 10 | THESE FOUR PHOTOS? |
| 14 | | |
| 15 | | |
| 16 | | |
| 17 | 22 | IT IS LABELED "RECEPTACLE END" |
| 18 | 23 | BECAUSE THIS PORTION OF THE WIRE WAS RELATED |
| 19 | 24 | TO A RECEPTACLE WHICH WAS FURTHER OVER ON THE |
| 20 | | |
| 21 | 1 | WALL, SO THAT WAS THE ONLY WAY THEY COULD |
| 22 | 2 | DESCRIBE IT. |
| 23 | 3 | Q.     JUST FOR THE RECORD, YOU DIDN'T |
| 24 | 4 | HARVEST THESE YOURSELF? |
| 25 | 5 | A.     I DID NOT HARVEST THEM.  MY |

Page 66

```
 1    6      UNDERSTANDING WAS THAT THIS WAS TAKEN FROM

 2    7      INSIDE THE WALL BUT NOT AT THE RECEPTACLE.

 3

 4

 5

 6    7          Q.    OKAY.  JUST, AGAIN, ASSUMING

 7    8      THAT JUDGE FALLON IS TRYING TO FOLLOW ALONG,

 8    9      TELL US WHAT PHOTO YOU'RE LOOKING AT.

 9   10          A.    I'M SORRY.  I'M LOOKING AT THE

10   11      UPPER RIGHT-HAND PHOTO, WHICH IS PHOTO 13.

11   12          Q.    WHAT DOES THAT SHOW?

12   13          A.    THAT'S THE ACTUAL PIECE OF THE

13   14      ROMEX THAT CAME OUT.

14   15                AND THEN IF YOU LOOK AT

15   16      PHOTO 16, WHICH IS IN THE LOWER LEFT, THOSE

16   17      ARE THE THREE COMPONENTS THAT ARE WITHIN THE

17   18      ROMEX.  SO IF YOU REMOVE THE OUTER JACKET OF

18   19      THE ROMEX, YOU GET A WHITE WIRE, A BLACK

19   20      WIRE, AND THE GROUND WIRE.

20   21          Q.    OKAY.

21   22          A.    I THEN STRIPPED OUT THE END OF

22   23      THE INSULATION, SO I COULD LOOK AT THE METAL

23   24      UNDERNEATH, AND OBVIOUSLY THE GROUND WIRE WAS

24

25    1      COVERED WITH PAPER, WHICH IS SHOWN IN
```

| | | |
|---|---|---|
| 1 | 2 | PHOTO 15.  THEY'VE GOT BACKWARDS ON THIS |
| 2 | 3 | SCHEME OF THINGS. |
| 3 | 4 | Q.    OKAY. |
| 4 | 5 | A.    AND THEN I LOOKED AT THE |
| 5 | 6 | SURFACES UNDER EXAMINATION, AND -- |
| 6 | 7 | Q.    SO NOW WE'RE BACK TO PAGE 0083? |
| 7 | 8 | A.    RIGHT.  AND THE ACTUAL WIRE |
| 8 | 9 | THAT -- THE ONLY ONE THAT ACTUALLY SHOWED |
| 9 | 10 | BLACKENING IS THE GROUND WIRE, SO YOU SEE THE |
| 10 | 11 | WIRE IN PHOTOGRAPH 1352, AND THEN YOU SEE IT |
| 11 | 12 | UP CLOSE IN PHOTOGRAPH 1353. |
| 12 | 13 | Q.    SO 1352 IS THE UPPER LEFT, AND |
| 13 | 14 | THEN THE UPPER RIGHT? |
| 14 | 15 | A.    AND THEN CLOSER UP, IT'S AT 40X |
| 15 | 16 | MAGNIFICATION, YOU CAN SEE THE BLACK DEPOSITS |
| 16 | 17 | ON THE SURFACE WHICH WERE LATER CONFIRMED BY |
| 17 | 18 | SEM/EDS TO BE COPPER SULFIDE. |
| 18 | 19 | Q.    OKAY.  NOW, DID YOU DO ANY |
| 19 | 20 | TESTING OF THE WIRE COATINGS IN BOTH THE LAMP |
| 20 | 21 | CORD AND THE ROMEX CORD? |
| 21 | 22 | A.    THE TESTING THAT I DID WAS TO |
| 22 | 23 | SEE WHETHER THE POLYMERS THEMSELVES |
| 23 | 24 | INCORPORATED SULFUR IN THEIR STRUCTURE.  SO |
| 24 | | |
| 25 | 1 | IF THERE WAS BULK SULFUR IN THE POLYMER, I |

|   |   |                                                          |
|---|---|----------------------------------------------------------|
| 1 | 2 | WAS LOOKING FOR THAT.                                    |
| 2 | 3 | Q.    OKAY.  AND WHAT DID YOU FIND?                       |
| 3 | 4 | A.    I DIDN'T SEE ANY SULFUR                             |
| 4 | 5 | INCORPORATED WITHIN THE PLASTIC ITSELF TO                |
| 5 | 6 | INDICATE TO ME THAT IT WAS A SULFONATED                  |
| 6 | 7 | POLYMER, SO MY CONCLUSION FROM THAT IS THAT              |
| 7 | 8 | THE SULFUR HAD TO COME FROM OUTSIDE IN.                  |
| 8 | 9 | Q.    OKAY.  SO WAS IT YOUR                               |
| 9 | 10 | CONCLUSION THAT IT ACTUALLY PERMEATED THROUGH           |
| 10 | 11 | THE OUTER COATING?                                      |
| 11 | 12 | A.    IT PERMEATES THROUGH AND                          |
| 12 | 13 | ATTACKS THE COPPER METAL UNDERNEATH.                    |
| 13 | 14 | Q.    OKAY.  NOW, DID YOU DO ANY OF                     |
| 14 | 15 | THIS TYPE OF TESTING -- WELL, LET ME ASK IT             |
| 15 | 16 | TO YOU THIS WAY.                                        |
| 16 | 17 | WHAT DID YOU DO IN THE CONTROL                          |
| 17 | 18 | HOMES WITH REGARD TO CORROSION?  DID YOU                |
| 18 | 19 | OBSERVE ANY?                                            |
| 19 | 20 | A.    IN THE CONTROL HOME, THERE WERE                   |
| 20 | 21 | SAMPLES OF WIRING HARVESTED.  I RECALL A                |
| 21 | 22 | SWITCH SPECIFICALLY AND THE GROUND WIRE; AND            |
| 22 | 23 | I DID EXAMINE THAT, AND I DIDN'T FIND ANY               |
| 23 | 24 | BLACK DEPOSITS ON THE SURFACE.                          |
| 24 |   |                                                          |
| 25 | 1 | Q.    DR. STREIT, DO YOU HAVE AN                         |

```
1    2    OPINION AS TO WHETHER THE HOMES, THE GERMANO

2    3    HOMES, THAT YOU VISITED AND DID TESTING IN

3    4    WITH CHINESE DRYWALL ARE A CORROSIVE

4    5    ENVIRONMENT FOR WIRES AND HVAC COILS?

5

6

7

8    8         A.    I THINK THAT IT'S BEEN CLEARLY

9    9    SHOWN THAT SULFUR GASES COME OUT OF THE

10   10   DRYWALL THAT'S INCORPORATED IN THE GERMANO

11   11   HOMES.   THERE'S SULFIDE GASES.   THE DEPOSITS

12   12   ON THE SURFACE ARE COPPER SULFIDE, WHICH

13   13   WOULD BE THE RESULT OF INTERACTION WITH

14   14   SULFIDE-CONTAINING GASES, AND, YOU KNOW,

15   15   THOSE ARE CLEARLY CORROSION DEPOSITS WHICH

16   16   HAVE BEEN OBSERVED ON WIRES AND APPLIANCES

17   17   AND THE A/C, HVAC COILS IN THOSE HOMES.

18   18   BY MR. SEEGER:

19   19        Q.    OKAY.  IS THAT -- YOUR

20   20   CONCLUSION THERE, IS THAT CONSISTENT WITH

21   21   WHAT YOU'VE SEEN PUBLISHED BY THE CPSC AND

22   22   THE FLORIDA DEPARTMENT OF HEALTH?

23   23        A.    I THINK, YES, THE CPSC, THE

24   24   FLORIDA DEPARTMENT OF HEALTH AND OTHER

25
```

```
 1    1    INVESTIGATORS FOR VARIOUS AGENCIES OR

 2    2    VARIOUS -- HIRED BY VARIOUS PEOPLE, WHETHER

 3    3    IT BE OTHER ENVIRONMENTAL FIRMS OR, YOU KNOW,

 4    4    WHOMEVER.

 5    5           THE DATA IS VERY CONSISTENT,

 6    6    THAT SULFUR GASES ARE BEING EMITTED BY THE

 7    7    CHINESE DRYWALL, AND THE CORROSION THAT'S ON

 8    8    THE SURFACE OF THE METALS IS COPPER SULFIDE

 9    9    WHICH RESULTS FROM THE INTERACTION WITH THOSE

10   10    SULFUR GASES.

11   11        Q.    AND IS THAT FINDING CONSISTENT

12   12    WITH THE PRESENTATION MADE BY ROBERT DEMOTT

13   13    FROM ENVIRON AT THE TAMPA CONFERENCE?

14

15

16

17   16        A.    I BELIEVE IT IS.  AS I'M GOING

18   17    THROUGH IT, HE TALKS ABOUT THE DIFFERENCES

19   18    BETWEEN REDUCED SULFUR GASES AND OTHER TYPES

20   19    OF OXIDE WHICH WE DON'T SEE ON THESE SAMPLES.

21   20    THESE ARE CAUSED BY REDUCED SULFUR GASES AS

22   21    EVIDENCED BY MY REPORT, THE CPSC, YOU KNOW,

23   22    HIS FINDINGS AND MANY OTHERS.

24   23        Q.    IS IT POSSIBLE FOR YOU TO SAY,

25   24    SITTING HERE NOW, WHICH OF THESE SULFUR GASES
```

1

2     1     IS CAUSING THE CORROSION OR IF IT'S A

3     2     COMBINATION OF THE SULFUR GASES?

4     3          A.    I REALLY DON'T THINK THAT

5     4     ANYONE KNOWS EXACTLY WHICH ONE SPECIFICALLY

6     5     IS RESPONSIBLE FOR THE CORROSION OR WHETHER

7     6     IT'S A MIXTURE OF ALL THREE.

8     7          I THINK THAT AT THIS POINT

9     8     EVERYONE IS CONVINCED THAT THOSE ARE -- THE

10    9     THREE GASES THAT I'VE ALREADY MENTIONED ARE

11   10     THE MAIN PLAYERS.  BUT, YOU KNOW, THIS IS

12   11     ONGOING, AND IT'S STILL BEING INVESTIGATED,

13   12     AND I HAVEN'T SEEN ANYONE WHO'S COME OUT AND

14   13     GIVEN A DEFINITIVE YES, IT'S THIS.  AND I'M

15   14     IN THAT BALLPARK AS WELL.  WE'RE STILL

16   15     LOOKING AT THE PROBLEM TO TRY TO ISOLATE, IF

17   16     WE CAN ISOLATE, WHICH ONE IT IS, OR IF IT

18   17     ISN'T, MAYBE IT IS A COMBINATION.

19   18          MR. SEEGER:  YOU KNOW, LET ME

20   19       MARK ANOTHER EXHIBIT JUST FOR THE NEXT

21   20       COUPLE OF QUESTIONS WE HAVE, THE DATA.

22

23

24

25    5          Q.    OKAY.  DR. STREIT, WE'VE JUST

1    6    MARKED FOR THE RECORD AS STREIT-11.  IT HAS

2    7    THE TRIAL STAMP P1.1849-0001.  AND NOT -- YOU

3    8    DON'T HAVE TO GO INTO SPECIFICS, BUT CAN YOU

4    9    GENERALLY DESCRIBE WHAT WE'VE JUST MARKED AS

5    10   STREIT-11?

6    11        A.     THESE ARE SAMPLES THAT WERE

7    12   RECEIVED ON JANUARY 20TH.  THEY ARE SAMPLES

8    13   FROM THE ORLANDO HOME OF PIECES OF DRYWALL

9    14   THAT WERE SUBSEQUENTLY ANALYZED.

10   15        Q.     RIGHT.  AND I NEED TO MAKE ONE

11   16   CORRECTION.  FOR THE RECORD, STREIT-11

12   17   CONSISTS OF SEVERAL TRIAL EXHIBITS.  THE

13   18   FIRST ONE IS P1.1849-0001 AND P1.1850-0001 --

14

15

16

17   20   SYSTEM -- AND P1.1851-0001.

18

19

20

21   4    HAVE IN FRONT OF YOU, IS WHAT DID YOU

22   5    DISCOVER IN THE GERMANO HOMES IN REGARD TO

23   6    THE STRONTIUM LEVELS?

24   7        A.     WELL, THE STRONTIUM LEVELS IN

25   8    THE GERMANO HOMES AS EVIDENCED BY NOT ONLY

1    9    THE EXHIBIT 1849, BUT ALSO INCORPORATED IN

2    10   OTHER DATA, SHOW THAT THE GERMANO SAMPLES

3    11   TEND TO BE PRETTY HIGH IN THE STRONTIUM.

4    12   THEY'RE IN EITHER THE UPPER 2,000S OR IN THE

5    13   3,000S PART PER MILLION, MILLIGRAMS PER

6    14   KILOGRAM OF STRONTIUM.  SO THEY'RE ON THE

7    15   HIGHER SIDE OF WHAT IS GENERALLY ACCEPTED AS

8    16   BEING THE LEVELS IN CHINESE-PRODUCED BOARD.

9

10

11

12   20            DO YOU HAVE AN OPINION AS TO

13   21   WHETHER THE OFF-GASSING ACCELERATES WITH THE

14   22   INCREASE IN HEAT AND HUMIDITY?

15   23        A.    I THINK THAT IT'S BEEN SHOWN

16   24   THAT IT ACCELERATES AND DIFFERENT GASES TEND

17

18   1    TO COME OUT WHEN IT'S HUMIDIFIED, WHEREAS IN

19   2    A LESS HUMIDIFIED SITUATION YOU TEND TO GET

20   3    MORE OF THE HYDROGEN SULFIDE.  IN THE

21   4    HUMIDITY STUDIES, AT LEAST IN THE CONTROLLED

22   5    ENVIRONMENTS, YOU TEND TO GET MORE OF THE

23   6    OTHER TWO BECAUSE THE HYDROGEN SULFIDE IS

24   7    READILY ABSORBED BY WATER.

25   8            SO WHAT WILL HAPPEN IS THE

9    HYDROGEN SULFIDE WILL ABSORB IN THE WATER AND

10   FORM AN ACIDIC ENVIRONMENT, AND THAT'S

11   ULTIMATELY WHAT'S CAUSING MUCH OF THE

12   CORROSION OR RELATED TO THE CORROSION,

13   SPECIFICALLY ON THE HVAC COILS WHICH ARE

14   MOIST ALL THE TIME.  THAT'S WHY YOU'RE

15   GETTING SIX FAILURES IN THREE YEARS.  IT'S

16   BECAUSE OF THE ACCUMULATION OF THE SULFIDE

17   GASES DISSOLVED IN THE WATER.

18        Q.    NOW, LET'S JUST PAUSE ON THAT

19   WITH REGARD TO HVAC COILS.

20             HAVE YOU SEEN COIL FAILURES IN

21   SHORTENED PERIODS OF TIME BECAUSE OF

22   CORROSION?

23        A.    I HAVE, YES.

24        Q.    AND WHAT IS A NORMAL LIFE OF,

1    LET'S SAY, AN HVAC COIL?

2         A.    ACCORDING TO THE MANUFACTURERS,

3    WHICH MANY OF WHICH ARE MY CLIENTS AND I'VE

4    LOOKED AT THEIR FAILED COILS AS WELL, WE'VE

5    HAD THAT DISCUSSION, BECAUSE I THOUGHT IT WAS

6    ODD THAT YOU'D GET THAT MANY FAILURES.  I'VE

7    NEVER SEEN THAT KIND OF FAILURE RATE.

8              AND WHAT THEIR TECHNICAL PEOPLE

|    |    |                                                      |
|----|----|------------------------------------------------------|
| 1  | 9  | HAVE REPORTED TO ME IS THAT THE TYPICAL LIFE         |
| 2  | 10 | WOULD BE ANYWHERE FROM 10 TO 20 YEARS, YOU           |
| 3  | 11 | KNOW, 20 BEING ON THE EXTREME SIDE IF YOU            |
| 4  | 12 | WERE WONDERFUL HOMEOWNER AND YOU DID ALL OF          |
| 5  | 13 | YOUR MAINTENANCE ON A REGULAR SCHEDULE, WHICH        |
| 6  | 14 | IN REALITY PROBABLY DOESN'T HAPPEN VERY MUCH,        |
| 7  | 15 | AND TEN YEARS ON THE OTHER SIDE, WHERE YOU           |
| 8  | 16 | MAY HAVE SOME OTHER FACTORS THAT ARE                 |
| 9  | 17 | POTENTIALLY CAUSING A PROBLEM LIKE EXPOSURE          |
| 10 | 18 | TO CHEMICALS, YOU KNOW, SEAWATERS,                   |
| 11 | 19 | FERTILIZERS AND THINGS LIKE THAT --                  |
| 12 | 20 | Q.    AND WHAT --                                    |
| 13 | 21 | A.    -- BUT TYPICALLY TEN YEARS IS                  |
| 14 | 22 | THE SHORTEST.                                        |
| 15 | 23 | Q.    WHAT HAVE YOU SEEN IN HOMES                    |
| 16 | 24 | WITH CHINESE DRYWALL?                                |
| 17 |    |                                                      |
| 18 | 1  | A.    YOU KNOW, MANY OF THESE HOMES                  |
| 19 | 2  | HAVE MULTIPLE FAILURES.  THE MCKELLAR HOME           |
| 20 | 3  | THAT YOU WERE LOOKING AT, THAT                       |
| 21 | 4  | AIR-CONDITIONING COIL HAD ONLY BEEN IN FOR           |
| 22 | 5  | TWO MONTHS, AND IT WAS ALREADY BLACK.                |
| 23 | 6  | AND I THINK THERE WAS ONE                            |
| 24 | 7  | HOME -- AND, EXCUSE ME, I DON'T REMEMBER THE         |
| 25 | 8  | HOMEOWNER'S NAME -- BUT SIX COILS IN THREE           |

Page 76

```
 1    9      YEARS.  THAT'S OUTRAGEOUS.  THAT'S AN

 2   10      UNBELIEVABLY FAST FAILURE RATE.

 3   11          Q.      HAD YOU EVER SEEN ANYTHING LIKE

 4   12      THAT?

 5   13          A.      NO, I HAVE NOT.

 6

 7

 8

 9   23          Q.      NOW, DO YOU HAVE AN OPINION TO

10   24      A REASONABLE DEGREE OF SCIENTIFIC CERTAINTY

11

12    1      AS TO WHETHER THAT OFF-GASSING CAUSING THE

13    2      CORROSION IS COMING FROM CHINESE DRYWALL?

14    3          A.      WELL, I DON'T THINK THERE'S ANY

15    4      DOUBT THAT THE DRYWALL IS RELEASING CORROSIVE

16    5      GASES AND THOSE GASES ARE ATTACKING THE METAL

17    6      AND FORMING CORROSION PRODUCTS.  THAT'S VERY

18    7      CLEAR.

19

20

21

22   11          Q.      DR. STREIT, THE OPINIONS THAT

23   12      YOU'VE EXPRESSED HERE IN THIS EXAMINATION, DO

24   13      YOU HOLD THEM TO A REASONABLE DEGREE OF

25   14      SCIENTIFIC CERTAINTY?
```

```
1   15        A.    I DO.

2   16        Q.    ALL OF THE OPINIONS YOU'VE

3   17   EXPRESSED IN THIS CASE?

4   18        A.    YES, SIR.

5        (WHEREUPON, THE VIDEO DEPOSITION WAS CONCLUDED.)

6

7             MR. ECUYER:  THE ONLY HOUSEKEEPING, I DIDN'T WANT TO

8   INTERRUPT THE VIDEO, BUT WE WOULD LIKE TO OFFER DR. STREIT,

9   OBVIOUSLY, AN EXPERT IN CHEMISTRY AND METAL FAILURE ANALYSIS.

10            THE COURT:  YES, OKAY.  THE COURT WILL ACCEPT HER, AND WE

11  WILL TAKE A 15-MINUTE BREAK AT THIS TIME.

12            THE DEPUTY CLERK:  EVERYONE RISE.

13       (WHEREUPON, A RECESS WAS TAKEN.)

14            THE COURT:  BE SEATED, PLEASE.  CALL YOUR NEXT WITNESS.

15            MR. ECUYER:  YOUR HONOR, JUST ONE BIT OF HOUSEKEEPING

16  AGAIN --

17            MR. SEEGER:  I'M SORRY, I MISSPOKE.  WHEN I OFFERED

18  DR. STREIT AS A CHEMISTRY, I SAID METALS, I SHOULD HAVE SAID

19  MATERIALS FAILURE ANALYSIS EXPERT, JUST FOR THE RECORD.  THANK YOU.

20            MR. ECUYER:  YOUR HONOR, ONE MATTER.  IN REVIEWING OUR

21  LIST, WE WOULD ALSO LIKE TO STRIKE PREVIOUSLY-ADMITTED EXHIBITS

22  P1.1889 AND P1.1890, AND IN MY EXCITEMENT THIS MORNING I MISSPOKE.

23  THE ONE WE ADDED THIS MORNING WAS P3.0636, YOUR HONOR, NOT 26.

24  THANK YOU.

25            THE DEPUTY CLERK:  P3 WHAT?
```



March 02, 2010

· INDUSTRIAL

· COMMERCIAL

· RESIDENTIAL

Mr. Kerry J. Miller and Mr. Paul C. Thibodeaux
Frilot L.L.C.
1100 Poydras St.
Suite 3700
New Orleans, LA 70163

RE:   *Hernandez Residence*
      *63048 Marion Road*
      *Mandeville, Louisiana, 70471*

Dear Mr. Miller and Mr. Thibodeaux:

In accordance with your request, we completed specific engineering, construction and general contractor services for the above captioned legal matter. My CV is attached to this report as Ex. F, and I charge $375/hour for trial and deposition testimony and $250/hour for all other services. A list of my deposition and trial testimony in the last four years is attached as Ex. G.

As part of our services, we performed the following tasks.

- Field determination of residence area by me and a team of experienced tradesman with whom I have worked in the past and who are well qualified and experienced in their trade or specialty.

- Translation of field data to electronic media for construction estimating purposes.

- Visual inspection/assessment of existing residence.

- Development of renovation cost estimate (per attached Exhibit B) with the assistance of experienced and qualified plumbing, HVAC and electrical subcontractors.

- Review of documents, including Expert Report of Matthew Perricone, dated March 2, 2010, Expert Report of Craig Beyler dated March 2, 2010.

**3621 Ridgelake Drive · Suite 204 · Metairie, LA 70002**
**Phone: 504.888.1490 · Fax: 504.888.1491 · www.carubbaengineering.com**



- Discussed scope of repair with Bruce Fusilier, Mark Hartenstein, Ray Canzoneri, and Matthew Perricone.

- Partial renovation effort on separate residence with KPT drywall (employing selected elements of protocol). Renovation included selected sampling of electrical cable and mechanical plumbing. Testing shall be performed by others and returned to your office under our direct supervision.

- Review costs of repair and discussion regarding costs of repairs with Alex Locay, Benchmark Custom Builders, another experienced general contractor who has experience in repairing Chinese drywall. houses in Florida and who reviewed my scope of work and assumptions and further validated those amounts based upon his experiences and accepted pricing guidelines and provided me with a comparable cost estimate. (Cost Estimate attached as Ex. B.)

We completed our scope of work and have the following observations and conclusions.

- Wallboard may be removed with a minimum amount of dust being made airborne by using normal and customary construction means and methods.

- Electrical wiring is tarnished at the exposed areas only. The sheathed wiring is acceptable in its present state. (See attached Exhibit D.)

- Plumbing fixture tarnish is surface discoloration only and can remain in place. As a courtesy to the homeowner, exposed copper can be cleaned by hand also using normal construction means and methods.

- Once demolition is complete, normal means and methods for disposing of dust (vacuum) and cleaning of wooden framing (water and chlorine solution) can be used successfully.

- Doors and cabinetry can be stored in the garage where a dehumidifier will be employed. Other elements such as electrical fixtures, plumbing fixtures, mirrors, etc. can also be stored in the garage.

- Brittle flooring and wooden flooring can be left in place. Carpet will be replaced.

- Granite countertops will be replaced given the possibility of damage in their removal.
- In my opinion, it would not be cost effective to preserve base, crown and door moldings in the Hernandez house given the quality of the trim and molding found in the house.

In the normal course of acting as a general contractor on this project, I have retained electrical and plumbing subcontractors to assist me in outlining the scope of work and cost of repairs for the Hernandez home. As I would in a typical renovation project, I am relying upon their expertise in their respective fields. The plumbing and HVAC subcontractor is Bruce Fusilier, and the electrical contractor is Mark Hartenstein of Graci Hart Electric. Both are experienced and well-respected in the New Orleans area in their respective fields.

Attached as Exhibit A is the protocol for the renovation of the above captioned single family residence.

Attached as Exhibit B is a cost estimate for the renovation work to be performed.

Attached as Exhibits C and D are individual observations of my retained plumbing and electrical subcontractors.

Attached as Exhibit E are photos depicting areas of the Hernandez home containing defects in materials and/or workmanship unrelated to KPT drywall. While our renovation will correct these defects, our cost estimate does not account for these upgrades to the Hernandez house.

I have estimated that it will take no more than sixty days to complete the renovation of this house.

In conclusion, our inspection, evaluation and analysis establishes to a reasonable degree of certainty in my field that the residence can be restored without removing such essential components as electrical, plumbing, and certain HVAC equipment. Also several finishes can be saved such as cabinetry, wooden flooring and ceramic tile leaving only the insulation, drywall, moldings, casings, and granite countertops to be replaced. Those components being replaced are based on a cost benefit analysis.

Thank you for the opportunity to provide this information to you. We reserve the right to amend and/or supplement this report as more information becomes available.

Sincerely,
Carubba Engineering, Inc.

Roy M. Carubba, PE

w/attachments



**Exhibit A**
**Repair Protocol for Hernandez Home**

The protocol is intended to detail steps that can be taken to identify and repair or replace affected drywall and damaged components in the Hernandez home in Mandeville, Louisiana, and to eliminate the potential for recurring damage. This protocol is based upon removal and replacement of wallboard and damaged components in the homes.

*Documentation of Interior Finishes and Conditions*

Document by handheld video or photos finishes and conditions in the home prior to resident move out including:

- Wall and door type (casing type).
- Trim (base and crown where applicable).
- Flooring (type and quantity).
- Light fixtures (type and quantity).
- Kitchen and bathroom fixtures and appliances.
- Counters and cabinets.
- Pre-existing damage to finishes and conditions in home.

*Pre Demolition Activities*

Subsequent to resident move-out, the following steps should be taken:

- Remove switch and receptacle cover plates, pull components out of boxes.
- Open cover to expose air handling unit(s).
- Document the type of board (e.g. green board to tile backer board) in each room and approximate amounts/proportions.
- Ensure that circuit breakers for inside wiring remain off.

*Removal of Certain Components*

Certain electrical, plumbing and HVAC components will be removed as a matter of course during renovation because of impracticality, cost-effectiveness to repair, clean or store and salvage the components. The process with respect to these components will include the following steps:

- Drain refrigerant from evaporator coils (completed by HVAC technician).

- Disconnect and remove evaporator coil(s) (completed by HVAC technician).
- Remove flexible duct.
- Disconnect water supply.
- Remove switches, outlets and safety devices such as smoke detectors.

*Demolition*

Following procurement of the relevant permits, demolition crew should start by:

- Remove carpet and turn backing up to cover tile flooring and wood flooring that is to be protected and left in place.
- Protect/remove and store, as necessary, cabinets, counters and doors. When granite countertops are installed, countertops, more probably than not will need to be replaced due to damage sustained during the removal and demolition process to the granite.
- Protect/remove and store, as necessary, sinks and plumbing fixtures.
- Remove any remaining light fixtures and ceiling fans as necessary and store.
- Remove insulation and HVAC non-metal ducting.
- Remove toilets as necessary and store.
- Remove low-voltage fixtures and store.
- Remove drywall from ceilings.
- Remove drywall and trim from walls.

*Cleaning and Confirmation of Gypsum Dust Removal*

Following demolition, a cleaning crew will:

- Remove any residual fragments of gypsum.
- Vacuum house with vacuum cleaners equipped with drywall bags.
- Clean wooden framing, floors and other exposed items with liquid solution immediately following vacuum operation.

*Cleaning/Replacement of Remaining Damaged Components*

- Replace fixtures damaged during drywall removal.
- To the extent requested by homeowner, clean exposed copper plumbing that is to remain in home by common means and methods, e.g., damp cloth, Scotch-Brite pad.
- Install new receptacles and switches. Clip ends of wires as necessary.
- Inspect and remake terminations in electrical panel(s) as necessary. (to be performed by electrician).

*Rebuilding*

After receiving relevant building inspections and confirmation to close up the walls, the following rebuilding steps will be taken:

- Standard building protocol and process will be followed for replacement of drywall, finishes and fixtures.

*Post-Repair Finalization*

Upon completion of the repairs and corresponding inspections, Contractor will prepare a letter specifying that the repair protocol has been implemented and completed and that no Chinese wallboard remains in the house.

# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * | MDL Docket No. 2047 SECTION L |
| | * * | JUDGE FALLON |
| THIS APPLIES TO: *Hernandez (09-6050)* | * * * * | MAG. JUDGE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that Defendant, Knauf Plasterboard (Tianjin) Co., Ltd., appearing through undersigned counsel, will bring the foregoing Motion in *Limine* (No. 4) To Exclude Dr. Lori Streit's Testimony Because It Relates Solely To Liability And Is Cumulative for hearing before the Honorable Eldon E. Fallon, Section "E," of the United States District Court, Eastern District of Louisiana, located at 500 Poydras Street, New Orleans, Louisiana on the 15th day of March, 2010 beginning at 9:00 o'clock, a.m. or as soon thereafter as counsel can be heard.

Respectfully submitted,

BY: _s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * | MDL Docket No. 2047 |
| | * | SECTION L |
| | * | |
| | * | JUDGE FALLON |
| THIS APPLIES TO: *Hernandez (09-6050)* | * | MAG. JUDGE WILKINSON |
| | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## DEFENDANT, KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S
## *DAUBERT* MOTION TO EXCLUDE TESTIMONY OF KENNETH ACKS

NOW COMES Defendant, Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT"), who moves this Honorable Court for an Order granting KPT's *Daubert* Motion to Exclude Testimony of Kenneth Acks on the grounds more fully set forth in the supporting Memorandum attached hereto.

Respectfully submitted,


BY: s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (Fla. Bar No. 0097136)
BAKER & McKENZIE LLP
MELLON Financial Center
1111 Brickell Avenue Suite 1700
Miami, FL 33131
Telephone:     (305) 789-8966
Facsimile:     (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:     (312) 861-8075
Facsimile:     (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| In re: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | * * * * * * * * * * | MDL Docket No. 2047 SECTION L JUDGE FALLON MAG. JUDGE WILKINSON |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

**THIS DOCUMENT RELATES TO:** *Hernandez v. Knauf Plasterboard (Tianjin) Co. Ltd. et al.*, Case No. 09-6050 (E.D. La.)

---

### KNAUF PLASTERBOARD (TIANJIN) CO. LTD.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO EXCLUDE THE REPORT AND TESTIMONY OF KENNETH ACKS

---

### I.    INTRODUCTION.

Defendant Knauf Plasterboard (Tianjin) Co. Ltd. ("KPT") submits this memorandum of law in support of its motion to exclude the report and testimony of Kenneth Acks. The PSC offers the opinions of Kenneth Acks ("Acks") regarding the alleged impact of Chinese drywall on the value of the Hernandez house.[1] Acks opines that his "preliminary estimate of diminution in property value" arising from the presence of Chinese drywall in the Hernandez house, as of March 19, 2009, would likely range from 10% to 40% with a most likely value of approximately 25%. (*See* Acks Report at P4.0010-0005, attached as Exhibit A). To reach this conclusion, Acks claims to engage

---

[1] The deposition of Acks in the *Hernandez* trial has not commenced. KPT will supplement this memorandum with citations and additional argument to the Acks deposition transcript, as necessary.

in an appraisal of the Hernandez property. (*Id.* at P4.0010-0010.) The core of Acks'

conclusion is the value of "stigma damages" and their impact on appraising the property,

which he improperly calculated by melding together five methods that he claims are

advocated by leaders in the field of appraisal of contaminated properties. (*Id.* at P4.0010-

0012.)

Acks' appraisal opinions should be excluded under *Daubert* for three fundamental

reasons: (1) Acks is not a licensed appraiser in Louisiana, or any other state, and as such,

he is not qualified to provide an opinion that appraises the value of the Hernandez

property; (2) even if this Court determines that Acks is qualified to give such an appraisal

opinion, Acks' report and testimony is unreliable because only the first of the five

methods utilized by Acks to determine the impact of Chinese drywall on the appraised

value of the Hernandez property has been professionally accepted by the appraisal

profession; and (3) his primary means for calculating stigma value—contingent

valuation—is not only unaccepted by the appraisal profession, but it also generates

hypothetical, speculative, and inaccurate estimates of damages.

Each of these deficiencies is more fully addressed in the Appraisal Review Report

prepared by Mr. Richard Roddewig of Clarion Associates, Inc. (*See* Appraisal Review

Report, R. Roddewig, attached as Exhibit B.) The Appraisal Review Report, a generally

accepted method of reviewing Appraisal Reports, was prepared by Roddewig pursuant to

the Uniform Standards of Professional Appraisal Practice ("USPAP") published by The

Appraisal Standards Board of The Appraisal Foundation, and the Supplemental Standards

of Professional Practice of the Appraisal Institute. (*See* Ex. B at 2.) The Appraisal

Review Report examines in great detail the accuracy, reliability, and appropriateness of

2

the information and methodology used, and damages conclusions reached, in the Acks report. (*Id.*) This analysis is directly relevant to the reliability of the report under *Daubert*, and although the extensive review conducted by Clarion Associates is not replicated in its entirely in this motion, it is fully incorporated herein.

## II.    APPLICABLE LAW.

Pursuant to Fed. R. Evid. 702, an expert must be qualified by knowledge, skill, experience, training, or education to provide scientific, technical or other specialized knowledge in a trial. Fed. R. Evid. 702. If an expert is sufficiently qualified, this Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid" before admitting expert testimony under FRD 702. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592-93 (1993); *Seaman v. Seacor Marine, L.L.C.*, 326 Fed. Appx. 721, 724 (5th Cir. 2009) ("charge[s] trial judges with the responsibility of acting as gatekeepers to exclude unreliable testimony"). As this Court noted in *Germano*, "scientific testimony is reliable only if 'the reasoning or methodology underlying the testimony is scientifically valid,' meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known." *Germano, et al. v. Taishan Gypsum Co. Ltd., et al.*, No. 09-6687, Order & Reasons of 02/17/10, at 4 (E.D. La. 2010) (citing *Daubert* at 592-93). In determining scientific reliability of expert testimony, this Court may consider whether the expert's theory: (1) is generally accepted; (2) is capable of, or has been tested; (3) has a known or potential rate of error; and (4) has been subjected to peer review. *Id.* (citing *Daubert*, 509 U.S. at 593-95).

As this Court further noted in *Germano*, the party seeking to introduce the expert

testimony bears the burden of proving by a preponderance of the evidence "*that the methodology used by the expert was proper.*" *Id.* at 5 (citing *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 275-76 (5th Cir. 1998) (emphasis added). In assessing the reasoning or methodology underlying the scientific expert's testimony, this Court "need not take the expert's word for it." *Id.* at 5 (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997). Rather, "when expert testimony is demonstrated to be speculative and lacking in scientific validity, trial courts are encouraged to exclude it." *Id.* at 5-6 (citing *Moore*, 151 F.3d at 279). The Fifth Circuit has confirmed that "non-scientific" testimony, such as real property valuations, are subject to the strictures of *Daubert*. *Hidden Oaks v. The City of Austin*, 138 F. 3d 1036 (5th Cir. 1998); *Hebbler v. Turner*, 2004 U.S. Dist. LEXIS 3258 (E.D. La. March 1, 2004) (Despite *Daubert* being a "flexible test...enabling trial courts to succeed as "gatekeepers" in both scientific and non-scientific expert determinations," court excluded property valuation expert under *Daubert* because of unreliable methodology.)

As set forth more fully herein, Acks' opinions fail the strictures of *Daubert* and should be excluded.

## III. ARGUMENT.

### A. Acks Is Not Licensed In Louisiana To Conduct A Real Property Appraisal.

The Acks report is an appraisal for which either a permanent or temporary Louisiana appraisal license is required. (Ex. B at 9-10.) Acks repeatedly describes his work as an "appraisal." (*See, e.g.,* Ex. A at P4.0010-0005.) Acks states that in reaching his opinions, he employed various methods and techniques derived from the appraisal industry, including the typical appraisal methods of "Cost, Sales and Income

4

Approaches." (*See id.* at P4.0010-0057.)   Acks does appear to limit his appraisal methodologies to the "Sales Comparison Approach" because it is the only methodology "directly relevant to this appraisal, though elements of the Cost and Income Approach were utilized in estimating value diminution." (*Id.* at P4.0010-0011.) Acks states that the final step in his "appraisal process" is to reconcile all of the approaches considered. (*Id.*)

Indeed, Acks claims that his report was prepared in conformity with applicable provision of the Code of Professional Ethics and Conduct of the Appraisal Institute, the Uniform Standards of Professional Appraisal Practice ("USPAP") as established by the Appraisal Foundation, and the appraisal requirements established by the State of Louisiana.   (*See id.* at P4.0010-0005 and 0054) ("This report has been made in conformity with, and is subject to the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute where applicable."). Because the Hernandez property is located in Louisiana, Acks also states that his report was prepared in conformity with the appraisal requirements established by the State of Louisiana. (*Id.*)

An "appraisal" in Louisiana is "an analysis, opinion or conclusion relating to the nature, quality, value or utility of specified interests in, or aspects of, identified real estate, for or in expectation of compensation." *See* Louisiana Real Estate Appraisers Law ("LREAL") § 3392. (*See also* Ex. B at 9.) An "appraisal assignment" in Louisiana is "an engagement for which an appraiser is employed or retained to act, or would be perceived by third parties or the public as acting, as a disinterested third party in rendering an unbiased analysis, opinion, or conclusion relating to the nature, quality, value, or utility of specified interests in, or aspects of, identified real estate." (*Id.*) Finally, an "appraisal

5

report" in Louisiana is defined as "any communication, written or oral, of an analysis, opinion, or conclusion relating to the nature, quality, value, or utility of specified interests in, or aspects of, identified real estate." (*Id.*) The USPAP defines "valuation services" as "services pertaining to aspects of property value" and pertain to all aspects of property value and include services performed by both appraisers and by others. (USPAP, 2008-2009 ed., Definitions, page U-1, lines 33-34, attached as Exhibit C.)

The purpose of the Acks report, to value the Hernandez property and estimate the effects of the presence of Chinese drywall on property value, falls squarely within the definition of an "appraisal" under the LREPL, or a "valuation" under the USPAP. (*See* Ex. A at P4.001-0002) ("The subject of this valuation is a single family home located at the above captioned address in Mandeville, Louisiana. This property reportedly contains contaminated drywall. The purpose of this report is to estimate the effects of the presence of the contaminated drywall upon property value.") Acks' reliance on a real property appraisal from a Louisiana appraiser dated March 2009 does not change the fact that his work was to appraise the Hernandez property, taking into account what Acks believes is a stigma value. By doing so, Acks is engaging in an appraisal of the Hernandez property without a license, as is required under Louisiana law. This Court should therefore reject Acks' valuation opinion as violative of Louisiana law. *See Hidden Oaks*, 138 F.3d at 1050; *Tennessee Dept. of Transportation v. Wheeler*, No. M1999-00088, Tenn. App. LEXIS 727, at *6-10 (Tenn. App. Ct. 2002) (citing Tennessee's requirement that only licensed appraisers can provide real estate valuations and finding that "the trial court erred by permitting [the expert witness at issue] to give an expert opinion regarding the value of the...farm...because [he] was no longer a licensed

6

real estate broker when he testified").

Even if the Louisiana statute is not dispositive of the qualification question, Acks lacks the requisite qualifications under FRE 702, making his opinions unreliable. As his curriculum vitae indicates, Acks is not a licensed appraiser in any state, and has not obtained any designation from the Appraisal Institute, the leading, national governing body for appraisers. (*See* Ex. A at P4.0010, 0049-0052.) Without such qualifications, Acks should not be considered an expert with appropriate knowledge, skill, experience, training or education to testify to an appraisal of the Hernandez property. As set forth more fully below, Acks' methodologies in determining stigma impact of Chinese drywall on the Hernandez property, particularly his contingent valuation methodology, are not generally accepted and provide inaccurate results. Coupled with these unreliable methodologies, Acks' lack of qualifications and accreditation further support the unreliability of his opinions such that they should be barred under FRE 702. *See Hidden Oaks*, 138 F. 3d at 1050; *James River Ins. Co. v. Rapid Funding, LLC*, 2009 U.S. Dist. LEXIS 14199, * 29-34 (D. Co. February 24, 2009) (lack of appraisal credentials persuades the court to find expert's experience is not enough to overcome problems with reliability of property depreciation calculation.)

**B.**   **Acks' Methodologies In Valuing Diminution In Property Arising From The Presence Of Chinese Drywall Are Either Not Accepted Methods By The Appraisal Profession Or Are Applied Improperly.**

Acks claims to use five methods to determine the impact of Chinese drywall on the Hernandez property:

- A sales comparison of homes with Chinese drywall;
- Contingent valuation;
- A methodology described as "inference based upon local tax assessor's actions";

- A methodology described as "benefits transfer" of results from other studies that used sales comparisons, contingent valuation, and hedonic regressions; and
- A so-called "discounted seller approach."

Only the first of these five methods, as defined and utilized by Acks in reaching his opinions, has been professionally accepted by the appraisal profession (although it was improperly applied by Acks). (*See* Ex. B at 18-19.) As Roddewig more fully explains, Acks fails to account for the recognized methods of appraising contaminated properties, (*see* Ex. B at 17-18), and relies on a combination of methodologies advocated by individuals—Robert Simons and Bill Mundy—whose qualifications in appraising properties has been judicially questioned. (*See* Ex. A at P4.0010-0012; Ex. B at p. 19); *see also LaBauve v. Olin Corp.*, 231 F.R.D. 632, 678 at n.99 (S.D. Ala. 2005) (excluding Simons' testimony where Simons asserted "in conclusory form, with no underlying analysis, that common, formulaic methods can compute diminution in property values for all proposed class members is so flawed as to be inadmissible as a matter of law"); *North Star Alaska Housing Corp. v. United States*, 76 Fed. Cl. 158, 215 (Fed. Cl. 2007) (rejecting Mundy's property valuation estimates and finding those estimates to be "riddled with flaws -- so many, in fact, as to render his findings worthless.") Because four of the five methodologies employed by Acks—both independently and in combination—are not acceptable appraisal methodologies, and one of which is Acks' report and testimony should be excluded as unreliable under FRE 702.

1.  **The sales comparison approach, while an accepted method for evaluating environmental property impacts, is improperly applied by Acks.**

Acks describes his sales comparison approach as an investigation into "Market Activity In Chinese Manufactured Drywall Contaminated Homes." (*See* Ex. A at

8

P4.0010-0030.) Despite this description, Acks' work is not an actual sales comparison approach, but is merely a reiteration by Acks of what he has heard from others in the market. (Ex. B at 26.) He does not independently collect, analyze, or compare actual home sales transactions to the Hernandez property. (*Id.* at 26-27) Rather, he relied on interviews conducted with two brokers/sales agents in the Parkland area of Broward County, Florida and an interview with a Virginia Beach, Virginia broker. (*Id.*) As set forth in the Appraisal Review Report, the data obtained from these two interviews are not evidence of actual market value. (*Id.*) Assessing actual market value as it relates to the property in question is critical to the reliability of the results. (*Id.* at 17, 26-29.) Failure to assess such market value undermines the reliability of the results.

> **2.   Acks' contingent valuation methodology is unreliable because it is not generally accepted in the field, as shown by the sole U.S. government report on the subject as well as recent appraisal literature, or supported by peer literature.**

The contingent valuation methodology, which Acks applies in this case, is "not generally accepted" or supported by peer reviewed literature and his opinion thus fails the reliability requirement set forth in *Daubert*. (*Id.* at 30-44.) In the wake of the Exxon Valdez oil spill, the National Oceanic and Atmospheric Administration ("NOAA") Panel – through the U.S. Department of Commerce – issued a report that evaluated whether the contingent valuation methodology could provide reliable estimates in assessing the diminution in value of natural resources affected by oil discharges. (*See Report of the NOAA Panel on Contingent Valuation* [hereinafter "NOAA Panel Report"], Appendix I, 58 Fed. Reg. 4601 (Jan. 15, 1993), attached as Exhibit D.) The Panel, comprised of a blue-ribbon panel of economists, found that contingent valuation methodology suffers from "an upward bias" because "hypothetical markets tend to overstate willingness to pay

for private as well as public goods." (*See* Ex. D at 4610.) The Panel thus concluded that continent valuation analysis is only reliable enough to be a "*starting point* of a judicial process of damage assessment." (*Id.*) (emphasis added) (noting that "the phrase 'starting point' is meant to emphasize that the Panel does not suggest that contingent valuation estimates can be taken as automatically defining the range of compensable damages"). Neither the Department of Commerce nor any other federal government body has issued a report since that has questioned the NOAA Panel's findings.

Appraisal literature from the leading peer-reviewed journals confirms that the NOAA Panel's findings were correct. In his 2006 article published in the most highly recognized peer reviewed journal in the appraisal industry, *The Appraisal Journal*, entitled "Contingent Valuation: Not An Appropriate Valuation Tool," Albert Wilson explains that the "contingent valuation technique was not designed for, nor it is applicable to, the valuation of goods for which there is a market." *The Appraisal Journal* 53, 60 (2006), attached as Exhibit E. Wilson adds that any endorsement that there may be of the contingent valuation method arises exclusively in the "public and quasi-public goods" arena. *See* Ex. D at 54. *See also* Richard T. Carson, Nicholas E. Flores, & Norman F. Meade, "Contingent Valuation: Controversies and Evidence, *Envtl. & Resource Econ.* 173, 180 (2001) ("rather than representing the 'best' case scenario for seeing how contingent valuation works as is often claimed, the private goods case is one that should ... and does ... perform poorly"), attached as Exhibit F.

In a separate article published through *Real Estate Issues*, Wilson explains other reasons why the contingent valuation method is unreliable:

> [M]ost hypothetical market surveys consider only the buyer's side of the relationship; that is, how much the buyer wants the seller to take off the purchase

price. Surveys rarely examine the seller's side and collect little or no information about whether a discount would receive serious consideration, let alone acceptance.

"Real Property Damages and Rubber Rulers," *Real Estate Issues* 25, 28 (2006), attached as Exhibit G. Wilson further mentions that contingent valuation surveys often give "no evidence of testing to ensure the survey would provide a comprehensive understanding of respondents' answers." (Ex. G at 29.) Contingent valuation surveys also often fail to include questions "to determine if respondents were provided unbiased and well-considered answers." (*Id.*) Therefore, concludes Wilson: "hypothetical market surveys are no better than rubber rulers—measurement devices that analysts can stretch knowingly or unknowingly to achieve a desired result while maintaining the superficial appearance of scientific validity. These methods are not scientifically valid or reliable." (*Id.* at 30.)

Members of the appraisal community who have not been as critical of contingent valuation methodology still point to its unreliability as a property appraisal tool. *The Appraisal Journal* published a 2003 article by Thomas Jackson, entitled, "Methods and Techniques for Contaminated Property Valuation," which explained that contingent valuation methodology at best can be used to "supplement a sales-based analysis." *Appraisal Journal* 311, 318 (2003), attached as Exhibit H. Jackson emphasizes that contingent valuation methodology "cannot stand alone as an appropriate or credible valuation method" as "appraisers must focus on *observable* market data." (Ex. H at 320.)[2]

---

[2] Moreover, the *Dictionary of Real Estate Appraisal*'s Third and Fourth Additions as well as the *Appraisal of Real Estate*'s the 11th and 12th Editions omit any mention whatsoever of contingent valuation methodology. The USPAP also omit contingent valuation methodology. Finally, the Appraisal Institute's 2008 seminar entitled: "Appraising Environmentally Contaminated Properties: Understanding and

Acks' opinion, which relies explicitly on contingent valuation methodology, suffers from all of the flaws mentioned by the NOAA and the relevant appraisal community literature. In Acks own report, he explains the hypothetical nature of his contingent valuation approach:

> [Contingent valuation methodology] attempts to estimate values by asking individuals, in survey or experimental settings, to reveal their personal valuations of increments or decrements in unpriced goods by using *hypothetical, contingent markets*."

(*See* Ex. A at P4.0010-0033) (emphasis added.)

Acks also concedes that the entire scope of contingent valuation survey data was "collected over 3 days between December 28, 2009 and December 30, 2009" during which time only "10 useable responses were collected through telephone interviews." (*Id.* at P4.0010-0036.) Acks also relies on a similarly faulty survey conducted by GCR & Associates in Louisiana that Acks claims confirms the contingent valuation survey conducted by Acks. (*Id.* at P4.0010-0033.) The critical questions assessing the discount needed to buy or rent a remediated house was answered by only 40 and 18 people, respectively. These samples, at best, provide directional data, and are not representative or may not be projected to the general population in Louisiana such that they are reliable to assess impact, if any, to the Hernandez property.

Acks' and the GCR contingent valuation approach mirrors the precise problem that the NOAA Panel and the appraisal literature caution against: it draws from un-observable market data and reaches a hypothetical conclusion that fails to account for upward bias. For example, the questions presented in Acks' contingent valuation survey

---

Evaluating Stigma," relegates contingent valuation methodology to the status of a "non-traditional method."

ask the interviewee whether s/he would purchase a given home under hypothetical conditions that include "odors resembling rotten eggs; respiratory tract infections; increased asthma attacks, coughing dizziness, fatigue, headaches" and other physical symptoms allegedly associated with the houses at issue. Acks' questions also state that "the links to these effects have been widely reported" to be associated with the houses. (*See id.* at P4.0010-0034-0035.) The GCR survey linked Chinese drywall with health and property damage, without controlling for any bias that such questions imposed. (*See* Rigamer Expert Report, P4.0001-0010 (Question 5: "There has been a lot of discussion in recent news reports and publication on Chinese drywall in homes and possible links between Chinese drywall and problems associated with corrosion of wiring and electrical equipment and reports of associated illness in some residents. Knowing the potential link between Chinese drywall and these issues, would you buy a home where Chinese drywall had been installed.")

Not only do Acks' questions and the GCR survey inappropriately invoke human health concerns, his questions also reveal an overwhelming bias against purchasing the properties at issue. Contrary to the specific guidelines set forth in the NOAA Panel Report, the questions do not allow for adequate time lapse from the accident, do not check for understanding and acceptance from the interviewees, and do not deflect what the NOAA Panel call the "warm-glow" effect in which the interviewees give their answers without consideration of the full transaction costs involved. (*See* Ex. D at 4613.) Nor does Acks even acknowledge the possibility of bias in his report, which is especially alarming given that he drew his conclusions from a mere *ten* responses. (*See* Ex. A at P4.0010.0035.)

Finally, Acks' contingent valuation methodology oversimplifies the complexity of private real estate transactions and ignores the individualized considerations in purchasing residential real estate. Acks fails to explain why his contingent valuation methodology is reliable as applied to the Louisiana houses at issue here where it is well-established that such methodology should only be used in the arena of public or quasi-public goods, not private real estate. Because the NOAA and the appraisal community have cautioned and stressed in peer reviewed articles that the contingent methodology is not a generally accepted appraisal approach, especially with respect to private market goods such as real estate, causes the Acks report to be unreliable.

> **3. Acks' reliance on tax assessors' actions is unreliable because reliance on such actions is not generally accepted in the field.**

Acks looks to the actions of tax assessors in Florida, Virginia, and allegedly, Louisiana, concerning their valuation of properties with Chinese drywall. According to Acks, these actions are indicative of the reduction in value to be attributed to homes with Chinese drywall. (*See* Acks Report at P4.0010-0038.) Acks admits, however, that "[w]e did not have sufficient time to produce a formal survey of assessors." (*See id.* at P4.0010-0037.) Despite this, Acks claims the "actions of the assessor clearly indicate a minimum estimate regarding the opinions of these experts of the effect upon property values." (*Id.*)

Acks reliance on such opinion fails to establish how he reviewed and assured the reasonableness of the determinations of the local assessors, which is a burden he carries under the USPAP. (Ex. B at 45-46.) Also, the data reported appears to assess the value of homes with Chinese drywall that have not been remediated, and there is nothing in the Acks report that deals with how local tax assessors will handle the valuation of a

remediated house. (Ex. B at 49-50) While some assessors appear to have unilaterally reduced assessed values on unremediated homes with Chinese drywall, others have not. The actions of a handful of assessors in unremediated homes are not attributable to all homes with Chinese drywall. (Ex. A at 50); *see also* Standard on the Valuation of Properties Affected by Environmental Contamination by IAAO in 2001 (requiring property-by-property rather than mass appraisal techniques), attached as Exhibit I.

Finally, the peer reviewed literature cited by Acks as supporting reliance on tax assessors also undermines the reliability of such data. (*See* Ex A. at 47-48) (Greenberg & Hughes article in The Appraisal Journal and the Leon, Vazquez-Polo and Gonzalez article in Environmental and Resource Method both challenge the reliability of tax assessor's judgments on property values). Because Acks cannot assure the reliability and reasonableness of tax assessors; assessments for unremediated homes in states other than Louisiana, the reliability of Acks opinions is in question.

> **4.    Acks' benefits transfer valuation method is unreliable because reliance on such actions is not generally accepted in the field and he conducts no underlying assessment of its veracity.**

Acks defines "benefit transfer" as "the practice of adapting available economic value estimates of a quality or quantity change for some environmental resource to evaluate a proposed change in some other "similar" resource." (*See* Ex. A at P4.0010-0039.) Acks relies on three approaches to complete the "benefit transfer": sales comparison and case study approaches, hedonic regressions and contingent valuation. As set forth more fully in the Appraisal Review Report, each of these approaches is improperly applied by Acks. (*See* Ex. A at 53-62.) Acks appears to interpret the "benefit transfer" practice as a review of published literature, and not any collection of direct

analysis of market data. (*See* Ex. A at P4.0010-0039.) Acks does no independent assessment of relevant data or any market research. Rather, his conclusions as they relate to these three approaches are all based on articles published, without any analysis of how those articles justifiably support a conclusion that property values are subject to diminution of value or that the values have declined.

The sales comparison and case study approach relies on ten published articles conducted by someone other than Acks. (*See* Ex. B at 54-55.) Acks collected no market information, does not identify any units of comparison, and makes no qualitative or quantitative adjustments to the sale prices of particular comparable sales. (*Id.*)

Hedonic regression analysis, which is used in real estate valuation, is improperly conducted by Acks. This type of analysis requires a calculation of select variables to determine the value associated with certain characteristics of property. The complete analysis supporting Acks' hedonic regression conclusion appears in a mere two lines of his report. (*See* Ex. A at P4.0010-0040.) In these two lines, Acks cites "Appendix P" (which in the *Hernandez* report is left blank), which, from his *Germano* report, lists roughly 300 articles that serve as the sole basis for his summary conclusion that "property values have declined 15%." (*Id.*) As Roddewig points out in the Appraisal Review Report, there is absolutely no discussion of any of these articles, the data contained in these articles, or how any such data were analyzed or weighed to reach the blunt conclusion that property values have declined 15%. (*See* Ex. B at 59-60.) There is no assessment of whether these articles address Louisiana properties or even properties with similar conditions such that hedonic regression analysis is permissible. A review of the list of articles cited by Acks suggest that none of those articles actually involve Louisiana

16

properties. While it is presumed that Acks intends for that conclusion to apply specifically to the Hernandez property in Louisiana, there is nothing in Appendix P or his report that establishes that Acks performed any independent testing on Louisiana properties, or any properties anywhere. Hedonic regression analysis is an economic regression analysis of actual data, and is not simply an amorphous, undefined analysis of articles. One of the criteria of *Daubert* is that the method or analysis conducted by the expert be replicable. In his two line "analysis", Acks outlines no such methodology or analysis, making replication impossible.

Finally, the review of nine articles concerning contingent valuations is subject to the same challenges as identified above. Contingent valuation is not a generally accepted appraisal method. (*See* Ex. B at 60.) Acks also admits that continent valuation produces not only hypothetical damages, but that it is also subject to other biases, making the results unreliable. (*See* Ex. A at P4.0010-0041) ("The Contingent Valuation studies account for hypothetical damages and are subject to other biases.")

Because Acks' opinions are not grounded in any actual market data, and because there is no analysis of how review of published literature is applicable to actual Louisiana property values and market conditions, the Acks' benefit transfer analysis as applied to the Hernandez property is unreliable.

### 5. Acks' discounted sellout approach is not subject to peer review and is not a generally accepted appraisal method.

Because the benefit transfer methodologies employed by Acks are "flawed," by Acks' own admission, Acks employed a discounted sellout approach that "takes into consideration account contamination, stigma and value changes over time as properties are remediated." (*See* Ex. A at P4.0010-0041.) As set forth more fully in the Appraisal

Rebuttal Report, Acks reviews data related to single-family homes, which is not the type of property applicable to discounted sellout approaches. (*See* Ex. B at 61.) In addition, Acks' various "assumptions" about home price appreciation rates, length of time for cleanup and remediation efforts, and difficulties and probabilities of selling a house at various points in time are not supported by any market data or analysis. He also provides no data or analysis to support an ongoing stigma following house remediation for a period of nine years. (*Id.*)

Like contingent sales analysis and other appraisal methods, a discounted sellout analysis should be based on actual market data. (*Id.*) (citing Statement on Appraisal Standards No. 2 (SMT-2) and USPAP 2008-2009 Edition, P. U-79, Lines 2507-2512.) The reliance on unsupported and unproven assumptions renders any of the conclusions unreliable.

**C.    Acks' Primary Means For Calculating Stigma Value—Contingent Valuation—is Not Only Unaccepted by the Appraisal Profession, But It Also Generates Hypothetical, Speculative and Inaccurate Estimates of Damage That Cannot Accurately Predict Market Outcomes.**

In addition to not being a reliable methodology acceptable in the appraisal industry, contingent valuation cannot accurately predict market outcomes and is therefore an unreliable measure of stigma damages for the Hernandez property.

The *Daubert* Court noted that a significant factor in determining whether a scientific expert's methodology is reliable is whether it "can be (and has been) tested." 509 U.S. at 593. By his own admission, Acks' contingent valuation methodology is entirely hypothetical and speculative; and as such, his methodology has a high potential rate of error which militates against admissibility under *Daubert.* 509 U.S. at 593-95.

Acks describes in his own words that his continent valuation methodology applies

18

to "*experimental* settings...to reveal their personal valuations of increments or decrements in unpriced goods by using *hypothetical, contingent markets.*" *See* Acks Report at P4.0010-0033 (emphasis added). By presenting his interviewees with various "what if" hypothetical scenarios, Acks does not focus on what Thomas Jackson in *The Appraisal Journal* called "observable market data." *See The Appraisal Journal,* Jackson at 321. Richard Carson, a preeminent researcher and proponent of the contingent valuation methodology for valuing public and quasi-public goods, echoes this in noting: "the term '*contingent*' valuation is apt and one should never forget that it is only the plan to provide the good that can [be] valued, not the good in the abstract." (Ex. F at 180.)

Carson then sets forth, in a separate article, the unique problem of the hypothetical approach for private goods: "[B]ecause of the manner in which they are provided, private goods differ fundamentally from public goods with respect to incentives for truthful preference revelation both in actual and survey contexts [and therefore] drawing inferences about private goods [from the contingent valuation methodology] is problematic." Richard Carson et al., "Contingent Valuation and Revealed Preference Methodologies: Comparing the Estimates for Quasi-Public Goods," *Land Econ.* 80, 81 n.6 (Feb. 1996), attached as Exhibit J.

The ultimate test for whether the contingent valuation methodology is reliable is therefore whether the hypothetical market outcomes that it predicts actually came to fruition. Those tests have indeed been performed on the continent valuation methodology which Acks uses here, and the results reveal that the contingent valuation methodology does not accurately and reliably predict actual market value for real estate. *See* Richard Roddewig & James Frey, "Testing the Reliability of Contingent Valuation in

the Real Estate Marketplace," *The Appraisal Journal*, 267, 268, 271-79 (2006), attached as Exhibit K. Specifically, Richard Roddewig and James Frey conducted follow-up studies on the reliability of contingent valuation methodology in four marketplace situations where it was employed to predict damages: North Tacoma, Washington; Corpus Christi, Texas, Crystal Springs, Mississippi; and Columbus, Mississippi. *Id.* at 267, 270-71. Roddewig and Frey found that in "each of the four situations, the marketplace subsequently failed to perform according to the prediction from the survey-based methodology." In each of these cases the real estate experts relied on contingent valuation methodology to predict substantial decreases in residential properties as a result of the contamination; yet across the board, *"the predicted decrease in prices failed to occur."* (Ex. K at 271) (emphasis added).

Since the tests show that Acks' contingent valuation methodology, which is hypothetical by its nature, cannot reliably predict real estate market value, this Court should exclude Acks' report and testimony accordingly.

## IV. CONCLUSION

For the foregoing reasons, and for the reasons more fully set forth in the Appraisal Review Report from R. Roddewig, this Court should find that Acks is not qualified to provide a real estate appraisal, that four of the five appraisal methodologies applied to the Hernandez property are not generally accepted appraisal methodologies, and that the continent valuation analysis, which is the primary method for determining stigma value, is not only hypothetical, but also unsupported by actual market data. As such, Acks' opinions in their entirety fail to satisfy the reliability requirement of Rule 702 and *Daubert* and should be excluded.

20

Respectfully submitted,

BY: /s/ Douglas B. Sanders
KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No.
0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS
(IL Bar No. 6256621)
RICHARD M. FRANKLIN
(IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED:
DRYWALL PRODUCTS
LIABILITY LITIGATION

WILKINSON

_____/

This Document Relates to:

*Hernandez v. Knauf,* Case No. 09-6050

MDL NO. 2047

SECTION L

JUDGE FALLON
MAG. JUDGE

# NOTICE OF MANUAL ATTACHMENT

Exhibits A through K in support of Knauf Plasterboard (Tianjin) Co., Ltd.'s Motion to Exclude the Testimony of Kenneth Acks will be filed manually by counsel directly with the Clerk's Office due to the size of the Exhibits.

Respectfully submitted,

/s/ Donald J. Hayden

Donald J. Hayden
**BAKER & MCKENZIE LLP**
1111 Brickell Avenue
Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8966
Facsimile:  (305) 789-8953
E-mail: Donald.hayden@bakernet.com

Douglas B. Sanders
Richard Franklin
**BAKER & MCKENZIE LLP**
130 E. Randolph Dr.
Chicago, IL 60601
Telephone: (312) 861-8075
Facsimile:  (312) 698-2375
Email: douglas.b.sanders@bakernet.com

Kerry Miller (LA Bar No. 24562)
Kyle A. Spaulding (LA Bar No. 29000)
**FRILOT L.L.C.**
1100 Poydras Street
Suite 3700
New Orleans, Louisiana 70163
Telephone:  (504) 599-8194
Facsimile:   (504) 599-8145
Email: kmiller@frilot.com

*Attorneys for Defendant, Knauf*
*Plasterboard (Tianjin) Co., Ltd.*


## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served upon all parties by electronically uploading same to LexisNexis File & Serve and filed via CM/ECF in accordance with procedures established in MDL 2047, on this 8th day of March, 2010.


/s/ Donald J. Hayden

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF LOUISIANA

In re: CHINESE-MANUFACTURED    *    MDL Docket No. 2047
        DRYWALL PRODUCTS       *
        LIABILITY LITIGATION       *    SECTION L
                                       *
                                       *    JUDGE FALLON
                                       *
THIS APPLIES TO: *Hernandez (09-6050)*  *    MAG. JUDGE WILKINSON
                                       *
                                       *
                                       *

* * * * * * * * * * * * * * * *

## <u>NOTICE OF HEARING</u>

PLEASE TAKE NOTICE that Defendant, Knauf Plasterboard (Tianjin) Co., Ltd., appearing through undersigned counsel, will bring the foregoing *Daubert* Motion to Exclude Testimony of Kenneth Acks on for hearing before the Honorable Eldon E. Fallon, Section "E", of the United States District Court, Eastern District of Louisiana, located at 500 Poydras Street, New Orleans, Louisiana on the 15th day of March, 2010 beginning at 9:00 o'clock, a.m. or as soon thereafter as counsel can be heard.

Respectfully submitted,

BY: s/Douglas B. Sanders

KERRY J. MILLER (#24562)
KYLE A. SPAULDING (#29000)
PAUL C. THIBODEAUX (#29446)
**FRILOT L.C.**
1100 Poydras Street
Suite 3700
New Orleans, LA 70163
Telephone: (504)599-8194
Facsimile: (504)599-8145
Email: kmiller@frilot.com

-AND-

DONALD J. HAYDEN (FL Bar No. 0097136)
**BAKER & MCKENZIE LLP**
Mellon Financial Center
1111 Brickell Avenue, Suite 1700
Miami, FL 33131
Telephone:    (305) 789-8966
Facsimile:    (305) 789-8953
Email: donald.j.hayden@bakernet.com

DOUGLAS B. SANDERS (IL Bar No. 6256621)
RICHARD M. FRANKLIN (IL Bar No. 0864390)
**BAKER & MCKENZIE LLP**
130 E. Randolph Drive
One Prudential Plaza
Chicago, IL 60601
Telephone:    (312) 861-8075
Facsimile:    (312) 698-2375
Email: douglas.b.sanders@bakernet.com

## CERTIFICATE

I hereby certify that the above and foregoing pleading has been served upon Russ Herman, Plaintiffs' Liaison Counsel, by email, and to all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system which will send a Notice of Electronic Filing in accord with the procedures established in MDL 2047, on this 8th day of March, 2010.

s/Douglas B. Sanders

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

|  |  |  |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | : : : : : : | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . :

**This Document Relates to *Tatum B. Hernandez, et al. v. Knauf Plasterboard Tianjin Co., Ltd.,* Case no. 09-6050**

**<u>ORDER & REASONS</u>**

Before the Court are various motions in *limine*, *Daubert* motions, and other similar motions filed by the Plaintiffs, Tatum B. Hernandez and Charlene M. Hernandez, individually and on behalf of their minor children, and Defendant Knauf Plasterboard Tianjin Co., Ltd. ("Knauf"). The Court has considered the arguments raised by the parties in their briefs, the exhibits submitted, and the applicable law, and now rules as follows.

1. <u>Plaintiffs' Motion to Preclude Specific Aspects of the Testimony of Knauf's Experts on the Impact of Corrosion on the Scope of Remediation </u>(Rec. Doc. No. 1653). Plaintiffs argue that four of Knauf's experts' opinions on the impact of the corrosion in the Hernandez home and the scope of remediation do not meet the scientific reliability standard of *Daubert*. Plaintiffs challenge testimony opining that most of the metal components in the home that are corroded with copper sulfide and silver sulfide can be left behind in the partial remediation proposal that Knauf recommends. Plaintiffs support their motion with the following claims: (1) building code requirements prohibit corrosive residues on electrical equipment and require six inches of slack at receptacles and outlets, (2) cleaning copper ground wires and other electrical components with a damp cloth or

scotch-brite is not a recognized method to repair corroded wires or electrical contacts, (3) the CPSC has not found the corroded wires to be safe, (4) Knauf experts ignore the Battelle corrosivity classifications and failure standards, (5) Knauf experts' contact resistence tests do not comply with recognized standards and are unreliable, (6) Knauf's experts incorrectly opine that copper oxide film on wires is the same as copper sulfide film, and (7) Knauf's experts incorrectly deny that water required for copper corrosion is in the Chinese drywall homes other than in the HVAC coils. The Court has considered the Motion and Knauf's opposition, and finds that the issues raised by the Plaintiffs are best addressed through vigorous cross-examination. Accordingly, Plaintiffs' Motion to Preclude Specific Aspects of the Testimony of Knauf's Experts on the Impact of Corrosion on the Scope of Remediation is DENIED.

2.  <u>Knauf's Motion in Limine to Exclude Testimony that Chinese Drywall Emissions or Odors are Harmful to, or Otherwise Impact, Health, are Toxic or Noxious</u> (Rec. Doc. No. 1654). Knauf argues that because the parties have agreed that the present matter is limited to property damages, excluding personal injuries, the Court should bar any references to alleged emissions or odors being toxic, noxious, or harmful, and any testimony with respect to alleged health problems or symptoms resulting from exposure to Chinese drywall. The Court has considered Knauf's Motion and Plaintiffs' response, and finds that the testimony Knauf seeks to exclude on the odors and health effects may be relevant to explain detection of Chinese drywall in the home and the degree of livability in the home as a result of the Chinese drywall's presence. Accordingly, Knauf's Motion in Limine to Exclude Testimony that Chinese Drywall Emissions or

Odors are Harmful to, or Otherwise Impact, Health, are Toxic or Noxious is DENIED.

3.  <u>Knauf's Motion in Limine to Exclude Reports and Testimony of John Scully, Ph.D.</u> (Rec.
    Doc. No. 1655).  Knauf notes that Plaintiffs previously stated that they will not call or
    introduce testimony or reports of Dr. Scully in the present matter.  Knauf further notes
    that it has not deposed Dr. Scully.  Accordingly, Knauf asks that the Court exclude Dr.
    Scully's reports, opinions, and prior deposition or trial testimony.  Plaintiffs do not
    challenge Knauf's motion directly, but request that other witnesses be allowed to rely
    upon Dr. Scully's opinions in their own testimony.  The Court finds that Dr. Scully's own
    testimony and reports are excluded, but that other witnesses may rely upon Dr. Scully's
    testimony or reports under Federal Rule of Evidence 703.  Knauf's Motion is thus
    GRANTED IN PART and DENIED IN PART.

4.  <u>Knauf's Motion in Limine to Bar David Maloney from Testifying About his</u>
    <u>Observations or Opinions with Respect to Purported Damage to Plaintiffs' Personal</u>
    <u>Property</u> (Rec. Doc. No. 1658).  Knauf notes that Plaintiffs retained Mr. Maloney to
    appraise the replacement cost of specific personal property.  Knauf further notes that Mr.
    Maloney admits that his direction by the Plaintiffs prevents him from considering other
    potential value measurements.  Accordingly, Knauf argues that because Mr. Maloney
    testifies that exposure to drywall may have damaged some personal property, this
    testimony is unrelated to his valuation determination, is irrelevant, and not grounded in
    the analysis of the actual condition of the personal property.  The Court finds that Mr.
    Maloney's opinions may be relevant to support the nature and extent of the damages to

the items which are the subject of his report.  Thus, Knauf's Motion to Exclude is
DENIED.

5.      <u>Knauf's Motion in Limine to Exclude Dr. Lori Streit's Testimony Because it Relates</u>

<u>Solely to Liability and is Cumulative </u>(Rec. Doc. No. 1659).  Knauf notes that the parties

have stipulated to liability under Louisiana's redhibition statute, La. Civ. Code arts. 2520

*et seq*.  Knauf argues that Dr. Streit's testimony regarding the emissions from Chinese

drywall and the formation of copper sulfide is unnecessary to the Plaintiffs' damages case

and duplicative of testimony offered by Plaintiffs' other experts, including Bradley

Krantz and Dean Rutila.  The Court finds that to the extent this testimony is cumulative,

it will be excluded, but to exclude it in advance of trial is not appropriate.  Thus, Knauf's

Motion in Limine is DENIED.

6.      <u>Knauf's Motion to Exclude the Report and Testimony of Kenneth Acks </u>(Rec. Doc. No.

1660).  Subsequent to Knauf filing this motion, the parties entered into a Joint Stipulation

agreeing that (1) no evidence will be presented regarding the diminution of property

value based upon Chinese drywall "stigma," and (2) it will not be necessary for Plaintiffs

to present the expert testimony of Kenneth Acks.  Accordingly, Knauf's Motion to

Exclude the Report and Testimony of Kenneth Acks is DENIED as MOOT.

7.      <u>Knauf's Motion for Partial Summary Judgment Relating to Alleged Nonpecuniary</u>

<u>Damages </u>(Rec. Doc. No. 1684).  Knauf notes that the Plaintiffs are parties in the

*Hernandez* bellwether trial and the *Payton* Omnibus Class Action Complaint I, Case No.

-4-

09-7628. Knauf further notes that for the bellwether trial, the parties entered into a Joint

Stipulation which limited Plaintiffs' cause of action to redhibition and fitness for ordinary

use, waiving personal injury claims. At depositions on March 5, 2010, Plaintiffs waived

all nonpecuniary damages claims, but reserved their rights to claim loss of enjoyment of

property. Knauf argues that the nonpecuniary damage claims should be dismissed

because (1) Plaintiffs failed to plead loss of enjoyment of their property in their Amended

and Restated Complaint, and (2) such nonpecuniary damages are not allowed under

Louisiana redhibition or fitness for use law. In response, Plaintiffs argue that while

nonpecuniary damages are generally available, the Hernandez's are not claiming non-

pecuniary damages in the present bellwether trial. Accordingly, Knauf's Motion for

Partial Summary Judgment Relating to Alleged Nonpecuniary Damages is DENIED AS

MOOT.


New Orleans, Louisiana, this 15th day of March 2010.

ELDON E. FALLON
UNITED STATES DISTRICT JUDGE