## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |

**THIS DOCUMENT RELATES TO:**

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 09-6687 (E.D. La.);**

*Gross v. Knauf Gips, KG*, **Case No. 09-6690 (E.D. La.);**

*Wiltz v. Beijing New Building Materials Public Limited Co.,* **Case No. 10-361 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1672 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1395 (E.D. La.); and**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1673 (E.D. La.).**

## BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY AND BEIJING NEW BUILDING MATERIAL (GROUP) CO., LTD.'S SUR-REPLY IN OPPOSITION TO PLAINTIFFS' MOTION FOR ASSESSMENT OF CLASS DAMAGES

Subject to and without waiver of their motions to dismiss for lack of jurisdiction and

failure of service, Defendants Beijing New Building Materials Public Limited Company

("BNBM PLC") and Beijing New Building Material (Group) Co., Ltd. ("BNBM Group")

respectfully submit this sur-reply in further response to Plaintiffs' Steering Committee's Motion

for Assessment of Class Damages (Rec. Doc. 18086, hereinafter "Damages Motion") and

Plaintiffs' Steering Committee's Reply Brief in support of its Damages Motion (Rec. Doc. 18958).

## PRELIMINARY STATEMENT

Rather than address the relevant, governing law on the issue of assessment of class damages from this Circuit, Plaintiffs' Reply brief is a scattershot array of irrelevant argument designed to distract the Court from the fatal flaws in their request for damages. Despite Plaintiffs' repeated revisions to their class definition, class membership listing and damages formula, Plaintiffs still have not offered a viable, statistically sound damage model that passes muster under the controlling law in this Circuit. And Plaintiffs' insistent return to other legal issues in the MDL cannot mask the problems with their proposed damages model.[1]

## I.   PLAINTIFFS' AGGREGATE DAMAGES MODEL FAILS AS A MATTER OF LAW.

Plaintiffs do not dispute that the use of estimates to calculate damages is improper where actual repair cost data is available. As identified previously, the Fifth Circuit has clearly prohibited the practice of disregarding the best evidence of damage—actual repair costs—in favor of estimates. *See* BNBM PLC and BNBM Group's Opposition to Damages (Rec. No. 18903) at p. 17 citing *Volkswagen of Am., Inc. v. Robertson*, 713 F.2d 1151, 1169 (5th Cir. 1983) ("Plaintiff must produce the best evidence available in support of his claim. . . . Where invoices, statements, or records of accounts expended in the repair of damages are in the possession of plaintiff or are available or attainable, such records constitute the best evidence and should be offered in proof of plaintiff's claim.")[2]

---

[1] In this regard, Plaintiffs' Reply brief is no different than their attempt to identify more than a thousand exhibits for use at the one day damages hearing. There can be no question that Plaintiffs are making every effort to divert the focus from their legally unsupported damages request.

[2] This principle of law is not limited to the State of Louisiana nor to the insurance context. *See In re Industrial Diamonds Antitrust Litig.*, 119 F.Supp.2d 418 (S.D.N.Y. 2000) (discussed *infra*); *Barile Excavating & Pipeline Co. v. Kendall Properties, Inc.*, 462 So. 2d 1129, 1130 (Fla. Dist. Ct. App. 1984)

Tellingly, the PSC never told their expert Mr. Inglis that a significant portion of the property owners on their class list have already remediated their homes.  (Inglis Dep.[3] 275:12-276:4.)  Upon learning this information at his deposition, Mr. Inglis explained that, in his view, if the property was properly remediated already, there was no reason that it should be included on the list of class members who would receive an award based on his estimate calculation formula.  As Mr. Inglis explained: "So if the home has been remediated, I'm not sure it would even belong on the list."  (Inglis Dep. 287:8-10; *see also* 288:12-17 ("If the work was done properly and there's an actual cost, I don't know that I would—I don't know if I would have even estimated it, if that was the case.")

Nevertheless, Plaintiffs concede throughout their Reply that their damages request relies upon estimates to seek an aggregated, estimated, class damages figure notwithstanding the fact that actual remediation cost data is available from members of the class all of whom are active litigants.  (*See, e.g*., Reply at 57, 61 ("The bids approach, a RS Means unit pricing approach, a dollars per square footage approach, or a combination of the tools, provides an estimate, not a precise actual remediation cost.").)  But neither the PSC nor Mr. Inglis requested such data from the active litigant class or, for that matter, from the named plaintiffs.  (Inglis Dep. 281-290.)  In fact, Plaintiffs' expert concedes that his proposed calculation does nothing more than provide a "reasonable estimate" of the damages any class member may have incurred.  (*See* Inglis Dep.

---

(since "actual cost figures were available, we conclude that error occurred when the trial court based its judgment on the estimated cost of completion"); *Arnett v. Helvie*, 267 N.E.2d 864, 872 (Ind. App. 1971) ("best evidence" of income from farm "would have been to have called the farmers sitting in the courtroom who had farmed the land during the time in question"; excluding expert's testimony based on "a study of court house records, other farms, and his knowledge of farm operations").

[3] "Inglis Dep." refers to the Deposition Transcript of George Inglis dated May 19, 2015.  All cited references to the Inglis Dep. are submitted herewith as Exhibit A.

213:7-214:14.)  This concession alone is dispositive and requires denial of Plaintiffs' Damages

Motion.

       The use of such a "formulaic method" to calculate damages is wholly improper where, as

here, the purported "formula" is derived from an unscientific and unrepresentative sample set.[4]

*See, e.g., MP Vista, Inc. v. Motiva Enterps., LLC*, 286 F.R.D. 299, 309-10, 312 (E.D. La. 2012)

(explaining there was no "formulaic way to calculate damages" where such determination "will

require analyzing the specific circumstances for every class member on an individualized basis";

denying certification motion where plaintiffs proposed "sample trials" and determination of

damages "for individual plaintiffs based on calculations derived from" expert's report).

Plaintiffs' expert, Mr. Inglis readily admitted that he made no attempt to determine whether there

was any statistical validity to the formula he has proposed.  (*See* Inglis Dep. 18:2-3 ("On this

project, I did not perform statistical analysis"); 121:5-7 ("I did not go through and do an

individual assessment of the properties that were in that property listing"); 421:22-422:4 (Q.

"[T]here was no attempt to do any type of statistical analysis to ensure representiveness; is that

correct?  A. This is [with] respect to Germano, correct?  Q. Correct.  A. No.")  According to Mr.

Inglis, such an analysis was simply "not part of his assignment."  (*See id*. at 18:9-11 ("I didn't

even consider [statistics]—that as part of my assignment on this.")  While it may be inconvenient,

and certainly beyond Mr. Inglis' field of expertise, such an analysis is required by law.  Contrary

to Plaintiffs' view on the subject, Plaintiffs are bound by the requirements of precedent.

---

[4]  Furthermore, Plaintiffs sweepingly—and inaccurately—assert that "[t]he calculation of class damages by a formulaic method is an acceptable class damages determination methodology which has been accepted by courts for decades."  (Reply at 53.)  As discussed in prior filings, however, the cases relied upon by plaintiffs involve  very limited antitrust situations which in any event are not applicable here. *See* BNBM PLC and BNBM Group's Opposition to Damages (Rec. No. 18903) at pp. 9-10 n. 11.

Indeed, Plaintiffs' assertion that "[t]he procedural posture of this case is unique in the annals of Fifth Circuit class action jurisprudence" (Reply at 38), is really an admission that they cannot reconcile their position with controlling law.  This case is not at all *sui generis*, it is controlled by prior Fifth Circuit (and Supreme Court) jurisprudence that Plaintiffs do not, and cannot, meaningfully distinguish, and that rejects Plaintiffs' attempt to obtain an aggregate damages award.  The core principles enunciated in cases such as *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297 (5th Cir. 1998), *In re FibreBoard Corp.*, 893 F.2d 706 (5th Cir. 1990), and *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), foreclose Plaintiffs' pursuit of aggregated damages extrapolated from a "sample set."[5]  Plaintiffs' assertion that their "damages calculation is not a 'lump sum award,' or an 'extrapolation'" (Reply at 52), is sophistry; those terms describe precisely what Plaintiffs seek to do here.

Plaintiffs say "[t]he cases on which Defendants rely are inapposite because each of those cases considered particularized distinct injuries" (Reply at 55), and that "the only variance" here "is in the amount required to pay for each remediation" (*id.* at 56)—but that is exactly Defendants' point.  While the <u>source</u> of Plaintiffs' injuries may be the same, the <u>cost</u> of remediating that injury plainly is not.  It is dependent on a multitude of factors, including floor plans, geographic location, ceiling heights, construction grade and quality, type and extent of plumbing and electrical systems, and a host of other individualized factors that Plaintiffs' "one

---

[5]  Plaintiffs attempt to wave off the controlling holdings in *Fibreboard* and *Cimino* as "cases involving 'personal injuries to individuals at widely different times and places'" (Reply at 38 n. 85), is unavailing. This case involves alleged property injuries "at widely different times and places" and circumstances impacting the cost of repairs.  The principles enunciated by the Fifth Circuit are foursquare applicable. Plaintiffs do not even attempt to distinguish the Supreme Court's holding in *Wal-Mart v. Dukes*, which disapproved the use of a "sample set to arrive at the entire class recovery—without further individualized proceedings."  131 S. Ct. at 2561.  That "novel project," attempting to short circuit a necessarily individualized damage inquiry, violated the Rules Enabling Act.  *Id.* (citing 28 U.S.C. § 2072(b)).  The same is true here.  (*See* BNBM PLC and BNBM Group's Opposition to Damages (Rec. No. 18903) at p. 11.)

size fits all" model does not take into account.  (Pogorilich Dep.[6] 121:11-122-12 (listing examples of some variances); Marais Supp. Decl.[7] ¶ 24 (identifying variables not accounted for in Inglis's formula).)  It is, in Plaintiffs' words, "particularized [and] distinct."

Unable to distinguish the binding Supreme Court and Fifth Circuit authority cited in Defendants' opening brief, Plaintiffs cite two state court decisions, *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1 (Pa. 2011), and *Meighan v. U.S. Sprint Commc'ns Co.*, 924 S.W.2d 632 (Tenn. 1996), for the proposition that "aggregate damage models have been found to be appropriate" not only in antitrust, but in products liability and trespass cases.  (Reply at 43.)  These, which in any event were not governed by the Federal Rules of Civil Procedure, are singularly unpersuasive.

While *Samuel-Bassett* "note[d] that some jurisdictions have permitted the use of aggregate damages calculations in class actions," it also noted that the Fifth Circuit was not among them.  34 A.3d at 40 (citing *In re Fibreboard Corp*., 893 F.2d at 711-12).  Moreover, the court there held that the defendant had waived objection to aggregation of damages, and explicitly "emphasize[d] the narrow nature of our holding in this regard":  in view of the waiver, the court "need not, and therefore [did] not, express a definitive view on the questions of whether proving damages in the aggregate in a class action is 'lawful and proper' in Pennsylvania, and of whether the methodology of [plaintiff's] expert in estimating individual damages here was sound."  *Id.* at 41 n. 27.  *See also In re Pharms. Indus. Average Wholesale Price Litig*., 582 F.3d 156, 198 (1st Cir. 2009)  (Reply at 54) (holding defendant had waived arguments that plaintiffs'

---

[6]  "Pogorilich Dep." refers to the transcript of the Deposition of David Pogorilich dated May 22, 2015. All cited references to the Pogorilich Dep. are submitted herewith as Exhibit B.

[7]  "Marais Supp. Decl." refers to the Supplemental and Updated Declaration of M. Laurentius Marais, Ph.D dated May 28, 2015.  A copy of the Marais Supp. Decl. is submitted herewith as Exhibit C.

damage expert's calculations failed to account for a small number of opt-outs and persons defined out of the class).

*Meighan,* which was decided 15 years before the U.S. Supreme Court's decision in *Dukes, supra,* was a putative class action by landowners, alleging that telephone company's installation of cable across plaintiffs' property was a trespass.  While "recogniz[ing] that the issue of compensatory damages may require some individual consideration," the court found that this would not preclude class treatment, nor would the fact "that the case involves property damage" per se "foreclose . . . Rule 23 procedures."  924 S.W.2d at 638.  Obviously, that is not what Defendants are contending.  And while opining in dicta that the case was "particularly amendable [*sic*] to the aggregate damage approach," the court did not actually determine how damages would be calculated or what standards would be applied.  *Id*.

By contrast, the Fifth Circuit in *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x. 350 (5th Cir. 2005) (Reply at 50) held that a claim virtually identical to that presented in *Meighan* was <u>not</u> suitable for class treatment due to the variability of members' damages. Addressing the calculation of property damages for alleged trespass, the court held it "would require examination of the peculiar circumstances of individual landowners," because, given their different geographical situations, the "value of the myriad easements would randomly vary in such a way as to defy any coherent system of determining damages."  *Id.* at 354.  As here, "the injury to the landowners varies in substantial ways, depending on the value, character and location of the property. . . ."  *Id.* at 355.

Thus, Plaintiff's citation to *Corley* for the circumstances under which "Fifth Circuit jurisprudence . . . approves of a 'suitable formula for calculation of damages' in the class context"

(Reply at 40) essentially concedes that such a formulaic calculation is <u>not</u> available on the facts presented here.

## II.   DAMAGES FOR THE CLASS MEMBERS ARE NOT FORMULAIC.

Plaintiffs assert that "[c]alculating damages 'using standard methodology premised on <u>data common to all class members</u> . . . is sufficiently reliable to establish that damages are susceptible of measurement across the entire class,'" and that here "each class member suffered <u>the same kind of injury</u>, and the only individualized determination required can be calculated using a formula to estimate each class member's damages."  (Reply at 53 (quoting *Rai v. Santa Clara Valley Transp. Auth.*, No. 5:12-CV-004344-PSG, 2015 WL 860761, at *15 (N.D. Cal. Feb. 24, 2015)).

What Plaintiffs' argument persistently ignores, however, is that even if they suffered the same "kind" of injury, the relevant data here—the costs of repair for different properties spread out over 18 states—are not "common to all class members," but individualized and variable.  As with the property owners' trespass claims in *Corley*, "geographic variations would render some parcels more valuable than others, thus precluding any mechanical calculation of damages in this case," and any attempt to calculate damages "based on a per-foot extrapolation" derived from what defendant charged other telecom companies for access would be "a poor proxy for the price of gaining access to any given parcel of land," and would "necessarily yield a windfall to some landowners at the expense of others."  *Corley*, 152 F. App'x. at 355.

Certainly, the cases Plaintiffs cite do not support the proposition that this case involves simple calculations based on data common to all class members.  For example, *Rai* involved bus and train operators' claims that they were undercompensated under state and municipal law; as in the inapposite antitrust and "overcharge" cases Plaintiffs cite, the method for calculating this

undercompensation was straightforward and sufficient at the class certification stage.  2015 WL 860761 at *14.  In contrast to the properties and repair cost data at issue in this case, the wage data in *Rai* was not only "premised on data common to all class members," it was "from [the defendant's] own records. . . ."  *Id.* at *15.  As Plaintiffs themselves note, other cases they rely upon likewise utilized "a simple formula, using data extracted from the defendant's databases" (Reply at 53, citing *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013); *Klay v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004)); clearly, such is not the case here.[8]

In any event, Mr. Inglis has not devised a "formula," and has no statistical expertise with which to do so.  (*See* Inglis Dep. 18:2-21 (explaining that he is not an expert in statistics, he has not performed statistics "in recent times" and it was not something he did on this project).)  Mr. Inglis has done nothing more than averaged the estimated remediation costs of six properties located in Northern Virginia and then pronounced that average somehow to be representative of a sprawling class of thousands of properties located across 18 States.  There is neither statistical nor scientific support for that assertion.  (*See* Marais Supp. Decl. ¶ 13 (explaining that Mr. Inglis' "far-reaching extrapolation to the entire class of estimated costs from the seven *Germano* properties . . . is fundamentally flawed because he provides no basis for assuming that this small sampling of seven class properties is validly representative of the great majority of 2,888 class properties.")

---

[8]  Plaintiffs also rely on *Goldenberg v. Indel, Inc.*, No. Civ. 09-5202 JBS/AMD, 2012 WL 3780555 (D.N.J. Aug. 30, 2012) (Reply at 54), an ERISA class action, but in denying defendants' *Daubert* motion there, the court held only that plaintiffs' expert report was "an appropriate fit to Plaintiffs' claim, which is that the [plan trustee's] asset allocation target was imprudent," and that it did not "unnecessarily attempt to actually calculate the exact amount of damages at this class certification stage."  *Id.* at *17.  Unlike this case, the allegedly imprudent asset allocation was common to all class members and had a uniform, readily calculable impact on each member's holdings; even so, the court expressly made "no determination of the admissibility of [the] expert opinion testimony for purposes of trial."  *Id.* at n. 8.

Clearly then, the foregoing cases do not support Plaintiffs' sweeping assertion that "courts have repeatedly recognized that formulaic damages meet Rule 23 standards in a variety of cases, not just antitrust cases," much less that formulaic damages would be appropriate here, even if Mr. Inglis had in fact derived a formula, which he has not.  (Reply at 54 n. 95.)

## III.   DEFAULT DOES NOT REPLACE INQUIRY INTO DAMAGES.

Plaintiffs' argument that "no . . . proof" of damage causation "will be required in this case due to the admissions resulting from Defendants' defaults" is also wide of the mark.  (Reply at 38 n. 85.)[9]  Whether liability is established by default or by judgment, the amount of damages must be proved up.  Under Rule 23, liability and damages require separate, and equally "rigorous analysis," *Comcast Corp. v. Behrend,* 133 S. Ct. 1426, 1433 (2013), and Rule 23's requirements "are not waived or admitted by the default." *In re Chinese-Manufactured Drywall Products Liab. Litig.*, No. MDL 2047, 2014 WL 4809520, at *10 (E.D. La. Sept. 26, 2014). Instead, after liability is established, "individual particularized damages still must be proved on an individual basis."  *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1200 (6th Cir. 1988) (cited with approval in *Cimino v. Raymark Indus.*, 151 F.3d at 317).

Thus, invoking the general rule that once the fact of damages is proved, courts do not require that the amount of damages be "measured with certainty" (Reply at 40) also does not help Plaintiffs.  As Plaintiffs' concede, "[o]nce liability is established . . . a plaintiff's proof of damages is evaluated under <u>a more lenient standard</u>" (*id.* (emphasis added)); that does not mean there are no standards, or that anything goes.

---

[9]  Plaintiffs argue that "Defendants have forfeited their right to a jury trial" and that "[t]his Court, not a jury, will sit as the trier of fact, and decide all facts relative to the quantum of damages owed to the class." (Reply at 39.)  That is beside the point; whether decided by a jury or court, as a matter of law, damages cannot be calculated the way Plaintiffs propose, both because of the necessarily individualized inquiry, and because estimates may not be used where actual cost records exist.

For example, in *In re Industrial Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418 (S.D.N.Y.

2000), buyers of industrial diamonds brought a class action against the two producers controlling

the majority of the world market, alleging a price-fixing conspiracy in violation of the antitrust

laws; after defendants defaulted, plaintiffs moved to assess damages pursuant to Fed. R. Civ. P.

55(b)(2).  Denying the motion, the court held the figures on sales of industrial diamond products

that plaintiffs' expert used in his computation "were not directly derived from corporate records

but upon estimates made through a complicated, roundabout process disturbingly redolent of

Rube Goldberg."  *Id.* at 422.  This "artificial process," involving "improbable assumptions based

on other improbable assumptions, was utterly unnecessary because, *mirabile dictu*, hard data on

such sales were available merely for the asking."  *Id.* at 423.

> With such ready availability of accurate data . . ., we can divine no reason why
> plaintiffs resorted to the circuitous and speculative methodology employed by
> [expert] other than a desire to magnify their damages. That, of course, is what
> plaintiffs' counsel naturally try to do, but it is the duty of the court, even where a
> defaulting defendant has not appeared at the inquest to challenge the plaintiffs'
> computation of damages, to protect the interest of the absent defendant and insure
> that justice is done to all parties, even foreign corporations who are reputedly
> members of powerful cartels.

*Id.; see also Hickory Securities Ltd., v. Republic of Argentina,* 493 F. App'x 156, 159, 160 n. 2

(2nd Cir. 2012) ("aggregate calculations that result in inflated damage figures that do not

accurately reflect" the "amount of economic harm actually caused . . . violate the Rules Enabling

Act"; vacating award of aggregated class damages against the Republic of Argentina).

Those observations are equally apt here.  Indeed, that Plaintiffs' methodology is designed

to magnify damages is strongly suggested by the tremendous disparity between the "per square

foot" estimates Mr. Inglis' formula creates and that Plaintiffs now rely upon, and the per square

foot remediation amounts that some of the same Plaintiffs' counsel negotiated in the Knauf

settlement.  (*See* Marais Supp. Dec. at ¶ 27 (noting that a comparison of the cost estimates

produced by the Inglis formula vs. the actual remediation costs within 398 Zip code areas showed that in 303 of 398 Zip code areas (76%) the Inglis formula overestimated that actual cost of remediation by an average of at least 37%).)  As demonstrated by these comparisons, there is no question that the calculations generated by Plaintiffs' proposed formula drastically overstates the damages awards in numerous circumstances.  (*Id.*; *see also* ¶ 27 n. 24.)

Plaintiffs mistakenly rely on *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014), misrepresenting that the court there "endorsed the concept" of aggregated damages "where the class plaintiffs could present damages in a formulaic manner."  (Reply at 43.)  In fact, *Deepwater Horizon* emphasizes the error of Plaintiffs' position.  There, as Plaintiffs note, the class members' damages were <u>not</u> "susceptible to a formula for classwide measurement" (Reply at 40); the predominance that supported class certification "was based not on common issues of damages but on the numerous common issues of liability," and "[t]he district court always recognized that the class members' <u>damages 'would have to be decided on an individual basis</u> were the cases not being settled. . . .'"  739 F.3d at 815 (emphasis added).  The Fifth Circuit agreed with defendants that "<u>the class members' damage calculations give rise primarily to individual questions that are not capable of classwide resolution</u>."  *Id.* (emphasis added). The only reason the Rule 23(b)(3) predominance inquiry was satisfied was because the proceedings were "structured to establish 'liability on a class-wide basis, with separate hearings to determine—if liability is established—the damages of individual class members.'"  *Id.* at 817.

## IV.   PLAINTIFFS CONTINUE TO RELY ON ANTITRUST CASES THAT ARE NOT APPLICABLE.

As noted in BNBM PLC's and BNBM Group's Opposition brief, Plaintiffs' heavy reliance on antitrust cases is misplaced.  Plaintiffs have no answer, other than to pronounce (in a footnote) that this is a "red herring" and that "antitrust cases are instructive regarding the type of

formulaic methodology acceptable in the calculation of aggregate classwide damages." (Reply at 54 n. 95). Those cases <u>are</u> instructive as to why a formulaic methodology may be appropriate in certain antitrust class actions, but not in a tort case like this.

For example, Plaintiffs cite *Allied Orthopedic Appliances, Inc. v. Tyco Healthcare Grp. L.P.,* 247 F.R.D. 156 (C.D. Cal. 2007), for the proposition that they "may prove class-wide damages in the same manner as class-wide impact" (Reply at 42), but, as the court there explains, where an antitrust suit alleges that "a challenged activity artificially maintained prices above competitive levels," damages may be readily calculated "by comparing prices during the period of challenged activity to prices as they would have been without the unlawful conduct, and arriving at a total damages figure for the class on the basis of the defendant's records of sales during the class period as to all members of the class." *Id.* at 175; *see also In re Polyurethane Foam Antitrust Litig.*, No. 1:10-MD-2196, 2014 WL 6461355, at *45 (N.D. Ohio Nov. 17, 2014) (Reply at 54) (proposed methods for calculating amounts by which antitrust violations caused plaintiffs to be overcharged were sufficient for purposes of class certification).[10] Moreover, "[a]ntitrust class actions are particularly well suited to proof of total class damages, because damages in an antitrust suit need not be proved with common law precision . . . [and] . . . antitrust violations typically involve relatively small injuries to an extremely large number of people." *Allied Orthopedic,* at 175 n. 26 (quoting 6 Newberg on Class Actions, § 18:53 (4th ed.)).

---

[10]   The same is true of the tort class action cases Plaintiffs cite that involve overcharging the plaintiff. *See In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir. 2013) (Reply at 53) (class action involving fraudulent overbilling by food distributor; "individual damages could be calculated on a class-wide basis with a simple formula using data extracted from USF's databases"); *In re Pharms. Indus. Average Wholesale Price Litig.*, 582 F.3d 156 (1st Cir. 2009) (Reply at 54) (class action involving deceptive trade practices that caused inflation of prescription drug's average wholesale price that plaintiff third party payors had to pay).

In contrast to an antitrust or "overcharge"-type class action, where the overcharge is shown through statistical and econometric data to be relatively uniform throughout the class, this case involves common law claims for relatively large damages by a relatively small class, and those damages cannot be determined by simply applying an across-the-board price reduction to whatever amount plaintiff paid.  Even in the antitrust context, a formulaic damage calculation may be unavailable "when factors affecting pricing constantly vary in the industry involved"; that was the case in *Allied Orthopedic*.  *See id.* at 175 ("Plaintiffs' alleged overcharge varies in complex ways across Tyco's diverse customer base" and "[t]his pricing complexity implies the need for individualized inquiry when estimating damages").

## V.      PLAINTIFFS' ADDITIONAL ARGUMENTS DO NOT BEAR ON DAMAGES AND ARE NOT SUPPORTED BY LAW.

### A.      *Germano* and *Hernandez* Cannot Estop Non-Parties From Litigating Claims.

Plaintiffs contend that BNBM PLC and BNBM Group are estopped from "relitigating issues that have already been litigated and determined by this Court in *Germano* and *Hernandez* and again considered in the Court's consideration of class certification."  (Reply at 30-37.)  But as BNBM Group and BNBM PLC have previously explained, they were not named as defendants in *Germano* or *Hernandez*, and those cases did not involve drywall manufactured by either BNBM PLC or BNBM Group.[11]  Indeed, *Hernandez* was a Knauf case.  Incredibly, Plaintiffs argue that BNBM PLC and BNBM Group could have intervened in those cases, and therefore should be bound by the findings there.  (Reply at 34-35.)  This proposition, if accepted, would mean that any non-party with knowledge of a lawsuit could be estopped from challenging findings made in that lawsuit.  This proposition would radically alter the law of collateral

---

[11]  *See* BNBM Group and BNBM PLC's Response to the PSC Memorandum Regarding Effects of Default and Issue Preclusion in April 28, 2015 Class-Wide Damages Trial, May 8, 2015, at pages 14-18 (Rec. Doc. 18874, cited as "Preclusion Response Br.")

estoppel, and as far as we can tell has never been adopted anywhere.  Certainly Plaintiffs offer no

authority for their proposed new standard.  BNBM PLC and BNBM Group respectfully submit

that the law of this Circuit, requiring actual identity of parties, should continue to be applied.

(*See* Preclusion Response Br. at 16.)

Similarly, it would be error to accept the PSC's proposal to substitute an undefined

"alignment of interests" standard (Reply at 36) for the privity standard announced in *In re*

*Hinsley*, 149 F.3d 1179, at *9 (5th Cir. 1998).  The PSC offers no authority for the proposition

that a supposed alignment of interests is adequate for collateral estoppel purposes.  Neither

BNBM companies' interests can be said to have been represented by Taishan.  Apart from the

fact that Taishan did not participate in those hearings even to represent its own interests, BNBM

PLC's drywall, deemed non-defective by the Consumer Products Safety Commission, was not at

issue in those cases.[12]   Knauf cannot be said to have "adequately represented" BNBM PLC's or

BNBM Group's interests in *Hernandez*, since they were not parties in that case and there were

no claims against them in that case.  There also was no "express or implied legal relationship

between" Knauf and either BNBM PLC or BNBM Group that would have obligated Knauf to

represent their interests in the prior action.  *Id.* at *10; *see generally* Preclusion Response Br. at

17.

---

[12]  The Consumer Products Safety Commission directed the Lawrence Berkley National Laboratory to test
30 brands of imported drywall used in the U.S. market for reactive sulfur gas emissions.  Memorandum
from Joanna Matheson, Ph.D., Toxicologist, Directorate for Health Sciences (Jan. 3, 2011),
http://www.cpsc.gov/PageFiles/99196/lblreport.pdf.  The report on the testing showed that certain non-
BNBM  drywall, including Knauf, had high levels of sulfur emissions.  *Id.* at 41.  In contrast, The testing
of a 2006 sample of BNBM PLC drywall obtained in America showed  hydrogen sulfide emissions of
2.45 µg-S/m2/h, on par with North American drywall, whose hydrogen sulfide emissions ranged from
0.00 - 4.00 µg-S/m2/h.  *Id.* at 41 (the relevant sample on this chart is 09-810-7078; *see* Draft Emission
Factor Results (µg/m²/h) from Lawrence Berkeley National Laboratories Chamber Testing (May 27,
2010), http://www.cpsc.gov//PageFiles/114656/LBNLsulfur.pdf).  As the CPSC specifically observed,
BNBM drywall "had low or no detectable emissions of hydrogen sulfide as did the drywall samples tested
that were manufactured domestically."  CPSC Identifies Manufacturers of Problem Drywall Made in
China, CPSC Release No. 10-243 (May 25, 2010), http://www.cpsc.gov/en/Newsroom/News-
Releases/2010/CPSC-Identifies-Manufacturers-of-Problem-Drywall-Made-in-China/.

The Plaintiffs acknowledge that on December 4, 2009, prior to the *Germano* damages hearing, the Court issued an order directing that the results of the hearing, while hopefully providing "guidance" for future proceedings, would only have preclusive effect as to the seven properties that were the subject of that hearing.  (Reply at 33.)  But Plaintiffs now are trying to do precisely what the Court's Order expressly did *not* do:  expand the preclusive effect of *Germano* to other cases involving other properties and other plaintiffs.

The  preclusive effect of a hearing is established by expectations, procedural posture and orders governing that hearing at the time it occurred, and all must comport with due process.  It would be error to accept Plaintiffs' argument that the issues involved in *Germano* and *Hernandez* are sufficiently similar to the issues to be tried in the damages hearing that they should be given preclusive effect.  The issues tried in those two cases, involving eight homes in two states, cannot be considered "identical" to the issues to be tried in the upcoming hearing, involving more than 3,500 properties in 18 states.  *Cf. Matter of Shuler*, 722 F.2d 1253, 1256 n.2 (5th Cir. 1984); *see also* Preclusion Response Br. at 14-16.  Without identity of issues or identity of parties, BNBM PLC and BNBM Group cannot be precluded from contesting the matters at issue at the June 9 hearing.  (Preclusion Response Br. at 14-18.)

Nor were the damages (or, for that matter, liability) issues presented here litigated in the prior proceedings.  Relying on a single, 40 year old decision from the Eastern District of Michigan, the PSC argues that issues need not be "actually litigated on the merits to have preclusive effect."  (Reply Br. at 31-32, discussing *Overseas Motors, Inc. v. Import Motors Ltd., Inc.,* 375 F. Supp. 499 (E.D. Mich. 1974).)  That argument flies in the face of the overwhelming weight of authority. "In the case of a judgment entered by confession, consent, or default, none of the issues is actually litigated."  Restatement (Second) of Judgments § 27 cmt. e (1982); *see*

*also In re Raynor*, 922 F.2d 1146, 1150 (4th Cir. 1991).  "If the important issues were not

actually litigated in the prior proceeding, ***as is the case with a default judgment***, then collateral

estoppel does not bar relitigation."  *Spilman v. Harley*, 656 F.2d 224, 228 (6th Cir. 1981)

(emphasis added).  Nor is *Overseas Motors* to the contrary.  There, collateral estoppel was

applied against an identical party that had refused to arbitrate despite having contractually agreed

to do so.  375 F. Supp. at 517.  Here, the PSC seeks to apply collateral estoppel against non-

parties to *Germano* and *Henandez* whose drywall was not even at issue in those cases.

Plaintiffs attempt to distinguish *Jackson v. FIE Corp.*, 302 F.3d 515, 522-23 (5th Cir.

2002), on the grounds that Jackson did not involve a Rule 55(b)(2) hearing.  (Reply at 28-30.)

That, however, is a distinction without a difference.  Regardless of whether it was in the context

of a Rule 55(b)(2) hearing, the *Jackson* court expressly rejected the argument that res judicata

and issue preclusion barred the defendant from contesting whether it was the manufacturer of a

defective product for purposes of challenging jurisdiction, even though the defendant knowingly

allowed the default judgment to be entered against it and the district court's default judgment on

the merits made a specific finding as to that issue.  302 F.3d at 524-30.

> **B.    Alter Ego Is Not An Issue In The Damages Hearing.  In Any Event, BNBM PLC and BNBM Group Have Demonstrated They Are Not Alter Egos of Taishan.**

In its Reply, the PSC continues to contend that the Court's findings of fact and

conclusions of law when it certified a class of plaintiffs against Taishan preclude BNBM PLC

and BNBM Group (and others) from challenging that they are alter egos of Taishan.  (*See* Reply

at 69-72.)  This Court has expressly ruled, and reiterated in a telephonic hearing with the parties

on May 28, 2015, that the July 9 hearing will be limited to the amount of damages to be awarded

to the class plaintiffs and that other issues will be taken up in later proceedings, including BNBM

PLC's and BNBM Group's Motions to Dismiss for Lack of Personal Jurisdiction, Motion to Vacate Entries of Preliminary Default, and Motion to Vacate Portions of the Class Certification Order Addressing Their Liability to the Class Under the Theories of Single Business Enterprise, Alter Ego or Piercing the Corporate Veil.  It is therefore not necessary to address these issues here.  In any event, these issues are addressed at length in several prior filings, and we refer the Court to the arguments presented there.[13]

## CONCLUSION

For all of these reasons and those set forth in their previously filed brief in opposition to damages, BNBM PLC and BNBM Group respectfully request that the Court deny Plaintiffs' Motion For Damages, and provide BNBM PLC and BNBM Group all such further relief that it deems just and proper.


Dated:  May 29, 2015

---

[13]  *See* Memorandum of BNBM PLC Company in Support of its Motion to Dismiss the Complaints Pursuant to Rules 12(B)(2) and 12(B)(5), Rec. Doc. 18849-1, filed April 29, 2015, at 6-10, 24-32; Memorandum of BNBM Group Company in Support of its Motion to Dismiss the Complaints Pursuant to Rules 12(B)(2) and 12(B)(5), Rec. Doc. 18776-1, filed April 29, 2015, at 6-10, 17-19; Memorandum of Law in Support of Motion of BNBM PLC and BNBM Group to Vacate Entries of Preliminary Default, Rec. Doc. 18851-1, April 29, 2015, at18-23; Memorandum of Law of BNBM PLC and BNBM Group in Support of Their Motion to Motion to Vacate Portions of the Class Certification Order Addressing Their Liability to the Class Under the Theories of Single Business Enterprise, Alter Ego or Piercing the Corporate Veil, Rec. Doc. 18876-1, filed May 8, 2015.

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
michael.barr@dentons.com
justin.kattan@dentons.com

- AND -

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 7800
Chicago, IL  60606-6306
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com

- AND -

C. Michael Moore
Texas Bar No. 14323600
Gene R. Besen
Texas Bar No. 24045491
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
mike.moore@dentons.com
gene.besen@dentons.com

- AND -

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130
harry.rosenberg@phelps.com

*Attorneys for Beijing New Building Material (Group) Co., Ltd. and Beijing New Building Materials Public Limited Company*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that the above and foregoing Sur-Reply of Beijing New Building Materials Public Limited Company and Beijing New Building Material (Group) Co., Ltd. in Opposition to Plaintiffs' Motion For Assessment of Class Damages Pursuant To Rule 55(B)(2)(B) has been served on Plaintiffs' Liaison Counsel, Leonard Davis, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 29th day of May, 2015.

<em>/s/    Michael H. Barr</em>