UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

THIS DOCUMENT RELATES TO:

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* Case No. 2:11-cv-01673

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* Case No. 2:11-cv-01395

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* Case No. 2:11-cv-01672

*Wiltz et al. v. Beijing New Building Material Public Limited Company et al.,* Case No. 2:10-cv-00361

*Gross et al. v. Knauf Gips KG et al.,* Case No. 2 :09-cv-06690

*Germano et al. v. Taishan Gypsum Co. Ltd. et al.,* Case No. 2:09-cv-06687

## SUPPLEMENTAL AND UPDATED DECLARATION OF M. LAURENTIUS MARAIS, Ph.D.

This declaration is made in accordance with and pursuant to 28 U.S.C. § 1746.

I, M. Laurentius Marais, declare under penalty of perjury under the laws of the United States of America that the following statements are true and correct:

1.    I am over eighteen (18) years of age, am competent to testify to the matters contained herein.



## Introduction

2.     I am a Vice President and Principal Consultant at William E. Wecker Associates, Inc., a consulting firm that specializes in applied mathematical and statistical analysis, including statistical extrapolations based on sampling, and the calculation of damages. I hold a Ph.D. degree and master's degrees in business administration, mathematics, and statistics from Stanford University. I have taught and conducted scholarly research while serving on the faculties of the University of Chicago and Stanford University. I am a fellow of the Royal Statistical Society and a member of the American Statistical Association and the Society for Industrial and Applied Mathematics, among other professional societies. I have extensive experience in applying statistical and mathematical theory and methods and in reviewing and assessing the validity of statistical studies, inferences, and conclusions.

3.     My qualifications and a list of my professional publications are shown in my curriculum vitae, which is attached to this declaration as Exhibit A. A list of all cases in which I have testified as an expert at trial or by deposition in the last four years is attached as Exhibit B. The billing rate for my work in this matter is $700 per hour.

4.     In my May 7, 2015, declaration in this matter (hereinafter "Marais Declaration"), I reviewed and commented from the perspective of my areas of expertise on the April 27, 2015, Affidavit of George J. Inglis, P.E. (hereinafter "Inglis Affidavit"). Since then, counsel for the defendants in this matter have asked me to review Mr. Inglis's revised declaration dated May 15, 2015 (hereinafter "Revised Inglis Declaration"), accordingly to revise my previous declaration as appropriate, and to comment on any new statistical issues arising from information provided to me since May 7, including the Revised Inglis Declaration.

5.     A list of materials I have reviewed in connection with this assignment is attached as Exhibit C.

6.    In sum, as I set forth below, I find no reason in the Revised Inglis Declaration to amend the substance of any opinion I stated in the Marais Declaration.[1] I have, however, added to this supplemental and updated declaration my comments on Mr. Inglis's reliance on new input from a "professional statistician,"[2] and on a test, based on data on the actual remediation costs at certain class properties recently provided to me, of the accuracy of Mr. Inglis's square-footage-based extrapolation method.

## Opinions in Response to the Revised Inglis Declaration

7.    In substance, the Revised Inglis Declaration differs from the Inglis Affidavit in three respects: (1) Mr. Inglis now calculates "remediation damages" for a reduced set of 2,888 class properties instead of the previous 3,739 class properties; (2) Mr. Inglis's purported calculations of alternative living expense have been deleted; and (3) Mr. Inglis now refers to the "the recommendation of a professional statistician" and relies on it to estimate the square footage for 7 properties.[3] Nothing in these revisions calls for any change the substance of my opinions as stated in the Marais Declaration.

8.    The Revised Inglis Declaration proffers a purported calculation of the total cost of remediation "for a class of 2,888 buildings in 18 states," based on five-year-old cost estimates from two contractors for remediating a total of seven class properties, all located in southeastern Virginia (hereinafter the "Germano Properties").[4]

9.    Mr. Inglis's revised calculation rests on two simple inputs for each class property: (1) the square footage of the property; and (2) the three leading digits of its Zip Code, from which he determines a single so-called "location factor" for all properties sharing the same three-digit prefix. Both inputs are subject to

---

[1] The Revised Inglis Declaration no longer includes a calculation of purported "alternative living expense" for the class; accordingly, I have omitted from this supplemental and updated declaration my previous comments on this aspect of the previous Inglis Affidavit.

[2] Revised Inglis Declaration, ¶ 2.

[3] Revised Inglis Declaration, pp. 2-3 at ¶2, and Revised Inglis Declaration Exhibit 11.

[4] Revised Inglis Declaration, pp. 3-4; Revised Inglis Declaration Exhibit 7; Affidavit of Ronald E. Wright, P.E. ("Wright Affidavit"), Exhibit 7, Case 2:09-md-02047-EEF-JCW Document 18086-10; and Exhibit 4 of Deposition Ronald E. Wright, dated February 9, 2010.

uncertainty for individual properties.[5] Mr. Inglis does not account for any such uncertainty or associated variation among class properties, however; instead, he applies a single, simplistic formula to class properties across the board: $118.89 × [location factor] × [square footage].

10.   The process of extrapolating measured values from a sample to the source population of that sample falls squarely within the purview of scientific statistical inference, and is governed and informed by the well established and broadly accepted principles of that branch of mathematical science.[6] However, Mr. Inglis neither employs nor makes reference to these principles, and his curriculum vitae produced in this proceeding contains no specific indication of any expertise in this area. Indeed, at deposition he disclaimed expertise in the field of statistics.[7]

11.   The mathematical theory and practice of statistical sampling and extrapolation demonstrate—as common sense also suggests—that the validity of such extrapolations from a sample to an entire population of interest depends critically on the empirical validity of the necessary assumption that the sample is properly representative of that population. The validity of an extrapolation therefore requires a sufficient basis for the assumption of representativeness. In the present case, Mr. Inglis provides no scientifically valid basis for assuming such representativeness, and the facts and circumstances surrounding his extrapolations provide ample indications to the contrary. Nor does he provide any basis for measuring, let alone any actual calculation of, the degrees of potential error in his extrapolations, i.e., the likely degrees of discrepancy between the true values of the quantities he claims to measure and the results of his purported calculations.

12.   In sum:

---

[5] Mr. Inglis relies on RS Means for the location factors. RS Means has more than one value for the location factor (e.g. the RS Means Construction Cost Data (2015) location factor for Norfolk Virginia is 0.864 and the RS Means Residential Cost Data (2015) location for Norfolk Virginia is 0.96). The measured square footage for remediation varies among contractors making the estimate (e.g. VB Homes estimated the square footage on the Orlando home as 3,005 and Virtexco estimated 3,485).
[6] See, for example, Cochran, William G., Sampling Techniques, 3rd ed. Wiley, 1977, and Lohr, Sharon L., Sampling: Design and Analysis, 2nd ed., Cengage Learning, 2009.
[7] Deposition of George Inglis, P.E., dated May 19, 2015 at p. 18:19-21.

- Mr. Inglis's purported calculations of class-wide remediation costs do not comport with well established principles for obtaining statistically and scientifically valid extrapolations from samples and, therefore, cannot be relied upon to estimate class-wide damages, or damages for individual class members.

## Opinions Concerning the Cost of Remediation

### *The critical importance of "random" sampling for a valid statistical extrapolation within a calculable degree of potential error*

13.   Mr. Inglis's far-reaching extrapolation to the entire class of estimated costs from the seven Germano Properties, an unscientific, improvised[8] sampling of class properties in Virginia, is fundamentally flawed because he provides no basis for assuming that this small sampling of seven class properties is validly representative of the great majority of 2,888 class properties. Indeed, because plaintiffs have disclosed no valid random sample of class properties, they possess no apparent basis for *any* statistically valid extrapolation concerning the entire population of class properties.

14.   Statistically valid "probability sampling" (also called "random sampling") from the actual population of interest (here the entire set of class properties) is essential for making statistically valid projections to that population.[9] A Gallup website report dated March 18, 2010, provides an illustrative example of this principle in a familiar context.[10] Specifically, this Gallup report states, based on telephone interviews with a "random sample" of American adults, that "Americans hold

---

[8] I describe the Germano Properties as an "unscientific" and "improvised" sampling of class properties because I understand that they were chosen by the Plaintiffs' Steering Committee, and that there is no evidence to suggest that the Steering Committee applied a statistically valid probability sampling procedure (see ¶ 21 below).

[9] See, for example, Cochran, op. cit., and Lohr, op. cit. "Random sampling" is a term of art for a sample selection process with specific mathematical properties, which Lohr describes as follows: "In a probability sample [or "random sample"], each unit in the population has a known probability of selection, and a random number table or other randomization mechanism is used to choose the specific units to be included in the sample." In other words, a sample selected by an unplanned, uncontrolled, haphazard process, whether subject to an intentional or conscious bias or not, neither qualifies as nor shares the desirable properties of a statistically valid "random" sample.

[10] See http://www.gallup.com/poll/126809/obama-approval-rating-lowest-yet-congress-declines.aspx (accessed September 19, 2014).

Congress in far less esteem than they do the president ... 80% disapprove of the job Congress is doing." There were at the time approximately 235 million American adults. Thus, Gallup was here extrapolating to a population of some 235,000,000 Americans a breakdown of opinions ascertained from a sample of only 1,014 Americans.

15.   The responses Gallup obtained from the 1,014 survey respondents did not, of course, reveal directly what responses would have been given by the 234.999 million Americans *not* asked the survey questions. Thus, the survey result could not absolutely rule out the remote possibility that every single one of the 234.999 million Americans *not* asked the survey questions actually *approved* of the job Congress was doing and, accordingly, that Americans' true rate of disapproval of Congress was virtually zero instead of 80%.[11]

16.   For this to be so, however, would require that Gallup's *random* sample of 1,014 out of 235,000,000 Americans had, by an astonishing fluke, included every last one of the hypothetically exceptional 811[12] Americans who disapproved of Congress.[13,14] Though it is remotely logically possible that the Gallup sample result *could* have been as extremely unrepresentative as this extreme hypothetical requires, that would require an extremely improbable fluke to have occurred.

17.   Less extreme margins of discrepancy between a random sample and its source population have corresponding, less extreme degrees of improbability. For example, Gallup notes, concerning the margin of error in their 80% survey result, that "one can say *with 95% confidence* [italics added] that the maximum margin of sampling error is ±4 percentage points," i.e., that the true population-wide rate of disapproval lies in the range from 76% to 84%. There exists no statistically valid method for

---

[11] Given that approximately 80% of 1,014 sample members disapproved of Congress, then if no one outside the Gallup sample disapproved, the implied population rate of disapproval would equal (80% × 1,014) / 235 million = 0.0003%.

[12] That is, 80% × 1,014.

[13] Expressed in percentage, this fluke has probability of less than 0.000 ... (for a total of 4,558 zeros) ... 0001%, i.e., it is vanishingly improbable.

[14] This hypothetical outcome is analogous to drawing 1,014 tickets from a "silo" containing 235,000,000 tickets, well mixed, including exactly 811 red tickets, and finding all 811 red tickets in the sample of 1,104.

calculating margins of error of this kind for an improvised "convenience sample" like the Germano Properties relied upon by Mr. Inglis.

18.   The extreme hypothetical described in ¶ 16 above illustrates a critically important property of *random* samples, *not* shared by the *improvised* sample on which Mr. Inglis relies in this case: large deviations between the composition of a genuinely random sample and the composition of the entire population from which it was drawn, though theoretically possible, are improbable, to a degree that depends on the sample size and can be calculated with mathematical precision. True random samples strongly tend to reflect the composition of the underlying population,[15] and the degree of probable deviation between the composition of a random sample and that of the underlying population can be calculated using the mathematics of probability theory. Stated differently, properly conceived and implemented random sampling provides a quantifiable assurance of "representativeness."[16]

19.   Moreover, the larger the sample the more closely its composition tends to reflect that of the underlying population. Mathematical sampling theory shows that if Gallup had used a random sample size of seven–Mr. Inglis's sample size in this case–instead of 1,104, the calculated margin of sampling error of the survey result would have been not 4% but approximately 48% or, more exactly, a range of uncertainty (i.e., "95% confidence interval") from 42.1% to 99.6%.[17,18]

---

[15] Stated more technically precisely, random sampling yields "unbiased" estimates of population characteristics.

[16] It is generally understood that a "representative" sample must be, in effect, a miniature of the population from which it was drawn. More precisely, for a sample to be representative of the population with respect to a given attribute of interest—e.g., the percentage of units having a defect of a given kind—the value of that attribute as measured in the sample must be a reasonably accurate approximation to the value that would be obtained by measuring that attribute in the entire population.

[17] Clopper-Pearson exact confidence interval for binomial parameter, based on 6 "successes" out of 7 trials, where $6 \approx 80\% \times 7$.

[18] An estimate obtained from a random sample will typically deviate from the true value of the corresponding quantity in the source population owing to "sampling error." A "95% confidence interval" based on a calculated "margin of error" is a statistical measure of the potential magnitude of this kind of deviation of a sample-based estimate from the corresponding true value.

20.   In sum, the *random* nature of Gallup's sample is critically important for the validity of Gallup's assumption that their sample was representative of American adults generally, and the *size* of Gallup's sample yielded a relatively precise estimate (having a margin of sampling error of "±4 percentage points"). Had Gallup instead conducted its study by selecting a small sample of customers at a Berkeley, California, coffee shop for questioning on a given weekday morning, it would be no surprise for their breakdown of opinions to be substantially different from that among American adults generally, to a degree essentially impossible to quantify. This would be an example of a small "convenience sample," subject to potential "selection bias," like the Germano Properties; convenience sampling provides *no* general assurance of representativeness.[19]

### *Plaintiffs' improvised sampling of seven class properties falls far short of the kind of statistically valid "random" sample that permits statistically valid extrapolations to the entire class within a calculable degree of potential error*

21.   I understand that the Germano Properties were selected by the Plaintiffs' Steering Committee, and that this occurred even before many of the properties in the class had been ascertained. Thus, the Germano Properties certainly could not have been properly sampled from a complete list of class properties (a "sampling frame"[20]), which did not yet exist. I understand further that there is in any case no evidence that the Plaintiffs' Steering Committee selected the Germano Properties randomly using proper statistical methodology (indeed, the probability that a genuinely random sample of seven class properties would *all* happen to be in Virginia is approximately 0.000000009%). Thus, the selection process that produced the Germano Properties provides no assurance whatever of representativeness and carries a high risk of selection bias.

22.   Accordingly, the seven properties underlying Mr. Inglis's calculations are not a proper analog of Gallup's random sample but are an analog, rather, of the likely

---

[19] See, for example, Lohr, op. cit., pp. 5-9.
[20] "Sampling frame: A list, map, or other specification of sampling units in the population from which a sample may be selected," Lohr, op. cit., p. 3.

biased, hypothetical convenience sample of coffee shop customers mentioned in ¶ 20 above. In sum, there is no basis in the principles of scientifically valid statistical sampling for supposing that these seven properties are representative of the entire population of class properties. These principles provide a basis, rather, for inferring that the Germano Properties are *un*representative of that population and can provide no basis for valid conclusions about the entire class.

23.   Mr. Inglis draws his unwarranted conclusions from the Germano Properties by assuming that the same ratio of remediation costs to nominal square feet that he obtains from the Germano Properties applies also to the entire class after a single gross adjustment for individual variation: an RS Means "location factor" applied uniformly within each three-digit Zip Code prefix area. Specifically, he relies on the square footage of each class property and its three-digit Zip Code prefix as the basis for his purported determination of class damages; this is the sole individualized aspect of his methodology.

24.   Mr. Inglis provides no logically compelling basis for his implicit assumption of an essentially perfect, universally applicable correlation between cost and square footage, however, and there are obvious a priori reasons to doubt it.[21] These reasons include, for example, individual variations in the amount and location of the drywall to be remediated within the home (i.e., the entire home or just a portion), likely additional variation by type of structure reflecting such factors as economies of scale for remediation of condominiums, and the quality of construction to be remediated (e.g., whether or not upgraded with trim and crown molding).[22] Mr.

---

[21] I understand that such cost estimation based on a fixed dollar amount per square foot is, at a minimum, not the standard practice for remodeling projects in the design and construction industry. For example, "The cost of a remodeling project is entirely dependent on a long list of variables including the level of finish, site characteristics, whether the project includes an addition or is a reconfiguration of an existing floor plan, and the complexity of the building. Square footage cost rules-of-thumb do not apply to remodeling projects." (http://leffconstruction.com/faqs, accessed Apr 10, 2015)

[22] RS Means Residential Cost Data, 2015, provides base cost per square foot estimates based on several factors such as living area square footage, type of exterior wall, building type (1 story, 1-1/2 story, 2 story, 2-1/2 story, 3 story, bi-level, and tri-level), class of construction (economy, average, custom, luxury), and type of home (inner unit or end unit townhouse).

Inglis's method does not account for any variation in such factors among class properties.[23]

25.   Whether there exists, in fact, a meaningful, strong correlation between square footage and the cost of remediation among the class properties–as Mr. Inglis assumes–is an empirical question. This empirical question cannot be answered by an analysis of the Germano Properties, because Mr. Inglis has provided no basis for assuming that these properties are properly representative of the entire class. Answering this question would require, instead, a genuinely random sample of class properties. The same holds for assessing the degree of error in remediation cost determinations by the Inglis method for individual class properties due to individualized, property-specific factors.

26.   Mr. Inglis's ratio method cannot produce a well-founded, accurate projected value for the class-wide *total* cost of remediation. The multiple sources of individual variation moreover demonstrate that his method must also be subject to substantial additional errors in determining the remediation costs for *individual* properties.

27.   The substantial rate of error of the Inglis method can be seen in Table 1 below, which compares the cost estimates produced by the Inglis method to actual remediation costs within 398 Zip Code areas.[24] In sum, for 303 of 398 Zip Code areas (= 76%) the Inglis method unambiguously *over*estimates the actual cost of

---

[23] The Germano Properties show that such variation does indeed occur. For example, the Virtexco estimates for remediating electrical systems at the Morgan and Heischober properties are $5.13 and $9.49 per square foot, respectively; and the VB estimates for flooring at the same two properties are $2.42 and $5.55.

[24] Data for 2,917 homes listed in "Table 2. Chinese Drywall Settlement Remediation Program Cost by Zip Code & Square Foot (As of 4/29/15)" show that actual cost per square foot in connection with the Knauf remediation program ranged from $3.83 to $192.65. (The next lowest recorded cost per square foot was $31.59, suggesting that the $3.83 value was recorded in error and that the actual lowest cost per square foot was no greater than $31.59.) The lowest total remediation cost for an individual property was $5,719 and highest was $1,474,712. It is also my understanding that the remediation program cost data includes move in/move out costs which are not included in Mr. Inglis's revised analysis, indicating that the actual remediation costs are lower than those stated in Table 2. I have been advised that BrownGreer will be providing an updated spreadsheet of actual remediation program cost data that will exclude move in/move out costs (as well as apply other minor adjustments). From the data provided to date it is clear, however, that Mr. Inglis's formula substantially overestimates the actual costs as compared to the Knauf remediation program.

remediation, by an average margin of *at least* 37% (= ($266.2m − $194.3m)/$194.3m).

**Table 1**
**Comparison of Inglis Method for Estimating Cost of Remediation**
**to Actual Costs of Remediation in 398 Zip Code areas**

|  | No. of Zip Codes | Actual Total Remediation Cost | Inglis Method Low Total Cost Estimate | Inglis Method High Total Cost Estimate |
|---|---|---|---|---|
| Inglis Method High/Low Estimates Greater Than Actual Remediation | 303 | $194,334,881 | $266,153,412 | $299,907,130 |
| Inglis Method High/Low Estimates Overlap Actual Remediation | 86 | $233,520,160 | $270,155,240 | $304,416,472 |
| Inglis Method High/Low Estimates Less Than Actual Remediation | 9 | $8,597,434 | $5,659,712 | $6,377,480 |
| Total | 398 | $436,452,475 | $541,968,364 | $610,701,082 |

Notes:
"High" refers to Inglis method as implemented with inflation adjustment, i.e., stated in terms of 2015 cost levels.
"Low" refers to Inglis method without inflation adjustment, i.e., stated in terms of 2010 cost levels.

28.   Mr. Inglis's data on the square footage of individual class properties show that they vary widely.[25] Table 1 below summarizes these size data for the 2,757 class properties with purportedly "known" square footage. The table documents a wide range of variation around this average. Specifically, the 25th and 75th percentile values are 1,368 and 2,394 square feet, respectively; the 10th and 90th percentiles are 1,082 and 3,200 square feet; and the 5th and 95th percentiles are 812 and 3,937square feet.

---

[25] The class properties also vary widely in location (see Revised Inglis Declaration, Exhibit 2).

11

**Table 2**
**Distribution of Square Footage**
**2,757 Properties with "Known" Size Data Relied on by Mr. Inglis**

| | |
|---|---:|
| Average Square Footage | 2,052 |
| Quantiles of Square Footage | |
| Minimum | 64 |
| 5% | 812 |
| 10% | 1,082 |
| 25% | 1,368 |
| 50% Median | 1800 |
| 75% | 2,394 |
| 90% | 3,200 |
| 95% | 3,937 |
| Maximum | 35,130 |

29.   Figure 1 below displays graphically this range of individual variation among the 2,888 units with "known" square footage in the form of a histogram (the blue bars). The red vertical bar overlaid on the histogram shows the simple average of the "known" square footage, 2,052 square feet. Obviously, the red bar by itself does not characterize well the configuration and range of variation of the blue bars.

**Figure 1**
**Distribution of Square Footage**
**2,757 Properties with "Known" Size Data Relied on by Mr. Inglis**



Note: Square footage categorized into 300-square-foot bins.

30.   Figures 2, 3, and 4 below show the distribution among states of the size data in Figure 1. These Figures reveal obvious differences among states. Again, the state-specific averages represented by the red bars in Figures 2 and 3 by themselves do not characterize well the configurations and ranges of variation of the blue bars. Even state-specific averages do not yet account for any regional variations within states, and in any case provide no assurance of representativeness even within states.

**Figure 2**
**Distribution of Square Footage**
**2,757 Properties with "Known" Size Data by State**

Class Properties with "Known" Square Footage



Note:
1) Square footage categorized into 300-square-foot bins.
2) Seven properties larger than 10,000 sq. ft. are contained in the largest bin shown.
3) Red lines are plotted at Ingles' mean of the state.

14

**Figure 3**
**Distribution of Square Footage**
**2,757 Properties with "Known" Size Data by State**



Notes:
1) Marker area is proportional to number of properties grouped into 300 sq. ft. bins. Seven properties larger than 10,000 sq. ft. are plotted at 10,000 sq. ft.
2) Red lines are plotted at Ingles' mean of the state.

**Figure 4**
**Distribution of Square Footage**
**2,757 Properties with "Known" Size Data by State**



**Class Properties with "Known" Square Footage**

Notes:
1) Marker area is proportional to reported sq. ft.  Each marker represents one property.
2) Seven properties larger than 10,000 sq. ft. are plotted at 10,000 sq. ft.

31.   The size data Mr. Inglis relies upon include actual values for approximately 95% of the class properties. For the remaining 5%, Mr. Inglis simply attributes to each property the average square footage of those class properties in the same state for which square footage is "known," represented by the red bars in Figures 1, 2 and 3 for properties in Alabama, Florida, Louisiana, and Mississippi.[26] For the remaining 7 properties, Mr. Inglis assigns the average of the "known" values based

---

[26] For states where *no* class properties have "known" square footage, Mr. Inglis assigns to each property a simple average of "known" square footage.

on the "recommendation of a professional statistician."[27] Accordingly, for these 131 (= 2,888 − 2757) properties the Inglis method assigns a uniform amount of remediation cost within each state. Mr. Inglis has no basis for assuming that averages describe these subpopulations of the class properties even as accurately, let alone more accurately, than averages characterize the subpopulations of properties with "known" square footage shown in Figures 1, 2, and 3.

32.   Using such averages is a source of gross errors at the level of individual class properties. Specifically, if the results of Mr. Inglis's method for assigning remediation costs to properties were used to compensate homeowners, where the true cost of remediation is below average, a homeowner compensated at the average would receive excess compensation. In contrast, where the true cost of remediation is above average, a homeowner compensated at the average would receive insufficient compensation.

33.   Since Mr. Inglis proffers no basis for assuming that the 2,757 class properties with "known" square footage are representative of the 131 class properties whose square footage is unknown, he has no apparent valid basis for attributing the averages by state of the former category to the latter category. Even if his unsupported implicit assumption were valid so that the former *were*, in fact, representative of the latter, it would then follow from the same assumption that the latter properties also varied widely in size. Thus, Mr. Inglis's attribution to this entire group of 131 properties of certain average square footage values must necessarily result in a broad scope for error in determinations for individual properties in the class.

34.   Table 2 below provides additional information on the scope for error in such individual determinations. Among the 2,757 units with "known" square footage, fully 2,258 (82%) deviate from the mean square footage by more than 10%, and 1,496 (54%) deviate from the mean by more than 25%.

---

[27] See ¶¶ 37-41 below for my responses to the opinions of "professional statistician" Michael A. Grossman.

**Table 2**

**Deviation of Square Footage From Average Among
Properties with "Known" Size Data Relied on by Mr. Inglis**

| Range of Percent Deviation from Average Square Footage | Properties Within Range | |
|---|---|---|
| | Number | Percent of Total |
| 0% to 10% | 499 | 18% |
| More than 10% | 2,258 | 82% |
| Total: | 2,757 | 100% |
| 0% to 25% | 1,261 | 46% |
| More than 25% | 1,496 | 54% |
| Total: | 2,757 | 100% |

35.  For purposes of his purported calculation of damages, Mr. Inglis draws no apparent distinction between the total square footage of a class property and its "affected" square footage, a distinction that arises in cases where the portion of a property requiring remediation represents less than 100% of its total square footage. Mr. Inglis's data for the Germano Properties show that such cases do, in fact, occur: one of the Germano Properties, the Leach property, apparently required remediation of only 56-100 square feet of a much larger property. Accordingly it *appears*–although Mr. Inglis does not address explicitly how his analysis treats this issue–that the ratio of remediation costs to square feet that he calculates from the Germano Properties data is a ratio of remediation costs to *affected* square feet.

36.  Mr. Inglis does not explain the nature of his square footage data for the 2,757 class properties with "known" square footage. To the extent that these data represent the *total* square footage of the corresponding properties, it would be a serious error to multiply them by an estimate of average remediation costs per *affected* square foot, whose effect (holding all else fixed) would be to overstate damages. Mr. Inglis's affidavit makes no mention of this issue, and so provides no assurance that he has not made this error.

***Mr. Inglis's Reference to and Reliance on a Letter from a "Professional Statistician" Fail to Respond to the Fundamental Statistical Deficiency of His Method Identified in My Previous Declaration, as Do the Letter Itself and Its Supporting Materials***

37.   The Revised Inglis Declaration attaches and makes reference to a May 15, 2015, letter and attached brief report from "professional statistician" Michael A. Grossman in support of Mr. Inglis's assignment to seven class properties with unknown square footage of the national average square footage of all properties with known square footage, regardless of location.[28] The reliance materials produced by Mr. Inglis in conjunction with his revised declaration include, in addition, an unsigned May 14 version of the Grossman letter as well as a longer version of the Grossman report attached thereto.

38.   Based on my review of these Grossman materials, I have formed four opinions about Mr. Grossman's limited contribution to this proceeding:

(1) Mr. Grossman conspicuously fails to respond to my explanation in my May 7 declaration of the fundamental statistical deficiency of Mr. Inglis's purported extrapolations of class damages from the Germano Properties, i.e., that there is no visible basis for Mr. Inglis's assumption that this unscientific, improvised sampling of seven class properties is representative of class properties generally and, therefore, no apparent basis for Mr. Inglis's extrapolation of class damages from remediation cost estimates for the Germano Properties.

(2) Mr. Grossman's letter is confined to a very narrow aspect of Mr. Inglis's analysis (i.e. the extrapolation of square footage for properties where the square footage has not been ascertained). Even with respect to that narrow issue, however, Mr. Grossman identifies no relevant citation or principle to support his conclusory assertion that "generally accepted statistical practice" suggests that Mr. Inglis may validly attribute the national average square

---

[28] Revised Inglis Declaration, ¶ 2 and Exhibit 11.

footage of class properties with known square footage to seven properties with unknown square footage, and I disagree with that assertion.[29]

(3) There is no valid statistical basis in the Inglis data for Mr. Grossman's calculations of "error ranges,"[30] on which he relies[31] for his claim that certain Inglis estimates of square footage are "highly accurate and precise".[32]

(4) Even if there were a valid basis for the statistical calculations on which Mr. Grossman relies for his claim that certain Inglis estimates of square footage are "highly accurate and precise"—which there is not—Mr. Grossman grossly misinterprets the results of those statistical calculations.

39.   Opinion (1) above is self-explanatory: the Grossman letter and report are simply silent about this fundamental issue. Concerning opinion (2) above, "generally accepted statistical practice" for predicting an unobserved value—in this case the square footage of a class property—typically employs a "statistical model" of a data generating process assumed to have produced the "known" square footage values.[33] Neither Mr. Grossman nor Mr. Inglis has defined or even alluded to any relevant model of this kind, however. Nor, given the origin of the square footage data relied upon by Mr. Inglis, does there exist any self-evident, valid foundation for such a model. Thus, Mr. Grossman's unsupported assertion and recommendation to Mr. Inglis are *in*consistent, in fact, with "generally accepted statistical practice."

40.   Concerning opinion (3) above, the validity of statistical intervals of the kind on which Mr. Grossman bases his claims requires that the data used for calculating them—in this case the square footage values of class properties in the same state having "known" square footage—be drawn at random from a probabilistic data

---

[29] Ibid., Exhibit 11, p. 2.
[30] These include, in particular, the "90 % likelihood the mean estimate of 2045 square feet is accurate within an error range of 29 %." See Revised Inglis Declaration disclosure file "05- Reliability of Est. Sq. Footage package [Unsigned Version].pdf."
[31] Ibid.
[32] Revised Inglis Declaration, Exhibit 11.
[33] See, for example, Lohr, op. cit., § 2.9, "A Prediction Approach to Simple Random Sampling."

generating process.[34] Mr. Grossman and Mr. Inglis neither mention this necessary condition for the validity of Mr. Grossman's calculations nor identify or explain any reason for assuming that the square footage data they rely upon satisfy it. Thus, the intervals Mr. Grossman reports are meaningless and the inferences he purports to draw from them groundless.

41.   Concerning opinion (4) above, the statistical intervals Mr. Grossman calculates and relies upon—were there a valid basis for his calculations, which there is not—properly describe only the *means* of the implicitly assumed much larger, state-specific source populations of square footage values, and not their wide ranges of variation (see Figures 2-4 above). Stated differently, Mr. Grossman reports so-called 90% "confidence intervals" for the *means* of the assumed state-specific source populations. In contrast, the intervals actually relevant for predicting with 90% confidence the square footages of additional observations drawn from these same assumed source populations are called "prediction intervals," and are calculated using a formula that necessarily yields much wider intervals than those calculated by Mr. Grossman.[35] In sum, the intervals Mr. Grossman reports and interprets are irrelevant to the question addressed by Mr. Inglis.

## Conclusion

42.   The opinions I have reached in this case are based on information, data, and analyses of types typically and reasonably relied upon by experts in my areas of expertise. In particular, my opinions are based on statistical and probability theory and principles as well as my background, knowledge, and experience in applied mathematics and statistics. I hold each of the opinions expressed in this declaration to a reasonable degree of scientific certainty.

43.   I may do additional work. In particular, I understand that I may be asked to assess and respond to opinions offered by other witnesses, and to review and

---

[34] See, for example, Chapter 4, "Methods for Calculating Statistical Intervals for a Normal Distribution," of Hahn, Gerald J., and William Q. Meeker, *Statistical Intervals: A Guide for Practitioners*, John Wiley & Sons, 2011.
[35] See Hahn and Meeker, op. cit., chapter 4.

respond, from the perspective of my areas of expertise, to any additional pretrial reports or other supplementation that may be produced by the plaintiffs' experts and to testimony and exhibits presented by the parties at trial.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 28, 2015

M. L. Marais
M. Laurentius Marais

**Exhibit A**


**Curriculum Vitae of M. Laurentius Marais**

January 2015

## M. LAURENTIUS MARAIS

**270 E Simpson Ave**
**PO Box 1010**
**Jackson WY 83001-1010**

**tel 307 732 6850**
**fax 307 732 6851**

**www.wecker.com**

### EDUCATION:

Ph.D.    Stanford University (Business Administration, Mathematics), 1985
M.S.    Stanford University (Statistics), 1983
M.S.    Stanford University (Mathematics), 1976
B.Sc.    Stellenbosch University (Mathematics, Applied Mathematics, Computer Science), 1973

### EMPLOYMENT:

1993 to date    Vice President, William E. Wecker Associates, Inc.
1994-1998    Stanford University, Consulting Professor, School of Law
1992 to date    Senior Consultant, now Principal Consultant, William E. Wecker Associates, Inc.
1982-1991    University of Chicago, Instructor, later Assistant and Associate Professor,
    Graduate School of Business.

### ACTIVITIES:

Editorial Board, Journal of Accounting Research, 1987-1992

Refereed for:    The Accounting Review
    Contemporary Accounting Research
    Journal of Accounting and Economics
    Journal of Accounting Research
    Journal of Business and Economic Statistics
    Journal of Financial Research
    Journal of Money, Credit and Banking

Member of:    American Accounting Association
    American Economic Association
    American Statistical Association
    Royal Statistical Society
    Mathematical Association of America
    Society for Industrial and Applied Mathematics

**PUBLICATIONS and WORKING PAPERS:**

"The experimental design of classification models: an application of recursive partitioning and bootstrapping to commercial bank loan classifications," (with James M. Patell and Mark A. Wolfson), Journal of Accounting Research, 1984.

"An application of the bootstrap method to the distribution of squared, standardized market model prediction errors," Journal of Accounting Research, 1984.

"An analysis of a multivariate regression model in the context of a regulatory event study by computer intensive resampling," Working Paper, Institute of Professional Accounting, University of Chicago, July 1986.

"A note on the algebraic and statistical properties of the multivariate market model," Working Paper, Institute of Professional Accounting, University of Chicago, September 1986.

"On drawing inferences about market reactions to the regulation of accounting for oil and gas exploration: An application of computer intensive resampling methods," Working Paper, Institute of Professional Accounting, University of Chicago, September 1986.

"On detecting abnormal returns to a portfolio of nonsynchronously traded securities," Working Paper, Institute of Professional Accounting, University of Chicago, October 1986.

"Reduced demands on recovery room resources with Diprivan compared to thiopental-isoflurane," (with Michael W. Maher et al.), Anesthesiology Review, January/February 1989.

"Wealth effects of going private for senior securities," (with Katherine Schipper and Abbie J. Smith), Journal of Financial Economics, 1989.

"Consequences of going-private buyouts for public debt and preferred stock: 1974 to 1985," (with Katherine Schipper and Abbie J. Smith), in Proceedings of the 25th Annual Conference on Bank Structure and Competition: Banking System Risk - Charting a New Course, Federal Reserve Bank of Chicago, 1989.

"Discussion of 'Post-earnings-announcement drift: Delayed price response or risk premium?'," Journal of Accounting Research, 1989.

"Using relative productivity assessments for allocating housestaff to departments," (with Michael W. Maher, Michael F. Roizen, et al.), Medical Care, 1990.

"An adaptable computer model of the economic effects of alternative anesthetic regimens in outpatient surgery," (abstract; with Michael W. Maher et al.), Anesthesiology (Supplement), September 1990.

"On the finite sample performance of estimated generalized least squares in seemingly unrelated regressions: nonnormal disturbances and alternative standard error estimators," Working Paper, Institute of Professional Accounting, University of Chicago, January 1991.

"Exploiting tax attributes of spinoffs to structure takeovers and takeover-related defenses," (with Katherine Schipper), Working Paper, Institute of Professional Accounting, University of Chicago, August 1991.

"Technological innovation and firm decision-making: accounting, finance and strategy," (with Paul J. H. Schoemaker), Working Paper, Institute of Professional Accounting, University of Chicago, September 1991.

"Process-oriented activity-based costing," (with Michael W. Maher), Working Paper, Institute of Professional Accounting, University of Chicago, June 1992.

"A field study on the limitations of activity-based costing when resources are provided on a joint and indivisible basis" (with Michael W. Maher), Journal of Accounting Research, 1998.

"Correcting for omitted-variables and measurement-error bias in regression with an application to the effect of lead on IQ" (with William E. Wecker), Journal of the American Statistical Association, June 1998.

"Event study methods: detecting and measuring the security price effects of disclosures and interventions" (with Katherine Schipper), in Litigation Services Handbook: The Role of the Financial Expert, 2005 Cumulative Supplement, 3rd Ed., John Wiley & Sons.

"Estimating Cost Behavior" (with Michael W. Maher), in Handbook of Cost Management, 2005, 2nd Ed., John Wiley & Sons.

"Audit Committee Financial Literacy: A Work in Progress" (with Douglas J. Coates and Roman L. Weil), Journal of Accounting Auditing and Finance, March 2007.

"Statistical Estimation of Incremental Cost from Accounting Data" (with Michael W. Maher, William E. Wecker, and Roman L. Weil), in Litigation Services Handbook: The Role of the Financial Expert, 2012, 5th Ed., John Wiley & Sons.

**Exhibit B**

**Previous Testimony of M. Laurentius Marais**

M. Laurentius Marais
Deposition and Trial Testimony
January 2011 – January 2015

1. Kaleh v. City and County of San Francisco. Superior Court of San Francisco County. Case No. CGC-09-495326.

2. In Re Baxter Healthcare Corporation Heparin Litigation. Circuit Court of Cook County, Illinois. Case No. 2009-l-011175.

3. In Re Budeprion XL Marketing and Sales Litigation (MDL 2107). United States District Court for the Eastern District of Pennsylvania. Case No. 2:09-CV-2811.

4. Michaels v. Pentair. District Court, Clark County, Nevada. Case No. A587256.

5. AIG Retirement Services v. Altus Finance S.A. United States District Court for the Central District of California, Western Division. No. CV-05-1035 JFW.

6. Stone v. Baxter International. District Court, Madison County, Nebraska. No. 08-400.

7. Schaffner v. Crown Equipment. United States District Court for the Northern District of California. No. CV-09-00284 SBA.

8. Gutierrez v. American Honda Motor Co. United States District Court for the Central District of California. No. EDCV09-1517 SGL (OPx).

9. Newman and Khawam v. McNeil Consumer Healthcare. United States District Court for the Northern District of Illinois, Eastern Division. No. 1:10-cv-01541.

10. Wells Fargo v. American General Life Insurance Co. District Court, 153rd Judicial District, Tarrant County, Texas. Cause No. 153-247206-10.

11. Brown and Reynolds v. Equipment Engineering. Circuit Court for Shelby County, Tennessee. No. 97528-9.

12. State of Indiana v. IBM and IBM v. State of Indiana. Superior Court of Marion County. Cause No. 49D10-1005-PL-021451.

13. Perez v. State Farm. United States District Court for the Northern District of California, San Francisco Division. No. C06-01962 (JW) (PSG).

14. Alcala v. Pentair. Superior Court, Pima County, Arizona. Case No. C20108860.

15. Avenue 6E Investments v. City of Yuma. United States District Court for the District of Arizona. Case No. 2:09-CV-00297-JWS.

16. Aventine-Tramonti v. Town Center Ventures. District Court of Clark County, Nevada, Case No. A555328.

17. Skyhawk Townhomes HOA v. Skyhawk Townhomes, LLC. District Court, Clark County, Nevada. Case No. A579563.

18. Congilaro v. Crown Equipment. United States District Court for the Northern District of New York. No. 5:09-cv-1452-FJS/GHL.

19. Kluger v. Omega Flex. Circuit Court for the Seventh Judicial Circuit, St. Johns County, Florida. No. 3:11-cv-00554-HWM-TEM.

20. Cincinnatus Partners v. Farm Bureau. United States District Court for the Southern District of Ohio, Western Division. Case No. 1:11CV427.

21. Hennigan v. General Electric. United States District Court for the Eastern District of Michigan. Civil Action No. 2:10-cv-14155-DPH-MKM.

22. Conseil Québécois sur le Tabac et la Santé and Jean-Yves Blais v. JTI-MacDonald et al. Superior Court for the Province of Quebec, District of Montreal. No. 500-06-000076-980.

23. Brown v. Johnson & Johnson. United States District Court for the Eastern District of Pennsylvania. Case No. 12-4929.

24. Anwar v. Fairfield Greenwich. United States District Court for the Southern District of New York. Case No. 09 Civ. 0118 (VM).

25. Walden v. Chrysler Group. Superior Court of Decatur County, Georgia. Case No. 12CV472.

26. Mikell v. Baxter Healthcare. United States District Court for the Central District of California. Case No. 2-13-cv-07611-MMM-PJW.

27. Olympus Insurance v. Omega Flex. United States District Court for the Middle District of Florida. Case No. 8:13-CV-01232-T-SDM-MAP.

28. Dei Rossi v. Whirlpool. United States District Court for the Eastern District of California. Case No. 2:12-cv-00125-JAM-JFM.

29. Luppino v. Mercedes-Benz USA. United States District Court for the District of New Jersey. Case No. 09-5582 (JLL) (JAD).

**Exhibit C**

**Documents Relied Upon or Reviewed**

**Documents Relied Upon or Reviewed**

| | |
|---|---|
| 1) | Affidavit of George J. Inglis, P.E., dated April 27, 2015. |
| 2) | Plaintiffs' Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice, Case 2:09-md-02047-EEF-JCW Document 18086, filed 10/29/2014. |
| 3) | Plaintiffs' Memorandum of Law in Support of Motion for Assessment of Class Damages Pursuant to Rule 55(b)(2)(B) and Request for Approval of Supplemental Notice, Case 2:09-md-02047-EEF-JCW Document 18086-1 with Exhibits (Document 18086-1 through 18086-18), filed 10/29/2014. |
| 4) | Affidavit of Ronald E. Wright, P.E. ("Wright Affidavit"), Case 2:09-md-02047-EEF-JCW Document 18086-3, filed 10/29/14 |
| 5) | Deposition and Exhibits of Ronald E. Wright, February 9, 2010. |
| 6) | Findings of Fact and Conclusions of Law, Germano, et al. v. Taishan Gypsum Co. Ltd., et al., Case 2:09-md-02047-EEF-JCW Document 2380, filed 04/08/10. |
| 7) | Cochran, William G. Sampling Techniques, 3rd ed. Wiley, 1977. |
| 8) | Lohr, Sharon L., Sampling: Design and Analysis, 2nd ed., Cengage Learning, 2009. |
| 9) | Plotner, Stephen C., RSMeans Building Construction Cost Data 2015. 73rd Annual Edition, RSMeans, 2014. |
| 10) | Mewis Bob, RSMeans Residential Cost Data 2015. 34th Annual Edition, RSMeans, 2014. |
| 11) | Flanagan, Christine and Mary Schwartz. *Rental Housing Market Condition Measures: A Comparison of U.S. Metropolitan Areas from 2009 to 2011.* US Census Bureau, April 2013. See http://www.census.gov/prod/2013pubs/acsbr11-07.pdf (accessed March 15, 2015). |
| 12) | Table 1. Overall Remediation Statistics (As of 4/29/15) and Table 2. Chinese Drywall Settlement Remediation Program Cost by Zip Code & Square Foot (As of 4/29/15). |
| 13) | Declaration, Exhibits, and Disclosure Materials of George J. Inglis, P.E., dated May 15, 2015. |
| 14) | Deposition of George J. Inglis, P.E., dated May 19, 2015. |
| 15) | Declaration of R. Bruce Gamble, dated May 8, 2015. |
| 16) | Declaration of David A. Pogorilich, CGC, MBA, dated May 7, 2015. |
| 17) | Deposition of Jacob S. Woody, dated May 26, 2015. |
| 18) | "Methods for Calculating Statistical Intervals for a Normal Distribution," of Hahn, Gerald J., and William Q. Meeker, Statistical Intervals: A Guide for Practitioners, John Wiley & Sons, 2011. |