**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |

**THIS DOCUMENT RELATES TO:**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:11-cv-01673**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:11-cv-01395**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:11-cv-01672**

*Wiltz et al. v. Beijing New Building Material Public Limited Company et al.,* **Case No. 2:10-cv-00361**

*Gross et al. v. Knauf Gips KG et al.,* **Case No. 2:09-cv-06690**

*Germano et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:09-cv-06687**

**MEMORANDUM OF LAW**
**OF BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY**
**AND BEIJING NEW BUILDING MATERIAL (GROUP) CO., LTD. IN OPPOSITION**
**TO PLAINTIFFS' MOTION TO LIMIT THE TESTIMONY OF DEFENDANTS'**
**EXPERT DR. LAURENTIUS MARAIS**

Subject to and without waiver of pending motions objecting to personal jurisdiction,

Beijing New Building Materials Public Limited Company ("BNBM PLC") and Beijing New

Building Material (Group) Co., Ltd. ("BNBM Group") respectfully submit this memorandum of

law in opposition to Plaintiffs' Motion to Limit the Testimony of Defendants' Expert Dr.

Laurentius Marais (Rec. Doc. 19014, hereinafter "Plaintiffs' Motion").

1

**PRELIMINARY STATEMENT**

There is no dispute that Dr. Laurentius Marais "is an expert in the field of mathematics and statistics," nor is there any dispute that Dr. Marais' opinions are valid and grounded in statistical science. (*See* Rec. Doc. 19014 at 6.) Plaintiffs nonetheless seek to block Dr. Marais' testimony by claiming it is "irrelevant" because their damages calculation supposedly is not an "extrapolation" and does not implicate statistical inferences. Not so. Plaintiffs admit that they do not know the true remediation costs for each class property and have never presented that evidence to the Court. Instead, Plaintiffs and their construction expert, George Inglis, P.E., rely on a so-called "formulaic estimate" to calculate remediation costs for thousands of properties, based on the average, five-year-old estimated square foot cost to remediate the seven *Germano* properties, all of which are located in southeastern Virginia. Put another way, Mr. Inglis utilizes the cost data for the limited sample set of *Germano* properties to estimate remediation costs for nearly 3,000 other properties of varying size, shape, layout, and construction, located over an 18-state region.

Mr. Inglis' model is clearly an "extrapolation" that draws conclusions for an entire population based on determinations from a sample within that population. And that analysis squarely falls within the field of statistics. (Marais Dec.[1] at 4 ¶ 10.)

In those rare instances where damages are based on extrapolations from bellwether cases, the Fifth Circuit has held that "before a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group . . . . based on competent, scientific,

---

[1] References to "Marais Dec." refer to the Supplemental and Updated Declaration of M. Laurentius Marais, Ph.D., previously submitted at Rec. Doc. 19022-5 and attached here as Exhibit A.

2

*statistical* evidence." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) (emphasis added). Dr. Marais' analysis proves conclusively that the standards laid down in *Chevron* are not met here. Dr. Marais explains that Inglis' model (1) is not based on a random sample reflective of the larger population, (Marais Dec. at 8-9 ¶¶ 21-26), and (2) in any event, does not utilize a sample size sufficient to allow any reliable conclusions to be drawn either as to individual properties or in the aggregate, (*id.* at 7 ¶¶ 18-19). Dr. Marais also demonstrates empirically that the Inglis "formula" simply does not work by comparing the results of the Inglis formula with the known, actual remediation costs incurred in connection with the Knauf remediation program. The Inglis formula rarely even came close to estimating the actual cost on an individual property-by-property basis, (in many cases being way too high, and in others, way too low), and in the instances of overestimation, the Inglis formula overcompensates by more than 35%. (Marais Dec. at 10-11 ¶ 27.) It is difficult to conceive of testimony more pertinent than that.

So Dr. Marais' opinions clearly are relevant. They are highly probative, compelling, and ultimately fatal to Plaintiffs' case. Plaintiffs' motion to exclude the testimony should therefore be denied.

## ARGUMENT

### I.  Dr. Marais' Testimony Is Relevant To Mr. Inglis' Estimate Of Remediation Costs.

Expert testimony is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993) (quoting Fed. R. Evid. 401). "Relevant evidence is admissible[.]" Fed. R. Evid. 402.

Plaintiffs cannot prevent Dr. Marais from testifying simply because they disagree with that testimony or because it differs from the testimony of their own purported expert. Federal

courts have unanimously and repeatedly held that an expert's testimony cannot be excluded solely because that expert utilized one test or methodology over another.  *See, e.g.*, *Tyler v. Union Oil Co. of California*, 304 F.3d 379, 393 (5th Cir. 2002) (affirming district court's admission of expert testimony presenting conflicting statistical analyses); *Ruiz-Troche v. Pepsi Cola of Puerto Rico Bottling Co.*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.").  Instead, Rule 702 "is broad enough to permit testimony that is the product of competing principles or methods . . . ."  Fed. R. Evid. 702, Advisory Committee Notes*; see also Heller v. Shaw Indus., Inc.*, 167 F.3d 146, 160 (3d Cir. 1999) (expert testimony cannot be excluded simply because the expert uses one test rather than another, when both tests are accepted in the field and both reach reliable results).  So long as the expert's testimony rests upon "good grounds"—which Plaintiffs admit Dr. Marias' testimony does—"it should be tested by the adversary process—competing expert testimony and active cross-examination."  *In re TIM Litig.*, 193 F.3d 613, 692 (3d Cir. 1999).

The primary issue "of consequence" at the June 9 hearing is the appropriate amount of damages for nearly 3,000 alleged class members spread over an 18-state region.  Plaintiffs—solely through the testimony of Inglis—have urged that those damages should be calculated using the average remediation cost of the seven Northern Virginia properties involved in the prior *Germano* action.  And, although Plaintiffs deny that the word "extrapolation" describes Inglis' methodology, that is exactly what it is: Inglis derives damages for a class of nearly 3,000 properties based on a sample of seven.  There can be no serious dispute that Inglis' method directly involves the field of statistics and, thus, the admitted expertise of Dr. Marais.

### A.   Inglis' Formula Necessarily Assumes *Germano* Is Representative Of The Entire Class.

The basis for Inglis' damages formula is the $86 per square foot calculation average from the *Germano* properties, which does not even reflect the actual remediation costs for any of the seven properties in that action.[2]  In his most recent declaration, Inglis explains that he begins his class-wide damages calculation with the $86 per square foot "average cost of remediation" from the *Germano* properties, which "was subjected to two independent construction bids from Virginia general contractors."  (Inglis Dec. at 4 ¶ 3.)  Although this $86 figure was the average cost of remediation for just seven properties, all located in southeastern Virginia, Inglis summarily and without analysis concludes "it is clear that the remediation estimate of $86 per square foot and the 6% inspection and certification fee (updated to $118.89 in 2015 dollars on a nationwide basis) is a valid estimate[3] for the expected costs of remediation in the 18 covered states."  (*Id.* at 5-6 ¶ 4.)  Because this "$86 per square foot determination was made in 2010," however, Inglis "relie[s] on RS Means data, and adjusted the $86 estimate to $112.16/square foot for the national average in 2015 dollars."  (*Id.*)  In short, Inglis takes the $86 estimate as a given and then uses RS Means to make geographical and inflation adjustments.

Although the $86 per square foot estimate is central to Inglis' analysis, Plaintiffs' Motion never mentions it.  But Plaintiffs cannot change the facts by ignoring them.  Through two separate declarations and an extensive deposition, Inglis has made repeatedly clear that his

---

[2] Plaintiffs' use of the *Germano* estimates as conclusive evidence of the remediation costs for all class members is directly contrary to this Court's holding that the findings in that action are to "only have a preclusive effect on those properties which are the subject of the hearing."  (Rec. Doc. 576.)

[3] Of course, the Fifth Circuit does not permit Plaintiffs to seek more than $600 million in damages through no more than an unverified estimate, particularly where evidence of actual damages exists.  (*See* BNBM PLC's and BNBM Group's Opposition to Plaintiffs' Motion for Assessment of Class Damages, Rec. Doc. 18903 at 9-16.)

calculation is founded wholly upon the $86 estimate from *Germano*.  For example, when

deposed, Inglis admitted his continued reliance on the five-year-old estimate:

> Q.  In 2015, when you gave an opinion in this case on remediation costs, you only used *Germano*, not *Hernandez* and Villa Lago, correct?
>
> . . . .
>
> A.  What we did in 2009-2010, we took our established scope to remediate a property, applied it to *Germano* to develop a cost, which was based on the two contractors' proposals, plus we added in the cost for a CIH.  We took that cost from *Germano*, which was nominally the $86, we cross-checked it with a separate RS means dollar-per-square-foot cost to—to validate the $86.
>
> . . . .
>
> Q.  But it all started with *Germano*, correct?
>
> A.  It started—the $86 that we had in *Germano*, that we developed there, that we cross-checked, goes back to *Germano*.  And we used that in 2015.

(Inglis Dep.[4] 86:18-87:18, 107:22-108:3.)

The reliability of Inglis' calculation therefore rests on the $86 per square foot factor being

representative of remediation costs across the entire class, and that issue falls within the purview

of statistical analysis.  As the Fifth Circuit has held:

> We, therefore, hold that before a trial court may utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried, it must, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected.  Typically, such a finding ***must be based on competent, scientific, statistical evidence*** that identifies the variables involved and that provides a sample of sufficient size so as to permit a finding that there is a sufficient level of confidence that the results obtained reflect results that would be obtained from trials of the whole.

*See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997) (emphasis added).

Mr. Inglis, however, is not a statistician and cannot competently address the question of

whether his sample properties form an adequate basis for extrapolating remediation costs for the

---

[4] "Inglis Dep." refers to the Deposition Transcript of George Inglis dated May 19, 2015.  All cited references to the Inglis Dep. are submitted herewith as Exhibit B.

class.[5]  Dr. Marais, however, is highly competent to address those issues, and he has done so.

**B.     Dr. Marais' Testimony Directly Refutes Inglis' Assumption That The *Germano* Properties Are Representative Of The Entire Class Or Can Be Used To Obtain Reliable Estimate Of Class Damages.**

Defendants must be allowed to present Dr. Marais' full testimony because that testimony directly refutes Inglis' unproven assumption that the *Germano* properties are representative of the class.  Indeed, Plaintiffs previously challenged Defendants to "make a showing that the bids and unit pricing converted to the dollars per square footage utilized by Mr. Inglis are unreliable or any better or worse than RS Means unit pricing, or bids by a builder who visits the home." (Plaintiffs' Reply at 62.)  Defendants have done exactly that through Dr. Marais' careful evaluation of Inglis' proposed formula.  But rather than deal directly with Dr. Marais' criticisms, Plaintiffs try to simply jettison those valid criticisms as "irrelevant."  To the contrary, Dr. Marais has demonstrated multiple errors in Inglis' opinions, each of which independently requires the rejection of Inglis' formula.

For example—as explained by Dr. Marais—Inglis cannot show the *Germano* properties

---

[5] As a further indication that Plaintiffs' motion is wholly without merit, it is self-contradictory in the extreme.  Plaintiffs freely acknowledge that the field of statistics is relevant to the narrow issue of Inglis' estimation of square footage for approximately 131 class properties for which there is no verified square footage.  (Plaintiffs' Motion at 10, 19-20.)  For those determinations, Inglis estimated the unknown square footage for each property by averaging actual square footage for properties across the state or, where necessary, across the entire country.  (Inglis Dec. at 3 ¶ 2.)  Inglis blindly asserts these estimates are reliable because they were "based on the recommendation of a professional statistician." (*Id.*)  While Inglis' reliance on the unverified opinion of another expert in a different field raises a host of issues that are addressed in other motions, it is nonetheless a direct acknowledgement that deriving unknown values from known data implicates the field of statistical inference.  Plaintiffs cannot have it both ways.  They cannot claim on the one hand that statistical science is pertinent to deriving the square footage of properties where there is no data based on the square footage of properties where data is available; but on the other hand claim that statistical science has no relevance to deriving unknown construction costs for the vast majority of properties, based on the costs that pertain to a small sample of other properties.

are representative of the entire class because they were not a randomly drawn sample.[6]  The properties at issue in *Germano* were selected before the entire class was ascertained.  And they were hand picked by the Plaintiffs' Steering Committee.  Because the *Germano* properties were not selected by a random selection process, they "provide[ ] no assurance whatever of representativeness and carr[y] a high risk of selection bias."  (Marais Dec. at 8 ¶ 21.)  Dr. Marais likens this risk of selection bias to conducting a nationwide political poll from only a "small sample of customers at a Berkeley, California coffee shop."  (Marais Dec. at 8 ¶ 20.)  And just as a small sample of individuals from one small location is unlikely to accurately represent the views of all voters across the country, the small sample of properties from *Germano* is unlikely to accurately represent the remediation costs of nearly 3,000 properties across the country. (Marais Dec. at 9 ¶ 22 ("In sum, there is no basis in the principles of scientifically valid statistical sampling for supposing that these seven properties are representative of the entire population of class properties.").)  Yet Inglis assumes this representativeness anyway without providing any support for that illogical assumption.

Moreover, Dr. Marais also explains that Inglis' sample size of seven properties—even if randomly drawn from the entire class—is simply too small to draw any accurate conclusions about the entire class.  To be put it plainly, Inglis relies on a sample that is less than .3% of the class to tell him all he needs to know about remediation costs for each and every class property. Even assuming an identical scope of work is required to remediate each of the nearly 3,000 proposed class properties, it is categorical error to assume that the 7 *Germano* properties reflect all the variables that can increase or decrease the remediation cost for any single class property.

---

[6] In fact, the odds of randomly selecting seven class properties all within Virginia—let alone all within southeast Virginia—are virtually nil.  (Marais Dec. at 8 ¶ 21 ("[T]he probability that a genuinely random sample of seven class properties would all happen to be in Virginia is approximately 0.000000009%.").)

(Marais Dec. at  7-8 ¶¶ 18-19.)

Plaintiffs try to assail Dr. Marais' testimony by arguing that he is out of his realm of expertise because these are matters of construction.  (Plaintiffs' Motion at 10, 18.)  But it is Mr. Inglis, not Dr. Marais, who lacks any expertise in extrapolating generalized conclusions from sample sets of data.  And Dr. Marais has opined as a matter of statistical science that, given the variations in class properties, Inglis' analysis cannot reliably predict remediation costs for the class properties because the *Germano* sample is neither random nor of a sufficient size to permit valid statistical inferences.  (Marais Dec. at 6-10 ¶¶ 17-26.)  Plaintiffs cannot seriously contend that factors such as quality of construction (*e.g.*, whether trim and crown molding exists, etc.) and layout of the property (*e.g.*, height of ceilings, number of bedrooms, number of plumbing and electrical fixtures and connections, etc.) will not affect the cost to remediate a given property.  These variables will affect the end result cost and are not accounted for in a hand-picked sample of only seven properties.

These faults in Inglis' analysis are not just theoretical.  Dr. Marais has also demonstrated, empirically, that Inglis' formula creates persistent and significant errors.   Using actual remediation cost data from the Knauf remediation program, Dr. Marais illustrates how unreliable Plaintiffs' formula is when compared to actual costs.   Dr. Marais' declaration provides a comparison of the cost estimates produced by Inglis' method with the actual remediation costs within 398 Zip Code areas.  (Marais Dec. at 10-11 ¶¶ 27-28.)   In 76% of the areas, Inglis indisputably ***overestimates*** the actual total cost of remediation, by a substantial margin:

| | No. of Zip Codes | Actual Total Remediation Cost | Inglis Method Low Total Cost Estimate[7] | Inglis Method High Total Cost Estimate[8] |
|---|---|---|---|---|
| Inglis Method High/Low Estimates Greater Than Actual Remediation | 303 | $194,334,881 | $266,153,412 | $299,907,130 |
| Inglis Method High/Low Estimates Overlap Actual Remediation | 86 | $233,520,160 | $270,155,240 | $304,416,472 |
| Inglis Method High/Low Estimates Less Than Actual Remediation | 9 | $8,597,434 | $5,659,712 | $6,377,480 |
| Total | 398 | $436,452,475 | $541,968,364 | $610,701,082 |

(Marais Dec. at 10-11 ¶¶ 27-28.)

In sum, Dr. Marais conclusively shows that Inglis' proposed method is not just a formulaic estimate. It is—as Dr. Marais explains—demonstrably wrong and wholly unreliable. As a result, his testimony is relevant and must be admitted as a rebuttal to Inglis' testimony.

## II. The Late Stage Of These Proceedings Does Not Change The Legal Requirement That Damages Be Properly Determined Based On Established Legal Standards And Rigorous Analysis.

Plaintiffs repeatedly argue that Dr. Marais' opinion should somehow be rejected because of the "late stage of the proceedings." (*See, e.g.*, Plaintiffs' Motion at 8-9.) But the amount of damages to be awarded to the members of the class is still very much an open question that has not been adjudicated, and Plaintiffs cite no authority even suggesting that the established legal standards for evaluating proof of damages can be disregarded based on the supposedly late stage of the proceedings. Even where liability has been established by default, the U.S. Supreme Court requires a separate and equally "rigorous analysis" to determine the appropriate level of damages. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *see also In re Chinese-*

---

[7] "Low" refers to Inglis method without Inglis' inflation adjustment (*i.e.*, stated in terms of 2010 cost levels).

[8] "High" refers to Inglis method as implemented with Inglis' inflation adjustment (*i.e.*, stated in terms of 2015 cost levels).

*Manufactured Drywall Products Liab. Litig.*, MDL No. 2047, 2014 WL 4809520, at *10 (E.D. La. Sept. 26, 2014) (Rule 23's requirements "are not waived or admitted by the default" and "the Court will engage in rigorous analysis of Rule 23's prerequisites").  Similarly, the Fifth Circuit has made clear that even after a finding of default for liability, a plaintiff must still prove up its asserted damages with reasonable certainty through evidence on the record.  *See Richardson v. Salvation Army, S. Territory, USA*, 161 F.3d 7, at *1 (5th Cir. 1998) (per curiam) (reversing entry of default judgment and award of damages where "there is no support in the record and no method of determining the accuracy of those totals"); *see also Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 312 (5th Cir. 1998) (holding Rules Enabling Act, 28 U.S.C. § 2072 mandates that Federal Rules of Civil Procedure do not "alter the required elements which must be found to impose liability and fix damages (or the burden of proof thereon)").  As a result, even if the proper scope of remediation for each class member has been established—which Defendants dispute—the ***cost*** of that remediation remains unresolved.  (*See* Plaintiffs' Motion at 8 ("[A]ll Defendants can and should do at this late stage of the proceedings is attempt to contest the *amount* of damages.").)  Dr. Marais' opinions are relevant and probative to that determination and should not be excluded.

## CONCLUSION

For the reasons set forth above, BNBM PLC and BNBM Group respectfully request that the Court deny Plaintiffs' Motion to Limit the Testimony of Dr. Laurentius Marais, and provide BNBM PLC and BNBM Group all such further relief that it deems just and proper.

Dated:  June 2, 2015

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
michael.barr@dentons.com
justin.kattan@dentons.com

- AND -

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 7800
Chicago, IL  60606-6306
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com

- AND -

C. Michael Moore
Texas Bar No. 14323600
Gene R. Besen
Texas Bar No. 24045491
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
mike.moore@dentons.com
gene.besen@dentons.com

- AND -

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130
harry.rosenberg@phelps.com

*Attorneys for Beijing New Building
Material (Group) Co., Ltd. and Beijing
New Building Materials Public Limited
Company*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that the above and foregoing Beijing New Building Materials Public Limited Company and Beijing New Building Material (Group) Co., Ltd. Memorandum of Law in Opposition to Plaintiffs**'** Motion to Limit the Testimony of Dr. Laurentius Marais has been served on Plaintiffs' Liaison Counsel, Leonard Davis, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 2nd day of June, 2015.

*/s/      Michael H. Barr*