# EXHIBIT "G"

# Deloitte.

# Taxation and Investment in China 2014

## Reach, relevance and reliability



A publication of Deloitte Touche Tohmatsu Limited

# Contents

**1.0 Investment climate**
1.1 Business environment
1.2 Currency
1.3 Banking and financing
1.4 Foreign investment
1.5 Tax incentives
1.6 Exchange controls

**2.0 Setting up a business**
2.1 Principal forms of business entity
2.2 Regulation of business
2.3 Accounting, filing and auditing requirements

**3.0 Business taxation**
3.1 Overview
3.2 Residence
3.3 Taxable income and rates
3.4 Capital gains taxation
3.5 Double taxation relief
3.6 Anti-avoidance rules
3.7 Administration

**4.0 Withholding taxes**
4.1 Dividends
4.2 Interest
4.3 Royalties
4.4 Branch remittance tax
4.5 Wage tax/social security contributions

**5.0 Indirect taxes**
5.1 Value added tax
5.2 Business Tax
5.3 Capital tax
5.4 Real estate tax
5.5 Transfer tax
5.6 Stamp duty
5.7 Customs and excise duties
5.8 Environmental taxes
5.9 Other taxes

**6.0 Taxes on individuals**
6.1 Residence
6.2 Taxable income and rates
6.3 Inheritance and gift tax
6.4 Net wealth tax
6.5 Real property tax
6.6 Social security contributions
6.7 Compliance

**7.0 Labor environment**
7.1 Employee rights and remuneration
7.2 Wages and benefits
7.3 Termination of employment
7.4 Labor-management relations
7.5 Employment of foreigners

**8.0 Deloitte International Tax Source**

**9.0 Office locations**

# 1.0 Investment climate

## 1.1 Business environment

China is comprised of 23 provinces, four "direct controlled" municipalities, five autonomous regions and two Special Administrative Regions (SARs) in Hong Kong and Macau. The National People's Congress (NPC) is the highest organ of state power and is empowered with the rights of legislation, decision, supervision, election and removal. The president, elected by the NPC, is the head of state, and the State Council, namely the Central People's government, is the highest organ of state administration. The premier, the head of the State Council, is nominated by the president, confirmed by the NPC, and appointed and removed by the president.

The Communist Party has held power since the People's Republic of China (PRC) was founded in 1949. Market reforms enacted over the past three decades have transformed the economy and raised the standard of living. Since the initiation of economic reforms in the late 1970s, China has become one of the world's fastest-growing economies. The industrial sector previously accounted for most of GDP, followed by the service sector and then agriculture, but the contribution of the service sector to GDP exceeded that of the industrial sector for the first time in 2013.

After joining the World Trade Organization (WTO) in 2001, China instituted a series of modifications to its trade regulations to conform to WTO standards. Various economic sectors and certain industries gradually have been opened to foreign investment. To bolster the economies of the Hong Kong and Macau SARs, the central government signed a Closer Economic Partnership Arrangement (CEPA) with both SAR governments in 2003. CEPA essentially is a free trade pact that exceeds WTO commitments and gives companies from the two SARs favorable tariff treatment in China before the same treatment is granted to other WTO members. CEPA sometimes grants privileges that are not part of China's WTO commitment.

Although the economy previously was dominated by state-owned enterprises (SOEs), domestic private enterprises and foreign investments have become the main driving force of economic development.

China has set up a number of special economic zones (SEZ), economic and technological development zones (ETDZ), export processing zones and bonded warehouse zones to attract domestic and foreign investment and export activities. Various preferential policies, covering tax, foreign exchange, customs, investment, employment, etc., are provided to qualified enterprises or industries in these areas. The Shanghai Pilot Free Trade Zone ("Shanghai Pilot FTZ") was launched in September 2013 with the aim to deepen reform and open up policy innovations to establish advanced rules on trade and investment. A series of preferential policies have been introduced within the Shanghai Pilot FTZ which we will cover in the following chapters.

The top three foreign direct investment concentrated industries are manufacturing, real estate and leasing and commercial services.

### Price controls

China has abolished most price controls, with market forces now determining the prices of the majority of products traded. In general, prices remain controlled only for goods and services that are deemed essential.

### Intellectual property

China has aligned its legislation with the minimum WTO requirements of the Trade-Related Aspects of Intellectual Property (TRIPs) protocol, which contains general standards for the enforcement of intellectual property rights.

The Copyright Law and its implementation rules protect copyrighted works of foreigners that are first published in China or in countries that are members of copyright protection treaty of which China also is a member. The Copyright Law and its implementation rules protect copyrighted works of a foreigner who is a national or is resident of a country that has signed a bilateral or multilateral copyright protection agreement with China.

The Patent Law conforms to international standards and protects a range of activities, including inventions, industrial designs and utility models. Penalties apply for patent infringement, including the confiscation of illegal proceeds and/or the imposition of fines of up to four times the illegal proceeds or criminal liability.

The Trademark Law allows the authorities and courts to confiscate and destroy pirated products and equipment for the manufacturing of such products. Trademark owners are entitled to seek compensation in an amount equal to the illegal gain of the infringer or the owner's loss, including reasonable expenses incurred in legally challenging an infringement (i.e. attorney's fees). A trademark holder or its stakeholders that have evidence of infringement may apply for a court order to protect the property and prohibit the infringer from conducting any activities. Implementation rules clarify the procedure for foreign companies seeking to register trademarks in China.

With most of China's legal framework meeting international requirements, China has shifted its focus to implementation and enforcement.

Patent disputes usually are settled through the courts and technology licensing disputes are resolved through arbitration. The State Intellectual Property Office (SIPO) deals with patents, and the National Copyright Administration of China (NCAC) deals with copyrights and software. The Trademark Office, an agency under the State Administration for Industry and Commerce (SAIC), handles the registration of trademarks; the Trademark Review and Adjudication Board handles disputes. Administrative decisions of the SIPO, the SAIC and the NCAC can be appealed through the court system.

The customs authorities, upon the application of the owner of intellectual property rights with sufficient evidence to prove an infringement and a security equivalent to the value of the goods provided by the applicant, will provide border protection to brand names, copyrights and patents that are related to imported/exported goods. Importers/exporters are required to register the relevant intellectual property rights with the customs authorities to enjoy such protection.

## 1.2 Currency

The currency in China is the renminbi (RMB) or yuan (CNY).

## 1.3 Banking and financing

Historically, the People's Bank of China (PBOC) acted both as a government organization in charge of overall financial supervision and as a national bank handling comprehensive banking businesses. The change began in 1978 when China enacted reforms and decided to convert its central planning economy to a market-based economy. The banking and financing system was transformed from central bank domination to the current diversified and sophisticated network. Since then, the banking and financing sector has become a major contributor to economic growth. After China entered the WTO, it accelerated the pace of opening up its banking sector.

China has stock exchanges in Shanghai and Shenzhen. The Growth Enterprise Market began trading shares of start-up companies in 2009. China's corporate bond market is currently small.

## 1.4 Foreign investment

China welcomes foreign investment and it is bound under WTO rules to further open its industries to foreign investors. A significant structural change to the foreign direct investment regime was announced in 2004. The Decision on Reforming the Investment System transformed a system that allowed foreign investment only in specific, government-designated sectors. However, it does not supersede the old system, the centerpiece of which is the Catalogue for Guiding Foreign Investment in Industries.

The Catalogue, revised in 2011, essentially divides China's economy into three categories for foreign investment purposes: prohibited, restricted and encouraged. Projects in these categories are subject to different examination, approval and registration requirements. Projects categorized as "encouraged" face relatively less scrutiny, while those categorized as "restricted" are subject to stringent requirements and examination.

Government examination and approval for investment projects can come from local, municipal, provincial or state authorities, depending on the size and/or industry of the projects. Certain projects may require approval by the State Council.

Prohibited foreign investments include projects that are harmful to state security or that impair the public interest; pollute the environment, are destructive to natural resources and detrimental to human health; or occupy excessive farmland and are unfavorable to the protection and development of land resources.

Restricted foreign investments include projects that are lagging technologically; unfriendly to resources and the environment; involve the exploitation of specific minerals that are protected by the state; or classified as industries that the government is opening up in phases.

Encouraged foreign investments, which make up about three-fourths of the Catalogue, mainly include the following:

- Projects related to new agricultural technology, construction and the operation of energy sources, transportation and the exploitation of raw materials for certain industries;

- Projects using new or advanced technology, including those that can improve product quality, save energy and raw materials, increase economic efficiency and alleviate shortages in the domestic market;

- Projects that meet international market demand to improve or add value to the industry;

- Projects that involve the integrated use of China's resources or renewable resources, new technology or equipment for preventing and controlling environmental pollution;

- Projects related to certain modern services; and

- Projects that can develop the manpower and resources of central and western China.

Projects not listed in the Catalogue generally are classified as permitted.

The Shanghai Pilot FTZ will test fundamental reforms to the financial sector and will further open the economy to foreign investment, in addition to operating as a typical FTZ, in which goods can be imported, processed and exported free from customs duties. Financial sector changes include liberalization of interest rates, free convertibility of the renminbi and removal of limits on foreign participation in the financial industry and offshore banking business.

Broadly, foreign investors in the zone will be able to obtain "national treatment" and gradually be allowed to invest freely in six modern service sectors: financial services, shipping and logistics services, commerce and trade services, professional services, cultural services and public sector services. Additional policies have been introduced to promote regional headquarter and regional operation center activities within the Shanghai Pilot FTZ. A "negative list"-based mechanism will be piloted in the zone to effectively supersede the prohibited, restricted and encouraged categories. Foreign investment in any activities other than those included on the negative list will no longer require preapproval.

The Shanghai Pilot FTZ is expected to be accompanied by radical economic reforms, principally to further open and rebalance the economy. The package of economic measures (e.g. the negative list-based mechanism in foreign investment sector, liberalization of interest rates, etc.)is expected to be rolled out in the Shanghai Pilot FTZ, and if successful, later implemented throughout the country.

## 1.5 Tax incentives

Projects in the encouraged category usually are eligible for preferential treatment. In general, apart from possible tariff exemption quotas for self-utilized capital imports for encouraged projects, companies engaged in encouraged projects may apply for certain tax incentives.

The principal incentives include a 15% preferential tax rate applicable to new high-technology enterprises and a 50% super deduction for qualifying R&D expenditure. There also is a geographically based incentive focused on new high-technology enterprises established in or after 2008. The incentive (in addition to the 15% rate that applies to all new high-tech enterprises) is a two-year tax holiday, followed by three years of tax levied at a 12.5% rate. The 15% preferential tax rate also is granted to qualified high-tech service enterprises in 21 specified cities between 1

July 2010 and 31 December 2018, and encouraged businesses in the western region between 1 January 2011 and 31 December 2020. Tax exemptions and other preferences apply to the agriculture, forestry, animal husbandry and fishery sectors, software and integrated circuit industry, major infrastructure projects, certain environmental projects, certain transfers of technology, etc.

See also the discussion of the Shanghai Pilot FTZ in 1.4, above. Although not the principal focus of the Shanghai Pilot FTZ, a competitive tax regime is expected to be introduced.

## 1.6 Exchange controls

China is a foreign exchange controlled country. Capital injections, cross-border trade and services transactions settled in foreign exchange, overseas financing and profit repatriations, etc. of foreign investment enterprises (FIEs) are subject to the exchange control regulations. The foreign exchange authority is the State Administration of Foreign Exchange (SAFE) and its local branches.

An FIE must apply for registration of foreign exchange with the SAFE after the issuance of a business license and obtain a foreign exchange registration certificate. The certificate should be subject to an annual inspection by the foreign exchange authorities.

In acceding to the WTO, China committed to implementing steps to liberalize the foreign exchange market. While current account convertibility is a reality, the convertibility of capital accounts is being introduced gradually. According to the 2008 Foreign Exchange Control Regulations, regular international payments and transfers are not restricted by the state. The circulation of foreign currency is prohibited and foreign currency may not be quoted for settlement within the PRC, except as otherwise provided by the state.

The new Shanghai Pilot FTZ (see 1.4 above) will operate as a platform for testing full convertibility of the renminbi and further opening the economy to foreign investment, including a relaxation of foreign exchange control (e.g. removal of certain preapproval requirements for capital account items). If successful, similar reforms eventually should be implemented throughout the country.

### Forex control on current and capital account

**Current account**. Transactions such as the sale of goods, the provision of services and other ordinary expenditure (e.g. payments and receipts from international trade, payments of interest on foreign loans (but not the repayment of principal) and the repatriation of dividends) generally are classified as "current account" items. Payments and receipts of foreign exchange under current account should be based on accurate and legitimate transactions. Financial institutions engaged in the settlement and sale of foreign exchange should conduct a proper inspection of the accuracy of dealing documents and conformity with the forex receipts and payments. The receipt of forex under current account may be retained or sold to financial institutions engaged in the settlement and sale of forex in accordance with relevant state regulations. A forex payment under current account should be supported by valid documents and settled with self-owned forex or forex purchased from financial institutions engaged in the settlement and sale of forex in accordance with the relevant rules on the administration of forex.

**Capital account**. If the purpose of a transaction is to create capital (i.e. equity or securities investment, loans, derivative deals, guarantees benefiting a foreign entity, etc.), the forex will be regarded as a "capital account" item with strict control over its movement. China previously required very strict foreign exchange administration of capital account transactions. However, in recent years, the SAFE issued guidance that simplifies and relaxes the rules governing foreign exchange administration of both inbound and outbound investment. Forex controls over the capital account mainly include the following:

- All forex in the capital account and the fund for settlement must be used in accordance with designated purposes approved by the relevant authorities and/or the SAFE.

- Overseas entities and individuals that invest in China or engage in the issuance and transaction of securities or derivatives must register for forex purposes.

- Domestic entities and individuals that engage in outbound investments or the issuance and transaction of securities or derivatives abroad must register for forex purposes.

- Foreign debts should be registered with the SAFE or its branches, which will not approve repayment of foreign debt unless it has been properly registered.

- The provision of outbound guarantees is subject to quota control or an approval requirement by the SAFE or its branches. Financial institutions in the banking industry can directly offer foreign commercial loans within the scope of their approved business, but other domestic institutions that offer foreign commercial loans must be approved by the SAFE or its branches.

# 2.0 Setting up a business

## 2.1 Principal forms of business entity

Foreign investors can invest in China through legal or nonlegal entities. Legal entities that can be set up by foreign investors generally include wholly foreign-owned enterprises (WFOEs), equity joint ventures (EJVs), cooperative joint ventures (CJVs) and joint stock companies (JSCs). Nonlegal entities include representative offices (ROs) and branches, as well as certain CJVs. The partnership also is available as an investment vehicle.

An investor's particular commercial considerations, any applicable regulatory limitations and home country tax considerations all play a role in determining the most appropriate entity in which to conduct business.

For foreigners, WFOEs offer a simpler approval procedure and complete management control. Foreign companies also often use the WFOE form to protect technology. WFOE status permits greater use of renminbi to pay for business expenses and local sales.

To establish a JV, it is critical to select an appropriate Chinese partner. The following are some factors that should be considered: a potential partner's access to domestic financing, the ability to provide a domestic market for products, the skill level of labor and the integrity and strength of management.

A holding company can offer certain economies of scale in operations and management through its collection of investments under one corporate identity. These include centralized purchasing of production materials, collective training of subsidiary project personnel, coordination of project management and the establishment of a single entity to market all subsidiary products.

JSCs offer different advantages. An FIE opting for this corporate form can invite the participation of shareholders in the company, both to expand capital and to secure links with other legal entities in China. A JSC also offers greater liquidity in transferring interests. Both EJVs and CJVs normally require the prior consent of the other partners, as well as the original examination and approval authority, to transfer interests. Companies limited by shares do not need prior consent from others to dispose of interests, although the promoters must wait one year from the company's first registration before assigning their shares.

### Forms of entity

#### Foreign investment enterprises

FIEs generally refer to Chinese entities with at least 25% foreign investment. FIEs are permitted to conduct business activities in accordance with the scope of their business plans as approved by the government. FIEs mainly are organized as limited liability companies, and the investor's ownership in an FIE is represented by the amount of registered capital it injects into the entity. FIEs do not issue shares until they have been transformed into JSCs.

The main forms of corporate entity for FIEs in China are the WFOE, EJV and CJV. In general, FIEs can carry out manufacturing, processing, trading and/or service activities in accordance with the approved business scope. There are certain FIEs incorporated pursuant to special regulations to be engaged in designated business activities, such as Foreign Invested Commercial Enterprises (FICE) in wholesale, retail or trade agency services; Chinese holding companies; regional headquarters; operating/finance leasing companies; fund management companies; etc.

#### Wholly foreign-owned enterprises

A WFOE organized as a limited liability company generally is a desirable investment vehicle for foreign investors, provided the participation of a Chinese partner is not required under the investment regulations. The limited liability company offers foreign investors sole control of the business operations and avoids lengthy negotiations with a Chinese partner, as in the case of an EJV or CJV.

Previously, there was minimum capital requirement under the Company Law, including the general minimum capital requirement to establish a WFOE of CNY 30,000 (or CNY 100,000 if there is only one shareholder). Following the release of the new Company Law in 2013, which took effect on 1

March 2014, these requirements have been removed, except for specified industries, such as banking, insurance, etc. Capital may be contributed in cash or in kind, although in-kind capital contributions are subject to valuation. The revised Company Law also abolished the requirement for a minimum 30% cash contribution in the registered capital, as well as other requirements in terms of the capital contribution deadline and capital verification, suggesting a more open and relaxing environment for the set up and operation of businesses.

A WFOE must establish a board of directors or a managing director for management structure. For corporate governance purposes, the company is required to have an independent supervisor (similar to a nonexecutive director in western countries).

A detailed management structure must be set out in the articles of association (including the duties and limits of authority of the legal representative, chief accountant, general manager and supervisor). The articles of association must specify procedures for termination and liquidation and for amending the articles.

A WFOE is required to appropriate 10% of its annual after-tax profits for its statutory general reserve fund account until the account balance reaches 50% of the company's registered capital. Hence, the distributable profits of the WFOE initially may be lower than an EJV or CJV, whose board may decide not to contribute to such a reserve.

**Equity joint venture**

An EJV, organized as a limited liability company, is a separate legal entity established by one or more foreign investors with one or more Chinese investors. Ownership and the investor's share of profits and losses are determined based on the relevant contributions to the registered capital of the EJV.

The minimum level of foreign participation in an EJV generally is 25%. There is no upper limit on foreign participation for general projects. The capital contribution requirements are almost the same as those for a WFOE.

Partners must pay their contribution within the timetable fixed in the contract. Failure to make timely capital contributions may result in the cancellation and compulsory surrender or revocation of the business license.

The governance of an EJV is different from that of a corporation in western countries. Investors hold equity interests, but no stock. Voting authority is vested in the board of directors rather than in the shareholders. The directors are appointed by the investors and, in general, the power to appoint directors reflects the ratio of the capital contributions of the partners.

**Contractual or cooperative joint venture**

A CJV differs from an EJV in two fundamental ways: a CJV does not have to be an independent legal entity from a legal formality perspective, i.e. it can be an incorporated arrangement (with a limited liability company) or a contractual cooperation arrangement. For tax purposes, an incorporated CJV is subject to tax at the entity level. The tax treatment of a CJV under a contractual cooperation arrangement (whether it should be taxed at the level of the entity or as a flow-through entity) is unclear under the prevailing regulations. The ownership and profits/losses are not necessarily shared based on equity/capital contributions (as in the case of an EJV), but rather on the basis of a contractual agreement. Thus, a CJV may provide more flexibility with respect to profit-sharing and risk-taking among the partners, subject to approval by the authorities (e.g. the shareholder(s) may be guaranteed a certain fixed annual return without regard to the actual performance of the CJV).

Capital is contributed in a ratio agreed by the parties to the CJV contract and a joint venture partner. Normally, the Chinese partner may provide cooperation terms (i.e. the provision of services or the rental-free use of factory premises of the Chinese partner) to the CJV instead of contributing capital, subject to approval by the authorities.

Multiple management structures are applicable to a CJV, including a board of shareholders, a board of directors, a joint management committee or a management by proxy. "Hybrid" CJVs tend to adopt management systems resembling those of an EJV; "true" CJVs tend to take the more flexible form of a joint management office. Under the latter structure, no general manager exists as such, although the parties usually appoint a legal representative. "True" CJVs, which do not have

independent legal status in China, generally allow the Chinese partner to enter into contracts, under a grant of power of attorney by the foreign party.

**Foreign investment joint stock company**

China is opening up its stock market to FIEs and foreign investors. FIEs increasingly are likely to be listed on Chinese stock markets (both A and B shares) and overseas stock markets. Only foreign investment joint stock companies (JSCs) qualify for public listing; FIEs that are planning to be listed on a Chinese stock market must be converted into a JSC, which generally means that the registered capital must be converted into stock of the company.

All of the capital must be divided into equal shares represented by share certificates. Companies must receive approval before they can issue A shares (denominated in renminbi and available to Chinese citizens and qualified foreign institutional investors) and B shares (denominated in US dollars). A and B shares are tradable on stock exchanges. A shares are further divided into shares owned by individuals, legal persons and the state. Unlisted shares owned by foreign investors of a qualified foreign investment joint stock company can be traded on the B share market if approved by the Ministry of Commerce.

**Partnership**

Foreign investors are permitted to form partnerships in China, as general or limited partners under the Foreign-Invested Partnership Rules, to engage in a wide range of business activities. There is no legal minimum or maximum for capital contributed by the partners to a partnership. Capital may be contributed in cash, in kind or in the form of land use rights, intellectual property rights or services. Contributions other than cash must be appraised at a specific value. Partners may increase their capital contributions to the partnership enterprise, as stipulated in the partnership agreement or as decided by all of the partners. These additional contributions should be used to expand the scale of business or to compensate for losses.

There are no specific limits on the number of partners in a general partnership, but a limited partnership is restricted to 50 partners. Each partner has equal rights to conduct the routine affairs of the partnership. The admission of new partners is subject to the approval of the partners and the conclusion of a written partnership agreement. Newly joined partners have the same rights and responsibilities as the original partners.

**Government fees on incorporation**

Fees payable are calculated on the basis of registered capital:

- CNY 10 million or less, 0.08% of registered capital;
- The portion in excess of CNY 10 million, 0.04%;
- The portion in excess of CNY 100 million, no additional fee.

A fee of CNY 300 is levied when a branch of an FIE is registered and a CNY 100 fee applies to filing ordinary changes in registered items.

## Branch of a foreign corporation

Although the Company Law provides for a foreign company to register a branch in China, under prevailing practice, only registration applications of overseas companies in the financial services sector and oil exploration industries are handled.

A branch remains part of its head office and thus is not entitled to the rights and protection accorded to Chinese legal entities. A branch must appoint a Chinese legal representative who is liable under civil law for its business activities. A branch is taxed at the same rate as domestic companies and may be closed only after a formal liquidation.

## Representative office

Foreign companies, particularly those in the trade agency and service industries, often choose an RO to carry on liaison and marketing activities in China. Although ROs allow foreign investors to enter the Chinese market with little initial investment, they are prohibited from direct profit-making activities.

In general, an RO of a foreign company may engage only in indirect business activities in China, including acting as a liaison with clients and the head office; introducing the products of the head

office; conducting market research; and collecting information. Thus, an RO of a foreign company may not sign and conclude contracts with Chinese customers directly and is prohibited from engaging in any "direct business operations" (with certain exceptions, such as the RO of a law firm).

ROs generally are taxed at the same rate as domestic companies. An RO is required to accurately calculate and pay tax on its taxable turnover and profits ("actual amount method"), based on a principle that reflects the actual functions performed by the RO and the risks borne. If an RO is unable to provide a complete accounting record or if it cannot calculate its income and expenses with reasonable certainty, the tax authorities reserve the right to use "deemed amount methods" to determine taxable turnover and profits. Practically speaking, ROs in only a limited number of industries (i.e. law firms) are taxed under the actual amount method, with others taxed on a deemed basis in accordance with the RO's expenses or revenue, depending on the industry.

## 2.2 Regulation of business

### Mergers and acquisitions

The Provisional Rules on the Merger and Acquisition of Domestic Enterprises by Foreign Investors describe two types of permitted operations: (1) equity acquisitions, where foreign investors purchase existing shares of a Chinese enterprise or subscribe to new shares issued by a Chinese enterprise; and (2) asset acquisitions, where foreign investors purchase the assets of a Chinese enterprise.

The Regulations on Mergers and Divisions of Enterprises with Foreign Investment establish the rights and obligations of merging and dividing FIEs, approval authority, capital requirements and share distributions. A foreign shareholding in a merged or divided entity generally should not be less than 25%; otherwise, the entity may not be entitled to certain special treatment applicable to FIEs. An FIE may not participate in a merger if its registered capital has not been paid in full or if the FIE has not commenced operations. A merger between a JV and an SOE must be approved in advance by all partners and the original approving authority. An anti-monopoly investigation may be launched if the merger or acquisition meets certain criteria.

Under the Company Law, a company seeking to undertake a merger must notify its creditors and give them up to 45 days to consent to the plan or propose an alternative settlement plan before the proposed merger. All parties involved enter into a merger agreement and three separate announcements of the merger must be made in approved publications. Each party then submits the agreement, along with a merger application, to the appropriate administrative department. Once approved, the parties must submit the same application to the examination authorities and for approval by the two companies. The newly merged entity then must apply to the authority in charge of registration of enterprises to amend its registration.

The tax treatment of the major forms of M&A is governed by the M&A tax rules. An M&A transaction is classified as an ordinary or a special reorganization. In the case of an ordinary reorganization, any taxable gain/loss derived by the transferor is recognized at the time of the transaction; however, in a special reorganization, the taxpayers may elect to temporarily defer recognizing taxable gain/loss on the transaction, provided certain requirements are met.

### Monopolies and restraint of trade

Under the 2008 Anti-Monopoly Law, regulated monopolistic activities include: (1) the conclusion of monopoly agreements between operators; (2) the abuse of a dominant market position by operators; and (3) market concentration of operators that eliminates or restricts competition or that may eliminate or restrict competition. The authority-in-charge may investigate suspected monopolistic activities, which may lead to an order to terminate the activities, the confiscation of illegal income and the imposition of administrative penalties.

China also has an Anti-Unfair Competition Law.

## 2.3 Accounting, filing and auditing requirements

Under the Company Law and relevant regulations, companies are required to prepare financial statements at each calendar year-end and be audited by a certified public accounting firm registered in China. Audited financial statements generally are required for annual enterprise

income tax settlement with the relevant tax authorities. FIEs may prepare financial statements in accordance with other accounting standards or in other languages for global consolidation purposes. However, the Chinese authorities will only recognize and accept accounts in Chinese that are prepared based on Chinese accounting standards.

Chinese Accounting Standards for Business Enterprises (ASBEs) became mandatory for listed Chinese enterprises as from 1 January 2007. Other Chinese enterprises are encouraged to apply the ASBEs, which are substantially in line with IFRS, except for certain modifications that reflect China's circumstances and environment. China is committed to convergence with IFRS.

# 3.0 Business taxation

## 3.1 Overview

The 2008 Enterprise Income Tax (EIT) Law applies to both domestic and foreign-invested enterprises, generally at the same rate, with special rates applying in certain cases. In addition to the EIT, China levies a number of turnover taxes, such as value added tax (VAT), business tax (BT), consumption tax and customs duties. There also is a resource tax, land appreciation tax (LAT), social security contributions, stamp duty, etc. China does not levy a branch profits tax, excess profits tax or alternative minimum tax.

As noted above in 1.5, various incentives may be available.

China has transfer pricing, thin capitalization and controlled foreign company rules, as well as a general anti-avoidance rule.

China's VAT and BT systems currently are in a state of transition. The pilot VAT reform program launched in Shanghai in 2012 and expanded nationwide in 2013 aims to transition service industries from liability to BT to liability to VAT. The pilot program, which initially applied to the nonrailway transportation industry and certain modern service sectors (e.g. R&D and technology services, leasing of moveable and tangible goods, etc.), as expanded to cover the railway transportation and postal services. The goals of the pilot is to eliminate double taxation issues arising under the prevailing indirect tax system (because no VAT-like credit mechanism is allowed under the BT system, so BT paid cannot be recovered by purchasers against their own BT liability, nor can VAT be recovered by purchasers who are only liable to BT) and to foster the development of modern service industries by gradually transitioning these industries from liability to BT to liability to VAT.

Tax law and policy are developed jointly by the State Administration of Taxation (SAT) and the Ministry of Finance. The SAT is the body charged with collecting tax and enforcing compliance. The SAT is assisted by the state and local tax bureaus at the provincial level and below.

| China Quick Facts for Companies | |
|---|---|
| Corporate income tax rate | 25% |
| Branch tax rate | 25% |
| Capital gains tax rate | 25% |
| Basis | Worldwide |
| Participation exemption | N0 |
| **Loss relief** | |
| – Carryforward | 5 years |
| – Carryback | No |
| Double taxation relief | Yes |
| Tax consolidation | No |
| Transfer pricing rules | Yes |
| Thin capitalization rules | Yes |
| Controlled foreign company rules | Yes |
| Tax year | Calendar year |
| Advance payment of tax | Yes |
| Return due date | Within 5 months of the end of the tax year |
| **Withholding tax** | |
| – Dividends | 10 |

| | | |
|---|---|---|
| – Interest | 10% | |
| – Royalties | 10% | |
| – Branch remittance tax | No | |
| Capital tax | No | |
| Social security contributions | Up to about 40% of employee base salary | |
| Real estate tax | 1.2% on cost or 12% on rental value | |
| Deed tax | 3%-5% | |
| Land appreciation tax | 30%-60% of gains on transfer | |
| Business tax | 3%-20% | |
| VAT | 0%, 3%, 6%, 11%, 13% and 17% | |
| VAT grouping | No | |
| Consumption tax | 1%-56% | |

## 3.2 Residence

A company is deemed to be resident in China if it is established in China or if its effective management is in China. Effective management is defined as substantial and overall management and control over manufacturing and business operations, human resources, financial and property aspects of the entity.

## 3.3 Taxable income and rates

EIT is imposed on the worldwide income of a resident enterprise (with a credit available for tax paid on foreign-source income); nonresident enterprises are subject to tax on China-source income and income effectively connected with an establishment in China. The definition of establishment is broad and does not include an exemption for an independent agent. If a foreign company has an establishment in China, it will be subject to China tax on all income effectively connected with that establishment.

Investors from the Hong Kong SAR and Macao SAR are taxed as nonresidents provided such investors are not effectively managed in mainland China.

The normal corporate income tax rate is 25%. Special rates apply to small and thin-profit enterprises (20%) and state-encouraged new high-technology enterprises (15%).

### Taxable income defined

Taxable income generally includes profits, capital gains and passive income, such as interest, royalties and rents. Dividends received from a foreign entity also are included in taxable income, but qualifying dividends received from another resident enterprise are tax exempt.

The taxable income of a company is the amount remaining from its gross income in a tax year after the deduction of allowable expenses and losses.

### Deductions

All documented costs related to the generation of taxable income are deductible unless the law specifically provides otherwise. Business-related interest is deductible if the amount is reasonable, but is subject to restrictions under the thin capitalization rules (see 3.6 below). Nondeductible items mainly include the following:

- Dividends and other distributions with respect to equity interests paid to investors;

- Management fees;

- EIT paid, as well as late payment surcharges and fines incurred on various tax payments;

- Fines for unlawful operations and losses sustained as a result of the confiscation of property;

- Unverified provisions; and

- Certain donations and sponsorship fees.

### Depreciation

Depreciation is calculated on a straight-line basis and assets are subject to certain minimum depreciation periods. Under certain circumstances, accelerated depreciation may apply. The minimum salvage value should be reasonably determined by a taxpayer, according to the nature and condition of the fixed assets.

Special depreciation rules apply to enterprises engaged in oil and gas exploration activities.

### Losses

Losses generally may be carried forward for five years, but the carryback of losses is not permitted.

## 3.4 Capital gains taxation

There is no separate capital gains tax; capital gains (and losses) of companies generally are combined with other operating income and taxed at the normal EIT rate. Gains on real property, net of development costs, are subject to the Land Appreciation Tax.

## 3.5 Double taxation relief

### Unilateral relief

If a resident entity receives income from a country that has not concluded a tax treaty with China, the resident is entitled to a tax credit for foreign income tax actually paid on the income. The foreign tax may be credited against Chinese tax on the same profits, but the credit is limited to the amount of China tax payable on the foreign income. A country-by-country limitation is applied. If the foreign tax credit exceeds the limit, the excess may be carried forward for five years. An indirect tax credit also is allowed.

### Tax treaties

China has a broad tax treaty network, the aim of which is to eliminate double taxation and provide for reduced rates of withholding tax on dividends, interest and royalties. Most of China's treaties are based on the OECD model treaty, providing for relief from double taxation on all types of income, limiting the taxation by one country of companies resident in the other and protecting companies resident in one country from discriminatory taxation in the other. Denmark's treaties generally contain OECD-compliant exchange of information provisions.

To claim benefits under China's tax treaties, a tax residence certificate issued by the tax authorities of the country where the recipient is resident, together with supporting evidence of residence in that country, must be submitted.

| China Tax Treaty Network | | | |
|---|---|---|---|
| Albania | France | Malaysia | Singapore |
| Algeria | Georgia | Malta | Slovakia |
| Armenia | Germany | Mauritius | Slovenia |
| Australia | Greece | Mexico | South Africa |
| Austria | Hong Kong* | Moldova | Spain |
| Azerbaijan | Hungary | Mongolia | Sri Lanka |
| Bahrain | Iceland | Morocco | Sudan |
| Bangladesh | India | Nepal | Sweden |
| Barbados | Indonesia | Netherlands | Switzerland |
| Belarus | Iran | New Zealand | Syria |
| Belgium | Ireland | Nigeria | Tajikistan |

| Bosnia & Herzegovina | Israel | Norway | Thailand |
|---|---|---|---|
| Brazil | Italy | Oman | Trinidad & Tobago |
| Brunei | Jamaica | Pakistan | Tunisia |
| Bulgaria | Japan | Papua New Guinea | Turkey |
| Canada | Kazakhstan | Philippines | Turkmenistan |
| Croatia | Korea | Poland | Ukraine |
| Cuba | Kuwait | Portugal | United Arab Emirates |
| Cyprus | Kyrgyzstan | Qatar | United Kingdom |
| Czech Republic | Laos | Romania | United States |
| Denmark | Latvia | Russia | Uzbekistan |
| Egypt | Lithuania | Saudi Arabia | Venezuela |
| Estonia | Luxembourg | Serbia and Montenegro | Vietnam |
| Ethiopia | Macao* | Seychelles | Zambia |
| Finland | Macedonia | | |
| * Mainland China has signed tax arrangements with Hong Kong and Macau. | | | |

## 3.6 Anti-avoidance rules

### Transfer pricing

The EIT Law and its implementation rules establish the basis for the Chinese tax authorities to make special adjustments related to transfer pricing. If two entities are related, all of their intercompany transactions must comply with the arm's length principle. Transactions covered by the Chinese rules include both tangible and intangible transactions, intragroup services and intercompany financing activities.

A related party is defined as one with a 25% direct or indirect ownership. A multi-layer calculation for indirect shareholdings also applies. An entity with significant control over the taxpayer's senior management, purchases, sales, production and the intangibles and technologies required for the business is defined as a related party.

Where intercompany charges or fees do not reflect an arm's length arrangement, the tax authorities may make compensatory adjustments by reference to normal market rates or prices for similar services or goods. In certain cases, the tax authorities are entitled to levy tax retroactively on transactions between affiliated companies that took place up to 10 years ago.

China has adopted the "best method" approach for selecting a transfer pricing method, with no specific ranking among the following methods: comparable uncontrolled price method, resale price method, cost plus method, transactional net margin method, profit split method and other methods that comply with the arm's length principle.

Contemporaneous documentation rules apply to an enterprise, unless the annual amount of related party purchases and sales is lower than RMB 200 million and the annual amount of other related party transactions is lower than RMB 40 million; or the foreign shareholding in the enterprise is less than 50% and the enterprise transacted only with domestic related parties (not including Hong Kong, Taiwan and Macau). Enterprises established by multinationals in China with limited functions and risks and that solely perform manufacturing/processing, distribution or contract R&D activities must prepare and submit contemporaneous documentation by 20 June of the subsequent tax year if they incur a loss. The contemporaneous documentation should include information on the structure of the organization, a summary of the business operations, information on related party transactions, a comparability analysis and the selection and application of the transfer pricing methodology.

There are rules on cost-sharing agreements and advance pricing arrangements (APAs). APAs can be unilateral, bilateral or multilateral, and are valid for three to five years. An APA generally includes six phases, including a prefiling meeting, formal application, review and evaluation, negotiations, signing of the agreement and monitoring and execution.

### Thin capitalization

The thin capitalization rules operate to disallow a deduction for excessive interest expense with respect to related party financing. The debt-to-equity ratio is specified as 5:1 for financial institutions and 2:1 in all other cases. Interest expense exceeding the stipulated threshold is nondeductible in the current and subsequent periods, unless the enterprise can produce supporting documentation demonstrating that the financing is at arm's length or that the effective tax rate of the borrowing entity is not higher than the rate of the domestic related party that receives the interest.

### Controlled foreign companies

A Chinese shareholder may be taxed currently on its proportionate share of undistributed profits of CFCs located in certain low tax jurisdictions where there are no valid business reasons for the decision not to distribute the profits. A CFC is defined as a non-Chinese company controlled by China tax residents (both companies and individuals, each of which must hold a 10% or greater voting shares and jointly own 50% or more of the shares) through direct or indirect share ownership. To be a CFC, the company must be incorporated in a country or region where the effective tax rate is 50% or less than China's statutory EIT rate (i.e. 12.5% or less).

A Chinese resident enterprise is required to file an annual reporting form on overseas investment, along with its annual tax return. The competent tax authorities will issue a confirmation notice where a CFC is identified based on a review of the reporting information.

A company can avoid application of the CFC rules if:

- The CFC is located in a "white list" country;
- The CFC's income is derived mainly from active business activities; or
- The annual profits of the CFC are lower than CNY 5 million.

### General anti-avoidance rule

China's general anti-avoidance rule (GAAR) requires a bona fide business purpose for any commercial arrangement that has the effect of reducing, deferring or avoiding taxable revenue or taxable income. In the absence of such a purpose, the tax authorities have the power to disregard the arrangement and impose Chinese tax.

## 3.7 Administration

### Tax year

The tax year is the calendar year and tax quarters are calendar quarters.

### Filing and payment

Enterprises normally are required to file provisional EIT returns with the local tax authorities within 15 days of the end of each quarter. These installments generally are calculated on actual quarterly profits. Enterprises that have difficulty prepaying tax based on actual quarterly profits may make prepayments based on the quarterly average taxable income for the preceding year, or by another method approved by the authorities.

Final settlement of tax liability must be made within five months of the end of the year. A return must be filed regardless of whether the operations of the enterprise resulted in a profit or a loss. An enterprise that cannot file a tax return within the prescribed time because of special circumstances (e.g. natural disasters or shifts in national economic policy) may request an extension from the local tax authorities.

A late payment surcharge will be imposed on a daily basis, at a rate of 0.05% of the amount of underpaid tax. Penalties may be imposed in addition to the late payment surcharge. An interest-based penalty may be imposed for transfer pricing, thin capitalization, CFC and general anti-avoidance tax adjustments. The tax authorities may issue rulings for special cases.

Where a resident enterprise has branch offices registered in different regions in China and operating cross-regionally, both the head office and the branches may be required to make EIT filings.

### Consolidated returns

China generally does not permit the filing of consolidated returns; each company must file a separate return.

### Statute of limitations

The statute of limitations for assessment and collection is three years if an underpayment of tax is due to the taxpayer's inadvertent error in tax computation (e.g. incorrect application of a formula). The period is extended to five years if the accumulated amount of underpaid tax is greater than RMB 100,000. The statute of limitations period could be up to 10 years for underpayments of EIT arising from transfer pricing issues or arrangements without a bona fide business purpose. There is no statute of limitations for tax evasion.

### Tax authorities

Tax legislation and policy are developed jointly by the SAT and the Ministry of Finance, with the SAT and its provincial and municipal offices administering taxation policies. Each locality in China has a state tax bureau under the SAT and a local tax bureau under both the SAT and the local government. The SAT and state tax bureaus mainly are responsible for the collection and administration of taxes that generate revenue for the central government or revenue that is shared between the central and local governments.

### Rulings

There are no advance ruling procedures in China. Taxpayers normally consult their local in-charge tax officials on an unofficial basis when issues arise. The tax authorities may issue post-transaction rulings in special cases. China does allow for APAs (see above under 3.6). The SAT recently announced that advance ruling procedures may be piloted in large businesses.

# 4.0 Withholding taxes

## 4.1 Dividends

A 10% withholding tax on dividends paid to a nonresident company was introduced as from 2008. Previously, dividends paid by a Chinese company with at least 25% foreign participation were exempt. It should be noted, however, that dividends paid out of pre-2008 earnings continue to be exempt from withholding tax. The 10% withholding tax may be reduced under an applicable tax treaty.

## 4.2 Interest

Interest generally is subject to a 10% withholding tax unless the rate is reduced under a tax treaty. Interest from certain loans made to the Chinese government or state banks is exempt. A 5% BT also applies to interest payments.

## 4.3 Royalties

The withholding tax rate on royalties and fees arising from the licensing of trademarks, copyrights and know-how and related technical service fees generally is 10%. Royalties generally are subject to a 6% VAT, except for payments made in connection with the use of technology, where an exemption may be granted.

## 4.4 Branch remittance tax

China does not levy a branch remittance tax.

## 4.5 Wage tax/social security contributions

The employer must withhold individual income tax on behalf of the employee and remit the correct amount to the tax authorities.

The employer must contribute approximately 20% of basic payroll to the state-administered retirement scheme. The employer also must contribute to a medical insurance fund, maternity insurance, unemployment insurance and work-related injury insurance. The total employer contribution can be up to about 40% of the employee's base monthly salary, although the rates can vary across the country. The employee is required to contribute a certain percentage of his/her monthly salary to the above funds, subject to a threshold set by the local authorities.

Foreign individuals legally working in China (including both locally hired individuals and those seconded from abroad to work in China) are required to participate in the same social security scheme as described above, unless an exemption is provided under an applicable bilateral social security totalization agreement. However, enforcement may vary in different cities.

# 5.0 Indirect taxes

## 5.1 Value added tax

VAT is a national tax, with a single rate imposed regardless of the location of the VAT taxpayer. Chinese VAT generally is levied on any person engaged in the sale of goods or the provision of processing, repair or replacement services within China, as well on the importation of goods into China.

As noted above, the VAT reform (initially applying to the non-railway transportation and modern service sectors) has been rolled out nationwide and new sectors have been added to the scope of the reform (i.e. railway transportation and postal services are included within the scope of the VAT reform as from 1 January 2014). The VAT reform aims to resolve the double taxation issues arising under the indirect tax system (because no VAT-like credit mechanism is allowed under the BT system, so BT paid cannot be recovered by purchasers against their own BT liability, nor can VAT be recovered by purchasers who are only liable to BT) and to foster the development of modern service industries by gradually transitioning these industries from liability to BT to liability to VAT. The reform is expected to be rolled out to more service sectors (e.g. telecommunications, financial services, etc.) by the targeted completion of the reform (end of 2015).

There are two types of VAT payers: general VAT payers and small-scale VAT payers. Small-scale VAT payers are entities engaged in manufacturing or providing VAT-taxable services with sales not exceeding RMB 0.5 million per year, and firms engaged in wholesale or retail trade with sales not exceeding RMB 0.8 million per year. All other taxpayers are general VAT payers. For taxpayers engaged in VAT-taxable services under the VAT reform program, the sales threshold is RMB 5 million per year. Taxpayers whose annual sales do not reach the above thresholds still may apply for the general VAT payer status if the taxpayer can demonstrate it has a sound financial and accounting system.

The VAT rate for a general VAT payer is 17%, which is applicable to the provision of processing, repair or replacement services and the value of products at importation. A reduced rate of 13% applies to certain food, goods, books and utilities. Rates of 6% and 11% apply to general VAT payers for most services under the VAT reform program. Small-scale VAT payers pay VAT at a rate of 3%, but there is no input VAT credit (i.e. this is a simplified VAT calculation method).

VAT incurred on the purchase or construction of fixed assets (excluding immovable property) may be credited against output VAT. Input VAT arising from following items, however, is not deductible against output VAT:

- The purchase of goods and services for the exclusive use for non-VAT taxable, VAT-exempt projects or projects subject to a simplified VAT calculation method, welfare activities or individual consumption;
- The purchase of yachts, motorcycles and motor vehicles that are subject to consumption tax and used for the taxpayer's own use;
- Goods and relevant services purchased that are lost in an unusual manner;
- Goods and relevant services purchased and consumed or used for products or finished goods that are lost in an unusual manner; and
- The purchase of passenger transportation services.

A VAT refund may be available in an export situation. Exports generally attract a zero rate of VAT, i.e. zero output VAT on export, along with a refund of input VAT incurred on materials purchased domestically for the export of goods. However, as the VAT refund rate ranges from 0% to 17%, many products do not enjoy a full refund of input VAT.

Under the VAT reform, the zero rate may be applied to R&D/design services provided to foreign entities and international transportation services, while qualified cross-border services may be VAT-exempt. Input VAT incurred in the zero-rated services may be refunded, but is unrecoverable in VAT-exempt services.

A company is required to register with the local tax authorities at the time of incorporation to have its status recognized. If the taxpayer's status is approved, VAT taxpayers (other than small-scale VAT taxpayers) must register for VAT purposes with the tax authorities. A nonresident company is not required to register for VAT.

VAT returns generally must be filed each calendar month and submitted before the 15th day of the following month. A taxpayer that imports goods must pay tax within 15 days after the issuance of the tax payment certificate by the customs authorities.

VAT grouping is not permitted.

## 5.2 Business Tax

BT used to be a turnover tax imposed on the sale of immovable property, and on sales of intangible goods and certain services subject to VAT. With various industries transitioning from liability to BT to liability to VAT under the VAT reform program (see 5.1), BT now only applies to the sale of immovable property and land use rights and a smaller group of services (e.g. construction, financial, hoteling and catering, entertainment, etc.). Services are subject to BT, regardless of whether the service provider or the recipient is located in China (before 1 January 2009, only services performed within China were subject to BT). However, the Chinese government has announced that entities located in Mainland China that render services outside China are "temporarily" exempt from the BT with respect to construction, cultural and athletic activities (except for broadcasting and television).

The BT rates are between 3% and 20%. The 3% rate applies to the provision of construction services (if not exempt), cultural and athletic activities; the 5% rate applies to servicing, interest, the sale of land use right and immovable property; and rates between 5% and 20% apply to the provision of entertainment services (as determined by the provincial-level tax authorities).

Once a taxpayer's tax status has been approved by the tax authorities, the company should register as a BT payer. Returns generally should be filed each calendar month and submitted before the 15th day of the following month.

BT is collected by the local tax bureau and remitted to the local government.

Enterprises operating within the service sector and liable for BT have no mechanism to claim a VAT credit for inputs of goods subject to VAT. Unlike VAT, no credit is granted for BT paid except that, in some cases, the tax may be levied on the difference between revenue and deductible costs. Tax paid on services received or property acquired may not be deducted from BT payable, although the deduction of costs is allowed in designated activities.

## 5.3 Capital tax

China does not levy capital duty.

## 5.4 Real estate tax

A real estate tax is imposed on the owner of property at a rate of 1.2% on the assessed value, or 12% on the rental value of leased property. This tax applies to entities, including FIEs, and individuals. A local land use tax is levied at varying rates, depending on the size of the city or locale.

A deed tax is imposed on the transferee of real property. The deed tax is calculated as a certain percentage of the total value of the transferred real property, with the rate ranging from 3% to 5%.

## 5.5 Transfer tax

China does not levy transfer tax.

## 5.6 Stamp duty

Stamp duty, ranging from 0.005% (for loan agreements) to 0.1% (for leasing agreements, warehousing and storage contracts) applies to prescribed contracts, written certificates of transfer of property rights, business account books and permits. The rate on share transactions is 0.1% for shares listed on a domestic stock exchange.

## 5.7 Customs and excise duties

Import duties are levied at both general and preferential rates. The preferential rates apply to imports originating from countries or regions that have signed agreements with China containing reciprocal preferential tariff clauses, and the general tariff rates apply to imports originating from all other jurisdictions. However, if the State Council Customs Tariff Commission grants special approval, preferential tariff rates may be applied to imports that otherwise would be subject to the general rates.

To encourage foreign investment, FIEs that meet certain requirements may be exempt from customs duties on the importation of machinery and equipment for self-use.

## 5.8 Environmental taxes

China does not levy environmental taxes.

## 5.9 Other taxes

### Consumption tax

Consumption tax applies to prescribed nonessential and luxury, or resource-intensive goods, including alcohol, cosmetics, fuel oil, jewelry, tires, motorcycles, motor vehicles, petrol, yachts, golf products, luxury watches, disposable wood chopsticks and tobacco, and it mainly affects companies involved in producing or importing these goods. The tax is calculated based on the sales value of the goods, the sales volume or a combination of the two. The proportional consumption tax rate is from 1% to 56% on the sales revenue of the goods. Exports are exempt.

Once the taxpayer's tax status has been approved by the tax authorities, the vendor should register as a consumption tax payer. Returns generally should be filed each calendar month and submitted before the 15th day of the following month.

### City maintenance and construction tax/education surcharge

The city maintenance and construction tax and national education surcharge apply to entities and individuals who are subject to VAT, BT or consumption tax. FIEs, foreign enterprises and foreign individuals were exempt from the surcharges before 1 December 2010. The two surcharges are calculated as a percentage of the VAT, BT and consumption tax due. The national education surcharge is levied at a flat rate of 3%, while the rates for city maintenance and construction tax depend on the location of the taxpayer or withholding agent: 7% for a location in a city; 5% for a county and town area; and 1% in other situations.

The local education surcharge, whose collection mechanism is almost the same as that of the national education surcharge, can apply at the discretion of the local government. However, after the MOF issued a notice in 2010 to urge all local governments to impose the local education surcharge at a flat rate of 2%, with a view to unifying the application of the surcharge across the country, the 2% rate has been applied in all provinces throughout China.

### Land appreciation tax

Gains on the sale of real property, net of development costs, are subject to the LAT. LAT applies to all types of land, construction and immovable property, including commercial, industrial and residential sites. The implementing regulations provide for a full deduction of qualified financing expenses, related taxes, administration and selling expenses. A super deduction equal to 20% of property development costs and land purchase costs is available to real estate development companies.

LAT is charged in four bands ranging from 30% to 60%, depending on the percentage of gain realized.

### Resource tax

The natural resources tax is levied on enterprises and individuals engaged in the exploitation of mineral products or the production of salt within the territory of and waters under the jurisdiction of China. A nationwide reform of the resource tax was launched in 2011, changing the tax basis from volume to selling price for certain categories of taxable resources, i.e. crude oil and natural gas. For most other taxable resources, the tax still is calculated based on the volume of products sold

or self-used, at revised tax rates. The resource tax is payable to the local authorities at the place of production or exploitation.

## License tax

License tax can apply at the discretion of the local authorities on vehicles and vessels belonging to enterprises (and individuals).

# 6.0 Taxes on individuals

Personal income tax is levied on both Chinese and foreign individuals (albeit with varying allowances) and tax is imposed on private business income.

Expatriate employees of FIEs, resident representatives of foreign businesses and other individuals who hold residence permits normally must register with the tax authorities if subject to individual income tax in China.

| China Quick Facts for Individuals | |
| --- | --- |
| Income tax rates | 3%-45% (wages/salaries), up to 35% (business profits) |
| Capital gains tax rates | 0%/20% |
| Basis | Worldwide income |
| Double taxation relief | Yes |
| Tax year | Usually calendar month |
| Return due date | Within 3 months of end of the calendar year (business profits tax return and return for individuals whose annual income exceeds RMB 12,000); within 30 days of end of the calendar year (foreign-source income tax return); and within 15 days of the month following the month in which income is earned (wages/salaries withholding return) |
| **Withholding tax** | |
| – Dividends | 20% |
| – Interest | 20% |
| – Royalties | 20% |
| Net wealth tax | No |
| Social security | Varies |
| Inheritance tax | No |
| Real estate tax | 12% (rental income), 4% (lease of residential property) |
| Deed tax | 3%-5% |
| Land appreciation tax | 30%-60% of gains on transfer |
| Business tax | 3%-20% |
| VAT | 0%, 3%, 6%, 11%, 13% and 17% |

## 6.1 Residence

There is no specific definition of tax residence for personal tax purposes in domestic law. However, the test for "domicile" in China is whether an individual is usually or habitually residing in China due to household, family or economic involvement.

## 6.2 Taxable income and rates

China-domiciled individuals are subject to individual income tax on their worldwide income; nondomiciled individuals are subject to tax depending on the source of income.

A nondomiciled individual who has resided or stayed in China for less than 90 days in a calendar year is subject to tax only on Chinese-source income borne by a Chinese entity or establishment. A nondomiciled individual who has resided or stayed in China for more than 90 days, but less than one year, is subject to tax only on Chinese-source income. A nondomiciled individual who is in China for one full year, but who does not meet the five-consecutive-year test (see below) is subject to personal tax on Chinese-source income, plus foreign-source income borne by a Chinese entity.

A nondomiciled individual who has resided in China for five consecutive full years is subject to Chinese individual income tax on his/her worldwide income for each full year the individual resides in China, as from the sixth year. Any absence from China for more than 30 days during a temporary trip, or cumulatively for more than 90 days over numerous trips within the same tax year, breaks up the "full" year.

## Taxable income

Taxable income comprises employment income (e.g. salary and wages, personal benefits, income in kind, cost of living allowances); production and business income; income derived from contracting for, or leasing operations of, enterprises or institutions; dividends and bonuses; interest income (except interest from bank deposits); royalty income; income from the leasing of property; income from the assignment or transfer of property; contingency income; and other income specified as taxable by the finance department of the State Council.

If a domiciled individual has to pay income tax on foreign-source income in another country as well as in China, the tax paid in the foreign country can be used to offset the individual's Chinese tax liability. However, the maximum amount of the offset may not exceed the Chinese individual income tax payable, as calculated in accordance with the law.

Items that can be paid to foreign employees (through reimbursement and with sufficient documentation) and remain tax-exempt include housing allowances, relocation expenses, meal subsidies and laundry expenses; reasonable allowances for business trips in China or abroad (including home leave); language training expenses; and a portion of child education fees. While advance approval of the tax authorities is not required for this exemption, supporting documents and valid commercial invoices must be retained for the tax authorities' review.

## Deductions and reliefs

Deductions and allowances are available, depending on the category of income. For wages and salaries received in China, individuals are entitled to a fixed monthly deduction of RMB 3,500 (foreign nationals are entitled to an additional fixed deduction of RMB 1,300). Personal basic contributions are deductible. These include payments to housing funds and certain medical insurance, pension and unemployment insurance payments.

Taxable income from personal services, royalties and remuneration from manuscripts and the leasing of property is net of a standard deduction for expenses that is equal to 20% of total income, with a minimum amount of CNY 800 per payment.

Reasonable business expenses incurred in earning income from a business are deductible.

## Rates

Tax rates can be progressive or flat. Seven progressive tax rates, ranging between 3% and 45%, are levied on wages and salaries. Tax is withheld by the employer each month and paid to the tax authorities. The same progressive rate schedule applies to both Chinese citizens and foreigners, except for a differential in basic monthly exemptions, with a standard monthly deduction of CNY 3,500 for local citizens and CNY 4,800 for expatriates and certain nationals.

A separate tax schedule applies to income from the operation of a private business (including on a contractual or lease basis). For a private business, taxable income is defined as total revenue net of costs, expenses and losses incurred. For a business operating on a contractual or lease basis, taxable income is total revenue net of necessary expenses. Progressive tax rates apply to such income: 5% on the first CNY 15,000; 10% on the next CNY 15,000; 20% on the next CNY 30,000; 30% on the next CNY 40,000; and 35% on income exceeding CNY 100,000.

Dividends, interest, royalties, income from the leasing of property, income from the transfer or assignment of property, income from manuscripts and contingency income are taxed at 20%. Interest on bank deposits is temporarily exempt from individual income tax (previously it was taxed

at 5%). Income from production and business and income derived from contracting or leasing operations is taxed at progressive rates between 5% and 35%. Income from personal services is subject to progressive rates ranging from 20% to 40%.

Gains on the sale of real property also may be subject to BT, LAT, etc. Individuals generally are exempt from income tax on gains from the sale of their sole private dwelling if they have occupied the residence for five years or more.

## 6.3 Inheritance and gift tax

China does not levy inheritance or gift tax.

## 6.4 Net wealth tax

China does not levy net wealth tax.

## 6.5 Real property tax

An individual who rents out his/her property is subject to real estate tax, which is 12% of the rental income. The rate may be reduced to 4% for the leasing of residential property. However, the practice may vary across China since the rates are determined by the local authorities.

Self-occupied residential property owned by individuals is not subject to real property tax, except in Shanghai and Chongqing where a pilot real estate tax has been imposed on such property at rates varying depending on the conditions.

## 6.6 Social security contributions

The employer is required to contribute approximately 20% of basic payroll to the state-administered retirement scheme and also must contribute to a medical insurance fund, maternity insurance, unemployment insurance and work-related injury insurance. The total employer contribution can be up to around 40% of the employee's base monthly salary, although the rates can vary across the country. The employee is required to contribute a certain percentage of his/her monthly salary to the funds, subject to certain limits.

As from 15 October 2011, foreign individuals legally working in China (including both locally hired individuals and those seconded from abroad to work in China) are required to participate in the same social security scheme as described above, unless an exemption is provided under an applicable bilateral social security totalization agreement. However, enforcement may vary in different cities.

## 6.7 Compliance

Each individual must file a separate return; joint filing is not permitted. Non-Chinese nationals may need to register with the competent Chinese tax authorities as soon as they become liable to individual income tax.

Individual income tax generally is collected via withholding at source. If Chinese-source income is not covered by the withholding procedure, the individual must file a return.

Individual income tax on wages and salaries is calculated and levied on a monthly basis. Withholding agents and individuals who file tax returns personally must submit the return to the tax authorities and make the tax payment to the state treasury within 15 days after the end of the month in which the income was derived.

Annual filing is required within three months of the end of a calendar year for individuals with annual income exceeding RMB 120,000. Nondomiciled individuals who have not resided in China for a full tax year may be exempt from the filing requirement. In most cases, an employer or a person who pays taxable income to a taxpayer is obliged to act as a withholding agent and is responsible for filing a tax return and remitting tax payments to the tax authorities on behalf of the individual. If there is no withholding agent, the individual is responsible for filing his/her tax return and paying the tax assessed.

A late payment surcharge is imposed on a daily basis at a rate of 0.05% of the amount of underpaid tax. Penalties may be imposed in addition to the late payment surcharge.

# 7.0 Labor environment

## 7.1 Employee rights and remuneration

Separate labor regulations govern unemployment insurance, employment of foreigners, maternity insurance, labor dispatch and rules on collective labor contracts.

Employees in all types of enterprises have equal rights to select an occupation and obtain employment, receive remuneration for their work, rest and take holidays and receive vocational training, health insurance and welfare benefits.

Employee rights and obligations must be clearly specified in a written labor contract and must include provisions covering the term of the contract, job description, labor protection and conditions, remuneration, labor discipline and conditions for breach and termination. Various probation periods must be granted, with the term depending on the length of the contract. A probation period is not required for employment contracts with a term of less than three months or those aimed at the completion of certain tasks. The employer is liable for economic damages to a previous employer if it recruits that employer's employees before the completion of their original labor contracts.

Only imminent bankruptcy and major production problems can justify layoffs due to redundancy. Moreover, trade unions are entitled to object to dismissals they consider inappropriate.

If any of the following circumstances makes it necessary to reduce the workforce by 20 persons or more, or by less than 20 individuals that accounts for at least 10% of the total number of the enterprise's employees, the employer may reduce the workforce after it has explained the circumstances to its trade union or to all of its employees 30 days in advance, has considered the opinions of the trade union or the employees and has subsequently reported the workforce reduction plan to the labor administration department:

- Restructuring pursuant to the Enterprise Bankruptcy Law;
- Serious difficulties in production and/or business operations;
- The enterprise switches production, introduces a major technological innovation or revises its business method, and, after amendment of employment contracts, still needs to reduce its workforce; or
- Other major change in objective economic circumstances relied on at the time employment contracts were concluded renders the contracts unperformable.

The employer is responsible for health and safety measures and must pay social insurance and housing fund to the local governments on behalf of its employees. Social insurance includes pension, medical care, unemployment, work-related injury and maternity insurance. The employer also may purchase commercial medical insurance or other additional commercial insurance for its employees from insurance companies.

The government continues to issue new regulations on labor-related issues. There are laws on preventing and controlling occupational diseases, toxic products in the workplace and the use of child labor (employment of those younger than age 16).

### Working hours

China generally operates an eight-hour work day or 40-hour work week for all employees.

Employees are guaranteed at least one day of rest per week and overtime should not exceed 36 hours per month. The local labor bureau and unions should ensure that employees receive rest and overtime entitlements.

## 7.2 Wages and benefits

Wages must be paid according to the principle of equal pay for work of comparable value. Apart from meeting minimum wage requirements, FIEs and SOEs are free to set their own wages.

Time wages are calculated on the basis of 21.75 work days per month under the standard eight-hour per day/40-hour work week. The regulations permit payment on an hourly, daily, weekly or monthly basis.

Housing and schooling allowances, perks and hardship pay are added to salary. Wages and salaries for Chinese staff vary widely by region, and total labor costs can be as much as five times higher than basic wages in some companies, with a range of benefits and subsidies making up the balance.

Each province or municipality must set a minimum wage.

A JV may determine its wage scales independently of the rates of the Chinese partner and other Chinese enterprises. The foreign partner in a JV often negotiates a wage scale with the Chinese partner or local labor service bureau and includes this in the labor contract, spelling out what benefits and subsidies are included and which party is responsible for them.

## Social insurance

Several pieces of legislation covering specific social security needs have been implemented nationwide, according to which, contribution rates and contribution base will be determined by the city level authorities following guidelines issued at the central level. As noted above, foreign individuals legally working in China generally are required to participate in the social security scheme unless otherwise agreed in bilateral agreements entered into by China.

Some large multinationals have implemented an Enterprise Annuity (EA) for local employees, as a way to attract and retain staff. To establish a multi-tiered social security system, which ensures a better quality of life for local employees after retirement and enhances the existing social security system, the Ministry of Labor and Social Security has issued legislation on EAs. The EA, considered the corporate pension plan, is an occupational voluntary defined contribution scheme applicable to all local employees. An EA must be set up under a trust arrangement and the trustees should appoint EA service providers, i.e. the plan administrator, the custodian and the investment manager, to jointly manage the EA.

The social security regulations set up a three-tiered structure: basic pension, personal accounts and supplementary schemes. The system requires employers (including state-owned, collective, foreign investment, private and joint stock enterprises) to contribute approximately 20% of basic payroll for the basic pension portion; most of the funds enter into a municipal-run pension fund. However, this fund eventually will be transferred to a provincial pension pool to fund the basic pension. The actual percentage of contribution varies throughout the country, since the percentage is set by the local authorities.

The employee contributes 8% of his/her salary to a personal account, which normally is portable if the employee changes employers.

An employee can choose to join a supplementary scheme, and the employer is given some freedom in designing these plans. The employer can pay the entire monthly contribution or share the burden with the employee, but the employee portion may not exceed 50% of the total.

Under the social security system, benefits on retirement are as follows:

- If contributions have been made for at least 15 years, a monthly payment equal to a certain percentage (depending on the length of the contribution period) of the average amount of the previous year's provincial or municipal average monthly salary and contribution base is payable from the basic pension fund, plus a certain percentage (variable upon the retirement age) of the personal account balance.

- A benefit equal to the remaining balance in the personal account is payable to a designated beneficiary upon the death of the employee.

- If contributions have been made for less than 15 years, a lump sum equal to the personal account balance is payable.

The unified pension regulations cover only urban employees and not those living in the countryside, although the longer-term objective is to extend coverage to the rural population.

Contributions to unemployment insurance vary by city. Employers in Shanghai, including FIEs, are required to pay the equivalent of 2% of total payroll for unemployment insurance funds and employees must pay 1% of their wages; government agencies supply an unspecified amount.

An employee is entitled to unemployment insurance benefits after involuntary dismissal for up to two years while actively seeking new employment. If the individual has not found employment at the end of this period, he/she is entitled to regular benefits.

As agreed by the local authorities and supported by local policies, many JVs pay a single sum to a comprehensive insurance scheme administered by the Labor Services Bureau.

Employer contributions to a housing fund vary by city. In Beijing, the government requires all enterprises, including FIEs, to contribute 12% of an employee's monthly salary to the Housing Provident Fund, up to a maximum of three times the average monthly earnings in Beijing in the previous year. In Shanghai, the most recent adjusted employee's contribution rate includes a 7% basic portion and a 1% to 8% complementary portion, together with maximum and minimum limits for contributions.

### Other benefits

There are 11 state holidays. Most employees of FIEs are entitled to another five to 15 days of annual leave. Employees separated from their families may be entitled to additional leave. Employees who have been with a company for more than one year enjoy paid annual leave, which usually is approximately one to three weeks, depending on how long they have worked for the company.

## 7.3 Termination of employment

The Labor Law allows an FIE to dismiss an employee (without advance notice) if the employee does not fulfill the requirements during the probation period, or if he/she "seriously" violates labor discipline or company regulations, is "seriously" derelict in his/her duties or engages in graft, favoritism or other activities that cause "serious" damage to the employer. An employee may be dismissed for other reasons under particularly egregious circumstances.

If an employer terminates an employment contract during the probation period, an explanation must be furnished to the employee.

An employer may dismiss an employee with one month's written notice or one month's wages in lieu of notice if the employee remains incompetent after training or rearrangement of duties, or where there are "major" operational or production difficulties. The trade union must be notified 30 days in advance. Employees dismissed because of major difficulties must be given priority if the same enterprise recruits employees within the following six months. Trade unions are entitled "to object" to dismissals they deem inappropriate. If disputes arising from such dismissals cannot be resolved, the courts or labor arbitration tribunals should handle the matter, with union representatives retaining the right to assist with such actions.

An employee also has the right to terminate employment, provided he/she notifies the employer 30 days in advance, or three days in advance within the probation period. In certain cases, an employee can choose to terminate employment without notice (e.g. when the employer fails to pay wages or fails to pay social insurance according to the law).

The Labor Law requires an employer to make severance payments, with the amount governed by local regulations. An employee must be paid severance pay based on the number of years worked with the employer, at the rate of one month's wage for each full year worked. Any period of at least six months but less than one year is counted as one year. The severance payable to an employee for any period of less than six months is one-half of his/her monthly wages.

If an employee's monthly wage is greater than three times the average monthly wage of employees in the employer's area, as published by the authorities, the rate for the severance pay is three times the average monthly wage of employees and may cover no more than 12 years of work. The term "monthly wages" means the employee's average monthly wage for the 12 months before the termination or ending of his/her employment contract.

## 7.4 Labor-management relations

China has a single trade union, the All-China Federation of Trade Unions (ACFTU), with local chapters at the factory level. Independent trade unions are not permitted. Chinese national law requires JVs to permit the formation of unions; in many areas, local regulations require the unionization of JV workforces. Domestic and foreign investment firms should consult with trade unions to conclude collective labor contracts.

In many FIEs, unions may be responsible for distributing wages, bonuses, housing and other payments to employees. Union representatives have the right to attend board meetings when labor matters are under discussion. They also may negotiate with management on behalf of individual employees. Each month, FIEs must contribute 2% of total wages (including those payable to expatriate employees) to the trade union fund, and this contribution normally is deductible for EIT purposes if valid supporting documents are provided.

The employee or the employer can take disputes to the labor dispute mediation committee in their own employing unit. Such committees, headed by a trade union representative, comprise staff, employee and trade union representatives. If mediation fails, the employee or employer may take the dispute to a tribunal organized under the local Labor Service Bureau. The committee is headed by an appointee of the bureau and includes representatives of the bureau, the trade union and the employing unit. Arbitration awards generally must be rendered within 60 days of submission. Parties dissatisfied with an award may appeal to the People's Court within 15 days.

The burden of proof is on the employer in disputes arising from a decision to dismiss or lay off an employee or reduce an employee's remuneration. The employer also is liable for paying remuneration or damages to an employee who has worked under especially harsh conditions, has been made to work long hours or has otherwise had his/her rights curtailed.

## 7.5 Employment of foreigners

In general, foreigners may be hired only where there is a demonstrated need and where approval is obtained from the local labor authorities. Foreigners must comply with a licensing system before they can start work. The system requires employment certificates, professional visas and residence permits.

The term "work" under the immigration rules is defined as carrying out activities with a remunerative nature, and "work in the PRC" means performing one's employment duties in the PRC pursuant to either: (1) an employment contract signed directly with a legal person in the PRC, regardless of the length of employment in China and regardless of whether the foreigner is paid in the PRC for the services rendered in China; or (2) an employment contract signed with a legal person outside China if the source of compensation is outside China and work is performed in China for more than three months in any calendar year, unless exceptions apply. Violation of these rules may be a criminal offense.

Employment permits and residence permits generally are valid for the shorter of one year, the remaining validity of the passport, the term of the employment in China or the remaining validity of the local employer's business license. Certain groups of foreigners may apply for a maximum five-year residence permit. Foreigners who are eligible for the longer-term residence permit include consultants and advisers to the Chinese government, those who take up a position of vice general manager level or above and those who are seconded as management or professionals to a Chinese company with foreign investment of more than USD 3 million.

All foreigners require visas to enter China. It is recommended that a passport be valid for at least six months from the date of arrival in the country. Generally, a transit visa is required for a stop in China, except in certain cases (e.g. where the foreigner directly transits through China by air and remains in the airport for no more than 24 hours).

An F/M (business) visa must be sponsored by a qualifying government entity in China. With a visa notification form (the sponsorship form), the applicant can apply for an F visa at a Chinese consular post overseas.

An L (tourist) visa can easily be obtained at a PRC embassy or consulate located in a foreign national's home country. The specific rules and policies for issuing L or F visas vary depending on the particular embassy or consulate.

# 8.0 Deloitte International Tax Source

The Deloitte International Tax Source (DITS) is a free online database that places up-to-date worldwide tax rates and other crucial tax information within easy reach.

## Connect to the source and discover:

**A database that allows users to view and compare tax information for 65 jurisdictions that includes –**

- Corporate income tax rates;
- Historical corporate rates;
- Domestic withholding tax rates;
- In-force and pending tax treaty withholding rates on dividends, interest and royalties;
- Indirect tax rates (VAT/GST/sales tax); and
- Information on holding company and transfer pricing regimes.

**Guides and Highlights** – Deloitte's Taxation and Investment Guides analyze the investment climate, operating conditions and tax systems of most major trading jurisdictions, while the companion Highlights series concisely summarizes the tax regimes of over 150 jurisdictions.

**Tax publications** – Global tax alerts and newsletters provide regular and timely updates and analysis on significant cross-border tax legislative, regulatory and judicial issues.

**Tax resources** – Our suite of tax resources includes annotated, ready-to-print versions of holding company and transfer pricing matrices; a summary of controlled foreign company regimes for the DITS countries; an R&D incentive matrix; monthly treaty updates; and expanded coverage of VAT/GST/Sales Tax rates.

**Webcasts** – Live interactive webcasts and Dbriefs by Deloitte professionals provide valuable insights into important tax developments affecting your business.

## DITS is free, easy to use and readily available!

http://www.dits.deloitte.com

# 9.0 Office locations

To find out how our professionals can help you in your part of the world, please contact us at the offices listed below or through the "contact us" button at **http://www.deloitte.com/tax** or or visit the Deloitte China site at **http://www.deloitte.com/view/en_CN/cn/index.htm**.

**Beijing**
F Office Tower W2
The Towers, Oriental Plaza
1 East Chang An Avenue
Beijing 100738, China
Tel: +86 10 8520 7788

**Shanghai**
30/F Bund Center
222 Yan An Road East
Shanghai 200002, China
Tel: +86 21 6141 8888

Deloitte refers to one or more of Deloitte Touche Tohmatsu Limited, a UK private company limited by guarantee ("DTTL"), its network of member firms, and their related entities. DTTL and each of its member firms are legally separate and independent entities. DTTL (also referred to as "Deloitte Global") does not provide services to clients.  Please see www.deloitte.com/about for a more detailed description of DTTL and its member firms.

Deloitte provides audit, tax, consulting, and financial advisory services to public and private clients spanning multiple industries. With a globally connected network of member firms in more than 150 countries and territories, Deloitte brings world-class capabilities and high-quality service to clients, delivering the insights they need to address their most complex business challenges. Deloitte's more than 200,000 professionals are committed to becoming the standard of excellence.

This communication contains general information only, and none of Deloitte Touche Tohmatsu Limited, its member firms, or their related entities (collectively, the "Deloitte Network") is, by means of this communication, rendering professional advice or services. No entity in the Deloitte network shall be responsible for any loss whatsoever sustained by any person who relies on this communication.

© 2014. For information, contact Deloitte Touche Tohmatsu Limited.