# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |

**THIS DOCUMENT RELATES TO:**

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 09-6687 (E.D. La.);**

*Gross v. Knauf Gips, KG*, **Case No. 09-6690 (E.D. La.);**

*Wiltz v. Beijing New Building Materials Public Limited Co.,* **Case No. 10-361 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1672 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1395 (E.D. La.); and**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.*, **Case No. 11-1673 (E.D. La.).**

## TAISHAN'S PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

# TABLE OF CONTENTS

I.     BACKGROUND & PROCEDURAL HISTORY ............................................................ 1
    A.    History of Chinese Drywall ...................................................................... 1
    B.    History of the Multidistrict Litigation..................................................... 1
    C.    Prior Adjudications ................................................................................ 1
        1.    *Germano* ..................................................................................... 1
        2.    *Hernandez* ................................................................................. 4
    D.    Taishan's Appeal from *Germano* ........................................................ 5
    E.    Contempt................................................................................................ 5
    F.    Class Certification................................................................................. 6

II.    FINDINGS OF FACT......................................................................................... 7
    A.    Evolution of the Class Damages Request ............................................... 7
    B.    Evidence at the June 9 Damages Hearing ............................................ 13
        1.    Jake Woody......................................................................... 13
        2.    George Inglis....................................................................... 17
        3.    David Pogorilich.................................................................. 23
        4.    Dr. M. Laurentius Marais .................................................... 27

III.    CONCLUSIONS OF LAW ................................................................................. 29
    A.    Fifth Circuit Law Bars Plaintiffs' Damages Plan ................................. 29
        1.    The Court May Not Award Aggregate, Lump-Sum Tort Damages
            Now and Work Out the Individualized Issues Later.................................. 29
    B.    Fifth Circuit Law Does Not Permit the Assessment of Tort Damages
        Based on Extrapolation from Averages ................................................ 34
        1.    Fifth Circuit Law Does Not Permit Assessment of Property
            Damages Based on Per-Square-Foot Formulas ......................... 38
        2.    Fifth Circuit Law Does Not Permit Extrapolation Based on
            Unrepresentative Cases ............................................................. 39
        3.    No Reason Exists for Distinguishing the Governing Fifth Circuit
            Law ........................................................................................... 40
    C.    The Evidence Supporting Aggregate Class Damages Is Insufficient. ................. 42
        1.    Mr. Inglis' Methodology Does Not Work ................................ 43
        2.    The Class List Is Unreliable as a Basis for Class Damages.................... 47
    D.    Default and Collateral Estoppel Have No Effect................................... 49
        1.    The Default Judgments Have No Relevant Effect on Damages ............. 49
        2.    Collateral Estoppel Does Not Apply........................................ 51

IV.    CONCLUSION................................................................................................. 55

## I.      BACKGROUND & PROCEDURAL HISTORY

### A.      History of Chinese Drywall

**1.**      From 2004 through 2006, the housing boom and rebuilding efforts necessitated by various hurricanes led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of residential and commercial buildings in coastal areas of the country, notably the Gulf Coast and East Coast.  Sometime after the installation of the Chinese drywall, property owners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices.   Dkt. No. 2380 ("*Germano* FOFCOL") at 4.

**2.**      Owners of residential and commercial property containing Chinese-manufactured drywall ("Chinese Drywall") began to file suit in various state and federal courts against homebuilders, developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese Drywall.  *Id.*

### B.      History of the Multidistrict Litigation

**3.**      The United States Judicial Panel on Multidistrict Litigation on June 15, 2009, ordered all federal cases involving Chinese drywall transferred for pretrial proceedings to the U.S. District Court, Eastern District of Louisiana.  *Id.* at 4-5.

### C.      Prior Adjudications

#### 1.      *Germano*

**4.**      Michelle Germano and four other Virginia homeowners filed a putative class action against Defendants Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd. ("Taishan"); Tobin Trading, Inc.; Venture Supply, Inc.; Harbor Walk Development, LLC; and The Porter-Blaine Corp.  Plaintiffs filed their initial complaint in the Eastern District of Virginia

on May 1, 2009.  Thereafter, on May 26, 2009, Plaintiffs filed their First Amended Complaint. Plaintiffs' case was then transferred to the Eastern District of Louisiana on October 13, 2009. Subsequent to transfer, Plaintiffs filed a Second Amended Complaint ("SAC") to make the putative class nationwide.  Plaintiffs' motion to amend was granted.

**5.**      Taishan did not initially appear in the lawsuit.  On November 18, 2009, Plaintiffs moved for a default judgment against Taishan.  Dkt. No. 464.  The Court granted a preliminary default against Taishan on November 20, 2009.  Dkt. No. 487.

**6.**      The Court then permitted the intervention of 14 individual plaintiffs ("*Germano* Intervenors") and scheduled a Rule 55(b) hearing on the *Germano* Intervenors' claimed damages.  Dkt. No. 641.  On December 4, 2009, the Court issued an Order to clarify that "the result of the hearing will only have a preclusive effect on those properties which are the subject of the hearing."  Dkt. No. 576.

**7.**      At the damages hearing held in February 2010, the *Germano* Intervenors presented evidence specific to seven individual properties.  To prove the presence of Taishan drywall, the *Germano* Intervenors proffered drywall supplier invoices and testimony from an expert who had conducted a site inspection and testing of each property.  For remediation costs, the *Germano* Intervenors' designated expert Ronald Wright based his testimony on property-specific estimates from two local contractors.   Mr. Wright acknowledged at the hearing that "individual characteristics . . . create some of the variations that we see in the square-foot price" among houses.  Dkt. No. 2191 (Trial Transcript at February 22, 2010, Vol. II) at 119:6-120:9 (explaining why the Heischober residence, with an elevator, more custom cabinetry, and better quality flooring had a higher per-square-foot remediation estimate).

8.  Consistent with the property-specific evidence presented, the Court's *Germano* FOFCOL focused on facts specific to each set of the *Germano* Intervenors and their particular property. Based on the developed evidentiary record for each set of the *Germano* Intervenors, the Court made individualized damages determinations and awarded the costs of remediating each specific property along with individual damages for alternative living expenses and loss of use and enjoyment.  Dkt. No. 2380 (*Germano* FOFCOL) at 69-108.  The Court issued separate awards to each set of the *Germano* Intervenors based on the property-specific evidence presented during the damages trial.  *Id.*

9.  Although immaterial to the Court's specific findings with respect to remediation costs for the seven properties at issue, the Court noted that the average cost per square foot to repair the *Germano* properties was $86 and that this average cost was based on "the average of independent quotes from two local reputable Virginia contractors."  *Id.* at 57.  The Court's double-average observation was not used to calculate actual remediation costs for any of the *Germano* properties.

10.  The Court commented that the "homes of the seven Plaintiff-intervenors are representative of a cross-section of contaminated homes," but did not base that comment on any statistical analysis or data, and none was presented.  *Id.* at 62.

11.  The Court did not make any findings about class-wide damages, nor were those issues before the Court.

12.  The Court entered Default Judgment for the *Germano* Intervenors on May 10, 2010 (Dkt. No. 3013) ("Final Default Judgment"), awarding seven judgments in the total amount of $2,609,099.99, plus pre-judgment interest of $149,256.53, plus undetermined post-judgment interest and costs.

### 2. *Hernandez*

**13.** On September 1, 2009, Tatum and Charlene Hernandez filed a similar individual action against Chinese drywall manufacturer Knauf Plasterboard Tianjin Co., Ltd. The matter culminated in a bench trial that concluded on March 19, 2010.

**14.** Unlike *Germano*, the *Hernandez* trial was adversarial, and several issues were contested. After having a chance to hear rebuttal testimony, the Court held that certain items like flooring and non-electronic personal property should be replaced only if damaged. Dkt. No. 2713 (*Hernandez* FOFCOL) at 32-33. In addition, the Court calculated alternative living expenses using a four-month remediation time (as opposed to six in *Germano*) and used an overhead and profit margin of 20% (as opposed to 25% in *Germano*). *Id.* at 39 and 42.

**15.** As in *Germano*, the Court based its damage award on property-specific proof. Both sides presented remediation estimates derived from detailed inspections of the property. *Id.* at 37 ("Plaintiffs' expert . . . performed a room-by-room analysis"); Dkt. No. 3169 (March 18, 2010 *Hernandez* Trial Transcript (vol. 4)) at 746 (defense expert "did a visual inspection of the house"). Plaintiffs' expert supplemented his site inspection with a unit-cost pricing software program. Dkt. No. 2713 at 37. Defendants' expert did it "the old-fashioned way," obtaining estimates from local contractors. Dkt. No. 3169 at 763-64; Dkt. No. 2713 at 37-38.

**16.** In awarding remediation damages, the Court primarily relied on the "actual estimates from local contractors," which the Court identified as "the most accurate estimates for work." Dkt. No. 2713 at 38.

**17.** The Court awarded remediation damages in the amount of $136,940.46 which represented a cost of $81.13 per square foot based on the footprint square footage of the house.

**18.** The Court did not make any findings about class-wide damages, nor were those issues before the Court in *Hernandez*.

### D.  Taishan's Appeal from *Germano*

**19.**     Following the Court's entry of the Final Default Judgment in *Germano* (Dkt. No. 3013), Taishan appeared and appealed the entry of default to the Fifth Circuit Court of Appeals based on lack of personal jurisdiction.  The Fifth Circuit remanded for jurisdictional discovery but ultimately affirmed both this Court's personal jurisdiction over Taishan and the *Germano* Default Judgment.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 580 (5th Cir. 2014).

### E.  Contempt

**20.**     In 2014, counsel for the Germano Intervenors commenced post-judgment discovery pursuant to Federal Rule of Civil Procedure 69(a).

**21.**     On June 20, 2014, the Court ordered a Taishan representative to appear for a judgment debtor examination on July 17, 2014.  Dkt. No. 17774.

**22.**     On July 15, 2014, Taishan's then counsel Hogan Lovells moved to withdraw as Taishan's counsel of record, reporting to the Court that Taishan "has notified Counsel that it does not intend to participate in the judgment debtor exam or any decision on the Bill of Costs."  Dkt. No. 17846-1.

**23.**     Taishan did not appear through counsel or a representative at the July 17, 2014 judgment debtor examination.  That same day, the Court entered the Contempt Order "[a]s a consequence of Taishan's refusal to appear at the Judgment Debtor Examination, in direct, willful violation of this Court's June 20, 2014 order."  Dkt. No. 17869 (Contempt Order) at 2.

**24.**     The Contempt Order directed Taishan to pay (1) $15,000 in attorneys' fees to Plaintiffs' counsel and (2) $40,000 as a penalty for contempt.  The Contempt Order also (3) enjoined "Taishan, and any of its affiliates or subsidiaries," from conducting any business in the United States "until or unless it participates in this judicial process."  *Id.* at 3.

**25.**     On February 17, 2015, the law firm Alston & Bird, LLP entered an appearance for Taishan.  Dkt. No. 18352.  Shortly thereafter Taishan paid the *Germano* judgment and the fees and penalty in the Contempt Order.

###### F.     Class Certification

**26.**     On July 21, 2014, Plaintiffs served Taishan with Requests for Admission propounding more than 100 questions directed to the corporate relationships between Taishan and other entities, including some co-Defendants.  Dkt. No. 17993.  Taishan did not object or respond to the Requests for Admission, and they were deemed admitted.

**27.**     On July 23, 2014, Plaintiffs moved for class certification.  Dkt. No. 17883.  Taishan did not appear, and the Court granted class certification on September 26, 2014.  Dkt. No. 18028 ("Class Certification FOFCOL").

**28.**     The Court defined the class as "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL complaints] asserting claims for remediated damages arising from, or otherwise related to" Taishan drywall.  *Id.* at 34-35.

**29.**     The Court found that the class comprised "approximately 4,150 members."  *Id.* at 23.

**30.**     On October 29, 2014, Plaintiffs moved the Court to award the class a single lump sum of $1,263,330,881.19 in damages, comprised of three components—remediation costs, alternative living costs (ALE) and loss of use and enjoyment (LOUE).   Dkt. No. 18086 (Plaintiffs' "Motion for Class Damages" or "Motion") at 3.[1]  Plaintiffs have never amended their Motion.

---

[1] In connection with the Motion for the Assessment of Class Damages, Plaintiffs sent out an amended class notice laying out in great detail the theories of recovery, the aggregate dollar amounts, and the methodologies in the damages motions and in the supporting affidavit of the first designated expert, Ronald Wright.  Dkt. No. 18086-18 at 3.

## II.   FINDINGS OF FACT

### A.   Evolution of the Class Damages Request

**31.**      At the June 9, 2015 damages hearing, Plaintiffs' expert, George Inglis, offered the summary opinion that class-wide remediation costs amounted to $497,180,467 for a class of 2,686 properties.   June 9, 2015 Hearing Transcript at 129:23-130:10;[2] 154:4-15.[3]   Mr. Inglis acknowledged that this opinion was a lower figure than several of his previous damages opinions and lower than Plaintiffs initially sought in their Motion for the Assessment of Class Damages filed in October 2014—both in terms of aggregate dollar amount and class size.   152:3-155:8. The evolution of the class list and remediation cost calculations demonstrates their unreliable, insufficient, and ultimately unpersuasive nature that requires denial of Plaintiffs' Motion.

**32.**      In early October 2014, the PSC engaged BrownGreer, the Court-appointed settlement administrator, to assist with building out the class list.[4]   The PSC "provide[d] [BrownGreer] with a list of properties and property owners."   39:23-40:1.   As Mr. Woody testified, no one "at BrownGreer took part in creating that Taishan class list."   40:4-6.   The PSC asked BrownGreer "essentially to fill in the blanks for a list of properties with square footage information."   Dkt. No. 19091-7 (Deposition Transcript of BrownGreer, through the testimony of Jacob S. Woody), 20:4-21:14.

**33.**      The PSC described their request as a "major project related to the class proceedings."   *Id.* at 109:12-110:19.   The PSC asked BrownGreer to "send us a spreadsheet with the square footage

---

[2]   All page and line references are to the June 9, 2015 hearing transcript unless otherwise identified.

[3]   Mr. Inglis offered no testimony about the individual remediation costs of any individual property owner.

[4]   In general terms, the class list is a spreadsheet that contains a list of claimants and the addresses and claimed footprint square footage of their properties.

of each of the properties on the attached [class list]."  *Id.*  If BrownGreer did not have square footage information, the PSC explained that they "may need to use an average square footage figure for such properties."  *Id.*  The PSC also explained that "it would be great if you could program the spreadsheet to total the square footage of all properties since we intend to calculate class damages based on the total number of square feet."  *Id.*

34.     On October 14, BrownGreer gave the PSC its "results for this project," which included square footage information for 2,346 properties but lacked square footage information for 1,219 properties.  *Id.* at 111:6-113:1.

35.     BrownGreer offered to "calculate the per square foot cost for the remediation of [Knauf] homes if you would like.  That might give you an idea of how much it would cost to remediate the entire Taishan class."  *Id.*  The PSC did not respond to that offer.  *Id.*

36.     On October 29, Plaintiffs filed the Motion for Class Damages, which requested three categories of damages for a class of 3,852 properties.   Plaintiffs sought a total of $1,263,330,881.19, which included $782,944,292.37 for remediation and $95,186,588.82 for ALE.  Those figures were based on calculations contained in the October 22, 2014 affidavit of Mr. Wright.

37.     Mr. Wright and Plaintiffs lacked square footage information for 1,317 properties, or about 34% of the class.[5]

38.     Plaintiffs also requested $385,200,000 for LOUE, denominated at $100,000 per property. Plaintiffs offered no evidence for the LOUE request.

---

[5] Until the June 9 hearing, Mr. Wright and Mr. Inglis used a series of averaging techniques to approximate the square footage for properties with no known square footage.  At the June 9 hearing, however, Plaintiffs apparently removed claims for properties with missing square footage. 154:1-15.

39.     On April 6, 2014, Taishan filed an Emergency Motion to Compel Production of Information Relevant to Plaintiffs' Motion for Assessment of Class Damages.  Dkt. No. 18598. Among other things, Taishan demonstrated that Plaintiffs were missing square footage information for 34% of the class and that the class spreadsheet contained a number of facial errors, such as the inclusion of plaintiffs who had dismissed their claims or opted out of the class, plaintiffs whose properties contained only Knauf drywall, plaintiffs who no longer owned the properties at issue, and multiple duplicate entries.  *Id*. at 4-5.

40.     The next day, Plaintiffs advised that Mr. Wright would need to serve an amended affidavit.  Dkt. No. 18697 (April 7, 2015 Status Conference) at 19:21-20:21.  Mr. Wright subsequently withdrew as a designated expert for personal reasons and Plaintiffs substituted in his employee, George J. Inglis, P.E.

41.     In April 2015, the PSC asked BrownGreer to "collect more square footage information, and where the square footage information was blank, [BrownGreer] collected additional information to add it to the list."  Dkt. No. 19091-7 at 28:17-29:18.  BrownGreer collected that information from public websites for approximately 1,000 properties, but did not save or document the sources because "[n]obody asked us to."  *Id.* at 197:18-25.

42.     At that time, the PSC also asked BrownGreer for "any information on the manufacturer of the drywall for the properties," which BrownGreer then "added to the extent [they] had it." *Id.* at 106:1-22.

43.     Using information from the Global, Banner, InEx ("GBI") settlements, BrownGreer purportedly located product information suggesting that only 1,285 of the then-3,739 class

properties (34%) had Taishan drywall.  PX 17 at 2.[6]  For 2,449 class properties, BrownGreer relied solely on allegations in plaintiff profile forms or allegations in various complaints.  *Id.* Mr. Woody testified that such reliance was contrary to standard settlement administration protocol.  75:17-76:4.  Mr. Woody also testified that he could not say that even 20 of these properties had any corroborating proof of the presence of Taishan drywall.  77:15-78:12.

**44.**     On April 27, Mr. Inglis served a sworn statement in which he calculated that a class of 3,739 properties was entitled to a total of $879,261,476.  April 27, 2015 Inglis Aff.  That figure included $788,631,684.90 for remediation costs and $90,629,791.10 for ALE.  Mr. Inglis' affidavit did not offer a LOUE opinion.  Mr. Inglis and Plaintiffs still lacked any type of square footage information for 497 properties.

**45.**     On May 8, Taishan filed several motions and expert declarations by David A. Pogorilich, CGC, MBA and M. Laurentius Marais, PhD.  Dkt. Nos. 18877; 18877-3; 18877-5; 18879. Those papers challenged the composition of Plaintiffs' class and Mr. Inglis' damages methodology.  Among other things, Taishan showed that the class spreadsheet: (1) contained at least 865 claimants who did not own the listed properties, and thus were not class members; (2) contained the *Germano* Intervenors, whose judgments Taishan had already paid; (3) contained dozens of duplicate entries; (4) contained plaintiffs who had opted out of the class; (5) contained plaintiffs who had filed notices of voluntary dismissal on the docket; and (6) contained plaintiffs whose properties were recorded as containing no Taishan drywall.

**46.**     In quick response to Defendants' "scrutiny" (Dkt. No. 18958 at 22), Plaintiffs directed BrownGreer to revise the class spreadsheet, and BrownGreer deleted 851 properties from the

---

[6] "PX" and "DX" refer to exhibits admitted into evidence during the June 9, 2015 hearing.  *See* Dkt. No. 19135.

class spreadsheet.  Dkt. No. 19091-7 at 131:22-137:6.  BrownGreer did not otherwise review the accuracy of the spreadsheet, and did not remove properties other than those Taishan identified. *Id*.; *see also id.* at 167:21:168:7.

47.    Plaintiffs also instructed Mr. Inglis to delete ALE damages from his opinion, which he did.  134:10-14.

48.    On May 15, Mr. Inglis served a second sworn statement.  He now opined that a class of 2,888 properties was entitled to $607,361,039, all for remediation damages.  Dkt. No. 19091-5 (Inglis May 15, 2015 Declaration).  Plaintiffs still lacked square footage information for 131 properties.  *Id*.

49.    At his May 19 deposition, Mr. Inglis was questioned as to whether he used the correct RSMeans "local cost factor" in his calculations (which Mr. Inglis and Plaintiffs would later admit was "wrong").  120:14-21.

50.    At his May 26 deposition, Jake Woody testified that a number of properties on the Taishan class list were Knauf-only properties.  52:5-18.  At the parties' request, BrownGreer deleted 127 such properties.  PX 78 (Woody June 4 Memo).  BrownGreer also "removed 46 properties because the PSC informed [BrownGreer] that the cases related to those properties had been dismissed, that the properties contained Knauf drywall, and/or that the property owners would not pursue claims against Taishan."  *Id*.

51.    On June 4, following BrownGreer's deletions, Plaintiffs served another amended version of their class damages spreadsheet.  June 5, 2015 Email from Palmer Lambert to Duncan Fulton.  Based on that new spreadsheet, Mr. Inglis opined on remediation damages for 2,714 properties in the amount of $579,020,032.  *Id*.  Twenty-eight properties still lacked square footage information.  *Id*.

11

52.     Four days later—the night before the class damages hearing—Plaintiffs confirmed that Mr. Inglis "got [it] wrong" by using the incorrect location factor from RSMeans.  120:14-122:20. Plaintiffs served their fifth version of the class spreadsheet, which listed damages of $502,047,116 for 2,714 properties.  That correction of Mr. Inglis' latest mistake reduced damages by approximately $77,000,000.

53.     The next morning at the June 9 hearing, Mr. Inglis offered his fifth opinion in six weeks—$497,180,467 in class remediation costs for 2,686 properties.  Plaintiffs apparently removed the claims on the 28 properties for which they still lacked any type of square footage information.

54.     The following table summarizes the changes in Plaintiffs' class size and damages request from October 2014 to the June 9, 2015 hearing:

| Date | Class Size | Damages Request |
|------|-----------|-----------------|
| Oct. 29, 2014<br><br>Motion for Assessment of Class Damages (Dkt.18086) | 3,852 properties | • Remediation: $782,944.292.37<br>• ALE: $95,186,588.82<br>• LOUE: $385,200,000<br>• Total: $1,263,330,881.19 |
| April 27, 2015<br><br>Inglis Affidavit | 3,739 properties | • Remediation: $788,631,684.90<br>• ALE: $90,629,791.10<br>• LOUE: no opinion<br>• Total: $879,261,476 |
| May 15, 2015<br><br>Inglis Declaration | 2,888 properties | • Remediation: $607,361,039<br>• ALE: removed<br>• LOUE: removed<br>• Total: $607,361,039 |
| June 4, 2015<br><br>Class Spreadsheet | 2,714 properties | • Remediation: $579,020,032 |
| June 8, 2015<br><br>Class Spreadsheet | 2,714 properties | • Remediation: $502,047,116 |

| June 9, 2015 PX 79 | 2,686 properties | • Remediation: $497,180,467 |
|---|---|---|

**55.** At the June 9 hearing, it became clear that Plaintiffs' request was not for "damages," but was simply an initial "aggregated fund" request.  34:11-14.  Plaintiffs acknowledged that "[t]here ultimately will have to be a claims process and there will be additional phases where adjustments will be made," and that "the claims process, at end of the day, will be the process by which we accurately allocate damages to each individual class member."

**B.     Evidence at the June 9 Damages Hearing**

**1.     Jake Woody**

**56.** After opening statements at the June 9 hearing, Plaintiffs called Jake Woody as their first witness.

**57.** Mr. Woody is employed by BrownGreer as an attorney.  17:13-14.  BrownGreer serves as settlement administrator for the Knauf settlement and as claims administrator for the Global, Banner and InEx settlements (collectively referred to as the "GBI settlements").  25:23-26:13.

**58.** As settlement administrator for the Knauf settlement, BrownGreer's job is limited to collecting documents and issuing payments.  26:18-27:9 ("There is no real claim determination that we make in that program.").

**59.** Mr. Woody testified that BrownGreer collects "inspection reports, photographs, estimates, requests for payment, change orders, all of the things that go along with a construction project" in connection with the Knauf settlement.  27:10-13.

**60.** As claims administrator for the GBI settlements, BrownGreer's job is to review claims, determine eligibility and then issue payment based on the "under air" square footage of an

eligible property.  27:14-24.  Under air square footage is the footprint measurement of the heated and cooled areas of the house.  *Id.*

61.     Mr. Woody testified that BrownGreer collects under air square footage data in connection with the GBI Settlements.  31:17-33:12.

62.      In connection with its work in this multidistrict litigation, BrownGreer maintains a database of information.  39:12-16.

63.     On or about September 2014, the PSC sent Mr. Woody a spreadsheet listing property addresses and requested BrownGreer to provide updated mailing addresses for a number of properties on the spreadsheet based on the information contained in BrownGreer's database. 39:12-20.

### a.      The BrownGreer Square Footage Project—Part I

64.     In October 2014, the PSC sent Mr. Woody a spreadsheet listing 3,709 properties and owners and requested BrownGreer to provide under air square footage information for each of the properties based on data BrownGreer collected for the GBI Settlements.  39:12-40:1; 41:12-24; PX 17.

65.     Mr. Woody testified that he understood that the spreadsheet provided by the PSC represented members of the Taishan class (the "Taishan Class List").  40:2-3.  According to Mr. Woody, BrownGreer did not take part in creating the Taishan Class List.  40:4-6.

66.     Mr. Woody testified that BrownGreer agreed to provide the under air square footage information in exchange for payment from the PSC.  40:13-24.

67.     According to Mr. Woody, BrownGreer responded to the PSC's request by reviewing a BrownGreer spreadsheet summarizing the information BrownGreer has received in connection with the GBI Settlements (hereinafter the "BrownGreer GBI Spreadsheet").  41:12-20; PX 17.

14

**68.**     Mr. Woody testified that the BrownGreer was not able to provide square footage information for 1,366 properties on the Taishan Class List.  42:3-6; 44:9-24; 67:20-68:19; PX 17.

### b.        The BrownGreer Square Footage Project—Part II

**69.**     Mr. Woody testified in April 2015 that the PSC asked BrownGreer to perform a second square footage project.  Specifically, the PSC asked BrownGreer to fill in the under air square footage for the 1,396 properties on a revised Taishan Class List with 3,739 properties.  42:7-10; 44:9-45:8; 67:20-69:18; PX 17.

**70.**     Mr. Woody testified that BrownGreer used the following three sources of information to identify under air square footage for the 1,396 properties on the revised Taishan Class List:

> (1) the  BrownGreer  GBI  Spreadsheet  (which  contained  some  additional  information based on data received by BrownGreer between October 2014 and April 2015);

> (2) publically  available  property  records  from  sources  like  "tax  appraisal  websites, property ownership websites, official government websites"; and

> (3) plaintiff profile forms.

42:7-19; 44:9-46:22; 67:20-69:18; PX 17.

**71.**     According to Mr. Woody, the PSC asked BrownGreer to prioritize those three sources of information in the same order.  67:20-69:18; PX 17.  Consequently, if BrownGreer had square footage information about a property in the BrownGreer GBI Spreadsheet, BrownGreer did not confirm this information by reviewing public property records or plaintiff profile forms.  *Id.* Likewise, BrownGreer reviewed plaintiff profile forms only if a property was not listed on the BrownGreer GBI Spreadsheet and BrownGreer could not locate square footage information through publically available property records.  *Id.*

72.     Mr. Woody testified that BrownGreer relied solely on the BrownGreer GBI Spreadsheet to determine the under air square footage for 2,342 of the 3,739 properties listed on the PSC's revised Taishan Class List.  67:20-69:19.

73.     Mr. Woody testified that BrownGreer relied solely on publically available property records or plaintiff profile forms to determine the square footage of "over 1,000" class properties.  68:11-69:18.

74.     Mr. Woody testified that BrownGreer did not maintain any record of the publically available property records BrownGreer consulted to provide square footage for class properties.  69:19-22.

75.     Mr. Woody testified that plaintiff profile forms are not always accurate with respect to the under air square footage of a property.  70:14-71:11.  According to Mr. Woody, BrownGreer would not normally rely on the square footage listed in a plaintiff profile.  71:24-72:9.

### c.     The BrownGreer Product Identification Project

76.     The PSC next asked BrownGreer to determine which of the 3,739 properties on the revised Taishan Class list BrownGreer had verified as containing Taishan drywall during BrownGreer's review of claims submitted in connection with the GBI Settlements.  47:12-15; PX 17.

77.     Mr. Woody said that as to the revised Taishan Class list BrownGreer had verified that 1,285 properties contained Taishan drywall using photographic evidence or inspection reports.  49:24-50:3; 74:10-21; PX 17.  Mr. Woody admitted that for the remaining two-thirds of that list he does not know what independent proof exists regarding the type of drywall in those properties.  76:9-78:7.

**78.**     According to Mr. Woody, statements in a plaintiff profile form are not sufficient proof of the type of drywall contained in a property "without some objective basis to support that assertion." 75:17-21.

**79.**     Mr. Woody testified that between May 15, 2015 and June 4, 2015, 127 properties were removed from the class list because BrownGreer had determined that those properties had 100% KPT drywall, not Taishan drywall, even though the claimants had identified Chinese drywall as being present.  79:8-23.

### d.     Knauf Remediation Data

**80.**     Mr. Woody confirmed that the Knauf remediation program provides for full remediation of affected properties.  71:12-20.

**81.**     Based on a review of BrownGreer's data related to the Knauf Settlement, Mr. Woody testified that the average cost per square foot for remediation under the Knauf program was $65.15 and that there is wide cost variation among the Knauf properties.  92:3-97:9; PX 30.

### 2.     George Inglis

**82.**     Plaintiffs called Mr. Inglis as their only designated expert to testify about aggregate class-wide damages at the hearing.  Mr. Inglis is a licensed engineer employed by Berman & Wright. 103:20-105:12.  He "got involved as a testifying expert for [the PSC] because Ron Wright couldn't continue."  105:13-16.

**83.**     Prior to the hearing, Taishan filed a motion to exclude Mr. Inglis' testimony under Federal Rule of Evidence 702 (Dkt. 19091).  The Court denied Taishan's motion and permitted

Mr. Inglis to testify.  Dkt. 19092.[7]  Taishan renewed its motion at the hearing, which the Court denied on the basis of its prior ruling.  107:9-13.

**84.**     Mr. Inglis proffers a formula for calculating remediation costs.  In general terms, Mr. Inglis multiples each class property's footprint square footage by a benchmark cost per square foot to calculate a total remediation figure for that property, which he then sums to reach aggregate class-wide remediation costs.

**85.**     Mr. Inglis' formula begins with a benchmark figure of $86 per square foot to remediate a property.  His benchmark "started with the work in *Germano*."  111:25-112:3; *see also* 118:19-119:6.  That $86 figure was the average remediation cost for the seven *Germano* properties combined.[8]  110:14-111:13 ("when we average the numbers, we got—developed the $86 a square foot number").

**86.**     Because the *Germano* average was calculated in 2010, Mr. Inglis adjusted it for inflation to 2015 dollars.  118:5-18.  Then he converted it from a Norfolk cost to a "national cost as if it was a location of the United States."  118:5-18.  Then Mr. Inglis "added" a uniform 6% cost for "certified industrial hygienist" fees, which was not part of the original *Germano* estimate.  119:12-15; Dkt. No. 19091-5 at ¶ 3.  Next, Mr. Inglis "applied a localized factor for that zip code . . . to bring it to a local cost for that building in that area."  118:5-18.

**87.**     Mr. Inglis used RSMeans for cost factors to generate his national average and local averages.  120:14-125:2.  At his deposition, Mr. Inglis was questioned about whether he used the correct location factor.  *Id*.  Ultimately, he admitted that he "got that wrong."  *Id*.  The night

---

[7] BNBM filed a more discrete Rule 702 motion with respect to certain statistical issues, which the Court granted in part and denied in part.

[8] The $86 benchmark is, in effect, a double average because the property-specific estimates in *Germano* were developed as averages of two local contractor bids for each property.  "$86 is an average of an average for seven homes in Germano."  191:1-24 (Pogorilich).

before the hearing, Mr. Inglis corrected his error and reduced his class-wide estimate by approximately $77,000,000.

**88.** Once Mr. Inglis derived a "local cost," he "multiplied that by the square footage of [each] building" to calculate a remediation figure for that property.  118:5-18.  "The math is once you develop the localized cost number, do these steps, you multiply that times the square footage of the residence to develop a cost to remediate."  120:4-8.

**89.** Mr. Inglis combines those figures for a single, aggregate class-wide remediation cost figure of $497,180,467.  129:23-130:10.

**90.** As Dr. Marais testified, Mr. Inglis' formula involves extrapolating his *Germano* benchmark to the class properties.  Mr. Inglis did not deny that he is extrapolating.  The following graphic (DX 33), which Mr. Inglis prepared (118:19-120:8), illustrates how he extrapolates from *Germano* to the class properties:



**91.**     Mr. Inglis admitted that he did not perform a statistical analysis of the *Germano* properties to determine whether they are representative of the class properties. 157:8-158:11.

**92.**     Mr. Inglis does "not hold [himself] out as a statistics expert." 156:3-13.

**93.**     In his formula, Mr. Inglis "used averaging, but [he] really didn't – [he] really didn't regard averaging as being statistics." 156:17-157:7.

**94.**     Mr. Inglis "basically did [his] analysis based on an average quality home, average, around the 2,000 square feet." 125:3-126:1.

**95.**     Because his "starting point is an average square foot price," Mr. Inglis agreed that he would "expect . . . for some people in the class to get more and maybe some people to get less" because of "variability based on the finishes of the interior and the size." 125:3-126:1.

**96.**     Mr. Inglis testified that you "can have different fit and finishes of kitchen cabinets, yes, you can." 161:17-162:11.

**97.**     Mr. Inglis testified that there is "variability" in remediation cost between properties. 160:23-161:8.

**98.**     Mr. Inglis testified that his method is "conceptual estimating [which] uses the gross square foot area of the structure as the reporting parameter. This is likewise meant as a planning tool." 128:6-21.

**99.**     This is the first time Mr. Inglis used such a method to calculate remediation costs for nearly 3,000 diverse properties he has not inspected. 113:23-114:13.

**100.**   Prior to using his formula to calculate class-wide remediation cost damages, Mr. Inglis did not test whether his formula works by comparing it to known remediation costs for the "particular properties" in the class. 162:21-166:9.

**101.**   "To confirm [his] methodology" after using it to calculate class-wide damages, Mr. Inglis "went back to these initial seven homes that were Germano."  168:22-170:22.  He adjusted the *Germano* contractor estimates to 2015 dollars, and compared those estimates against results for the Germano properties based on his class damages formula.  "And doing that, the damage calculation under this methodology was actually less, with the exception of Morgan, the Morgan residence, it was higher."  *Id.*  "[O]n average it was 13 percent less using [Inglis' class] methodology."  *Id.*[9]

**102.**   Mr. Inglis did not inspect any of the class properties in connection with formulating his class damages estimate.  143:24-145:19.

**103.**   Mr. Inglis did recall visiting one class property, the Gail residence, in 2013, two years before he became a testifying expert.  *Id.*

**104.**   He "prepared a unit price estimate in 2013 for that property."  *Id.*  Mr. Inglis does not "know" if the property had already been remediated.  *Id.*

**105.**   Mr. Inglis was not using that unit price estimate to calculate remediation damages for the Gail property.  *Id.*

**106.**   Mr. Inglis testified that for the class properties that have "already been remediated, [he] certainly would not recommend that they be remediated again.  [He] wouldn't say that.  That's not at all the case," because that "would not make sense."  *Id.*

**107.**   Mr. Inglis did not factor into his calculations whether any class properties had been remediated because it was only his "assignment to calculate the damages to these properties."  *Id.*

---

[9] At the level of individual properties, the differences were 25% or 30% or more, including a difference for the Heischobers of $113,000.  199:12-202:9 (Pogorilich).

**108.** Mr. Inglis was "not familiar with the specifics on individual residences." 160:17-19.

**109.** Mr. Inglis was "not familiar with the layouts of the residences." 160:13-14.

**110.** Mr. Inglis "didn't review floor plans of the class properties." 160:17-19.

**111.** Mr. Inglis did not "know the specifics on a particular home." 160:20-22.

**112.** Mr. Inglis "didn't do a determination to locate a property to see if it was a rural or urban location." 160:2-8.

**113.** Mr. Inglis obtained square footage and ZIP code information for the class properties from "the list" he received from "the previous gentleman" to testify (*i.e.*, Jake Woody). 116:18-117:12. Mr. Inglis "actually just met [Mr. Woody] during one of the breaks" in the hearing. 139:12-140:2. Prior to that, he had never met Mr. Woody. *Id.*

**114.** Mr. Inglis "was not involved with the collection of the data or verification of the data" in the class spreadsheet. *Id.* at 142:1-4. Mr. Inglis "accepted [the spreadsheet] as being accurately prepared." 142:12-143:14.

**115.** Mr. Inglis "wasn't about to undertake the task of investigating 2,700 properties to determine the ownership, whether it had been remediated, what the source of the drywall [is]." 147:5-148:4. He testified that is "an important undertaking." *Id.*

**116.** Mr. Inglis testified that he "did not" exercise any independent judgment "[a]s it relates to verifying whether or not these homes – what the square footage was, if they had been remediated or not." 137:6-10.

**117.** Mr. Inglis testified that "Yeah, that was not my assignment to confirm ownership of properties." 137:15-19. He "did not try to determine who the owner was of the building or if it was even a current owner or past owner." 138:8-21.

**118.**   Mr. Inglis emphasized that he "did no independent verification of these property owners and what type of drywall they have in their homes, and he did "not performed that type of evaluation."   151:14-19.   He cannot testify as to which properties on the spreadsheet have Taishan drywall and which do not.   151:25-152:2.

**119.**   Mr. Inglis testified that he changed his opinions several times based on "adjustments made to the data."   131:21-136:10.   "[T]o the extent that the list of properties changed, [he] changed [his] damages calculation."   132:11-19.   "Each time [he] modified them downwards."   146:14-20.   On cross examination, Mr. Inglis conceded that, absent proof that more than 1,285 properties contain Taishan drywall, his most recent class remediation cost opinion could be overstated by more than 100%.   148:7-151:13.

**120.**   Mr. Inglis testified that "[i]f there's an issue with the list of properties, [he] will revise the damages estimate.   If there's an issue there, [he will] revise it and that's what [he has] consistently done."   147:5-25.

**121.**   Mr. Inglis believes that "when it comes time to remediate homes there will be some additional steps taken to ensure that there was a safeguard" to prevent incorrect damages awards.   140:22-141:9.

### 3.      David Pogorilich

**122.**   Defendants called David Pogorilich as their first damages rebuttal expert at the hearing.

**123.**   Mr. Pogorilich is a Director in the Construction Practice at Navigant Consulting.   172:20-173:20.   He is a licensed Certified General Contractor in the State of Florida with more than 30 years of experience in construction cost estimating.   174:4-177:17.   Mr. Pogorilich has experience performing construction cost estimates for residential and commercial projects.   174:22-175:13.

**124.**     Mr. Pogorilich was qualified and accepted by the Court as an expert in the field of construction cost estimating and project management for construction sites.  178:15-179:2.

**125.**     Based on his experience and actual physical inspection of multiple single-family residences containing Chinese drywall, Mr. Pogorilich testified that Mr. Inglis' methodology to estimate remediation costs for the class properties does not work and would not be utilized in the construction industry to estimate costs to be incurred for remediation. 193:8-24.

**126.**     Mr. Pogorilich testified that the only way to reliably estimate remediation cost is to perform site-specific, individual inspection of the property in order to determine the layout, the finishes, ceiling height, plumbing, number of outlets, switches, fixtures, the nature of the HVAC system (*i.e.*, single or dual zone), the nature, grade and number of appliances, etc.  177:18-178:14; 179:5-8; 184:17-185:12; 188:12-25; 189:8-18; 190:5-23; 192:8-21; 195:9-199:11.

**127.**     As Mr. Pogorilich explained, "in order to satisfy that scope of work, you have to go in and look at the line items, the tasks, the quantities that will satisfy that general scope of work, and that's going to change from house, to house, to house, to house."  193:25-194:8.

**128.**     According to Mr. Pogorilich, an on-site inspection is necessary to develop a reasonable remediation estimate because interior layout and fit and finish will have a material impact on price.  195:9-199:11.  For example, a property with 12-foot ceilings will necessarily have more drywall than a property with the same square footage and 8-foot ceilings.  *Id.*  Mr. Pogorilich presented the following graphic (DX 34) that illustrates this point:



**129.** In this graphic, both properties have identical footprint square footage of 2,100 square feet. *Id.*; DX 34. In Mr. Inglis' calculation, they would receive identical remediation amounts. *Id.* But Layout A has a more open floor plan with less drywall square footage, and less expensive finishes and details. *Id.* Layout B has more partitions and higher ceilings, and thus more drywall to remove and replace. *Id.* Layout B also has more expensive finish to replace. *Id.* As Mr. Pogorilich explained, the cost will be higher when "you're replacing the copper piping in House [B], you have more expensive crown molding, more expensive appliances, and you've got sold wood cabinetry versus just builder grade cabinetries in House A." 197:17-198:7. Because of those differences, "[i]f all you price your bids on is square footage, your actual cost is going to be wrong." 198:21-199:7.

25

**130.** Mr. Pogorilich described Mr. Inglis' formula as an "average of an average" that fails to take into account property-specific features that affect cost. 189:1-18.

**131.** Mr. Pogorilich said that in 30 years in the construction industry, he had never seen a universal price per square foot utilized to determine construction costs for thousands of properties. 193:8-194:8.

**132.** Based on an empirical test, Mr. Pogorilich explained that even with respect to the *Germano* properties from which Mr. Inglis' $86/sq. ft. method is derived, there is significant variation on a property by property basis, ranging from an overestimation of 15% on the Morgan property to an underpayment of more than 25% on the McKellar property and more than 30% on the Heischober property. 199:12-201:15.

**133.** Mr. Pogorilich explained that Mr. Inglis' method failed to reasonably approximate the remediation costs for the *Germano* properties "because when you take an average of an average and apply it to a footprint [square footage], you don't take into account the real work that has to be done to remediate that particular property." 202:5-9.

**134.** Empirical data from the Knauf remediation program also demonstrate that there is no universal per square foot remediation cost. Mr. Pogorilich examined data for nearly 3,000 Knauf properties, and found "great variability between the high and low" costs, as well as "great variability between either the high or the low and the average." 202:10-205:8. Even "within [one] ZIP code, there's wide variability between the price of one home versus the next." *Id.* For

example, within ZIP code 70433 in Louisiana, "the high was $135.80 per square foot, the low was $40.37 per square foot, and the average was $64.18 per square foot." *Id*.[10]

135.   Mr. Pogorilich concluded, from the empirical data, that "an average is never going to be exact on either a high or a low." 204:8-205:8. Only "if the next property you're looking at is exact in every way to the house that you took or the homes that you took the average from" would the average "hit the mark." *Id.*

136.   According to Mr. Pogorilich, even if Mr. Inglis' method constituted an "approximate estimate" under R.S. Means, R.S. Means states that such estimates have an accuracy range of minus 30% to plus 50%. Mr. Pogorilich explained that "approximate estimates" are typically used for feasibility studies or to obtain "ball-park" pricing estimates for projects and are not an appropriate measure of costs for a specific remediation project or a substitute for an estimate based on on-site inspection. 226:24-228:13.

137.   Plaintiffs offered no rebuttal to the conclusions reached by Mr. Pogorilich.

### 4.   Dr. M. Laurentius Marais

138.   Defendants called Dr. M. Laurentius Marais as their second damages rebuttal expert at the hearing.

139.   Dr. Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc., specializing in applied mathematical and statistical analysis, including statistical extrapolations based on sampling, and calculation of damages. He holds a Ph.D. from Stanford University and has been on the faculties of the University of Chicago and Stanford. A fellow of the Royal Statistical Society and a member of the American Statistical Association, among other

---

[10] That the Knauf data produced by BrownGreer do not contain certain across-the-board expenses, does not change the overall picture, which is one of wide variability from property to property.

professional societies, Dr. Marais has extensive experience assessing the validity of statistical studies. 229:19-231:13.

**140.** The Court held that Dr. Marais was an expert in statistical science and statistical sampling. 231:14-20.

**141.** Dr. Marais testified that Mr. Inglis' damages methodology is an extrapolation in that it attempts to determine, based on information obtained from a sample of properties, conclusions about the larger group of properties that comprise the class. 232:4-23. Dr. Marais also testified that extrapolation of values falls within the purview of statistical science and is governed by the principles of that branch of mathematical science. 232:24-233:3.

**142.** According to Dr. Marais, Mr. Inglis' methodology does not comport with well-established principles for obtaining statistically and scientifically valid extrapolations from samples and, therefore, cannot be relied upon to estimate class-wide damages or damages for individual class members. 233:4-238:1. Mr. Inglis did not base his model on a random sample of properties, which would requires a selection from the entire list of class properties, and the sample of the seven *Germano* properties is in any event not of sufficient size that one could draw conclusions within any reasonable margin of error. *Id.*

**143.** According to Dr. Marais, no margin of error could be calculated for Mr. Inglis' model because the mathematical formulae for testing for margins of error are premised on data derived through random sampling techniques that Mr. Inglis did not utilize. 238:2-14.

**144.** Contrary to Mr. Inglis' assumption that there is a strong, meaningful correlation between the total cost of remediation and the total square footage of the property, Dr. Marais said that based on the statistical data that he has seen there is no basis to assume that such a correlation exists. 240:7-243:9. Dr. Marais' analyzed the actual cost data from the Knauf remediation with

the predictions from Mr. Inglis' method.  Dr. Marais found that Mr. Inglis' formula does not accurately predict the numbers in the Knauf remediation data set.  243:2-244:9.  Dr. Marias found that Mr. Inglis' method generated results that were neither consistently high nor consistently low.  *Id.*

**145.**   Plaintiffs offered no rebuttal to the conclusions reached by Dr. Marais.

**III.   CONCLUSIONS OF LAW**

> **A.   Fifth Circuit Law Bars Plaintiffs' Damages Plan**
>
> > **1.   The Court May Not Award Aggregate, Lump-Sum Tort Damages Now and Work Out the Individualized Issues Later**

**146.**   Fifth Circuit law does not permit the Court to award aggregate, class-wide damages in a lump sum as Plaintiffs request.  *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990).

**147.**   In *Fibreboard*, the Fifth Circuit issued a writ of mandamus to stop a multi-phase trial of asbestos cases in which Phase II would "determine actual damages in a lump sum" for an entire class.  *Id.* at 709.  Like here, the class was "a diverse group," with "disparities among 'class' members."  *Id.* at 710.  Like here, "the focus" was "upon the 'total picture' with arrays of data that will attend the statistical presentation."  *Id.* at 709.  Like here, the lump-sum damages award was to be based on a small subset of cases "plus the data supporting the calculation of the experts regarding the total damages suffered by the remaining 2,990 class members."  *Id.*  Like here, the "proof for 2,990 class members will be supplied by expert opinion regarding their similarity to 41 representative plaintiffs."  *Id.* at 711.  Like here, the plaintiffs conceded that "there will inevitably be individual class members whose recovery will be greater or lesser than it would have been if tried alone."  *Id.*

**148.**   The Fifth Circuit expressed "a profound disquiet" with that "omnibus damages" scheme and blocked it for violating basic state tort law requiring damages assessment for "individuals,

29

not groups." *Id.* at 710-11.  The aggregated plan was "beyond the scope of federal judiciary authority" because it infringed "upon the dictates of *Erie*" that courts "remain faithful" to the applicable state law, including the state law requirement to prove "individual" damages, which "requirements of proof define the duty of the manufacturers." *Id.* at 711.  Thus, the plan violated "defendants' right to due process." *Id.*

149.     *Fibreboard* is substantively indistinguishable from this case and thus bars the remedy requested in Plaintiffs' Motion for the Assessment of Damages.  Plaintiffs identified the damages hearing as merely the "first phase of a multi-phase trial."  16:12-22.  Plaintiffs' Motion explicitly asks the Court to "award damages to the class on an aggregate basis."  Dkt. No. 18086 (Motion) at 3.  Plaintiffs' plan relies on the results of a small subset plus additional data for a "calculation of aggregate damages" for a much larger set numbering in the thousands. *Id.* at 5.

150.     At the hearing, Plaintiffs' counsel confirmed the aggregate nature of the requested remedy.  64:17-21 (discussing "the aggregated damages presented here today"); 54:24-55:2 (identifying purpose of "today's hearing" as "aggregating damages for owners"); 100:9-10 (identifying proceeding as "an aggregation, not an allocation hearing'); *see also* 34:11-14 (discussing that approval of "the damages model suggested by the plaintiffs" would lead to an "aggregated fund in this case").  Counsel also confirmed that they sought "class-wide damages."  6:14 and 9:6.

151.     Plaintiffs' only designated expert expressed his class damages testimony only as a single lump-sum number of $497,180,467.  129:23-130:10 (on cross-examination).

152.     Plaintiffs' proof for 2,686 class members was supplied by expert opinion that the class properties were "similar to what we observed in Germano."  125:3-22.

**153.**    Plaintiffs' counsel admitted that they expect "some people in the class to get more and maybe some people to get less."  125:3-22; *see also* Dkt. No. 19081 (Opposition to Defendants' Motion to Exclude Testimony of George Inglis) at 15 ("for some, the estimate will be high and for some, it will be low").

**154.**    Plaintiffs' request for a single aggregate dollar figure masks great disparities in the class. 158:25-159:18.   The evidence for class remediation damages was the testimony of a single expert based on an array of data where the expert knew nothing about the specific properties. 160:13-22 ("I am not familiar with the specifics on individual residences.").

**155.**    As in *Fibreboard*, Plaintiffs' aggregate focus on "the total picture" and their request for an "overall omnibus figure" ignores state law requirements to determine property damages based on the facts of each individual case.  893 F.2d at 709.  For example, as this Court recognized in *Hernandez*, Louisiana law requires that "every case must rest on its own facts and circumstances."  Dkt. No. 2713 (quoting *Roman Catholic Church v. Louisiana Gas Co.*, 618 So.2d 874, 877 (La. 1993)); *see also Bell v. First Columbus Nat. Bank*, 493 So.2d 964, 970 (Miss. 1986) (holding that "the mode and amount of proof must be adapted to the facts of each case") (citation omitted); *Adams v. Star Enterp.*, 851 F. Supp. 770, 773 (E.D. Va. 1994) (holding that property damages "must depend upon the facts and circumstances of each particular case") (quoting *Bragg v. Ives*, 140 S.E. 656 (Va. 1927)).  Plaintiffs have not addressed those state law requirements.  Plaintiffs have never identified which state law governs which case.

**156.**    This Court may not ignore its *Erie* obligation under Article III to "remain faithful" to the applicable law of each state in these diversity cases.  *Fibreboard*, 893 F.2d at 711.

**157.**    Consistent with Fifth Circuit law, the Court must also remain faithful to the Due Process Clause and the Rules Enabling Act and thus must reject Plaintiffs' plan for "fluid recovery."

*McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  In *McLaughlin*, the district court wrongly approved a plan under which the plaintiffs "could prove collective damages on a class-wide basis, and individual plaintiffs would then claim shares of this fund."  *Id.* at 231.  The appellate court held that "[r]oughly estimating the gross damages to the class as a whole and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability."  *Id.*  That "offends the Rules Enabling Act."  *Id.*; *accord Cimino,* 151 F.3d at 312, 319 (confirming that "[e]ven in the context of a class action, . . . individual damages must still be proved individually" and explaining that "use of Rule 23(b)(3) or 42(a) does not alter" the *Fibreboard* principles that bar aggregate tort damages) (citations omitted).

**158.**    Moreover, "[w]hen fluid recovery is used to permit the mass aggregation of claims, the right of defendants to challenge the allegations of individual plaintiffs is lost, resulting in a due process violation."  *McLaughlin*, 522 F.3d 215 at 232.  As the Second Circuit held, "[i]f the 'class as a whole' is or can be substituted for the individual members of the class as claimants, then the number of claims filed is of no consequence and the amount found to be due will be enormous . . . Even if Rule 23 could be read so as to permit such a fantastical procedure, the courts would have to reject it as an unconstitutional violation of the requirement of the due process of law."  *Id.* (citation omitted); *accord* 2 McLaughlin on Class Actions § 8.6 (11th ed.) (noting that "courts have repeatedly rejected the use of fluid recovery or its equivalent as a substitute for individualized proof when the class pursues claims that seek redress for individualized injuries.").

**159.** At the June 9 hearing, Plaintiffs left no doubt that their plan seeks "an impermissible fluid recovery." *McLaughlin*, 522 F.3d at 227.  Plaintiffs explained that they were first seeking to determine aggregate "class-wide damages," followed up with "a claims process" and "additional phases where adjustments will be made."  9:4-10.  According to Plaintiffs, "the claims process, at end of the day, will be the process by which we accurately allocate damages to each individual class member." *Id.*

**160.** This Court cannot approve a fluid recovery process with "an aggregate determination [that] is likely to result in an astronomical damages figure that does not accurately reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants." *McLaughlin*, 522 F.3d at 231.

**161.** Rather than following Fifth Circuit law barring aggregate class-wide damages in tort actions, Plaintiffs have essentially attempted to implement the procedures adopted for the GBI settlements, which "provide for payment based on the square footage in a property."  27:14-24 (Woody).  Under those settlements, "the payments made to homeowners is [sic] based on the square footage of the property, and the pro rata calculations are based on the total aggregate square footage of eligible claims submitted."  31:17-24.  The claims administrator screens for sufficient, reliable individual proof of square footage and product identification in the "allocation" process.  33:8-34:10 (square footage) and 35:17-36:14 (product identification).

**162.** Plaintiffs repeatedly showed their intention to put "that exact same system in place . . . to allocate any aggregated fund in this case should the Court approve the damages model suggested by the plaintiffs."  34:11-14; *see also* 36:15-18 ("And that same protocol would be in place, for example, for allocation purposes in any settlement the Court approved or quantified through this hearing?").  But Plaintiffs may not use a compromised private settlement procedure in litigation

that violates Fifth Circuit law against aggregate damages.  As Plaintiffs repeatedly asserted, "a settlement is a compromise" that is different from litigation.  219:14220:5.  Fifth Circuit law precludes the use in litigation of the GBI square footage aggregation and allocation settlement scheme.

163.    The damages plan here also is an impermissible "fluid damages" plan because the exact composition of the class and the status of the class properties are in flux.  As shown at the hearing and discussed below, the significant errors in the class spreadsheet on which Plaintiffs' damages request depends have caused plaintiffs to cut nearly 1,000 class members and will cause the removal of hundreds, if not thousands, of additional members from the class.  Like the damages plan in *McLaughlin*, the fluid aggregate damages plain based on an ever-changing number of class members proposed here is invalid because it violates defendants' due process rights and the Rules Enabling Act.  *See also Hickory Sec. Ltd, v. Republic of Argentina*, 493 F. App'x 156, 160 (2d Cir. 2012) (reversing aggregate class-wide relief because it did not accurately reflect the losses to the class or adequately account for parties that are not class members).

### B.    Fifth Circuit Law Does Not Permit the Assessment of Tort Damages Based on Extrapolation from Averages

164.    Plaintiffs' class damages request also violates Fifth Circuit law prohibiting class tort damages derived from extrapolation formulas using averaged results from prior cases. *Cimino v. Raymark Indus., Inc.*, 151 F.3d 297, 319-321 (5th Cir. 1998) (rejecting plan for damages awards based on group averages rather than individualized inquiry).  In *Cimino*, which involved the same asbestos cases from *Fibreboard*, the same plaintiffs proposed a  new plan that contemplated trying 160 sample cases and then awarding each of the remaining 2,128 plaintiffs "an amount of actual damages equal to the *average* of the awards made in" the sample cases.  *Id.*

at 319 (emphasis added).  The Fifth Circuit decisively rejected that extrapolation plan, finding no "legally valid ground on which the . . . damages suffered by one person may be determined . . . solely on the basis of the average of awards made to other persons in similar cases."  *Cimino*, 151 F.3d at 321, n.51.  The court held that the damages plan for the so-called "extrapolation cases" was "fatally defective" and "plainly contravenes *Fibreboard*'s holding" that damages are permissibly recoverable only to the extent "suffered by each of the several particular plaintiffs as 'individuals, not groups.'"  *Id.* at 319-20 (quoting *Fibreboard*).  In short, "permitt[ing] recoverable tort damages to be determined in a lump sum for the entire class" is "simply contrary to *Fibreboard*."  151 F.3d at 319.

**165.**   The Supreme Court also has rejected extrapolated damages procedures as a violation of due process and the Rules Enabling Act.  In *Wal-Mart Stores, Inc. v. Dukes*, the Supreme Court rejected an extrapolation-based approach to class-wide adjudication using a "sample set of the class members" and subsequent application "to the entire remaining class . . . without further individualized proceedings."  131 S.Ct. 2541, 2561 (2011).  The Supreme Court unanimously "disapprove[d] that procedure, which it labeled "Trial by Formula."  *Id.*;[11] *accord Duran v. U.S. Bank Nat. Ass'n*, 325 P.3d 916 935 (Cal. 2014) (rejecting trial plan that "extrapolated the average amount of overtime reported by the sample group to the class as a whole").[12]

---

[11] The Supreme Court rejected "Trial by Formula" in Section III of the Wal-Mart Opinion.  The Justices were unanimous as to all but Section II.  131 S.Ct. at 2567 (Ginsburg, J., concurring in part and dissenting in part).

[12] The Supreme Court recently decided  to review an Eighth Circuit decision permitting an extrapolated damages plan.  *Tyson Foods, Inc. v. Bouaphakeo*, --- S.Ct. ---, 2015 WL 1278593 (June 8, 2015).  The issue presented is "Whether differences among individual class members may be ignored and a class action certified under Federal Rule of Civil Procedure 23(b)(3), or a collective action certified under the Fair Labor Standards Act, where liability and damages will be determined with statistical techniques that presume all class members are identical to the average observed in a sample."

**166.**     This litigation involves an extrapolated damages plan precluded by *Cimino*.  Mr. Inglis never denied that his method for calculating aggregate class-wide damages was based on extrapolation.  Even if he had, he would not have been qualified to do so.  The undisputed evidence showed that "extrapolation is a kind of statistical calculation."  232:3-12 (Marais).  But Mr. Inglis is not an expert in statistics.  156:3-4 (Inglis).  Indeed, he did not know whether averaging was a form of statistical calculation.  157:14-157:7.

**167.**     Thus, the only competent evidence at the hearing on the nature of Mr. Inglis' method for calculating aggregate class-wide was the testimony of the expert statistician, Dr. Marais. Dr. Marais opined that "Mr. Inglis's analysis, specifically his calculation of aggregate damages, is a quintessential example of an extrapolation from a small sample to an entire population." 232:17-23.[13]   Dr. Marais defined "extrapolation" as a statistical calculation in which one attempts to extend from some portion of universe of a relevant population, something that you have measured in that portion of the population and you are attempting to extend it to the entire population."  232:3-12.

**168.**     Mr. Inglis' method fits the record definition of extrapolation.  Mr. Inglis explained at the hearing that he started with $86, which "was initially developed in *Germano*."  118:24-199:6 ("it initially came in 2010 from Norfolk, Virginia"); *see also* 111:25-112:3 ("That was how we initially developed the $86 pricing for remediation of homes.  It started with the work in *Germano*, but that was in 2010.").

**169.**     Mr. Inglis' demonstrative of his method presented in connection with that testimony (DX 33) shows in graphical form the extrapolation nature of Mr. Inglis' methodology.  Starting with "$86/sq. ft. for Norfolk, Virginia in 2010" in step 1, Mr. Inglis created a "NATIONAL

---

[13] Plaintiffs' counsel's argument is not evidence.  7:23-24 (Seeger).

AVERAGE" in steps 2 and 3, and then in step 4 applied that figure across the universe of class properties (multi-colored arrows).  Mr. Inglis acknowledged that his "national average" was a "universal constant."  164:4-6.

**170.**   Mr. Inglis' method also fits the definition of Fifth Circuit's definition of the type of damages extrapolation categorically rejected in *Cimino*.  *See* 151 F.3d at 321 n.51 ("damages suffered by one person . . . determined, without any evidence, solely on the basis of the average of awards made to other persons in similar cases").  The benchmark $86 figure is an average of the awards for seven *Germano* properties (each of which was itself an average of two contractor bids for each property).  110:14-111:13; *see also* 187:22-188:6 (Pogorilich) and 189:1-7 ("Mr. Inglis's formula is an average of an average.").  Mr. Inglis also claimed to determine damages for each property without any evidence; he was "not familiar with the specifics on individual residences" in the class, including "layouts" and "floor plans."  *Id*.

**171.**   Mr. Inglis' unsubstantiated claim that he has "reinforced" $86 benchmark averaged from the *Germano* awards does not somehow transform his method into something other than extrapolation or otherwise make it acceptable under Fifth Circuit law.  118:24-119:6.  Whether reinforced or not, the $86 is still an "inference" based on an average of awards in unrepresentative prior cases applied to subsequent cases.  *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir.1997).

**172.**   Mr. Inglis testimony is also factually insufficient to avoid *Cimino* and *Chevron* because he presented no evidence and certainly no analysis to support his claim that he had "reinforced" *Germano*.  As Dr. Marais put it, "I found no numbers to back up those words."  284:3-7.  Mere assurances by an expert witness as to the accuracy of his own methods or results, in the absence

of other credible supporting evidence, is insufficient.  *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999).

**173.**    Moreover, Mr. Inglis consistently appeared to confuse "scope of remediation" and "pricing for remediation."  *E.g.*, 113:23-114:13.  Mr. Pogorilich persuasively explained that similar scope can result in dissimilar pricing, depending on the property's specific characteristics.  195:9-199:11.

### 1.    Fifth Circuit Law Does Not Permit Assessment of Property Damages Based on Per-Square-Foot Formulas

**174.**    Fifth Circuit law also precludes Plaintiffs' Motion because Plaintiffs impermissibly base their damages plan on a one-size-fits-all formula that obscures individualized property characteristics.  *Corley v. Orangefield Ind. School Dist.*, 152 F. App'x 350, 355 (5th Cir. 2003). In *Corley*, the Fifth Circuit rejected the notion that class-wide property damages "may be calculated based on a per-foot extrapolation" based on "an average."  152 F. App'x at 355.  As in *Fibreboard* and *Cimino*, the *Corley* court relied on "the necessity of individualized damage calculations" as "the most important factor."  *Id.*  The court rejected a formulaic "model for damages" because it failed to consider that "the injury to the landowners varies in substantial ways, depending on the value, character and location of the property."  *Id.*  The *Corley* court confirmed that a formula based on "an average" is improper because it "would *necessarily* yield a windfall to some landowners at the expense of others."  *Id.* (emphasis added).

**175.**    Here, Plaintiffs' damages evidence similarly relies on a "formulaic calculation for class-wide damages."  16:12-22.  Mr. Inglis used a formula with a per-square-foot universal constant, which he identified as a "national average."  163:25-164:6.  With the new figures generated the night before the hearing, he "multiplied [the] national figure of 105.91 times the local cost factor, and we applied that to the square footage for each property."  119:18-25.

**176.**   As in *Corley*, Plaintiffs' method ignores class property variability.   Mr. Inglis acknowledged, as he must, that "[t]here could be some variability based on the finishes on the interior and the size.  125:3-22.  He also acknowledged that the class properties include "a mix of properties," including commercial properties and apartment and condominium complexes." 158:25-159:6.

### 2.   Fifth Circuit Law Does Not Permit Extrapolation Based on Unrepresentative Cases

**177.**   Even if Fifth Circuit law did not preclude an aggregate class-wide damages award based on extrapolation from prior cases using a one-size-fits-all formula, Plaintiffs extrapolation damages evidence also fails to pass muster under Fifth Circuit law because Plaintiffs presented no "competent, scientific, statistical evidence" that the *Germano* cases are representative of the class, as required by *Chevron*, 109 F.3d at 1020.  In *Chevron*, the Fifth Circuit issued a writ of mandamus to stop an "extrapolation" plan that attempted to "utilize results from a bellwether trial for a purpose that extends beyond the individual cases tried."  *Id.*   Relying on specific statistical concepts of representativeness and sampling, *Chevron* held that a trial court "*must*, prior to any extrapolation, find that the cases tried are representative of the larger group of cases or claims from which they are selected."  *Id.*   As in *Fibreboard* and *Cimino*, *Chevron* cited "considerations of due process" and "fundamental fairness."  *Id.* at 1020-21.

**178.**   Plaintiffs' damages evidence cannot satisfy *Chevron* because the undisputed evidence from Dr. Marais is that "there is no scientifically statistically valid principle for supporting the extrapolation that [Mr. Inglis] makes."  239:17-240:6.

**179.**   Plaintiffs also cannot satisfy *Chevron* because they presented no statistical evidence that the *Germano* cases from which Mr. Inglis derived his $86 benchmark were representative of the

class. Mr. Inglis admitted that he did no statistical analysis to determine if the *Germano* cases were representative of the class properties.

180. The undisputed evidence from Dr. Marais was that, from a statistical standpoint, the *Germano* properties were not representative of the class properties. 234:17-235:18 (opining that the *Germano* properties "have no qualification from a statistical perspective as being a representative random sample from the class in this case"). Dr. Marais supported his testimony with detailed explanation of the science of statistical sampling—in terms entirely consistent with *Chevron*. *Compare* 109 F.3d at 1019-20 (explaining that "the sample must be a randomly selected one of sufficient size") *with* 233:20-238:1 (Dr. Marais' explanation of "sample size" and "random sampling").

181. The undisputed testimony from the construction experts supported Dr. Marais' statistical testimony that the *Germano* properties are not representative of the class. Mr. Pogorilich testified that the *Germano* properties are not representative of the class because of many factual differences. 194:9-21. And Mr. Inglis testified to the many differences between the *Germano* residences in Norfolk, Virginia, and the "mix of properties" in 16 states. 158:6-160:22.

### 3. No Reason Exists for Distinguishing the Governing Fifth Circuit Law

182. Throughout the briefing connected to the damages motion, Plaintiffs have avoided the Fifth Circuit tort cases that preclude their damages case. Instead, they have pointed the Court to antitrust and other types of cases with general language (but not always holdings) supporting the use of mechanical, formulaic methods for recovery of damages. *See, e.g.,* Dkt. No. 18958 (Plaintiffs' Reply Brief in Support of Motion for Assessment of Class Damages) at 40-42. Those authorities do not govern in this context and are not persuasive for various reasons.

183. First, *Fibreboard* considered—and rejected—identical arguments, finding "little comfort" in such non-tort cases. 893 F.2d at 710.

**184.**     Second, antitrust cases that allow damages on a group basis have no bearing on the individual nature of *tort* damages because there is a "more relaxed burden of proof" for antitrust damages "than would justify an award in other civil cases."   *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n*, 213 F.3d 198, 206–207 (5th Cir. 2000).[14]

**185.**     Third, antitrust damages are typically awarded under federal law, and thus may not be subject to the state law, *Erie* and Article III concerns that were dispositive in *Fibreboard* and *Cimino*.

**186.**     Fourth, if this Court were to look at antitrust cases, it would rely on *Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 309 (5th Cir. 2006)—relied on by Plaintiffs—which rejected class treatment due to "vast differences among the class members and rejected a damages formula based on "averages."

**187.**     The absence of a seventh amendment right to a jury trial in the Rule 55(b) context does not permit the Court to ignore the governing Fifth Circuit authority.   Although *Fibreboard* and *Cimino* both discuss the seventh amendment, both decisions fundamentally rest on due process and Article III concerns applicable here.   The requirement to assess tort damages on an individualized basis is ultimately grounded in state tort law, which federal courts have no power to alter or abridge.   *See Cimino*, 151 F.3d at 319-20 (holding that the extrapolation plan "plainly contravenes *Fibreboard*'s holding that under the substantive law of Texas recoverable damages are the 'wage losses, pain and suffering, and other elements of compensation' suffered by the each of the several particular plaintiffs as 'individuals, not groups'").

---

[14] Even under that "more relaxed" burden, antitrust damages cannot be premised on "guesswork" or "speculation".   *Eleven Line, Inc, supra.* Mr. Inglis offers nothing more than "guesswork" and "speculation" here.

**188.**    The foregoing *Cimino* quote also makes clear that the Fifth Circuit principles requiring individual damages treatment apply to all tort "elements of compensation."    There is no principled basis for distinguishing personal injury damages from property damages.    As discussed above, applicable state law explicitly requires property damages to be assessed based on the facts of the individual case.    Furthermore, *Corley* confirms that as a matter of Fifth Circuit law economic property damages must be assessed on an individual basis where individual property differences affect the damages for each individual property.    *See* 152 F. App'x at 355.

**189.**    The Court does not find relevant its class certification order in *Turner v. Murphy Oil USA, Inc.*, 234 F.R.D. 597 (E.D. La. 2006), for several reasons.    That district court decision cannot overrule governing Fifth Circuit precedent that precludes Plaintiffs' aggregate damages request.    *Turner* did not authorize aggregate damages, but explicitly allowed for "bifurcation of the issues of liability and damages" to address the defendants' "concerns that individualized inquiries will be needed to determine damage amounts in these cases."    *Id*. at 606; *accord O'Sullivan v. Countrywide Home Loans*, 319 F.3d 732, 744 (5th Cir. 2003) (reversing class certification of economic loss claims solely because "individualized calculation of damages predominate").    Furthermore, class certification law has changed since 2006, with the Supreme Court limiting class damages plan that conduct a "Trial by Formula" and do not permit defendants to raise all defenses.    *Wal-Mart Stores*, 131 S.Ct. at 2561.

###### C.    The Evidence Supporting Aggregate Class Damages Is Insufficient.

**190.**    Even if several Supreme Court and Fifth Circuit precedents did not categorically bar Plaintiffs' damages evidence, the Court must still deny Plaintiffs' damages Motion because at the hearing Plaintiffs failed to present a reliable and sufficient evidentiary basis for the requested aggregate (initial) award of $497 million.

### 1.      Mr. Inglis' Methodology Does Not Work

**191.**   The Court cannot grant Plaintiffs' aggregate damages request, which they base solely on Mr. Inglis' unreliable, insufficient, and ultimately, unpersuasive testimony.  In the Fifth Circuit, a district court should not award property damages where the plaintiffs' expert bases his damages assessment on an extrapolation method that is "fundamentally flawed."  *Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 590 (5th Cir. 2002); *see also Anheuser-Busch*, 317 F.3d at 1266-66 (denying request for damages under Rule 55(b) because of expert's insufficient testimony).

**192.**   In *Anthony*, the Fifth Circuit held that property-owner plaintiffs "failed to establish a legally sufficient evidentiary basis" for damages using a soils expert "to testify to the extent of the damage to the ranch and to establish the approximate cleanup costs for each pollution site." *Anthony*, 284 F.3d at 590.  The expert took a soil samples from around the ranch.  *Id.*  Then, "to minimize costs, he took averages from these samples and then used the data to extrapolate the size and scope of the oil pollution in each area."  *Id.*  The Fifth Circuit found that the expert's "own testimony" about the variability of the pollution "undermines the reliability of such a method."  *Id.*   The court highlighted that the expert's underlying "assumption" of uniformity of pollution was "deeply troubling" and held that the expert's insufficient testimony would require the finder of fact "to speculate as to . . .  the extent of the damage."  *Id.*

**193.**   Mr. Inglis' methodology would similarly require this Court to speculate about the amount of remediation sought by the class.  Mr. Inglis used a homemade formula for this litigation that started with the $86/square foot average from the *Germano* intervenors and involved a series of conversions using RSMeans location factors. 118:5-18.  The weight of the evidence showed that Mr. Inglis' novel formula method was not reliable for reasonably estimating remediation costs for any particular property.

194.    Mr. Inglis had no record basis for the assumption underlying his methodology that most of the class properties "are more around the middle."   125:3-22 ("They're more towards the means.").   That assumption about averages was critical to his extrapolation methodology, as he testified:   "We basically did our analysis based on an average quality home, average, around 2000 square feet.   We felt that this was similar to what we observed in Germane and we felt comfortable with the data."   *Id.*   At the hearing, Mr. Inglis demonstrated no basis for any assumptions about the class properties.   He testified repeatedly that he was "not familiar with the specifics on individual residences."   160:17-22 ("I don't know the specifics on a particular home.").   Mr. Inglis did not "employ[] in the courtroom the same level of intellectual rigor"—or common sense—"that characterizes the practice of an expert" in the construction field.   *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

195.    Like the expert in *Anthony*, Mr. Inglis' own testimony undermined his use of averages and extrapolation from *Germano*.   Although all the *Germano* properties were residences, Mr. Inglis admitted that the class includes "mix of properties," including other building types such as commercial properties and condominium complexes.   158:12-159:18.   Mr. Inglis admitted that property-to-property remediation costs necessarily have "variability based on the finishes on the interior and the size."   125:3-22.

196.    Mr. Inglis method was also insufficient and unreliable because it did not include a site visit to any of the class properties.   Even worse than the insufficient expert in *Anthony* who at least "began his investigation by conducting a physical inspection of each contamination site," 284 F.3d at 590, Mr. Inglis visited none of the class properties to formulate his damages opinion after he became an expert witness.   144:16-145:8.   Mr. Pogorilich was persuasive that a reliable property remediation requires a visit to the property because each property is unique and

44

accuracy requires the estimator to know the house layout, quantities and quality of material in the property, including finishes and appliances. 185:1-12. All of those property-specific elements have a material impact on the cost of remediation. 190:5-23. Mr. Inglis admitted that in *Germano* his colleague Mr. Wright had "visited the homes" and that the contractors doing the estimates "visited the homes." 110:13-111:13.

**197.** Mr. Pogorilich also persuasively showed that a property specific estimate requires the estimator to consider more than the footprint square footage of the property. As Mr. Pogorilich explained, two properties with identical exterior footprint square footage may have materially different amounts of drywall square footage due to interior layout. Differences in "the number of partitions" and "the height [are] going to impact the price." 195:9-196:19. Mr. Inglis' method also fails to account for differences in fit and finish, which also can have a significant impact on remediation cost. *Id.* As demonstrated by Defendants' Exhibit 34, properties with identical footprint square footage can have significantly different remediation costs based on interior layout and fit and finish. Mr. Inglis' formula does not account for critical property-specific differences that have a material impact on remediation costs.

**198.** In essence, Mr. Inglis' formula relies wholly on external similarities and ignores internal differences.

**199.** The fact that properties need to be remediated according to the same general scope does not mean they will incur the same remediation cost in practice. As Mr. Pogorilich explained, "in order to satisfy that scope of work, you have to go in and look at the line items, the tasks, the quantities that will satisfy that general scope of work, and that's going to change from house, to house, to house, to house." 193:25-194:8.

**200.**    Mr. Inglis' novel method was unreliable because he failed to test whether it generated accurate estimates by comparing it to a traditionally generated estimate of any of the class properties.

**201.**    Mr. Inglis' particular novel method was not shown to be accepted in the construction industry for obtaining accurate remediation estimates.  Mr. Pogorilich testified that he had never seen a construction professional use a universal constant price per square foot to prepare remediation estimates for thousands of properties.  193:8-12.  Mr. Inglis claimed that his methods were accepted in the construction industry, but the only evidence presented, the RSMeans book, referenced "square footage estimate" generally, not Mr. Inglis complicated series of conversions.  127:19-128:21.  Even as to square footage estimates itself, the RS Means books relied on by both sides identified that as resulting in "approximate estimates," also called "order of magnitude, preliminary, back of the envelope, or summary estimates" or "conceptual estimates."  227:4-228:5.  That method has a wide "accuracy range" of minus 30 percent to plus 50 percent.  *Id.*  The Court cannot rely on a "back of the envelope" estimate with such a huge margin of error to award class damages for thousands of properties.

**202.**    Mr. Inglis did not show that he had ever before used his novel method for even one property, much less thousands that he had never visited.  113:23-114:13.  Mr. Inglis' vague reference to cost estimates for "EFIS damage" was not persuasive, and Mr. Inglis appeared not to have personal knowledge of that situation, which he cryptically described as "actually in the 90s, that was before I was employed."  115:16-116:13.

**203.**    Mr. Inglis was still reinventing his novel method the night before the hearing because he was using the "wrong" number for the Norfolk, Virginia location factor.   120:14-125:2 ("That number is wrong."); 162:16-20.  Mr. Inglis changed his opinions numerous times in the lead-up

to the hearing.  131:4-133:6. Mr. Inglis' errors and his multiple amendments to his reports "call into question the validity of his opinions and undermine the value of those calculations to a factfinder."  *Castellow v. Chevron USA*, 97 F. Supp. 2d 780, 793 (S.D. Tex. 2000).

**204.**    Mr. Inglis' testimony also lacked credibility  because he essentially served as a human calculator who got all his information from law firms, exercised no independent judgment, and failed to verify any of the information he received, even after the class list had been shown repeatedly to contain material mistakes and thus inherently unreliable.  *See JRL Enterprises, Inc. v. Procorp Assocs., Inc.* 2003 WL 21284020, *8 (E.D. La. June 3, 2003) (Fallon, J.) (excluding expert who "merely accepted as true the facts given to him" and whose calculations were merely "an exercise in arithmetic based on inherently unreliable values"); *see also Cimino*, 151 F.3d at 309 (rejecting extrapolation by expert who exercised "no independent judgment" and whose data "was furnished by someone in the offices of plaintiffs' counsel"); *In re Paoli RR Yard PCB Litig.*, 35 F.3d 717, 763 (3d Cir. 1994) (excluding testimony of experts who "simply relied on [the plaintiffs'] answers to a questionnaire he gave them"); *In re Agent Orange Prod. Liab. Litig.*, 611 F. Supp. 1223, 1247 (E.D.N.Y. 1985) *aff'd* 818 F.2d 187 (2d Cir. 1987) (excluding testimony of experts who relied on "self-serving layperson's general affidavits and checklists prepared in gross for complex litigation").

### 2.    The Class List Is Unreliable as a Basis for Class Damages

**205.**    The Court must also deny Plaintiffs' Motion for class damages because the class list that was the source of Mr. Inglis opinion for $497 million for 2,686 properties is not trustworthy.

**206.**    In *Slaughter v. Southern Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990), the Fifth Circuit affirmed summary judgment because experts' sources "were replete with so many errors as to be of no value to the trier of fact" and thus the expert testimony "represented nothing more than bare conclusions derived from erroneous data."

47

207.    Over the last year, the class list has never been a reliable enumeration of the properties entitled to remediation damages through a class-wide procedure.  Since it was first presented by Mr. Wright in October 2014, the class list—and the aggregate damages figure generated from it—have changed numerous times.

208.    At the hearing, Mr. Inglis could not demonstrate that the current iteration of the class list is reliable.  Mr. Inglis did not supervise the generation of the list and did not confirm or verify any information on the list.  He merely "accepted it as being accurately prepared."  14212-15. Even at the hearing, Mr. Inglis accepted that there could be "an issue with the list of properties," and offered to "revise the damages estimate."

209.    Taishan has submitted additional information after the hearing that raises continuing serious doubt about the trustworthiness of the properties listed among the 2,714 because the claimants are no longer owners or because the property does not have Taishan drywall.  Dkt. No. 19191.  Taishan has also submitted property records that raise serious doubts about the accuracy of the square footage listed on the class list.

210.    The list that ultimately was provided to Mr. Inglis includes a substantial number of properties for which there has been no reliable verification and no admissible evidence presented that the property contained defective drywall that is traceable to any of the defendants in this proceeding, which is a necessary prerequisite for a finding of damages.  In addition, significant questions exist about whether Plaintiffs' square footage determinations for each property are sufficiently reliable to serve as the underpinning for a damage calculation based on square footage.  Finally, other than Mr. Woody's testimony that the PSC removed 865 properties from the class list because the claimants no longer owned the property (82:8-23), Plaintiffs presented no evidence as to how such determinations were made and have presented nothing from which

the Court can conclude that the class list that was used to calculate damages was appropriately limited to those properties still owned by the respective Plaintiffs.  Putting aside questions about whether aggregate damage awards are permissible at all, such an award certainly cannot be premised based on a class list that does not reliably reflect class membership and that is virtually certain to require significant modification.  That cannot be "fixed" in a later claims process.

### D.   Default and Collateral Estoppel Have No Effect

**211.**   The Court rejects Plaintiffs' arguments that Defendants cannot challenge Mr. Inglis' approach to class-wide damages because of default and collateral estoppel of prior proceedings. The prior preliminary liability defaults have no preclusive effect on damages issues and do not alter Plaintiffs' burden of proof or the admissibility of evidence for meeting that burden.  No prior proceeding or ruling in this litigation has a collateral estoppel effect in the damages proceeding.

### 1.   The Default Judgments Have No Relevant Effect on Damages

**212.**   A preliminary default under Rule 55 does not change the individualized damages principals in *Fibreboard, Cimino* and *Corley.*  "A default judgment is a judgment on the merits that conclusively establishes the defendant's liability.  But it does not establish the amount of damages. . . .  After a default judgment, the plaintiff's well-pleaded factual allegations are taken as true, except regarding damages."  *U.S. Use of M-Co Const., Inc. v. Shipco General, Inc..*, 814 F.2d 1011, 1014 (5th Cir. 1987) (citations omitted).  "The case law is clear that a judgment by default may not be entered without a hearing unless the amount claimed is a liquidated sum or one capable of mathematical calculation. *United Artists Corp. v. Freeman*, 605 F.2d 854, 857 (5th Cir.1979).  At the hearing, Plaintiffs were obligated to prove both the fact of damages and the amount of damages according to applicable state law.  *See Anheuser Busch, Inc. v. Philpot*,

317 F.3d 1264, 1266 (11th Cir. 2003) (declining to award damages in Rule 55(b) hearing because of failure of expert proof under applicable Florida law).

213.     The Court must determine tort damages that vary among claimants on an individualized basis regardless of whether liability has been established and regardless of the method used to adjudicate liability.  *See Robertson v. Monsanto Co.*, 287 F. App'x 354, 361-62 (5th Cir. 2008) (reversing class certification where liability had already been decided on a class-wide basis because damages determinations were "highly individualized, and thus would not be well-served by a class action"); s*ee also In re Deepwater Horizon*, 739 F.3d 790, 814 (5th Cir. 2014) (recognizing in economic loss litigation "that the class members' damages 'would have to be decided on an individual basis were the cases not being settled'").  Taishan is entitled to fully litigate all issues unique to damages, including what method Plaintiffs may legally use to calculate class-wide damages.

214.     Plaintiffs cannot avoid the infirmity of their evidence by arguing that default abridges the Federal Rules of Evidence.  The Federal Rules of Evidence apply with full force in a Rule 55(b) proceeding.  Federal Rule of Evidence 1101, which delineates the narrow circumstances in which the rules do not apply to civil cases, has no exception for Rule 55(b) proceedings.  *See* Fed. R. Evid. 1101.  And "where there are enumerated exceptions, additional exceptions are not to be implied."  *In re Condor Ins. Ltd.*, 601 F.3d 319, 324 (5th Cir. 2010) (citations and grammatical marks omitted).

215.     Accordingly, "[j]ust as a defendant's default under Rule 55 does not automatically result in entry of a judgment on a claim that is legally insufficient, no logic warrants deeming a Rule 55 hearing to suddenly abate the Federal Rules of Evidence . . . thus allowing a plaintiff to prove

claims by resort to the most base forms of inadmissible evidence." *Shell v. Henderson*, No. 09-CV-00309-MSK-KMT, 2014 WL 3716165, *5 (D. Colo. July 28, 2014).

**216.** Taishan's default does not save Plaintiffs' fatally flawed damages case.

### 2. Collateral Estoppel Does Not Apply

**217.** Collateral estoppel has no effect on these damages proceedings for various reasons.

### a. *Hernandez* Has No Collateral Estoppel Effect

**218.** First, the *Hernandez* trial against a different defendant, Knauf, cannot collaterally estop Taishan, who was never a party to that case. It would be "a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 7 (1979) (citing *Blonder-Tongue Laboratories, Inc. v. University of Ill. Found.*, 402 U.S. 313, 329 (1971); *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)).[15]

**219.** None of the narrow exceptions for collaterally estopping a nonparty applies here. *See Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 339-340 (5th Cir. 1982) (listing three "virtual representation" circumstances). First, Taishan did not succeed to any property interest held by Knauf. Second, Taishan had no control over the *Hernandez* lawsuit. Third, Knauf did not virtually represent Taishan's interests. The Fifth Circuit has unequivocally held that separate product manufacturers with similar legal interests do not virtually represent each other. *See Hardy*, 681 F.2d at 338-40 (holding that nonparty asbestos manufacturers were not estopped by a prior judgment against other asbestos manufacturers simply because they shared an identity of interests or similar legal positions). Taishan had no legal relationship with *Hernandez* defendant Knauf, and thus the *Hernandez* FOFCOL has no preclusive effect on Taishan.

---

[15] The collateral estoppel effect of prior federal adjudications is controlled by federal law. *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 337 (5th Cir. 1982).

### b.   *Germano* has no Collateral Estoppel Effect

**220.**   Prior to the damages hearing in *Germane*, the Court directed in its December 4, 2009 Order "that the result of the hearing will only have a preclusive effect on those properties which are the subject of the hearing but, hopefully, the Court's findings will provide some guidance for similarly situated and/or affected properties."  Dkt. No. 576.  Plaintiffs' recognized this fact in PSC's Motion in Limine No. 5, which stated, "the Court's findings as a result of the hearing shall have no preclusive effect save as to the seven Virginia homes at issue. . . . [T]he Court already has declared that its findings will have no preclusive effect on Knauf or any other parties, besides those of the intervenor plaintiffs."  Dkt. No. 1089-1 at 1, 4.

**221.**   Even if the Court had not already held that *Germano* would have no preclusive effect, it could not collaterally estop Taishan from litigating damages under binding Fifth Circuit law.  In *Cimino*, the Fifth Circuit barred any preclusive effect of prior product liability trials of other plaintiffs' claims against the same defendants.  151 F.3d at 318-21.  The Fifth Circuit decisively rejected binding defendants as to subsequent plaintiffs, finding no "legally valid ground on which the . . . damages suffered by one person may be determined . . . solely on the basis of the average of awards made to other persons in similar cases."  *Id.* at 321, n.51.  The court relied on its prior holding "to prevent *any* preclusive use" of prior trials.  *Id.* at 318 (emphasis in original).

**222.**   Furthermore, *Germano* cannot be considered a bellwether because it did not involve a representative sample.  *See Chevron*, 109 F.3d at 1019 ("It is not a bellwether trial.").  The Court's statement in the *Germano* FOFCOL that those cases were "representative" was merely an observation, not a legally binding holding because no statistical evidence was presented as required by *Chevron*.  Even if *Germano* were a bellwether, it would still have no preclusive effect on Taishan.  In *Cimino*, *Chevron*, and other decisions, the Fifth Circuit "has been particularly critical of using bellwether trials to bind related claimants."  Eldon E. Fallon et. al.,

*Bellwether Trials in Multidistrict Litigation*, 82 Tul. L. Rev. 2323, n. 27 (2008) (citations omitted).

### c.    Plaintiffs Have Not Established The Elements for Offensive Collateral Estoppel

**223.**    Offensive collateral estoppel also does not apply here because Plaintiffs failed to establish any of the required elements.  Under Fifth Circuit law, "[f]our conditions must be met before collateral estoppel may be applied to bar re-litigation of an issue previously decided by a court of competent jurisdiction:

> (1) the issue under consideration is identical to that litigated in the prior action; (2) the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to support the judgment in the prior case; and (4) there is no special circumstance that would make it unfair to apply the doctrine.

*Winters v. Diamond Shamrock Chemical Co.*, 149 F.3d 387 (5th Cir. 1998) (citing *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir.1995)).

**224.**    First, the Court cannot apply collateral estoppel because the *Germane* finding did not address "the precise questions at issue" in the subsequent damages proceeding.  *Rufenacht v. Iowa Beef Processors, Inc.*, 656 F.2d 198, 204 (5th Cir. 1981).  The precise finding on average square footage in *Germano* related only to "the *Germano* homes."  *Germano* FOFCOL at 57 ("The evidence supports the conclusion that the average cost per square foot to repair the *Germano* homes is $86.").  The question here is whether there can be an average cost of repair applied to 2,700 homes in 16 states and what should that be.  The ultimate determination of that non-identical issue of the suitability of Plaintiffs' proposed dollar/square foot formula for class damages under Rule 23 still remains in this proceeding.

**225.**    Second, no issue of fact or law was actually "litigated" for purposes of collateral estoppel because *Germano* was a default proceeding.  It is black-letter law that "[i]n the case of a

judgment entered by confession, consent, or default, none of the issues is actually litigated." Restatement (Second) of Judgments § 27 cmt. e (1982).  Moreover, the non-adversarial *Germano* proceeding cannot have estoppel effect because "[t]he requirement that the issues sought to be estopped must have been 'actually litigated' in the prior proceeding contemplates something more than a one-sided presentation of facts." *Franks v. Thomason*, 4 B.R. 814, 822 (N.D. Ga. 1980).  Taishan never answered in *Germano* and thus never put at issue any substantive issue of fact or law.  "The refusal to give preclusive effect to default judgments . . . , at its core, is based upon the fact that at no time during the litigation was the court ever presented with a disputed issue." *In re Staggs*, 178 B.R. 767, 776, n.5 (Bkrtcy. N.D. Ind. 1994).

226.    Third, the average-cost-per-square-foot finding was not "necessary" for the *Germano* judgment.   The Court here based its actual remediation damages awards and its final judgments not on the average cost of remediation, but on Mr. Wright's seven property-specific remediation estimates, which in turn were each based on property-specific estimates from local contractors. Neither the Court's "conclusion" about an $86/sq. ft. average repair cost nor its recitation of the "average cost to repair" each intervenor's house played any part in the damages awards or the final judgments.   They cannot have collateral estoppel effect.

227.    Fourth, "[t]he injustice of applying collateral estoppel in cases involving mass torts is especially obvious." *Hardy*, 681 F.2d at 346 n.13.  As the Sixth Circuit noted, "[i]n *Parklane Hosiery*, the Supreme Court explicitly stated the offensive collateral estoppel could not be used in mass tort litigation." *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305 n.11 (6th Cir. 1984).   Extrapolating the limited damages award in *Germano* (which was never actually litigated) would not only be unfair, it would strip Taishan of its constitutional due process rights.

**228.**   Finally, Plaintiffs may not invoke collateral estoppel based on any findings set forth in the Court's Class Cert. FOFCOL.   Class certification orders are not final judgments on the merits, and thus cannot have collateral estoppel effect.   *See J.R. Clearwater Inc. v. Ashland Chemical Co.*, 93 F.3d 176, 179 (5th Cir. 1996) (holding that class certification order is not a final judgment, and therefore "lacks sufficient finality to be entitled to preclusive effect while the underlying litigation remains pending"); *accord Baldridge v. SBC Communications, Inc.*, 404 F.3d 930, 931 (5th Cir. 2005) (holding that certification order is not a final decision).

## IV.   CONCLUSION

**229.**   For the foregoing reasons, Plaintiffs' Motion for Assessment of Class Damages is DENIED.


Respectfully submitted,

Dated:  June 23, 2015


/s Michael P. Kenny
Bernard Taylor, Esq.
Georgia Bar No. 669625
Michael P. Kenny, Esq.
Georgia Bar No. 415064
Christina Hull Eikhoff, Esq.
Georgia Bar No. 242539
David Venderbush, Esq.
New York Bar No. 2920817
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
mike.kenny@alston.com
*Counsel for Taishan Gypsum Co., Ltd. and Tai'an Taishan Plasterboard Co., Ltd.*

Alan Dean Weinberger
LA Bar No. 13331
HANGARTNER, RYDBERG & TERRELL, LLC

55

One Shell Square
701 Poydras St., Suite 310
New Orleans, Louisiana  70179
Phone:  (504) 434-6815
Fax: (504) 522-5689
aweinberger@hanrylaw.com
*Local Counsel for Taishan Gypsum Co., Ltd. and*
*Tai'an Taishan Plasterboard Co., Ltd.*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Plaintiffs' Liaison Counsel, Russ Herman, by U.S. mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 23rd day of June, 2015.

/s Michael P. Kenny
Michael P. Kenny, Esq.
Georgia Bar No. 415064
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
mike.kenny@alston.com
*Counsel for Taishan*