## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 <br> SECTION: L |
| **THIS DOCUMENT RELATES TO:** <br> **ALL CASES AND** | **JUDGE FALLON** |
| *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); | **MAG. JUDGE WILKINSON** |
| *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); | |
| *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al.*, Case No 10-361 (E.D.La.); | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1672 (E.D.La.); | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); | |
| *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.) | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED TO THE JUNE 9, 2015 REMEDIATION DAMAGES TRIAL

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................... 1

   A. Procedural History ............................................................................................. 6

   B. Relevant Findings from *Germano* ................................................................... 11

II.    CLASS REMEDIATION DAMAGES ............................................................... 17

   A.    The Data Provided by BrownGreer ................................................................ 18

      1.    The List of Properties with Verified Square Footage Information and Identification of Taishan Drywall ....................................................................................... 21

      2.    The Knauf Settlement Remediation Cost Data ............................................. 23

   B.    The Calculation of Class Remediation Damages ........................................... 24

      1.    The Qualifications of George Inglis and Defendants' Experts to Testify about the Remediation Damages Estimates of the Taishan Property Owners. ............................ 24

      2.    Mr. Inglis Used a Formulaic Method to Reliably Determine Remediation Damages for Each Taishan Chinese Drywall Property. ....................................................... 29

      3.    Mr. Inglis' Methodology Used Well Accepted Tools and Data of the Type Typically Relied on By Professionals in the Field. ...................................................... 38

      4.    Mr. Inglis's Formulaic Damages Calculation is Based on Regular Arithmetic and Does Not Require Statistical Analysis ...................................................................... 41

      5.    The Data from The Knauf Remediation Program and Settlement ................................ 42

III.    CONCLUSIONS OF LAW ................................................................................. 45

   A.    The Nature of these Proceedings Under Rule 55(b) ....................................... 45

   B.    Plaintiffs Have Established Class-Wide Remediation Damages of $497,180,467 ........ 49

      1.    Plaintiffs Use an Appropriate Formula To Calculate Remediation Damages ............... 50

      2.    Aggregate Award of Class Damages Is Appropriate .................................................... 53

      3.    Damages Calculations Need Not Be Exact ................................................................. 56

      4.    Mr. Inglis' Method Is Based on Established Tools, Experience and Regular Addition and Multiplication, Not Statistical Extrapolation ................................................... 58

      5.    Mr. Inglis Appropriately Relied on the Property Data Provided by BrownGreer ........... 63

IV.    CONCLUSION ................................................................................................... 65

## I.       INTRODUCTION

1.       This matter involves the claims of thousands of current and former owners of properties with Chinese Drywall manufactured by the Taishan Defendants ("Taishan Property Owners") who have suffered property damages arising from defective Chinese-manufactured drywall ("CDW" or "Chinese Drywall") manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants and used in plaintiffs' properties.

2.       The Taishan Property Owners have waited for over six years for remediation and other compensation for damage caused by the Taishan manufactured drywall that was installed in their homes.  While the other major manufacturer, Knauf, and many of the other defendants in this litigation have come forward and resolved the property owners' claims against them, the Taishan Defendants have stood resolutely indifferent to the property owners and the importance of due process in bringing this litigation to a close.

3.       Now, after six years, the closure and opportunity to be made whole for the Taishan Property Owners has begun.

4.       The Class of Taishan Property Owners includes all active litigants (either in the original action or in complaints in intervention) named in *Germano, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co. Ltd., et al.*, Case No. 09-6687 (E.D.La.); *Gross, et al. v. Knauf Gips, KG, et al.*, Case No. 09-6690 (E.D.La.); *Wiltz, et al. v. Beijing New Building Materials Public Limited Co., et al*., Civ. Action No. 10-361 (E.D.La); *Abel, et al. v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al*., Civ. Action No. 11-080 (E.D.La); *Haya, et al. v. Taishan Gypsum Corp. Ltd., et al.*, Civ. Action No. 11-1077 (E.D.La.); *Almeroth, et al. v. Taishan Gypsum Co., Ltd., et al.*, Civ. Action. 12-0498 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No.

1

11-1672 (E.D.La.); *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1395 (E.D.La.); and/or *Amorin, et al. v. Taishan Gypsum Co., Ltd. f/k/a Shandong Taihe Dongxin Co., Ltd., et al.*, Civ. Action No. 11-1673 (E.D.La.).  On September 26, 2014, the Court found that certain of the Plaintiffs were adequate representatives of the class of Taishan Property Owners (Rec. Doc. 18028 at 28).

5.      The "Taishan Defendants" are comprised of the following entities: Taishan Gypsum Co. Ltd. (hereafter "Taishan"); Beijing New Building Materials Limited Co. (hereafter "BNBM"); Beijing New Building Materials Group Co., Ltd. (hereafter "BNBM Group"); China National Building Materials Co., Ltd. (hereafter "CNBM"); China National Building Materials Group Corporation (hereafter "CNBM Group"); and Tai'an Taishan Plasterboard Co., Ltd. (hereafter "TTP").  The Taishan Defendants are in default.

6.      The "Taishan Affiliates" are comprised of the following entities: BNBM, BNBM Group, CNBM, CNBM Group, and TTP.  The Taishan Affiliates are in default.  On September 26, 2014, the Court found that the Taishan Affiliates were liable to the Taishan Property Owners under a theory of alter ego/piercing the corporate veil.  (Rec. Doc. 18028 at 18-21).

7.      On September 26, 2014, the Court certified the following class of Taishan Property Owners based, in substantial part, on the fact that the "class proceeding will facilitate an expeditious and streamlined resolution for all impacted residents . . . avoiding duplicate hearings on identical issues":

> All owners of real properties in the United States who are named Plaintiffs on the complaints in *Amorin*, *Germano*, *Gross*, and/or *Wiltz* (*i.e.*, not absent class members), asserting claims for remediated damages arising from, or otherwise related to Chinese Drywall manufactured, sold, distributed, supplied, marketed, inspected, imported or delivered by the Taishan Defendants.

(Rec. Doc. 18028 at 34-35).[1]

8.      Notice was sent to the Taishan Property Owners on December 29, 2014.  This notice

fully apprised members of the class, each of whom is a named and known litigant in these

proceedings, of the pendency of the Rule 55(b)(2) proceedings against the defaulted Taishan

Defendants.  Rec. Doc. 18238-1.  The Notice laid out three categories of damages that will be

sought for the members of the class, including remediation damages, alternative living expenses

and loss of use and enjoyment of their properties, setting the maximum amount for each that

would be sought for the Taishan Property Owners in these damages proceedings.  *Id.*  The Notice

explained that damages would be determined on the basis of the square footage of the Taishan

Properties.  *Id.*  Further, the Notice made clear that, if any funds ultimately recovered were

insufficient to make the Taishan Property Owners whole, an appropriate allocation would be

made to each member of the class.  *Id.*  The Notice also contemplated proceedings subsequent to

a damages hearing, including a process whereby property owners would need to establish,

among other things, that their properties contained Taishan drywall.  *Id.* The Class Notice

remains adequate, even after the subsequent appearances of the Taishan Defendants, and the

refined, phased structure these proceedings have taken.  Rec. Doc. 18998 at 4-5.

9.      After certification of the Taishan Property Owners Class, the Court set a class damages

hearing for February 12, 2015.  At that hearing, BNBM entered an appearance for the first time

in this litigation and asked for a continuance to prepare for the class damages hearing. (Rec. Doc.

18331). The Court granted the request for a continuance.  CNBM also entered an appearance for

the first time in this litigation.

---

[1] On June 9, 2015, this court clarified that the term "remediated" in the class definition
encompassed "[a]ll of the damages resulting from the need to remediate or the fact that it's
remediated." (Transcript at p. 91: 3-6).

10.     Taishan subsequently entered an appearance with new counsel after having endeavored to again evade the jurisdiction of this Court after its unsuccessful appeals to the Fifth Circuit.  *See In re Chinese-Manufactured Drywall Products Liab. Litig.,* 753 F.3d 521 (5th Cir. 2014) ("Wiltz Opinion"); *In re Chinese Manufactured Drywall Products Liab. Litig.,* 742 F.3d 576 (5th Cir. 2014) ("Germano Opinion").

11.     On March 17, 2015, the Court ordered Taishan to purge itself of contempt (*infra* at ¶ 27) and, again, continued the damages hearing to April 28, 2015. (Rec. Doc. 18831). Thereafter, the Court granted yet another request for a continuance and set the hearing for the measure of remediation damages for June 9, 2015.  Minute Entry of April 24, 2015 (Rec. Doc. 18757).

12.     Taishan and BNBM participated in the June 9, 2015 damages hearing.  CNBM elected not to participate.  In advance of the hearing, the Court provided the parties with time to serve expert disclosures, take discovery, and otherwise brief matters relevant to the measure of damages related to remediation of Chinese drywall.

13.     The class of Taishan Property Owners is a class of known litigants, most of whom are represented by counsel.  As known litigants, each Taishan Property Owner received notice of the class and that the damages sought were to be allocated on the basis of square footage.  Only two members of this class of thousands of known litigants opted-out.  Rec. Doc. 18152.  At the June 9, 2015 damages hearing, the Plaintiffs presented proof on a square foot and class-wide basis of the remediation damages suffered by the current property owners.  Under Plaintiffs' trial plan, remaining damages and other entitlements for relief will be determined at later phases before a final judgment is entered.  Rec. Doc. 18673.

14.     Throughout the proceedings, and subsequent to the certification of and notice to the class, there has been no change to the class definition or the relief being sought on behalf of the

Taishan Property Owners.  Remediation damages are but one component of the relief being sought.  Defendants' concerns that the Taishan Property Owners have not received due process are baseless – as they were when the Court rejected these same arguments in denying Defendants' motion for continuance of the June 9, 2015 damages hearing.   Rec. Doc. 18998 at 4.[2]

15.    At that hearing, the Plaintiffs presented evidence regarding only remediation damages for current homeowners (the list of properties with verified square footage that had been created by BrownGreer, which served as the basis for the calculation of remediation damages) and Defendants presented their response to Plaintiffs' calculation.  The Court was not presented with evidence relating to remediation damages for former homeowners or any other category of damages.  Later damages hearings (or "phases") will address such matters as potential off-sets to any damages awards to homeowners, claims for damages other than remediation damages that were established at the June 9, 2015 damages hearing on a class-wide basis (such as alternative living expenses), and attorneys' fees.

---

[2] It ill behooves Defendants to make feigned efforts to protect the class Plaintiffs. *See Umbriac v. American Snack Food*, 388 F.Supp. 265, 275 (E.D. Pa. 1977) ("It is in the nature of the motion practice on class determination issues that defendants, who naturally have no interest in the successful prosecution of the class suit against them, are called upon to interpose arguments in opposition to class determination motions verbally grounded upon a concern for the 'best' representation for the class while the implicit, but nonetheless real, objective of their vigorous legal assaults is to insure 'no' representation for the class."); *Sley v. Jamaica Water and Utilities, Inc.*, 77 F.R.D. 391, 394 (E.D. Pa. 1977) ("defendants who take such a position on class certification or decertification motions are realistically not concerned with the 'best' representation for the plaintiff class but rather their goal is to ensure 'no' representation"). Rather, without the efficiencies of the expedited and streamlined proceedings undertaken by Plaintiffs, relief for the Taishan Property Owners will be further delayed.

### A. Procedural History

16.     From 2005 through 2008, the housing boom and rebuilding efforts necessitated by

Hurricanes Katrina and Rita led to a shortage of construction materials in the United States,

including drywall. As a result, drywall manufactured in China was brought into the United States

and used in the construction and refurbishing of homes in coastal areas of the country, notably

the East Coast and Gulf South. After installation of the Chinese Drywall, property owners began

to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring,

surfaces, and objects, and the breaking down of appliances and electrical devices in their homes.

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829-30 (E.D.La.

2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014).

17.     On June 15, 2009, the Judicial Panel on Multidistrict Litigation transferred all federal

civil actions alleging damages from Chinese Drywall to the United States District Court for the

Eastern District of Louisiana for coordinated and consolidated pretrial proceedings in MDL 2047

pursuant to 28 U.S.C. § 1407.  *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 626 F.

Supp. 2d 1346 (J.P.M.L. 2009).

18.     The *Germano* Plaintiffs (Michelle Germano, Dennis and Sharon Jackson, Jason and Lisa

Dunaway), on behalf of themselves and all other similarly situated owners and residents,

initiated a class action against Defendant Taishan on May 1, 2009, by filing a complaint in the

Eastern District of Virginia. (Dkt. 09-cv-0202, Doc. 1 at p. 7, May 1, 2009, E.D.Va.).

Thereafter, on May 26, 2009, the *Germano* Plaintiffs filed their First Amended Complaint. On

August 3, 2009, Plaintiffs received notice that service of process of the First Amended

Complaint was perfected on Taishan. On October 13, 2009, their case was then transferred to the

Eastern District of Louisiana as part of MDL 2047. Subsequent to transfer, on October 30, 2009,

Plaintiffs moved to amend the First Amended Compliant to assert a national class against Taishan. The *Germano* Plaintiffs' motion to amend was granted on November 18, 2009. *See* Rec. Doc. 469.

19.     The *Germano* Plaintiffs obtained a default judgment against Taishan on November 20, 2009 (Rec. Doc. 487); furthermore, seven intervenor Plaintiff families in *Germano* (Robert and Lisa Orlando, William and Deborah Morgan, Joseph and Vannessa Michaux, Preston and Rachel McKellar, Steven and Elizabeth Heischober, Jerry and Inez Baldwin, and Joseph and Cathy Leach), who are (or were) Virginia homeowners with Taishan Chinese Drywall in their properties, obtained a default judgment against Taishan on May 11, 2010 (Rec. Doc. 3013).

20.     The Taishan Affiliates also defaulted in the *Wiltz*, *Gross*, and *Amorin* proceedings.  On February 1, 2011, the Court found that BNBM, BNBM Group, CNBM, and CNBM Group were in default in the *Gross* proceedings. *See* Rec. Doc. 7302. The Court again found that these same entities were in default in *Gross* on August 7, 2012 (*i.e.*, as to the omnibus intervention complaint that was filed in *Gross*).  *See* Rec. Doc. 15687.  On February 24, 2011, the Court found that BNBM was in default in the *Wiltz* proceedings.  *See* Rec. Doc. 7735.  On July 1, 2014, the Court found that Taishan, TTP, and CNBM were in default with respect to the *Amorin* case originally filed in this Court (Case No. 2:11-CV-1395).  *See* Rec. Doc. 17814.  Pursuant to this same Order, Taishan and TTP were held in default with respect to the *Amorin* complaint originally filed in the Southern District of Florida prior to its transfer to this Court (Case No. 2:11-CV-1672).  *Id*.  Also on July 1, 2014, this Court found that Taishan, TTP, BNBM, CNBM, and CNBM Group were in default with respect to the *Amorin* complaint originally filed in the Eastern District of Virginia prior to its transfer to this Court (Case No. 2:11-CV-1673).  *See* Rec. Doc. 17815.

21.     The Court held an evidentiary hearing in the *Germano* intervenor proceedings on February 19 and 22, 2010, and issued detailed Findings of Fact and Conclusions of Law on April 8, 2010.  *See Germano* Findings of Fact and Conclusions of Law, (hereinafter "*Germano* FOFCOL"), Rec. Doc. 2380.  In the *Germano* FOFCOL, the Court made detailed judicial findings regarding the scope of remediation and property damages sustained by the intervenor *Germano* Plaintiffs as a result of defective Taishan Chinese Drywall.  This Court's *Germano* FOFCOL are supported by the robust factual and scientific record presented during the evidentiary hearing on confirmation of the default against Taishan, including the Affidavit of Russ M. Herman in Support of the Plaintiffs' Steering Committee's Evidentiary Presentation Regarding Taishan Gypsum Co., Ltd. dated February 19, 2010, the trial transcripts, the testimony and reports of Plaintiffs' expert witnesses, as well as the exhibits admitted into evidence.  A complete list of all witnesses providing testimony during these proceedings (whether by live testimony or deposition transcript), and all exhibits admitted into evidence, are set forth in this Court's minute entries dated February 22, 2010 and February 26, 2010.  *See* Rec. Docs. 1258 and 1497.

22.     The factual and scientific record presented at the *Germano* bellwether trial was fully litigated through the intervention of the drywall manufacturer, Knauf Plasterboard Tianjin Co. Ltd. and the Mitchell Company.  Both the Knauf and *Germano* Intervenors conducted vigorous discovery, through depositions and expert reports. The expert reports and testimony were challenged *in limine* by both sides*,* including under *Daubert*, regarding the science underlying reactive Chinese drywall damage, type of corrosive environment created by Chinese Drywall, the appropriate scope of remediation of Chinese Drywall and the corrosive environment it creates, the lack of viability of "selective" remediation of only Chinese-manufactured drywall in mixed

homes, and the appropriate measure of damages for homeowners with Chinese Drywall.  (Rec. Doc. 2380 at 5). The court denied the *Daubert* challenges to the PSC's experts' opinions regarding defective Chinese Taishan drywall, corrosion, the need for full and complete remediation, and remediation damages were all found to be reliable by this Court.

23.     The intervening Defendants withdrew on the eve of the *Germano* bellwether trial.  (Rec. Doc. 380 at 5).  After the evidentiary hearing, the Court entered a final default judgment with awards to the seven Plaintiff Intervenors on May 10, 2010.  (*See* Rec. Doc. 3013).

24.     Following the *Germano* trial, counsel for Taishan entered a limited appearance and filed a notice of appeal at the eleventh hour, contesting the Court's exercise of personal jurisdiction over Taishan and TTP.

25.     On September 4, 2012, this Court issued its Order and Reasons denying (1) Taishan's Renewed Motion to Vacate the Default Judgment and Dismiss the Complaint in *Germano v. Taishan Gypsum, Co., Ltd.*, Case No. 09-6687 [Rec. Doc. 13490]; (2) Taishan's Renewed Motion Pursuant to Rules 55(c) and 12(b)(2) to Vacate the Entry of Default and Dismiss this Action in *The Mitchell Co., Inc., v. Knauf Gips, KG*, Case No. 09-4115 [Rec. Doc. 13566]; (3) Taishan and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Gross v. Knauf Gips KG*, Case No. 09-6690 [Rec. Doc. 13590]; and (4) Taishan and TTP's Motion Pursuant to Rule 12(b)(2) to Dismiss the Complaint in *Wiltz v. Beijing New Building Materials Public Ltd., Co.*, Case No. 10-361 [Rec. Doc. 13591]. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012) (hereafter the "Jurisdictional Rulings").

26.     On January 28, 2014, the Fifth Circuit affirmed this Court's jurisdictional ruling in the *Germano* action. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 742 F.3d 576 (5th Cir. 2014). Thereafter, the Fifth Circuit affirmed the Court's September 4, 2012 Order as it

related to the *Gross*, *Wiltz* and *Mitchell* actions. *See In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014). The Fifth Circuit's Orders affirming this Court's Jurisdictional Rulings are final; no petitions for a writ of certiorari to the United States Supreme Court were filed. Pursuant to these rulings, jurisdiction over Taishan and TTP has been conclusively established.

27.     Thereafter, Taishan again sought to evade responsibility to homeowners with Taishan drywall and the authority of this Court.  The PSC noticed a judgment debtor deposition for the *Germano* judgment for July 17, 2014.  After that date came and passed without any appearance by Taishan, the Court entered a contempt order.  Rec. Doc. 17869.  Pursuant to this order, Taishan was ordered to pay $15,000 in attorneys' fees to Plaintiffs' counsel and pay $40,000 as a penalty for contempt.  Taishan and its affiliates or subsidiaries were further enjoined from conducting any business in the United States until or unless they participate in this judicial process, with a further penalty of 25% of the profits earned by the company or its affiliates who violate the order, for the year of the violation.

28.     The Court is currently entertaining three litigation tracks with the Taishan Defendants. The first track involves litigation related to the assessment of damages suffered by the Taishan Property Owners.  This litigation track includes the June 9, 2015 hearing on remediation damages, and will continue with later phases at which the Taishan Defendants will be entitled to seek off-sets and class members will be entitled to submit claims for other damages they may have suffered as a result of Chinese Drywall, including alternate living expenses for time that they were required to seek alternate housing, and attorneys' fees.  The second track involves litigation related to the contempt order and the violation of the injunction on doing business in the United States during the period of contempt.  The third track includes discovery and

subsequent briefing regarding this Court's jurisdiction over the Taishan Affiliates, BNBM, BNBM Group, CNBM, and CNBM Group.

29.     The instant Findings of Fact and Conclusions of Law pertain to the class damages litigation, and specifically to remediation damages that have been calculated on a class-wide basis.

### B. Relevant Findings from *Germano* and *Hernandez*

30.     As established by the Consumer Product Safety Commission ("CPSC"), the Florida Department of Health, other scientific entities, and by this Court through the *Germano* trial on February 19, 2010 through February 22, 2010 and in the subsequent April 8, 2010 Findings of Fact and Conclusions of Law ("*Germano* FOFCOL") [Rec. Doc. 2380], Chinese Drywall releases reduced sulfur gases. *Germano* FOFCOL at 12. The three main gases that are released from Chinese-manufactured drywall are hydrogen sulfide (H2S), carbonyl sulfide (COS), and carbon disulfide (CS2). *Germano* FOFCOL at 12.

31.     The sulfur gases released by Chinese Drywall cause offending odors in homes, making them hard, if not impossible, to live in, and are corrosive to metals, particularly copper and silver, which are uniquely vulnerable to corrosion from the sulfur gases. *Germano* FOFCOL at 13.  These gases emitted from Chinese Drywall create an environment classified as the most severe industrial corrosive environments in the Battelle Classification scheme and the standards established by the International Standards Association.  *Germano* FOFCOL at 19-20.

32.     Forensic examination by the scientific and technical experts, including sampling and testing of all building materials in the damaged homes of the *Germano* Plaintiffs, confirmed the wide-spread impact of the corrosive atmosphere on a household, including severe pitting and

11

corrosion on copper wiring, copper pipes and silver-based components in electronics, including HVAC circuitry and brazing on pipes.  *Germano* FOFCOL at 23.

33.     Based on the scientific and practical constructability evidence presented at the *Germano* trial, proper remediation of the danger posed by Chinese Drywall in a household requires full "back-to the-studs" removal of all drywall, wiring and plumbing.  *Germano* FOFCOL at 26-40. This scope of remediation is necessary even in homes with "mixed" drywall, where Chinese and non-reactive drywall may be found.  *Germano* FOFCOL at 27-40.  The sulfur gases from Chinese Drywall disburse and are circulated throughout the entire home, creating a house-wide corrosive environment, *Germano* FOFCOL at 30.  Moreover, there is no reliable or practicable method for selective identification and removal of Chinese drywall in mixed homes.  *Germano* FOFCOL at 28-34.

34.     The same scientific and practical constructability evidence presented at the *Germano* trial requires that the HVAC units in Chinese Drywall homes be fully replaced, that all flooring (except for tile flooring) and all counters, cabinets, trim, molding, fixtures and insulation need to be replaced to efficiently and fully restore the household.  *Germano* FOFCOL at 40-52.

35.     In sum, the Court found in *Germano* that any costs of remediation would need to account for the following: Demolition and disposal of all damaged and affected building components in the properties, replacement of all drywall, replacement of the entire HVAC assembly, replacement of the entire electrical system (including receptacles and switches), replacement of all copper and silver plumbing, replacement of insulation, replacement of all items that are likely to be damaged during demolition (*i.e.,* cabinets, trim and baseboards), and replacement, from a constructability perspective, of items that are ultimately more efficient to replace than restore

(*i.e.* carpet and flooring).  *Germano* FOFCOL at 38; *see also* Rec. Doc. 2713 ("*Hernandez FOFCOL*") at 36-37.

36.     After the home is stripped to the studs, a complete cleaning of the premises needs to be completed.  *Germano* FOFCOL at 53.  The required cleaning removes all traces of Chinese Drywall from the home, including all residual dust and gases, with a wet wipe-down of the home, a HEPA vacuuming, and an extended airing-out period.  *Germano* FOFCOL at 53.

37.     The scope of work for remediating a Chinese drywall home, which includes the need for complete remediation and cleaning, was established and confirmed by the practices of two major homebuilders – Lennar Homes and Beazer Homes.  *Germano* FOFCOL at 54-55.

38.     The Court determined that the average cost per square foot to repair the seven *Germano* homes was $86 per square foot.  This determination was based on two competitive bids of reputable and experienced contractors in the Norfolk, Virginia area for the required scope of work, which bids were cross-checked against an estimation for that same scope of work derived from RS Means, a widely recognized construction estimate guide which compiles data on a national basis for cost to repair and replace building components.  *Germano* FOFCOL at 57-59.

39.     The Court also determined that the services of an independent and qualified engineering company, such as a certified industrial hygienist ("CIH") are necessary during and after the remediation to confirm the quality and completeness of the cleanup, and, in addition, to provide the necessary assurances for insurance, resale potential and peace of mind for the affected property owners.  *Germano* FOFCOL at 53-54.  The cost for CIH for the *Germano* homes was approximately 6% of the total cost to remediate their homes.  *Germano* FOFCOL at 73-74, 78, 88-89, 93-94, 99-100, 104-105.

40.     The seven homes before the Court in *Germano* represented "a cross-section of contaminated homes, including single family homes, duplex construction, and townhomes.  They included a range of values, types of construction and amount of drywall."  *Germano* FOFCOL at 62.[3]  The *Germano* intervenor homes reflected "a broad cross-section ranging from that of a modest townhome to that of a higher-end custom home, including an elevator and custom floors and cabinetry."  *Germano* FOFCOL at 62.  Varying amounts of Chinese drywall were installed in these homes.  *Germano* FOFCOL at 62-63.  Accordingly, the Court found that "the general principles found applicable to them will have relevance, if not in toto, at least partially, to all of the homes contaminated by defective Chinese drywall." *Germano* FOFCOL at 63-64

41.     The Court reaffirmed the appropriate scope of remediating properties with reactive Chinese drywall, and the resulting damages calculation, in *Hernandez v. Knauf Gips KG, et al.*, 09-6050 which, like *Germano*, was vigorously litigated by the Knauf defendants through discovery and expert challenges, but, in *Hernandez*, through to verdict.  (Rec. Doc. 2713 ("*Hernandez* FOFCOL") at 23-37).  The court determined remediation damages to be $81 per square foot, with an award of $10,000 (here 13.6% of the remediation costs) for CIH inspection and certification. (Rec. Doc. 2713 at 38-39).

42.     Accordingly, in certifying the class of Taishan Property Owners on September 26, 2014, the Court concluded that "[d]amages were previously presented in *Germano* and *Hernandez* and sufficed to allow the Court to make a per square foot damages calculation for all affected plaintiffs . . . .   Indeed, damages are simply calculated by using a mathematical formula similar

---

[3]     The Leach property was "unique" in that the Chinese Drywall was used in "an extremely localized use . . . in a single room added to the home after construction was completed. *Germano* FOFCOL at 82.  The wine cellar was effectively separated from the rest of the home and had no shared HVAC registers or returns.  *Germano* FOFCOL at 83.

to what the Court utilized in *Germano* and *Hernandez* (*i.e.,* price per square foot to remediate X number of square feet in class members' homes = damages)."  Rec. Doc. 18028 at 32, 33.

43.     A collateral outcome of the Taishan Defendants' decision to evade these proceedings since 2009 is that all of the prior findings made by the Court, particularly those in *Germano*, where Taishan was a named defendant, are made as to these defaulting Defendants.  The well-settled doctrine of collateral estoppel precludes the re-litigation of any factual or legal issues tried and decided in a prior proceeding, provided that the party seeking to re-litigate such an issue had the "full and fair opportunity to litigate the issue in the prior proceeding and the resolution of that issue was 'necessary to support a valid and final judgment.'"  *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 330-31 (1979: *see also U.S. v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007).  Although there are certain factors which may render application of the doctrine of collateral estoppel inappropriate, this Court already reviewed these factors and determined that none of them apply (*see* Rec. Doc. 18028 at 25-26).  Defendants are fully bound by the Court's findings of fact and conclusions of law in *Germano* and *Hernandez.*

44.     The Defendants rely on this Court's December 8, 2009 Order (Rec. Doc. 576) to support their argument that the *Germano FOFCOL* is neither relevant nor binding on Defendants regarding the issue of damages.  Defendants' arguments misinterpret both what the Court may consider in determining damages under Rule 55(b)(2) and the Court's December 8, 2009 order.

45.     First, in a Rule 55(b)(2) damages proceeding, the Court may rely on its extensive knowledge and experience with this litigation, from six years of evidence, pleadings, and the over 19,000 docket entries that have been made in this case to date; this is a mature litigation with a robust evidentiary record addressing the underlying factual and scientific evidence regarding Chinese drywall remediation scope of work and costs.  *See, e.g., James v. Frame*, 6

15

F.3d 307, 311 (5th Cir. 1993).  This plethora of evidence has universal application to any

Chinese drywall proceeding, regardless of whether collateral estoppel or, even, Rule 55(b)(2)

applies.

46.     Second, the Court specifically acknowledged in its December 8, 2009 order that the

Court's findings would still provide "guidance for similarly situated or affected properties."

(Rec. Doc. 576).  It is completely consistent with this Court's December 8, 2009 order for this

court to approve of a damages estimate which utilized the findings from *Germano*, particularly

those regarding scope of work.

47.     Third, after *Germano*, this court made nearly identical findings in the *Hernandez*

FOFCOL, based on the record in that case, which affirmed as reliable the basic use of the three

estimation methods (bids, unit price, and square footage pricing) employed by Mr. Inglis here.

(*Hernandez* FOFCOL at 37-39).

48.     Fourth, the historical evidence regarding scope of work and costs of repair was submitted

again to this court in the form of Inglis' testimony in this case on June 9, 2015.  The Court is free

to consider it and find it reliable; again, without needing to determine the preclusive effect of the

*Germano* FOFCOL here.  *See James v. Frame*, 6 F.3d 307, 311 (5th Cir. 1993).

49.     Fifth, Rule 55(b)(2) requires that these determinations, which are part of the underlying

complaints in this case, apply here to make these earlier findings binding – this is particularly so

in light of the fact that Taishan knowingly and deliberately failed to participate in either

*Germano* or *Hernandez*.  *See Class* FOFCOL, 2014 WL 4809520, at *15; *see also See Myers v.

Powell,* No. 12-2181, 2013 WL 3832414, at *4 (E.D. La. July 23, 2013) (citing *U.S. ex rel. M–

CO Const., Inc. v. Shipco Gen., Inc.,* 814 F.2d 1011, 1014 (5th Cir. 1987)) ("a default judgment

is a final judgment on the merits that conclusively establishes the defendant's liability.").

50.     Finally, collateral estoppel is an equitable doctrine. *Copeland v. Merrill Lynch & Co.,* 47 F.3d 1415, 1423 (5th Cir. 1995).  At the time this Court entered its December 2009 order, it did not consider the intentional strategic decision the Taishan defendants would make to avoid judicial process. With the full facts regarding Taishan's prolonged and deliberate absence from this litigation before the Court, this Court finds that Taishan is precluded from litigating issues decided in *Germano* and *Hernandez.*

## II.     CLASS REMEDIATION DAMAGES

51.     Plaintiffs' calculation on a class-wide basis of the remediation damages suffered by the Taishan Property Owners appropriately builds on the *Germano* and *Hernandez* findings as well as the repeated and consistent observations made by the many experts (including George Inglis) who have spent years studying and analyzing the problem of remediating properties with reactive Chinese drywall.

52.     The Taishan Property Owners are all known, named litigants in these proceedings, many of whom had already registered with and provided detailed property and drywall information to BrownGreer, the Court appointed Special Master and settlement claims administrator for the Knauf and Global Banner INEX ("GBI") settlements.  BrownGreer supplied this information to the parties in advance of the June 9, 2015 damages hearing.

53.     On June 9, 2015, Plaintiffs submitted a list of 2,686 properties in the Class with claims for remediation damages based on a formulaic damages methodology.  For these properties, BrownGreer was able to provide Mr. Inglis and the court with verified square footage information as of the date of the damages hearing. This data utilized by the plaintiffs and submitted at the June 9, 2015 damages hearing was limited to the square footage of interior living space ("under-air square footage") of those properties.  Plaintiffs' Exhibit 79.

17

54.     Plaintiff's expert, George Inglis, P.E., estimated the cost of remediating each of the properties on the list utilizing a common, per square foot remediation cost based on extensive historical data accumulated by Mr. Inglis and his firm Berman & Wright over a six year period, which is adjusted to account for the local costs of materials and labor and, then, multiplied by the under-air square footage of each property.  Additionally, Mr. Inglis added 6% of the remediation costs to pay for an appropriate CIH inspection and certification during and after remediation. The aggregate remediation damages, including CIH expenses, for the 2,686 properties presented to the Court on June 9, 2015 totals $497,180,467.  *Id.*

55.     Defendants offered no alternate class-wide measure of remediation damages suffered by the Taishan Property Owners. Rather, Defendants challenge both the accuracy of the list of properties and the Inglis remediation damages estimation methodology.  The Court has considered these challenges.  Because the alternative to estimating damages on a class wide basis would be a series of costly (and wasteful), individualized mini-trials, inspections and estimates that would not provide a meaningfully more reliable estimate for class remediation damages, and because the Court finds that the Inglis methodology and calculations are reasonable and reliable, the Court rejects Defendants' challenges.

### A. The Data Provided by BrownGreer

56.     BrownGreer under the oversight of Jacob Woody, an attorney with BrownGreer, provided a list of properties (class member names and addresses) and square footage data for Mr. Inglis to use in calculating the remediation damages estimate.

57.     BrownGreer received many court appointments to serve as Special Master and claims administrator in multiple MDL and other complex cases and utilizes a Quality Assurance Protocol for these services.  Transcript at pp. 18:1-19:4.  BrownGreer has served as Special

Master, Claims and Settlement Administrator for the Court-approved class settlements in this MDL, specifically, the Knauf remediation class settlement and the Global, Banner, and INEX ("GBI") Class Settlements.  Transcript at p. 26:1-:17.

58.     In the course of its claims administration activity, BrownGreer allows audits by any party on request, and would have allowed Taishan to request such an audit had it chosen to be, and remain, an active litigant in the MDL as claims data was being submitted and verified. Transcript at p. 19:10-:20.

59.     Jacob Woody testified that, at all pertinent times, BrownGreer has endeavored to provide the best available claims information to all parties, has remained mindful of his Court-appointed position in the case, and has taken no interest in which party prevails in the class damages hearing.  Transcript at p. 102:08-:17.

60.     In providing claims administration services in this MDL, BrownGreer has relied upon a Court-approved Plaintiff Profile Form, attached to PTO 11 as Rec. Doc. 168-1.  The form specifies that it is to be completed under oath and signed under penalty of perjury.  It further allows for claimants to supplement information on an ongoing basis, requires identification of the manufacturer of the Chinese drywall found on the property, and requests the amount of square footage for the property.  The form allows for attachments such as photographs, inspection reports, etc. in support of the information provided.  Transcript at 22:7-23:23.

61.     In order to identify the types of drywall and the manufacturers of drywall in the MDL, BrownGreer has utilized a Court-approved photograph catalog, attached to PTO 10 as Rec. Doc. 171.  This catalog was last revised in January 2012.  Transcript at 23:24-25:4.

62.     BrownGreer also has utilized a Court-approved "Drywall Indicia Guide" for the purpose of identifying types of drywall and drywall manufacturers.  This Guide is attached to PTO 27 as Rec. Doc. 17060.  Transcript at p. 34:15-:19.

63.     The Knauf remediation settlement requires that both product identification and square footage information be provided to BrownGreer through inspection activities and reports.  The square footage information collected for the Knauf settlement is total property square footage for the property being remediated, not limited to living space or "under air" square footage. Transcript at pp. 28:14-29:14.

64.     Since payments made to class members in the GBI Settlements are calculated on a square footage basis for affected properties, BrownGreer was required to collect square footage information in administering the GBI Settlements.  Transcript at pp. 27:14-:24; 31:17-:24.

65.     The Court-approved allocation plans for the GBI Settlements specify protocols for the submission of square footage data to BrownGreer.  These plans are identified as Rec. Docs. 16528-1, 1657-1 & 16609-2.  Transcript at pp. 31:25-33:15.  Under the allocation plans for the GBI Settlements, claimants must submit only "under air" square footage.

66.     The GBI Settlements process allows for resolution of deficiencies in square footage data submissions.  Transcript at pp. 33:14-34:6.  The Court has also put in place an appeals process for BrownGreer's consideration of, and decision-making for, claims submissions.  Transcript at p. 37:1-:8.

67.     Pursuant to PTO 27, entered on September 10, 2013 as Rec. Doc. 17060, the Court has conferred discretionary authority on BrownGreer to establish Claims Administration Procedures (CAP's) in administering the GBI Settlements.  Transcript at pp. 34:20-35:12.

68.     Based on the Court-approved CAP, which was admitted into evidence as Plaintiffs'

Exhibit 76, the Court authorized BrownGreer to accept claims information in the GBI settlement

based on (a) inspection reports, (b) repair agreements, <u>or</u> (c) affidavits, provided the latter stated

a factual basis for the assertions made by the affiant.  Transcript at pp. 35:10-36:19.

69.     A BrownGreer internal document, dated 10/23/13 and admitted into evidence as

Plaintiffs' Exhibit 77, sets forth the firm's document review protocol for GBI claim submissions,

together with a checklist of items and specific, written procedures to implement this review

protocol.  Transcript at pp. 38:1-39:10.

### 1.     The List of Properties with Verified Square Footage Information and Identification of Taishan Drywall

70.     In the Spring of 2015, the PSC asked Mr. Woody to provide additional square footage

information for properties on a revised properties list, specifically for properties for which Mr.

Woody was unable to provide data in the Fall of 2014.  Transcript at p. 42:7-:23.

71.     Mr. Woody's file memo of May 5, 2015, admitted into evidence as Exhibit 17, sets forth

the process by which Mr. Woody located and verified this additional square footage information

for the Spring 2015 list.  Transcript at pp. 42:20-43:5; 44:1-:7.  As the May 5, 2015 memo and

Mr. Woody's testimony establish, he was able to provide square footage information at that time

for an additional 899 properties on the list, by referring to (a) additional GBI Settlements data

received by BrownGreer after the Fall of 2014, (b) public sources, such as tax appraisals,

property ownership records and official government websites, and (c) square footage data

provided in Plaintiff Profile Forms.  Transcript at pp. 44:25-47:11.

72.     Following his deposition on May 26, 2015, Mr. Woody received additional and updated

square footage information from the PSC, based on supplemental claimant submissions.  Mr.

Woody verified this new square footage information using the same Court-approved protocol for the GBI Settlements, and was able to verify square footage based on objective documentation for each of the 2,686 properties presented at the June 9, 2015 hearing.  Transcript at pp. 52:19-53:7.

73.     In addition to providing square footage data, BrownGreer provided product identification information to Mr. Inglis.  Using the property list furnished by the PSC, and the 44-page Drywall Indicia Guide attached to his May 5, 2015 memo, Mr. Woody identified Taishan, BNBM and other types of drywall associated with the Taishan Defendants for certain properties on the class list.  Transcript at pp. 47:12-49:5.  In identifying properties on the class list as having Taishan Gypsum drywall, he also referred to Taishan's Profile Form.  Transcript at p. 49:11-:19.

74.     Mr. Woody was, thus, able to verify that drywall manufactured by a Taishan Defendant was associated with 1,285 properties on the PSC's class list.  Transcript at pp. 49:24-50:11.

75.     Mr. Woody then verified Taishan drywall for an additional 2,449 properties on the class list, using the information provided in Plaintiff Profile Forms.  He did not undertake, and has not yet been asked to undertake, a review of attachments to the Profile Forms.  Transcript at pp. 50:12-51:16.

76.     When he last reviewed the Taishan class list provided by the PSC (with 2,715 properties), Mr. Woody therefore verified the existence of Taishan drywall for 1,285 of these properties using the court-approved GBI Settlements protocol, and identified Taishan drywall for the balance of the properties on the list by reference to the sworn statements of claimants on their Plaintiff Profile Forms.  Transcript at pp. 55:23-56:10; 100:14-101:1.

77.     In any settlement allocation process to follow the Court's aggregation or assessment of class-wide remediation damages, Mr. Woody confirmed that BrownGreer would be able to use

its existing systems and protocols to verify Plaintiff Profile Form statements identifying Taishan defendant drywall for any given property.  Transcript at pp. 51:23-52:3.

78.     None of the changes to the list of properties for this first phase of damages proofs – the calculation of class-wide remediation damages – changed the class definition, but rather only refined, by decreasing the number of properties, the list of properties (2,686) that is the subject of remediation damages proof during this initial phase. *See* Transcript at pp. 64:11-65:2.

### 2.     The Knauf Settlement Remediation Cost Data

79.     BrownGreer responds to reasonable requests by parties for claims information, and, since Defendants' re-appearance in the litigation, has provided claims information (regarding the Knauf remediation data) to the Taishan defendants' counsel.  Transcript at pp. 20:16-21:9.

80.     At Defendants' request, Mr. Woody provided Knauf remediation payment data which, initially, included both remediation and move-in/move-out payments.  Transcript at pp. 29:19-30:4.  Then, after a second request from Defendants, Mr. Woody provided data that included only remediation payments and not move-in/move-out payments.  The Knauf Settlement remediation payments and amounts recorded by BrownGreer do <u>not</u> include:

> (1) Any delay payments made due to problems with the Knauf remediation;
>
> (2) Still-open remediation properties (a total of 655 as of the time the information was provided by BrownGreer);
>
> (3) Insurance premiums for subcontractor or drywall disposal activities;
>
> (4) Both pre- and post- remediation inspection (including Xactimate and bid proposals) costs;

(5) Certified Industrial Hygienist/Environmental charges for inspection and

testing (clearance) remediation of a property, which is required in every case

of remediation by Knauf;

(6) "Economies of scale" associated with the Knauf use of Moss as a single,

general contractor for the remediation settlement; and

(7) Remediation administration/oversight fees and costs for Moss' services as

general contractor.  Transcript at pp. 59:4-61:23.

81.    Mr. Woody confirmed that these cost items were not included in the Knauf remediation

data provided to Defendants.  *See* Mr. Woody's file memo of May 22, 2015, offered into

evidence as Exhibit 18.  Transcript at p. 62:17-:19.

82.    Thus, the average cost of $65.15 per square foot for the Knauf remediation activities does

not reflect the necessary remediation-related costs for general contractor oversight, CIH charges,

inspection costs, or insurance premiums.  Transcript at p. 98:4-:11.  Additionally, it is based on a

different and far more limited scope of work than the scope of work recommended by Mr. Inglis.

(*Infra* at ¶151)

   **B.  The Calculation of Class Remediation Damages**

   **1.  The Qualifications of George Inglis and Defendants' Experts to Testify about the**

   **Remediation Damages Estimates of the Taishan Property Owners.**

83.    Mr. Inglis is a Professional Engineer and Senior Project Consultant with Berman &

Wright Architecture, Engineering, and Planning ("Berman & Wright").  He has 40 years of

experience in project and construction management, building diagnostics, building forensics and

remediation of building defect damages.  Plaintiffs' Exhibit 1; Transcript at pp. 103:25-104:6

84.     His experience with matters related to property projects is wide-ranging and his experience is relevant to the damages calculation before the Court.  Mr. Inglis has managed capital and maintenance projects that have ranged up to $90 million, and have consisted of industrial and residential projects and buildings, including multifamily buildings. These projects required Mr. Inglis' experience with services such as: project development and justification, design, construction, evaluation of existing buildings, scoping of building modifications, evaluation for construction deficiencies, compliance to building specifications, compliance to manufacturers' specifications, and remediation due to mold, lead, EFIS (synthetic stucco), Chinese drywall, asbestos issues, project safety, budgeting, scheduling, contract negotiations, environmental permitting and development of project alternatives, including financing alternatives.  Plaintiffs' Exhibit 1; Transcript at pp. 103:25-104:6, 105:17-106:16.

85.     For the first 30 years of Mr. Inglis' career, he was a Managing Engineer for U.S. Steel where he oversaw a variety of construction projects with an annual budget of $300-400 million per year.  Plaintiffs Exhibit 1; Transcript at pp. 104:7-105:3.

86.     After joining Berman & Wright's predecessor – Buric – in 2010 Mr. Inglis performed forensic engineering services to identify construction deficiencies and compliance with building codes, design documents, and manufacturers' specifications.  He determined cause and effect relationships that resulted in damage to residential, multifamily, industrial, and commercial buildings, including damages such as water intrusion, mold, structural repairs, roofing repairs and replacement, and costs to remediate homes constructed with reactive Chinese drywall. Additionally, he has identified possible sources of defects that lead to water intrusion and/or mold problems and has worked with buildings in post-Hurricane Katrina and post-Hurricane

Wilma settings to determine specific causes of damages and related cost estimations.  Plaintiffs' Exhibit 1; Transcript at pp. 103:25-104:6, 105:17-106:16.

87.     Mr. Inglis' professional engineering engagements also include multi-state building defect cases, including the assessment and remediation of damages caused by synthetic stucco on buildings across several states.  Transcript at pp. 105:17-106:7

88.     In addition to these individual qualifications, Mr. Inglis and his firm, Berman & Wright have widespread general experience estimating cost of repair damages and utilizing RS Means and, specific to the issues in this case, they have been assessing construction estimates for remediating Chinese Drywall properties since 2009, have engaged with experts, and have researched literature from many fields to determine the best method to remediate the corrosive environment created by that reactive drywall.  Transcript at pp. 106:8-107:5.  Indeed, Mr. Inglis and his firm have been instrumental in these proceedings, including in determining the appropriate scope and costs of remediating Chinese Drywall properties.  *Germano* FOFCOL at 26-27, 33-36, 38, 40, 43-46, 48-54; Transcript at pp. 107:17-108:2, 109:10-110:3.

89.     Mr. Inglis and his firm have continued their work on a wide variety of Chinese drywall properties across several states into 2015, establishing the scope of remediation for these properties and estimating the costs of remediation.  Transcript at pp. 112:6-:19; 157:8:18.

90.     Defendants have put forth experts as well, but the Court finds that Defendants' experts do not have building damage and cost of repair experience comparable to that of Mr. Inglis.  David Pogorilich, Defendants' expert in General Contracting, is not an engineer; rather, he is a claims analyst who was involved with only five homes in Florida with Chinese Drywall for which he assisted an insurance adjustor; he has no experience with establishing or implementing the remediation protocol for Chinese drywall homes, which were already being remediated when he

was retained.  Transcript at pp. 207:4-:19, 210:11-213:3, 213:20-:24.  Mr. Pogorilich completed

no research about Chinese Drywall and, while he was aware of the pending Chinese Drywall

litigation, sought no information from any of the experts in these proceedings.  Transcript at pp.

214:1-:17, 216:14-:16. While Mr. Pogorilich appreciates that Chinese Drywall must come out of

homes (Transcript at p. 216:20-:23), he supports "selective remediation", notwithstanding this

Court's considered decision on the impracticality and risks of such an approach, and he has no

appreciation of the role CIH inspection and certification plays in a Chinese Drywall remediation.

Transcript at pp. 215:23-216:13.  His sole experience with Chinese drywall was with the five

homes noted above in 2012; he has not worked on Chinese drywall in anyway prior to and

subsequent to that assignment. Transcript at p. 183:3-5.

91.      Similarly, this Court earlier held that Dr. Marais is not qualified to address the Court

regarding building damage or remediation estimation methodology, but may only offer, to the

extent relevant, testimony about raw statistics.  Rec. Doc. 19092 at 4 ("There is no basis for him

to provide expert testimony regarding methods or scope of remediation or accuracy of square

footage cost data."); *see also* Transcript at pp. 274:10-276:12 (Dr. Marais conceded that he has

no relevant training or experience as an engineer or with RS Means and has no exposure to

Chinese Drywall remediation or related damages.).

92.      Thus, without knowledge or experience with the robust scientific evidence considered by

this Court and the cost of repair findings made by this court in *Germano* and *Hernandez*, both

Mr. Pogorilich and Dr. Marais supported the idea that Chinese drywall can be selectively

remediated, despite the established risks of such limited demolition. Transcript at pp. 214:14-

215:4.

93.     In addition to a lack of expertise relevant to these proceedings, the Court has reservations about the candor of Dr. Marais.

94.     Dr. Marais spends two-thirds of his professional time as a consultant/expert witness in litigation, and has been a hired expert in between 100 and 150 cases.  Transcript at p. 257:18-:20.

95.     When he testified in his deposition on May 21, 2015, Dr. Marais professed to being unaware of a prior case in which his testimony had been excluded or limited by a Court under *Daubert*.  He claims he was unaware at that time of the case of *Walden v. Chrysler*, which he first identified by way of an "errata" sheet with his deposition transcript, and claims he did not mention this case in his deposition because he was not aware it involved a *Daubert* ruling as to his testimony.  Transcript at pp. 269:17-271:5.

96.     The Court, for the sake of judicial efficiency at the time of the June 9, 2015 hearing, allowed counsel for the PSC to keep the record open in order to file into the record additional information about matters in which Dr. Marais' testimony was excluded based on *Daubert*.  Transcript at pp. 271:22-72:3.

97.     Pursuant to this opportunity, the Court is now made aware that those cases include *Walden v. Chrysler*, in which, according to a public website, a four-year old child was killed in March of 2012 because the vehicle he was a passenger in was struck from behind and burst into flames.  *See* Exhibit "A" hereto.  This same website confirms that the plaintiff filed a *Daubert* motion addressed to the testimony of Dr. Marais.  *See id.*  Moreover, the judge in that matter, on March 11, 2015, excluded the testimony of Dr. Marais because it did not address the safety question at issue in the litigation and was based on sample data that was too small/uncertain so as to be both unreliable and potentially confusing and misleading.  *See* Exhibit "B" hereto, Order of

March 11, 2015, *Walden v. Chrysler Group*, Civil Action No. 12-cv-472, Superior Court of Decatur County, State of Georgia.

98.     The Court finds it difficult to believe that, in such a recent and high-profile matter, Dr. Marais was not aware at the time of his deposition, or even at the time of the hearing, that his testimony had been excluded in *Walden* on the basis of *Daubert*.

99.     The Court also takes cognizance of two other matters now made part of this record pursuant to the Court's invitation at the hearing, *i.e.,* (1) Exhibit "C" hereto, *Tuff Racing Prods., Inc. v. American Suzuki Motor Corp.*, Case No.94-C-50392, USDC, in M.D. Ill. June 6, 1998; and (2) *Hernandez v. Crown Equipment Corp.*, 2015 WL 1064557, ___ F.Supp. ___ (MD Ga. Mar. 11, 2015). In the decisions in both cases, Dr. Marais' testimony was limited by the Court under *Daubert*. The Court again finds it difficult to believe that Dr. Marais was unaware of these cases as of the time of his deposition or at the time of the June 9, 2015 hearing.

100.    Further, Dr. Marais offers no analysis for the calculation of remediation damages, but merely challenges Mr. Inglis' method. Transcript at p. 273:13-:23.

101.    The Court will consider accordingly the testimony of Defendants' witnesses as to the cost of remediation.

102.    In sum, as first noted in this court's *Daubert* opinion, Mr. Inglis is uniquely well qualified to address Chinese Drywall cost of repair, and his opinions are "highly relevant" to the damages question at issue in this proceeding (Rec. Doc. 19092 at 5); in contrast to the qualifications of Mr. Pogorilich and Dr. Marais, who lack any meaningful experience in building engineering and Chinese Drywall scope of work and cost of repair estimates.

     **2.  Mr. Inglis Used a Formulaic Method to Reliably Determine Remediation Damages for Each Taishan Chinese Drywall Property.**

103.    Mr. Inglis determined the remediation damages for each of the properties with verified under air square footage based on the following factors:

- A uniform and well defined scope of work necessary to eliminate the harm and remediate the damage that is caused by Chinese Drywall to the interior of each property;

- An established cost on a per square foot basis (based on extensive historical evidence) for this uniform interior remediation converted to present value (2015 dollars);

- A measure of the under air space to be remediated; and

- Consideration of local factors related to building labor and materials.

Transcript at pp. 118:9-120:3, 161:25-162:9; Defendants' Exhibit 33; *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34.

104.    At the end of the process, Mr. Inglis took the localized square foot cost and multiplied that sum by the verified square footage of each property, to arrive at the remediation damages estimate for each property.  This method was in accordance with the Court's *Class* FOFCOL which provided that remediation damages should be calculated based on existing data regarding scope of work and square footage of class member homes: "*i.e.,* price per square foot to remediate X number of square feet in class members' homes = damages."  Rec. Doc. 18028 at 32, 33.

105.    Mr. Inglis' estimate applies to each of the Taishan properties, regardless of whether they have been remediated by the Taishan Property Owners in the past or are yet to be remediated. Each Taishan Property Owner is entitled to a sum that would pay for a proper, full scope of work, completed remediation of Chinese Drywall.  The fact that a Taishan Property Owner may have already self-remediated or cut corners on their remediation because of a lack of personal funds or traded-off some of the benefits of a full remediation, does not mitigate his or her eligibility for a damages based on a full remediation estimate that would make them whole.

Further, the fact that a Taishan Property Owner might already have resolved their claims in whole or in part with other defendants is a (set-off) matter for later phases of this litigation, not an impediment to a calculation of their remediation damages.

### *Uniform and Well Defined Scope of Work*

106.    As this Court earlier determined and Mr. Inglis confirms, there is a well-established and defined scope of work necessary to fully remediate a Chinese drywall property.  *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Transcript at pp. 157:8-:18; 157:19-158:5, 159:21-160:1.  Defendants' expert, Mr. Pogorilich testified that the scope of work drives a remediation estimate.  Transcript at p. 215:15-:19.

107.    The well-established scope of work for remediating a Chinese drywall property requires that the interior of the home be stripped to the studs (with all wiring, plumbing, fixtures, cabinets, HVAC systems and insulation removed), cleaned by wet-wipe and HEPA vacuum before the property is brought back to its originally intended condition.  *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Transcript at pp. 110:4-:1,130:3-:10.

108.    This scope of work was established based on long-term continuous observations of properties with Chinese Drywall (including sampling and testing), scientific investigation of Chinese drywall and the science of corrosion, practical construction experience (particularly the experience of national builders), and electric and building codes.  *Germano* FOFCOL at 27-55; *Hernandez* FOFCOL at 20-34; Transcript at pp. 106:8-110:3

109.    The scope of work, like the damage caused to a property, is the same no matter the type of building (single family home, multi-unit residence, commercial building, etc.) or the location of the property.  *Germano* FOFCOL at 62-63; Transcript at pp. 112:19-113:2,157:8-:18; 157:19-158:5, 159:21-160:1.

*An Established Per Square Foot Cost for Remediation*

110.     Mr. Inglis developed a historical remediation cost per square foot based on repeated and consistent observation regarding the scope of work and costs in five states from 2009 through 2014. Transcript at pp. 106:8-:16, 112:16-:19, 113:23-114:15; 116:21-117:3; 157:8-:18, 157:19-158:5, 163:22-:24, 165:22-166:1, 166:16-167:17.

111.     In 2010 in the *Germano* litigation, Berman & Wright established that the cost of remediating the seven *Germano* homes was $86 per square foot.  This figure was based on two competitive bids for the appropriate scope of work with a pricing cross-check developed through R.S. Means, which has been recognized by this Court (and other courts) to be a standard textbook and reference tool for building construction estimation.  *Germano* FOFCOL at 57-68; Transcript at pp. 110:14-:23, 111:7-:24.

112.     After establishing the $86 per square foot remediation figure in *Germano,* Berman & Wright continued to use the underlying scope of work and that figure as a touchstone in each of their subsequent engagements with Chinese drywall remediation.  They have found, over the following years of experience with many Chinese Drywall properties in several states, that $86 per square foot is a reliable measure of the costs on a square foot basis for a full scope remediation of Chinese Drywall properties, when adjusted for location and time.  Transcript at pp. 111:23-112:3, 113:23-114:19, 116:21-117:3, 163:22-:24, 165:22-166:1, 166:16-117:17.

113.     In contrast to the concerns raised by Defendants, $86 per square foot is not an untested or hypothetical figure.  Rather, it is a figure based on extensive historical experience and data in several states over several years and a consistent scope of work that reflects a measure of damages reinforced by multiple estimation methods, including competitive bids, and unit pricing developed by Mr. Inglis and his firm.  Transcript at pp. 127:19-128:19, 164:9-:10.  Indeed, Mr.

Inglis and his firm have used similar estimating tools, and estimated remediation costs on a per square foot basis (with and without individual inspections) in Chinese Drywall and in other contexts.  Transcript at pp. 113:23-114:19, 115:11-116:9.

114.    Defendants' expert, Mr. Pogorilich, acknowledged that an estimate can be based on an estimator's judgment with good historic data.   Transcript at p. 217:17-:24.

115.    Particularly in the context of the uniform and well-defined scope of work required for Chinese Drywall remediation, the $86 per square foot estimate is highly reliable.  As this Court noted earlier, the only part of a property impacted by reactive drywall is the *interior*, "the cost per square foot to repair does not include the replacement of the exterior shell of the house, including windows, exterior doors, structural members, exterior siding, roof trusses, the roof, concrete, and nails." *Germano* FOFCOL at 58.

116.    As Mr. Inglis noted, the task of stripping a property to the studs and rebuilding does not present the same variability in costs as does an entirely new construction (*i.e.,* building a new house).  Transcript at pp. 161:25-162:9.   Rather, with Chinese Drywall remediation, the bulk of the cost is in nearly uniform demolition of the drywall and replacement of standard building materials – differences in finish from home to home will add to little variability to the total damages estimate.  *Id.*

117.    Thus, the hypothetical problem posed at the June 9, 2015 damages hearing by Defendants' expert, Mr. Pogorilich, when he compared two equally sized properties with different (extreme) lay-outs, is not a problem at all but, rather, a routine aspect of damages estimation. Such variations, to the extent they exist in some outlier homes, present minimal cost variation in the final total remediation damages estimate.  Defendants' Exhibit 34; Transcript at pp. 195:22-196:19.

118.     In the final analysis, most of the Taishan properties are modern single family homes—
like the *Germano* homes—typical average homes where variations in trim and standard
appliances will ultimately make no significant difference in the cost of repair.  Transcript at p.
125:3-:22.  Similarly, the base cost of remediation is the same whether a property is residential or
commercial – the same basic tear out and rebuild is required in each and every property.
Transcript at pp. 157:8-158:8

119.     Inn applying the $86 per square foot baseline number in his estimate, Mr. Inglis takes
into account  the square footage of interior living space of each property, which is the key
variable driving the cost of the remediation.   In addition, in using the $86 per square foot figure
as a baseline, Mr. Inglis updated the figure to current building material and labor costs and then
made further adjustments to account for prevailing building material and labor costs in each
locality (*infra* at ¶¶ 120, 125).

120.     Using the widely recognized and Court-approved construction estimate guide, RS Means,
Mr. Inglis adjusted the $86 per square foot cost to reflect the current-day building materials and
labor costs. ($95.92 per square foot).  Transcript at p. 119:8-:11; Defendants' Exhibit 33.
Thereafter, he generated a national square foot unit price by adjusting for the local building labor
and material costs for Norfolk Virginia where all of the *Germano* homes were located ($99.92
per square foot.).  *Id.* In making both of these adjustments, Mr. Inglis then used data from RS
Means to adjust for local material and labor costs listed by zip code.  *Id.*

121.     Regarding the location adjustment, Mr. Inglis discovered an error in the original
estimations he had prepared before the June 9, 2015 damages hearing.  Although he used the
appropriate RS Means resources and appropriately cross-referenced the data by the zip code of
each property, (Transcript 120:14-123:10), the RS Means online tool he initially used,

CostWorks, provided incorrect adjustments for local building material and labor costs due to a technical error in the RS Means electronic local cost factor data.  *Id.*  The final estimations Mr. Inglis presented at trial (Plaintiffs' Exhibit 79) corrected for this error in the software.  Transcript at pp. 123:11-:16, 124:21-:25.

122.    Finally, Mr. Inglis added 6% of the remediation costs to the national square foot unit price to pay for the CIH inspection and certification for each property.  Defendants' Exhibit 33; Transcript at pp. 110:21-:23.  Based on the Court's earlier award (informed by Beazer's actual CIH costs) of approximately 6% of the cost of remediation for such services in *Germano* and $10,000 in *Hernandez* (over 13% of the costs of remediation), an award of 6% for pre- and post-remediation inspection, sampling, testing, and certification by a trained professional is conservative.  The final, national square foot unit price with CIH costs included is $105.91.  However, this is reduced by the local building costs factors in nearly every state in which Taishan class properties exist (*infra* at ¶ 125).

123.    Estimations, even when they are competitive bids (performed by a builder personally inspecting the property), are just that – estimations.  As the American Association of Professional Estimators notes in a leading treatise acknowledged by Plaintiffs and Defendants, variations even among several competitive bids can reach up to 30% with an average of 17% difference: "that if general contractors, bidding with the same documents, can't get closer than a 15%-20% spread, it is unrealistic to guarantee an estimate to be within a specific, small percentage."  Defendants' Exhibit 7 at p. 77; *see also* Defendants' Exhibit 5 (Estimating with RS Means at 495 (noting square foot bids may vary 20%)).  Indeed, the Court noted a similar disparity between the bids that were developed by the two contractors bidding on the identical project within a few days of each other and notes that an estimation of these damages using Mr.

Inglis' method would fall within the range of the competitive bids for each of the properties. Transcript at p. 161:10-:15; P1.2060-0001 (*Germano* trial exhibit).  Defendants' expert, Mr. Pogorilich, conceded that variations of over 20%, even when inspections are made, could occur. Transcript at p. 218:15-218:6.

124.    Importantly, Mr. Inglis' estimation of the remediation costs - rather than the series of individual inspections and individual mini-trial estimates for which Defendants argue - spares the Taishan Property Owners (and defendants) from the costs and further delay of such individual inspections, which may cost thousands of dollars per person and may take several months to complete – and most likely will not lead to a more precise estimate than the ones provided by Mr. Inglis.  Transcript at pp. 161:10-:15; Transcript at pp. 209:4-210:10.

### Consideration of Local Costs

125.    Having determined the national per square foot unit cost to remediate a property containing Taishan drywall, Mr. Inglis determined what the local building material and labor costs would be.  As with the earlier adjustment to create the national average baseline, Mr. Inglis used RS Means data on local building material and labor costs to determine the cost per square foot for each home based on the zip code of a the properties.  Transcript at pp. 117:20-:22, 118:5-:18.

126.    The same technical error in the CostWorks database that impacted his initial calculation of the building material and labor costs for each property was corrected in his final estimation presented at trial.  Transcript at pp. 120:12-123:16, 124:21-:25.

127.    Defendants raised concerns during Mr. Inglis' testimony that he did not consider whether each property was in an urban, suburban or rural setting.  However, the Court is satisfied that the use of RS Means data, a standard cost reference used by professionals in the field, keyed to the

zip code of each property sufficiently and reliably accounts for location factors in the individual and aggregate damages estimate.  Transcript at pp. 159:19-:24, 170:20-171:2

### *A Measure of the Under Air Square Footage*

128.    As discussed more fully above (see *supra* at ¶¶ 70-76), Mr. Inglis himself did not create or amend the list of Taishan properties.  Transcript at pp. 138:10-:21, 146:24-147:2.  The PSC provided BrownGreer with a list of properties and BrownGreer provided Mr. Inglis with square footage data for the properties on that list.   Mr. Inglis relied on BrownGreer's data as he would any other source of objective and routine data in the course of his responsibilities as an engineer. Transcript at p. 136:21-:27

129.    While the list of properties did change as a result of deletions based on legal determinations by counsel (former owners deleted) and data management corrections by BrownGreer (*e.g.* duplicates deleted) in advance of the June 9, 2015 damages hearing, this did not impact or change Mr. Inglis' damages methodology; his methodology remained unchanged and was applied consistently to each property on the lists he was provided.  Transcript at pp. 134:1-135:15, 137:13-:14, 147:23-:25.  His testimony at the hearing reflected the final list of properties—Plaintiffs' Exhibit 79.

130.    Defendants argue that the damages estimate is not reliable because there were several changes made to the estimate from the October 2014 Ronald Wright Affidavit, the Inglis April 2015 Affidavit, the Inglis May 2015 Declaration, and his final submission on June 9, 2015.  The Court acknowledges that the final damages estimate did, indeed, change as a result of 1) refinements in the data set; 2) the PSC's decision to defer proof of certain damages to later stages of these proceedings; and 3) errors in the CostWorks database that have, since, been discovered and fixed.

131.     The Court finds that none of the changes to the final damages estimate between October

2014 and June 9, 2015 impact the reliability of the Inglis methodology or the reasonableness of

the Plaintiffs' damages estimate.  None of the changes were the result of any errors made by Mr.

Inglis himself in implementing his methodology.  Rather, the majority of the modifications,

particularly to the final list of properties submitted on June 9, 2015, were the result of changes in

legal determinations by the PSC that reduced the number of properties considered at this stage of

the proceedings and have nothing to do with the reliability or accuracy of the damages

methodology at all.  The other refinements made to the data set were based on supplemental

information that became available to BrownGreer who provided objective data on class member

properties to Mr. Inglis regarding class member properties as that information became available.

Additionally, the CostWorks system, which Mr. Inglis used properly in applying location factors,

had a technical error for which Mr. Inglis was not at all responsible, and which he corrected in

his final estimate.

132.     Additionally, the modifications to the damages estimate, which actually decreased the

number of properties to be considered at this stage of proceedings, actually focused the

remediation aggregate damages claim and reduced the final aggregate damages estimate.

Defendants, thus, can hardly argue that refinements to the data set which resulted in a lower

damages estimate were somehow prejudicial.

### 3.  Mr. Inglis' Methodology Used Well Accepted Tools and Data of the Type Typically Relied on By Professionals in the Field.

133.     Mr. Inglis used several, well accepted tools of estimation in the course of his work to

develop his remediation damages estimate in this litigation. These tools included: Contractor bid

pricing; RS Means Unit pricing; and Square Footage Pricing. *See e.g.* Plaintiffs' Exhibit 27 (RS Means Estimating Handbook (3d Ed) at xix-xxii).

134.    *Contractor bid pricing* is based on an informed contractor inspecting a damaged building and putting forth an estimate ("bid") to accomplish the needed repair.  Mr. Inglis used this estimation method. *Id.*; Transcript at pp. 105:4-:8, 110:16-:21.

135.    *RS Means Unit Pricing* is based on contractor or estimator doing "quantity take offs" of units of building materials and work required to accomplish the repair and relying on RS Means unit prices for the materials and work to formulate the cost of repair estimate.  Mr. Inglis used this estimation method.  Plaintiffs' Exhibit 27 (RS Means Estimating Handbook (3d Ed.) at xxii); Transcript at pp.111:7-:24, 114:8-:9, 115:25-116:2, 128:7-:9.  Defendants' expert, Mr. Pogorilich, himself uses and acknowledge the authority of RS Means.  Transcript at pp. 216:24-:25, 217:7-:9, 218:3-:5.

136.    *Square Footage Pricing* is based on utilizing a cost of repair based on the estimator's historical work on similar projects (or RS Means data) to establish a dollars per square foot cost to be multiplied by the interior square footage to develop the cost of repair estimate.  Mr. Inglis used this estimation method. Plaintiffs' Exhibit 27 (RS Means Estimating Handbook (3d Ed.) at xx-xxi); Defendants' Exhibit 4 (How to Estimate with RS Means Data at 494-495); Transcript at p. 182:2-:3.

137.    All three methods are recognized in the relevant textbooks as acceptable methods to be used by the professional building engineer making remediation or construction estimates.  These authorities and textbooks contrast with the opinion of Mr. Pogorilich, who testified that the use of on-site estimation was the only acceptable method of estimation. Transcript at p. 209:4-:6.

138.    All three methods of developing a construction costs estimate require the judgment, experience and skill of a professional estimator to apply the available tools and data. Defendants' Exhibit 4 (How to Estimate with RS Means Data at 493, 494); Plaintiffs' Exhibit 10 (RS Means Residential Cost Data 2015 at v ("*With reasonable exercise of judgment, the figures can be used for any building work.*") (emphasis original)).  Indeed, Mr. Pogorilich acknowledged that an estimate can be based on the experienced judgment of an estimator with sufficient historic data.  Transcript at p. 217:17-:24.  There is no dispute that Mr. Inglis has robust Chinese drywall cost of repair experience and sufficient historical data (2009-2015) from several states.  Transcript at p. 116-117.

139.    Defendants argue that Mr. Inglis used an unsubstantiated methodology based on cost per square foot to the exclusion of other, more reliable methods.  The Court does not find this argument convincing.  First of all, Mr. Inglis relied on all three estimation methods, not one. Second, as the textbook excerpts provided by Defendants regarding RS Means costs estimates make explicitly clear: "The [square footage cost estimates] are based on the premise that all building types can be distilled to a cost per SF of gross floor space."  Defendants' Exhibit 5 (Estimating Building Costs with RS Means at p. 494).  Thus, Mr. Inglis properly used all three methods to establish the per square foot cost used in his estimate for each of the Taishan Properties, including appropriate historical data regarding the costs on a per square foot basis to remediate properties with Chinese Drywall.  Transcript at pp. 127:19-128:1;128:10-:25;164:9-:10.

140.    Indeed, in *Germano* (and again in *Hernandez*) after hearing extensive expert testimony on remediation damages for Chinese Drywall buildings, this Court determined the average cost per square foot to remediate the *Germano* and *Hernandez* homes, based on these very methods,

tools, and data; and that these methods, tools, and data are reliable and of the type used by professionals in the field. *Germano* FOFCOL at 57-59.

### 4. Mr. Inglis's Formulaic Damages Calculation is Based on Regular Arithmetic and Does Not Require Statistical Analysis

141.    Defendants argue that Mr. Inglis performed a statistical extrapolation as part of his damages estimate. The Court does not find that Mr. Inglis employed extrapolation or statistical sampling to develop and calculate his damages estimate.

142.    Plaintiffs assert, and this Court agrees, that Mr. Inglis used basic multiplication and addition to determine the remediation costs for each of the Taishan properties with verified under air square footage. Transcript at pp. 120:4-:8. He used the basic arithmetic that any engineer uses on a daily basis—including averaging. Transcript at p. 114:14-:16. To the extent Mr. Inglis made judgments based on his on-going and repeated observations and experience with Chinese Drywall remediation estimates, he made these judgments based on professional experience, not statistical parsing. Transcript at pp. 157:8-158:5. His work was that of a forensic investigator and an engineer, not a statistician. Transcript at pp. 157:19-158:11. Mr. Inglis explicitly testified he did not rely on statistical sampling in reaching his opinions; rather, he relied on extensive historical scope of work and cost of repair data, and his robust professional experience evaluating the cost of repair for Chinese drywall buildings. *Id.* at pp. 115-117; 156.

143.    The statistical opinion of Dr. Marais does not alter this Court's conclusion regarding the adequacy of Plaintiffs' formulaic damages calculation. Dr. Marais testified that, in forming his statistical opinion in this case, he did not rely on (nor was he qualified as an expert to opine on)[4]

---

[4] In its Order and Reasons on Motions In Limine, Rec. Doc. 19092 at p. 4, the Court granted in part and denied in part Plaintiffs' motion to limit the testimony of Dr. Marais. The Court found that there was "no basis for [Dr. Marais] to provide expert testimony regarding methods or scope

the court's Findings of Fact and Conclusions of Law in *Germano* and *Hernandez* regarding the scope of work or costs of repair to remediate Chinese drywall homes. Transcript at pp. 278:17-25; 280:6-10.  Dr. Marais also acknowledged that he did not consider in his analysis anything related to Mr. Inglis' engineering experience and historical data, including what Mr. Inglis learned from field visits to Beazer Homes and remediation activities in Louisiana, Florida, North Carolina, and New Jersey; rather, the Marais "analysis is confined to the specific verifiable and auditable numbers." *Id*. at pp. 281-82, 283:10-:15.

144.    Dr. Marais' say-so is insufficient to establish that Mr. Inglis engaged in any type of extrapolation which would lend itself to the use of statistical sampling in order for him to arrive at a reliable damages estimate.   That is because, as Mr. Inglis testified, the $86 per square foot baseline is based on his extensive historical Chinese Drywall remediation cost data, multiple estimation methods, and decades of relevant experience; <u>not</u> statistical samples.  Transcript at pp. 116-117.

### 5.  The Data from The Knauf Remediation Program and Settlement

145.    The Taishan Defendants have endeavored to make use of data available from the Knauf settlement to challenge Mr. Inglis' remediation damages estimate.

146.    There is no dispute that Mr. Inglis did not possess, consider, or rely on the Knauf data in developing his opinions.  Rather, his estimate is based on a robust historical data set of repeated and consistent observations of scope of work and cost estimates over a period of six years and his extensive professional experience developing construction scopes of work and cost estimates with Chinese Drywall homes.

---

of remediation or accuracy of square footage cost data." *Id.*  Thus, the Court limited his opinion to the field of "mathematical and statistical analysis." *Id.*

147.    Defendants argue that the variation in per square foot prices among homes remediated under the Knauf Settlement demonstrates that Mr. Inglis' method cannot reliably estimate remediation damages.   This Court is convinced that a certain degree of variability is to be expected in any group of remediation cost estimates. Transcript at pp. 125-127.  The selections of Knauf data relied upon by Defendants' expert, Mr. Pogorilich, were outlier data points, hand-picked to emphasize variability.  Transcript at p. 224:11.

148.    Similarly, Dr. Marais did not address several characteristics about the Knauf data, such as adjustments for inflation or the economies of scale underlying the Knauf program, in rendering his opinion.  Transcript at pp. 288-290; 222:13-224:15, 290.

149.    The Court finds that Mr. Inglis did rely on extensive historical scope of work and cost of repair data of the type relied on by professionals in the field; thus he is not required to rely on the Knauf Settlement data in order to make a reasonable and reliable damages estimate in this case. Furthermore, the remediation program established by Knauf differed in substantial ways from the scope of remediation set forth in *Germano* and contemplated by Mr. Inglis' method.  These differences drive down the average cost of remediation under the Knauf settlement and lead to greater variation among remediation costs from home to home. *See infra* at ¶¶ 151, 152.

150.    The Knauf remediation program was a compromise between the parties.  A mark of this compromise – to bring relief to Knauf homeowners sooner than later - were certain deviations from the scope of remediation set forth in *Germano*.  While Defendants' experts were ignorant of the differences, these differences are significant.  *Id.*

151.    The Knauf Settlement remediation program allowed for efforts to salvage a wide range of building materials whenever possible, including plumbing, appliances, cabinets, counters, fixtures, doors, trim, and hardwood floors, and leaving in place certain drywall and backers;

whereas, Inglis required replacement.  *See* Rec. Doc. 16407 (Third Settlement Agreement Regarding Claims Against the Knauf Defendants, Exhibit F – Remediation Protocol, Section I, Subsections A, B, I and J).  Moreover, the CIH inspection, sampling, testing and certification costs were paid separately from the remediation payments reflected in the BrownGreer Knauf Settlement data.  Transcript at p. 61:1-:13.

152.    The Knauf Settlement data also includes other features that make comparison here inappropriate.  First, the Knauf data treats the payments for mixed homes (that is homes with less than 90% Knauf drywall) differently than homes with 100% Knauf drywall, with Knauf payments limited only to its share of the drywall in a property.  *See* Rec. Doc 16407, Third Settlement Agreement Regarding Claims Against the Knauf Defendants, Section 4.3.4; Transcript at p. 30:14-:22.  Second, the remediation program is run by a single general contractor, Moss Associates, and is a massive project which necessarily enjoys economies of scale.  *See supra* at ¶ 80; *see e.g.* Transcript at p. 61:1-:13.  Such facts drive down the cost of Knauf remediations in a manner that Taishan Property Owners, who must individually contract with a remediation construction company, will not enjoy.

153.    However, the Knauf Settlement costs data, even if not directly comparable to the Inglis damages estimates because of the different parameters discussed above, still affirm the fundamental point that there are real and measurable remediation damages suffered by the Taishan Property Owners that can be estimated on an aggregate basis.

154.    For example, Defendants' expert, Dr. Marais, readily made a calculation based on the Knauf settlement data allowing for a comparison of the Inglis estimate to (some of ) the costs actually paid by Knauf (*i.e.,* not including the 6% CIH costs). The Marais calculation resulted in a figure of over $386,000,000 – which Marais argued showed that the Inglis estimate of

approximately $497,000,000 was too high. Defendants' Ex. 21.  Although Dr. Marais would not

admit this fact, his calculation also showed that the remediation damages in this case could

readily be determined in the form of aggregate damages  ($386,000,000), or a dollars per square

foot figure ($65 per square foot). *Id.*   Thus, the Defendants' experts' use of the Knauf Settlement

data in the BrownGreer spreadsheet provides support for the feasibility of calculating aggregate

damages in this case and shows that those aggregate damages are at least $386,000,000.

Plaintiffs' Exhibit 30 and Transcript at p. 95:13-:21; *see also* Defendants' Exhibit 21.

155.    Thus, in conclusion, the Court finds that Mr. Inglis employed a formulaic method of

calculating damages utilizing well recognized and accepted methods of construction damages

estimation (contractor bids, RS Means Unit Pricing, and Square Foot Pricing), refined by local

building costs and present value factors, and informed by robust historical data regarding the

scope of work and costs of repair, in addition to substantial professional experience.  This

formulaic remediation damages estimate employs the types of methods and data used by

professionals in the field and is highly reliable.

## III.    CONCLUSIONS OF LAW

### A.  The Nature of these Proceedings Under Rule 55(b)

156.    This Court has already found the Taishan defendants in default pursuant to Fed. R. Civ.

P. 55(a).  This Court has, also, already determined in its *Class* FOFCOL that the defendants'

liability has been conceded by their default.  *See Class* FOFCOL, 2014 WL 4809520, at *15; *see*

*also See Myers v. Powell,* No. 12-2181, 2013 WL 3832414, at *4 (E.D. La. July 23, 2013) (citing

*U.S. ex rel. M–CO Const., Inc. v. Shipco Gen., Inc.,* 814 F.2d 1011, 1014 (5th Cir. 1987)) ("a

default judgment is a final judgment on the merits that conclusively establishes the defendant's

liability."); *accord Nishimatsu Const. Co. v. Houston Nat. Bank,* 515 F.2d 1200, 1206 (5th Cir.

1975) ("[a]ttempts by a defendant to escape the effects of his default should be strictly circumscribed; he should not be given the opportunity to litigate what has already been considered admitted in law.").

157.    Thus, as a result of Defendants' default, the well-pleaded allegations of fact in Plaintiffs' complaints (like all the prior findings of fact discussed at length above) have been deemed admitted and issues regarding, *inter alia*, the defectiveness and corrosive effect of Chinese drywall were resolved in favor of Class Members.

158.    Accepting the well-pleaded allegations in Plaintiffs' complaints as true, the issue before the Court is only the amount of damages which should be awarded to the Class.  Since defendants are in default and this court has already entered a liability judgment, Rule 55(b)(2) governs the procedure for determining the amount of damages.

159.    Pursuant to Rule 55(b)(2) and well established precedent in this Circuit, the Court may conduct hearings to determine the amount of damages. *James v. Frame*, 6 F.3d 307 (5th Cir. 1993).  Although the rule does not mandate such a hearing, the Court determined that such hearings are appropriate under the circumstances to allow both sides to present the court with the best evidence to determine a damages calculation. *Id.* at 311 (noting that, while an evidentiary hearing is not required, the judge has "wide latitude in determining whether such a hearing will be beneficial").

160.    In determining damages under Rule 55(b), the Court may rely on detailed affidavits or documentary evidence, supplemented by the judge's personal knowledge (which is extensive in this case, including two trials and the Court personally supervising discovery in China) , to evaluate the proposed sum. *Richardson v. Salvation Army, S. Territory, USA*, 161 F.3d 7 (5th Cir. 1998) (citing *James v. Frame,* 6 F.3d 307, 310 (5th Cir.1993)).

161.    The June 9, 2015 Damages Hearing was the first hearing of what will be multiple

hearings (or "phases") that the Court will hold in order to assess the full amount of damages to

class members.  On June 9, 2015, the Court considered only remediation damages for current

owners.  Other damages, such as alternative living expenses, will be considered at later hearings.

162.    The Court has divided the hearings into phases both because Plaintiffs have proposed

such a structure to best meet the needs of the Taishan Property Owners[5] and because the Court

recognizes that it is the most fair and efficient way to assess damages in this complex case.  As

discussed further below, remediation damages can be calculated on an aggregated formulaic

basis and, thus, it is in the best interests of all parties to consider remediation damages together

in the first stage of the proceedings.

163.    It is well established in this Circuit that the court may divide hearings regarding damages

into phases, particularly in complex cases where, as here, such a division would serve judicial

efficiency by separating common issues from individual ones. *See, e.g., In re Deepwater

Horizon*, 739 F.3d 790, 816 (5th Cir.) *cert. denied sub nom. BP Exploration & Prod. Inc. v. Lake

Eugenie Land & Dev., Inc.,* 135 S. Ct. 754, 190 L. Ed. 2d 641 (2014) ("[P]redominance may be

ensured in a mass accident case when a district court performs a sufficiently 'rigorous analysis'

of the means by which common and individual issues will be divided and tried. In many circuits,

this has been accomplished by means of multi-phase trials under Rule 23(c)(4), which permits

district courts to limit class treatment to 'particular issues' and reserve other issues for individual

determination."); *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1023 (5th Cir. 1992) *on reh'g,* 53 F.3d

663 (5th Cir. 1994) (affirming the district court's four stage trial plan, which included three

---

[5] Plaintiffs informed both the Court and Defendants of their intention to streamline the June 9, 2015 damages hearing to "focus solely on calculating class members' actual damages for repair and remediation" as the "soundest way to proceed on an aggregated formulaic basis".  *See* Reply Brief Assessment of Damages, Rec. Doc. 18958 at p. 2; fn. 1; p. 22).

damages phases and allowed the district court to adjudicate common class issues in the first phase and later adjudicate individualized issues in later phases, despite due process challenge); *Turner v. Murphy Oil USA, Inc.,* 234 F.R.D. 597, 606 (E.D. La. 2006) (developing a three-phase trial plan which separated common issues of liability from more individualized compensatory damages issues and noting that the Fifth Circuit "has repeatedly upheld the decisions of district courts to bifurcate class action trials into liability and damages phases").

164.     Further, this Court finds that the Class Notice and Supplemental Class Notice issued on September 26, 2014 and December 30, 2014 (*see* Rec. Doc. 18231-1 at 4) were sufficient under Rules 23(c)(2) and 23(d)(2) to inform class members about the nature of the litigation, the class claims, and their legal rights.  *See* Order and Reasons Denying Motion to Modify the Scheduling Order, Rec. Doc. 18998 at 5 citing *Turner v. Murphy Oil USA*, *Inc.,* 2006 WL 286009, *2 (E.D. La. Feb. 6, 2006).   Although Class Plaintiffs made certain changes to their damages model leading up to the hearing on June 9, 2015, including the decision to defer presenting evidence regarding alternative living expenses to a later hearing, this procedural change did not alter the sufficiency of the class notices. (Rec. Doc. 18998 at 4-5).  The Class definition has remained the same and there is no precedent to suggest that changes to a damages model require supplemental class notice. *Id.* at 5.

165.     Additionally, pursuant to Rule 55(b)(2), in the default judgment context, the Court has wide discretion to hold multiple "hearings" and may look to the complete record in a case to determine the proper measure of damages. *James v. Frame*, 6 F.3d 307, 311 (5th Cir. 1993).  The Courts' multi-phased plan divides Rule 55(b)(2) damages hearings along lines that have been well-established by courts managing complex cases in this circuit for decades. *See* supra ¶ 163.

166.    Thus the Court's plan to divide assessment of Class damages comports with both due process and well-established judicial discretion under Rule 55(b)(2) to manage complex cases in this Circuit.

### B.  Plaintiffs Have Established Class-Wide Remediation Damages of $497,180,467

167.    District courts are encouraged to "devise imaginative solutions to problems created by the presence in a class action of individual damages issues." *Pella Corp. v. Saltzman,* 606 F.3d 391, 396 (7th Cir. 2014); *see also Byrd v. Aaron's Inc*., ___ F.3d ___, 2015 WL 1727613, *14 (3d Cir. Apr. 16, 2015) (Rendell, J., concurring) (when damages are determined in the aggregate, issues of proper allocation may be addressed during claims processing).

168.    Plaintiffs have presented a reasonable and reliable method of calculating remediation damages on a class-wide basis and have accommodated individual class damage issues by shifting the individual damage components to subsequent adjudicative phases.

169.    At the June 9, 2015 hearing, Plaintiffs established the measure of remediation damages of each of the 2,686 Taishan properties with verified under air square footage individually and in the aggregate as $487,180,467.  Plaintiffs' Exhibit 79.  This procedure is superior to the thousands of individual proceedings that would result if Defendants' proposal for property by property inspection and estimation were accepted – further burdening the Taishan Property Owners and further delaying the benefits they can hope to receive from this litigation. Courts that have addressed such invitations to abandon class proceedings for cost-intensive and inefficient procedures have rejected them. *See, e.g., In re: Antibiotic Antitrust Actions*, 333 F.Supp. 278, 289 (S.D.N.Y. 1971) ("[T]he court cannot conclude that the defendants are constitutionally entitled to compel a parade of individual plaintiffs to establish damages.");

*Phila. Elec. Co. v. Anaconda Am. Brass Co.,* 43 F.R.D. 452, 463 (E.D. Pa. 1968) ("I see no necessity for encumbering the judicial process with 25 lawsuits, if one will do.").

## 1. Plaintiffs Use an Appropriate Formula To Calculate Remediation Damages

170.    Mr. Inglis.'s methodology for calculating remediation damages is based on a formula that is applied to every individual home based on three factors: (1) scope of work, (2) historical unit costs and bid costs converted to square footage costs for each home, and (3) localization building cost factors. Individual damages are calculated for each home and set forth in Plaintiffs' Exhibit 79.  The damages calculation is not a "lump sum award," an "extrapolation," or a "generalized proof."  Rather, the damages calculation is a house by house damages determination, based on a formula.

171.    This Court has already ruled that damages may be calculated in a formulaic manner. *Class* FOFCOL*,* 2014 WL 4809520 at *4 ("[T]he average cost of repairing class members' homes is subject to calculation on a formulaic, square footage basis."). This reasoning is entirely consistent with Fifth Circuit jurisprudence which approves of a "suitable formula for calculation of damages" in the class context. *See Corley v. Orangefield Indep. Sch. Dist.*, 152 F.App'x. 350, 355 (5th Cir. 2005), *citing Bell Atlantic Corp. v. AT&T Corp.*, 339 F.3d 294, 306 (5th Cir. 2006); *see also Deepwater Horizon*, 739 F.3d at 815 (rejecting BP's argument that *Comcast Corp. v. Behrend,* 133 S.Ct. 1426 (2013), "precludes certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for class-wide measurement.") .

172.    The Defendants elected by default not to appear or challenge the *Class* FOFCOL.

173.    The calculation of class damages by a formulaic method is an acceptable class damages determination methodology which has been accepted by courts for decades.  *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *16 (D. Conn. Nov. 29, 2011) (citing *Klay*

*v. Humana, Inc.*, 382 F.3d 1241, 1259-60 (11th Cir. 2004) (in ERISA and RICO suit,

"[p]articularly where damages can be computed according to some formula, statistical analysis,

or other easy or essentially mechanical methods, the fact that damages must be calculated on an

individual basis is no impediment to class certification")). Calculating damages "using standard

methodology premised on data common to all class members . . . is sufficiently reliable to

establish that damages are susceptible of measurement across the entire class." *Rai v. Santa*

*Clara Valley Transp. Auth.*, No. 5:12-CV-004344-PSG, 2015 WL 860761, at *15 (N.D. Cal.

Feb. 24, 2015) (internal quotation marks omitted) (finding in employee compensation case that

expert's methodology met *Comcast*'s requirements).

174.     Each class member suffered the same kind of injury, and the only individualized

determination required – the amount it will cost to remediate the properties -- can be calculated

using a formula to estimate each class member's damages.  It is, therefore, unnecessary to hold

individual mini-trials to determine remediation damages in this case.  *See Goldenberg v. Indel,*

*Inc.*, 2012 WL 3780555 at *13-17 (D.N.J. Aug. 30, 2012) (explaining in ERISA case how a

formula based on class members' ages can be applied to determine classwide damages); *see also*

*In re Polyurethane Foam Antitrust Litig.*, 2014 WL 6461355 at *44 (N.D.Ohio Nov. 17, 2014)

(permitting approximation of aggregate damages proven as a matter of just and reasonable

inference in antitrust class action, where damages were "susceptible to computation using a

'mathematical or formulaic' calculation"); *In re Pharm. Indus. Average Wholesale Price Litig.,*

582 F.3d at 197 ("The use of aggregate damages calculations is well established in federal court

and implied by the very existence of the class action mechanism itself."); *Rai v. Santa Clara*

*Valley Transp. Auth.,* No. 5:12-CV-004344-PSG, 2015 WL 860761, at *15 (N.D. Cal. Feb. 24,

2015) (approving formulaic damages methodology in an employment law case); *see also Cason-*

*Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 544 (E.D. Mich. 2013) (approving class certification based on damages expert's formula without requiring statistical sampling); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009) (noting that the use of widely accepted formulaic methodology to estimate damages is proper).

175.    The fact that the each Taishan Property Owner suffered the same harm and the same nature of damage puts this case in contrast to cases where each plaintiff suffers a distinctly different *kind* of individualized wrong. *See, e.g.*, *Corley v. Orangefield Indep. Sch. Dist.*, 152 F.App'x. 350, 355 (5th Cir. 2005) (finding aggregate damages to be inappropriate because "injury to the landowners varies in substantial ways"—differences in the prices telecommunications companies would pay for access to different parcels of land based on desirability of location required individualized inquiries); *Robertson v. Monsanto Co.*, 287 F. App'x 354, 362 (5th Cir. 2008) (finding aggregate damages inappropriate where "each individual plaintiff suffered different alleged periods and magnitudes of exposure and suffered different alleged physical symptoms as a result"); *In re Deepwater Horizon*, 739 F.3d at 815 (affirming certification of settlement class but finding aggregate damages inappropriate where a formula for classwide measurement of damages could not be developed due to need for individualized inquiry into the extent to which an oil spill caused decline in business); *Kemp v. Metabolife Int'l, Inc.*, No. CIV. 00-3513, 2002 WL 113894, at *3 (E.D. La. Jan. 25, 2002) (finding aggregate damages inappropriate in products liability case where individual issues included knowledge and expertise of the user, degree to which each was exposed to the product, different types of medical conditions caused, and degree to which diseases were caused by other factors).

176.    The class remediation damages here do not present significant individualized issues, like physical ailments and loss of business profits. *Id.* Rather, the only variance is in the amount

required to pay for each remediation, which can be readily determined using the formulaic methodology presented by Mr. Inglis.

## 2. Aggregate Award of Class Damages Is Appropriate

177. Contrary to the position taken by Defendants, the Fifth Circuit does not prohibit aggregate tort damages based on formulas. *See, e.g., Cimino v. Raymark Indus., Inc.,* 151 F.3d 297, 321 (5th Cir. 1998); *In re Fibreboard Corp.,* 893 F.2d 706, 711 (5th Cir. 1990); *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 355-54 (5th Cir. 2005). Rather, the Fifth Circuit has affirmatively articulated, on multiple occasions, the standard which allows for proof of formulaic class-wide damages under particular circumstances. *See, e.g., Corley.* (recognizing that damages which are "capable of computation by means of objective standards" are permissible so long as there exists a "suitable formula for calculation of damages"); *Bell Atlantic Corp. v. AT&T Corp.,* 339 F.3d 294, 306 (5th Cir. 2003) ("[R]elatively few motions to certify a class fail because of disparities in the damages suffered by the class members"). This standard is readily met by the Inglis damages estimate, which is a formulaic calculation of class wide damages based on objective standards and verifiable data for each property, and does not use or require extrapolation.

178. In a class action trial, plaintiffs may present evidence of damages for the entire class in the aggregate. As the First Circuit in *In re: Pharms. Indus. Average Wholesale Price Litig.*, 582 F.3d 156, 197-98 (1st Cir. 2009), opined:

> Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages.... Challenges that such aggregate proof affects substantive law and otherwise violates the defendants' due process or jury trial rights to contest each member's claim individually, will not withstand analysis....Just as an adverse decision against the class in the defendants' favor will be binding against the entire class in the aggregate without any rights of individual class members to litigate the common issues individually, so, too, an aggregate monetary liability award for the class will be binding on the defendant without offending due process.

179.    It is entirely appropriate in a class action trial to award a defendant's total liability to the class even without identifying those entitled to the award. *See Hilao v. Estate of Marcos*, 103 F.3d 767, 786 (9th Cir. 1996) (noting that a defendant's interest is "only in the total amount of damages for which it will be liable," not "the identities of those receiving damage awards"); *see also Forcellati v. Highlands, Inc.*, 2014 WL 1410264 at *6 (C.D. Cal. Apr. 9, 2014) ("Aggregate computation of class monetary relief is lawful and proper.").

180.    While such aggregate determination of damages is a standard practice in antitrust litigation, such damages awards are by no means limited to antitrust cases.  Aggregate damage models have been found to be appropriate in products liability cases, *e.g. Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 39-42 (Pa. 2011), trespass and property damage cases, *Meighan v. U.S. Sprint Communications Co.,* 924 S.W. 632, 638 (Tenn. 1996), and the Fifth Circuit has endorsed the concept in other contexts where the class plaintiffs could present damages in a formulaic manner. *See generally Deepwater Horizon*, 739 F.3d at 815. And, importantly, *this Court agrees based on its extensive personal experience with this litigation and the factual and expert evidence* that damages may be calculated formulaically.  (Rec. Doc. 18028 at 32, 33)

181.    So long as the aggregate damage calculation is based on a reasonable and reliable methodology and the individual damage calculations that follow can be made according to a common methodology or formula, aggregate proof of damages is proper. *See In re: Nexium Antitrust Litig.*, 296 F.R.D. 47, 58 (D.Mass.2013) ("Aggregate computation of class monetary relief is lawful and proper. Courts have not required absolute precision as to damages[.]"); *In re: NASDAQ Market Makers Antitrust Litig.*, 169 F.R.D. 493, 521 (S.D.N.Y. 1996) ("Once a measure of damages is established, it can be applied to the aggregate trading volumes in Class Securities to determine aggregate damages for the Class as a whole, or to individual transactions

to determine damages for individual Class members."); *In re Neurontin Antitrust Litig.,* 2011
WL 286118 at *10 (D.N.J. Jan. 25, 2011) ("[T]he use of an aggregate approach to measure class-
wide damages may be appropriate.") (citing authorities); *In re: Cardizem CD Antitrust Litig.*,
200 F.R.D. 297, 324 (E.D.Mich. 2001) ("Moreover, despite Defendants' claims to the contrary,
the use of an aggregate approach to measure class-wide damage is appropriate."); *Allied
Orthopaedic Appliances, Inc. v. Tyco Healthcare Group, LP*, 247 F.R.D. 156, 175 (C.D.Cal.
2007) ("[T]he plaintiffs may prove class-wide damages in the same manner as class-wide
impact[.]"); *In re Static Random Access Antitrust Litig.*, 2008 WL 4447592, *6 (N.D. Cal. 2008)
("Plaintiff has proffered methods for calculating aggregate damages for overcharges paid by
class members, based on average market prices."); *see also* William B. Rubenstein *et al.*,
*Newberg on Class Actions*, § 12:2 (5th ed. 2014). So long as there is a common formula to
provide individual damages to each class member, certifying a class for aggregate damages is
appropriate. *See In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014)*; In re: Pharms.
Indus. Average Wholesale Price Litig.*, 582 F.3d at 197-98 ("The use of aggregate damages
calculations is well established in federal court and implied by the very existence of the class
action mechanism itself.").

182.    *In re Chevron U.S.A., Inc.*, 109 F.3d 1016 (5th Cir. 1997) is not to the contrary.  Chinese
drywall damages claims, including those against the Taishan Defendants, have been fully
litigated.  Manufacturer liability has been established with proof that Chinese Drywall is
defective, not merely through default.  Measures of damages, particularly the proper scope of
remediation, have been repeatedly established, and not only in a single bellwether trial.  This
Court has tried this case two times, supervised discovery in China, and has boiled down the
scope of work for remediation to a uniform remedy for the interiors of homes on two separate

55

occasions after hearing extensive expert damages testimony.  The class members here all have the same problem (personal injury is not at issue), that requires the same remedy. All that is to be determined now is the measure of remediation damages to which the Taishan Property Owners are entitled.  Given the mature stage of this litigation, *Chevron* is inapposite. *Chevron* concerned whether bellwether trials (and extrapolation from the results of those individual trials) regarding the issues of liability and causation satisfied due process.  The court in *Chevron* did not opine on the issue of damages and did not evaluate expert testimony on class action damages.

### 3. Damages Calculations Need Not Be Exact

183.    Defendants argue that Mr. Inglis' calculation of damages is insufficiently precise. However, $86 per square foot is a reliable benchmark estimate for the costs of repair. Undoubtedly, this estimate will be accurate for most who have an average size home with average amenities; for some, the estimate will be high and; for some, it will be low. That is the nature of *any damages estimate*, for a class or an individual.  *See, e.g., Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563, (1931) (ruling that damages estimates are appropriate even where "they cannot be measured with . . . exactness and precision . . . ."); *In re Park Cent. Global Litig.*, 3:09-cv-765-M, 2014 WL 4261950, at *13 (N.D. Tex. Aug. 25, 2014) (noting that "damage calculations need not be exact," so long as "any model supporting a plaintiff's damages case"  is "consistent with its liability case and damages [are] be capable of determination on a class-wide basis.") (internal citations omitted); *In re Electronic Books*, 2014 WL 1282293, at *26 (S.D.N.Y. Mar. 28, 2014) (holding that damages calculations need not be exact).

184.    Moreover, as this is proceeding as a class action, "[o]nce liability is established . . . a plaintiff's proof of damages is evaluated under a more lenient standard." *In re Scrap Metal*

*Antitrust Litig.*, 527 F.3d 517, 533 (6th Cir. 2008) (*citing* J. *Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 567 (1981)). Given the inherent difficulty of proving damages, courts do not require that damages be measured with certainty, but rather that they be demonstrated as "a matter of just and reasonable inference." *Bigelow v. RKO Radio Pictures*, 327 U.S. 251, 258 (1946); *Story Parchment Co. v. Paterson Parchment Paper* Co., 282 U.S. 555, 563 (1931)). Where the fact of damages is proven, as it is here, by default, the computation of actual damages may suffer from minor imperfections without incident and still be permitted. *Scrap Metal*, 527 F.3d at 533. *See also AAA Tire Finishing Equip. & Supplies, Inc. v. Tire Cosmotology, Inc.*, 530 F.Supp. 1530, 1532 (E.D.La. 1984) ("Damage approximation is appropriate.").

185.    Further, Mr. Inglis' estimated average remediation cost is the foundation for later claims processing, allowing many of the issues that Defendants have identified (such as off-sets or drywall identification) to be later verified and resolved.  *See S. States Coop., Inc. v. Melick Aquafeeds, Inc.*, 701 F. Supp. 2d 1348, 1361 (M.D. Ga. 2010) aff'd sub nom. *S. States Co-op., Inc. v. Melick Aquafeeds, Inc.*, 476 F. App'x 185 (11th Cir. 2012).

186.    Ultimately, Defendants are seeking to avoid accountability by arguing for the interests of the very persons they abandoned when they refused to come to the Court to answer the claims against them.  "The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created." *Bigelow*, 327 U.S. at 265. It is therefore the case that, even where the amount of damages cannot be proven with certainty, Plaintiffs are entitled to recover for the wrongs they suffered. *Id.* at 265-66 ("The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proven invasion of the plaintiff's rights.") (internal quotation marks omitted).

187.     Given the *uniform* scope of the repair for each class member, the *limited* nature of repair (interiors only), and the use of well-established mid-points as the baseline for each damages estimate before considering individualized square footage and local building cost factors, the degree of variability of square foot costs for remediation of these homes is typical of what is expected in the discipline of damages estimation, and is not significant when viewed in relation to the total costs of repair.  Even the defendants' suggestion – house by house inspection by a contractor—is not likely to lead to a more precise estimate for class damages, given the acknowledged variation of at least 17%  in that method of estimation recognized by the estimation textbook  authorities.  *See supra* at ¶ 123.

### 4.  Mr. Inglis' Method Is Based on Established Tools, Experience and Regular Addition and Multiplication, Not Statistical Extrapolation

188.     Defendants argue that Mr. Inglis's method of calculating remediation damages is based on an invalid statistical sample. Here, Plaintiffs' expert relied on multi-disciplinary corrosion science (as discussed at length in the Court's earlier FOFCOLs in *Germano* and *Hernandez,* particularly when defining the scope of work for remediation), in conjunction with bid pricing, unit pricing, square footage pricing, and localized construction costs factors, to establish the *damages formula*; he did not rely on statistical sampling.  This formula, built on the relevant science and historical cost data, is applied to each individual building in the class to determine individual awards for each class member.  The formula then utilizes basic addition and multiplication, along with simple averaging skills a building engineer of Mr. Inglis' experience can readily carry out.

189.     As discussed above, Mr. Inglis used several well-established estimation methods in arriving at the base $86 per square foot measure, and then used RS Means to adjust this sum to

current building material and labor costs and then to reflect the local building and material costs for each Taishan property.  RS Means provides reliable data for such a calculation.  *Germano FOFCOL* at p. 58 ("RS Means is a publication which compiles data on a national basis for cost to repair and replace building components."); *See, e.g., Gulbankian v. MW Mfrs., Inc.,* 2014 WL 7384075, at *5 (D. Mass. Dec. 29, 2014) (noting that use of RS Means "as the starting point for calculating damages is widespread and accepted" and approving settlement that used RS Means in calculating damages for class of thousands of homeowners to repair defective windows over class member objections to the damages methodology); *In re CertainTeed Fiber Cement Siding Litig.,* 303 F.R.D. 199, 205 (E.D. Pa. 2014) (approving class action settlement which calculated amount of settlement payments for class of thousands of claimants with damaged siding using "RS Means cost estimator and noting that RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country . . . It has been used in the construction/building industry for almost 40 years."); *In re Louisiana‑Pac. Inner‑Seal Siding Litig.,* 2004 WL 1246050, at *6 (D. Or. May 24, 2004) (construction class action settlement used "an independent court-approved supplier of construction cost information, the R.S. Means Company, Inc." to calculate location-specific per square foot compensation rate).

190.    Courts frequently recognize that formulaic damages methodologies like the Inglis methodology do not rely on true statistical sampling requiring the opinion of a statistician.  *See, e.g., In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *16 (D. Conn. Nov. 29, 2011); *Rai v. Santa Clara Valley Transp. Auth.*, No. 5:12-CV-004344-PSG, 2015 WL 860761, at *15 (N.D. Cal. Feb. 24, 2015); *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 45 F. Supp. 3d 724, 735-36 (N.D. Ohio 2014) (rejecting defendant's arguments that the

methodology of plaintiff's engineering expert was unreliable because it was not representative, particularly where the engineer had "called on *his own experience in washer design for Whirlpool* to support his conclusion that the design of the Duet machines led to a propensity to develop mold"); *see also Cason-Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 544 (E.D. Mich. 2013) (approving class certification based on damages expert's formula without requiring statistical sampling); *S. States Coop., Inc. v. Melick Aquafeeds, Inc.*, 701 F. Supp. 2d 1348, 1361 (M.D. Ga. 2010) *aff'd sub nom. S. States Co-op., Inc. v. Melick Aquafeeds, Inc.*, 476 F. App'x 185 (11th Cir. 2012) (fishery expert can use "simple arithmetic and algebra" to support his opinion); *accord In re Domestic Air Transp. Antitrust Litig.*, 137 F.R.D. 677, 691-693 (N.D. Ga. 1991) ("The fact that the methodologies contain some form of averaging does not automatically render them methods of fluid recovery. On the contrary, Dr. Beyer's economic analysis evidences common impact and permits, with reasonable certainty, formulaic calculation of damages.").

191.    Formulaic class damages estimates, particularly those based on engineering, are by nature mathematical and do not require a statistical foundation.  *See In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 350 (E.D. Mich. 2001) (a formulaic calculation based on computer records and averaging is proper under Rule 23); *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 165 (S.D. Ind. 2009) (noting that the use of widely accepted formulaic methodology to estimate damages is proper).

192.    *Corley v. Orangefield Indep. Sch. Dist.*, 152 F. App'x 350, 354 (5th Cir. 2005) does not demand a different result.  In *Corley*, landowners in Texas, Louisiana and Mississippi contended that Entergy's fiber optic cables installed in its existing network were violating easements and rights-of-way obtained to transmit electricity and internal communications.  In its *per curiam*

opinion, the appellate panel concluded that the district court did not abuse its discretion by finding that individualized damage calculations would defeat certification where the plaintiffs provided "no evidentiary support" to disprove random variation in easement valuation. *Id*. at 354. That is not the case here because Plaintiffs have produced evidence of estimates based on contractor bids and RS Means data converted to dollars per square foot which constitutes a well-established methodology to develop remediation costs. *See Germano FOFCOL.*, 706 F.Supp.2d 655, 688 (E.D.La. 2010) ("RS Means is a publication which compiles data on a national basis for cost to repair and replace building components."); *Hernandez FOFCOL,* 2010 WL 1710434, *19 (E.D.La. April 27, 2010) (approving of RS Means as an acceptable source for calculating cost estimates for remediation). Further, Plaintiffs' expert, Mr. Inglis, has opined that aggregated class remediation damages may be calculated through use of his universal scope of work (developed over time and based on repeated continuous observations, expert submissions, federal and state guidelines, and orders of this Court) which was adjusted to present value using RS Means data and even further refined by applying zip code specific RS Means cost data to the available square footage data. (Rec. Doc. 18958-52 at ¶52). In light of the present record of proof of damages employing RS Means, *Corley* would appear to support class certification since a suitable formula for calculation of damages exists. *Corley*, 152 F. App'x at 355. The variances of "value, character and location of the property" that gave the *Corley* panel pause, *id..*, are of no moment here since a mechanical formula that provides a reliable estimate of the costs of remediating the interiors of CDW damaged buildings and accounts for such  significant differences can and will be applied.

193.    Rather, engineers like Mr. Inglis routinely *and reliably* average numbers and develop estimates based on the tools of the profession, including their experience. *See S. States Coop.,*

*Inc. v. Melick Aquafeeds, Inc.*, 701 F. Supp. 2d 1348, 1361 (M.D. Ga. 2010) aff'd sub nom. *S. States Co-op., Inc. v. Melick Aquafeeds, Inc.*, 476 F. App'x 185 (11th Cir. 2012) (finding the expert's opinion, which utilized basic mathematical principles to arrive at an average, was derived from a reliable methodology); *Schwegmann Family Trust No. 2 v. Circuit City Stores, Inc.*, 2008 WL 2795136, at *3- 4 (E.D. La. July 16, 2008) (approving as reliable a square foot cost of remediation based on the experience of the expert).

194.    When examining the basis for expert testimony about cost estimation of damaged buildings, this Court has routinely held that cost estimation is also properly based on the experience of the expert applying the established methods of cost estimation to the facts presented to him. *See, e.g. Voth v. State Farm Fire & Cas. Ins. Co.*, 2009 WL 411463, at *5 (E.D. La. Feb. 16, 2009) ("Although Mr. Velez did not prepare his estimate by pricing every item of material, labor, and overhead necessary for reconstructing plaintiff's home, his opinion is nonetheless reliable for purposes of *Daubert.* Mr. Velez's opinion is based on his discussion with Ms. Voth, review of State Farm's estimate which provides details of the reconstruction, and his considerable experience in construction.  Considering Mr. Velez's experience in construction, estimating the cost of reconstruction of a single family dwelling, even one of a style which he had not previously constructed, would not be difficult."); *Denley v. Hartford Ins. Co. of Midwest*, 2008 WL 2951926, at *3-4 (E.D. La. July 29, 2008) ("Wirth is a licensed contractor, was a lead home inspector for HUD, has built more than 150 homes, and is certified in Xactimate [like RS Means], the tool used to generate the damage estimates. . . . Wirth's methodology for determining damage was using the Xactimate [like RS Means] tool, which Wirth is certified to use. This tool is widely recognized and used in the insurance industry to estimate damage. . . . Using the Xactimate [like RS Means] as an estimate tool, this methodology meets the soundness

criteria."); *see also In re CertainTeed Fiber Cement Siding Litig.,* 303 F.R.D. 199, 205 (E.D. Pa. 2014) (approving class action settlement which calculated amount of settlement payments for class of thousands of claimants with damaged siding using "RS Means cost estimator and noting that RS Means is a cost estimator that accounts for regional differences in labor and materials costs by using zip codes to factor in the specific costs of nearly any type of construction in a particular area of the country . . . It has been used in the construction/building industry for almost 40 years."); *In re Louisiana–Pac. Inner–Seal Siding Litig.,* 2004 WL 1246050, at *6 (D. Or. May 24, 2004) (construction class action settlement used "an independent court-approved supplier of construction cost information, the R.S. Means Company, Inc." to calculate location-specific per square foot compensation rate).

195.    As set forth above, the experience of Mr. Inglis and his firm, Berman & Wright, is nearly without peer when it comes to the remediation of Chinese drywall homes, and the forensic investigation they completed to estimate the remediation costs in this litigation are reliable and based on well-established methods.

### 5. Mr. Inglis Appropriately Relied on the Property Data Provided by BrownGreer

196.    Mr. Inglis was not required to independently check the square footage of each property in order to rely on the BrownGreer data.  *See Bryan v. John Bean Div. of FMC Corp.,* 566 F.2d 541, 546 (5th Cir. 1978) ("Sometimes the evidence can be relied upon because it constitutes a routine and customary record of a business concern, [ ] or because an uninterested, expert third party prepared the report, [ ] or because experts. . . customarily rely upon third party reports from other experts . . . in whom the testifying expert places his trust.") (internal citations omitted); *Gussack Realty Co. v. Xerox Corp.,* 224 F.3d 85, 94-95 (2d Cir. 2000) ("an expert may rely on

data that she did not personally collect. . . . The expert need not have conducted her own tests.")

citing *B.F. Goodrich v. Betkoski*, 99 F.3d 505, 524 (2d Cir. 1996) ("Dr. Brown did not personally

visit the landfills or dig up any shovelfuls of waste, but he was not required to do so.").

197.    Rather, Mr. Inglis testified that he regular relies on data from third parties in the course of

his work as an engineer, and accordingly relied on the data collected by BrownGreer.   *See*

*United States v. Seale*, 600 F.3d 473, 491 (5th Cir. 2010) ("experts are permitted wide latitude in

choosing what data they rely on in forming their opinions, *including those that are not based on*

*first hand knowledge or observation*") (emphasis added); *In re Paoli R.R. Yard PCB Litig.*, 35

F.3d 717, 747 (3d Cir. 1994) ("the proper inquiry is not what the court deems reliable, but what

experts in the relevant discipline deem it to be.").

198.    Further, the data collected by BrownGreer has an independent indicia of reliability

(including checks of floor plans and tax records and an independent, credible, third-party

reviewer of claimant-submitted information) that bolsters the reasonableness of Mr. Inglis' use

of the data. *Legier & Matherne, Apac v. Great Plains Software, Inc*., No. CIV.A. 03-278, 2004

WL 1488597, at *2-3 (E.D. La. June 30, 2004) (it is appropriate for an expert to rely on third-

party facts or data so long as the data "possess an element of credibility and reliability").

199.    Given the role of BrownGreer as both a Court Appointed Special Master and the third-

party claims administrator for the Knauf and GBI settlements, Mr. Inglis' reliance on the data

was appropriate.

## IV.    CONCLUSION

200.    Plaintiffs have offered a reasonable and reliable measure of the remediation damages for the 2,686 Taishan Properties with verified under air living space square footage.  The individual calculations for each of these properties is set forth on Plaintiffs' Exhibit 79.  The aggregate total of these remediation damages is $497,180,467.

201.    The Taishan Defendants will have the opportunity at later phases to seek off-sets for this amount.

202.    The Taishan Property Owners will still have an opportunity at later phases to seek damages for alternate living expenses and loss of use and enjoyment of their properties. Ultimately, all such claims will be based on verifications, not only of the square footage of the Taishan Property, but also the presence of Taishan Drywall in those properties.

203.    The relevant case law under Rule 23, Rule 55(b)(2), and the case law on the reliability of methodologies employed by experts making construction damages estimates all support the appropriateness and reliability of the Inglis remediation damages estimate presented at the June 9, 2015 hearing.  Therefore, the Court finds the damages estimate of $497,180,467 to be a reliable, fair and reasonable estimate of aggregate remediation damages. The final determination of these damages shall be made pursuant to the subsequent set offs and claims processing proceedings.

Respectfully submitted,

Dated:  June 23, 2015

/s/ Russ M. Herman_____
**Russ M. Herman** (Bar No. 6819)
Leonard A. Davis (Bar No. 14190)
Stephen J. Herman (Bar No. 23129)
***HERMAN, HERMAN & KATZ, LLC***
820 O'Keefe Avenue
New Orleans, LA  70113
PH:  (504) 581-4892
FAX:  (504) 561-6024
ldavis@hhklawfirm.com
***Plaintiffs' Liaison Counsel***
***MDL 2047***

Arnold Levin
Fred S. Longer
Sandra L. Duggan
Matthew C. Gaughan
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
PH:  (215) 592-1500
FAX:  (215) 592-4663
Alevin@lfsblaw.com
***Plaintiffs' Lead Counsel***
***MDL 2047***

### PLAINTIFFS' STEERING COMMITTEE

Dawn M. Barrios
Barrios, Kingsdorf & Casteix, LLP
701 Poydras Street, Suite 3650
New Orleans, LA 70139
Phone: (504) 524-3300
Fax: (504) 524-3313
Barrios@bkc-law.com


Daniel E. Becnel, Jr.
Becnel Law Firm, LLC
425 W. Airline Highway, Suite B
Laplace, LA 70068
Phone: (985) 536-1186
Fax: (985) 536-6445
dbecnel@becnellaw.com


Peter Prieto
Podhurst Orseck, P.A.
25 Flagler Street, 8th Floor
Miami, FL 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com


Bruce William Steckler (on the brief)
Steckler, LLP
12720 Hillcrest Road, Ste 1045
Dallas, TX 75230
Phone: (972) 387-4040
Fax: (972) 387-404
bruce@stecklerlaw.com


Ervin A. Gonzalez
Colson, Hicks, Eidson
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
ervin@colson.com


Jerrold Seth Parker
Parker Waichman, LLP
27300 Riverview Center Blvd.
Suite 103
Bonita Springs, FL 34134
Phone: (239) 390-1000
Fax: (239) 390-0055
Jerry@yourlawyer.com


Scott Wm. Weinstein
Morgan & Morgan
12800 University Drive, Suite 600
Ft. Meyers, FL 33907
Phone: (239) 433-6880
Fax: (239) 433-6836
sweinstein@forthepeople.com


James Robert Reeves
Reeves & Mestayer, PLLC
160 Main Street
Biloxi, MS 39530
Phone: (228) 374-5151
Fax: (228) 374-6630
jrr@attorneys4people.com


Christopher Seeger
Seeger Weiss, LLP
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
cseeger@seegerweiss.com


Daniel K. Bryson
Whitfield, Bryson & Mason, LLP
900 W. Morgan Street
Raleigh, NC 27603
Phone: (919) 600-5000
Fax: (919) 600-5002
dan@wbmllp.com

Ben W. Gordon, Jr.
Levin, Papantonio, Thomas, Mitchell
 Echsner & Proctor, P.A.
316 S. Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7000
Fax: (850) 435-7020
bgordon@levinlaw.com

Hugh P. Lambert
The Lambert Firm
701 Magazine Street
New Orleans, LA 70130
Phone: (504) 581-1750
Fax: (504) 529-2931
hlambert@thelambertfirm.com

Gerald E. Meunier
Gainsburgh, Benjamin, David, Meunier
 & Warshauer, LLC
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
gmeunier@gainsben.com

Richard J. Serpe, Esquire
Law Offices of Richard J. Serpe
Crown Center, Ste. 310
580 East Main Street
Norfolk, VA 23510-2322
Phone: (757) 233-0009
Fax: (757) 233-0455
rserpe@serpefirm.com

Victor M. Diaz, Jr., Esquire
V.M. Diaz and Partners, LLC
119 Washington Ave, Suite 402
Miami Beach, FL 33139
Phone: (305) 704-3200
Fax: (305) 538-4928
victor@diazpartners.com

**OF COUNSEL TO PLAINTIFFS' STEERING COMMITTEE**

Richard S. Lewis
HAUSFELD LLP
1700 K Street, N.W Suite  650
Washington, DC 20006
Phone: (202) 540-7200
Fax:  (202) 540-7201
rlewis@hausfeldllp.com

Anthony D. Irpino
IRPINO LAW FIRM
2216 Magazine Street
New Orleans, LA 70130
Phone: (504) 525-1500
Fax: (504) 525-1501
airpino@irpinolaw.com

Andrew A. Lemmon
Lemmon Law Firm, LLC
P.O. Box 904
15058 River Road
Hahnville, LA 70057
Phone: (985) 783-6789
Fax: (985) 783-1333
andrew@lemmonlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing has been served on Defendants' Liaison Counsel, Kerry Miller, by e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 23rd day of June, 2015.

Respectfully Submitted,

BY:  */s/ Leonard A. Davis*
        Leonard A. Davis
        Herman, Herman & Katz, LLC
        820 O'Keefe Avenue
        New Orleans, LA 70113
        Phone: (504) 581-4892
        Fax: (504) 561-6024
        ldavis@hhklawfirm.com

        *Plaintiffs' Liaison Counsel*
        *MDL 2047*

69