# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |

**THIS DOCUMENT RELATES TO:**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,*
**Case No. 2:11-cv-01673**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,*
**Case No. 2:11-cv-01395**

*Amorin et al. v. Taishan Gypsum Co. Ltd. et al.,*
**Case No. 2:11-cv-01672**

*Wiltz et al. v. Beijing New Building Material Public Limited Company et al.,* **Case No. 2:10-cv-00361**

*Gross et al. v. Knauf Gips KG et al.,* **Case No. 2:09-cv-06690**

*Germano et al. v. Taishan Gypsum Co. Ltd. et al.,* **Case No. 2:09-cv-06687**

## BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY'S AND BEIJING NEW BUILDING MATERIAL (GROUP) CO., LTD.'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Beijing New Building Materials Public Limited Company and Beijing New Building

Material (Group) Co., Ltd. respectfully submit[1] these proposed findings of fact and conclusions

of law.

---

[1] <u>Reassertion of Objection to Personal Jurisdiction</u>:  On March 4, 2015, the BNBM companies formally appeared in the above-captioned actions, through Notices of Appearance that specifically raised and preserved defenses relating to, *inter alia*, lack of personal jurisdiction.  As the BNBM companies have done with each prior submission, they raise the issue of personal jurisdiction at the outset of these proposed findings of fact and conclusions of law to preserve the BNBM companies' legal rights to assert this fundamental defense.

## FINDINGS OF FACT[2]

I.     **Procedural Background.**

1.     This litigation arose from property damage to houses and other buildings in several states allegedly caused by drywall imported from China.  Owners sued entities in the chain of distribution in state and federal courts, and in 2009, the Judicial Panel on Multidistrict Litigation created an MDL and transferred certain drywall-related lawsuits to this Court.

2.     Defendants in the current proceedings are:  Taishan Gypsum Ltd., Co. and Tai'an Taishan Plasterboard Co., Ltd. ("Taishan"); Beijing New Building Materials Public Limited Company ("BNBM PLC") and Beijing New Building Material (Group) Co., Ltd. ("BNBM Group," collectively the "BNBM companies"); China National Building Materials Group Corporation ("CNBM Group") and China National Building Materials Co., Ltd. ("CNBM Company," collectively the "CNBM companies").

A.     **The *Germano* Lawsuit.**

3.     In one lawsuit, Michelle Germano and four other Virginia homeowners filed a putative class action against Taishan and three U.S. drywall suppliers.

4.     Neither the CNBM companies or BNBM Group and BNBM PLC were defendants in the *Germano* lawsuit.

5.     Defendant Taishan did not initially appear.  On November 18, 2009, Plaintiffs moved for an order entering a default judgment against Taishan (Dkt. No. 464), and filed a Second Amended Complaint ("SAC") to make the putative class nationwide.  (Dkt. No. 470.)

---

[2]  To the extent that any finding of fact herein is more properly characterized as a conclusion of law, or *vice versa*, the Court adopts it as such.

6.      On November 20, 2009, the Court entered a preliminary default against Taishan. (Dkt. No. 487.)  Plaintiffs did not serve Taishan with the SAC prior to preliminary default, and no class had been certified.

7.      The Court permitted the intervention of 14 individual plaintiffs in *Germano* (the "Intervenors") and scheduled a Rule 55(b) hearing on the Intervenors' claimed damages.  On December 4, 2009, the Court issued an Order to clarify that "the result of the hearing will only have a preclusive effect on those properties which are the subject of the hearing."  (Dkt. No. 576.) Taishan did not appear at or otherwise defend the damages proceeding.

8.      At the damages hearing, Intervenors presented evidence specific to each property, and the Court considered testimony from each set of Intervenors and from expert witnesses.  *See, e.g.*, *In re Chinese Manufactured Drywall Prods. Liab. Litig. (Germano)*, 706 F. Supp. 2d 655, 671-88 (E.D. La. 2010).  Plaintiffs' expert witness Ronald Wright based his remediation damages testimony in *Germano* on property-specific estimates on each property from two local contractors.  Mr. Wright acknowledged at the hearing that "individual characteristics . . . create some of the variations that we see in the square-foot price" among homes.  (Dkt. No. 2191 at 119-120.)  The court undertook a factually intensive and property-specific analysis into the specific circumstances of each of the seven homeowners, discussing at length how each homeowner suffered as a result of the drywall in their homes.  *See Germano*, 706 F. Supp. 2d at 693-712.  Based on the evidentiary record for each set of homeowner Intervenors, the Court made individualized damages determinations and awarded the costs of remediating each specific property along with damages for alternative living expenses ("ALE") and loss of use and enjoyment.  *Id.* at 712-13.

9.      While the Court noted that the average remediation cost for the seven homes was $86.00 per square foot, its damages findings were individually determined with respect to each of the homes. *Id.* "$86.00 per square foot" does not reflect the actual damages awarded to *any* of the *Germano* Intervenors. In addition, this Court specifically limited its finding in *Germano* to the properties at issue in those cases, and specifically ordered that its *Germano* findings would not have preclusive effect in any other proceedings. (Dkt. No. 576.)

10.     The Court did not make any findings about class-wide damages, nor were those issues before the Court in *Germano*.

### B.      The *Hernandez* Lawsuit.

11.     On September 1, 2009, Tatum and Charlene Hernandez filed a similar individual action against Chinese drywall manufacturer Knauf Plasterboard Tianjin Co., Ltd. ("Knauf"). The matter culminated in a contested bench trial that concluded on March 19, 2010.

12.     Neither the CNBM companies or BNBM Group and BNBM PLC were defendants in the *Hernandez* lawsuit.

13.     As in *Germano*, the Court's damage award turned on property-specific proof. Both sides presented property-specific remediation estimates derived from detailed inspections of the property. *See, e.g., In re Chinese Manufactured Drywall Prods. Liab. Litig. (Hernandez),* No. MDL 2047, 2010 WL 1710434, at *19-20 (E.D. La. Apr. 27, 2010). In awarding remediation damages of approximately $164,000, the Court primarily relied on the "actual estimates from local contractors," which were "the most accurate estimates for work." *Id.* at *19.

14.     The remediation cost for the Hernandez home was $81.00 per square foot.

15.     The Court did not make any findings about class-wide damages, nor were those issues before the Court in *Hernandez*.

### C.   Entry of Default and Class Certification.

**16.**     Following the default judgment in *Germano* (Dkt. No. 3013), Taishan appeared and appealed the entry of default based on lack of personal jurisdiction.  Taishan's appeal was remanded to this Court solely for a ruling on Taishan's motion to vacate the default for lack of personal jurisdiction.  After extensive discovery, this Court ruled that personal jurisdiction had been established with respect to Taishan, and the motion to vacate the *Germano* Default judgment was denied.  The Fifth Circuit subsequently affirmed both this Court's personal jurisdiction over Taishan and the *Germano* Default Judgment.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576, 580 (5th Cir. 2014).

**17.**     The Court ordered a Taishan representative to appear for a judgment debtor examination on July 17, 2014.  (Dkt. No. 17774.)  Taishan did not appear, and the Court entered a contempt order. (Dkt. No. 17869 at 2.)

**18.**     On July 20, 2014, Plaintiffs served on Taishan 123 requests for admissions relating to its alleged alter ego relationship with other Chinese companies, *viz.*, the BNBM companies and the CNBM companies.  (Dkt. No. 17993.)  Taishan did not respond to the requests for admissions, resulting in the admissions being deemed admitted pursuant to Rule 36(a)(3).  (Dkt. No. 18028 at 14 n. 5.)

**19.**     On July 23, 2014, in Taishan's absence, Plaintiffs filed their Omnibus Motion for Class Certification Pursuant to Rules 23(a)(1)-(4) and 23(b)(3).  (Dkt. No. 17883.)

**20.**     On September 26, 2014, the Court granted certification of a class defined as "[a]ll owners of real properties in the United States, who are named Plaintiffs [in the various MDL

complaints] asserting claims for remediated damages arising from, or otherwise related to" Taishan drywall.  (Dkt. No. 18028 ("Class FOFCOL") at ¶ 79.)[3]

21.     On March 6, 2015, BNBM PLC and BNBM Group filed their notice of appearances subject to their preservation of personal jurisdiction defenses.  (Dkt. Nos. 18247, 18248.)

**D.      Plaintiffs' Motion for Class Damages.**

22.     On October 29, 2014, Plaintiffs moved the Court to award a single lump sum, exceeding $1.2 billion, as damages for the entire class.  (Dkt. No. 18086-1 (Plaintiffs' "Damages Motion").)  Plaintiffs' Motion also requested that a new class notice be issued that contained the definition of the class.

23.     In their Damages Motion, Plaintiffs proposed a mechanical formula: (1) remediation costs calculated at single cost per square foot; (2) ALE calculated at a single cost per square foot; and (3) $100,000 for each class member for loss of use and enjoyment of their property.  (*See id.* at 5-7.)  Plaintiffs' support for items 1 and 2 was an affidavit provided by Plaintiffs' designated expert witness, Ronald Wright.  Plaintiffs submitted no evidence in support of item 3.

24.     Mr. Wright's remediation estimation method combined the total averaged cost estimates from the seven properties in *Germano*, and divided by the total square footage of those properties to generate a per-square-foot cost average of $86, which he then adjusted for 2014 dollars.  (*See* Affidavit of Ronald E. Wright, P.E. (Dkt. No. 18086-3).)  He then multiplied that

---

[3]  Taishan's "deemed" admissions under Rule 36 were the basis for the Court's determination that Taishan, the BNBM companies, and the CNBM companies, constitute "a single business enterprise for purposes of. . . holding each of these entities liable for the conduct of their affiliated entities" (Class FOFCOL ¶ 50), and for the certification of the damages class set forth above as against all of the Defendants.  The BNBM and CNBM companies have challenged that ruling, which will be the subject of separate proceedings.

adjusted average by a figure that he represented was the total square footage of all class members' properties, based on properties selected by the Plaintiffs' Steering Committee ("PSC").  Utilizing Mr. Wright's formula, Plaintiffs sought an aggregate sum of $878,130,881 in remediation and ALE costs.  (*Id.*)

25.    Due to personal circumstances, Mr. Wright subsequently was unable to continue to perform work as Plaintiffs' designated expert.  Plaintiffs withdrew Mr. Wright as their expert and substituted his colleague George J. Inglis, serving Defendants with Mr. Inglis' substitute Affidavit on April 27, 2015.  (Affidavit of George J. Inglis (Dkt. No. 18877-2) (herein, "Inglis Aff.").)  Mr. Inglis' Affidavit used the same basic cost-per-square-foot methodology as Mr. Wright, the same $86.00 per-square-foot starting point, and even some of Mr. Wright's verbiage.  (*Id.*)  However, Mr. Inglis' Affidavit opined on 3,739 properties—113 fewer than Mr. Wright.  (*Id.* at ¶ 2.)  The list of 3,739 properties had been prepared by the PSC.  Mr. Inglis' Affidavit purported to establish damages for estimated remediation costs and ALE in the amount of $879,261,476.  (*Id.* at ¶ 9.)

26.    On May 8, 2015, Defendants filed and served briefs in opposition to Plaintiffs' Damages Motion (Dkt. Nos. 18877, 18887, 18890), including supporting declarations by expert witnesses David A. Pogorilich, CGC, MBA (Dkt. No. 18877-3), and M. Laurentius Marais, Ph.D (Dkt. No. 18877-5).

27.    On May 15, 2015, Mr. Inglis produced an amended opinion.  (*See* Declaration of George J. Inglis (herein, "Inglis Decl.").)  The amended opinion now addressed 2,888 buildings; Mr. Inglis revealed that he had "reduced the number of buildings . . . due to a number of buildings being deleted by BrownGreer," and that  "buildings formerly owned by class members have been deleted."  (Inglis Decl. at ¶ 2.)  Further, "[i]n light of the scrutiny imposed by the

7

Defendants," Plaintiffs requested that Mr. Inglis amend his opinion to remove all calculations of ALE and remove remediation damage calculations for former, not current, property owners. (Dkt. No. 18958 (Plaintiffs' "Damages Reply"), at 22.)  The PSC also eliminated its demand for $100,000 per class property for loss of use. [4]  Based on the Reply, Plaintiffs' requested aggregate damages now totaled $607,361,039 for estimated remediation costs.  (*Id.* at 23 (quoting Inglis Decl. at ¶ 8).)

      28.     On May 29, 2015, Dr. Marais produced a Supplemental and Updated Declaration (Dkt. No. 19045-1 ("Marais Supp. Decl.")), responding to the revised Inglis Declaration.

      29.     On May 29, 2015, Defendants filed and served motions to exclude Mr. Inglis' testimony.  (Dkt. Nos. 19017, 19019.)

      30.     On May 29, 2015, Plaintiffs filed and served a motion to exclude Dr. Marais' testimony.  (Dkt. No. 19014.)

      31.     On June 4, 2015, Plaintiffs notified Defendants that additional class members were being removed from the class list and that the number of class members for whom relief was being sought was down to 2,714.  Plaintiffs' aggregate damages for estimated remediation costs was reduced to $579,020,032.

      32.     Late in the afternoon of June 8, 2015, Plaintiffs notified Defendants that Mr. Inglis' damages model was being revised further to account for an error in the R.S. Means geographical adjustments.  Plaintiffs also provided a revised damages model that removed 28 properties for which square footage had not been confirmed, bringing the total number of class

---

[4]  Plaintiffs have asserted their intention "to reserve until subsequent phases the determination of individual damages related to class members' [ALE] and loss of use and enjoyment" and to limit the June 9, 2015 proceedings to calculating damages for "repair and remediation," which they seek on "an aggregated formulaic basis." (*Id.* at 2 n. 1).

properties down to 2,686.  (PX 79-3.)  As a result, Plaintiffs' aggregate damage demand, and the amount sought at the evidentiary hearing, was reduced to $497,180,467.

**II.**   **Testimony Regarding Damages.**

    **A.**   **Jake Woody.**

    **33.**   Jake Woody was called as a fact witness by Plaintiffs.  Mr. Woody is employed by BrownGreer as an attorney.  (Tr.[5] 17.)  BrownGreer has served, and continues to serve, as settlement administrator for various settlements that have been entered into in these consolidated proceedings, including the *Knauf* settlement and the settlements involving Global, Banner and InEx (the "GBI Settlements").  (Tr. 26.)  In connection with the settlements, BrownGreer has amassed a database containing square footage and other information regarding properties that have been the subject of claims in this litigation, including many of the properties that PSC sought to include in the class.  (Tr. 39.)

    **34.**   Accordingly, in October 2014, the PSC requested BrownGreer to provide information regarding square footage of class properties to the extent that it was able to do so, and Mr. Woody oversaw that project.  (Tr. 39-41.)  BrownGreer's database and records also included information regarding product identification to support the class list that was ultimately utilized by Mr. Inglis for his damage calculation.  (Tr. 47-50.)  Mr. Woody understood that the work being requested by the PSC was going to be used in connection with the class proceedings. (Tr. 40, 54, 81.)

        **1.**   **The Property List Provided to Mr. Inglis.**

    **35.**   BrownGreer used three sources of information to "verify" the square footage of class members' properties:  (1) BrownGreer's prior GBI review process; (2) local property

---

[5] "Tr." refers the official transcript of the June 9, 2015 Hearing on Damages Proceedings Heard Before the Honorable Eldon E. Fallon.

appraisal websites; and if those two sources were unavailable, (3) "square foot data" from the claimants' profile forms—even though Mr. Woody testified that using square footage information from the profile form alone would not normally be sufficient confirmation.  (Tr. 44-47, 67-70, 73; PX 17.)  In addition, while Mr. Woody described the process used to confirm square footage data from appraisal websites, BrownGreer did not maintain any record of the websites used to confirm the square footage.  (Tr. 69-70.)  Plaintiffs provided no evidence that identifies which of the class properties' square footage was confirmed by which of the above three methods.

36.     BrownGreer also maintains records of photographs or inspection reports confirming evidence of Chinese drywall with respect to properties for which claims have been made in these MDL proceedings.  However, BrownGreer could not verify that all of the class properties on the list utilized by Mr. Inglis did, in fact, have "Taishan" drywall.  In fact, Mr. Woody admitted that on the original list of over 3,700 class members, BrownGreer only confirmed that 1285 of the properties submitted proof that "Taishan" drywall was used in their home.  (Tr. 74.)

37.     Indeed, Mr. Woody admitted for over two thirds of the class there was no proof that Taishan or Chinese Drywall was used in the claimants' homes other than the claimant's statement on a profile form.  (*See* Tr. 74-78.)  Mr. Woody acknowledged that information on plaintiff profile forms was not necessarily reliable and, absent verifiable supporting evidence, such as photographs or inspection reports, he did not regard a statement on a profile form as sufficient evidence of product identification in connection with any of the settlements being administered by BrownGreer.  (Tr. 75.)[6]

---

[6] In addition, the Court notes that a statement on a plaintiff profile form, even if sworn, does not constitute admissible evidence of product identification under Rule 802, Fed. R. Evid.

**38.**     In fact, between May 15, 2015 and June 4, 2015, 127 properties were removed from the class list because BrownGreer had determined that those properties had 100% Knauf drywall, not Taishan drywall, even though the claimants had identified Chinese drywall as being present.  (*See* Tr. 76-79.)  Mr. Woody was unable at the hearing to identify which properties on the class list had the presence of Chinese drywall product confirmed through supporting evidence, and which relied simply on a profile form.

**39.**     Moreover, BrownGreer did not differentiate between the various defendants in this proceeding for purposes of determining the existence of Chinese drywall product.  BNBM Group and BNBM PLC submitted a summary exhibit, DX 28, that was based on a review of all 23,000 properties for which various plaintiffs in these consolidated proceedings had submitted initial profile forms as well as updated or supplemental profile forms.  Based on that exhibit, which was not contested, the plaintiffs in all of these consolidated proceedings identified a total of 65 properties where the plaintiff claimed to have BNBM drywall, of which a total of 39 appeared to be owned by a plaintiff identified on the final class list proffered by the PSC.  It is not known based on the evidence adduced at the hearing, whether there is supporting evidence such as photographs or inspection reports for any of those properties, or how many.

**40.**     Plaintiffs submitted no evidence demonstrating the presence of BNBM drywall caused damage in the home of any property in the class.

**41.**     Finally, Mr. Woody acknowledged that many of the properties on the class list provided to Mr. Inglis had already undergone remediation.  (Tr. 89.)  Presumably, the actual cost of remediation is available for those properties, but Plaintiffs did not present evidence of the actual remediation cost for those properties during the hearing.

42.     Based on Mr. Woody's testimony, and questions about the reliability of Mr. Inglis' damage model aside, the Court finds that Plaintiffs did not provide an adequate class list that could be used as the basis for a damages calculation at this time.  The list that ultimately was provided to Mr. Inglis includes a substantial number of properties for which there has been no reliable verification and no admissible evidence presented that the property contained defective drywall that is traceable to any of the defendants in this proceeding, which is a necessary prerequisite for a finding of damages.  In addition, significant questions exist about whether Plaintiffs' square footage determinations for each property are sufficiently reliable to serve as the underpinning for a damage calculation based on square footage.  Finally, other than Mr. Woody's testimony that the PSC removed 865 properties from the class list because the claimants no longer owned the property (Tr. 82), Plaintiffs presented no evidence as to how such determinations were made and have presented nothing from which the Court can conclude that the class list that was used to calculate damages was appropriately limited to those properties still owned by the respective Plaintiffs.  Putting aside questions about whether aggregate damage awards are permissible at all, such an award certainly cannot be premised based on a class list that does not reliably reflect class membership and that is virtually certain to require significant modification.

43.     The Court's findings regarding the inadequacy of the class list, without more, requires denial of the Plaintiffs' motion for assessment of class damages.  However, even if the Court had been presented with a sufficiently reliable class list, the Court finds for the reasons set forth below that Mr. Inglis' methodology for calculating class damages lacks sufficient reliability.  Accordingly, the Court will address Mr. Inglis' testimony and his methodology for determining class damages.

## 2.     The Knauf Remediation Data.

**44.**     Mr. Woody also testified about a spreadsheet, PX 30, containing data that BrownGreer collected and identified with respect to the Knauf Remediation and maintained in the ordinary course of business; this spreadsheet includes the actual costs that were paid to Moss and other contractors to remediate the Knauf properties.  (Tr. 92-93.)  After he initially compiled the information, Mr. Woody adjusted the Knauf remediation information to remove costs that were distinct from the costs being sought by the PSC here.[7]  As this Court has previously observed, and as Mr. Woody testified, the Knauf remediation program provided for full remediation of affected properties.  (*See, e.g.*, Tr. 71; *see also* Dkt. No. 12915, at 6 ("[t]he [Knauf] remediation protocol option is intended to make the owners whole . . . .").

**45.**     In Table 1 of the Knauf spreadsheet, PX 30, the summary states that the average cost per square foot for remediation under the Knauf program was $65.15.

**46.**     The PX 30 spreadsheet also reflects a wide variation among the average actual costs depending on the zip code; for example:

- Zip Code 33993 (33 properties):  average $48.68 per sq. ft.

- Zip Code 34953 (52 properties):  average $58.29 per sq. ft.

- Zip Code 33309 (46 properties):  average $45.72 per sq. ft.

- Zip Code 32080 (16 properties):  average $98.89 per sq. ft.

---

[7] At the Defendants' request, Mr. Woody modified the spreadsheet: (1) to remove approximately 20 so-called "mixed" properties, where Knauf paid only a portion of the remediation expense and the other portion was paid by a third-party, and (2) to remove certain "move in/move out" costs in the nature of ALE.  These adjustments were made to provide a more reasonable basis for comparison to Mr. Inglis' projected remediation costs, which assumed damages for 100% of remediation costs without ALE.  The revised spreadsheet was introduced into evidence as PX 30.

**B.      Mr. Inglis.**

47.      Plaintiffs proffered Mr. Inglis as their designated damages expert.  Mr. Inglis is a

licensed engineer with experience in "construction, remediation, and implementation of projects";

he is currently employed by Berman & Wright Architecture, Engineering & Planning LLC.

(Inglis Decl. at ¶ 1.)  Mr. Inglis admittedly has no expertise in the field of statistics or statistical

sampling.  (Tr. 156.)

48.      To calculate damages, Mr. Inglis relied on general contractor bids received in

2009 with respect to the seven *Germano* properties.  (Tr. 110-12.)  Mr. Inglis testified that he

believed the seven *Germano* properties were "similar" to the 2,686 properties in the current class

list (Tr. 125), but presented no verifiable data, compilations, or comparisons from which that

conclusion could be verified or tested.  Nor was there any evidence that Mr. Inglis or others

working under his direction and control had inspected any more than a handful of the properties

on the class list.

49.      Mr. Inglis determined that the average cost of remediation for the *Germano*

properties based on the general contractor estimates was $86 per square foot.  (Tr. 112; Inglis

Decl. at ¶ 3.) Mr. Inglis claimed to have confidence in the $86 per square foot number based on

other estimates that he had performed (Tr. 114), but there was no evidence of those other

estimates in the record, no comparison to actual remediation costs incurred, and no indication

that Mr. Inglis' methodology was peer reviewed by another competent professional.

50.      Taking the $86 per square foot number as a given, Mr. Inglis then utilized data

from R.S. Means to adjust for geographic variations by zip code, and to adjust for inflation.  (Tr.

119, 164; Inglis Decl. at ¶ 4.)  Mr. Inglis also claims to have "evaluated the need for a

professional environmental inspection throughout and at conclusion of the remediation to certify

the remediation successfully returned the residential units to their pre-damage condition," the cost of which he estimated to be "an additional 6% per residential unit remediation cost." (Inglis Decl. at ¶ 3.)

51.     Based on those assumptions, Mr. Inglis calculated estimated remediation costs, in the aggregate, for all of the properties on the class list provided to him by the PSC, based on the square footage data set forth on the list. (Tr. 130, 138, 168-70, PX 80; Inglis Decl. at ¶¶ 2, 7-8.)

52.     As he explained during the hearing, Mr. Inglis used the initial $86/sq. ft. average from *Germano* "adjusted to reflect 2015, then he "adjusted [it] to reflect the national average" using R.S. Means, and then again "adjusted [it] to reflect the labor and material costs for each home" by zip code using R.S. Means. (*See* DX 33 (demonstrative used by Inglis).) While he never used the word "extrapolation" to describing this formula, his diagram depicting his method illustrates precisely this process of using the estimated for the seven *Germano* properties to derive remediation costs for the entire set of class properties.



3.  Add 6% for CIH:
NATIONAL AVERAGE
**$105.91/sq.ft.**

2.  The relative costs for labor and materials in Virginia are adjusted to reflect the national average using RS Means: $99.92

1.  $86/sq.ft. for Norfolk, Va. in 2010 is adjusted to reflect 2015 material and labor costs in Norfolk: $95.92

4.  The national average is adjusted to reflect the labor and material costs for each home (by zip code) using RS Means. (Inglis, Ex.10)

(DX 33.)

**53.**    Mr. Inglis did nothing to independently verify any of the information set forth on the class list or to determine whether any of the purported class members in fact received Taishan or BNBM drywall.  (Tr. 138-43, 151-52.)

**54.**    Both the class list and Mr. Inglis' calculations underwent a number of modifications prior to the hearing, as set forth in ¶¶ 24-32, above.  At the hearing, Plaintiffs introduced PX 79-3, which Mr. Inglis identified as his then-final damage calculation.  Mr. Inglis estimated remediation damages for 2,686 properties in the total amount of $497,180,467.

**55.**    Although Mr. Inglis also estimated damages on a property-by-property basis (PX 79-5), Plaintiffs made clear both in opening statement and at the hearing that they were seeking an aggregate award to be followed by a claims procedure to determine the actual amount, if any,

due to each claimant.  (Tr. 9.)  Neither Mr. Inglis, nor Mr. Woody, nor Plaintiffs' counsel put

forth any mechanism by which an aggregate judgment, at the conclusion of the claims process,

could be reduced if it ultimately overstated damages, or increased if it ultimately understated

damages.

56.     In addition, based on Mr. Woody's testimony, the class list included a substantial

number of properties—as many as 700—for which remediation had already been performed.  (Tr.

89.)  Plaintiffs presented no evidence regarding the actual cost of remediation for those

properties, nor did Mr. Inglis account for the actual cost of remediating those properties in his

damage analysis.

### C.     Defendants' Experts.

#### 1.     Mr. Pogorilich.

57.     David Pogorilich is a Director in the Construction Practice at Navigant Consulting.

He has over twenty years of experience in claims analysis and resolution on projects in the

United States and abroad, with a background that includes construction estimating (both new and

repairs) and project management.  He is a licensed Certified General Contractor in the State of

Florida, and has himself performed carpentry, mechanical, plumbing and electrical work for

residential construction, including numerous remediation projects.  (Tr. 172-77.)  Mr. Pogorilich

was qualified and accepted by the Court as an expert in the field of construction cost estimating

and project management for construction sites.  (Tr. 178-79.)

58.     Based on his experience and actual physical inspection of multiple single family

residences containing Chinese drywall, Mr. Pogorilich testified that Mr. Inglis' methodology to

estimate remediation costs for the class properties does not work and would not be utilized in the

construction industry to estimate costs to be incurred for remediation.  Mr. Pogorilich described

Mr. Inglis' method as an "average of an average" and testified that Mr. Inglis' method fails to take into account property-specific features that affect cost.  (Tr. 189.)  Mr. Pogorilich testified that the only way to reliably estimate cost is to do a site-specific, individual inspection of each house and determine the layout, the finishes, ceiling height, plumbing, number of outlets, switches, and fixtures, the nature of the HVAC system (*i.e*., single or dual zone), the nature, grade and number of appliances, etc.  (Tr. 185, 188-90, 192, 196-99.)  Mr. Pogorilich testified about the differences two homes with the same square footage and footprint could have.  (Tr. 195-99, DX 34.)



(DX 34.)

**59.**     Mr. Pogorilich testified that in 30 years in the construction industry, he had never seen a universal price per square foot utilized to determine construction costs for thousands of properties.  (Tr. 193.)

**60.**     Mr. Pogorilich also testified that he did not regard the *Germano* properties as representative of the class properties because they were all located in one geographic area, contained different square footage, and were all residential single-family homes whereas the class properties included commercial and institutional properties.  (Tr. 194.)

**61.**     Mr. Pogorilich compared Mr. Inglis' $86/sq. ft. average cost of remediating the *Germano* properties with the actual *Germano* awards.  Even with respect to the *Germano* properties on which the $86/sq. ft. average number is based, there was significant variation on a property by property basis, ranging from an overestimation of 15% on the Morgan property to an underpayment of more than 25% on the McKellar property and more than 30% on the Heischober property.  (Tr. 199-202.)  Mr. Pogorilich also reviewed some of the Knauf remediation data and observed that the Knauf actual remediation costs showed significant variability from property to property on a square footage basis.  (Tr. 202-205.)[8]

**62.**     Mr. Pogorilich further testified that, while Mr. Inglis claims to have used R.S. Means Residential Cost Data, his use of R.S. Means data amounted to an "approximate estimate," which, according to an authoritative industry source, have an accuracy range of minus 30% to plus 50%.  According to Mr. Pogorilich, such estimates are typically used for feasibility studies

---

[8] On cross-examination, Plaintiffs asked Mr. Pogorilich if he knew whether Knauf provided drywall "free of charge" in connection with the settlement, and Mr. Pogorilich stated that he did not know the answer to that question.  Plaintiffs, however, introduced no evidence that Knauf had provided the remediation drywall free of charge.  Mr. Woody testified that the *Knauf* remediation program provided for full remediation and did not testify that the *Knauf* remediation costs excluded the actual cost of drywall.  Moreover, this Court can take judicial notice that the *Knauf* settlement agreement, which was approved by this Court  (Dkt. No. 16570) contains no provision requiring Knauf to provide drywall free of charge in connection with remediation work.

or to obtain "ball-park" pricing estimates for projects.  They are not an appropriate measure of costs for a specific remediation project or a substitute for an estimate based on on-site inspection. (Tr. 226-28.)

### 2. Dr. Marais.

63.     Dr. M. Laurentius Marais is Vice President and Principal Consultant at William E. Wecker Associates, Inc., specializing in applied mathematical and statistical analysis, including statistical extrapolations based on sampling, and calculation of damages.  He holds a Ph.D from Stanford University and has been on the faculties of the University of Chicago and Stanford.  A fellow of the Royal Statistical Society and a member of the American Statistical Association, among other professional societies, Dr. Marais has extensive experience assessing the validity of statistical studies.  (Tr. 229-31.)  Dr. Marais was qualified and accepted by this court as an expert in statistical science and statistical sampling.  (Tr. 231.)

64.     Dr. Marais testified that Mr. Inglis' damage model is "a quintessential example of an extrapolation from a small sampling to an entire population."  (Tr. 232.)  As explained by Dr. Marais, Mr. Inglis' method fits into this definition because his formula attempts to determine, based on information obtained from a sample of properties, conclusions about the larger group of properties that comprise the class.  (Tr. 232.)

65.     Dr. Marais also testified that extrapolation is one of the principal areas of focus of mathematical and statistical science, both areas in which he has extensive training and expertise. (Tr. 232-33.)

66.     According to Dr. Marais, Mr. Inglis' methodology does not comport with well established principles for obtaining statistically and scientifically valid extrapolations from

20

samples and, therefore, cannot be relied upon to estimate class-wide damages, or damages for individual class members.  (Tr. 233.)

68.     In particular, Mr. Inglis' model is not based on a random sample of properties, which would require a selection from the entire list of class properties, and the sample of the seven *Germano* properties is in any event not of sufficient size that one could draw conclusions within any reasonable margin of error.  (Tr. 233-38.)  Dr. Marais testified that the likelihood that a random sample of the class properties would result in seven properties all located in the State of Virginia was one in one hundred million.  (Tr. 238.)  Dr. Marais further testified that no margin of error could be calculated for Mr. Inglis' model because the mathematical formulae for testing for margins of error are premised on data derived through random sampling techniques that Mr. Inglis simply did not utilize.  (*Id*.)

68.     Dr. Marais testified that Mr. Inglis has improperly assumed a correlation between the total cost of remediation and the total square footage of the property.  (Tr. 240.)  Dr. Marais explained that, contrary to Mr. Inglis' assumption that there is a strong, meaningful correlation between the two, based on the statistical data that he has seen there is no basis to assume there is a significant correlation.  (Tr. 243.)

69.     In order to test this assumption, Dr. Marais analyzed the actual cost data from the *Knauf* remediation with the predictions from Mr. Inglis' method to test the implicit correlation Mr. Inglis' method relies upon.  Through this testing, Dr. Marais found that Mr. Inglis' formula does not accurately predict the remediation costs in the *Knauf* remediation data set.  (Tr. 242-44.)  Specifically, Dr. Marias found that Mr. Inglis' method generated results that were neither consistently high nor consistently low.  (Tr. 244.)  Instead, on many observations it predicted high, unambiguously high; and in other cases, it predicted unambiguously low.  (*Id*.)  In other

21

words, Mr. Inglis' formula, when applied to *Knauf* data, varied substantially from the actual

remediation costs, and in both directions, further evidencing that the Inglis formula was not an

accurate predictor of actual remediation cost.

70. More specifically, Dr. Marais found that for 316 of the 398 Zip Codes reflected in

the *Knauf* data, Mr. Inglis' analysis overstated the cost of remediation, in many cases

substantially.[9] (*See* Tr. 243-55; DX 21.) On average, the *Knauf* cost of remediation was $65 per

square foot. Under Mr. Inglis' formula, and even taking into account the Plaintiffs' last minute

revision to their damage calculation, the average estimated cost of remediation for the *Knauf*

properties, fully adjusted for inflation, would have been $83.33, or approximately 30% higher

than the actual costs reported by BrownGreer. On a property by property basis, the actual costs

ranged dramatically, from as low as about $40 per square foot to $108 per square foot or more.

71. Dr. Marais also testified about the calculations produced by Plaintiffs the evening

before the hearing. (*See* Tr. 252-56.) As illustrated by the graph supplied in DX 115, the

average values of Mr. Inglis' method (both the highest values it could yield as well the lowest

values) are significantly higher than the average cost of remediation as supplied in the *Knauf*

data. (Tr. 255.) Stated another way, Mr. Inglis' method overstates the cost of remediation when

measured against the *Knauf* data. (*Id*.)

---

[9] Dr. Marais' spreadsheet, DX 21, had not been updated to take into account the revision to Mr.
Inglis' analysis that was served on Defendants the evening before the hearing. However, Dr.
Marais' Demonstrative Exhibit 115 ("DX 115") was updated to reflect the revised calculation
and continued to show a substantial overstatement in the vast majority of cases when compared
to the actual *Knauf* remediation costs.



(DX 115.)

**72.** Plaintiffs offered no rebuttal to the conclusions reached by Mr. Pogorilich or Dr. Marais.

<strong><u>CONCLUSIONS OF LAW</u></strong>

**I.** **The Default Judgment Is Not Conclusive of Plaintiffs' Damages Motion, and Defendants Are Not Collaterally Estopped by the *Germano* and *Hernandez* Cases, or by the Class Certification Order.**

**73.** "A default judgment is a judgment on the merits that conclusively establishes the defendant's liability. But it does not establish the amount of damages. After a default judgment,

the plaintiff's well-pleaded factual allegations are taken as true, except regarding damages." *U.S. For Use of M-Co Const., Inc. v. Shipco General, Inc.*, 814 F.2d 1011, 1014 (5th Cir. 1987).[10]

**74.**     Thus, even if liability of any of the Defendants could be established by default in this case, that is not conclusive of the class damages Plaintiffs seek. *Id.* Liability and damages require separate, and equally "rigorous analysis." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013); *In re Chinese-Manufactured Drywall Products Liab. Litig.*, MDL No. 2047, 2014 WL 4809520, at *10 (E.D. La. Sept. 26, 2014). Nor does any prior proceeding or ruling in this litigation have a collateral estoppel effect in this damages proceeding.[11] Federal law governs the collateral estoppel effect of federal adjudications. *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 337 (5th Cir. 1982).

**75.**     Plaintiffs nonetheless claim that Mr. Inglis' methodology has been approved by this Court in the prior *Germano* and *Hernandez* proceedings, and that Mr. Inglis' approach to class-wide damages cannot now be challenged by Defendants. The Court finds that argument is both legally and factually incorrect.

### A.     *Hernandez* **Has No Collateral Estoppel Effect.**

**76.**     The *Hernandez* proceeding against defendant Knauf does not collaterally estop Defendants, who were never parties to that case. It would be "a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had

---

[10]   On April 19, 2015, BNBM PLC and BNBM Group filed a Motion and Memorandum of Law in Support of Their Motion to Vacate Entries of Preliminary Default, Dkt. No. 18851-1. *See also* Memorandum of Law of BNBM PLC and BNBM Group in Support of Their Motion to Motion to Vacate Portions of the Class Certification Order Addressing Their Liability to the Class Under the Theories of Single Business Enterprise, Alter Ego or Piercing the Corporate Veil, Dkt. No. 18876-1, filed May 8, 2015.

[11]   Ultimately, as discussed below, Plaintiffs' damages plan so violates explicit governing Fifth Circuit authority that it cannot stand as a matter of law, regardless of collateral estoppel.

an opportunity to be heard." *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n. 7 (1979)

(citing *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971)).

77.     Plaintiffs have not shown that any of the narrow exceptions for collaterally

estopping a nonparty applies here. *See Hardy*, 681 F.2d at 339-40 (listing three "virtual

representation" circumstances).  Defendants did not succeed to any property interest held by

Knauf; they had no control over the *Hernandez* lawsuit; and Knauf did not virtually represent

Defendants' interests.  Separate product manufacturers with similar legal interests do not

virtually represent each other.  *See id.* at 338-40 (nonparty asbestos manufacturers not estopped

by prior judgment against other asbestos manufacturers simply because they shared identity of

interests or similar legal positions).

###    B.    *Germano* Has No Collateral Estoppel Effect.

78.     The BNBM companies were not parties to the *Germano* case, and that proceeding

could not collaterally estop them, for the reasons just discussed.

79.     In any event, this Court explicitly directed in its December 4, 2009 Order "that the

result of the [*Germano*] hearing *will only have a preclusive effect on those properties which are

the subject of the hearing* but, hopefully, the Court's findings will provide some guidance for

similarly situated and/or affected properties."  (Dkt. No. 576 (emphasis added).)  Plaintiffs have

acknowledged as much.  (*See* Motion in Limine No. 5 (Dkt. No. 1089-1) at 1, 4 ("the Court's

findings as a result of the hearing shall have no preclusive effect save as to the seven Virginia

homes at issue. . . . [T]he Court already has declared that its findings will have no preclusive

effect on Knauf or any other parties, besides those of the intervenor plaintiffs").)

80.     Characterizing the prior proceedings in *Hernandez* and *Germano* as "bellwether"

trials is unavailing; in *Cimino v. Raymark Indus., Inc.*, the Fifth Circuit barred any preclusive

25

effect of prior product liability trials of other plaintiffs' claims against the same defendants.  151

F.3d 297, 318-21 (5th Cir. 1998) (finding no "legally valid ground on which the . . . damages

suffered by one person may be determined . . . solely on the basis of the average of awards made

to other persons in similar cases."  *Id.* at 321, n.51).

> **C.**     **Plaintiffs Failed To Establish Any Of The Required Elements For Offensive
> Collateral Estoppel.**

**81.**     Under Fifth Circuit law, "[f]our conditions must be met before collateral estoppel

may be applied to bar relitigation of an issue previously decided by a court of competent

jurisdiction:  (1) the issue under consideration is identical to that litigated in the prior action; (2)

the issue was fully and vigorously litigated in the prior action; (3) the issue was necessary to

support the judgment in the prior case; and (4) there is no special circumstance that would make

it unfair to apply the doctrine."  *Winters v. Diamond Shamrock Chem. Co.*, 149 F.3d 387, 391

(5th Cir. 1998) (citing *Copeland v. Merrill Lynch & Co.*, 47 F.3d 1415, 1422 (5th Cir. 1995)).

**82.**     First, collateral estoppel can apply only if the Court had "addressed the precise

questions at issue herein."  *Rufenacht v. Iowa Beef Processors, Inc.*, 656 F.2d 198, 204 (5th Cir.

1981).  The precise finding on average square footage in *Germano* related only to "the *Germano*

homes," each of which was the subject of individual inspections and estimates.  *Germano*, 706 F.

Supp. 2d at 687 ("The evidence supports the conclusion that the average cost per square foot to

repair the *Germano* homes is $86").  The question here is whether there can be an average cost

of repair applied to nearly 3,000 homes in 19 states and what should that be.  That issue was not

decided in *Germano*.  Likewise, *Hernandez* involved a determination of damages for a single

home and did not involve issues of class-wide damages or extrapolations.

**83.**     Second, no issue of fact or law was actually "litigated" for purposes of collateral

estoppel because *Germano* was a default proceeding.  "In the case of a judgment entered by

confession, consent, or default, none of the issues is actually litigated."  Restatement (Second) of Judgments § 27 cmt. e (1982).  Where the defaulting party files no answer, "[i]ssues determined by default are not actually litigated because no issue was ever raised by the pleadings."  *In re Staggs*, 178 B.R. 767, 776, n.6 (Bankr. N.D. Ind. 1994).  Moreover, the non-adversarial *Germano* trial cannot have estoppel effect because "[t]he requirement that the issues sought to be estopped must have been 'actually litigated' in the prior proceeding contemplates something more than a one-sided presentation of facts."  *Franks v. Thomason*, 4 B.R. 814, 822 (N.D. Ga. 1980).

84.     Third, the average-cost-per-square-foot finding was not "necessary" for the *Germano* judgment. When "the trial court's determination . . . was not necessary to support the judgment in the prior case . . . [c]ollateral estoppel poses no obstacle."  *State Farm Mut. Auto. Ins. Co. v. LogistiCare Solutions, LLC*, 751 F.3d 684, 689 (5th Cir. 2014) (internal quotation marks omitted).  The Court based its actual remediation damages awards and its final judgments not on the average cost of remediation, but on Mr. Wright's seven property-specific remediation estimates, which in turn were each based on property-specific estimates from local contractors.  Any discussion of an $86/sq. ft. average repair cost played no part in the damages awards or the final judgments.  They cannot have collateral estoppel effect.

85.     Fourth, that this is a mass tort litigation is a special circumstance that makes collateral estoppel unfair and inappropriate, particularly for individual damages.  The Fifth Circuit has recognized that "[t]he injustice of applying collateral estoppel in cases involving mass torts is especially obvious."  *Hardy*, 681 F.2d at 346 n.13.  And the Sixth Circuit has noted that "[i]n *Parklane Hosiery*, the Supreme Court explicitly stated that offensive collateral estoppel could not be used in mass tort litigation."  *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305 n.11 (6th Cir. 1984).  Extrapolating the limited damages award in *Germano* (which was never

actually litigated) would not only be unfair, but violative of Defendants' constitutional due process rights.

**D.    The Class Certification FOFCOL Has No Preclusive Effect.**

86.    Collateral estoppel may not be based on any findings set forth in the Court's Class FOFCOL.  Class certification orders are not final judgments on the merits, and thus cannot have collateral estoppel effect.  *See J.R. Clearwater Inc. v. Ashland Chem. Co.*, 93 F.3d 176, 179 (5th Cir. 1996) (class certification order is not a final judgment, and therefore "lacks sufficient finality to be entitled to preclusive effect while the underlying litigation remains pending"); *accord Baldridge v. SBC Commc'ns, Inc.*, 404 F.3d 930, 931 (5th Cir. 2005).

**II.    Mr. Inglis' Testimony Is Not Reliable And Is Clearly Outweighed By The Testimony of Mr. Pogorilich and Dr. Marais.**

87.    Prior to the damages hearing, this Court denied in part Defendants' *Daubert* motion to exclude Mr. Inglis' testimony.  The Court ruled that Mr. Inglis was qualified to opine on areas of construction cost, but that he would not be permitted to offer testimony dealing with statistics.  (Dkt. No. 19092.)

88.    While this Court was not prepared to exclude Mr. Inglis' testimony, the *Daubert* criteria are nonetheless relevant for determining the weight that it should be accorded.  All expert testimony "must meet" Federal Rule of Evidence 702's "exacting standards."  *Weisgram v. Marley Co.*, 528 U.S. 440, 455 (2000); *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  "The threshold inquiry" for any proposed expert testimony "is whether the expert possesses the requisite qualifications to render an opinion on a particular subject matter."  *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 272 (E.D. La. 2014).  It is Plaintiffs' burden to establish that Mr. Inglis "employs in the courtroom the same level of intellectual rigor that

characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526

U.S. 137, 152 (1999). Mr. Inglis' proposed testimony does not meet these standards.

89.     Although Mr. Inglis may be qualified to render an opinion regarding construction

costs with respect to a single residence, the damage analysis proffered by Mr. Inglis attempts to

extrapolate class-wide damages based on the sample set of properties that were the subject of the

*Germano* litigation. That kind of analysis and extrapolation goes beyond Mr. Inglis' area of

expertise and falls within the purview of statistical science. Mr. Inglis has no expertise in that

area, and acknowledges that he did not perform a statistical analysis in this matter.

90.     Even in the field of construction cost estimation, where Mr. Inglis does have

expertise, Mr. Pogorilich's uncontroverted testimony was persuasive in establishing that Mr.

Inglis at most performed an "approximate estimate" with a substantial degree of inaccuracy, and

did not perform the kind of detailed, property-specific estimate accepted in the industry for a

reasonably reliable estimate of construction costs.

91.     Mr. Inglis' credibility is further undermined because he did nothing to

independently verify the data presented to him in the form of the class list compiled by the PSC.

*See, e.g., JRL Enters., Inc. v. Procorp Assocs., Inc.*, No. 01-2893, 2003 WL 21284020, *8 (E.D.

La. June 3, 2003) (excluding damages testimony from expert who "merely accepted as true the

facts given to him"). Testimony that simply summarizes or repackages the opinions of others is

inadmissible as "inherently unreliable" because it indicates that the testifying expert did not

verify the accuracy of the underlying opinions (which are improperly shielded from cross-

examination). *See Hunt*, 297 F.R.D. at 275.

92.     Mr. Inglis got his class property information from the PSC. Although the PSC

had asked BrownGreer to verify certain information—which in many cases it was unable to do—

Mr. Inglis himself did nothing to investigate or verify anything given to him; he just accepted the list as correct, and processed the information. (Tr. 142-43.) Even after the BrownGreer data was shown to be unreliable—because, for example, the number of class properties changed by almost 1,000—Mr. Inglis did not try to determine why there were changes and the nature of the changes. (Tr. 138-39.) And as it turned out, the BrownGreer spreadsheet that is the basis for Mr. Inglis' damages opinion is itself riddled with error, including duplicate addresses, properties that have already been remediated, and properties without Taishan drywall. (Tr. 76-77, 86, 89-90.)[12]

      **93.**     Thus, on the crucial facts underpinning his opinion, Mr. Inglis failed to bring to the courtroom the same intellectual rigor that characterizes an expert in the field. *Kumho Tire*, 526 U.S. at 152. Instead, he blindly accepted as true hearsay information fed to him by someone who was not working under his direction and supervision, and Plaintiffs cannot show that his "calculations were 'anything more than an exercise in arithmetic based on inherently unreliable values.'" *JRL Enters.*, 2003 WL 21284020 at *7 (citation omitted).

      **94.**     Even more fundamentally, Mr. Inglis' proposed testimony is not the product of a reliable methodology under Rule 702(c). It is a "homemade methodology, crafted by a witness with no particular expertise to craft it . . . tested by no one, and accepted only by the witness himself." *EEOC v. Kaplan Higher Ed. Corp.*, 748 F.3d 749, 754 (6th Cir. 2014). Other than to provide his own subjective opinion, Mr. Inglis has done nothing to demonstrate that the

---

[12]  The Court notes that, in applying the requirement of Fed. R. Evid. 703 that the information forming the basis of the expert's opinion be "of a type reasonably relied upon by experts," the "'trustworthiness of the underlying data is not irrelevant.'" *Barrel of Fun, Inc. v. State Farm Fire & Cas. Co*., 739 F.2d 1028, 1033 (5th Cir. 1984) (citation omitted). Instead, Rule 703 "requires courts to examine the reliability of those sources." *Soden v. Freightliner Corp*., 714 F.2d 498, 505 (5th Cir.1983) (excluding expert opinion based on unreliable accident statistics); *accord Slaughter v. Southern Talc Co.*, 919 F.2d 304, 307 (5th Cir. 1990) ("[t]he 'sources' of the experts' opinions were the examination reports previously compiled," a sampling of which "revealed that they were replete with 'so many obvious errors as to be of no value to the trier of fact'").

*Germano* properties are in fact representative of the entire class or that the sample size is sufficient to allow any statistically significant conclusions.

95. "Ordinarily, a key question to be answered" in determining whether an expert's technique is reliable is "whether it can be (and has been) tested"; similarly, "in the case of a particular scientific technique, the court ordinarily should consider the known or potential rate of error." *Daubert*, 509 U.S. at 593-94. The courts have "excluded expert opinions where the expert failed to conduct any independent research to determine the reliability of his assumptions." *JRL Enters.*, 2003 WL 21284020, at *8 (excluding expert whose "theory cannot be tested, and the rate of error is not known"); *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir.2002) ("[T]he absence of any testing indicates that Petry's proffered opinions cannot fairly be characterized as scientific knowledge"). Here, Mr. Inglis' extrapolation is based on a sample that is admittedly so lacking in statistical validity that no rate of error could be ascertained. *See also Rowe Ent'mnt, Inc. v. William Morris Agency, Inc.*, No. 98-civ-8272, 2003 WL 22124991, at *3, *6 (S.D.N.Y. Sept. 15, 2003) (excluding expert opinion based on sample provided by plaintiffs' counsel that was "neither random nor representative" and could not be "tested for known or potential rate of error").

96. Furthermore, Mr. Inglis *could have* tested his theory against actual facts—as Mr. Pogorilich and Dr. Marais did. But instead, he testified that he believed his $86 per square foot number was "reasonable" based only on his subjective experience rather than actual testing of his method. Moreover, Mr. Inglis offered no rebuttal to the empirical testing of his method identified by Dr. Marais. "To ignore contradictory [facts] in order to arrive at a desired conclusion highlights the unreliability of [expert's] methodology." *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 383 (S.D.N.Y. 2014) (quoting *EEOC v. Bloomberg L.P.*, No. 07-civ-

8383, 2010 WL 3466370, at *17 (S.D.N.Y. Aug. 31, 2010)); *see also Celebrity Cruises Inc. v. Essef Corp.*, 434 F. Supp. 2d 169, 182 (S.D.N.Y. 2006) (excluding damages expert who was not aware of availability of "actual performance data" and "declined to incorporate their actual growth rates into her methodology" once she became aware of data); *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 889 (E.D. Wis. 2010) (finding expert's "methodology unreliable because of how [he] uniformly treated all evidence that undermined his underlying conclusion: unwarranted dismissal of the evidence or outright blindness to contrary evidence"; a "selective use of facts fails to satisfy the scientific method and *Daubert*") (quoting *Barber v. United Airlines, Inc.*, 17 F. App'x 433, 437 (7th Cir. 2001)); *United States v. King*, 539 F. App'x 235, 242 n. 3 (4th Cir. 2013) ("We have clearly stated that it is error for a district court to rely upon the testimony of an expert who 'largely ignored all contradictory evidence'").

97.     Finally, the Court concludes that, by using a formula that replaces individualized inquiry and empirical data with extrapolation, gross averages and speculation, Mr. Inglis' testimony is contrary to controlling Fifth Circuit law discussed *infra*, section IV.  Expert testimony based on an impermissible damages framework is "inadmissible under *Daubert* and the Federal Rules of Evidence, because it fails to tie . . . to the facts of the case at issue."  *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011) (excluding expert testimony based on legally impermissible damages theory); *accord Corley v. Entergy Corp.*, No. 98-cv-2006, 2004 WL 5627176, *3 (E.D. Tex. April 14, 2004) (excluding expert testimony based on a per-foot formula as "neither reliable nor relevant" because "[d]amages to trespass to land cannot be calculated without examining the individual circumstances underlying land ownership").

98.     Thus, Mr. Inglis' testimony, even standing alone, is inherently unreliable and insufficient to support an award of class damages in this matter.  *See Brooke Group Ltd. v.*

32

*Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993) ("When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict"). But the testimony is in any event clearly outweighed by the very persuasive testimony of both defense experts, Mr. Pogorilich and Dr. Marais.  The Court credits the testimony of Defendants' experts and their critique of Mr. Inglis' methodology, and finds that Plaintiffs have not put forward a sufficiently reliable model on which to base an award of class damages.

99.     Mr. Inglis made clear that his calculation is founded wholly upon the $86 per square foot estimate from *Germano*.  However, remediation costs for the seven *Germano* properties cannot be used to extrapolate remediation costs for each of the nearly three thousand other properties in the class unless "competent, scientific, statistical evidence" shows the *Germano* properties are "representative of the larger group of cases or claims from which they are selected."  *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997).  Plaintiffs offered no "scientific, statistical evidence" at all to support Mr. Inglis' damage model, either during their case in chief or in rebuttal to Dr. Marais' testimony.

100.     The undisputed evidence from Dr. Marais was that, from a statistical standpoint, the *Germano* properties were not representative of the class properties.  (Tr. 234-235 (opining that the *Germano* properties "have no qualification from a statistical perspective as being a representative random sample from the class in this case").)  Dr. Marais supported his testimony with detailed explanation of the science of statistical sampling—in terms entirely consistent with *Chevron*.  *Compare* Tr. 233-238 (explaining "sample size" and "random sampling"), *with Chevron*, 109 F.3d at 1019-20 (explaining that "the sample must be a randomly selected one of sufficient size").

33

101.    Given the absence of any competent evidence of statistical validity, the Court has no alternative but to find that Mr. Inglis' damage model does not present a statistically sound model from which one can extrapolate class damages based on the seven *Germano* properties, either on an individual or an aggregate basis.  "[E]vidence of the experience of a small, unrepresentative sample" of claimants cannot establish damages for the whole class, where, as here, there is "no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses . . . ."  *Espenscheid v. DirectSat USA, LLC*, 705 F.3d 770, 773, 774 (7th Cir. 2013); *see also EEOC v. Kaplan Higher Ed.*, 748 F.3d at 753-54 (sampled group of credit applicants was not "'representative' of the applicant pool as a whole,' and "an unrepresentative sample by definition" is not "reliable"); *Bloomberg L.P.*, 2010 WL 3466370, at *14; *Rowe Ent'mnt*, 2003 WL 22124991, at *3.

102.    Statistical validity aside, there was also ample empirical evidence that Mr. Inglis' model was not reliable.  Mr. Pogorilich's testimony established that Mr. Inglis' $86/sq. ft. average cannot possibly be applied to thousands of disparate class properties, each of which have varying footprints/configurations (which can impact the quantity of drywall even if the square footage is the same), locales, and level of fit and finish, all of which can greatly impact costs. (*See, e.g.,* Tr. 185, 188-90, 192, 196-99; *see also* DX 34 (depicted above).)

103.    The actual *Knauf* remediation cost data and Dr. Marais' analysis of that actual cost data further demonstrates that Mr. Inglis' method is not an accurate predictor of remediation costs, either individually or in the aggregate, as it has empirically been shown to overstate significantly the aggregate remediation costs for the *Knauf* population by nearly 30% and is highly erratic in projecting construction cost on an individual, property by property basis.  In short, Dr. Marais' empirical comparison between the actual remediation costs of the *Knauf*

34

program and the results obtained by Mr. Inglis' formula confirm Mr. Pogorilich's opinion that Mr. Inglis' formula "does not work."

104.     Although Plaintiffs suggested that the cost variances between Mr. Inglis' formula and the actual *Knauf* remediation data might be attributable to discounts or "economies of scale" in the *Knauf* program, they offered no evidence to support those propositions.  Moreover, as Dr. Marais testified, there is no apparent pattern in the deviations between the Inglis formula and the *Knauf* actual costs that could be explainable by a discount or a missing cost component.  As Dr. Marais testified, "sometimes the Inglis extrapolations are high and sometimes they're low.  And when they are high, sometimes they're not high by a very large margin, and on other occasions they are high by a very large margin.  Sometimes they are high by 15 percent, sometimes they are high by more than 100 percent."  (Tr. 293.)  Even a causal review of DX 21 confirms Dr. Marais' description of the data.  To say that Mr. Inglis' formula yields haphazard results is being charitable.

105.     Finally, the Court observes that the representativeness and reliability of Mr. Inglis' universal $86/sq. ft. estimate is further undermined by the *Hernandez* case.  There, no $86/sq. ft. benchmark was used.  Instead, the Court awarded damages based on actual estimates submitted by both plaintiffs and defendants and an evaluation of the specific characteristics of the *Hernandez* property.  The result was that remediation costs in *Hernandez* were $81 per sq. ft.— not the average $86/sq. ft. cost applicable to the *Germano* properties.  And as Mr. Pogorilich pointed out, Mr. Inglis' formula does not even prove reliable when applied to the *Germano* properties, which are the very properties from which the $86 per sq. ft. benchmark number was drawn.

**106.** As demonstrated, Inglis' extrapolation method is "fundamentally flawed" and cannot serve as a basis for a damages award. *See Anthony v. Chevron USA, Inc.*, 284 F.3d 578, 590 (5th Cir. 2002).

**107.** In *Anthony*, the Fifth Circuit explained that the plaintiffs' expert could not rely upon an assumption that damages were uniform across the various pollution sites at issue. *Id*. at 590. The *Anthony* court further determined that plaintiffs "failed to establish a legally sufficient evidentiary basis" for damages where the expert "took averages from [the pollution] samples and then used the data to extrapolate the size and scope of the oil pollution in each area." *Id*. According to the court, such a methodology was "deeply troubling" in light of not only the expert's own testimony but the contradictory evidence. *Id*. Here, Mr. Inglis does no better and the evidence submitted at the hearing established that Plaintiffs' methodology was not reliable and did not reasonably estimate the remediation costs for any particular property.

### III. Plaintiffs' Claim for Remediation Damages May Not Rely On Estimates Where Actual Repair Cost Data Is Available.

**108.** Another fundamental problem with Mr. Inglis' damage model and Plaintiffs' proof of damages is that Plaintiffs failed to introduce evidence of the actual remediation costs incurred for class properties that have already been remediated.

**109.** "Damages may be predicated on the basis of estimates only when the loss has not been repaired. If the damaged property has been restored to its former condition by repair, the proper basis for assessing the damage is the repair bill." *Volkswagen of Am., Inc. v. Robertson*, 713 F.2d 1151, 1169 (5th Cir. 1983) (quoting *Lambert v. Allstate Ins. Co.*, 195 So.2d 698, 700-01 (La. App. 1st Cir. 1967) (internal citations omitted)); *accord Lacroix v. State Farm Fire & Cas. Co.*, No. 09–cv–0609, 2010 WL 2265577, at *4 (E.D. La. June 2, 2010). The rule is simply a recognition of the common-sense proposition that, where actual damages are known, estimates

36

are speculative and no longer relevant.  As the Fifth Circuit stated in *Volkswagen*, "Plaintiff must produce the best evidence available in support of his claim. . . . Where invoices, statements, or records of accounts expended in the repair of damages are in the possession of plaintiff or are available or attainable, such records constitute the best evidence and should be offered in proof of plaintiff's claim."  713 F.2d at 1169.  While this rule has often been cited in insurance cases, it does not turn on any particular feature of insurance law, and has been applied in other contexts, including construction defect cases.  *See, e.g., Barile Excavating & Pipeline Co. v. Kendall Props., Inc.*, 462 So.2d 1129, 1130 (Fla. Dist. Ct. App. 1984) (since "actual cost figures were available, we conclude that error occurred when the trial court based its judgment on the estimated cost of completion"); *see also* Bruner and O'Connor on Construction Law § 19:80 (owner has burden of proving "cost to repair" to a "reasonable certainty"; "for repairs already completed at time of trial, 'cost to repair' is proven by actual incurred costs—the best evidence of such damages").

     **110.**    There is no evidence that Plaintiffs made any attempt to obtain the actual cost of repairs incurred by class members whose properties had been remediated.  Plaintiffs cannot ignore that actual repair cost data is available, nor may the Court disregard Plaintiffs' duty to present the best evidence available in support of their damage request.[13]  *See In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1235 (5th Cir. 1986) (reversing award of loss of inheritance damages, court noted that instead of "attempting to calculate probable future consumption of income based on [decedents' actual] spending habits," plaintiffs' expert

---

[13]  Courts in this district have consistently excluded expert testimony where, as here, the purported expert relied on estimates and failed to consider the repair costs actually incurred in restoring properties.  *See, e.g., Trujillo v. State Farm Fire & Cas. Ins. Co.*, No. 09–cv–8, 2011 WL 162883, at *3 (E.D. La. Jan. 19, 2011) ("the court will *not* allow Mr. Kotter to testify regarding his estimate of repairs if actual repairs were substantially performed or actual repair costs were incurred . . . and he failed to take into account the actual repairs or the repair costs") (emphasis in original).

inappropriately "relied on statistical studies showing how average families consume available income"; assumptions were "abusive of the known facts" and "provide[d] no reasonable basis for calculating" lost inheritance); *Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 383 (S.D.N.Y. 2014) ("'projections' are inappropriate" to calculate damages where expert has information "reflecting actual, not projected, sales").

**111.** In *In re Industrial Diamonds Antitrust Litig.*, 119 F. Supp. 2d 418, 419 (S.D.N.Y. 2000), buyers of industrial diamonds brought a class action against the two producers controlling the majority of the world market, alleging a price-fixing conspiracy; after defendants defaulted, plaintiffs moved to assess damages pursuant to Fed. R. Civ. P. 55(b)(2). Denying the motion, the court held the sales figures that plaintiffs' expert used in his computation "were not directly derived from corporate records but upon estimates made through a complicated, roundabout process disturbingly redolent of Rube Goldberg." *Id.* at 422. This "artificial process," involving "improbable assumptions based on other improbable assumptions, was utterly unnecessary because, *mirabile dictu*, hard data on such sales were available merely for the asking." *Id*. at 423.

> With such ready availability of accurate data . . . , we can divine no reason why plaintiffs resorted to the circuitous and speculative methodology employed by [expert] other than a desire to magnify their damages. That, of course, is what plaintiffs' counsel naturally try to do, but it is the duty of the court, even where a defaulting defendant has not appeared at the inquest to challenge the plaintiffs' computation of damages, to protect the interest of the absent defendant and insure that justice is done to all parties, even foreign corporations who are reputedly members of powerful cartels. (*Id.*)

**112.** Those observations are equally apt here. The evidence shows that Mr. Inglis' supposed formula is not a reliable indicator of damages either on an individual property or in the aggregate. Moreover, for the remediated class properties, actual cost data should be available from which actual damages can be established without the need for extrapolation or assumptions.

As the Supreme Court has observed, "[e]xpert testimony is useful as a guide to interpreting" the facts, but is "not a substitute for them." *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 242 (1993).

## IV.   Plaintiffs Are Not Entitled to the Award of Aggregate, Lump Sum Class Damages They Request.

113.   Plaintiffs made clear at the damages hearing that the Court was not being asked to enter individual damage awards for members of the class, but rather an aggregate damages award that would be subject to a subsequent claims proceeding to determine the amount, if any, of each class members' recovery.  Plaintiffs did not even suggest that Mr. Inglis' model could be used as an accurate basis on which to determine individual damages.  As Plaintiffs' counsel stated in his opening statement:

> At the end of the day we'll provide this Court with a reasonable approach based upon the science in this case for determining class-wide damages.  There ultimately will have to be a claims process and there will be additional phases where adjustments will be made. But the claims process, at the end of the day, will be the process by which we accurately allocate damages to each individual class member.  (Tr. 9.)

Even if Plaintiffs could rely on estimates instead of actual repair costs for their remediation damage claim, the Court is bound by controlling precedent that precludes Plaintiffs' proposed class damages framework.

### A.   Fifth Circuit and Supreme Court Authority Forecloses Plaintiffs' Plan to Extrapolate Aggregate Class-Wide Damages From A Sample Set.

114.   The Fifth Circuit has repeatedly held that courts may not award aggregated damages by lump sum or formula, but must assess tort damages for "individuals, not groups." *In re Fibreboard Corp.*, 893 F.2d 706, 711 (5th Cir. 1990).  "Even in the context of a class action, . . . individual damages must still be proved individually." *Cimino v. Raymark Indus.,*

*Inc.*, 151 F.3d 297, 319 (5th Cir. 1998); *see also Corley v. Orangefield Indep. School Dist.*, 152 F.
App'x 350, 355 (5th Cir. 2005); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014).
(recognizing in economic loss litigation "that the class members' damages 'would have to be
decided on an individual basis were the cases not being settled'").

115.     The "fatally defective" class damage plan in *Cimino* contemplated trying 160
sample cases and then awarding each of the remaining 2,128 plaintiffs "an amount of actual
damages equal to the average of the awards made in" the sample cases.  151 F.3d at 319.  But
like the *Germano* proceedings on which Plaintiffs rely, the sample trials in *Cimino* involved
"evidence only of the damages to the particular plaintiffs before them" and "did not determine or
purport to determine, the damages of any other plaintiffs or group of plaintiffs."  *Id.* at 320.  The
Fifth Circuit found no "legally valid ground on which the . . . damages suffered by one person
may be determined . . . solely on the basis of the average of awards made to other persons in
similar cases."  *Id.* at 321 n. 51.

116.     *Cimino* and *Fibreboard* foreclose Plaintiffs' plan, whereby damages would be
assessed for a limited number of class members, averaged, and then applied to the rest of the
class.  Indeed, the sample size in *Cimino* was significantly larger than the sample size utilized by
Mr. Inglis here, and was still found not to provide an acceptable basis for calculating class
damages.  The Supreme Court likewise confirmed that such a "trial by formula" is impermissible
in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2561 (2011) ("trial by formula" contravened
the Rules Enabling Act because it would award the "entire class recovery" by multiplying the
"average" backpay by the number of valid claims).[14]

---

[14]  Plaintiffs' attempt to distinguish *Fibreboard* and *Cimino* as "cases involving 'personal
injuries to individuals at widely different times and places'" (Damages Reply, at 38 n. 85), is
unavailing.  This case involves alleged property injuries "at widely different times and places"
and circumstances impacting the cost of repairs.  No Fifth Circuit case draws the distinction

117.    In other words, Plaintiffs may not use the proceedings in *Germano* as a damages "bellwether."  *See In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1020 (5th Cir. 1997); *Cimino*, 151 F.3d at 318 (casting doubt as to whether extrapolation from bellwether is ever permissible and noting that any suggestion to the contrary in *Chevron* is *dicta*); *see also Fibreboard*, 893 F.2d at 709-10 (mandamus issued blocking district court's multi-phase plan to use damage awards for 41 individual tort plaintiffs to determine "total damages suffered by the remaining 2,990 class members" in a "lump sum").

118.    The Court is aware that the United States Supreme Court has granted a writ of certiorari in *Tyson Foods v. Bouaphakeo,* No. 14-1146, and will be addressing the issue of extrapolated aggregate damages in the context of an FLSA collective action.  That decision may or may not ultimately provide additional guidance here, but the controlling precedent in this Circuit is clear and unequivocal.  This Court is bound by the holdings in *Chevron, Cimino,* and *Fibreboard* and is constrained to reject Plaintiffs' request for an award of aggregate damages based on the Inglis extrapolation.

### B.    Plaintiffs' Fluid Recovery Plan Based On A Rough Estimate of Aggregated Damages Violates Due Process And the Rules Enabling Act.

119.    Consistent with the controlling authority discussed above, the Second Circuit has held a "fluid recovery" plan identical to what Plaintiffs propose here "offends both the Rules Enabling Act and the Due Process Clause."  *McLaughlin v. Am. Tobacco Co*., 522 F.3d 215, 231 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).  This Court likewise cannot approve a fluid recovery process with "an aggregate determination [that] is likely to result in an astronomical damages figure that does not accurately

---

Plaintiffs propose.  *See, e.g., Corley v. Orangefield Indep. School Dist.*, 152 F. App'x 350, 355 (5th Cir. 2005).

reflect the number of plaintiffs actually injured by defendants and that bears little or no relationship to the amount of economic harm actually caused by defendants." *McLaughlin*, 522 F.3d at 231.

120.    In *McLaughlin*, the district court approved class plaintiffs' proposed damages "distribution method" under which first, "[t]he total amount of damages suffered would . . . be calculated . . . on an estimate of the average loss for each plaintiff," followed by a second phase in which "individual class members are afforded an opportunity to collect their individual shares." *Id.* Vacating that plan, the Court of Appeals held that "[r]oughly estimating the gross damages to the class as a whole" in the aggregate "and only subsequently allowing for the processing of individual claims would inevitably alter defendants' substantive right to pay damages reflective of their actual liability." *Id.* "When fluid recovery is used to permit the mass aggregation of claims, the right of defendants to challenge the allegations of individual plaintiffs is lost, resulting in a due process violation." *Id.* at 232; *accord Hickory Sec. Ltd., v. Rep. of Argentina*, 493 F. App'x 156, 159, 160 n.2 (2d Cir. 2012). Plaintiffs' plan here fails for all the same reasons.

121.    In addition, Plaintiffs' request for an aggregate judgment to be followed by a procedure to determine individual claims raises a host of practical and manageability concerns. What is the appropriate process if, after the claims procedure, it appears that the aggregate award was insufficient to cover the total damages incurred by the members of the class? Conversely, if the aggregate award is overly generous, what is the appropriate process to reduce the amount of the judgment or to provide defendant with a refund? Who bears the cost of this claims procedure? And is it appropriate in the context of this class action to award damages on a class-wide basis

when it appears from this record that individual, plaintiff-by-plaintiff damage determinations would need to be made in any event?[15]

### C.      Plaintiffs' Authority and Argument Do Not Justify The Relief They Seek.

**122.**      The authority on which Plaintiffs rely does not support their proposed class-wide damage award. *Monumental Life Ins. Co., v. National Life*, 365 F.3d 408, 419 (5th Cir. 2004)—a civil rights class action under Federal Rule *23(b)(2)*, alleging discriminatory practices in the sale of life insurance—addressed whether a damage claim predominated over the request for injunctive relief. In finding it did not, the court opined that the equitable damages in that case could be mechanically calculated. *Id.* at 419. However, *Monumental* provides no guidance in determining damages in a Rule *23(b)(3)* products liability action where the "recoverable damages are fixed by state substantive law." *Cimino*, 151 F.3d at 317-18.

**123.**      Plaintiffs' reliance on cases that granted certification of federal antitrust class actions is also misplaced because "a more relaxed burden of proof obtains for the amount of damages [in an antitrust case] than would justify an award in other civil cases." *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.*, 213 F.3d 198, 206-07 (5th Cir. 2000). In the cases Plaintiffs rely upon, class members were overcharged and the amount of that overcharge was shown through statistical and econometric data to be relatively uniform throughout the class; in contrast, this case involves common law claims for relatively large damages by a relatively small class, and those damages cannot be determined by simply applying an across-the-board price reduction to whatever amount plaintiff paid.

---

[15]  Defendants have moved for decertification of the class. That motion will be taken up at a later stage of these proceedings, but at a minimum the proofs at the damages hearing raise serious questions in the Court's mind about whether a class-wide determination of damages based on common proof is feasible in this case.

124.    Even in the cases relied upon by plaintiffs, damage determinations cannot rely on "speculation" or "guesswork."  *Eleven Line, Inc., supra.*  In contrast to *Monumental* and the antitrust cases Plaintiffs cite, this case presents numerous "variables" that "implicate[ ] the subjective differences of each plaintiff's circumstances" and must be considered about each plaintiff in order to assess damages.  *Monumental*, 365 F.3d at 419 (citation omitted).  Even in the antitrust context, those variables would preclude the damage award Plaintiffs seek.  *See, e.g., Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 304-06 (5th Cir. 2003) (damages formula improperly "utilized a nationwide average cost of labor"; "any adequate estimation of actual damages suffered would require consideration of the variegated nature of" the class members); *Eleven Line*, 213 F.3d at 207-209 (damage formula based on average of rates of return of similar businesses failed to account, *inter alia*, for differences in location and size between various businesses used to calculate the average).

125.    As this Court observed in *Hernandez*, "the cost of restoration [is] the proper measure of damages where the thing damaged cannot be adequately repaired" and "[n]o mechanical rule is applied with exactitude.  *Each case must rest on its own facts and circumstances.*"  *Hernandez*, 2010 WL 1710434 at *23.  For example, with respect to remediation costs, damages could depend significantly on a host of variables, including floor plans, geographic location, ceiling heights, construction grade and quality, type and extent of plumbing and electrical systems, and a host of other individualized factors that Plaintiffs' "one size fits all" model does not take into account.

126.    Plaintiffs' methodology for calculating property damage considers none of these subjective, individualized factors.  Because the remediation damages sought "would require examination of the peculiar circumstances of individual landowners"—not to mention the actual

cost of repairs—Plaintiffs' request to calculate those damages formulaically, by means of extrapolations from estimates, must be rejected as a matter of law. *Corley*, 152 F. App'x at 355 (trespass damages could not be formulaically calculated because "the injury to the landowners varies in substantial ways, depending on the value, character and location of the property"; "geographic variations would render some parcels more valuable than others, thus precluding any mechanical calculation of damages in this case").

127. Plaintiffs argue that their methodology is "premised on data common to all class members," and that "each class member suffered the same kind of injury, and the only individualized determination required can be calculated using a formula to estimate each class member's damages." (Damages Reply, at 53.) The Court finds that argument is not well taken. As Mr. Pogolirich's testimony established, even if Plaintiffs suffered the same "kind" of injury, the relevant data here—the costs of repair for different properties spread out over 18 states—are *not* "common to all class members," but individualized and variable. *See, e.g., Corley*, 152 F. App'x. at 355; *Bell Atl. Corp.*, 339 F.3d at 304-06; *Eleven Line*, 213 F.3d at 207-09.

128. "At trial, a plaintiff must prove the amount of his damages with reasonable certainty." *Schmueser v. Burkburnett Bank*, 937 F.2d 1025, 1030 (5th Cir. 1991) (affirming judgment *n.o.v.* declining to award certain elements of damage). Plaintiffs' invocation of the general rule that "the wrongdoer shall bear the risk of the uncertainty which his own wrong has created" (Damages Reply, at 41) does not relieve them of that burden. Here, *there is no* "uncertainty" as to the actual cost of remediation; it is Plaintiffs who seek to avoid the certainty of the actual repair costs in favor of an unscientific exercise in speculative extrapolation.

129. Thus, while absolute "certainty" of proof may be too exacting a standard, the burden is nonetheless on Plaintiffs to demonstrate damages with reasonable accuracy, based on

an accepted and verifiable methodology. *See, e.g., Eleven Line*, 213 F.3d at 207 (even antitrust law's "more relaxed burden of proof . . . for the amount of damages . . . is limited by our responsibility not to allow damages to be determined by 'guesswork' or 'speculation;' we must at least insist upon a 'just and reasonable estimate of the damage based on relevant data'") (citations omitted); *Arthur J. Gallagher & Co. v. Babcock*, 703 F. 3d 284, 293-94 (5th Cir. 2012) ("The plaintiff has the burden of proving damage and its amount" and such "damages may not be based on speculation or conjecture, but must be proven with 'reasonable certainty'"); *R.E. Davis Chem. Corp. v. Diasonics, Inc.*, 826 F.2d 678, 684 (7th Cir. 1987) ("[T]he burden of proof is generally on the party claiming injury to establish the amount of its damages; especially in a case such as this, the plaintiff has easiest access to the relevant data."). "[P]eople who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence." *Schiller & Schmidt, Inc. v. Nordisco Corp.*, 969 F.2d 410, 415 (7th Cir. 1992). Mr. Inglis' model wholly fails in that regard.

     **130.** Accordingly, Plaintiffs motion for the assessment of class damages must be denied.

Dated:  June 23, 2015                    Respectfully submitted,


**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
michael.barr@dentons.com
justin.kattan@dentons.com

- AND -

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 5900
Chicago, IL  60606-6306
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com

- AND -

C. Michael Moore
Texas Bar No. 14323600
Gene R. Besen
Texas Bar No. 24045491
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
mike.moore@dentons.com
gene.besen@dentons.com

- AND -

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130
harry.rosenberg@phelps.com

*Attorneys for Beijing New Building Material (Group) Co., Ltd. and Beijing New Building Materials Public Limited Company*

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing Beijing New Building Materials Public Limited Company's and Beijing New Building Material (Group) Co., Ltd.'s Proposed Findings of Fact and Conclusions of Law has been served on Plaintiffs' Liaison Counsel, Leonard Davis, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail or by hand delivery and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 23rd day of June, 2015.

*/s/     Michael H. Barr*