1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3       ****************************************************************

4       In re:  CHINESE-MANUFACTURED
        DRYWALL PRODUCTS LIABILITY          CIVIL DOCKET NO. 09-MDL-2047
5       LITIGATION,                         SECTION L
                                            NEW ORLEANS, LOUISIANA
6       THIS DOCUMENT RELATES TO:           Wednesday, July 15, 2015
                                            9:00 A.M.
7       ALL CASES.

8       ****************************************************************

9                        TRANSCRIPT OF PROCEEDINGS
10          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
11

        APPEARANCES:
12

        FOR THE PLAINTIFF:          HERMAN, HERMAN & KATZ, LLC
13                                  BY:  RUSS M. HERMAN, ESQ.
                                    820 O'Keefe Avenue
14                                  New Orleans, Louisiana 70113

15

16      FOR THE NON-PARTY:          MCGLINCHEY STAFFORD, PLLC
                                    BY:  GABRIEL A. CROWSON, ESQ.
17                                  601 Poydras Street, 12th Floor
                                    New Orleans, Louisiana 70130
18

19

20      OFFICIAL
        COURT REPORTER:   TERRI A. HOURIGAN, CRR, RPR
21                        CERTIFIED REALTIME REPORTER
                          REGISTERED PROFESSIONAL REPORTER
22                        500 POYDRAS STREET, ROOM B-275
                          NEW ORLEANS, LOUISIANA  70130
23                        (504) 589-7775
                          Terri Hourigan@laed.uscourts.gov
24

25      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
        PRODUCED BY COMPUTER.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P-R-O-C-E-E-D-I-N-G-S**

2

3                    July 15, 2015

4              (COURT CALLED TO ORDER)

5

6          THE CASE MANAGER:  All rise.

7          THE COURT:  Be seated, please.  Good morning, ladies

8      and gentlemen.  Call the case.

9          CASE MANAGER:  *MDL No. 2047, In re:*

10     *Chinese-Manufactured Drywall Products Liability Litigation.*

11         THE COURT:  Counsel, make your appearance for the

12     record, please.

13         MR. CROWSON:  Good morning, Your Honor.  Gabriel

14     Crowson for non-party, JP Morgan Chase & Company.

15         MR. HERMAN:  May it please the Court, good morning,

16     Judge Fallon, Russ Herman for the PSC.

17         THE COURT:  All right.  We have a budding lawyer there,

18     huh?

19         MR. CROWSON:  Your Honor, that is my son, Brady.  He's

20     out of camp this week, so I brought him here.

21         THE COURT:  Good, I appreciate you being here.

22         MR. HERMAN:  Well, he is a good second chair.  I wish I

23     had brought one with me.

24         THE COURT:  Okay.  This matter is before the Court.

25     It's a question of discovery.

1    We have met before on some similar issues.  It has to

2  do with subpoena of the issue by the PSC and a 30(b)(6)

3  deposition request.

4    Basically, the PSC is interested in finding documents

5  or finding out whether you have any documents in possession in

6  control regarding the Taishan entities, as we refer to them,

7  and/or their affiliates.

8    I know that you have taken the position and moved to

9  quash the subpoena, so that's what we're here for.

10    I will take up the motion.  Either one of you can speak

11  first.  Go ahead, Russ.

12    MR. HERMAN:  May it please the Court.  Judge Fallon,

13  good morning.

14    The first thing I'm going to deal with is very briefly

15  the hurdles that learned counsel has placed to this discovery.

16    First, a statement of privilege, both financial

17  privilege and attorney-client privilege under FRCP 45(e)(2)(A).

18  There is no privilege law, and there have been no documents

19  produced.

20    Secondly, the word "affiliates" is overbroad.  The word

21  "affiliates" is not overbroad, whether you use Black's Law

22  Dictionary, whether you use Harvard Dictionary, whether you use

23  Webster's Unabridged, affiliates all mean the same thing, and

24  it has to do with relationships, commercial and other

25  relationships.

1        It does not have to rise to control as alter ego does.

2   And, in addition, this is the Court's language and the Court's

3   language actually conforms with CNBM's annual reports and

4   interim reports which uses the word "affiliates."

5        Next, JP Morgan says it hasn't had reasonable time, and

6   I'm going to get back to that.  They have had a lot of time.

7        I want to make it clear that all we're interested in

8   are financial records from July 17, 2014, to March 25, 2015,

9   first of all, as to the relationships among JP Morgan and the

10  principal alter egos, BNBM, CNBM, BNBM Group, and CNBM Group

11  and Taishan, and next, financial transactions with them or any

12  of their subsidiaries.

13       I thought, and perhaps I wasn't clear in the responsive

14  brief that I filed, but I did, following the Court's direction,

15  narrow in a meet and confer in my office with both JP Morgan

16  and Morgan Stanley, and gave them Exhibit A, because they said

17  they had no idea what relationships I was talking about.

18       I set forth the pages, the years of the annual

19  statements of CNBM and BNBM.

20       Counsel also indicates that Exhibits D and E should be

21  stricken.  Those are the depositions of CNBM and CNBMG because

22  they're under seal.  But I never got a request to join in

23  unsealing the documents.  The Court never got the request, and

24  I made it very clear at the inception to any third party, you

25  need to get your counterpart, and I use that term, not

1    pejoratively, to okay the release of confidential documents.

2         Now opposition has always been clear.  We follow the

3    brand ice rule, which is sunshine is the best disinfectant.  We

4    don't think anything ought to be under seal except the HL

5    documents, which I won't refer to further because there will be

6    a transcript, et cetera.

7         We are perfectly happy.  But I don't think it's an

8    issue because the only reason D and E were attached was so that

9    everyone could be sure that I accurately cited in my brief

10   attribution in those depositions.

11        I have checked it and doubled checked it, and if they

12   want to strike D and E, it's okay with me, but the brief still

13   stands as well as the information in the brief.

14        The next issue is Your Honor's October 25th 2011 order.

15   I want to go through some history, basically for the record, in

16   the event that this matter, whichever way your Your Honor rules

17   may go further.

18        In early 2009, we were contacted at HHK by Katrina

19   clients who were having problems related to drywall.  At that

20   time we undertook an investigation, and as much as we could, we

21   found out there was a German manufacturer in China and a

22   Chinese manufacturer.  As a matter of fact two Chinese

23   manufacturers, Taishan and BNBM, and there were others.  They

24   were the principals.

25        We hired and interviewed graduate students who were

1   Chinese lawyers at Loyola, one at LSU, several at Tulane.  We

2   retained them before there was ever an MDL, a translator to

3   translate from the public documents, whatever we could find out

4   about CNBM and Taishan.

5       Fortunately, CNBM had published every annual report and

6   interim report and notices in English and Chinese from 2005 on.

7       And so in October 25th 2011, we had already done some

8   preliminary research in 2009 and 2010.  And around

9   October 2011, Your Honor ruled that we wanted to go upstream

10  and Your Honor correctly said, "No, you need to focus on

11  Taishan and Knauf."  So we didn't go upstream.  It wasn't a lot

12  of information really, about the true relationship of JP Morgan

13  other than in the CNBM annual report of 2009, but not nearly

14  what has developed since then.

15      We did not -- the defendants and Your Honor ruled that

16  we had to show -- we had a burden to show that, quote, there

17  was control by JP Morgan of its Chinese subsidiaries in order

18  to get discovery, and that was fine, we couldn't prove control

19  at that time.

20      I am going to take this up again, that the defendants

21  were found to be alter ego, and the Fifth Circuit approved.

22      There were HL documents that indicated BNBM and CNBM

23  and possibly CNBM Group were involved in decisions of Taishan

24  to withdraw.  And Your Honor is very familiar with that issue.

25      At the time, and even today, JP Morgan says they are

1    not an investor in any Chinese drywall company.  Well that is a

2    little stretch because BNBM and Taishan are Chinese companies

3    controlled by CNBM, and as such, and as alter egos, they have a

4    very strong relationship from 2006 to today.  They are a

5    primary investor in CNBM.

6         They need time for a search.  Well, this has been going

7    on for a while.  And they need time, they have never said how

8    much time they need, what the problems are, and we have

9    definitely narrowed our inquiry.

10        Now, I think it's helpful, because at this juncture,

11   CNBM is definitely in the case as a defendant and it says JP

12   Morgan has the highest stake among all H-share companies.

13        It's interesting that CNBM now says, "Well, gee, we are

14   controlled by the state."  I would like to know how a public

15   company is controlled by the state, but maybe that issue is

16   coming.

17        Then in 2009, they were listed as the number one public

18   investor.  And in January 2009, Song Zhiping, that is Chairman

19   Song, then and now, during every moment from the time drywall

20   was negotiated in 2005, shipped to the U.S. in 2006 and 2007,

21   at the time of the *Germano* trial and the *Hernandez* trial,

22   Chairman Song made a public statement, that JP Morgan, an

23   active supporter of CNBM, not JP Morgan identified as anything

24   else, and indeed the vice president of CNBM also issued a

25   statement.

1    Now where does this come from?  It comes from the 2009
2  annual report.
3    As a way of explanation, each year in March of each
4  year, the prior years reports are due from CNBM and BNBM, so
5  that when you look at CNBM 2009 annual report, it was published
6  in March 2010, disseminated to the public, its witnesses say
7  because it's a public company, and it was disseminated in
8  English.
9    And the testimony is that in every CNBM report, it was
10  vetted.  There has never ever been a request or anything in it
11  to be changed.
12    Now, when did JP Morgan know about this litigation?  It
13  began monitoring this litigation in September 2009, and it
14  commented that the Chinese Drywall case has limited influence
15  on CNBM stocks, and we recommend investors to buy CNBM stocks.
16  This is coming, again, from a major shareholder of CNBM.
17    Now during the 30(b)(6) deposition of the chief
18  economist of CNBMG, about a month ago, "I asked had Chairman
19  Song of CNBM Group, if he knew about the drywall case."
20    "He said, yes, he knew about the drywall case in '09.
21  But I did not ask him if he learned of it from according to
22  what I see, it's not an e-mail.  It's a letter -- if he had
23  learned about it from the letter.  If he had learned it from
24  the letter, I'm not sure."
25    The letter was from Knauf directed to Chairman Song,

1    "You better get this lawsuit and help us out."

2          Now we haven't taken his deposition, so I can't confirm

3    that because their chief economist couldn't confirm it.

4          Now further, in the deposition -- I was inarticulate.

5          I had to ask a question again, and I said:

6          "QUESTION:  "Isn't it true that in 2014, the chairman

7    of CNBM Company, Limited; BNBM Group; and CNBM Group was Song

8    Zhiping."

9          "As far as I understand, yes."

10          And it is to be noted that she is an officer and a

11    30(b)(6) representative, when she makes that statement.

12          So there is no question as to the relationship, not

13    only of CNBM Group and CNBM, but also Chairman Song to

14    JP Morgan.

15          Again, the same witness:

16          "QUESTION:  Isn't it more probable than not that

17    Chairman Song, as chairman of CNBM Company, BNBM Group and

18    chairman of CNBM Group, was consulted by Taishan before Taishan

19    did not appear at a hearing ordered by Judge Fallon?"

20          "Objection to form."

21          I think it's really an objection to substance, but it's

22    an objection to form.  There is the possibility of such.

23          "Is that possibility more probable than not?"

24          "Objection."

25          "Objection."

1       "More probable."

2           So at least at this juncture, it's more probable than

3   not, both by mail, by HL documents, and by testimony that

4   Chairman Song, who was the chairman of the board of all of

5   these entities, not only was familiar with the litigation, but

6   put on notice at an earlier time.

7           Now:  "Isn't it true that on July 18, 2014, BNBM

8   Company, Limited was a 52.4% held subsidiary of CNBM Company

9   Limited?"

10          "Yes, according to the Chinese version of CNBM Company

11  Limited, voluntary announcement, July 18th 2014," which

12  coincides, frankly, with Taishan's failure to appear with the

13  contempt order that follows:

14          "...it is stated that CNBM Company, Limited, know from

15  the BNBM Company, Limited, parentheses, 52.4 held -- stock held

16  subsidiary of the company, yes.  Correct."

17          Now the importance is under the tax law in China, which

18  we went into, and it's a lengthy thing, you only need

19  25 percent to be in control.

20          So here you have got 52.4 percent even though there is

21  some testimony, Your Honor, that you need 50 percent.

22          Now what is the crux of the situation?  And this may be

23  the most important document, because it was not until the

24  annual report of China National Building Material Company,

25  Limited, and you will note, ALRMHCNB, these documents we had to

1    download, which now have been introduced in depositions.

2         It wasn't until then, which, of course, came out in

3    March -- mid March 2015, about the same time that Taishan

4    begins to come forward and pay under contempt.

5         To me, this is the key document.  JP Morgan Chase and

6    Company, the proposed opponent and producer, was deemed to hold

7    businesses in a total of, and I will round it off, 230,700,000

8    H-shares, long position, and another 6 million H-shares in a

9    short position in the company.

10        The company is defined as CNBM Company Limited, by

11   virtue of its control.  I love facts.  What a wonderful word

12   "control" is, by virtue of its control over the following

13   corporations which held interest in the company.  And then it

14   lists.

15        Now we do not contend that at this juncture that

16   JP Morgan is an affiliate within Your Honor's contempt ruling,

17   and within Your Honor's prior rulings and within the two Fifth

18   Circuit opinions.

19        But what we do say is that we are entitled to know

20   particularly during the period of July 17, to March 25, 2015,

21   what the relationship is between JP Morgan and its subsidiaries

22   that it controls thus far, alter ego defendants or the Taishan

23   defendants.

24        We're also entitled to know what financial

25   transactions, if any, any of these companies, and JP Morgan

1   Chase had with the Taishan defendants and their subsidiaries.

2          In our papers we listed the 2014 diagram that shows

3   clearly who the subsidiaries and related corporation affiliates

4   are.

5          So we have a limited period of time.  We have a limited

6   inquiry, and we have a necessary and relevant inquiry.

7          Now there is always a motive.  Recently, Morgan Stanley

8   -- the same thing -- the only difference with Morgan Stanley is

9   in 2006 and 2007, Morgan Stanley handled the CNBM public

10  offering, which we also have in evidence.  It's also been

11  identified.

12         And by handling that, that is the vehicle by which

13  eventually JP Morgan made its investments, and Morgan Stanley

14  has said, "Okay, we will produce, we will reserve our rights."

15         Now, I'm not going to put up the other slides, but

16  there is always a motive for -- and a legitimate motive, you

17  know, you get instruction from a client.  You do what the

18  client says as long as you are not violating some ethical

19  requirement or Court order.

20         But, what are client's motivations?  And that is an

21  issue, because recently JP Morgan has had to plead to two very

22  serious felonies.

23         Now why is that relevant here?  Because if it's not

24  relevant, it shouldn't be mentioned.

25         Well, it's relevant because it had to do with the

1   Foreign Corrupt Practices Act and illegal cabal among five

2   major U.S. banks -- four major U.S. banks, and one foreign bank

3   to fix currency, and the chief currency involved was the yuan,

4   which is the Chinese yen and sometimes pronounced "yuan."

5          And it seems to me since this was a recent development

6   that JP Morgan, the client, and probably their general counsel

7   for good reasons said, "Let's delay this.  We have got these

8   matters under investigation, when we have completed them..."

9   and I had fully expected that once that was done that there

10  might be a shift in JP Morgan's motivation, but I know learned

11  counsel is a very fine lawyer and honorable man.  He's with the

12  McGlinchey firm, which has an excellent reputation and a very

13  fine banking department.

14         So I am not -- I have no criticism at all the way that

15  opposite counsel from McGlinchey has handled this matter, and

16  they were very successful initially in 2011.

17         But now it's 2014.  And what has happened is a lot of

18  facts have come out.

19         And, I thank Your Honor for the opportunity to stand

20  before you on this issue today and for granting oral argument.

21         THE COURT:  Okay.  Let me hear from counsel.

22         MR. CROWSON:  Your Honor, first I would like to thank

23  Mr. Herman and the Court for accommodating my vacation schedule

24  and having the hearing today.  I know it would have been more

25  convenient to have it at the status conference, which was

1    yesterday.

2          THE COURT:  It's okay.

3          MR. CROWSON:  In terms of the argument, I almost feel

4    like it's sort of two ships sailing past each other in a way

5    which Mr. Herman has focused on and what I think the core issue

6    is.

7          Our motion to quash that we filed, cross motion to

8    quash, really raised three points:  One, the PSC started this

9    as an emergency motion, when there really wasn't an emergency,

10   and that has sort of been mooted because of the damages

11   hearing.

12         The second point is the relevancy issue.

13         And then the third point is the subpoena.  We're a

14   non-party to this litigation.  And the way they phrased the

15   subpoena, it imposes an undue burden on the non-party,

16   particularly when you have the defendants here in the

17   litigation, and you know, the depositions, and a lot of the

18   facts Mr. Herman was talking about.  I think that proves my

19   point that if you want to go at this alter ego issue, you are

20   at it right now with the defendants here.

21         But let me back up to the -- and in our motion to

22   quash, we didn't raise privilege issues or financial privilege

23   or even the reasonableness of the time.

24         Now, if Your Honor denies our motion and allows the

25   subpoena, I'm sure that, you know, we have to make privilege

1    law, if there are any privileged documents, and things like

2    that.

3            But that wasn't part of our cross motion to quash.  I

4    think Mr. Herman may have confused some of the objections that

5    Morgan Stanley may have made in some of its papers.

6            But in terms of the relevancy, which is really the core

7    issue here, what we had was a lot of information about

8    investments in one company, CNBM.

9            And then a second level of information about, well the

10   relationship between CNBM and all of the other Chinese

11   defendants in the case.

12           But from JP Morgan Chase's standpoint, they are a

13   public investor in one company.  Now albeit, it's significant,

14   it's -- you know, several million shares, but so is the

15   investments of Citibank, UBS, the Bill and Melinda Gates

16   Foundation, which are disclosed in some of these annual

17   reports, as very, very large stockholders.

18           So if this case were about what JP Morgan Chase did in

19   China, and its dealings in China, then this information might

20   be relevant.  But what the focus of the discovery here is did

21   these Taishan companies conduct business in the United States

22   since July 2014, and are they alter egos of each other?

23           There hasn't been a single legal authority that has

24   been cited back to us that would suggest that the fact that a

25   U.S. company invests in one publically-traded company, even if

1   its a large stockholder, somehow means that separate Chinese

2   companies are conducting business in the United States or that

3   those separate Chinese companies are somehow alter egos of each

4   other.

5         THE COURT:  It doesn't go to the substance of the

6   issue.  I mean, you may be right about that, but you may not --

7   you may prevail in the substance, but the question of discovery

8   is before me at this point.

9         MR. CROWSON:  Correct.  But I think even though

10   discovery is liberally and broadly construed, and, you know, I

11   recognize that that is the typical rule, you still have a core

12   relevancy issue, and, you know, all of the discovery has been

13   couched in terms of Your Honor's contempt judgment and the

14   alter ego issue.

15         So that's the prism in which we have to look at this.

16   You know, if we talked about Morgan Stanley, you know, was sort

17   of an advisor and brought them public, well that is a specific

18   deal.  I mean, I can understand that.

19         But, you know, just any U.S. investor investing stock

20   in CNBM, if that means that they are now all of a sudden open

21   to discovery in this case, at that point Rule 45 really doesn't

22   have any bounds.

23         And again, particularly when you have the ability to,

24   you know, depose all of these executives of CNBM and whoever

25   else, and say, "What did you do in the United States, and what

1    is the relationship between and among all of your different

2    entities."

3         But the mere fact that JP Morgan Chase owns stock in

4    CNBM, I don't think means that we somehow have evidence that

5    all of these other companies conducted business in the United

6    States.  And if that is the only fact that you have, I don't

7    think that the door has been opened for discovery of us.

8         Mr. Herman makes it seem like this information about

9    JP Morgan Chase is sort of just all of a sudden been sprung on

10   him.  That is just not the case.

11        The very first time that the PSC issued a subpoena to

12   JP Morgan Chase, four years ago in 2011, asking for a lot of

13   the same stuff, they sent it to the parent holding company, we

14   objected, and said, "Look, we don't have custody or control

15   over all of our affiliates and their documents, so you have to

16   be more precise with your subpoena."

17        And at that time, we provided them with the

18   information.  Well, there are certain JP Morgan companies that

19   do own stock in CNBM.  It's publically traded on the Hong Kong

20   Exchange.  It was, you know, a sizeable stake at that time.

21        So that's not new information.  So the fact that the

22   more recent annual reports also show, well, here is the

23   holdings of various JP Morgan Chase companies and they are

24   reported through the parent company, it's still the same fact

25   that, you know, they know that we had a sizeable interest.

1    That has been going on since, you know, years before the
2    contempt judgment.

3          And, you know, Mr. Herman pointed out motives of, you
4    know, delaying discovery, and I don't want to even really
5    address that.

6          But I do think we have to think about what are some of
7    the motives of the PSC here in getting this.  I mean, they
8    tried back in 2011.  I think it's almost to make JP Morgan
9    Chase responsible for this judgment in the event that some of
10   these Chinese companies don't stick around in this litigation.
11   I think that is the motive of the PSC to get -- to try to get
12   information from JP Morgan Chase, not are these companies
13   violating the contempt judgment, or are they alter egos of each
14   other.

15         We're not a defendant.  We're a non-party to this case.
16   The fact that, you know, to make an investment or to consider
17   keeping an investment in a publically-traded Chinese company
18   several years ago, I think it's natural that you would be doing
19   research on the things that impact that company, including this
20   litigation.

21         So to me, that is not unheard of or doesn't strike me
22   as anything remarkable.  I'm sure UBS and Citibank and the Bill
23   and Melinda Gates Foundation, or their research analysts
24   probably track this litigation as well.

25         That doesn't mean that they all of a sudden have

1    evidence of the Taishan companies conducting business in the

2    United States in the last year.

3         So with that, Your Honor, the discovery is not relevant

4    simply because we own stock for several years.  And I think

5    that the way it's phrased, and the way it's set up, it imposes

6    an undue burden on non-parties to the case, particularly when

7    you have the various Chinese defendants who are litigating this

8    case and engaging in discovery right now.

9         Thank you.

10        THE COURT:  Any response?

11        MR. HERMAN:  Thank you, counsel.  May it please the

12   Court, Judge Fallon and learned counsel, Document No. 18933

13   filed by JP Morgan Chase on May 14, 2015, specifically says at

14   Paragraph 13, Page 5, an assertion of attorney-client and

15   financial privilege, which is why I felt I needed to respond to

16   it.

17        No one claims that JP Morgan Chase is an alter ego of

18   anything other than its controlled subsidiaries.  It is not a

19   defendant.

20        But Your Honor issued a contempt order and instructed

21   the PSC to go forward and determine what affiliates of the

22   Taishan entities may have conducted business in violation of

23   your contempt order.

24        What we seek here is to determine, since JP Morgan

25   Chase is so involved in these defendant entities, whether they

1    conducted business as banks or guarantors or guarantees with

2    any of these Taishan defendants during the period of contempt.

3            It seems relevant.  It seems responsive to the

4    direction that we have received, and I don't think it's over

5    burdensome.  I mean, this has been going on now for quite some

6    time.

7            Counsel admits that JP Morgan has followed the

8    litigation.  I don't think it's relevant for other entities who

9    are not involved in this controversy at all, and of which there

10   is no evidence, to be cited as a hurdle to the discovery we're

11   entitled to.

12           And what is it we want?  We want the relationships

13   material among JP Morgan Chase, its subsidiaries, and the

14   Taishan defendants for a limited period of time from July 17,

15   2014, until March 25th.

16           Why March 25th?  I don't believe -- although, payments

17   were made pursuant to your order in mid March 2015, the final

18   payments didn't come until the end of the month, and there

19   wasn't -- it's not a problem, but that is why I chose that day,

20   which is different.  I wanted to point out that is the date

21   that Your Honor chose.

22           And what financial transactions occurred among JP

23   Morgan, its alter ego subsidiaries, and the Taishan defendants?

24   Maybe there were none, so there will be no documents to

25   produce.  But if there were, we are entitled.

1          Lastly, I'm very -- it will sound like I have engaged

2     in my customary hubris, but I'm very confident that we're going

3     to be able to hold Taishan in this case in damages, and we're

4     going to be able to hold BNBM in damages, and CNBM as a public

5     company and not a state-owned company that has control of BNBM;

6     we believe that we're going to be able to hold them.

7          We await hearings, evidence, and depositions are

8     ongoing, but I can assure you we're not looking to JP Morgan to

9     pay a judgment because of Chinese Drywall.  But what we are

10    looking for is a truthful response on the issue of whether

11    Taishan defendants and their subsidiaries violated a contempt

12    order.

13         Thank you, Your Honor.

14         THE COURT:  Okay.  Thank you very much.  I do

15    understand the issue.

16         I visited this once before.  The times have changed a

17    little bit, and since the time I issued a contempt order.  That

18    has skewed matters.

19         But the plaintiffs have been working on several tracts.

20    One tract, of course, is the contempt order.  The contempt

21    order now has a time frame to it.  I'm happy that the party

22    that was in contempt is no longer in contempt, and they were

23    only in contempt July 17th 2014, to March of 25th 2015.

24         As part of the contempt order the party was fined a

25    certain amount and required to pay a judgment, and in addition

1    to that, I provided that if they violated the contempt order,

2    which was to not do business in the United States, either they

3    or their affiliates, that if they did violate the contempt

4    order, they would have to then give up 25 percent of their

5    earnings during the period of time that they were in contempt.

6              So the plaintiffs are focused primarily on whether or

7    not the party did business during that period of time, either

8    personally or through their affiliates.

9              With regard to that, I think that the PSC is interested

10   in knowing whether there is any documents between

11   JP Morgan and the affiliates that it controls or subsidiaries

12   that it controls, because the law is pretty specific that only

13   those subsidiaries that a company controls, do they have any

14   obligation to produce any material, if it exists.

15             It seems to me that the defendants that I'm interested

16   in knowing about are:  Taishan, TTP, BNBM and BNBM Group, CNBM

17   and CNBM Group.  I think it's fair for the plaintiffs to seek

18   and obtain documents, if there be any documents, regarding the

19   relationship, if any, between JP Morgan and the subsidiaries

20   JP Morgan controls and those above-mentioned defendants.

21             And I also think that it's fair to inquire of JP Morgan

22   whether there are any financial transactions or arrangements

23   between JP Morgan or its subsidiaries that it controls and the

24   above entities during the period of time July 17, 2014, to

25   March 25, 2015.

1           I also feel that it's appropriate that JP Morgan

2    produce a 30(b)(6) witness who can testify regarding these

3    matters, because oftentimes documents just don't speak for

4    themselves.  We, as lawyers, oftentimes say the document speaks

5    for itself, but most of the time I find that they don't speak

6    for themselves, and that it's in the eye of the beholder or the

7    ear of the beholder, pen of the drafter that needs to be

8    fleshed out.

9           If JP Morgan, during that period of time, has any

10   privilege matters, and there may well be some, I would expect

11   them to prepare a privileged log in accordance with the rules,

12   and then produce any documents that they do seek to hold

13   privilege to the Court *in camera*.  I will review them and

14   decide whether or not they are indeed privileged.

15          I would like counsel to get together and determine a

16   time frame.  I don't want to impose any on you because I don't

17   know whether any documents exist.  It's one thing if none

18   exists and you can do it within a matter of a week or two

19   weeks.  If a lot exists, then you may take longer, and I

20   understand that.

21          But I would like to have the PSC have some input on

22   that so that if you all can agree on the time frame, that is

23   fine.  If not, then I will come up with a time frame.

24               MR. HERMAN:  I'm going to confer briefly with counsel.

25               (Off the record discussion between parties.)

```
 1              THE COURT:  Anything further from counsel?

 2              Anything further from counsel?

 3              MR. HERMAN:  I guess not.  Thank you, Your Honor.

 4              THE COURT:  Thank you very much.

 5              Court is in recess.

 6              CASE MANAGER:  All rise.

 7

 8                              *    *    *

 9

10                     REPORTER'S CERTIFICATE

11         I, Terri A. Hourigan, Certified Realtime Reporter,

12    Official Court Reporter for the United States District Court,

13    Eastern District of Louisiana, do hereby certify that the

14    foregoing is a true and correct transcript to the best of my

15    ability and understanding from the record of the proceedings in

16    the above-entitled and numbered matter.

17

18                              s/Terri A. Hourigan
                              _____
19                              Terri A. Hourigan, CRR, RPR
                              Certified Realtime Reporter
20                              Registered Professional Reporter
                              Official Court Reporter
21                              United States District Court
                              Terri_Hourigan@laed.uscourts.gov
22

23

24

25
```