1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3    ****************************************************************

4    In re:  CHINESE-MANUFACTURED
     DRYWALL PRODUCTS LIABILITY           MDL DOCKET NO. 2047
5    LITIGATION                           SECTION L
                                          NEW ORLEANS, LOUISIANA
6    THIS DOCUMENT RELATES TO:            Friday, September 4, 2015
                                          2:30 p.m.
7    ALL CASES

8
     ****************************************************************
9

10        TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE PROCEEDINGS
             HEARD BEFORE THE HONORABLE ELDON E. FALLON
11                  UNITED STATES DISTRICT JUDGE

12

13

14

15

16

17

18

19   OFFICIAL
     COURT REPORTER:   TERRI A. HOURIGAN, CRR, RPR
20                     CERTIFIED REALTIME REPORTER
                       REGISTERED PROFESSIONAL REPORTER
21                     500 POYDRAS STREET, ROOM B-275
                       NEW ORLEANS, LOUISIANA  70130
22                     (504) 589-7775
                       Terri Hourigan@laed.uscourts.gov
23
     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
24   PRODUCED BY COMPUTER.

25

```
 1   APPEARANCES:

 2   FOR THE PLAINTIFFS:          LEVIN, FISHBEIN, SEDRAN & BERMAN
                                  BY:  ARNOLD LEVIN, ESQ.
 3                                     FRED S. LONGER, ESQ.
                                  510 Walnut Street, Suite 500
 4                                Philadelphia, Pennsylvania 19106

 5
     THE PLAINTIFF'S LIAISON
 6   COUNSEL:                     HERMAN, HERMAN & KATZ, LLC
                                  BY:  LEONARD A. DAVIS, ESQ.
 7                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113
 8

 9   DEFENDANT:                   ALSTON & BIRD, LLP
     TAISHAN AND TTP              BY:  BERNARD TAYLOR, ESQ.
10                                     ALIYYA HAQQUE, ESQ.
                                       CHRISTINA EIKHOFF, ESQ.
11                                1201 West Peachtree Street NW
                                  Suite 4200
12                                Atlanta, Georgia  30309

13   DEFENDANT
     CNBM:                        ORRICK HERRINGTON & SUTCLIFFE
14                                BY:  CHRISTOPHER VEJNOSKA, ESQ.
                                  405 Howard Street, Suite 11
15                                San Francisco, California 94105

16
     LIAISON COUNSEL:             PHELPS DUNBAR, LLP
17                                BY:  HARRY ROSENBERG, ESQ.
                                  365 Canal Street, Suite 2000
18                                New Orleans, Louisiana  70130

19

20

21

22

23

24

25
```

1                    **P R O C E E D I N G S**

2

3                  **Telephone Status Conference**

4                            **\* \* \***

5

6          THE COURT:  Good morning, everyone -- I mean,

7     afternoon.  This is Judge Fallon, who is the line.

8          MR. LEVIN:  Arnold Levin, Fred Longer.

9          Sandy Duggan and Leonard Davis are at a different

10    venue.

11         THE COURT:  Good afternoon.  For Taishan is?

12         MR. TAYLOR:  Good afternoon, Your Honor.  For Taishan

13    is Bernard Taylor, and with me is my colleague, Aliyya Haqque,

14    and I think my partner, Christy Eikhoff, may be on the phone,

15    also.

16         THE COURT:  Okay.  Anyone else?

17         MR. ROSENBERG:  Your Honor, this is Harry Rosenberg.

18    I am liaison counsel.

19         THE COURT:  Good.  Okay, Harry.  Anyone else?

20         MR. VEJNOSKA:  Good afternoon, Your Honor.  This is

21    Chris Vejnoska for CNBM.

22         THE REPORTER:  I can't hear him.

23         THE COURT:  Would you speak up a little bit when you

24    come on, Chris?

25         I think we got you that time, but speak a little bit

1    louder.

2         Anyone else?

3         All right.  We are here today for me to listen to

4    counsel's comments on the issues before me.

5         Depositions are going to be taken in the near future in

6    China, and one of the prospective deponents is an individual,

7    who at one time, worked for Taishan, and does not work now for

8    Taishan.

9         The issue -- really, the issue that counsel are focused

10   on, is whether -- during the fact he is no longer working for

11   Taishan, whether there is a attorney-client privilege regarding

12   certain communications that he had with attorneys for Taishan

13   during the course of this litigation.

14        It falls into two categories:  One, a number of

15   documents that I looked at, and previously held, were

16   privileged.

17        And the issue now is whether or not some 17 or so of

18   those documents ought to be unprivileged because they relate to

19   communications or information imparted by the ex-employee.

20        And there are other, some four or so, documents that I

21   haven't seen -- I haven't seen *in camera*, whether or not those

22   documents are also privileged.

23        That's what I understand from the briefs that you have

24   given to me.

25        MR. LEVIN:  Your Honor, may I address the issue, sir?

1    THE COURT:  Yes.  Go ahead.

2    MR. LEVIN:  One thing for clarification:  The deponent

3    in Hong Kong is not Peng, the witness that left -- the witness

4    that left the employment, the material witness that left the

5    employment.  Rather, it is Chairman Jia, who will be deposed,

6    and for reasons that I will show you, that becomes even more

7    relevant to our position.

8    We believe these documents, which Your Honor found to

9    be privileged in the first instance with regard to Hogan

10   Lovells, are no longer privileged because Mr. Peng is no longer

11   an employee.  And we cited the cases and we cited Professor

12   Rice's opinions with regard to that.

13   More so, as we go along, they become very important

14   with regard to alter ego, because it appears from the documents

15   that we have that you allowed us to see, Your Honor, that

16   Mr. Peng and Chairman Jia needed the approval of higher-ups

17   which would be BNBM and CNBM, in order for them not to appear

18   before you in the judgment dinner.

19   Now the history of Mr. Peng is bizarre.  We were told

20   when we first asked for Mr. Peng's deposition that he was no

21   longer in their employ, and they have no idea where he is.

22   And you have the statements that Russ Herman has made

23   on the record that has never been denied, that I heard that we

24   were told when we were setting up all of the depositions with

25   Taishan's counsel, that he could not be found, and he is no

1  longer there.

2      Well, it turns out at the Che Gang deposition, that

3  Che Gang had his telephone number.  And Che Gang spoke with him

4  with regard to preparation for the 30(b)(6) deposition.  This

5  is the witness that couldn't be found.

6      Then we go along and what are we told -- well, he's a

7  consultant.  The affidavit says there is a consulting

8  agreement.

9      We haven't seen it.  There was a one-time payment for

10 the witness that couldn't be found.

11     The attorneys for the defendant have had the ability to

12 speak to this witness.  We haven't.

13     And then, as we move along and say, "What do you mean

14 he's a consultant?"

15     "Well, he's no longer a consultant.  He was just

16 consulting."

17     "Well, could we at least get to him?  Could you produce

18 him, this consultant that was very cooperative with you?"

19     "No, he will not come in.  Not only will he not come

20 in, we haven't been provided with any of his personal documents

21 from his e-mail files, because we believe it was told to us

22 that he took them with him."

23     "Well, what about his computer?"

24     "Well, that was" -- I was hoping that Anthony

25 Urpino [sic] would be on because Your Honor knows how

1    inadequate I am with computers, but they were repurposed; in

2    other words, broken down before he left when there is a

3    preservation order in 2009, in place.

4         And the documents leave Taishan, and are now with the

5    witness that was a consultant, then was consulting, and now he

6    has made himself unavailable even though he cooperated with

7    Taishan in preparing their 30(b)(6) witness, who we thought

8    should have been Mr. Peng.

9         But they produced Che Gang, a salesman, who knew very

10   little, and that's why we are over in Hong Kong, and I will be

11   taking Jia's deposition.

12        Your Honor, the situation is bizarre.  There is either

13   spoliation here, there is an adverse inference in the fact that

14   they won't produce the witness, and they are privy to the

15   witness, that he is a consultant.

16        And I know that, you know, I was born, but not

17   yesterday, but consulting agreements have a duty of

18   cooperation.

19        And I'm sure that Taishan had that in their agreement,

20   and if they didn't, it was obviously why they didn't put it

21   there, that we should have the ability to have this witness,

22   and they should have the ability to tell the Court why they

23   can't get this witness in this late date.

24        And the fact they can't get this witness at this late

25   date, there should be some adverse consequences to Taishan, not

1    only including the adverse inference from the material.

2            There is Fifth Circuit law on this.  And I remember the

3    case very early in my career, *Vigderman versus USA*.  *Vigderman*

4    -- it's an Eastern District of Pennsylvania case on adverse

5    influence.  In fact, Vigderman was my partner.  He just

6    happened to be an administrator of the seaman.

7            We are frustrated.  We don't have the documents.  We

8    don't have the witnesses.  We have a deposition, and what we

9    have is hide the pea.

10           And I think the case law supports us in a situation

11   like this.  This Peng was the foreign sales representative.  He

12   stepped in just for two e-mails where he says they can't --

13   they can't walk away from the lawsuit without checking with

14   higher-ups.  And there we got a brick wall.  So that's our

15   position.

16           THE COURT:  Let me ask you this:  What do you want from

17   them?  Do you want Peng or do you want documents that Peng

18   contributed to, or what?

19           MR. LEVIN:  I want anything Your Honor and everything

20   Your Honor can give me.  We want Peng.  We want the documents.

21           If we have to follow through with other motions on the

22   adverse inference, after we come back from Hong Kong, we will

23   do that.

24           But we are totally frustrated on this issue.

25           In fact, Peng, even in what we have seen, had defined

1    affiliates as BNBM and CNBM.  And yet we don't have Peng to

2    corroborate that.

3         And we have a contempt order that talks in terms of

4    affiliates.

5         THE COURT:  Okay.  So the issue is whether or not Peng

6    should be produced.  Is that what, at least, your position is?

7         MR. LEVIN:  That and the documents.

8         THE COURT:  The documents.

9         MR. ROSENBERG:  Because I need the documents for Jia's

10   deposition, which is scheduled -- well, I leave on Tuesday.

11   Russ is there.

12        THE COURT:  Okay.  Let me hear from you, Bernard, or

13   Christy.

14        What is your situation?

15        MR. TAYLOR:  Your Honor, first of all, again, good

16   afternoon.  And let me be sure that I clarify a couple of

17   things before we get going.

18        THE COURT:  Sure.

19        MR. TAYLOR:  First of all, I didn't think -- I don't

20   think we are here to argue over the spoliation issue.  That is

21   a different motion.

22        THE COURT:  Yes.

23        MR. TAYLOR:  It's a different issue, and I assume that

24   that was going to be taken up at another time.

25        THE COURT:  Yes, right.

1      MR. TAYLOR:  Secondly, we have never misrepresented
2  anything regarding the location or our knowledge regarding
3  Mr. Peng.
4      From the very beginning, we advised the PSC, that we,
5  the lawyers, didn't know where Mr. Peng was, and that we were
6  engaging our client to try to figure out where he was located.
7      We were advised by our client that at one point he was
8  -- after he left his employ with Taishan, he volunteered to
9  help Taishan with the litigation in a way that we will talk
10  about in greater detail in just a few minutes, Your Honor.
11      THE COURT:  Okay.
12      MR. TAYLOR:  And then, as a result of the period of
13  time that he found himself having to commit to the work that he
14  was performing with Taishan, he was provided with a one-time
15  payment for his time.
16      And when he was advised that the PSC wanted to take his
17  deposition, realizing, Your Honor, that the PSC had taken his
18  deposition already once or twice, but when he was advised that
19  the PSC wanted to take his deposition again, he said he would
20  not help out any more.
21      And we told the client, of course, that we would like
22  to speak with Mr. Peng or figure out if Mr. Peng would be
23  willing to help out.
24      Our client went back to Mr. Peng, spoke with Mr. Peng,
25  and Mr. Peng told him he would not be willing to help out.

1      Our client said, "Okay, would you give us your phone

2  number."

3      I personally told Mr. Herman ahead of time that we were

4  trying to get Mr. Peng's phone number, and we felt that

5  Mr. Churr [sic] would be able to testify regarding that phone

6  number when he gave his deposition.  And he did give that phone

7  number during the deposition.

8      So, we're not trying to hide anything.

9      Those are the facts in regards to our knowledge about

10 Mr. Peng and Mr. Peng's willingness to participate in this

11 litigation going forward.

12     Now, let's get to the issues that -- I'm prepared, Your

13 Honor, to respond to any questions the Court may have.

14     THE COURT:  I understand.  We're talking now about Peng

15 only.

16     So what I'm hearing you say is that he no longer works

17 for you.

18     MR. TAYLOR:  That's right.

19     THE COURT:  Other than his telephone number, you don't

20 know how to reach him.

21     MR. TAYLOR:  That's correct, Your Honor.  We have given

22 that number to the PSC.

23     THE COURT:  Right.  Yeah, I have it.  I seem to

24 remember it.  It's something like 13325270000, if I remember

25 right.  It's four zeros.

1          MR. TAYLOR:  You are better than I am, Your Honor.  I
2     don't remember.
3          THE COURT:  Well, in any event, what is your -- let's
4     just stick with Mr. Peng for a moment.
5          What is your response, Arnie, to that situation?  What
6     he says is that his whereabouts are unknown.  He knows about
7     the phone number.  He has given it to you, and that's all he
8     knows.
9          MR. LEVIN:  We don't think his whereabouts are unknown,
10    because he has told them that he won't cooperate with them any
11    more.
12         Although, when we took his deposition, we didn't have
13    these hot documents from Hogan Lovells at the time.
14         We believe that -- it's incomprehensible that nobody
15    knows where he works, and nobody knows where he is.
16         Mr. Che Gang can speak to him.  He's not going to speak
17    to us.  They could ask him where he lives, where he resides.
18         They can tell him, that pursuant to that consulting
19    agreement, he has to cooperate.  He just can't walk away from
20    the litigation.  He was a material witness in the litigation.
21         And it's easy for Taishan to take that position,
22    because when they take that position, they block not only the
23    knowledge that we would get, but the knowledge that we could
24    tell the Court about all of this.
25         Everybody else testifies that they have no recollection

1    of anything in this litigation, and you will see a host of

2    that.

3           Everybody else in this litigation hears objections that

4    are speculative, and then witnesses that do not speak English

5    or say they do not speak English, then answer the question, "I

6    can't speculate on that."

7           Your Honor, we have established an awful lot, but we

8    are completely frustrated by this Peng situation.

9           I think that, at the least, a directive should be given

10   to counsel, to state who they spoke with, what they did to

11   determine where he lives, where they knew he lived.

12          I think that I don't have to see that.  That could be

13   submitted *in camera* to Your Honor.

14          THE COURT:  Has anybody called him at that number that

15   they have given to you -- any of your people?

16          MR. TAYLOR:  Our client has, Your Honor, and our client

17   has obviously reported back to us on the response of their

18   discussions with Mr. Peng.

19          THE COURT:  Yes.

20          MR. TAYLOR:  But, Your Honor, one point I think is very

21   important here.

22          THE COURT:  Yes.

23          MR. TAYLOR:  We're here to deal with this issue of

24   whether or not the privilege applies to those e-mails.

25          All of these other issues can be dealt with in other

1    ways, obviously.

2            And we're prepared to respond to that motion to compel

3    regarding these e-mails.

4            Then, if there are other issues or other avenues that

5    need to be taken in regards to Mr. Peng, we will be prepared to

6    respond to that also.

7            But for now, we are here to address these e-mails, to

8    which we believe the privilege applies.

9            THE COURT:  Yes.  I thought we were talking about

10   privilege in this situation, and not production of witnesses.

11           Let's focus on that.

12           MR. LEVIN:  I'm sorry, Your Honor, I spoke over you.

13           THE COURT:  That's all right.  Go ahead.

14           MR. LEVIN:  I think that you can't look at the

15   privilege issue and the need for these documents without

16   looking for the mysterious whereabouts of Mr. Peng.

17           At one point, we saw on a website that he was with a

18   subsidiary of Taishan.

19           Now, counsel has told us that website is wrong.  We

20   have no reason to disbelieve counsel, although, we don't know

21   how it got on the website.  Maybe he's with another company.

22           There is no question that they are in the industry, and

23   if they wanted to find out where he was and wanted to speak

24   with him, and he was a former employee, and he was a former

25   employee that was paid for either a consultant agreement or

1    consulting -- we don't know what date that agreement is, we

2    haven't seen it.  Perhaps that is something that occurred after

3    the fact of his cooperation, I don't know.

4           But I think at the least, Your Honor, I would like to

5    impose upon the Court to review those documents and perhaps let

6    us know, you know, your opinion as to those documents, given

7    the law, given Professor Rice's statements, given the

8    exceptions to *Upjohn*.

9           It's just very important to us.  We are going over to

10   take Chairman Jia's deposition.  I am sure that he is no

11   different than any other witness that we had.  When you have

12   something like this, you will have no clear recollection of

13   anything.

14          THE COURT:  What is the documents?  The 17 documents;

15   is that what we're talking about?

16          MR. LEVIN:  Yes, and before that are Taishan's, Your

17   Honor.

18          THE COURT:  I haven't seen the four yet.

19          MR. TAYLOR:  And, Your Honor -- I am sorry, Your Honor,

20   go ahead.

21          THE COURT:  No, I was just going to say, I haven't seen

22   the four.  I have seen the 17.  I have ruled on the 17.  I

23   assume I still have them.  I don't know whether I gave them

24   back or not, but in any event --

25          MR. TAYLOR:  I think you may have given them back, Your

1    Honor.  I'm not sure, though.

2         THE COURT:  Let's focus on the issue that the briefs

3    are focused on, whether or not a prior employee is entitled to

4    assert the privilege, or whether the fact that the person is a

5    former employee, whether or not the privilege is still extant

6    -- still exists.

7         MR. TAYLOR:  Can I start, Your Honor or --

8         THE COURT:  Go ahead, Bernard, you have got the floor.

9         MR. TAYLOR:  All right.  Thank you, Your Honor.

10        This is, as the Court knows, very fact-specific.

11        THE COURT:  Right.

12        MR. TAYLOR:  The issue here is that Mr. Peng, as

13   everyone knows, was the manager of Taishan's foreign trade

14   department.

15        As the manager of the foreign trade department, he was

16   involved in the sales of two foreign customers.

17        He also was responsible for monitoring the U.S. drywall

18   litigation.

19        And he also acted as and for the client, that is

20   Taishan, in providing information to and seeking advice from

21   the attorneys involved in the U.S. drywall litigation.  That

22   fact is not disputed.

23        In March of 2014, he -- it is our understanding that he

24   resigned from Taishan.

25        But as Chairman Jia's affidavit indicates, Chairman Jia

1    asked him to continue in that capacity of acting for the

2    client, of acting as the client, and of interacting with the

3    U.S. attorneys in order to seek legal advice regarding the

4    drywall litigation.

5          He did that initially, voluntarily.

6          And then because it was taking more of his time than he

7    anticipated, Taishan, in good faith, made a one-time payment to

8    him in order to compensate him for his time.

9          Now, the plaintiff contends that Taishan lost the

10   expectations -- excuse me, Your Honor, of the privilege

11   covering Mr. Peng's post-employment activities, and they relied

12   upon the *Clark Equipment* case, which is at page 10 of their

13   brief, which is Document No. 19420.

14         And in that case, Your Honor, the Court -- the Court

15   concluded the following:  The reasoning of *Upjohn*, as the Court

16   knows, *Upjohn* is the seminal 1981 case that provided the

17   privilege to employees.

18         THE COURT:  To employees, yes.

19         MR. TAYLOR:  The reason that *Upjohn* does not support

20   extension of the attorney-client privilege to cover

21   post-employment communications with former employees of a

22   corporate party -- and now, this is the case that PSC is

23   relying on -- the case goes further and states that former

24   employees are not the client.  They share no identity of the

25   interest in the outcome of the litigation.  Their willingness

1    to provide information is unrelated to the directions of their

2    former corporate superiors and they have no duty to their

3    former employer to provide such information.

4         It is virtually impossible to distinguish the position

5    of a former employee from any other third party who might have

6    pertinent information about one or more corporate parties in a

7    lawsuit.

8         Your Honor, the facts in our case are totally

9    distinctive and different from the facts as outlined in the

10   *Clark* case.  But it goes further.

11        The plaintiff in this case, the PSC has also relied

12   upon the *Hanover* case.

13        In the *Hanover* case, I'm probably going to mispronounce

14   the Judge's name, Your Honor, but I'm certain you know who the

15   Judge is, it's Judge Milazzo.

16        THE COURT:  Milazzo.

17        MR. TAYLOR:  Milazzo, very good.  This basically states

18   that there is a broad consensus in federal case law across

19   multiple circuits, supporting extension of the *Upjohn*

20   attorney-client privilege to former employees.

21        And Judge Milazzo goes further and states:  The single

22   case relied upon," and I'm stating that, the single case relied

23   upon by the PSC, Judge Milazzo said, "is an outlier case."

24        And Judge Milazzo states, and quote, and I'm quoting:

25   "It appears that every Federal Court to address the issue with

1    the exception of a single District Court decision in 1985, and

2    that is the *Clark* case, has held that the privilege extends to

3    former employees in certain context."

4           And the Ninth Circuit, in various cases, and the one

5    that I will refer the Court to, is the:  *In re:*

6    *Con-coordinated Pretrial Proceedings in Petroleum Product*

7    *Anti-Trust Litigation*, which is at page 6 of our brief.  This

8    is the 1981 case.

9           And in that case, the Court concluded that the *Upjohn*

10   rationale to former employees applied simply because, and this

11   is a quote:  "The employee may possess the relevant information

12   needed by the corporate counsel to advise the client with

13   respect to actual or potential difficulties."

14          That is exactly what Mr. Peng was doing before he left

15   his employment, and after he left his employment at the request

16   of his client.

17          But Judge Milazzo, or the *Hanover* case, also adopts the

18   four factors in the *Allen* case, which is a 1997 case.

19          Of course, the *Hanover* case is a 2015 case.

20          THE COURT:  Right.

21          MR. TAYLOR:  And in the *Allen* case, the Court adopted

22   four factors in determining whether or not the attorney-client

23   privilege applies to former employees.

24          One, the former employee had been employed by the

25   client during a time period relevant to counsel's inquiry.

1       Mr. Peng was definitely employed during that period of

2   time.

3       Two, the former employee possessed knowledge relevant

4   to counsel's inquiry.

5       Mr. Peng clearly had knowledge, both from when he was

6   an employee, and from when he continued to help out as a

7   volunteer or consultant or whatever you want to call it, at the

8   time he left Taishan's employment, and provided that

9   information to counsel.

10      The counsel communicated -- this is Point 3, that

11  counsel communicated with the former employee at the direction

12  of the client.

13      There is no dispute that that was happening.  Chairman

14  Jia tells you that in his affidavit.

15      And the purpose of the communication was to enable

16  counsel to provide legal advice to the client.

17      And that is exactly what Chairman Jia tells you that

18  Mr. Peng was doing under these circumstances.

19      So, Your Honor, we've got a whole line of cases from

20  1981 through 2015, that are totally in conflict and opposite to

21  what the PSC is trying to convince the Court to do, and trying

22  to convince the Court to apply to the circumstances involving

23  Mr. Peng's involvement in this litigation.

24      So, Your Honor, we believe that there is no basis for

25  the PSC's position, that based upon the circumstances in this

1    factual scenario with Mr. Peng, both when he was an employee

2    and when he was a former employee, for the attorney-client

3    privilege or for the work-product privilege to be waived or for

4    any of those e-mails to be waived because there is an exception

5    to the application of those privileges.

6            THE COURT:  And has -- yeah, just a moment, Arnie.

7    That has to do with the 17 documents, Bernard, that Arnold

8    wants.

9            Is that what you are saying?

10           MR. TAYLOR:  That's correct, Your Honor.

11           THE COURT:  All right.  What about the four documents

12   that you have -- that Taishan has.

13           Is he in any way involved with that?

14           MR. TAYLOR:  Yes, sir.  Those four documents, I think,

15   he's copied on, and those are, of course, from when we got

16   involved in the case, and he's copied on a couple of them.

17           I think it's really two documents.  I think two of them

18   are duplicates of the other documents, where he is copied in

19   his role, as I have described that role for Taishan.

20           THE COURT:  Arnold, why don't you respond.

21           MR. LEVIN:  It is what it is, Your Honor.  But it's 24

22   documents of Hogan Lovells and four of Taishan.

23           THE COURT:  Right.

24           MR. LEVIN:  Your Honor, you can quote black letter law

25   and it becomes important, but you can't divorce the facts from

1    a situation.  And this is why we have law review articles and

2    professors in the law who spend their life writing about

3    privilege.

4          Professor Rice definitely said that a privilege in this

5    case is in derogation of the right the plaintiffs in this case

6    have to information on these documents.

7          We have no other source to get it.

8          Now Mr. Peng was not in the legal department.  He was

9    not there in 2009, when they say they didn't know about the

10   case and didn't understand what a lawsuit in the United States

11   was.  And, we find out they were speaking to counsel at that

12   time.  He was not there at that time.

13         He was only a facilitator after Your Honor entered the

14   contempt citation to determine who would have to be spoken to

15   -- who would have to be spoken to higher up the ladder in BNBM

16   and CNBM, and what an affiliate was or what they thought an

17   affiliate was in connection with your clear ruling on

18   affiliates and subsidiaries.

19         That is the only thing that he did.  And that's not in

20   the legal department.  They have their own legal department.

21         Most of the witnesses say, they know nothing about it.

22   Even general managers, chairmans of the board, you have to talk

23   to the legal department.

24         Peng was a messenger, at best, and we want to talk to

25   the messenger.  We want to see his documents.

1          THE COURT:  Okay.

2          MR. TAYLOR:  Your Honor, I apologize, but there is no

3     evidence that Taishan has any legal department.

4          MR. LEVIN:  It is BNBM and CNBM.

5          MR. TAYLOR:  We're talking about Taishan now.

6          THE COURT:  Okay, wait.  I understand the issue.

7          Look, we're talking -- at this stage of the

8     discussion -- we're talking about either 17 or 24 documents

9     that I have looked at before and I made a judgment on.

10          The plaintiff's counsel, the plaintiff's PSC wants me

11     to review those documents again with this in mind, namely, that

12     the person who either generated it or gave information about

13     the documents or had something to do with the documents, and

14     since they are a former employee, whether those documents are

15     still privileged.

16          There are the other four documents that I have never

17     seen that were generated by new counsel of Taishan.

18          The fair thing for me to do, and I think I have given

19     them back to you, Bernard, I'm not sure, but I think I have

20     given them back to you, because once I make those decisions, I

21     get rid of the documents.  So unless I have destroyed the

22     documents, you must have them back.

23          I really think it's fair for me to see the documents

24     again *in camera*, and if I feel they are privileged, I will just

25     return them to you, or at your request, destroy them.

1    But it's hard for me to determine, one, whether they

2    are even relevant, because that was a big thing when I looked

3    at some of the other documents, I didn't even see any relevance

4    in those documents, much less whether they were privileged or

5    not.

6    But I did look at them all.  I held that they were

7    privileged with the exception of 12 or 13 or whatever it was.

8    But I think I returned them to you.  But if we are only

9    talking about 24 documents, and four from you, I really need to

10   see those documents, and I will issue an order immediately.

11   The second thing, though, that we talked about is the

12   presence of Mr. -- the whereabouts of Mr. Peng.

13   As I hear from both of you all, you have a telephone

14   number.  Your people have communicated with him.

15   It's fair for me to direct you to give the plaintiffs

16   an address.  That is all you need to do.

17   You don't need to produce the person, if he's not in

18   your employ any more.  But they are entitled to a telephone

19   number and also his address.  So give them the address.

20   But with regard to the documents, I really want to see

21   them.

22   Can somebody get those to me today or tomorrow or

23   something?

24   MR. TAYLOR:  Well, Your Honor, I think we can -- well,

25   first of all, the Court, when you said you gave them back to

1    me, I'm certain you mean just to Taishan's counsel.

2         THE COURT:  Yes, whoever it was, Taishan's counsel.

3         MR. TAYLOR:  Yes.  We believe we have all of the

4    documents, and we will go back and make sure we have got all

5    24, and I'm pretty sure we do.

6         THE COURT:  Okay.

7         MR. TAYLOR:  We will get those to you.  We may not be

8    able to get them to you until, like, e-mail you until either

9    later today or in the morning.

10        THE COURT:  That's fine.

11        MR. TAYLOR:  Then we will go from there.

12        In regards to Mr. Peng's address, we don't know it.

13        THE COURT:  Okay.

14        MR. TAYLOR:  We're told that our client doesn't know

15   it, either.

16        But that is why we gave the PSC his phone number, so

17   they could do whatever work they needed to do in order to try

18   to get in contact with him.

19        But we understand exactly what the Court has asked us

20   to do, and we will make our best effort to try to get an

21   address that we can provide to the PSC, Your Honor.

22        THE COURT:  Thank you.

23        MR. LEVIN:  Your Honor, this may be a very small thing,

24   but we weren't given the phone number.

25        Mr. Herman found out the phone number on questioning a

1    witness at his deposition.

2              THE COURT:  All right.

3              MR. TAYLOR:  Your Honor -- Arnie, maybe you weren't

4    part of the discussion --

5              MR. LEVIN:  If I'm wrong, Bernie, I apologize for that

6    statement.

7              MR. TAYLOR:  Okay.  Thank you.

8              THE COURT:  The other thing that you all wanted to talk

9    to me about is the time for taking depositions.

10             There is concern as to whether or not I can be reached.

11             MR. LEVIN:  Yes, sir.  The time is a 12-hour

12   difference.

13             THE COURT:  Yes.

14             MR. LEVIN:  I'm taking the deposition, and I'm the one

15   that goes to bed at, according to my wife, at 7:30 every night.

16             THE COURT:  Yes.

17             MR. LEVIN:  So we want to take that deposition in some

18   fashion where, if there is a problem, and I'm not saying there

19   will be a problem, but we've had problems with the Taishan

20   witnesses before, that we could reach you before the deposition

21   is concluded.

22             Now the deposition of Chairman Jia is going to be taken

23   on Thursday and Friday of -- not next week -- but the following

24   week.

25             Most of us, on Saturday, have flights to leave Hong

1    Kong.

2         THE COURT:  Flights back, right.

3         MR. LEVIN:  We don't want to wake you up in the middle

4    of the night.  We don't mind your waking us in the middle of

5    the night.

6         THE COURT:  From the standpoint of the witnesses, you

7    know, you guys can handle it.  But the witnesses, to keep them

8    up all night, that is not fair to them.

9         We have got to figure out a way of dealing with it.

10        MR. LEVIN:  Quite frankly, Your Honor, we only proposed

11   this problem with Jia, based on past conduct.

12        We haven't proposed it with regard to Chairman Song.

13        Mr. Herman is taking that deposition, and he feels

14   comfortable doing it during daylight hours.

15        MR. TAYLOR:  Well, Your Honor --

16        MR. LEVIN:  But I heard Your Honor about the witness, I

17   did.  I was just telling you what motivated me.

18        THE COURT:  I understand.  We have got to figure out a

19   different way, Arnold and Bernard.

20        It's not fair to the witness to keep the witness up

21   until 12 o'clock at night.  You are not going to get the

22   best -- he's going to say, "I'm tired, I can't remember."

23        MR. LEVIN:  Or the questioner.

24        THE COURT:  Or the questioner, yes.

25        I don't have any problem, it's 12 hours difference,

1    when do you all start?

2         MR. LEVIN:  We start at nine o'clock.  Of course, we

3    could adjust that, Bernie.  We have to have a time frame,

4    where, if necessary, to speak to the Court.

5         MR. TAYLOR:  I would be willing --

6         We're available any time.  As Your Honor knows, I will

7    talk to you at two o'clock in the morning.

8         THE COURT:  I know, you have already done that,

9    Bernard, I know, but it's not fair to the witness.

10        MR. TAYLOR:  Exactly.  But maybe 5:00 or 6:00 in the

11   morning we could call you with any problems we have got?

12        THE COURT:  Yeah, that is fine with me.  At 6:00,

13   particularly, I will be at Court.  I get to Court at

14   six o'clock.

15        MR. LEVIN:  Six o'clock your time, Your Honor, and

16   there is a 13-hour difference.

17        MR. TAYLOR:  Is it 13 or 12?

18        MR. LEVIN:  I think it's 13 to New Orleans, and 12 to

19   the east coast.

20        MR. TAYLOR:  I got it.  I think you may be right.

21        MR. LEVIN:  We will figure it out, Your Honor.

22        THE COURT:  You can hold a witness there, and hold a

23   witness so that if I rule, and the witness needs to answer a

24   question, he is available.

25        MR. TAYLOR:  Okay.

1          MR. LEVIN:  Okay.

2          THE COURT:  I will let you all work that out.

3          Whatever I can do to accommodate you, I will do so, of

4     course.

5          Anything else, Bernard or Arnold that we need to talk

6     about?

7          MR. LEVIN:  Not right now, sir.

8          THE COURT:  Bernard, do you have anything?

9          MR. TAYLOR:  No.  I think we're fine, Your Honor.

10         I think the only other issue, I'm sorry, Your Honor, is

11    we do want to be sure that the deposition ends on Friday.

12         THE COURT:  Yes.

13         MR. LEVIN:  Well, I could assure you that it will end

14    on Friday, not necessarily what time, but I have a flight on

15    Saturday.

16         MR. TAYLOR:  All right.  Your Honor, understood.

17         THE COURT:  All right.

18         MR. TAYLOR:  Thank you, Your Honor.

19         THE COURT:  Thank you very much.  You all have a good

20    weekend.

21                              *    *    *

22

23

24

25

REPORTER'S CERTIFICATE

        I, Terri A. Hourigan, Certified Realtime Reporter,

Official Court Reporter for the United States District Court,

Eastern District of Louisiana, do hereby certify that the

foregoing is a true and correct transcript to the best of my

ability and understanding from the record of the proceedings in

the above-entitled and numbered matter.




                        s/Terri A. Hourigan
                        _____

                        Terri A. Hourigan, CRR, RPR
                        Certified Realtime Reporter
                        Registered Professional Reporter
                        Official Court Reporter
                        United States District Court
                        Terri_Hourigan@laed.uscourts.gov