```
 1                      UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
 2     ****************************************************************

 3
       IN RE:  CHINESE-MANUFACTURED          Docket No. 09-MD-2047
 4     DRYWALL PRODUCTS LIABILITY            New Orleans, Louisiana
                                             Friday, August 7, 2015
 5

 6     ****************************************************************

 7
            TRANSCRIPT OF MONTHLY STATUS CONFERENCE AND MOTION PROCEEDINGS
 8               HEARD BEFORE THE HONORABLE ELDON E. FALLON
                        UNITED STATES DISTRICT JUDGE
 9


10
       APPEARANCES:
11
       FOR THE PLAINTIFFS:             HERMAN, HERMAN & KATZ
12                                     BY:  RUSS HERMAN, ESQ.
                                       820 O'Keefe Avenue
13                                     New Orleans, LA 70130

14                                     LEVIN, FISHBEIN, SEDRAN & BERMAN
                                       BY:  ARNOLD LEVIN, ESQ.
15                                     510 Walnut Street, Suite 500
                                       Philadelphia, PA 19106
16
                                       BARRIOS, KINGSDORF & CASTEIX
17                                     BY:  DAWN M. BARRIOS, ESQ.
                                       701 Poydras Street, Suite 3650
18                                     One Shell Square
                                       New Orleans, LA 70139
19

20     FOR THE DEFENDANT:             BAKER DONELSON
                                       BY:  DANIEL J. DYSART, ESQ.
21                                     201 St. Charles Ave., Suite 3600
                                       New Orleans, LA 70170
22

23                                     PHELPS DUNBAR
                                       BY:  HARRY ROSENBERG, ESQ.
24                                     365 Canal St., Suite 2000
                                       New Orleans, LA 70130-6534
25
```

```
 1                                    ORRICK, HERRINGTON & SUTCLIFFE
                                      BY:  JAMES L. STENGEL, ESQ.
 2                                    51 West 52nd St.
                                      New York, NY 10019-6142
 3
                                      DENTONS
 4                                    BY:  RICHARD L. FENTON, ESQ.
                                      7800 Sears Tower
 5                                    233 South Wacker Drive
                                      Chicago, IL 60606
 6
                                      ALSTON & BIRD
 7                                    BY:  CHRISTINA H. EIKHOFF, ESQ.
                                      One Atlantic Center
 8                                    1201 W. Peachtree St.
                                      Atlanta, GA 30309-3424
 9

10   ACE HOME CENTER:                 LUTHER, COLLIER, HODGES & CASH
                                      BY:  DANNY J. COLLIER, JR., ESQ.
11                                    Post Office Box 1002
                                      Mobile, Alabama 36633
12

13   SETTLEMENT ADMINISTRATOR:        BROWNGREER
                                      BY:  JACOB WOODY
14                                    250 Rocketts Way
                                      Richmond, VA 23231
15

16   Official Court Reporter:         Karen A. Ibos, CCR, RPR, CRR
                                      500 Poydras Street, Room HB-406
17                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
18

19      Proceedings recorded by mechanical stenography, transcript
     produced by computer.
20

21

22

23

24

25
```

1              P R O C E E D I N G S

2        (MONTHLY STATUS CONFERENCE AND MOTIONS)

3

09:05:36   4      (OPEN COURT.)

09:05:36   5          THE COURT:  Be seated, please.  Good morning, ladies and

09:05:38   6    gentlemen.  Call the case, please.

09:05:40   7          THE DEPUTY CLERK:  MDL No. 2047, *in re:  Chinese*

09:05:43   8    *Manufactured Drywall Products Liability Litigation.*

09:05:45   9          THE COURT:  Liaison counsel make their appearance for the

09:05:49  10    record, please.

09:05:59  11          MR. ROSENBERG:  Good morning, your Honor, Harry Rosenberg

09:06:03  12    as liaison counsel for the Taishan, BNBM, and CNBM entities, your

09:06:09  13    Honor.

09:06:09  14          MR. HERMAN:  May it please the court, good morning, Judge

09:06:12  15    Fallon, Russ Herman for the PSC.

09:06:15  16          MR. ROSENBERG:  Your Honor, in fairness, I understand

09:06:19  17    Mr. Miller had a court conflict.

09:06:20  18          THE COURT:  Yes, he called me and he talked to me about

09:06:22  19    it, so I understand.

09:06:22  20          MR. DYSART:  Yes, your Honor, Danny Dysart on behalf of

09:06:24  21    the Knauf defendants standing in for Kerry Miller.

09:06:27  22          THE COURT:  Thank you very much.

09:06:28  23          MR. HERMAN:  Your Honor, when you recess before the

09:06:30  24    argument after the conference, I will distribute to everybody and

09:06:38  25    the law clerk the PowerPoints that we have.

09:06:40  1          THE COURT:  I met with liaison and lead counsel a moment

09:06:42  2  ago to talk about the agenda that they proposed today.

09:06:46  3          The first item is Pre-trial Orders.  Anything on that?

09:06:50  4          MR. HERMAN:  No, your Honor.

09:06:51  5          THE COURT:  Anything on state court trial settings?

09:06:56  6          MR. HERMAN:  Ms. Barrios will address that.

09:06:58  7          MS. BARRIOS:  Thank you, Mr. Herman.  Good morning, your

09:07:00  8  Honor, Dawn Barrios for the Federal/State Committee.

09:07:02  9          The one trial that is listed in the joint report, the

09:07:06 10  parties are trying to work it out, it's an already remediated home.

09:07:13 11  I was going to ask Mr. Miller today, but since he is running late --

09:07:14 12          THE COURT:  Where is it?

09:07:16 13          MS. BARRIOS:  It's in Florida.

09:07:17 14          Your Honor, while I am here, if you permit me just to

09:07:19 15  discuss the Venture settlements in Virginia.  The property damage

09:07:24 16  has been totally distributed, all that money has gone out on the

09:07:27 17  streets.  Now we have the other loss claims.  Everything has been

09:07:32 18  done except there is one appeal to your Honor that the Nguyens are

09:07:39 19  appealing the Special Master award.

09:07:41 20          I believe that someone spoke with your chambers and talked

09:07:44 21  about putting that argument to you on September 18th, which I

09:07:48 22  believe is the next status conference.

09:07:51 23          Garretson Resolution Group notified me that the

09:07:54 24  determination of that issue is holding up distribution of everyone

09:07:59 25  else's money, so they asked me if I could get together with your

09:08:02  1   clerk later to maybe get an earlier telephone conference date.

09:08:06  2                THE COURT:  Sure.  We will do that.  That'll be fine.

09:08:10  3                MS. BARRIOS:  Thank you, your Honor.

09:08:10  4                MR. LEVIN:  Your Honor, in light of what we know about

09:08:12  5   September 18th, that's advisable.

09:08:14  6                THE COURT:  Okay, that's fine.

09:08:15  7                MS. BARRIOS:  Thank you, your Honor.

09:08:18  8                THE COURT:  Anything on the Omnibus Class Action

09:08:23  9   complaints?

09:08:23 10                MR. HERMAN:  Your Honor, nothing at this time.

09:08:28 11                Nothing, may it please the court, on Roman numeral V.

09:08:31 12                THE COURT:  How about Remediation, anything of that sort?

09:08:34 13                MR. HERMAN:  We have representatives of the remediation

09:08:41 14   program present, and I believe that BrownGreer has a report to make,

09:08:47 15   which can come at this point.

09:08:48 16                THE COURT:  Okay.

09:08:49 17                MR. WOODY:  Good morning, your Honor.  My name is Jake

09:09:09 18   Woody from BrownGreer here to give the monthly status report.

09:09:13 19                As always we'll start with our payments.  To date we've

09:09:16 20   issued $79,496,921, which is an increase of just over $1.4 million

09:09:25 21   since our last status conference.  Most of the payments we've made

09:09:29 22   since then have been from the other loss fund, and I'll cover that

09:09:33 23   briefly.

09:09:35 24                Twenty-five percent of our total payments have come from

09:09:37 25   the other loss fund.  We are at $19,495,738 paid out for other loss

1    claims.  And just over 60 million, $60,001,182 from the Global

2    Banner INEX repair and relocation claims, which are a pro rata share

3    of three different settlement funds based on the square footage of

4    an eligible property.

5          As I mentioned, the GBI payments make up the bulk of our

6    payments.  We have issued, like I said, just over $60 million; paid

7    14,925 separate claims.

8          We do have $16.2 million remaining to distribute for GBI

9    claims.  We have about $1.8 million allocated to eligible properties

10   where the claimant has not submitted payment documentation to us to

11   allow us to release those payments.  We need a W-9 and our

12   verification of claims form in order to make those payments.  And

13   that is a pretty significant portion of the amount remaining.

14        We also, it's a good time I think to touch on how the GBI

15   process works with the Knauf payments.  When Knauf remediates a

16   property or settles an already remediated property, they oftentimes

17   receive an assignment of the claimant's Global Banner INEX repair

18   and relocation claim as part of that remediation settlement process.

19   When they receive that assignment, we make the GBI payment that

20   would have been made to the homeowner, we make it to Knauf.  And

21   some of the remaining funds, because Knauf is still remediating

22   properties and settling already remediated properties, some of the

23   remaining 16.2 is allocated to future assignments to Knauf.

24        There will be some excess remaining, we are not quite

25   sure what it will be yet because of the uncertainty around how many

09:11:33  1   assignments there will be and whether or not people will submit

09:11:35  2   their payment documentation and claim their payments.  But we do

09:11:38  3   believe there will be some left.

09:11:41  4          As we wind down on the remediation program, which I

09:11:44  5   expect to happen late this year or early first quarter of next year,

09:11:49  6   we will have a good idea of how much is left and how much needs to

09:11:53  7   be distributed to Knauf, and can come up with a plan to distribute

09:11:57  8   the rest.

09:11:57  9          THE COURT:  Okay.

09:11:58 10          MR. WOODY:  Our other loss payments are, we've made to

09:12:03 11   five separate claim types:  Foreclosure and short sale claims have

09:12:08 12   received $4.9 million or 26 percent of the total; lost rent, use and

09:12:13 13   sales have received $5.5 million, which is 28 percent of the total;

09:12:17 14   miscellaneous has received 17 percent of the total, three and a half

09:12:20 15   million; pre-remediation alternative living expenses, we paid 5.2

09:12:27 16   million, which is 28 percent; bodily injury we've paid $110,000,

09:12:32 17   which is less than one percent of the total.  Total payments

09:12:36 18   $19,495,738.

09:12:39 19          THE COURT:  And those payments, of course, Knauf has no

09:12:42 20   interest in that?

09:12:44 21          MR. WOODY:  Knauf has no interest in these types of

09:12:47 22   claims, we haven't made any payments to Knauf.  For the most part,

09:12:50 23   these are payments made to non-commercial entities, to real people.

09:12:54 24   Some of the commercial entities received payments from lost rent,

09:12:59 25   for instance, and miscellaneous.  But for the most part, these

09:13:02  1    payments have been made to homeowners.

09:13:06  2         I did want to touch real quickly on where we are with our

09:13:11  3    loss claims as a whole.  We have 7,908 total other loss claims.  We

09:13:18  4    have issued eligibility notices to 5,064; denied 2,078.  To this

09:13:27  5    point, all of the denials have been because of incompleteness;

09:13:31  6    people haven't given us the documents they need to prove their

09:13:35  7    claim.

09:13:35  8         We do have 140 incomplete claims at this point, that

09:13:38  9    number is down significantly from the last status conference.  As

09:13:41 10    we've talked about throughout this program, whenever we have an

09:13:42 11    incomplete claim or an open offer, it affects how we can close the

09:13:46 12    program.  And the incompletes have been low for awhile and they

09:13:51 13    continue to dwindle, and I think we have, to be honest with you,

09:13:56 14    just about run out of claims at this point.  Once we close these

09:13:59 15    incompletes, either deny them for being incomplete or mark them

09:14:03 16    eligible because people have submitted them, we should be able to

09:14:07 17    wind down the other loss program, tell the Special Master how much

09:14:11 18    money is available to him to distribute to the people who have

09:14:15 19    requested a Special Master award from another loss eligibility

09:14:19 20    notice and resolve those claims as well.

09:14:23 21         And again, just touching on what we've done with our

09:14:27 22    other loss eligibility notices:  5,006 have received notices; we

09:14:32 23    have 140 that are with offers that are open, meaning that we've

09:14:35 24    issued them an eligibility notice, they haven't accepted yet.  The

09:14:39 25    time to do that, you have 30 days from the date of the notice.  Most

09:14:42  1   of these -- all of these notices predate this conference, obviously,

09:14:46  2   and will close at most 30 days from yesterday.  And they'll close

09:14:52  3   either because the claimant accepts the offer and we pay them, the

09:14:55  4   claimant does nothing and we mark them as accepted, or the claimant

09:14:58  5   requests a Special Master award, as I touched on just a moment ago,

09:15:03  6   where they feel that the initial offer that we made is not

09:15:06  7   sufficient and they can ask the Special Master for an increased

09:15:10  8   offer.  696 people have done that so far.  4,178 have accepted the

09:15:16  9   offer.  And 140 are open.

09:15:19 10        Finally, I just wanted to touch on what we've been doing

09:15:23 11   since the last status conference.  We've made 320 payments totalling

09:15:28 12   $1.4 million.  We've received 168 accepted offers, which means we

09:15:32 13   can close those claims and pay them.  We've issued 902 notices.  Of

09:15:38 14   those, 644 have been incompleteness denial notices, meaning people

09:15:42 15   have gone through the incomplete process, we've issued incomplete

09:15:45 16   notices, a follow-up, and they still haven't responded so we've

09:15:49 17   denied their claim.

09:15:50 18        This is significant because of what I just mentioned.

09:15:53 19   Once they are denied, we can close the claim, take them off the

09:15:56 20   books, and have a better understanding of what claims we have left

09:16:00 21   to deal with.

09:16:01 22        We've closed 347 claims either because the time to

09:16:05 23   respond, time to appeal has run out or we've paid them.

09:16:08 24        And I just wanted to touch briefly on the inspection

09:16:12 25   reimbursement stipend that I mentioned last month.  We received

09:16:16  1   responses from many firms, we issued a notice to each firm telling

09:16:20  2   them what we had on our records for them.  We received 175

09:16:25  3   confirmations, 175 firms confirmed that the spreadsheet entirely.

09:16:30  4   Forty-six have some revisions, we are looking at those now and

09:16:33  5   expect to finish that process next week.

09:16:35  6               MR. LEVIN:  Your Honor, I just want to assure the

09:16:38  7   plaintiffs bar that the stipend is being evaluated and worked on,

09:16:44  8   and Jake has been working diligently on it.  It's a very complex

09:16:49  9   situation and we're going to put it to bed, but it takes time.  But

09:16:54 10   lead liaison counsel have interfaced with Jake and we will solve all

09:16:58 11   of the problems.

09:16:58 12               THE COURT:  Okay.

09:16:59 13               MR. WOODY:  Yes, sir.

09:17:01 14               THE COURT:  So how many, you have 175 firms confirmed?

09:17:06 15               MR. WOODY:  Yes.  We sent out just about 220 lists to

09:17:12 16   firms.  We asked for responses, either confirming our information.

09:17:17 17   The information we asked to confirm was whether an attorney

09:17:21 18   represented the homeowner and the type of drywall in the property.

09:17:26 19   As you can see, the majority of people confirmed and a few had some

09:17:30 20   revisions and we're looking at those now.  As Arnie mentioned, we're

09:17:35 21   working quickly through this.

09:17:36 22               THE COURT:  Okay.

09:17:37 23               MR. WOODY:  Thank you, your Honor.

09:17:38 24               THE COURT:  Thank you.  And of course, as I mentioned

09:17:40 25   several times, this is in addition the remediation of the home by

```
09:17:44  1   Knauf.
09:17:45  2           All right.  Anything from Knauf on the remediation?
09:17:51  3           MR. DYSART:  Nothing particularly new, your Honor.  There
09:17:59  4   are currently ten homes under construction, four that are set to
09:18:02  5   begin.  They are on track to try to follow-up and finish by the end
09:18:06  6   of this year.
09:18:06  7           THE COURT:  Okay.  Good.  Thank you.
09:18:09  8           Anything in the seven INEX, Banner, Knauf settlements,
09:18:14  9   we've heard that review.  Anything else on that?
09:18:16 10           MR. HERMAN:  No, your Honor.
09:18:17 11           THE COURT:  How about Taishan, BNBM, and CNBM?
09:18:22 12           MR. HERMAN:  I'll state for the record, we appreciate
09:18:25 13   Mr. Egan and Mr. Rosenberg making their offices available for
09:18:30 14   depositions and their courtesies.  And discovery is proceeding in
09:18:38 15   those matters.
09:18:38 16           MR. ROSENBERG:  That's correct, your Honor.  I was just
09:18:40 17   going to echo Mr. Herman's comments, which is that all three
09:18:44 18   entities have been working with the PSC to productively resolve
09:18:49 19   discovery issues, both with respect to individuals associated with
09:18:57 20   these entities as well as third parties, and we're moving together
09:19:02 21   amicably, your Honor.
09:19:03 22           THE COURT:  Okay.  Good.  Thank you, Harry.
09:19:04 23           MR. ROSENBERG:  Your Honor, and of course we will address
09:19:06 24   the motions but that's part 12.
09:19:08 25           THE COURT:  Right.  As we all know, that there are two
```

09:19:13  1  lines of manufacturing in this particular case, those of you

09:19:20  2  litigants in the office and in the courtroom and also on the phone.

09:19:27  3  One is the Knauf entities, they are German companies wholly owned

09:19:34  4  subsidiary, Chinese wholly owned subsidiary by German companies.

09:19:40  5  We've proceeded along that line for a long time, and we're in the

09:19:44  6  distribution phase of that particular case.

09:19:46  7        The claims against Knauf were resolved.  But another line

09:19:50  8  of manufacturers is what we've been calling the Taishan entities.

09:19:56  9  There's been some jurisdictional issues with that group and also

09:20:03 10 some discovery issues that we're dealing with now.  But that group

09:20:06 11 is not resolved, it's in the discovery phase and in the trial phase

09:20:14 12 of this particular case.

09:20:14 13       So that's what we're talking about now, we're talking

09:20:17 14 about the Taishan entities.  And that's in the discovery phase and

09:20:21 15 also the motion phase, which we will be going into shortly.

09:20:25 16       MR. ROSENBERG:  And, your Honor, if it please the court,

09:20:27 17 without belaboring that issue, I understand that term Taishan

09:20:31 18 entities is just an abbreviation for the moment, but really the

09:20:34 19 court recognizes the three separate entities.

09:20:37 20       THE COURT:  Yes, I think that's fair.  What we're dealing

09:20:41 21 with now is Taishan, TTP, BNBM, CNBM, BNBM Group, CNBM Group, and

09:20:52 22 the latter groups feel that they are solely, totally indifferent

09:20:57 23 from Taishan.  Simply for purposes, as I mentioned, I've group those

09:21:04 24 as Taishan entities; but that's not something that is a finding of

09:21:09 25 fact or a conclusion of law at this time, it is vigorously objected

09:21:14  1    to.

09:21:15  2              MR. ROSENBERG:  Thank you, your Honor.

09:21:17  3              THE COURT:  Anything from Venture Supply and Porter

09:21:25  4    Blaine?

09:21:25  5              MR. HERMAN:  I think Ms. Barrios reported on that.

09:21:27  6              MS. BARRIOS:  Yes, your Honor.

09:21:28  7              THE COURT:  Okay.  Plaintiff and Defendant Profile Forms.

09:21:32  8              MR. HERMAN:  Excuse me, your Honor, because there are so

09:21:34  9    many people in the courtroom and I understand a number on the phone,

09:21:39 10    counsel have agreed to have depositions in Hong Kong the week of

09:21:48 11    September 14th.  I am not going to elaborate on that, Monday

09:21:53 12    afternoon or Tuesday we will be filing notices.  And ask that they

09:21:57 13    be posted on the judge's website, as well as being served by ECF.

09:22:08 14              THE COURT:  Okay.

09:22:08 15              MR. HERMAN:  Plaintiff and Defendant Profile Forms, your

09:22:10 16    Honor, there is no issue at this point.

09:22:14 17              Frequently Asked Questions, there's no issue.

09:22:19 18              Matters for hearing following the status conference, as I

09:22:23 19    understand it, your Honor will hear those after the status

09:22:29 20    conference is over.

09:22:30 21              MR. ROSENBERG:  That's correct, your Honor.

09:22:31 22              THE COURT:  That's right.

09:22:32 23              MR. ROSENBERG:  As your Honor knows, there are three

09:22:35 24    motions and we're going to address those after this conference.

09:22:41 25              THE COURT:  Yes.

09:22:41  1          MR. HERMAN:  Your Honor, there is no new report regarding

09:22:48  2     Physical Evidence or Preservation Order or any request pursuant to

09:22:52  3     that order.

09:22:57  4          The Entry of Preliminary Default, there's nothing new at

09:23:03  5     this time.

09:23:04  6          Already Remediated Homes, there may be an issue, but I am

09:23:10  7     not directly aware of it.  And your Honor may want to inquire about

09:23:16  8     that.

09:23:17  9          THE COURT:  Yes, I will.  I know we have someone, a

09:23:20 10     litigant that had some issues with the remediated home, we will take

09:23:26 11     that up now if the person who would like to come forward.  Yes,

09:23:41 12     ma'am.  Introduce yourself for the record, please.

09:23:44 13          MS. REBECCA HAINEY:  Rebecca Hainey.

09:23:45 14          THE COURT:  Ms. Hainey.

09:23:48 15          MS. REBECCA HAINEY:  Last time I came here, you know, I

09:23:50 16     was explaining my situation with the house.  Of course, we had

09:23:54 17     health problems after we moved back in and we moved back out.  And

09:23:58 18     just recently Tuesday they came to my house to look at it, and they

09:24:01 19     didn't find anything wrong with the house.  The three gentlemen said

09:24:06 20     that they didn't notice any smell or notice any corrosion in the

09:24:10 21     house, which I think everyone but those three gentlemen who have

09:24:14 22     gone into my house have noticed a smell and had some type of

09:24:18 23     physical irritation.

09:24:19 24          And they only stayed in there 20 minute s and they said it

09:24:23 25     would take about an hour and a half.

09:24:24  1          Now, about a year ago I did go into the house and I did

09:24:28  2   pull the plugs out to try to look at the wiring to see if it was

09:24:31  3   corroded, and some of it is darker but the air and the power's been

09:24:35  4   off since then.  And honestly, I think that since it's been pulled

09:24:41  5   away from the wood, the 2x4s, that it might not be corroding as much

09:24:47  6   because I believe that the wood has absorbed the chemicals and the

09:24:51  7   sulphur from the Chinese drywall.

09:24:54  8          And I actually had some testing done.  I had some testing

09:25:04  9   done and it shows that my samples were higher with the elemental

09:25:12 10   sulphur versus new samples.  Shows there that, I guess the paper,

09:25:21 11   mine was 54.9 and new samples are 29.7 as far as the elemental

09:25:28 12   sulphur goes.  So I don't know if the gentlemen took any drywall

09:25:32 13   with them to test it as well.

09:25:37 14          But like I said, I truly believe that the 2x4s have

09:25:42 15   absorbed the chemicals from the elevated sulphur levels because

09:25:49 16   that's what they believe ended up causing a lot of the health

09:25:53 17   problems, you know, the respiratory problems.  And, you know, now I

09:25:56 18   have asthma and I can't even go back in the house.  That's why I

09:25:59 19   left the wiring and the plugs out is because after I was in there

09:26:03 20   last year I ended up getting very sick again, so I haven't been able

09:26:08 21   to go back in the house.

09:26:11 22          And another thing is that my cabinets were not replaced

09:26:15 23   in the house, they were just stored, and I am not sure -- I've heard

09:26:21 24   that you made a recommendation that the cabinets were supposed to be

09:26:25 25   replaced, but I am not sure about that.  But I also wanted to bring

09:26:31  1    up the fact that -- the victims in these houses, we have had so many

09:26:41  2    health problems.  And I think just about everyone in one way or

09:26:47  3    another have experienced some type of health problems.  And as far

09:26:50  4    as the claims go, I believe that they settled with everybody -- not

09:26:54  5    everybody because it looks like a lot were denied.  But for some

09:26:58  6    people they settled for $1,000.  And when you experience asthma,

09:27:02  7    nose bleeds, you know, I've got a friend who their daughter gets

09:27:08  8    seizures.  I mean, it's heart breaking as a parent to sit there and

09:27:12  9    watch your child go through all types of problems.

09:27:14  10          And the confidential settlement agreement released

09:27:18  11   between Banner and Knauf that was dated on 2006, December of 2006.

09:27:25  12   This states in here -- well, it states all kind of things.  But it

09:27:33  13   talks about how a breach of this provision could cause irreparable

09:27:37  14   harm to Knauf and then it talks about how -- it talks about that

09:27:47  15   they have to keep it confidential right here and they can't make any

09:27:50  16   statements regarding any perceived or actual smell or health risks

09:27:55  17   relating to the Knauf plasterboard.

09:27:58  18          And there's a lot of different reports that have come out

09:28:01  19   where the executives of Knauf, that they knew about this and they

09:28:05  20   knew about the health problems.  Here is something that was from

09:28:10  21   2010 and it states that Knauf officials tried to resell the suspect

09:28:16  22   board after taking it from Banner in 2007 but nobody wanted their

09:28:20  23   board.  So they knew that there were health risks, they knew that it

09:28:24  24   caused air problems, they knew that it corroded different metals and

09:28:27  25   different construction materials in the house, but they still wanted

09:28:29  1    to get rid of it and they still wanted to sell it and put it in

09:28:32  2    people's homes.

09:28:34  3           And here is the thing is that if -- and then another

09:28:39  4    thing it says is the agreement also appears that they wanted to

09:28:43  5    block Banner from informing any government agency, including health

09:28:48  6    and consumer authorities.  So no media, no press or public media, no

09:28:52  7    internet web sites, nothing.  So they wanted to keep it as

09:28:55  8    confidential as possible, you know, with it causing health problems

09:28:59  9    to the consumers.

09:29:00 10           THE COURT:  Did you sign it, did you agree with the

09:29:03 11    settlement?

09:29:04 12           MS. REBECCA HAINEY:  I did.  I did.  But I did not realize

09:29:08 13    at the time then of what I know now.

09:29:10 14           But the thing is is that I don't understand how they were

09:29:18 15    allowed to sell that to us and they knew that there were health

09:29:21 16    problems and it doesn't seem like there's any justice.  It seems

09:29:25 17    like if they knew that they had testing done and they knew that

09:29:31 18    there was health problems and it can make consumers and people sick,

09:29:36 19    how they were allowed to sell it, you know, to everyone.

09:29:42 20           And here it is on December 13th, 2006, Knauf executives,

09:29:47 21    and it lists a lot of executives, that they said that they were

09:29:52 22    notified that it contains sulphur compounds and the release, you

09:29:56 23    know, in a gaseous form.  They had testing done from CTH, but CTH

09:30:05 24    wasn't allowed to release the statement until they consulted with

09:30:11 25    the Knauf attorneys.  So they had to, you know, word it just so to

09:30:15  1    where it wouldn't affect them or harm their name in any kind of way.

09:30:19  2        And I just don't understand, it seems like there's no

09:30:22  3    justice; because honestly I think that, you know, the Department of

09:30:26  4    Justice and other people need to step in because what they've done

09:30:29  5    it should be illegal, you know, to sell, you know, toxic chemicals.

09:30:34  6        THE COURT:  Well, first of all, I do appreciate you being

09:30:38  7    here.  I always encourage the litigants to come as well as attorneys

09:30:43  8    and participate in the program.  That's why I have it in open court

09:30:48  9    and I also put it on the telephone so that anybody interested can

09:30:56 10    listen in and find out what's happening.  And I know that you've

09:31:01 11    come a long way and I appreciate you being here and telling me about

09:31:04 12    those things.

09:31:05 13        Let me make a couple of observations.  Part of the issue

09:31:10 14    here is you say that they knew or didn't know.  I don't know what

09:31:16 15    they knew or what they didn't know.  I heard evidence and one jury

09:31:20 16    found that they did not, that Knauf did not know, could not have

09:31:24 17    known because it never happened before, and that's an issue.  But it

09:31:30 18    doesn't mean that Knauf's not liable.  Under the law of most states,

09:31:35 19    and certainly Louisiana and most states, if you manufacture

09:31:40 20    something that is defective, whether you knew, could have known,

09:31:45 21    should have known, must have known is of no relevance.  You're

09:31:49 22    liable.  You're liable because you manufactured a defective product.

09:31:54 23    So whether they knew or didn't know doesn't mean that they're not

09:31:58 24    liable.

09:31:59 25        But the people downstream when they sell it to a

09:32:04  1    distributor or a builder, the builder or distributor's liability is

09:32:09  2    not based on the manufacturer's what we call strict liability.  The

09:32:14  3    builder must know, a builder must have had some opportunity to know

09:32:18  4    or could have known or should have known for them to be liable.

09:32:22  5         But when you say that Knauf knew, they take the opposite

09:32:28  6    view and say they did not know; and at least one jury had agreed

09:32:33  7    with them that they did not know.  So there is a question of fact

09:32:37  8    here that caused the parties to at least open discussions and

09:32:42  9    discuss the case and ultimately resolve the case.

09:32:44  10        But part of the settlement, I heard evidence and I

09:32:50  11   designed a protocol that had to be followed in order to remove the

09:32:59  12   drywall, remove all of the wires connected to the house; and in

09:33:07  13   addition to removing the drywall and replacing the drywall and

09:33:11  14   replacing all of the wires in the house, I required that an

09:33:16  15   inspector look at the house, take photographs of the house, showing

09:33:21  16   that it's removed, and then issue a -- and make sure it's clean.

09:33:29  17   Remove all of the material out of it and clean it and then issue a

09:33:34  18   certificate.

09:33:34  19        The reason I did that is because individuals who have

09:33:38  20   drywall in their home and have it removed, when they go to sell

09:33:44  21   their home they have to disclose that they had drywall, defective

09:33:48  22   drywall in their home.  And if they disclose that, someone may not

09:33:54  23   want to buy the house and they have to sell the house or they want

09:33:57  24   to sell the house.  So I felt that in order to give those

09:34:01  25   individuals some comfort, we ought to have someone issue a

09:34:05  1   certificate saying all of the drywall has been removed, the house

09:34:09  2   has been cleaned, and there is no evidence of any defective chemical

09:34:14  3   in it.  I put that in the program that they had to issue that.

09:34:20  4          So the individual came out to your home, the company who

09:34:30  5   is the inspector, they inspected the home and they took photographs

09:34:35  6   of it after the drywall was removed, and they issued a report saying

09:34:43  7   that there was no -- that the drywall had been removed and there was

09:34:50  8   no evidence of the contaminants in the house anymore and new drywall

09:34:55  9   was put in.

09:34:56 10          Now the last time you came you indicated that you felt

09:34:59 11   that, well, perhaps Chinese drywall was replaced with Chinese

09:35:06 12   drywall, so I had them go back out and look at the house and they

09:35:10 13   did.  And they indicated that they looked at the drywall and found

09:35:14 14   that it was American made drywall, not Chinese drywall.

09:35:17 15          MS. REBECCA HAINEY:  Right, I didn't think it was Chinese

09:35:20 16   made before because I knew that it had a plaque of Florida stamped

09:35:24 17   on it saying made in the U.S.A.

09:35:26 18          THE COURT:  In any effect, they issued another report

09:35:28 19   saying that there's no evidence, they took apart some of the wires

09:35:31 20   and didn't find any evidence of any problem.  They report that

09:35:37 21   there's no unusual odor was detected, and there's no blackening of

09:35:43 22   copper or silver.

09:35:46 23          You know, I have before me documents from individuals

09:35:52 24   saying that your home is safe and your home doesn't have a problem.

09:35:56 25   But if you're dissatisfied, you need to have a lawyer look at it.  I

09:36:02  1    understand you had a lawyer.

09:36:02  2         MS. REBECCA HAINEY:  Right.  I mean, honestly, it's been

09:36:05  3    very hard to try to find a lawyer to help me in this case.  And I

09:36:09  4    think that the drywall should be tested, because like I said, I

09:36:12  5    think that the 2x4s, the wood is pour Russ in the home and I think

09:36:15  6    they absorbed the sulfides and all of the other chemicals and now

09:36:20  7    they're being re-released back into the air of the home.

09:36:22  8         THE COURT:  I understand your feeling and I understand and

09:36:28  9    you articulate it very well.  But what you need to do at this point,

09:36:30 10    you need to have a lawyer represent you and proceed to litigation

09:36:35 11    because it's not before me.  You signed a settlement agreement, you

09:36:41 12    agreed with the terms of the settlement agreement.  Now you're

09:36:44 13    indicating that the terms of the settlement agreement weren't

09:36:48 14    properly carried out.  That's an issue of a breach of contract and

09:36:54 15    you need somebody to file a suit for you on a breach of contract,

09:36:59 16    and I'll hear evidence on both sides.  That's the best I can do with

09:37:04 17    it.

09:37:04 18         What I see before me is that you agreed to a settlement,

09:37:12 19    and the terms of the settlement at least indicate that it was

09:37:16 20    carried out.  Now you feel it wasn't carried out.

09:37:21 21         MS. REBECCA HAINEY:  I do believe that they followed --

09:37:23 22         THE COURT:  There is nothing else I can do.

09:37:26 23         MS. REBECCA HAINEY:  I do believe that they followed

09:37:27 24    protocol, I do believe -- I mean, I know for a fact, you know, that

09:37:27 25    they did remove all of the drywall, they did clean it, they did

09:37:30  1   replace the copper and the plumbing and all of that.  They didn't

09:37:34  2   replace the cabinets.  But they --

09:37:35  3        THE COURT:  You wanted them to knock the house down, is

09:37:38  4   that what you would do?  I mean, you don't -- they removed it

09:37:42  5   down -- I have pictures showing that it's just down to the studs.

09:37:49  6        MS. REBECCA HAINEY:  Well, I mean, not now, now it's back

09:37:51  7   to normal, you know.  Back then they did because that's what they

09:37:55  8   did with all of the houses is they removed everything and put it

09:38:00  9   back down to the studs.  But like I said, I do believe that the

09:38:02 10   studs is what absorbed, and I think the wood should be tested in

09:38:04 11   these houses.

09:38:05 12        THE COURT:  Okay.  That may be a breach of contract claim

09:38:09 13   that you need to do.

09:38:11 14        MS. REBECCA HAINEY:  Okay.

09:38:12 15        THE COURT:  But I would urge you to contact counsel and

09:38:16 16   deal with it accordingly because you need to file a suit.

09:38:19 17        MS. REBECCA HAINEY:  Yeah, okay.  All right.  Thank you,

09:38:21 18   your Honor.

09:38:21 19        THE COURT:  Okay.  Thank you very much, though, for

09:38:25 20   coming.

09:38:25 21        Okay.  Anybody else from the audience that would like to

09:38:29 22   speak?  I always entertain any comments by counsel or litigants or

09:38:36 23   anything else.

09:38:37 24        All right.  I will be back in a moment then to hear oral

09:38:41 25   argument.  The court will stand in recess.

09:38:42 1    THE DEPUTY CLERK:  All rise.

09:38:43 2   (WHEREUPON, A RECESS WAS TAKEN.)

09:55:14 3   (OPEN COURT.)

09:55:16 4    THE COURT:  Be seated, please.

09:55:16 5    As part of the proceeding today, we have two motions

09:55:20 6 before the court.  One motion is the motion by CNBM and BNBM,

09:55:28 7 motions to clarify or alter the contempt order.  I'll hear from the

09:55:35 8 parties at this time.

09:55:37 9    MR. ROSENBERG:  Your Honor, if it please the court, I

09:55:42 10 think the court is correct, of course as it always is, that there

09:55:47 11 are two substantive motions, but one of the motions is a subpart of

09:55:52 12 the first motion that's going to be presented to the court, which is

09:55:54 13 the motion to strike an affidavit.

09:55:57 14    THE COURT:  Right.  Okay.  I didn't need any argument on

09:56:02 15 that, I'll agree with that, I'll grant the motion to strike the

09:56:07 16 affidavit; it's argument and it may have a place, but not at this

09:56:10 17 time.

09:56:11 18    MR. ROSENBERG:  Well, to Mr. Fenton's chagrin, your Honor,

09:56:15 19 he's prepared a 30-minute argument, so I'll have to break the news

09:56:18 20 to him.

09:56:19 21    MR. FENTON:  Not quite, your Honor, but I will say no more

09:56:21 22 on the subject.

09:56:22 23    THE COURT:  Okay, fine.  When you win, you don't say

09:56:24 24 anything.

09:56:27 25    MR. STENGEL:  Good morning, your Honor, Jim Stengel from

09:56:32 1    Orrick, Herrington for the CNBM movants on this matter.

09:56:35 2          We've made a motion to modify or vacate or seek

09:56:40 3    clarification in some ways of the court's July 17, 2014, contempt

09:56:45 4    order.  We've had a dispute in chambers as to documents that I

09:56:52 5    believe Mr. Herman, I believe, intends to use, and I think we've

09:56:55 6    resolved that to the parties' satisfaction.

09:56:57 7          But there was one point that I did want to clarify, which

09:56:59 8    was, as we discussed earlier during the status conference, there are

09:57:04 9    multiple entities on the defense side of this case; and we

09:57:06 10   understand for convenience and economy of expression, the court

09:57:10 11   refers to it sometimes collectively.  That has from our perspective

09:57:15 12   a pernicious risk in that we view ourselves, and view the record

09:57:21 13   will show quite clearly we are separate entities; and that brings to

09:57:25 14   mind that the documents at issue here, although this is a CNBM

09:57:30 15   entity motion joined in by BNBM entities, the documents at issue as

09:57:35 16   to confidentiality are not ours but we will respect the wishes of

09:57:38 17   other parties in that respect.

09:57:39 18         What I want to do today, and this -- the vibe of the

09:57:45 19   submission, the fact that the documents I think shows that we and

09:57:48 20   the PSC are in some way ships passing in the night.  We view this as

09:57:54 21   a strictly legal motion, a modification of an interlocutory order of

09:57:59 22   this court under Rule 54, we are not seeking partial or full summary

09:58:02 23   judgment under Rule 56, so the factual material to our view is not

09:58:07 24   relevant.  This is purely a matter of legal issues to be decided by

09:58:12 25   the court.

09:58:15  1          Now, what are those legal issues?  First and most
09:58:19  2  obviously there is the issue of the scope and the definiteness of
09:58:25  3  the injunction under Rule 65.  But in bringing that matter to the
09:58:29  4  Court's attention, there are a number of related procedural issues
09:58:33  5  which we view both purely legal, meaning they're ripe for
09:58:37  6  determination by the court at this time, but critical to what we are
09:58:41  7  doing.
09:58:43  8          Which brings me to my concluding point, which is broader
09:58:47  9  than a motion to clarify, vacate, or modify an existing Rule 65
09:58:52 10  injunction; and that is I hope the court will take this motion and
09:58:59 11  our explanation of the governing law and have the chance at this
09:59:06 12  juncture to rethink what we're doing.  And I understand, your Honor,
09:59:10 13  that we are procedurally in unchartered waters.  I have never been
09:59:14 14  in a case like this before, I suspect none of us have; and looking
09:59:17 15  around the room, there are very few of us for whom this is our first
09:59:22 16  rodeo.  We've created a situation which is unprecedented I think in
09:59:26 17  the complication and we appreciate the court's efforts to get this
09:59:30 18  on an orderly path.
09:59:32 19          And we understand that because of that history we started
09:59:33 20  with the July order and moved from there, and we came back into the
09:59:38 21  litigation.  And the fact that shouldn't be lost here on the court
09:59:42 22  or the litigants is we are back.  We've been litigating, I think
09:59:46 23  we've been litigating reasonably successfully in terms of making
09:59:49 24  progress with the PSC.  I think we've demonstrated that we are
09:59:53 25  litigating.

09:59:54  1          As your Honor will remember, when we first re-entered the

09:59:57  2   litigation earlier this year, we were under a fairly strict

10:00:00  3   admonition that the Court was watching our conduct and we were

10:00:04  4   liable to have our defenses stricken, or the sanctions entered if we

10:00:09  5   didn't comply with what the court expected in terms of active

10:00:13  6   litigation.

10:00:13  7          We're here and we've done that.  So there's a very

10:00:17  8   substantial argument, I think the compelling argument that the

10:00:21  9   injunction has served its coercive purpose, which was to bring the

10:00:26 10   litigants back to court.

10:00:29 11          Now the court may have concerns about what happens in the

10:00:31 12   future, but I think there are mechanisms to deal with that.  And I

10:00:35 13   think we need to deal with the hear and now, which I will go into in

10:00:38 14   greater detail, of the fact that -- now, granted, we're serving

10:00:41 15   multiple purposes with the discovery that's going on now, but much

10:00:44 16   of it is focused, if not exclusively, but substantially on the issue

10:00:50 17   of whether there's any conduct of business in the United States

10:00:53 18   during the contempt order period.

10:00:56 19          That is consuming literally millions of dollars a month

10:01:00 20   of attorney time.  I think it's slowing down the process of our

10:01:06 21   being in a position to litigate substantial issues like personal

10:01:10 22   jurisdiction, or in the case of my client group, subject matter

10:01:15 23   jurisdiction.  And we have been accommodating I think on the PSC's

10:01:19 24   insistence that certain discovery needs to be completed before they

10:01:22 25   can proceed with substantive briefing and argument on motions

10:01:26  1   relating to the sovereign immunity of one of my clients.

10:01:30  2         But when in response to our 14 page legal brief we get 40

10:01:36  3   something pages of briefing, a 40 page Herman affidavit, attaching

10:01:40  4   96 exhibits, which I unfortunately went through the process of

10:01:44  5   actually printing them and it occupies about this much space

10:01:48  6   (DEMONSTRATING), there's something wrong with that.  When we say we

10:01:52  7   have a problem with the ambiguity of the order and the responses

10:01:58  8   briefing of that level and now we have another 50 pages of purported

10:02:02  9   factual material, I think it highlights the fact that the court

10:02:05 10   should pay careful attention to what we're saying here.  Because it

10:02:10 11   does implicate how this proceeding goes, how efficient we are in

10:02:14 12   resolving the open issues, the issues that matter.

10:02:16 13         And this frankly has become a side show, which is

10:02:19 14   consuming substantial resources; and a substantial resource which I

10:02:22 15   know the court is very sensitive to is the consumption of time.  And

10:02:27 16   as you know, we started with what were probably optimistic and

10:02:31 17   unrealistic deadlines at the start of this process, we were going to

10:02:35 18   be done with discovery on a very breakneck pace.  Everyone, the PSC,

10:02:40 19   the defendants has worked very hard to do that.  And I think we,

10:02:44 20   frankly, in some ways moved heaven and earth to make this thing

10:02:46 21   work.

10:02:46 22         But we are a long way from being done, we are now setting

10:02:49 23   conferences and arguments for early December, this matter will

10:02:52 24   clearly run deeply into next year.  And I don't think that was

10:02:54 25   anyone's contemplation.

10:02:56  1          So I think that's a framing reference for what I am going

10:02:58  2   to talk about this morning, which are, and again, the legal

10:03:01  3   deficiencies of the injunction order under Rule 65 and other

10:03:06  4   provisions, not the facts of the relationship among the parties, not

10:03:11  5   whether there is an alter ego basis beyond the findings of fact and

10:03:16  6   conclusions of law.  Those really miss the point.

10:03:18  7          As I said, we are in many ways ships passing in the

10:03:21  8   night.  But I urge the court, as I know you already have, to look

10:03:24  9   carefully at the briefing.  This matter has been extensively briefed

10:03:26 10   now, and although I will focus initially on Rule 65, there are a

10:03:30 11   number of procedural issues, which again because of our unique

10:03:34 12   situation may not be within our normal experience, they may not be

10:03:38 13   obvious, but some of them raise very critical issues and run afoul

10:03:43 14   of very clear Fifth Circuit law.

10:03:45 15          With that, let's turn to Rule 65.  And we have a dispute

10:03:51 16   with the PSC because they want to treat the injunction initially as

10:03:55 17   being a product of Rule 37, a discovery sanction.  They are correct

10:04:01 18   in that an injunction may be issued as a discovery sanction under

10:04:05 19   Rule 37, but every injunction is governed by Rule 65.  And the rule

10:04:11 20   is quite clear in that respect and every order granting injunction

10:04:17 21   must state its terms specifically.

10:04:18 22          And, again, contempt is an available sanction, but it

10:04:22 23   doesn't create a separate body of law governing the clarity of the

10:04:28 24   injunction, that's all Rule 65 and the cases interpreting Rule 65.

10:04:34 25          Obviously here there are two critical issues with respect

| | |
|---|---|
| 10:04:41 1 | to how the injunction works here.  The first is whether person -- |
| 10:04:46 2 | who the persons bound are.  And I wasn't here in July of '14, so I |
| 10:04:55 3 | can't speak of the circumstances at that time, others were.  But the |
| 10:04:59 4 | order uses a set of phrases, which we think are inherently |
| 10:05:05 5 | uncertain.  And Rule 62(d)(2) lays out who can be bound, and we |
| 10:05:11 6 | submit the CNBM entities are not part of any of that. |
| 10:05:18 7 | One of the analytical collapses I think we need to avoid |
| 10:05:23 8 | here is to realize that there are two separate events:  There's |
| 10:05:27 9 | Taishan's withdrawal from the litigation.  And while Taishan, as I |
| 10:05:34 10 | understand it, was under a clear directive from this court to appear |
| 10:05:37 11 | and participate in a debtor's exam.  There was no injunction, there |
| 10:05:40 12 | was no injunction directed at any other party.  It was Taishan as a |
| 10:05:44 13 | party in *Germano,* and our clients were not parties in *Germano*, had |
| 10:05:49 14 | not been served in *Germano*, they were not there. |
| 10:05:53 15 | Now, I know the PSC thinks they have an argument, but we |
| 10:05:59 16 | weren't there.  That's one element. |
| 10:06:03 17 | The second event, which is where we consumed all of this |
| 10:06:07 18 | time and effort in discovery, lots of third-party discovery, is the |
| 10:06:11 19 | conducting business during the July to March period.  A huge amount |
| 10:06:17 20 | of time and we submit a waste of time.  And there's no evidence, |
| 10:06:25 21 | there's no allegation that any of the CNBM entities aided or caused |
| 10:06:32 22 | Taishan to do business during the period. |
| 10:06:37 23 | So we start with the July order, and the July order is |
| 10:06:42 24 | simple, it's brief, and it refers to Taishan and any of its |
| 10:06:50 25 | affiliates or subsidiaries is hereby enjoined.  Well, subsidiaries |

10:06:55  1    is fairly clear in this context, that really means TTP, and I think

10:07:00  2    the order fairly read is referring to subsidiaries of Taishan, not

10:07:04  3    subsidiaries of affiliates.

10:07:05  4         But affiliates is the evil that lurks in this order.

10:07:10  5    Because affiliates, as your Honor knows, is often a defined term in

10:07:14  6    contracts because parties don't know what it means necessarily.

10:07:19  7    Blacks gives a very expansive view of affiliates, can mean almost

10:07:23  8    any relationship.  And affiliates, while the court may have had

10:07:26  9    something firmly in mind, unfortunately the text of the order does

10:07:30 10    not communicate that clearly to a reader.

10:07:33 11         And ironically some of the materials that I think

10:07:36 12    Mr. Herman's going to display involves dialogue about what does this

10:07:41 13    mean.  And while Mr. Herman will focus on how that dialogue might

10:07:46 14    have been resolved, from my perspective the fact that there is that

10:07:50 15    dialogue, that parties who at least in the PSC's view are subject to

10:07:56 16    those limitations, are debating.  I think you'll find takes this

10:08:02 17    order out of the context of Rule 65 and makes it inadequate because

10:08:07 18    there is that ambiguity.

10:08:11 19         But the PSC says, well, we have the findings and

10:08:14 20    conclusions finding that five of these entities are affiliates, for

10:08:17 21    purposes alter egos.  But those findings, conclusions happened after

10:08:23 22    the contempt order, and the law is clear you can't nunc pro tunc

10:08:30 23    clarify an injunction by subsequent rulings in developments.  So as

10:08:34 24    interesting as the findings of facts and conclusions of law may be,

10:08:38 25    they don't really help clarify or save the contempt order in this

```
10:08:42   1    respect.
10:08:42   2            And we have an issue that I am sure in many motions we
10:08:48   3    will be discussing, that is the binding effect of Taishan's
10:08:53   4    admissions.  Now, these were admissions in response to discovery
10:08:57   5    requests, which I understand were served after Taishan had announced
10:09:01   6    its intention to leave the litigation, so it's perhaps no surprise
10:09:04   7    that there was no response and they were deemed admitted against
10:09:08   8    Taishan.  And I think they are binding as to Taishan.
10:09:11   9            But again, recognizing the separate status of these
10:09:13  10    defendants, the findings of fact and conclusions of law may not be
10:09:18  11    used as a binding determination of the status as to us.  We cite the
10:09:24  12    controlling Fifth Circuit law which is quite clear on this, but
10:09:29  13    Wright, Miller, et cetera, make it fairly clear that this is not a
10:09:33  14    unique Fifth Circuit provision, but that's how the law is generally
10:09:36  15    applied.  The courts take very seriously the provision with which
10:09:41  16    Rule 65 injunctions must be framed.
10:09:44  17            Now, the PSC has contributed in many ways and I think
10:09:49  18    affirmed the problem with the affiliates language.  These are
10:09:51  19    successive in time, but first there were five, then there were 39,
10:09:56  20    then there were 46, and then there were 66.  If the party which
10:10:02  21    wishes to prosecute the injunction from time to time can't state
10:10:07  22    with certainty who it is they believe is bound by the injunction,
10:10:11  23    the inherent ambiguity of that phrase becomes manifest, and that's
10:10:16  24    what we have here.
10:10:17  25            And while in fairness the PSC has not described the other
```

10:10:21 1    150 SOE's from which they sought discovery as affiliates for these

10:10:25 2    purposes, the definition they've used is so broad relating to

10:10:30 3    ownership, given the strict government ownership of Group, one of my

10:10:35 4    clients, I believe there is an argument under their construction

10:10:39 5    that most of the state owned enterprises in the People's Republic of

10:10:44 6    China would be affiliates for these purposes.

10:10:46 7        And I can't believe that that was the court's intent in

10:10:49 8    July of last year.  I think the court's clear intent was to achieve

10:10:55 9    exactly the result it did, which was to bring these litigants back

10:10:59 10   in so there could be a resolution of this case.

10:11:03 11       Now I'll touch briefly on jurisdiction as a legal

10:11:09 12   prerequisite.  I touch briefly on this because we tried to frame

10:11:13 13   this motion surgically.  We have Rule 12 motions pending for our

10:11:17 14   client, we have a sovereign immunity challenge as part of those

10:11:20 15   challenges pending.  We didn't want to wander into the complex area

10:11:24 16   of jurisdictional findings.  We don't think you need to do that at

10:11:27 17   this point.  But we did think it was fair to make sure that the

10:11:30 18   court understood how stringently the jurisdictional requirement,

10:11:34 19   personal jurisdiction, and subject matter jurisdiction is applied in

10:11:38 20   these cases.

10:11:40 21       The case we cite from the Fifth Circuit does cite the

10:11:43 22   prevailing Fifth Circuit standard, but that's been the standard in

10:11:46 23   federal courts since the *Zenith Radio v. Hazeltine Research*

10:11:51 24   antitrust case I believe in the early '60s.  That case was extreme

10:11:54 25   in many ways.  There was a subsidiary as a defendant, there was a

10:11:57  1   stipulation in the record that the subsidiary and its parent could
10:12:00  2   be treated as one entity for purposes of litigation.  The
10:12:03  3   stipulation was entered into specifically to avoid veil piercing
10:12:05  4   discovery.  Subsequently the court attempted, the district court
10:12:08  5   entered injunction against both subsidiary and parent, and the
10:12:13  6   Supreme Court ultimately ruled that as the parent, despite the
10:12:15  7   stipulation, had not been served with process, was not a party to
10:12:19  8   the litigation, was not subject to the jurisdiction of the court,
10:12:22  9   they could not be bound by an injunction.
10:12:24 10          So again, that's a placeholder, a gentle reminder to the
10:12:28 11   court that that is a substantial issue, and it's a predicate issue
10:12:32 12   towards any party being held to be bound by an injunction.
10:12:37 13          Now I would like to turn, this is who is bound.  Let's
10:12:40 14   talk about what conduct is prohibited.  And this again, plain
10:12:48 15   meaning.  You've got to be able to look at the injunction and say I
10:12:52 16   understand what I can or cannot do.  In the cases involving the idea
10:12:56 17   of conducting some activities, commercial activity, are very clear.
10:13:01 18   And just to take an example, again, how the PSC I think proves the
10:13:06 19   case of ambiguity.  And I will say and I don't want to be unfair
10:13:11 20   because we're in the process of discovery, which is inherently
10:13:14 21   broader than the PSC may want to go in terms of recoveries, but the
10:13:20 22   assertions from discovery perspective of the interests that are
10:13:24 23   necessary to be conducting business include people investing in
10:13:28 24   securities of my clients that are listed on the Hong Kong exchange,
10:13:32 25   the Shenzhen exchange, Shanghai exchange.  It may very well be that

10:13:36  1  American invest or a bank invest in those.

10:13:39  2          But it's strange credulity to say that someone could have

10:13:42  3  picked up this order in July of 2014 and said, boy, I better not

10:13:47  4  invest in a company which is three or four levels of ownership,

10:13:52  5  including intervening publicly traded companies removed from

10:13:57  6  Taishan.

10:13:57  7          But here we have a very specific example and the

10:14:00  8  plaintiffs have been very clear that they consider this doing

10:14:03  9  business, conducting business to use the phrase of the order; that

10:14:08  10  is, we know you've done things in Oregon, Texas, and other places.

10:14:11  11  When you look at the actual governing state law in each case, the

10:14:14  12  state corporate law exempts from the concept of doing business,

10:14:18  13  albeit this is for registration purposes, that very conduct.

10:14:23  14          So how the PSC can stand up and say, well, obviously

10:14:27  15  conducting business, everyone would have known that that included

10:14:32  16  litigation.  I think again, strange credulity.  I also would say, to

10:14:38  17  put it in context, some of the litigation involved here was ongoing

10:14:41  18  at the time the order was entered, and I can't believe it was the

10:14:44  19  intention of this court to force parties to do in other cases

10:14:50  20  exactly what they were doing here that got them in trouble with this

10:14:53  21  court.  I don't think this court would have ever said, "I am going

10:14:57  22  to enjoin you from conducting litigation in Texas."  "That Oregon

10:15:02  23  case, walk away."  That again is so far beyond the bounds of

10:15:11  24  reasonable I can't believe it was part of the court's thinking at

10:15:13  25  the time.

10:15:15  1          Now, we've had some debate in the briefing as to whether

10:15:18  2    the court entered criminal or civil sanctions here, and whether the

10:15:24  3    injunction was criminal or civil.  I will be bound by the wording of

10:15:32  4    the order, which says explicitly it was criminal.  And to the extent

10:15:35  5    criminal contempt is involved, there are a host of procedural

10:15:39  6    protections.  Due process standards, these are square corners that

10:15:44  7    have to be honored.  And they will have a substantial impact on how

10:15:48  8    we go forward.

10:15:49  9          I think it's a substantial impact on the existing

10:15:52 10    adequacy of procedure to support this injunction if it is read with

10:15:57 11    the breadth that the PSC urges.  You can't make that work.

10:16:06 12          Again, I think it's abundantly clear, this is criminal

10:16:12 13    contempt.  The order says the court holds Taishan in contempt of

10:16:16 14    court both criminally and civilly.  In the deprivileging order of

10:16:20 15    December, the court recites historical facts that it was both a

10:16:24 16    civil and criminal contempt citation, and notes that the PSC argues

10:16:29 17    that it was criminal in part to support the application of the crime

10:16:32 18    fraud exception of the Hogan Lovells documents.  So I don't think

10:16:35 19    there's a serious issue as to whether this was both species of

10:16:40 20    contempt.

10:16:40 21          Of the reasons that I think the court and litigants need

10:16:45 22    to think very hard about what we're doing with this path towards I

10:16:50 23    suppose expected recoveries of profits for conduct of business is,

10:16:56 24    and there seems to be some confusion here, to the extent this was a

10:16:59 25    coercive mechanism, and clearly was, there was no relationship

10:17:04   1    between any injury to any user of Taishan drywall and the profits of

10:17:09   2    sometimes far removed entities.  That was a substantial hammer.

10:17:16   3         If that's what it was, and I think it clearly was

10:17:19   4    coercive, then any recoveries realized here would be paid to the

10:17:23   5    clerk of the court.  That's what you do with those awards.  And in

10:17:28   6    my experience, every time you've had a witness who wouldn't testify

10:17:31   7    before they were incarcerated they were paid -- they had a fine

10:17:34   8    imposed of X dollars a day until they purged themselves.  And there

10:17:40   9    was never any question in my mind in those cases that the plaintiff

10:17:42  10    was going to receive those funds.

10:17:45  11         Now, the court does have in its power and does issue

10:17:48  12    compensatory contempt awards, but those would have to be clearly

10:17:53  13    linked with the injury to the plaintiffs and there is no linkage

10:17:57  14    here.  So we have the possibility of spending huge amounts of time

10:18:01  15    and resources to pursue money, which although I'm sure the clerk of

10:18:06  16    the Eastern District of Louisiana would love to get an unexpected

10:18:11  17    check for a very substantial amount of money, I don't think that's

10:18:12  18    what the court intended us to be doing, and I don't think that's how

10:18:15  19    we should be spending our time right now.

10:18:17  20         A more serious issue in many respects is the next one.

10:18:22  21    And this one I am not sure we have a good fix for.  This is a quote

10:18:31  22    from *in re:  H. Peter Davidson* in the Fifth Circuit, it cites the

10:18:36  23    Supreme Court, Scalia I believe in the *Vuitton et Fils* case, but it

10:18:42  24    stands for what's really I think in most contexts an unexceptional

10:18:46  25    proposition, that when you are dealing with a contempt situation,

10:18:49  1   particularly in a contempt situation including criminal contempt,

10:18:54  2   the defendants, and this is not a matter of stepping into the shoes

10:18:57  3   of the plaintiffs and looking out for that interest, this is a

10:19:01  4   straight due process issue for we defendants.  We deserve and the

10:19:04  5   law contemplates in criminal contempt if it has to be proceeded, it

10:19:09  6   would be a special prosecutor assigned, because, as in all

10:19:13  7   defendants' cases, we're entitled to an objectively minded

10:19:17  8   prosecutor who can do what prosecutors do.  If the evidence is

10:19:21  9   adequate, I'll walk away.

10:19:24 10        By delegating this process to someone with, in their

10:19:27 11   view, very direct financial interest because they don't agree with

10:19:30 12   us as to the ability to have the plaintiff class recover the

10:19:34 13   proceeds of this exercise, we have interested counsel pursuing

10:19:40 14   contempt claims.  Clearly impermissible.

10:19:45 15        And, your Honor, the *Davidson* case goes on to distinguish

10:19:48 16   the law in the Fifth Circuit from others on this very point; which

10:19:53 17   is because of the seriousness of this issue from a defendant due

10:19:56 18   process perspective, there is no harmless error carved out as to

10:20:02 19   these cases in the Fifth Circuit.  If you touch this third rail,

10:20:06 20   you're done.

10:20:07 21        And I don't know how we unpack this now because we've

10:20:10 22   gone some distance with an impermissible prosecutor in these cases.

10:20:16 23        Now, I don't want to be accused of sort of creating a

10:20:22 24   Christmas tree of issues, but I do want to make sure the court is

10:20:25 25   aware of some other issues.

10:20:29   1          The complaints allege that Group is a state owned

10:20:34   2   enterprise owned by the Chinese government, and we have, as your

10:20:37   3   Honor knows, briefed the issue of sovereign immunity under the

10:20:43   4   Foreign Sovereign Immunity Act.  And that has consequences on

10:20:46   5   subject matter jurisdiction, personal jurisdiction, jury trial, the

10:20:50   6   availability of punitive damages, how you would execute and recover

10:20:54   7   if anything was ever found to be liable.

10:20:56   8          But it also has direct consequences in a situation of

10:21:01   9   contempt, and the Act and the cases interpreting the Act place

10:21:05  10   substantial limitations on the court's ability to pursue contempt

10:21:08  11   remedies against sovereign immunities.

10:21:10  12          So in this collection of issues which we think the court

10:21:14  13   needs to consider when deciding whether we're going to consider

10:21:20  14   continue howling down the path of looking for discovery about

10:21:23  15   conduct of business in the United States, it's something that the

10:21:25  16   court ought to consider.

10:21:27  17          Now, can I have the last slide, please.

10:21:30  18          Obviously I spent a fair amount of time looking at this

10:21:34  19   language, and I have shared with the court the defects we see.  And

10:21:38  20   I say that with all respect, your Honor, but we think those are

10:21:42  21   fatal.

10:21:43  22          But when I looked at it and I thought there was another

10:21:46  23   source of ambiguity, which is this phrasing here is a little

10:21:50  24   peculiar.  Most of us would say "unless and until," the order

10:21:57  25   doesn't say that.  The order is stated in the disjunctive.  Until or

10:22:01  1    unless it participates in this judicial process.  I think that "or"

10:22:09  2    is significant and the "or" allows you to read either until or

10:22:14  3    unless Taishan and the other defendants having subjected themselves

10:22:19  4    to this court's tender mercies in some way, although obviously we've

10:22:24  5    reserved personal jurisdiction and other issues, we're back and I

10:22:28  6    think a fair reading of this order is unless and since we're here,

10:22:32  7    the contempt process should stop.

10:22:36  8           And that's broader than the motion we started with, but

10:22:39  9    it's where we ended up after the analytical process of looking where

10:22:43 10    we were and frankly looking at the extensive factual matter provided

10:22:47 11    by the PSC.  So we think we are at a juncture in time where the

10:22:53 12    court should suspend activity, and I say this knowing that one of

10:22:56 13    the things that PSC said in response to our motion was we were

10:23:00 14    seeking a stay of discovery, we're not.  We think this is a discrete

10:23:03 15    binary decision on the court's part.

10:23:05 16           If we're going to continue with discovery, we're going to

10:23:09 17    continue prosecution in this form with a contempt remedies, if we're

10:23:14 18    going to continue to try and enforce the July 17th injunction as

10:23:19 19    written, absent a consideration of my suggestion on "or," then I

10:23:24 20    think we're into that realm.

10:23:27 21           But I do think the order having served its purpose with

10:23:31 22    the litigants back and with us, I think, still searching for a

10:23:36 23    viable damage model on the part of the plaintiffs, there are lots of

10:23:41 24    issues that need to be resolved.  Jurisdiction, alter ego, damages,

10:23:47 25    who is entitled.

10:23:49   1          I don't think it's constructive for this court and these

10:23:52   2     litigants to engage in extensive fraud and detour to see who was

10:23:58   3     doing what through an Nth level subsidiary in the United States

10:24:03   4     between July and March.  It's a waste of this court's time, it's a

10:24:06   5     waste of resources, it is legally, we think, facially impermissible.

10:24:11   6          And with that, thank you, your Honor.

10:24:13   7          THE COURT:  Okay.  Thank you very much, I appreciate your

10:24:15   8     comments.

10:24:15   9          MR. FENTON:  Your Honor, very briefly.  There's little I

10:24:23   10    can add to Mr. Stengel's very comprehensive and very excellent

10:24:27   11    presentation.  There's a couple of specific points to my clients

10:24:31   12    BNBM, PLC and BNBM Group that I would like to make.

10:24:36   13         First of all, we had raised very much the same arguments,

10:24:40   14    with the exception of sovereign immunity, we had raised very much

10:24:43   15    the same arguments in our May 8 filing, Record Document 18872 in

10:24:52   16    response to the PSC's request for an expedited hearing and we

10:24:57   17    incorporated that in our joinder.

10:24:59   18         In particular, your Honor, with respect to BNBM Group,

10:25:04   19    which is the entity that the plaintiffs are claiming engaged in

10:25:08   20    transactions that violated the injunction, BNBM Group is an entity

10:25:15   21    that has and never had any ownership interest in Taishan, either

10:25:20   22    direct or indirect.  It has no ability to control Taishan.  There is

10:25:26   23    no ownership relationship between those companies whatsoever, and

10:25:33   24    that obviously implicates the ambiguity of the term affiliate.  And

10:25:41   25    so everything that I think Mr. Stengel said about that ambiguity

10:25:46 1    applies with great force with respect to BNBM Group.

10:25:50 2            Obviously BNBM, PLC does have a substantial stake in

10:25:55 3    Taishan, that's a little different analysis.  But I think the point

10:25:59 4    that was made about the ambiguity of the term affiliate is quite

10:26:04 5    salient.

10:26:05 6            Also, your Honor, with respect to the individual

10:26:09 7    transactions that were raised by the PSC, I agree that for purposes

10:26:13 8    of today's motion, which really go to the face of the order, they

10:26:18 9    are not particularly relevant.  We discussed them in our reply, not

10:26:23 10   just to set the record straight on some of the facts, but also I

10:26:28 11   think to illustrate for the court that these transactions, which

10:26:36 12   largely involve U.S. companies going over to China and doing

10:26:42 13   business with some of the BNBM entities in one form or another, are

10:26:48 14   being construed to implicate this language of the court doing

10:26:54 15   business in the United States, and that I think highlights the vague

10:27:00 16   nature of that language.  And really it's not clear at all what the

10:27:06 17   companies are allowed to do or not allowed to do.

10:27:09 18           And I think Mr. Stengel is quite right that there has

10:27:14 19   been a tremendous amount of extensive and expensive discovery spent

10:27:19 20   on pursuing these transactions that I don't think were fairly

10:27:23 21   intended by the scope of this order.  All because there is vagueness

10:27:29 22   in the order and the PSC is trying to force fit some of these

10:27:33 23   transactions.  And I do think that addressing that at this juncture

10:27:39 24   is appropriate.

10:27:44 25           And the only other thing that I will say, your Honor, is

10:27:48  1    I want to reiterate Mr. Stengel's observation that if you need a

10:27:53  2    50-page brief and a 40 page now stricken affidavit and exhibits from

10:27:58  3    one end of this courtroom to the other in order to understand what

10:28:02  4    this two-page order means, there is a problem.  And I think the

10:28:07  5    court should address it.

10:28:08  6              THE COURT:  Okay.

10:28:09  7              MR. FENTON:  Thank you, your Honor.

10:28:10  8              THE COURT:  Thank you very much, you've been very helpful.

10:28:13  9              Any response?  I'm sorry, Bernard, do you have anything?

10:28:21 10              MR. TAYLOR:  Your Honor, just one thing.  Bernard Taylor

10:28:22 11    for Taishan.

10:28:23 12              We filed a motion to lift the contempt order by showing

10:28:27 13    compliance, which is Document No. 18449, I think we filed it in

10:28:32 14    March.  I believe that Mr. Stengel and Mr. Fenton's arguments

10:28:37 15    capsulize very clearly the same arguments we made in our motion

10:28:41 16    briefs.

10:28:42 17              THE COURT:  All right.  Thank you.

10:28:45 18              Any response?

10:28:46 19              MR. LEVIN:  Good morning, your Honor.  I will present

10:29:11 20    argument based on the facts of this case, what we've observed from

10:29:19 21    an alphabet soup of companies, and Mr. Herman will then delve into

10:29:27 22    the documents that we've been able to uncover that were in Chinese,

10:29:33 23    that were machine translated, that were determined by picking up a

10:29:38 24    word here and there, translated into English, and they are the

10:29:46 25    subject matter and you will see.

10:29:49  1          I want to assure the court that Mr. Herman filed an

10:29:53  2    affidavit, much like the affidavits that were filed in the Taishan

10:29:58  3    motions that went to the Fifth Circuit, to put those documents

10:30:02  4    before the court for the purposes of this hearing.  I want to assure

10:30:07  5    the court that I've dealt with Mr. Herman, and I would take this

10:30:11  6    affidavit that the division of labor of plaintiff's counsel in this

10:30:17  7    case was devised where Mr. Herman took Taishan and CNBM and I took

10:30:24  8    BNBM depositions.  Every document that was used, and more, has been

10:30:30  9    read by Mr. Herman and it's on his personal information that that

10:30:35 10    affidavit was created.  He not only read the CNBM and Taishan

10:30:41 11    documents, he read the BNBM.  We counselled each other before the

10:30:47 12    depositions, and he is fully conversant with what was established at

10:30:51 13    the depositions.

10:30:53 14          Your Honor, contempt is not a side show.  Nor is what our

10:31:00 15    clients have gone through, 4,000 of them, been a side show for the

10:31:06 16    last five, six years living as they had to live because of the

10:31:11 17    conduct of these defendants.

10:31:15 18          It's nice to have something to say that's fresh in the

10:31:20 19    mind of the argument.  BNBM stood up and said BNBM Group, one of the

10:31:28 20    alphabet companies, had absolutely nothing to do with anything here.

10:31:35 21    CNBM we know, Group, controls everything going down; BNBM Group, the

10:31:46 22    one that has nothing to do with anything, 70 percent of its stock is

10:31:52 23    owned by CNBM Group, 30 percent by CNBM Trading, and CNBM Group owns

10:31:59 24    100 percent of Trading.  Now, sure they would like us to stay away

10:32:05 25    from the facts, but the facts are what this is all about.  And we've

10:32:10  1    had to uncover the facts.

10:32:17  2            Your Honor, they've done a marvelous job, CNBM Group,

10:32:23  3    CNBM, BNBM, BNBM Group, CNBM Trading, CNBM Investing, CNBM this,

10:32:31  4    CNBM that, BNBM this, BNBM that, and they sat together and they

10:32:36  5    formed a global offering and they put together a conglomerate.  I am

10:32:44  6    from Philadelphia.  The Wharton School would love to teach a course

10:32:50  7    on this because it's marvelous.  It's a money making organization,

10:32:55  8    and there's nothing wrong in making money, but it wasn't designed to

10:33:03  9    defend this lawsuit.

10:33:06  10           And as a result of that, they are -- they are not

10:33:12  11   independent defendants that have been brought into the litigation

10:33:14  12   and held in contempt because somebody, a codefendant is in contempt.

10:33:20  13   They are alter egos, they are a single business enterprise, they

10:33:25  14   take the situation of Taishan and TTP, which your Honor ruled on and

10:33:32  15   the Fifth Circuit ruled on twice, and take it to its farthest point

10:33:38  16   north of how they're interrelated with boards of directors that are

10:33:43  17   the same.  Everything is controlled up top.

10:33:48  18           And control is good when you're setting up a money making

10:33:54  19   corporation that's the biggest wall board company in China and

10:33:58  20   perhaps the world.

10:34:00  21           So why now are we here?  We have a December hearing on

10:34:08  22   jurisdiction or foreign sovereign immunity.  Your Honor has given us

10:34:12  23   instructions as to how to take this discovery, that's alter ego and

10:34:17  24   contempt, do it right now, and affiliates.  And suddenly four or

10:34:24  25   five months before the hearing they come in and say the facts are

10:34:28  1    not important.  It's completely a legal issue.  What did your Honor

10:34:37  2    tell us to do, what have we been doing and why are we here?  Because

10:34:46  3    they're like, at least some of my 14 grandchildren, they want their

10:34:51  4    ice cream before their meal.

10:34:55  5          The meal and the meat of this case is in December and

10:34:59  6    that's what we're involved in.  And they do not want discovery and

10:35:03  7    they want to stop discovery.  And as a result, we have asked for

10:35:09  8    depositions of affiliates:  CNBM Import and Export, CNBM Forest,

10:35:16  9    CNBM U.S.A., United Sun Tech, and we can't get a date.

10:35:25  10         We finally found out this week:  Well, we can't give you

10:35:30  11   a date because we don't know what's going to happen in these

10:35:34  12   motions.  You have to wait until Friday.  Well, your Honor, Friday

10:35:39  13   is here, today is Friday, and we should get on with what we've been

10:35:47  14   doing.

10:35:48  15         And it's not been easy, your Honor.  We've taken 30(b)(6)

10:35:53  16   depositions where CNBM has produced 1,967 pages before the

10:36:01  17   deposition; CNBM document production after the 30(b)(6) depositions,

10:36:10  18   that's like two, three weeks ago, 143,560 pages.  That was produced

10:36:19  19   three days before Mr. Herman had to take a deposition this week of

10:36:24  20   CNBM.  CNBM Group did a little bit better, they produced 13,851

10:36:31  21   pages before the 30(b)(6) and 202,421 pages after the 30(b)(6).

10:36:42  22         Your Honor, you know, I was born but not yesterday.

10:36:49  23   Probably the oldest person in this courtroom because I haven't asked

10:36:53  24   your Honor your age.  But this is not mind boggling.  We know

10:37:02  25   exactly what's happening here.  They're running the clock, and it's

10:37:10  1    especially difficult because the clock is in Chinese and we're faced
10:37:15  2    with that.  They're not co-defendants in a case.  They are
10:37:23  3    co-conspirators, they are alter egos, they're a single business
10:37:29  4    enterprise under Florida law, as we found out in the original
10:37:34  5    Taishan jurisdictional motions, they're agencies.  They've traded
10:37:42  6    lawyers.  Sometimes this one represents them, so they hide the pea.
10:37:49  7    Sometimes this one represents them.  BNBM was in China before,
10:37:54  8    before, before they appeared in this litigation with attorney
10:38:00  9    sitting with Taishan.
10:38:03  10          I can't comment on everything in the HL, Hogan Lovells
10:38:07  11   privilege log, but your Honor has seen it and our briefs that are
10:38:12  12   marked confidential, secret -- which is another thing.  We're also
10:38:19  13   hamstrung.  We don't know what the defendants really have, because
10:38:25  14   in China, they have a Chinese Secrecy Act and you can't find out
10:38:30  15   what the privilege is, what has been withheld because it's a secret.
10:38:36  16          Despite all of that, with all of those limitations,
10:38:42  17   Mr. Herman will show you the tip of the iceberg of what's here.
10:38:52  18          Now, they argue whether it's civil or criminal contempt.
10:38:56  19   They were all aware, BNBM, CNBM of what Taishan was going to do when
10:39:04  20   they fired their attorneys and went back to China.  And then they
10:39:09  21   came back in.  They were aware then.  And they all knew what was
10:39:15  22   happening, they took a gamble; and because of what happened in this
10:39:19  23   courtroom, they lost that gamble and now they come in like the kid
10:39:28  24   that kills his parents.  And when he appears in court, he pleads for
10:39:33  25   mercy.  And the reason he needs mercy is he is an orphan.

10:39:39   1          Well, they created the situation that puts them here.

10:39:43   2   And in the middle of discovery when they're being found with their

10:39:47   3   hands in the cookie jar, what do they do?  They file a motion to try

10:39:52   4   to stop everything.  Well, whether it's civil or criminal contempt,

10:40:01   5   and your Honor will make this decision, the damages can go to the

10:40:04   6   class.  There are cases that say even in criminal contempt they can.

10:40:07   7   This contempt occurred in the open courtroom, and your Honor had the

10:40:14   8   ability to do exactly what you did when it did.

10:40:17   9          And they argue that they want to be in criminal contempt.

10:40:20  10   Can you really believe that these Chinese defendants, who have

10:40:24  11   ruined the lives of thousands of Louisiana residents, want to be in

10:40:30  12   front of a jury in Louisiana on a contempt citation?  Everything is

10:40:36  13   done to stop the wheels of justice and stop us from proceeding so

10:40:41  14   that we can get to December.  And there is no reason that we

10:40:45  15   can't -- that we shouldn't do that.

10:40:48  16          We will be able to prove, your Honor, I could read the

10:40:51  17   12, 14 statements in the *Jackson* case that your Honor cited, that

10:40:56  18   the Fifth Circuit cited with regard to alter ego, and your Honor

10:41:01  19   told us to take discovery on alter ego, and we did.  And you'll see

10:41:05  20   part of it.

10:41:07  21          But most shocking, and I would like to hand out a

10:41:14  22   document that is not confidential, I'm sure you've both seen it.

10:41:19  23   May I approach the clerk?  Your Honor, this document has been marked

10:41:37  24   as Exhibit 215 in depositions.  It came out in the BNBM deposition.

10:41:46  25   It's a CNBM Group document.  Not so separate that they end up with

this document.

This is six days before they were to appear in court for the judgment debtor hearing. Six days before. And from the top CNBM Group down the line to all of the other alphabet companies, what do they tell them? Controlling shareholder, they tell them don't use banks in New York and use private e-mails. It's a lot more in the document. They already knew what was going to happen here, that we were going to chase them on the *Germano* judgment and further with regard to the 4,000 other homes and they set that out.

And we didn't know that at the time, and I know your Honor didn't know that at the time, I just gave you the document. And we just found the document two weeks ago in Chinese. This was a plan, not only to commit a fraud on our clients, but a fraud on our courts; and we know what they've said about our courts, we have their announcements, don't worry, they tell their shareholders. They can't get us in China. You can't execute on a judgment in China. And we don't like what the courts did. We don't like the American courts. We feel that we've been dealt with unfairly. Unfairly by the Eastern District of Louisiana, District Court, your Honor, and two panels of the Fifth Circuit Court of Appeals.

And they have the audacity to come in here today when they have a hearing in December and we're engaged in discovery and we're recovering something like 215, Exhibit 215, and asked to stop everything and we want to get out of jail free card.

Your Honor, there are a million stories in a naked city,

| | |
|---|---|
| 10:43:58 1 | you've heard two today.  I think ours is a very valid story.  And |
| 10:44:04 2 | Mr. Herman will address the other issues. |
| 10:44:06 3 | THE COURT:  All right.  Thank you. |
| 10:44:17 4 | Let's see if we can move along faster, folks.  It's been a |
| 10:44:22 5 | long time now. |
| 10:44:24 6 | MR. HERMAN:  Well, your Honor, my affidavit is out, I |
| 10:44:27 7 | ought to at least be able to argue. |
| 10:44:29 8 | THE COURT:  You can argue. |
| 10:44:32 9 | MR. HERMAN:  I feel sort of like the ring dang doo, that's |
| 10:44:36 10 | what they call it in South Carolina; that's a snake that swallows |
| 10:44:41 11 | its tail but keeps on rolling.  So I accept, don't agree with your |
| 10:44:47 12 | Honor's ruling, but of course I accept it. |
| 10:44:50 13 | I will state this:  Everything in that affidavit is on |
| 10:44:53 14 | personal knowledge.  If your Honor looks at it closely, you'll see |
| 10:44:57 15 | that the majority of documents were created by and published to the |
| 10:45:03 16 | world by CNBM and BNBM.  I had employed four or five interpreters, |
| 10:45:14 17 | we downloaded these documents as soon as we knew there was an issue. |
| 10:45:20 18 | We started reading them, we've taken depositions.  I am certain that |
| 10:45:27 19 | they are authentic.  I am also certain that they were introduced in |
| 10:45:31 20 | depositions. |
| 10:45:35 21 | I supervised the interpreters myself.  I have supervised |
| 10:45:40 22 | and directed every lawyer that has reviewed a document on the |
| 10:45:46 23 | plaintiff's side.  I supervised the translation of these documents. |
| 10:45:56 24 | And even though I am a ring dang doo, I am not on a New York street |
| 10:46:00 25 | corner with three shells hiding facts. |

10:46:05  1        And I understand why they don't want to argue the facts

10:46:07  2   and I understand why they have miscited the law.  And the key thing

10:46:13  3   that they've miscited is that there is some great misunderstanding

10:46:17  4   of alter ego and it makes no difference if they are Taishan.  And

10:46:24  5   the judge obviously was wrong when he used the word affiliate.

10:46:28  6   Nobody knows what that means.

10:46:32  7        Yesterday I had the good fortune to take the deposition

10:46:36  8   of Chairman Cao, who said under oath he doesn't read e-mails, he

10:46:44  9   doesn't send e-mails, he doesn't engage in chat talk, and therefore,

10:46:51 10   he doesn't really respond to notices that are sent him.

10:47:00 11        Having said that, let's talk about what the case is

10:47:06 12   really about a year after your Honor filed a very ascertainable

10:47:15 13   order.  This matter comes in argument more than a year, your Honor,

10:47:19 14   after you issued your order.

10:47:21 15        What happened?  This document comes from the deposition

10:47:30 16   of a 30(b)(6) witness of CNBMG:  "Isn't it true that in 2014, the

10:47:39 17   chairman of CNBM Company, Limited; BNBM Group; and CNBM Group was

10:47:49 18   Song Zhiping?  As far as I understand, yes."

10:47:59 19        This comes from the deposition of the same 30(b)(6)

10:48:04 20   witness:  "Is it true that in 2014, Cao was president of CNBM

10:48:15 21   Company, Limited?  Yes.  As far as I understand, yes.  Isn't it true

10:48:20 22   that in 2014, Cao was chairman of the supervisory committee of BNBM

10:48:27 23   Group?  Yes.  As far as I understand, yes.  And isn't it true that

10:48:34 24   in 2014, Cao was the general manager and a director of CNBM Group?

10:48:42 25   As far as I know, yes."

10:48:47  1        We have two individuals controlling aspects of two alter

10:48:53  2   egos from each of the defendants.

10:49:01  3        Now, it's been denied that anybody in BNBM Group received

10:49:14  4   a letter from Knauf addressed to Wang Bing of BNBM Group, which

10:49:27  5   indicates that they met, they understood what was happening in

10:49:33  6   Louisiana, and they talk about Taishan Gypsum Company and that BNBM

10:49:45  7   has already been named as a defendant in 90 lawsuits.  It's

10:49:51  8   May 15th, 2009.  They didn't get it.  BNBM Group didn't get it.

10:49:57  9   BNBM didn't get it.

10:50:00 10        But what it does evidence is that at least Knauf's

10:50:04 11   understanding was that these companies were related.  And it also

10:50:11 12   indicates that there was activity and attempt to get BNBM involved.

10:50:23 13        The letter also went from Mr. Norris of Knauf, and there

10:50:43 14   was additional letters to Chairman Song of CNBM Group and the other

10:50:53 15   interrelated corporations saying:  After our letter dated April 21,

10:50:58 16   2009, more developments.  More developments on U.S. plasterboard

10:51:05 17   'incident'.  It wasn't incidental to the people that had that

10:51:08 18   drywall in their homes.

10:51:10 19        Media point out in their reports that BNBM and CNBM are

10:51:15 20   all enterprises owned by Chinese government.  Of course that doesn't

10:51:21 21   bind them, but it does indicate that Knauf put them on notice, as

10:51:29 22   they deny, but they wish, Knauf wishes that CNBM and BNBM will take

10:51:35 23   effective measures to respond and that Knauf was willing under the

10:51:39 24   leadership of CNBM to safeguard their international reputation.

10:51:46 25   Now, they deny they received it.

10:51:50  1        At any rate, by May 2009, BNBM, CNBM had already been

10:52:00  2   involved in lawsuits in the United States.

10:52:04  3        Now, there was no response that we've been able to

10:52:12  4   determine.  However, a month later, your Honor, HSBC Global Banking

10:52:21  5   sends an e-mail to Song Zhiping and Cao, Cao Jianglin, the two

10:52:30  6   individuals that I first introduced the court to this morning that

10:52:33  7   control these entities.  And it says according to Knauf's request,

10:52:39  8   the bank wishes to arrange a meeting with your esteemed company,

10:52:46  9   Knauf's partners and its president suggest to meet with your

10:52:49 10   esteemed company on November 23rd or 24th, 2010 in China.  The

10:52:56 11   topics are update of gypsum board in U.S. and potential cooperation

10:53:01 12   with BNBM gypsum board and Knauf.

10:53:05 13        What it does show is that Knauf's understanding was that

10:53:11 14   BNBM was definitely involved.  We'll get to why that was a realistic

10:53:19 15   fact.  And it's interesting because chairman Cao said, well, I don't

10:53:25 16   read e-mails.  Did you respond to this?  No.  Who takes your

10:53:29 17   e-mails?  My secretary.  Is your secretary under orders to summarize

10:53:34 18   your e-mails?  No.  Did you reply?  I don't think I ever got this.

10:53:46 19        So there were at least three attempts beginning in May

10:53:55 20   15, 2009 and October 21st, 2010 of Knauf saying, hey, BNBM, CNBM,

10:54:01 21   you're involved in this.

10:54:08 22        Now, to me, to raise due process and equal protection,

10:54:15 23   evidently I'm too involved in reading *The Federalist Papers* and

10:54:23 24   *Common Sense* by Thomas Paine and the other early American framers of

10:54:29 25   our Constitution, because as I understand it, everybody gets due

10:54:36  1   process and equal protection.  And as a matter of fact, in

10:54:39  2   Louisiana, there's a constitutional provision that says everyone is

10:54:43  3   allowed access to the court.

10:54:49  4         So I asked -- this is one of the questions:  "Let me ask

10:54:52  5   this question:  As the corporate representative of CNBM Group, do

10:54:56  6   you think it's fair for your subsidiaries to sue American companies

10:55:00  7   in America, but refuse to accept service from American citizens who

10:55:04  8   have been damaged by Chinese products in the United States?"

10:55:15  9         My clients or our clients entitled to due process?

10:55:20 10   What's the answer?  The answer under oath on a 30(b)(6) deposition

10:55:26 11   is:  "I think this is the management behavior by individual

10:55:29 12   companies.  What steps or strategies each company will take, it's

10:55:36 13   according to each company's -- the decision will be made legally by

10:55:42 14   each individual company."

10:55:44 15         Does that mean that every company that is involved in

10:55:49 16   this lawsuit has the ability to file suits in America through

10:55:54 17   subsidiaries and affiliated companies to use our court system to

10:55:59 18   collect against American citizens, but they are shielded from

10:56:06 19   responsibility of due process and equal protection according to what

10:56:11 20   a Chinese individual sitting on a board of directors in China

10:56:16 21   determines?  That's really what this is about.

10:56:22 22         Now let's talk about alter ego, which is at the center of

10:56:27 23   this issue, as well as the word affiliate.

10:56:36 24         30(b)(6) deposition:  "Isn't it true that on July 18th,

10:56:41 25   2014, BNBM Company, Limited was a 52.4% held subsidiary of CNBM

10:56:50 1    Company, Limited?  A:  Yes, according to the Chinese version of CNBM

10:56:59 2    Company, Limited voluntary announcement dated July 18th, 2014, it is

10:57:05 3    stated that CNBM Company, Limited know from BNBM Company,

10:57:12 4    Limited ... 52.4 percent of the held -- stock..."

10:57:18 5         And you'll see I put some blanks here in order to make

10:57:25 6    this easier to deal with and more intelligible.

10:57:30 7         Again, this is the 30(b)(6) deposition of Zhangli Chang

10:57:42 8    of China National Building Materials Company, Limited.  This is

10:57:47 9    CNBM.  "Did the board of directors of CNBM Company, Limited, in the

10:57:51 10   annual report of 2013 approve of the language that Taishan Gypsum

10:57:58 11   was a 65 percent held subsidiary of BNBM?  A:  BNBM holds 65 percent

10:58:05 12   of Taishan Gypsum.  That is a fact.  BNBM decided the percentage of

10:58:11 13   share it holds according to its own procedures."

10:58:18 14        Public document, a public document.  That's not Russ

10:58:21 15   Herman's knowledge.  It's a public document filed by CNBM and BNBM

10:58:38 16   for the world.  Why?  Well, it's interesting.  CNBM says, hey, you

10:58:44 17   know, Judge, we're entitled to be treated like a sovereign even

10:58:51 18   though we are a public company with people all over the world owning

10:58:56 19   our stock.  You know, maybe BNBM is a ring dang doo with a circular

10:59:14 20   argument.

10:59:19 21        Let's be clear.  Did Taishan act alone?  This is from a

10:59:31 22   Taishan deposition.  "Isn't it true -- isn't it true that you did

10:59:41 23   not undertake, as the corporate representative of Taishan, to

10:59:44 24   determine who controlled BNBM?"  He is the 30(b)(6) representative.

10:59:50 25   He said:  "I have investigated and I confirmed that CNBMG is the

10:59:54  1   shareholder of CNBM, Inc. and CNBM, Inc. is a shareholder of BNBM
11:00:02  2   and BNBM is a shareholder of Taishan.  And I know that BNBM, Inc.
11:00:08  3   directly or indirectly owns 65% of Taishan Gypsum, but as for the
11:00:17  4   specific shares, I don't know."
11:00:24  5           THE COURT:  I am understanding your argument now.  Let's
11:00:27  6   see if we can shorten this because you have another 50 or 60 pages.
11:00:31  7   I've looked at them.  Let's see if you can shorten your argument.  I
11:00:35  8   got it, I understand it.
11:00:41  9           MR. HERMAN:  Okay.  You're the judge and I respect your
11:00:43 10   Honor, and I am going to shorten it at your Honor's direction.
11:01:05 11           I've eliminated about 50 percent of what I wanted to speak
11:01:11 12   about, your Honor.
11:01:14 13           This comes from a CNBM document, it's been introduced as
11:01:19 14   Exhibit 27.  "BNBM has been listed as one of the defendants in
11:01:33 15   various gypsum board litigation cases in the US.  Although the
11:01:39 16   company has neither produced nor exported any gypsum boards."
11:01:46 17   Reported publicly on July 18, 2014, the date that you issued your
11:01:52 18   order.
11:01:53 19           Regina, would you play just two or three minutes of
11:01:58 20   Exhibit 107-1.  It's been offered in deposition.  This is taken on
11:02:08 21   the 15th of June, 2015.  It's a warehouse in Florida.
11:02:20 22           (WHEREUPON, THE VIDEO CLIP WAS PLAYED AS FOLLOWS:)
11:02:20 23       Q:  Tell us your name, please, sir.
11:02:29 24       A:  Stefan Davis.
11:02:29 25       Q:  What do you do for a living?

11:02:31 1      A:  I am a developer and a contractor.

11:02:32 2      Q:  Previously in this case we took your deposition related to

11:02:36 3      Beijing New Building Materials, Chinese Drywall.  Do you

11:02:38 4      remember that?

11:02:38 5      A:  Yes.

11:02:39 6      Q:  During that deposition you testified that you had some

11:02:41 7      drywall on hand from BNBM, right?

11:02:44 8      A:  Yes, that might be an understatement, but yes.

11:02:47 9      Q:  Where are we today?

11:02:48 10     A:  We are at the warehouse where the drywall is warehoused.

11:02:51 11     Q:  Where is that located?

11:02:53 12     A:  44th Avenue in Ocala.

11:02:55 13     Q:  Approximately how many boards of BNBM drywall boards do you

11:02:59 14     have inside the warehouse?

11:03:00 15     A:  About 230,000 sheets.

11:03:02 16     Q:  Do you mind if we go inside and take a look at it?

11:03:05 17     A:  Sure.

11:03:05 18     Q:  Great.  Thank you.

11:03:05 19     (WHEREUPON, A BRIEF RECESS WAS TAKEN.)

11:03:05 20   BY MR. MONTOYA:

11:03:06 21     Q:  So we've moved inside the warehouse.

11:03:08 22     A:  Yes.

11:03:08 23     Q:  Can you tell us what's inside the warehouse?

11:03:10 24     A:  Basically about 139,000 sheets of 5/8" Type X drywall 4x12.

11:03:18 25     And about 87,000 sheets of 1/2" drywall 4x12.

| | | |
|---|---|---|
| 11:03:23 | 1 | Q:  All of this drywall was from your orders from BNBM? |
| 11:03:26 | 2 | A:  That's correct. |
| 11:03:27 | 3 | Q:  I think when we talked in your deposition they were |
| 11:03:28 | 4 | shipment one, right? |
| 11:03:29 | 5 | A:  Yes. |
| 11:03:29 | 6 | Q:  And shipment 1 came into Florida? |
| 11:03:31 | 7 | A:  Yes. |
| 11:03:31 | 8 | Q:  And shipment 2 also came into Florida? |
| 11:03:33 | 9 | A:  That is correct. |
| 11:03:34 | 10 | Q:  Let's take a look at some of the markings if we could.  If |
| 11:03:38 | 11 | we could walk right over here. |
| 11:03:40 | 12 | A:  Okay. |
| 11:03:41 | 13 | Q:  This board that we are looking at here, can you read the |
| 11:03:44 | 14 | label for us? |
| 11:03:45 | 15 | A:  Yes.  Beijing New Building Materials Public Limited |
| 11:03:48 | 16 | Company. |
| 11:03:50 | 17 | Q:  Does it say Beijing, China on it? |
| 11:03:53 | 18 | A:  Beijing, China.  The ASTM numbers and, I guess, the date |
| 11:03:58 | 19 | of when it was manufactured. |
| 11:03:58 | 20 | Q:  In 2006? |
| 11:04:00 | 21 | A:  2006. |
| 11:04:02 | 22 | Q:  One of the other things we talked about at length in your |
| 11:04:05 | 23 | deposition was the UL listing. |
| 11:04:06 | 24 | A:  Yes. |
| 11:04:07 | 25 | Q:  That UL stamp is also on this board, right? |

11:04:10 1    A:  That is correct.

11:04:10 2    Q:  Can you point that out for us?

11:04:13 3    A:  It's right here (INDICATING).

11:04:14 4    Q:  Now, the 5/8 board -- or all of the board has end tape on

11:04:19 5    it, right?

11:04:19 6    A:  Yes.

11:04:19 7    Q:  Can you show us one of the end tapes from the 5/8 board?

11:04:22 8    A:  Sure.  This is an intake for the 5/8 Type X.

11:04:30 9    Q:  What's the Type X?

11:04:31 10   A:  Type X is a fire rating that's required on any

11:04:35 11   multi-family apartments built in the United States.

11:04:40 12   Q:  If we could, I'm going to ask the videographer to back up

11:04:43 13   a bit and kind of give us an idea of the perspective of how

11:04:45 14   many --

11:04:45 15   (WHEREUPON, THE VIDEO WAS CONCLUDED.)

11:04:45 16        MR. HERMAN:  I think that's enough, Regina.  I have

11:04:54 17   Mr. Montoya in the courtroom, who not only took the deposition but

11:04:59 18   this statement not less than a month ago.

11:05:01 19        Now, I want to speak about another issue, which I think

11:05:05 20   is important, and I've cut out an awful lot.  I am not going to go

11:05:10 21   into the Hogan Lovells documents, which I am not allowed to go into.

11:05:15 22   However, there is someone who reported it at an unsuspicious time on

11:05:22 23   a document that Taishan couldn't make a decision for itself, it had

11:05:27 24   to go up to some of these other alter egos.

11:05:35 25        The word affiliates is clearly in your order.  Evidently

11:05:38 1   all of the lawyers that have participated for defendants, in the

11:05:42 2   U.S. and in China, don't understand what the word affiliates mean

11:05:56 3   and think it's ambiguous.  However, the word affiliates in document

11:06:12 4   Exhibit 28-R, you see the red line that learned counsel for BNBM

11:06:20 5   reading our translation from a machine translation inserted the word

11:06:27 6   in red "affiliates".

11:06:31 7        But what does affiliates mean?  Let's see.  *Black's Law*

11:06:39 8   definition:  "A corporation that is related to another corporation

11:06:43 9   by shareholdings or other means of control; a subsidiary, a parent,

11:06:51 10  or a sibling corporation...

11:06:54 11       What does *Black's* online dictionary say at page 63:

11:07:01 12  "Companies that have a shared resources, interests, or business

11:07:06 13  dealings.  Or a Website that sells products they don't physically

11:07:10 14  own for commission.  Refer to subsidiary."

11:07:16 15       Well, I mean there's another one.  Definition of

11:07:19 16  affiliates from Merriam-Webster online dictionary as to what

11:07:27 17  affiliate means:  "An organization that is a member of a larger

11:07:30 18  organization."

11:07:37 19       And I have an enlargement of the Exhibit 22-R where you

11:07:44 20  can say related parties is struck and it says now Taishan and its

11:07:49 21  affiliates.  Now, that's in a BNBM annual report in 2014.

11:08:01 22       CNBMIT Company, Limited website lists "Affiliated

11:08:11 23  Corporations".

11:08:17 24       To come in and say to this court, "we don't understand

11:08:20 25  what the word affiliates mean, we don't understand what subsidiaries

11:08:25  1    mean, we don't understand what we were supposed to do."  Okay, I

11:08:34  2    don't understand it.

11:08:35  3         The last thing I am going to say from exhibits is that

11:08:45  4    they blatantly ignored your Honor's order.  They're wholly owned

11:08:51  5    subsidiaries, a number of them, continued to conduct business in the

11:08:55  6    U.S. and were never notified by BNBM, CNBM, CNBMG or BNBMG that they

11:09:07  7    were to stop doing business.  And they could have sought this motion

11:09:11  8    and this clarification a year ago when the order was issued, or soon

11:09:19  9    a reasonable time thereafter, instead of having us spend millions

11:09:22 10    and millions of dollars, hire translators, and take very expensive

11:09:29 11    depositions at our cost on something that we were doing in

11:09:36 12    accordance with an order of the court.

11:09:39 13         Now, I don't know whether there's laches, I don't know

11:09:43 14    whether this is a reasonable time, this matter's been brought.  And

11:09:48 15    this is my last comment.  My affidavit is struck, I understand that.

11:09:57 16    It's okay.  The exhibits in evidence are authentic, and as an

11:10:02 17    officer of the court, I ask that the exhibits not be struck and

11:10:08 18    anything that's argumentative in my affidavit I'm certain the court

11:10:14 19    will not consider.

11:10:15 20         Thank you, your Honor, for giving me the opportunity to

11:10:18 21    address these matters.

11:10:19 22         THE COURT:  Okay.  Thank you very much.  Do you have a

11:10:21 23    response?

11:10:24 24         MR. STENGEL:  Your Honor, in the interest of time I will

11:10:26 25    try and be as quick as I can.  I apparently need to apologize for a

11:10:29 1    misperception or misstatement.  I started my comments with we are

11:10:33 2    passing like ships in the night.  We're not even on adjacent oceans.

11:10:37 3    I don't know what that was directed to.  I never suggested we were

11:10:40 4    going to shut down discovery.  I said we should think about whether

11:10:44 5    we should be continuing this path of discovery, particularly third

11:10:48 6    parties on the issues with the business being done during the

11:10:52 7    contempt period.

11:10:53 8             I think I said fairly clearly we understood there would be

11:10:55 9    ongoing discovery for jurisdictional purposes, alter ego, etc.  So

11:11:00 10   it is a gross misstatement of our position to suggest that we were

11:11:04 11   trying to shutdown discovery across the board, and I want that to be

11:11:09 12   completely clear to the court.

11:11:10 13            The demonstration we've seen, and it tempts to cite *Sound*

11:11:16 14   *and Fury* or *Signifies Nothing*, obviously these are complex corporate

11:11:22 15   forms, and much of what was put up before you we cannot and would

11:11:28 16   not dispute.  There is interlocking ownership, there is interlocking

11:11:30 17   board membership.  All of that is fine, that's legal as a matter of

11:11:33 18   Chinese law.  They need to show some abuse of that process.

11:11:36 19            And I want to thank Mr. Herman because his panoply of

11:11:40 20   definitions of affiliate made up for a deficiency in my presentation

11:11:45 21   because I didn't have those with me.  And I think by looking at the

11:11:48 22   variability of those it explains, particularly when you're talking

11:11:52 23   about people who don't normally function in the United States, in

11:11:56 24   English, in the United States legal system, how ambiguus the term

11:12:00 25   "affiliate" would be from the perspective of these defendants.

11:12:03   1        Now, I don't want to get into the factual presentation,
11:12:07   2   because I, again as I said, I don't think that's at all relevant to
11:12:10   3   what we were doing.  But I do take issue with what I believe was the
11:12:14   4   predicate, the display of Exhibit 27 by Mr. Herman where he took a
11:12:26   5   single page and said, aha, this says that BNBM is denying being a
11:12:34   6   manufacturer of drywall.  What this actually shows is -- and this is
11:12:40   7   the rest of that document in the original form -- the company
11:12:43   8   referred to in the slide Mr. Herman showed you was not BNBM, the
11:12:49   9   manufacturer of the drywall and the nice video of the warehouse, but
11:12:53  10   the company here is China National Building Material Company,
11:12:56  11   Limited, and there is no evidence in this record, there cannot be
11:13:01  12   evidence in this record that a Chinese holding company ever
11:13:04  13   manufactured or sold anything.  They invest in other companies.
11:13:08  14        So this was a hugely misleading presentation about what
11:13:12  15   the evidence shows.  And I suggest we're going to need to devote
11:13:16  16   some substantial time for the hearing on personal jurisdiction and
11:13:23  17   sovereign immunity, because to sort of sort out this record is
11:13:26  18   frankly at this point terrifying.
11:13:29  19        I just want to remind your honor, Mr. Herman raised the
11:13:37  20   issue of, well, is this timely, it is within your rights.  You'll
11:13:43  21   remember, your Honor, and we're reasonably careful lawyers, when we
11:13:45  22   first appeared we raised the issue we didn't want to accuse of
11:13:48  23   waiver of delay by participating in the discovery process that your
11:13:51  24   Honor had entered, and your Honor was considerate enough to give us
11:13:54  25   the order we had requested.  And you'll see at the last line through

11:14:00  1    procedural filings related to the July 17th order.

11:14:02  2            So as always, your Honor, as a practicing attorney I wish

11:14:06  3    I could have done things sooner, but we've been somewhat busy.

11:14:11  4            So at the end of the day, your Honor, we didn't really

11:14:15  5    join issue in this argument, I apologize for that because I was

11:14:19  6    hopeful we would be useful for the court.  I do think we've raised

11:14:23  7    very substantial issues for the court to consider about the whole

11:14:27  8    contempt path we are on.  I would request that the court because of

11:14:33  9    the importance of the issues and their importance here and

11:14:37 10    elsewhere, accommodate us that the court is going to rule against

11:14:41 11    us, I think the court needs to rule specifically on all of the legal

11:14:45 12    issues we've raised, including the classes' entitlement to damages

11:14:48 13    and the ability of the PSC to prosecute this contempt.

11:14:50 14            And with that your Honor, thank you very much.

11:14:52 15            THE COURT:  Let's take just a ten-minute break and I'll

11:14:55 16    come back and let you know how I feel about it.  The court will

11:14:58 17    stand in recess for ten minutes.

11:14:58 18            THE DEPUTY CLERK:  All rise.

11:14:59 19        (WHEREUPON, A RECESS WAS TAKEN.)

11:20:15 20        (OPEN COURT.)

11:20:16 21            THE COURT:  Be seated, please.  I've heard arguments from

11:20:19 22    both sides dealing with the injunction.  I make the following

11:20:23 23    comments:

11:20:23 24            The injunction in addition to finding Taishan in contempt

11:20:29 25    and requiring Taishan to pay damages as well as attorney's fees for

11:20:41  1    its inaction or action, the injunction went on to say that I

11:20:50  2    enjoined Taishan and any of its affiliates or subsidiaries from

11:20:55  3    doing business in the United States until and unless Taishan

11:21:00  4    participated in this judicial proceeding.

11:21:03  5         Now, I was concerned at that time that if I simply held

11:21:08  6    them in contempt and required them to pay damages -- they left the

11:21:19  7    United States, they left the Court.  They fired their attorneys and

11:21:22  8    said we don't like what the Fifth Circuit has said, we don't like

11:21:25  9    what this court has said, so we're going home.  If I held them in

11:21:32 10    contempt only and said you have to pay "X" amount of money and they

11:21:37 11    didn't pay it, what was the court to do at that time?

11:21:43 12         They had turned their back and left.  So it would be a

11:21:46 13    meaningless order if they did not pay.  If they did not pay the

11:21:54 14    judgment, if they did not pay the damages, if they did not pay

11:21:58 15    attorney's fees and walked away, what was I to do?

11:22:05 16         So I provided in addition to the damages, in addition to

11:22:12 17    the award of attorney's fees, I told them that they, their

11:22:18 18    affiliates, alter egos were not able to do business in the United

11:22:25 19    States until they paid up.  I said that if they did do business in

11:22:31 20    the United States, they should know that they would have to forfeit

11:22:35 21    25 percent of their earnings.  They or their affiliates or

11:22:42 22    subsidiaries would have to do that.

11:22:43 23         Now, they took awhile to think about what I said, from

11:22:50 24    July to March apparently they were thinking about it, and then

11:22:55 25    decided in March that they would come back, and Taishan did, and

11:23:00  1    they would pay the judgment of several million dollars and the

11:23:07  2    attorney's fees and the damages.

11:23:12  3              But that left us at that point -- they were no longer in

11:23:17  4    contempt of court, but they had been in contempt of court from July

11:23:21  5    till March, and the rest of my order provided that they should not

11:23:27  6    do business until they purged themselves of the contempt.  So that

11:23:33  7    left that period from July to March as to whether or not they had

11:23:37  8    done business in the United States or whether they did it through

11:23:42  9    their affiliates or subsidiaries, or whether they did it in some

11:23:51 10    alter ego status, or whether there was any single business

11:23:57 11    enterprise among and between all of these entities.

11:24:00 12              So I directed the PSC to conduct discovery to see whether

11:24:05 13    or not they did any business.  Taishan hired new attorneys, very

11:24:11 14    capable attorneys, who advised the court that in his view they

11:24:17 15    hadn't done business in the United States.  I don't dispute that he

11:24:21 16    believes that; but I had some difficult experiences with his client,

11:24:29 17    so I felt that I needed more than simply well-respected learned

11:24:36 18    counsel's comment.  I know that Taishan had fired their previous

11:24:41 19    attorneys for some reason.  So I let the parties conduct discovery.

11:24:49 20              The issue, as I felt, was No. 1, who were affiliates?

11:24:57 21    Who were subsidiaries?  No. 2, whether Taishan was acting through an

11:25:04 22    alter ego status, whether there were other companies involved that

11:25:14 23    had some single -- that created some single business enterprise

11:25:17 24    which allowed Tashan to do business during that period of time when

11:25:24 25    I said they shouldn't do business or couldn't do business.

11:25:28  1          I really feel that those issues are generally factually

11:25:34  2    determinative, so I asked the parties to conduct discovery.  I think

11:25:42  3    that it's appropriate to look at that discovery, look at that

11:25:47  4    factual record, and also perhaps hold an evidentiary hearing on the

11:25:58  5    issue.  I don't think it's only law.  There are certain aspects of

11:26:03  6    it that are legal, but who is an affiliate is going to depend upon

11:26:09  7    what they did, what their relationship is, what their power is.

11:26:16  8    What's an associate or a subsidiary also depends more on fact than

11:26:22  9    in law.  I can make legal judgments but I have to base them on

11:26:28 10    facts.  Whether or not they did business in a joint enterprise or

11:26:37 11    one enterprise, I don't know the answer to that.

11:26:40 12          The complication is caused oftentimes in this type of

11:26:44 13    case by the number of entities and the relationship between and

11:26:48 14    among those entities.  I don't know what it is at this point.

11:26:52 15    There's some evidence that some of the entities have absolutely

11:26:57 16    nothing to do with Taishan, other than to own stock.  There's other

11:27:03 17    evidence that questions whether or not that's their only role in

11:27:11 18    this situation.

11:27:17 19          So with regard to the affiliates or subsidiaries, it's

11:27:22 20    not their precipitous act which led to the contempt.  That was the

11:27:26 21    action or inaction of Taishan, that's clear to me.  It was Taishan's

11:27:30 22    action or inaction because Taishan was the only person, only

11:27:35 23    defendant involved in *Germano* where I issued the order.  But if any

11:27:40 24    affiliates or subsidiaries or alter egos, entities did business

11:27:47 25    during the contempt period, they would be in violation of the

11:27:51  1    contempt because that was the aspect of the contempt which causes

11:27:56  2    them to at least have some interest in this contempt order.

11:28:02  3         At this point I have not had a hearing.  It seems to me

11:28:07  4    that it's appropriate to allow some discovery on these issues,

11:28:11  5    particularly as I say because the same witnesses are giving

11:28:15  6    testimony regarding the jurisdictional issues.  That seemed to me to

11:28:21  7    be an opportunity to handle both of these matters expeditiously.

11:28:29  8    Many of the people, through counsel's cooperation, came to the

11:28:34  9    United States to give evidence, give testimony.  While they were

11:28:36 10    here talking about jurisdiction, I felt it was also helpful so that

11:28:42 11    they didn't have to come back, so that the expense would not be

11:28:46 12    required to get them back, that they also testify as to whether or

11:28:49 13    not there's any relationship between the entities that are

11:28:54 14    represented here today, that may or may not be involved because of

11:29:00 15    their status.

11:29:05 16         So in summary, while the precipitous action or inaction

11:29:09 17    which caused the injunction to be issued was that of Taishan.  If

11:29:15 18    any of the affiliates or subsidiaries of Taishan did business in the

11:29:19 19    United States during the contempt period, they would have violated

11:29:26 20    the injunction and will be required to remit 25 percent of their

11:29:30 21    earnings during that time.

11:29:31 22         Also, if Taishan did business in the United States during

11:29:35 23    that time, as an alter ego or by means of some common business

11:29:42 24    enterprise, then Taishan will be in violation of the injunction and

11:29:48 25    will be required to remit 25 percent.

11:29:51  1      As I said previously, the presence or absence of such

11:29:56  2  subsidiary, affiliate, alter ego, or common business enterprise

11:30:00  3  status or relationship with Taishan is enshrouded in facts.  This

11:30:09  4  justifies, or requires, some discovery and will, likely, require an

11:30:19  5  evidentiary hearing in court with live testimony or depositions;

11:30:27  6  certainly documents would be introduced.  Following the hearing, the

11:30:30  7  court will make findings of fact and conclusions of law as to

11:30:34  8  whether or not they are affiliates, whether or not they are alter

11:30:40  9  egos, whether or not they are subsidiaries, whether or not there is

11:30:45 10  a common business enterprise.  And then the issue is whether or not

11:30:53 11  they did business during the period in question; and if so, how

11:30:55 12  much.  And if so, how much do they owe.

11:31:04 13      I think that hearing should probably be scheduled after

11:31:06 14  the jurisdictional ruling because the jurisdictional ruling may well

11:31:11 15  affect some aspect of this ruling.

11:31:16 16      So I do agree that the precipitous act is that of

11:31:23 17  Taishan, but the aspect of the injunction doesn't simply say to

11:31:37 18  Taishan you're in contempt, pay attorney's fees, pay the judgment,

11:31:42 19  and pay the damages; but it also says don't do business in the

11:31:52 20  United States in any form.  And if you do, this is the consequence.

11:31:59 21      So we're at that second phase now.  Taishan, to their

11:32:05 22  credit, has paid up, paid the judgment, paid the attorney's fees,

11:32:10 23  paid the damages.  But from July to March they were thinking about

11:32:16 24  it and, therefore, were in contempt; and it's that period where I

11:32:25 25  think the focus should be and that's where BNBM, CNBM, BNBM Group,

11:32:35  1   CNBM Group may have some involvement in this aspect of this case.

11:32:45  2           So that's my ruling.  I will do a better job in writing

11:32:51  3   than I did in speaking, but that's basically what my ruling will

11:32:55  4   entail.  So I do appreciate counsel, they were very effective in

11:33:02  5   their presentation.  And of course as usual, their writing was very

11:33:07  6   well done.

11:33:09  7           I'll go to the next motion.

11:33:11  8           MR. TAYLOR:  Your Honor, before we go to the next motion,

11:33:14  9   I have one point of clarification.

11:33:16 10           THE COURT:  Sure.

11:33:17 11           MR. TAYLOR:  Bernard Taylor for Taishan.  Our client

11:33:21 12   Taishan has asked us on numerous occasions are we still in contempt

11:33:25 13   or not.  And it looks like based upon what the court has said today

11:33:28 14   that we have purged ourselves of contempt.

11:33:32 15           THE COURT:  Yes.

11:33:33 16           MR. TAYLOR:  We are in agreement on that?

11:33:35 17           THE COURT:  Well, I am in agreement that you purged

11:33:37 18   yourself from the precipitous act.  At this point you still have an

11:33:44 19   interest in the litigation in the contempt proceeding because I

11:33:46 20   provided that during that time that you were in contempt.  I don't

11:33:50 21   think you're in contempt anymore in the sense of you paid the

11:33:55 22   amount, and I appreciate your help in getting your client purged of

11:34:00 23   that.  But now I'm focused on during that period of time that you

11:34:04 24   were in contempt what has happened.

11:34:07 25           MR. TAYLOR:  All right.  That's very helpful.  One other

11:34:10 1    point, your Honor.

11:34:12 2              THE COURT:  Sure.

11:34:13 3              MR. TAYLOR:  In chambers or the back room we had some

11:34:15 4    discussions about the Hogan Lovells documents that were to remain

11:34:21 5    confidential.

11:34:21 6              THE COURT:  Yes, thanks for bringing that up.  There are

11:34:24 7    certain documents in the presentation of counsel that I know he

11:34:30 8    distributed, as he was required to do, to his co-counsel and other

11:34:34 9    individuals.  But those, many of those documents, or at least some

11:34:39 10   of those documents are under seal because there are certain

11:34:46 11   privileges, privilege objections made to them.  They're attorney

11:34:51 12   documents involving their clients, and so there is good reason for

11:34:56 13   at least putting them under seal.

11:34:59 14             So if anybody has those documents, I direct them not to

11:35:04 15   disclose it.  It's under seal and part of this litigation.

11:35:09 16             MR. TAYLOR:  Thank you, your Honor.

11:35:10 17             THE COURT:  Thank you.  I'll go to the next motion.  And

11:35:13 18   we have someone on the line.  Call the next motion, Dean.

11:35:16 19             THE DEPUTY CLERK:  Motion Document No. 19296, motion of

11:35:21 20   Taishan Gypsum to dismiss Ace Home Center, Inc.'s first amended

11:35:26 21   third-party complaints.

11:35:28 22             THE COURT:  Make your appearance for the record, please.

11:35:30 23   The moving party.

11:35:31 24             MS. EIKHOFF:  Hello, your Honor, Christy Eikhoff of Alston

11:35:37 25   Bird on behalf of Taishan, the movant.

11:35:38  1          THE COURT:  Okay.  We have someone on the phone that's

11:35:40  2   going to respond?

11:35:42  3          MR. COLLIER:  Yes, your Honor.  Danny Collier for Ace Home

11:35:46  4   Center, Inc.

11:35:46  5          MS. EIKHOFF:  And, your Honor, we're going to have a very

11:35:49  6   brief demonstrative.  We have e-mailed Mr. Collier a copy of that so

11:35:52  7   he has it available to him as well.

11:35:54  8          THE COURT:  All right.

11:35:58  9          MS. EIKHOFF:  Your Honor, Ace Home Center filed the

11:36:01 10   complaint at issue pursuant to Federal Rule Of Civil Procedure 14.

11:36:05 11   And as this court knows, Rule 14 allows for third party process and

11:36:11 12   it permits, but does not require, the court to allow a defendant to

11:36:16 13   bring a claim against a non-party to drag the non-party into the

11:36:21 14   lawsuit.

11:36:24 15          And the purpose of the rule, as many authorities including

11:36:26 16   in the Fifth Circuit and Wright and Miller have noted, is to avoid

11:36:33 17   circuity of action and to eliminate duplication of suits.  But what

11:36:37 18   we submit to this court, your Honor, is that the complaint that Ace

11:36:41 19   Home Center has filed against Taishan in this circumstance does the

11:36:44 20   exact opposite of the purpose of Rule 14.  It turns Rule 14 on its

11:36:49 21   head.

11:36:50 22          And just to illustrate just the procedural circuity that's

11:36:56 23   going on here, this really starts with homeowners, the Collins and

11:37:00 24   the Herringtons, who are claimants who claim to have been harmed by

11:37:04 25   Chinese drywall in their homes.

11:37:06  1              They asserted claims against Taishan in the *Wiltz* case in

11:37:14  2     this court in 2010.  And pursuant to the July 9th hearing that we

11:37:18  3     had on damages between the two of them, they are asking this court

11:37:21  4     to award them and make Taishan pay them more than $400,000 worth of

11:37:28  5     damages for remediation alone.  And we know that the PSC has said

11:37:32  6     that's just the beginning, that they want to seek more.

11:37:35  7              We have -- just by the way, that amount is at least the

11:37:42  8     full fair market value of their properties already.  So that is

11:37:46  9     pending before this court against Taishan seeking damages for

11:37:50 10     Taishan directly.

11:37:53 11              But then the Collins and Herringtons also filed a

11:37:57 12     complaint, which we are calling Complaint No. 2, in the Southern

11:38:00 13     District of Mississippi, not naming Taishan but seeking relief and

11:38:05 14     damages for the exact same harm from a whole host of other

11:38:09 15     defendants, including fictitious Defendants 5 through 150.

11:38:15 16              THE COURT:  Is that in state court?

11:38:17 17              MS. EIKHOFF:  It was originally filed in state court, your

11:38:19 18     Honor, then it was removed to the Southern District of Mississippi.

11:38:22 19     And as you know, it's now been transferred here.

11:38:24 20              THE COURT:  Yes.

11:38:29 21              MS. EIKHOFF:  So now then the next step of this procedural

11:38:32 22     triangle is that Ace Home Center, a defendant in that action, is

11:38:36 23     seeking to bring Taishan in to that action asserting a complaint in

11:38:41 24     this court in 2014 against Taishan for indemnification for damages

11:38:45 25     that they owe to the Collins and Herringtons.

11:38:49  1       And just to make it even more complicated, at the same

11:38:51  2  time they filed a complaint against DEVON, and the Cincinnati

11:38:58  3  Insurance Company has recently moved to intervene in that case and

11:39:01  4  open up the default in that case.

11:39:03  5       THE COURT:  Right.

11:39:05  6       MS. EIKHOFF:  Now, I would like to say that allowing Ace

11:39:11  7  Home Center to prosecute its claims against Taishan now would be

11:39:14  8  putting the cart before the horse.  But in this case there are so

11:39:17  9  many horses and so many carts, we can't even keep up with them all;

11:39:22 10  and that is the exact opposite of the purpose of Rule 14, which is

11:39:26 11  to allow these types of claims when it will make the adjudication

11:39:31 12  more efficient and more streamlined.  And so what we have is that a

11:39:37 13  rule that is seeking to avoid circuity is being used to create a

11:39:41 14  triangle of duplicative liability, at least as far as Taishan is

11:39:46 15  concerned.

11:39:47 16       THE COURT:  What would your suggestion be, wait until Ace

11:39:50 17  gets found liable from Collins and Herringtons and then allow Ace to

11:39:57 18  sue Taishan?

11:40:00 19       MS. EIKHOFF:  Yes, your Honor.  What we have proposed in

11:40:02 20  our papers, we moved to dismiss and we provided substantive

11:40:05 21  Mississippi law why we think dismissal is proper.  But in the

11:40:08 22  alternative, and we put this in our motion, we would ask at a

11:40:11 23  minimum that Complaint No. 3 be stayed until resolution of Complaint

11:40:16 24  No. 1, because resolution of Complaint No. 1, we believe, could very

11:40:21 25  easily moot Complaints No. 2, 3 and 4.  They're going to get more

| | | |
|---|---|---|
| 11:40:26 | 1 | than the value, you know, if they get what they're seeking, they'll |
| 11:40:28 | 2 | get more than the value of their properties. |
| 11:40:30 | 3 | THE COURT:  You would agree, though, that they have proper |
| 11:40:36 | 4 | service on you now? |
| 11:40:38 | 5 | MS. EIKHOFF:  Yes, your Honor, we accepted service. |
| 11:40:40 | 6 | THE COURT:  Would you require them to do a service under |
| 11:40:43 | 7 | the Haig on you later on? |
| 11:40:46 | 8 | MS. EIKHOFF:  No, we accepted service, your Honor.  So |
| 11:40:49 | 9 | that's what was the predicate for us being able to file the motion |
| 11:40:54 | 10 | to dismiss. |
| 11:40:55 | 11 | THE COURT:  Okay. |
| 11:40:56 | 12 | MS. EIKHOFF:  And so, your Honor, in our court conference |
| 11:40:57 | 13 | that we had earlier this week, your Honor raised the question of |
| 11:41:01 | 14 | whether it would be prudent to send the case back to the Southern |
| 11:41:06 | 15 | District of Mississippi for adjudication and trial.  And, your |
| 11:41:11 | 16 | Honor, as far as Taishan is concerned, you know, the issues |
| 11:41:15 | 17 | between -- that are raised between the Collins and Herringtons and |
| 11:41:18 | 18 | all of these other defendants, I know some of those defendants have |
| 11:41:21 | 19 | raised motions to dismiss that are pending; and if that needs to go |
| 11:41:25 | 20 | back to Mississippi, so be it. |
| 11:41:27 | 21 | But we ask this court not to drag Taishan down with them. |
| 11:41:31 | 22 | Because if Taishan gets sent away and then -- that'll exacerbate the |
| 11:41:38 | 23 | inefficiencies of this situation because then we're having to fight |
| 11:41:41 | 24 | the battle on not only on two different fronts but in two different |
| 11:41:45 | 25 | courts. |

11:41:46  1          THE COURT:  I see.

11:41:47  2          MS. EIKHOFF:  So in closing, we ask that the court

11:41:51  3    exercise its authority and its discretion under Rule 14 to either

11:41:57  4    dismiss the complaint that has been filed against us by Ace or to at

11:42:02  5    least to stay it until there's been resolution.

11:42:05  6          And I'll just add one more point, which is Ace Home

11:42:09  7    Center in their response papers seems to acknowledge that there has

11:42:12  8    to be some phasing of these procedures.  When we argued to the court

11:42:18  9    that we're being faced with potential duplicate liability here,

11:42:22 10    their response was, well, don't worry about that because whatever

11:42:26 11    the Collins and Herringtons recover from Taishan will be an offset

11:42:30 12    against what we will be seeking from them.  But that presumes that

11:42:35 13    there's anything left to be sought from them, and also presumes that

11:42:40 14    one has happened before the other.

11:42:42 15          THE COURT:  I got it.  Let me hear any response.  What's

11:42:46 16    the harm with staying the matter if you don't have to worry about

11:42:53 17    the Haig service, you've got them here, it would have to be staged

11:42:59 18    anyway, what's the harm of doing that?  Danny, let me hear from you.

11:43:02 19          MR. COLLIER:  Your Honor, thank you.  Again, Danny Collier

11:43:04 20    for Ace Home Center.

11:43:06 21          And, your Honor, the harm is the very rule for -- reason

11:43:11 22    for Rule 14, and that is to handle everything at one time.  And the

11:43:18 23    relief Taishan asks for is not found in the rule, not found in the

11:43:24 24    law.  And I would like to respond to a number of points we just

11:43:28 25    heard.

11:43:29   1           THE COURT:  Okay.

11:43:30   2           MR. COLLIER:  A couple of opening comments and then I'll

11:43:33   3   get right to my comments.

11:43:38   4           We just heard several iterations that Ace Home Center is

11:43:46   5   dragging Taishan here, Ace is dragging Taishan there.  That's false.

11:43:52   6   Your Honor, Taishan's actions in putting this board in the market

11:43:58   7   that wound up in our store that we sold to Bass, that Bass used to

11:44:03   8   build the Collins and Herringtons' homes, that drug us into court in

11:44:09   9   Mississippi and Taishan has thereby drug us into the present forum.

11:44:14  10           So they're the ones dragging folks around, not us.

11:44:18  11           Next point:  I listened for an hour and a half this

11:44:25  12   morning to very good lawyers, but what it showed was a very tangled

11:44:31  13   web that Taishan has woven, and I say that to contrast and compare

11:44:39  14   this slide that perhaps is on the screen at this time.  Those four

11:44:47  15   red arrows show how simple our matter is compared to what we just

11:44:52  16   heard for an hour and a half.

11:44:55  17           One more comment before I get to my prepared remarks.

11:44:59  18   Taishan has shown itself to have an endless capacity to litigate

11:45:04  19   with seemingly a bottomless pit from which to pay lawyers, yet

11:45:09  20   somehow unable to compensate these poor plaintiffs.

11:45:12  21           Now, on the merits:  Fundamental fairness requires the

11:45:21  22   denial of Taishan's request.  Let me explain.  They want to point to

11:45:28  23   Collins and Herringtons somehow being part of the class action

11:45:32  24   against Taishan yet Collins and Herringtons are suing us in a

11:45:40  25   separate forum, and they would point to the exclusive remedy

11:45:43 1   language of the class members.  Well, your Honor, that exclusive

11:45:49 2   remedy language is for Collins and Herringtons, not for Ace Home

11:45:55 3   Center.  That is to say, it is not our remedy.  Our remedy has not

11:46:02 4   been abrogated by anything the Collins or Herringtons did or failed

11:46:07 5   to do, our remedy is found in the rules of Civil Procedure Rule 14.

11:46:12 6          It's as if Taishan is trying to say, well, since Taishan

11:46:14 7   might -- I'm sorry, it's as if Taishan is trying to say, well, since

11:46:20 8   Collins and Herringtons might get two bites at an apple, Ace should

11:46:25 9   get no bites at the apple.  And that's not fair.

11:46:27 10         In truth Taishan did not only damage Collins and

11:46:35 11  Herringtons.  Taishan's conduct in putting this defective board into

11:46:42 12  the stream of commerce that landed in our store exposed Ace to

11:46:47 13  liability to these plaintiffs.  As well as the expense of

11:46:52 14  litigation.  And so Taishan must answer in damages to Ace as well as

11:46:57 15  to Collins and Herringtons.

11:47:00 16         And, your Honor, if there is a true double recovery

11:47:04 17  problem here, it can be addressed at the appropriate time.  For

11:47:10 18  example, let's assume one day in the future Collins and Herringtons

11:47:13 19  recover from Taishan in the MDL.  Remediation costs, alternative

11:47:20 20  living expenses, loss of use, whatever.  Well, then at that time the

11:47:25 21  trial judge can consider whether the Collins and Herringtons have

11:47:31 22  their exclusive remedy, thus cutting off the Collins and Herringtons

11:47:35 23  claims against Ace, but it's too early to do that now.

11:47:40 24         Taishan has only recently, your Honor, come out of hiding

11:47:43 25  from that Chinese bunker; and though we can see the whites of their

11:47:47 1    eyes now, they're still fighting tooth and nail.  These poor

11:47:50 2    plaintiffs haven't received a red penny from Taishan yet and yet

11:47:55 3    Taishan wants to argue and complain about double recovery.  We

11:47:58 4    haven't seen a single recovery yet.

11:48:06 5         Your Honor, this forum -- when I say this forum, let me

11:48:10 6    back up.  The forum where Ace finds itself in a state court action,

11:48:19 7    removed to federal court, funneled into the MDL forum, that forum is

11:48:24 8    where Ace finds itself and that forum affords Ace a Rule 14

11:48:32 9    third-party complaint vehicle.  That's the only way and only place

11:48:36 10   and only way Ace to protect itself.  In other words, Ace can't be in

11:48:43 11   the MDL protecting itself.

11:48:49 12        On the flip side, Taishan can be in my forum and protect

11:48:54 13   itself just fine, but the reverse is not true.  In other words, we

11:49:01 14   have no standing over there to protect ourselves, yet Taishan does

11:49:05 15   have standing in our state court/federal court action to protect

11:49:09 16   itself.  And if in the end Taishan ultimately cannot protect itself,

11:49:15 17   it's only because it's guilt and its culpability proximately damaged

11:49:20 18   Ace Home Center and we've got a Rule 14 remedy.

11:49:23 19        So that covers the duplicatus argument.  Let me raise,

11:49:34 20   comment one more time on something not raised just a moment ago, but

11:49:38 21   raised in the papers; and that is Taishan says, well, Danny's client

11:49:43 22   can't sue us under Rule 14 because Mississippi law does not

11:49:47 23   recognize contribution among joint tortfeasors.  Very simply, your

11:49:54 24   Honor, there's not a word of contribution in our third-party

11:49:58 25   complaint.  It explicitly alleges common law, equitable indemnity

11:50:05 1   under active passive negligence.  So we seek indemnity, not

11:50:09 2   contribution.

11:50:09 3          And finally, and I'll be quiet, I would ask your Honor

11:50:14 4   from my writings to ignore the bit of argument about "if credit were

11:50:20 5   set off" issue because my mind was still in Alabama where we had

11:50:28 6   joint and several liability.  This will be Mississippi law, we're a

11:50:34 7   pure comparative state.  That's just to correct an error on my part

11:50:37 8   and I appreciate the court's indulgence.

11:50:40 9          THE COURT:  Okay.  Thank you very much.  Any response?

11:50:42 10         MS. EIKHOFF:  Just to make one point, your Honor, and that

11:50:46 11  is, as Mr. Collier just clarified, their complaint against Taishan

11:50:53 12  is seeking pure indemnification.  The damages that they seek is only

11:50:58 13  recovery of what they are forced to pay to the Collins and

11:51:01 14  Herringtons or what they settled for, which may be disputed.

11:51:05 15         But in any event, it's purely contingent on them first

11:51:09 16  being held liable.  And so we think that is all the more reason,

11:51:13 17  especially when the same plaintiffs are coming after us directly for

11:51:16 18  the same harm at the same time, then it makes sense to put one

11:51:21 19  before the other; and the direct claim against Taishan should go

11:51:26 20  first, the other one should be stayed.

11:51:29 21         THE COURT:  I see the issue and I understand the issue.  I

11:51:31 22  am going to this under advisement because I understand that the

11:51:35 23  claimants are in the throws of negotiation at this time and their

11:51:42 24  decisions may make this matter moot.  I think that by taking it

11:51:47 25  under advisement I may be encouraging a successful resolution of the

11:51:52  1    case, and I do that for that purpose.

11:51:54  2            But I am not going to keep it under advisement long, I

11:51:57  3    will do that for a couple of weeks, but I am going to come out with

11:52:01  4    a motion and ruling.

11:52:02  5            Harry, do you have something?

11:52:04  6            MR. ROSENBERG:  Yes, your Honor.  Please the court, I know

11:52:06  7    that we discussed this chambers the scheduling of the next status

11:52:11  8    conference.  I may have just not heard it, because my hearing is

11:52:15  9    fading, your Honor, but whether it was actually announced in open

11:52:19 10    court that we rescheduled.

11:52:21 11            THE COURT:  Thanks for bringing it to my attention, I

11:52:24 12    didn't so let me do that again.

11:52:24 13            As I understand the parties feel that because of the

11:52:28 14    depositions that are in Hong Kong, the schedule of September the

11:52:33 15    19th, that's when they're going to be in Hong Kong; so as I

11:52:38 16    understand it, we're going to dispense with the September meeting

11:52:42 17    and have the meeting for September and October on October the 7th.

11:52:48 18            MR. ROSENBERG:  That's correct, your Honor.

11:52:49 19            THE COURT:  Is that right?

11:52:50 20            MR. ROSENBERG:  I think the September 18th conference was

11:52:53 21    canceled, as I understand the court's decision, and it was going to

11:52:57 22    be rescheduled to October 7th with a possible telephone conference

11:53:01 23    on October the 22nd.

11:53:03 24            THE COURT:  On October the 22nd.  The parties will let me

11:53:06 25    know if you need a telephone call, because we may have some issues

| | | |
|---|---|---|
| 11:53:09 | 1 | that we can deal with in discovery of that aspect of the case. |
| 11:53:15 | 2 | MR. ROSENBERG:  Thank you, your Honor. |
| 11:53:16 | 3 | THE COURT:  Thank you.  Anything else anybody? |
| 11:53:17 | 4 | Thank you.  The court will stand in recess. |
| 11:53:19 | 5 | THE DEPUTY CLERK:  All rise. |
| 11:53:20 | 6 | (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.) |

7

8                              * * * * * *

9

10                      REPORTER'S CERTIFICATE

11

12        I, Karen A. Ibos, CCR, Official Court Reporter, United

13   States District Court, Eastern District of Louisiana, do hereby

14   certify that the foregoing is a true and correct transcript, to the

15   best of my ability and understanding, from the record of the

16   proceedings in the above-entitled and numbered matter.

17

18

19                     /s/ Karen A. Ibos

20                Karen A. Ibos, CCR, RPR, CRR, RMR

21                Official Court Reporter

22

23

24

25