# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION** | **MDL NO. 2047**<br>**SECTION: L**<br>**JUDGE FALLON**<br>**MAG. JUDGE WILKINSON** |

**THIS DOCUMENT RELATES TO:**

*Germano v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd.,* **Case No. 09-6687 (E.D. La.);**

*Gross v. Knauf Gips*, **KG,** *et al.,* **Case No. 09-6690 (E.D. La.);**

*Wiltz v. Beijing New Building Materials Public Limited Co., et al.,* **Case No. 10-361 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-1672 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-1395 (E.D. La.);**

*Amorin v. Taishan Gypsum Co., Ltd., f/k/a Shandong Taihe Dongxin Co., Ltd., et al.,* **Case No. 11-1673 (E.D. La.); and**

*Amorin v. State-Owned Assets Supervision and Administration Commission of the State Council, et al.,* **Case No. 14-1727 (E.D. La.).**

# MEMORANDUM OF BEIJING NEW BUILDING MATERIALS PUBLIC LIMITED COMPANY IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINTS PURSUANT TO RULES 12(B)(2) AND 12(B)(5)

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 6

    A.    The Corporate Relationship Between BNBM PLC and Taishan............... 6

    B.    BNBM PLC Has Not Conducted Business in the Forum States ............. 15

    C.    BNBM PLC Did Not Target the American Drywall Market................... 15

    D.    BNBM PLC Did Not Injure Anyone in the Forum States ...................... 18

        1.    The Evidence Shows That BNBM PLC's Drywall Was Not Defective ................................................................................ 18

        2.    Nobody In Louisiana or Virginia Claims Injury From BNBM PLC Drywall ..................................................... 21

    E.    Taishan Is Not An Agent of BNBM PLC ................................................ 22

    F.    Taishan Is Not an Alter Ego of BNBM PLC ........................................... 23

        1.    Taishan Is a Successful and Autonomous Company ................... 23

        2.    There Is No Commingling Between the Companies ................... 25

            a.    There Is No Financial Commingling ............................... 25

            b.    There Is No Operational Commingling ............................ 29

        3.    BNBM PLC And Taishan Are Part of a Business Group, Not Divisions of a Single Business............................................. 33

ARGUMENT ................................................................................................................... 34

  I.    Plaintiffs' Contentions About Alter Ego Are Meritless........................................ 35

    A.    BNBM PLC's Ability to Nominate Three of Taishan's Five Directors Is Not Grounds to Pierce the Veil ......................................... 36

    B.    That BNBM PLC Officers and Directors Are Also Directors of Taishan Is Not Grounds to Pierce the Veil ................................................ 38

    C.    BNBM PLC's Guaranties of Taishan's Operating Capital Lines Are Not Grounds to Pierce the Veil........................................................ 40

    D.    BNBM PLC's 2006 Transactions in Connection With the Acquisition of the Donglian Investment Shares of Taishan Are Not Grounds to Pierce the Veil ....................................................................... 43

    E.    BNBM PLC's Corporate Reports and Financial Statements Do Not Support Piercing the Veil................................................................... 44

    F.    Chairman Jia's Ownership Interest in Taishan and Titular Position at BNBM PLC Are Not Grounds to Pierce the Veil................................. 46

    G.    Even if BNBM PLC Had a Role in Taishan's 2014 Decision to Withdraw From the MDL, That Would Not Be Grounds to Pierce the Veil......................................................................................................... 47

**TABLE OF CONTENTS**
**(Continued)**

**Page**

II.   The Actual Relationship Between BNBM PLC and Taishan Does not Make Them Alter Egos Under Any Conceivably Applicable Law ..................... 51

    A.   Chinese Company Law Should Apply to the Veil Piercing Analysis................................................................................................ 51

    B.   Taishan Is Not BNBM PLC's Alter Ego Under Chinese Law ................ 53

    C.   Taishan Is Not BNBM PLC's Alter Ego Under the Laws of the Forum States ........................................................................................ 60

        1.   Application of Virginia Law ....................................................... 62

        2.   Application of Louisiana Law ..................................................... 64

        3.   Application of Florida Law.......................................................... 68

    D.   The Court's Prior Holding ..................................................................... 68

III.   Plaintiffs Cannot Establish Jurisdiction Over BNBM PLC Under the Forum States' Long Arm Statutes............................................................... 70

    A.   Applicable Law ...................................................................................... 71

    B.   Virginia Cannot Exercise Long-Arm Jurisdiction Over BNBM PLC ......................................................................................................... 71

    C.   Louisiana Cannot Exercise Long-Arm Jurisdiction Over BNBM PLC ......................................................................................................... 73

    D.   Florida Cannot Exercise Long-Arm Jurisdiction Over BNBM PLC........ 75

IV.   The Exercise of Jurisdiction Over BNBM PLC Is Inconsistent With Due Process ......................................................................................................... 78

    A.   BNBM PLC Did Not Have Minimum Contacts With the Forum States ...................................................................................................... 79

    B.   Plaintiffs' Causes of Action Did Not Arise Out of BNBM PLC's Contacts With the Forum States ............................................................ 82

    C.   Jurisdiction Over BNBM PLC Would Not Comport With Notions of Fair Play and Substantial Justice ....................................................... 83

  V.   The Complaints Should Be Dismissed Under Rule 12(B)(5).............................. 84

CONCLUSION..................................................................................................................... 87

CERTIFICATE OF SERVICE ............................................................................................ 90

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpine View Co. v. Atlas Copco AB,*
   205 F.3d 208 (5th Cir. 2000) ................................................39

*Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cty.,*
   480 U.S. 102 (1987)................................................84

*Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart,*
   845 A.2d 1040 (Del. 2014) ................................................40

*Bearry v. Beech Aircraft Corp.,*
   818 F.2d 370 (5th Cir. 1987) ................................................80

*Becerra v. Asher,*
   105 F.3d 1042 (5th Cir. 1997) ................................................5, 70

*Becerra v. Asher,*
   921 F. Supp. 1538 (S.D. Tex. 1996) ................................................70

*Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind,*
   841 F.2d 646 (5th Cir. 1998) ................................................86

*Blumberg v. Weiss & Co.,*
   922 So. 2d 361 (Fla. 3d DCA 2006) ................................................77

*BP Prods. N. Am., Inc. v. Dagra,*
   236 F.R.D. 270 (E.D. Va. 2006) ................................................86

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
   447 F.3d 411 (5th Cir. 2006) ................................................50, 61

*Brown v. Slenker,*
   220 F.3d 411 (5th Cir. 2000) ................................................73

*Bujol v. Entergy Sys., Inc.,*
   922 So. 2d 1113 (La. 2004) ................................................64

*Burger King Corp. v. Rudzewicz,*
   471 U.S. 462 (1985)................................................79, 80, 83

*Cannon Mfg. Co. v. Cudahy Packing Co.,*
   267 U.S. 333 (1925)................................................60, 61

*Cheatle v. Rudd's Swimming Pool Supply Co.*,
   360 S.E.2d 828 (Va. 1987) ................................................................................62

*Colt Def. LLC v. Heckler & Koch Def., Inc.*,
   No. 2:04-cv-258, 2004 U.S. Dist. LEXIS 28690 (E.D. Va. Oct. 22, 2004) ...........................63

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
   561 F.3d 273 (4th Cir. 2009) ............................................................78, 79, 82, 83

*Davaco, Inc. v. AZ3, Inc.*,
   Civil Action No. 3:07-cv-803, 2008 WL 2243382 (N.D. Tex. May 30, 2008) ......................52

*Davis v. Dempster, Inc.*,
   790 So.2d 43 (La. App. 3 Cir. 2000) .....................................................................65

*De Reyes v. Marine Mgmt. & Consulting, Ltd.*,
   586 So. 2d 103 (La. 1991) ..................................................................................79

*DeSantis v. Hafner Creations, Inc.*,
   949 F. Supp. 419 (E.D. Va. 1996) .........................................................................73

*Development Corp. of Palm Beach v. WBC Construction, L.L.C.*,
   925 So. 2d 1156 (Fla. 4th DCA 2006) ...................................................................68

*Dickson Marine Inc. v. Panalpina, Inc.*,
   179 F.3d 331 (5th Cir. 1999) ..............................................................................62

*Doe v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001) ..........................................................................42, 46

*Earl Realty, Inc. v. Leonetti* (*In re Leonetti*),
   28 B.R. 1003 (Bankr. E.D. Pa. 1983) ...................................................................70

*Enic. PLC v. F.F. S. & Co.*,
   870 So. 2d 888 (Fla. Ct. App. 2004) .....................................................................64

*Esmark, Inc. v. NLRB*,
   887 F.2d 739 (7th Cir. 1989) ..............................................................................38

*First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*,
   703 F.3d 742 (5th Cir. 2012) ..........................................................................50, 61

*Fluorine On Call, Ltd. v. Fluorogas Ltd.*,
   380 F.3d 849 (5th Cir. 2004) ..............................................................................48

*Foster, Pepper & Riviera v. Hansard*,
   611 So. 2d 581 (Fla. 1st DCA 1992) .....................................................................76

*Freedman v. Redstone*,
753 F.3d 416 (3d Cir. 2014) ............................................................................... 40

*Gadea v. Star Cruises, Ltd.*,
949 So. 2d 1143 (Fla. 3d DCA 2007) ................................................................. 78

*Gardemal v. Westin Hotel Co.*,
186 F.3d 588 (5th Cir. 1999) .............................................................................. 39

*Gatekeeper Inc. v. Stratech Sys., Ltd.*,
718 F. Supp. 2d 664 (E.D. Va. 2010) ................................................................. 79

*Green v. Champion Ins. Co.*,
577 So.2d 249 (La. Ct. App. 1991) ............................................................... 67, 69

*Gurung v. Malhotra*,
279 F.R.D. 215 (S.D.N.Y. 2011) ........................................................................ 87

*Hanson v. Denckla*,
357 U.S. 235 (1958) ............................................................................................ 79

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
466 U.S. 408 (1984) ............................................................................................ 81

*High Island Health, LLC v. Libertybelle Mktg. Ltd.*,
No. CIV A H-06-2931, 2007 WL 1173631 (S.D. Tex. Apr. 18, 2007) ................ 86

*Homeway Furniture Co. of Mount Airy, Inc. v. Horne*,
822 So. 2d 533 (Fla. 2d DCA 2002) .................................................................. 80

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*,
767 F. Supp. 2d 649 (E.D. La. 2011) ................................................................. 67

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*,
894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014) .................... *passim*

*In re Chinese-Manufactured Drywall Products Liab. Litig.*,
753 F.3d 521 (5th Cir. 2014) ........................................................................ 36, 65

*In re Opus E., LLC*,
528 B.R. 30 (Bankr. D. Del. 2015) ............................................................... 50, 61

*In re Vioxx Prod. Liability Litig.*,
478 F. Supp. 2d 897 (E.D. La. 2007) ................................................................. 51

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945) ............................................................... 79, 80, 82, 83

*Jackson v. Tanfoglio Giuseppe, S.R.L.*,
　　615 F.3d 579 (5th Cir. 2010) ........................................................................64, 67

*Johnston v. Multidata Sys. Int'l Corp.*,
　　523 F.3d 602 (5th Cir. 2008) ...................................................................................81

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
　　8 F.3d 130 (2d Cir. 1993)........................................................................................52

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
　　213 F.3d 841 (5th Cir. 2000) ...................................................................................80

*Long v. Chevron Corp.*,
　　Civil Action No. 4:11-cv-47, 2011 WL 3903066 (E.D. Va. Sept. 2, 2011) ...............63, 64, 79

*LTD Mgmt. Co. v. Holiday Hospitality Franchising, Inc.*,
　　Civil Action No. 2:07-cv-530, 2008 WL 7281926 (E.D. Va. Mar. 11, 2008)........................63

*Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*,
　　729 F. Supp. 1035 (D.N.J. 1990) .............................................................................51

*Marina Dodge, Inc. v. Quinn*,
　　134 So.3d 1103 (Fla. 4th DCA 2014) ..............................................................79, 81

*McCarthy v. Giron*,
　　No. 1:13-CV-01559-GBL, 2014 WL 2696660 (E.D. Va. June 6, 2014)...............................53

*McGuire v. Sigma Coatings, Inc.*,
　　48 F.3d 902 (5th Cir. 1995) .....................................................................................86

*Mega Tech Int'l Corp. v. Al-Saghyir Establishment*,
　　No. 96 CIV 8711, 1999 WL 269896 (S.D.N.Y. May 3, 1999)...............................................52

*Mobil Oil Corp. v. Linear Films, Inc.*,
　　718 F. Supp. 260 (D. Del. 1989).............................................................................50

*Morales v. Bayou Concessions Salvage, Inc.*,
　　No. 03-657, 2004 WL 2381525 (E.D. La. Oct. 22, 2004) .................................................68, 69

*Morales v. Bayou Concessions Salvage, Inc.*,
　　No. 03-657, 2004 WL 2381525 (E.D. La. Oct. 2004) ...........................................................68

*Mukamal v. Bakes*,
　　378 F. App'x 890 (11th Cir. 2010) (Florida) .......................................................................53

*Nicastro v. J. McIntyre Machinery, Ltd.*,
　　131 S.Ct. 2780 (2011)................................................................................................81

*Oldfield v. Pueblo De Bahia Lora, S.A.*,
    558 F.3d 1210 (11th Cir. 2009) .......................................................80

*Omega Homes, Inc. v. Citicorp Acceptance Co.*,
    656 F. Supp. 393 (W.D. Va. 1987) .................................................63

*Pacific Tel. & Tel. Co. v. Geist*,
    505 So. 2d 1388 (Fla. 5th DCA 1987) .....................................79, 82

*Patin v. Thoroughbred Power Boats, Inc.*,
    294 F.3d 640 (5th Cir. 2002) (Louisiana) ......................................53

*PBM Prods. v. Mead Johnson Nutrition Co.*,
    No. 3:09-CV-269, 2009 WL 3175665 (E.D. Va. Sept. 29, 2009) ...........................................63

*People Express Airlines, Inc. v. 200 Kelsey Assocs.*,
    LLC, 922 F. Supp. 2d 536 (E.D. Va. 2013) ...................................72

*Petroleum Helicopters, Inc. v. Avco Corp.*,
    513 So. 2d 1188 (La. 1987) .............................................................78

*Polskie Linie Oceaniczne v. Seasafe Transport A/S*,
    795 F.2d 968 (11th Cir. 1986) ........................................................36

*Poth v. Russey*,
    281 F. Supp. 2d 814 (E.D. Va. 2003) .............................................40

*Prejean v. Sonatrach, Inc.*,
    652 F.2d 1260 (5th Cir. 1981) ..................................................80, 82

*Provident Pharm., Inc. v. Amneal Pharms., LLC*,
    Civil Action No. 3:08-CV-393, 2008 WL 4911232 (E.D. Va. Nov. 13, 2008)......................72

*Puckett v. Advance Sports, Inc.*,
    2009 WL 3430283 (La. App. 1 Cir. Oct. 26, 2009) (unpublished opinion) ...........................65

*Quadrant Structured Prods. Co. v. Vertin*,
    102 A.3d 155 (Del. Ch. 2014)..........................................................40

*Qualley v. Int'l Air Serv., Ltd.*,
    595 So. 2d 194 (Fla. 3d DCA 1992) ...............................................68

*Reiss v. Ocean World, S.A.*,
    11 So. 3d 404 (Fla. 4th DCA 2009)................................................77

*Riberglass, Inc. v. Techni-Glass Indus., Inc.*,
    811 F.2d 565 (11th Cir. 1987) ........................................................70

*Riggins v. Dixie Shoring Co.*,
   590 So. 2d 1164 (La. 1991) ...........................................................................................50, 64

*Rio Properties, Inc. v. Rio Int'l Interlink*,
   284 F.3d 1007 (9th Cir. 2002) ..................................................................................................87

*Saudi v. Northrop Grumman Corp.*,
   427 F.3d 271 (4th Cir. 2005) ....................................................................................................64

*Securities Exchange Comm'n v. Tome*,
   833 F.2d 1086 (2d Cir. 1987) ...................................................................................................87

*Seiferth v. Helicopteros Atuneros, Inc.*,
   472 F.3d 266 (5th Cir. 2006) ....................................................................................................82

*Seiko Epson Corp. v. Glory S. Software Mfg., Inc.*,
   No. 06-CV-236-BR, 2007 WL 282145 (D. Or. Jan. 24, 2007) ...............................................87

*Sinclair Oil Corp. v. Levien*,
   280 A.2d 717 (Del. 1971) .........................................................................................................28

*South Carolina Elec. & Gas Co. v. UGI Utils., Inc.*,
   No. 2:06-cv-2627–CWH, 2012 WL 1432543 (D.S.C. Apr. 11, 2012) ....................................38

*Strong ex rel. Tidewater, Inc. v. Taylor*,
   877 F. Supp. 2d 433 (E.D. La. 2012) .......................................................................................40

*Stuart v. Spademan*,
   772 F.2d 1185 (5th Cir. 1985) ..................................................................................................36

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013) ................................................................................................52

*Thompson v. Chrysler Motors Corp.*,
   755 F.2d 1162 (5th Cir. 1985) ..................................................................................................36

*Town of Haynesville, Inc. v. Entergy Corp.*,
   956 So. 2d 192 (La. Ct. App. 2007) .........................................................................................69

*United States Fire Ins. Co. v. Allied Towing Corp.*,
   866 F.2d 828 (4th Cir. 1992) ....................................................................................................62

*United States v. Bestfoods*,
   524 U.S. 51 (1998)...............................................................................................................38, 63

*United States v. Wallace*,
   961 F. Supp. 969 (N.D. Tex. 1996) ..........................................................................................48

*Unspam Techs., Inc. v. Chernuk*,
    716 F.3d 322 (4th Cir. 2013) .................................................................79

*Venetian Salami Co. v. Parthenais*,
    554 So. 2d 499 (Fla. 1989).................................................................78

*Vitol, S.A. v. Primerose Shipping Co.*,
    708 F.3d 527 (4th Cir. 2013) .................................................................64

*Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*,
    517 F.3d 235 (5th Cir.2008) .................................................................73

*Washington & Old Dominion Users Ass'n v. Washington & Old Dominion R.R.*,
    155 S.E.2d 322 (Va. 1967)....................................................................62

*Waterman Oy v. Carnival Cruise lines, Inc.*,
    632 So. 2d 724 (Fla. 3d DCA 1994) ...............................................68, 81, 82

*Westwind Limousine v. Shorter*,
    932 So. 2d 571 (Fla. 5th DCA 2006) .................................................82

*Whitener v. Pliva, Inc.*,
    CIV.A. 10-1552, 2012 WL 1343964 (E.D. La. Apr. 18, 2012)........................65, 67

*William v. AES Corp.*,
    28 F. Supp. 3d 553, 563 (E.D. Va. 2014) ...........................................38, 62, 63, 64

*World-Wide Volkswagen Corp. v. Woodson*,
    444 U.S. 286 (1980)............................................................................81

*Young v. New Haven Advocate*,
    315 F.3d 256 (4th Cir. 2002) .................................................................78

**Statutes**

Company Law, Art. 14................................................................................53

Company Law, Art. 20...........................................................................53, 54

Company Law, Art. 20(3).......................................................................46, 57

Company Law, Art. 34................................................................................54

Fla. Stat. Ann. § 48.193 (2009)..................................................................76

Fla. Stat. Ann. § 607.1505(3).....................................................................52

La. Rev. Stat. § 1-1702 .............................................................................52

La. Rev. Stat. § 13:3201 (2001) ........................................................................................74

La. Rev. Stat. § 13:3201(B) (2001) ..................................................................................78

Va. Code Ann. § 8.01-328.1 ............................................................................................72

Va. Code Ann. § 8.01-328.1(A)(3) ..................................................................................72

Va. Code Ann. § 8.01-328.1(A)(4) ..................................................................................73

Va. Code Ann. § 13.1-923(C) ..........................................................................................52

**Rules**

Fed. R. Civ. P. 4(f)(3) .....................................................................................................86

Fed. R. Civ. P. 12 ..............................................................................................................1

Fed. R. Civ. P. 12(b)(2) ...............................................................................................6, 35

Fed. R. Civ. P. 12(b)(5) .................................................................................................1, 5

Fed. R. Civ. P. 36 .........................................................................................................5, 70

Fed. R. Evid. § 1006 ...........................................................................................21, 41, 42

**Other Authorities**

Chao Xi, *Piercing the Corporate Veil in China: How Did We Get There?*, 5 J.
    BUS. L. 413 (2011) .....................................................................................................54

http://china.ul.com ...........................................................................................................18

http://www.astm.org/ABOUT/factsheet.html ..................................................................18

http://www.astm.org/ABOUT/faqs.html#used ................................................................18

http://www.prnewswire.com/news-releases/zimmer-completes-combination-with-
    biomet-300104244.html .............................................................................................47

http://www.saic.gov.cn/zcfg/fl/xxb/201206/t20120612_126990.html .........................53

http://www.wsj.com/articles/SB113813740822755125/ ................................................47

https://ul.com/customer-resources/field-services-global-inspection-office-
    locator/europe/ ...........................................................................................................18

John A. Swain & Edwin E. Aguilar, *Piercing the Veil to Assert Personal
  Jurisdiction over Corporate Affiliates: An Empirical Study of the Cannon
  Doctrine*, 84 B.U. L. REV, 445 (2004).......................................................................61

Kyle M. Bacon, *The Single Business Enterprise Theory of Louisiana's First
  Circuit: An Erroneous Application of Traditional Veil Piercing*, 63 LA. L.
  REV. 75 (Fall 2002)...............................................................................................69

Merissa Marr & Nick Wingfield, *Disney Sets $7.4 Billion Pixar Deal: Jobs to
  Take Seat on Board and Play Integral Role In Setting Creative Course*, Wall
  Street Journal, January 25, 2006 ...........................................................................47

Restatement (Second) of Conflict of Laws, § 302(2) (1971)..........................................52

Restatement (Second) of Conflict of Laws, § 307 (1971) .............................................52

William O. Douglas & Carrol M. Shanks, *Insulation from Liability Through
  Subsidiary Corporations,* 39 YALE L.J. 193 (1929) .................................................38

Defendant Beijing New Building Materials Public Limited Company ("BNBM PLC") respectfully submits this memorandum in support of its motion pursuant to Rules 12(b)(2) and 12(b)(5) of the Federal Rules of Civil Procedure for an order dismissing the complaints against it for lack of personal jurisdiction and failure of service.[1]

## **INTRODUCTION**

BNBM PLC moves to dismiss because it does not have sufficient minimum contacts with the forum states of Virginia, Louisiana and Florida to meet their long-arm statutes or satisfy due process. BNBM PLC did not market or sell drywall in Louisiana or Virginia, did not target the market in Florida, and made sales only to a handful of U.S. customers who initiated the contacts with BNBM PLC in China. The facts are indisputable that BNBM PLC made only eight sales of its own manufactured and branded drywall to five American purchasers in 2005 and 2006. None of the purchasers were based in Louisiana or Virginia. While BNBM PLC contracted to sell its drywall to three companies resident in Florida, it did not actively solicit the Florida marketplace. Instead, the Florida marketplace solicited BNBM PLC during a drywall shortage. The Florida importers reached out to BNBM PLC in Beijing; each transaction was negotiated and consummated in China; in each transaction, the customer took delivery of the drywall in China.

---

[1]   On April 29, 2015, BNBM PLC moved to dismiss the complaints against it for lack of personal jurisdiction and failure of service. (Rec. Doc. 18849). On May 13, the Court entered a Scheduling Order stating, "after the damages hearing, the Court will set deadlines, briefing schedules, and hearing dates for the contempt track and the jurisdictional track." (Rec. Doc. 18921). On June 12, 2015, the Court denied BNBM PLC's motion to dismiss as premature, but provided that "BNBM Group and BNBM PLC reserve the right to re-urge their motions after the appropriate discovery has been discovered." (Rec. Doc. 19127). In the meantime, the Court has permitted jurisdictional discovery, which has produced further evidence that BNBM PLC is not subject to the Court's jurisdiction.

Beijing New Building Material (Group) Co., Ltd. ("BNBM Group") also will be moving to dismiss for lack of jurisdiction. BNBM Group has independent grounds for its jurisdictional motion.

In short, every aspect of these few transactions occurred in China and do not evidence the requisite minimum contacts with American jurisdictions required to exercise personal jurisdiction over BNBM PLC in U.S. courts.

BNBM PLC did not seek business in America generally during this period.  BNBM PLC's drywall likely did not even reach Virginia or Louisiana and, if it did, assuredly was not defective.  After all, there is not a single profile form submitted by a class member, or any other evidence, claiming that BNBM PLC's drywall injured anyone in Louisiana or Virginia.  And while BNBM PLC drywall was installed in homes in Florida, it could not have been the source of injury for the homeowners.  The U.S. Consumer Product Safety Commission ("CPSC") tested BNBM PLC drywall from 2006, obtained in America, and determined that it did not have the high levels of sulfur emissions found in other drywall manufactured in China.  While some Chinese manufactured drywall tested by the CPSC had high emissions levels, "[o]ther Chinese drywall samples had low or no detectable emissions of hydrogen sulfide as did the drywall samples tested that were manufactured domestically.  They include . . . Dragon Brand, Beijing New Building Materials Co. Ltd.: (2006) China."

The plaintiffs have adduced no contrary evidence.  The complaints do not allege that the plaintiffs performed testing of BNBM PLC drywall and their discovery responses confirm that.  Similarly, the report of the plaintiffs' expert witness in *Germano* includes no findings specific to BNBM PLC drywall.

BNBM PLC has not conducted other business in the forum states that would subject it to long-arm jurisdiction, does not solicit business in the forum states either directly or through agents, does not have offices or own or lease property in the forum states, and does not manufacture goods there.  BNBM PLC did nothing to avail itself of the privilege of doing

business in the forum states.  The handful of transactions between BNBM PLC and Florida importers, initiated by the Floridians and negotiated and consummated entirely on Chinese soil, are insufficient minimal contacts for BNBM PLC to anticipate being haled into court in Florida.

BNBM PLC had no agents acting in Louisiana, Virginia or Florida who could subject the company to either general or specific jurisdiction.  Neither Taishan Gypsum Co., Ltd. ("Taishan") nor anybody else acted as BNBM PLC's agent in the forum states, or anywhere else for that matter.  Taishan and BNBM PLC manufacture different grades of drywall, in different factories, under different brands.  No Taishan drywall at issue in this case was sold by BNBM PLC.  No "Dragon Brand" or other BNBM PLC drywall purportedly at issue in this case was sold by Taishan.

Nor can Taishan's contacts with the forum states be imputed to BNBM PLC as an alter ego.  BNBM PLC owns a majority of Taishan's stock, but stock ownership merely makes Taishan a subsidiary of BNBM PLC, not its alter ego.  BNBM PLC did not incorporate or form Taishan.  Taishan has been a successful and profitable drywall manufacturing business since 1992, long before any affiliation with BNBM PLC.  BNBM PLC had to pay fair value to purchase Taishan shares in two arms-length transactions in 2005 and 2006, directly and indirectly acquiring a total of 65% of the company's stock.  There are no allegations that Taishan's corporate form has been used to defraud anyone.  BNBM PLC's equity interest is short of the supermajority required for significant votes.  After BNBM PLC purchased the stock, Taishan retained its operational, management and financial autonomy.  Taishan is run by the same management team that ran it before BNBM PLC purchased its equity stake.  There has been no organizational, business or financial commingling between BNBM PLC and Taishan. Both Taishan and BNBM PLC have shown exceptional annual performance for the last decade

but, even compared to BNBM PLC's high standards, Taishan has had higher net revenue and profits.  The two companies even have competed with one another on occasion.

In other words, by every established standard, under Chinese or American law, Taishan is not the alter ego of BNBM PLC.  Taishan is an independent, successful profit center in the CNBM business group of companies.  As demonstrated in detail below, the corporate structure of the CNBM business group is not unusual; most large American companies or conglomerates have at least one subsidiary or operating unit in the same primary industry classification.  BNBM PLC and Taishan are no different in relation to each other than a typical parent and subsidiary in an American corporate structure.

Rather than addressing the factors that the courts in the forum states have found most important in determining whether to pierce the corporate veil, the plaintiffs have focused almost entirely on BNBM PLC's 65% equity interest in Taishan and the ordinary parent-subsidiary control that goes with it.  BNBM PLC can nominate three of Taishan's five directors.  BNBM PLC has input into Taishan's significant capital decisions, major business decisions and managerial performance metrics.  BNBM PLC guarantees bank lines of credit for ███████████ ████████████████████████  Under Chinese law BNBM PLC is the "controlling shareholder" of Taishan.  But far from being excessive or nefarious, these actions benefit Taishan, are completely consistent with parent-subsidiary relationships in American companies as well as Chinese business groups, and provide no basis to render an alter ego finding under Chinese or American law.  BNBM PLC's "control" over Taishan is nothing more than the dynamic, positive interest of a parent company in maximizing the performance of its subsidiary.  Every parent company, American or Chinese, *should* take such an interest in its subsidiaries and

has an obligation to its shareholders to do so. The plaintiffs' contentions on alter ego are non-starters economically, practically, legally and logically.

Taishan's contacts with the forum states also cannot be imputed to BNBM PLC based on this Court's finding last year, in its order certifying the plaintiff class, that Taishan and BNBM PLC (and others) constitute "a single business enterprise for purposes of . . . holding each of these entities liable for the conduct of their affiliated entities."[2] This finding was made on an uncontested record and relied on Rule 36 Requests for Admissions propounded to Taishan alone. The Court deemed the requests admitted when Taishan failed to respond.[3] No requests for admission, however, were made to BNBM PLC. Therefore Taishan's deemed admissions cannot be used against BNBM PLC under controlling Fifth Circuit authority. *See Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997), *as supplemented on denial of reh'g* (Apr. 7, 1997). The wisdom of this rule can be seen in the declarations and evidence submitted with this motion, which prove that many of the deemed admissions are incorrect.

The Court also lacks jurisdiction over BNBM PLC because it has not been served with process in any of the MDL cases. It is undisputed that BNBM PLC did not actually receive service; the plaintiffs only claim that they should be excused from making actual service because of their efforts already undertaken. But those efforts were too scant. The proofs of service demonstrate that they did not make adequate efforts to serve BNBM PLC, and in the *Gross* and *Wiltz* cases instead attempted to serve an entirely different entity. The failure of service is an independent basis to dismiss the complaints under Rule 12(b)(5).

The simple reality is that BNBM PLC had *no* contacts with two of the forum states and insufficient contacts with the third. Accordingly, this Court lacks jurisdiction over BNBM PLC,

---

[2]  Rec. Doc. 18028 at 12-20.

[3]  *Id.*

which respectfully requests the Court to dismiss the complaints against it under Rule 12(b)(2) and 12(b)(5).

## FACTUAL BACKGROUND

### A.    The Corporate Relationship Between BNBM PLC and Taishan

BNBM PLC manufactures building materials, including drywall, in China.[4]  BNBM PLC is a public company traded on the Shenzhen Stock Exchange, with over 21,000 shareholders.[5]  It is a majority shareholder in Taishan.[6]  BNBM PLC did not create or incorporate Taishan. Taishan began as a separate and independent manufacturer of drywall, focused on the residential marketplace.  When BNBM PLC first purchased shares, Taishan already had revenues of RMB 48.2 million.[7]  But Taishan was losing potential market share because it lacked capital to expand its production facilities.  Accordingly, Taishan turned to BNBM PLC to provide funding.[8] BNBM PLC acquired its equity stake in Taishan through two separate, arms-length transactions. BNBM PLC paid fair value to acquire its interest in Taishan, subject to a third-party audit and

---

[4]   *See* Ex. 1, BNBM PLC Annual Report for 2014, BNBMPLC0003164-3336, at BNBMPLC0003179 (relevant pages attached as Exhibit 1 and cited as "Ex. 1, 2014 BNBM PLC Annual Report").

[5]   *Id.* at BNBMPLC0003213.

[6]   Ex. 1, 2014 BNBM PLC Annual Report, at BNBMPLC0003180-3181; Ex. 2, Transcript of the deposition of Yu Chen, the General Manager of BNBM PLC and 30(b)(6) witness for BNBM PLC, taken July 8-11, 2015, at 76:11-77:1 (relevant pages of the transcript are attached as Exhibit 2 and cited as "Ex. 2, Chen Tr.").

[7]   Ex. 8, Taian Donglian Investment Trade Co., Ltd., Equity Transfer Evaluation Project, Asset Appraisal Report, BNBMPLC0006114-6139, at BNBMPLC0006114, 6122 (attached as Exhibit 8 and cited as "Ex. 8, 2005 Asset Appraisal Report").

[8]   Ex. 4, Transcript of the Deposition of Tongchun Jia, taken April 2011 and January 2012, at 576:22-577:16 (relevant pages of the transcript are attached as Exhibit 4 and cited as "Ex. 4, Jia 2011 & 2012 Tr.").

asset valuation process.[9]  After the acquisition Taishan maintained its original management and continued to operate separately from BNBM PLC.[10]

In March and April 2005, BNBM PLC entered into a Share Subscription Agreement to purchase 65,362,500 shares of Taishan, representing 42% of the registered capital of the company.[11]  The subscription price paid by BNBM PLC was about RMB 117.65 million.[12]  The purchase price was determined "[b]ased on the consideration of the market, of the bargain and of

---

[9]  *See* Ex. 3, Declaration of Yanjun Yang, dated April 16, 2015, at ¶ 8 (attached as Exhibit 3 and cited as "Ex. 3, Yang Decl."); Ex. 4 Jia 2011 & 2012 Tr. at 576:22-578:5, 594:9-17, 595:10-597:16; Ex. 5, BNBM PLC Board Resolution (20050423), BNBMPLC 0004402-4403 (attached as Exhibit 5 and cited as "Ex. 5, 2005 BNBM PLC Board Resolution) ("Beijing Zhongzheng Appraisal Co., Ltd. qualified for guarantees appraised Shandong Taihe Dongxin Co., Ltd. and issued ZZA Bao Zi [2005] No. 010 Assets Appraisal Report to show that the appraised net assets of Shandong Taihe Dongxin Co., Ltd. is 14,687.65 Yuan in the appraisal base date of Mar. 31, 2005, and the net asset per stock is 1.77 Yuan.  All parties reached an agreement on the basis of the appraisal result above and purchased new stocks of Shandong Taihe Dongxin Co., Ltd, with price of $1.8 Yuan per stock."); Ex. 6, BNBM PLC Board Resolution (20060828) BNBMPLC000445R-447R, at BNBMPLC000445R (attached as Exhibit 6 and cited as "Ex. 6, 2006 BNBM PLC Board Resolution) ("In accordance with the equity transfer agreement, the company purchased 100% equity of Taian Donglian Investment & Trade Co., Ltd. from Liu Huan and Jiao Wenbo with cash of 114.54 million Yuan"); Ex. 7, Equity Purchase Announcement (20060828), BMBMPLC0006218-6220, at BMBMPLC0006218 (attached as Exhibit 7 and cited as "Ex. 7, Equity Purchase Announcement) ("Beijing Xinghua Public Certified Accountants Co., Ltd. with the securities business qualifications conducted an audit . . . . As of June 30, 2006, the audited total assets of Donglian Company were RMB88.0413mn and its audited net assets were RMB78.6857mn. Zhongshang Assets Appraisal Co., Ltd. with the securities business qualifications conducted an appraisal . . . . With June 30, 2006 as the appraisal reference date, the appraised total assets of Donglian Company were RMB117.097mn and its appraised net assets were RMB107.7414mn").

[10]  *Compare* Ex. 65, Taishan's July 30, 2002 Board Resolution, TG040615-0028148 (attached as Ex. 65 and cited as "Ex. 65, Taishan's 2002 Board Resolution"); *with* Ex. 66, Taishan's May 20, 2008 Board Resolution, TG0020787 (attached as Ex. 66 and cited as "Ex. 66, Taishan's 2008 Board resolution") (appointing senior officers)

[11]  Ex. 3, Yang Decl. ¶ 8; Ex. 9, Share Subscription Agreement, March 19, 2005, BNBMPLC006153-6168, at BMBMPLC0006155-6157 (attached as Exhibit 9 and cited as "Ex. 9, Share Subscription Agreement").

[12]  Ex. 9, Share Subscription Agreement, at BNBMPLC0006155-6157.

the profit of Shandong Taihe Dongxin Company."[13]  A professional third-party appraisal of the value of Taishan confirmed the adequacy of the purchase price with reference to the net asset value of Taishan as of March 31, 2005.[14]

In addition to BNBM PLC's investment, Taishan's Chairman agreed to subscribe to new shares that would preserve his 5% interest, and Taishan's employee stock ownership plan and managers agreed to transfer their shares to two companies, one of which was a new investment company, Anxin Investment, which would also subscribe to new shares.[15]  Taishan's shareholders and BNBM PLC's board of directors voted on and approved the acquisition in compliance with each company's articles of association.[16]  The spring 2005 transaction amounted to a recapitalization of Taishan, with the participation of the existing management team.

Taishan's articles of incorporation were amended as part of the transaction.[17]  The amended Taishan articles contain important minority stockholder protections.  Many important business decisions must be decided by a "special resolution," which requires an "affirmative vote cast by 2/3 or more of the voting rights," rather than a simple majority.[18]  Such decisions include increasing or decreasing capital, issuing bonds, engaging in mergers and spinoffs, undertaking stock repurchases, pledging stock owned by a shareholder, or taking other actions with

---

[13]   Ex. 4, Jia 2011 & 2012 Tr. 578:1-5.

[14]   *See* Ex. 8, 2005 Asset Appraisal Report, at BMBMPLC0006114.

[15]   Ex. 10, Shandong Taihe Dongxin Co., Ltd. Articles of Incorporation, adopted April 25, 2005, TG0020608-0629, at Article 17 (attached as Exhibit 10 and cited as "Ex. 10, Articles of Incorporation"); *see also* Ex. 8, 2005 Asset Appraisal Report, at BNBMPLC0006119-6120 .

[16]   Ex. 4, Jia 2011 & 2012 Tr. 576:22-578:5; Ex. 5, 2005 BNBM PLC Board Resolution.

[17]   Ex. 10, Articles of Incorporation.

[18]   *Id.* Article 45.

"important impact" on the company.[19]  Without "a special resolution by the shareholder meeting, the Company may not enter into a contract with people other than the Director, Manager and other high-level management personnel which shall give such person the right to handle the Company's entire or important business operation."[20]  The Taishan articles thus place significant limits on BNBM PLC's power as a 42% owner and specifically prevent BNBM PLC from assuming operational control of the company.

The articles also were amended to provide for a seven person board of directors; four nominated by BNBM PLC, one by Tai'an State-owned Assets Operation Co., Ltd, and two others by the management shareholders including Chairman Jia.[21]  The Taishan board later was downsized to five directors, with three BNBM PLC designees, one management designee and one Tai'an designee.[22]

Thus Taishan management and its shareholders did not sell out to a new owner who installed its own management team and assumed operational control of the business.  Rather Taishan's original owners, management and directors decided that Taishan needed recapitalization to pursue business opportunities.  In the circumstances of the Chinese capital markets, accepting a capital contribution from another firm in a related business segment was an effective way to augment financial resources.[23]  For its part, BNBM PLC was not buying Taishan shares to wrest control and install a new hand-picked management team, but investing in

---

[19]   *Id.* Article 47.

[20]   *Id.* Art. 48.

[21]   *Id.* Art. 67.

[22]   Ex. 4, Jia 2011 & 2012 Tr., 604:9-23, 743:22-745:20.

[23]   Ex. 12, Declaration of Professor Jeffrey N. Gordon, October 22, 2015, ¶¶ 17-19, 36, 43 (attached as Exhibit 12 and cited as "Ex. 12, Gordon Decl.").

a successful management team that remained in place and utilized the new capital invested by BNBM PLC to pursue its own expansion plans.[24]

In 2006, BNBM PLC acquired an additional, indirect 23% equity interest in Taishan through the purchase of one of Taishan's shareholders, Taian Donglian Investment Trade Co., Ltd. ("Donglian").[25]  BNBM PLC paid RMB 114,540,000.[26]  A professional third-party valuation company determined that the net appraised value of Donglian was RMB 107.74 million as of June 30, 2006.[27]  Added to the RMB 5.6 million investment by the original shareholders after June 30 but prior to the appraisal, "the net asset value of Donglian Company [was] RMB113.3414mn," which confirmed the adequacy of the stock purchase price.[28]  BNBM PLC's three independent directors issued an opinion finding that the transaction was in the company's best interest, the board of directors voted to approve the acquisition, and the company issued a formal public announcement disclosing the sale.[29]  BNBM PLC did not seek the approval of CNBM PLC for the decision to invest and did not have to.[30]

---

[24]  *Id.* ¶ 45.

[25]  Ex. 3, Yang Decl. ¶ 8.

[26]  Ex. 7, Equity Purchase Announcement (20060828), BNBMPLC0006218 - 6220, at BNBMPLC0006218 (attached as Exhibit 7 and cited as "Ex. 7, Equity Purchase Announcement").

[27]  Ex. 15, 2006 Asset Appraisal Report, BNBMPLC0006183 - 6194, at BNBMPLC0006185 (attached as Exhibit 15 and cited as "Ex. 15, 2006 Asset Appraisal Report").

[28]  *See id*; Ex. 14, Equity Purchase Announcement, at BNBMPLC0006219.

[29]  Ex. 16, August 25, 2006 BNBM PLC Board Resolution Announcement, BNBMPLC0004445- 04447 (attached as Exhibit 16 and cited as "Ex. 16, 2006 BNBM PLC Board Resolution"); Ex.17, Independent Opinion of the Independent Directors of BNBM PLC, BNBMPLC0006214 (attached as Exhibit 17 and cited as "Ex. 17, 2006 Opinion of Independent Directors"); Ex. 7, Equity Purchase Announcement.

[30]  Ex. 18, Transcript of deposition of Song Zhiping, September 14, 2015, at 28:1-11 (relevant pages of the transcript attached as Exhibit 18 and cited as "Ex. 18, Song Tr.").

This acquisition left BNBM PLC with a 65% equity interest in Taishan.[31]  The other 35% was and remains owned by other investors.[32]  The ceiling on BNBM PLC's ownership interest is not accidental.  Taishan bargained at the time for BNBM PLC to purchase less than a two-thirds ownership interest so that BNBM PLC "would not have the right to make decisions on important matters"—a limit on the ownership percentage designed to ensure Taishan would operate independently.[33]  Taishan's articles of association continue to delineate the limits of BNBM PLC's rights as a majority shareholder.[34]  They have been amended from time to time since 2006, but have never scaled back the limitations on the majority stockholder.  Because the remaining shareholders were concentrated holders, rather than dispersed holders, a party with 65% would still need the support of other shareholders to undertake such actions.[35]  In short, the most important business decisions of Taishan would require the support of minority shareholders, who could be expected to act in their own interests.  The anti-delegation provisions of the articles also means that Taishan cannot be managed by BNBM PLC or any other party, but only by Taishan's own management team.[36]

---

[31]  Ex. 3, Yang Decl. ¶ 8

[32]  Ex. 2, Chen Tr. 76:11-77:1.

[33]  Ex. 4, Jia 2011 & 2012 Tr. 595:17-597:16

[34]  Ex. 19, Articles of Association of Shandong Taihe Dongxin Co., Ltd., as amended on August 8, 2006 Amendments, TG0020686 - TG0020709, at Articles 39, 41, 42 (attached as Exhibit 19 and cited as "Ex. 19, August 8, 2006 Articles of Association); Ex. 20, Articles of Association of Tai Shan Gypsum Co., Ltd., as amended on June 20, 2007, TG0020725 - TG0020748, at Articles 46, 47, 49 (attached as Exhibit 20 and cited as "Ex. 20, June 20, 2007 Articles of Association); Ex. 21, Amendment to Article of Association of Taishan Gypsum Co., Ltd., adopted May 18, 2009, TG0020799 - TG0020800 (attached as Exhibit 21 and cited as "Ex. 21, Amendment to Articles of Association").

[35]  Ex. 12, Gordon Decl. ¶ 46.

[36]  *Id.*

Under Chinese law, BNBM PLC is the "controlling shareholder" of Taishan.[37]  However, BNBM PLC's position as controlling shareholder is an ordinary instance of parent-subsidiary relations, similar to the relationship seen within the companies that comprise the Standard & Poors 1500 index.[38]  To test this point, BNBM PLC retained two experts.  The first is one of the country's leading experts on corporate governance, Professor Jeffrey Gordon of Columbia University School of Law, who has performed a comparative analysis of the relationships between and among CNBM,  BNBM and Taishan to those found in large, American public companies.[39]  BNBM PLC also retained Analysis Group, an economic and research consulting firm, to perform econometric and quantitative analyses supporting Professor Gordon's declaration.[40]  The work of these experts shows that the degree of control exercised by BNBM PLC over Taishan is no greater than that typically exercised by major American companies over their subsidiaries.

Like American parents and subsidiaries, BNBM PLC does not control the day-to-day operations of Taishan; rather, it provides credit enhancement such as loan guaranties, allocates

---

[37]   The Company Law of the People's Republic of China Article 217(2) ("A 'controlling shareholder' refers to a shareholder whose capital contribution occupies . . . more than 50% of the total equity stocks of a joint stock limited company . . . .").

[38]   Ex. 12, Gordon Decl. ¶ 4.

[39]   Ex. 12, Gordon Decl. ¶¶ 1-13.

[40]   Ex. 11, Declaration and Expert Report of Bruce Deal, October 20, 2015 (attached as Exhibit 11 and cited as "Ex. 11, Deal Decl.").  Mr. Deal, Managing Principal with the Analysis Group, performed several analyses relating to common corporate structure in the United States.  First, he and his team performed a review of the S&P 1500 to determine what percentage of companies had subsidiaries, to what extent such subsidiaries were in the same industry as the parent company and the extent of board of director and senior corporate overlap that existed among parents and subsidiaries.  Second, they identified and provided a more in-depth analysis of four specific companies: Walt Disney Company, FedEx Corporation, Post Holdings, Inc. and Zimmer Biomet Holdings, Inc. and their corporate structure.  Third, the Expert Report and Declaration analyzed the extent to which companies in the S&P 1500 provide loan guaranties among and between subsidiaries and parent companies.

capital as needed and appropriate, approves major capital expenditures of Taishan, and establishes performance based metrics for Taishan's management.[41]  Day-to-day operations and management, however, are the province of Taishan's management and its own Board of Directors.[42]  The Taishan directors meet regularly and exercise their duties with respect to the corporation.[43]

BNBM PLC, in turn, has its own "controlling shareholder" (as defined in its articles of association), which since March 2005 has been CNBM PLC.[44]  CNBM PLC currently holds about 45% of the shares of BNBM PLC.[45]  Just like BNBM PLC's relationship with Taishan, CNBM PLC does not exercise day-to-day operational control over BNBM PLC.[46]  CNBM PLC

---

[41]  Ex. 12, Gordon Decl. ¶¶ 3, 61, 63, 67, 84-85; *see also* Ex. 2, Chen Tr. 110:8-13, 276: 22 - 277:5; Ex. 38, Transcript of the deposition of Bing Wang, taken August 25-27, 2015, at 394:18-24 (relevant pages of the transcript are attached as Exhibit 48 and cited as "Ex. 48, Wang Tr.").

[42]  Ex. 12, Gordon Decl. ¶ 47, 61; *see* Ex. 2, Chen Tr. 284:21-285:11.

[43]  *See, e.g.*, Ex. 13, Taishan's June 20, 2007 Board Resolution, TG 0025903-5905 (attached as Exhibit 13 and cited as "Ex. 13, Taishan's June 2007 Board Resolution) and Ex. 24, Taishan's May 20, 2008 Board Resolution, TG0025906-5908 (attached as Exhibit 24 and cited as "Ex. 24, Taishan's May 2008 Board Resolution); *see also* Ex. 2, Chen Tr. 283:5-12; Ex. 38, Wang Tr. 151:1-24.

[44]  *See* Ex. 22, BNBM PLC's November 17, 2014 Articles of Association, BNBMPLC0004238R-427R, at Art. 192 (attached as Exhibit 22 and cites as "Ex. 22 BNBMPLC 2014 Articles") (BNBM PLC's 2014 Articles provides at Article 192 that the "controlling shareholder refers to the shareholder whose share account for more than 50% of the total capital stock of the Company and the shareholder whose voting right for his/her shares has been enough to materially affect the resolution of general meeting of shareholders regardless of his/her shareholding ration of less than 50%."); Ex. 2, Chen Tr. 239:3-12.  CNBM PLC acquired a 60.33% interest in BNBM PLC on March 24, 2005.  *See* Ex. 23, China National Building Material Company Limited Global Offering Prospectus, prepared by Morgan Stanley, March 13, 2006, ALRMH-CNBM00000001-0643, at ALRMH-CNBM00000013 (attached as Exhibit 23 and cited as "Ex. 23, CNBM PLC Global Offering").  CNBM PLC's ownership interest decreased after it went public, and was further reduced to 45.2% after a private offering of BNBM PLC shares to institutional investors in the fall of 2014.  *See* Ex. 1, BNBM PLC 2014 Annual Report, at BNBMPLC 0003213.

[45]  Ex. 1, BNBM PLC 2014 Annual Report, at BNBMPLC 0003213.

[46]  Ex. 2, Chen 238:21-239:7; 240:3-8.

provides credit enhancement, allocates capital as needed and appropriate, approves major capital expenditures of BNBM PLC, and establishes performance based metrics for BNBM PLC's management.[47]

Like Taishan's articles of incorporation, BNBM PLC's articles contain important restrictions on the "controlling shareholder."  Article 39 provides:

> The controlling shareholder and the actual controller of the Company shall have the duty of good faith to the Company and other shareholders of the Company.  The controller shareholder shall strictly exercise the rights of contributor according to law, and shall not impair the legitimate rights and interests of the Company and other shareholders of the Company by use of profit distribution, asset restructuring, foreign investment, occupation of funds, security for loan and others, or impair the interests of the Company and other shareholders of the Company by taking advantage of his/her dominant position.[48]

BNBM PLC's articles of association require shareholders to commit no "abuse of shareholder's rights to impair the interests of the Company or other shareholders" and "no abuse of independent status for the legal person of the Company and the limited liability of shareholder to impair the interests of creditor of the Company."[49]  A controlling shareholder must compensate other shareholders for losses "arising from his/her abuse of shareholder's rights according to law."[50]

The minutes and resolutions of the BNBM PLC board reflect that the directors meet regularly and exercise their duties with respect to the corporation.[51]  The BNBM PLC nominees

---

[47]  *See* Ex. 12, Gordon Decl. ¶¶ 27-31.

[48]  Ex. 22, BNBM PLC 2014 Articles, at Art. 39.

[49]  *Id.* Art. 37(IV).

[50]  *Id.*

[51]  In response to the PSC's discovery requests, BNBM PLC produced 100 board resolutions from November 2001 to March 2015 as BNBMPLC0004275-BNBMPLC0004958.  Attached as Exhibit 62 are sample BNBM PLC Board Resolutions, BNBMPLC0004392-04392,

on the Taishan board exercise their duties as directors of Taishan with the best interests of Taishan foremost in mind.[52]

**B.       BNBM PLC Has Not Conducted Business in the Forum States**

BNBM PLC does not conduct any business in the forum states, and never has.  BNBM PLC has never registered to do business in Virginia, Louisiana or Florida, maintained offices or employees there, paid taxes in those states or owned or leased property in those states.[53]  BNBM PLC has never marketed or advertised its drywall in Virginia, Louisiana or Florida.[54]  BNBM PLC sales representatives have not traveled to the forum states to market or sell drywall or otherwise conduct business.[55]  BNBM PLC sales representatives have not solicited American companies to sell BNBM PLC products in the forum states or elsewhere in America.[56]

**C.       BNBM PLC Did Not Target the American Drywall Market**

In 2005, the domestic housing boom, compounded by regional devastation from tropical storms, triggered a shortage of domestic drywall, and American contractors turned to China as a source for wallboard.  While some overseas manufacturers may have reached out to America for a share of this drywall market, BNBM PLC did not.  However, the same American distributors

---

BNBMPLC0004435-4463, BNBMPLC0004504-4507, BNBMPLC0004528-004531, BNBMPLC0004595-4597, BNBMPLC0004868-4889 (cited as "Ex. 62, Sample BNBM PLC Board Resolutions").  BNBM PLC also produced 54 board meeting minutes dated from April 2000 to March 2015 as BNBMPLC0005794-6089.  Attached as Exhibit 63 are sample BNBM PLC Board Meeting Minutes BNBMPLC0005932-5937, BNBMPLC0005955-5956, BNBMPLC0005989-05992, BNBMPLC0005967-5968, BNBMPLC0006020-6024, BNBMPLC0006069-6070 (cited as "Ex. 63, Sample BNBM PLC Board Minutes").

[52]   Ex. 2, Chen Tr. 287:22-288:1;  Ex. 38 Wang. Tr. 380:20-381:23.

[53]   Ex. 25, Declaration of Kai Cai, dated April 17, 2015, ¶ 3 (attached as Exhibit 25, and cited as "Ex. 25, Cai Decl.").

[54]   *Id.* ¶ 4.

[55]   *Id.*

[56]   *Id.* ¶¶ 4-7.

contacted BNBM PLC on their own initiative.  Following solicitations from American buyers

between November, 2005 and July, 2006, BNBM PLC sold its drywall to five such American

customers.  None were located in Virginia or Louisiana, and there is no evidence that any of

BNBM PLC's drywall entered Virginia or Louisiana.[57]  Three companies resident in Florida

contracted with BNBM PLC to purchase its drywall, as did two other purchasers based in

Connecticut and California.  The sales were relatively modest; BNBM PLC sells 99% of its

product in China.[58]  Since mid-2006, BNBM PLC has made no drywall sales to American

customers.[59]

Each of the American contracting parties—EAC & Sons Corp ("EAC"), Great Western

Building Materials ("Great Western"), Wood Nation Inc. ("Wood Nation"), Triorient Trading

Inc. ("Triorient") and Davis Construction Supply, LLC ("Davis")—initiated contact with BNBM

PLC.[60]  Four of these importers traveled to China to meet with BNBM PLC and examine the

product.[61]

---

[57] Ex. 25, Cai Decl. ¶¶ 6, 10(a)-(e); *see also* the following contracts identifying purchasers as
residents of Florida: Ex. 26, EAC & Sons Purchase Agreement, BNBMPLC0007421-7423
(attached as Exhibit 26 and cited as "Ex. 26, EAC Agreement"); Ex. 27, Davis Construction
Purchase Agreement, BNBMPLC 0007467-7479 (attached as Exhibit 27 and cited as "Ex. 27
Davis Agreement"); Ex. 28,Wood Nation Inc. Purchase Agreement, BNBMPLC0007445-7448
(attached as Exhibit 28 and cited as "Ex. 28 Wood Nation Agreement"); Exs. 29 and 30,
California—Great Western Building Materials Purchase Agreements, BNBMPLC0007430-7433
and BNBMPLC0007441-7444, respectively (attached as Exhibits 29 and 30, respectively, and
collectively cited as "Exs. 29 & 30, Great Western Agreements"); Exs. 31 and 32, Connecticut—
Triorient Trading Inc. Purchase Confirmations, BNBMPLC0007456-7460 and
BNBMPLC00007461-7466, respectively (attached as Exhibits 31 and 32, respectively, and
collectively cited as "Exs. 31 & 32, Triorient Agreements").

[58]   Ex. 2, Chen Tr. 543:12-17.

[59]   Ex. 25, Cai Decl. ¶¶ 5, 10.

[60]   *Id*. ¶ 6, 10(a)-(e); Ex. 33, Transcript of the deposition of Stefan Davis, the owner and 30(b)(6)
witness for Davis Construction, taken May 19, 2015, at 22:12-23:17, 24:9-26:4, 100:21-101:9,
139:2-14, 140:2-10 (relevant pages are attached as Exhibit 33 and cited as "Ex. 33, Davis Tr.");
Ex. 34, Transcript of the deposition of Edgar Chaparro, the 30(b)(6) witness for EAC, taken May

BNBM PLC employees did not visit America in connection with any of the sales, which were all negotiated in China.[62]  The contracts were performed in China.[63]  The customers took possession of the drywall in China.[64]  None of the drywall was designated for shipment to Virginia or Louisiana.[65]  Although EAC, Wood Nation, Triorient and Davis designated Florida as the destination for some of the drywall shipments, none told BNBM PLC where they intended

---

18, 2015, at 24:7-25:15, 26:5-27:1, 134:1-135:1, 144:9-25, 155:19-156:1 (relevant pages are attached as Exhibit 34 and cited as "Ex. 34, Chaparro Tr."); Ex. 35 transcript of the deposition of Albert Winslow, the 30(b)(6) witness for Triorient, taken July 27, 2015, at 36:14-37:14 (relevant pages are attached as Exhibit 35 and cited as "Ex. 35, Winslow Tr."); Ex. 36, Transcript of the deposition of Larry Rogers, the 30(b)(6) witness for Great Western, taken August 4, 2015, at 22:4-23:10, 24:15-19, 65:1-14, 66:3-20 (relevant pages are attached as Exhibit 36 and cited as "Ex. 36, Rogers Tr."); Ex. 37, Transcript of the deposition of Richard Hannam, owner and 30(b)(6) witness of Wood Nation, taken February 14, 2011, at 12:16-14:8; 14:15-15:5, 35:19-36:15 (relevant pages are attached as Exhibit 37 and cited as "Ex. 37, Hannam Tr."); Ex. 38 Wang Tr. 70:3-13 (foreign customers came to China to purchase BNBM products).

[61]   Ex. 25, Cai Decl. ¶¶ 6, 10(a), (b), (d) & (e); Ex. 34, Chaparro Tr. 28:22-29:11; Ex. 36, Rogers Tr. 65:1-14, 66:3-20.  While such visits were made at the customers' request (Ex. 25, Cai Decl. ¶ 10(a)), some of the American customers required a technical "invitation" from BNBM PLC to satisfy Chinese visa requirements; such invitations were extended at the American companies' request.  *See* Ex. 34, Chaparro Tr. 24:7-21.

[62]   Ex. 25, Cai Decl. ¶¶ 6-7, 10(a)-(e); Ex. 33, Davis Tr. 139:2-14, 140:2-6; Ex. 34, Chaparro Tr. 144:9-25, 176:5-16; Ex. 35, Winslow Tr. 57:22-58:9; Ex. 36, Rogers Tr. 66:21-67:7.

[63]   Ex. 25, Cai Decl. ¶¶ 6-9, 10(a)-(e); see Ex. 26, EAC Agreement, at BNBMPLC0007421-7422 (pricing term is CIF - "Port of Shipment: Any main port in China"); Exs. 29 & 30, Great Western Agreements, at BNBMPLC0007430-7431 and -7441-7442 (Pricing Terms are CFR - "Port of Shipment: Tianjin, China"); Ex. 28, Wood Nation Agreement, at BNBMPLC0007446-7447 (Pricing Terms are CFR - "Port of Load: Tianjin, China"); Exs. 31 & 32, Triorient Agreements, at BNBMPLC0007457 and -7463 (Noting terms are FOB, "Load Port: Tianjin, China"); Ex. 27, Davis Agreement, at BNBMPLC0007469 (pricing term is "FOB under tackle China Port").

[64]   Ex. 25, Cai Decl. ¶¶ 7, 10(a)-(e); *see* Ex. 26, EAC Agreement, at BNBMPLC0007421-7422 (pricing term is CIF - "Port of Shipment: Any main port in China"); Exs. 29 & 30, Great Western Agreements, at BNBMPLC0007430-7431 and -7441-7442 (Pricing Terms are CFR - "Port of Shipment: Tianjin, China"); Ex. 28, Wood Nation Agreement, at BNBMPLC0007446-7447 (Pricing Terms are CFR - "Port of Load: Tianjin, China"); Exs. 31 & 32, Triorient Agreements, at BNBMPLC0007457 and -7463 (Noting terms are FOB, "Load Port: Tianjin, China"); Ex. 27, Davis Agreement, at BNBMPLC0007469 (pricing term is "FOB under tackle China Port")

[65]   Ex. 25, Cai Decl. ¶¶ 7, 10(a)-(e).

to market or use the drywall they bought.[66]  Other shipments of BNBM PLC's drywall went to ports outside of Florida and was intended for use outside of Florida.[67]

BNBM PLC did not solicit Virginia, Louisiana or Florida customers by mailing drywall samples to the states.[68]  BNBM PLC did not stamp American telephone numbers or otherwise change the markings on its drywall to make it appear as though it came from Florida, Virginia, Louisiana or elsewhere in America.  The wallboard ordered by Davis said "[p]roduced by BNBM, PLC and distributed by Davis in the U.S.A.," which makes clear that the wallboard was not produced in the United States.[69]  BNBM PLC was not involved with the sale of any other brand of drywall.[70]

### D.    BNBM PLC Did Not Injure Anyone in the Forum States

### 1.    The Evidence Shows That BNBM PLC's Drywall Was Not Defective

BNBM PLC did not injure anyone in the forum states because the drywall it manufactured and shipped to America in 2005 and 2006 was not defective.  The CPSC

---

[66]  Ex. 25, Cai Decl. ¶¶ 10 (a), (c)-(e); Ex. 2, Chen Tr. 547:14-549:7.

[67]  *See, e.g.,* Ex. 33, Davis Tr. at 138:1-17; Ex. 36, Rogers Tr. 70:8-17.

[68]  In the jurisdictional discovery, three of BNBM PLC's American customers have been asked about drywall samples, and all testified they did not receive samples from BNBM PLC, other than samples given to them in China, before doing business with BNBM PLC.  *See* Ex. 33, Davis Tr. 95:24-96:19; Ex. 34, Chaparro Tr. 112:24-113:4; Ex. 35, Winslow Tr. 62:5-9.

[69]  Ex. 33, Davis Tr. 42:23-44:1.  The plaintiffs contend that because BNBM PLC often produces drywall according to ASTM and UL specifications, it must be targeting the United States market.  This contention ignores the commercial reality that ASTM and UL set international product standards used and sought after throughout the globe, including in Europe, South America and China.  *See, e.g.*, http://www.astm.org/ABOUT/faqs.html#used; http://www.astm.org/ABOUT/factsheet.html; http://china.ul.com; https://ul.com/customer-resources/field-services-global-inspection-office-locator/europe/.  The high-end commercial Chinese domestic drywall market insists that such standards be met, and BNBM PLC is happy to meet them.  But that has nothing to do with targeting the American marketplace.

[70]  Ex. 25, Cai Decl. ¶¶ 11, 12; Ex. 2, Chen Tr. 517:15-518:11 (discussing PSC deposition Exhibit 138, a chart prepared by the PSC reflecting all BNBM PLC sales of drywall to the United States (a copy is attached hereto as Exhibit 39)).

commissioned the Lawrence Berkley National Laboratory to test 30 brands of imported drywall used in the U.S. market for reactive sulfur gas emissions.[71]  The testing of a 2006 sample of BNBM PLC drywall obtained in America showed hydrogen sulfide emissions of 2.45 µg-S/m2/h and sulfur dioxide emissions of 4.37 µg-S/m2/h,[72] both of which are on par with North American drywall, whose hydrogen sulfide emissions ranged from 0.00 to 3.99 µg-S/m2/h and sulfur dioxide emissions ranged from 0.00 to 4.99 µg-S/m2/h.[73]  "Other Chinese drywall samples had low or no detectable emissions of hydrogen sulfide as did the drywall samples tested that were manufactured domestically," the CPSC observed.[74]  "They include . . . Dragon Brand, Beijing New Building Materials Co. Ltd.: (2006) China."[75]

The testimony of BNBM PLC's American customers confirms that there were no problems with the drywall they purchased from BNBM PLC.  Davis, EAC, Triorient and Great Western affirmatively testified that they received no complaints, whether directly—from the suppliers they sold to—or from homeowners, concerning BNBM PLC's drywall.[76]  Nor did

---

[71]  *See* JOANNA MATHESON, PH.D., LAWRENCE BERKELEY NATIONAL LABORATORY OCTOBER 2010 CHAMBER STUDY REPORT (Jan. 3, 2011) (attached as Exhibit 40 and cited as "Ex. 40, Matheson Memo").

[72]  *Id.* at 41.  The relevant sample on this chart is 09-810-7078.  *See* DRAFT EMISSION FACTOR RESULTS (µG/M²/H) FROM LAWRENCE BERKELEY NATIONAL LABORATORIES CHAMBER TESTING (May 27, 2010) (attached as Exhibit 41 and cited as "Ex. 41, Draft Emission Results") (providing a key to the Matheson Memo sample numbers).

[73]  Ex. 40, Matheson Memo, at 41 (showing USG's hydrogen sulfide emissions at 3.99 µg-S/m2/h and Temple-Inland Inc.'s  sulfur dioxide emissions at 4.99 µg-S/m2/h)

[74]  *See* CONSUMER PROT. SAFETY BD., CPSC IDENTIFIES MANUFACTURERS OF PROBLEM DRYWALL MADE IN CHINA, RELEASE NO. 10-243 (May 25, 2010) (attached as Exhibit 42 and cited as "Ex. 42, CPSC Release").

[75]  *Id.*

[76]  Ex. 33, Davis Tr. 111:18-112:2; 131:3-19; 132:16-24, 149:5-13; Ex. 34, Chaparro Tr. 167:25-168:14; Ex. 35, Winslow Tr. 196:11-197:6; Ex. 36, Rogers Tr. 70:5-7.

Wood Nation offer any testimony that it had received complaints about BNBM PLC drywall.[77]
Davis and EAC specifically advised the CPSC that they had received no complaints.[78]  The
CPSC tested BNBM PLC drywall purchased by EAC and Davis and confirmed that it was not
defective.[79]  In fact, Davis even testified that BNBM PLC's drywall "is better material than the
one we produce in the United States."[80]

The plaintiffs have offered no expert reports showing that BNBM PLC drywall was
defective.  The only PSC expert who has testified about the sulfur content of any drywall is Lori
Streit.  But Streit's report, written well prior to the CPSC investigation, shows test results for
Taishan drywall and provides no results identified as testing of BNBM PLC drywall; she
extrapolates from the testing of Taishan samples blunderbuss conclusions about "Chinese
drywall" and "Chinese-manufactured drywall."[81]  Streit does not identify any specific testing or
analysis of BNBM PLC drywall, and she has not provided the results of any brand-by-brand
testing or comparisons, if she performed any.  She relied on over a dozen papers and reports, but
none reflect that their authors tested BNBM PLC drywall (the only brand identified in the reports
Streit relied upon is Knauf).[82]  Streit's flawed generalizations were exposed by the CPSC testing,
which demonstrated enormous differences between emissions from different samples of drywall
manufactured in China.[83]  The plaintiffs have conceded they performed no testing that found

---

[77]  *Cf.* Ex. 37, Hannam Tr. 81:4-14.

[78]  Ex. 33, Davis Tr. 126:13-23; 131:3-132:24; Ex. 34, Chaparo Tr. 166:11-168:7.

[79]  Ex. 34, Chaparro Tr. 164:14-165:2.

[80]  *Id.* 165:8-9.

[81]  *Germano et al. v. Taishan Gypsum Co., et al.* (09-6687), Plaintiffs' Trial Ex. P1. 2023,
Expert Report of Dr. Lori Streit, Ph.D. (Dec. 28, 2009), at 8-11 & App. III.

[82]  *See id.* at 8-9, 13.

[83]  *See* Ex. 42, CPSC Release.

BNBM PLC drywall defective.[84]  As the Department of Housing and Urban Development

reported to Congress, "not all drywall imported from China is problematic."[85]  And "[b]ased on

information from the CPSC, a problem is associated with about 43 percent of drywall imported

from China."[86]  The BNBM PLC manufactured drywall tested by the CPSC was not in the

defective minority.

### 2.     Nobody In Louisiana or Virginia Claims Injury From BNBM PLC Drywall

No profile forms have been submitted by Virginia or Louisiana plaintiffs claiming that

they have been injured by drywall manufactured or sold by BNBM PLC.  On April 3, 2015,

BrownGreer produced 23,057 plaintiff profile forms.[87]  In addition, on April 30, 2015

BrownGreer served an excel spreadsheet containing a summary of supplemental profile form

data for 3,736 plaintiffs; on May 1, 2015, the PSC  served 496 supplemental profile forms in

PDF format; and on May 6, 2015, BrownGreer produced 1,806 additional documents, which

primarily consisted of supplemental profile forms and inspection reports.[88]  Finally, on October

---

[84]   BNBM PLC sought discovery of all documents relating to the testing of BNBM PLC drywall.  The plaintiffs have answered that the "request seeks information in the public domain and in Court records, such as reports from the Consumer Product Safety Commission and expert opinions."  *See* Pls.' Resp. to Beijing New Building Materials Public Limited Company and Beijing New Building Materials (Group) Co., Ltd.'s First Req. for Produc. from Pls., dated April 27, 2015, Resp. to Req. No. 2; *see also* Resp. to Req. No 4. (Plaintiff's complete Responses are attached as Exhibit 43.)

[85]   U.S. DEP'T OF HOUS. &  URBAN DEV., STUDY OF THE POSSIBLE EFFECT OF PROBLEM DRYWALL PRESENCE ON FORECLOSURES, REPORT TO CONGRESS, 4 (July 17, 2012) (attached as Exhibit 44 and cited as "Ex. 44,  HUD Report").

[86]   *Id.* at 9 (internal footnote omitted).

[87]   June 8, 2015, Supplemental Declaration of Carolyn F. Taylor in Support of the Federal Rule of Evidence 1006 Summary of Property Owners Identifying BNBM or Dragon Brand Drywall, marked by BNBM PLC and BNBM Group as Defendants' Exhibit 28 at the June 9, 2015 damages hearing before the Court, ¶ 3.  (A copy of Ms. Taylor's supplemental declaration and its attachment is attached as Exhibit 45 and cited as "Ex. 45, Taylor Supp. Decl.")

[88] *Id.* ¶¶ 11-13

20, 2015, the PSC served an additional 229 profile forms on Defendants' Liaison Counsel, Harry Rosenberg.  The original 23,057 profile forms, and all of the supplemental forms and reports produced by the plaintiffs, have been reviewed, and out of all these claims only 69—less than one quarter of one percent of all forms—used the words "BNBM," "Dragon" or "Beijing" when identifying the manufacturer of the drywall found in their homes (regardless of whether they are even class members)—and none of the 69 identified any testing of that drywall.[89]

### E.   Taishan Is Not An Agent of BNBM PLC

There is no evidence that Taishan (or anybody else) acted as BNBM PLC's agent in Virginia, Louisiana, Florida or anywhere else.  BNBM PLC did not authorize Taishan to act as its agent or vice versa.[90]  Taishan has never sold goods for BNBM PLC or otherwise acted as its agent.[91]  BNBM PLC has never "served as an agent for Taishan Gypsum or its predecessors in the United States."[92]  Taishan and BNBM PLC manufacture different grades of drywall, in different factories, under different brands.[93]  The drywall sold by BNBM PLC to American purchasers in 2005 and 2006 was made only by BNBM PLC.[94]  Taishan does not contract for BNBM PLC or fulfill BNBM PLC's contracts and vice versa.[95]  BNBM PLC does not market its

---

[89]   *Id*. ¶ 17, Exhibit 1 to Taylor Supp. Decl.; Ex. 64, Oct. 20, 2015 Suppl. Profile Forms Identifying BNBM PLC Drywall, Faber, F. 0001-0007, Jagat, H. 0001-0004, Ryan, F. 0001-0004 (attached as Ex. 64 and cited as Oct. 20, 2015 "Ex. 64, Suppl. Profile Forms")."

[90]   Ex. 2, Chen Tr. 600:18-601:17.

[91]   *See id*.; *see also* Ex. 25, Cai Decl. 10(a)-(e).

[92]   Ex. 4, Jia 2011 & 2012 Tr. 608:9-12; Ex. 2, Chen Tr. 600:18-25.

[93]   Ex. 23, CNBM PLC Global Offering, ALRMH-CNBM00000082, -0083, -0121; Ex. 2, Chen Tr. 600:9-25; Ex. 4, Jia. 2011 & 2012 Tr. 582:8-21, 615:4-15.

[94]   *See* Ex. 25, Cai Decl. ¶ 10(a)-(f), (11).

[95]   Ex. 2, Chen Tr. 600:18-601:17.

Dragon Brand board jointly with Taishan's wallboard.[96] "It has never been the case" that BNBM PLC "marketed itself at any point as part of the Taihe Group."[97] "[They] have completely independent sales, completely independent marketing promotional works."[98] Therefore "representatives of Taishan were never in attendance" at BNBM PLC's marketing promotional meetings, including Chairman Jia.[99]

### F.    Taishan Is Not an Alter Ego of BNBM PLC

#### 1.    Taishan Is a Successful and Autonomous Company

Prior to BNBM PLC first investing in 2005, Taishan had a 58.4% share of the Chinese low-cost drywall market, was the largest producer of gypsum board in China in terms of production capacity, and made RMB 58,000,000 in net profits.[100] The Taishan management team in place when BNBM PLC first acquired its shares largely continues in place today, reflecting Taishan's operational autonomy.[101] Indeed, Taishan's management team has shown remarkable stability. In addition to Chairman and General Manager Jia, three of six deputy general managers in 2008 had been deputy general managers in 2002, well before the recapitalization.[102] Taishan also continues to maintain separate offices and manufacturing facilities, as described below. Notwithstanding the addition of the BNBM PLC nominated

---

[96]   *See id.* 595:19-596:2.

[97]   Ex. 4, Jia 2011 & 2012 Tr. 190:5-8.

[98]   Ex. 38, Wang Tr. 229:10-12.

[99]   *Id.* 229:7-19.

[100]   Ex. 23, CNBM PLC Global Offering, at ALRMH-CNBM00000082; *see also* Ex. 11, Deal Decl., Table 18.

[101]   *See* Ex. 65, Taishan's 2002 Board Resolution, Ex. 66, Taishan's 2008 Board resolution.

[102]   Ex. 65, Taishan's 2002 Board Resolution; Ex. 66 Taishan's 2008 Board Resolution.

directors, the secretary of the Taishan board in 2008 held the same position in 2002.[103]

Chairman Jia has the strong incentive, in the form of his 5% equity ownership, to run Taishan in

Taishan's interest, regardless of the interest of BNBM PLC, and has the managerial authority to

do so.  Through their 14% stock ownership position in Taishan, the other managers and

employees also share a powerful incentive to advance Taishan's own economic interests,

regardless of the interests of BNBM PLC. [104]



.[105]                                                                      [106] By

contrast, BNBM PLC's revenue was about 2.789 billion yuan.[107]

BNBM PLC's margin, while robust, was 17%.[108]

　　　As can be expected when an acquired subsidiary, partially owned by a public company,

has retained its own management and business lines and is not only profitable but out-performing

the parent, Taishan is an autonomous, decision-making subsidiary and profit center for BNBM

PLC and the CNBM business group of companies as a whole.[109]  Each "company is entitled to

make its own decisions on the items related to the production and operation of the company."[110]

Because significant decisions such as major capital improvement projects require majority

---

[103]  *Id.*

[104]  Ex. 12, Gordon Decl. ¶ 47.  Originally held by Anxin Investment Trading Co., which in 2008 was renamed Shandong Taihe Building Materials Co., Ltd.

[105]  *Id.* ¶ 55-59.

[106]  *Id.* Figure 1.

[107]  *Id*. Figure 3.

[108]  Ex. 11, Deal Decl., Table 18.

[109]  Ex. 12, Gordon Decl. ¶¶ 55-63.

[110]  Ex. 38, Wang Tr. 161:14-16.

stockholder approval,[111] BNBM PLC reviews and approves such decisions.[112]  At least since

BNBM PLC's acquisition of its interest in Taishan, Taishan has complied with all corporate

legal requirements under Chinese law, including shareholder and board of directors meetings and

obtaining corporate authorizations for major transactions.[113]  Taishan conducts periodic meetings

of the board of directors and stockholders, and obtains required corporate authorizations for

major transactions.[114]  BNBM PLC also complies with all corporate governance requirements.

### 2.    There Is No Commingling Between the Companies

#### a.    *There Is No Financial Commingling*

Taishan is not undercapitalized.  Taishan had net profits of RMB 1,020,505,550 in 2014

and RMB 978,569,269 in 2013.[115]  At least from the time BNBM PLC acquired its interest in

Taishan, Taishan has been adequately capitalized and has had sufficient funding for its

operations.[116]  BNBM PLC does not provide financing for Taishan's operations by providing

---

[111]   *See* Ex. 10, Taishan Articles of Incorporation, Articles 45, 47, 48.

[112]   Ex. 2, Chen Tr. 349:10-19.

[113]   Ex. 67, Declaration of Yu Chen, dated April 16, 2015 ¶11 (attached as Ex. 67 and cited as
"Ex. 67, Chen Decl.").

[114]   *Id.*; *see, e.g.*, Ex. 65, Taishan's 2002 Board Resolution ; Ex. 13, Taishan's June 2007 Board
Resolution, Ex. 24, Taishan's May 20, 2008 Board Resolution; Ex. 72, March 24, 2005
Resolution of Taishan's Shareholders, TG025887-5888 (attached here as Ex. 72 and cited as Ex.
72, Taishan's March 2005 Shareholder Resolution); Ex. 73, April 15, 2006, Resolution of
Taishan's Shareholders, TG00258889-5891 (attached here as Ex. 73 and cited as "Ex. 73
Taishan's April 2006 Shareholder Resolution"); Ex. 74, May 18 2009 General Meeting of
Taishan's Shareholders, TG0020795-0798 (attached as Ex. 74 and cited as "Ex. 74, 2009
General Meeting of Taishan's Shareholders").

[115]   Ex. 1, 2014 BNBM PLC Annual Report at BNBMPLC0003185; Ex. 48, 2013 BNBM PLC
Annual Report, BNBMPLC0002743-2944, at BNBMPLC0002762 (attached as Exhibit 48 and
cited as "Ex. 48, 2013 BNBM PLC Annual Report").

[116]   Ex. 3, Yang Decl. ¶ 9; Ex. 49, BNBM PLC Annual Report 2006, BNBMPLC0000490-0605,
at BNBMPLC0000516-0517 (relevant excerpts attached as Exhibit 49 and cited as "Ex. 49, 2006
BNBM PLC Annual Report"); Ex. 50, BNBM PLC Annual Report 2007, BNBMPLC0000722-
0841, at BNBMPLC0000749 (relevant excerpts attached as Exhibit 50 and cited as "Ex. 50,
2007 BNBM PLC Annual Report"); Ex. 51, BNBM PLC Annual Report 2008,

non-repayable funds.[117]  BNBM PLC has never paid debts for Taishan.[118]  BNBM PLC has

never paid Taishan's expenses.[119]  BNBM PLC has never paid Taishan's losses.[120]

    Consistent with the parental responsibility for capital allocation and credit enhancement,

BNBM PLC guaranties working capital lines for Taishan.[121]  BNBM PLC has never had to

perform on these guarantees.  They are made to lower the price for Taishan to obtain working

capital lines to "satisfy the normal production and operational needs of Taishan Gypsum."[122]

The loan guarantees are arms-length transactions; for some of the guaranties BNBM PLC

charges fees to Taishan, and seeks counter-guarantees from other stockholders.[123]  As Chairman

Wang has explained, "the guaranty that BNBM provides to Taishan Gypsum, BNBM would

require the other shareholders of Taishan Gypsum to provide guaranty to BNBM.  The

---

BNBMPLC0000961-1080, at BNBMPLC0000992 (relevant excerpts are attached as Exhibit 51
and cited as "Ex. 51, 2008 BNBM PLC Annual Report"); Ex. 52, BNBM PLC Annual Report
2009, BNBMPLC0001229-1378, at BNBMPLC0001255-1256 (relevant excerpts attached as
Exhibit 52 and cited as "Ex. 52, 2009 BNBM PLC Annual Report"); Ex. 53, BNBM PLC
Annual Report 2010, BNBMPLC0001542-1695, at BNBMPLC0001569 (relevant excerpts
attached as Exhibit 53 and cited as "Ex. 53, 2010 BNBM PLC Annual Report"); Ex. 54, BNBM
PLC Annual Report 2011, BNBMPLC0001862-2018, at BNBMPLC0001888 (relevant excerpts
attached as Exhibit 54 and cited as "Ex. 54, 2010 BNBM PLC Annual Report"); Ex. 55, BNBM
PLC Annual Report 2012, BNBMPLC0002273-2480, at BNBMPLC0002290-2291 (relevant
excerpts attached as Exhibit 55 and cited as "Ex. 55, 2012 BNBM PLC Annual Report"); Ex. 1,
2014 BNBM PLC Annual Report at BNBMPLC0003185; Ex. 48, 2013 BNBM PLC Annual
Report at BNBMPLC0002762.

[117]  Ex. 3, Yang Decl. ¶ 10.

[118]  *Id.* ¶ 18.

[119]  Ex. 2, Chen Tr. 600:3-8.

[120]  *Id.* 600:6-8.

[121]  *See generally* "Draft Public Announcement on the External Guarantees for the Year 2015,"
PSC deposition Exhibit 322-R (Partial Translation of BNBMPLC-E-0112095-0112112.  A copy
is attached as Exhibit 56 and cited as "Ex. 56, 2015 External Guarantees."

[122]  Ex. 56, 2015 External Guarantees, at BNBMPLC-E-0112095.

[123]  Ex. 4, Jia 2011 & 2012 Tr. 607:9-23.

responsibility of guaranty is in proportion to [] the percentage that the shareholder holds in Taishan Gypsum."[124]

It is a standard practice in China for a bank to require loan guarantees, and they are typically provided by the biggest shareholder.[125]  It also is a routine practice in the United States. As the studies performed by Analysis Group confirm, such major American companies as Federal Express and the Walt Disney Company guarantee the loans of their subsidiaries.[126]

Taishan's finances, financial controls, and accounting functions operate independently of BNBM PLC.[127]  Each company is responsible for its own debts, liabilities, and losses.[128] Taishan has never "entered into an agreement with BNBM whereby" it "shared the liabilities of anything with PLC."[129]  BNBM PLC and Taishan manage and use their assets separately.[130] They have never had joint bank accounts.[131]  Neither can access the other's bank accounts.[132] There have been no undocumented transfers of funds.[133]  They have never had common accounting books.[134]

---

[124]  Ex. 38, Wang Tr. 388:2-8.

[125]  *Id.* 363:1-9, 364:17-366:1.

[126]  Ex. 12, Gordon Decl. ¶¶ 67, 70, 76.

[127]  Ex. 3, Yang Decl. ¶¶ 11-16; Ex. 2, Chen Tr., 596:3-11.

[128]  Ex. 2, Chen Tr. 600:3-8.

[129]  Ex. 4, Jia. 2011 & 2012 Tr. 609:5-12.

[130]  Ex. 2, Chen Tr. 596:16-20.

[131]  Ex. 3, Yang Decl. ¶ 11.

[132]  *Id.* ¶¶ 14, 15.

[133]  *Id.* ¶ 13.

[134]  *Id.* ¶ 12.

Each prepares independent financial statements, separately audited by a third-party accounting firm that is independent of Taishan and BNBM PLC.[135]  Each prepares and files separate tax returns.[136]  "The CPA for BNBM is an employee of BNBM.  And the CPA for Taishan Gypsum is the employee of Taishan Gypsum."[137]

As required by Chinese law and accounting standards, Taishan's results are consolidated into BNBM PLC's financial statements.  But of course consolidated financial statements for majority owned subsidiaries are also required by the U.S. Financial Accounting Standards Board and the Accounting Review Board, and there are consolidated financial statements across the Fortune 100.[138]  With the exception of the required consolidated reporting, BNBM PLC and Taishan each have separate, audited financial statements.[139]

Taishan makes its own decisions on whether and to what extent to pay dividends.[140]  Its articles of incorporation specify the waterfall for the distribution of its after-tax profits, with dividends only considered after the company has first made up for the prior year's loss and set aside a 10% statutory surplus fund, a 5-10% statutory public welfare fund and discretionary

---

[135]   *Id.* ¶¶ 16, 17.

[136]   *Id.* ¶ 16.

[137]   Ex. 38, Wang Tr. 124:2-4.

[138]   Ex. 38, Wang Tr. 122:25-123:8;  Ex. 47, Accounting Standards for Business Enterprises No. 33, promulgated by the Chinese Ministry of Finance and effective from February 15, 2006 until July 1, 2014, required that a "parent company shall prepare consolidated financial statements" and that consolidated financials ordinarily shall be filed when a "parent company owns more than half of the voting rights of the invested unit directly" (attached as Ex. 47 cited as "Ex. 47, Accounting Standard No. 33").  With respect to the American standard, *see* Financial Accounting Standards Board, FAS 94: "Consolidation of All Majority-Owned Subsidiaries, an amendment of ARB No. 51, with related amendments of APB Opinion No. 18 and ARB No. 43, Chapter 12."

[139]   Ex. 3, Yang Decl. ¶¶ 16, 17.

[140]   Ex. 4, Jia 2011 & 2012 Tr. 199 :13-200:-10.

surplus funds.[141]  "The Company shall not make dividend distribution to the shareholder[s]

before making up for the Company's loss and setting aside the statutory surplus fund."[142]

"Taishan Gypsum's dividends is [sic] decided by Taishan's board of directors and shareholder

meeting.  It is not decided by BNBM."[143]

### b.     There Is No Operational Commingling

Taishan and BNBM PLC are managed and operated independently.  The headquarters

and plants for BNBM PLC are in a different Chinese province than Taishan's offices and

operations, roughly 330 hundred miles apart.[144]  With the exception of Mr. Jia's formerly-held,

honorary position at BNBM PLC, BNBM PLC and Taishan have never had overlapping

executives or employees.[145]  BNBM PLC and Taishan have never shared employees.[146]

Production staff, secretarial staff, sales and marketing staff, procurement staff and management

---

[141]   *See* Ex. 10, Taishan Articles of Incorporation, Art. 119.

[142]   *Id.*

[143]   Ex. 38, Wang Tr. 268:25-269:3; *see also* Ex. 4, Jia 2011 & 2012 Tr.199:17-21.  Of course, the decision to pay dividends is presumed to be made in the best interest of the company and its stockholders, absent evidence to the contrary.  *See Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 722 (Del. 1971) ("The motives for causing the declaration of dividends are immaterial unless the plaintiff can show that the dividend payments resulted from improper motives and amounted to waste.").

[144]   Ex. 38, Wang Tr. 151:16-19 (describing distance as "very far away, a few hundred[] kilometers").

[145]   Ex. 2, Chen Tr. 595:19-596:2, 596:12-15, 599:14-20; Ex. 57, Transcript of the deposition of Gang Che, 30(b)(6) witness for Taishan Gypsum Co., Ltd., taken June 2-3, 2015, 196:23-197:2 (relevant pages attached as Exhibit 57 and cited as "Ex. 57, Che Tr.").  The sole exception is Taishan Chairman Tongchun Jia, who held the title of "Deputy General Manager" at BNBM PLC from August, 2005 until September, 2012, but who had no actual duties or responsibilities in that position.  Ex. 2, Chen Tr. 599:14-600:2; Ex. 4, Jia. 2011 & 2012 Tr. 880:17-23, 935:8-936:3; Ex. 57, Gang Che Tr. 97:4-16.  Mr. Jia did "not receive[] a penny for the position" that I have with BNBM as its deputy general manager."  Ex 4, Jia Tr. 935:12-16; *see also* 880:17-23.  "My salary is all from TG."  *Id.* 935:16-17.

[146]   Ex. 4, Jia. 2011 & 2012 Tr. 190:21-24.

teams are independent.[147]  Nor does Taishan have overlapping executives or directors with

BNBM PLC's parent company CNBM PLC.[148]  No employees, officers or directors of Taishan

are paid by BNBM PLC with the exception of one-time bonus paid to Mr. Jia in 2012 for the

exceptional performance of Taishan.[149]  BNBM PLC does not determine the remuneration for

Taishan employees or officers.[150]

      The employees of Taishan and BNBM PLC do not use the same telephone and fax

numbers, email addresses or business cards.  Taishan does not contract for BNBM PLC or fulfill

BNBM PLC's contracts or vice versa.[151]  BNBM PLC and Taishan maintain separate

manufacturing facilities and separate offices.[152]  They do not "share any plants, factories or

production lines."[153]  Each manufactures products under its own brand names.[154]  Taishan has

not purchased or rented its equipment, factory or offices from BNBM PLC, and has never sold

equipment, factories or offices to BNBM PLC.  BNBM PLC has not sold equipment to Taishan,

or vice versa.  BNBM PLC has never sold or rented a factory to Taishan.  BNBM PLC and

Taishan have never used or leased each other's production lines, equipment or facilities.  After

six months of jurisdictional discovery, there is no evidence to the contrary.

---

[147]  Ex. 57, Che Tr. 196:17-197:14.

[148]  *Id.* 197:4-14.

[149]  Ex. 4, Jia 2011 & 2012 Tr. 195:20-24; Ex. 75, Award for Significant Business Contributors from Taishan Gypsum and BNBM Homes, BNBMPLC0007291R-7291R (attached as Ex. 75 and cited as "Ex. 75, Business Contributors Award").

[150]  Ex. 38, Wang Tr. 247:8-17.

[151]  Ex. 2, Chen Tr. 601:2-24.

[152]  *Id*. 600:9-16.

[153]  Ex. 4, Jia. 2011 & 2012 Tr. 196:10-19 ; Ex 2 Chen Tr. 600:12-16.

[154]  *Id*. 198:20-199:8.

Although both companies focus on domestic Chinese drywall sales, each pursues different segments of the drywall market. BNBM PLC competes at the higher end of the market, in what the China Association of Decorative Building Materials calls the "first category."[155] First category "producers generally produced gypsum boards of superior physical characteristics, including higher durability and better dimensional consistency and stability," and this board is typically sold for the "construction and renovation of offices, hotels, sports facilities and other national key projects."[156] Taishan operates in the "second category" of producers, which makes less expensive lines of drywall marketed "to a broader base of cost-conscious customers," typically for use in residences.[157]

To the extent their market segments have overlapped, BNBM PLC has been an "active competitor" of Taishan. In fact, BNBM PLC introduced a new lower cost "BNBM" brand drywall a decade ago that Taishan believes was introduced specifically to target market segments previously dominated by Taishan and other producers.[158]

In dealings with American companies, BNBM PLC has never held itself out to be Taishan or vice versa. To the contrary, the PSC has deposed American companies that know Taishan and BNBM PLC, and the American witnesses testified that they understood them to be separate companies. For example, when Stepan Company Gypsum, a manufacturer of a product used in making drywall, was planning sales pitches to BNBM PLC and Taishan, one of Stepan's employees explained to his manager that the BNBM PLC and Taishan are entirely different companies:

---

[155]   Ex. 23, CNBM PLC Global Offering, at ALRMH-CNBM00000082.

[156]   *Id*. at ALRMH-CNBM00000121.

[157]   *Id.*

[158]   Ex. 4, Jia. 2011 & 2012 Tr. 615:4-617:10; *see also* Ex. 38, Wang Tr. 133:11-12 (discussing competition between the companies).

The relationship of Taishan and BNBM is that BNBM controls Taishan's share holding but two company [sic] runs separately. They are competitors in the market. Taishan knows nothing about BNBM and PABCO's cooperation.

Most of potential is from Taishan. BNBM only has 13 lines and all other lines are from Taishan with a 50% China market share. Taishan can be our focus.[159]

At the 30(b)(6) deposition of Stepan Company on September 4, 2015, its officer Brian Boyle testified that Stepan understood this statement to be correct.[160] Stepan treated Taishan and BNBM as two separate entities and two separate accounts; generated separate customer visit reports for the two companies; created separate call reports for the two companies; and understood at all times that BNBM PLC and Taishan were two separate business entities.[161] Similarly, U.S. company PABCO Building Products, which also makes a component used in manufacturing drywall, understood that BNBM and Taishan were separately managed and operated companies.[162] Richard Hannam, the principal of Wood Nation which imported BNBM PLC drywall in 2005 and 2006, testified that he understood that BNBM PLC and Taishan were distinct companies offering different products.[163]

---

[159] Ex. 58, email from Jinliang Dou to Mike Maretich, May 17, 2014, produced by Stepan Gypsum and bearing Stepan bates number STP 004081 (attached as Exhibit 58 and cited as "Ex. 58, Dou Email").

[160] Ex. 59, Transcript of deposition of Brian Boyle, 30(b)(6) witness for Stepan Company, Sept. 4, 2015, at 215:16-216:10 (relevant pages attached as Exhibit 59 and cited as "Ex. 59, Boyle Tr.").

[161] *Id.* 213:8-214:1.

[162] Ex. 60, Transcript of deposition of Emil Kopilovich, 30(b)(6) witness for PABCO, August 19, 2015, at 88:15-89:2 (relevant pages attached as exhibit 60 and cited as "Ex. 60, Kopilovich Tr.").

[163] Ex. 61, Transcript of deposition of Richard Hannam, 30(b)(6) witness for Wood Nation, Inc., February 14, 2011, at 17:25-18:11, 44:17-24, 48:24-49:11 (relevant pages attached as Exhibit 61 and cited as "Ex. 61, Hannam Tr.").

### 3. BNBM PLC And Taishan Are Part of a Business Group, Not Divisions of a Single Business

BNBM PLC, Taishan, and their affiliates, parents and subsidiaries are not divisions of a single corporate enterprise.  They are autonomous business units within a "business group."  As Professor Gordon explains, this type of corporate family structure is well known in most parts of the world.[164]  It is not used in the United States, solely for tax reasons, but is closely analogous to American conglomerates, like Walt Disney, Post Holdings, and Federal Express, to name but a few.[165]  The business group structure facilitates strategic allocation of capital within the group while leaving operational autonomy at the individual company level.[166]  This structure can promote efficiency as well as protection of minority shareholder rights, since operational decisions are made by managers of the operating subsidiaries, who will be close to the business issues at hand as well as more directly accountable to the minority shareholders.[167]  The business group structure is considered to be particularly valuable where  external capital markets are constrained, and therefore the "internal capital market" is important in both the allocation of capital and managerial monitoring.[168]  This allows subsidiaries to utilize within-group sources of funds and loan guarantees while allowing the parent firm to evaluate within-group managerial performance using quantitative metrics.[169]

The business group structure also serves the value of diversification, as separate subsidiaries within the group can conduct their businesses in different markets, as is the case

---

[164]   Ex. 12, Gordon Decl. ¶ 16.

[165]   *Id.*  ¶¶ 16-31, 67-85.

[166]   *Id.* ¶ 16.

[167]   *Id*.

[168]   *Id*. ¶ 17.

[169]   *Id*.

with BNBM PLC and Taishan.[170]  This diversified structure provides stability within the group and better protects a consistent earnings stream for the top level parent.[171]  Often diversification within business groups focuses on a specific industry sector, with subsidiaries specializing in specific segments of the industry.[172]  This diversification strategy permits the group to direct financial resources towards higher growth opportunities within the sector, while buffering the cash flow effects of cyclical shifts in demand within the sector.[173]

None of these characteristics of a typical business group, including the CNBM Group of companies, provides a basis for the alter ego finding that the plaintiffs seek here.  We have seen no case in any jurisdiction that imposes alter ego liability based solely on the existence of a business group or conglomerate-type structure with the normal relationship attributes they entail.

## **ARGUMENT**

Given the facts concerning BNBM PLC's limited sales to the United States, the contractual negotiation and performance that occurred entirely in China, and the quality of BNBM PLC's own drywall, it is unsurprising that the plaintiffs have focused on trying to conjure jurisdiction and liability from a contention that BNBM PLC is an alter ego of Taishan.  The PSC's pursuit of another deep pocket is unavailing.  As described above, the record after the Court ordered jurisdictional discovery amply demonstrates corporate separateness, respect for corporate formalities, absence of commingling, lack of involvement by BNBM PLC in Taishan's daily operations, and active management by Taishan's officers.  BNBM PLC invested in an already successful company in 2005, never changed Taishan's original management, and

---

[170]   *Id.* ¶ 18.

[171]   *Id.*

[172]   *Id.*

[173]   *Id.*

Taishan has performed successfully every year since, with net profits of over a billion yuan last year.

The PSC's response is to claim that commonplace incidents of parent-subsidiary relations justify imputing Taishan's contacts to BNBM PLC: director nominees on the subsidiary board, inter-company guarantees to lower interest rates on bank lines of credit, approval of major capital expenditures by the subsidiary and consolidated financial statements in annual reports of the parent. It is hard to imagine similar grounds for piercing the veil being advanced against American corporate affiliates. Belaboring ordinary facts of corporate existence is not a substitute for showing fraudulent abuse of corporate separateness, excessive control or dominance, commingling, undercapitalization, nonfunctioning subsidiary management or other indicia that one company is an alter ego of another. Not one of the factors found in the alter ego jurisprudence from courts across the country exists here.

## I.     PLAINTIFFS' CONTENTIONS ABOUT ALTER EGO ARE MERITLESS

In the course of jurisdictional discovery and in  motion practice over the last six months, the PSC has emphasized a number of facts which they contend provide a basis to find that BNBM PLC is an alter ego of Taishan. Typically, the plaintiffs lump these unrelated facts together, without much explanation of why they support an alter ego finding. Their hope appears to be that taken together and viewed from afar the Court will assume there must be something to the argument; where there is smoke there must be fire, as it were.

Sometimes, however, where there is smoke, there is a smoke machine. None of the facts trumpeted by the plaintiffs' evidence a lack of corporate separateness or indicate that BNBM PLC is an alter ego of Taishan. On this Rule 12(b)(2) motion, the plaintiffs bear the burden of proving that BNBM PLC is an alter ego of Taishan. *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 836 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014); *In re*

35

*Chinese-Manufactured Drywall Prod. Liab. Litig.*, 753 F.3d 521 (5th Cir. 2014) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985) (citing *Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1165, 1174 (5th Cir. 1985))).  After a defendant makes a showing of the inapplicability of the long-arm statute, "the plaintiff is required to substantiate the jurisdictional allegations in the complaint by affidavits or other competent proof, and not merely reiterate the factual allegations in the complaint."  *Polskie Linie Oceaniczne v. Seasafe Transport A/S*, 795 F.2d 968, 972 (11th Cir. 1986).  "When there is an evidentiary hearing" the plaintiffs are "held to the higher standard" of establishing personal jurisdiction by "preponderance of the evidence."  *In re Chinese Manufactured Drywall,* 894 F. Supp. 2d at 836.  The plaintiffs cannot meet this burden of proof, as can be seen by considering in turn each of the facts the plaintiffs rely upon to claim that Taishan and BNBM PLC are alter egos.

### A.   BNBM PLC's Ability to Nominate Three of Taishan's Five Directors Is Not Grounds to Pierce the Veil

The plaintiffs emphasize that the Taishan articles of incorporation permit BNBM PLC to nominate three of the five directors of Taishan.  The plaintiffs contend that as "the controlling shareholder of Taishan, BNBM PLC deliberates, votes, and approves actions by Taishan," such as "to invest in its wholly-owned subsidiaries."[174]  The plaintiffs also critique that as "the controlling shareholder of Taishan, BNBM PLC reviews and approves Taishan resolutions for Taishan to provide security for its wholly-controlled subsidiaries."[175]

---

[174]   Affidavit of Russ M. Herman in Support of the Plaintiffs' Steering Committee's Response in Opposition to the Motion to Clarify the Contempt Order and the Joinder of BNBM Group and BNBM PLC in the Motion, July 28, 2015, Rec. Doc. 19354-1, at ¶¶ 41-43 (cited as "Herman 7/28/15 Aff., Rec. Doc. 19354-1").

[175]   *Id.* ¶ 43.

Essentially, the plaintiffs contend that because BNBM PLC has voting power on Taishan's board and reviews and takes positions on some of the actions of its subsidiary, it is an alter ego of that subsidiary. But a majority owner having voting power on the board of directors, as well as the ability to consider and voice views on the investment decisions of the company it has invested in, are ordinary incidents of majority stock ownership.[176] As Professor Gordon and Analysis Group have explained, 98% of the Standard & Poors 1500 have at least one subsidiary; 95% of those subsidiaries are majority owned; and 64% of the companies that have subsidiaries with boards of directors have subsidiary board seats held by C-level executives or board members of the direct or ultimate parent.[177] It would defy reason to believe that these parent companies do not express their views on significant actions being considered by their subsidiaries, particularly when those actions involve investment and capital allocation. It is a standard attribute of both American conglomerates like Walt Disney and Federal Express, described in detail in case studies by Analysis Group, and foreign business groups like the CNBM business group, that they control investment and capital allocation within the corporate family.[178] That, after all, is one of the principal benefits to the subsidiaries in a conglomerate or a business group—access to capital and access to credit enhancement and cheaper capital—and that access depends on the parent's control.[179]

Finding, then, that the corporate veil can be pierced when a parent has board voting power and input on the capital allocation decisions of its subsidiaries would allow the corporate veil to be pierced with respect to the majority of the S & P 1500. It would also be contrary to:

---

[176]   Ex. 12, Gordon Decl. ¶ 4.

[177]   Ex. 11, Deal Decl. ¶¶ 17-18, 22 and Table 1.

[178]   Ex. 12, Gordon Decl. ¶¶ 66-78.

[179]   *Id.* ¶¶ 17-19.

> "[H]ornbook law that the "exercise of the 'control' which stock
> ownership gives to the stockholders . . . will not create liability
> beyond the assets of the subsidiary."  That 'control' "includes the
> election of directors, the making of by-laws and the doing of all
> other acts incident to the legal status of stockholders.  Nor will a
> duplication of some or all of the directors or executive officers be
> fatal."

*United States v. Bestfoods,* 524 U.S. 51, 61-62 (1998) (quoting William O. Douglas & Carrol M.

Shanks, *Insulation from Liability Through Subsidiary Corporations,* 39 YALE L.J. 193, 196

(1929)).  In the context of parental oversight over a subsidiary, "monitoring of the subsidiary's

performance, supervision of the subsidiary's finance and capital budget decisions and

articulation of general policies and procedures, should not give rise to direct liability."  *Id.* at 72

(internal quotation marks omitted).  "Indeed, parents 'are almost always active participants in the

affairs of an owned corporation . . . in the usual case, the exercise of such control over a

subsidiary's actions in entirely permissible.'"  *William v. AES Corp.*, 28 F. Supp. 3d 553, 563

(E.D. Va. 2014) (quoting *South Carolina Elec. & Gas Co. v. UGI Utils., Inc.*, No. 2:06-cv-2627–

CWH, 2012 WL 1432543, at *60 n.21 (D.S.C. Apr. 11, 2012) (quoting *Esmark, Inc. v. NLRB*,

887 F.2d 739, 759 (7th Cir. 1989))).

### B.    That BNBM PLC Officers and Directors Are Also Directors of Taishan Is Not Grounds to Pierce the Veil

The plaintiffs claim that BNBM PLC is an alter ego of Taishan because some of the

officers and directors of BNBM PLC are directors of Taishan, or have positions elsewhere in the

CNBM business group.  There is no authority for this position, and if it were the law many of

America's biggest companies would be alter egos.  After all, 778 firms in the S & P 1500—

64%—have subsidiary board seats held by C-level executives or board members of the direct or

ultimate parent.[180]  That is no reason to pierce the corporate veil.  "[O]ne-hundred percent ownership and identity of directors and officers are, even together, an insufficient basis for applying the alter ego theory to pierce the corporate veil."  *Gardemal v. Westin Hotel Co.*, 186 F.3d 588, 594 (5th Cir. 1999) (affirming dismissal for lack of personal jurisdiction).  That two corporations might be "closely tied through stock ownership, shared officers, financing arrangements, and the like" evinces "nothing more than a typical corporate relationship between a parent and subsidiary."  *Id.* at 593.  In *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 218-19 (5th Cir. 2000), the Fifth Circuit affirmed a dismissal for lack of personal jurisdiction despite the fact that the parent owned 100% of the subsidiary's stock and that a "number of individuals appear to have been directors or officers for multiple [defendant] companies."

Moreover, the Taishan articles of incorporation require its directors to "faithfully carry out his duties and to safeguard the Company's interests, and when "there is a conflict between his personal interest and the interest of the Company and the shareholder[s], the code of conduct shall be to maintain the maximum interest of the Company and the shareholder[s]."[181]  The testimony is uncontradicted that the Taishan directors nominated by BNBM PLC make decisions as directors with Taishan's best interests in mind, and recuse themselves from decisions involving BNBM PLC.  As Chairman Wang testified, when "I attend Taishan Gypsum board of directors meeting as Taishan Gypsum's director, I'm only Taishan Gypsum's director, not somebody who holds any position in BNBM."[182]  The Taishan board meetings do not address the company's relationship with BNBM PLC.[183]  If "the issues in the board of directors of Taishan

---

[180]   Ex. 12, Gordon Decl. ¶ 88.

[181]   Ex. 10, Articles of Incorporation, Art. 61.

[182]   Ex. 38, Wang Tr. 281:18-24; 291:4-12.

[183]   *Id.* 282:19-21.

Gypsum had anything to do with its transactions with BNBM, these three directors who were nominated by BNBM and elected by Taishan Gypsum's shareholder meeting would recuse themselves from voting."[184]  Of course, the same principles apply under American law.

"In general, 'directors are entitled to a presumption that they were faithful to their fiduciary duties,' and the putative plaintiff bears the burden of overcoming this presumption." *Freedman v. Redstone*, 753 F.3d 416, 424 (3d Cir. 2014) (quoting *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1048 (Del. 2014)).  "It is presumed that when directors of a corporation make a business decision they act on an informed basis, in good faith and with the honest belief that the action taken was in the best interest of the company." *Strong ex rel. Tidewater, Inc. v. Taylor*, 877 F. Supp. 2d 433, 442 (E.D. La. 2012).  Virginia law also presumes that "when making business decisions, the directors of a corporation act on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the corporation." *Poth v. Russey*, 281 F. Supp. 2d 814, 826 (E.D. Va. 2003); *see also Quadrant Structured Prods. Co. v. Vertin*, 102 A.3d 155, 183 (Del. Ch. 2014) (Delaware law "presumes that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action was in the best interests of the company") (internal quotation marks omitted).  In the absence of any evidence to the contrary— and there is none—the directors of Taishan are entitled to the legal presumption that they have executed their duties properly, in good faith and in the best interests of Taishan.

### C.     BNBM PLC's Guaranties of Taishan's Operating Capital Lines Are Not Grounds to Pierce the Veil

The plaintiffs contend that Taishan and BNBM PLC are alter egos because BNBM PLC has served as a guarantor for Taishan's working lines of credit and loans.  The plaintiffs have

---

[184]  *Id.* 284:2-7; *see also* 291:14-25; Ex. 2, Chen Tr. 354:3-15.

produced an FRE 1006 summary chart which, they claim, reflects "BNBM Guarantees to/investments in Taishan Gypsum."[185]  Without conceding the accuracy of the summary chart, it is a striking example of the plaintiffs trying to dramatize completely ordinary parent-subsidiary relationships, whether in China or the United States.  A principal impetus for conglomerate corporate families and business groups is to enable parents to provide credit enhancement to their subsidiaries.[186]  "According to the custom of Chinese bank and the rules of Chinese bank, when a company goes to a bank for a loan, a guaranty is needed.  Usually the guaranty would be provided by the shareholder, the biggest controlling shareholder of that company . . . ."[187]  Consistent with the parental responsibility for capital allocation and credit enhancement, BNBM PLC guarantees working capital lines for Taishan.[188]

The BNBM PLC guarantees lower the price for Taishan to obtain working capital lines to "satisfy the normal production and operational needs of Taishan Gypsum."[189]  The guarantees are arms-length transactions; BNBM PLC charges fees to Taishan for its loan guarantees and seeks counter-guarantees from other stockholders.  As Chairman Jia explained about a transaction in June 2007:

> We had to obtain a loan from the bank.  The bank required a guarantor when we applied [for] the loan.  BNBM provided the guarantee for us, but they were very stingy.  They asked for a guarantee fee.  BNBM, therefore, had been taking our guarantee

---

[185]   Ex. 68, BNBM Guarantees to/investments in Taishan Gypsum - FRE 1006 Summary Chart, Plaintiffs' Deposition Exhibit 162, B, taken July 8-11, 2015 (attached as Exhibit 68 and cited as "Ex. 68, FRE 1006 Summary Chart").

[186]   Ex. 12, Gordon Decl. ¶ 19.

[187]   Ex. 38, Wang Tr. 363:3-8; see also 364:17-366:1.

[188]   *See, e.g.*, Ex. 56, 2015 External Guarantees.

[189]   *Id.* BNBMPLC-E-0112097.

> fee throughout the entire period.  And they also required a reverse
> guarantee from other shareholders.[190]

As Chairman Wang has explained, for "the guaranty that BNBM provides to Taishan Gypsum

BNBM would require the other shareholders of Taishan Gypsum to provide guaranty to BNBM.

The responsibility of guaranty is in proportion to [] the percentage that the shareholder holds in

Taishan Gypsum."[191]

Downstream loan guaranties are a beneficial fact of life among American corporate

families.  Walt Disney Company, Post Holdings and Zimmer-Biomet, just three examples of

billion dollar companies assessed by Analysis Group, provide credit enhancement to subsidiaries

by guaranteeing outside bank financing.[192]  The plaintiffs include in their FRE 1006 exhibit a

████████████████████████████, but such loans in a corporate family are common,

appropriate, and an important benefit that assists the subsidiary in maintaining autonomy by

providing an additional source of capital.  For instance, Walt Disney Company's 2014 Annual

Report reflects that Walt Disney provided $1.6 billion in inter-company loans to a Disneyland

subsidiary that was used to repay bank debt, to provide lines of credit totaling $444 million, and

to convert some inter-corporate loans into equity.[193]  Such activity is to be encouraged, not recast

as a reason to pierce corporate separateness.  "A parent corporation may be directly involved in

financing and macro-management of its subsidiaries, however, without exposing itself to a

charge that each subsidiary is merely its alter ego."  *Doe v. Unocal Corp.*, 248 F.3d 915, 927 (9th

Cir. 2001)(collecting cases).

---

[190]  Ex. 4, Jia. 2011 & 2012 Tr. 607:9-23; *see also* Ex. 13, Taishan's June 2007 Board Resolution.

[191]  Ex. 38, Wang Tr. 387-88.

[192]  Ex. 11, Deal Decl. ¶¶ 101-109, 113-116.

[193]  Ex. 12, Gordon Decl. ¶ 70 (citing The Walt Disney Co., Annual Report (Form 10-K), at 85 (Nov. 19, 2014)).

D.   **BNBM PLC's 2006 Transactions in Connection With the Acquisition of the Donglian Investment Shares of Taishan Are Not Grounds to Pierce the Veil**

The plaintiffs contend that BNBM PLC's August 28, 2006 purchase of all the equity of Donglian Investment & Trading Limited Company ("Donglian"), and its contemporaneous loan to Tai'an State-Owned Asset Management Company ("Tai'an") in return for a pledge of Tai'an's shares in Taishan, is a basis to find that Taishan is an alter ego of BNBM PLC.[194]   The loan of RMB 50 million (about $7.87 million USD) had a one year term.[195]   It carried interest at the benchmark one year lending rate from the People's Bank of China plus 10%.[196]

Plaintiffs have articulated two reasons why the loan to Tai'an, in their view, supports an alter ego finding.   Plaintiffs claim that the loan "further cemented BNBM PLC's control over Taishan" and that it demonstrates "closeness of BNBM PLC's relationships with the other shareholders of Taishan."[197]

But in reality the loan, pledge and temporary restrictions on the shares "cemented" nothing.   The loan was repaid according to its terms, and Tai'an's pledge of the shares and the restrictions on transfer were thereupon released.[198]   Tai'an maintained voting rights on its shares at all times.[199]   The plaintiffs have provided no evidence that the loan lacked commercially

---

[194]   May 8, 2012 affidavit of Russ Herman in Support of the PSC's Global Statement of Facts in Opposition to Taishan's Jurisdictional Motions, at ¶¶ 151-53, 156 (Rec. Doc. 14215-3); Herman 7/28/15 Aff. ¶¶ 38-39.

[195]   Ex. 69, CNBM PLC Public Announcement, "Connected Transaction Acquisition of the Entire Equity Interest in Taian Donglian Investment Trading Company Limited" and "Connected Transaction Provision of Financial Assistance to Taian State Owned Asset Management Company," August 28, 2006, marked as Herman Affidavit Exhibit 134, at Q000010 (attached as Exhibit 69 and cited as "Ex. 69, Aug. 28, 2006 Announcement").

[196]   *Id.* at Q000011.

[197]   Herman 7/28/15 Aff. ¶¶ 39-40.

[198]   Ex. 4, Jia. 2011 & 2012 Tr. 597:17-599:23.

[199]   *Id.*

reasonable terms, and with an interest rate exceeding 16%, we can perhaps understand why.[200]
Nor have the plaintiffs provided evidence that the loan had anything to do with drywall sales to
the United States because it did not.  The plaintiffs' attempts that the loan shows the "closeness"
of the relationship between the stockholders,[201] whatever that means, is neither self-evident nor a
basis to pierce the corporate veil.  Shareholders of many corporations often will have business
dealings with each other, particularly in closely held corporations.  But what do the relationships
of the shareholders have to do with whether the corporation itself is a fiction?  We are aware of
no authority that a corporation will be found to be an alter ego of one of its shareholders because
that shareholder has made a loan to another shareholder.

### E.     BNBM PLC's Corporate Reports and Financial Statements Do Not Support Piercing the Veil

To support imputing Taishan's contacts to BNBM PLC, the plaintiffs have relied on
statements in BNBM PLC's annual reports, a prospectus, regulatory announcements,
consolidated financial statements, and the like.  When the documents are reviewed, however,
they reflect nothing more than the usual relationship between a parent corporation and its
subsidiary.  For instance, the plaintiffs rely on BNBM PLC's consolidated financials that include
rolled-up numbers from Taishan.  But consolidated financials are required by Chinese
accounting rules at a majority level of stock ownership.  Accounting Standards for Business
Enterprises No. 33, promulgated by the Ministry of Finance on February 15, 2006 and effective
from February 15, 2006 until July 1, 2014, requires that a "parent company shall prepare
consolidated financial statements" and that consolidated financials ordinarily shall be filed when

---

[200]   Ex. 69, Aug. 28, 2006 Announcement, at Q000011.

[201]   Herman 7/28/15 Aff. ¶¶ 39-40.

a "parent company owns more than half of the voting rights of the invested unit directly."[202]  Of course American accounting rules provide the identical standard for consolidated financial statements.[203]  In addition to the required consolidated financials, BNBM PLC and Taishan prepare separate, audited financial statements.[204]

The plaintiffs have claimed that annual summary reports show that BNBM PLC and Taishan are treated as a single entity, but in fact the opposite is true.  For example, the BNBM PLC 2009 summary statement discusses brand awards won by BNBM PLC and Taishan while expressly referring to them as separate companies.[205]  The annual summary reports for BNBM PLC repeatedly emphasize BNBM PLC's compliance with Chinese Company Law by, among other things, ensuring the appointment of independent directors and establishing systems to continually evaluate all senior executives.[206]  The BNBM PLC annual summary reports make clear that BNBM PLC's ownership interest in Taishan is limited to 65%, short of the supermajority needed to exercise complete control.[207]  Each company looks to its own interests; it is not "all for one and one for all."[208]  There is nothing that would meet the plaintiffs' burden

---

[202]  Ex. 47, Accounting Standards No. 33, at Articles 47.

[203]   Financial Accounting Standards Board, FAS 94: "Consolidation of All Majority-Owned Subsidiaries, an amendment of ARB No. 51, with related amendments of APB Opinion No. 18 and ARB No. 43, Chapter 12."

[204] Ex. 3, Yang Decl. ¶¶ 16, 17; *see, e.g.*, Ex. 46, Taishan's 2013 Audited Financials, TG-040615-0026285-TG-040615-0026377 (attached

[205]  *See* Ex. 70, Overseas Regulatory Announcement, Summary of the 2008 Annual Report of BNBM Group, Exhibit 140 to Herman Affidavit, Q000091-0154, at Q000117 (attached as Exhibit 70 and cited as "Ex. 70, 2009 Annual Report Summary").

[206]  *See, e.g.*, Ex. 50, 2007 BNBM PLC Annual Report, at BNBMPLC0000738-0741; Ex. 51, 2008 BNBM PLC Annual Report, at BNBMPLC0000978- 0982; Ex. 52,2009 BNBM PLC Annual Report, at BNBMPLC0001245-1248.

[207]  *See, e.g.*, Ex. 50, 2007 BNBM PLC Annual Report, at BNBMPLC0000749.

[208]  Ex. 2, Chen Tr. 209:10-17.

on this motion of showing that as a stockholder of a corporation, BNBM PLC abused "the corporate independent status or the limited liability of shareholders" (Company Law, Art. 20(3)) or commingled the corporate identities of the companies.

Moreover, references to subsidiaries in an annual report are not grounds to pierce the veil. References "in the parent's annual report to subsidiaries or chains of subsidiaries as divisions of the parent company do not establish the existence of an alter ego relationship." *Doe v. Unocal Corp.*, 248 F.3d 915, 928 (9th Cir. 2001).

**F.      Chairman Jia's Ownership Interest in Taishan and Titular Position at BNBM PLC Are Not Grounds to Pierce the Veil**

Plaintiffs have argued that Chairman Jia's 5% ownership interest in Taishan and his former board seat and unpaid, non-operational title at BNBM PLC provide a basis for finding Taishan to be an alter ego of BNBM PLC.  In fact the opposite is the case:  Mr. Jia has at all times retained the power to manage Taishan, just as he had before BNBM PLC invested in Taishan.[209]  These facts reflect Taishan's autonomy within the business group.  Mr. Jia retains the power, and his five percent equity stake gives him the incentive to run Taishan in Taishan's interest, without regard to BNBM PLC's interest.

With respect to Mr. Jia's position on BNBM PLC's board, he was elected at the time of BNBM PLC's investment.[210]  It was a reflection that Taishan would have a voice in BNBM PLC's board, even as BNBM PLC obtained a voice in Taishan's.  Once again, this is no different than common practice in major American companies after the acquisition of a significant new subsidiary.  For example, after Walt Disney acquired Pixar, Steve Jobs was placed on the board

---

[209] *See* Ex. 65, Taishan's 2002 Board Resolution; Ex. 66, Taishan's May 20, 2008 Board Resolution.

[210]   Ex. 2, Chen Tr. 599:14-600:2; Ex. 4, Jia. 2011 & 2012 Tr. 880:17-23, 935:8-936:3.

of Walt Disney.[211]  Similarly, when Zimmer acquired Biomet, Michael Michaelson, a Biomet

director, became a member of the Zimmer board.[212]  This issue is a red herring.

Ultimately, Mr. Jia left the BNBM PLC board in September 2012, after concerns were

raised that his ownership stake in Taishan and incentives as a Taishan equity holder could create

the perception of a conflict with his director's duties to BNBM PLC.  Whether Mr. Jia left

because of a company audit or a change in Chinese law,[213] his departure confirms that his former

position on the board is not a reason to pierce the veil.  There is also zero evidence that Mr. Jia's

role as a BNBM PLC director had anything to do with BNBM PLC's or Taishan's sales of

drywall to U.S. customers in 2005 or 2006.

### G.    Even if BNBM PLC Had a Role in Taishan's 2014 Decision to Withdraw From the MDL, That Would Not Be Grounds to Pierce the Veil

The plaintiffs assert that BNBM PLC made, or played a role in making, the decision for

Taishan to withdraw from this litigation in 2014.  Even if that allegation were correct it would

not justify an alter ego finding, as the claims in this case concern sales of allegedly defective

drywall—not the conduct of later filed litigation.  As the Court recently observed in its ruling on

the hearing of CNBM's FSIA motion, "the PSC's claims are based on allegedly defective

drywall (and not on Taishan's decision regarding the debtor examination)."[214]  The 2014

withdrawal cannot be used for the purpose of imputing Taishan's 2005 and 2006 contacts with

---

[211]   Merissa Marr & Nick Wingfield, *Disney Sets $7.4 Billion Pixar Deal:  Jobs to Take Seat on Board and Play Integral Role In Setting Creative Course*, Wall Street Journal, January 25, 2006, http://www.wsj.com/articles/SB113813740822755125/.

[212]   ZIMMER COMPLETES COMBINATION WITH BIOMET: ZIMMER BIOMET TO BE A LEADING MUSCULOSKELETAL INNOVATOR, http://www.prnewswire.com/news-releases/zimmer-completes-combination-with-biomet-300104244.html (last visited October 21, 2015).

[213]   *See* Ex. 38, Wang Tr. 265:20-266:24.

[214]   Order and Reasons (Oct. 15, 2015) Rec. Doc. 19612.

the forum states to BNBM PLC.  An alter ego finding, after all, requires the plaintiffs to show

that BNBM PLC was Taishan's alter ego "at the time of the wrongful act."  *Fluorine On Call,*

*Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861-62 (5th Cir. 2004) ("It is illogical, for example, to hold

a parent liable for controlling another corporation's debts when it had no control at the time the

debts were incurred.").  "Under general corporate law principles, the relevant inquiry into the

control issue focuses on the relationship between the parent and the subsidiary *at the time the*

*acts complained of took place*."  *United States v. Wallace*, 961 F. Supp. 969, 979 (N.D. Tex.

1996) (emphasis in original).  Each of the class action complaints alleges causes of action based

on sales of allegedly defective drywall, not on the conduct of later-filed litigation.

BNBM PLC did not have a role in the withdrawal decision, as witness after witness has

testified.  The PSC has now had the opportunity to depose representatives from Taishan, BNBM

PLC, BNBM Group and the CNBM entities, and the record is clear:  Taishan, and Taishan alone,

made the decision to withdraw from this litigation.  As BNBM PLC's Chairman Wang Bing has

explained, Taishan's decision to withdraw from the litigation was not discussed by the board of

directors of BNBM PLC:

> Q.  As a member of the board of directors of BNBM, did you ever
> attend the board of directors meeting where the lawsuit against
> Taishan was discussed?
>
> A.  BNBM's board meeting had never had any issues or topics
> regarding the lawsuit, including topics regarding the lawsuits
> against Taishan Gypsum.  But according to the law, BNBM itself
> was also listed as a defendant, and the situation of the lawsuit
> against Taishan Gypsum all requires regular information and
> public announcements, and they all need to be disclosed in
> BNBM's annual report as public announcements.
>
> Q.  Was this lawsuit or any portion of the lawsuit discussed at a
> BNBM board of directors meeting?

A.  No.[215]

Rather, the decision to withdraw was made by Taishan management.[216]  As Taishan's Chairman

Jia has explained, only after deciding to withdraw did Taishan's management bring the decision

to Taishan's board for approval.[217]   Gang Che, the 30(b)(6) witness for Taishan, testified:

> Q.  But did you discuss at all with Chairman Jia the decision of
> Taishan not to appear in July of 2014for its debtor examination in
> the Germano case?
>
> A.   We did discuss.
>
> Q.   Can you please tell me the substance of your discussions?
>
> A.   Under the advice and instruction of the attorney, I confirmed
> with Chairman Jia who made the decision of not participating,
> which was to withdraw from the lawsuit.  So the result I had
> received was -- the decision of withdraw from the case was made
> by Taishan's board of directors.
>
> Q.   Is that what Chairman Jia told you?
>
> A.   Correct.[218]

BNBM PLC thereafter made the public announcement required by Chinese law regarding

the decision made by its subsidiary.[219]

Finally, any role BNBM PLC could conceivably have played in Taishan's withdrawal

from the litigation did not involve abusing the corporate form or corporate separateness to

commit fraud or malfeasance.  BNBM PLC did not purchase a minority interest in Taishan in

---

[215]   Ex. 38, Wang Tr. 306:3-19.

[216]   Ex. 71, Transcript of deposition of Tongchun Jia, September 17-18, 2015, at 188:22-189:3
(relevant pages of the transcript are attached as Exhibit 71 and cited as " Ex. 71 Jia 2015 Tr.").

[217]   *Id.*

[218]   Ex. 57, Gang Che Tr. 266:13-267:1; *see also* 193:25-194:9, 194:13-21, 266:13-24, 267:7-
268:1.

[219] Ex. 78, BNBM PLC Public Announcement in Relation to the Developments of the Gypsum
Board Litigation dated July 18, 2014 (No. 2014-030), ALRMH-CNBM000051108R-5111R
(attached as Exhibit 78 cited as "BNBM PLC's July 18, 2014 Public Announcement").

2005, and a majority interest on August 28, 2006—after all the sales of drywall at issue—so that it could export drywall to the United States.  That was never part of either's business model and never a significant part of either's business.  BNBM PLC certainly did not purchase a majority interest in Taishan in 2005 and 2006 so that it could push Taishan to withdraw from the litigation in 2014.  Taishan's withdrawal from the litigation in 2014 did not utilize or abuse corporate separateness in any way.

Finding a corporation "to be simply the 'alter ego' of the shareholder . . . usually involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation."  *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1168 (La. 1991).  "To meet this element, 'fraud or injustice [must] be found in the defendants' use of the corporate form' itself." *In re Opus E., LLC*, 528 B.R. 30, 65 (Bankr. D. Del. 2015) (quoting *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F. Supp. 260, 269 (D. Del. 1989)) (alteration in original).  It is not enough that a parent and subsidiary jointly make a decision with adverse or unjust consequences, if that decision does not involve a misuse of corporate separateness.  *See First Inv. Corp. of the Marshall Islands v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 755 (5th Cir. 2012) ("For First Investment to meet this prong it is not sufficient for it merely to point out an injustice that would result from an adverse decision.  Rather, First Investment must show how the PRC manipulated FSIGC's corporate form to perpetuate a fraud or injustice"); *see also, e.g., Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006) (the "Government's exercise of its sovereign powers may have constituted a wrong to Bridas, but it was not a wrong based on misuse of the corporate organizational form").  "The "mere fact" that a subsidiary "has committed infringement of [a party's] intellectual property rights is not enough to satisfy the second prong of the piercing of the corporate veil standard.  The second prong of the standard

requires a showing that the major purpose, if not the sole purpose, of the subservient corporation was illegitimate." *Major League Baseball Promotion Corp. v. Colour-Tex, Inc.*, 729 F. Supp. 1035, 1047 n.5 (D.N.J. 1990) (piercing corporate veil "requires a showing that the major purpose, if not the sole purpose, of the subservient corporation was illegitimate"). If Taishan's decision to withdraw from the litigation was wrong, it certainly was not a "wrong based on misuse of the corporate organizational form," and therefore cannot be used to pierce the veil to assert jurisdiction over BNBM PLC.

## II. THE ACTUAL RELATIONSHIP BETWEEN BNBM PLC AND TAISHAN DOES NOT MAKE THEM ALTER EGOS UNDER ANY CONCEIVABLY APPLICABLE LAW

As demonstrated above, the facts that plaintiffs emphasize simply are not germane to whether an alter ego relationship exists between BNBM PLC and Taishan. The facts that have been found germane in the jurisprudence conclusively demonstrate that BNBM PLC and Taishan have an ordinary parent-subsidiary relationship displaying none of the "extraordinary" and "exceptional" circumstances needed to overcome the presumption of corporate separateness. BNBM PLC and Taishan are separate corporate entities, and their relationship is utterly unlike the relationship between Taishan and TTP that the Court found relevant in its 2012 decision. *Chinese Manufactured Drywall*, 894 F. Supp. 2d at 867-74. BNBM PLC and Taishan are not alter egos no matter which jurisdiction's law the Court applies.

### A. Chinese Company Law Should Apply to the Veil Piercing Analysis

MDL Courts apply the choice-of-law rules of the state of transferor forum, that is, the law of the state in which the action was filed. *In re Vioxx Prod. Liability Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007). Whether corporations are alter egos is an issue relating to the internal affairs of the corporations. Similarly, whether an agency relationship exists between affiliates

based on "evidence of a lack of true corporate separateness between the two companies" is an

issue relating to the internal affairs of the corporations.  The law of the state of incorporation of

the alleged alter ego corporation determines allegations of alter ego.  *Taurus IP, LLC v.

DaimlerChrysler Corp.*, 726 F.3d 1306, 1336 (Fed. Cir. 2013); *Kalb, Voorhis & Co. v. Am. Fin.

Corp.*, 8 F.3d 130, 132 (2d Cir. 1993).  "The local law of the state of incorporation will be

applied to determine the existence and extent of a shareholder's liability to the corporation for

assessments or contributions and to its creditors for corporate debts."  Restatement (Second) of

Conflict of Laws, §§ 307, 302(2) (1971).  The principle that the law of the state of incorporation

governs the alter ego analysis applies with equal force to companies incorporated outside the

United States.  *See, e.g.*, *Davaco, Inc. v. AZ3, Inc.*, Civil Action No. 3:07-cv-803, 2008 WL

2243382, at *1 (N.D. Tex. May 30, 2008) (applying Quebec law to decide jurisdictional alter ego

dispute); *Mega Tech Int'l Corp. v. Al-Saghyir Establishment*, No. 96 CIV 8711, 1999 WL

269896, at *8 (S.D.N.Y. May 3, 1999) (applying Saudi Arabia law to decide jurisdictional alter

ego dispute).

　　　The foreign corporation statute of Virginia "does not authorize the Commonwealth to

regulate the organization or internal affairs of a foreign corporation authorized to transact

business in the Commonwealth."  Va. Code § 13.1-923(C).  Similarly, Louisiana's statute

provides that except "where express reference is made to foreign corporations, this Chapter does

not apply to foreign corporations."  LA. R.S. § 1-1702.  Likewise, Florida's statute provides that

the "act does not authorize this state to regulate the organization or internal affairs of a foreign

corporation authorized to transact business in this state."  Fla. Stat. § 607.1505(3).

　　　Here, the Court must apply the law of the state of incorporation to conduct a veil piercing

or alter ego analysis.  *See, e.g., Mukamal v. Bakes*, 378 F. App'x 890, 897 (11th Cir. 2010)

(Florida); *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 646-47 (5th Cir. 2002)

(Louisiana); *McCarthy v. Giron*, No. 1:13-CV-01559-GBL, 2014 WL 2696660, at *11 (E.D. Va.

June 6, 2014).  Accordingly, any veil piercing or alter ego analysis related to BNBM PLC must

be conducted pursuant to the law of China.  BNBM PLC respectfully submits that the Court

erred when it previously applied Louisiana law to determine that BNBM PLC and Taishan

constitute a "single business enterprise."[220]

### B.      Taishan Is Not BNBM PLC's Alter Ego Under Chinese Law

Companies formed under the laws of China are subject to the country's Company Law,

which regulates the formation, operation and governance of all Chinese corporations.[221]  Under

the Company Law, a corporation may establish subsidiary companies that are recognized as

separate and distinct legal entities.  Company Law, Article 14.  As in the United States, a parent

corporation and its subsidiary are distinct legal entities even when they share common officers,

managers, and directors.[222]  Similarly, the parent corporation—by virtue of its ownership and/or

voting shares—can exert some level of control over the subsidiary, while still retaining its status

as a separate entity.

In 2005, the Company Law was amended to provide that a company's separate legal

personality only may be disregarded when a shareholder of a company "evades the payment of

its debts by abusing the independent status of juridical person or the shareholder's limited

---

[220]   Rec. Doc. . 18028 at 12-20.

[221]   Ex. 76, Declaration of George Washington University Law School Professor Donald Clarke, submitted by the CNBM defendants in connection with their jurisdictional motion, Rec. Doc. 19179-9, at. ¶ 11 (attached as Exhibit 76 cited as "Clarke Decl.").   China's first Company Law was passed in 1993 and became effective in 1994.  It underwent a major revision in 2005, including the addition of Article 20 discussed herein.  *Id.* ¶ 11 n.3.  The current version can be found at http://www.saic.gov.cn/zcfg/fl/xxb/201206/t20120612_126990.html.  As amended, the statute is cited herein as the "Company Law."

[222]   *See id.*

liabilities, and thus seriously damages the interest of any creditor."  Company Law Article 20.

There is no evidence of such abuse here.[223]  As we describe in detail above, Taishan is a highly

successful company that has grown dramatically over the past decade.  There is no evidence that

BNBM PLC received any money from Taishan except in the form of dividends, which of course

were also received by the other shareholders of Taishan and which were proper, proportionate

and obviously have not hindered Taishan's growth.  Ironically, BNBM PLC's guarantees of

Taishan's borrowings hammered on by the PSC actually evidence BNBM PLC's efforts to

strengthen the capitalization, business growth and profitability of Taishan.

In addition to the Company Law, another source of norms regarding veil-piercing and

alter-ego theory is found in "Regulations on Several Issues Concerning the Adjudication of

Cases Involving Company Disputes (I) (Consultation Draft)," issued by the Supreme People's

Court in November 2003 (the "Consultation Draft").  *See* Chao Xi, *Piercing the Corporate Veil*

*in China: How Did We Get There?*, 5 J. BUS. L. 413, 418-20 (2011) (citing and discussing the

Consultation Draft).  Although never formally adopted by the Supreme People's Court, the

Consultation Draft appears to guide adjudication in relevant cases.  *Id.* at 420.  Article 51 sets

forth an "alter ego"[224] theory, providing that shareholders should bear liability for corporate

---

[223]   The declarations previously filed by the PSC's three Chinese legal experts with respect to
the Taishan cases discuss at length veil-piercing under Article 34 of the Company Law.  *See*
Affidavit of Liu Junhai, date May 4, 2012 (Rec. Doc. 14203-1), ¶¶ 57-70 (the "Junhai Aff.");
Declaration of Bing Cheng, dated May 3, 2012 (Rec. Doc. 14203-2), ¶¶18-23 (the "Cheng
Decl."); Declaration of James V. Feinerman, dated May 7, 2012 (Rec. Doc. 14203-3), ¶¶ 12, 13
& 16-23 (the "Feinerman Decl.").  But Article 34 is expressly limited to "one-person limited
liability companies," Junhai Aff. ¶ 47, which is the term used to describe a wholly owned
subsidiary.  *Id.* ¶ 37.  Taishan is not a one-person limited liability company; BNBM PLC only
owns sixty-five percent of Taishan, with the remainder composed of independent, non-public
stockholders.  Ex. 3, Yang Decl. ¶ 8; Ex. 4, Jia. 2011 & 2012 Tr. 596:11-597:16.

[224]   Technically, Xi does not use the term "alter ego."  But the purpose of the principles he
explores are clear: to determine whether "alter ego" liability, as we understand the term, should
be imposed.

debts when the company and the shareholders have no separate existence. Separate existence is to be deemed absent when:

> a. corporate income is not separate from shareholder income, resulting in commingling of accounts;

> b. the company and its controlling shareholders commingle business funds and personal funds, and continuously use the same accounts; or

> c. there is a constant commingling of corporate business and personal business, and the company's business transactions are under the complete control of the controlling shareholders.

*See id.* at 419.

Authority from the Supreme People's Court, including authority predating the 2005 amendment to the Company Law, shows how these principles are applied. In a 2004 decision, the Supreme People's Court opined that corporate separateness will be disregarded:

> When a shareholder behind the veil of limited liability abuses corporate personality and harms the interests of the company and its creditors, it means in fact that the shareholder divests assets in order to evade debts and establishes a new company with such assets, or the shareholder withdraws his capital investment in a company after it is established, or the shareholder commingles the assets of the company with those of his own, or the shareholder interferes with the business of the company in such an arbitrary manner that the company has no independent operation of its own.

*US Minmetals Inc. v Xiamen United Development (Group) Co.*, 12 Sup. People's Ct. Gaz. 24 (Sup. People's Ct. 2004) (China).[225]

Similarly, in a 2003 case the Supreme People's Court found alter ego liability based on the following evidence of commingling of corporate personalities:

> The subsidiary's chairman and staff were simultaneously employees of the parent. Funds that the subsidiary had secured from banks were used to finance a project of the parent company. The parent was also in possession of various chops belonging to

---

[225] An English translation is available at 7 Chinese Journal of International Law 257 (2008).

> the subsidiary, which, under Chinese law, in effect enabled the
> parent to enter into transactions that legally bind the subsidiary.
> The SPC opined that personnel, assets and business operation of
> the subsidiary were commingled with those of the parent and that
> the parent company exercised excessive control over the subsidiary
> by keeping the latter's chops.  On the basis of these circumstances,
> the court decided to lift the corporate veil and hold the parent
> company liable for the debts of its subsidiary.

*See* Xi, 5 J. BUS. L. at 422 (discussing *China Construction Bank, Chengdu Municipality Jinhe*

*Sub-Branch v. Sichuan Communications Services Co., Sichuan Jinzu Industrial Co. and Sichuan*

*Financial Leasing Joint Stock Co.*, Judgment No. 111 (2003) of the Supreme People's Court,

Second Civil Division.  Xi provides a complete citation at n.48.).

In a 2008 decision, the Supreme People's Court found the corporate personalities of three

companies to be commingled when they all operated at the same address, used the same

telephone numbers, shared management and financial personnel, used bank loans to one

company to finance a project of another, jointly repaid loans made to one company, and used

revenue from one company to pay for office rentals, utility bills and salaries of all three.  *Id.* at

429-30 (discussing *China Cinda Asset Management Co., Chengdu Office v. Sichuan Tailai*

*Decoration Project Ltd. Co., Sichuan Tailai Real Estate Development Ltd. Co. and Sichuan*

*Tailai Entertainment Ltd. Co.,* 10 Sup. People's Ct. Gaz. 27 (Sup. People's Ct. 2008) (China)).

In 2013, the Supreme People's Court issued a case decision further elucidating the

standards for disregarding corporate separateness.  *China Great Wall Asset Management*

*Company, Shenyang Office v. New Northeast Electrical (Shenyang) High Pressure Insulated*

*Switch Co. Ltd. et al.*, Min Er Zhong Zi No. 66 (Sup. People's Court 2013) (China).[226]  After

rejecting a piercing claim under Article 20(3) of the Company Law, the court addressed liability

under a commingling theory.  "In deciding whether a company's corporate personality is

---

[226]   A copy of the opinion is attached as Exhibit 77 (cited as "Ex. 77, China Great Wall Case").

commingled with that of another, an overall analysis and judgment should be made on the basis

of whether there exists a commingling in areas such as finances, organization, and business

between the companies."[227]

> Financial commingling is an important element in testing whether commingling of corporate personality is present.  Its main external manifestations are companies' commingling in areas such as the place of business, main offices, production facilities, and finances.  Its essence is that financial commingling violates the basic principles of separateness of corporate property from shareholder property, the maintenance of corporate capital and the permanence of corporate capital, thus seriously damaging the material basis for the company's ability to repay external indebtedness.[228]

The court declined to find sufficient financial commingling to impose liability, despite

that assets formally in the name of one defendant were in fact controlled by another and some

defendants shared the same office.  The court then considered organizational commingling.  "Its

essence is that organizational commingling causes the company to be unable to form an

independent will that is based entirely on the company's own interests, such that the company

loses its independence and the basis for it to independently bear liability."[229]  The court found

that some overlapping of senior management personnel was insufficient to establish

organizational commingling.[230]

Lastly, the court analyzed business commingling:

> The main external manifestations of business commingling are matters such as the continuous commingling of business operations, business behavior, transactional methods, and price-setting between the company.  Its essence is that the commingling

---

[227]   Ex. 77, *China Great Wall*, at 15-16.

[228]   *Id.*

[229]   *Id.*

[230]   *Id.*

> of business leads to the company losing its operational autonomy
> and independent personality.[231]

There was insufficient evidence of business commingling, "even though the companies showed some overlaps in time and space with respect to place of operations, scope of business, appointment of senior management and other matters."[232]

There is no suggestion of such commingling or other abuse here. Rather, as described above, there is complete corporate separateness between Taishan and BNBM PLC. There has been no attempt to evade debts, abuse the independent status of the juridical person, or abuse the shareholder's limited liabilities. Taishan and BNBM PLC abide by all the governance requirements of Chinese law.[233] There has been no financial, operational or business commingling. As described in detail above, BNBM PLC invested in Taishan's 2005 recapitalization because it already was a successful drywall company that, with additional access to capital, could reach for the stars. The pre-recapitalization management team was retained and continues today; remarkably, the original general manager and three of six original deputy general managers remain. The businesses are located hundreds of miles apart, operate different manufacturing plants, share no employees or workplaces or equipment, and make different brands of drywall targeted at different sectors of the market. The finances of the two companies are equally distinct: separate books, bank accounts, accounting functions and accounting employees, with no evidence of any commingling at any point in time. No element required to pierce corporate separateness under Chinese law is present here. George Washington University

---

[231]   *Id.*

[232]   *Id.*

[233]   Ex. 67, Chen Decl., ¶ 11; *see also* Ex. 50, 2007 BNBM PLC Annual Report, at BNBMPLC0000738-0741; Ex. 51, 2008 BNBM PLC Annual Report, at BNBMPLC0000978-0982; Ex. 52,2009 BNBM PLC Annual Report, at BNBMPLC0001245-1248.

Professor Donald Clarke, who submitted his opinion in conjunction with CNBM's motion to dismiss has opined that he believes it is "highly unlikely that a Chinese Court would disregard the corporate separateness" of the defendants, including specifically BNBM PLC and Taishan:

> Each entity is separately organized in the People's Republic of China and to the best of my knowledge observes all of the requirements of corporate independence imposed by Chinese law. Although the Five Defendants are connected by virtue of shared investors, it is normal under Chinese law, as it is under U.S. law, for significant equity stakeholders to exercise influence over a company without for that reason being considered an alter ego of that company or being made liable for that company's debts. Even sole ownership, under Chinese law, is not enough to establish alter ego liability. Something more, and improper, must be shown. Further, the Five Defendants and the Drywall Entities do not appear to commingle finances or property, nor do they disregard corporate form in business transactions. Chinese law sets a high bar for disregarding of the corporate form, especially in firms that are directly or indirectly state-owned. Thus, plaintiffs bear a heavy burden of proof in seeking to make a related company liable for the debts of another under an alter ego theory.[234]

Even the declarations of plaintiffs' experts submitted in conjunction with the 2012 jurisdictional briefing support that under Chinese law BNBM PLC is not liable for Taishan's liabilities.[235] When "shareholders refrain themselves from abusing the corporate independent status or the limited liability of shareholders, they could enjoy their limited liability privilege."[236] The PSC's expert Dr. Junhai opines that the "common abuses of the corporate independent status or the limited liability of shareholders could be classified as undercapitalization and commingling of legal personalities between corporation and its shareholder."[237] By contrast here, Taishan is well capitalized. ███████████████████████

---

[234]  Ex. 76, Clarke Decl. ¶ 10.

[235]  Liu Junhai Aff. ¶¶ 44, 49-55; Feinerman Decl. ¶¶ 11, 15, 17.

[236]  Ex. 76, Clarke Decl. ¶ 51.

[237]  *Id.* ¶ 53.

██████████████████████████████████████████████

███████████████████████ In the absence of undercapitalization, commingling of finances, business operations or legal personalities, or any other abuse by BNBM PLC, according to the plaintiffs' own experts there is no reason to strip BNBM PLC of its limited liability privilege under Chinese law.  Moreover, as the plaintiffs' experts emphasize, the plaintiffs bear the burden of proof.[238]  An alter ego justification for asserting jurisdiction cannot be found here with respect to BNBM PLC when the plaintiffs bear the burden and there are no facts to support the required shareholder "abuse."

### C. Taishan Is Not BNBM PLC's Alter Ego Under the Laws of the Forum States

Even if this Court were to apply the law of the forum states, there is still no basis to impute Taishan's forum contacts to BNBM PLC as an alter ego.  Since well before *Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333 (1925), the formal separation of corporate entities prevented the exercise of jurisdiction over the parent corporation based on the contacts of the subsidiary.  Even when (in contrast to the autonomy of Taishan and lack of dominance by BNBM PLC here), a parent dominates the subsidiary "immediately and completely" and "exerts its control both commercially and financially in substantially the same way," if the "corporate separation, though perhaps merely formal," is "real" and "not pure fiction," jurisdiction cannot be exercised over the parent.  267 U.S. at 335-37.  The Fifth Circuit continues to apply *Cannon*.  As of 2004, the Fifth Circuit had followed *Cannon* in 85% of its alter ego jurisdictional opinions.  John A. Swain & Edwin E. Aguilar, *Piercing the Veil to Assert Personal Jurisdiction over Corporate Affiliates: An Empirical Study of the Cannon Doctrine*, 84 B.U. L. REV, 445, 472-73 (2004).

---

[238]  Ex. 76, Clarke Decl. ¶ 17; Cheng Decl. ¶ 25.

As the Court knows, under the *Cannon* doctrine the veil should only be pierced in instances of fraud, in instances of excessive domination or control where the subsidiary exists only to serve the parent, commingling of funds, undercapitalization or non-functioning subsidiary management. Courts most typically pierce the veil when a subsidiary is created for the purpose of effecting a fraud or the corporate separateness itself is used to perpetrate a fraud, typically a fraudulent transfer, siphoning the funds of an affiliate, or parking liabilities in the affiliate. To pierce the veil for fraud, there must be a misuse of corporate separateness to perpetrate the fraud. *First Inv. Corp. of the Marshall Islands v. Fuijan Mawea Shipbuilding, Ltd.*, 703 F. 3d 742, 755 (5th Cir. 2012); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006). "To meet this element, 'fraud or injustice [must] be found in the defendants' use of the corporate form' itself." *In re Opus E., LLC*, 528 B.R. 30, 65 (Bankr. D. Del. 2015) (alteration in original). The plaintiffs have presented no evidence that BNBM PLC has misused Taishan's corporate separateness in any way to perpetrate a fraud.

*None* of these factors are present here, as we have discussed above. The PSC has never alleged that BNBM PLC exploited corporate separateness to perpetrate a fraud. The same Taishan management that ran the company before BNBM PLC acquired any of its shares continues to manage that company to ever greater levels of profitability, proving beyond doubt that BNBM PLC does not excessively control or dominate Taishan. The funds of BNBM PLC and Taishan, and their accounting functions, are completely independent, which is why it is necessary for BNBM PLC to provide an independent guarantee of Taishan's borrowings and investments. ██████████████████████████████████████████

██ ██.[239] ███████████████████████████████████████████████████████████

---

[239]   Ex. 12, Gordon Decl. ¶¶ 51, 56.

███[240]  It is hard to imagine a more compelling example that Taishan is well capitalized. None of the core factors needed to pierce the veil are present here and the courts of Virginia, Louisiana and Florida would not conclude otherwise.

### 1.      Application of Virginia Law

Under Virginia law "a corporation is a legal entity entirely separate and distinct" from its shareholders. *Cheatle v. Rudd's Swimming Pool Supply Co.*, 360 S.E.2d 828, 831 (Va. 1987). This distinction "is a basic provision of statutory and common law and supports a vital economic policy underlying the whole corporate concept." *Id.*  The separate corporate forms are recognized even as between related corporations. *See, e.g.*, *United States Fire Ins. Co. v. Allied Towing Corp.*, 866 F.2d 828, 829 (4th Cir. 1992) ("The corporate veil, however, may not be pierced solely because of an overlap (or even identity) of corporate officers and directors.") (citing *Washington & Old Dominion Users Ass'n v. Washington & Old Dominion R.R.*, 155 S.E.2d 322, 325-26 (Va. 1967)).

Consistent with Virginia's recognition that related corporations are nonetheless separate legal persons, courts in the Commonwealth "have long presumed the institutional independence of related corporations, such as parent and subsidiary, when determining if one corporation's contacts with a forum can be the basis of a related corporation's contacts." *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *see also William v. AES Corp.*, 28 F. Supp. 3d 553, 563-65 (E.D. Va. 2014) (defendant with 56% equity interest in subsidiary, which exercised only the usual control of a parent over a subsidiary, was not an alter ego and contacts could not be imputed).  While BNBM PLC owns 65% of Taishan, even "[c]omplete ownership of a subsidiary that transacts business in the forum is, alone, insufficient to deem the parent

---

[240]   *Id.* ¶¶ 55-57.

company also present within the forum." *Colt Def. LLC v. Heckler & Koch Def., Inc.*, No. 2:04-cv-258, 2004 U.S. Dist. LEXIS 28690, at *51 (E.D. Va. Oct. 22, 2004) (citations omitted).

Overcoming the presumption against imputing contacts of a subsidiary to a corporate parent for the purposes of personal jurisdiction requires an affirmative showing that "the subsidiary acts as an agent or alter ego of the parent." *LTD Mgmt. Co. v. Holiday Hospitality Franchising, Inc.*, Civil Action No. 2:07-cv-530, 2008 WL 7281926, at *6 (E.D. Va. March 11, 2008); *see also PBM Prods. v. Mead Johnson Nutrition Co.*, No. 3:09-CV-269, 2009 WL 3175665, at *3-*4 (E.D. Va. Sept. 29, 2009); *Omega Homes, Inc. v. Citicorp Acceptance Co.*, 656 F. Supp. 393, 399 (W.D. Va. 1987). Virginia courts impute contacts only "if the plaintiffs' evidence demonstrates that the subsidiary is a fictitious shield erected by the parent to protect itself from liability." *Long*, 2011 WL 3903066, at *7. Typically the corporate veil may be pierced only where "the corporate form would otherwise be misused to accomplish certain wrongful purposes, most notably fraud, on the shareholder's behalf." *United States v. Bestfoods*, 524 U.S. at 63. Establishing an alter ego relationship requires showing that there is "such unity" between a corporation and its parent that "the separateness of the corporation has ceased." *William*, F. Supp. 3d at 62 (quoting 1 WILLIAM MEADE FLETCHER ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS, § 41.10). Factors considered include "whether the corporations maintain the necessary formalities, have separate books, have separate officers, directors, and employees, separately manage their own day to day affairs, and the degree of control exercised by the parent over the subsidiary." *Long*, 2011 WL 3903066, at *7. Courts also focus on "gross undercapitalization, insolvency, siphoning of funds, failure to observe corporate formalities or maintain proper corporate records, non- functioning of officers, control by a dominant stockholder and injustice or fundamental unfairness." *William*, 28 F. Supp. 3d at

562 (quoting *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 544 (4th Cir. 2013)); *cf. Enic. PLC v. F.F. S. & Co.*, 870 So. 2d 888, 891 (Fla. Ct. App. 2004) (a parent company's control for jurisdiction based on agency theory "must be high and very significant").

Once again, none of these factors are present in the relationship between BNBM PLC and Taishan.  As discussed above, BNBM PLC and Taishan follow all corporate governance requirements and best practices, maintain separate books, records and finances, employ separate workers and management, and autonomously manage their day-to-day affairs.

## 2.    Application of Louisiana Law

Under Louisiana law, a corporation is a distinct legal entity, separate from its shareholders and subsidiaries.  *See Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164, 1167 (La. 1991).  Courts are permitted to disregard this corporate distinction only in "exceptional circumstances," and in "order properly to disregard the corporate entity, one of the primary components which justifies piercing the veil is often present: to prevent the use of the corporate form in the defrauding of creditors."  *Id.* at 1168-69.  Simply alleging that a parent controls the actions of its subsidiary does not rise to the level of "exceptional circumstances."  *See Bujol v. Entergy Sys., Inc.*, 922 So. 2d 1113, 1127-28 (La. 2004).

Louisiana law recognizes the possibility of imputing contacts of a subsidiary to a parent for purposes of personal jurisdiction when the subsidiary is actually an alter ego of the parent. *Long*, No. 4:11cv47, 2011 WL 3903066, at *7 (quoting *Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005)); *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010); *Whitener v. Pliva, Inc.*, CIV.A. 10-1552, 2012 WL 1343964, at *5 (E.D. La. Apr. 18, 2012); *Puckett v. Advance Sports, Inc.*, 2009 WL 3430283, at *5 (La. App. 1 Cir. Oct. 26, 2009) (unpublished opinion); *Davis v. Dempster, Inc.*, 790 So.2d 43, 48-49 (La. App. 3 Cir. 2000).  In 2012 in this MDL, the Court determined that it would impute TTP's contacts to Taishan

Gypsum, and thus asserted jurisdiction over Taishan in Louisiana, based on 15 facts that the Court considered to be "conclusive of an alter ego and/or agency relationship between TG and TTP." *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819, 895 (E.D. La. 2012), *aff'd*, 742 F.3d 576 (5th Cir. 2014). *None* of the facts that caused the Court to pierce the veil between Taishan Gypsum and TTP are present in the relationship between BNBM PLC and Taishan:

(1)  BNBM PLC did not create Taishan, for its own purposes or otherwise; Taishan began operations in 1992 and was already one of China's largest drywall manufacturers when BNBM PLC acquired its equity stake in Taishan. *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d 521, 528 (5th Cir. 2014).[241]  Moreover, Taishan does not sell BNBM PLC products, it sells Taishan products, and the market sectors for the two companies overlap only in part.

(2)  Taishan is not a wholly-owned subsidiary of BNBM PLC.  35% of Taishan remains owned by its original investors and original management.  BNBM PLC's 65% ownership stake is less than necessary to control major corporate decisions.

(3)  Taishan's directors do not come solely from BNBM PLC.  At present BNBM PLC has the right to nominate 3 of the 5 directors on the Taishan Board; previously it was 4 of 7.

(4)  Taishan's directors receive a fixed payment per meeting from Taishan.

(5)  There is no overlap between the employees, officers or management of BNBM PLC and Taishan.

---

[241]  *See also* Ex. 8, 2005 Asset Appraisal Report.

(6)  Taishan has not purchased or rented any, much less all, of its equipment, factory or offices from BNBM PLC, and has never sold equipment, factories or offices to BNBM PLC, or vice versa.  BNBM PLC has never sold or rented a factory to Taishan or vice versa.

(7)  Taishan employees have not "volunteered" to work at BNBM PLC or vice versa. The employees of BNBM PLC and Taishan are not exchanged or utilized interchangeably between the companies.

(8)  The employees of Taishan and BNBM PLC do not use the same telephone and fax numbers, email addresses, and business cards.

(9)  Taishan and BNBM PLC do not hold themselves out as each other or as representing each other in dealings with customers or potential customers (or anybody else).

(10)  BNBM PLC has not authorized Taishan to use its registered trademarks, or vice versa.  Taishan and BNBM PLC make and sell different brands of drywall.

(11)  Taishan did not enter into an agreement with a U.S. customer whereby the customer was given rights to a BNBM PLC brand, with or without authorization.  BNBM PLC did not enter into an agreement with a U.S. customer whereby the customer was given rights to a Taishan brand.

(12)  BNBM PLC and Taishan have not interchanged in conducting business.  Taishan has not sold BNBM PLC's drywall, or vice versa, and they do not conduct business in each other's names.

(13)  Both BNBM PLC and Taishan hold regular board meetings.  Both companies comply fully with all governance and other requirements of Chinese corporate law.

(14)  BNBM PLC has never settled Taishan's debts, and vice versa.

66

(15)  Neither company has stopped production or gone out of business.  Taishan remains an active corporation with net profits last year of over a billion yuan.[242]

In its 2012 opinion imputing TTP's contacts to Taishan for jurisdictional purposes, the Court also relied on a number of Louisiana cases.  *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d at 895-96.  None of the additional veil-piercing factors the Court identified as significant in this authority are present in the relationship between BNBM PLC and Taishan.  BNBM PLC and Taishan have not operated in a way that the entities' brands and products appear identical, their business relationships are not deeply intertwined, they do not maintain a website that holds out the parent and subsidiary as a single entity, there is no evidence of undocumented transfers of funds between the entities, Taishan has its own business (not business given to it by BNBM PLC and vice versa), financial activities are properly reflected in the books of each, funds have not been transferred either way without a repayment schedule, and they do not pay each others' employees.  *Cf. Jackson*, 615 F.3d at 587 (finding the following cut in favor of an alter ego relationship: (1) operating in a way that the entities' brands and products appear identical and their business relationships are deeply intertwined; (2) shared phone numbers; common officers and directors; (3) evidence of undocumented transfers of funds between the entities; (4) one entity's payment of the employee salaries of the other); *Whitener v. Pliva, Inc.*, No. 10-1552, 2012 WL 1343964, at *6-7 (E.D. La. Apr. 18, 2012) (referencing *Jackson*); *Green*, 577 So.2d at 257–59 (listing factors); *In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 767 F. Supp. 2d 649, 667 (E.D. La. 2011) (same).

---

[242] Ex. 1, 2014 BNBM PLC Annual Report, at BNBMPLC0003185.

### 3. Application of Florida Law

For the same reasons, BNBM PLC is not Taishan's alter ego under Florida law.  In

*Development Corp. of Palm Beach v. WBC Construction, L.L.C.*, the Florida Court of Appeal

held that a nonresident defendant was not subject to jurisdiction in Florida where it "did not

control the daily operations" of its Florida subsidiary, and therefore did not exert the level of

"'operational control' necessary to subject the parent to jurisdiction" in Florida.  925 So. 2d

1156, 1162 (Fla. 4th DCA 2006).  Similarly, in *Waterman Oy v. Carnival Cruise Lines, Inc.*, 632

So. 2d 724 (Fla. 3d DCA 1994), the Court of Appeal concluded Florida lacked jurisdiction over a

Finnish manufacturer based on acts of an affiliated company doing business in Florida, where

there was no evidence that the affiliate was the Finnish company's parent's agent or that the

Finnish company "controlled or directed its activities."  632 So. 2d at 726-27.  "Even the

presence of a wholly owned subsidiary corporation which does business in Florida is not

sufficient to subject a foreign corporation to jurisdiction in Florida."  632 So. 2d at 727 (citing

*Qualley v. Int'l Air Serv., Ltd.,* 595 So. 2d 194, 196 (Fla. 3d DCA 1992)).

### D. The Court's Prior Holding

The Court's prior finding that BNBM PLC and Taishan are part of a "single business

enterprise" was largely based on deemed admissions by Taishan following its failure to respond

to requests for admission and on the PSC's unchallenged, but erroneous, view of Louisiana law.

In fact, Louisiana courts impose liability on shareholders in only "the most rare and

extraordinary of circumstances."  *Morales v. Bayou Concessions Salvage, Inc.*, No. 03-657, 2004

WL 2381525, at *2 (E.D. La. Oct. 22, 2004).  As this Court held in *Morales*, it must follow the

Louisiana Supreme Court's interpretation and application of Louisiana law.  *See id.* at *1-2.  In

*Riggins*, the Supreme Court established the factors to consider in determining whether to pierce

the veil and treat a corporation as an alter ego.  590 So. 2d at 1168.  But at the plaintiffs' urging, in its prior decision the Court utilized a "single business enterprise" test, first articulated in *Green v. Champion Ins. Co.*, 577 So.2d 249, 256-60 (La. Ct. App. 1991), which focuses disproportionately on the question of an investor's "control" of the corporation.  This test does not accurately reflect the Louisiana Supreme Court's interpretation and application of the law. In the two decades since *Green* was decided, the Louisiana Supreme Court has never adopted the "single business enterprise" test.  Instead, and as this Court has recognized, Louisiana's highest court continues to adhere to its traditional veil piercing analysis, focusing on control *and* an abuse of the corporate structure.  *See Morales*, 2004 WL 2381525, at *3-4.  "There is simply no persuasive evidence" that "the Louisiana Supreme Court would abandon" the traditional veil piercing test "and adopt the more expansive single business enterprise theory articulated in *Green*."  *Id*. at *3.  As Louisiana's Second Circuit Court of Appeals admonished in reversing a trial court's application of the "single business enterprise" test, "we note that control alone is not sufficient to warrant a piercing of the corporate veil."  *Town of Haynesville, Inc. v. Entergy Corp*., 956 So. 2d 192, 197-98 (La. Ct. App. 2007).[243]

Even if the "single business enterprise" test were to be applied here, there is no evidence in the record to support the proposition that BNBM PLC and Taishan were part of a "single business enterprise," for all of the reasons we have discussed.  This Court's previous finding that Taishan, BNBM PLC, BNBM Group, and others constitute "a single business enterprise" rests— erroneously and entirely—upon Taishan's deemed admissions when they failed to respond to

---

[243]   *See also* Kyle M. Bacon, *The Single Business Enterprise Theory of Louisiana's First Circuit: An Erroneous Application of Traditional Veil Piercing*, 63 La. L. Rev. 75 (Fall 2002). *Green's* "single business enterprise theory is a poor theory for two main reasons.  First, the theory has been developed through poor legal methodology.  Second, the theory promotes bad policy."  *Id.*

Rule 36 requests to admit.[244]  Controlling precedent prevents those deemed admissions from being used against BNBM PLC.  *See Becerra v. Asher*, 105 F.3d 1042, 1048 (5th Cir. 1997), *as supplemented on denial of reh'g* (Apr. 7, 1997) (deemed admissions of one party cannot be used against a co-party); *see also Riberglass, Inc. v. Techni-Glass Indus., Inc*., 811 F.2d 565, 566-67 (11th Cir. 1987) (deemed admissions of co-defendants could not bind defendant who did respond to requests); *Earl Realty, Inc. v. Leonetti* (*In re Leonetti*), 28 B.R. 1003, 1009 (Bankr. E.D. Pa. 1983) (admission of one defendant not admissible against co-defendant).

The plaintiff in *Becerra* attempted to use a defendant's unanswered request for admissions to defeat a co-defendant's motion for summary judgment.  105 F.3d at 1048.  The district court ruled that the deemed admissions were not competent evidence, because they "are binding only on the non-responding party, not on co-parties."  *Becerra v. Asher,* 921 F. Supp. 1538, 1544 (S.D. Tex. 1996), *as supplemented on denial of reh'g* (Apr. 7, 1997)*, aff'd,* 105 F.3d 1042 (5th Cir. 1997).  The Fifth Circuit affirmed, holding that "[d]eemed admissions by a party opponent cannot be used against a co-party."  105 F.3d at 1048.  That holding controls this case. The requests for admissions were not made to or served on BNBM PLC, and thus cannot be used to support either the exercise of personal jurisdiction or the imposition of liability against it.  As the record in this case demonstrates, these deemed admissions are contradicted by the facts.

## III.    PLAINTIFFS CANNOT ESTABLISH JURISDICTION OVER BNBM PLC UNDER THE FORUM STATES' LONG ARM STATUTES

With alter ego and agency eliminated as bases to impute Taishan's contacts to BNBM PLC for jurisdictional purposes, the Court can only exercise jurisdiction over BNBM PLC if it has had sufficient direct contacts with the forum states.  The record following discovery proves this is not the case.

---

[244] Rec Doc. 18028, at 12-20.

## A.     Applicable Law

Seven active complaints in these MDL proceedings name BNBM PLC as a defendant.

Four were filed by class plaintiffs Eduardo and Carmen Amorin.  The initial *Amorin* complaint

was filed in the Eastern District of Virginia, a subsequent identical *Amorin* complaint was filed

in federal court in Florida, and the subsequent *Amorin* complaints and the *Gross* and *Wiltz*

complaints all were filed in this Court in the first instance.  As the MDL transferee court, the

Court applies "the substantive state law of the transferor court" and "the federal law of its own

circuit, the Fifth Circuit."  *In re Chinese Manufactured Drywall,* 894 F. Supp. 2d at 836-37.  As

demonstrated below, the application of that law here cannot support the exercise of long-arm

jurisdiction.

## B.     Virginia Cannot Exercise Long-Arm Jurisdiction Over BNBM PLC

The threshold issue is to determine whether the defendants' conduct falls within the

relevant long-arm statue.  The Virginia long-arm statute provides in relevant part:

> A.  A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's:
>
> 1. Transacting any business in this Commonwealth;
>
> 2. Contracting to supply services or things in this Commonwealth;
>
> 3. Causing tortious injury by an act or omission in this Commonwealth;
>
> 4. Causing tortious injury in this Commonwealth by an act or omission outside this Commonwealth if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this Commonwealth;
>
> 5. Causing injury in this Commonwealth to any person by breach of warranty expressly or impliedly made in the sale of goods outside this Commonwealth when he might reasonably have expected such person to use, consume, or be affected by the goods

> in this Commonwealth, provided that he also regularly does or
> solicits business, or engages in any other persistent course of
> conduct, or derives substantial revenue from goods used or
> consumed or services rendered in this Commonwealth[.]

Va. Code Ann. § 8.01-328.1.

BNBM PLC meets none of the statutory prerequisites for exercising long-arm jurisdiction in the Commonwealth:

1. There is no allegation in the *Amorin* complaint, and no evidence, that BNBM PLC transacted any business in Virginia. In fact it did not. The only sales of drywall to American purchasers were made to buyers from Florida, Connecticut and California, who initiated the commercial contacts with BNBM PLC in China.[245]

2. There is no allegation in the *Amorin* complaint, and no evidence, that BNBM PLC contracted to supply services or things to Virginia. In fact it did not.[246]

3. BNBM PLC did not cause any tortious injury in Virginia. *No* profile forms from Virginians identify BNBM drywall as the source of their injuries.[247] No testing shows that BNBM PLC drywall found in Virginia was defective, despite the fact that the expert relied on by the PSC gathered her samples in Virginia.[248] Moreover, "to subject a nonresident defendant to personal jurisdiction in Virginia pursuant to § 8.01–328.1(A)(3)" requires "that one essential act of the alleged tort occurred in Virginia." *People Express Airlines, Inc. v. 200 Kelsey Assocs., LLC*, 922 F. Supp. 2d 536, 545 (E.D. Va. 2013) (quoting *Provident Pharm., Inc. v. Amneal Pharms., LLC*, Civil Action No. 3:08-CV-393, 2008 WL 4911232, *3 (E.D. Va. Nov. 13, 2008)). Jurisdiction under paragraph (A)(3) "requires that an out-of-state defendant be physically present

---

[245]   Ex. 25, Cai Decl. ¶¶ 10(a)-(e).

[246]   *Id.* ¶¶ 10(a)-(e), 11.

[247]   Ex. 45, Taylor Supp. Decl., ex. 1.

[248]   *See* Factual Section E(1) above.

in Virginia when committing the act or omission giving rise to the tort at issue." *DeSantis v. Hafner Creations, Inc.*, 949 F. Supp. 419, 425-26 (E.D. Va. 1996). So, for instance, that a Florida corporation advertised a product in Virginia, answered telephone inquiries from Virginia residents, and sold and delivered the product to a Virginia customer was insufficient to establish personal jurisdiction under subsection (A)(3), because the corporation "was not physically present in Virginia when committing the tort at issue." *See id.* at 426.

4.  BNBM PLC does not conduct or solicit business in Virginia, engage in other persistent course of conduct, or derive any, much less substantial, revenue from goods used or consumed in the Commonwealth. The *Amorin* complaint does not allege to the contrary.

5.  BNBM PLC has caused no injury in the Commonwealth. No profile forms identify BNBM drywall as injuring any Virginian.[249] The PSC's expert did not test BNBM PLC drywall and she relied on no reports of such testing.[250] The plaintiffs have the burden on this motion to substantiate the jurisdictional allegations in the complaint by a preponderance of the evidence, and they cannot meet that burden under § 8:01-328.1(A)(4). *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008); *Brown v. Slenker*, 220 F.3d 411, 419 (5th Cir.2000).

### C.   Louisiana Cannot Exercise Long-Arm Jurisdiction Over BNBM PLC

The Louisiana long-arm statute provides, in pertinent part:

> A.  A court may exercise personal jurisdiction over a nonresident, who acts directly or by an agent, as to a cause of action arising from any one of the following activities performed by the nonresident:
>
> > (1) Transacting any business in this state.

---

[249]  Ex. 45, Taylor Supp. Decl. at ex. 1.

[250]  *See supra* page 20 and accompanying text.

> (2) Contracting to supply services or things in this state.
>
> (3) Causing injury or damage by an offense or quasi offense committed through an act or omission in this state.
>
> (4) Causing injury or damage in this state by an offense or quasi offense committed through an act or omission outside of this state if he regularly does or solicits business, or engages in any other persistent course of conduct, or derives revenue from goods used or consumed or services rendered in this state.
>
> (5) Having an interest in, using or possessing a real right on immovable property in this state.
>
> . . . .
>
> (8) Manufacturing of a product or component thereof which caused damage or injury in this state, if at the time of placing the product into the stream of commerce, the manufacturer could have foreseen, realized, expected, or anticipated that the product may eventually be found in this state by reason of its nature and the manufacturer's marketing practices.

La. Rev. Stat. § 13:3201 (2001).  BNBM PLC meets none of the criteria that would permit Louisiana to exercise jurisdiction.

1.  BNBM PLC did not transact business in Louisiana.  No sales of drywall were made to Louisiana purchasers.[251]  The complaints do not allege otherwise and there is no evidence to the contrary.

2.  BNBM PLC did not contract to supply services or things, including drywall, in Louisiana.  There are no such allegations in the complaints and no evidence to the contrary.[252]

---

[251]  Ex. 25, Cai Decl. ¶¶ 10(a)-(e).

[252]  *Id.* ¶¶ 10(a)-(e), 11.

3.  Subsection A(3) requires the plaintiffs to establish that BNBM PLC committed a substantial aspect of an alleged tort in Louisiana.  BNBM PLC has taken no actions in Louisiana, and the complaints contain no specific contrary allegations.

4.  BNBM PLC did not cause any injury or damage by an offense or quasi offense committed through an act or omission outside of Louisiana.  BNBM PLC has injured no one in Louisiana.  No Louisianans have identified BNBM PLC drywall as the source of their injuries.[253] There is no testing of BNBM PLC drywall found in Louisiana.[254]  Nor does BNBM PLC do or solicit business in Louisiana, or engage in any other persistent course of conduct, or derive revenue from goods used or consumed in Louisiana.

5.  BNBM PLC has no interest in, does not use and does not possess a real right in immovable property in Louisiana.

8.  BNBM PLC has not manufactured a product or component that has caused damage or injury in Louisiana.  No Louisianans have identified harmful BNBM PLC drywall, the CPSC found BNBM PLC's drywall not defective, and no testing has shown otherwise.  Nor did BNBM PLC have a reason to foresee, realize, expect or anticipate that its drywall eventually would be found in Louisiana by reason of  the drywall's nature or BNBM PLC's marketing practices, and there is no reason to believe that BNBM PLC's drywall got to the State.

### D.    Florida Cannot Exercise Long-Arm Jurisdiction Over BNBM PLC

In pertinent part, the Florida long arm statute reads as follows:

> (1) Any person, whether or not a citizen or resident of this state, who personally or through an agent does any of the acts enumerated in this subsection thereby submits himself or herself and, if he or she is a natural person, his or her personal

---

[253]  Ex. 45, Taylor Supp. Decl., ex. 1.

[254]  *See* Factual Section E(1) above.

representative to the jurisdiction of the courts of this state for any cause of action arising from the doing of any of the following acts:

(a) Operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state.

(b) Committing a tortious act within this state.

. . . .

(f) Causing injury to persons or property within this state arising out of an act or omission by the defendant outside this state, if, at or about the time of the injury, either:

1. The defendant was engaged in solicitation or service activities within this state; or

2. Products, materials, or things processed, serviced, or manufactured by the defendant anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

Fla. Stat. Ann. § 48.193 (2009).

As discussed above, BNBM PLC did not engage in "a general course of business activity in the State for pecuniary benefits." *Foster, Pepper & Riviera v. Hansard*, 611 So. 2d 581, 582 (Fla. 1st DCA 1992).  It has never had offices, employees or property in Florida, has never been licensed or registered to do business in Florida, and has not solicited drywall sales or business in Florida, and has never targeted the Florida drywall market.  Indeed, BNBM has sold no drywall to Floridians since 2006.[255]  No BNBM PLC representative or employee has visited Florida to market or advertise drywall products or conduct business on behalf of BNBM PLC.  BNBM PLC has engaged in sales to only three customers located in Florida, each of whom approached BNBM of their own volition, came to China to negotiate, and took title to the drywall in China.[256]

---

[255]   Ex. 25, Cai Decl. ¶¶ 5, 10-11.

[256]   *Id.* ¶¶ 10(a), 10(b), 10(e).

BNBM PLC likewise did not commit a tortious act within Florida sufficient to satisfy Section 48.193(1)(a)(2).  It is not enough that a defendant's actions committed outside of Florida ultimately have consequences in Florida.  *See Reiss v. Ocean World, S.A.*, 11 So. 3d 404, 406-07 (Fla. 4th DCA 2009).  So, for instance, when a New York company without Florida offices purchased a nutritional supplement ingredient from an overseas seller, without altering the ingredient sold it to a Missouri company, who utilized the ingredient in a supplement and sold it over the internet to a Florida plaintiff who ingested the product and was injured by it in Florida, the New York company had not committed a tortious act "within the state."  *Blumberg v. Weiss & Co.*, 922 So. 2d 361, 364-65 (Fla. 3d DCA 2006).  Although the ingredient's sale had ultimate consequences in Florida, the sale to the Missouri manufacturer did not directly cause injury in Florida.  922 So. 2d at 364; *see also Reiss*, 11 So. 3d at 406-07 (reversing denial of motion to dismiss; trial court lacked personal jurisdiction over New York resident who sent allegedly tortious e-mails to Florida because none of the defendant's activities in Florida were tortious acts).

BNBM PLC engaged in no acts in Florida and did not directly cause injury in Florida. BNBM PLC sold drywall to only three Florida customers through transactions negotiated, finalized, and consummated in China.[257]  BNBM PLC did not travel to or negotiate with anyone in Florida, and the Florida customers took possession of their drywall in China.  As in *Blumberg*, downstream injury in Florida from a drywall placed in the stream of commerce outside Florida does not constitute commission of a substantial aspect of a tort for purposes of Section 48.193(1)(a)(2).

---

[257]  Ex. 25, Cai Decl. ¶¶ 10(a), 10(b), 10(e).

The plaintiffs also cannot satisfy Section 48.193(1)(a)(6) because BNBM PLC did not cause any "injury" in Florida.  Plaintiffs do not allege that the allegedly defective drywall hung in their houses came to them through EAC, Davis or Wood Nation, the three Florida companies that purchased drywall from BNBM PLC.  Not only did the CPSC test not show that the BNBM PLC drywall was defective, EAC and Davis both specifically testified that there was nothing wrong with BNBM PLC drywall, that they received no customer complaints about it, and that they so advised the CPSC.  Davis even conducted its own test of the drywall and uncovered no problems.  There is no contrary evidence.  Whatever defective drywall the plaintiffs claim to have installed in their houses, it was not sold by BNBM PLC.

Similarly, the plaintiffs cannot establish jurisdiction under any of the provisions of the long arm statute because their claims do not "arise from" BNBM PLC actions that connect it to Florida, as required by the statute.  As the Court stated in *Gadea v. Star Cruises, Ltd.*, 949 So. 2d 1143, 1149-50 (Fla. 3d DCA 2007), "arising from" requires a "direct affiliation, nexus, or substantial connection to exist between the basis for the plaintiffs' cause of action and the defendants' business activity in the state."  There is no such connection here.

## IV.    THE EXERCISE OF JURISDICTION OVER BNBM PLC IS INCONSISTENT WITH DUE PROCESS

The second part of the jurisdictional analysis considers whether, in addition to the provisions of long-arm statutes, the Court may exercise personal jurisdiction over a nonresident on a basis consistent with the Constitution of the United States.  La. Rev. Stat. § 13:3201(B) (2001); *see also Petroleum Helicopters, Inc. v. Avco Corp.*, 513 So. 2d 1188, 1191-92 (La. 1987); *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 277 (4th Cir. 2009); *Young v. New Haven Advocate*, 315 F.3d 256, 261 (4th Cir. 2002); *Venetian Salami Co. v. Parthenais*, 554 So. 2d 499, 502 (Fla. 1989).  A plaintiff may establish specific jurisdiction over a nonresident

defendant by showing that the defendant has "purposefully directed" his activities at residents of the forum states and that the litigation results from injuries that "arise out of or relate to" those activities.  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472-73, 477 (1985); *Consulting Eng'rs*, 561 F.3d at 277; *Gatekeeper Inc. v. Stratech Sys., Ltd.*, 718 F. Supp. 2d 664, 667-68 (E.D. Va. 2010); *Marina Dodge, Inc. v. Quinn*, 134 So.3d 1103, 1109 (Fla. 4th DCA 2014).  For the same reasons that the Virginia, Louisiana and Florida long-arm statutes do not permit the exercise of jurisdiction over BNBM PLC, BNBM PLC does not have sufficient "minimum contacts" with the forum states to satisfy Constitutional due process.  *Cf. Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945); *Consulting Eng'rs*, 561 F.3d at 277; *Long v. Chevron Corp.*, No. 4:11-CV-0047, 2011 WL 3903066, at *4 (E.D. Va. Sept. 2, 2011); *Pacific Tel. & Tel. Co. v. Geist*, 505 So. 2d 1388, 1390 (Fla. 5th DCA 1987).

### A.    BNBM PLC Did Not Have Minimum Contacts With the Forum States

Plaintiffs cannot show that BNBM PLC "purposefully directed" its "activities at residents" of the forum states "or purposely availed itself of the privilege of conducting activities there."  Indeed, BNBM PLC engaged in no activities directed at the residents of Virginia, Louisiana or Florida.  Therefore the complaints do not result from "alleged injuries that arise out of or relate to those activities."  *Burger King*, 471 U.S. at 472-73, 477; *De Reyes v. Marine Mgmt. & Consulting, Ltd.*, 586 So. 2d 103, 106 (La. 1991); *Unspam Techs., Inc. v. Chernuk*, 716 F.3d 322, 328 (4th Cir. 2013).

BNBM PLC had no contacts with Virginia, Louisiana or Florida and never availed itself of the privilege of conducting business there.  It "is essential in each case that there be some act by which the defendant ***purposefully avails*** itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."  *Hanson v. Denckla*, 357

U.S. 235, 253 (1958) (citing *Int'l Shoe*, 326 U.S. at 319) (emphasis added); *Burger King*, 471 U.S. at 472-73, 477; *Oldfield v. Pueblo De Bahia Lora, S.A.*, 558 F.3d 1210, 1220-24 (11th Cir. 2009). BNBM PLC has never had offices, employees or property in Virginia, Louisiana or Florida, has never registered to do business in Virginia, Louisiana or Florida, has not solicited drywall sales or business there, has never made drywall sales to Virginia or Louisiana, has never targeted the Virginia, Louisiana or Florida drywall markets (or the U.S. market, for that matter), and has not engaged in any regular course of business activity in Virginia, Louisiana or Florida. Five isolated sales in Florida in 2005-2006, with no other contacts in the state, is not the "general course of business activity" necessary to establish general jurisdiction under Florida law. *See Homeway Furniture Co. of Mount Airy, Inc. v. Horne*, 822 So. 2d 533, 536 (Fla. 2d DCA 2002). Thus BNBM PLC has never purposefully availed itself of the privilege of conducting activities within the forum states, thereby invoking the benefits and protections of their laws. Instead, BNBM PLC avoided availing itself of the benefits of doing business in those states (or any other state) by completing its drywall sales entirely in China.

Therefore, any arrival of Dragon Brand drywall in the forum states cannot constitute minimum contacts. Minimum contacts are met if the Court "finds that the defendant delivered the product into the stream of commerce with the ***expectation*** that it would be purchased by or used by consumers in the forum state." *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987) (emphasis added). There must also be a nexus between a plaintiff's harm and the defendant's contacts with the forum to satisfy due process. *See Prejean v. Sonatrach, Inc.*, 652 F.2d 1260, 1270 n.21 (5th Cir. 1981); *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 855-856 (5th Cir. 2000). "The defendant's transmission of goods permits the exercise of jurisdiction only where the defendant can be said to have targeted the forum; as a general rule, it

is not enough that the defendant might have predicted that its goods will reach the forum State."
*Nicastro v. J. McIntyre Machinery, Ltd.*, 131 S.Ct. 2780, 2788 (2011).  The "fortuitous
'unilateral activity' of a third party" in a forum state does not subject a defendant to personal
jurisdiction in that state.  *Johnston v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 611 (5th Cir.
2008) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416-17
(1984)).

In particular, "the attenuated contacts" with Florida cannot be regarded as contact of a
"'continuous and systematic' nature, and thus cannot support an assertion of personal
jurisdiction."  So, for instance, evidence that a Finnish company had engaged in "substantial
business in Florida" by making repairs to a boat through a related entity, claimed to be the
company's agent in Florida, was insufficient for Florida to exercise jurisdiction consistent with
due process.  *Waterman Oy*, 612 So.2d at 726-27.  Advertisements in international trade
magazines, "substantial revenues" derived from "Waterman-fitted cruise ships that embark from
Florida ports, and financial benefits accruing to the defendant from a collateral relation to the
forum State" do not support jurisdiction "if they do not stem from a constitutionally cognizable
contact with that State."  632 So. 2d at 726-27 (quoting *World-Wide Volkswagen Corp. v.
Woodson*, 444 U.S. 286, 299 (1980)); *see also Marina Dodge*, 134 So.3d at 1104-05, 1109.

As in *Waterman Oy* and *Marina Dodge*, BNBM PLC's pecuniary gain based on out-of-
state conduct that, while tangentially connected to Florida, did not reflect purposeful efforts to do
business in Florida and is insufficient contact with the state to satisfy constitutional due process.
BNBM PLC did not court, nurture, or entice Florida customers in an effort to bring drywall to

Florida.  BNBM PLC has never been registered to do business in Florida, maintained an office there, marketed drywall there, or sent anybody there in connection with sales of drywall.[258]

BNBM PLC did not purposefully avail itself of the privilege of conducting business in Florida.  That some shipments of BNBM PLC's drywall ultimately were sent to Florida—the only connection between BNBM PLC and Florida—is insufficient to confer jurisdiction over BNBM PLC.  The "mere foreseeability of injury in a foreign jurisdiction is not a sufficient benchmark for exercising personal jurisdiction."  *Pacific Tel*., 505 So. 2d at 1391; *see also Waterman Oy*, 632 So. 2d at 727; *Westwind Limousine v. Shorter*, 932 So. 2d 571, 575 (Fla. 5th DCA 2006).  The contacts between the plaintiffs and BNBM PLC was "fortuitous," occasioned by the actions of the few companies who bought BNBM PLC drywall in 2005-2006  and suppliers and contractors to whom the drywall was then distributed without BNBM PLC's involvement or knowledge.  *Cf. Scordilis*, 443 So. 2d at 413.  Jurisdiction should not be exercised here.

### B.   Plaintiffs' Causes of Action Did Not Arise Out of BNBM PLC's Contacts With the Forum States

To satisfy their burden of proving that the Court may exercise personal jurisdiction over BNBM PLC consistent with due process, the plaintiffs also must show that their claims arose out of or resulted from BNBM PLC's contacts with the forum states.  *Seiferth*, 472 F.3d at 270-71; *Consulting Eng'rs*, 561 F.3d at 277-78; *Int'l Shoe*, 326 U.S. at 316.  Given that BNBM PLC made no drywall sales in Virginia or Louisiana, and its limited contracts with Florida companies were made and performed in China, plaintiffs cannot demonstrate the requisite nexus between their claims and BNBM PLC conduct directed at those states.  *Prejean*, 652 F.2d at 1270 n.21.

---

[258]   Ex. 25, Cai Decl. ¶¶ 3, 4.

### C.      Jurisdiction Over BNBM PLC Would Not Comport With Notions of Fair Play and Substantial Justice

The exercise of personal jurisdiction must be constitutionally reasonable.  Therefore the Court should consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there.  *Burger King*, 471 U.S. at 476-77; *Consulting Eng'rs*, 561 F.3d at 277.  Here, exercising personal jurisdiction over BNBM PLC would offend "traditional notions of fair play and substantial justice."  *Int'l Shoe*, 326 U.S. at 316.  As the Supreme Court has explained:

> Once it had been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice."  Thus courts in "appropriate cases" may evaluate "the burden on the defendant," "the forum State's interest in adjudicating the dispute," "the plaintiff's interest in obtaining convenient and effective relief," "the interstate judicial system's interest in obtaining the most efficient resolution of controversies," and the "shared interest of the several States in furthering fundamental substantive social policies."

*Burger King*, 471 U.S. at 476-77 (internal citations omitted).

Each of these "fairness" factors weigh against asserting personal jurisdiction over BNBM PLC.  First, BNBM PLC will be heavily burdened.  To defend these cases, BNBM PLC would incur substantial costs in traveling around the world, translating the voluminous current and future court filings, and surmounting logistical difficulties in litigating a matter half way around the globe.  The Court has ordered that depositions will occur in Louisiana, which requires senior officers of the company to obtain visas to enter the United States and travel to the United States for depositions, greatly lengthening their time away from work.  Once this matter proceeds to a defense on the merits, such burdens will increase exponentially.  Consequently, the burdens on BNBM PLC would be so severe that they would be constitutionally unreasonable.

With respect to the interests of the plaintiffs and the forum states, BNBM PLC has not done business in the forum states, has no employees, offices or property there, and is not registered to do business or pay taxes in the U.S.  Therefore the interests of the forum states are not served by requiring BNBM PLC to defend the litigation here.

The judicial system's interest in efficient resolution of controversies weighs against exercising jurisdiction over BNBM PLC because of the difficulties relating to translation, travel and cross-continent discovery in this litigation, as evidenced already in this litigation.  Haling a Chinese company into an extended MDL litigation, in which its only connection is that it holds a majority share of another defendant, does not serve this Court's interest in efficiently resolving the matter.

Finally, the shared interest of the "several states" in a case with a foreign defendant requires "a court to consider the procedural and substantive policies of other *nations* whose interests are affected by the assertion of jurisdiction" of the forum states.  *Asahi Metal Indus. Co., Ltd. v. Superior Court of California, Solano Cty.,* 480 U.S. 102, 115 (1987) (emphasis in original).  Here, litigating in the forum states would offend China's procedural and substantive policies, especially its policies regarding the separateness of companies.  BNBM PLC did not seek out customers in the United States and has no control over the final destination of its products once they were delivered into the stream of commerce, and therefore China has a greater interest in a matter concerning BNBM PLC.

## V.      THE COMPLAINTS SHOULD BE DISMISSED UNDER RULE 12(B)(5)

The plaintiffs admit that they have not actually served BNBM PLC.  Instead, they have submitted proofs of service attesting that service was attempted and refused.  In *Gross* and *Wiltz*, there was only one effort to serve.  The Amorins have attempted service of two of their complaints, and have not attempted to serve the other two.

The plaintiffs' proofs of service reflect no proper attempt to serve BNBM PLC in either *Gross* or *Wiltz*. The *Gross* plaintiffs assert that they made an adequate attempt to serve BNBM PLC on February 25, 2010, about five months after they filed their amended complaint, and that service was rejected.[259] To support their claim of an adequate attempt to serve BNBM PLC, the *Gross* plaintiffs proffered two proofs of service that describe attempts at service on February 25, 2010, one with the recipient of service identified as "Beijing New Building Material (Group) Co., Ltd. (CNBM Group)" and "Beijing New Building Material (Group) Co., Ltd (BNBM)." According to the affidavit, the reason given for refusal was "wrong company name and address."[260] If these proofs of service are accurate, then the *Gross* plaintiffs in fact did not properly attempt service of the summons and complaint on BNBM PLC, and the summons and complaint were properly refused.

Similarly, the *Wiltz* plaintiffs claim to have attempted to serve BNBM PLC on August 25, 2010 (also about five months after they filed suit) by serving "Beijing New Building Material (Group) Co., Ltd. (BNBM)." Having again delivered the summons and complaint to a different and independent company, service was refused.[261] No other attempt to serve BNBM PLC is described by the *Wiltz* plaintiffs.

---

[259]   Rec. Docs. 5621-1, 6970-3.

[260]   Exhibit A to *Gross* Motion for Preliminary Default Judgment at 88-93 (Rec. Doc. 5621-3); Exhibit X to *Gross* Declaration (Rec. Doc. 7446-6). BNBM Group was at one time the parent corporation of BNBM PLC, but it divested its interest in BNBM PLC in 2005. Ex. 14, Zhao Tr. 425:2-426. BNBM PLC operates independently of BNBM Group. *Id.* 425:2-433:6.

[261]   Exhibit A to *Wiltz* Plaintiffs' Omnibus Motion for Preliminary Default Judgment (Rec. Doc. 6974-3); Exhibit A to *Wiltz* Plaintiffs' Supplemental Declaration (Rec. Doc. 7410-3).

The *Amorin* plaintiffs submitted no evidence of their attempts to serve BNBM PLC when they moved for a default, instead supporting the motion with nothing more than a statement in an exhibit to the default motion.[262]

The preliminary defaults must be vacated because BNBM PLC has not been served with process in these actions.  "A judgment rendered in the absence of personal jurisdiction is void and must be set aside."  *McGuire v. Sigma Coatings, Inc.*, 48 F.3d 902, 907 (5th Cir. 1995).  To acquire jurisdiction over the person, "a court must serve on the person a document, 'such as a summons, notice, writ, or order.'"  *Id.*  This fundamental tenet applies even when dealing with a default judgment.  *See Bludworth Bond Shipyard, Inc. v. M/V Caribbean Wind*, 841 F.2d 646, 649-51 (5th Cir. 1998); *High Island Health, LLC v. Libertybelle Mktg. Ltd.*, No. CIV A H-06-2931, 2007 WL 1173631, at *3-7 (S.D. Tex. Apr. 18, 2007) (granting defendant's motion to dismiss after default judgment vacated because of insufficient service of process).

The plaintiffs apparently believed that attempting service on BNBM PLC would have been futile.  Yet their affidavits of service show that they attempted to serve the wrong entities, and that even when service was attempted on the proper entity only an insufficient effort was made, never amounting to more than two delivery attempts.

Where a defendant resides outside the United States, and service cannot be made under the Hague Convention by Federal Rule of Civil Procedure 4(f)(3), provides a potential for alternative service in a foreign country "by other means not prohibited by international agreement, as the court orders."  *BP Prods. N. Am., Inc. v. Dagra*, 236 F.R.D. 270, 271 (E.D. Va. 2006) (quoting Rule 4(f)(3)).  Thus, if a plaintiff cannot serve an elusive international defendant, the district court may craft "alternate means of service."  *Rio Props., Inc. v. Rio Int'l Interlink*,

---

[262]   *See* Exhibit C, *Amorin* Plaintiffs' Fourth Omnibus Motion for Preliminary Default Judgment, (Rec. Doc. 17378-4).

284 F.3d 1007, 1016 (9th Cir. 2002).  "Where the plaintiff can show that deliberate avoidance and obstruction by the defendants have made the giving of notice impossible, statutes and caselaw have allowed substitute notice by mail and by publication in media of general and wide circulation."  *Securities Exchange Comm'n v. Tome*, 833 F.2d 1086, 1092 (2d Cir. 1987); *Seiko Epson Corp. v. Glory S. Software Mfg., Inc.*, No. 06-CV-236-BR, 2007 WL 282145, at *2 (D. Or. Jan. 24, 2007) (approving alternative service on Chinese entity).  Assertions that service is difficult or could be futile is not enough.  This Court therefore lacks jurisdiction over BNBM PLC.

## Conclusion

For all of the foregoing reasons, and the reasons set forth in the declarations and exhibits provided with this motion, as well as in BNBM PLC's other motions and papers in these actions, defendant BNBM PLC respectfully requests the Court to dismiss the complaints against it in this MDL proceeding.

Dated:  October 22, 2015

Respectfully submitted,

**DENTONS US LLP**

By: */s/ Michael H. Barr*
Michael H. Barr
New York Bar No. 1744242
Justin N. Kattan
New York Bar No. 3983905
1221 Avenue of the Americas
New York, NY 10020-1089
Telephone:  (212) 768-6700
Facsimile:  (212) 768-6800
michael.barr@dentons.com
justin.kattan@dentons.com

Richard L. Fenton
Illinois Bar No. 3121699
Leah R. Bruno
Illinois Bar No. 6269469
233 South Wacker Drive
Suite 5900
Chicago, IL  60606-6306
Telephone:  (312) 876-8000
Facsimile:  (312) 876-7934
richard.fenton@dentons.com
leah.bruno@dentons.com

Kenneth J. Pfaehler
D.C. Bar No. 461718
Drew Marrocco
D.C. Bar No. 453205
1301 K Street N.W.
Suite 600, East Tower
Washington, D.C. 20005
Telephone:  (202) 408-6400
Facsimile:  (202) 408-6399
kenneth.pfaehler@dentons.com
drew.marrocco@dentons.com

C. Michael Moore
Texas Bar No. 14323600
Matthew T. Nickel
Texas Bar No. 24056042
2000 McKinney Ave, Suite 1900
Dallas, TX  75201
Telephone:  (214) 259-0900
Facsimile:  (214) 259-0910
mike.moore@dentons.com
matt.nickel@dentons.com

- and -

**PHELPS DUNBAR LLP**

Harry Rosenberg
Louisiana Bar No. 11465
365 Canal Street, Suite 2000
New Orleans, Louisiana 70130-6534
Telephone:  (504) 566-1311
Facsimile:  (504) 568-9130
harry.rosenberg@phelps.com

***Attorneys for Beijing New Building Materials Public Limited Company and Beijing New Building Material (Group) Co., Ltd.***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **Memorandum In Support of Motion to Dismiss the Complaints Pursuant to Rules 12(b)(2) and 12(b)(5)** has been served on Plaintiffs' Liaison Counsel, Leonard Davis, and Defendants' Liaison Counsel, Kerry Miller, by U.S. Mail and e-mail and upon all parties by electronically uploading the same to Lexis Nexis File & Serve in accordance with the Pretrial Order No. 6, and that the foregoing was also electronically filed with the Clerk of the Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this October 22, 2015.

*/s/      Michael H. Barr*