```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2

 3    IN RE:  CHINESE-MANUFACTURED     MDL NO. 2047
      DRYWALL PRODUCTS LIABILITY
 4    LITIGATION                       SECTION: L

 5    THIS DOCUMENT APPLIES TO ALL     JUDGE FALLON
      CASES
 6                                     MAG JUDGE WILKINSON

 7                         - - -

 8                    MAY 18, 2015

 9                         - - -

10         CONFIDENTIAL - SUBJECT TO FURTHER
                  CONFIDENTIALITY REVIEW
11
                           - - -
12

           Videotaped deposition of EAC & SONS
13    CORPORATION, BY EDGAR A. CHAPARRO, held at
      Hilton Hotel, 6001 Destination Parkway, Orlando,
14    Florida at 1:41 p.m., on the above date, before Joan
      L. Pitt, Registered Merit Reporter, Certified
15    Realtime Reporter, and Florida Professional
      Reporter.
16
                           - - -
17

              GOLKOW TECHNOLOGIES, INC.
18         877.370.3377 ph | 917.591.5672 fax
                  deps@golkow.com
19

20

21

22

23

24                                    EXHIBIT 34

25
```

```
 1    APPEARANCES:
 2        PATRICK S. MONTOYA, ESQUIRE
          Colson Hicks Eidson
 3        255 Alhambra Circle, Penthouse
          Coral Gables, Florida 33134
 4        305.476.7400
          patrick@colson.com
 5        Representing Plaintiffs' Steering Committee
 6
          ALEX B. ROTHENBERG, ESQUIRE
 7        Gordon Arata McCollam Duplantis & Eagan LLC
          201 St. Charles Avenue, 40th Floor
 8        New Orleans, Louisiana 70170-4000
          504.582.1111
 9        arothenberg@gordonarata.com
          Representing Defendant CNBM Company
10
11        MATTHEW T. NICKEL, ESQUIRE
          Dentons US LLP
12        2000 McKinney Avenue, Suite 1900
          Dallas, Texas 75201-1858
13        214.259.0976
          matt.nickel@dentons.com
14        Representing Defendants Beijing New Building
          Materials Public Limited Company and
15        Beijing New Building Material (Group) Co., Ltd.
16
          MACKENZIE (MACK) KAHNKE, ESQUIRE   (Via telephone)
17        Alston & Bird LLP
          1201 West Peachtree Street
18        Atlanta, Georgia 30309
          404.881.4828
19        mackenzie@alston.com
          Representing Defendant Taishan Gypsum Co.
20
21    ALSO PRESENT:
22        Jeff Fleming, Videographer
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
 1                       - - -

 2                   I N D E X

 3                       - - -

 4   Testimony of:  EDGAR A. CHAPARRO

 5       DIRECT EXAMINATION BY MR. MONTOYA..............   6

 6       CROSS-EXAMINATION BY MR. NICKEL................ 126

 7       REDIRECT EXAMINATION BY MR. MONTOYA........... 177

 8       RECROSS-EXAMINATION BY MR. NICKEL............. 179

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
 1                    E X H I B I T S
 2   CHAPARRO
 3   No. 1    DEPOSITION NOTICE AND SUBPOENA           8
 4   No. 2    SALES CONTRACT DATED NOVEMBER 18, 2005   44
              BNBMPLC0007421 - BNBMPLC0007423
 5
     No. 3    EXPORT AGENCY AGREEMENT DATED NOVEMBER   56
 6            30, 2005
              BNBMPLC0007427 - BNBMPLC0007429
 7
     No. 4    MATERIAL SAFETY DATA SHEET               59
 8
     No. 5    PURCHASE/SUPPLY AGREEMENT                77
 9            BNBMPLC0007467 - BNBMPLC0007479
10   No. 6    LETTER DATED MARCH 14, 2006              106
11   No. 7    EAC & SONS CORPORATION ENTIRE FILE       115
12   No. 8    UNDERWRITERS LABORATORIES, INC., AGENCY  118
              AUTHORIZATION NOTIFICATION
13
     No. 9    FAX DATED 5/19/06                        118
14
     No. 10   BNBM SERIES PRODUCTS CATALOG             121
15
     No. 11   LETTER DATED OCTOBER 31, 2005            123
16
     No. 12   COVER LETTER DATED JULY 2, 2009 WITH     165
17            ATTACHED DOCUMENTS
18   No. 13   COVER LETTER E-MAIL DATED JUNE 15, 2009  168
              WITH ATTACHMENTS
19
20
21
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
1            THE VIDEOGRAPHER:  We are now on the record.

2    My name is Jeff Fleming, videographer for Golkow

3    Technologies.

4            Today's date is May 18, 2015.  The time is

5    1:41 p.m.  The video deposition is being held in

6    Orlando, Florida, in the case of

7    Chinese-Manufactured Drywall Products Liability

8    Litigation, in the United States District Court,

9    Eastern District of Louisiana.  The deponent is

10    EAC & Sons Corporation by Edgar Chaparro.

11            Counsel, please identify yourselves for the

12    record.

13            MR. MONTOYA:  Patrick Montoya on behalf of the

14    Plaintiffs' Steering Committee.

15            MR. NICKEL:  Matthew Nickel on behalf of

16    Beijing New Building Materials Public Limited

17    Company and Beijing New Building Material (Group)

18    Co., Ltd.

19            MR. ROTHENBERG:  Alex Rothenberg on behalf of

20    CNBM Company.

21            MR. MONTOYA:  Folks on the phone?  Anyone on

22    the phone want to make their appearance?

23            MS. KAHNKE:  Mack Kahnke from Alston & Bird on

24    behalf of Taishan Gypsum Co.

25            THE VIDEOGRAPHER:  The court reporter is
```

Confidential - Subject to Further Confidentiality Review

```
 1        Joan Pitt and will now swear in the witness.
 2             THE COURT REPORTER:  Let me have you raise your
 3        right hand, sir.  Do you swear or affirm the
 4        testimony you give will be the truth, the whole
 5        truth, and nothing but the truth?
 6             THE WITNESS:  I do.
 7             THE COURT REPORTER:  Thank you.
 8             EDGAR A. CHAPARRO, called as a witness by the
 9   Plaintiffs' Steering Committee, having been first duly
10   sworn, testified as follows:
11                    DIRECT EXAMINATION
12   BY MR. MONTOYA:
13        Q.   Tell us your name, please, sir.
14        A.   My name is Edgar A. Chaparro.
15        Q.   Mr. Chaparro, what do you do for a living?
16        A.   I am a builder.
17        Q.   A builder and developer?
18        A.   No, just a builder.
19        Q.   Okay.  How long have you been a builder for?
20        A.   I believe since 1999, 1998.
21        Q.   Are you a licensed general contractor?
22        A.   No, I'm not.  No, I'm not.
23        Q.   Okay.  What types of things do you build?
24        A.   I normally do multi-family complex and student
25   housing, the trade of drywall.
```

Confidential - Subject to Further Confidentiality Review

1   employees or subsidiaries, sublieutenants, from the

2   general manager of CNBM.

3       Q.   And there was an interpreter there for you?

4       A.   Yes, always.

5       Q.   What -- when -- what city were you in?

6       A.   We were in Beijing.

7       Q.   Okay.  Did you get invited out to Beijing by

8   BNBM?

9       A.   Of course.

10      Q.   Tell us how that occurred.

11      A.   I believe that there's one of the letters that

12  is on the file.  They -- they invite you.  You have to

13  request an invitation to go to China.  You cannot just

14  show up, unless you're going on nonbusiness and

15  recreational, you don't need a visa, but if you're going

16  to do any kind of business, you need a visa.

17           So we requested the visa in New York, and they

18  provided it to us.  Wang Bing -- I think the original

19  one was Cai Kai, the one that sent the letter, the

20  original letter on the first time to invite us to meet

21  with BNBM.

22      Q.   Did you contact Cai Kai, or did he contact you?

23  How did the relationship between?

24      A.   I was searching into the -- the Internet to

25  looking for materials, and I find out that BNBM was the

Confidential - Subject to Further Confidentiality Review

1    only company that have the certification from UL in the

2    entire country outside the United States.  It was not

3    viable for me to bring the material from LaFarge in

4    Europe, because the Euro was 1.6 compared to the

5    American dollar, so it was better to look to the other

6    side, to the eastern, and looking into China, and find

7    out that BNBM produced -- they already have produced

8    material to the United States, and they were certified.

9    It's the only company that I find out on UL Laboratories

10   that was certified by UL Laboratories to produce

11   materials certified by UL.

12        Q.   Do you recall what website you were on that

13   showed that BNBM had UL certifications?

14        A.   I think it's UL.com or one of the others.

15   Yeah, it's related to UL Laboratories.

16        Q.   Why was the UL certification important to you?

17        A.   Why was it important to me?  Because I didn't

18   want to have any inconvenience with the material

19   whatsoever.  So my main reason to have certification

20   from a company that certify the majority of the products

21   in the United States, and if I have that certification,

22   that made me feel a lot more comfortable bringing it in

23   from China, knowing that in the prior past or present

24   there's a lot of materials that come from China that you

25   can see in the news that they come in defective, or they

Confidential - Subject to Further Confidentiality Review

1    come in with too many lead, or so many other products

2    that we don't allow in the United States, and the only

3    main reason is that, you know, that security, to put it

4    that way.

5        Q.   When you did this Internet search and you found

6    the UL certification through -- for BNBM, was this in

7    2005?

8        A.   That was in 2005, yes.

9        Q.   What was your next step after that?  Did you

10   get in touch with BNBM?

11       A.   I get in touch through a person that I know

12   which live in front of me.  His name is John White.

13   John White is Chinese originally.  He's a US citizen.

14       Q.   Is it White, W-h-i-t-e?

15       A.   White, yes.

16       Q.   Okay.

17       A.   He was the one that helped me out because he

18   knows the communication and he knows the language in

19   Chinese.  So he made the original step to find -- led me

20   through to find out the way to communicate with them.

21       Q.   Then what happened after that?

22       A.   After that, we have the -- as I told you, we --

23   he sent a letter to BNBM.  BNBM sent us the invitation

24   and we -- and then I went with him to China and

25   generated the first contract, get the material, and send

Confidential - Subject to Further Confidentiality Review

1    it over here.

2        Q.    So your first trip to China was in late 2005?

3        A.    Late 2005.

4        Q.    What was going on with the drywall market in

5    the United States at that time?

6        A.    We were in allocation.  There was so much boom

7    in the housing market that there was not enough supply

8    from US material for the demand on the -- on the market.

9    This is not the first time it happened.  Before it

10   happened -- it happened in 2004.  It happened in 1999.

11   It's a kind of cycle.  It happened every four or five

12   years.

13       Q.    And allocation, to you, means what?

14       A.    Allocation is shortage of material.  And why

15   they call it allocation is that they allocate the

16   material for amount through all -- all the customers.

17   For example, USG or Celotex or Lafarge, anybody that

18   manufactures drywall-related material, when this kind of

19   situation happened and the demand is so high, they call

20   it allocation is because they allocate the amount.

21           Let's say, for example, normally yards have a

22   quote.  So every month they receive a quote based on

23   their sales.  If they increase the sale, their quote

24   raise, raise up.  However, when the -- when the shortage

25   started, then they go into allocation, and what they do,

Confidential - Subject to Further Confidentiality Review

1    based on the amount that all yards sells, they allocate

2    the amount through all those yards and all those

3    companies that sell the material.

4         Q.   Did you have any direct communications with

5    BNBM in that late 2005 time frame that John White had

6    set up the meeting for?

7         A.   Uh-huh.

8         Q.   Is that a yes?

9         A.   What did you say?  Say if for me again.

10             MR. NICKEL:  Object to the form.

11        Q.   Did you have any communications directly with

12   BNBM after John White made the initial contact?

13        A.   No.  No.

14        Q.   Everything went through Mr. White?

15        A.   Mr. White started the negotiation until -- and

16   then we fly right after.  Very, very, very short period

17   that John White.  Was maybe one or two weeks that I

18   worked with him.  Other than that, after that, I took

19   over.

20        Q.   Did Mr. White speak Chinese?

21        A.   Yes.

22        Q.   Okay.  Did you go with anybody else to China to

23   visit with BNBM in that first visit?

24        A.   No.

25        Q.   Who did you meet with -- first of all, what

1    city did you fly to?

2        A.   Beijing.

3        Q.   Okay.  Who did you meet with in Beijing from --

4    from BNBM?

5        A.   From BNBM, we started meeting with Mr. Cai Kai,

6    that was the original meeting, and subsequently to that,

7    I think Wang Bing showed up in one of the last meetings.

8        Q.   How many times total did you go out to China

9    for your business relationship?

10       A.   For the business relation?  Wow.  10 or 20

11   times.

12       Q.   Those 10 to 20 times that you went out there,

13   was that at the invitation of BNBM each time?

14       A.   All the time, yes.  After that, I have -- after

15   the second visit, we have a visa that allows me to go

16   throughout six months or a year, I believe it is.  I

17   think it's six months.  Every six months you have to

18   renew it.  Once you have an invitation from any

19   corporation in China, the Chinese embassy in New York

20   issue you a visa for business for six months or for a

21   year term.  One or the other.

22       Q.   Did -- each time you went out, did you need a

23   separate letter from BNBM to invite you out,

24   or --

25       A.   No, that's what I explained, that that kind of

1      A.   No.

2      Q.   That was after the relationship had broken

3   down?

4      A.   That's right.

5      Q.   Okay.

6      A.   It was a personal relationship.  It's not in

7   anything whatsoever related to business.

8      Q.   Okay.

9      A.   And I believe that he was not working for BNBM

10   at the time anymore.

11      Q.   Do you know if any of the -- any BNBM

12   representatives visited the United States while you were

13   doing business with them?

14      A.   If they did, I was not aware.

15      Q.   Did they, any of the BNBM folks that you spoke

16   with, ever talk to you about visiting Washington, for

17   example, where you said they had other buyers?

18      A.   They implied -- they didn't imply.  They told

19   us that in the future they were -- they were especially

20   wanting -- wanting to come to the United States to visit

21   to see how our operations were running and everything

22   else, but other than that, I don't remember anything

23   else.

24      Q.   Okay.  Did you ever receive any drywall samples

25   from BNBM before you went and purchased the larger

```
 1    shipments, for example, for your company, for EAC?

 2        A.   No.

 3        Q.   Did Mr. Davis, to your knowledge?

 4        A.   No.

 5        Q.   Everything you did was in the factory on-site

 6    in terms --

 7        A.   That's right.

 8        Q.   -- of looking at the product?

 9        A.   That's right.

10        Q.   Okay.  Did anyone at BNBM ever express a

11    willingness to expand business in the United States?

12        A.   That was the main idea, to become -- to become

13    partners so they can introduce all the materials that

14    they wanted to introduce into the United States.

15        Q.   You mentioned before something about

16    measurements on the drywall.

17        A.   Uh-huh.

18        Q.   Using metrics versus the --

19        A.   American.

20        Q.   -- measurement system we used in the United

21    States?

22        A.   American measurement, yes.

23        Q.   To your knowledge, does any other market other

24    than the United States use the measurements such as 1/2"

25    or 5/8?
```

1      Q.   So let's make sure we have the order correct.

2   I believe what you testified to earlier is that you

3   found a company called BNBM through Internet searches;

4   is that correct?

5      A.   That is correct.

6      Q.   And you were drawn to BNBM because they had a

7   drywall product that had UL certification; is that also

8   correct?

9      A.   In part, yes.

10      Q.   And then I believe you testified that you had

11   Mr. White reach out to BNBM?

12      A.   Yes.  As I told you, I met Mr. White prior to

13   this -- this business, and I knew that he was Chinese,

14   and I knew that he knows the language, and I talked to

15   him because we were involved in some other business

16   prior to this, and I asked him if he can help me out,

17   facilitate to get the contact with BNBM.

18      Q.   Before you found BNBM on the Internet, did --

19   did you have any knowledge of a company called BNBM or

20   Beijing New Building Materials in the name?

21      A.   No.

22      Q.   Before you found BNBM on the Internet, did any

23   company with the name BNBM or Beijing New Building

24   Materials in its name send you any kind of samples or

25   flyers or mailers?  Anything?

1    A.    No.

2    Q.    And the invitation that you were referring to

3    earlier that came from BNBM that invited you to come to

4    China, you and Mr. White, that was an invitation that

5    you actually needed to get a visa; correct?

6    A.    To get a -- I guess you need it to get a

7    business visa, not in order to get into China.  As I

8    explained before, you can go as a tourist to China and

9    you don't need even a visa.  You just go to the -- you

10   know, you need a visa, but you don't have to apply for

11   it or get in a letter to -- in order to get a visa.  You

12   just go to New York, go to the embassy in New York of

13   China, and tell them that you want to visit the country,

14   and they'll issue a visa as a -- as a tourist.

15   Q.    And did you obtain a tourist visa to go to

16   China, or did you obtain a business visa to go to China?

17   A.    I don't recall specifically which one we choose

18   to pull out first.  I don't recall what -- specifically

19   which one.  I think that we took the letter, so I don't

20   know if the China decided to issue as a business visa or

21   as a pleasure visa.  One or the other, but I don't

22   recall.

23   Q.    But you took the letter that came from China --

24   A.    Yes.

25   Q.    -- from BNBM?

Confidential - Subject to Further Confidentiality Review

1   company, EAC, or Mr. Davis' company, each one of those

2   contracts were negotiated entirely in China; is that

3   correct?

4       A.   Not entirely.  We -- me and Stefan after

5   discussion and Stefan have some input from some

6   professionals in the area here in the United States.  So

7   to say that the entire contract was drafted in China, I

8   don't know.

9       Q.   I just want to make sure I have your testimony

10  correct.  Whenever you and Mr. Davis were negotiating

11  any contracts with one of the BNBM entities, you

12  traveled to China to handle those negotiations; correct?

13      A.   I traveled to China.  The -- the primary reason

14  was not the contract per se.  It was normally to oversee

15  the operation, the manufacturing of the material.  That

16  while I was there, there were some conversation in

17  relationship to the contract for the long-term and the

18  exclusivity to it, yes.

19      Q.   And nobody from BNBM ever came to America and

20  negotiated a contract with you here in America; correct?

21      A.   No.

22      Q.   And you don't know of anybody from BNBM that

23  came to America to negotiate a contract with Mr. Davis,

24  either; correct?

25      A.   None that I'm aware of.

Confidential - Subject to Further Confidentiality Review

```
1    Type X?  You bought Type C; correct?

2         A.   No.

3         Q.   Did you buy moisture-resistant Type X?

4         A.   No.

5         Q.   Okay.  So what kinds of drywall did you buy

6    from BNBM PLC?

7         A.   5/8 Type X and 1/2".

8         Q.   And the 1/2" was not Type X?

9         A.   It's not Type X.

10        Q.   What does the Type X mean?

11        A.   It's the amount of resistance to fire.

12        Q.   So Type X is a fire retardant?

13        A.   Fire retardant, actually.  Fire retardant

14   board.  You can buy 5/8 regular.  It doesn't have the

15   retardant.  It doesn't give you the retardant time frame

16   that is specifically on the -- on the drawings to

17   provide the time frame that the people needs to get out

18   in the case of fire.

19        Q.   All of the purchase supply agreements that you

20   signed or that Mr. Davis signed with BNBM PLC were --

21   were signed in China; correct?

22        A.   Yes.  The contract was generated in China.  The

23   signature was generated and signed in China.  Stefan had

24   the ability to -- through computer, to place orders.

25   But the contract was already created and it was signed
```

1    in China.

2        Q.   There were some questions earlier today about

3    whether or not BNBM sells to Home Depot and Lowe's.  Do

4    you recall those questions?

5        A.   Yes.

6        Q.   Have you ever seen any BNBM or Dragon-branded

7    product in Home Depot or Lowe's?

8        A.   No.

9        Q.   So you don't have any independent knowledge,

10   sitting here today, that Home Depot or Lowe's has ever

11   sold any BNBM manufactured product?

12       A.   I was not aware.  If they did, I was not aware.

13       Q.   The second boat, when -- when you had issues

14   with shipping with Cosco and the boat coming here had to

15   be rerouted to a different port, do you recall --

16       A.   Yes.

17       Q.   -- talking about that earlier today?

18       A.   Yes.

19       Q.   That was the second boat where you had taken

20   over responsibility for shipping from BNBM PLC; correct?

21       A.   That's correct.

22       Q.   So there were no issues with anything that BNBM

23   PLC did that caused the boat to have to be redirected to

24   a different port; correct?

25       A.   Not that I can prove or anything, but knowingly

Confidential - Subject to Further Confidentiality Review

1    they're fragments of the board.  Let's say, for example,

2    one of the samples could be 3 inches by 6 inches, and

3    there were triangle shape, and they provide you samples

4    like that for the drywall, for the wood, for the metal

5    trim, and things like that.

6        Q.   And you don't recall when you received those

7    samples, whether it was early before you had placed an

8    order, or later after you had already started receiving

9    orders; correct?

10       A.   It was either after the first boat, throughout

11   the first and second boat, throughout the business

12   relationship.

13       Q.   Have you heard of the US Consumer Product

14   Safety Commission?

15       A.   Oh, yeah.

16       Q.   What do you know about the US Consumer Product

17   Safety Commission?

18       A.   Well, they -- they came to inspect the material

19   that we have.  We have to provide them with samples of

20   every single one of the pieces.  They did an

21   investigation throughout.  They concluded that there was

22   no damage on our material.

23       Q.   When did the US Consumer Product Safety

24   Commission, or the CPSC -- if I call them that, you know

25   who I'm referring to -- when did the CPSC come and do an

1  investigation?

2      A.    I don't recall specifically the time frame, but

3  it was after the scandal when they already find out and

4  they, I guess, determined that the problem with the

5  damage in housing was done by drywall, and because, as

6  you guys find out about me, the Consumer Report also

7  find out about me, so they request me and Davis

8  Construction Supply to supply samples so they can test

9  it and allow us to either sell it or return it.

10     Q.    Did EAC and Davis comply with the CPSC

11  request --

12     A.    Entirely.

13     Q.    -- for samples?

14     A.    Entirely.

15     Q.    Did EAC and Davis provide the CPSC with samples

16  of all different types of drywall that they'd received

17  in Boats 1, 2, and 3?

18     A.    For the two types of material, which is the 5/8

19  and the 1/2".

20     Q.    So the CPSC received from EAC and Davis both

21  1/2" drywall and 5/8" drywall --

22     A.    Samples.

23     Q.    -- samples?

24           And you said that the CPSC told you that the

25  drywall was fine?

Confidential - Subject to Further Confidentiality Review

```
 1            MR. MONTOYA:  Object to the form.

 2       A.   A clear, clean bill.

 3       Q.   And is that why you still feel like the drywall

 4  that you have in the warehouses from Boats 2 and 3 could

 5  still be sold or used on job sites?

 6       A.   Should.  That we cannot -- we cannot use it

 7  because of the brand got damaged and nobody allow me to

 8  use it is another thing.  That is better material than

 9  the one we produce in the United States, of course.

10       Q.   I'm going to mark something from Exhibit 7 as

11  the next exhibit.

12            MR. MONTOYA:  Do you got an extra copy?

13            MR. NICKEL:  I do not.  It came from the

14       documents he brought.  That would be Exhibit 12.

15            MR. MONTOYA:  Let me see if I have a copy.

16       Just give me a second so I can follow along.

17            MR. NICKEL:  Great.

18            MR. MONTOYA:  Go ahead.

19            (Chaparro Exhibit No. 12 was marked for

20       identification.)

21  BY MR. NICKEL:

22       Q.   So go ahead and take a look at the document.

23  I'm sorry.  Read it and let me know when you feel

24  comfortable asking a few questions about it.

25            THE VIDEOGRAPHER:  Counsel, while he's looking
```

Confidential - Subject to Further Confidentiality Review

1     at that, do you have a cell phone in one of your

2     pockets close by the microphone?

3          MR. NICKEL:  I'm sorry.

4          THE VIDEOGRAPHER:  Thanks.

5     A.   Yes.

6     Q.   Do you recognize this document?

7     A.   Yes.

8     Q.   And this is actually a stapled collection of

9  documents that was in your files; correct?

10    A.   That's correct.

11    Q.   Would you describe what this collection of

12 documents is?

13    A.   This is a collection of documentation that were

14 provided to the US Consumer Product Safety Commission in

15 relationship to the boat that I -- that I shipped out

16 out of China to United States.

17    Q.   So if we flip back two pages, there's a letter

18 dated June -- at least stamped June 16, 2009?

19    A.   That's correct.

20    Q.   From the US Consumer Product Safety Commission;

21 correct?

22    A.   Yes, that's correct.

23    Q.   And this letter is addressed to EAC & Corp.?

24    A.   Yes.

25    Q.   And is that your business address?

Confidential - Subject to Further Confidentiality Review

 1      A.   It is.

 2      Q.   So this was addressed to your company?

 3      A.   I believe so, yes.

 4      Q.   Is it fair to say that the CPSC asked, among

 5   other things, for some information from your company

 6   about the drywall that you purchased from China?

 7      A.   Yes.

 8      Q.   One of the questions, if we flip back to page 4

 9   of the CPSC letter, Request No. 9 asked you to "Identify

10   all complaints or claims of any sort related to the

11   drywall problem, including, but not limited to, warranty

12   or insurance claims, legal actions, repair, refund, or

13   injury claims, comments related to quality or conformity

14   of the drywall, or customer complaints made by your firm

15   or received by your firm, including any internal

16   complaints or claims, in any manner."

17           Did I read that correctly?

18      A.   Yes.

19      Q.   And EAC provided a response to the CPSC to this

20   letter and specifically to Request No. 9; correct?

21      A.   That's correct.

22      Q.   I believe that's the first document there,

23   dated July 2nd, 2009; is that -- is that accurate?

24      A.   Yes.

25      Q.   This is a letter to the US Consumer Product

Confidential - Subject to Further Confidentiality Review

1  Safety Commission, and on page 2, signed by you;

2  correct?

3      A.   That's correct.

4      Q.   Will you read what the response was to that

5  Inquiry No. 9?

6      A.   "We have received no complaints of any sort

7  related to the drywall problem."

8      Q.   And so EAC had never received any complaints

9  related to the drywall purchased from BNBM; correct?

10     A.   No.

11     Q.   Never had any problems with the BNBM drywall

12  that was consistent with the rumors you were hearing

13  about Chinese drywall; correct?

14     A.   None whatsoever.

15     Q.   I'm going to mark another set of materials from

16  Exhibit 7 as Exhibit 13.

17          MR. MONTOYA:  Okay.

18          (Chaparro Exhibit No. 13 was marked for

19  identification.)

20  BY MR. NICKEL:

21     Q.   I'm handing you what's been marked as

22  Exhibit 13.  Do you recognize this document?

23          Again, this came from your files that you

24  brought here today.  To be clear, it's a collection of

25  documents that was stapled in your files.

```
 1      A.   No.

 2      Q.   You don't know either way, whether they own

 3   property or don't; correct?

 4      A.   I don't.

 5      Q.   And no BNBM PLC or (Group) sales reps ever

 6   visited you in the United States for the purposes of

 7   marketing or selling drywall; correct?

 8      A.   No.

 9      Q.   And no BNBM PLC or BNBM (Group) employee ever

10   visited the United States or visited you in Florida, or

11   any other state, to solicit or negotiate the sales

12   contract with EAC or Davis; correct?

13      A.   No.  Yes, that's correct.

14      Q.   All of those discussions happened in China;

15   correct?

16      A.   Yes.

17           THE VIDEOGRAPHER:  Counsel, I have about five

18       minutes on tape.

19           MR. NICKEL:  Why don't we take a quick break.

20       I'll look through my notes.

21           THE VIDEOGRAPHER:  Off the record 6:55 p.m.

22           (Recess from 6:55 p.m. until 6:59 p.m.)

23           THE VIDEOGRAPHER:  On the record 6:59 p.m.

24           MR. NICKEL:  I have no further questions at

25       this time.  I'll pass the witness.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    C E R T I F I C A T E

 2

 3          I, JOAN L. PITT, Registered Merit Reporter,

 4   Certified Realtime Reporter, and Florida Professional

 5   Reporter, do hereby certify that, pursuant to notice,

 6   the deposition of EDGAR A. CHAPARRO was duly taken on

 7   MAY 18, 2015, at 1:41 p.m., before me.

 8          The said EDGAR A. CHAPARRO was duly sworn by me

 9   according to law to tell the truth, the whole truth, and

10   nothing but the truth, and thereupon did testify as set

11   forth in the above transcript of testimony.  The

12   testimony was taken down stenographically by me.  I do

13   further certify that the above deposition is full,

14   complete, and a true record of all the testimony given

15   by the said witness.

16

17          _____

18          JOAN L. PITT, RMR, CRR, FPR

19

20          (The foregoing certification of this transcript

21   does not apply to any reproduction of the same by any

22   means, unless under the direct control and/or

23   supervision of the certifying reporter.)

24

25
```