UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*****************************************************************

In re:  CHINESE-MANUFACTURED
DRYWALL PRODUCTS LIABILITY          MDL NO. 2047
LITIGATION                          SECTION L
                                    NEW ORLEANS, LOUISIANA
THIS DOCUMENT RELATES TO:           Thursday, May 7, 2015
                                    2:30 p.m.
ALL CASES

*****************************************************************

TRANSCRIPT OF TELEPHONIC STATUS CONFERENCE PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

OFFICIAL
COURT REPORTER:   TERRI A. HOURIGAN, CRR, RPR
                  CERTIFIED REALTIME REPORTER
                  REGISTERED PROFESSIONAL REPORTER
                  500 POYDRAS STREET, ROOM B-275
                  NEW ORLEANS, LOUISIANA  70130
                  (504) 589-7775
                  Terri Hourigan@laed.uscourts.gov


PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
PRODUCED BY COMPUTER.



```
 1    APPEARANCES:

 2    FOR THE PLAINTIFFS
      STEERING COMMITTEE:          HERMAN, HERMAN & KATZ, LLC
 3                                 BY:  RUSS M. HERMAN, ESQ.
                                        LEONARD A. DAVIS, ESQ.
 4                                 820 O'Keefe Avenue
                                   New Orleans, Louisiana 70112
 5

 6                                 LEVIN, FISHBEIN, SEDRAN & BERMAN
                                   BY:  ARNOLD LEVIN, ESQ.
 7                                      FRED S. LONGER, ESQ.
                                        SANDRA L. DUGGAN, ESQ.
 8                                      MATTHEW GAUGHAN, ESQ.
                                   510 Walnut Street, Suite 500
 9                                 Philadelphia, Pennsylvania 19106

10    PLAINTIFFS:                  THE LAMBERT FIRM
                                   BY:  HUGH LAMBERT, ESQ.
11                                 701 Magazine Street
                                   New Orleans, Louisiana 70130
12
                                   GALLOWAY JOHNSON TOMPKINS
13                                 BURR & SMITH
                                   BY:  JAMES J. REEVES, II, ESQ.
14                                 701 Poydras Street, 40th Floor
                                   New Orleans, Louisiana  70139
15
                                   MORGAN & MORGAN
16                                 BY:  RENE F. ROCHA, ESQ.
                                   600 N. Pine Island Road, Suite 400
17                                 Plantation, Florida  33324

18                                 BECNEL LAW FIRM, LLC
                                   BY:  SALVADORE CHRISTINA, JR., ESQ.
19                                 425 West Airline Highway, Suite B
                                   LaPlace, Louisiana 70068
20
                                   SEEGER WEISS
21                                 BY:  CHRISTOPHER A. SEEGER, ESQ.
                                   77 Water Street
22                                 New York, New York  10005

23                                 GAINSBURGH, BENJAMIN,
                                   DAVID & MEUNIER
24                                 BY:  GERALD E. MEUNIER, ESQ.
                                   1100 Poydras Street, Suite 2800
25                                 New Orleans, Louisiana  70163
```

```
 1    APPEARANCES:   (CONTINUED)

 2
                                    BAKER DONELSON BEARMAN
 3    DEFENSE HEARING               CALDWELL & BERKOWITZ
      COMMITTEE AND KNAUF           BY:   JAMES PARISH, ESQ.
 4                                  201 St. Charles Avenue,  Suite 3600
                                    New Orleans, Louisiana   70170
 5

 6    SPECIAL MASTER:               BROWNGREER PLC
                                    BY:   ORRAN BROWN, ESQ.
 7                                        JACOB WOODY, ESQ.
                                    250 Rocketts Way
 8                                  Richmond, Virgina   23231

 9
      DEFENDANT:                    ALSTON & BIRD, LLP
10    TAISHAN AND TTP               BY:   BERNARD TAYLOR, ESQ.
                                          MICHAEL KENNY, ESQ.
11                                        CHRISTINA EIKHOFF, ESQ.
                                    1201 West Peachtree Street NW
12                                  Suite 4200
                                    Atlanta, Georgia   30309
13
      DEFENDANT
14    TAISHAN:                      HANGARTNER Rydberg & Terrell, LLC
                                    BY:   ALAN WEINBERGER, ESQ.
15                                  701 Poydras Street, Suite 310
                                    New Orleans, Louisiana   70139
16
      DEFENDANT
17    CNBM:                         ORRICK HERRINGTON SUTCLIFFE
                                    BY:   CHRIS VEJNOSKA, ESQ.
18                                        JAMES STENGEL, ESQ.
                                          TIM EGAN, ESQ.
19                                  405 Howard Street, Suite 11
                                    San Francisco, California 94105
20

21

22

23

24

25
```

```
 1    APPEARANCES (CONTINUED)

 2

 3    DEFENDANT
      BNBM:                          DENTONS, US LLP
 4                                   BY:   MICHAEL BARR, ESQ.
                                           RICHARD FENTON, ESQ.
 5                                         MICHAEL MOORE, ESQ.
                                     1221 Avenue of the Americas
 6                                   New York, New York  10020

 7                                   233 S. Wacker Drive Suite 7800
                                     Chicago, Illinois 60606
 8
                                     1858, 2000 McKinney Avenue,
 9                                   Suite 1900
                                     Dallas, Texas 75201
10    DEFENDANT
      BNBM:                          PHELPS DUNBAR, LLP
11                                   BY:   HARRY ROSENBERG, ESQ.
                                     365 Canal Street, Suite 2000
12                                   New Orleans, Louisiana  70130

13
      OFFICE OF ATTORNEY             OFFICE OF ATTORNEY GENERAL
14    GENERAL:                       BY:   DAVID BLACK, ESQ.
                                           CHRIS STEINER, ESQ.
15                                   1885 N. Third Street
                                     Baton Rouge, Louisiana 70802
16

17    JP MORGAN                      MCGLINCHEY STAFFORD
                                     BY:   GABRIEL CROWSON, ESQ.
18                                   601 Poydras Street, 12th Floor
                                     New Orleans, Louisiana 70130
19
      MORGAN STANLEY                 SHER GARNER CAHILL RICHTER
20                                   KLEIN & HILBERT, LLC
                                     BY:   JAMES M. GARNER, ESQ.
21                                         JOSHUA FORCE, ESQ.
                                           ASHLEY COKER, ESQ.
22

23

24

25
```

1                    P-R-O-C-E-E-D-I-N-G-S

2

3                       May 7, 2015

4

5          THE COURT:  Good afternoon, this is Judge Fallon.  This

6      is our check-in on the discovery issues that exist in the

7      Chinese-Manufactured Drywall Products Liability Litigation.

8          For the Plaintiffs Steering Committee, who is on the

9      line?

10         MR. LEVIN:  Your Honor, good afternoon.  This is Arnold

11     Levin.  I have Fred Longer, Sandy Dugan, and Matt along with

12     me.

13         Russ has a group in his office and will identify them.

14         THE COURT:  All right.

15         MR. HERMAN:  Good afternoon, Judge Fallon.  May it

16     please the Court, this is Russ Herman.  In our office on this

17     conference, Lenny Davis and Madeline O'Brien are in our office.

18         MR. LAMBERT:  Skip Lambert with the Lambert Law Firm.

19         MR. REEVES:  Jim Reeves of the Reeves Law Firm.

20         MR. ROCHA:  Rene Rocha of the Morgan & Morgan Law Firm.

21         MR. CHRISTINA:  And Sal Christina, Jr., of the Becnel

22     Law Firm.

23         THE COURT:  Anyone else on the PSC?

24         MR. SEEGER:  Hi Judge, it's Chris Seeger, how are you?

25         THE COURT:  Fine, thanks.

1              MR. MEUNIER:  Your Honor, Gerry Meunier.

2              THE COURT:  All right.  Anyone else?

3              Okay, for the Knauf entities?

4              MR. PARISH:  Your Honor, this is James Parish.

5              THE COURT:  All right.  And for Taishan?  Anybody for

6      Taishan?

7              MR. TAYLOR:  Your Honor, this is Bernard Taylor.  I am

8      on a cell phone.  I hope you can hear me.

9              THE COURT:  Yes.  I can hear you, Bernard.

10             MR. TAYLOR:  Good afternoon.

11             THE COURT:  Good afternoon.

12             MR. KENNY:  Good afternoon, Your Honor.  Michael Kenny,

13     Christy Eikhoff, and Aaron Block, also for Taishan.

14             THE COURT:  Okay.

15             MR. WEINBERGER:  And Alan Weinberger, locally as well.

16             THE COURT:  All right.  And for CNBM?

17             MR. VEJNOSKA:  Good afternoon, Your Honor.  This is

18     Chris Vejnoska with Jim Stengel and Tim Egan.

19             THE COURT:  Okay.  For CNBM Group -- the same?

20             MR. VEJNOSKA:  Same, Your Honor.

21             THE COURT:  Okay.  And for, let's see, BNBM?

22             MR. BARR:  Your Honor, Michael Barr, Rick Fenton, and

23     Mike Moore, and Harry Rosenberg are all for the BNBM Group and

24     BNBM, PLC.

25             THE COURT:  Okay.  For the Attorney General?

1          MR. BLACK:  David Black, and I think Chris Steiner is

2     also from the Attorney General's office.

3          THE COURT:  Okay.  Is there somebody from JP Morgan?

4          MR. CROWSON:  Hi, Your Honor, it is Gabriel Crowson

5     with McGlinchey Stafford for JP Morgan Chase.

6          THE COURT:  Thank you.  For Morgan Stanley?

7          MR. GARNER:  Good afternoon, Judge, Jim Garner, Josh

8     Force, and Ashley Coker.

9          THE COURT:  Did I cover everybody?  Everybody is in?

10          THE LAW CLERK:  BrownGreer.

11          THE COURT:  BrownGreer.  Anybody from BrownGreer?

12          MR. BROWN:  Good afternoon, Your Honor.  This is Orran

13     Brown, Sr., and Jake Woody is also on from BrownGreer.

14          THE COURT:  All right.

15          Okay.  The first item on the agenda was the plaintiff

16     profile forms.

17          Taishan indicates that there is some issue with that.

18          Bernard, do you want to bring us up to date on that?

19          MR. TAYLOR:  Your Honor, my colleagues, Michael Kenny

20     and Christy Eikhoff have been focusing on the issue.

21          THE COURT:  All right.

22          MR. KENNY:  Your Honor, Michael Kenny.  With regard to

23     the supplemental plaintiff profile forms, the other side has

24     indicated that they will produce -- we are trying to get them

25     to produce -- we have had some technical difficulty.

1        Jake Woody is on the line, as I understand it.

2        We anticipate that we're going to get these documents

3   but we haven't gotten them yet.

4        So at this point we're just waiting.

5        THE COURT:  Okay.  Jake, is there any issue there?

6        MR. WOODY:  Yes, I can comment on that.

7        THE COURT:  Go ahead.

8        MR. WOODY:  Yesterday we copied over what we call the

9   supplemental Taishan forms.  They are the forms that were

10  filled out in the last, I would say two to three weeks.

11       We copied those PDFs over to an external site that we

12  made accessible to Alston & Bird.

13       I understand we had a lot of back and forth.  They had

14  some technical difficulties.

15       So we burned those to a DVD and overnighted it.

16       I spoke with Aaron Block this morning and provided him

17  the password to access those documents.

18       I think they were able to access them eventually to the

19  FTP sight, but we did do the DVD.  I haven't heard that there

20  was any problem with DVD.

21       We also, some days ago, provided spreadsheets that list

22  all of the fact sheets, all of the Taishan supplemental forms

23  that were completed online.  It lists the answers for each

24  question in a spreadsheet form.

25       I provided the raw spreadsheet so that could be

1    filtered, sorted, manipulated and things of that nature.

2            THE COURT: All right.

3            MR. WOODY: To my understanding, we have produced

4    everything we have on a Taishan supplemental forms. It may be

5    that Alston & Bird needs some time to review what we submitted,

6    but we have done that.

7            THE COURT: All right. Michael, the most important are

8    -- the document that will help you the most is the spreadsheet.

9    The other material is really backup for the spreadsheet.

10            The spreadsheet gives it a quick informational thing

11    so, you know what I mean, I would look at FTP rather than DVD.

12    But it's up to you on that.

13            But the spreadsheet is a key thing. The material on

14    the FTP will probably be backup material. I don't know whether

15    it will give you any -- it may give you some in-depth material,

16    but it's not going to give you anything different than the

17    spreadsheet.

18            All right. Expedited discovery, the JP Morgan Chase.

19    Any issue on that?

20            MR. KENNY: Your Honor, I'm sorry, this is Michael

21    Kenny. I just want to make the comment with regard to the

22    spreadsheet, that it is in summary form, and as Your Honor

23    knows, oftentimes the devil is in the details.

24            THE COURT: Yes.

25            MR. KENNY: That's why we need the backup and the

1   supporting material to be able to figure out, really, what the
2   summary information is.

3           THE COURT: Yes. But I think your backup -- I think
4   the backup will be helpful to you maybe in fleshing out some of
5   the details, but you are going to find that the material on the
6   summary is really the crux of it.

7           The material on FTP will verify the accuracy of the
8   material, but the material is pretty well-summarized on that
9   spreadsheet.

10          All right. Let's leave it this way: If you don't have
11  it in a day, get to me one day -- get to me, and I will get
12  with Orran or Jake and see what the problem is.

13          All right. What about JP Morgan Chase, Morgan Stanley
14  issue.

15          MR. LEVIN: Your Honor, this is Arnold Levin. We are
16  only looking here for not the original subpoena, but just
17  materials and transactions during the contempt period and Russ
18  will speak to the relevance of it.

19          THE COURT: All right.

20          MR. HERMAN: Your Honor, we have dug materials out
21  ourselves. We have listed illustratively a number of those
22  materials in the brief that we filed.

23          I don't see much use in doing that except to add to it.
24  An hour ago we found in the BNBM annual report, which was
25  published on March 15th 2015, that Morgan Stanley Securities,

1  during the contempt period from September 30th 2014, to

2  December 30th 2015, was contracted by quote, "the company," end

3  quote here BNBMP and BNBM LC as a financial advisor hired by

4  the company for performing continuous supervision duties during

5  the reporting period.

6      It's clear from the documents that we have been able to

7  obtain, and for the most part, these are documents which we

8  have accessed on our own rather than been furnished.

9      We haven't had any return by Morgan Stanley or by JP

10  Morgan, but it's clear to us at any rate, that during the

11  contempt period BNBM and other of these defendants were doing

12  business with Morgan Stanley and JP Morgan.

13      THE COURT:  All right.  What is the issue?  What is the

14  issue that I'm dealing with?

15      MR. HERMAN:  It is we are prohibited as affiliates from

16  doing business --

17      THE COURT:  I understand.  That's another issue.  What

18  is the discovery issue that you want to talk to me about?

19      Is there a problem with that, is somebody resisting?

20      MR. HERMAN:  Well, they have objected to it.

21      THE COURT:  Okay.

22      MR. GARNER:  Judge, this is Jim Garner.  If we get

23  specifics, it's very helpful, but the subpoena themselves are

24  incredibly broad and all over the place.

25      THE COURT:  The way you have to do it, Jim, if you feel

12

1    it's broad and you need some specifics, get to Russ and say, "I

2    need some specifics." What do you need?

3        And Russ, if he calls you and asks you for specifics,

4    tell him what the specifics are. You are not locked in.

5        If there is something else that pops up during the

6    discovery, that may be significant, too.

7        But let's communicate, folks, with each other before

8    you get me on the phone. It's really useful.

9        MR. HERMAN: I will certainly comply with that, and I

10   will list *in seriatim* as well as discuss with opposing counsel.

11       THE COURT: Jim, I don't know whether it's relevant

12   from the standpoint of any hearing or trial, but it's certainly

13   relevant from a discovery standpoint.

14       I don't know what the limits are, what the amounts are,

15   what they have to do with the litigation. It may not have

16   anything to do, but it does seem to me to be close enough for

17   discoverable information.

18       MR. GARNER: Judge, we understand and we really have no

19   dog in the fight. We are trying to comply.

20       We did get some specifics earlier this week, and what

21   we all learned were, they were all inactive accounts that

22   occurred in China.

23       So it would help, and I appreciate and I'm happy to

24   meet with Russ. If they give us specifics, we're certainly

25   willing to run it down. If these people are violating Court

1  orders, we will give the information to the Court.

2          THE COURT:  All right.

3          MR. BARR:  Your Honor, it is Michael Barr on behalf of

4  BNBM.

5          THE COURT:  Okay.

6          MR. BARR:  If I could just for a moment, here, people

7  are a little too quick to characterize, and we see this in

8  repeated filings made with the Court, that violations of this

9  or violations of that have occurred.

10         BNBM PLC is a public company in China.  It is hardly

11 shocking that they would have global financial advisors,

12 presumably in China.

13         I don't know the specific facts to which are being

14 referred to here, but I'm just a little concerned and I don't

15 want to have to -- and I'm sure the other defense counsel don't

16 want to be in the same position either -- of being compelled to

17 constantly, you know, reply to either these daily status

18 reports that are coming in or comments like that, that were

19 made on the record here, that assert that a violation has

20 occurred when no such facts have been adduced as of yet.

21         I will just make that general comment.  I don't want to

22 have to hopefully repeat that, but it's a matter of concern the

23 way some of these materials have been --

24         THE COURT:  I understand that.

25         What about the Baoan International Investments.

1 | Anything there?

2 | The PSC recently filed another expedited discovery
3 | request, requesting Baoan, B-a-o-a-n International Investments.

4 | MS. EIKHOFF: Your Honor, it's my understanding that
5 | that was one of the companies that BNBM identified they had
6 | been doing business with.

7 | THE COURT: Okay.

8 | MR. BARR: Your Honor, if I might again, it's Michael
9 | Barr speaking. Again, I want to be careful about this in terms
10 | of the way things get presented.

11 | We provided documents to the plaintiff voluntarily, I
12 | might add, because it wasn't covered by a specific request
13 | relating to certain sales that were made of BNBM Drywall in
14 | 2005 and 2006.

15 | Their requests that the deposition subpoena to which
16 | they are referring, which was one of the series of five, all
17 | had as the relevant time period for discovery, 2001 until the
18 | present.

19 | That respectfully, Your Honor, is not relevant to the
20 | contempt period at all.

21 | And further, you know, to the extent that it is
22 | relevant to the issues that we put into play in terms of
23 | personal jurisdiction, alter ego, you know, if that is fair
24 | game for discovery, Judge, we discussed that with you the last
25 | time that we were on the phone.

1        But again, I get a little concerned when there is one

2   motion that gets filed asking to put off the issues of personal

3   jurisdiction and alter ego until after the damages hearing, and

4   then we get served with five subpoenas for depositions in mid

5   May, all of which plainly go to the issue of personal

6   jurisdiction and alter ego.

7        MR. LEVIN:  Your Honor, this is Levin.  I will address

8   myself to that.

9        THE COURT:  All right.

10       MR. LEVIN:  Certainly, we prioritize discovery of doing

11  business during the contempt period as the issues of the

12  subpoena.  But once the deponent is in the room, if he has

13  other information that go to jurisdiction or alter ego or

14  anything else, we shouldn't let him out of the room.

15  Certainly, it could be kept open, otherwise, they're all going

16  to have to come back.  They probably may come back.

17       It seems like a waste of time when you have a witness

18  that is, one, as you called it the track three in the last

19  conference, and on track two with contempt, that you don't at

20  least explore it while you have them, especially when they are

21  third-party witnesses.

22       MR. BARR:  Your Honor, again, this is Michael Barr.

23       Again, I don't agree with that, and I certainly would

24  hope, and I'm sure those third parties would anticipate that if

25  they were going to be deposed, would be deposed once.

1      My point relates simply to let's recognize what is
2 going on.

3      THE COURT:  Yes.

4      MR. BARR:  This discovery relates to multiple of these
5 tracks.  Let's cooperate among counsel in terms of when those
6 depositions will be taken, so that we can be efficient and do
7 as much of this as we can at one time.

8      THE COURT:  Yes.

9      MR. BARR:  That's why I raise the issue, and again,
10 when we seem to have conflicting filings, let's put off
11 personal jurisdiction until later, but at the same time, let's
12 do these third parties that clearly relate to personal
13 jurisdiction issues.  It makes my head spin, Judge.

14      THE COURT:  Okay.

15      MR. BARR:  I would like to try and keep it clear.

16      THE COURT:  Look, I agree with both of you all.

17      I think that both of you are correct.

18      If somebody comes over and you can facilitate, Arnold,
19 the situation by asking questions involving another area, so
20 that that individual doesn't have to come back over to answer
21 questions on that area, it makes sense to me.

22      Now if it's an area that is going to take three days to
23 do, and it's only five minutes on the main one, then I think
24 you all ought to get together and say, look it's going to take
25 five minutes to deal with the issue of contempt, and three days

1   on the other one.  Why don't we let them come back.  That makes

2   some kind of sense to me, unless the guy is *in extremis*, and

3   you better get him now, because he is not going to come back

4   for anything.

5          MR. BARR:  Your Honor, we can work that out.

6          THE COURT:  Okay.

7          MR. LEVIN:  This is Arnold Levin.  I am just raising

8   the issue because of this.

9          THE COURT:  I got it, Michael.  I think you raised a

10  good point.

11         I'm getting flooded with material and each of you say

12  the other side is just demeaning.  That is really not helpful

13  to me.

14         I'm concerned that we're wasting time in these

15  conferences, so I'm not sure that it's the most efficient way

16  of doing it, and I will talk with you all after we get through

17  with today's work.

18         Taishan's objection and motion for protective order.

19  What's that about?

20         MR. TAYLOR:  Your Honor, I will try to get right to the

21  point.

22         The issue for our motion is the PSC has served, I

23  guess, five different types of discovery over a period of time

24  on both pre-March 17th discovery, both discovery on other

25  issues that go above and beyond the scope of the track of

1  discovery that the Court has indicated we need to focus on.

2          And, as a result, they are indicating that we need to

3  respond to that discovery by May 15.  It's distractive.  It's

4  taking us away from the focus that we are trying to be focused

5  upon, which is the track dealing with the affiliates of Taishan

6  and whether or not those affiliates were doing business in the

7  U.S.  When you look at --

8          THE COURT:  Go ahead, Bernard.

9          MR. TAYLOR:  When you look at some of the questions

10  that they are asking us to respond to, it is questions like all

11  documents related to the preparation of tax returns, financial

12  statements, from 2005 to the present, all documents and

13  communications related to any accounts Taishan had in the past

14  and was authorized to use.  There is no limitation of the time

15  period.

16          I mean, it just goes on and on asking for financial

17  records at a time when we just need to focus on that contempt

18  track of discovery.

19          As I understand it, the Court has made it clear that

20  that is what we should be focusing on.  And at this juncture,

21  the Court is not interested in focusing on their financial

22  records.  That is something to come afterwards.

23          MR. LEVIN:  Your Honor, this is Levin.  I'm sorry, I

24  think I stepped on you.

25          MR. TAYLOR:  Go ahead.

1          MR. LEVIN:  I'm wont to do that.

2          As long as these witnesses come back to the United

3     States to complete the discovery with regard to the other

4     issues that have been raised, and we know how long it took to

5     get those issues resolved with discovery in third-party

6     discovery, and when Taishan was contesting personal

7     jurisdiction, we certainly will not need to inquire of these

8     witnesses as to those issues at the present discovery.

9          However, much of what we ask for is within the time

10    frame of the contempt order.

11         We have yet to find one defendant other than BNBM, who

12    has given us six or seven transactions, that have given us any

13    documents with regard to an affiliate doing business during the

14    time frame of the contempt.

15         Every transaction that we found during this contempt

16    period has come from third-party discovery where perhaps we've

17    told the defense counsel more than they knew from their

18    clients, but we haven't gotten anything from CNBM and they are

19    in it.

20         BNBM gave us a little bit.  Taishan has given us

21    nothing on affiliates.

22         Now Bernard mentioned accounting and banking.  We know

23    they deal with an accounting firm that seems to parcel out work

24    to various countries and various entities and various cities.

25    It's just a facilitator.

1      We know that there are banking arrangements that they
2  have, and we discussed them -- Russ discussed them as to Morgan
3  Stanley and JP Morgan during the contempt period.

4      Certainly, the accounting materials during the contempt
5  period, if I remember accounting correctly, will have payables,
6  receipts, profits, and what business was being done and so will
7  the banks.

8      The Bank of China appears to be their primary bank.
9  The check for the payment of the *Germano* judgments came from
10  the Bank of China.  We want to know where the money came from
11  to the Bank of China to draft the check that paid off our
12  clients, because we think that is very important and that
13  certainly was in the contempt period.

14      In essence, we're getting nothing, especially with
15  regard to affiliates.

16      CNBM says there are no affiliates.  Well, we have given
17  them a list of affiliates.  If there are no affiliates and they
18  say there are not affiliates, then they have to bring that to
19  the attention of the Court, and we have to resolve it either by
20  discovery or by analysis, and the Court will make a decision.

21      But the defendants can't *ipse dixit* make these
22  decisions for themselves.  This goes into my argument --

23      MR. HERMAN:  I would like to, at least, be pretty short
24  on what I have to say.

25      On March 17th Taishan finally had new counsel appear.

1    Now -- it's now May.  We have received 49 documents in
2    English from Taishan, and 118 in Chinese with significant
3    problems.  Things changed.  Once we had an April 17th
4    conference, I specifically raised the issue, are you going to
5    file jurisdiction and alter ego defenses.  There was silence.

6        I raised it again.  Once CNBM Group or defendants,
7    group of defendants, and BNBM Group of defendants raised
8    motions to get out of the case on alter ego, service of
9    process, et cetera, it changed the discovery.

10       We didn't change the discovery.  And I find it very
11   difficult because obviously all parties have very competent
12   counsel, very fine counsel in the case, but Taishan has to be,
13   as a defendant, that already has been found in contempt who
14   absented itself from this litigation as did some of these other
15   defendants, is not providing to its attorneys to provide to us
16   legitimate materials that we have been requesting for several
17   months.

18       THE COURT:  Okay.  I got it.  I got it.  I have heard
19   that.

20       Bernard, you wanted to say something.

21       MR. TAYLOR:  Yes, Your Honor.  My response and my focus
22   was based upon Taishan.

23       THE REPORTER:  That isn't clear.

24       THE COURT:  You are breaking away, Bernard.  We can't
25   hear you.

1      MR. TAYLOR:  I'm sorry, can you hear me now?

2      THE COURT:  Yeah, I can hear you now.

3      MR. TAYLOR:  Okay, good.  My response was focused upon

4 Taishan, and as to what occurred -- (inaudible)

5      THE COURT:  Wait, you are in and out.

6      MS. EIKHOFF:  Bernard, you are really cutting in and

7 out.  This is Christy Eikhoff.

8      MR. TAYLOR:  Your Honor, Christy knows what I was about

9 to talk about.  Christy, why don't you take over.

10      MS. EIKHOFF:  Yes, I'm sorry, Your Honor.  This is

11 Christy Eikhoff.

12      We are happy to report that we do have a production of

13 e-mails underway that is in process right now.

14      The e-mails are specifically in the time frame from

15 July -- well, actually from a few months prior to July 2014, to

16 the end of the contempt period.

17      They are e-mails from the custody of some of the key

18 people that the PSC has been the most interested in, including

19 our deposition witness, Mr. Chess.

20      As the Court knows, we understand that those have been

21 a long time in coming.  We have presented status reports to the

22 Court explaining the technical issues that we encountered and

23 just the logistical issues of getting the documents from China

24 and reviewed in the U.S.

25      THE COURT:  When can you get that?  When can you get

1    that to the PSC?

2        MS. EIKHOFF:  They will be ready for export tomorrow

3    morning, early a.m.

4        THE COURT:  All right.  Well, let's get it to the PSC.

5        MR. HERMAN:  Your Honor, I don't understand the

6    documents that have been produced in Chinese and haven't been

7    produced in English by Taishan.

8        And secondly, I think that to be fair, once you raise

9    alter ego, who is the center of the issue?  It's Taishan's

10   relationship with these other entities.

11       And to have produced only 118 total documents, the fact

12   that now we're only going to get some documents in the contempt

13   period, but we're not going to get the documents that relate to

14   ego -- alter ego issues and single business enterprise, to me,

15   is an avoidance, not by counsel --

16       THE COURT:  Okay.

17       MR. HERMAN:  -- but by Taishan.

18       THE COURT:  Okay.  I understand.  Let's get the

19   documents first and then if you need additional material, let's

20   make a motion.

21       MR. LEVIN:  Your Honor, this is Levin.  It seems to be

22   free-wheeling and I guess you could stop me, but this may be a

23   very good time to speak in terms of the translation of the

24   documents that we're getting if Your Honor wants to hear from

25   us on that now?

1           THE COURT:  Yeah, let me get to that in a moment.

2           The second thing I wanted to talk about was the

3  Louisiana Attorney General.

4           Taishan takes the position that the Attorney General

5  doesn't have any dog in this fight and therefore shouldn't

6  participate.

7           My feeling is this:  That is accurate from the

8  standpoint of the contempt, and it may be accurate in terms of

9  the damage, but not as closely.

10          I think the Attorney General ought to be allowed to

11  participate, at least, be present in the room.

12          If there is some issue as to whether or not they could

13  ask questions, I'm going to have to deal with that, if it

14  occurs.  But they should be able to be in a room and let

15  everybody who has a potential interest in this litigation in a

16  room, and I don't want to just close it out.  I don't want to

17  have to have these things over again with just the Attorney

18  General at that time.

19          MR. BLACK:  Your Honor, this is David Black for the

20  Attorney General.  Thank you.  We need documents, though, in

21  order to be able to potentially participate.

22          THE COURT:  I understand.

23          MR. BLACK:  We haven't been getting any documents.

24          THE COURT:  David, you can get the documents or you

25  should be able to get the documents from the PSC, whatever they

1  have, you ought to have.

2       MR. HERMAN:  We have had 22 lawyers involved in the

3  process for the PSC so far on a daily basis, and have three

4  interpreters and substantial funds expended, and we are not --

5  we have not been requested by the Louisiana Attorney General to

6  provide anything.

7       But I have a question:  Is the Louisiana Attorney

8  General willing to participate in the cost, the raw cost of the

9  activities which we have had to date, including the duplication

10  of millions -- well, I won't say that, because I don't know

11  what the total is, but it was at 700,000 pages at one time.

12       THE COURT:  Well, that's another issue, and I will have

13  to deal with that if it comes up.

14       David, you have got to be aware of the fact that you

15  are adverse to some extent to the PSC.  Some issues you are

16  common with, some issues you are adverse with them.  And it's

17  fair that you get -- you pay for what you get, if you are going

18  to get it from that party.

19       So I will have to deal with that.

20       MR. HERMAN:  Your Honor, we are willing to deliver to

21  a copier here at Mr. Black's direction, by box of documents

22  that have been produced to us as distinguished from those that

23  we have achieved on our own and get them copied.

24       He can pay for it and return the box of documents to

25  us.  We can do that today if he will name a copier.

```
 1            THE COURT:  Okay.

 2            MR. BLACK:  Aren't those electronically available?  I

 3    thought they had been shared with everybody.  I don't

 4    understand why we have to get copies?

 5            MR. HERMAN:  That is an internal process of our own.

 6    We do have our own FTP site that we established, but our

 7    documents have been reproduced in paper form for use at trial

 8    and depositions.

 9            That site has documents that we generated from our own

10    work product, David, and we don't want to share that unless you

11    want to come down and talk to us.

12            THE COURT:  Folks, you all can talk about that.

13            David, talk with them about it, and if there is an

14    issue on either side, get to me, and I will resolve the issue,

15    but see what it is first.

16            MR. BLACK:  Thank you.

17            THE COURT:  PSC's motion to compel outstanding

18    discovery.  Does anybody want to talk about that?

19            MS. EIKHOFF:  Your Honor, if I may --

20            THE COURT:  Go ahead.

21            MS. EIKHOFF:  I'm sorry.  I apologize.  Before we

22    closed the last topic, which was Taishan's motion to compel,

23    I'm sorry, motion for protective order on the scope of the

24    30(b)(6) deposition, one of our concerns is as we prepare our

25    30(b)(6) witness for this deposition, in making sure that we
```

1    have an understanding of what the topics are that are going to

2    be the topics of the examination, so he can be adequately

3    prepared.

4         It's my understanding, I just want to make sure it's

5    clear for the record, that the topics of the 30(b)(6)

6    examination are going to be on the contempt track, which is

7    whether or not Taishan and its affiliates were doing business

8    during the contempt period and who the affiliates are.

9         THE COURT:  There is also some issue on the damage

10   track that somebody might -- it might bleed into that.  I don't

11   know whether it will or not.

12        But that I can see some area there.  I don't know what

13   you have been asked or what questions or what areas of

14   deposition you have been asked to provide a 30(b)(6) deponent

15   for, but primarily, I would think that it would be on the

16   contempt track dealing with alter ego and dealing with all of

17   the people, the associates, the affiliates, wholly-owned

18   subsidiaries, things of that sort.

19        But there may be something on the damage track that

20   either you want to ask about or they want to ask about.  But

21   that is, I think, basically you are right.

22        If there is somebody, and Bernard, you brought this up,

23   you and Michael, if there is somebody that is going to be --

24   that knows something about the issue that Michael has just

25   opened up, you know, let's talk with each other first and tell

1   them that that's an area that you want to go into to facilitate

2   the witness, so that that witness and that defendant doesn't

3   have to incur expense and come over a second time.

4        It makes sense.  It's not going to be an ambush.  It's

5   just you all have to cooperate a little bit to get this thing

6   handled.

7        MR. BLACK:  This is David Black, again, for the state.

8   Just to return -- in thinking about the discussion with the

9   PSC, just a thought, why don't all of the defendants just

10   provide us with the documents they provided the PSC

11   contemporaneous with providing them to the PSC.  And likewise,

12   to the extent they provided that to this point, if they just

13   provide them directly to us in whatever form they gave the PSC,

14   this whole thing would be a lot simpler.

15        THE COURT:  What about that?  That seems fair to me.

16        MR. VEJNOSKA:  Your Honor, this is Chris Vejnoska.  I

17   mean, I would say there is a cost associated with our producing

18   the documents.

19        The state is part of the MDL, and I think Your Honor

20   correctly noted that the PSC should be able to coordinate this

21   for them.

22        It's our view that it makes most sense for us to

23   produce this one time to the counsel and there are many, many

24   counsel representing the plaintiffs in this MDL and how they

25   want to share it among themselves or not share it is up to

```
 1    them, and we shouldn't be burdened with it.
 2                (Music played on the telephone.)
 3                I appreciate the musical accompaniment to my remarks,
 4    Your Honor.
 5                I am off key.
 6                THE COURT:  All right.
 7                David, if you feel strongly about it, you are going to
 8    have to file a motion just for the record, and I will deal with
 9    it.
10                MR. BLACK:  Thank you.
11                THE COURT:  Talk with the PSC first.
12                MR. BLACK:  Will do.
13                MS. EIKHOFF:  Your Honor, in terms of the -- I think so
14    that we can understand, Bernard and I are leaving for China
15    tomorrow, so just that we can understand what we're prepping
16    for, the PSC has asked for information on financials and
17    relationships and all transactions going back to 2005, 10 years
18    worth of information.
19                To me, that seems incompatible with the contempt
20    period, which is the ten-month period.
21                So some guidance would be appreciated.
22                MR. LEVIN:  Christy, I will respond to that.  This is
23    Levin.
24                If you want to make two productions, obviously, the
25    Judge has prioritized, and we understand why damages and alter
```

1    ego is prioritized, so just give us the information with the

2    Bank in China, Morgan Stanley, JP Morgan and any other banks

3    during -- and accounting firms during the contempt period.

4    MR. HERMAN: Alternatively, though, I'm going to say

5    this, if I'm going to take this deposition to the extent I'm

6    allowed to take it by the Court, and this 30(b)(6) deposition

7    will include, since the Chairman Gea [phonetic] is no longer

8    available, and Mr. Pang [phonetic] can't be found, and they are

9    the principals that would be deposed, the materials from their

10   files will be explored with the witness you do produce.

11   The controls of BNBM, CNBM, BNBM Group, CNBM Group and

12   SASIC of Taishan's activities and alter ego relationships to

13   the extent we have time will be explored.

14   The service of process issues, which now has been

15   raised, will be explored. Bernard has said the financial

16   matters will be explored.

17   Now, whether they are explored in your first production

18   of this witness, really, we are willing to work with you. We

19   will limit it to the contempt period as long as there is an

20   agreement that the deposition is held open so that we can

21   explore more fully these are the issues.

22   This is not a PLC problem. We did not cause the delay

23   after 2005. And to us, the alter ego, single business

24   enterprise issues, the jurisdictional issues, the *res judicata*

25   issues are absolutely fundamental to Taishan.

1    THE COURT: I understand the issue. Christy, this is a

2 problem that we're confronting.

3    And Michael, you addressed this. Once you have come in

4 and opened up the issue of jurisdiction, then we have to have a

5 third track.

6    Now the question with the third track is whether you do

7 it at the same time that you do one and two or you do it at a

8 different time. But it has to be done because BNBM has raised

9 the issue, or CNBM -- whoever, raised the issue.

10    Now the problem that you are going to have personally

11 is that I'm going to look to you and your firm to guarantee the

12 production of that person next time, if that's what your

13 decision is, if that's what you are asking the Court.

14    I will go along with that, but I need your firm to

15 guarantee his presence. If you can't guarantee his presence or

16 if you guarantee it and he doesn't show up, then your firm is

17 going to be in big trouble with me.

18    So I hear you, I understand you, but this has been

19 raised by your group or your team or your associates.

20    I was just going on two tracks, but for the third track

21 you are exactly right. That's what we would be doing,

22 restricting it to that time. But once the third track comes in

23 that individual may have information.

24    Now it seems to me the easiest way of doing it is to do

25 one and two first, and then do three at another time. That

1    makes a lot more sense to me.

2            But I don't want a situation to develop where this

3    individual is here now, but then when he is asked to come back,

4    nobody can find him.  That is a problem.

5            MR. BARR:  Your Honor, this is Michael Barr.  If I

6    could just address that briefly.

7            The reality, Judge, and I know there have been findings

8    made with respect to single business and enterprises and the

9    like, but I think as you can hear from speaking with the

10   different counsel, are actually not all identically situated.

11   We actually have different issues that pertain to our clients.

12   They are unique.  Their involvement here was unique and

13   different with respect to the BNBM Group witnesses.

14           I'm hopeful of working with them before with Mr. Herman

15   or whoever it may be, to try to do this once and to do it right

16   so that -- because as Your Honor knows, it is extraordinarily

17   difficult, these issues and permission issues and everything

18   else, to get these witnesses out of China.  Most of them have

19   never been out of the country even once.  And to come here is,

20   you know, no small thing, and so we want to be efficient like

21   we would be in any other big litigation that everyone was

22   involved with for many years.

23           We would like to do things efficiently.  We would like

24   to work with the PSC in terms of doing.  That's why we have

25   produced kinds of documents, you know, that we have, which I

1    think I'm being completely consistent with what I said to the
2    Court.

3         THE COURT:  You are, but I hope all of the other
4    defendants feel the same way, because that's, you know, that
5    makes a lot of sense to me, or it makes sense to me to do it in
6    two ways.

7         But we have got to be able to do it.  I can't do track
8    one and two, and then when the plaintiffs get on track three,
9    all of a sudden nobody is there.  That is not going to work
10   well.

11        So I think you all ought to talk about it and discuss
12   it and come to some resolution.  If not, then I'm going to have
13   to get involved in it.

14        MR. KENNY:  Your Honor, Michael Kenny on behalf of
15   Taishan, just following up on Christy's point.

16        THE COURT:  Yes.

17        MR. KENNY:  I would like to please note for Your Honor,
18   the witness that Bernard and Christy are going to prepare when
19   they leave to go to China tomorrow is a 30(b)(6) witness.

20        Perhaps the plaintiffs' concerns about bringing the
21   witness back would have a little greater force if we were
22   talking about a witness in his individual capacity.  But this
23   witness is a 30(b)(6) witness.  And it would seem to me, Your
24   Honor, that it's eminently reasonable to stick to your original
25   track one/track two type of analysis in a contempt discovery

1   for this 30(b)(6) witness.

2          Down the road, if we get there, and we are ordered to

3   bring back either an individual or a 30(b)(6) witness to talk

4   about the additional topics Mr. Herman wants to address, we can

5   deal with that issue then.

6          MR. HERMAN:  I don't want to be restricted in that way.

7          I mean, you are producing a person who is a tertiary

8   witness.  Your principal witnesses are gone.  One has heart

9   trouble and the other nobody can find.  And they are all over

10  the issues.

11         So by producing a tertiary witness as a 30(b)(6)

12  witness, I don't really feel that it's proper, given the

13  history of this case, for the PLC to be limited without the

14  various areas that I have stated.  And we will do it any way

15  you want, as long as, you know, you agree that, you know, you

16  are going to control the witness and make sure they are back

17  here.

18         MR. LEVIN:  Your Honor, this is Levin.  You know, I

19  believe that the defense counsel when they say that, they will

20  bring the witnesses back and that they control the witnesses.

21         My problem is with the witnesses.  We have had a bad

22  experience here, and there is no guarantee that this particular

23  group of defendants, this group, has the ability to fire

24  counsel and absent themselves from the jurisdiction.

25         I don't know that today is the day to do this, but we

1    may have to file some sort of motion to have a bond or

2    something to make sure that they don't flee the jurisdiction.

3            MR. KENNY:  Your Honor, this is the problem of getting

4    off track on the very issue we're asking you to decide.

5            The limited issue here is the scope of this particular

6    30(b)(6) deposition.  We're obligated under the federal rules,

7    as Your Honor knows, to prepare a witness, to produce a witness

8    who is knowledgeable and can speak on behalf of the corporation

9    with regard to what I hope you will decide will be the limited

10   topics of the contempt issues, and we are going to do that.

11           MR. HERMAN:  I'm looking at the first transcript when

12   the lawyers for the opposition appeared at pages 35 to 45, in

13   particular, and it's very clear at that point that the Court

14   was interested not only in the contempt issue but also in the

15   issue of relationships, and I will just say generically alter

16   ego.

17           Counsel has repeatedly tried to narrow the scope of

18   these depositions, you know, to a six- or seven-month period.

19           And again, we will cooperate.  We will be willing to

20   limit ourselves to financial matters, the contempt issues, the

21   affiliates during the period as long as we have some guarantee

22   that as regards to all of the other issues that have been

23   raised, you are going to produce with knowledgeable witnesses,

24   witnesses that can be questioned on these various areas.

25           THE COURT:  Okay.  I understand the issue.

1    This is what is going to happen:  With the witness, the

2    30(b)(6) witness, take them on the information dealing with the

3    contempt period or any issues that relate to the damage period.

4        When we get to the question of jurisdiction that BNBM

5    has raised, I'm going to look to BNBM, since they have raised

6    it, to produce witnesses that the plaintiffs feel are

7    necessary.

8        If they don't, then we will assume that BNBM is not

9    really serious about their motion to contest jurisdiction.  So

10   I will deal with it in that fashion.

11       MR. KENNY:  Your Honor, if I may, it is Michael again.

12   Just to quickly say, that we will try to work with the

13   plaintiffs in this regard.

14       There is overlap with respect to the three witnesses

15   who have been designated so far.

16       They will be ready to testify more broadly because we

17   have raised that track at this point.  We will work this out

18   with the plaintiffs.

19       There are issues that were raised, you know, in terms

20   of dates and double tracking and triple tracking, you know, and

21   the like, which we thought is what the plaintiffs wanted.  They

22   raised some concerns about that now.

23       I would like to believe that counsel can work this

24   through together and then come back to the Court, at least,

25   with respect to where we are situated, given the fact that we

1  do have those motions pending, and you know, as we were

2  discussing before.

3  They have already served a whole lot of discovery that

4  bears on those issues. We have been producing documents

5  related to those issues.

6  MR. HERMAN: Your Honor, could we assume that Taishan

7  is going to be under the same direction to produce additional

8  witnesses on these other issues?

9  MS. EIKHOFF: Your Honor, we have not filed a

10  jurisdictional motion, you know, or anything related to alter

11  ego. We understand that that ship has sailed, as far as

12  Taishan is concerned.

13  MR. HERMAN: That alter ego for BNBM and CNBM involves

14  Taishan.

15  THE COURT: Yeah, well I will have to deal with that.

16  I'm looking for BNBM to produce those witnesses when

17  that issue is before me, but I think that the PSC raises a

18  point.

19  I think Taishan is going to have to cooperate, also.

20  Otherwise, they are before me, so I can -- and they are not

21  leaving, I mean, we have already established that. So I will

22  look to Taishan to deal with that when the time comes.

23  All right. I don't know, we have got some other -- I

24  have got another defendant that objects to the deposition

25  notices. They are broad. Have we covered that enough?

1    The briefing schedule is another one.  Plaintiff moves

2 for a discovery briefing schedule for BNBM's recent motions to

3 dismiss and to vacate the preliminary default.  This is not

4 necessary, because I think we need some discovery.

5    I think that's where BNBM is going to have to produce

6 some witnesses.

7    MR. KENNY:  We agree, Your Honor, and as I continually

8 make clear, we recognize the discovery related to those

9 motions.

10    MR. LEVIN:  Your Honor, this is Levin.  We will also

11 have third-party discovery on those motions as we did with

12 Taishan.

13    THE COURT:  Right.  English translation.  Does anybody

14 want to speak on that?

15    MR. LEVIN:  Yes, I would like to speak to that.

16    Your Honor, the defendants were told to give us English

17 translations.

18    Seven weeks later, we were told within the last couple

19 of days that they didn't have an obligation to do that.

20    I remember clearly, and I reviewed the transcript that

21 Your Honor indicated that they should do this and that there

22 may be costs involved and you would handle it later.

23    THE COURT:  Yes.  Let me short stop on that.  That is

24 right.  I want English translations.  This is the reason for it

25 from the defendant's standpoint:  They need to know this.

1    The reason for it is that you get to translate what the
2    English is, and give it to the plaintiffs.  The plaintiffs may
3    check it but you get to do it.

4    If they get to do it, you are going to have to do it
5    anyway because you are not going to believe what their
6    translation is, particularly with this language.

7    In fact, that is one of the problems that we had with
8    the initial depositions, the interpreters couldn't agree what
9    the language was, much less translators.

10    So it's a little more difficult.  So I expect the
11    defendants to do the translation.  If there is cost involved, I
12    will listen to you later on.  But let's get them the material
13    and get it to them in English.  We can't delay this.

14    MR. LEVIN:  If the Court will let me, then you can
15    answer both my questions.

16    THE COURT:  Okay.

17    MR. LEVIN:  Also we're finding out that translations
18    are not translations.  They are feeding documents through
19    machines and we're getting gibberish.

20    We're not checking on them, and we are not feeding them
21    through machines, and when our translator translates the
22    document into English, it makes sense.

23    We have given Your Honor a few examples.  Machines just
24    don't cut the mustard.  It's foolish to think that you could
25    put a document through a machine and get a proper translation.

1    It's like me speaking to Siri with a south Philadelphia accent.

2    You should see what comes out, and that's what is coming out of

3    these machines.

4            MR. HERMAN:  I do want to give one citation because I

5    know learned counsel opposite cited a First Circuit case from

6    1982.  In 1994, in the *Amatex* case, 1994 Lexus 4490, which

7    factually is a lot closer to our case.  The district Court in

8    New York ordered a foreign defendant to produce documents in

9    translation.  That is *Amatex*, 1994 Lexus 4490.

10           THE COURT:  I have it.  Okay.

11           MR. VEJNOSKA:  Your Honor, I'm sorry, this is Chris

12   Vejnoska for BNBM.

13           THE COURT:  Go ahead, Chris.

14           MR. VEJNOSKA:  Let's be clear on something.  We are

15   producing translations.  We are producing translations for

16   every document we use that we are producing.  We are producing

17   machine translations, that is true.  Those are the same

18   translations that we are using.

19           The cases are clear, Your Honor, that there is no

20   obligation for a defendant when producing documents that are in

21   a foreign language that have not already been translated; in

22   other words, that do not exist in a translated state, that

23   there is no obligation to actually translate them at all.

24           We have put them, some of those in a filing that we

25   sent to the Court yesterday.  I will give you two more quick

1    cites.  If you will look at *Morris Federal Practice, Civil*

2    *Section 34.14.*  It says:  "If a document that is required to be

3    produced is in a foreign language and no English version

4    exists, the producing party should not be required to translate

5    the document into English at its own expense."

6        It goes on to say:  "Subsequent cases," referring to

7    the one, I think, that Mr. Herman just quoted, "have refused to

8    order that translations be produced."

9        The Rider Guide citing the Fifth Circuit, Chapter 11

10   says that the requesting party normally must bear the cost of

11   translating documents written in a foreign language, especially

12   if it comes at a time when the significance of the documents is

13   not known.

14       So there are other citations we can provide to the

15   Court.  But, Your Honor, the point is we are providing them.

16   They are machine-translated.  We certainly acknowledge that

17   machine translations are not perfect, but the PSC has shown

18   that it is able to take a document, look at it, and if it wants

19   to, translate it itself.  We -- as I said -- we are using the

20   same machine translations on our side.

21       If they want to further translate them, they may.  I

22   guess if we want to, we may also.

23       But I need to tell Your Honor that we have investigated

24   this, and if human translations were required, we are told an

25   excellent pace for a translator is five to eight pages per day.

1      I will also tell you that given the numbers of pages

2  that we are producing and anticipate producing, it will cost

3  millions of dollars if the obligation is to translate by human

4  every single document, and I cannot even imagine, then, when

5  the productions would be closed.

6      So it's our view that they can use -- I mean, we're

7  giving them something we're not obligated to give at all.

8      We are reviewing the documents with bilingual reviewers

9  who are looking at them and simply deciding whether or not they

10  are responsive or not.  Then once they are marked for

11  responsive, we are going ahead and producing machine

12  translations for them and for our own use as well.

13      That is more than the law entitles them to.  And if

14  they look at those, and as we do, we can look at those and see

15  if they refer to something that looks like it might require

16  additional translation, they can do so.

17      THE COURT:  Okay.  I understand both of you all.  Now

18  with respect to "obligated," I'm the one who decides whether

19  you are obligated until you appeal.

20      So my decision is that you are obligated.  But I do

21  feel that the obligation may not -- the cost may well be

22  shifted in something of this sort.

23      But I think that from the standpoint of time, we don't

24  have time to have personal translations of every document.

25      The best you can do is machine translations, and then

1  if the plaintiff needs some additional translations, the
2  plaintiff can employ someone to translate those specific
3  documents.

4       Keep an accounting of the amount that it is going to
5  cost the plaintiff to do that, and at the appropriate time, I
6  will hear from both of you all.

7       If there is a cost involved from the defendant, I will
8  listen to you.

9       If it's a cost involved from the plaintiff, I will
10  listen to you, and I will deal with it.

11       But we have got to get the documents translated as best
12  we can, as quickly as we can.  So do it.

13       I want the defendants to do it.  Do it by machine.  If
14  the plaintiffs want to specifically have somebody look at that
15  particular document because it seems like a really hot
16  document, and you need a better translation, get somebody to do
17  it.

18       Keep a count of it and we will deal with the costs
19  later on, but let's do it from the defendant's standpoint and
20  do it by machine, and let's do it as quickly as possible.

21       Okay.  Motions to compel.  PSC's motion to compel
22  BNBM's profile forms.  What is the situation there?

23       MR. BARR:  Your Honor, I am having a hard time,
24  somebody put a cell phone on mute.

25       BNBM produced profile forms a week ago.  So I'm not

1  sure what that is about.

2  THE COURT: That is not an issue; is that right?

3  MR. LONGER: Your Honor, this is Fred Longer. We have

4  filed a motion against BNBM to file complete profile forms. We

5  felt that the profile forms that they had submitted were

6  insufficient.

7  The first thing that we had said was that they had not

8  identified all of their affiliates, and the second point that

9  we had said was that under Pretrial Order No. 10, they were

10  obliged to produce the identifying information of all of the

11  drywall that they have imported in the United States.

12  To my knowledge we have never received any compliance

13  by the defendants with Pretrial Order No. 10. In that

14  capacity, the order is very specific that any new defendant

15  that came in had to identify its board, whether by the tape on

16  the side of the drywall or the identifying markings on the

17  sides of the drywall themselves. They did not do that.

18  To my knowledge none of these defendants have done it

19  except for Taishan when Hogue & LaVelle represented them. They

20  did that up front.

21  And as to the affiliates, it's my recollection that

22  they did not identify any of their affiliates and the same

23  applies to the CNBM entities, but we only moved against BNBM.

24  MR. BARR: Your Honor, this is Michael Barr, if I could

25  respond very quickly.

1        A couple of things:  No. 1, this has been a problem

2   that we have had since we have entered the case, where it is

3   sort of an ever-shifting target of what is requested at various

4   times.

5        We received a specific letter, I think it was signed by

6   Russ or signed by Arnie, saying this is the profile form we

7   want you to fill out and you have got ten days to do it.  They

8   made a motion on it even though we told them they didn't need

9   to make a motion on it because we would comply with that.

10       We filled out precisely the form that they gave us.  We

11  gave exactly the information requested, including the

12  identification of affiliates and compliance with what that form

13  required.

14       This is the same issue we keep having with you on the

15  document requests shifting every single time.  If they have

16  something that they need for us for discovery for purposes of

17  our personal jurisdiction motion or the alter ego motion, they

18  can serve a discovery request.  We can respond to it in due

19  course.  That would be part of track three that we're dealing

20  with.

21       I mean, to have this come back with some motion that

22  wasn't responded to, when I can show the Court exactly the

23  letter we received asking us to fill out a particular profile

24  form, which we did.

25            MR. LEVIN:  This is Levin.  You have loads of

 1    discovery.  You have complained about it that go to alter ego

 2    and single enterprise liability.  That is track three.  So we

 3    don't have to look at that.

 4         But with regard to affiliates, that is key to the

 5    contempt citation.  We have filed discovery requests after

 6    discovery requests, specific as to certain issues, but they are

 7    always specific as to who the affiliates are.

 8         Now if you don't believe that they are the affiliates,

 9    you can't make that decision.

10         The Court has to make that decision and there may be

11    discovery as to what the affiliate is.  But you just can't

12    ignore it.  And you've ignored everything that we have ever

13    said and everything that we have ever pointed to with regard to

14    affiliates, because affiliates is the key to the contempt

15    motion and the contempt proceeding.  And we have gotten nothing

16    from anybody on that.  As far as we're concerned you don't have

17    affiliates from your own perspective, other than five or six

18    transactions that BNBM did during the period of contempt with

19    certain entities whose depositions were taken.

20         But again, never an affiliate.  We found out about

21    Oregon, what was going on.  We found out in Texas with the

22    lumber --

23         THE COURT:  Wait, wait, wait, just a minute, Arnie.

24    We're talking about the profile forms at this point.

25         MR. LEVIN:  Well, we would like their affiliates in the

1    profile forms.

2            MR. BARR:  Your Honor, if they look at our profile

3    forms it specifically identified as affiliates.  We responded

4    to the form as it required.  If they have more that they want

5    to ask about, we have discovery to do this.

6            The form asked for which BNBM affiliates did business

7    in the U.S., while reserving our rights as to whether any of

8    that constituted doing business for either jurisdictional

9    purposes, contempt purposes, or anything else, we responded to

10   that in the form that we are given.

11           You know, this endless painting with this broadest of

12   brushes, ignoring the fact of what has been produced, what has

13   been provided, the changes for the requests that are made, it's

14   not fair.  I mean, there has got to be some orderliness to this

15   process for us to engage here.

16           THE COURT:  Okay.  Let me put some order it in.

17           My meetings with you all have really deteriorated.

18   It's causing everybody to write me daily status logs.  You are

19   wasting a lot of time on telling me what the status of the case

20   is rather than dealing with it.

21           So I'm not going to have any more meetings.

22           What I'm going to do is if somebody has a specific

23   issue that they want to raise, file a motion with me.  I will

24   hear it within three days.  Give the opposing party one day to

25   respond, and I will hear it on the third day, either oral

1    motion, and those who are present in this area need to come in

2    to Court.

3         Those who are not present, can come into Court or if

4    it's helpful to you, I have facilities for the courtroom to

5    accommodate you by telephone.

6         But we just -- you give me five or six or ten issues to

7    deal with on discovery things, and we just talk about the whole

8    five of them at one time, or some people talk about five of

9    them instead of one, and then somebody responds to No. 2, by

10   discussing No. 5 and 6 and 7.  We're all over the place.

11        I'm wasting your time, and I have got trials on other

12   cases in the meantime.

13        So I just can't -- we have got to do it in a little

14   better way.  I thought I was going to be helpful to you, but it

15   turns out that I'm just giving you a forum for people shouting

16   at each other.  That is not the purpose of these things.

17        I'm not going to set another discovery meeting.  If you

18   all have a specific issue, file a motion on it, and I will hear

19   it within three days.

20        All right.  Folks, thank you, anyway.  Thank you very

21   much.  Have a good evening.  Good-bye.

22

23

24

25

```
1                           *     *     *

2

3                       REPORTER'S CERTIFICATE

4

5          I, Terri A. Hourigan, Certified Realtime Reporter,

6    Official Court Reporter for the United States District Court,

7    Eastern District of Louisiana, do hereby certify that the

8    foregoing is a true and correct transcript to the best of my

9    ability and understanding from the record of the proceedings in

10   the above-entitled and numbered matter.

11

12

13                         s/Terri A. Hourigan

14                         Terri A. Hourigan, CRR, RPR
                           Certified Realtime Reporter
15                         Registered Professional Reporter
                           Official Court Reporter
16                         United States District Court
                           Terri_Hourigan@laed.uscourts.gov
17

18

19

20

21

22

23

24

25
```