UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

*******************************************************************

IN RE:  CHINESE-MANUFACTURED   *   Docket No. 09-MDL-2047
DRYWALL PRODUCTS LIABILITY     *
LITIGATION                     *
                               *   November 16, 2015
                               *
                               *
Relates to all cases           *   Section "L"
*******************************************************************

### REPORTER'S OFFICIAL TRANSCRIPT OF THE
### ORAL MOTIONS HEARING REGARDING

RECORD DOCUMENT 19584, SECOND EXPARTE MOTION TO DEPOSIT
SETTLEMENT FUNDS INTO THE REGISTRY OF THE COURT REGARDING
ROGER AND ALLISON ELLIOTT

AND

RECORD DOCUMENT 19428, MOTION TO RECONSIDER ORDER REGARDING
OCEANIQUE'S MOTION FOR COURT REVIEW OF THE SPECIAL MASTER'S
OPINION

### BEFORE THE HONORABLE ELDON E. FALLON,
### UNITED STATES DISTRICT JUDGE.

REPORTED BY:   Mary Thompson, RMR, FCRR
               500 Poydras Street, Box 2-13
               New Orleans, Louisiana  70130
               (504)589-7783
               mary_v_thompson@laed.uscourts.gov

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

**APPEARANCES:**

For the Plaintiffs:     Herman, Herman & Katz
             BY:  RUSS HERMAN
               LEONARD DAVIS
             820 O'Keefe Avenue
             New Orleans, LA  70113

             Levin, Fishbein,
             Sedran & Berman
             BY:  ARNOLD LEVIN
               FREDERICK LONGER
             510 Walnut Street, Ste. 500
             Philadelphia, PA  19106

             Colson Hicks Eidson
             BY:  ERVIN GONZALEZ
             1100 Poydras Street
             Suite 2800
             New Orleans, LA  70163


For the Defendants:     Baker Donelson Bearman
             Caldwell & Berkowitz
             BY:  KERRY J. MILLER
             201 St. Charles Avenue
             Ste. 2400
             New Orleans, LA  70112

**FINAL TRANSCRIPT ˙ FINAL TRANSCRIPT**

1                **P R O C E E D I N G S**

2                 (Call to order of the court.)

3     THE COURT:  Be seated, please.

4     THE CASE MANAGER:  Mr. and Ms. Ellison, are you still

14:36:28  5 on the line?

6     MR. ELLIOTT:  Yes.

7     MS. ELLIOTT:  Yes, sir, I am.

8     THE COURT:  As I understand this motion, it involves

9 drywall that was in the home.  The case was resolved, the money

14:36:44  10 was placed in the registry of the court, the husband and wife

11 are divorced, and the question is who is entitled to the funds.

12 There was an attempt at mediation.  That was unsuccessful.  The

13 spouse went to the court, and a state court judge heard evidence

14 and ruled that the money should be given to the wife.  The

14:37:21  15 husband contests that, and I set this rule to show cause why the

16 state court judgment should not be enforced.

17     I'll hear from the parties at this time.  I suppose

18 the best way of handling this is let me hear from the husband

19 first -- or the ex-husband, and then I'll hear from the ex-wife.

14:37:45  20     Yes, sir.

21     MR. ELLIOTT:  Good afternoon, Judge Fallon.  I wanted

22 to say, first of all, thank you for your chivalrous fight

23 against the Chinese and Taishan.  I'm sure history will say that

24 you fought the good fight.  And so regardless of this particular

14:38:01  25 outcome, I thank you for looking out for the little folks.

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1       The -- you ordered that I file a rule to show cause,

2  and I would like to say there are three principle factors which

3  I believe should be weighed in this case.

4       One is that at the time when the marital -- or the

5  divorce was going through and the marital settlement agreement,

6  I was recovering from Stage IV cancer.  My surgeon had performed

7  surgery, chemo, and radiation.  I was, in his opinion, which I

8  found out later, a terminal cancer patient, and that I lived was

9  surprising to both he and his wife.  I'm thankful, of course.

10  But I was in such a weakened state, and frankly, Your Honor,

11  fearful of continuing to live in the home, so I was willing to

12  do practically anything to escape.

13       And I don't wish to cast aspersions on my wife, but

14  she had a drinking problem at the time and it made -- anyway, in

15  any case, I wanted out because I had cancer.  But I was in such

16  a sick state that I didn't really have many options, and she had

17  all the chips and I had so few.  So cancer led me to sign a

18  marital settlement agreement that I probably would not have

19  otherwise signed.

20       I realize that's only tangential to this case, but

21  that marital settlement agreement is the foundation for which

22  the judge based her order.  And the marital settlement agreement

23  is flawed.  It's flawed for two reasons.

24       First because there was no due process, Your Honor.  I

25  came home from work one afternoon and received an e-mail from

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    the Court -- or actually from her attorney that was forwarded

2    from the Court saying that there would be a hearing the next

3    day.  I lived in the panhandle, and this hearing was going to be

4    in South Florida.

14:39:56

5           Now, prior to that I had received notice of an

6    upcoming court date, but with no date yet, and I was asked if I

7    would consent or not and to file an agreement -- or file in

8    writing if I didn't agree.  And I didn't, and I filed that.  And

9    I never heard back from the Court.

14:40:10

10          So I was given less than 24 hours' notice of the

11   hearing date.

12          And I woke up the next morning -- as you know, I'm on

13   central time and they're on eastern time -- and in my in-box was

14   the signed order from the judge which happened early that

14:40:26

15   morning, probably at 8:00 or 9:00.  So by the time I read the

16   e-mail, it was, Your Honor, less than 24 hours' notice for a

17   court date.

18          So the second point I would make, in addition to

19   cancer, is there was no due process for that judge's order.

14:40:41

20          And then underlying all of this was the marital

21   settlement agreement.  And I have here -- and you do not have,

22   sir, although I would be happy to forward it to you, the family

23   law financial affidavit, the short form, which my former wife,

24   Allison, completed with her attorney.  And in it she perjured

14:40:59

25   herself to say that she had only a few thousand dollars when in

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    fact she had nearly a half-million dollars.  So I would ask if

2    the Court would compel her to disclose her financial statements

3    from October to November of 2013, which you'll see that she had

4    10,000 percent more money, cash on hand, than she claimed in her

14:41:18   5    financial affidavit.

6         So because of cancer, because of the lack of due

7    process for that judge's order, and because of the foundation

8    for the marital settlement agreement being in her case

9    fallacious statements, I don't think she should be entitled to

14:41:34   10    all of the money.  No, sir, I do not, but I trust your judgment.

11         THE COURT:  Okay.

12         MR. ELLIOTT:  And I rest.

13         THE COURT:  Thank you, Mr. Elliott.  And I know

14    everyone is sorry for your cancer, and I hope that it's been

14:41:49   15    remedied now and that you're with us for a long time to come.

16         I appreciate you being on the phone.

17         MR. ELLIOTT:  Thank you, sir.

18         THE COURT:  And expressing yourself so articulately.

19         I'll hear from Ms. Elliott now.

14:42:03   20         MS. ELLIOTT:  Yes, sir.  My insurance paid for my

21    ex-husband to receive all of the medical care that he needed.

22    Not only that, I also paid all the copayments.  Roger had not

23    worked for the nine years we were married.

24         MR. ELLIOTT:  Your Honor, that's not true.

14:42:34   25         THE COURT:  Wait, wait.  Now, she didn't interrupt

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1  you, Mr. Elliott.  I'll give you an opportunity to speak also.

2          Go ahead, Ms. Elliott.

3          MS. ELLIOTT:  Yes, sir.

4          The house was purchased on my credit because --

5  Mr. Elliott had a bankruptcy, and the house was purchased on my

6  credit.  The loan was on my credit.  He built the home because I

7  sent him to contractor school and I paid for all of that.  And

8  he left with plenty of money.  And I know that's not what we're

9  here today to talk about.

10          Laurie Buchanan sent out the information and -- my

11  lawyer sent out the information a week in advance, and

12  Mr. Elliott replied that he could not make it.  And I went to

13  court and Judge Laurie Buchanan said that the money should be

14  mine because I'm in the house now with Chinese drywall.  And the

15  amount of money won't even come close to fixing the Chinese

16  drywall.  However, I've already paid over $2,000 myself to get

17  remediation done as well as an additional $5,000 I've paid to

18  get the remediation done.  And the fact that he is stating that

19  he should get this money makes no sense to Judge Buchanan nor

20  myself.

21          And I'm sorry that he had cancer.  I stood by him the

22  entire time.  I paid all of the bills the entire time.  And I

23  don't really -- you know, according to my lawyers, they say that

24  they're shocked that my ex would even try to get the money

25  because obviously the house is in my name only.  And I should

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    have never put it in his name as well considering that he did

2    not put one dime into building the house nor did he put one dime

3    into paying any of the mortgages.  I paid the mortgage for

4    eight-and-a-half years, and I paid cash for the land.  And that

5    was only in my name.  Therefore, I don't understand why I

6    shouldn't get the money to fix my home.

7            THE COURT:  Okay.  Thank you, Ms. Elliott.  I

8    appreciate also your being here and expressing yourself.  You

9    have a right to do so and you've done so very well.

10           Mr. Elliott, you have a right to rebut anything she

11   says or to argue -- say anything you would like to say, sir.

12           MR. ELLIOTT:  I'm a Christian so I'm constrained to

13   say what I would prefer to say, but the truth of the matter,

14   sir, is she is a pathological liar.  And there is only one thing

15   in that string of indictments which is true, and that is that

16   she paid cash for the land.  That was a true statement.

17   Everything else was a lie.

18           THE COURT:  Okay.  Well, let me step in here and tell

19   you that our system is what we all know as a federal type of

20   system.  We have both federal courts and state courts.  And each

21   of us --

22           MS. ELLIOTT:  Yes, sir.

23           THE COURT:  And each of us respect the other.  And

24   there are certain areas that the federal court is superior in

25   and there are certain areas that the state court is superior in.

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1       Generally speaking, with regard to matters of family

2  law, the federal court listens to the state court that deals

3  with this family issue.  That state court judge had all of the

4  documents before them, heard whatever argument the state court

5  felt was necessary, and looked at any documents and evidence

6  that the state court felt was germane, and rendered a judgment.

7       The judgment provides that the monies belong to

8  Ms. Elliott.  The federal court is bound by that position.  I

9  don't see any way around it.

10       Mr. Elliott, if you take issue with that court's

11  findings, sir, you need to file an appropriate appeal in the

12  state court and bring it up in the state court, not in the

13  federal court.  I have no authority over the marital regime of

14  the parties.  The state court has made a finding, and I have no

15  intention or power, in my view, of overriding the state court in

16  the state of Florida who makes a finding in the marital

17  community so I'm going to dispose of the money in accordance

18  with the state court.

19       Now, you have a right to appeal the state court's

20  decision, but that's where your remedy is, Mr. Elliott, to deal

21  with that on that basis.

22       In closing, I appreciate both of you all bringing the

23  issue to the Court.  That's the way to do it.  We resolve

24  matters in this society in that way rather than how other

25  societies take a different approach.  So both of you all have

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1   come together in bringing it to the Court, and both of you have

2   expressed yourselves very well, and I've heard and understood

3   both of you so thank you very much.  I'm going to issue an order

4   in accordance with that view.

14:49:24   5   Thank you, Mr. Elliott.

6   Let me go to the next motion that we have, which is

7   the Oceanique -- let me see, what is the number on that?

8   Dean, do you have it?

9   MR. MILLER:  The Record Doc. is 19413.

14:50:19   10   THE COURT:  Okay.  I have it now, the Document 19428?

11   MR. MILLER:  Correct.  That's the motion to

12   reconsider.

13   THE COURT:  Right.

14   MR. MILLER:  The document that we're seeking

14:50:29   15   reconsideration on is 19413.

16   THE COURT:  Right.

17   MR. MILLER:  Your Honor, Kerry Miller on behalf of

18   Knauf.  And like Mr. Elliott, I'm a Christian.  I won't go

19   there.  I won't call Fred any such names as the spouse was

14:50:44   20   called.

21   Your Honor, in the motion for reconsideration, this is

22   on the issue of Oceanique.  And just some context as to how this

23   came down and came to be.

24   This was part of what I think is one of the best

14:51:02   25   administrations I've ever seen of any kind of a class action

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    settlement.  When there are disputes, they're identified and

2    they're resolved very quickly and very efficiently.

3         In this particular case, Your Honor, it came up that

4    Oceanique was one of our ARHs.  Maybe a large one, maybe a

5    multi-unit, but it was an ARH under the Knauf Settlement

6    Agreement.  And we've had lots of reports to you on that.

7         Because it was an ARH that the parties could not

8    resolve on its own, either side was able to invoke the

9    assistance of Dan Balhoff.  Dan Balhoff sat in two different

10   capacities in the Oceanique matter.  He's also sat in two

11   different capacities in other matters.  He sat both, Your Honor,

12   as the court-appointed special master on disputed ARHs and also

13   as a mediator.

14        Your Honor, in most of the cases that go to

15   Dan Balhoff that are disputes, he's able to resolve them as

16   mediator.  If he's not able to resolve them as mediator, then he

17   puts on his special master hat and writes a recommendation to

18   Your Honor, and either side can appeal from that recommendation.

19   And that's what happened here.

20        In this particular case, we all appeared in person in

21   Miami.  Mr. Balhoff was there, and he sat as both mediator and

22   as special master.

23        He had done a number of these before this one took

24   place.  He quickly identified what the issues are.  He has

25   scheduling conferences like a court does.  He requires letter

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    briefs like a court does.  He wants the party to identify and

2    highlight the relevant issues like a court does.  And so all of

3    this had happened prior to the actual in-person setting in

4    Miami.

14:52:47

5            He came to the conclusion, after the first opening

6    statements and some shuttle diplomacy, that mediation probably

7    wasn't going to work that particular day, and so he shifted his

8    focus to functioning as a special master.

9            In that vein, Your Honor, there were two issues -- or

14:53:07

10   there are two issues with the claim.

11           Number one was the preservation of evidence issue.

12   It's the same as the spoliation claim, Your Honor.  You have

13   pretrial orders which relate to it, but it's no different than

14   spoliation.  That's what the issue was.

14:53:22

15           And then second there's an issue of costs, of damages.

16           Your Honor, when we sat with Mr. Balhoff, it was his

17   instruction and direction to focus on what he thought was the

18   fundamental issue.  And in that case it was preservation slash

19   spoliation.  So he handled it, Your Honor, as if it were a

14:53:45

20   standing issue presented to the court.  We have to decide

21   standing before we can move to the merits and before we can move

22   to the damages.

23           It is not unlike what Your Honor is doing in the next

24   couple of days with the Chinese defendants in that you have to

14:54:00

25   look at spoliation before you can assess damages.

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    And so what Mr. Balhoff decided to do, during the
2  second part of the mediation splash special master setting and
3  in some follow-up phone calls prior to the filing of Oceanique's
4  appeal, was to focus on the issue of preservation and
5  spoliation.  And that's what Knauf did and that's the basis
6  under which he ultimately made a recommendation that was
7  appealed to Your Honor.

8    There was no attention or focus on Mr. Balhoff's part
9  or on Knauf's part on the issue of damages or costs.  We were
10  focused on the fundamental issue analogous to standing.  In this
11  particular case, preservation or spoliation.

12    So that's what was discussed in Miami, and certainly
13  that was the only thing that was in Mr. Balhoff's recommendation
14  to Your Honor.

15    Because these issues went to Mr. Balhoff, as both
16  mediator and special master, I don't blame the plaintiffs for
17  putting in what their damages were, because it was a position
18  paper.  And you want to put your number in a position paper
19  because you never know which way these mediations slash sessions
20  go.  That's how the $3.18 million claimed cost got into the
21  position paper.  That's how it made it into the appeal.

22    But as Your Honor pointed out just 10 or 15 minutes
23  ago, one of the issues we have now is certain of the claimed
24  costs that Oceanique had, that were subject to Your Honor's
25  award in Record Doc. 19413, are, in fact, of the loss fund

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    claims which goes above and beyond the Knauf remediation

2    program.  An ARH is a functionary of the remediation program.

3    That's where it falls under the settlement agreement.

4            A couple of additional points here on the standard for

14:55:59    5    motion for reconsideration, Your Honor.  There are some points

6    in the plaintiffs' opposition about delay and justice.  As

7    Your Honor knows, reconsideration is an extraordinary remedy and

8    what needs to be balanced is justice, finality, and fairness.

9            In this particular case, Your Honor, what I want to

14:56:16   10    point out is that Oceanique itself sought to continue the

11    mediation twice.  I think we were due to originally mediate last

12    October, and then it was December, and then it got moved to

13    March of 2015.  So the arguments they make about delay and

14    justice being denied just are not appropriate in this particular

14:56:34   15    context.

16            Also, Your Honor, I'd like to focus in on what an

17    analysis, either by Your Honor or if you were to remand back to

18    Mr. Balhoff, on costs would entail.  It is not some exercise

19    like you're dealing with tomorrow, what's in computers in China.

14:56:55   20    It's nothing like that at all.  It's a very discrete inquiry.

21            Your Honor, Exhibit A to Knauf's Motion For

22    Reconsideration was sort of a one-page summary sheet that

23    Oceanique had provided in connection with the mediation slash

24    special master setting.

14:57:09   25            If I may, Your Honor, I can approach and hand you a

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    copy and hand a copy to Eliza.

2            So, Your Honor, if you look at it, that was their

3    one-page summary of what their costs were as collected by

4    Oceanique -- the Russian gentleman who owned Oceanique.  And at

5    the bottom of the page you see the total number of

6    $3.18 million.

7            And in Your Honor's ruling on Oceanique's appeal, you

8    awarded Oceanique an award of 60 percent of that $3.18 million,

9    which was 60 percent of the claimed cost as opposed to the

10   arguments we made which is it should be 60 percent of the

11   reimbursable costs under the remediation program of the Knauf

12   Settlement Agreement.

13           Your Honor, so what we did in a summary way was

14   identify what the issues were on ferreting out what's a claimed

15   cost and truly what's a reimbursable cost.

16           And what we put, Your Honor, in here is if it's

17   highlighted in blue, that's another loss fund claim.  That's

18   about $770,000 that Oceanique claimed against the other loss

19   fund and was paid the max by BrownGreer of $420,000.  So what's

20   in blue has been paid, $420,000.  That's categorized, as

21   Your Honor put it, as something separate and apart from

22   remediation benefits under the Knauf Settlement Agreement, and

23   that's been disposed of by BrownGreer.

24           The plaintiffs make an argument much like David Vitter

25   made when his investigator got caught at the coffee shop spying

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1      on Sheriff Normand and John Cummings, which is ignore that, it

2      doesn't matter.  You can't just make that argument.  You can't

3      just make that argument, just ignore it, it doesn't matter,

4      sweep it under the rug.  That's another loss fund claim.  That's

14:59:03    5      what we just heard from Mr. Woody from BrownGreer about, so we

6      can't just sweep that under the rug.  And that's what's in blue.

7              Your Honor, what's in red or pink would be items that

8      we would consider non-protocol.  Again, because an ARH is an

9      offshoot of the remediation program agreement, the ARHs, in

14:59:24    10     order to be a reimbursable cost, must follow protocol.

11             Items in pink, such as scratched glass, asphalt

12     repair, and redoing pool decks -- I'm looking at Items 26, 25,

13     and 23, for example -- would not be Chinese drywall repair

14     protocol.  Oftentimes we see in cases, when you're doing

14:59:49    15     substantial work to your home to remove the drywall and to

16     repair your home, if you have other issues unrelated to drywall,

17     oftentimes you'll want to get those fixed, too, and that's

18     understandable.

19             The issue is they're not reimbursable costs under the

15:00:06    20     settlement agreement.  In fact, under the remediation program,

21     Your Honor, there is a provision which allows Moss to sign a

22     separate contract with the homeowner if they want to move a wall

23     or change certain things with respect to the home while the home

24     is gutted or while the condo is gutted and undergoing

15:00:23    25     remediation.

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    But the things in pink, Your Honor, we would submit

2 are not protocol.  Some may be debatable and some may not be

3 debatable.  In some cases -- we've done plenty of these.  Some

4 say, "Hey, it's a bad description.  What was actually done was

5 this."  Or, you know, there's one called "plumbing repairs" on

6 here, Item 30.  That could very well be related, we just don't

7 know what the plumbing repairs were for.  Maybe it was related

8 to drywall, maybe it wasn't related to drywall.

9    But certainly scratched glass and asphalt repair and

10 redoing pool decks are probably not related to Chinese drywall.

11    And then, Your Honor, there are items in yellow which

12 we highlighted, and they say, "Look, we attached as Exhibit A to

13 our opposition something from early 2014 where we gave you a

14 data dump.  We gave you three binders."

15    We looked at every single page in those three binders,

16 and my client in Germany looked at everything in those three

17 binders, and what we couldn't find is any backup for the items

18 that are highlighted in yellow.  Again, at the end of the day

19 these may be reimbursable costs.  We just don't know because we

20 haven't seen it.

21    And the items highlighted in yellow would be, number

22 one, payroll, $360,000.  Number two, supervision, $120,000.  And

23 then so on and so forth.

24    If the items are not highlighted, Your Honor, at this

25 point in the game you would simply apply the 60/40 split to

**FINAL TRANSCRIPT ˙ FINAL TRANSCRIPT**

1    those remaining items.

2        I think this analysis or this inquiry could be done in

3    a matter of a couple of hours either by Your Honor -- if you are

4    willing to take it on.  I know you just declined jurisdiction

15:02:00    5    over the divorce court.

6        So Your Honor could look at this or it could be

7    remanded for Mr. Balhoff.  He does these things over the phone.

8    We don't need to fly people in.

9        He can say, "Look, the stuff in yellow, do you have

15:02:14    10    it?"

11        "Yeah, we have it."

12        "Did you send it?"

13        "We thought we did but we didn't."  Or "Oh, we did,

14    but it's on a CD.  Go pull the CD."

15:02:22    15        It's that kind of an exercise.

16        And then the stuff in pink, you know, we can debate

17    it.  Maybe they can explain what some of these items are.  Maybe

18    we'll give on some and they would give on some.

19        And then really the only legal issue, as we see it, is

15:02:34    20    the stuff that's in blue which we think are other loss fund

21    claims -- clearly are other loss fund claims because they were

22    submitted against the other loss fund and paid under the other

23    loss fund.

24        So that's why we say, Your Honor, the most simplest

15:02:48    25    argument is a double recovery, and the fact that Oceanique has

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    been put in a position of favor over all other class members.

2    No other class member has gotten their other loss funds paid

3    from the remediation program and been able to keep their other

4    loss fund money, and that's what happened here.

5            So, Your Honor, that's sort of the background.  That's

6    sort of the context.

7            What we're asking for at this point is a review

8    either -- or an analysis either by Your Honor -- and we're happy

9    to do it on the papers that have been submitted.  We're happy to

10   submit -- or go through an exercise with Oceanique if we can

11   narrow some of these issues.  And certainly, if Your Honor

12   wants, to remand it to Mr. Balhoff.

13           I think it would involve a couple of calls in an

14   afternoon to try and figure out what are reimbursable costs

15   versus what are claimed costs.

16           THE COURT:  Okay.  I understand your issue.

17           MR. MILLER:  Thank you.

18           THE COURT:  Let me hear from your opponent.

19           Fred.

20           MR. LONGER:  Good afternoon, Your Honor.  Fred Longer

21   on behalf of the Oceanique properties, Your Honor.

22           Mr. Miller started out his argument by talking about

23   the virtues of the settlement program.  And quite honestly, the

24   Plaintiff Steering Committee is quite proud of this settlement

25   with Knauf, and, actually, all of the interrelated settlements

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    that comprise the Knauf settlement.

2           And while extolling the virtues of the settlement and

3    efficiencies of it, the settlement is efficient because it had

4    very specific rules addressed within it.  And one of them was

5    that Your Honor's order from August was supposed to be a final

6    order that was not to be reviewed.

7           So when we come here talking about efficiencies, the

8    motion for reconsideration of an order that was supposed to be

9    final, end of the story, is actually an inefficient motion

10   because it is outside of the scope of the actual terms that

11   Knauf negotiated.

12          So here we are negotiating -- and, actually, I should

13   say here Knauf is trying to renegotiate terms of an agreement

14   and terms of a negotiation and a mediation which didn't go its

15   way when Your Honor came to a different conclusion in August.

16          So I come to Your Honor from a very different

17   perspective than Knauf.  I begin by saying the first argument is

18   why are we here?  The Court's ruling was final, and that should

19   end the appellate process and we should not be here today.

20          Secondly, when Your Honor ruled -- well, actually,

21   going back to when Mr. Balhoff ruled in his decree, Mr. Balhoff

22   ruled that the matter included remediation claims of Oceanique.

23          And I'm rounding up, Your Honor.  If you want, I can

24   give you a precise number, but it's $3.2 million.

25          And he said it very specifically on Page 3 of his

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    ruling, his decree.  He said Oceanique's total claim is
2    $3,180,499.28.

3            Knauf didn't challenge that.  They never challenged it
4    before.  In fact, when we argued to Your Honor, I said there's a
5    lot of facts that are not in dispute.  We never heard that those
6    numbers were in dispute.

7            So when the ruling came to Your Honor, and Your Honor
8    ruled -- and it was a final judgment, if you will.  All of the
9    issues that could have been raised and should have been raised
10   were merged into the final judgment.  And the final judgment
11   being what it is, is final, and it should not be subject to
12   appeal because that's what Knauf agreed would be the terms of
13   its settlement agreement.

14           The next point, Your Honor, comes down to something
15   that Mr. Miller raised, and that's whether or not there should
16   be reconsideration.  And as he mentioned, and Your Honor ruled
17   in the *Vioxx* litigation, reconsideration is basically an
18   extraordinary remedy.  And you have to have certain conditions
19   that are met, and they haven't met any of the conditions.  There
20   is no intervening change in controlling law.  The only issue
21   that the Knauf defendants are actually challenging here are
22   facts.  So they failed on the first condition.

23           The second condition is that there has to be evidence
24   not previously available.  Everything that they're arguing is
25   the evidence that already was available.  Their biggest

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1  challenge, Your Honor, is Exhibit A, which was presented by

2  Oceanique.  Now they're challenging the terms of Exhibit A, but

3  it was always available.  So the second prong of reconsideration

4  hasn't been met.

5  And finally the third prong, which is to correct a

6  clear error of law or injustice.  They're arguing that there's

7  an injustice here.  And they're saying because Oceanique

8  apparently asked for two postponements of a negotiation, that

9  somehow that trumps the injustice that my clients feel after

10  having waited six-and-a-half years to get paid.  Frankly, my

11  clients, I think, are much more harmed by the fact that they had

12  to endure the original insult and go through this whole process.

13  So to hear prejudice on the defendant's part in terms of

14  injustice strikes me as sort of crocodile tears.

15  So now they're here seeking to renegotiate, and they

16  want us to come back and renegotiate.  Well, this isn't an

17  endless loop tape that we were supposed to go through.  There's

18  supposed to be finality here.

19  And, frankly, if we go through all of these items --

20  and I don't want to go through all of these items, Your Honor,

21  because I don't think it's appropriate at this time, or

22  otherwise, because procedurally I don't think this matter should

23  be heard.

24  But the challenge about the other loss fund, well, the

25  other loss fund addresses loss of use and sales and rentals.

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1 These blue items are not dealing with lost sales.  They're

2 dealing with components that are not covered by the other loss

3 fund.

4   The pink items, the non-protocol items, so to speak,

5 all of these, Your Honor -- Oceanique, as you'll recall, did its

6 demo and did its remediation prior to the existence of PTO 1B,

7 and it also did its remediation prior to the protocol, which is

8 in the settlement agreement, which was 2012, so to apply again

9 prospectively what happened retroactively is inappropriate.

10   And the settlement agreement, the ARH protocol,

11 actually covers that in Section IV.D.1.A.  And it says only

12 remediation work reasonably consistent with the remediation

13 protocol shall be eligible for reimbursement.  "Reasonably

14 consistent" is a permissible reimbursement, and Knauf never

15 challenged whether this -- the work done by Oceanique years ago

16 was not consistent.  Now they're challenging it.  Too late.

17   And finally, Your Honor, they say that all of the

18 expenses were not substantiated.  We presented all of this

19 material to Knauf.  If they don't have it, I'd sort of say tough

20 nuggies, but that would be wrong.

21   I would say that the answer is simply the evidence is

22 before them, and they had had it when we presented it all to

23 them in Exhibit A of my reply brief -- I'm sorry, it's not a

24 reply, it's a response.

25   Mr. Montoya wrote on April 11, 2014, "Kindly review

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

15:10:02
15:10:29
15:10:53
15:11:17
15:11:37

1   and let us know if you believe there's anything missing."

2        We never heard that anything was missing.  Today we're

3   hearing we're missing information, and we believe it's too late

4   to make these sort of factual challenges.  Your Honor has ruled.

5   The matter should be terminated at that point.

6        And to the extent it's not -- you know, if we're

7   talking about injustice here, Your Honor, my client has

8   already -- it had a $3.2 million claim.  It was reduced by

9   40 percent.  The 40 percent is already enough reduction from our

10  perspective.  We should not be negotiating again over what an

11  additional cut should be.  We've already suffered enough.

12       And with that, I'm concluded, Your Honor, unless you

13  have any further questions.

14       THE COURT:  No, I don't.

15       Let me tell you what I recall about the case.

16       The matter came to me because the question was whether

17  the figure that the special master set was appropriate under the

18  circumstances.  And he set a figure that was a couple thousand

19  dollars, as I recall, because he felt that that was the only

20  amount that the plaintiffs could show that they expended.

21       In this case, when I saw it, they indicated that they

22  spent $3 million, and the special master awarded them a couple

23  thousand dollars.  I looked into it a little closer, and I found

24  that this plaintiff remediated the homes before the Court got

25  the suit, before there was an MDL.  They did what they felt they

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1   had to do to protect their people.  They tried to get them back

2   in their home -- back into their apartments or condos as quickly

3   as possible so they hurried up and remediated it.

4        Now, they did their best to keep documentation, but

5   they didn't know the amount of documentation or the type of

6   documentation that they needed.  But they were willing to

7   testify that this is what we spent, and this is why we spent it,

8   and this was reasonable, otherwise we wouldn't have paid it, or

9   whatever.

10       So I felt that this was a special circumstance.  That

11  that evidence was valid evidence based upon the fact that it was

12  done before the Court was even involved in the case, much less

13  made protective orders in this particular case.

14       But I assumed that the $3 million figure was the

15  reimbursable costs because that's what is recovered.  And

16  "reimbursable costs" under the already remediated cost protocol

17  is further defined as reasonable costs that the owner incurred

18  in remediating the property.

19       I just assumed it was $3 million.  I assumed it

20  because that was the claim that was made.  And that was a

21  claim -- so I assumed that that was a claim.  And I reviewed it,

22  and I felt that they proved or could prove, by their testimony

23  and other documentation, 60 percent of that particular figure.

24  But it was 60 percent, and I assumed that these were the

25  reimbursable costs.

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    It may well be the reimbursable costs, but now the

2  defendant says that, okay, they don't -- they begrudgingly

3  accept the 60 percent, but they want to know 60 percent of what.

4  And they say that 60 percent of the reasonable cost is what it

5:16:04    5  should be.  And they say that some of this is not reasonable.

6    I don't know whether it is or isn't, to tell you the

7  truth.  I had assumed it, as I say.  I think it's fair to let me

8  determine what the reasonable cost is.

9    But the defendants should realize that testimony or

5:16:27   10  statements are sufficient for me to make that cut.  I don't want

11  to give it back to Mr. Balhoff, because I suspect I'll be

12  visiting it again so I might as well just take it myself.

13    So I'll do this in two weeks.  I'll either do it on

14  the phone or in court, whichever is easiest for you all.  But

5:16:55   15  I'll have a hearing, and I'll determine what the reasonable cost

16  is.

17    And it may well come out to the same amount.  I'm not

18  really saying that it's not.

19    The interest on property, that to me can be -- or I

5:17:09   20  don't know what the interest is, I don't know what the part is,

21  but that may well be reimbursable.

22    The others may well be.  I don't know.

23    The plumbing repairs, if the plumbing repairs are

24  necessary because they're contaminated -- we've had plumbing

5:17:30   25  repairs related to drywall.  If they're repairs that update,

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1    then that's one thing; but if they're repairs made necessary,

2    that would come in.

3         Door and lock repairs the same way.  I can see if

4    there's some contamination.  And in some of those homes that you

5    all brought me to, there were nicks in various parts of the

6    property that could well be caused by drywall.

7         But I think I ought to make a finding for that to

8    satisfy the fairness.  I don't think it's 60 percent of whatever

9    figure that's claimed, it's 60 percent of reimbursable costs.  I

10   think the defendant has a point there, but it may turn out to be

11   the same.  I don't know.  But I will have a hearing.  I'll set

12   it in a couple of weeks.

13        MR. LONGER:  So, Your Honor, just for understanding

14   and clarification, it's going to be an evidentiary hearing that

15   you --

16        THE COURT:  Yes.

17        MR. LONGER:  Because if that is the case, we could

18   have our clients brought here, we could -- we would do it that

19   way.  I don't know that it could be done over the telephone.

20        THE COURT:  Okay.  Let's have a hearing, then.

21        If you all are ready for an evidentiary hearing, we'll

22   do it that way.

23        MR. GONZALEZ:  If I may, Your Honor.

24        THE COURT:  Yes.

25        MR. GONZALEZ:  As co-counsel --

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1        THE COURT:  Tell her your name.

2        MR. GONZALEZ:  -- we would request an evidentiary

3   hearing --

4        THE COURT:  Okay.  That's fine.

5        MR. GONZALEZ:  -- because we think it would make sense

6   for the Court to look the witnesses in the eye, determine

7   credibility.  Because you would not be able to do so by the

8   phone.

9        THE COURT:  Okay.  That's fine.  That's fair.  I'll do

10  that.

11       MR. LONGER:  That was Ervin Gonzalez, my co-counsel.

12       MR. MILLER:  Your Honor, Kerry Miller.

13       Are you going to issue a minute entry?  Are you going

14  to want additional briefing on the reimbursable claimed cost

15  issue?  I know we did some of it --

16       THE COURT:  Yeah.  I'm not sure I need that, Kerry.

17  You know, I look to you all for guidance.  If you think it's

18  going to be helpful -- just like Ervin, I think he made a good

19  suggestion.

20       MR. MILLER:  Yeah.  I mean, I imagine we could call

21  Moss and --

22       THE COURT:  And ordinarily we would be dealing with

23  what the witnesses said about the specifics, and what they have

24  to present, but they don't have it.  But the reason they don't

25  have it is it happened before the Court even got into the case,

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1   so it didn't seem fair to stick them with what was required when

2   they hurried up and remediated the homes and the apartments or

3   the condos.  And that's exactly what they should have done, and

4   to penalize them for doing it just seemed to me to be unfair.

l5:20:16   5          But in their situation, other evidence is acceptable

6   if it's accurate.

7          MR. MILLER:  Your Honor, for something, for example,

8   like the first item on the list, payroll, $360,000 --

9          THE COURT:  Yeah, that may be a problem.

l5:20:32   10          MR. MILLER:  I mean, we say we don't have it.  I don't

11   know if their position is "it's been too long so we don't have

12   it anymore" or "we gave it to you" or "we thought we gave it to

13   you."

14          But it may make some sense, particularly for these

l5:20:44   15   items in yellow -- I mean, we can come out here and do a CDC

16   type rule day on things like that, but my evidence on payroll,

17   for example, would be testimony from someone in my office -- or

18   someone at Moss who looks at these binders and they would say --

19          THE COURT:  Yeah.  Right.

l5:20:57   20          MR. MILLER:  -- we got these three binders here --

21          THE COURT:  But they ought to have some documentation

22   of payroll.

23          MR. MILLER:  -- that are in the letters and we don't

24   have it.  I don't know what extra evidence I can give for you on

l5:21:05   25   that other than someone who looked at the binders to say, "I

**FINAL TRANSCRIPT ˙ FINAL TRANSCRIPT**

1    looked for it and I couldn't find it in there."

2           So, you know, I think it makes some sense for us to

3    get on the phone and maybe figure out if there's a way to narrow

4    some of these issues or there are some affidavits and things

5    like that.

6           THE COURT:  I don't have any problem with that.

7           But I also would like you all to exchange documents

8    that you're going to be introducing so that nobody is surprised

9    with it.  So --

10          MR. LONGER:  There's already been a substantial

11   exchange of documents, Your Honor, but we can cover it again --

12          THE COURT:  If you have, let's --

13          MR. LONGER:  -- and be sure that we've got all of our

14   T's crossed and all that stuff.

15          MR. MILLER:  From our standpoint, this is a template.

16   You know, the number we came up with in our reply was basically

17   the 60 percent of what's in white.  So we're not interested

18   about what's in white.  It's the yellow, the pink.  And then,

19   like I said, the blues are legal issues so maybe we'll call

20   BrownGreer on that.

21          But at any rate, it's the yellow and the pink where we

22   ought to be spending some time.

23          THE COURT:  Yeah.  Let me do this.  What's a date,

24   Dean, that I have available next week that we can do this or the

25   following week?

**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1                      (A pause in the proceedings.)

2              MR. MILLER:  Your Honor, we were just talking.  Could

3      we do this maybe after the next status conference on

4      December 7th?  That's less than three weeks away with

5      Thanksgiving in between.

6              THE COURT:  Yeah, I don't have any problem with that.

7              Are you all okay with that?

8              MR. GONZALEZ:  That's fine, Your Honor.

9              MR. MILLER:  You'll already be here.

10             MR. LONGER:  Yeah, that's a great suggestion, Your

11     Honor.

12             THE COURT:  Okay.  And at least a week before, just

13     exchange documents and exchange the witness list.

14             MR. GONZALEZ:  We've never had problems working

15     together, Your Honor.

16             MR. HERMAN:  This has nothing to do with Oceanique,

17     Your Honor.

18             THE COURT:  Okay.

19             MR. HERMAN:  I have been prided -- my friends filed a

20     clawback motion today, which we expected, and they told us they

21     were doing it.

22             Everybody complains about an emergency motion, but we

23     want to file an emergency response because we do need that

24     material, if we're entitled to it, for our November 30th brief.

25             THE COURT:  Okay.


**FINAL TRANSCRIPT * FINAL TRANSCRIPT**

1        MR. BARR:  Your Honor, we filed our brief today, and

2    the Court will address this as to what it deems appropriate.

3    Our papers will be on file.

4            THE COURT REPORTER:  Sir, could I get your name?

5            MR. BARR:  Sure.  Michael Barr.

6            THE COURT:  Okay.

7            MR. LEVIN:  About time we had his name.

8            THE COURT:  Okay.  Anything else?

9            MR. HERMAN:  No.

10           THE COURT:  Okay, folks.  Thank you very much.

11                              (Proceedings concluded.)

12

13                      *  *  *  *

14                     CERTIFICATE

15

16       I hereby certify this 19th day of November, 2015, that the

17   foregoing is, to the best of my ability and understanding, a

18   true and correct transcript of the proceedings in the

19   above-entitled matter.

20

21                              /s/ Mary V. Thompson

22                         _____
                              Official Court Reporter

23

24

25

**FINAL TRANSCRIPT ˟ FINAL TRANSCRIPT**