UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL No. 2:09-md-2047 |
| | SECTION L |
| **THIS DOCUMENT RELATES TO:** | JUDGE ELDON E. FALLON |
| *Gross v. Knauf Gips KG, 2:09-cv-6690* | |
| *Amorin v. Taishan Gypsum, 2:11-cv-1672* | MAGISTRATE JUDGE |
| *Amorin v. Taishan Gypsum, 2:11-cv-1395* | JOSEPH C. WILKINSON, JR. |
| *Amorin v. Taishan Gypsum, 2:11-cv-1673* | |
| *Amorin v. SASAC, 2:14-cv-1727* | |
| *State of Louisiana v. Knauf, 2:10-cv-340* | |
| *Abner v. Taishan Gypsum, 2:11-cv-3094* | |
| *Posey v. BNBM Co., 2:09-cv-6531* | |
| *Morris v. BNBM Co., 2:09-cv-6530* | |

## REPLY IN SUPPORT OF CNBM GROUP'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION UNDER THE FSIA

# TABLE OF CONTENTS

**Page**

I.    CNBM GROUP'S STATE OWNERSHIP ESTABLISHES ITS PRESUMPTIVE
      IMMUNITY FROM SUIT. ............................................................................. 3

II.   NO STATUTORY EXCEPTION TO CNBM GROUP'S IMMUNITY APPLIES. ......... 4

      A.    CNBM Group's Own Acts Do Not Satisfy The Commercial Activity
            Exception. ............................................................................................ 6

            1.    CNBM Group Did Not Manufacture, Sell, Or Export Drywall,
                  Which Is The Conduct On Which Plaintiffs' Claims Are "Based." .......... 7

            2.    The Limited CNBM Group Acts That Plaintiffs Identify Are Not
                  The Basis Of Their Claims And Also Lack The Requisite
                  Geographical Nexus To The United States. ............................................. 9

      B.    CNBM Group's Conduct Abroad Cannot Satisfy The Tort Exception. .............. 14

      C.    Other Companies' Actions Cannot Be Attributed To CNBM Group To
            Deprive It Of Immunity Under The FSIA. ..................................................... 15

            1.    Plaintiffs Must Show Extensive, Day-to-Day Control To
                  Overcome CNBM Group's Presumption Of Separate Status. ................. 16

            2.    CNBM Group Did Not And Does Not Exercise Extensive, Day-
                  To-Day Control Over Companies That Manufactured Or Sold
                  Drywall. .......................................................................................... 19

            3.    Respecting CNBM Group's Separate Status Would Work No
                  Fraud Or Injustice. ........................................................................... 30

III.  ADDITIONAL DISCOVERY IS PLAINLY UNWARRANTED. ................................ 32

CONCLUSION ......................................................................................................... 36

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Agudas Chasidei Chabad of U.S. v. Russian Fed'n,*
528 F.3d 934 (D.C. Cir. 2008) ...................................................11

*Alejandre v. Telefonica Larga Distancia de P.R., Inc.,*
183 F.3d 1277 (11th Cir. 1999) ...................................................32

*Allen v. Russian Federation,*
522 F. Supp. 2d 167 (D.D.C. 2007) ...................................................11

*Altmann v. Republic of Austria,*
317 F.3d 954 (9th Cir. 2002) ...................................................11

*Argentina v. Weltover,*
504 U.S. 607 (1992)...................................................12

*Argentine Republic v. Amerada Hess Shipping Corp.,*
488 U.S. 428 (1989)...................................................14

*Arriba Ltd. v. Petroleos Mexicanos,*
962 F.2d 528 (5th Cir. 1992) ................................................... *passim*

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009)...................................................21

*Asociacion de Reclamantes v. United Mexican States,*
735 F.2d 1517 (D.C. Cir. 1984) ...................................................14

*Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC,*
2 F. Supp. 3d 550, 558 (S.D.N.Y. 2014) ...................................................13, 14

*Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.,*
875 F. 2d 1174 (5th Cir. 1989) ...................................................4

*Banco Nacional de Cuba v. Sabbatino,*
376 U.S. 398 (1964)...................................................18

*Bridas S.A.P.I.C. v. Gov't of Turkmenistan,*
447 F.3d 411 (5th Cir. 2006) ...................................................31

*Byrd v. Corporacion Forestal Y Indus. De Olancho,*
S.A., 974 F. Supp. 2d 264 (S.D.N.Y. 2013) ...................................................31

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Chinese Manufactured Drywall Prods. Liab. Litig.*,
  894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd* 753 F.3d 521 (5th Cir. 2014) .............................17

*Coleman v. Alcolac, Inc.*,
  888 F. Supp. 1388 (S.D. Tex. 1995) ......................................................................................5

*Dale v. Colagiovanni*,
  443 F.3d 425 (5th Cir. 2006) ................................................................................................7

*De Sanchez v. Banco Central de Nicaragua*,
  770 F.2d 1385 (5th Cir. 1985) ...........................................................................................6, 7

*Doe v. Holy See*,
  557 F.3d 1066 (9th Cir. 2009) .............................................................................................28

*Dole Food Co. v. Patrickson*,
  538 U.S. 468 (2003)..................................................................................................4, 21, 23

*DRC, Inc. v. Republic of Honduras*,
  71 F. Supp. 3d 201 (D.D.C. 2014) ......................................................................................31

*EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*,
  322 F.3d 635 (9th Cir. 2003) ................................................................................................4

*EM Ltd. v. Banco Central De La Republica Argentina*,
  800 F.3d 78 (2d Cir. 2015)...............................................................................16, 26, 28, 30

*In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*,
  735 F. Supp. 2d 277 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012) ...........................20

*Farhang v. Indian Inst. of Tech.*,
  2012 WL 113739 (N.D. Cal. Jan. 12, 2012) .........................................................................12

*Fed. Ins. Co. v. Richard I. Rubin & Co.*,
  12 F.3d 1270 (3d Cir. 1993)...........................................................................................14, 19

*First City, Texas-Houston, N.A. v. Rafidain Bank*,
  150 F.3d 172 (2d Cir. 1998)................................................................................................19

*First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding, Ltd.*,
  858 F. Supp. 2d 658 (E.D. La.), *aff'd* 703 F.3d 742 (5th Cir. 2012) .............................. *passim*

*First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba* ("*Bancec*"),
  462 U.S. 611 (1983)...................................................................................................... *passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Flatow v. Islamic Republic of Iran*,
    308 F.3d 1065 (9th Cir. 2002) .......................................................................27, 28

*Fletcher v. Atex, Inc.*,
    68 F.3d 1451 (2d Cir. 1995).....................................................................................20

*Flourine On Call, Ltd. v. Fluorogas Ltd.*,
    380 F.3d 849 (5th Cir. 2004) ...................................................................................28

*Foremost-McKesson, Inc. v. Islamic Republic of Iran*,
    905 F.2d 438 (D.C. Cir. 1990) ......................................................................4, 6, 25

*Freund v. Republic of France*,
    592 F. Supp. 2d 540 (S.D.N.Y. 2008).....................................................................23

*Gates v. Victor Fine Foods*,
    54 F.3d 1457 (9th Cir. 1995) ...................................................................................19

*Guevara v. Republic of Peru*,
    468 F.3d 1289 (11th Cir. 2006) ...............................................................................11

*Hatzlachh Supply, Inc. v. Savannah Bank of Nigeria*,
    649 F. Supp. 688 (S.D.N.Y. 1986) ..........................................................................11

*Hester Int'l Corp. v. Federal Republic of Nigeria*,
    879 F.2d 170 (5th Cir. 1989) ........................................................................ *passim*

*Holden v. Canadian Consulate*,
    92 F.3d 918 (9th Cir. 1996) .....................................................................................11

*Jones v. Petty-Ray Geophysical, Geosource, Inc.*,
    954 F.2d 1061 (5th Cir. 1992) .................................................................................14

*Kelly v. Syria Shell Petroleum Dev. B.V.*,
    213 F.3d 841 (5th Cir. 2000) ........................................................................ *passim*

*Lusk v. Foxmeyer Health Corp.*,
    129 F.3d 773 (5th Cir. 1997) ...................................................................................20

*Marathon Int'l Petroleum Supply Co. v. I.T.I. Shipping, S.A.*,
    728 F. Supp. 1027 (S.D.N.Y. 1990).........................................................................11

*MCI Telecomms. Corp. v. Alhadhood*,
    82 F.3d 658 (5th Cir. 1996) .....................................................................................34

iv

**TABLE OF AUTHORITIES**

(continued)

**Page(s)**

*Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard the United Kalavryta,*
  2015 U.S. Dist. LEXIS 1566, 2015 AMC 262 (S.D. Tex. Jan. 7, 2015) ...............................12

*Moran v. Kingdom of Saudi Arabia,*
  27 F.3d 169 (5th Cir. 1994) ...................................................................................35

*Oceanic Exploration Co. v. ConocoPhillips, Inc.,*
  2006 WL 2711527 (D.D.C. Sept. 21, 2006) ..........................................................12

*Pere v. Nuovo Pignone, Inc.,*
  150 F.3d 477 (5th Cir. 1998) ...................................................................................5

*Phoenix Consulting Inc. v. Republic of Angola,*
  216 F.3d 36 (D.C. Cir. 2000) ...........................................................................35, 36

*Reers v. Deutsche Bahn AG,*
  320 F. Supp. 2d 140 (S.D.N.Y. 2004) ....................................................................20

*Robinson v. Gov't of Malaysia,*
  269 F.3d 133 (2d Cir. 2001)....................................................................................15

*S & Davis Int'l, Inc. v. Republic of Yemen,*
  218 F.3d 1292 (11th Cir. 2000) ..............................................................................21

*Saudi Arabia v. Nelson,*
  507 U.S. 349 (1993).................................................................................... *passim*

*Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.D.,*
  923 F.2d 380 (5th Cir. 1991) ............................................................................10, 11

*In re Teleglobe Comms.Corp.,*
  493 F.3d 345 (3d Cir. 2007)....................................................................................28

*Transamerica Leasing, Inc. v. La Republica de Venezula,*
  200 F.3d 843 (D.C.Cir. 2000) ...........................................................25, 27, 28, 31

*Ungar v. Palestine Liberation Org.,*
  402 F.3d 274 (1st Cir. 2005)...................................................................................34

*United States v. Bestfoods,*
  524 U.S. 51 (1998)............................................................................................20, 27

# TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*United States v. Moats*,
      961 F.2d 1198 (5th Cir. 1992) ......................................................................32

*United States v. Wallace*,
      961 F. Supp. 969 (N.D. Tex. 1996) ..............................................................28

*United World Trade v. Mangyshlakneft Oil Prod. Ass'n*,
      33 F.3d 1232 (10th Cir. 1994) ......................................................................12

*Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation*,
      730 F.2d 195 (5th Cir. 1984) ..........................................................................9

*Verlinden B.V. v. Cent. Bank of Nigeria*,
      461 U.S. 480 (1983)................................................................................5, 18

*Virtual Countries v. Republic of S. Afr.*,
      300 F.3d 230 (2d Cir. 2002)...........................................................................12

*Voest-Alpine Trading USA Corp. v. Bank of China*,
      142 F.3d 887 (5th Cir. 1998) .......................................................................7, 9

*Walker Int'l Holdings Ltd. v. Republic of Congo*,
      395 F.3d 229 (5th Cir. 2004) ..........................................................................5

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
      965 F.2d 1375 (5th Cir. 1992) .......................................................4, 16, 18, 19

*Walters v. Indus. & Commercial Bank of China, Ltd.*,
      651 F. 3d 280 (2d Cir. 2011).........................................................................5

*Zenith Radio Corp. v. Hazeltine Research, Inc.*,
      395 U.S. 100 (1969)......................................................................................17

**Statutes**

28 U.S.C. § 1603(b) .....................................................................................3, 4

28 U.S.C. § 1604 ...........................................................................................5

28 U.S.C. § 1605(a)(2).............................................................................. *passim*

28 U.S.C. § 1605(a)(5).....................................................................................14

28 U.S.C. § 1608............................................................................................5, 34

# TABLE OF AUTHORITIES

(continued)

**Page(s)**

**Other Authorities**

Fed. R. Civ. P. 30(b)(6).................................................................................................34, 35, 36

Fed. R. Civ. P. 30(e) ..........................................................................................................23

The Foreign Sovereign Immunities Act: A Guide for Judges (2013), *available at*
    http://www.fjc.gov/public/pdf.nsf/lookup/fsiaguide2013.pdf/$file/fsiaguide20
    13.pdf ....................................................................................................................3, 9, 14

H.R. Rep. No. 94-1487 (1976)............................................................................................18, 19

Mary Kay Kane, *Suing Foreign Sovereigns: A Procedural Compass*,
    34 Stan. L. Rev. 385 (1982)..................................................................................17

Plaintiffs' lengthy responses are most notable for the lack of any evidence that China National Building Materials Group Corporation ("CNBM Group") engaged in activity on which their product liability claims are based—i.e., the manufacture or sale of allegedly defective drywall. That is because months of discovery have confirmed what CNBM Group maintained from the outset—it is not a proper party to these suits because it merely invested in companies that invested in *other* companies that engaged in such conduct. The Foreign Sovereign Immunities Act ("FSIA") requires more—far more—to establish jurisdiction over a state-owned entity like CNBM Group. Because CNBM Group's acts are not those on which Plaintiffs based their underlying claims, the commercial activity exception does not apply and this Court lacks subject-matter jurisdiction over the claims against it.

Plaintiffs' arguments expose a fundamental misunderstanding of sovereign immunity and the FSIA. Plaintiffs contend, among other misstatements of law, that CNBM Group is not an agency or instrumentality of a foreign state even though it is directly and wholly owned by the People's Republic of China ("PRC"); that CNBM Group's acts *after* this litigation was filed somehow constitute activity on which Plaintiffs "based" their underlying claims; and that the well-recognized presumption of independent status does not apply because Plaintiffs did not sue the PRC itself. These contentions are wrong—profoundly so—and should give this Court considerable pause before it places trust in any of Plaintiffs' other assertions.

The FSIA itself is relatively straightforward: a state-owned entity is presumptively immune from suit (as well as other attendant burdens of litigation), and the court lacks subject-matter jurisdiction unless one of the narrow statutory exceptions to immunity applies. Plaintiffs rely on the commercial activity exception, which requires that the underlying claims be "based upon" commercial acts *by the sovereign defendant* that occur in or directly affect the United

1

States.  In other words, CNBM Group's own acts must be those that form the basis of Plaintiffs' product liability claims.  But as Plaintiffs' responses make clear, their claims are based upon the acts of *other companies* that actually manufactured or sold drywall.

For example, trying mightily to muster some connection between CNBM Group and the acts that gave rise to their claims, Plaintiffs' brief includes a major section heading proclaiming that CNBM Group was "directly involved" in the sale of drywall to the United States by Taishan Gypsum Co. ("Taishan").  PSC Resp. at 60.  But within the 85-page "factual" portion of their brief, that critical assertion is supported by just a single paragraph (and not a very long one), which relies on a single piece of evidence that doesn't even support the point.  *See infra* at 11.  Instead, it shows only that CNBM Group may have *requested data* from Taishan about its sales years after the fact—indeed, only *after* this litigation was filed.

Because Plaintiffs' claims are based upon the conduct of other companies, Plaintiffs attempt to lump them together with CNBM Group—along with several other companies that stand between them in the corporate structure—through the bold proposition that they are *all* alter egos of one another.  To bootstrap jurisdiction over CNBM Group in this way, however, Plaintiffs must overcome its presumption of separate status and show that it exercised "extensive control" over the "day-to-day operations" of the entities that manufactured or sold drywall.  Plaintiffs' lengthy allegations regarding a purported alter ego relationship demonstrate no such thing.  Rather, they show only that CNBM Group held an indirect minority ownership interest in those companies, and—at most—had some influence over its subsidiaries' high-level strategic decisions, as any typical corporate shareholder would.

Perhaps the best indication that Plaintiffs' evidence falls flat is their extraordinary request for *yet more* discovery on these issues.  Discovery concerning sovereign immunity is required to

be limited and circumspect.  Here, however, CNBM Group has produced over 400,000 pages of documents in response to Plaintiffs' discovery requests, and its highest officials have sat for seven days of depositions.  In short, discovery already has been anything but limited and circumspect—as evidenced by Plaintiffs' 116-page brief and 135 exhibits.  And Plaintiffs utterly fail to specify how yet more discovery could possibly make a difference.  Their request is a naked attempt to further delay what already has taken too long.  CNBM Group should be dismissed from these suits for lack of subject-matter jurisdiction.

I.      **CNBM Group's State Ownership Establishes Its Presumptive Immunity From Suit.**

CNBM Group has demonstrated that it is an "agency or instrumentality of a foreign state" within the meaning of the FSIA, 28 U.S.C. § 1603(b), because it is a state-owned company incorporated under Chinese law; it enjoys the rights of a separate corporate legal person; and it is—and was, at the time this suit was filed—directly and wholly owned by the PRC.  *See* Amended Motion to Dismiss at 10 (Rec. Doc. 19527-2) (hereinafter "Mot.") (citing Cao Decl. ¶¶ 3-6 (Rec. Doc. 19527-6)).  Plaintiffs do not contest this clear evidence, but argue instead that CNBM Group is not an agency or instrumentality under the FSIA because it does not qualify as an "organ" of the PRC.  *See* PSC Resp. at 89-94; *Kelly v. Syria Shell Petroleum Dev. B.V.*, 213 F.3d 841, 846-47 (5th Cir. 2000) (describing five-factor framework for determining "organ" status under § 1603(b)(2)).

Plaintiffs' argument fails because it confuses and conflates two separate inquiries.  An entity qualifies as an agency or instrumentality if it is *either* "an organ of a foreign state"—the straw man that Plaintiffs knock down—"*or* [if] a majority of [its] shares or other ownership interest is owned by a foreign state."  28 U.S.C. § 1603(b)(2) (emphasis added); *see also* The Foreign Sovereign Immunities Act: A Guide for Judges (2013) at 30 (hereinafter "FSIA

Guide").[1]  That is, "there are two ways in which an entity can fulfill the requirements of § 1603(b)(2)": by demonstrating state ownership *or* that it qualifies as an "organ."  *EIE Guam Corp. v. Long Term Credit Bank of Japan, Ltd.*, 322 F.3d 635, 639 (9th Cir. 2003).  And as Plaintiffs' own authority observes, the vast majority of cases "have determined § 1603(b)(2) agency/instrumentality status using the 'ownership', rather than the 'organ', prong" of the statute.  *Kelly*, 213 F.3d at 846; *see also, e.g.*, *Dole Food Co. v. Patrickson*, 538 U.S. 468, 477 (2003) ("The terms of § 1603(b)(2) are explicit and straightforward.  Majority ownership by a foreign state … is the benchmark of instrumentality status."); *Hester Int'l Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 176 n.5 (5th Cir. 1989) ("NGPC is clearly an 'agency or instrumentality' of Nigeria for purposes of the FSIA, because Nigeria owned 100% of NGPC's stock."); *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F. 2d 1174, 1176 (5th Cir. 1989) (finding agency/instrumentality status because "the government of Brazil owns a majority of Petrobras's shares").

Whether CNBM Group qualifies as an "organ" of the PRC is therefore irrelevant because it is directly and wholly owned by the PRC, which Plaintiffs never even dispute. [2]

## II.    No Statutory Exception To CNBM Group's Immunity Applies.

As an agency or instrumentality of a foreign state, CNBM Group is "presumptively immune" from suit under the FSIA "unless a specified exception applies."  *Saudi Arabia v.*

---

[1] *Available online at* http://www.fjc.gov/public/pdf.nsf/lookup/fsiaguide2013.pdf/$file/fsiaguide2013.pdf.

[2] Plaintiffs again confuse two distinct issues by citing *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438 (D.C. Cir. 1990) for the proposition that majority shareholding "is not enough."  PSC Resp. at 90. *Foremost-McKesson* explained that "majority shareholding and majority control of a board of directors" are insufficient to overcome the presumption of separate status for purposes of attribution, *see also infra* at 16, it was not discussing whether an entity qualified as an agency or instrumentality of a foreign state under § 1603(b).  905 F.2d at 448.  And as the Fifth Circuit has repeatedly explained, these two inquiries are "completely different." *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1381 (5th Cir. 1992); *Hester*, 879 F.2d at 176 n.5.  Thus, while "mere state ownership" does not prove an alter ego relationship for purposes of attribution, it does establish agency or instrumentality status under § 1603(b)(2).  *Hester*, 879 F.2d at 176 n.5.

4

*Nelson*, 507 U.S. 349, 355 (1993).  And because none does, this Court "lacks subject-matter jurisdiction over a claim against [it]." *Id.*; *see* 28 U.S.C. § 1604.[3]

Consistent with this presumption (and a plaintiff's general obligation to establish subject-matter jurisdiction), once a defendant presents a prima facie case that it is an agency or instrumentality, "the burden shifts to the party opposing immunity to present evidence that one of the exceptions to immunity applies." *Kelly*, 213 F.3d at 847.  And only if the plaintiff satisfies this burden of *production* does the defendant's burden of *persuasion* ultimately matter.  *See id.*; *see also Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 482 (5th Cir. 1998) (reversing the district court's denial of sovereign immunity because the plaintiff "failed to meet her burden of proof that the commercial activity exception applied").  Further, when (as here) jurisdiction under the FSIA relies on an attribution theory—i.e., that an exception to immunity applies because *another entity* acted as the foreign sovereign's agent or alter ego—"the plaintiff bears the burden of proving this relationship." *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533-34 (5th Cir.

---

[3] The Court also should recognize the sovereign immunity of the State-owned Assets Supervision and Administration Commission ("SASAC").  *See* Mot. at 22 & n.12 (Rec. Doc. 19527-2).  As this Court is aware, it is "duty-bound to consider the jurisdictional issue of sovereign immunity at the earliest opportunity, even when the state has not entered an appearance to raise this defense."  *Coleman v. Alcolac, Inc*., 888 F. Supp. 1388, 1404 (S.D. Tex. 1995); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 & n.20 (1983).  And here, the Court entered into the record correspondence from the Chinese Embassy and PRC Ministry of Foreign Affairs that raises SASAC's sovereign immunity.  *See* Rec. Doc. 19329; *see also Walker Int'l Holdings Ltd. v. Republic of Congo*, 395 F.3d 229, 233 (5th Cir. 2004) ("[T]he very language of the FSIA makes clear that the [sovereign's] presence [in the litigation] is irrelevant."); *Walters v. Indus. & Commercial Bank of China, Ltd.*, 651 F. 3d 280, 292 (2d Cir. 2011).

Plaintiffs have nowhere disputed that SASAC is a foreign state within the meaning of the FSIA, nor could they. *See* Rec. Docs. 18679-2, 19376-1 (recognizing that SASAC is a sovereign entity covered by the FSIA by seeking to serve SASAC under § 1608 of the statute).  As the Ministry explained, SASAC is a government commission operating under the State Council of the PRC, and thus clearly a sovereign entity within the meaning of the FSIA. *See* Rec. Doc. 19329-1 at 1, 3 (describing SASAC as "an integral part of the Chinese government").  And Plaintiffs' product liability claims are not based upon any activity by SASAC, much less activity by SASAC that occurred in or directly affected the United States.  *See* Rec. Doc. 19329-1 at 3 (SASAC "has not engaged in any commercial activities in the United States, and is not associated with any commercial activities of these enterprises in the United States concerning drywall.").  Nor can this Court assert jurisdiction over SASAC based on the other companies' drywall activities because, as Plaintiffs acknowledge in their response, although SASAC "makes some 'big picture' decisions" regarding state-owned enterprises and their subsidiaries, "SASAC does not exercise day-to[-]day control" over them.  PSC Resp. at 94; *see also id.* at 93 (SASAC does not provide "detailed government direction").  Indeed, this Court has expressly rejected the argument that (a provincial-level) SASAC's supervisory control over a state-owned enterprise and its subsidiary was sufficient to overcome their presumption of separate status.  *First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding, Ltd.*, 858 F. Supp. 2d 658, 676 (E.D. La.), *aff'd* 703 F.3d 742 (5th Cir. 2012).  Accordingly, Plaintiffs' claims against SASAC must also be dismissed.

1992) (citing *Hester*, 879 F.2d at 176; *Foremost-McKesson, Inc. v. Islamic Republic of Iran*, 905 F.2d 438, 447 (D.C. Cir. 1990)).

Plaintiffs have failed to satisfy their burden.  After months of discovery, Plaintiffs have not produced any evidence that CNBM Group itself engaged in drywall-related activity that could establish jurisdiction under one of the FSIA's narrow statutory exceptions to immunity. (Indeed, the State of Louisiana's separate brief does not even attempt to make this argument.) And Plaintiffs' purported "evidence" of an alter ego relationship falls far short of the extensive, day-to-day control required to defeat CNBM Group's immunity based solely on the actions of other companies that actually manufactured or sold the drywall at issue.

### A.   CNBM Group's Own Acts Do Not Satisfy The Commercial Activity Exception.

The signal defect in Plaintiffs' attempt to invoke the commercial activity of § 1605(a)(2) is their failure to tie any conduct by CNBM Group to their product liability claims.  It is not enough to point to activity by a state actor that can be labeled "commercial."  Rather, *the defendant's commercial activity must also form the basis of the underlying claims* (and have a direct connection to the United States).  In other words, per the Fifth Circuit's instruction, a court must follow a three-step inquiry to determine whether the commercial activity exception applies. *First*, the court "must isolate those specific acts of the named defendant that form the basis of the plaintiff's suit."  *Second*, the court determines whether the defendant's relevant activity is "sovereign or commercial."  And *third*, if the activity is commercial, the court inquires whether it has the requisite territorial nexus with the United States pursuant to one of the exception's three separate clauses—e.g., whether it occurred in or directly affected the United States.  *De Sanchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1391 (5th Cir. 1985).

Plaintiffs' response all but ignores the critical first and third steps, and offers instead an extended discourse on the second one: explaining that the FSIA codified a restrictive theory of sovereign immunity, and that the export and marketing of products is commercial activity.  *See* PSC Resp. at 96-102.  These unremarkable observations only highlight the deficiencies in Plaintiffs' attempt to establish jurisdiction.  Plaintiffs cannot identify any activity *by CNBM Group* on which their product liability claims are based.  And further, any acts by CNBM Group occurred abroad, had nothing to do with the marketing of drywall, and had no "direct effect" in the United States, as § 1605(a)(2) requires.

### 1.    CNBM Group Did Not Manufacture, Sell, Or Export Drywall, Which Is The Conduct On Which Plaintiffs' Claims Are "Based."

The commercial activity exception, by its plain terms, applies only if Plaintiffs' claims are "based upon" an act or activity of CNBM Group.  28 U.S.C. § 1605(a)(2); *see also Kelly*, 213 F.3d at 853.  The Court therefore must "begin [its] analysis by identifying the particular conduct" on which Plaintiffs' claims are "based"—i.e., "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  *Nelson*, 507 U.S. at 356-57.  And because the statute "makes clear that the commercial activity must be that '*of the foreign state*,'" *Dale v. Colagiovanni*, 443 F.3d 425, 428 (5th Cir. 2006), the inquiry "requires focusing on the acts of the named defendant," *De Sanchez*, 770 F.2d at 1391.  In other words, for the commercial activity exception to apply and deprive a sovereign entity of its presumptive immunity, that entity's acts "must form the basis of at least some element of the cause of action."  *Voest-Alpine Trading USA Corp. v. Bank of China*, 142 F.3d 887, 892 (5th Cir. 1998).

CNBM Group explained in its motion, and Plaintiffs have not disputed, that Plaintiffs base their product liability claims on the manufacture, sale, and export of allegedly defective drywall.  *See* Mot. at 12 (citing complaints).  Yet after many months of discovery, Plaintiffs

7

cannot point to any act or activity by CNBM Group to show that it actually engaged in any of this conduct.  Indeed, perhaps the most extraordinary thing about Plaintiffs' 100-plus-page response is the utter lack of evidence tying CNBM Group to the allegedly defective drywall at issue.  Plaintiffs identify no drywall-related activity *by CNBM Group* during the relevant period, when the allegedly defective drywall was manufactured and exported to the United States.  Their response instead highlights that their claims are actually based on "the commercial activity and tortious conduct *of BNBM and Taishan* in manufacturing and selling defective Chinese Drywall to customers in the United States."  PSC Resp. at 4 (emphasis added).  (Which explains why Plaintiffs did not name CNBM Group as a defendant in *Germano v. Taishan Gypsum Co.*, Case No. 09-6687, the case on which their entire class damages model rests.)  And Plaintiffs do not even attempt to substantiate (much less mention) the only CNBM Group-specific allegation in their complaints: that CNBM Group somehow "caused the drywall at issue in the case to be imported, distributed, delivered, supplied, inspected, marketed and/or sold."  Mot. at 13 (citing complaints).  This is for a simple reason: as CNBM Group's general manager Jianglin Cao explained, CNBM Group never engaged in any of this activity.  *See* Cao Decl. ¶¶ 9, 16 (Rec. Doc. 19527-6).  And the months of discovery have served only to confirm this fact.

The commercial activity exception therefore does not apply because Plaintiffs fail at the very first step of the inquiry: Plaintiffs have not produced any evidence that CNBM Group engaged in the acts or activities on which Plaintiffs' claims are based.[4]

---

[4] Plaintiffs apparently misconstrue CNBM Group's motion as having argued that Plaintiffs' claims are not "based upon" the exportation of drywall.  *See* PSC Resp. at 103.  To the contrary, CNBM Group recognized this as one of the bases of Plaintiffs' claims, but explained that CNBM Group never exported drywall.  *See* Mot. at 12-13.

  **2.**  **The Limited CNBM Group Acts That Plaintiffs Identify Are Not The Basis Of Their Claims And Also Lack The Requisite Geographical Nexus To The United States.**

  Having failed to show that CNBM Group actually manufactured, sold, or exported drywall, Plaintiffs instead contest sovereign immunity by pointing to other, tangential activity upon which their claims are *not* based—including CNBM Group's alleged conduct during the course of this litigation.  But these activities did not give rise to any of Plaintiffs' claims, and Plaintiffs do not even try to argue that they occurred in or directly affected the United States.

  **a.** As a threshold matter, Plaintiffs' argument is infected by a basic mischaracterization of the legal standard.  They acknowledge that § 1605(a)(2) requires a connection between the cause of action and the commercial acts of the foreign sovereign, but—perhaps realizing how far removed CNBM Group's activities are from their product liability claims—suggest the Fifth Circuit does not require that the sovereign defendant's activity give rise to any element of the cause of action.  *See* PSC Resp. at 103 (citing *Vencedora Oceanica Navigacion, S.A. v. Compagnie Nationale Algerienne De Navigation*, 730 F.2d 195, 200 (5th Cir. 1984)).  However, their argument is predicated entirely on cases that predate the Supreme Court's authoritative statement of the legal standard in *Saudi Arabia v. Nelson*.  There, the Supreme Court explained that the phrase "based upon" refers to "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case."  507 U.S. at 357-58 (finding that § 1605(a)(2) was not satisfied because, even though the defendant's commercial "activities led to the conduct that eventually injured the [plaintiff], they are not the basis for the [plaintiff's] suit"); *see also* FSIA Guide at 49-50.  Thus, after *Nelson*, the Fifth Circuit looks to whether the sovereign defendant's commercial activity constitutes an "essential element" of the plaintiff's claim.  *Kelly*, 213 F.3d at 853; *see also Voest-Alpine*, 142 F.3d at 892 ("[T]he act or activity [of the foreign state] must form the basis of at least some element of the cause of action. *See Nelson*.").  Plaintiffs ignore

*Nelson*, and produce no evidence of a CNBM Group activity that would satisfy any element of their claims.[5]

    **b.**  For example, Plaintiffs suggest that the commercial activity exception applies because CNBM Group coordinated other defendants' "response to the drywall litigation," including Taishan's decision not to appear for its debtor examination hearing.  PSC Resp. at 104.  But this Court already properly recognized that these allegations—even if they were true—have "no bearing" on the applicability of the commercial activity exception because Plaintiffs' claims "are based on allegedly defective drywall (and not on Taishan's decision regarding the debtor examination)."  Rec. Doc. 19612 at 3-4.  The Court was unquestionably correct; the Fifth Circuit has rejected a similar argument that a sovereign defendant's participation in settlement negotiations triggered the commercial activity exception.  *See Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.D.*, 923 F.2d 380, 388 (5th Cir. 1991).  Such activities "do not provide the basis for any of [the plaintiff's] complaints" because "[s]ettlement negotiations, by their very definition, occur after the inception of a cause of action."  *Id.*  Here too, any role CNBM Group may have played in coordinating a response to the drywall litigation obviously occurred only *after* the facts that gave rise to Plaintiffs' claims, and thus cannot possibly form the basis of those claims.

    **c.**  Plaintiffs also assert that the commercial activity exception applies because CNBM Group was involved in "analyzing the volume of Taishan's sales" of drywall to the United

---

[5] In any event, even Plaintiffs' pre-*Nelson* cases recognize that the connection between the cause of action and the foreign sovereign's commercial acts "must be *material*," and that this requirement poses a "significant barrier to the exercise of subject matter jurisdiction" under the FSIA.  *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo Gen. del Sindicato Revolucionario de Trabajadores Petroleros de la Republica Mexicana, S.D.*, 923 F.2d 380, 387 (5th Cir. 1991).  The limited acts of CNBM Group that Plaintiffs identify therefore cannot possibly satisfy the "based upon" requirement of § 1605(a)(2) because they lack even a material connection to (much less constitute an essential element of) their product liability claims.

States.  PSC Resp. at 103.  This argument fails for at least three reasons.  *First*, the only evidence Plaintiffs produce shows that CNBM Group may have requested export data from Taishan in 2010, *after* the litigation was filed and the allegedly defective drywall was sold; thus, like CNBM Group's alleged coordination of litigation strategy, this cannot be activity on which Plaintiffs based their claims.  Specifically, Plaintiffs rely on a single document: a June 2010 email from Taishan to a CNBM Group official that references the drywall litigation and attaches a statistical report on the export of drywall to the United States between 2005 and 2007.  *See* Email from Peng Wenlong to Zhang Jian (PSC Resp. Ex. 81).  Because this request for data— "[w]hile perhaps a derivative" of the litigation—occurred "after the inception" of Plaintiffs' claims, it cannot form the basis of those causes of action.  *Stena*, 923 F.2d at 388; *see also Allen v. Russian Federation*, 522 F. Supp. 2d 167, 189 (D.D.C. 2007) ("the commercial activities that are identified must be the same activities that give rise to Plaintiffs' claims").

*Second*, Plaintiffs' claims are based upon the manufacture and sale of drywall—not the post hoc "analysis" of export data.  Merely reviewing export data after the fact cannot possibly form the "basis" of Plaintiffs' product liability claims.  Nor do Plaintiffs identify any case (much less a product liability case) finding that such activity could strip a foreign sovereign entity of its immunity under the FSIA.  Plaintiffs provide a lengthy string cite of cases where the commercial activity exception applied because the sovereign defendant actually sold, contracted, or marketed the product or services at issue.[6]  *See* PSC Resp. at 100-01.  But not a single one of those cases

---

[6] *See, e.g.*, *Guevara v. Republic of Peru*, 468 F.3d 1289, 1300 (11th Cir. 2006) (describing a contract for the shipment of oil); *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 948 (D.C. Cir. 2008) (sovereign entities signed contracts for publishing and sale of documents); *Altmann v. Republic of Austria*, 317 F.3d 954, 969 (9th Cir. 2002) (foreign sovereign published book and marketed art exhibition); *Holden v. Canadian Consulate*, 92 F.3d 918, 922 (9th Cir. 1996) (foreign sovereign's consulate directly employed plaintiff in the United States); *Marathon Int'l Petroleum Supply Co. v. I.T.I. Shipping, S.A.*, 728 F. Supp. 1027, 1030 (S.D.N.Y. 1990) (affirming dismissal on sovereign immunity grounds where complaint was "not based…upon any relationship, contractual or otherwise, that [the complainant] had with [the sovereign entity]");  *Hatzlachh Supply, Inc. v. Savannah Bank of Nigeria*, 649 F. Supp. 688, 689 (S.D.N.Y. 1986) (sovereign defendant coordinated payment for plaintiff's export of

found that § 1605(a)(2) applied where the defendant merely "analyzed" data about some other company's exports or sales.

*Third*, even if the "based upon" standard were satisfied—which it is not—"analyzing" export data would lack the required territorial nexus with the United States.  Plaintiffs never say which clause of the commercial activity exception they mean to rely upon, *see* FSIA Guide at 50-51, but they must rely on third clause: The first two clauses of § 1605(a)(2) each require conduct by the sovereign entity "in the United States," and CNBM Group's alleged "analysis" of export data occurred abroad.[7]  Under the third clause, Plaintiffs must show that the foreign state's acts cause a "direct effect" in the United States.  But Plaintiffs did not invoke this clause in their complaints, *see* Mot. at 12 & n.6 (citing complaints), and they understandably do not even attempt to argue that "analyzing" export data has the requisite "direct effect."  As CNBM Group explained in its motion, *see* Mot. at 15-16, Plaintiffs' alleged injuries are an "immediate consequence" of the manufacture and sale of the drywall at issue, *Argentina v. Weltover*, 504 U.S. 607, 618 (1992), not the "analyzing" of export data after the fact.  Their injuries "depended crucially"—indeed, entirely—"on variables independent of" CNBM Group, whose role was confined to (at most) passively analyzing reports about transactions entered into by other actors. *Virtual Countries v. Republic of S. Afr.*, 300 F.3d 230, 237-38 (2d Cir. 2002).  Where, as here, a plaintiff's alleged injuries are "dependent on an intervening factor," the plaintiff cannot establish that they are the "direct effect" of the sovereign defendant's acts.  *United World Trade v. Mangyshlakneft Oil Prod. Ass'n*, 33 F.3d 1232, 1238 (10th Cir. 1994).

---

goods from the United States to Nigeria); *Ministry of Oil of the Republic of Iraq v. 1,032,212 Barrels of Crude Oil Aboard the United Kalavryta*, 2015 U.S. Dist. LEXIS 1566, 2015 AMC 262 (S.D. Tex. Jan. 7, 2015) (foreign sovereign allegedly converted oil for sale in the United  States); *Farhang v. Indian Inst. of Tech.*, 2012 WL 113739 (N.D. Cal. Jan. 12, 2012) (sovereign entity entered into joint venture agreement for the development and marketing of technology); *Oceanic Exploration Co. v. ConocoPhillips, Inc.*, 2006 WL 2711527 (D.D.C. Sept. 21, 2006) (sovereign entity entered into production sharing contracts).

[7] Plaintiffs' allegations that CNBM Group or its subsidiaries engaged in *lumber*-related activity in the United States, *see* PSC Resp. 78-82, are plainly irrelevant to whether § 1605(a)(2) applies to this *drywall* litigation.

**d.**  Plaintiffs' only other argument is that CNBM Group "oversaw" or "actively managed" other companies' marketing of drywall to the United States.  PSC Resp. at 102-03.  But this assertion is unfounded: Plaintiffs have produced *no* evidence that CNBM Group oversaw or managed other companies' drywall marketing.  Plaintiffs purport to support their assertion by citing generally to "Sections II.A & II.B" of their response.  PSC Resp. at 103.  But Section II.A is comprised of allegations that CNBM Group is the "alter ego" of other defendants; it does not include any evidence that CNBM Group "actively managed" or otherwise participated in their drywall marketing.  *See* PSC Resp. at 5-60.[8]  And Section II.B is the single paragraph (discussed above) about CNBM Group's request for export data in 2010.  *See* PSC Resp. at 60-61.  Nothing within either section shows that CNBM Group "oversaw" drywall marketing or played any role in the other companies' manufacture and sale of drywall during the relevant period.  That is because CNBM Group did no such thing.  As CNBM Group general manager Jianglin Cao explained, neither Taishan nor any other drywall manufacturer ever consulted with CNBM Group regarding their decisions to market or sell drywall into the United States.  *See* Cao Decl. ¶ 16 (Rec. Doc. 19527-6).  And after months of discovery, Plaintiffs have produced no evidence to the contrary.

Plaintiffs' lone case citation for this assertion also highlights their error.  They cite a district court case where, they suggest, the commercial activity exception applied because the sovereign defendant "created [a] subsidiary to market notes to U.S. investors."  PSC Resp. at 103 (citing *Atlantica Holdings, Inc. v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 2 F. Supp. 3d 550, 558 (S.D.N.Y. 2014)).  Never mind that CNBM Group did not "create" Taishan or Beijing New Building Materials Public Limited Company ("BNBM PLC").  Other courts have

---

[8] To the extent Plaintiffs argue that the commercial activity exception applies because CNBM Group "managed" these other companies more generally, their argument is simply an attribution theory in other garb.  And it fails for the reasons explained below (at 15-32).

confirmed that the mere creation of a subsidiary that engages in commercial activity in the

United States is itself insufficient to trigger application of § 1605(a)(2) against the sovereign

corporate parent.  *See Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1287-89 (3d Cir.

1993).  And *Atlantica* relied on many other commercial acts *by the sovereign defendant* to

conclude that § 1605(a)(2) applied to plaintiff's securities fraud claims against that defendant—

including, most notably, that the defendant "made a series of false or misleading statements" that

left U.S. investors "with assets worth less than ten percent of their face value."  2 F. Supp. 3d at

558.  Here, by contrast, Plaintiffs still have not identified any specific acts *by CNBM Group itself*

"to show that their claims are based upon [its] commercial activity."  *Id.*  Nor have they

identified any acts by CNBM Group that caused a "direct effect" in the United States.  Section

1605(a)(2) therefore does not apply.

      **B.**     **CNBM Group's Conduct Abroad Cannot Satisfy The Tort Exception.**

      Plaintiffs' cursory argument about the tort exception also fails.  *See* PSC Resp. at 104.

As CNBM Group explained previously, *see* Mot. at 17, § 1605(a)(5) applies only when the

alleged injury *and* the foreign state's tortious conduct occurred within the United States.  *See*

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439-41 (1989); *Jones v.*

*Petty-Ray Geophysical, Geosource, Inc.*, 954 F.2d 1061, 1065 (5th Cir. 1992); *see also* FSIA

Guide at 61.  Although Louisiana acknowledges this "geographical limitation[] of the tort

exception" in the context of its attribution argument, La. Resp. at 16, the PSC fails entirely to

acknowledge it.  This is for a very good reason: CNBM Group did not engage in any drywall-

related conduct (much less tortious conduct) within the United States, and Plaintiffs have no

evidence to suggest that it did.

      Because Plaintiffs fail to satisfy this geographical requirement, the Court "need not pause

to consider" whether CNBM Group engaged in tortious conduct.  *Asociacion de Reclamantes v.*

*United Mexican States*, 735 F.2d 1517, 1524 (D.C. Cir. 1984).  And it did not.  Although

Plaintiffs' response refers to the "tortious conduct *of BNBM and Taishan* in manufacturing and

selling defective Chinese Drywall," PSC Resp. at 4 (emphasis added), they never say what

tortious conduct *CNBM Group* allegedly committed.  A plaintiff fails to satisfy its burden of

proof under the tort exception where it attempts "to circumvent the jurisdictional hurdle of the

FSIA" based only on "vague and conclusory allegations of tortious conduct."  *Robinson v. Gov't

of Malaysia*, 269 F.3d 133, 146 (2d Cir. 2001).  Allowing a case to proceed without actual

evidence of tortious conduct by the sovereign defendant would be "at odds with the goal of the

FSIA to enable a foreign [sovereign] to obtain an early dismissal when the substance of the claim

against it does not support jurisdiction."  *Id.*

### C.   Other Companies' Actions Cannot Be Attributed To CNBM Group To Deprive It Of Immunity Under The FSIA.

Because CNBM Group itself did not engage in activity that can trigger an exception to

immunity, Plaintiffs instead seek to bootstrap jurisdiction by attributing to CNBM Group the

conduct of other companies that actually manufactured or sold allegedly defective drywall.

Indeed, this is the only argument Louisiana makes in its separate brief.

However, "duly created instrumentalities of a foreign state are to be accorded a

presumption of independent status" for purposes of the FSIA.  *First Nat'l City Bank v. Banco

Para El Comercio Exterior de Cuba* ("*Bancec*"), 462 U.S. 611, 627 (1983).  And Plaintiffs'

purported "evidence" of an alter ego relationship does not show the extensive, day-to-day control

required to overcome this presumption and defeat CNBM Group's immunity from suit.  Rather,

their evidence demonstrates only that CNBM Group held an indirect ownership interest in

companies that manufactured or sold drywall, and—at most—exerted some influence over its

subsidiaries' strategic decisions.  That is, Plaintiffs' "evidence" amounts to nothing more than

the type of corporate relationships one finds within a typical U.S. conglomerate, where a parent corporation sets policies and exercises high-level supervision over its direct and indirect subsidiaries, each of which retain autonomy over their daily business operations. *See infra* at 29-30. Plaintiffs therefore have not and cannot "demonstrate the level of control necessary to overcome the presumption in favor of [CNBM Group's] separate identity." *First Inv. Corp. of Marsh. Is. v. Fujian Mawei Shipbuilding, Ltd.*, 703 F.3d 742, 754 (5th Cir. 2012), *aff'g* 858 F. Supp. 2d 658 (E.D. La. 2012).

<blockquote>

**1.     Plaintiffs Must Show Extensive, Day-to-Day Control To Overcome CNBM Group's Presumption Of Separate Status.**

</blockquote>

**a.**  A plaintiff seeking to defeat an agency or instrumentality's presumption of separate status faces a high bar. The presumption may be overcome only where a corporate entity is "extensively controlled" by its owner. *Bancec*, 462 U.S. at 629. Complete ownership and appointment of a board of directors are not enough. *Hester*, 879 F.2d at 181. Nor is it sufficient for the defendant to exercise a "supervisory role" over its subsidiaries, *id.*; even a "significant amount of supervisory control" does not "overcome the presumption of separateness," *Fujian Mawei*, 858 F. Supp. 2d at 676. Rather, a plaintiff must prove that the sovereign exercised "extensive control" over the "*day-to-day management*" of the subsidiary. *Hester*, 879 F.2d at 181 (emphasis added); *see also Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1382 (5th Cir. 1992) (the Fifth Circuit pays "particularly close attention" to whether the sovereign defendant "is involved in day-to-day operations" of its purported alter ego); *accord* La. Resp. at 9. Put another way, the "touchstone inquiry" for attribution under the FSIA is whether the sovereign defendant exercises "significant and repeated control" over the subsidiary company's "day-to-day operations." *EM Ltd. v. Banco Central De La Republica Argentina*, 800 F.3d 78, 91 (2d Cir. 2015).

**b.**  Plaintiffs do not seriously contend that CNBM Group is an alter ego of Taishan or BNBM PLC under this standard.  *See* PSC Resp. at 111-12.  And the arguments that they do make are predicated on a series of legal errors.

*First*, Plaintiffs contend that imputing the contacts of one corporate entity to another for jurisdictional purposes is "part of the law of this case."  PSC Resp. at 105.  In support of that contention, they cite the decisions of this Court and the Fifth Circuit holding that Taian Taishan Plasterboard's ("TTP") conduct could be imputed to Taishan for purposes of establishing personal jurisdiction.  *See In re Chinese Manufactured Drywall Prods. Liab. Litig.*, 894 F. Supp. 2d 819 (E.D. La. 2012), *aff'd* 753 F.3d 521 (5th Cir. 2014).  Of course, the Court's finding of an agency or alter ego relationship between TTP and Taishan does not extend to CNBM Group, and the stark difference between the two sets of relationships only highlights the separateness that exists between Taishan and CNBM Group.[9]  In any event, as the Court is well aware, those proceedings considered personal jurisdiction in diversity suits under different forum states' long-arm statutes, *see, e.g.*, *id.* at 868 & n.9; the immunity determination under the FSIA, however, is a distinct question of federal law.  *See* Mary Kay Kane, *Suing Foreign Sovereigns: A Procedural Compass*, 34 Stan. L. Rev. 385, 402-04 (1982) ("judicial interpretations of state long-arm statutes are irrelevant to deciding claims of immunity").

---

[9] In concluding that TTP was an agent or alter ego of Taishan, this Court relied on the important facts that (1) Taishan formed TTP to sell Taishan products to its existing customers; (2) Taishan owned all of TTP and appointed its board of directors; (3) Taishan authorized TTP to use a trademark without requiring compensation; (4) Taishan and TTP held themselves out to customers as a single entity, and used each other's names interchangeably on contracts; (5) Taishan employees "volunteered" to work for TTP, and returned to Taishan after TTP stopped producing drywall; and (6) rental and sales transactions between the two companies were not accurately reflected in their financial records.  *See In re Chinese Drywall*, 894 F. Supp. 2d at 872-74, 894-96.  Plaintiffs' lengthy response here reveals that *none* of these same facts exist between Taishan and CNBM Group.

Furthermore, as CNBM Group previously explained and Plaintiffs do not dispute, the Court's prior alter ego findings based on *Taishan's* deemed admissions cannot possibly bind CNBM Group.  *See* Mot. at 18 n.11, 41-44; *cf. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 395 U.S. 100, 110-11 (1969) (corporate subsidiary's stipulation to an alter ego relationship cannot bind the corporate parent).

Plaintiffs are therefore mistaken when they argue that Taishan's conduct should be attributed to CNBM Group for purposes of the FSIA based on the *state law* of the various states from which this litigation originated.  In *Bancec*, the Supreme Court made clear that, in determining when attribution is permissible under the FSIA, federal law governed.  462 U.S. at 622 n.11.  "When it enacted the FSIA," the Court explained, "Congress expressly acknowledged 'the importance of developing a uniform body of law' concerning the amenability of a foreign sovereign to suit in United States courts.'"  *Id.* (quoting H. R. Rep. No. 94-1487, p. 32 (1976)).  Such matters "'should not be left to divergent and perhaps parochial state interpretations.'"  *Id.* (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 425 (1964)); *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 493-94 (1983) (a court, in carrying out its obligation to determine that an exception to immunity applies, "must apply the detailed federal law standards").  Thus, *Bancec* "'remains the seminal case on the circumstances under which American courts may disregard the separate status of instrumentalities created by foreign governments.'"  *Fujian Mawei*, 703 F.3d at 752 (quoting *Walter Fuller*, 965 F.2d at 1381).[10]

*Second*, although *Bancec* clearly held that "duly created *instrumentalities* of a foreign state are to be accorded a presumption of independent status," 462 U.S. at 627 (emphasis added), Plaintiffs contend that CNBM Group is not entitled this presumption because the presumption applies only in cases brought against a sovereign state itself.  *See* PSC Resp. at 111.  That is incorrect.  In *Arriba*, the Fifth Circuit applied the presumption of independent status in a case where, as here, the plaintiff sued not the state, but a nationally owned company, and asserted

---

[10] Louisiana agrees that *Bancec* provides the governing standard, yet mistakenly suggests that CNBM Group argued the Court should apply Chinese law in determining whether an alter ego relationship exists for purposes of the FSIA.  *See* La. Resp. at 7-8.  CNBM Group very clearly argued that *Bancec* controlled in the FSIA context, *see* Mot. at 19-22, but that Chinese law should govern in the personal jurisdiction context because all of the forum states' choice-of-law rules applied the law of the state of incorporation to determine corporate separateness, *see id.* at 42-43.  In any event, CNBM Group does not qualify as an alter ego of Taishan or BNBM PLC under any applicable standard. *See id.* at 43-44 & n.37; *see also infra* at 19-32.

jurisdiction under the FSIA based on the commercial activity exception. 962 F.2d at 533; *see also, e.g.*, *First City, Texas-Houston, N.A. v. Rafidain Bank*, 150 F.3d 172, 176-77 (2d Cir. 1998); *Gates v. Victor Fine Foods*, 54 F.3d 1457, 1464-65 (9th Cir. 1995); *Fed. Ins. Co. v. Richard I. Rubin & Co.*, 12 F.3d 1270, 1287 (3d Cir. 1993). The presumption of independent status is rooted in principles of comity and respect that are "undoubtedly relevant *whenever* a plaintiff seeks to disregard a foreign government instrumentality." *Walter Fuller*, 965 F.2d at 1382 (emphasis added); *see also Gates*, 54 F.3d at 1464. Indeed, *Bancec* relied specifically on the FSIA House Report, which observed that "[i]f U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations *or between a U.S. corporation and its independent subsidiary*." 462 U.S. at 628 (quoting H.R. Rep. No. 94-1487, pp. 29-30 (1976)) (emphasis added). No surprise, then, that Plaintiffs identify no authority to support their argument that *Bancec*'s presumption does not apply in situations like the one here. Plaintiffs' suggestion to ignore the presumption is an invitation to error. *See Arriba*, 962 F.2d at 534 & n.8 ("The district court erred in apparently saddling [the sovereign defendant] with the burden of proving it is not an agent or alter ego of [other entities].").

### 2. CNBM Group Did Not And Does Not Exercise Extensive, Day-To-Day Control Over Companies That Manufactured Or Sold Drywall.

Because Plaintiffs' claims are based on the manufacture or sale of allegedly defective drywall, they must prove that CNBM Group controlled the day-to-day operations of companies that engaged in such activity. *See Hester*, 879 F.2d at 181. However, one must search long and hard through Plaintiffs' lengthy response to find anything even allegedly tying CNBM Group to Taishan. For example, Plaintiffs note that CNBM Group and some of its subsidiaries share common officers and directors, *see* PSC Resp. at 36-42, but fail to acknowledge that CNBM

Group has no officers or directors at Taishan.[11]  Similarly, they note that CNBM Group has or

had its office in the same building (but on different floors) as other subsidiaries, *see* PSC Resp. at

47-50, without mentioning that Taishan's office is located hundreds of miles away.[12]  And

Plaintiffs argue that various CNBM Group subsidiaries share the same red logo, *see* PSC Resp.

at 51-54, without acknowledging that Taishan does not use this logo.[13]  Plaintiffs intentionally

obscure these facts because *none* of the traditional markers of an alter ego or agency relationship

exist between CNBM Group and Taishan, as evidenced by Plaintiffs' failure even to allege such

a relationship between the two entities in their Complaints.  *See* Mot. at 40.

   Plaintiffs' attribution theory is instead far more strained than that, attempting to

manufacture jurisdiction by linking CNBM Group and Taishan through multiple levels of

---

[11] *See* Declaration of Jianglin Cao ¶ 9, attached hereto as Exhibit 1 (hereinafter Cao Decl. 2); *see also* Chart of Overlapping Executives and Officers (PSC Resp. Ex. 42).  The closest Plaintiffs come is identifying *one* CNBM Group official who served on the supervisory committee of Taishan.  *See* PSC Resp. at 39.  But that committee performs only a *supervisory* role—as its name makes clear—which does not affect the presumption of separate status.  *See Hester*, 879 F.2d at 180-81; *Fujian Mawei*, 858 F. Supp. 2d at 676.  That is, supervisory committees do not "control" a company or its board of directors but rather act as an additional check to protect shareholders and employees.  *See* Declaration of Professor Robin Hui Huang ¶¶ 15-20, attached hereto as Exhibit 3; *see also, e.g.*, Cao Decl. 2 ¶ 8; Yang Decl. ¶ 6, Ex. C arts. 51-54 (Rec. Doc. 19527-12); Taishan Articles of Ass'n arts. 96-107 (PSC Resp. Ex. 32).  And in any event, some overlap among officers and directors does not indicate an alter ego relationship because it is a "'well established principle [of corporate law] that directors and officers holding positions with a parent and its subsidiary can and do 'change hats' to represent the two corporations separately.'" *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 779 (5th Cir. 1997)).

[12] *See* Cao Decl. 2 ¶ 11; *see also* Yang Decl. ¶¶ 4-5, Exs. A-B (Rec. Doc. 19527-12) (CNBM Group's Beijing location); Taishan Articles of Ass'n art. 4 (PSC Resp. Ex. 32) (Taishan's Shangdong Province location).  The most Plaintiffs can say is that Taishan's Board of Directors *once* held a meeting in a CNBM Company conference room, but that it did not do so with any regularity.  *See* PSC Resp. at 50.

[13] *See* Cao Decl. 2 ¶ 10, Exs. B-C.  Nor, for that matter, does BNBM PLC.  *See id.* ¶ 10, Ex. D.  And in any event, the sharing of a common logo and part of a common name does not show alter ego status.  *See, e.g.*, *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1460 (2d Cir. 1995) (sharing of conglomerate logo does not justify piercing the corporate veil); *In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 323 (W.D. Pa. 2010) ("[C]ommon marketing imaging and joint use of trademarked logos fails to render [one company] an alter ego of [another].  [A company may be] portrayed as a single brand to the public, but this evidence does not demonstrate the necessary control by defendant parent over the subsidiaries."), *aff'd*, 683 F.3d 462 (3d Cir. 2012).  Thus, a customer's or supplier's occasional confusion about which CNBM-related entity they are transacting with, *see* PSC Resp. at 52-53, does not show that CNBM Group is an alter ego even of other companies with "CNBM" in their name, let alone with Taishan or BNBM PLC, companies that do *not* share the CNBM name or logo.  Nor does it matter that CNBM Group on its English website aggregates the production of all companies in which it holds an indirect interest.  *See* PSC Resp. Ex. 1; Cao Decl. 2 ¶ 12; *see also Reers v. Deutsche Bahn AG*, 320 F. Supp. 2d 140, 157 (S.D.N.Y. 2004) ("[T]hat subsidiaries share a logo, or that the parent decides to present several corporations on a website in a unified fashion, is insufficient to show lack of formal separation between two entities.").

independent, publicly traded companies that stand between them in the corporate structure. To attribute Taishan's actions to CNBM Group under this theory, however, the Court would have to determine that an alter ego relationship exists among *each* of these intermediate companies. But piercing the corporate veil is the "rare exception," applied only in the most "exceptional circumstances," *Dole*, 538 U.S. 475, and it is Plaintiffs' burden to prove attribution for each and every step, *Arriba*, 962 F.2d at 534 & n.8. Here, Plaintiffs never even pleaded the existence of an alter ego relationship among any of these entities[14], and the intermediate companies have separately explained why no such relationship exists. *See, e.g.*, BNBM PLC Renewed Motion to Dismiss at 23-50 (Rec. Doc. 19646-1); BNBM Group Renewed Motion to Dismiss at 12-16 (Rec. Doc. 19649-3); Mot. at 36-44 (explaining why no agency or alter ego relationship exists between Taishan and CNBM Company). Nor can Plaintiffs identify any case that has credited such a "breathtakingly bold theory" of attribution in order to strip a sovereign of its jurisdiction immunity from suit. *Arriba,* 962 F.2d at 534.[15]

In fact, Plaintiffs' purported "evidence" does not demonstrate that CNBM Group controlled *any* other company's day-to-day operations. Instead, Plaintiffs show only that CNBM Group exercised—at most—a "supervisory role" over its subsidiaries' high-level decisions, consistent with its shareholder rights. *Hester*, 879 F.2d at 181. This is plainly insufficient to support

---

[14] *See* Mot. at 40; *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). Plaintiffs did allege that CNBMIT, CNBM USA, and United Suntech acted as agents of CNBM Group and other intermediate companies by marketing drywall to U.S. customers, *see* Mot. at 36  & n.27 (citing complaints), but Plaintiffs do not even attempt to substantiate these unfounded allegations in their response.

[15] Tellingly, the PSC does not cite a single case that found an alter ego or agency relationship in the FSIA context. And Louisiana cites only one: *S & Davis Int'l, Inc. v. Republic of Yemen*, 218 F.3d 1292 (11th Cir. 2000). But that case is plainly inapposite, as there the sovereign defendant "gave direct orders" to terminate a contract that formed the basis of the plaintiffs' breach-of-contract claim, and the defendant failed to submit *any* evidence that the subsidiary corporation was an independent entity with its own papers of incorporation, financial accounts, or board of directors. *Id.* at 1299-1300; *see also Fujian Mawei*, 703 F.3d at 754-55 (discussing *S & Davis*). Here, of course, CNBM Group did not order Taishan to manufacture or sell drywall, and the record is clear that the entities were incorporated separately, maintain separate accounts, and have their own boards of directors. *See, e.g.*, Yang Decl. ¶¶ 4-5, Exs. A-B (Rec. Doc. 19527-12); Cao Decl. 2 ¶ 9; CNBM Company Annual Report 2005 (PSC Resp. Ex. 2); BNBM PLC Annual Report 2005 at 16 (PSC Resp. Ex. 3); Taishan Articles of Ass'n (PSC Resp. Ex. 32).

attribution under any standard, much less overcome the presumption of separate status accorded pursuant to the FSIA.

**a.**   **CNBM Group's Limited Influence As An Indirect Minority Owner Does Not Show Day-To-Day Control.**

Plaintiffs devote considerable space to describing the ownership structure of the various companies between CNBM Group and Taishan.  *See* PSC Resp. at 5-24.  However, Plaintiffs notably fail to mention that, at all relevant times, CNBM Group has held only an indirect, minority equity interest in Taishan that never rose above 21%.[16]  As general manager Jianglin Cao previously explained, CNBM Group "has no direct investment or shareholder stake in BNBM PLC, Taishan, or TTP, and has never held a majority ownership interest, either directly or indirectly, in [any] of these entities."  Cao Decl. ¶ 17 (Rec. Doc. 19527-6).  Indeed, all Plaintiffs demonstrate in the first 20 pages of their brief is that CNBM Group holds a minority interest in CNBM Company; CNBM Company holds a minority interest in BNBM PLC; and BNBM PLC holds a majority interest in Taishan.[17]  But because *complete* ownership and appointment of a board of directors does not overcome the presumption of separate status, *see Hester*, 879 F.2d at 181, it "follows with even greater force" that an indirect minority

---

[16] Although Plaintiffs' response included several tables depicting CNBM Group's direct or indirect ownership in other intermediate companies' shares, *see* PSC Resp. at 12, 18, it notably did *not* include a table regarding CNBM Group's indirect interest in Taishan.  However, that interest is calculated by multiplying CNBM Group's indirect interest in BNBM PLC by BNBM PLC's interest in Taishan.  *See* PSC Resp. at 18-19 & n.67.  Thus, in 2005, after BNBM PLC acquired a minority of Taishan's shares (42%), CNBM Group indirectly held a 15% equity interest in Taishan.  *See, e.g.*, CNBM Company Annual Report 2005 at 8 (PSC Resp. Ex. 2).  In 2006, after BNBM PLC increased its ownership share of Taishan to 65%, CNBM Group's indirect minority equity interest increased slightly to 20.5%.  *See, e.g.*, CNBM Company Annual Report 2006 at 10 (PSC Resp. Ex. 7).  Since then, CNBM Group's indirect equity interest in Taishan has decreased to 13%, as a result of CNBM Group's decreased equity interests in CNBM Company and its subsidiary, BNBM PLC.  *See, e.g.*, CNBM Company Annual Report 2014 at 13 (PSC Resp. Ex. 22).

[17] Plaintiffs misleadingly quote deposition testimony that "CNBM is Taishan's biggest shareholder," PSC Resp. at 19 (quoting Song Dep. at 51:20-52:2 (PSC Resp. Ex. 25)), even though the witness later corrected his testimony in errata pursuant to Fed. R. Civ. P. 30(e) to state that "CNBM Company holds shares in BNBM Company, which is Taishan's biggest shareholder."  *See* Errata to the Deposition of Song Zhiping, attached as Ex. F to Declaration of L. Christopher Vejnoska, attached hereto as Exhibit 2.  And the other deposition testimony that Plaintiffs cite confirms the *correction*, not the original statement.  *See* Jia Tongchun Dep. at 212:15-213:6 (PSC Resp. Ex. 31) (asserting that BNBM was Taishan's majority shareholder).

22

ownership filtered through multiple levels of investment comes nowhere close.  *Dole*, 538 U.S.
at 475 (a corporate parent "does not own or have legal title to the subsidiaries of the
subsidiary"); *see also Freund v. Republic of France*, 592 F. Supp. 2d 540, 556-57 (S.D.N.Y.
2008) (sovereign defendant "cannot control the business decisions" of an indirect subsidiary
"through its 35% ownership interest" in another intermediate subsidiary").

Plaintiffs' allegation that CNBM Group "appoints" directors of some companies is
similarly misplaced.  *See* PSC Resp. at 26-29.  First, the evidence shows that CNBM Group
only nominates and votes for directors of subsidiaries in which it *directly* holds an ownership
interest, such as CNBM Company and BNBM Group.  That is, in fact, how corporate structure
across the world exists: directors are nominated and voted upon by shareholders.  CNBM
Group does not "appoint" directors of any company[18], and it certainly lacks the ability to
appoint directors of companies in which it holds only *indirect* equity interests, such as BNBM
PLC or Taishan.[19]  Second, while Plaintiffs also claim that CNBM Group appoints "high-
ranking Officers and Executives" for each of its subsidiaries, it cites no evidence that CNBM
Group actually appointed someone to any such position at BNBM PLC or Taishan (or, for that
matter, CNBM Company or BNBM Group).  In fact, Plaintiffs' "evidence" reflects that
corporate officers of subsidiaries, including the general managers or presidents, are selected by
the corporation's respective board of directors.[20]

---

[18] *See, e.g.*, Cao Decl. 2 ¶ 4; CNBM Company Annual Report 2005 at 29 (PSC Resp. Ex. 2) ("directors are elected
by the shareholders"); CNBM Company Annual Report 2006 at 37, 39 (PSC Resp. Ex. 7) (same); CNBM Company
Annual Report 2007 at 37, 39 (PSC Resp. Ex. 9) (same).

[19] *See* Cao Decl. 2 ¶ 6.  Indeed, Plaintiffs' evidence demonstrates that Taishan's shareholders elect its directors. *See,
e.g.*, Taishan Articles of Ass'n arts. 22(2), 40(5), 54 (PSC Resp. Ex. 32); Resolutions of the General Meeting of
Shareholders (PSC Resp. Ex. 121); Resolution of the First Extraordinary General Meeting of 2006 (PSC Resp. Ex.
122); Wang Bing Dep. at 95:22-96:21 (PSC Resp. Ex. 41); Yu Chen Dep. at 75:22-24 (PSC Resp. Ex. 40).  And
Plaintiffs provide no support whatsoever for their allegation that CNBM Group had BNBM PLC "install" certain
directors of Taishan.  PSC Resp. at 110.

[20] *See, e.g.*, PSC Resp. at 28 ("'The enterprise that has the board of directors select and appoints, or changes its
general manager, chief financial officer, or chief accountant.'") (quoting CNBM Group Admin. Measures For

In an attempt to tie CNBM Group to some of the intermediate companies above Taishan, Plaintiffs also resort to Chinese accounting terms that reflect nothing more than basic ownership structure and shareholding influence. "Controlling entity," for example, merely refers to an entity that owns 20% or more of another company's stock and has the right to nominate directors. *See* PSC Resp. at 9. And it describes not even the relationship between CNBM Group and companies that manufactured or sold drywall, but that between *other* companies within the corporate structure. Likewise, the Chinese accounting term "actual controller," which Plaintiffs repeat a half dozen times, refers not to an entity that controls the day-to-day operations of another, but merely to a company that is capable of having a significant influence on shareholder resolutions. *See* PSC Resp. at 15. In other words, "control" in this context refers only to shareholding structure and the ability to influence another company's larger "finance and business policy," not its daily operations. *Id.*; *see also* Declaration of Professor Robin Hui Huang ¶¶ 10-14, attached hereto as Exhibit 3; Yu Chen Dep. at 240:5-8 (PSC Resp. Ex. 40) ("actual controller" is a "legal term[]" that does not mean it can "interfere with or control the daily management and operation" of the other entity); BNBM PLC Annual Report 2005 at 16 ("The Company and its controlling shareholder are totally separated and operate independently of each other.").

BNBM PLC's reference to CNBM Group in annual reports as an "actual controller" is not, therefore, an admission or even evidence that CNBM Group controls its day-to-day operations. It is simply an indication that CNBM Group's indirect equity interest in BNBM PLC is sufficient to give it *influence* over the board of directors—a fact that is not in dispute and does not affect the companies' separate status. *See Foremost-McKesson*, 905 F.2d at 448

---

Appointing Reps. at 6 (PSC Resp. Ex. 43)); Taishan Articles of Ass'n art. 84 (PSC Resp. Ex. 32); Taishan Resolutions of the First Meeting of 4th Board of Directors (PSC Resp. Ex. 73) (Taishan directors' resolutions hiring company officers); BNBM PLC Annual Report 2006 at 17 (PSC Resp. Ex. 8); *see also* Cao Decl. 2 ¶¶ 5-7.

("majority control of a board of directors" is "not sufficient to establish a relationship of principal to agent under FSIA").  By relying on these terms, Plaintiffs argue that an indirect shareholder exercising its influence through a subsidiary's Board of Directors is enough to make the shareholder answerable for the subsidiary's acts.  But "[t]hat is not the law." *Transamerica Leasing, Inc. v. La Republica de Venezula*, 200 F.3d 843, 851 (D.C.Cir. 2000).

### b.   CNBM Group Exercised Only Strategic Supervision, Not Day-To-Day Control, Over Its Subsidiaries.

Plaintiffs' other allegations of "control" show only that CNBM Group exercised high-level supervision of its subsidiaries, consistent with its shareholder rights.  In other words, while these allegations suggest that CNBM Group "may have had a general supervisory role" over its subsidiaries, "they do not demonstrate that [it] was involved in the[ir] day-to-day management."  *Hester*, 879 F.2d at 181.  And certainly Plaintiffs have no evidence that CNBM Group ever controlled the day-to-day management of any company's drywall business.[21]  That is because, as CNBM Group explained at the outset, it does not "manage the daily operations of" or "make ordinary business decisions for" any of its subsidiaries.  Cao Decl. at ¶ 14 (Rec. Doc. 19527-6); *see Fujian Mawei*, 858 F. Supp. 2d at 677 (rejecting alter ego allegation where the defendant's "uncontroverted" declaration showed a "lack of … involvement in the day-to-day operations" of the subsidiaries).  And the months of discovery have confirmed this fact, with witness after witness testifying that CNBM Group did not control its subsidiaries' daily

---

[21] Many conclusory assertions in Plaintiffs' response are entirely unsupported by the evidence.  For example, they assert "the evidence shows that at the time the defective drywall was shipped to the U.S., CNBM Group controlled Taishan, and it had direct involvement in analyzing the volume of Taishan's sales."  PSC Resp. at 112.  But for this proposition, they cite to "Sections II.A.2 & II.B."  Section II.A.2 suggests only that Taishan's shares were owned by entities or persons with alleged ties to BNBM PLC.  *See* PSC Resp. at 21-24.  Even if the allegations were true, *nothing* within that section indicates that CNBM Group controlled Taishan.  And as explained above, Section II.B includes only a single email indicating that CNBM Group requested export data from Taishan *after* this litigation was filed and *years after* the allegedly defective drywall was shipped.  Reviewing data after the exports occurred hardly qualifies as "control" over those exports, especially when the data is requested in response to litigation.

business operations, but merely exercised high-level supervision pursuant to its shareholder rights.[22]

For example, Plaintiffs show that CNBM Group behaves as any other responsible shareholder would: by issuing strategic guidance to its representatives on the boards of directors of its direct subsidiaries CNBM Company and BNBM Group.  *See* PSC Resp. at 28-29.  And those directors are instructed to consult with CNBM Group not for every decision, or for issues concerning daily operational matters, but only for "significant decisions"—e.g., changes in high-level executive officers, significant investments, and financial guarantees to other entities.  CNBM Group Admin. Measures at 6 (PSC Resp. Ex. 43).  Ensuring that directors share the sovereign's goals with respect to significant decisions does not support an alter ego relationship, however.  "The sovereign must instead use its influence over these directors in order to interfere with the [subsidiary's] *ordinary* business affairs."  *EM Ltd.*, 800 F.3d at 93 (emphasis added).  But Plaintiffs here have no evidence that CNBM Group's "appointment of board members then caused it to interfere in and dictate [these other companies'] daily business decisions."  *Id.*

Similarly, Plaintiffs note that CNBM Group issues "group-wide policies and procedures" to its subsidiaries by, for example, setting "strategic goals," requiring annual risk management reports, and exercising its shareholder rights on "major issues" related to "investment and financing."  PSC Resp. at 30-35, 43-47 (internal quotation marks omitted).[23]  But again, none

---

[22] *See, e.g.*, Song Zhiping Dep. at 41:2-11 (PSC Resp. Ex. 25) (any influence that CNBM Group exercises is only through its "shareholder rights"); Zhou Guoping Dep. at 207:17-208:18, 210:7-12 (PSC Resp. Ex. 119) (CNBM Group manages subsidiaries only by "exercising as a shareholder's right" and does not have a "direct decision-making power"); *see id.* at 325:8-16 (the decision to conduct business in the United States is "decided independently by each individual company"); Wang Bing Dep. at 161:12-16 (PSC Resp. Ex. 41) ("each company is entitled to make its own decision on the items related to production and operation of the company").

[23] Louisiana relies on these same policies and procedures to suggest that CNBM Group "manifested its desire" for Taishan to act on its behalf.  La. Resp. 9-10.  But because such high-level, strategic supervision is a common feature

of this indicates an alter ego relationship.  Rather, "monitoring of the subsidiary's performance, supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedure" is perfectly "consistent with the parent's investor status."  *United States v. Bestfoods*, 524 U.S. 51, 72 (1998) (internal quotation marks omitted).  Indeed, elsewhere in their response, Plaintiffs agree that making "'big picture' decisions" about another entity—including, e.g., determining operational guidelines and development strategy, approving annual financial plans, and conducting audits—does not constitute "day-to[-]day control."  PSC Resp. at 94 (citing Cao Decl., Ex. B, arts. 14-15 (Rec. Doc. 19527-6)).[24]

Thus, if anything, CNBM Group's policies and procedures indicate that it concerns itself only with general strategic guidance for and high-level supervision of its subsidiaries, "leaving to [them] the task of running 'day-to-day' operations."  *Transamerica*, 200 F.3d at 851.  CNBM Group issues policies concerning issues such as "risk management," "significant personnel appointments," and "significant business decisions," not routine daily operational issues.  PSC Resp. at 30-31.  And CNBM Group "guides" subsidiaries in "establishing … a set of unified enterprise values" by, for example, occasionally inviting high-level executives to leadership seminars and executive retreats.  PSC Resp. at 30, 35-36.  But that CNBM Group took steps to ensure that subsidiaries "shared its policies and goals" does not in any way show that it "so extensively controlled" their day-to-day operations as to "transform" them into its alter ego.  *EM Ltd.*, 800 F.3d at 94; *see also Flatow v. Islamic Republic of Iran*, 308 F.3d 1065,

---

of corporate relationships, "[n]one of the documents prepared by [CNBM Group] ever communicated that [Taishan] represented it beyond the extent that all corporate entities represent their shareholders."  *Hester*, 879 F.3d at 181.

[24] Realizing they lack evidence of day-to-day control, Plaintiffs misrepresent Taishan's 2011 annual risk management report as purportedly stating that CNBM Group's high-level supervision extends to "daily operational management."  PSC Resp. at 34 (quoting Taishan Risk Mgmt. Report for the Year 2011 (PSC Resp. Exh. 47)).  But what the report actually says is that *Taishan* took steps "to achieve the integration of risk management with daily operational management."  PSC Resp. Exh. 47.  And the lengthy section from the report that Plaintiffs excerpt in their response simply explains *Taishan's* own internal approval process for its financing and investment decisions, *see* Jia Tongchun Dep. at 285:20-23 (PSC Resp. Exh. 31), which are submitted to BNBM PLC, not CNBM Group.

1072-73 (9th Cir. 2002) ("policymaking" represents mere "supervision" and does not show the "day-to-day control sufficient to overcome" the presumption of separate status).

For the same reason, Plaintiffs' allegation that CNBM Group coordinated the subsidiaries' response to this litigation—even if it were true—would not demonstrate the kind of "day-to-day, routine involvement" necessary to overcome the presumption of separate status. *Doe v. Holy See*, 557 F.3d 1066, 1079-80 (9th Cir. 2009) (per curiam). First, Plaintiffs must prove that CNBM Group controlled Taishan's daily operations "at the time of the wrongful acts"—i.e., during the manufacture and sale of allegedly defective drywall—not years after the fact. *Flourine On Call, Ltd. v. Fluorogas Ltd.*, 380 F.3d 849, 861-62 (5th Cir. 2004); *see also United States v. Wallace*, 961 F. Supp. 969, 979 (N.D. Tex. 1996). Second, international litigation seeking "massive" damages against numerous subsidiary entities "hardly qualifies" as "'day-to-day' business." *Transamerica*, 200 F.3d at 851.[25] And because Plaintiffs took the approach of suing every company with even the most indirect relationship to Taishan, it should come as no surprise that the litigation sparked joint meetings and occasional cooperation among those co-defendant companies.[26] Plaintiffs also spend considerable time discussing the circumstances surrounding Taishan's decision to withdraw from the litigation. *See* PSC Resp. at 73-78. But that consequential decision was not a routine, day-to-day operation and, in any event, Plaintiffs' evidence reflects not that CNBM Group "controlled" the decision, as Plaintiffs have repeatedly alleged, but rather merely that its board voted to

---

[25] Further, that CNBM Group held a meeting on "international risk prevention," during which the progress of the litigation was simply "reported" as one agenda item, again reflects only its occasional supervision over high-level issues. *See* PSC Resp. at 32-33 (quoting Statement on Implementing the Requirements from the Group Corp.'s Meeting of Int'l Business Risk Prevention (PSC Resp. Ex. 50)). And even with respect to such issues, CNBM Group merely offers "suggestions," rather than issuing "directives," as Plaintiffs assert. *See* PSC Resp. Ex. 50.
[26] Plaintiffs cite no authority to support their suggestion that a joint-defense agreement is indicative of an alter-ego relationship; *see* PSC Resp. at 70-71, and in fact, the purpose of such an agreement is to ensure that communications between attorneys of *separate* defendant companies remain privileged. *See In re Teleglobe Comms. Corp.*, 493 F.3d 345, 364-65 (3d Cir. 2007).

"respect" Taishan's independent decision not to appear.  CNBM Group Resolution No. 17

(PSC Resp. Ex. 82).[27]

    In sum, as Professor Jeffrey Gordon, an expert on corporate governance, has explained,

Plaintiffs' "evidence" reflects the type of corporate relationships that commonly exist within a

U.S. conglomerate, where a parent corporation sets policies and exercises high-level control

over its direct and indirect subsidiaries, each of which retain autonomy over their daily

business operations.  *See* Declaration and Expert Report of Jeffrey Gordon ¶¶ 16-31, 66-90,

attached as Ex. 12 to BNBM PLC Renewed Motion to Dismiss (Rec. Doc. 19646).[28]  In such

conglomerates, the parent corporation frequently makes "strategic" choices and capital

allocation decisions for its subsidiaries, and also monitors their managerial performance.  *See*

*id.* ¶ 22.  Corporate parents also often designate members of subsidiary boards, with senior

executives or board members of the parent serving on a subsidiary board.  *See id.* ¶ 67.  But

subsidiaries retain day-to-day control over their own operations because, among other things, it

would be inefficient for the parent itself to attempt to exert control over their daily business

operations.  *See id.* ¶ 31.  Professor Gordon specifically found the corporate structure of

CNBM Group and its subsidiaries to be analogous to those of major U.S. conglomerates like

the Walt Disney Company, FedEx Corporation, and Post Holdings.  *See id.* ¶¶ 68-83.  He

concluded that the "organization and monitoring" described in Plaintiffs' response are "quite

common" in the United States and, "unless accompanied by strong evidence of a parent's

---

[27] The depositions of both CNBM Group and Taishan officials have confirmed that Taishan made its decision independently.  *See, e.g.*, Jia Dep. at 175:17-19 (PSC Resp. Ex. 31) ("Taishan Gypsum's board of directors' meeting decided not to respond to the US litigation"); *id.* at 206:12-15 (same); Gang Che Dep. at 266:13-267:1 ("the decision … was made by Taishan's board of directors"); Song Dep. at 131:6-11 (PSC Resp. Ex. 25) ("Taishan is an independent company and its decision was made independently"); Cao Dep. at 101:11-17 (PSC Resp. Ex. 125) ("Taishan itself made the decision"); Zhou Dep. at 182:6-10 (PSC Resp. Ex. 119) (same).

[28] Professor Gordon's declaration was further supported by a quantitative analysis performed by Analysis Group, an economic and research consulting firm.  *See* Declaration and Expert Report of Bruce Deal, attached as Ex. 11 to BNBM PLC Renewed Motion to Dismiss (Rec. Doc. 19646).

involvement in daily business decisions," would not warrant finding an alter ego relationship "under commonly held principles of American corporate common law."  *Id.* ¶ 89.

And as has been shown, Plaintiffs lack any evidence that CNBM Group was involved in its subsidiaries' daily business decisions.  Their 135 exhibits do not demonstrate that CNBM Group controlled Taishan's or BNBM PLC's "day-to-day operation[s], but rather that at most [it] exercised general supervisory control over" them.  *Hester*, 879 F.2d at 180.

### 3.    Respecting CNBM Group's Separate Status Would Work No Fraud Or Injustice.

Finally, Louisiana's conclusory assertion of "injustice" provides no basis for overcoming CNBM Group's presumption of independent status.  *See* La. Resp. at 10-11.  To overcome the presumption of separateness, "it is not sufficient for [a plaintiff] merely to point out an injustice that would result from an adverse decision."  *Fujian Mawei*, 703 F.3d at 755.  Rather, a plaintiff must show that the defendant actually "manipulated" its corporate form in order to "perpetuate a fraud" or "do something it otherwise would not have been able to do."  *Id.*; *see also EM Ltd.*, 800 F.3d at 95 (plaintiff must show that the sovereign defendant "abused the corporate form").

Here, Louisiana does not even contend that CNBM Group "manipulated" or "abused" the corporate form of any of its direct or indirect subsidiaries; and, in fact, the evidence demonstrates that CNBM Group respected and observed corporate formalities.[29]  There is no suggestion that CNBM Group diverted Taishan's assets or left it undercapitalized.  *See Transamerica*, 200 F.3d at 854 (rejecting attribution based on "injustice" where the subsidiary defendant was not "thinly

---

[29] Plaintiffs refer repeatedly to an earlier corporate reorganization wherein some assets were transferred among companies for "nil consideration."  PSC Resp. at 54-55.  But those transfers were described and disclosed in public filings, *see, e.g.*, 2006 CNBM Global Offering Prospectus (PSC Resp. Ex. 5), and Plaintiffs do not contend that such transfers were unlawful or designed to allow any company to "do something it otherwise would not have been able to do."  *Fujian Mawei*, 703 F.3d at 755.  Indeed, Plaintiffs' only allegations about anything "improper" are two minor, non-drywall-related incidents where Taishan or other intermediate companies (but not, notably, CNBM Group) may not have followed corporate procedures.  *See* PSC Resp. at 57-59.  But if anything, these incidents actually support a finding of corporate separateness because they were caught by internal auditing procedures and, by Plaintiffs' own account, CNBM Group took steps to help "rectify the situation" when it was brought to its attention.  PSC Resp. at 58.

capitalized"); *Bridas S.A.P.I.C. v. Gov't of Turkmenistan*, 447 F.3d 411, 417 (5th Cir. 2006) (allowing attribution where the government manipulated an undercapitalized corporation "to prevent [the plaintiff] from recovering any substantial damage award").  To the contrary, the evidence reveals that Taishan has significant profits and assets.  *See* BNBM PLC Renewed Motion to Dismiss at 23-24 (Rec. Doc. 19646-1); *see also* Gordon Decl. ¶¶ 3, 44-54.  Because "[t]here is no evidence that [CNBM Group] abused the corporate form, or that it used [Taishan's] separate status to shield itself from liability," Louisiana's argument that respecting CNBM Group's separate status would work an injustice must fail.  *Byrd v. Corporacion Forestal Y Indus. De Olancho*, S.A., 974 F. Supp. 2d 264, 272 (S.D.N.Y. 2013).

Louisiana's sole contention is that CNBM Group benefited from its subsidiaries' drywall business, and yet may be immune from suits alleging that its subsidiaries' drywall turned out to be defective.  *See* La. Resp. at 10-11.[30]  But that "concern is present in every case in which a plaintiff seeks to hold an instrumentality responsible for" some other entities' actions, and "[a]llowing the *Bancec* presumption of separate juridical status to be so easily overcome would effectively render it a nullity."  *Alejandre v. Telefonica Larga Distancia de P.R., Inc.*, 183 F.3d 1277, 1286-87 (11th Cir. 1999).  Indeed, the cases that Louisiana itself cites recognize that this is an impermissible ground on which to base attribution and jurisdiction under the FSIA.  As the court explained in *DRC, Inc. v. Republic of Honduras*: "That a sovereign … may derive benefits from" its subsidiaries' commercial activities, "yet still avoid amenability to suit in United States courts in an action stemming from [those activities], is a necessary corollary of *Bancec*'s holding."  71 F. Supp. 3d 201, 218 (D.D.C. 2014).  Therefore, even if CNBM Group was the "beneficiary" of other companies' commercial activities, "declining to exercise jurisdiction over

---

[30] Louisiana misleadingly suggests that "CNBM Group boasted about its growing drywall business to potential investors," La. Resp. at 11, when the evidence on which it relies is actually *CNBM Company's* statements in connection with its public offering.  *See also id.* at 3-4 (citing 2006 CNBM Prospectus (PSC Resp. Ex. 5)).

[CNBM Group] will not permit the kind of fraud and injustice" that Louisiana suggests. *Fujian Mawei*, 858 F. Supp. 2d at 679. Accordingly, Louisiana has provided no reason to overcome CNBM Group's presumption of separate status.

## III. Additional Discovery Is Plainly Unwarranted.

At the end of a 116-page brief, accompanied by a declaration attaching 135 exhibits, Plaintiffs argue—without a hint of irony—that the Court should grant them *yet more* discovery on these issues. But CNBM Group has already been subject to discovery that is far more extensive, and far more burdensome, than the FSIA ordinarily permits. Those nine months of discovery have produced no evidence that defeats CNBM Group's sovereign immunity, and Plaintiffs unsurprisingly cannot point to anything concrete that further discovery would uncover. Additional discovery is therefore not permitted because Plaintiffs—*still*—do not identify any "specific facts" crucial to the immunity determination that they intend to verify. *Kelly*, 213 F.3d at 849. Plaintiffs' request for further discovery violates the cardinal rules that discovery against a foreign sovereign must be carefully circumscribed, and that questions of sovereign immunity must be decided at the earliest possible stage of litigation. Because Plaintiffs have "made *no* showing of what they hope[] to obtain by [additional] discovery, the court should *not* permit a 'fishing expedition'" beyond what has already occurred. *Id.* at 850.

The Fifth Circuit is clear: Sovereign immunity is immunity not only from liability, but "from the burdens of becoming involved in *any part* of the litigation process." *United States v. Moats*, 961 F.2d 1198, 1203 (5th Cir. 1992) (emphasis added); *see Kelly*, 213 F.3d at 849. A defendant asserting immunity under the FSIA therefore has a "legitimate claim to immunity from discovery." *Arriba*, 962 F.2d at 534. Discovery is allowed only if it is "ordered circumspectly ... to verify allegations of specific facts crucial to an immunity determination." *Id.* This Court acknowledged these principles in its July 22, 2015 order, when it set CNBM Group's FSIA

motion for a December hearing.  Recognizing that CNBM Group at that time had already been subject to more than four months of discovery, *see, e.g.*, Rec. Doc. 19267, and that its immunity defense "is not the type of issue that can be discovered indefinitely and without limits," the Court granted Plaintiffs only "further *limited* discovery" prior to the December hearing.  Rec. Doc. 19323 at 9-10 (emphasis in original).  Allowing even more discovery, and further delaying resolution of CNBM Group's immunity defense, would flout the Fifth Circuit's cases and this Court's prior order.

A simple review of the record reveals that Plaintiffs have already had more than "ample opportunity to conduct discovery."  *Kelly*, 213 F.3d at 855.  CNBM Group has produced 401,215 pages of records in response to the PSC's innumerable document requests in its serial amended and supplemental deposition notices.  *See* Declaration of L. Christopher Vejnoska ¶¶ 11-12, 14, attached hereto as Exhibit 2.  The PSC has also taken four days of depositions of CNBM Group's highest-ranking executives: chairman of the board Zhiping Song (September 14-15, 2015) and general manager Jianglin Cao (August 4-5, 2015).  *See id.* ¶ 14; PSC Resp. Exs. 25, 125.  And Plaintiffs previously deposed CNBM Group's Rule 30(b)(6) witness, Zhou Guoping, over the course of three days (June 15-17, 2015) on the dates of Plaintiffs' choosing.  *See* Vejnoska Decl. ¶¶ 9-10, Exs. D-E; PSC Resp. Ex. 119.  Plaintiffs propounded their document requests and took all of these depositions with the knowledge that CNBM Group would assert (or had already asserted) its sovereign immunity defense.  *See* Vejnoska Decl. ¶¶ 2-14.[31]  In addition, Plaintiffs

---

[31] CNBM Group formally asserted its sovereign immunity defense on June 16, 2015.  *See* Rec. Doc. 19152. Although Plaintiffs criticize the timing of CNBM Group's motion, *see* PSC Resp. at 2, they do not argue that CNBM Group has waived its immunity defense—nor could they.  A foreign sovereign does not waive its defense by waiting to assert its immunity until after entry of a final default judgment, *see MCI Telecomms. Corp. v. Alhadhood*, 82 F.3d 658, 662 (5th Cir. 1996) ("Such a waiver would be inconsistent with section 1608(e) of the FSIA, which requires the court to satisfy itself that jurisdiction exists prior to entering a default judgment."), much less after the mere preliminary defaults entered here.  And unlike the defendant in the case that Plaintiffs cite, *Ungar v. Palestine Liberation Org.*, 402 F.3d 274, 293 (1st Cir. 2005), CNBM Group asserted its immunity defense in its first (rather than third) motion to dismiss.  Moreover, to the extent Plaintiffs fault CNBM Group for filing its FSIA motion "only

33

have taken depositions and received substantial discovery from Taishan[32], as well as from

BNBM PLC[33], BNBM Group[34], and CNBM Company.[35]  Plaintiffs have also taken depositions

of yet more corporate defendants and third parties.[36]

Plaintiffs barely acknowledge the massive discovery that has largely consumed the last

nine months of litigation, admitting only that "there has been some discovery."  PSC Resp. at

115.  And they now try to use the fact that CNBM Group produced thousands of documents as a

reason to grant them *even more* discovery.

Indeed, the only reason Plaintiffs provide to support their request for additional discovery

is their suggestion that the timing of CNBM Group's document production somehow prejudiced

them.  Specifically, they complain that documents were produced after they deposed CNBM

Group's Rule 30(b)(6) witness.  *See* PSC Resp. at 115.  But this timing was a result of Plaintiffs'

own making: CNBM Group agreed to provide its corporate representative for deposition in New

Orleans on the date specified in the PSC's deposition notice.  *See* PSC Resp. at 83 (citing Rec.

Doc. 19006).  And at the time of the deposition, Plaintiffs were well aware that document

productions were in their initial stages, and would not be completed until August 14, 2015.[37]

Even so, Plaintiffs acknowledge that they received 224,260 pages of CNBM Group documents

before the August deposition of CNBM Group's general manager, and 400,604 of 401,215 pages

---

after actively participating in this case," PSC Resp. at 2, that is because the Court *ordered* CNBM Group to participate in discovery at the pain of striking its jurisdictional defenses.  *See* Rec. Doc. 19267 at 6 n.5.

[32] The PSC deposed Taishan's 30(b)(6) witness for three days, received 354,890 pages of documents produced by Taishan, and deposed Taishan's board chairman for an additional two days.  *See* PSC Resp. Exs. 24, 31, 106.

[33] The PSC deposed BNBM PLC's 30(b)(6) witness for four days, received 167,743 pages of documents produced by BNBM PLC, and deposed BNBM PLC's board chairman for an additional three days.  *See* PSC Resp. Exs. 40-41; Rec. Doc. 19784-2.

[34] The PSC deposed BNBM Group's 30(b)(6) witness for three days, and received 69,008 pages of documents produced by BNBM Group.  *See* PSC Resp. Exs. 1, 107.

[35] The PSC deposed CNBM Company's 30(b)(6) witness for three days, and received 215,122 pages of documents produced by CNBM Company.  *See* PSC Resp. Exs. 24, 105.

[36] *See, e.g.*, PSC Resp. Exs. 4, 62, 108-10, 124, 126.

[37]The PSC has even recently demonstrated an eagerness to proceed with depositions despite knowledge that document productions are incomplete.  *E.g.*, Rec. Doc. 19702-1 ("As for documents , They will be produced when they are produced and we should not delay a Deposition To await production and review.").

a month prior to the September deposition of CNBM Group's board chairman.  *See* PSC Resp.

Exh. 102.  And Plaintiffs knew that CNBM Group's sovereign immunity defense was set for a

December hearing, yet took no additional steps to re-depose the Rule 30(b)(6) witness after

receiving the additional document productions.  *See* Rec. Doc. 19323; Vejnoska Decl. ¶ 17.

Plaintiffs therefore had ample opportunity to question a qualified witness regarding the contents

of CNBM Group's document productions.  That Plaintiffs "did not take advantage" of the

opportunity to do so is the result of their own choices.  *Kelly*, 213 F.3d at 855.

        Moreover, Plaintiffs identify nothing within those document productions that could

defeat CNBM Group's sovereign immunity.  The only documents Plaintiffs mention as even

purportedly relevant to their assertion of "prejudice" are those concerning the litigation in 2014

and a report about international trade in 2012, *see* PSC Resp. at 84—neither of which can

support an exception to immunity because they occurred years after the facts that gave rise to

Plaintiffs' claims.  *See supra* at 10-11.  Plaintiffs do not attempt to explain how these documents

would support an exception to immunity under the FSIA, or why they need to question another

witness about them.  Instead, Plaintiffs ask that the Court postpone resolution of CNBM Group's

FSIA motion and order it to provide another Rule 30(b)(6) witness to answer unspecified

questions about largely irrelevant documents.  Additional discovery is not warranted where

Plaintiffs have failed to explain "what facts they hoped to obtain from such [additional]

discovery, or how it would produce information that would support [subject-matter]

jurisdiction."  *Kelly*, 213 F.3d at 855.

        As this Court has recognized, "Fifth Circuit law is clear that immunity defenses must be

decided at the earliest possible stage of litigation."  Rec. Doc. 19612; *see also, e.g.*, *Moran v.*

*Kingdom of Saudi Arabia*, 27 F.3d 169, 172 (5th Cir. 1994); *Phoenix Consulting Inc. v. Republic*

*of Angola*, 216 F.3d 36, 39 (D.C. Cir. 2000) ("[T]he 'critical preliminary determination' of its own jurisdiction as early in the litigation as possible.").  Plaintiffs' argument for additional discovery is nothing more than a naked attempt to further delay resolution of CNBM Group's sovereign immunity defense.  And their request reveals that after nine months of discovery, weeks of depositions, and the production of hundreds of thousands of pages of documents, they have no evidence that CNBM Group engaged in the activity on which their product liability claims are based, or exercised extensive control over other companies that did.

Plaintiffs' failure to marshal such evidence is a reflection of the simple fact that no such evidence exists.  This Court therefore lacks subject-matter jurisdiction over CNBM Group because it is entitled to sovereign immunity under the FSIA.  And the Court should dismiss CNBM Group from this litigation without further delay.

## CONCLUSION

For the foregoing reasons set forth herein, as well as those stated in the memorandum supporting CNBM Group's motion, this Court should dismiss the claims against CNBM Group for lack of subject matter jurisdiction.

Dated: November 24, 2015

Respectfully submitted,

/s/ L. Christopher Vejnoska

36

L. Christopher Vejnoska (CA Bar No. 96082)
Ian Johnson (CA Bar No. 208713)
Andrew Davidson (CA Bar No. 266506)
Jason Wu (CA Bar No. 279118)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA  94105
Tel:  415-773-5700
Email:  cvejnoska@orrick.com
          ijohnson@orrick.com
          adavidson@orrick.com
          jmwu@orrick.com

Ewell E. Eagan, Jr. (LA Bar No. 5239)
Donna Phillips Currault (LA Bar No. 19533)
Alex B. Rothenberg (LA Bar No. 34740)
GORDON, ARATA, MCCOLLAM,
DUPLANTIS & EAGAN, LLC
201 St. Charles Avenue, 40th Floor
New Orleans, LA 70170-4000
Tel: (504) 582-1111
Email: eeagan@gordonarata.com
          dcurrault@gordonarata.com
          arothenberg@gordonarata.com

James L. Stengel (NY Bar No. 1800556)
Xiang Wang (NY Bar No. 4311114)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY, 10019
Tel:  212-506-5000
Email:  jstengel@orrick.com
          xiangwang@orrick.com

Eric A. Shumsky (D.C. Bar No. 477926)
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street NW
Washington, D.C. 20005
Tel: 202-339-8400
Email: eshumsky@orrick.com

*Counsel for CNBM Group*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **Reply in Support of CNBM Group's Motion to Dismiss for Lack of Subject Matter Jurisdiction Under the FSIA** and accompanying documents have been served on Plaintiffs' Liaison Counsel, Russ Herman, and Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail and upon all parties by electronically uploading the same to File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on November 24, 2015.

/s/ L. Christopher Vejnoska

L. Christopher Vejnoska (CA Bar No. 96082)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105
Tel:  415-773-5700
Fax: 415-773-5759
Email: cvejnoska@orrick.com

*Counsel for CNBM Group*