**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047 SECTION: L JUDGE FALLON MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO: ALL ACTIONS | |

**TAISHAN'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**
**FROM THE NOVEMBER 17, 2015 EVIDENTIARY HEARING**

## I.     INTRODUCTION

After considering the parties' proposals, the Court set a relatively narrow scope for the evidentiary hearing. The Court defined the scope as addressing "issues of spoliation, contempt, and/or adverse inferences" relating to Mr. Peng Wenlong's "post-employment" relationship with Taishan and his "documents and/or computer-stored information." (Rec. Doc. 19630). Mr. Peng's post-employment period and the alleged denial of and failure to preserve Mr. Peng's information occurred entirely in 2014 and 2015.

The Court has now received the parties' argument and evidence. The Plaintiffs' Steering Committee (PSC) does not claim any spoliation and has not proven any spoliation. Nor has the PSC proven that Taishan is in contempt of the Court's preservation directive in Pretrial Order 1. (Rec. No. 2). Because there is no evidence of missing evidence, the Court imposes no adverse inference or any other spoliation sanction.

The Court does find that Taishan delayed production of Mr. Peng's documents in the "contempt track" of discovery by several months. But the PSC has failed to show that the delay caused them meaningful prejudice in the contempt track. The only prejudice claimed by the PSC

relates to the Taishan personal jurisdictional dispute in 2011-2012, an issue that is outside the defined scope of the present proceedings and an issue that the PSC won. Moreover, the PSC had and presented to the Court most of the drywall sales information contained in the newly produced documents.

The Court finds no prejudice within the scope of the contempt track because the PSC now has the documents and can present them in their case on whether Taishan or its affiliates engaged in U.S. business activity during the seven-month contempt period following July 17, 2014, which has not yet been decided. Accordingly, the Court imposes no costs or other remedy for delay.

## II.   BACKGROUND, PROCEDURAL HISTORY & FINDINGS OF FACT

### A.   Taishan's Return to the Litigation and the Contempt Track

1.   On July 17, 2014, the Court entered an Order holding Taishan in contempt and assessing penalties, fees, and an injunction for Taishan's failure to appear at the July 17, 2014 Judgment Debtor Examination. (Rec. Doc. 17869) (the "Contempt Order").

2.   On February 17, 2015, Taishan returned to the litigation with the appearance of new counsel. (Rec. Doc. 18352). The Court has held that Taishan's return to the litigation ended the "contempt period" initiated by the Contempt Order. (Transcript of November 9, 2015 Hearing on Morgan Stanley's Omnibus Motion at 2).

3.   On February 20, 2015, the PSC issued a 30(b)(6) deposition notice to Taishan for production of documents on Taishan's assets and financial relationship with other entities. (Rec. Doc. 18369).

4.   On March 17, 2015, the Court announced an expedited discovery track (the "contempt track") related to compliance with the injunction prong of the Court's July 17, 2014 Contempt Order and the identity of Taishan's "affiliates" within the meaning of the

Contempt Order. The Court's Order required Taishan's participation in the contempt track. (Rec. Doc. 18493).

5.    Two days later, on March 19, 2015, the PSC issued 30(b)(6) deposition notices to Taishan for production of documents related to the contempt discovery track. The PSC also issued a deposition notice for former Taishan employee Peng Wenlong, whom the PSC had already deposed twice in the 2011-2012 personal jurisdiction discovery phase of the litigation. (Rec. Docs. 18500, 18501, and 18502).

**B.    Peng Wenlong**

6.    Peng Wenlong was a Taishan employee until February 2014. Mr. Peng had been Manager of Taishan's Foreign Trade Department, but also served a role with respect to the U.S. drywall litigation as a liaison between Taishan and Taishan's U.S. counsel. After leaving Taishan's employment, Mr. Peng joined Shenyang Taishi Rock Wool Co., Ltd. He works there today. (PSC Supplemental Exhibit 144, 11/13/15 Deposition of Peng Wenlong at 200:4-201:5; 202:2-5; 248:3-249:8; 249:25-250:8).

7.    After leaving Taishan, Mr. Peng continued his liaison services as a consultant to Taishan regarding the U.S. litigation, initially on a voluntary basis and later through a compensable consulting agreement. He continued as a liaison in the consulting role for Taishan until March 2015. He was replaced by Mr. Che Gang. (PSC Supplemental Exhibit 144, 2015 Peng Dep. at 170:11-15; 170:20-171:23; 264:10-265:16; Taishan Exhibit 1).

**C.    Discovery Related to Peng Wenlong**

8.    On April 6, 2015, Taishan's counsel and the PSC engaged in a meet-and-confer conference where Taishan's counsel informed the PSC of its intention to investigate the status of Mr. Peng's custodial files and any information about his current whereabouts. (PSC Exhibit 30).

9.    On April 28, 2015, Taishan filed a discovery status report stating that Mr. Che Gang would serve as Taishan's 30(b)(6) witness and that Mr. Peng had left Taishan's employment in spring 2014. (Rec. Doc. 18765).

10.   At the June 2, 2015 30(b)(6) deposition, Mr. Che stated that Mr. Peng had left Taishan's employment in March 2014 and had continued to assist Taishan with the U.S. drywall litigation until that function was transitioned to Mr. Che. (PSC Exhibit 85, 6/2/15 Deposition of Che Gang, 49:3-21).

11.   At the same deposition, Mr. Che gave the PSC Mr. Peng's phone number. Mr. Che stated that he believed Mr. Peng lived in Taian City, but stated that he did not know where Mr. Peng worked. (PSC Exhibit 85, Che Dep. at 106:4-107:19).

12.   From April 2015 through August 2015, Taishan and the PSC engaged in numerous meet-and-confer sessions on discovery in the contempt track, discussing many discovery-related issues in addition to Mr. Peng's custodial files and his whereabouts. (Taishan Supplemental Exhibits 3-24).

13.   On August 31, 2015, in the context of rebutting the PSC's argument that Mr. Peng's presence on certain emails with Taishan's counsel waived the privilege as to those emails, Taishan submitted the Declaration of Jia Tongchun, which stated that "Mr. Peng voluntarily left the employment of TG in March 2014 to pursue another career at a company unrelated to TG, TTP, and to [Chairman Jia's] knowledge any of the Defendants in this action, including any BNBM or CNBM entity." Chairman Jia also stated that Mr. Peng "continue[d] to assist TG with coordination and communications regarding the U.S. lawsuits while [TG] transitioned that responsibility to another employee." The Declaration stated that after TG informed Mr. Peng of the PSC's intention to depose him in a March 19,

4

2015 notice, Mr. Peng "declined to participate, and communicated that he no longer would provide consulting services on these litigation matters." The Declaration also stated that "Mr. Peng has never told [Chairman Jia] the name of the company where he currently works, nor had he told anyone else at TG to [Chairman Jia's] knowledge. (Rec. Doc. 19431-1, Taishan Exhibit 2).

14. Chairman Jia later testified that he learned where Mr. Peng worked, not from Mr. Peng, but from relatives associated with Shenyang Taishi Rock Wool Co., Ltd. (PSC Exhibit 92, 9/17/15 Deposition of Jia Tongchun at 110:14-111:15; PSC Exhibit 93, 9/18/15 Deposition of Jia Tongchun at 169:24-171:25).

15. On September 12, 2015, Taishan located Mr. Peng's desktop computer, which Taishan had previously been unable to find. (Taishan Supplemental Exhibit 1). At the request of the PSC, Taishan produced the Chain of Custody Statement of Che Gang, dated November 9, 2015, which outlines the chain of custody of Mr. Peng's desktop computer. The statement shows that Taishan unsuccessfully attempted to locate Mr. Peng's work computer in April and May of 2015 and ultimately located the computer on September 12, 2015, after Chairman Jia learned of the issue and insisted that the computer be found. Mr. Peng's desktop computer hard drive was imaged on September 29 and 30, 2015 by discovery vendor Grant Thornton. Additionally, Mr. Peng delivered his personal laptop computer to Taishan on October 8, 2015, which was imaged by Grant Thornton on the same date. Grant Thornton also downloaded Mr. Peng's emails from web-based email providers. Mr. Peng's computers and hard drives remain in sealed containers in Grant Thornton's possession in China. (Taishan Supplemental Exhibit 1).

**D.     The Court Requests an Evidentiary Hearing with Limited Scope**

16.     On September 13, 2015, PSC attorneys emailed the Court alleging that a PSC-retained

private investigator had discovered information about Mr. Peng's whereabouts and current

employment. The PSC's email alleged potential spoliation and other discovery misconduct

by Taishan and requested that the Court impose sanctions. (PSC Exhibit 37).

17.     On September 16, 2015, Taishan submitted the Declaration of Jia Tongchun for

Clarification and Supplementation, in which Chairman Jia stated that he knew where

Mr. Peng worked but did not share that information with Mr. Che, anyone else at Taishan,

Taishan's attorneys, anyone at BNBM, BNBM Group, CNBM, CNBM Group, or any

attorneys for those entities. Chairman Jia acknowledged that his first declaration "gave the

misimpression that [he] did not know where Mr. Peng currently works, when in fact [he

does] and [he] did know that [Mr. Peng] worked at Shenyang Taishi Rock Wool Co., Ltd."

(Taishan Exhibit 3).

18.     In additional to depositions previously designated to occur in Hong Kong, the PSC took

Chairman Jia's deposition on September 17 and 18 in Hong Kong, and cross-examined

Chairman Jia on his original and supplemental declarations. (PSC Exhibits 92 and 93, 2015

Jia Dep.).

19.     On September 17, 2015, the Court ordered an evidentiary hearing on issues of spoliation,

contempt, adverse inferences and possible penalties related to the discovery and disclosure

of information related to Peng Wenlong. After the discovery of Mr. Peng's desktop

computer on September 12, the Court ordered Taishan to refrain from changing, deleting

or modifying any aspect of the computer or its hard drive. (Rec. Doc. 19526).

20.     At the October 13, 2015 status conference, the Court ordered Taishan to produce from Mr.

Peng's custodial files all non-privileged documents regardless of relevance to the contempt

track or other issues in the litigation. The Court directed Taishan to produce the documents to the PSC on a rolling basis and to produce a privilege log. (Rec. Doc. 19611).

21.     Prior to the November 17, 2015 evidentiary hearing, the Parties agreed to disclosure deadlines but could not agree on the scope of the hearing. At the October 21 status conference, the PSC proposed a broad scope that would have focused the hearing on any potential issues with Taishan's preservation or production of evidence since 2009, regardless of their applicability to Mr. Peng or the contempt track of discovery. The PSC also requested that the hearing's scope include any generalized allegations of Taishan's "[f]ailure to comply with proper discovery requests and other discovery abuses." (Joint Proposed Order and Plan for November 10, 2015 Evidentiary Hearing, Exhibit A, PSC's Proposal for the Scope of the November 10, 2015 Hearing).

22.     The Court rejected the PSC's proposal in favor of a much more limited scope focused on discovery conduct since Taishan's return to the litigation in February 2015. (Rec. Doc. 19656 at 6-7).

23.     The Court defined the scope of the November 17, 2015 evidentiary hearing as addressing issues of spoliation, contempt, and/or adverse inferences relating to the allegations that:

a.      Taishan knew of and refused or intentionally failed to disclose the current (i.e. post-employment) business relationships with and the location or whereabouts of their former employee, Mr. Peng Wenlong; and

b.      Taishan knew that Mr. Peng, had documents and/or computer-stored information but denied knowing the same or intentionally failed to disclose it and did not take proper measures to protect or collect these documents and/or computer-stored information.

(Rec. Doc. 19630).

### D.    Taishan's Production of Documents and the Deposition of Peng Wenlong

24.    From October 16, 2015, through November 4, 2015, Taishan produced on a rolling basis over 84,000 documents from Mr. Peng's custodial files, including thousands of non-responsive documents as ordered by the Court to expedite production. The number of pages produced was more than 383,000. (PSC Exhibit 50). Taishan also provided a privilege log describing 3,150 items. (Taishan Supplemental Exhibit 2 and Taishan Exhibit 6).

25.    As noted above, Taishan preserved Mr. Peng's desktop computer, and Mr. Peng delivered his personal laptop to Taishan.

26.    Chairman Jia testified that he instructed Taishan employees to preserve evidence. (PSC Exhibit 92, 2015 Jia Dep. at 70:12 – 72:24; 85:15-19).

27.    Mr. Peng testified that he understood the obligation to preserve evidence, and did not intentionally or accidentally destroy evidence relevant to the contempt track. (PSC Supplemental Exhibit 145, 2015 Peng Dep. at 407:12-409:7).

28.    Mr. Peng voluntarily traveled from China and took time off from his current employment to appear for two and a half days of deposition testimony in New York City from November 12, 2015 through November 14, 2015. (PSC Supplemental Exhibit 145, 2015 Peng Dep. at 395:8-396:8). This was Mr. Peng's first visit to the United States, and it required him to apply for and obtain a U.S. entry visa for the first time.  (*Id.*).

29.    An evidentiary hearing was held on November 17, 2015. Opening statements were made by counsel for the PSC and Taishan and exhibits were offered and admitted by both sides, subject to objections lodged with the Court. (Rec. Doc. 19752).

30.    Discovery in the contempt track is ongoing and the Court has not set a date for an evidentiary hearing related to that discovery track. (Rec. Doc. 19392)

### III.   CONCLUSIONS OF LAW

#### A.   The PSC Has Not Proven Spoliation

31.   The Court may consider spoliation and possible sanctions under Federal Rule of Civil Procedure 37 or under its own inherent power. *See, e.g.*, *REP MCR Realty, L.L.C. v. Lynch*, 363 F. Supp. 2d 984, 998 (N.D. Ill. 2005), *aff'd*, 200 F. App'x 592 (7th Cir. 2006).

32.   The Court invokes its inherent sanctioning powers only where no sanction established by the Federal Rules or a pertinent statute is 'up to the task' of remedying the damage done by a litigant's malfeasance. *See Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1998); *accord Chambers v. NASCO, Inc.*, 501 U.S. 32, 50 (1991) (directing that, in sanction proceedings, "the court ordinarily should rely on the Rules rather than the [court's] inherent power");

33.   Rule 37 authorizes the Court to appropriately respond to and deal with parties who have disobeyed discovery orders. *See Chilcutt v. United States*, 4 F.3d 1313, 1319–1320 (5th Cir.1993).

34.   Rule 37 applies to these circumstances in which Plaintiffs claim that Taishan violated this Court's evidence preservation directives in PTO 1. *See* Fed.R.Civ.P. 37(b)(2); *Morin v. Chevron U.S.A. Inc.*, No. CIV.A. 11-45, 2012 WL 2116368, at *6 (E.D. La. June 11, 2012); *see also* Rec. Doc. 19777, November 17, 2015 Hearing Transcript. at 9:25-10:10 (citing PTO 1).

35.   The Court assesses the document preservation and production issues under PTO 1 and Federal Rule of Evidence 37, rather than its inherent power.

36.   This Court's Pretrial Order #1, entered on June 16, 2009, required all parties to "take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation" and reminded that this duty

9

"extends to documents, data, and tangible things in possession, custody and control of the parties to this action, and any employees, agents, contractors, carriers, bailees, or other nonparties who possess materials reasonably anticipated to be subject to discovery in this action. (Rec. Doc. 2 at 7-8).

37.    The Court finds insufficient evidence of failure to preserve evidence under PTO 1 (spoliation). The PSC has failed to prove that Taishan destroyed, lost or altered evidence relevant to potential violations of the injunction or the relationship between Taishan, BNBM, and CNBM during the contempt period. *See Williams v. Briggs Co.,* 62 F.3d 703, 708 (5th Cir. 1995) (no finding of spoliation where "the evidence in issue was not destroyed or lost" and plaintiff offered no evidence to suggest defendant did anything to alter the condition of the evidence in issue).

38.    The PSC notably does not claim that any relevant Taishan evidence is missing, or that Taishan destroyed relevant evidence.

39.    The Court does not find evidence that Taishan violated PTO 1 or the general duty of preservation.

40.    The evidence shows that Chairman Jia instructed Taishan employees to preserve evidence. Mr. Peng testified that he understood that directive and did not intentionally or accidentally destroy evidence relevant to the contempt track.

41.    Taishan's corporate representative, Mr. Che, pursuant to the PSC's request, provided a chain of custody affidavit regarding Mr. Peng's two computers. Mr. Peng's desktop computer, which was Taishan's property, was preserved and imaged. Although the desktop was misplaced for a period of time, Taishan ultimately located it and produced documents on the device to the PSC. Mr. Peng also delivered his personal laptop to Taishan, which

produced the documents on that device to the PSC. Taishan also obtained and produced emails from multiple web-based email accounts belonging to Mr. Peng.

42.     Delayed production of all relevant, non-privileged documents from a computer does not constitute spoliation. *See Cenveo Corp. v. S. Graphic Sys., Inc.*, No. CIV. 08-5521 JRT/AJB, 2010 WL 3893680, at *14 (D. Minn. June 18, 2010) ("In the absence of showing how the delayed search of O'Donnell's computer was flaw[ed], Plaintiff has not met its burden to show that documents on O'Donnell's computer have not been produced.").

43.     In the absence of proof of missing evidence, the Court will not impose an adverse inference. *See Williams,* 62 F.3d at 708; *see also Perez v. Great Wolf Lodge of the Poconos*, No. 3:12-CV-1322, 2015 WL 4066633, at *4 (M.D. Pa. June 15, 2015) (refusing to impose extreme spoliation sanctions in the "unusual circumstance in which the plaintiffs point to the defendants' voluminous disclosures").

**B.      Delay in Producing Mr. Peng and his Custodial Documents in Contempt Track Discovery**

44.     The Court finds evidence that Taishan delayed the progress of the contempt track. Chairman Jia initially failed to disclose the location of Mr. Peng's current (i.e., post-Taishan) employment status, which led to a delay of several months before that information was provided to the PSC, his documents were produced, and he was deposed.

45.     Chairman Jia's failure to disclose Mr. Peng's employment status delayed the progress of the contempt track.

46.     Ultimately, there was a delay of several months between the operative March 2015 request for Mr. Peng's documents and deposition and the October 16 initial production of Mr. Peng's documents and Mr. Peng's November 2015 deposition.

47.    That period is not entirely attributable to Taishan. Some delay is inherent in large-scale document productions and the coordination of international travel and depositions. The Court is satisfied that, once Taishan identified Mr. Peng's location in September 2015, Taishan proceeded expeditiously and the parties cooperated in the discovery efforts.

48.    Additionally, the parties were able to continue discovery on the overall contempt track despite the distraction of the delay. The PSC received thousands of other documents from Taishan and other defendants. The PSC deposed many witnesses.

### C.    No Relevant Prejudice from Delay in Discovery

49.    The Court finds that the delay did not prejudice the PSC's litigation position on the contempt track. The Court has not yet scheduled an evidentiary hearing on that track. The PSC received Mr. Peng's documents and then deposed him for more than two days.

50.    Notably, the PSC made no specific claim of prejudice on the contempt track.

51.    Because the PSC has made no showing of harm or prejudice in the contempt track from the several month delay, and the Court having found none, the Court makes no award of costs (or any other remedy) to the PSC.

52.    The Court now turns to the ways in the PSC does claim prejudice. The PSC's prejudice claims also do not relate to the contempt track. Those prejudice claims also do not relate to Chairman Jia's conduct in 2015. Instead, the PSC claims prejudice to a previous part of these proceedings that concluded several years ago, and in the PSC's favor.

53.    The PSC claims to have located a few documents in the recent production from Mr. Peng's files that relate to drywall sales to the U.S. in 2005-2007 and to Taishan's and CNBM's response to the drywall litigation in 2009-2010.

54.     The PSC argues that those documents were not previously produced during the personal jurisdiction phase, despite Hogan Lovells' representation in August 2011 that it had produced responsive documents from Mr. Peng's custody.

55.     The PSC has speculated, without evidentiary proof, that Taishan engaged in discovery abuse in 2011 by intentionally withholding certain of the documents that have been recently produced. The PSC has further speculated that earlier production of those documents would have fundamentally altered the course of this litigation in the personal jurisdiction phase.

56.     For several reasons, the Court rejects the PSC's claims of prejudice from the delayed document production and finds that no further discovery or sanctions on the matter are warranted.

57.     First, Taishan's discovery activities in 2011 when represented by prior U.S. legal counsel are not within the scope of this hearing, which the Court limited to 2014-2015 contempt track discovery issues. The Court considered and rejected the PSC's pre-hearing request to broaden the scope of the hearing to undefined and temporally unlimited "[f]ailure[s] to comply with proper discovery requests and other discovery abuses." (Rec. Doc. 19656 at 6-7). Because the PSC seeks sanctions and remedies based on alleged conduct beyond the scope of the issues that the Court defined as the subject of the instant hearing, they are denied.

58.     Second, the Court finds that the PSC has not established actual prejudice to their litigation of personal jurisdiction from the delayed document production. Any limitation on the PSC's ability to prove U.S. drywall sales was harmless because the PSC won on that issue. Taishan's personal jurisdiction position was rejected by this Court (and subsequently affirmed by the Fifth Circuit).

59.   Nor is the Court persuaded that the documents at issue would, as the PSC has hypothesized, have accelerated the personal jurisdiction phase of these proceedings. The handful of new documents appear to be cumulative of hundreds (if not thousands) of documents relating to Taishan's export of drywall to the U.S. in the 2005-2008 time period.

60.   For example, the PSC places considerable emphasis on its Exhibits 125-127, which relate to a spreadsheet created by Mr. Peng in 2009 purporting to show drywall sales to the U.S. from 2005 to 2007. According to the PSC, the spreadsheet is "very important to the jurisdictional issues." (Rec. Doc. 19777, Nov. 17, 2015 Hearing Transcript. at 26:6-24).

61.   Mr. Peng testified that the spreadsheet was "prepared according to the invoices that we had," and that "the statistics came out only after we had received the invoices and speculated that they might have been shipped to the United States based on the specifications." (PSC Supplemental Exhibit 143, 2015 Peng Dep. at 85-86; 93-94). Mr. Peng reiterated the position that Taishan (through its prior counsel) advanced in the personal jurisdiction phase, testifying that "The majority numbers in the statistics are the gypsum board purchased by Chinese companies at our company. . . . Our transactions and sales were done in China." (*Id.* at 86.)

62.   The PSC had access to this information, including the underlying invoices, which were produced in 2011. Taishan has shown that the PSC created and submitted to this Court a substantially similar summary chart based on the same invoices. (Rec. Doc. 14215, Exhibit 1). The Court's ruling—and the Fifth Circuit's affirmances—that Taishan is subject to personal jurisdiction were based on all the evidence and testimony developed in that phase. For example, the Fifth Circuit held that its minimum-contacts test was "more than satisfied in *Gross* and *Wiltz* because, again, there is evidence showing that Taishan 'absolutely'

knew that the drywall was going to New Orleans." *In re Chinese-Manufactured Drywall Products Liab. Litig.,* 753 F.3d 521, 548 (5th Cir. 2014); *accord In re Chinese Manufactured Drywall Products Liab. Litig.*, 742 F.3d 576, 590, n.14 (5th Cir. 2014) ("a number of employee affidavits, declarations, depositions, and emails that support [this Court's] finding" of "regular and relatively extensive" contacts with a Virginia resident company).

63. The PSC's conjecture that a few additional documents would have necessarily dispensed with more than a year's worth of discovery and briefing is just that: conjecture. The Court declines the invitation to speculate on how history might have changed if a few additional documents had been produced.

64. Sanctions are not warranted for alleged discovery misconduct occurring more than four years ago involving prior legal counsel on an issue decided entirely in the PSC's favor through final appeal based on evidence substantially consistent with the documents now the subject of the PSC's complaints.

65. The PSC also has not been prejudiced by delayed discovery of a handful of emails between Taishan and CNBM, which the PSC describes only as "highly relevant to the jurisdictional issues before the court." (Rec. Doc. 19762 at 11).

66. To the extent the PSC means the Taishan personal jurisdiction issue, the Court declines to find prejudice for the above reasons.

67. To the extent the PSC means the CNBM and BNBM jurisdictional issues (along with alter-ego issues), there is no substantial prejudice. The PSC now has the documents and can use them for the jurisdictional and alter ego issues, which have not yet been decided.

IV.   **CONCLUSION**

68.     For the foregoing reasons, the Court finds that sanctions against Taishan are not warranted

because the PSC has failed to prove spoliation and identify prejudice relevant to the focus

of this hearing.

                                            Respectfully submitted,

Dated: December 7, 2015


                                            /s Bernard Taylor
                                            Bernard Taylor, Esq.
                                            Georgia Bar No. 669625
                                            Michael P. Kenny, Esq.
                                            Georgia Bar No. 415064
                                            Christina Hull Eikhoff, Esq.
                                            Georgia Bar No. 242539
                                            David Venderbush, Esq.
                                            New York Bar No. 2920817
                                            ALSTON & BIRD LLP
                                            1201 West Peachtree Street
                                            Atlanta, Georgia 30309
                                            Phone: (404) 881-7000
                                            Fax: (404) 881-7777
                                            bernard.taylor@alston.com
                                            *Counsel for Taishan Gypsum Co., Ltd. and Tai'an
                                            Taishan Plasterboard Co., Ltd.*

                                            Alan Dean Weinberger
                                            LA Bar No. 13331
                                            HANGARTNER, RYDBERG & TERRELL, LLC
                                            One Shell Square
                                            701 Poydras St., Suite 310
                                            New Orleans, Louisiana 70179
                                            Phone: (504) 434-6815
                                            Fax: (504) 522-5689
                                            aweinberger@hanrylaw.com
                                            *Local Counsel for Taishan Gypsum Co., Ltd. and
                                            Tai'an Taishan Plasterboard Co., Ltd.*

16

**CERTIFICATE OF SERVICE**

I hereby certify that the above and foregoing has been served on Plaintiffs' Liaison Counsel, Russ Herman by U.S. mail and e-mail and upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 7th day of December, 2015.

/s Bernard Taylor
Bernard Taylor, Esq.
Georgia Bar No. 669625
ALSTON & BIRD LLP
1201 West Peachtree Street NW
Atlanta, Georgia 30309
Phone: (404) 881-7000
Fax: (404) 881-7777
bernard.taylor@alston.com
*Counsel for Taishan*