```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2


 3    ***************************************************************

 4    IN RE:  CHINESE-MANUFACTURED
 5    DRYWALL PRODUCTS
      LIABILITY LITIGATION
 6
                              CIVIL DOCKET NO. 09-MD-2047 "L"
 7                            NEW ORLEANS, LOUISIANA
                              MONDAY, DECEMBER 7, 2015, 2:45 P.M.
 8    THIS DOCUMENT RELATES TO
      ALL CASES
 9
      ***************************************************************
10

11            TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
              HEARD BEFORE THE HONORABLE ELDON E. FALLON
12                   UNITED STATES DISTRICT JUDGE

13
      APPEARANCES:
14

15    FOR THE PLAINTIFFS'
      LIAISON COUNSEL:            LEVIN, FISHBEIN, SEDRAN & BERMAN
16                                BY:  FRED S. LONGER, ESQUIRE
                                  510 WALNUT STREET, SUITE 500
17                                PHILADELPHIA, PA  19106

18

19                                COLSON HICKS EIDSON
                                  BY:  PATRICK S. MONTOYA, ESQUIRE
20                                225 ALHAMBRA CIRCLE, PENTHOUSE
                                  CORAL GABLES, FL  33134
21

22    FOR THE KNAUF
      LIAISON COUNSEL:            BAKER DONELSON BEARMAN
23                                CALDWELL & BERKOWITZ
                                  BY:  KERRY MILLER, ESQUIRE
24                                     DANIEL J. DYSART, ESQUIRE
                                       RENE MERINO, ESQUIRE
25                                201 ST. CHARLES AVENUE, SUITE 3600
                                  NEW ORLEANS, LA  70170
```

***OFFICIAL TRANSCRIPT***

1    APPEARANCES CONTINUED:

2

3    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
4                                CERTIFIED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
5                                NEW ORLEANS, LA   70130
                                 (504) 589-7779
6                                Cathy_Pepper@laed.uscourts.gov

7

     PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
8    PRODUCED BY COMPUTER.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

1                        **I N D E X**

2

3    ITEMS                                          PAGE

4

5    THE COURT............................................   5

6    MR. MILLER..........................................   6

7    MR. DYSART..........................................   7

8    **PHILIP ADAMS** ......................................   7

9    VOIR DIRE EXAMINATION BY MR. DYSART..................   7

10   DIRECT EXAMINATION BY MR. DYSART....................   8

11   CROSS-EXAMINATION BY MR. GONZALEZ...................  27

12   REDIRECT EXAMINATION BY MR. DYSART..................  44

13   **JACOB WOODY**.......................................  47

14   DIRECT EXAMINATION BY MR. DYSART....................  48

15   CROSS-EXAMINATION BY MR. GONZALEZ...................  54

16   REDIRECT EXAMINATION BY MR. DYSART..................  56

17   **MAURICE KODSI** .....................................  58

18   DIRECT EXAMINATION MR. GONZALEZ.....................  58

19   CROSS-EXAMINATION

20   EXAMINATION BY MR. MILLER...........................  84

21   **PROFFER**...........................................  131

22   ROBERT KODSI........................................  133

23   DIRECT EXAMINATION BY MR. MONTOYA...................  133

24

25

                    **OFFICIAL TRANSCRIPT**

```
1                         E X H I B I T S

2

3    DESCRIPTION                                         PAGE

4

5    DEFENSE EXHIBIT 1....................................   9

6    DEFENSE EXHIBIT 2....................................  12

7    DEFENSE EXHIBIT 3....................................  15

8    DEFENSE EXHIBIT 4....................................  16

9    DEFENSE EXHIBIT 5....................................  18

10   DEFENSE EXHIBIT 1, 2, EN GLOBO, 3, 4, AND 5 ARE      27

11   ADMITTED............................................

12   PLAINTIFF'S EXHIBIT 1...............................  27

13   DEFENSE EXHIBIT 6....................................  48

14   EXHIBIT 6 IS ADMITTED..............................  54

15   EXHIBIT 2..........................................  74

16   EXHIBIT 2 IS ADMITTED..............................  75

17   DEFENDANT'S EXHIBIT 9..............................  96

18   EXHIBIT 11......................................... 112

19

20

21

22

23

24

25
```

**OFFICIAL TRANSCRIPT**

**P-R-O-C-E-E-D-I-N-G-S**

MONDAY, DECEMBER 7, 2015

A F T E R N O O N   S E S S I O N

(COURT CALLED TO ORDER)

THE DEPUTY CLERK:  All rise.

THE COURT:  This hearing grows out of a matter involving the Knauf settlement.  The Knauf defendants and the Plaintiffs' Steering Committee entered into a Class Settlement Agreement that established two funds intended to reimburse class members for different types of losses -- a Remediation Fund and an Other Loss Fund.

In this particular case, when the drywall started manifesting itself in some form of problems, the plaintiffs, owners of a condominium complex, responded to it immediately and began remediating the condos.  Long before litigation was started, they felt it was their responsibility to do it and they did it.

As a result, they didn't take all of the photographs and record information that was necessary under the program.  When they made their claim, they didn't have the information.  They did the best they could to reconstruct some of the information when they sent it along, and the information was rejected because technically, it didn't fall under the

*OFFICIAL TRANSCRIPT*

02:49:50   1   protocol that had been established by the settlement;

02:49:54   2   therefore, the claim was denied.  There was some issue as to

02:50:01   3   how much of it was Knauf and how much of it was Taishan board

02:50:07   4   and that was a big issue.

02:50:12   5          I looked at the appeal and I felt that it was

02:50:18   6   appropriate to make a split of 60/40.  60 percent of the

02:50:23   7   damages, I felt, were due to the Knauf drywall and the other

02:50:29   8   not, but the issue is, 60 percent of what?

02:50:33   9          This settlement involved a number of pots which

02:50:43  10   the settlement aspects fell into.  One was the remediation pot.

02:50:49  11   Then things that didn't fall into remediation, people had to

02:50:53  12   spend money to move or people had to spend money to pay rent

02:50:57  13   and people had to spend money for various other reasons, that

02:51:01  14   was a later addendum to the concept, and so that was another

02:51:09  15   pot.

02:51:14  16          Knauf took the position that in my initial

02:51:17  17   opinion, I didn't take that into consideration and asked that

02:51:21  18   we reconsider with that in mind; so, we're here today to deal

02:51:28  19   with that.

02:51:29  20          I'll hear from the parties.

02:51:32  21          MR. MILLER:  Thank you, Judge.  It's Kerry Miller for

02:51:36  22   Knauf.  We're going to go ahead and go first, since our motion

02:51:39  23   for reconsideration kicked this all off.  We had a conference

02:51:41  24   with plaintiff counsel last week and we decided that then.

02:51:45  25          So we're going to present two witnesses today,

*OFFICIAL TRANSCRIPT*

02:51:49  1    Your Honor, Phil Adams from Moss and Jake Woody from

02:51:56  2    Brown Greer, and Danny Dysart of my office will conduct those

02:52:00  3    direct examinations.

02:52:15  4         MR. DYSART:  Good morning.  Danny Dysart on behalf of

02:52:17  5    the Knauf defendants.  We call Philip Adams as our first

02:52:19  6    witness.

02:52:29  7              Your Honor, to make this a little faster, may I

02:52:33  8    approach Mr. Adams and I'll hand him a binder of exhibits?

02:52:47  9              THE COURT:  Yes.

02:52:47 10         THE DEPUTY CLERK:  Would you please raise your right

11    hand.  Do you solemnly swear that the testimony which you are

12    about to give will be the truth, the whole truth, and nothing

13    but the truth, so help you God?

14              THE WITNESS:  I do.

15                          **PHILIP ADAMS**

16     was called as a witness and, after being first duly sworn by

17      the Clerk, was examined and testified on his oath as follows:

18              THE DEPUTY CLERK:  Please have a seat, and for the

19    record, state and spell your name for the record.

02:52:49 20         THE WITNESS:  Philip Adams, A-D-A-M-S.

02:52:49 21    VOIR DIRE EXAMINATION BY MR. DYSART:

02:52:55 22    Q.   Good afternoon, Mr. Adams.  My name is Danny Dysart.  I

02:52:59 23    have you on direct examination.  Where do you live, Mr. Adams?

02:53:01 24    A.   125 SE 16th Avenue, Fort Lauderdale, Florida.

02:53:05 25    Q.   Who do you work for?

*OFFICIAL TRANSCRIPT*

02:53:06 1   A.    Moss & Associates.

02:53:07 2   Q.    What is your position at Moss & Associates?

02:53:09 3   A.    Senior project manager.

02:53:10 4   Q.    And in what other capacity have you worked in

02:53:13 5   construction?

02:53:14 6   A.    From 1978 to 2006, I worked as a builder/developer.

02:53:19 7   Q.    Are you a licensed contractor?

02:53:20 8   A.    Yes, I am, since 1980.

02:53:22 9   Q.    Can you briefly tell us what is your experience and

02:53:27 10  background in construction.

02:53:28 11  A.    As a builder/developer, I built 2,500 single-family homes,

02:53:32 12  over a thousand condominium units, and within the remediation

02:53:36 13  program, we have completed 2,700 single-family homes and

02:53:42 14  condominiums.

02:53:45 15        MR. GONZALEZ:  Your Honor, we will stipulate to his

02:53:47 16  ability to testify regarding the matters before the Court today

02:53:49 17  to save some time.

02:53:56 18        MR. DYSART:  Thank you, Ervin.

02:53:56 19  DIRECT EXAMINATION BY MR. DYSART:

02:53:57 20  Q.    Just before we move ahead, Mr. Adams, how was Moss

02:54:00 21  involved in the administration of the Knauf Class Settlement

02:54:01 22  Agreement?

02:54:01 23  A.    We're the lead contractors listed in the Settlement

02:54:05 24  Agreement.

02:54:05 25  Q.    Aside from the remediation program, does Moss also consult

*OFFICIAL TRANSCRIPT*

02:54:09  1  with Knauf regarding ARH properties in connection with the

02:54:13  2  Settlement Agreement?

02:54:13  3  A.    Yes, we did.

02:54:13  4  Q.    To date, how many ARH claims have you reviewed?

02:54:15  5  A.    Over 350.

02:54:16  6  Q.    Of those that you have reviewed, how many have been

02:54:19  7  settled under the Knauf Settlement Agreement?

02:54:21  8  A.    As of today, 315.

02:54:24  9  Q.    Mr. Adams, if you could please turn to Tab 1 of your

02:54:28 10  binder, what I will mark as Defense Exhibit 1.

02:54:38 11  A.    Okay.

02:54:38 12  Q.    Mr. Adams, can you identify this document for the Court.

02:54:44 13  A.    Yes, it's the Already Remediated Properties protocol.

02:54:48 14  Q.    And under Section 1, it states "Objective of Protocol,"

02:54:59 15  correct?

02:54:59 16  A.    Yes, it does.

02:54:59 17  Q.    Can you briefly describe for the Court what the ARH

02:55:03 18  protocol is.

02:55:04 19  A.    That creates a process for claimants to process a claim

02:55:07 20  for self-remediated properties.

02:55:09 21  Q.    If you go down to Section 3, what is the title of that

02:55:14 22  section?

02:55:15 23  A.    "Materials to Be Provided By the Owner."

02:55:16 24  Q.    Can you briefly describe for the Court what this section

02:55:20 25  is intended to do.

*OFFICIAL TRANSCRIPT*

02:55:21   1   A.    Yes.  This is the materials that we actually review as

02:55:26   2   part of our scope for the Already Remediated Homes.  It entails

02:55:31   3   the ODA, which is Owner Disclosure Affidavit; the PPF, Personal

02:55:36   4   Profile Form; floor plans; photo documentation of KPT; photo or

02:55:43   5   video documentation of before, during and after the

02:55:47   6   remediation; cost documentation; and the environmental

02:55:52   7   certificate.

02:55:52   8   Q.    All of those materials are in support of an ARH claim?

02:55:56   9   A.    That's correct.

02:55:57  10   Q.    And in reviewing the claim for an ARH, who is responsible

02:56:00  11   for generating, maintaining and providing these items for

02:56:04  12   Knauf?

02:56:04  13   A.    The claimant.

02:56:05  14   Q.    Can you briefly describe for the Court what types of cost

02:56:12  15   documentation would be provided for an ARH claim.

02:56:15  16   A.    The items I just described, which was the ODA, the PPF.

02:56:20  17   Q.    As far as cost documentation, though, specifically,

02:56:24  18   Mr. Adams?

02:56:24  19   A.    I'm sorry.  It would be a cost ledger with line items

02:56:28  20   listing the expenses.  It would be invoices or contracts to

02:56:32  21   support those line items.  Then cost support, whether it be

02:56:37  22   canceled checks, bank statements or paid receipts.

02:56:40  23   Q.    Now, does the ARH protocol identify the types of costs

02:56:44  24   that are reimbursable under the Settlement Agreement?

02:56:46  25   A.    Yes, it does.

*OFFICIAL TRANSCRIPT*

02:56:48 1    Q.    Where in the ARH protocol does it identify that?

02:56:52 2    A.    It's on Section IV D.

02:56:53 3    Q.    Mr. Adams, would you please turn to page 4 of Defense

02:56:59 4    Exhibit 1, which I'll put up.  Under D, can you please state

02:57:09 5    the title of that section.

02:57:11 6    A.    "Reimbursable Costs."

02:57:13 7    Q.    Can you please identify for the Court where reimbursable

02:57:18 8    costs are defined in the section.

02:57:19 9    A.    First paragraph, first sentence.

02:57:20 10   Q.    And could you please read it for the Court.

02:57:23 11   A.    "The Knauf defendants will reimburse the owner only for

02:57:26 12   reasonable costs that the owner incurred in remediating the

02:57:29 13   affected property."

02:57:30 14   Q.    Now, did the ARH protocol also identify how reasonable

02:57:35 15   costs should be determined when reviewing an ARH claim?

02:57:38 16   A.    Yes, it does.

02:57:39 17   Q.    Where does it state that in the protocol?

02:57:40 18   A.    The next sentence.

02:57:42 19   Q.    Can you please state that for the Court.

02:57:42 20   A.    "In determining reasonable costs, the Knauf defendants and

02:57:46 21   owner, Special Master where necessary and Court where

02:57:49 22   necessary, shall employ the following criteria:  Only

02:57:54 23   remediation work reasonably consistent with the remediation

02:57:59 24   protocol shall be eligible for reimbursement."

02:58:00 25   Q.    So in that, they just talk about the remediation protocol.

*OFFICIAL TRANSCRIPT*

02:58:02 1   Does the ARH protocol work with the remediation protocol in

02:58:07 2   determining what are reasonable reimbursable costs?

02:58:08 3   A.   Yes, they do.

02:58:09 4   Q.   Mr. Adams, if you could please turn to Tab 2.

02:58:15 5        Do you recognize this document, Mr. Adams?

02:58:17 6   A.   Yes, I do.

02:58:18 7   Q.   For the record, I'm for marking this as Defense Exhibit 2.

02:58:23 8   Can you please identify it for the Court.

02:58:25 9   A.   It's Exhibit F, the remediation protocol.

02:58:28 10  Q.   And when you say "Exhibit F" -- "Exhibit F," it's

02:58:31 11  Exhibit F to the Knauf Class Settlement Agreement?

02:58:35 12  A.   Yes, it is.

02:58:35 13  Q.   Does the remediation protocol identify the scope of work

02:58:39 14  that should take place under the Knauf Class Settlement

02:58:41 15  Agreement?

02:58:41 16  A.   Yes, it does.

02:58:42 17  Q.   Where?

02:58:44 18  A.   Sections A through P.

02:58:45 19  Q.   And how do these items relate to ARH properties in

02:58:51 20  particular?

02:58:52 21  A.   The ARH protocol and the remediation protocol are linked

02:58:56 22  together.  They should be the same.

02:58:58 23  Q.   When you say they should be the same, under Section I, the

02:59:06 24  title is "Scope of Work"; is that correct?

02:59:07 25  A.   Yes.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 02:59:08 1 | Q.    So is this -- is this scope of work below in the items, |
| 02:59:13 2 | are those -- is that the scope of work for a remediation claim? |
| 02:59:17 3 | A.    Yes. |
| 02:59:17 4 | Q.    Mr. Adams, are you familiar with the Oceanique ARH claim |
| 02:59:24 5 | in this matter? |
| 02:59:25 6 | A.    Yes, I am. |
| 02:59:26 7 | Q.    And how is that? |
| 02:59:27 8 | A.    I reviewed this as part of the 350 ARH claims. |
| 02:59:30 9 | Q.    Did you receive documents in connection with this claim? |
| 02:59:34 10 | A.    Yes, I did.  I received three binders in September of |
| 02:59:37 11 | 2014. |
| 02:59:37 12 | Q.    Did you receive any other materials in connection with |
| 02:59:41 13 | this claim? |
| 02:59:42 14 | A.    I received additional information last Wednesday evening. |
| 02:59:45 15 |        [!EZ SPEAKER 107]:  Your Honor, if I may approach |
| 02:59:48 16 | briefly. |
| 03:00:10 17 |        THE COURT:  Are you introducing all of the documents |
| 03:00:12 18 | that you've discussed here? |
| 03:00:15 19 |        MR. DYSART:  The documents that we've identified so |
| 03:00:18 20 | far, we're going to introduce, yes, Your Honor. |
| 03:00:20 21 |        THE COURT:  Okay.  Any objection to any of these |
| 03:00:22 22 | documents? |
| 03:00:22 23 |        MR. GONZALEZ:  No, Your Honor. |
| 03:00:24 24 |        MR. DYSART:  I should have noted that for the record, |
| 03:00:26 25 | Your Honor, that we've discussed exhibits previously, so if |

*OFFICIAL TRANSCRIPT*

03:00:28  1  it's okay with the Court, after the direct examination of

03:00:30  2  Mr. Adams and Mr. Woody, at that time I would move all the

03:00:34  3  evidence into the record.

03:00:37  4      THE COURT:  All right.  Any objections to any of 1

03:00:38  5  through 7?

03:00:39  6      MR. GONZALEZ:  Your Honor, we advised defense counsel

03:00:41  7  that we would stipulate to the admission of the documents that

03:00:44  8  they are seeking to introduce today, and I asked them only if

03:00:46  9  there was something so strange that it was more of a zebra than

03:00:51 10  anything else in this case; otherwise, it would be fair game.

03:00:53 11      THE COURT:  Okay.  All right.

03:00:53 12      MR. MILLER:  Judge, we did the same thing on the other

03:00:56 13  side.  So I think the idea was we were just going to move our

03:00:59 14  exhibits at the end of the presentation to keep it short.

03:01:01 15      THE COURT:  Okay.  That's fine.  Okay.  All right.

03:01:03 16  EXAMINATION BY MR. DYSART:

03:01:03 17  Q.   Mr. Adams, the four binders that I just handed to you, did

03:01:08 18  have you an opportunity to look through those documents?

03:01:10 19  A.   Briefly, yes.

03:01:10 20  Q.   Do you recognize these documents?

03:01:12 21  A.   Yes.

03:01:12 22  Q.   Can you identify them for the Court?

03:01:15 23  A.   They appear to be the binders that I received in

03:01:18 24  September 14th of 2014 via the Knauf counsel.

03:01:21 25  Q.   The fourth binder, the white binder that was provided, can

**OFFICIAL TRANSCRIPT**

1   you please identify that for the Court.

2   A.    This is the additional information that was received last

3   Wednesday, and then additional information received last night.

4          [!EZ SPEAKER 107]:  And I would mark these items,

5   Your Honor, as en globo Exhibit 3.

6          THE COURT:  Okay.

7   EXAMINATION BY MR. DYSART:

8   Q.    Mr. Adams, have you reviewed these binders in your review

9   of the Oceanique claim?

10  A.    Yes, I did.

11  Q.    Did your review include a review of the remediation scope?

12  A.    Yes, it did.

13  Q.    Did it include a review of the cost documentation that was

14  provided?

15  A.    Yes, it did.

16  Q.    Did your review consider what claim costs were reasonable

17  reimbursable costs under the Knauf Class Settlement Agreement?

18  A.    Yes, it did.

19  Q.    How was your review conducted?

20  A.    There was a ledger that was provided in the binder, and I

21  went through all three binders to try and compare the

22  documentation supporting the ledger.

23  Q.    What was the ultimate goal of your review?

24  A.    There was missing documentation on quite a few items.

25  Q.    I'm sorry, Mr. Adams, I'll ask you, what was your ultimate

*OFFICIAL TRANSCRIPT*

03:02:36 1   goal of your review?

03:02:37 2   A.    I'm sorry.  To determine what were the reasonable

03:02:41 3   reimbursable costs.

03:02:42 4   Q.    If you could please turn to Tab 4, Mr. Adams.  This is

03:02:47 5   what I'll mark as Defense Exhibit 4.  Do you recognize this

03:02:52 6   document?

03:02:53 7   A.    Yes, I do.

03:02:53 8   Q.    Can you identify it for the Court.

03:02:55 9   A.    It was the cost ledger that was supplied with the binders.

03:02:58 10  Q.    Mr. Adams, if we were to go line by line through this

03:03:06 11  ledger, would you be able to identify for the Court which of

03:03:09 12  those costs has supporting documentation and which are

03:03:13 13  considered reasonable reimbursable expenses?

03:03:15 14  A.    Yes.

03:03:15 15  Q.    Under the first line item, "Payroll," in your review of

03:03:20 16  the Oceanique materials, did you identify any cost

03:03:22 17  documentation to support any of the $360,000 for payroll?

03:03:26 18  A.    No.

03:03:26 19  Q.    As an experienced developer of a multifamily condominium

03:03:37 20  unit, is it reasonable not to maintain payroll records in the

03:03:40 21  amount of $360,000?

03:03:42 22  A.    No.

03:03:42 23  Q.    On the next line item, what is the entry for line Item

03:03:46 24  Number 2?

03:03:47 25  A.    "MK - supervision."

*OFFICIAL TRANSCRIPT*

03:03:48  1    Q.    Based on your review of the materials in this case, what

03:03:50  2    is your understanding of this line item?

03:03:52  3    A.    This was supervision by Maurice Kodsi.

03:03:55  4    Q.    And who is Mr. Kodsi, based on your knowledge of this

03:03:59  5    matter?

03:04:00  6    A.    Mr. Kodsi is the owner of Oceanique and also an owner or

03:04:04  7    principal in Tricon Development.

03:04:07  8    Q.    In your review of the Oceanique materials, did you

03:04:10  9    identify any cost documentation or records to support the

03:04:13  10   $120,000 in claimed costs for MK - supervision?

03:04:16  11   A.    No.

03:04:16  12   Q.    As an experienced developer, is it reasonable not to

03:04:23  13   maintain records of costs with supervision of a project the

03:04:26  14   size of Oceanique in the amount of $120,000?

03:04:29  15   A.    No.

03:04:29  16   Q.    The next line item is "Appliances," correct?

03:04:35  17   A.    Correct.

03:04:35  18   Q.    And in your review of all the Oceanique materials, did you

03:04:40  19   identify any cost documentation or records to support this line

03:04:44  20   item?

03:04:44  21   A.    Not until last night.

03:04:45  22   Q.    What did you receive last night, Mr. Adams?

03:04:48  23   A.    There was a QuickBooks statement.

03:04:52  24   Q.    And did the QuickBooks statement change your

03:04:56  25   recommendation regarding whether it is a reasonable

*OFFICIAL TRANSCRIPT*

03:04:58  1   reimbursable cost?

03:04:59  2   A.    No.

03:04:59  3   Q.    Why is that?

03:05:00  4   A.    There were no supporting invoices, proof of payment, and

03:05:04  5   the QuickBooks does not relate to any individual units.

03:05:08  6   Q.    Why is it important to maintain invoices and proof of

03:05:12  7   payment of appliances?

03:05:13  8   A.    Typically invoices would have serial numbers for that

03:05:16  9   particular appliance, and it would be used for the purchaser

03:05:19 10   for warranties.

03:05:20 11   Q.    Mr. Adams, what is the next line item entry on this ledger

03:05:26 12   that you consider not a reasonable reimbursable cost?

03:05:30 13   A.    Number 13, "Trim/Paint Labor - Charlie."

03:05:35 14   Q.    Based on your review of the materials, what is your

03:05:39 15   knowledge of what this line item is?

03:05:42 16   A.    Up until four days ago, the binders contained limited

03:05:47 17   information that related to trim and paint for two units only

03:05:51 18   for $9,300.  Four days ago, additional handwritten invoices and

03:05:57 19   canceled checks were delivered.  They were payable to a

03:06:00 20   Charlie McPhilany, and it appears that he was a handyman who

03:06:07 21   did other items besides trim and paint.

03:06:10 22   Q.    Mr. Adams, if you could please turn to Tab 5.  I'll mark

03:06:15 23   this as Defense Exhibit 4 -- 5, excuse me.

03:06:20 24         Mr. Adams, do you recognize this document?

03:06:26 25   A.    Yes, I do.

*OFFICIAL TRANSCRIPT*

03:06:27 1    Q.    Can you identify it for the Court.

03:06:29 2    A.    This was the additional information that was received last

03:06:32 3    Wednesday night.

03:06:32 4    Q.    Based on your review of this documentation, did you change

03:06:37 5    your recommendation for reasonable reimbursable costs?

03:06:40 6    A.    I did.

03:06:40 7    Q.    What is your amended recommendation?

03:06:42 8    A.    Of the 38,550 claimed, 35,490 are reasonable reimbursable

03:06:50 9    costs.

03:06:50 10   Q.    Why is it not the full amount of $38,550?

03:06:55 11   A.    Three of the invoices contained nonprotocol items which

03:07:00 12   total $3,060.

03:07:02 13   Q.    Mr. Adams, why are those -- why is the shutter crank

03:07:15 14   installation not included as a reasonable reimbursable cost?

03:07:19 15   A.    They are nonprotocol items and typically not affected by

03:07:25 16   CDW.

03:07:26 17   Q.    Mr. Adams, what is the next line item on Exhibit 4 that

03:07:30 18   you consider not to be a reasonable reimbursable cost?

03:07:34 19   A.    Number 16, "Storage."

03:07:34 20   Q.    Why is that line item not a reasonable reimbursable cost?

03:07:38 21   A.    No documentation.

03:07:39 22   Q.    Mr. Adams, what is the next item that is not a reasonable

03:07:45 23   reimbursable cost, based on your review?

03:07:47 24   A.    Number 18, "Moving/hauling."

03:07:49 25   Q.    And why is this line item not a reasonable reimbursable

*OFFICIAL TRANSCRIPT*

03:07:49  1    cost?

03:07:57  2    A.    The only supporting documentation for this is a one-page

03:08:01  3    statement from Tricon, which is the developer.  There is no

03:08:05  4    proof of payment, and typically moving would be a soft cost.

03:08:08  5    Q.    The next line item is line item number 19, "Utilities -

03:08:17  6    FPL."  What's your understanding of what this line item is?

03:08:19  7    A.    This would be the utility bills that would be a carrying

03:08:22  8    cost and not a construction cost.  It would also be considered

03:08:26  9    a soft cost.

03:08:26 10    Q.    So is this line item a reasonable reimbursable cost?

03:08:30 11    A.    No.

03:08:30 12    Q.    Mr. Adams, what is the next line item that you consider

03:08:40 13    not to be a reasonable reimbursable cost?

03:08:42 14    A.    Number 20, "Engineering letters."

03:08:44 15    Q.    Based on your review and experience and background with

03:08:48 16    the settlement program, what is your understanding of this line

03:08:52 17    item?

03:08:52 18    A.    Up until four days ago, we had no documentation.  Four

03:08:55 19    days ago, we received copies of canceled checks for has Golden.

03:08:59 20    We still do not have invoices, so we do not know what those

03:09:04 21    engineering letters were for.

03:09:05 22    Q.    So without knowing what those engineering letters were

03:09:08 23    for, would you recommend this as a reasonable reimbursable

03:09:10 24    cost?

03:09:10 25    A.    No.

*OFFICIAL TRANSCRIPT*

03:09:11  1   Q.    If you did receive invoices for these canceled checks,

03:09:16  2   would you believe then that it's a reasonable reimbursable

03:09:19  3   cost?

03:09:19  4   A.    It's possible.   Typically engineering letters relate to

03:09:24  5   permitting.   The engineering letters and checks were dated

03:09:29  6   after the permits were issued.

03:09:31  7   Q.    Mr. Adams, regarding permits, did you receive and review

03:09:37  8   documentation related to permits regarding this claim?

03:09:39  9   A.    Again, this was information that was delivered four days

03:09:43 10   ago.

03:09:43 11   Q.    At the time -- well, let's go back.

03:09:47 12         At the time of your initial review, did you include

03:09:49 13   this item as a recommended reasonable reimbursable cost?

03:09:52 14   A.    No.

03:09:52 15   Q.    Following review of the documentation received four days

03:09:56 16   ago, have you amended your finding or recommendation regarding

03:10:00 17   permit fees?

03:10:00 18   A.    Yes, I have.

03:10:01 19   Q.    And what is that finding?

03:10:04 20   A.    The dollar amount actually exceeds the ledger.   It's

03:10:07 21   $15,075.

03:10:09 22   Q.    And is that a reasonable reimbursable cost?

03:10:12 23   A.    Yes, it is.

03:10:13 24   Q.    So for 21, we would scratch it and put in 15,075, correct?

03:10:20 25   A.    Correct.

*OFFICIAL TRANSCRIPT*

03:10:21  1   Q.    Under the next line item, "Utilities - Water/Sewer," is
03:10:31  2   this a reasonable reimbursable cost?
03:10:33  3   A.    No, this is similar to number 19.  It's a carrying cost,
03:10:37  4   not a construction cost.  It would be considered a soft cost.
03:10:42  5   Q.    The next item, Number 23, "Scratched/Delaminated Glass,"
03:10:49  6   is this a reimbursable cost?
03:10:52  7   A.    No, it is not.
03:10:53  8   Q.    Why not?
03:10:54  9   A.    CDW does not cause scratching or delaminating of glass.
03:10:59 10   It's a non-CDW expense.
03:11:01 11   Q.    If this property were remediated by Moss under the
03:11:05 12   remediation program, and this glass was broken, scratched or
03:11:08 13   delaminated, who would bear the cost to repair it?
03:11:12 14   A.    Moss would.
03:11:12 15   Q.    So again, scratched/delaminated glass is not a reasonable
03:11:22 16   reimbursable cost?
03:11:23 17   A.    Correct.
03:11:23 18   Q.    What is the next line item that you consider not to be a
03:11:28 19   reasonable reimbursable cost?
03:11:29 20   A.    Number 25, "Asphalt Repair."
03:11:31 21   Q.    And what is your understanding of what that line item is
03:11:35 22   for?
03:11:35 23   A.    In review of the documents, there was an invoice for
03:11:38 24   sealing and striping of the asphalt areas.
03:11:40 25   Q.    Why is that not a reasonable reimbursable cost under the

*OFFICIAL TRANSCRIPT*

03:11:43 1    Settlement Agreement?

03:11:43 2    A.    It is not caused or affected by CDW.  It's a

03:11:47 3    nonremediation protocol item.

03:11:49 4    Q.    Mr. Adams, what is the next line item that is not a

03:11:53 5    reimbursable cost?

03:11:54 6    A.    26, "Redo Decks."

03:11:57 7    Q.    What is your understanding of this line item?

03:12:03 8    A.    Several of the invoices include "level ponding areas on

03:12:07 9    balconies."

03:12:08 10   Q.    So why is this not a reasonable reimbursable cost?

03:12:12 11   A.    It's not caused by CDW and it's a nonprotocol item.

03:12:17 12   Q.    Mr. Adams, what is the next line item that you determined

03:12:20 13   was not a reasonable reimbursable cost?

03:12:24 14   A.    Number 30, "Plumbing Repairs."

03:12:26 15   Q.    What is your understanding of this scope of work?

03:12:27 16   A.    There were multiple invoices which had drain cleaning for

03:12:31 17   the main sewer lines.

03:12:32 18   Q.    So is this a reasonable reimbursable cost?

03:12:35 19   A.    No, it is not.

03:12:37 20   Q.    Why?

03:12:38 21   A.    It's nonprotocol.  It's not caused by CDW.

03:12:41 22   Q.    Item Number 30.  Are there any other line item numbers

03:12:49 23   between 1 and 42 under the construction costs that you

03:12:52 24   determined were not reasonable reimbursable costs?

03:12:55 25   A.    One last one, number 33, "Door/Locks Repair."

*OFFICIAL TRANSCRIPT*

03:12:59 1    Q.    What is your understanding of that scope of work?

03:13:01 2    A.    The invoices for rekeying of locks.

03:13:03 3    Q.    Why is that not a reasonable reimbursable cost?

03:13:06 4    A.    It's nonprotocol.  It's not CDW related.

03:13:11 5    Q.    Moving down to Items Number 33 to 47, for builder

03:13:18 6    overhead -- "Builder Profit/Overhead/Legal/Accounting," based

03:13:22 7    on your review and experience for the settlement program and

03:13:25 8    your review of the materials, what is this line item for?

03:13:28 9    A.    This is for the developer, his profit and overhead for

03:13:33 10   performing the remediation.

03:13:34 11   Q.    Based on your review and experience and background with

03:13:43 12   the settlement program and your review of this matter, is the

03:13:46 13   claimed amount on Exhibit 4, the $441,909, is that a reasonable

03:13:53 14   reimbursable cost?

03:13:54 15   A.    No, it is not.

03:13:56 16   Q.    Why not?

03:13:57 17   A.    For several reasons.  The industry standard is 10 percent

03:14:03 18   overhead, 10 percent profit.  Also, the 10 percent profit and

03:14:06 19   10 percent overhead would be based upon all of the items listed

03:14:08 20   from 1 to 42 that were reimbursable reasonable costs.

03:14:20 21   Q.    The next three items, 44, 45 and 46, "Interest on

03:14:25 22   Property, Interest on Construction Costs, Condo Fees and Real

03:14:30 23   Estate Taxes," did you include those amounts in your

03:14:32 24   recommendation for what is a reasonable reimbursable cost?

03:14:35 25   A.    No, I did not.

*OFFICIAL TRANSCRIPT*

03:14:36  1    Q.   Why not?

03:14:37  2    A.   These are nonconstruction costs, and there was no

03:14:41  3    documentation.

03:14:41  4    Q.   In the 350 ARH claims that you have reviewed, have you

03:14:48  5    ever approved items such as interest, condo fees or taxes as a

03:14:51  6    reasonable reimbursable cost?

03:14:53  7    A.   No.

03:14:53  8    Q.   And why not?

03:14:56  9    A.   They are nonprotocol, nonconstruction items.

03:14:59 10    Q.   Moving to the last item, "Punch Out," this is line item

03:15:04 11    number 47, "Punch Out/Warranty/Reserve/Contingency," what is

03:15:15 12    your understanding of these items?

03:15:16 13    A.   It's simply that.  It's a contingency for warranty items.

03:15:20 14    The dollar amount of $200,000 that is listed, there is no

03:15:25 15    incurred costs, there are no invoices, no expenses.

03:15:28 16    Q.   In the review of all of the materials that you were

03:15:33 17    provided for the Oceanique claims, did you identify any

03:15:37 18    documentation that establishes that Oceanique incurred costs

03:15:40 19    for punch out, warranty, reserve or contingency?

03:15:42 20    A.   No.

03:15:43 21    Q.   And if I could circle back, Mr. Adams, to the ledger,

03:15:49 22    under Item Number 26, "Redo decks," did you review

03:15:53 23    documentation related to that line item?

03:15:56 24    A.   Yes, I did.

03:15:57 25    Q.   And what is your understanding of that scope of work?

*OFFICIAL TRANSCRIPT*

03:16:01 1    A.    Redo decks was level ponding areas on balconies.

03:16:06 2    Q.    Is that a reasonable reimbursable cost?

03:16:08 3    A.    No.

03:16:08 4    Q.    Why not?

03:16:09 5    A.    It's nonprotocol.  It's not a remediation item.

03:16:12 6    Q.    So, Mr. Adams, if we were to go back and add up these

03:16:20 7    items -- so going back, Mr. Adams, to the items that you would

03:16:25 8    deduct out for line item 1 through 42, did you come up with a

03:16:31 9    subtotal for the construction costs that would be considered

03:16:35 10   reasonable reimbursable costs?

03:16:36 11   A.    Yes, I did.

03:16:37 12   Q.    What is that number?

03:16:38 13   A.    $895,899.15.

03:16:44 14   Q.    Based on the 10 percent overhead and 10 percent of profit,

03:16:55 15   what is the amount of the reasonable reimbursable cost for

03:16:58 16   overhead and profit?

03:17:00 17   A.    $179,179.83.

03:17:04 18   Q.    If you were to add those two numbers up, what would that

03:17:13 19   amount represent?

03:17:17 20   A.    $1,075,078.98.

03:17:23 21   Q.    Back to my question, Mr. Adams, that amount would

03:17:27 22   represent what for the Oceanique claim?

03:17:29 23   A.    That would be the reasonable reimbursable cost.

03:17:32 24   Q.    Would that be the reasonable reimbursable cost if the unit

03:17:35 25   was 100 percent KPT?

*OFFICIAL TRANSCRIPT*

03:17:39  1   A.    Yes, it would be.

03:17:40  2   Q.    If you were to apply a 60 percent percentage to that

03:17:43  3   number, what is the number for the reasonable reimbursable

03:17:45  4   costs of a 60 percent KPT property?

03:17:48  5   A.    $645,047.38.

03:18:01  6        MR. DYSART:  Your Honor, I have no further questions at

03:18:10  7   this time.  I can move these documents into evidence now or

03:18:13  8   wait until after redirect.

03:18:14  9        THE COURT:  That's fine.  Let's do it now.

03:18:16 10        MR. DYSART:  At this time, Your Honor, I would move

03:18:18 11   into evidence Defense Exhibit 1, 2, en globo, 3, 4, and 5.

03:18:29 12        THE COURT:  The Court will admit it.

03:18:35 13        [!EZ SPEAKER 107]:  Thank you, Mr. Adams.

03:18:43 14        THE COURT:  Cross-examination.

03:18:44 15        MR. GONZALEZ:  I know I'm out of turn, but I will offer

03:18:46 16   Exhibit 1, which consists of a white notebook with 16 subtags

03:18:50 17   as Plaintiff's exhibit.

03:18:55 18        THE COURT:  Do you want the witness to have one, Ervin?

03:18:57 19        MR. GONZALEZ:  I'll put up whatever I want.  We'll

03:19:02 20   follow our --

03:19:07 21        MR. MILLER:  Mr. Gonzales handed me a copy.  The

03:19:12 22   witness is welcome to have mine.  It's easy for him to follow.

03:19:12 23        MR. GONZALEZ:  Thank you very much.

03:19:12 24   CROSS-EXAMINATION BY MR. GONZALEZ:

03:19:22 25   Q.    Good afternoon, Mr. Adams.

**OFFICIAL TRANSCRIPT**

03:19:22  1    A.    Good afternoon.

03:19:23  2    Q.    I'm Ervin Gonzalez, and I represent Mr. Kodsi and his

03:19:29  3    company.  With me today is Fred Longer and my law partner

03:19:33  4    Patrick Montoya.

03:19:35  5              Mr. Adams, you're being paid for your services today

03:19:38  6    on an hourly basis?

03:19:39  7    A.    No.

03:19:39  8    Q.    How are you being compensated for your time?

03:19:39  9    A.    I'm not.

03:19:43 10    Q.    You work for Moss?

03:19:44 11    A.    Yes.

03:19:44 12    Q.    And Moss is being compensated for the work it's done?

03:19:48 13    A.    Yes.

03:19:48 14    Q.    For how many thousands of houses?

03:19:50 15    A.    As I stated earlier, 2,700 homes we've completed so far.

03:19:54 16    Q.    Have you been doing this exclusively?

03:19:57 17    A.    Yes, I have.

03:19:57 18    Q.    So what for -- what is it, the last two or three years?

03:20:02 19    A.    Five.

03:20:02 20    Q.    The last five years, this has been exclusively your job?

03:20:05 21    A.    Yes.

03:20:05 22    Q.    You've been working very closely with the individuals from

03:20:09 23    Knauf?

03:20:09 24    A.    Yes, I have.

03:20:10 25    Q.    And very closely with the lawyers from Knauf?

*OFFICIAL TRANSCRIPT*

03:20:12  1   A.   Yes.

03:20:12  2   Q.   You went over your testimony here today so that you could

03:20:16  3   make it smooth and quick, correct?

03:20:18  4   A.   Correct.

03:20:18  5   Q.   How much time do you think you spent preparing?

03:20:21  6   A.   A couple hours.

03:20:21  7   Q.   Now, you never talked to Mr. Kodsi directly other than

03:20:26  8   hello and good-bye, right, sir?

03:20:28  9   A.   That's correct.

03:20:28 10   Q.   Did you ever go to the site to see the buildings?

03:20:31 11   A.   No, I did not.

03:20:32 12   Q.   Do you know what they look like?

03:20:33 13   A.   I've seen pictures.

03:20:34 14   Q.   Do you know how many units it has?

03:20:39 15   A.   I do not.

03:20:40 16   Q.   It's actually two buildings with 122 units.  Would you

03:20:45 17   accept that to be true?

03:20:46 18   A.   If you say so, yes.

03:20:47 19   Q.   And it's located in south Florida?

03:20:50 20   A.   Yes.

03:20:50 21   Q.   Hutchinson Island.  Now, you would agree with me if we

03:20:58 22   were to look at a timeline, which will be Tab number 2, if

03:21:06 23   you -- we could just follow it up here, February 2006 through

03:21:15 24   September 2006, Oceanique received thousands of sheets of

03:21:19 25   drywall from Banner Supply; does that sound about right?

*OFFICIAL TRANSCRIPT*

03:21:22   1    A.    I have no clue.

03:21:22   2    Q.    Well, I'll ask you to accept these things to be true.

03:21:28   3    January 2007, construction of the North Tower of Oceanique was

03:21:30   4    started.   February of 2009, construction of South Tower was

03:21:34   5    completed.   That's when the residents started complaining about

03:21:38   6    the Chinese drywall smell and problems.   Will you accept that

03:21:41   7    to be true?

03:21:42   8    A.    Yes.

03:21:42   9    Q.    As early as May of 2009, Oceanique began demolishing

03:21:49  10    39 units that tested positive for Chinese drywall

03:21:53  11    contamination; would you agree with me on that?

03:21:54  12    A.    Yes.

03:21:54  13    Q.    The JPML, which created the multidistrict litigation here

03:22:01  14    before the Honorable Judge Fallon -- Eldon Fallon was set up

03:22:06  15    and transferred June 15, 2009; are you aware of that?

03:22:10  16    A.    Yes.

03:22:11  17    Q.    That's a month after the work had already begun at

03:22:14  18    Oceanique, correct?

03:22:15  19    A.    Yes.

03:22:15  20    Q.    Then the date of Pretrial Order No. 1, which talked about

03:22:23  21    having to preserve the drywall for evidence, didn't come into

03:22:27  22    effect until June 16, 2009, correct, sir?

03:22:31  23    A.    I believe so.

03:22:32  24    Q.    By then, Oceanique had already begun the demolition for

03:22:35  25    about a month?   Right, sir?

*OFFICIAL TRANSCRIPT*

03:22:38  1    A.    According to your timeline, yes.

03:22:40  2    Q.    The preservation protocol did not come into effect until

03:22:48  3    October 9, 2009, right, sir?

03:22:49  4    A.    Yes.

03:22:50  5    Q.    And that would be about five months after Oceanique had

03:22:54  6    begun its work demolishing the units that had bad drywall in

03:22:58  7    it, correct?

03:22:58  8    A.    Correct, sir.

03:22:59  9    Q.    Oceanique hired a lawyer December of 2009.  That's about

03:23:05 10    seven months after they had already started, correct?

03:23:06 11    A.    Yes.

03:23:07 12    Q.    So you would agree with me that it would not be

03:23:11 13    unreasonable for Oceanique to take steps to cure the problem,

03:23:18 14    fix the problem for its unit owners and for its building the

03:23:21 15    minute they found out that there was a problem, correct?

03:23:23 16    A.    Correct.

03:23:24 17    Q.    It would be responsible, right?

03:23:26 18    A.    Yes.

03:23:26 19    Q.    It's commendable, right?

03:23:31 20    A.    Yes.

03:23:31 21    Q.    That's what you would do as an employee of Moss if you

03:23:33 22    found out that one of your buildings had a problem, perhaps

03:23:37 23    toxic, perhaps damaging to individuals living in there?  Right,

03:23:41 24    sir?

03:23:41 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

03:23:42   1    Q.    Now, you would agree with me that Mr. Kodsi is not a huge
03:23:48   2    builder?
03:23:48   3    A.    I do not know.
03:23:49   4    Q.    Moss is a huge builder, correct?
03:23:52   5    A.    We are a large builder.
03:23:54   6    Q.    Very large?
03:23:54   7    A.    Large.
03:23:55   8    Q.    Well, you built the baseball stadium at Marlins Park in
03:24:01   9    Miami, didn't you?
03:24:02  10    A.    We were a joint venture partner with that one with a very
03:24:05  11    large builder.
03:24:05  12    Q.    Right.  You were involved in it?
03:24:07  13    A.    Yes.
03:24:09  14    Q.    Mr. Kodsi was not?
03:24:10  15    A.    Right.
03:24:11  16    Q.    You've built skyscrapers, haven't you?  Moss?
03:24:14  17    A.    Yes.
03:24:15  18    Q.    Lots of them?
03:24:15  19    A.    Yes.
03:24:15  20    Q.    Throughout the country?
03:24:16  21    A.    Throughout south Florida, yes.
03:24:17  22    Q.    You enjoy a good reputation with -- how many employees do
03:24:22  23    you all have?
03:24:23  24    A.    Approximately 400.
03:24:24  25    Q.    Plus all the subcontractors and individuals that you hire

*OFFICIAL TRANSCRIPT*

03:24:28  1    to get all your jobs done in each location that you're at?

03:24:31  2    A.    Correct.

03:24:32  3    Q.    Your corporation's net worth is probably close to a

03:24:37  4    billion dollars, if not more?

03:24:39  5    A.    I don't know.

03:24:39  6    Q.    Now, the work that was done by Moss in the Chinese drywall

03:24:45  7    remediation program, the square foot amount was $56 a square

03:24:51  8    foot, correct?

03:24:52  9    A.    Cumulative, yes.

03:24:56 10    Q.    So I saw you were real quick with your math when the

03:25:03 11    defense attorney was asking you some questions.  Let's do a

03:25:06 12    little math together.

03:25:07 13         If we take your -- Moss -- when I say "your," I mean

03:25:11 14    Moss.  If you take Moss's $56 a square foot and we multiply it

03:25:17 15    times 104,000 square feet, we get $5,824,000, correct?

03:25:26 16    A.    I'll trust your math.

03:25:28 17    Q.    All right, sir.  Assuming that the square footage for the

03:25:32 18    39 units in this case amount to 104,000 square feet, you would

03:25:39 19    agree with me that a -- an amount of $56 a square foot totaling

03:25:48 20    $5,824,000 would be reasonable?

03:25:53 21    A.    If the protocol was followed, yes.

03:25:55 22    Q.    All right.  And because that's what Moss would charge,

03:25:55 23    right?

03:26:00 24    A.    Yes.

03:26:00 25    Q.    And Moss is reasonable?  Correct?

*OFFICIAL TRANSCRIPT*

03:26:03  1    A.    Yes, we follow the protocol.

03:26:04  2    Q.    Moss is fair, right?

03:26:06  3    A.    Yes.

03:26:07  4    Q.    Moss doesn't charge more than what's right; correct?

03:26:11  5    A.    Correct.

03:26:11  6    Q.    So if Mr. Kodsi and the companies he was working with

03:26:16  7    charged up to $56 a square foot, that would be fair and

03:26:20  8    reasonable as well, correct?

03:26:21  9    A.    If the protocol was followed, yes.

03:26:23  10   Q.    All right.  So your concerns are that the protocol was not

03:26:28  11   followed, right?

03:26:28  12   A.    Correct.

03:26:28  13   Q.    But the protocol did not exist when Oceanique began its

03:26:32  14   work, do you agree with that?

03:26:34  15   A.    Yes.

03:26:34  16   Q.    You agree with me that Mr. Kodsi is not a soothsayer or a

03:26:40  17   fortune teller?

03:26:41  18   A.    Correct.

03:26:42  19   Q.    Now, if we take $30.58 a square foot, that's about $26

03:26:51  20   less than Moss, correct?

03:26:52  21   A.    Yes.

03:26:52  22   Q.    That's a significant difference, isn't it?

03:26:55  23   A.    Yes.

03:26:55  24   Q.    If we multiply $30.58 a square foot times 104,000 square

03:27:02  25   feet, we would get $3,180,499.28, correct?

03:27:08  1    A.    Correct.

03:27:08  2    Q.    And that's about $2.7 million, roughly, difference between

03:27:16  3    $56 a square foot and $30.58 a square foot times 104,000 square

03:27:24  4    feet?

03:27:24  5    A.    Yes.

03:27:25  6    Q.    Now, when you say matters are "soft costs," they are soft

03:27:35  7    as long as you're not paying for them, right?  But for

03:27:38  8    Mr. Kodsi to have to pay for certain items, that was not easy

03:27:42  9    for him, it was a hard cost that way?  Would you agree with me?

03:27:46 10    A.    No.

03:27:46 11    Q.    He had to pay for it out of his pocket.

03:27:49 12    A.    Okay.

03:27:49 13    Q.    All right, sir.  Do you know how Mr. Kodsi got the money

03:27:55 14    to remediate the 39 units?

03:27:57 15    A.    I do not.

03:27:59 16    Q.    He had to get a loan.  The bank wouldn't fund the loan;

03:28:01 17    were you aware of that?

03:28:02 18    A.    No.

03:28:02 19    Q.    Were you aware that the bank said they were going to

03:28:06 20    default him and take back the project because of the problem?

03:28:09 21    A.    No.

03:28:09 22    Q.    Were you aware that if that were to have occurred,

03:28:14 23    Mr. Kodsi would have lost $50 million?

03:28:20 24    A.    I don't know.

03:28:20 25    Q.    Were you aware that because Mr. Kodsi spent 3,180,000 to

*OFFICIAL TRANSCRIPT*

03:28:27 1  fix the 39 units, he mitigated his damages by $50 million that

03:28:35 2  otherwise would have been a claim against Knauf?  Were you

03:28:42 3  aware of that?

03:28:43 4  A.   No.

03:28:43 5  Q.   Have you seen the remediation photographs that were taken?

03:28:52 6  A.   Yes, I have.

03:28:52 7  Q.   The work was done, correct?

03:28:55 8  A.   Yes.

03:28:55 9  Q.   As far as you know, the work was done satisfactorily,

03:29:00 10  right, sir?

03:29:01 11  A.   Yes.

03:29:01 12  Q.   All right, sir.  Now, you agree with me that payroll is an

03:29:07 13  appropriate amount?  You're just concerned that the protocol

03:29:10 14  required more documentation, right, sir?

03:29:12 15  A.   That's correct.

03:29:12 16  Q.   You agree with me that supervision is appropriate, and

03:29:17 17  your concern is there is not enough documentation, right, sir?

03:29:19 18  A.   There is no documentation.

03:29:20 19  Q.   You agree with me that if appliances corrode because of

03:29:24 20  Chinese drywall corrosion, which damages the copper coils and

03:29:31 21  aluminum -- I'm sorry, and silver and gold conduits on

03:29:36 22  operating boards, they need to be replaced?

03:29:38 23  A.   Correct.

03:29:38 24  Q.   So the replacement of appliances is something that you

03:29:46 25  would expect?

03:29:46 1    A.    Yes.

03:29:46 2    Q.    You agree with me that if paint is damaged as a result of

03:29:52 3    the remediation, you have got to repaint it, if walls are

03:29:56 4    damaged, right, sir?

03:29:56 5    A.    Yes.

03:29:56 6    Q.    You can't just leave it like that?

03:29:58 7    A.    I agree.

03:29:59 8    Q.    And that costs money, doesn't it?

03:30:01 9    A.    Yes.

03:30:01 10   Q.    I'm referring in particular to Item Number 13.  Your

03:30:04 11   concern there was that there wasn't enough documentation as

03:30:07 12   well?

03:30:07 13   A.    No.

03:30:07 14   Q.    Now, moving and hauling, that doesn't happen for free,

03:30:15 15   does it?

03:30:16 16   A.    It depends on what they are hauling and moving.

03:30:17 17   Q.    Well, if you've got to move and haul things as a result of

03:30:20 18   construction work, that's not free.  You've got to pay somebody

03:30:24 19   to do it?

03:30:25 20   A.    I believe the invoice said it was moving items from one

03:30:28 21   unit to another.

03:30:28 22   Q.    Do you know what those items were?

03:30:31 23   A.    No.

03:30:31 24   Q.    Do you know if they were related to Chinese drywall -- I'm

03:30:34 25   sorry, to things that were reasonably related to

*OFFICIAL TRANSCRIPT*

03:30:37 1    Chinese drywall?

03:30:37 2    A.    I do not.

03:30:38 3    Q.    Do you know if they were related to moving appliances from

03:30:40 4    one unit to another?

03:30:41 5    A.    I do not.  The invoice was unclear.

03:30:44 6    Q.    Let me ask you this:  Do you think it would be reasonable

03:30:46 7    to move appliances from unaffected units that hadn't been sold

03:30:52 8    yet and placing them in the repaired units that were remediated

03:30:55 9    for Chinese drywall?  Do you understand my question?

03:31:02 10   A.    No.

03:31:02 11   Q.    Let's assume I've got ten units, and one of them has a

03:31:05 12   Chinese drywall problem and the appliances are bad.  I've got

03:31:09 13   to change them.  Are you with me so far?

03:31:11 14   A.    Okay.

03:31:11 15   Q.    So I go to unit -- that's unit Number 1.  Now, unit Number

03:31:16 16   10, I haven't sold unit 10 yet, but it's got the same kind of

03:31:19 17   appliances.  I take those appliances from unit 10 and I put

03:31:23 18   them into unit 1 until I sell unit 10.  Then when I sell

03:31:28 19   unit 10, I then buy the appliances for it.  That's a reasonable

03:31:31 20   move, isn't it?

03:31:31 21   A.    Yes.

03:31:31 22   Q.    If I had to transport or have moving and hauling for those

03:31:35 23   types of things, that would be appropriate?

03:31:36 24   A.    Yes.

03:31:38 25   Q.    Now, if I'm trying to sell those units and make people

*OFFICIAL TRANSCRIPT*

03:31:47 1  comfortable that I have properly remediated the units so it's

03:31:51 2  safe for them -- for homeowners to live in it, you would agree

03:31:55 3  with me that having an engineer inspect it and give them a

03:31:59 4  letter saying it's been done properly is a wise thing?

03:32:03 5  A.   Yes.

03:32:03 6  Q.   I'm referring here to Item Number 20.

03:32:10 7  A.   Okay.

03:32:10 8  Q.   You agree with me that if glass is damaged during

03:32:16 9  remodeling, construction, remediation, it needs to be replaced?

03:32:20 10  A.   Yes.

03:32:20 11  Q.   That actually does happen, doesn't it?

03:32:23 12  A.   Occasionally.

03:32:24 13  Q.   Sometimes glass breaks.  Right?

03:32:27 14  A.   Occasionally, yes.

03:32:28 15  Q.   Doors get scratched, right?

03:32:30 16  A.   Yes.

03:32:30 17  Q.   The replacement of that would be a reasonable expense,

03:32:35 18  wouldn't it?

03:32:38 19  A.   Moss would not charge that.

03:32:38 20  Q.   Well, we know Moss would have charged over $5 million in

03:32:43 21  this case, don't we?  Right?

03:32:43 22  A.   Yes.

03:32:47 23  Q.   And Mr. Kodsi didn't charge that, did he?

03:32:50 24  A.   No.

03:32:51 25  Q.   Asphalt repair and redoing decks.  Let's take them

*OFFICIAL TRANSCRIPT*

03:32:55 1  together.  Those are Items 25 and 26.  As a result -- I would

03:32:58 2  like you to assume this to be true:  As a result of having to

03:33:03 3  do these remediation repairs, the nicely done asphalt on the

03:33:08 4  roads leading into the condominiums -- in the condominium area

03:33:12 5  and the decks were damaged severely because of construction

03:33:16 6  equipment, you would agree with me that they would have to be

03:33:19 7  redone?

03:33:19 8  A.    Yes.

03:33:20 9  Q.    That would then be a reasonable expense related to

03:33:25 10  remediation, right?

03:33:26 11  A.    Yes.

03:33:26 12  Q.    Similarly, if plumbing needed repair because items fell

03:33:33 13  into the plumbing area and created all sorts of problems with

03:33:39 14  the fluidity of the water running through, that would have to

03:33:42 15  be fixed as well?

03:33:42 16  A.    Yes.

03:33:43 17  Q.    You can't just leave it there?

03:33:44 18  A.    Correct.

03:33:44 19  Q.    And that would make it a reasonable expense if that were

03:33:47 20  true?

03:33:47 21  A.    Yes.

03:33:47 22  Q.    Some of the doors and locks had copper -- I'm sorry --

03:33:52 23  yes, copper elements in it, and we know that Chinese drywall,

03:33:55 24  with its high sulfur gas transfers, damaged copper, correct?

03:34:00 25  A.    Yes.

*OFFICIAL TRANSCRIPT*

03:34:00  1    Q.    So if the door fixtures needed to be replaced and repaired

03:34:06  2    because of damage caused by Chinese drywall, then it would be

03:34:08  3    reasonably related?

03:34:10  4    A.    The invoices were for rekeying locks.

03:34:13  5    Q.    Right, but we'll clarify that.  But you would agree with

03:34:16  6    me based on my hypothetical?

03:34:18  7    A.    Yes.  Yes.

03:34:19  8    Q.    Now, you agree with me that builders are allowed to

03:34:25  9    recover overhead damages, correct?

03:34:26  10   A.    Yes.

03:34:26  11   Q.    And the issue is whether it should be -- overhead and

03:34:30  12   profit should be 20 percent or 25 percent, correct?

03:34:32  13   A.    Correct.

03:34:32  14   Q.    That's a 5 percent spread one way or the other?

03:34:36  15   A.    Yes.

03:34:36  16   Q.    Did Moss charge 20 percent?

03:34:38  17   A.    No.

03:34:38  18   Q.    What did Moss charge?

03:34:42  19   A.    4.75 percent.

03:34:43  20   Q.    For overhead and profit?

03:34:45  21   A.    No, for profit.

03:34:46  22   Q.    In addition to the $56 a square foot?

03:34:48  23   A.    No.  That was inclusive.

03:34:51  24   Q.    In the $56 a square foot?

03:34:53  25   A.    Yes.

*OFFICIAL TRANSCRIPT*

03:34:56  1    Q.    If the developer has to pay interest on carrying charges

03:35:03  2    because he cannot sell his units as a result of the

03:35:06  3    Chinese drywall problem, and he's got them -- there's a loan on

03:35:15  4    them, the interest on that loan would be reasonably related to

03:35:19  5    the Chinese drywall problem, correct?

03:35:23  6    A.    That's not part of my review.

03:35:24  7    Q.    Well, I'm asking you the question.  If I can't sell --

03:35:29  8    let's say I'm the builder.  I can't sell my units because I'm

03:35:32  9    doing the remediation, and I can't sell anything until I finish

03:35:36 10    my remediation because nobody wants to move in.  Now, I have to

03:35:40 11    keep my loans going, or the bank is going to take over my

03:35:44 12    property, right?

03:35:45 13    A.    Yes.

03:35:45 14    Q.    Hypothetically speaking, if I got my units completed

03:35:50 15    timely and never had to remediate them because of

03:35:53 16    Chinese drywall, I probably wouldn't have to carry them as

03:35:55 17    long; that's reasonable, isn't it?

03:35:58 18    A.    Yes.

03:35:58 19    Q.    All right, sir.  Similarly, I wouldn't have to incur

03:36:01 20    condominium fees for those units I couldn't sell or real estate

03:36:04 21    taxes because I would have sold them, right, sir?

03:36:07 22    A.    Okay.

03:36:07 23    Q.    Do you -- do you agree with me based on that hypothetical?

03:36:11 24    A.    Yes.

03:36:11 25    Q.    Now, punchlist items are matters that Moss would have to

*OFFICIAL TRANSCRIPT*

03:36:18  1    cover, right, sir?

03:36:18  2    A.    Yes.

03:36:19  3    Q.    That means if something is not done right or if there is a

03:36:22  4    defect in it or something is discovered that needs to be fixed,

03:36:25  5    the construction company has to come back and make it right for

03:36:28  6    the owner?

03:36:28  7    A.    Correct.

03:36:28  8    Q.    And that costs money?

03:36:31  9    A.    We do not charge for that.

03:36:32 10    Q.    No, I'm saying, sir -- I'm not asking if you charge for

03:36:36 11    it.  It costs money?

03:36:39 12    A.    Warranties should not cost money.

03:36:40 13    Q.    It costs the company money to have to go fix things.  You

03:36:46 14    have got to pay employees to do it, right?

03:36:47 15    A.    Yes.

03:36:48 16    Q.    All right, sir.  We already know that in the $5 million --

03:36:54 17    $5,824,000 Moss would have charged, it would have included the

03:36:59 18    punchlist items, right?

03:37:00 19    A.    Yes.

03:37:01 20    Q.    But in the $3,180,000 that Mr. Kodsi incurred as a result

03:37:08 21    of this, it included the punchlist items as well, right?

03:37:13 22    A.    Yes.

03:37:14 23    Q.    Would you agree with me that overhead and profit, some

03:37:25 24    people charge more and some people charge less?

03:37:27 25    A.    Yes.

*OFFICIAL TRANSCRIPT*

03:37:38  1          MR. GONZALEZ:  Thank you very much, sir.  That's all I

03:37:40  2   have for now.

03:37:40  3                  Thank you, Your Honor.

03:37:41  4   REDIRECT EXAMINATION BY MR. DYSART:

03:37:43  5   Q.   Mr. Adams, Danny Dysart on redirect.  I just have a few

03:37:47  6   questions, Your Honor.  I'm going to back up to Exhibit 4.

03:37:51  7          Mr. Adams, on cross-examination you were asked about

03:38:00  8   Moss's construction costs price per square foot to remediate

03:38:05  9   property; do you recall that?

03:38:06 10   A.   Yes, I do.

03:38:07 11   Q.   Is the Moss average cost per square foot directly relevant

03:38:11 12   to ARH review?

03:38:13 13   A.   No, it is not.

03:38:14 14   Q.   Why not, sir?

03:38:17 15   A.   Moss follows the remediation protocol to the letter.

03:38:21 16   Typically, the ARHs do not.

03:38:23 17   Q.   So where it is a remediation protocol, you follow your

03:38:31 18   scope of work, correct?

03:38:31 19   A.   Correct.

03:38:31 20   Q.   In the ARH protocol, you're not paying price per square

03:38:34 21   foot; you're paying based on what costs are actually incurred

03:38:37 22   and submitted, correct?

03:38:38 23   A.   Reasonable reimbursable costs.

03:38:41 24   Q.   That are actually submitted and proven by a claimant,

03:38:44 25   correct?

                          *OFFICIAL TRANSCRIPT*

03:38:44  1    A.    Yes.

03:38:44  2    Q.    You mentioned that the scope of work may differ.  How is

03:38:47  3    it that a scope of work from an ARH may differ from a

03:38:52  4    remediation project that is done by Moss?

03:38:54  5    A.    With the remediation protocol, we follow it to the letter,

03:38:58  6    which is replacing wire.  On many of the ARHs, they do not

03:39:02  7    replace the wire; they replace the devices.  Air conditioning,

03:39:05  8    plumbing.  It varies on the replacement.

03:39:08  9    Q.    So is it fair to say that certain items for an ARH that

03:39:13  10   are completed are nonprotocol remediation costs that are

03:39:16  11   incurred?

03:39:16  12   A.    Yes.

03:39:16  13   Q.    And then there are other items that aren't completed that

03:39:20  14   would be required by Moss under the remediation program,

03:39:22  15   correct?

03:39:23  16   A.    That's correct.

03:39:26  17   Q.    You were also asked about the date of remediation in this

03:39:30  18   case and whether it was responsible or commendable; do you

03:39:34  19   recall that?

03:39:34  20   A.    Yes.

03:39:34  21   Q.    As a sophisticated developer, would it be responsible or

03:39:39  22   commendable to maintain payroll expenses?

03:39:41  23   A.    Yes.

03:39:42  24   Q.    And to submit those in support or defense of a claim?

03:39:44  25   A.    Yes.

*OFFICIAL TRANSCRIPT*

03:39:45 1    Q.    What about expense documents, would that be commendable or

03:39:48 2    responsible to maintain?

03:39:49 3    A.    Yes.

03:39:50 4    Q.    And also to present for a claim that you were either

03:39:53 5    prosecuting or defending against?

03:39:54 6    A.    Yes.

03:39:55 7    Q.    You also discussed some loan documents and hypotheticals

03:40:02 8    regarding some loan of Oceanique; do you recall that?

03:40:05 9    A.    Yes.

03:40:05 10   Q.    Did you receive any documentation related to construction

03:40:08 11   loan documents?

03:40:09 12   A.    No.

03:40:09 13   Q.    In your review of the Oceanique matter, can you determine

03:40:19 14   what the scope of the review is, the full scope of review of

03:40:23 15   the remediation was?

03:40:24 16   A.    No, I cannot.

03:40:25 17   Q.    Why is that?

03:40:26 18   A.    The Owner Disclosure Affidavit was not complete.

03:40:30 19   Q.    You talked about it briefly a minute ago, but does the

03:40:35 20   scope of the remediation ultimately impact what the cost of the

03:40:40 21   remediation is?

03:40:40 22   A.    Yes, it does.

03:40:41 23   Q.    Again, you were also asked about Items 44, 45 and 46,

03:40:50 24   "Interest on Property, Interest on Construction Costs, Condo

03:40:53 25   Fees and Real Estate Taxes"; do you recall that?

*OFFICIAL TRANSCRIPT*

03:40:55  1   A.    Yes.

03:40:55  2   Q.    Did you receive any documentation that would support any

03:40:58  3   of those costs?

03:40:58  4   A.    No.

03:40:59  5   Q.    If you did, would those costs be considered a reasonably

03:41:04  6   reimbursable expense under the Settlement Agreement?

03:41:07  7   A.    No.

03:41:07  8          MR. DYSART:  Thank you, Mr. Adams.

03:41:09  9          THE COURT:  You're excused.  Thank you.

03:41:12 10          Let's call your next witness.

03:41:14 11          MR. DYSART:  Yes, Your Honor.  We would call

03:41:19 12   Jacob Woody.

03:41:50 13          THE DEPUTY CLERK:  Would you please raise your right

14   hand.  Do you solemnly swear that the testimony which you are

15   about to give will be the truth, the whole truth and nothing

16   but the truth, so help you God?

17          THE WITNESS:  I do.

18                        **JACOB WOODY**

19   was called as a witness and, after being first duly sworn by

20   the Clerk, was examined and testified on his oath as follows:

21          THE DEPUTY CLERK:  Please state and spell your name for

22   the record.

03:41:51 23          THE WITNESS:  J-A-C-O-B, W-O-O-D-Y.

03:41:54 24          MR. GONZALEZ:  Your Honor, we'll stipulate to his

03:41:58 25   background, education and training for his opinions and

*OFFICIAL TRANSCRIPT*

03:42:00 1    statements in court.

03:42:02 2           THE COURT:  Okay.

03:42:03 3    DIRECT EXAMINATION BY MR. DYSART:

03:42:03 4    Q.    Briefly, Mr. Woody, my name is Danny Dysart.  I have you

03:42:06 5    on direct examination for the Knauf defendants.

03:42:09 6           Briefly, Mr. Woody, who do you work for?

03:42:15 7    A.    I work for BrownGreer.

03:42:15 8    Q.    What do you do at BrownGreer?

03:42:18 9    A.    We are the settlement administrator for the

03:42:21 10   Chinese Drywall Settlement Program, among other things.

03:42:22 11   Q.    As the settlement administrator, does BrownGreer -- did

03:42:27 12   their role in the settlement include a review of claims,

03:42:30 13   determination of eligibility, and processing of payments for

03:42:34 14   Other Loss Fund claims?

03:42:34 15   A.    Yes.

03:42:34 16   Q.    Are you familiar with the claimant Oceanique Development

03:42:38 17   Company in the Settlement Agreement?

03:42:40 18   A.    Yes.

03:42:40 19   Q.    Did they make an Other Loss Fund claim to the settlement?

03:42:43 20   A.    Yes.

03:42:43 21   Q.    What type of Other Loss claim did they make?

03:42:47 22   A.    They made, I believe, 42 separate lost rent, use and sales

03:42:52 23   claims.

03:42:53 24   Q.    Mr. Woody, if you could open up the binder that I put in

03:42:57 25   front of you to Tab 6, which we'll mark as Defense Exhibit 6.

*OFFICIAL TRANSCRIPT*

03:43:07 1    Do you recognize this document?

03:43:07 2    A.    Yes.

03:43:08 3    Q.    Can you please identify it for the Court.

03:43:11 4    A.    This is a version of one of our settlement program

03:43:16 5    reports.  This has been filtered to show the payments made just

03:43:21 6    to Oceanique.

03:43:22 7    Q.    This document would show the claimant Oceanique for all 42

03:43:30 8    claims, correct?

03:43:30 9    A.    Yes.

03:43:31 10    Q.    It would also show the claim type as a lost rent, use or

03:43:39 11    sales?

03:43:39 12    A.    That's correct.

03:43:39 13    Q.    It would also show a payment amount, correct?

03:43:43 14    A.    Correct.

03:44:04 15    Q.    Mr. Woody, under the lost sales claim type, the Other Loss

03:44:08 16    Fund, does it permit compensation to claimants for interest on

03:44:11 17    loans and other lost value money resulting from the delay in

03:44:15 18    selling the affected property?

03:44:17 19    A.    Yes, I believe the Settlement Agreement does provide for

03:44:20 20    that.

03:44:20 21    Q.    Do you recall what section of the Settlement Agreement

03:44:23 22    would provide that?

03:44:24 23    A.    I think that it's Section 4.7.1.2.3.

03:44:32 24         [!EZ SPEAKER 107]:  I'm putting up, Your Honor, for the

03:44:34 25    record, Record Document 16407-3.  This is the third amended

*OFFICIAL TRANSCRIPT*

03:44:40 1    Settlement Agreement regarding claims against the Knauf

03:44:44 2    defendants in the MDL 2047.

03:44:44 3    EXAMINATION BY [!EZ SPEAKER 107]:

03:44:48 4    Q.    If I go to Section 4.7.1.2, Mr. Woody, is this the section

03:44:54 5    that you were just referencing regarding a lost sales claim to

03:44:57 6    the Other Loss Fund?

03:44:58 7    A.    Yes.

03:44:59 8    Q.    If we go to 4.7.1.2.3, under what section does it state

03:45:10 9    that interest payments on loans and other lost value would be

03:45:14 10   included for an Other Loss Fund claim?

03:45:16 11   A.    Can you say that again?  I'm sorry.

03:45:19 12   Q.    Yeah, so, under what section under 4.7.1.2.3 would it

03:45:28 13   support a claimant getting an interest payment on loans and

03:45:32 14   other lost value for an Other Loss Fund claim?

03:45:37 15        MR. GONZALEZ:  Objection, Your Honor.  That's going to

03:45:39 16   call for a legal conclusion, and that's for the Court.

03:45:41 17        MR. DYSART:  Your Honor, to state it differently,

03:45:45 18   Your Honor, if we could just read Section B and C, the

03:45:48 19   highlighted portion, if he could just read it into the record.

03:45:51 20        MR. GONZALEZ:  Your Honor, may we have what we're

03:45:53 21   looking at, what program this relates to.

03:45:53 22   EXAMINATION BY MR. DYSART:

03:45:56 23   Q.    When you say what program, this is the Other Loss Fund

03:46:00 24   section?

03:46:00 25   A.    Yes, Section B says, "The commercial owner shall be

*OFFICIAL TRANSCRIPT*

03:46:04  1    entitled only to the lost value of money resulting from the

03:46:07  2    delay in selling the affected property or units within a

03:46:11  3    multiple-unit property."

03:46:12  4    Q.    If you could go on to read C.

03:46:14  5    A.    Section C says, "If a commercial owner who is qualified to

03:46:17  6    obtain benefits under this section has outstanding loans on the

03:46:20  7    affected property, the commercial owner shall be entitled to

03:46:23  8    recover interest, but not principal payments on the loan or

03:46:26  9    loans, but only to the extent that the commercial owner was

03:46:29 10    unable to sell the affected property due to KPT

03:46:34 11    Chinese drywall.  For example, a commercial owner of an

03:46:37 12    affected multiple-unit property with" -- and that's where -- I

03:46:41 13    don't have the rest.

03:46:42 14         THE COURT:  Turn the page.  Move it down a little bit

03:46:46 15    so you can see it.

03:46:47 16         THE WITNESS:  -- "a hundred units who was unable to

03:46:49 17    sell 50 units due to KPT Chinese drywall would be entitled to

03:46:53 18    50 percent of the interest payments."  That's the end of

03:46:58 19    Section C.

03:46:58 20    EXAMINATION BY MR. DYSART:

03:47:00 21    Q.    Just for comprehensive sake, would you please read D into

03:47:02 22    the record.

03:47:02 23    A.    Section D says, "If a commercial owner who is qualified to

03:47:07 24    obtain benefits under this section has no outstanding loans on

03:47:09 25    the affected property, the commercial owner shall be entitled

03:47:14  1    to claim lost interest as if the commercial owner invested in
03:47:18  2    one-year U.S. Treasury bills, but only to the extent that the
03:47:21  3    commercial owner was unable to sell the affected property due
03:47:21  4    to KPT Chinese drywall."
03:47:24  5    Q.   If we go back, there was a couple references in this
03:47:28  6    section to the word "section."  What is your understanding of
03:47:30  7    that term?  What section are they referring to?
03:47:34  8    A.   I'm not sure I understand that question.
03:47:35  9    Q.   So if we flip back to -- well, just for purposes of moving
03:48:16 10    forward, the term "section" would be defined in the Settlement
03:48:19 11    Agreement?
03:48:19 12    A.   Yes, I'm sure it is.
03:48:20 13    Q.   Is it your understanding that it refers to the Other Loss
03:48:27 14    section?
03:48:27 15    A.   Yes, that was part of the Other Loss section.
03:48:31 16    Q.   I'm putting back up Defense Exhibit C.
03:48:43 17         Mr. Woody, how much did Oceanique receive in
03:48:46 18    connection with its lost sales claims to the Other Loss Fund?
03:48:49 19    A.   They received $10,000 on 42 separate claims, which is a
03:48:54 20    total of $420,000.
03:48:55 21    Q.   Why were they only paid $10,000 on each claim?
03:48:59 22    A.   The Other Loss Fund is a capped fund, and we worked with
03:49:04 23    the parties to develop PTO 29, which set out the amounts that
03:49:10 24    we could offer on each claim type, and the maximum amount that
03:49:15 25    we could offer on lost use, rent and sales was $10,000.

*OFFICIAL TRANSCRIPT*

03:49:20 1    Q.    Did the payment for the 42 claims include Unit 801-B, if
03:49:25 2    you look at -- would it be Line at 118?
03:49:34 3    A.    Yes.
03:49:34 4    Q.    What other types of claims can be found under the Other
03:49:40 5    Loss Fund?
03:49:40 6    A.    There are seven different claim types.  There is lost
03:49:44 7    rent, use and sales; foreclosure and short sale; preremediation
03:49:49 8    alternative living expenses; bodily injury; tenant loss; and we
03:49:53 9    have a miscellaneous claim.
03:49:53 10   Q.    What types of losses or costs can be compensated under the
03:49:58 11   miscellaneous claim type?
03:49:59 12   A.    Miscellaneous allows for claimants to make claims that are
03:50:05 13   not subsumed in another claim type and that are not
03:50:09 14   specifically excluded from -- in the Settlement Agreement.
03:50:12 15   Q.    Based on your knowledge of the administration of this
03:50:15 16   settlement, does the miscellaneous claim type cover carrying
03:50:21 17   costs such as condo fees or real estate taxes to the -- for
03:50:25 18   claims to the Other Loss Fund?
03:50:27 19   A.    Yes.
03:50:29 20   Q.    Did Oceanique file an Other Loss Fund miscellaneous claim?
03:50:34 21   A.    No.
03:50:34 22   Q.    Had Oceanique filed a miscellaneous claim, what was the
03:50:39 23   maximum amount that could have been awarded for each claim?
03:50:42 24   A.    The maximum amount we could offer across the entire
03:50:45 25   settlement was $2,500.

*OFFICIAL TRANSCRIPT*

03:50:46  1    Q.    Did Oceanique file any other claims to the Other Loss
03:50:46  2    Fund?
03:50:50  3    A.    No.
03:50:50  4          MR. DYSART:  At this time, Your Honor, I would offer,
03:50:52  5    file and introduce into evidence Exhibit 6.
03:50:56  6                Thank you, Mr. Woody.  I have no further
03:50:58  7    questions.
03:50:58  8          THE COURT:  Let it be admitted.
03:51:00  9                Is that 2,500 per claim?
03:51:02 10          THE WITNESS:  Yes, sir, under the Miscellaneous Claim
03:51:06 11    tab.
03:51:10 12          THE COURT:  Cross?
03:51:12 13          MR. GONZALEZ:  Yes, thank you.
03:51:14 14    CROSS-EXAMINATION BY MR. GONZALEZ:
03:51:14 15    Q.    Good afternoon, Mr. Woody.
03:51:15 16    A.    Good afternoon.
03:51:16 17    Q.    Kind of funny finding you on this side of the chair.
03:51:20 18    A.    Well, it keeps happening.
03:51:21 19    Q.    Mr. Woody, would you agree with me that if a contractor
03:51:26 20    had done the work at Oceanique for the amount that Moss would
03:51:31 21    charge per square foot at $56 a square foot times
03:51:37 22    104,000 square feet, the amount would be in excess of
03:51:40 23    $5.8 million?
03:51:43 24    A.    I'm not sure I'm qualified to talk about that but it
03:51:46 25    sounds correct.

*OFFICIAL TRANSCRIPT*

03:51:46 1   Q.   Well, just basic math?

03:51:49 2   A.   Yes.  Yes.

03:51:49 3   Q.   Right.  So if that comes through, and it's the same as

03:51:54 4   Moss, that would be reasonable?

03:51:58 5   A.   I suppose so.

03:51:59 6   Q.   It would follow, right?  Common sense?

03:52:01 7   A.   Yes.

03:52:01 8   Q.   And if somebody does a really good job for less than

03:52:05 9   $3.2 million on the same project, they saved a lot of money,

03:52:10 10  right?

03:52:11 11  A.   I think so, yeah.

03:52:11 12  Q.   And, in fact, if Knauf had been charged the $5.8 million

03:52:18 13  for this particular job, they probably would have to pay it?

03:52:22 14  A.   I assume so.

03:52:23 15  Q.   But instead they were only asked to pay 60 percent of

03:52:26 16  3 point -- less than 3.2 million?

03:52:29 17  A.   I guess.  I don't know the circumstances of that request.

03:52:32 18  Q.   All right.  Now, you would agree with me that it's

03:52:37 19  impossible to submit paperwork that you don't have?

03:52:40 20  A.   That is true.

03:52:43 21  Q.   It's impossible to obey a rule that doesn't exist when

03:52:46 22  you're actually doing it?

03:52:47 23  A.   I suppose so.

03:52:49 24  Q.   It's a lot to ask of someone, isn't it?

03:52:52 25  A.   I think so.

*OFFICIAL TRANSCRIPT*

03:52:52  1    Q.   All right, sir.  Now, under the Already Remediated Homes,

03:52:58  2    you agree with me that the plaintiff is entitled to recover all

03:53:03  3    reasonably related expenses to the remediation?

03:53:06  4    A.   I assume so.  I think that's part of the agreement.  We

03:53:12  5    don't really have much to do with that part of the settlement.

03:53:14  6    Q.   Right, but it's in the actual -- you've seen the

03:53:17  7    agreement, haven't you?

03:53:18  8    A.   Yes.

03:53:18  9    Q.   In fact, you were reading part of it before.

03:53:20  10   A.   I was, yes.

03:53:20  11   Q.   You agree with me that there is language under ARH,

03:53:25  12   Already Remediated Homes, that it's based on expenses that are

03:53:29  13   reasonably related to remediation?

03:53:33  14   A.   Yes.

03:53:33  15   Q.   It doesn't have any limiting language, does it?

03:53:40  16   A.   Not that I'm aware of.

03:53:41  17   Q.   It doesn't say you cannot recover carrying charges for

03:53:45  18   units, does it?

03:53:46  19   A.   Not that I know of.

03:53:47  20   Q.   It doesn't say you're not allowed to recover additional

03:53:51  21   loan charges that you have to take, does it?

03:53:53  22   A.   Not that I'm aware of.

03:54:00  23        MR. GONZALEZ:  Thank you, sir.  That's all I have.

03:54:02  24   REDIRECT EXAMINATION BY MR. DYSART:

03:54:05  25   Q.   Very briefly, Danny Dysart on redirect.

*OFFICIAL TRANSCRIPT*

03:54:08  1        Mr. Woody, you have given presentations in the past

03:54:10  2   to this Court, in fact, today, regarding the various pots in

03:54:14  3   the settlement, correct?

03:54:15  4   A.   Yes.

03:54:15  5   Q.   And the Remediation Fund is one pot?

03:54:18  6   A.   Yes.

03:54:19  7   Q.   The Other Loss Fund is another?

03:54:20  8   A.   Yes.

03:54:21  9   Q.   And the Settlement Agreement, you would agree that based

03:54:24 10   on the type of claim, that claim would go into one or the other

03:54:28 11   pot?

03:54:28 12   A.   Correct.

03:54:28 13   Q.   It cannot be to both pots?

03:54:35 14   A.   Can you say that again.

03:54:36 15   Q.   Could you make a claim -- for a particular claim, could

03:54:39 16   you make a claim to both the Remediation Fund and the Other

03:54:44 17   Loss Fund?

03:54:44 18   A.   No, I don't think so.

03:54:44 19   Q.   Would that result in a double recovery?

03:54:48 20   A.   I guess it would depend on the claim and whether it was

03:54:51 21   paid and things of that nature.

03:54:53 22        MR. DYSART:  Thank you, Your Honor.  No further

03:54:54 23   questions.

03:54:54 24        THE COURT:  All right.  You're excused.  Thank you.

03:54:57 25        Any further witnesses?

*OFFICIAL TRANSCRIPT*

03:55:00 1          MR. DYSART:  None for Knauf, Your Honor.

03:55:03 2          THE COURT:  Anything from --

03:55:04 3          MR. GONZALEZ:  Your Honor, we're going to call

03:55:05 4   Mr. Kodsi.  Just very briefly, Your Honor, what we're going to

03:55:08 5   hit are the one -- items that are in dispute, not the entire

03:55:14 6   item.  We're going to present the Court with evidence that

03:55:17 7   shows that the expenses were reasonably related to the

03:55:20 8   remediation of this project, and Mr. Kodsi will be the first

03:55:23 9   witness.  Maurice Kodsi.

03:55:43 10          May I approach the witness, Your Honor?

03:55:45 11          THE COURT:  Yes.

03:55:46 12          THE DEPUTY CLERK:  Would you please raise your right

13   hand.  Do you solemnly swear that the testimony which you are

14   about to give will be the truth, the whole truth, and nothing

15   but the truth, so help you God?

16          THE WITNESS:  Yes.

17                      **MAURICE KODSI**

18    was called as a witness and, after being first duly sworn by

19     the Clerk, was examined and testified on his oath as follows:

20          THE DEPUTY CLERK:  Please state and spell your name for

21   the record.

03:56:00 22          THE WITNESS:  My name is Maurice Kodsi, K-O-D-S-I.

03:56:00 23   DIRECT EXAMINATION MR. GONZALEZ:

03:56:06 24   Q.   Mr. Kodsi, please tell the Court about your background and

03:56:09 25   experience with respect to developing buildings.

*OFFICIAL TRANSCRIPT*

03:56:14  1   A.    I mostly specialized in building condominiums on the
03:56:22  2   water.
03:56:22  3   Q.    About how many buildings have you built in your career?
03:56:25  4   A.    Probably 30 buildings or more.
03:56:29  5   Q.    How old are you, sir?
03:56:32  6   A.    I'm 72.
03:56:32  7   Q.    Do you have -- are you a family-type business?
03:56:35  8   A.    Yes, sir.  It belong to me and my son.
03:56:39  9   Q.    Your son is whom?
03:56:40 10   A.    My son is Robert Kodsi.
03:56:42 11   Q.    Where do you operate out of?
03:56:44 12   A.    We operate in Merritt Island, Florida.
03:56:49 13   Q.    Tell the Court about your educational background.
03:56:52 14   A.    Well, I started -- I mean, I finish high school, but --
03:56:55 15   and then I was -- started as a carpenter and I moved on and
03:57:00 16   contractor and stuff like that.
03:57:02 17   Q.    Thank you, sir.
03:57:04 18         Now, let's talk about the project called "Oceanique"
03:57:07 19   that's located in Hutchinson Island in south Florida.  Can you
03:57:11 20   tell us about that project.
03:57:13 21   A.    Well, the project consists of 144 units, recreation room
03:57:19 22   and lobby and also outside garages.  It's two buildings.  One
03:57:29 23   building have 60 units and one building have 84 units, so total
03:57:34 24   of units is 144 units, plus amenities and pool.
03:57:38 25   Q.    I'm going to show you a photograph, and this comes from

*OFFICIAL TRANSCRIPT*

03:57:41  1    Tab Number 2.  Does this truly and accurately represent the
03:57:46  2    buildings as they appear?
03:57:48  3    A.    Yes, sir.  That's the buildings.
03:57:49  4    Q.    How many buildings are there?
03:57:52  5    A.    There are two buildings.  In the back of them, you have
03:57:55  6    the garages.  Garages.  Enclosed garages.  On the first floor
03:58:06  7    is garages and recreation room and lobby.
03:58:11  8    Q.    When was the project started?
03:58:14  9    A.    It started in 2005.
03:58:19 10    Q.    Did there come a time in February through September of
03:58:23 11    2006 when Oceanique received thousands of drywall sheets from
03:58:30 12    Banner Supply Company?
03:58:31 13    A.    Yes, we did.
03:58:32 14    Q.    How do you know that?
03:58:37 15    A.    Well, we -- when the time came that we found that we had
03:58:42 16    defective drywall, we discovered -- I mean, all our bills, we
03:58:49 17    pay them -- we bought all of the drywall from Banner Supply.
03:58:56 18    All of it.  We have been dealing with them for many years.
03:58:59 19    Q.    All right, sir.  Let's go over this timeline here.  When
03:59:05 20    was the construction of the North Tower of Oceanique completed?
03:59:09 21    A.    It was completed in January 2007.  January 22, 2007.
03:59:18 22    Q.    When was the construction of the South Tower completed?
03:59:21 23    A.    It was completed in February 2, 2009, plus or minus.
03:59:26 24    Q.    When did the complaints start regarding the
03:59:29 25    Chinese drywall problem?

*OFFICIAL TRANSCRIPT*

03:59:32  1    A.    Well, we do not sell our product.  We hire real estate

03:59:38  2    company to sell them.  We are a small company.  The real estate

03:59:43  3    company, around the spring, they said that you have an issue

03:59:49  4    with a smell on the unit and the -- we have a smell and we have

03:59:57  5    corrosion and stuff of this nature, and we didn't understand

04:00:00  6    what's happening.

04:00:01  7    Q.    When was that?

04:00:04  8    A.    That was around May -- April, May of 2009.

04:00:07  9    Q.    What did you do?

04:00:10 10    A.    Well, we assessed the situation and we really didn't know

04:00:16 11    what's happening here, but after three -- two, three weeks, the

04:00:20 12    real estate brokerage firm, they hired somebody.  They told us

04:00:24 13    that we have an issue in this building, you have a

04:00:28 14    contamination, and we believe that this is Chinese drywall, and

04:00:34 15    you need to do something about it.  At that time, we didn't

04:00:38 16    know what to do, so we just was, like, on hold for a few days.

04:00:43 17         But then they sent us a letter and they left the

04:00:49 18    office and they put the letter that we need to refund the

04:00:51 19    people their money and we need to -- they are not going to go

04:00:55 20    ahead and represent us any longer because our building is

04:00:59 21    contaminated and they quit.

04:01:02 22         Now we were sitting with 122 units that, you know, we

04:01:09 23    refund the money, 122 units empty that you had to pay

04:01:14 24    condominium fees, you had to pay taxes, and we have to pay, you

04:01:18 25    know, the loan and others, and we had an investor involved, we

**OFFICIAL TRANSCRIPT**

04:01:23  1    have the bank that want to take it over.  So the solution is --

04:01:30  2    Q.    Let me interrupt you there.

04:01:32  3    A.    Yes.

04:01:32  4    Q.    Did the bank threaten to take over the project?

04:01:34  5    A.    Yes, of course, yes.

04:01:36  6    Q.    What would have happened economically with respect to your

04:01:40  7    damages and losses had the bank taken the project over?

04:01:43  8    A.    We would have lost our credit and all the work that I did

04:01:46  9    for 50 years.  That's Number 1.  Number 2, we would not be able

04:01:50 10    to pay the investor and return their money.  Number 3, we could

04:01:57 11    not pay the -- the bank.  The bank would lose, you know,

04:02:01 12    because you have to pay them back.

04:02:02 13    Q.    How much would you have lost economically?

04:02:04 14    A.    Oh, we lost money ourselves, but on top of that, the

04:02:10 15    investor and the bank, everybody would have lost.

04:02:12 16    Q.    How much?

04:02:14 17    A.    Oh, in the millions, $50 million because we salvage -- by

04:02:19 18    doing that, we salvage and we sold.

04:02:20 19    Q.    By doing what?

04:02:23 20    A.    Well, this what happened:  So we went to the real estate

04:02:27 21    brokerage firm, and they did not want to sell our product.

04:02:32 22    This area which we build, the population is 3,000 people.  It's

04:02:38 23    on Hutchinson Island.  We sell to people that want to retire

04:02:43 24    and live on the ocean and they want to retire.  Now, those

04:02:48 25    people, you know, I want to say --

*OFFICIAL TRANSCRIPT*

04:02:54  1    Q.    Let me redirect to you the specific issues in this case.

04:02:58  2    A.    No, I would like to mention about the real estate broker.

04:03:01  3    Okay.  So, we went to the real estate brokers, and nobody want

04:03:05  4    to represent us.  However, they told us the following:

04:03:10  5    Number 1, we need to remove all and every evidence of any

04:03:16  6    Chinese drywall.  That to start.  And we need to redo them and

04:03:22  7    bring them as brand new.  And for me to provide them with

04:03:26  8    documentation and letters and assurance that we don't have any

04:03:30  9    Chinese drywall in this building before them coming and trying

04:03:34 10    to sell.

04:03:35 11            But I want to go a step before that.  What did

04:03:38 12    happen, this is a small area and we have a news bulletin on

04:03:43 13    this island, and the news bulletin, they came and they took

04:03:47 14    picture and they put it on the news bulletin that Oceanique is

04:03:52 15    contaminated, beware, don't even get close to the project.  So

04:03:55 16    that was already -- we were done.  So we went and we -- and if

04:04:00 17    you want to ask me the question now.

04:04:01 18    Q.    Yeah, I would love to.  Thank you.  When did you start the

04:04:06 19    demolition work for remediating the Chinese drywall problem in

04:04:10 20    the 39 units in question at Oceanique?

04:04:13 21    A.    We had to move very quickly, and first of all, people were

04:04:17 22    living there.

04:04:18 23    Q.    Tell us the date, please.

04:04:19 24    A.    That was around June of 2009.

04:04:22 25    Q.    There is a timeline in front of you.

*OFFICIAL TRANSCRIPT*

04:04:24 1   A.   Oh, I did not -- I don't know.  What is that?

04:04:29 2   Q.   Number 4, does that refresh your recollection?

04:04:31 3   A.   Yes, May 2009, yes.  Something like that.

04:04:34 4   Q.   All right, sir.  What did you do?

04:04:37 5   A.   It was May 2009.  We immediately -- this is when I got

04:04:42 6   involved, and the matter was that how could we go about it?  If

04:04:51 7   we hire a company and that would cost us -- I mean, we are a

04:04:58 8   general contractor, myself, my son, so if we would hire the

04:05:02 9   company, we won't be able to pay this money.

04:05:05 10          And, you know, the only choice we had is that -- to

04:05:10 11   piecemeal and to demolish and show evidence to the company that

04:05:16 12   we sell the product.  So we start demolishing very quickly, but

04:05:21 13   we have a situation that -- how to preserve the material in

04:05:26 14   this unit without damaging it.

04:05:30 15          So if I would have somebody going there, like I would

04:05:36 16   hire a superintendent or a manager, would he make sure that I

04:05:40 17   could do that work without breakage?  If you break a kitchen

04:05:44 18   cabinet or a granite counter, it's 40-, $45,000; times 40,

04:05:48 19   that's 1.6 million.  Now, I couldn't pay that.  I had no money

04:05:53 20   to do that.

04:05:54 21          So I borrow $2 million, okay, on a private source and

04:05:59 22   I commence the work with this money.  I wanted to try to do as

04:06:05 23   much as I could.

04:06:05 24   Q.   At what rate did you borrow the $2 million for?

04:06:09 25   A.   I borrowed the money for 10 percent for one year on a rate

*OFFICIAL TRANSCRIPT*

04:06:13 1    and one point.

04:06:14 2    Q.   Who did the work on your behalf?  Who was the person there

04:06:17 3    on a daily basis?

04:06:18 4    A.   I was the one supervising that.  My son is a contractor,

04:06:25 5    and he would go to the City and pull up the building permit and

04:06:27 6    do, and then make sure that OSHA -- everything is done right.

04:06:31 7         The biggest problem we have is that to hire people,

04:06:36 8    it's very hard to get somebody to do that because nobody wants

04:06:39 9    to come close because of the issue of the contamination.  So I

04:06:43 10   had to be there to make sure that they wear the masks because

04:06:47 11   if somebody would sue us by saying, I got sick from

04:06:51 12   contamination, because when you demolish this unit, the smell,

04:06:53 13   it was out of this world.

04:06:56 14        So we had to demolish them and vacuum them to the

04:07:00 15   bottom to the studs.  After that, we looked at the quality

04:07:05 16   control and to show that it's not contamination and give it to

04:07:09 17   the broker so -- you know, so he be happy with that.

04:07:12 18   Q.   Mr. Kodsi, the remediation occurred during the late spring

04:07:17 19   and through the summer of 2009; is that right?

04:07:19 20   A.   That's right.

04:07:19 21   Q.   Describe to the Court very briefly how hot and humid it is

04:07:24 22   in south Florida during those months.

04:07:25 23   A.   Well, but you are used to that weather.  But anyway, I

04:07:29 24   mean, it's -- first of all, it's three and a half years

04:07:34 25   (verbatim) from my office or from my home to the project.

*OFFICIAL TRANSCRIPT*

04:07:37  1   Three and a half hours' return I had to do every day there.

04:07:42  2   Q.   Mr. Kodsi, my question is:  Explain to the Court how hot

04:07:46  3   and humid it is from May to August of 2009.

04:07:48  4   A.   It's hot, it's miserable and it's humid.

04:07:50  5   Q.   The Court is aware that the drywall reacts heavily to heat

04:07:56  6   and humidity.

04:07:56  7   A.   Oh, there is no question.

04:07:57  8   Q.   Now, was the project completed August of 2010?

04:08:00  9   A.   Yes.

04:08:01  10  Q.   The remediation?

04:08:02  11  A.   Yes.

04:08:02  12  Q.   How many units were remediated?

04:08:05  13  A.   We remediated 39 units, lobbies, recreation area and some

04:08:13  14  garages.

04:08:13  15  Q.   Now, tell us generally, were the -- was the asphalt

04:08:18  16  towards the condominium damaged as a result of the remediation?

04:08:21  17  A.   Well, if you want to walk through --

04:08:23  18  Q.   Talking generally.

04:08:25  19  A.   Well, when we have to orange peel spray on the drywall,

04:08:34  20  which when it comes off, we have to put the drywall back, then

04:08:38  21  we -- it goes with the truck that it has a hose and it shoots

04:08:43  22  up to the 12th floor and they sprayed the wall.  That truck

04:08:50  23  spilled white from the orange peel onto the asphalt and the

04:08:56  24  asphalt absorbed that.

04:08:57  25            On top of that, we had the bins that we put the

*OFFICIAL TRANSCRIPT*

04:09:03  1    drywall inside them, the damaged drywall, and that was on the

04:09:07  2    asphalt.  When the company took the bins to throw the garbage,

04:09:13  3    they scratched the asphalt, and from the white -- we had the

04:09:20  4    damage that we have to resurface this area and stripe it in

04:09:24  5    order to do that.

04:09:24  6    Q.    Were the decks also damaged as a result of the

04:09:31  7    remediation?

04:09:31  8    A.    Yes.

04:09:31  9    Q.    Explain to the Court what decks we are talking about and

04:09:34  10   how they were damaged.

04:09:34  11   A.    This building has a catwalk.  The catwalk, it's about 6,

04:09:40  12   7 feet wide by the length of the building.  Now, when you go to

04:09:44  13   the unit and you go as a worker and demolish and redo and move

04:09:49  14   and haul the furniture, I mean, the stuff, the finishes,

04:09:54  15   they -- and the -- from the orange peel, we damaged the

04:09:59  16   walkway, so we had to repaint them.  So we paint the walkway in

04:10:05  17   order that, you know, we -- to be back to normal.

04:10:08  18   Q.    So is this --

04:10:10  19   A.    So this is what we did.

04:10:11  20   Q.    Were windows damaged as a result of the remediation?

04:10:14  21   A.    Yes, we had some windows that were scratched.  When they

04:10:17  22   removed the drywall, some drywall fell or whatever, the workers

04:10:22  23   were -- and they scratched some of the glass.  So we have to

04:10:25  24   change those.

04:10:25  25   Q.    Were walls and trimming in the units damaged as a result

**OFFICIAL TRANSCRIPT**

04:10:34 1   of the remediation?

04:10:34 2   A.   Well, let me explain.  We demolish all the unit to the

04:10:43 3   stud.  We demolish all the unit completely.  Completely to the

04:10:45 4   stud.  Completely.  And vacuum it and clean it and leaving it

04:10:50 5   for aeration for at least few days till we went and we get to

04:10:57 6   see the air control, that it's okay.  It's fine.

04:11:04 7   Q.   Let me show you some of the windows that had to be

04:11:08 8   replaced.  Does this reflect some of the windows that had to be

04:11:15 9   replaced?

04:11:15 10  A.   Yes.  Yes.

04:11:20 11  Q.   This is in Tab Number 3.  I'm going to flip quickly

04:11:28 12  through this.  Does this reflect part of the remediation work

04:11:34 13  that was being done?

04:11:34 14  A.   Yes.

04:11:34 15  Q.   I'll flip you through some of the photos just so we can

04:11:39 16  look at some of the work.

04:11:40 17  A.   Yes.  As you can see, we had to completely demolish and

04:11:46 18  get the building inspector come and inspecting the unit to make

04:11:48 19  sure that we did -- we did demolish everything completely

04:11:52 20  and --

04:11:53 21  Q.   Did you have to replace appliances?

04:11:55 22  A.   Of course.

04:11:56 23  Q.   Why?

04:11:58 24  A.   Well, all the coil, all the silver inside the appliances

04:12:04 25  was melted.  It was completely done.

*OFFICIAL TRANSCRIPT*

04:12:07 1    Q.    What appliances did you use to put into the damaged

04:12:10 2    39 units?

04:12:12 3    A.    We bought appliances, and we give you the bill.  We bought

04:12:18 4    the appliances, but in order to save money, we took some

04:12:21 5    appliances from other floors and we put them on this -- on the

04:12:26 6    one that we did when we sell the unit because we didn't have

04:12:30 7    money to buy the appliances.  We bought them as it goes.

04:12:33 8    Q.    Did you incur moving expenses as a result of moving the

04:12:38 9    appliances?

04:12:38 10   A.    Yes.

04:12:38 11   Q.    Was that reasonably related to the remediation?

04:12:41 12   A.    Yes, sir.

04:12:41 13   Q.    And I believe this is interior gutting for your units?  Is

04:12:47 14   that right?

04:12:48 15   A.    Yes, sir.

04:12:49 16   Q.    Now here you're airing it out.  Tell us what airing out

04:12:56 17   meant.  You have that open and you have the fan going?

04:13:01 18   A.    Yes.

04:13:04 19   Q.    Was that to remove the gasses?

04:13:06 20   A.    Remove the gasses, yes.

04:13:07 21   Q.    I think the Court gets it.

04:13:14 22          Now, let's go to the exhibits.

04:13:20 23   A.    Excuse me.  I want to mention one thing about the mirror,

04:13:23 24   the gentleman saying that the mirror is not part of the

04:13:27 25   remediation.

*OFFICIAL TRANSCRIPT*

04:13:27 1    Q.    The mirror?

04:13:28 2    A.    Yes, we demolished -- we broke those mirrors when we

04:13:31 3    demolish the drywall because that glued on the drywall, so we

04:13:35 4    have to break them.  But anyway...

04:13:37 5    Q.    Okay.  Let's go to the -- let's go to this list, and we'll

04:13:41 6    move as quickly as we can through it because we're getting

04:13:44 7    close to the Court's time to finish.

04:13:46 8          Item Number 1, "Payroll, $360,000," was the payroll

04:13:51 9    related to the remediation work in this case?

04:13:54 10   A.    Yes, sir.  Ordinary -- yes.

04:13:55 11   Q.    Was it paid?

04:13:55 12   A.    It was paid.

04:13:56 13   Q.    Was it reasonable and necessary for this project?

04:13:59 14   A.    If you wouldn't have spent this money, you would have

04:14:03 15   spent $6 million.

04:14:04 16   Q.    Is this amount reasonable and customary in the industry in

04:14:08 17   south Florida?

04:14:08 18   A.    That's the minimum of the minimum that we spent.  The

04:14:11 19   minimum of the minimum.

04:14:12 20   Q.    Item Number 2, "Supervision, $120,000," is this an amount

04:14:19 21   that was reasonably related to the remediation?

04:14:22 22   A.    If you would hire a superintendent --

04:14:23 23   Q.    Answer my question first, please.  Because she needs to

04:14:26 24   have a good record and so do we.

04:14:29 25          Is the $120,000 for supervision reasonably related to

*OFFICIAL TRANSCRIPT*

04:14:33  1   the remediation?

04:14:34  2   A.   Yes, sir.

04:14:35  3   Q.   Was it necessary and usual and customary based on south

04:14:41  4   Florida prices for this type of work?

04:14:43  5   A.   Yes, sir.

04:14:44  6   Q.   Let's turn to the appliances.  I think you told us that

04:14:49  7   the appliances had to be replaced.  What was the average cost

04:14:53  8   of appliances per unit?

04:14:54  9   A.   The package is 8,500, and we only replaced 32 units.

04:14:59 10   Q.   If we look at the Number 3, appliances, $274,000, was the

04:15:04 11   expense of $274,000 for appliances reasonably related to the

04:15:10 12   remediation?

04:15:10 13   A.   Yes, sir.

04:15:10 14   Q.   Was it a reasonable and necessary expense, based on south

04:15:13 15   Florida prices?

04:15:13 16   A.   Yes, sir.  Otherwise, you cannot sell the unit.

04:15:16 17   Q.   We can't talk over each other, because she'll get really

04:15:19 18   mad at me.  She'll hit me.  She won't hit you.

04:15:22 19        All right, sir.  Now let's go to Item Number 13,

04:15:25 20   "Charlie."  That's Trim/Paint.  Tell us what the trim/paint

04:15:31 21   labor for Charlie was for $38,550.

04:15:34 22   A.   No.  I know that very clear that we hired another crew in

04:15:40 23   order to expedite and to help the first crew.  We gave him a

04:15:45 24   couple of units, two, three units to see how he was going to do

04:15:48 25   them, but he didn't do the best job, so that was only for a

*OFFICIAL TRANSCRIPT*

04:15:52 1   couple of units.

04:15:52 2   Q.   Was the amount of $38,550 for trimming and painting walls

04:16:00 3   that were damaged during the remediation related to the

04:16:04 4   remediation?

04:16:04 5   A.   All of it was related to the remediation.

04:16:07 6   Q.   And was it reasonable and necessary based on south Florida

04:16:10 7   prices?

04:16:10 8   A.   That's very, very reasonable.

04:16:11 9   Q.   Let's turn now to Item Number 18.  I'm sorry, let's see --

04:16:21 10  yes, let's go to Item Number 18, "Moving and Hauling, $20,000,"

04:16:25 11  was that reasonably related to the remediation?

04:16:28 12  A.   Yes.

04:16:28 13  Q.   Was the $20,000 a reasonable expense based on south

04:16:35 14  Florida prices?

04:16:36 15  A.   All right.  Yes.

04:16:37 16  Q.   Tell us what it is.

04:16:38 17  A.   Okay.  What happened is that when we dismantled the

04:16:44 18  finishes -- like doors and cabinet and granite, we had to put

04:16:47 19  them somewhere.  So it was really -- the best thing is not to

04:16:50 20  take them to a truck and put them in a warehouse because they

04:16:53 21  would break.

04:16:53 22      So we took them to the next door, the closer, so we

04:16:58 23  won't damage it.  Then after, when we remove them back to bring

04:17:02 24  them to the unit, we had to reclean that unit that we stored

04:17:06 25  because that was a hundred percent completed.  That cost is

*OFFICIAL TRANSCRIPT*

04:17:12 1    $500 per unit, and we had 40 units, and that's how we came to

04:17:15 2    that amount.

04:17:16 3    Q.   Let's turn to Number 19, utilities, Florida Power & Light,

04:17:19 4    $15,000.  Do you believe that the $15,000 for utilities was

04:17:23 5    reasonably related to the remediation?

04:17:26 6    A.   Because we spend money for electrical for the units to

04:17:29 7    make sure that they are dry when we did the drywall in the

04:17:34 8    beginning when we had the fans and others, and the worker

04:17:37 9    needed electricity.  So that's the cost of that.

04:17:40 10   Q.   Was that the amount that FP&L charged?

04:17:44 11   A.   Yes, sir.

04:17:45 12   Q.   Was it paid?

04:17:46 13   A.   It's paid -- hundred percent paid.

04:17:49 14   Q.   Now, the next item is 20.  It says "Engineer Letters."

04:17:54 15   Can you tell what that is.

04:17:55 16   A.   Yes.  We had an engineer that he had to come inside the

04:17:59 17   units and make sure that we demolish the unit 100 percent up to

04:18:05 18   the studs and the quality control.  He would testify that we

04:18:10 19   passed the quality control.

04:18:11 20        He would then give us a letter of that it's okay, we

04:18:19 21   did what we have to do.  We had to pay him this amount of

04:18:23 22   money, which is very, very reasonable, very reasonable.  That

04:18:29 23   should cost three times more.

04:18:30 24   Q.   Did the engineer go to each unit?

04:18:34 25   A.   Yes, sir.  You have to go to each unit, and they have to

*OFFICIAL TRANSCRIPT*

04:18:37  1    testify, and they have to testify for the building department

04:18:40  2    and all of this, you know.

04:18:41  3    Q.    Was this done for the 39 units?

04:18:43  4    A.    It was done for the 39 units, lobby, garages, and

04:18:49  5    recreation area.

04:18:49  6    Q.    Was it necessary as a result of the remediation?

04:18:51  7    A.    Well, you have no choice.  You have to do that.

04:18:53  8    Otherwise, you cannot sell the unit and you won't get the

04:18:56  9    building inspector to pass to give you a certificate of

04:18:59 10    occupancy.

04:19:00 11    Q.    Was the expense of $14,523 reasonably related to the

04:19:04 12    remediation?

04:19:05 13    A.    Yes, sir.

04:19:05 14    Q.    And was it reasonable and necessary based on south Florida

04:19:08 15    prices?

04:19:08 16    A.    Yes, sir.  It had to be done.

04:19:10 17    Q.    I think we don't have an issue on permit fees.

04:19:19 18          Before I leave --

04:19:20 19          [!EZ SPEAKER 117]:  May I approach the witness,

04:19:21 20    Your Honor?

04:19:21 21          THE COURT:  Yes.

04:19:22 22    EXAMINATION BY MR. GONZALEZ:

04:19:22 23    Q.    I'm going to show you a letter that's marked December 18,

04:19:25 24    2009.  It will be marked as Exhibit 2 for identification and

04:19:28 25    later in evidence.  Do you recognize that letter?

*OFFICIAL TRANSCRIPT*

04:19:30 1    A.    Yes, sir.

04:19:30 2    Q.    Is that an example of a letter that was issued by the

04:19:33 3    engineer per unit?

04:19:34 4    A.    Yes, sir.

04:19:35 5          [!EZ SPEAKER 117]:  Your Honor, at this time, I would

04:19:36 6    like to mark what was previously marked as Exhibit 2 for

04:19:39 7    identification in evidence.

04:19:40 8          THE COURT:  Let it be admitted.

04:19:46 9    EXAMINATION BY MR. GONZALEZ:

04:19:52 10   Q.    Can you tell us about Item Number 22, "Utilities -

04:19:58 11   Water/Sewer."  Do you believe that $12,000 charge for

04:20:01 12   utilities, water sewer are reasonably related to the

04:20:05 13   remediation?

04:20:05 14   A.    Yes.

04:20:05 15   Q.    Were they reasonable -- reasonably (verbatim) and

04:20:08 16   necessary costs?

04:20:10 17   A.    We had to have water to finish the units.  That was what

04:20:16 18   the cost that we incurred for that portion of the water that we

04:20:21 19   used on those units.

04:20:22 20   Q.    We previously discussed Item Number 23 generally, the

04:20:27 21   scratched and delaminated glass.  Did the expense related that

04:20:31 22   item amount to $11,308.19?

04:20:34 23   A.    Yes, sir.

04:20:34 24   Q.    Was that reasonably related to the remediation?

04:20:38 25   A.    100 percent.

*OFFICIAL TRANSCRIPT*

04:20:39  1    Q.    Was the cost reasonable, necessary, usual and customary,
04:20:43  2    based on the south Florida costs?
04:20:44  3    A.    Yes, very reasonable.
04:20:46  4    Q.    We previously discussed the asphalt repair and also the
04:20:52  5    redoing of the decks.  Was the amount for asphalt repair,
04:20:56  6    Item 25, of $7,200 reasonably related to the remediation?
04:21:01  7    A.    Yes, that had to be done.
04:21:01  8    Q.    Is that expense usual and customary and reasonable based
04:21:05  9    on south Florida pricing?
04:21:06 10    A.    Yes.
04:21:06 11    Q.    Similarly, Item Number 26 we've discussed before, was the
04:21:10 12    amount of $6,716.01 reasonably related to the remediation?
04:21:17 13    A.    Yes.
04:21:18 14    Q.    Was it a usual, customary and reasonable charge based on
04:21:22 15    south Florida prices?
04:21:23 16    A.    100 percent.
04:21:24 17    Q.    "Plumbing Repairs," Item Number 30, please explain to us
04:21:28 18    what plumbing repairs were necessary as a result of the
04:21:32 19    remediation.
04:21:32 20    A.    The plumbing was damaged from the drywall and the chrome
04:21:43 21    was pitted.  And the shower was pitted and it was -- it was
04:21:48 22    very bad.  And we had a condensation.  This is not the total
04:21:52 23    amount because we got from the subcontractors for free at least
04:21:57 24    $20,000 worth of items that he gave us without charge.  So this
04:22:01 25    is just a little portion of the repairs.  Nobody is going to

*OFFICIAL TRANSCRIPT*

04:22:06 1    change all the faucets, you have six, seven faucets and shower

04:22:12 2    for the amount of -- let me see, where are we?

04:22:17 3    Q.    Item Number 30.

04:22:19 4    A.    Item Number 30.  Yes, plumbing, it is not $5,000.  That

04:22:23 5    should be more like $30,000 or more.

04:22:25 6    Q.    Was the amount of $3,726.73 usual and customary and

04:22:32 7    reasonably necessary because of the remediation?

04:22:34 8    A.    100 percent.

04:22:35 9    Q.    Are those expenses reasonably related to the expenses in

04:22:38 10   south Florida?

04:22:39 11   A.    100 percent.

04:22:40 12   Q.    Let's turn to door locks and repair.  The amount is

04:22:45 13   $1,590.76.  That's Item 33.  Was that amount reasonably related

04:22:52 14   to the remediation?

04:22:53 15   A.    Yes.

04:22:53 16   Q.    And was it -- are they reasonable, usual and customary

04:22:58 17   expenses based on the south Florida prices?

04:22:59 18   A.    Yes.  I'm going to tell you also why.

04:23:01 19   Q.    Tell us --

04:23:01 20   A.    Oh, sorry, go ahead.

04:23:01 21   Q.    Tell us why.

04:23:04 22   A.    Well, the locks, when you go back and forth and redo the

04:23:10 23   drywall, you break the locks.  We had to change the locks and

04:23:14 24   change the keys.  We had to change doors on a little bit, but I

04:23:20 25   didn't have the money to change the doors, so we changed them

*OFFICIAL TRANSCRIPT*

04:23:23  1   later on.  That's going to fall under the punch, but we had to

04:23:27  2   change those locks so the door would lock.

04:23:29  3   Q.   Did you also have problems with some locks that had copper

04:23:32  4   within them that wouldn't work because of the Chinese drywall?

04:23:36  5   A.   The inside of the lock is copper.  But regardless, it

04:23:38  6   break from the wear and tear also of the door, you know,

04:23:41  7   because the worker, they push the door and they close the door

04:23:44  8   and, you know.

04:23:46  9   Q.   Okay.  Let's turn to Item Number 43, "Profit and

04:23:51  10  Overhead."  What profit and overhead did you charge for this

04:23:56  11  remediation project?

04:23:58  12  A.   Well, we ask for this type of work, tedious work,

04:24:03  13  including the general contractors, including liability,

04:24:07  14  including insurances, including, you know, our overhead and

04:24:15  15  profit, we -- this is what customary we do.  We charge

04:24:20  16  20 percent -- 25 percent on the cost, which is 20 percent on

04:24:25  17  the top of the -- of the amount, you know.  In other words, if

04:24:29  18  you take a dollar, you put a dollar 25, but then it's --

04:24:35  19  20 percent is the 25.

04:24:37  20  Q.   We heard earlier from Moss's representative.  Were you

04:24:42  21  here when you heard him speak?

04:24:44  22  A.   Yes, plus or minus, yes.

04:24:46  23  Q.   That it can be a little more or a little less than

04:24:50  24  25 percent?

04:24:50  25  A.   Yes.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 04:24:50 1 | Q.   Is 25 percent within the reasonable range of overhead and |
| 04:24:59 2 | profits for this type of project? |
| 04:25:00 3 | A.   Especially for this type of work, that's very, very |
| 04:25:03 4 | reasonable.   To go with the liability with contamination and |
| 04:25:08 5 | others, you know, and liability, and who is going to sign off |
| 04:25:12 6 | at the end, you know? |
| 04:25:13 7 | Q.   Was this amount reasonably related to the remediation? |
| 04:25:17 8 | A.   Yes, sir. |
| 04:25:17 9 | Q.   Let's turn to Item 44, "Interest on Property for Three |
| 04:25:21 10 | Months at 1 Percent Times 20 Million."  Can you tell us what |
| 04:25:26 11 | that means. |
| 04:25:26 12 | A.   Well, what we did, we took the number of units, the |
| 04:25:32 13 | 122 units and we know that we have sold -- we have 5 units |
| 04:25:37 14 | left, but the 122 units, the -- minus the 5, so it's 117, and |
| 04:25:45 15 | the average was about $580,000. |
| 04:25:52 16 | Q.   Were those the carrying costs on the units that were |
| 04:25:56 17 | delayed because of the remediation necessary -- |
| 04:25:58 18 | A.   Exactly. |
| 04:25:59 19 | Q.   -- because of the Chinese drywall problem? |
| 04:26:01 20 | A.   Yes, and we took only three months. |
| 04:26:02 21 | Q.   Do you believe that amount is reasonably related to the |
| 04:26:07 22 | remediation? |
| 04:26:07 23 | A.   We should get far more than that.  Three months, it cost |
| 04:26:13 24 | us four or five years, six years to sell. |
| 04:26:16 25 | Q.   Did you incur those expenses? |

*OFFICIAL TRANSCRIPT*

04:26:17  1    A.    Yes.

04:26:17  2    Q.    Did you pay them?

04:26:18  3    A.    Yes, sir.

04:26:19  4    Q.    Turning now to Item 45, "Interest on Construction Costs,"

04:26:22  5    was this for the loan to be able to remediate?

04:26:25  6    A.    Yes.  The $2 million, we got 1 million 9.  They kept the

04:26:31  7    1 percent, which it was -- and then they give us the

04:26:36  8    difference.

04:26:37  9    Q.    Were you able to find conventional banks willing to loan

04:26:40 10    you the money?

04:26:40 11    A.    No.

04:26:40 12    Q.    Where did you go to get the loan for $2 million at

04:26:44 13    10 percent?

04:26:44 14    A.    Private source and my reputation.

04:26:46 15    Q.    Is the amount of $220,954 related to interest on

04:26:52 16    construction costs for this project reasonably related to the

04:26:55 17    remediation?

04:26:55 18    A.    Yes.  Very reasonable, and it's only for the period of one

04:26:58 19    year of the time that we did the remediation and that's it.

04:27:01 20    Q.    Did you have a choice but to accept the 10 percent

04:27:04 21    interest on the loan?

04:27:05 22    A.    I had no other choice.

04:27:07 23    Q.    Did you have the money to do it on your own?

04:27:08 24    A.    No.

04:27:08 25    Q.    Were you able to repay the loan?

*OFFICIAL TRANSCRIPT*

04:27:10  1    A.    Yes.

04:27:12  2          By the way, the item before is that when we said --

04:27:16  3    that was only 4 1/2 percent.  So the only one that's 10 percent

04:27:21  4    is this one.  The one before was 4 1/2 percent calculated on --

04:27:26  5    Q.    Turning now to Item 46, "Condo Fees and Real Estate Taxes

04:27:30  6    Over Three Months Times a Hundred Units," can you tell us what

04:27:33  7    that is.

04:27:33  8    A.    We had to shut the project completely and we had to

04:27:37  9    demolish the lobbies, so we cannot get anybody in and out.  We

04:27:41 10    had one area that the people living that could come around, you

04:27:45 11    know.  So by shutting the project for almost a year, we -- we

04:27:55 12    had to pay the condominium fees and taxes.

04:27:58 13          The average condominium fees and taxes per unit is at

04:28:01 14    least $15,000.  If you were to apply 14- or 15,000 by

04:28:07 15    122 units, you're going to see that the number is far more

04:28:10 16    greater than what we have here.

04:28:11 17    Q.    Is the $350,000 on under Item 46 reasonably related to the

04:28:17 18    remediation expenses?

04:28:18 19    A.    Very reasonable because only three months.

04:28:20 20    Q.    Was that amount reasonable itself?

04:28:22 21    A.    Very reasonable.

04:28:22 22    Q.    Let's turn now to the final item, 47, "Punch

04:28:28 23    Out/Warranty/Reserve/Contingency."  Can you tell us what punch

04:28:31 24    out items, warranty, reserve, contingency means.

04:28:33 25    A.    It's customary when we finish the unit, it's not

*OFFICIAL TRANSCRIPT*

04:28:37 1    100 percent completed, and we leave it like that instead of

04:28:40 2    finishing it up because it costs us a lot of money.  So what we

04:28:43 3    do, we wait until we sell.  When we sell the unit, then the

04:28:50 4    inspector and the buyer would come and make their list of

04:28:56 5    demand of how we have to finish.

04:28:58 6           Even if we finish it ourselves and we think it's a

04:29:01 7    hundred percent, it means nothing.  Remember, you're dealing

04:29:05 8    with people that they are retirees and it's the last place they

04:29:10 9    are going to live, and they are going to check every inch of

04:29:11 10   it, and we have to accommodate them.  They pay $600,000, and

04:29:16 11   this is the last place they're going to live, and we need to

04:29:19 12   really make sure that they are happy so they close on the unit

04:29:22 13   or they won't close.

04:29:23 14          So the inspector give us and the buyers, and then we

04:29:26 15   fix it to their satisfaction.  So that cost is customary

04:29:31 16   between 5- and 6,000, 7,000 per unit.  Some of them more; some

04:29:34 17   of them less.  So when I did the estimation at this time, I

04:29:39 18   took the 40 unit at $5,000, 200,000, but that was an

04:29:47 19   estimation.  So this what it means to me.

04:29:50 20          But as we are sitting here today, and I have the

04:29:52 21   evidence in my hand, it cost us so far 280,000.  So I have the

04:29:59 22   bills and the backup on those, all of the items that we have in

04:30:04 23   here.  This is what you have.

04:30:07 24   Q.  Was the amount of $3,180,499.28 that you incurred as a

04:30:13 25   result of the Chinese drywall problem related to the

*OFFICIAL TRANSCRIPT*

04:30:17 1    remediation?

04:30:17 2    A.   Yes, sir.

04:30:17 3    Q.   Based on south Florida prices and the market, were they

04:30:22 4    reasonable, usual and customary charges?

04:30:24 5    A.   Very reasonable.  Very customary.  Below cost.

04:30:26 6    Q.   If you had hired an outside corporation like Moss, would

04:30:31 7    the expenses have been significantly higher?

04:30:34 8    A.   There is no question.  We -- we -- we also had access to

04:30:39 9    other people that we know, and we asked them for the costs, and

04:30:43 10   they gave us $58 a square foot.

04:30:46 11   Q.   Now, with respect to the amount of 3,180,000, would you

04:30:52 12   agree with me that 60 percent of that number is significantly

04:30:55 13   lower than 60 percent of 5,800,000?

04:30:58 14   A.   This is really -- this is the biggest item that we have,

04:31:02 15   we have only 60 percent of the value.

04:31:05 16   Q.   Now, before we came into the courtroom, you told me you

04:31:08 17   wanted to explain to the Court -- but do it briefly, please --

04:31:12 18   what burden this problem placed on you and your business, and

04:31:17 19   briefly tell the Court.

04:31:19 20   A.   Well, it's really hard work of so many years that is going

04:31:25 21   to be lost.  We lost a lot of money ourselves because we had to

04:31:30 22   pay the investor first and the bank and others, so we took the

04:31:34 23   hardest hit.

04:31:37 24        Not only that, it was a nightmare to do that, to do

04:31:41 25   the repairs, the stress of what to do, and the banks, and the

*OFFICIAL TRANSCRIPT*

04:31:46  1    investor and the buyers and the brokers and all of that put
04:31:50  2    together, it was very, very hard on us.
04:31:53  3             But we are tough and it's a tough business.  We -- we
04:31:59  4    went through the course and we made it.  In the end, we are
04:32:02  5    back to normal.
04:32:02  6    Q.   Did you have the guidance of the Court's instructions when
04:32:05  7    you started this work?
04:32:06  8    A.   No.
04:32:07  9    Q.   Did you have the guidance of a lawyer when you started
04:32:10 10    this work?
04:32:10 11    A.   No.
04:32:11 12    Q.   Did you do the best you could under the circumstances?
04:32:13 13    A.   Yes, sir.  I took the decision, and it worked in the end.
04:32:18 14             MR. GONZALEZ:  Thank you, sir.
04:32:20 15             That's all I have, Your Honor.  I pass the
04:32:22 16    witness.
04:32:22 17             THE COURT:  Any cross?
04:32:29 18             [!EZ SPEAKER 105]:  Yes, sir, Your Honor.  Kerry Miller
04:32:31 19    for Knauf.
04:32:27 20                          CROSS-EXAMINATION
04:32:27 21    EXAMINATION BY MR. MILLER:
04:32:32 22    Q.   Good afternoon, Mr. Kodsi.  I have you on
04:32:35 23    cross-examination.
04:32:35 24             [!EZ SPEAKER 105]:  Your Honor, I'm going to go ahead
04:32:37 25    and hand the witness a binder and the Court a binder so we can

*OFFICIAL TRANSCRIPT*

04:32:41  1    follow.

04:32:41  2    EXAMINATION BY [!EZ SPEAKER 105]:

04:32:55  3    Q.   Mr. Kodsi, as I ask you a question, I'm going to refer to

04:32:59  4    tabs and numbers.  Do you see the numbers on the right?

04:33:01  5    A.   Yes, sir.

04:33:02  6    Q.   Just go to that.  It will come up on the screen too, so

04:33:05  7    whatever your preference is, you have the screen and the book,

04:33:08  8    that's for you.

04:33:19  9         Mr. Kodsi, I just want to be clear on a couple of

04:33:20 10    things because I've seen some different names pop up.  You and

04:33:25 11    your son were principals in a company called "Oceanique

04:33:29 12    Development Company," correct?

04:33:29 13    A.   Yes, sir.

04:33:29 14    Q.   That was a company that developed the Oceanique property

04:33:32 15    in Florida, correct?

04:33:33 16    A.   Yes, sir.

04:33:34 17    Q.   Now, I've seen other documents that refer to a company by

04:33:38 18    the name of "Tricon."  That's a construction company, correct?

04:33:41 19    A.   Yes, sir.

04:33:42 20    Q.   That's a construction company that you and your son are

04:33:46 21    principals at, correct?

04:33:47 22    A.   Yes, sir.

04:33:47 23    Q.   Mr. Kodsi, I saw a newspaper article in which you gave a

04:33:58 24    quote.  It's at Tab 2.  Mr. Kodsi, you will see that this is an

04:34:08 25    article dated November 15, 2011.  Do you see that?

*OFFICIAL TRANSCRIPT*

04:34:13  1    A.    Yes, sir.

04:34:13  2    Q.    All right.  Mr. Kodsi, you'll see that this article is in

04:34:23  3    relation to Tricon Development.  Do you see that right here?

04:34:26  4    A.    Yes, sir.  May I use the book?

04:34:29  5    Q.    Absolutely.

04:34:33  6    A.    I have a hard time to read it.

04:34:35  7    Q.    Absolutely.  That's why I gave it to you.  Whatever is

04:34:38  8    easier on your eyes.  Tab 2.

04:34:40  9    A.    Okay.  I have it now.

04:34:41 10    Q.    You see the reference here to "Tricon Development"?  First

04:34:44 11    words.

04:34:49 12    A.    Right.  Tricon Development.

04:34:52 13    Q.    Yes, sir.  Tricon Development, that's your company,

04:34:52 14    correct?

04:34:55 15    A.    Yes.

04:34:55 16    Q.    Okay.  And you see -- come down with me one, two, three,

04:34:59 17    four paragraphs.  It says "developer Maurice Kodsi."  That's

04:35:04 18    you, right?

04:35:04 19    A.    Yes, sir.

04:35:04 20    Q.    You were the president of Tricon, correct?

04:35:10 21    A.    Yes.  Plus or minus.  Sometime my son; sometime me.

04:35:11 22    Q.    But when this was written in 2011, you were the president,

04:35:15 23    correct?

04:35:20 24    A.    Okay.  I have to -- no, no, sir, this is not me in here.

04:35:27 25    That's wrong.  This article is wrong.

*OFFICIAL TRANSCRIPT*

04:35:28  1    Q.    You're not Maurice Kodsi?

04:35:30  2    A.    No.  The developer president of Tricon said he intend to

04:35:34  3    build 18-unit condo building on 901-1001 South Ocean Drive --

04:35:40  4    that's -- I didn't build any of that.

04:35:43  5    Q.    So I understand.  But this Maurice Kodsi is you, correct?

04:35:47  6    A.    Yes, sir.

04:35:48  7    Q.    Okay.  And this article states that you intend to build

04:35:53  8    three 18-unit condo buildings.  That's what the article states,

04:35:58  9    correct?

04:35:58 10    A.    Yes, sir.

04:35:58 11    Q.    It states you intended to build those condo buildings when

04:36:01 12    the economy turns around; do you see that, sir?

04:36:07 13    A.    Well, let me state a little bit --

04:36:07 14    Q.    Hold on.  Answer my question first.  Do you see that, sir?

04:36:10 15    A.    Which one?

04:36:11 16    Q.    That it says when the economy turns around, you plan on

04:36:14 17    building these buildings when the economy turns around.  Is

04:36:18 18    that a statement that you made, sir?

04:36:19 19    A.    No, sir.

04:36:19 20    Q.    You didn't make that statement?

04:36:20 21    A.    Because --

04:36:23 22    Q.    Sir, answer that question.  Did you make that statement or

04:36:26 23    not?

04:36:26 24    A.    No, no, no.  The media, they came and they create stories,

04:36:30 25    the newspapers and others.  We never read that; we never seen

**OFFICIAL TRANSCRIPT**

04:36:33  1    that.  We never discussed anybody on this item.  So I don't

04:36:36  2    know what you're coming with, but I never seen that item.  I

04:36:40  3    never discussed any -- with any person on that item whatsoever.

04:36:43  4    Q.    Let's look on the last paragraph on this first page.  It

04:36:48  5    says -- and it's a quote -- do you see that?  It's a quote of

04:36:50  6    you.  Do you see that, Mr. Kodsi?  It says, "We have been in

04:36:53  7    business building for 32 years in central Florida."  Do you see

04:36:58  8    that?

04:36:58  9    A.    That's hearsay.

04:37:00  10   Q.    You don't agree with that statement?

04:37:02  11   A.    No.

04:37:02  12   Q.    It says, "'And we have built in excess of 50

04:37:07  13   condominiums,' he said," close quotes.

04:37:09  14   A.    No.

04:37:10  15   Q.    Isn't that true?  So this particular reporter made this

04:37:13  16   up?  Correct?

04:37:15  17   A.    Well, the media, they write anything and nothing.  How --

04:37:22  18   it could be from a broker representing us and they are bragging

04:37:24  19   that we build so many condominiums and we're going to do this,

04:37:28  20   we're going to do that, in order for them to sell our product.

04:37:31  21   We do not sell our product.  We don't go for propaganda.  We do

04:37:36  22   not do that.

04:37:37  23   Q.    So, sir, you did not make that quote, that's your

04:37:38  24   testimony?

04:37:38  25   A.    I did not make that comment.

**OFFICIAL TRANSCRIPT**

04:37:40  1    Q.    During your testimony, your direct testimony, you

04:37:49  2    mentioned that your company built 30 condominium units.  That's

04:37:52  3    correct, right?

04:37:52  4    A.    30 or more.

04:37:53  5    Q.    30 or more.  So it could be 50, right?

04:37:55  6    A.    No, I didn't say 50.  I said could be 30 or more.

04:37:58  7    Q.    And, Mr. Kodsi, was --

04:37:59  8    A.    By the way, I don't know exactly what we -- how many we

04:38:02  9    build or whatever, so....

04:38:03 10    Q.    Mr. Kodsi, is it correct that in 2011, the date of this

04:38:07 11    article, that the economy for multifamily housing was bad in

04:38:13 12    Florida?

04:38:13 13    A.    It was bad, sure.

04:38:15 14    Q.    And it was bad in 2010, right?  There was a recession,

04:38:18 15    correct?

04:38:19 16    A.    Sure, it was bad.  The economy was bad.

04:38:20 17    Q.    It was bad in 2009, correct?

04:38:23 18    A.    2009, yes, it was bad, too.

04:38:26 19    Q.    Because the recession started in 2008, correct, Mr. Kodsi?

04:38:29 20    A.    Yes.

04:38:31 21    Q.    So the time period 2008 to 2012 was very difficult on

04:38:35 22    multifamily builders in Florida, correct?

04:38:37 23    A.    Especially if they are contaminated with Chinese drywall.

04:38:42 24    Q.    That wasn't my question.  It was hard to sell condominium

04:38:46 25    units in central Florida from 2008 to 2012, correct?

*OFFICIAL TRANSCRIPT*

04:38:49 1    A.    Well, if you reduce the price, you could sell it.

04:38:52 2    Q.    The economy was not conducive to developing condos between

04:38:58 3    2008 and 2012, correct, Mr. Kodsi?  Answer my question.  Yes or

04:39:02 4    no?

04:39:02 5    A.    Well, it's no question that the economy was slow.  We are

04:39:05 6    not -- we are not negating that.  Anybody will tell you that it

04:39:11 7    was slow at this time.  But, again, remember, this is an

04:39:14 8    oceanfront, and oceanfront has far more appeal to retirees than

04:39:14 9    anything else.

04:39:25 10        [!EZ SPEAKER 105]:  Do you have a copy of that

04:39:26 11   timeline?  Can I borrow it?

04:39:28 12        MR. GONZALEZ:  Of course.

04:39:29 13        MR. MILLER:  Thank you.

04:39:31 14   EXAMINATION BY MR. MILLER:

04:39:53 15   Q.    Mr. Kodsi, I've put up on the screen -- let's look at the

04:39:55 16   screen for a second.  This was a timeline that you testified

04:39:58 17   about in your direct examination.  Do you recall this timeline,

04:40:01 18   sir?

04:40:01 19   A.    Okay.  Yes.

04:40:04 20   Q.    Do you recall it?  It says in January of 2011,

04:40:10 21   construction of the North Tower was completed; do you see that,

04:40:13 22   sir?

04:40:13 23   A.    Yes, sir.

04:40:13 24   Q.    How many units were in the North Tower?

04:40:16 25   A.    60.

*OFFICIAL TRANSCRIPT*

04:40:16  1    Q.    60 units.  Sir, the next line says, "February of 2009 -

04:40:27  2    construction of South Tower completed."  Do you see that, sir?

04:40:31  3    A.    Yes, sir.

04:40:31  4    Q.    How many units were in the South Tower?

04:40:35  5    A.    84.

04:40:36  6    Q.    84.  Then here it says in May 2009, Oceanique begins

04:40:43  7    demolition; do you see that, sir?

04:40:44  8    A.    Yes, sir.

04:40:45  9    Q.    So you had 39 units in the two buildings that had

04:40:48 10    Chinese drywall?

04:40:49 11    A.    Yes, but we have also recreation area, lobbies, and

04:40:53 12    garages.

04:40:53 13    Q.    Sir, of the 60 units in the North Tower, how many of those

04:40:58 14    units were sold when Oceanique began demolition in 2009, May of

04:41:03 15    2009, according to this timeline?  Do you know?

04:41:07 16    A.    Not exactly, no.

04:41:08 17    Q.    Mr. Kodsi, February of 2009, there was a recession in

04:41:19 18    building in multifamily housing in central Florida in February

04:41:22 19    of 2009, correct?

04:41:22 20    A.    Correct.

04:41:23 21    Q.    Do you know how many units of the 80 units in the

04:41:28 22    South Tower that opened or was completed in February of 2009

04:41:31 23    were sold when the tower was completed?

04:41:35 24    A.    Exactly to give you the number, I wouldn't know.

04:41:37 25    Q.    Of the 39 units in the two buildings that had

*OFFICIAL TRANSCRIPT*

04:41:42  1   Chinese drywall, do you know how many of those units were sold

04:41:46  2   and how many of those units you still owned as a developer?

04:41:50  3   A.   As for now?

04:41:52  4   Q.   No, at the time you started -- you did the remediation in

04:41:55  5   2009 and 2010.

04:41:56  6   A.   We had six units that they were sold, and there were five

04:42:05  7   doctors and one builder.

04:42:06  8   Q.   So 6 of the 39 units were sold?

04:42:08  9   A.   Yes.  And people were occupying those units.

04:42:11 10   Q.   And 33 you still owned as the developer?

04:42:14 11   A.   We owned them at the time.  Not any longer.

04:42:21 12   Q.   Sir, are you aware that Oceanique has been involved in

04:42:41 13   over 30 lawsuits as both the plaintiff and defendant,

04:42:45 14   apparently unrelated to Chinese drywall --

04:42:46 15          MR. GONZALEZ:  Objection, Your Honor.

04:42:46 16   EXAMINATION BY MR. MILLER:

04:42:51 17   Q.   -- unrelated to Chinese drywall between 2007 and 2012?

04:42:51 18          MR. GONZALEZ:  Relevance, Your Honor.

04:42:55 19          [!EZ SPEAKER 105]:  I have him under cross, Your Honor.

04:42:55 20          THE COURT:  It's credibility.  I'll allow it.

04:42:58 21          THE WITNESS:  Well, we had a situation with the people

04:43:03 22   that they had a deposit on the unit, and they didn't close, so

04:43:09 23   we initiated against them through a law firm in order to

04:43:15 24   recuperate at least that 10 percent.  But in vain, it didn't

04:43:20 25   work, so we had to pay them back.

*OFFICIAL TRANSCRIPT*

04:43:26 1   EXAMINATION BY MR. MILLER:

04:43:26 2   Q.   In this litigation, these foreclosures, this related to --

04:43:30 3   it did not relate to Chinese drywall, correct?

04:43:32 4   A.   Well, I need to read what you're saying here.  I cannot

04:43:35 5   read that what you give me, sir.

04:43:37 6   Q.   It's Tab 3 of your binder.

04:43:39 7   A.   3?

04:43:40 8   Q.   Yes, sir.

04:43:42 9   A.   Okay.  Let me see 3 binder.  It says court case.  Okay.

04:43:46 10          The first one is Southern Electric that we had some

04:43:59 11   work that they didn't complete, and we went and we initiated a

04:44:06 12   demand from him, but that was settled after two weeks.

04:44:11 13   Q.   And the next case is --

04:44:13 14   A.   The next case is the Oceanique.  That's about the

04:44:16 15   10 percent.  Those people voluntarily left their deposit.

04:44:20 16   Q.   Has nothing to do with Chinese drywall?

04:44:22 17   A.   We -- and we won the case.  No.

04:44:23 18   Q.   Next case is breach of contract, *Oceanique v Chucky*

04:44:30 19   (spelled phonetically), anything to do with Chinese drywall?

04:44:31 20   A.   No.

04:44:32 21   Q.   So, Mr. Kodsi, I don't want to go through all these, but

04:44:35 22   you would agree with me, sir, that Oceanique was a frequent

04:44:40 23   litigant involving foreclosure and other issues?

04:44:44 24   A.   I disagree with you completely.

04:44:46 25   Q.   So you don't think 30 cases make you a frequent --

**OFFICIAL TRANSCRIPT**

04:44:49  1   A.   No, sir, I disagree, because that was an unusual time that

04:44:51  2   we had that the people, they left their deposit, and we had to

04:44:55  3   try to recuperate that because the bank requests from us to do

04:45:00  4   that because the bank wants to get paid, and we had the deposit

04:45:05  5   sitting with escrow with the lawyers, and we needed to do

04:45:08  6   something about it.  And we had nothing else in here that you

04:45:11  7   are giving me that we are not credible.

04:45:14  8           THE COURT:  Let's move on to something else, Counsel.

04:45:20  9   EXAMINATION BY MR. MILLER:

04:45:21 10   Q.   Sure.  Mr. Kodsi, Tricon -- Tricon was also involved in

04:45:25 11   court cases; is that correct, sir?

04:45:26 12   A.   Show me.

04:45:28 13   Q.   I'll show you this one.  It's up on the screen, if you can

04:45:32 14   look at your screen.

04:45:33 15   A.   I cannot read the screen.

04:45:34 16   Q.   Tab 4 of your book.

04:45:37 17   A.   Tab 4, okay.  All right.  That's exactly the same one that

04:45:41 18   you showed before, the electrician.

04:45:43 19   Q.   Let me give you a point of reference.  *Pride Electrical v*

04:45:50 20   *Flat River and Tricon*, do you see that, sir?

04:45:50 21   A.   No, sir, we are not Flat River and we are not a Nebraska

04:45:55 22   corporation.

04:45:56 23   Q.   But you're Tricon Development, correct?

04:45:57 24   A.   We are Tricon Development -- yes.

04:45:59 25   Q.   The summary says, "All in all, the plaintiff has not been

*OFFICIAL TRANSCRIPT*

04:46:03  1   paid $296,000"; do you see that, sir?

04:46:05  2   A.   Sir, this is exactly the same lawsuit that you went on the

04:46:09  3   first page in duplication.

04:46:10  4   Q.   Sir, I'm asking you the question.  Do you see where it

04:46:10  5   says, "All in all, the plaintiff has not been paid $296,000."?

04:46:13  6   A.   That's not true.  Anybody could demand from anybody

04:46:16  7   anything else, but that's not true.  That was settled for maybe

04:46:20  8   less than $10,000.  It was settled and moved on within a few

04:46:24  9   weeks.  We have the proof.  I could send it to you.

04:46:28 10   Q.   So when you settled and moved on, you got proof from the

04:46:30 11   plaintiff, correct?

04:46:31 12   A.   We have proof from the plaintiff?  No, we have a

04:46:34 13   settlement.

04:46:34 14   Q.   But you got proof.  Correct?

04:46:35 15   A.   I got proof on this.  Right.

04:46:37 16   Q.   Getting proof was important to you, correct?

04:46:40 17   A.   No, it's not the matter of getting proof.  We have the

04:46:43 18   documentation that it's a type of settlement, you know.

04:46:48 19   Q.   But the documentation would be important to you, correct?

04:46:53 20   A.   Well, it's a settlement.  I didn't even do it.  That was

04:46:55 21   the corporate lawyer did that.

04:46:57 22   Q.   Sir, going back to the timeline, it says, "Oceanique

04:47:20 23   retained MDL counsel in December 2009."

04:47:22 24   A.   Which page?

04:47:24 25   Q.   That's the timeline.  Point of reference, you see that

*OFFICIAL TRANSCRIPT*

04:47:40 1   sir, "December 2009 - Oceanique retains counsel"?

04:47:43 2   A.   Yes, sir.

04:47:43 3   Q.   You would agree with that statement, since this is your

04:47:46 4   timeline, correct, sir?

04:47:49 5   A.   Well, it shows in here, but it doesn't show we did.   When

04:47:53 6   we retained the counsel, it was in December of this year.

04:47:56 7   Q.   That's my question, sir.

04:47:58 8   A.   That was in December.   So don't try to mislead me here.

04:48:02 9   Q.   No, I'm just saying, do you agree with this statement that

04:48:04 10  you retained counsel in December of 2009?

04:48:07 11  A.   Yes.

04:48:08 12  Q.   Okay.   Thank you, sir.   Thank you.

04:48:10 13        Okay.   That would have been in connection with this

04:48:15 14  MDL, correct, sir?

04:48:16 15  A.   What now?

04:48:19 16  Q.   The counsel that you retained, that would have been for

04:48:22 17  this case, right?

04:48:22 18  A.   Yes, sir, yes.

04:48:24 19  Q.   Okay.   Thank you, sir.

04:48:25 20        In connection with this case, you, like other

04:48:30 21  litigants, had to fill out certain paperwork.   Sir, let's go to

04:48:36 22  Tab 5 of your binder.

04:48:42 23        I tell you what, mark this Defendant's Exhibit 9.

04:48:49 24        Are you with me, sir?

04:48:50 25  A.   Yes, sir.

*OFFICIAL TRANSCRIPT*

04:48:50  1    Q.    It's called "Owner Disclosure Affidavit"; do you see that?

04:48:54  2    A.    Yes, sir.

04:48:55  3    Q.    It says Case 9 -- I'm going to represent to you, sir, that

04:48:58  4    that's this case, 2009 MDL 2047.  Are you with me, sir?

04:49:02  5    A.    Yes, sir.

04:49:03  6    Q.    The owner name is listed as "Oceanique Development

04:49:06  7    Company"; do you see that, sir?

04:49:07  8    A.    Yes, sir.

04:49:07  9    Q.    Okay.  It says "affected property address"; do you see

04:49:12 10    that, sir?

04:49:13 11    A.    Yes, sir.

04:49:13 12    Q.    It says "see attached list of addresses"; do you see that,

04:49:16 13    sir?

04:49:16 14    A.    Wait.  I'm losing you.  Where now?

04:49:19 15    Q.    The second line.  It says "see attached list of

04:49:22 16    addresses;" do you see that?

04:49:29 17          THE COURT:  It's the second line.

04:49:30 18          THE WITNESS:  Oh, yes, sir, I saw it.

04:49:32 19    EXAMINATION BY MR. MILLER:

04:49:33 20    Q.    Thank you, sir.

04:49:34 21          If you flip to the third to last page of this

04:49:40 22    document, three pages from the end, okay.

04:49:45 23    A.    Three pages from the end.

04:49:46 24    Q.    I think, sir, this is the attached list of the addresses.

04:49:53 25    Let me know when you get there.

**OFFICIAL TRANSCRIPT**

04:49:55 1    A.    Okay, I have the page.

04:49:56 2    Q.    Do you see, sir, it's an e-mail from Rob, who is your son,

04:49:56 3    correct?

04:50:05 4    A.    Okay.

04:50:06 5    Q.    Is that correct?

04:50:06 6    A.    Well, it says from Robert to Fred Longer.

04:50:10 7    Q.    Right.   There is a list of addresses, correct, sir?

04:50:14 8    A.    Correct, sir.   Yes.

04:50:14 9    Q.    Those would have been the 39 addresses that had CDW at

04:50:22 10   Oceanique, correct?

04:50:22 11   A.    Yes, sir.

04:50:23 12   Q.    Of these 39 addresses, just to make sure I understood your

04:50:26 13   testimony correctly, 33 were owned by Oceanique at the time,

04:50:33 14   correct?

04:50:33 15   A.    Yes, sir.

04:50:34 16   Q.    Then 6 were owned by buyers, correct?

04:50:44 17   A.    Yes, sir.

04:50:44 18   Q.    Thank you, sir.

04:51:07 19          Sir, this document sets the move-out date of May of

04:51:10 20   2009; do you see that, sir?   Back on the first page.

04:51:14 21   A.    I cannot find it.

04:51:15 22   Q.    First page.   First page of the document.

04:51:17 23   A.    First page, yeah.

04:51:17 24   Q.    It says move-out date, May 2009; are you with me?

04:51:20 25   A.    I don't have that in here.

*OFFICIAL TRANSCRIPT*

04:51:23 1  Q.    It's the fourth line down, sir, first page of the exhibit.

04:51:29 2          MR. GONZALEZ:  Your Honor, I will stipulate that the

04:51:31 3  document says what it says.

04:51:32 4          THE WITNESS:  I cannot find it.

04:51:32 5          THE COURT:  The first page of the exhibit.  Turn to 6.

04:51:38 6          THE WITNESS:  Oh, back to the beginning?

04:51:44 7          THE COURT:  Right.

04:51:46 8          THE WITNESS:  Okay.  Back to the beginning on which

04:51:48 9  one?

04:51:48 10 EXAMINATION BY MR. MILLER:

04:51:52 11 Q.    Fourth line down, sir.  It says move-out date --

04:51:52 12 A.    Yeah, May, 2009.

04:51:53 13 Q.    It says move-in date, June 2010, correct?

04:51:57 14 A.    Okay.

04:51:58 15 Q.    Are you with me, sir?

04:51:59 16 A.    Yes, sir.

04:51:59 17 Q.    That's approximately 13 months, correct?

04:52:02 18 A.    Okay.

04:52:02 19 Q.    That's when your company would have incurred the expenses

04:52:07 20 associated with the Chinese drywall repair, correct?

04:52:09 21 A.    Plus or minus.

04:52:10 22 Q.    Sir, flip with me to Tab 6 in your book.

04:52:29 23 A.    Okay.  Okay.

04:52:30 24 Q.    This is something you looked at during your direct

04:52:35 25 examination.  Are you with me, sir?

*OFFICIAL TRANSCRIPT*

04:52:40  1    A.    Yes, sir.

04:52:40  2    Q.    This should be an item called "Oceanique Development

04:52:56  3    Permit Fees"; do you see that, sir?

04:52:58  4    A.    Permit fees.  Let me see one second.  Yes.  Yes, sir.

04:53:02  5    Q.    Okay.  Are you with me, sir?

04:53:06  6    A.    Okay.

04:53:06  7    Q.    And, sir, the first page that we're looking at right here,

04:53:19  8    this would be sort of a summary of the various permit fees that

04:53:24  9    Oceanique incurred in connection with the Chinese drywall

04:53:26 10    repairs?

04:53:27 11    A.    Yes, sir.

04:53:30 12    Q.    It relates to check numbers; do you see that, sir?

04:53:34 13    A.    Yes, sir.

04:53:34 14    Q.    Sir, and with that, we received the actual checks.  So if

04:53:44 15    you look at the second page of Tab 6 in your booklet, or here

04:53:49 16    with me on the screen, do you see this check, sir?  I'm

04:53:56 17    pointing to it.  It's made out to St. Lucie County; do you see

04:54:00 18    that, sir?

04:54:00 19    A.    Yes, sir.

04:54:00 20    Q.    So that relates to -- that's Check Number 1642.  Do you

04:54:11 21    see it?

04:54:12 22    A.    Yes, sir.

04:54:12 23    Q.    So if you go back to the ledger, the first page, it's the

04:54:16 24    first item, 1642; do you see that, sir?

04:54:18 25    A.    Yes, sir.

*OFFICIAL TRANSCRIPT*

04:54:18  1    Q.   This check made out to St. Lucie County, is it your
04:54:25  2    understanding that that's a check for permit fees?
04:54:26  3    A.   Well, I am sure that is for permitting, probably when we
04:54:31  4    received the -- I don't know.  I don't know exactly.
04:54:33  5    Q.   Well, it's permit fees, sir, because if you look back at
04:54:37  6    the first page, it says permit fees.  Are you with me?
04:54:40  7    A.   Yes.
04:54:40  8    Q.   And, sir, are you with me that Check Number 1642, your
04:54:51  9    first check for permit fees, is dated September 14, 2009?  Do
04:54:56 10    you see that, sir?
04:55:01 11    A.   9/14, yes.
04:55:08 12    Q.   And, sir, I understood your direct testimony to be, and I
04:55:11 13    think I quoted, that you get the permit and then you do the
04:55:14 14    work.  That was your testimony on direct, correct, Mr. Kodsi?
04:55:18 15    A.   I cannot answer you that one because that's really -- it
04:55:22 16    depends when the permit is pulled and how it's pulled and where
04:55:26 17    and when it has to be, before, during.  I need to look at the
04:55:30 18    document, and then I give you an honest answer whether or not.
04:55:33 19    Q.   So based on all of your experience in construction in
04:55:36 20    Florida, you can't tell the Court, Mr. Kodsi, that you are
04:55:40 21    supposed to get a permit before doing the work?
04:55:41 22    A.   It depend on the municipality.  If we requiring to pull up
04:55:50 23    a permit, we do 100 percent.  If we're not required, we don't.
04:55:56 24    So to answer you what happened at that time, six and a half
04:55:58 25    years ago, I need to look at the document.  I need to see what

*OFFICIAL TRANSCRIPT*

04:56:03  1    the document says.

04:56:04  2    Q.   What about to get a permit in St. Lucie County for drywall

04:56:08  3    remediation, would you need a permit for that before starting

04:56:11  4    work?

04:56:11  5    A.   No, sir.  No, sir.  I don't believe that you need a

04:56:14  6    permit.

04:56:14  7    Q.   These permit checks, these were just provided to your

04:56:22  8    counsel last week, correct?

04:56:24  9    A.   Yes.

04:56:24 10    Q.   These are the books and records of your company,

04:56:26 11    Oceanique, correct, sir?

04:56:28 12    A.   Yes, sir.  Yes, sir.

04:56:28 13    Q.   And checks?

04:56:29 14    A.   We wanted -- as you know, we were not requested to bring

04:56:32 15    in anything, and just now we were told to.

04:56:36 16    Q.   Sir, I don't know that.  I've been requesting documents

04:56:38 17    from you for five years, is what I know, sir.  Are you aware of

04:56:41 18    that?

04:56:41 19    A.   I gave what?

04:56:43 20    Q.   That I've been requesting documents from you for five

04:56:47 21    years; are you aware of that, sir?

04:56:48 22    A.   No.  We brought the document when we were told to bring

04:56:52 23    the documents.

04:56:52 24    Q.   You do banking, I see it, sir, with Wachovia.  That's your

04:57:00 25    bank?

*OFFICIAL TRANSCRIPT*

04:57:01 1    A.    Yes, sir.

04:57:01 2    Q.    That's the bank that Oceanique would have used for its

04:57:04 3    business checking account back in 2009 and 2010?

04:57:08 4    A.    I don't remember which one.  It could be Wachovia or

04:57:11 5    others that we bank with.

04:57:11 6    Q.    But these particular permit fees that Oceanique paid --

04:57:14 7    A.    Probably Wachovia, yes.

04:57:16 8    Q.    -- were paid by Wachovia, correct?

04:57:18 9    A.    Yes.

04:57:34 10        THE COURT:  Counsel, in a couple of minutes, we'll take

04:57:37 11   a break.

04:57:37 12        MR. MILLER:  Your Honor, if you want to take a break

04:57:41 13   now, that would be fine.

04:57:41 14        THE COURT:  Okay.  Let's take a break.  We'll take a

04:57:43 15   10-minute break.  The Court will stand in recess.

04:57:45 16        THE DEPUTY CLERK:  All rise.

04:58:09 17        (WHEREUPON, at 4:48 p.m. the Court took a recess.)

05:03:23 18        THE DEPUTY CLERK:  All rise.

05:03:32 19        THE COURT:  Continue, Counsel.

05:03:34 20        MR. MILLER:  Thank you, Judge.

05:03:34 21   EXAMINATION BY MR. MILLER:

05:03:35 22   Q.    Mr. Kodsi, let me remind you that you're still under oath.

05:03:39 23   Do you understand that, sir?

05:03:39 24   A.    Yes, sir.

05:03:39 25   Q.    Mr. Kodsi, I have now on the screen, and I think it was

*OFFICIAL TRANSCRIPT*

05:03:42  1   Tab 6 to your book, a copy of the ledger we have been looking

05:03:47  2   at this afternoon.  This is the ledger for the Chinese drywall

05:03:50  3   repairs at Oceanique.  Let me know when you get it to, sir.

05:03:56  4          THE COURT:  Which tab is that, Kerry?

05:04:00  5          MR. MILLER:  I think it's Tab 6, I believe, Judge.

05:04:04  6          THE COURT:  Six in yours?

05:04:15  7          MR. MILLER:  I'm sorry, Tab 9 in mine.

05:04:15  8   EXAMINATION BY MR. MILLER:

05:04:23  9   Q.    Are you with me, sir?

05:04:24  10  A.    Yes, sir.

05:04:24  11  Q.    First item, I heard you speak on your direct examination

05:04:28  12  about the payroll expenses.  Do you see that, sir?

05:04:30  13  A.    Yes, sir.

05:04:30  14  Q.    Sir, what I want to know is where is the documentation to

05:04:37  15  support those expenses?

05:04:38  16  A.    Well, you have documentation here.

05:04:42  17  Q.    Where is it, sir?  I haven't seen a single canceled check.

05:04:46  18  I haven't seen a single payroll report.  I've been looking for

05:04:49  19  it for five years.  I've not seen a shred of paper.  Where is

05:04:53  20  it, sir?

05:04:55  21          MR. GONZALEZ:  Objection, argumentative.

05:04:56  22          THE COURT:  Where is it, Mr. Kodsi?

05:04:58  23          THE WITNESS:  Well, I have here the -- I did it as fast

05:05:00  24  as I could, and I have the RH claim.  And I have the -- I have

05:05:23  25  in here.

**OFFICIAL TRANSCRIPT**

05:05:25  1          MR. MILLER:  May I approach, Your Honor?

05:05:27  2          THE COURT:  Yes.

05:05:28  3          THE WITNESS:  This is for the period that we did the

05:05:37  4    remediation, and it came to about $360,000.  So that was the

05:05:44  5    payroll which account for payment and FICA, insurance, travel

05:05:51  6    and cell phone, all of that together came to about $360,000

05:05:56  7    from the period started on July to July.

05:05:56  8    EXAMINATION BY MR. MILLER:

05:06:02  9    Q.    May I take that from you, sir?

05:06:04 10    A.    Sure.

05:06:04 11    Q.    Since we only have one copy, we're going to have to look

05:06:09 12    at this on the screen together.  Okay?

05:06:11 13    A.    All right.

05:06:21 14    Q.    Sir, you just handed to me a document called "Oceanique

05:06:25 15    Development, Inc. Transaction Detail by Account."  Do you see

05:06:28 16    that, sir?

05:06:28 17    A.    Yes, sir.

05:06:29 18    Q.    And is that a document that you generated, sir?

05:06:32 19    A.    Yeah, we just took it from the computer.  The bookkeeper.

05:06:37 20    Q.    Dated November 27, 2015?

05:06:40 21    A.    Yes, sir.

05:06:40 22    Q.    And so is that the date that it was printed from your

05:06:43 23    computer, November 27, 2015?

05:06:45 24    A.    Yes, sir.

05:06:46 25    Q.    Sir, do you know why, despite looking for it for five

*OFFICIAL TRANSCRIPT*

05:06:53  1   years -- asking for it for five years, I've never seen a copy

05:06:56  2   of this report before?

05:06:58  3   A.    Nobody -- we gave the list, and nobody ask us anything --

05:07:04  4   anything else.  When it was under remediation, it was that your

05:07:10  5   company agreed on everything and anything, and it was a matter

05:07:13  6   of a settlement and a percentage.  But they never requested

05:07:18  7   anything.  So we had -- you know, we didn't prepare this, but

05:07:23  8   we would have if you would been -- if you would have asked us,

05:07:26  9   we would have bring it.  I have all others.

05:07:28 10   Q.    I asked you many, many, many, many times.  Your counsel

05:07:32 11   never conveyed the request to produce documents?

05:07:34 12   A.    We went into mediation, and nobody came and ask us

05:07:38 13   anything to do or not to do.  I have all the other evidence, as

05:07:43 14   you're going to walk through yourself with copies and you will

05:07:46 15   have them.

05:07:55 16   Q.    So, sir, it says "Name, Tricon Development," what does

05:07:59 17   that mean?  Is that the payee?

05:08:01 18   A.    Yes.  That's a construction that we pay through it.

05:08:05 19   Q.    Okay.  Oceanique Development, Inc. would have been the

05:08:09 20   payor, I take it, based on this report, correct, sir?

05:08:13 21   A.    Yes, yes.

05:08:13 22   Q.    And, sir, you see there are checks referenced in this

05:08:21 23   left-hand side and check numbers; do you see that, sir?

05:08:23 24   A.    Yes, sir.

05:08:23 25   Q.    Sir, do you remember talking about permit expenses a

*OFFICIAL TRANSCRIPT*

05:08:31  1    little earlier today?

05:08:32  2    A.    Yes, sir.

05:08:37  3    Q.    You had checks and check numbers supporting those permit

05:08:41  4    expenses; do you recall that, sir?

05:08:42  5    A.    Yes, sir.

05:08:43  6    Q.    Where are the checks to support this, sir?

05:08:49  7    A.    I don't have.  This is all what I have.

05:08:50  8    Q.    So, sir, you would have saved and preserved checks for

05:08:55  9    $15,000 in permit expenses, but you didn't save or preserve

05:09:01 10    checks for $360,000 in payroll?

05:09:03 11    A.    This is what the payroll -- it's what we spend and this is

05:09:06 12    the check that we paid the payroll to pay off.

05:09:09 13    Q.    That just became important to you today?  Never been

05:09:14 14    produced beforehand, correct, sir?

05:09:16 15    A.    We did not produce before, yes.

05:09:18 16    Q.    Sir, do you see the next item on the list?

05:09:35 17    A.    Yes, sir.

05:09:36 18    Q.    "MK - Supervision, $120,000"?

05:09:40 19    A.    Yes, sir.

05:09:40 20    Q.    MK refers to you, Maurice Kodsi, correct?

05:09:44 21    A.    Yes, sir.

05:09:46 22    Q.    Sir, is there any supporting documentation behind that

05:09:50 23    particular line item for $120,000?

05:09:52 24    A.    Yes.  Yes, I have in here, which I'm going to find in one

05:09:54 25    moment, one second.

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 05:10:02 | 1 | Q.   Did you find this one today, too, sir? |
| 05:10:08 | 2 | A.   Excuse me? |
| 05:10:09 | 3 | Q.   You just found one today, too, sir? |
| 05:10:12 | 4 | A.   Well, I just have the reason why, how it came to $120,000, |
| 05:10:18 | 5 | and I would like to -- |
| 05:10:21 | 6 | MR. MILLER:  May I approach, Your Honor? |
| 05:10:22 | 7 | THE COURT:  Yes. |
| 05:10:23 | 8 | THE WITNESS:  Here it is.  I have an invoice for that |
| 05:10:25 | 9 | amount. |
| 05:10:31 | 10 | EXAMINATION BY [!EZ SPEAKER 105]: |
| 05:10:31 | 11 | Q.   Sir, this document that you just handed to me, when was it |
| 05:10:34 | 12 | generated? |
| 05:10:36 | 13 | A.   That was generated just when we did the remediation, we |
| 05:10:45 | 14 | knew what -- the time that I invested, and I requested to you |
| 05:10:50 | 15 | people this amount to be paid to me, and this is the backup of |
| 05:10:56 | 16 | the amount which, if you would like to read it to the judge, |
| 05:11:00 | 17 | you'll see what it encompasses. |
| 05:11:03 | 18 | Q.   Sir, I'll put this up on the screen, again, because we |
| 05:11:07 | 19 | have only one copy.  Sir, you'll agree with me this document is |
| 05:11:11 | 20 | not dated, correct? |
| 05:11:11 | 21 | A.   Yes, sir. |
| 05:11:12 | 22 | Q.   So my question is:  Was it generated back in 2009 and 2010 |
| 05:11:16 | 23 | when you did the repairs or was it just generated to come here |
| 05:11:20 | 24 | and testify in court today? |
| 05:11:21 | 25 | A.   No, sir, this was generated when I went and I needed to |

*OFFICIAL TRANSCRIPT*

05:11:26  1    hire somebody, and the cost to hire the person, which he would

05:11:30  2    not do what I could do, and I could really -- that could cost

05:11:35  3    me a couple of million dollars because of his mistake, so this

05:11:39  4    is when I put the number that this would be my cost as of a

05:11:45  5    minimum to charge for instead of having a superintendent,

05:11:49  6    project manager or whoever, you know.

05:11:52  7            I mean, I am more familiar to the building than

05:11:56  8    anybody else.  It would be risky for me to get somebody at this

05:11:59  9    time, and I couldn't find somebody anyway.

05:12:01 10    Q.   Sir, did you prepare this Tricon document reference

05:12:06 11    "Maurice Kodsi - Supervision" backup of Line Item 2?

05:12:09 12    A.   Well, yeah, because I wanted to show you and show the

05:12:12 13    Court that this is what I charged and this is what I put -- I

05:12:16 14    did work for that -- for that thing.

05:12:19 15    Q.   Sir, read with me, if you don't mind.  Just follow with me

05:12:25 16    as I read, rather.  The fourth paragraph, last sentence.  It

05:12:28 17    says, and I quote, "Also paying the $120,000 up front,

05:12:33 18    collecting six and a half years later, plus the risk to this

05:12:38 19    complicated task would yield even a greater amount."  Period,

05:12:42 20    close quotes.

05:12:43 21    A.   All right.  What I'm saying is --

05:12:44 22    Q.   Hold on.  Let me finish my question.  It seems to me,

05:12:47 23    given the reference of six and a half years later, that this

05:12:49 24    particular document was generated in connection with coming to

05:12:53 25    court today, correct, sir?

*OFFICIAL TRANSCRIPT*

05:12:56  1    A.    Yes, but -- yes and no.  I have to disagree with you,

05:13:01  2    because if you look at the document here and if you put that on

05:13:04  3    the screen, and I'm going to read you an item that you said,

05:13:09  4    and you said in here that also paying $120,000 up front,

05:13:17  5    collecting seven and a half (verbatim) years, what that mean in

05:13:21  6    here is that if I would hired that person and pay him $120,000,

05:13:24  7    which I didn't have, I was going to hell and bankrupt, so the

05:13:31  8    $120,000 that I charged in here, if I would paid them and I am

05:13:36  9    collecting the money six and a half years later, how much

05:13:38 10    interest I have to pay on this money.  This what I meant in

05:13:41 11    here.  Plus the risk and the complication (verbatim) tax that

05:13:47 12    would yield a greater amount.

05:13:48 13          Imagine my superintendent would not supervise the

05:13:52 14    person with the mask.  Then I lose everything.  So I had to go

05:13:55 15    and drive three and a half hours per day, and because of the

05:13:58 16    $120,000, this is not a bargain, I saved you millions.

05:14:02 17          THE COURT:  Okay.  Mr. Kodsi, we've got to move on.  I

05:14:05 18    mean, it's 5 o'clock.  Just answer the questions.

05:14:09 19          THE WITNESS:  Thank you.

05:14:09 20    EXAMINATION BY MR. MILLER:

05:14:10 21    Q.    One more point on supervision and then we'll move on.

05:14:13 22    Sir, was this amount ever paid to you by Oceanique?  Did funds

05:14:16 23    change hands?

05:14:18 24    A.    Well, I take it as a profit, if any.  If there is any

05:14:21 25    left.  Why do I have to charge it right now?  Where am I going

*OFFICIAL TRANSCRIPT*

05:14:26 1    to get the money to pay it at that time?

05:14:28 2    Q.    Sir, it's a question.  Did you receive $120,000 --

05:14:30 3    A.    Yes, I did receive it.  I received it for sure.

05:14:33 4    Q.    Who did you receive it from?

05:14:34 5    A.    From Oceanique Development, Inc.

05:14:37 6    Q.    They wrote you a check?

05:14:39 7    A.    Well, I get investment return and stuff of this nature.

05:14:43 8    Q.    Did they write you a check or not?  Did they pay you in

05:14:47 9    cash or not?

05:14:47 10    A.    Of course, they paid me off, sure.

05:14:50 11    Q.    So in those manila folders, do you have a copy of the

05:14:54 12    canceled check?

05:14:55 13    A.    No, because it is part of the money that I am receiving

05:14:57 14    from the corporation.  It's the same.  I am the owner also.

05:15:00 15    Q.    Do you have an accounting to reflect any kind of transfer

05:15:05 16    that would indicate that you received $120,000 from Oceanique

05:15:08 17    in those manila folders?

05:15:10 18    A.    No.  But I have them because I received them -- part of

05:15:14 19    the money that if -- as a profit.  If the profit comes, then

05:15:20 20    the $120,000 is profit to me.  So, yes, I did receive.

05:15:24 21    Q.    Sir, the information that's in those manila folders,

05:15:28 22    you've never given that information to your counsel, have you?

05:15:31 23    A.    I was told that to -- bring them to court with me, and I

05:15:34 24    did bring them to court with me.

05:15:36 25    Q.    But prior to court today, you didn't turn that information

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 05:15:39 1 | over to your counsel, correct? |
| 05:15:40 2 | A.   Well, we -- remember last week was a Thanksgiving week, |
| 05:15:44 3 | and we get the information to bring the stuff and I was -- I |
| 05:15:48 4 | was out of town. |
| 05:15:50 5 | Q.   Sir, it's a simple question.  Did you give them to your |
| 05:15:53 6 | counsel or not? |
| 05:15:55 7 | A.   Well, no.  I did not give them.  I don't know if I give |
| 05:15:59 8 | them or not.  I didn't give them. |
| 05:16:01 9 | Q.   Sir, in those manila folders that you brought up with you |
| 05:16:06 10 | to the stand, that would constitute your files, your books and |
| 05:16:09 11 | records for the Chinese drywall repair at Oceanique? |
| 05:16:11 12 | A.   Yes, sir. |
| 05:16:11 13 | Q.   Sir, do you recall earlier in this case, back in August of |
| 05:16:28 14 | 2014, submitting affidavits?  Turn to Tab 11.  I'll refresh |
| 05:16:43 15 | your recollection.  Let me know when you're there, sir. |
| 05:16:50 16 | A.   I am here. |
| 05:16:51 17 | Q.   Okay.  Sir, you see this document, it's entitled |
| 05:16:55 18 | "Affidavit of Maurice Kodsi"? |
| 05:16:57 19 | A.   Yes, sir. |
| 05:16:57 20 | Q.   We'll mark that as Exhibit 11.  This is an affidavit, sir, |
| 05:17:04 21 | if you want to look at it.  It is four pages of text with your |
| 05:17:12 22 | signature page on the fifth page; do you see that, sir? |
| 05:17:14 23 | A.   Yes, sir. |
| 05:17:14 24 | Q.   Look at page 4.  Is that your signature, Maurice Kodsi? |
| 05:17:19 25 | A.   Yes, sir. |

*OFFICIAL TRANSCRIPT*

05:17:19 1   Q.   Okay.  Sir, let's turn to page 2 of the document.

05:17:27 2   A.   Okay.

05:17:27 3   Q.   It says, "I personally visited and viewed the demolition,

05:17:34 4   repair and remediation of each of the following units and

05:17:38 5   locations containing Knauf Tianjin Chinese drywall."  Do you

05:17:43 6   see that statement, sir?

05:17:44 7   A.   Yes, sir.

05:17:44 8   Q.   Sir, do you understand an affidavit is just like courtroom

05:17:49 9   testimony?

05:17:49 10  A.   Yes, sir.

05:17:50 11  Q.   That when you sign an affidavit, you sign it under penalty

05:17:53 12  of perjury?

05:17:54 13  A.   Yes, sir.

05:17:55 14  Q.   You swear to tell the truth, the whole truth, and nothing

05:17:58 15  but the truth?

05:17:59 16  A.   Yes, sir.

05:17:59 17  Q.   Look at page 3 of the affidavit.  It says, "Oceanique

05:18:05 18  Development community affected Chinese drywall properties."  Do

05:18:08 19  you see that, sir?

05:18:08 20  A.   Yes, sir.

05:18:08 21  Q.   The first block deals with these units in the South Tower.

05:18:15 22  Do you see that, sir?

05:18:16 23  A.   Yes, sir.

05:18:16 24  Q.   The next block relates to units in the North Tower; do you

05:18:23 25  see that, sir?

**OFFICIAL TRANSCRIPT**

05:18:23  1   A.   Yes, sir.

05:18:23  2   Q.   That includes Unit 801-B; do you see that, sir?

05:18:26  3   A.   Yes, sir.

05:18:31  4   Q.   Sir, on page 4 of your affidavit, it says, "in each of the

05:18:35  5   units..."  That would have been in each one of the 39 units,

05:18:35  6   correct?

05:18:40  7   A.   Correct.

05:18:40  8   Q.   "... in locations listed above, I observed numerous sheets

05:18:44  9   of drywall being removed."  Do you see that, sir?

05:18:47 10   A.   Yes, sir.

05:18:47 11   Q.   "And all of the drywall sheets contained the distinctive

05:18:53 12   Knauf Tianjin markings on the reverse side of the drywall..."

05:18:58 13   Do you see that, sir?

05:18:58 14   A.   Yes, sir.

05:18:58 15   Q.   "... identical to that in the Court's photographic catalog

05:19:03 16   contained in Pretrial Order No. 10."  Do you see that, sir?

05:19:07 17   A.   Yes, sir.

05:19:07 18        MR. GONZALEZ:  Your Honor, I object.  This is

05:19:08 19   irrelevant to this claim.  The percentage of KPT is not at

05:19:13 20   issue.  The Court has already determined 60 percent is the

05:19:16 21   proper number.  We're only discussing the amounts that are

05:19:18 22   appropriate.

05:19:19 23        THE COURT:  Well, let's see where he goes with this.

05:19:20 24        MR. MILLER:  Your Honor, this relates to this witness,

05:19:22 25   who has been very evasive, who brought files of documents into

*OFFICIAL TRANSCRIPT*

05:19:25  1    court for the first time today.  It relates to his credibility

05:19:28  2    as a witness, Your Honor, and to his testimony in an affidavit

05:19:30  3    which I believe contains false statements.

05:19:32  4         THE COURT:  Okay.  I'll overrule the objection and

05:19:36  5    allow it.  Let's see where we're going with it.

05:19:39  6    EXAMINATION BY MR. MILLER:

05:19:39  7    Q.    Sir, Unit 801-B at Oceanique, that was one of the units

05:19:48  8    that you had sold prior to commencing Chinese drywall repairs

05:19:54  9    in May of 2009, correct, sir?

05:19:56 10    A.    Correct.  Correct.

05:19:57 11    Q.    The buyer of that unit, sir -- I'll show a document to

05:20:00 12    refresh your recollection -- was a couple by the name of

05:20:07 13    Lincoln and America Mendez; do you see that, sir?

05:20:10 14    A.    Yes, sir.

05:20:10 15    Q.    They owned Unit 801-B; do you see that, sir?

05:20:15 16    A.    Yes, sir.

05:20:15 17    Q.    Sir, are you aware that an inspection of the Mendez unit

05:20:22 18    that was done prior to the drywall being removed from that unit

05:20:29 19    revealed that that unit contained Chinese drywall exclusively

05:20:35 20    manufactured by a company by the name of Taishan, not Knauf

05:20:43 21    Tianjin?  Are you aware of that, sir?

05:20:44 22    A.    Well, I would like to see when that affidavit was written.

05:20:51 23    What's the date of the affidavit?

05:20:52 24    Q.    Sir, you signed an affidavit in August of 2014.  We just

05:20:56 25    covered it.  So you signed an affidavit in August of 2014, and

*OFFICIAL TRANSCRIPT*

05:21:08 1   it specifically references Unit 801-B.  Do you see that, sir?

05:21:13 2   A.   Yes, sir.

05:21:13 3   Q.   You say, "In each of the units and locations listed above,

05:21:19 4   I observed numerous sheets," and you say that all of the

05:21:23 5   drywall sheets contained the distinctive Knauf Tianjin

05:21:29 6   markings; do you see that, sir?

05:21:30 7   A.   Yes, sir.

05:21:35 8   Q.   Sir, look with me on the second page of the Mendez

05:21:38 9   Plaintiff Profile Form.  It would be the second page of this

05:21:41 10  document.  It says "Drywall manufacturer."  Do you see that,

05:21:44 11  sir?

05:21:45 12  A.   Yes, sir.

05:21:45 13  Q.   It says Taishan.  Do you see that, sir?

05:21:48 14  A.   Yes, sir.

05:21:48 15  Q.   Sir, you understand that's not Knauf Tianjin, correct?

05:21:53 16  A.   Well, I made a mistake.  I overlooked, and to me, it's

05:21:59 17  Chinese drywall; so, how did I know that?  It is what it is.

05:22:11 18  It was not done intentionally anyway.

05:22:13 19  Q.   Sir, Tab 14 of your book.  Tab 14 of your binder, sir.

05:22:23 20  A.   Yes.

05:22:23 21  Q.   Mr. Kodsi?  Are you with me?

05:22:25 22  A.   Yes, sir.

05:22:25 23  Q.   Do you see this is the inspection report, product ID and

05:22:29 24  collection of evidence related to Lincoln Mendez, the owner of

05:22:33 25  Unit 801-B; do you see that, sir?

*OFFICIAL TRANSCRIPT*

05:22:35  1    A.    Yes, sir.  Yes, sir.

05:22:36  2    Q.    For your reference, it's in your book at Tab 14.  Sir, do

05:23:05  3    you see this drywall marking that's part of that report, it

05:23:08  4    says "drywall"?  My finger is on it.

05:23:10  5    A.    Yes.

05:23:10  6    Q.    Do you understand that to be a marking for Taishan

05:23:14  7    drywall?

05:23:14  8    A.    Yes.

05:23:15  9    Q.    In your affidavit, you mentioned that the KPT drywall had

05:23:25 10    a distinctive marking.  Do you recall that testimony, sir?

05:23:28 11    A.    Yes.

05:23:30 12    Q.    You used the word "distinctive."  What did that mean to

05:23:34 13    you?  What's so distinctive about it?

05:23:36 14    A.    I don't remember.

05:23:36 15    Q.    Again, sir, this was an earlier inspection report for

05:23:43 16    Mendez.  Do you see that, sir?

05:23:45 17    A.    Yes.

05:23:46 18    Q.    Do you see these pictures?  These are a bit clearer.

05:23:54 19    Drywall --

05:23:54 20    A.    I don't see the Taishan word written anywhere on the

05:23:56 21    drywall so far.  You didn't show me one picture saying Taishan.

05:24:01 22    Q.    So I represent to you that PTO Number 10, the same PTO

05:24:05 23    that you referenced in your affidavit, when you look up Taishan

05:24:08 24    drywall in PTO Number 10, it has copies of these pictures with

05:24:14 25    these markings.  Do you understand that, sir?

***OFFICIAL TRANSCRIPT***

05:24:16 1   A.   I'm not following up.  But whatever it's saying -- I'm not

05:24:18 2   really following anything up.  I don't see any names anywhere.

05:24:22 3   Q.   Sir, this was a picture that was in the inspection report

05:24:24 4   for the Mendez unit on August 27, 2009.  And these are

05:24:29 5   dumpsters at the job site that contained drywall that would

05:24:33 6   have been ripped from other units.  Do you see that, sir?  On

05:24:35 7   the screen.

05:24:36 8   A.   I don't know, really, which unit and -- and what you are

05:24:41 9   getting at, I really don't know.

05:24:41 10  Q.   I'm not asking you unit specific, but, sir, you claim

05:24:46 11  $120,000 in supervisory expenses.

05:24:49 12          Thank you, Dean.  Maybe I should rotate it too.

05:24:54 13          You claim $120,000 of supervisory expenses, and I

05:24:58 14  think you testified you knew the property better than anyone

05:25:01 15  else.  Does this appear to be a photograph, sir, of the

05:25:07 16  remediation, the demolition of Chinese drywall from Oceanique?

05:25:10 17  A.   Yes.  It could be.

05:25:13 18  Q.   Do you see anything in these dumpsters in these

05:25:18 19  photographs that would indicate KPT drywall, blue and yellow

05:25:22 20  end tape, the word "Knauf," the word "Tianjin"?

05:25:27 21  A.   You would have to look at each board and see what it says.

05:25:34 22  Q.   Sir, I didn't see any evidence of KPT drywall in those

05:25:38 23  photos.  Did you?

05:25:42 24  A.   I have to check and see what was in the dumpster and see

05:25:47 25  in the back of the drywall.

*OFFICIAL TRANSCRIPT*

05:25:49  1    Q.    Sir, this is the follow-up report for the Mendez unit.

05:25:54  2    It's dated September 30, 2009.  Do you see that, sir?

05:25:58  3    A.    Okay.

05:25:58  4    Q.    In your affidavit, and in the timeline, it indicated that

05:26:04  5    drywall removal was completed by October of 2009.  Are you

05:26:08  6    familiar with that statement, sir?

05:26:10  7    A.    Plus or minus.

05:26:11  8    Q.    In this particular unit, Unit 801-B, though, sir, it

05:26:17  9    appears that as of September 30, 2009, with the exception of

05:26:20 10    the cuts that were made to try and identify the manufacturer of

05:26:24 11    the drywall, that all the drywall was still intact; do you see

05:26:31 12    that, sir?  These are pictures of that unit.  You are familiar

05:26:34 13    with these units; aren't you, sir?

05:26:34 14    A.    Which unit is that?

05:26:34 15    Q.    801-B.

05:26:36 16    A.    Okay.

05:26:36 17    Q.    Sir, do you agree with me that this report dated

05:26:40 18    September 30th represents that the drywall, the Chinese drywall

05:26:43 19    was still in place in Unit 801-B as of September 30, 2009?

05:26:47 20    A.    That, I cannot tell you, you know.  I cannot tell you what

05:26:51 21    happened six years ago, what the date that it was done.

05:26:55 22    Q.    Sir, I take it you have no reason to doubt the veracity of

05:26:59 23    this report, correct, dated September 30, 2009, done by

05:27:03 24    Mr. Yemez (spelled phonetically), who works for the Colson

05:27:07 25    Hicks firm?

*OFFICIAL TRANSCRIPT*

05:27:07  1          MR. GONZALEZ:  Objection, Your Honor.  He does not work

05:27:10  2     for the Colson Hicks firm.

05:27:10  3          THE WITNESS:  I don't know what you're talking about.

05:27:10  4     EXAMINATION BY MR. MILLER:

05:27:13  5     Q.   Any reason to doubt this, sir?

05:27:14  6     A.   (Indicating).

05:27:15  7     Q.   You told me a newspaper reporter misquoted you earlier,

05:27:19  8     she was wrong.  Any reason to doubt this particular report?

05:27:22  9     A.   The newspaper media --

05:27:22 10          MR. GONZALEZ:  Objection, calls for speculation.

05:27:24 11          THE COURT:  That's right.  Let's move on, Counsel.  I

05:27:26 12     got the gist of what you're doing.

05:27:28 13          MR. MILLER:  Sure, Judge.

05:27:29 14     EXAMINATION BY MR. MILLER:

05:28:08 15     Q.   So back to your affidavit.  Do you see in paragraph 11 of

05:28:13 16     your affidavit it states, "We completed the demolition of the

05:28:16 17     units in affected areas in October of 2009"?

05:28:19 18     A.   Yes, sir.

05:28:19 19     Q.   And that's a statement you made in you affidavit, correct,

05:28:21 20     sir?

05:28:22 21     A.   Yes, sir.

05:28:22 22     Q.   I want to go back to this document, sir, and move on.

05:29:11 23          One of the items that you were questioned about dealt

05:29:17 24     with "Trim/Paint Labor - Charlie."  Do you see that sir?

05:29:25 25     A.   Yes, sir.

*OFFICIAL TRANSCRIPT*

05:29:25  1   Q.    It's Number 13 on your ledger.  I know we have various
05:29:29  2   different versions of that floating around.  And, sir, I'm
05:29:33  3   going to ask you to go to Exhibit 15, Tab 15, in my binder.
05:29:41  4   Okay, sir?
05:29:42  5   A.    Yes.
05:29:46  6   Q.    Sir, what I believe this particular document to be is an
05:29:58  7   invoice from "Trim/Paint - Charlie."  Is that correct, sir?
05:30:04  8   A.    I don't know what it is.  It's a document showing unit
05:30:11  9   numbers and prices.
05:30:13  10  Q.    You see at the top it says "Charles McPhilany"?
05:30:20  11  A.    Yes, sir.
05:30:20  12  Q.    Is that -- how does that relate, sir, to Item Number 13 on
05:30:29  13  the ledger, "Trim/Paint - Charlie"?  Is that one and the same?
05:30:35  14  A.    Well, the gentleman here --
05:30:37  15  Q.    Sir, do you know if Charlie on the ledger is
05:30:42  16  Charles McPhilany?
05:30:44  17  A.    Yes, probably it's the same.
05:30:45  18  Q.    Thank you, sir.  I appreciate that.
05:30:47  19        Okay.  In Mr. McPhilany's invoice that he sent to
05:30:51  20  you, sir, do you see that it's dated November 2nd, correct,
05:30:55  21  sir?  Actually, it's dated November 4, 2009.  Do you see that
05:30:58  22  at the bottom?
05:30:59  23  A.    Yes, sir.
05:30:59  24  Q.    Okay.  It says, "Invoice, from November 2nd to
05:31:06  25  November 8th."  Are you with me, sir?

*OFFICIAL TRANSCRIPT*

05:31:07 1    A.    Yes, sir.

05:31:07 2    Q.    It says:  "Tearouts completed in unit building A, floors 2

05:31:14 3    and 3.  Units complete:  207, 301, 302, 303, 304, 305.

05:31:22 4    Completed tear out everything on drywall as of November 4,

05:31:27 5    2009."  Correct, sir?

05:31:29 6    A.    Whatever the document says.  I'm not --

05:31:32 7    Q.    You're not contesting what this document says?

05:31:34 8    A.    No.  Whatever it says.

05:31:36 9    Q.    And Charles McPhilany worked for you as part --

05:31:40 10   A.    100 percent he worked, and we paid him, and that was very

05:31:44 11   reasonable what he did for us.  We hired small subcontractors,

05:31:48 12   small people so we paid the minimum money.  We didn't want to

05:31:53 13   hire big company, so we hired small people.

05:31:55 14   Q.    Sir, you would agree with me that as of November 4, 2009,

05:32:01 15   that there were at least 6 of the 39 units at Oceanique where

05:32:04 16   the drywall had not been removed, correct, sir?

05:32:07 17   A.    I don't know.

05:32:09 18   Q.    Mr. Charlie did it between November 2nd and November 4th,

05:32:13 19   right, sir?

05:32:13 20   A.    First of all --

05:32:14 21   Q.    Sir, answer my question.

05:32:15 22   A.    So repeat the question, please.

05:32:16 23   Q.    For the units that are on Mr. Charlie's e-mail (verbatim),

05:32:21 24   units 207 -- I'm sorry, Mr. Charlie's invoice, units 207, 301,

05:32:26 25   302, 303, 304, and 305, he would have been the demolition

*OFFICIAL TRANSCRIPT*

05:32:32  1    contractor?

05:32:33  2    A.    The answer -- the answer to you that none of this unit

05:32:36  3    people were living there.  The people were living there was on

05:32:39  4    other unit, not on those unit.  This is on building A, the

05:32:45  5    84-unit.  None of this unit was occupied by any person.  We

05:32:49  6    didn't sell none of these units of the 14-unit.  The sale was

05:32:57  7    on building B on the 25 units.

05:32:58  8    Q.    Thank you, but my question is, Mr. Charlie did the drywall

05:33:02  9    demolition in these six units that are on --

05:33:04 10    A.    What the evidence says, the documents are there and the

05:33:05 11    checks are counted behind it.

05:33:07 12    Q.    So his invoice says he did drywall demolition for these

05:33:11 13    six units between November 2nd and November 4th, okay?

05:33:13 14    A.    It could be part demolition with somebody else.  I don't

05:33:16 15    know.  Laborers or others.  It was -- it was a combination of

05:33:20 16    all kind of things.

05:33:20 17    Q.    So if Mr. Charlie is right that he did drywall tearout on

05:33:27 18    six units between November 2nd and November 4th of 2009 --

05:33:29 19    A.    Whatever the document says.

05:33:31 20    Q.    -- your statement in your affidavit that "we completed the

05:33:34 21    demolition of the units in affected areas in October 2009" is

05:33:38 22    false, correct, Mr. Kodsi?

05:33:40 23    A.    I don't know if it's false or right.  Or exactly the

05:33:43 24    invoices it says that and the date, I don't know.

05:33:47 25    Q.    Let's go back to the ledger and wrap up here, Mr. Kodsi.

*OFFICIAL TRANSCRIPT*

05:33:57  1   At the very end of the document, okay, "Plumbing Repairs," do
05:34:21  2   you see this one, Mr. Kodsi?
05:34:22  3   A.   Yes, sir.  Plumbing.  "Plumbing Repair."
05:34:24  4   Q.   On direct examination, you said that plumbing repairs -- I
05:34:31  5   wrote this down in my notes, but you said that they were
05:34:35  6   related to pitting on the chrome and pitting on the shower
05:34:38  7   fixtures; do you recall that testimony?
05:34:39  8   A.   No, that's part of it, but I'm going to tell you also
05:34:43  9   another thing that we will get to it quickly.  When the drywall
05:34:47 10   was done on the unit and we had the mud, they threw the mud in
05:34:58 11   the lines and we had to clean the lines, so that's what --
05:35:00 12   that's what it was.  You're going to get into that.  I'm trying
05:35:03 13   to save you time.
05:35:04 14   Q.   Well, when did they have to clean the lines?
05:35:06 15   A.   When they -- when they closed the sewer lines with the
05:35:12 16   mud.  Because they do that.  They are too lazy to throw it out,
05:35:18 17   so they throw it in the sewer line in the unit.
05:35:20 18   Q.   But this would have been done in connection with the
05:35:24 19   Chinese drywall repair?
05:35:24 20   A.   Of course, it's the unit that we would have been doing.
05:35:28 21   Q.   When did you realize that the drywall muds had been thrown
05:35:32 22   down the drain?
05:35:32 23   A.   Because it clogs the whole thing.
05:35:33 24   Q.   I'm sorry.  When did you realize that the drywall mud had
05:35:37 25   been thrown down the drains?

*OFFICIAL TRANSCRIPT*

05:35:38  1    A.    At the same time that we were doing the unit.

05:35:40  2    Q.    And your Owner Disclosure Affidavit says that you

05:35:45  3    completed your drywall repairs in June of 2010, correct, sir?

05:35:49  4    A.    Yes, sir.

05:35:49  5    Q.    Okay.  So one of the invoices that you have to support the

05:35:55  6    plumbing repairs, you see it says "clear main line"?

05:35:59  7    A.    Okay.

05:36:00  8    Q.    It's dated October 19, 2011; do you see that, sir?

05:36:05  9    A.    It could be.

05:36:06 10    Q.    So that's over a year after the remediation was done,

05:36:10 11    correct, sir?

05:36:10 12    A.    Exactly.  It could take two, three years later that you

05:36:13 13    find that part of the pipes are clogged.

05:36:15 14    Q.    It's your testimony that it's related to the mud?

05:36:19 15    A.    Yes, sir.

05:36:19 16    Q.    And you didn't have other drainage problems at the

05:36:22 17    project?

05:36:22 18    A.    No.  No, sir.

05:36:23 19    Q.    So plumbing invoices that I have from 2011 and 2012 which

05:36:29 20    says, "Clogged drain, clear the drain," are all related to

05:36:34 21    Chinese drywall?

05:36:34 22    A.    Yes, sir.  Hundred percent.

05:36:35 23    Q.    No doubt about it, right, sir?

05:36:56 24          Let's focus in again, sir, on the bottom real quick

05:36:59 25    and I'll let you go.  "Interest on Property," sir, this Line

*OFFICIAL TRANSCRIPT*

05:37:04 1    Item 44, do you see that?

05:37:05 2    A.    Yes, sir.

05:37:05 3    Q.    $200,000.  I take that to mean that was a debt service,

05:37:16 4    interest payments on the actual land that was bought to build

05:37:19 5    the units; is that correct?

05:37:19 6    A.    No, sir.

05:37:20 7    Q.    It's not?  What does "Interest on Property" mean?

05:37:22 8    A.    Well, I'm going to tell you in a moment.  Okay.  We took

05:37:49 9    the things off the units as of today from the time of -- that

05:37:57 10   we sold them, and we came to the amount of $67,397,837.  We

05:38:12 11   calculated 4 1/2 percent interest.

05:38:15 12         Let me look at my document to make sure that I would

05:38:18 13   give you the right information.  Okay.  Which line item was --

05:38:28 14   40?

05:38:29 15   Q.    44, sir.

05:38:30 16   A.    44.  Okay.  The 44 is I sold.  We remediated 39 units, 6

05:38:38 17   of which were previously sold.  We had 33 of those units off

05:38:42 18   the market at an average price of $576,050 for a total of

05:38:49 19   19,005,650.  The interest is calculated at a rate of 4 1/2

05:38:56 20   percent, okay.  So for the three months that -- which equal to

05:39:02 21   $215,858.  This is how we arrived at this number, and we

05:39:07 22   charged the three months only instead of charging 12 months.

05:39:11 23   Q.    Sir, in connection with Line Item 44, is there a loan

05:39:16 24   document that would support this interest charge?

05:39:19 25   A.    Well, no matter what, this is what the unit that we had --

*OFFICIAL TRANSCRIPT*

05:39:23  1   and we paid the bank the interest, no question.  But we

05:39:26  2   calculated that on the sales actual to be exact on the number

05:39:31  3   of units sold, and we calculated that on the units that --

05:39:37  4   average of those 33 units, and at 4 1/2 percent, which the bank

05:39:42  5   charged us, and this is how we came with.

05:39:44  6   Q.   Sir, I don't have a loan document.  Is there a loan

05:39:47  7   document to support this charge?

05:39:48  8   A.   We have a loan document, yes, but no matter what, the loan

05:39:52  9   document and this has nothing to do with one another.  This is

05:39:56 10   what -- I have the loan document, but this is what we lost on

05:39:59 11   the 33 units.

05:40:01 12   Q.   Sir, do you have a canceled check to support these

05:40:04 13   interest payments for Line Item 44?

05:40:06 14   A.   We have interest paid to the bank, yes.

05:40:08 15   Q.   By way of check?

05:40:10 16   A.   By way of checks, of course.

05:40:11 17   Q.   Item 43, sir, the "Builder Profit and Overhead" line item.

05:40:19 18   A.   Yes.

05:40:19 19   Q.   Do you have canceled checks to support payment of that

05:40:22 20   amount?

05:40:25 21   A.   No, because we are not -- we are -- we are the developer.

05:40:28 22   We are not a person that is a contractor.  This is what you are

05:40:32 23   mixing.  We are the developer, and we are the builder.  We do

05:40:37 24   not build for other people.  So we don't -- this is different

05:40:41 25   way that you look at things because it goes into same pool.

*OFFICIAL TRANSCRIPT*

05:40:44  1   Q.   So this would have been the charge, Line Item 43, that

05:40:51  2   Oceanique would not have billed to Tricon, correct?

05:40:53  3   A.   Well, if -- if we needed tax loss, we would do something

05:40:58  4   like that.  But, again, we lost in this project millions.  We

05:41:03  5   didn't need any tax loss.

05:41:05  6   Q.   Let me direct your attention to Line Number 45, "Interest

05:41:09  7   on Construction Costs".  Do you see that one?

05:41:12  8   A.   Yes, sir.

05:41:12  9   Q.   I heard you testify, sir, that this was for a loan you got

05:41:14 10   from what you called a "private source" to finance the

05:41:18 11   construction -- rather, the Chinese drywall repair at

05:41:21 12   Oceanique; did I recall that correctly?

05:41:23 13   A.   Yes, sir.

05:41:23 14   Q.   Sir, I haven't seen a single sheet of paper, a single loan

05:41:28 15   document, a single IOU, a single promissory note to support

05:41:33 16   that purported loan.  Is there such a document, sir?

05:41:37 17   A.   No.  We have -- we have a private source that give us this

05:41:42 18   money, and we promised to pay him back and we did.  It's

05:41:47 19   unsecured because the bank is the first lienholder, and we

05:41:50 20   cannot have any second mortgage on this property.

05:41:52 21   Q.   Sir, who was the private source?

05:41:54 22   A.   Well, that's personal.  That's confidential.

05:41:56 23   Q.   Confidential.  You won't disclose that information?

05:41:59 24   A.   Well, we don't want to get anything that -- that person

05:42:02 25   doesn't want to be involved in that.

*OFFICIAL TRANSCRIPT*

05:42:05 1    Q.    Is there any paperwork, sir, to support or to document the

05:42:10 2    loan arrangement between the private source and Oceanique in

05:42:14 3    connection with Line Item Number 44?

05:42:17 4    A.    No, we don't have any documentation.

05:42:21 5    Q.    It's a handshake deal?

05:42:22 6    A.    It's mostly like that.  It's unsecured loan, and we

05:42:26 7    promised to pay back.  If we couldn't pay back, we would have

05:42:30 8    collateralized it, but we paid it back within the time.

05:42:33 9    Q.    Did you, in fact, pay it, sir?

05:42:35 10   A.    We paid it, sure, of course.  We paid it from -- as paying

05:42:41 11   ourselves, paying the investors, paying the bank.

05:42:44 12   Q.    Did you pay the interest on the construction costs,

05:42:48 13   Line Item 45, by way of check?  Did you pay it by way of check?

05:42:51 14   A.    No, as an expense.

05:42:52 15   Q.    You paid it with cash?

05:42:53 16   A.    No, as an expense.  An expense meaning --

05:42:56 17   Q.    Sir, how do you pay a private source, someone who loaned

05:43:01 18   you money, as an expense item?  I don't get it.

05:43:04 19   A.    Well, we pay it from the company.  Everything we pay from

05:43:07 20   the company.  We pay back the loan as anybody else.

05:43:11 21   Q.    Sir, was it an intercompany loan --

05:43:13 22   A.    No, no, no.

05:43:14 23   Q.    -- for tax purposes?

05:43:16 24   A.    No, no, we paid it as we paid the investors, we paid it as

05:43:20 25   paying ourselves back and investment return and paying the

*OFFICIAL TRANSCRIPT*

05:43:25  1   bank.

05:43:25  2   Q.    You paid it with what?  What currency?

05:43:27  3   A.    With -- from the payment from development to the

05:43:30  4   individual.

05:43:30  5   Q.    Did you pay it in cash?

05:43:32  6   A.    No.  We paid it in checks.

05:43:34  7   Q.    Checks?  Where are the canceled checks?

05:43:37  8   A.    Well, I don't have the canceled checks in here.

05:43:46  9   Q.    Last item, "Punch Out/Warranty/Reserve/Contingency."  Do

05:43:52 10   you see that, sir, for $200,000?

05:43:52 11   A.    May I ask you a question?

05:43:53 12          THE COURT:  The lawyer is the one that asks questions.

05:43:54 13          MR. MILLER:  Sir, no, that's for redirect.  I'm asking

05:43:57 14   questions.

05:43:57 15          THE COURT:  He's asking questions.

05:43:57 16   EXAMINATION BY MR. MILLER:

05:43:58 17   Q.    Last item, and I'm done with you, okay?  "Punch out,"

05:44:00 18   Number 47, "Warranty/Reserve/Contingency, $200,000."  Do you

05:44:04 19   see that, sir?

05:44:05 20   A.    Yes, sir.

05:44:05 21   Q.    Do you have any canceled checks to support the expenses

05:44:10 22   associated with that $200,000 charge, any proof of payment at

05:44:13 23   all?

05:44:13 24   A.    Okay.  Yes.

05:44:15 25   Q.    What do you have?

*OFFICIAL TRANSCRIPT*

05:44:17 1    A.   I have them in here in my hand.  And I'm going to walk you

05:44:23 2    through them, because that's what really I put my time and

05:44:28 3    effort --

05:44:28 4    Q.   Sir, I'm not really interested in that because this is a

05:44:31 5    hearing, and the documents were supposed to be produced and

05:44:34 6    exchanged before the hearing.  They were not, and so I would

05:44:38 7    move to strike any testimony about that information or any

05:44:43 8    introduction or use of those exhibits at this hearing because

05:44:46 9    they were not provided, despite numerous requests for years.

05:44:53 10            With that, no further questions.

05:44:54 11           THE COURT:  Okay.  I'll grant that motion.

05:44:56 12               Any redirect?

05:44:58 13           MR. GONZALEZ:  Not of this witness, Your Honor.

05:45:01 14           THE COURT:  Okay.  All right.  Thank you.

05:45:01 15               You're excused, sir.

05:45:03 16               Any other witnesses?

05:45:04 17           MR. MILLER:  Judge, I kind of pilfered these exhibits.

05:45:06 18   I'll go through a different binder and move the appropriate

05:45:11 19   ones in.

05:45:13 20           MR. GONZALEZ:  Your Honor, we have a witness that won't

05:45:14 21   take very long at all.  I would just like to publish this to

05:45:18 22   Court, which will take a minute, at the most.

05:45:18 23                           **PROFFER**

05:45:20 24           MR. GONZALEZ:  This is Document Item 19502-1.  It was

05:45:24 25   filed with our response to Knauf's memorandum.  It's our

*OFFICIAL TRANSCRIPT*

05:45:30 1   response.  It was the first exhibit, actually A, and it's dated
05:45:35 2   April 11, 2014, from Mr. Montoya to Garrett Thalgott of Frilot.
05:45:44 3   It was regarding Already Remediated Homes claims, Oceanique
05:45:44 4   Development Company.
05:45:45 5       "Dear Mr. Thalgott:  Attached please find
05:45:48 6   Oceanique Development Company, Inc.'s Owner Disclosure
05:45:50 7   Affidavit and three notebooks containing the required
05:45:53 8   information under the ARH home protocol.  Kindly review it and
05:45:57 9   let us know if you believe there is anything missing and advise
05:46:01 10   us of your client's offer of the claim.  Should you have any
05:46:04 11   questions, please do not hesitate to contact us."
05:46:06 12       I will proffer to the Court, Your Honor, that
05:46:07 13   there was never a letter or memoranda until after the Court
05:46:10 14   reversed the mediator's ruling requesting for any additional
05:46:15 15   information.
05:46:18 16       MR. MILLER:  I would respond to that, Your Honor.  I
05:46:20 17   would object to that proffer because the Court can take
05:46:22 18   judicial notice of its own documents of the settlement
05:46:26 19   agreements of the ARH protocol and of the evidence preservation
05:46:30 20   PTOs which govern this particular situation.
05:46:34 21       THE COURT:  It was not a part of the record.  I mean,
05:46:36 22   the evidence he's proffered it, and he has a right to proffer
05:46:40 23   whatever he wants to proffer.  I'll allow the proffer, but I
05:46:43 24   understand the issue.
05:46:49 25       MR. MONTOYA:  Your Honor, we call Rob Kodsi.

*OFFICIAL TRANSCRIPT*

05:46:59 1          THE DEPUTY CLERK:  Would you please raise your right

2     hand.  Do you solemnly swear that the testimony which you are

3     about to give will be the truth, the whole truth and nothing

4     but the truth, so help you God?

5          THE WITNESS:  I do.

6                         **ROBERT KODSI**

7      was called as a witness and, after being first duly sworn by

8       the Clerk, was examined and testified on his oath as follows:

9          THE DEPUTY CLERK:  Please state and spell your name for

10     the record.

05:47:16 11          THE WITNESS:  Robert Kodsi, K-O-D-S-I.

05:47:16 12     DIRECT EXAMINATION BY MR. MONTOYA:

05:47:17 13     Q.   Mr. Kodsi, what was your role in the Oceanique

05:47:19 14     Development?

05:47:19 15     A.   Pretty much all the day-to-day operations, managed the

05:47:22 16     whole project.

05:47:23 17     Q.   Are you a licensed general contractor?

05:47:25 18     A.   Yes.

05:47:25 19     Q.   There was some specific questions directed towards the

05:47:29 20     permitting fees in this case.  Do you recall those questions to

05:47:31 21     your father?

05:47:32 22     A.   Yes.

05:47:32 23     Q.   Did you handle any of the permitting fee issues related to

05:47:37 24     Oceanique?

05:47:37 25     A.   Yes.

                              *OFFICIAL TRANSCRIPT*

05:47:37  1    Q.   What was your role?

05:47:40  2    A.   Well, I was responsible for obtaining the permits and

05:47:43  3    meeting with the building department.

05:47:44  4    Q.   How did you go about obtaining the permits?

05:47:47  5    A.   I met with the City officials or the building officials

05:47:50  6    and discussed the situation with them, and I got the permits.

05:47:54  7    Q.   When did you obtain the permits for Oceanique as it

05:47:57  8    related to the demolition that began in May 2009?

05:48:01  9    A.   Well, I got the permits for those probably about three or

05:48:07 10    four months after I actually started demolition.

05:48:09 11    Q.   Why did you get the permits after demolition began as

05:48:13 12    opposed to when construction began?

05:48:17 13    A.   From what I remembered, it was an emergency situation, so

05:48:20 14    I went ahead and took the liberty to go ahead and start

05:48:23 15    demolishing the units.  Then I figured I would suffer the

05:48:27 16    consequences later on, and that's when I went -- I think maybe

05:48:32 17    two or three months after demolitions had begun, I went to the

05:48:37 18    building -- actually the building official and discussed the

05:48:40 19    situation with them.

05:48:40 20         They were actually, like, I would say shocked that I

05:48:45 21    went ahead and discussed it with them because they didn't know

05:48:49 22    that -- they knew about the situation, but -- let me go back.

05:49:01 23    So I met with them, and -- this is six years ago, let me think

05:49:08 24    about this.

05:49:08 25    Q.   Sure, let me interrupt you for a moment.  Were you asked

*OFFICIAL TRANSCRIPT*

05:49:11  1    to go back and to compile the backup for the permitting fees?

05:49:15  2    A.    Yes.

05:49:16  3    Q.    Did you do that?

05:49:16  4    A.    Yes.

05:49:17  5    Q.    How long ago did you do that?

05:49:19  6    A.    Can you repeat the question.

05:49:21  7    Q.    How long ago did you get the permitting fee backup

05:49:24  8    information?  Just a few days ago?

05:49:26  9    A.    Yes.

05:49:26 10    Q.    That's Item Number 10 in Plaintiff's Exhibit --

05:49:30 11    A.    Actually, now I'm recalling it now.  Sorry to interrupt.

05:49:33 12    I remember when I met with the building department, I explained

05:49:37 13    to them that we had an emergency situation, and they said that

05:49:41 14    there are emergency permits you can get, but they told me

05:49:44 15    that -- for one, they commended me to -- they thanked me for

05:49:49 16    going ahead and taking care of the situation, because at that

05:49:51 17    time, there was a lot of other builders that were just turning

05:49:53 18    their heads back.  So they were kind of surprised about that.

05:49:55 19          But what they did is they said, go ahead and continue

05:49:58 20    your demolition, come back, and we'll give you a permit, a

05:50:03 21    combined demolition and building permit together.  So what

05:50:07 22    happened is I remember them charging me -- I think they charged

05:50:10 23    me double the permit fees because of my mistake.

05:50:14 24    Q.    Are those the charges reflected at Tab 10 of Plaintiff's

05:50:20 25    Exhibit 1 which we're showing on the screen now?  Up on the

*OFFICIAL TRANSCRIPT*

05:50:22  1    screen.

05:50:23  2    A.    Can you repeat the question.

05:50:25  3    Q.    Were those charges, the construction and building permits

05:50:28  4    combined, are those the charges what are reflected --

05:50:31  5    A.    Yes.

05:50:31  6    Q.    Did you compile this ledger?

05:50:34  7    A.    Yes.

05:50:34  8    Q.    Did you go back through and you added up the checks?

05:50:37  9    A.    Yes.

05:50:37  10   Q.    And that's an accurate number, $15,075?

05:50:41  11   A.    Yes.

05:50:46  12   Q.    Based on your recollection, about what time frame do you

05:50:50  13   recall the demolition ending for the majority of the units at

05:50:54  14   Oceanique?

05:50:56  15   A.    I remember it ending around October -- September, October,

05:51:00  16   around that time of '09.

05:51:01  17   Q.    And if there were a few --

05:51:03  18   A.    Actually, it was 2010.  No, no, '9.  It was '9, yes.

05:51:06  19   Q.    If there were a few weeks' lead period into November,

05:51:10  20   2009, would that surprise you at all?

05:51:13  21   A.    No.

05:51:13  22   Q.    You weren't doing -- were you doing the remediations all

05:51:17  23   at once together or on a rolling basis?

05:51:19  24   A.    Everything was done at the same time.

05:51:22  25   Q.    As to the plumbing, there was some questions related to

*OFFICIAL TRANSCRIPT*

05:51:26  1    some plumbing charges.  Were you familiar with any plumbing

05:51:30  2    issues at Oceanique as a result of the Chinese drywall

05:51:33  3    remediation?

05:51:35  4    A.    There were tons of issues with plumbing there.  I remember

05:51:37  5    that.  I don't remember any specific ones, but there were a lot

05:51:40  6    of issues.  And some of them happened after -- after the

05:51:43  7    remediation.

05:51:43  8    Q.    What were the major problems, the significant problems

05:51:46  9    that you had at Oceanique related to the Chinese drywall

05:51:51 10    remediation and the plumbing?

05:51:52 11    A.    You mean, like, fixtures or clogging?  I mean, there was

05:51:55 12    both.

05:51:55 13    Q.    Clogging specifically.

05:51:57 14    A.    Some of the stuff got clogged, the dirt and the debris got

05:52:01 15    down the drains, and we had to fish it out.

05:52:04 16    Q.    Why was that?

05:52:05 17    A.    Because of the Chinese drywall, the debris and some of the

05:52:10 18    mud.

05:52:19 19            MR. MONTOYA:  Nothing further.

05:52:20 20            THE COURT:  Any cross?

05:52:22 21            MR. MILLER:  No, Your Honor, no cross.

05:52:23 22            MR. GONZALEZ:  That concludes our evidentiary

05:52:25 23    presentation, Your Honor.

05:52:26 24            THE COURT:  Okay, fine.  Any rebuttal?

05:52:28 25            MR. MILLER:  No, Your Honor, we don't have any

*OFFICIAL TRANSCRIPT*

05:52:33 1    rebuttal.

05:52:34 2              Does the Court want proposed findings and

05:52:38 3    conclusions form the parties based on this hearing?

05:52:39 4         THE COURT:  Probably it would help me if you gave me

05:52:41 5    something.  I don't need, you know, a book or anything, but

05:52:43 6    just some minor suggestions.

05:52:49 7         MR. MILLER:  Should the form take proposed findings of

05:52:51 8    fact and conclusions of law, Your Honor, or just the form of a

05:52:55 9    memo?

05:52:55 10        THE COURT:  Yeah, let's do it that way.

05:52:56 11        [!EZ SPEAKER 105]:  Whatever the Court prefers.

05:52:56 12        MR. GONZALEZ:  By when would the Court like it?

05:52:59 13        THE COURT:  About two weeks.  Can you all do it --

05:53:01 14        MR. GONZALEZ:  Is there a page limitation?

05:53:02 15        THE COURT:  Not really, no.  I don't need a page

05:53:04 16   limitation.

05:53:04 17        MR. GONZALEZ:  Mr. Longer will be assisting us with

05:53:08 18   that.  We may need a page limitation.  I'm smiling and winking

05:53:10 19   as I say it because the record is silent.

05:53:12 20        THE COURT:  All right.  Okay.  Let me have it in two

05:53:13 21   weeks then, findings of fact and conclusions.  Let's make sure

05:53:19 22   you've introduced all of the exhibits that you need to

05:53:21 23   introduce.

05:53:21 24        [!EZ SPEAKER 105]:  Are you ready now?  Your Honor, can

05:53:30 25   I submit that tomorrow?  Would that be possible?

                          *OFFICIAL TRANSCRIPT*

05:53:32  1          MR. GONZALEZ:  No problem, Your Honor.

05:53:34  2          THE COURT:  Make sure that you've got your stuff in,

05:53:38  3   too.

05:53:38  4          MR. GONZALEZ:  He does not need to meet with me on

05:53:41  5   that.  I trust that he will submit what is appropriate based on

05:53:44  6   what he's submitted in court today.  If I'm wrong, I will be

05:53:49  7   shocked.

05:53:49  8          THE COURT:  All right.  Okay.  I have it.

05:53:52  9          MR. MILLER:  Judge, I'm sorry, did you say there would

05:53:54 10   be a page limit to the proposed findings?

05:53:57 11          THE COURT:  No, no page limit.

05:54:03 12          Court will stand in recess.  Thank you very much.

        13          (WHEREUPON, at 5:54 p.m. the proceedings were

        14   concluded.)

        15                         *    *    *

        16

        17                    REPORTER'S CERTIFICATE

        18         I, Cathy Pepper, Certified Realtime Reporter, Registered
             Merit Reporter, Certified Court Reporter in and for the State
        19   of Louisiana, Official Court Reporter for the United States
             District Court, Eastern District of Louisiana, do hereby
        20   certify that the foregoing is a true and correct transcript to
             the best of my ability and understanding from the record of the
        21   proceedings in the above-entitled and numbered matter.

        22                         *s/Cathy Pepper*
                                   Cathy Pepper, CRR, RMR, CCR
        23                         Certified Realtime Reporter
                                   Registered Merit Reporter
        24                         Official Court Reporter
                                   United States District Court
05:54:05 25                        Cathy_Pepper@laed.uscourts.gov

                         ***OFFICIAL TRANSCRIPT***