UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br>SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE WILKINSON |
| THIS DOCUMENT RELATES TO:<br>Case No. 10-362 Sec. L. Mg. 2 | |

**OCEANIQUE DEVELOPMENT COMPANY, INC.'S PROPOSED
FINDINGS OF FACT AND CONCLUSIONS OF LAW RELATED
TO THE DECEMBER 7, 2015 EVIDENTIARY HEARING**

**I.    INTRODUCTION**

Oceanique Development Company, Inc. ("Oceanique") participated in the Already Remediated Properties Protocol ("ARP Protocol") of the Knauf Settlement. Following a mediation before the Special Master, Oceanique appealed the Special Master's May 11, 2015 Opinion and Decree to this Court. *See* Rec.Doc. 19023. On July 14, 2015, this Court heard oral argument on Oceanique's appeal. By Order and Reasons dated August 21, 2015 (Rec.Doc. 19413), this Court adopted the Special Master's finding that "Oceanique's total claim is $3,180,499.28," but rather than reject Oceanique's Remediation Claim, the Court applied a 40% reduction to that claim based on insufficient proof of the KPT percentage, which resulted in an award to Oceanique of $1,908,299.57. Thereafter, on August 31, 2015, Knauf moved to reconsider this Court's Order and Reasons on the grounds that this Court's adoption of the Special Master's finding of the total value of Oceanique's claim had not been fully vetted as "Reimbursable Costs," as set forth in Paragraph IV(D) of the ARP Protocol. On November 16, 2015, this Court heard oral argument on Knauf's motion for reconsideration and determined that

1

an evidentiary hearing to address the veracity of Oceanique's Reimbursable Costs should occur. *See* Minute Entry of November 16, 2015 (Rec.Doc. 19753). That Evidentiary Hearing took place on December 7, 2015, and from that record, this Court makes the following Findings of Fact and Conclusions of Law.

## II.     FINDINGS OF FACT

1.     In its Motion for Reconsideration, Knauf challenged 19 entries on Oceanique's ledger which Oceanique presented in connection with its claim for Remediation Costs.[1] *See* Knauf Defendants' Exhibit No. 4 and Plaintiffs' Exhibit 1 at Tab 4. Specifically, Knauf challenged the following ledger entries:

        1. (Payroll);

        2. (MK-Supervision);

        3. (Appliances);

        13. (Trim/Paint Labor—Charlie);

        18. (Moving/Hauling);

        19. (Utilities—FPL);

        20. (Engineer Letters);

        21. (Permit Fees);

---

[1] For several ledger entries, the Knauf defendants contended that Oceanique failed to produce adequate records supporting the underlying expenses to the ledger entries. At the Evidentiary Hearing, Oceanique established that on April 11, 2014, it had produced to the Knauf defendants all of the required information under the ARH home protocol, Hearing Transcript of December 7, 2015 at 131-132, and Rec.Doc. 19502-1 ("Kindly review it and let us know if you believe there is anything missing…."), and Knauf never made any additional requests for more supporting documentation. Further, pursuant to the Court's directive at the November 16, 2015 hearing, prior to the Evidentiary Hearing, the parties exchanged exhibits and other information confirming the ledger entries. As a result, Knauf's contentions that Oceanique's ledger entries were not supported are unfounded and without merit.

22. (Utilities—Water/Sewer);

23. (Scratched/Delaminate Glass);

25.  (Asphalt Repair);

26.  (Redo Decks);

30.  (Plumbing Repairs);

33.  (Door/Locks Repair);

43. (BLDR Profit/Overhead/Legal/ACCTG—25%);

44.  (Interest on Property—3mos (1%) x $20M);

45.  (Interest on Constr. Costs ($2,209,544 x 10%));

46. (Condo Fees & RE Taxes—3 mos. X 100 Units); and

47. (Punch Out/ Warranty/ Reserve/Contingency).  *Id.*

2. As discussed below, Oceanique established actual expenses incurred for each of these disputed ledger items at the December 7, 2015 Evidentiary Hearing.

3. Oceanique is a condominium development located in Hutchinson Island, Florida. *Id.* at 29, 59.

4. Demolition of the 39 units and common areas that tested positive for Chinese Drywall contamination began as early as May 2009, prior to the creation of MDL 2047.  *Id.* at 30.

5. The Knauf Settlement Agreement and its Remediation Protocol regarding Already Remediated Properties did not exist when Oceanique performed its remediation.  *Id.* at 34.

6. Moss & Associates, the lead contractor in the Knauf class Settlement Agreement, performs remediation work under the Settlement Agreement and charges Knauf at the rate of $56/square foot.  *Id*. at 33. Had Moss performed the equivalent work to remediate the Oceanique

3

condominiums as that conducted by Oceanique, Moss would have charged $5,824,000. *Id.* This is in contrast to Oceanique's remediation charges of $30.58/square foot, which, applied over the course of the remediation project, amounted to $3,180,499.28. *Id.* at 34-35. Knauf does not dispute that the remediation work performed by Oceanique was done satisfactorily. *Id.*

7. Oceanique Development Company, Inc. is a family business owned by Maurice and Robert Kodsi. *Id.* at 59. Mr. Kodsi provided credible testimony regarding each of the 19 ledger items disputed by Knauf.

8. Item No. 1, regarding payroll expenses of $360,000, were confirmed by Mr. Kodsi as reasonable and necessary expenses related to the remediation of the Oceanique contaminated properties. *Id.* at 70. In addition to his testimony, Mr. Kodsi also produced a document called "Oceanique Development, Inc. Transaction Detail by Account" supporting these expenses. *Id*. at 105-106.

9. Item No. 2, regarding supervision expenses of $120,000, were confirmed by Mr. Kodsi as being reasonable and necessary related to the remediation work performed at Oceanique. *Id*. at 70-71, 108-111.

10. Item No. 3, regarding appliances expenses in the amount of $274,000, was confirmed by Mr. Kodsi as reasonable and necessary expenses related to the remediation of the contaminated Oceanique properties. *Id.* at 71. *See also* Plaintiffs' Exhibit 1 at Tab 5.

11. Item No. 13, regarding trim/paint labor expenses in the $38,550, was confirmed by Mr. Kodsi as reasonable and necessary expenses incurred in relation to the remediation of the

contaminated units in the Oceanique properties. *Id*. at 71-72.[2] *See also* Plaintiffs' Exhibit 1 at Tab 6.

12. Item No. 18, regarding moving/hauling expenses in the amount of $20,000, was confirmed by Mr. Kodsi as reasonable and necessary expenses related to the remediation of the Oceanique contaminated units. *Id*. at 72. These charges were for labor moving materials related to the remediation. *Id. See also* Plaintiffs' Exhibit 1 at Tab 7.

13. Item No. 19, regarding utility expenses in the amount of $15,000, was confirmed by Mr. Kodsi as reasonable and necessary expenses related to the remediation of the Oceanique contaminated properties. *Id.* at 73. *See also* Plaintiffs' Exhibit 1 at Tab 8.

14. Item No. 20, regarding engineer letter expenses in the amount of $14,523, was confirmed by Mr. Kodsi as a reasonable and necessary expense as a result of remediation. *Id*. at 73-74.[3] Mr. Kodsi explained that the engineer letters were necessary to pass quality control concerns. *Id.*[4] *See also* Plaintiffs' Exhibit 1 at Tab 9.

15. Item No. 21, regarding permit fees expenses in the amount of $13,687, was not disputed by Knauf at the Evidentiary Hearing. In fact, Knauf agreed that the reimbursable permit fees should in fact be more, *i.e.*, $15,075. *Id*. at 21. *See also* Plaintiffs' Exhibit 1 at Tab 10.

---

[2] Knauf does not dispute that $35,490 of Oceanique painting expenses were properly expensed for trim and paint labor, but takes issue with $3,060 in painting costs it considers non-protocol. *Id.* at 18-19. Mr. Kodsi's testimony reasonably justified the additional expenses incurred for repairing trimming and walls that were damaged during the remediation. *Id.* at 72.
[3] At the Evidentiary Hearing plaintiffs produced an example of an engineering letter applicable to each of the affected units. *See* Oceanique Exhibit 2. *See also*, Hearing Transcript at 75.
[4] Knauf does not dispute that engineer letters are a reasonable reimbursable cost. *Id.* at 20-21.

5

16. Item No. 22, regarding utilities/water/sewer expenses in the amount of $12,000, was confirmed by Mr. Kodsi as being a reasonable and necessary cost related to the remediation of the contaminated Oceanique units. *Id*. at 75. *See also* Plaintiffs' Exhibit 1 at Tab 11.

17. Item No. 23, regarding scratched/delaminate glass expenses in the amount of $11,308.19, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 67, 75. *See also* Plaintiffs' Exhibit 1 at Tab 12.

18. Item No. 25, regarding asphalt repair expenses in the amount of $7,200, was confirmed by Mr. Kodsi as a reasonable and necessary expense related to the remediation of the contaminated Oceanique units. *Id*. at 76. Mr. Kodsi testified that trucks used in the repair of the Oceanique units damaged the asphalt and required a resurfacing of the asphalt. *Id*. at 67. *See also* Plaintiffs' Exhibit 1 at Tab 13.

19. Item No. 26, regarding deck repair expenses in the amount of $6,716.01, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 76. These decks, or catwalks, had been damaged during the remediation efforts and required refinishing "to be back to normal." *Id.* at 67. *See also* Plaintiffs' Exhibit 1 at Tab 14.

20. Item No. 30, regarding plumbing expenses in the amount of $3,726.73, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 76. Mr. Kodsi explained that "[t]he plumbing was damaged from the drywall and the chrome was pitted." *Id. See also* Plaintiffs' Exhibit 1 at Tab 15.

21.     Item No. 33, regarding door lock repair expenses in the amount of $1,590.76, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 76. These locks were damaged during the remediation and required replacement. *Id.* at 77. *See also* Plaintiffs' Exhibit 1 at Tab 16.

22.     Item No. 43, regarding builder profit and overhead expenses in the amount of $441,909.00, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 76. Mr. Kodsi explained that charging 25% for profit and overhead, under the circumstances where the potential for liability from contamination existed was more than reasonable. *Id*. at 78-19.[5]

23.     Item No. 44, regarding interest on property in the amount of $200,000, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 79. Mr. Kodsi explained that in the Spring of 2009, the need to remediate the contaminated condominiums was patent, which required his company to forfeit sales, and incur expenses including the carrying costs on the 39 units, six of which were previously sold. *Id*. at 61-62, 79, 126. While the company incurred far more costs over the course of the 4-6 years it took to sell the units, Oceanique only requested 3 months of interest paid on its carrying costs. These interest charges at 4 ½ percent were, in fact, incurred and exceeded the $200,000 submitted for reimbursement. *Id.* at 79-80, 126. ($19,005,650 x .045 = $855, 244.25/per year or approximately $215,000 per quarter).

---

[5] Knauf contended that industry standard charges for overhead and profit are 20%, but acknowledged that a responsible builder faced with contamination would remediate, and that not only could some builders reasonably charge more than 20%, many do charge more than 20%. *Id*. at 31, 43.

24. Item No. 45, regarding interest on construction costs, in the amount of $220,954.00, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 80. Mr. Kodsi testified that rather than forfeit the project to his bank, Mr. Kodsi borrowed $2 million from a private source at 10% and one point to obtain the necessary funds to remediate the contaminated units. *Id*. at 62-64. As a consequence, Oceanique incurred interest charges on its construction costs, which were essential for the project to continue. These charges permitted Oceanique to remediate the damaged units and mitigate its damages, which otherwise were estimated to approximate $50 million. *Id.* at 62.

25. Item No. 46, regarding condominium fees expenses in the amount of $350,000.00, was confirmed by Mr. Kodsi as being reasonable and necessary costs incurred that were related to the remediation of the contaminated Oceanique units. *Id*. at 81. These expenses were incurred because of the need to shut down the condominium project and remediate both the contaminated units and common areas. *Id*. As a consequence, Oceanique was responsible for paying the condominium fees and taxes, for which Oceanique only sought reimbursement for only $350,000*, i.e.,* 3 months of charges. *Id.*[6]

---

[6] At the Evidentiary Hearing, Knauf contended that several items of Oceanique's Remediation Claim (Item Nos. 44, 45, & 46) overlapped with Oceanique's Other Loss Fund claim which resulted in a double recovery. *Id.* at 50-51, 53 (Jake Woody testimony regarding Section 4.7.1.2.3 (c & d). Mr. Woody testified that Oceanique recovered "in connection with its *lost sales claim*s" from the Other Loss Fund "$10,000 on 42 separate claims, which is a total of $420,000." *Id.* at 52. But, Mr. Woody acknowledged that Oceanique's Other Loss Fund claim was distinct from its Remediation Claim, and that there is no limiting language in the Remediation Claim section of the Knauf Settlement Agreement which would preclude recovery under the Already Remediated Homes protocol for carrying charges and loan charges, etc. *Id.* at 56. Mr. Woody was unable to conclude that the Other Loss claim of Oceanique duplicated its

26.     Item No. 47, regarding estimated punch out expenses in the amount of $200,000.00 was confirmed by Mr. Kodsi as being reasonable and necessary costs that were later incurred but still related to the remediation of the contaminated Oceanique units. *Id*. at 81-82. Mr. Kodsi explained how the punch out costs were conservatively estimated at $5,000 per unit over the contaminated areas (including the common areas ~ 40 units x $5,000 = $200,000). Mr. Kodsi further explained that the estimated punch out costs were low, and that Oceanique actually incurred punch out costs approximating $280,000.00. *Id*. at 82.

27.     The costs recorded on Oceanique's ledger (Knauf Exhibit 4) were fully supported by the evidence provided at the December 7, 2015 Hearing, including the testimony of the witnesses, invoices, and other documentary evidence. In fact, certain entries on the ledger under-reported certain costs incurred by Oceanique, e.g., permit fees.

28.     Oceanique's reasonable Reimbursable Costs are $3,180,499.28.

## III.    CONCLUSIONS OF LAW

29.     The Knauf Settlement Agreement ("SA") created two discrete funds to compensate victims of Knauf's defective drywall – a Remediation Fund and an Other Loss Fund. *See* SA §4.1. The Remediation Fund was established to pay for Remediation Claims, *i.e.*, "claims associated with the KPT Property Owner's or Mixed Property Owner's remediation of the Affected Property prior to the Execution Date, including the reasonable costs of remediation and the Other Covered Expenses," SA §1.61, and, for Commercial Owners, like Oceanique, the Other Loss Fund was established to pay for Lost Use, Sales and Rent, SA §4.7.1.2. Recognizing

---

Remediation Claim. *Id*. at 57 ("I guess it would depend on the claim and whether it was paid and things of that nature.").

that Already Remediated Properties were uniquely situated, Knauf agreed to a separate track to address ARP claims.  Accordingly, the ARP Protocol was established.  *See* SA §4.3.7.1 & Exhibit A to the Settlement Agreement.

30.	The purpose of the ARP Protocol was to create "a process by which to resolve the *Remediation Claims* of Individual Owners who self-remediated their Affected Properties" prior to the execution date of the Settlement Agreement.   ARP Protocol §I (emphasis added).[7]  The ARP Protocol contemplated submissions of all documentation concerning *remediation* of the Affected Property, followed by negotiations by the parties "to attempt to resolve the Owner's Remediation Claims in accordance with Paragraph IV (D) [addressing Reimbursable Costs] and subject to the conditions set forth in Paragraph V [addressing Other Covered Expenses]," ARP Protocol, §IV (A) (1).  If the negotiations of the Owner's Remediation Claims could not be negotiated by the parties, the ARP Protocol required the matter to be submitted to non-binding mediation before the Special Master.  Consideration of whether costs were reimbursable, *i.e.*, reasonable, incurred in remediating the Affected Property, etc., was a condition of mediation that was demanded by KPT at the time the SA was negotiated.  Specifically, the ARP Protocol requires:

> In mediating the Remediation Claims, the Special Master shall follow

---

[7] Section II makes clear that all defined terms shall have the meanings set forth in the SA.  In the SA, "Remediation Claims" are distinctly defined separately from "Other Loss Claims."   The Court finds that Knaufs' contentions that Oceanique is making a double recovery between the two funds is misplaced.  Oceanique's Other Loss Claims that were presented to BrownGreer are supported by different evidence of lost sales, rent and use than that presented for remediation claims.  Thus, there is no double-recovery.  *See* Oceanique Other Loss Claim Form and submission from Brown Greer (Exhibit 4).  *See also* fn. 6, *supra*.

10

>   the provisions set forth in <u>Paragraph IV (D)</u>.

ARP Protocol, §IV (B)(3) (emphasis added).

31. Section IV (D) provides that Reimbursable Costs are only the "reasonable costs that the Owner incurred in remediating the Affected Party." ARP Protocol §IV (D)(1). The ARP Protocol provides additional criteria for evaluating Reimbursable Costs, which included whether the 1) remediation work was "reasonably consistent" with the Remediation Protocol; the costs were only for replacement costs as opposed to upgrades, and that waste and fraud were prohibited. *Id.*

32. The ARP Protocol also permits a final submission with respect to the Remediation Claims to the Court in the event the mediation is unsuccessful. *Id.*, § IV (C) (1). Like the scope of the mediation, "[t]he scope of the Court's review shall be limited to the Reimbursable Costs set forth in Paragraph IV (D)." *Id.*, §IV (C)(2). The Court's determination of the Remediation Claims is to be "final without appeal." *Id.*, §IV (C)(3).

33. The Court finds that Oceanique's evidence supports its Remediation Claim for $3,180,499.28 in Reimbursable Costs, all of which are reasonably consistent with the ARP Protocol (which Protocol did not even exist at the time Oceanique remediated its property).

34. Based upon the Order & Reasons of August 21, 2015, Oceanique is entitled to 60% of its Reimbursable Costs, and it is therefore ORDERED that Oceanique be awarded a total of $1,908,299.57.

Dated:  December 21, 2015

Respectfully submitted,

*/s/ Fred S. Longer*
Arnold Levin
Fred S. Longer
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA 19106
215-592-1500 (phone)
215-592-4663 (fax)
Alevin@lfsblaw.com
Flonger@lfsblaw.com


Ervin A. Gonzalez
Patrick S. Montoya
Colson, Hicks, Eidson, Colson
  Matthews, Martinez, Gonzales,
  Kalbac & Kane
255 Alhambra Circle, Penthouse
Cora Gables, FL 33134
Phone: (305) 476-7400
Fax: (305) 476-7444
Ervin@colson.com
Patrick@colson.com


Counsel for Oceanique Development Company, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that the above and foregoing pleading has been served upon all parties by electronically uploading the same to LexisNexis File & Serve in accordance with Pre-Trial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047 on this 21st day of December, 2015.

*/s/ Fred S. Longer*
Fred S. Longer