```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3    ****************************************************************

 4    In re:  CHINESE-MANUFACTURED      MDL DOCKET NO. 09-MD-2047
      DRYWALL PRODUCTS LIABILITY        SECTION L
 5    LITIGATION                        NEW ORLEANS, LOUISIANA
                                        Wednesday, December 16, 2015
 6    THIS DOCUMENT RELATES TO:         9:00 A.M.

 7    ALL CASES

 8
      ****************************************************************
 9
                 TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS
10            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
11
      APPEARANCES:
12
      FOR THE PLAINTIFF:          REBECCA HOHNE, PRO SE
13                                1025 Little Sorrel Drive
                                  Calera, Alabama
14

15    FOR THE DEFENDANT:          BAKER DONELSON BEARMAN
                                  CALDWELL & BERKOWITZ
16                                BY:  KERRY J. MILLER, ESQ.
                                  201 St. Charles Avenue, Suite 3600
17                                New Orleans, Louisiana 70170

18

19    OFFICIAL
      COURT REPORTER:   TERRI A. HOURIGAN, CRR, RPR
20                      CERTIFIED REALTIME REPORTER
                        REGISTERED PROFESSIONAL REPORTER
21                      500 POYDRAS STREET, ROOM B-275
                        NEW ORLEANS, LOUISIANA  70130
22                      (504) 589-7775
                        Terri Hourigan@laed.uscourts.gov
23

24    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
      PRODUCED BY COMPUTER.
25
```

1                          I N D E X

2      WITNESS:                                    PAGE

3      PHILIP ADAMS

4         Direct Examination by Mr. Miller..................6

5         Cross-examination by Ms. Hohne...................38

6         Redirect Examination by Mr. Miller...............54

7

8      THOMAS ORTNER

         Direct Examination by Mr. Miller.................57
9
         Cross-examination by Ms. Hohne...................68
10
         Redirect Examination by Mr. Miller...............76

11

12     CHRISTOPHER CHARLES BROWN

13        Direct Examination by Ms. Hohne..................80

14        Cross-examination by Mr. Miller..................86

15

16

17

18

19

20

21

22

23

24

25

1                    **P-R-O-C-E-E-D-I-N-G-S**

2

3                     December 16, 2015

4                 (COURT CALLED TO ORDER)

5

6          THE CASE MANAGER:  All rise.

7          THE COURT:  Be seated, please.

8          Let's call the case.

9          CASE MANAGER:  *09-MDL-2047, in re:*

10    *Chinese-Manufactured Drywall Products Liability Litigation.*

11         THE COURT:  Will the parties or counsel make their

12    appearances.  Stand up and tell us who you are, please, ma'am.

13         MS. HOHNE:  Yes, sir.  Rebecca Hohne.

14         THE COURT:  Plaintiff in this case.

15         MR. MARINO:  Your Honor, my name is Rene Marino.  I am

16    working with Kerry Miller.  He should be back in a minute.

17         THE COURT:  Okay.  Just by way of the background in

18    this case, this is a matter which grows out of the Chinese

19    Drywall Litigation.

20         As we all know, as a result of the hurricanes and the

21    building boom in Florida, drywall was short.  We didn't have

22    enough American-made drywall to take care of those tragedies or

23    boom, so other drywall was brought into the United States.  The

24    area that it was brought in from is China.

25         Knauf, the world-wide building manufacturer and

08:59AM 1   distributor formed a Chinese corporation, wholly-owned

08:59AM 2   subsidiary Chinese corporation, to prospect for a mine and

08:59AM 3   produce drywall.

08:59AM 4        They brought drywall into the United States and the

08:59AM 5   drywall proved to be defective, unknown to Knauf.  But in any

08:59AM 6   event, since they manufactured it, they were liable for it.

08:59AM 7        They stepped up to the plate and recognized that, and

08:59AM 8   agreed to settle the matter.

08:59AM 9        Basically, the terms of their settlement was that they

08:59AM 10  agreed to fully remediate the homes with the drywall and also

08:59AM 11  pay attorney's fees, and most of the claims were resolved in

09:00AM 12  that fashion.

09:00AM 13       Today, we have one claim that the individual owner says

09:00AM 14  that she had drywall in her house; it was remediated, but she

09:00AM 15  still feels she has defective drywall in the house, and not all

09:00AM 16  of it was taken out of the house.  So she says that she did not

09:00AM 17  get the full value of the settlement that she agreed to, and

09:00AM 18  objects to the situation.

09:00AM 19       She produced the report, or has told me in open court,

09:00AM 20  that she had a report from someone who indicated that the

09:00AM 21  drywall was not appropriate.

09:00AM 22       I told her that I had to have a hearing to determine

09:01AM 23  that fact, and the parties could produce evidence on it.

09:01AM 24       I talked to her yesterday with opposing counsel to find

09:01AM 25  out what they were going to do at the hearing, and she says she

09:01AM 1    was going to call a witness who prepared the report, and the

09:01AM 2    defendant indicated he was intending to call two witnesses.  So

09:01AM 3    that's the hearing today.

09:01AM 4         Ms. Hohne, do you want to call your witness?

09:01AM 5         MS. HOHNE:  Actually, I just let Mr. Miller know that

09:01AM 6    he is running behind.

09:01AM 7         THE COURT:  Do you want to stand up?  I can't hear you.

09:01AM 8         MS. HOHNE:  He's running behind, and I'm not sure he is

09:01AM 9    going to be able to make it in the next few minutes.  He's tied

09:01AM 10   up with something at the hospital.

09:01AM 11        I don't know if we can carry on until then -- until he

09:01AM 12   can make it?

09:01AM 13        THE COURT:  Well --

09:01AM 14        MR. MILLER:  Your Honor, if Ms. Hohne needs some

09:01AM 15   additional time, I'm happy to put my two witnesses on first.

09:02AM 16        THE COURT:  Yeah, let's do that.  Let's put your

09:02AM 17   witnesses on first.

09:02AM 18        Ms. Hohne, if he comes in the meantime, we will put him

09:02AM 19   on, and if he doesn't, that is going to be an issue, because we

09:02AM 20   need to have live testimony.

09:02AM 21        MS. HOHNE:  All right.

09:02AM 22        THE COURT:  Call your witnesses.

09:02AM 23        MR. MILLER:  Good morning, Your Honor.  Kerry Miller on

09:02AM 24   behalf of Knauf in connection with this evidentiary hearing.

09:02AM 25        Our first witness is Philip Adams.

09:02AM  1          THE COURT:  Would you come forward, Mr. Adams?

2          THE CASE MANAGER:  Raise your right hand, please.

09:02AM  3                    (Oath was administered.)

09:02AM  4          THE WITNESS:  I do.

09:02AM  5          CASE MANAGER:  Please be seated and state and spell

09:02AM  6  your name for the record.

09:02AM  7          THE WITNESS:  Phillip Adams, A-d-a-m-s.

8

9                         PHILLIP ADAMS,

10           Having been duly sworn, testified as follows:

09:02AM 11          MR. MILLER:  Good morning, Mr. Adams.

09:02AM 12          THE WITNESS:  Good morning.

13

14                    DIRECT EXAMINATION

15          MR. MILLER:  Your Honor, if it's okay and permissible

09:03AM 16  with the Court, I would like to approach to hand the witness

09:03AM 17  and the Court binders of the exhibits that we plan on using

09:03AM 18  this morning.

09:03AM 19          The exhibits that we plan on using were exchanged the

09:03AM 20  other day after the telephone conference that we had, that Your

09:03AM 21  Honor referenced in his opening remarks, and we gave Ms. Hohne

09:03AM 22  a hard copy of the documents this morning.

09:03AM 23          THE COURT:  Okay.

09:03AM 24  BY MR. MILLER:

09:03AM 25  Q.   Mr. Adams, for the record, if you would please give a

09:03AM 1    brief summary description of your role and your experience in

09:03AM 2    the Chinese Drywall Court Remediation Program?

09:03AM 3    A.    I am the senior project manager with Moss & Associates.

09:03AM 4          Moss is the lead contractor for the Knauf Settlement

09:03AM 5    Program.

09:03AM 6          We have completed, to date, approximately 2700 single

09:04AM 7    family homes and condominiums.

09:04AM 8    Q.    Mr. Adams, just to put in context, is the home at issue

09:04AM 9    today, Ms. Hohne's home, one of the 2700 homes that Moss

09:04AM 10   remediated during the Court Remediation Settlement Program?

09:04AM 11   A.    Yes, it is.

09:04AM 12         MR. MILLER:   Okay.   Mr. Adams, I'm going to ask you to

09:04AM 13   turn to Tab A of Exhibit 1.

09:04AM 14         Your Honor and Madam Court reporter, I'm going to refer

09:04AM 15   to the binder as Exhibit 1.   We will move it in after the

09:04AM 16   witness's testimony, and this basically is the remediation file

09:04AM 17   for Ms. Hohne.

09:04AM 18         The different documents and photographs are tabbed, so

09:04AM 19   we will work through the tabs.

09:04AM 20   BY MR. MILLER:

09:04AM 21   Q.    So Mr. Adams, let me know when you have opened your binder

09:04AM 22   up to Tab A of Exhibit 1.

09:04AM 23   A.    I have it.

09:04AM 24   Q.    Mr. Adams, can you identify that document for me?

09:04AM 25   A.    This is Exhibit F, of the remediation protocol from the

09:04AM 1    settlement program.

09:04AM 2    Q.   That would be the Knauf Settlement Program approved by

09:05AM 3    this Court?

09:05AM 4    A.   Yes.

09:05AM 5    Q.   Mr. Adams, if you could briefly describe what this

09:05AM 6    remediation protocol covers?

09:05AM 7    A.   This is a scope of work that we performed during the

09:05AM 8    remediation.  It lists numerous items which are to be removed

09:05AM 9    and replaced and which items could be detached and reset.

09:05AM 10       It tells about the drywall removal, the dust, the

09:05AM 11   particulates, the electrical wiring, the HVAC system,

09:05AM 12   insulation, carpeting, appliances, and the actual Odorox

09:05AM 13   procedure environmental certificate before we can actually

09:05AM 14   reinstall or replace any items.

09:05AM 15   Q.   Thank you, Mr. Adams.

09:05AM 16       Now, the remediation protocol from the Knauf Class

09:05AM 17   Settlement Agreement set forth at Tab A to Exhibit 1, is that

09:05AM 18   the remediation protocol that Moss filed in connection with

09:05AM 19   remediation of Ms. Hohne's home?

09:05AM 20   A.   Yes, it is.

09:05AM 21   Q.   Mr. Adams, let's flip to Tab B of Exhibit 1.

09:06AM 22       Let me ask you to go ahead and identify that document

09:06AM 23   for the record.

09:06AM 24   A.   This is the Remediation Guidance from the Consumer

09:06AM 25   Products Safety Commission.

09:06AM 1   Q.   And the Consumer Products Safety Commission, is that a

09:06AM 2   federal agency, per your understanding, Mr. Adams?

09:06AM 3   A.   Yes, it is.

09:06AM 4   Q.   And Mr. Adams, do you have an understanding if this

09:06AM 5   particular remediation protocol from CPSC was basically the

09:06AM 6   suggested remediation standards advanced by the U.S. Consumer

09:06AM 7   Product Safety Commission and the U.S. Department of Housing

09:06AM 8   and Urban Development?

09:06AM 9   A.   Yes.

09:06AM 10  Q.   Mr. Adams, let me ask you, the Knauf Class Action

09:06AM 11  Settlement Remediation Protocol at Tab A, does that call for a

09:06AM 12  broader remediation or a narrower remediation than the CPSC

09:06AM 13  remediation document?

09:06AM 14  A.   The Knauf Settlement Program Protocol far exceeds the

09:07AM 15  Consumer Product Safety Commission guidelines.

09:07AM 16  Q.   In what ways, Mr. Adams?

09:07AM 17  A.   Basically, the Consumer Products Safety guidelines call

09:07AM 18  for removal of drywall particulates and dust, and electrical

09:07AM 19  devices only -- not electrical wiring.  It does not address

09:07AM 20  HVAC systems or any other product.

09:07AM 21  Q.   Mr. Adams, let's turn now and focus on the particular

09:07AM 22  remediation of Ms. Hohne's home.  We will cover the various

09:07AM 23  steps along the way that were filed in connection with the

09:07AM 24  class action settlement.

09:07AM 25       Mr. Adams, at Tab C and D of the binder, we have

09:07AM 1    inspection reports from a firm by the name of Morse Zehnter &

09:07AM 2    Associates.

09:07AM 3            Are you familiar with those reports, sir?

09:07AM 4    A.    Yes, I am.

09:07AM 5    Q.    And would those be reports that are done pursuant to the

09:07AM 6    class action settlement agreement inspection reports where an

09:07AM 7    inspector goes in and looks to see what type of Chinese drywall

09:08AM 8    in the home, is it KPT Chinese drywall or it, for example,

09:08AM 9    Taishan Chinese drywall?

09:08AM 10   A.    Yes, it is.

09:08AM 11   Q.    And do you have an understanding, sir, that if the

09:08AM 12   inspector finds KPT Chinese drywall in the home, that that home

09:08AM 13   then becomes eligible for the Knauf Class Settlement

09:08AM 14   Remediation Program?

09:08AM 15   A.    Yes.

09:08AM 16   Q.    So would it be fair to say, Mr. Adams, that these two

09:08AM 17   inspection reports at Tab C and D, were basically the opening

09:08AM 18   kickoff, if you will, to Ms. Hohne's remediation?

09:08AM 19   A.    Yes.

09:08AM 20   Q.    Mr. Adams, let's flip to Tab E of the binder.

09:08AM 21           Mr. Adams, you are familiar with the BrownGreer firm

09:08AM 22   and the role that they performed in the connection with the

09:08AM 23   Knauf Class Remediation Program?

09:09AM 24   A.    Yes.

09:09AM 25   Q.    And Mr. Adams, in your words, basically what did

09:09AM 1    BrownGreer do and how do they interface with your company,

09:09AM 2    Moss?

09:09AM 3    A.    BrownGreer is the settlement administrator.  They also

09:09AM 4    maintain all of the documents.

09:09AM 5          They have a portal which we upload all of our documents

09:09AM 6    to their website.  We also request funding from them when we

09:09AM 7    meet milestones.

09:09AM 8    Q.    Mr. Adams, let's turn to Tab E of the binder.

09:09AM 9          I will represent to you, sir, that this is a screen

09:09AM 10   shot from a BrownGreer portal that you just referenced in

09:09AM 11   connection with Ms. Hohne's home and involvement in the Knauf

09:09AM 12   Class Action Settlement.

09:09AM 13         Let me just ask you a couple of questions about this,

09:09AM 14   because you see basically there are two columns.  One called

09:09AM 15   "event type" and the other called "event date".

09:09AM 16         Do you see that, Mr. Adams?

09:09AM 17   A.    Yes.

09:09AM 18   Q.    I know you are familiar with some of these descriptions of

09:10AM 19   "event type" that are set forth in that column?

09:10AM 20   A.    Yes.

09:10AM 21   Q.    And such as, if you look at the second description under

09:10AM 22   "event type" "Remediation:  Moss indicates home is ready for

09:10AM 23   escrow funding."

09:10AM 24         What does that mean, Mr. Adams?

09:10AM 25   A.    That means that we have performed a scope.  We have come

09:10AM 1    up with a final cost estimate and that the work authorization

09:10AM 2    has been executed.

09:10AM 3    Q.    So in connection with Ms. Hohne's home, Moss was ready for

09:10AM 4    funding and ready for remediation on March 13th 2012,

09:10AM 5    Mr. Adams?

09:10AM 6    A.    That is the time that we upload to the portal, so, yes.

09:10AM 7    Q.    Okay.  Mr. Adams, I'm not going to go through every line

09:10AM 8    item, just skipping down, I think, about five or six line

09:10AM 9    items, there is an event type entry, called "certificate of

09:10AM 10   occupancy issued."

09:10AM 11          Do you see that, Mr. Adams?

09:10AM 12   A.    Yes.

09:10AM 13   Q.    What is that event?

09:10AM 14   A.    That is the certificate that the city where the home is

09:10AM 15   located, issues that the home or that the permit items are

09:11AM 16   complete.

09:11AM 17   Q.    Okay.  And just moving up there a couple, I skipped and I

09:11AM 18   didn't mean to skip, if you look up two lines, it says:

09:11AM 19   "Environmental inspector issues certification."

09:11AM 20          Do you see that, Mr. Adams?

09:11AM 21   A.    Yes.

09:11AM 22   Q.    And what does that mean?

09:11AM 23   A.    We obtain an environmental certificate before we can

09:11AM 24   actually move forward to reinstall any of the items.

09:11AM 25   Q.    And so is there work done by Moss prior to obtaining the

09:11AM 1   environmental certificate?

09:11AM 2   A.   Yes, there is.  It is complete demo, cleaning, and Odorox

09:11AM 3   treatment.

09:11AM 4   Q.   And so it says, in this particular report, that the

09:11AM 5   environmental certificate was issued on July 11th 2012.

09:11AM 6        Do you see that, Mr. Adams?

09:11AM 7   A.   Yes.

09:11AM 8   Q.   And then going back, the certificate of occupancy, it says

09:11AM 9   that that was issued on September 12th 2012.

09:11AM 10       Do you see that, Mr. Adams?

09:11AM 11  A.   Yes.  Those dates actually, though, are the times that we

09:11AM 12  upload.  The certificate was actually issued before that.

09:11AM 13  Q.   Okay.  All right.  So we should look at the actual

09:11AM 14  certificates to find them?

09:12AM 15  A.   Same with the GFA certificate.  It was issued before the

09:12AM 16  date that is uploaded.

09:12AM 17  Q.   Okay.  Sounds good.

09:12AM 18       Let's flip to Tab F in the binder.

09:12AM 19       And Mr. Adams, when Moss goes in and remediates a home

09:12AM 20  prior to the remediation, in addition to doing the scope of

09:12AM 21  work documents, does Moss take photos of the home prior to the

09:12AM 22  remediation?

09:12AM 23  A.   Yes, we do.

09:12AM 24  Q.   Mr. Adams, if you can flip through -- I know, it's quite

09:12AM 25  extensive, If you can flip through the photos in Tab F and

09:12AM 1    identify those for the record, I would appreciate it, sir.

09:12AM 2    A.    These are the photos of the home at the time of the exact

09:12AM 3    documentation which was performed in December of 2011.

09:12AM 4    Q.    And that would be Ms. Hohne's home in Alabama?

09:12AM 5    A.    Yes, it is.

09:12AM 6    Q.    And these photos would come from Moss's file, sir?

09:12AM 7    A.    Yes.

09:12AM 8    Q.    And you provided those photographs to my office, sir?

09:12AM 9    A.    Yes.

09:12AM 10   Q.    Thank you.  Sir, let's skip to Tab G of Exhibit 1, and

09:13AM 11   explain for the record what this document is at Tab G of

09:13AM 12   Exhibit 1.

09:13AM 13   A.    After we performed an exact inspection and come up with

09:13AM 14   the scope, we put it out to bid.  We come up with a final cost

09:13AM 15   estimate, which is part of our funding request.

09:13AM 16   Q.    Okay.  So this would be part of Moss's file in connection

09:13AM 17   with the settlement remediation program, correct?

09:13AM 18   A.    That's correct.

09:13AM 19   Q.    Let's look at the next document, which is Tab H of

09:13AM 20   Exhibit 1.

09:13AM 21         Mr. Adams, are you familiar with this document?

09:13AM 22   A.    Yes, I am.

09:13AM 23   Q.    And what is this document, for the record, sir?

09:13AM 24   A.    This is a release that we send out along with the work

09:13AM 25   authorization to be executed by the homeowner, and then it's

09:13AM 1    forwarded to BrownGreer.

09:13AM 2    Q.   And if you look at the first paragraph of this document,

09:14AM 3    who is the name of the homeowner in this particular case?

09:14AM 4    A.   Rebecca Yarbrough.

09:14AM 5    Q.   Do you understand Rebecca Yarbrough to be one in the same

09:14AM 6    with Rebecca Hohne?

09:14AM 7    A.   Yes, I do.

09:14AM 8    Q.   And what is the address indicated on the release?

09:14AM 9    A.   1025 Little Sorrel Drive, Calera, Alabama.

09:14AM 10   Q.   Do you understand that to be the home at issue for this

09:14AM 11   evidentiary hearing?

09:14AM 12   A.   Yes.

09:14AM 13   Q.   Mr. Adams, let's go now to Tab I of Exhibit 1, and please

09:14AM 14   go ahead and explain this document for the record.

09:14AM 15   A.   This is an item that we use to send out as the official

09:14AM 16   move-out notice.  It's after we obtain permit funding and the

09:14AM 17   homeowner's selections.

09:14AM 18        It was sent out on May 1st 2012.  It tells the duration

09:14AM 19   of the remediation, the start date, and the finish date.

09:14AM 20   Q.   So the projected start date for Ms. Hohne's home was

09:15AM 21   June 19, 2012, Mr. Adams?

09:15AM 22   A.   That's correct.

09:15AM 23   Q.   The projected finish date was September 19th 2012,

09:15AM 24   Mr. Adams?

09:15AM 25   A.   That's correct.

09:15AM 1   Q.   Do you know if those dates were met by the actual

09:15AM 2   remediation?

09:15AM 3   A.   The actual certificate of occupancy was issued a month

09:15AM 4   earlier, which was August 22nd 2012.

09:15AM 5   Q.   So Moss was able to remediate Ms. Hohne's home pretty

09:15AM 6   quickly, correct?

09:15AM 7   A.   Yes.

09:15AM 8   Q.   And let's talk about the remediation process of

09:15AM 9   Ms. Hohne's home.

09:15AM 10       Mr. Adams, let's turn to Tab J of Exhibit 1, and why

09:15AM 11  don't you identify for the Court and for the record what that

09:15AM 12  photograph represents, sir?

09:15AM 13  A.   It's one of our milestone photos.  We obtained our first

09:15AM 14  milestone which releases funding to us when we have had the GFA

09:15AM 15  certificate.  And we provide a photo showing the home has been

09:15AM 16  completely cleaned.

09:15AM 17  Q.   And Mr. Adams, I think, just for completeness in the

09:16AM 18  record, Moss is not the only entity that takes photos of a home

09:16AM 19  to demonstrate that it's been clean, correct, sir?

09:16AM 20  A.   That's correct.

09:16AM 21  Q.   GFA, the environmental and certification company would

09:16AM 22  also take photographs of the home post-drywall removal and

09:16AM 23  prior to the new drywall and building components going in,

09:16AM 24  correct, sir?

09:16AM 25  A.   That is part of their inspection.

09:16AM 1    Q.   Let's turn to Exhibit O -- Tab O, I'm sorry, of Exhibit 1

09:16AM 2    in the binder.

09:16AM 3         That is a series of photographs, sir, and I think it's

09:16AM 4    ten different pictures.

09:16AM 5         There are numbers on the bottom of each, and for the

09:16AM 6    Court and for the record, sir, can you identify the ten

09:16AM 7    photographs of Exhibit O -- of Tab O to Exhibit 1, please, sir?

09:16AM 8    A.   I believe these are the photos taken by GFA during the

09:16AM 9    environmental inspection.

09:16AM 10   Q.   And sir, if you can look at Photographs 1, 2, 3, 4, 5, 6

09:17AM 11   -- 1 through 7, those photographs appear to me, sir, of a home

09:17AM 12   where the drywall has been removed; is that correct, sir?

09:17AM 13   A.   Yes, it is.

09:17AM 14   Q.   Where all of the insulation has been removed; is that

09:17AM 15   correct?

09:17AM 16   A.   Yes.

09:17AM 17   Q.   Where all of the electrical wiring has been removed; is

09:17AM 18   that correct, sir?

09:17AM 19   A.   Yes.

09:17AM 20   Q.   Where all dust and debris and screws associated with the

09:17AM 21   Chinese drywall have been removed; is that correct, sir?

09:17AM 22   A.   They look clean.

09:17AM 23   Q.   Sir, does Moss employ a treatment of the home after the

09:17AM 24   old drywall comes out and before the new drywall goes in, that

09:17AM 25   would have been done at or around the time that these photos

09:17AM 1    are taken?

09:17AM 2    A.    Yes.

09:17AM 3    Q.    And what is that treatment, sir?

09:17AM 4    A.    It's Odorox treatment.  It's by a company that is SGD,

09:18AM 5    which is sulfur gas destruction.

09:18AM 6          After the home is cleaned they bring in their Odorox

09:18AM 7    machines, which actually run for 24 hours.

09:18AM 8    Q.    And what is the purpose of running those machines in the

09:18AM 9    home after all of the old Chinese drywall is taken out and the

09:18AM 10   home is cleaned?

09:18AM 11   A.    They are actually oxygen-generating machines that actually

09:18AM 12   take all of the smells out of the home.

09:18AM 13   Q.    And Odorox, on this particular home, Ms. Hohne's home,

09:18AM 14   that would have been performed prior to GFA taking these photos

09:18AM 15   at Tab O?

09:18AM 16   A.    Yes.

09:18AM 17   Q.    Sir, if you look at page 8, of Tab O.  That is a

09:18AM 18   photograph of the outside of the home.

09:18AM 19          Do you see that, sir?

09:18AM 20   A.    Yes.

09:18AM 21   Q.    And can you identify for the record, if in fact that is a

09:18AM 22   photograph of Ms. Hohne's home from the outside?

09:18AM 23   A.    Yes, it is.

09:18AM 24   Q.    And sir, if you look at the photograph marked at No. 9 of

09:18AM 25   Tab O of the record, can you describe for the Court and for the

09:18AM 1   record, what that photograph represents, sir?

09:19AM 2   A.   This is the building permit issued to Moss & Associates

09:19AM 3   for Ms. Hohne's home.

09:19AM 4   Q.   And the date of that permit is what, sir?  Can you see

09:19AM 5   that?

09:19AM 6   A.   March 21st 2012.

09:19AM 7   Q.   And sir, look at the last photograph at Tab O, and if you

09:19AM 8   could, identify for the record what that photograph represents.

09:19AM 9   That would be on page 10 of Tab O.

09:19AM 10   A.   This is a picture that shows still no drywall installed.

09:19AM 11       We leave the panel in the home for temporary electric

09:19AM 12   to run the Odorox machines.

09:19AM 13       MR. MILLER:  Thank you, sir.

09:19AM 14   BY MR. MILLER:

09:19AM 15   Q.   Sir, when Moss removes Chinese drywall from a home under

09:20AM 16   the settlement program, does Moss maintain records of the

09:20AM 17   disposal of the Chinese drywall?

09:20AM 18   A.   Yes, we do.

09:20AM 19   Q.   If you could turn to Tab K of Exhibit 1, sir, and identify

09:20AM 20   what that document is, for the record?

09:20AM 21   A.   This is our drywall disposal form.  It shows the location

09:20AM 22   of the pickup from the dumpster.  It's the contents, the

09:20AM 23   Chinese drywall, and it tells what landfill it went to.

09:20AM 24   Q.   Okay.  Mr. Adams, can you focus the Court in on where, on

09:20AM 25   this document, it confirms that this is the disposal manifest

09:20AM 1    for the Chinese drywall from Ms. Hohne's home?

09:20AM 2    A.    There are three highlighted items on 6/21/2012, from

09:20AM 3    Little Sorrel Drive, and it must have been three dumpsters that

09:20AM 4    were disposed of.

09:20AM 5    Q.    And 1025 Little Sorrel Drive, that is Ms. Hohne's home,

09:21AM 6    correct?

09:21AM 7    A.    Yes.

09:21AM 8    Q.    Let's turn to Exhibit L -- I'm sorry, Tab L of Exhibit 1.

09:21AM 9    If you could, go ahead and identify that document for the

09:21AM 10   record.

09:21AM 11   A.    This is the contractor certification.

09:21AM 12   Q.    And what does that -- explain the purpose of that document

09:21AM 13   in the context of the process of the Chinese drywall

09:21AM 14   remediation of Ms. Hohne's home?

09:21AM 15   A.    This is a document executed by Moss & Associates that says

09:21AM 16   that we followed protocol.

09:21AM 17          We provide this to GFA when they come to do the

09:21AM 18   environment inspection.

09:21AM 19   Q.    This certifies that Moss removed all Chinese drywall,

09:21AM 20   including debris and dust, from the home, correct, sir?

09:21AM 21   A.    That's correct.

09:21AM 22   Q.    In fact, this document was signed by Moss?

09:21AM 23   A.    Yes, it was.

09:22AM 24   Q.    And certified to GFA that the home was ready for

09:22AM 25   inspection, correct, sir?

09:22AM 1    A.    That's correct.

09:22AM 2    Q.    Let's turn to Tab M of Exhibit 1.  And sir, are you

09:22AM 3    familiar with this document?

09:22AM 4    A.    Yes, I am.

09:22AM 5    Q.    What is it, sir?

09:22AM 6    A.    This is GFA's inspection report that they issued during

09:22AM 7    the day of the inspection.

09:22AM 8    Q.    Okay.  Maybe I will ask Mr. Ortner some questions about

09:22AM 9    that since that is his company's document.

09:22AM 10         Sir, it your understanding that Ms. Hohne's home passed

09:22AM 11   the GFA inspection?

09:22AM 12   A.    Yes, it did.

09:22AM 13   Q.    Let's turn to Tab N quickly, sir.

09:22AM 14         For the record, can you identify the document that is

09:22AM 15   set forth at Tab N of Exhibit 1?

09:22AM 16   A.    This is the actual environmental certification.

09:22AM 17   Q.    That would be the environmental certification issued by

09:22AM 18   GFA?

09:22AM 19   A.    Yes, following the inspection report.

09:22AM 20   Q.    And it's in reference to the Yarbrough residence at 1025

09:23AM 21   Little Sorrel Drive, Calera, Alabama?

09:23AM 22   A.    Yes, it is.

09:23AM 23   Q.    Sir, let's turn to Tab P of Exhibit 1, and it's another

09:23AM 24   photograph that indicates Yarbrough, 1025.

09:23AM 25         Do you see that, sir?

09:23AM 1    A.    Yes, I do.

09:23AM 2    Q.    Can you state for the record, sir, what this photograph

09:23AM 3    represents in the course of the Chinese drywall remediation at

09:23AM 4    Ms. Hohne's home?

09:23AM 5    A.    This is our second milestone photo.  When we have drywall

09:23AM 6    installed, we have to submit this for payment.

09:23AM 7    Q.    And do you know what kind of drywall was installed during

09:23AM 8    remediation of Ms. Hohne's home?

09:23AM 9    A.    Not specifically, no.

09:23AM 10   Q.    Not specifically from this photograph, correct, sir?

09:23AM 11   A.    No.

09:23AM 12   Q.    But it wasn't Chinese drywall, right?

09:23AM 13   A.    That's correct.

09:24AM 14   Q.    Moss made sure that it got its replacement drywall from

09:24AM 15   the United States, correct?

09:24AM 16   A.    Yes.

09:24AM 17   Q.    Sir, let's turn to Tab Q of Exhibit 1.

09:24AM 18         This is another Moss document from the Rebecca Hohne

09:24AM 19   home file.

09:24AM 20         If you could explain for the record, sir, what the

09:24AM 21   document is at Tab G of Exhibit 1?

09:24AM 22   A.    This is our homeowner punch list that we prepare at the

09:24AM 23   completion of the home.

09:24AM 24   Q.    What's the date of this punch list?

09:24AM 25   A.    August 22nd 2012.

09:24AM 1    Q.   And these punch list items that are set forth on the

09:24AM 2    issue, I see the first one relates to a ceiling fan and light.

09:24AM 3         Were these items fixed or taken care of by Moss?

09:24AM 4    A.   To the best of my knowledge, yes.

09:25AM 5    Q.   This punch list was created, sir, do you know how it is

09:25AM 6    created?  I mean, typically does a Moss representative and the

09:25AM 7    homeowner walk the home and set forth items on the punch list?

09:25AM 8    A.   Yes, we do.

09:25AM 9    Q.   Sir, let's turn to Tab R of Exhibit 1, and please explain,

09:25AM 10   for the record, what this document is?

09:25AM 11   A.   This is a copy of the certificate of occupancy issued by

09:25AM 12   the city in which the home was located.

09:25AM 13   Q.   And shows a certificate of occupancy; am I correct, sir?

09:25AM 14   It represents that a home that is either newly constructed or

09:25AM 15   been renovated is ready for occupancy by the owners of the home

09:25AM 16   again?

09:25AM 17   A.   That's correct.

09:25AM 18   Q.   It's certified as safe and ready for occupancy by the city

09:25AM 19   inspectors, correct?

09:25AM 20   A.   Yes.

09:25AM 21   Q.   Let's look at the next tab, Tab S of Exhibit 1.

09:25AM 22        And this is a document entitled "Homeowner Release of

09:26AM 23   Contract."

09:26AM 24        Do you see that, sir?

09:26AM 25   A.   That's correct.

09:26AM 1    Q.    Is that a document that Moss generates?

09:26AM 2    A.    Yes, we do.

09:26AM 3    Q.    And this was a document you obtained from your file, sir?

09:26AM 4    A.    Yes.

09:26AM 5    Q.    The name of the homeowner on this document is Rebecca

6    Yarbrough, sir?

09:26AM 7    A.    Yes.

09:26AM 8    Q.    It is dated August 29th 2012, sir?

09:26AM 9    A.    That's correct.

09:26AM 10   Q.    Sir, in your own words, what is the purpose of this

09:26AM 11   Homeowner Release of Contractor document?

09:26AM 12   A.    It's basically stating that the home has been completed,

09:26AM 13   except for the punch items listed previously.

09:26AM 14   Q.    And effectively, is the homeowner releasing Moss from any

09:26AM 15   liability in connection with the renovation of the home?

09:26AM 16   A.    Yes.

09:26AM 17   Q.    That's the purpose of the document, correct?

09:26AM 18   A.    That's correct.

09:26AM 19   Q.    Okay.  Sir, so it looks like Moss finished the remediation

09:26AM 20   on or about the end of August of 2012, correct?

09:26AM 21   A.    That's correct.

09:26AM 22   Q.    And I'm going to direct your attention to Tab T of

09:27AM 23   Exhibit 1, sir, because it's my understanding for about nine or

09:27AM 24   ten months you didn't hear anything about what we refer to now

09:27AM 25   as the Hohne home, correct?

09:27AM   1    A.    That's correct.

09:27AM   2    Q.    That would be fairly typical after Moss remediates a home,

09:27AM   3    you typically don't hear back from the homeowner or homeowner's

09:27AM   4    lawyer, correct?

09:27AM   5    A.    That's correct.

09:27AM   6    Q.    But in this particular case, did you hear back from

09:27AM   7    Ms. Hohne's lawyer?

09:27AM   8    A.    Yes, we did.

09:27AM   9    Q.    Is that communication, when you heard back from

09:27AM  10    Ms. Hohne's lawyer, set forth at Tab T?

09:27AM  11    A.    Yes, it is.

09:27AM  12    Q.    What is this document, sir?

09:27AM  13    A.    It's a copy of an e-mail that was sent to us on June 3rd,

09:27AM  14    2013, by Mr. Hoaglund.

09:27AM  15    Q.    And do you know who Mr. Hoaglund is?

09:27AM  16    A.    Yes.  He was the homeowner's counsel.

09:27AM  17    Q.    Yeah.  I take it that Zach Tapley is someone at Moss?

09:27AM  18    A.    He was our project engineer in charge of the Alabama

09:28AM  19    remediations.

09:28AM  20    Q.    Okay.  And the document states, "I have one client who

09:28AM  21    believes that after the remediation her home is still suffering

09:28AM  22    from Chinese drywall symptoms."

09:28AM  23          Do you see that, sir?

09:28AM  24    A.    Yes, I do.

09:28AM  25    Q.    And it says, "Have had any similar issues with any homes."

09:28AM 1        Do you see that, sir?

09:28AM 2  A.    Yes.

09:28AM 3  Q.    It says, "Would Moss investigate.  Please call to

09:28AM 4  discuss."

09:28AM 5        Do you see that, sir?

09:28AM 6  A.    Yes.

09:28AM 7  Q.    After you got this request from Ms. Hohne's lawyer, and

09:28AM 8  when I say you, I mean Moss, after Moss got this request from

09:28AM 9  Ms. Hohne's lawyer, did Moss do any followup?

09:28AM 10 A.    Yes.  A Moss representative, along with Ms. Hohne's

09:28AM 11 counsel went to the home.

09:28AM 12 Q.    And what did Moss observe?

09:28AM 13       You would have went to -- Moss would have went to the

09:28AM 14 home in the summer of 2013, almost a year after the remediation

09:28AM 15 is complete?

09:28AM 16 A.    According to the e-mail, it was June 7th 2013.

09:28AM 17 Q.    Okay.  You are referring to the second e-mail at Tab T,

09:28AM 18 sir?

09:29AM 19 A.    Yes.

09:29AM 20 Q.    And so you received the request on June 3rd to go back to

09:29AM 21 the home; is that right, sir?

09:29AM 22 A.    Yes.

09:29AM 23 Q.    And Moss, in fact, went back on June 7th; is that correct,

09:29AM 24 sir?

09:29AM 25 A.    That's correct.

09:29AM 1    Q.    What did Moss observe at the Hohne home on June 7th 2013,

09:29AM 2    in response to the inquiry from Ms. Hohne's lawyer?

09:29AM 3    A.    I can only refer to the e-mail that is in the binder.

09:29AM 4    Q.    What does the e-mail say, sir?

09:29AM 5    A.    It said they took out receptacles, checked plumbing lines,

09:29AM 6    opened a coil to check for tarnish and found none.

09:29AM 7    Q.    Why would you look for tarnish on the air-conditioning

09:29AM 8    coil.  What is that a sign of, sir?

09:29AM 9    A.    Typically copper is affected by Chinese drywall.  It will

09:29AM 10   either turn black, or actually have some type of residue on it.

09:29AM 11   Q.    Sir, would you -- I mean, Your Honor has heard for six

09:29AM 12   years now the symptoms associated with Chinese drywall.

09:29AM 13          Is blackening of the coil the most telltale of the

09:29AM 14   symptoms if you are looking for Chinese drywall?

09:30AM 15   A.    Yes, it is.

09:30AM 16   Q.    That would be because of the environment that the coil is

09:30AM 17   in, sir?

09:30AM 18   A.    Yes.

09:30AM 19   Q.    The fact that the coil is in the south, in Alabama,

09:30AM 20   Louisiana, Florida, the HVAC is under regular use, correct,

09:30AM 21   sir?

09:30AM 22   A.    That's correct.

09:30AM 23   Q.    And the coil is typically exposed to a moist environment,

09:30AM 24   correct?

09:30AM 25   A.    Yes.

09:30AM 1    Q.    Is it your understanding, sir, that that particular

09:30AM 2    environment, if in fact there is Chinese drywall, would be the

09:30AM 3    place where the reaction shows up first?

09:30AM 4    A.    Yes.

09:30AM 5    Q.    And shows up most drastically?

09:30AM 6    A.    Yes.

09:30AM 7    Q.    Sir, have you seen, in the course of your work on Chinese

09:30AM 8    drywall, lots of black air-conditioning coils?

09:30AM 9    A.    Hundreds, if not thousands.

09:30AM 10   Q.    And sir, would it be correct to say that is the telltale

09:30AM 11   sign of whether or not your home contains reactive Chinese

09:30AM 12   drywall?

09:30AM 13   A.    Yes, it is.

09:30AM 14   Q.    And your man, back in June of 2013, looked at the coil,

09:30AM 15   correct, sir?

09:30AM 16   A.    That's correct.

09:30AM 17   Q.    And it was shiny copper, correct, sir?

09:30AM 18   A.    Yes.

09:30AM 19   Q.    Okay.  Now after your man went out there on June 7th 2013,

09:31AM 20   when is the next time did Moss hear about Ms. Hohne's home?

09:31AM 21   A.    Next time I heard about it was either in July or August of

09:31AM 22   this year, here in Court.

09:31AM 23   Q.    In Court.  Okay, sir, in connection with hearing about

09:31AM 24   Ms. Hohne's issues in 2015, did Moss do a followup

09:31AM 25   investigation?

09:31AM 1    A.    Yes, we did.

09:31AM 2    Q.    And sir, what did Moss do?

09:31AM 3    A.    Moss visited the home with GFA on August 4th, of this

09:31AM 4    year.

09:31AM 5    Q.    Sir, did you personally visit that home?

09:31AM 6    A.    Yes, I did.

09:31AM 7    Q.    Sir, let's turn to Tab V of Exhibit 1.  And if you could

09:31AM 8    explain, for the record, what these photos are at Tab V of

09:31AM 9    Exhibit 1?

09:32AM 10   A.    These are the photos taken at the time of our inspection

09:32AM 11   on August 4th.

09:32AM 12   Q.    And so there are page numbers at the bottom.

09:32AM 13         Do you see that, sir?

09:32AM 14   A.    Yes, I do.

09:32AM 15   Q.    Let's turn to page 3 of Tab V.  Are you with me, sir?

09:32AM 16   A.    Yes.

09:32AM 17   Q.    What does that page indicate?

09:32AM 18   A.    It shows ground wires that have shiny copper.

09:32AM 19   Q.    So those ground wires are not showing any signs of Chinese

09:32AM 20   drywall?

09:32AM 21   A.    No.

09:32AM 22   Q.    What about page 4, sir?

09:32AM 23   A.    Page 4 shows a receptacle that had been taken out of the

09:32AM 24   wall and two holes that had been cut in the wall.

09:32AM 25   Q.    Sir, let's flip to Tab 7.  That is a clearer photograph.

09:32AM 1                Explain, for the record, what is depicted here at

09:32AM 2      Tab 7 -- page 7 -- I'm sorry, of Tab V.

09:32AM 3      A.    This is the top of the hot water heater.  The copper

09:33AM 4      supply lines are bright and shiny.

09:33AM 5      Q.    Sir, in your experience, visiting hundreds of Chinese

09:33AM 6      drywall homes over the years, when you have a Chinese drywall

09:33AM 7      home, do you typically find these copper supply lines to be

09:33AM 8      blackened and tarnished?

09:33AM 9      A.    Correct.

09:33AM 10     Q.    So let me ask you this:  When you were at the Hohne home

09:33AM 11     in August of 2014, did you observe any odors at all?

09:33AM 12     A.    No.

09:33AM 13     Q.    Did you observe any odors consistent with Chinese drywall

09:33AM 14     odors?

09:33AM 15     A.    No.

09:33AM 16     Q.    Sir, based upon your inspection and visits of hundreds of

09:33AM 17     homes containing Chinese drywall over the last several years,

09:33AM 18     are you familiar with the odor that has been associated with

09:33AM 19     Chinese drywall homes?

09:33AM 20     A.    Very much so.

09:33AM 21     Q.    Did this home have any odor like the homes that you

09:33AM 22     visited with Chinese drywall that, in fact, had the odors?

09:33AM 23     A.    No.

09:33AM 24     Q.    Sir, let's turn to page 9 of Tab V, Exhibit 1.

09:34AM 25                If you could explain, for the record, what the photo at

09:34AM 1    page 9 of Tab V depicts?

09:34AM 2    A.    This is a photo of the air-conditioning coil that was

09:34AM 3    taken on the day of the inspection, August 4th.

09:34AM 4         The air handler was located in the attic area.

09:34AM 5    Q.    Sir, does this picture or exhibit show any signs of

09:34AM 6    corrosion or blackening that would be associated with exposure

09:34AM 7    to Chinese drywall?

09:34AM 8    A.    No, it does not.

09:34AM 9    Q.    Let's look at the next page of the tab, tab -- page 10 of

09:34AM 10   Tab V.

09:34AM 11        What is depicted in that photograph, sir?

09:34AM 12   A.    This is a picture of a receptacle that had been pulled

09:34AM 13   out.  I believe this is also in the attic area, since there is

09:35AM 14   exposed wire, that shows the copper ground wires are still

09:35AM 15   bright and shiny.

09:35AM 16   Q.    Okay.  Over the course of your work on the Chinese Drywall

09:35AM 17   Repair Program, have you seen thousands of copper ground wires

09:35AM 18   in homes?

09:35AM 19   A.    Yes.

09:35AM 20   Q.    Sir, is it true that when you have a lot of Chinese

09:35AM 21   drywall in the home, and typically if the electrical box was

09:35AM 22   located on a wall where there was Chinese drywall -- reactive

09:35AM 23   Chinese drywall -- the shiny ground wires that you see in this

09:35AM 24   picture would be blackened or tarnished?

09:35AM 25   A.    Yes, they would.

09:35AM 1    Q.    These don't show any blackening or tarnishing, do they,
09:35AM 2    sir?
09:35AM 3    A.    No, they do not.
09:35AM 4    Q.    Sir, turning to page 12, Tab V, and if you could explain
09:35AM 5    what that photograph depicts, for the record?
09:35AM 6    A.    This is the inside of the main panel box.  It is located
09:35AM 7    in the utility room.
09:35AM 8          Again, it shows bright and shiny ground wires.
09:36AM 9    Q.    Sir, when you visited the home in August of 2015, that was
09:36AM 10   a hot day, was that not, sir?
09:36AM 11   A.    Yes, it was.
09:36AM 12   Q.    And when you entered the home, had it been
09:36AM 13   air-conditioned?
09:36AM 14   A.    No.
09:36AM 15   Q.    The home was hot?
09:36AM 16   A.    Yes, it was.
09:36AM 17   Q.    And sir, is it your experience that odors associated with
09:36AM 18   Chinese drywall are exacerbated if a home has been closed up in
09:36AM 19   the summertime?
09:36AM 20   A.    Yes.
09:36AM 21   Q.    And even with that phenomenon, sir, is it true that you
09:36AM 22   did not observe or smell any Chinese drywall odors in the Hohne
09:36AM 23   home in August of 2015?
09:36AM 24   A.    That's correct.
09:36AM 25   Q.    Sir, turning to page 13 and 14, if you would of Tab V.

09:36AM 1    A.    Yes.

09:36AM 2    Q.    And just identify it, for the record, what pages 13 and 14

09:36AM 3    represent, just so we're clear.

09:36AM 4    A.    Typically from my files, I take a picture of the address

09:36AM 5    of the home, which in this case, it was located on the mailbox,

09:37AM 6    and then a picture of the front of the home.

09:37AM 7    Q.    And is that in fact the home owned by Ms. Hohne in

09:37AM 8    Alabama?

09:37AM 9    A.    Yes, it is.

09:37AM 10   Q.    Now Mr. Adams, when you were there in March, I think, you

09:37AM 11   testified that you were there along with Mr. Ortner from GFA?

09:37AM 12   A.    I was there in August.

09:37AM 13   Q.    August -- I'm sorry, August of 2014?

09:37AM 14   A.    That's correct.

09:37AM 15   Q.    Mr. Ortner accompanied you on the trip?

09:37AM 16   A.    Yes, he did.

09:37AM 17   Q.    I think Mr. Rene Marino, from my office, also accompanied

09:37AM 18   you on the trip?

09:37AM 19   A.    Yes, he was there, also.

09:37AM 20   Q.    So Mr. Marino and Mr. Ortner also took photographs of what

09:37AM 21   you all observed during the inspection of the Hohne home in

09:37AM 22   August of 2015?

09:37AM 23   A.    Yes, they did.

09:37AM 24   Q.    Mr. Adams, I'm going to ask you to turn to Tab X of

09:38AM 25   Exhibit 1.  I think these would be photos that either

09:38AM 1    Mr. Marino or Mr. Ortner took.

09:38AM 2         Is that your understanding, sir?

09:38AM 3    A.   Yes, they are.

09:38AM 4    Q.   If you were, again, at least some of the pages are

09:38AM 5    numbered at the bottom -- maybe they got cut off -- but if you

09:38AM 6    were to flip to -- it's easier to do this, sir, if you start at

09:38AM 7    the back.  Do you see this page 24 at the end?

09:38AM 8    A.   Yes.

09:38AM 9    Q.   So if you flip forward from the back, go to page 19.

09:38AM 10   A.   Yes.

09:38AM 11   Q.   And if you would, sir, please identify for the record what

09:38AM 12   is depicted at page 19 of Tab X?

09:38AM 13   A.   This is a photo taken in the attic that shows the back

09:38AM 14   side of the board that was installed.

09:38AM 15   Q.   This would be in the attic of Ms. Hohne's home that you

09:38AM 16   guys saw when you were there in August of 2014?

09:38AM 17   A.   Yes.

09:38AM 18   Q.   And there is a label or a brand.  What does that

09:38AM 19   particular label or brand indicate on page 9 of Tab X?

09:39AM 20   A.   It has "USA" listed on it.

09:39AM 21   Q.   Does that refresh your recollection of, at least in terms

09:39AM 22   of the drywall boards that you were able to see when you were

09:39AM 23   there in August of 2015, where the boards came from and who the

09:39AM 24   manufacturer was?

09:39AM 25   A.   I do not know who the manufacturer was, specifically.

09:39AM 1    Q.    But does the "USA" indicate that the drywall came from the

09:39AM 2    United States?

09:39AM 3    A.    Yes, it does.

09:39AM 4    Q.    Sir, has Moss remediated other homes in this neighborhood

09:39AM 5    in Alabama that Ms. Hohne lives in?

09:39AM 6    A.    Many.

09:39AM 7    Q.    Did you get any post-remediation odor complaints from any

09:39AM 8    of those homes?

09:39AM 9    A.    No, we did not.

09:39AM 10   Q.    In terms of homes that from properly cleaned and properly

09:40AM 11   certified under the remediation program, 2700 of them, I think

09:40AM 12   you said, have you had any issues where, after proper cleaning

09:40AM 13   and after proper remediation, the home experience odors that

09:40AM 14   were actually caused by cross-contamination or residual odors

09:40AM 15   from Chinese drywall that were in the home prior to the

09:40AM 16   renovation by Moss?

09:40AM 17   A.    No.

09:40AM 18   Q.    Sir, we looked earlier during your testimony, it was at

09:40AM 19   the very beginning -- I think it was Tab B of the CPSC

09:40AM 20   remediation guidelines.

09:40AM 21         Why don't you turn back to Tab B, sir.

09:41AM 22         In your role as a project manager for the Chinese

09:41AM 23   drywall repairs at Moss, have you kept yourself familiar with

09:41AM 24   and abreast of CPSC remediation protocols?

09:41AM 25   A.    Yes, I have.

09:41AM 1    Q.    Let me draw your attention to page 3 of Tab B in the CPSC

09:41AM 2    remediation document.

09:41AM 3          And at the bottom of page 3, there is a section heading

09:41AM 4    called, "Other Building Materials and Contents."

09:41AM 5          Do you see that section heading, sir?

09:41AM 6    A.    Yes, I do.

09:41AM 7    Q.    I'm going to read it, for the record, and then ask you

09:41AM 8    couple of questions about it.

09:41AM 9          It states, and I quote:  "Underlying the CPSC and HUD

09:41AM 10   staff's recommendations is the view that removal of the source

09:41AM 11   material, i.e., the problem drywall will eliminate the cause of

09:41AM 12   the corrosive environment."

09:41AM 13         Do you see that, sir?

09:41AM 14   A.    Yes, I do.

09:41AM 15   Q.    Do you agree with that statement based upon your

09:42AM 16   experience in remediating 2700 homes?

09:42AM 17   A.    Yes.

09:42AM 18   Q.    The next sentence states, and I quote:  "Staffs of CPSC

09:42AM 19   and HUD do not have a scientific basis to believe that

09:42AM 20   emissions from the problem drywall require replacement of

09:42AM 21   non-problem drywall, wood studs, flooring, cabinetry,

09:42AM 22   insulation, or other household components and fixtures that may

09:42AM 23   have been exposed to the drywall emissions."

09:42AM 24         Do you see that statement, sir?

09:42AM 25   A.    I do.

09:42AM 1   Q.   And sir, do you agree with that statement, based upon your

09:42AM 2   own experience and your company's experience as a program

09:42AM 3   contractor in this case?

09:42AM 4   A.   In the protocol, we removed some of these items.

09:42AM 5   Q.   I understand your protocol actually removed some of these

09:42AM 6   items, but you have never experienced, and you would agree with

09:42AM 7   the statement, there is no cross-contamination from the studs,

09:42AM 8   for example?

09:42AM 9   A.   That's correct.

09:42AM 10  Q.   Let's focus on the studs, because I think the pictures of

09:42AM 11  Ms. Hohne's home indicates that that was all that was left,

09:42AM 12  correct, sir?

09:42AM 13  A.   Wood framing, yes.

09:43AM 14  Q.   After Moss did its demolition, you took everything out

09:43AM 15  except for the slab and wood framing, correct, sir?

09:43AM 16  A.   That's correct.

09:43AM 17  Q.   And you are not aware of wood framing -- it's clean, it's

09:43AM 18  dusted, and subject to Odorox, ever then emitting Chinese

09:43AM 19  drywall odors, and I guess it would have purportedly would have

09:43AM 20  absorbed while the Chinese drywall was attached to it, after

09:43AM 21  the Chinese drywall was removed and when the new USA drywall

09:43AM 22  was put in?

09:43AM 23  A.   That's correct.

09:43AM 24       MR. MILLER:  Give my one second, Your Honor.  I think

09:43AM 25  I'm done.

09:43AM 1        No further questions for this witness.

09:43AM 2        We tender him to Ms. Hohne.

09:43AM 3        THE COURT:  Do you have questions of the witness,

09:43AM 4  ma'am?

09:43AM 5        MS. HOHNE:  I do.

09:43AM 6        MR. MILLER:  Of course, Your Honor, if you would like

09:43AM 7  to ask the witness any questions, feel free to do so.

8

09:43AM 9                    CROSS-EXAMINATION

09:43AM 10 BY MS. HOHNE:

09:44AM 11 Q.   Your Honor, Rebecca Hohne.  And I just recently right

09:44AM 12 before we got started, got all of these documents, so I have

09:44AM 13 been trying to look over them as quick as possible.

09:44AM 14      Mr. Adams, how long have you worked at Moss?

09:44AM 15 A.   Nine years.

09:44AM 16 Q.   Nine years, okay.  So you have been there through the

09:44AM 17 whole time, through the whole Chinese drywall?

09:44AM 18 A.   That's correct.

09:44AM 19 Q.   Okay.  Can you tell me who designed the remediation

09:44AM 20 protocol?

09:44AM 21 A.   It was various people in the early stages of the program.

09:44AM 22 Q.   Could you tell me who they are and their qualifications?

09:44AM 23 A.   No, not exactly, no.

09:44AM 24 Q.   Okay.  Do you have any idea who had anything to do --

09:44AM 25 because you are in construction, so I'm asking you if y'all

09:44AM 1    talked with them or did y'all go over the Moss Construction

09:44AM 2    Company -- go over the whole protocol?

09:44AM 3    A.    We discussed it after it actually was created.

09:45AM 4    Q.    You discussed it with the experts who designed it?

09:45AM 5    A.    No.

09:45AM 6    Q.    No.

09:45AM 7    A.    The Courts.

09:45AM 8    Q.    Who did you discuss it?

09:45AM 9    A.    With the Courts.

09:45AM 10   Q.    With the Court's, okay.

09:45AM 11        Is there any way I can find out who the experts were?

09:45AM 12        THE COURT:  I can explain what happened.

09:45AM 13        In the early stages of this case, I did not know, and

09:45AM 14   there was no evidence as to what needed to be done to remediate

09:45AM 15   the matter.

09:45AM 16        So I had a number of trials in which various witnesses

09:45AM 17   testified, some experts for each side, and as a result of that

09:45AM 18   testimony, I drew on the evidence and designed the protocol

09:45AM 19   that was consistent with the testimony that I heard.

09:45AM 20        I then instructed Knauf to take the protocol and

09:46AM 21   utilize it in remediating a small number of homes to see

09:46AM 22   whether or not this protocol actually was functional and able

09:46AM 23   to be done.

09:46AM 24        They did it and applied it to a number of homes, and

09:46AM 25   some of the aspects of it had to be tweaked because

09:46AM 1    theoretically, it worked, but practically, it didn't.

09:46AM 2    Generally speaking, more was done as a result of the actual

09:46AM 3    application of the protocol.

09:46AM 4         Once we had four or five or six homes remediated with

09:46AM 5    that protocol, then it seemed to me to be able to monetized.

09:46AM 6         So I asked the parties for both sides to get together

09:46AM 7    to see whether or not some settlement could be worked out

09:47AM 8    involving the remediation consistent with the protocol.

09:47AM 9         They eventually worked out a settlement based on the

09:47AM 10   protocol and applied the protocol to remediate the homes, and

09:47AM 11   that's what was done and how it came about.

09:47AM 12   BY MS. HOHNE:

09:47AM 13   Q.   Okay.  So you said it was done on, like, four or five or

09:47AM 14   six homes and then it had to be tweaked a little bit, so

09:47AM 15   whatever didn't work may be -- in some of the few homes they

09:47AM 16   ended up with maybe sort of started construction over again.

09:47AM 17        Is that what you are saying?

09:47AM 18        THE COURT:  No.  They have used it now on some 2700

09:47AM 19   homes.

09:47AM 20        MS. HOHNE:  Okay.  So maybe something similar to, like,

09:47AM 21   the pilot program; is that right?

09:47AM 22        Weren't there pilot programs on the 300 houses?

09:47AM 23        THE COURT:  There was a pilot program to work on

09:48AM 24   protocol, and the protocol came out of that pilot program, as

09:48AM 25   well as the other evidence that I heard.

09:48AM 1          MS. HOHNE:  Yes, sir.

09:48AM 2     BY MS. HOHNE:

09:48AM 3     Q.   Mr. Adams, was my house part of that pilot program?

09:48AM 4     A.   I do not know.

09:48AM 5          MS. HOHNE:  Okay.  Well, I will say to say to the Court

09:48AM 6     that my house was part of the first 300 homes that was in the

09:48AM 7     pilot program.

        8     BY MS. HOHNE:

09:48AM 9     Q.   What was the pilot program designed for, would you say?

09:48AM 10    A.   The protocol for the pilot program was very, very similar

09:48AM 11    to the final settlement protocol.

09:48AM 12         There were minimal, minimal differences.

        13    Q.   Okay.

09:48AM 14    A.   One of the differences were, in pilot program, we had to

09:48AM 15    replace the air conditioning coil only.  When it went to the

09:48AM 16    final settlement protocol, we replaced the entire air handler.

09:48AM 17         The first protocol pilot program, it was inspection of

09:48AM 18    appliances, and it was not replacement of the appliances.

09:48AM 19         In the final settlement protocol, it went to

09:48AM 20    replacement of certain appliances.

09:48AM 21         That's basically the only changes that were done.

09:49AM 22    Q.   Okay.  So what changes were done with my house?

09:49AM 23         Like, how is my house different, because it was part of

09:49AM 24    pilot program, would you say than the rest of the 2700 houses

09:49AM 25    -- or sorry, 2400.

09:49AM 1    A.    I mentioned earlier that the air conditioning coil was

09:49AM 2    part of the protocol.

09:49AM 3         But in many cases, it was easier and more economical to

09:49AM 4    replace the entire air handler.  That's why it went in the

09:49AM 5    final settlement protocol.

09:49AM 6         So I don't know if yours was just the coil or the

09:49AM 7    complete air handler itself.

09:49AM 8         And any appliance was affected was replaced.

09:49AM 9    Q.    Okay.  Was there scientific -- did they use scientific

09:49AM 10   evidence with the whole protocol, like, who designed it -- the

09:49AM 11   experts?

09:49AM 12   A.    I don't know.

09:49AM 13        MR. HOHNE:  Knauf -- do you know if your side did that?

09:49AM 14        MR. MILLER:  I think it's what Judge Fallon said.

09:49AM 15        I mean, there were trials -- I don't know, a dozen of

09:49AM 16   experts testified at the various trials, and we took the output

09:50AM 17   from those trials, and we commenced settlement discussions,

09:50AM 18   Knauf and the Plaintiff Steering Committee.

09:50AM 19        We had our experts present at the discussion and the

09:50AM 20   output of that was the remediation protocol.

09:50AM 21        MS. HOHNE:  Okay.

09:50AM 22   BY MS. HOHNE:

09:50AM 23   Q.    All right.  And is there certain houses that were

09:50AM 24   something called document houses where you kind of took more

09:50AM 25   information or took evidence of -- I might be using the wrong

09:50AM  1    verbiage, it might not be a document house, but a type of house

09:50AM  2    where you documented every piece of drywall that came out of

09:50AM  3    there?

09:50AM  4    A.    There were cases of that, yes.

09:50AM  5    Q.    What was it called?

09:50AM  6    A.    That was actually similar to, like, an Environ 5.  It was

09:50AM  7    a documentation of the board that came out of the home.  It was

09:50AM  8    not Moss that did that.

09:50AM  9    Q.    Oh, it wasn't?

09:50AM 10    A.    No.

09:50AM 11    Q.    Okay.

09:50AM 12    A.    If it was chose to be done, it was by another party.

09:51AM 13    Q.    Do you know who that party is?

09:51AM 14    A.    No.

09:51AM 15    Q.    You don't know who that is?

09:51AM 16    A.    No.  And I don't know if your home was done that way.

09:51AM 17    Q.    Okay.  I was told that it was.  That's why I was just

09:51AM 18    asking.  I thought that is what Moss --

09:51AM 19    A.    I have no documentation for that.

09:51AM 20    Q.    -- was part of that.

09:51AM 21          Okay.  All right.  Was it ever brought to your

09:51AM 22    attention that the copper was turning, shortly after it was put

09:51AM 23    up on the wood in the houses, by anyone in the construction

09:51AM 24    industry?

09:51AM 25    A.    No.

09:51AM 1    Q.   So you are saying that no one at Moss was notified that

09:51AM 2    the electrical wiring, the copper electrical wiring in the

09:51AM 3    home, was starting to turn and show signs of what, you know,

09:51AM 4    like Mr. Kerry said, the telltale signs of Chinese drywall, by

09:51AM 5    turning dark?

09:51AM 6    A.   I don't believe so.

09:51AM 7    Q.   Okay.  And is there any kind of protocol set up where if

09:52AM 8    someone did want to come to the Moss representatives, to the

09:52AM 9    head over the whole construction part of it, was there

09:52AM 10   protocol set up where they would follow up for that?

09:52AM 11   A.   Yes.  If we received information from either a homeowner

09:52AM 12   or from their counsel, we responded to it.

09:52AM 13   Q.   Okay.  I'm not talking about counsel.  I'm talking about,

09:52AM 14   like, someone who is actually doing the construction work, so

09:52AM 15   one of the workers who has hands-on experience, who was out

09:52AM 16   there putting wire, like an electrician or something like that.

09:52AM 17   A.   I don't know what you are referring to.

09:52AM 18   Q.   Okay.  An electrician, they are the ones that puts up the

09:52AM 19   wiring in the house?

09:52AM 20   A.   Right.

09:52AM 21   Q.   They attach the wiring to the two by fours --

        22   A.   Correct.

09:52AM 23   Q.   -- the framing of the house.

09:52AM 24   A.   Right.

09:52AM 25   Q.   If they noticed shortly after that they had put the wiring

09:52AM  1    up to the house, and they notified your office, or if they

09:52AM  2    wanted to notify your office, was there any type of protocol or

09:53AM  3    anything set up for that to let Moss know that this

09:53AM  4    construction -- like, the remediation isn't working?

09:53AM  5    A.   I'm in charge of the remediation at Moss.  I would have

09:53AM  6    known about it, and I do not know that.

09:53AM  7    Q.   So there is no type of protocol set up; is that what you

09:53AM  8    are saying?

09:53AM  9    A.   No.

09:53AM  10   Q.   Okay.

09:53AM  11        THE COURT:  Are you saying there is no protocol, or are

09:53AM  12   you saying you weren't notified?

09:53AM  13        THE WITNESS:  Both.

09:53AM  14   BY MS. HOHNE:

09:53AM  15   Q.   Okay.  In my house, you saw pictures of my house, and

09:53AM  16   everything was taken out.

09:53AM  17        I will have to look at the pictures again.  And it was

09:53AM  18   clear there was nothing in there.  Did you guys -- did Moss

09:53AM  19   replace my cabinets with new cabinets?

09:53AM  20   A.   Typically, no.

09:53AM  21   Q.   Okay.

09:53AM  22   A.   That is not part of the protocol.

09:54AM  23   Q.   Wasn't it in the *Germano* case, wasn't it ordered that

09:54AM  24   cabinets be replaced --

         25   A.   I don't know.

09:54AM 1   Q.   --in 2010?

09:54AM 2   A.   It's not part of the remediation protocol from the

09:54AM 3   settlement program.

09:54AM 4   Q.   Okay.  On Tab C, I think you have that booklet there.

09:54AM 5   That is from the MZA Florida?

09:54AM 6   A.   That's correct.

09:54AM 7   Q.   If you flip toward the back -- I don't think the pages

09:54AM 8   aren't really numbered on here, but if you flip toward the

09:54AM 9   back, it shows the wiring and the coil.

09:54AM 10          And if you can flip on the very last page on Section C,

09:55AM 11   what does that say there under the picture?

09:55AM 12   A.   What does it say?

09:55AM 13   Q.   Yes, sir.

09:55AM 14   A.   It says, "HVAC - coated coils - no blackening."

09:55AM 15   Q.   Why is that?  Do you know what that is?

09:55AM 16   A.   Why is what?

09:55AM 17   Q.   Why is the -- why is there no blackening from the coated

09:55AM 18   coils; do you know?

09:55AM 19   A.   Because the coils had been coated.  This is probably a

09:55AM 20   replacement coil.

09:55AM 21   Q.   Right.  And the coils -- the new coils that you put in the

09:55AM 22   new homes, were those coated coils as well?

09:55AM 23   A.   No, they were not.

09:55AM 24   Q.   Because I told my coil was a coated coil in my house.

09:55AM 25   A.   The photos that we looked at -- those were in August --

09:55AM 1    those were not coated coils.

09:55AM 2    Q.   Okay.  I told it was.

09:55AM 3    A.   Okay.

09:55AM 4    Q.   Okay.  If you flip back a few pages, it talked about in

09:56AM 5    the report, and I didn't -- I'm sorry, I hadn't read over all

09:56AM 6    of this real quick, I just looked over it briefly -- but it

09:56AM 7    talked about how the light fixtures -- how the light fixtures

09:56AM 8    -- because there was a lot in the ceiling at the house.

09:56AM 9         So the lights, they were really corroded from the MZA

09:56AM 10   inspection.

09:56AM 11        When y'all came out to my house in August of 2015, how

09:56AM 12   many light fixtures did y'all look at?  How many wiring did

09:56AM 13   y'all pull out?

09:56AM 14   A.   When we came out when?

09:56AM 15   Q.   When you came out in August to look at the house, to look

09:56AM 16   and y'all looked, and walked around the house?

09:56AM 17   A.   I don't believe we looked at any light fixtures.

09:56AM 18   Q.   You didn't look at any light fixtures to see the copper on

09:56AM 19   the wiring?

09:57AM 20   A.   (Witness shakes head.)

21   Q.   Okay.

22        THE COURT REPORTER:  Your answer?

09:57AM 23        THE WITNESS:  Pardon.  I don't think we looked at any

09:57AM 24   light fixtures.

09:57AM 25   BY MS. HOHNE:

09:57AM 1    Q.    If you look at Tab O on page 6, take a look at that.

09:57AM 2          First, do you notice that there is some white on the

09:57AM 3    floor there, in the foyer tile, which looked like dust?

09:57AM 4    A.    Okay.

09:57AM 5    Q.    Do you see that?

09:57AM 6    A.    I see something, yes.

09:57AM 7    Q.    What -- does that appear to be dust to you?

09:57AM 8    A.    I don't know.  I don't know what it is.

09:57AM 9    Q.    What color of dust or what color typically does the

09:57AM 10   drywall -- just in general drywall, when you have dust from it,

09:58AM 11   what color is it, typically?

09:58AM 12   A.    It's white.

09:58AM 13   Q.    Right.  And what color is that on the floor right there

09:58AM 14   that you can tell?

09:58AM 15   A.    It's a grayish white.

09:58AM 16   Q.    Okay.  And what is the -- I know we had talked about this

09:58AM 17   -- what is the purpose of the Odorox machine, again?

09:58AM 18   A.    Odorox is like -- it's actually after the home has been

09:58AM 19   closed up, it's an oxygen-generating machine that takes out all

09:58AM 20   odors.  They use it a lot in morgues, crime scenes.

09:58AM 21   Q.    Uh-huh.  Okay.  There is documented scientific proof that

09:58AM 22   it takes out sulfides?

09:58AM 23   A.    Yes.  I believe so, yes.

09:58AM 24   Q.    Okay.  Because I was told that it wasn't.

09:59AM 25         MS. HOHNE:  Let me ask you this:  Your Honor, can I

09:59AM 1    approach?

09:59AM 2              THE COURT:  Yes.

09:59AM 3              MS. HOHNE:  I will show you this right here.

09:59AM 4    BY MS. HOHNE:

09:59AM 5    Q.   If you will look on the pictures, I'm trying to see where

09:59AM 6    the tab is from when y'all took the pictures when you came out

09:59AM 7    to my house in August.

09:59AM 8              MS. HOHNE:  Do you know where that is?  Is that it?

09:59AM 9              MR. MILLER:  Yes.

09:59AM 10             MS. HOHNE:  Okay.  Thanks.

09:59AM 11   BY MS. HOHNE:

09:59AM 12   Q.   Okay.  So if you look at some of the pictures from when

09:59AM 13   y'all came out, and you looked at my house, and you said that

09:59AM 14   you didn't notice any discoloration; is that right?

09:59AM 15   A.   That's correct.

09:59AM 16   Q.   Okay.  And copper is typically shiny, like in the

10:00AM 17   Picture 1 on Tab X, there is, like, a shiny copper, and there

10:00AM 18   is dark.  It's kind of weaved in, braided and kind of together

10:00AM 19   twisted.

10:00AM 20             So you see the shiny and the dark there; is that

10:00AM 21   correct?

10:00AM 22   A.   In this photo, No. 1?

10:00AM 23   Q.   Yes.

10:00AM 24   A.   Yes.

10:00AM 25   Q.   Okay.  Do you see -- would you say that there is no

10:00AM 1    discoloration of the copper in that picture?

10:00AM 2         Do you think that all of the wiring looks exactly the

10:00AM 3    same in that?

10:00AM 4    A.   It's hard to tell.

10:00AM 5    Q.   So you are saying that that whole -- all of that wiring

10:00AM 6    looks exactly the same color?

10:00AM 7    A.   I see some that is bright and shiny and I see some that is

10:00AM 8    a little darker.

10:00AM 9    Q.   Okay.  So the bright and shiny is what copper is supposed

10:00AM 10   to look like; is that correct?

10:00AM 11   A.    It can be.  We checked all of the wire.  We actually

10:00AM 12   rubbed our fingers on it, since there was no power in the

10:00AM 13   home --

10:00AM 14   Q.   I'm just wondering --

        15   A.   -- and nothing came off.

        16   Q.   -- if that is exactly what copper is supposed to look

10:00AM 17   like.  Is it supposed to be shiny?

10:00AM 18   A.   Copper actually will turn color just with age.

10:01AM 19   Q.   Like, when it's new, is it shiny?

10:01AM 20   A.   Yes.  When it is new, it is shiny, yes.

10:01AM 21   Q.   Okay.  If you look at those pictures I just gave you,

10:01AM 22   those were pictures taken out of my house this past week --

        23   A.   Okay.

10:01AM 24   Q.   -- does that cooper look shiny to you?

10:01AM 25   A.   Parts of it do, and parts of it do not.

10:01AM 1    Q.    Did you look at all three pages -- through all of three

10:01AM 2    pages there.  Does that copper look shiny to you?

10:01AM 3    A.    Page 2, yes.

10:01AM 4    Q.    So you are saying that copper looks --

10:01AM 5    A.    On page, two, yes.

10:01AM 6    Q.    Okay.  On all three pages, you are saying that the copper

10:01AM 7    looks like new shiny copper?

10:01AM 8    A.    It's darker on page 3.

10:01AM 9    Q.    Okay.  What is the telltale sign of Chinese drywall?

10:01AM 10   A.    Actually, when you have black on wiring and copper, it

10:01AM 11   will come off on your fingers.  It's a residue.  It's not --

10:01AM 12   copper will turn color with age with element exposure.

10:01AM 13   Q.    Right.

10:01AM 14   A.    It has a patina to it after a while.

10:01AM 15   Q.    Okay.  And my house was built -- I'm sure it's somewhere

10:01AM 16   in here -- but my house was built in 2006?

10:02AM 17   A.    Correct.

10:02AM 18   Q.    And your company came out and examined it and gave us

10:02AM 19   certifications and all of that in 2011?

10:02AM 20   A.    Correct.

10:02AM 21   Q.    Correct.  So that is five years later?

10:02AM 22   A.    Okay.

10:02AM 23   Q.    So that wiring had been in the house for five years.

10:02AM 24         Would you say that copper gets worse over time, darker

10:02AM 25   over time with Chinese drywall?

10:02AM 1   A.   Yes.

10:02AM 2   Q.   Okay.  So how long has my copper been -- that new copper

10:02AM 3   been in my house?

10:02AM 4   A.   Since 2012.

10:02AM 5   Q.   Okay.  All right.  And if you look in the tab of the same

10:02AM 6   Tab X, where y'all took pictures of the drywall, that was in

10:02AM 7   the attic --

10:02AM 8   A.   Which page?

10:02AM 9   Q.   I'm looking for it.  Okay, page 19.

10:02AM 10  A.   Okay.

10:02AM 11  Q.   Where it says "USA"?

10:02AM 12  A.   Yes.

10:02AM 13  Q.   Did you guys also take pictures where it had Palatka,

10:03AM 14  Florida stamped on it?

10:03AM 15  A.   I did not know.

10:03AM 16  Q.   Okay.  Did you all see it on there because it was really

10:03AM 17  close to that right there.  So did y'all see where it was

10:03AM 18  written "Palatka, Florida" stamped on there?

10:03AM 19  A.   I don't believe -- I don't recall.

10:03AM 20  Q.   You don't recall.

        21  A.   No.

10:03AM 22  Q.   Okay.  Do you know anything about the drywall plant in

10:03AM 23  Palatka, Florida?

10:03AM 24  A.   Yes, it's Lafarge plant, yes.

10:03AM 25  Q.   Lafarge.  Do you know what that plant is typically for,

10:03AM 1    like, if you were to Google it on the Internet?

10:03AM 2    A.    It's a drywall company.

10:03AM 3    Q.    Okay.  And is it a recycled drywall company?

10:03AM 4    A.    I don't know.

10:03AM 5    Q.    Okay.  Well, if you Google it, I just want to say that for

10:03AM 6    the record, if you Google it on the Internet, it says that on

10:03AM 7    there.

10:03AM 8          THE COURT:  That's, yeah -- I'm trying to allow you to

10:03AM 9    -- I understand you are not a lawyer, and, you know, I am

10:03AM 10   potentially allowing you to ask questions in a strange way --

11         MR. HOHNE:  Yes, sir.

10:03AM 12         THE COURT:  -- but you can't testify at this point.

10:03AM 13         MS. HOHNE:  Okay.

10:03AM 14   BY MS. HOHNE:

10:04AM 15   Q.    Can you tell me who decided on what materials to choose to

10:04AM 16   put in the house?

10:04AM 17   A.    We have a drywall contractor that provides material and

10:04AM 18   labor, so it would have been the drywall contractor.

10:04AM 19   Q.    But, like, as far as all of the material, because it's a

10:04AM 20   lot -- I mean, it's been close to a billion dollars on the

10:04AM 21   whole remodeling, remediation on these houses, so who

10:04AM 22   originally decides what, like, piping, copper, where you buy

10:04AM 23   everything, drywall -- all that -- who decides, like, where you

10:04AM 24   buy the materials?

10:04AM 25   A.    The material -- I mean, we did five states, so the

10:04AM 1    material came from various suppliers --

2    Q.   Okay.

10:04AM 3    A.   -- including the drywall.

10:04AM 4         There are different manufacturers.  Our only

10:04AM 5    requirement to our drywall contractors was that it was made in

10:04AM 6    the USA.

10:04AM 7         MS. HOHNE:  Okay.  No more questions.

10:05AM 8         THE COURT:  Okay.  Redirect?

10:05AM 9         MR. MILLER:  Yes, sir, very briefly.

10

10:05AM 11                    REDIRECT EXAMINATION

10:05AM 12   BY MR. MILLER:

10:05AM 13   Q.   Mr. Adams, Ms. Hohne was asking you about the various

10:05AM 14   colors that copper comes in.

10:05AM 15        Let me direct your attention to Tab D of Exhibit 1.

10:05AM 16   And sir, I would like you to go ahead and take a look at page 3

10:05AM 17   and page 4 of Tab D of Exhibit 1.

10:05AM 18        Let me know when you are there, Mr. Adams.

10:05AM 19   A.   Yes.

10:05AM 20   Q.   Okay.  If you could explain, for the record, if you look

10:05AM 21   at the photograph on the bottom half of page 4.

10:05AM 22        Are you with me, sir, it says, "figure 4, hallway"?

10:05AM 23   A.   Yes.

10:05AM 24   Q.   "Significant blackening on ground wire in ceiling light

10:05AM 25   fixture."

10:05AM 1    Explain to me what that picture of that ground wire

10:05AM 2    represents, sir, based on your experience.

10:05AM 3    A.   That is extremely, extremely black discoloration on the

10:06AM 4    ground wire.

10:06AM 5    Q.   Would that be black discoloration on a copper ground wire

10:06AM 6    that is consistent with the emissions caused by Chinese drywall

10:06AM 7    exposure?

10:06AM 8    A.   Yes, it would.

10:06AM 9    Q.   And that kind of blackening on a copper ground wire, if

10:06AM 10   you rub it, it comes off on your fingers, doesn't it?

10:06AM 11   A.   Yes, it does.

10:06AM 12   Q.   So it's more of a tarnishing, a coating, if you will, than

10:06AM 13   a patina of copper, correct?

10:06AM 14   A.   It's like a black soot on the wire.

10:06AM 15   Q.   So we know that, for example, probably the copper object

10:06AM 16   that we're most familiar with, in general terms, is a penny,

10:06AM 17   correct?

10:06AM 18   A.   Correct.

10:06AM 19   Q.   And when it comes right from the U.S. mint, it is shiny

10:06AM 20   and bright, correct?

10:06AM 21   A.   Correct.

10:06AM 22   Q.   But a five- or ten year-old penny is not so shiny.  It's

10:06AM 23   more brown than it is bronze, correct?

10:06AM 24   A.   It's patina, yes.

10:06AM 25   Q.   It's still copper, correct?

10:07AM 1   A.   Yes.

10:07AM 2   Q.   But if you rub your fingers on a five- or ten year-old

10:07AM 3   penny, black coating does not rub off, correct?

10:07AM 4   A.   That's correct.

10:07AM 5   Q.   Okay.  So the black coating on a copper ground wire, is

10:07AM 6   what is symptomatic of reactive Chinese drywall, correct, sir?

10:07AM 7   A.   Yes.

10:07AM 8   Q.   Now, sir, in terms of distinction between the pilot

10:07AM 9   program and the ultimate Class Action Settlement Remediation

10:07AM 10  Program, the drywall removal and the cleaning in the

10:07AM 11  environmental certification, those steps of the process that

10:07AM 12  Moss employed, did they ever change?  Were they ever different?

10:07AM 13  A.   The only thing that was added was the Odorox treatment.

10:07AM 14  Q.   But in terms of removing all the drywall, and taking out

15          all the dust --

16          A.   No.

10:07AM 17  Q.   -- it was the same in the pilot program as it was in the

10:07AM 18  remediation program?

10:07AM 19  A.   Exactly.

20                  MR. MILLER:  Thank you, sir.  That is all I have.

10:07AM 21              THE COURT:  Okay.  Call your next witness, then,

10:07AM 22  please.

10:07AM 23              MR. MILLER:  At this time point, Your Honor, Knauf

10:07AM 24  would like to call Mr. Tom Ortner as the final witness for this

10:08AM 25  evidentiary hearing.

1       THE COURT:  Okay.

2       CASE MANAGER:  Raise your right hand.

10:08AM   3               (Oath was administered.)

10:08AM   4       THE WITNESS:  I do.

5       CASE MANAGER:  Please be seated and state and spell

6   your name for the record.

7       THE WITNESS:  Thomas Ortner, O-r-t-n-e-r.

8

9                    THOMAS ORTNER,

10:08AM  10       Having been duly sworn, testified as follows:

10:08AM  11       MR. MILLER:  Good morning, Mr. Ortner.

10:08AM  12       THE WITNESS:  Good morning.

13

14                 DIRECT EXAMINATION

15   BY MR. MILLER:

10:08AM  16   Q.   If you could, sir, briefly describe your role in the

10:08AM  17   Chinese Drywall Repair Program.  And, I mean, your role

10:08AM  18   personally, and the role of your company?

10:08AM  19   A.   I'm the senior project manager for GFA International, who

10:08AM  20   performs the environment certification inspections.

10:08AM  21   Q.   Okay.  And in connection with Chinese drywall repairs, how

10:08AM  22   many inspections has your company done, sir?

10:08AM  23   A.   We have done well over 3,000 inspections on various

10:09AM  24   products -- homes.

10:09AM  25   Q.   And how many environmental certifications has your firm

10:09AM 1    done in connection with Chinese drywall repairs?

10:09AM 2    A.    Around 3,000 for that.

10:09AM 3    Q.    Sir, and if you can explain sort of the steps in the

10:09AM 4    process of your inspection, your firm's inspection, and your

10:09AM 5    firm's environmental certification process, when you are called

10:09AM 6    in, what do you do, and what the effect of all that is?

10:09AM 7    A.    Okay.  We're notified by the contractor when they are

10:09AM 8    ready for the inspection, and that usually means that the house

10:09AM 9    has all the drywall and everything have been -- components

10:09AM 10   regarding the remediation protocol, Exhibit F, have been

10:09AM 11   completed.

10:09AM 12        Our inspection is to perform a verification of that

10:09AM 13   remediation.  So we're going in, we're making sure we don't

10:09AM 14   smell any Chinese drywall symptoms, any odors of Chinese

10:10AM 15   drywall, and then verify that all of the copper components,

10:10AM 16   drywall, insulation, basically absorbant materials, types of

10:10AM 17   thing, insulation -- fibers of insulation have been removed.

10:10AM 18        We also make sure that all dust and debris have been

10:10AM 19   removed.

10:10AM 20        It's not just a visual.  We don't just look for things.

10:10AM 21   We're actually touching, feeling, wiping studs, tops of members

10:10AM 22   to verify that nothing is concealed anywhere.

10:10AM 23   Q.    Thank you, sir.  And just to make clear, your company,

10:10AM 24   GFA, that is an independent entity from Moss, correct?

10:10AM 25   A.    That's correct.

10:10AM 1    Q.    Not related at all?

10:10AM 2    A.    Not at all.

10:10AM 3    Q.    It's not the case that Moss passes the environmental

10:10AM 4    certificate in every case on the first time, correct, sir?

10:10AM 5    A.    That's correct.

10:10AM 6    Q.    Sometimes GFA requires Moss to come back and do additional

10:10AM 7    cleanup, correct, sir?

10:10AM 8    A.    That's correct.

10:10AM 9    Q.    Now, sir, let's talk about the residence at issue in this

10:11AM 10   case.

10:11AM 11          Let's go to Tab M.  I think Mr. Adams left the binder

10:11AM 12   in front of you on the witness stand.

10:11AM 13          Tab M of Exhibit 1, and if you would, sir, explain what

10:11AM 14   that document is, for the record?

10:11AM 15   A.    This is our field inspection report performed by our staff

10:11AM 16   that does the inspections.

10:11AM 17          It identifies the home, the product, and then has key

10:11AM 18   components that we ask them to verify that have been completed,

10:11AM 19   including all Chinese drywall has been removed, all affected

10:11AM 20   copper components are removed, dust, debris, and it has been

21   cleaned.

10:11AM 22          We receive a contractor's verification certification

10:11AM 23   that they have done -- completed the work.  And then for own QA

10:11AM 24   purposes in quality control, we take photographs of the home.

10:11AM 25   Q.    And sir, this document that you just described at Tab M of

10:11AM 1    Exhibit 1, is this GFA's general inspection report notes from

10:12AM 2    Ms. Hohne's home at 1025 Little Sorrel Drive, in Calera,

10:12AM 3    Alabama?

10:12AM 4    A.   Yes, it is.

10:12AM 5    Q.   And this a document, sir, that you produced from your

10:12AM 6    files, correct, sir?

10:12AM 7    A.   Yes.

10:12AM 8    Q.   And the date of the document is what, sir?

10:12AM 9    A.   June 28th 2012.

10:12AM 10   Q.   Okay.  And sir, you mentioned that as further backup for

10:12AM 11   your -- during your inspection, that your inspectors take

10:12AM 12   photographs of the homes; is that correct?

10:12AM 13   A.   That's correct.

10:12AM 14   Q.   Sir, go ahead and flip to Tab O of the binder, and if you

10:12AM 15   can confirm, for the record, what those photographs are at

10:12AM 16   Tab O?

10:12AM 17   A.   These would be photographs of the home at the time of the

10:12AM 18   inspection, identifying that there is no insulation, no drywall

10:12AM 19   in the home, no copper in the home.

10:12AM 20   Q.   And these would have been photos from GFA's files, sir?

10:12AM 21   A.   Yes, they would.

10:12AM 22   Q.   Sir, you have been in the courtroom this morning, and I

10:12AM 23   ask you to turn to page 6 of Tab O.

10:13AM 24       During Mr. Adams' cross-examination, Ms. Hohne was asking

10:13AM 25   him questions about dust.

10:13AM 1        Sir, what does GFA do in the course of looking at

10:13AM 2   homes, inspecting homes, and looking for dust associated with

10:13AM 3   Chinese drywall?

10:13AM 4   A.   As I said earlier, it's a visual and a touch.

10:13AM 5        So if we see anything that looks like dust, we're going

10:13AM 6   to wipe it with our hands to see if any residue comes up from

10:13AM 7   it.

10:13AM 8   Q.   Sir, if there Chinese drywall dust on the floor, would GFA

10:13AM 9   require that the Chinese drywall dust be removed before

10:13AM 10  issuance of the certificate?

10:13AM 11  A.   Yes, we would.

10:13AM 12  Q.   Sir, in Tab 6, there is a photograph that you took, or

10:13AM 13  your company took, correct, sir?

10:13AM 14  A.   That's correct.

10:13AM 15  Q.   There is some lighter areas on the floor, sir.  Does that

10:13AM 16  appear to be from sunlight coming in, reflection from sunlight

10:13AM 17  to you?

10:13AM 18  A.   Certainly, it could be sunlight.  It could be various

10:14AM 19  different colors of the tile floor, itself.

10:14AM 20  Q.   Okay.  Sir, ultimately, you can't confirm that the

10:14AM 21  photograph at page 6 is showing dust from Chinese drywall, can

10:14AM 22  you, sir?

10:14AM 23  A.   I cannot.

10:14AM 24  Q.   If you go back to Tab N of Exhibit 1, why don't you

10:14AM 25  explain what this document is, for the record, sir, please?

10:14AM 1    A.    This is the official environmental certification issued by

10:14AM 2    our firm.   It's issued after the inspection report inspection

10:14AM 3    passes from our field inspector and is reviewed by a

10:14AM 4    professional engineer.

10:14AM 5    Q.    This would have been the inspection report issued in

10:14AM 6    connection with Ms. Hohne's home, correct?

10:14AM 7    A.    Correct.

10:14AM 8    Q.    Sir, now after your company was at Ms. Hohne's home in

10:14AM 9    2012, and did the inspection and issued the certificate, is it

10:14AM 10   correct, sir, that my office called you in August of 2015, to

10:15AM 11   conduct a followup inspection of Ms. Hohne's home?

10:15AM 12   A.    Yes, it is.

10:15AM 13   Q.    Sir, and who, from your office, conducted that followup

10:15AM 14   inspection in August of 2015?

10:15AM 15   A.    I did.

10:15AM 16   Q.    Sir, and did you take -- well, tell me, what are your

10:15AM 17   observations, if you could, in narrative form from the August

10:15AM 18   of 2015 inspection with respect to looking at symptoms

10:15AM 19   associated with Chinese drywall?

10:15AM 20   A.    Well, we always use the same protocol when we're looking

10:15AM 21   at homes that have any question of Chinese drywall.

10:15AM 22          So the first step is to enter the home and smell for

10:15AM 23   any signs of the Chinese drywall symptoms.

10:15AM 24          And then from there, we would open isolated random

10:15AM 25   receptacles, electrical, and switches.   We are looking for

10:15AM 1    signs of the blackening of the copper.

10:15AM 2            We would open the electrical panel box, and we would

10:15AM 3    open the AC coils.

10:15AM 4            If the appliances are in the home, we look at the

10:16AM 5    bottom of the refrigerator for any signs of Chinese drywall.

10:16AM 6    Q.   Did you see any signs of Chinese drywall or did you detect

10:16AM 7    any signs of Chinese drywall, because you are using your

10:16AM 8    various senses, not just your eyes, when you visited

10:16AM 9    Ms. Hohne's home in August of 2015?

10:16AM 10   A.   We did not.

10:16AM 11   Q.   Sir, you mentioned a protocol.  Let's turn to Tab U of the

10:16AM 12   binder.

10:16AM 13           And sir, if you could identify for the record the

10:16AM 14   document that set forth at Tab U of the binder.

10:16AM 15   A.   Yes.  This is the identification guidance from the CPSC

10:16AM 16   for identifying whether or not a home has Chinese drywall.

10:16AM 17   Q.   And, sir, if you can, can you tell us if, in general

10:16AM 18   terms, this particular identification guideline document from

10:16AM 19   CPSC was the protocol that you used when you visited

10:16AM 20   Ms. Hohne's home in August of 2015?

10:16AM 21   A.   Yes, it is.

10:16AM 22   Q.   And, sir, basically describe -- if you turn to page 2, the

10:17AM 23   executive summary, it sets forth identification methods and

10:17AM 24   various steps.

10:17AM 25           Describe how your inspection in August of 2014,

10:17AM 1    followed the identification method and the various steps that

10:17AM 2    is set forth at Tab U of Exhibit 1.

10:17AM 3    A.   Yeah.  The first step is the threshold inspection, which

10:17AM 4    is what we performed.

10:17AM 5         So it's looking for blackening of the coils and

10:17AM 6    electrical components.

10:17AM 7         Obviously, the smells, we are looking for the smells

10:17AM 8    and proof that the insulation of the drywall would have been

10:17AM 9    between 2001 and 2009, when Chinese drywall was manufactured.

10:17AM 10    Q.   And how are your findings consistent with this protocol at

10:18AM 11    the Hohne home?

10:18AM 12    A.   We had no exhibit signs of the blackening of the copper

10:18AM 13    components within the home.

10:18AM 14         We were able to identify, actually in the attic as

10:18AM 15    previously noted, that the board was manufactured from the USA

10:18AM 16    origin.

10:18AM 17    Q.   And sir, how many Chinese drywall homes have you

10:18AM 18    personally been in over the years?

10:18AM 19    A.   Hundreds, if not thousands.

10:18AM 20    Q.   And you are familiar with the odors associated with

10:18AM 21    Chinese drywall, sir, based on your experience?

10:18AM 22    A.   I am.

10:18AM 23    Q.   Sir, and also are you also familiar with the blackening or

10:18AM 24    discoloration of various building components that have been

10:18AM 25    associated with exposure to Chinese drywall?

10:18AM  1    A.    Yes.

10:18AM  2    Q.    And sir, in your role as an inspector for GFA Company that

10:18AM  3    has done thousands of Chinese drywall inspections and issued

10:18AM  4    thousands of environmental certifications, have you kept

10:18AM  5    yourself abreast and familiar with guidance and other materials

10:18AM  6    issued by the Consumer Product Safety Commission and the

10:19AM  7    Department of Housing and Urban Development on Chinese drywall?

10:19AM  8    A.    We monitor periodically for any updated information.

10:19AM  9    Q.    Sir, I'm going to ask you to turn to Tab B of Exhibit 1,

10:19AM 10    and this is the remediation guidance that I asked Mr. Adams

10:19AM 11    some questions about.

10:19AM 12          Are you familiar with that document, sir?

10:19AM 13    A.    I am.

10:19AM 14    Q.    Sir, I'm going to ask you to turn to page 3 of Tab B of

10:19AM 15    the building materials and contents.

10:19AM 16          It states at the bottom, if you just want to read with

10:19AM 17    me, sir:  "Underlying the CPSC and HUD staff's recommendations

10:19AM 18    is the view that removal of the source material will eliminate

10:19AM 19    the cause of the corrosive environment."

10:19AM 20          Do you see that statement, sir?

10:19AM 21    A.    I do.

10:19AM 22    Q.    Is that statement consistent and true to you, based upon

10:19AM 23    your own personal experience and inspecting thousands of

10:19AM 24    Chinese drywall homes?

10:19AM 25    A.    Yes.

10:19AM 1    Q.   And sir, the next sentence reads:  "Staffs of CPSC and HUD

10:19AM 2    do not have a scientific basis to believe that emissions from

10:20AM 3    the problem drywall require replacement of non-problem drywall,

10:20AM 4    wood studs, flooring, cabinetry, insulation, or other household

10:20AM 5    components and fixtures that may have been exposed to Chinese

10:20AM 6    drywall emissions."

10:20AM 7        Do you see that statement, sir?

10:20AM 8    A.   Yes.

10:20AM 9    Q.   And based upon your experience of conducting thousands of

10:20AM 10   inspections of Chinese drywall homes, do you agree, sir, that

10:20AM 11   that statement today remains accurate?

10:20AM 12   A.   Yes.

10:20AM 13   Q.   Sir, just couple of final questions.

10:20AM 14       We have looked at your photographs from the August

10:21AM 15   of 2015 inspection.  Did your company also issue a written

10:21AM 16   report in connection with your inspection in August of 2015?

10:21AM 17   A.   Yes, we did.

10:21AM 18   Q.   Let me ask you to turn to Tab W of Exhibit 1, sir, and if

10:21AM 19   you could, please, identify the document that is set forth

10:21AM 20   behind Tab W of Exhibit 1?

10:21AM 21   A.   This would be the final report issued after the August 4th

10:21AM 22   inspection for the Hohne residence.

10:21AM 23   Q.   And this report would have been prepared by your company,

10:21AM 24   sir?

10:21AM 25   A.   Yes, it would.

10:21AM 1    Q.    It was prepared for me; correct, sir?

10:21AM 2    A.    Correct.

10:21AM 3    Q.    And this is a document that would have come from your

10:21AM 4    files, correct, sir?

10:21AM 5    A.    Yes.

10:21AM 6    Q.    Let's look at page 6, it sets forth your conclusion.

10:21AM 7          Go ahead and read into the record, sir, the conclusion

10:21AM 8    that your firm made in connection with the inspection of the

10:22AM 9    Hohne residence in August of 2015.

10:22AM 10   A.    "Based on our visual observations review of previous

10:22AM 11   inspections and photos there is no apparent evidence of

12   corrosive Chinese drywall observed/detected at the time of our

10:22AM 13   site visit."

10:22AM 14   Q.    Sir, your inspection and your report and your conclusions,

10:22AM 15   that information, that documentary evidence followed and was

10:22AM 16   done pursuant to the CPSC inspection protocol at Tab U; is that

10:22AM 17   correct, sir?

10:22AM 18   A.    Yes, it is.

10:22AM 19   Q.    Sir, based upon your experience in inspecting thousands of

10:22AM 20   Chinese drywall repair homes, are you aware of any home

10:22AM 21   remediated in the Court-approved program that suffered

10:22AM 22   cross-contamination from the studs or anywhere else after the

10:22AM 23   home was properly cleaned and certified?

10:22AM 24   A.    I do not.

10:23AM 25         MR. MILLER:  That's all we have, Your Honor.  Thank

10:23AM 1    you, Mr. Ortner.

10:23AM 2           I tender the witness.

10:23AM 3           THE COURT:  Any questions of this witness?

10:23AM 4           MR. MILLER:  Your Honor, if I may -- I'm sorry,

10:23AM 5    Ms. Hohne, at this point, Your Honor, I would like to move into

10:23AM 6    evidence, Exhibit 1.

10:23AM 7           We have covered all of the various tabs with Mr. Ortner

10:23AM 8    and Mr. Adams.

10:23AM 9           As previously indicated, these exhibits were shared

10:23AM 10   with the Court on Monday and with Ms. Hohne on Monday.  So at

10:23AM 11   this time we would like to offer, file, and introduce into

10:23AM 12   evidence of this hearing, Exhibit 1, which consists of various

10:23AM 13   tabs that we have covered during the testimony this morning.

10:23AM 14          THE COURT:  I will admit it.

10:23AM 15          MR. MILLER:  Thank you, sir.

        16

10:23AM 17                       CROSS-EXAMINATION

10:23AM 18   BY MS. HOHNE:

10:23AM 19   Q.   Did he leave the pictures up there for you?

10:23AM 20   A.   Yeah, the binder is still here, yes.

10:23AM 21   Q.   Just making sure.

10:23AM 22          Okay.  When you came to the house in August, you said

10:23AM 23   you were approximately there about ten minutes?

10:23AM 24   A.   I can't really say if I was there ten minutes to half an

10:24AM 25   hour, but it was not long.

10:24AM 1   Q.   Okay.  And you said that there was -- in your report you

10:24AM 2   said there was no odor at all; is that right?

10:24AM 3   A.   That's correct.

10:24AM 4   Q.   And are you aware of the fact that women have -- there is

10:24AM 5   a scientific proof -- that women have a much stronger sense of

10:24AM 6   smell than men do?

10:24AM 7   A.   I am not.

10:24AM 8   Q.   Was there any woman present during the inspection in

10:24AM 9   August?

10:24AM 10  A.   You were at the home.

10:24AM 11  Q.   Was there anyone there for the, like, in the house during

10:24AM 12  the inspection?

10:24AM 13  A.   I do not believe so.

10:24AM 14  Q.   Okay.  And then the pictures that I have right there, the

10:24AM 15  1, 2, and 3, in front of you?

10:24AM 16  A.   Which tab, please?

10:24AM 17  Q.   No.  The ones that I had given him up there.  There is

10:24AM 18  three photographs.

10:24AM 19        MS. HOHNE:  Do you have them?  Did you leave them up

       20  there?

10:25AM 21        THE WITNESS:  I do not have those photos.

10:25AM 22        MS. HOHNE:  Do you have them?

10:25AM 23        THE COURT:  Who took these, Ms. Hohne?

10:25AM 24        MS. HOHNE:  I took these at my house this week.

10:25AM 25        THE COURT:  When did you take them, ma'am?

10:25AM 1          MS. HOHNE:  Where?

10:25AM 2          THE COURT:  When.

10:25AM 3          MS. HOHNE:  When -- last Tuesday.  I'm not sure of the

10:25AM 4    date.

10:25AM 5          THE COURT:  Well, I will mark them for identification

10:25AM 6    purposes.  I will put it as -- proffered 1, the Plaintiff 1

        7    proffered.

10:25AM 8          It's hard for me to introduce -- to admit these into

10:25AM 9    evidence, but I will allow them into the record.

10:25AM 10         MS. HOHNE:  Thank you, sir.

10:25AM 11   BY MS. HOHNE:

10:25AM 12   Q.   Okay.  Looking at those pictures on Exhibit 1, does that

10:25AM 13   copper look shiny to you?

10:25AM 14   A.   There are shiny areas in the photos, yes.

10:26AM 15   Q.   What about in Picture 2?

10:26AM 16   A.   That is much -- it is shinier there in that one.

10:26AM 17   Q.   Okay.  What about Picture 3?

10:26AM 18   A.   A little bit more dark.

10:26AM 19   Q.   Okay.  And what would you say that one of the first signs

10:26AM 20   of Chinese drywall is?

10:26AM 21   A.   It's a blackening of the copper and a soot -- debris.

10:26AM 22   Q.   Would you say that it gets darker over time?

10:26AM 23        So say, if the copper has only been there in a year,

10:26AM 24   it's not going to be as dark and have as much soot on it, as it

10:26AM 25   would from five or six years?

10:26AM  1   A.   I can't say, but it does get darker over time.

10:26AM  2   Q.   Okay.  And when you were in the house, did you take

10:26AM  3   samples of the drywall to get tested?

10:26AM  4   A.   No, we did not.

10:26AM  5   Q.   Did you take any samples of the wood to have it tested?

10:26AM  6   A.   No, we did not.

10:26AM  7   Q.   Did you take samples of any of the copper?

10:27AM  8   A.   No.

10:27AM  9   Q.   Okay.  And on Tab U, it has from the Consumer Product

10:27AM 10   Safety Commission, these are the guidelines for testing of the

10:27AM 11   drywall.

10:27AM 12         So on page 3, and it looks like you should do two of

10:27AM 13   the five -- should be done to test for drywall.

10:27AM 14         Did y'all do anything from (a) on that page?

10:27AM 15   A.   No, we did not.

10:27AM 16   Q.   What about from (b)?

10:27AM 17   A.   No.

10:27AM 18   Q.   (C)?

10:27AM 19   A.   Yes, we did.  We were able to confirm the board was USA

10:28AM 20   origin.

10:28AM 21   Q.   So you had samples of the drywall in placement to a test

10:28AM 22   chamber?

10:28AM 23   A.   Page 3 says, "confirm markings of Chinese origin of the

10:28AM 24   drywall home."

10:28AM 25   Q.   Sorry, I'm looking at (d), where it says, "elevated of

10:28AM 1   hydrogen sulfide, carbonyl sulfide and/or carbon disulfide."

10:28AM 2   A.    No, we did not do (d).

10:28AM 3   Q.    Okay.  What about (e) where it says, "corrosion of copper

4   metal to form --

5   A.    No, we did not.

10:28AM 6   Q.    -- copper sulfide placed in test chambers?

10:28AM 7   A.    No, we did not.

10:28AM 8   Q.    Okay.  So you guys didn't do any of these testings on my

10:28AM 9   house?

10:28AM 10   A.    That's correct.

10:28AM 11   Q.    And if you look at Tab O -- well, let me go back.

10:28AM 12        Let's see, you are on Tab M?

10:28AM 13   A.    M?

10:28AM 14   Q.    That was not you, that was the other GFA inspector; is

10:28AM 15   that right?

10:28AM 16   A.    That's correct.

10:28AM 17   Q.    Okay.  So this was done prior -- this was done in

10:28AM 18   conjunction with the pictures that were taken to prove that the

10:29AM 19   house was free and clear of all drywall?

10:29AM 20   A.    Yes.  Yes, during the remediation, yes.

10:29AM 21   Q.    Okay.  And under Tab N, the GFA International

10:29AM 22   Environmental Certification, let's see, on the second sentence,

10:29AM 23   it says that you found no dust, debris, or residue; is that

10:29AM 24   right?

10:29AM 25   A.    That's correct.

10:29AM 1    Q.    Okay.  So in Tab O, when you go to Picture 6, and you look

10:29AM 2    at the floor -- do you see that picture?

10:29AM 3    A.    I do.

10:29AM 4    Q.    Of the tile?

10:29AM 5          And I just want to say for the record that that tile

10:29AM 6    was the exact same tile throughout the foyer, kitchen, and

10:29AM 7    laundry room area.  I'm sorry, not the laundry room area, the

10:30AM 8    bathroom room area.

10:30AM 9          Can you say on Picture 6, without a doubt, that that

10:30AM 10   white on the floor on the tile is not from Chinese drywall?

10:30AM 11   A.    I was not at the inspection, so I cannot say without a

10:30AM 12   doubt.

10:30AM 13   Q.    Okay.  I believe he asked you, without a doubt, that their

10:30AM 14   was no debris or anything left over from the Chinese drywall?

10:30AM 15         MR. MILLER:  That's not what I asked him.  I asked him

10:30AM 16   if he could confirm.

10:30AM 17         MS. HOHNE:  Okay.

10:30AM 18         THE COURT:  Do you inspect it and do you look for

10:30AM 19   drywall -- do you look for Chinese drywall dust?  Did you do

10:30AM 20   that this time?

10:30AM 21         THE WITNESS:  Yes.

10:30AM 22         THE COURT:  Did you find any dust?

10:30AM 23         THE WITNESS:  We did not.

10:30AM 24   BY MS. HOHNE:

10:30AM 25   Q.    But you were not the one who inspected house?

| | |
|---|---|
| 10:30AM 1 | A.    That's correct.  The inspector previously in a previous |
| 10:30AM 2 | tab would have inspected that house. |
| 10:30AM 3 | Q.    Okay.  So looking at Picture 6, can you say without a |
| 10:30AM 4 | doubt that white on the tile is not dust from -- |
| 5 | A.    I cannot. |
| 10:30AM 6 | Q.    -- Chinese drywall? |
| 10:30AM 7 | A.    I cannot. |
| 10:30AM 8 | Q.    Okay.  And I'm sorry, I'm just confused about something |
| 10:31AM 9 | right here real quick. |
| 10:31AM 10 | On R, the certificate of occupancy, it says the issue |
| 10:31AM 11 | date is 3/21, and it is signed 8/22, and I just wanted to |
| 10:31AM 12 | clarify.  Is that just getting ready -- it's saying it is okay |
| 10:31AM 13 | to occupy the home? |
| 10:31AM 14 | A.    That is a document issued the by the City of Calera.  That |
| 10:31AM 15 | is not something that GFA would be involved with. |
| 10:31AM 16 | Q.    Okay.  And I know that, you know, a large part of when |
| 10:31AM 17 | y'all do inspections from -- when you all came to my house in |
| 10:31AM 18 | August, y'all kept talking about the smell and the sense and |
| 10:31AM 19 | all of that, but if you look in the e-mail under T, dated back |
| 10:31AM 20 | in June of 2013 -- |
| 10:31AM 21 | A.    Okay. |
| 10:31AM 22 | Q.    -- do you see anywhere in there for the symptoms of smell, |
| 10:32AM 23 | because I know that was a large part of what your report was |
| 10:32AM 24 | based off of, was the sense of smell? |
| 10:32AM 25 | A.    Well, I don't see anything about smell within the e-mail, |

10:32AM 1    no.

10:32AM 2    Q.   Okay.  And just to go over real quick under W, from your

10:32AM 3    report, I believe it's the fourth page, you wrote:  "There was

10:32AM 4    no unusual odor, normal weathering on the copper, and there was

10:32AM 5    no discoloration."

10:32AM 6              Okay.  And if you look under X, at the first picture

10:33AM 7    there, you see that is where the wire is listed?

10:33AM 8    A.   Yes.

10:33AM 9    Q.   Okay.  Does that look exactly the same -- all of those

10:33AM 10   wires?

10:33AM 11   A.   No.

10:33AM 12   Q.   Okay.  Do you see discoloration in that picture?

10:33AM 13   A.   I do.

10:33AM 14   Q.   Okay.

10:33AM 15             THE COURT:  What is that?

10:33AM 16             THE WITNESS:  It's more of a tarnishing over time and

10:33AM 17   age.  No dust or debris -- no residue comes off of it.

10:33AM 18             Copper will tarnish over time, specifically if the home

10:33AM 19   is subject to humidity and higher temperatures, like no

10:33AM 20   air-conditioning on.

10:33AM 21   BY MS. HOHNE:

10:33AM 22   Q.   And what is the first sign -- the telltale sign of Chinese

10:33AM 23   drywall after a short period of time?

10:33AM 24   A.   Blackening and a residue.

10:33AM 25   Q.   Okay.  Darkening of the wiring?

10:33AM 1    A.    Correct.

10:33AM 2              MS. HOHNE:  Okay.  That's all, Your Honor.

10:33AM 3              THE COURT:  Redirect?

10:33AM 4              MR. MILLER:  Very quickly, Your Honor.

        5

10:33AM 6                        REDIRECT EXAMINATION

10:33AM 7    BY MR. MILLER:

10:33AM 8    Q.    Tom, if you don't mind, turn to Tab M of Exhibit 1.

10:34AM 9              Let me know when you get there.

10:34AM 10   A.    Okay.

10:34AM 11   Q.    Ms. Hohne asked you questions on cross with respect to

10:34AM 12   drywall dust at her home during the time GFA did its

10:34AM 13   inspection.

10:34AM 14             Do you recall those questions?

10:34AM 15   A.    Yes, I do.

10:34AM 16   Q.    If you look at two-thirds down the page, there is a

10:34AM 17   checklist.  Are you with me, sir?

10:34AM 18   A.    Yes.

10:34AM 19   Q.    Read Item 3 on the checklist of the GFA inspection report.

10:34AM 20   A.    "All debris, visible dust, and residue has been removed

10:34AM 21   and cleaned."

10:34AM 22   Q.    And it's checked "yes," that it has been, correct, sir?

10:34AM 23   A.    Yes, it is.

10:34AM 24   Q.    And this document is signed by who?

10:34AM 25   A.    William Worthington.

10:34AM  1    Q.   And he was an employee of GFA?

10:34AM  2    A.   He was.

10:34AM  3    Q.   Was he a good employee?

10:34AM  4    A.   He was an excellent employee.

10:34AM  5    Q.   Good inspector?

10:34AM  6    A.   Yes, sir.

10:34AM  7    Q.   Truthful?

10:34AM  8    A.   Yes.

10:34AM  9    Q.   Reports were accurate?

10:34AM 10    A.   Yes.

10:34AM 11    Q.   Let's turn to Tab U, sir.  This is a CPSC Inspection

10:35AM 12    Protocol.

10:35AM 13         Ms. Hohne was asking you questions on cross-examination

10:35AM 14    about this document.

10:35AM 15         Do you recall those questions, sir?

10:35AM 16    A.   Yes.

10:35AM 17    Q.   Okay.  And let's turn to page 2 of the document.

10:35AM 18    A.   Okay.

10:35AM 19    Q.   And sir, as I understand it, and please correct me if I'm

10:35AM 20    wrong, that the inspection protocol set forth by the CPSC is a

10:35AM 21    phased protocol or a step protocol; is that correct?

10:35AM 22    A.   That's correct.

10:35AM 23    Q.   Okay.  So if we look at Step 1, sir, it states "threshold

       24    inspection."

10:35AM 25         Do you see that, sir?

10:35AM 1      A.   Yes.

10:35AM 2      Q.   And it says, "visual inspection must show" -- are you with

10:35AM 3      me, Mr. Ortner?

10:35AM 4      A.   Yes.

10:35AM 5      Q.   Part (a) "blackening of copper electrical wiring and/or

10:35AM 6      air-conditioning evaporator coils."

10:35AM 7           Do you see that?

10:35AM 8      A.   Yes.

10:35AM 9      Q.   Mr. Ortner, when you were at Ms. Hohne's home in August

10:35AM 10     of 2014, did you look for blackening of the electrical wire

10:35AM 11     and/or air-conditioning evaporator coil?

10:36AM 12     A.   Yes, we did.

10:36AM 13     Q.   Did you find any, sir?

10:36AM 14     A.   No, we did not.

10:36AM 15     Q.   Point No. (B) under Step 1, it says:  "The installation of

10:36AM 16     new drywall (for new construction or renovations) between 2001

10:36AM 17     and 2009."

10:36AM 18           Sir, did you look for the installation of new drywall?

10:36AM 19     A.   We did.

10:36AM 20     Q.   And did you find new drywall manufactured in the USA to be

10:36AM 21     in Ms. Hohne's home?

10:36AM 22     A.   Yes, we did.

10:36AM 23     Q.   Sir, right under that point (b), if you look at the next

10:36AM 24     words in this document, it says:  "A positive result for the

10:36AM 25     first step (including both criteria)."

10:36AM 1         That is sub (a) and sub (b), do you see that,

10:36AM 2   Mr. Ortner?

10:36AM 3   A.   I do.

10:36AM 4   Q.   "Is a prerequisite to any further consideration."

10:36AM 5         Do you see that, sir?

10:36AM 6   A.   Yes.

10:36AM 7   Q.   Did Ms. Hohne's home meet any of the prerequisites?

10:36AM 8   A.   No, it did not.

10:36AM 9   Q.   Because it didn't meet any the prerequisites of Step 1, is

10:36AM 10  that why GFA did not proceed to any of the analysis set forth

11  under Step 2?

10:36AM 12  A.   Yes, it is.

10:36AM 13  Q.   Sir, is the inspection of GFA conducted in Mr. Hohne's

10:37AM 14  home in August of 2015, consistent with the two-step protocol

10:37AM 15  set forth at Tab U of Exhibit 1?

10:37AM 16  A.   Yes, it is.

10:37AM 17         MR. MILLER:  Thank you, sir.  That's all I have.

10:37AM 18         THE COURT:  Okay.  Do you have any witnesses, ma'am?

10:37AM 19         MS. HOHNE:  I do.  Can I ask him one more question?

10:37AM 20         THE COURT:  No.  It's direct and redirect.  That's the

10:37AM 21  end of it, but you can call your witness.

10:37AM 22         MS. HOHNE:  Okay.

10:37AM 23         CASE MANAGER:  Raise your right hand.

10:37AM 24              (Oath was administered.)

10:37AM 25         THE WITNESS:  I do.

10:37AM  1           CASE MANAGER:  Please be seated and state and spell
10:37AM  2   your name for the record.
10:37AM  3           THE WITNESS:  My name is Christopher Brown.
         4   C-h-r-i-s-t-o-p-h-e-r, middle name, Charles, C-h-a-r-l-e-s, and
         5   last name, Brown, B-r-o-w-n.
10:38AM  6           THE COURT:  You have to get his qualifications first,
10:38AM  7   and then counsel has an opportunity to question him on his
10:38AM  8   qualifications.
10:38AM  9           MS. HOHNE:  Okay.
        10
        11           CHRISTOPHER CHARLES BROWN,
        12       Having been duly sworn, testified as follows:
10:38AM 13                   DIRECT EXAMINATION
10:38AM 14   BY MR. HOHNE:
10:38AM 15   Q.   Can you tell me where you live and your educational
10:38AM 16   background?
10:38AM 17   A.   I currently live in Pensacola, Florida.  I work for -- my
10:38AM 18   educational background is biochemistry and molecular biology,
        19   and most recently a medical physics student at Kennesaw State
10:38AM 20   University.
10:38AM 21   Q.   Okay.  And are you going to be seeking further education?
10:38AM 22   A.   Correct.  I'm working towards a Master's degree in medical
10:38AM 23   physics.
10:38AM 24   Q.   Okay.  What experience do you have in testing?
10:38AM 25   A.   I have worked as a teaching assistant and lab assistant

1  and research assistant for biochemistry, organic chemistry in

10:38AM  2  Polymar Labs.

10:38AM  3  Q.    Okay.  Can you tell me when the test took place?

10:38AM  4  A.    I actually -- the testing occurred over a number of weeks

10:38AM  5  because I currently have a full-time position, and I'm not

10:38AM  6  currently a full-time student.

10:38AM  7        I had access to research labs at Kennesaw State

8  University.

10:39AM  9        When I had time available, I would drive from

10:39AM 10  Pensacola, Florida, to Atlanta, and I would perform testing

10:39AM 11  that was available to me.

10:39AM 12  Q.    Okay.  Can you go over what the testing showed?

10:39AM 13  A.    Based off the tests -- do you have a copy -- I apologize,

10:39AM 14  Your Honor, I came directly from the hospital.

10:39AM 15        THE COURT:  Yes.  Before we get to that, counsel has a

10:39AM 16  right or an opportunity to ask questions on qualifications

10:39AM 17  since you are being called as an expert.

10:39AM 18        MR. MILLER:  I'm not sure that Ms. Hohne has tendered

10:39AM 19  the witness as an expert.

10:39AM 20        Maybe what I would like to do, if it's acceptable to

10:39AM 21  the Court, is my defer my voir dire of this witness.

22        THE COURT:  Okay.  That's fine.

10:39AM 23        MR. MILLER:  I'm not quite sure if he's a 702 witness

10:39AM 24  or not at this point, until my cross-examination.

10:39AM 25        THE COURT:  Okay.  I will allow that.

10:39AM 1          Why don't you ask him then --

10:39AM 2          MS. HOHNE:  Okay.  I have no idea what that meant.

10:39AM 3          THE COURT:  Well, it's asking him --

10:39AM 4          MS. HOHNE:  I'm not saying that he's an expert.

10:39AM 5          THE COURT:  Okay.  If that's what he was asking.

10:40AM 6          All right.  Let's take it a step at a time.

10:40AM 7          You can ask him when did he go out to the house, what

10:40AM 8  did he do, what did he find.

10:40AM 9  BY MS. HOHNE:

10:40AM 10  Q.   What did the test results show?

10:40AM 11          THE COURT:  When did you go out to the house?

10:40AM 12          THE WITNESS:  I did not physically go to the house and

10:40AM 13  remove any of the samples.

10:40AM 14          So therefore, a chain of custody was not followed in a

10:40AM 15  normal scientific manner.

10:40AM 16          This was performed as a service or as a request of

10:40AM 17  Rebecca, who is a personal friend, and it was done as a

10:40AM 18  scouting experiment to provide a baseline idea of whether we

10:40AM 19  should continue on and go with the company such as Cas

10:40AM 20  Analytics or someone else who would come out and do removal and

10:40AM 21  subsequent testing of the materials.

10:40AM 22          THE COURT:  Well, did you go to the house?

23          THE WITNESS:  I did not go to the house, Your Honor.

10:40AM 24          THE COURT:  Where did you get the samples?

10:40AM 25          THE WITNESS:  I received the samples directly from

10:40AM  1      Ms. Hohne.

10:40AM  2              MS. HOHNE:  I shipped them to him.

10:40AM  3              THE COURT:  Okay.  What did you do with them?

10:41AM  4              THE WITNESS:  Once I received the samples --

10:41AM  5              THE COURT:  What samples did you receive?

10:41AM  6              THE WITNESS:  I received three pieces of drywall,

10:41AM  7      approximately.  I believe, it was ten by 12 inches.

10:41AM  8              I then separated those into sections of approximately

10:41AM  9      two by two inches, and then performed the testing.

10:41AM 10              THE COURT:  Okay.  I don't want to ask you questions.

10:41AM 11      BY MS. HOHNE:

10:41AM 12      Q.   Okay.  What did the test results show?

10:41AM 13      A.   The samples I received, I tested them in accordance with

10:41AM 14      the same testing manner that Cas Analytics would do, which is a

10:41AM 15      recognized Chinese drywall testing facility in the United

10:41AM 16      States.

10:41AM 17              I separated them into two-by-two sections.

10:41AM 18              I then mechanically separated paper backing from the

10:41AM 19      front and the back.

10:41AM 20              I pulverized the paper and the gypsum samples in

10:41AM 21      separate containers with cyclohexane, which is a chemical

10:41AM 22      solvent.  Then those samples were injected into GEG -- GCMS

10:42AM 23      analysis equipment, which is a gas chromatograph mass

10:42AM 24      spectrometer, and then those samples were compared to drywall

10:42AM 25      samples that I had collected myself from Home Depot and Lowe's

10:42AM 1     -- simple samples.

10:42AM 2           And then those numbers were compared against testing

10:42AM 3     that had been performed by -- I apologize, this was done in a

10:42AM 4     test paper called, Statistical Analysis of Chemical Screening

10:42AM 5     of a Small Sample of Unused Chinese and Non-Chinese Drywall.

10:42AM 6           Based off of this, the CV or the citation did not come

10:42AM 7     across that she received.  I don't currently have that

10:42AM 8     information with me.

10:42AM 9           This is an accepted paper that has been used by the EPA

10:42AM 10    for criteria for testing.

10:42AM 11    Q.   So the test results did show that --

10:42AM 12    A.   The test results showed that there were elevated levels of

10:42AM 13    elemental sulfur in the samples that I received.

10:42AM 14          Where those samples came from, I'm not able to

10:43AM 15    determine.  As far as where the sulfur comes from, I'm unable

10:43AM 16    to determine.

10:43AM 17    Q.   So you can't say that if it came from the drywall or if it

10:43AM 18    was cross-contamination maybe from the wood that was in the

10:43AM 19    house?

10:43AM 20    A.    I have no way me being able to determine whether it was

10:43AM 21    resident drywall before, or was it in the resident drywall

         22   after.

10:43AM 23          The only thing I will say is that based off the samples

10:43AM 24    that I received, that the numbers were different across the

10:43AM 25    pieces of drywall.

10:43AM 1      So, each two-by-two section had a number that was

10:43AM 2 similar, but not quite within the realm of statistical

10:43AM 3 difference that I would expect.

4 Q.    Uh-huh.

10:43AM 5 A.    So, I'm not able to determine where the sulfur came from.

10:43AM 6 Q.    Okay.  What would you say needs to be done to try to find

10:43AM 7 out?

10:43AM 8 A.    As I stated, this test was performed so that we could

10:43AM 9 continue on and determine whether the additional testing should

10:43AM 10 be performed by a professional lab or by a scientific or

10:43AM 11 educational facility, such as Georgia Tech, Kennesaw State, or

10:44AM 12 another facility where a Ph.D would be able to put his CV on

10:44AM 13 the line to discuss it.

10:44AM 14 Q.    So you would say that the drywall needs to be tested again

10:44AM 15 and perhaps the wood in the house, what is porous, so you think

10:44AM 16 the wood should be tested?

10:44AM 17 A.    I think that the -- in my personal opinion, that an

10:44AM 18 additional test of the drywall should be performed.

10:44AM 19      And then based off of those results, determine whether

10:44AM 20 other testing should be done.

10:44AM 21      But that is my personal opinion.

10:44AM 22      MS. HOHNE:  Okay.  No more questions.

10:44AM 23      MR. MILLER:  Good morning, Mr. Brown.  My name is Kerry

10:44AM 24 Miller.

10:44AM 25      THE WITNESS:  Good morning, sir.

10:44AM  1          MR. MILLER:  Your Honor, may I approach the witness?

10:44AM  2          THE COURT:  Yes.

10:44AM  3          MR. MILLER:  The reason I want to approach, Mr. Brown,

10:44AM  4     is I want to make sure I have the same document that you have.

         5          THE WITNESS:  Okay.

10:44AM  6          MR. MILLER:  Because Ms. Hohne provided us with a

10:44AM  7     couple of different versions of it.

         8          THE WITNESS:  Okay.

10:45AM  9          MR. MILLER:  And I want to make sure we're working off

10:45AM 10     the same document.

10:45AM 11          THE WITNESS:  Okay.

        12

        13                      CROSS-EXAMINATION

        14     BY MR. MILLER:

10:45AM 15     Q.   Let's look at the first page.

10:45AM 16     A.   First page, 6.8, the last number for ph?

        17     Q.   Yes, could you look at that page?

10:45AM 18     A.   30.12 for the last number?

10:45AM 19     Q.   Yes.  The third page?

10:45AM 20     A.   Then .95 for standard deviation.

10:45AM 21     Q.   Yes, sir.

10:45AM 22     A.   Then a simple discussion based off of what I had done.

10:45AM 23          THE WITNESS:  Again, Your Honor, I would like to add

10:45AM 24     that this was never intended to be introduced as specific

10:45AM 25     evidence.

10:45AM 1      It was supposed to be used to determine whether we

10:45AM 2   should continue on or not.  I was giving her a basic idea of

10:45AM 3   where we should go.

10:45AM 4   BY MR. MILLER:

10:45AM 5   Q.   Mr. Brown, my understanding is that the only opinion that

10:45AM 6   you have been able to express this morning in your testimony is

10:45AM 7   that -- your personal opinion -- is that some accredited

10:45AM 8   testing laboratory ought to take a look at Ms. Hohne's drywall;

10:45AM 9   is that it?

10:45AM 10  A.   Based off the current results, I would recommend that a

10:45AM 11  third-party company be used to do testing.

10:45AM 12  Q.   Sir, as I understand it, you don't personally have any

10:46AM 13  scientific opinions based upon peer-reviewed literature,

10:46AM 14  treatises, learned treatises, or other academic work that would

10:46AM 15  support scientific conclusions that you would opine as to the

10:46AM 16  source of the sulfur in the drywall in Ms. Hohne's home,

10:46AM 17  correct?

10:46AM 18  A.   Based on the information that I was able to obtain, I am

10:46AM 19  not able to determine the source of the sulfur, nor am I able

10:46AM 20  to make a specific determination other than the levels that I

10:46AM 21  witnessed in the testing.

10:46AM 22  Q.   Sir, if you look at the discussion you have on the last

10:46AM 23  page of your document that is in front of you, I think it's the

10:46AM 24  last complete sentence of this document.

10:46AM 25      It states, sir, and I quote:  "We are unable to

10:46AM 1    determine the root cause with this limited test."

10:46AM 2         Do you see that, sir?

10:46AM 3    A.   Correct.

10:46AM 4    Q.   And that is your ultimate conclusion, you weren't able to

10:47AM 5    determine any root cause of sulfur in the drywall, correct,

10:47AM 6    sir?

10:47AM 7    A.   Regrettably, I'm not able to determine the root cause.

10:47AM 8    Q.   I think in response to Judge Fallon's questions, when you

10:47AM 9    took the stand, you never personally inspected Ms. Hohne's

10:47AM 10   residence, correct?

10:47AM 11   A.   I have seen the home, but I have never done an inspection,

10:47AM 12   and I never removed the materials.

10:47AM 13   Q.   So you haven't done an inspection of Ms. Hohne's home,

10:47AM 14   correct?

10:47AM 15   A.   No.  And I would not be qualified in any way, shape, or

10:47AM 16   form to perform an inspection.

10:47AM 17   Q.   You didn't remove the drywall materials that you sampled

10:47AM 18   from Ms. Hohne's home, correct?

10:47AM 19   A.   Negative.

10:47AM 20   Q.   There is no chain of custody in connection with those

10:47AM 21   samples, correct, sir?

10:47AM 22   A.   Correct.  This would not currently stand up to a

10:47AM 23   scientific rigor.

10:47AM 24        MR. MILLER:  At this point, Your Honor, I don't think

10:47AM 25   this witness has been established as an expert under 702.

10:48AM   1          He has expressed one personal opinion, which I guess he

10:48AM   2     can testify to.  I think it's a weight and credibility issue.

10:48AM   3          But we would object to the qualification of this

10:48AM   4     witness as any kind of expert under Rule 702 or under *Daubert*.

10:48AM   5          THE COURT:  Yes, I would grant that.

10:48AM   6          I would allow his testimony to be made as a proffer, we

10:48AM   7     will put it in that way.

10:48AM   8          MR. MILLER:  If his testimony is made as a proffer, but

10:48AM   9     not as an expert witness, Your Honor, we have no further

10:48AM  10     questions.

10:48AM  11          THE COURT:  All right.  Any rebuttal or any redirect

10:48AM  12     questions that you have, ma'am?

10:48AM  13          MS. HOHNE:  No, Your Honor.

10:48AM  14          THE COURT:  Okay.  You are excused.  Thank you very

10:48AM  15     much.

10:48AM  16          Okay.  Anything else -- any other witnesses or

10:48AM  17     anything, Ms. Hohne, that you wish to put on?

10:48AM  18          MS. HOHNE:  No other witnesses.

10:48AM  19          Can I speak freely?

10:48AM  20          THE COURT:  I will let you all -- each of you take five

10:48AM  21     minutes and just talk to me.

10:48AM  22          Go ahead.  You can sum up.

10:48AM  23          MS. HOHNE:  Okay.  I just wanted to say that I worked

10:49AM  24     for the construction company during the remediation, while the

10:49AM  25     remediation was going on.

10:49AM 1      It was known throughout that industry, that this

10:49AM 2  remediation protocol was not working.  It was said that, by

10:49AM 3  different people, that someone --

10:49AM 4      THE COURT:  You are putting in evidence now, and you

10:49AM 5  have to just argue what evidence I have before me, and what I

10:49AM 6  should conclude as a result of the evidence before me.

10:49AM 7      You can't talk and introduce any other evidence.

10:49AM 8      It's an opportunity to sum up to me.

10:49AM 9      You have put your witness on the stand.  You have

10:49AM 10 cross-examined.

10:49AM 11     What do you conclude from that?

10:49AM 12     MS. HOHNE:  Okay.  My conclusion is that they did not

10:49AM 13 take any samples from my house when they came out to do the

10:49AM 14 testing.  They didn't take any drywall samples.  They didn't

10:50AM 15 take anything to test.

10:50AM 16     And I had said all along that this house needs to be

10:50AM 17 tested.  There needs to be further tests.

10:50AM 18     Me and my child, we moved in this house, and we started

10:50AM 19 getting sick again, the exact same symptoms that we had prior

10:50AM 20 to the remediation protocol, prior when we moved out in

10:50AM 21 December of 2009.

22     THE COURT:  Okay.

10:50AM 23     MS. HOHNE:  I would like for more testing to be done by

10:50AM 24 a third party to test the drywall, and the wood and whatever

10:50AM 25 other materials that need to be tested to find out what this

10:50AM 1    problem -- what is causing this problem in the house.

2         THE COURT:  Okay.

10:50AM 3         MS. HOHNE:  And the drywall is from Palatka, Florida,

10:50AM 4    which is from Lafarge.  They are known to be a recycling plant.

10:50AM 5         I think there needs to be some type of investigation

10:50AM 6    looking into that and more about that drywall to make sure

10:50AM 7    maybe that drywall doesn't have any recycle drywall in it.

10:50AM 8         MR. MILLER:  Again, Your Honor, I would object.  There

10:50AM 9    has been no evidence about the plant who produced the drywall

10:51AM 10   in her house.

10:51AM 11        THE COURT:  You see, the problem that you face is that

10:51AM 12   this is a settlement, and the settlement is based on protocol.

10:51AM 13        The parties testified that they did the protocol.  They

10:51AM 14   did what was required that you agreed in the settlement.

10:51AM 15        They didn't manufacture the drywall.  Their purpose is

10:51AM 16   to remediate the problem, and they do it according to a

10:51AM 17   protocol that was agreed upon by the parties.

10:51AM 18        That's what they have to do, according to the

10:51AM 19   settlement.

10:51AM 20        You are not suing, or in this case, the party who

10:51AM 21   remediated it, didn't -- he's just -- they are just following a

10:51AM 22   protocol.  It's an agreed settlement protocol.

10:51AM 23        MS. HOHNE:  Right.

10:51AM 24        THE COURT:  That's what I'm dealing with, whether or

10:51AM 25   not they followed the protocol.

10:51AM 1         MS. HOHNE:  Well --

10:51AM 2         THE COURT:  And that's the issue, because it was a

10:52AM 3    settlement of the case.  The settlement is to agree to follow

10:52AM 4    the protocol, plus pay attorney's fees, and the parties agreed

10:52AM 5    to it.

10:52AM 6         MS. HOHNE:  Right.  You are right, I did agree to that.

10:52AM 7    I did completely agree to the whole settlement.

10:52AM 8         However, I did not know that the settlement and the

10:52AM 9    protocol would not work.

10:52AM 10        Wood is porous, and from the pictures you can see there

10:52AM 11   is dust on the floor, on the tile, and I don't believe that GFA

10:52AM 12   inspection.  I think that needs to be looked into because the

10:52AM 13   pictures clearly show that there is dust.

        14        THE COURT:  Okay.

10:52AM 15        MS. HOHNE:  So maybe all of the dust and the debris

10:52AM 16   wasn't cleared out of the house.

10:52AM 17        THE COURT:  All right.  Okay.  Let me hear from

10:52AM 18   Mr. Miller.

10:52AM 19        MR. MILLER:  Thank you, Judge.  Kerry Miller for Knauf.

10:52AM 20        I would sum up this evidentiary hearing as follows, but

10:53AM 21   really only two statements.

10:53AM 22        No. 1, Your Honor, the evidence, both in terms of the

10:53AM 23   testimony and the documents, clearly show that Ms. Hohne's home

10:53AM 24   was remediated pursuant to the Court-Approved Chinese Drywall

10:53AM 25   Remediation Program.

10:53AM  1          It was done completely in accordance with the protocol,

10:53AM  2     according to schedule of the Court-approved settlement, which

10:53AM  3     is broader than, and more extensive than the CPSC and other

10:53AM  4     approved remediation protocols.  That would be Point 1, that we

10:53AM  5     have established today.

10:53AM  6          Point 2, Your Honor, would be that upon receiving a

10:53AM  7     complaint from Ms. Hohne's attorney back in 2013, almost a year

10:53AM  8     after the home was turned back over to Ms. Hohne, about

10:53AM  9     residual odors in the home, Moss, the remediation contractor,

10:53AM 10     went back out, conducted an inspection, and confirmed to the

10:53AM 11     Moss foreman that the home exhibited no symptoms of Chinese

10:54AM 12     drywall odor.

10:54AM 13          He looked at the air-conditioning coil, which is the

10:54AM 14     first sign, if you will, of Chinese drywall corrosion, and

10:54AM 15     found no symptomology with the air-conditioning coil.

10:54AM 16          He then looked at various wires to the home and found

10:54AM 17     nothing, and there was no odor in the home.

10:54AM 18          Your Honor, then fast forward to 2015, Ms. Hohne began

10:54AM 19     appearing in this Court making complaints on the record.

10:54AM 20          In connection with those complaints she was making on

10:54AM 21     the record, Your Honor asked -- and we complied with doing

10:54AM 22     inspection of Ms. Hohne's home in August of 2015.

10:54AM 23          Your Honor, at that inspection we had Mr. Phil Adams

10:54AM 24     from Moss, the project supervisor, Mr. Tom Ortner from GFA, the

10:54AM 25     environmental certification company and project supervisor, and

10:54AM 1   someone from my office went to Ms. Hohne's home to take

10:54AM 2   photographs.

10:54AM 3         More importantly, Your Honor, they followed the CPSC

10:54AM 4   inspection protocol in connection with that inspection.

10:54AM 5         They followed that protocol, Your Honor.  It's a

10:55AM 6   two-step protocol.

10:55AM 7         Step 1 says, look for signs of Chinese drywall, and I

10:55AM 8   summarize that.  Look for signs where we know they show up,

10:55AM 9   based upon a lot of evidence and information that this Court,

10:55AM 10  the CPSC, and other agencies have accumulated over time.

10:55AM 11        That is what Moss and GFA did.  They followed the

10:55AM 12  protocol.  They found no evidence, and they wrote a report.

10:55AM 13        That evidence has gone into the record, Your Honor,

10:55AM 14  unrebutted.  That the home was properly remediated, in the

10:55AM 15  first instance, and when Ms. Hohne and her counsel had

10:55AM 16  inquiries, it was properly responded to with the protocol that

10:55AM 17  was done, an inspection that was done, per the protocol with

10:55AM 18  the CPSC for inspections.

10:55AM 19        Your Honor, and finally in terms of Ms. Hohne's case,

10:55AM 20  her witness, her documents were not able to refute the fact

10:55AM 21  that the home was properly remediated, No. 1.

10:55AM 22        And No. 2, that a proper inspection of the home was

10:55AM 23  done in August of 2015, after Ms. Hohne voiced her concerns to

10:56AM 24  the Court.

10:56AM 25        With that, Your Honor, we would be happy to submit

10:56AM 1    proposed findings of fact and conclusions of law in connection

10:56AM 2    with this evidentiary hearing or whatever the Court would

10:56AM 3    prefer in terms of a written submission, or if the Court would

10:56AM 4    prefer, we are fine with resting on the record that we

10:56AM 5    established today.

10:56AM 6            THE COURT:  Okay.  I will take this under consideration

10:56AM 7    and I will write my findings on it.

10:56AM 8            MR. MILLER:  So you don't need findings from us, Judge?

10:56AM 9            THE COURT:  No.  Thank you very much.

10:56AM 10           Okay.  Court is in recess.

11           CASE MANAGER:  All rise, please.

12                              *    *    *

13

14                       REPORTER'S CERTIFICATE

15        I, Terri A. Hourigan, Certified Realtime Reporter,
     Official Court Reporter for the United States District Court,
16   Eastern District of Louisiana, do hereby certify that the
     foregoing is a true and correct transcript to the best of my
17   ability and understanding from the record of the proceedings in
     the above-entitled and numbered matter.

18

19                            *s/Terri A. Hourigan*
                              Terri A. Hourigan, CRR, RPR
20                            Certified Realtime Reporter
                              Registered Professional Reporter
21                            Official Court Reporter
                              United States District Court
22                            Terri_Hourigan@laed.uscourts.gov

23

24

25