UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| | : | MDL NO. 2047 |
| IN RE: CHINESE MANUFACTURED DRYWALL | : | |
| PRODUCTS LIABILITY LITIGATION | : | SECTION L |
| | : | |
| | : | JUDGE FALLON |
| | : | MAGISTRATE JUDGE |
| .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. .. : | | WILKINSON |

**THIS DOCUMENT RELATES TO:** ALL CASES

### FINDINGS OF FACTS AND CONCLUSIONS OF LAW FROM THE NOVEMBER 17, 2015 EVIDENTIARY HEARING

**I.     INTRODUCTION**

In the course of discovery regarding alter ego relationships between and among Taishan Gypsum Co., Ltd. ("TG") and its wholly-owned subsidiary and alter ego Taian Taishan Plasterboard Co., Ltd. ("TTP") (collectively, "Taishan") and its parent companies and whether any of Taishan's affiliates or subsidiaries violated the injunction prong of the Court's July 17, 2014 Contempt Order, it came to the Court's attention that Taishan may have endeavored to keep from discovery the computers and electronic mail of its former employee, Mr. Peng Wenlong ("Mr. Peng") and preclude further testimony by Mr. Peng in this litigation. Accordingly, on September 18, 2015, the Court directed that an evidentiary hearing take place to determine whether Taishan's actions amounted to spoliation, contempt, and/or required adverse inferences relating to allegations that:

(1) Taishan knew of and refused or intentionally failed to disclose the current (i.e., post-employment) business relationships with and the locations or whereabouts of Mr. Peng; and
(2) Taishan knew that Mr. Peng had documents and/or computer-stored information but denied knowing the same or intentionally failed to disclose it and did not take proper measures to protect or collect these documents and/or computer-stored information. (R. Doc. 19657)

1

(R. Doc. 19657). The Court has now received the parties' argument and evidence and issues the following findings of fact and conclusions of law.

## II.  FINDINGS OF FACT

### a. Taishan's Initial Appearance and the Subsequent Default Judgment

1.  Upon receipt of the June 15, 2009 transfer order from the Judicial Panel for Multidistrict Litigation, this Court promptly issued Pretrial Order No. 1, on June 16, 2009, and posted it on the Court's official website. *See* R. Doc. 2. Paragraph 14 of PTO 1 made clear the duty of each party and each counsel in the consolidated proceedings to preserve documents and, it further specified the potential consequences for the breach of this duty: "All parties and their counsel are reminded of their duty to preserve evidence that may be relevant to this action…Failure to comply may lead to dismissal of claims, striking of defenses, imposition of adverse inferences or other dire consequences."

2.  The first perfected service on Taishan in this litigation was on May 8, 2009 in *Mitchell Co., Inc. v. Knauf Gips KG*, Case No. 09-4115. *Mitchell* was originally filed on March 6, 2009 in the U.S. District Court for the Northern District of Florida. *See* (R. Doc. 1-1, Case No. 09-4115).

3.  On May 1, 2009, *Germano v. Taishan Gypsum Co., Ltd.*, Case No. 09-6687 was filed in the U.S. District Court for the Eastern District of Virginia as a Virginia class action against Taishan by the owners of homes located in Virginia which were alleged to contain Taishan-manufactured Chinese drywall. *See* (R. Docs. 1-1, 1-2, Case No. 09-6678). On August 3, 2009, Taishan was served in that matter pursuant to the Hague Convention. *See* (R. Doc. 1-7, Case No. 09-6687). *Germano* was then transferred to the U.S. District Court

for the Eastern District of Louisiana and consolidated with this MDL litigation on October 13, 2009. Thereafter, the class was expanded to a nationwide class. *See* (R. Doc. 470).

4. Taishan failed to timely answer the complaints or otherwise enter an appearance in *Mitchell* and *Germano*, although it had been properly served in both matters. (R. Doc. 52). As a result, the Court after encouraging a response and allowing extensive delay finally entered preliminary defaults against Taishan in *Germano* and *Mitchell*. (R. Docs. 277, 487); *see In re Chinese Manufactured Drywall Products Liab. Litig.*, 894 F. Supp. 2d 819, 832 (E.D. La 2012) *aff'd*, 742 F.3d 576 (5th Cir. 2014) and 753 F.3d 521 (5th Cir. 2014).

5. After affording Taishan more than a reasonable amount of time to answer or enter an appearance, the Court moved forward with an evidentiary hearing under FRCP 55, in order to monetize the claims of 14 intervening plaintiffs in *Germano* as a predicate for entry of a default judgment. (R. Docs. 502, 1223, 1258, 2380). Following this hearing on February 19 and 20, 2010, the Court issued detailed Findings of Fact & Conclusions of Law. (R. Doc. 2380). On May 11, 2010, the Court issued a Default Judgment against Taishan in *Germano* and in favor of the intervening plaintiffs, in the amount of $2,609,129.99. (R. Doc. 3031). On June 10, 2010, the last day to timely do so, Taishan filed a Notice of Appeal of the Default Judgment in *Germano*. (R. Doc. 3670). On this same day, Taishan also entered its appearance in *Germano* and *Mitchell*. (R. Doc. 3668).

6. After Taishan entered its appearance in the MDL through its then-counsel Hogan Lovells LLP ("Hogan Lovells"), it immediately sought to have the Default Judgment in *Germano* and the Preliminary Default in *Mitchell* vacated for lack of personal jurisdiction, as well as on procedural grounds. (R. Docs. 5436, 5583).

7.      The Court of Appeal recognized that Taishan's motion for the first time raised jurisdictional issues which were not raised or addressed by the district court. The Court of Appeal thus remanded the case to the district court to address the jurisdictional issue.

8.      Formal personal jurisdiction discovery of Taishan began in October 2010. *See* (R. Docs. 5839, 5840). Discovery included the production of both written and electronic documents, as well as the depositions of Taishan's corporate representatives. This discovery required close supervision by the Court. The first Taishan depositions were held in Hong Kong on April 4-8, 2011. *See* (R. Docs. 8296, 8297). Upon return to the United States, several motions were filed seeking to schedule a second round of Taishan depositions as a result of problems during the depositions. The Court, after reviewing the transcripts from the depositions, concluded that the "depositions were ineffective." (R. Doc. 9107). Accordingly, the Court ordered the parties to move forward with further written discovery and to schedule a second round of Taishan depositions, but with knowledgeable and prepared witnesses, a single translator, and Court supervision. *See id.*

9.      The Court scheduled the second round of Taishan depositions for the week of January 9, 2012 in Hong Kong. Counsel for the interested parties and Judge Fallon traveled to Hong Kong for these depositions. On June 29, 2012, after a year-and-a-half of personal jurisdiction discovery on Taishan, the Court presided over a hearing on Taishan's motions to dismiss. The Court coordinated its hearing with Judge Joseph Farina of the 11th Judicial Circuit of Florida, who had a similar motion involving Taishan's challenge to personal jurisdiction.

10.     Subsequently, on September 4, 2012, this Court determined that is had jurisdiction over TG and its alter ego TTP and denied the motions to vacate and dismiss.

Taishan appealed the decision of this Court.  However, the rulings of this Court were affirmed by the Court of Appeals for the Fifth Circuit.  *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 742 F.3d 576 & 753 F.3d 521 (5th Cir. 2014).

11.    Taishan filed no petition for *writ of certiorari*, and the judgment in *Germano* became final and enforceable.  In order to execute the judgment, Plaintiffs moved for a Judgment Debtor Examination.  On June 20, 2014, the Court ordered Taishan to appear in open court on the morning of July 17, 2014 for the Judgment Debtor Examination.  (R. Doc. 17774).

12.    Taishan failed to appear for the July 17, 2014 Judgment Debtor Examination.  Accordingly, on July 17, 2014, the Court entered an Order holding Taishan in contempt and assessing penalties, fees, and enjoining Taishan or its affiliates or alter egos from doing business in the United States until it purged itself of its contempt.  (R. Doc. 17869).  The Contempt Order further provided that if Taishan violated the injunction, it must pay a further penalty of 25% of the profits earned by the company or its affiliates who violate the order.  *Id.*

      **b.  Taishan's Return to the Litigation and the Contempt Track**

13.    On February 17, 2015, Taishan returned to the litigation with the appearance of new counsel, Alston & Bird LLP ("Alston Bird").

14.    On February 20, 2015, the Plaintiffs' Steering Committee (the "PSC)") sought to continue its discovery of Taishan, issuing a 30(b)(6) deposition notice and seeking production of documents regarding, *inter alia*, Taishan's assets in the United States and entities affiliated with Taishan in an effort to determine if they or any affiliated entities did business in the United States in violation of the injunction.  (R. Doc. 18369).

15.     On March 17, 2015, the Court ordered BNBM, BNBM Group, CNBM, CNBM Group, and Taishan to participate in an expedited discovery track related to the issue of whether Taishan or any of its affiliates or alter egos violated the Court's injunction by doing business in the United States during the period it was in contempt of Court.

16.     On March 19, 2015, the PSC served Taishan with a 30(b)(6) Notice of Deposition and expedited document requests related to violations of the Contempt Order (R. Doc. 17869) and alter-ego relationships among Taishan, BNBM, BNBM Group, CNBM, and CNBM Group.  (R. Doc. 18500).  The PSC also sought the deposition of Mr. Peng.  (R. Doc. 18502).

17.     On April 6, 2015, Taishan's counsel and the PSC engaged in a meet-and-confer-conference where Taishan's counsel informed the PSC of its intention to investigate the status of Mr. Peng's files and his current whereabouts.  (PSC Exhibit 30).

18.     On April 24, 2015, Mr. Herman of the PSC reported to the Court that little progress had been made and the PSC still had not been made aware of Mr. Peng's whereabouts or the location of his files.  (PSC Exhibit 70, pp. 10:10-13, 11:18-21, 13:21-14:1).

19.     On April 28, 2015, Taishan filed a discovery status report stating that Mr. Che Gang ("Mr. Che") would serve as Taishan's 30(b)(6) witness and that Mr. Peng had left Taishan's employment in the Spring of 2014.  (R. Doc. 18765).

20.     In an email to counsel for Taishan dated May 18, 2015, Mr. Herman of the PSC again inquired about Mr. Peng's files: "Have you located the e-files and other custodial files of Jia Tongchun and Wenlong Peng? When may we expect production?" (PSC Exhibit 44).

6

In that email, the PSC further requested that Taishan "concentrate efforts on the custodial files of Che Gang, Peng, Jia…" *Id.*

21. Beginning on June 2, 2015, the PSC moved forward with the examination of Taishan's corporate designee, Mr. Che. (PSC Exhibit 44).

22. At the June 2, 2015 30(b)(6) deposition, Mr. Che testified that Mr. Peng had formally left Taishan's employment but had continued to assist Taishan with the U.S. Drywall litigation until that function was transitioned to Mr. Che. (PSC Exhibit 85, 6/2/15 Deposition of Che Gang ("Che Depo."), 49:3-21). While Mr. Che claimed to not know where Mr. Peng worked, he had been in telephone contact with Mr. Peng in preparation for and leading up to his deposition as the corporate representative for Taishan. He stated he believed Mr. Peng lived in Taian City and provided Mr. Peng's phone number. Che Depo., 6/2-4/2015, pp. 29:8-11, 49:3-21, 105:20-21, 106:1-107:19, 108:3-12, 150:3-13, 206:10-19.

23. There were several topics about which Mr. Che was not fully able to testify, such as details about the refusal of Taishan to appear at the Judgment Debtor Hearing. *See id.* 264:2-23. For such topics, he indicated that Mr. Peng was the person from Taishan who could have best answered these questions. *Id.* 265:15-22.

    **c. Discovery Related to Mr. Peng**

24. From April 2015 through August 2015, Taishan and the PSC engaged in numerous meet-and-confer sessions on discovery-related issues, including the location of Mr. Peng's custodial files and his whereabouts. (Taishan Supplemental Exhibits 3-24).

25. Following a discovery-related meet-and-confer on August 28, 2015, and as evidenced by an email from the PSC to counsel for Taishan dated August 31, 2015, the PSC

was under the impression that Mr. Peng's laptop was unsearchable and/or incapable of providing responsive documents. (PSC Exhibit 16).

26. On August 31, 2015, Taishan produced a declaration from Chairman Jia, which stated that Mr. Peng had been the Manager of TG's Foreign Trade Department and Chairman Jia had "tasked Mr. Peng with the responsibility of monitoring the developments in the lawsuit, working with TG's counsel, and coordinating TG's involvement" in the litigation. (PSC Exhibit 12, ¶ 4). When Mr. Peng left Taishan in March 2014, Chairman Jia asked that he continue as "a special consultant continuing in the role that he served while an active employee," which he did "on-and-off as needed for several months, including in TG's decision to retain new counsel and resume participation in the U.S. lawsuits." *Id.* at ¶ 5, 6. Because of his continued assistance as a consultant, Mr. Peng and Taishan "entered into a more formal consulting agreement for his services for which he received a onetime lump sum payment." *Id.* at ¶ 6.

27. Despite Mr. Peng's continuing role as a consultant, Chairman Jia also stated, under penalty of perjury that "Mr. Peng voluntarily left the employment of TG in March 2014, to pursue another career at a company unrelated to TG, TTP, and to my knowledge, [and the knowledge of] any of the Defendants in this action, including any BNBM or CNBM entity" and Mr. Peng "never told me the name of the company where he currently works, nor has he told anyone at TG to my knowledge." *Id.* at ¶ 3. Chairman Jia, like Mr. Che, did offer a phone number, but said that Mr. Peng was no longer cooperating. *Id.* at ¶ 7.

28. On September 12, 2015, Taishan located Mr. Peng's desktop computer. Taishan was unsuccessfully in locating Mr. Peng's work computer in April and May of 2015 but

ultimately located the computer in September, after Chairman Jia learned of the issue and insisted that the computer be found. (Taishan Supplement Exhibit 1).

29. On September 13, 2015, the PSC emailed the Court with copies to opposing counsel alleging that a PSC-retained private investigator had discovered information about Mr. Peng's whereabouts and current employment. The PSC's email to the Court with copies to opposing counsel alleged spoliation and other discovery misconduct and averred that such misconduct may require the Court to impose sanctions. (PSC Exhibit 37).

30. On September 16, 2015, on the eve of its continued deposition, Taishan provided the PSC with two new documents: a Declaration of Jia Tongchun for Clarification and Supplementation and an "Employment Agreement" with Mr. Peng from February 2015.

31. The "Employment Agreement," dated February 2, 2015 (more than 11 months after Mr. Peng left Taishan but continued to consult with on an "as needed" basis), provided that "[b]ased on Mr. Peng's full understanding of the Taishan Chinese drywall litigations in U.S., [Taishan] hires [Mr. Peng] to be the consultant for these cases" for the sum of 50,000 Yuan plus expenses. (PSC Exhibit 46).

32. In his new declaration, Chairman Jia "clarifies" some points he made in his prior declaration. (PSC Exhibit 11). First, while he had claimed that he was not told where Mr. Peng worked, he did in fact know the entire time that Mr. Peng worked at Shenyang Taishi Rock Wool Co., Ltd. ("Shenyang") which is a wholly-owned subsidiary of Taishi Rock Wool Co. Ltd. ("Taishi). *Id.* at ¶ 4. While he claimed that Mr. Peng was at a company "unrelated" to Taishan or any of the other Defendants, in fact, Taishi was owned by Shandong Taihe Building Material Co., Ltd., which owns 92 percent of Taishi and 14 percent of Taishan, and is itself owned by Chairman Jia and his family. *Id.* at ¶ 4 ("I and my family are one of 503

individual shareholders or Shandong Taihe Building Material Co., Ltd.). Notwithstanding the foregoing, Chairman Jia says that he held a "sincere belief that Sheyang is unrelated to any Defendant in this action" and he insisted that his prior declaration was "technically correct", but acknowledged that "it gave the misimpression that I personally did not know where Mr. Peng currently works, when in fact I do and I did know." *Id.* at ¶ 6.

33. On September 17 and 18, 2015, the PSC deposed Chairman Jia in Hong Kong. As is pertinent to Mr. Peng's whereabouts, Chairman Jia testified that:

> a. He knew at all times where Mr. Peng worked. (PSC Exhibits 92 and 93, 2015 Jia Deposition ("Jia Depo."), pp. 109:14-110:17, 110:19-11:18).
>
> b. Mr. Peng is Executive Director of Taishi. *Id.*, pp. 110:19-111:18.
>
> c. Chairman Jia's wife is Chairman of the Board at Taishi. *Id.*, p. 171:12-13.
>
> d. Chairman Jia first learned about Mr. Peng's employment at Taishi from his nephew who is, among other things, the legal representative of Shenyang. *Id.*, p. 171:10-11.

34. As is pertinent to Mr. Peng's computer, Chairman Jia testified that Mr. Peng continued to use his computer as a litigation consultant and it contains some of the information he kept about the litigation. *Id.*, pp. 45:13-19, 86:14-18.

35. The day after Taishan's 30(b)(6) deposition concluded, Taishan provided Mr. Peng's home address to the PSC. (PSC Exhibit 32).

36. On September 17, 2015, the Court ordered an evidentiary hearing on issues of spoliation, contempt, adverse inferences and possible penalties related to the discovery and disclosure of information related to Mr. Peng. After the discovery of Mr. Peng's desktop

computer on September 12, the Court ordered Taishan to refrain from changing, deleting or modifying any aspect of the computer or its hard drive.  (R. Doc. 19526).

37. At an October 13, 2015 status conference, the Court ordered Taishan to produce from Mr. Peng's custodial files all non-privileged documents regardless of relevance to the contempt track or other issues in the litigation.  The Court directed Taishan to produce the documents to the PSC on a rolling basis and to produce a privilege log.

38. From October 16, 2015, through November 4, 2015, Taishan produced on a rolling basis over 84,000 documents from Mr. Peng's custodial files.  The number of pages produced was more than 383,000.  (PSC Exhibit 50).  Taishan also provided a privilege log describing 3,150 items.  (Taishan Supplemental Exhibit 1 and Taishan Exhibit 6).

### d. The Deposition of Mr. Peng

39. Mr. Peng who purportedly had previously refused to cooperate now agreed to voluntarily make himself available for a deposition.

40. Mr. Peng voluntarily traveled from China to appear for two and half days of deposition testimony in New York City from November 12, 2015 through November 14, 2015.  (PSC Supplemental Exhibit 145, 2015 Peng Depo. ("Peng Depo.")).  During his deposition, he testified to the following:

   a. He confirmed he consulted with Taishan for, and assisted Mr. Che with, matters related to the litigation.  *Id.*, pp. 173:20-174:8, 195:6-196:4.

   b. He used his personal computer and desktop for Taishan business, including his work on the litigation.  *Id.* pp. 203:18-204:1, 204:15-205:12, 206:2-207:9.

   c. All the documents relating to the litigation are electronic and were on his computers and emails.  *Id.*, p. 223:13-23.

11

    d.  He was told in 2010 to preserve documents for the litigation. *Id.*, p. 226:4-15.

    e.  He left his desktop at Taishan when he last left his office in February 2014, but took his laptop with him. *Id.*, pp. 219:12-17, 240:21-241:5, 242:18-243:9, 277:13, 278:9-13.

    f.  He continued to serve as the litigation consultant with Taishan into 2015 when he gradually began to hand these responsibilities over to Mr. Che. *Id.*, p. 231:19-232:2.

    g.  He continued to use his laptop for business, including emails related to Taishan and the litigation, even after he left Taishan. *Id.*, pp. 204:15-205:12, 206:2-207:9, 209:10-13, 209:22-24, 211:6-15, 291:17-291:3.

    h.  He used a special email address when communicating on behalf of Taishan about the litigation and stopped using it in March 2015. *Id.*, pp. 334:24-335:2, 336:8-11, 336:25-337:10, 337:17-338:6, 339:3-13.

    i.  He turned over his laptop, the only one he ever used for Taishan business, to Mr. Che in October 2015. *Id.*, pp. 334:15-335:13.

    j.  He was not consulted about the Chain of Custody declaration that had been produced by Taishan and signed by Mr. Che. *Id.*, p. 351:16-22.

    k.  He willingly testified when Chairman Jia requested him to do so. *Id.*, pp. 172:24-173:9.

41.    Because of this factual scenario, a hearing was set for November 17, 2015 to determine whether Taishan's actions amounted to spoliation, contempt and/or required adverse inferences and, if so, to determine the appropriate consequences regarding those actions.

### e. The November 17, 2015 Hearing

42. On November 9, 2015, Taishan produced the Chain of Custody Statement of Che Gang, which outlines the chain of custody of Mr. Peng's desktop computer. The statement states that Taishan unsuccessfully attempted to locate Mr. Peng's work computer in April and May of 2015 and eventually located the computer on September 12, 2015. On September 25, 2015, after the 30(b)(6) depositions had concluded, Taishan learned that Mr. Peng had a laptop. On September 29, 2015, discovery vendor Grant Thorton imaged Mr. Peng's desktop computer hard drive and searched three of Mr. Peng's email addresses. On October 8, 2015, Mr. Peng tendered his laptop to Mr. Che, and the vendor imaged that laptop. On that date, each of three imaged drives were sealed into containers in the vendor's possession in China. On October 27, 2015, two additional emails for Mr. Peng are identified and searched. (PSC Exhibit 105).

43. Prior to the November 17, 2015 evidentiary hearing, the Parties agreed to disclosure deadlines but could not agree on the scope of the hearing. At the October 21 status conference, the PSC proposed a broad scope. The Court rejected the PSC's proposal in favor of a more limited scope focused on Taishan's discovery conduct since Taishan's return to the litigation in February 2015. (R. Doc. 19656).

44. The Court directed that an evidentiary hearing take place to address issues of spoliation, contempt, and/or adverse inferences relating to allegations that:

    a. Taishan knew of and refused or intentionally failed to disclose the current (i.e., post-employment) business relationships with and the locations or whereabouts of Mr. Peng; and

    b. Taishan knew that Mr. Peng had documents and/or computer-stored information but denied knowing the same or intentionally failed to disclose it and did not take proper measures to protect or collect these documents and/or computer-stored information. (R. Doc. 19657)

45. The evidentiary hearing was held on November 17, 2015. Opening statements were made by counsel for the PSC and Taishan and exhibits were offered and admitted by both sides, subject to objections lodged with the Court. (R. Doc. 19752). Closing arguments were heard on December 15, 2015.

## III. CONCLUSIONS OF LAW

46. The Court finds, as a matter of law, that Taishan engaged in discovery abuses. Specifically, Taishan's protracted withholding of relevant evidence, as more fully described below, is sanctionable under Rule 37 of the Federal Rules of Civil Procedure and through this Court's inherent powers to issue discovery sanctions.

47. When considering discovery abuses, the court must consider the suitability of remedies based on defendants' conduct. *See Coane v. Ferrara Pan Camdy Co.*, 898 F.2d 1030 (5th Cir. 1990). The court's remedies must be just and related to the conduct of the defendants. *Insurance Corp. of Ireland v. Campagnie Des Bauxites de Guinee*, 456 U.S. 694, 707 (1984). Thus, the issue before the Court is the type and nature of the appropriate remedies.

    **a. The PSC Has Not Proven Spoliation**

48. This Court's Pretrial Order No. 1, entered on June 16, 2009, required all parties to "take reasonable steps to preserve all documents, data and tangible things containing information potentially relevant to the subject matter of this litigation." (R. Doc. 2)

49. The Court finds insufficient evidence of intentional failure to preserve evidence under PTO 1 to justify a finding of spoliation. The PSC has failed to prove that Taishan destroyed, lost, or altered evidence relevant to potential violations of the injunction or the relationship between Taishan, BNBM, and CNBM during the contempt period. *See Williams v. Briggs Co.*, 62 F.3d 703, 708 (5th Cir. 1995) (no finding of spoliation where "the evidence in issue was not destroyed or lost" and plaintiff offered no evidence to suggest defendant did anything to alter the condition of the evidence in issue).

50. The PSC does not claim that any relevant Taishan evidence is missing, or that Taishan destroyed any relevant evidence.

51. The Court does not find evidence that Taishan intentionally violated PTO 1 or the general duty of preservation.

52. Taishan's corporate representative, Mr. Che, pursuant to the PSC's request, provided a chain of custody affidavit regarding Mr. Peng's two computers. Mr. Peng's desktop computer, which was Taishan's property, was preserved and eventually imaged. Notably, the desktop was misplaced for a period of time but Taishan ultimately located it and produced documents on the device to the PSC. Mr. Peng also delivered his personal laptop to Taishan, which produced the documents on that device to the PSC. Taishan also obtained emails from multiple web-based email accounts belonging to Mr. Peng.

53. In the absence of proof of missing evidence, the Court will not impose any adverse inferences. *See Williams*, 62 F.3d at 708.

54. Notwithstanding the fact that the evidence does not support a finding of spoliation to justify imposing adverse inferences, the evidence is sufficient to support of finding of discovery abuses warranting sanctions.

### b. The PSC Has Proven Intentional Delay in Responding to the Contempt Track Discovery Warranting Sanctions

55. When issuing discovery sanctions, Courts consider pleadings, motions, papers, and prior discovery orders to determine whether defendants' conduct warrants providing remedies to the opposing party. Often it is necessary to consider orders entered by the court and motions filed by the parties requesting and compelling discovery to make findings regarding whether a party committed any discovery abuses. The court may consider promises made by counsel when considering discovery abuses. *Metropolitan Life Ins. Co. v. Camman*, No. 88 C 5549, 1989 WL 153558, at * 4 (N.D. Ill. November 7, 1989) (violation of an order found where party failed to deliver documents it promised it would produce).

56. The court should apply its review of evidence even-handedly, but is not bound by the rules of evidence. *See Jensen v. Phillips Screw Company*, 546 F.3d 59, n.5 (1st Cir. 2008) ("We do not suggest that the rules of evidence necessarily apply to fact finding in the context of sanctions. That is not the case.") Thus, the court should consider based on its judgment whether the evidence is reliable and its opinions will not be disturbed unless it abuses its discretion. *See Moore v. CITGO Refining and Chemicals Co., LP*, 735 F.3d 309 (5th Cir. 2013).

57. Rule 37 provides that a district court may impose sanctions for a party's failure to comply with discovery orders. Fed.R.Civ.P. 37(b)(2)(A).

58. An award of sanctions under Rule 37(b)(2)(A) must be both "just" and "fair", meaning that the conduct is sanctionable and that the sanction is appropriate to the wrong. *See Insurance Corp. of Ireland v. Compagnie des Bauxites*, 456 U.S. 694, 707 (1982).

59. Additionally, an award of fees and expenses must be made in addition to sanctions under Rule 37(b)(2)(A). Rule 37(b)(2)(C) provides that "the court must order the

16

disobedient party, the attorney advising the party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust."

60. Taishan has conceded its failure to relay Mr. Peng's whereabouts and produce documents from his computer in a timely manner. There is no justification for this failure. Chairman Jia admitted that he knew where Mr. Peng worked and Taishan has produced no evidence to justify the delay in locating Mr. Peng's computers.

61. Ultimately, there was a delay of approximately eight months between the March 2015 request for Mr. Peng's documents and deposition and the October 16 initial production of Mr. Peng's documents and Mr. Peng's November 2015 deposition.

62. Taishan should be made accountable for those costs and expenses attributable to its unjustified eight-month delay in complying with discovery requests. Such expenses will relate to the time the PSC spent briefing the instant issue, expenses related to both the delay and eventual deposition of Mr. Peng, and such other expenses as may be relevant to the tasks forced upon the PSC by Taishan's delay in complying with the discovery orders of this Court. The PSC shall submit to the Court within (30) days of the entry of this order, to serve on Taishan and produce to the Court the expenses it believes were incurred as a result of Taishan's delay from March 19, 2015 through Mr. Peng's November 2015 deposition.

63. Having conceded that Rule 37 is applicable, Taishan claims that there is no prejudice to justify further sanctions. However, this is not the standard under Rule 37. Even if a party eventually cures a violation of Rule 37, such as by a late production of withheld evidence, they are still subject to sanction. *Chilcutt v. United States*, 4 F.3d 1313, 1319 (5th Cir. 1993) (affirming the trial court's finding that discovery sanctions were warranted where

17

the Government had disadvantaged the plaintiffs by producing the documents on the eve of trial and by causing the plaintiffs' counsel to devote a great amount of time, not to preparing for trial, but to dealing with the Government's discovery abuses).

64. The question turns to what is "just and fair" for a party that has answered orders and discovery with evasiveness, possible outright lies, and delay. Any sanctions need have some relationship to the claim at issue. Accordingly, Courts have typically considered the striking of factual defenses or adverse inferences related to the information that a party has kept from discovery. As the information at issue in the present proceeding was eventually produced to the PSC, neither the striking of factual defenses nor the finding of adverse inferences is warranted.

65. However, the culpability evidenced in this case is clear. According to Chairman Jia's Declaration for Clarification, Taishan acted in bad faith in keeping the whereabouts of Mr. Peng concealed. Additionally, Taishan offered no evidence as to why two prior searches for Mr. Peng's computer revealed nothing whereas mere insistence by Chairman Jia that the computer be found in September 2015 proved fruitful.

66. Accordingly, **IT IS ORDERED** that

    a. All documents produced from Mr. Peng's computers and emails since October 2016 be accurately (non-machine) translated into English by Taishan and at Taishan's cost.

    b. Taishan pay all litigation costs and fees to the PSC that are related to the discovery delay by Taishan from March 19, 2015 through Mr. Peng's deposition, the amount of which will be determined based on records to be submitted to the Court by the PSC.

    c. Taishan pay $40,000 as a discovery penalty, which is equivalent to $5,000 per month for the eight-month delay attributable to Taishan in keeping the whereabouts of Mr. Peng concealed and in failing to produce Mr. Peng's ESI documents in a timely manner.

67. **IT IS FURTHER ORDERED** that Taishan's Motion to Quash Plaintiffs' Subpoena for Production of Items Related to Peng Wenlong (R. Doc. 19733) and Taishan's Motion to Exclude Plaintiffs' Proposed Exhibits and Irrelevant Depositions Designations for the November 17, 2015 Hearing (R. Doc. 19731) are **DISMISSED** as **MOOT**.

New Orleans, Louisiana, this 8th day of January, 2016.

                                               */s/ Eldon E. Fallon*
                                            UNITED STATES DISTRICT JUDGE