UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | MDL NO. 2047<br><br>SECTION "L"<br><br>JUDGE FALLON<br><br>MAG. WILKINSON |

### RESPONSE BRIEF IN OPPOSITION TO MRS. FERCHAUD'S OBJECTION TO SPECIAL MASTER'S OPINION AND DECREE AND BRIEF IN SUPPORT

**MAY IT PLEASE THE COURT:**

On November 8, 2014, Special Master Daniel J. Balhoff (hereinafter "Special Master") rendered an *Opinion and Decree* regarding a dispute between Mrs. Jody Ferchaud (hereinafter "Mrs. Ferchaud") and Moss & Associates, LLC (hereinafter "Moss") with respect to the Chinese drywall remediation project that was in progress at the rental property of Mrs. Ferchaud located at 6021-6025 Canal Boulevard, New Orleans, Louisiana 70124 (hereinafter the "Property" or "Ferchaud units"). The Property is a split-level, two-family residence containing 3 levels.

The Special Master's *Opinion and Decree* correctly determined that (1) Mrs. Ferchaud was responsible for the delay in the remediation, and, therefore, she was not entitled to delay damages; (2) Mrs. Ferchaud was not entitled to the other damages claimed by Mrs. Ferchaud under the Remediation Fund and/or the Other Loss Fund since her lawsuit is governed by the New Claims Settlement Agreement which specifically limits the benefits available to claimants; and (3) certain of the code violations outlined by the City of New Orleans in its June 23, 2015 were the responsibility of Mrs. Ferchaud and certain of the code violations outlined by the City of New Orleans in its June 23, 2015 correspondence were the responsibility of Moss.

Notwithstanding same, Mrs. Ferchaud has filed an objection to this Opinion and Decree. For the reasons set forth below, Moss respectfully requests that this Court overrule Mrs. Ferchaud's Objection to the Special Master's *Opinion and Decree* and affirm the November 8, 2015 ruling of the Special Master, as is.

## **INTRODUCTION AND FACTUAL BACKGROUND**

As accurately detailed by Mrs. Ferchaud, Moss requested the Special Master's intervention in this matter on May 1, 2015. This matter was set for mediation on August 6, 2015 and prior to that date Mrs. Ferchaud submitted her position paper with exhibits on July 23, 2015, Moss submitted its position paper with exhibits on July 31, 2015 and Mrs. Ferchaud submitted her reply on August 5, 2015.[1] Following mediation, Moss provided a brief supplement to the Special Master with respect to code violations listed by the City of New Orleans in correspondence sent to the parties following a courtesy inspection at Mrs. Ferchaud's property at her request. Importantly, the City of New Orleans specifically stated "[t]his report does not differentiate between issues that may or may not have been present prior to the remediation renovations." In other words, the City of New Orleans did not opine on which party was responsible for the violations, it merely noted the code issues it observed on the Property.

By way of brief background, Mrs. Ferchaud did not file suit against the Knauf Defendants (hereinafter "Knauf"). Knauf did, however, agree to settle certain late-filed claims, like that of Mrs. Ferchaud, pursuant to the Settlement Agreement Regarding Post-December 9, 2011 Claims Against the Knauf Defendants in MDL No. 2047 (Rec. Doc. 16978, hereinafter "New Claims Settlement Agreement"). Mrs. Ferchaud's claim does not fall under the Knauf Class Settlement Agreement; instead her claims fall under the New Claims Settlement

---

[1] Moss does not attach the mediation filings that were submitted by Mrs. Ferchaud and Moss as detailed herein, but instead incorporates same by reference to Mrs. Ferchaud's Brief in Support of her Objection, wherein all mediation filings were included as Exhibit "A".

2

Agreement. In opting into the program, Mrs. Ferchaud represented that she owned the property at issue, and became aware of the presence of Chinese Drywall on the affected property on September 23, 2013 and that the property consisted of a rental property.[2][3]

Mrs. Ferchaud opted into the Program on or about July 28, 2014, by executing a Work Authorization Agreement for each Ferchaud unit.[4][5]

The Ferchaud units were scheduled as a three-month project. Pursuant to the Revised Move-Out Notices, the remediation was scheduled to commence on November 13, 2014, with an estimated completion date of February 13, 2015.[6] On December 1, 2014, both Ferchaud units received their Environmental Certification, stating that there was no detectable odor of Chinese drywall at the completion of removal and cleaning work, prior to the start of the new drywall installation.[7] This remediation has been on hold since approximately, December 11, 2014, due to preexisting violations at the Ferchaud units as well as Mrs. Ferchaud's direct instructions that the drywall remediation was to remain on hold.

## **LAW**

This Court's review of Mrs. Ferchaud's objection to the Special Master's Opinion and Decree is governed by Federal Rule of Civil Procedure 53. Fed. R. Civ. P. 53(f)(1) provides that after notice and an opportunity to be heard as well as receipt of evidence, the Court may adopt or affirm, modify, wholly or partly reject or reverse, or resubmit the Special Master's Order with instructions. This Court is to decide *de novo* all objections to findings of fact or conclusions of

---

[2] Please see Composite Exhibit "A", Homeowner Affirmation Form and Lump Sum Payment Eligibility Form for 6025 Canal Boulevard.
[3] Please see Composite Exhibit "B", Homeowner Affirmation Form and Lump Sum Payment Eligibility Form for 6021 Canal Boulevard.
[4] Please see Exhibit "C", Work Authorization Agreement for 6021 Canal Boulevard.
[5] Please see Exhibit "D", Work Authorization Agreement for 6025 Canal Boulevard.
[6] Please see Composite Exhibit "E", Revised Move-Out Notices for 6021 Canal Boulevard and 6025 Canal Boulevard.
[7] Please see Composite Exhibit "F", Environmental Certification from GFA for 6021 Canal Boulevard and 6025 Canal Boulevard.

1211493v1 301707.0180

law made or recommended by a master. Fed. R. Civ. P. 53(f)(3) and (4). Moss respectfully requests that after the January 14, 2016 evidentiary hearing on this matter, that this Honorable Court affirm the Special Master's *Opinion and Decree* of November 8, 2015. As will be discussed below, the evidence in this matter plainly supports the factual findings and legal conclusions that were made by the Special Master in his Opinion and Decree.

## ARGUMENT

### A. SPECIAL MASTER DID NOT ERR IN FINDING THAT MRS. FERCHAUD IS RESPONSIBLE FOR THE DELAY

As noted above, the drywall remediation began on November 13, 2014 and both Ferchaud units received the Environmental Certification on December 1, 2014. Between December 9, 2014 and December 19, 2014, Moss passed rough inspections for Framing, Electrical and Mechanical for both units.[8,9] These inspections were conducted by Mr. Bryan Surgi of IECI & Associates, a third party inspector contracted by the City of New Orleans, pursuant to and in accordance with the Building Department's policies and procedures. Mrs. Ferchaud did not agree with the results of these rough inspections and therefore spent untold amounts of money to hire independent experts (no less than 3 separate experts) to review and analyze any potential code violations on her property (including preexisting violations). Her own actions eventually resulted in the City of New Orleans converting the passed inspections to a fail on the mechanical and electrical rough.

Important to this response, the Work Authorization Agreements for the Ferchaud units governed the relationship between the parties during the remediation process. These Agreements state in relevant part as follows:

---

[8] Please see Composite Exhibit "G": Summary of Passed inspection for Rough Mechanical, Rough Electrical and Rough Framing for 6021 Canal Boulevard.
[9] Please see Composite Exhibit "H": Summary of Passed inspection for Rough Mechanical, Rough Electrical and Rough Framing for 6025 Canal Boulevard.

> Neither the Knauf Defendants nor Contractor are responsible for the failure of the Property to comply with building codes and regulations *where such failure is unrelated to the Repair Work.*

*See* Exhibits "C" and "D", p. 4, ¶4

The Work Authorization Agreements further state on page 6:

> Contractor *shall have complete control of the Property at all times during the Construction Duration* and to the extent the Property Owner needs to enter the Property, he shall do so with advance notice to the Contractor and in such a manner so as not to interfere with the Repair Work.  Separate contractors of Property Owner shall not enter the Property during the Construction Period unless accompanied by Contractor's authorized representative and only after they have executed a visitor waiver in which they assume all risks, and waive all claims in connection with entering the Property during the construction.

*See* Exhibits "C" and "D", p. 6, ¶4.  The Agreements also provide that the "Contractor is not responsible for, and accepts no liability for, any defects or deficiencies in work that was not replaced or reinstalled by Contractor."  *See* Exhibits "C" and "D", p. 8, ¶3.

On or about December 9, 2014, Moss received notice of a code violation on the Property; specifically, that notice stated "Illegal 3-plex, 3rd unit in rear".  Moss immediately advised Mrs. Ferchaud of this issue as well as her counsel.[10]  Moss delayed placing the home on hold until December 11, 2014 when Moss was able to forward the documentation from the City's website regarding the violation.  Because the issue of the "illegal triplex" was preexisting, Mrs. Ferchaud was put on notice that the Chinese Drywall remediation would remain on hold until the necessary corrections were made by her and the delay would not be attributable to Moss since the delay did not result from the remediation work.  The incident summary from the City of New Orleans demonstrated that a pending violation existed on November 9, 2014 and November 13, 2014 with Gary Graham listed as the inspector.

---

[10] Please see Composite Exhibit "I", Email Communications between Moss, Mrs. Ferchaud, and Mrs. Ferchaud's counsel between December 9, 2014 and December 11, 2014 regarding the preexisting violations at Mrs. Ferchaud's Property.

While Mrs. Ferchaud claims that this document from the City of New Orleans was "bogus" or manipulated by Moss, which Moss vehemently denies and which claim is refuted by the record, it is clear from Mrs. Ferchaud's communications with Moss that she was aware of the issue of the "illegal triplex" as she acknowledged to Moss and her original counsel that she "requested not replacing the lower refrigerator, hood, stove, and main kitchen washer and dryer at 6021 Canal Blvd *because it is not permitted for a third unit.* In the long run, this will delete certain installs, along with electrical and plumbing from the scope of work. I talked to the plumber and he said he would cap the plumbing line for the washer in the main kitchen." *See* Composite Exhibit "I", Email from Mrs. Ferchaud dated December 11, 2014 at 2:08PM to Moss and Vickie Lory. By December 16, 2014, Mrs. Ferchaud was able to remedy this preexisting issue as the City inspector, Mr. Steven Dwyer, indicated on that date that there was "No Violation" following an inspection.[11] Around this same time, Mrs. Ferchaud began inquiring about making changes to her home outside the original scope of work.[12] Pursuant to Moss' policy, Mrs. Ferchaud signed a Schedule Waiver on December 16, 2014, acknowledging and affirming that she had requested additional work from Moss which impacted the original schedule and she was waiving any claims to Delay payments under the Knauf Class Settlement Agreement.[13]

The next homeowner initiated delay began on or about December 18, 2014, the date of the initial plumbing inspection. The rough plumbing inspection failed due to multiple, pre-existing code violations.[14] Mrs. Ferchaud and the Ombudsman, Mr. Louis Velez, were present for this plumbing inspection, and it was confirmed that Mrs. Ferchaud would be responsible for

---

[11] Please see Exhibit "J", LAMA Incident Summary from December 16, 2014.
[12] Please see Exhibit "K", Email communication from Justin Smith confirming the additional work requested by Mrs. Ferchaud outside the scope of the remediation.
[13] Please see Exhibit "L", Schedule Waiver signed by Moss and Mrs. Jody Ferchaud.
[14] Please see Exhibit "M", Failed Plumbing Inspection dated December 18, 2014.

6

the home's preexisting plumbing violations, which corrections Mrs. Ferchaud estimated were to cost between $7,000 and $8,000. Contrary to Mrs. Ferchaud's representations, at no point did any Moss representative indicate that preexisting code violations were Moss' responsibility to correct. Moss advised Mrs. Ferchaud that the Chinese Drywall remediation was again on hold until the preexisting code violations were remedied by her.[15] On December 22, 2014, Moss again requested that Mrs. Ferchaud advise when the plumbing code violations had been corrected.[16] On January 7, 2015, Ms. Ferchaud met with Moss, Mr. Louis Velez (Ombudsman), J.E.S., and her counsel from HH&K to resolve a number of issues existing at her home. At this meeting, Mrs. Ferchaud acknowledged that her own plumbers would perform the work necessary to bring the property in compliance due to the preexisting code violations. It was agreed on that date that while the plumbing code violations were being addressed, Mrs. Ferchaud would retain possession of the home.[17]

Pursuant to this meeting, on January 9, 2015, the lockbox code on the Property was changed to a code of Mrs. Ferchaud's choice in connection with her retaking possession of the home. Since that date, Moss has been prevented from reentering the premises. Mrs. Ferchaud has indefinitely extended this hold on the remediation process, continuing to deny Moss access, even after the plumbing reinspection passed on January 27, 2015.[18] Specifically, while Mrs. Ferchaud advised that the plumping reinspection had passed, she began to assert concerns with other inspections that had already passed, such as the mechanical and electrical rough. She advised that she needed to have more inspections conducted by independent inspectors and on February 9, 2015, her counsel advised that the remediation would remain on hold per the request

---

[15] Please see Exhibit "N", Email from Moss to Mrs. Ferchaud dated December 19, 2014 at 10:01AM.
[16] Please see Exhibit "O", Email from Moss to Mrs. Ferchaud dated December 22, 2014 at 9:11AM.
[17] Please see Exhibit "P", Email summary from Lenny Davis of HH&K re: January 7, 2015 meeting dated January 7, 2015 at 5:19PM.
[18] Please see Exhibit "Q"; Plumbing Inspector's Report dated 1/27/2015.

7

1211493v1 301707.0180

of Mrs. Ferchaud.[19]  Mrs. Ferchaud has had no less than three independent inspectors at her property during this past twelve-month time frame, including her current expert Mr. Flettrich.  In that time period, Mrs. Ferchaud also had different workers in and out of the property presumably working on the property and altering items outside the presence of the Lead Contractor Moss or its subcontractors.  Mrs. Ferchaud has now had exclusive possession of the home for approximately one year, and it is unknown what changes have been made to the home and the remediation work that commenced in November of 2014 by individuals she has hired since she took possession.

Despite the lack of cooperation from Mrs. Ferchaud, Moss continued to attempt to address any issues at the property.  For example, on January 26, 2015, Moss met with Mrs. Ferchaud to address repairs made by Verges (the electrical contractor on the job) and to address any other issues.[20]  Another meeting was conducted on March 12, 2015 to address concerns raised by Mrs. Ferchaud's paid inspectors.  Moss continued to try to work with Mrs. Ferchaud during this period of time and was in receipt of her inspectors' reports dated 02/24/2015; 03/07/2015; and 03/12/2015, but Moss was never again given possession of the home to continue the drywall remediation after 01/07/2015.[21]  Moss continued to address issues raised by Mrs. Ferchaud.

For example, Mrs. Ferchaud insisted for a several week period that Moss had not replaced the duct work in the house like for like, insisting that there was hard duct throughout the home prior to the remediation and it was replaced with flex duct.  However, with the exception of two areas in the home, all duct work was flexible prior to the remediation commencing.  Moss

---

[19] Please see Exhibit "R", Email from Toni Becnel of Becnel Law Firm LLC dated February 9, 2015, 12:59PM confirming that Mrs. Ferchaud would like her home to remain on hold.
[20] Please see Exhibit "S", Email dated January 26, 2015 at 9:00PM from Moss to Mrs. Ferchaud summarizing the meeting on January 26, 2015.
[21] Please see Exhibit "T", Email dated March 19, 2015 at 12:33PM from Moss to Mrs. Ferchaud's counsel.

8

did reinstall like for like one of the hard duct drop ins, and agreed to drop the second hard duct in, but Moss was not given access to the home to do so. Upon reviewing this issue, the Ombudsman Louis Velez confirmed on March 24, 2015 that the ductwork was flexible prior remediation. The house continued on hold per Mrs. Ferchaud's insistence throughout April of 2015 awaiting another inspection report that Mrs. Ferchaud commissioned, despite Moss' best efforts to address issues raised by Mrs. Ferchaud.[22] After meeting with Mrs. Ferchaud at the end of April of 2015, Moss issued a formal response to her synopsis of the meeting.[23] Moss formally requested the Special Master's intervention on May 1, 2015 to resolve these issues. After the Special Master was requested, Mrs. Ferchaud delayed in setting a mediation date, seeking several extensions prior to obtaining counsel, which were provided without issue.

During this time frame, Moss has had to continue to pay for the PODs and portable toilets beyond the estimated completion date of February 13, 2015, which costs represent general conditions costs above and beyond the scope of the project that Moss is continuing to incur. The PODS represent a cost $348.78 per month and the temporary toilets represent a cost of $163.50 per month. Moss is continuing payments on these items as it waits for this project to restart upon instruction of Mrs. Ferchaud.[24]

As a final point relating to this section, Mrs. Ferchaud's Brief attributes an additional delay to the remediation purportedly resulting from correspondence issued by the City of New Orleans on July 7, 2015 wherein the City stated that the structure should be designated a substantial improvement, requiring sections of the structure to be elevated. However, this is a red herring as the original correspondence issued by the City of New Orleans occurred while the

---

[22] Please see Exhibit "U", Email dated March 23, 2015 between Mrs. Ferchaud, Moss and her counsel wherein Mrs. Ferchaud confirms that she will not be removing the hold.
[23] Please see Exhibit "V", Email dated April 23, 2015 from Moss to Mrs. Ferchaud.
[24] Please see Exhibit "W", POD invoice and Port-o-let Invoice.

home was already on a hold initiated and maintained by Mrs. Ferchaud and subsequent to Moss' request for the Special Master's intervention. Moreover, the City of New Orleans issued a correction on August 19, 2015 clarifying that the structure was not substantially damaged based upon the cost of work applied for by Moss in its permits in comparison to the value of the property.[25]

The record before this Honorable Court, including Mrs. Ferchaud's continued assertions that Moss was to remain off the property and that the remediation was on hold as well as the homeowner's preexisting code violations that caused the delay to begin with, and the Work Authorization Agreements signed by both parties that plainly state that if a homeowner must do corrective work the Construction Duration will be extended without penalty to the Contractor, demonstrates that Moss was not responsible for delays in this matter; Mrs. Ferchaud was and continues to be responsible for the delays in this matter. In addition, Mrs. Ferchaud executed a Schedule Waiver on December 16, 2014, waiving her rights to any Delay Period Payments under MDL No. 2047 for additional work outside the scope of the remediation. For these reasons, the Special Master's Opinion and Decree finding that Mrs. Ferchaud is not entitled to delay damages should be affirmed and upheld by this Court.

### B. SPECIAL MASTER DID NOT ERR IN ONLY ADDRESSING THE CODE ISSUES/VIOLATIONS ADDRESSED BY THE CITY OF NEW ORLEANS

As detailed *supra*, Moss submitted a brief supplement to address the code violations cited by the City of New Orleans on June 23, 2015. This supplement was attached as Composite Exhibit "A" to Mrs. Ferchaud's Brief in Support of her Objection and it is incorporated herein by reference. To be clear, the City of New Orleans enumerated certain building/general deficiencies; electrical deficiencies; and mechanical deficiencies but did not attribute

---

[25] Please see Exhibit "X", August 19, 2015 Letter from the City of New Orleans.

1211493v1 301707.0180

responsibility to either party. Moss's October 12, 2015 submission to the Special Master detailed which deficiencies were preexisting and would therefore not be Moss' responsibility under the Chinese Drywall Remediation Program. Moss also detailed which deficiencies were related to the drywall remediation program, and, thus, would be corrected by Moss upon being allowed back onto the property. Mrs. Ferchaud issued a reply to this supplement on October 21, 2015. This reply to the brief supplement at no point stated that additional code violations should be ruled upon by the Special Master. As suc, this argument should be considered another red herring and/or waived.

Mrs. Ferchaud's brief now takes issue with the fact that the Special Master did not address the issues raised in the report of her expert Mr. David C. Flettrich. However, Mr. Flettrich's analysis is not what governs the remediation process under the Knauf Settlement Agreement and whether the remediation work has met the applicable codes. Instead, the remediation work is governed by the City of New Orleans Building Department and whichever inspectors they elect to contract with for inspection purposes. As this Court is now well aware, Moss passed its rough mechanical, electrical and framing inspections in December of 2014. It was not until after the City of New Orleans received numerous visits, phone calls, and complaints from Mrs. Ferchaud that the City of New Orleans changed the inspection results in May of 2015 (five months later) and subsequently issued its correspondence in June of 2015 outlining certain deficiencies. Mrs. Ferchaud has acted in bad faith, obstructing Moss from entering the property, utilizing no less than three experts, which she appears to have paid handsomely, to prepare multiple reports indicating that a plethora of issues exist at her properties, all conveniently concluding that any issues are tied to the drywall remediation process, and, therefore, Moss' responsibility.

11

In short, the Special Master was not required to address code violations that were not determined by the enforcing entity, the City of New Orleans Building Department. Accordingly, Moss respectfully request that this Honorable Court affirm the Special Master's Opinion and Decree as it relates to the code violations which it addressed and to determine that the Special Master was under no obligation to determine which party is responsible for the speculative and/or potential code violations noted by Mrs. Ferchaud's third expert, Mr. David Flettrich in his Preliminary Expert Report.

### C. SPECIAL MASTER DID NOT ERR IN ADOPTING THE DIVISION OF RESPONSIBILITY FOR THE CODE VIOLATIONS SET FORTH IN THE OCTOBER 12, 2015 BRIEF SUPPLEMENT TO THE MEDIATION

Mrs. Ferchaud submits a third objection to the Special Master's Opinion and Decree, claiming that the Special Master erred in dividing responsibility for the code violations listed by the City of New Orleans in the manner advocated by Moss in its October 12, 2015 submission. However, this submission specifically stated the rationale behind said division and, in weighing the submissions of both parties, as well as the governing agreements, the Special Master properly ruled that the division of responsibility propounded by Moss was appropriate.

For example, Issue No. 1 under the heading Building/General on the June 23, 2015 correspondence from the City of New Orleans states that "Condensate and overflow water is being directed to the foundations of the home. These conditions must be corrected to prevent water from draining to the foundations. Water must be directed away from the foundations of a house." Resolution of this issue would involve replacing or changing the PVC lines, which is well outside the scope of a drywall remediation. Mr. Flettrich's report insists that this is Moss' responsibility since the remediation work involved work on the HVAC system. Thus, anything related to the HVAC system, even if not part of the remediation work, is Moss' responsibility in

12

Flettrich's opinion. Mr. Flettrich's extrapolation goes far beyond then language in the Work Authorization Agreement, which clearly states that non-compliant work on the Property remains the responsibility of the Property Owner where it is unaffected by the Repair Work. It specifically states "Neither the Knauf Defendants nor Contractor are responsible for the failure of the Property to comply with building codes and regulations where such failure is unrelated to the Repair Work." Overflow issues with PVC piping are unrelated to the Repair Work and the scope of the remediation and the Special Master correctly determined that to be the responsibility of the Homeowner.

Regarding Item 2 under the Building/General headline of the June 23, 2015 correspondence, which states that the "common wall must have a fire resistance rating not less than 1-hour" and "shall extend to and be tight against the exterior wall" as well as "extend from the foundation to the underside of the roof sheathing", again, this issue involves framing changes to the structure of the property. The remediation protocol does not involve structural and framing changes to the home, as explained in the October 12, 2015 correspondence, which the Special Master reviewed and acknowledged. With respect to Item 4 under the Building/General headline of the June 23, 2015 correspondence, requiring that notches and studs/joists be reviewed to see if any members are compromised and indicating that some studs are located in areas not permitted, Moss has repeatedly confirmed that all notches in all structural members were preexisting and that no new notches or holes were created for the piping and wiring. Because this deficiency is a framing and structural issue, it remains the responsibility of the homeowner under the remediation protocol and the Special Master's Opinion and Decree rightfully adopted the division of responsibility urged by Moss.

With respect to the Electrical deficiencies noted in the June 23, 2015 correspondence, Moss indicated that it was not responsible for only Items 3 and 6, but agreed to remedy Item 3 (as well as Items 1, 2, 4, 5, and 7) whereas Mrs. Ferchaud insists Moss is responsible for all Items noted.  Item 6 indicates that the bonding connection on the gas line must be accessible as per NEC 250.  Under the Remediation Protocol, Moss is not responsible for changing the location of an existing gas line or changing the framing to allow such access.  The Special Master's Opinion and Decree adopted the division of responsibility urged by Moss as it is the correct division of responsibility based upon the Protocol and should be affirmed.

Lastly, with respect to the Mechanical deficiencies noted by the City of New Orleans in the June 23, 2015 correspondence, Mrs. Ferchaud again in one broad brush states that deficiencies 4-15 are related to mechanical work necessitated by the Chinese Drywall problem and Moss is responsible for each deficiency.  However, this statement is unsupported by the record evidence.  First and foremost, Moss agreed to address item 4, item 9, item 10, item 11, item 12, item 14 and item 15 in the manner set forth in its October 12, 2015 submission.  Item 7 was already remedied as Moss provided a copy of the sizing and duct schedule requested to Mrs. Ferchaud.  Thus, the only remaining items are 5, 6, and 13, as Mrs. Ferchaud has agreed that Items 1-3 are her responsibility.  Items 5 and 6 relate to PVC piping issues and gas line supports, which are preexisting and not Moss' responsibility under the Protocol.  Item 13 relates to ensuring the dryer exhaust ducts terminate on the exterior perimeter of the building, which would require construction work to the property that is outside the scope of the remediation protocol.

While Mrs. Ferchaud attempts to portray Moss as an irresponsible Contractor, purportedly derelict in its duties (despite the abundant evidence to the contrary), a careful review of all items validates Moss' position.  As noted by Mrs. Ferchaud, the drywall remediation

14

program is a like-for-like program and allows the Lead Contractor to remediate the property, remove the drywall and replace any damaged items that were removed with items of the same construction quality and finishes. The program does not entitle a homeowner to additional gratis construction labor with respect to issues entirely unrelated to the remediation work. Based on the foregoing, as well as Moss' previous October 12, 2015 submission to the Special Master, which is incorporated herein, Moss respectfully requests that this Court affirm the division of responsibility with respect to code violations set forth in the Special Master's Opinion and Decree.

### D. SPECIAL MASTER DID NOT ERR IN FINDING THAT MRS. FERCHAUD WAS NOT ENTITLED TO OTHER/ADDITIONAL DAMAGES

Mrs. Ferchaud has made claims to damages that are not delay damages and has asserted the ability to do so under the Remediation Fund and/or the Other Loss Fund. Mrs. Ferchaud has submitted her travel expenses, annual expenses, loss of rentals, property damages, credits due, storage fees, expert fees, costs, other damages and Attorney's Fees as being due and payable under section 14 of the Knauf Class Settlement Agreement. On November 8, 2015, the Special Master ruled that Mrs. Ferchaud was making a claim pursuant to the Settlement Agreement Regarding Post-December 9, 2011 Claims Against the Knauf Defendants in MDL No. 2047 ("New Claims Settlement Agreement") and stated that "[t]hat Agreement limits a claimant's recovery to section 4.3 of the Knauf Settlement Agreement." Mrs. Ferchaud now objects to this ruling with no apparent basis for said objection other than the "belief" that Mrs. Ferchaud is entitled to other damages requested. Mrs. Ferchaud is unable to state a basis for the other damages she is seeking under the contractual documents, and accordingly, the Special Master's Opinion and Decree should also be affirmed and upheld by this Court on this issue.

15

More specifically, the New Claims Settlement Agreement limits the benefits available to claimants, stating in Section II, Paragraph A:

> All Exhibit A Claimants whose Affected Properties have not already been remediated are entitled to select Remediation Fund Benefits from among the options set forth in Section 4.3 of the Knauf Class Settlement. All such benefits, including any administrative expense associated with providing such benefits, will be paid from the Remediation Fund.

As was discussed during mediation with the Special Master, the non-remediation damages that Mrs. Ferchaud is claiming are not applicable to a Post-December 9, 2011 claimant under the New Claims Settlement Agreement. These claims would fall under either the Other Loss Fund administered by Brown Greer or the Other Covered Expenses for residential owners, which are paid through the Lump Sum Payment. Mrs. Ferchaud is not eligible to receive benefits for either of these types of claims.

This is due to the fact that Post-December 9, 2011 claimants, which includes Mrs. Ferchaud, per the explicit language in the New Claims Settlement Agreement, are limited to Section 4.3 of the Knauf Class Settlement Agreement, which covers the three Remediation Fund Options. Under Section 4.3, Ms. Ferchaud selected Option 1, Program Contractor Remediation Option. This section specifies that for homeowners selecting this option:

> the Remediation Fund will pay the Lead Contractor or Other Approved Contractor to remediate the Owner's KPT Property, according to the Remediation Protocol and consistent with Section 4.5 below, plus, for Residential Owners, the applicable Other Covered Expenses according to the following criteria: 4.3.1.1. Lump Sum Payment…4.3.12. Delay Period Payment.

In other words, "Other Covered Expenses" as defined in Section 1.47 to include alternative living expenses, personal property damage, maintenance of the KPT Property during remediation including utility bills, insurance, property taxes, and maintenance of landscaping, and moving and storage expenses, incurred as a result of the remediation, are only applicable to Residential

16

Owners. Mrs. Ferchaud is a Commercial Owner under the Knauf Class Settlement Agreement and utilizes these two properties in New Orleans as income-producing rentals. Under these circumstances, and pursuant to the applicable provisions of the Knauf Class Settlement Agreement as delineated in the New Claims Settlement Agreement, Mrs. Ferchaud does not receive "Other Covered Expenses" as a Commercial Owner. Any remaining claim of Mrs. Ferchaud would be categorized as "Other Loss Fund" damages under Section 4.7 of the Knauf Class Settlement Agreement, which the New Claims Settlement Agreement does not grant to post-December 9, 2011 claimants.

Mrs. Ferchaud's signed Work Authorization Agreements further clarify that the Property Owner shall be responsible for ordinary exterior maintenance of the Property including maintenance of landscaping, pools, exterior finishes, roof, etc. and payment of all utility bills, property taxes, and other similar expenses during the Construction Duration.[26] Moss takes issue with Mrs. Ferchaud's claims that Moss made any misrepresentations or performed defective work that would have led to the damages as part of the drywall remediation process at this home. A review of the record demonstrates that Moss has performed professionally in the short time that they were allowed on the premises (November 13, 2015-December 18, 2015) and continued to communicate with Mrs. Ferchaud in a professional manner to address her interminable list of "issues" despite being on hold since December 18, 2015. The initial hold was caused by Mrs. Ferchaud's need to address preexisting plumbing code violations, for which Moss is not responsible, and the continued hold was perpetuated by Mrs. Ferchaud's refusal to allow any further access to the home after January 9, 2015, for which Moss is not responsible. Mrs. Ferchaud is now concerned that the New Claims Settlement Agreement does not address the inordinate sums of money she spent in hiring various experts for her own purposes in her efforts

---

[26] Please see Exhibits "C" and "D", p. 6, ¶ 5.

1211493v1 301707.0180

to indefinitely delay this project; however, these expenses incurred were entirely avoidable and in no way benefitted the progress of the remediation process. Moss performed all work in compliance with the applicable codes and it is Mrs. Ferchaud that has unduly and prejudicially delayed the remediation progress of this home.

## CONCLUSION

For the reasons explained above, Lead Contractor, Moss & Associates, LLC respectfully moves this Honorable Court for an Order affirming the Special Master's Opinion and Decree, which correctly found that (1) Moss is not responsible for the delay during this remediation projection; and therefore, Mrs. Ferchaud is not entitled to delay payments; (2) Mrs. Ferchaud is not entitled to other/additional damages; and (3) correctly adopted the division of responsibility for certain code violations urged by Moss as such division is in accordance with the applicable agreements and applicable Settlement Agreement in this matter.

Respectfully submitted,

**TRIPP SCOTT, P.A.**

*/s/ Stephanie C. Mazzola*
**STEPHANIE C. MAZZOLA (#00077661)**
110 Southeast Sixth Street, Suite 1500
Fort Lauderdale, Florida 33301
Telephone:   (954) 525-7500
Facsimile:    (954) 761-8475
Primary Email:      scm@trippscott.com
Secondary Email:   tlk@trippscott.com
***Attorneys for Lead Contractor,***
***Moss & Associates, LLC***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that this pleading has been electronically filed with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all counsel

18

1211493v1 301707.0180

who are CM/ECF participants. According to the CM/ECF docket sheet, all parties to this civil action receive electronic notification. Done on January 11, 2016.

                                              */s/ Stephanie C. Mazzola*
                                              **STEPHANIE C. MAZZOLA**

19