Confidential - Subject to Further Confidentiality Review

```
1                  IN THE UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
2
3                              - - -
4
      IN RE:  CHINESE-MANUFACTURED :   MDL NO. 2047
5     DRYWALL PRODUCTS LIABILITY    :   SECTION:  L
      LITIGATION                    :
6                                   :
      THIS DOCUMENT APPLIES TO ALL  :   JUDGE FALLON
7     CASES                         :   MAG. JUDGE WILKINSON
8                              - - -
9               CONFIDENTIAL - SUBJECT TO FURTHER
                        CONFIDENTIALITY REVIEW
10
                       Tuesday, August 4, 2015
11                             - - -
12             Videotaped 30(b)(6) deposition of GREAT
13    WESTERN BUILDING MATERIALS, through its representative,
14    LARRY ROGERS, held at FERGUSON CASE ORR PATERSON,
15    L.L.P., 1050 South Kimball Road, Ventura, California,
16    commencing at approximately 9:05 a.m., before Rosemary
17    Locklear, a Registered Professional Reporter, Certified
18    Realtime Reporter and California CSR (#13969).
19
20
21
22                             - - -
23
24                  GOLKOW TECHNOLOGIES, INC.
                877.370.3377 ph | 971.591.5672 fax
25                     deps@golkow.com
```

EXHIBIT

1

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1  APPEARANCES:
 2
 3     SEEGER WEISS, L.L.P.
          BY: SCOTT ALAN GEORGE, ESQUIRE
 4     sgeorge@seegerweiss.com
       1515 Market Street
 5     Philadelphia, Pennsylvania 19102
       (215) 553-7982
 6     Appearing on behalf of the Plaintiffs' Steering
       Committee
 7
 8
       DENTONS US, L.L.P.
 9     BY: JUSTIN N. KATTAN, ESQUIRE
       justin.kattan@dentons.com
10     1221 Avenue of the Americas
       New York, New York 10020-1089
11     (212) 768-6700
       Appearing on behalf of the BNBM Defendants
12
13
       ORRICK HERRINGTON & SUTCLIFFE, L.L.P.
14     BY: JASON CABOT, ESQUIRE
       jcabot@orrick.com
15     The Orrick Building
       405 Howard Street
16     San Francisco, California 94105-2669
       (415) 773-5700
17     Appearing on behalf of the CNBM Defendants
18
19     ALSTON & BIRD, L.L.P.
       BY: MACKENZIE (MACK) HELLER (KAHNKE), ESQUIRE
20     (via telephone)
       mackenzie.heller@alston.com
21     1201 West Peachtree Street, N.E.
       Atlanta, Georgia 30309-3424
22     (404) 881-4828
       Appearing on behalf of the Defendants Taishan
23     Gypsum Company
24
25
```

Page 3

```
 1  APPEARANCES:  (Continued)
 2
 3     FERGUSON CASE ORR PATERSON, L.L.P.
          BY: DAVID W. TREDWAY, ESQUIRE
 4     dtredway@fcoplaw.com
       1050 South Kimball Road
 5     Ventura, California 93004
       (805) 659-6800
 6     Appearing on behalf of the Witness
 7
 8            - - -
 9
10  ALSO PRESENT:
11
12     JIM LOPEZ, Video Operator
13
14            - - -
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1                   I N D E X
 2
 3  WITNESS                        PAGE
 4
 5  LARRY ROGERS
 6
 7     By Mr. George          7, 80
 8
 9     By Mr. Kattan          64, 84
10
11     By Mr. Tredway         79
12
13            - - -
14
15            EXHIBIT INDEX
16  GREAT WESTERN NUMBER              MARKED
17
18  1     41-page copy of document entitled    14
           "Amended Notice of Expedited Oral
19         and Videotaped Deposition
           Pursuant to the Court's Directive
20         During the March 17, 2015,
           Special Hearing and Minute Entry
21         and Order [REC.DOC.18493]"
22  2     1-page copy of document dated        16
           1/9/06 entitled "Commercial
23         Invoice," plus attachments,
           Great Western 0002 -
24         Great Western 0014
25
```

Page 5

```
 1            EXHIBIT INDEX (Continued)
 2  GREAT WESTERN NUMBER              MARKED
 3
 4  3     1-page copy of document dated        16
           3/9/06 entitled "Commercial
 5         Invoice," plus attachments,
           Great Western 0015 -
 6         Great Western 0026
 7  4     4-page copy of document dated        46
           11/15/05 entitled "Sales
 8         Contract," BNBMPLC0007430 -
           BNBMPLC0007433
 9
10  5     4-page copy of document dated        52
           11/30/05 entitled "Export Agency
11         Agreement," BNBMPLC0007437 -
           BNBMPLC0007440
12  6     2-page copy of document,             53
           BNBM(Group)-E-0019553 -
13         BNBM(Group)-E-0019554
14  7     4-page copy of document dated        55
           2/21/06 entitled "Sales
15         Contract," BNBMPLC0007441 -
           BNBMPLC0007444
16
17  8     4-page copy of letter dated          58
           8/9/05 to Mr. James Fan from Bob
18         White
19  9     4-page copy of document dated        60
           9/27/07 entitled "Bill of Sale
20         and Assignment Agreement"
21  10    5-page copy of document dated        61
           2005, BNBM(Group)-E-0019753 -
22         BNBM(Group)-E-0019755
23
       (Exhibits retained by the court reporter and attached to
24     transcript.)
25            - - -
```

Confidential - Subject to Further Confidentiality Review

---

Page 6

1  VIDEO OPERATOR: We are now on the record.
2  My name is Jim Lopez. I'm a videographer for
3  Golkow Technologies. Today's date is August 4th, 2015,
4  and the time is approximately 9:05 a.m.
5  This video deposition is being held in Ventura,
6  California, in the matter of In Re. Chinese-Manufactured
7  Drywall Products Liability Litigation, MDL Number 2047,
8  for the United States District Court, Eastern District
9  of Louisiana.
10  The deponent is Larry Rogers, 30(b)(6) witness
11  of Great Western Building Materials.
12  Counsel and all present, will you please
13  identify yourselves.
14  MR. GEORGE: Go ahead.
15  MR. TREDWAY: David Tredway, appearing on behalf
16  of Mr. Rogers.
17  MR. GEORGE: Scott Alan George for the PSC.
18  MR. KATTAN: Justin Kattan from Dentons US,
19  L.L.P., on behalf of BNBM PLC and BNBM (Group).
20  VIDEO OPERATOR: All those on the line?
21  MS. HELLER: This is Mack Heller from Alston &
22  Bird on behalf of Taishan Gypsum Co.
23  VIDEO OPERATOR: Counsel will be noted on the
24  stenographic record.
25  The court reporter is Rosemary Locklear, and she

---

Page 7

1  will now swear in the witness.
2  LARRY ROGERS, having been duly sworn, was
3  examined and testified as follows:
4  EXAMINATION
5  BY MR. GEORGE:
6  Q.  Good morning, Mr. Rogers.
7  A.  Good morning.
8  Q.  I want to appreciate your -- I appreciate your
9  time today for this deposition. I don't expect to take
10  more than a couple of hours with you this morning.
11  A couple ground rules will help move things
12  along. Let me finish my question, pause, and then
13  answer and I'll let you finish your answer and then I'll
14  ask a question. That way, we'll have a clear record for
15  the reporter to take down and there won't be any
16  confusion.
17  Does that make sense?
18  A.  Okay.
19  Q.  Okay. And another thing is that if it's a yes
20  or no answer, to give a yes or no and don't do a shaking
21  of the head or nodding. Unfortunately, the reporter
22  can't take that down, and we need a languaged exchange.
23  Does that make sense?
24  A.  Okay.
25  Q.  Okay. Have you ever been deposed before?

---

Page 8

1  A.  Yes.
2  Q.  How many times?
3  A.  More than six, probably fewer than ten.
4  Q.  Okay. When was the most recent deposition?
5  A.  Within the last couple of years.
6  Q.  Okay. Was it involved in Chinese drywall or
7  other matters?
8  A.  Other matters.
9  Q.  Okay. Was it business related?
10  A.  Yes.
11  Q.  Okay. What did you do to prepare for today's
12  deposition?
13  MR. TREDWAY: Excluding anything that had to do
14  with a meeting with me and our discussions, you may
15  answer the question.
16  THE WITNESS: Not very much. I had a brief
17  meeting with Mr. Tredway here.
18  MR. TREDWAY: You're -- anything that you and I
19  said is not to be discussed. Anything you did outside
20  of that meeting you can relate to him.
21  MR. GEORGE: Although I believe he can say that
22  he met with you, how long, where, stuff like that.
23  He's correct -- your counsel is correct,
24  however, if I ask you what did your counsel tell you,
25  I'm not allowed to hear about that.

---

Page 9

1  THE WITNESS: Yeah.
2  BY MR. GEORGE:
3  Q.  Did you meet with Mr. Tredway?
4  A.  I did.
5  Q.  Okay. For how long did you meet with
6  Mr. Tredway for today's deposition?
7  A.  Approximately 20 minutes.
8  Q.  Okay. Was that this morning or an earlier time?
9  A.  Yesterday.
10  Q.  Yesterday. Okay.
11  Did you have any phone conversations with
12  Mr. Tredway before that about the deposition?
13  A.  No.
14  Q.  Okay. Were you ever requested by Mr. Tredway to
15  gather documents recently for today's deposition and
16  related to a Subpoena that was served?
17  A.  Yes.
18  Q.  Okay. Were you responsible for gathering those?
19  A.  Yes.
20  Q.  Okay. Did anyone assist you in gathering those
21  documents?
22  A.  Just Mr. Tredway.
23  Q.  Okay. And so no one on your staff was helping
24  you find them?
25  A.  No.

---

Confidential - Subject to Further Confidentiality Review

---

**Page 10**

1 Q.    Okay. Prior to receiving contact from
2 Mr. Tredway were you aware of a Contempt Order that had
3 issued from Louisiana against BNBM?
4       MR. TREDWAY:  May I just suggest, I think before
5 there was contact with me, I believe you served a
6 Subpoena.
7       MR. GEORGE:  Uh-huh.  Sure.
8 BY MR. GEORGE:
9 Q.    You can answer.
10 A.    Yeah.  That Subpoena was my only knowledge of
11 the contempt.
12 Q.    Okay.  Did you have knowledge of the litigation
13 before the Subpoena was served on you?
14 A.    No.
15 Q.    What is your role in Great Western?
16 A.    I was formerly the -- the owner and president,
17 CEO.
18 Q.    Okay.  And currently?
19 A.    I work for another company.
20 Q.    Do you have any roles with Great Western
21 presently?
22 A.    No.
23 Q.    Is Great Western still in business?
24 A.    Great Western was sold.
25 Q.    Okay.  When was that?

---

**Page 11**

1 A.    March of this year.
2 Q.    Was the sale in -- have any relationship to the
3 litigation?
4 A.    No.
5 Q.    Okay.  To whom was it sold?
6 A.    Foundation Building Materials.
7 Q.    Were they already existing as a business?
8 A.    Yes.
9 Q.    So they acquired all of Great Western's
10 business?
11 A.    Yes.
12 Q.    What business are you working for now?
13 A.    Foundation Building Materials.
14 Q.    Okay.  And what's your title?
15 A.    Manager.
16 Q.    How long had you been the owner of Great Western
17 Building Materials?
18 A.    For 43 years.
19 Q.    Okay.  Did you found the business?
20 A.    Yes.
21 Q.    Okay.  Can you just give me a brief sense in the
22 last decade of what Great Western's business was?
23 A.    Great Western is a distributor of building
24 material, various specialty building materials products
25 in California.

---

**Page 12**

1 Q.    Okay.  So your market is -- was California?
2 A.    Correct.
3 Q.    Any other West Coast states?
4 A.    Arizona.
5 Q.    Anywhere else?
6 A.    No.
7 Q.    When you said specialty, specialty material
8 products, building material products, what does that
9 mean?
10 A.    We distributed products for walls and ceilings,
11 interior and exterior.
12 Q.    So in addition to drywall, what would be some of
13 the major materials you would stock?
14 A.    Exterior stucco products, lath and stucco
15 products, acoustical tile, door materials, insulation,
16 steel studs.
17       MR. GEORGE:  Let the record reflect someone has
18 come in.
19       Who are you, sir?
20       MR. CABOT:  What's that?
21       MR. GEORGE:  Who are you?
22       MR. CABOT:  Jason Cabot from Orrick for CNBM.
23       MR. GEORGE:  Okay.
24       Did you get that, Madam Reporter?
25       THE COURT REPORTER:  Yes.

---

**Page 13**

1       MR. GEORGE:  Thank you.
2 BY MR. GEORGE:
3 Q.    Where is Foundation Building headquartered?
4 A.    In Tustin, California.
5 Q.    Okay.  Were they competitors before they
6 acquired Great Western?
7 A.    Yes.
8 Q.    Okay.  Did Great Western do any
9 manufacturing of materials?
10 A.    No.
11 Q.    Okay.  Did Great Western have reason to import
12 drywall from China at any time in the past decade?
13 A.    Yes.
14 Q.    Okay.  Did Great Western have any other
15 experience with importing building materials from China
16 besides drywall?
17 A.    No.
18 Q.    Okay.  Did Great Western import building
19 materials from anywhere else in Asia in the last decade?
20 A.    No.
21       MR. GEORGE:  Okay.  If we can mark this as Great
22 Western Exhibit 1, please.
23       It's the Amended Notice of today's deposition
24 with all of the bells and whistles.
25       (Exhibit Great Western-1 was marked for

---

Golkow Technologies, Inc.

Confidential - Subject to Further Confidentiality Review

Page 14

1  identification.)
2     MR. GEORGE: Okay.
3  BY MR. GEORGE:
4  Q.   If you could refer, sir, to that, this is the
5  Amended Notice setting today's date and this location
6  for the deposition today.  It was originally set for a
7  place in Los Angeles, and talking to Mr. Tredway, we
8  agreed it would be more convenient for everybody to have
9  it here closer to where you are based.
10     I am interested, if you would please turn to, at
11  the top right there's Page 10 of 41, it's one, two,
12  three.  And I'm hoping you could review, under little n,
13  there's a list of company names, if you could review
14  those and let me know which ones you are familiar with.
15  A.   There's only two that I see that look familiar,
16  and that would be Roman numeral XII and XIII.
17     MR. TREDWAY:  Look at Roman numeral XV also.
18     THE WITNESS:  Whoops.  Okay.
19     MR. GEORGE:  That was my next --
20     THE WITNESS:  I'm sorry.  Correction.  Roman
21  numeral XII --
22     MR. GEORGE:  Uh-huh.
23     THE WITNESS:  -- and XV.
24     MR. GEORGE:  Okay.
25

Page 15

1  BY MR. GEORGE:
2  Q.   So you were under -- you're not -- you were
3  not familiar with Taishan Gypsum?
4  A.   No.
5  Q.   And you're not aware of Tai'an Taishan
6  Plasterboard Company?
7  A.   No.
8  Q.   And you're not aware of Shandong Taihe Dongxin
9  Company?
10  A.   No.
11  Q.   Okay.  How are you -- what is the
12  familiarity with Beijing New Building Materials (Group)
13  Company, Limited?
14  A.   I -- I'm only familiar with the name Beijing New
15  Building Materials --
16  Q.   Okay.
17  A.   -- or BNBM.
18  Q.   Uh-huh.
19  A.   As far as the Group or the Public Limited, it's
20  something that I don't -- I'm not familiar with
21  specifically.
22  Q.   Okay.  So to you, BNBM was both those entities?
23  A.   That's --
24     MR. KATTAN:  Objection to form.
25     THE WITNESS:  That's correct.

Page 16

1  BY MR. GEORGE:
2  Q.   Do you recall -- okay.  Okay.
3     Now, if we could just go to this -- under O on
4  Page 12 of 41, there's a list of state-owned
5  enterprises.  If you could review that and let me know
6  if you're familiar with any of those, I would appreciate
7  it.  It's quite a -- quite a list.  Please take your
8  time.
9  A.   No, I'm not.
10  Q.   Okay.  Now, if you could turn -- pardon me -- to
11  Page 24 and also 25, those are documents that we
12  requested to be produced.
13     Did you review this list of documents we were
14  requesting pursuant to the Subpoena?
15  A.   Yes, I did.
16  Q.   Okay.  I'm going to mark as Great Western
17  Exhibit 2 and 3 the documents that Mr. Tredway produced
18  to us that came from you, from Great Western.
19     Two is on top.
20     (Exhibit Great Western-2 was marked for
21  identification.)
22     (Exhibit Great Western-3 was marked for
23  identification.)
24     MR. GEORGE:  I'll be talking to the reporter
25  while you review that, sir.

Page 17

1     So Exhibit 2 starts with the page Bates stamped
2  Great Western 0002 and ends 0014, and 3 starts with
3  Great Western 0015 and ends with 0027.
4  BY MR. GEORGE:
5  Q.   When you were looking for documents, were you
6  still the owner of Great Western or had you sold it?
7  A.   I had sold it.
8  Q.   Okay.  But did you have full access to the files
9  of Great Western at the time?
10  A.   Yes.
11  Q.   Okay.  And you still do; correct?
12  A.   Yes.
13  Q.   Okay.  So in the course of the sale, your access
14  to any documents that related to business transactions
15  in 2005 and 2006 are still at your disposal?
16  A.   As far as whatever has been maintained, yes.
17  I -- it's --
18  Q.   Of course.
19  A.   Everything is -- everything is still there.
20  Q.   Uh-huh.
21  A.   Yeah.
22  Q.   Okay.  And are -- if you could review those
23  documents, my question for you is, are those all the
24  documents that you located and forwarded to counsel
25  to be produced in response to the Subpoena?

Confidential - Subject to Further Confidentiality Review

Page 18

1 Take your time.
2 MR. TREDWAY: I think I can help you. He wasn't
3 able to locate anything. These are copies that came
4 from my files relating to the litigation in Louisiana --
5 MR. GEORGE: Okay.
6 MR. TREDWAY: -- that I had put together for
7 defense counsel way back when.
8 MR. GEORGE: Okay. During the first round of
9 Chinese drywall litigation, so to speak?
10 MR. TREDWAY: Yeah.
11 THE WITNESS: No, sir, this is not all the
12 documents that I have seen.
13 MR. GEORGE: Okay.
14 THE WITNESS: There are a couple more.
15 BY MR. GEORGE:
16 Q. There are more? Do you know what they are?
17 You're seeing some missing, so what are you
18 seeing missing?
19 A. There was a bill of -- there was an invoice for
20 a machine that was purchased that I was -- our company
21 was a partner in purchasing.
22 Q. What kind of machine was that?
23 MR. TREDWAY: If you would ask questions about
24 Baoan International.
25 MR. GEORGE: Uh-huh.

Page 19

1 MR. TREDWAY: You know, I went back into our
2 files and found what we had related to Baoan
3 International.
4 MR. GEORGE: Okay.
5 MR. TREDWAY: And that's the document.
6 Are these the documents you're referring to?
7 THE WITNESS: Yes.
8 MR. GEORGE: Okay.
9 THE WITNESS: Two more -- two more documents,
10 right here (indicating).
11 MR. GEORGE: Okay.
12 BY MR. GEORGE:
13 Q. And aside from those two additional documents,
14 is there anything else that you see missing from
15 Exhibits 2 and 3?
16 A. Nothing.
17 Q. Okay. And were all those documents in Exhibits
18 2 and 3 prepared at the time of the transaction
19 reflected in those documents, those two sales and two
20 purchases of drywall?
21 MR. KATTAN: Objection to form.
22 THE WITNESS: Yes, I believe so.
23 MR. GEORGE: Okay.
24 BY MR. GEORGE:
25 Q. And were they prepared by somebody with

Page 20

1 authority to prepare them as part of the business
2 transaction that you --
3 MR. KATTAN: Objection to form. Lacks
4 foundation.
5 You haven't established that he or his company
6 was the one who prepared all of the documents.
7 BY MR. GEORGE:
8 Q. You can answer.
9 A. These were prepared by the company that we were
10 dealing with.
11 Q. Okay.
12 A. Or it -- it appears that they were.
13 Q. Okay. And you received them in the course of
14 your transaction with the company?
15 A. Yes.
16 Q. Okay. And that company is BNBM?
17 A. Correct.
18 Q. Okay. And I assume your counsel initially got
19 them from you and they were maintained in your own files
20 in the course of your business?
21 A. That's my recollection.
22 Q. Okay. And as far as you know, there were no
23 alterations or revisions made to the documents?
24 MR. TREDWAY: Let me add to that, there is a
25 stamp on the documents that says, the information

Page 21

1 contained in this document is considered a trade secret
2 and confidential information by the sender and neither
3 the document nor the contents of the document are to be
4 publicly disclosed. That stamp was added by my
5 office --
6 MR. GEORGE: Okay.
7 MR. TREDWAY: -- back in 2009.
8 MR. GEORGE: Okay.
9 BY MR. GEORGE:
10 Q. Does that blend with your understanding?
11 A. Yes.
12 Q. Okay. Aside from those stamps that were added
13 in the course of the Chinese drywall litigation, as far
14 as you understand, all these documents are as they were
15 at the time they were created and received by your
16 company?
17 A. As far as I can recollect, yes.
18 Q. Okay. One of the things that I noticed
19 missing from these documents, there's a commercial
20 invoice and a packing list and other documents relating
21 to shipping and importing products, I didn't see a sales
22 agreement.
23 Was there one that was entered into between
24 Great Western and BNBM?
25 A. Yeah. I -- I really don't recall.

Confidential - Subject to Further Confidentiality Review

## Page 22

1 Q. Okay. So you have no understanding of any
2 difference between BNBM (Group) and BNBM PLC?
3 A. I don't.
4 Q. How did you first become aware of BNBM?
5 A. I made a trip with -- with a supplier to Beijing
6 in 2005 and was meeting with -- it was part tourism trip
7 and -- and part business, just to meet some various
8 operations in China, and BNBM was one of the visits
9 that -- that I had when I was there.
10 Q. Okay. So BN --
11 A. That was my first introduction to the company.
12 Q. Okay. Before you went on this trip, was the
13 meeting with BNBM arranged?
14 A. It wasn't arranged by me but the -- the folks
15 that I went with, they had arranged a number of
16 different meetings and -- and -- and tours, plant tours,
17 with different groups.
18 Q. Okay. Who was the supplier who made this
19 arrangement?
20 A. It was a company by the name of USA Wire.
21 Q. How did you know them?
22 A. They were one of our suppliers.
23 Q. Are they based in California?
24 A. They were. In Corona, California.
25 Q. And what was the purpose of your trip?

## Page 23

1     MR. KATTAN: Objection. Asked and answered.
2     THE WITNESS: They were a steel company, and I
3 believe they had -- you know, they were offering me a
4 chance to see one of the steel factories in China, and
5 then while we were there, there were some other visits
6 that were arranged.
7     MR. GEORGE: Okay.
8 BY MR. GEORGE:
9 Q. Including to BNBM?
10 A. Yes.
11 Q. Okay. When you were at BNBM, do you remember
12 who you met with?
13 A. No.
14 Q. Did you meet with anybody from BNBM?
15 A. I -- I believe so.
16 Q. Okay. Do you recall if you took any tour of the
17 facilities or manufacturing plants?
18 A. Yes.
19 Q. Okay.
20 A. One of the gypsum manufacturing plants.
21 Q. Does the name Dragon Board ring a bell to
22 you?
23 A. No.
24 Q. Was the tour given in English or Chinese?
25 A. Well, the people that I was with spoke both.

## Page 24

1 Q. Okay.
2 A. And so, you know, my portion of the tour was in
3 English.
4 Q. Okay. Did the people from BNBM who were giving
5 the tour, did they engage with you in English or did
6 they engage with you through intermediaries or a
7 translator?
8 A. You know, I don't -- I don't remember.
9 Q. You don't remember?
10 A. No.
11 Q. You don't speak Chinese?
12 A. No.
13 Q. Does anyone at Great Western speak Chinese?
14 A. No.
15 Q. And that was in 2005? When was this?
16 A. 2005.
17 Q. Okay. So that was your first encounter with
18 BNBM; correct?
19 A. Yes.
20 Q. What was your next encounter with BNBM?
21 A. It was this transaction.
22 Q. Okay. Between the tour in 2005 -- and when you
23 say "this transaction," you mean the documents in
24 Exhibit 2 and 3, the two purchases?
25 A. Correct.

## Page 25

1 Q. Okay. And are those two the only two purchases
2 that Great Western made from BNBM?
3 A. Yes.
4 Q. And that's true throughout time?
5 A. Yes.
6 Q. Were there any communications between BNBM and
7 yourself before these -- before the first of these
8 transactions was engaged in?
9 A. No.
10 Q. Okay. Did you receive any marketing materials
11 or any further correspondences from BNBM after the tour?
12 A. I don't recall.
13 Q. Okay. Did your supplier, US Wire, tell you what
14 their relationship with BNBM was?
15 A. No.
16 Q. Did you visit any other drywall manufacturers in
17 China during this tour?
18 A. No.
19 Q. Why were you interested in developing a
20 relationship with a Chinese manufacturer of drywall?
21     MR. KATTAN: Objection to form. Lacks
22 foundation.
23     THE WITNESS: I -- I really wasn't interested in
24 developing a relationship. I was looking for supply.
25     MR. GEORGE: Okay.

Confidential - Subject to Further Confidentiality Review

**Page 26**

BY MR. GEORGE:

1 Q. Any supply?

3 A. Any supply.

4 Q. Okay. Did you discuss what other supplies BNBM

5 could offer?

6 A. No.

7 Q. Were you aware of what else they could offer

8 besides drywall?

9 A. No.

10 Q. Did you tour any other manufacturing facilities

11 of theirs besides the gypsum plant?

12 A. No.

13 Q. Why did you visit the gypsum plant?

14 A. Well, the gypsum, it was a -- was a major

15 product line that we carried and at the time was in

16 short supply so, you know, I had an interest in looking

17 for additional supply at that time.

18 Q. Were you looking at any other sources besides

19 BNBM at the time for possible supplies?

20 A. Yes.

21 Q. Where else?

22 A. There's -- there's a company in Mexico. I'm

23 trying to remember the name.

24 Q. El Rey?

25 A. Yes. Yeah.

**Page 27**

1 And we had contacted them and really never got a

2 return phone call.

3 Q. Really? So because the -- and so did you pursue

4 BNBM as a supplier because El Rey didn't return the

5 call?

6 A. I think it's Panel Rey, now that you've jogged

7 my memory.

8 Q. Oh, Panel Rey. Yeah. Yeah. Yeah. Yeah,

9 you're right.

10 A. Yeah. I -- I -- I tried to contact Panel Rey a

11 few times. That was my -- my first option because they

12 were closer.

13 Q. Uh-huh.

14 A. And that didn't work out. So as a result of the

15 trip to China, I was introduced to these people and

16 subsequently we entered into this transaction.

17 Q. Okay. Those two transactions; correct? There

18 are --

19 A. Yes.

20 Q. -- two transactions? Okay.

21 Had you done importing from Mexico before

22 or ever?

23 A. No.

24 Q. Okay. So this was your first -- this was only

25 your first engagement with importing from either Mexico

**Page 28**

1 or China?

2 A. Yes.

3 Q. Okay. Did BNBM indicate -- direct you or were

4 you directed at all to any sort of Websites or Internet

5 resources to understand what materials or sources they

6 could provide you?

7 A. No.

8 Q. When you were there, do you recall them ever

9 mentioning Taishan Gypsum?

10 A. No.

11 Q. Okay. Were you given a list of the different

12 drywalls that they could supply for you when you visited

13 them?

14 A. No.

15 Q. Okay. Did you ever receive a brochure or a list

16 of materials they could supply for you?

17 A. I don't believe so.

18 Q. Okay. Did you ever discuss with them whether or

19 not their drywall would meet U.S. specifications in

20 terms of size, testing, and so forth and so on?

21 A. Yes.

22 MR. KATTAN: At any time?

23 BY MR. GEORGE:

24 Q. You can answer.

25 A. Yes.

**Page 29**

1 Q. Okay. And when was that conversation?

2 A. It was during the process of placing the order

3 with them.

4 Q. Okay. When did that process start, if you

5 recall?

6 A. I -- I don't recall.

7 Q. Okay. And what was your question for them about

8 specifications for the U.S. market?

9 A. My question was to -- to find out if they met

10 ASTM standards in the U.S.

11 Q. Okay. Any other specification concerns you had

12 in these conversations during the process?

13 A. Nothing other than just to verify that the --

14 the dimension of the material was -- was compatible with

15 our codes in the U.S.

16 Q. Okay. And did BNBM say yes to both the ASTM and

17 codes requirements?

18 A. Yes.

19 Q. Okay. Did they provide you with any sort of

20 documentation or laboratory testing to back up the

21 certification?

22 A. They provided -- and I think it's in this packet

23 here -- some certification that their material was --

24 met the standards.

25 Q. Okay. Aside from that certification, which is

Confidential - Subject to Further Confidentiality Review

Page 30

1  in, I believe, both Exhibit 2 and 3, was there any other
2  documentation they provided for you?
3  A.    Not that I can recall.
4  Q.    Okay.  During this early process before any
5  agreements were reached to a sale, what other
6  conversations did you have with BNBM?
7  A.    I don't recall any.
8  Q.    Okay.  Let's just step back for a second.
9        When you were communicating with BNBM, how did
10  you communicate with BNBM?
11        MR. KATTAN:  Are you talking about on his trip
12  while he was there or --
13        MR. GEORGE:  No.  During the process.
14  BY MR. GEORGE:
15  Q.    While you're talking now about what they can
16  sell you, you're getting ready to make the first
17  purchase.  You're communicating with BNBM;
18  correct?
19  A.    Correct.  And -- and I believe most of my
20  communication was through the supplier, my -- my wire,
21  my stucco netting, supplier that actually took me to the
22  trip, because he was bilingual.
23  Q.    Okay.  And that's USA Wire?
24  A.    Yes.
25  Q.    Okay.  So how would that communication then

Page 31

1  work?  You had a question, say, about ASTM.  How would
2  you present that to BNBM and how did you receive a
3  response from them?
4  A.    I -- I really don't recall.
5  Q.    Okay.
6  A.    It was a long time ago.
7  Q.    Yeah, truly.  And I understand that completely.
8        Do you recall, was it like a phone link,
9  were there conference calls, were there E-mails?
10  What would you typically do?
11  A.    Most of my conversation with the -- the folks
12  from USA Wire was done via telephone.
13  Q.    Okay.  During this time leading up to the first
14  purchase did you ever have any direct communications
15  with BNBM?
16  A.    No.
17  Q.    Okay.  So they were all through USA Wire?
18  A.    Through USA Wire and faxes to me that either
19  went through USA Wire or from BNBM directly to me.  And
20  I honestly can't remember which way they came to me, but
21  they got to me.
22  Q.    Okay.  Now, there's -- there's one
23  facsimile in Exhibit 2 that's on Page Great
24  Western 6.
25        MR. TREDWAY:  Let me just add that the Bates

Page 32

1  stamping at the bottom right-hand corner --
2        MR. GEORGE:  -- was added by my firm.
3        MR. TREDWAY:  Okay.
4        THE WITNESS:  It's Page -- Page 6?
5        MR. GEORGE:  Yes.
6        MR. TREDWAY:  Yeah.
7  BY MR. GEORGE:
8  Q.    So this is one of the facsimiles.
9        Were there other faxes that you would have
10  received either directly from BNBM or through USA Wire
11  besides this?
12  A.    I -- I don't recall.
13  Q.    Okay.
14  A.    There may have been, but I don't recall.
15  Q.    Okay.  Did USA -- did you and -- you, Great
16  Western, and USA Wire have any sort of agreement?  Were
17  they doing this gratis?  Was there some sort of supplier
18  agreement, referral agreement that they were operating
19  under?
20  A.    Well, they were just doing this gratis.  We --
21  we were a good -- a good customer of theirs and some of
22  the individuals I think were, you know, maybe from
23  China.
24  Q.    Okay.
25  A.    And, you know, so they were the liaison on the

Page 33

1  communication side.
2  Q.    Okay.  Are you aware of any agreements that USA
3  Wire had with BNBM relating to drywall sales?
4  A.    No.
5  Q.    Do you have a particular person or persons at
6  BNBM who you knew their name that was involved in these
7  transactions?
8  A.    No.
9  Q.    Okay.  There's a name ALECLU appears on some of
10  the documents in Exhibits 2 and 3.
11        Does that name ring a bell?
12  A.    No.
13  Q.    Okay.  Were you involved in any -- before either
14  of these transactions in Exhibit 2 and 3 were
15  entered into, were you involved in any discussions
16  regarding a distribution agreement with BNBM where Great
17  Western would have a territorial exclusivity for BNBM
18  drywall?
19  A.    No.
20  Q.    Were you aware of those discussions?
21        MR. KATTAN:  Objection to form.
22        MR. TREDWAY:  Assumes a fact not in evidence,
23  that there were any such discussions --
24        THE WITNESS:  No.
25        MR. TREDWAY:  -- with Great Western.

Confidential - Subject to Further Confidentiality Review

Page 34

1  BY MR. GEORGE:
2  Q.    So that's no.
3  A.    No.
4  Q.    After the closure of the second purchase of
5  drywall in 2006 you had no further dealings with BNBM?
6  A.    That's correct.
7  Q.    Why did you have no further dealings with BNBM?
8  A.    Because the market conditions, the domestic
9  market conditions, changed and the supply of domestic
10  wallboard loosened up a little bit.
11  Q.    Uh-huh.
12  A.    Sometime later in 2006 we were able to get the
13  domestic product, more of it, and it was the preferred
14  product by our customers.
15  Q.    Okay. Let's start with Exhibit 2 -- I want to
16  walk through these, if you would be kind enough -- which
17  starts with Great Western 0002.
18       So this was the first purchase you made
19  from BNBM; correct?
20  A.    Yes.
21  Q.    Okay. And I'll be referring to this one
22  throughout as probably by the contract number, GB25190.
23       Do you see that in the upper right area?
24  A.    Yes.
25  Q.    Was that number a contract number that was

Page 35

1  created by BNBM or by Great Western?
2  A.    It was not created by Great Western.
3  Q.    Okay. And on the bottom there's a stamp, not
4  the confidential stamp that was added by your counsel,
5  but it says, for on -- for and on behalf of, and I
6  believe it says, Beijing New Building Materials Company,
7  Limited.
8       Do you recognize -- do you know who would have
9  stamped and signed that? Do you recognize that
10  signature?
11  A.    No.
12  Q.    Okay. And this is a purchase of regular
13  4-by-12-foot drywall; correct?
14  A.    Correct. Half-inch thick.
15  Q.    Okay. And that's the standard drywall that goes
16  in residential homes?
17  A.    In most cases, yes.
18  Q.    Okay. And how many -- can you tell from this
19  how many sheets of drywall there are?
20  A.    Not without a calculator.
21  Q.    Okay. Well, okay. So we know that there was
22  what, almost 2,500 kilos square feet?
23  A.    Well, that -- that would be almost two and a
24  half million square feet.
25  Q.    Okay.

Page 36

1  A.    Because the kilo would be thousand.
2  Q.    Okay.
3  A.    One thousand.
4  Q.    And that would be on top of -- on -- what's the
5  756 pallets mean?
6  A.    Well, they -- they stack drywall in -- in lifts
7  or I think the Chinese refer to them as pallets, but
8  in -- in stacks or -- or lifts.
9  Q.    Okay. So there would be 756 of those stacks?
10  A.    Yes.
11  Q.    Okay. And, typically, how many sheets of
12  drywall are in a stack?
13  A.    It really depends on the manufacturer.
14  Q.    Okay. On average.
15  A.    Half inch, 4 by 12s, 40 to 60 --
16  Q.    So 40 to --
17  A.    -- pieces.
18  Q.    -- 60 pieces.
19       And that's individual sheets or sheets like
20  they're --
21  A.    Pieces. Sheets.
22  Q.    Individual sheets, not -- because when I
23  go to Home Depot, I buy it, it's always like two
24  together.
25  A.    It comes -- yeah, it comes two to a bundle.

Page 37

1  Q.    Okay.
2  A.    But that would be sheets.
3  Q.    Okay.
4  A.    40 to 60 pieces.
5  Q.    Okay. Remind me, I don't do international
6  shipping too much, unit price, C.F.R., Angeles,
7  California.
8       C.F.R., what does that mean? Do you recall?
9  A.    I don't recall.
10  Q.    Okay. And the pricing there, you were paying
11  $175 per kilo square feet; correct?
12  A.    Per -- per thousand square feet.
13  Q.    Okay.
14  A.    Correct.
15  Q.    And so the total cost, everything in, to you was
16  reflected there, $431,826.20?
17  A.    Correct.
18  Q.    Okay. Okay. Next page, that's just the packing
19  slip; correct?
20  A.    Yes.
21  Q.    Now, the invoice and the packing slip are dated
22  on the same day. Is that unusual?
23       MR. KATTAN: Objection to form.
24  BY MR. GEORGE:
25  Q.    In your experience.

Confidential - Subject to Further Confidentiality Review

Page 38

1  A.    I -- I don't know.  I've never imported
2  wallboard --
3  Q.    Okay.
4  A.    -- prior to this.
5  Q.    All right.  Turning to the third page, Bates
6  stamped 004, Certificate of Origin, there's a guy named
7  ALECLU here, project manager for BNBM.
8      So this doesn't ring your -- remind you of him
9  or his role in your transaction?
10 A.    No.
11 Q.    Was the document created for Great Western's
12 purposes or for other purposes?
13     MR. TREDWAY: I'm sorry?  Which?
14 BY MR. GEORGE:
15 Q.    Meaning, was this created for your
16 needs or was this produced for needs about which
17 you're not aware?
18 A.    I -- I don't remember if I requested this or
19 they just included it.
20 Q.    Okay.  As part of the import?  Okay.
21     Next page, Great Western 005.  Is this the
22 certification you discussed about meeting ASTM
23 standards?
24 A.    Yes.
25 Q.    Okay.  And, again, that signature there with the

Page 39

1  stamp, for and on behalf of BNBM, you don't know that --
2  who that is that signed that?
3  A.    I don't.
4  Q.    Okay.  Why was ASTM certification important for
5  your business?
6  A.    The ASTM is -- is a standard that is required by
7  most building, home builders, building contractors.
8  Q.    And if it didn't have that certification, how
9  would that impact your business?
10 A.    I'm sorry?
11 Q.    If it didn't have that certification of being
12 ASTM-compliant, how would that impact your business?
13 A.    More than likely, we wouldn't have purchased the
14 material if it did not meet that standard.
15 Q.    Okay.  Are there any other standards that you
16 made clear to BNBM that you needed to sell the product
17 on the American market?
18 A.    Nothing other than that it have the correct
19 dimensions.
20 Q.    Okay.  And they assured you that it did?
21 A.    Yes.
22 Q.    Okay.  And when it came here, did it?
23 A.    Yes.
24 Q.    Did they offer you any other size product or did
25 they just give you what you asked for?

Page 40

1  A.    That's all I asked for.
2  Q.    Okay.  In the course of these -- while you were
3  in the process of negotiating this first purchase, was
4  there any -- ever any discussions from them or from you
5  about other products of theirs that you could import and
6  sell in the American market?
7      MR. KATTAN: Objection.  Asked and answered.
8      THE WITNESS: No.
9      MR. GEORGE: Okay.
10 BY MR. GEORGE:
11 Q.    Turning to Page 006, the fax we looked at
12 earlier, I assume Mr. Larry refers to you, sir?
13 A.    Yes.
14 Q.    Okay.  From BNBM.
15     It says, Dear Larry, date of shipment, January
16 10th, 2006.
17     Do you know whether that's accurate?
18 A.    I believe so.
19 Q.    Okay.  And this refers to this Contract Number
20 GB25190; correct?
21 A.    As far as I know, yes.
22 Q.    Okay.  In the course of your business with BNBM,
23 with this transaction, did you ever have any reason to
24 see any of these same documents in Chinese or were
25 all the documents you were given in English?

Page 41

1  A.    This is all the documents that I remember
2  seeing.
3  Q.    Okay.  So you never saw anything in Chinese?
4  A.    Not that I can remember.
5  Q.    Okay.
6      MR. TREDWAY: You mean other than the Chinese
7  characters that are associated with the stamp on each
8  page?
9      MR. GEORGE: Correct.  Obviously, the signature
10 is not in -- it's not -- is Chinese and there's
11 the Chinese BNBM and then in English, Beijing.
12 BY MR. GEORGE:
13 Q.    And just to confirm what your counsel presented
14 on the record, the stamp on each of these pages that
15 starts, the information contained in this document is
16 considered a trade secret, that was not on the original
17 documents that you received from BNBM; correct?
18 A.    Correct.
19 Q.    Okay.  On Page 0009, an Entry Summary, the top
20 left refers to a Brokers Box Number, Hankyu
21 International Tran in Carson, California.
22     Are you familiar with that organization?
23 A.    No, I'm not.
24 Q.    Did you use any sort of broker or import agent
25 in the course of this transaction?

Confidential - Subject to Further Confidentiality Review

Page 42

1  A.    We may have.
2  Q.    Okay. You don't recall?
3  A.    Would the stevedore be included? I mean, would
4  that be a broker or --
5  Q.    Let's not speculate. Stevedores tend to
6  be the people who handle logistics on the
7  dock.
8  A.    Yeah. I really don't recall a broker.
9  Q.    Okay. If you don't recall --
10  A.    Yeah.
11  Q.    -- I don't want to start going down rabbit
12  holes.
13       On Page 011, 11, there's a reference made to a
14  Judy Moseley of Great Western Building Materials.
15       Do you know who Judy Moseley was or is?
16  A.    Judy was my assistant working at Great Western.
17  Q.    Okay. What responsibilities did she have for
18  this transaction?
19  A.    Not much.
20  Q.    Well --
21  A.    She -- she -- she assisted in opening the mail
22  and, you know, accepting phone calls whenever I was gone
23  on the road --
24  Q.    Okay.
25  A.    -- and probably -- not probably. She assisted

Page 43

1  in a Letter of Credit with the bank. But nothing more
2  than that.
3  Q.    Okay. I just want to -- another thing I
4  noticed that was not in the documents that you produced
5  for these two transactions, there was the sales
6  agreement, the contract that preceded the invoice, and
7  you said you produced everything that you had in your
8  files.
9       And, also, I believe that there was a Letter --
10  both transactions relied on a Letter of Credit being
11  issued by Great Western; correct?
12  A.    Correct.
13  Q.    Okay. Do you happen to keep a copy of the
14  Letters of Credit for each of these transactions?
15  A.    I could not locate one.
16  Q.    Okay. So you did look?
17  A.    I did look.
18  Q.    Okay. When you went on this trip to Beijing,
19  were there any other American companies going along with
20  you and USA Wire?
21       MR. KATTAN: Objection to form.
22       THE WITNESS: No.
23       MR. GEORGE: Okay.
24  BY MR. GEORGE:
25  Q.    Who was the person at USA Wire with whom

Page 44

1  you particularly would deal in matters like this?
2  A.    There were two individuals. One was the -- the
3  salesman that worked for USA Wire and the other was an
4  individual in management for USA Wire.
5  Q.    Okay. And who was the salesperson?
6  A.    Oh, gosh.
7  Q.    If you recall.
8  A.    I remember his first name being Gary, and I --
9  I'm sorry. I can't remember his last name.
10  Q.    That's fine.
11       And the manager's name? Do you recall him?
12  A.    James.
13  Q.    Okay.
14  A.    Last name I believe was Fan, F-A-N.
15  Q.    Okay. Is James Fan also involved in Baoan
16  International?
17  A.    Yes.
18  Q.    Okay. When you went to Beijing, was James Fan
19  along?
20  A.    Yes.
21  Q.    Okay. Did Mr. Gary come?
22  A.    Yes.
23  Q.    Okay. Anyone else from USA Wire?
24  A.    Not that I recall.
25  Q.    Okay. Did anyone else from your company go over

Page 45

1  besides yourself?
2  A.    I don't think so.
3  Q.    Okay. Does USA stand for Universe Sourcing of
4  America, if you know, or --
5  A.    I don't recall.
6  Q.    Okay. Okay. If we could turn to Exhibit 3.
7  A.    Can I correct that last answer?
8  Q.    Sure.
9  A.    USA does stand for Universe Sourcing of America.
10  Q.    Okay. If we could turn now to Exhibit 3 of your
11  deposition, it starts with the page Bates stamped Great
12  Western 15.
13       So this is the second of the two transactions
14  you had with BNBM; correct?
15  A.    Yes.
16  Q.    Okay. And this is under Contract Number
17  GB26024?
18  A.    Yes.
19  Q.    Okay. I assume all of the -- and this is the
20  same kind of drywall that you purchased the first time
21  as well, regular, plain, old drywall; correct?
22  A.    Correct.
23  Q.    Okay. And it accurately reflects what
24  was purchased and what was delivered and what you
25  paid?

Confidential - Subject to Further Confidentiality Review

Page 46

1  A.    Far as I can remember, yes.
2  Q.    Okay. So you don't recall any shortages
3  or deviations from what you agreed to purchase
4  and what they agreed to sell?
5  A.    I don't. There -- there -- there may have been
6  a small percentage that was damaged in the transit but,
7  far as I remember, everything that they represented was
8  there.
9  Q.    Okay. Thank you.
10     MR. GEORGE: If we could mark this as Exhibit 4.
11     (Exhibit Great Western-4 was marked for
12  identification.)
13     MR. GEORGE: Okay.
14  BY MR. GEORGE:
15  Q.    What's been marked as Exhibit 4 is a
16  three-page -- four-page document. First page is Bates
17  stamped BNBMPLC0007430, last page is 7433.
18     If you could review this, sir, and let me know
19  when you're finished looking at it.
20  A.    Okay.
21  Q.    Okay. Have you seen this document before?
22  Withdraw that question.
23     If you look on the last page, it says under
24  "Buyers," there's a signature line for Great Western
25  Building Materials.

Page 47

1  Is that your signature?
2  A.    Yes.
3  Q.    And as far as you know, you dated it on
4  December 1st, 2005?
5  A.    Apparently.
6  Q.    Okay. And on the first page am I correct to
7  read that the contract number refers to GB25190?
8  A.    Yes.
9  Q.    Okay. So as far as you understand, this is the
10  contract for the transaction reflected in Exhibit 2?
11  A.    As far as I know, yes.
12  Q.    Okay. Is that your fax header at the top of
13  Exhibit 4?
14  A.    Yes.
15  Q.    And that's your fax number, 805-278-4667? Or
16  was?
17  A.    I'm looking at --
18  Q.    The top -- fax header, top middle.
19  A.    Oh.
20  Q.    Fax number 805-278-4667.
21  A.    It -- it may have been.
22  Q.    Now, there -- on this -- for this transaction
23  there were two buyers. There is Great Western and then
24  Baoan International Investment Company, Limited; is that
25  correct?

Page 48

1  A.    That's not my understanding. Great -- Great
2  Western was the buyer, not --
3  Q.    Okay.
4  A.    -- Baoan International.
5  Q.    Okay. So Great Western paid all the sums?
6  A.    Yes.
7  Q.    And Great Western received all the products?
8  A.    Correct.
9  Q.    And there were no agreements between Great
10  Western and Baoan International regarding this
11  transaction?
12  A.    No.
13  Q.    Do you have any understanding why Baoan
14  International then is a party to the sales
15  contract?
16     MR. TREDWAY: If you have an understanding, he's
17  entitled to it. Don't guess.
18  BY MR. GEORGE:
19  Q.    Never guess.
20  A.    They were assisting with, you know, as a liaison
21  in the transaction.
22  Q.    Okay. So at the end, on the last page, again,
23  where you signed, are you familiar with James Fan's
24  signature?
25  A.    I'm not.

Page 49

1  Q.    Okay. How do you know James Fan? Is it
2  from USA Wire?
3  A.    Correct.
4  Q.    Do you know why he would be signing for Baoan
5  International as opposed to USA Wire for this
6  transaction?
7  A.    He was assisting in a liaison capacity.
8  Q.    So when he was a liaison, he used Baoan
9  International, and when he was -- what's the difference?
10  A.    He worked for Baoan International.
11  Q.    Okay. But he also worked for USA Wire; correct?
12  A.    Correct.
13  Q.    Okay. Do you know if USA Wire has any
14  relationship to Baoan International?
15  A.    I don't.
16  Q.    Okay. Did you ask Mr. Fan why Baoan
17  International was signing this contract alongside Great
18  Western at the time?
19  A.    No.
20  Q.    Okay. Do you know who's signing on behalf of
21  Beijing New Building Materials Company, Limited, per the
22  stamp at the top of that page, the last page of
23  Exhibit 4?
24  A.    No, I don't.
25  Q.    Okay. Are you still in contact and

Confidential - Subject to Further Confidentiality Review

Page 50

1 communication with Mr. Fan?
2 A.    No.
3 Q.    When was the last time you had communications
4 with Mr. Fan?
5 A.    About the time that they sold their USA Wire
6 business, which would have been sometime in 2007.
7 Q.    So you've had no dealings with him since that
8 time?
9 A.    No.
10 Q.   Have you had any dealings with Baoan
11 International since that time, since these transactions
12 in 2006?
13 A.   I don't believe so.
14 Q.   Okay. Were you familiar with Baoan
15 International Investment Company before these
16 transactions in 2006?
17 A.   I knew that there was a connection with Baoan
18 and USA Wire. I didn't know exactly what that was.
19 Q.   Okay. Are you aware of any relationship between
20 Baoan International and BNBM?
21 A.   No, I'm not.
22 Q.   Okay. Do you know if there were any amendments
23 to this sales contract or was this the final form, as
24 far as you know?
25 A.   Far as I know, this is the final one.

Page 51

1 Q.    Okay. And during this time did Mr. Fan and
2 yourself ever have conversations about the business
3 engagement with BNBM?
4       MR. KATTAN: Objection to form.
5       THE WITNESS: During which time?
6       MR. GEORGE: Late 2005, early 2006, leading up
7 to these two purchases and following these two
8 purchases.
9       THE WITNESS: More than likely, we did.
10      MR. GEORGE: Okay.
11 BY MR. GEORGE:
12 Q.    Did you discuss any wider possibilities in terms
13 of engagement with BNBM outside of these two purchases?
14 A.    No.
15 Q.    Did Mr. Fan in any companies with which he was
16 affiliated buy or sell drywall?
17 A.    Not to my knowledge.
18 Q.    Okay. So how would you describe his
19 relationship in these two transactions with BNBM?
20 A.    He --
21      MR. KATTAN: Objection to form.
22      THE WITNESS: He was Chinese, spoke Chinese, was
23 bilingual in English and a supplier, and he offered to
24 assist us and offered to take me to -- to China.
25      MR. GEORGE: Okay.

Page 52

1 BY MR. GEORGE:
2 Q.    And so throughout all of these transactions
3 there was no agreement for compensation or
4 remuneration from Great Western to James Fan for his
5 services?
6 A.    None whatsoever.
7 Q.    Okay. Okay.
8       MR. GEORGE: Exhibit 5, please.
9       (Exhibit Great Western-5 was marked for
10 identification.)
11 BY MR. GEORGE:
12 Q.    What's been marked as Exhibit 5 is a four-page
13 document. First page is Bates stamped BNBMPLC0007437,
14 last page is 7440.
15      So have you seen this document before, BNB --
16 Great Western Exhibit 5?
17 A.    I may have, but I don't recall.
18 Q.    Okay. Were there ever any discussions in the
19 course of the first purchase that you made from BNBM
20 about the need for an export or import agent on behalf
21 of either party?
22 A.    Not that I can remember. There may have been.
23 Q.    So -- and during the course of these
24 discussions, do you recall any distinctions being made
25 between BNBM, PLC, and BNBM (Group)?

Page 53

1       MR. KATTAN: Objection to form. Lacks
2 foundation. Assumes that there were any discussions
3 about the two companies.
4       THE WITNESS: I don't recall.
5       MR. GEORGE: Exhibit 6, please.
6       (Exhibit Great Western-6 was marked for
7 identification.)
8 BY MR. GEORGE:
9 Q.    When you get a chance, sir, we've marked
10 Exhibit 6 to your deposition, which is waiting for your
11 perusal. And I believe this is the Letter of Credit
12 related to the first transaction, GB25190.
13      Can you confirm that for me?
14 A.    Okay.
15 Q.    Okay. And is this the Letter of Credit related
16 to the first purchase?
17 A.    Well, I don't recall this, but it --
18      MR. TREDWAY: Well, that's the answer. If you
19 don't know what --
20      MR. GEORGE: Well, let him finish. He was
21 going to continue.
22      THE WITNESS: I don't remember this document.
23      MR. GEORGE: Okay.
24 BY MR. GEORGE:
25 Q.    Did Great Western use Guaranty Bank?

Confidential - Subject to Further Confidentiality Review

Page 54

1  A.    Yes.
2  Q.    Okay.  And that's based in Texas; correct?
3  A.    I -- I don't -- I don't know.  We don't deal
4  with them anymore.
5  Q.    At the time you used Guaranty Bank?
6  A.    I believe so.
7  Q.    Okay.  And it lists here as the applicant Great
8  Western Building Materials; correct?  Right in the
9  middle of the first page.
10  A.    Yes.
11  Q.    And that's -- that was your address of your
12  business at the time, 301 Kinbard Street; correct?
13  A.    No.
14  Q.    Oh, really?  What was that address?
15  A.    It's a typo.  It -- it -- our address is
16  Lombard, not Kinbard.
17  Q.    Okay.  So it's 301 Lombard?
18  A.    Yes.
19  Q.    Okay.  But it's in Oxnard, California?
20  A.    Yes.
21       MR. TREDWAY:  Would this be a convenient point
22  to take a short break --
23       MR. GEORGE:  Oh, absolutely.  Yeah.  Yeah.
24       MR. TREDWAY:  -- since we've been on the record
25  for an hour?

Page 55

1       MR. GEORGE:  Yeah.  Yeah.  Yeah.
2       VIDEO OPERATOR:  With the approval of counsel,
3  going off the record.
4       The time is approximately 10:05 a.m.
5       (Recess, 10:05-10:14 a.m.)
6       VIDEO OPERATOR:  With the approval of counsel,
7  back on the record.
8       The time is approximately 10:14 a.m.
9       MR. GEORGE:  Let's mark this as Exhibit 6.
10       THE COURT REPORTER:  Seven.
11       MR. GEORGE:  Seven.  Oh, I was doing so good.
12       (Exhibit Great Western-7 was marked for
13  identification.)
14  BY MR. GEORGE:
15  Q.    What's been marked as Exhibit 7 is a four-page
16  document.  First page is Bates stamped BNBMPLC0007441,
17  the last page is 7444.
18       MR. GEORGE:  Thank you.
19       THE WITNESS:  Okay.
20       MR. GEORGE:  Okay.
21  BY MR. GEORGE:
22  Q.    This sales contract relates to the second of the
23  two transactions you had with BNBM; correct?
24  A.    Yes.
25  Q.    Okay.  Can you tell me who Jim Moore is?

Page 56

1  A.    Jim Moore was our company comptroller prior to
2  the sale of the company.
3  Q.    Okay.  And did he have authority to sign this
4  contract on behalf of Great Western?
5  A.    Yes.
6  Q.    And is that his signature there?
7  A.    Yes.
8  Q.    Okay.  And you were aware, as the owner
9  of the company, of him entering into this agreement
10  to purchase the drywall?
11  A.    Yes.
12  Q.    Any idea why it would be Mr. Moore signing this
13  as opposed to you on February 24th, 2006?
14  A.    He would occasionally sign agreements if I was
15  absent.
16  Q.    Okay.
17  A.    But with my -- with my acknowledgment and
18  approval.
19  Q.    Okay.  Thank you.
20       And that was true -- you would acknowledge
21  and approve of this --
22  A.    Correct.
23  Q.    -- contract?  Okay.
24       Now, again, when you reviewed your personal,
25  Great Western's files, you did not find a copy of this

Page 57

1  sales contract?
2  A.    I did not.
3  Q.    Okay.  Do you have any doubts that this is the
4  contract related to the second transaction?
5  A.    No.
6  Q.    No, no doubts?
7  A.    No doubts.
8  Q.    Okay.  Thank you.
9       Are you aware at all of any of the following
10  companies, a company called American Fasteners?
11  A.    No.
12  Q.    How about U-F-A-N, UFAN, International
13  Investment?
14  A.    No.
15  Q.    North American Tian Tang?
16  A.    No.
17  Q.    Pacific American Materials?
18  A.    No.
19  Q.    Okay.  But you are aware of USA Wire?
20  A.    Yes.
21  Q.    Okay.  Did you have any relationship with
22  Mr. Fan outside of the business that you had with
23  USA Wire and these two transactions?
24  A.    No.
25  Q.    Okay.  What would you -- did you -- did Great

Confidential - Subject to Further Confidentiality Review

Page 58

1  Western purchase products from USA Wire?

2  A.    Yes.

3  Q.    What would you typically purchase from USA Wire?

4  A.    These would have been steel-related products,

5  wire products, wire mesh, stucco mesh, CornerAid, things

6  like that.

7  Q.    Okay.  Now, I understand from my conversations

8  with your counsel you went through Great Western's files

9  and found two additional documents that related to Mr.

10  Fan; correct?

11       Well, let's -- tell you what:  Why don't I mark

12  these and we can talk about what you found.

13  A.    Okay.

14       MR. GEORGE:  Mark this Number 8, please.

15  Do you want a copy back?

16       MR. TREDWAY:  Yeah.

17       (Exhibit Great Western-8 was marked for

18  identification.)

19  BY MR. GEORGE:

20  Q.    Sir, I was provided with a copy of this document

21  today, and can you tell me why you gathered this and

22  brought it to your deposition today, please?

23  A.    Because this purchase of -- of a machine --

24  Q.    Uh-huh.

25  A.    -- to fabricate corner mesh products used in --

Page 59

1  in stucco was done in partnership with USA Wire and

2  Great Western Building Materials.

3  Q.    Okay.  So this was a business transaction that

4  Great Western had with USA Wire?

5  A.    Correct.

6  Q.    Okay.  And who was purchasing the

7  machine?

8  A.    USA Wire and Great Western Building Materials.

9  Q.    Okay.  Were there any other agreements related

10  to this purchase, such as ones between USA Wire and

11  Great Western?

12  A.    No.

13  Q.    Okay.  And this machine was purchased from Janda

14  Company?

15  A.    Correct.

16  Q.    Okay.  Who paid for the machine?

17  A.    Both partners, USA Wire and Great Western

18  Building Materials.

19  Q.    Okay.  And did both companies use the machine?

20  A.    Yes.

21  Q.    Okay.  Who has current ownership of the machine?

22  Do you know?

23  A.    Neither party.

24  Q.    Was it sold?

25  A.    It sold.

Page 60

1  Q.    Were the proceeds shared equally between USA

2  Wire and Great Western?

3  A.    No.  When USA Wire sold their company to one of

4  their competitors, the machine was acquired from -- from

5  that company by Great Western.

6  Q.    Okay.

7  A.    So we ended up with the machine.

8  Q.    Okay.

9  A.    This would have been sometime in 2007.

10       MR. TREDWAY:  Yeah.  There's the Bill of Sale is

11  that other document.

12       MR. GEORGE:  Oh, okay.  All right.  Good.

13       Then we'll mark it as Exhibit 9, then.

14       Thank you, David.

15       (Exhibit Great Western-9 was marked for

16  identification.)

17       MR. GEORGE:  Sorry.

18       MR. KATTAN:  An extra copy.

19       MR. GEORGE:  Oh, okay.

20  BY MR. GEORGE:

21  Q.    So what's been marked as Exhibit 9 is that sale

22  we were just discussing --

23  A.    Correct.

24  Q.    -- when USA Wire was purchased by its

25  competitor?

Page 61

1  A.    Yes, that's correct.

2  Q.    Okay.  Out -- outside of this, were there

3  no other -- I mean, this was an unusual transaction

4  involving Great Western and USA Wire; correct?

5  Typically, your purchases were just of regular

6  supplies, like the wiring and the metal we

7  discussed; correct?

8  A.    Yes, that's correct.

9  Q.    And outside of the engagement with BNBM, did you

10  have any other -- did Mr. Fan or USA Wire or Baoan

11  International ever discuss other import opportunities

12  with Great Western?

13  A.    Not that I can recall.

14  Q.    Okay.  And one more thing.

15       MR. KATTAN:  Holding you to that.

16       MR. GEORGE:  One more thing.  Might be a

17  big thing.

18       MR. TREDWAY:  Famous lawyer words.

19       MR. GEORGE:  I've got one more question, one

20  more question.

21       Number 10, please.

22       (Exhibit Great Western-10 was marked for

23  identification.)

24  BY MR. GEORGE:

25  Q.    What's been marked as Exhibit 10, this is a

Confidential - Subject to Further Confidentiality Review

Page 62

1 five-page document. The first three pages are Bates
2 stamped BNBM(Group)-E-0019753 and the last page is 19755
3 and then there follows, I'll say on the record, what's
4 called a machine translation that was produced in
5 discovery by BNBM (Group) that is basically a
6 computerized translation of the Chinese reflected
7 in the document.
8     And the English translation suggests that the
9 title of the first document is sole agency -- "Sole
10 Agent and Distribution Agreement," dated July 22nd,
11 2005.
12     And I notice, sir, that -- am I correct that
13 your company, Great Western Building Materials Company,
14 Limited, is mentioned here in English on the first page
15 of the document? First page.
16 A.    Oh, okay.
17     MR. TREDWAY: I'd point out that it is not the
18 correct name of the company.
19 BY MR. GEORGE:
20 Q.    Is that your company's name there?
21 A.    No.
22 Q.    How is it different?
23 A.    We -- our company does not have a C-O or L-T-D
24 after the name.
25 Q.    Okay. So it would just be Great Western

Page 63

1 Building Materials?
2 A.    Correct.
3 Q.    Okay. Now, this agreement, according to the
4 machine translation, was basically a sole sale for
5 certain American West Coast states carving out Home
6 Depot and Lowe's as being allowed to sell at retail BNBM
7 products.
8     Does seeing this document refresh your
9 recollection about possible conversations you had with
10 Baoan International or Mr. Fan about an exclusive
11 agreement with BNBM to sell their drywall on the West
12 Coast?
13     MR. KATTAN: Objection to form.
14     THE WITNESS: It does not.
15     MR. GEORGE: Okay.
16 I may have asked this, and I apologize if I did,
17 so you can hold off on the objection.
18 BY MR. GEORGE:
19 Q.    Did you ever have any discussions with Mr. Fan
20 or anyone at USA Wire regarding any wider relationship
21 they had with BNBM?
22 A.    No.
23     MR. GEORGE: Okay. Let's go off the record for
24 one minute. I think I'm going to be finished. And I
25 appreciate it.

Page 64

1     VIDEO OPERATOR: With the approval of counsel,
2 going off the record.
3     The time is approximately 10:25 a.m.
4     (Discussion off the record.)
5     VIDEO OPERATOR: With the approval of counsel,
6 back on the record.
7     The time is approximately 10:27 a.m.
8     MR. GEORGE: Okay. Pending any questions by
9 counsel for defendants, no further questions from the
10 PSC.
11     Thank you.
12         EXAMINATION
13 BY MR. KATTAN:
14 Q.    Mr. Rogers, I introduced myself earlier but for
15 purposes of the record, my name is Justin Kattan. I
16 represent BNBM (Group) and BNBM, PLC, in connection with
17 this litigation.
18     You testified about a trip that you had taken to
19 China with your supplier, USA Wire, and you testified
20 earlier that that trip was sometime in 2005; correct?
21 A.    Yes.
22 Q.    Do you recall when in 2005?
23 A.    It was in the first half of the year.
24 Q.    And your supplier, USA Wire, paid for that trip?
25 A.    I believe they did.

Page 65

1 Q.    Okay. You didn't receive an invitation to go to
2 China from BNBM, did you?
3 A.    No.
4 Q.    Prior to going to China, you were not familiar
5 with BNBM?
6 A.    No.
7 Q.    Had your suppliers at USA Wire told you that you
8 would be meeting with people from BNBM prior to your
9 departure for China?
10 A.    I -- I don't remember hearing the name BNBM
11 prior to the trip.
12 Q.    Okay. So as of the time you were leaving for
13 China, you still had never even heard of BNBM; correct?
14 A.    Not as far as I can remember.
15 Q.    And while you were on this trip in China, you
16 didn't specifically ask to meet with BNBM; correct?
17 A.    Correct.
18 Q.    Between the time that you returned from your
19 trip to China in the first half of 2005 and the time
20 that you began discussions with the or with respect to
21 the first purchase of drywall from BNBM, do you recall
22 what the time gap there was?
23 A.    I don't.
24 Q.    Okay. It was a number of months; correct?
25 A.    I don't recall.

Confidential - Subject to Further Confidentiality Review

Page 66

1  Q.     Between the time that you returned from China --
2  withdrawn.
3      After you returned from China, nobody from BNBM
4  reached out to contact you, either directly or
5  indirectly, to solicit business following up on your
6  meeting; correct?
7  A.     I don't remember any contact with them.
8  Q.     I'm talking about either directly or indirectly.
9  A.     Correct.
10 Q.     And am I correct that sometime towards the end
11 of 2005, it was you, in fact, who reached out through
12 USA Wire to inquire of BNBM about the purchase of
13 drywall; correct?
14 A.     I believe that's the way it happened.
15 Q.     And am I correct that, again, with respect to
16 the second purchase of drywall, the one that occurred
17 sometime in 2006, from BNBM, again, that was as a result
18 of you reaching out to BNBM through USA Wire, not as a
19 result of BNBM soliciting additional business from you?
20 A.     Correct.
21 Q.     Am I correct that no one from BNBM came to the
22 United States in connection with the transactions that
23 you entered into with them?
24 A.     Nobody that I had contact with.
25 Q.     Well, are you aware of someone from BNBM who

Page 67

1  came to the United States in connection with these
2  transactions that you didn't have contact with?
3  A.     I'm not.
4  Q.     All right. So, to your knowledge, no one from
5  BNBM came to the United States in connection with these
6  transactions; correct?
7  A.     To my knowledge, that's correct.
8  Q.     I'm only asking for the -- for what you know.
9      You testified earlier that you weren't aware of
10 or familiar with the distinction between BNBM, PLC, and
11 BNBM (Group).
12     You recall that testimony?
13 A.     Yes.
14 Q.     You also testified that while you were in China,
15 you toured a gypsum plant that you believed -- you
16 believed belonged to BNBM.
17     You recall that testimony.
18 A.     Yes.
19 Q.     You don't know whether that plant belonged to
20 BNBM (Group) or BNBM, PLC, do you?
21 A.     I do not.
22 Q.     And you don't know whether the individuals that
23 you met with who you believe were from BNBM worked for
24 either BNBM, PLC, or BNBM (Group); correct?
25 A.     Correct.

Page 68

1  Q.     You testified that you had conversations, again,
2  through USA Wire to ensure that the drywall that you
3  were purchasing met ASTM standards.
4      Do you recall that testimony?
5  A.     Yes.
6  Q.     Okay. And you testified that you received an
7  assurance from BNBM that their drywall that they were
8  selling you in fact met ASTM standards.
9      You recall that testimony?
10 A.     Yes.
11 Q.     Now, you don't know if BNBM, BNBM's drywall
12 typically met ASTM's standards or whether they specially
13 made it ASTM-compliant for purposes of your two
14 transactions, do you?
15 A.     I do not.
16 Q.     So the board, the drywall board that you
17 purchased in 2006 from BNBM, actually was shipped to the
18 United States; correct?
19 A.     Yes.
20 Q.     And that was shipped to California?
21 A.     Yes.
22 Q.     And you actually -- withdrawn.
23     Great Western actually took possession of the
24 drywall?
25 A.     Correct.

Page 69

1  Q.     What did Great Western do with the drywall after
2  you took possession of it?
3  A.     We brought it into one or two of our warehouses.
4  Q.     Okay. Did you sell it?
5  A.     We did. Most of it.
6  Q.     Okay. Let's deal with the first transaction
7  first.
8      Do you recall to whom you sold the drywall?
9  A.     No.
10 Q.     Okay. Sitting here today, can you identify
11 any purchaser of the drywall from that first
12 transaction?
13 A.     No.
14 Q.     Sitting here today, can you identify any
15 construction projects, be they residential, commercial
16 or otherwise, in which the drywall was -- from the first
17 transaction was used?
18 A.     No.
19 Q.     Let's talk about the second purchase of drywall
20 that you received from BNBM.
21     Sitting here today, can you identify any --
22 anyone, any contractor or any other entity, to whom
23 Great Western sold that drywall?
24 A.     No.
25 Q.     Sitting here today, can you identify any

Confidential - Subject to Further Confidentiality Review

Page 70

1  construction project, again, be it residential or
2  commercial, in which the drywall that Great Western
3  purchased from BNBM in that second transaction was used?
4  A.    No.
5  Q.    Did you receive any complaints about BNBM's
6  drywall from any of the entities to whom you sold it?
7  A.    No.
8  Q.    Do you have any reason to believe, sitting here
9  today, that any of the drywall that you acquired from
10 BNBM was used outside of the State of California or
11 Arizona?
12 A.    No.
13 Q.    You testified earlier that you, your, Great
14 Western's, market was typically Arizona and California.
15       Was the same true of the contractors and other
16 entities to whom you typically sold materials?
17 A.    Correct.
18 Q.    Did you have any discussion, either directly or
19 through USA Wire, with BNBM concerning what Great
20 Western intended to do with the drywall that it bought
21 from BNBM?
22 A.    Nothing specific that I can recall.
23 Q.    Do you recall ever informing BNBM, either
24 directly or indirectly through USA Wire, where Great
25 Western intended to sell the drywall?

Page 71

1  A.    No.
2  Q.    What markets it intended to sell the drywall.
3  A.    No.
4  Q.    You testified earlier that you were not aware of
5  any relationship between USA Wire and BNBM.  Are you
6  aware of any relationship -- well, withdrawn.  Let me
7  start that again.
8        You testified earlier that you were not aware of
9  any relationship between USA Wire and BNBM.
10       Do you recall that testimony?
11 A.    Correct.
12 Q.    Are you aware of any relationship with Mr. Fan
13 personally and BNBM at the time, as of 2005 or 2006?
14 A.    No.
15 Q.    To your knowledge, had Mr. Fan ever done
16 business with BNBM prior to assisting Great Western with
17 the transactions that we've been discussing here today?
18 A.    No.
19 Q.    To your knowledge, did Mr. Fan ever do business
20 with BNBM after assisting Great Western with the
21 transactions that we've been discussing here today?
22 A.    No.
23 Q.    To your knowledge, had USA Wire ever done
24 business with BNBM prior to assisting Great Western with
25 the transaction we -- transactions we've been discussing

Page 72

1  here today?
2  A.    No.
3  Q.    And what about after the transactions we've been
4  discussing here today?
5  A.    To my knowledge, no.
6  Q.    All right.  Let me ask you the same question
7  about Baoan?  Is that how you pronounce that?
8  A.    I'm not sure.
9  Q.    Well, the entity is, the spelling is B-A-O-A-N.
10 I'll pronounce it as Baoan.
11 A.    Okay.
12 Q.    To your knowledge, B -- withdrawn.
13       To your knowledge, had Baoan ever done business
14 with BNBM prior to assisting Great Western with the
15 transactions we've been discussing here today?
16 A.    No.
17 Q.    And what about after the transactions we've been
18 discussing here today?
19 A.    No.
20 Q.    Can you please take out Exhibit 2 and turn to
21 Page Great Western 0009.
22 A.    Okay.
23 Q.    Now, you see there is an entity identified on
24 this document as the importer of record, it's in Box
25 Number 11, and the entity is identified as Oxnard

Page 73

1  Building Materials, Inc.
2        Do you see that?
3  A.    Yes.
4  Q.    Are you familiar with Oxnard Building Materials,
5  Inc.?
6  A.    Yes.
7  Q.    And who or what was Oxnard?
8  A.    Oxnard is the company known as Great Western
9  Building Materials.
10 Q.    Okay.  And so why for the purposes of this
11 document was it identified as Oxnard as opposed to Great
12 Western?
13       Well, I mean, I see that it's doing business
14 as Great Western, but why on this document was it
15 identified as Oxnard?
16 A.    I don't know.
17       MR. TREDWAY:  Calls for speculation because I
18 don't think this witness prepared this document.
19       MR. KATTAN:  All right.
20 BY MR. KATTAN:
21 Q.    Understanding that you did not prepare this
22 document, but this document was prepared by somebody
23 either from Oxnard or Great Western; correct?
24       MR. TREDWAY:  Assumes a fact not in evidence.
25       MR. GEORGE:  True.  Objection.

Confidential - Subject to Further Confidentiality Review

Page 74

1    MR. TREDWAY: I don't think so.
2    MR. GEORGE: Yeah.
3    THE WITNESS: I -- I -- I don't believe it was.
4    MR. GEORGE: Yeah.
5  BY MR. KATTAN:
6  Q.    Do you know who this was prepared
7  by?
8  A.    No.
9  Q.    Are you familiar with a government agency known
10 as the Consumer Product Safety Commission, or CPSC?
11 A.    Vaguely, yes.
12 Q.    And did you have any communications with them
13 concerning the drywall that you purchased from
14 BNBM?
15 A.    Yes.
16 Q.    Okay.  Do you recall when those communications
17 took place?
18 A.    No.
19 Q.    Were they in writing or were they in person or
20 were they over the phone?
21 A.    Possibly all three, but I -- I don't remember
22 exactly.
23 Q.    Okay.  And, obviously, if you had kept copies of
24 those communications, to the extent that they were
25 written, they would have been produced in connection

Page 75

1  with this Subpoena; correct?
2  A.    Correct.
3  Q.    Do you recall discussing with the CPSC results
4  of any testing of BNBM's drywall?
5  A.    No.
6    MR. KATTAN: All right.  Can I have a minute off
7  the record to just go over my notes, see if there's
8  anything more that I need to cover, and then we can
9  resume in a minute or two?
10   VIDEO OPERATOR: With the approval of counsel,
11 going off the record.
12   The time is approximately 10:41 a.m.
13   (Discussion off the record.)
14   VIDEO OPERATOR: With the approval of counsel,
15 back on the record.
16   The time is approximately 10:45 a.m.
17 BY MR. KATTAN:
18 Q.    I just want to confirm that Great Western had no
19 direct communications with BNBM in connection with
20 either of the two purchases of drywall that we've been
21 discussing here today; correct?
22   MR. GEORGE: Objection.  Misstates testimony.
23   THE WITNESS: Not that I can recall.
24 BY MR. KATTAN:
25 Q.    To your -- to the best of your recollection, any

Page 76

1  communications concerning these transactions that Great
2  Western had with BNBM was done through USA Wire;
3  correct?
4  A.    Yes.
5    MR. GEORGE: Objection.
6    In fact, it was a facsimile sent directly.
7    MR. KATTAN: Are you testifying here today?
8    MR. GEORGE: No.  I'm --
9    MR. KATTAN: You can --
10   MR. GEORGE: I'm articulating the basis for my
11 objection.
12   MR. KATTAN: Okay.  Well, then that's not an
13 appropriate objection.
14   MR. GEORGE: And why the question is
15 objectionable.
16   MR. KATTAN: All right.
17 BY MR. KATTAN:
18 Q.    Turn to Page 6 of Exhibit 2.  That's the
19 facsimile that counsel is referring to.
20   So other than this facsimile, you are not aware
21 of any direct communications that Great Western had with
22 BNBM in connection with this transaction, correct, this
23 first transaction that's reflected in Exhibit 2?
24 A.    You said that was Page 6?
25 Q.    Yes, sir.

Page 77

1  A.    That's correct.
2  Q.    Okay.  And if you'd turn to Exhibit 3 and you'll
3  look at Page 19.
4  A.    Okay.
5  Q.    Am I correct, this is another facsimile that
6  Great Western received from BNBM, this time in
7  connection with the second purchase of drywall?
8  A.    I -- I really can't tell where we received this
9  from.
10 Q.    Okay.  To the best of your knowledge, though,
11 given that it was in your files, you received it from
12 BNBM?
13 A.    Either directly or indirectly, one way or the
14 other, yes.
15 Q.    So you may have received this from USA
16 Wire.
17 A.    Correct.
18 Q.    Okay.  So other than possibly the document
19 that's reflected on Great Western 19, you are not aware
20 of any other direct communication that Great Western had
21 with BNBM in connection with this second transaction
22 that's reflected in Exhibit 3; correct?
23 A.    Correct.
24 Q.    Do you know who arranged the shipping details
25 for either of the two transactions we've been discussing

Confidential - Subject to Further Confidentiality Review

Page 78

1 here today?

2 A. No, I don't.

3 Q. To your knowledge, did BNBM have any employees

4 in the United States?

5 A. No.

6 Q. To your knowledge, did BNBM have any offices in

7 the United States?

8 A. No.

9 Q. Can you turn to the documents that were marked

10 as Exhibits 9 and 10. I'm sorry. 8 and 9.

11 A. Okay.

12 Q. These two documents reflect a transaction that

13 you entered into in connection with the acquisition of a

14 mesh machine; right?

15 A. Document 8 does, yes.

16 Q. Okay. Let's start with Document 8, then.

17 Am I correct that BNBM had nothing to do with

18 this transaction?

19 A. Correct.

20 Q. All right. Let's take a look at Exhibit 9,

21 which is a Bill of Sale relating to a mesh machine.

22 Am I correct that BNBM had nothing to do with

23 this transaction?

24 A. Correct.

25 Q. Let's take out Exhibit 10.

Page 79

1 Now, you testified that you didn't recall any

2 discussions that Great Western had with BNBM concerning

3 a distributorship agreement; right?

4 A. That's correct.

5 Q. Are you aware of any discussions that either USA

6 Wire or Baoan had on Great Western's behalf with BNBM

7 concerning a distributorship agreement?

8 A. No.

9 Q. Do you recall ever authorizing any such

10 communications on behalf of Great Western?

11 A. No, I do not recall that.

12 MR. KATTAN: I have nothing further at this

13 time.

14 MR. GEORGE: Anything from CNBM before I follow

15 up?

16 MR. CABOT: Nothing.

17 MR. TREDWAY: One question.

18 EXAMINATION

19 BY MR. TREDWAY:

20 Q. Mr. Rogers, did you ever enter into a

21 distributorship agreement with Beijing New Building

22 Materials?

23 A. Not that I can recall.

24 MR. GEORGE: Okay.

25

Page 80

1 EXAMINATION

2 BY MR. GEORGE:

3 Q. A few follow-up questions, and I think we'll be

4 done after that.

5 When you went to China, was it your

6 understanding that you were visiting BNBM?

7 MR. KATTAN: Objection to form.

8 THE WITNESS: Before I went to China?

9 MR. GEORGE: When you were in China.

10 BY MR. GEORGE:

11 Q. There were some questions by counsel suggesting

12 that maybe it wasn't BNBM after all, that it was some

13 other operation that was showing you around.

14 A. It was my understanding that it was BNBM.

15 Q. Were introductions made when you arrived?

16 A. Yes.

17 Q. And did the introductions make you understand

18 that you were visiting BNBM?

19 A. That's the way it was represented to me.

20 Q. Okay. And they were expecting you as a visitor;

21 correct?

22 A. Yes.

23 Q. And they were going to tour you as a potential

24 customer, correct, in their facility?

25 MR. KATTAN: Objection to form.

Page 81

1 THE WITNESS: They provided me with a tour. I

2 don't know what their expectations were.

3 MR. GEORGE: Okay.

4 BY MR. GEORGE:

5 Q. Did they -- did you discuss the possibility

6 of purchasing product from them when you were taking

7 the tour or during the visit?

8 MR. KATTAN: Objection.

9 THE WITNESS: During the visit, yes.

10 MR. GEORGE: Okay.

11 BY MR. GEORGE:

12 Q. And that was with BNBM personnel; correct?

13 A. Through an interpreter.

14 MR. KATTAN: Objection to form.

15 MR. GEORGE: Okay.

16 BY MR. GEORGE:

17 Q. And when you finally did make those two

18 purchases in 2006, they were -- that was drywall from

19 BNBM; correct?

20 A. Yes.

21 Q. And you made payments to BNBM; correct?

22 A. Yes.

23 Q. Okay. And that was payments made from your

24 American bank account; correct?

25 MR. KATTAN: Objection to form.

Confidential - Subject to Further Confidentiality Review

## Page 82

1    THE WITNESS: Whatever bank account that was at
2  the time.
3  BY MR. GEORGE:
4  Q.    You don't have any --
5  A.    Yes.
6  Q.    -- accounts in China.
7  A.    Oh.  The U.S. bank accounts.
8  Q.    Yeah.
9  A.    Correct.  Yes.
10 Q.    Okay.  All right.  Now, when you sell your
11 drywall, say, in 2006, to your customers, you keep
12 records of each of the sales that were made; correct?
13 A.    Yes.
14 Q.    Okay.  So if we need to find out to whom you
15 sold drywall in 2006 and 2007, we could find that out;
16 correct?
17 A.    If the records still exist, yes.
18 Q.    Okay.  Assuming that.
19    Who are your customers?
20    MR. KATTAN:  Objection to form.
21    Now?
22    MR. TREDWAY:  Objection.
23    MR. GEORGE:  That's a good question.  Thank you
24 for clarifying.
25

## Page 83

1  BY MR. GEORGE:
2  Q.    In 2006 and 2007 who were your customers for
3  drywall?  And as a type, not by list of names.
4  A.    There would be a variety, and the largest
5  concentration would be subcontractors.
6  Q.    Okay.  And you have a list of those names as
7  well, correct, somewhere?
8    MR. TREDWAY:  The question is, do you have a
9  list of names now?
10    THE WITNESS:  For sales made in 2006?
11    MR. GEORGE:  No.  Of customers.
12 BY MR. GEORGE:
13 Q.    If we needed to find out to whom you sold in
14 2006, 2007, we could find that out; correct?
15 A.    If those records exist, yes.  I'm not sure they
16 do.
17 Q.    Okay.  Okay.  And if you reviewed your
18 files, you could also probably determine a list
19 for me or for anybody, a list of the customers you
20 had at the time in 2006, 2007; correct?
21 A.    Yes.
22 Q.    Okay.  In terms of the drywall that you
23 purchased from BNBM, Great Western did not make the
24 shipping arrangements; correct?
25 A.    Correct.

## Page 84

1  Q.    And at all times when you were visiting BNBM,
2  they understood that you were an American company;
3  correct?
4    MR. KATTAN:  Objection to form.
5    THE WITNESS:  Yes.
6    MR. KATTAN:  Lacks foundation.
7    MR. GEORGE:  Okay.
8  No further questions.
9    MR. KATTAN:  Let me just follow up on one thing.
10    EXAMINATION
11 BY MR. KATTAN:
12 Q.    I understand that when you went to China, you
13 understood that you were meeting with BNBM.
14    The question that I had asked earlier is, and I
15 just want to confirm, you don't know whether the
16 individuals who you met worked for BNBM (Group) or BNBM,
17 PLC; correct?
18 A.    I do not.
19    MR. KATTAN:  Nothing further.
20    MR. GEORGE:  Okay.  Thank you.
21    VIDEO OPERATOR:  With the approval of counsel,
22 this concludes today's video deposition.
23    Today's video deposition consists of one
24 recorded disc.
25    The time is approximately 10:54 a.m.

## Page 85

1    We are now off the record.
2    (Whereupon the deposition concluded at 10:54
3  a.m.)
4    TESTIMONY CLOSED
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Confidential - Subject to Further Confidentiality Review

Page 86

1  STATE OF CALIFORNIA        )
2  COUNTY OF LOS ANGELES      )
3        I, ROSEMARY LOCKLEAR, a Certified Shorthand
4  Reporter of the State of California, duly authorized to
5  administer oaths pursuant to Section 2025 of the
6  California Code of Civil Procedure, do hereby certify
7  that
8        LARRY ROGERS, the witness in the foregoing
9  deposition, was by me duly sworn to testify the truth,
10  the whole truth and nothing but the truth in the
11  within-entitled cause; that said testimony of said
12  witness was reported by me, a disinterested person, and
13  was thereafter transcribed under my direction into
14  typewriting and is a true and correct transcription of
15  said proceedings.
16        I further certify that I am not of counsel or
17  attorney for either or any of the parties in the
18  foregoing deposition and caption named, nor in any
19  way interested in the outcome of the cause named in
20  said deposition dated the_____ day of
21  _____, 2015.
22
23
24
25  ROSEMARY LOCKLEAR, RPR, CRR, CSR 13969

Page 88

1        E R R A T A
2        - - - - - -
3
4  PAGE LINE CHANGE
5  ____ ____ _____
6  REASON:_____
7
8  PAGE LINE CHANGE
9  ____ ____ _____
10  REASON:_____
11
12  PAGE LINE CHANGE
13  ____ ____ _____
14  REASON:_____
15
16  PAGE LINE CHANGE
17  ____ ____ _____
18  REASON:_____
19
20  PAGE LINE CHANGE
21  ____ ____ _____
22  REASON:_____
23
24
25

Page 87

1        INSTRUCTIONS TO WITNESS
2
3
4        Please read your deposition over carefully and
5  make any necessary corrections.  You should state the
6  reason in the appropriate space on the Errata Sheet for
7  any corrections that are made.
8        After doing so, please sign the Errata Sheet
9  and date it.
10        You are signing same subject to the changes
11  you have noted on the Errata Sheet, which will be
12  attached to your deposition.
13        It is imperative that you return the original
14  Errata Sheet to the deposing attorney within thirty (30)
15  days of receipt of the deposition transcript by you.  If
16  you fail to do so, the deposition transcript may be
17  deemed to be accurate and may be used in court.
18
19
20
21
22
23
24
25

Page 89

1        ACKNOWLEDGEMENT OF DEPONENT
2
3
4        I, _____, do hereby certify
5  that I have read the foregoing pages, and that the same
6  is a correct transcription of the answers given by me to
7  the questions therein propounded, except for the
8  corrections or changes in form or substance, if any,
9  noted in the attached Errata Sheet.
10
11
12
13  _____
14  LARRY ROGERS                DATE
15
16  Subscribed and sworn
    to before me this
17  _____ day of _____, 20____.
18
    My commission expires:_____
19
20  _____
    Notary Public
21
22
23
24
25

Confidential - Subject to Further Confidentiality Review

Page 90

1          LAWYER'S NOTES
2   PAGE LINE
3   _____ _____ _____
4   _____ _____ _____
5   _____ _____ _____
6   _____ _____ _____
7   _____ _____ _____
8   _____ _____ _____
9   _____ _____ _____
10  _____ _____ _____
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24  _____ _____ _____
25  _____ _____ _____