UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: CHINESE-MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | CIVIL ACTION |
| | NO. 09-02047 |
| | SECTION "L" (5) |
| THIS DOCUMENT RELATES TO: ALL CASES | |

ORDER & REASONS

Before the Court is Jodi Ferchaud's ("Mrs. Ferchaud") Objection to the Special Master's *Opinion and Decree* (R. Doc. 19786). Having read the parties' briefs, reviewed the applicable law, and heard the Objection on oral argument, the Court now issues this Order and Reasons.

I. BACKGROUND

From 2004 through 2006, the housing boom in Florida and rebuilding efforts necessitated by Hurricanes Rita and Katrina led to a shortage of construction materials, including drywall. As a result, drywall manufactured in China was brought into the United States and used in the construction and refurbishing of homes in coastal areas of the country, notably the Gulf Coast and East Coast. Sometime after the installation of the Chinese drywall, homeowners began to complain of emissions of smelly gasses, the corrosion and blackening of metal wiring, surfaces, and objects, and the breaking down of appliances and electrical devices in their homes. *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 894 F. Supp. 2d 819, 829 (E.D.La. 2012), *aff'd*, 742 F. 3d 576 (5th Cir. 2014). Many of these homeowners also began to complain of various physical afflictions believed to be caused by the Chinese drywall. Accordingly, these homeowners began to file suit in various state and federal courts against homebuilders,

developers, installers, realtors, brokers, suppliers, importers, exporters, distributors, and manufacturers who were involved with the Chinese drywall. Because of the commonality of facts in the various cases, this litigation was designated as multidistrict litigation. Pursuant to a Transfer Order from the United States Judicial Panel on Multidistrict Litigation on June 15, 2009, all federal cases involving Chinese drywall were consolidated for pretrial proceedings in MDL 2047 in the U.S. District Court, Eastern District of Louisiana.

The Chinese drywall at issue was largely manufactured by two groups of defendants: (1) the Knauf Entities, and (2) the Taishan Entities. The litigation has focused upon these two entities and their downstream associates. The present motion relates to the proceedings against the Knauf Entities.

The Knauf Entities are German-based, international manufacturers of building products, including drywall, whose Chinese subsidiary, Knauf Plasterboard (Tianjin) Co., Ltd. ("KPT"), advertised and sold its Chinese drywall in the United States. The Knauf Entities are named defendants in numerous cases consolidated with the MDL litigation and litigation in state courts. The Knauf Entities first entered their appearance in the MDL litigation on July 2, 2009. *See* (R. Doc. 18). On November 2, 2009, in Pretrial Order No. 17, KPT agreed to a limited waiver of service. *See* (R. Doc. 401). On March 15-19, 2010, the Court presided over a bellwether trial in *Hernandez v. Knauf Gips KG*, Case No. 09-6050, involving a homeowner's claims against KPT for defective drywall. *See* (R. Doc. 2713). For purposes of the trial, KPT stipulated that its Chinese drywall "emits certain reduced sulfur gases and the drywall emits an odor." *Id*. The Court found in favor of the plaintiff family in *Hernandez*, issued a detailed Findings of Fact and Conclusions of Law ("*Hernandez* FOFCOL"), *see id.*, and entered a Judgment in the amount of $164,049.64, including remediation damages in the amount of $136,940.46, which represented a

cost of $81.13 per square foot based on the footprint square footage of the house. *See* (R. Doc. 3012).

Thereafter, on October 14, 2010, the Knauf Entities entered into a pilot remediation program with the Plaintiffs' Steering Committee ("PSC") in the MDL. This program was largely based upon the remediation protocol formulated by the Court in *Hernandez*. The Knauf pilot remediation program is ongoing and has, at present, remediated over 2,000 homes containing KPT Chinese drywall using the same protocol.

Mrs. Ferchaud's Objection arises out of the *Opinion and Decree* rendered by Special Master Daniel J. Balhoff ("Special Master") regarding a dispute between Mrs. Ferchaud and Moss & Associates, LLC ("Moss") with respect to the Chinese Drywall remediation project that was in progress at Mrs. Ferchaud's rental property located at 6021-6025 Canal Boulevard, New Orleans, Louisiana 70124 (the "Property"). Mrs. Ferchaud's property was damaged during Hurricane Katrina. It was repaired following the storm but, unfortunately, Knauf Chinese drywall was used. Mrs. Ferchaud filed a claim in this MDL and, when Knauf entered into a settlement agreement, Mrs. Ferchaud joined in that agreement.

Specifically, as an affected KPT property owner, Mrs. Ferchaud took part in the Remediation Protocol outlined in the *Third Amended Settlement Agreement Regarding Claims Against the Knauf Defendants in MDL 2047* (the "Knauf Class Settlement") (R. Doc. 16407-3). During remediation, a dispute arose between Mrs. Ferchaud and Moss, the lead contractor performing remediation in this MDL action. Moss, pursuant to the Knauf Class Settlement, requested that the Special Master make a determination regarding the respective rights and obligations of Moss and Mrs. Ferchaud. The parties filed mediation papers to the Special Master, who held a hearing on August 6, 2015. After the hearing was concluded, Moss

3

submitted a supplement on October 12, 2015 addressing disputed responsibility for 27 code violations identified by the City of New Orleans in a June 23, 2015 correspondence, and Mrs. Ferchaud submitted a reply. Moss identified specific violations that it was willing to remedy, but alleged that the majority of the deficiencies were homeowner issues outside of the scope of remediation and were thus the responsibility of the Mrs. Ferchaud.

On November 8, 2015, the Special Master rendered his *Opinion and Decree*, which adopted Moss's October 12, 2015 recommended division of responsibility for code violations finding that the majority of the deficiencies were Mrs. Ferchaud's responsibility. The Special Master's opinion also concluded that Mrs. Ferchaud was responsible for the delay in remediation and was therefore not entitled to receive delay payments or any other/additional damages from Moss. Mrs. Ferchaud disputes this *Opinion and Decree*, arguing that the Special Master erred in determining the division of responsibility for both the delay and code deficiencies and denying her delay payments as well as other/additional damages.

For the reasons set forth below, the Court overrules Mrs. Ferchaud's Objection and affirms the November 8, 2015 Special Master's *Opinion and Decree*, which correctly determined that (1) Mrs. Ferchaud was responsible for the delay in remediation, and, therefore, was not entitled to delay payments; (2) the majority of the code violations outlined by the City of New Orleans in its June 23, 2015 correspondence were the responsibility of Mrs. Ferchaud; and (3) Mrs. Ferchaud was not entitled to the other damages claimed under the Remediation Fund and/or Other Loss Fund since her lawsuit is governed by the New Claims Settlement Agreement.

## II. LAW AND ANALYSIS

### a. Delays in Remediation Work

Plaintiff contends that Moss is responsible for the delay in remediating her property and, therefore, she is entitled to delay payments. The Drywall remediation began on November 13, 2014 and, on December 1, 2014, the property received its Environmental Certification stating that the defective drywall had been removed. Mrs. Ferchaud correctly noted that the remediation was temporarily put on hold in early December. However, this hold was the result of a preexisting code violation related to the presence of a third residential unit behind Mrs. Ferchaud's duplex. Specifically, on or about December 9, 2014, Moss received notice of a code violation that stated "Illegal 3-plex; 3rd unit in rear." Because this issue was preexisting, Mrs. Ferchaud was put on notice that the Drywall remediation would remain on hold until necessary corrections were made by her and the delay would not be attributable to Moss. By December 16, 2014, Plaintiff was able to remedy this preexisting issue.

Mrs. Ferchaud also alleges a delay relating to a plumbing inspection on December 18, 2015. On December 18, 2015, Moss paid the City of New Orleans to perform a special inspection report regarding plumbing. The inspection found plumbing code violations. On December 19, 2014, Moss informed Mrs. Ferchaud by email that she could either hire Moss's subcontractor or her own contractor to perform the necessary plumbing work. While Moss indicated that it was Mrs. Ferchaud's option to subcontract the repairs with Moss's plumbers or subcontract with one of her own, it did not indicate that preexisting code violations were Moss's responsibility to correct. On December 22, 2014, Moss requested that Mrs. Ferchaud advise Moss when the plumbing code violations had been corrected. On January 7, 2015, Mrs. Ferchaud acknowledged that her own plumbers would perform the necessary work. Accordingly, the lockbox code on the property was changed to a code of the Mrs. Ferchaud's choice. Since that date, Moss has been prevented from reentering the premises, even though the plumbing re-

inspection passed on January 27, 2015. Mrs. Ferchaud has had exclusive possession of the home for approximately one year, and it is unknown what changes have been made to the home and the remediation work that commenced in November of 2014 by individuals she has hired since she took possession.

Finally, Mrs. Ferchaud contends that any other delays caused by her conduct were justified by her efforts to prevent the permanent creation of life safety and property damage hazards. She stated that she observed deficiencies in construction during her own visual inspection and was therefore forced to hire experts to examine the property in order to prevent Moss from completing work on walls and ceilings that would have concealed the problems and create permanent hazards. Notably, however, the Property passed its initial rough inspections for Framing, Electrical and Mechanical, which were conducted by a third party inspector contracted by the City of New Orleans between December 9 and December 19, 2014. Mrs. Ferchaud disagreed with the positive results of inspections and spent money to hire no less than three experts to review and analyze any potential code violations. It was not until after the City of New Orleans received numerous visits, phone calls, and complaints from Mrs. Ferchaud that the City changed the inspection results five months later, converting the passed inspections to fail on the Mechanical and Electrical rough. Nonetheless, neither Knauf nor Moss are responsible for the failure of property to comply with building codes and regulations *where such failure is unrelated to the Repair Work* (as was the case with the majority of the violations listed in the subsequent inspections).

Around this same time, Mrs. Ferchaud also began inquiring about making changes to her home outside the original scope of work. Pursuant to Moss's policy, she signed a waiver, acknowledging and affirming that she had requested additional work from Moss which impacted

the original schedule and she was waiving any claims to additional payments due to delay. Considering the foregoing, the record indicates that any delays in remediation were caused by the homeowner and not by Moss.  Therefore, delay payments are not appropriate.

    **b.  Code Violation Responsibility**

Mrs. Ferchaud argues that the Special Master erred in finding that Moss was not responsible for certain code violations identified by the City of New Orleans.  The violations for which she disputes responsibility are: Building/General items 1, 2, and 4; Electrical item 6; and Mechanical items 5, 6, and 13.  Mrs. Ferchaud contends that these items, including work related to the common wall in the duplex, electrical repairs, and the HVAC system, were necessitated by the Chinese drywall remediation and were thus Moss's responsibility.

Item 1 under Building/General states that overflow water directed to the foundations of the home must be corrected to prevent water from draining to the foundations.  Mr. Flettrich's report, Mrs. Ferchaud's current expert, stated that this was Moss's responsibility because it is related to the HVAC system and the remediation work involved the HVAC system.  However, resolution of this issue would involve replace or changing the PVC lines, which is outside the scope of a drywall remediation. Because overflow issues with PVC piping are unrelated to the remediation, the Special Master correctly determined Item 1 to be the responsibility of the Homeowner.  Item 2 involves framing changes to the structure of the property, which the remediation protocol does not cover.  Item 4 requires that notches and stud/joints be reviewed to see if any are compromised and indicates that some studs are located in areas not permitted.  However, all notches in all structural members were preexisting and no new notches or holes were created for the piping and wiring.  Also, as with Item 2, this deficiency is a framing and structural issue and is the responsibility of the homeowner under the remediation protocol.

Electrical Item 6 indicates that the bonding connection on the gas line must be accessible. Under the remediation protocol, Moss is not responsible for changing the location of an existing gas line or changing the framing to allow such access. Lastly, with respect to the Mechanical deficiencies noted by the City of New Orleans, Items 5 and 6 relate to PVC piping issues and gas line supports, which are preexisting and not Moss's responsibility under the protocol. Finally, Item 13 relates to ensuring the dryer exhaust ducts terminate on the exterior perimeter of the building, which would require construction work to the property that is outside the scope of the remediation protocol. Accodingly, the Special Master properly ruled that the division of responsibility propounded by Moss was appropriate.

 Ms. Ferchaud also argues that the Special Master should have determined responsibility for additional code violations that she contends exist on her property besides those 27 already identified by the City of New Orleans in its June 23, 2015 correspondence. Mrs. Ferchaud's Preliminary Expert Report from April 2015 identified additional deficiencies beyond those identified by the City of New Orleans in its June 23, 2015 correspondence, which she asserts are the responsibility of Moss. However, Flettrich's analysis is not what governs the remediation process under the Knauf Settlement Agreement and whether the remediation work has met the applicable codes. The remediation work is governed by the City of New Orleans Building Department and whichever inspectors they elect to contract with for inspection purposes. Therefore, the Special Master was not required to address code violations that were not determined by the City of New Orleans Building Department.

  c. **Other Damages**

 Mrs. Ferchaud claims she is entitled to other damages because of the expenses she has incurred on account of the building remediation being incomplete and unfit for occupancy. She

submitted her travel expenses, annual expenses, loss of rentals, property damages, credits due, storage fees, expert costs, and attorney's fees as being due and payable under section 14 of the Knauf Class Settlement Agreement. On November 8, 2015, the Special Master ruled that Mrs. Ferchaud was making a claim pursuant to the Settlement Agreement Regarding Post-December 9, 2011 Claims against the Knauf Defendants in MDL No. 2047 (the "New Claims Settlement Agreement") and stated that "[t]hat Agreement limits a claimant's recovery to section 4.3 of the Knauf Settlement Agreement." In other words, the Special Master determined that Mrs. Ferchaud's remedy was limited to remediation under Section 4.3 of the Knauf Settlement Agreement and that she was not entitled to relief under Section 4.7 which provides for the Other Loss Fund.

As was discussed during mediation with the Special Master, the non-remediation damages that Mrs. Ferchaud is claiming are not applicable to a Post-December 9, 2011 claimant under the New Claims Settlement Agreement. Those claims would fall under either the Other Loss Fund administered by BrownGreer or the Other Covered Expenses for residential owners. Mrs. Ferchaud is not eligible to receive benefits for either of these types of claims. Post-December 9, 2011 claimants, including Mrs. Ferchaud, are limited to Section 4.3 of the Knauf Class Settlement Agreement, which covers three Remediation Fund Options. Mrs. Ferchaud selected Option 1, which specifies that Other Covered Expenses, including, *inter alia*, alternative living expenses, personal property damage, and maintenance of the KPT property during remediation are only applicable to *residential* owners. Mrs. Ferchaud is a commercial owner and utilizes her New Orleans properties as income-producing rentals. Mrs. Ferchaud's remaining claims would be categorized as "Other Loss Fund" damages, which the New Claims Settlement Agreement does not grant to post-December 9, 2011 claimants.

### III. CONCLUSION

**IT IS ORDERED** that the Special Master's *Opinion and Decree* correctly found that (1) Mrs. Ferchaud was responsible for the delay in remediation, and, therefore, was not entitled to delay payments; (2) the majority of the code violations outlined by the City of New Orleans in its June 23, 2015 correspondence were the responsibility of Mrs. Ferchaud; and (3) Mrs. Ferchaud was not entitled to the other damages claimed under the Remediation Fund and/or Other Loss Fund since her lawsuit is governed by the New Claims Settlement Agreement.

**IT IS FURTHER ORDERED** that the Special Master's *Opinion and Decree* is **AFFIRMED**.

New Orleans, Louisiana this 1st day of February, 2015.

_____
UNITED STATES DISTRICT JUDGE