IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL NO. 2047 |
| | ) | SECTION L |
| THIS DOCUMENT RELATES TO: | ) ) | JUDGE FALLON |
| Case No. 09-7628 | ) | MAG. JUDGE WILKINSON |
| Payton et al v. Knauf Gips KG et al | ) | |
| Case No. 10-0361 | ) | |
| Wiltz et al v. Beijing New Building etc | ) | |
| Case No. 11-1077 | ) | |
| Haya et al v. Taishan Gypsum Co Ltd | ) | |
| Case No. 11-1395 | ) | |
| Amorin et al v. Taishan | ) | |
| Case No. 11-1672 | ) | |
| Amorin et al v. Taishan Gypsum Co., Ltd. | ) | |
| Case No. 11-1673 | ) | |
| Amorin et al v Taishan Gypsum Co., Ltd | ) | |

### OBJECTION TO SPECIAL MASTER'S DETERMINATION DENYING CLAIMANT, JOHN ADAMS' GLOBAL BANNER IN-EX REPAIR AND RELOCATION EXPENSES CLAIM

NOW INTO COURT, through undersigned counsel, comes Claimant, JOHN ADAMS including other officers of the dissolved corporation MAKB, Kathleen Mead, Andrea Adams and Brieon Marais who respectfully moves this Honorable Court for an Order reversing the SPECIAL MASTER's denial of Claimant's entitlement to Global, Banner, In-Ex Repair and Relocation Expenses ("GBI") claim and represents as follows:

### SUMMARY OF ARGUMENT

Claimant is and was a Commercial Owner as defined in the Settlement Agreement. Section 1.1.2.2.

Prior to any remediation, the property was sold to a subsequent purchaser with full disclosure of the existence of reactive Chinese Drywall. The Settlement Administrator correctly

concluded Claimant is eligible for a "sales-in-mitigation" claim, pursuant to Section 4.7.1.4. because the Affected Property was sold to mitigate the damages caused by reactive Chinese Drywall. The subsequent purchaser had full knowledge of the existence of reactive Chinese Drywall in the affected property. The home was also sold at a deep discount to reflect the existence of reactive Chinese Drywall.

Claimant filed a GBI claim. Initially, it was determined by the Settlement Administrator that Claimant was entitled to the GBI payment. However, seventeen (17) months later, the Settlement Administrator reversed that eligibility notice and issued a denial because the subsequent purchaser, who purchased the home with full knowledge of the existence of reactive Chinese Drywall and who obtained a market adjustment for the existence of reactive Chinese Drywall, filed a claim for the GBI.

Subsequent purchasers who purchased with knowledge that the affected property contained KPT Chinese Drywall are not class members and are, therefore, not entitled to recovery.

However, language buried in a footnote to the Second Amended Allocation Plan, suggests that for an Owner Subclass member to make a claim for GBI payment, they must have affirmatively retained those rights in any sale or foreclosure. This predicate requirement was an error of law and fact.

Further, there has never been a requirement by the Settlement Administrator that a GBI claimant who has had the home foreclosed upon or sold in mitigation to affirmatively establish they retained the right to make a claim. Instead, this issue only has come up because a subsequent purchaser latched on to the footnote language and actually filed a claim.

2

If it is an affirmative requirement in order to be a Class Member that an Affected Property owner must have retained the right to make a claim, even though that was not a requirement at the time of the sale of the property, then millions of dollars should have been funneled to subsequent purchasers as opposed to those who were otherwise class members. Said another way, a conclusion that subsequent purchasers, who were not harmed by the defendants, can obtain GBI payments means that millions of dollars were wrongfully paid to those who had their homes foreclosed upon or who sold their homes in mitigation because they never affirmatively retained the right to these claims. That could not have been the intention of the settlement.

It would be a horrible injustice for a subsequent purchaser, who purchased the property with knowledge, "as is" and/or at a discount, to receive any benefits for any aspect of the Chinese Drywall settlements as this would operate as an unjust enrichment to a non-injured party.

## FACTUAL AND PROCEDURAL SUMMARY

Mr. Adams purchased the Affected Property originally from Centerline Homes at Tradition LLC on July 19, 2006 for $206,770.00. After the confirmed discovery of reactive Chinese Drywall he was faced with the inability to rent the home, Mr. Adams regrettably had to sell the home to mitigate his damages. Mr. Adams was included in the first Omnibus Complaint filed in December 2009 as well as Omnibus Complaint II file in 2010, IX filed in 2011 and XV, XVI and XVII filed in 2012.

On September 19, 2013, Mr. Adams sold the home to Monica P. Saenz Hamon for $50,000.00. See Exhibit A. The buyers knew the home had Chinese Drywall as noted in the contract for sale. See Exhibit B.

3

Mr. Adams timely registered in the Chinese Drywall Settlement program on May 10, 2013. Mr. Adams submitted a timely claim for "sales in mitigation" pursuant to Section 4.7.1.4 and was determined to be eligible for payment. See Exhibit C.

Mr. Adams also submitted a timely claim for GBI on April 8, 2014. The Settlement Administrator determined Mr. Adams was eligible for the GBI payment from the builder on May 2, 2014. See Exhibit D. Claimant was successful in his appeal for the installer and supplier and the Claims Administrator determined Mr. Adams was eligible for the GBI payments for Builder, Supplier, and Installer on June 2, 2014. See Exhibit E. Checks were issued and made payable to Adams John/MAKB LLC on September 1, 2015 but because the corporation MAKB had dissolved, it was requested that the checks be reissued to counsel, Krupnick Campbell Malone Buser Slama Hancock Liberman P.A. for disbursement to the officers. See Exhibit F. The checks were never reissued.

Seventeen (17) months later, on November 4, 2015, the Settlement Administrator provided a Denial Notice:

> You submitted a Global, Banner, InEx Repair and Relocation Expenses claim for an un-remediated property that you no longer own. The Allocation Agreements that govern this Settlement Program specify that a payment may only be made to you if you retained the right to the Chinese Drywall claim. The Allocation Agreements require us to deny this claim because you sold the un-remediated Affected Property and did not retain the right to this claim.

See Exhibit G.

Claimant appealed on December 4, 2015. On January 28, 2016, the Special Master denied the appeal. See Exhibit H.

4

## LEGAL ARGUMENT

The denial of Mr. Adams' claim is predicated on the analysis that (a) in order to present a valid GBI claim Mr. Adams, despite being a plaintiff in the action, had to also affirmatively retain the right to file a claim in the claims process against the manufacturer and/or the supply chain at the time of the actual sale of the Affected Property AND (b) the subsequent owner, who purchased the home with the full knowledge of the existence of reactive Chinese Drywall in the home, automatically (and without any affirmative action) has a priority over Mr. Adams' status as a Class Member and Claimant to make such a claim.

The Knauf Third Amended Settlement Agreement approved by the Court, states affirmatively

> Section 1.1.2.2 The Commercial Owner Subclass: All members of the Class who are owners of Affected Property for the purposes of selling or renting the Affected Property or using the Affected Property to conduct a business and who do not reside in the Affected Property ("Commercial Owners"). <u>The Commercial Owner Subclass shall not include Owners, other than Mortgagees, who purchased Affected Properties with knowledge that the properties contained KPT Chinese Drywall and/or Non KPT Chinese Drywall.</u> The Commercial Owner Subclass also shall not include Owners who sold or otherwise disposed of Affected Properties except for former owners who lost Affected Properties due to foreclosure or sold Affected Properties to mitigate losses. Members of the Residential and Commercial Owner Subclasses also are referred to as "Owners".

(emphasis added). Doc. No. 16407-3.

Therefore, a subsequent purchaser who purchased the home with knowledge that the property contained reactive Chinese Drywall is NOT a member of the class in the settlement. The settlement's prohibition on recovery for subsequent homeowners who purchased with knowledge that the properties contained reactive Chinese drywall makes sense factually and legally.

First, purchasing an Affected Property with the knowledge of reactive Chinese Drywall eliminates any legal action the subsequent purchaser may have against the manufacturer and/or the supply chain. There is no legal principle which would give a subsequent purchaser who purchased the home with knowledge that the home contained reactive Chinese Drywall automatically any claim against Banner, Builders, Installers, and/or the manufacturer. Said another way, this settlement could not automatically create an action or legal right which did not and does not exist for subsequent purchasers, particularly those who could not demonstrate a legally cognizable harm. No settlement should compensate those who have no legal right to recovery.

Second, given the fact that the sales price of such an Affected Property was deeply discounted to reflect, among other risks associated with reactive Chinese drywall, the cost of remediation, allowing a recovery by a subsequent homeowner who purchased with knowledge that the home contained reactive Chinese drywall both (1) depletes the limited capped fund to the prejudice of those with legal claims AND (2) provides a double recovery by the subsequent purchaser.

Third, Mr. Adams is the ONLY "Owner" who had a legal and sustainable claim pending in the Court against the manufacturer and supply chain -- not the subsequent purchasers-- as evidenced by his participating in the Omni Complaints.

The Knauf Third Amended Settlement Agreement further states:

> 4.1. In consideration of settlement of all claims against the Knauf Defendants by Participating Class Members, the Knauf Defendants shall establish two funds, a Remediation Fund and an Other Loss Fund. Only the Owner Subclasses are eligible to participate in the Remediation Fund. Both the Owner Subclasses and the Tenant Subclass are eligible to participate in the Other Loss Fund.
>
> 4.2. Establishment and Administration of the Remediation Fund:

6

> 4.2.1. The Remediation Fund will be a Court-approved Qualified Settlement Fund pursuant to Section 1.468B-1 et seq. of the Treasury Regulations promulgated under Section 468B of the Internal Revenue Code of 1986, as amended. The escrow agreement establishing the Remediation Fund will be in a form mutually agreed upon by the Parties and approved by the Court.

Doc. No. 16407-3.

On August 13, 2012, a Settlement Agreement involving the Builders, Installers, Suppliers and Participating Insurers was filed. Doc. No. 15695-2. The August 2012 Agreement begins:

> This Settlement Agreement is entered into by and among the Plaintiffs' Steering Committee on behalf of the Class Members, as defined below, in In re: Chinese Manufactured Drywall Products Liability Litigation, MDL No. 2047 (EDLA), including the various consolidated Omnibus Complaints and individual actions.

Section 1.1.1 of the August 13, 2012 Settlement Agreement defines Class to include:

> ... all persons or entities, along with their heirs, representatives, attorneys, executors, administrators, executives, subsequent purchasers, residents, guests, tenants, lenders, successors and assigns, with claims, known or unknown, arising from or related to actual or alleged Chinese Drywall purchased, imported, supplied, distributed, marketed, installed, used, sold or in any way alleged to be within the legal responsibility of any Participating Defendant.

Doc. No. 15695-2.[1] Interestingly, Footnote One makes reference to the Knauf Settlement Agreement. ("This Settlement is referred to in the Knauf Defendants' Settlement Agreement as the "Prospective Insurance Agreement.")

---

[1] While there is a reference to "subsequent purchaser", there is no explanation of what that means. Does it mean subsequent purchasers of Affected Property from original owners prior to discovery of the existence of reactive Chinese Drywall? Does it mean subsequent purchasers no matter when they became a subsequent purchaser (i.e. how many iterations of purchasers after the original injured homeowner), with full knowledge of the existence of reactive Chinese Drywall? The answer to this latter question must be in the negative, because such a purchase is "not within the legal responsibility of a participating defendant" as there could be no claim once it is purchased with knowledge. Does it mean subsequent purchasers of Chinese drywall or actual boards in the distribution chain?

7

"Affected Property" is defined under Section 1.2 as

> "Affected Property" shall mean any real or personal property, residential or commercial, actually or allegedly containing or exposed to Chinese Drywall allegedly purchased from, imported, supplied, distributed, marketed, installed, used, sold and/or delivered by or in any way alleged to be within the legal responsibility of any Participating Defendant.

Doc. No. 15695-2. Again, an "Affected Property" subsequently sold with full knowledge of the existence of reactive Chinese Drywall breaks the causal chain and legal responsibility of participating defendants. Therefore, a subsequent purchaser does NOT have an "Affected Property".

The GBI Settlement goes on to outline the terms of the settlement:

> 4.1. In consideration of the settlement of all Class Members' claims arising out of or related to Chinese Drywall in the Litigation and/or CDW-Related Actions and/or Related Claims against Participating Defendants and Participating Insurers, the Participating Defendants and Participating Insurers will pay the collective sum of EIGHTY TWO MILLION SEVEN HUNDRED EIGHTY-FOUR THOUSAND DOLLARS ($82,784,000.00) (the "Settlement Funds"), subject to the credits in Section 4.2.

Importantly, Section 4.3 defines obligations of "Class Members" and distinguishes "subsequent purchasers of an Affected Property"; there can be no interpretation that a Class Member is a subsequent purchaser of the Affected Property:

> Any <u>Class Member that fails to comply with the obligations</u> set forth in this paragraph shall indemnify, (including attorney fees and costs, both at trial court and appellate court levels), <u>defend and hold harmless</u> each Participating Defendant and Participating Insurer for any claim brought by any person or entity, including, without limitation, that <u>Class Member's lender or any subsequent purchaser of that Affected Property</u>, against the Participating Defendant or Participating Insurer relating to the existence of Chinese Drywall in the Affected Property.

(emphasis added). To have a hold harmless whereby the Class Member protects against any claim brought by a subsequent purchaser means that the Class Member cannot be a subsequent purchaser.

Section 5.2, Class Release, prohibits the assignment of any claim:

> Each Class Member represents and warrants that it has not assigned and will not assign any claims relating to Chinese Drywall it may possess against any Participating Defendant or Participating Insurer to any person or entity, except as set forth below and in Exhibit 4. This representation and warranty shall not, however, apply to a Class Member who has had their Affected Property remediated by a Participating Defendant and assigned some or all of their claims in connection with this remediation.

Doc. No. 15695-2.[2]

Bodily injury claims were also included in the GBI determination. See Section 16, Doc. No. 15695-2.  If subsequent purchasers are defined as "Class members" under the GBI Agreement, even though they bought with full knowledge of the existence of the reactive Chinese drywall, then they could assert bodily injury claims. That is simply illogical. It would also mean those who had valid bodily claims but who happened to have their homes foreclosed or had to sell to mitigate damages had their claims eliminated automatically.  That could not have been the intent of the settlement, just as it could not have been the intent to eliminate GBI claims for those who sold or foreclosed.

The Court granted preliminary approval on May 31, 2012 (Doc No 14562) and final approval on February 7, 2013 (Doc No. 16570).

Then, on January 22, 2013, a Second Amended Settlement Allocation Plan for Settlement involving Builders, Installers Suppliers and Participating Insurers (Global Allocation Plan was filed.  Doc. No. 16528-1. The very first paragraph of the Second Amended Settlement Allocation Plan sets forth eligibility based upon the claimant being a "Class Member".

> 1. Eligibility. To be eligible for an allocation of Settlement Funds, a **Class Member** must own, have owned, reside in, or have resided in, or in the

---

[2] Exhibit 4 specifies specific assignments amongst discrete parties and entities. Neither Mr. Adams nor the subsequent purchaser of the Affected Property is listed.

> case of a defendant Class Member must have repaired, an Affected Property containing defective Chinese Drywall ("CDW"), and the Affected Property's builder, installer, and/or supplier must have participated in this Settlement by contributing to the Settlement Funds.

(emphasis added). Throughout the Allocation Plan, the numerous and repeated references to "Class Member" must be based upon the definition of "Class Member" as set forth in the Knauf Settlement Agreement.

To this point, the "Class Member" is consistently defined throughout the Knauf Settlement Agreement and the Allocation Plan. That is, no owner who purchased an affected property with knowledge that the home contained reactive Chinese Drywall can be a claimant or class member.

### Footnote 2 of Allocation Plan Jeopardizes Millions Already Paid?

According to the June Settlement Administrator's Status Report, 14,873 GBI claims have been made totaling $59,723,742.90. Doc. No. 19172. According to the same report, 466 foreclosure and sales-in-mitigation claims have been determined to be eligible. We can be certain a large number of those claims involve an Affected Property which had been foreclosed upon or the Affected Property was sold in mitigation of damages.

To date, the Settlement Administrators has NEVER used as an eligibility factor whether or not the claimant can demonstrate that the claimant affirmatively retained the right to assert claims despite being foreclosed upon or having sold the property in mitigation of damages.

However, in the limited number of occasions where a subsequent purchaser who has purchased the property with full knowledge of the existence of reactive Chinese Drywall and who received a deep discount in the sales price to account for the existence of the drywall has thought they could gain additional benefit by filing a claim, the Settlement Administrator has

been faced with a predicament of "competing" claims entirely caused by language buried in a single footnote.[3]

> On page 2 of the Second Amended Allocation Plan, a footnote reads:
>
>> The term "Repair and Relocation Damages" shall mean costs and expenses associated with the following: (i) the removal of the CDW from the Affected Property and repairing or replacing affected building materials and fixtures in the Affected Property (the "repair work"); (ii) the relocation of the property owners' belongings (i.e., moving expenses and storage-related expenses) during the repair work; and (iii) if necessary, obtaining comparable alternative living arrangements for the homeowners during the repair work. Notwithstanding the foregoing, <u>sellers of Affected Properties who sold un-remediated Affected Properties at a diminished value after disclosure of the existence of CDW to the buyer and retained, in writing, the exclusive right to assert all claims associated therewith against the builder, installer or supplier of the Affected Property, shall be entitled to make a claim for their damages under the distribution terms of this "Repair and Relocation Payment" section.</u> All other sellers of Affected Properties who sold Affected Properties at a diminished value, including but not limited to sellers of Affected Properties that were later remediated by a repairing builder, shall be entitled to make a claim for their damages exclusively from the "Other Loss Set Aside," as defined below, and, in that situation, the builder that repaired the Affected Property shall be the exclusive right to make a claim for "Repair and Relocation Damages" under this section.

(emphasis added). This highlighted provision is in direct conflict with the Settlement Agreement and the intent of this settlement.

Disturbingly, such a provision, if enforced, would have created an affirmative obligation of the Settlement Administrator to determine, prior to any payments, whether or not claimants who sold their homes to mitigate losses or lost their homes to foreclosure affirmatively retained

---

[3] Importantly, there is no method for an owner whose home is being foreclosed upon to retain any rights as they are extinguished. Further, subsequent purchasers of a foreclosed proper property purchase the property "as is" and have no claims as against the distribution chain. However, applying the language in the footnote from the Second Amended Allocation Plan means that no homeowner who was foreclosed upon could assert a GBI claim and that the claim would run to any one of a number of subsequent purchasers with no limit in the iterations of those who could possibly file a claim.

the right to assert a GBI claim. If they did not prove they affirmatively retained that right, then they were never eligible for a GBI claim. Instead, millions of dollars would be funneled to subsequent purchasers out of foreclosure and sales in mitigation, even in "as is" and with full knowledge of the existence of reactive Chinese drywall. This could not have been the intention of the Court, the parties or any just settlement. Of course, such a conclusion is only logical if the footnote in the Second Amended Allocation Plan was rightfully intended to automatically eliminate the rights of "Class members".

Upon reflection, there was no reason to include "retained, in writing, the exclusive right to assert claims", particularly since many homes had already sold. This footnote language provision would act to eliminate claims without the specific intent of any of the parties to eliminate such a claim. Moreover, the Global Allocation Plan could not legally alter the class definition to provide subsequent purchasers an unfair double recovery – having already received the benefit of a deeply discounted purchase price.

Additionally, the Global Allocation Plan could not create a legal claim against the manufacturer and supply chain for a subsequent purchaser that did not exist under law. The only way that legal claim against the manufacturer and/or the supply chain for a subsequent purchaser who purchased with knowledge that the home contained reactive Chinese Drywall could have been created is if the seller and buyer bargained for the exchange of rights AND there was an affirmative assignment of that right That is, rather than the Global Allocation Plan wrongfully defaulting to the concept that the right to make a claim is automatically extinguished if the seller (who may have sold long before the Global Allocation Plan) did not affirmatively RETAIN, the Global Allocation Plan should have, consistent with the law and the Knauf

Settlement Agreement, required the subsequent purchaser to affirmatively and explicitly obtain that right from the seller. Of course, Section 5.2 seems to prevent assignment of any such right.

The error of allowing subsequent purchasers through a sale and/or foreclosure, who accepted the property with full knowledge of the existence of reactive Chinese Drywall, can and must be corrected to preserve the intent and integrity of the settlement and the rights of those who have been innocently injured. As has been aptly said,

> It is settled that, to the extent a decree is drafted to deal with events in the future, the court must remain continually willing to modify the order to ensure that it accomplishes its intended result. United States v. United Shoe Mach. Corp., 391 U.S. 244, 252, 88 S.Ct. 1496, 1501, 20 L.Ed.2d 562 (1968); Exxon Corp. v. Texas Motor Exchange of Houston, 628 F.2d 500, 503 (5th Cir.1980). Further, a court must never overlook substantial changes in the circumstances surrounding a decree, lest it become an "instrument of wrong". United States v. Swift & Co., 286 U.S. 106, 115, 52 S.Ct. 460, 462–63, 76 L.Ed. 999 (1932)."

Police Ass'n of New Orleans Through Cannatella v. City of New Orleans, 100 F.3d 1159, 1169 (5th Cir. 1996).

As explained by the Court in Chisom v. Roemer, 1994 WL 261806 (E.D. La. 1994):

> We glean, from this, certain factors of importance: (1) that, where modification and amendment of an existing decree is under consideration, there are "limits of inquiry" for the decree court and for the reviewing court; (2) that the inquiry is "whether the changes are so important that dangers, once substantial, have become attenuated to a shadow"; (3) that movants must be "suffering hardship so extreme and unexpected" as to be regarded as "victims of oppression"; and (4) that there must be "[n]othing less than a clear showing of grievous wrong evoked by new and unforeseen conditions." Placed in other words, this means for us that modification is only cautiously to be granted; that the dangers which the decree was meant to foreclose must almost have disappeared; that hardship and oppression, extreme and unexpected, are significant; and that movants' task is to provide close to an unanswerable case. To repeat: caution, substantial change, unforeseeness, oppressive hardship, and a clear showing are the requirements.

Chisom v. Roemer, 1994 WL 261806 at *4 (E.D. La. 1994), quoting Humble Oil & Refining Co. v. American Oil Co., 405 F.2d 803, 813 (8th Cir.1969)(Blackmun, J.). See also Valentine Sugars, Inc. v. Sudan, 34 F.3d 320, 322 (5th Cir. 1994).

Claimant has established the unforeseen consequences of language buried in a footnote. Claimant has established the oppressive hardship caused by entirely eliminating claimants' rights as a Class Member to benefit of those unharmed. Claimant has established a clear showing that application of the language requiring both those who were foreclosed upon and or sold their homes in mitigation to affirmatively retain rights (some of whom long before the Allocation Plan was even filed), jeopardizes the intent of the settlement and undermines justice for innocent victims. Claimant has established the to do otherwise will provide unjust enrichment to those who purchased a home with full knowledge of the existence of reactive Chinese Drywall and funnel millions of dollars to individual who were not harmed, but rather are taking advantage of a mistake in a footnote of the Allocation Plan.

## **CONCLUSION**

In this claim, Mr. Adams would have otherwise been entitled to approximately $7,389.90 for the GBI Claim. In short, Mr. Adams is a "Class Member", was included in the Omnibus Complaint I, II, IX, XV, XVI and XVII timely filed eligible claims for sale-in-mitigation, timely filed his GBI claim and was initially determined to be eligible. The idea that this settlement was intended to funnel millions of dollars to subsequent purchasers who purchased homes out of foreclosure and/or with the full knowledge of the existence of reactive Chinese drywall while achieving a market adjustment for that defective drywall, is inconceivable, illogical and inconsistent with fundamental notions of justice. This Court is empowered to correct this

14

mistake and should to protect innocent owners who were harmed by the reactive Chinese Drywall.

The Special Master Denial Notice should be reversed and Claimant's claim reinstated.

/s/ *Michael J. Ryan*
Michael J. Ryan, Esquire
Florida Bar No. 975990
Krupnick Campbell Malone Buser Slama,
Hancock Liberman P.A.
12 S.E. 7 Street, Suite 801
Fort Lauderdale, FL 33301
Phone (954) 763-8181; Fax (954) 763-8292
pleadings-MJR@krupnicklaw.com
Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing Objection to Special Master's Determination Denying Claimant, John Adams, Global, Banner, In-Ex Repair and Relocation Expense Claim has been electronically uploaded to File and ServeXpress f/k/a Lexis Nexis File and Serve in Accordance with Pretrial Order No. 6, and that the foregoing was electronically filed with the Clerk of Court of the United States District Court for the Eastern District of Louisiana by using the CM/ECF system, which will send a notice of electronic filing in accordance with the procedures established in MDL 2047, on this 11th day of February, 2016.

/s/ *Michael J. Ryan*
Michael J. Ryan, Esquire
Florida Bar No. 975990
Krupnick Campbell Malone Buser Slama,
Hancock Liberman P.A.
12 S.E. 7 Street, Suite 801
Fort Lauderdale, FL 33301
Phone (954) 763-8181; Fax (954) 763-8292
pleadings-MJR@krupnicklaw.com
Attorneys for Plaintiff