Confidential - Subject to Further Confidentiality Review

Page 1

     IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA
                    - - -

IN RE:                    :
CHINESE-MANUFACTURED      :
DRYWALL PRODUCTS          :  MDL NO. 2047
LIABILITY LITIGATION      :
                          :  SECTION L
                          :
_____  :
                          :  JUDGE FALLON
This Document Relates     :
to:                       :  MAG. JUDGE
                          :  WILKINSON
All Actions               :


                    - - -


              February 3, 2016


                    - - -


        - C O N F I D E N T I A L -

SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

              Videotaped deposition of
CURTIS J. MILHAUPT, JD, taken pursuant to
notice, was held at the law offices of
Dentons USA, 1221 Avenue of the Americas,
New York, New York, beginning at 9:07
a.m., on the above date, before Michelle
L. Gray, a Registered Professional
Reporter, Certified Shorthand Reporter
and Notary Public.


                    - - -


        GOLKOW TECHNOLOGIES, INC.
   877.370.3377 ph | 917.591.5672 fax
          deps@golkow.com

<div style="border:1px solid black; display:inline-block; padding:4px;">
<b>EXHIBIT<br>79</b>
</div>

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1   APPEARANCES:
 2
         COUNSEL FOR PLAINTIFF CLASS:
 3
 4       LEVIN FISHBEIN SEDRAN & BERMAN
         BY:  FEDERICK S. LONGER, ESQUIRE
 5       BY:  ARNOLD LEVIN, ESQUIRE
         510 Walnut Street, Suite 500
 6       Philadelphia, Pennsylvania 19106
         (215) 592-1500
 7       flonger@lfsblaw.com
         alevin@lfsblaw.com
 8
            - and -
 9
         STECKLER, LLP
10       BY:  BRUCE W. STECKLER, ESQUIRE
         12720 Hillcrest Road, Suite 1045
11       Dallas, Texas 75230
         (972) 387-404
12       Bruce@StecklerLaw.com
13
14       COUNSEL FOR THE STATE OF LOUISIANA:
15
         PERKINS COIE, LLP
16       BY:  DAVID L. BLACK, ESQUIRE
         1900 Sixteenth Street, Suite 1400
17       Denver, Colorado 80202
         (303) 291-2304
18       Dblack@perkinscoie.com
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1        APPEARANCES:  (Cont'd.)
 2
          COUNSEL FOR BNBM DEFENDANTS:
 3
 4        DENTONS US, LLP
          BY:  RICHARD L. FENTON, ESQUIRE
 5        233 South Wacker Drive, Suite 5900
          Chicago, Illinois 60606-6361
 6        (312) 876-8000
          Richard.fenton@dentons.com
 7
             -  and -
 8
          DENTONS US, LLP
 9        BY:  KENNETH J. PFAEHLER, ESQUIRE
          1301 K Street, NW
10        Suite 600, East Tower
          Washington, DC 20005-3364
11        (202) 408-6400
          Kenneth.pfaehler@dentons.com
12
13
          COUNSEL FOR TAISHAN GYPSUM COMPANY:
14
          ALSTON + BIRD, LLP
15        BY:  DAVID R. VENDERBUSH, ESQUIRE
          1201 W. Peachtree Street, NE
16        Atlanta, GA 30309
          (404) 881-7000
17        david.venderbush@alston.com
18
19        COUNSEL FOR CNBM DEFENDANTS:
20
          ORRICK, HERRINGTON & SUTCLIFFE, LLP
21        BY:  IAN JOHNSON, ESQUIRE
          The Orrick Building
22        405 Howard Street
          San Francisco, California 94105
23        (415) 773-5700
          Ijohnson@orrick.com
24
```

Confidential - Subject to Further Confidentiality Review

Page 4

```
 1        TELEPHONIC APPEARANCES:

 2

          COUNSEL FOR BNBM DEFENDANTS:

 3

          DENTONS US, LLP

 4        BY:  C. MICHAEL MOORE, ESQUIRE

          2000 McKinney Avenue, Suite 1900

 5        Dallas, Texas 75201

          (214) 259-0900

 6        Mike.moore@dentons.com

 7

 8

          VIDEOTAPE TECHNICIAN:

 9            Sally Browne

10

11

12                    -   -   -

13

14

15

16

17

18

19

20

21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 5

```
 1                      -  -  -
 2                    I N D E X
 3                      -  -  -
 4
     Testimony of:    CURTIS J. MILHAUPT, JD
 5
           By Mr. Fenton          10, 411
 6
           By Mr. Johnson            365
 7
           By Mr. Longer             393
 8
 9
10
11                      -  -  -
12                  E X H I B I T S
13                      -  -  -
14
15   NO.          DESCRIPTION          PAGE
16   Milhaupt-1   Declaration of        53
                  Professor Milhaupt
17
     Milhaupt-2   Partial Translation  103
18                Of BNBM Group
                  Chapters 1-6
19                General Provisions
                  BG
20
     Milhaupt-3   Partial Translation  132
21                Present the People,
                  the Object, and the
22                Mindset, Integrate
                  Strictness with
23                Reliability, and Change
                  the Work Style
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        -  -  -
 2              E X H I B I T S  (Cont'd.)
 3                        -  -  -
 4
 5     NO.            DESCRIPTION            PAGE
 6     Milhaupt-4    Partial Translation    180
                     Board of Directors
 7                   Meeting Minutes
                     2/26/14
 8
       Milhaupt-5    We are the (National) 199
 9                   Champions:  Understanding
                     The Mechanisms of State
10                   Capitalism in China
11     Milhaupt-6    Chinese Corporate      217
                     Capitalism in
12                   Comparative Context
                     10/13/15
13
       Milhaupt-7    Why Mixed-Ownership    223
14                   Reforms Cannot Fix
                     China's State Sector
15                   January 2016
16     Milhaupt-8    Beyond Ownership:      237
                     State Capitalism and
17                   the Chinese Firm
18     Milhaupt-9    Oxford Handbooks       247
                     Online
19                   The Governance Ecology
                     Of China's State-Owned
20                   Enterprises
21     Milhaupt-10   Beijing New Building   264
                     Materials Public
22                   Limited Company
                     Articles of Association
23                   5/16/06
24
```

Confidential - Subject to Further Confidentiality Review

Page 7

```
 1                    -  -  -
 2           E X H I B I T S  (Cont'd.)
 3                    -  -  -
 4
 5    NO.            DESCRIPTION            PAGE
 6    Milhaupt-11   BNBMPLC Annual         273
                    Report 2007
 7
      Milhaupt-12   BNBMPLC Annual         286
 8                  Report 2008
 9    Milhaupt-13   BNBMPLC Annual         288
                    Report 2009
10
      Milhaupt-14   Articles of           290
11                  Incorporation of
                    Taishan Gypsum Co.
12                  Ltd.
                    6/20/07
13
      Milhaupt-15   Declaration of        308
14                  Yu Chen
15    Milhaupt-16   Declaration of        329
                    Yanjun Yang
16
      Milhaupt-17   Excerpts of the       336
17                  Transcript of
                    Yu Chen
18
      Milhaupt-18   CNBM                  343
19                  Global Offering
                    3/13/06
20                  ALRMH-CNBM-1-162
21    Milhaupt-19   Declaration of        357
                    Jianglin Cao
22
      Milhaupt-20   BNBM Annual           393
23                  Report, 2007
                    BNBMPLC-722-841
24
```

Confidential - Subject to Further Confidentiality Review

Page 8

```
 1                    -  -  -
 2           DEPOSITION SUPPORT INDEX
 3                    -  -  -
 4
 5    Direction to Witness Not to Answer
 6    PAGE    LINE
      None.
 7
 8    Request for Production of Documents
 9    PAGE    LINE
      38      12
10    401     18
11
      Stipulations
12
      PAGE    LINE
13    None.
14
      Questions Marked
15
      PAGE    LINE
16    None.
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 9

```
 1                    -  -  -
 2              THE VIDEOGRAPHER:  We are
 3         now on the record.
 4              My name is Sally Browne.  I
 5         am a videographer for Golkow
 6         Technologies.
 7              Today's date is February 3,
 8         2016, and the time is 9:07 a.m.
 9              This video deposition is
10         being held in New York City, New
11         York, In Re: Chinese-Manufactured
12         Drywall Products Liability
13         Litigation, for the United States
14         District Court, Eastern District
15         of Louisiana.
16              The deponent is Professor
17         Curtis J. Milhaupt.
18              Counsel will now be noted on
19         the stenographic record.
20              The court reporter is
21         Michelle Gray, and she will swear
22         in the witness.
23                    -  -  -
24         ... CURTIS J. MILHAUPT, JD, having
```

Confidential - Subject to Further Confidentiality Review

Page 10

1    been first duly sworn, was examined and

2    testified as follows:

3                    -  -  -

4              DIRECT EXAMINATION

5                    -  -  -

6    BY MR. FENTON:

7         Q.    Good morning, Professor.

8         A.    Good morning.

9         Q.    We met a little earlier.  My

10   name is Rick Fenton.  I represent the

11   BNBM companies that are defendants in

12   this litigation.

13        A.    Yes, sir.

14        Q.    And I've got some questions

15   for you today.  Have you ever had your

16   deposition taken before?

17        A.    I have not.

18        Q.    Okay.  I know you are a

19   lawyer and a law professor, so I assume

20   you know the general process.  But let me

21   just go over a few of the ground rules.

22              I'm going to be asking you a

23   series of questions.  I'd like you to

24   answer the questions as truthfully and

Confidential - Subject to Further Confidentiality Review

1    honestly as you can.

2              And obviously you are under

3    oath while you are doing so.

4              If at any time you don't

5    understand one of my questions, either

6    because I haven't phrased it well or

7    because you didn't hear it properly or

8    whatever the case may be, please let me

9    know, and I'll rephrase it or restate it.

10         A.    Okay.

11         Q.    Fair enough?

12         A.    Yes.

13         Q.    And if you do answer my

14   question, I will assume that you

15   understood the question and answered it

16   accordingly.  Fair enough?

17         A.    Fair enough.

18         Q.    Okay.  If at any time during

19   this deposition, Professor, you feel the

20   need for a break, you want to stretch

21   your legs or need to use the restroom,

22   whatever it may be, just let me know.

23   And we won't break while a question is

24   pending --

Confidential - Subject to Further Confidentiality Review

1          A.      Sure.

2          Q.      -- or I may want to finish

3    up a line.  But we'll take a break at the

4    next convenient opportunity.

5          A.      Okay.   Thank you.

6          Q.      Okay.   Professor Milhaupt,

7    just can you give me about a two-minute

8    bio, where you're from originally, your

9    educational background, professional

10   background.  I know a lot of it's in your

11   CV.

12         A.      Sure.

13         Q.      If you can just cover the

14   highlights for me.

15         A.      Okay.  Sure.  I grew up in

16   Wisconsin.  I went to the University of

17   Notre Dame.  I attended -- participated

18   in a foreign study program in Japan.  I

19   studied in Japan on a Japanese government

20   scholarship after graduation, then

21   attended Columbia Law School where I sort

22   of married my interest in corporate law

23   and Japan.

24                 I worked at Shearman &

Confidential - Subject to Further Confidentiality Review

Page 13

1    Sterling from 1990 -- sorry -- 1989 after

2    my graduation until 1994, although I took

3    two leaves of absence in that time to do

4    academic things.  Went back to Japan.

5          Q.    Is that Shearman & Sterling

6    in New York here?

7          A.    Tokyo.  New York and Tokyo.

8    After -- around 1994, I decided to go

9    into academia.  And so I applied on the

10   academic circuit.  And my first teaching

11   job was at Washington University in

12   St. Louis, where I was from 1994 to 1999,

13   when I was invited to join the Columbia

14   Law School faculty, where I have been

15   since 1999.

16              And my research has focused

17   initially on Japan, particularly Japanese

18   corporate law and corporate governance,

19   although as far back as 1997, I wrote an

20   article which tries to lay out

21   analytically the relationship between the

22   government or the state and business in a

23   variety of different countries, using the

24   U.S., Korea, and Japan as kind of -- to

Confidential - Subject to Further Confidentiality Review

1    set up a sort of spectrum.

2              I also got involved around

3    that same time in a project on Korean

4    unification sponsored by the Korean

5    government.  And that turned out to be

6    premature, obviously.  But my task was to

7    think about the privatization of Korean

8    SOEs.

9              So I looked very extensively

10   at the literature on Eastern European

11   privatization, for example.

12             So then fast-forward to

13   about the mid-2000s; I had significant

14   exposure in Japan, significant exposure

15   in Korea.  I felt it was time to gain

16   significant exposure in China.  I began

17   to study the language intensively in

18   preparation for a sabbatical.

19             I spent two months in 2006

20   at Tsing Hua University in Beijing.

21   That's where I really began to dive into

22   corporate ownership structures, state

23   ownership structures in China.

24             For the last seven or

Confidential - Subject to Further Confidentiality Review

1    eight years, my research has focused

2    predominately on that -- on that topic.

3         Q.    Okay.  Very good.  Now, I

4    see you have a copy of your report in

5    front of you.  And we'll be marking that

6    a little bit later.  But, you know, feel

7    free to refer to it if it will assist you

8    in --

9         A.    Thank you.

10         Q.    -- your testimony today.

11               But let me ask you this

12    question:  Are there any additions or

13    changes to your -- let me talk first

14    about the substance of your report since

15    it was submitted to us.

16         A.    No.

17         Q.    All right.  What about with

18    respect to the CV, the list of

19    publications, those cases in which

20    you've --

21         A.    No change.  I noticed that I

22    omitted a teaching stint at East China

23    University School of Political Science

24    and Law in 2014.  A speech that I gave

Confidential - Subject to Further Confidentiality Review

Page 16

1   there appears in the speech section, but

2   I omitted the actual appointment as a

3   distinguished visiting professor from my

4   CV.

5        Q.    Okay.  I appreciate your

6   supplementing that.

7             All right.  Since the last

8   session of your deposition, have you

9   reviewed any documents other than those

10   that were identified in your report?

11        A.    Well, I was given a copy of

12   the plaintiffs' response to your motions.

13   And that had several additional exhibits

14   that were not made available to me at the

15   time that I prepared the declaration.  So

16   I did review those.

17        Q.    All right.  Do you -- do you

18   happen to recall which exhibits those

19   were?

20        A.    I do not recall at this

21   moment.  It may come to me later.  It

22   was -- it was several additional

23   exhibits.  I can't recall them at the --

24   at the moment.

Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  Do you -- do you

2     know whether -- well, let me ask you this

3     question:  Did reviewing those exhibits

4     in any way change your opinions?

5          A.    No, none whatsoever.

6          Q.    All right.  And do you

7     intend to rely on those additional

8     exhibits for your opinions?

9          A.    No.  I mean, since I can't

10    remember them, I won't be relying on them

11    unless they -- unless they come to me.

12         Q.    All right.  Professor, how

13    much -- first of all, you said you

14    studied the Chinese language.  Are you at

15    this point fluent in one or more Chinese

16    dialects?

17         A.    No.  Unfortunately, I

18    studied intensively, as I said, in 2005.

19    I did not continue my study, because I

20    got busy with other things.

21               And so I am familiar with

22    the language.  I can read some of the

23    characters because of my fluency in

24    Japanese, although the mainland Chinese

Confidential - Subject to Further Confidentiality Review

Page 18

1  have simplified the characters.  So it's

2  not a straight translation.

3          But I have -- I have some

4  comfort level with the language, but I

5  would not use it professionally.

6          Q.    Okay.  Are you able to read

7  professional literature in Chinese?

8          A.    No.

9          Q.    So you would need an English

10 translation?

11         A.    Yes.

12         Q.    Are you able to converse in

13 Chinese?

14         A.    Basic, basic conversational

15 Chinese.

16         Q.    When we are talking about

17 Chinese, are we talking about essentially

18 Mandarin?

19         A.    Mandarin.

20         Q.    You are fluent in Japanese?

21         A.    Yes.

22         Q.    Okay.  And how much time

23 altogether have you spent in the People's

24 Republic of China in your various

Confidential - Subject to Further Confidentiality Review

1    academic and professional pursuits?

2           A.    Right, it would take me a

3    minute to --

4           Q.    Ballpark?

5           A.    -- accumulate the

6    experience.

7                 I would say ballpark four

8    months.

9           Q.    Okay.  And in the total of

10   four months that you've spent in the

11   People's Republic of China, have you made

12   acquaintances and friends among Chinese

13   academics?

14          A.    Yes.

15          Q.    Okay.  And have you also met

16   and made acquaintance with businessmen in

17   China, whether in state-owned enterprises

18   or private enterprises?

19          A.    Not -- no such acquaintances

20   really come to mind, no.  I have -- I

21   have not had extensive contact with

22   business people.

23          Q.    All right.  And as a result

24   of your work here in the U.S., you have

Confidential - Subject to Further Confidentiality Review

Page 20

```
 1    also made contacts and acquaintances with

 2    some of your counterparts in Chinese

 3    academia, haven't you?

 4         A.    Correct.

 5         Q.    Okay.  And so you have a

 6    number of friends and acquaintances in

 7    the People's Republic of China that you

 8    deal with on a regular basis; is that

 9    correct?

10         A.    Somewhat regular.  We are

11    not in daily contact or anything like

12    that.

13         Q.    Sure.

14         A.    But sure, I'm in contact

15    with Chinese academics.

16         Q.    All right.  And do you -- do

17    you hold them in high regard?

18         A.    Yes.

19         Q.    All right.  Do you -- do you

20    hold them in high regard for their

21    scholarship?

22         A.    Yes.

23         Q.    Do you hold them in high

24    regard for their integrity?
```

Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Do you hold them in high

3    regard for their honesty?

4          A.     Yes.

5          Q.     Okay.  If someone were to

6    say to you that you can't believe a thing

7    the Chinese say because they lie all the

8    time, you wouldn't buy that, would you?

9          A.     I think that would be an

10   overly broad statement.

11         Q.     Okay.  That -- that's --

12   that's not a statement -- that's not a

13   belief that you would subscribe to, would

14   you?

15         A.     You're asking me if I would

16   believe that all Chinese lie all the

17   time?

18         Q.     Yep.

19         A.     No, I would not ascribe to

20   that belief.

21         Q.     Okay.  Now, Professor, when

22   were you engaged for this litigation?

23         A.     I believe it was on or about

24   January 12th.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.     Okay.  Of this year?

 2          A.     Of this year.

 3          Q.     2016?

 4          A.     Mm-hmm.

 5          Q.     All right.  And so by my

 6    calculations, that was about three weeks

 7    ago?

 8          A.     Correct.

 9          Q.     Okay.  And who contacted

10    you?

11          A.     Both gentlemen here, Fred

12    and Bruce.  Fred Longer and Bruce

13    Steckler.

14          Q.     Okay.  And was that contact

15    by telephone?

16          A.     An initial inquiry by e-mail

17    and then follow-up by telephone.

18          Q.     Okay.  And you understood

19    that they were seeking your possible

20    assistance with respect to expert

21    testimony in the Chinese drywall

22    litigation?

23          A.     Correct.

24          Q.     Did you know anything about
```

Confidential - Subject to Further Confidentiality Review

Page 23

1    the Chinese drywall litigation prior to

2    your first discussion with Mr. Longer or

3    Mr. Steckler?

4          A.    I recall reading press

5    accounts about the litigation some years

6    ago.  I didn't remember more than that,

7    that I had seen, you know, mention of

8    this litigation in the press.  That was

9    it.

10         Q.    All right.  And after Mr. --

11   after you had this initial phone call

12   with Mr. Longer and Mr. Steckler, were

13   you engaged at that point?  Had you been

14   hired?

15         A.    Well, I think I told them

16   that I was interested.  I indicated

17   interest.  They indicated that, you know,

18   that was good, and could I get back to

19   them as soon as possible.

20              I don't recall exactly how

21   much time elapsed between the initial

22   contact and when I said yes.  But it was

23   not a long period of time.  It was no

24   more than, say, 36 to 48 hours.

Confidential - Subject to Further Confidentiality Review

Page 24

1          Q.    And in that 36-to-48-hour

2    period, had you been sent any materials

3    on the litigation by counsel for the

4    plaintiffs?

5          A.    No.  And I was told that

6    none could be sent until -- there was a

7    protective order and that none could be

8    sent until I had signed that and

9    obviously had accepted the assignment.

10         Q.    All right.  So the 36 to

11   48 hours was basically your trying to

12   determine in your own mind whether you

13   had the time and/or desire to take this

14   on?

15         A.    Correct.

16         Q.    Okay.  Fair enough.  All

17   right.  After that initial call, you got

18   back to Mr. Steckler and Mr. Longer

19   within a couple of days?

20         A.    Yes.  At most.

21         Q.    And you -- did you have

22   another telephone conversation with them?

23         A.    Well, to indicate that I

24   would accept the assignment, yes.

Confidential - Subject to Further Confidentiality Review

Page 25

1          Q.     All right.  And then what
2     was the next step in your process?
3          A.     I was sent the protective
4     order, the confidentiality order to
5     review and sign.
6          Q.     Okay.  And after you
7     reviewed and signed the confidential and
8     protective order, I assume you returned
9     it to them?
10          A.     Correct.
11          Q.     And then what happened next?
12          A.     Then I received -- I
13     received the defendants' briefing, I
14     believe --
15          Q.     Mm-hmm.
16          A.     -- on the Foreign
17     Sovereignty Immunity Act or -- it was
18     either your briefing or the -- the
19     plaintiffs' response brief.  I don't have
20     a precise recollection.
21          Q.     Okay.  Would it refresh your
22     recollection if I told you that -- that
23     the defendants who had briefed the
24     Foreign Sovereign Immunities Act issue

Confidential - Subject to Further Confidentiality Review

 1   were the CNBM defendants?

 2          A.    Um, perhaps.  I'm -- I'm

 3   quite certain it was the -- it was the

 4   plaintiffs' papers in connection with

 5   it --

 6          Q.    Oh, the plaintiffs'

 7   papers --

 8          A.    Yeah.

 9          Q.    -- in connection with the

10   Foreign Sovereign Immunities Act.  Okay.

11               Any other materials that --

12   that you were sent?

13          A.    Not at that point in time,

14   no.

15          Q.    Okay.  And what was the date

16   of your report?

17          A.    The 21st of January, I

18   believe.

19          Q.    Okay.  And when did you

20   receive these materials?

21          A.    Well, it would have been

22   very shortly after -- I mean, assuming

23   I -- I dated the initial conversation on

24   the 12th, so it was approximately the

Confidential - Subject to Further Confidentiality Review

1    14th of January.

2         Q.    Okay.  All right.  And

3    then -- so on the 14th of January -- that

4    is to say, approximately one week before

5    you submitted your report -- you received

6    the first materials in this case, and

7    that consisted of the plaintiffs'

8    briefing and the Foreign Sovereign

9    Immunities Act?

10        A.    Correct.

11        Q.    All right.  And -- and do

12   you -- did you review those materials

13   when you received them?

14        A.    I did.

15        Q.    Okay.  And after you

16   reviewed those materials, what was the

17   next thing you did in connection with

18   this engagement?

19        A.    Well, I began studying the

20   voluminous discovery record, the exhibits

21   that had been attached, and began

22   learning -- learning the case basically.

23        Q.    All right.  So you began

24   studying the voluminous discovery record.

Confidential - Subject to Further Confidentiality Review

1    When you say the exhibits attached, you

2    are talking about the exhibits that were

3    attached to the plaintiffs' Sovereign

4    Immunity Act papers?

5              A.    Correct.

6              Q.    Did you review the exhibits

7    that were attached to the defendants'

8    Sovereign Immunity Act?

9              A.    You know, I -- I may have

10   misspoken when I said I was sent the

11   defendants' papers.  I -- I was sent the

12   plaintiffs' papers and -- and the

13   exhibits thereto.

14             Q.    Okay.  Have you reviewed any

15   of the defendants' briefs or papers in

16   this case?

17             A.    I have.

18             Q.    Okay.  And when did you

19   first review those?

20             A.    Well, it certainly would

21   have been in the few days following the

22   acceptance of my assignment.  I tried to

23   really do a deep dive into all of the

24   papers at -- at that time.

Confidential - Subject to Further Confidentiality Review

Page 29

```
1            Q.    Mm-hmm.  Well, when did --
2      okay.  I -- I want -- I just want to make
3      sure that the sequence is correct.
4                  You said that the first
5      thing that was sent to you was the
6      plaintiffs' Foreign Sovereign Immunity
7      Act papers?
8            A.    Correct.
9            Q.    Okay.  At what point in
10     time, if you recall -- and if you don't
11     that's fine.  Just tell me.
12                 At what point in time did
13     you receive the defendants' briefs in
14     this case, either with respect to
15     jurisdiction or sovereign immunity?
16           A.    Yeah, I'm afraid I don't
17     have a specific recollection of that.
18           Q.    Okay.  Was it sometime after
19     you received the plaintiffs' papers?
20           A.    Yes.
21           Q.    All right.  So you knew from
22     reviewing the plaintiffs' papers at the
23     outset that plaintiffs were seeking to
24     establish essentially alter-ego liability
```

Confidential - Subject to Further Confidentiality Review

Page 30

1    against the BNBM companies and the CNBM

2    companies with respect to the activities

3    of Taishan, correct?

4            A.    Correct.  And I mean, this

5    is also -- it jogged my memory.  I was

6    sent the two Circuit Court opinions --

7            Q.    Mm-hmm.

8            A.    -- on -- on the -- this

9    jurisdiction on this alter-ego issue.

10            So, yes, correct.

11            Q.    When you say the "Circuit

12    Court opinions," do you mean the District

13    Court opinion?

14            A.    The -- this -- the Fifth

15    Circuit.  The Fifth Circuit opinions

16    affirming the -- the District Court

17    findings.

18            Q.    Okay.  And was that with

19    respect to alter ego, or was that with

20    respect to jurisdiction over Taishan?

21            A.    Well, it's -- it's with

22    respect to piercing to reach the

23    subsidiary of Taishan.

24            Q.    All right.  And -- and it's

Confidential - Subject to Further Confidentiality Review

1    your testimony the Fifth Circuit has made

2    a ruling on that issue in this case?

3            A.    Well, it has -- it has

4    rendered an issue on -- a ruling on

5    that -- on that issue, yes.  It has

6    rendered a ruling on that issue.

7            Q.    Okay.  That's your

8    testimony?

9            A.    To the best of my

10   recollection, yes.

11           Q.    Okay.  Any other cases that

12   you rely on with respect to the issue of

13   alter-ego liability or, as it's referred

14   to in your report, single business

15   enterprise?

16           A.    Mm-hmm.

17                 MR. LONGER:  Object to the

18           form.

19                 THE WITNESS:  Well, could

20           you -- could you clarify the

21           question when you say am I relying

22           on any other cases?  Do you mean

23           have I encountered other cases in

24           my scholarship or in my teaching,

Confidential - Subject to Further Confidentiality Review

Page 32

1            or do you mean with respect to the

2            prep -- specifically with respect

3            to the prep --

4    BY MR. FENTON:

5            Q.    Specifically with respect to

6    preparing your opinion.

7                Let me ask you this

8    question.  Did you do any research, legal

9    research into the areas of alter ego or

10   single business enterprises as you were

11   preparing your report, or did you

12   simply rely -- rely on your general

13   knowledge of the area?

14           A.    I relied mostly on my

15   general knowledge.  But I consulted

16   Bloomberg, for example, his famous book

17   on business enterprises, as a way of

18   simply sort of recalling this into my

19   mind.  But beyond that, I did not do deep

20   research.

21               I did read -- there is a --

22   there is a case, an -- an arbitral case

23   that's cited in the plaintiffs' briefs

24   that deals with alter-ego issues.  You

Confidential - Subject to Further Confidentiality Review

Page 33

1    know, again, but I did not specifically

2    rely on any of those cases in preparing

3    my opinion.

4              Because my assignment was

5    not to determine alter-ego status.  It

6    was to provide context for understanding

7    this issue.

8         Q.    Okay.  So you are not

9    rendering an opinion in your report on

10   whether or not the BNBM companies are

11   alter egos of Taishan; is that correct?

12        A.    Correct.  I think that's for

13   the judge.

14        Q.    Okay.  And you are not

15   rendering an opinion on whether the CNBM

16   companies are or are not alter egos of

17   Taishan, correct?

18        A.    Correct.  I'm trying to

19   provide helpful context for the judge to

20   make what is a very fact-intensive

21   inquiry.  But I'm not reaching that legal

22   conclusion.

23        Q.    Okay.  Fair enough.

24              In reaching your conclusion

Confidential - Subject to Further Confidentiality Review

Page 34

1    about what should be considered in order

2    for the judge to reach his conclusion,

3    did you rely on the law of any particular

4    jurisdiction?

5            A.    Well, my opinion --

6                  MR. LONGER:  Just going to

7            object to form and foundation.

8                  THE WITNESS:  I guess I

9            would -- I would like to ask

10           clarification.  When you say did I

11           rely on it, could you specify what

12           you mean by that?

13   BY MR. FENTON:

14           Q.    Sure.  You are aware -- or

15   maybe you're not, but you'll tell me --

16   that there are various plaintiffs in this

17   case, some of whom are located in

18   different states, such as Louisiana,

19   Florida, Texas; I think we even have some

20   from California, North Carolina,

21   South Carolina.  You are aware of that,

22   aren't you?

23           A.    Yes.

24           Q.    All right.  And -- and you

Confidential - Subject to Further Confidentiality Review

Page 35

1    are aware that each state jurisdiction,

2    while the laws may or may not to a degree

3    be similar, has its own body of

4    jurisprudence with respect to issues of

5    corporate law and, more specifically,

6    issues of alter ego or single business

7    enterprise law.

8          A.    Correct, mm-hmm.

9          Q.    Okay.  And my -- my question

10   is, in formulating your opinion, did you

11   look to the law of any of those

12   particular jurisdictions, such as

13   Louisiana?

14         A.    No, I did not.  I -- I

15   certainly familiarized myself in reading

16   the briefs.  I certainly confronted those

17   discussions of those laws --

18         Q.    Mm-hmm.

19         A.    -- to the extent to which

20   they may differ or not.  But I did not

21   rely on those in -- in drafting this

22   declaration.

23         Q.    All right.  And did you rely

24   on the discussion in the briefs, in the

Confidential - Subject to Further Confidentiality Review

1    plaintiffs' briefs, on the law of those

2    various jurisdictions as part of your

3    background into the area of alter ego and

4    single business enterprise?

5         A.    Well, again, I guess -- I

6    don't mean to take issue with your use of

7    the word "rely."  But as a part of

8    educating myself about the case and the

9    legal issues therein, of course I -- I

10   tried to absorb that information.

11        Q.    All right.  So you --

12        A.    But I didn't see that as

13   directly bearing upon my expert opinion.

14        Q.    Fair enough.  So you -- you

15   did, however, look to the plaintiffs'

16   briefs to educate yourself about the law

17   of alter ego and single business

18   enterprise in connection with your

19   opinion?

20        A.    Yes.

21             MR. LONGER:  Object to the

22        form and foundation.

23        Mischaracterizes his testimony.

24             MR. FENTON:  You did get the

Confidential - Subject to Further Confidentiality Review

```
 1          answer?
 2                   THE REPORTER:  Mm-hmm.
 3     BY MR. FENTON:
 4          Q.    All right.  How much time
 5     did you spend with the materials that
 6     were given to you between the -- the
 7     point in time that you received them on
 8     or about January 14th, and when you
 9     finalized your report on or about
10     January 21st?
11          A.    About -- about somewhere in
12     the ballpark of 50 to 55 hours.
13          Q.    Okay.  Now, at that time --
14     that is to say, between January 14th and
15     January 21st -- did you also have a
16     teaching schedule at Columbia?
17          A.    No.  We were not in session
18     yet.
19          Q.    Okay.  And so you basically
20     spent that entire week on this project?
21          A.    Correct.
22          Q.    Nothing else going on?
23          A.    Well, other things that may
24     have -- I -- I would have done had -- had
```

Confidential - Subject to Further Confidentiality Review

Page 38

1    it not been for this -- this assignment.

2    Let me put it that way.

3         Q.    All right.  And do you keep

4    time records?

5         A.    Yes.

6         Q.    Of -- of the time that

7    you've spent?

8         A.    Yes.

9         Q.    Okay.  Do you have those

10   with you today?

11        A.    No, I don't.

12        Q.    Okay.  Could you provide

13   those to Mr. Longer, and I'm going to ask

14   Mr. Longer to provide those to me when he

15   has an opportunity.

16             MR. LONGER:  We will

17        consider the request.

18             MR. FENTON:  Okay.  I know

19        you will.

20   BY MR. FENTON:

21        Q.    All right.  In connection

22   with your work, Professor, were any

23   assumptions given to you by counsel for

24   the PSC?

Confidential - Subject to Further Confidentiality Review

1              And do you know who I mean

2    when I talk about the PSC?

3         A.    Well, I think I do, but I'd

4    be happy to have you explain it to me.

5         Q.    What I mean by the PSC is

6    the plaintiffs' steering committee in

7    this case.  Okay.  I may also refer to

8    the PRC, which is the People's Republic

9    of China.  But that's a different body.

10             MR. LEVIN:  It certainly is.

11   BY MR. FENTON:

12        Q.    We understand that.

13        A.    Yes.

14        Q.    So I think my question is,

15   were any assumptions provided to you by

16   the PSC to utilize in connection with

17   your work in this case?

18        A.    No.

19        Q.    Okay.  So your knowledge

20   about the case came principally from your

21   review of the plaintiffs' briefs and

22   supporting materials in this matter,

23   correct?

24        A.    Correct.  I also did some

Confidential - Subject to Further Confidentiality Review

Page 40

1    Internet searches to see what else

2    would -- would turn up in the press and

3    the like.

4          Q.    Okay.  And do you have the

5    results of those Internet searches

6    memorialized somewhere?

7          A.    No.

8          Q.    Do you have any particular

9    websites or Internet materials in

10   connection with your research?

11         A.    No.

12         Q.    Did anything that turned up

13   on the Internet constitute part of the

14   basis for your opinion?

15         A.    No.

16         Q.    Okay.  Did everything that

17   constituted part of the basis for your

18   opinion get listed in your report?

19         A.    Yes.

20         Q.    Okay.  Now, I know you said

21   that you have been at Columbia Law School

22   since -- I believe it was 1999?

23         A.    Correct.

24         Q.    All right.  And Jeff Gordon

Confidential - Subject to Further Confidentiality Review

 1   has taught there --

 2          A.     Yeah.

 3          Q.     -- during your entire

 4   tenure?

 5          A.     Yes.

 6          Q.     Isn't that correct?

 7          A.     It is correct.

 8          Q.     Matter of fact, you two

 9   office near each other?

10          A.     They are -- yes, we're good

11   friends.

12          Q.     Okay.  I'm glad to hear

13   that.  He's a nice man.

14                 And so you know Professor

15   Gordon very well?

16          A.     I do.

17          Q.     Okay.  And you read his

18   report --

19          A.     I have.

20          Q.     -- in this case.

21                 First of all, do you hold

22   Professor Gordon in high regard for the

23   quality of his scholarship and academic

24   rigor?

Confidential - Subject to Further Confidentiality Review

Page 42

1          A.     Yes.

2          Q.     Do you hold Professor Gordon

3    in high regard for his honesty and

4    integrity?

5          A.     Yes, I do.

6          Q.     Okay.  And Professor Gordon,

7    in your view, does not issue frivolous or

8    ill-founded opinions, correct?

9          A.     Well --

10               MR. LONGER:  At what point

11          in time?  In what subject?

12               THE WITNESS:  Yeah, I have

13          no basis for answering that.

14   BY MR. FENTON:

15         Q.     Well, in your experience,

16   have you ever known Professor Gordon to

17   take a position that you considered

18   ill-founded or frivolous?

19               MR. LONGER:  Objection.

20               THE WITNESS:  He's a law

21          professor.  Of course -- of course

22          I do.  You know, law professors

23          disagree.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 43

1      Q.    Okay.  Well, let me ask you

2  this question.  Have you ever known

3  Professor Gordon to take a position that

4  was insincere?

5           MR. LONGER:  Object to the

6           form.

7           Go ahead and answer.

8           THE WITNESS:  Well, I mean,

9           it's -- I really don't know how to

10          answer that kind of a question.  I

11          hold Jeff in high regard.  I think

12          he's an honest person.

13 BY MR. FENTON:

14     Q.    Okay.  And as you sit here

15 now, can you tell me of any instance that

16 you ever recall Professor Gordon being

17 disingenuous in any way?

18     A.    No.

19     Q.    And holding him in high

20 regard, you believe that when Professor

21 Gordon gives an opinion on something,

22 it's an opinion that should be taken

23 seriously, whether one agrees with it or

24 not, correct?

Confidential - Subject to Further Confidentiality Review

Page 44

```
 1        A.    Yes.
 2        Q.    Yeah.  And certainly an
 3   opinion within his area of expertise,
 4   which is corporate law and comparative
 5   corporate governance; isn't that right?
 6              MR. LONGER:  Object to the
 7        form.
 8              THE WITNESS:  Well, I mean,
 9        as you expand outward in -- I
10        guess I'm feeling a little bit of
11        pushback.  I mean, I don't agree
12        with everything that he says or
13        writes, if that's what you're
14        asking me.
15   BY MR. FENTON:
16        Q.    And I'm sure the same -- he
17   would say the same of you, sir.  I'm
18   simply asking you, when Professor Gordon
19   says something or writes something, it's
20   something that you will take seriously,
21   whether you agree with it or not.  You'll
22   consider it, right?
23        A.    Yes.
24        Q.    It's worthy of
```

Confidential - Subject to Further Confidentiality Review

 1    consideration?

 2          A.    Yes.

 3          Q.    Okay.  When did you review

 4    Professor Gordon's report?

 5          A.    Well, I don't have an exact

 6    date.  But it was one of the first things

 7    that I looked at.

 8          Q.    All right.  Now, I notice

 9    that other than listing his report in

10    your own report, I don't believe that you

11    ever refer to it or cite it.  I may be

12    incorrect about that, but I don't --

13          A.    I think that's correct.  I

14    think that's correct.

15          Q.    All right.  And is that to

16    say that you are not expressing any

17    opinion on Professor Gordon's report

18    itself?

19          A.    Well, if I could refer to my

20    own declaration.  Paragraph 37 says,

21    "Given the importance and distinctiveness

22    of the political and institutional in

23    which the Chinese SOE business groups

24    operate, in my opinion it's not possible

Confidential - Subject to Further Confidentiality Review

Page 46

1  to assess Taishan's corporate

2  separateness from other CNBM business

3  group companies by comparing CNBM

4  business group structures and practices

5  with those of a U.S. conglomerate,

6  because there are no examples in the

7  United States that would facilitate a

8  meaningful apples-to-apples comparison."

9      Q.   Okay.  And I'm sorry.  What

10  paragraph are you --

11      A.   That's Paragraph 37.

12      Q.   37.  Okay.  What work did

13  you do in the 55 hours that you spent on

14  this case between January 14th and

15  January 21st to study the practices of

16  U.S. conglomerates, other than reviewing

17  Professor Gordon's report?

18      A.   I didn't spend much time on

19  that, because I teach U.S. corporate law,

20  and I think I'm quite familiar with the

21  corporate governance and practices of

22  U.S. conglomerates.

23      Q.   Okay.  Did you review the

24  report that was done by Mr. Deal?

Confidential - Subject to Further Confidentiality Review

1          A.     I did.

2          Q.     Okay.  And you're aware that

3    Mr. Deal collected certain data regarding

4    S&P 500 companies?

5          A.     Correct.  I think it was

6    S&P 1500.

7          Q.     S&P 1500.  You're quite

8    correct.

9                 And that -- first of all, do

10   you -- do you have any reason to dispute

11   the accuracy of the data that Mr. Deal

12   reports in his report?

13         A.     No.

14         Q.     Do you have any reason to

15   believe that Mr. Deal did not report it

16   accurately?

17         A.     No.

18         Q.     Do you agree that many

19   S&P 1500 companies are structured as

20   conglomerates?

21         A.     Yes.  I suppose we could --

22   you know, we could quibble over the

23   definition of conglomerate.  It's

24   obviously not a legal term.  But, sure,

Confidential - Subject to Further Confidentiality Review

Page 48

```
 1   I'll take that.

 2           Q.    I don't want to quibble.

 3   Let's just use the plain everyday sense

 4   of the term.

 5           A.    Sure.  No problem.

 6           Q.    And the conglomerates

 7   typically have numerous subsidiaries and

 8   sometimes multiple levels of

 9   subsidiaries?

10           A.    Yes.

11           Q.    Okay.  You'd agree with

12   that?

13           A.    Yes.

14           Q.    Okay.  And that in a U.S.

15   conglomerate, many of those subsidiaries

16   are either substantially or wholly owned

17   by the ultimate parent, either directly

18   or indirectly, correct?

19           A.    Yes.

20           Q.    All right.  And that it's

21   not uncommon in U.S. conglomerates for

22   corporate parents and their subsidiaries

23   to be classified in the same primary

24   industry, correct?
```

Confidential - Subject to Further Confidentiality Review

1          A.     Correct.

2          Q.     Okay.  And that boards of

3   director seats in conglomerates of a

4   corporate -- or in subsidiaries of a

5   corporate family may well be filled by

6   persons employed with or holding

7   positions with the ultimate parent,

8   correct?

9          A.     Yes.

10         Q.     That's very commonplace in

11  the U.S., isn't it?

12         A.     Uhm --

13         Q.     You're also aware that --

14                MADAM REPORTER:  I didn't

15         get an answer to that.

16  BY MR. FENTON:

17         Q.     I'm sorry.  My question was,

18  that's very commonplace in the U.S.,

19  isn't it?

20         A.     You know, again, I don't

21  want to quibble with commonplace.  But,

22  yes, it's a -- it is a known phenomenon.

23  It's not unusual.

24         Q.     Certainly not a basis on

Confidential - Subject to Further Confidentiality Review

Page 50

1   which to pierce the corporate veil, is

2   it?

3          A.    In and of itself, that

4   factor alone would not constitute a

5   grounds for a piercing.

6          Q.    Okay.  And you're also aware

7   that in many U.S. conglomerates,

8   sometimes the income or revenue generated

9   by the subsidiaries can approach or

10  exceed the income generated by the parent

11  company, correct?

12         A.    Yes.

13         Q.    All right.  You're also

14  aware that Mr. Deal in his report did

15  some case studies?

16         A.    Correct.

17         Q.    Some of which were also

18  relied upon by Professor Gordon in his

19  report?

20         A.    Yes.

21         Q.    All right.  Do you consider

22  Disney and its direct and indirect

23  subsidiaries to be a single business

24  enterprise for which corporate separation

Confidential - Subject to Further Confidentiality Review

1    should be disregarded?

2         A.    Well, I mean, I guess I

3    would just preface my response by saying

4    my job in the declaration was not to pass

5    judgment on whether Disney is a single

6    business entity.  That wasn't --

7         Q.    Professor, with all due

8    respect, your job at this deposition is

9    to answer my questions.  Please answer my

10   question.

11              MR. LONGER:  I think he was

12         answering your question.

13   BY MR. FENTON:

14        Q.    Do you consider Disney and

15   its direct and indirect subsidiaries to

16   be a single business enterprise for which

17   corporate separation should be

18   disregarded?

19              MR. LONGER:  Hold on.  In

20         all candor, Rick, he's answering

21         your questions directly.  So be

22         patient.  You'll get through the

23         deposition.

24              MR. FENTON:  I'm very

Confidential - Subject to Further Confidentiality Review

1          patient.  I just want him to

2          answer my question.

3    BY MR. FENTON:

4          Q.    You may answer the question,

5    please.

6               MR. LONGER:  Object to the

7          form.

8               THE WITNESS:  I don't have

9          enough information on which to

10         draw a conclusion -- to draw a

11         conclusion.  I don't know enough

12         about the Disney corporation.

13         Certainly I wouldn't base my

14         answer on what's been provided in

15         these -- in these declarations.

16   BY MR. FENTON:

17         Q.    Well, you based your -- your

18   report on what was provided to you by the

19   PSC, correct?

20         A.    But I'm not drawing a legal

21   conclusion about single business

22   enterprise of these corporations.

23         Q.    Okay.  Let me ask you this

24   question, Professor.

Confidential - Subject to Further Confidentiality Review

1          In your report -- and
2     actually, let's mark that as Exhibit 1.
3               (Document marked for
4          identification as Exhibit
5          Milhaupt-1.)
6     BY MR. FENTON:
7          Q.    If you look at -- if you
8     turn to Page 3 of your report.
9               Paragraph 12, you talk about
10    a contextualized analysis being required
11    to assess the separate legal personality
12    of members of the CNBM business group in
13    the above-referenced matter.  And then a
14    little further down the paragraph you
15    use, I believe, for the first time, the
16    phrase "single business entity."
17         A.    Mm-hmm.
18         Q.    Okay.  And that is
19    footnoted.  And in the footnote, you say,
20    "As used in this declaration, the term
21    'single business entity' encompasses
22    alter-ego theory as well."
23         A.    Mm-hmm.
24         Q.    Okay.  And I -- I guess my

Confidential - Subject to Further Confidentiality Review

1    question to you, Professor, is:  What do

2    you mean in this report by single

3    business entity?  How are you defining

4    that?

5         A.    Well, I -- I'm defining it

6    as a group of -- a group of companies

7    that is deemed to be operating as a

8    single business enterprise.

9         Q.    All right.  Forgive me,

10   Professor, but that seems to me to be a

11   little bit of a tautology.  That if I

12   understand what you just testified to,

13   you said a single business entity is a

14   group of companies deemed to be operating

15   as a single business enterprise --

16        A.    Well -- okay.  I mean,

17   obviously there's going to --

18             MR. LONGER:  Excuse me.  Is

19        that a question?

20             MR. FENTON:  No.

21   BY MR. FENTON:

22        Q.    My -- my -- so my question

23   is, can you -- can you tell me more

24   specifically how one determines whether a

Confidential - Subject to Further Confidentiality Review

1    particular group of companies is

2    operating as a single business

3    enterprise?

4           A.    Well, you know, again, this

5    is a -- this -- this term has legal

6    consequence.  So if a factfinder

7    determines that a group of companies is a

8    single business enterprise, then it would

9    not respect the corporate separateness of

10   those member entities.

11          Q.    Okay.  I think you just said

12   the same thing in slightly different

13   words.

14                What are the factors that a

15   factfinder would need to look to to

16   determine whether it is a single business

17   enterprise?

18          A.    Respective corporate

19   formalities.  Commingling of operations,

20   finance, business.

21          Q.    Anything else?

22          A.    Well, I think it's, you

23   know, these typical factors in piercing

24   or alter ego or single business

Confidential - Subject to Further Confidentiality Review

Page 56

1    enterprise tend to cut toward the same

2    thing:  disrespect of corporate

3    formalities, exercise of control or

4    domination with respect to the downstream

5    entities.

6          Q.    Are you aware of any

7    authority in the U.S. or otherwise,

8    holding that companies organized under

9    the laws of a communist country should be

10   regarded as alter egos, without more?

11         A.    I just -- I just want to

12   make sure I heard the question.  You said

13   am I aware of the -- the laws of any

14   communist country?

15         Q.    Are you aware of any legal

16   authority holding that the laws -- or --

17   or holding that the corporations

18   organized under the laws of a communist

19   country should be deemed alter egos?

20         A.    Per se?  Without --

21         Q.    Per se, yes.

22         A.    No, I'm not aware of that.

23         Q.    Okay.  Are you aware of any

24   authority, in the U.S. or elsewhere,

Confidential - Subject to Further Confidentiality Review

1    holding that business groups organized in

2    the People's Republic of China should be

3    deemed alter egos without more?

4                    MR. LONGER:  Object to the

5            form.

6                    THE WITNESS:  No.

7    BY MR. FENTON:

8            Q.    Are you aware of any

9    authority in the U.S. or elsewhere

10   holding that state-owned enterprises

11   under the supervision of SASAC in the

12   People's Republic of China should be

13   deemed alter egos without more?

14                   MR. LONGER:  You're saying,

15           per se?

16                   MR. FENTON:  Per se.

17                   MR. LONGER:  Object to form.

18                   THE WITNESS:  If -- if all

19           these questions are assuming a per

20           se rule, no, I'm not aware of any

21           such rule.

22   BY MR. FENTON:

23           Q.    Okay.  Now, I'm on a -- sort

24   of apropos of nothing.  Let's go back to

Confidential - Subject to Further Confidentiality Review

Page 58

1    Japan.

2            A.    Okay.

3            Q.    Okay.  Because you -- you

4    obviously have done a lot of work in --

5    in the field of Japanese law.

6                  Okay.  Are state-owned

7    enterprises prevalent in Japan?

8            A.    No.

9            Q.    Does Japan have any

10   state-owned enterprises?

11           A.    It does.  It does, although

12   they have been largely privatized and

13   they recently partially -- they floated

14   the shares of Japan post.

15           Q.    Mm-hmm.  So what you're

16   saying is that Japan at one time had much

17   more in the way of state-owned

18   enterprises than they do now?

19           A.    They had more, certainly.

20           Q.    Okay.

21           A.    But they were never

22   particularly prevalent.

23           Q.    Okay.  And are you aware of

24   any authority in the U.S. or otherwise

Confidential - Subject to Further Confidentiality Review

Page 59

```
 1    holding that Japanese state-owned
 2    enterprises are -- should, per se, be
 3    regarded as alter egos?
 4          A.    No.
 5          Q.    Okay.  We talked about China
 6    and Japan having state-owned enterprises.
 7    Have you studied state-owned enterprises
 8    in other countries?
 9          A.    North Korea, for whatever
10    that's worth.
11          Q.    Okay.  Any other countries
12    where you've looked closely at
13    state-owned enterprises?
14          A.    I'm in the process of -- of
15    sort of a global study of best practices
16    in so-called mixed ownership enterprises.
17    So this would be a firm in which the
18    state owns a share, typically a
19    controlling share.  But it's listed on a
20    stock exchange, so it also has private
21    investors.  But I'm at the very early
22    stages of that.
23          Q.    So let me ask you this
24    question.  Other than China, Japan, and
```

Confidential - Subject to Further Confidentiality Review

Page 60

1    North Korea, are you aware of other

2    countries that have state-owned

3    enterprises, wholly owned or -- or

4    partially owned?

5         A.    Yes.

6         Q.    Could you give me a list?

7         A.    Brazil.

8         Q.    Okay.

9         A.    India.  I think those are

10   the two probably most relevant in terms

11   of global economy.  But there -- many

12   countries have state-owned enterprises.

13        Q.    Give me -- give me some

14   more.

15        A.    Italy, France.

16        Q.    Any other members of NATO

17   that have state-owned enterprises?

18        A.    I -- offhand I can't think

19   of others.

20        Q.    Any other U.S. allies.  How

21   about Canada?  Doesn't Canada have some

22   Crown corporations?

23        A.    Yes, I believe so.

24        Q.    Okay.  And -- and the United

Confidential - Subject to Further Confidentiality Review

Page 61

 1   Kingdom, don't they have some Crown

 2   corporations that are state-owned?

 3          A.    I haven't done any study

 4   on -- on UK SOEs.

 5          Q.    Okay.  So you have no reason

 6   to know one way or the other, correct?

 7          A.    Correct.  I mean, I know

 8   they used to have.  I know there was a

 9   massive privatization wave under

10   Thatcher, but I haven't -- I have not

11   followed -- I have not followed that.

12          Q.    How about here in the U.S.?

13   Are there any corporations that are owned

14   in whole or in part by the U.S.

15   government?

16          A.    Amtrak.

17          Q.    Okay.  What else?

18          A.    I mean, Fannie and Freddie

19   typically make the list.

20          Q.    You're talking about Fannie

21   Mae and Freddie Mac?

22          A.    Yes.

23          Q.    Okay.  They -- they make the

24   list of corporations that are owned by

Confidential - Subject to Further Confidentiality Review

Page 62

1    the U.S. government?

2           A.    Well, I wouldn't say they

3    are owned by the U.S. government, but if

4    one is creating a list of corporations

5    that have links to the government, Fannie

6    and Freddie typically make the list.

7           Q.    Okay.  And that's because

8    the U.S. government holds warrants in

9    Fannie Mae and Freddie Mac whereby it can

10   take a controlling interest anytime it

11   wants; isn't that right?

12          A.    I'm not -- I'm not extremely

13   familiar with the structure of those

14   organizations.

15          Q.    All right.  Well, you say

16   that they frequently make the list.  So

17   you understand that the U.S. government

18   does have some role?

19          A.    Yes.

20          Q.    Would you say that the U.S.

21   government has a controlling interest in

22   Fannie Mae and Freddie Mac?

23          A.    I don't have a basis to

24   respond.  I'm sorry.

Confidential - Subject to Further Confidentiality Review

Page 63

1          Q.    What about the Federal

2    Deposit Insurance Corporation?  Is that a

3    state-owned enterprise?

4          A.    Well, I'm not an -- I'm not

5    an expert on this, but I would not

6    categorize it as a state-owned

7    enterprise.  I think it's a -- it's a --

8    partly a regulatory body.

9          Q.    Like SASAC, right?  SASAC is

10   a -- partly a regulatory body, isn't it?

11              MR. LONGER:  Object to the

12         form and foundation.

13              THE WITNESS:  SASAC is a

14         part of a regulatory body.

15   BY MR. FENTON:

16         Q.    Okay.  And SASAC issues

17   various regulations for Chinese

18   companies, much the way the FDIC does for

19   banking institutions in the U.S., don't

20   they?

21         A.    Well, I think the comparison

22   is -- with all due respect, I don't -- I

23   don't think it's apt.

24         Q.    You are aware that the FDIC

Confidential - Subject to Further Confidentiality Review

Page 64

1    does issue regulations which U.S. banks

2    are required to follow?

3          A.    Yes.

4          Q.    And SASAC issued regulations

5    of its own which various Chinese

6    companies are required to follow.

7          A.    Yes.

8          Q.    All right.  Would you say

9    that the FDIC is an alter ego of the U.S.

10   government?

11         A.    It would have never occurred

12   to me to ask the question --

13         Q.    I'm sure not.

14         A.    -- so the answer would be

15   no.

16         Q.    When the FDIC takes over a

17   bank in the United States, does that bank

18   become an alter ego of the Federal

19   Deposit Insurance Corporation?

20               MR. LONGER:  Object to form

21          and foundation.

22               THE WITNESS:  I think it

23          would not typically be

24          characterized that -- that way.

Confidential - Subject to Further Confidentiality Review

Page 65

 1   BY MR. FENTON:

 2        Q.   Oh, I would think not

 3   either.

 4             Are you familiar with any

 5   case holding that when the FDIC takes

 6   over a bank in the United States, that

 7   the bank becomes the alter ego of the

 8   FDIC?

 9             MR. LONGER:  Same

10        objections.

11             THE WITNESS:  No, I'm not

12        aware of any sort to that effect.

13   BY MR. FENTON:

14        Q.   Okay.  How about the

15   Tennessee Valley Authority?  Is that a

16   U.S. state-owned enterprise?

17        A.   I have seen it categorized

18   as such.  I don't have a basis for

19   evaluating that.

20        Q.   Okay.  And do you know what

21   amount of control the U.S. government

22   exercises over the Tennessee Valley

23   Authority?

24        A.   I do not.

Confidential - Subject to Further Confidentiality Review

Page 66

1          Q.    Okay.  Amtrak.  Do you know

2    how many different subsidiary and

3    affiliated corporations Amtrak has?

4          A.    I do not.

5          Q.    You haven't studied that?

6          A.    No.

7          Q.    You didn't think that was

8    important in rendering your opinion?

9               MR. LONGER:  Object to the

10         form.  Argumentive.

11              MR. FENTON:  Thank you.

12         Yes, it is.

13   BY MR. FENTON:

14         Q.    Please answer my question.

15         A.    I actually did do a bit of

16   research on ownership structure at

17   Amtrak.  In preparation for this, I did.

18         Q.    Okay.  And what did you find

19   about the ownership structure of Amtrak?

20         A.    That it is created by

21   statute in -- in the 1970s, and it's a

22   hundred percent owned by -- by the U.S.

23   government.

24         Q.    All right.  And is that in

Confidential - Subject to Further Confidentiality Review

Page 67

1    your report?

2                    MR. LONGER:   Object to the

3            form.   Argumentive.

4    BY MR. FENTON:

5            Q.    I just asked if it's in your

6    report.

7            A.    No, it's not.

8            Q.    Why not?

9            A.    Because I was asked to opine

10   on corporate governance structure in

11   Chinese SOEs.

12           Q.    So why were you looking at

13   Amtrak?

14           A.    Because I thought that

15   for -- with all, you know, due respect, I

16   thought that Professor Gordon's approach

17   of looking at, and -- and Mr. Deal's

18   approach of looking at S&P 1500

19   companies, or Disney or FedEx, was not an

20   apt comparison.

21           Q.    But you thought Amtrak was

22   perhaps an apt comparison?

23           A.    Well, I was looking for apt

24   comparisons.   I didn't find any.

Confidential - Subject to Further Confidentiality Review

1          Q.    Why didn't you mention in

2    your report that, in looking for apt

3    comparisons, you didn't find any?  What

4    other apt comparisons did you look for?

5                MR. LONGER:  Object to form.

6          Compound.

7                THE WITNESS:  Could you

8          repeat the question?

9    BY MR. FENTON:

10         Q.    Yes.  You said you were

11   looking at Amtrak because you were

12   looking for apt comparisons.  Okay.  What

13   other apt comparisons did you look for?

14         A.    I did not find any.  And I

15   don't think Amtrak is an apt comparison.

16   I don't think there are any apt

17   comparisons in the United States.

18         Q.    Okay.  What about the

19   Government National Mortgage Corporation?

20   Did you look at that as a potential apt

21   comparison?

22               MR. LONGER:  Object to the

23         form.  It's asked and answered.

24               MR. FENTON:  Never asked

Confidential - Subject to Further Confidentiality Review

Page 69

1          that one.

2                    MR. LONGER:  I think it's

3          subsumed in his past answer.  So

4          I'm objecting to the form.  You

5          can go through a whole litany of

6          these things.  And his answer is

7          probably going to be quite the

8          same.

9                    We'll do it however you

10         want.  It's your deposition.

11                   THE WITNESS:  No.

12    BY MR. FENTON:

13         Q.    Okay.  How about the

14    Commodity Credit Corporation?

15         A.    No.

16                   MR. LONGER:  Objection.

17    BY MR. FENTON:

18         Q.    How about the Export-Import

19    Bank?

20                   MR. LONGER:  Same objection.

21    BY MR. FENTON:

22         Q.    Did you look at that?

23         A.    No.

24         Q.    How about the Federal Prison

Confidential - Subject to Further Confidentiality Review

Page 70

1    Industries or UNICOR?

2                MR. LONGER:   Same

3         objections.

4    BY MR. FENTON:

5         Q.    Did you look at that?

6         A.    No.

7         Q.    Okay.  How many comparisons

8    did you look at other than Amtrak?

9         A.    Well, I looked for

10   comparisons.  The one that I found that

11   was even conceivably in the realm of

12   relevant in my mind was Amtrak.

13        Q.    Did you make -- did you look

14   at the -- at the corporate structure of

15   Amtrak?  Did you look at whether Amtrak

16   has subsidiaries and affiliates?

17        A.    I did not look deeply into

18   the corporate structure of Amtrak, no.

19        Q.    All right.  Well, as thinly

20   or as deeply that you looked, did you

21   determine that Amtrak does in -- does, in

22   fact, have subsidiary corporations?

23        A.    I would assume that it does.

24   I did not -- I did not study it deeply.

Confidential - Subject to Further Confidentiality Review

Page 71

1          Q.    Okay.  And are you aware of

2     any case that holds that by virtue of its

3     ownership and control of, or by -- let me

4     rephrase the question.

5                Are you aware of any case

6     that holds by virtue of the U.S.

7     government's ownership and control of

8     Amtrak, that Amtrak and its subsidiaries

9     should be regarded as alter egos?

10         A.    I'm not aware of that, no.

11         Q.    Are you aware of something

12    called government-sponsored entities in

13    the U.S.?

14         A.    Well, I think Fannie and

15    Freddie are typically categorized as

16    government-sponsored entities.

17         Q.    Okay.  And that's because

18    the U.S. holds an ultimate controlling

19    interest in those companies should it

20    choose to exercise it?

21              MR. LONGER:  It's been asked

22         and answered.

23              THE WITNESS:  I don't have a

24         basis for saying that.  What I

Confidential - Subject to Further Confidentiality Review

1           said was they are typically so

2           categorized.

3    BY MR. FENTON:

4           Q.    Well, but, Professor, I

5    mean, you are the expert.  When you were

6    asked to find comparisons in the U.S. --

7           A.    I was not --

8           Q.    -- didn't you think to

9    look -- didn't you think to look at

10   government-sponsored entities in the

11   U.S.?

12                MR. LONGER:  Let me just

13           object.

14                It mischaracterizes his

15           testimony.  He's never said that

16           he was asked by us to do exactly

17           what you're saying.  And he

18           wasn't.

19                So you can answer the

20           question, but...

21                MR. FENTON:  All right.

22           Well --

23                THE WITNESS:  I was not

24           asked to do that.

Confidential - Subject to Further Confidentiality Review

1              MR. FENTON:  Let's note the

2         speaking objection.

3    BY MR. FENTON:

4         Q.    You weren't asked to do it,

5    and you didn't think it was important to

6    do, did you?

7              MR. LONGER:  Object to the

8         form.

9              THE WITNESS:  That's not

10        what I said.

11   BY MR. FENTON:

12        Q.    How about the 11 Federal

13   Home Loan Banks that are

14   government-sponsored entities in the

15   U.S.?  Are you aware of any authority

16   that they are regarded as alter egos

17   because the U.S. government has ultimate

18   control if it chooses to exercise its

19   warrants?

20             MR. LONGER:  Excuse me.

21             And by "authority," you mean

22        caselaw?  What you do you mean by

23        "authority"?

24             MR. FENTON:  Caselaw,

Confidential - Subject to Further Confidentiality Review

Page 74

1           statutes, academic literature,

2           anything.

3                THE WITNESS:  I have not

4           studied this issue.

5     BY MR. FENTON:

6           Q.    And you didn't think it was

7     important to study the issue for your

8     work here, did you?

9                MR. LONGER:  Objection.

10               THE WITNESS:  Was that a

11          question?

12    BY MR. FENTON:

13          Q.    Yes.

14          A.    I did not think it was

15    relevant.

16          Q.    Okay.  So the fact that

17    there are government-sponsored entities

18    in which the United States government

19    holds warrants that if exercised would

20    give it a controlling interest in these

21    companies did not seem to you to be

22    relevant in assessing whether Chinese

23    state-owned enterprises can be considered

24    comparable to companies here in the U.S.?

Confidential - Subject to Further Confidentiality Review

Page 75

1              MR. LONGER:  Object to the

2         form.

3              THE WITNESS:  I mean, all I

4         can answer -- you know, all I can

5         say by way of answering is, your

6         own experts apparently didn't deem

7         it to be relevant.

8    BY MR. FENTON:

9         Q.   No, no, no, sir.  They used

10   a different measure of comparison.  I'm

11   asking what you deemed to be relevant.

12             MR. LONGER:  If that's the

13        question, object to the form.

14             THE WITNESS:  I mean, I

15        guess I can just simply repeat

16        what I said, which was, that was

17        not the scope of my assignment.

18   BY MR. FENTON:

19        Q.   Okay.  You defined the scope

20   of your assignment to what the

21   plaintiffs' lawyers asked you to do,

22   right?

23        A.   Yes.

24        Q.   And the result was your

Confidential - Subject to Further Confidentiality Review

Page 76

1    opinion that we marked as Exhibit 1,

2    correct?

3            A.    That's correct.

4                  MR. FENTON:  Let's take a

5           break.

6                  THE VIDEOGRAPHER:  The time

7           is 10:02 a.m.  We are going off

8           the record.

9                  (Short break.)

10                  THE VIDEOGRAPHER:  The time

11           is 10:16 a.m., and we are back on

12           the record.

13                  THE WITNESS:  One

14           misstatement in my prior testimony

15           I'd like to correct is that I had

16           earlier said I think that I had

17           looked at the exhibits in the

18           plaintiffs' papers.  But I -- I

19           also looked at the exhibits in the

20           defendants' papers as well.

21                  I received a Dropbox

22           containing all of those exhibits.

23    BY MR. FENTON:

24            Q.    Okay.  So you looked at the

Confidential - Subject to Further Confidentiality Review

Page 77

1   exhibits on both sides?

2         A.   Correct.

3         Q.   Okay.

4         MR. STECKLER: And -- and I

5         think we provided him, Rick, the

6         moving papers --

7         MR. FENTON: Yeah.

8         MR. STECKLER: -- by

9         defendant responding to the --

10        MR. LEVIN: Okay. Look,

11        it's not your testimony.

12        THE WITNESS: If you look at

13        the reliance material, it's there.

14  BY MR. FENTON:

15        Q.   All right. So when you were

16  testifying a bit earlier, you had

17  neglected to mention that you had also

18  looked at defense materials and you've

19  now corrected the record on that?

20        A.   Correct.

21        Q.   Any other corrections to

22  your previous testimony?

23        A.   No.

24        Q.   Okay. And thank you for

Confidential - Subject to Further Confidentiality Review

1    that, Professor.

2              All right.  Now, Professor,

3    in terms of the -- well, let -- let's

4    come back to your report.

5              In Paragraph 6 of your

6    report, you mention that you testified

7    before the U.S.-China Economic and

8    Security Review Commission on the policy

9    implications of global Chinese SOE

10   investment and trade equity.

11        A.    Correct.

12        Q.    Did any of your testimony

13   before the U.S.-China Economic and

14   Security Review Commission involve the

15   question of whether the influence of the

16   Chinese Communist party rendered Chinese

17   SOEs to be alter egos?

18        A.    No.

19        Q.    Have you ever expressed that

20   opinion anywhere before producing your

21   report here?

22              And I'm not suggesting your

23   report says that, but have you ever

24   expressed that opinion anywhere?

Confidential - Subject to Further Confidentiality Review

1          A.    No.

2          Q.    Okay.

3          A.    Although if I could just

4     add, I -- I did flag similar issues, I

5     think, in the -- in my testimony.  I just

6     flagged as a possible issue, in the

7     antitrust area, what is the relevant unit

8     of analysis.

9          Q.    For purposes of determining

10    monopolization of markets and those kinds

11    of things?

12         A.    Correct.  Correct.

13         Q.    Okay.  In other words, it's

14    sort of the -- the Copperweld issue about

15    whether corporate affiliates can conspire

16    with one another, that kind of thing?

17         A.    Well, an issue like that.  I

18    mean, there's issues that have arisen in

19    the EU, in which the E -- EEC has been

20    forced to, you know, confront the issue.

21    What is the undertaking --

22         Q.    Mm-hmm.

23         A.    -- exactly what is the

24    undertaking?  Is it this corporation?  Is

Confidential - Subject to Further Confidentiality Review

Page 80

1    it the group?  Is it the entire network

2    of -- of SOEs?  So I did not opine as to

3    that.  I simply raised it as an issue

4    for -- for policymakers.

5            Q.    All right.  So you've

6    never -- you've never expressed an

7    opinion with respect to alter ego or

8    single business enterprise with respect

9    to Chinese state-owned enterprises?

10           A.    Correct.

11           Q.    All right.  Now, is it your

12   understanding, Professor, that -- let's

13   stick with China for the moment -- that

14   the Chinese government only has influence

15   over state-owned enterprises as opposed

16   to privately owned enterprises?

17           A.    I think they have forms of

18   controls over SOEs and -- and private

19   S -- private enterprise.

20           Q.    And is it your testimony

21   that the United States government has no

22   forms of controls over private

23   enterprises?

24           A.    Oh, of course they do.

Confidential - Subject to Further Confidentiality Review

1    Regulation and taxation is a form of

2    government influence over private

3    enterprise.

4         Q.    Okay.  So in the United

5    States, we have various regulatory bodies

6    that oversee various industries.  And

7    that, to a greater or lesser degree, can

8    influence the policies of private

9    corporation through the regulations that

10   they issue, correct?

11        A.    That's certainly true.  But

12   I think the forms of control and

13   influence in China are different.  They

14   go well beyond the standard forms of

15   regulation and taxation.

16        Q.    My question had to do with

17   the United States.  In the United States,

18   the government does have influence over

19   the conduct of private corporations

20   through the issuance and implementation

21   of the laws and regulations and the

22   oversight of regulatory structures,

23   correct?

24        A.    Certainly.

Confidential - Subject to Further Confidentiality Review

Page 82

1          Q.    Okay.  And so if, for

2    example, in the agricultural industry, if

3    the United States government wants to

4    support agricultural prices, they

5    sometimes pay farmers to not grow as many

6    crops, correct?  That's happened in the

7    U.S., right?

8          A.    I'm certainly not an expert

9    in this field.  I don't hold myself out

10   as one.  But that's my general

11   understanding.

12         Q.    Okay.  And that is a form of

13   the U.S. government influencing private

14   enterprise?

15              MR. LONGER:  In the broadest

16         sense of the term "influence"?  Is

17         that what you're --

18              MR. FENTON:  In any sense of

19         the term.

20              MR. LONGER:  Object to form.

21         Go ahead and answer.

22              THE WITNESS:  It is a form

23         of influence.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 83

1          Q.    Okay.   And you also

2    mentioned that tax policy can influence

3    the conduct of U.S. enterprises, correct?

4          A.    Correct.

5          Q.    As a matter of fact, I think

6    Professor Gordon points out in his report

7    that the reason that the U.S. has

8    developed conglomerates as opposed to the

9    kinds of business groups that one sees in

10   other countries is largely driven by tax

11   considerations, right?

12         A.    That's one academic theory.

13         Q.    Okay.   Is it a theory

14   that -- that you think is -- is

15   supportable?

16         A.    I think, my own personal

17   view if you're interested, my academic

18   view, is that a broader variety of

19   factors probably influence why business

20   groups or, slash, conglomerates develop

21   in one economy versus another.   I don't

22   think it's all driven by tax.

23         Q.    Okay.   Fair enough.   And

24   there are other regulations other than

Confidential - Subject to Further Confidentiality Review

1    tax regulations, correct?

2            A.      As to what?

3            Q.      As to -- as to the conduct

4    of private industry, correct?

5            A.      Of course.

6            Q.      Okay.  You have the SEC

7    regulating.  You have in, on a -- on a

8    state level, you have regulation of the

9    insurance industry, correct?

10                   MR. LONGER:  I've lost the

11           question.  Object to form.

12                   Go ahead.

13                   THE WITNESS:  Yes.

14   BY MR. FENTON:

15           Q.      Okay.  And certainly the

16   insurance commissioners of various states

17   can influence the behavior of private

18   insurance companies within that state to

19   the issuance and implementation of

20   regulations.

21           A.      Yes.  Again, using

22   influence, in the broadest sense of the

23   term, that's hard to argue with.

24           Q.      Okay.  And the government of

Confidential - Subject to Further Confidentiality Review

Page 85

1    the United States through its

2    investigatory power can influence the

3    conduct of private companies; isn't that

4    right?

5              MR. LONGER:  It's a very

6         vague question.

7              Go ahead and answer it.

8              Objection.

9              THE WITNESS:  Yes.

10   BY MR. FENTON:

11        Q.   Okay.  And, in fact, the

12   Justice Department from time to time does

13   launch investigations of certain

14   industries as part of its law enforcement

15   operations, doesn't it?

16              MR. LONGER:  Objection.

17         Vague.  Overbroad.  Irrelevant.

18              Go ahead and answer the

19         question.

20              THE WITNESS:  Yes.

21   BY MR. FENTON:

22        Q.   Is it your testimony that

23   those kinds of investigations have no

24   influence on the conduct of private

Confidential - Subject to Further Confidentiality Review

Page 86

```
 1    corporations in the United States?

 2                    MR. LONGER:  Same

 3           objections.

 4                    THE WITNESS:  That's not my

 5           testimony.

 6    BY MR. FENTON:

 7           Q.    Okay.  During the financial

 8    crisis, I seem to recall this picture

 9    that was on the front page of the New

10    York Times of half a dozen or so CEOs

11    with their right hands raised testifying

12    before Congress on the financial

13    collapse.

14                    Is that a form of U.S.

15    government influence over the conduct of

16    private companies?

17                    MR. LONGER:  Same

18           objections.

19                    THE WITNESS:  Again, it's

20           hard to quarrel or say no, because

21           influence, yes, sure, it would

22           influence behavior.  The

23           government influences behavior.

24    BY MR. FENTON:
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Well, I understand that,

2    sir.  So the government influences

3    behavior.  And it doesn't always

4    influence behavior through official

5    proclamations or through corporate

6    resolutions; isn't that right?

7                MR. LONGER:  Very vague.

8          Object.

9                Go ahead and answer if you

10         can.

11               THE WITNESS:  The government

12         does not always act through

13         government proclamations, yes.

14   BY MR. FENTON:

15         Q.    The government has the power

16   to regulate, does it not?

17         A.    Yes.

18         Q.    The government has the power

19   to tax, does it not?

20         A.    Correct.

21         Q.    The government has the power

22   to prosecute, does it not?

23         A.    Correct.

24         Q.    The government has the power

Confidential - Subject to Further Confidentiality Review

1    to sue for civil penalties, does it not?

2            A.    Correct.

3            Q.    Okay.  And all of those

4    powers can be exercised in a way or

5    threatened in a way that can influence

6    the behavior of private participants in

7    the marketplace; isn't that true?

8            A.    That is true.

9            Q.    Have you ever written an

10   article positing that U.S. conglomerates

11   should be regarded as alter egos because

12   of these influences that the government

13   wields over their behavior?

14           A.    I have not.

15           Q.    Okay.  Have you ever seen

16   such an article?

17           A.    I have not looked for such

18   an article, but, no, I have not seen such

19   an article.

20           Q.    Okay.  Now, you reviewed

21   this mass of materials that was sent to

22   you by the PSC, and it included both

23   plaintiffs' submissions and defendants'

24   submissions.

Confidential - Subject to Further Confidentiality Review

1          What is the methodology that

2    you then applied to your work?

3          A.    Are you talking about the

4    methodology in crafting my declaration?

5          Q.    In reaching the conclusions

6    that you reached.

7          A.    Well, I first absorbed

8    myself in the facts of the case.

9          And I focused on my

10   assignment, which was, as I understood

11   it, to provide context on corporate

12   governance practices in a Chinese SOE

13   group supervised by SASAC, as it would

14   have a bearing on the legal issues in

15   this case around the issue of personal

16   jurisdiction and alter ego or single

17   business entity status, again, with a

18   focus on context, not conclusion.

19         Q.    Okay.  Now, is there some

20   name for this kind of methodology?

21         A.    Well, comparative corporate

22   governance is a name that could be given

23   to what I did.

24         Q.    Okay.  And it is -- it is

Confidential - Subject to Further Confidentiality Review

Page 90

1   very much the process that you understand

2   Professor Gordon followed; that is to

3   say, he looked at all the facts; he tried

4   to construct an analytical framework and

5   render and opinion, correct?

6                   MR. LONGER:   Object to form.

7           Assumes facts not in evidence.

8                   THE WITNESS:  Well, again, I

9           can't say what he did.  But I can

10          say that, in my own view, he

11          committed a fundamental error,

12          which is only looking for things

13          that were familiar to him and

14          omitting things that were not

15          familiar.

16  BY MR. FENTON:

17          Q.   Well, you omitted some

18  things that were not familiar, didn't

19  you?  We went through a whole long list.

20          A.    Because I didn't think they

21  were --

22                  MR. LONGER:  Wait, wait,

23          wait.  Excuse me.  I don't want

24          you talking over one another,

Confidential - Subject to Further Confidentiality Review

Page 91

1          first.

2                  Second, when he asks an

3          argumentive question like that,

4          I'd like to be able to object

5          before you answer.  My objection

6          is noted.

7                  Go ahead and answer.

8     BY MR. FENTON:

9          Q.     Do you remember the

10    question?

11         A.     Could you repeat it for me.

12         Q.     Probably not.  But I can ask

13    the reporter to read it back.

14                 (Whereupon, the court

15         reporter read back the requested

16         portion of the record.)

17    BY MR. FENTON:

18         Q.     Of the government-sponsored

19    and government-owned entities in the

20    United States.  You omitted that from

21    your analysis.

22         A.     Correct, because --

23                 MR. LONGER:  Object to the

24         form.

Confidential - Subject to Further Confidentiality Review

Page 92

```
 1              THE WITNESS:  -- I felt that
 2         they were irrelevant, because I
 3         think it is -- again, my
 4         assignment was to focus on Chinese
 5         SOEs.  And there is quite a body
 6         of literature that indicates that
 7         these are distinctive entities,
 8         and if you just try to compare
 9         them to United States, you're
10         going to miss very important,
11         relevant factors.
12    BY MR. FENTON:
13         Q.    Is it -- is it your
14    testimony that Professor Gordon cited no
15    professional literature or articles on
16    Chinese SOEs in his report?
17         A.    I believe he did.
18         Q.    Okay.  So he took it into
19    account.  You may think he didn't take it
20    into account enough, but he took it into
21    account, didn't he?
22         A.    He cited, to my
23    recollection, two articles.
24         Q.    Okay.  And the thrust of
```

Confidential - Subject to Further Confidentiality Review

Page 93

1   Professor Gordon's report was that he

2   didn't see any evidence of party or SASAC

3   influence that would justify piercing the

4   corporate veil; isn't that right?  Not

5   that he didn't think it was relevant, his

6   report said he didn't think there was

7   evidence of that, correct?

8         A.    I'm not sure he addresses

9   the topic at all.

10         Q.    Did you read his deposition?

11         A.    I did.

12         Q.    Okay.  Do you recall his

13   testimony that he did not see any

14   evidence of SASAC or Communist Party

15   control over the affairs of Taishan or

16   BNBM?

17         A.    I don't have an exact

18   recollection verbatim of what he

19   testified to.  But I think that's

20   probably a fair characterization of

21   his -- of his testimony.

22         Q.    Okay.  And what evidence did

23   you see of SASAC -- let's start with

24   SASAC, and then we'll move on to the

Confidential - Subject to Further Confidentiality Review

1    Chinese Communist Party.

2              What specific evidence did

3    you see in the record of SASAC control

4    over the affairs of Taishan in connection

5    with the sale and distribution of Chinese

6    drywall?

7         A.   Well, let me start with the

8    articles of association of CNBM Group,

9    the corporate charter, which state -- I

10   want to focus -- you want me to focus on

11   SASAC?

12        Q.   Yes.

13        A.   Okay.  Provision of the

14   articles of incorporation state that the

15   board of directors will implement SASAC's

16   decision with respect to the running of

17   the corporation.

18              Those same articles also

19   provide a long list of important

20   decisions that are to be made by SASAC

21   rather than the board of directors.

22              I also saw in a document --

23   I'm going to forget the precise title,

24   but it's something like "Leading the

Confidential - Subject to Further Confidentiality Review

1    People."  It's a record of the leadership

2    team of Taishan, which refers to a

3    supervision team from SASAC as well as

4    CNBMG as well as BNBM.  It's not clear

5    from the record whether it's G or PLC.

6              Those three supervisory

7    committees, from SASAC on down, going

8    into Taishan to, I assume, explore

9    problems there.  And the record states

10   that there is some kind of a

11   rectification plan that was devised for

12   Taishan.

13        Q.    Anything else that comes to

14   mind?

15        A.    Well, I can speak more about

16   SASAC if you'd like me to.

17        Q.    Well, you know, I think you

18   may have misunderstood my question.  So

19   let me -- and perhaps I didn't phrase it

20   properly.

21              My question is, what

22   specific evidence did you see in the

23   record of SASAC control or direction over

24   the sale and distribution of Chinese

Confidential - Subject to Further Confidentiality Review

1    drywall by Taishan in the United States?

2    And what I mean is, have you seen

3    anything that ties SASAC directly to

4    those decisions or transactions?

5         A.    Well, I mean, I think by

6    implication the -- the record that I just

7    referred to, this meeting at Taishan,

8    suggests that SASAC exercises supervisory

9    authority over the downstream entities.

10             It has appointment and

11   removal power with respect to senior

12   executives throughout this corporate

13   hierarchy.

14             So, you know, in some sense,

15   I wouldn't expect to see a fulsome record

16   on this -- on this point, because we are

17   talking about, in essence, a kind of

18   parallel system or a system in which

19   SASAC has powers that go beyond what is

20   normally thought to be the power of a --

21   of a controlling shareholder.

22        Q.    All right.  Who at SASAC,

23   and I want the name of the person, who at

24   SASAC was involved in Taishan's decision

Confidential - Subject to Further Confidentiality Review

1   to market drywall in the U.S. in the 2006

2   to 2 -- 2009 period?

3          A.    I -- I don't have --

4                MR. LONGER:  Object to the

5          form.

6                THE WITNESS:  Sorry.  I

7          don't have a name.

8   BY MR. FENTON:

9          Q.    Do you -- are you aware of

10  any documents issued by SASAC or a

11  representative thereof directed to

12  Taishan in the period 2006 to 2009

13  relating to Taishan's sale of drywall in

14  the U.S.?

15         A.    I'm -- I'm not aware of such

16  a document.  I -- I am told that there

17  are thousands of pages of documents that

18  have yet to be translated and processed.

19  So I obviously don't know what's in those

20  documents.

21         Q.    Yes, you obviously do not.

22                My question is based on what

23  you have reviewed.  Have you seen any

24  document --

Confidential - Subject to Further Confidentiality Review

Page 98

```
 1              MR. LONGER:  Object to the
 2         colloquy.
 3    BY MR. FENTON:
 4         Q.    -- whereby SASAC or one of
 5    its representatives is issuing any
 6    directives to Taishan in connection with
 7    the sale of drywall in the U.S. between
 8    2006 and 2009?
 9              MR. LONGER:  Object to the
10         colloquy.
11              Go ahead and answer the
12         question.
13              THE WITNESS:  No.
14    BY MR. FENTON:
15         Q.    Okay.  Have you seen any
16    documents from the leadership of CNBM to
17    Taishan directing them or telling them
18    how to sell drywall in the U.S. generated
19    between 2006 and 2009?
20         A.    I don't recall seeing such a
21    document.
22         Q.    Can you name for me any
23    senior executive, or junior executive,
24    for that matter, of CNBM who was involved
```

Confidential - Subject to Further Confidentiality Review

Page 99

1   with Taishan's decision to sell drywall

2   in the U.S. between 2006 and 2009?

3          A.    Well, by way of answer, I

4   would point to the articles of

5   administration --

6          Q.    No, I asked for the name of

7   a person, sir.

8          A.    I -- I do not have such a

9   name.

10         Q.    Can you name for me any

11   individual associated -- strike that.

12               Can you name for me any

13   person from BNBM PLC or BNBM Group who

14   was directly or indirectly involved in

15   Taishan's decision to sell drywall in the

16   U.S. during the period 2006 to 2009?

17         A.    I mean, they had board --

18   they had people on the board of Taishan.

19   They had three of the five board seats.

20         Q.    Okay.  Can you tell me

21   when -- whether the board of Taishan ever

22   considered the issue?

23         A.    No.  And the record is

24   rather thin on formal corporate actions

Confidential - Subject to Further Confidentiality Review

Page 100

1   by the board or shareholders.

2           Q.     Have you reviewed all of the

3   board minutes of BNBM, CNBM, and Taishan?

4           A.     If they -- if they were in

5   the record, I have -- I have looked at

6   them.

7           Q.     Okay.  And as you sit here

8   now, you don't recall any issues raised

9   by the board -- and I'm talking about

10  contemporaneously with the sales -- about

11  to whether or not Taishan should sell

12  drywall in the U.S. during the period

13  2006 to 2009, right?

14          A.     I do not recall, no.

15          Q.     All right.  And that is an

16  issue that would normally be handled by a

17  company's management, right?  That's an

18  operational issue that you would normally

19  expect maybe the -- the CEO or maybe even

20  a deputy CEO or administrator to address,

21  right?

22          A.     Yes.  Not necessarily on a

23  formal record, though.

24          Q.     Right.  But that's not the

Confidential - Subject to Further Confidentiality Review

1    kind of thing that necessarily would rise

2    to a board-level decision, right?

3         A.    I'm -- well, I'm -- I'm not

4    sure I agree with you about -- about

5    that.

6         Q.    Well, in these articles of

7    incorporation that you talk about for

8    CNBM, is there anything in there that

9    says that if you want to sell drywall in

10   the U.S., you have to come to us for

11   permission?

12        A.    Well, the -- if I may refer

13   to these articles of association or

14   administration, which is the overarching

15   contract that governs the relations among

16   the firms in the group, there's a long

17   list of important decisions that need to

18   be -- for which the top group, for which

19   group company, needs to give a reply.

20        Q.    Right.  And that concerns

21   things like major sales of assets,

22   correct?  Mergers and acquisitions,

23   correct?

24        A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 102

1          Q.    Divestitures, correct?

2                Okay.  Expenditures --

3                THE REPORTER:  Did he --

4                MR. JOHNSON:  Professor

5          Milhaupt, if you could answer

6          instead of nodding your head.

7                MR. FENTON:  Yes, we need an

8          audible answer.

9                THE WITNESS:  Correct.

10               MR. FENTON:  Okay.  As a

11         matter of fact, let's get the

12         document, Ken.  Let's get the

13         articles so we know what we are

14         talking about.

15    BY MR. FENTON:

16         Q.    You didn't see anything

17    about drywall in the articles, did you?

18         A.    No, I did not.

19         Q.    It might be helpful, sir, if

20    you could -- do you recall where you

21    refer to these articles in your report?

22         A.    Yes.  Footnote 11.

23               (Document marked for

24               identification as Exhibit

Confidential - Subject to Further Confidentiality Review

 1          Milhaupt-2.)

 2    BY MR. FENTON:

 3          Q.    Okay.  All right.  Let me

 4    show you what we've marked as -- as

 5    Exhibit 2.  And this is labeled "Partial

 6    Translation."

 7                Did you ever read the whole

 8    translation, by the way?

 9          A.    No.

10          Q.    Okay.

11                China National Building

12    Material Group Corporation,

13    Administrative Measures for Appointing

14    Representatives of Capital Contributors.

15                And I believe this is the

16    document you're talking about, but if

17    you -- if you can confirm that for me,

18    I'd appreciate it.

19          A.    Yes.

20          Q.    Okay.  And what you were

21    referring to, if I'm not mistaken, is

22    Article 15 of the document; isn't that

23    right?

24          A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 104

1          Q.    All right.  And let's look

2    at the list of items for which CNBM Group

3    must be consulted if its subsidiaries

4    want to engage in the -- in the -- in the

5    action, correct?

6          A.    Yes.

7          Q.    One is that the enterprise

8    has the board of directors and selects

9    and appoints or changes its general

10   managers, chief -- chief financial

11   officer or chief accountant --

12              MR. LONGER:  Excuse me one

13         second --

14   BY MR. FENTON:

15         Q.    -- correct?

16              MR. LONGER:  -- before

17         you -- before you answer the

18         question.

19              I think you're chasing down

20         a rabbit trail here on something

21         irrelevant.  So I'm going to

22         object to the line of questioning.

23              If -- can -- if I can have a

24         standing objection, it will avoid

Confidential - Subject to Further Confidentiality Review

Page 105

1           me repeating it.

2                   MR. FENTON:  Fred, you can

3           even have a sitting objection.

4                   MR. LONGER:  You're so kind.

5                   MR. FENTON:  I don't -- I

6           just don't want to tire you out.

7           That's all.

8                   MR. LONGER:  Like I said,

9           you are a gentleman.

10                  MR. FENTON:  Standing

11          objection on the record.  Okay.

12   BY MR. FENTON:

13          Q.   The first decision that can

14   only be implemented after the group

15   corporation gives a reply is that the

16   enterprise that has the board of

17   directors selects and appoints or changes

18   its general manager, chief financial

19   officer, or chief accountant, correct?

20          A.   Correct.

21          Q.   Okay.  That doesn't have

22   anything to do with drywall, does it?

23                  MR. LEVIN:  Well --

24                  MR. LONGER:  If -- I -- I

Confidential - Subject to Further Confidentiality Review

Page 106

1              almost have troubles with the

2              standing objection.

3                   MR. LEVIN:  Then stand,

4              Fred.  On that one, you have my

5              permission to stand.

6                   MR. LONGER:  It -- it --

7              it's totally irrelevant --

8                   MR. FENTON:  Let me rephrase

9              the question.  It's a bad

10             question --

11                  MR. LONGER:  -- and it's

12             argumentive.

13                  MR. FENTON:  Fred, you just

14             won.  Let me rephrase it.

15                  MR. LONGER:  Okay.

16                  MR. LEVIN:  Don't encourage

17             me.

18     BY MR. FENTON:

19             Q.   Are you familiar --

20                  MR. JOHNSON:  Don't be

21             discouraged.  It was a perfectly

22             fine question.

23     BY MR. FENTON:

24             Q.   All right.  Are you familiar

Confidential - Subject to Further Confidentiality Review

```
 1   with any point in time between 2006 and

 2   2009 when Taishan went to CNBM for

 3   permission to change its general manager,

 4   chief financial officer, or chief

 5   accountant?

 6          A.    I'm not aware.

 7          Q.    Okay.  Number 2, "Is there

 8   are any decisions on significant

 9   investments and directions of

10   operations?"

11                Are you aware of any point

12   in time when Taishan went to CNBM for

13   permission between 2006 and 2009 on

14   significant investments and directions of

15   operation?

16          A.    I'm not --

17                MR. LONGER:  Objection.

18   BY MR. FENTON:

19          Q.    Are you aware of Taishan at

20   any time going to CNBM for permission

21   about anything regarding its sale of

22   drywall in the U.S. between 2006 and

23   2009?

24          A.    Well, there is the episode
```

Confidential - Subject to Further Confidentiality Review

1    of Chairman Jia visiting the board to

2    inform them of the decision to withdraw

3    from litigation and the board --

4              Q.    Yes, and that was well after

5    the fact.

6                    I'm asking you between 2006

7    and 2009.

8              A.    I'm not aware.

9              Q.    Okay.  Number 3, the

10   enterprise has an investment increase

11   plan, profit income distribution plan, or

12   bond issue.

13                   Are you aware of Taishan

14   going to CNBM with respect to any of

15   those matters between 2006 and 2009?

16             A.    I'm not aware, no.

17             Q.    Number 4, the enterprise

18   provides guarantees to any other

19   entities.

20                   Are you aware of Taishan

21   going to CNBM for permission to provide

22   guarantees to other entities at any time

23   between 2006 and 2009?

24             A.    No, I'm not aware of that.

Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  Five, the

2     enterprise's asset collaterals exceed

3     one-third of its net assets.

4                Are you aware at any time of

5     Taishan going to CNBM with respect to its

6     asset collateral exceeding one-third of

7     its net assets?

8          A.    No.

9          Q.    Okay.  Number 6, the

10    enterprise experiences significant losses

11    in operation or is in liquidation and is

12    being acquired.

13                Are you aware of any point

14    in time between 2006 and 2009 when

15    Taishan advised CNBM that it is

16    experiencing significant losses in

17    operation or is in liquidation and is

18    being acquired?

19          A.    No.

20          Q.    Okay.

21                And let me ask you this

22    question, sir.

23                In point of fact, Taishan

24    has been a quite profitable company

Confidential - Subject to Further Confidentiality Review

1    during the period from 2006 all the way

2    up to the present day, based on what

3    you've seen; isn't that correct?

4          A.    It's my understanding based

5    on what I've seen.

6          Q.    All right.  Do you have any

7    reason to dispute either Mr. Deal's

8    analysis of Taishan's profitability or

9    the analysis of profitability that

10   Professor Gordon set forth relying on

11   Mr. Deal?

12         A.    No, no reasons.

13         Q.    Okay.  Number 7, "The

14   enterprise discards, reports damages of,

15   writes off, or transfers fixed assets,

16   excluding the normal discarding and

17   write-off of fixed assets."

18              Are you aware of Taishan

19   going to CNBM at any point in time

20   between 2006 and 2009 with respect to

21   Item 7?

22         A.    No.

23         Q.    All right.  Mr. Pfaehler has

24   just handed me a note saying I should

Confidential - Subject to Further Confidentiality Review

1    have been asking 2005 to 2009 --

2            A.    Okay.

3            Q.    -- as opposed to 2006.  So

4    if I were to amend my prior questions to

5    cover the period 2009 to -- I'm sorry --

6    2005 to 2009, would that change your

7    answers in any way?

8            A.    It would not.

9            MR. LONGER:  Thank you,

10           Mr. Pfaehler, because I objected

11           earlier about the 2006 time frame.

12           MR. FENTON:  Then I

13           shouldn't have cut you off.

14           MR. LONGER:  Just say I'm

15           right again, and I'll just keep

16           going.

17           MR. FENTON:  You're right.

18           Music to his ears.

19   BY MR. FENTON:

20           Q.    Okay.  Eight, "The

21   enterprises involved in mergers,

22   split-up, dissolution, acquisition, being

23   acquired, or any plans that involve asset

24   changes."

Confidential - Subject to Further Confidentiality Review

Page 112

1                    Are you aware of any point

2     in time where, between 2005 and 2009,

3     Taishan went to CNBM with respect to the

4     items set forth in Paragraph 8?

5              A.    I am not aware, no.

6              Q.    The next paragraph, 9, is,

7     "The enterprise causes losses of

8     state-owned assets or jeopardizes the

9     safety of state-owned assets because it

10    violates laws or makes a significant

11    operational mistake or the enterprise is

12    involved in litigation."

13                   Okay.  Are you aware of any

14    point in time between 2005 and 2009 when

15    Taishan went to CNBM with respect to

16    those issues?

17             A.    Not within that time frame,

18    no.

19             Q.    Right.  But as you did point

20    out earlier, in 2014 Taishan did report

21    to CNBM on the conduct of the U.S.

22    litigation?

23             A.    Correct.

24             Q.    All right.  But you're well

Confidential - Subject to Further Confidentiality Review

Page 113

1    aware that the actual sales and

2    installation of the drywall had occurred

3    years earlier, correct?

4         A.    Yes.

5         Q.    Okay.   Number 10 is, "Any

6    other matters that may affect the capital

7    contributor's rights and interests."

8              Are you aware of Taishan at

9    any time going to CNBM with respect to

10   Item 10 between 2005 and 2009?

11        A.    I am not.

12        Q.    All right.   So have we now

13   covered all of the items in these

14   articles that require consent by the CNBM

15   group as to its subsidiaries?

16        A.    We have.

17        Q.    Okay.   And that's what you

18   were referring to in your earlier

19   testimony?

20        A.    That's correct.

21        Q.    Correct.   Now, wouldn't you

22   expect a U.S. subsidiary to report to its

23   wholly owned parent on these same types

24   of things?

Confidential - Subject to Further Confidentiality Review

Page 114

1            A.    I would not.  I would not

2     expect to see it in this type of

3     contractual form, which is a form that's

4     used by all SOE business groups under

5     SASAC supervision.

6            Q.    That was not my question.

7            MR. FENTON:  Please read

8         back my question.

9            (Whereupon, the court

10        reporter read back the requested

11        portion of the record.)

12    BY MR. FENTON:

13           Q.    Let me rephrase the

14    question.

15           Wouldn't you expect a wholly

16    owned U.S. subsidiary to report to its

17    parent, in the ordinary course, on

18    exactly these same types of things,

19    Items 1 through 10?

20           MR. LONGER:  It's -- object.

21        It's been asked and answered.

22        Go ahead, please.

23           THE WITNESS:  Well, I think

24        what's different here from the way

Confidential - Subject to Further Confidentiality Review

```
 1          you phrased your question is that
 2          Taishan is many tiers below the
 3          parent company.  So it does seem a
 4          bit extraordinary that a third- or
 5          fourth-tier subsidiary would be
 6          reporting to the ultimate parent.
 7   BY MR. FENTON:
 8          Q.   All right.  Well, in -- is
 9   there anything unusual about the
10   subsidiary reporting through the
11   subsidiaries?
12              In other words, let's say
13   you have a third- or fourth-tier
14   subsidiary, and the fourth-tier
15   subsidiary decides, "Gee, I want to do a
16   merger tomorrow."
17              Okay.  It would report to
18   the subsidiary above, which would report
19   to the subsidiary above, which would
20   report to the ultimate parent, right?
21              MR. LONGER:  And we're
22          talking about United States
23          corporations?
24              MR. FENTON:  In the U.S.,
```

Confidential - Subject to Further Confidentiality Review

Page 116

```
 1          wouldn't you expect that?

 2                  MR. LONGER:  Still a vague

 3          question.

 4                  Go ahead and answer.

 5                  Objection.

 6                  THE WITNESS:  I would expect

 7          formal corporate action in the

 8          tiers above that subsidiary.

 9  BY MR. FENTON:

10          Q.   Sir, I'm not talking about

11  formal corporate action.  I'm talking

12  about reporting.

13                  MR. LONGER:  I don't

14          understand the question.  If you

15          do...

16  BY MR. FENTON:

17          Q.   Let me put it this way, sir.

18                  Okay.  Let's say I am a

19  fourth-tier subsidiary of Disney.  Okay?

20                  And I've got a couple of

21  Disney officers sitting on my board.  And

22  in this fourth-tier subsidiary, we decide

23  that we want to sell all or substantially

24  all of our assets.
```

Confidential - Subject to Further Confidentiality Review

Page 117

1               Wouldn't you expect that

2     that would get reported in some way to

3     the ultimate parent at Disney holdings?

4               MR. LONGER:  Objection.

5          Hypothetical.

6               THE WITNESS:  I mean, would

7          it be reported in some way?

8     BY MR. FENTON:

9          Q.    Yes.

10         A.    Well, it's hard to say no to

11    that.

12         Q.    Okay.  Whether it's reported

13    up the corporate chain or whether the CEO

14    of the subsidiary picks up the phone and

15    calls the chairman of Disney and says,

16    "This is what we want to do," it would

17    get reported, right?

18              MR. LONGER:  Objection.

19         Incomplete hypothetical.

20              But answer the question if

21         you can.

22              THE WITNESS:  Well, I think

23         I already answered it.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  That would apply

2     to all ten of these types of transactions

3     or events that are listed in Article 15

4     of Exhibit 2; isn't that right?

5          A.    Subject to what I said

6     earlier, which is I think it would be

7     very unusual to see it formalized in this

8     sort of a document, skipping over many

9     tiers of intervening subsidiaries.

10          Q.    Well, does it say anything

11     about skipping?  It simply says has to

12     give a written report to the group

13     corporation beforehand.

14          A.    The decision can only be

15     implemented after the group corporation

16     gives a reply.

17          Q.    Right.  So maybe they do it

18     a little differently in China.  Does that

19     mean it's wrong?

20                MR. LONGER:  Objection to

21          the form.

22                THE WITNESS:  I'm not here

23          to say anything is right or wrong.

24          I'm here to describe how the

Confidential - Subject to Further Confidentiality Review

Page 119

1          system operates.

2     BY MR. FENTON:

3          Q.    Well, are you aware of any

4     case that says that if somebody reports

5     these kinds of events directly to the

6     parent corporation as opposed to going

7     through three different levels of

8     executives between the parent and the

9     subsidiary, that that in and of itself is

10    a basis for piercing the corporate veil?

11         A.    No.

12         Q.    Now, you've made some

13    references to the record in this case.

14    And I -- and I simply want to understand.

15    When you are talking about the record in

16    this case, you're talking about the

17    record that has been made available to

18    you, correct?

19         A.    That's correct.

20         Q.    That has all come to you

21    through the PSC, right?

22         A.    That's correct.

23         Q.    I haven't sent you anything?

24         A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 120

1          Q.     Okay.  Mr. Venderbush hasn't

2     sent you anything?

3          A.     Correct.

4          Q.     Mr. Johnson hasn't sent you

5     anything?

6          A.     Correct.

7          Q.     It's all come to you from

8     the PSC.  That is the source of your

9     knowledge and the source of your record,

10    correct?

11         A.     Well, when you say the

12    source of my knowledge, I mean, I have

13    knowledge --

14         Q.     About the facts.

15         A.     Correct.

16         Q.     Okay.  And all of what the

17    PSC provided to you is listed on your

18    report, as you testified to earlier

19    today?

20         A.     That's correct.

21         Q.     All right.  And that's what

22    you're talking about when you talk about

23    the record?

24         A.     That's correct.

Confidential - Subject to Further Confidentiality Review

Page 121

1          Q.    Okay.  Now, by the -- when

2     it comes to mergers and acquisitions and

3     this reporting business, okay, you

4     understand that SASAC has some say in

5     whether certain mergers and acquisitions

6     can be done?  Is that your understanding?

7          A.    Yes.

8                MR. LONGER:  Objection.

9     BY MR. FENTON:

10         Q.    Did you ever hear of a piece

11    of legislation in the United States

12    called Hart-Scott-Rodino?

13         A.    Yes, I have.

14         Q.    Okay.  What is

15    Hart-Scott-Rodino?

16         A.    It regulates certain aspects

17    of merger activity.

18         Q.    All right.  And private

19    companies that hold a certain amount of

20    market share are required to report to

21    the U.S. government before completing any

22    kind of a transaction that might create

23    antitrust issues; isn't that right?

24         A.    My general understanding of

Confidential - Subject to Further Confidentiality Review

1    how the statute operates.

2         Q.    In order to give the

3    government the opportunity to try and

4    block the transaction; isn't that right?

5         A.    Yes.

6         Q.    All right.  So things aren't

7    all that different in various parts of

8    the world, are they?

9              MR. LONGER:  Objection to

10             the form.  You may say that.  It's

11             argumentive.

12   BY MR. FENTON:

13        Q.    Can you answer that?

14        A.    Well, was that a question?

15        Q.    Yes.

16        A.    Things aren't all that

17   different in the United States and China?

18   I would have to disagree.

19        Q.    Okay.  You're right.  We

20   don't have the Forbidden City.

21             All right.  Let's move along

22   with your report here.

23             MR. LONGER:  A lot more

24             different than that.  But go

Confidential - Subject to Further Confidentiality Review

 1          ahead.

 2                  They have Chicago.

 3     BY MR. FENTON:

 4          Q.    As a matter of fact, sir, I

 5     got a little bit ahead of myself.  But

 6     what I was referring to was in

 7     Paragraph 28.  And I believe you're

 8     talking about the SOE asset law in China.

 9          A.    Correct.

10          Q.    Okay.  It says, "Article 34

11     requires that SASAC obtain government

12     approval before exercising its rights as

13     a shareholder with respect to the merger,

14     splitting, dissolution, or petition for

15     bankruptcy of an important SOE under its

16     supervision."

17          A.    Correct.

18          Q.    Correct?

19                  And it was in that context

20     that I was raising Hart-Scott-Rodino with

21     respect to mergers and acquisitions.

22     With respect to bankruptcies of important

23     companies, hasn't the U.S. government

24     come to the rescue of certain companies

Confidential - Subject to Further Confidentiality Review

Page 124

1    that were deemed too big to fail?

2          A.    When you say "come to the

3    rescue of," I mean, that's a broad term.

4          Q.    Well, let's start with AIG.

5          A.    No, I'm -- I'm familiar with

6    what you're saying.  I'm just -- "come to

7    the rescue of" is kind of a broad

8    characterization.  You know, it was

9    injected with capital --

10         Q.    Would you prefer "bailout"?

11               MR. LONGER:  I'm going to

12         object to the form.  If -- if

13         that's a question, I object to the

14         form.

15   BY MR. FENTON:

16         Q.    Okay.  So, in other words,

17   the U.S. government has stepped in, in

18   one form or another, from time to time to

19   avoid the bankruptcy of major companies

20   where it was felt that it would have a --

21   a deleterious impact on the interests of

22   the country or the overall economy,

23   correct?

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 125

1          Q.     Okay.

2                 (Discussion held off the

3          record.)

4     BY MR. FENTON:

5          Q.     Now, let's talk a little bit

6     about this parallel structure.

7          A.     Yes.

8          Q.     The -- if I understand what

9     you're saying is that if one is to make a

10    proper determination regarding what

11    you've termed "single business entity

12    analysis," one needs to understand the

13    parallel influence of both SASAC and the

14    Communist Party, correct?

15         A.     That's correct.

16         Q.     All right.  And we've talked

17    a little bit about SASAC.  Let's talk

18    about now about the Communist Party.

19                Who in the Chinese Communist

20    Party directed the actions of Taishan

21    between 2005 and 2009?  And when I say

22    "who," I would like you to name for me

23    the individual or individuals who played

24    that role.

Confidential - Subject to Further Confidentiality Review

Page 126

```
 1          A.    I could name the
 2   organization within SASAC responsible for
 3   the appointment of Chairman Song.
 4          Q.    Mm-hmm.
 5          A.    And -- but I cannot name a
 6   specific individual.
 7          Q.    I'm asking about the Chinese
 8   Communist Party, not SASAC.
 9                Who are the party
10   apparatchiks?
11          A.    Well, the -- the party also
12   exists within SASAC.
13          Q.    And the party is an integral
14   part of the political system in China;
15   isn't that right?
16          A.    Correct.
17          Q.    Okay.  And so there -- there
18   is an interrelationship under the Chinese
19   form of government between SASAC and the
20   Communist Party?
21          A.    Correct.
22          Q.    So are you saying that --
23   that the Chinese Communist Party
24   exercises its influence through SASAC?
```

Confidential - Subject to Further Confidentiality Review

Page 127

1          A.     In part.

2          Q.     Okay.  And what's the other

3     part?

4          A.     Its control of the entire

5     governmental apparatus.

6          Q.     Okay.  And how has the

7     Chinese Communist Party exercised control

8     of the entire governmental apparatus to

9     force Taishan to sell drywall in the U.S.

10    between 2005 and 2009?

11         A.     Well, every corporate entity

12    in China, particularly the SOEs, must

13    have a Communist Party committee internal

14    to the firm.  That's -- that's right in

15    the company law, and that's right in CNBM

16    Group's corporate charter.

17               It says, "The firm must

18    establish an organization of the party to

19    carry out its political" -- "its

20    political work with respect to the major

21    business decisions of the corporation."

22               And you will find such a

23    provision in every corporate entity in

24    China.

Confidential - Subject to Further Confidentiality Review

1                 That's the mechanism through

2      which the party exercises its influence

3      over corporations.

4            Q.    All right.  So are you

5      saying there's a -- there's a political

6      committee within Taishan?

7            A.    Yes.

8            Q.    Okay.  Who is on that

9      committee?

10           A.    I -- I don't know, because

11     the -- the bios of the individuals is not

12     typically listed.  With respect to CNBM

13     G, the party affiliations are listed.

14     But for public companies, where they need

15     to report this information, you also --

16     you get the corporate position and the

17     party position.

18           Q.    All right.  What -- what

19     evidence have you seen that this

20     Communist Party committee at Taishan

21     directed Taishan to sell drywall in the

22     U.S. between 2005 and 2009?  Can you

23     point me to a document that evidences

24     that?

Confidential - Subject to Further Confidentiality Review

Page 129

1         A.    Well, I can point you to a

2    document in which the party committee of

3    Taishan says, in the first line, and I'm

4    quoting verbatim, "We are owned by the

5    party committee of CNBM G."  That to me

6    is suggestive of party -- extensive party

7    influence down through this corporate

8    hierarchy.

9         Q.    Fine.  Then let's talk about

10   the Communist Party committee at CNBM G.

11   What did the Communist Party committee at

12   CNBMG do to direct Taishan to sell

13   drywall in the United States between 2005

14   and 2009?

15        A.    Well, I think the party's

16   supervisory function, its appointment and

17   removal power, its maintaining of

18   personnel files on all key executives, is

19   a -- is a significant form of influence.

20   I -- I cannot point you to a specific

21   directive of the Communist Party, but I

22   would not expect to see that.  Indeed, I

23   would be very surprised to see such a

24   directive in corporate documentation.

Confidential - Subject to Further Confidentiality Review

Page 130

1          Q.    So what -- are you telling
2    me that everything that Taishan does is
3    in one way or another directed by the
4    Communist Party?
5          A.    No.  I'm talking about
6    capacity to control.  I'm talking about
7    capacity to control.
8          Q.    All right.  And my question
9    has to do with exercise of control.  What
10   did C -- the Communist Party committee at
11   CNBMG do in the exercise of control to
12   force Taishan to sell drywall in the U.S.
13   between 2005 and 2009?
14         A.    I -- I did not see
15   documentation that would allow me to
16   answer that.
17         Q.    And would the same be true
18   if I asked you about BNBMG?
19         A.    Yes.
20         Q.    And would the same be true
21   if I asked you about BNBM PLC?
22         A.    Yes.
23         Q.    And would the same be true
24   if I asked you about Taishan's own

Confidential - Subject to Further Confidentiality Review

Page 131

1    Communist Party committee?

2          A.    Well, again, I did refer you

3    to a document which discusses the -- the

4    party.

5          Q.    Mm-hmm.

6          A.    And it's apparent, at least

7    in its view, its ownership of Taishan by

8    the Communist Party of CNBM Group.  I

9    think that's evocative.  I mean, it -- it

10   raises questions in my mind.

11          But, no, I -- I cannot point

12   you to a specific document.

13          Q.    Well, we know Taishan

14   ultimately is -- is owned by the CNBM

15   Group, right?

16          A.    Well, I think the phrasing

17   was interesting.  The specific language

18   is, "We are owned by the Communist Party

19   committee of CNBM G."

20          Q.    Okay.  And what -- what

21   you're saying is you have no evidence

22   that you can point to right now that the

23   Communist Party committee of CNBMG

24   exercised its ownership or control, if

Confidential - Subject to Further Confidentiality Review

1    that's what one calls it, to force

2    Taishan to make drywall sales in the U.S.

3    between 2005 and 2009?

4         A.    I saw no documentation to

5    that effect.

6         Q.    Okay.  What is the document

7    that you were referring to, the one that

8    you said --

9         A.    Yes.  If you'd just bear

10   with me for one minute.  It is

11   Footnote 21, "Present the People," et

12   cetera.

13        Q.    Okay.  Why don't we pull

14   that document and take a look at Tab 12.

15             (Document marked for

16             identification as Exhibit

17             Milhaupt-3.)

18   BY MR. FENTON:

19        Q.    Now, this is a document --

20   it -- it's -- again, it's a partial

21   translation.  Did you ever read the full

22   translation?

23        A.    I did not.

24        Q.    Okay.  And we've marked this

Confidential - Subject to Further Confidentiality Review

Page 133

1    as Exhibit 3, is it?

2            A.    Correct.

3            Q.    Okay.  And Exhibit 3 is

4    entitled "Present the People, the Object,

5    and the Mindset, Integrate Strictness

6    With Reliability and Change the Work

7    Style."

8                  And then there is a

9    subheading "Main measures taken by the

10   leadership team of Taishan Gypsum at the

11   special Democratic life meeting," right?

12           A.    Correct.

13           Q.    Okay.  When was this meeting

14   held?

15           A.    I see a reference to June.

16   I do not see a date.

17           Q.    Can you tell me whether this

18   meeting was held before or after 2009?

19           A.    If you would just bear with

20   me one more time.

21           Q.    Take your time, Professor.

22           A.    Well, I -- I assume that it

23   was relatively recently, because there's

24   a reference to the four forms of

Confidential - Subject to Further Confidentiality Review

Page 134

1    decadence on the next page, which is a

2    political campaign or slogan of President

3    Xi Jinping, who came to power in 2012.

4              So I would -- I would assume

5    that document is prepared after that --

6    that time period.

7         Q.    Okay.  So this is a document

8    that would have been generated post 2012,

9    in your view, based on the -- the

10   campaign slogan of -- of China's

11   president?

12        A.    That would be my assumption,

13   yes.

14        Q.    All right.  And it's the

15   four -- I'm sorry.

16        A.    Four forms of decadence.

17        Q.    Four forms of decadence.

18   You're familiar with them all?

19        A.    Please don't ask me to

20   recite them, although I think I do know

21   them.

22        Q.    Well, let me see if I can

23   refresh your -- let me see if I can

24   refresh your recollection.

Confidential - Subject to Further Confidentiality Review

Page 135

 1                    Are the four forms of -- of

 2     decadence, formalism, bureaucratism,

 3     hedonism, and extravagance?

 4          A.    That's my -- that's my

 5     understanding.

 6                    MR. LEVIN:  I'm glad you

 7          didn't ask me that question.

 8     BY MR. FENTON:

 9          Q.    All right.  Now, what does

10     this document have to do with Taishan

11     operations, other than telling people not

12     to be decadent?

13          A.    Well, it says that various

14     supervision teams, including the party's

15     supervision team --

16          Q.    Mm-hmm.

17          A.    -- from SASAC, from CNBM G,

18     went into Taishan to, as I read the

19     document, to discuss problems going on in

20     that -- in that company.

21          Q.    Okay.  Wouldn't you expect

22     in the United States, if a parent

23     corporation was having problems with a

24     particular subsidiary, whether direct or

Confidential - Subject to Further Confidentiality Review

Page 136

1    indirect, that they might send in a team

2    of people to deal with it?

3              MR. LONGER:  Objection to

4         the form.  It's assuming facts

5         that are not in evidence.  It's

6         actually an incomplete

7         hypothetical.  It would be more

8         appropriate to say, "Is the

9         Republican Party doing that?"

10             MR. FENTON:  Fred, let me --

11        there's four words:  Object to the

12        form.

13             If you would stick to that,

14        I'd appreciate it.

15             MR. LONGER:  I've been doing

16        a pretty good job with that.  This

17        one just seemed over the top, so I

18        just went with it.  You'll have to

19        forgive me on that.

20             MR. FENTON:  I'm a very

21        forgiving guy.

22             MR. LONGER:  You look like

23        it.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 137

```
 1          Q.    Please answer my question,
 2   Professor.  And if you don't remember it,
 3   I'll forgive that too, and read it back.
 4              THE WITNESS:  I actually
 5         would appreciate it if you'd read
 6         it back.
 7              (Whereupon, the court
 8         reporter read back the requested
 9         portion of the record.)
10              THE WITNESS:  Well --
11              MR. LONGER:  Please note my
12         objection to the form.
13              THE WITNESS:  I would not --
14         well, first of all, I would not
15         see a party committee in any
16         corporation of the United States.
17         I would simply not see Republican
18         or --
19   BY MR. FENTON:
20          Q.    Really?  Have you looked at
21   the Koch brothers' operation lately?
22          A.    I don't think there's a
23   Republican committee specified in its
24   charter.  I don't think that it coexists
```

Confidential - Subject to Further Confidentiality Review

1   with the Sarbanes-Oxley reporting

2   requirements.  So I don't see it as part

3   of the internal control structure.

4        Q.    We don't have a Chinese

5   Communist Party here in the United

6   States.  My question was, if a U.S.

7   conglomerate determined that there were

8   problems at a subsidiary company, even

9   two or three levels down, that the parent

10  might want to send in a team to deal with

11  those problems, whatever they may be.

12            MR. LONGER:  Objection.

13       Vague.

14  BY MR. FENTON:

15       Q.    Let me ask you this

16  question, sir.

17       A.    Well --

18       Q.    Go ahead and answer.

19       A.    No.

20       Q.    I didn't mean to cut you

21  off.

22       A.    That's fine.

23       Q.    Let me ask you this

24  question:  Isn't it common in U.S.

Confidential - Subject to Further Confidentiality Review

Page 139

1    corporations for conglomerates, and

2    non-conglomerates, for that matter, to

3    require all of their subsidiary operating

4    companies to have some form of mandatory

5    sexual harassment training?

6            A.    I don't have a basis to

7    answer that.  I'm not familiar with such

8    a requirement.  I'm not saying it doesn't

9    exist.  I'm just not -- I don't have a

10   basis --

11           Q.    You're not familiar with

12   mandatory sexual harassment training?

13           A.    Well, yes, I am.  But I

14   don't know precisely where such a

15   requirement -- where in the law it comes

16   from.  That's what I'm saying.

17           Q.    I'm not talking about the

18   law.  I'm talking about as a matter of

19   corporate policy, isn't it true that

20   major corporations in the United States

21   require mandatory sexual harassment

22   training for the entire corporate

23   organization?

24                   MR. LONGER:  I think that's

Confidential - Subject to Further Confidentiality Review

Page 140

```
 1            a different question.  I object to

 2            the form.

 3                  Go ahead and answer.

 4                  THE WITNESS:  Are you asking

 5            me whether every corporation has a

 6            mandatory policy for every

 7            employee?

 8  BY MR. FENTON:

 9            Q.    I'm not asking --

10            A.    I just don't have a basis

11  for answering that.

12            Q.    -- whether every

13  corporation --

14                  MR. LONGER:  He's saying

15            major corporations.

16  BY MR. FENTON:

17            Q.    I am asking you whether it

18  is common in the United States for major

19  corporations, major corporate

20  conglomerates, to require all of their

21  employees, including employees of

22  subsidiaries, to undergo mandatory sexual

23  harassment training.

24            A.    It's probably common.
```

Confidential - Subject to Further Confidentiality Review

Page 141

1          Q.    Okay.  I bet you even have

2    it at Columbia, don't you?

3          A.    We sure do.

4          Q.    Okay.  And the same goes for

5    diversity training; isn't that right?

6          A.    Whether this is -- I can't

7    say that it's mandatory.  I mean, I just

8    don't have a basis for saying that it's

9    mandatory in every major corporation.

10          Q.    And that wasn't my question,

11    sir.  What I'm saying is it's not

12    uncommon in the U.S.

13          A.    It's not uncommon.

14          Q.    And that is to deal with

15    behavior patterns that may be detrimental

16    to the workplace, correct?

17          A.    Correct.

18          Q.    Such as hedonism or

19    extravagance, right?

20                MR. LONGER:  Object to the

21          form.

22                THE WITNESS:  I think it

23          would be unusual for major

24          corporations in the United States

Confidential - Subject to Further Confidentiality Review

Page 142

```
 1          to be promulgating President

 2          Obama's latest -- whatever topic

 3          he's picked up on and to be having

 4          a government owner and major party

 5          committees in upper-tiered

 6          subsidiaries going down into the

 7          lower-tiered subsidiaries to talk

 8          about President Obama's latest

 9          slogan on whatever he's interested

10          in.  Yes, I would find that

11          extremely unusual.

12   BY MR. FENTON:

13          Q.    Well, but is it unusual in

14   response to major decisions of courts in

15   the U.S. to deal with that by way of

16   things like sexual harassment training,

17   diversity training?

18          A.    I'm not sure I followed the

19   question.

20          Q.    Well, you raised the issue

21   of President Obama.  But you understand

22   that we have other political bodies

23   besides the president of the United

24   States.
```

Confidential - Subject to Further Confidentiality Review

Page 143

```
 1              A.      I do.
 2              Q.      We have the Congress.   Okay.
 3       We have the Supreme Court.
 4              A.      Yes.   We have the Supreme
 5       Court.
 6              Q.      Okay.   And we have the
 7       Congress, right?
 8              A.      Yes.
 9              Q.      And the legitimate corporate
10       response to court decisions dealing with
11       sexual harassment in the workplace would
12       be for a corporate parent to require
13       sexual harassment training all the way up
14       and down the corporate ladder, correct?
15              A.      Correct.
16                     MR. LONGER:   Objection to
17              the form.
18                     THE WITNESS:   Correct.
19       BY MR. FENTON:
20              Q.      Okay.   Now, would you please
21       tell me where in this document that's
22       been marked as Exhibit 3 there is
23       evidence of this committee telling
24       Taishan how much it has to produce or who
```

Confidential - Subject to Further Confidentiality Review

Page 144

1    it can sell to or how its operations are

2    to be conducted?  Is there anything in

3    this document that relates to that?

4          A.    Well, as to the last thing,

5    how its operations should be conducted,

6    it says that -- you see I'm reading from

7    the second page, "SASAC's third circuit

8    supervision teams, CNBM Group, BNBM, et

9    cetera, provided three-tier supervision,

10   insisting on maintaining strictness and

11   reliability, strength and coordination,

12   communication of the work, cooperated

13   exercise joint forces of supervision,

14   passed on the pressure when

15   appropriate" -- whatever that means

16   exactly -- "and provided targeted and

17   effective guidance and assistance for

18   Taishan Gypsum to fully understand the

19   spirits of the central government to good

20   control of the key points and to

21   straighten out the ideas of the

22   activities."

23              That sounds to me like

24   intervention in the operations of

Confidential - Subject to Further Confidentiality Review

Page 145

1    Taishan.

2         Q.    All right.  And what

3    operations were they intervening in?

4         A.    I wasn't there.  I don't

5    know.

6         Q.    And what operational

7    decisions did they make?

8         A.    It's not apparent from the

9    document.

10         Q.    What operational decisions

11    did they force the managers of Taishan to

12    make?

13         A.    It's not apparent from the

14    document.

15         Q.    In the exercise of avoiding

16    hedonism, formalism, bureaucratism, or

17    extravagance?

18         A.    Well, I see the latter as

19    being somewhat connected of what went

20    before, which goes to operations.  This

21    strikes me as kind of a political add-on.

22         Q.    Okay.  And when you say it's

23    a political add-on, they're dealing with

24    forms of behavior in the workplace that

Confidential - Subject to Further Confidentiality Review

1    the party or SASAC or whoever deems

2    detrimental, right?

3            A.    Correct.

4            Q.    Okay.  Just the way in the

5    U.S., sexual harassment would be

6    detrimental, or racial or ethnic

7    discrimination would be detrimental,

8    correct?

9            A.    Well, when you say "just the

10   way that," I think -- I mean, again, I'm

11   not trying to quibble.  But when you say

12   "just the way that," I would have to say

13   no.

14           Q.    Fine.  Let me rephrase the

15   question.

16                 Okay.  They are dealing with

17   forms of behavior in the workplace in

18   this document, Exhibit 3, that are deemed

19   detrimental?

20           A.    Correct.

21           Q.    Okay.  There's nothing

22   specific in here about their operation,

23   how much they produce, where they buy

24   their product, where they sell their

Confidential - Subject to Further Confidentiality Review

Page 147

1   product, nothing of that nature in this

2   document, right?

3        A.    That's correct.

4        Q.    Okay.  And U.S. companies,

5   conglomerates up and down the corporate

6   chain may also try to influence workplace

7   behavior through things like sexual

8   harassment training and diversity

9   training, correct?

10       A.    Correct.

11            MR. FENTON:  Okay.  And with

12       that, let's take a break.

13            THE VIDEOGRAPHER:  The time

14       is 11:17 a.m. on February 3rd,

15       2016.  And this completes DVD

16       Number 1.

17            (Short break.)

18            THE VIDEOGRAPHER:  The time

19       is 11:36 a.m. on February 3rd,

20       2016.  And this is DVD Number 2.

21   BY MR. FENTON:

22       Q.    All right.  Professor, I

23   remind you, you're still under oath.

24            We talked about Exhibits 2

Confidential - Subject to Further Confidentiality Review

Page 148

1    and 3.  Are there any other documents

2    that you're aware of in the record that

3    you reviewed which you would consider to

4    be showing the evidence of exercise of

5    control over Taishan by either the BNBM

6    companies, the CNBM companies, or SASAC?

7            A.    Well, there were -- I mean

8    the deposition of Ms. Hu, which is

9    referred to in my Footnote 10, talking

10   about what I took to be quite a

11   hierarchical governance structure,

12   supervisory structure by the upstream

13   entities over downstream entities.  She

14   refers to her auditing activities as a --

15   as a cascade form of management.

16            So that suggested potential

17   and some exercise, actually, of control.

18            Q.    Well, you understand that

19   under Chinese law, the various members of

20   the CNBM corporate group are required to

21   file consolidated financial statements?

22            A.    Yeah, that's right.

23            Q.    Just as in the U.S.,

24   corporate conglomerates file consolidated

Confidential - Subject to Further Confidentiality Review

Page 149

1    financial statements?

2              A.    Yes.

3              Q.    Did you see anything in this

4    deposition of Hu Jinyu that indicated to

5    you any commingling of assets among the

6    various companies that make up the CNBM

7    Group?

8              A.    No.

9              Q.    Did you see anything in the

10   testimony of Hu Jinyu that suggested to

11   you that different members of the CNBM

12   Group were financing the operations of

13   other members?

14             A.    Were financing the

15   operations of other members?

16             Q.    Yes.  Giving them money,

17   supporting them?

18             A.    No.

19             Q.    Okay.  Did you see any

20   evidence in this deposition of Hu Jinyu

21   that suggested that upper-tier companies

22   were looting the assets of lower-tier

23   companies within the CNBM corporate

24   group?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     No.

 2          Q.     How about vice versa?

 3          A.     No.

 4          Q.     Okay.  All right.  Any other

 5   evidence that you can point to in the

 6   record that you reviewed that you say

 7   demonstrates the exercise of control over

 8   Taishan by any member of the CNBM

 9   corporate group?

10          A.     There was a deposition of

11   Mr. Zhou, I believe, Z-H-O-U, who I

12   believe serves as the secretary to the

13   board of BNBMG.  I think he may also be

14   the deputy general manager.

15                And when he was asked about

16   his job responsibilities, he included,

17   quote/unquote, party activities.  When he

18   was asked what does that mean, he said

19   disciplining party members.

20                So again, I think it points

21   out the -- this parallel control

22   structure of the party which is embedded

23   in the corporate structures, which

24   exercises monitoring and potential
```

Confidential - Subject to Further Confidentiality Review

1    disciplining over members of the party.

2           Q.    Okay.   What to -- what does

3    that mean, discipline?   Discipline can

4    take many forms.

5           A.    Yes.

6           Q.    Okay.   It can mean, you

7    know, a pay cut, right?

8           A.    Yes.

9           Q.    It can mean not getting a

10   raise, right?

11          A.    Correct.

12          Q.    These are all forms of

13   discipline in the corporate structure?

14          A.    Yes.

15          Q.    Okay.   We have those forms

16   of discipline in U.S. corporate

17   structures.   Somebody may not get a bonus

18   one year because the boss didn't like the

19   way they were behaving, right?

20               MR. LONGER:   Are you

21          limiting your definition of

22          discipline to just that?

23               MR. FENTON:   No.   But I'm

24          giving those by way of examples.

Confidential - Subject to Further Confidentiality Review

Page 152

1              MR. LONGER:  All right.  So

2         I object to the scope and the

3         question.

4              Please answer.

5              THE WITNESS:  Let me answer

6         at two levels.  So one, I mean,

7         this is -- again, this is a --

8         this is a political party

9         monitoring and supervisory

10         structure, to which there is

11         absolutely no counterpart in a

12         U.S. corporation.

13    BY MR. FENTON:

14         Q.    Okay.

15         A.    Secondly, SASAC, which also

16    has a party committee internal to it, has

17    appointment, removal, remuneration, and

18    supervisory power with respect to all of

19    the downstream companies under its

20    supervision.

21              That's an extraordinary

22    power.

23         Q.    Yes.  Okay.  Can you tell me

24    any instance where this disciplining

Confidential - Subject to Further Confidentiality Review

Page 153

1    party members power was exercised in

2    order to force Taishan to sell drywall

3    into the U.S. between 2005 and 2009?

4         A.    Well, you know, again, my

5    role is to provide context on the Chinese

6    system.  And people respond to

7    incentives.

8              And so if you have this

9    party committee structure and you have

10   SASAC with this quite extraordinary power

11   of appointment, removal, remuneration,

12   supervision, I think people would respond

13   accordingly.

14             So I think it would shape

15   behavior in these -- in these corporate

16   groups.

17        Q.    All right.  Please tell me

18   specifically the actions taken by the

19   Chinese Communist Party that influenced

20   Taishan to sell drywall in the U.S.

21   between 2005 and 2009.

22        A.    Well, I think there would be

23   government approvals required for major

24   overseas investments or trade.

Confidential - Subject to Further Confidentiality Review

1          Q.    Are you aware of any

2    government approvals that Taishan was

3    required to obtain before selling drywall

4    into the U.S. between 2005 and 2009?

5          A.    I'm not specifically aware.

6          Q.    Are you generally aware?

7          A.    I'm generally aware that

8    Chinese corporations face many

9    bureaucratic hoops in investing and

10   operating overseas.

11         Q.    Okay.  But you're not aware

12   of any requirement that Taishan would

13   have needed government approval or party

14   approval, for that matter, to sell

15   drywall into the U.S. between 2005 and

16   2009?

17         A.    Well, I mean, again, I have

18   to say something about Chinese context

19   here within -- we're talking about a

20   state-owned enterprise, a very large

21   state-owned enterprise, which is

22   considered to be a, quote/unquote, pillar

23   industry by the Chinese party state.

24              Okay.  A pillar industry.

Confidential - Subject to Further Confidentiality Review

1      That means that they care a lot about the

2      construction industry and the materials

3      industry.

4                    I would assume that the

5      activities of important players in this

6      group are monitored and supervised quite

7      closely, actually, by government and

8      party officials.

9           Q.    You would assume?

10          A.    Knowing -- based on my

11     experience and my research on how SOEs

12     operate and their connections to the

13     Chinese government.

14          Q.    All right.  Who are the

15     Chinese party officials who monitor or

16     who monitored the activities of Taishan

17     between 2005 and 2009?  Name them for me.

18                    MR. LONGER:  That may have

19               been already asked and, I believe,

20               answered.  And I may be mistaken.

21               But I think it was directly asked

22               and answered.

23                    If you want him to repeat

24               his testimony, he can.  If he

Confidential - Subject to Further Confidentiality Review

 1          wants to answer it differently.

 2    BY MR. FENTON:

 3          Q.    And if it was not

 4    answered -- if it was asked and answered

 5    before, Professor, I apologize.  Please

 6    answer it.

 7          A.    I do not have the name of a

 8    specific individual or individuals.

 9          Q.    All right.  And I believe I

10    did ask you before:  You also don't have

11    any document showing a directive to

12    Taishan from the Communist Party to sell

13    drywall into the U.S. between 2005 and

14    2009?

15          A.    No, but there are references

16    in the -- in the documents to so-called

17    red letterhead documents which

18    Chairman Song laments having to circulate

19    downward to group member companies.  And

20    by red letterhead documents, I assume he

21    means directives from the party.

22          Q.    Well, that's fine.  Show me

23    a red letterhead document that has

24    anything to do with sales of Chinese

Confidential - Subject to Further Confidentiality Review

Page 157

1    drywall into the United States between

2    2005 and 2009.

3         A.    I haven't seen any.  I

4    wouldn't expect to find those in the --

5    in the record.

6         Q.    So why did you bring them

7    up?

8              MR. LONGER:  Objection to

9         the form.  It's argumentive.

10             THE WITNESS:  You're

11        asking --

12             MR. LONGER:  You were asking

13        him --

14   BY MR. FENTON:

15        Q.    What in the world -- what in

16   the world does that have to do --

17        A.    You asked about --

18        Q.    -- with the sales of drywall

19   in the United States?

20        A.    You asked about government

21   or party approvals for the activities of

22   Taishan.

23        Q.    Yes --

24        A.    And I said that --

Confidential - Subject to Further Confidentiality Review

1          Q.     -- with respect to sales of

2     drywall in the United States between 2005

3     and 2009.

4          A.     Was that a question?

5          Q.     Yes.

6                 You're not aware of any such

7     documents, are you?

8          A.     Correct.

9          Q.     Are you aware of any party

10    positions or favors that were handed out

11    to members of Taishan's management as a

12    result of drywall sales in the United

13    States between 2005 and 2009?

14         A.     I mean, again, I -- I really

15    have to go back to my answer, which is,

16    you know, we are talking about incentive

17    structures here.  So I can't -- no, I

18    cannot point to a specific.  But it

19    stands to reason that this environment

20    would have influenced managerial

21    behavior.  I mean, people are the same in

22    China as they are here.  They respond to

23    their incentive structure.

24         Q.     Right.  And we have

Confidential - Subject to Further Confidentiality Review

Page 159

```
 1   incentive structures in the U.S., don't

 2   we?

 3          A.    But they're not linked to a

 4   political party.

 5          Q.    No.  But they can be linked

 6   to government organizations, can't they?

 7          A.    But I'm talking --

 8          Q.    They can be linked to acts

 9   of Congress, can't they?

10          A.    But I'm talking about

11   internal to the firm.

12          Q.    They can be linked to acts

13   of Congress, can they not?

14          A.    The only remuneration that I

15   can think of linked to an act of Congress

16   would be with respect to S&P and the

17   like.  But that's not really what we are

18   talking about, with all due respect.

19   We're talking about a Chinese state-owned

20   enterprise --

21          Q.    I -- I understand that.  But

22   we have been talking about -- in your

23   earlier testimony, you testified that the

24   U.S. government has the power to tax, it
```

Confidential - Subject to Further Confidentiality Review

1    has the power to regulate, it has the

2    power to prosecute, it has the power to

3    investigate.

4               And those powers may be

5    exercised differently depending on which

6    political party is in power at a given

7    time; isn't that right?

8               MR. LONGER:  I -- you're so

9          far afield.  This is irrelevant.

10              But go ahead.

11              Object to the form of the

12         question.

13              THE WITNESS:  Well, I -- I

14         agree.

15   BY MR. FENTON:

16         Q.    All right.  So again, just

17   to tie down the question that I started

18   with, you are not aware of any favors or

19   positions that the party handed out to

20   anybody at Taishan based on their

21   decision to sell drywall into the U.S.

22   between 2005 and 2009; isn't that

23   correct?

24         A.    Correct.  Although there

Confidential - Subject to Further Confidentiality Review

Page 161

1    does seem to be some disciplining going

2    on with respect to Chairman Jia and his

3    share ownership in -- in Taishan.  So I

4    can't point to a reward, but I can point

5    to a punishment.

6            Q.    Who is being punished?  How

7    was he being punished?

8            A.    Jia was reprimanded by -- by

9    SASAC for his ownership in BNBM PLC.

10           Q.    What you are talking about

11   there is the fact that Mr. Jia had a

12   board position at BNBM PLC which the

13   regulators viewed to be a potential

14   conflict of interest and asked him to

15   step down, right?

16           A.    Correct.

17           Q.    Okay.  And do directors in

18   U.S. companies ever develop conflicts of

19   interest?

20           A.    Yes.  But again --

21           Q.    Are directors in U.S.

22   companies sometimes asked to step down

23   because of conflict of interest?

24                   MR. LEVIN:  Finish your

Confidential - Subject to Further Confidentiality Review

Page 162

```
 1            answer.
 2                 THE WITNESS:  What I was
 3            going to add to that is we are
 4            talking about SASAC, which is a
 5            combination of controlling
 6            shareholder and regulator.
 7    BY MR. FENTON:
 8            Q.    Mm-hmm.
 9            A.    It's a -- it's a participant
10    in the market at the same time it's a
11    regulator.  I think that's quite unusual.
12    And I think it's an important part of the
13    context that is required to understanding
14    how Chinese SOE business groups are
15    structured and the relationships among
16    them.
17            Q.    Well, that may be.  But are
18    you aware of any authority that says just
19    because one acts as a shareholder and a
20    regulator, that one must pierce the
21    corporate veil?
22            A.    No, but it would certainly
23    be relevant to me if I were conducting
24    the analysis.
```

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Are U.S. directors

2     ever asked to step down by regulatory

3     bodies because of potential conflicts of

4     interest?

5               MR. LONGER:  Objection.

6          Vague.

7     BY MR. FENTON:

8          Q.    Let's think about the SEC

9     for a minute.

10         A.    Certainly -- certainly --

11              MR. LONGER:  If that's a

12         question, I object to the form.

13         It's vague too.

14              THE WITNESS:  Directors in

15         U.S. companies can be barred from

16         serving.

17     BY MR. FENTON:

18         Q.    Okay.  And if a director in

19     a U.S. company develops a conflict of

20     interest, are you aware of any authority

21     that says that that is a ground for

22     piercing the corporate veil?

23         A.    I mean, my declaration

24     relates to Chinese SOEs; it doesn't

Confidential - Subject to Further Confidentiality Review

Page 164

1    relate to the SEC.  I'm sorry.  I'm not

2    trying to be argumentative.  But we are

3    talking about Chinese SOEs.  We are

4    talking about state capitalism where a

5    regulator is also a participant in the

6    market.

7              I don't think you can draw a

8    straight line to comparisons to the

9    United States government in the operation

10   of the market.

11        Q.    I'm just asking questions

12   here.  I'm not drawing any comparison.

13             Okay.  Now let me ask my

14   next question.

15             Are you aware during the

16   period of time that Chairman Jia held

17   this position with BNBM that was deemed a

18   conflict of interest, are you aware of

19   any action taken by that board that was

20   not supported by a disinterested

21   majority?

22        A.    Well -- I'm not sure -- can

23   you define "designated majority"?

24        Q.    Yeah.  Everybody except

Confidential - Subject to Further Confidentiality Review

Page 165

1  Chairman Jia.

2         A.    We are talking about a

3  disinterested majority of BNBM PLC.

4         Q.    The board, yes.  That was --

5  that was the seat that he had --

6         A.    Correct.

7         Q.    -- that was deemed a

8  conflict of interest.  All right.

9         A.    Mm-hmm, mm-hmm.

10        Q.    Is there any vote that was

11  taken during the period of time that he

12  sat on the board where, even if you took

13  him out of the equation, it wouldn't have

14  passed?

15        A.    I'm not aware of any.

16        Q.    Okay.  All right.  Let's go

17  to the conclusions of your report on

18  Page 9 if we can.

19        A.    Yes.

20        Q.    Okay.  And Paragraph 38, my

21  understanding there is what you're saying

22  is that because of this group structure

23  that you have been talking about

24  throughout your testimony, it allows the

Confidential - Subject to Further Confidentiality Review

1    Chinese government and CCP, working

2    through SASAC, to operate the

3    subsidiaries of SOE business group

4    companies outside of the formal dictates

5    of the corporate law.

6            A.    Yes.

7            Q.    Okay.  And what you are

8    talking about there is not the actual

9    exercise of control, but simply the

10   ability to control, correct?

11           A.    Certainly the -- the

12   capacity to control, correct.

13           Q.    Okay.  And that capacity may

14   be exercised, or it may not be exercised,

15   right?

16           A.    Yes.

17           Q.    And it can be exercised in a

18   proper way, and it can be abused, can't

19   it?

20           A.    Well, the whole exercise is

21   out of the norm of best practices in

22   corporate governance from a global

23   perspective.  I mean, that's basically my

24   point.  The whole system is off the ranch

Confidential - Subject to Further Confidentiality Review

Page 167

1    as compared to global best practices for

2    corporate governance.

3        Q.    It's -- it's different,

4    right?  It's different?

5        A.    It is different.

6        Q.    Okay.  We've established

7    that.

8            MR. LONGER:  Can we go home

9        now?

10   BY MR. FENTON:

11       Q.    Let's go to your next

12   opinion.  And -- and I just want to make

13   clear because you said earlier you are

14   not expressing an opinion --

15       A.    Correct.

16           MR. LONGER:  Wait, wait,

17       wait.

18           THE WITNESS:  I am

19       expressing an opinion.  Sorry.

20           MR. FENTON:  Let's --

21       let's -- you know what, let's stop

22       here.  Have a good trip home.

23           MR. LEVIN:  I wanted to go

24       home after your statement.

Page 168

1           MR. LONGER:  I thought we

2       were done after the second

3       question if that was...

4           Go ahead.

5  BY MR. FENTON:

6       Q.   All right.  Professor, you

7  are not expressing an opinion on whether

8  either of the BNBM companies or CNBM

9  companies are, in fact, alter egos --

10       A.   That's correct.

11       Q.   -- of Taishan.

12           Okay.  But you do say in the

13  last paragraph, you say, "Considering

14  these features," that you referenced

15  above, "there is evidence in the record

16  to support a finding that the CNBM

17  business group is a single business

18  entity."

19       A.   Yes.

20       Q.   Okay.  Are those your words,

21  "There is evidence to" -- "in the record

22  to support a finding," or are those words

23  that were suggested to you by someone?

24       A.   No, those are my words.

Confidential - Subject to Further Confidentiality Review

1          Q.     Those are your words.  Okay.

2                 And we've already talked

3     about what you mean by single business

4     entity.

5                 When you say, "There is

6     evidence in the record to support the

7     finding," is that the evidence that we

8     have discussed in your testimony up until

9     now?  That is to say, Exhibits 2, 3 --

10         A.     Well, the --

11         Q.     -- and the other things that

12    you've mentioned?

13         A.     Yes.  Let me -- let me give

14    you a fulsome response to that.

15                So I'm writing the opinion

16    based on my study and knowledge of how

17    Chinese SOEs operate.

18         Q.     Mm-hmm.

19         A.     I have looked through the

20    record, and I have found illustrations or

21    examples that are very consistent with my

22    research and knowledge of how Chinese

23    SOEs are structured and operate --

24         Q.     Mm-hmm.

Confidential - Subject to Further Confidentiality Review

1          A.     -- and the extralegal forms

2    of control and capacity for control that

3    result from those.

4          Q.     Mm-hmm.

5          A.     And, yes, I have referenced

6    specific illustrations of that consistent

7    with my research in the -- in this

8    declaration.  But I am not -- you know, I

9    was not charged with finding every piece

10    of evidence you could possibly find to

11    support that.

12          Q.     And I understand that.

13          A.     So -- so in that sense, it's

14    a combination of my knowledge and skill

15    or research, and the fact that I find

16    some evidence that is reflective of my

17    understanding of how these firms operate.

18          Q.     And my only question is,

19    because I just want to make sure the

20    record is complete, when you talk about

21    that evidence -- and I understand that

22    it's illustrative, and I understand that

23    you may not have found everything that's

24    out there -- but when you talk about that

Confidential - Subject to Further Confidentiality Review

```
 1    evidence, that's the evidence that we
 2    have discussed this morning, Exhibit 2,
 3    Exhibit 3, and the other things you
 4    mentioned in your testimony, correct?
 5          A.    Yes, although, I mean, I
 6    could expand on my understanding of how
 7    the SOEs operate and their possible
 8    relevance to a judge's determination of
 9    single entities.  I don't want to say yes
10    and then have it assumed that, you know,
11    that's all I have to say --
12          Q.    I just want --
13          A.    -- because I have other
14    things to say.
15          Q.    Yeah.  I just want to make
16    sure there's no other document or
17    testimony that you'd like to point us to
18    to illustrate this point.
19          A.    I mean, there are -- there
20    are some other things.  I mean, you have
21    a document in which CNBM Group is
22    instructing the downstream entities to
23    establish trade unions, which are also --
24    they don't exist separate from the party.
```

Confidential - Subject to Further Confidentiality Review

Page 172

1          Q.     What's the date of that

2     document?

3          A.     I'm afraid that I don't

4     have -- I don't have that in front of me.

5          Q.     Did that document have any

6     connection to Taishan's sale of drywall

7     in the U.S. between 2005 and 2009?

8               MR. LONGER:  Object to the

9          form.

10              THE WITNESS:  I don't have a

11         basis for answering.  Not to my

12         knowledge.

13    BY MR. FENTON:

14         Q.     What else?  And, by the way,

15    was the CNBM Group, when it was

16    instructing its downstream entities,

17    acting pursuant to a direction of the

18    Chinese government, the People's Republic

19    of China, to establish trade unions?

20         A.     I would have to refresh my

21    recollection, but it may have referenced

22    national legislation or some other higher

23    authority.  But I don't -- I don't

24    recall.

Confidential - Subject to Further Confidentiality Review

Page 173

1          Q.    All right.  Any other

2    documents or testimony that you'd like to

3    point to?

4                    MR. LONGER:  Some gentleman

5              is just trying to get your

6              attention.  I'm sorry to

7              interrupt.

8                    Was there a question

9              pending?

10                    MR. FENTON:  Yes.  I'm

11              asking if there are any other

12              documents or testimony that he

13              wishes to point us to, to

14              illustrate the point that there is

15              evidence in the record.

16                    THE WITNESS:  I mean, as I'm

17              sitting here right now, that --

18              that seems to me to be the

19              evidence.

20    BY MR. FENTON:

21          Q.    Fair enough.  If something

22    comes to you later, let me know.

23          A.    Thank you.

24          Q.    Okay.  Now, is there

Confidential - Subject to Further Confidentiality Review

Page 174

1    evidence in this record that would

2    support a finding that CNBM business

3    group is not a single business entity?

4              MR. LONGER:   Object to the

5         form.

6              THE WITNESS:   Well, as

7         everyone at the table is aware,

8         this is a fact-intensive inquiry.

9         So the finder of fact is going to

10        consider all -- do a 360-degree

11        analysis of these facts.

12             So would there be some facts

13        that could cut against the finding

14        of single business entity?   Yes.

15   BY MR. FENTON:

16        Q.    Okay.   And we talked about

17   some of those facts.   In other words, you

18   haven't seen any evidence of commingling

19   of funds between the different

20   subsidiaries in the CNBM business group,

21   correct?

22        A.    Correct.

23        Q.    Okay.   You haven't seen

24   evidence of different companies financing

Confidential - Subject to Further Confidentiality Review

1    the operations of other companies,

2    keeping them afloat, that kind of thing,

3    correct?

4          A.    I mean, there are guarantees

5    going on.

6          Q.    Yes.  Yes.

7          A.    Yes.

8          Q.    And you are also familiar

9    with Mr. Deal's research into the

10   prevalence of intercompany guarantees in

11   the U.S., correct?

12         A.    Yes.  Yes.

13         Q.    And you would agree,

14   wouldn't you, that it is very common in

15   U.S. conglomerates for members of the

16   conglomerate to guarantee the debts of

17   the other members?

18              MR. LONGER:  And you're

19              focused only on the United States

20              in that question?

21              MR. FENTON:  Well, we can

22              talk about the rest of the world,

23              but within the U.S. --

24              MR. LONGER:  You're

Confidential - Subject to Further Confidentiality Review

Page 176

```
 1          differentiating between China and

 2          United States.

 3               MR. FENTON:  I'm asking a

 4          question, Fred.  I want an answer.

 5               MR. STECKLER:  About

 6          corporations or SOEs?

 7    BY MR. FENTON:

 8          Q.    My question has to do with

 9    U.S. conglomerates.  I thought that was

10    pretty clear.  Okay.  You are aware that

11    it is common in U.S. conglomerates for

12    members of the group to guarantee the

13    debts of each other?

14          A.    These --

15               MR. LONGER:  Note my

16          objection.

17               THE WITNESS:  It is common,

18          but, again, I'm here to talk about

19          China.  And I think it's relevant

20          that those loans would be made by

21          an SOE bank to an SOE corporate

22          group, guaranteed by an upstream

23          member of the corporate group.

24               So the context, yes, we can
```

Confidential - Subject to Further Confidentiality Review

Page 177

```
 1          see outward manifestations of the

 2          same kind of behavior in the

 3          United States.  But the context is

 4          relevant.

 5              I mean, that really -- with

 6          all respect, that's the point of

 7          my declaration.  The context is

 8          relevant in thinking about, for

 9          the judge, thinking about running

10          this analysis of alter ego or

11          single business enterprise.

12  BY MR. FENTON:

13      Q.    All right.  So the answer to

14  my question was yes, correct?

15      A.    As to the U.S., yes.

16      Q.    Okay.  And with respect to,

17  again, U.S. conglomerates, the use of

18  intercompany guarantees for members of

19  one business group to guarantee the debts

20  of another business group is commonly

21  known as credit enhancement; isn't that

22  right?

23      A.    Yes.

24      Q.    Okay.  Because it's, again,
```

Confidential - Subject to Further Confidentiality Review

1     the whole being greater than the sum of

2     the parts.  If you use the

3     creditworthiness of the entire group, you

4     can generally get a more favorable

5     interest rate, correct?

6          A.     That's correct.

7          Q.     Okay.  Does CNBM Group have

8     a bank?

9          A.     You mean a finance company?

10    It does not have a bank.  And to my

11    knowledge, it does not have a finance

12    company.

13               MR. FENTON:  Okay.  Is lunch

14          ready?

15               MR. PFAEHLER:  Let me check.

16          You want to take a break, or you

17          want to --

18               MR. FENTON:  Well, if it's

19          here, let's eat, because I'm about

20          to move on.

21               (Whereupon, a discussion was

22          held off the record.)

23               THE VIDEOGRAPHER:  The time

24          is 12:03 p.m.  We are going off

Confidential - Subject to Further Confidentiality Review

Page 179

```
 1          the record.
 2                (Lunch break.)
 3                THE VIDEOGRAPHER:  The time
 4          is 1:03 p.m., and we are back on
 5          the record.
 6   BY MR. FENTON:
 7          Q.    All right, Professor.  I'll
 8   remind you that you're still under oath.
 9          A.    Yes.
10                May I -- may I -- you had
11   asked me -- I don't mean to interrupt,
12   but you asked me if anything else came to
13   mind.  You were referring to my last
14   sentence, referring to evidence in the
15   record to support a finding.
16          Q.    Yes.
17          A.    One thing did occur to me
18   over the break.  It's a document that
19   I've already referenced or alluded to,
20   but I wanted to mention it explicitly.
21   And that's the document mentioned in
22   Footnote 24.
23          Q.    Okay.  Which page of your
24   report, sir?
```

Confidential - Subject to Further Confidentiality Review

Page 180

```
 1                  MR. LONGER:  Page 9.
 2                  THE WITNESS:  It's Page 9,
 3           Footnote 24.  Meeting minutes of
 4           the seminar and deepening reform.
 5                  (Document marked for
 6           identification as Exhibit
 7           Milhaupt-4.)
 8   BY MR. FENTON:
 9           Q.    We've now marked that
10   document -- that is to say, the meeting
11   minutes of the seminar on deepening
12   reform -- as Exhibit 4 to your
13   deposition.  That's the document that you
14   were just referring to, sir?
15           A.    Yes, it is.
16           Q.    All right.  And again, this
17   is a partial translation; is that
18   correct?
19           A.    That's the way it's titled,
20   yes.
21           Q.    All right.  As a matter of
22   fact, it looks like there's sort of
23   little bits and snippets taken out of the
24   document.  Is that the way it appears to
```

Confidential - Subject to Further Confidentiality Review

Page 181

1    you?

2          A.    It does appear to be

3    excerpted, yes.

4          Q.    All right.  Who did the

5    excerpting?

6          A.    I assume that the machine

7    translation was turned into a -- this

8    translation that we are seeing here, a

9    more polished translation.

10         Q.    My question is --

11         A.    I don't know --

12         Q.    -- do you know who did the

13   excerpting?

14         A.    -- who did -- I don't

15   know -- no.

16               MR. STECKLER:  Do you have

17         another translation of it?

18               MR. FENTON:  Well, I'll ask

19         the questions for now, Bruce.

20               MR. LONGER:  If you like,

21         it's my understanding that

22         plaintiffs had it partially

23         translated.  I think if it was

24         used at a deposition, you all may

Confidential - Subject to Further Confidentiality Review

Page 182

1          have redlined it and given a

2          separate translation.

3               But this is the translation

4          that I think has been agreed to by

5          the parties for --

6               MR. FENTON:  I've just asked

7          the witness if he knows who did

8          the excerpting.

9               MR. LEVIN:  We'll stipulate

10         the plaintiffs did the excerpting.

11              MR. FENTON:  Thank you.

12    BY MR. FENTON:

13         Q.   Did you ever ask to see a

14    full translation of this document?

15         A.   I did not.

16         Q.   Okay.  And nobody has shown

17    you one, have they?

18         A.   Correct.

19         Q.   Okay.  Now, what is it in

20    this -- well, first of all, is there

21    anything in this document where CNBM is

22    issuing any directives to Taishan

23    management?

24         A.   No.

Confidential - Subject to Further Confidentiality Review

Page 183

1          Q.    Is there anything in this

2     document where CNBM executives are

3     issuing directives to BNBM management?

4          A.    No.  This appears to be a

5     board discussion about reform of the

6     group.

7          Q.    So it's a discussion?

8          A.    Correct.

9          Q.    And there doesn't appear to

10    be any official action taken at this

11    meeting.  This is a bunch of board

12    members throwing out ideas, correct?

13         A.    From the -- from the

14    context, that appears to be the case,

15    yes.

16         Q.    Okay.  And what conclusion

17    do you draw from that with respect to the

18    exercise of control by CNBM over any of

19    its subsidiary companies?

20         A.    Well, if I may refer to the

21    sentence in which I cited this document,

22    which is at Paragraph 36, the last

23    sentence.  And here I'm talking about the

24    importance for looking at noncorporate

Confidential - Subject to Further Confidentiality Review

Page 184

1    structures, noncorporate governance in

2    assessing this alter-ego question.

3              I say, "In fact, the

4    evidence suggests that senior managers of

5    the CNBM business group recognize the

6    complications that state ownership and

7    related noncorporate governance practices

8    create for Chinese SOEs on the issue of

9    separate corporate identity."

10         Q.    All right.  And what -- what

11   in this document tells you that?

12         A.    It's Page -- this isn't

13   numbered.  I -- I believe it's Page 6

14   or -- I mean, it really --

15              MR. LONGER:  You can

16         reference the Bates numbers here.

17              THE WITNESS:  Okay.  Well --

18         for example, it's 23369.

19   BY MR. FENTON:

20         Q.    Okay.

21         A.    I mean, first, if I could

22   just set the context here.  I think that

23   what they are discussing, what is being

24   discussed at the board level here is a

Confidential - Subject to Further Confidentiality Review

Page 185

1    so-called mixed ownership reform, which

2    is a current reform agenda of the -- of

3    the Chinese government.

4         Q.    Right.  This is a meeting

5    that took place in 2014.

6         A.    Right.

7              MR. STECKLER:  Let him

8         finish the question.

9              THE WITNESS:  So he says

10        the -- these red -- turning the

11        page now, "These red letterhead

12        documents are actually harmful,"

13        "a lawsuit on gypsum board in the

14        U.S.," "how did it become like

15        this," et cetera.

16              Because there is a law

17        piercing the corporate veil, if

18        they think you surpass the

19        authority as a shareholder, or

20        action and control, the limited

21        company would not -- the company

22        limited would not be independent,

23        et cetera.

24              If you have a -- board of

Confidential - Subject to Further Confidentiality Review

Page 186

1          directors documents, fine.  If you

2          have shareholder meeting

3          documents, fine.  But if there are

4          a lot of noncorporate governance,

5          nonstandard content in them that

6          surpass the scope of the corporate

7          system, these would be seized

8          by -- these would be seized by

9          attorneys.

10               Although Tai-An is a limited

11          company, it's not independent, et

12          cetera.

13               So, you know, it seems to me

14          this is in -- an insight into the

15          mindset of senior managers and a

16          recognition that the features that

17          I'm describing, the specific

18          distinctive features of Chinese

19          corporate governance in the SOE

20          world, may be problematic from the

21          standpoint of this -- this single

22          business entity inquiry.

23     BY MR. FENTON:

24          Q.   Well, doesn't it look to you

Confidential - Subject to Further Confidentiality Review

Page 187

1   as if somebody in this meeting is

2   describing the very allegations that the

3   plaintiffs have made in this litigation?

4           I mean, isn't that what they

5   are talking about?

6           A.   Well, yes indeed.  I'm sure

7   that's what he's -- I'm sure that's what

8   he's -- he's referencing, but --

9           Q.   Yes, I agree.

10          MR. STECKLER:  Let him

11          finish his answer.

12          MR. FENTON:  You want to

13          know something?  Can we have one

14          lawyer for the plaintiffs do the

15          talking?

16          MR. LEVIN:  Yes.  You can

17          and you should.

18          MR. LONGER:  And I was about

19          to say two things:  one, to stop

20          cutting him off.

21          Two, this references red

22          letterhead documents --

23          MR. FENTON:  Just a minute,

24          Fred.  Don't start testifying.

Confidential - Subject to Further Confidentiality Review

1              MR. LONGER:  No, I'm not.

2              MR. FENTON:  If your

3        objection was that I cut him off,

4        that's a fair objection.  I

5        believe you are correct, and I did

6        not do it intentionally.  But I

7        believe you are correct.  I

8        believe the witness was about to

9        finish his answer.

10             So why don't we both let him

11       finish his answer before you start

12       characterizing documents.

13             MR. LONGER:  If you would --

14       that's fine with me, but before

15       you ask him that question --

16  BY MR. FENTON:

17       Q.   Please finish your answer,

18  Professor Milhaupt.

19             MR. LONGER:  -- I'd like to

20       ask -- make one point.

21             MR. FENTON:  Okay.  That's

22       fine.  But let Mr. -- Professor

23       Milhaupt finish his answer.

24             THE WITNESS:  So I -- I was

Confidential - Subject to Further Confidentiality Review

Page 189

```
 1          saying that I think the -- the
 2          context for this discussion is
 3          important, because they're clearly
 4          talking about mixed ownership
 5          reform, which entails reducing the
 6          share of state ownership in -- in
 7          these enterprises.
 8               And he seems to be saying
 9          here that if we were to -- it
10          says -- if I could refer back to
11          23369, the beginning of this
12          paragraph.  If we say CNBM is an
13          investment company, this is a
14          state-owned enterprise, et cetera;
15          it holds boards -- meetings as
16          usual, et cetera.  However, this
17          company is liberated.  Then if we
18          receive letterhead documents, we
19          don't need to forward it...
20               So, in other words, it seems
21          to me that the context here is
22          state ownership is a complicating
23          factor for our -- for our group.
24               And he mentions elsewhere in
```

Confidential - Subject to Further Confidentiality Review

1        this document that he has spoken

2        to SASAC about the need for reform

3        of the enterprise.  And so, to me,

4        that's -- that's revealing of a

5        recognition that this structure,

6        these distinctive features, may be

7        problematic from a -- the

8        perspective of

9        piercing-the-corporate-veil

10       analysis.

11   BY MR. FENTON:

12       Q.    My question was very simple,

13   Curtis.

14            MR. FENTON:  Did you want to

15       say something, Fred?

16            MR. LONGER:  I did.

17            MR. FENTON:  Okay.

18            MR. LONGER:  So to the

19       extent this document references

20       red letterhead documents --

21            MR. FENTON:  Okay.  Now, the

22       witness hasn't said anything about

23       red letterhead documents --

24            MR. LONGER:  He's reading

Confidential - Subject to Further Confidentiality Review

Page 191

1        the document.  And I'm reading the

2        document myself.

3            To the extent that there are

4        red letterhead documents, we're

5        not aware of them being produced

6        in this litigation.

7            MR. FENTON:  All right.  We

8        can take that up -- we can take

9        that up.

10           MR. LONGER:  And I request

11       on the record that they be

12       produced.  I have not seen any

13       state secret privilege log where

14       they are identified --

15           MR. FENTON:  This is not the

16       appropriate time --

17           MR. LONGER:  -- and to the

18       extent that it mentions with any

19       of these parties, we would like to

20       have them.

21           MR. FENTON:  All right.

22       Fred, you have had this document

23       for ages.  It's cited in your

24       expert report.  If you have a

Confidential - Subject to Further Confidentiality Review

Page 192

1            document request to make, there is

2            a time, a place, and a manner to

3            do it.

4                   The middle of this

5            deposition is not it.  I move to

6            strike counsel's remarks.

7                   If you wish to confer on

8            that issue later on, I'm happy to

9            confer with you.  This isn't the

10           place.

11                  MR. LONGER:  Well, consider

12           this a --

13    BY MR. FENTON:

14           Q.    Professor, would you

15    please --

16                  MR. FENTON:  We don't do

17           meet-and-confers in the middle of

18           a deposition, Fred.  I'm sorry.

19                  MR. LONGER:  You asked me

20           for documents in this deposition.

21                  MR. FENTON:  Okay.  Anything

22           else that you'd like to put on

23           record, Counsel?

24                  MR. LONGER:  No, sir.

Confidential - Subject to Further Confidentiality Review

Page 193

```
 1                  MR. LEVIN:  Do you have to
 2         go to the bathroom?
 3                  MR. FENTON:  All right.
 4    BY MR. FENTON:
 5         Q.    Professor, my question, I
 6    think, was a very simple one.
 7                  Whoever is speaking -- by
 8    the way, who is speaking in this passage
 9    that you just read?
10         A.    Well, the -- in -- in the
11    top of the page, it's -- references
12    Chairman Song.  I continue with what I
13    was saying, and it continues from there.
14         Q.    But -- yes, but then there's
15    ellipses --
16                  MR. STECKLER:  He's not
17         finished.
18    BY MR. FENTON:
19         Q.    -- and one, two, three,
20    four, five sets of ellipses before you
21    get to the paragraph that you just
22    referenced, correct?
23         A.    That's correct.
24         Q.    So you don't know who is
```

Confidential - Subject to Further Confidentiality Review

Page 194

1    speaking in this paragraph --

2              MR. LONGER:  Object to the

3         form.

4    BY MR. FENTON:

5         Q.    -- correct?

6              MR. LONGER:  He's already

7         testified who he thought was

8         testifying -- or speaking.

9    BY MR. FENTON:

10        Q.    You don't know --

11        A.    I would infer --

12        Q.    -- because you haven't seen

13   the rest of the document.

14              MR. STECKLER:  Excuse me.

15        Let him finish.

16              THE WITNESS:  I would infer

17        from this structure --

18              MR. FENTON:  I thought we

19        were going to have one lawyer

20        talking for the plaintiffs.

21              MR. STECKLER:  I appreciate

22        that.  I'm listening to the depo,

23        and he's trying to answer and

24        you're interrupting --

Confidential - Subject to Further Confidentiality Review

Page 195

```
 1            MR. FENTON:  Bruce, I don't
 2       care.
 3            MR. STECKLER:  Okay --
 4            MR. FENTON:  Fred is
 5       perfectly capable.
 6            MR. STECKLER:  -- for the
 7       record, I'm asking as a matter of
 8       courtesy.  I'm not asking you as
 9       contentious.  Just please let him
10       finish.
11  BY MR. FENTON:
12       Q.   All right.  We identified
13  five sets of ellipses between the
14  reference to Chairman Song and the
15  paragraph that you read.  Okay.
16            So while you may assume it
17  is Chairman Song speaking, you don't know
18  that for a fact; is that correct?
19            MR. LONGER:  Let me object.
20            And if you had something
21       that you wanted to say that you
22       were interrupted before this
23       question, please continue your
24       answer.
```

Confidential - Subject to Further Confidentiality Review

1              THE WITNESS:  Well, I -- the

2         only thing I would add is it seems

3         to me apparent from the context of

4         the rest of the discussion that

5         Chairman Song, particularly as the

6         chairman, is speaking his mind

7         about this -- this issue.  The

8         other parties seem to be simply

9         interjecting small side comments.

10   BY MR. FENTON:

11        Q.    Okay.  But whoever the

12   speaker is, be it Chairman Song or

13   somebody else, they are describing the

14   allegations about alter ego in connection

15   with the U.S.-Chinese drywall litigation;

16   isn't that correct?

17        A.    Correct.

18        Q.    Do you consider to be

19   chairman's -- do you consider Chairman

20   Song to be an expert in U.S. alter-ego

21   law?

22        A.    I have no basis for -- for

23   answering.

24        Q.    Okay.  Do you consider any

Confidential - Subject to Further Confidentiality Review

Page 197

1    of the other participants at this meeting

2    as being experts in U.S. alter-ego law?

3         A.    Again, I have no basis

4    for -- for answering.

5         Q.    Okay.  And the problem of

6    alter ego that they were identifying was

7    a problem because it was raised by the

8    plaintiffs in this very litigation; isn't

9    that right?

10                That's what they are talking

11   about, correct?

12                MR. LONGER:  Objection to

13           the form.  Foundation.  And it

14           mischaracterizes his testimony.

15                THE WITNESS:  The context of

16           the document suggests that it's a

17           much broader discussion than

18           simply about this -- this

19           litigation.

20                It -- it -- to me, the

21           discussion is about the reform of

22           state-owned enterprises.  And this

23           litigation is being offered --

24           this is my -- this is my

Confidential - Subject to Further Confidentiality Review

Page 198

1          interpretation.

2                 This litigation is being

3          offered as an example of the sort

4          of problems that can befall

5          state-owned enterprises in the --

6          in the Chinese system.

7    BY MR. FENTON:

8          Q.    Do they -- do they reference

9    any alter-ego problems that they've

10   encountered other than this litigation?

11         A.    Well, I mean, certainly they

12   do not speak in terms of alter ego, no.

13         Q.    Okay.  To your knowledge,

14   was there any official action taken as a

15   result of this meeting?

16         A.    Not to my knowledge.

17         Q.    Any directives issued to

18   Taishan as a result of this meeting?

19         A.    Not to my knowledge.

20         Q.    Any directives issued to

21   BNBM, either PLC or Group, as a result of

22   this meeting?

23         A.    Not to my knowledge.

24         Q.    Any directives issued to

Confidential - Subject to Further Confidentiality Review

Page 199

1    CNBM or CNBMG as a result of this

2    meeting?

3            A.    Not to my knowledge.

4            Q.    All right.  Any other

5    documents that you would like to call to

6    my attention as further supporting your

7    opinion at this time?

8            A.    Not at this time.

9            Q.    Okay.  So let me call to

10   your attention Tab 3 --

11               (Document marked for

12               identification as Exhibit

13               Milhaupt-5.)

14   BY MR. FENTON:

15           Q.    -- a document which we have

16   marked as Exhibit 5.

17               And it's a document that

18   appeared in the Stanford Law Review,

19   Volume 65, beginning at 697.  And it's

20   entitled "We Are the (National)

21   Champions:  Understanding the mechanism

22   of state capitalism in China."  And it

23   says that it was authored by Li-Wen Lin

24   and Curtis J. Milhaupt.

Confidential - Subject to Further Confidentiality Review

1        A.     Yes indeed.

2        Q.     And that's -- that's

3    Curtis J. Milhaupt --

4        A.     That's me.  That's me.

5        Q.     Okay.  And this is an

6    article that you published in the

7    Stanford Law Review in approximately

8    April of 2013?

9        A.     That's correct.

10        Q.     Okay.  And in -- this is

11    part of your body of scholarship --

12        A.     Correct.

13        Q.     -- with respect to Chinese

14    state-owned enterprises and -- and, in

15    particular, the -- the role of SASAC in

16    the Communist Party, correct?

17        A.     I'm not sure if it's in

18    particular with respect to that.  But it

19    is certainly part of the body of my

20    research and knowledge on the corporate

21    governance structure of Chinese SOEs,

22    absolutely.

23        Q.     All right.  I wonder if you

24    could do me the kindness, Professor, of

Confidential - Subject to Further Confidentiality Review

1    turning to Page 734 of the article.

2                    All right.  And in the first

3    paragraph, under III, which is entitled

4    "The party's state as controlling

5    shareholder" --

6            A.    Yes.

7            Q.    -- you make the following

8    statement, or I guess I should say you

9    and Professor Lin make the following

10   statement -- but you agree that this

11   represents both your views?

12           A.    Absolutely, absolutely.

13           Q.    So you make the following

14   statement.  And let me quote it.

15                   "Atop the national groups is

16   SASAC, ostensibly 'the world's largest

17   controlling shareholder.'  Controlling

18   shareholder regimes are prevalent

19   throughout the world.  And in this sense,

20   China's variety of capitalism shares an

21   important trait with corporate capitalism

22   in many other developing and recently

23   developed countries."

24                   Have I read that accurately?

Confidential - Subject to Further Confidentiality Review

Page 202

1         A.    Yes.

2         Q.    And was that and is that

3    your view?

4         A.    Yes.

5         Q.    And then if you turn to the

6    next page, Page 735, at the very top of

7    the page, you say, and I quote, "More

8    importantly, as we explained below, it is

9    misleading to attribute to SASAC the same

10   bundle of control rights associated with

11   controlling shareholders and other

12   regimes."

13              Was that and is that your

14   view?

15        A.    It is.  But you've skipped a

16   very important section in between those

17   two.  I mean, it says -- the paragraph

18   after the one from which you quoted says,

19   "Macro-level generalizations and

20   comparisons with other controlling

21   shareholder regimes, however, are likely

22   to mislead, because several aspects of

23   China's regime make it highly

24   distinctive."  I mean, that is -- that is

Confidential - Subject to Further Confidentiality Review

Page 203

1    the basis.  That is the gist of my

2    declaration.

3              MR. PFAEHLER:  I regret to

4         make the statement I'm about to

5         make on the record, but

6         Mr. Steckler jumped up when

7         Mr. Fenton was asking the next

8         question, signaling in an obvious

9         way to you, and Mr. Milhaupt

10        observed that and then gave his

11        answer.  I do have a problem with

12        that.

13             MR. STECKLER:  Hold on.  My

14        conversation with Mr. Longer

15        actually had nothing to do with

16        that section.  But I don't

17        appreciate what is clearly a

18        mischaracterization of my

19        communications with Mr. Longer.

20             If you want to ask Professor

21        Milhaupt how he came about that, I

22        have no problem with that, because

23        I know it had nothing to do with

24        what we were talking about.  Feel

Confidential - Subject to Further Confidentiality Review

```
 1        free to do so.
 2                MR. FENTON:  Hold on.  We're
 3        not going to make an issue out of
 4        this.  First of all, I did, out of
 5        the corner of my eye, happen to
 6        see Mr. Steckler conferring with
 7        Mr. Longer.  And as co-counsel,
 8        he's certainly entitled to do
 9        that.
10            I do not know what was said.
11        I didn't see any suggestions being
12        made to the witness.  That doesn't
13        mean they weren't.  But I
14        certainly didn't see it.
15                MR. LONGER:  I didn't see it
16        either.
17                MR. FENTON:  Okay.  And
18        also, Ken, what I have said for
19        counsel on the other side goes for
20        us as well.  We will have one
21        lawyer doing the speaking.  If
22        there's something that you want to
23        call to my attention, you let me
24        know.
```

Confidential - Subject to Further Confidentiality Review

Page 205

1              MR. PFAEHLER:  Fair enough.

2              MR. STECKLER:  Okay.  And

3       let me say something.  I agree

4       with you.  Thank you for your

5       professionalism.  And throughout

6       this case, you have our word that

7       we will act professionally and in

8       accordance with the rules, and in

9       no way would interfere with

10      anybody's testimony.  You have my

11      word.  And I know you all feel

12      that way.  I've always trusted

13      your judgment in that regard too.

14      So thank you.

15              MR. FENTON:  All right.

16      Let's consider this matter closed

17      and move on.

18  BY MR. FENTON:

19      Q.   Okay.  Thank you for that

20  addition, Professor.

21              But I'd like to go on to the

22  next section on Page 735 where you talk

23  about SASAC as controller.

24      A.   Yes.

Confidential - Subject to Further Confidentiality Review

1        Q.    And you point out there that

2    SASAC has a staff of about 800 employees,

3    correct?

4        A.    That's correct.

5        Q.    All right.  And to the best

6    of your knowledge, is that how SASAC was

7    staffed in 2014?

8        A.    I have no basis for saying

9    what the staffing was.  I mean, this

10    research was conducted probably about

11    2012 or so.

12        Q.    Okay.  But do you have any

13    more recent information that the level of

14    staffing has changed in any significant

15    way?

16        A.    No.

17        Q.    Okay.  And those 800

18    employees are in charge of how many

19    Chinese SOEs?

20        A.    Well, I guess when you say

21    in charge of, could you clarify that?

22        Q.    Well, you talked about the

23    role that SASAC has in both being a

24    shareholder and a regulator.

Confidential - Subject to Further Confidentiality Review

1              So how many Chinese

2    state-owned enterprises does SASAC

3    own/regulate?

4         A.    It -- it supervises

5    approximately -- it holds the shares of

6    the core companies of and supervises

7    approximately 110 SOE groups.

8         Q.    And CNBM is one of those SOE

9    groups, correct?

10        A.    Correct.

11        Q.    All right.  And if you were

12   to count up all of the first- and second-

13   and third-level subsidiaries of all of

14   those groups, how many different

15   companies are we talking about?

16        A.    Many.  I couldn't give you a

17   number.

18        Q.    Thousands?

19        A.    I couldn't give you a

20   number.

21        Q.    Well, you did -- well, do

22   you know how many different subsidiaries

23   the CNBM Group has, direct and indirect,

24   approximately?

Confidential - Subject to Further Confidentiality Review

1          A.    I guess an approximate

2    estimation would be something like 100.

3          Q.    Okay.   That's just for the

4    CNBM Group alone.

5                And if you were to take the

6    CNBM Group as representative, and maybe

7    it is and maybe it isn't, there's 100

8    different subsidiaries in the CNBM Group.

9    SASAC is regulating 100 such groups.   100

10   times 100, that would be 10,000 companies

11   being monitored and regulated by these

12   800 employees, correct?

13               MR. LONGER:   I'm going to

14          object.   Calls for speculation.

15          I'll just leave it at that.

16               THE WITNESS:   Yeah.   Again,

17          I mean, I really -- I have no

18          basis for quantifying, other than

19          to say there clearly are many,

20          many corporations involved here.

21   BY MR. FENTON:

22          Q.    Well, do you think it is

23   realistic to expect that the 800

24   employees at SASAC exercise control over

Confidential - Subject to Further Confidentiality Review

Page 209

1  day-to-day decisions of second- and

2  third- and fourth-tier subsidiaries in

3  the state-owned enterprises in which

4  SASAC has an interest?

5          A.    Well, I think we -- I think

6  we have to distinguish capacity from

7  actual micromanagement.  I'm certainly

8  not saying in my declaration and in my

9  scholarship that SASAC is micromanaging

10  every downstream decision.  They are not

11  telling Taishan that they need to export

12  X number of drywall.

13              The question is, what is

14  their capacity to regulate and to

15  monitor?

16              And I think it's magnified

17  by the structures that we've already

18  alluded to.  The fact that SASAC can

19  appoint and remove and remunerate and

20  supervise the downstream entities, and

21  it's working in cooperation with the

22  party, which has, you know, as we've

23  explored, has these party committees at

24  each level.

Confidential - Subject to Further Confidentiality Review

Page 210

1                    So if we're talking about

2     capacity to intervene, it clearly has

3     that capacity.

4            Q.    Let me read you a little

5     more of that paragraph.  And I'm going to

6     start with the sentence I referred to,

7     but I'm going to read after there.  And

8     you wrote, quote --

9                    MR. LONGER:  What page are

10             you on?  I'm sorry.

11                    MR. FENTON:  I'm on 735.

12             Last full -- or last paragraph on

13             the page.

14     BY MR. FENTON:

15            Q.    You're talking about SASAC.

16     And you say, "It has a staff of about 800

17     employees organized into diverse bureaus,

18     ranging from enterprise restructuring to

19     foreign affairs.  But despite outward

20     appearances of consolidated control over

21     the SOEs it formally supervises" -- "over

22     the SOEs it formally supervises, SASAC is

23     a work in progress, and the SOE's legacy

24     of shared control rights was not overcome

Confidential - Subject to Further Confidentiality Review

Page 211

1    simply by SASAC's establishment.

2                    "This is particularly true

3    given SASAC's location in the

4    governmental organization chart.

5    Although SASAC is a ministry-level

6    agency, so are 53 of the most important

7    SOEs under its supervision.

8                    "SASAC faces potential

9    resistance, not only from the firms it

10   supervises, but also from the competing

11   agendas pursued by other important

12   ministries, such as the Ministry of

13   Finance.

14                   "As one commentator notes,

15   'In practice, SASAC has faced an uphill

16   struggle to establish its authority over

17   the SOEs that it supposedly controls as a

18   representative of the state owner.'"

19                   Was that and is that your

20   view?

21        A.    I certainly stand by what I

22   wrote.  But I'd like to offer a little

23   bit of context for what -- for what this

24   means.

Confidential - Subject to Further Confidentiality Review

Page 212

1        Q.    No, sir.  I think you've
2   answered my question.
3             MR. LONGER:  Well, let him
4        answer his question -- or answer
5        your question.
6             MR. FENTON:  The question
7        was, "Was that your view?"
8             MR. LONGER:  No, no, no.
9        I'm sorry.  I'm sorry.  Let him
10       answer the question.
11            MR. FENTON:  Fred, if you
12       want to elicit something further,
13       you are perfectly entitled to do
14       that on cross-examination.
15            MR. LONGER:  I think you're
16       cutting him off.  You agreed you
17       shouldn't cut him up.
18            Sir, I'd ask you to answer
19       the question fully.
20   BY MR. FENTON:
21       Q.    Go ahead.
22       A.    What I was saying is I agree
23   with it.  But I think context is
24   important to understand what we're saying

Page 213

 1   here.

 2                   We're talking -- SASAC is

 3   part shareholder and part regulator.

 4   It's very unusual in that -- in that

 5   regard.

 6                   In its regulatory capacity,

 7   what we said here, I think, is accurate.

 8   There are other regulators that may be

 9   more powerful than SASAC with respect to

10   some of the activities of the SOEs.  But

11   that's looking at SASAC purely in its

12   regulatory role.

13                   It's not just a regulator.

14   It's also a conduit for the party, for

15   the party to exercise its influence over

16   the SOEs, and it's also an actor in the

17   economy, as a shareholder.

18                   So when you bundle those

19   things together, it is a distinctively

20   powerful actor.  If you just look at it

21   as a regulator, then, yes, it faces some

22   of the resistance that we mention here.

23          Q.    Well, let's go a few lines

24   down.  I'm looking at the middle of that

Page 214

1    next paragraph, right after Footnote 113.

2                   "In essence, the law

3    formally recognizes SASAC as an investor,

4    a shareholder in the national SOEs with

5    the ordinary rights and duties of a

6    shareholder.

7                   "Ostensibly, the law

8    confines SASAC to that role and governs

9    the agency's performance of its functions

10   as an investor.  But there are no formal

11   mechanisms in the law to enforce SASAC's

12   responsibilities.  And in reality the law

13   grants SASAC powers greater than those

14   available to it as a shareholder under

15   China's corporate law.

16                   "In short, SASAC has both

17   less and more power as a controlling

18   shareholder than meets the eye."

19                   Was that and is that your

20   view?

21        A.    Again, yes, in the full

22   context of what I just explained.  So it

23   has less power, perhaps, as a pure

24   regulator.  If we would think of a

Confidential - Subject to Further Confidentiality Review

Page 215

1   purely -- it's pure regulatory function,

2   but it has more power, because I don't --

3   I'm not aware of any other controlling

4   shareholder in the world that has this

5   combination of attributes of regulator,

6   investor, and investor with superpowers

7   under the law as well as a conduit for

8   party and state influence over the -- the

9   SOEs that it supervises.  So that --

10  that's the full meaning of what we are

11  saying there.

12       Q.    Okay.  And let's take a look

13  at Page 745 if we may.

14            Under the Subheading B,

15  "Consequences," you write, "SASAC is not

16  only the largest controlling shareholder

17  in the world, at least in formal terms,

18  it may be also the most idiosyncratic.

19  Deconstructing SASAC's control rights in

20  the firms it ostensibly owns reveals that

21  it's simultaneously weaker and more

22  powerful than a typical shareholder in

23  other regimes.

24            "It is weaker because it

Confidential - Subject to Further Confidentiality Review

Page 216

1    lacks the exclusive power to appoint top

2    management of the most important

3    enterprises whose shares it controls and

4    defers to other agencies and even to the

5    SOEs themselves on substantive issues

6    outside of its realm of expertise.

7                    "It is more powerful due to

8    the vast scope of its holdings over the

9    most important firms in the national

10   economy, and because of its supercontrol

11   rights which trumps standard corporate

12   norms in state enterprise assets."

13                   Was that and is that your

14   view?

15          A.    Yes.  And at some point --

16   I -- I'm not going to be able to put my

17   fingers on the precise language here, but

18   we say that SASAC is an organizational

19   manifestation of the party state in its

20   role as controlling shareholder.

21          Q.    All right.  And you wrote

22   the words that I read, or at least they

23   were published, in April of 2013; is that

24   correct?

Confidential - Subject to Further Confidentiality Review

Page 217

1          A.    That's correct.

2          Q.    Okay.  Let's take a look at

3   another article.

4              (Document marked for

5              identification as Exhibit

6              Milhaupt-6.)

7   BY MR. FENTON:

8          Q.    We have marked as Exhibit 6

9   a working paper entitled "Chinese

10  Corporate Capitalism in Comparative

11  Context," authored by Curtis J. Milhaupt,

12  Columbia Law School.

13             And again, that is you?

14         A.    That is me.

15         Q.    And, in fact, you did author

16  this paper?

17         A.    I did.

18         Q.    And this paper was presented

19  in October of 2015; isn't that right?

20         A.    I'm not sure it was

21  presented then, but I -- I -- I published

22  it, if you will -- I posted it to SSRN

23  in -- in October of 2015; that's correct.

24         Q.    All right.  When you say you

Confidential - Subject to Further Confidentiality Review

Page 218

1    "posted it to SSRN," what do you mean?

2         A.    SSRN is a website for

3    working papers, works in progress that

4    have not yet reached final -- final stage

5    of publication.

6              So this is a work in

7    progress.

8         Q.    Okay.  But nonetheless,

9    you -- you considered it sufficiently

10   mature to post on SSRN to get comments?

11        A.    Correct.

12        Q.    All right.  And have you, at

13   this stage of the game, prepared any

14   modifications or revisions to this draft?

15        A.    I mean, I am still -- I am

16   still working on it in the sense that I

17   will certainly go back to this and

18   potentially revise it, but I am not

19   currently in the process of -- of doing

20   that.  This is not yet at a stage where

21   deadlines are forcing me to -- to

22   finalize it.  So it is still truly a work

23   in progress.

24        Q.    Okay.  Well, at least in its

Confidential - Subject to Further Confidentiality Review

Page 219

1    current form -- and -- and this is a --

2    this is a document that you prepared?

3          A.    It is.

4          Q.    Okay.  At least in its

5    current form, if you'd turn to Page 13.

6    And I'm looking at Item 2 on that page.

7              You wrote as follows -- and

8    I'm quoting:

9              "Organizational forms

10   matter.  While history indicates that

11   countries can grow dramatically without

12   strong formal institutions, no country in

13   the last 300 years has achieved

14   significant development except in

15   reliance upon corporate capitalism.  In

16   other words, the corporate form is common

17   to all national development stories.  For

18   all the discussion about varieties of

19   capitalism and the law/finance

20   connection, a particular legal form, the

21   corporation is an indispensable component

22   of any functional national system

23   regardless of the legal family to which

24   the country belongs, the left/right

Confidential - Subject to Further Confidentiality Review

Page 220

1    dimension of its politics, or the

2    libertarian-to-authoritarian range of the

3    roots of its political economy."

4              MR. LONGER:  You -- you left

5         out the word "economic system."

6         But keep going.

7              MR. FENTON:  I don't believe

8         I did.  But if I did, I apologize.

9    BY MR. FENTON:

10        Q.    But you see the paragraph

11   that I'm referring to --

12        A.    Yes.

13        Q.    -- Professor?

14             Okay.  Now that was your

15   view when you posted this paper in

16   October of 2015; is that correct?

17        A.    Yes.  But if I could just --

18   again, if I can just provide a little bit

19   fuller flavor for what I'm saying here,

20   so there's no misunderstanding.  It says,

21   at the end of that, "It's not surprising,

22   then, that the corporate form has also

23   been readily adapted to the Chinese party

24   state.  The corporate form can be

Confidential - Subject to Further Confidentiality Review

Page 221

1    shareholder-centric, board-centric,

2    employee-centric, or state-centric,

3    depending on the institutional setting

4    and the political economy in which it is

5    nested."

6          Q.    Well, that was what I was

7    going to read next.  But thank you.

8                MR. LONGER:  He did a good

9          job.

10   BY MR. FENTON:

11         Q.    So taking -- taking both of

12   those -- that is to say, the passage that

13   I quoted and the passage that you just

14   added -- those were your views in October

15   2015, and they are your views today, are

16   they not?

17         A.    Yes.

18         Q.    And -- and, in fact, if we

19   can go to the very end of the article,

20   sir, in -- in your rather pithy

21   concluding paragraph, you say as follows:

22                "China has developed

23   spectacularly over the last" -- "over the

24   past three decades.  Its success is a

Confidential - Subject to Further Confidentiality Review

Page 222

1    function of many factors, including the

2    navigational skills of its economic

3    strategists and the growth focus of its

4    authoritarian leadership.  But if a

5    consensus is to be formed around

6    Beijing's developmental miracle, it just

7    might begin with the genius of a legal

8    fiction available to dictators and

9    democrats alike throughout the world, the

10   corporation."

11                Did I read that accurately,

12   sir?

13          A.    You did.  And thanks for

14   the -- what I think is a compliment.

15          Q.    That was -- that was

16   your view -- I thought that was very well

17   put.

18                That was your view in

19   October 2015, was it not?

20          A.    Yes.

21          Q.    And that is your view as we

22   sit here today, is it not?

23          A.    It is.  And again I would

24   just like to stress though that the

Confidential - Subject to Further Confidentiality Review

Page 223

1    article does go through the way in which,

2    in my view, the corporate form has been

3    adapted to and effected by the ecology of

4    Chinese capitalism, which I set out at

5    Pages 10 and 11.

6              And so my point is that this

7    is a very adaptable form, legal fiction,

8    and it has been adapted by the Chinese

9    authoritarian regime.

10        Q.    Right.  And -- and part of

11    the -- the corporate legal fiction that

12    one sees throughout the world is the

13    notion of limited liability; isn't that

14    right?

15        A.    Yes.

16              (Document marked for

17              identification as Exhibit

18              Milhaupt-7.)

19              THE WITNESS:  Thank you.

20    BY MR. FENTON:

21        Q.    Professor, I'm going to hand

22    you what we have marked as Milhaupt

23    Exhibit 7.

24        A.    Mm-hmm.

Confidential - Subject to Further Confidentiality Review

Page 224

1         Q.    And this is a document that
2    bears the logo of the Paulson Institute.
3    What is the Paulson Institute?
4         A.    It's set up by Henry Paulson
5    at the University of Chicago, and it's a
6    policy-oriented institute that directs
7    policy issues toward -- related to China
8    and China's economic system and reform.
9         Q.    All right.  And this
10   particular memorandum is entitled "Why
11   mixed ownership reforms cannot fix
12   China's state sector."  And it bears a
13   date of January 2016.  That is to say
14   just a few weeks ago.
15        A.    Yes.
16        Q.    And the authors are listed
17   as Curtis J. Milhaupt -- that's you?
18        A.    It is.
19        Q.    -- and Wentong Zheng.
20   Who -- who is Professor Zheng?
21        A.    He's a professor of law at
22   the University of Florida.
23        Q.    Mm-hmm.
24        A.    He has a J.D. and a Ph.D. in

Confidential - Subject to Further Confidentiality Review

Page 225

1    economics from Stanford.

2         Q.    Okay.  And again, in this

3    article, you discuss the development of

4    China's SOEs, do you not?

5         A.    Yes.

6         Q.    Okay.  And you point out on

7    Page 2 of the article, don't you, and I'm

8    quoting -- this is toward the bottom of

9    the first column:

10              "China's institutional

11   environment blurs the boundary between

12   SOEs and privately owned firms, which

13   permits the state to exercise significant

14   influence over firms irrespective of its

15   equity ownership stakes and where firms

16   of all ownership types compete for

17   state-generated rents.

18              "As a result, SOEs" --

19   that's state-owned enterprises, right?

20        A.    Yes.

21        Q.    -- "and many large privately

22   owned firms in China actually share

23   substantial similarities."

24              That was your view as of

Page 226

1    last month, was it not?

2         A.    Yeah, I just want to make

3    sure, because the -- they wrote a --

4    their own sort of executive summary for

5    this, which I've seen in some versions.

6    I just want to make sure that you're

7    reading my language and not their --

8    their executive summary.

9         Q.    If I did, it was

10   inadvertent.

11        A.    No, I'm not --

12        Q.    But I do want you to

13   confirm.

14        A.    Yeah.

15        Q.    I don't want to be putting

16   somebody else's words in your mouth --

17        A.    Right.

18        Q.    -- unless they're mine.

19             MR. LEVIN:  That's fair.  I

20        will never give you attribution

21        for that comment.  But I will use

22        it.

23             THE WITNESS:  Yeah, this

24        is -- this is our language.

Confidential - Subject to Further Confidentiality Review

Page 227

 1    BY MR. FENTON:

 2           Q.    And that's you and Professor

 3    Zheng?

 4           A.    Yes.

 5           Q.    And if we turn over to

 6    Page 5, the concluding paragraph on that

 7    page, you say, "Specifically, the Chinese

 8    state does not exercise control over SOEs

 9    to the degree that its equity ownership

10    would indicate.

11                 "At the same time, it is

12    misleading to view private firms in China

13    as insulated from the state in ways that

14    set them apart from SOEs.  Rather, the

15    human agents managing Chinese SOEs and

16    private firms respond in similar fashion

17    to their institutional environment

18    fostering close ties to state bodies,

19    seeking state largess, and resisting

20    government policies that are not in their

21    interests."

22                 Was that your view as of a

23    few weeks ago when this article was

24    published?

Confidential - Subject to Further Confidentiality Review

Page 228

```
 1          A.    It is.
 2          Q.    And is it your view as you
 3    sit here today?
 4          A.    It is.  Although, again, I
 5    think that if you -- one just reads this
 6    paragraph, it may somewhat -- you may get
 7    a misimpression of what we're arguing.
 8                And we're suggesting that,
 9    given the -- given the entire
10    institutional context in China and all of
11    the different mechanisms that the Chinese
12    party state has to influence firm
13    behavior, that equity ownership is not
14    the key indicia of control.  You have to
15    look at the larger institutional
16    structure in which both SOEs and private
17    firms are operating.
18          Q.    All right, sir.  If we go to
19    Page 8.  Again, towards the bottom of the
20    first column, under the heading
21    "Implementing Operational and Policy
22    Decisions at SOEs," you say, "It is
23    widely considered to be good practice for
24    any state to avoid involvement in the
```

Confidential - Subject to Further Confidentiality Review

Page 229

 1   day-to-day management of SOEs.  That is

 2   because government agents generally lack

 3   the expertise, information, and

 4   incentives necessary to effectively run a

 5   commercial enterprise.

 6                  "At the same time, however,

 7   market failure is a principal theoretical

 8   justification for the existence of SOEs.

 9                  "From this perspective, it

10   would be anomalous if a government were

11   unable to implement major operational

12   decisions at SOEs on issues that directly

13   implicate important state objectives."

14                  Continuing on, you say, "And

15   yet, at times, this is precisely the case

16   in China.

17                  "One example of the Chinese

18   government's imperfect record in

19   implementing major operational or policy

20   decisions at SOEs can be found in the

21   government's failure to prevent them from

22   investing in the real estate sector

23   during the recent boom.

24                  "In an effort to reign in

Confidential - Subject to Further Confidentiality Review

Page 230

1    skyrocketing housing prices, SASAC in

2    March 2010 ordered 78 central SOEs to

3    withdraw from the real estate sector.

4              "But almost three years

5    later, as of December 2012, less than

6    one-quarter of the affected SOEs had

7    complied with that order.  In fact, many

8    of the SOEs subject to the order actually

9    expanded their real estate-related

10   business during this period."

11             Was that your view and

12   understanding as of a few weeks ago when

13   this article was published by the Paulson

14   Institute?

15        A.   It is.  And again, if I

16   could be permitted to contextualize what

17   you've read, this is -- part of this is

18   simply an acknowledgment that any

19   enterprise -- this is kind of a basic

20   corporate governance principle.  Any

21   enterprise suffers from an agency problem

22   between its owner and its managers.

23             All we are saying here is

24   China is no different in that respect.

Confidential - Subject to Further Confidentiality Review

Page 231

1    This is not a centrally planned economy

2    from 30, 40 years ago.

3                So of course there can be

4    times in which the government faces

5    resistance from the SOEs.  That's -- I

6    mean, that's kind of a truism, I would

7    think, almost.

8                What we're -- what we're

9    also saying here is that the theoretical

10   justification for the existence of SOEs

11   is market failure.  It's not clear that

12   there is market failure in China.  Why

13   haven't the firms been privatized?

14                If the government and the

15   party don't care about the capacity to

16   control these enterprises, why haven't --

17   why haven't they privatized them?

18                The fact that they have not

19   is a pretty strong indication that the

20   government and the party care a great

21   deal about their capacity to control.

22                It's not -- no one is

23   100 percent successful in any endeavor.

24   And so we're pointing out an -- this

Confidential - Subject to Further Confidentiality Review

Page 232

1    is -- this is the most prominent example.

2    I actually can't find -- I could not draw

3    your attention to other examples.

4                    But I think that the mere

5    fact that the SASAC does not always get

6    its way doesn't really undercut the idea

7    that SASAC has very considerable power in

8    connection with and capacity in

9    connection with the party to influence

10   behavior.  And if it didn't care about

11   that, it would have privatized these

12   enterprises 20 years ago.

13                   But it refuses to privatize

14   them.  To me, that is proof positive that

15   they care a hell of a lot about retaining

16   the capacity to control these

17   enterprises.

18        Q.    Okay.  Whether they

19   successfully exercise that capacity or

20   not, right?

21        A.    Well, they are continuing to

22   try to increase their capacity to

23   exercise that, because even with respect

24   to the mixed share ownership reform,

Confidential - Subject to Further Confidentiality Review

Page 233

1    despite the rhetoric about privatization,

2    privatization is not on the table.

3    They're actually combining SOEs to make

4    them stronger.

5                  So the number is going down.

6    But they're getting larger, and they're

7    subjecting even more private capital to

8    this system, which is under this very

9    distinctive mechanism of control that we

10   have been talking about.

11             Q.    Professor, you related an

12   instance in this article, okay, where

13   with respect to a major directive handed

14   down by SASAC, three years later, less

15   than one-quarter of the affected

16   state-owned enterprises had complied.

17   Okay.

18                  Now, I understand you're

19   saying that that may be an extreme

20   example.  But doesn't that tell you that

21   SASAC is not all powerful and that the

22   PRC is not all powerful when it comes to

23   the operation of Chinese companies,

24   whether or not owned by the state?

Confidential - Subject to Further Confidentiality Review

Page 234

1        A.     Nowhere in my scholarship or

2    my declaration have I asserted that the

3    Chinese government or SASAC is all

4    powerful.  Absolutely correct.

5        Q.     And what you do say in the

6    following paragraph is, to the extent

7    that the Chinese state does successfully

8    intervene in SOE operations to achieve

9    policy objectives, it often does so as a

10   regulator, not as a controlling

11   shareholder, correct?

12       A.     I said that.  I mean, I --

13   you know, I think that what -- this gives

14   the impression that somehow the party --

15   or it might give the impression that

16   somehow the alternatives are SASAC or

17   noncorporate regulation.

18             But, of course, we -- as a

19   scholar, I mean, I'm not able to see

20   party influence.  I mean, I can't see

21   that from what I'm looking at.

22             So I think I stand by this.

23   But my only caveat is I think that this

24   paragraph would have been better had it

Confidential - Subject to Further Confidentiality Review

Page 235

1    acknowledged the possibility of party

2    influence that doesn't take place through

3    SASAC as a controller or through the

4    government in its regulatory capacity.

5         Q.    When was this published,

6    sir?

7         A.    Very early.  Recently.

8         Q.    Well, January 2016?

9         A.    Correct.

10         Q.    Before or after you were

11    retained in this case?

12         A.    Well, I have to think about

13    it.  I mean, it was certainly written

14    before.  I mean, this was accepted for

15    publication in -- I'm going to say

16    roughly December, early December.

17              We had been talking to

18    Paulson.  They had been trying to get us

19    to write something for a long time.  We

20    submitted a draft, I believe in December.

21    It was finalized.

22              So I don't know precisely

23    when this appeared on the Web.  But it

24    was certainly written prior to my

Confidential - Subject to Further Confidentiality Review

Page 236

 1    retention in this case.

 2           Q.    Okay.  And the article -- I

 3    understand the caveat you've outlined.

 4    But the article reflects your views as

 5    you sit here today, right?

 6           A.    Yes.

 7           Q.    By the way, you do mention

 8    in this article that -- let me see if I

 9    can find the passage.

10           I believe you referenced in

11    this article that SASAC had chosen about

12    a dozen SOEs for some type of special

13    treatment.  There it is, top of Page 2.

14           It says, "Subsequent to the

15    third plenum in July 2013, the

16    State-Owned Assets, Supervision, and

17    Administration Commission, the agency

18    responsible for supervising China's 107

19    central SOEs, selected six of these SOEs

20    for a mixed-ownership pilot program."

21           Do you see that?

22           A.    Mm-hmm.

23           Q.    And you've got a footnote

24    there, and that's Footnote 2.  That

Confidential - Subject to Further Confidentiality Review

Page 237

1    indicates that CNBM was one of the SOEs

2    that was selected?

3         A.    Correct.

4         Q.    Okay.

5              MR. LONGER:  Are we through

6         with this document?

7              MR. FENTON:  In a moment.

8         We may be through with it forever,

9         but --

10             MR. LONGER:  I'm just

11        wondering --

12             MR. FENTON:  -- it can be

13        retired.

14             MR. LONGER:  I'm just

15        wondering if I should put it down.

16             (Document marked for

17        identification as Exhibit

18        Milhaupt-8.)

19   BY MR. FENTON:

20        Q.    All right.  Professor, we

21   have marked as Milhaupt Exhibit 8 an

22   article that appeared in the Georgetown

23   Law Journal 2015 at Page 665 entitled

24   "Beyond Ownership:  State Capitalism and

Confidential - Subject to Further Confidentiality Review

Page 238

```
 1    the Chinese Firm," and the authors are
 2    Curtis J. Milhaupt and, again, Wentong
 3    Zheng.  That's the same gentleman --
 4          A.    Yes.  I didn't receive a
 5    copy of that.
 6          Q.    I'm about to hand it to you.
 7          A.    Oh, okay.  Yes.
 8          Q.    Okay.  And -- and are you
 9    the co-author of this article?
10          A.    I am.
11          Q.    And does the article reflect
12    your views?
13          A.    Yes.
14          Q.    Okay.  I would like to
15    direct you, if I could, to Page 677 of
16    this article.  And I'm -- I'm going to
17    start reading four lines down in that
18    last paragraph on the page.
19                Where you say, "To meet its
20    governance goals, the Chinese state has
21    to delegate a significant amount of
22    discretion to its local agents and
23    accommodate their special interests to
24    ensure their participation and
```

Confidential - Subject to Further Confidentiality Review

1   cooperation.  The frequent rotations of

2   senior SOE executives may be a reflection

3   of the weakness, rather than the

4   strength, of top-down political control,

5   because they suggest that the state lacks

6   other effective means of keeping SOE

7   executives in check.  This is all the

8   more likely given the enormous size and

9   complexity of China's SOEs.

10               "At the national level,

11   SASAC is formally responsible for

12   exercising the interest of the state as

13   an investor in over 100 massive SOE

14   business groups, some of which have over

15   100 downstream subsidiaries.  How likely

16   is it that a group of bureaucrats in

17   Beijing actually controls such a vast

18   business enterprise?"

19               And now departing from the

20   document itself, I take it, sir, that

21   that last question that was in your

22   article -- that is to say, "How likely is

23   it that a group of bureaucrats in Beijing

24   actually controls such a vast business

Confidential - Subject to Further Confidentiality Review

1    empire" -- was a rhetorical one?

2          A.    Well, it's rhetorical in

3    that we don't -- we don't know the answer

4    to that.  I wouldn't pretend to know the

5    answer to that question.

6          Q.    Well, how would you answer

7    the question as to how likely it is that

8    a group of 800 bureaucrats in Beijing

9    actually controls over 100 massive SOE

10   business groups, some of which have over

11   100 downstream subsidiaries?

12          MR. LONGER:  Object to the

13       form and foundation.

14       Mischaracterizes his testimony.

15          THE WITNESS:  I -- I am

16       going to say -- give you a

17       response very similar to the one I

18       gave with respect to the Paulson

19       memo which is, we are not

20       asserting, and I don't think

21       anything in my testimony rests on

22       the assumption, that China's

23       essentially planned economy in

24       which, you know, a few people

Confidential - Subject to Further Confidentiality Review

Page 241

```
 1          behind a curtain are dictating

 2          downstream decisions.

 3               We are talking about, and

 4          my -- my declaration goes to the

 5          unique structures in which Chinese

 6          SOEs exist, structures which are

 7          unlike any other that I'm aware of

 8          anywhere in the world.

 9               So it -- it seems to me

10          that -- you know, I'm not

11          asserting that the party can

12          simply snap its fingers and have

13          all of these downstream entities

14          just -- just fall into line.

15          That's -- that's essentially a

16          planned economy.  China is not an

17          essentially planned economy.

18               So of course SASAC faces

19          some resistance, particularly when

20          it's trying to get the SOEs to

21          take actions that are not in their

22          interest.

23               I don't see -- you know,

24          just bringing this back to our
```

Page 242

1           case, I don't see any evidence

2           that SASAC was trying to get CNBM

3           Group to do something that it

4           would not have wanted to -- to do.

5           So I don't see any basis for --

6           for resistance.

7                And again, we're talking

8           about the capacity to exercise

9           influence over downstream

10          entities.  And I think that

11          nothing that is written here

12          undermines the idea that there is

13          tremendous capacity to exercise

14          influence on these groups.

15  BY MR. FENTON:

16          Q.   All right, sir.  Reading on

17  in the article, same page.

18                You say, "Efforts to

19  revitalize the state-owned sector in many

20  formerly Communist countries, including

21  China, include a delegation of managerial

22  discretion to SOE insiders to varying

23  degrees.

24                "In China, the delegation of

Confidential - Subject to Further Confidentiality Review

Page 243

1    authority has been an overarching theme

2    of SOE reforms since the late 1970s.  As

3    a result of such policies throughout the

4    transition economies, irreversible

5    jurisdictional authority was conferred on

6    managers within their own SOEs.  These

7    reforms, together with privatization of

8    SOEs into the hands of entrenched

9    managers, led to rampant insider control.

10              "Thus, in theory, the sheer

11   size and complexity of the SOE sector and

12   the obvious consequences of economic

13   transition policies in China suggest far

14   greater managerial autonomy from the

15   state in the SOE sector than a focus of

16   ownership alone would suggest."

17              Was that your view when you

18   wrote those words in -- when was this

19   published? -- in 2015?

20        A.    Yeah.  They were probably

21   written in 2014.

22        Q.    Okay.  Was -- was that your

23   view when they were written in 2014?

24        A.    Yes.  And let me --

Confidential - Subject to Further Confidentiality Review

Page 244

1          Q.    Is it your view as you sit

2     here today?

3               MR. LONGER:  Let him finish

4          answering his question.

5               THE WITNESS:  Yes, but I

6          would like to underline the

7          passage that says "greater

8          managerial autonomy than a focus

9          on ownership alone would suggest."

10              The foundation of this

11         article, our jumping-off point, is

12         that equity ownership in corporate

13         governance literature, 50 years of

14         corporate governance literature,

15         are based around the idea, the

16         central idea, that equity

17         ownership is the driving

18         determinant of control, and from

19         that springs all kinds of

20         consequences for dispersed versus

21         concentrated ownership for the

22         monitoring of management, the

23         incentives of management.

24              Our starting point for this

Confidential - Subject to Further Confidentiality Review

Page 245

1          article is given China's

2          institutional environment and the

3          fact that the Chinese party state

4          exercises influence, so much

5          influence, and intervenes so

6          extensively in the economy, this

7          focus on ownership alone is and

8          could be highly misleading.

9     BY MR. FENTON:

10         Q.    So you've got to look at

11    actions, not just ownership, right?

12         A.    You have to look at the

13    entire structure.  I mean, I know I'm

14    repeating myself, but I'm a big context

15    guy.  I mean, my entire professional

16    career as an academic is about the

17    importance of context in understanding

18    corporate structures.  And that's really

19    the point of my declaration, and so you

20    have to look at it in context.

21         Q.    All right.  Fair enough.

22              MR. FENTON:  Why don't we

23         take a break here.

24              THE VIDEOGRAPHER:  The time

Confidential - Subject to Further Confidentiality Review

Page 246

1            is 2:05 p.m.

2                    We are going off the record.

3                    (Short break.)

4                    THE VIDEOGRAPHER:  The time

5            is 2:14 p.m., on February 3rd,

6            2016.  And this is DVD Number 3.

7    BY MR. FENTON:

8            Q.    All right.  Professor, we're

9    back on the record.  By the way, I don't

10   think I asked you this.  I know the

11   information has been given to us, but I'm

12   not sure I recall exactly.

13                   You're being paid by the

14   hour for this engagement, correct?

15           A.    Correct.

16           Q.    And what's your hourly rate?

17           A.    $650.

18           Q.    All right.  And you do

19   differentiate between testimonial time

20   and --

21           A.    No, I do not.

22           Q.    Okay.  So it's $650 an hour

23   for research, writing, testimony --

24           A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 247

1          Q.     -- whatever it may be.

2                 All right.  Have you been

3     asked to prepare any supplements or

4     additional work in this case?

5          A.     No.

6          Q.     And have you sent a bill for

7     your services to date?

8          A.     Not yet.

9          Q.     Okay.  All right.  Were you

10    paid a retainer upfront?

11         A.     No.

12         Q.     Okay.  All right.  I'd like

13    to show you --

14                MR. LONGER:  We're good for

15         the money.

16                (Document marked for

17         identification as Exhibit

18         Milhaupt-9.)

19    BY MR. FENTON:

20         Q.     I'll show you what we marked

21    as Milhaupt Exhibit 9, which is Oxford

22    Handbooks Online, "The Governance Ecology

23    of China State-Owned Enterprises" by

24    Curtis J. Milhaupt, edited by Jeffrey

Confidential - Subject to Further Confidentiality Review

Page 248

1    Gordon and Wolf-Georg Ringe.

2                This bears an online

3    publication date of June 2015, correct?

4         A.    Well, this is interesting,

5    because I have not seen this before.  I

6    was not notified this was going online.

7    And I've actually never signed a contract

8    to -- I've been shown a contract, but

9    I've never signed it.  So this is news to

10   me.

11        Q.    Okay.  Well, I'll let you

12   and Professor Gordon deal with that.  So

13   I guess that leads to the question, sir,

14   did you write it?

15        A.    Let me take a careful look

16   at it.

17        Q.    Take a look.

18        A.    Yes, if I can -- if I can --

19   I mean, because this is coming as a bit

20   of a surprise to me.  If I can provide

21   some context for this document, which I

22   have never -- have not reviewed.

23                They held a conference for

24   this volume quite some time ago.

Confidential - Subject to Further Confidentiality Review

1          Q.    "They" being?

2          A.     Professor Gordon and

3    Professor Ringe.  I don't remember the

4    date.  It's well over a year, maybe close

5    to two years ago.

6               I did indeed prepare a draft

7    for that, but I had heard nothing further

8    about the progress toward publication.

9               And I had been getting

10   pinged by Oxford to sign a contract.  But

11   I had some problems with it because of

12   the various stipulations that were in the

13   contract which I said I can't -- I can't

14   stipulate to.  So that's -- that's the

15   status of this.  So I am surprised to see

16   this.

17         Q.    Okay.  And I was not aware

18   of that background.  Be that as it may,

19   I'm actually interested in --

20               MR. LONGER:  Before you ask

21          a question, can I ask of the

22          provenance?  Did you obtain this

23          online, or did you get this from

24          Professor Gordon?

Confidential - Subject to Further Confidentiality Review

Page 250

```
 1                MR. FENTON:  I believe -- I
 2         believe we obtained it online.
 3         I'm not entirely sure about that.
 4                MR. LONGER:  All right.
 5  BY MR. FENTON:
 6         Q.    In any event, what I'd like
 7  to do is direct your attention -- and
 8  feel free to refamiliarize yourself with
 9  the article to the extent that you feel
10  necessary, Professor.
11                But I'd like to direct your
12  attention specifically to the last full
13  paragraph on Page 3, under Section 2.2.1,
14  "A Simple Analytical Construct."
15         A.    Okay.
16         Q.    Do you recall approximately
17  when that document was prepared?
18                MR. LONGER:  I object to the
19         form of the question, because I'm
20         not sure that he prepared it.
21                MR. FENTON:  I'm sorry.  I
22         thought we established that.
23  BY MR. FENTON:
24         Q.    I thought we established
```

Confidential - Subject to Further Confidentiality Review

Page 251

1    that you, in fact, wrote this.

2         A.    I prepared a draft for a

3    conference a long time ago.  But I

4    have -- I had never reviewed it.  Never

5    revised it.  And as I said, this comes as

6    a surprise to me.  And it's a little

7    unsettling to see it in print in this

8    form.

9         Q.    Okay.  All right.  Be that

10   as it may, what I'd like to ask you about

11   is the last paragraph on Page 3, last

12   full paragraph on Page 3.  And I would

13   simply like to ask you whether it

14   reflects your views.  Okay.

15              And it reads as follows:

16   "The hierarchical aspects of Chinese

17   industrial organization are readily

18   apparent.  They range from the vertical

19   integration of firms along the production

20   chain to the top-down character of

21   industrial policy formulation and

22   transmission in an authoritarian

23   political regime.

24              "But the Chinese system is

Confidential - Subject to Further Confidentiality Review

Page 252

 1   not simply one in which vertically

 2   integrated groups transmit commands from

 3   state economic planners to SASAC and down

 4   through a chain to vertically integrated

 5   firms.  These hierarchical structures are

 6   embedded in dense networks, not only of

 7   other firms, but also of party and

 8   government organs.

 9              "These networks appear to

10   facilitate information flow from the

11   bottom up as well as from the top down.

12   They foster relational exchange and

13   collaboration on many levels of the

14   production and policy implementation

15   processes, and they provide high-powered

16   incentives to leaders within the system,

17   because success in business leads to

18   promotion and accompanying rewards in the

19   political realm and vice versa.

20              "The combination of

21   authoritarian hierarchy and collaboration

22   within high-powered incentive structures

23   is reminiscent of another mechanism

24   economic transitions, private equity

Confidential - Subject to Further Confidentiality Review

Page 253

1    investments."

2                    Now, let me first ask you,

3    Professor, given the question of where it

4    came up.

5                    Do you recall writing that?

6         A.    You know, certainly this was

7    in an early draft.  That's all I can say.

8                    I mean, I -- as I said, I

9    have not seen this document in probably a

10   year and a half.

11        Q.    All right.  And -- and at

12   the time that you wrote this, that did

13   reflect your views; is that correct?

14        A.    Yes.  Although, you know,

15   again I -- with respect to this last

16   sentence, the -- the reference to private

17   equity investments, I mean, this is a bit

18   of, if I can -- if I can use this term,

19   "poetic license" or "argumentation by

20   analogy."  Certainly not suggesting that

21   this is a literal translation of private

22   equity into the Chinese context.

23                    I just want to make it clear

24   that the -- the reference here is by way

Confidential - Subject to Further Confidentiality Review

1    of figurative analogy.

2            Q.    I -- I'm just asking if you

3    wrote the words.

4            A.    To the best of my knowledge,

5    this looks familiar from -- from my -- my

6    earlier draft.

7            Q.    All right.  And does it

8    reflect your views as you sit here today?

9            A.    Yes.

10           Q.    All right.  Professor,

11   moving away from your writings,

12   interesting though they may be, and I

13   mean -- I mean that sincerely, you are

14   aware, are you not, that the Taishan was

15   a functioning standalone company in its

16   own right before it was acquired by BNBM

17   PLC?

18           A.    Yes.

19           Q.    Okay.  So, in other words,

20   BNBM PLC didn't incorporate Taishan for

21   some purpose.  It acquired what was

22   already a fully up and running,

23   functioning business, correct?

24           A.    That's my understanding.

Confidential - Subject to Further Confidentiality Review

Page 255

1          Q.    Okay.  And do you have any

2    reason to believe that BNBM's acquisition

3    of its interests in Taishan in 2005 and

4    2006 were conducted in anything other

5    than what we here in America would call

6    an arm's-length transaction?

7          A.    I have no -- no reason to

8    believe otherwise.

9          Q.    Okay.  And -- and -- and

10   Taishan was purchased for fair value?

11         A.    Well, I mean, that --

12   that -- I mean, I don't think I have a

13   basis to respond to that.

14         Q.    But you have no reason to

15   believe it was not purchased for fair

16   value -- for fair value?

17              MR. LONGER:  It's the same

18         question in a way.  Object to the

19         form.

20              THE WITNESS:  I mean,

21         it's -- it's hard to -- it's hard

22         to give an -- an answer on fair

23         value.  I mean, I just don't have

24         a basis for -- for answering that.

Confidential - Subject to Further Confidentiality Review

Page 256

 1   BY MR. FENTON:

 2        Q.    Did you review -- in the

 3   materials that you were given, did you

 4   review any appraisal reports that were

 5   prepared in connection with the BNBM

 6   acquisition of Taishan shares?

 7        A.    I -- I believe there were

 8   appraisal reports in the -- in the

 9   record, yes.

10        Q.    All right.  Do you have any

11   reason to believe that those appraisal

12   reports were in any way inaccurate?

13        A.    No.  Mm-hmm.

14        Q.    All right.  And --

15             THE REPORTER:  I didn't hear

16        an answer.

17             THE WITNESS:  I said no.

18             MR. FENTON:  He said it in

19        this direction, and it was very

20        soft.

21             MR. LONGER:  He's from

22        Wisconsin.

23   BY MR. FENTON:

24        Q.    Now, you are also aware that

Confidential - Subject to Further Confidentiality Review

Page 257

```
 1   Taishan itself, because we talked about
 2   this a little earlier, has shown
 3   substantial profits between the time BNBM
 4   acquired its initial interest and the
 5   present, correct?
 6          A.    Correct.
 7          Q.    That is to say, throughout
 8   the period of 2004 all the way up to the
 9   present day, Taishan has shown
10   substantial profit growth, and in some
11   cases, greater growth than its parent
12   corporation, correct?
13          A.    I mean, that's -- that's my
14   general understanding, yes.  I -- I --
15   you know, I don't know exactly
16   substantial, depending -- but, yeah, I
17   have no reason to dispute your
18   characterization.
19          Q.    It's a profitable company?
20          A.    Profitable company.
21          Q.    Okay.  And you are also
22   aware that -- that Taishan maintains its
23   own manufacturing facilities?
24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 258

1          Q.      Separate from BNBM?

2          A.      Yes.

3          Q.      That goes for PLC and Group,

4    correct?

5          A.      Yes.

6          Q.      Does BNBM Group have any

7    direct ownership interest in Taishan at

8    this point, to your knowledge?

9          A.      I did not see any indication

10   of that.

11         Q.      And you are also aware that

12   Taishan has separate management from the

13   BNBM companies and the CNBM companies?

14              MR. LONGER:  Object to the

15         form.

16              THE WITNESS:  I mean, there

17         are -- there are certainly PLC

18         directors on the board of Taishan.

19   BY MR. FENTON:

20         Q.      Mm-hmm.  Okay.  But the

21   management, the officers of the company

22   are separate, aren't they?

23         A.      I mean, that's -- that's my

24   recollection.

Confidential - Subject to Further Confidentiality Review

Page 259

1           Q.    All right.  And, in fact,

2    Chairman Jia, who is Taishan's chairman,

3    ran Taishan before BNBM acquired its --

4    its interest and continues to run it up

5    to the present day, correct?

6           A.    Yes.

7           Q.    And you are also aware,

8    because we talked about this earlier,

9    that Taishan maintains separate

10   accounting functions, correct?

11          A.    Yes.  I -- I don't have

12   reason to dispute that.

13          Q.    All right.  And it has its

14   own employees, correct?

15          A.    Yes.

16          Q.    Has its own sales force,

17   correct?

18          A.    Yes.

19          Q.    Okay.  Are you familiar with

20   the difference in the -- the target

21   customer or customer base as between

22   Taishan and PLC with respect to drywall

23   sales?

24          A.    My understanding from

Confidential - Subject to Further Confidentiality Review

1    reading the documents is that the PLC

2    board is pitched at a somewhat higher

3    market than the Taishan board.

4         Q.    In other words, the -- the

5    PS -- the BNBM PLC drywall is sold more

6    to the commercial and high-end market and

7    the Taishan gypsum board is sold more in

8    the consumer market?

9         A.    That is my understanding --

10   I'm sorry.

11              MR. LONGER:  Sorry.

12              I didn't understand that to

13         be a question.  It sounded more

14         like a statement, but you answered

15         it --

16   BY MR. FENTON:

17        Q.    Well, in other words, in any

18   event, you agree with my statement, do

19   you not?

20        A.    It's my understanding from

21   reading the documentation.  I have no

22   independent source of, you know,

23   authority for that.

24        Q.    All right.  And -- and given

Confidential - Subject to Further Confidentiality Review

Page 261

1    the fact that Taishan has its -- its own

2    management, its own sales force, its own

3    manufacturing facilities, its own

4    customer base, and earns substantial

5    profits, do you think it's fair to

6    describe Taishan as a shell?

7                 MR. LONGER:  Object to the

8           form.  Foundation.

9                 THE WITNESS:  I mean,

10          it's -- I think it's calling for

11          me to, in essence, reach a legal

12          conclusion.  I mean, I think a

13          shell is a term that has

14          significant -- legal significance

15          in the context of this -- of the

16          question that is before the court.

17                 I -- I don't have a basis

18          for rendering a legal decision

19          about that.

20   BY MR. FENTON:

21          Q.    Well, I'm not asking for a

22   legal opinion.  In the ordinary parlance

23   when somebody talks about a shell

24   corporation, would you describe Taishan

Confidential - Subject to Further Confidentiality Review

Page 262

 1   as a shell?

 2              MR. LONGER:  You know -- you

 3         know, I'm going to object and say

 4         that it does call for a legal

 5         conclusion.

 6              MR. FENTON:  That's fine.

 7   BY MR. FENTON:

 8         Q.   Answer it anyway.

 9         A.   It appears to have operating

10   assets.

11         Q.   Which is another way of

12   saying that it's not a shell, correct?

13         A.   Yes.

14         Q.   Okay.  Did you read BNBM

15   PLC's articles of incorporation in

16   connection with the work that you did?

17         A.   I -- you know, in the mass

18   of documentation, I'm sure I looked at

19   them.  I -- I'm sure I looked at them.

20         Q.   Okay.  And let me just show

21   you...

22              Okay.  We have the entire

23   articles here.  I think what we're going

24   to mark, Professor, is just an excerpt.

Confidential - Subject to Further Confidentiality Review

Page 263

1    But if you want to review the entire

2    document, I've got it here for you to

3    review.

4            A.    Okay.

5            (Document marked for

6            identification as Exhibit

7            Milhaupt-10.)

8    BY MR. FENTON:

9            Q.    And we're marking as

10   Exhibit 10 excerpts from the Beijing New

11   Building Materials public limited company

12   annual report.

13           MR. FENTON:  Wait.  This is

14           not it.  This is not it.  This is

15           not the articles.

16           (Exhibit 10 withdrawn.)

17           (Whereupon, a discussion was

18           held off the record.)

19           MR. LONGER:  Do you want to

20           go off the record for a minute?

21           MR. FENTON:  Yeah, let's go

22           off the record.

23           THE VIDEOGRAPHER:  The time

24           is 2:32 p.m.  We are going off the

Confidential - Subject to Further Confidentiality Review

1          record.

2                    (Short break.)

3                    THE VIDEOGRAPHER:  The time

4          is 2:42 p.m.  We are back on the

5          record.

6                    (Brief pause.)

7                    THE VIDEOGRAPHER:  The time

8          is 2:42.  We are off the record.

9                    (Brief pause.)

10                   THE VIDEOGRAPHER:  We are

11         going back on the record.  The

12         time is 2:45 p.m.  We are back on

13         the record.

14                   (Document remarked for

15         identification as Exhibit

16         Milhaupt-10.)

17  BY MR. FENTON:

18         Q.    Professor Milhaupt, there

19  was a little confusion with respect to

20  the exhibits before the break.  I

21  apologize for that, because I know your

22  time is valuable, unlike the rest of us.

23                   Let me show you what has now

24  been marked as Milhaupt Exhibit 10, which

Page 265

1    is a copy of the Beijing New Materials

2    Public Limited Company articles of

3    association, dated May 16, 2006.

4              Now, I will tell you there

5    have been subsequent amendments to these

6    articles, but not to the provision that

7    I'm going to ask you about.  But if you'd

8    like to review any of the subsequent

9    amendments, we have them here for you to

10   do so.

11        A.    Okay.

12        Q.    My first question, after

13   you've had a chance to review the

14   document, is whether you reviewed this

15   document or a similar document in

16   connection with your work in this case.

17        A.    I reviewed it as an exhibit

18   to the briefs, but I did not consider it

19   to be central to the preparation of my

20   declaration.  So I have not deeply

21   studied this document.

22        Q.    All right.  And when you say

23   that you did not consider it central to

24   the -- to your declaration, is that to

Confidential - Subject to Further Confidentiality Review

Page 266

1   say that you did not consider it to be

2   relevant?

3          A.    Well, my -- again, the

4   thrust of my research into this world of

5   Chinese SOEs and the thrust of my

6   declaration is that the corporate

7   features need to be understood in

8   context, and indeed the formal corporate

9   features may not be the most important

10  aspect of governance in a Chinese SOE.

11              So in that context, the

12  articles of incorporation are relevant,

13  but again, I did not deem them to be

14  central, because I view the group as the

15  most important entity in a Chinese SOE as

16  opposed to the particular members of the

17  group.

18         Q.    The context of your opinion

19  was also what one should consider in

20  assessing whether or not, in essence, to

21  pierce the corporate veil, correct?

22         A.    Yes.

23         Q.    And I understand that you're

24  not expressing an opinion on ultimately

Confidential - Subject to Further Confidentiality Review

Page 267

1    whether it should or should not be

2    pierced, but your opinion was rendered in

3    the context of what is relevant to

4    consider.

5         A.    Yes.

6         Q.    All right.  And is it

7    relevant to consider -- in addressing

8    that question, I'm going to direct you to

9    Article 39 of these articles of

10   association.  And the Bates number on the

11   bottom is 3766, if that's of assistance.

12   Let me know when you get there.

13              MR. LONGER:  You said 39?

14              MR. FENTON:  Article 39.

15              THE WITNESS:  Yes, I've read

16        it.

17   BY MR. FENTON:

18        Q.    Okay.  And article 39 says

19   as follows:  "The controlling shareholder

20   and the actual controller of the company

21   shall not impair the interests of the

22   company by use of their association

23   relationship.  In case of any violation

24   of provisions and any lost" -- "losses to

Confidential - Subject to Further Confidentiality Review

Page 268

1    the company, they shall bear the

2    liabilities for compensation.

3              "The controlling shareholder

4    and the actual controller of the company

5    shall have the duty of good faith to the

6    company and other shareholders of the

7    company.  The controller shareholders

8    shall strictly exercise the rights of

9    contributor according to law and should

10   not impair the legitimate rights and

11   interests of the company and other

12   shareholders of the company by use of

13   profit distribution, asset restructuring,

14   foreign investment, occupation of funds,

15   security for loan and others, or impair

16   the interest of the company and other

17   shareholders of the company by taking

18   advantage of his/her" -- and then this is

19   a translation correction that I believe

20   everybody agreed to -- "controlling

21   position."

22              Do you see that?

23       A.    Yes.

24       Q.    All right.  And you did not

Confidential - Subject to Further Confidentiality Review

Page 269

1    consider this relevant to any inquiry

2    about whether corporate formalities were

3    being observed?

4              MR. LONGER:  Objection to

5         the form.  Mischaracterizes his

6         testimony.

7              THE WITNESS:  Yes, I was

8         going to say that isn't what I

9         said.

10             And actually, the point of

11        the literature that I cite to

12        motivate the declaration, is to

13        say that, yes, Chinese SOEs have

14        taken on the garb of the corporate

15        form.  Yes, there are minority

16        shareholder protections in these

17        articles.

18             But they have to be

19        understood in the context of

20        China's legal system.  And one can

21        be misled by focusing too much on

22        the formal legal garb in which

23        these entities have wrapped

24        themselves.

Confidential - Subject to Further Confidentiality Review

Page 270

1              So a question that arises

2       from reading this is, you know, I

3       see the language, but who is going

4       to enforce this provision?

5       Chinese courts, as your own

6       expert, Donald Clark, has written,

7       will not touch the assets of

8       state-owned enterprises.

9              And they are particularly

10      reluctant to pierce, to reach a

11      public company.  So I see the

12      language.

13             But this is really kind of

14      the central piece of my -- of my

15      declaration.

16             Don't be -- don't be overly

17      fixated on the formal corporate

18      form.  These companies have

19      recently moved out of a centrally

20      planned economy.  They have been

21      corporatized, but they have not

22      been privatized.  And they're

23      operating in a legal system with

24      very weak concepts of minority

Confidential - Subject to Further Confidentiality Review

Page 271

```
1            shareholder protections and courts

2            that are not independent of the

3            party and which are particularly

4            reluctant to rule against the

5            controlling shareholder, which is

6            ultimately the state.

7    BY MR. FENTON:

8            Q.    All right.  Are you aware of

9    any instance where the controlling

10   shareholder or actual controller of BNBM

11   PLC violated Article 39?

12           A.    I don't have a basis,

13   really, for answering that.  I mean, I've

14   read what's in the documentation.

15           Q.    So as you sit here right

16   now, despite the vast record that you

17   reviewed, you cannot cite to me a single

18   instance where either the controlling

19   shareholder or the actual controller of

20   BNBM PLC violated the dictates of

21   Article 39?

22           A.    Again, as I -- I mean, I can

23   only say what I said before, which is I

24   don't have a basis for answering -- for
```

Page 272

1    answering.

2         Q.    Because you haven't seen

3    such an instance, correct?

4              MR. LONGER:  Asked and

5         answered.

6              THE WITNESS:  It did not

7         appear to me from the record that

8         I reviewed.

9    BY MR. FENTON:

10        Q.    Thank you.  BNBM PLC, you

11   understand, is limited on the Shenzhen

12   Stock Exchange?

13        A.    Yes.

14        Q.    Are you familiar with the

15   rules of the Shenzhen Stock Exchange?

16        A.    I am not -- I am not deeply

17   familiar with them, no.

18        Q.    All right.  Do you

19   understand that they -- that they

20   generally provide for things like

21   disclosures of major corporate events,

22   accuracy in reporting, those kinds of

23   things?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 273

1          Q.    Okay.  And the annual

2    reports of listed companies have to

3    comply with the rules?

4          A.    Yes.

5          Q.    Let me show you...

6                (Document marked for

7                identification as Exhibit

8                Milhaupt-11.)

9    BY MR. FENTON:

10         Q.    Let me show you, Professor,

11   what has been marked as Milhaupt

12   Exhibit 11, which is excerpts.  Again, we

13   have the entire report here if you'd like

14   to review it.

15               These are excerpts of the

16   BNBM PLC annual report for 2007.  Bears a

17   date of March 24, 2008.

18               What I would like to direct

19   your attention to in this document that

20   was subject to the rules of the Shenzhen

21   Stock Exchange, is Roman III, which is

22   titled "Separation of the Company and the

23   Controlling Shareholder in Operations,

24   Personnel, Assets, Organization, and

Confidential - Subject to Further Confidentiality Review

1    Finance."

2              Do you see that section?

3    A.    Yes.

4    Q.    All right.  Now, was this

5    something -- by "this" I mean this

6    document in its entirety or this section

7    in particular.  Was this something that

8    you reviewed in connection with the

9    materials that you looked at?

10   A.    Again, I would give the same

11   answer, which is yes -- yes, I reviewed

12   it as an exhibit to the briefs.  It's not

13   something that I have -- that I focused

14   on in the preparation of my -- of my

15   declaration.

16   Q.    All right.  And is that

17   because you did not believe it was

18   particularly relevant to your inquiry?

19   A.    Well, I mean, I'm sorry, but

20   I give the same answer that I gave

21   before, which is, given the scope of my

22   assignment, which was to talk about the

23   governance characteristics of SOEs under

24   SASAC, my approach and my -- my approach

Confidential - Subject to Further Confidentiality Review

Page 275

```
 1   was to provide an accounting of the

 2   entire set of circumstances that's

 3   relevant.

 4               And so I focused in

 5   particular on those factors which were

 6   not -- which were noncorporate.  I'm not

 7   saying this isn't relevant.  I'm saying

 8   the spirit of my declaration is that we

 9   can be overly persuaded by formal

10   governance structures in the SOEs.

11       Q.    All right.  So in the spirit

12   of your declaration, you did not think it

13   important to mention that this Shenzhen

14   Stock Exchange-listed company in its 2008

15   annual report stated as follows:

16               "One, operational

17   independence.  The company is an

18   independent and complete business entity

19   in its own right and is capable of

20   operating independently.  The controlling

21   shareholder and any subordinate entity

22   thereof are not engaged in business

23   activities that are the same as or

24   similar to those of the company?"
```

Confidential - Subject to Further Confidentiality Review

Page 276

```
 1              MR. LONGER:  Object to the
 2         form.  It mischaracterizes his
 3         testimony, and it actually
 4         misstates his testimony.
 5   BY MR. FENTON:
 6         Q.    Well, my question is, did
 7   you cite to that provision in your
 8   report?
 9         A.    I did not, but I wouldn't
10   find the statement to be particularly
11   surprising.  The fact that they state
12   that they are independent, I mean, this
13   is -- this is a company that is
14   ultimately under the control of the CNBM
15   Group and ultimately, ultimately SASAC.
16   So, to me, that context is more important
17   than a statement by the company that it's
18   independent.
19         Q.    Are you saying that this is
20   something that a court should disregard
21   in considering whether or not to pierce
22   the corporate veil?
23              MR. LONGER:  Object to the
24         form.
```

Confidential - Subject to Further Confidentiality Review

Page 277

1              THE WITNESS:  Well, again,

2          you know, a Court is obviously

3          free to consider anything that it

4          wants.  I think the spirit of my

5          declaration is that there's a much

6          wider context for these formal

7          corporate structures and

8          formalities and listings and that

9          that context is actually crucial

10          to understanding and

11          contextualizing these kinds of

12          disclosures.

13  BY MR. FENTON:

14          Q.    All right.  And -- and while

15  we are talking about the spirit of your

16  declaration, it was also not within the

17  spirit of your declaration to make

18  reference to Paragraph 2, which reads as

19  follows:

20              "About personnel separation.

21  The company's personnel are independent

22  of the controlling shareholder.  None of

23  the senior executives, including the

24  general manager, the deputy general

Confidential - Subject to Further Confidentiality Review

Page 278

1    manager, the chief financial officer, and

2    the secretary of the board of directors

3    hold any position in the controlling

4    shareholder.  The controlling

5    shareholder's senior executives who serve

6    concurrently as the company's directors

7    have enough time and energy to work for

8    the company.  The company is completely

9    separated from the controlling

10   shareholder in the labor personnel, in

11   payroll management, and manages its

12   personnel independently."

13              That also was not within the

14   spirit of your declaration, was it?

15              MR. LONGER:  Object to the

16          form.  Mischaracterizes his

17          testimony.

18              You can answer the question.

19              THE WITNESS:  Well, I mean,

20          there is no discussion, for

21          example -- you know, understanding

22          what this says, there is no

23          discussion of SASAC's appointment

24          and removal powers.  There is no

Page 279

```
 1            discussion of the party role in

 2            the enterprise.  And from what I

 3            am seeing, it's hard to really

 4            even get a picture of where this

 5            corporation fits into the CNBM

 6            Group.

 7                 So again, I'm -- I'm not

 8            overly -- I would not put a lot of

 9            emphasis on this blanket

10            statement, because there's very

11            little context for -- for

12            understanding -- for understanding

13            this.

14   BY MR. FENTON:

15            Q.   Well, are you saying that

16   the -- the -- the BNBM, the

17   Shenzhen-listed company, was violating

18   disclosure rules of the Shenzhen exchange

19   when it put out its -- when it put out

20   its annual report?

21                 MR. LONGER:  Object to the

22            form.  Mischaracterizes his

23            testimony.

24   BY MR. FENTON:
```

Confidential - Subject to Further Confidentiality Review

Page 280

```
 1          Q.    Is that a charge that you're
 2    leveling here, Professor?
 3              MR. LONGER:   It's
 4          argumentive.   Mischaracterizes his
 5          testimony.   Object to the form.
 6    BY MR. FENTON:
 7          Q.    Good.   Answer my question.
 8          A.    I'm not an expert on
 9    Shenzhen's listing requirements, so I'm
10    certainly not leveling any charges
11    against anyone.
12          Q.    All right.   And the spirit
13    of your declaration also did not include
14    Item Number 3, "Integrity of Assets."
15              "The company's assets are
16    independent and complete.   There is a
17    clear line of demarcation between the
18    company and the controlling shareholder
19    in terms of industrial property and
20    nonpatented technology.   The company is
21    completely separated from the controlling
22    shareholder and operates independently in
23    production, supply, and marketing."
24              That's not referenced in
```

Confidential - Subject to Further Confidentiality Review

Page 281

```
 1   your report either --
 2               MR. LONGER:   Objection to
 3         the form.   Mischaracterizes his
 4         testimony.
 5   BY MR. FENTON:
 6         Q.     -- correct?
 7               MR. LONGER:   Answer it.
 8               THE WITNESS:   I -- I just
 9         have to give -- can I just say I
10         give the same answer that I gave
11         with respect to the other two
12         points.
13   BY MR. FENTON:
14         Q.     Sure.   That will shorten
15   things up.
16               But let me read the next two
17   paragraphs.   And if your answer is the
18   same, all you have to do is say so.
19               Number 4, "Organizational
20   Independence."
21               "The company's board of
22   directors, supervisory committee, and
23   other internal bodies operate
24   independently.   There is no
```

Confidential - Subject to Further Confidentiality Review

Page 282

1    superior-subordinate relationship between

2    the controlling shareholder and its

3    functional departments and the listed

4    company and its" -- "and its functional

5    departments."

6              That's not in your

7    declaration either, right?

8         A.    Correct --

9              MR. LONGER:  I have the same

10         objections --

11   BY MR. FENTON:

12         Q.    Either in letter or spirit,

13   correct?

14              MR. LONGER:  Same

15         objections.

16              THE WITNESS:  It -- it's not

17         in my declaration.

18   BY MR. FENTON:

19         Q.    Okay.  And last, "Financial

20   Separation."

21              "The company is completely

22   financially independent and completely

23   separated from the controlling

24   shareholder, has its own independent

Confidential - Subject to Further Confidentiality Review

1    finance department, independent financial

2    accounting system, and independent

3    financial management system, and has

4    established a strict financial management

5    system for its subsidiaries.  The company

6    has set up a separate bank account and

7    does not share a bank account with the

8    controlling shareholder.  The company

9    pays taxes independently according to

10   law."

11              That is not in the letter or

12   the spirit of your declaration either, is

13   it?

14              MR. LONGER:  Objection to

15         the form.  Mischaracterizes his

16         testimony and his declaration.

17              You can answer the question.

18              THE WITNESS:  It's not in my

19         declaration.

20   BY MR. FENTON:

21         Q.    All right.  And these --

22   these passages that I have read from the

23   2007 BNBM PLC annual report, 1 through 5,

24   are you in a position as you sit here

Confidential - Subject to Further Confidentiality Review

Page 284

1   today, Professor, to dispute the factual

2   accuracy of any of the statements

3   contained therein?

4                MR. LONGER:  Objection to

5        the form.

6   BY MR. FENTON:

7        Q.   I understand you say they

8   don't talk about the party.  I understand

9   you say they don't talk about SASAC.

10                My question is, are you in a

11  position to dispute anything they do say?

12       A.   Well, I -- I mean, I would

13  have to take a -- I would have to take a

14  very careful look at the document,

15  because I -- I don't think I'm in a

16  position sitting here to -- to respond to

17  that.

18       Q.   All right.  Well, do you

19  think, perhaps, you might have taken a

20  more careful look at the document before

21  you prepared your report?

22                MR. LONGER:  Objection to

23        the form.  Argumentive.

24                MR. JOHNSON:  Can I suggest

Confidential - Subject to Further Confidentiality Review

Page 285

1           we take a short break for to look

2           at those five points and then

3           maybe you can give answer after

4           review, Professor.

5                   MR. FENTON:  I don't think

6           we need to break.

7                   MR. LONGER:  It's his

8           deposition, not yours.

9                   MR. JOHNSON:  I just want a

10          clean record.

11  BY MR. FENTON:

12          Q.    At least as you sit here

13  right now, you are not in a position to

14  dispute any of the statements that appear

15  in Paragraphs 1 through 5 that we've read

16  into the record?

17                  MR. LONGER:  Asked and

18          answered.  Still argumentive.

19                  THE WITNESS:  I have no

20          basis to dispute these statements.

21  BY MR. FENTON:

22          Q.    All right.  And we are going

23  to mark -- I'm sorry.  Professor, what

24  exhibit was that?

Confidential - Subject to Further Confidentiality Review

Page 286

1            MR. LONGER:  Exhibit 11.

2            THE WITNESS:  11.

3            (Document marked for

4       identification as Exhibit

5       Milhaupt-12.)

6  BY MR. FENTON:

7       Q.   All right.  We're going to

8  mark as Exhibit 12 --

9            MR. STECKLER:  By the way --

10       I'm sorry -- these are just

11       portions.  11 is just portions?

12            MR. FENTON:  That's what I

13       said.  We have the full documents

14       here if anybody wants to look at

15       them.

16            MR. STECKLER:  You have the

17       full documents?  Could I look

18       at --

19            MR. FENTON:  Yeah.  We can

20       get you those at the next break.

21            MR. PFAEHLER:  It's 120

22       pages.

23  BY MR. FENTON:

24       Q.   All right.  I have marked as

Confidential - Subject to Further Confidentiality Review

Page 287

1    Milhaupt Exhibit 12, the BNBM PLC annual

2    report for 2008, dated March 17, 2009.

3    Again, the report issued by BNBM as a

4    Shenzhen-listed company.

5              And I'm not going to tarry

6    too long, Professor Milhaupt, but if I

7    can address your attention to the third

8    page of the -- I'm sorry -- the fourth

9    page of the document that has been handed

10   to you.

11             You'll see a III, and you'll

12   see the same statements that appeared in

13   the previous annual report from 2007.

14        A.    Yes, I see that.

15             MR. LEVIN:  It's Page 19.

16             MR. LONGER:  Object to the

17        form, foundation, and the comments

18        of counsel.

19   BY MR. FENTON:

20        Q.    It's actually Pages 20 and

21   21.

22             All right.  And my -- my

23   only question is this, Professor:

24             If I were to ask you the

Confidential - Subject to Further Confidentiality Review

Page 288

1    same questions regarding these statements

2    in the 2008 annual report that I asked

3    you about the 2007 annual report, would

4    your answers be the same?

5              MR. LONGER:  I'd have the

6         same objections.

7              But go ahead.  Subject to

8         that.

9    BY MR. FENTON:

10        Q.    Instead of going through

11   them one by one, I'm trying to speed

12   things up.

13        A.    I would have the same

14   response.

15        Q.    Okay.

16             (Document marked for

17        identification as Exhibit

18        Milhaupt-13.)

19   BY MR. FENTON:

20        Q.    And then next I'd like to

21   show you the -- the BNBM PLC annual

22   report for 2009.  Again, these are

23   excerpts.

24             And we'll mark that as

Confidential - Subject to Further Confidentiality Review

Page 289

 1    Milhaupt-13.

 2             A.     Thank you.

 3             Q.     And again, directing your

 4    attention to Page 17, you'll see III,

 5    "Separation of the company and the

 6    controlling shareholder and operations

 7    personnel, operations organization and

 8    finance."  You'll see the same five

 9    paragraphs.

10             And my question, sir, is, if

11    I were to ask you the same questions

12    about these statements as I did with

13    respect to the 2007 and 2008 annual

14    reports, would your answers be the same?

15             MR. LONGER:  Same

16        objections.

17             THE WITNESS:  Same response.

18    BY MR. FENTON:

19             Q.     Same response, meaning your

20    answers would have been the same?

21             A.     Correct.

22             Q.     Okay.  Then we don't have to

23    tarry too long on that.

24             MR. FENTON:  Why don't we

Confidential - Subject to Further Confidentiality Review

Page 290

```
1              take a short break here.  I've

2              still got more.  But I think if I

3              take a few minutes, I might be

4              able to shorten things up and get

5              people out of here at a reasonable

6              hour.

7                   THE VIDEOGRAPHER:  The time

8              is 3:07 p.m., and we are going off

9              the record.

10                  (Short break.)

11                  THE VIDEOGRAPHER:  The time

12             is 3:30 p.m.  We are back on the

13             record.

14                  (Document marked for

15             identification as Exhibit

16             Milhaupt-14.)

17   BY MR. FENTON:

18        Q.    All right.  Professor, let

19   me hand you what's been marked as

20   Milhaupt Exhibit 14.

21        A.    Thank you.

22        Q.    This document -- and again,

23   I believe we've included some excerpts --

24   are the articles of association of
```

Confidential - Subject to Further Confidentiality Review

Page 291

1    Taishan Gypsum, dated June 20, 2007.

2                    Take your time and

3    familiarize yourself with -- with the

4    document, but I'm specifically going to

5    be asking you about Article 64 and

6    Article 103.

7                    Actually, 64 and

8    Articles 102 and 103.  Just let me know

9    when you're ready.

10          A.    I'm sorry.  It was 64.

11          Q.    62.

12          A.    62.

13          Q.    I'm sorry.  64 and 102 and

14   103.  Page 10 and then Page 15.

15          A.    Okay.  All right.

16          Q.    You see Article 64 on

17   Page 10 deals with the powers of the

18   board of directors?

19          A.    Yes.

20          Q.    All right.  This is for

21   Taishan, correct?

22          A.    Yes.

23          Q.    Now, was this a document

24   that you considered in connection with

Confidential - Subject to Further Confidentiality Review

Page 292

1    your work?

2           A.    Again, I looked at it.  I

3    reviewed it in connection with my -- my

4    perusal of the entire record.

5           Q.    All right.  This, again, was

6    another document that wasn't within the

7    spirit of your declaration?

8                 MR. LONGER:  Objection to

9           the form.

10                THE WITNESS:  It was not --

11          we -- deep study of this document

12          was not within the scope of the --

13          squarely within the scope of

14          the -- my assignment in connection

15          with the preparation of my -- of

16          my declaration.

17   BY MR. FENTON:

18          Q.    All right.  Well, I'm going

19   to -- I'm going to give you another

20   assignment and ask you to -- to take a

21   look at this Article 64 now.

22                Before we get to that,

23   Article 63 provides that "The board of

24   directors shall be constituted to five

Confidential - Subject to Further Confidentiality Review

Page 293

```
 1   directors and shall have one chairman."
 2              Do you see that?
 3        A.    Yes.
 4        Q.    Okay.  And it says, "Of the
 5   five directors, Beixin Group Construction
 6   Materials Company, Ltd., and Tai'an
 7   Donglian Investment & Trading Company,
 8   Ltd., shall jointly nominate three
 9   directors, Tai'an Stated-Owned Assets
10   Corporation Company, Ltd., shall nominate
11   one director, and Tai-an Anxin Investment
12   & Trading Company and Jia Tongchun shall
13   jointly nominate one director."
14              Do you see that?
15        A.    Yes.
16        Q.    All right.  And those are
17   the various -- those parties who nominate
18   the various directors were the various
19   interest holders in Taishan.  Is that --
20   to your knowledge?
21        A.    Yes.
22        Q.    All right.  Do you see
23   anything in there about CNBM nominating
24   any directors?
```

Confidential - Subject to Further Confidentiality Review

1              MR. LONGER:  We'll stipulate

2         that the document says what it

3         says.

4    BY MR. FENTON:

5         Q.   That's fine.  Please answer

6    my question.

7         A.   I -- I do not see that.

8         Q.   Okay.  Do you see anything

9    in here about SASAC nominating any

10   directors?

11             MR. LONGER:  Same

12        stipulation is offered.

13             THE WITNESS:  Well, I

14        think -- I think SASAC's ability

15        to nominate and -- and remove

16        senior personnel is -- it's baked

17        into their powers as -- as SASAC.

18   BY MR. FENTON:

19        Q.   That's fine.  I'm asking you

20   if you see anything in this document

21   about SASAC nominating any directors.

22        A.   I do not.

23        Q.   Okay.  And do you see

24   anything in this document about the

Confidential - Subject to Further Confidentiality Review

Page 295

1    Chinese Communist Party nominating any

2    directors?

3                    MR. LONGER:  Objection to

4          the form.  We'll stipulate that

5          the document says what it says.

6                    THE WITNESS:  I do not.

7    BY MR. FENTON:

8          Q.    Were any Taishan directors

9    party appointed by SASAC or the Chinese

10   Communist Party to your knowledge?

11         A.    I -- I have no basis for

12   answering that.

13         Q.    So, to your knowledge, the

14   answer is no, correct?

15         A.    I have no basis for

16   answering.  I -- I don't know what the

17   Communist Party has done with respect to

18   the -- the managers of the -- of the

19   company.

20         Q.    In the mass of materials

21   that you reviewed in connection with your

22   work, did you see any evidence that

23   either the Chinese Communist Party or

24   SASAC appointed any directors to the

Confidential - Subject to Further Confidentiality Review

1  Taishan board?

2          MR. LONGER:  Objection.  It

3      mischaracterizes his testimony.

4      The document speaks for itself.

5          THE WITNESS:  I did not, and

6      I would not expect to see such

7      documentation.

8  BY MR. FENTON:

9      Q.    All right.  Now, Article 64

10  says that the board of directors shall

11  exercise the -- the following powers, and

12  there is a list 1 through 14, and let me

13  read it.

14          "1, convening general

15  meetings and reporting its work to the

16  same.

17          "2, implementing resolutions

18  of the general meeting."

19          That's a shareholders

20  meeting, correct?

21      A.    Correct.

22      Q.    Determine -- "3, determining

23  the operation plan and investment

24  projects of the company.

Confidential - Subject to Further Confidentiality Review

Page 297

1                    "4, formulating annual

2    financial budgets and financial

3    accounting plans of the company."

4                    There's a second 4, but it

5    should be 5.

6                    "Formulating the profit

7    distribution and loss covering plans of

8    the company.

9                    "6, formulating plans for

10   registered capital increase or reduction,

11   the issuing of corporate bonds or other

12   securities, and listing of the company's

13   securities.

14                    "7, formulating plans of

15   major acquisition, redemption of shares,

16   merger, division, or dissolution of the

17   company.

18                    "8, determining the venture

19   investments and mortgage and other

20   security created on the assets of the

21   company within the authority vested in it

22   by the general meeting."

23                    I'm going to stop there for

24   the moment.  We'll continue with the rest

Confidential - Subject to Further Confidentiality Review

Page 298

1    of those, but aren't those typical powers

2    of a board of directors that one would

3    expect to see in corporations generally,

4    regardless of the -- of the country in

5    which they are incorporated?

6           A.    Yes.  This looks like a

7    pretty normal list.

8           Q.    All right.  And then let's

9    continue with the list.

10                "9, determining the

11   establishment of internal management

12   organs of the company.

13                "10, hiring or dismissing

14   general manager, board secretary, and the

15   openly recruited financial principal of

16   the company; hiring and dismissing deputy

17   general manager and other senior

18   management personnel of the company based

19   on nomination by general manager, and

20   determining remuneration and rewards and

21   punishment matters of such personnel.

22                "11, formulating basic

23   management systems of the company.

24                "12, drafting amendments to

Confidential - Subject to Further Confidentiality Review

Page 299

1    these articles of association of the

2    company.

3              "13, listening to operation

4    reports of the general manager and

5    inspecting its performance.

6              And, "14, other powers

7    provided by laws, regulations, and these

8    articles of association of the company or

9    vested in it by the general meeting."

10             And again, the ones I've

11   just read, 9 through 14, are also fairly

12   typical powers that one would expect to

13   see in a -- in a articles of association

14   for a corporation, again regardless of

15   the country of origin; is that correct?

16             MR. FENTON:  We'll bid

17        farewell to Mr. Levin.  Good to

18        see you, Arnie.

19             THE WITNESS:  Well, I mean,

20        in the United States, one would

21        not find a list like this.  It

22        would simply say that the board of

23        directors manages the company.  So

24        in that sense, I think this is

Confidential - Subject to Further Confidentiality Review

Page 300

```
 1            somewhat distinctive.
 2    BY MR. FENTON:
 3        Q.    Well, it's a little more
 4    detailed, right, but all of these would
 5    be powers that would be within the normal
 6    U.S. board?
 7               MR. LONGER:
 8            Mischaracterizes his testimony.
 9    BY MR. FENTON:
10        Q.    Is that correct?
11        A.    Yes.  These would be powers
12    within -- within the board's jurisdiction
13    in the United States.
14        Q.    All right.  And now I'd like
15    to -- to direct your attention to
16    Page 15, Section 2 of the board of
17    supervisors.
18               Now, typically U.S.
19    companies don't have a board of
20    supervisors; is that correct?
21        A.    Correct.
22        Q.    Okay.  Are you familiar with
23    any countries where they do typically
24    have a board of supervisors?
```

Confidential - Subject to Further Confidentiality Review

Page 301

1          A.     Yes, I am.

2          Q.     Okay.  And -- and let me

3    take a guess.  That happens to be the

4    country of Japan?

5          A.     Japan does, Germany does,

6    and of course China does.

7          Q.     Okay.  And -- and does the

8    board of supervisors serve similar roles

9    in all three countries?

10         A.     No.

11         Q.     Okay.  What does the board

12   of supervisors do in Japanese companies?

13         A.      In -- in Japanese companies,

14   the board of supervisors monitors the

15   director's compliance with the law

16   essentially --

17         Q.     Mm-hmm.

18         A.      -- and ensures or tries to

19   ensure accurate accounting.

20         Q.     So it's like a combined

21   compliance audit committee in a U.S.

22   corporation?

23         A.     Well, I -- I -- you know,

24   this is my field, so I guess I would

Confidential - Subject to Further Confidentiality Review

1    resist a generalization.

2              Q.    Okay.

3              A.    It does have audit powers

4    and it does have compliance powers, but

5    the reality is that the powers of the

6    board of supervisors in Japan, and I

7    think it's fair to say in China as well,

8    are actually very limited.

9              Q.    Okay.  And so are -- are you

10   saying that the board of supervisors

11   serve similar roles in Japan and in

12   China?

13             A.    On a -- on a formal level,

14   if one were to look at the corporate law,

15   yes, you would see very similar

16   descriptions of those -- of those organs.

17             Q.    All right.  And you also

18   mentioned Germany.

19             A.    Correct.

20             Q.    And I take it from your

21   previous answers that a board of

22   supervisors in a German corporation

23   serves a somewhat different role?

24             A.    It has more power because it

Confidential - Subject to Further Confidentiality Review

1    appoints the management board.

2            Q.    Mm-hmm.

3            A.    Whereas in Japan and China,

4    the board of supervisors does not have

5    any appointments power with respect to

6    the board.  It does not have a vote at

7    the -- at the board level.

8            Q.    Okay.  And is it fair to say

9    that in both Japan and China, the board

10   of supervisors provides sort of an extra

11   layer of oversight over the board of

12   directors?

13           A.    In theory, yes.  The

14   reality, I think, in -- in both countries

15   is -- is that it is a weak corporate

16   governance organ.

17           Q.    Okay.  The -- Article 103

18   talks about the power of the board of

19   supervisors.  It -- it talks about

20   inspecting the financial matters of the

21   company.

22               Number 2 is "Supervising the

23   directors, general manager, and other

24   senior management personnel in their

Page 304

1    performance of duties with the company,

2    and proposing the removal of any of the

3    directors, the general manager, and other

4    senior management personnel who has

5    violated any provision of the laws,

6    administrative regulations, or these

7    articles or the resolutions of the

8    board."

9              Number 3 is where "any

10   activity of the directors, the general

11   manager, or other senior management

12   personnel violates the interests of the

13   company, requesting correction of such

14   personnel and, if necessary, reporting

15   such activity to the general meeting or

16   relevant government authority."

17             Number 4 is "proposing the

18   convening of interim general meetings and

19   where the board of directors fails to

20   perform its responsibilities of convening

21   and presiding over general meetings as

22   provided in the company law, these

23   articles of association, convening, and

24   presiding over general meetings."

Confidential - Subject to Further Confidentiality Review

1              5 is submitting proposals to

2      general meetings.

3              6 is bringing lawsuits

4      against directors and senior management

5      personnel pursuant to the provisions of

6      Section 152 of company law; and 7 is

7      other powers vested by these articles of

8      association or the general meeting.

9              Is -- is that the typical

10     function -- or are those the typical

11     functions of a board of supervisors,

12     again at least theoretically in -- in

13     Chinese companies as you understand them?

14          A.    Yes.

15          Q.    All right.  So this is a

16     fairly typical provision?

17          A.    I think so.

18          Q.    And would it be a fairly

19     typical provision if we were looking at

20     Japanese companies?

21          A.    Well, this is a little bit

22     more expansive than I think you would

23     typically find.  But in general terms,

24     yes.

Confidential - Subject to Further Confidentiality Review

Page 306

1          Q.    Okay.  And do you see

2     anything in this Article 103 about

3     fulfilling the will of the Chinese

4     Communist Party?

5                    MR. LONGER:  Objection.  The

6               document speaks for itself.

7                    THE WITNESS:  No, I don't.

8               If I could add one thing, though,

9               which is that the board of

10              supervisors is elected or

11              appointed by the very same

12              shareholders who are electing

13              the -- the board of directors.

14                   So there's a -- there's a

15              kind of inherent weakness in -- in

16              the structure of this provision.

17              And I -- I would not expect to see

18              the directors -- the supervisors,

19              rather, really pushing back and

20              actually exercising any of these

21              powers.

22                   And indeed, I'm not going to

23              be able to point -- recall the

24              specific document.  But there was

Confidential - Subject to Further Confidentiality Review

Page 307

1          a -- a supervisor who was asked,

2          "What do you actually do?"

3              And he or she said, "Well, I

4          monitor compliance of the law

5          of the" -- "of the directors."

6              And the questioning

7          continued.  "Well, what is it that

8          you actually do?  How do you do

9          that?"

10             And there was really not

11         much of a response.

12             And so -- I mean, that's

13         very consistent with my sense of

14         the lack of power of the board of

15         supervisors in -- in a Chinese

16         corporation.

17     BY MR. FENTON:

18         Q.    All right.  Is that a

19     document you're referring to in this

20     case?

21         A.    Yes.

22         Q.    Okay.  Do you recall the --

23     whose testimony it was?

24         A.    I'm -- I'm afraid -- I'm --

Confidential - Subject to Further Confidentiality Review

Page 308

1    I'm afraid that I -- I don't have it.

2    But this -- one of the -- someone was a

3    supervisor on the board.  I don't have

4    the instant recall of who that was.  I'm

5    sorry.

6         Q.    Okay.  Fair enough.  If it

7    comes to you, let me know.

8         A.    I will.

9         Q.    All right.  In any event,

10   did you think it important for your work

11   to consider the fact that -- that Taishan

12   has its own separate articles of

13   association that contain these and other

14   provisions that we've just reviewed?

15        A.    Well, I -- I'm not surprised

16   that it has articles of association, no.

17             (Document marked for

18             identification as Exhibit

19             Milhaupt-15.)

20   BY MR. FENTON:

21        Q.    Let me show you what we've

22   marked as Milhaupt Exhibit 15, which is

23   the declaration of Yu Chen that was filed

24   in this action on October 23, 2015.  And

Page 309

1    take a minute to familiarize yourself

2    with it, Professor.  But my first

3    question is going to be, have you ever --

4    have you ever reviewed this document?

5            A.    I have.

6            Q.    Okay.  And is this among the

7    materials that you reviewed in connection

8    with your work in this case?

9            A.    Yes.

10           Q.    Okay.  And you don't mention

11   this declaration in your report; is that

12   correct?

13           A.    That's correct.

14           Q.    Okay.  That's because it was

15   not within the spirit of your report or

16   within the scope of your assignment; is

17   that right?

18           A.    It was not directly relevant

19   to my assignment, as I -- as I understood

20   it.

21           Q.    All right.  Well, you do see

22   that Yu Chen is the general manager of

23   Beijing New Building Materials Public

24   Limited Company?

Confidential - Subject to Further Confidentiality Review

1          A.     Yes.

2          Q.     Okay.  Which owns a

3     controlling interest in Taishan?

4          A.     Yes.

5          Q.     Is that correct?

6                 Okay.  And you see that Yu

7     Chen states in Paragraph 5 that BNBM PLC

8     complies with all corporate requirements

9     of the Chinese law, including

10    shareholders meetings, board meetings,

11    and corporate authorizations for major

12    transactions.

13                Is that something that you

14    think is important for a court to

15    consider in terms of making a decision

16    about alter ego or single business

17    enterprise liability?

18                MR. LONGER:  Object to the

19           form.  And the document speaks for

20           itself.  But what the judge

21           considers or not is going to be up

22           to his discretion.

23                MR. FENTON:  Well, I don't

24           know.  This witness has offered an

Confidential - Subject to Further Confidentiality Review

Page 311

1              opinion on what should be

2              considered.  And I'm just asking

3              him if this is something that

4              should be considered.

5                    MR. LONGER:  I think that

6              that mischaracterizes the

7              witness's testimony as well.

8                    MR. FENTON:  We can agree to

9              disagree.

10                   MR. LONGER:  Is there a

11             question?  I lost it.

12  BY MR. FENTON:

13        Q.   Yes.  My question is, the

14  statement in Paragraph 5, is that

15  something that you believe it's important

16  for a prior effect in taking into account

17  in assessing corporate veil or single

18  enterprise liability?

19                   MR. LONGER:  Subject to my

20             objections, go ahead and answer.

21                   THE WITNESS:  Compliance

22             with corporate formalities is

23             typically a factor that is

24             considered in these analyses.

Confidential - Subject to Further Confidentiality Review

Page 312

```
 1   BY MR. FENTON:

 2         Q.    So the court should

 3   consider?

 4         A.    Well, compliance for

 5   corporate formalities should be

 6   considered.  I'm not -- I'm not saying

 7   about the weight that should be given to

 8   this document.

 9         Q.    I understand.  You also see

10   that the affiant is stating that "Since

11   November 2014, I" -- that is to say, Yu

12   Chen -- "have served on the board of

13   directors of Taishan Gypsum Company,

14   Limited"?

15         A.    I'm sorry.  Excuse me.

16   Where are you reading from?

17         Q.    Paragraph 7.

18               MR. LONGER:  I thought you

19         said 14.

20               THE WITNESS:  Yeah, I

21         thought you had said 14.

22   BY MR. FENTON:

23         Q.    Since November 2014.

24         A.    Got it.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. LONGER:  Sorry.  Where
 2          are you?  Paragraph 7?
 3                    MR. FENTON:  Yes.
 4                    MR. LONGER:  And what's your
 5          question, now?
 6   BY MR. FENTON:
 7          Q.    My question is, do you see
 8   that statement?
 9          A.    I do.
10          Q.    And then the affiant goes on
11   to say, "In my capacity as a director on
12   Taishan's board of directors, I act in
13   the best interest of Taishan."  And then
14   Number 9, "BNBM PLC does not exercise
15   management or operational control over
16   Taishan."
17                    Are those factors that are
18   appropriate for a prior effect to
19   consider in assessing alter ego and
20   single enterprise liability?
21                    MR. LONGER:  Well, I'm going
22          to object to the characterization
23          of this gentleman's declarence
24          affidavit to be factors that
```

Confidential - Subject to Further Confidentiality Review

Page 314

1          should be considered.

2                The witness can answer the

3          question subject to that.

4                THE WITNESS:  Well, I mean,

5          I have the same reaction, which is

6          the fact that whether or not BNBM

7          PLC exercises or does not exercise

8          management, operation, or control,

9          is a factor that I would think

10         would be relevant.

11               But again, I'm not putting

12         any particular weight.  I'm not

13         commenting on what weight the

14         judge should give to this

15         affidavit.

16   BY MR. FENTON:

17         Q.    I understand that.

18               You didn't weigh the

19   evidence that was in front of you as part

20   of your assignment, right?

21         A.    Well, it's not exactly what

22   I said.  I did not -- my assignment was

23   not to reach a legal conclusion about the

24   separate identity of these actors.

Confidential - Subject to Further Confidentiality Review

Page 315

1          Q.    I understand that.  But your

2    opinion that you rendered in this case

3    stated simply that you believe there is

4    evidence in the record to support a

5    finding of single business enterprise,

6    correct?

7          A.    There is evidence in the

8    record to support such a finding.

9          Q.    All right.  And you also

10   testified earlier today that there is

11   also evidence in the record to support

12   the opposite finding, correct?

13         A.    I don't recall specifically.

14         Q.    Well, is there evidence in

15   the record, and this is part of what's in

16   the record, to support a finding that

17   Taishan, BNBM, and CNBM are not a single

18   business enterprise?

19              MR. LONGER:  I'm going

20         object to the form of that

21         question and the foundation.

22              I do think that you're

23         asking him to go into matters that

24         are --

Confidential - Subject to Further Confidentiality Review

Page 316

1              MR. FENTON:  Fred, we

2         discussed the speaking objections.

3         Just object to the form.

4    BY MR. FENTON:

5         Q.    Professor, please answer my

6    question.

7              MR. LONGER:  I think my

8         objection is complete.

9              THE WITNESS:  I have no

10        comment on what weight the trier

11        of fact should give to this

12        affidavit.

13   BY MR. FENTON:

14        Q.    I'm not asking you to

15   comment on its weight, sir.  I'm simply

16   asking you whether these are factors that

17   it's appropriate for a court to consider

18   in making its determination.

19        A.    I think I already answered

20   that.

21             MR. LONGER:  Excuse me.  I'm

22        going to object.  There's a

23        difference between factors and

24        presenting --

Confidential - Subject to Further Confidentiality Review

1          MR. FENTON:  Fred, I am not

2     here to argue with you.  If you

3     have an objection, state your

4     objection to the form and let the

5     witness answer the questions.

6          MR. LONGER:  That's fine.  I

7     object to the form of the

8     question.  You're asking --

9          MR. FENTON:  Fine.  You've

10    objected to the form of the

11    question.

12         MR. LONGER:  Your question

13    is misleading.

14         MR. FENTON:  If you think my

15    questions are misleading, take me

16    up in front of the bar

17    association.

18         Okay.  Could you read back

19    the question?

20         (Whereupon, the court

21    reporter read back the requested

22    portion of the record.)

23         THE WITNESS:  Well, could

24    you clarify what you mean by

Confidential - Subject to Further Confidentiality Review

Page 318

1            "these factors"?

2    BY MR. FENTON:

3            Q.    Yes.  I read you

4    Paragraphs 7, 8, and 9 where the witness

5    said that he -- I'm not sure whether it's

6    a he or she -- but where the witness said

7    that they served on the board of

8    directors of Taishan; in their capacity

9    as a director on Taishan's board of

10   directors, they act in the best interest

11   of Taishan; and that BNBM PLC does not

12   exercise management or operational

13   control over Taishan.

14               Okay.  Now, putting aside

15   what weight should be given to this

16   affiant's under-oath declaration, are

17   those things that a court ought to

18   consider in making a determination about

19   whether there is an alter ego or single

20   business enterprise liability?

21               MR. LONGER:  Object to the

22        form.  Foundation.  And

23        mischaracterizes the document and

24        his testimony.

Confidential - Subject to Further Confidentiality Review

Page 319

```
 1                THE WITNESS:  Speaking in
 2         the abstract -- and I think I
 3         already said this.  Speaking in
 4         the abstract, an alter ego or a
 5         piercing analysis is a factually
 6         pregnant analysis.  Among the
 7         factors considered would be
 8         whether an entity exercises
 9         control over another entity and
10         whether corporate formalities are
11         followed.
12   BY MR. FENTON:
13         Q.   Okay.  So the answer to my
14   question is yes; is that right?
15                MR. LONGER:  Object to the
16         form.
17                THE WITNESS:  I don't think
18         that's what I said.
19   BY MR. FENTON:
20         Q.   Let's move on.
21                Paragraph 10.  The affiant
22   says, "With the exception of Tong Chun
23   Jia, who held an honorary title of the
24   deputy general manager at BNBM PLC from
```

Page 320

```
 1   August 2005 to September 2012, Taishan

 2   and BNBM PLC have never had overlapping

 3   officers or employees.  Mr. Jia had no

 4   actual duties or responsibilities at BNBM

 5   PLC and performed no management functions

 6   at BNBM PLC."

 7              My first question is, do you

 8   have any facts at your disposal, sir, to

 9   dispute the accuracy of what is stated in

10   Paragraph 10?

11         A.    I have no -- I really have

12   no basis for responding.  This is what

13   someone is asserting in a declaration.  I

14   have -- I can't comment about it.

15         Q.    Yes, I know what it is.  I'm

16   asking if you have any facts at your

17   disposal to dispute what is being

18   asserted here.

19              MR. LONGER:  I believe it's

20         been asked and answered.

21              THE WITNESS:  I do not have

22         such facts at my disposal.

23   BY MR. FENTON:

24         Q.    And then my next question
```

Confidential - Subject to Further Confidentiality Review

Page 321

1   is, is that something that a trier of

2   fact is entitled to consider in

3   determining whether there is corporate

4   veil or single business enterprise

5   liability, i.e., that Taishan and BNBM

6   PLC, with the exception of Mr. Jia, never

7   had overlapping officers or employees?

8               MR. LONGER:  Objection to

9          the form and foundation.

10              THE WITNESS:  Again, in the

11         abstract, these are factors that a

12         finder of fact may consider in

13         rendering an opinion about

14         alter-ego status.

15   BY MR. FENTON:

16         Q.   All right.  And is your

17   answer the same with respect to

18   Paragraph 11, which says, "Since BNBM

19   PLC's acquisition of its interest in

20   Taishan, Taishan has complied with all

21   corporate legal requirements under

22   Chinese law, including shareholders

23   meetings, board meetings, and corporate

24   authorizations for major transactions."

Confidential - Subject to Further Confidentiality Review

Page 322

1          A.     I'm sorry.  Your --

2          Q.     I'm asking if your answer

3   would be the same, i.e., that these are

4   things that a court can consider in

5   determining whether there's alter ego or

6   single business enterprise liability.

7               MR. LONGER:  That

8          incorporates my objections.

9               You can answer.

10              MR. FENTON:  You can have a

11         standing objection to the whole

12         line, Fred.

13              MR. LONGER:  Thank you.

14              THE WITNESS:  Compliance

15         with legal requirements --

16         compliance with legal requirements

17         could be a factor that would be

18         considered by a court.

19  BY MR. FENTON:

20         Q.     All right.  And does the

21  same thing go for Paragraph 12, which

22  says, "BNBM PLC has never paid for

23  Taishan's expenses"?

24         A.     Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.    And does the same thing go

2     for Paragraph 13 where it says, "BNBM PLC

3     has never paid Taishan's employees'

4     salaries nor paid for Taishan's losses"?

5          A.    Yes.

6          Q.    And does the same thing go

7     for Paragraph 14 where it says, "BNBM PLC

8     has never used the same office space,

9     secretarial staff, and office supplies as

10    Taishan"?

11         A.    Yes.

12         Q.    Okay.  Does the same thing

13    go for paragraph 15, which says, "Taishan

14    has never acted to fulfill BNBM PLC's

15    independent contractual obligations, and

16    BNBM PLC has never acted to fulfill

17    Taishan's independent contractual

18    obligations."

19              MR. LONGER:  I --

20              Mr. Steckler has to leave.  I'd

21              like to take a break when you get

22              this question done.

23              I'm not sure if your

24              question is just reading these

Confidential - Subject to Further Confidentiality Review

Page 324

 1          things out and --

 2                  MR. FENTON:  Well, I'm

 3          trying to go to --

 4                  MR. LONGER:  -- asking if

 5          his answer is going to be the

 6          same.

 7                  MR. FENTON:  I'm trying to

 8          go through --

 9    BY MR. FENTON:

10          Q.    First, let's get the answer

11    to the last question -- okay? -- which

12    was Paragraph 15, is your response the

13    same?  That is to say, that is something

14    that a court can consider in making a

15    determination of alter ego or single

16    business enterprise liability?

17                  MR. LONGER:  I'm going to

18          object to the form.  Same

19          objections.

20                  Go ahead and answer.

21                  THE WITNESS:  Yes.

22                  MR. FENTON:  All right.

23          Now, I plan to go through the rest

24          of the paragraphs, but do you need

Confidential - Subject to Further Confidentiality Review

Page 325

1          to take a break right now?

2                    MR. STECKLER:  Yeah, I

3          just -- I'm leaving, and I want to

4          just chat with Fred before I head

5          out --

6                    MR. FENTON:  Fair enough.

7          We'll take a break now and --

8                    THE VIDEOGRAPHER:  The time

9          is 3:57 p.m.  We are going off the

10         record.

11                   (Short break.)

12                   THE VIDEOGRAPHER:  The time

13         is 4:04 p.m.  We are back on the

14         record.

15   BY MR. FENTON:

16         Q.    All right.  Professor, we

17   are back on the record, continuing

18   with -- with Exhibit 15.  I'm going to

19   try to speed things up --

20         A.    Okay.

21         Q.    -- so I'm just going to read

22   the remaining paragraphs here and then --

23   and then ask you my question.

24                   Starting with Paragraph 16,

Confidential - Subject to Further Confidentiality Review

Page 326

1    Yu Chen states, "BNBM PLC and Taishan

2    maintain separate production facilities.

3                "17, BNBM PLC and Taishan

4    have manufactured products under their

5    respective own brands.

6                "18, Taishan has never been

7    authorized to act as an agent of BNBM PLC

8    in entering into contracts or binding

9    BNBM PLC.

10                "19, BNBM PLC has never been

11    authorized to act as an agent of Taishan

12    in entering into contracts or binding

13    Taishan.

14                "20, BNBM PLC and Taishan

15    have their own procurement teams, sign

16    procurement contracts separately, and

17    carry out procurement contract" --

18    "procurement activities independently.

19                "21, BNBM PLC and Taishan

20    each have their own sales and marketing

21    forces.  There is no overlap of BNBM

22    PLC's and Taishan's sales and marketing

23    forces.

24                "22, no person at BNBM PLC

Confidential - Subject to Further Confidentiality Review

Page 327

1   controls the finances of Taishan.

2   Taishan is financially independent and is

3   responsible for its own debt and loss.

4           "23, BNBM PLC and Taishan

5   have their own separate management.

6           "24, BNBM PLC did not create

7   or incorporate Taishan, but rather

8   acquired an ownership interest in Taishan

9   through BNBM PLC's subscription of the

10  new shares issued by Taishan in 2005.

11          And, "25, BNBM PLC and

12  Taishan manage and use their own assets

13  separately."

14          My first question with

15  respect to the paragraphs that I just

16  read, Professor Milhaupt, is, do you have

17  any facts at your disposal to dispute

18  anything that is stated in those

19  Paragraphs 16 through 25?

20      A.   Again, I have no basis for

21  commenting on -- on these, on -- on the

22  veracity of these statements.

23      Q.   Okay.  So as you sit here

24  now, you have no facts at your disposal

Confidential - Subject to Further Confidentiality Review

Page 328

1    with which to dispute these statements?

2              MR. LONGER:  Objection to

3         the form and foundation, and it

4         mischaracterizes his testimony.

5    BY MR. FENTON:

6         Q.    Is that correct?

7         A.    I have -- I have no basis

8    for evaluating the -- the veracity of

9    these statements.

10        Q.    All right.  So you have

11   nothing with which to dispute them,

12   correct?

13             MR. LONGER:  Same objection.

14             THE WITNESS:  Correct.

15   BY MR. FENTON:

16        Q.    And are the facts set forth

17   in Paragraphs 16 through 25, again

18   putting aside whatever weight may -- one

19   may assign to them, facts that a court

20   would be entitled to consider in making a

21   determination as to whether or not there

22   is alter ego or single enterprise

23   liability?

24             MR. LONGER:  Objection.

Confidential - Subject to Further Confidentiality Review

1          Incomplete hypothetical.

2          Foundation.

3                THE WITNESS:  Again, without

4          making any comment on the veracity

5          of these statements in the

6          abstract, the factors listed are

7          things that a court may take into

8          account in -- in performing its

9          analysis.

10   BY MR. FENTON:

11        Q.    Okay.  Let me hand you,

12   Professor Milhaupt, Exhibit 16, which is

13   the declaration of Yanjun Yang, which was

14   filed in this case on October 23, 2015.

15                (Document marked for

16          identification as Exhibit

17          Milhaupt-16.)

18   BY MR. FENTON:

19        Q.    Take a few minutes to

20   familiarize yourself with the documents.

21                But my first question will

22   be:  Did you look at this document in

23   connection with your work in this matter?

24        A.    I did.

Confidential - Subject to Further Confidentiality Review

Page 330

1          Q.     Okay.  And you see that

2     Yanjun Yang, in Paragraph 2, indicates

3     that he or she, as the case may be, is

4     the deputy general manager and chief

5     financial officer of BNBM PLC?

6          A.     Yes, I see that.

7          Q.     And has held the positions

8     at BNBM PLC since September 2005?

9          A.     Yes.

10         Q.     Okay.  Starting at

11    Paragraph 5, the declaration reads -- I'm

12    going to quote, "5, BNBM PLC is

13    independently incorporated and has its

14    own articles of association and an

15    independent board of directors and board

16    of supervisors.

17              "6, I hold no position with

18    Beijing New Building Material Group

19    Company Limited, BNBM Group.

20              "7, Since April 2006, I have

21    served on the board of directors of

22    Taishan Gypsum Company Limited, Taishan.

23              "8, BNBM acquired 42 percent

24    equity interest in Taishan in 2005

Confidential - Subject to Further Confidentiality Review

Page 331

1    through subscription of the new shares

2    issued by Taishan.  BNBM PLC indirectly

3    acquired an additional 23 percent equity

4    interest in Taishan in 2006 by purchasing

5    100 percent equity interest of Taishan

6    Donglian Investment and Trading Company

7    Limited, one of Taishan's shareholders.

8              "Currently BNBM PLC directly

9    and indirectly owns 65 percent equity

10   interest aggregately in Taishan."

11             Let me stop there and ask

12   you, Professor, with respect to the

13   paragraphs I've just read, 5 through 8,

14   do you have any facts at your disposal

15   with which to dispute the statements made

16   therein?

17             A.    I do not.

18             Q.    And with respect to

19   Paragraphs 5 through 8, are the facts set

20   forth therein the kinds of things that a

21   court can consider in making a

22   determination as to whether there is

23   alter ego or single business enterprise

24   liability?

Confidential - Subject to Further Confidentiality Review

Page 332

1           A.     Again, subject to

2      qualification -- and I'm not commenting

3      on the veracity of these assertions -- in

4      general, in the abstract, these are

5      things that a court may consider.

6           Q.     Picking up with Paragraph 9.

7      "Since BNBM PLC's acquisition of its

8      interest in Taishan, Taishan has been

9      adequately capitalized and has had

10     sufficient funding for its operations.

11               "10, BNBM PLC has never

12     financed Taishan's operations by

13     providing non-repayable funds.

14               "11, BNBM PLC has never had

15     a joint bank account with Taishan.

16               "12, Since I held my current

17     positions, BNBM PLC and Taishan have

18     never had common accounting books.

19               "13, BNBM PLC has never made

20     undocumented transfers of funds to

21     Taishan, and Taishan has never made

22     undocumented transfers of funds to BNBM

23     PLC.

24               "14, Since I held my current

Confidential - Subject to Further Confidentiality Review

Page 333

1    positions, BNBM PLC has never had the

2    authority to withdraw money from

3    Taishan's bank accounts and has never

4    done so.

5              "15, since I held my current

6    positions, Taishan has never had the

7    authority to withdraw money from BNBM

8    PLC's bank accounts and has never done

9    so."

10              And my question, sir, with

11   respect to Paragraphs 9 through 15,

12   first, is, do you have any facts at your

13   disposal to dispute anything stated in

14   what I just read?

15        A.    Again, I really have no

16   basis for answering, particularly with

17   respect to undocumented transfers.

18              I would have absolutely no

19   way of commenting on that.

20        Q.    So you have no facts at your

21   disposal with which to dispute these

22   statements, correct?

23        A.    Correct.

24        Q.    Okay.  And are these facts

Confidential - Subject to Further Confidentiality Review

Page 334

```
 1   set forth in Paragraphs 9 through 15 that
 2   I just read factors that a court is
 3   entitled to consider in making a
 4   determination of alter ego or corporate
 5   veil analysis?
 6           A.    Again, same response.
 7   Without commenting on the veracity of
 8   these statements, these are factors that
 9   a court may consider.
10           Q.    All right.  And then I'm
11   going to read the final three paragraphs.
12               "16, except as required
13   under Chinese laws, regulations, and
14   relevant accounting principles, BNBM PLC
15   and Taishan prepare their financial
16   statements independently and file their
17   tax returns separately.
18               "17, BNBM PLC's and
19   Taishan's financial statements are
20   separately audited by a third-party
21   accounting firm, which is independent
22   from BNBM PLC and Taishan.
23               "18, BNBM PLC has never paid
24   any debt for Taishan."
```

Confidential - Subject to Further Confidentiality Review

Page 335

1              And again, with respect to

2    Paragraphs 16 through 18, do you have any

3    facts at your disposal with which to

4    dispute the statements made therein?

5          A.    No basis for -- for really

6    knowing, so I have no -- I have no facts

7    to dispute this.

8          Q.    Okay.  And with respect to

9    the facts stated in Paragraphs 16 through

10   18, are those facts that a court is

11   entitled to consider in making a

12   determination regarding alter ego or

13   single business enterprise liability?

14         A.    Again, without commenting on

15   the veracity of the statements, these are

16   factors that a court may consider.

17         Q.    Let me show you what has

18   been marked as Milhaupt 17, Professor.

19   Beijing New Building Materials Public

20   Limited Company, through the testimony of

21   Yu Chen, and the date was July 8, 2015.

22              (Document marked for

23              identification as Exhibit

24              Milhaupt-17.)

Confidential - Subject to Further Confidentiality Review

```
 1   BY MR. FENTON:
 2         Q.    Let me hand that to you.
 3              And again, you can flip
 4   through it.  My first question is going
 5   to be, was this among the materials that
 6   you reviewed?  But my specific questions
 7   are really going to start on Page 599.
 8              And again, these are
 9   excerpts.  This is not the entire
10   transcript.
11              MR. LONGER:  As I understand
12         it, this was Exhibit 2 to your
13         motion to dismiss.  Is that why it
14         has that legend?
15              MR. FENTON:  I believe -- I
16         know it was an exhibit, Fred.  If
17         it was Exhibit 2, I don't know.
18              MR. PFAEHLER:  I believe it
19         was Exhibit 2.
20              MR. LONGER:  All right.
21         That's why it's redacted and
22         excerpted the way it is?
23              MR. PFAEHLER:  I wouldn't
24         say redacted, but certainly
```

Confidential - Subject to Further Confidentiality Review

1          excerpted.

2                  MR. LONGER:  What I saw is

3          redacted.

4                  MR. PFAEHLER:  Pages are

5          selected.

6                  Oh, yeah, this is -- fair

7          enough.  Because it was filed

8          under seal, I suppose.

9                  MR. LONGER:  All right.

10         Well, you've handed him something

11         that's been redacted.

12                 MR. FENTON:  I have

13         absolutely no intention of asking

14         him about the redacted portion

15         which appears on Page 283.  My

16         questions are going to have to do

17         with Page 599.  And if you want to

18         pull out the full transcript,

19         Fred, and introduce it, be my

20         guest.

21                 MR. LONGER:  I'll wait and

22         see what your question is.

23    BY MR. FENTON:

24         Q.   Is this among the materials

Confidential - Subject to Further Confidentiality Review

Page 338

1    that you reviewed?

2            A.     I reviewed a full --

3            Q.     You reviewed a full

4    transcript?

5            A.     The full transcript, yes.

6            Q.     Okay.  And is this -- the

7    testimony of Yu Chen for BNBM PLC, is

8    that something that you considered to be

9    important in your analysis?

10           A.     Well, it's something --

11                  (Brief interruption.)

12                  MR. LONGER:  I'm sorry.  I

13           lost track.

14                  MR. FENTON:  Let me ask it

15           again.

16    BY MR. FENTON:

17           Q.     Was the testimony of Yu Chen

18    for BNBM PLC something that you

19    considered to be important in your

20    analysis?

21                  MR. LONGER:  Objection to

22           the form.

23                  THE WITNESS:  It's something

24           that I reviewed in connection with

Page 339

1          the preparation of my declaration.

2     BY MR. FENTON:

3          Q.    Okay.  And did you consider

4     it to be important?

5               MR. LONGER:  Objection to

6          the form.

7               THE WITNESS:  I did not see

8          it to be central to the assignment

9          that I was given.

10    BY MR. FENTON:

11         Q.    Did you see any testimony --

12    strike that.

13              Directing your attention

14    to -- directing your attention to

15    Page 599, picking up at Line 21.

16              The testimony -- it's only

17    going for a couple pages, so I'm going to

18    read it into the record -- is as

19    follows -- and I believe this is the

20    examination by Mr. Barr.

21              MR. LONGER:  What line?

22              MR. FENTON:  Picking up on

23         21, on 599.

24    BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

Page 340

```
 1          Q.    "Question:  Did Mr. Jia have
 2    any duties or responsibilities at BNBM
 3    PLC during that period of time" --
 4    referring to the previous question,
 5    August 2005 to September 2012.
 6               "Answer:  No.
 7               "Question:  Did he perform
 8    any management functions at BNBM PLC
 9    during that period?
10               "Answer:  No.
11               "Question:  Has BNBM PLC
12    ever paid for any of Taishan's expenses?
13               "Answer:  No.
14               "Question:  Has BNBM PLC
15    ever paid Taishan's employees' salary or
16    for Taishan's losses?
17               "Answer:  No.
18               "Question:  Does BNBM PLC
19    use the same office spaces, secretarial
20    staff, and office supplies as Taishan
21    does?
22               "Answer:  No.
23               "Question:  Do BNBM PLC and
24    Taishan maintain separate production
```

Confidential - Subject to Further Confidentiality Review

Page 341

1   facilities?

2                "Answer:  They are

3   independent from each other.

4                "Question:  During the

5   period of time that you've been general

6   manager at BNBM PLC, to your knowledge,

7   has Taishan ever been authorized to act

8   as an agent of BNBM PLC in entering any

9   contracts that bind PLC?"

10                There is an objection from

11  Mr. Levin.

12                "Answer:  No.

13                "Question:  Has BNBM PLC

14  ever been authorized to act as an agent

15  of Taishan in entering into contracts

16  that would bind Taishan?"

17                There's some colloquy:

18                "Answer:  No.

19                "Question:  Do BNBM PLC and

20  Taishan each have their own procurement

21  team?

22                "Answer:  Yes.

23                "Question:  Do they each

24  sign procurement contracts separately?

Confidential - Subject to Further Confidentiality Review

1              "Answer:  Yes."

2              My first question,

3    Professor, is:

4              Do you have any facts at

5    your disposal with -- with which to

6    dispute any of the testimony that I have

7    just read to you?

8         A.    Again, I have no basis

9    for -- for commenting on the accuracy of

10   these statements.

11        Q.    So you have no evidence at

12   your disposal with -- with which to

13   dispute those statements; is that

14   correct?

15        A.    That's correct.

16        Q.    All right.  And the next

17   question, Professor, is:

18             Are the facts set forth in

19   the testimony of Yu Chen for BNBM PLC

20   facts that a Court can consider in making

21   a determination as to whether to impose

22   alter ego or single enterprise liability?

23        A.    Again, without making any

24   comment on the veracity of these

Confidential - Subject to Further Confidentiality Review

Page 343

1    statements, they are factors that a Court

2    may consider.

3              Q.    Okay.

4              (Document marked for

5              identification as Exhibit

6              Milhaupt-18.)

7    BY MR. FENTON:

8              Q.    All right.  Professor, I'm

9    going to hand you what's been marked as

10   Milhaupt-18.  This is a copy of the

11   global offering statement for CNBM

12   Company -- CNBM Company Ltd. issued by

13   Morgan Stanley and bears the date of

14   March 13, 2006.

15             A.    Thank you.

16             Q.    Okay.  Okay.  And that --

17   that consists of the -- that's basically

18   the text of the document.

19             MR. PFAEHLER:  Yeah, much of

20        the text of the document or at

21        least --

22             MR. FENTON:  It's the first

23        158 pages, so it's --

24             MR. LONGER:  It's not a

Confidential - Subject to Further Confidentiality Review

Page 344

1              complete document?

2                      MR. PFAEHLER:  We have a

3              complete document literally

4              sitting in my office.  At,

5              Professor Gordon's deposition,

6              Mr. Steckler marked just the first

7              100 pages or so, so --

8                      MR. LONGER:  All right.  I

9              understand what you're doing.

10                     MR. FENTON:  None of

11             which -- none of which is going to

12             be particularly pertinent, because

13             my questions are going to have to

14             do with Page 78.

15                     MR. PFAEHLER:  But I do have

16             a full copy if you'd like to see

17             it, Mr. Longer.

18                     MR. FENTON:  Or Professor --

19             Professor Milhaupt, as the case

20             may be.

21                     MR. PFAEHLER:  Exactly.

22                     MR. LONGER:  Has anything

23             been redacted from the -- the

24             pages that we have?

Confidential - Subject to Further Confidentiality Review

Page 345

```
 1              MR. PFAEHLER:  I don't
 2        believe so.
 3              MR. FENTON:  Not that I'm
 4        aware of.  I think this is a
 5        public document.
 6              MR. LONGER:  All right.
 7        Well --
 8              MR. FENTON:  I'm quite
 9        certain it is a public document.
10        It is a global offering
11        memorandum.
12              MR. PFAEHLER:  I'll be upset
13        if anything is redacted.
14              MR. LONGER:  I'll be upset
15        too.  Be right beside you.  So...
16              MR. FENTON:  You guys get
17        upset very easily.
18              MR. LONGER:  So why don't
19        you have a look at it and --
20        and --
21              THE WITNESS:  Mm-hmm.
22              MR. LONGER:  -- you let us
23        know if you have any issues.
24              The -- your -- your question
```

Confidential - Subject to Further Confidentiality Review

```
 1          is about a particular page?
 2                    MR. FENTON:  I'm going to
 3          direct the witness's attention to
 4          Page 78.
 5                    MR. LONGER:  78.
 6                    MR. FENTON:  Mm-hmm.  But I
 7          have a few preliminary questions
 8          when you get there.
 9   BY MR. FENTON:
10          Q.    You just tell me when you're
11   ready.
12          A.    Right.  So you -- just to
13   confirm, it looks like the -- basically
14   what's been omitted here is the -- is the
15   financials, financial information.
16          Q.    I think that's correct.
17          A.    Okay.
18          Q.    All right.  And my first
19   question is, Professor, did you review
20   this document in connection with your
21   work?
22          A.    I did.
23          Q.    Okay.  And is this a
24   document that you considered to be
```

Confidential - Subject to Further Confidentiality Review

Page 347

1    important?

2                    MR. LONGER:   Objection to

3           form.

4                    THE WITNESS:   It certainly

5           formed the basis of my

6           understanding of the facts as to

7           the -- the defendants in this --

8           in this company -- sorry -- in

9           this litigation.

10   BY MR. FENTON:

11           Q.    All right.   And with respect

12   to the description of the companies that

13   appears at Page -- the industry overview

14   and -- and the description of the

15   companies appears at Page 78.

16                    Is there any discussion in

17   there about the role of the Communist

18   Party with respect to the affairs of CNBM

19   Company Ltd.?

20                    MR. LONGER:   Object, and the

21           document speaks for itself.

22                    THE WITNESS:   On Page 78, I

23           see no such reference.

24   BY MR. FENTON:

Confidential - Subject to Further Confidentiality Review

1          Q.    All right.  And -- and are

2    you aware of any such reference in the

3    document, based on your recollection of

4    having reviewed it in connection with

5    your work?

6          A.    I don't recall.  I mean, if

7    I could -- if I could add to that

8    statement, I would not expect to see a

9    discussion of -- of the party, because

10   the whole point of the global offering is

11   to raise capital from foreign investors.

12   And so I wouldn't expect to see -- I

13   would expect to see an emphasis on the

14   corporate -- recognizable, familiar

15   corporate forms.  I would not expect to

16   see a fulsome discussion of what I'm

17   calling the noncorporate aspect to

18   Chinese SOE groups.

19         Q.    Well, another purpose of the

20   document, though, is to provide full

21   disclosure to investors; isn't that

22   right?

23               MR. LONGER:  Objection to

24         the form.

Confidential - Subject to Further Confidentiality Review

Page 349

1              THE WITNESS:  Yes.  Subject

2         to the laws of the jurisdiction in

3         which the shares are floated.

4    BY MR. FENTON:

5         Q.    And -- and subject to the

6    rules of the Shenzhen Stock -- Stock

7    Exchange; isn't that right?

8         A.    Well, what this --

9              MR. LONGER:  Wait.

10         Objection to the form.  This is

11         CNBM Group.

12              MR. FENTON:  All right.  I

13         take -- I take that back.

14    BY MR. FENTON:

15         Q.    Hong Kong.

16         A.    This is Hong Kong.

17         Q.    Okay.  Are you familiar with

18    the rules of the Hong Kong Stock

19    Exchange?

20         A.    Generally.  I'm not an

21    expert.

22         Q.    All right.  And -- and do

23    the rules of the Hong Kong Stock Exchange

24    generally require listed companies to

Confidential - Subject to Further Confidentiality Review

Page 350

1    provide adequate disclosures to

2    investors?

3         A.    I -- I am sure they do.  But

4    I have no basis to comment on what

5    materiality means for purposes of Hong

6    Kong disclosures.

7         Q.    Well, would you -- would --

8    would you assume that if the party had

9    the pervasive role in Chinese companies

10   that you have talked about here today,

11   that that is something that might be

12   material to investors?

13              MR. LONGER:  Objection to

14        form and foundation.

15              THE WITNESS:  I mean, I --

16        well, I think you are a asking me

17        for a legal conclusion.

18        Materiality is a term of art in

19        the securities laws, and I have no

20        basis for commenting on what the

21        Hong Kong Stock Exchange deems to

22        be material information.

23   BY MR. FENTON:

24        Q.    Well, let me put it a little

Page 351

1  bit differently.

2            If you were considering an

3  investment in a Chinese company and you

4  were looking at the disclosure documents

5  that were put out in accordance with

6  Exchange rules, would it be important for

7  you as an investor -- I'm talking about

8  you personally, Professor Milhaupt -- to

9  know whether the Chinese Communist Party

10  has a pervasive role in the operations

11  and management of the company?

12            MR. LONGER:  I'm going to

13        object to the form of the

14        question.  It's irrelevant what

15        Mr. Milhaupt -- or Professor

16        Milhaupt thinks about it as from

17        an investment standpoint.

18            I also object to the

19        foundation of the question.  And

20        again, the document speaks for

21        itself.

22  BY MR. FENTON:

23        Q.   Answer my question.

24        A.   If you're asking me entirely

Confidential - Subject to Further Confidentiality Review

Page 352

1    my personal capacity, would I -- would I

2    be interested in this information, the

3    answer is yes.

4          Q.    Okay.  So it would be

5    material, at the very least, to you,

6    right?

7          A.    It would be material to me.

8          Q.    Okay.  Do you think that the

9    Morgan Stanley firm would mislead

10   investors about a company that it was

11   underwriting on the Hong Kong Stock

12   Exchange?

13         MR. LONGER:  I object to the

14         form of the question.  Object to

15         the foundation of the question.  I

16         think it lacks foundation.  I

17         think it is irrelevant, and --

18         MR. FENTON:  Come on, Fred.

19         You can come up with more than

20         that.

21         MR. LONGER:  I could keep

22         going, is right.  But I'll stop

23         with that and just say, "Carry

24         on."

Confidential - Subject to Further Confidentiality Review

Page 353

1                    MR. FENTON:  Thank you.

2                    MR. LONGER:  Godspeed.

3    BY MR. FENTON:

4         Q.    Can you -- can you answer my

5    question, Professor?

6         A.    Well, I -- you know, I have

7    no idea what -- what Morgan Stanley's

8    practices and procedures are in listing

9    securities in the Hong Kong Stock

10   Exchange.  I don't know what materiality

11   means for purposes of the Hong Kong Stock

12   Exchange.  I am not accusing anyone of

13   misleading or trying to mislead anyone.

14                    All I know is the

15   information isn't in this document.

16        Q.    Professor -- and I

17   appreciate the answer.  Professor

18   Milhaupt, okay, with all due respect,

19   sir --

20                    MR. LONGER:  That means he

21        has no respect.

22   BY MR. FENTON:

23        Q.    -- you are a -- a professor

24   of corporate governance at one of the

Confidential - Subject to Further Confidentiality Review

```
 1   major law schools in the United States.
 2   You have written extensively on the
 3   subject of Chinese SOEs.  You have
 4   rendered to the Court here an opinion
 5   that talks about consideration of the
 6   role of the Communist Party, and you
 7   can't answer a question about whether
 8   that's material?
 9             MR. LONGER:  If you have a
10        relevant question, I'd like you to
11        ask it, but to --
12             MR. FENTON:  I'd like an
13        answer to what I just asked.
14             MR. LONGER:  Object to the
15        question.  It lacks -- I object to
16        the form, foundation.  It's
17        argumentive, and that's enough.
18   BY MR. FENTON:
19        Q.    Would you like the question
20   back?
21        A.    Well, I think I already
22   answered it.  You asked me personally
23   would I consider it to be material, and I
24   said yes.
```

Confidential - Subject to Further Confidentiality Review

Page 355

```
 1          Q.    Okay.  But then I thought
 2   you had said that you cannot comment on
 3   materiality.
 4               MR. LONGER:  For the reasons
 5          that he already testified to.
 6          He -- he's not -- said he's not an
 7          expert on the Hong Kong Stock
 8          Exchange.
 9   BY MR. FENTON:
10          Q.    All right.  We're getting --
11   we're getting off track here, and I
12   apologize, Professor.  It's getting late
13   in the day.  So why don't we move on.
14               MR. LONGER:  Do you want to
15          take a break?
16               MR. FENTON:  No.
17               MR. LONGER:  Okay.
18   BY MR. FENTON:
19          Q.    Unless you do, Professor.
20          A.    No.  I'm fine.  Thank you.
21          Q.    Okay.  In any event, let me
22   direct your attention to Page 78 of the
23   document.
24               And I -- I can read it.  But
```

Confidential - Subject to Further Confidentiality Review

```
 1   let me give you the gist and just see if

 2   you agree with my characterization.

 3              It appears that what they're

 4   basically saying there is that there's

 5   two categories of gypsum producers, the

 6   first consisting of BNBM, which is a

 7   higher product line with superior

 8   physical characteristics, higher

 9   durability and better dimensional

10   consistency and stability?

11              And that BNBM has a market

12   share of about 36 percent in that market.

13              And then it talks about in

14   the next paragraph a second category of

15   producers that have low capital

16   investment and low production costs.

17              And they satisfy the needs

18   of mid-tier customers with competitive

19   pricing.  And that Taishan has about a --

20   58.4 percent of that market share.

21              Do you see that?

22       A.    Yes.

23       Q.    Okay.  And that formed part

24   of your understanding of the difference
```

Confidential - Subject to Further Confidentiality Review

Page 357

1    in the product lines and the

2    differentiation in customer base between

3    BNBM and Taishan; is that correct?

4          A.    That's correct.

5                (Document marked for

6          identification as Exhibit

7          Milhaupt-19.)

8    BY MR. FENTON:

9          Q.    Professor Milhaupt, I'm

10   going to hand you what's been marked as

11   Milhaupt-19.  This is the declaration of

12   Jianglin Cao, which was filed in this

13   action on June 22nd, 2015.  Take a look

14   at that.  And my first question is going

15   to be whether that's a document that you

16   reviewed in connection with your work.

17         A.    Yes, it is.

18         Q.    Okay.  And did you consider

19   this document to be important?

20               MR. LONGER:  Objection to

21         the form.

22               THE WITNESS:  I certainly

23         reviewed it in connection with the

24         preparation of my declaration.

Confidential - Subject to Further Confidentiality Review

Page 358

 1  BY MR. FENTON:

 2          Q.     You understand that Mr. Cao

 3  is a general manager of CNBM Group and

 4  was since April of 2014 and was a

 5  director of CNBM Group since October of

 6  2005?

 7          A.     I see that.

 8          Q.     Okay.  And that he was also

 9  the president and the executive director

10  of CNBM company since March 2005?

11          A.     Yes, I see that.

12          Q.     Okay.  Starting with

13  Paragraph 11 on Page 3, Mr. Cao --

14  Jianglin Cao states under oath, "11, CNBM

15  Group is a shareholder in several other

16  Chinese entities, including CNBM company,

17  approximately 12 percent; BNBM Group,

18  approximately 70 percent; CNBM Import and

19  Export, 100 percent; and China Building

20  Materials Academy, 100 percent, among

21  others, collectively the sharehold

22  entities.

23          "CNBM Group holds an

24  additional approximately 32 percent

Confidential - Subject to Further Confidentiality Review

Page 359

```
 1    indirect interest in CNBM Co. through
 2    BNBM Group, CNBM Import and Export, and
 3    China Building Materials Academy, and an
 4    additional approximately 30 percent
 5    indirect interest in BNBM Group through
 6    CNBM Import and Export."
 7              Do you see that?
 8        A.    I do.
 9        Q.    Okay.  And do you have any
10    basis on which to dispute the statement
11    made by Mr. Jianglin in Paragraph 11?
12              MR. LONGER:  Object to the
13         form.
14              THE WITNESS:  I have no
15         basis for verifying this
16         information.  But I have no
17         information to contradict it.
18    BY MR. FENTON:
19        Q.    Okay.  And Paragraph 12, the
20    affiant goes on to say, "Each sharehold
21    entity is adequately capitalized and had
22    sufficient funds for its operations.  To
23    my knowledge, CNBM Group has never had a
24    joint bank account with any sharehold
```

Confidential - Subject to Further Confidentiality Review

Page 360

1    entity or had the ability to withdraw or

2    deposit funds in the account of a

3    sharehold entity without express

4    authorization of that entity.

5                   "13, except as required

6    under Chinese laws, regulations, and

7    relevant accounting principles, CNBM

8    Group and the sharehold entities prepare

9    independent financial statements and file

10   their tax returns separately.

11                  "Where required by law or

12   regulations, sharehold entity financial

13   statements are audited by an independent

14   third-party accounting firm.

15                  "14, CNBM Group does not

16   directly manage or make ordinary business

17   decisions for any of the sharehold

18   entities.  Each sharehold entity is

19   independently incorporated and has its

20   own articles of association and, where

21   required by law or regulation, has a

22   separate board of directors, board of

23   supervisors and corporate officers that

24   manage the daily operations of the entity

Confidential - Subject to Further Confidentiality Review

Page 361

1    and make business decisions regarding

2    that entity."

3              With respect to those

4    paragraphs that I just read, 12 through

5    14, Professor, do you have any facts at

6    your disposal to -- with which to dispute

7    any of the statements made therein?

8              MR. LONGER:  I object to the

9         question and the form and

10        foundation.  And his testimony

11        today has covered quite a lot of

12        this.

13             So go ahead.

14             THE WITNESS:  I mean, again

15        with respect to what CNBM Group

16        does and the management and so on,

17        I mean, we have covered this.  So

18        I would say I do have -- to some

19        extent, I do have facts at my

20        disposal which challenges or

21        contradicts some of these -- some

22        of these statements.

23   BY MR. FENTON:

24        Q.   All right.  Which statements

Confidential - Subject to Further Confidentiality Review

Page 362

1    are you contradicting here?  Are you

2    contradicting that each sharehold entity

3    is adequately capitalized?

4         A.    No.  I'm looking in

5    particular at 14.

6         Q.    Okay.  Which statement

7    there?

8         A.    "CNBM Group does not

9    directly manage or make ordinary business

10   decisions for any of the sharehold

11   entities."

12              I mean, I think in the

13   context of the administrative articles

14   that we've -- that we've talked about and

15   the right of CNBM Group to appoint and

16   remove managers, I think there is some --

17   I think there is some tension between

18   what we've discussed and this statement.

19         Q.    All right.  So give me a

20   specific instance where CNBM Group

21   directly managed or made ordinary

22   business decisions for any of these

23   sharehold entities.

24         A.    I don't have one.

Confidential - Subject to Further Confidentiality Review

Page 363

1          Q.     Anything else that you'd

2     like to challenge?

3          A.     No.   Thank you.

4          Q.     Paragraph 16 states as

5     follows:  "I am presently aware that BNBM

6     PLC, Taishan Gypsum Company Limited, and

7     Tai'an Taishan Plasterboard Company, TTP,

8     engaged in transactions to sell drywall

9     to United States purchasers.  To my

10    knowledge, BNBM PLC, Taishan, and TTP did

11    not consult CNBM Group regarding their

12    decisions to market or sell drywall into

13    the United States."

14               With respect to Paragraph 16

15    that I have just read, Professor

16    Milhaupt, do you have any facts at your

17    disposal with which to dispute the

18    statements that were made?

19         A.     Again, I have no basis for

20    knowledge.  But I have no facts at my

21    disposal to dispute this.

22         Q.     All right.  And again, is

23    this something that a court would be

24    entitled to take into account in making a

Confidential - Subject to Further Confidentiality Review

Page 364

1    determination as to alter ego or single

2    enterprise liability?

3              MR. LONGER:  Object to the

4         form.

5              THE WITNESS:  Again, without

6         commenting on the veracity, this

7         is a factor that a court may take

8         into account.

9              MR. FENTON:  What I'd like

10        to do right now, Fred, is take

11        15 minutes.  I am, if not done,

12        very close.

13             I just want to go through my

14        notes, go through a few documents,

15        and we'll be out of here in fairly

16        short order.  Thank you.

17             THE VIDEOGRAPHER:  The time

18        is 4:41 p.m. on February 3, 2016.

19        And this completes DVD Number 3.

20             (Short break.)

21             THE VIDEOGRAPHER:  The time

22        is 5:03 p.m. on February 3, 2016.

23        This is DVD Number 4.

24             MR. FENTON:  Professor, I am

Confidential - Subject to Further Confidentiality Review

```
 1          finished.  I think some of the

 2          other lawyers in the room may have

 3          some questions for you.  But I do

 4          want to thank you for your

 5          patience today.  The depositions

 6          are never a pleasant process.  I

 7          hope it wasn't too unpleasant for

 8          you.  I do appreciate your --

 9               THE WITNESS:  Thank you.

10               MR. FENTON:  -- testimony

11          today.  Thank you.

12               THE WITNESS:  Thank you.

13                    -  -  -

14               EXAMINATION

15                    -  -  -

16   BY MR. JOHNSON:

17          Q.    Hi, Professor Milhaupt.  My

18   name is Ian Johnson.  We met before.

19          A.    Yes.

20          Q.    I represent CNBM Company and

21   CNBM Group.

22          A.    Okay.

23          Q.    And I'll apologize in

24   advance if I'm not as organized as Rick
```

Confidential - Subject to Further Confidentiality Review

Page 366

1    was.  I'm trying to build on the

2    testimony of today.

3            A.    Okay.  I understand.

4            Q.    And I also apologize if I

5    cover ground that we've already covered.

6    I hope I do it in a way that's somewhat

7    different and helpful.

8                  Earlier you talked about

9    some of the elements that might be

10   relevant to an alter-ego analysis.  You

11   talked about respectful corporate

12   formalities, intermingling or commingling

13   of operations and management.  Do you

14   recall that testimony?

15           A.    Yes.

16           Q.    Now, in your report, I'm

17   going to try to describe what I see as

18   its overall import, and tell me if I'm

19   right or wrong.

20                 Your report -- your report

21   talks about sort of a dual system of

22   control in Chinese state-owned

23   enterprises, one system of corporate

24   control and another of noncorporate

Confidential - Subject to Further Confidentiality Review

Page 367

1    control; is that correct?

2                    MR. LONGER:  Object to the

3           form.

4                    THE WITNESS:  I mean, that's

5           a -- that's a very brief summary.

6           But those are -- you know, this

7           ideal of dual forms of control is

8           certainly one piece of the

9           analysis, yes.

10   BY MR. JOHNSON:

11          Q.    And you do refer to

12   noncorporate control, correct?

13          A.    Yes.

14          Q.    That's control by the

15   Chinese state or state organs; is that

16   right?

17          A.    It's -- well, it's control

18   outside of the ordinary mechanisms of

19   control that we are all familiar with.

20                    So anything outside of that

21   corporate -- the standard forms of

22   corporate control, I would consider to be

23   noncorporate forms of control.

24          Q.    Okay.  So some of that

Confidential - Subject to Further Confidentiality Review

Page 368

1    noncorporate control is exercised by the

2    Chinese state or state organs or the

3    Chinese Communist Party; is that right?

4            A.    Yes, they certainly have the

5    capacity to do so.

6            Q.    Okay.  And let's talk about

7    the sort of control those organs

8    exercise.

9                  If I understand your report

10   correctly and other things that you've

11   written, primarily it relates to

12   political or policy concerns; is that

13   correct?

14                 MR. LONGER:  Object to the

15           form.

16                 THE WITNESS:  Well, I would

17           say not exactly, in the sense that

18           SASAC's authority is sort of

19           extraordinary in the sense that it

20           has what I would say is

21           superpowers as a shareholder, by

22           which I mean shareholders don't

23           typically have the right to bypass

24           boards of directors through the

Confidential - Subject to Further Confidentiality Review

Page 369

1          corporate hierarchy to be involved

2          in or direct transfers of shares

3          or assets.  SASAC does that.

4               Shareholders don't typically

5          have the right to appoint, remove,

6          and remunerate downstream senior

7          executives.

8               So that's an -- that's an

9          element of sort of super-corporate

10         control, if you will.  It's an

11         unusual form of control that

12         the -- that the state shareholder

13         exercises.

14              In addition to that,

15         certainly there are these

16         political -- there's the political

17         dimensions in the capacity of

18         control and the fact that the

19         Communist Party is, in essence, a

20         giant -- or one function of it is

21         as a giant personnel committee to

22         monitor people's behavior and

23         compliance with the party policies

24         and so on.

Confidential - Subject to Further Confidentiality Review

 1              So, yes, there is a

 2         political dimension.

 3              There is also this -- what

 4         I'm calling kind of super --

 5         super-corporate dimension to the

 6         capacity to control as well.

 7    BY MR. JOHNSON:

 8         Q.    Okay.  So on the political

 9    front, you testified about what you view

10    as these extraordinary shareholder powers

11    of SASAC.  But putting that to one side

12    for just a moment, on the political side,

13    a political policy that the state might

14    embrace, for example, would be they don't

15    want to see corruption in state-owned

16    enterprise.

17              Would that be a political

18    policy?

19              MR. LONGER:  Objection.  I

20         don't know if that's a

21         hypothetical or not.  So I object

22         to the form and foundation.

23              THE WITNESS:  Well, I mean

24         I'm not sure I would characterize

Confidential - Subject to Further Confidentiality Review

Page 371

```
 1          that particular example as -- as

 2          political.  It may have a

 3          political dimension or it may not.

 4          I mean, anticorruption could also

 5          just be part of good -- good

 6          governance.

 7   BY MR. JOHNSON:

 8          Q.    Okay.  What about full

 9   employment?

10          A.    I would say -- I mean, I --

11   that's a -- I would say that's a social

12   objective.  So SOEs clearly can be tasked

13   with performing social objectives like --

14   like full employment.

15          Q.    Okay.  And environmental

16   concerns, those sorts of things, also

17   political policymaking?

18                MR. LONGER:  I don't even

19          know if that's a question.  So I

20          object to form.

21   BY MR. JOHNSON:

22          Q.    Would you include that

23   within a -- on the political side of

24   things?
```

Confidential - Subject to Further Confidentiality Review

Page 372

```
 1          A.    Not -- not necessarily, no.
 2          Q.    It could be either; is that
 3    right?
 4          A.    It could also be a -- I
 5    mean, it could simply be government
 6    policy.  I mean, I -- I'm not -- I'm not
 7    characterizing all government regulation
 8    or government policy as -- as,
 9    quote/unquote, political.
10          Q.    Okay.
11          A.    I just want to draw that
12    distinction.
13          Q.    Sure.  In Exhibit 6, we
14    looked at this earlier.  It's entitled
15    "Chinese Corporate Capitalism Comparative
16    Context."
17          A.    Yeah.
18          Q.    This was a working paper?
19          A.    Mm-hmm.
20          Q.    You wrote on Page 11 under
21    the heading --
22               MR. LONGER:  Can you give us
23          one second.
24               MR. JOHNSON:  Oh, sure.
```

Confidential - Subject to Further Confidentiality Review

Page 373

1                    MR. LONGER:  On what page?

2                    MR. FENTON:  Page 11.

3                    THE WITNESS:  Yes, I believe

4          so --

5    BY MR. JOHNSON:

6          Q.    So about halfway down, you

7    can refresh your recollection on this,

8    you wrote it.  But, you wrote, "Thus its

9    objectives are not limited to serving the

10   interests of its first-degree

11   stakeholders, but also encompass

12   political and policy agendas via external

13   dimensions."

14                   Do you see that sentence?

15         A.    Yes, I see that sentence.

16         Q.    So what are the political

17   and policy agendas?  Give me some

18   examples.

19         A.    A political objective or a

20   political agenda in operating and

21   supervising the SOEs is, I would say -- I

22   would say threefold.

23                   Ideology, so operating SOEs

24   fits with the idea of a socialist market

Confidential - Subject to Further Confidentiality Review

Page 374

1    system in which assets are at least

2    theoretically owned by the people, the

3    whole people.

4          Q.    Mm-hmm.

5          A.    I think this is a -- I think

6    there's a dimension of power,

7    maintaining -- maintaining power.  I

8    don't think it's really a controversial

9    assertion to say that -- I don't think

10   it's a controversial assertion to say

11   that the party does not permit

12   alternative sources of power or

13   organization to form in society.

14             And I would say that the

15   third is a very practical reason, which

16   is, the party obtains many rents and

17   sources of patronage from operating

18   the -- the SOEs.

19             So, to me, none of that is

20   a -- that's -- that's political.

21          Q.   And we talked about policy

22   objectives, full employment, and those

23   sorts of things, correct?

24          A.    Yes.  Full employment would

Confidential - Subject to Further Confidentiality Review

Page 375

1  be a good example of a policy objective.

2       Q.    Okay.  So U.S. corporations,

3  U.S. business groups, as business groups

4  also adopt normative policy

5  considerations for the entire group;

6  isn't that correct?

7            MR. LONGER:  Object to the

8       form and foundation.

9            THE WITNESS:  Can you

10       clarify what you mean by -- I

11       think you said the term "normative

12       policy objectives"?

13  BY MR. JOHNSON:

14       Q.    If -- if -- if a -- if a

15  U.S. business group, by way of example,

16  took a policy line that they were going

17  to focus on environmentally sound and

18  environmentally sustainable business

19  models, would that be an example of a --

20  of a policy objective?

21       A.    Well, I mean, I think today

22  we would call that corporate social

23  responsibility.  You know, a firm that

24  wants to promote itself as being

Confidential - Subject to Further Confidentiality Review

Page 376

1    environmentally sound, I think we would

2    say that this is part of the corporate

3    social responsibility program.

4              I guess policy, to me,

5    implies some sort of governmental action.

6    I don't think of private actors as having

7    policy objectives.

8         Q.   Okay.  But putting aside the

9    word then, if you don't want to use

10   "policy," but that is a -- that is a

11   stance taken by the company, correct?

12        A.   Could be.

13        Q.   And it could take that as

14   a -- as a business group, correct?

15             MR. LONGER:  Object to the

16             form and foundation.

17             THE WITNESS:  You're -- are

18             you asking me whether a -- what

19             Professor Gordon has characterized

20             as a U.S. conglomerate could --

21             could have a corporate social

22             responsibility platform?

23   BY MR. JOHNSON:

24        Q.   Yes.

Confidential - Subject to Further Confidentiality Review

Page 377

        1        A.    Yes.

        2        Q.    And would -- would adopting

        3    such a platform be in itself indicative

        4    of some -- would -- would -- would it in

        5    itself be some reason to pierce the veil

        6    or find alter ego?

        7               MR. LONGER:  It's an

        8          incomplete hypothetical.  I think

        9          I object to the form, foundation.

        10          Incomplete hypothetical.

        11               If you can answer the

        12          question.

        13               THE WITNESS:  It -- it is

        14          hard to answer the question,

        15          because, I mean, it's completely

        16          divorced from the context in which

        17          I'm talking -- you know, you

        18          started by pointing me to this

        19          passage which has to do with the

        20          characteristics, at least as I see

        21          them, of Chinese state capitalism.

        22          I don't really see much of a

        23          bridge to talking about, you know,

        24          Disney's corporate social

Confidential - Subject to Further Confidentiality Review

Page 378

1             responsibility program as -- as a

2             factor for piercing the corporate

3             veil.  I -- I don't see a link

4             there.

5                   The --

6    BY MR. JOHNSON:

7             Q.    Go ahead.

8             A.    Well, I mean, this is taken

9    in the context of discussion about the

10   role of SASAC, the role of the party,

11   parallel systems of supervision, control,

12   monitoring.

13                  So that's the context in

14   which I'm talking about political or

15   policy agenda.  So it's very hard for me

16   to now move and talk about a corporate

17   social responsibility program as being

18   relevant to a -- a piercing exercise.

19            Q.    Well, would it be relevant

20   to a piercing exercise?

21            A.    Well, let me put it this

22   way.  If we are talking about U.S.

23   corporate law --

24            Q.    Mm-hmm.

Confidential - Subject to Further Confidentiality Review

Page 379

1          A.      -- I have not seen a

2    corporate social responsibility program

3    viewed as a factor inclining toward

4    piercing.

5          Q.     Okay.  So the -- the fact

6    that a corporate group adopts some

7    normative policy platform, a social

8    responsibility platform, is not relevant

9    to an alter-ego analysis, correct?

10                MR. LONGER:  Object to form.

11            Mischaracterizes testimony.

12                THE WITNESS:  I am talking

13            about -- what I said was I've

14            never seen it under U.S. law.  I

15            did not say it -- it would never

16            be relevant.

17    BY MR. JOHNSON:

18          Q.     Well, under the prongs

19    you -- of the alter-ego tests as you

20    described them, which are with respect to

21    corporate formalities, commingling of

22    finance, and operations, et cetera, would

23    the fact that a U.S. corporation adopted

24    a social responsibility platform for its

Confidential - Subject to Further Confidentiality Review

Page 380

1    entire business group be relevant to the

2    alter-ego analysis?

3              MR. LONGER:  Again, I object

4         to the form.  I -- I think you are

5         mischaracterizing his testimony.

6         And I don't think that the list

7         was, you know, exclusive.

8              So if you can answer the

9         question, go ahead.

10             THE WITNESS:  I'm -- I'm

11        sorry.  Can you -- can you repeat

12        what you're -- I'm losing you a

13        little bit on exactly what you're

14        asking me.

15             MR. JOHNSON:  Can I have it

16        read back.

17             (Whereupon, the court

18        reporter read back the requested

19        portion of the record.)

20             THE WITNESS:  Yeah.  I mean,

21        I think you are talking about a

22        corporate social responsibility

23        program.  I mean, divorced from

24        any other fact about what would go

Confidential - Subject to Further Confidentiality Review

Page 381

```
 1          into the piercing analysis with

 2          respect to a particular set of

 3          corporations, I -- I mean, it's

 4          very hard to answer that question.

 5              If you had -- if you had

 6          commingling and you had all these

 7          other factors, you know, a -- a

 8          judge can consider almost anything

 9          in an alter ego or a

10          piercing-the-corporate-veil

11          analysis.

12              And I -- you know, it's hard

13          to pick out one -- one thing and

14          say, yes, that would be relevant

15          or -- or, no, it would not be

16          relevant.

17  BY MR. JOHNSON:

18      Q.    Absent all those other

19  factors, absent the commingling of

20  finances and operations, is the fact that

21  a U.S. corporation adopts a normative

22  policy of social responsibility

23  irrelevant to an alter-ego analysis?

24              MR. LONGER:  Object to the
```

Confidential - Subject to Further Confidentiality Review

Page 382

1           form.  I think -- and I think it's

2           been asked and answered now twice.

3                THE WITNESS:  In and of

4           itself, divorced from all other

5           factors, the fact that a -- a

6           company pursues a corporate social

7           responsibility program, divorced

8           from all other factors, that

9           clearly is not a, per se, reason

10          to pierce the corporate veil.

11   BY MR. JOHNSON:

12          Q.    Okay.  And generally

13   speaking, then, if a parent corporation

14   with a business group adopts some

15   corporate culture and there's no evidence

16   of any commingling of assets, et cetera,

17   would it be appropriate to find -- to

18   pierce the veil or find alter ego?

19                MR. LONGER:  Are we talking

20          about a United States corporation?

21          a Chinese corporation?  a Timbuktu

22          corporation?

23   BY MR. JOHNSON:

24          Q.    U.S. corporation.

Confidential - Subject to Further Confidentiality Review

Page 383

```
 1              MR. LONGER:  Object to the

 2         form.

 3              THE WITNESS:  I -- this is

 4         purely hypothetical.

 5              I mean, it -- it's difficult

 6         to answer.  I mean, it's -- it's

 7         completely hypothetical.  I have

 8         no -- there's no context in which

 9         to answer yes or no to that

10         question.

11              I -- what I can tell you is

12         that I am not aware of a case in

13         which a Court has said, "This

14         corporate group has adopted a

15         corporate social responsibility

16         program; therefore, I am piercing

17         the corporate veil."

18              I am not aware of any such

19         legal authority in the United

20         States.

21   BY MR. JOHNSON:

22         Q.    And U.S. corporations do

23   adopt cultural norms; isn't that correct?

24              MR. LONGER:  Object.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Overbroad.  Vague.
 2                  THE WITNESS:  Yeah.  I mean,
 3          I -- I would have to ask for
 4          clarification.  What do you mean
 5          by adopting a cultural norm?  I
 6          mean, in some sense, that's an
 7          oxymoron.  You can't adopt a
 8          cultural norm.  A cultural norm
 9          emerges through human interaction.
10  BY MR. JOHNSON:
11          Q.   Or it can be imposed
12  top-down, correct?
13                  MR. LONGER:  Objection.
14          Same objection.
15                  THE WITNESS:  Frankly, I
16          don't know how to answer that.  I
17          don't -- I don't see how you can
18          impose a cultural norm from the
19          top down.  And I don't know what
20          context you are talking about.
21  BY MR. JOHNSON:
22          Q.   Do U.S. corporations -- do
23  the corporate cultures of U.S.
24  corporations vary from one to the other?
```

Confidential - Subject to Further Confidentiality Review

Page 385

```
 1              MR. LONGER:  If you can
 2         answer it.
 3              THE WITNESS:  I mean, I'm
 4         not really sure.  I mean, can you
 5         define corporate culture for me?
 6  BY MR. JOHNSON:
 7         Q.    Professor, I thought the
 8  term was sort of self-explanatory.
 9         A.    Actually, no.  In the
10  literature, it's -- there's a lot of
11  definitions about what it may mean,
12  whether it may or may not actually exist
13  as a thing.  So it's actually quite a
14  pregnant question.
15         Q.    Okay.  Who -- who owns CNBM
16  Group?
17         A.    100 percent of the shares of
18  CNBM, it is a wholly state-owned
19  limited -- sorry -- limited liability
20  company.  That is its structure under
21  the -- under the Chinese corporate law.
22  100 percent of its shares are held by
23  SASAC on behalf of -- at least ostensibly
24  on behalf of the Chinese people.
```

Confidential - Subject to Further Confidentiality Review

1          Q.    And that ownership structure

2    was relative to your opinions here,

3    correct?

4          A.    Yes.

5          Q.    So it's significant to you

6    that SASAC held 100 percent of CNBM Group

7    shares in rendering your opinion?

8          A.    Well, it's significant to me

9    that CNBM Group -- and I'll now use the

10   defined term that I said, Business Group,

11   capital B, capital G -- it is certainly

12   significant to me that it is a group

13   under SASAC.  It is an SOE under SASAC

14   supervision.

15         Q.    You would agree that

16   state-owned enterprises vary

17   considerably, that they differ quite a

18   bit, one from the other; isn't that

19   right?

20              MR. LONGER:  Objection.

21         Overbroad.  Vague.

22              THE WITNESS:  They operate

23         in different industries.  And

24         that's one basis for

Confidential - Subject to Further Confidentiality Review

Page 387

 1          differentiating them.

 2   BY MR. JOHNSON:

 3          Q.    Have you ever cautioned

 4   readers in anything that you've written

 5   that, you know, one should try to avoid

 6   any generalizations about Chinese

 7   state-owned enterprises because they vary

 8   from one to the other?

 9          A.    I'm not sure I've said

10   precisely what you're saying.  But I

11   certainly have cautioned against viewing

12   all SOEs as a -- as a monolith.  Yes.

13          Q.    And so one would take -- one

14   would need to take care to look at the

15   specifics, the actual facts relating to

16   control, et cetera, when looking at any

17   particular Chinese SOE; is that correct?

18   In making an alter-ego analysis; is that

19   right?

20               MR. LONGER:  Objection to

21          the form and foundation.

22               THE WITNESS:  Well, clearly

23          an alter-ego analysis is

24          fact-specific, absolutely.

Confidential - Subject to Further Confidentiality Review

1  BY MR. JOHNSON:

2         Q.    Okay.  So you need to look

3  at the actual, for example, involvement

4  of the state or SASAC in a particular

5  Chinese SOE in effecting that analysis;

6  is that correct?

7                MR. LONGER:  As opposed to

8         the capacity to control?

9                MR. JOHNSON:  That really is

10        a speaking objection.  That was a

11        fair question.

12               MR. LONGER:  I don't know

13        that it was.

14               MR. JOHNSON:  I said actual

15        control.

16               MR. LONGER:  All right.

17        Actual.  I object to the form of

18        the question.

19               THE WITNESS:  Well, I think

20        that you have to look at the -- I

21        mean, again, I really am going to

22        say what I said before, which is

23        context is crucial.  It is

24        relevant that these companies are

Confidential - Subject to Further Confidentiality Review

Page 389

1          owned by SASAC.  It is relevant to

2          the alter-ego question, in my

3          opinion.

4               The judge can decide whether

5          he feels it's relevant or not.

6          But, in my opinion, the fact that

7          SASAC is involved, the fact that

8          these are corporate groups under

9          SASAC's supervision, the fact of

10         party involvement in these

11         enterprises is a factor that is

12         relevant to the issue of control.

13   BY MR. JOHNSON:

14         Q.   Are you suggesting the court

15   should take general context into

16   consideration in running the alter-ego

17   analysis or look at the specific facts

18   relevant to CNBM -- what has been

19   described as the CNBM business group?

20               MR. LONGER:  Object to the

21         form.

22               THE WITNESS:  Well, I mean,

23         I'm not sure you can separate the

24         two.  I mean, of course -- of

Confidential - Subject to Further Confidentiality Review

```
 1          course the factfinder is focused

 2          on CNBM business group, is not

 3          focused on Chinese SOEs in the

 4          abstract.

 5              So to that extent, of course

 6          they're focused on the individual

 7          characteristics of the enterprise.

 8              But those characteristics

 9          include everything that we have

10          been talking about with respect to

11          SASAC's powers, the role of the

12          party, et cetera.

13  BY MR. JOHNSON:

14      Q.    But what you just said,

15  isn't that general?  That's not -- that

16  doesn't look specifically at what's going

17  on in CNBM business group, correct?

18              MR. LONGER:  Objection to

19          the form.

20              THE WITNESS:  Well, I've

21          pointed in my declaration to

22          evidence that I saw that was very

23          consistent with, from my academic

24          study, the way I see SOEs under
```

Confidential - Subject to Further Confidentiality Review

```
 1          SASAC supervision being operated

 2          and the influence of SASAC and the

 3          party.

 4               So I'm having a hard time

 5          really disentangling what you're

 6          calling the specific from the --

 7          from the general.

 8 BY MR. JOHNSON:

 9     Q.    You gave in your report --

10 unless I misread it, you gave some

11 general context.  And then you gave some

12 three, I believe, examples; is that

13 correct?

14     A.    I'm not sure about the

15 example -- the number of examples.  We

16 talked about them extensively.

17               I certainly attempted to set

18 up in a general way the characteristics

19 of SOE business groups, hopefully for the

20 benefit of the judge so that he could

21 understand, you know, some context for

22 the specific defendants at issue here.

23 And I tried to find, by way of

24 illustration and emphasis, some examples,
```

Confidential - Subject to Further Confidentiality Review

Page 392

1    concrete examples from the record that

2    indicated that the general -- that CNBM

3    partook of these general characteristics.

4              So I refer to it as a

5    typical SOE under SASAC supervision.

6              The expert, Donald Clark,

7    referred to them in precisely the same

8    way.  He uses almost identical language

9    to that.  He says these are typical

10   characteristics of an SOE in the Chinese

11   SOE system.

12       Q.    Okay.  But as Mr. Fenton

13   established, those -- the examples that

14   you put in your report are the examples

15   that you have; is that correct, sir?

16       A.    Yes.  And as I said earlier,

17   that my task was not to find every

18   example that I possibly could.  My task

19   was to provide helpful context hopefully

20   for the judge in rendering his decision,

21   reaching his legal conclusion.

22              MR. JOHNSON:  Bear with me

23        one moment.  I think that's it.

24        Thanks.

Confidential - Subject to Further Confidentiality Review

Page 393

1                    THE WITNESS:  Thank you.

2                    MR. VENDERBUSH:  I have no

3          questions.

4                    MR. LONGER:  I just have a

5          few questions.

6                    Actually, let's go off the

7          record just for one second.

8                    THE VIDEOGRAPHER:  The time

9          is 5:28 p.m.  We are going off the

10         record.

11              (Brief pause.)

12                   THE VIDEOGRAPHER:  The time

13         is 5:29 p.m.  We are back on the

14         record.

15              (Document marked for

16         identification as Exhibit

17         Milhaupt-20.)

18                      -  -  -

19              CROSS EXAMINATION

20                      -  -  -

21     BY MR. LONGER:

22         Q.    Professor Milhaupt, good

23     afternoon.  Close to evening, but still

24     afternoon.

Confidential - Subject to Further Confidentiality Review

Page 394

1              I'm Fred Longer.  I have a

2    few questions for you.  And I wanted to

3    start -- I had marked over the break what

4    defense counsel gave to us as the full

5    copy of the 2007 annual report of BNBM

6    PLC.

7              And if I didn't say it

8    already, I marked it as Exhibit 20.  I

9    want to show it to you.

10             You were asked questions in

11   connection with the section which had the

12   heading, as I understood it to say,

13   "Separation of the Company and the

14   Controlling Shareholder and Operations

15   Personnel, Assets, Organization, and

16   Finance."

17             Do you recall those

18   questions?

19        A.    Yes, I do.

20        Q.    And this document talks in

21   terms -- or that heading talks in terms

22   of controlling shareholder.  And the

23   version --

24             MR. FENTON:  Can you -- can

Confidential - Subject to Further Confidentiality Review

```
 1          you just --
 2                    MR. LONGER:  I'm on Page --
 3                    MR. FENTON:  -- point me to
 4          the page.
 5                    MR. LONGER:  It's Bates
 6          Number 740.  Number 19 of 120.
 7                    MR. FENTON:  Got it.
 8                    MR. LONGER:  Are you with
 9          me?
10                    MR. PFAEHLER:  We're with
11          you now.
12   BY MR. LONGER:
13          Q.    Okay.  So it talks -- that
14   section dealt with the separation of the
15   company and the controlling shareholder
16   and operations.
17                    And the document, which this
18   was Exhibit Number 11, I believe, did not
19   talk in terms of the definitions of
20   controlling shareholder.  And this
21   document, which is the complete document,
22   as I understand it, does.
23                    Is that your understanding
24   from looking at the document?
```

Confidential - Subject to Further Confidentiality Review

Page 396

1              MR. FENTON:  Object to the

2        form of the question.  I have no

3        idea what you're asking.

4              MR. LONGER:  I can reframe

5        the question.

6    BY MR. LONGER:

7        Q.    Does the definition

8    "controlling shareholder" appear in this

9    document, Exhibit Number 20, on Page 10

10   of the document?

11       A.    Yes, it does.

12       Q.    All right.  And who is the

13   controlling shareholder of the company,

14   as you see the definition?

15       A.    The controlling shareholder

16   is defined as China National Building

17   Material Company Limited.

18       Q.    Okay.  And who is the actual

19   controller of the company?

20       A.    That's listed as China

21   National Building Materials Group

22   Corporation.

23       Q.    All right.  And in the next

24   page, there is a graphic, is there not?

Confidential - Subject to Further Confidentiality Review

 1           A.     There is.

 2           Q.     And what does this graphic

 3    say about the actual controller and the

 4    actual controller's owner, as you see it?

 5           A.     This graphic shows that the

 6    actual controller -- that is, Group

 7    Corporation -- is -- 100 percent of its

 8    shares are held by SASAC.

 9           Q.    All right.  And does SASAC

10    have within it a Communist Party

11    component?

12                  MR. FENTON:  Object to the

13            lack of foundation.

14    BY MR. LONGER:

15           Q.    To your knowledge, does

16    SASAC have a Communist Party component?

17           A.    Yes.  SASAC has within it

18    a -- a Communist Party committee.

19           Q.    All right.  And does -- does

20    the presence of SASAC in BNBM's annual

21    report suggest that the Communist Party

22    committee has some influence on BNBM?

23                  MR. FENTON:  Object to the

24            form.  Leading your own witness.

Confidential - Subject to Further Confidentiality Review

Page 398

 1            THE WITNESS:  The fact that
 2         SASAC is listed as the ultimate
 3         controller of this group is, to my
 4         mind, highly relevant to questions
 5         of group status.
 6            And it also indicates that
 7         there is a -- although it's not
 8         graphically illustrated here, it
 9         indicates that there is a
10         Communist Party involvement or
11         parallel structure set apart
12         from -- both embedded within SASAC
13         but also apart from SASAC.
14  BY MR. LONGER:
15      Q.   All right.  And is that a
16  consideration, the presence of the
17  Communist Party being embedded all the
18  way as you describe, a characteristic
19  that is of concern to you when evaluating
20  the alter-ego issues that are in this
21  litigation?
22      A.   Yes.  As my declaration
23  states, I believe, given -- based on my
24  study of Chinese SOEs under SASAC

Confidential - Subject to Further Confidentiality Review

1    supervision, that it is a relevant -- it

2    is a distinctive and relevant

3    consideration for a court in considering

4    single entity or alter-ego status of

5    the -- of the defendants.

6          Q.    Thank you.

7                You were also provided, as

8    Exhibit Number 1, your declaration?

9          A.    Yes.

10         Q.    And I just want to ask you a

11   few questions about this.

12               So did you, in the course of

13   preparing this declaration, apply the

14   same sort of rigor, if you will,

15   intellectual rigor, to preparing this

16   declaration as you would to any of the

17   many studies that you have seen and been

18   provided that you have previously

19   authored?

20         A.    Yes.  The -- the foundation

21   for the declaration is based heavily on a

22   significant amount of scholarly research

23   and publications that I've done into

24   Chinese SOEs under SASAC supervision.

Confidential - Subject to Further Confidentiality Review

Page 400

1          Q.    And those prior studies and

2    the prior research that you've done,

3    has -- it's been published, correct?

4          A.    Correct.

5          Q.    And -- and in the course of

6    publication, has any of your work been

7    peer-reviewed?

8          A.    Yes.  The -- the book, the

9    Oxford book that just came out, was

10   extensively subjected to -- subjected to

11   quite an extensive peer-review process,

12   both with respect to the concept of the

13   book -- that is a description or summary

14   of the book -- plus the synopsis of every

15   chapter.  That is read by several outside

16   reviewers on a blind basis.  And the

17   contract is obtained on the basis of

18   those reviews.  And then the actual

19   chapters were subjected to intensive

20   discussion at a workshop at Columbia Law

21   School in June of 2014 in which every

22   author's paper was subjected to

23   discussion by every other author.

24                And then, finally, Professor

Confidential - Subject to Further Confidentiality Review

Page 401

1   Liebman and myself reviewed and edited

2   extensively every chapter before it was

3   finally published.

4          Q.    And the title of that book

5   is "Regulating the Visible Hand?"

6          A.    Yes.

7          Q.    And --

8                MR. FENTON:  May I see the

9          book, please, Fred.

10               MR. LONGER:  It's my copy.

11         You are certainly welcome to it.

12               MR. FENTON:  You can

13         autograph it.

14               MR. LONGER:  It's already

15         been autographed.

16               MR. FENTON:  It certainly

17         has.

18               Can I get one, Professor?

19               THE WITNESS:  Certainly.

20               MR. FENTON:  I'd appreciate

21         it.

22               Go ahead with your

23         examination.

24               MR. LONGER:  I'll take it

Confidential - Subject to Further Confidentiality Review

 1          back too.  Thank you.

 2     BY MR. LONGER:

 3          Q.    So -- and the other

 4     articles, some that you've co-authored,

 5     your co-authors have published

 6     extensively in their discipline; is that

 7     correct?

 8          A.    Yes.

 9          Q.    And did they -- they agreed,

10     I take it, because it was a co-authored

11     article, some of them, with your

12     opinions?

13          A.    Well, the work that -- that

14     went into, for example, the Stanford Law

15     Review article, which -- which I will

16     just say, as an aside, was informally

17     peer-reviewed, but the work that went

18     into the Stanford Law Review article and

19     the Georgetown Law Review article were

20     completely collaborative.  So it's -- I

21     mean, I wouldn't even characterize it as

22     us agreeing.  I mean, we -- we came -- we

23     developed those projects and we came to

24     those conclusions together as part of a

Confidential - Subject to Further Confidentiality Review

 1   team -- team production effort.

 2          Q.    All right.  And in -- in the

 3   general scope of your field, dealing with

 4   state capitalism and the interplay of

 5   state-owned enterprises in China, are

 6   you -- do you consider yourself to be an

 7   expert in that field?

 8          A.    I mean, I was born in the

 9   Midwest, so I'm totally modest.  But,

10   yes, I would consider myself an expert,

11   and I think -- I think more relevantly

12   for me, I am considered to be, perhaps,

13   the leading expert in the United States

14   on -- on Chinese state capitalism,

15   particularly as it relates to

16   corporate -- SOE governance issues.

17          Q.    Right.  And in the

18   declaration that you've provided to me on

19   behalf of the plaintiffs' steering

20   committee, which was Exhibit Number 1, is

21   your -- are your opinions, do they

22   reconcile with your published work?

23                MR. FENTON:  Object to the

24          form.

Confidential - Subject to Further Confidentiality Review

Page 404

1           MR. LONGER:  And if -- I can

2       restate it.

3  BY MR. LONGER:

4       Q.    Is what you wrote consistent

5  with what you've been studying?

6           MR. FENTON:  Object to the

7       form.

8           THE WITNESS:  The -- the

9       declaration really grew out of my

10      entire body of study into Chinese

11      SOEs.  And so in -- in that sense,

12      I think it is entirely consistent

13      with my prior -- my prior study.

14 BY MR. LONGER:

15      Q.    And what was the methodology

16 you employed to arrive at the findings

17 that you made in your declaration?

18      A.    Well, obviously, I studied

19 the -- I studied the record.  But as to

20 setting the -- the framework for the --

21 the declaration, again that is based on

22 my study of this subject matter.  And let

23 me talk specifically about the Stanford

24 Law Review article.

Confidential - Subject to Further Confidentiality Review

1          So we discovered quite early

2     on that almost all existing literature on

3     Chinese corporate governance, to the

4     extent that it was oriented at all to

5     a -- a Western audience, focused

6     exclusively on listed companies.  So it

7     looked at the -- the number of

8     independent directors and listing

9     standards and -- and the like.

10          And we felt that that was

11     missing a significant part of the context

12     or the picture that was relevant to

13     thinking about corporate governance of

14     Chinese SOEs.  We decided -- I mean we --

15     we saw that these groups, the listed

16     companies, were part of a much larger

17     group.  And so we determined that the

18     group would be an interesting and

19     fruitful area of analysis or unit of

20     analysis.  So that was our -- that was

21     our approach.

22          In terms of specific

23     methodology, we adopted at least in some

24     measure an approach from sociology that's

Confidential - Subject to Further Confidentiality Review

1    known as a network analysis, which

2    involves delving deeply into who the

3    actors are in a given realm, looking at

4    how those actors are linked, how do those

5    linkages form, and then what are the

6    consequences of those -- of those

7    linkages.  So that's the basic

8    methodology that we used to -- to produce

9    the -- the Stanford Law Review article.

10                   And I would say that a very

11   similar approach underlies my approach

12   to -- to drafting the declaration.

13            Q.    All right.  Now, obviously,

14   and -- and you have testified, you --

15   you -- you have about 55 hours of time in

16   this.  It strikes me that it probably

17   took a lot more time for you to write

18   your Stanford Law Review article than the

19   declaration.

20                   But tell us how, even with

21   the less time, you're -- you feel

22   comfortable -- if whether you feel

23   comfortable that your results

24   are reliable.

Confidential - Subject to Further Confidentiality Review

1          MR. FENTON:  Object to the

2      form.

3          THE WITNESS:  Well, the --

4      the characteristics that I saw

5      when -- when investigating the

6      companies at issue here, the

7      CNBM -- what I'm calling the CNBM

8      business group, they were very

9      consistent with my scholarly

10     research; hence my statement that

11     it is a typical business group

12     under SASAC supervision.

13         So I feel very confident

14     that the description that I've

15     given of the main characteristics

16     of the CNBM business group, as

17     I've defined it, are consistent

18     with SOEs under SASAC supervision

19     in general, and that gives me

20     confidence in fleshing out some of

21     the issues of -- relating to

22     control or capacity for control

23     that we have -- that we have

24     talked about.

Confidential - Subject to Further Confidentiality Review

Page 408

1                    I would just add one other
2           thing, which is, I'm really not
3           aware of any literature, any
4           literature, that fundamentally
5           contradicts the description of
6           Chinese SOEs under SASAC
7           supervision that we have
8           presented.  And, in fact, Donald
9           Clark has written in much the same
10          thing about many of these -- these
11          issues.
12                   The other authors that I've
13          cited, to the extent that someone
14          focuses on SOEs under SASAC
15          supervision -- now, some people
16          don't.  I mean, Chinese corporate
17          law scholars often just focus on
18          the corporate law because that's
19          their -- that's their disciplinary
20          focus.
21                   To the extent that
22          someone -- that a scholar focuses
23          on SOEs under SASAC supervision,
24          as I said, I'm not aware of any

Confidential - Subject to Further Confidentiality Review

 1          literature that fundamentally

 2          contradicts the picture that we --

 3          that I have painted in the

 4          declaration or that we have

 5          painted in our scholarship.

 6   BY MR. LONGER:

 7          Q.    Now, that description of

 8   your whole declaration where -- you've

 9   been here for probably seven or

10   eight hours today alone, but you've

11   described this dual system of control

12   within the state of China, the People's

13   Republic, correct?

14          A.    When you say "dual system of

15   control," you're talking about a

16   corporate system -- a familiar corporate

17   system and a "less familiar to outsiders"

18   party system?

19          Q.    Yes, sir.

20          A.    Yes.

21          Q.    All right.  And that

22   analysis, you're saying, has been

23   corroborated as you see it throughout the

24   literature, that you're not aware of any

Confidential - Subject to Further Confidentiality Review

Page 410

1    inconsistent literature?

2         A.    That's correct.

3         Q.    I don't know if you're

4    familiar with the Daubert opinion.  But

5    Daubert requires that there be a fit

6    between the analysis and the facts of the

7    case.

8              Do you see a fit, if you

9    understand that term as used by the

10   Supreme Court, between what you did and

11   the analysis -- or the facts and the

12   analysis that you performed?

13             MR. FENTON:  Objection to

14        form.  Leading.  Calls for a legal

15        conclusion.

16             THE WITNESS:  I see the

17        assignment that I received as

18        providing context on corporate

19        governance of SOEs under SASAC

20        supervision.  I see that as -- in

21        my opinion, as being relevant and

22        helpful context for a judge in

23        rendering his legal conclusion.

24             And the facts that I saw

Confidential - Subject to Further Confidentiality Review

Page 411

```
 1          from the record corroborated or --
 2          corroborated my scholarly
 3          understanding of this route, the
 4          SOE universe under SASAC
 5          supervision.
 6               MR. LONGER:  Thank you,
 7          Professor.  I have no further
 8          questions.
 9                   -  -  -
10          REDIRECT EXAMINATION
11                   -  -  -
12 BY MR. FENTON:
13          Q.   I just have a few,
14 Professor, if you'll indulge me.
15          You've described your level
16 of scholarship.  You consider Professor
17 Gordon to be every bit the scholar you
18 are, don't you?
19          A.   We have different fields and
20 strengths, but he is -- he is a very
21 reputed scholar.  I respect him.
22          Q.   Okay.  And he has published
23 peer-reviewed articles just as you have,
24 correct?
```

Confidential - Subject to Further Confidentiality Review

1          A.    I'm not -- I can't speak to

2     that, because I don't know.  I would not

3     be surprised to learn of that fact.  But

4     I can't say yes or no.

5          Q.    Well, you also talked about

6     informal peer review.  You've reviewed

7     some of his articles from time to time

8     while they were works in progress --

9          A.    Yes.

10         Q.    -- and gave him some

11    comments?

12         A.    Yes.  Sure.

13         Q.    Okay.  And he's done the

14    same for you, correct?

15         A.    He has.

16         Q.    Okay.  Who peer-reviewed

17    your report that we marked as Milhaupt

18    Exhibit 1?

19         A.    Who peer-reviewed my

20    declaration?

21         Q.    Yes.  Who peer-reviewed your

22    declaration?

23              MR. LONGER:  Object to form

24         and foundation.  It's -- it

Confidential - Subject to Further Confidentiality Review

Page 413

```
 1          wasn't -- it's even outside the
 2          scope of the limited inquiry that
 3          I made.
 4                 MR. FENTON:  I don't think
 5          so.
 6    BY MR. FENTON:
 7          Q.    Who peer-reviewed it?  You
 8    talk about someone peer-reviewing your
 9    book.  I want to know who peer-reviewed
10    your declaration.
11          A.    I'm not aware that
12    declarations by experts are to be
13    peer-reviewed.  That would seem to be
14    inappropriate and perhaps in violation of
15    the confidentiality order that I signed.
16          Q.    So the answer to my question
17    is nobody, right?  The declaration isn't
18    peer-reviewed, right?
19          A.    Correct.  The scholarship
20    underlying it has been peer-reviewed.
21          Q.    Well, I understand that in
22    terms of your articles and so on.
23                 Did anybody peer-review your
24    review of the factual materials in this
```

Confidential - Subject to Further Confidentiality Review

1    case?

2              A.    No.

3              Q.    Okay.  Did you -- did you go

4    out and get a peer review?  Did you go

5    out and find a colleague and say, "This

6    is how I intend to approach this project.

7    Will you peer-review my methodology for

8    giving an opinion in this case"?

9                   MR. LONGER:  Objection.

10             Argumentive.

11                  THE WITNESS:  Well, and I

12             mean, to the extent that we're

13             talking about the analytical basis

14             or framework for my declaration,

15             it has been peer-reviewed.

16   BY MR. FENTON:

17             Q.    Yes, sir.  Did you tell --

18   you described a methodology whereby you

19   took the materials provided to you by the

20   PSC in the case.  You reviewed the facts

21   within the analytical framework --

22             A.    Well, I reviewed all --

23             Q.    -- that you previously had.

24   Okay.  My question is, before you did

Confidential - Subject to Further Confidentiality Review

Page 415

1    that, did you go out and grab a colleague

2    and say, "This is what I intend to do.

3    Will you peer-review this methodology for

4    me?"

5            A.    No, I did not, but I did not

6    review the facts -- I mean, I want to

7    just correct one impression you made --

8    misimpression.  I did not say I reviewed

9    the facts in a way to -- by way of

10   corroborating my scholarly understanding

11   of this SOE.

12               I said that the facts that I

13   saw did tend to corroborate that.  But I

14   didn't read the record in an attempt to

15   verify my scholarly understanding of

16   SOEs.

17           Q.    All right.  And so the facts

18   that you saw corroborated your

19   preconceived notions, did they?

20           A.    That's not what I said.

21           Q.    Okay.  Well, based on the

22   facts that you saw, all of the materials

23   provided to you by the PSC, can you name

24   me one instance where SASAC,

Confidential - Subject to Further Confidentiality Review

Page 416

1    notwithstanding its 100 percent ownership

2    in CNBM Group Corporation, has interfered

3    in the affairs of Taishan, of BNBM PLC,

4    of BNBM Group, of CNBM PLC, or of CNBM

5    Group?

6              Can you, as the leading

7    expert in the United States on Chinese

8    state capitalism, particularly as it

9    relates to corporate SOE governance

10   issues, give me a single instance where

11   that has happened?

12             MR. LONGER:  Objection to

13        the form.

14             THE WITNESS:  Well, I think

15        we discussed one.

16             I mean, we're going back to

17        ground we already covered.  But we

18        talked about the SASAC supervision

19        committee, together with

20        supervision committees from other

21        group companies going down into

22        Taishan and examining the

23        situation and coming up with a

24        rectification plan and stressing

Confidential - Subject to Further Confidentiality Review

Page 417

```
 1          the importance of following

 2          governmental spirit and

 3          regulations, et cetera.  That's

 4          what we discussed earlier.

 5     BY MR. FENTON:

 6          Q.    This was the decadence stuff

 7     we talked about?

 8          A.    I'm not referring

 9     specifically to that, but we talked

10     about --

11          Q.    So that's the document that

12     you're referring to?

13          A.    That's the document --

14          MR. LONGER:  Wait, wait,

15          wait.  We're talking over one

16          another.

17          You have a question.  He can

18          answer.

19     BY MR. FENTON:

20          Q.    Go ahead, Professor.

21          A.    That's the document that I

22     was referring to.

23          Q.    Milhaupt Exhibit 3?

24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

```
 1          Q.    Okay.  And I believe you
 2   said that from the context you believe
 3   that this meeting took place sometime
 4   after 2012?
 5          A.    That's correct.
 6          Q.    And we talked about this
 7   before.  There's nothing in here
 8   directing Taishan or BNBM PLC or BNBM
 9   Group or CNBM PLC or CNBM Group what they
10   are to produce or how they are to produce
11   it or where they are to produce it or who
12   they are supposed to sell to, right?
13              MR. LONGER:  Objection to
14          the form.  Mischaracterizes his
15          testimony.
16              THE WITNESS:  This document
17          does not relate to those -- to
18          those issues, no.
19   BY MR. FENTON:
20          Q.    Right.  They're related to
21   the four forms of decadence that we
22   talked about earlier.
23          A.    Well, that's -- I mean, I've
24   said -- I've stressed this several times
```

Confidential - Subject to Further Confidentiality Review

Page 419

1    now.  That's not what I'm referring to.

2    I'm referring to supervision teams from

3    three tiers, which carefully reviewed the

4    checking and assessing of materials, et

5    cetera, see whether the materials

6    complied with the requirements of the

7    central government, whether they

8    reflected the actual situations of the

9    enterprise, to see whether the leadership

10   team and the members identified the

11   problems accurately, dug into the cause

12   of the problems in depth, and made solid

13   rectification plans.  That's what I'm

14   referring to.

15          Q.    So you don't even know what

16   problems they're talking about, do you?

17                MR. LONGER:  Objection to

18          the form.

19   BY MR. FENTON:

20          Q.    You don't know what problems

21   are being addressed in this document, do

22   you?

23          A.    Well, I mean, I have -- I

24   have some -- I have my ideas about that,

Confidential - Subject to Further Confidentiality Review

1  yes.

2          Q.    Okay.  Do you know?

3          A.    No.  From the context, it

4  seems fairly obvious.

5          Q.    And when you say, "From the

6  context, it seems fairly obvious," are

7  they addressing operational issues at

8  Taishan?  That is to say, production

9  management, production lines, how much to

10  make, who to sell to, what to sell.

11          A.    It's not apparent from the

12  document.

13          Q.    Okay.  So other than this

14  document from sometime after 2012,

15  dealing with four forms of decadence and

16  some addressing of some problems that we

17  don't know what they are, can you give me

18  any other instance where SASAC interfered

19  in the affairs of CNBM Group, CNBM PLC,

20  BNBM Group, BNBM PLC, or Taishan?

21              MR. LONGER:  Object to the

22          form.  You're using the term

23          "interfere."  You mean that in the

24          sense of any effect?

Confidential - Subject to Further Confidentiality Review

 1                    MR. FENTON:  Intermeddled.

 2                    MR. LONGER:  Same objection.

 3              If you can answer the

 4         question, go ahead.

 5                    THE WITNESS:  I mean, they

 6         have supervisory control and they

 7         have a right to appoint or replace

 8         personnel.  I mean, is that -- how

 9         would you characterize that?

10    BY MR. FENTON:

11         Q.    I would characterize that as

12    ability to control.

13              I'm asking, do you have any

14    other instance, other than this

15    Exhibit 3, which we have been through ad

16    nauseam, of actual exercise of control by

17    SASAC over the operations of Taishan,

18    BNBM Group, BNBM PLC, CNBM Group, or CNBM

19    PLC?  Can you give me any specific

20    instance?

21                    MR. LONGER:  Asked and

22         answered.

23                    THE WITNESS:  I mean, I

24         think we have been through all of

Confidential - Subject to Further Confidentiality Review

Page 422

1            this, haven't we?

2    BY MR. FENTON:

3            Q.    The answer to my question is

4    no, correct?

5                  MR. LONGER:   Objection.

6                  THE WITNESS:   Well, I mean,

7            my -- my declaration goes to, and

8            I think speaks of, capacity,

9            capacity to influence and capacity

10           to control.

11    BY MR. FENTON:

12           Q.    All right.  And so as the

13    leading expert in the United States on

14    Chinese state -- I can't even read my own

15    writing at this point.

16                  Leading expert in the United

17    States on Chinese state capitalism --

18                  MR. LONGER:   You said he's

19           the leading expert, and I'll --

20           I'll live with that --

21    BY MR. FENTON:

22           Q.    -- particularly as it

23    relates to corporate SOE governance

24    issues.

Confidential - Subject to Further Confidentiality Review

Page 423

```
 1              As the leading expert on
 2   that, Professor, that's the best you can
 3   do?
 4        A.    Well --
 5              MR. LONGER:  Objection.
 6         Argumentive.
 7              THE WITNESS:  I would just
 8         say that I said I think that that
 9         is how I am -- I am considered.
10         I -- I would just clarify that.
11   BY MR. FENTON:
12        Q.    Okay.  But that last answer
13   that you just gave me, that's the best
14   you can do for me on that question,
15   right?
16        A.    I -- I don't have anything
17   else to respond to -- to that.
18        Q.    Okay.
19              MR. FENTON:  Okay.
20         Professor, thank you again.
21              THE WITNESS:  Thank you.
22              MR. FENTON:  I am done.
23              MR. LONGER:  We're
24         concluded.
```

Confidential - Subject to Further Confidentiality Review

Page 424

1              THE VIDEOGRAPHER:  The time

2        is 5:57 p.m. on February 3, 2016.

3              And this completes the

4        deposition of Professor Curtis J.

5        Milhaupt.

6              (Witness excused.)

7              (Deposition concluded at

8        approximately 5:57 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 425

1
2                    CERTIFICATE
3
4
5           I HEREBY CERTIFY that the
     witness was duly sworn by me and that the
6    deposition is a true record of the
     testimony given by the witness.
7
             It was requested before
8    completion of the deposition that the
     witness, CURTIS J. MILHAUPT, JD, have the
9    opportunity to read and sign the
     deposition transcript.
10
11
12    _____
         MICHELLE L. GRAY,
13       A Registered Professional
         Reporter, Certified Shorthand
14       Reporter and Notary Public
         Dated:  February 3, 2016
15
16
17           (The foregoing certification
18    of this transcript does not apply to any
19    reproduction of the same by any means,
20    unless under the direct control and/or
21    supervision of the certifying reporter.)
22
23
24

Confidential - Subject to Further Confidentiality Review

Page 426

1                    INSTRUCTIONS TO WITNESS

2

3                    Please read your deposition

4    over carefully and make any necessary

5    corrections.  You should state the reason

6    in the appropriate space on the errata

7    sheet for any corrections that are made.

8                    After doing so, please sign

9    the errata sheet and date it.

10                   You are signing same subject

11   to the changes you have noted on the

12   errata sheet, which will be attached to

13   your deposition.

14                   It is imperative that you

15   return the original errata sheet to the

16   deposing attorney within thirty (30) days

17   of receipt of the deposition transcript

18   by you.  If you fail to do so, the

19   deposition transcript may be deemed to be

20   accurate and may be used in court.

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 427

```
 1                    -  -  -  -  -  -

                       E R R A T A

 2                    -  -  -  -  -  -

 3

 4    PAGE   LINE   CHANGE

 5    ____  ____   _____

 6       REASON:   _____

 7    ____  ____   _____

 8       REASON:   _____

 9    ____  ____   _____

10       REASON:   _____

11    ____  ____   _____

12       REASON:   _____

13    ____  ____   _____

14       REASON:   _____

15    ____  ____   _____

16       REASON:   _____

17    ____  ____   _____

18       REASON:   _____

19    ____  ____   _____

20       REASON:   _____

21    ____  ____   _____

22       REASON:   _____

23    ____  ____   _____

24       REASON:   _____
```

Confidential - Subject to Further Confidentiality Review

Page 428

1

2          ACKNOWLEDGMENT OF DEPONENT

3

4              I,_____, do

5    hereby certify that I have read the

6    foregoing pages, 1 - 429, and that the

7    same is a correct transcription of the

8    answers given by me to the questions

9    therein propounded, except for the

10   corrections or changes in form or

11   substance, if any, noted in the attached

12   Errata Sheet.

13

14

15   _____

16    CURTIS J. MILHAUPT, JD              DATE

17

18

19   Subscribed and sworn
     to before me this

20   _____ day of _____, 20____.

21   My commission expires:_____

22

     _____

23   Notary Public

24

Confidential - Subject to Further Confidentiality Review

Page 429

1                       LAWYER'S NOTES

2     PAGE  LINE

3     _____ _____  _____

4     _____ _____  _____

5     _____ _____  _____

6     _____ _____  _____

7     _____ _____  _____

8     _____ _____  _____

9     _____ _____  _____

10    _____ _____  _____

11    _____ _____  _____

12    _____ _____  _____

13    _____ _____  _____

14    _____ _____  _____

15    _____ _____  _____

16    _____ _____  _____

17    _____ _____  _____

18    _____ _____  _____

19    _____ _____  _____

20    _____ _____  _____

21    _____ _____  _____

22    _____ _____  _____

23    _____ _____  _____

24    _____ _____  _____