# Beyond Ownership: State Capitalism and the Chinese Firm

Curtis J. Milhaupt* & Wentong Zheng**

*Chinese state capitalism has been treated as essentially synonymous with state-owned enterprises (SOEs). But drawing a stark distinction between SOEs and privately owned enterprises (POEs) misperceives the reality of China's institutional environment and its impact on the formation and operation of large enterprises of all types. We challenge the "ownership bias" of prevailing analyses of Chinese firms by exploring the blurred boundary between SOEs and POEs in China. We argue that the Chinese state has less control over SOEs and more control over POEs than its ownership interest in the firms suggests. Our analysis indicates that Chinese state capitalism can be better explained by capture of the state than by ownership of enterprise. We explain the mechanisms of capture in China and argue that due to China's institutional environment, large, successful firms—regardless of ownership—exhibit substantial similarities in areas commonly thought to distinguish SOEs from POEs: market dominance, receipt of state subsidies, proximity to state power, and execution of the state's policy objectives. We explore the significant implications of this argument for theory, policy, and law.*

## Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 667

I.  The Ownership Bias . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 670

    A.  Blurred Boundary between SOEs and POEs . . . . . . . . . . . . . 671

    B.  State "Ownership" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 676

        1.  The State Collects Little or No Dividends from SOEs . . . . . 678

        2.  Executive Compensation Practices at SOEs Suggest Limited State Control over Managers . . . . . . . . . . . . . . 680

        3.  The State Often Fails to Implement Major Operational and Policy Decisions at SOEs . . . . . . . . . . . . . . . . . . . . 681

   \* Parker Professor of Comparative Corporate Law and Fuyo Professor of Japanese Law, Columbia Law School; Research Fellow, European Corporate Governance Institute. © 2015, Curtis J. Milhaupt.

   \*\* Associate Professor of Law, University of Florida Levin College of Law. © 2015, Wentong Zheng. The authors thank Donald Clarke, Ronald Gilson, Zohar Goshen, Li-Wen Lin, Tom Merrill, Ed Morrison, Mariana Pargendler, Mario Shapiro, Daniel Sokol, and Angela Zhang for helpful comments, and workshop participants at the Office of the United States Trade Representative, Tsinghua University School of Law, the Center for Chinese Legal Studies at Columbia Law School, FGV Law School, Sao Paulo, the Foreign and Comparative Law Committee of the New York City Bar Association, the University of Florida Competition Policy Workshop, the Columbia Law Faculty Workshop, and the Columbia Workshop on Chinese State Capitalism for stimulating discussions on prior drafts and early presentations of this paper. The authors also thank University of Florida Levin College of Law student Xin Yang for excellent research assistance.

EXHIBIT
89



EXHIBIT
Milhaupt 8
Date: 2-3-16
M.L. GRAY, CSR, RPR

        4.    The State Influences SOE Behavior Principally
             in Its Role as a Regulator, Not as a Controlling
             Shareholder . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   682

     C.  "PRIVATE" OWNERSHIP  . . . . . . . . . . . . . . . . . . . . . . . . .   683

        1.    Politically Connected Entrepreneurs  . . . . . . . . . . . . . .   683

        2.    Government Support for Private Firms  . . . . . . . . . . . .   685

        3.    Extralegal Control of Private Firms . . . . . . . . . . . . . . .   685

II.  STATE CAPITALISM AND STATE CAPTURE  . . . . . . . . . . . . . . . . . . .   688

     A.  SUSCEPTIBILITY TO CAPTURE . . . . . . . . . . . . . . . . . . . . . . . . . .   689

     B.  MECHANISMS OF CAPTURE  . . . . . . . . . . . . . . . . . . . . . . . . . . .   692

     C.  STATE CAPTURE AND MARKET DOMINANCE  . . . . . . . . . . . . . . . .   697

III.  IMPLICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   700

     A.  THEORY  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   700

     B.  POLICY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   702

        1.    China's Domestic Economy . . . . . . . . . . . . . . . . . . . .   702

        2.    Host Countries Receiving Chinese Investment . . . . . . . .   705

        3.    International Trade and Investment Regimes . . . . . . . . .   707

     C.  LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   708

        1.    Antitrust . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   709

        2.    Anticorruption . . . . . . . . . . . . . . . . . . . . . . . . . . .   713

        3.    Antisubsidy . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   713

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   716

APPENDIX I . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   718

APPENDIX II . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   722

## INTRODUCTION

Ownership is the touchstone of corporate governance analysis[1] and a central strand of literature on theory of the firm.[2] The identity of a corporation's equity owners has enormous significance for the oversight and incentives of management, the corporate governance challenges it faces, and ultimately, the goals it pursues.[3]

The impact of corporate ownership is considered to be particularly acute when a contrast is drawn between privately owned enterprises (POEs) and state-owned enterprises (SOEs). SOEs, by virtue of their privileged position vis-à-vis the state, are widely believed to enjoy privileged market access, to pursue noneconomic objectives, and to be uniquely positioned to influence the rules by which they are regulated.[4] A large body of theoretical literature tries to explain why the state would act as an owner of enterprise.[5] And the very existence of SOEs in domestic and global markets is thought to necessitate

---

1. *See, e.g.*, ADOLF A. BERLE, JR. & GARDINER C. MEANS, THE MODERN CORPORATION AND PRIVATE PROPERTY (1933) (highlighting the separation of ownership and control in corporations in the United States); Rafael La Porta et al., *Corporate Ownership Around the World*, 54 J. FIN. 471 (1999) (finding that the lack of legal protection for minority investors results in concentrated ownership structures); Mark J. Roe, *Some Differences in Corporate Structure in Germany, Japan, and the United States*, 102 YALE L.J. 1927 (1993) (discussing differences in the ownership of large public corporations in the United States, Germany, and Japan).

2. *See, e.g.*, Sanford J. Grossman & Oliver D. Hart, *The Costs and Benefits of Ownership: A Theory of Vertical and Lateral Integration*, 94 J. POL. ECON. 691 (1986) (advancing a theory of ownership of the firm as the purchase of residual rights of control); Oliver Hart & John Moore, *Property Rights and the Nature of the Firm*, 98 J. POL. ECON. 1119 (1990) (theorizing optimal arrangements of asset ownership to define the boundaries of the firm); Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. FIN. ECON. 305 (1976) (using agency cost analysis in developing a theory of ownership structure).

3. *See, e.g.*, Saul Estrin & Virginie Pérotin, *Does Ownership Always Matter?*, 9 INT'L J. INDUS. ORG. 55 (1991) (discussing the relationship between firm ownership and firm performance); Henry Hansmann, *Ownership of the Firm*, 4 J.L. ECON. & ORG. 267 (1988) (discussing differences in costs of ownership and costs of market contracting among firms of different ownership types); D. Daniel Sokol, *Competition Policy and Comparative Corporate Governance of State-Owned Enterprises*, 2009 BYU. L. REV. 1713, 1720–44 (discussing differences in internal and external controls of firms between private firms and state-owned enterprises); Michael J. Trebilcock & Edward M. Iacobucci, *Privatization and Accountability*, 116 HARV. L. REV. 1422, 1424–30 (2003) (discussing differences in profit incentives between private firms and government enterprises).

4. *See* ORG. FOR ECON. CO-OPERATION & DEV. (OECD), STATE-OWNED ENTERPRISES AND THE PRINCIPLE OF COMPETITIVE NEUTRALITY 34 (2009) [hereinafter OECD, COMPETITIVE NEUTRALITY], *available at* http://www1.oecd.org/daf/competition/46734249.pdf ("Governments may create an uneven-playing field in markets where an SOE competes with private firms, as they have a vested interest in ensuring that state-owned firms succeed.").

5. *See, e.g.*, Jiahua Che & Yingyi Qian, *Insecure Property Rights and Government Ownership of Firms*, 113 Q.J. ECON. 467 (1998) (proposing a theory of state ownership of firms in an environment without secure property rights); Jean-Jacques Laffont & Jean Tirole, *Privatization and Incentives*, 7 J.L. ECON. & ORG. 84 (1991) (discussing the tradeoff between state and private ownership of firms); Klaus M. Schmidt, *The Costs and Benefits of Privatization: An Incomplete Contracts Approach*, 12 J.L. ECON. & ORG. 1 (1996) (proposing a model of privatization in which different allocations of ownership rights lead to different allocations of inside information about the firm); Andrei Shleifer & Robert W. Vishny, *Politicians and Firms*, 109 Q.J. ECON. 995 (1994) (proposing a model of bargaining between politicians and managers to explain the privatization of state-owned firms); Andrei Shleifer, *State Versus Private*

special rules for trade, investment, and corporate governance.[6] POEs, by contrast, are often idealized as "the quintessence of private property, a sanctuary from government authority."[7]

But what if a state sets the rules for economic activity (or the rules are set by actors with influence over the state) such that the standard dichotomy between SOEs and POEs breaks down? In other words, imagine a state in which the institutional environment results in virtually all large, successful firms—irrespective of ownership—having close connections to state actors and agencies, access to state largesse, and a role in carrying out the policies of the ruling political party. Further imagine a state in which no firm—again irrespective of ownership—is truly autonomous from the government.

In this Article, we argue that contemporary China is such a state. Analysts have devoted considerable attention to SOEs "as the primary vehicles for Chinese state capitalism."[8] This attention is deserved, but incomplete. Drawing a stark distinction among Chinese firms based on the ownership of enterprise (SOE versus POE) to frame Chinese state capitalism, we argue, misperceives the reality of that country's institutional environment as it has evolved in the economic reform era and its impact on the formation and operation of large enterprises of all types. Functionally, SOEs and large POEs in China share many similarities in the areas commonly thought to distinguish state-owned firms from privately owned firms: market access, receipt of state subsidies, proximity to state power, and execution of the government's policy objectives. A complete account of Chinese state capitalism must explain these similarities.

*Ownership*, 12 J. ECON. PERSP. 133 (1998) [hereinafter Shleifer, *State Versus Private*] (discussing the appropriate role of state ownership).

6. For example, Article XVII of the General Agreement on Tariffs and Trade (GATT) requires "state trading enterprises," defined to include state-owned enterprises and enterprises with exclusive or special privileges, to act in a manner consistent with the general principles of non-discriminatory treatment in its purchases or sales involving either imports or exports. Understanding on the Interpretation of Article XVII of the General Agreement on Tariffs and Trade, Apr. 15, 1994, Annex 1A, 33 I.L.M. 1157. China's WTO Accession Protocol also contains a special requirement for Chinese state-owned enterprises: subsidies provided to Chinese state-owned enterprises are considered per se specific and therefore are subject to discipline under the WTO Agreement on Subsidies and Countervailing Measures if, "inter alia, state-owned enterprises are the predominant recipients of such subsidies or state-owned enterprises receive disproportionately large amounts of such subsidies." Protocol on the Accession of the People's Republic of China, ¶ 10.2, WT/L/432 (Nov. 23, 2001). In addition, a number of free-trade agreements the United States has entered into have special provisions on SOEs. *See* IAN F. FERGUSSON ET AL., CONG. RESEARCH SERV., R42694, THE TRANS-PACIFIC PARTNERSHIP NEGOTIATIONS AND ISSUES FOR CONGRESS 47–48 (2013). Special disciplines for SOEs have also been proposed in the ongoing negotiations for the Trans-Pacific Partnership. *See id.*

7. WILLIAM G. ROY, SOCIALIZING CAPITAL: THE RISE OF THE LARGE INDUSTRIAL CORPORATION IN AMERICA xiv (1997).

8. USHA C.V. HALEY & GEORGE T. HALEY, SUBSIDIES TO CHINESE INDUSTRY: STATE CAPITALISM, BUSINESS STRATEGY, AND TRADE POLICY 24 (2013); *see also* Li-Wen Lin & Curtis J. Milhaupt, *We Are the (National) Champions: Understanding the Mechanisms of State Capitalism in China*, 65 STAN. L. REV. 697 (2013) (providing analysis of Chinese SOEs as a "networked hierarchy" with deep connections to the party-state).

Simultaneously, recognizing the functional blurriness of corporate ownership categories in the Chinese context calls attention to how the rules of the game for economic activity are shaped in contemporary China. Our central claim is that Chinese state capitalism is closely associated with state capture. That is, large firms in China—whether SOEs, POEs, or ambiguous state-private blends—survive and prosper precisely *because* they have fostered connections to state power and have succeeded in obtaining state-generated rents.[9] As a result, large firms in China exhibit substantial similarities in their relationship with the state in ways that distinctions based on corporate ownership simply do not pick up. Indeed, as preparations for the initial public offering of Alibaba on the New York Stock Exchange in 2014 revealed, it can be difficult to draw a clear distinction between a "state-owned" Chinese firm and a "private" one with extensive ties to politically powerful backers.[10] We do not argue that corporate ownership is completely irrelevant in China or that Chinese POEs are identical in all respects to SOEs. The claim is simply that with respect to the relationship between firms and the state, a focus on ownership alone is likely to mislead in the Chinese context, and policies pivoting on equity ownership are likely to miss the mark.

Looking beyond ownership is not only essential to understanding Chinese state capitalism; it also has important policy implications. The international trade and investment regimes draw stark distinctions between POEs and SOEs, with the latter being subjected to extra "disciplines" intended to account for their special qualities. Similarly, the corporate governance challenges of POEs and SOEs are thought to be sufficiently distinct to merit separate codes of best practice.[11] And the Organisation for Economic Co-operation and Development's (OECD) "competitive neutrality" project starts from the assumption that SOEs (alone) enjoy unique state access and privileges that can distort competition in

---

9. As we elaborate below, we use the term "capture" somewhat more broadly than is common in academic literature. Influenced by public choice theory, the term usually refers to the capture of the regulatory process by well-organized, narrowly focused interest groups with a large stake in the regulatory outcome, such that the resulting rules benefit these groups at the expense of "the public." *See generally* George J. Stigler, *The Theory of Economic Regulation*, 2 BELL. J. ECON. & MGMT. SCI. 3 (1971) (proposing a capture theory of the regulatory process). In this Article, we use the term to refer to a continuum of behavior ranging from capture in this narrow sense—including through the use of corrupt payments to government officials—to the formation of alliances between business and political elites that engender convergence between the fortunes of a specific firm or industry and the government's goals and priorities. Depending on the specific type of behavior involved, these alliances may have a variety of consequences for public policy, such as misallocation of capital or limited market competition; they may also create "national champions" or promote economic development by generating high-powered incentives for China's managerial elites. *See infra* Part II.

10. *See* Michael Forsythe, *Alibaba's I.P.O. Could Be a Bonanza for the Scions of Chinese Leaders*, N.Y. TIMES (July 20, 2014, 8:16 PM), http://dealbook.nytimes.com/2014/07/20/alibabas-i-p-o-could-be-a-bonanza-for-the-scions-of-chinese-leaders.

11. *See* ORG. FOR ECON. CO-OPERATION & DEV., OECD PRINCIPLES OF CORPORATE GOVERNANCE (2004); ORG. FOR ECON. CO-OPERATION & DEV., OECD GUIDELINES ON CORPORATE GOVERNANCE OF STATE-OWNED ENTERPRISES (2005).

markets in which both SOEs and POEs participate.[12] Given the growing importance of Chinese firms of all ownership types to the global economy, if Chinese SOEs and POEs under the current political climate are not significantly distinguishable in terms of state access, influence, and privileges, these widespread policy assumptions must be reexamined.

The rise of Chinese state capitalism poses challenges not only for policy makers, but also for courts, administrative agencies, and dispute settlement tribunals around the world. In grappling with the complex relationships between Chinese firms and the Chinese state, these institutions have often resorted to ownership of enterprise as a means of demarcating the boundary of the state. We explore the problems associated with this ownership bias in several areas of economic regulation, including the antitrust, anticorruption, and antisubsidy regimes.[13]

The Article proceeds in three parts. Part I explores and undermines two parallel, faulty assumptions that are fostered by overattention to the public or private character of corporate ownership in China: First, that the Chinese state exerts nearly unbridled control over SOEs and has free reign to use these firms as tools of government policy, both domestically and abroad. Second, that large "private" firms in China are autonomous actors operating outside the mechanisms of Chinese state capitalism. Part II explains the dynamics of capture in the Chinese economy, in which firms of all ownership types face a choice: Grow and prosper by nestling up to the state and demonstrating the capacity to deliver on key party-state objectives, or seek autonomy from the state and risk being marginalized. As noted, looking beyond ownership has important implications for theory, policy, and law. Part III explores the implications across all three realms that follow from our analysis.

## I. THE OWNERSHIP BIAS

Although ownership of enterprise is a natural starting point for analysis of Chinese corporate governance, focusing on the SOE–POE dichotomy fosters two assumptions that skew analysis of Chinese state capitalism and may lead policy makers astray. In this Part, we explore and unsettle these assumptions. Neither theory nor practice suggests that the Chinese state "controls" SOEs to the degree its equity ownership would indicate. At the same time, however, it is misleading to view "private" firms in China as insulated from the state in ways that set them wholly apart from SOEs. Rather, the human agents managing Chinese SOEs and POEs respond in similar fashion to their institutional environ-

---

12. *See* OECD, COMPETITIVE NEUTRALITY, *supra* note 4, at 9 ("Due to their privileged position SOEs may negatively affect competition and it is therefore important to ensure that, to the greatest extent possible consistent with their public service responsibilities, they are subject to similar competition disciplines as private enterprises." (emphasis omitted)).

13. *See infra* section III.C.

ment, fostering close ties to party-state organs, seeking state largesse, and resisting government policies that are not in their interests.

Before elaborating, we begin with a foundational point: Even the labels "SOE" and "POE" are misleading because the boundary between state and private ownership of enterprise is often blurred in contemporary China.

### A.  BLURRED BOUNDARY BETWEEN SOES AND POES

In all economies, the boundary between public and private ownership of enterprise is more porous than conventional analysis assumes because the state retains control rights over firms even in the absence of ownership interests.[14] These state control rights are typically obtained through taxation, regulation, and subsidization.[15] The causes of and response to the 2008–2009 financial crisis in the United States illustrate that even in countries where private ownership of enterprise has strong ideological and historical roots, the boundary between government control and private control can be blurry[16] and susceptible to change.[17]

The boundary between public and private enterprises is even more blurred in China, a country with a long tradition of state dominance in the economy, underdeveloped legal institutions, and relatively inchoate conceptions of property rights. In practice, the ownership types of many firms in China are ambiguous. For example, one of the main drivers of China's economic miracle during the 1980s and the early 1990s was the emergence of the so-called non-state firms, whose share of national industrial output increased from twenty-two percent in 1978 to forty-two percent in 1993.[18] Many of the non-state firms were "collectively owned"—that is, ostensibly owned by all residents in a community—yet none of the residents possessed the exclusive rights of owner-

---

14. *See* Curtis J. Milhaupt, *Property Rights in Firms*, 84 VA. L. REV. 1145, 1154 (1998).

15. *See id.*

16. In the United States, "[d]istinctions between the governmental and private sectors are especially blurred with respect to a category of organization known as 'government-sponsored enterprises' (GSE)." KEVIN R. KOSAR, CONG. RESEARCH SERV., RL30533, THE QUASI GOVERNMENT: HYBRID ORGANIZATIONS WITH BOTH GOVERNMENT AND PRIVATE SECTOR LEGAL CHARACTERISTICS 7 (2011). Typically, GSEs are privately owned but enjoy implicit government guarantees of obligations. *See id.* at 8. The two best-known GSEs, Fannie Mae and Freddie Mac, were placed into government conservatorship at the height of the 2008–2009 financial crisis. *Id.* at 10.

17. During the 2008–2009 financial crisis, even icons of capitalism like General Motors did not escape government encroachment. In March 2009, in what was described as a "milestone in the state's intervention in the economy," "[t]he Obama administration used the threat of withholding more bailout money to force out General Motors Corp. Chief Executive Rick Wagoner." Neil King Jr. & John D. Stoll, *Government Forces Out Wagoner at GM*, WALL ST. J. (Mar. 30, 2009, 11:59 PM ET), http://online.wsj.com/news/articles/SB123836090755767077. In June 2009, the U.S. government acquired a sixty-percent ownership stake in General Motors as part of a "government-orchestrated" bankruptcy process. Neil King Jr. & Sharon Terlep, *GM Collapses into Government's Arms*, WALL ST. J. (June 2, 2009, 12:01 AM ET), http://online.wsj.com/news/articles/SB124385428627671889.

18. Che & Qian, *supra* note 5, at 467.

ship associated with traditional property rights theories.[19] One scholar has theorized that these collectively owned firms represent an arrangement in which private entrepreneurs choose to have local governments as the owner of the otherwise private firms as a response to a market environment in which business transactions are easily blocked by government regulations.[20] Another scholar has argued that these collectively owned firms were in fact privately owned and operated and were registered as collectively owned only because, at the time, there was no legal framework for the registration of private firms.[21]

With the adoption of the Chinese Company Law in 1994, private entrepreneurs gained the ability to register their firms as POEs,[22] but the state also increasingly participated in the ownership of corporate shares. It did so not only through "wholly state-owned entities,"[23] but also through mixed-ownership entities, where the ownership and management of the firms are shared among state and private shareholders. In 1997, China announced a massive program to privatize all but the largest SOEs under the slogan of "'grasp the large, let go of the small' (*zhuada fangxiao*)."[24] In practice, however, the newly privatized SOEs did not become private firms as that term is commonly understood in the privatization context–that is, firms in which the state has no equity ownership; instead, they became firms with mixed ownership.[25] It was estimated that as of 2003, mixed-ownership firms accounted for forty percent of China's GDP.[26] Some of the best-known Chinese firms, such as Haier, TCL, and Lenovo, are mixed-ownership firms.[27] In particular, publicly listed firms in China are typi-

---

19. Martin L. Weitzman & Chenggang Xu, *Chinese Township-Village Enterprises as Vaguely Defined Cooperatives*, 18 J. COMP. ECON. 121, 131–32 (1994). These collectively owned non-state firms are also referred to as Township-Village Enterprises (TVEs). *See, e.g., id.* at 121; Che & Qian, *supra* note 5, at 467.

20. *See* David D. Li, *A Theory of Ambiguous Property Rights in Transition Economies: The Case of the Chinese Non-State Sector*, 23 J. COMP. ECON. 1, 8–15 (1996).

21. *See, e.g.,* Yasheng Huang, *How Did China Take Off?*, 26 J. ECON. PERSP. 147, 154 (2012).

22. *See id.* at 154–55. For an overview of China's Company Law and the corporate governance issues arising under it, see Donald C. Clarke, *Corporate Governance in China: An Overview*, 14 CHINA ECON. REV. 494 (2003). The Company Law was enacted primarily to facilitate reforms of traditional SOEs, and the need of non-state actors occupied a very low priority in the minds of state policymakers. *See id.* at 495–96.

23. The Chinese government formed a number of state-owned company groups and holds 100% of their shares through the State-Owned Assets Supervision and Administration Commission (SASAC). *See* Lin & Milhaupt, *supra* note 8, at 700.

24. LENG JING, CORPORATE GOVERNANCE AND FINANCIAL REFORM IN CHINA'S TRANSITION ECONOMY 50 (2009).

25. This was because of ownership restrictions on the actual implementation of privatization, such as the requirement that publicly listed former SOEs maintain a controlling state-ownership stake. *See id.* at 51.

26. *Hùnhé Suǒyǒuzhì Jīngjì Yǐ Zhàn 40%—5–10 Nián Hòu Jiāng Dádào 80% [Mixed-Ownership Sector Accounts for 40% of Economy—To Hit 80% in 5–10 Years]*, XĪNHUÁ WǍNG [NEW CHINA NET] (Nov. 25, 2003, 14:15:17), http://www.southcn.com/news/china/zgkx/200311250786.htm.

27. Ming Zeng & Peter J. Williamson, *The Hidden Dragons*, HARV. BUS. REV., Oct. 2003, at 92, 94.

cally of the mixed-ownership type.[28] Mixed ownership has also become an important ownership form among some of China's central SOE groups at the subsidiary level. For example, almost all of the thirty-four subsidiaries of China National Offshore Oil Corporation (CNOOC) are mixed-ownership firms with an average state-share percentage ranging from forty to sixty-five percent.[29] Mixed ownership is set to become a more pervasive ownership form for central SOEs given that the CPC Third Plenum in 2013 made mixed ownership a goal of SOE reforms.[30]

Classifying the mixed-ownership firms as SOEs or POEs presents a challenge. When the percentage of state shares in a mixed-ownership firm is relatively large, the firm could, at least in theory, still be classified as an SOE. But classification gets more difficult as the percentage of state shares decreases. In some cases, the ownership structure of a mixed-ownership firm becomes so fragmented that none of its state or non-state shareholders holds a controlling interest in the firm. An example is Ping An Insurance (Group) Co. of China Ltd. Table 1 shows the top ten shareholders of Ping An by type and their respective ownership percentages.[31]

Ping An's 2012 annual report notes that "[t]he shareholding structure of the Company is relatively scattered. There is no controlling shareholder, nor de facto controller."[32] Because of its fragmented ownership structure, it is difficult to classify Ping An as an SOE or POE based on equity ownership alone. The inconsistent classification of Ping An by outside observers illustrates the problem. In 2012, Ping An was treated as a POE when it was included in the Fortune Global 500 ranking of the world's largest firms.[33] Yet in the same year, Ping An

---

28. The three main categories of shareholders of publicly listed firms in China are the state, institutional shareholders (also known as legal person investors), and individual investors, each holding about one-third of the total outstanding shares. *See* Lihui Tian & Saul Estrin, *Retained State Shareholding in Chinese PLCs: Does Government Ownership Reduce Corporate Value?* 8 (Inst. for the Study of Labor, Discussion Paper No. 1493, 2005), *available at* ftp://ftp.iza.org/dps/dp1493.pdf; *see also* Xiaonian Xu & Yan Wang, *Ownership Structure and Corporate Governance in Chinese Stock Companies*, 10 CHINA ECON. REV. 75, 80 (1999) (analyzing the ownership structure of Chinese publicly listed firms in the early 1990s).

29. *See* Wáng Rùnqiū: *Qǐchéng Yāngqǐ Gǎizhì—Dàli Fāzhǎn Hùnhé Suǒyǒuzhì Jīngjì* [*Wang Runqiu: Seventy Percent of Central SOEs Undergoing Structural Reforms—Promoting the Development of Mixed-Ownership Economy*], RÉNMÍN WǍNG [PEOPLE'S DAILY ONLINE] (Nov. 26, 2012, 08:21), http://dangjian.people.com.cn/n/2012/1126/c117092-19693335.html.

30. *See* U.K. Foreign & Commonwealth Office, *China Economy: China's SOE Reform Since the Third Plenum—August 2014* (Aug. 7, 2014), https://www.gov.uk/government/publications/china-economy-chinas-soe-reform-since-the-third-plenum-august-2014/china-economy-chinas-soe-reform-since-the-third-plenum-august-2014.

31. *See* PING AN INS. (GRP.) CO. OF CHINA, LTD., ANNUAL REPORT 2012, at 83 (2012), *available at* http://www.irasia.com/listco/hk/pingan/annual/ar106101-e_101.pdf. We reformatted the data in the Ping An 2012 annual report by grouping shareholders by ownership type.

32. *Id.* at 84.

33. *See* Zhōu Zhǎnhóng, *2012 Nián Shìjiè 500 Qiáng Páihángbǎng Shàng de Zhōngguó Gōngsī* [*Chinese Companies on 2012 Fortune Global 500*], CÁIFÙ ZHŌNGGUÓ [FORTUNE CHINA] (July 9, 2012), http://www.fortunechina.com/fortune500/c/2012-07/09/content_106895.htm.

### Table 1: Top Ten Shareholders of Ping An Insurance

| Type | Shareholder | |
|------|-------------|---|
| State | Shenzhen Investment Holdings Co., Ltd. | 6.08% |
| | Shum Yip Group Ltd. | 2.27% |
| Domestic Non-State | Yuan Trust Investment Co., Ltd. | 4.80% |
| | Linzhi New Horse Investment Development Co., Ltd. | 4.03% |
| | Linzhi Jingao Industrial Development Co., Ltd. | 3.46% |
| | Shenzhen Wuxin Yufu Industrial Co., Ltd. | 2.22% |
| | Gongbujiangda Jiangnan Industrial Development Co., Ltd. | 1.76% |
| Foreign | The Hongkong and Shanghai Banking Corporation Ltd. | 7.76% |
| | HSBC Insurance Holdings Ltd. | 4.58% |
| | All Gain Trading Ltd. | 1.04% |

did not appear on an influential ranking of China's top 500 private companies,[34] suggesting that it may not have been considered a POE by the domestic organization that conducted the ranking.[35]

For some mixed-ownership firms, taxonomy is difficult because of the way they are managed. A prominent example is ZTE Corporation (ZTE), China's second largest telecommunications equipment manufacturer and the subject of a U.S. House Committee investigation in 2012.[36] ZTE's shares are listed on both the Shenzhen and Hong Kong Stock Exchanges. ZTE's largest shareholder is ZTE Holdings, which with 30.76% of ZTE's shares[37] might be considered ZTE's controlling shareholder.[38] The shares of ZTE Holdings in turn are held by

---

34. See 2012 Zhōngguó Mínyíng Qǐyè 500 Qiáng Bǎngdān Fābù [2012 Ranking of China's Top 500 Private Companies Released], XĪNLÀNG CÁIJĪNG [SINA FIN. & ECON.] (Aug. 30, 2012, 16:12), http://finance.sina.com.cn/hy/20120830/161213002302.shtml. The ranking was conducted by All-China Federation of Industry and Commerce.

35. In 2013, Ping An did not appear on the same ranking of top 500 private firms conducted by the same organization, despite the fact that its revenues exceeded those of the top ranked firm, Suning Electronics Group. Chinese media observed that obviously the organization that conducted the ranking did not consider Ping An a private firm. See Mínqǐ 500 Qiáng Míngdān Chūlú: Zhōngguó Píng'ān Wèihé Luòxuǎn? [Ranking of Top 500 Private Firms Released: Why Is China Ping An Not on the List?], XĪNHUÁ WǍNG [NEW CHINA NET] (Aug. 30, 2013, 15:59:30), http://news.xinhuanet.com/fortune/2013-08/30/c_125285188.htm.

36. See MIKE ROGERS & C.A. DUTCH RUPPERSBERGER, H.R. PERMANENT SELECT COMM. ON INTELLIGENCE, 112TH CONG., INVESTIGATIVE REPORT ON THE U.S. NATIONAL SECURITY ISSUES POSED BY CHINESE TELECOMMUNICATIONS COMPANIES HUAWEI AND ZTE (2012), available at http://intelligence.house.gov/sites/intelligence.house.gov/files/Huawei-ZTE%20Investigative%20Report%20(FINAL).pdf.

37. See infra Figure 1.

38. ZTE CORP., ANNUAL REPORT 2012, at 98–100 (2012) [hereinafter ZTE 2012 ANNUAL REPORT], available at http://wwwen.zte.com.cn/en/about/investor_relations/corporate_report/annual_report/201304/P020130414667427851218.pdf. ZTE Holdings is also known as Zhongxingxin Telecommunication Equipment Ltd. Co., or Zhongxingxin for short. Under both Chinese and Hong Kong law, thirty percent



**Figure 1: Ownership Structure of ZTE Corporation**

Xi'an Microelectronics (34%), Aerospace Guangyu (17%), and Zhongxing WXT (49%).[39] Xi'an Microelectronics and Aerospace Guangyu are both SOEs.[40] State-owned entities, therefore, control 51% of ZTE Holdings. Perhaps for this reason ZTE's 2012 annual report lists the ownership type of ZTE Holdings as "state-owned."[41] According to the website of ZTE Holdings, it is one of the key national SOEs designated by the State Council.[42] The third shareholder of ZTE

---

is the point at which a shareholder is considered to have acquired a large enough stake in a publicly listed company to trigger a mandatory bid rule, a common mechanism for protecting minority shareholders against an unfair acquisition by the controlling shareholder. Under the mandatory bid rule, a shareholder intending to surpass thirty percent share ownership is required to make an offer to purchase the shares of all other shareholders. *See Shàngshì Gōngsī Shōugòu Guǎnlǐ Bànfǎ* [Rules on Mergers and Acquisitions Involving Publicly Listed Companies] (promulgated by the Sec. Regulatory Comm'n, May 17, 2006, effective Sept. 1, 2006), Chinese Securities Regulatory Commission (CSRC) Order No. 35, art. 47, *available at* http://www.gov.cn/flfg/2006-08/02/content_352370.htm; SEC. & FUTURES COMM'N, THE CODES ON TAKEOVERS AND MERGERS AND SHARE REPURCHASES Rule 26.1 (1992), *available at* http://www.sfc.hk/web/EN/pdf/sfcRegulatoryHandbook/EN_H622.pdf.

39. ZTE 2012 ANNUAL REPORT, *supra* note 38, at 100.

40. Xi'an Microelectronics is a "large state-owned research institute." *Id.* Aerospace Guangyu is a wholly state-owned enterprise. *See id.* at 100–01.

41. *See id.* at 98.

42. *Gōngsī Jiǎnjiè* [*Company Overview*], ZTE HOLDINGS, http://www.zteholdings.com/about-intro.htm [hereinafter *ZTE Overview*] (stating in Chinese).

Holdings, Zhongxing WXT (also known as Zhongxingweixiantong), is a private firm owned by a group of individuals, of whom the founder, Hou Weigui, holds the largest percentage (18%).[43] According to the website of ZTE Holdings, it was the first firm in China to adopt a state-owned, privately managed model in 1993.[44] Under this so-called ZTE model, the majority state shareholders contractually authorize the minority private shareholders to assume sole responsibility for managing the firm, subject only to the requirement that the state shareholders be guaranteed a minimum rate of return. Under the ZTE model, therefore, a firm is an SOE from the standpoint of equity ownership, but a POE from the standpoint of management.[45]

The preceding discussion suggests that classifying Chinese firms according to ownership is problematic. These problems are greatly compounded by the reality we explore in the next two sections of this Part: Equity ownership alone reveals very little about the degree of control the Chinese state exercises over Chinese firms, be they SOEs or POEs.

### B. STATE "OWNERSHIP"

By simple syllogism, the state "owns" an SOE. This is literally true in China: The State-Owned Assets Supervision and Administration Commission (SASAC), a government agency that plays the role of both a holding company and a supervisory authority, holds 100 percent of the shares of the parent companies of each of the approximately 115 central state-owned business groups.[46] While the business groups may contain one or more entities whose shares are listed on a domestic or foreign stock exchange and held by minority private investors, SASAC, which reports to the State Council (China's cabinet), is the ultimate controlling shareholder atop the business groups. At least formally, this makes SASAC "the world's largest controlling shareholder."[47]

Straightforward application of agency analysis, however, points out the problem with assuming that state ownership of a corporate enterprise means unbridled state control over the firm. Berle and Means long ago identified the separation of ownership and control in large firms as a threat to private property, because it produces a misalignment of incentives between shareholders (own-

---

43. *See* Sūn Jiāxià, *Zhōngxìng Xì Dìguó Tújǐng: Hóu Wéiguì Yàowéi Zhōnggāocéng Xúnzhǎo Lìyì Fēnpèi Lùjìng* [*Future of the ZTE Empire: Hou Weigui Seeks Path to Allocate Benefits and Interests Among Mid- and High-Level Executives*], FÈNGHUÁNGWĂNG CÁIJĪNG [PHOENIX NET FIN.] (Nov. 28, 2012, 04:30), http://finance.ifeng.com/stock/ssgs/20121128/7356422.shtml.

44. *ZTE Overview, supra* note 42.

45. *See* Eric Harwit, *Building China's Telecommunications Network: Industrial Policy and the Role of Chinese State-Owned, Foreign and Private Domestic Enterprises*, 190 CHINA Q. 311, 325 (2007).

46. Lin & Milhaupt, *supra* note 8, at 700. Prior to the establishment of SASAC in 2003, China had an ad hoc institutional structure for overseeing SOEs, with SOEs being essentially production bureaus under the direct control of government ministries. *See* ORG. FOR ECON. CO-OPERATION & DEV., OECD ECONOMY SURVEYS: CHINA 109 (2010).

47. Lin & Milhaupt, *supra* note 8, at 700 (internal quotation marks omitted).

ers) and managers.[48] This problem, which carries the economic label "agency costs," remains the central concern of corporate governance regimes everywhere.[49]

Agency costs, of course, can also jeopardize *public* property. Majority or even 100 percent ownership of a firm's equity by the state does not necessarily solve the misalignment of incentives between the SOE's "owners" and managers. Rather, it may multiply the agency problem.[50] The SOE managers must be monitored by an agent of the state, which in turn must be monitored.[51] In the case of Chinese SOEs, this chain of monitors does not lead to an ultimate principal, because the theoretical owner of the SOEs—the citizenry of China—is too dispersed and powerless to play a meaningful monitoring role.[52]

The Chinese state does exert significant political control over senior executives of large SOEs.[53] In particular, the Party and SASAC routinely rotate senior SOE executives among different business groups in the same sector.[54] Top-down political control, however, does not fully eliminate agency costs. To meet its governance goals, the Chinese state has to delegate a significant amount of discretion to its local agents and accommodate their special interests to ensure their participation and cooperation.[55] The frequent rotations of senior SOE executives may be a reflection of the weakness, rather than the strength, of top-down political control, because they suggest that the state lacks other effective means of keeping SOE executives in check.[56] This is all the more

---

48. *See generally* BERLE & MEANS, *supra* note 1. Jensen and Meckling developed the concept of agency costs as a conflict of interests between managers and shareholders. *See generally* Jensen & Meckling, *supra* note 2.

49. The location and severity of agency problems, however, will differ across countries and corporate ownership structures. *See* Roe, *supra* note 1, at 1977–89 (discussing advantages of corporate ownership structures in Japan and Germany in reducing agency costs).

50. *See* Estrin & Pérotin, *supra* note 3, at 61–62.

51. *See* Clarke, *supra* note 22, at 499.

52. *See id.* However, as Clarke observes, the absence of an effective ultimate principal is not unique to state ownership; many other institutions such as nonprofit organizations and industrial foundations also lack an ultimate human "owner." *Id.*

53. In China, the appointment of senior executives at large SOEs takes place in a highly institutionalized sharing arrangement between the Communist Party and SASAC. At the largest fifty or so SOEs, top executives are appointed and evaluated by the Organization Department of the Party's Central Committee, and less senior executives are appointed by the Party Building Bureau of SASAC. Appointments and evaluations of top executives at the remaining SASAC-supervised SOEs are made by SASAC only. *See* Lin & Milhaupt, *supra* note 8, at 737–38.

54. *See id.* at 740. In recent years, such rotations have been conducted in the telecommunications sector (2004 and 2007), the energy sector (2008), and the petroleum sectors (2011). *See id.*

55. *See* Linda Chelan Li, *Central-Provincial Relations: Beyond Compliance Analysis, in* CHINA REVIEW 1998, at 157, 160 (Joseph Y.S. Cheng ed., 1998) ("Economic decentralization builds in vested interests among a larger group of officials in the policy processes and, thus, ensures a higher level of participation and openness in the political system than when both political and economic resources are concentrated at the top of the hierarchy in the hands of a few.").

56. A similar argument has been made regarding an analogous relationship: the relationship between central and local government officials. The central government frequently rotates senior provincial officials—every three or four years according to one tally. *See* YASHENG HUANG, INFLATION AND INVESTMENT CONTROLS IN CHINA: THE POLITICAL ECONOMY OF CENTRAL-LOCAL RELATIONS DURING THE

likely given the enormous size and complexity of China's SOEs. At the national level, SASAC is formally responsible for exercising the interests of the state as an investor in over 100 massive SOE business groups, some of which have over 100 downstream subsidiaries.[57] How likely is it that a group of bureaucrats in Beijing actually controls such a vast business empire?

Policy choices made in the transition from communism to market economies compound the agency problem in SOEs. Efforts to revitalize the state-owned sector in many formerly communist countries, including China, included delegation of managerial discretion to SOE insiders to varying degrees.[58] In China, the delegation of authority has been an overarching theme of SOE reforms since the late 1970s.[59] As a result of such policies throughout the transition economies, "irreversible jurisdictional authority" was conferred on managers within their own SOEs.[60] These reforms, together with privatization of SOEs into the hands of entrenched managers, led to rampant insider control.[61]

Thus, in theory, the sheer size and complexity of the SOE sector, and the obvious consequences of economic transition policies in China suggest far greater managerial autonomy from the state in the SOE sector than a focus on ownership alone would suggest. The relatively attenuated nature of the Chinese state's control over SOEs is evidenced in a variety of ways, discussed below. The evidence we present is of necessity circumstantial, but cumulatively, in combination with the realities we have just described, it casts considerable doubt on conventional wisdom.

1.  The State Collects Little or No Dividends from SOEs

Equity owners have a residual claim on the cash flows generated by the corporation. Residual claimant status is a key theoretical reason why equity owners, as opposed to contractual claimants such as bondholders or employees, are legally vested with the right to elect the board of directors. Although in theory the state is entitled to all of the SOEs' after-tax profits, the Chinese government has historically collected little or no dividends from SOEs.[62] In

---

REFORM ERA 115 (1996). While such rotations confirm that central government officials have discretion to hire and fire provincial officials, they might be the last major instrument the central government has to deal with growing provincial power. *See* Li, *supra* note 55, at 161.

57. See Lin & Milhaupt, *supra* note 8, at 733, for a chart illustrating the byzantine corporate structure of a single national SOE under SASAC's supervision.

58. *See* Masahiko Aoki, *Controlling Insider Control: Issues of Corporate Governance in Transition Economies*, *in* CORPORATE GOVERNANCE IN TRANSITIONAL ECONOMIES: INSIDER CONTROL AND THE ROLE OF BANKS 3, 7–12 (Masahiko Aoki & Hyung-Ki Kim eds., 1995).

59. *See* Wentong Zheng, *Transplanting Antitrust in China: Economic Transition, Market Structure, and State Control*, 32 U. PA. J. INT'L L. 643, 662–63 (2010).

60. Aoki, *supra* note 58, at 8.

61. *See id.*

62. During the SOE reforms in the 1980s and early 1990s, the government allowed SOEs to retain an individually negotiated percentage of their profits, which could be used to finance benefits and awards paid to managers and employees. A 1994 tax reform set a uniform rate of tax on SOE profits; any remaining profits belonged to the SOEs. *See* WORLD BANK, SOE DIVIDENDS: HOW MUCH AND TO

2007, the State Council required central SOEs (those under SASAC supervision) to begin paying dividends ranging from 0%–10%.[63] In 2011, the SOE dividend rates were increased by 5% across the board, to 5%–15%.[64] The CPC Third Plenum in 2013 set a goal of increasing the SOE dividend rate to 30% by the year 2020.[65] These rates, however, are still below the average dividend rates paid by established industrial firms in the United States (50%–60%) and the average dividend rate paid by SOEs in five developed economies (33%).[66] Moreover, the dividend rates paid by central SOEs to the government in its capacity as shareholder are lower than those paid to private shareholders by Chinese SOEs listed in Hong Kong.[67] Most importantly, perhaps, virtually all of the dividends paid by SOEs to the government are eventually recycled back to them: More than 92% of the dividends paid by central SOEs to the government in 2012 were remitted back to the SOEs in the form of subsidies.[68]

From an agency perspective, these dividend policies have a number of negative implications. First, it is difficult to justify maintaining a large SOE sector on behalf of the citizens—the ultimate principals—if profits from the enterprises are not remitted to the state. Second, low dividend payouts to the government and heavy recycling of profits back to the SOEs in the form of subsidies increase free cash flow, which generates additional agency slack between SOE managers and the government in its role as owner–investor. By increasing the amount of cash at the SOE managers' disposal, these policies

---

WHOM? 2 (2005), *available at* http://www-wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2010/09/17/000334955_20100917050418/Rendered/PDF/566510WP0SOE1E10Box353729B01PUBLIC1.pdf. But between 1994 and 2007, the state collected no dividends from SOEs. *See* Nicholas Borst, *SOE Dividends and Economic Rebalancing*, PETERSON INST. FOR INT'L ECON. (May 11, 2012, 12:28 PM), http://www.piie.com/blogs/china/?p=1258.

63. *See* Borst, *supra* note 62.

64. *See id.*

65. *See* NARGIZA SALIDJANOVA & IACOB KOCH-WESER, U.S.–CHINA ECON. & SEC. REVIEW COMM'N, THIRD PLENUM ECONOMIC REFORM PROPOSALS: A SCORECARD 3 (2013), *available at* http://origin.www.uscc.gov/sites/default/files/Research/Backgrounder_Third%20Plenum%20Economic%20Reform%20Proposals—A%20Scorecard%20(2).pdf.

66. *See* WORLD BANK, EFFECTIVE DISCIPLINE WITH ADEQUATE AUTONOMY: THE DIRECTION FOR FURTHER REFORM OF CHINA'S SOE DIVIDEND POLICY 13, 23–30 (2010), *available at* http://www-wds.worldbank.org/external/default/WDSContentServer/WDSP/IB/2010/03/02/000333038_20100302031054/Rendered/PDF/532540ESW0P11310final0Nov27020090En.pdf. The five developed economies discussed by the report are New Zealand, Norway, Sweden, Finland, and France. *See id.*

67. *See id.* at 35.

68. *See* Qùnián Yāngqǐ Shàngjiǎo Hónglì Yòng Yú Mínshēng Bùzú 8%, Dàbù Liúhuí Nèibù [*Less than 8% of the Dividends Central SOEs Paid Last Year Were Spent on People's Livelihood, Most Remitted Back*], ZHŌNGGUÓ XĪNWÉN WǍNG [CHINA News NET] (Mar. 10, 2013, 08:41), http://finance.chinanews.com/cj/2013/03-10/4629550.shtml. For a general discussion of the recycling of SOE dividends, see John Foley, *Dividend Reform Won't Fix China SOE Money-Go-Round*, REUTERS (Feb. 6, 2013), http://blogs.reuters.com/breakingviews/2013/02/06/dividend-reform-wont-fix-china-soe-money-go-round.

facilitate managerial misbehavior in the form of perk consumption and empire building.[69]

## 2. Executive Compensation Practices at SOEs Suggest Limited State Control over Managers

Theory and cross-country experience suggest that concentrated ownership alleviates agency problems in setting managerial pay.[70] Yet executive compensation practices at Chinese SOEs, with concentrated ownership in the hands of the state, have posed problems throughout the reform era, suggesting limited state control over SOE managers.

During the initial phase of market-oriented reforms of Chinese SOEs, individual state-owned firms were allowed to base executive compensation on firm performance.[71] The practice led to significant disparities in pay levels across SOEs. To address this perceived problem, several ministries of the State Council in 2009 introduced a scheme that capped executive compensation at the central SOEs overseen by SASAC at twenty times average employee compensation.[72] Putting aside the question of whether this is an optimal compensation formula, such a system ostensibly suggests a significant degree of state control over managerial incentives.

But beneath the surface of state control over executive pay lies a vast domain of managerial autonomy. A common form of private-benefit extraction by SOE managers is the practice of "on-duty consumption," a catchall category of perquisites, expense accounts, and side payments that often significantly exceed a manager's formal compensation, which is regulated by SASAC in cooperation with senior Party organs.[73] The scale and pervasiveness of these practices[74]

---

69. *See* Michael C. Jensen, *Agency Costs of Free Cash Flow, Corporate Finance, and Takeovers*, 76 AM. ECON. REV. 323, 323 (1986). For discussions of the empire-building incentives of China's SOE managers, see Angela Huyue Zhang, *Foreign Direct Investment from China: Sense and Sensibility*, 34 NW. J. INT'L L. & BUS. 395 (2014).

70. Jensen and Meckling's agency analysis suggests that executive pay would be structured differently in the dispersed shareholding context as compared to concentrated ownership regimes. *See* Jensen & Meckling, *supra* note 2, at 313–19; *see also* Niamh Moloney, *The EU and Executive Pay: Managing Harmonization Risks*, *in* RESEARCH HANDBOOK ON EXECUTIVE PAY 466, 468–69 (Randall S. Thomas & Jennifer G. Hill eds., 2012) (exploring divergence in pay practices among dispersed and blockholder regimes in the EU).

71. *See* Theodore Groves et al., *Autonomy and Incentives in Chinese State Enterprises*, 109 Q.J. ECON. 183, 183 (1994).

72. *See* Guóqǐ Gāoguǎn Xīnchóu Shàngxiàn: 20 Bèi Zhígōng Píngjūn Gōngzī [*Pay for Senior SOE Executives: Capped at 20 Times Average Employee Pay*], ZHŌNGGUÓ XĪNWÉN WǍNG [CHINA NEWS NET] (Sept. 25, 2009, 09:13), http://www.chinanews.com/cj/cj-gncj/news/2009/09-25/1885412.shtml.

73. *See generally Shrouded in Mystery: Chinese Executive Compensation and the Numbers Behind the Numbers*, KNOWLEDGE@WHARTON (May 14, 2012), http://knowledge.wharton.upenn.edu/arabic/article.cfm?articleid=2824.

74. A study showed that the average on-duty consumption of 1320 listed companies in China exceeded average executive compensation by two to fifty times, and had been growing over time. Another study showed that on-duty consumption at China's SOEs has a significant negative correlation with company earnings. *See id.*

belie the notion that the Chinese government, as a controlling shareholder, is closely monitoring SOE managers and carefully tailoring incentives to maximize returns on state assets. Rather, these practices suggest a considerable degree of agency slack between SOE managers and the controlling shareholder.

### 3. The State Often Fails to Implement Major Operational and Policy Decisions at SOEs

It is considered good practice for the state to avoid involvement in day-to-day management of SOEs,[75] because government agents generally lack the expertise, information, and incentives necessary to run a commercial enterprise effectively. At the same time, however, a principal theoretical justification for the existence of SOEs is to accomplish objectives that, due to market failure, would otherwise be impossible. From this perspective, it would be anomalous if the state were unable to implement major operational decisions at SOEs on issues implicating key state policies. But at times, this is precisely the case in China.

One example can be found in the government's failure to prevent SOEs from investing in the real estate sector. One of the top priorities of the Chinese government in recent years has been to rein in skyrocketing housing prices.[76] In furtherance of that goal, SASAC in March 2010 ordered seventy-eight central SOEs whose main business was not real estate, but which had entered the real estate sector, to withdraw.[77] Yet almost three years later, as of December 2012, less than one-quarter of the affected SOEs had complied with the SASAC order.[78] Many of the SOEs subject to the order actually expanded their real estate businesses during this period.[79]

Another example is the recent setback in the Chinese government's efforts to restructure central SOEs. Over the years, one of the government's key policies has been to consolidate the SOE sector to address market segmentation, to implement China's long-term SOE strategy, and to promote China's national champions.[80] In accordance with these objectives, the number of central SOEs overseen by SASAC has been reduced through mergers to 121 in 2011, down

---

75. *See* ORG. FOR ECON. CO-OPERATION & DEV., OECD GUIDELINES ON CORPORATE GOVERNANCE OF STATE-OWNED ENTERPRISES 13 (2005).

76. *See* Keith Bradsher, *Government Policies Cool China's Real Estate Boom*, N.Y. TIMES, Nov. 10, 2011, http://www.nytimes.com/2011/11/11/business/global/government-policies-cool-china-real-estate-boom.html.

77. *See Guózīwěi: 78 Jiā Yāngqǐ Jiāng Tuìchū Fángdìchǎn Shìchǎng [SASAC: 78 Central SOEs to Withdraw from the Real Estate Market]*, XĪNHUÁ WǍNG [NEW CHINA NET] (Mar. 18, 2010, 15:40:32), http://news.xinhuanet.com/fortune/2010-03/18/content_13194385.htm.

78. *See Yāngqǐ Sānnián Wèi "Tuìfáng": 78 Jiā Tuìchū Bùzú 1/4 [Three Years Later, Central SOEs Still Not Withdrawn from Real Estate Market: 78 (Less than a Quarter) Withdrew]*, XĪNHUÁ WǍNG [NEW CHINA NET] (Dec. 5, 2012, 08:55:03), http://news.xinhuanet.com/house/2012-12/05/c_124048485.htm.

79. *See id.*

80. *See* Zheng, *supra* note 59, at 714–15.

from 196 in 2003.[81] SASAC seeks to reduce the number of central SOEs to below 100.[82] To achieve this goal, SASAC's original plan was to package the assets of about two dozen smaller central SOEs whose businesses were not complementary into a holding company called Guoxin Assets Management Co.[83] However, the plan reportedly met fierce resistance from the target SOEs, particularly those that had acquired monopoly status in niche industries.[84] The holding company was eventually established in December 2010 but with no initial assets.[85] One year after its establishment, the holding company had acquired only one central SOE, as opposed to the two dozen contemplated by the government's original plan.[86] Since then, it has acquired the state-held shares of Shanghai Bell, a telecommunications equipment manufacturer that has lost out in competition with other telecommunications equipment firms.[87]

### 4. The State Influences SOE Behavior Principally in Its Role as a Regulator, Not as a Controlling Shareholder

To the extent that the state does successfully intervene in SOE operations to achieve policy objectives, it typically does so as a regulator, not as a controlling shareholder.

For example, the Chinese government has been waging an anticorruption campaign since Xi Jinping took over the Party leadership in November 2012.[88] One focus of the anticorruption campaign is to prohibit the consumption of expensive liquors by government officials. Demand for the products of two prestigious Chinese liquor firms, Maotai and Wuliangye, both SOEs, plummeted as a result of the campaign.[89] Starting in December 2012, some distributors of Maotai and Wuliangye offered deep price discounts to win sales. Maotai

---

81. See Guózīwěi Fùzhǔrèn: Yāngqǐ Jiāng Jiǎnshǎo Dào 100 Jiā Yǐnèi [SASAC Vice Chairman: Number of Central SOEs to Be Reduced to Below 100], XĪNHUÁ WǍNG [NEW CHINA NET] (Jan. 22, 2011, 08:15:56), http://news.xinhuanet.com/fortune/2011-01/22/c_121011135.htm.

82. Id.

83. See "Zhōngtóu Èrhào" Zuìkuài 8 Yuè Guàpái—Bùfen Yāngqǐ Jùjué Bèi Chóngzǔ ["CIC No. 2" to Be Established in August at the Earliest—Some Central SOEs Refuse to Be Restructured], TÉNGXÙN CÁIJĪNG [TENCENT QQ] (Aug. 7, 2010, 02:05), http://finance.qq.com/a/20100807/000569.htm.

84. See id.

85. See SASAC Notice No. 2010-3, available at http://www.sasac.gov.cn/n1180/n1226/n2665/13063724.html.

86. See Chén Yánpéng, Zhōngtóu Èrhào Chénglì Yīnián Yèwù Wú Jìnzhǎn—Bèi Yí Dìngwèi Bù Qīng [One Year After Establishment, No Progress at CIC No. 2—Business Scope in Doubt], XĪNLÀNG CÁIJĪNG [SINA FIN. & ECON.] (Feb. 18, 2012, 07:36), http://finance.sina.com.cn/china/jrxw/20120218/073611405303.shtml.

87. See Gǔ Xiǎoyǔ, Guóxīn Gōngsī Jiēshǒu Shànghǎi Bèi'ěr Zhōngfāng Gǔfēn [Guoxin Acquires Chinese-Held Shares of Shanghai Bell], RÉNMÍN WǍNG [PEOPLE'S DAILY ONLINE] (Mar. 3, 2012, 14:02 PM), http://finance.people.com.cn/GB/70846/17283754.html. For discussions of competition between Shanghai Bell and other telecommunications equipment firms, see infra notes 153–154 and accompanying text.

88. See Heng Shao, Tumbling Stock of Luxury Chinese Liquor Company Reflects Strength of Corruption Clamp-Down, FORBES (Sept. 3, 2013, 6:26 PM), http://www.forbes.com/sites/hengshao/2013/09/03/tumbling-stock-of-luxury-chinese-liquor-company-reflects-strength-of-corruption-clamp-down.

89. See id.

and Wuliangye responded by setting minimum sales prices for their products and penalizing distributors that sold below the minimum prices. In response, the National Development and Reform Commission (NDRC), China's price regulator, conducted "interviews" with executives of the firms and warned them of their violation of China's Antimonopoly Law, which prohibits the fixing of resale prices.[90] Following the NDRC interviews, Maotai and Wuliangye publicly announced that they would heed the NDRC warning and terminate their minimum resale price policies.[91]

The important point about this incident is not that the state intervened, but the way in which it intervened. The state did not act as the liquor firms' controlling shareholder, directing management through the board of directors to change their pricing policies. It intervened as law enforcer, in the same fashion as if the firms had been privately owned. This is not in itself negative. The state should enforce laws neutrally against both SOEs and POEs, and perhaps there were public policy benefits in acting publicly in a case such as this one. But coupled with the other evidence of attenuated government control over SOEs, incidents such as this suggest that the government does not view standard mechanisms of corporate control as its most effective means of influencing SOE behavior.

### C. "PRIVATE" OWNERSHIP

In the context of Chinese state capitalism, private ownership does not mean autonomy from the state. In fact, POEs bear striking resemblance to SOEs along the dimensions typically thought to distinguish state-owned firms from the private sector: ready access to state power and largesse, proximity to the regulatory process, and little autonomy from discretionary state intervention in business judgment. We elaborate below, highlighting several features of Chinese private firms that are taken for granted in SOEs but rarely associated with POEs: formal membership of top management in party-state organs, large government subsidies, and extralegal control by the state.

### 1. Politically Connected Entrepreneurs

As one of us has written elsewhere, SOEs are deeply enmeshed in a larger system of party-state organs, a phenomenon we called "institutional bridging."[92] These bridges consist of dense, stable networks of relationships fostered through rotations of managers, personnel exchanges, and the wearing of multiple hats (on behalf of SOEs, the government, and the Party) by managerial elites in China.

---

90. *Wǔliángyè Jì Máotái Hòu Bèi Fàgǎiwěi Yuētán—Jiǎng An Fǎnlǒngduànfǎ Zhěnggǎi* [*After Maotai, Wuliangye Interviewed by NDRC—Agreement to Amend Policies Pursuant to Antimonopoly Law*], XĪNLÀNG CÁIJĪNG [SINA FIN. & ECON.] (Jan. 17, 2013, 17:34), http://finance.sina.com.cn/chanjing/gsnews/20130117/173414320012.shtml.

91. *See id.*

92. Lin & Milhaupt, *supra* note 8, at 708.

Institutional bridges are also prevalent between state or Party organs and senior executives of large private enterprises in China. We studied the government affiliations of the founders or de facto controllers of China's one hundred largest POEs (by revenue) as ranked by All-China Federation of Industry and Commerce,[93] as well as China's top ten Internet firms (by revenue)—all POEs—as ranked by China Internet Association.[94] Based on publicly available information, we identified ninety-five out of the top one hundred private firms and eight out of the top ten Internet firms whose founder or de facto controller is currently or formerly a member of central or local party-state organizations such as People's Congresses and People's Political Consultative Conferences.[95] Moreover, that no such memberships could be found for founders or de facto controllers of the rest of the firms does not necessarily mean they lack high-level political connections. Information about their affiliations simply may not be publicly available, or their connections to the political establishment may have purposely been kept informal to avoid suspicion about their firm's motives, as is likely the case with the founder of Huawei.

Why do private entrepreneurs join these political organs, whose powers are largely symbolic? One potential explanation is that membership in political organs signals allegiance to and influence within the party-state—creating and reinforcing networks with state-linked actors important to a firm's success, such as banks, SOEs, and regulators. The signal of influence sent by political participation may also help ward off potential new market entrants and local government officials eager to share in the spoils of a lucrative hometown business. At the same time, widespread membership of successful entrepreneurs in party-state organizations is indicative of the confluence of interests and a shared worldview of political and economic elites in China—the "integration of wealth and power," in the words of China scholar Bruce Dickson.[96] As the *Wall Street Journal* reported of the Twitter-like enterprise, Tencent Holdings, "The company is politically as well as technologically savvy. . . . Tencent's chief executive, Pony Ma, joined China's nearly powerless but symbolically significant parliament, a sign the company had become part of the Chinese establishment."[97]

---

93. *See 2013 Zhōngguó Mínqǐ 500 Qiáng Jiēxiǎo Sūníng Liánxiǎng Huáwèi Jū Qián Sān* [*2013 Ranking of China's Top 500 Privately Owned Companies Unveiled*], XĪNLÀNG CÁIJĪNG [SINA FIN. & ECON.] (Aug. 29, 2013, 10:18), http://finance.sina.com.cn/leadership/mroll/20130829/101816602059.shtml.

94. *See 2014 Nián Zhōngguó Hùliánwǎng Bǎiqiáng Qǐyè Bǎngdān Jiēxiǎo* [*2014 Ranking of China's Top 100 Internet Companies Unveiled*], SOHU IT (Aug. 28, 2014, 18:09:20), http://it.sohu.com/20140828/n403865758.shtml.

95. *See infra* Appendices I–II.

96. Bruce J. Dickson, *Integrating Wealth and Power in China: The Communist Party's Embrace of the Private Sector*, 192 CHINA Q. 827, 827–28 (2007).

97. Bob Davis, *China's Top-Down Take on Innovation*, WALL ST. J. (Sept. 29, 2013, 4:18 PM ET), http://online.wsj.com/news/articles/SB10001424052702304795804579099640843773148.

### 2. Government Support for Private Firms

The Chinese state provides extensive support to SOEs—$310 billion in nominal terms between 1985 and 2005 according to a recent estimate.[98] But SOEs are not the only firms supported by the state. Subsidies to large, fast-growing private firms are widespread and can constitute a significant portion of a company's net profits.[99] Privately owned Geely Automobile, for example, received subsidies totaling $141 million in 2011, over half of its net profits for the year.[100] When Geely acquired Volvo from Ford in 2010, much of the $1.5 billion purchase price was financed by local governments in northeast China and the Shanghai area.[101] Huawei, China's largest telecommunications equipment maker, provides another example. Huawei's shares are held by its employees under an arrangement resembling an Employee Stock Ownership Plan.[102] Yet analysts have suggested that Huawei is viewed by the Chinese government as a "national champion," and it receives major funding from state banks.[103] As one commentator notes, "The irony that the SOE [ZTE] turned to equity markets while the private company [Huawei] relied on state funds indicates the blurred lines between the public and private sectors in China's creation of industries considered to be strategic."[104]

### 3. Extralegal Control of Private Firms

The line between state and private ownership of enterprise in China is blurred not only due to ambiguous ownership structures of the kind discussed in section I.A above, but also because the state exercises significant extralegal control rights over private firms. To be sure, in every economy corporations are subject to regulations that dilute the control rights of corporate equity owners.[105] State encroachment into private ownership of enterprise is particularly acute, however, when the state does not scrupulously follow clearly delineated and neutrally enforced legal rules in exercising its control rights over private enterprises.

---

98. HALEY & HALEY, *supra* note 8, at 2–3. A recent study found that the interest rate subsidies received by China's SOEs alone are greater than their profits. *See* Giovanni Ferri & Li-Gang Liu, *Honor Thy Creditors Beforan Thy Shareholders: Are the Profits of Chinese State-Owned Enterprises Real?*, 9 ASIAN ECON. PAPERS 50, 50 (2010).

99. *See* MATTHEW FORNEY & LAILA F. KHAWAJA, FATHOM CHINA LTD., PUBLIC FUNDS FOR PRIVATE FIRMS 3 (2013).

100. *Id.* at 10.

101. Michael Wines, *China Fortifies State Businesses to Fuel Growth*, N.Y. TIMES, Aug. 29, 2010, http://www.nytimes.com/2010/08/30/world/asia/30china.html.

102. *See* ROGERS & RUPPERSBERGER, *supra* note 36, at 15. The firm's founder, Ren Zhengfei, retains veto power under a shareholders' agreement. *See id.* at 20.

103. For example, in 1998, the Beijing headquarters of China Construction Bank lent Huawei 3.9 billion RMB in buyer's credit, representing forty-five percent of the total credit it extended that year. NATHANIEL AHRENS, CTR. FOR STRATEGIC & INT'L STUDIES, CHINA'S COMPETITIVENESS: MYTH, REALITY, AND LESSONS FOR THE UNITED STATES AND JAPAN—CASE STUDY: HUAWEI 6 (2013).

104. *Id.* at 11.

105. *See* KENT GREENFIELD, THE FAILURE OF CORPORATE LAW: FUNDAMENTAL FLAWS AND PROGRESSIVE POSSIBILITIES 65–67 (2006).

The Chinese state relies on several means to exercise extralegal control of private firms. One such mechanism is so-called industrial associations, also known in some sectors as chambers of commerce. Established in industries for which supervising ministries have been disbanded, these ostensibly private organizations are designed to coordinate activities within an industry.[106] Yet the industrial associations are staffed by former government officials from the defunct ministries and have the same organizational structures and functions as those ministries.[107] The industrial associations actively supervise the operations of firms in their respective industries and have retained much, if not all, of the power exercised by their state predecessors.[108] In the early 2000s, one such industrial association, China Chamber of Commerce for Import and Export of Medicine and Health Products (Chamber), implemented an export regime for the vitamin C industry under which the export prices of all vitamin C producers were subject to review and approval by the Chamber.[109] Some members of the Chamber were sued in the United States for fixing the prices of vitamin C products in violation of section 1 of the Sherman Act. Defendants contended that the Chamber is an entity through which the Chinese government exercises its regulatory authority and that the price-fixing agreements at issue were

---

106. In the restructuring of the central government agencies in 1998, the ministries overseeing a number of industries including coal, machinery, metallurgy, chemical, and textile were downgraded to "national bureaus" under the State Economic and Trade Commission. *See Jīngmàowěi Chèxiāo Guójiā Guónèi Màoyì Jú Děng 9 Gè Guójiā Jú [State Economic and Trade Commission Abolishes Nine National Bureaus Including Domestic Distribution Bureau]*, XĪNHUÁ WǍNG [NEW CHINA NET] (Feb. 19, 2001, 17:33), http://finance.sina.com.cn/g/37340.html. In 2003, the national bureaus were abolished and the administrative functions of those national bureaus were assumed by the SASAC. *See* ORG. FOR ECON. CO-OPERATION & DEV., OECD REVIEWS OF REGULATORY REFORM: CHINA—DEFINING THE BOUNDARY BETWEEN THE MARKET AND THE STATE 94 (2009) [hereinafter OECD, BOUNDARY].

107. *See* Zheng, *supra* note 59, at 669–70. A number of industrial associations were established to assume the regulatory functions of the national bureaus abolished in 2003. These industrial associations include: China Iron and Steel Association, China Machinery Industry Federation, China Petroleum and Chemical Industry Federation, China Light Industry Federation, China Textile Industry Association, China Coal Industry Association, China Federation of Logistics and Purchasing, and China Non-Ferrous Metals Industry Association. In addition, a number of chambers of commerce were established in the import and export sector. These chambers of commerce include: China Chamber of Commerce for Import and Export of Textiles, China Chamber of Commerce for Import and Export of Light Industrial Products and Arts-Crafts, China Chamber of Commerce of Metals, Minerals and Chemicals Importers and Exporters, China Chamber of Commerce for Import and Export of Foodstuffs, Native Produce and Animal By-Products, China Chamber of Commerce for Import and Export of Machinery and Electronic Products, and China Chamber of Commerce for Import and Export of Medicines and Health Products. *See* LIÚ JIÀNHUÁ, ZHŌNGGUÓ SHÌCHǍNG XĪN ZHÌXÙ [CHINA'S NEW MARKET ORDER] 178 & n.1 (2006).

108. On the official functions of such industrial associations, a U.S. court noted:

> The [industrial associations] were given both governmental functions, which had previously been performed by the [ministries], and private functions. The governmental functions included, *inter alia*, responding to foreign anti-dumping charges and industry "coordination." The private functions of the [industrial associations] included organizing trade fairs, conducting market research and "mediating" trade disputes.

*In re* Vitamin C Antitrust Litigation, 810 F. Supp. 2d 522, 526 (E.D.N.Y. 2011).

109. *See id.* at 528–29.

compelled by the Chinese government.[110] The Chinese Ministry of Commerce took the unusual step of submitting an amicus brief in support of the defendants' motion to dismiss.[111] The federal district court in New York, however, rejected this argument, holding that none of the laws and regulations cited by the defendants and the Ministry of Commerce actually compelled the defendants to fix the prices of vitamin C products.[112] In so doing, the court focused solely on the formal language of the relevant legal rules and directives; it did not consider the Chinese government's ability and tendency to impose its policies on private firms on an extralegal basis.

Another means by which the state exercises extralegal control over private firms is the practice of regulators conducting "interviews" with private firm managers to encourage or compel compliance with policies favored by the government. As indicated above, the NDRC, China's chief economic planning agency, engages in this practice regularly.[113] By law, the NDRC has the authority to regulate the prices of only a small number of products and services still subject to formal price control.[114] Yet the NDRC routinely conducts interviews with firms that are not subject to these controls to prod, and at times order, adoption of NDRC-favored pricing policies. For example, in 2010, China's main cooking oil producers increased or were planning to increase prices due to cost pressures. Concerned about the impact of these price hikes on food-price inflation, the NDRC interviewed executives of the cooking oil producers three times to urge them not to increase prices. During one of the interviews, the NDRC straightforwardly ordered the producers to freeze prices for four months, and the producers complied.[115]

Yet another means by which the state exercises extralegal control over private firms is the practice of prodding or even forcing private firms to participate in state-led industry-restructuring efforts. The right of ownership implies the right to retain control or to be acquired by another firm, but in China, this right must yield to the state's plans for restructuring an industry. In 2009, for example, Shandong Steel Group, a major SOE steel producer in the province, acquired sixty-seven percent of the ownership of Shandong Rizhao Steel, an emerging

110. *See id.* at 525.

111. *See id.*

112. *See id.* at 551, 554, 555–56, 558 (rejecting agreed output restrictions, subcommittee membership, inability to export without price-setting, and the same treatment clause as sources of compulsion).

113. NDRC engages in this practice not only with private firms, but also with SOEs. For an example involving SOEs, see *supra* section I.B.4.

114. In a government catalog published in 2001, the last year for which such catalogs are publicly available, only thirteen categories of products or services were subject to price control by the government, such as electricity, military products, and postal services. *See* GUÓJIĀ JÌWĚI HÉ GUÓWÙYUÀN YǑUGUĀN BÙMÉN DÌNGJIÀ MÙLÙ [PRICING FIXING CATALOG OF THE STATE PLANNING COMMISSION AND THE STATE COUNCIL] (2001), *available at* http://www.pkulaw.cn/fulltext_form.aspx?Db=chl&Gid=36273.

115. *See Shíyòngyóu Qǐyè Jìnnián Sāncì Bèi "Yuētán"—Xiàyóu Cānyǐnyè Zhàn Bú Zhuī Zhǎng* [*Cooking Oil Companies "Interviewed" Three Times in Recent Years—Downstream Restaurants Temporarily Halting Price Hikes*], XĪNHUÁ WǍNG [NEW CHINA NET] (July 30, 2012, 14:17:08), http://news.xinhuanet.com/fortune/2012-07/30/c_123494170.htm.

privately owned steel producer in the same province, under the auspices of an industry restructuring plan drawn up by the Shandong provincial government a year earlier.[116] The acquisition was completed after the owner of Shandong Rizhao Steel, Du Shuanghua, had repeatedly objected to the deal and had put up fierce resistance by listing thirty-percent of Shandong Rizhao Steel's assets in Hong Kong through a reverse merger with a Hong Kong-listed company.[117]

The point of the foregoing discussion is not that the government has unbridled control over private firms, any more than it has free reign to impose its will on SOEs. Rather, the point is that where a government routinely chooses to enforce its policies by extralegal means, the added degree of autonomy from government influence that ordinarily follows from private, as compared to government, ownership of enterprise may be illusory. Of course, this is a principal reason why politically connected entrepreneurs are so prevalent in China: If private entrepreneurship does not bring added autonomy from the state, better to seek the benefits of affiliation with the government.[118] Simply put, if you can't beat 'em, join 'em.

## II. STATE CAPITALISM AND STATE CAPTURE

To this point, we have painted a rather paradoxical picture of the relationship between the Chinese state and Chinese firms: The state has only attenuated control over state-owned enterprises, yet it exerts significant control rights over private firms in which it holds no ownership interests. The paradox, however, is resolved when the focus of analysis shifts from the "state" versus "private" nature of ownership rights in firms to the dynamics of capture in Chinese state capitalism. For lack of a more widely accepted and analytically tractable term, we use "capture" to describe the phenomenon in which firms obtain special advantages from the national or local governments by aligning themselves with the political leadership's interests, goals, and priorities. The mechanisms or means by which firms obtain these advantages range from corruption to ideology, and from the power of incumbency to the Party's overriding political

---

116. *See Shàngǎng Chóngzǔ Rìgǎng Qiāodìng Zhàn Gǔ 67% [Shandong Steel Clinches Deal to Acquire 67% of Rizhao Steel]*, XĪNLÀNG CÁIJĪNG [SINA FIN. & BUS.] (Sept. 7, 2009, 04:56), http://finance.sina.com.cn/chanjing/gsnews/20090907/04566714022.shtml.

117. *Id.* For more background on the acquisition, see SHENG HONG & ZHAO NONG, CHINA'S STATE-OWNED ENTERPRISES: NATURE, PERFORMANCE AND REFORM 145–48 (2013). Interestingly, as shown in Appendix I, Mr. Du was a politically connected entrepreneur, but all of his party-state affiliations were in Hebei Province where he was born and predated his founding of Shandong Rizhao Steel in the neighboring Shandong Province. *See infra* Appendix I, No. 36. Du's apparent lack of party-state affiliations in Shandong may have contributed to his firm becoming an acquisition target. *See id.*

118. This is corroborated by research indicating that the political participation of private entrepreneurs can be explained by the underdevelopment of markets and market-supporting institutions. *See, e.g.*, Hongbin Li et al., *Why Do Entrepreneurs Enter Politics? Evidence from China*, 44 ECON. INQUIRY 559 (2006) (showing that the probability of private entrepreneurs participating in political activities decreases by 8%–20% from the mean when institutional indices improve by one standard deviation).

imperative of sustained economic growth. Thus, as will become clear below, capture in the Chinese context takes many different forms and has a variety of different consequences.

### A. SUSCEPTIBILITY TO CAPTURE

Every government creates and maintains rents by virtue of its regulatory power.[119] And in every economy where the government imposes restrictions on economic activities, firms devote resources to capturing rents generated by government restrictions.[120] China is obviously not unique in the creation and allocation of rents through government intervention in the economy.

Among the world's major economies, however, the Chinese state is highly— and perhaps uniquely—susceptible to capture for two reasons: the degree of state intervention and porousness of its institutions. First, China's huge economy and massive state interventions therein increase the opportunities for and pay-offs from capture. The Chinese economy, at $9 trillion as of 2013, is now the second largest in the world.[121] Yet the economy is, in the words of the Heritage Foundation's *2013 Index of Economic Freedom*, "mostly unfree."[122] China ranks near the bottom of the countries surveyed on measures of limited government, regulatory efficiency, and open markets.[123] Despite liberalization efforts in the past three decades that significantly reduced the formal share of the state-owned sector in the economy, the Chinese state still plays a dominant role in the economy, a role far greater than its equity ownership would suggest. In addition to dispensing vast amounts of subsidies,[124] the state intervenes in the economy in significant ways, generating rents that are crucial for firms' prosperity or even survival.

One primary example of state-generated rents is access to financing. The state imposes a ceiling on bank deposit rates and channels credit at below-market cost to firms favored by the state.[125] As a result, firms in China invest in political connections with the party-state to obtain low-cost financing. An

---

119. *See* Charles A. Reich, *The New Property*, 73 YALE L.J. 733, 733 (1964) (arguing that government largesse is replacing private property as a major source of wealth in the United States).

120. *See* Anne O. Krueger, *The Political Economy of the Rent-Seeking Society*, 64 AM. ECON. REV. 291, 291 (1974) (proposing a model in which firms compete for government-generated rents).

121. *See GDP (Current US$)*, WORLD BANK, http://data.worldbank.org/indicator/NY.GDP.MKTP.CD (last visited Jan. 18, 2015).

122. TERRY MILLER ET AL., HERITAGE FOUND., 2013 INDEX OF ECONOMIC FREEDOM 165 (2013) (internal quotation marks omitted).

123. China ranks 136th, 147th, and 116th in the world by those measures, respectively. *Id.* at 166.

124. *See supra* section I.C.2.

125. *See* Tarhan Feyzioğlu et al., *Interest Rate Liberalization in China* 3 (Int'l Monetary Fund, Working Paper No. 09/171, 2009). Prior to July 2013, China maintained both a ceiling on bank deposit rates and a floor on bank lending rates. In July 2013, the floor on bank lending rates was eliminated. This move, however, was largely symbolic because the vast majority of loans are made at or above the benchmark rate. *See* Neil Gough, *Liberalizing Interest Rates Remains a Challenge for China*, N.Y. TIMES (July 21, 2013), http://www.nytimes.com/2013/07/22/business/global/liberalizing-interest-rates-remains-a-challenge-for-china.html.

abundance of empirical evidence indicates that the political connections of firms in China are a strong indicator of their access to bank loans.[126] Similarly, firms with political connections are also favored in stock listings.[127] Smaller firms without political connections, by contrast, are forced to obtain financing from China's vast shadow banking system at high interest rates.[128]

Another example of state-generated rents is pervasive state-sanctioned monopolies. Many key industries in China, such as electricity, telecommunications, petroleum, railroads, public utilities, and banking, are dominated by firms that are de facto monopolies or oligopolies.[129] These firms acquired their monopoly

---

126. *See, e.g.*, Clement Kong Wing Chow et al., *Investment Opportunity Set, Political Connection and Business Policies of Private Enterprises in China*, 38 REV. QUANTITATIVE FIN. ACCT. 367, 367 (2012) (finding that firms with political connections in China are able to borrow more); Hongbin Li et al., *Political Connections, Financing and Firm Performance: Evidence from Chinese Private Firms*, 87 J. DEV. ECON. 283, 284 (2008) (finding that Communist Party membership helps private entrepreneurs in China to obtain loans from banks or other state institutions); Wubiao Zhou, *Bank Financing in China's Private Sector: The Payoffs of Political Capital*, 37 WORLD DEV. 787, 788 (2008) (finding that membership in China's legislative or semilegislative organs helps private entrepreneurs obtain access to bank loans); Robert Cull et al., *Government Connections and Financial Constraints: Evidence from a Large Representative Sample of Chinese Firms* 7 (World Bank, Policy Research Working Paper No. 6352, 2013) (finding that government connections are associated with substantially less severe financial constraints at private firms in China).

127. More than half of the companies listed on the Shanghai Stock Exchange are formerly state-owned companies. *See* Shen Hong, *Weak Links Mar Investing in China*, WALL ST. J. (June 26, 2013, 3:51 AM ET), http://online.wsj.com/article/SB10001424127887323998604578567722934644106.html. A significant percentage of the listed firms have former or current government officials as their CEOs. *See* Joseph P.H. Fan et al., *Politically Connected CEOs, Corporate Governance, and Post-IPO Performance of China's Newly Partially Privatized Firms*, 84 J. FIN. ECON. 330, 335 (2007) (finding that almost 27% of the CEOs in a sample of 790 newly partially privatized firms in China are former or current government bureaucrats or military officers). Among the listed firms, firms with politically connected CEOs tend to underperform firms without politically connected CEOs, suggesting that firms with politically connected CEOs may have been unduly favored in the state's listing decisions. *See id.* Politically connected firms also reap greater benefits in the process of going public. *See* Bill B. Francis et al., *Political Connections and the Process of Going Public: Evidence from China*, 28 J. INT'L MONEY & FIN. 696, 698 (2009) (finding that politically connected firms, irrespective of their ownership status, have relatively higher offering prices, lower underpricing, and lower fixed costs during the going-public process).

128. There is neither an official definition of shadow banking nor official statistics on the size of shadow banking in China. If defined to include only underground lending, shadow banking is estimated to total $1.3 trillion in China, according to Ren Xianfang, an economist with IHS Global Insights Ltd. in Beijing. *Shadow Banks on Trial as China's Rich Sister Faces Death*, BLOOMBERG NEWS (Apr. 11, 2012, 3:24 AM ET), http://www.bloomberg.com/news/2012-04-10/shadow-banks-on-trial-as-china-s-rich-sister-faces-death.html. If defined to also include the off-balance-sheet activities of banks, trust companies, and businesses lending to each other, China's shadow banking system is estimated to total about $2.4 trillion, a third the size of China's official loan market, according to Societe Generale SA economist, Yao Wei. *Id.* The customers of China's shadow banking system are primarily small businesses who are shunned by China's state-owned banks. *Id.*

129. The power-generating industry in China is dominated by five SOE power-generating company groups: China Huaneng Power Group, China Datang Corporation, China Huadian Corporation, China Guodian Corporation, and China Power Investment Corporation. *See* Zheng, *supra* note 59, at 703 n.254. The telecommunications industry in China is dominated by three SOE telecommunications carriers: China Telecom, China Unicom, and China Mobile. *See id.* at 701 n.251. The petroleum industry is dominated by three SOE petroleum company groups: China National Petroleum Corporation, Sinopec,

or dominant status not through market competition, but through market-entry restrictions imposed by the state.[130] China adopted an Antimonopoly Law (AML) in 2007, but the AML left intact the monopoly or dominant status of firms in these industries.[131]

The second reason for the susceptibility of the Chinese state to capture is the lack of procedural checks on the process by which rents are generated and allocated. Although China has lawmaking institutions and procedures that outwardly resemble those typically found in a democracy,[132] real lawmaking power in China resides with the Communist Party.[133] The party-state also enjoys broad discretion in setting administrative rules.[134] As the Heritage Foundation's *2013 Index of Economic Freedom* notes, "The legal and regulatory system is vulnerable to political influence and Communist Party directives. The party's ultimate authority throughout the economic system undermines the rule of law and respect for contracts. Corruption is widespread, and cronyism is institutionalized and pervasive."[135] These weaknesses are partly a reflection of China's stage of development, but are also traceable to the Communist Party's monopoly on political power. The monopoly reduces incentives to create neutral market institutions that provide a level playing field for all entrepreneurs, because the Party does not need to account for future states of the world in which it is not in power.[136] The result is an institutional ecology that encourages

---

and China National Offshore Oil Corporation. *See* BO KONG, CHINA'S INTERNATIONAL PETROLEUM POLICY 15 (David L. Goldwyn & Jan H. Kalicki eds., 2010). The railroad industry is monopolized by one SOE, China Railways Corporation. *See Chinese State-Owned Railway Giant Goes into Business*, PEOPLE'S DAILY ONLINE (Mar. 17, 2013, 13:44), http://english.people.com.cn/90778/8171077.html. Public utilities are dominated by two SOEs, State Grid Corporation of China and China Southern Power Grid Company. *See* OECD, BOUNDARY, *supra* note 106, at 236. The banking industry in China is dominated by four state-owned banks: the Industrial and Commercial Bank of China, the China Construction Bank, the Agricultural Bank of China, and the Bank of China. *See* CHEN MENG, MULTINATIONAL BANKING IN CHINA: THEORY AND PRACTICE 28 (2009).

130. Most of these market entry restrictions are effectuated through implicit licensing and minimum capital requirements. *See* Zheng, *supra* note 59, at 660 n.72.

131. The AML provides that "the state protects the lawful business operations" of "the industries controlled by the State-owned economy and concerning the lifeline of national economy and national security or the industries implementing exclusive operation and sale according to law." The Antimonopoly Law of the People's Republic of China (promulgated by the Standing Comm. Nat'l People's Cong., Aug. 30, 2007, effective Aug. 1, 2008), art. 7, *available at* http://www.china.org.cn/government/laws/2009-02/10/content_17254169.htm.

132. For an overview of China's lawmaking institutions and procedures, see ALBERT HUNG-YEE CHEN, AN INTRODUCTION TO THE LEGAL SYSTEM OF THE PEOPLE'S REPUBLIC OF CHINA 79–88 (1992).

133. *See* Perry Keller, *Sources of Order in Chinese Law*, 42 AM. J. COMP. L. 711, 729–31 (1994).

134. *See* Peter Howard Corne, *Creation and Application of Law in the PRC*, 50 AM. J. COMP. L. 369, 381 (2002).

135. MILLER ET AL., *supra* note 122, at 165. Moreover, China receives low rankings on the World Justice Project's Rule of Law Index with respect to variables such as limited government powers, open government, and regulatory enforcement, even in regional rankings and within its income group. *See* MARK DAVID AGRAST ET AL., WORLD JUSTICE PROJECT, RULE OF LAW INDEX 2012–2013, 77 (2012–2013).

136. *Cf.* Matthew C. Stephenson, *"When the Devil Turns...": The Political Foundations of Independent Judicial Review*, 32 J. LEGAL STUD. 59, 73 (2003) (arguing that an independent judiciary is sustainable only when the political system is sufficiently competitive).

all firms, whether SOE, POE, or of mixed ownership, to remain close to the party-state as a source of protection and largesse.

### B. MECHANISMS OF CAPTURE

The Chinese economy is distinctive not only in the scale of rents it generates, but also in the mechanisms used to capture those rents. To illuminate the mechanisms of capture in China, we adapt a simple model from Joel Hellman, Geraint Jones, and Daniel Kaufmann, who studied the capture of state power in transition economies in Eastern Europe and the former Soviet Union.[137] They distinguish two types of powerful firms in an economy with insecure property rights: "influential firms" are incumbents, typically SOEs, that inherited their privileged position from the previous communist system; "[c]aptor firms . . . are . . . de novo private firms" that "choose to engage in state capture as a strategy to compete against these influential incumbents"—or, as they put it more colorfully, "[c]aptor firms . . . purchase advantages directly from the state."[138] Because Hellman et al. focused on Eastern Europe, the currency for the purchases in their model consists solely of illicit, nontransparent payments.[139] According to their analysis, the key distinguishing trait between these two types of powerful firms is that captor firms pay bribes to shape the rules of the game, whereas influential firms can do so simply through the power of incumbency.[140]

Much of this model can be applied directly to China. Because property rights are weak, in order to succeed firms must either inherit or earn privileges and protections from the state—or more precisely, from the Party in its role as the shadow monitor of state agencies and institutions. And as in their model, it is useful to distinguish between influential firms (SOE incumbents) and captor firms (large, successful POEs) in China. Chinese SOEs, like their counterparts everywhere, have natural advantages in capturing state power and state-generated rents. In the Chinese case, many SOEs were literally hived off of government ministries that were eliminated in the transition to a market-oriented economy. Examples are abundant. China National Petroleum Corporation (CNPC), Sinopec, and China National Offshore Oil Corporation (CNOOC), China's three state-owned petroleum firms, were created from the operating assets of the former Ministry of Petroleum Industry.[141] China's five state-owned

---

137. *See* Joel S. Hellman, Geraint Jones & Daniel Kaufmann, *Seize the State, Seize the Day: State Capture and Influence in Transition Economies*, 31 J. COMP. ECON. 751, 752–53 (2003).

138. *Id.* at 753.

139. *See id.* at 756.

140. *See id.* at 756–57.

141. *See* Kong, *supra* note 129, at 13. In 1982, the State Council created CNOOC under the Ministry of Petroleum Industry (MPI) to be in charge of offshore oil exploration and production. In 1983, the State Council grouped the refining and petrochemical assets from the MPI together with certain assets from the Ministry of Chemical Industry and the Ministry of Textile Industry to create Sinopec. In 1988, the government converted the MPI to CNPC, which inherited the remaining assets of the MPI and all the administrative functions of the MPI. *Id.*

power generating firms and two state-owned power grids were all part of the State Power Corporation, which received the operating assets of the former Ministry of Electricity.[142] China's three largest SOE telecommunications firms, China Telecom, China Unicom, and China Mobile, were converted from the operating assets of the Ministry of Post and Telecommunications through many rounds of industry restructuring.[143] When the Ministry of Railways was eliminated in March 2013, its operating assets were taken over by the newly established China Railway Corporation.[144]

In addition to their provenance traceable directly to the state, despite decades of economic reforms, Chinese SOEs may also still benefit from orthodox socialist ideology, enshrined in the constitution, which emphasizes state ownership of the means of production. Article 7 of the constitution, for example, provides that the state-owned economy, that is, the socialist economy with ownership by the whole people, is the leading force in the national economy.[145] Within this constitutional framework, the private sector is a complement to the socialist public economy.[146]

Despite these natural advantages of SOEs, it is possible for other firms in China to purchase the right to compete with incumbent firms—that is, to play the role of captor firms in the Hellman et al. model. Corruption of the sort that figures prominently in that model certainly can buy influence in China, as seen in the widespread phenomenon of private firms bribing party-state officials to obtain government contracts and other favors from the state.[147] Familial, personal, and professional connections also play important roles in capturing the

---

142. In 1997, the State Power Corporation took over the assets of the Ministry of Electricity. In 2002, the State Power Corporation was split into five power-generating company groups and two power grids. *See* OECD, BOUNDARY, *supra* note 106, at 144.

143. Prior to 1994, China's telecommunications industry was monopolized by China Telecom, an arm of the Ministry of Post and Telecommunications. In 1994, the government formed two new carriers, China Unicom and China Jitong, to compete with China Telecom. In 2000, the government split China Telecom into four separate companies: China Mobile, China Netcom, China Satellite, and a slimmed-down China Telecom. The telecommunication industry went through two other reshuffles in 2002 and 2008, resulting in the current industry structure where China Telecom, China Unicom, and China Mobile divide the market for basic telecommunications services. *See* Zheng, *supra* note 59, at 701–02 n.251.

144. *See Chinese State-Owned Railway Giant Goes into Business*, *supra* note 129.

145. *See* XIANFA art. 7 (1982) (China). Ideology, however, may be a pretext for ulterior motives; it is difficult to disentangle influence rooted in ideology from that based on the power of incumbency or corruption.

146. *Id.* art. 11.

147. A recent example of corruption buying influence in China can be found in the case of the former Minister of Railways, Mr. Liu Zhijun, who was investigated for channeling railway contracts to a private businesswoman in return for kickbacks and sexual favors arranged by her. *See* Wang Chen et al., *How Dangerous Liaisons Led to Massive Corruption*, CAIXIN ONLINE (Aug. 14, 2012, 18:51), http://english.caixin.com/2012-08-14/100424022.html. Mr. Liu was convicted of corruption and abuse of power and received a suspended death sentence. *See China's Former Railways Minister Liu Zhijun Given Suspended Death Penalty for Bribery, Power Abuse*, PEOPLE'S DAILY ONLINE (July 8, 2013, 16:09), http://english.people.com.cn/90785/8315997.html.

state in China.[148] In particular, firms connected to family members of senior government officials can gain a significant advantage over other firms in securing business deals with the state.[149]

But the mechanisms of capture in China differ from those of Eastern Europe in that one key form of currency used by captor firms is not bribes, but growth potential. This difference may be attributed to the vastly different paths of economic reform followed in China as compared to Eastern Europe: gradualism (in which the state has relaxed its grip on the economy episodically over a period of decades) versus a big bang (in which state assets were released into private hands almost overnight). Because the Chinese Communist Party is averse to establishing accountability through the political process, its primary claim to legitimacy in the reform era is the ability to deliver sustained economic development and its hoped for counterpart, social stability.[150] The overriding primacy placed on sustained economic growth has enabled some private firms to obtain special benefits from the state by demonstrating the potential to deliver that growth. For example, Huawei, China's leading telecommunications equipment company, achieved its initial success by developing a particular digital telephone switch with greater capacity than any other products available on the Chinese market at the time.[151] After Huawei's technological breakthrough, government support flowed into the firm.[152] Through its advanced technology and ingenious marketing strategies, Huawei was able to overtake other influential firms in the Chinese market, including Shanghai Bell, a joint venture between the business arm of the Ministry of Post and Telecommunications and the French corporation Alcatel,[153] and Julong, which was assembled from eight

---

148. In an online application, Connected China, Reuters documents the complex webs of family, personal, and professional relationships that form China's elite power structure. *See* CONNECTED CHINA, http://china.fathom.info (last visited Jan. 18, 2015).

149. As one example, it was reported in August 2013 that U.S. authorities opened a bribery investigation into whether J.P. Morgan Chase hired the children of powerful Chinese officials to help the bank win lucrative business in China. *See* Jessica Silver-Greenberg et al., *Hiring in China by JPMorgan Under Scrutiny*, N.Y. TIMES (Aug. 17, 2013, 8:01PM), http://dealbook.nytimes.com/2013/08/17/hiring-in-china-by-jpmorgan-under-scrutiny.

150. Scholars have hypothesized that the expectation of future income growth helps explain China's relatively high degree of social stability despite the enormous socioeconomic transition experienced over the past three decades. *See* Paul Frijters et al., *Are Optimistic Expectations Keeping the Chinese Happy?*, 81 J. ECON. BEHAV. & ORG. 159, 165 (2012).

151. *See Huawei: The Company that Spooked the World*, ECONOMIST, Aug. 4, 2012, http://www.economist.com/node/21559929.

152. *See* AHRENS, *supra* note 103, at 5–6.

153. Shanghai Bell was established in 1983 as a joint venture between the China Post and Telecommunications Industry Corporation, the business arm of the Ministry of Post and Telecommunications, and the ITT Corporation's Belgian subsidiary, BTM. *See* Harwit, *supra* note 45, at 318. Alcatel took control of BTM and became the new foreign partner for Shanghai Bell in 1987. *Id.* at 319. Shanghai Bell's market share was increasingly eclipsed by Huawei. By 1996, Huawei had twenty percent of China's switch market, second only to Shanghai Bell's. *Id.* at 327. In 1998, Huawei pulled even with Shanghai Bell, with a market share of about twenty-two percent. *Id.* By 2004, Huawei had acquired a seventy-six percent share of the Chinese domestic market for telecommunications equipment. *Id.* at 330.

SOEs supervised by key government ministries and the Chinese military.[154]

The political imperative for growth has been institutionalized in ways that further distinguish the mechanisms of capture in China from those in other transition economies. A unique attribute of state capitalism in China is the large role played by local governments. Contrary to popular perception, China's model of economic decisionmaking is highly decentralized. This was true even before the commencement of economic reform,[155] but economic decentralization accelerated under transition policies such as "fiscal federalism"—a revenue-sharing regime that grants a significant amount of autonomy to local governments in setting local budgets and expenditures.[156] In particular, a fundamental fiscal reform in 1994 assigned local governments a lower revenue share but higher expenditure responsibilities, leaving them no choice but to seek new tax bases.[157] This reform, combined with the delegation of investment-approval authority to local governments,[158] led to competition among local governments for investment projects with high potential to generate tax revenues.[159] Olivier Blanchard and Andrei Shleifer theorized that this competition is made possible by a politically centralized party-state that is ready to reward and punish local officials based on their economic performance.[160] This hypothesis finds support in empirical evidence indicating that the likelihood of promotion of China's

---

154. Julong was established in 1995 by grouping eight SOEs, four from the Post and Telecommunications Industry Corporation, three from the Ministry of Electronics Industry, and one from the Chinese military. *Id.* at 322–23. Julong had the financial backing of the state, but over the years it lost out in competition with Huawei and ZTE. *See id.* at 323–24.

155. Unlike the Soviet Union, China structured its industries in a much more decentralized fashion, giving local governments considerable responsibility for coordinating production and distribution within their jurisdictions. *See* Yingyi Qian & Barry R. Weingast, *China's Transition to Markets: Market-Preserving Federalism, Chinese Style*, 1 J. POL'Y REFORM 149 (1996) (explaining the historical process of decentralization in China).

156. *See* Zheng, *supra* note 59, at 656–57.

157. *See* Justin Yifu Lin et al., *Deregulation, Decentralization, and China's Growth in Transition*, in LAW AND ECONOMICS WITH CHINESE CHARACTERISTICS: INSTITUTIONS FOR PROMOTING DEVELOPMENT IN THE TWENTY-FIRST CENTURY 467, 485 (David Kennedy & Joseph E. Stiglitz eds., 2013).

158. The central government began to delegate a significant amount of investment approval authority to local governments starting in the 1960s. This trend continued into the reform era. By the early 2000s, a large majority of investments in urban areas were approved by local governments. *See* Zheng, *supra* note 59, at 678–79.

159. *See* Lin et al., *supra* note 157, at 486 ("The pro-business tendency of Chinese local governments has become particularly obvious since the late 1990s, as local governments anxiously seek new revenue sources by engaging in fierce competition for investment.").

160. *See* Olivier Blanchard & Andrei Shleifer, *Federalism with and Without Political Centralization: China Versus Russia* 2 (Nat'l Bureau of Econ. Research, Working Paper No. 7616, 2000). Note that local government officials' control over land use allows them a direct means of allocating property rights to firms that place the highest value on such rights, presumably those with highest growth potential. Often, the officials benefit personally in this process through side payments and the like. No additional career incentives offered by the national government are required to make this system function. Assignment of land-use rights is a capsule illustration of capture in both of the forms we use it in this Article: corruption and convergence of interests. We are grateful to Tom Merrill for this point.

provincial leaders increases with favorable economic performance.[161] Scholars have argued that competition among local governments is a main driver of China's economic growth in the reform era.[162]

This institutional setting suggests the diminishing relevance of enterprise ownership to the party-state as the economy grows more complex. The growth imperative forces the Party to look beyond SOEs in bolstering its claim to legitimacy and enables private firms to capture state rents by demonstrating growth potential, particularly to local government officials. As a recent report notes, "Local leaders these days are assessed based on economic growth, and are increasingly agnostic about what type of firm provides that growth."[163]

The structural dynamics of capture are enhanced by two other factors that provide special privileges to favored firms without particular regard to public or private ownership. One such factor is industrial policy, which is used extensively to guide and promote economic development.[164] Firms in preferred sectors or industries, such as renewable energy, are in a privileged position whether they are state-owned or privately owned.[165] Another factor is nationalist sentiment, which favors Chinese firms, state-owned or private, over foreign companies.[166]

As a result of these dynamics, successful large firms in China, irrespective of ownership, are likely to be those that have captured state power and rents either through incumbency or by demonstrating growth potential to government officials. Industrial policies, nationalist sentiment, and outright corruption reinforce the advantages enjoyed by these firms. Firms that lack politically influential attributes tend to be marginalized in China's state-centered economy. Even

---

161. *See* Hongbin Li & Li-An Zhou, *Political Turnover and Economic Performance: The Incentive Role of Personnel Control in China*, 89 J. Pub. Econ. 1743, 1744 (2005).

162. *See, e.g.,* Jean C. Oi, *Fiscal Reform and the Economic Foundations of Local State Corporatism in China*, 45 World Pol. 99 (1992); Yingyi Qian & Barry R. Weingast, *Federalism as a Commitment to Preserving Market Incentives*, 11 J. Econ. Persp. 83 (1997). The competition among local governments, however, also leads to severe excess-capacity problems in many of China's industries. *See* Zheng, *supra* note 59, at 675–82; *see also* Jamil Anderlini, *Chinese Industry: Ambitions in Excess*, Fin. Times (June 16, 2013, 6:29 PM), http://www.ft.com/intl/cms/s/0/4d5528ec-d412-11e2-8639-00144feab7de.html.

163. Forney & Khawaja, *supra* note 99, at 18.

164. The use of industrial policy in China was scattered and ineffective prior to the mid-2000s. Since 2004, however, there has been a marked increase in the number of national industrial policy programs. *See* Sebastian Heilmann & Lea Shih, The Rise of Industrial Policy in China, 1978–2012, at 3 fig. 1 (2013) (unpublished manuscript), *available at* http://www.harvard-yenching.org/features/hyi-working-paper-series-sebastian-heilmann-and-lea-shih.

165. China's solar industry presents an example. China National Development Bank, one of China's policy-lending banks, provided $47 billion in preferential loans to Chinese solar companies in 2010. *See* Mariana Mazzucato, The Entrepreneurial State: Debunking Public vs. Private Sector Myths 153 (2013). Shi Zhengrong, the founder of China's leading solar panel manufacturer Suntech, received $6 million from the City of Wuxi to have the company set up in Wuxi. *Id.* at 152. Suntech received a preferential fifteen percent tax rate, millions in grants, and a $7 billion line of credit from China National Development Bank. *Id.* at 153.

166. The rise of Huawei, for example, has benefited from nationalist sentiment and concomitant national security concerns. *See* Harwit, *supra* note 45, at 325–28.

SOEs that rely exclusively on incumbency, without the promise of growth, face the prospect of being absorbed by stronger SOEs.[167]

### C.  STATE CAPTURE AND MARKET DOMINANCE

Patterns of market dominance in China are consistent with the claim that state capture—as we have used the term—is a main determinant of success of Chinese firms. These patterns simultaneously demonstrate how Chinese corporate development has been affected by path dependence and adaptation to the institutional environment. When the state first withdrew from direct participation in commercial activity, SOEs were the default arrangement: They inherited all of the operating assets from the supervising ministries and were the only players in the market.[168] The subsequent path of development would diverge, however, depending on whether the SOE incumbents could secure state-generated rents, particularly state-sanctioned monopoly status. When the SOE incumbents fail to do so, they are exposed to the vagaries of market competition and often lose out to emerging firms. The above-mentioned Shanghai Bell, an incumbent telecommunications equipment firm that was marginalized by Huawei, provides an example.[169] But if SOE incumbents could erect state-sanctioned entry barriers against emerging firms, their incumbency status could become entrenched, as seen in China's monopoly industries.

The entrenching of incumbent firms due to state capture could lock China's industries in a pattern of path dependence. When incumbent firms have captured the state, they become well positioned to resist additional reforms that would threaten their incumbency status. This power of incumbency can be seen from the state's repeated failures to break up SOE monopolies in key industries. With few exceptions, all such efforts have resulted in the breakup of SOEs along either geographical or product lines, ensuring minimal competition among the successor entities. In the petroleum industry, when the three giant state-owned firms—CNPC, Sinopec, and CNOOC—were initially created in the 1980s, they were assigned mutually exclusive business areas, with CNPC focusing on onshore upstream production, Sinopec focusing on downstream refining, and CNOOC focusing on offshore upstream production.[170] Between 1998 and 2001, the state restructured the petroleum industry and converted CNPC and Sinopec into vertically integrated firms in preparation for China's entry into the World Trade Organization, but it did so by exchanging assets between CNPC and Sinopec along geographical lines.[171] As a result of the restructuring, CNPC and

---

167. For example, Shanghai Bell, which lost out in the competition with Huawei and ZTE, was absorbed by Guoxin, the holding company established by SASAC to consolidate the central SOEs. *See supra* note 87 and accompanying text.

168. *See supra* notes 141–144 and accompanying text.

169. *See supra* note 153 and accompanying text.

170. *See* KONG, *supra* note 129, at 14.

171. *See id.* at 15.

Sinopec were assigned separate business territories, with CNPC concentrating in the north and Sinopec concentrating in the south.[172]

In the telecommunications industry, since 1994 the state has engaged in a continuous process of breaking up SOEs along product or geographical lines, reshuffling industry assets, and merging state enterprises.[173] But all of the activities still have not resulted in nationwide competition among firms across all product lines.[174] A similar pattern of breaking up a massive SOE into smaller units along geographical lines exists in the power-generating industry[175] as well as in public utilities.[176]

The power of incumbency can also be seen in the marginalization of emerging firms that attempt to compete with incumbents but fail due to the lack of state support. An example is the fate of China's privately owned airlines. Following the issuance of a government guidance document aimed at encouraging private firms to enter SOE-dominated sectors,[177] six privately owned air-

---

172. *See id.*

173. In 1994, the state created a new telecommunications carrier, China Unicom, to compete with China Telecom, the business arm of the Ministry of Post and Telecommunications. *See* Zheng, *supra* note 59, at 668 n.111. In 2000, the state broke up China Telecom along product lines, with four successor companies—China Telecom, China Mobile, China Netcom, and China Satellite—being assigned business areas in landline, mobile, broadband internet, and satellite businesses, respectively. *See id.* at 701–02 & n.251. In 2002, the already slimmed-down China Telecom was further broken up—this time along geographical lines—into China Telecom Northern, which was merged into China Netcom, and China Telecom Southern, which retained the name China Telecom. *See id.* In 2008, the state reshuffled the telecommunications industry once again, creating three nationwide firms—China Telecom, China Unicom, and China Mobile. *See id.*

174. In 2009, the Ministry of Industry and Information Technology (MIIT) redivided the nationwide landline market between China Telecom and China Unicom, again along geographical lines. The MIIT assigned ten provinces in northern China and the province of Sichuan and the City of Chongqing in southern China to China Unicom, and assigned twenty provinces in southern China and the City of Beijing in northern China to China Telecom. *See Gōngxìnbù Huàdìng Yùnyíngshāng Jīngyíng Fànwéi: Diànxìn Liántōng "Gējù" Nánběi* [*MIIT Divides Business Territories for Carriers: China Telecom and China Unicom Assigned Southern and Northern China Respectively*], XĪNHUÁ WǍNG [NEW CHINA NET] (Mar. 18, 2009, 08:31:28), http://news.xinhuanet.com/fortune/2009-03/18/content_11029184.htm.

175. When the State Power Corporation was broken up in 2002, its assets were allocated to five successor companies that acquired a strong presence in their respective regional power markets. Among the five successor companies,

> Datang retained its strength in the north of China, near the coal supplies; Huaneng was strong along the east coast; and Huadian was well represented in Shandong Province. . . . China Power Investment was the only one of the five with significant nuclear capacity, and Guodian was an important player in wind power.

OECD, BOUNDARY, *supra* note 6, at 236.

176. The power-transmission and distribution assets of the State Power Corporation were allocated in 2002 to two successor power grids along geographical lines, with State Grid Corporation taking over the majority of the regional grids in China and China Southern Power Grid Company taking over assets in the far south of the country. *See id.*

177. *See Guówùyuàn Guānyú Gǔlì Zhīchí Hé Yǐndǎo Gètǐ Sīyíng Děng Fēi Gōngyǒuzhì Jīngjì Fāzhǎn de Ruògān Yìjiàn* [*State Council's Opinions on Encouraging, Supporting, and Guiding the Economic Development of Individual, Private, and Other Nonpublic Sectors*], ZHŌNGHUÁ RÉNMÍN GÒNGHÉGUÓ ZHŌNGYĀNG RÉNMÍN ZHÈNGFǓ [CENTRAL PEOPLE'S GOVERNMENT OF THE PEOPLE'S REPUBLIC OF

lines came into operation after 2005.[178] But the new airlines were unable to compete with SOE incumbents, which had been allocated the most lucrative routes.[179] In the wake of the 2008–2009 global financial crisis, SOE incumbent airlines, but not the private carriers, received major government subsidies.[180] Within a short period of time, most of the privately owned airlines were either liquidated, acquired by SOE carriers, or in serious financial difficulty.[181]

This is not to say, however, that new firms cannot compete with entrenched SOEs. Some large, successful private firms have emerged in industries with strong SOE incumbents, but they did so principally in new markets—markets not controlled from the outset by SOE incumbents. Where POEs demonstrate growth potential and technological innovation in markets valued by the state, their rise has not been blocked; indeed, it has been nurtured, particularly at the local level. SOE incumbents, inured to the rents they have captured, generally lack the acumen and incentives to anticipate or create new markets. Private firms have developed to fill the void. Once POEs have become entrenched in a new market with the backing of the state, it is difficult for SOEs to unseat them, despite their natural advantages.

Examples of POEs dominating new markets in China are plentiful. Baidu, China's largest Internet search engine, spearheaded the Internet search market in China when that market was still in its infancy.[182] AliPay, a third-party online payment platform owned by the e-commerce giant, Alibaba Group, became the largest player in China's emerging online payment market despite the dominance of state-owned banks in the traditional banking market.[183] Private firm ENN Group, China's largest downstream natural gas supplier, achieved its initial success by distributing natural gas to city residents through pipelines at a time when most city residents in China either did not use natural gas at home or

---

CHINA] (Aug. 12, 2005), *available at* http://www.gov.cn/zwgk/2005-08/12/content_21691.htm (promulgated by the St. Council, Feb. 19, 2005).

178. *See* Zheng, *supra* note 59, at 661 n.77.

179. *Id.* at 661 n.78. Chunqiu Airlines, one of the six private carriers, was forced to reassign airplanes away from its Shanghai hub due to its inability to obtain more routes to and from the city. *See id.*

180. *See id.* at 661 n.79.

181. *See id.* at 662.

182. For discussions of Baidu's history and business models, see HUIYAO WANG, GLOBALIZING CHINA: THE INFLUENCE, STRATEGIES AND SUCCESSES OF CHINESE RETURNEE ENTREPRENEURS 94–95 (2012). When Baidu was first founded in 2000, the number of Internet users in China was estimated to be 16.9 million. *See* JOHN WONG & NAH SEOK LING, CHINA'S EMERGING NEW ECONOMY: THE INTERNET AND E-COMMERCE 18 (2001). By the middle of 2012, that number was 538 million. *See* Jon Russell, *Internet Usage in China Surges 11%*, USA TODAY (July 19, 2012, 9:15 AM), http://usatoday30.usatoday.com/tech/news/story/2012-07-19/china-internet-usage/56329450/1.

183. *See* LIU SHIYING & MARTHA AVERY, ALIBABA: THE INSIDE STORY BEHIND JACK MA AND THE CREATION OF THE WORLD'S BIGGEST ONLINE MARKETPLACE 137–41(2009) (discussing AliPay's history and business models).

had it distributed in tanks.[184] ENN Group acquired its dominant market position after it was able to secure franchise rights from over ninety cities across China.[185] By contrast, CNPC, China's main upstream natural gas supplier, was late in entering the downstream residential market; it had to use its monopoly on upstream natural gas supply to pressure provinces and cities into granting it franchise rights for downstream distribution.[186]

Large firm development in China, therefore, illustrates a large measure of path dependence, with SOE incumbents dominating certain traditional industries and state-favored POEs controlling newer markets and industries. It also demonstrates adaptation to the institutional environment. In a state-centered ecosystem, successful private firms are the ones that have learned to ingratiate themselves with the state. This suggests a survivorship bias at work in the Chinese economy: State capitalism generates considerable institutional isomorphism between SOEs and POEs in regard to their business strategies and relationship with the state. By contrast, firms that have failed to master the capture economy or sought autonomy from the state are disproportionately marginalized.

## III. IMPLICATIONS

The foregoing analysis raises far-reaching implications for a host of theoretical, policy, and legal issues. Across all of these realms, the prevailing focal point is the existence and extent of the state's equity ownership in a firm. In this dichotomous world, theorists and policy makers either check the SOE Box or the POE Box, and a variety of implications follow from that fundamental choice. If, as we have discussed, this exercise is largely unrevealing of the Chinese state's influence on and connections to a particular business enterprise, then this entire construct needs to be rethought.

### A. THEORY

The emergence of state capitalism in the global economy has exposed limitations in the standard state-versus-private taxonomy of enterprise ownership.[187] Not only have some SOEs proven to be formidable global competitors, a far cry from the "grotesque failure" of state ownership in the era of central

---

184. See "Ránqì Dàwáng" Wèihé Xiǎng Tuìxiū [Why the "King of Natural Gas" Wants to Retire], XĪNHUÁ WǍNG [NEW CHINA NET] (July 4, 2011, 09:08:02), http://news.xinhuanet.com/fortune/2011-07/04/c_121618110.htm.

185. Id.

186. See SHENG HONG & ZHAO NONG, supra note 117, at 152–54 (discussing CNPC's efforts to marginalize downstream natural gas suppliers through leveraging its control on upstream natural gas supply).

187. See Shleifer, State Versus Private Ownership, supra note 5, for an example of analysis based on a stark state-versus-private taxonomy. At the time most of this literature was produced, this simple taxonomy was adequate to explain prevailing firm types.

planning,[188] but the theoretical underpinnings of the taxonomy seem increasingly impoverished in light of developments over the past decade. For example, scholars have explored an undertheorized organizational alternative that is prevalent in state capitalist economies: Enterprises with mixed state and private ownership structures—that is, private investment in firms controlled by the state.[189] They hypothesize that mixed ownership, under circumstances such as weak regulatory institutions, provides an attractive alternative to the typical pattern in which private ownership of the firm is coupled with government regulation of its activities.[190] Examples of mixed ownership strategies in the Chinese context are explored in section I.A of this Article and appear to support the contention that these organizational forms are developed at least in part as a response to gradual privatization programs carried out in a weak regulatory environment, in which government backing remains a crucial element of a firm's success and protection.

Our analysis has highlighted a complementary organizational consequence of state capitalism as practiced in China: Ownership of the firm *as such* provides relatively little information about the degree of autonomy the firm enjoys from the state. In the classic Grossman and Hart formulation, "Ownership is the purchase of . . . residual rights of control."[191] But because the Chinese party-state retains (relatively undefined) residual control rights in firms of all types, corporate "ownership" is less central to understanding the attributes of the Chinese firm as compared to firms operating under market-neutral institutions and relatively robust constraints on state intervention.

The diluted impact of ownership on the Chinese firm provides an illustration of the by-now familiar point that institutions matter.[192] But our analysis has highlighted an underappreciated way in which the incentive effects generated by the institutions of Chinese state capitalism matter: By blurring the distinction between state and private enterprise. Scholars and policy analysts have widely assumed that private firms by definition have more incentives to be innovative than state-owned firms.[193] And they have often used corruption as a sweeping placeholder for the incentive effects operating on firms in low quality institutional environments.[194] We have provided a much richer perspective, in which the institutions of Chinese state capitalism cause all large successful firms,

---

188. *Id.* at 135.

189. *See, e.g.,* Mariana Pargendler et al., *In Strange Company: The Puzzle of Private Investment in State-Controlled Firms,* 46 CORNELL INT'L L.J. 569 (2013).

190. *See id.* at 578–91.

191. Grossman & Hart, *supra* note 2, at 692.

192. According to Douglass North, institutions play an instrumental role in economic development. *See* Douglass C. North, *Economic Performance Through Time,* 84 AM. ECON. REV. 359, 366 (1994) ("It is the admixture of formal rules, informal norms, and enforcement characteristics that shapes economic performance.").

193. *See, e.g.,* Shleifer, *State Versus Private, supra* note 5, at 135 ("[P]rivate ownership is the crucial source of incentives to innovate and become efficient . . . .").

194. *See id.* at 143–44.

irrespective of ownership, to share similar incentives and to be positioned nearly identically in relation to the state. Underdeveloped legal and political institutions do lead to corruption as one mechanism of capture, but in China, growth potential, due to its close association with political legitimacy, is the key currency with which to obtain state backing irrespective of ownership.

This insight reinforces conclusions about China's unorthodox developmental path that one of us has reached in separate co-authored works.[195] The alliances formed by the party-state with firms offering growth potential, regardless of ownership, and the role of the party-state in funding, incentivizing, and monitoring the managers of such firms, is reminiscent of a private equity partnership.[196] Moreover, the integration of a large swath of the entrepreneurial population into the formal structures of party-state governance, which is documented in our Appendices, calls to mind Mancur Olson's concept of an "encompassing coalition"—a group representing a large enough segment of the population that it has incentives to grow the pie.[197] By creating dense networks of managerial elites permeating both politics and business in China, an encompassing coalition has been created with control over developmental policy formation and implementation.[198]

### B.  POLICY

Rent seeking, like productive innovation, is ultimately a product of institutions. Thus, as we elaborate below, reform-minded analysts and policy makers would do well to focus less on privatization of SOEs and shrinking the size of the state sector—a common prescription—than on changing the incentives generated by the institutions of Chinese state capitalism.

### 1.  China's Domestic Economy

As China's investment-driven economy matures, economic growth and competitiveness will increasingly depend on the ability of Chinese firms to move up the value chain. Innovation and productivity will be central to this effort, and thus the future dynamism of the Chinese economy will depend in large measure on the country's capacity to foster entrepreneurship and to nurture enterprises that direct more efforts toward generating consumer surplus than to cozying up to the state. Chicago school economist, Gary Becker, sums up the situation thus:

> China's new leaders have now made clear that the country needs to rely much more on the creativity and resourcefulness of the private sector if it is to move beyond middle income status, and become a major economic power as

---

195. *See, e.g.*, Ronald J. Gilson & Curtis J. Milhaupt, *Economically Benevolent Dictators: Lessons for Developing Democracies*, 59 AM. J. COMP. L. 227 (2011); Lin & Milhaupt, *supra* note 8.

196. *See* Gilson & Milhaupt, *supra* note 195, at 262.

197. *See* MANCUR OLSON, THE RISE AND DECLINE OF NATIONS: ECONOMIC GROWTH, STAGFLATION, AND SOCIAL RIGIDITIES 48 (1982).

198. Lin & Milhaupt, *supra* note 8, at 708.

> measured . . . by per capita GDP. It remains to be seen whether even the new
> leaders can overcome the strong opposition of SOEs and other special interest
> groups to the implementation of a major shift toward the private sector.[199]

As Becker suggests, SOEs are typically seen as the major obstacle to a move toward a private-sector driven economy. Ironically, our analysis suggests that, in China's current institutional environment, the "private sector" poses equally formidable obstacles to this transformation. Chinese state capitalist institutions do encourage private entrepreneurs to innovate and to explore new markets, and private firm innovation has undoubtedly contributed significantly to China's economic growth. But once innovative entrepreneurs become acclimated to state largesse and protection, it is to be expected that many will shift focus to maintaining the privileges of incumbency.[200] Even if innovative private firms increasingly chafe at the strings that come with state support and affiliation, it is unlikely that they can become an independent force for institutional reform in the current political climate.

Does ownership matter when considering obstacles to China's institutional development? In other words, does it matter whether SOEs or POEs have captured state power and largesse? Any influential firm—whether SOE, POE, or a mixed-ownership enterprise—will resist reforms that threaten its privileged position in the economy. From this perspective, that not only SOEs but also large swaths of the private sector have vested interests in the status quo bodes ill for the development of a truly entrepreneurial economy in China. It is plausible that potential improvement in the quality of China's institutions is less threatened, or even favored, by firms that are free of government ownership. As compared to SOEs, POEs have a smaller stake in defending the political and ideological predilection for pervasive state intervention in the economy.[201] But as noted above, even assuming the motivation to do so, private firms abandoning state support have little prospect of constituting a reform-oriented interest group.

Closely related to this question is the so-called *guo jin min tui* (the state advances, the private sector retreats) debate. Critics assert that the Chinese government has failed to deliver on its commitment to the creation of a market economy, made in connection with China's accession to the WTO in 2001.[202] By some measures and in the perception of many, over the past decade the

199. Gary Becker, *China's Tilt Toward the Private Sector?*, BECKER–POSNER BLOG (May 26, 2013, 4:48 PM), http://www.becker-posner-blog.com/2013/05/chinas-tilt-toward-the-private-sector-becker.html.

200. For example, research indicates that once a POE receives a government subsidy, it tends to continue receiving subsidies in subsequent years. *See* FORNEY & KHAWAJA, *supra* note 99, at 3.

201. As the European Commission has observed of Chinese firms, "[T]he possibilities for SOEs to act completely independently might be more limited than for private enterprises . . . ." Commission Decision No. COMP/M.6113 (DSM/Sinochem/JV) ¶ 24 (May 19, 2011).

202. *See, e.g., Ten Years in the WTO: Has China Kept Its Promises?: Hearing Before the Cong.-Exec. Comm'n on China*, 112th Cong. 27–28 (2011) (statement of Alan H. Price, Partner and Chair,

state's role in the economy has actually expanded, to the detriment of market-oriented institutions and private enterprise.[203] Defenders of current policy assert that the *guo jin min tui* concept is based on a one-sided perspective of the ownership of enterprise and a "false proposition" because the state and private sectors are complementary.[204]

Our analysis presents a more nuanced perspective on the *guo jin min tui* phenomenon than the views above. Conceptually, it is true that the *guo jin min tui* critique may have overemphasized the ownership of enterprise—precisely the tendency we have argued is to be avoided in analyzing Chinese firms. But our analysis does not support the view that the state and private sectors in China, as currently constituted, are complementary. They are potentially complementary only if the state sector is equated simply with the state-*owned* sector, as is common among analysts.[205] But our analysis suggests that the *size* of the state-owned sector is not an accurate measure of the *impact* of state capitalism on the Chinese domestic economy. Considering the incentive effects of the institutional environment, the state and private sectors are anything but complementary; rather, a state-centered ecology creates a vacuum siphoning oxygen out of the private sector, generating large "private" firms that are avatars of state-owned enterprises.

Thus, a shift toward the creation of a true private sector in China will require more than the commonly proffered prescriptions of privatizing SOEs and shrinking the state's share of the economy. It will require the formation of robust market-neutral institutions: a corporate law that permits entrepreneurs to contract away from state-favored organizational forms, a robust and neutrally enforced antimonopoly law, and elimination of preferential access to bank finance and the capital markets for state-favored firms, to name a few key reforms. As the World Bank's influential report, *China 2030*, argues, "As an economy approaches the technology frontier and exhausts the potential for acquiring and applying technology from abroad, the role of the government and its relationship to markets and the private sector needs to change fundamentally."[206] Our analysis indicates that the state sector must be curtailed, not principally through changes in ownership, but through massive institutional reforms that foster the growth of firms without deep ties to the party-state.

---

International Trade Practice, Wiley Rein, LLP) (criticizing China's continued state ownership and control over key segments of its economy as contrary to its WTO commitments).

203. *See, e.g.*, SHENG HONG & ZHAO NONG, *supra* note 117, at 154–56 (discussing the dangers of the advancement of state-owned enterprises in China).

204. *Economist Defends Relationship Between SOEs, Private Firms*, CHINA DAILY (May 12, 2012, 16:29), http://www.chinadaily.com.cn/business/2012-05/12/content_15277374.htm (quoting economist Hu Angang as arguing that the widening development gap between the state-owned sector and the private sector is a "false proposition").

205. *See, e.g.*, *China's State Capitalism: Not Just Tilting at Windmills*, ECONOMIST, Oct. 6, 2012, http://www.economist.com/node/21564235.

206. WORLD BANK & DEV. RESEARCH CTR. OF THE STATE COUNCIL, THE PEOPLE'S REPUBLIC OF CHINA, CHINA 2030: BUILDING A MODERN, HARMONIOUS, AND CREATIVE SOCIETY xxi (2013).

But here the dynamics of capture again rear their ugly head. China's incremental economic reforms in the past three decades have led to the entrenchment of interest groups—perhaps an inevitable consequence of any gradualist transition model.[207] Even if the top political leadership is serious about altering the state's relationship to the economy, a large class of powerful interests—again, comprised not only of SOE incumbents but of private entrepreneurs deeply connected to the party-state as well—is positioned to undermine the impact of market-neutral policies.[208] Worse yet, if gradualism leads to the public perception that market reforms benefit only the well connected, the state may be prompted to backtrack on reforms in response to popular discontent.[209] Increased state intervention could prompt more rent seeking, resulting in a "political 'vicious circle.'"[210] In light of these complexities, our analysis casts doubt on how far China can go in reducing the role of the state in its economy without significant political reforms.[211]

## 2. Host Countries Receiving Chinese Investment

Barring a major shift toward a truly private-sector driven economy in China, regulators and policy makers around the world will likely face more conundrums of the sort posed by Huawei and ZTE—commercially oriented, globally active firms that nonetheless have deep connections to the Chinese party-state.

---

207. For analysis of the perils of the gradualist transition model, see generally SERGUEY BRAGUINSKY & GRIGORY YAVLINSKY, INCENTIVES AND INSTITUTIONS: THE TRANSITION TO A MARKET ECONOMY IN RUSSIA (2000); MINXIN PEI, CHINA'S TRAPPED TRANSITION: THE LIMITS OF DEVELOPMENTAL AUTOCRACY (2006); Joel S. Hellman, *Winners Take All: The Politics of Partial Reform in Postcommunist Transitions*, 50 WORLD POL. 203, 232–33 (1998).

208. The government's failure to open up China's monopoly industries to private investment illustrates the power of special interests. *See supra* section II.C. Following the issuance of a 2005 guidance document aimed at encouraging private investment in China's monopoly industries, in 2010, the State Council made renewed efforts to relax market entry restrictions against private firms by issuing another guidance document. *See Guówùyuàn Guānyú Gǔlì Hé Yǐndǎo Mínjiān Tóuzī Jiànkāng Fāzhǎn de Ruògān Yìjiàn* [*State Council's Opinions on Encouraging and Guiding the Healthy Development of Private Investments*], ZHŌNGHUÁ RÉNMÍN GÒNGHÉGUÓ ZHŌNGYĀNG RÉNMÍN ZHĒNGFǓ [CENTRAL PEOPLE'S GOVERNMENT OF THE PEOPLE'S REPUBLIC OF CHINA] (May 13, 2010), *available at* http://www.gov.cn/zwgk/2010-05/13/content_1605218.htm (promulgated by the St. Council, May 7, 2010). The new efforts, however, have not yielded concrete progress to date. *See "Xīn 36 Tiáo" Xuán ér Wèi Luò* ["*New Thirty-Six Articles" Issued But Not Implemented*], CÁIJĪNG ZÁZHÌ [CAIJING MAG.] (May 22, 2011, 22:17), http://magazine.caijing.com.cn/2011-05-22/110726162.html.

209. There are signs that this is already taking place, as a "new left" movement in China is increasingly criticizing the party's current policies for widening inequality and breeding social unrest. *See* Brian Spegele, *China's "New Left" Grows Louder*, WALL ST. J. (Oct. 5, 2012, 7:08 PM ET), http://online.wsj.com/article/SB10000872396390443493304578038121620762516.html.

210. Krueger, *supra* note 120, at 302.

211. China's former premier repeatedly called for political reforms—an indication that the Chinese leadership recognizes that further economic reforms require new political institutions. *See* Malcolm Moore, *Wen Jiabao Promises Political Reform for China*, TELEGRAPH (Oct. 4, 2010, 5:35 AM BST), http://www.telegraph.co.uk/news/worldnews/asia/china/8040534/Wen-Jiabao-promises-political-reform-for-China.html; Michael Wines, *Wen Calls for Political Reform but Sidesteps Details*, N.Y. TIMES, Mar. 14, 2012, http://www.nytimes.com/2012/03/15/world/asia/china-wen-jiabao-calls-for-political-reform.html.

As China's "go global" policy accelerates, other Chinese firms will have to convince skeptical foreign governments that their motives and strategic orientation are purely commercial and not aimed at siphoning technologies or controlling natural resources for the benefit of the Chinese state. This is a collateral cost of state capitalism, borne by all globally active Chinese firms, whether SOE, POE, or a mixed-ownership blend. The House Select Committee investigation of Huawei and ZTE underscores this collateral cost. The committee's findings on the links between these firms and the Chinese government were far from conclusive, but in the absence of more information, doubts were resolved in favor of the Committee's suspicions that "Huawei and ZTE cannot be trusted to be free of foreign state influence and thus pose a security threat to the United States and to our [telecommunications] systems."[212]

The controversy over a Chinese acquisition of a U.S. meat producer suggests that state capitalism imposes costs on globally active Chinese firms even where sensitive technology or critical infrastructure is not involved. In May 2013, Shuanghui, a privately owned Chinese meat processor, announced a deal to acquire Smithfield, the largest pork producer in the United States.[213] The taint of suspicion over Shuanghui's motives clouded announcement of the deal and led to a Senate hearing on the transaction.[214] Shuanghui, like many private firms in China, emerged out of state ownership, having been publicly listed in 2006.[215] As with Huawei and ZTE, controversy focused on whether Shuanghui was still effectively under the control of the Chinese government and the Communist Party, such that the acquisition was a Trojan horse bringing any number of potential problems to the United States, such as technology theft, predatory pricing, and contamination of the food supply.[216] The U.S.–China Economic and Security Review Commission noted that Wan Long, Shuanghui's chairman and major shareholder of the entity used for the management buyout in the privatization process, is a member of the Communist Party and a delegate

---

212. ROGERS & RUPPERSBERGER, *supra* note 36, at vi–vii.

213. Michael J. de la Merced, *A Mystery of Smithfield's Big China Deal: What Continental Grain Will Do*, N.Y. TIMES (May 30, 2013, 4:30 PM), http://dealbook.nytimes.com/2013/05/30/a-mystery-of-smithfields-big-china-deal-what-continental-grain-will-do.

214. Michael J. de la Merced, *Senate Agriculture Committee Calls Hearing on Smithfield Deal*, N.Y. TIMES (June 27, 2013, 12:12 PM), http://dealbook.nytimes.com/2013/06/27/senate-agriculture-committee-calls-hearing-on-smithfield-deal.

215. Currently, Shuanghui's management owns 36% of the equity, but those shares have greater voting rights than other shares. Its other major shareholders are CDH, a Chinese private equity firm (34%), Goldman Sachs (5%), New Horizon, a Chinese private equity firm founded by the son of China's former premier (5%), and Temasek, the Singapore sovereign wealth fund (3%). Chao Deng, *Smithfield Buy Could Help Shuanghui Owners Exit*, WALL ST. J. (June 3, 2013, 5:46 AM ET), http://blogs.wsj.com/moneybeat/2013/06/03/smithfield-buy-could-hel-shuanghui-owners-exit.

216. Consider this comment: The Shuanghui bid "is so wrapped up in previous and current government control or strategy that it cannot be considered a free market transaction. Goldman Sachs should not be allowed to launder China's SOEs for global foreign investment purposes." Michael Stumo, *Mapping China's Foreign Investment—and the Smithfield Deal*, TRADE REFORM (June 4, 2013), http://www.tradereform.org/2013/06/mapping-chinas-foreign-investment-and-the-smithfield-deal.

to the National People's Congress.[217] Commenting skeptically on the proposed transaction, the Commission concluded, "A final concern is that Shuanghui is an instrument for the Chinese government's industrial policy."[218]

Suspicions about foreign investments by Chinese firms, regardless of ownership, are likely to remain as long as the state retains equity interests in ostensibly private enterprises; the government routinely provides subsidies and privileged market access to state-linked firms; and it is common practice for senior executives at major firms, SOE or POE, to be affiliated with the party-state in various capacities. In short, suspicions about foreign investments by Chinese firms will linger as long as the institutional foundations of Chinese state capitalism remain intact.

### 3. International Trade and Investment Regimes

The global trade and investment regimes rely heavily on ownership-based distinctions among firms. To list just a few examples, the Model Bilateral Investment Treaty of the United States, published in April 2012, attempts to discipline the preferential treatment of SOEs.[219] SOEs have cropped up as an important issue in the negotiation of free trade agreements (FTAs) as the United States and the European Union seek to create special rules to regulate the market distorting activities of state-owned firms that are not adequately addressed by existing trade and investment regimes. And the OECD's "competitive neutrality" project pivots on ownership.[220] The project's premise is that

> [g]overnments may create an uneven-playing field in markets where state-owned enterprises (SOE) compete with private firms, as they have a vested (direct or indirect) interest in ensuring that state-owned firms succeed. . . .
> . . . In the current context the ownership issue is limited to the state and is applied to the activities of all types of government-owned bodies that are actually or potentially competing with private operators in any market . . . .[221]

---

217. *See* U.S.–CHINA ECON. & SEC. REVIEW COMM'N. MONTHLY SUMMARY OF U.S.–CHINA TRADE DATA 7 (2013), *available at* http://origin.www.uscc.gov/sites/default/files/trade_bulletins/June%202013%20 Trade%20Bulletin_6%207%2013.pdf.

218. *Id.*

219. *See* 2012 U.S. Model Bilateral Investment Treaty, OFFICE OF THE U.S. TRADE REPRESENTATIVE (Apr. 20, 2012), http://www.ustr.gov/sites/default/files/BIT%20text%20for%20ACIEP%20Meeting.pdf.

220. *See* ORG. FOR ECON. CO-OPERATION & DEV., COMPETITIVE NEUTRALITY: A COMPENDIUM OF OECD RECOMMENDATIONS, GUIDELINES AND BEST PRACTICES 13 (2012).

221. *Id.* Note, however, that some OECD research on the subject has taken a holistic view of these challenges. An OECD policy paper, while focused on SOEs, makes clear that the problem of "national champions" receiving preferential treatment by home governments is not limited to SOEs, but can extend to private firms. Antonio Capobianco & Hans Christiansen, *Competitive Neutrality and State-Owned Enterprises: Challenges and Policy Options* 30 (OECD Corporate Governance, Working Paper No. 1, 2011), *available at* http://www.oecd-ilibrary.org/docserver/download/5kg9xfgjdhg6.pdf?expires= 1421632592&id=id&accname=guest&checksum=404DF23FAB29AF738F37C3F32F07D42F.

Similarly, analysis of China's foreign direct investment is often based on simple ownership taxonomies. A recent, widely cited report highlighted a major increase in investment in the United States by private Chinese firms.[222] However, "private" firms were defined in the report as those with less than twenty percent government ownership.[223]

If, as we have argued, the dichotomy between SOE and POE is a false one in the Chinese institutional context, then ownership-based analyses of and policy responses to the rise of Chinese firms in the global economy are likely to be imprecise and possibly misdirected. Our discussion suggests that the SOE–POE dichotomy is simply unworkable in the Chinese context and should be abandoned. Unfortunately, there is no easy substitute for this shorthand analytic device. But the first step in understanding the ecology of corporate capitalism in China is moving away from ownership-based distinctions and focusing on the impact of party-state influence on firm incentives, and on firm-state connections beyond the realm of equity ownership. As we explore below, this step is crucial for reform of several legal regimes relevant to Chinese firms in the global economy.

### C.  LAW

The rise of Chinese state capitalism poses challenges not only for policy makers, but also for courts, administrative agencies, and dispute settlement tribunals around the world. These institutions must grapple with complex issues raised by Chinese firms—newly active global players rising out of a domestic system that does not operate according to prevailing assumptions about the market–state boundary or settled notions about ownership and security of property rights. Yet confronted with these issues, many regulatory and legal regimes tend to use the blunt gauge of enterprise ownership to demarcate the boundary of the Chinese state. We previously noted a U.S. federal court's difficulty in accepting a government compulsion argument in an antitrust case based on informal Chinese norms and extralegal government control of private firms.[224] Ownership-based analyses are now a standard feature in multiple areas of economic regulation, including the antitrust, anticorruption, and antisubsidy regimes. Without attempting a comprehensive analysis of these regimes, we briefly discuss below the ownership bias in these areas of law and the resulting

---

222. *See* Thilo Hanemann, *Chinese FDI in the United States: Q1 2013 Update*, RHODIUM GROUP (Apr. 30, 2013), http://rhg.com/notes/chinese-fdi-in-the-united-states-q1-2013-update ("In the past 15 months private Chinese firms spent more on US deals than in the 11 years before combined. In the same period they accounted for 80% of transactions and 50% of total transaction value, a dramatic change compared to previous years when state-owned firms dominated Chinese capital flows to the US.") A representative media account of this report is David Welch et al., *Smithfield Stoking U.S. Unease Belies Benefit of China Deals*, BLOOMBERG (June 7, 2013, 4:12 PM ET), http://www.bloomberg.com/news/201 3-06/smithfield-stoking-u-s-unease-belies-benefit-of-chinese-deals.html (noting that "[p]rivate companies are also freer of government influence").

223. Hanemann, *supra* note 222.

224. *See supra* notes 112 and accompanying text.

difficulty of addressing issues raised by Chinese firms under existing legal frameworks.

1. Antitrust

Antitrust law is the leading edge in the developed West's encounter with Chinese state capitalism. In addition to muddling analysis in the state compulsion doctrine as noted above, the nebulous market–state boundary in China poses challenges for merger analysis and potentially for analysis of horizontal agreements as well.

In merger review, the conventional framework, which takes the individual firms that are parties to the merger as the unit of analysis, has proven inadequate when a Chinese SOE is a party to the merger. In theory, the Chinese state owns all SOEs. The question for antitrust regulators is thus whether the entire SOE sector should be considered a single economic entity, such that the relevant unit of analysis is all SOEs in the sector in question.

The Australian Competition and Consumer Commission (ACCC) grappled with this question in its evaluation of a proposed alliance between Rio Tinto and state-owned China Aluminum Corporation, or Chinalco.[225] When evaluating the competitive impact of the proposed transaction, the ACCC considered whether the proposed transaction would likely affect iron ore prices by providing Chinalco with the incentive and ability to reduce iron ore prices below competitive levels to benefit Chinese steel mills. The ACCC pointed out that Chinalco might have such an incentive if Chinalco, the Chinese government, and Chinese steel mills operate as a "single entity."[226] The ACCC determined that if they do constitute a single entity, it might be worthwhile for Chinalco to pursue such a strategy because the loss to Chinalco as a shareholder of Rio Tinto would likely be offset by gains to the Chinese steel mills.[227] However, the agency estimated that Rio Tinto would not have the ability to unilaterally influence global iron ore prices to a significant extent.[228] Therefore, it concluded that it was not necessary to conduct the single-entity analysis.[229]

This "recognize-but-dodge" approach has also been adopted by the European Commission. Recital 22 of the Preamble to the European Merger Regulation provides that in the evaluation of mergers involving SOEs, account has to be taken of the "undertakings making up an economic unit with an independent power of decision, irrespective of the way in which their capital is held or of the rules of administrative supervision applicable to them."[230] As a result, the

---

225. *See* AUSTL. COMPETITION & CONSUMER COMM'N, PUBLIC COMPETITION ASSESSMENT: CHINALCO (ALUMINUM CORPORATION OF CHINA) (2009), http://www.accc.gov.au/content/index.phtml/itemId/866064/fromItemId/751043.

226. *Id.* ¶ 37.

227. *See id.* ¶ 40.

228. *See id.* ¶ 41.

229. *See id.* ¶ 42.

230. Council Regulation 139/2004, 2004 O.J. (L 24) ¶ 22 (EC).

European Commission looks beyond the nominal shareholding and governance structures of SOEs, and focuses instead on whether SOEs have an "independent power of decision."[231] In several merger cases involving Chinese SOEs,[232] however, the European Commission dodged this inquiry. In one recent case, for example, China National Bluestar, a Chinese SOE, proposed to acquire Elkem, a Norwegian silicon producer. China National Bluestar is a subsidiary of China National Chemical Corporation (ChemChina), a central SOE overseen by SASAC.[233] The parties to the acquisition submitted evidence that ChemChina has independent power of decision from the Chinese state, at both the central and local government levels.[234] After a lengthy examination of the competitive position of Elkem versus China National Bluestar, ChemChina, and other Chinese SOEs, the European Commission concluded that "the proposed transaction would not lead to any competition concerns even if ChemChina and other SOEs operating in any of the markets concerned, under the Central and Regional SASACs, were to be regarded as one economic entity."[235] According to the European Commission, therefore, "it is not necessary to conclude definitively on the ultimate control of ChemChina."[236]

Although the ACCC and the European Commission disposed of these cases in a manner that obviated the need for factual inquiries into the control of Chinese SOEs, they did recognize, as a matter of principle, that state ownership is not synonymous with state control. This approach avoids the ownership bias of treating SOEs as the alter ego of the state by virtue of equity ownership alone. But these regulators exhibit a quintessential ownership bias in the sense that only SOEs are subject to heightened scrutiny.[237] For instance, in its review of Geely's acquisition of Volvo in 2010, the European Commission approved

---

231. *Id.*

232. *See* Commission Decision No. COMP/M.6141 (China National Agrochemical Corp./Koor Indus./Makhteshim Agan Indus.) (Oct. 3, 2011); Commission Decision No. COMP/M.6113 (DSM/Sinochem/JV) (May 19, 2011); Commission Decision No. COMP/M.6151 (Petrochina/Ineos/JV) (May 13, 2011); Commission Decision No. COMP/M.6082 (China National Bluestar/Elkem) (Mar. 31, 2011). For detailed discussions of the European Commission's analysis in these cases, see Angela Huyue Zhang, *The Single-Entity Theory: An Antitrust Time Bomb for Chinese State-Owned Enterprises?*, 8 J. COMPETITION L. & ECON. 805, 821–24 (2012).

233. *See* Commission Decision No. COMP/M.6082 (China National Bluestar/Elkem) ¶¶ 2–4 (Mar. 31, 2011).

234. *See id.* ¶¶ 18–32. The evidence submitted by the Chinese parties concerned whether SASAC interferes with the strategic decision making of ChemChina, whether SASAC has requested commercial information from ChemChina or otherwise influenced the commercial operations of the company, and whether central SASAC has operational control over local SASACs or firms supervised by local SASACs. *See id.*

235. *Id.* ¶ 34.

236. *Id.*

237. In one EU merger review case, the European Commission stated in a footnote that it analyzed whether the Chinese state could influence the behavior of private Chinese firms active in the industry and determined that it could not. *See* Commission Decision No. COMP/M.6113 (DSM/Sinochem/JV) 6 n.15 (May 19, 2011). The European Commission, however, did not elaborate on the basis of that determination. *See id.*

the transaction on the grounds that there were very limited horizontal overlaps between the activities of Geely and Volvo.[238] The European Commission did not examine whether the Chinese state could influence the activities of Geely, presumably because Geely is privately owned.[239] If the Chinese state could influence the activities of Geely, it would become necessary for the European Commission to examine not only whether there were overlaps between the activities of Volvo and Geely, but also whether there were overlaps between the activities of Volvo and other Chinese firms subject to state influence. The lack of inquiry into the relationships between POEs and the Chinese state is all the more striking in this case given that much of the financing for Geely's acquisition was provided by local governments in China.[240]

If, as our analysis suggests, the institutions of Chinese state capitalism incentivize POEs to behave like SOEs in areas of concern to antitrust regulators, the theoretical premise for applying the "independent power of decision" scrutiny to Chinese SOEs alone may be called into question. Granted, this bright-line rule applying the single-entity test only to SOEs may have been motivated by considerations of administrative efficiency. But given the substantial similarities between SOEs and POEs in China in terms of government influence, an alternative rule would be to submit no Chinese firms, whether SOEs or POEs, to the single-entity test unless there is particular evidence indicating a level of government influence beyond what is normally expected in commercial settings. This alternative rule arguably achieves an equivalent level of administrative efficiency but is better suited to the realities of China's institutional environment.

The ownership bias is even more evident in the antitrust analysis of horizontal agreements. Under the so-called single-entity defense, units of a single economic entity cannot conspire to restrain trade within the meaning of the antitrust laws.[241] In *Copperweld Corp. v. Independence Tube Corp.*, the U.S. Supreme Court held that "an internal 'agreement' to implement a single, unitary firm's policies does not raise the antitrust dangers that §1 [of the Sherman Act] was designed to police."[242] Whether the horizontal agreement in question is an internal agreement among units of a single entity turns on control, proxied primarily by ownership. According to the Supreme Court in *Copperweld*, a parent firm and its wholly owned subsidiary are a single entity because they have a "unity of purpose or a common design," and "the parent may assert full

---

238. *See* Press Release, European Commission, Mergers: Commission Approves Proposed Acquisition of Volvo Cars by Geely and Daqing (July 6, 2010), *available at* http://europa.eu/rapid/press-release_IP-10-904_en.htm.

239. *See id.* Geely appears as number six in a ranking of China's top 100 POEs. *See infra* Appendix I.

240. *See supra* note 1 and accompanying text.

241. Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade." Sherman Antitrust Act, 15 U.S.C. § 1 (2012).

242. 467 U.S. 752, 769 (1984).

control at any moment if the subsidiary fails to act in the parent's best interests."[243] After *Copperweld*, the single-entity defense has frequently barred antitrust claims involving horizontal agreements among members of a single corporate family.[244]

Given the widening global reach of Chinese SOEs, it appears inevitable that someday Chinese SOEs will be accused of conspiracy in violation of section 1 of the Sherman Act, and the SOE defendants may raise the single-entity defense. The difficult question then will be the extent to which Chinese SOEs should be considered units of a single economic entity and therefore immune from section 1 liability. Our analysis suggests that the answer should not turn on ownership alone. Factual inquiries into the actual control of the SOEs—the kind of inquiries the ACCC and the European Commission suggested but did not undertake in the merger context—will be necessary.[245]

An even more perplexing question in horizontal agreement analysis posed by Chinese state capitalism is whether privately owned Chinese firms could ever resort to the single-entity defense. Courts have treated ownership as the primary indicia of corporate control, but U.S. case law has little to say about how ownership and control are related.[246] Indeed, courts have extended single-entity immunity to governance structures not characterized by ownership, including the agency relationship,[247] the franchisor–franchisee relationship,[248] and the relationship between a trade association and its members,[249] among others. In 2010, the U.S. Supreme Court put a halt to this trend in *American Needle, Inc. v. National Football League*, holding that the single-entity defense is not available to the thirty-two member teams of the National Football League when they jointly license their intellectual property rights to apparel manufacturers.[250] But the *American Needle* case did not provide an analytical framework for courts to apply when differentiating between concerted and independent action.[251] So it remains possible, at least in theory, for private Chinese firms not connected by

---

243. *Id.* at 771–72 (internal quotation marks omitted).

244. *See, e.g.*, Eichorn v. AT & T Corp., 248 F.3d 131, 139 (3d Cir. 2001) (extending single-entity immunity to a parent accused of conspiring with a subsidiary it was readying for sale); Davidson & Schaaff, Inc. v. Liberty Nat'l Fire Ins. Co., 69 F.3d 868, 871 (8th Cir. 1995) (extending single-entity immunity to sibling corporations); Leaco Enters., Inc. v. Gen. Elec. Co., 737 F. Supp. 605, 608–09 (D. Or. 1990) (extending single-entity immunity to corporate families with more than ninety percent ownership).

245. Such factual inquiries should focus on whether the government exercises influence over the strategic or operational decisions of the SOEs, irrespective of the state's equity ownership.

246. *See* Dean V. Williamson, *Organization, Control, and the Single Entity Defense in Antitrust*, 5 J. COMPETITION L. & ECON. 723, 726 (2009).

247. *See* Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313, 1317 (8th Cir. 1986).

248. *See* Orson, Inc. v. Miramax Film Corp., 862 F. Supp. 1378, 1386 (E.D. Pa. 1994); Williams v. Nevada, 794 F. Supp. 1026, 1032 (D. Nev. 1992), *aff'd*, 999 F.2d 445 (9th Cir. 1993) (per curiam).

249. *See* Am. Council of Certified Podiatric Physicians & Surgeons v. Am. Bd. of Podiatric Surgery, Inc., 185 F.3d 606, 620–21 (6th Cir. 1999).

250. 560 U.S. 183, 201–02 (2010).

251. *See* Nathaniel Grow, *American Needle and the Future of the Single Entity Defense Under Section One of the Sherman Act*, 48 AM. BUS. L.J. 449, 455 (2011).

common ownership to assert single-entity status if they demonstrate a unity of interest and common control by the Chinese state. This argument may be more plausible in the context of unique Chinese state-capitalism institutions, such as the quasi-governmental industrial associations discussed in section I.C.

2. Anticorruption

The ownership bias can also be seen in the U.S. Foreign Corrupt Practices Act (FCPA). Enacted in 1977, the FCPA prohibits U.S. companies, certain foreign issuers of securities, and any persons in U.S. territory from corruptly making payments to foreign officials for purposes of obtaining or retaining business.[252] The term "foreign official" is defined under the FCPA as

> any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.[253]

Both the Department of Justice and the Securities and Exchange Commission have interpreted the word "instrumentality" in this definition to include state-owned or state-controlled enterprises, making employees of such enterprises foreign officials for purposes of the FCPA.[254]

Our analysis calls into question the appropriateness of this interpretation. As we have discussed, the boundary between SOEs and POEs in China is often so blurred that classification on the basis of equity ownership alone is highly problematic. Even if the ownership type of a Chinese firm can be ascertained with confidence, it is not clear why assignment of a firm to one box in the taxonomy or the other should be relevant for purposes of the antibribery laws. If, as our analysis indicates, SOEs and large POEs in China exhibit substantial similarities in terms of access to the state and integration into the government's policies and priorities, it is conceptually dubious to label all SOEs "instrumentalities" of the state when all large POEs remain outside the scope of the statute.

3. Antisubsidy

Ownership is also a key factor in antisubsidy law. Under the WTO Agreement on Subsidies and Countervailing Measures (SCM Agreement), only a

---

252. *See* 15 U.S.C. §§ 78dd-1 to -3 (2012).

253. *Id.* § 78dd-2(h)(2)(A).

254. *See* Amy Deen Westbrook, *Enthusiastic Enforcement, Informal Legislation: The Unruly Expansion of the Foreign Corrupt Practices Act*, 45 GA. L. REV. 489, 532 n.225 (2011) (internal quotation marks omitted). Note, however, that courts have pushed back against this expansive definition. *See, e.g.*, United States v. Aguilar, 783 F. Supp. 2d 1108, 1115 (C.D. Cal. 2011) (requiring a five-factor test for applying the FCPA to SOE employees).

government or a public body is capable of directly giving subsidies.[255] If a subsidy is given by a private body, it must be demonstrated that the private body is "entrust[ed] or direct[ed]" by a government or a public body in giving the subsidy.[256] When Chinese SOEs are accused of giving subsidies, a challenging question arises as to whether they should be considered a public or private body. Since 2007, the U.S. Department of Commerce (USDOC) has dealt with this question in a series of cases.[257] In *Light-Walled Rectangular Pipe and Tube from People's Republic of China*, for example, USDOC investigated whether certain SOE steel producers provided a subsidy to downstream steel pipe and tube producers by selling steel inputs for less than adequate remuneration.[258] One of the steel input producers was Baosteel, a major SOE. In order to discern whether Baosteel provided a subsidy, USDOC applied a five-factor test to determine whether the firm was a public body: (1) government ownership—because Baosteel was majority-owned by the Chinese government, USDOC concluded that this factor clearly supported the finding that it was a public body;[259] (2) government presence on the board of directors—USDOC noted evidence suggesting that some members of Baosteel's board may have had ties to the government;[260] (3) government control—USDOC determined that the Chinese government provided no information specific to the activities of Baosteel;[261] (4) pursuit of government interest—USDOC cited statements from Baosteel's annual reports referring to the implementation of the government's five-year plan and the government's steel industry policy;[262] and (5) creation by statute—USDOC determined that evidence was insufficient to rule out the possibility that Baosteel was created by statute.[263] Ultimately, USDOC concluded that the Chinese government failed to provide sufficient information

---

255. *See* Agreement on Subsidies and Countervailing Measures art. 1.1, Apr. 15, 1994, 1867 U.N.T.S. 14 ("[A] subsidy shall be deemed to exist if . . . there is a financial contribution by a government or any public body within the territory of a Member . . . .").

256. *Id.* art. 1.1(a)(1)(iv).

257. *See, e.g.*, Certain New Pneumatic Off-the-Road Tires from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Negative Determination of Critical Circumstances, 73 Fed. Reg. 40,480 (July 15, 2008); Laminated Woven Sacks from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination, in Part, of Critical Circumstances, 73 Fed. Reg. 35,639 (June 24, 2008); Light-Walled Rectangular Pipe and Tube from People's Republic of China: Final Affirmative Countervailing Duty Investigation Determination, 73 Fed. Reg. 35,642 (June 24, 2008); Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, 73 Fed. Reg. 31,966 (June 5, 2008).

258. *See* Memorandum from Stephen J. Claeys, Assistant Sec'y for Import Admin., to David M. Spooner, Deputy Assistant Sec'y for Import Admin., on the Final Determination in the Countervailing Duty Investigation of Light-Walled Rectangular Pipe and Tube from the People's Republic of China 8–9 (June 13, 2008), *available at* http://enforcement.trade.gov/frn/summary/prc/E8-14250-1.pdf.

259. *See id.* at 29.

260. *See id.*

261. *See id.* at 30.

262. *See id.*

263. *See id.*

necessary to conduct the five-factor test other than the levels of government ownership of Baosteel.[264] Consequently, the U.S. agency adopted a rule of majority ownership under which Baosteel was determined to be a public body because it was majority owned by the government.[265]

This majority-ownership rule won support at a WTO Dispute Settlement Panel in DS379 that was established to hear China's challenges against the rule, among other issues.[266] Based largely on textual analysis, the WTO Panel interpreted the term "public body" in article 1.1(a)(1) of the SCM Agreement to mean "any entity controlled by a government."[267] The Panel considered government ownership to be "highly relevant" and "potentially dispositive" evidence of government control,[268] and on that basis, upheld USDOC's public-body determinations as to the SOE input suppliers.[269]

On appeal, the WTO Appellate Body reversed the Panel's decision.[270] The Appellate Body held that "evidence of government ownership, in itself, is not evidence of meaningful control of an entity by government and cannot, without more, serve as a basis for establishing that the entity is vested with authority to perform a governmental function."[271] Because USDOC only focused on government ownership and did not comply with its obligation to seek information on the other factors in conducting its five-factor test, the Appellate Body reversed the Panel's finding that China did not establish that USDOC acted inconsistently with the obligations of the United States under article 1.1(1)(a) of the SCM Agreement.[272]

The Appellate Body in DS379 deserves credit for avoiding the common mistake of conflating government ownership with government control. In a subsequent WTO dispute settlement proceeding, DS437, a WTO Dispute Settlement Panel further clarified that the Appellate Body in DS379 intended to move away from a control-based definition of public body.[273] According to the Panel in DS437, the Appellate Body in DS379 equated a public body not with

---

264. *See id.*

265. *See id.*

266. *See* Report of the Panel, *United States—Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, ¶ 8.136, WT/DS379/R (Oct. 22, 2010) ("We find no legal error, in analyzing whether an entity is a public body, in giving primacy to evidence of majority government-ownership.").

267. *Id.* ¶ 8.94.

268. *Id.* ¶ 8.134.

269. *See id.* ¶ 8.142.

270. *See* Report of the Appellate Body, *United States—Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, ¶ 347, WT/DS379/AB/R (Mar. 11, 2011).

271. *Id.* ¶ 346.

272. *See id.* ¶ 340.

273. *See* Report of the Panel, *United States—Countervailing Duty Measures on Certain Products from China*, ¶ 7.72, WT/DS437/R (July 14, 2014) ("Therefore, as noted by the Appellate Body, simple ownership or control by a government of an entity is not sufficient to establish that it is a public body.").

governmental control but with governmental functions.[274] In light of our analysis, this move by the WTO is in the right direction because, as applied to Chinese firms operating under the institutions of Chinese state capitalism, a control-based definition of "public body" would require not only SOEs but also POEs to be subject to the "public body" test. This can be seen by comparing the outcomes of USDOC's five-factor test, which is based on government control, for a Chinese SOE and for a large Chinese POE: (1) the government is likely to have a presence on the board of the POE, in the form of politically connected entrepreneurs, that differs little from the political connections of high-level SOE managers; (2) the government does not exercise day-to-day control over either the POE or the SOE (indeed, as we suggested, the government may not even control the SOE as to some policy matters); (3) the POE is as likely as the SOE to embrace government interest; and (4) few, if any, Chinese firms are created by special statute. A control-based definition of "public body" in the Chinese context would therefore require a substantial broadening of the WTO subsidy rules to cover firms of all ownership types. This raises challenges both to the WTO's institutional capacity and to the faithful interpretation of the original meaning of the treaty text. The alternative definition of "public body" based on whether an entity exercises governmental functions would avoid these thorny issues.

## CONCLUSION

This Article has offered a new perspective on Chinese firms. Shifting the focus of analysis from corporate ownership to the state-centered institutional ecology in which firms operate exposes similarities between state-owned enterprises and privately owned enterprises in China. Our perspective suggests less state control over SOEs and greater state control over POEs than is commonly assumed. Because the Chinese economy under the institutions of state capitalism is highly susceptible to capture (understood broadly to mean both corrupt access to government and a deep convergence of interests between managerial elites in the party-state and business), successful Chinese firms of all ownership types share important traits that distinctions based on corporate ownership alone simply do not pick up. Yet prevailing theories, policies, and regulatory regimes take equity ownership as their focal point, dividing the world into a simple taxonomy of SOEs and POEs. Understanding the blurriness of this dividing line in the Chinese institutional context and recognizing that many large, successful Chinese firms exhibit substantial similarities in terms of market dominance, receipt of state subsidies, proximity to state power, and execution of the state's developmental policy objectives, is the starting point for rethinking the ap-

---

274. *See id.* ¶ 7.73 ("In none of these investigations did the USDOC rely on evidence of the kind that led the Appellate Body to conclude in *US–Anti-Dumping and Countervailing Duties (China)* that the USDOC had before it evidence indicating that state-owned commercial banks exercised 'governmental functions.'").

proach to a wide range of issues. This insight, for example, bears strongly on the necessary scope of China's economic reforms. And it has thorny implications for many U.S. and multilateral economic regulatory regimes, which pivot on "state" versus "private" ownership of enterprise.

APPENDIX I[275]

Politically Connected Entrepreneurs at China's 100 Largest Private Firms
(by Revenue)[276]

| Firm Rank | Firm | Founder or De Facto Controller | Party-State Affiliations[277] |
|---|---|---|---|
| 1 | Suning Appliance Co., Ltd. | ZHANG Jindong | CPPCC |
| 2 | Legend Holdings Co., Ltd. | LIU Chuanzhi | CPC National Delegate; NPC; ACFIC (Vice President) |
| 3 | Huawei Investment Holdings Co., Ltd. | REN Zhengfei | None[278] |
| 4 | Jiangsu Sha Steel Group Co., Ltd. | SHEN Wenrong | NPC; CPC National Delegate |
| 5 | Shandong Weiqiao Group Co., Ltd. | ZHANG Shiping | NPC; Shandong Prov. PC |
| 6 | Zhejiang Geeli Holdings Group Co., Ltd. | LI Shufu | CPPCC; Taizhou City PC |
| 7 | Dalian Wanda Group Co., Ltd. | WANG Jianlin | CPC National Delegate; CPPCC (Standing Comm.); ACFIC (Vice President) |
| 8 | Yurun Holdings Group Co., Ltd. | ZHU Yicai | NPC; ACFIC (Standing Comm.) |
| 9 | Wanke Enterprises Co. Ltd. | WANG Shi | China Real Estate Association; Shenzhen Chamber of Commerce |
| 10 | Meidi Group Co., Ltd. | HE Xiangjian | Shunde District PC; Foshan City PPCC |
| 11 | Hengli Group Co., Ltd. | CHEN Jianhua | Jiangsu Prov. PPCC; Jiangsu Prov. FIC (Vice President) |
| 12 | Xinjiang Guanghui Industry Investment (Group) Co., Ltd. | SUN Guangxin | Xinjiang PPCC (Standing Comm.); ACFIC (Standing Comm.) |
| 13 | Sani Heavy Industry Co., Ltd. | LIANG Wengen | NPC; CPC National Delegate; ACFIC (Executive Comm.) |
| 14 | New Hope Group Co., Ltd. | LIU Yonghao | CPPCC (Standing Comm.); China Feedstock Industrial Association (Vice President) |
| 15 | Hailiang Group Co., Ltd. | FENG Yali | Zhejiang Prov. CPC Delegate; Zhuji City PC |

275. The party-state affiliations of the entrepreneurs listed in Appendices I and II are gathered primarily from the official websites of the companies in question. When official company information is not available, we used information collected from news items in the Chinese media. Affiliations include both present and past ones. The names of the companies listed in this table were translated by the authors and may not conform to the companies' official English names.

276. The ranking was conducted by All-China Federation of Industry and Commerce in 2013. *See 2013 Zhōngguó Mínqǐ 500 Qiáng Jiçxiǎo Sūníng Liánxiǎng Huáwèi Jū Qián Sān [2013 Ranking of China's Top 500 Privately Owned Companies Unveiled]*, XĪNLÀNG CÁIJĪNG [SINA FIN. & ECON.] (Aug. 29, 2013, 10:18), http://finance.sina.com.cn/leadership/mroll/20130829/101816602059.shtml.

277. The abbreviations used in this column and the same column in Appendix II below are: CPPCC (China People's Political Consultative Conference); CPC (Chinese Communist Party); ACFIC (All-China Federation of Industry and Commerce); FIC (Federation of Industry and Commerce); NPC (National People's Congress); PPCC (People's Political Consultative Conference); and PC (People's Congress).

278. The fact that Mr. Ren Zhengfei of Huawei does not have any formal government affiliations is very likely due to his and the Chinese government's desires to minimize such affiliations, given that Mr. Ren's past affiliation with the Chinese military has already subjected Huawei to close scrutiny in the United States. *See* ROGERS & RUPPERSBERGER, *supra* note 36, at 13–14.

279. It is unclear why Rizhao Steel appears on this list, given that sixty-seven percent of its shares are now owned by the state-owned Shandong Steel Group. *See supra* note 116 and accompanying text.

| Firm Rank | Firm | Founder or De Facto Controller | Party-State Affiliations[277] |
|---|---|---|---|
| 16 | Zhejiang Hengyi Group Co., Ltd. | QIU Jianlin | China Chemical Fiber Industrial Association (Vice President) |
| 17 | Zhongtian Steel Group Co., Ltd. | DONG Caiping | NPC; Jiangsu Prov. CPC Delegate; Jiangsu Prov. PC; Changzhou City PC |
| 18 | Beijing Jianlong Heavy Industry Group Co., Ltd. | ZHANG Zhixiang | China Metallurgic Industrial Association (Vice President); China Steel Industrial Association (Vice President) |
| 19 | Hangzhou Wahaha Group Co., Ltd. | ZONG Qinghou | NPC; Zhejiang Prov. PC; Hangzhou City PC |
| 20 | Xinhua United Metallurgic Holdings Group Co., Ltd. | SUN Jimu | NPC |
| 21 | Pang Da Automobile Trade Group Co., Ltd. | PANG Qinghua | China Automobile Supply Chain Industrial Association (Vice President) |
| 22 | Shandong New Hope Liuhe Group Co., Ltd. | TAO Xi | China Meat Products Industrial Association (Executive Comm.) |
| 23 | Jiangsu San Fang Xiang Group Co., Ltd. | BU Xingcai | Jiangsu Prov. PC; Jiangyin City PC (Standing Comm.); Wuxi City CPC Delegate |
| 24 | San Bao Group Co., Ltd. | YUAN Yafei | CPPCC; ACFIC (Standing Comm.) |
| 25 | Suning Global Group Co., Ltd. | ZHANG Guiping | Jiangsu Prov. PPCC; ACFIC; Jiangsu Prov. FIC (Vice President) |
| 26 | Shanghai Fuxing Hi-Tech (Group) Co., Ltd. | GUO Guangchang | NPC; ACFIC (Standing Comm.) |
| 27 | Hebei Jinxi Steel Group Co., Ltd. | HAN Jingyuan | Hebei Prov. PC; China Steel Industrial Association (Vice President) |
| 28 | Shandong Chenxi Group Co. Ltd. | SHAO Zhongyi | NPC; Shandong Prov. FIC (Vice President); Rizhao City PC; Rizhao City PPCC |
| 29 | Shaanxi Dongling Industry Trade Group Co. Ltd. | LI Heiji | NPC; Dongling Village, Baoji City CPC Secretary |
| 30 | Jiangsu Xicheng Sanlian Holdings Group Co., Ltd. | YUN Xiangcai | Jiangyin City Charitable Association (Executive Comm.) |
| 31 | Jiulong Paper (Holdings) Co., Ltd. | ZHANG Qian | CPPCC; ACFIC |
| 32 | BYD Co., Ltd. | WANG Chuanfu | Shenzhen City PC (Standing Comm.) |
| 33 | Zhejiang Rongsheng Holdings Group Co., Ltd. | LI Shuirong | China Chemical Fiber Industrial Association (Vice President); Hangzhou Chamber of Commerce (Vice President); Xiaoshan District, Hangzhou City PC (Standing Comm.) |
| 34 | Tianjin Rongcheng United Steel Group Co., Ltd. | ZHANG Xiangqing | Tangshan City PC |
| 35 | Inner Mongolia Yitai Group Co., Ltd. | ZHANG Shuangwang | Erduosi Credit Promotion Association (Honorary President) |
| 36 | Rizhao Steel Holdings Group Co., Ltd.[279] | DU Shuanghua | Hengshui City PC, Hebei Prov. PC |
| 37 | Youngor Group Co., Ltd. | LI Rucheng | NPC |
| 38 | Jiangsu New Long River Industry Group Co., Ltd. | LI Liangbao | Long River Village, Jiangyin City CPC Secretary |
| 39 | Qingshan Holdings Group Co., Ltd. | ZHANG Jimin | Wenzhou City PC; China Metal Industrial Association Stainless Steel Sub-Association (Vice President) |
| 40 | Country Garden Holdings Co., Ltd. | YANG Guoqiang | Guangdong Prov. PPCC (Standing Comm.) |
| 41 | Wumei Holdings Group Co., Ltd. | WU Jianzhong | Beijing City PC, China Supply Chain and Procurement Industrial Association (Vice President) |
| 42 | Tongwei Group Co., Ltd. | LIU Hanyuan | CPPCC (Standing Comm.); ACFIC, China Feedstock Industrial Association (Vice President) |

| Firm Rank | Firm | Founder or De Facto Controller | Party-State Affiliations[277] |
|---|---|---|---|
| 43 | Zhongtian Development Holdings Group Co., Ltd. | LOU Yongliang | Zhejiang Prov. PC; Zhejiang Prov. FIC (Vice President) |
| 44 | Aux Group Co., Ltd. | ZHENG Jianjiang | NPC; Zhejiang Prov. PPCC; Zhejiang Chamber of Commerce (Vice President) |
| 45 | Hongdou Group Co., Ltd. | ZHOU Yaoting | NPC |
| 46 | ENN Group Co., Ltd. | WANG Yusuo | CPPCC (Standing Comm.); Hebei Prov. PPCC (Standing Comm.); Hebei Prov. FIC (Vice President) |
| 47 | Dunan Holdings Group Co., Ltd. | YAO Xinyi | Zhejiang Prov. PC |
| 48 | Linyi Xincheng Jinluo Meat Products Group Co., Ltd. | ZHOU Liankui | Shandong Prov. PC |
| 49 | New China United Group Co., Ltd. | FU Jun | CPPCC; ACFIC (Vice President); Hainan Prov. FIC (Vice President) |
| 50 | Jiangsu Nantong Sanjian Group Co., Ltd. | XU Zhulin | Haimen City PPCC (Standing Comm.); China Construction Industrial Association (Executive Comm.) |
| 51 | Jiangsu Yonggang Group Co., Ltd. | WU Dongcai | Yonglian Village, Zhangjiagang City CPC Secretary |
| 52 | Jiangyin Chengxing Industrial Group Co., Ltd. | LI Xing | China Petrochemical Industrial Association (Vice President) |
| 53 | Tianneng Group | ZHANG Tianren | NPC; Zhejiang Prov. CPC Delegate; Zhejiang Prov. PC |
| 54 | Sichuan Chuanwei Group Co., Ltd. | WANG Jin | NPC; Chengdu City FIC |
| 55 | Jiangxi Ping Steel Industrial Co., Ltd. | TU Jianmin | CPC National Delegate |
| 56 | Sichuan Hongda (Group) Co., Ltd. | LIU Canglong | NPC; ACFIC (Vice President); Sichuan Prov. FIC (Vice President) |
| 57 | Shenghong Holdings Group Co., Ltd. | MU Hangen | Suzhou City PPCC |
| 58 | Yuanda Wuchan Group Co., Ltd. | JIN Bo | Ningbo City Foreign Trade Industrial Association (Vice President) |
| 59 | Jiangsu Shente Steel Co., Ltd. | YANG Jianzhong | Liyang City PPCC (Vice President) |
| 60 | Zhongnan Holdings Group Co., Ltd. | CHEN Jinshi | Guangdong Real Estate Chamber of Commerce (President) |
| 61 | Kechuang Holdings Group Co., Ltd. | HE Junming | NPC; ACFIC (Vice President); Sichuan Prov. PPCC (Standing Comm.); Sichuan Prov. FIC (Vice President) |
| 62 | Chaowei Group | ZHOU Mingming | Huzhou City PC; Changxing County PC |
| 63 | Oriental Hope Group Co., Ltd. | LIU Yongxing | Shanghai City FIC |
| 64 | Huasheng Jiangquan Group Co., Ltd. | WANG Yanjiang | Shenquan Village, Linyi City CPC Secretary |
| 65 | Shandong Taishan Steel Group Co., Ltd. | WANG Shoudong | NPC |
| 66 | Jiangsu Nantong Erjian Group Co., Ltd. | CHEN Jiannian | None |
| 67 | Yinyi Group Co., Ltd. | XIONG Xuqiang | Ningbo City Chamber of Commerce (Vice President) |
| 68 | Huaqin Rubber Industry Group Co., Ltd. | NIU Yishun | Shandong Prov. PC |
| 69 | Golden Dragon Precision Copper Pipes Group Co., Ltd. | LI Changjie | NPC; Henan Prov. CPC Delegate |
| 70 | Xiuzheng Pharmaceutical Group Co., Ltd. | XIU Laigui | Jilin Prov. PC; ACFIC (Executive Comm.); Jilin Prov. FIC (Vice President) |
| 71 | Zhengtai Group Co., Ltd. | NAN Cunhui | Taizhou City PC; Wenling City PC |

| Firm Rank | Firm | Founder or De Facto Controller | Party-State Affiliations[277] |
|---|---|---|---|
| 72 | Ningbo Jintian Investment Holdings Co., Ltd. | LOU Guoqiang | ACFIC; Jingbo City PC; China Non-Ferrous Metal Processing Industrial Association (Vice President) |
| 73 | Jiangsu Gaoli Group Co., Ltd. | GAO Shijun | Nanjing City PPCC; Jiangsu Prov. FIC (Standing Comm.); Nanjing City FIC (Vice President) |
| 74 | Twins (Group) Co., Ltd. | BAO Hongxing | None |
| 75 | Yunnan Zhonghao Zhiye Co., Ltd. | LIU Weigao | NPC; Kunming City FIC (Vice President) |
| 76 | Huatai Group Co., Ltd. | CHEN Xianbao | Anhui Prov. PPCC; Hefei City PPCC (Vice President); Anhui Prov. FIC (Vice President) |
| 77 | Sichuan Desheng Group Steel Co., Ltd. | SONG De-An | Sichuan Prov. PPCC |
| 78 | Jiangsu Yangzijiang Ship Group Co., | REN Yuanlin | Jiangyin City PPCC |
| 79 | Jiuzhoutong Pharmaceutical Group Co., Ltd. | LIU Baolin | Hubei Prov. PC |
| 80 | Chongqing Longhu Enterprise Development Co., Ltd. | WU Yajun | NPC; Chongqing City FIC (Vice President) |
| 81 | Shandong Jincheng Petro-Chemical Group Co., Ltd. | ZHOU Jingcai | Shandong Prov. PC |
| 82 | Sichuan Kelun Industry Group Co., Ltd. | LIU Gexin | CPPCC; Sichuan Prov. PC; Sichuan Prov. CPC Delegate; Sichuan Prov. FIC (Vice President) |
| 83 | Zhejiang Zhongcheng Holdings Group Co., Ltd. | WANG Yongquan | Shaoxing City PC (Standing Comm.) |
| 84 | Guangsha Holdings Group Co., Ltd. | LOU Zhongfu | NPC; ACFIC (Executive Committee) |
| 85 | Shanghai People Enterprise (Group) Co., Ltd. | JIN Fuyin | Shanghai City PC; Shanghai City PPCC; Shanghai City FIC (Standing Comm.) |
| 86 | Shandong Jingbo Holdings Co., Ltd. | MA Yunsheng | Shandong Prov. PC; Binzhou City PC (Standing Comm.); ACFIC |
| 87 | Yabang Investment Holdings Group Co., Ltd. | XU Xiaochu | Wujin District Chamber of Commerce (Vice President) |
| 88 | People Electronics Group Co., Ltd. | ZHENG Yuanbao | Jiangxi Prov. PPCC; Shanghai City PPCC; Wenzhou City PC; Nanchang City PC |
| 89 | Delixi Group Co., Ltd. | HU Chengzhong | Zhejiang Prov. PC; ACFIC (Executive Comm.); Zhejiang Prov. FIC (Vice President) |
| 90 | Zhejiang Qiancheng Investment Co., Ltd. | SHEN Zhihong | Ningbo City PPCC (Standing Comm.) |
| 91 | Huafang Group Co., Ltd. | QIN Daqian | None |
| 92 | Qingjian Group Co., Ltd. | DU Bo | NPC; Qingdao City PC |
| 93 | Lihuayi Group Co., Ltd. | XU Yunting | Shandong Prov. CPC Delegate; Dongying City PC |
| 94 | Baixing Group Co., Ltd. | RU Boxing | Changzhou City PC; Changzhou City CPC Delegate; China Plastics Industrial Association (Vice President) |
| 95 | Tianzheng Group Co., Ltd. | GAO Tianle | CPPCC |
| 96 | Hengtong Group Co., Ltd. | CUI Genliang | NPC; Jiangsu Prov. PPCC; Suzhou City PC |
| 97 | Tangshan Guofeng Steel Co., Ltd. | ZHANG Zhen | Hebei Prov. Enterprise Association (Vice President) |
| 98 | Tianjin Baodi Agriculture & Technology Co., Ltd. | BI Guoxiang | Jianye District (Nanjing) PC; Jianye District FIC (Vice President); China Foodstuff Industrial Association (Executive Comm.) |
| 99 | Shengtong Technology Group Co., Ltd. | LI Ruishi | NPC |
| 100 | Shandong Dahai Group Co., Ltd. | LIU Fuhai | None |

APPENDIX II

Politically Connected Entrepreneurs at China's Top Ten Internet Companies
(by Revenue)[280]

| Firm Rank | Firm | Founder or De Facto Controller | Party-State Affiliations |
|---|---|---|---|
| 1 | Tencent | Pony Ma | NPC, Shenzhen City PC |
| 2 | Alibaba Group | Jack Ma | Zhejiang Prov. PPCC |
| 3 | Baidu | Robin Li | CPPCC, CNAIC (Vice President) |
| 4 | JD.com | Liu Qiangdong | Shanghai City PPCC |
| 5 | Sohu | Zhang Chaoyang | CNAIC (Executive Comm.) |
| 6 | Qihu 360 | Zhou Hongwei | None |
| 7 | Xiaomi Technology | Lei Jun | NPC |
| 8 | NetEase | Ding Lei | Guangdong Prov. PC |
| 9 | Suning Appliance | Zhang Jindong | CPPCC |
| 10 | Sina | Wang Zhidong | None |

280. The ranking was conducted by China Internet Association in 2014. *See 2014 Nián Zhōngguó Hùliánwǎng Bǎiqiáng Qǐyè Bǎngdān Jiēxiǎo [2014 Ranking of China's Top 100 Internet Companies Unveiled]*, SOHU IT (Aug. 28, 2014, 18:09:20), http://it.sohu.com/20140828/n403865758.shtml.