Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED        :   MDL NO. 2047
DRYWALL PRODUCTS LIABILITY          :
LITIGATION                          :   SECTION:  L
                                    :
------------------------------      :   JUDGE FALLON
This Document Relates to:           :
ALL CASES                           :   MAG. JUDGE
                                    :   WILKINSON


CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

MONDAY, OCTOBER 1, 2012

- - -


        Videotaped deposition of CLAY GEARY, held
at the Law Offices of Galloway, Johnson, Tompkins,
Burr & Smith, One Shell Square, 701 Poydras Street,
40th Floor, New Orleans, Louisiana, commencing at
9:34 a.m., on the above date, before Leslie B.
Doyle, Certified Court Reporter (LA), Registered
Diplomate Reporter, Certified LiveNote Reporter.


- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

EXHIBIT
1

Confidential - Subject to Further Confidentiality Review

```
                                                  Page 2
 1   A P P E A R A N C E S:
 2
 3   APPEARING ON BEHALF OF THE PLAINTIFFS' STEERING
 4   COMMITTEE:
 5        CHRISTOPHER A. SEEGER, ESQUIRE
             Email:  Cseeger@seegerweiss.com
 6           Phone:  (212) 584-0700
          SEEGER WEISS, LLP
 7        77 Water Street
          New York, New York  10005
 8
 9        SCOTT ALAN GEORGE, ESQUIRE
             Email:  Sgeorge@seegerweiss.com
10           Phone:  (215) 553-7982
          SEEGER WEISS, LLP
11        1515 Market Street, Suite 1380
          Philadelphia, Pennsylvania  19102
12
13        GERALD E. MEUNIER, ESQUIRE
             Email:  Gmeunier@gainsben.com
14           Phone:  (504) 522-2304
          GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
15           WARSHAUER, LLC
          2800 Energy Centre
16        1100 Poydras Street
          New Orleans, Louisiana  70163
17
18   APPEARING ON BEHALF OF INTERIOR/EXTERIOR BUILDING
19   SUPPLY, L.L.C.:
20        RICHARD G. DUPLANTIER, JR., ESQUIRE
             Email:  Rduplantier@gjtbs.com
21        BENJAMIN R. GRAU, ESQUIRE
             Email:  Bgrau@gjtbs.com
22           Phone:  (504) 525-6802
          GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, PLC
23        701 Poydras Street, 40th Floor
          New Orleans, Louisiana  70139
24
25
```

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1   APPEARANCES (CONTINUED):

 2

 3   APPEARING ON BEHALF OF NORTH RIVER INSURANCE
 4   COMPANY:
 5        KEVIN F. RISLEY, ESQUIRE
             Email:  Krisley@thompsoncoe.com
 6        BRIAN S. MARTIN, ESQUIRE
             Email:  Bmartin@thompsoncoe.com
 7        Phone:  (713) 403-8210
          THOMPSON, COE, COUSINS & IRONS, L.L.P.
 8        One Riverway, Suite 1600
          Houston, Texas  77056
 9

10   APPEARING ON BEHALF OF LANDMARK AMERICAN INSURANCE
11   COMPANY:
12        JUDY L. BURNTHORN, ESQUIRE
             Email:  Jburnthorn@dkslaw.com
13        Phone:  (504) 593-0689
          DEUTSCH, KERRIGAN & STILES, LLP
14        755 Magazine Street
          New Orleans, Louisiana  70130
15

16   APPEARING ON BEHALF OF NATIONAL SURETY CORPORATION
17   AND FIREMAN'S FUND INSURANCE COMPANY:
18        MEGAN E. DONOHUE, ESQUIRE
             Email:  Mdonohue@joneswalker.com
19        Phone:  (337) 593-7600
          JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
20          DENEGRE, L.L.P.
          600 Jefferson Street, Suite 1600
21        Lafayette, Louisiana  70501
22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 4
  1   APPEARANCES (CONTINUED):
  2
  3   APPEARING ON BEHALF OF KNAUF:
  4        JAY P. MAYESH, ESQUIRE
               Email:  Jmayesh@kayescholer.com
  5          Phone:  (212) 836-7606
           KAYE SCHOLER, LLP
  6        425 Park Avenue
           New York, New York  10022-3598
  7
  8   APPEARING ON BEHALF OF THE STATE OF LOUISIANA:
  9        L. CHRISTOPHER STYRON, ASSISTANT AG
               Email:  Styronl@ag.state.la.us
 10          Phone:  (225) 326-6468
           OFFICE OF THE ATTORNEY GENERAL
 11        PUBLIC PROTECTION DIVISION
           1885 North 3rd Street
 12        Baton Rouge, Louisiana  70802
 13        DAVID L. BLACK, ESQUIRE (VIA TELEPHONE)
               Email:  Dblack@perkinscoie.com
 14          Phone:  (303) 291-2300
           PERKINS COIE, L.L.P.
 15        1900 Sixteenth Street, Suite 1400
           Denver, Colorado  80202
 16
 17   APPEARING ON BEHALF OF VARIOUS HOME BUILDERS:
 18   (VIA TELEPHONE)
 19        BRIAN A. EVES, ESQUIRE
               Email:  Beves@defensecounsel.com
 20          Phone:  (305) 774-9966
           MINTZER, SAROWITZ, ZERIS, LEDVA & MEYERS, LLP
 21        1000 NW 57th Court, Suite 300
           Miami, Florida  33126
 22
 23
 24
 25
```

Confidential - Subject to Further Confidentiality Review

                                                              Page 5

 1   APPEARANCES (CONTINUED):

 2

 3   APPEARING ON BEHALF OF VARIOUS HOME BUILDERS:

 4   (VIA TELEPHONE)

 5         STEPHANIE L. CHERALLA, ESQUIRE
              Email:  Scheralla@degan.com

 6         Phone:  (504) 529-3333

           DEGAN, BLANCHARD & NASH, PLC

 7         400 Poydras Street, Suite 2600

           New Orleans, Louisiana  70130

 8

 9   ALSO PRESENT:

10         JIM GEARY

11

12   VIDEOGRAPHER:

13         HANK COBB

           Golkow Technologies, Inc.

14

15                           ---

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

1                    INDEX OF EXAMINATIONS

2    EXAMINATION

3       BY MR. SEEGER...............................8

4       BY MR. MAYESH.............................56

5    ACKNOWLEDGMENT OF DEPONENT...................81

6    ERRATA......................................82

7    LAWYER'S NOTES..............................83

8    CERTIFICATE.................................84

9                         * * *

10

11                   INDEX OF EXHIBITS

12   EXHIBIT 1...................................21

13      TEST REPORT (INT/EXT05774 - INT/EXT05775)

14   EXHIBIT 2...................................26

15      E-MAIL CHAIN (INT/EXT05718 - INT/EXT05720)

16   EXHIBIT 3...................................26

17      E-MAIL CHAIN (INT/EXT05946 - INT/EXT05947)

18   EXHIBIT 4...................................45

19      PABCO GYPSUM PHYSICAL TEST (INT/EXT00696)

20   EXHIBIT 5...................................59

21      E-MAIL CHAIN (KI0000073)

22   EXHIBIT 6...................................64

23      E-MAIL CHAIN (KI0000084)

24   EXHIBIT 7...................................71

25      E-MAIL CHAIN (INT/EXT03843 - INT/EXT03844)

Confidential - Subject to Further Confidentiality Review

Page 7

1    EXHIBITS (CONTINUED):

2

3    EXHIBIT 8..................................73

4       E-MAIL (KI0000011)

5    EXHIBIT 9..................................74

6       E-MAIL (KI0000088)

7                              *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 8

```
 1                        PROCEEDINGS
 2              THE VIDEOGRAPHER:  We are now on the
 3         record.  My name is Henry Cobb.  I'm the
 4         videographer for Golkow Technologies.
 5         Today's date is October 1st, 2012.  The
 6         time on the video screen is 9:34 a.m.
 7              This video deposition is being held in
 8         New Orleans, Louisiana, in the matter of
 9         Chinese Drywall.  The deponent today is
10         Clay Geary.
11              Counsel will be noted on the
12         stenographic -- stenographic record, and
13         the court reporter is Leslie Doyle, and
14         will now swear in the witness.
15              MR. SEEGER:  Do you want appearances?
16              COURT REPORTER:  No, sir.  We're going
17         to -- I'll note them on the stenographic
18         record.
19                          * * *
20                       CLAY GEARY,
21    after having been first duly sworn, was examined and
22            testified as follows:
23                          * * *
24                       EXAMINATION
25    BY MR. SEEGER:
```

Confidential - Subject to Further Confidentiality Review

Page 9

```
1         Q.    Good morning, Mr. Geary.  I'm Chris
2    Seeger.
3         A.    Good morning.
4         Q.    I'm going to ask you some questions.  Jay
5    may, also, so...
6               Mr. Geary, how did you first become aware
7    of your -- you know, of the fact that Chinese
8    drywall was available to you to import into the
9    United States?  I'm thinking up around the 2005 time
10   frame -- time line.
11        A.    Well, that question would probably be
12   better asked to Jim.  He was -- he was the first one
13   that had the contact with Knauf.
14        Q.    Okay.  So putting aside the first
15   contact, --
16        A.    Okay.
17        Q.    -- were you involved in any of those
18   contacts?
19        A.    Yeah.  After the storm -- actually, the
20   supply was very tight before the storm, so the storm
21   just kind of exacerbated the problem.  After the
22   storm, we were contacted by numerous people about
23   the possibility of importing gypsum board from
24   different parts of the country -- different parts of
25   the world.  I'm sorry.
```

Confidential - Subject to Further Confidentiality Review

1       Q.   So you were already kind of checking other

2    areas for where you can get your hands on some more

3    drywall during that time frame, is that fair enough?

4       A.   Yes.  People had contacted us.

5       Q.   Okay.  Was China one of the places you

6    were looking, or was that the one area of focus?

7       A.   It wasn't -- no.  It wasn't where we were

8    looking.  It was where people had come to us and

9    suggested.

10      Q.   Okay.  And to the extent you know -- and

11    we're going to get to question your brother --

12                 MR. SEEGER:  Are you the brother?

13                 MR. JAMES GEARY:  Yes.

14                 MR. SEEGER:  Okay.  I got the faces

15          right.

16    BY MR. SEEGER:

17      Q.   To the extent, you know, can you talk to

18    me a little bit about those relationships, those

19    people that came to you?  Who came to you?

20      A.   Various people, mainly people we did not

21    have relationships with in the past.  People were

22    contacting us via telephone.  They'd come in various

23    ways.  Flyers.

24      Q.   Just cold calls?

25      A.   Yes.

Confidential - Subject to Further Confidentiality Review

Page 11

1       Q.   Did you seek out anybody, brokers or

2    people that served in that kind of function that

3    would match, you know, your company up with

4    companies outside the U.S.?

5       A.   My recollection is we had -- we had

6    contacted the people who had imported some board

7    from -- for us back in '99, and we did not have any

8    luck with them.  I don't recall contacting anyone

9    else that I can think of.

10      Q.   Talk to me just a little bit about the

11   company, the people back in '99 where you had

12   imported board from outside the U.S.  Just tell me

13   what you know about it.

14      A.   Two different sources.  One was from

15   Indonesia, a company called Borel, and then there

16   was -- the name escapes me.  We shipped some other

17   product -- got some other product from Thailand.  I

18   think it was SCG or SCT was the name of the company,

19   I believe.

20      Q.   And in both cases, Indonesia and Thailand,

21   was that drywall?

22      A.   Yes.

23      Q.   And you said it didn't work out.  Can you

24   explain what you mean by that?

25      A.   What I mean is that, when we contacted

Confidential - Subject to Further Confidentiality Review

1     them about the problems we were having with supply

2     in 2005, they were not able to supply us anything in

3     2005.

4          Q.   Okay.  And how did it work out back in

5     '99, when you imported drywall from Indonesia and

6     Thailand?  Were you satisfied with the product?

7          A.   It was fine.  Everything was fine.

8          Q.   No complaints that you can recall?

9          A.   The complaints were heavy and sometimes

10    brittle.

11         Q.   Okay.  Was that a common complaint or just

12    a sporadic once -- one off?

13         A.   I would say sporadic.

14         Q.   Coming from homeowners, builders or across

15    the --

16         A.   Usually, the guy who has to hang it,

17    because he's the guy that has to pick it up.

18         Q.   Okay.  So heavy and brittle.  Any other

19    complaints with that?

20         A.   Not that I can recall.

21         Q.   Now, other than the instances that you

22    just told us about, where you -- in '99 now, I'm

23    going to go back a little bit -- Indonesia and

24    Thailand, had you imported or brought drywall in

25    from any other country outside the U.S.?

Confidential - Subject to Further Confidentiality Review

Page 13

1        A.    The only other time I would tell you would

2    be -- is a company based in Mexico, Panel Rey, and

3    we've gotten a little bit of product through those

4    guys through the years, not much.  But that's very

5    similar to the way we get domestic product, because

6    you just call them and they send a truckload, an

7    18-wheeler.

8        Q.    How did that work out?

9        A.    I think that was fine.

10       Q.    The companies that you used to put you

11   together with the Indonesian board and the board

12   from Thailand, were they involved in 2005 at all?  I

13   mean, you said you contacted them and they couldn't

14   help you, but were they involved in any way with

15   bringing in Chinese board?

16       A.    No, no.

17       Q.    Okay.  So who assisted you -- to the

18   extent you know, who assisted you at INEX with

19   bringing in board from China, the names if you can

20   identify people?

21       A.    We dealt directly with Knauf --

22       Q.    Okay.

23       A.    -- with the Knauf shipments.

24       Q.    And what about what regard to the Taishan

25   board?

Confidential - Subject to Further Confidentiality Review

Page 14

1          A.    Jim had more of the dealings with that,

2     and that was through a broker.

3          Q.    Okay.  And just so I can really delineate

4     who did what, did you have any dealings with anybody

5     regarding Taishan board?

6          A.    I really did not.

7          Q.    Okay.  Because I -- there's a glimmer of

8     hope there, that I should keep asking you questions,

9     I think.

10          A.    No.  Jim dealt with most of the Metro

11     Resources transactions.  I dealt with most of the

12     Knauf transactions.  Jim had the initial

13     conversation with Knauf regarding the Knauf

14     transactions.  But as far as the transactions

15     themselves, I dealt with them; he dealt with Metro.

16          Q.    Okay.  But you are on some of the e-mails

17     regarding imported drywall from China, right?  I

18     mean, you recall being on e-mails?

19          A.    Yeah.  And we -- you know, we had

20     conversations back and forth.

21          Q.    Okay.  And do you know who -- I'm sorry.

22     I forgot the name.  I'm probably going to say all

23     these names wrong, but David Zhang, Zhang (different

24     pronunciation)?

25          A.    David Zhang, I think that was the broker

Confidential - Subject to Further Confidentiality Review

1    for -- with Metro Resources.

2        Q.    Okay.  Who is Metro Resources?

3        A.    That was the broker that helped us secure

4    the Taishan board.

5        Q.    Okay.

6            And had you ever dealt directly or spoken

7    directly or been in any kind of communication with

8    David Zhang or anybody at Metro?

9        A.    Not that I recall.

10       Q.    Are you involved in quality --

11       A.    I take that back.  When the problem

12   surfaced, I think I was on a conference call with

13   Jim when we tried to call David Zhang, but I -- it's

14   very fuzzy.  I don't remember the exact

15   conversation.

16       Q.    When you say, "the problem surfaced,"

17   what's the time frame you're talking about?

18       A.    That would be, I guess May of '09,

19   probably.

20       Q.    And do you know who Susan Li is?

21       A.    Susan Li is -- was with Weida Freight.

22       Q.    And can you tell me who she is?

23       A.    J.W. Allen, who was our freight forwarder,

24   hired Weida Freight to inspect some of the product

25   as it was being loaded onto the ships.  In addition,

Confidential - Subject to Further Confidentiality Review

Page 16

1    Susan Li contacted BNBM for us and tried to develop

2    a relationship so that we could possibly get board

3    from those guys.

4         Q.   Now, between you and Jim, would it be both

5    of you or one of you responsible for, like, making

6    sure that the board is ASTM compliant or just, you

7    know, up to your standards?  Who would be involved

8    in that?

9         A.   Well, we're both aware that you need an

10   ASTM standard.  I don't think either one of us could

11   tell you, you know, the specifics of what an AS --

12   what that standard is, but we are both aware that

13   you have to have that ASTM standard.

14        Q.   Okay.  Mr. Geary, you would agree that

15   that's a very important thing to have, particularly

16   with regard to drywall or bringing product -- buying

17   product outside the U.S. and bringing it in,

18   correct?

19        A.   Yes.

20        Q.   So what did you do -- and to the extent

21   you were involved, what did you do to satisfy

22   yourself that the board that came from Taishan --

23   put aside Knauf -- was ASTM compliant?

24        A.   As I said, Jim handled that, but --

25        Q.   So just speak as to what you know.

Confidential - Subject to Further Confidentiality Review

Page 17

1      A.   We needed to make sure that it was ASTM
2   compliant.
3      Q.   How did you do that?
4      A.   As I said, he handled that transaction.
5      Q.   Okay.  So you want me to talk to Jim
6   about --
7      A.   Yes.
8      Q.   Okay.  What kind of -- going now to
9   Chinese drywall, the Taishan board or Knauf, when
10  did you personally first become aware of any kind of
11  complaints about the drywall itself?  Anything.  It
12  can be anything, small, big, you know.
13                MR. DUPLANTIER:  Let me object to the
14           form of the question.
15                Subject to that, you can answer it.
16  BY MR. SEEGER:
17     Q.   That would be something that you should
18  only answer what you can answer.
19     A.   In general, we heard that it was heavy.
20     Q.   Uh-huh.
21     A.   And some people said it was brittle.
22     Q.   And the heaviness and the brittleness in
23  your mind, it related to the gypsum itself, correct?
24     A.   The heaviness was just the weight of the
25  product.

Confidential - Subject to Further Confidentiality Review

1      Q.   It wasn't related to the paper; it was

2  related to the gypsum in the board, right?

3      A.   The board itself.

4      Q.   Did you receive any other complaints that

5  you can think of sitting here right now?

6      A.   No.

7      Q.   Putting aside drywall, have you ever

8  imported a product from China, any product?  Screws,

9  anything?

10      A.   Have we?

11      Q.   Yeah, INEX.

12      A.   I know -- I believe we've gotten imported

13  product before, but whether we did -- I don't recall

14  if we've imported any screws or not before.  I think

15  we may have, but I am not positive.

16      Q.   I didn't mean to limit it to screws.  I'm

17  sorry.  I was just trying to give an example.

18      A.   No.  That would probably be the only

19  product, I think.  Maybe fasteners, other types of

20  fasteners.  But whether someone else imported it for

21  us and we just bought it or we imported it directly,

22  I don't recall.

23      Q.   Any problems with the product?

24      A.   No.

25      Q.   Now, Mr. Geary, this may sound like a

Confidential - Subject to Further Confidentiality Review

 1    crazy question, but I got to ask you.  Do you read

 2    the newspaper every day?

 3         A.    Skim it, yes.

 4         Q.    Okay.  Which newspaper do you read?

 5         A.    The Times Picayune.

 6         Q.    And what about watch TV?  Do you watch

 7    news on TV?

 8         A.    On occasion.

 9         Q.    And do you have a station that you prefer

10    to watch for news?

11         A.    I usually tend to watch Fox.

12         Q.    And had you been aware -- let's go back to

13    2005.  Had you been aware or do you recall being

14    aware of just problems that might have been reported

15    in the news regarding products from China, toys --

16    anything now?  I'm just -- the gamut.

17         A.    I'm sure I have.  I don't recall

18    specifically.

19         Q.    Do you -- when you buy product from

20    outside the U.S. -- and, again, I'm just talking

21    about any kind of product -- do your antennas go up;

22    do you say to yourself, I need to have sort of a

23    heightened level of carefulness here; I want to make

24    sure it's, you know, up to U.S. standards, it's a

25    good product?  Do you do that kind of --

Confidential - Subject to Further Confidentiality Review

Page 20

```
1        A.   Well, we thought we were being as diligent
2   as possible.  We had, you know ASTM certifications.
3   We had a -- what I thought was a pretty
4   all-encompassing warranty.  We had, you know,
5   certification of quality, condition.  We thought we
6   were dotting our "I"s and crossing our "T"s.
7        Q.   When you say you had ASTM certifications,
8   I mean, I haven't seen anything produced -- I could
9   be wrong -- that showed actual, like, ASTM
10  certifications.  Do they exist as far as you know?
11  I'm not asking you what you might have discussed
12  with your lawyer or anything like that.  But did you
13  actually see U.S.-produced ASTM certifications?
14       A.   I don't know that we did or not.
15       Q.   I mean, you probably saw -- I saw one in
16  the production that was in Chinese, and it was kind
17  of translated into English.
18       A.   There was one that -- it did have --
19  correct.  There was an ASTM certification.
20       Q.   Okay.  Did you do anything to satisfy
21  yourself that that was actually a real ASTM
22  certification as opposed to something somebody might
23  have just created on their laptop?
24       A.   No.
25       Q.   Okay.  And you understand reps and
```

Confidential - Subject to Further Confidentiality Review

1    warranties that you may get from a company that

2    sell you drywall, that's not an ASTM certification,

3    that's just their promise that there's a certification,

4    correct?

5        A.    Repeat the question.

6        Q.    If you get a representation or a warranty

7    from a company like Taishan and they say, we promise

8    we're ASTM certified, that's not an actual ASTM

9    certification, that's just them saying it's an ASTM

10   certification?

11               MR. DUPLANTIER:  I'm going to object

12          to the form of the question.

13               Subject to that, you can answer it.

14       A.    Yes.

15   BY MR. SEEGER:

16       Q.    So -- and other than getting reps and

17   warranties and a certificate in Chinese, you didn't

18   satisfy yourself, do any search, hire anybody to go

19   check records to determine whether it was an actual

20   ASTM certification; is that fair?

21       A.    You say it's in Chinese.  My under -- my

22   recollection was it was in Chinese, but it had

23   English writing on it, also.

24       Q.    I'll show it to you.  Might as well.

25               MR. SEEGER:  Can I just mark 1 and

Confidential - Subject to Further Confidentiality Review

Page 22

1            we'll put the name later?

2                 COURT REPORTER:  Yes.

3                 MR. SEEGER:  To save time.

4    BY MR. SEEGER:

5        Q.    Mr. Geary, what I've just marked as 1, is

6    this the ASTM certification you're talking about?

7            (Deposition Exhibit 1 was marked for

8                       identification.)

9        A.    Yes.

10       Q.    Okay.  Now, prior to the time that you got

11   that document in front of you, and the jury will get

12   to see it, which is somewhat in Chinese and there's

13   some English translations, had you ever received a

14   certification like that for either -- prior to the

15   time you got that one, for either drywall or any

16   kind of product that you sell at INEX?

17                 MR. DUPLANTIER:  I'm going to object

18           to the form of the question.

19              Subject to that, if you understand it,

20           you can answer it, Clay.

21       A.    I'm not sure if I do understand it.

22   BY MR. SEEGER:

23       Q.    Okay.  Let me -- thank you for that.  Let

24   me try to do a better job.

25              So you imported -- you know, drywall is

Confidential - Subject to Further Confidentiality Review

Page 23

1    not the only product that requires an ASTM -- that

2    requires ASTM compliance; is that fair?

3         A.    Correct.

4         Q.    Okay.  And you have imported other

5    products that require them to be compliant with ASTM

6    or U.S. standards; fair enough?

7         A.    As I said, I don't recall if we imported

8    it or someone else imported it for us.

9         Q.    Okay.  But you still would want to be sure

10   before you sold it to a builder or a homeowner that

11   it was compliant with U.S. standards anyway; is that

12   fair?

13        A.    Yes.

14        Q.    Okay.  Had you ever received a

15   certification for any product that was in two

16   languages like that that purported to say that it

17   was ASTM compliant?

18        A.    No, I did not -- I have not.

19        Q.    Okay.  Did you take that certification and

20   just compare it to what you would typically see as a

21   ASTM certification to satisfy yourself that, you

22   know, the testing looked appropriate, at least on

23   the surface?

24        A.    No, I did not.

25        Q.    Okay.  Do you know if anybody at INEX did

Confidential - Subject to Further Confidentiality Review

Page 24

1    that?

2         A.    It would have been either Jim or I.

3         Q.    Okay.  So we'll talk to Jim later about

4    that.

5              MR. MAYESH:  May I just ask, what is

6         the exhibit number for this?

7              MR. SEEGER:  Oh, thanks, Jay.

8              MR. GRAU:  1.

9              MR. SEEGER:  Oh, the exhibit number is

10        1.

11             MR. MAYESH:  We're not going to

12        continue the prior --

13             MR. SEEGER:  Oh, you know something?

14        I didn't even think about that.

15             MR. MAYESH:  Okay.  1 is good.  I

16        don't care.

17             MR. SEEGER:  Is that okay?

18             MR. MAYESH:  Yeah, sure.

19             MR. SEEGER:  All right.

20    BY MR. SEEGER:

21        Q.    Now, do you recall with regard to Taishan

22    board there actually -- in terms of the people you

23    dealt with, David Zhang and Susan Li, there being

24    somewhat of a conflict as to whether ASTM

25    certification even existed for the board?  Do you

Confidential - Subject to Further Confidentiality Review

Page 25

1    have a recollection of that?

2         A.   David Zhang and Susan Li were two

3    different transactions.

4         Q.   That's correct.  Okay.  So then correct me

5    on that, please.  Which -- what was David Zhang

6    involved with, and what was Susan Li --

7         A.   I believe David Zhang was with Metro

8    Resources.

9         Q.   Right.

10        A.   Susan Li was with Weida Freight, and

11   she -- she did some of the inspection of the Knauf

12   product as it was loading onto the ships, and she's

13   the one that developed the relationship with BNBM.

14        Q.   Okay.  And was it your under -- let me

15   strike that.

16             But they both were assisting you in

17   importing board from Taishan; is that fair?

18        A.   Yes.

19        Q.   Okay.

20        A.   No, no, no, no.  Not from Taishan.

21        Q.   Okay.  That's what I want.

22        A.   Susan Li was helping us with Knauf.

23        Q.   Okay.  Let me just mark two exhibits and

24   give you a moment to look at them, Mr. Geary.

25                  MR. MAYESH:  Which one is 2 and which

Confidential - Subject to Further Confidentiality Review

Page 26

1          one is 3?

2                  MR. SEEGER:  I'm going to tell you in

3          two seconds, Jay.  I thought as you got

4          older you'd be more patient, you know.

5                  MR. MAYESH:  You know what?

6                  MR. MEUNIER:  I think it works in the

7          other direction.

8                  MR. MAYESH:  It sure does.  I often

9          chide -- I need more Zen.  I need more of

10         what you're doing, Chris.

11    BY MR. SEEGER:

12         Q.   For the record, I'm marking as Exhibit 2

13    the e-mail that's Bates stamped INT/E -- INEX 05718

14    through 20, and I'm going to hand that to you,

15    Mr. Geary.  And let me just identify the other one,

16    and then you can take a moment to look at them, if

17    you like.

18              (Deposition Exhibit 2 was marked for

19                   identification.)

20              Exhibit 3 I'm marking, which is INEX05946

21    through 47.

22              (Deposition Exhibit 3 was marked for

23                   identification.)

24              And here, now you have both of them.  I'm

25    going to start with the document that we marked as

Confidential - Subject to Further Confidentiality Review

1    2, but if you want to take a quick look at both,

2    feel free to do that.

3              MR. DUPLANTIER:  Which one did you

4         mark as 2?  5718?

5              MR. SEEGER:  Yes.

6    BY MR. SEEGER:

7         Q.   Mr. Geary, let me ask you just a couple

8    questions, and if you feel you need to look at this

9    to answer any of them, just let me know and go ahead

10   and do it.  Okay?

11        A.   Okay.

12        Q.   All right.  You're on this e-mail, first

13   of all, right, on Exhibit 2?

14        A.   You're on 2?

15        Q.   Yeah.  You're looking at 3.

16        A.   Okay.  I'm sorry.

17        Q.   That's okay.

18        A.   Okay.

19        Q.   Okay.  And this is the e-mail that has --

20   that Susan Li is on, correct?

21        A.   Yes.

22        Q.   It's dated -- the one I'm looking at is at

23   the bottom of the first page dated December 28th,

24   2005.  Do you see that?

25        A.   Yes.

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  The subject line says, "Gypsum

2   wallboard market in China."  I'm just wondering,

3   and you might know where, and I may have missed

4   it, but is there any -- anywhere on the three

5   pages of this exhibit where she's talking about

6   Knauf board?  Because when I look on the second

7   page, there's a mention of Shandon Taihe Tongxing,

8   Limited, which I understand to be Taishan.

9      A.    Okay.  Excuse me.  No, she's not.

10     Q.    All right.  So for the correction, it's

11  Taishan, correct, not Knauf?

12     A.    Well, they talk about BNBM in here, as

13  well.

14     Q.    Okay.  But BNBM you understand to be -- in

15  your mind, is linked up with the Taishan board,

16  correct?

17     A.    I did not know that at the time, but I'm

18  understanding that that's the case.

19     Q.    Okay.  Do you understand that -- did you

20  understand at the time that BNBM and TTP -- I think

21  it's Tongxing Taihe Plasterboard -- had a

22  relationship?

23     A.    No.

24     Q.    Okay.  But by looking at this e-mail, you

25  can see we're talking about the board from Taishan

Confidential - Subject to Further Confidentiality Review

Page 29

1    and not the Knauf board; correct?

2        A.   Yes.

3        Q.   Okay.  And if you look on the first page

4    of this, sir, she says -- she's writing to Rudy.

5    Who's Rudy Remont, by the way?

6        A.   Rudy Remont was an employee of J.W. Allen,

7    did some of the inspection of the product getting

8    onto the ships for us.

9        Q.   Okay.  And this e-mail was ultimately

10   forwarded to you, because if you look at the top of

11   the page, you're on the one that's dated

12   December 29th, 2005, 3:30 p.m., correct?

13       A.   Yes.

14       Q.   And she says -- you know, it's kind of

15   written in code, but it says, ASTM C-36 have not got

16   the license.  She says H-V, but I understand that to

17   be "have."  Is that a fair reading of that?

18            MR. DUPLANTIER:  Object to the form of

19            the question.

20            Subject to that, you can answer it,

21            Clay.

22       A.   Yes.

23   BY MR. SEEGER:

24       Q.   That would be a fair reading of ASTM C-36

25   H-V, meaning have not got the license, correct?

Confidential - Subject to Further Confidentiality Review

1        A.    Correct.

2        Q.    Okay.  It means the factory of Taihe do

3    not apply ASTM C-36 authentication in America, but

4    they have got -- and then she says 100,000 pieces,

5    correct?  Am I reading that correctly?

6                MR. DUPLANTIER:  Object to the form of

7            the question.

8                You can answer.

9        A.    They've got 100,000 pieces, it says.

10   BY MR. SEEGER:

11       Q.    And she also says that the factory of

12   Taihe do not apply ASTM C-36 authentication in

13   America, correct?

14       A.    Yes.

15       Q.    All right.  Now, I'm just curious.  When

16   you saw this -- because you're Clay Geary and you're

17   on this -- did you do anything to satisfy yourself

18   that that statement was either not true or, in

19   fact -- other than what we talked about, that

20   certificate we looked at.

21       A.    Uh-huh.

22       Q.    Did you do anything beyond that

23   certificate to satisfy yourself that there was, in

24   fact, ASTM compliant board coming from Taishan?

25       A.    This was in December of '05, and we did

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

1    not buy the Taihe board at that time.

2         Q.   But you did buy board from Taihe, correct,

3    ultimately?

4         A.   We did.

5         Q.   Did you do anything at that time to

6    satisfy yourself, other than the certificate that we

7    talked about -- all right?  In your mind, that could

8    be whatever it is.  But I'm saying, other than that

9    certificate, did you do anything else to satisfy

10   yourself that the board was ASTM compliant?

11        A.   As I said, Jim handled that transaction.

12        Q.   Okay.  So we'll talk to Jim.

13             Now, if you look at the other document

14   that we marked as Exhibit 3, the e-mail from David

15   Zhang, I guess -- you can see at the very top of

16   this e-mail, it's dated December 14th, 2005,

17   also -- not also.  Strike that.

18             It's dated December 14th, 2005, correct?

19        A.   Yes.

20        Q.   Okay.  And I see your brother is on this

21   at the top, but you're not, correct?

22        A.   Correct.

23        Q.   Okay.  Did you have any direct dealings

24   with David Zhang or Metro Resources at -- in this

25   time frame I'm talking about?

Confidential - Subject to Further Confidentiality Review

Page 32

1                  MR. DUPLANTIER:  Object.  It's been

2                  asked and answered, but you can answer it

3                  again.

4           A.   Not that I recall.

5       BY MR. SEEGER:

6           Q.   Okay.  At any time frame later than this?

7           A.    I mentioned that I think we got on the

8       phone with him in, you know, the spring of '09 time

9       frame when the problems had arisen.

10          Q.   Okay.  I'll try not to ask you that again.

11                  MR. DUPLANTIER:  You mean the third

12                  time?

13                  MR. SEEGER:  I'll try not to ask it a

14                  third time, correct, because you look

15                  grumpy today, and I don't want to get into

16                  an argument.  You're a little

17                  scary-looking.

18      BY MR. SEEGER:

19          Q.   Okay.  So we covered that.

20                  Are you familiar with who King Wholesale

21      is?

22          A.   Yes.

23          Q.   Who is that?

24          A.   That's a predecessor company, I guess

25      you'd say.

Confidential - Subject to Further Confidentiality Review

1          Q.    Okay.  Predecessor company to who?

2          A.    We had a family reorganization, and so

3     Interior/Exterior was formed in 2001.

4          Q.    I see.  Does King Wholesale still exist?

5          A.    I think we're still registered with the

6     Secretary of State, but there are no operations;

7     haven't been since 2002.

8          Q.    Is that -- to the extent it would still

9     exist, is that a company that you and your brother

10    own?

11         A.    Yes, amongst others.

12         Q.    Okay.  In the INEX family of companies,

13    could you identify who that -- like the corporate

14    organization -- who that is?  Is there a parent

15    company that owns INEX or a sister company --

16         A.     It's a limited partnership.  The general

17    partner is Interior/Exterior Enterprises.  The

18    limited partner is South Cortez, L.L.C.  Jim, myself

19    and two other siblings own -- are the members of the

20    general partnership.

21         Q.    Okay.  Are there companies that do this

22    kind of work, you know, supply type -- you know,

23    building supply work that are under INEX that are

24    owned by INEX?

25                MR. DUPLANTIER:  I'm going to object

Confidential - Subject to Further Confidentiality Review

Page 34

 1              to the form of the question.

 2                  You can answer it, though, Clay.

 3        A.   No.  We have, you know, branches but no

 4   other divisions.

 5   BY MR. SEEGER:

 6        Q.   Right.

 7        A.   No.

 8        Q.   But the branches are owned by INEX?

 9        A.   Yes, yes.

10        Q.   Was it INEX or King Wholesale that

11   was involved in the purchase of the Indonesian

12   board?

13        A.   That would have been King Wholesale.

14        Q.   Okay.  And I'm sorry.  This is me asking

15   you the question over again.  When did you say INEX

16   sort of became -- when it took over the operations?

17   2001?

18        A.   INEX -- interior/Exterior was formed in

19   2001; began operations on January 1st, 2002.

20        Q.   Okay.  Thank you.  I won't ask you that

21   one again, either.

22                  I came across, looking through documents,

23   of a reference to Elephant Board.  Can you clarify

24   that for me?  What's that about?

25        A.   My recollection is Elephant Board was the

Confidential - Subject to Further Confidentiality Review

1    brand name of the gypsum board we brought in from

2    Thailand.

3         Q.   Okay.  And that would -- that brand name,

4    that was on the board?

5         A.   My recollection, yes.

6         Q.   Okay.  And you had customers at that

7    time -- and I asked you a little bit about it.  I

8    want to go a little bit more into it.  You had

9    customers at that time that specifically had asked

10   you not to ship or sell them Elephant Board; is that

11   right?

12        A.   We may have.  I don't recall.

13        Q.   When did you stop importing board from

14   Indonesia?  I know you bought it in '99.  Did it

15   continue for several years or --

16        A.   No.  Similar to the situation -- actually

17   shorter, I believe.  You know, it was a very tight

18   supply in the U.S., and we did it for a very short

19   period of time, and then supply freed up in the

20   U.S., so we stopped importing.

21        Q.   Okay.  And it would always be your

22   preference to buy board in the -- domestic board in

23   the U.S. as opposed to going outside the U.S.; is

24   that fair?

25        A.   It's much easier and less risky because

Confidential - Subject to Further Confidentiality Review

1    your -- you know, the price fluctuates on the

2    product, and if you place an order today, normally

3    you can get it in two or three days.  If you order a

4    ship from overseas, the price could drop

5    tremendously by the time you get it.

6         Q.   Do you also, though, have a higher comfort

7    level with American products as opposed to going

8    outside the U.S.?

9         A.   We didn't -- I don't know that it was that

10   as much as it was -- it was convenience, easy, not

11   as much risk, price risk --

12        Q.   Sitting --

13        A.   -- or cost risk.

14        Q.   I'm sorry.  I didn't mean to cut you off.

15        A.   That's okay.

16        Q.   Sitting here today, do you have domestic

17   board in your supply houses, your warehouses?

18        A.   Yes.

19        Q.   Any foreign board?

20        A.   No.

21        Q.   Did the -- you can only answer this for

22   yourself.  We'll speak to your brother later.  But

23   did the experience with the Indonesian board shape

24   your impressions on what you should or should not do

25   with regard to importing board from outside the

Confidential - Subject to Further Confidentiality Review

Page 37

1    U.S.?

2         A.    To a certain degree.  I think in the

3    documents I produced, I remember, you know, getting

4    a copy of our letter of credit that we used for that

5    other board to make sure that we had all the

6    specifics as far as the requirements that we needed,

7    as far as warranties and ASTM certificates and so

8    forth.

9         Q.    Okay.

10             MR. SEEGER:  I'm going to streamline

11             this, and I know this is an early time to

12             take a five-minute break, but if I take a

13             five-minute break, I'll probably save us

14             an hour.

15             MR. DUPLANTIER:  You can take any

16             time -- take as many breaks as you like.

17             MR. SEEGER:  Okay.  And feel free to

18             use the bathroom.

19             THE WITNESS:  I'm fine.

20             MR. SEEGER:  Let's take a five-minute

21             break.

22             THE VIDEOGRAPHER:  The time now is

23             10:04 a.m.  We are now off the record.

24    (Recess.)

25             THE VIDEOGRAPHER:  The time now is

Confidential - Subject to Further Confidentiality Review

1              11 -- or, sorry -- 10:12 a.m.  We are now

2              back on the record.  This is a

3              continuation of tape 1.

4       BY MR. SEEGER:

5          Q.   Mr. Geary, I just want to clarify

6       something.  When I was asking you about the board

7       from Indonesia, and you had said some of the

8       complaints were about the weight of the board and

9       brittleness.  Do you recall us discussing that?

10         A.   Yes.

11         Q.   Okay.  And I said to you, the brittleness

12      and the weight, in your mind, did it relate to the

13      gypsum itself?  I just want to be clear on what you

14      thought the problem was there.  Was it the -- was it

15      the paper?  Was it the gypsum?

16              MR. DUPLANTIER:  I'm going to object

17              to the form of the question.

18              Subject to that, you can answer it.

19              MR. RISLEY:  Object to the form.

20         A.   I would assume it would be the product,

21      the whole product.  I can't imagine the weight of

22      the paper would have necessarily made much of a

23      difference, but the weight of the product itself.

24      BY MR. SEEGER:

25         Q.   Right.  Okay.

Confidential - Subject to Further Confidentiality Review

Page 39

```
 1              COURT REPORTER:  I'm sorry.  Can you
 2          say that one more time, please?
 3              THE WITNESS:  The weight of the
 4          product itself.
 5   BY MR. SEEGER:
 6       Q.   I can't imagine that the weight of the
 7   paper would have made much -- it was the weight of
 8   the product.  That was the answer, right?
 9       A.   Yes.
10       Q.   Okay.  Now, I want to go back a little bit
11   now to the time frame when you're receiving the
12   Taishan board.  We talked a little bit about ASTM.
13   Are there things on the board itself that you would
14   look for to satisfy yourself that the board is ASTM
15   compliant?
16       A.   Things on the board?
17       Q.   Yeah.  Identification --
18       A.   I can't recall.  I believe it -- I can't
19   recall if it had ASTM stamped on it or not, the ASTM
20   number.
21       Q.   And if it did or didn't, would it have
22   other things?  Would the rule, the ASTM rule,
23   require the board to have things, like the name of
24   the -- you know, of the manufacturer or, you know, a
25   certain kind of bonding tape or something like that?
```

Confidential - Subject to Further Confidentiality Review

Page 40

1    A.   It did have the name of the -- it said

2    Taihe brand name on the end tape.

3    Q.   Okay.  And were there other things that

4    you can recall that would help you satisfy yourself

5    that the board is ASTM compliant that you would look

6    for?

7    A.   Not that I recall.

8    Q.   Okay.  Would you be -- would you have been

9    involved in that at that time, or would your

10   brother?

11   A.   As far as whether there was a marking, an

12   ASTM number on the board?

13   Q.   Either an ASTM number or that the board

14   itself had the things that the ASTM rule says it

15   needs to have.

16   A.   We had in a letter of credit that the

17   board would be ASTM certified.  We also had in there

18   that it had to say "Made in China" on it, because we

19   understood that to be a regulatory concern.

20   Q.   And did you satisfy yourself that those

21   things were there?

22   A.   "Made in China," yes.

23   Q.   What about with regard to the thickness?

24   Was that identified on the board?

25   A.   Yes, it is.

Confidential - Subject to Further Confidentiality Review

Page 41

```
 1          Q.    The name of the producer or supplier?

 2          A.    It said "Taihe."  You're talking about the

 3     Taishan board?

 4          Q.    Yeah.

 5          A.    It said "Taihe" on the end tape.

 6          Q.    Okay.  The brand name?

 7          A.    I don't recall.

 8          Q.    ASTM specification for the product?  And I

 9     think you said you don't recall if that was there.

10          A.    I don't recall that.

11          Q.    Did you have dealings with SGH?

12          A.    SGH?

13          Q.    SGS.  So many initials here.  SGS; did you

14     have dealings with SGS?

15          A.    We discussed them doing some inspections

16     for us, but we did not -- not do any.

17          Q.    Didn't do any?

18          A.    Not with them.

19          Q.    What does SGS do?  What's their business?

20          A.    I believe they do inspections for products

21     coming into the U.S., but that's a guess.  I'm not

22     positive.

23          Q.    Well, why would you hire them?  Just to

24     get into your head a little bit, why would you -- I

25     understand you're saying they didn't do anything,
```

Confidential - Subject to Further Confidentiality Review

Page 42

1    but if you were to hire SGS, what would you hire

2    them to do?

3         A.   We were -- we wanted to make sure the

4    product was loaded onto the ship without damage,

5    that the quantity was correct, you know, whether

6    there were banged ends on the side when they get

7    loaded to the ship and so forth.

8         Q.   Would SGS be -- have the ability to do

9    testing on a product if you wanted them to?

10        A.   I don't -- I don't know if they do

11   testing, actual -- during the manufacturing process,

12   you're talking about?

13        Q.   Well, at any point.

14        A.   I don't know if they do testing during the

15   manufacturing process.  I don't know.

16        Q.   Would they do testing at any point?  Would

17   they do testing at the -- like, if you received the

18   board and you wanted to have some tests done to make

19   sure -- to check purity or things like that?

20        A.   I don't -- I don't know.

21        Q.   Okay.  Who -- and I'm sorry.  You said

22   that you wound up not using SGS with regard to the

23   Taishan board; is that right, or you did?

24        A.   We did not.

25        Q.   Did not.  So who did the inspections for

Confidential - Subject to Further Confidentiality Review

Page 43

1    you when the board came in?  Did you guys do that?

2         A.   As I said, Jim handled that.

3         Q.   Okay.  So we'll ask Jim.

4              Give me a second.

5              What would have been the minimum type of

6    testing or inspection that INEX would have wanted

7    with regard to the Taishan board?

8                   MR. DUPLANTIER:  I'm going to object

9              to the form of the question.

10                  Subject to that, you can answer it,

11             Clay.

12        A.   We were basically concerned whether it

13   had -- same with the Knauf board.  We were basically

14   concerned whether it was banged up and as it was --

15   well, let me take a step back.  The Taishan board

16   was shipped via container.  It was a broker who

17   handled it.  So we didn't inspect the product or

18   have anyone look at the product prior to delivery to

19   New Orleans.

20   BY MR. SEEGER:

21        Q.   Okay.  But what about when it got to New

22   Orleans?

23        A.   When it got to New Orleans, it came in

24   container, and we, you know, had to take the product

25   out of the containers, and we were looking for

Confidential - Subject to Further Confidentiality Review

Page 44

1    visual damage.

2        Q.    Would you have noticed -- like, you had

3    said that some of the complaints about the Taishan

4    board was also weight and brittleness.   Would that

5    have been noticed at the time of those inspections,

6    when the board came off the ship, or no?

7        A.    No.   The weight we would have known

8    probably before we ordered the product.

9        Q.    Okay.   Did you have the ability to

10   actually go and view the manufacturing processes in

11   Taishan if you wanted to?

12       A.    I don't believe so.

13       Q.    Did you ask or inquire?

14       A.    That would be Jim.

15       Q.    Okay.   Do you know what a material safety

16   data sheet is?

17       A.    In general.

18       Q.    Could you tell me what your general

19   understanding of that is?

20       A.    My general understanding is that's a sheet

21   used in case there's any problem with a product, be

22   it being ingested by an employee or an airborne

23   problem and what you should do in the event there's

24   some type of safety problem with the product.

25       Q.    Okay.   And you received actually a

Confidential - Subject to Further Confidentiality Review

 1    material safety data sleet for the Knauf board,

 2    correct, Mr. Geary?

 3        A.    Yes.

 4        Q.    Did you ever get one for Taishan?

 5        A.    You'd have to ask Jim that.

 6        Q.    Who's David Alexander?

 7        A.    I don't recall that name.

 8        Q.    That's another Jim question?

 9        A.    I'm not sure who that is.  I don't recall

10    that name.

11        Q.    Okay.  For the record, Mr. Geary, I'm

12    marking Exhibit 4, which is INEX00696.

13            (Deposition Exhibit 4 was marked for

14                    identification.)

15            Can you identify this for me?

16        A.    It says, "PABCO Gypsum Physical Test."

17        Q.    Do you see up in the upper left-hand

18    corner?

19        A.    Uh-huh.

20        Q.    That's your name there, right?

21        A.    Yes.

22        Q.    Okay.  Would that indicate that you

23    received that, that went to you in your files?

24        A.    That's not my writing.  That looks like

25    someone may have put my name on it.

Confidential - Subject to Further Confidentiality Review

Page 46

1          Q.    Do you recall receiving it?

2          A.    No, I don't.

3          Q.    I mean, prior to today, have you ever seen

4     it before?

5          A.    I think it was in the documents we

6     produced, but I really don't remember it.

7          Q.    Okay.  Does the general form of this

8     document look familiar to you?  Put aside it says,

9     "PABCO" at the top, "Gypsum Physical Test."  The

10    format, can you tell me what this is, why you would

11    get something like this?

12         A.    It says an ASTM C 1396 worksheet.

13         Q.    Okay.  Is this the kind of thing that you

14    would have requested with regard to buying drywall

15    from a manufacturer?

16         A.    I don't -- this looks like a different

17    format than some others that I've seen.

18         Q.    Is it similar to the others you've seen?

19         A.    Actually, it looks like it's got a lot

20    more numbers and a lot less wording than some of the

21    other ones.

22         Q.    Okay.  I'm just -- because I don't

23    understand the inner workings of INEX, why would

24    this go to you?  Is this something that would

25    typically go to you; would it go to Jim; would it go

Confidential - Subject to Further Confidentiality Review

Page 47

1    to both of you?

2         A.   The only thing I can surmise is that, you

3    know, people were contacting us about product,

4    trying to get product, and they were sending over,

5    you know, brochures and coming to see us, and

6    possibly this was something that came over at that

7    time.

8         Q.   Okay.  It's not the kind of document you'd

9    request from a manufacturer, you know, selling to

10   you drywall to be resold?

11        A.   You know, I'm sure that during the

12   process, when people would come see us, we told them

13   some of our requirements, one of which was it had to

14   be ASTM certified.

15        Q.   Okay.

16        A.   And possibly they gave it to us because of

17   that.

18        Q.   Now, I want to bring you to 2009.  Have

19   you -- or your -- not you.  Has your company ever

20   been involved in a recall of a product that you

21   sold?

22        A.   No.

23        Q.   When did you tell your customers about the

24   problems with the Chinese drywall?

25        A.   We did not notify our customers.  We

Confidential - Subject to Further Confidentiality Review

Page 48

1    notified the insurance company, and then we

2    talked -- Jim talked to Knauf.

3        Q.   But no notification directly to your

4    customers; is that right?

5        A.   We did not know who had the product and

6    who did not.

7        Q.   Did you notify installers or builders?

8        A.   No.  We didn't know who had the product

9    and who did not.

10       Q.   Did you ever send anything out saying

11   there's a possibility you might have received this

12   board that's being recalled?

13       A.   We did not.

14       Q.   How did you handle the -- did anybody try

15   to return Chinese board to you?

16       A.   Try to --

17       Q.   In this time frame, 2009, did people call

18   you up and say, look, we'd like to bring back the

19   Chinese board and get our money back?

20       A.   I think I need to talk to my attorney

21   about that first.

22       Q.   Okay.  We'll hold off on that.

23            Well, other -- I'm going to ask it through

24   you, because I want to make sure he doesn't step

25   over the line.  Other than any kind of a settlement

Confidential - Subject to Further Confidentiality Review

 1   that might have involved attorneys -- I'm talking

 2   just a customer coming back saying, I got a few

 3   boards, I'd like to get my money back.  Anything

 4   like that happen?

 5        A.   I don't know if it was during litigation

 6   or not, if litigation had ensued, so I don't know if

 7   I can answer that or not.

 8        Q.   Okay.  In the 2009 time frame, did you

 9   resolve any lawsuits that might have been brought

10   against INEX with regard to Chinese drywall?

11        A.   Did the company?

12        Q.   Yeah.

13        A.   No.

14        Q.   Did you determine -- when you first became

15   aware of the problem with Chinese drywall, did you

16   go and look and see how much of it might still be in

17   your warehouses?

18        A.   I don't think we had any.

19        Q.   Do you know if you had any?  Can you say

20   with certainty?

21        A.   I'm pretty sure.  I wouldn't swear to it,

22   but I'm pretty sure we didn't.

23        Q.   Okay.  Because you're under oath, so I

24   need you to swear to something.

25        A.   Well, then I'm not sure.

Confidential - Subject to Further Confidentiality Review

1      Q.    Okay.  Did you do -- I mean, were you

2    involved in any procedures that the company might

3    have implemented to determine whether there was

4    still Chinese board in your warehouses?  Like, did

5    you go and say to your employees, go and find

6    anything marked with Taihe or Taishan or Knauf?

7      A.    My recollection is we checked and we did

8    not have any, but, like I said, I am not positive.

9      Q.    Okay.  And who would have been involved in

10   that process, just so we can get a final answer?

11     A.    Jim and I.

12     Q.    So Jim would be the better person to ask

13   on that?

14     A.    Ask him.  Maybe his memory is better than

15   mine.

16     Q.    Okay.  So with regard to the Knauf board,

17   you dealt with -- I believe your prior testimony is

18   that you dealt with some -- you dealt with somebody

19   in Knauf's U.S. -- it was a U.S. insulation person

20   for Knauf; is that fair?

21     A.    The initial conversation Jim had with Jeff

22   Brisley.

23     Q.    Okay.

24     A.    And so you probably want to ask him about

25   that.  As far as dealing with ordering the product

Confidential - Subject to Further Confidentiality Review

Page 51

1    and all the logistics and so forth, I handled most

2    of that.

3         Q.    Okay.  And who did you deal with?

4         A.    The primary guy was Mark Norris.

5         Q.    I'll come back to that.

6               When did INEX first admit in any public

7    way that it had sold Chinese drywall?

8                    MR. RISLEY:  Objection to form.

9                    MR. DUPLANTIER:  Let me just object

10                   to the extent that you're asking him

11                   to begin down that path that I think

12                   you're asking for attorney-client

13                   privilege.

14                   MR. SEEGER:  I'm not asking for that.

15                   So anything that you can be --

16                   MR. DUPLANTIER:  You know, for the

17                   record, and we'll -- let me clarify for

18                   the record that -- but we have an

19                   agreement and an understanding that we're

20                   not going to repeat the 30(b)(6)

21                   deposition of Interior/Exterior.

22                   MR. SEEGER:  Uh-huh.

23                   MR. DUPLANTIER:  These issues were

24                   covered extensively in that deposition,

25                   and it was explained at that time that, by

Confidential - Subject to Further Confidentiality Review

Page 52

```
 1              the time INEX first became aware of the
 2              problem, they were already in litigation.
 3              So I think you're asking him what are the
 4              consequences of what they did after they
 5              consulted counsel, and I think what comes
 6              after that is privileged.
 7                   MR. SEEGER:  Okay.  I don't think we
 8              needed the whole answer, but that would
 9              have been fine if you just said, it came
10              after you consulted counsel.  So that's
11              what we have, right?
12      BY MR. SEEGER:
13           Q.   How did INEX deal with customer inquiries
14      once the news was out about problem Chinese drywall?
15                   MR. DUPLANTIER:  Again, you're asking
16              for attorney-client privilege.
17                   MR. SEEGER:  How?  How is that
18              possible?  A customer calls him up and
19              says, I want to know about this problem
20              with Chinese drywall.  You were involved
21              in every discussion?
22                   MR. DUPLANTIER:  Yes.
23                   MR. SEEGER:  Okay.  I can't argue with
24              that.
25                   MR. DUPLANTIER:  It was done under the
```

Confidential - Subject to Further Confidentiality Review

Page 53

```
 1                direction of counsel.  It was done at the
 2                direction of counsel.  Do you want him to
 3                disclose that information?
 4                     MR. SEEGER:  No.  Only if you want to
 5                let him --
 6                     MR. DUPLANTIER:  (Talking over one
 7                another) -- instruct him to do?
 8                     MR. SEEGER:  Only if you want to let
 9                him do that.  That's up to you.  I assume
10                you're not waiving privilege, so --
11                     MR. DUPLANTIER:  No.
12                     MR. SEEGER:  Okay.
13                     Well, I mean, that's a very good
14                point.  Anything that was said by the
15                Gearys or INEX to the public.
16                     MR. DUPLANTIER:  You can say that --
17                you can answer that, Clay.
18                     MR. SEEGER:  That's my fault, then.
19                     THE WITNESS:  I'm sorry.  Then what's
20                your question?
21           BY MR. SEEGER:
22                Q.  My question is:  Did you -- how did you
23           respond directly to customers, to the public, about
24           inquiries about Chinese drywall?
25                A.  To customers or --
```

Confidential - Subject to Further Confidentiality Review

1      Q.   Yeah.  A customer calls you up and said,

2   do I have this stuff; I mean, I bought drywall from

3   you, I'm concerned about it.  How did you deal with

4   that?  The discussion between you and the customer,

5   nothing to do with counsel.

6      A.   Well, we instructed our employees to have

7   the customer talk directly to our branch managers,

8   and the branch manager took down the information.

9   And I believe at that point in time, we had

10  contacted Doug Sanders with Knauf, and we gave them

11  Doug Sanders' phone number or Chuck Fossler, who is

12  with the inspection company that inspected the

13  houses.

14     Q.   Okay.  And Sanders, I think you said this,

15  but he represent -- he's a lawyer who represented

16  Knauf, correct?

17     A.   Yes.

18     Q.   Okay.  And why did you think to contact

19  Doug Sanders, because he didn't represent you,

20  right?

21     A.    I think Jim can tell you how that

22  transpired.  He -- well, I guess that'd be

23  secondhand, so you'd want to ask him that, how that

24  all began.

25     Q.   Okay.  You can only -- you can tell me

Confidential - Subject to Further Confidentiality Review

1    about your involvement to the extent you were

2    involved or involved in discussions with Jim.  Why

3    did you decide to contact Doug Sanders, to the

4    extent you were involved?

5         A.   My understanding is Jim contacted Kurt

6    Heider, who is our sales rep, which was in our

7    previous deposition, that Kurt Heider apparently

8    sent up the ladder, and went up the ladder and what

9    we got back from him is, you need to call Doug

10   Sanders; Knauf -- Knauf said, you got to call Doug

11   Sanders.

12        Q.   You got to call their lawyer?

13        A.   Yeah.

14        Q.   And then he wrote you an e-mail, which

15   kind of gave you some direction --

16        A.   Probably to Jim, as I recall.

17        Q.   You're right.  I'll ask Jim about it.

18   You're right.

19             MR. SEEGER:  We got ten minutes on the

20             tape, so we'll take another break.  We may

21             be done --

22             MR. DUPLANTIER:  Okay.

23             MR. SEEGER:  -- with you, Mr. Geary.

24             MR. DUPLANTIER:  Like I said, you can

25             take as many breaks as you want.

Confidential - Subject to Further Confidentiality Review

1          MR. SEEGER:  You're so generous.

2          THE VIDEOGRAPHER:  The time now is

3     10:31 a.m.  We are now off the record.

4  (Recess.)

5          THE VIDEOGRAPHER:  The time now is

6     10:40 a.m.  We are now back on the record.

7     This is the beginning of tape 2.

8                    * * *

9                 EXAMINATION

10 BY MR. MAYESH:

11     Q.   Mr. Geary, did you do anything to prepare

12 for your deposition here today?

13     A.   Yes.

14     Q.   Okay.  What did you do?

15     A.   I reviewed previous -- my previous

16 deposition.

17     Q.   You read it?

18     A.   Yes.

19     Q.   And did you also take a look at the

20 exhibits that were marked at that deposition?

21     A.   I did.

22     Q.   Did you review any other documents in

23 addition to what was previously marked at your

24 deposition?

25     A.   I looked through my binder that I, you

Confidential - Subject to Further Confidentiality Review

1    know, produced and just glanced through the

2    documents.

3         Q.   Uh-huh.  Could you describe for us,

4    please, the condition of the market for wallboard

5    in -- after the storm in 2005?

6         A.   It was a -- actually, before the storm,

7    there was a shortage of drywall, and the storm just

8    kind of exacerbated the problem, so the

9    manufacturers put -- domestic manufacturers put the

10   suppliers on what they called allocation, meaning if

11   you bought 20 trucks a week, you know, prior to the

12   shortage, then you would get 20 trucks a week after

13   the shortage.  That's simplistic, but that's

14   basically what they did.  So there -- it was a

15   supply and demand problem.

16        Q.   Right.  So supply was short, demand was

17   high?

18        A.   Correct.

19        Q.   And demand was going higher, and you

20   anticipated demand would go higher, I take it?

21        A.   Correct.

22        Q.   So you guys had been in this business

23   many, many years, this business of buying and

24   distributing wallboard, right?

25        A.   Correct.

Confidential - Subject to Further Confidentiality Review

Page 58

1          Q.    Now, what did you do in that market to try
2     to assure that you would have a sufficient supply?
3          A.    Well, that's when we -- you know, we
4     talked about domestic manufacturers.  Actually, I
5     know I produced a letter I had written to National
6     Gypsum pleading for more product, and, you know,
7     they -- we got as much as they would allow us to
8     get, and so we explored other avenues, and that's
9     when we ended up importing product.
10         Q.    And were you forecasting at that time that
11    you would be able to sell virtually all the
12    wallboard you could manage to put your hands on?
13         A.    In the -- while that shortage --
14         Q.    Yeah.
15         A.    -- was occurring, yes.
16         Q.    Now, I believe I read in your brother's
17    deposition last time -- he said that your customers
18    were desperate to get wallboard product.  Do you
19    agree with that characterization?
20         A.    I don't know if desperate, but they needed
21    product, yes.
22         Q.    They needed product?
23         A.    Yeah.
24         Q.    I want to show you a document that I
25    believe was previously marked in this case, not your

Confidential - Subject to Further Confidentiality Review

1    deposition, but I think you were present when

2    Mr. Brisley testified, right?

3        A.    I was.

4        Q.    Okay.  And I'll mark this as exhibit --

5                  MR. MAYESH:  I guess we're up to 5,

6            are we?

7                  COURT REPORTER:  Yes.

8                  MR. DUPLANTIER:  Yeah.

9         (Deposition Exhibit 5 was marked for

10                    identification.)

11                 MR. MAYESH:  Here's a couple more.

12           You may want them.

13                 MR. SEEGER:  Thank you.

14   BY MR. MAYESH:

15       Q.    Now, you'll see on Exhibit 5 here that

16   we've just marked, down in the lower right, it's got

17   an identification number that says KI, and then

18   there's a whole bunch of zeros and then the number

19   73.  And it also says, "Knauf Insulation 41."

20   That's Exhibit No. 41 from Mr. Brisley's deposition.

21   Take a look at that, if you will.

22       A.    (Reviewing document.)  Okay.

23       Q.    All right.  Let me ask you, in preparation

24   for today's deposition, did you review this

25   document?

Confidential - Subject to Further Confidentiality Review

Page 60

1          A.    No.

2          Q.    Is this the first time that you've seen

3     it?

4          A.    I don't recall seeing this document.

5          Q.    Okay.  And you'll see there -- and I'm

6     focusing on the lower e-mail.  There's really two

7     e-mails on the page.  The first one is from Kurt

8     Heider?

9          A.    Correct.

10         Q.    I believe you told us Kurt Heider was your

11    salesman at Knauf Insulation?

12         A.    Yes.

13         Q.    You know him?

14         A.    Yes.

15         Q.    Now, the e-mail from Mr. Heider says that

16    he, Mr. Heider, got a call from Clay Geary today.

17               My question to you is:  Did you call him

18    on that day?

19         A.    I don't recall.  I possibly did.

20         Q.    Okay.  So possibly it was you, not Jim --

21    your brother, Jim, who made the initial call to

22    Knauf on September 23rd, 2005; is that right?

23         A.    It could have been.

24         Q.    Okay.  You have no reason to deny what

25    Mr. Heider recorded here in this e-mail, do you?

1          A.    No.

2          Q.    Okay.  And he goes on to say that he,

3     meaning you, had a real interesting request.  He

4     asked what is the availability of Knauf Gypsum

5     Board.

6                Did you make that request of him, sir?

7          A.    I wouldn't be surprised if I didn't.  I

8     don't recall it, but I wouldn't be surprised.

9          Q.    If you did?

10         A.    Yeah.

11         Q.    Right.  Because you were looking for

12    supply?

13         A.    We were looking for board.  Yeah, we were.

14         Q.    All right.  He would be interested in

15    buying some if the opportunity presented itself.

16    Does that sound like something you said on that

17    date?

18                    MR. DUPLANTIER:  Object to the form of

19                    the question.  Subject to that, you can

20                    answer it, Clay.

21         A.    Yes.

22    BY MR. MAYESH:

23         Q.    Again, do you have any reason to deny that

24    you said words like that --

25         A.    No.

Confidential - Subject to Further Confidentiality Review

Page 62

1          Q.    -- to Mr. Heider?

2          A.    No.

3          Q.    Okay.  He said, a present time -- I think

4     he meant to say "at," but it says -- he said a

5     present time -- board is harder and harder to get

6     and anticipates it to get even harder in the next

7     few months.

8                That is what you anticipated in late

9     September of 2005, isn't it, sir?

10         A.    Yes, it is.

11         Q.    Okay.  So here's my question:  You said

12    that you had foreign manufacturers call you and see

13    if you wanted to buy board from them.  Do you recall

14    that testimony?

15         A.     No, I wouldn't say foreign manufacturers.

16    We had people coming in.  I would tell you probably

17    for the most part they were brokers.

18         Q.    Brokers.  Okay.

19                But in this case, in the case of Knauf, it

20    was you who reached out to Knauf Insulation to see

21    if they could help get you some Knauf wallboard;

22    isn't that true?

23                     MR. DUPLANTIER:  I'm going to object

24                to the form of the question.  Subject to

25                that, you can answer it, Clay.

Confidential - Subject to Further Confidentiality Review

1      A.    In this e-mail, yes.

2    BY MR. MAYESH:

3      Q.    Well, again, I understand this is what the

4    e-mail says, but I want to know from you, your best

5    recollection now, was it INEX through you, Clay

6    Geary, who picked up that phone and called Mr.

7    Heider and said, we need wallboard, can you help

8    us get some?

9      A.    I don't recall it, but I wouldn't be

10   surprised if I didn't.

11     Q.    Okay.  Now, if you look a little farther

12   down in the e-mail -- one, two, three -- fourth

13   paragraph, it says, Clay is trying to be a bit more

14   proactive in anticipating those needs and wants to

15   know if he could supply him -- if we could supply

16   him if he needs board as well as how soon Knauf

17   could supply him with a boatload of board.

18            Do you see that?

19     A.    Yes.

20     Q.    So is it true that you anticipated that,

21   when you called up Mr. Heider, you were looking for

22   board manufactured overseas, right?

23     A.    Yes.

24     Q.    Because that's the only board that would

25   require a boat to bring it in as opposed to a truck?

Confidential - Subject to Further Confidentiality Review

Page 64

1          A.    Correct.

2          Q.    Okay.  And did you discuss with him the

3     availability of board in China?

4          A.    I don't recall the conversation, so I

5     don't know if I did or not.

6          Q.    Okay.  Now, there did come a time when

7     Knauf China plants were prepared to give you a quote

8     on board from China, right?

9          A.    Correct.

10         Q.    Okay.  And you did buy that board from

11    Knauf China?

12         A.    Correct.

13         Q.    Let me show you and mark Exhibit 6, a

14    document that was previously marked -- previously

15    marked as Knauf Insulation Exhibit 43.  Again, I

16    think that was to Mr. Brisley's deposition.  The

17    identification numbers are KI, a bunch of zeros, and

18    the last two digits are 84.

19              (Deposition Exhibit 6 was marked for

20                    identification.)

21              Please take a look at that, and I'm going

22    to focus on the lower part again, Mr. Heider's

23    e-mail to Mr. Brisley, talking about his discussion

24    with you.

25         A.    (Reviewing document.)  Okay.

Confidential - Subject to Further Confidentiality Review

Page 65

1        Q.    All right.  Can you explain what was going

2    on with this letter of credit problem?

3        A.    I don't remember any particular.  I think

4    it was just negotiating back and forth on the letter

5    of credit, and, apparently, we were concerned that

6    they could produce -- we had a ship, it looks like,

7    and we were concerned that they could produce the

8    product, package the product and have it ready for

9    that ship.  And I think what we were trying to do is

10   see if Knauf could just bill us as they do for their

11   domestic insulation, rather than doing the letter of

12   credit, which would have taken more time and

13   possibly slowed down the shipment.

14       Q.    Okay.  So you were anxious to get the

15   product, and you didn't want these financial terms

16   to essentially make you miss the boat, right?

17       A.    Miss the boat, exactly.

18       Q.    Okay.  Now, you had been a customer of

19   Knauf Insulation for sometime?

20       A.    Probably 15 or 20 years.

21       Q.    They're located in Indiana, right?

22       A.    Shelbyville, Indiana.

23       Q.    Shelbyville.

24             When you bought insulation from Knauf

25   Insulation in Shelbyville, Indiana, they didn't

Confidential - Subject to Further Confidentiality Review

Page 66

1    have to ask you how good your credit was, did

2    they?

3         A.   We had an open line of credit with them.

4         Q.   Because you were a very good customer,

5    sir, right?

6         A.   Yes, we were.

7         Q.   And now, suddenly, you're dealing with

8    this Knauf operation over in China, right, on this

9    wallboard?

10        A.   Correct.

11        Q.   And for some reason that operation doesn't

12   want to sell you on open account, right?

13        A.   Correct.

14        Q.   They want a letter of credit to make sure

15   that you're going to pay the bill, right?

16        A.   Correct.  Correct.

17        Q.   They didn't trust your credit, did they?

18             MR. DUPLANTIER:  I'm going to object

19             to the form of the question.

20             MR. MAYESH:  I'll withdraw the

21             question.  I'll withdraw the question.

22             MR. DUPLANTIER:  Good.

23   BY MR. MAYESH:

24        Q.   Did you say in words or substance to

25   anybody at Knauf Insulation in Shelbyville, Indiana,

Confidential - Subject to Further Confidentiality Review

Page 67

1    what is this with a letter of credit, we're one of

2    your best customers, why do you want a letter of

3    credit from us?

4         A.   I don't recall that conversation.

5         Q.   In fact, sir, you understood that you were

6    dealing with a different company in China.  You

7    weren't dealing with Knauf Insulation, you were

8    dealing with a Knauf company that made wallboard in

9    China, right?

10                  MR. DUPLANTIER:  I'm going to object

11              to the form of the question.  Actually,

12              the e-mail from Knauf Insulation says that

13              we were dealing with Knauf Gyps.

14          MR. MAYESH:  Okay.  Well, thank you,

15              sir, --

16              MR. DUPLANTIER:  So it's a

17              mischaracterization.

18              MR. MAYESH:  -- but I would ask you

19              just -- if you could just object.

20   BY MR. MAYESH:

21        Q.   Would you like my question read back?

22        A.   Please.

23        Q.   Sure.

24              COURT REPORTER:  "In fact, sir, you

25              understood that you were dealing with a

Confidential - Subject to Further Confidentiality Review

Page 68

1           different company in China.  You weren't

2           dealing with Knauf Insulation, you were

3           dealing with a Knauf company that made

4           wallboard in China, right?"

5               MR. RISLEY:  We join in the objection.

6               MR. DUPLANTIER:  You can answer it.

7       A.   I guess I never really thought about it at

8    the time.  I assumed that Knauf was Knauf.

9    BY MR. MAYESH:

10      Q.   Yeah, but you knew that this boat was

11   being loaded over in China, right?

12      A.   Yes.

13      Q.   Okay.  And you also knew that Knauf in

14   China was unwilling to sell you on open account;

15   they wanted a letter of credit?

16      A.   Correct.

17               MR. RISLEY:  Object to form.

18               MR. DUPLANTIER:  Objection.  Come on,

19           asked and answered, Jay.

20   BY MR. MAYESH:

21      Q.   What is it that you asked Mr. Heider to do

22   for you with respect to this letter of credit

23   situation?

24      A.   I think we just went through that.  I

25   asked him to -- the ship was -- according to the

Confidential - Subject to Further Confidentiality Review

Page 69

1    e-mail, the ship was going to be leaving, and we

2    wanted to see if we could buy it on open account

3    rather than negotiating back and forth on the letter

4    of credit, which may, as we said before, might miss

5    the boat.

6         Q.    And what happened?

7         A.    We ended up doing a letter of credit.

8         Q.    They wouldn't accept it on open account,

9    would they?

10        A.    Correct.

11        Q.    And that was the seller of the drywall who

12   refused to accept it on -- accept your order on open

13   account, correct?

14        A.    I don't recall who made the decision.  I

15   didn't read the top of this.  You told me not to

16   look at the top of this.  Should I look at the

17   response?

18        Q.    Sure.  Go right ahead.

19        A.    (Reviewing document.)  It looks like Bob

20   Britton spoke with Tony -- and I can't remember

21   Tony's last name -- and it says, I'll be asking

22   Mr. Britton to speak with Tony, but I'm not sure

23   what that will do.

24        Q.    And you see that Mark Norris was involved

25   here?

Confidential - Subject to Further Confidentiality Review

1              MR. DUPLANTIER:  Object to the form of

2              the question.  Subject to that, you can

3              answer.

4    BY MR. MAYESH:

5         Q.   I'm just looking at the second paragraph

6    in the top e-mail.  It says, the feedback I get from

7    Mark Norris.

8         A.   He's corresponding.  He's not copied on

9    this e-mail, though.  Mark Norris is not.

10        Q.   You were dealing with Mark Norris, weren't

11   you?

12        A.   Yes, I was.

13        Q.   You knew Mark Norris was in China, right?

14        A.   Yes.

15        Q.   Is it fair to say you knew you were buying

16   wallboard from Mark's company in China?

17             MR. DUPLANTIER:  Object to the form of

18             the question.

19        A.   Buying wallboard from Knauf.

20   BY MR. MAYESH:

21        Q.   Okay.  Did you ever get an explanation as

22   to why the Chinese wallboard company with the name

23   Knauf was not accepting you on open account when an

24   American insulation company with the name Knauf was

25   perfectly prepared to accept your orders on open

Confidential - Subject to Further Confidentiality Review

Page 71

1    account?

2              MR. RISLEY:  Objection; form.

3        A.   I don't recall that.

4    BY MR. MAYESH:

5        Q.   Okay.  Let me mark this as exhibit next in

6    order.  It's a two-page document.  I'll identify it

7    for the record.  This was marked as Knauf Insulation

8    Exhibit 42 at Mr. Brisley's deposition.

9              MR. SEEGER:  Do you need this marked,

10         Jay?

11             MR. MAYESH:  Please.  Exhibit 7.

12         (Deposition Exhibit 7 was marked for

13                  identification.)

14    BY MR. MAYESH:

15       Q.   Take a moment to look at that, sir, and

16    let me know when you've done so.

17             MR. DUPLANTIER:  This is 7?

18             MR. MAYESH:  I believe it is.  Am I

19         right?

20             COURT REPORTER:  Yes.

21             MR. MAYESH:  Numbers are not my forte.

22       A.   (Reviewing document.)  Okay.

23    BY MR. MAYESH:

24       Q.   All right.  So I take it you have seen

25    this bottom e-mail before, right?

Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   Because you wrote it?

3      A.   Yes.

4      Q.   And it says -- you're writing it to

5   Mr. Barry Topple, correct?

6      A.   Correct.

7      Q.   It says, I am Clay Geary with INEX; Jeff

8   Brisley sent you an e-mail on our behalf requesting

9   your help in trying to get us some additional gypsum

10  board; I have been dealing with your China

11  operations, and we have our third ship arriving in

12  two days.

13          Do you see that?

14     A.   Yes.

15     Q.   By that time, by the time you wrote this,

16  were you still giving Mr. Norris letters of credit

17  or were they selling you on open account?

18     A.   Letters of credit.

19     Q.   Did you make a request after two thousand

20  and -- after 2007 -- I see this is April -- I'm

21  sorry.  April 2006.  Did you make a request

22  beginning in January of 2006 to dispense with the

23  letters of credit and/or Knauf in China to be

24  selling you on open account?

25     A.   I don't recall that.

Confidential - Subject to Further Confidentiality Review

1   Q. Okay. I'll mark as Exhibit 8 this next

2 e-mail. This is an e-mail that was previously

3 marked as Knauf Insulation Exhibit 40 to the

4 deposition of Mr. Brisley, and its identification

5 number is KI, a bunch of zeros, and the last two

6 digits are 11, one one.

7   (Deposition Exhibit 8 was marked for

8       identification.)

9   A. (Reviewing document.) Okay.

10   Q. This is an e-mail from you to Jeff

11 Brisley, right?

12   A. Yes.

13   Q. I believe it is May 2, 2006, right?

14   A. Correct.

15   Q. Now, you say here in the first sentence --

16 you're thanking him for increasing your allocation

17 of insulation.

18   A. Correct.

19   Q. Was insulation also a building material

20 that was in short supply at this time?

21   A. I believe it was. I don't remember if

22 it -- I don't think it was to the extent of drywall,

23 but I believe it was in some short supply.

24   Q. And he helped you out, he increased your

25 allocation, and you were thanking him for that?

Confidential - Subject to Further Confidentiality Review

Page 74

1        A.    Yes.

2        Q.    Now, when you were buying this insulation,

3    did you have to post a letter of credit?

4        A.    No.

5        Q.    You bought this on open account, right?

6        A.    Yes.

7        Q.    You bought it from Knauf Insulation in

8    Shelbyville, Indiana, right?

9        A.    Yes.

10       Q.    All right.  Let me just mark this next one

11   as Exhibit 9.  I think it probably is the last one.

12   Don't hold me to that statement.

13            (Deposition Exhibit 9 was marked for

14                     identification.)

15            So what we've marked as Exhibit 9, it is a

16   document previously marked as Knauf Insulation

17   Exhibit 44 to the deposition of Mr. Jeff Brisley.

18   And the identifier number on this is KI, a whole

19   bunch of zeros, as usual, and the last two digits

20   are 88.

21       A.    (Reviewing document.)  Okay.

22       Q.    All right, sir?  And you say in -- this is

23   from you to Mr. Brisley, and you're thanking him for

24   helping you out; is that right?

25       A.    Correct.

1      Q.   Okay.  You say one, two, three, four,

2   five, six lines down, you say, the fact that

3   we were able to partner with Knauf China during a

4   time of hard allocation was very beneficial.

5           Do you see that?

6      A.   Yes.

7      Q.   And what did you mean by Knauf China?

8      A.   You know, we refer to our branches as

9   Interior/Exterior Baton Rouge, Interior/Exterior

10  Mobile.  I thought it was just Knauf, a division of

11  Knauf.

12     Q.   Uh-huh.  That was the seller of

13  drywall that was asking you for a letter of

14  credit, correct?

15              MR. RISLEY:  Objection to form.

16  BY MR. MAYESH:

17     Q.   Knauf China?

18     A.   That was asking us for a letter --

19     Q.   Yeah.

20     A.   It was -- it was -- yes, it was Knauf

21  China.  It was Tianjin, I think, and WuHu.

22     Q.   Okay.  You also hear -- you've heard of

23  KPT, Knauf --

24     A.   Yes.

25     Q.   -- Plasterboard Tianjin?

Confidential - Subject to Further Confidentiality Review

1      A.   Yes.

2      Q.   That was one of the companies in China?

3      A.   Yeah.  I don't remember what exactly was

4  on the letter of credit, but whatever it was.

5           MR. MAYESH:  That was Exhibit 9?

6           MR. DUPLANTIER:  Yes.

7           MR. MAYESH:  Give me one moment here.

8       I think that may be all for Mr. Clay.

9       Just a few more questions.

10  BY MR. MAYESH:

11      Q.   At your earlier deposition, you were asked

12  a number of questions -- both you and your brother,

13  Jim, were asked a number of questions about invoices

14  that were coming in from your -- I shouldn't say

15  invoices -- purchase orders that were coming in from

16  your customers that said right on them, no Knauf, no

17  China board, words like that.

18      A.   Invoices to our customers?

19      Q.   No.  I mean -- no, I corrected it.

20  Purchase orders from your customers to you ordering

21  drywall, but saying, no Knauf, no China board and

22  that kind of notation.

23      A.   I don't know if I remember the purchase

24  orders.  I remember the invoices to our customers

25  that said, no China board, no Knauf.

Confidential - Subject to Further Confidentiality Review

```
 1        Q.   And why would your invoices to your
 2    customers say, no China board, no Knauf?
 3        A.   Why would they say that?
 4        Q.   Uh-huh.
 5        A.   That was a preference of the customer.
 6        Q.   Okay.  So it was -- an invoice is a bill,
 7    right?
 8        A.   Yes.
 9        Q.   So when you say you gave invoices to
10    customers, you were sending them a bill?
11        A.   Yes.
12        Q.   And on the bill, you put down their
13    preference, no China board, no Knauf?
14        A.   Correct.
15        Q.   There were a number of customers who
16    indicated such a -- shall I say negative preference
17    for China board or Knauf board, right?
18        A.   Correct.
19        Q.   Why did the customers not want Knauf board
20    or China board?
21        A.   My feeling was it was, once again, because
22    it's heavy and the other complaint was brittle.
23        Q.   That was your feeling?
24        A.   Yeah.
25        Q.   Did you ever -- and by the way, this was
```

Confidential - Subject to Further Confidentiality Review

1    a -- there was still kind of a shortage, right?

2       A.   Yes.

3       Q.   Did you ever pick up the phone and say to

4    a customer, why don't you want China board, why

5    don't you want Knauf board?

6       A.   No.  Understand that Jim and I were not

7    involved day-to-day in the sales process, so we

8    weren't actually getting those calls or necessarily

9    seeing those invoices at the time.  It would have

10   been various salesmen throughout the company.

11      Q.   Salesmen, your salespeople?

12      A.   Salespeople throughout the company.

13      Q.   So did you ever say to any of your

14   salespeople, what is it with these people not

15   wanting China board, not wanting Knauf board?

16      A.   My -- you know, we were aware that the

17   product was heavier.  We bought it, and it was

18   heavier.  As far as brittle, you hear the same thing

19   of domestic manufacturers.  You hear, you know, one

20   guy says, USG is more brittle, and the other guy

21   says, Temple is more brittle.  It's a preference.

22      Q.   Yeah.  Here's my question directly, sir:

23   Did you ever have a conversation with any of your

24   salespeople in which you directly asked why

25   customers did not want Knauf board?

Confidential - Subject to Further Confidentiality Review

Page 79

```
 1          A.    I don't think so.
 2          Q.    Did any of your salespeople ever say to
 3    you, a customer told me they did not want Knauf
 4    board because?
 5          A.    No.
 6          Q.    And was it you, sir, who yourself,
 7    when you were doing some building in your own
 8    home?
 9          A.    Yes.
10          Q.    And you told your people, don't give me
11    any Knauf board?
12          A.    Actually, what I said was, USG board.
13          Q.    USG board?
14          A.    Yes.
15          Q.    Okay.
16                MR. MAYESH:  That's all my questions.
17                Thank you.
18                MR. DUPLANTIER:  Thank you.
19                MR. SEEGER:  You want to switch them
20                up, or you want to take a five-minute
21                break?
22                MR. DUPLANTIER:  Let's -- I want to
23                take a break for about five or six
24                minutes.  You're done?
25                MR. SEEGER:  I'm done with this
```

Confidential - Subject to Further Confidentiality Review

Page 80

1           Mr. Geary.

2                THE VIDEOGRAPHER:  The time now is

3           11:13 a.m.  We are now off the record.

4           This is the end of tape 2.

5                (DEPOSITION CONCLUDED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 81

1                   ACKNOWLEDGMENT OF DEPONENT

2

3          I,_____, do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10         _____

11         CLAY GEARY                          DATE

12

13   Subscribed and sworn to before me this

14   _____ day of _____, 20 _____.

15   My commission expires: _____

16

17   Notary Public

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 82

```
1                      - - - - - -

2                         ERRATA

3                      - - - - - -

4    PAGE    LINE    CHANGE/REASON

5    _____   _____   _____

6    _____   _____   _____

7    _____   _____   _____

8    _____   _____   _____

9    _____   _____   _____

10   _____   _____   _____

11   _____   _____   _____

12   _____   _____   _____

13   _____   _____   _____

14   _____   _____   _____

15   _____   _____   _____

16   _____   _____   _____

17   _____   _____   _____

18   _____   _____   _____

19   _____   _____   _____

20   _____   _____   _____

21   _____   _____   _____

22   _____   _____   _____

23   _____   _____   _____

24   _____   _____   _____

25   _____   _____   _____
```

Confidential - Subject to Further Confidentiality Review

Page 83

1                              - - - - - -

2                         LAWYER'S NOTES

3                              - - - - - -

4      PAGE   LINE

5      _____  _____   _____

6      _____  _____   _____

7      _____  _____   _____

8      _____  _____   _____

9      _____  _____   _____

10     _____  _____   _____

11     _____  _____   _____

12     _____  _____   _____

13     _____  _____   _____

14     _____  _____   _____

15     _____  _____   _____

16     _____  _____   _____

17     _____  _____   _____

18     _____  _____   _____

19     _____  _____   _____

20     _____  _____   _____

21     _____  _____   _____

22     _____  _____   _____

23     _____  _____   _____

24     _____  _____   _____

25     _____  _____   _____

Confidential - Subject to Further Confidentiality Review

Page 84

```
 1                    CERTIFICATE
 2          I, LESLIE B. DOYLE, Certified Court
 3    Reporter (LA), NCRA Registered Professional Reporter
 4    and Certified LiveNote™ Reporter, do hereby certify
 5    that prior to the commencement of the examination,
 6    CLAY GEARY was duly sworn by me to testify to the
 7    truth, the whole truth and nothing but the truth.
 8          I DO FURTHER CERTIFY that the foregoing is
 9    a verbatim transcript of the testimony as taken
10    stenographically by and before me at the time, place
11    and on the date hereinbefore set forth, to the best
12    of my ability.
13          I DO FURTHER CERTIFY that I am neither a
14    relative nor employee nor attorney nor counsel of
15    any of the parties to this action, and that I am
16    neither a relative nor employee of such attorney or
17    counsel, and that I am not financially interested in
18    the action.
19          This 12th day of October, 2012.
20
21
22          _____

            LESLIE B. DOYLE, RMR, RDR
23          Certified Court Reporter (LA)
            Certified LiveNote™ Reporter
24
25
```