Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

IN RE:                      §
CHINESE-MANUFACTURED        §   MDL NO. 2047
DRYWALL PRODUCTS            §
LIABILITY LITIGATION        §   SECTION: L
_____§
                            §   JUDGE FALLON
This document applies       §
to all cases                §   MAG. JUDGE WILKINSON
_____§


FRIDAY, FEBRUARY 5, 2010


- CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW


Videotaped deposition of CLAYTON C.
GEARY and JAMES F. GEARY, SR., AS JOINT
30(B)(6) REPRESENTATIVES OF THE
INTERIOR/EXTERIOR BUILDING SUPPLY, LP, held
at the offices of Frilot, LLC, 3700 Energy
Centre, 1100 Poydras Street, New Orleans,
Louisiana, commencing at 9:15 a.m., on the
above date, before Michael E. Miller,
Certified Court Reporter, Registered
Diplomate Reporter, Certified Realtime
Reporter.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

EXHIBIT
2

Confidential - Subject to Further Confidentiality Review

Page 2

 1    CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
                    STATE OF LOUISIANA
 2
      NO. 09-8144                    DIVISION "H-12"
 3
 4      PATRICK DENNIS, M.D., AND WIFE KATHLEEN
      DENNIS, INDIVIDUALLY AND ON BEHALF OF THEIR
 5        MINOR CHILDREN, ISABELLA DENNIS AND
                    GABRIELLE DENNIS
 6
                       -VERSUS-
 7
        INTERIOR EXTERIOR BUILDING SUPPLY, L.P.;
 8    INTERIOR EXTERIOR ENTERPRISES, L.L.C.; RSUI
           INDEMNITY COMPANY; LANDMARK AMERICAN
 9     INSURANCE COMPANY; ARCH INSURANCE COMPANY;
       THE NORTH RIVER INSURANCE COMPANY; LIBERTY
10    MUTUAL FIRE INSURANCE COMPANY; UNITED STATES
      FIRE INSURANCE COMPANY; BITUMINOUS FIRE AND
11    MARINE INSURANCE COMPANY; SAVOIE REAL ESTATE
          HOLDINGS, L.L.C.; SAVOIE REALTY, L.L.C.;
12       CLARENDON AMERICAN INSURANCE COMPANY;
      PRAETORIAN SPECIALTY INSURANCE COMPANY; QBE
13      SPECIALTY INSURANCE COMPANY; COLONIAL
       INSPECTION SERVICES, L.L.C.; SEALS DRYWALL
14         AND HERMITAGE INSURANCE COMPANY
15    _____
16
17
18
19
20
21
22
23
24

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1     A P P E A R A N C E S :
 2         HERMAN, HERMAN, KATZ & COTLAR, LLP
           BY:  STEPHEN J. HERMAN, ESQUIRE
 3             sherman@hhkc.com
           820 O'Keefe Avenue
 4         New Orleans, Louisiana 70113
           (504) 581-4892
 5         Counsel for MDL Plaintiffs
 6
           LUMPKIN, REEVES & MESTAYER, PLLC
 7         BY:  JIM REEVES, ESQUIRE
               jrr@lumpkinreeves.com
 8             TOM BUSBY, ESQUIRE
               twb@lumpkinreeves.com
 9         160 Main Street
           Biloxi, Mississippi 39530
10         (228) 374-5151
           Counsel for MDL Plaintiffs
11
12         LAMBERT AND NELSON, PLC
           BY:  HUGH P. LAMBERT, ESQUIRE
13             hlambert@lambertandnelson.com
           701 Magazine Street
14         New Orleans, Louisiana 70130-3629
           (504) 581-1750
15         Counsel for MDL Plaintiffs
16
           BECNEL LAW FIRM, LLC
17         BY:  DANIEL E. BECNEL, JR., ESQUIRE
               dbecnel@becnellaw.com
18         106 West Seventh Street
           Reserve, Louisiana 70084
19         (985) 536-1186
           Counsel for MDL Plaintiffs
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 4

```
 1     A P P E A R A N C E S:
 2         LEMMON LAW FIRM, LLC
           BY:  ANDREW A. LEMMON, ESQUIRE
 3             andrew@lemmonlawfirm.com
           550 Poydras Street
 4         Suite 2335
           New Orleans, Louisiana 70130
 5         (504) 581-5644
           Counsel for Plaintiffs
 6
 7         KANNER & WHITELEY, LLC
           BY:  MELISSA M. FUSELIER, ESQUIRE
 8             m.fuselier@kanner-law.com
               CYNTHIA ST. AMANT, ESQUIRE
 9             c.stamant@kanner-law.com
               (via teleconference)
10         701 Camp Street
           New Orleans, Louisiana 70130
11         (504) 524-5777
           Counsel for Dennis Plaintiffs
12
13         GALLOWAY, JOHNSON, TOMPKINS,
           BURR & SMITH
14         BY:  RICHARD G. DUPLANTIER, JR., ESQUIRE
               rduplantier@gjtbs.com
15             LAMBERT J. HASSINGER, JR., ESQUIRE
               jhassinger@gjtbs.com
16         One Shell Square
           701 Poydras Street, 40th Floor
17         New Orleans, Louisiana 70139
           (504) 525-6802
18         Counsel for Interior/Exterior
           Building Supply, LP, et al.
19
20         CARR ALLISON
           BY:  VINCENT A. NOLETTO, ESQUIRE
21             vnoletto@carrallison.com
           6152 Monroe Street
22         Suite 200
           Daphne, Alabama 36526
23         (251) 626-9340
           Counsel for Interior/Exterior
24         Building Supply, LP, et al.
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 5
   1      A P P E A R A N C E S:
   2         BAKER & McKENZIE, LLP
             BY:  DOUGLAS B. SANDERS, ESQUIRE
   3              douglas.b.sanders@bakernet.com
             One Prudential Plaza, Suite 3500
   4         130 East Randolph Drive
             Chicago, Illinois 60601
   5         (312) 861-8000
             Counsel for Knauf Plasterboard
   6         Tianjin Company, Ltd.
   7
             FRILOT, LLC
   8         BY:  PAUL C. THIBODEAUX, ESQUIRE
                  pthibodeaux@frilot.com
   9         3700 Energy Centre
             1100 Poydras Street
  10         New Orleans, Louisiana 70163
             (504) 599-8000
  11         Counsel for Knauf Plasterboard
             Tianjin Company, Ltd.
  12
  13         CUNNINGHAM BOUNDS, LLC
             BY:  STEVEN L. NICHOLAS, ESQUIRE
  14              sln@cunninghambounds.com
             1601 Dauphin Street
  15         Mobile, Alabama 36604
             (251) 471-6191
  16         Counsel for The Mitchell Company
  17
             BARRASSO, USDIN, KUPPERMAN,
  18         FREEMAN & SARVER, LLC
             BY:  CHRISTY HAROWSKI, ESQUIRE
  19              charowski@barassousdin.com
                  (via teleconference)
  20         909 Poydras Street
             Suite 2400
  21         New Orleans, Louisiana 70112
             Phone: (504) 589-9700
  22         Counsel for The Mitchell Company
  23
  24
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 6
  1      A P P E A R A N C E S:
  2         WRIGHT GREEN, PC
            BY:  TIFFANY B. SMITH, ESQUIRE
  3              tiffanysmith@wrightgreen.com
                 (via teleconference)
  4         Post Office Box 16818
            Mobile, Alabama 36616-0818
  5         (251) 344-7744
            Counsel for The Mitchell Company
  6
  7         DEUTSCH, KERRIGAN & STILES, LLP
            BY:  JAMES W. HAILEY, III, ESQUIRE
  8              jhailey@dkslaw.com
            755 Magazine Street
  9         New Orleans, Louisiana 70130
            (504) 581-5141
 10         Counsel for Landmark American
            Insurance Company
 11
 12         JONES WALKER, LLP
            BY:  MEGAN E. DONOHUE, ESQUIRE
 13              mdonohue@joneswalker.com
            201 St. Charles Avenue
 14         New Orleans, Louisiana 70170-5100
            (504) 582-8000
 15         Counsel for National Surety
            Insurance Company
 16
 17         SHARON B. KYLE, APLC
            BY:  STEVEN K. SCHILLING, ESQUIRE
 18              SS@KYLELAW.NET
            4960 Bluebonnet Road
 19         Suite A
            Baton Rouge, Louisiana 70809-3088
 20         (225) 293-8400
            Counsel for Mayeaux Construction
 21         Company, Inc.
 22
 23
 24
```

Confidential - Subject to Further Confidentiality Review

Page 7

```
 1     A P P E A R A N C E S:
 2          ADAMS, HOEFER, HOLWADEL & ELDRIDGE, LLC
            BY:  D. RUSSELL HOLWADEL, ESQUIRE
 3               drh@ahhelaw.com
            400 Poydras Street
 4          Suite 2450
            New Orleans, Louisiana 70130
 5          (504) 581-2606
            Counsel for Arch Insurance Company
 6
 7          BARRASSO, USDIN, KUPPERMAN,
            FREEMAN & SARVER, LLC
 8          BY:  JUDY Y. BARRASSO, ESQUIRE
                 jbarasso@barassousdin.com
 9          909 Poydras Street
            Suite 2400
10          New Orleans, Louisiana 70112
            (504) 589-9700
11          Counsel for Liberty Mutual Insurance
            Company
12
13          WATSON, BLANCHE, WILSON & POSNER, LLP
            BY:  GARRETT S. CALLAWAY, ESQUIRE
14               gcallaway@wbwplaw.com
            505 North Boulevard
15          Post Office Drawer 2995
            Baton Rouge, Louisiana 70821
16          (225) 387-5511
            Counsel for Bituminous Fire and
17          Marine Insurance Company
18
            CHOPIN, WAGAR, RICHARD & KUTCHER, LLP
19          BY:  JASON P. FOOTE, ESQUIRE
                 jfoote@chopin.com
20          Two Lakeway Center, Suite 900
            3850 North Causeway Boulevard
21          Metairie, Louisiana70002
            (504) 830-3838
22          Counsel for ASI Lloyds, Clarendon
            American Insurance Company and
23          Praetorian Specialty Insurance
            Company
24
```

Confidential - Subject to Further Confidentiality Review

Page 8

```
 1    A P P E A R A N C E S:
 2         LOWE, STEIN, HOFFMAN,
           ALLWEISS & HAUVER, LLP
 3         BY:  MAX J. COHEN, ESQUIRE
                mcohen@lshah.com
 4         One Shell Square, Suite 3600
           701 Poydras Street
 5         New Orleans, Louisiana70139-7735
           (504) 581-2450
 6         Counsel for Rockhill Insurance
           Company
 7
 8         PRINCE, McKEAN, McKENNA & BROUGHTON, LLC
           BY:  DENNIS MCKENNA, ESQUIRE
 9              dm@princemckean.com
           56 St. Joseph Street
10         Suite 1301
           Mobile, Alabama36602
11         (251) 433-5441
           Counsel for Creola Ace Hardware, Inc.
12
13         JAMES RYAN III & ASSOCIATES, LLC
           BY:  JAMES RYAN, III, ESQUIRE
14              jryan@ryan-law.us
           201 St. Charles Avenue
15         Suite 2420
           New Orleans, Louisiana70170
16         (504) 599-5990
           Counsel for Hermitage Insurance
17         Company
18
           FOWLER WHITE BURNETT, PA
19         BY:  ELIZABETH J. FERRY, ESQUIRE
                eferry@fowler-white.com
20              (via teleconference)
           Espirito Santo Plaza
21         1395 Brickell Avenue, 14th Floor
           Miami, Florida33131
22         (305) 789-9200
           Counsel for Black Bear Gypsum
23         Supply, Inc. and Smoky Mountain
           Materials, Inc.
24
```

Confidential - Subject to Further Confidentiality Review

                                                        Page 9

```
 1     A P P E A R A N C E S:
 2         HUNTON & WILLIAMS, LLP
           BY:  A. TODD BROWN, ESQUIRE
 3             tbrown@hunton.com
               (via teleconference)
 4         Bank of America Plaza
           101 South Tryon Street, Suite 350
 5         Charlotte, North Carolina28280
           (704) 378-4700
 6         Counsel for Stock Building Supply, LLC
 7
           LLOYD, GRAY & WHITEHEAD, PC
 8         BY:  J. RICK WALLIS, ESQUIRE
               rwallis@lgwpc.com
 9             (via teleconference)
           2501 20th Place South
10         Suite 300
           Birmingham, Alabama35223
11         (205) 967-8822
           Counsel for Capstone Partners, LLC
12
13         PARSONS, LEE & JULIANO, PC
           BY:  DOROTHY A. POWELL, ESQUIRE
14             dpowell@pljpc.com
               (via teleconference)
15         300 Protective Center
           2801 Highway 280 South
16         Birmingham, Alabama 35223
           (205) 326-6600
17         Counsel for George Drywall, Inc.
18
           ADORNO & YOSS
19         BY:  KRISTEN LAKE CARDOSO, ESQUIRE
               kcardoso@adorno.com
20             (via teleconference)
           888 S.E. 3rd Avenue
21         Suite 500
           Ft. Lauderdale, Florida 33316
22         (954) 523-5885
           Counsel for Banner Supply Company
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1     A P P E A R A N C E S:
 2        FRIEDMAN, LEAK, DAZZIO,
          ZULANAS & BOWLING, PC
 3        BY:  CHRISTOPHER J. ZULANAS, ESQUIRE
                czulanas@friedmanleak.com
 4             (via teleconference)
          3800 Corporate Woods Drive
 5        Birmingham, Alabama 35242
          (205) 278-7000
 6        Counsel for Larry Hodge Excavating, LLC
 7
          PHELPS DUNBAR, LLP
 8        BY:  SUSIE MORGAN, ESQUIRE
                susie.morgan@phelps.com
 9             (via teleconference)
          365 Canal Street
10        Suite 2000
          New Orleans, Louisiana 70130-6534
11        (504) 566-1311
          Counsel for J.W. Allen & Co., Inc.
12
13        HAYNSWORTH SINKLER BOYD, PA
          BY:  W. DAVID CONNER, ESQUIRE
14             dconner@hsblawfirm.com
               (via teleconference)
15        75 Beattie Place
          11th Floor
16        Greenville, South Carolina 29601-2119
          (864) 240-3200
17        Counsel for L&W Supply Corporation
18
          PORTEOUS, HAINKEL & JOHNSON, LLP
19        BY:  EMILY STICKNEY MORRISON, ESQUIRE
               emorrison@phjlaw.com
20             (via teleconference)
          408 North Columbia Street
21        Covington, Louisiana 70433
          (985) 893-4790
22        Counsel for State Farm Fire &
          Casualty Company
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 11

```
 1     A P P E A R A N C E S:
 2        PUGH, ACCARDO, HAAS, RADECKER,
          CAREY & HYMEL, LLC
 3        BY:  H. PHILIP RADECKER, JR., ESQUIRE
               hpradecker@pugh-law.com
 4           (via teleconference)
          1100 Poydras Street
 5        Suite 3200
          New Orleans, Louisiana 70163-1132
 6        (504) 799-4521
          Counsel for Murphy Bateman Building
 7        Supplies, LLC
 8
 9     VIDEOGRAPHER:
10        WILLIAM GEIGERT,
          Golkow Technologies, Inc.
11
12                      - - -
13
14
15
16
17
18
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 12

1                          I N D E X

            CLAYTON C. GEARY & JAMES F. GEARY, SR.

2           AS JOINT 30(B)(6) REPRESENTATIVES FOR

                INTERIOR/EXTERIOR BUILDING SUPPLY

3                        February 5, 2010

4      APPEARANCES                                        3

5      PROCEEDINGS                                        25

6

7      EXAMINATION OF CLAYTON C. GEARY:

8           BY MR. HERMAN:                               27

9           BY MR. HERMAN:                               114

10          BY MR. REEVES:                               280

11          BY MR. NICHOLAS:                             347

12

13     EXAMINATION OF JAMES F. GEARY, SR.:

14          BY MR. HERMAN:                               54

15          BY MR. HERMAN:                               241

16          BY MR. NICHOLAS:                             382

17

18     CERTIFICATE                                       394

19     ACKNOWLEDGMENT - CLAYTON C. GEARY                 395

20     ERRATA - CLAYTON C. GEARY                         396

21     ACKNOWLEDGMENT - JAMES F. GEARY, SR.              397

22     ERRATA - JAMES F. GEARY, SR.                      398

23     LAWYER'S NOTES                                    399

24

Confidential - Subject to Further Confidentiality Review

Page 13

1                    DEPOSITION EXHIBITS
          CLAYTON C. GEARY & JAMES F. GEARY, SR.
2          AS JOINT 30(B)(6) REPRESENTATIVES FOR
              INTERIOR/EXTERIOR BUILDING SUPPLY
3                    February 5, 2010

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|
| 5 | INEX-30b6-1 | Supplemental and Amended | 28 |
| 6 | | Re-Notice of Oral and Videotaped Deposition | |
| 7 | INEX-30b6-2 | Interior Exterior Building Supply | 28 |
| 8 | | Distributor Profile Form | |
| 9 | INEX-30b6-3 | Knauf Plasterboard Wuhu | 29 |
| 10 | | Certificate of Origin, INT/EXT00084 - INT/EXT00089 | |
| 11 | | | |
| 12 | INEX-30b6-4 | Knauf Plasterboard Tianjin Mill Certificate, | 44 |
| 13 | | INT/EXT00227 - INT/EXT00231 | |
| 14 | | | |
| 15 | INEX-30b6-5 | Knauf Plasterboard Tianjin Indicative Price Summary, | 69 |
| 16 | | INT/EXT00659 - INT/EXT00660 | |
| 17 | | | |
| 18 | INEX-30b6-6 | Handwritten Notes, "John Davis," etc., | 71 |
| 19 | | INT/EXT00058 | |
| 20 | INEX-30b6-7 | Handwritten Notes, "Rick Wendel," etc., | 72 |
| 21 | | INT/EXT00951 - INT/EXT00952 | |
| 22 | INEX-30b6-8 | Handwritten Notes, "Storage fee at wharf," | 74 |
| 23 | | etc., INT/EXT00294 | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

Page 14

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER              DESCRIPTION          MARKED
 4     INEX-30b6-9    E-mail Chain Ending            74
                      10/18/05 Davis E-mail to
 5                    C. Geary,
                      Subject: Plasterboard to
 6                    New Orleans,
                      INT/EXT00638
 7
       INEX-30b6-10   E-mail Chain Ending            75
 8                    10/18/05 Davis E-mail to
                      C. Geary,
 9                    Subject: Plasterboard to
                      New Orleans,
10                    w/Handwritten
                      Interlineations,
11                    INT/EXT01292
12     INEX-30b6-11   E-mail Chain Ending            77
                      10/21/05 Davis E-mail to
13                    C. Geary, Subject: "Made
                      in China,"
14                    INT/EXT00635 -
                      INT/EXT00637
15
       INEX-30b6-12   10/28/05 Handwritten           79
16                    Notes, "Mark Norris of
                      Knauf," etc.,
17                    INT/EXT00608
18     INEX-30b6-13   E-mail Chain Ending            80
                      11/29/05 C. Geary E-mail
19                    to Srinivasan,
                      Subject: Sheetrock
20                    inspection in China,
                      INT/EXT05980
21
       INEX-30b6-14   12/5/05 Uni-Pac, Ltd.          86
22                    Letter to C. Geary,
                      INT/EXT00942
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 15

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|
| 1 | | DEPOSITION EXHIBITS | |
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | MARKED |
| 4 | INEX-30b6-15 | E-mail Chain Ending | 86 |
| | | 3/31/06 App E-mail to | |
| 5 | | Wei, Subject: Great | |
| | | Immensity, | |
| 6 | | INT/EXT03864 | |
| 7 | INEX-30b6-16 | E-mail Chain Ending | 91 |
| | | 4/3/06 Heider E-mail to | |
| 8 | | C. Geary, Subject: U.S. | |
| | | Wallboard Imports from | |
| 9 | | Knauf, | |
| | | INT/EXT04116 | |
| 10 | | | |
| | INEX-30b6-17 | E-mail Chain Ending | 91 |
| 11 | | 4/7/06 Topple E-mail to | |
| | | C. Geary, | |
| 12 | | Subject: Gypsum Board, | |
| | | INT/EXT03843 | |
| 13 | | | |
| | INEX-30b6-18 | 7/21/06 | 94 |
| 14 | | Fumigation/Disinfection | |
| | | Certificate, | |
| 15 | | INT/EXT00080 | |
| 16 | INEX-30b6-19 | PABCO Gypsum Physical | 95 |
| | | Test, ASTM C1396 | |
| 17 | | Worksheet, | |
| | | INT/EXT00696 | |
| 18 | | | |
| | INEX-30b6-20 | Knauf MSDS for | 97 |
| 19 | | Plasterboard Standard | |
| | | Core, | |
| 20 | | INT/EXT00059 - | |
| | | INT/EXT00061 | |
| 21 | | | |
| | INEX-30b6-21 | BNBM Authorization to | 102 |
| 22 | | Manufacture UL Marks, | |
| | | INT/EXT02171 | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

Page 16

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|
| 1 | | DEPOSITION EXHIBITS | |
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | MARKED |
| 4 | INEX-30b6-22 | 2/16/06 Test Report on | 103 |
| | | Gypsum Wallboard, | |
| 5 | | INT/EXT01990 | |
| 6 | INEX-30b6-23 | Addendum to Application | 107 |
| | | and Agreement for | |
| 7 | | Documentary Credit | |
| | | Between | |
| 8 | | Interior/Exterior and | |
| | | Knauf Plasterboard | |
| 9 | | Tianjin, | |
| | | INT/EXT00243 - | |
| 10 | | INT/EXT00246 | |
| 11 | INEX-30b6-24 | Knauf Plasterboard | 110 |
| | | Tianjin Informal Tender | |
| 12 | | for Freight Handling: | |
| | | January to April 2006, | |
| 13 | | INT/EXT04071 | |
| 14 | INEX-30b6-25 | 7/5/06 Contract Between | 111 |
| | | Knauf Plasterboard Wuhu | |
| 15 | | and Interior/Exterior, | |
| | | INT/EXT00171 | |
| 16 | | | |
| | INEX-30b6-26 | Knauf Plasterboard Wuhu | 112 |
| 17 | | Commercial Invoice, | |
| | | INT/EXT00077 | |
| 18 | | | |
| | INEX-30b6-27 | Gypsum Wallboard | 112 |
| 19 | | Producing Factory | |
| | | Information, BNBM, Co., | |
| 20 | | Ltd., | |
| | | INT/EXT00849 - | |
| 21 | | INT/EXT000850 | |
| 22 | INEX-30b6-28 | Handwritten Notes, | 150 |
| | | "Tianjin Sheetrock," | |
| 23 | | etc., | |
| | | INT/EXT00416 | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

Page 17

DEPOSITION EXHIBITS

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|
| | INEX-30b6-29 | E-mail Chain Ending 4/28/06 Li E-mail to to C. Geary, Subject: IEBS company information, INT/EXT02069 - INT/EXT02073 | 153 |
| | INEX-30b6-30 | E-mail Chain Ending 5/8/06 App E-mail to Li, Subject: Gypsum Wallboard, INT/EXT02061 - INT/EXT02063 | 156 |
| | INEX-30b6-31 | Application and Agreement for Documentary Credit Between BNBM and Interior/Exterior, INT/EXT00814 - INT/EXT00817 | 164 |
| | INEX-30b6-32 | Addendum to Application and Agreement for Documentary Credit Between Interior/Exterior and BNBM, INT/EXT00809 - INT/EXT00812 | 165 |
| | INEX-30b6-33 | SGS North America Inspection Request Application, INT/EXT06089 - INT/EXT06091 | 167 |

Confidential - Subject to Further Confidentiality Review

Page 18

1                       DEPOSITION EXHIBITS
2
3        NUMBER              DESCRIPTION          MARKED
4     INEX-30b6-34  6/13/06 Taian Taishan          172
                    Plasterboard Letter of
5                   Certificate,
                    INT/EXT06045
6
      INEX-30b6-35  Listing of                     173
7                   Interior/Exterior
                    Branches and Managers,
8                   INT/EXT04561
9     INEX-30b6-36  Interior/Exterior              176
                    Product Shipment
10                  Documentation,
                    INT/EXT00331 -
11                  INT/EXT00344
12    INEX-30b6-37  Freight Company Shipping       183
                    Documents,
13                  INT/EXT00004 -
                    INT/EXT00005
14
      INEX-30b6-38  Interior/Exterior              186
15                  Invoices, INT/EXT19884,
                    INT/EXT24995,
16                  INT/EXT17768,
                    INT/EXT17901,
17                  INT/EXT19699,
                    INT/EXT17467,
18                  INT/EXT17432,
                    INT/EXT21205,
19                  INT/EXT31881,
                    INT/EXT33080,
20                  INT/EXT24700
21    INEX-30b6-39  10/24/05 Davis E-mail to       202
                    C. Geary, Subject: USA
22                  Wallboard,
                    INT/EXT00623
23
24

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 19

```
 1                    DEPOSITION EXHIBITS
 2
 3       NUMBER            DESCRIPTION          MARKED
 4     INEX-30b6-40   11/23/05 App E-mail to      203
                      C. Geary,
 5                    Subject: Wallboard
                      Business - Continuation,
 6                    INT/EXT04048
 7     INEX-30b6-41   E-mail Chain Ending         205
                      1/10/06 App E-mail to
 8                    C. Geary,
                      Subject: Update - Pallet
 9                    Weights - Imported
                      Wallboard,
10                    INT/EXT00030
11     INEX-30b6-42   E-mail Chain Ending         207
                      3/9/06 App E-mail to
12                    C. Geary, Subject: IEBS
                      and Pan Ocean,
13                    INT/EXT03928
14     INEX-30b6-43   E-mail Chain Ending         212
                      3/10/06 App E-mail to to
15                    Bernas, Subject: LOI of
                      8 tires hold -
16                    Wallboard,
                      INT/EXT03916
17
       INEX-30b6-44   E-mail Chain Ending         216
18                    3/24/06 Norris E-mail to
                      C. Geary,
19                    Subject: Interior/
                      Exterior Building Supply
20                    (IEBS),
                      INT/EXT02445 -
21                    INT/EXT02447
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 20

| 1 | | DEPOSITION EXHIBITS | |
|---|---|---|---|
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | MARKED |
| 4 | INEX-30b6-45 | E-mail Chain Ending | 219 |
| | | 3/31/06 App E-mail to | |
| 5 | | Wei & Li, Subject: Great | |
| | | Immensity, | |
| 6 | | INT/EXT03865 | |
| 7 | INEX-30b6-46 | E-mail Chain Ending | 221 |
| | | 4/6/06 App E-mail to to | |
| 8 | | Li, Subject: IEBS/Knauf | |
| | | Container Shipments, | |
| 9 | | INT/EXT02442 - | |
| | | INT/EXT02443 | |
| 10 | | | |
| | INEX-30b6-47 | E-mail Chain Ending | 222 |
| 11 | | 6/19/06 App E-mail to to | |
| | | C. Geary, Subject: Knauf | |
| 12 | | and BNBM Business, | |
| | | INT/EXT02000 - | |
| 13 | | INT/EXT02003 | |
| 14 | INEX-30b6-48 | 6/20/06 App E-mail to | 223 |
| | | Wei & Li, No Subject, | |
| 15 | | INT/EXT01999 | |
| 16 | INEX-30b6-49 | Handwritten Notes, | 223 |
| | | "M/V MYSTRAS," | |
| 17 | | INT/EXT00053 | |
| 18 | INEX-30b6-50 | Handwritten Notes, | 225 |
| | | "Break Bulk," etc., | |
| 19 | | INT/EXT00278 | |
| 20 | INEX-30b6-51 | 7/6/06 Interior/Exterior | 226 |
| | | Memo to Whitney National | |
| 21 | | Bank, | |
| | | INT/EXT00177 | |
| 22 | | | |
| 23 | | | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

Page 21

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER              DESCRIPTION          MARKED
 4     INEX-30b6-52  9/20/06 Remont E-mail to      227
                     C. Geary, et al.,
 5                   Subject: Sheetrock /
                     Wed / Sep 20, 2006 /
 6                   Evening,
                     INT/EXT02379
 7
       INEX-30b6-53  E-mail Chain Ending           229
 8                   7/11/06 Davis E-mail to
                     App, Subject: IEBS Wuhu
 9                   Wallboard,
                     INT/EXT03767
10
       INEX-30b6-54  E-mail Chain Ending           229
11                   7/11/06 App E-mail to
                     Li, Subject: Wuhu
12                   Wallboard Order,
                     INT/EXT03757
13
       INEX-30b6-55  7/26/06 "Kevin" E-mail        230
14                   to "WL," Subject: M/V
                     ALEXANDERGRACHT,
15                   INT/EXT03699
16     INEX-30b6-56  Teamhead Surveyors Co.,       232
                     Ltd., Cargo Condition
17                   Report,
                     INT/EXT00447
18
       INEX-30b6-57  7/21/06                       209
19                   M/V ALEXANDERGRACHT
                     Pre-Loading Survey of
20                   Gypsum Boards,
                     INT/EXT00091 -
21                   INT/EXT00097
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER              DESCRIPTION        MARKED
 4     INEX-30b6-58   7/21/06                      233
                      M/V ALEXANDERGRACHT
 5                    Pre-Loading Survey of
                      Gypsum Boards,
 6                    INT/EXT00091 -
                      INT/EXT00097
 7
       INEX-30b6-59   Mediterranean Shipping       234
 8                    Company Original Bill of
                      Lading,
 9                    INT/EXT00975
10     INEX-30b6-60   Addendum to Application      235
                      and Agreement for
11                    Documentary Credit
                      Between
12                    Interior/Exterior and
                      Knauf Plasterboard
13                    Tianjin,
                      INT/EXT00233 -
14                    INT/EXT00236
15     INEX-30b6-61   DestinAsia Material          237
                      Gypsum Board Price List,
16                    INT/EXT00940
17     INEX-30b6-62   5/26/06 Zhang E-mail to      238
                      J. Geary, Subject: D&B,
18                    INT/EXT05897
19     INEX-30b6-63   6/20/06 Metro Resources      242
                      Correspondence to
20                    Interior/Exterior,
                      INT/EXT00967 -
21                    INT/EXT00971
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 23

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER          DESCRIPTION          MARKED
 4    INEX-30b6-64    E-mail Chain Ending          246
                      11/23/05 Zeng E-mail to
 5                    C. Geary & Stetin,
                      Subject: Inspection of
 6                    Gypsum Board,
                      INT/EXT00738
 7
      INEX-30b6-65    6/20/06 Metro Resources      247
 8                    Certificate of Warranty
                      to Interior/Exterior,
 9                    INT/EXT00969
10    INEX-30b6-66    E-mail Chain Ending          248
                      1/19/07 J. Geary E-mail
11                    to C. Geary,
                      Subject: Sheetrock,
12                    INT/EXT02293 -
                      INT/EXT02294
13
      INEX-30b6-67    COMEX Int'l "Attention:      250
14                    Purchasing Department"
                      Fax,
15                    INT/EXT00707
16    INEX-30b6-68    Bubba Board                  252
                      Information &
17                    Certification Packet,
                      INT/EXT00897 -
18                    INT/EXT00939
19    INEX-30b6-69    4/16/07 Camden Builders      254
                      Fax re: Drywall
20                    Verification,
                      INT/EXT05747 -
21                    INT/EXT05750
22    INEX-30b6-70    11/06 AWCI Tech Update,      256
                      INT/EXT06042
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 24

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER              DESCRIPTION        MARKED
 4     INEX-30b6-71   6/13/06 Becnel E-mail to    259
                      C. Geary, et al.,
 5                    Subject: Coastal Cargo -
                      $75.00 "No-Show" Appt.
 6                    Fee Approved, Effective
                      July 01, 2006,
 7                    INT/EXT04689
 8     INEX-30b6-72   3/21/06 App E-mail to       260
                      C. Geary,
 9                    Subject: Corrected page
                      two of letter to BNBM,
10                    INT/EXT03888
11     INEX-30b6-73   E-mail Chain Ending         270
                      1/26/09 Heider E-mail to
12                    Brisley,
                      Subject: Bessemer Family
13                    Sales, Knauf
                      Plasterboard problem,
14                    INT/EXT34599 -
                      INT/EXT34605
15
       INEX-30b6-74   Interior/Exterior           318
16                    Invoices,
                      INT/EXT27357,
17                    INT/EXT28739,
                      INT/EXT28746,
18                    INT/EXT27312,
                      INT/EXT27316
19
       INEX-30b6-75   Interior/Exterior           325
20                    Invoice,
                      INT/EXT19773
21
       INEX-30b6-76   Interior/Exterior           332
22                    Invoices,
                      INT/EXT21416 -
23                    INT/EXT21417
24
```

Confidential - Subject to Further Confidentiality Review

Page 25

```
 1                 DEPOSITION EXHIBITS
 2
 3       NUMBER            DESCRIPTION        MARKED
 4    INEX-30b6-77  Interior/Exterior          336
                    Invoice,
 5                  INT/EXT32838
 6    INEX-30b6-78  Notice of 1442             341
                    Deposition (Dennis v.
 7                  Interior/Exterior,
                    et al.)
 8
      INEX-30b6-79  1/26/10 Kanner Letter to   341
 9                  Herman & Levin
10    INEX-30b6-80  Exhibit A, Knauf           348
                    Commercial Invoice,
11                  IE-000003, IE-000005,
                    IE-000007, IE-000009
12
      INEX-30b6-81  Customs Information on      349
13                  Knauf Plasterboard
                    Shipments
14
      INEX-30b6-82  Sales Documentation        373
15                  Between Creola Ace
                    Hardware,
16                  Interior/Exterior and
                    Mitchell Co.,
17                  700109, 70010, 700115,
                    700118, 700112, 700124,
18                  700127
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 26

```
 1                    PROCEEDINGS
 2             (February 5, 2010 at 9:15 a.m.)
 3             THE VIDEOGRAPHER:  Stand by.
 4       We're now on the record.  My name is
 5       Bill Geigert.  I'm a videographer for
 6       Golkow Technologies.  Today's date is
 7       February 5th, 2010, and the time is
 8       9:15 a.m.
 9             This video deposition is being
10       held in New Orleans, Louisiana in the
11       matter of Chinese-Manufactured Drywall
12       Products Liability Litigation for the
13       U.S. District Court, Eastern District
14       of Louisiana.  The deponent is Clay
15       Geary.  Counsel will be noted on the
16       stenographic record.
17             The court reporter is Mike
18       Miller, and he will now swear in the
19       witness.
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

1                    CLAYTON C. GEARY,

2        having been first duly sworn, testified as

3                        follows:

4                        EXAMINATION

5    BY MR. HERMAN:

6            Q.      Good morning.

7            A.      Good morning.

8            Q.      Can you please state your name

9    for the record?

10            A.      Clayton Cook Geary.

11            Q.      And you are here today to

12    testify on behalf of Interior/Exterior; is

13    that right?

14            A.      Yes, sir.

15            Q.      And somebody else is here to

16    testify on behalf of Interior/Exterior?

17            A.      Yes, sir.

18            Q.      And who is that person?

19            A.      James Geary.

20            Q.      And what is it that you

21    perceive is your primary area of knowledge or

22    responsibility, in terms of the deposition?

23            A.      In terms of the deposition, I

24    had more of the interaction with Knauf.

Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Deposition Exhibit

 2             INEX-30b6-1, Supplemental and Amended

 3             Re-Notice of Oral and Videotaped

 4             Deposition, was marked for

 5             identification.)

 6                    (Whereupon, Deposition Exhibit

 7             INEX-30b6-2, Interior Exterior

 8             Building Supply Distributor Profile

 9             Form, was marked for identification.)

10      BY MR. HERMAN:

11             Q.    Okay.  Just for the record, I'm

12      just going to make the notice INEX-30b6-1,

13      and there's also a Distributor Profile Form,

14      which will be INEX-30b6-2.

15                    Are you familiar with the

16      Distributor Profile Form that's Exhibit 2?

17             A.    Yes.

18             Q.    And did you participate in the

19      creation of that or the responses that were

20      given?

21             A.    With conjunction of counsel.

22             Q.    Okay.  Did anybody else

23      participate, in conjunction with counsel, in

24      the responses that are provided on the
```

Confidential - Subject to Further Confidentiality Review

 1    Distributor Profile Form?

 2         A.    Jim.

 3         Q.    Okay.  And that's the other

 4    person that's here to testify on behalf of

 5    the company today, correct?

 6         A.    Yes, sir.

 7               (Whereupon, Deposition Exhibit

 8          INEX-30b6-3, Knauf Plasterboard Wuhu

 9          Certificate of Origin, INT/EXT00084 -

10          INT/EXT00089, was marked for

11          identification.)

12    BY MR. HERMAN:

13         Q.    I'm going to show you what's

14    been marked as INEX-30b6-3, previously

15    marked, with Interior/Exterior Bates numbers

16    84 to 89.

17               MR. HERMAN:  Doug, you might

18          want to...

19         A.    Yes, sir.

20    BY MR. HERMAN:

21         Q.    Are you familiar with INEX

22    Exhibit 3?

23         A.    Yes, sir.

24         Q.    What is it?

Confidential - Subject to Further Confidentiality Review

Page 30

1          A.      These are warranties and

2     certifications that we had required of Knauf

3     when we purchased material from them.

4          Q.      And from your point of view,

5     everything that you purchased from Knauf came

6     with these certificates and warranties?

7          A.      Yes, sir.

8          Q.      Or certificates and warranties

9     that were substantially similar to this?

10          A.      Yes.

11          Q.      And why did you want these

12     certificates and warranties?

13          A.      To make sure it complied with

14     certain standards that were applicable in the

15     U.S.

16          Q.      Okay.  Did you have some

17     concern that they wouldn't be?

18          A.      Just wanted to make sure they

19     were.

20          Q.      Okay.  The first one, which is

21     Bates number 84, says, "Certificate of

22     Origin.  We hereby certify that the following

23     gypsum boards have been shipped from

24     Shanghai, China to New Orleans, Louisiana,"

Confidential - Subject to Further Confidentiality Review

Page 31

1     and then it says, "Country of Origin:

2     China."

3                    Why did you want a certificate

4     of origin?

5          A.     To verify where it came from.

6          Q.     Did you have some concern that

7     it might come from somewhere other than

8     China?

9          A.     No.  We just were under the --

10    well, we were under the understanding that

11    you had to have all the products marked that

12    they were made in China or wherever the

13    country of origin was.

14         Q.     That's some type of, to your

15    knowledge, U.S. regulation?

16         A.     Yes, sir.

17         Q.     Okay.  If we look at the second

18    one, which is -- well, let me ask you this.

19                    Based on your knowledge,

20    understanding and recollection, did Knauf

21    comply with this certificate?

22         A.     Yes, sir.

23         Q.     Okay.  Okay.  Let's go to 85.

24    That's something called a mill certificate?

Confidential - Subject to Further Confidentiality Review

     1            A.      Uh-huh.

     2            Q.      And it says, "We hereby certify

     3     that the 1/2" gypsum boards were manufactured

     4     in accordance to ASTM C36."

     5            A.      Yes, sir.

     6            Q.      Okay.   Why did you want that

     7     certificate?

     8            A.      Because that's the standard

     9     that is the U.S. standard.

    10            Q.      ASTM C36 is the U.S. standard?

    11            A.      Yes, sir.

    12            Q.      And you have some concern that

    13     this gypsum board might not comply with that

    14     standard?

    15                    MR. SANDERS:   Object to form.

    16            A.      No, we just wanted to make sure

    17     it did.

    18     BY MR. HERMAN:

    19            Q.      Okay.   And if you look on the

    20     stamp, it says, "Knauf Plasterboard Wuhu

    21     Company, Ltd."

    22            A.      Yes.

    23            Q.      Are you familiar with that?

    24            A.      Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.      What is that, to your knowledge
2      and recollection?
3          A.      We had one shipment from their
4      Wuhu plant, which is different from their
5      Tianjin plant.
6          Q.      And are there similar
7      warranties and certificates and
8      representations with respect to the Knauf
9      plasterboard that you received from the
10     Tianjin plant?
11         A.      Yes, we got the same warranties
12     and certifications.
13         Q.      And from your point of view,
14     did Knauf comply with this certificate?
15         A.      The ASTM certificate?
16         Q.      Yes.
17         A.      We got the certificate saying
18     that they did.
19         Q.      Do you have any knowledge or
20     information at this point that some of the
21     gypsum boards might not have complied with
22     ASTM C36?
23         A.      No, sir, I don't.
24         Q.      Is that something you've looked

Confidential - Subject to Further Confidentiality Review

Page 34

```
 1     into?
 2            A.      No.
 3                    MR. DUPLANTIER:  Let me just
 4            object to the form of the question.
 5            To the extent that you're asking
 6            information that he might have
 7            obtained as part of attorney-client
 8            privilege, I'm going to instruct the
 9            witness not to answer what he's
10            learned from his counsel.
11                    MR. HERMAN:  Okay.
12     BY MR. HERMAN:
13            Q.      Outside of discussions with
14     your counsel, have you looked into that?
15            A.      No, sir.
16            Q.      Okay.  Bates number 86,
17     something called "Beneficiary Signed
18     Statement."  What's a Beneficiary Signed
19     Statement?
20            A.      We wanted to make sure that the
21     product was packaged correctly because it's
22     coming from overseas.
23            Q.      Okay.  And in terms of
24     "beneficiary," what are you the beneficiary
```

Confidential - Subject to Further Confidentiality Review

1    of, or what is Knauf the beneficiary of, if

2    you know?

3          A.    I guess they're certifying that

4    they shipped it, that they packaged it

5    properly for oceangoing shipment.

6          Q.    Okay.  And it says, "We hereby

7    certify that, (A), the gypsum boards goods

8    shipped were properly palletized, wrapped,

9    sealed, to protect them against damage in

10   shipment."

11              Do you see that?

12         A.    Yes, sir.

13         Q.    And is that something you were

14   concerned about?

15         A.    Yes.

16         Q.    And, to your knowledge, as we

17   sit here today, did Knauf comply with that

18   certification?

19         A.    Yes.

20         Q.    Okay.  "(B), that the packing

21   of each 68-piece pallet consisted of wrapping

22   them with six pieces of rejected boards on

23   each side to protect against damage.  Pallets

24   are constructed so as to allow for forklift

Confidential - Subject to Further Confidentiality Review

Page 36

```
 1    loading."

 2              Do you see that?

 3       A.    Yes, sir.

 4       Q.    And, to your knowledge, as we

 5    sit here today, did Knauf comply with that

 6    certificate?

 7       A.    Yes, sir.

 8       Q.    And then it says that, "Each

 9    pallet was wrapped in plastic sheet and belts

10    to further protect against damage and

11    moisture.  Each pallet was marked for size

12    with thickness and, (D), the gypsum boards

13    have end tape."

14              Do you see that?

15       A.    Uh-huh.

16       Q.    As we sit here today, do you

17    have any knowledge or information that Knauf

18    did not comply with that certificate?

19              MR. DUPLANTIER:  Answer "yes"

20       or "no."

21       A.    Do I have information that they

22    did not comply?

23    BY MR. HERMAN:

24       Q.    Yeah.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 37

```
 1              A.      No.
 2              Q.      Okay.  And why were you
 3      concerned that the gypsum boards would have
 4      end tape?
 5              A.      To mark where it came from.
 6              Q.      Okay.  And --
 7              A.      The manufacturer.
 8              Q.      And why was that of concern?
 9              A.      Just to show where it came
10      from.
11              Q.      From a client-customer
12      relations point of view, is it important to
13      be able to know or represent which
14      manufacturer is associated with which piece
15      of drywall?
16              A.      Can you repeat that question?
17              Q.      From a client-customer point of
18      view, is it important to know which
19      manufacturer is associated with which piece
20      of drywall?
21              A.      There's a preference,
22      sometimes.
23              Q.      On the part of customers?
24              A.      Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 38

1          Q.      The next Bates number is 87.

2     It says "Certificate of Quantity, Quality and

3     Condition."

4                  Do you see that?

5          A.      Yes, sir.

6          Q.      And it says, "Condition:   In

7     good conditions."

8                  You see that?

9          A.      Uh-huh.

10          Q.      As we sit here today, do you

11     have any knowledge or information that the

12     plasterboard that was shipped was not in good

13     condition?

14          A.      As far as the packaging?

15          Q.      Well, I don't know.  What does

16     this mean to you?

17          A.      That the product, I guess, is

18     in accordance with the ASTM standards.

19          Q.      Okay.  And that's all it means,

20     based on your knowledge and understanding?

21          A.      The package was made towards --

22     the product was manufactured in accordance to

23     the standards, it was packaged properly, and

24     it complied with all the standards that were

Confidential - Subject to Further Confidentiality Review

Page 39

1    applicable and the warranty that was

2    applicable.

3          Q.    Okay.  And so above that, it

4    says, "Quality in accordance to ASTM C36,"

5    and we've covered that.

6                And then separately, it says,

7    "Condition:  In good conditions."  That

8    doesn't have any meaning to you, besides the

9    fact that it was packed correctly and is in

10   accordance with ASTM C36?

11         A.    That there are no problems --

12   there should be no problems with the product.

13         Q.    Okay.  And, as we sit here

14   today, to your knowledge, are there problems

15   with the product that was shipped?

16         A.    Yes, there are.

17         Q.    Okay.  And is it the position

18   of Interior/Exterior that Knauf breached this

19   certification?

20               MR. DUPLANTIER:  Let me object

21         to the form of the question.  You're

22         asking for a legal conclusion.  But

23         subject to that, you can answer it.

24         A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 40

1    BY MR. HERMAN:

2         Q.     Okay.  Then Bates number 88,

3    the next page, it says, "Certificate.  We

4    hereby certify that one set to nonnegotiable

5    copies of required documents has been sent to

6    applicant by courier service at the address

7    of: 727 South Cortez Street, New Orleans,

8    Louisiana 70119."

9              What is that address?

10        A.     That's where our corporate

11   office is.

12        Q.     And did you, in fact, receive

13   documents from Knauf Plasterboard Wuhu at

14   that address?

15        A.     I don't recall if it was at

16   that address, but we received documents from

17   them.

18        Q.     And you received those

19   documents in the United States of America?

20        A.     Yes, sir.

21        Q.     You didn't have to go to China

22   to pick up the documents?

23        A.     No, sir.

24        Q.     Okay.  Then Exhibit 89 is

Confidential - Subject to Further Confidentiality Review

Page 41

1      "Certificate of Warranty.  We hereby certify

2      that the gypsum boards manufactured and sold

3      to Interior/Exterior Building Supply, LP are

4      guaranteed to be free from defects in

5      materials and workmanship."

6                      Why were you interested in

7      getting that warranty?

8            A.      Should there be any problems,

9      that they would take care of it.

10            Q.      Okay.  And, as we sit here

11      today, do you have any knowledge or

12      information that the plasterboards that you

13      received were not free from defects in

14      materials and workmanship?

15                      MR. SANDERS:  Object to form.

16                      MR. DUPLANTIER:  Object to the

17            form.  But you can answer it.

18            A.      Well, we wouldn't be here, I

19      guess, if there weren't some problems.

20      BY MR. HERMAN:

21            Q.      Has Interior/Exterior, to your

22      knowledge, taken the position that Knauf

23      breached this warranty?

24                      MR. DUPLANTIER:  I'm going to

Confidential - Subject to Further Confidentiality Review

Page 42

```
 1              object to the form of the question.
 2                      MR. SANDERS:  Can we just make
 3              one objection for everybody, so I
 4              don't have to chime in.
 5                      MR. HERMAN:  Sure.
 6                      MR. DUPLANTIER:  You're asking
 7              for legal conclusions, so I -- you can
 8              answer it, to the best of your
 9              ability, but -- I'm not even sure that
10              that question is within the scope of
11              the 30(b)6 deposition, but you can
12              answer it.
13                      THE WITNESS:  Can you repeat
14              the question?
15                      MR. HERMAN:  I'll try to ask a
16              better one.
17      BY MR. HERMAN:
18              Q.    To your knowledge, has
19      Interior/Exterior made any claim to Knauf
20      that this warranty was breached?
21              A.    My understanding is we -- my
22      attorney could better answer it, but we've
23      made cross-claims in some of the suits that
24      we've been named.
```

Confidential - Subject to Further Confidentiality Review

Page 43

1          Q.      And do those cross-claims

2     allege, among other things, that this

3     warranty, with respect to the plasterboards

4     being free from defects in materials and

5     workmanship, was breached?

6          A.      I don't know.

7          Q.      Based on your knowledge and

8     information as we sit here today, do you

9     believe that the plasterboards that you

10    received were free from defects in materials

11    and workmanship?

12         A.      No.

13         Q.      And what do you base that on?

14         A.      The problems that we've had.

15         Q.      What are the problems that

16    you've had?

17         A.      These lawsuits and customer

18    complaints.

19              MR. McKENNA:  Could we possibly

20         ask the witness to speak up a bit?

21              THE WITNESS:  Okay.

22              MR. DUPLANTIER:  Speak a little

23         louder, if you can.

24              THE WITNESS:  Okay.

Confidential - Subject to Further Confidentiality Review

 1                     MR. HERMAN:  Doug, I thought

 2             you were going to pose an objection,

 3             but just to be clear, you were just

 4             saying that if one defendant makes an

 5             objection, that's good for everyone?

 6                     MR. SANDERS:  (Nods head.)

 7                     MR. HERMAN:  Okay.

 8                     (Whereupon, Deposition Exhibit

 9             INEX-30b6-4, Knauf Plasterboard

10             Tianjin Mill Certificate,

11             INT/EXT00227 - INT/EXT00231, was

12             marked for identification.)

13     BY MR. HERMAN:

14         Q.    I'm going to show you what's

15     been previously marked as INEX-30b6-4.

16                     MR. HERMAN:  Doug might want

17             one.

18                     MR. SANDERS:  Thanks.

19     BY MR. HERMAN:

20         Q.    These, for the record, are

21     Bates numbers INT/EXT227 through 231.

22                     What is INEX-30b6-4, to the

23     best of your knowledge and understanding?

24         A.    Excuse me?

Confidential - Subject to Further Confidentiality Review

Page 45

1          Q.      What is this exhibit, to the

2     best of your knowledge and understanding?

3          A.      These are the warranties, the

4     mill certificates, certificate of quantity,

5     quality, ASTM certificates -- standards.

6     Well, actually, I don't see the ASTM in here.

7     Yes, I do.  Yes, I do.

8          Q.      And this is the same set of

9     warranties and certificates and

10    representations that we just looked at,

11    except it's from Knauf Plasterboard Tianjin

12    instead of Knauf Plasterboard Wuhu?

13         A.      Correct.

14         Q.      And, to your knowledge and

15    understanding, what is the difference, if

16    any, between Knauf Plasterboard Tianjin and

17    Knauf Plasterboard Wuhu?

18         A.      Manufactured at a different

19    facility.

20         Q.      Okay.  And if we look at the

21    certificate of warranty, which is Bates

22    number 230, as we sit here today, would it be

23    your knowledge and understanding that Knauf

24    Plasterboard Tianjin breached this warranty?

Confidential - Subject to Further Confidentiality Review

Page 46

1          A.      Yes.

2          Q.      And let's look at Bates

3    number 228, which is the statement.  I think

4    I'd asked you before about the term

5    "beneficiary."  There's something on this

6    that says, "This letter of credit."  What

7    does that mean, if you know?

8          A.      These were all conditions in

9    the letter of credit.

10         Q.      And who's the beneficiary of

11   the letter of credit, if you know?

12         A.      The beneficiary, I assume,

13   would be Knauf.

14         Q.      Okay.  And in this statement,

15   it says, "We hereby certify that the gypsum

16   boards goods shipped were properly

17   palletized, wrapped, sealed, to protect them

18   against damage in shipment."

19               Do you see that?

20         A.      Uh-huh.

21         Q.      Did the Knauf Tianjin

22   plasterboard come on the same shipment as the

23   Knauf Wuhu?

24         A.      No, it did not.

Confidential - Subject to Further Confidentiality Review

1          Q.      And based on your knowledge and

2     understanding, did Knauf Tianjin comply with

3     this representation?

4          A.      Yes.

5          Q.      And it says, "that the packing

6     of each 68-piece pallet consisted of wrapping

7     them with six pieces of rejected boards on

8     each side as to protect against damage.

9     Pallets are constructed so as to allow for

10    forklift loading."

11              Based on your knowledge,

12    understanding and recollection, did Knauf

13    Tianjin comply with this representation?

14         A.      Yes.

15         Q.      And then it says that each

16    pallet was wrapped in plastic sheet and belts

17    to further protect against damage and

18    moisture, each pallet was marked for

19    size/width/thickness, and the gypsum boards

20    have end tape.

21              To your knowledge,

22    understanding and recollection, did Knauf

23    Tianjin comply with that statement?

24         A.      Yes.

 1          Q.     Okay.  If you'll look at

 2    Exhibit 2, which is the Distributor Profile

 3    Form, on page 2, there's a Section 3, which

 4    talks about "Distributor's purchase of

 5    Chinese drywall," and the first thing that's

 6    listed as a source is Knauf Plasterboard

 7    Tianjin?

 8          A.     Uh-huh.

 9          Q.     Are you the best person to talk

10    about how these purchases came about, or

11    would that be Jim?

12          A.     Originally, that would be Jim.

13          Q.     Okay.  I'll try to ask you what

14    questions I can, and then we'll take a short

15    recess and try to switch over.

16                 In terms of these purchases

17    from Knauf Plasterboard Tianjin, on number 4,

18    it says, "Dates of purchases."  Do you see

19    that?

20          A.     Uh-huh.

21          Q.     And there's four different

22    dates there?

23          A.     Uh-huh.

24          Q.     What are those dates --

Confidential - Subject to Further Confidentiality Review

Page 49

1                MR. DUPLANTIER:  "Yes" or "no."

2    BY MR. HERMAN:

3         Q.    I think you meant "yes"?

4         A.    I'm sorry?

5         Q.    When you said "uh-huh," I think

6    you meant "yes"?

7         A.    Okay.  I'm sorry.  Yes.

8         Q.    Okay.  Okay.  And with respect

9    to those four dates, what do those dates

10   relate to, to the best of your knowledge and

11   recollection?

12        A.    Best of my knowledge, those are

13   the dates of the contracts.

14        Q.    The contracts --

15        A.    But I'd have to verify those.

16        Q.    And those were formal contracts

17   between Interior/Exterior and Knauf Tianjin?

18        A.    And Knauf Wuhu.  One of those

19   is Knauf Wuhu, I believe.

20        Q.    Okay.  And are these --

21        A.    I'm sorry.  I'm sorry.  Those

22   four would be Knauf Tianjin.

23        Q.    And Knauf Wuhu is listed on

24   page 3 as a separate source, correct?

Confidential - Subject to Further Confidentiality Review

Page 50

1          A.      Yes.

2          Q.      Okay.  And did those four

3    purchases come on four different ships?

4          A.      Actually, they came on three

5    ships.

6          Q.      Okay.  Do you know which two

7    were shipped together?

8          A.      My recollection is the first

9    one and the second one each came on their own

10   ships, and then the third and fourth came

11   together.

12         Q.      Okay.  And do you know about

13   when each shipment actually arrived in the

14   U.S.?

15         A.      I don't recall exactly, but it

16   is in the documents.

17         Q.      Okay.  Did anything from China

18   get to the U.S. before 2006, to the best of

19   your recollection?

20         A.      No.

21         Q.      Do you know around when in 2006

22   was the first shipment?

23         A.      It was around January 26th.

24         Q.      And was that the first time

Confidential - Subject to Further Confidentiality Review

1    that Interior/Exterior ever received any

2    drywall that was manufactured in China?

3           A.     Yes.

4           Q.     If we go to page 3, we were

5    talking about how there's a separate entry

6    for Knauf Wuhu.  Do you see that?

7           A.     Uh-huh.

8           Q.     And are you --

9           A.     Yes.

10          Q.     Are you the best person to

11   address how that purchase came about?

12          A.     Yes.

13          Q.     How did that purchase come

14   about?

15          A.     My recollection was Knauf

16   Tianjin was having trouble producing enough

17   product, and they gave us an alternative to

18   try and get it from Wuhu.

19          Q.     And when you say "they" gave

20   you an alternative, who was it that actually

21   directed you to Knauf Wuhu, if you remember?

22          A.     Mark Norris was the, I believe,

23   manager, I guess, of Knauf over there; and

24   he's the one that was our main contact as far

Confidential - Subject to Further Confidentiality Review

1     as making decisions.

2          Q.      Do you remember having a

3     specific like phone conversation or something

4     with him, where he might have directed you

5     over to Knauf Wuhu?

6          A.      We had conversations.  I can't

7     remember if it was e-mails, but there was --

8     production was getting tight for them, and

9     they gave us this alternative.

10         Q.      And did Mr. Norris speak

11    English?

12         A.      Yes.

13         Q.      And so you were able to

14    communicate with him directly?  You didn't

15    have to go through a translator?

16         A.      Correct.

17         Q.      Did you ever meet Mr. Norris in

18    person?

19         A.      No.

20         Q.      Did Mr. Norris, to your

21    knowledge, ever come to the United States?

22         A.      Not to my knowledge.

23         Q.      Did you ever go to China?

24         A.      Did not.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  There's a date of

2     purchase in number 4 of July 5th, 2006.  Do

3     you see that?

4          A.     Uh-huh.

5          Q.     Is that a contract date, to the

6     best of your recollection?

7          A.     The best of my recollection,

8     yes.

9          Q.     And would that shipment have

10    come -- or would that purchase have come on a

11    different shipment than the Knauf Tianjin

12    shipments?

13         A.     Yes, it did.

14         Q.     And do you know about when that

15    arrived?

16         A.     I believe September, but I'm --

17    of '06, but I'm not sure.

18         Q.     I understand that the other

19    Mr. Geary is the best person to address the

20    Metro Resource purchases?

21         A.     Yes.

22                MR. HERMAN:  If nobody minds,

23         let's just go off the record for one

24         second and we can switch up.

Confidential - Subject to Further Confidentiality Review

```
 1                    MR. DUPLANTIER:  That's fine
 2         with me.
 3                    THE VIDEOGRAPHER:  Off the
 4         record, 9:39 a.m.
 5                    (Recess taken, 9:39 a.m. to
 6         9:41 a.m.)
 7                    THE VIDEOGRAPHER:  Stand by.
 8         Back on the record, 9:41 a.m.
 9                    JAMES F. GEARY, SR.,
10          having been first duly sworn, testified as
11                        follows:
12                        EXAMINATION
13    BY MR. HERMAN:
14         Q.    Could you please state your
15    name for the record?
16         A.    James Geary.
17         Q.    And you're also here to testify
18    on behalf of Interior/Exterior?
19         A.    Yes, I am.
20                    MR. HERMAN:  Just as a
21         preliminary matter, I'll just state
22         for the record that we are optimistic
23         that we will reach a stipulation as to
24         the authenticity of the documents that
```

Confidential - Subject to Further Confidentiality Review

1          have been produced by

2          Interior/Exterior as business records,

3          and so we're not going to waste time

4          in this deposition trying to

5          authenticate documents, except for

6          maybe some clarifications on

7          handwriting.  And if we have to

8          address that, we will later; but

9          hopefully, we'll resolve it by

10         stipulation.

11                    MR. DUPLANTIER:  That is

12         correct.

13                    MR. HERMAN:  Okay.

14    BY MR. HERMAN:

15         Q.    How did Interior/Exterior come

16    to start purchasing drywall from China?

17         A.    Shortly after the storm, we

18    were displaced from our offices in

19    New Orleans, and we relocated to our office

20    on the north shore in Mandeville.  We have a

21    warehouse, a branch warehouse over there, and

22    we have excess office, so we moved a lot of

23    our corporate people over there.

24                    Sometime after the storm, when

Confidential - Subject to Further Confidentiality Review

1    we finally got relocated, I would get

2    periodic calls from some of our vendors,

3    checking in with us, see how we did, see how

4    we were doing since the storm, you know, just

5    asking us how we made out.

6              My recollection is I got a call

7    from -- one day, from Mr. Jeff Brisley with

8    Knauf, who is an insulation vendor of ours.

9    We have bought insulation from Knauf for

10   many, many years, and he was calling to check

11   in with me to see how I was doing.

12             Prior to the storm, there was a

13   nationwide shortage of drywall.  In the

14   course of our conversation, he mentioned to

15   me that Knauf overseas had manufacturing

16   facilities that produced drywall, and we then

17   discussed the possibility of us getting some

18   product from them.

19        Q.    Okay.

20             MR. NICHOLAS:  I didn't get his

21        last name, Steve.  I'm sorry.

22             THE WITNESS:  Pardon?

23             MR. DUPLANTIER:  Brisley,

24        B-R-I-S-L-E-Y.

Confidential - Subject to Further Confidentiality Review

1              MR. NICHOLAS:  Thank you.

2              THE WITNESS:  B-R-I-S-L-E-Y.

3              MR. HERMAN:  Okay.

4    BY MR. HERMAN:

5         Q.    And so when you say "vendors,"

6    you're talking about organizations that sold

7    product to Interior/Exterior?

8         A.    Correct.

9         Q.    And do you know what company

10   Mr. Brisley was with?

11        A.    Yeah.  Mr. Brisley is with

12   Knauf USA.

13        Q.    Okay.  And who was it that made

14   the suggestion or recommendation or inquiry

15   that you might seek drywall from China?

16        A.    To the best of my recollection,

17   he did.

18        Q.    Okay.  Did you know that

19   drywall was even manufactured in China?

20        A.    I don't know.  I had suspicions

21   that it would be, but I don't recall if I did

22   at the time or not.

23        Q.    Okay.  Have you ever reviewed

24   any literature or product placement or

Confidential - Subject to Further Confidentiality Review

Page 58

1     advertising or marketing regarding any

2     drywall from China?

3          A.     At the time, no.

4          Q.     Did Mr. Brisley provide you

5     with some?

6          A.     I'm trying to remember.  I know

7     he sent us, via an e-mail through his local

8     sales rep, just a communication with some

9     contact information with their people in

10    China, as well as some prices.

11         Q.     Okay.  Did you have any

12    concerns about importing drywall from China?

13         A.     No.  Did not.

14         Q.     Did you have any concerns that

15    your customers might have concerns about

16    buying drywall that had been manufactured in

17    China?

18         A.     No, we didn't.  I did not think

19    that would be an issue, because at the time

20    there was such a severe shortage of drywall,

21    we were having to turn customers down because

22    of our lack of supply.  So this was an

23    attempt on us to get additional supply,

24    knowing that, additionally with the storm,

Confidential - Subject to Further Confidentiality Review

1    that there would be additional demand.

2         Q.    Okay.  After this phone call

3    with Mr. Brisley, how did either

4    Interior/Exterior follow up or Knauf follow

5    up, in terms of actually providing drywall

6    from China to Interior/Exterior?

7              MR. SANDERS:  Object to the

8         form.

9              THE WITNESS:  Can you repeat

10        that?  I'm not sure if I followed the

11        question.

12   BY MR. HERMAN:

13        Q.    What was the next step after

14   this phone call?

15        A.    The next step is, actually, I

16   kind of handed the ball off to Clay, and he

17   took it from there.  And then he had the

18   communications with the Knauf folks in China.

19        Q.    Okay.  And my understanding is,

20   if you look at Exhibit 2, which is in front

21   of you --

22        A.    Yeah.

23        Q.    -- if you go to page 4, it

24   says, "Source:  Metro Resources Corporation"?

Confidential - Subject to Further Confidentiality Review

```
1              A.     Yes.

2              Q.     And it's my understanding that

3     you had more involvement in terms of

4     purchasing drywall from Metro Resources?

5              A.     That is correct.

6              Q.     How did that come about, that

7     you started purchasing drywall from Metro

8     Resources Corporation?

9              A.     We came to a time where Knauf,

10    for whatever reason -- I'm trying to remember

11    the particulars, but they essentially told us

12    they could no longer provide us any drywall,

13    and we were still -- the shortage was still

14    very severe.  And we were trying to get more

15    product, and so we used Metro to try and get

16    additional product.

17             Q.     Do you know why Knauf couldn't

18    provide you with more?

19             A.     I don't know for sure.  My

20    appreciation at the time was that it was just

21    a severe supply-and-demand situation, and

22    overseas as well.

23             Q.     Okay.  And it says that the

24    name of the Chinese drywall manufacturer
```

Confidential - Subject to Further Confidentiality Review

1      is -- I don't know if I'll pronounce it

2      right, but Taian Taishan Plasterboard

3      Company?

4           A.      Right.

5           Q.      Do you have any idea what is

6      that is?

7           A.      It's a manufacturer.

8           Q.      Okay.  But do you know any

9      other companies or governments or anything

10     that that might be associated with?

11          A.      No.

12          Q.      Did you have any concern about

13     switching from Knauf drywall to Taian Taishan

14     plasterboard?

15          A.      No, we did not.

16          Q.      It says, "Name of the Chinese

17     drywall product, if known," and I -- Taihe --

18          A.      Taihe is the brand name of the

19     drywall, just as National Gypsum, you

20     probably heard, has -- their brand name is

21     called Gold Bond.  So it's a similar deal.

22          Q.      Okay.  Had you ever heard of

23     Taihe drywall before the storm?

24          A.      No, sir, I had not.

Confidential - Subject to Further Confidentiality Review

Page 62

1           Q.      It says on number 4, "Dates of

2     Purchase," and it has a contract date and

3     then four different invoice dates.  Could you

4     kind of explain the distinction between the

5     contract date and the invoice dates?

6           A.      I believe that the invoice date

7     would -- is the time in which the letter of

8     credit or the transaction on the letter of

9     credit occurs with the bank, but I'm not

10    positive about that.

11          Q.      Okay.  Did you get four

12    different shipments of Taihe drywall?

13          A.      Yes, we did.

14          Q.      And those correspond with the

15    four different invoice dates?

16          A.      That would be my understanding,

17    yes.

18          Q.      And do you know around when the

19    Taihe drywall started coming into

20    New Orleans?

21          A.      Taihe drywall -- it's in the

22    documents.  I'm trying to recall.  It was in

23    the neighborhood of July -- no, August

24    through September.

Confidential - Subject to Further Confidentiality Review

Page 63

1          Q.      Of 2006?

2          A.      2006, yes.

3          Q.      Okay.  And at the time you

4     started selling Taihe drywall to your

5     customers, were you completely out of Knauf

6     drywall?

7          A.      No, I believe when we got the

8     Taihe, if my memory serves me right, the last

9     shipment of the Knauf was coming in.  So I

10    think that we did have some overlap, not a

11    lot, of having Knauf and Taihe at the same

12    time; but I'm not positive about that.

13         Q.      Do you know around when you ran

14    out of Knauf drywall?

15         A.      Essentially, we're not

16    positive.  We're fairly certain we ran out

17    before the end of 2006.  To err on the side

18    of caution, we're thinking that maybe we had

19    some in the early parts of 2007.

20         Q.      And do you know around when you

21    ran out of the Taihe drywall?

22         A.      About approximately the same

23    time, although we do think we had a little

24    bit that was -- had some beat-up board that

Confidential - Subject to Further Confidentiality Review

Page 64

```
 1    was left over that didn't get out until

 2    approximately May of '07.  This was product

 3    that got damaged in either unloading or in

 4    shipment.

 5         Q.    In the earlier part of the

 6    deposition, we looked at a couple of

 7    certificates and warranties from the Knauf

 8    companies.  Did you get a similar set of

 9    certificates and warranties from either Metro

10    Resources Corporation or Taian Taishan?

11         A.    Yes, we did.

12         Q.    Okay.  And from your point of

13    view as we sit here today, did either Metro

14    or Taian Taishan comply with those

15    warranties?

16         A.    No.

17         Q.    Okay.  You mentioned some stuff

18    about some plasterboard that was damaged

19    during the shipment.  Do you believe that

20    that's because it was not packaged properly?

21         A.    No.  For the most part, it was

22    packaged well.  It came in okay.  And I think

23    a lot of the damage actually occurred with --

24    the Taihe came in on containers as opposed to
```

Confidential - Subject to Further Confidentiality Review

Page 65

1    the break bulk that Knauf did.

2              We had to manually unload those

3    containers, which proved to be a little bit

4    more difficult because it was manually

5    involved.  And I think we incurred some

6    damage in that phase of it.

7         Q.    Okay.  Was there some claim

8    that was made by Interior/Exterior against --

9         A.    No, there wasn't.

10        Q.    -- a shipper or a marine

11   insurance company or anything like that?

12        A.    Was not.

13        Q.    Okay.  When you say that it's

14   your opinion or belief that some of the

15   warranties and certificates were breached

16   with respect to the Taihe drywall, is that

17   the warranty against defective materials and

18   workmanship?

19        A.    Yes.

20        Q.    What about the warranty that it

21   complies with ASTM C36?  Do you have any

22   knowledge or information that --

23        A.    I couldn't answer that.

24        Q.    Okay.  Is that something, other

Confidential - Subject to Further Confidentiality Review

Page 66

1      than conversations with your attorneys, that

2      Interior/Exterior has looked into?

3              MR. DUPLANTIER:  Let me, again,

4          object to the question.  To the extent

5          that those queries are asking for

6          privileged information, I'm going to

7          instruct him not to answer the

8          question.

9              MR. HERMAN:  I understand.  Can

10         you answer without...

11             THE WITNESS:  Would you repeat

12         the question, please?

13     BY MR. HERMAN:

14         Q.    I'm trying to find out if

15     Interior/Exterior, when they started getting

16     complaints or lawsuits or whatever, undertook

17     any type of investigation, other than talking

18     to their lawyers, about whether the drywall

19     complied with ASTM C36.

20         A.    Specific to ASTM C36, no.  Our

21     first reaction was to contact the Knauf

22     attorney -- or Knauf organization.  Pardon

23     me.

24         Q.    Okay.  Okay.  And what about

Confidential - Subject to Further Confidentiality Review

1    with respect to any of the other warranties

2    or quality control issues?  Did you take

3    any -- did you do any investigation, other

4    than talking to your own attorneys?

5           A.     Not on our own, no, sir.  We

6    did not.

7           Q.     What did you do for drywall

8    after the end of 2006, beginning of 2007,

9    when the Chinese drywall ran out?

10          A.     At that point in time,

11   throughout the country the availability of

12   domestic product was becoming a lot more

13   available, so it was no longer an issue.  So

14   we were able to supply our company with

15   enough domestic drywall.

16          Q.     You'd prefer to use domestic?

17          A.     Sure.

18          Q.     Was there some preference on

19   the part of the customers to have domestic as

20   opposed to Chinese?

21          A.     You had situations where people

22   would say yes, they would be brand-specific

23   or have a brand preference.

24                 When we first got this drywall

Confidential - Subject to Further Confidentiality Review

Page 68

1  in, though, from China, people were so

2  desperate to get product, there was very

3  little resistance to anybody.  They just

4  wanted drywall.

5      Q.    Did there continue to be a

6  price difference between Chinese drywall and

7  domestic drywall in, let's say, 2007?

8      A.    No, sir.  The prices were

9  relatively the same.

10     Q.    Is that something that you

11 checked into, to see if you could provide a

12 cheaper line of drywall from China?

13     A.    That was not our motivation,

14 no.  Our motivation was simply to get enough

15 product.

16     Q.    And so in 2008, for example,

17 you never undertook any investigation to try

18 to see if drywall might be available cheaper

19 from China than it could be provided

20 domestically?

21     A.    No, we did not.  You know, when

22 we did this, there was a -- actually, a large

23 risk involved.  Because of the period of time

24 that it took from inception to delivery, the

Confidential - Subject to Further Confidentiality Review

Page 69

1    price of drywall -- drywall is a commodity

2    product, and the price can fluctuate

3    tremendously.

4               So there was a huge risk that

5    we undertook when we did this, because the

6    price, for whatever reason, could have

7    dropped.

8               (Whereupon, Deposition Exhibit

9          INEX-30b6-5, Knauf Plasterboard

10         Tianjin Indicative Price Summary,

11         INT/EXT00659 - INT/EXT00660, was

12         marked for identification.)

13   BY MR. HERMAN:

14        Q.    I'm going to show you

15   INEX-30b6-5, which has the Bates numbers

16   INT/EXT659 and 660.

17             Can you recall ever seeing

18   Exhibit 5 before?

19        A.    I don't recall seeing this, no.

20   I may have, but I don't recall.

21        Q.    Okay.  Can you tell from

22   looking at it what it is?

23        A.    Basically, a price list for

24   containers of drywall going to -- freight

Confidential - Subject to Further Confidentiality Review

Page 70

1      options to New Orleans or Mobile, from

2      Tianjin.

3              Q.      Okay.

4              A.      The first one is 4x8x5/8

5      Type X, and the second is 4x8x1/2" regular.

6              Q.      What's the difference between

7      5/8ths and 1/2" regular, just for the purpose

8      of the record?

9              A.      1/2" regular is a standard

10     wallboard product that is used throughout for

11     residential construction.  Five-eighths

12     fire-rated drywall is used in commercial

13     construction, in a building such as this.

14             Q.      Did Interior/Exterior purchase

15     both types of drywall?

16             A.      No, sir.  We only purchased

17     4x12x1/2" regular.

18             Q.      Did you sell -- did

19     Interior/Exterior sell 5/8ths during the

20     2006, early 2007 time frame?

21             A.      Sure, we did.  We -- supplied

22     by domestic manufacturers.

23             Q.      Okay.  They didn't have the

24     same crunch on 5/8ths as they did on 1/2"?

Confidential - Subject to Further Confidentiality Review

Page 71

1           A.      No, it was an overall crunch,

2      so we elected to get just the commodity

3      4x12x1/2" product from China, make it simple.

4           Q.      Okay.  It says at the bottom,

5      "Knauf Plasterboard Tianjin," and then

6      there's a quote that says, "Delivering

7      reliable quality across the globe."

8                   Are you familiar with that as

9      some type of slogan that Knauf uses?

10          A.      I don't recall ever seeing

11     that.

12                  MR. SANDERS:  Object to form.

13          A.      I may have.  I just don't

14     recall.

15                  (Whereupon, Deposition Exhibit

16          INEX-30b6-6, Handwritten Notes, "John

17          Davis," etc., INT/EXT00058, was marked

18          for identification.)

19     BY MR. HERMAN:

20          Q.      Okay.  Let me show you

21     INEX-30b6-6, which is Bates number 58.

22          A.      Okay.

23          Q.      Do you have any idea what

24     Exhibit 6 is?

Confidential - Subject to Further Confidentiality Review

1          A.     This is handwriting by Clay.  I

2     can recognize the writing.  It's some contact

3     information for Knauf, different people with

4     Knauf; and, also, people down at the bottom,

5     Billy App would be our freight forwarder.

6     Phillip Gordillo is one of our bankers.

7          Q.     Okay.  And Mark Norris is the

8     person that you mentioned who's over at Knauf

9     in China?

10          A.     I didn't mention.  Clay did.

11          Q.     Oh.  I'm sorry.

12          A.     And my understanding is, yes,

13     that was his contact over there.

14          Q.     And Jeff Brisley is the person

15     you mentioned?

16          A.     Jeff Brisley is the person at

17     Knauf that I mentioned, yes.

18          Q.     And I guess I'll just save

19     this, ask your brother about it.

20          A.     Sure.

21               (Whereupon, Deposition Exhibit

22               INEX-30b6-7, Handwritten Notes, "Rick

23               Wendel," etc., INT/EXT00951 -

24               INT/EXT00952, was marked for

Confidential - Subject to Further Confidentiality Review

Page 73

```
 1            identification.)

 2      BY MR. HERMAN:

 3            Q.      I'm going to show you

 4      INEX-30b6-7, which are Bates numbers 951 and

 5      952.

 6            A.      Uh-huh.

 7            Q.      Do you know whose handwriting

 8      this is?

 9            A.      That looks like Clay's writing.

10      Maybe not.

11            Q.      Okay.

12            A.      But it does look like his

13      writing.

14            Q.      Well, I'll probably save it for

15      him.  But I just wanted to ask, because it

16      has Taihe on here:  Do you have any idea what

17      this references, "Chinese board, Taihe,

18      Uni-Pac"?

19            A.      I'm not sure.

20            Q.      Do you have any idea who Rick

21      Wendel is?

22            A.      I'm not positive.

23            Q.      Or what "Saratoga" means, or

24      is?
```

Confidential - Subject to Further Confidentiality Review

Page 74

1          A.     I'm not positive on that

2     either.

3          Q.     At the bottom of 952, it says,

4     "3% damaged."  Do you know what that means?

5          A.     I'm not sure of that either.

6               MR. HERMAN:  Okay.  Save that.

7               (Whereupon, Deposition Exhibit

8          INEX-30b6-8, Handwritten Notes,

9          "Storage fee at wharf," etc.,

10          INT/EXT00294, was marked for

11          identification.)

12     BY MR. HERMAN:

13          Q.     I'll show you INEX-30b6-8,

14     which is Bates number 294.

15          A.     Same thing; I'm fairly certain

16     this is Clay's handwriting again.

17               MR. HERMAN:  Okay.  Well, I'll

18          just wait and ask him about it.

19               (Whereupon, Deposition Exhibit

20          INEX-30b6-9, E-mail Chain Ending

21          10/18/05 Davis E-mail to C. Geary,

22          Subject: Plasterboard to New Orleans,

23          INT/EXT00638, was marked for

24          identification.)

Confidential - Subject to Further Confidentiality Review

```
 1                    (Whereupon, Deposition Exhibit
 2              INEX-30b6-10, E-mail Chain Ending
 3              10/18/05 Davis E-mail to C. Geary,
 4              Subject: Plasterboard to New Orleans,
 5              w/Handwritten Interlineations,
 6              INT/EXT01292, was marked for
 7              identification.)
 8    BY MR. HERMAN:
 9         Q.    I'm going to show you two
10    exhibits, which I think go together.
11    Exhibit 9 is Bates number 638, and Exhibit 10
12    is Bates number 1292.
13         A.    Okay.
14         Q.    And I see, actually, that this
15    is addressed to your brother, so maybe I'll
16    ask him about it.  But do you know whose
17    handwriting that is?
18         A.    That is actually my
19    handwriting.
20         Q.    Okay.
21         A.    And I'm fairly certain that
22    this screen print of the e-mail did not come
23    out completely, and that's my writing,
24    filling in all the not-shown information.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      Right.  It looks like

2     Exhibit 10 has your supplementation of

3     Exhibit 9; is that right?

4          A.      Right.  That's what I believe

5     too.

6          Q.      And when you made these notes,

7     did you make them at the time you got the

8     e-mail, or is this something you've done

9     recently --

10         A.      No, this would have been at the

11    time of the e-mail.

12         Q.      Okay.  And how did you know

13    what words to write in here?

14         A.      I'm not sure.  I guess -- well,

15    I don't -- I don't know.

16         Q.      Okay.  It says -- if you look

17    at the middle of the e-mail, it says, "We can

18    then ship approximately 300,000 sheets per

19    month from our Tianjin plant.  If you require

20    additional board, we would employ the other

21    two Knauf China plants to supplement your

22    shipments."

23              Is that right, with your

24    handwriting?

Confidential - Subject to Further Confidentiality Review

Page 77

1          A.     That is my handwriting,

2     that's -- yeah.

3          Q.     And who is this e-mail from?

4          A.     It says, "From:  John Davis."

5          Q.     Do you know who that is?

6          A.     Well, he's with Knauf.

7          Q.     Okay.  And it says -- at the

8     bottom, it says, "Business Development

9     Manager, Knauf Plasterboard and Insulation,

10    China."

11               Do you see that?

12         A.     Yes.

13         Q.     And is he somebody that you

14    dealt with to kind of coordinate shipments

15    from whichever Knauf China plant could

16    provide the drywall?

17         A.     Again, Clay had most of the

18    dealings with John Davis, yes.

19               (Whereupon, Deposition Exhibit

20               INEX-30b6-11, E-mail Chain Ending

21               10/21/05 Davis E-mail to C. Geary,

22               Subject: "Made in China,"

23               INT/EXT00635 - INT/EXT00637, was

24               marked for identification.)

Confidential - Subject to Further Confidentiality Review

1    BY MR. HERMAN:

2          Q.     Okay.  I'm going to show you

3    what's been marked INEX-30b6-11, which, for

4    the record, is Bates numbers 635 to 637.  And

5    it looks like this is a -- to your brother

6    too.  Is this handwriting his or yours, to

7    the best of your recollection?

8          A.     That appears to be his writing.

9          Q.     Okay.  Well, let me just ask

10   you if you can shed some light on this --

11         A.     Sure.

12         Q.     -- and I'll ask your brother as

13   well:  If you look at the second page, 636,

14   there's a sentence towards the bottom that

15   says, "We have priced your plasterboard order

16   according to 'sister company' rates upon the

17   request of Knauf USA."

18                Do you see that?

19         A.     Yes, I do.

20         Q.     Do you know what that means?

21         A.     I would only assume that

22   because of our longstanding relationship with

23   Knauf USA as an insulation purchaser, that

24   that's what he's referring to.

Confidential - Subject to Further Confidentiality Review

1        Q.      From your point of view, were

2    these all sister companies?

3                MR. SANDERS:  Object to form

4           and foundation.

5           A.      Were they -- these all sister

6    companies --

7    BY MR. HERMAN:

8           Q.      These Knauf companies:  Knauf

9    USA, Knauf Tianjin, Knauf Wuhu?

10                MR. SANDERS:  Same objection.

11          A.      Yeah, I don't know.  My

12   assumption would have been yes, but I don't

13   know that to be true.

14   BY MR. HERMAN:

15          Q.      Okay.

16          A.      I mean, that was our perception

17   at the time, yes.

18                (Whereupon, Deposition Exhibit

19           INEX-30b6-12, 10/28/05 Handwritten

20           Notes, "Mark Norris of Knauf," etc.,

21           INT/EXT00608, was marked for

22           identification.)

23   BY MR. HERMAN:

24          Q.      Let me show you INEX-30b6-12,

Confidential - Subject to Further Confidentiality Review

1    which, for the record, is Bates number 608.

2    Is this your handwriting or --

3              A.     This is Clay's, again.

4              Q.     Okay.

5              MR. REEVES:   What's the Bates

6         number, again?

7              MR. HERMAN:   It's 608.

8    BY MR. HERMAN:

9              Q.     Well, I'll ask your brother

10   about it, but just maybe you could shed some

11   light on this.  It looks like it says

12   "antitrust," maybe, or something.  Do you

13   know what that means, or if that's what it

14   says?

15             A.     Yeah, I think -- I have an

16   idea -- I think he can answer that question

17   for you a lot better than I could.

18             Q.     Well, I'll just hold off.

19             A.     Yeah.

20             MR. HERMAN:   Okay.  That's

21        fine.

22             (Whereupon, Deposition Exhibit

23        INEX-30b6-13, E-mail Chain Ending

24        11/29/05 C. Geary E-mail to

Confidential - Subject to Further Confidentiality Review

1          Srinivasan, Subject: Sheetrock

2          inspection in China, INT/EXT05980, was

3          marked for identification.)

4    BY MR. HERMAN:

5          Q.    Let me show you INEX-30b6-13,

6    which, for the record, is Bates number 5980.

7    It looks like you're cc'd on this?

8          A.    Right.

9          Q.    And if you look at the e-mail

10   trail --

11              MR. DUPLANTIER:  Someone on the

12          line needs to mute their line.

13   BY MR. HERMAN:

14         Q.    It looks like the beginning of

15   the e-mail trail, or at least what's provided

16   here, is from somebody at SGS North

17   America, Inc.  You see that?

18         A.    Yes, I do.

19         Q.    What is SGS North

20   America, Inc.?

21         A.    SGS, to the best of my

22   knowledge, is an international firm that does

23   inspections of manufacturing facilities.  I'm

24   not certain of this, but I believe their

Confidential - Subject to Further Confidentiality Review

1    primary focus of attention is for

2    import/export.

3         Q.    Okay.  And it looks like

4    they're receiving some type of instruction.

5    "Please proceed to inspect the product while

6    it is being produced."

7              Do you have any recollection

8    about that?

9         A.    To the best of my recollection,

10   we had made some early -- or had some early

11   communications with them, when we were still

12   putting everything together, and trying to --

13   and inquiring with them as to whether or not

14   they could do some inspections for us.  And

15   when I say "inspections," you know, talking

16   about the shipments.

17        Q.    Well, what is it that you would

18   have hoped that SGS would have ascertained

19   about the drywall from observing the

20   production process?

21        A.    It was for them to check the

22   shipments as they were being loaded onto the

23   ship from a quantity and making sure that the

24   products were in good order and not damaged.

Confidential - Subject to Further Confidentiality Review

1          Q.      Oh.  So this doesn't mean that

2     they're supposed to inspect it during the

3     production process?

4          A.      That is correct.

5          Q.      Okay.  Do you know whether SGS

6     ever did attempt to do any type of inspection

7     of the production process?

8          A.      To my knowledge, they did not.

9          Q.      Or anybody else on

10    Interior/Exterior's behalf?

11         A.      We had someone from our freight

12    forwarder, J.W. Allen, who went to China to

13    observe the loading of the container ships,

14    which had a lot -- which was really why we

15    did not end up using SGS.

16         Q.      Does Interior/Exterior have a

17    certain level of knowledge or sophistication

18    about how drywall is produced?

19         A.      A basic understanding.

20         Q.      And where does that come from?

21         A.      Experience in the industry.

22         Q.      Would it have been common for

23    people from Interior/Exterior to go to

24    domestic manufacturers to see how drywall is

Confidential - Subject to Further Confidentiality Review

1    produced?

2         A.    No.  I have -- you know, we get

3    invitations from some of our manufacturers,

4    and we get our salespeople to go to these

5    facilities, just so they have an

6    understanding of how the product is made.

7         Q.    And why is that important?

8         A.    Just so -- just for them to

9    have an understanding that, you know, what

10   the -- what the product is.

11        Q.    Okay.  Did you think, when you

12   first started importing drywall from China,

13   that it was important to understand how they

14   made drywall in China, as opposed to or,

15   perhaps, similar to --

16        A.    My appreciation would be that,

17   I mean, it's -- drywall is drywall, and

18   it's -- probably some variations; but for the

19   most part, it's all the same.

20        Q.    That's what you believed at the

21   time?

22        A.    That is correct.

23        Q.    Do you still believe that now?

24        A.    Obviously, there -- no.

Confidential - Subject to Further Confidentiality Review

1          Q.      Do you have any knowledge or

2     information, as we sit here today, that

3     doesn't come from your attorneys, that,

4     perhaps, comes from any other source, about

5     how drywall was manufactured in China as

6     distinguished from how it's manufactured

7     domestically?

8          A.      Nothing that I could say is

9     certain.  I've certainly read articles with

10    people making -- or having speculation on the

11    manufacturing process and what was done.

12         Q.      Okay.  Do you have some

13    understanding, as we sit here today, that

14    doesn't come from your attorneys, about what

15    the difference is, in your mind, between

16    Chinese drywall and domestic drywall?

17              MR. DUPLANTIER:  Again, the

18          objection isn't just what came from

19          his attorneys, but what's been

20          obtained in anticipation of

21          litigation.  Subject to that, you can

22          answer the question.

23              MR. SANDERS:  Object to form.

24              THE WITNESS:  Could you repeat

Confidential - Subject to Further Confidentiality Review

Page 86

1           it for me, please?

2      BY MR. HERMAN:

3           Q.      As we sit here today, do you

4      have some knowledge or impression in your own

5      mind about what the difference is between

6      Chinese drywall and domestic drywall?

7           A.      Nothing that I could say for

8      sure.  You know, again, I've read the

9      articles and seen what people are saying was

10     done, but I -- you know, beyond that, I don't

11     know.

12          Q.      Okay.  I see this is addressed

13     to your brother, but just so we don't get out

14     of order on the exhibits, I'm just going to

15     identify INEX-30b6-14, which is Bates

16     number 942.

17               (Whereupon, Deposition Exhibit

18          INEX-30b6-14, 12/5/05 Uni-Pac, Ltd.

19          Letter to C. Geary, INT/EXT00942, was

20          marked for identification.)

21               (Whereupon, Deposition Exhibit

22          INEX-30b6-15, E-mail Chain Ending

23          3/31/06 App E-mail to Wei,

24          Subject: Great Immensity,

Confidential - Subject to Further Confidentiality Review

```
 1          INT/EXT03864, was marked for

 2          identification.)

 3     BY MR. HERMAN:

 4          Q.     I'm going to show you

 5     INEX-30b6-15, which, for the record, is Bates

 6     number 3864.  You can read that, if you want.

 7          A.     Okay.  I'm sorry, you want me

 8     to read '42?

 9          Q.     If you want to.  I was going to

10     ask your brother about it, but --

11          A.     Okay.  Okay.

12          Q.     Have you ever seen that before?

13     We're talking about Exhibit 14 now.

14          A.     I'm not sure if I have.

15          Q.     Okay.  Have you ever seen

16     Exhibit 15 before?

17          A.     I believe I have seen this,

18     yes.

19          Q.     William App is with a company I

20     think you mentioned, J.W. Allen; is that

21     correct?

22          A.     That is correct, yes.

23          Q.     And what, in layman's terms,

24     does J.W. Allen do for Interior/Exterior?
```

Confidential - Subject to Further Confidentiality Review

1          A.     They facilitated the shipments,

2     assisted us with, you know, the documents,

3     shored up the letters of credit, also with

4     the shipments and lining up freight

5     forwarders and such like that to just -- we

6     relied on them to help us because we're not

7     experts in the shipping process, and that's

8     what these guys do.

9          Q.     Is this some kind of assistance

10    that you had to acquire after the storm?

11         A.     We acquired their assistance to

12    help facilitate with importing the drywall

13    from overseas.

14         Q.     You didn't have a relationship

15    with them before the drywall shortage?

16         A.     Did we have a relationship

17    with -- no, we did not.

18         Q.     When you decided that you might

19    want to get drywall from China, you had to go

20    out and enlist the assistance of J.W. Allen

21    to facilitate getting it?

22         A.     Right.

23         Q.     They didn't come to you and

24    say, "Hey, we've got a great idea, we can

Confidential - Subject to Further Confidentiality Review

1    bring in drywall from China"?

2          A.      That is correct; they did not.

3          Q.      And who's Victor Wei, to the

4    extent you know?

5          A.      I've seen his name.  I'm not

6    positive who he is.

7          Q.      Okay.  Do you know what the

8    "Great Immensity" is?

9          A.      I'm sorry, the "great" --

10   where's that?

11         Q.      It's the subject, "great" --

12         A.      I do not know.

13         Q.      Okay.  Is "GWB market," gypsum

14   wallboard market?

15         A.      That would be my best guess,

16   yes.

17         Q.      It's not a term that you

18   commonly use?

19         A.      I've seen -- I think I've seen

20   it used, but it's not something we use,

21   typically.

22         Q.      Okay.  It says something on the

23   second line, "We look forward to you and

24   Mrs. Wei visiting New Orleans."

Confidential - Subject to Further Confidentiality Review

1          Do you have any recollection of

2    that?

3          A.     I'm sorry, where is that,

4    again?

5          Q.     It's in the second line.

6          A.     Oh, I see.

7          Q.     It looks like Mr. and Mrs. Wei

8    were going to visit New Orleans at some

9    point.

10         A.     And then your question was?

11   I'm sorry.

12         Q.     Do you recall meeting them?

13         A.     I do not.

14         Q.     Okay.  "I will inform Clay, and

15   we will plan to visit IEBS on Monday,

16   May 1st."

17               Is "IEBS" Interior/Exterior

18   Building Supply?

19         A.     I would assume so.

20         Q.     Okay.  And -- but you don't

21   have any recollection of meeting them here in

22   the States?

23         A.     I do not, no.

24         Q.     Okay.

Confidential - Subject to Further Confidentiality Review

Page 91

 1          A.    We may have.  I just don't
 2     recall.
 3          Q.    Okay.  And do you have any idea
 4     of what relationship, if any, Mr. Wei had to
 5     any of the Knauf entities?
 6                MR. SANDERS:  Object to form,
 7          foundation.
 8          A.    Clay could answer that question
 9     much better than I.
10                (Whereupon, Deposition Exhibit
11          INEX-30b6-16, E-mail Chain Ending
12          4/3/06 Heider E-mail to C. Geary,
13          Subject: U.S. Wallboard Imports from
14          Knauf, INT/EXT04116, was marked for
15          identification.)
16                (Whereupon, Deposition Exhibit
17          INEX-30b6-17, E-mail Chain Ending
18          4/7/06 Topple E-mail to C. Geary,
19          Subject: Gypsum Board, INT/EXT03843,
20          was marked for identification.)
21     BY MR. HERMAN:
22          Q.    Okay.  I'm just going to --
23     this looks like a Clay document, but just so
24     we don't get out of order, just identify

Confidential - Subject to Further Confidentiality Review

1       INEX-30b6-16, which, for the record, is Bates

2       number 4116.

3                     INEX-30b6-17, Bates

4       number 3843, this also seems to be addressed

5       to Clay, but I just want to ask you a

6       question about it.  Maybe you can shed some

7       light on it for us.

8             A.      Sure.

9             Q.      The e-mail seems to be from

10      somebody named Barry Topple at Knauf U.K.  Do

11      you know who Barry Topple is?

12            A.      I've heard that name.  I'm not

13      positive who Barry Topple is.

14            Q.      Okay.  And there's a cc to Jeff

15      Brisley at Knauf USA.  You see that?

16            A.      Yes.

17            Q.      And he's the gentleman that

18      you've mentioned before?

19            A.      That is correct.

20            Q.      And it starts out, "Currently,

21      the Knauf group is fully committed to supply

22      its usual markets."

23                    Do you see that?

24            A.      No, I'm sorry.  Where --

Confidential - Subject to Further Confidentiality Review

Page 93

1          Q.      "Dear Clay:  Currently" --

2          A.      Oh.  Pardon me.  The wrong one.

3          Q.      Oh.  Sorry about that.

4                  (Witness reviews document.)

5          A.      Yes.

6     BY MR. HERMAN:

7          Q.      Do you have some perception or

8     impression, based on your experience, what

9     the Knauf group is?

10                 MR. SANDERS:  Object to

11                 foundation.  He's not part of this

12                 e-mail.

13         A.      The Knauf group?

14    BY MR. HERMAN:

15         Q.      Yeah.

16         A.      I would assume that to be just

17    the whole company.

18         Q.      Including U.S., U.K. and these

19    Chinese companies?

20         A.      That would be my understanding

21    or appreciation.

22         Q.      Was that your impression from

23    doing business with the Knauf group or parts

24    of the Knauf group?

Confidential - Subject to Further Confidentiality Review

Page 94

1                    MR. SANDERS:  Object to form.

2          A.      Yes.  Yes.

3     BY MR. HERMAN:

4          Q.      Do you recall ever inquiring of

5     the Knauf group whether it could supply

6     gypsum board from Europe or South America?

7                    MR. SANDERS:  Object to form.

8          A.      I'm not sure.  When Jeff

9     Brisley and I spoke, I, quite frankly, don't

10    recall if the conversation was only about

11    China or if it was other parts of the world.

12                    (Whereupon, Deposition Exhibit

13              INEX-30b6-18, 7/21/06

14              Fumigation/Disinfection Certificate,

15              INT/EXT00080, was marked for

16              identification.)

17    BY MR. HERMAN:

18         Q.      Okay.  Let me show you

19    INEX-30b6-18, which, for the record, is Bates

20    number 80.  Do you know what Exhibit 18 is?

21         A.      I'm not sure.  It appears to

22    be -- it says, "Fumigation/Disinfection

23    Treatment."  My best guess would be that this

24    is one of the documents that come in -- comes

Confidential - Subject to Further Confidentiality Review

Page 95

1    in when product is imported.

2         Q.    Do you recall any discussions

3    about whether the drywall would be fumigated

4    or disinfected at some point during the

5    shipping process?

6         A.    I do not recall any

7    conversation about that.

8         Q.    Do you recall whether that was

9    a concern by anyone at Interior/Exterior, as

10   to whether the drywall should or shouldn't be

11   fumigated or disinfected?

12        A.    No.

13        Q.    Do you know whether domestic

14   drywall is fumigated or disinfected at some

15   point?

16        A.    I don't know.

17             (Whereupon, Deposition Exhibit

18             INEX-30b6-19, PABCO Gypsum Physical

19             Test, ASTM C1396 Worksheet,

20             INT/EXT00696, was marked for

21             identification.)

22   BY MR. HERMAN:

23        Q.    INEX-30b6-19 is Bates

24   number 696.  I see that it says "Clay" at the

Confidential - Subject to Further Confidentiality Review

1      top, but I don't know if he wrote that or

2      somebody else wrote it to give it to him.

3                    Do you know what this is?

4          A.      "ASTM C1396 Worksheet, 1/2"

5      gypsum board."  ASTM C1396 is, again, the

6      main ASTM standard for regular drywall.

7          Q.      Do you recall ever seeing this

8      worksheet or a worksheet similar to this?

9          A.      No, I do not.

10         Q.      Do you know which drywall it

11     relates to?

12         A.      No, I do not.

13         Q.      Okay.  Is there some person at

14     Interior/Exterior that would have checked

15     these types of technical documents?

16         A.      I'm not sure I understand at

17     what point in time you're referring to.

18         Q.      Well --

19         A.      Prior to or --

20         Q.      -- from October 2005 to the end

21     of 2006.

22         A.      And we would have -- and to

23     make sure I understand the question, we would

24     have checked --

Confidential - Subject to Further Confidentiality Review

Page 97

1          Q.     Well, let me see if I can ask a

2     better question.

3                 From the end of 2005 to 2006,

4     did Interior/Exterior have a designated like

5     quality assurance/quality control person?

6          A.     No.

7          Q.     Have you ever had that?

8          A.     No.

9          Q.     Do you know what that is?

10         A.     Yes.

11         Q.     Okay.  Is there some reason

12    that you didn't think it was necessary to

13    have a quality assurance/quality control

14    person?

15         A.     No, our feeling was as long as

16    the products would comply with ASTM, that we

17    were -- that's all we needed.  That's all we

18    get from our domestic manufacturers.

19         Q.     And you rely on the

20    manufacturer to make that certification,

21    correct?

22         A.     Yes, we do.

23                (Whereupon, Deposition Exhibit

24    INEX-30b6-20, Knauf MSDS for

Confidential - Subject to Further Confidentiality Review

1              Plasterboard Standard Core,

2              INT/EXT00059 - INT/EXT00061, was

3              marked for identification.)

4     BY MR. HERMAN:

5          Q.     Let me show you INEX-30b6-20,

6     which, for the record, is Bates number 59

7     through 61.

8                 Do you know what a Material

9     Safety Data Sheet is?

10         A.     Yes, I do.

11         Q.     Just for the record, what is

12    it?

13         A.     It is issued on products.

14    That's just an overall description of the

15    product in question, you know, what it --

16    pardon me.  I'm trying to think of a good

17    explanation.

18                Just an all -- a description

19    and -- of the product.  I'm sorry, I'm not

20    coming up with a good answer.

21         Q.     That's okay.  That's okay.

22                Do you have any impression that

23    it's somehow associated with OSHA regulations

24    or requirements?

Confidential - Subject to Further Confidentiality Review

 1            A.      I'm not sure.

 2            Q.      Okay.  Do you have any idea of

 3    what a spec sheet is?

 4            A.      A spec sheet, to my

 5    appreciation, would be a product -- or a

 6    manufacturer would put out a listing of the

 7    qualities and functions of a product.

 8            Q.      Do you have any idea of what

 9    the difference is, if any, between a spec

10    sheet and an MSDS?

11            A.      I'm not sure.

12            Q.      Okay.  Do you recall ever

13    seeing Exhibit 20?

14            A.      Yes, I have.

15            Q.      Okay.  It says, "Product Name:

16    Knauf Plasterboard Standard Core."

17                    You see that?

18            A.      Yes, I do.

19            Q.      Do you have any idea what

20    "standard core" means?

21            A.      My belief would be that

22    standard core would be for the standard

23    drywall, which is the residential grade, as

24    opposed to a fire-rated core, again, that you

Confidential - Subject to Further Confidentiality Review

1    would use, say, in a commercial application.

2         Q.     And that's, generically, the

3    5/8ths that we talked about before?

4         A.     The 5/8ths is fire-rated, yes.

5    It can be 5/8ths --

6         Q.     Not -- oh, I'm sorry.

7         A.     I was just going to say, 5/8ths

8    could be moisture-resistant or it could be an

9    exterior-grade product, something of that

10   nature.

11        Q.     And is standard core the only

12   type of plasterboard that Interior/Exterior

13   imported from Knauf?

14        A.     That is correct.

15        Q.     And is standard core the only

16   type of Taihe plasterboard that

17   Interior/Exterior imported?

18        A.     Yes.

19        Q.     It says -- or it looks like it

20   says, "Per an e-mail from Knauf, spec sheet

21   and MSDS are one and the same."

22               Do you see that?

23        A.     Yes, I do.

24        Q.     Do you have any information

Confidential - Subject to Further Confidentiality Review

Page 101

1    about that or...

2        A.      I don't.

3        Q.      Okay.  Are the Material Safety

4    Data Sheets something that Interior/Exterior

5    has available somewhere so that workers can

6    refer to them?

7        A.      Yes.

8        Q.      And do you know what the

9    purpose of that is?

10       A.      I think that, for example, say

11   if a worker got some drywall in their eye,

12   they would have procedures or instructions as

13   far as how to treat that.  Some dust in their

14   eye is what I meant.

15       Q.      Yeah.  In terms of how to

16   handle the --

17       A.      Yeah, the dust, or if they

18   cut -- or ingested something, some of the

19   product.

20       Q.      Is there some type of a process

21   or procedure that Interior/Exterior has when

22   employees have concerns or complaints about

23   whatever product they're handling?

24       A.      I don't ever recall having that

Confidential - Subject to Further Confidentiality Review

```
 1    situation.
 2          Q.      Okay.  You don't recall anybody
 3    ever complaining about the drywall in any way
 4    or handling it or dealing with it?
 5          A.      No, sir.
 6          Q.      Were you ever present when
 7    drywall was being unloaded from the ship,
 8    say?
 9          A.      Yes, I was.
10          Q.      And did you have any
11    observations about the drywall?
12          A.      Absolutely none.
13                  (Whereupon, Deposition Exhibit
14          INEX-30b6-21, BNBM Authorization to
15          Manufacture UL Marks, INT/EXT02171,
16          was marked for identification.)
17    BY MR. HERMAN:
18          Q.      Okay.  I'll show you
19    INEX-30b6-21, Bates number 2171.  Do you have
20    any idea what this is?
21          A.      I'm not positive, no.
22          Q.      Okay.  Are you familiar with a
23    company called Beijing New Building Materials
24    Company, Ltd.?
```

Confidential - Subject to Further Confidentiality Review

1          A.      Yes, I am.

2          Q.      And that's sometimes referred

3    to as "BNBM"?

4          A.      Yes.

5          Q.      And does BNBM have any type of

6    relationship, to your knowledge, with Taihe?

7          A.      I don't know that for sure.  I

8    believe since all of this has occurred, I've

9    heard that there is some form of corporate

10   connection, but I don't know that for sure.

11         Q.      Did Interior/Exterior, at some

12   point in time, investigate importing or

13   purchasing BNBM drywall?

14         A.      Yes, we did.

15         Q.      And was there a decision made

16   not to do that?

17         A.      Clay could answer that question

18   better than I.

19              MR. HERMAN:  Okay.  Well, I'll

20          save that, then.

21              (Whereupon, Deposition Exhibit

22          INEX-30b6-22, 2/16/06 Test Report on

23          Gypsum Wallboard, INT/EXT01990, was

24          marked for identification.)

Confidential - Subject to Further Confidentiality Review

Page 104

1    BY MR. HERMAN:

2         Q.    I'm going to show you

3    INEX-30b6-22, which, for the record, is Bates

4    number 1990.  Have you ever seen Exhibit 22

5    before?

6         A.    Yes, I have.

7         Q.    What is it?

8         A.    A test report, which says that

9    it -- the product conforms to the ASTM

10   standard.

11        Q.    And who is providing, to your

12   knowledge and understanding, this

13   certificate?

14        A.    I'm fairly certain I received

15   this from the gentleman with Metro Resources.

16        Q.    Okay.  Do you know whether

17   similar test reports or certificates were

18   received from Knauf?

19        A.    We received -- I'm not sure.

20   Not in this form, but I believe -- I'm not

21   sure.

22        Q.    Okay.  You see at the bottom --

23   well, let me ask you this.

24             Did the report come with the

Confidential - Subject to Further Confidentiality Review

1     translation?

2          A.     Did the report -- just as I'm

3     looking at it?

4          Q.     Yeah, with the English words

5     here too.

6          A.     Yes.

7          Q.     It's not something that anybody

8     expected you to supply?

9          A.     Correct.

10          Q.     And at the bottom, where it

11     says "Remarks," it says, "The test report is

12     responsible only for the sample delivered by

13     the manufacturer."

14               Do you know what that means?

15          A.     I'm not positive.

16          Q.     Was there some sample that was

17     provided by Taian Taishan?

18          A.     I do not recall us getting any

19     samples.  We may have, but I'm not sure of

20     that.

21          Q.     Do you recall getting any

22     samples from Knauf?

23          A.     I don't know.

24          Q.     And then it says, "The valid

Confidential - Subject to Further Confidentiality Review

1    period of the test report will only be within

2    one year exactly after the signed date."

3              Do you see that?

4         A.    Yes, I do.

5         Q.    And do you have any knowledge

6    about why the report would be efficacious for

7    a year?

8         A.    I do not know.

9         Q.    Is there some expectation that

10   nothing is going to go wrong with the drywall

11   within a year?

12        A.    I -- no, I don't know.

13        Q.    Do you know of any reason why

14   the manufacturer would be concerned about

15   changes to the drywall after a year?

16             MR. SANDERS:  Object to the

17             form.

18        A.    No, I don't know.

19   BY MR. HERMAN:

20        Q.    How long is drywall supposed to

21   last?

22        A.    I've never been asked that

23   question.  Drywall goes up on walls and --

24   you know, many, many years.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.  Have you ever had a

2      complaint from a customer that their drywall

3      didn't last long enough?

4          A.      No, never.

5          Q.      And how long have you guys been

6      in business?

7          A.      This company's been in since

8      19- -- excuse me, since 2001.

9          Q.      Since 2001?

10         A.      Right.

11         Q.      And what did you do before

12      2001?

13         A.      There was a company that

14      preceded this company.

15         Q.      Okay.  Were you in the drywall

16      business before 2001?

17         A.      Yes.

18         Q.      How long have you been in the

19      drywall business?

20         A.      Since -- in the distribution

21      business, since 1981.

22              (Whereupon, Deposition Exhibit

23              INEX-30b6-23, Addendum to Application

24              and Agreement for Documentary Credit

Confidential - Subject to Further Confidentiality Review

Page 108

```
 1          Between Interior/Exterior and Knauf

 2          Plasterboard Tianjin, INT/EXT00243 -

 3          INT/EXT00246, was marked for

 4          identification.)

 5     BY MR. HERMAN:

 6          Q.    Okay.  I'm going to show you

 7     INEX-30b6-23, Bates number 243 to 246.  Is

 8     this something I should ask your brother

 9     about?

10          A.    If you want to ask me, there

11     may be a question I can answer.  I'm not

12     sure.

13          Q.    Okay.  Do you know whose

14     handwriting this is?

15          A.    I believe that to be Clay's.

16          Q.    Okay.  Maybe you can just help

17     me out with this.

18          A.    Sure.

19          Q.    Where it says, "Description of

20     Goods:  Gypsum board, tapered edge," what

21     does "tapered edge" mean, just for the

22     record?

23          A.    Tapered edge is along the long

24     side of drywall, so that when they -- you
```

Confidential - Subject to Further Confidentiality Review

1    have joints that abut from one board to the

2    next, it tapers in.  That allows the finisher

3    to put in the joint treatment and tape to get

4    a very smooth edge.

5              Without that tapered edge,

6    you'd have a bump in it because of the tape

7    and the mud.

8         Q.    Does all of the drywall that

9    Interior/Exterior imported from Knauf have

10   tapered edge?

11        A.    That's what we requested, and I

12   never heard anything to the contrary.

13        Q.    Okay.  And did all of the

14   drywall that Interior/Exterior imported from

15   Taihe have a tapered edge?

16        A.    Same thing, yes.

17        Q.    Okay.  Originally, it says,

18   "FOB:  Wuhu, China."

19              What does "FOB" mean?

20        A.    Freight on board.

21        Q.    And just in layman's terms,

22   does that have some significance?

23        A.    Again, I think Clay could

24   answer that question better than I.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.

2          A.      Yeah.

3          Q.      But somebody changed it from

4     "FOB" to "free alongside ship."  Do you see

5     that?

6          A.      Yes, I do.

7          Q.      Do you know what the difference

8     is between FOB and free alongside ship?

9          A.      Yeah, that -- you know, that

10    has to do with the freight and who's handling

11    the cost of shipping the material.

12                 (Whereupon, Deposition Exhibit

13           INEX-30b6-24, Knauf Plasterboard

14           Tianjin Informal Tender for Freight

15           Handling: January to April 2006,

16           INT/EXT04071, was marked for

17           identification.)

18    BY MR. HERMAN:

19          Q.      Okay.  I'll probably ask your

20    brother about this, but just for the record,

21    so we don't get out of order, INEX-30b6-24,

22    which, for the record, is Bates number 4071.

23                 What's an informal tender, to

24    the extent you know?

Confidential - Subject to Further Confidentiality Review

Page 111

1          A.     I do not know.

2                 (Whereupon, Deposition Exhibit

3          INEX-30b6-25, 7/5/06 Contract Between

4          Knauf Plasterboard Wuhu and

5          Interior/Exterior, INT/EXT00171, was

6          marked for identification.)

7     BY MR. HERMAN:

8          Q.     Okay.  Let me show you

9     INEX-30b6-25, which is Bates number 171.

10    Maybe I'll ask Clay about this, but at the

11    top, it says, "Contract."  Do you see that?

12         A.     Yes.

13         Q.     In your defendant profile forms

14    or Distributor Profile Forms, where you talk

15    about contract dates, is this the type of

16    contract that you're referring to?

17         A.     That would be my understanding,

18    yes.

19         Q.     Okay.  And this is a contract

20    between Knauf Plasterboard Wuhu and

21    Interior/Exterior?

22         A.     Yes.

23         Q.     And would it be your

24    understanding that Knauf accepted this

Confidential - Subject to Further Confidentiality Review

Page 112

1    contract with all of these handwritten

2    changes?

3              MR. SANDERS:  Object to form,

4         foundation.

5         A.    Hard to say.  A lot of these

6    contracts were changed many times over, so at

7    the end of the day, I couldn't tell you for

8    sure.

9              (Whereupon, Deposition Exhibit

10        INEX-30b6-26, Knauf Plasterboard Wuhu

11        Commercial Invoice, INT/EXT00077, was

12        marked for identification.)

13   BY MR. HERMAN:

14        Q.    Okay.  Probably ask Clay about

15   this, but just for the record, INEX-30b6-26,

16   Bates number 77, you ever seen that before?

17        A.    I'm not sure.

18             (Whereupon, Deposition Exhibit

19        INEX-30b6-27, Gypsum Wallboard

20        Producing Factory Information, BNBM,

21        Co., Ltd., INT/EXT00849 -

22        INT/EXT000850, was marked for

23        identification.)

24   BY MR. HERMAN:

Confidential - Subject to Further Confidentiality Review

1          Q.      And let me show you this,

2     INEX-30b6-27, Bates numbers 849 and 850.

3          A.      Yes.

4          Q.      Do you have any idea what this

5     is?

6          A.      You know, it appears to be from

7     BNBM, a -- it says "Introduction," and then

8     it goes into their specifications.

9          Q.      Do you have any recollection of

10    seeing it before?

11         A.      No, I do not.  I may have.

12    Probably did, but I don't recall.

13         Q.      And I think you mentioned that

14    Clay would be a better person to ask about

15    the evaluation of potentially buying BNBM

16    materials?

17         A.      That is correct, yes.

18              MR. HERMAN:  All right.  Why

19         don't we take a quick break, go off

20         the record and we can switch up.

21              MR. DUPLANTIER:  Why don't we

22         take a ten-minute break here, so that

23         way, everybody can...

24              THE VIDEOGRAPHER:  Off the

Confidential - Subject to Further Confidentiality Review

Page 114

1          record, 10:37 a.m.

2                    (Recess taken, 10:37 a.m. to

3          10:50 a.m.)

4                    THE VIDEOGRAPHER:  We're back

5          on the record.  The time is 10:50 a.m.

6                    CLAYTON C. GEARY,

7     having been first duly sworn, testified as

8                    follows:

9                    EXAMINATION

10   BY MR. HERMAN:

11        Q.     Your brother and I were looking

12   a little bit ago at Exhibit 27.  It says,

13   "Gypsum Wallboard Producing Factory

14   Information, BNBM."

15                  Do you see that?

16        A.     Yes.

17        Q.     Do you recall seeing this

18   document before?

19        A.     Yes, I do.

20        Q.     Do you know how you got it?

21        A.     I don't recall.

22        Q.     Do you know how you became

23   aware of BNBM's existence?

24        A.     In the beginning, after the

Confidential - Subject to Further Confidentiality Review

1    storm, there were several people who

2    approached us, and I remember seeing that

3    name, BNBM.

4              Our recollection is, when we

5    began having troubles getting enough material

6    from Knauf -- you'd asked about Weida

7    Freight.  Weida Freight was helping out

8    J.W. Allen because they have a presence over

9    in China.  And they had, I believe, made some

10   connections with BNBM, and that's possibly

11   where this came from.

12        Q.    Okay.  And was it Weida Freight

13   that recommended to you that you might want

14   to look into buying drywall from BNBM --

15        A.    Yes.

16        Q.    -- to the best of your

17   recollection?

18        A.    Yes.

19        Q.    And have you ever heard of

20   Dragon wallboard?

21        A.    No.  Not prior to this.

22        Q.    Okay.  And what was your

23   evaluation process in terms of deciding

24   whether you wanted to import from BNBM?

Confidential - Subject to Further Confidentiality Review

Page 116

1      A.      It would require the same

2   certifications, the same warranty, quality

3   condition; all of the same certifications

4   that we had with Knauf.

5      Q.      Did anybody associated with

6   Interior/Exterior ever go over to China and

7   look at the BNBM operation?

8      A.      Well, we had hired J.W. Allen,

9   who had gotten Weida Freight, who were the

10  ones that actually brought them to us, as I

11  recall.

12     Q.      Okay.  Did anybody from BNBM or

13  anybody associated with BNBM come to

14  New Orleans?

15     A.      No.

16     Q.      And am I correct that at the

17  end of the day, for whatever reason,

18  Interior/Exterior decided not to buy drywall

19  from BNBM?

20     A.      We never got any BNBM product.

21     Q.      Is there a specific reason that

22  you didn't?

23     A.      I can't recall exactly.  I

24  think there was -- they had such trouble

Confidential - Subject to Further Confidentiality Review

1      getting ships, was the main part of the

2      problem; and that was one reason that we

3      didn't go forward with it.

4              Q.     Okay.  And you don't know who

5      put together this kind of information, huh --

6              A.     I don't know.

7              Q.     -- that's reflected in

8      Exhibit 27?

9              A.     I don't know.

10             Q.     If we go backwards to

11     Exhibit 26, it says, "Knauf Plasterboard Wuhu

12     to Interior/Exterior Building Supply," and it

13     says, "Commercial Invoice."

14                    What's a commercial invoice?

15             A.     It's an invoice where they're

16     showing the unit price, quantity and total

17     amount for the product.

18             Q.     And when we were looking at the

19     defendant profile form, which is Exhibit 2,

20     if you want to refer to it, there was a

21     contract date and then several different

22     invoice dates.  Do you remember that?

23             A.     Uh-huh.

24             Q.     Is this one of the several

Confidential - Subject to Further Confidentiality Review

Page 118

1    invoices, to the best of your understanding?

2         A.    This would have been the one

3    that came from -- the only one that came from

4    the Wuhu plant.

5         Q.    Okay.  The other ones came

6    from --

7         A.    From Tianjin.

8         Q.    Okay.  It says the "Name of

9    Manufactured as Knauf Plasterboard."

10              Do you see that?

11        A.    Yes.

12        Q.    What does that mean, to the

13   best of your knowledge?

14        A.    Manufactured from Knauf.

15        Q.    Okay.  And it says, "Tapered

16   edge, 68,000 PCS."

17              What's "PCS" mean?

18        A.    I'm sorry, where are you?

19        Q.    I'm sorry.

20        A.    Okay.  There we go.

21              Pieces.

22        Q.    And those pieces are

23   4x12x1-1/2?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.     And that would have been

2     standard?

3          A.     Yes.

4          Q.     Okay.  If we look at -- going

5     backwards to Exhibit 25, there's a contract.

6     And what's the distinction, if any, to your

7     impression, between the invoice and the

8     contract?

9          A.     The difference between the two?

10          Q.     If any.

11               MR. SANDERS:  Objection,

12          foundation.

13          A.     I guess the contract has some

14     more of the terms, I would assume, than the

15     invoice.

16     BY MR. HERMAN:

17          Q.     Okay.  It looks like there was

18     an "FAS Shanghai, China" that's scratched

19     out?

20          A.     Uh-huh.

21          Q.     And then it says, "CIF

22     New Orleans, Louisiana" --

23          A.     Yes.

24          Q.     -- something, "free out"?

```
 1           A.      "Liner in, free out."

 2           Q.      Okay.  What's the difference

 3     between "FAS Shanghai, China" and "CIF

 4     New Orleans, Louisiana, liner in, free out"?

 5           A.      Well, I can't give you the

 6     actual terminology, but in general, it meant

 7     that the product would be -- "CIF" meant that

 8     it would be delivered to New Orleans, so

 9     Knauf was paying for the shipment, whereas

10     "FAS" would have meant that we would have

11     picked up the shipping cost.

12                   That's also why you see the

13     difference in price compared to a lot of the

14     other invoices.

15           Q.      And is that change, to the best

16     of your recollection, something that

17     Interior/Exterior requested or something that

18     Knauf requested?

19           A.      We were having a lot of trouble

20     getting ships at the time, and Knauf,

21     somehow, was able to -- and I don't remember

22     the particulars, but they were able to secure

23     shipping, and that's why they handled it.

24           Q.      And the final contract or
```

Confidential - Subject to Further Confidentiality Review

Page 121

```
 1    agreement has them bringing the stuff to

 2    New Orleans, right?

 3         A.    Yes.

 4         Q.    And where you see "Shipping

 5    Date," and then there's some language below

 6    that that's changed --

 7         A.    Uh-huh.

 8         Q.    -- does that reflect the same

 9    type of change, instead --

10         A.    The seller -- yeah.  The

11    seller, rather than the buyer, would arrange

12    the bulk vessel.

13         Q.    And ocean freight will be for

14    seller's account?

15         A.    Correct.  Correct.

16         Q.    Now, is this something that

17    happened only with Knauf Wuhu, or did this

18    happen with Knauf Tianjin too?

19         A.    This was the only shipment with

20    Knauf where they handled the freight.

21         Q.    Okay.  Going back to

22    Exhibit 24, do you know what this informal

23    tender is?

24         A.    I don't recall it.  I believe
```

Confidential - Subject to Further Confidentiality Review

Page 122

1     it -- I really -- I don't know.  I'm not

2     sure.

3          Q.     Okay.  Do you have some just

4     general idea from your business, generally,

5     what an informal tender is?

6          A.     I would assume it's some type

7     of quote, you know, a quote sheet or -- well,

8     actually, it looks like vessel availability

9     dates.

10               Yeah, this seems to be some

11    type of sheet that they would use to quote

12    vessels at a certain time.

13         Q.     Do you know what the

14    distinction is between Shanghai, Dongwan --

15         A.     My understanding was, Dongwan

16    was another plant for Knauf, but we did not

17    get any product from there.

18         Q.     Is that something that Knauf

19    offered to do?

20         A.     There was a lot of talk.  I

21    don't think we ever got a quote from Dongwan,

22    to my recollection.

23         Q.     Did you ever speak to anyone

24    directly at Dongwan?

Confidential - Subject to Further Confidentiality Review

Page 123

1          A.      I don't think so.

2          Q.      That was coordinated by some

3     other Knauf entity or person?

4                  MR. SANDERS:  Object to the

5          form.

6          A.      Yes.  We talked to, you know,

7     my -- I guess the guy calling the shots, it

8     appeared to me, was Mark Norris.

9     BY MR. HERMAN:

10         Q.      Okay.  Going back to

11    Exhibit 23, Addendum to Application and

12    Agreement, and this was -- does this relate

13    to one of those letters of credit that

14    somebody discussed earlier?

15         A.      Yes.

16         Q.      And who, to your understanding,

17    are the parties to this letter of credit?

18         A.      Interior/Exterior and Knauf.

19         Q.      And is The Whitney somehow a

20    party to this?

21         A.      The Whitney is the bank that,

22    you know, take the funds, the letter of

23    credits.  Assuming that Knauf met all the

24    obligations of the letter of credit, then the

Confidential - Subject to Further Confidentiality Review

1    funds would transfer.

2         Q.    Okay.  Do you know whether

3    there's any direct contract or document

4    between Knauf and The Whitney?

5         A.    I'm not aware of any.

6         Q.    Okay.  And where it says,

7    "Description of Goods," there's "FOB Wuhu,

8    China" scratched out, and then it says, "Free

9    alongside ship, Shanghai, China"?

10        A.    Uh-huh.

11        Q.    What does that mean?

12        A.    There were a lot of iterations

13   as far as changes to the letter of credit

14   when we were having trouble with shipping and

15   so forth, and I guess at one point, it was --

16   we were going to get -- it's coming back to

17   me a little bit.

18             I may be off here, but Wuhu

19   was, I believe, inland, and they had to

20   somehow get the product from Wuhu to

21   Shanghai, is my recollection.

22        Q.    And then it was -- you were

23   going to take title from it at Shanghai?

24        A.    Well, there was talk at --

Confidential - Subject to Further Confidentiality Review

1    yeah, at some point, they were going to get

2    it to Shanghai, then we were going to ship it

3    from Shanghai.  And then they ended up, with

4    the Wuhu shipment, bringing it to

5    New Orleans.

6         Q.    Okay.  If you look at the

7    second page, which is Bates number 244, it

8    says, "Documents Required," and then under

9    number 2, it says, "Bills of lading must show

10   shipment by 40-foot-high cube," and that's

11   scratched out and it says "under deck."  Do

12   you see that?  Or "by 40-foot-high cube

13   container," I guess, is scratched out.

14        A.    Okay.

15        Q.    Do you recall either you or

16   Knauf wanting to change it from containers to

17   under deck?

18        A.    They wanted to ship by

19   container.  I think it was easier for them.

20   And we preferred it break bulk.  It was

21   easier.  As Jim mentioned earlier, the labor

22   to unload the container was more difficult.

23        Q.    And just for the record, what

24   does "break bulk" mean?

Confidential - Subject to Further Confidentiality Review

Page 126

1           A.      "Break bulk" means that it was

2    put on the ship, palletized, with protective

3    covering and so forth, and they had slings

4    underneath it.  And the crane would pick it

5    up -- go into the ship, pick it up and bring

6    it off the ship.

7           Q.      Okay.  And what does "under

8    deck" mean?

9           A.      A covered deck.  You know, the

10   material would be covered.

11          Q.      Okay.

12          A.      In the ship.

13          Q.      And then if we look at the next

14   page, 245, it's been changed from "container

15   is sufficient" to "68-piece pallet," and

16   that's kind of the language that we saw

17   before on the certification; is that correct?

18          A.      Uh-huh.

19          Q.      And --

20                  MR. DUPLANTIER:  You have to

21          say "yes."

22          A.      Yes.  I'm sorry.

23   BY MR. HERMAN:

24          Q.      And Knauf agreed to that,

Confidential - Subject to Further Confidentiality Review

Page 127

1      correct?

2                    MR. SANDERS:  Object.

3           A.      Once again, this is a -- I

4      don't know if this was the final one that

5      occurred.

6      BY MR. HERMAN:

7           Q.      I understand.  But at the end

8      of the day, Knauf agreed to ship by 68-piece

9      pallet, correct?

10          A.      Yes.

11          Q.      And based on all of your

12     knowledge and understanding, all of the

13     shipping was done correctly?

14          A.      Yes.

15          Q.      Has there been a claim, to your

16     knowledge, by Interior/Exterior, as against

17     either Knauf or one of the carriers, that

18     there was some problem during shipping or

19     that the drywall was damaged during shipping?

20          A.      No.

21          Q.      Do you have any reason to

22     believe, as we sit here today, other than a

23     conversation you may have had with your

24     attorney, that the problems that people are

Confidential - Subject to Further Confidentiality Review

Page 128

1    experiencing or complain to be experiencing

2    with the drywall are caused by something that

3    happened during the shipping process?

4         A.    No.

5         Q.    You have no information that

6    seawater contamination during the shipping

7    process, if any, has anything to do with what

8    people are complaining about, correct?

9         A.    No, I do not.

10        Q.    If we go back to Exhibit 21,

11   it's Underwriters Laboratory.  Have you ever

12   seen this before?

13        A.    I don't recall it.

14        Q.    You don't remember where you

15   would have gotten this from or who would have

16   provided it or why?

17        A.    No.  No, I do not.

18        Q.    Okay.  If we go back to

19   Exhibit 17, it starts with an e-mail to you

20   from Barry Topple.

21        A.    Okay.

22        Q.    Who is Barry Topple, if you

23   remember?

24        A.    I don't remember his exact

Page 129

```
 1    title.
 2         Q.    Do you remember dealing with
 3    anybody at Knauf in the U.K.?
 4         A.    Well, from his e-mail, it does
 5    say "U.K."
 6         Q.    Would it be fair to say that
 7    you didn't really make any distinction
 8    between Knauf USA and Knauf U.K.?
 9              MR. SANDERS:  Object to the
10         form.
11         A.    Yes.
12    BY MR. HERMAN:
13         Q.    Would it be fair to say that
14    you didn't make a distinction between Knauf
15    USA and the Knauf Chinese companies?
16              MR. SANDERS:  Same objection.
17         A.    Yes.
18    BY MR. HERMAN:
19         Q.    And it says, "Dear Clay:
20    Currently, the Knauf group is fully committed
21    to supply its usual markets."
22              Do you see that?
23         A.    Uh-huh.
24         Q.    Do you recall getting that?
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.      Yes.
 2          Q.      Do you know what that was in
 3    response to?
 4          A.      My e-mail below that.  I
 5    believe I called or e-mailed Jeff Brisley and
 6    said, "Look, things are getting tougher,
 7    and -- to get product, and anything you can
 8    do for us?"
 9               And he suggested, I believe,
10    that we contact Barry Topple.  I think he
11    even did that on our behalf, and I went ahead
12    and sent him an e-mail myself.  And this is
13    his response that they're fully committed, I
14    guess, in all their other markets.
15          Q.      Did you have some knowledge, by
16    this point in time, that there was like a
17    Knauf Brazil or some other Knauf companies
18    somewhere else in the world?
19          A.      You just heard things.  I don't
20    recall where I heard that.
21          Q.      Okay.  Did you have some
22    conception of what the Knauf group was when
23    you got this e-mail?
24          A.      I knew it was a worldwide
```

Confidential - Subject to Further Confidentiality Review

Page 131

1    company.

2            Q.      Okay.  If we go back to

3    Exhibit 16, do you recall looking at this

4    e-mail chain before?

5            A.      Yes.

6            Q.      And it starts off on the bottom

7    with Jeff Brisley sending something to

8    somebody that talks about Knauf Brazil.  Do

9    you have any recollection of that?

10           A.      I remember the e-mail.

11           Q.      It says, "They would like to

12   understand if they have any options to

13   purchase additional wallboard, but not in

14   containers, whether that is from China,

15   Brazil or Europe."

16           A.      Correct.

17           Q.      And you recall making that

18   inquiry?

19           A.      Yes.

20           Q.      And somebody at Knauf was

21   finding out if some Knauf entity could

22   accommodate you?

23           A.      Correct.

24           Q.      And it looks like a response

Confidential - Subject to Further Confidentiality Review

```
1       from Mr. Topple to Mr. Brisley was, "The

2       Knauf group currently is consuming all spare

3       capacity for its own needs."

4                    Do you know what that means?

5       A.       Yes.

6       Q.       What does it mean, to your

7       knowledge?

8       A.       That they were maxed out, they

9       couldn't get us any more.

10      Q.       Okay.  And then somehow these

11      communications got forwarded to you, correct?

12      A.       Yes.

13      Q.       And is it fair to say that

14      because the Knauf group couldn't supply any

15      more drywall, that it was at that point that

16      Interior/Exterior went to get the Taihe

17      product?

18                    MR. SANDERS:  Object to form.

19      A.       Yes.

20      BY MR. HERMAN:

21      Q.       But is it fair to say that

22      Interior/Exterior would have been happy to

23      continue to import product from any of these

24      other Knauf entities?
```

Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      If we go back to Exhibit 15, do

3     you recall Mr. and Mrs. Wei visiting

4     New Orleans?

5          A.      I think I do recall Mr. Wei

6     coming in.

7          Q.      And was the GREAT IMMENSITY a

8     ship?

9          A.      Yes, it was.

10         Q.      Okay.  And that was one of the

11    Knauf Tianjin shipments?

12         A.      I don't recall which one it

13    was.

14         Q.      Don't recall.  Okay.

15         A.      But it was one of the ships.

16         Q.      Okay.  And is it your

17    understanding, or would it be your

18    impression, that GWB market is the gypsum

19    wallboard market?

20         A.      Yes.

21         Q.      And what, to your

22    understanding, was Mr. Wei's relationship, if

23    any, to the Knauf entities?

24         A.      No relationship.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  What was, to your

2     understanding, Mr. Wei's role in helping to

3     facilitate the importation of Chinese

4     drywall?

5          A.     As I said earlier, J.W. Allen,

6     our freight forwarder, had contacted them

7     because they're based in China, or Victor Wei

8     is, and they actually inspected some of the

9     product as it was loading onto the ships,

10     took some pictures for us, made sure that

11     things were okay.  And then they were the

12     ones that investigated a possible

13     relationship with BNBM for us.

14          Q.     Okay.  If you go back to

15     Exhibit 14, do you know what Uni-Pac, Ltd.

16     is?

17          A.     Yes, it's a little fuzzy, but I

18     believe so.  I believe this was someone who

19     had approached us about buying product, as

20     did a lot of people at the time.

21          Q.     Do you know whether they had

22     any relationship with Knauf?

23          A.     No, I don't know.

24          Q.     Do you know what type of

Confidential - Subject to Further Confidentiality Review

1    drywall they proposed to sell or broker?

2            A.      I don't recall.

3            Q.      Do you know whether they had a

4    relationship with BNBM?

5            A.      I don't recall.

6            Q.      Or Taihe?

7            A.      I don't recall.

8            Q.      Did you ever respond to this?

9            A.      We talked to them on numerous

10   occasions, but we never did anything with

11   them.

12           Q.      Okay.  It says, "In regards to

13   the stamping of the sheetrock, it will come

14   stamped 'Made in China.'"

15                   Was that some kind of

16   consideration?

17           A.      We were -- we talked to a lot

18   of people, and, you know, we told them what

19   some of the, you know, conditions would have

20   to be, so that's possibly where that came

21   from.

22           Q.      And it's your understanding,

23   and I don't know if I asked you or your

24   brother before -- but it's your understanding

Confidential - Subject to Further Confidentiality Review

Page 136

1       that that's a regulatory requirement?

2               A.      Yes.

3               Q.      If you look at the fourth

4       bullet point, it says, "Your order will come

5       FOB Houston and will take four to six weeks

6       for delivery port to port."

7                       What does that mean?

8               A.      That -- I assume that they

9       would pay the -- to have the product shipped

10      to Houston.

11              Q.      Okay.  And then it says, "We

12      are willing to enter into an exclusive

13      arrangement with you, based on projected

14      quantities per territory."

15              A.      Uh-huh.

16              Q.      Did you ever -- do you recall

17      negotiating with them on that?

18              A.      I remember talking to them

19      about it, yes.

20              Q.      Was that a sticking point?

21              A.      They were -- they were -- I

22      think they were interested in having a person

23      who was in the industry take a big -- a large

24      volume of their business, rather than having

Confidential - Subject to Further Confidentiality Review

1     a lot of little people, little customers.

2            Q.     And were you interested in

3     doing that?

4            A.     If it had been -- if it had

5     worked out.

6            Q.     Okay.  If we go back to

7     Exhibit 13, it says, "Please proceed to

8     inspect the product while it is being

9     produced."

10            Do you have any recollection

11     about that?

12            A.     I remember this was early on,

13     and we ended up having J.W. Allen do the

14     inspection of the product when it was loaded

15     onto the ship.

16            Q.     Was there ever any discussions

17     at Interior/Exterior about, "Maybe we should

18     have someone go and look at the manufacturing

19     process"?

20            A.     Only to the extent that we

21     talked about possibly looking at the product

22     as to whether it was out of square, whether

23     there were bubbles in the paper, you know,

24     busted edges, those type of things; but no,

Confidential - Subject to Further Confidentiality Review

1    not the actual manufacturing of the

2    process -- of the product.

3         Q.    Did you ever get samples from

4    Knauf?

5         A.    I don't recall.

6         Q.    Okay.  Has there been, since

7    this litigation started, some effort to try

8    to go and see if there's any Knauf or Taihe

9    drywall sitting around somewhere?

10             MR. DUPLANTIER:  I'm going to

11             object to the form of the question.

12             To the extent you're asking him things

13             that have been done by counsel in

14             anticipation of litigation, I don't

15             think he can answer that question and

16             should answer that question.

17             If they did it independent of

18             the litigation, go ahead and answer

19             the question.

20             MR. HERMAN:  Well, I don't

21             think it's covered by privilege or

22             work product, but we'll fight about

23             that later.

24    BY MR. HERMAN:

Confidential - Subject to Further Confidentiality Review

1          Q.      Did you ever do it independent

2     of your counsel?

3          A.      Please repeat it.

4          Q.      Did Interior/Exterior ever,

5     independently of counsel, try to ascertain

6     whether there was still some -- either Knauf

7     or Taihe drywall in a warehouse somewhere or

8     otherwise within Interior/Exterior's

9     possession?

10         A.      I don't recall if we did or

11    not.

12                 MR. HERMAN:  And I'll reserve

13         our rights to ask further about that.

14    BY MR. HERMAN:

15         Q.      If we look back at Exhibit 12?

16         A.      Okay.

17         Q.      This is your handwriting?

18         A.      Yes, it is.

19         Q.      And it looks like the first

20    part says, "Mark Norris of Knauf"?

21         A.      Uh-huh.

22         Q.      And it looks like October 28th,

23    2005?

24         A.      Yes.

Confidential - Subject to Further Confidentiality Review

1        Q.      Is this pretty early on in the

2   process when you started investigating

3   possibly importing Chinese drywall?

4        A.      Yes, it is.

5        Q.      What does that first line say?

6        A.      "Antitrust was the reason we

7   had to handle shipping, 12-1/2% of USG."

8        Q.      What does that mean?

9        A.      Originally, we'd gotten a quote

10  sheet -- Jim had gotten a quote sheet from

11  Knauf, and it had, basically, a delivered

12  price.

13              And my recollection in

14  talking -- and I jotted down the note,

15  talking to Mark, when they switched it to

16  they wanted us to handle the shipping, it had

17  something to do with antitrust as far as they

18  owned a certain -- I guess 12-1/2% of USG at

19  the time, and they couldn't ship any more

20  into the country without being over a

21  threshold and somehow having some regulatory

22  problem.

23        Q.      Okay.  Is it fair to say from

24  your perspective, that Knauf was desiring to

Confidential - Subject to Further Confidentiality Review

1     do business in the United States, subject to

2     the antitrust restrictions?

3               MR. SANDERS:  Object to form,

4          foundation.

5               THE WITNESS:  Repeat that

6          again.

7     BY MR. HERMAN:

8          Q.    Knauf wanted to sell drywall to

9     the United States, correct?

10              MR. SANDERS:  Same objection.

11         A.    Yes.

12    BY MR. HERMAN:

13         Q.    Based on your perception?

14         A.    Yes.

15         Q.    And the only hitch in that, to

16    your understanding, was that they couldn't

17    ship it to the United States directly,

18    correct?

19              MR. SANDERS:  Same objection.

20         A.    Yes.

21    BY MR. HERMAN:

22         Q.    But was there any discussion

23    about, "We don't want to ship it to the

24    United States because then we would somehow

Confidential - Subject to Further Confidentiality Review

Page 142

1    be subject to jurisdiction there"?

2                    MR. SANDERS:  Same objection.

3         A.     I guess I'll go back to what I

4    said earlier.  What he told me was they were

5    concerned about shipping -- because of their

6    interest in USG, shipping into the U.S.,

7    because somehow it would pass some threshold

8    and cause some regulatory problem.

9                    As far as on an ongoing basis

10   shipping into the U.S., this was a period of

11   time, I guess, that there was probably a

12   window of opportunity.  It's a very --

13   drywall is a very inexpensive product, very

14   freight-intensive, and --

15                    MR. COHEN:  You have to talk

16        up, please.

17                    THE WITNESS:  I'm sorry.

18        A.     The drywall is a very

19   inexpensive product, very freight-intensive,

20   and prices have come up.  And it would have

21   been difficult, in most circumstances, to

22   ship it into the U.S.

23   BY MR. HERMAN:

24        Q.     So from your perception at

Confidential - Subject to Further Confidentiality Review

1    least, Knauf was trying to monopolize on this

2    opportunity from the shortage to be able to

3    do business in the United States?

4                   MR. SANDERS:  Object to form.

5          A.     They were trying to ship

6    product into the U.S. to help with the demand

7    in the U.S.

8    BY MR. HERMAN:

9          Q.     Okay.  There's a line down here

10   that says, "Jeff Brisley explained to him

11   what happened."

12                 Do you know, or can you

13   remember, what it is that happened that he

14   explained?

15         A.     I don't recall what that is.

16         Q.     Okay.  If we go back to

17   Exhibit 11, it says, "Dear Clay:  After

18   speaking with our production manager, we've

19   discovered that to put an extra 'Made in

20   China' would be doubling up on the

21   information."

22                 Do you have any recollection

23   about that?

24         A.     Yeah.  We had been told by our

Confidential - Subject to Further Confidentiality Review

 1    freight forwarder that the product -- any

 2    product coming into the U.S. has to say "Made

 3    in China," and so that was one of our

 4    stipulations.  And I guess he thought we

 5    wanted it on there twice, apparently, and

 6    having it on there once was fine with us.

 7         Q.    Okay.  If we look at the second

 8    page, which is Bates number 636, it says, "We

 9    have priced your plasterboard order according

10    to 'sister company' rates upon the request of

11    Knauf USA."

12              You see that?

13         A.    Uh-huh.

14         Q.    Do you have any recollection

15    about that?

16         A.    I remember reading that, yes.

17         Q.    Okay.  What did that mean to

18    you?

19         A.    I think Jim stated correctly

20    that because of our longstanding relationship

21    with Knauf here, that's why they were going

22    to give us the rates that they did.

23         Q.    If we look at Exhibit 10, it

24    says, "We can then ship approximately 300,000

Confidential - Subject to Further Confidentiality Review

1    sheets per month from our Tianjin plant.  If

2    you require additional board, we would employ

3    the other two Knauf China plants to

4    supplement your shipments."

5              Do you see that?

6         A.    Uh-huh.

7         Q.    And did you have an

8    understanding at that time that one Knauf

9    plant would fill in, if they could?

10             MR. SANDERS:  Object to form.

11        A.    At that point in time, it

12   appeared they could ship from any plant, any

13   of their plants.

14   BY MR. HERMAN:

15        Q.    Okay.  And as it turned out,

16   when Tianjin had a crunch, Knauf shipped from

17   their Wuhu plant, correct?

18             MR. SANDERS:  Object to form.

19        A.    Correct.

20   BY MR. HERMAN:

21        Q.    Let's look at Exhibit 8.  Do

22   you recognize Exhibit 8?

23        A.    It's my handwriting.

24        Q.    Okay.  And you have three Knauf

Confidential - Subject to Further Confidentiality Review

1      plants noted there?

2            A.      Yes.

3            Q.      Do you know what these notes

4      are from, what person you were maybe speaking

5      to when you made them?

6            A.      No, I don't recall.

7            Q.      If you look at Exhibit 7, do

8      you have any knowledge or recollection of

9      what Exhibit 7 is?

10           A.      My recollection was this was

11     somebody -- it might have been that Uni-Pac

12     guy.  I would have to look at that document

13     and see.  It might be one and the same.

14           Q.      Exhibit 14.

15           A.      14?

16           Q.      You can look at mine, if you

17     want.

18           A.      Okay.

19                   Maybe I'm wrong.

20           Q.      Okay.  But somehow you heard

21     about Uni-Pac, apparently?  You don't --

22           A.      Or maybe he is with -- okay.

23     It does say "Uni-Pac."  That was probably

24     someone who had contacted us, also, and

Confidential - Subject to Further Confidentiality Review

Page 147

```
 1    wanted to ship product to us.
 2          Q.     Do you know who Rick Wendel is,
 3    or Wendel?
 4          A.     I remember meeting him or
 5    talking to him.  I don't remember him.
 6          Q.     Okay.  And then it says,
 7    "Chinese board, Taihe."
 8                 You see that?
 9          A.     Uh-huh.  This would have been
10    very early in the program.
11          Q.     Okay.
12          A.     Like October-ish.  Probably
13    November would be my guess.
14          Q.     And if we look at the next
15    page, which is 952, there's another person
16    listed, Terry Williams.  And that's the same
17    person that's on --
18          A.     Yeah, that is.  Apparently,
19    these two must have been working together.
20          Q.     Okay.  And then it says,
21    "Uni-Pac," and then, "Taihe," and then
22    there's "Billy App."  Is that the same guy?
23          A.     He's J.W. Allen.  He's our
24    freight forwarder.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      And would he have been somebody

2     that Uni-Pac would have recommended, or you

3     would have already been working with him?

4          A.      No, he wouldn't have.  We would

5     have already been working with Billy App.

6          Q.      And where it says "3% damage,"

7     do you know what that means?

8          A.      No, I don't.

9          Q.      Okay.

10          A.      No, I don't.

11          Q.      If we go back to Exhibit 6, is

12     this your handwriting?

13          A.      Yes, it is.

14          Q.      And do you know what this is?

15          A.      These are numerous contact

16     information for various people.

17          Q.      Okay.  And John Davis and

18     Cecelia Wang are, at least to your knowledge,

19     at Knauf in China?

20          A.      Correct.

21          Q.      And Jeff Brisley is the person

22     at Knauf USA that we talked about before?

23          A.      Yes.

24          Q.      Who is Kurt?

Confidential - Subject to Further Confidentiality Review

Page 149

1          A.      Kurt is a sales rep for Knauf

2      in the U.S.

3          Q.      Okay.  And who is Lydia

4      Alvarez?

5          A.      Lydia Alvarez is -- she worked

6      at The Whitney Bank and helped with the

7      actual paperwork for the letter of credit.

8          Q.      Okay.  And Mark Norris is

9      another Knauf person?

10         A.      Yes.

11         Q.      Do you know where he's located?

12         A.      China, I believe.

13         Q.      Okay.  And we know who Billy

14     App is.

15                 And who's Phillip somebody?

16         A.      Phillip is our Whitney banker.

17                 MR. HERMAN:  Okay.  Okay.

18             Let's take a break right now, because

19             we're going to run out of tape,

20             anyway.

21                 THE VIDEOGRAPHER:  Going off

22             the record.  The time is 11:23 a.m.

23             This is the end of Tape 1.

24                 (Recess taken, 11:23 a.m. to

Confidential - Subject to Further Confidentiality Review

Page 150

```
 1            11:33 a.m.)

 2                 THE VIDEOGRAPHER:  We're back

 3            on the record.  The time is 11:33 a.m.

 4            This is the start of Tape 2.

 5                 (Whereupon, Deposition Exhibit

 6            INEX-30b6-28, Handwritten Notes,

 7            "Tianjin Sheetrock," etc.,

 8            INT/EXT00416, was marked for

 9            identification.)

10    BY MR. HERMAN:

11            Q.    I'm going to show you what's

12    been marked as Exhibit 28 for the deposition,

13    Bates number INT/EXT416.  Do you recall ever

14    seeing Exhibit 28 before?

15            A.    Actually, I think these are

16    sticky notes that were on top of a document.

17            Q.    Oh, okay.  Are they your

18    handwriting?

19            A.    Yes, they are.

20            Q.    Okay.  And if you look at the

21    top right, or the top sticky note, it seems

22    to say, "Tianjin sheetrock, executed

23    12/15/05, order #3."

24                 You see that?
```

Confidential - Subject to Further Confidentiality Review

Page 151

1          A.      Yes.

2          Q.      Do you know what that means?

3          A.      Yeah.   That was just a

4     filename, I think, that was set up for the

5     name of it, the date it was executed, and

6     then that there was the third order with

7     Knauf.

8          Q.      Okay.  Do you know what the

9     "5/4/09, order #3" means?

10         A.      No, I don't.

11         Q.      And then if you look at the

12    left sticky note, it looks like it says,

13    "Trading company on West Coast."

14                 Do you have any recollection of

15    what that might be?

16         A.      I'm sure it was someone who had

17    contacted us, but I don't recall the details.

18         Q.      BNBM?

19         A.      Yeah, but I don't recall the

20    details.

21         Q.      Do you see where it says --

22    what does it say below that, "Taishan,"

23    or "Tiaz-shan" or...

24         A.      "Taishan."  Maybe that was my

Confidential - Subject to Further Confidentiality Review

Page 152

1    writing for "Taishan," would be my guess.

2         Q.      And then it looks like it says

3    "middle quality."

4                 Do you know what that means?

5         A.      No.

6         Q.      And then there was -- looks

7    like "Shan," something.  "Shandong Province,"

8    is that where it was made?

9         A.      I think that's where it was

10   made.

11        Q.      Do you have any recollection of

12   having any discussions with anybody about

13   Taishan being of -- sheetrock being of middle

14   quality?

15        A.      No, I don't.

16        Q.      Do you have any, as we sit here

17   today, definition of what "middle quality"

18   means?

19        A.      No.

20        Q.      Did you get some impression,

21   over the course of importing Chinese

22   sheetrock, that it was of somewhat lesser

23   quality than domestic?

24        A.      No.

Confidential - Subject to Further Confidentiality Review

Page 153

1          Q.      Would you consider domestic

2     sheetrock to be middle quality?

3          A.      They're all very similar.

4          Q.      Was there any distinction that

5     you recall discussing or hearing between

6     Taishan sheetrock and Knauf sheetrock, in

7     terms of quality?

8          A.      Don't recall.

9                  (Whereupon, Deposition Exhibit

10          INEX-30b6-29, E-mail Chain Ending

11          4/28/06 Li E-mail to to C. Geary,

12          Subject: IEBS company information,

13          INT/EXT02069 - INT/EXT02073, was

14          marked for identification.)

15     BY MR. HERMAN:

16          Q.      Okay.  Let me show you

17     INEX-30b6-29, which, for the record, are

18     Bates numbers 2069 through 2073.  Do you

19     recall dealing with somebody named Susan at

20     Weida Freight?

21          A.      Yes.

22          Q.      And was that person in China --

23          A.      I believe so, yes.

24          Q.      -- to your understanding?

Confidential - Subject to Further Confidentiality Review

1                    And IEBS is you guys?

2         A.    Yes.

3         Q.    It says, "Have got GWB sample

4    from BNBM just now and will mail them to you

5    today"?

6         A.    Uh-huh.

7         Q.    Do you see that?

8         A.    Yes.

9         Q.    And is "GWB" gypsum wallboard?

10        A.    Yes.

11        Q.    Do you recall getting a BNBM

12   sample?

13        A.    I don't recall.

14        Q.    Do you recall trying to locate

15   this BNBM sample since the litigation

16   started?

17        A.    All of my files were all

18   together in one spot, so it was -- it would

19   have been there.

20        Q.    Have you ever gotten a

21   wallboard sample from any other manufacturer?

22        A.    We did get some samples during

23   the process.  I don't recall from whom.

24        Q.    And how did the samples come?

Confidential - Subject to Further Confidentiality Review

1          A.      Small piece, I don't know, four

2     inches, six inches by six inches.

3          Q.      Were they wrapped in something?

4          A.      Possibly wrapped in plastic,

5     you know, overnighted or something like that.

6     We did get some.  I don't recall from whom.

7          Q.      Were you able to identify any

8     after the litigation started?

9          A.      Any samples?

10         Q.      Yeah.

11         A.      No.

12         Q.      When you got the samples, what

13    did you do with them?

14         A.      Nothing.

15         Q.      Did you run any testing on them

16    or --

17         A.      No.

18         Q.      What did you want them for?

19         A.      Just to have a sample of the

20    product.

21         Q.      Did you ever compare the

22    Chinese samples to domestic samples?

23         A.      No.

24         Q.      If you look at 2071, it says

Confidential - Subject to Further Confidentiality Review

1    it's from Mr. App.  It says, "Clay, does IEBS

2    have a website that we can let BNBM have to

3    give them a good introduction of the company

4    and its history, or what do you suggest?"

5              Do you know why BNBM would have

6    been interested in your business?

7         A.    The only thing I can guess is a

8    lot of people were trying to obtain drywall

9    at that time, and I assume they wanted to

10   know that we were a legitimate company.

11             (Whereupon, Deposition Exhibit

12             INEX-30b6-30, E-mail Chain Ending

13             5/8/06 App E-mail to Li,

14             Subject: Gypsum Wallboard,

15             INT/EXT02061 - INT/EXT02063, was

16             marked for identification.)

17   BY MR. HERMAN:

18        Q.    Let's look at INEX-30b6-30,

19   Bates numbers 2061 through 2063.  Do you

20   recall ever receiving or looking at

21   Exhibit 30?

22        A.    Yes.

23        Q.    What do you recall about it?

24        A.    I just reviewed the document in

Confidential - Subject to Further Confidentiality Review

Page 157

1    preparation for this, this deposition.  I

2    reviewed all my documents.

3          Q.    And at the time, do you recall

4    trying to negotiate and ultimately execute a

5    contract to import BNBM drywall?

6          A.    Yes, we did.

7          Q.    And that fell through, for some

8    reason, right?

9          A.    Yes, it did.

10         Q.    And maybe you already answered

11   this.  I apologize, if you did.  But why did

12   it fall through, again?

13         A.    I'm not positive, but I think

14   it had to do with the difficulty in getting

15   shipping.  But I'm not positive.

16         Q.    Okay.  And it talks about to --

17   item 5, "New Orleans, Louisiana, USA was

18   added."

19               Do you remember who --

20         A.    I'm sorry, where are you?

21         Q.    On the first page from App, it

22   says, "Dear Susan," and then there's a kind

23   of like four items?

24         A.    Yeah, I see it.  Okay.

Confidential - Subject to Further Confidentiality Review

1        Q.     One of them says, "Item 5,

2    New Orleans, Louisiana, USA was added"?

3        A.      Uh-huh.

4        Q.      Do you know why somebody wanted

5    that to be added, or what that means or...

6        A.      I don't recall if that was to

7    define where we were from or what.  I don't

8    recall.

9        Q.      Do you recall there being some

10   type of desire on Interior/Exterior's part to

11   make it clear, for some reason, that product

12   was going to be shipped to or somehow come

13   into New Orleans, Louisiana?

14       A.      That would be my guess, that we

15   were defining where it was coming, but I'm

16   not positive.

17       Q.      Is that for shipping purposes

18   or for some other purposes, or both?

19       A.      For shipping purposes.

20       Q.      Do you recall there being any

21   other concerns or discussions about

22   specifically identifying New Orleans or

23   Louisiana or the United States?

24       A.      As far as any markings?

Confidential - Subject to Further Confidentiality Review

1      Q.      Well, as far as making it clear

2   in a contract that you have a Chinese company

3   doing business with a U.S. company.

4      A.      The letter of credit stated

5   where we were from, and that's possibly why

6   it was in there.

7      Q.      Okay.  It says, "Susan, we need

8   to get this contract signed and whatever else

9   we need to do to get BNBM to start producing

10  product.  Please review the document included

11  in this transmission, and we will forward you

12  a copy."

13          Was there -- to your

14  recollection, they wouldn't begin production

15  until they had a formal contract?  Is that

16  the way you recall it or --

17     A.      Yes, and the letter of credit

18  was until that was opened.

19     Q.      Well, they would have been in

20  production with the shortage all the time,

21  you would think, huh?

22          MR. DUPLANTIER:  Well, object

23      to the form of the question.

24  BY MR. HERMAN:

Confidential - Subject to Further Confidentiality Review

1          Q.     Based on your knowledge and

2     impression.

3          A.     But I can't -- I don't know

4     that they would make this -- you know, that

5     one specific product unless they had an

6     order.

7          Q.     Okay.  If we go to 2062,

8     "Dear Clay Geary:  We have contacted

9     SGS Company, but SGS Company can't determine

10    which side about quality and condition."

11              Do you have any idea what that

12    means?

13         A.     SGS, as I recall, was trying to

14    define the scope of what they needed to do

15    for us.

16         Q.     They were going to do some type

17    of inspection?

18         A.     Yes.

19         Q.     And then they didn't do it

20    because you got Allen to do it or they didn't

21    do it because you ended up not buying the

22    product, or both?

23         A.     I don't recall.  We didn't end

24    up getting the product.  I believe we would

Confidential - Subject to Further Confidentiality Review

1      have had Weida Freight do it, but I'm not

2      sure.

3             Q.      Okay.  "Please tell us which

4      side about quality and condition."

5                     Do you have any recollection

6      about --

7             A.      Where is that?

8             Q.      It's in --

9             A.      Oh, there it is.  Okay.

10            Q.      Do you know what they were

11     talking about, in terms of quality and

12     condition?  It says, "because quality and

13     condition is very wide"?

14            A.      I assume they're trying to

15     better define what we meant by "quality and

16     condition."

17            Q.      Okay.  It says, "If you can

18     delete 'in good order,' because SGS Company

19     will examine goods according to contract."

20                    Do you have any idea what that

21     means?

22            A.      I don't recall.

23            Q.      Do you recall ever agreeing to

24     accept Chinese drywall where there was no

Confidential - Subject to Further Confidentiality Review

Page 162

1      specific representation from the manufacturer

2      that the drywall was in good order?

3            A.      We would not do that.

4            Q.      I don't remember if it was you

5      or your brother, but I think somebody said

6      earlier in the deposition that there had

7      never been any claim by Interior/Exterior

8      that any of the drywall was damaged during

9      shipping, correct?

10           A.      Correct.

11           Q.      Or at least with respect to the

12     complaints here, correct?

13           A.      Correct.

14           Q.      And certainly if there had been

15     drywall that had been damaged during the

16     shipping process, Interior/Exterior wouldn't

17     have sold that to a customer, correct?

18           A.      We did have some that was

19     banged up.  We didn't make an insurance

20     claim, but we did have some banged up.

21           Q.      And you sold that damaged

22     drywall to customers?

23           A.      Yes.

24           Q.      And did they know it was

Confidential - Subject to Further Confidentiality Review

Page 163

1    damaged?

2         A.    Yeah.  Some people wanted, you

3    know, a distressed price for banged-up

4    drywall.  Happens all the time.

5         Q.    Okay.  And so when you're

6    talking about damage, what's the type of

7    damage that you're talking about?

8         A.    Banged-up ends, you know, hit

9    in some kind of way, by a forklift or -- or

10   what.

11        Q.    Was there any of the drywall

12   that, based on your impression, when it

13   reached the United States, it had been

14   contaminated by seawater?

15        A.    No.

16        Q.    If there had been drywall that

17   had been contaminated by seawater during the

18   shipping process, would you have sold that to

19   customers?

20        A.    No.

21        Q.    Did you change the marking or

22   the labeling with respect to any of the

23   damaged drywall?

24        A.    Did we change the marking or

Confidential - Subject to Further Confidentiality Review

Page 164

1    the labeling on the product?

2           Q.      Yeah.

3           A.      No.

4           Q.      Like sell it as Crescent City

5    gypsum as opposed to --

6           A.      No.  No.

7           Q.      -- something else.

8                   Do you know what Crescent City

9    gypsum is?

10          A.      I've seen an e-mail in there.

11   I think someone had sent us a flier or

12   something on that.

13                  (Whereupon, Deposition Exhibit

14          INEX-30b6-31, Application and

15          Agreement for Documentary Credit

16          Between BNBM and Interior/Exterior,

17          INT/EXT00814 - INT/EXT00817, was

18          marked for identification.)

19   BY MR. HERMAN:

20          Q.      Okay.  Let me show you

21   INEX-30b6-31, Bates numbers 814 to 817.  What

22   is Exhibit 31?

23          A.      Application and Agreement for

24   Documentary Credit.

Confidential - Subject to Further Confidentiality Review

Page 165

```
 1          Q.     And is this similar to the
 2   letters of credit that we had discussed
 3   before, when we were looking at certificates?
 4          A.     Yes.
 5          Q.     And this one is for BNBM,
 6   correct?
 7          A.     Yes.
 8          Q.     And so the letter of credit was
 9   executed by Interior/Exterior, but then it
10   ended up not being needed, correct?
11          A.     Correct.
12          Q.     Is this similar to the letters
13   of credit that would have been executed with
14   respect to Knauf or Taihe?
15          A.     Similar.
16          Q.     Did you always use The Whitney
17   Bank?
18          A.     Yes, we did.
19                 (Whereupon, Deposition Exhibit
20                 INEX-30b6-32, Addendum to Application
21                 and Agreement for Documentary Credit
22                 Between Interior/Exterior and BNBM,
23                 INT/EXT00809 - INT/EXT00812, was
24                 marked for identification.)
```

Confidential - Subject to Further Confidentiality Review

Page 166

1    BY MR. HERMAN:

2         Q.    Okay.  I'm going to show you

3    INEX-30b6-32, which, for the record, is Bates

4    numbers 809 through 812.  Just for the

5    record, what is Exhibit 32?

6         A.    A letter of credit.

7         Q.    And there is within this letter

8    of credit some representations that are

9    similar to the Knauf representations that we

10   looked at earlier?

11        A.    Uh-huh.

12        Q.    Am I correct about that?

13        A.    Yes.

14        Q.    The way that the gypsum boards

15   were going to be shipped, correct?

16        A.    Yes.

17        Q.    And that they were free from

18   defects in materials and workmanship?

19        A.    Yes.

20        Q.    And that they complied with

21   ASTM C36?

22        A.    Yes.

23        Q.    I realize that, ultimately,

24   Interior/Exterior never imported the drywall

Confidential - Subject to Further Confidentiality Review

Page 167

1    from BNBM; but from your perspective, did

2    BNBM agree to these terms?

3              A.    Yes.

4                   (Whereupon, Deposition Exhibit

5              INEX-30b6-33, SGS North America

6              Inspection Request Application,

7              INT/EXT06089 - INT/EXT06091, was

8              marked for identification.)

9    BY MR. HERMAN:

10             Q.    I'm going to show you

11   INEX-30b6-33, Bates number 6089 through 6091.

12                  Do you know what Exhibit 33 is?

13             A.    It says, "Inspection Request

14   Application."

15             Q.    Do you have any idea what that

16   means?

17             A.    A request, I believe by us, to

18   have SGS do an inspection.

19             Q.    And it says, "Company Name for

20   Exporter Supplier:  Taihe Shandong Plant 2, a

21   Division of BNBM."

22                  You see that?

23             A.    Uh-huh.

24             Q.    Do you know what that is?

Confidential - Subject to Further Confidentiality Review

```
 1            A.     A Taihe plant, Taihe Shandong
 2      plant.
 3            Q.     If you look back at Exhibit 2,
 4      which is your responses, Distributor Profile
 5      Form, at page 4.
 6                  MR. HERMAN:  Thanks.
 7      BY MR. HERMAN:
 8            Q.     There's -- it says under 3,
 9      "Name of Chinese Drywall Product, if known,"
10      and it says "Taihe"?
11            A.     Uh-huh.
12            Q.     And then --
13                  MR. DUPLANTIER:  "Yes."
14            A.     Yes.
15      BY MR. HERMAN:
16            Q.     -- with respect to the Chinese
17      Drywall Manufacturer, if known, it says -- I
18      don't know if I'm pronouncing it right, but
19      "Taian Taishan Plasterboard Company"?
20            A.     I'm sorry, where are you?
21            Q.     On number --
22            A.     Okay.  I see.
23            Q.     -- 2 on page 1.  I'm sorry.
24            A.     Okay.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      Do you know what, if any,

2     relationship there is between the Taihe

3     that's reflected on Exhibit 33 and the Taihe

4     that's reflected on page 4 of Exhibit 2, if

5     any?

6          A.      I assume they're affiliated.

7          Q.      Do you know whether there's a

8     relationship between Taian Taishan

9     Plasterboard Company and Beijing New Building

10    Materials?

11         A.      I don't know.

12         Q.      Did SGS ever do the inspection

13    that's requested here?

14         A.      No.

15         Q.      Is this something that you guys

16    filled out or that SGS filled out?

17         A.      I don't recall.

18         Q.      Okay.  If you look at 6090,

19    where it says, "Scope of Inspection"?

20         A.      Uh-huh.

21         Q.      "Verify correct quantity is

22    shipped and received," is that something that

23    you guys put in or that they typed in before

24    they sent it to you, if you know or if you

Confidential - Subject to Further Confidentiality Review

Page 170

1    remember?

2          A.     I don't remember.

3          Q.     Well, it says under number 2,

4    "Problems to look for include dents, cracks,

5    paper peel and bubbles on the paper."

6               Do you see that?

7          A.     Yes.

8          Q.     Are those the types of things

9    that you were looking for?

10          A.     No, we did not.  We ended up

11    just inspecting the loading of the trucks.

12          Q.     Okay.

13          A.     I mean, the loading of the

14    ships.  Excuse me.

15          Q.     Okay.  When you talked about

16    damaged drywall that had come in and was sold

17    by Interior/Exterior at reduced prices, is

18    the damage that you're referring to things

19    like dents, cracks, paper peels and bubbles?

20          A.     No.  It was mainly damage,

21    forklift damage or possibly some damage on

22    the ship.  But no, not -- we didn't have any

23    paper peeling or bubbles or out of square or

24    any of those issues.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.     Okay.  It says, "Verify that
 2     each sheet has been marked 'Made in China.'"
 3                   Is there somebody that did that
 4     with respect to the Knauf shipments that were
 5     made?
 6            A.     Yes.
 7            Q.     In addition to the
 8     certification that you got from Knauf?
 9            A.     Oh, I'm sorry.  Did someone
10     verify that each sheet was marked "Made in
11     China"?
12            Q.     Yeah.
13            A.     No, they did not.
14            Q.     It says, "Verify all pallets
15     unloaded at port of discharge have no
16     apparent physical damage."
17                   Is that the type of damage you
18     were referring to?
19            A.     Yeah, damage, you know, either
20     in the loading or unloading process of the
21     ship.
22            Q.     Okay.  "Verify that all pallets
23     have been loaded onto ship 'preslung,'" in
24     quotes.
```

Confidential - Subject to Further Confidentiality Review

```
 1                    What's "preslung" mean?
 2          A.       Meaning it had the slings
 3     underneath each pallet so that the crane in
 4     New Orleans could take it off easily.
 5                    (Whereupon, Deposition Exhibit
 6              INEX-30b6-34, 6/13/06 Taian Taishan
 7              Plasterboard Letter of Certificate,
 8              INT/EXT06045, was marked for
 9              identification.)
10     BY MR. HERMAN:
11          Q.       Okay.  I'm going to show you
12     INEX-30b6-34, which is Bates number 6045.
13                    Do you have any idea what
14     Exhibit 34 is?
15          A.       Letter of certificate.  A
16     letter of certificate.  Jim handled more of
17     the Taian or the Taihe shipments than I did.
18          Q.       Okay.  Okay.  It says -- well,
19     I'll just ask you about this, and then maybe
20     I'll ask your brother about it further, but
21     it says, "All gypsum wallboard does not
22     contain asbestos."
23                    Do you see that?
24          A.       Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 173

1          Q.    Do you recall there being some

2     concern at some point about whether the

3     wallboard contained asbestos?

4          A.    I think Jim can better answer

5     that.

6               MR. HERMAN:  Okay.  Thanks.

7               (Whereupon, Deposition Exhibit

8          INEX-30b6-35, Listing of

9          Interior/Exterior Branches and

10         Managers, INT/EXT04561, was marked for

11         identification.)

12    BY MR. HERMAN:

13         Q.    Let me show you INEX-30b6-35,

14    which is Bates number 4561.  What is

15    Exhibit 35?

16         A.    These are locations, branch

17    locations.

18               MR. DUPLANTIER:  This is your

19         original.

20               MR. HERMAN:  Oh, okay.  Thanks.

21    BY MR. HERMAN:

22         Q.    Is this as of a certain point

23    in time?

24         A.    Yes, it was.

Confidential - Subject to Further Confidentiality Review

Page 174

1          Q.      If we're talking about the
2     period from Katrina through the beginning of
3     2007, were some of these branches not in
4     operation?
5          A.      Well, Elmwood is where we went
6     after the storm, because our facility got
7     flooded.  So that's, you know, kind of one
8     and the same with New Orleans.
9          Q.      Okay.
10         A.      Those were in existence.  We
11    did open up Lafayette.  I don't remember the
12    time, but they never received any shipments
13    of Chinese board.
14         Q.      Okay.  And at some point,
15    didn't you have a place in Rome, Georgia?
16         A.      No.
17         Q.      No?  Okay.
18                 Is there a place where you
19    shipped to in Rome, Georgia, like a customer?
20         A.      I believe we did.
21         Q.      Okay.  Do you remember who that
22    customer was?
23         A.      I'm not sure.
24         Q.      Okay.  I don't have copies of

Confidential - Subject to Further Confidentiality Review

Page 175

1    these.  I apologize.  I just got them

2    yesterday.  But at some point, did you have a

3    location in Longview, Texas?

4            A.    We do now.

5            Q.    Was that a place that was open

6    between Katrina and the beginning of 2007?

7            A.    It was not -- it did not get

8    any Chinese drywall.  It was opened, I think,

9    about a year and a half ago.

10           Q.    Okay.  What about Tuscaloosa?

11           A.    It was opened subsequent to all

12   this.

13           Q.    What about Shreveport?

14           A.    Subsequent also.

15           Q.    And Birmingham -- oh, you have

16   Birmingham on here?

17           A.    Uh-huh.

18           Q.    Did all the locations on

19   Exhibit 35 receive Chinese drywall?

20           A.    Yes, they did.

21           Q.    What about Abita Springs?

22           A.    That's the same as Mandeville.

23   We just had moved.

24           Q.    Okay.  Is there any other place

Confidential - Subject to Further Confidentiality Review

1    like Rome, Georgia, where you would have made

2    shipments even though you didn't have a

3    definite location there, of Chinese drywall?

4         A.    There were a few shipments that

5    we made directly from the port to specific

6    customers.  Other than that -- and there

7    weren't that many.  Other than that,

8    everything went through our warehouses.

9                   (Whereupon, Deposition Exhibit

10             INEX-30b6-36, Interior/Exterior

11             Product Shipment Documentation,

12             INT/EXT00331 - INT/EXT00344, was

13             marked for identification.)

14   BY MR. HERMAN:

15        Q.    Okay.  Let me show you

16   INEX-30b6-36, which, for the record, is

17   Bates-numbered 331 through 344.

18                   Are you familiar with

19   Exhibit 36?

20        A.    Yes.

21        Q.    What is it?

22        A.    This was a -- I guess a

23   delivery form used --

24                   MR. McKENNA:  I'm sorry, could

Confidential - Subject to Further Confidentiality Review

Page 177

1            you speak up a little, please?

2            A.      This was a delivery form used,

3    or spreadsheet, that was set up when we were

4    shipping product from the wharf to various

5    locations.

6    BY MR. HERMAN:

7            Q.      And there's a -- I assume a

8    vessel, it says the "M/V MYSTRAS"?

9            A.      Yes.

10            Q.      And do you recall whether there

11    was drywall that came in on the M/V MYSTRAS?

12            A.      Yes, there was.

13            Q.      And do you know from which

14    manufacturer that came?

15            A.      Knauf.

16            Q.      Okay.  And then it says, just

17    so we can -- it may be kind of tedious, but

18    might be helpful to people understanding

19    later.

20            If we go through these columns,

21    the delivery date is when the drywall was

22    actually delivered or when it was expected to

23    be delivered, if you know?

24            A.      It appears to be the same as

Confidential - Subject to Further Confidentiality Review

Page 178

1      the scheduled pickup date, so, apparently --

2      it appears to be the date that it was

3      scheduled.

4             Q.     Okay.  And then it says, "From

5      WHSE."  What does that mean?

6             A.     I'm sorry, "From Warehouse A."

7             Q.     And where is warehouse A

8      located?

9             A.     We set up -- in our system, we

10     set up a warehouse for each ship that came

11     in, to make the accounting easier.

12            Q.     Okay.

13            A.     So it's shipped from

14     warehouse 1.  That first delivery, for

15     instance, went from warehouse 1 to Baton

16     Rouge, our Baton Rouge branch.

17            Q.     Okay.  And then there's a

18     product number, 41212R, which seems to --

19            A.     That's the only product that we

20     got.

21            Q.     That is kind of a product ID

22     for drywall?

23            A.     Yes, it is.

24            Q.     And is that like kind of an

Confidential - Subject to Further Confidentiality Review

Page 179

```
 1      Interior/Exterior internal number?
 2            A.      Yes.
 3            Q.      Is that a number that's used by
 4      or for anybody else?
 5            A.      For everybody else.
 6            Q.      So like RSMeans, Xactimate,
 7      people like that?
 8            A.      I'm sorry, what?
 9            Q.      Who else would use --
10            A.      That's just a number that we
11      generated years ago, and that's how we define
12      4x12x1/2" regular sheetrock.
13            Q.      Okay.  So it is just
14      Interior/Exterior?
15            A.      Just us.  Just us.
16            Q.      Okay.  I'm sorry, I
17      misunderstood you.
18                    Then it says, "Quantity
19      Pallet"?
20            A.      Uh-huh.
21            Q.      Is that the number of pallets
22      or the quantity that's in each pallet?
23            A.      Quantity per pallet.
24            Q.      Okay.  And then it says,
```

Confidential - Subject to Further Confidentiality Review

Page 180

1      "Quantity Per Truck."  Is that the number of

2      pallets per truck or...

3            A.      Total number of pieces per

4      truck.

5            Q.      Oh, pieces per truck.  Okay.

6                    Then there's a BL number.  What

7      does a BL number mean?

8            A.      Bill of lading number.

9            Q.      And that shows what bill of

10     lading the shipment is associated with?

11           A.      Yes.

12           Q.      What's "WT Number"?

13           A.      That's a transfer number that

14     we use in our system.

15           Q.      What is it supposed to

16     describe?

17           A.      Just like you would have an

18     invoice number.  It's a number that shows,

19     you know, where it came from and where it

20     went to.

21           Q.      Okay.  And then it says, "To

22     Branch"?

23           A.      Baton Rouge.

24           Q.      And that's the

Confidential - Subject to Further Confidentiality Review

Page 181

```
 1      Interior/Exterior Baton Rouge branch?
 2           A.      Yes.
 3           Q.      And then it says, "Inland
 4      Carrier"?
 5           A.      That's the freight company that
 6      handled it.
 7           Q.      Okay.  "Scheduled Pickup Date,"
 8      "Pickup Confirmed, Yes."
 9                   What's the "Coastal Dock
10      Receipt Number"?
11           A.      Coastal Cargo handled the -- I
12      guess the stevedoring for us, so that's their
13      number.
14           Q.      Okay.  And was that true for
15      all the shipments?
16           A.      I don't think so.
17           Q.      Okay.  What other stevedoring
18      outfits do you recall doing work for you?
19           A.      I don't recall.
20           Q.      Okay.  And what's "JWA Invoice
21      Number"?
22           A.      That's J.W. Allen, the freight
23      forwarder.  That's their invoice number to
24      us.
```

Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  And then is the invoice

2   date -- what's that relate to?

3      A.     I would assume that that's

4   related to the J.W. Allen invoice number, but

5   I'm not positive.

6      Q.     Okay.  Why would the same

7   shipment have different invoice dates, if you

8   know?

9      A.     Have different -- I'm sorry?

10      Q.     Why would the same shipment on

11   the same ship have different invoice dates,

12   if you know?

13      A.     Because, you know, we got in

14   quite a bit of material at one time, and

15   there's several -- you know, one truck at a

16   time would go out.

17      Q.     So it's an invoice that's

18   associated with the distribution, not the

19   importing?

20      A.     Correct.

21      Q.     Okay.  Are any of these numbers

22   on the drywall itself?

23      A.     Are any of these numbers?

24      Q.     I mean, is there any way to

Confidential - Subject to Further Confidentiality Review

Page 183

 1    look at the drywall and say, "Okay.  This

 2    came in on this ship," or "in this shipment"?

 3           A.     No.

 4           Q.     I thought this was the thing

 5    that talked about Rome, Georgia.  Oh, here it

 6    is.

 7                  If you look at the last page,

 8    344, does this refresh your recollection

 9    about any shipments to Rome, Georgia?

10           A.     Yeah, I believe we shipped it

11    to -- I think it was a distributor in Rome,

12    Georgia, not to an end-user.  But I'm not

13    positive.

14                  (Whereupon, Deposition Exhibit

15           INEX-30b6-37, Freight Company Shipping

16           Documents, INT/EXT00004 -

17           INT/EXT00005, was marked for

18           identification.)

19    BY MR. HERMAN:

20           Q.     Okay.  INEX-30b6-37, Bates

21    number 4 and 5.  Do you have any idea what

22    Exhibit 37 is?

23           A.     It looks like some sort of

24    receipt for the freight company that took

Confidential - Subject to Further Confidentiality Review

1    it -- that took the product to our Houston

2    office.

3         Q.    Okay.  And can you tell which

4    type of sheetrock we're dealing with, in

5    terms of Knauf versus Taihe or anything like

6    that?

7         A.    No.

8         Q.    Okay.  On the front page, it

9    says, "Material Received in Good Condition,"

10   and somebody signed off on that.  Do you know

11   who that person is?

12        A.    I'm sorry, where are you seeing

13   that?

14        Q.    "Material Received in Good

15   Condition."  It looks like "Peter Gonzo" or

16   Ganza or something.  Garza?

17              It's not an employee of

18   Interior/Exterior in Houston that you

19   recognize?

20        A.    Not that I recognize.

21        Q.    Okay.  And it looks like

22   there's a notation that says, "No paperwork."

23              Do you know what that means?

24        A.    No.

Confidential - Subject to Further Confidentiality Review

Page 185

1    Q.    And if we look at the second
2    page, it says, "Carrier agrees to notify
3    Sutex of any problems as they occur and when
4    the load has been delivered.  Failure to do
5    so will result in $100 deduction from carrier
6    pay."
7          Do you see that?
8    A.    Okay.
9    Q.    Is it fairly standard that the
10   carrier was supposed to notify of any
11   problems as soon as they occurred, if there
12   was some problem during shipping?
13   A.    I'm not sure who Sutex is.
14   Q.    Okay.  Well, you certainly
15   don't recall anybody -- you receiving any
16   notice of any problems during shipping,
17   correct?
18   A.    No.  No.
19   Q.    And --
20   A.    I will say there were a couple
21   of loads that -- you know, that were untarped
22   that we talked to the freight lines about,
23   but that's the only issue we ever had with
24   the freight lines.

Confidential - Subject to Further Confidentiality Review

```
 1            Q.      If they were untarped, does
 2       that mean that they would have incurred any
 3       type of water intrusion?
 4            A.      Possibly.
 5            Q.      And did you inspect any of
 6       those affected boards or potentially affected
 7       boards?
 8            A.      The manager would have at the
 9       branch.
10            Q.      Okay.  And were you ever
11       advised by any manager at any branch that any
12       of the drywall had been affected by seawater
13       or other water?
14            A.      There were some untarped loads,
15       not seawater, but untarped loads, and it
16       could have had some rain on them.
17            Q.      Okay.  And what, if anything,
18       did Interior/Exterior do about that?
19            A.      I don't recall whether those
20       were thrown away or we back-charged the
21       freight company.  I don't recall.  It was a
22       minor amount in the big picture.
23                    (Whereupon, Deposition Exhibit
24            INEX-30b6-38, Interior/Exterior
```

Confidential - Subject to Further Confidentiality Review

Page 187

```
 1          Invoices, INT/EXT19884, INT/EXT24995,
 2          INT/EXT17768, INT/EXT17901,
 3          INT/EXT19699, INT/EXT17467,
 4          INT/EXT17432, INT/EXT21205,
 5          INT/EXT31881, INT/EXT33080,
 6          INT/EXT24700, was marked for
 7          identification.)
 8  BY MR. HERMAN:
 9          Q.     Okay.  I'm going to show you
10  INEX-30b6-38.  And this consists of, for the
11  record, Bates numbers 19884, 24995, 17768,
12  17901, 19699, 17467, 17432, 21205, 31881,
13  33080 and 24700, which are just kind of a
14  sampling of invoices so we can try to get
15  some kind of understanding about how the
16  drywall is delivered to the customer.
17             Do you recognize these as basic
18  Interior/Exterior invoices?
19          A.     Yes.
20          Q.     And there's kind of a "Ship To"
21  date and then a "Bill To" date.  Do you see
22  that?
23          A.     Yes.
24          Q.     What's the distinction between
```

Confidential - Subject to Further Confidentiality Review

Page 188

1    the "ship to" and the "bill to"?

2         A.    The "bill to" is where the

3    company wanted their invoices sent.  "Ship

4    to" is where the product was shipped.

5         Q.    Okay.  And if we look at the

6    first one, which is Bates-numbered 19884, it

7    looks like it was shipped to Lowe's

8    store 594.  Do you see that?

9         A.    Yes.

10        Q.    And then it says it's billed to

11   Lowe's Companies?

12        A.    Yes.

13        Q.    And there's a -- it shows

14   4x12x1/2" regular sheetrock.  You see that?

15        A.    Yes.

16        Q.    Can you tell by looking at this

17   invoice whether it's Chinese or domestic?

18        A.    No, I can't.

19        Q.    Do you recall selling Chinese

20   drywall to Lowe's?

21        A.    We sold domestic, and we sold

22   imported, and we did not make a distinction.

23        Q.    Well, for a certain time

24   period, it's my understanding that you were

Confidential - Subject to Further Confidentiality Review

1    generally selling the one-1/2" regular from

2    China, and it was the 5/8ths that was

3    domestic; is that right?

4              MR. DUPLANTIER:  I'm going to

5         object to the form of the question.  I

6         don't think that's been the testimony

7         today.

8              MR. HERMAN:  Okay.  How am I

9         wrong?

10             THE WITNESS:  I'm sorry, can

11        you repeat?

12             MR. HERMAN:  Yeah.

13   BY MR. HERMAN:

14        Q.    In terms of the time period

15   from January 26th, 2006, to the end of 2006

16   or early 2007, I had thought that you guys

17   said, or one of you said that you basically

18   made a decision that you would import Chinese

19   drywall for 4x12x1/2 regular, and then you

20   would use domestic for the 5/8ths; is that

21   not correct?

22        A.    We only brought in 4x12x1/2"

23   regular from overseas.  We did, however -- it

24   did not meet our demand, so we bought

Confidential - Subject to Further Confidentiality Review

1      domestic 4x12x1/2" also, along with 5/8ths

2      and all the other products.

3            Q.     Okay.  And do you have some

4      quantification of, you know, for that time

5      period, you got x amount from China -- I'm

6      just talking about the one-half regular.  You

7      know, x percentage from Chinese versus x

8      percentage from wherever you brought it from

9      domestically?

10           A.     I did a spreadsheet on that,

11     and I'm trying to remember what it was.  But

12     my recollection was -- I think in that time

13     frame, was we shipped somewhere in the

14     neighborhood of 1.8, 1.9 million sheets of

15     4x12x1/2".  That's including what was brought

16     from overseas.

17           Q.     And do you know how much of

18     that was brought from overseas?

19           A.     I believe, including Wuhu,

20     including Taihe, was in the neighborhood of

21     511,000 sheets.

22           Q.     And you didn't -- when I say

23     "you," I mean Interior/Exterior didn't

24     capture in its standard invoice whether it

Confidential - Subject to Further Confidentiality Review

Page 191

1    was Chinese-manufactured or

2    domestic-manufactured or who the specific

3    manufacturer was; is that correct?

4         A.    No.  No.  There were notes on

5    occasion.  If a customer had a preference and

6    requested something, there were notes on

7    occasion, but nothing uniformly.

8         Q.    Okay.  Did you ever have anyone

9    from Lowe's say, "We don't want Chinese

10   wallboard"?

11        A.    No.

12        Q.    Do you ever recall delivering

13   Chinese wallboard to Lowe's and having them

14   send it back?

15        A.    I don't recall, no.

16        Q.    Was there a cost difference

17   between the Chinese wallboard and the

18   domestic wallboard during this 2006 time

19   frame?

20        A.    No.

21        Q.    Not to the customer?

22        A.    Are you talking about sale

23   price?

24        Q.    Well, I was going to try to

Confidential - Subject to Further Confidentiality Review

Page 192

```
 1    break it down.

 2            A.     Okay.

 3            Q.     Let's talk about sale price

 4    first to the customer.

 5            A.     Okay.  Okay.

 6                   No.  I mean, the market

 7    fluctuated, and each market is different.  So

 8    the sale price fluctuated by market and by

 9    time frame.

10            Q.     Okay.  But you don't recall

11    having a clear distinction where you broke it

12    down where, you know, "I'll give you American

13    for x price and Chinese for less"?

14            A.     No.  No.  The only distinction

15    would have been the damaged product that we

16    talked to you about that was busted.

17            Q.     Okay.  What about on the

18    purchase side, was there a general difference

19    between the purchase price of the Chinese

20    versus the American?

21            A.     No, it was at or near the

22    market price.

23            Q.     And what were the American

24    brands that you were selling at that time?
```

Confidential - Subject to Further Confidentiality Review

1          A.      National Gypsum.

2          Q.      And that's gold board?

3          A.      Gold Bond.

4          Q.      Gold Bond?

5          A.      National Gypsum, U.S. Gypsum, I

6    think Temple-Inland, and maybe CertainTeed

7    also, and possibly American Gypsum.

8          Q.      And this spreadsheet that you

9    did, was that done for litigation purposes,

10   or that was done just in ordinary business

11   purposes?

12         A.      It was done for litigation.

13         Q.      Okay.

14              MR. HERMAN:  Do you know

15         whether you produced it or whether

16         it's work product?  I mean, I can't

17         recall whether we got it or not.  We

18         may have, but I'm just --

19              MR. DUPLANTIER:  I believe we

20         produced it.

21              MR. HERMAN:  Okay.

22              THE WITNESS:  I don't know that

23         we did.

24              MR. DUPLANTIER:  Okay.

Confidential - Subject to Further Confidentiality Review

Page 194

1              MR. HERMAN:  Well, we'll figure

2        it out.  Okay.

3              THE WITNESS:  It wasn't

4        something that anybody -- I just put

5        it together to see how much domestic

6        versus imported that we bought.

7              MR. HERMAN:  Okay.

8              MR. DUPLANTIER:  Oh, that

9        spreadsheet, you're talking about.

10             THE WITNESS:  Yeah.

11             MR. DUPLANTIER:  I thought you

12        were talking about the calculation of

13        the cost, because we did produce that.

14             THE WITNESS:  Oh.  No.  No.

15             MR. HERMAN:  Well, is it work

16        product?

17             MR. DUPLANTIER:  The

18        calculation of the cost?  No, we don't

19        consider that to be work product.  I

20        believe that's been produced.

21             MR. HERMAN:  Okay.  And what

22        about the breakdown of U.S. to

23        Chinese?

24             MR. DUPLANTIER:  I -- we have

Confidential - Subject to Further Confidentiality Review

Page 195

1          no objection to producing that to you.

2          We've produced all invoices for all

3          sales of drywall during the relevant

4          period of time.

5                  THE WITNESS:  Yeah, the sum of

6          all those invoices should equal the

7          number that you're talking about.

8                  MR. DUPLANTIER:  So you can

9          take those and do your calculation.

10    BY MR. HERMAN:

11          Q.     The second one is Bates

12    number 24995.  There's a "ship to," which is

13    a Home Depot in Baton Rouge.  See that?

14          A.     Yes.

15          Q.     And then there's a "bill to,"

16    Home Depot in Atlanta, Georgia.  Is that just

17    the corporate headquarters of Home Depot?

18          A.     That's where they accept their

19    invoices.

20          Q.     Okay.  And then it says in the

21    invoice, "Off George O'Neal, T/L into White

22    Oak Place, first house on right."

23                 Do you know what that is?

24          A.     Appears to be kind of more

Confidential - Subject to Further Confidentiality Review

1    specific directions to get to the -- possibly

2    to the house where it was delivered.

3         Q.    Did Home Depot somehow, on some

4    occasions, purchase drywall that

5    Interior/Exterior would deliver or arrange

6    for the delivery to specific properties?

7         A.    Normally, the only time we

8    shipped to Home Depot was -- we have crane

9    trucks, boom trucks with labor, and we'll go

10   and -- we call it stocking a job for them,

11   and spread the material out in the house and

12   then bill Home Depot, and Home Depot will

13   bill their customer.

14        Q.    Okay.  And did the same thing

15   happen with Lowe's?

16        A.    Yes.  We did not usually ship

17   directly to a Lowe's store.  They would buy

18   their own drywall for their own customers

19   that come in, but it would be product that

20   they wanted stocked at a house.

21        Q.    Okay.  But it looks like, to me

22   at least, if you look at the first page,

23   19884, it looks like it's actually going to a

24   store, huh?  Oh.  Oh, okay.

Confidential - Subject to Further Confidentiality Review

```
 1          A.      "Lot 2, Acton Meadows."
 2          Q.      I see.  Okay.  So it's actually
 3     going to a lot?
 4          A.      Yeah.
 5          Q.      Okay.  And then Lowe's is going
 6     to bill the customer for that?
 7          A.      The customer, yeah.
 8          Q.      Okay.  And then if we look at
 9     the third one, 17768, it looks like it's
10     billed to Creola Ace Hardware.  Do you know
11     what that is?
12          A.      Creola Ace is a -- I think
13     they're a -- some type of hardware store, and
14     they bought product and sold it to -- looks
15     like Mitchell.
16          Q.      Okay.  And what's Mitchell, to
17     your knowledge?
18          A.      It's a construction company.
19          Q.      Okay.  And where -- there's an
20     address there.  Do you know whether that's
21     the actual Mitchell Corporation address or
22     whether that's a house that they were
23     building?
24          A.      I don't know.
```

Confidential - Subject to Further Confidentiality Review

Page 198

1          Q.     Okay.  Do you know what was

2     ordinarily the procedure, in terms of

3     Mitchell?

4          A.     In terms of Mitchell, no, I

5     don't.

6          Q.     Okay.  Then we've got Bailey

7     Lumber in 17901.  Do you know what Bailey

8     Lumber is?

9          A.     Bailey Lumber is a customer of

10    ours.  They're a lumber yard, and we --

11    similar to what you mentioned with Home

12    Depot, we will -- they'll call us and say,

13    "Hey, deliver 200 sheets to Mrs. Smith's

14    house on number 12 Elmwood Lane," and we'll

15    go deliver it and bill them and they bill the

16    customer.

17         Q.     Okay.  So on 17901, where it

18    talks about 98 Mount Vernon Court in Ocean

19    Springs, based on your experience, that would

20    be the house that Bailey was building and not

21    the actual Bailey facility?

22         A.     Not building.  They're a supply

23    company also.  They're a lumber yard.

24         Q.     Okay.  They're -- okay.

Confidential - Subject to Further Confidentiality Review

1          A.     Once again, we have the crane

2      trucks and the labor, and they're not set up

3      for that.

4          Q.     Okay.  What is 84 Lumber?

5          A.     A lumber company also.  Similar

6      situation.

7          Q.     And you supplied them with

8      drywall?

9          A.     Yes.

10         Q.     Do you know whether you gave

11     them Chinese, domestic or both?

12         A.     Do not know.

13         Q.     Do you know whether you gave

14     Bailey Chinese, domestic or both?

15         A.     Do not.

16         Q.     Do you know whether you gave

17     Mitchell Chinese, domestic or both?

18         A.     I do not.

19         Q.     Do you know whether you gave

20     Creola Ace Hardware Chinese, domestic or

21     both?

22         A.     Do not.

23         Q.     Do you know whether you gave

24     Home Depot Chinese, domestic or both?

Confidential - Subject to Further Confidentiality Review

Page 200

1          A.     Do not.

2          Q.     All right.  17467 is Llano

3     Construction Company.  Do you know what that

4     is?

5          A.     A construction company here in

6     New Orleans.

7          Q.     And you supplied them with

8     drywall?

9          A.     Yes.

10         Q.     Do you know whether you gave

11    them Chinese, domestic or both?

12         A.     Do not.

13         Q.     Did you guys supply Habitat for

14    Humanity with drywall?

15         A.     Yes.

16         Q.     Do you know whether you gave

17    them Chinese, domestic or both?

18         A.     Do not.

19         Q.     Okay.  If you look at 24700, it

20    says "Ship To:  Royal Homes."

21              Do you know what Royal Homes

22    is?

23         A.     Royal Homes, I believe, is a

24    builder.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.  And it says, "Bill To:

2     Louisiana Lumber."

3                  Do you know what Louisiana

4     Lumber is?

5          A.      Yes.

6          Q.      What's that?

7          A.      A lumberyard.

8          Q.      And you supplied Louisiana

9     Lumber with drywall?

10         A.      Yes.

11         Q.      Would you generally give the

12    drywall to Louisiana Lumber, or you would

13    deliver it to the actual house that was being

14    built or under construction?

15         A.      Typically, deliver straight to

16    the house.

17         Q.      Okay.  So here we have "68034

18    Marion, corner of Strain Road and Marion" --

19         A.      Uh-huh.

20         Q.      -- in Mandeville?

21                 So that's the house that the

22    drywall would have been delivered to?

23         A.      Yes.

24         Q.      And you can't tell from looking

Confidential - Subject to Further Confidentiality Review

Page 202

1    at this invoice whether it was Chinese,

2    domestic or both?

3           A.     No.

4                  (Whereupon, Deposition Exhibit

5           INEX-30b6-39, 10/24/05 Davis E-mail to

6           C. Geary, Subject: USA Wallboard,

7           INT/EXT00623, was marked for

8           identification.)

9    BY MR. HERMAN:

10          Q.     I show you INEX-30b6-39.  Do

11   you recall getting this or seeing it or...

12          A.     I recall seeing it.

13          Q.     Okay.  It says, "We have found

14   it difficult to find both marine insurance

15   and a vessel."

16                 This is from the guy at Knauf?

17          A.     This is from John Davis, who I

18   understood to be kind of the salesman.

19          Q.     Okay.  "There may be up to

20   60 days' wait for a vessel to the Gulf of

21   Mexico.  You may want to consider organizing

22   the shipping from your end.  Again, as

23   mentioned before, we've always sold strictly

24   FOB for all of our export orders."

Confidential - Subject to Further Confidentiality Review

1              And do you recall that you did

2      arrange for the shipping on your end?

3              A.      Yes.

4              Q.      And it says, "Previously, we

5      have sent over the ASTM test report via

6      e-mail.  Is that sufficient?"

7              Do you know whether that's the

8      test report that we looked at earlier?

9              A.      I don't know.

10             (Whereupon, Deposition Exhibit

11             INEX-30b6-40, 11/23/05 App E-mail to

12             C. Geary, Subject: Wallboard

13             Business - Continuation, INT/EXT04048,

14             was marked for identification.)

15     BY MR. HERMAN:

16             Q.      Okay.  This is INEX-30b6-40,

17     Bates number 4048.  It says, "Rudy leaves

18     for," I guess, "China tomorrow and will

19     return on December 7th."

20             Do you know who Rudy is?

21             A.      Rudy worked for J.W. Allen.

22             Q.      It says, "I want him to learn

23     as much as he can on how this business is

24     done in China."

Confidential - Subject to Further Confidentiality Review

Page 204

1             Do you know specifically what

2     Rudy was doing over there?

3          A.     As I recall, Rudy was going

4     over to, you know, inspect the product as it

5     was -- that first shipment -- well, that

6     would be too early, actually.

7                  I don't recall.

8          Q.     It says, "Rudy and Weida

9     Freight Systems have an appointment to visit

10    Knauf on November 28th."

11                 Do you know what they were

12    supposed to be doing when they were visiting

13    Knauf?

14         A.     I don't remember.

15         Q.     In terms of observing the

16    actual shipping, that would be where the

17    plasterboard was loaded onto the ship?

18         A.     Yes.

19         Q.     Is the plasterboard loaded onto

20    the ship at the plant?  Is the plant on a

21    port?

22         A.     I don't know.

23         Q.     It says, "Would it be okay for

24    Rudy to visit Beijing New Building Materials

Confidential - Subject to Further Confidentiality Review

1    Company?  The only reason we want to visit is

2    that the more you meet and have some dialogue

3    is the better we become and can better handle

4    your business."

5              Do you recall that?

6         A.    Yes.  I guess once again, at

7    that point in time, to try and develop any

8    relationships to try and get board from

9    another manufacturer.

10              (Whereupon, Deposition Exhibit

11              INEX-30b6-41, E-mail Chain Ending

12              1/10/06 App E-mail to C. Geary,

13              Subject: Update - Pallet Weights -

14              Imported Wallboard, INT/EXT00030, was

15              marked for identification.)

16   BY MR. HERMAN:

17        Q.    Okay.  I'm going to show you

18   INEX-30b6-41, which, for the record, is Bates

19   number 30.  And if you look at the e-mail on

20   the bottom from Mr. App, it says, "The

21   M/V MYSTRAS, our first vessel, will discharge

22   at 7th Street, January 13th."

23              Do you recall that?

24        A.    I recall the e-mail, yes.

Confidential - Subject to Further Confidentiality Review

1          Q.      And is this the first shipment

2    of Chinese drywall coming in, to the best of

3    your recollection?

4          A.      Yes.

5          Q.      And then do you know who Ray

6    Hardin is?

7          A.      Where?

8          Q.      He's the middle e-mail.

9          A.      Oh.  No.  No, I don't know him.

10         Q.      Okay.  Do you recall using CSX

11   Transportation for something?

12         A.      I don't recall if we did or

13   not.

14         Q.      Okay.  It says, "CSX

15   Transportation will not accept for

16   transportation any AAR Section 5 Figure 101 A

17   or B loads with incomplete layers."

18              Do you have any idea what that

19   means?

20         A.      No, I do not.

21         Q.      "Loads must be level."

22              Do you know what that means?

23         A.      I'll assume it just means that

24   they need to be level.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  "It will also be

2     necessary to replace the water barrier

3     because CSX does not pay for water damage

4     claims on open-top loads."

5                  Do you know what that means?

6          A.     No.

7                  (Whereupon, Deposition Exhibit

8             INEX-30b6-42, E-mail Chain Ending

9             3/9/06 App E-mail to C. Geary,

10            Subject: IEBS and Pan Ocean,

11            INT/EXT03928, was marked for

12            identification.)

13    BY MR. HERMAN:

14         Q.     Okay.  Let's look at

15    Exhibit 42, which, for the record, is Bates

16    number 3928.

17                 Do you recall ever seeing this

18    e-mail?

19         A.     Yes.

20         Q.     Okay.  If you look under 8, it

21    says, "When you lift the Knauf package with a

22    forklift, the package bends from the lift,

23    machine forks out.  This breaks the outside

24    packaging and loosens the bands."

Confidential - Subject to Further Confidentiality Review

Page 208

1                    Do you see that?

2         A.      Uh-huh.

3         Q.      Do you recall ever being

4    advised about that?

5         A.      What was happening at this time

6    was there's some shipments, apparently, in

7    other parts of the country that had a lot of

8    damage, and there was a lot of going back and

9    forth as far as the packaging and did more

10   need to be done as far as the packaging.

11        Q.      Did you have any concern that

12   this was an indication of some problem with

13   the drywall itself?

14        A.      No.

15        Q.      It says, "When you lift the

16   BNBM units with wood pallets, the unit

17   remains flexed and solid across the length of

18   the unit, thus not loosening the bands or

19   outer protection."

20                    Do you know what that means?

21        A.      I assume that it means it's not

22   going to bend on the ends.

23        Q.      Okay.  Because of the way that

24   it's packaged?

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Yes.
 2          Q.     Okay.  And then it says, "I am
 3    by far not an expert, but I have seen the
 4    rehandled Knauf packages."
 5                 Do you know what that means?
 6          A.     He's seen our ships being
 7    loaded and unloaded in New Orleans.
 8          Q.     Okay.  This would have been
 9    after -- this is March of 2006, so it's after
10    you've already gotten a couple?
11          A.     Right.  I'm not sure if we got
12    a couple.  I know we had one at that point.
13                 (Whereupon, Deposition Exhibit
14                 INEX-30b6-57, 7/21/06
15                 M/V ALEXANDERGRACHT Pre-Loading Survey
16                 of Gypsum Boards, INT/EXT00091 -
17                 INT/EXT00097, was marked for
18                 identification.)
19    BY MR. HERMAN:
20          Q.     Okay.  Let me show you --
21                 MR. HERMAN:  Oh, I'm way ahead
22                 of myself, but that's okay.  Does it
23                 matter if the exhibit numbers are
24                 messed up?
```

Confidential - Subject to Further Confidentiality Review

Page 210

1                THE REPORTER:  (Shakes head.)

2                MR. HERMAN:  Okay.

3    BY MR. HERMAN:

4        Q.     Skipping ahead to INEX-30b6-57,

5    which, for the record, is Bates number 91 to

6    97, do you have any idea what we're looking

7    at?

8        A.     It looks like a surveyor's

9    report on a shipment.  The ship name was

10   ALEXANDERGRACHT.

11       Q.     And do you know whether this

12   relates to a specific shipment of Chinese

13   drywall?

14       A.     I believe it does.

15       Q.     It talks about "July 20th,

16   2006, in order to survey and report on the

17   preloading condition of gypsum boards to be

18   exported from Shanghai, China to New Orleans,

19   USA."

20               Do you see that?

21       A.     Uh-huh.

22       Q.     And do you know whether this

23   was a Knauf shipment or a Taihe shipment?

24               MR. SANDERS:  Object to form.

Confidential - Subject to Further Confidentiality Review

Page 211

1          A.     If it was Shanghai, I would

2     assume it was the Wuhu shipment.

3     BY MR. HERMAN:

4          Q.     Okay.  And what was the purpose

5     of getting this report?

6          A.     Weida Freight -- well,

7     J.W. Allen had gone over there before to

8     inspect the shipments that had left.  And

9     Weida Freight, on our behalf, had -- well,

10    J.W. Allen contracted Weida Freight, who

11    apparently contracted these China Marine

12    Surveyors to inspect the product before it

13    got loaded on the ship.

14         Q.     China Marine Surveyors and

15    Sworn Measurers Corp.?

16         A.     Yes.

17         Q.     Okay.  And they were supposed

18    to make sure that there was nothing wrong

19    with the drywall at the time it got put on

20    the ship, right?

21         A.     Loaded onto the ship.

22         Q.     At least nothing obvious?

23         A.     Correct.

24                (Whereupon, Deposition Exhibit

Confidential - Subject to Further Confidentiality Review

Page 212

```
 1          INEX-30b6-43, E-mail Chain Ending
 2          3/10/06 App E-mail to to Bernas,
 3          Subject: LOI of 8 tires hold -
 4          Wallboard, INT/EXT03916, was marked
 5          for identification.)
 6   BY MR. HERMAN:
 7          Q.      I'm going to show you
 8   INEX-30b6-43, which, for the record, is Bates
 9   number 3916.  You ever recall seeing this
10   e-mail?
11          A.      Vaguely.
12          Q.      It says, "Unfortunately on the
13   third vessel, on the water now, was delayed,
14   and the manufacturer had to put about a third
15   of the cargo into public storage."
16                  Do you recall that happening?
17          A.      Yes.  We had a lot of trouble
18   getting a ship at that point.
19          Q.      Do you recall having any
20   concerns, other than the delays, about the
21   cargo having to sit in public storage?
22          A.      No.
23          Q.      And there's never any
24   indication that there was any contamination
```

Confidential - Subject to Further Confidentiality Review

1    or anything happened to the drywall while it

2    was sitting in public storage, is there?

3           A.      No.

4           Q.      Okay.  "Rudy was present in

5    China for the first loading, and we were both

6    at the wharf in New Orleans for discharge.

7    In our opinion, the package looks beat up,

8    but the contents is in good shape.  The scrap

9    board does what it is supposed to do and

10   protect the contents."

11              I think I have an

12   understanding, but just for the record, can

13   you explain how the packaging works to

14   protect the contents?

15          A.      They had rejected board, you

16   know, that they would put around the product

17   to protect it, and then I think they banded

18   it, as I recall, and it was palletized, so

19   you could get a forklift underneath the

20   pallet, or sling, as we talked about earlier.

21          Q.      And nobody was going to use

22   that external drywall anyway, correct?

23          A.      No.  No.

24          Q.      And did Interior/Exterior ever

Confidential - Subject to Further Confidentiality Review

Page 214

1    sell that wrapped drywall --

2         A.    No.

3         Q.    -- at discounted prices or

4    anything?

5         A.    No.

6         Q.    Okay.  And based on your

7    recollection for this shipment, even though

8    some of the outer stuff was banged up, the

9    internal contents appeared to be in good

10   shape?

11        A.    Yes.

12        Q.    Okay.  It says, "Our Chinese

13   manufacturer is Knauf, and they use scrap

14   board cut in strips as risers under the

15   wallboard for pallets."

16              Is that pretty much what you

17   just described, or is that something else?

18        A.    Yeah, when they made the

19   pallets, they cut it into what they call

20   dunnage, and it was, I don't know, four or

21   six inches high, and spaced those so that you

22   can get a forklift under it.

23        Q.    Okay.  "Another Chinese

24   manufacturer, BNBM, uses wood strips and

Confidential - Subject to Further Confidentiality Review

Page 215

1    plywood under the package and is a better

2    package, but, again, I believe that Knauf's

3    is adequate."

4                Did this have anything to do

5    with your shipping -- with your -- excuse me.

6    Strike that.

7                Did the packaging that Knauf

8    used have anything to do with

9    Interior/Exterior switching from Knauf to

10   Taihe?

11        A.     No.

12        Q.     Do you have any idea what this

13   Pan Ocean Company is, that they're talking

14   about?

15        A.     Pan Ocean, I think, was one of

16   the vessels that they were trying to get, and

17   I don't know whether they got them or not.

18   But it was a time when, once again, we were

19   having trouble getting ships.

20        Q.     Okay.  And there's some talk

21   about how high the pallets are stacked or how

22   high the boards are stacked on the pallet.

23   Why is that a concern, if at all?

24        A.     Frankly, you know, we didn't

Page 216

1      end up having a problem with our shipments,

2      but apparently in some other places, there

3      were problems. And so the freight -- or the

4      shipping companies were concerned about the

5      packaging, more than we were.  We felt like

6      it discharged, for the most part, fine.

7                    (Whereupon, Deposition Exhibit

8              INEX-30b6-44, E-mail Chain Ending

9              3/24/06 Norris E-mail to C. Geary,

10             Subject: Interior/Exterior Building

11             Supply (IEBS), INT/EXT02445 -

12             INT/EXT02447, was marked for

13             identification.)

14     BY MR. HERMAN:

15             Q.    Okay.  Let me show you

16     INEX-30b6-44, Bates number 2445 through 2447.

17     First of all, do you remember this

18     correspondence from Mr. App to Cecilia Wang?

19             A.    Yes.

20             Q.    And do you recall the

21     circumstances under which this was generated?

22             A.    I guess I have to read it in

23     detail.

24             Q.    Was there a concern on

Confidential - Subject to Further Confidentiality Review

1    J.W. Allen's part, to your knowledge, that

2    Knauf wasn't going to want to do business

3    with J.W. Allen or you guys anymore, for some

4    reason?

5         A.      Knauf got mad at Weida Freight

6    for a while, having to do with the logistics.

7    Everybody was getting frustrated because we

8    couldn't get a shipping line to take the ship

9    because it was a very busy time, apparently.

10   So there was some -- some difficulty between

11   those two, Weida and Knauf.

12        Q.      And they wanted to ship in

13   containers and you wanted to do the break

14   bulk, was the other thing, or...

15        A.      They said it would be a lot

16   easier for them to do it in container.

17        Q.      Okay.  There's something in

18   here one, two, three -- six paragraphs down,

19   that says, "Further, the inland distance to

20   Alabama, Texas and Georgia is 300 to

21   600 miles, and the containers need to be

22   returned to the Port of New Orleans at a

23   cost of $1.25 per mile."

24                We talked about Rome, Georgia.

Confidential - Subject to Further Confidentiality Review

Page 218

1    Were there any other places in Georgia that

2    you were shipping to or concerned about

3    delivering to?

4         A.    I don't know if we shipped

5    anywhere else in Georgia.  I don't think so,

6    but I'd have to check the invoices.

7         Q.    Okay.  It says at the bottom,

8    "GWB is not the preferred cargo of vessel

9    owners."

10              Do you know why that is?

11        A.    I think it had gotten a bad

12   reputation because of some damage they'd had

13   off-loading or in transit with one shipment.

14        Q.    Well, later in this, they talk

15   about, "We observed severe damage in

16   Virginia, 45%; and Port Manatee, 35%."

17              Do you have any idea whose

18   drywall that is or what shipments they're

19   talking about?

20        A.    We'd gotten some pictures sent

21   to us.  I'm sure they're in the -- what we

22   produced.  But I don't know any details about

23   them.

24              (Whereupon, Deposition Exhibit

Confidential - Subject to Further Confidentiality Review

Page 219

```
 1          INEX-30b6-45, E-mail Chain Ending
 2          3/31/06 App E-mail to Wei & Li,
 3          Subject: Great Immensity,
 4          INT/EXT03865, was marked for
 5          identification.)
 6    BY MR. HERMAN:
 7          Q.    Okay.  I'm going to show you
 8    INEX-30b6-45, which, for the record, is Bates
 9    number 3865.  Do you have any recollection of
10    this?
11          A.    Vaguely.  It had to do with we
12    were having, once again, trouble getting a
13    ship.  And, as I recall, Knauf had another
14    customer that we were trying to get that
15    ship, and apparently the other customer got
16    the ship, and we think it was with -- I think
17    he thought it was with the assistance of
18    Knauf.
19          Q.    So were you concerned that
20    Knauf had other preferred customers that they
21    were using a limited amount of ships to get
22    their product to, or were you trying to think
23    of a way -- or is this an opportunity for
24    Weida Freight or J.W. Allen to get a new
```

Confidential - Subject to Further Confidentiality Review

Page 220

```
 1    avenue towards getting shipping?
 2                 MR. SANDERS:  Object to form.
 3         A.     I think he was frustrated and
 4    felt like Knauf wasn't working with Weida,
 5    was the concern.
 6    BY MR. HERMAN:
 7         Q.     Okay.  And then there's a
 8    question, or two questions, in the middle of
 9    the Williams e-mail that says, "Did Knauf
10    sell the product to a Chinese company who
11    sold it to a company in the United States, or
12    was Knauf the principal party that took
13    responsibility and sold direct to the company
14    in Tampa?"
15                 Do you know if you ever got an
16    answer to that question or if Mr. App ever
17    got an answer to that question?
18         A.     I don't know.
19         Q.     Have you ever heard of Knauf
20    selling a product to another Chinese company,
21    which would then sell it to the United
22    States?
23         A.     No.
24         Q.     From your point of view, when
```

Confidential - Subject to Further Confidentiality Review

1    you were doing business with Knauf, is it

2    fair to say that Knauf was the principal

3    party that took responsibility selling

4    directly to Interior/Exterior?

5                MR. SANDERS:  Object to the

6           form.

7           A.    Yes.

8                (Whereupon, Deposition Exhibit

9           INEX-30b6-46, E-mail Chain Ending

10          4/6/06 App E-mail to to Li,

11          Subject: IEBS/Knauf Container

12          Shipments, INT/EXT02442 -

13          INT/EXT02443, was marked for

14          identification.)

15   BY MR. HERMAN:

16          Q.    I show you INEX-30b6-46.  For

17   the record, it is Bates number 2442 and 2443.

18                If you look at the top of

19   page 2, which is Bates number 2443, the

20   second bullet point says, "The terms of sale

21   are FOB Wuhu, but Knauf will handle the

22   pickup of the containers, loading at Wuhu and

23   delivery of the containers to Shanghai.

24                "Further, Knauf is responsible

Confidential - Subject to Further Confidentiality Review

Page 222

```
 1    for all costs expensed to deliver other

 2    containers FAS Shanghai."

 3              Do you have any recollection

 4    about that?

 5         A.    Yeah.  This is when we were

 6    talking about containers, and I think I said

 7    earlier, I believe the Knauf Wuhu plant was

 8    inland, and they had to get -- you know, in

 9    this case, the containers inland to the port.

10         Q.    Do you know whether the Knauf

11    Tianjin plant was inland?

12         A.    I don't know.

13              (Whereupon, Deposition Exhibit

14         INEX-30b6-47, E-mail Chain Ending

15         6/19/06 App E-mail to to C. Geary,

16         Subject: Knauf and BNBM Business,

17         INT/EXT02000 - INT/EXT02003, was

18         marked for identification.)

19    BY MR. HERMAN:

20         Q.    I'll show you INEX-30b6-47,

21    Bates number 2000 through 2003.

22              MR. HERMAN:  While you're

23         reviewing that, let's go off the

24         record for just one second.
```

Confidential - Subject to Further Confidentiality Review

Page 223

1           THE VIDEOGRAPHER:  Off the
2      record, 12:48 p.m.
3           (Recess taken, 12:48 p.m. to
4      1:11 p.m.)
5           THE VIDEOGRAPHER:  Stand by.
6      We're back on the record.  The time is
7      1:11 p.m.
8           MR. HERMAN:  Okay.  We're back
9      on the record.  I had identified
10     Exhibit 47.
11          (Whereupon, Deposition Exhibit
12     INEX-30b6-48, 6/20/06 App E-mail to
13     Wei & Li, No Subject, INT/EXT01999,
14     was marked for identification.)
15          MR. HERMAN:  Exhibit 48 is
16     going to be -- INEX-30b6-48 is going
17     to be Bates number 1999.  I don't
18     think it's necessary to ask any
19     questions on it at this time, given
20     your previous answers.
21          (Whereupon, Deposition Exhibit
22     INEX-30b6-49, Handwritten Notes,
23     "M/V MYSTRAS," INT/EXT00053, was
24     marked for identification.)

Confidential - Subject to Further Confidentiality Review

    1      BY MR. HERMAN:

    2           Q.      Deposition Exhibit INEX-30b6-49

    3      is Bates number 53.  Do you know whose

    4      handwriting that is?

    5           A.      That's my handwriting.

    6           Q.      Do you have any idea what

    7      Exhibit 49 is?

    8           A.      The top of it was calculation

    9      on the -- looks like the weight per piece.

   10           Q.      Okay.  And why were you

   11      concerned about that, if you remember?

   12           A.      For shipping, truck lines being

   13      able to -- the weight we could put on the

   14      truck.

   15           Q.      Okay.  And then down at the

   16      bottom, it looks like it says like "Temple"

   17      or something, and then "USG" and "BPB"?

   18           A.      Yes.

   19           Q.      What does all that mean?

   20           A.      Those are three different

   21      manufacturers, and those are their weights.

   22           Q.      All domestic?

   23           A.      Yes.

   24                   (Whereupon, Deposition Exhibit

Confidential - Subject to Further Confidentiality Review

Page 225

```
 1          INEX-30b6-50, Handwritten Notes,

 2          "Break Bulk," etc., INT/EXT00278, was

 3          marked for identification.)

 4     BY MR. HERMAN:

 5          Q.     All right.  Let's look at

 6     Deposition Exhibit INEX-30b6-50, which, for

 7     the record, is Bates number 278.  Do you have

 8     any idea what this is?

 9          A.     Looks like I was trying to

10     calculate the price per square foot.  It

11     looks like containers versus break bulk at

12     the top.  Two variables on the top appear to

13     be the ocean freight.

14              The middle looks to be --

15     calculate the cost of the product with the

16     product and the ocean freight from BNBM; and

17     then at the bottom, break bulk versus

18     container on Taihe.

19          Q.     And what's the bottom line

20     price?  That's per square foot?

21          A.     Per square foot, yes.  That

22     does not include -- that would not include

23     transportation to our branches and probably a

24     lot of fees at the wharf.
```

Confidential - Subject to Further Confidentiality Review

Page 226

1          Q.     Okay.  And then if you look at

2     the top right, this is where -- does this

3     account for the situation where Knauf shipped

4     directly from Wuhu to New Orleans?

5               MR. SANDERS:  Object to form.

6     BY MR. HERMAN:

7          Q.     Or is that just the two legs of

8     the trip?  I think I --

9          A.     I think if you -- if you add up

10    those two numbers, I think it comes out to

11    about $4178 per container, if I'm not

12    mistaken.

13         Q.     Okay.  I think I may have

14    misread it.  I'm sorry.  All right.

15         A.     Okay.

16         Q.     And then given this

17    information, did you use it to make any

18    decisions?

19         A.     We're evaluating costs all

20    along the process.

21               (Whereupon, Deposition Exhibit

22               INEX-30b6-51, 7/6/06 Interior/Exterior

23               Memo to Whitney National Bank,

24               INT/EXT00177, was marked for

Confidential - Subject to Further Confidentiality Review

Page 227

1              identification.)

2    BY MR. HERMAN:

3         Q.    I'm just going to mark this, so

4    we don't lose our place later, but I don't

5    need to ask you about it.  It's

6    Deposition Exhibit 51, which, for the record,

7    is Bates number 177.

8                   (Whereupon, Deposition Exhibit

9              INEX-30b6-52, 9/20/06 Remont E-mail to

10             C. Geary, et al., Subject: Sheetrock /

11             Wed / Sep 20, 2006 / Evening,

12             INT/EXT02379, was marked for

13             identification.)

14   BY MR. HERMAN:

15        Q.    I'm going to show you

16   Deposition Exhibit 52, which is Bates

17   number 2379.  There's a notation in this PS,

18   where it says, "Please keep this

19   confidential.  They do not know the exact

20   relationship of me with IEBS."

21                  Do you have any idea what this

22   is referring to?

23        A.    Phoenix Imports came and

24   approached us about buying board from them,

Confidential - Subject to Further Confidentiality Review

1    and apparently Rudy Remont, who's with

2    J.W. Allen, had seen them, I guess, at the

3    port, and they didn't realize that he was

4    working with us.  He was our freight

5    forwarder.

6        Q.    So what was he trying to do on

7    INEX's behalf?

8        A.    I think he was just trying to

9    relate to me that they're very interested in

10   moving the product and getting it to

11   New Orleans -- I mean, just selling the

12   product.

13       Q.    It was still in short supply at

14   this time?

15       A.    It had eased up, so it was --

16   at this point, we weren't interested in

17   ordering any more.

18       Q.    Okay.  This is getting towards

19   the end of 2006?

20       A.    This is September 20th, 2006,

21   it looks like.

22       Q.    So it's fair to say that as

23   soon as you didn't really have to get drywall

24   from China anymore, you went right back to

Confidential - Subject to Further Confidentiality Review

Page 229

 1    domestic?

 2            A.     Yes.

 3            Q.     They talk about 4x8 and 4x12.

 4    My understanding and recollection is that

 5    Interior/Exterior only imported 4x12; is that

 6    correct?

 7            A.     That's correct.

 8                   (Whereupon, Deposition Exhibit

 9            INEX-30b6-53, E-mail Chain Ending

10            7/11/06 Davis E-mail to App,

11            Subject: IEBS Wuhu Wallboard,

12            INT/EXT03767, was marked for

13            identification.)

14                   (Whereupon, Deposition Exhibit

15            INEX-30b6-54, E-mail Chain Ending

16            7/11/06 App E-mail to Li,

17            Subject: Wuhu Wallboard Order,

18            INT/EXT03757, was marked for

19            identification.)

20                   MR. HERMAN:  Just for the

21            purposes of the record, I'm going to

22            identify Exhibit 53 as Bates

23            number 3767, and Exhibit 54 as Bates

24            number 3757.

Confidential - Subject to Further Confidentiality Review

                                                    Page 230

1                    (Whereupon, Deposition Exhibit

2           INEX-30b6-55, 7/26/06 "Kevin" E-mail

3           to "WL," Subject: M/V ALEXANDERGRACHT,

4           INT/EXT03699, was marked for

5           identification.)

6    BY MR. HERMAN:

7           Q.    Let me show you

8    Deposition Exhibit 55, which is Bates

9    number 3699.

10                   MR. SANDERS:  Are you just

11          identifying it?  Are you going to ask

12          any questions?

13                   MR. HERMAN:  I am going to ask

14          about this one, which is --

15                   MR. SANDERS:  But the ones you

16          just introduced into the record, that

17          was for what purpose?

18                   MR. DUPLANTIER:  They were

19          identified.

20                   MR. HERMAN:  Just so they're

21          noted.

22                   MR. DUPLANTIER:  Keep them in

23          order.

24                   MR. SANDERS:  But you're not

Confidential - Subject to Further Confidentiality Review

Page 231

1          asking anybody here questions?
2                    MR. HERMAN:   Somebody may
3               later.   I guess that's the potential
4               downside of marking them early, hope
5               that the advantages outweigh the
6               risks.
7     BY MR. HERMAN:
8          Q.    It talks about -- at some
9     point, it says, "Our Knauf boards can be
10    recognized easily."
11                   You see that?
12         A.    No, I'm sorry, I don't.
13         Q.    Is that on yours?
14         A.    Yes.  Okay.
15         Q.    Do you know who this person is
16    that's sending this e-mail, Xu Long Chun?
17         A.    No.
18         Q.    Well, I guess my question is:
19    Based on your experience in dealing with
20    Knauf drywall, is it your impression and do
21    you agree that Knauf boards can be recognized
22    easily?
23                   MR. SANDERS:  Object to the
24              form.

Confidential - Subject to Further Confidentiality Review

Page 232

```
 1          A.     I think they're referring to
 2     the packaging outside, and there was -- yes,
 3     it was easily recognizable.
 4     BY MR. HERMAN:
 5          Q.     From a packaging, shipping
 6     standpoint?
 7          A.     Yes.
 8               (Whereupon, Deposition Exhibit
 9               INEX-30b6-56, Teamhead Surveyors Co.,
10               Ltd., Cargo Condition Report,
11               INT/EXT00447, was marked for
12               identification.)
13     BY MR. HERMAN:
14          Q.     I'm going to show you
15     Deposition Exhibit 56, which, for the record,
16     is Bates number 447.  Do you recall dealing
17     with Teamhead Surveyors?
18          A.     I don't recall it, but I -- it
19     says "DUAL CONFIDENCE," so I assume that was
20     us.
21          Q.     Is DUAL CONFIDENCE one of the
22     ships that brought over Knauf drywall?
23          A.     I believe it was.
24          Q.     Do you recall there being any
```

Confidential - Subject to Further Confidentiality Review

Page 233

1    complaints about the condition of the Knauf
2    drywall that came on the DUAL CONFIDENCE?
3            A.     No.
4                  (Whereupon, Deposition Exhibit
5            INEX-30b6-58, 7/21/06
6            M/V ALEXANDERGRACHT Pre-Loading Survey
7            of Gypsum Boards, INT/EXT00091 -
8            INT/EXT00097, was marked for
9            identification.)
10   BY MR. HERMAN:
11           Q.     We may have looked --
12                  MR. DUPLANTIER:  We did that
13           already.
14                  MR. HERMAN:  We did this
15           already?
16                  MR. DUPLANTIER:  57.  Yeah,
17           this is the survey report.
18                  MR. HERMAN:  Okay.  And I think
19           that's just a different version of 58;
20           which I apologize, but -- whatever.
21                  MR. DUPLANTIER:  That's all
22           right.
23   BY MR. HERMAN:
24           Q.     Anyway, 58, for whatever

Confidential - Subject to Further Confidentiality Review

Page 234

```
 1    purposes, is Bates number 3959 to 3965.
 2                    (Whereupon, Deposition Exhibit
 3            INEX-30b6-59, Mediterranean Shipping
 4            Company Original Bill of Lading,
 5            INT/EXT00975, was marked for
 6            identification.)
 7    BY MR. HERMAN:
 8            Q.    I show you Exhibit 59, which is
 9    Bates number 975.
10                    Just for purposes of explaining
11    for the record, what's a bill of lading, to
12    the best of your knowledge and understanding?
13            A.    Identification of the product
14    that the shipping company carried.
15            Q.    Okay.  And it says notify -- or
16    it looks like, "Notified Metro Resources
17    Corp."
18            A.    As I mentioned, Jim handled
19    more of the Taihe and Metro Resources
20    purchases.
21            Q.    Okay.  And it's your
22    understanding that Taihe gypsum board that's
23    manufactured in China was purchased through
24    Metro Resources by Interior/Exterior?
```

Confidential - Subject to Further Confidentiality Review

Page 235

1           A.      Yes.

2           Q.      And do you know where Metro

3    Resources is located?

4           A.      I do not.

5                   (Whereupon, Deposition Exhibit

6                   INEX-30b6-60, Addendum to Application

7                   and Agreement for Documentary Credit

8                   Between Interior/Exterior and Knauf

9                   Plasterboard Tianjin, INT/EXT00233 -

10                  INT/EXT00236, was marked for

11                  identification.)

12   BY MR. HERMAN:

13          Q.      Okay.  I'm going to show you

14   Deposition Exhibit 60, Bates numbers 233 to

15   236.

16                  What is Exhibit 60?

17          A.      A letter of credit.

18          Q.      And this relates to a purchase

19   from Knauf Tianjin?

20          A.      Well, I see where it says

21   "Beneficiary:  Knauf Tianjin," but the FOB

22   was Wuhu, China.

23          Q.      Okay.

24          A.      This was not a letter of credit

Confidential - Subject to Further Confidentiality Review

1    that actually got executed.  I think there

2    was a later one that got executed for Wuhu.

3            Q.     Okay.  On 236, it looks like at

4    least Interior/Exterior executed, huh?

5            A.     Yeah, it does.  I think this

6    had to do with the problem with the shipping,

7    because as you can see -- I can tell by the

8    price, because the price ended up being, I

9    think, $10.67 because they handled the

10   shipping.

11              In the beginning, we were going

12   to, and then they secured a ship for us, so

13   Knauf handled the shipping.

14           Q.     Okay.  Do you recall a

15   situation where somebody said, "Oh, no, we've

16   got to change this letter of credit because

17   it's got to be a different company for Knauf

18   Wuhu instead of Knauf Tianjin"?

19           A.     I don't recall that.  I do --

20   we had to, obviously, make the description of

21   goods -- the terms, liner in, free out, or

22   whatever it was, those had to be changed and

23   put to New Orleans.

24           Q.     But from your point of view,

Confidential - Subject to Further Confidentiality Review

1    whether the letter of credit was executed

2    with Knauf Tianjin as the beneficiary or

3    Knauf Wuhu as the beneficiary didn't make any

4    difference, right?

5         A.    Didn't matter to us.

6         Q.    Okay.  And based on your

7    recollection, you never got any indication

8    that it mattered to them, correct?

9              MR. SANDERS:  Object to form,

10        foundation.

11        A.    I don't recall if the final

12   letter of credit had -- was listed "Knauf

13   Wuhu" or not.

14             (Whereupon, Deposition Exhibit

15        INEX-30b6-61, DestinAsia Material

16        Gypsum Board Price List, INT/EXT00940,

17        was marked for identification.)

18   BY MR. HERMAN:

19        Q.    I'm going to show you

20   Deposition Exhibit 61, which is Bates

21   number 940.

22             Do you ever recall seeing

23   Exhibit 61 before?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

1           Q.     What is it?

2           A.     This was someone else trying to

3      sell us board.

4           Q.     Did you ever purchase drywall

5      from DestinAsia?

6           A.     No.

7           Q.     Do you know where DestinAsia

8      got their drywall?

9           A.     No.

10          Q.     Did you ever sell any drywall

11     in Destin, that you recall?

12          A.     I don't think so, but I'm not

13     positive.  It would be in the invoices, if we

14     did.

15                 (Whereupon, Deposition Exhibit

16                 INEX-30b6-62, 5/26/06 Zhang E-mail to

17                 J. Geary, Subject: D&B, INT/EXT05897,

18                 was marked for identification.)

19     BY MR. HERMAN:

20          Q.     Okay.  I show you

21     Deposition Exhibit 62, which is Bates

22     number 5897.  Looks like Jim might be more

23     familiar with this than you are, but let me

24     just ask you.

Page 239

1                    Do you have any recollection of

2       initially being solicited by Metro to try to

3       sell Chinese drywall?

4            A.      I can't remember how it all

5       came about, to tell you the truth.

6            Q.      Do you know why they were

7       providing, I guess Jim, with Dun & Bradstreet

8       information?

9            A.      I think that would be better

10      asked to Jim.

11           Q.      Okay.  Well, I can ask these to

12      Jim too.  Let me just ask you real quickly,

13      and then I may be able to switch over to Jim,

14      and then I may be able to finish up and pass

15      the baton to somebody else.

16                   Are you familiar with ISO 9000

17      or ISO 9001 standards?

18           A.      I've heard of them.

19           Q.      Do you know what they are?

20           A.      Quality control, but I don't

21      know much about that, much more.

22           Q.      Do you recall, in any of your

23      dealings in terms with either Chinese

24      companies or people that were representing

Confidential - Subject to Further Confidentiality Review

1    Chinese companies in some way, having any

2    discussions about whether the Chinese

3    manufacturers complied with ISO standards?

4         A.    I don't recall.

5         Q.    Would it have been your

6    expectation that the Chinese manufacturers

7    would have complied with ISO standards?

8         A.    No.

9         Q.    Is it your expectation that

10   U.S. domestic manufacturers comply with

11   ISO standards?

12        A.    No.

13             MR. HERMAN:  I think if we just

14        go off the record for a second, switch

15        up, then I can hopefully finish with

16        Jim and pass the baton.

17             THE VIDEOGRAPHER:  Off the

18        record, 1:29 p.m.

19             (Recess taken, 1:29 p.m. to

20        1:31 p.m.)

21             THE VIDEOGRAPHER:  Stand by.

22        We're back on the record.  The time is

23        1:31 p.m.

24             ///

Confidential - Subject to Further Confidentiality Review

Page 241

```
 1              JAMES F. GEARY, SR.,
 2       having been first duly sworn, testified as
 3                    follows:
 4                  EXAMINATION
 5   BY MR. HERMAN:
 6        Q.    We were looking with your
 7   brother at Exhibit 62.  Do you recall getting
 8   this e-mail from somebody at Metro Resources?
 9        A.    Yes, I do.
10        Q.    And how did this come about, to
11   the best of your recollection?
12        A.    You know, I've thought about
13   it, and I do not recall how we first made
14   contact with Metro Resources.  I just -- I do
15   not recall.
16        Q.    Okay.  And do you recall asking
17   for Dun & Bradstreet information, for some
18   reason?
19        A.    I believe I did.
20        Q.    Okay.  And why were you
21   interested in that?
22        A.    Just -- I mean, just normal
23   course of business.
24        Q.    Okay.  What types of things are
```

Confidential - Subject to Further Confidentiality Review

Page 242

1    you looking for, in terms of requesting the

2    Dun & Bradstreet information?

3         A.    What their business activity

4    is, how long they've been in business, would

5    be primary.

6              (Whereupon, Deposition Exhibit

7              INEX-30b6-63, 6/20/06 Metro Resources

8              Correspondence to Interior/Exterior,

9              INT/EXT00967 - INT/EXT00971, was

10             marked for identification.)

11   BY MR. HERMAN:

12        Q.    Okay.  Let me show you

13   Deposition Exhibit 63, which is Bates

14   numbers 967 through 971.  There's -- on the

15   first page, which is Bates number 967,

16   there's a certification, which we've seen

17   before associated with Knauf drywall.

18             Am I correct that this is a

19   certification that similarly covers the Taihe

20   drywall that you imported?

21        A.    Yes, sir.

22        Q.    And if we look at 968, there's

23   a certification for Metro of warranty that

24   it's going to be free from defects in

Confidential - Subject to Further Confidentiality Review

1    materials and workmanship.  Do you see that?

2          A.     Yes, I do.

3          Q.     And from your point of view,

4    that covers the Taihe drywall that was

5    imported?

6          A.     That is correct.

7          Q.     And from INEX's point of view,

8    did Taihe and/or Metro breach that warranty?

9          A.     Yes, they did.

10         Q.     If we look at 970, it says,

11   "Transportation by ocean vessel MSC INGRID

12   from Qingdao, China to New Orleans,

13   Louisiana, USA."

14               You see that?

15         A.     I'm sorry, where are you?  Down

16   here?

17         Q.     Yeah.

18         A.     Okay.  Yes.

19         Q.     And what was the transportation

20   arrangement with Metro regarding Taihe

21   drywall?

22         A.     It was a different situation

23   from what we had done with Knauf, in that we

24   purchased from him -- from Metro containers.

Confidential - Subject to Further Confidentiality Review

1    These containers were shipped directly to our

2    warehouse, and everything was price

3    delivered.

4         Q.    So you took title in

5    New Orleans?

6         A.    We took -- if I'm saying that

7    correctly, we took title in New Orleans, yes,

8    because they had paid the freight for it.

9         Q.    Okay.  And you don't know to

10   what extent Metro Resources took title or was

11   simply acting as an agent for Taihe?

12        A.    I do not know.

13        Q.    If you look at 971, it says,

14   "No solid wood packing materials and no wood

15   packing materials."

16              What does that mean?

17        A.    You know, I believe that was

18   something that we requested on advice from

19   the freight forwarders, but I'm not positive

20   about that.

21        Q.    Okay.  And "CIF New Orleans,"

22   what does "CIF" mean, if you know?

23        A.    I couldn't tell you that.  You

24   know, I don't recall.

Confidential - Subject to Further Confidentiality Review

Page 245

```
 1              Q.      And then at the bottom, it
 2       says, "Two pieces boards one set."
 3                      What does that mean?
 4              A.      I would only assume that to
 5       mean that the drywall is -- has two pieces
 6       back to back or face to face, and then you
 7       have the end tape; and that would be my
 8       assumption, if that's what that means.
 9              Q.      Okay.  And it says, "The board
10       is going to be labeled 'Made in China, meet
11       or exceed ASTM C1396-04 standard."
12                      Did you see that?
13              A.      Yes, I do.
14              Q.      Based on your recollection, did
15       the board that came in from Taihe actually
16       have that designation?
17              A.      Yes, my -- yes, I believe it
18       did have that designation on it.
19              Q.      Do you recall whether there was
20       some other designation?
21              A.      I do not recall.
22              Q.      Like "Taian" or "Taihe" or...
23              A.      No.  The end tape said "Taihe,"
24       but stamped on the back of the board, was
```

Confidential - Subject to Further Confidentiality Review

1      this right here, "Made in China.  Meet or

2      exceed," et cetera, et cetera.

3              Q.      Okay.  Have you heard the term

4      "Dragon board"?

5              A.      I have heard the term, yes.

6              Q.      And did you ever see any

7      drywall marked "Dragon" or labeled "Dragon"?

8              A.      I have not, no.

9              Q.      Okay.  And the end tape, I

10     think you were saying, said "Taihe"?

11             A.      Yes, it did.

12             Q.      And is that end tape on all of

13     the board that you imported?

14             A.      Yes, it did.  Yes.  All of

15     the --

16             Q.      Taihe board?

17             A.      Yes.

18                     MR. HERMAN:  Right.  Okay.

19             Thanks.

20                     I apologize for the delay.

21                     (Whereupon, Deposition Exhibit

22             INEX-30b6-64, E-mail Chain Ending

23             11/23/05 Zeng E-mail to C. Geary &

24             Stetin, Subject: Inspection of Gypsum

Confidential - Subject to Further Confidentiality Review

Page 247

1            Board, INT/EXT00738, was marked for

2            identification.)

3     BY MR. HERMAN:

4            Q.     Okay.  I'm going to show you

5     Exhibit 64.  It's actually to Clay, but for

6     the record, anyway, this is exhibit 738.

7                   Do you know who Jeffrey Zeng

8     is?

9            A.     I don't, no.

10           Q.     Do you have any recollection of

11    dealing with him?

12           A.     I don't -- I'm fairly certain I

13    did not.  Clay may have, but I don't know.

14           Q.     Okay.  Do you consider drywall

15    to be a hard good?

16           A.     I don't know the answer to

17    that.

18           Q.     It says this guy was in charge

19    of inspection of toys and hard goods.  You

20    see that?

21           A.     I do.  I do.  I don't know what

22    that means.

23                  (Whereupon, Deposition Exhibit

24           INEX-30b6-65, 6/20/06 Metro Resources

Confidential - Subject to Further Confidentiality Review

Page 248

```
 1            Certificate of Warranty to
 2            Interior/Exterior, INT/EXT00969, was
 3            marked for identification.)
 4       BY MR. HERMAN:
 5            Q.     This is Deposition Exhibit 65,
 6       Bates number 969.  And this is the same type
 7       of warranty that we saw before, "free from
 8       defects in materials and workmanship"?
 9            A.     Yes.
10            Q.     And this is a warranty that you
11       consider to be binding with respect to the
12       Taihe drywall, correct?
13            A.     That is correct.
14                 (Whereupon, Deposition Exhibit
15            INEX-30b6-66, E-mail Chain Ending
16            1/19/07 J. Geary E-mail to C. Geary,
17            Subject: Sheetrock, INT/EXT02293 -
18            INT/EXT02294, was marked for
19            identification.)
20       BY MR. HERMAN:
21            Q.     Okay.  I show you Exhibit 66,
22       which, for the record, is Bates numbers 2293
23       to 2294.
24                 Who is Allan Colley?
```

Confidential - Subject to Further Confidentiality Review

Page 249

1          A.      Allan Colley is with Dupuy

2     Storage Company.

3          Q.      And what's Dupuy Storage

4     Company?

5          A.      They are a warehousing

6     operation.  My belief is and understanding is

7     that their primary business is in coffee

8     storage at the wharf, at the port.

9          Q.      Okay.  Did you use them to

10    store Chinese drywall at all?

11         A.      We did not.

12         Q.      Okay.  What was the

13    circumstances surrounding these

14    communications, if you remember?

15         A.      Allan Colley is an acquaintance

16    of mine.  And long after we had sold all of

17    our Chinese drywall, I remember having a

18    discussion with Allen and him telling me that

19    he had some Chinese drywall that he had in

20    storage for a client.

21              When all the news reports

22    started surfacing towards the end of January,

23    I remembered that conversation and called

24    Allen just to -- just for general

Confidential - Subject to Further Confidentiality Review

1     information, to find out what he had, if he

2     had it.

3          Q.     And do you know who the client

4     was that had the -- that owned the sheetrock

5     or was storing the sheetrock?

6          A.     I do not.

7          Q.     And do you know what the

8     manufacturer was of the sheetrock that he

9     had, or who the manufacturer was?

10         A.     No, I do not.  Well, actually,

11    I think there was another e-mail, and he made

12    reference to Crescent City Gypsum.

13         Q.     Which is on --

14         A.     Oh, I'm sorry.  Pardon me.

15    Okay.

16         Q.     That's okay.

17                And do you have any idea what

18    Crescent City Gypsum is or who owns it or...

19         A.     No, I do not.

20         Q.     And did you guys ever have any

21    Crescent City Gypsum sheetrock?

22         A.     No, sir, we did not.

23                (Whereupon, Deposition Exhibit

24                INEX-30b6-67, COMEX Int'l "Attention:

Confidential - Subject to Further Confidentiality Review

Page 251

1           Purchasing Department" Fax,

2           INT/EXT00707, was marked for

3           identification.)

4       BY MR. HERMAN:

5           Q.      Okay.  Here is

6       Deposition Exhibit 67, which is Bates number

7       707.  This looks like something else

8       involving Crescent City Gypsum.  Do you ever

9       remember seeing this before?

10          A.      I've seen this communication in

11      the last few months.  The writing down at the

12      bottom addresses Trey, who is our -- who at

13      the time was our purchasing manager, and then

14      it says, "Sent to Mandeville branch."

15              So our Mandeville branch

16      received this fax from this company, COMEX.

17          Q.      Have you ever dealt with COMEX

18      before?

19          A.      No, sir, we did not.

20          Q.      Do you know anything about

21      COMEX?

22          A.      I do not.

23          Q.      Okay.  And, to your knowledge,

24      did the Mandeville branch ever decide to

Confidential - Subject to Further Confidentiality Review

Page 252

1    purchase this Crescent City gypsum board?

2           A.    No, they did not.

3                 (Whereupon, Deposition Exhibit

4           INEX-30b6-68, Bubba Board

5           Information & Certification Packet,

6           INT/EXT00897 - INT/EXT 00939, was

7           marked for identification.)

8    BY MR. HERMAN:

9           Q.    Okay.  I'll hand you

10   Deposition Exhibit 68, which is Bates

11   numbers 897 through 939.

12                Have you ever seen Exhibit 68

13   before?

14          A.    No, sir, I have not.

15          Q.    Have you ever heard of Bubba

16   Board?

17          A.    You know, in the back of my

18   mind, I think I may have heard the term, but

19   I'm not familiar with it at all.

20          Q.    Have you ever heard of World

21   Trade Brokers?

22          A.    No, I do not -- or I have not.

23   I'm sorry.

24          Q.    Did Interior/Exterior, to your

Confidential - Subject to Further Confidentiality Review

Page 253

1    knowledge, ever do any business with Bubba

2    Board or --

3           A.      We did not.

4           Q.      -- World Trade Brokers?

5           A.      Did not.

6           Q.      If you look at Bates

7    number 902, which is, I think, page 3 of

8    the --

9           A.      Yes.

10          Q.      It says, "Conclusion:

11   According to the national standard GB/T

12   9775-1999, paper plaster plate."

13                  Do you have any idea what that

14   is, what that standard is?

15          A.      I'm not familiar with that at

16   all.

17          Q.      Okay.  Then there's some stuff

18   in here about ISO standards, and I'll ask you

19   the same question that I asked your brother:

20   Do you recall ever making -- anyone making

21   any representations that any of the Knauf

22   drywall complied with ISO standards?

23          A.      I do not recall.

24          Q.      What about Taihe drywall?

Confidential - Subject to Further Confidentiality Review

Page 254

 1          A.      I do not recall that either.

 2          Q.      Is it your expectation that

 3    they would have complied with ISO 9000 or

 4    9001 standards?

 5          A.      Not necessarily.

 6          Q.      What's your understanding of

 7    what the ISO standards are?

 8          A.      I'm not exactly sure.  It's

 9    some form of international testing or

10    something of that nature.

11          Q.      Do you know whether domestic

12    drywall manufacturers comply with

13    ISO standards?

14          A.      I do not know.

15              (Whereupon, Deposition Exhibit

16              INEX-30b6-69, 4/16/07 Camden Builders

17              Fax re: Drywall Verification,

18              INT/EXT05747 - INT/EXT05750, was

19              marked for identification.)

20    BY MR. HERMAN:

21          Q.      I'm going to show you

22    Deposition Exhibit 69, which, for the record,

23    is Bates numbers 5747 through 5750.

24              Do you know who or what Camden

Page 255

1    Builders, Inc. is?

2          A.      I do not.

3          Q.      Do you know who Ronnie Marek or

4    Ronnie Mauk is?

5          A.      No, I don't.

6          Q.      Do you recall seeing this

7    information about potential asbestos in

8    drywall?

9          A.      Yes, I do.  Sometime well after

10   we had sold all of the Chinese drywall, I

11   received this e-mail from a gentleman who

12   works for National Gypsum who knew that we

13   had imported some Chinese drywall.  So he had

14   forwarded me this e-mail, just, I think, as a

15   form of information.

16         Q.      Is there anything that

17   Interior/Exterior did, in terms of following

18   up with their clients or samples or anything

19   else, to try to determine whether there was

20   any asbestos in the drywall that they

21   imported?

22         A.      No, we did not.

23         Q.      Did you ever follow up with any

24   of the manufacturers to see whether there

Confidential - Subject to Further Confidentiality Review

1    were any reports or they had any information

2    about asbestos?

3         A.    We had documentation that

4    stated that it did not contain asbestos.

5         Q.    From whom?

6         A.    I know we had from Taihe,

7    specifically; and I think we had something

8    from Knauf, but I can't tell you for sure.

9         Q.    Was that something that you

10   were interested in or concerned about when

11   you originally purchased the drywall, that it

12   might contain asbestos?

13        A.    No.  You know, that's something

14   that's so far off the radar screen, because I

15   don't think asbestos -- to my knowledge,

16   asbestos is not in any products these days.

17             (Whereupon, Deposition Exhibit

18             INEX-30b6-70, 11/06 AWCI Tech Update,

19             INT/EXT06042, was marked for

20             identification.)

21   BY MR. HERMAN:

22        Q.    Let me show you

23   Deposition Exhibit 70.  I don't know why

24   there's two copies of it, but in any case...

Confidential - Subject to Further Confidentiality Review

1              This is Bates number 6042.  Do

2       you know anything about phosphogypsum

3       wallboard?

4              A.     I do now.

5              Q.     How did you come to find out

6       about it?

7              A.     Once all of the articles

8       started appearing that we saw in January of

9       last year, and then there was a lot of talk

10      about, you know, phosphogypsum, did it have

11      or did it not.  But that was the first time

12      we'd seen it.

13             Q.     Do you know how this article

14      got to be in Interior/Exterior's files or

15      where it was in Interior/Exterior's file?

16             A.      It was in our files, and I

17      found it.  It was an attachment with a number

18      of other attachments from Metro Resources

19      when I was getting verification on the ASTM

20      standards -- I'm sorry, the certificates.

21             Q.     Okay.  And did

22      Interior/Exterior make any efforts, either

23      with its customers or with the manufacturers,

24      to try to determine or make sure that there

Confidential - Subject to Further Confidentiality Review

Page 258

1    was no phosphogypsum in the wallboard that it

2    imported from China?

3         A.    What point of time are you

4    referring to?

5         Q.    Why don't we take it up to

6    January of 2009.

7         A.    No, we did not.

8         Q.    Outside of discussions with

9    counsel, have you made any efforts since

10   then?

11        A.    Have we made any efforts to

12   discuss this with our --

13        Q.    No.  No.  Outside of

14   information that you got from your counsel --

15        A.    Yes.

16        Q.    -- has Interior/Exterior made

17   any efforts since January of 2009 to try to

18   determine whether there is phosphogypsum in

19   the drywall that it imported from China?

20        A.    No, sir, we have not.

21             MR. HERMAN:  I think we need to

22        change the tape.  And as far as I'm

23        concerned, we can come right back on.

24             THE VIDEOGRAPHER:  Off the

Confidential - Subject to Further Confidentiality Review

```
 1              record, 1:50 p.m.  End of Tape 2.
 2                      (Recess taken, 1:50 p.m. to
 3              1:53 p.m.)
 4                      THE VIDEOGRAPHER:  Stand by.
 5              We're back on the record.  The time is
 6              1:53.  This is the start of Tape 3.
 7                      (Whereupon, Deposition Exhibit
 8              INEX-30b6-71, 6/13/06 Becnel E-mail to
 9              C. Geary, et al., Subject: Coastal
10              Cargo - $75.00 "No-Show" Appt. Fee
11              Approved, Effective July 01, 2006,
12              INT/EXT04689, was marked for
13              identification.)
14         BY MR. HERMAN:
15              Q.    Deposition Exhibit 71, Bates
16         number 4689.  Do you ever recall seeing this?
17              A.    Do not, no.
18              Q.    There's a quote here that says,
19         "I fought the law, but the law won."
20                    Do you have any idea what that
21         means?
22              A.    No idea.
23              Q.    Or what it relates to?
24              A.    Well, it says, "Subject:
```

Confidential - Subject to Further Confidentiality Review

Page 260

1    Coastal Cargo, $70 no-show, fee approved."  I

2    do not know what that means.

3                   (Whereupon, Deposition Exhibit

4              INEX-30b6-72, 3/21/06 App E-mail to

5              C. Geary, Subject: Corrected page two

6              of letter to BNBM, INT/EXT03888, was

7              marked for identification.)

8    BY MR. HERMAN:

9         Q.    Okay.  Let me show you

10   Exhibit 72, Bates number 3888.  I think this

11   is addressed to your brother, but do you ever

12   recall seeing this before?

13        A.    No, sir, I do not.

14        Q.    Do you have any idea why Billy

15   App would not have wanted something forwarded

16   or copied or given to anyone?

17        A.    No, I don't.

18             MR. DUPLANTIER:  Object to the

19        form.

20   BY MR. HERMAN:

21        Q.    Have you ever heard of

22   something called Cretin Homes?

23        A.    Cretin Homes is a homebuilder

24   on the north shore.

Confidential - Subject to Further Confidentiality Review

1          Q.      Did Interior/Exterior, to the

2     best of your recollection, supply them with

3     drywall?

4          A.      Yes, I believe so.

5          Q.      Do you know whether it was

6     Chinese, domestic or both?

7          A.      Do not know.

8          Q.      Just real quickly, and then I'm

9     going to let Jim take over his -- I don't

10    think we need these as exhibits, but I made a

11    couple copies, just in case you want to refer

12    to them.  These are your document responses.

13    I just wanted to try to get a few things

14    clear on the record.

15              It says, "Documents" -- I'm

16    looking at Request for Production No. 2.

17    "Documents generated by, prepared for,

18    reviewed by, received by or concerning

19    defendants' board of directors or any

20    committee thereof or authorized thereby

21    concerning Chinese drywall or of problems

22    with the drywall," and after a bunch of

23    stuff, the bottom-line answer is,

24    "Interior/Exterior is not in possession of

Confidential - Subject to Further Confidentiality Review

1     any documents responsive to No. 2."

2               You guys don't have any minutes

3     of meetings or any type of formal recordation

4     of the drywall issues?

5          A.     No, sir, we do not.

6          Q.     Okay.  If we look at on page 5,

7     Request for Production No. 7, "All filings

8     made to any state, federal, domestic and/or

9     foreign governmental agencies, departments,

10    divisions, bodies, entities or

11    representatives," and after some other

12    objections, it says, "Those governmental

13    investigations are confidential and not

14    subject to disclosure by Interior/Exterior."

15              Do you know of any law or

16    regulation or anything that protects or makes

17    confidential communications that you have

18    with governmental agencies?

19              MR. DUPLANTIER:  I'm going to

20         object to the form of the question.

21         You're asking for a legal conclusion.

22         We've objected to the production of

23         these reports, and we're not waiving

24         that objection.

Page 263

1          MR. HERMAN:  Okay.

2          MR. DUPLANTIER:  We believe

3     that while an investigation is ongoing

4     with the Consumer Products Safety

5     Commission, that their investigation

6     material and interim material, until

7     their investigation is concluded, is

8     privileged and not to be released by

9     anyone except for the CPSC.

10          MR. HERMAN:  Okay.  And there's

11     some regulation or something that says

12     that?  I mean, I asked you, "What's

13     your authority" -- or no, I said, "Do

14     you have authority," and your answer

15     was yes, but you didn't tell me what

16     it was.

17          SPEAKER 1:  That was the only

18     question you asked, if we did it.

19          MR. HERMAN:  Well, I'll sic

20     Anthony Irpino on you, and you can

21     fight out the privileges.  Okay.  I

22     just wanted to get them on the record.

23     Okay.

24          MR. DUPLANTIER:  I will

Confidential - Subject to Further Confidentiality Review

Page 264

1          reiterate that every piece of paper

2          and every document that we have

3          provided to any governmental agency

4          has been produced in accordance with

5          this request.

6                The only things that have not

7          been produced are the actual letters

8          written by the attorneys for

9          Interior/Exterior in response to the

10         inquiries from the governmental

11         agencies.

12               You can see most of our

13         response in the Attorney General

14         lawsuit and the Attorney General

15         response.

16               MR. HERMAN:  Thank you.

17    BY MR. HERMAN:

18         Q.    On Request for Production

19    No. 9, it seems to be talking for documents

20    which might relate to Interior/Exterior's

21    participation or supervision of the design,

22    development, test, inspection, manufacture

23    and some other things of Chinese drywall, and

24    it says that you're not in possession of any

Confidential - Subject to Further Confidentiality Review

Page 265

1    documents responsive.

2            I guess my question is:  Is it

3    Interior/Exterior's position that they were

4    never involved in any way with any aspect of

5    design, development, testing or inspection or

6    manufacture of Chinese drywall?

7            MR. DUPLANTIER:  I think we've

8        answered those questions today during

9        the deposition, and we reiterate our

10       objection to the vagueness of the way

11       the question was worded.

12           I think we have otherwise

13       answered those questions for the last

14       four hours.

15           MR. HERMAN:  So you're

16       instructing him not to answer?

17           MR. DUPLANTIER:  I'm

18       instructing him not to answer beyond

19       what he's answered already today.  I

20       think we have answered those

21       questions.

22           MR. HERMAN:  Well, if we have

23       to fight about it, we'll fight about

24       it later.

Confidential - Subject to Further Confidentiality Review

1              MR. DUPLANTIER:  We should.

2    BY MR. HERMAN:

3         Q.     On 14, it talks about any types

4    of indemnity agreements or joint defense

5    agreements or anything like that.

6              Are you aware of any agreements

7    with any of the other defendants or

8    cross-defendants in the litigation where one

9    party is going to indemnify the other or

10   they're going to work together or anything

11   like that?

12        A.     No, I'm not.

13        Q.     In terms of -- well, I think

14   you've already answered this, but on page 11,

15   Request for Production 24 -- oh.  I know what

16   I wanted to ask you.

17             You've already said you can't

18   differentiate sales of Chinese drywall from

19   domestic drywall; that's correct, right?

20        A.     Yes.

21        Q.     What is the system on which

22   these invoices are maintained?

23        A.     I'm sorry?

24        Q.     We've looked at a bunch of

Confidential - Subject to Further Confidentiality Review

Page 267

1    invoices?

2          A.      Right.

3          Q.      Is there some kind of database

4    that's like the invoice database or are they

5    generated piece by piece or...

6                  If you know.

7          A.      I'm still not sure I understand

8    the question.  I apologize.

9          Q.      I'm trying to find out if

10   Interior/Exterior has some type of database

11   in electronic form that keeps track of all

12   its customers and all the shipments.

13         A.      Then the answer is:  Yes, we

14   do.

15         Q.      Okay.  And the materials that

16   were provided are presumably printed out from

17   that database?

18         A.      That is correct, yes.

19         Q.      There's a request on page 14,

20   Request for Production No. 34, "All notices,

21   claims, complaints, communications or

22   documents of any kind between defendants'

23   employees and employees of affiliate

24   companies or consultants and any property

Confidential - Subject to Further Confidentiality Review

Page 268

1    owners, homeowners associations, corporate

2    condo boards, property managers, tenants,

3    concerning problems with the drywall,

4    including any symptoms of the drywall's

5    presence and smells or odors,

6    air-conditioning unit or component

7    replacement, corrosion of metals, electrical

8    and/or plumbing systems or components and any

9    related health and safety concerns, issues or

10   claims."

11              Here, there's an objection.  My

12   understanding is that you claim that you

13   don't have any of those, even beyond the

14   objection?

15              MR. DUPLANTIER:  Let me clarify

16         one thing for the record.  You're

17         going through a set of discovery

18         responses that we have discussed with

19         both you and other members of the PSC.

20              MR. HERMAN:  Okay.

21              MR. DUPLANTIER:  Had you guys

22         wanted to address that in a memorandum

23         in a motion to the Court, we've made

24         our position on that -- on this issue

Confidential - Subject to Further Confidentiality Review

Page 269

```
 1          patently clear.
 2                  We do not have any of these
 3          complaints prior to the first notice
 4          of this litigation being instituted.
 5          That is the way we interpreted the
 6          question.  Beyond that, we believe
 7          that it's privileged information.
 8                  We're going to maintain our
 9          objection to this discovery request,
10          and I will again explain, like I've
11          explained to you in writing, that we
12          do not have any complaints prior to
13          the first notice that litigation was
14          imminent.
15                  MR. HERMAN:  Okay.  Can I ask
16          the witness on the record if he's
17          aware of any complaints prior to the
18          first notice of the litigation?
19                  MR. DUPLANTIER:  Yes.
20     BY MR. HERMAN:
21          Q.    Are you?
22          A.    Absolutely not.
23                  MR. HERMAN:  Okay.  This is
24          going to be somewhat out of order,
```

Confidential - Subject to Further Confidentiality Review

Page 270

1          which I apologize for, but I just got

2          this yesterday afternoon.  I can make

3          it the next exhibit, if you think that

4          makes things easier, and just relabel

5          it.

6                    MR. DUPLANTIER:  It's up to

7          you.  I don't care.  What's it labeled

8          now?

9                    MR. HERMAN:  It's 94.  I'll

10         just make it the right number, which

11         is 73.

12                   (Whereupon, Deposition Exhibit

13         INEX-30b6-73, E-mail Chain Ending

14         1/26/09 Heider E-mail to Brisley,

15         Subject: Bessemer Family Sales, Knauf

16         Plasterboard problem, INT/EXT34599 -

17         INT/EXT34605, was marked for

18         identification.)

19    BY MR. HERMAN:

20         Q.    For the record, Exhibit No. 73

21    to the deposition is Bates-numbered 34599

22    through 34605.  I apologize.  I thought this

23    was one document, but then I realized last

24    night, when I was reviewing it, it's a bunch

Confidential - Subject to Further Confidentiality Review

Page 271

1   put together, but that's the way I thought it

2   was produced.

3                Anyway, are you familiar with

4   the e-mails that are -- that comprise

5   Exhibit 73?

6        A.     Yes, I am.

7        Q.     Okay.  If you go to the last

8   one, 34605, what is that?

9        A.     That is a communication that I

10  had with Doug Sanders.

11       Q.     Okay.  And how did this

12  communication come about?

13       A.     Well, when things started

14  happening and one of the first things we did

15  was try and contact -- that's right.  We

16  contacted Knauf and -- seeking their

17  assistance.

18       Q.     Okay.  What was the first

19  indication that you got that there might be a

20  problem with the drywall that you got from

21  Knauf?

22       A.     We had communication from --

23  our Mobile office, I believe, was the first

24  communication.  And then Jill Donaldson -- I

Page 272

1    got a phone call from Jill Donaldson right

2    around the same time.

3              She contacted our company,

4    stating that she had some problems and said

5    that she had gotten drywall from us and it

6    was Chinese, and essentially wanted to know

7    what we were going to do to take care of it.

8         Q.    Do you know around when that

9    was?

10         A.    It was very close to Mardi Gras

11    of last year.

12         Q.    Okay.  And how did -- who do

13    you recall contacting at Knauf, initially?

14         A.    Well, we went through the

15    chain, and the first person to contact was

16    our insulation local sales rep.

17         Q.    That's the -- is that

18    Jeffrey --

19         A.    No, that's Kurt Heider, who's

20    the local sales rep, and he reports to Jeff

21    Brisley.

22         Q.    Okay.  And somehow that got

23    funneled around to Doug Sanders?

24         A.    That's my understanding, yes.

Confidential - Subject to Further Confidentiality Review

Page 273

1          Q.      And is it your impression, or

2     was it your impression when you received

3     this, that this -- what's reflected in this

4     e-mail was kind of Knauf's formal statement

5     position at the time, in February of 2009?

6                    MR. SANDERS:  Object to the

7            form.

8          A.      Which -- I'm sorry, which

9     statement are you referring to?

10                   MR. DUPLANTIER:  He's talking

11           about the last.

12                   THE WITNESS:  Pardon me.  I'm

13           sorry.

14    BY MR. HERMAN:

15         Q.      In early 2006.  "KPT has been

16    investigating complaints"?

17         A.      Right.  And, I'm sorry, your

18    question again, please?

19         Q.      Is this what you understand to

20    be Knauf's kind of position at the time?

21         A.      At the time, yes, obviously

22    that's what they told us.

23         Q.      Okay.  And did you rely on that

24    in some way?

Confidential - Subject to Further Confidentiality Review

Page 274

1          A.      Yes, we did.

2          Q.      Did you pass what's

3    communicated in here along to your own

4    clients or customers?

5          A.      If -- well, specifically what

6    do you mean?  You know, in this

7    communication, it makes reference to Strategy

8    Claims, so if people were to contact us with

9    concerns that they had Chinese drywall, we

10   would then have them contact either Doug

11   Sanders or Charles Fossler of Strategy Claims

12   directly.

13         Q.      And were you aware of Strategy

14   Claims doing some type of investigation with

15   respect to some of the houses that

16   Interior/Exterior had provided Knauf drywall

17   to?

18         A.      Yes.

19         Q.      And were you present or

20   involved with those investigations?

21         A.      No, we were not.

22         Q.      Is there some reason why you

23   guys weren't involved?

24         A.      We felt like it was not our

Confidential - Subject to Further Confidentiality Review

1      position.  It was Knauf's position to handle

2      these complaints.

3            Q.    Was there some type of letter

4      or something written to Knauf indicating that

5      it was Interior/Exterior's position that

6      under the warranties, et cetera, whatever

7      happened was going to be Knauf's

8      responsibility?

9                  MR. DUPLANTIER:  Let me object

10            to the form of the question to the

11            extent that you're asking for any

12            attorney-client privilege.  Other than

13            that, you can answer the question.

14      A.    No, we did not send any letter,

15      formal letter, to Knauf for that regard.

16      BY MR. HERMAN:

17            Q.    Okay.  If you'll look at 34602,

18      who's Bert Allen, if you know?

19            A.    I'm not sure.

20            Q.    Do you know who Charles Farr

21      is?

22            A.    No, I'm not sure.

23            Q.    Is "BFS," to your knowledge,

24      Bessemer Family Sales?

Confidential - Subject to Further Confidentiality Review

1          A.      I don't know.  That would be a

2      guess.

3          Q.      Have you ever done business, to

4      your recollection, with Bessemer Family

5      Sales?

6          A.      I know that we sold to Creola

7      Ace, who sold to contractor Mitchell Homes,

8      who was doing a project for Bessemer Family

9      Sales, to the best of my knowledge.

10         Q.      Okay.  If you look at

11     page 34600, it looks like Bert Allen may be

12     with Mitchell Company.  Does that refresh

13     your recollection?

14         A.      That's what it appears to be,

15     yes.

16         Q.      And the other place that you

17     mentioned was Creola Ace Hardware?

18         A.      Yes.

19         Q.      Okay.  And do you recall seeing

20     this e-mail at some point?

21         A.      Yes, I do.

22         Q.      And it says, "I met with Chris

23     on site last week.  He pointed out the

24     concerns regarding the copper on the

Confidential - Subject to Further Confidentiality Review

1    interior" --

2          A.      Pardon me.  I'm sorry.  I got

3    it.

4          Q.      I'm sorry.

5          A.      I got it now.  Thank you.

6          Q.      I'm probably talking too fast

7    anyway.

8                  -- "on the interior of the

9    houses noted above," I guess.  "The greatest

10   impact is on the copper coils in the

11   air-handling units.  We have narrowed the

12   cause down to sheetrock."

13                 Is that consistent with the

14   complaints that Interior/Exterior has

15   received thus far?

16         A.      It is consistent that the coils

17   in houses or...

18         Q.      That there's been problems with

19   the coils that has been caused by the

20   sheetrock?

21         A.      We've heard that.  I couldn't

22   tell you the consistency of it.  I don't

23   know.  But most definitely, we have heard

24   that --

Confidential - Subject to Further Confidentiality Review

Page 278

1          Q.     Okay.  Outside of --

2          A.     -- on numerous occasions.

3          Q.     Outside of what your lawyers

4     may have done that may be privileged, has

5     Interior/Exterior conducted its own

6     investigation of any kind that has produced

7     evidence that's inconsistent with the fact

8     that sheetrock causes problems with

9     air-conditioning coils?

10         A.     We have not done any testing in

11    that regard.

12         Q.     Okay.  And you see where

13    Mr. Allen says, "The potential impact of this

14    issue for all involved is catastrophic"?

15         A.     Yes, I do.

16         Q.     And what, if anything, did

17    Interior/Exterior do in response to this

18    information?

19         A.     Well, that was at the same time

20    we were contacting Knauf to get their

21    assistance in this.

22         Q.     And if you look at the first

23    page, which is 34599, you have

24    kurt.heider@us.knaufinsulation.com.  That's

Confidential - Subject to Further Confidentiality Review

Page 279

1    the person you referred to before?

2           A.     Yes.  He is the local sales

3    rep.

4           Q.     And Jeff Brisley is the same

5    Knauf USA guy that you referred to before?

6           A.     That is correct.

7                  MR. HERMAN:  Okay.  I don't

8           have any other questions right now,

9           but my comrade in arms from the PSC,

10          Jim Reeves, has some.  I don't know if

11          you want Jim or Clay.

12                 MR. REEVES:  Probably, it would

13          be more on the Knauf side of

14          questions.  That would be Clay,

15          wouldn't it?

16                 MR. DUPLANTIER:  Let's take a

17          five-minute break.

18                 THE VIDEOGRAPHER:  We're off

19          the record at 2:13 p.m.

20                 (Recess taken, 2:13 p.m. to

21          2:22 p.m.)

22                 THE VIDEOGRAPHER:  We're back

23          on record.  The time is 2:22 p.m.

24                 ///

Confidential - Subject to Further Confidentiality Review

Page 280

```
 1                  CLAYTON C. GEARY,

 2        having been first duly sworn, testified as

 3                       follows:

 4                     EXAMINATION

 5    BY MR. REEVES:

 6          Q.     Good afternoon, Mr. Geary.  My

 7    name is Jim Reeves.  I'm a member of the PSC.

 8    Glad to meet you.  I'm going to have some

 9    follow-up questions.  I'm going to try not to

10    repeat what Mr. Herman has already asked, but

11    I do have a couple follow-ups on some

12    exhibits that were identified.

13                 First of all, looking at

14    Exhibit 35 and 38, 35 lists the different

15    offices that Interior/Exterior had in 2006;

16    is that correct?

17          A.     Yes, sir.

18          Q.     I saw some additional

19    addresses, I thought, on some of the

20    letterhead, including a Tuscaloosa branch.

21    Did you have a Tuscaloosa branch as well?

22          A.     Not at that time.  The

23    Lafayette branch would have been next branch

24    after Foley, and it did not get any Chinese
```

Confidential - Subject to Further Confidentiality Review

Page 281

1     drywall.

2              Q.      The --

3              A.      Lafayette branch.

4              Q.      Lafayette did not?

5              A.      Did not.  And that was the next

6     branch that we opened after Foley.

7              Q.      Help me out here, because I

8     know you've said several times -- my

9     understanding is, the documents indicate when

10    drywall was delivered and where?

11             A.      Uh-huh.

12             Q.      But in some instances, you seem

13    to be sure that no Chinese drywall was

14    delivered to a particular location.  How do

15    you know that?

16             A.      From a transfer in our system.

17             Q.      All right.  Explain that to me.

18             A.      Well, those transfer numbers

19    that we went through on that exhibit earlier,

20    it shows a transfer number; and it shows that

21    it went from, say, the port to Baton Rouge, I

22    think is the one we were discussing.  So

23    we --

24                      MR. DUPLANTIER:  You're

Confidential - Subject to Further Confidentiality Review

Page 282

1           referring to Exhibit 36.

2                   MR. REEVES:  Yeah, I remember.

3           Thanks.

4           A.      And there were no transfers to

5     Lafayette.

6     BY MR. REEVES:

7           Q.      Okay.  So, as I understand it,

8     in some instances, you can verify that

9     Chinese drywall was not sent to a particular

10    location and in others, you know that 1/2"

11    12-foot board was delivered, but it may be

12    domestic or may be Chinese; is that fair?

13          A.      I'm sorry, repeat that.

14                  MR. REEVES:  Can you repeat

15          that?

16                  (The following portion of the

17          record was read.)

18                  "QUESTION:  So, as I understand

19          it, in some instances, you can verify

20          that Chinese drywall was not sent to a

21          particular location and in others, you

22          know that 1/2" 12-foot board was

23          delivered, but it may be domestic or

24          may be Chinese; is that fair?

Confidential - Subject to Further Confidentiality Review

Page 283

1          A.      I think I need you to rephrase

2      that.

3      BY MR. REEVES:

4          Q.      Well, let me ask you this:  Can

5      you tell me everywhere that you sent Chinese

6      drywall?

7          A.      No.

8          Q.      Why not?

9          A.      Because it's one product code,

10     whether it was domestic or imported.

11         Q.      But in some locations, you can

12     tell me that you didn't send Chinese drywall;

13     is that correct?

14         A.      Tell you that I didn't send?

15         Q.      You just told me you didn't

16     send any to Lafayette.

17         A.      Oh, I can -- yes.  I'm sorry.

18     We can look in the system and see if we had a

19     transfer from the wharf to Lafayette, and we

20     did not.

21         Q.      Okay.  And if you did have that

22     transfer, that would tell you what?

23         A.      That we had shipped it to our

24     branch in Lafayette, not to a specific

Confidential - Subject to Further Confidentiality Review

Page 284

1    customer.

2            Q.      "It" being the Chinese drywall?

3            A.      Yes.

4            Q.      All right.   The Tuscaloosa

5    branch opened when?

6            A.      I don't know the exact date and

7    time.

8            Q.      Was the Chinese drywall shipped

9    to Tuscaloosa?

10           A.      Not to our branch, no.

11           Q.      Anywhere else in Tuscaloosa?

12           A.      I don't know.   I'd have to look

13   at the invoices.

14           Q.      Let me ask you a little bit

15   about the invoices.   Who prepares those, or

16   who prepared them in '06 through '08?

17           A.      Well, it's pretty much done by

18   the salesman.   The salesman will take an

19   order and put the information in, then it's

20   invoiced.   But the salesman does most of the,

21   you know, writing-up of the order.

22           Q.      So a typical transaction,

23   somebody would either come or call in, order

24   a certain amount of drywall, talk to a

Confidential - Subject to Further Confidentiality Review

1    salesman, he would type up or put in the

2    invoice, correct?

3           A.     Correct.

4           Q.     The invoice would then tell the

5    next person in line where to send the drywall

6    and how much to charge; is that --

7           A.     Well, no, he would put the

8    price in.

9           Q.     Okay.

10          A.     So he would put the price.  He

11   would put the quantity.  He would put ship

12   to, where it's going to go.  He would put the

13   sales taxes.  And really, then, it goes out

14   into the warehouse, gets delivered, comes

15   back; and then it's invoiced, really, at that

16   point.

17          Q.     All right.  In terms of the

18   structure, I'm going to take, for instance,

19   the Gulfport office.  I'm based in Biloxi.

20   You've got a branch manager listed as Chip

21   Williams.  Is he still with the company?

22          A.     Yes, he is.

23          Q.     Is he still a branch manager?

24          A.     Yes, he is.

Confidential - Subject to Further Confidentiality Review

Page 286

1        Q.      Where at?

2        A.      In Gulfport.

3        Q.      Still in Gulfport?

4        A.      Uh-huh.

5        Q.      Would he have a sales team

6   working under him, or would he be the primary

7   person to generate these invoices?

8        A.      A typical branch has a branch

9   manager, any number of inside salespeople, a

10  couple of outside salespeople, then probably

11  a warehouse manager, warehousemen, and then

12  drivers and laborers.

13       Q.      Salespeople work on commission?

14       A.      Commission along with salary.

15       Q.      I want to ask you on some of

16  these other names if these people are still

17  with the company.

18               Charles Gray is listed as the

19  Foley branch manager.  Is he still with --

20       A.      That should be Charles Gay, and

21  yes, he's still there.

22       Q.      Still in the same capacity?

23       A.      Yes.

24       Q.      Gary Hymel in Houston?

Confidential - Subject to Further Confidentiality Review

Page 287

1          A.      He is not.

2          Q.      Where is he now?

3          A.      He is with a steel stud

4      manufacturer in Houston.

5          Q.      If we wanted to get his

6      last-known address, where would you look to,

7      if I asked you to do that?

8          A.      We have his phone number.  We

9      could get it for you.

10          Q.      All right.  Ben Diano in

11      Mandeville, is he still with the company?

12          A.      Still there.

13          Q.      He is?

14          A.      Yes.

15          Q.      Bobby Freedman?

16          A.      No longer with the company.

17          Q.      When did he leave?

18          A.      A few months ago.

19          Q.      Where is he now?

20          A.      Don't know.  He's in

21      Birmingham, but I don't know who he's working

22      for.

23          Q.      In the Birmingham area?

24          A.      He's in the Birmingham area,

Confidential - Subject to Further Confidentiality Review

Page 288

1     yes, sir.

2             Q.     Why did he leave?

3             A.     He was dismissed.

4             Q.     Why?

5             MR. DUPLANTIER:  I'm going to

6         object to the form of the question.

7         That's actually a privilege

8         information.  It's also outside the

9         scope of the 30(b)(6) notice.  It has

10        nothing to do with this litigation,

11        but it's privileged for other reasons.

12            MR. REEVES:  I guess that

13        depends on why he was fired.  So are

14        you instructing him not to answer?

15            MR. DUPLANTIER:  Yeah, I am.

16        It's also outside the scope of the

17        notice, so...

18            MR. REEVES:  Well, we don't

19        agree.  We'll take it up, if we deem

20        it necessary.

21            MR. DUPLANTIER:  That's fine.

22            MR. REEVES:  Okay.

23    BY MR. REEVES:

24            Q.     So Mr. Friedman is no longer

Confidential - Subject to Further Confidentiality Review

Page 289

1      with the company as of a few months ago?

2              A.      Yes.

3              Q.      Jim Green in Mobile, is he

4      still --

5              A.      Still with the company.

6              Q.      Still in the same capacity?

7              A.      Yes.

8              Q.      Bill Tarleton?

9              A.      No longer with the company.

10             Q.      When did he leave?

11             A.      I don't recall.

12             Q.      Where is he now?

13             A.      I don't know.

14             Q.      Why did he leave?

15             A.      He resigned.

16             Q.      Why?

17             A.      We had a personnel issue that

18     we confronted him on, and he -- he basically

19     said, "I'm not enjoying what I'm doing

20     anymore.  I think it would better for me to

21     go."

22             Q.      All right.  I'll ask you the

23     same question with regard to Robert McCay:

24     Is he still with the company?

Confidential - Subject to Further Confidentiality Review

1          A.     Yes, he is.

2          Q.     In the same capacity?

3          A.     Yes.

4          Q.     And in terms of all these

5     individuals, your personnel records would

6     have their last-known address and phone

7     number?

8          A.     Yes.

9          Q.     Who is Mark Peterson?

10         A.     Mark Peterson is a warehouseman

11    in New Orleans.

12         Q.     Is he still with the company?

13         A.     Yes, he is.

14         Q.     Same capacity?

15         A.     Yes.

16         Q.     What's your current address,

17    Mr. Geary?

18         A.     My current address?

19         Q.     Yes.

20         A.     450 Fairway Drive.

21         Q.     Okay.  Let me ask you a little

22    bit about Bailey's Lumber.  They appear to be

23    a fairly large customer back in the '06

24    to '08 time period; is that fair?

Confidential - Subject to Further Confidentiality Review

Page 291

1              A.      Yes.

2              Q.      Do you have any primary

3       contacts over at Bailey's?

4              A.      My branch manager, Chip

5       Williams, deals primarily with them; but yes,

6       we have some contacts over there.

7              Q.      Mr. Kostal, Robert Kostal?

8              A.      Richard Kostal.

9              Q.      Richard Kostal.  I'm sorry.

10             Anyone else?

11             A.      Steve Braun, I think it is.

12             Q.      Right.

13             Would those be the two people,

14      primarily, that you would have dealt with or

15      your company would have dealt with during

16      this time?

17             A.      Well, they are more the

18      management.  Typically, what happened is a

19      salesman from Bailey would call my guy and

20      say, "Please make this delivery."

21             Q.      Okay.  Which brings me to sort

22      of my next question.  You did the same thing

23      with Bailey's, did you not, that you

24      described earlier with Lowe's and Home Depot,

Confidential - Subject to Further Confidentiality Review

Page 292

1      and that is a drop shipment method of

2      delivery?

3          A.      Yeah, where they would place

4      the order with us, we would bill them, and

5      they would bill the customer.

6          Q.      Just so it's clear as to how

7      that would work, a customer would come into

8      Bailey's, a builder or somebody who wanted

9      some drywall, they would place an order,

10     Bailey's --

11         A.      Well, actually, it would be,

12     you know, they would be building a house,

13     probably, and so they would have the

14     whole package --

15              MR. DUPLANTIER:  Let him ask

16          his question.

17              THE WITNESS:  I'm sorry.

18              MR. REEVES:  That's okay.

19     BY MR. REEVES:

20         Q.      So they'd come in and they

21     would -- for instance, with the sheetrock, if

22     they wanted sheetrock, they would ask

23     Bailey's, I guess, for the rock.

24              Bailey's would, in

Confidential - Subject to Further Confidentiality Review

Page 293

1    circumstances where they dealt with y'all,

2    pick up the phone or otherwise contact you

3    and say, "You need to deliver x amount of a

4    certain kind of sheetrock to a work site."

5    Is that how it worked?

6            A.      Yes.  Yes, sir.

7            Q.      Okay.  And then would it be a

8    paper trail generated, or would that be a

9    telephone call from Bailey's?

10           A.      Usually a telephone call.

11           Q.      Okay.  Who would be the person

12   at Bailey's that would be making those calls

13   during the '06 to '08 time period?

14           A.      I think it would be various

15   salesmen.

16           Q.      Same thing; salesmen on that

17   end?

18           A.      Yeah.

19           Q.      Who would they contact on your

20   end during that time period?

21           A.      Various salespeople on our end.

22           Q.      All right.  And then you would

23   actually -- in many instances, then, your

24   company would deliver that rock to that site?

Confidential - Subject to Further Confidentiality Review

Page 294

1          A.      Yes.

2          Q.      Okay.  And then Bailey's would

3     presumably bill the customer?

4          A.      Correct.

5          Q.      You would bill Bailey's?

6          A.      Yes.

7          Q.      All right.  And that's the same

8     sort of -- I've used -- I've seen the term

9     "drop ship."  Is that what's used to describe

10    that?

11         A.      No.  A drop ship would normally

12    be more of a direct shipment of product,

13    where we just send a truck and it's unloaded

14    there.  This is more we have a boom truck and

15    labor and go stock the house, for instance.

16         Q.      Okay.  And that's the way you

17    would generally deal with Bailey's, Lowe's,

18    Home Depot?

19         A.      Most -- yes.

20         Q.      Would you deal with 84 Lumber

21    in the same manner?

22         A.      Yes.

23         Q.      In those instances, would

24    the -- the product, then, would never

Confidential - Subject to Further Confidentiality Review

Page 295

```
 1    actually be in Bailey's possession; is that
 2    correct?
 3         A.    It would not usually go to
 4    Bailey's facility.  It would go straight to
 5    the house.
 6         Q.    Looking at Exhibit 38,
 7    Bates-stamp page 17768, this is the invoice
 8    for Creola Ace Hardware that you discussed
 9    earlier.  It's listed as "drop ship."  Do you
10    see that in the middle of the page?
11         A.    Yes.
12         Q.    Just so I'm clear, what is
13    that -- what procedure is that describing?
14         A.    It could mean a couple of
15    things.  It appears to be -- it appears to be
16    an 18-wheeler, because it's 612 pieces, which
17    is a full 18-wheeler.  So my guess would be
18    is that this came straight from a domestic
19    manufacturer and went straight to the
20    jobsite.
21         Q.    Let me ask you in terms of your
22    situation with Bailey's.  Isn't it true that
23    at some point, you actually warehoused some
24    of Bailey's sheetrock in one of your
```

Confidential - Subject to Further Confidentiality Review

 1    facilities?

 2          A.      I don't recall that.

 3          Q.      Just don't recall, one way or

 4    another --

 5          A.      No.

 6          Q.      -- or you deny doing it?

 7          A.      I don't recall it.

 8          Q.      Okay.

 9          A.      It may have happened.  I don't

10    recall it.

11          Q.      You have a warehouse in the

12    Gulfport area?

13          A.      Yes, we do.

14          Q.      All right.  A large warehouse?

15          A.      I'm trying to remember the

16    footage.  Maybe 20,000 feet or so.

17          Q.      All right.  And I've seen some

18    e-mails about other warehouse facilities that

19    you have.  Where else did you have warehouse

20    facilities in the '06 to '08 time period?

21          A.      In that time frame, we were in

22    New Orleans, Baton Rouge, Mobile, Birmingham,

23    Gulfport, Mandeville, Houston, Foley.  And,

24    as I said, we brought Lafayette on right at

Confidential - Subject to Further Confidentiality Review

Page 297

1    the tail end, but they did not get any

2    imported board.

3         Q.    Okay.  Did Bailey's, during

4    this time period, sell you any domestic or

5    imported drywall?

6         A.    I think they may have sold us

7    some domestic.  What was happening was

8    everybody was on allocation from their

9    manufacturers, and so I think Bailey's may

10   have sold us some domestic, but I can't swear

11   to it.

12        Q.    What would you need to look to

13   to verify that?

14        A.    I would have to -- I guess I

15   would go look in our purchase orders and pull

16   up "Bailey Lumber" and see if they sold us

17   any 4x12x1/2" regular sheetrock.

18        Q.    We haven't talked much about

19   your corporate structure.  How were you set

20   up, legally speaking, in '06 to '08 time

21   period?

22        A.    Limited partnership.

23        Q.    All right.  And describe for me

24   the members of the partnership.

Confidential - Subject to Further Confidentiality Review

Page 298

1          A.     Well, the general partner is

2     Interior/Exterior Enterprises, and the

3     limited partner is South Cortez, LLC.

4          Q.     And you and your brother are

5     members of both?

6          A.     We are both members of the

7     general partnership.

8          Q.     Anybody else a member of

9     either?

10          A.     My two siblings -- other two

11     siblings are members of the general

12     partnership.

13          Q.     And who are they?

14          A.     Jeff and Sid Geary.

15          Q.     All right.  And that's true

16     today, as well as in the '06 to '08 time

17     period?

18          A.     Yes.  Yes.

19          Q.     In terms of your structure, who

20     would report to you with regard to sales?  If

21     we were looking at a flowchart from you down

22     to who directed sales, who would be the next

23     person in line?

24          A.     It's a pretty flat

Confidential - Subject to Further Confidentiality Review

1    organization.  Jim and I pretty much -- I

2    guess you'd kind of consider us partners.

3    We're kind of interchangeable.  Below us, we

4    have functional managers and then branch

5    managers, and they report directly to us.

6            Q.     We went through the branch

7    managers, right?

8            A.     Uh-huh.

9            Q.     And the functional managers --

10           A.     We have accounting, human

11   resources, purchasing, credit.  Those type of

12   things.

13           Q.     Who is in charge of human

14   resources now?

15           A.     Now?

16           Q.     Yes.

17           A.     Jim McLaughlin.

18           Q.     What about in '06 to '08 time

19   period?

20           A.     Oh, we had a lady who was with

21   us in '05.  She's passed away; Tina Gorman, I

22   believe her name was.  And then Deana Eister

23   was with us for a period of time.  And I

24   can't remember when Jill came on.

Confidential - Subject to Further Confidentiality Review

Page 300

1          Q.      Did you have anybody in charge

2     of customer or contractor complaints and/or

3     quality control?

4          A.      No.

5          Q.      Do you have anybody that

6     handles those jobs today?

7          A.      No.

8          Q.      Is there a procedure in place

9     for handling contractor or customer

10    complaints?

11         A.      Yeah.  Usually if we get a --

12    you know, a salesman or manager gets a call,

13    he'll call the manufacturer rep, and the rep

14    will come out to the job and try and resolve

15    the problem.

16         Q.      Okay.  So the typical way you

17    would receive a complaint, I guess, with

18    regard to any product, would be somebody

19    calling in and complaining about what they

20    received?

21         A.      From a customer, yeah.

22         Q.      Right.

23                 And they would typically talk

24    to a salesperson?

Confidential - Subject to Further Confidentiality Review

1          A.      A salesperson, yes.

2          Q.      And the salesperson would go

3     out with who?

4          A.      He would call the

5     manufacturer's rep, and either the

6     manufacturer's rep would go out or he'd go

7     out with them.

8          Q.      Would there be a written

9     document or file set up with regard to the

10    complaint?

11         A.      I guess it would depend.  The

12    manufacturer would do that, not us.  But the

13    manufacturer would document any problems that

14    they have and replace the material or

15    whatever.

16         Q.      Well, I was asking specifically

17    with regard to Interior/Exterior.  Did you

18    have any procedure --

19         A.      No formal procedure.

20         Q.      Okay.  And so it wouldn't

21    necessarily be a file with a complaint?

22         A.      No.

23         Q.      Wouldn't necessarily be

24    electronic -- electronically stored anywhere,

Confidential - Subject to Further Confidentiality Review

Page 302

```
 1    any history of a complaint --
 2         A.     No.
 3         Q.     -- is that correct?
 4         A.     No.
 5         Q.     Still the same today?
 6         A.     Yes.
 7         Q.     It's my understanding that
 8    during this time period, you -- I think you
 9    went through the various types of drywall
10    that y'all were selling:  several domestic,
11    then these Chinese that we're talking about.
12    And I've seen some different abbreviations in
13    the documents.
14                "USG" would be?
15         A.     United States Gypsum, probably.
16         Q.     United States Gypsum.
17                And if we're talking about gyp
18    board, that would be gypsum as well?
19         A.     "Gyp board" would just be a
20    generic term, like "drywall."
21         Q.     Okay.  There seemed to be some
22    discussion in the documents about competition
23    for product during this time period, that
24    there wasn't enough to go around, at least
```

Confidential - Subject to Further Confidentiality Review

1    for part of this time, right?

2         A.    Yes.

3         Q.    Who were some of your

4    competitors who were also trying to get rock?

5         A.    I'm sure everybody was.

6              MR. DUPLANTIER:   Just object to

7         the form of the question.  But you can

8         answer it.

9         A.    I'm sure everyone was.

10   BY MR. REEVES:

11        Q.    You have primary competitors in

12   your field?

13        A.    In different markets, there are

14   different competitors.

15        Q.    Who would some of those be?

16        A.    In the New Orleans market?

17        Q.    Sure.

18        A.    Seacoast Supply, metal studs;

19   Acoustical Ceiling Supply; and then to a

20   certain degree, we compete with the Lowe's

21   and Home Depots and so forth.

22        Q.    What about on the Mississippi

23   Gulf Coast, who would you consider your

24   primary competitors during this time period?

Confidential - Subject to Further Confidentiality Review

1              A.      Let's see.  I'm trying to

2        remember the name.  They just closed the

3        door.  We competed with Seacoast Supply, out

4        of Mobile.  We competed with Renfro, out of

5        Jackson, Mississippi.  The company that

6        closed down, and I can't recall their name.

7        Just Rite.  Just Rite Supply, that's what it

8        was.

9              Q.      When -- it was a little unclear

10       to me:  When did you last sell Chinese

11       drywall?

12             A.      Well, we don't know, exactly.

13       We feel like it was the end of 2006.  We

14       produced documents through the first quarter

15       of 2007, you know, to be as safe as we could.

16       And there were an additional 23 invoices that

17       we identified that were after March 31st, and

18       I think they ended in May of '07.

19             Q.      That were after March 31st

20       of '07?

21             A.      Yes, and they were -- I think

22       they went until May of '07.

23             Q.      And that includes Knauf,

24       obviously?

Confidential - Subject to Further Confidentiality Review

Page 305

```
 1          A.      Yes.
 2          Q.      How were you able to estimate
 3   when you last sold the Chinese drywall?
 4          A.      Talking to our managers, and I
 5   guess we could look and see -- well, really,
 6   I guess it would just be -- we discussed it
 7   with our managers, and our recollection,
 8   mainly.
 9          Q.      Who were the managers you
10   discussed it with?
11          A.      Probably Mandeville,
12   New Orleans, Gulfport.
13          Q.      You're talking about the branch
14   managers?
15          A.      The branch managers, yeah.
16   Yeah.
17          Q.      Okay.  So tell me how that
18   happened.  You basically -- you or your
19   brother, or both of y'all, called them or had
20   a conference and tried to figure out when it
21   was last sold?
22          A.      Yes.
23          Q.      Was it face-to-face or a
24   telephone call?
```

Confidential - Subject to Further Confidentiality Review

Page 306

```
 1          A.      Telephone call.
 2          Q.      Did everybody participate at
 3  once, or did you just make the rounds
 4  calling?
 5          A.      No, I think we just made
 6  various calls.
 7          Q.      Create any notes with regard to
 8  those conversations?
 9          A.      No.
10          Q.      Just remembered it all?
11          A.      Yeah.
12          Q.      There's been a lot of
13  conversation about the Crescent City Gypsum
14  we talked about earlier.
15                  When did you first hear that
16  name?
17          A.      I'd, frankly, forgotten about
18  it until I went and reviewed these documents
19  and I saw that document.  Sometime during the
20  whole process when we were trying to acquire
21  gyp board.
22          Q.      And your company has not issued
23  any type of notices or warning to customers
24  who bought the drywall, have they?
```

Confidential - Subject to Further Confidentiality Review

Page 307

1           A.      No.

2           Q.      Just some names that popped out

3    in the documents and I'm not sure if we've

4    covered them all.  I want to see if you can

5    tell me who they are.

6                   Rudy Remont, does that name

7    ring a bell?

8           A.      Rudy Remont worked for

9    J.W. Allen, which was the freight forwarder.

10          Q.      Is he still with them?

11          A.      I don't think so.

12          Q.      Do you know what happened to

13   him?

14          A.      I think he just retired, but

15   I'm not positive.

16          Q.      What did he do for J.W. Allen,

17   do you know?

18          A.      I don't know exactly.  For us,

19   he did a lot of -- he went over to China and

20   inspected the product as it was going onto

21   the ships and so forth.  I'm not sure what

22   his day-to-day duties were.

23          Q.      The inspections you talked

24   about earlier with my colleague, Mr. Herman?

Confidential - Subject to Further Confidentiality Review

Page 308

1           A.      Yes.  Yes.

2           Q.      Jerry Becnel, who is he?

3           A.      Jerry Becnel handled kind of

4    the logistics of the trucks for J.W. Allen,

5    so he helped coordinate, you know, the trucks

6    as they went off the wharf to our branches.

7           Q.      So he was a J.W. Allen

8    employee?

9           A.      Yes, he was.

10          Q.      Is he still with them?

11          A.      I don't know.

12          Q.      David Zhang?

13          A.      I don't recall David Zhang.

14          Q.      Ring a bell?

15          A.      No.

16          Q.      Jeffrey Zeng?

17          A.      I don't recall him either.

18          Q.      Susan Li, L-I?

19          A.      Susan Li was with Weida

20   Freight.  And a lot of correspondence back

21   and forth.  She had -- we were trying to --

22   she was the one that had a little contention

23   with Knauf, I think, for a while, as far as

24   the logistics of getting the ships and so

Confidential - Subject to Further Confidentiality Review

Page 309

1    forth.

2          Q.       What did Weida Freight do for

3    you?

4          A.       Weida Freight was really

5    J.W. Allen's contact in China, and they made

6    a contact at BNBM for us.  They did some of

7    the inspections, I think, of the products as

8    it was going onto the ships also.

9          Q.       Cecil -- Cecilia Wang?

10         A.       Cecilia Wang was -- Mark Norris

11   made the call.  You know, he was the -- I

12   guess the manager, because he would make the

13   decision, and then she was kind of logistics.

14         Q.       Manager of?

15         A.       Mark?

16         Q.       Yeah.

17         A.       I don't know.  I'm not sure --

18         Q.       What company was he with?

19         A.       Knauf --

20         Q.       Knauf?

21         A.       -- in China.

22         Q.       And then David Alexander?

23         A.       I don't remember that name.

24         Q.       Barry Topple?

Confidential - Subject to Further Confidentiality Review

1          A.      Barry Topple was with Knauf.

2    When we tried to get more board from Knauf,

3    from Jeff Brisley, he, I guess, went up the

4    ladder to Barry Topple to see if Barry could

5    help him.

6          Q.      Carlos Cisneros?

7          A.      I can't remember who that is.

8          Q.      Has Interior/Exterior been

9    involved in any remediation of any properties

10   that have had the Chinese drywall problem?

11         A.      No.

12         Q.      And I was a little unclear:  In

13   terms of the inspections that were being

14   done, when people would call in with the

15   problem, they were referred to Knauf to be

16   handled; is that right?

17                 MR. SANDERS:  Object to the

18         form.

19         A.      Yes.

20   BY MR. REEVES:

21         Q.      And I was unclear:  Did someone

22   from your company accompany the people with

23   Knauf out to these inspections of these

24   properties?

Confidential - Subject to Further Confidentiality Review

Page 311

1          A.      Did we accompany?

2          Q.      Yeah.

3          A.      To do the inspections?  No.  I

4     think one or two of my guys may have gone to

5     a couple of the houses with them, but not on

6     a regular basis, no.

7          Q.      But they've been to some.  Who

8     would have went?

9          A.      I believe Ben Diano went to

10    one.

11         Q.      Do you know what property?

12         A.      No, I don't.

13         Q.      And Ben is still with the

14    company?

15         A.      Yes, he is.

16         Q.      Who else went on these

17    inspections?

18         A.      I don't know if anybody else

19    did.

20         Q.      I want to talk a little bit

21    about insurance.  Y'all have identified a

22    number of policies in your profile form.

23              Have you been told by any of

24    your insurance companies that you may not

Confidential - Subject to Further Confidentiality Review

Page 312

1      have coverage for these claims?

2                    MR. DUPLANTIER:  I'm going to

3             object to the form of the question.

4             I'm going to instruct the witness not

5             to answer that question.

6                    MR. REEVES:  I just asking

7             about communication with his insurance

8             company.

9                    MR. DUPLANTIER:  I understand

10            that, but to the extent that those --

11            those communications occurred in

12            anticipation of litigation or as a

13            result of litigation or occurred with

14            lawyers, I'm instructing the witness

15            not to answer.  I think you're asking

16            for information that's both privileged

17            and irrelevant to this proceeding.

18                    MR. REEVES:  Well, we'll

19            disagree; and if we have to address

20            that later, we will.  Okay.

21     BY MR. REEVES:

22            Q.    What types of warranties, if

23     any, did Interior/Exterior provide to those

24     who purchased Chinese drywall from them?

Confidential - Subject to Further Confidentiality Review

Page 313

```
 1              A.      We did not --
 2                      MR. DUPLANTIER:  Object to the
 3              form of the question.  You can answer.
 4              Go ahead.
 5              A.      We did not provide any
 6      warranties.
 7      BY MR. REEVES:
 8              Q.      Okay.  Let me make sure I just
 9      kind of understand a few things from a
10      big-picture standpoint.
11                      The first shipment that y'all
12      actually received of Chinese drywall was in
13      January of '06; is that right?
14              A.      Yes.
15              Q.      And based upon your best
16      estimation in talking to your branch
17      managers, you sold through the end of that
18      year, maybe early into '07; is that your
19      testimony?
20              A.      Yes.
21              Q.      And I think we've confirmed
22      that you didn't have in place during this
23      time any sort of official complaint procedure
24      or policy to document complaints; is that
```

Confidential - Subject to Further Confidentiality Review

Page 314

1      correct?

2              A.      That's correct.

3              Q.      You had no certain person that

4      was designated as the contact person for

5      anybody who may have had a complaint with a

6      product you sold them; is that right?

7              A.      That's correct.

8              Q.      And I understand your testimony

9      is the first inclination or knowledge that

10     Interior/Exterior knew where they knew that

11     Chinese drywall was a problem was in January

12     of '08, or was that...

13                     MR. DUPLANTIER:  I'm going to

14             object to the form of his question.

15             That's not his testimony.

16                     MR. REEVES:  Okay.

17     BY MR. REEVES:

18             Q.      Tell me when it is.

19             A.      The first notice that we had

20     was we got an e-mail that's -- I think it was

21     January 12th from someone saying -- a Wall

22     Street Journal article, I believe it was, was

23     January 12th of '09.

24             Q.      Of '09?

Confidential - Subject to Further Confidentiality Review

Page 315

1          A.      Yeah.

2          Q.      Okay.  You'd agree with me,

3    sir, as a seller of these products, that if

4    you become aware or if you have a lot of

5    complaints about a product that you're

6    selling, you ought to look into that, don't

7    you?  You agree with that?

8          A.      Yes.

9          Q.      That's just common sense,

10   right?

11         A.      Yes.

12         Q.      So if you're getting systematic

13   complaints of people saying that a product is

14   inferior, that's something that a responsible

15   seller of the product ought to look into;

16   you'd agree?

17              MR. DUPLANTIER:  Object to the

18         form of the question.  You can answer

19         it.

20         A.      Yes.

21   BY MR. REEVES:

22         Q.      Okay.  And you would certainly

23   agree with this, sir, that you shouldn't

24   continue to sell a product if you suspect

Confidential - Subject to Further Confidentiality Review

Page 316

```
 1    it's unsafe or is an inferior product.  You
 2    would agree with that, wouldn't you?
 3         A.    Yes.
 4         Q.    And I think I heard you testify
 5    earlier that, basically, in your estimation,
 6    I'm paraphrasing here, that drywall was --
 7    was sort of drywall and there was no
 8    significant difference between any of it; is
 9    that fair?
10         A.    Correct.
11         Q.    But, sir, isn't it true that as
12    early as February and March of '06, you began
13    to get specific requests from builders who
14    routinely did business with you that they
15    didn't want to use the Knauf wall; isn't that
16    true?
17         A.    We have requests -- preference
18    requests all the time.  I mean, some people
19    wanted USG.  Some people want National.  Some
20    people wanted --
21              MR. McKENNA:  I'm sorry, I
22         can't hear the answer at all.
23         A.    We always have preference
24    requests, one vendor versus another, one
```

Confidential - Subject to Further Confidentiality Review

1    manufacturer versus another.  So some people

2    preferred domestic; some people didn't.

3    BY MR. REEVES:

4         Q.     Well, some people specifically

5    didn't specify anything, other than they

6    didn't want Knauf, didn't they?

7         A.     There may have been someone who

8    did that.  I don't recall that.

9         Q.     There were several people that

10   did that, weren't there?

11        A.     I don't recall that.

12        Q.     Okay.  Well, if it's in the

13   documents, you wouldn't dispute that, would

14   you?  In the invoices?

15        A.     Correct.

16        Q.     Okay.  In fact, they didn't

17   want the Knauf product because they reported

18   to your company that it was an inferior

19   product, didn't they?

20             MR. SANDERS:  Object to form.

21        A.     I don't recall anyone reporting

22   to us that it was an inferior product.

23   BY MR. REEVES:

24        Q.     I'm going to mark --

Confidential - Subject to Further Confidentiality Review

Page 318

```
 1                   MR. REEVES:  What are we up to,
 2          Court Reporter?
 3                   (Whereupon, Deposition Exhibit
 4          INEX-30b6-74, Interior/Exterior
 5          Invoices, INT/EXT27357, INT/EXT28739,
 6          INT/EXT28746, INT/EXT27312,
 7          INT/EXT27316, was marked for
 8          identification.)
 9     BY MR. REEVES:
10          Q.    All right.  Sir, what's been
11     attached as Exhibit 74 to your deposition are
12     documents produced by Interior/Exterior,
13     27357, 28739, 28746, 27312, 27316; and those
14     are invoices, aren't they, sir?
15          A.    Yes, they are.
16          Q.    And the first one is dated
17     2/23/06, isn't it?
18          A.    Invoice date, 2/28/06?
19          Q.    Yes.  I'm sorry.  You're right.
20     2/28/06; is that correct?
21          A.    Yes.
22          Q.    So that's the date that the
23     invoice would have been generated?
24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      And this is roughly a month

2     after your first purchase of Chinese drywall;

3     is that correct?

4          A.      Yes.

5          Q.      And this is shipping to Rivers

6     Edge in Richmond, Texas, correct?

7          A.      Yes, it is.

8          Q.      Billing to Aurora Commercial

9     Construction, Inc. in Crosby, Texas; isn't

10    that correct?

11         A.      Yes.

12         Q.      And in the description, where

13    it says, "Product and Description," I'm going

14    to read this, and make sure I read it

15    correctly, sir.  It says, "No Knauf, no

16    Knauf, no Knauf, no Knauf, no Knauf, no

17    Knauf," doesn't it?

18         A.      Yes.

19         Q.      So this is a person, within a

20    month after your receipt of Chinese drywall,

21    specifying that they don't want the Knauf

22    product, correct?

23         A.      Correct.

24         Q.      And isn't it true, sir, that

Confidential - Subject to Further Confidentiality Review

```
1     they didn't want the Knauf product because
2     they told you it was an inferior product?
3     Isn't that true?
4               MR. SANDERS:  Object to form.
5          A.     I'm not aware of that.
6     BY MR. REEVES:
7          Q.     Do you know the persons at
8     Aurora Commercial?
9          A.     I don't know them personally.
10         Q.     Are they -- they've done a
11    significant amount of business with you over
12    the years, haven't they?
13         A.     I'm not sure what their sales
14    figures are.
15         Q.     Would they have any reason to
16    tell anything other than the truth here in
17    this case?
18         A.     I don't know why not.
19         Q.     Well, if they say that they
20    advised you they didn't want Knauf because it
21    wasn't a good product, you wouldn't dispute
22    that, then?
23         A.     I can't dispute what they have
24    to say.  I haven't heard what they had to
```

Confidential - Subject to Further Confidentiality Review

1  say.

2        Q.     Okay.  What we know is, though,

3  that Interior/Exterior didn't have any method

4  to document whatever the complaints were or

5  the reason they didn't want Knauf, right?

6        A.     That's correct.

7        Q.     So if they had made complaints

8  and specified what the problems were, we

9  couldn't look to any document to find that

10  out because none were supposed to be kept,

11  necessarily; isn't that right?

12        A.     None were kept.

13        MR. DUPLANTIER:  Object to the

14        form of the question.  You can answer.

15  BY MR. REEVES:

16        Q.     Okay.  Let's go to the next

17  page of the document.  That's an invoice

18  dated 3/14/06, correct?

19        A.     Yes.

20        Q.     And this is a -- would have

21  been the date the invoice was generated,

22  right?

23        A.     3/14/06.

24        Q.     And generated just the way we

Confidential - Subject to Further Confidentiality Review

Page 322

1    talked about earlier, correct?

2         A.    Uh-huh.

3         Q.    And this says, "Ship To:  Glen

4    Abbey subdivision in Houston, Texas,"

5    correct?

6         A.    Yes.

7         Q.    And it says, "Bill To:  Titan

8    Drywall, Inc.," correct?

9         A.    "Bill To:  Titan," yes.

10        Q.    And this, again, is two months,

11   or maybe a month and a half, after you first

12   started selling Chinese drywall, correct?

13        A.    Yes.

14        Q.    And this is a different builder

15   than -- saying -- different builder than the

16   builder on the earlier page that said they

17   didn't want Knauf, right?

18        A.    Yes.

19        Q.    But these people don't want

20   Knauf either, correct?

21        A.    That's correct.

22        Q.    In fact, at the bottom, make

23   sure I read it correctly, it says, "Load only

24   American Board.  No Knauf, no Knauf, no

Confidential - Subject to Further Confidentiality Review

Page 323

1    Knauf, no Knauf," correct?

2         A.      Correct.

3         Q.      Who generated these two

4    invoices?  Can you look at them and tell me?

5         A.      Yeah, that would probably be

6    Terri Collura.  "TYC," I think, is her

7    initials.

8         Q.      Is he still with the company,

9    or she?

10        A.      It's a she; and yes, she is.

11        Q.      Where does she work?

12        A.      Excuse me?

13        Q.      And she works here in

14   New Orleans?

15        A.      No.  Actually, she works in

16   Shreveport now.

17        Q.      And what is her job title?

18        A.      Inside sales.

19        Q.      Let's go to the next page of

20   this exhibit, Exhibit 74.  And it's dated

21   3/14/06 as well, correct?

22        A.      Yes.

23        Q.      And this is also from Titan for

24   delivery to another site, correct?

Confidential - Subject to Further Confidentiality Review

Page 324

```
 1              A.      Yes.
 2              Q.      And, again, they request no
 3       Knauf, right?
 4              A.      Correct.
 5              Q.      Let's flip to the next page.
 6       Invoice is dated 4/25/06, correct, sir?
 7              A.      Yes.
 8              Q.      Again, a delivery to bill to
 9       Houston area, to be delivered in the Houston
10       area, right?
11              A.      Correct.
12              Q.      To David E. Smith.  Again, a
13       different builder than on the earlier two
14       pages that we looked at, correct?
15              A.      Correct.
16              Q.      So this is the third builder.
17       And at the bottom, I'm going to read it.
18       Make sure I read it correctly.  Specifically
19       says, "No Knauf, no Knauf, no Knauf,"
20       correct?
21              A.      Correct.
22              Q.      And 5/24 invoice date, is the
23       next one; and it's, again, the same builder
24       saying, "No Knauf," correct?
```

Confidential - Subject to Further Confidentiality Review

Page 325

```
 1          A.     Yes, it is.
 2          Q.     So in light of all these
 3    people, or at least four builders saying, "We
 4    don't want Knauf," you can't point to us
 5    any -- to any document or any investigation
 6    that you did to determine why they didn't
 7    want Knauf, can you?
 8          A.     No, I can't.
 9          Q.     And you have no document or
10    files that we can look at to see why they
11    didn't want Knauf, correct?
12          A.     No, I don't.
13          Q.     That's not documented in any
14    way?
15          A.     No.
16          Q.     If an invoice ever said, "No
17    Knauf," did you deliver Knauf anyway, in some
18    cases?
19          A.     They shouldn't, if it was a
20    customer preference to not.  They should not
21    have.
22                 (Whereupon, Deposition Exhibit
23          INEX-30b6-75, Interior/Exterior
24          Invoice, INT/EXT19773, was marked for
```

Confidential - Subject to Further Confidentiality Review

Page 326

1          identification.)

2     BY MR. REEVES:

3          Q.    Let me ask you about another

4     series -- another invoice that I saw.  This

5     will be 75.  Take a look at that, sir, and

6     tell me, once you've had a chance to do so.

7          A.    Okay.

8               MR. DUPLANTIER:  What are you

9          numbering this?  Did you just number

10         the last set 75?

11              THE REPORTER:  Yes.

12              MR. REEVES:  This should be 75.

13         You got it?  This should be 75.

14    BY MR. REEVES:

15         Q.    Who generated this invoice,

16    sir?

17         A.    My guess would be Rebecca

18    Galleon.

19         Q.    Is she still with your company?

20         A.    Yes, she is.

21         Q.    And where is she employed, and

22    in what capacity?

23         A.    Mandeville branch, inside

24    sales.

Confidential - Subject to Further Confidentiality Review

1       Q.      I want to ask you about the

2     first line under "Product and Description."

3     This is a sale to 84 Lumber, correct?

4       A.      Yes, it is.

5       Q.      And it's got a bunch of dollar

6     signs, right?

7       A.      Uh-huh.

8       Q.      And then, "China rock," and

9     then a bunch of dollar signs again, correct?

10      A.      Uh-huh.

11      Q.      And this is dated 3/28/07,

12    correct?

13      A.      Yes.

14      Q.      What does she mean by the

15    dollar signs?

16      A.      They usually just do that to

17    make a note.  They'll sometimes use a pound

18    sign or something to just -- to make sure

19    that you can see the note.

20      Q.      Is it your testimony they do

21    that frequently?

22      A.      They'll put notes on tickets

23    quite often.

24      Q.      Will they mark it with dollar

Confidential - Subject to Further Confidentiality Review

```
 1    signs frequently?
 2         A.     I don't know that it's
 3    frequently or not.
 4         Q.     This is the only one we found,
 5    is why I ask you --
 6         A.     Okay.  Okay.
 7         Q.     -- in the 30,000 or so
 8    documents that have been produced, so I'll
 9    ask you:  Is this something that's frequently
10    done, the dollar signs?
11              MR. DUPLANTIER:  He answered
12         the question.  Ask him another
13         question.  He answered the question.
14              MR. REEVES:  Well, maybe he
15         did.  Okay.
16    BY MR. REEVES:
17         Q.     Mr. Geary, isn't it true that
18    you, yourself, knew in '06 that the Knauf
19    product was an inferior product that you were
20    selling, didn't you?
21         A.     No, that's not true.
22         Q.     You were, in fact, in '06,
23    doing some work on your house, weren't you?
24         A.     Yes, I was.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      Or were you building your

2    house?

3          A.      Excuse me?

4          Q.      Were you building your house or

5    doing work on it?

6          A.      No, my house got flooded.

7          Q.      Okay.  So you got flooded in

8    the storm; and you bought product for your

9    home from your company, didn't you?

10          A.      Yes.

11          Q.      You bought drywall, didn't you?

12          A.      Yes, I did.

13          Q.      And the truth is, in the

14    invoice that you submitted for your home, for

15    your family, right, you specifically

16    requested domestic board, didn't you?

17          A.      I requested USG board.

18          Q.      Right.  That's domestic board,

19    isn't it?

20          A.      Yes, it is.

21          Q.      Okay.  You didn't request

22    Knauf?

23          A.      No, I did not.

24          Q.      You didn't say, "I don't care,

Confidential - Subject to Further Confidentiality Review

```
 1      just send me half-inch."  You requested USG,

 2      didn't you?

 3              A.      Yes, I did.

 4              Q.      And you did that because you

 5      knew that was a better product, didn't you?

 6              A.      It was a personal preference.

 7              Q.      Right.

 8                      In your opinion, it was a

 9      superior product.  The Knauf product was

10      inferior; isn't that the truth?

11                      MR. SANDERS:  Object to form.

12                      MR. DUPLANTIER:  I'm going to

13              object to the form too.  He's answered

14              the question.  He's answered the

15              question.  You can ask him another

16              question.

17                      MR. REEVES:  I don't think he

18              has.

19                      MR. DUPLANTIER:  He just did.

20              He just said it was a personal

21              preference.

22                      MR. REEVES:  Read the question

23              back, please.

24                      (The following portion of the
```

Confidential - Subject to Further Confidentiality Review

```
 1              record was read.)
 2                    "QUESTION:  In your opinion, it
 3              was a superior product.  The Knauf
 4              product was inferior; isn't that the
 5              truth?"
 6                    THE WITNESS:  Did you read back
 7              my answer?
 8                    THE REPORTER:  There was not an
 9              answer after that.
10                    THE WITNESS:  Okay.
11         A.       Knauf product was -- no, I'm
12    sorry.  It was not an inferior product, no.
13    BY MR. REEVES:
14         Q.       Well, you didn't request an
15    inferior product to go into your own home,
16    did you?
17         A.       I had a personal preference for
18    USG product.
19         Q.       You preferred a better product,
20    right, like most people?
21         A.       I preferred it over National
22    Gypsum, over Temple, over all of the domestic
23    manufacturers as well.
24         Q.       And the Chinese as well,
```

Confidential - Subject to Further Confidentiality Review

Page 332

1      correct?

2            A.     Yes.

3            Q.     And you preferred it over

4      Knauf?

5            A.     Yes.

6                   MR. REEVES:  Let's mark that

7            invoice as the next exhibit.

8                   (Whereupon, Deposition Exhibit

9            INEX-30b6-76, Interior/Exterior

10           Invoices, INT/EXT21416 - INT/EXT21417,

11           was marked for identification.)

12                  MR. REEVES:  Do you need an

13           extra copy?

14                  MR. DUPLANTIER:  Yeah, I'm

15           trying to keep two sets of copies.

16                  MR. SANDERS:  Do you have

17           another copy, Jim?

18                  MR. REEVES:  I'm sorry?

19                  MR. SANDERS:  Do you have an

20           extra?

21                  MR. REEVES:  I don't know.  Let

22           me see.

23                  Yeah, here's an extra one.

24                  MR. SANDERS:  Thanks.

Confidential - Subject to Further Confidentiality Review

Page 333

1       BY MR. REEVES:

2              Q.      I want to go back, sir, to

3       Exhibit -- I think we marked it 74 or 75, the

4       one with the dollar signs on it.   75?

5              A.      Okay.

6              Q.      Let me ask you:   This invoice

7       is dated 3/28/07, correct?

8              A.      Yes.

9              Q.      And it references specifically

10      China rock?  China rock.   It specifically

11      references to use China rock, doesn't by, it

12      the dollar signs?

13             A.      Yes, it does.  Yes.

14             Q.      So we know your company was

15      selling Chinese rock at least through

16      3/28/07, don't we?

17             A.      Yes.

18             Q.      Okay.  So at least until then,

19      based upon this invoice we just looked at,

20      correct?

21             A.      Yes.

22             MR. REEVES:  Let's take a quick

23          break.  I may can pull my stuff

24          together.

Confidential - Subject to Further Confidentiality Review

Page 334

 1                    MR. DUPLANTIER:  Why don't you

 2              try and finish up so that, when we

 3              take a break, someone else can kind of

 4              take into your spot?

 5                    MR. REEVES:  It'd be more

 6              efficient if you'd let me kind of go

 7              through my things where I can check

 8              them off.  We'll just take five.

 9                    THE VIDEOGRAPHER:  Off the

10              record at 3:07 p.m.

11                    (Recess taken, 3:07 p.m. to

12              3:14 p.m.)

13                    THE VIDEOGRAPHER:  Stand by.

14              We're back on the record.  The time is

15              3:14 p.m.

16         BY MR. REEVES:

17              Q.    Mr. Geary, just a few more

18         questions.

19                    Describe for me the

20         procedure -- I think we went through it all,

21         but you basically had a telephone conference

22         with your branch managers, looked over

23         documentation and tried to determine when you

24         last sold the Chinese drywall.  Is that

Confidential - Subject to Further Confidentiality Review

1    basically what you did?

2         A.    I had a telephone conversation

3    with them and, you know, I guess we all

4    wracked our brains to try and recall when,

5    you know, the last shipments were sent out.

6         Q.    Was it multiple phone

7    conversations, a single one?

8         A.    I don't recall.

9         Q.    All right.  Was your brother in

10   on those as well?

11        A.    Yes.

12        Q.    Okay.  And this would have been

13   after litigation had ensued?

14        A.    Yes.

15        Q.    Y'all understood this was an

16   important matter, to know when you last sold

17   it, correct?

18        A.    Yes, sir.

19        Q.    And it was important for a lot

20   of reasons, so that you'd know who ended up

21   with the Chinese drywall, right?

22        A.    Correct.

23        Q.    And could report that back and

24   figure out if they had a problem, right?

Confidential - Subject to Further Confidentiality Review

```
 1            A.      Correct.
 2                    (Whereupon, Deposition Exhibit
 3            INEX-30b6-77, Interior/Exterior
 4            Invoice, INT/EXT32838, was marked for
 5            identification.)
 6     BY MR. REEVES:
 7            Q.      Let me show you what I'll mark
 8     as the next exhibit.  And this, sir, what
 9     we've marked as Exhibit 77, is Bates-stamped
10     32838; and it's an invoice dated 5/18/07,
11     correct?
12            A.      Yes, sir.
13            Q.      Who created this invoice?
14            A.      I'm not sure.
15            Q.      What were you looking to
16     earlier to determine who created a particular
17     invoice?
18            A.      I was looking at the initials,
19     "KLM," and it escapes me who that is.
20            Q.      Okay.  So the initials would be
21     there for the person that created a
22     particular invoice?
23            A.      Yes.
24            Q.      All right.  And that just
```

Confidential - Subject to Further Confidentiality Review

1    doesn't ring a bell to you?

2          A.     Right.

3          Q.     Now, specifically here, they're

4    referencing the sale of Knauf, aren't they?

5    If you look in the middle of the page there,

6    it says, "Knauf, Knauf, Knauf," does it not?

7          A.     Yes, they are.

8          Q.     Okay.  And this is in May

9    of '07?

10         A.     Yes.

11         Q.     Actually, May 18th, correct?

12         A.     Uh-huh.

13         Q.     So that indicates that you were

14   selling Chinese drywall at least until that

15   date, correct?

16         A.     We identified -- I think it was

17   23 invoices past March 31st that were

18   imported board.

19         Q.     And this is one of those?

20         A.     I believe so.

21         Q.     I want to make sure we're

22   covering this insurance issue, because your

23   counsel and I have a disagreement over that

24   and I want to make sure it's clear for the

Confidential - Subject to Further Confidentiality Review

1      judge.

2                    I'm not asking you for any

3      conversations you've had with your attorneys

4      with regard to your insurance coverage that

5      you've had with them in private.

6                    What I am asking you is:  Have

7      any of your insurers themselves or their

8      agents advised you as to whether you may or

9      may not have coverage for the Chinese drywall

10     litigation?

11                   MR. DUPLANTIER:  You can answer

12        that question.

13        A.     We've received a reservation of

14     rights letter from all of our carriers.

15     BY MR. REEVES:

16        Q.     From all of them?

17        A.     Well, I say that.  I know from

18     the underlying carriers.  I don't know about

19     the excess carriers.

20        Q.     All right.  And you have copies

21     of those letters?

22        A.     Yes.

23        Q.     All right.  And what's the

24     stated reason for the reservation, if any?

Confidential - Subject to Further Confidentiality Review

Page 339

```
 1            A.     You have to talk to the

 2    attorney about that.  We have a coverage

 3    attorney who's looking at that for us.

 4            Q.     All right.  And who is that?

 5            A.        Phil Nizialek.

 6            MR. REEVES:  Subject to the

 7        reservations that -- we'd like to get

 8        copies of those letters, if that's

 9        okay.  Can we do a formal --

10            MR. DUPLANTIER:  We've objected

11        to that.

12            MR. REEVES:  To providing the

13        letter?

14            MR. DUPLANTIER:  Yeah.

15            MR. REEVES:  Okay.  We can take

16        that up with the Court.

17            Subject to taking up with the

18        Court the areas that we reserved the

19        right to do that on the record, we

20        will tender the witness.

21            MR. DUPLANTIER:  This

22        deposition was cross-noticed in a

23        number of state court proceedings by

24        Kanner & Whiteley, and we're going to
```

Confidential - Subject to Further Confidentiality Review

Page 340

```
 1          give them an opportunity to ask
 2          questions next.
 3               MR. LAMBERT:  Just on behalf of
 4          Allan, who's not here right now, he'll
 5          pass this witness until Knauf is
 6          finished, and hopefully he will be
 7          there by then.  We've contacted him.
 8          You can't set up an order of a
 9          deposition.
10               MR. DUPLANTIER:  Actually, I
11          can.
12               MR. LAMBERT:  Well, I don't
13          think so.
14               MR. DUPLANTIER:  Mr. Kanner
15          cross-noticed the deposition for
16          today.
17               MR. LAMBERT:  I --
18               MR. DUPLANTIER:  If he's not
19          here to ask questions, we're going to
20          pass his questions.
21               MR. LAMBERT:  You can go --
22               MR. DUPLANTIER:  So he's been
23          given an opportunity to ask questions
24          in accordance with the notice that he
```

Confidential - Subject to Further Confidentiality Review

Page 341

1          issued for today.  He issued his

2          notice before anybody else, other than

3          the PSC.

4               MR. LAMBERT:  I understand.

5          And we'll just attach, for the record,

6          a copy of a letter dated the 26th of

7          2010 as the next number exhibit.  What

8          is that?

9               THE REPORTER:  78.

10               MR. DUPLANTIER:  We object to

11          that being attached to the deposition,

12          actually.

13               MR. LAMBERT:  You can do that.

14          You can object.

15               77?  78?  And 79 is the 1442

16          notice.

17               (Whereupon, Deposition Exhibit

18          INEX-30b6-78, Notice of 1442

19          Deposition (Dennis v.

20          Interior/Exterior, et al.), was marked

21          for identification.)

22               (Whereupon, Deposition Exhibit

23          INEX-30b6-79, 1/26/10 Kanner Letter to

24          Herman & Levin, was marked for

Confidential - Subject to Further Confidentiality Review

Page 342

1          identification.)

2                    MR. DUPLANTIER:  Can I have a

3          copy of the notice?

4                    77 [sic] is the cross-notice of

5          this deposition, which mimicked in its

6          entirety the notice issued by the PSC.

7          And this is issued in the Dennis case

8          by Kanner & Whiteley.

9                    Counsel for the Dennis

10         plaintiffs is Allan Kanner, along with

11         Ms. Fuselier, who is present here and

12         is being given the opportunity to ask

13         questions.  And it's not my fault that

14         they're not prepared to ask their

15         questions.

16                   MR. LAMBERT:  I don't want to

17         argue with you.  I just --

18                   MR. DUPLANTIER:  I understand.

19         I understand, Mr. Lambert, that you

20         didn't issue these notices, nor do you

21         represent these parties, from what I

22         understand.

23                   MR. LAMBERT:  That's correct.

24                   MR. DUPLANTIER:  I'm not sure

Confidential - Subject to Further Confidentiality Review

Page 343

```
 1          why you're handling this for the
 2          counsel that's present.  But we're
 3          going to -- if they are not willing to
 4          ask their questions at the present
 5          time, let's go to the next witness.
 6               MR. HERMAN:  Okay.  This is
 7          Steve Herman, and I'd just like to put
 8          something on the record.  You can take
 9          this up with Judge Bagneris or
10          Judge Fallon or whoever you want to
11          take it up with.
12               I just want to say, for the
13          record, that somebody from Allan's
14          office called me yesterday to see if
15          they thought that we would be going
16          all day and have to continue the
17          deposition onto another day, and I
18          thought that we would.
19               If that has created confusion,
20          I apologize to everyone involved.  But
21          they may have been relying on my
22          belief, which was a good-faith belief
23          that we would go at least all day and
24          have to continue it.
```

Confidential - Subject to Further Confidentiality Review

Page 344

```
 1                    MR. DUPLANTIER:  And let me
 2           state for the record -- hold on.  I
 3           got that information, that Mr. Herman
 4           had made those representations to
 5           Kanner & Whiteley.
 6                    I corrected those
 7           representations, that we were going to
 8           be here to complete this deposition
 9           today, and that we were not going to
10           agree to continue this deposition
11           beyond today.  So they should have
12           been on notice within an hour of the
13           conversation with Mr. Herman that we
14           intended to be prepared to answer
15           their questions.
16                    MR. LAMBERT:  Rick, with all
17           due respect, you've got your position
18           on the record.  Cantor has his
19           position on the record, and with the
20           attachments.  There's no rush.  These
21           can be set at a later point in time.
22           There's no intention to go all night
23           or tomorrow.
24                    MR. DUPLANTIER:  It's not all
```

Page 345

1        night.  It's only 3:19 in the

2        afternoon.

3            MR. LAMBERT:  No, no, I

4        understand.  But I'm simply saying

5        that the convenience of the witnesses,

6        your convenience, can all be met.

7        There's no intention --

8            MR. DUPLANTIER:  You're making

9        representations that you can't --

10       let's go off the record.  You're

11       making representations that you can't.

12       We don't have all the time.  There are

13       exceptions pending in state court that

14       you are unaware of, with deadlines.

15           MR. LAMBERT:  Look, Rick --

16       excuse me.  Rick, I don't want to

17       argue with you right now.

18           MR. DUPLANTIER:  Yes, you do.

19           MR. LAMBERT:  Put your position

20       on the record.

21           MR. DUPLANTIER:  You're arguing

22       with me.  You're making

23       representations that are, in fact,

24       untrue.  And there are deadlines that

Confidential - Subject to Further Confidentiality Review

Page 346

1          are applicable to the state court

2          proceeding.  Judge Bagneris has

3          ordered my client to be present for a

4          deposition.  They're here to answer

5          questions in accordance with this

6          deposition notice.

7                    MR. LAMBERT:  Okay.  I

8          understand your position.

9                    MR. DUPLANTIER:  Next?

10         Who's -- is anyone from Kanner &

11         Whiteley, on behalf of the Dennises,

12         going to ask questions?

13                    MS. FUSELIER:  No, we're not

14         going to ask any questions.

15                    MR. DUPLANTIER:  Okay.

16                    MR. LAMBERT:  Not right now.

17                    MR. DUPLANTIER:  Who's next?

18                    MR. SANDERS:  Plaintiffs go

19         before me.

20                    THE VIDEOGRAPHER:  Off the

21         record, 3:22 p.m.

22                    (Recess taken, 3:22 p.m. to

23         3:25 p.m.)

24                    THE VIDEOGRAPHER:  Stand by.

Confidential - Subject to Further Confidentiality Review

Page 347

1              We're back on the record.  The time is

2              3:25 p.m.

3                   MS. FUSELIER:  This is Melissa

4              Fuselier with Kanner & Whiteley.  I

5              just wanted to put on the record that

6              the exceptions in front of

7              Judge Bagneris are pending in April.

8              They're not pending next month or the

9              month after, so it's the end of April,

10             that they're pending.  That's all I

11             wanted to say.

12                   CLAYTON C. GEARY,

13        having been first duly sworn, testified as

14                   follows:

15                   EXAMINATION

16   BY MR. NICHOLAS:

17        Q.    Is it Geary or Geary?  I want

18   to get it straight.

19        A.    "GEER-ree."

20        Q.    Geary.

21             Mr. Geary, my name is Steve

22   Nicholas.  I represent The Mitchell Company,

23   who's been mentioned once or twice as a

24   plaintiff in the MDL.  I've got some

Confidential - Subject to Further Confidentiality Review

1    questions to ask you.  I'm going to try not

2    to repeat, so, by nature, it's going to kind

3    of bounce around a little bit, but I'll try

4    to tell you where I'm headed?

5              And I've also, frankly, lost

6    track of, between you and your brother, maybe

7    who said what.  So if I ask you something and

8    you think your brother is better able to

9    answer the question, if you tell me that, I

10    would appreciate it --

11         A.    Okay.

12         Q.    -- is that fair?

13              If you don't understand me or

14    if I'm not clear in a question, please ask me

15    to rephrase it, okay?

16         A.    Okay.

17              (Whereupon, Deposition Exhibit

18         INEX-30b6-80, Exhibit A, Knauf

19         Commercial Invoice, IE-000003,

20         IE-000005, IE-000007, IE-000009, was

21         marked for identification.)

22    BY MR. NICHOLAS:

23         Q.    First, I'd like to just kind of

24    establish the timeline a little better.  Let

Confidential - Subject to Further Confidentiality Review

1      me show you what I've marked as Exhibit 80,

2      and one of these may already be marked

3      somewhere else.  But do you recognize those

4      as invoices that would have come from Knauf

5      to Interior/Exterior Building Supply?

6              A.      Yes.

7              Q.      All right.  And from looking at

8      the invoices, at least for these, and I think

9      these are all the Knauf Tianjin shipments,

10     but it would tell you the vessel and the bill

11     of lading number.  Do you see that?

12             A.      Yes, I do.

13                     (Whereupon, Deposition Exhibit

14             INEX-30b6-81, Customs Information on

15             Knauf Plasterboard Shipments, was

16             marked for identification.)

17     BY MR. NICHOLAS:

18             Q.      All right.  And let me show you

19     what I've marked as Exhibit 81 to your

20     deposition, which I'm going to just see if we

21     can use to maybe help identify some dates.

22     And I'll represent to you that this is a

23     printout of the customs information regarding

24     those shipments.

Confidential - Subject to Further Confidentiality Review

Page 350

1                   And so if you look at the

2      second page first, the one at the top there,

3      you see the vessel, the MYSTRAS?

4               A.     Okay.

5               Q.     You see that?

6               A.     Yes, I do.

7               Q.     Now, you also see it says,

8      "Cosignee to the order of Whitney Bank."

9                   On each of these shipments,

10     Whitney Bank issued a letter of credit,

11     correct?

12              A.     Yes.

13              Q.     And then it says, "Notify

14     Interior/Exterior Building Supply"?

15              A.     Yes.

16              Q.     And the actual arrival date,

17     you see towards the upper right-hand corner

18     of that block, says "1/14/2006"?

19              A.     Okay.  Yes.

20              Q.     Does that refresh your

21     recollection about the time you would have

22     received the first shipment of Knauf Tianjin

23     drywall?

24              A.     It was -- yeah, it was in that

Confidential - Subject to Further Confidentiality Review

```
1    neighborhood.
2         Q.    All right.
3         A.    And then if you look back at
4    the first page again, the one just before
5    that one, you see it says the vessel is the
6    UPC TORONTO?  It would be the bottom of the
7    one with the sticker on it that you have in
8    your right hand.
9              MR. DUPLANTIER:  I don't see
10        that.
11        A.    I don't see "UPC TORONTO"
12   either.
13   BY MR. NICHOLAS:
14        Q.    Right here.
15        A.    Okay.
16        Q.    And if you looked at the
17   invoice, you'll see, if you want to refer
18   back to it, that one of the vessels was the
19   UPC TORONTO?
20        A.    Yes.
21        Q.    Do you remember that?
22        A.    I do remember that.
23        Q.    All right.  And it's -- the
24   actual arrival date there is 2/1/06?
```

Confidential - Subject to Further Confidentiality Review

Page 352

```
 1          A.     Correct.
 2          Q.     Does that sound about right of
 3    when the second shipment would have come in?
 4          A.     Yes, sir.
 5          Q.     And then if you look again on
 6    the second page, again -- I'm sorry for
 7    having to bounce around -- you see the second
 8    one there, the second entry, talks about the
 9    vessel DUAL CONFIDENCE, the bottom of the
10    second page --
11          A.     Yes.
12          Q.     -- or the second entry on the
13    second page?
14          A.     Yes.
15          Q.     And there are actually two
16    invoices with the DUAL CONFIDENCE.  That one
17    is on the third page as well.  And it came in
18    in May -- I mean, I'm sorry, April of 2006?
19    Does that sound right to you?
20          A.     That sounds right.  I thought
21    it was later than that, but...
22          Q.     Well, and then the final one
23    would be the first one on Exhibit 81, which
24    is the one that's notifying J.W. Allen
```

Confidential - Subject to Further Confidentiality Review

1      instead of notifying you.  But they were your

2      freight forwarder, correct?

3              A.      Yes, they were.

4              Q.      And that's the ALEXANDERGRACHT

5      or something like that?

6              A.      Yes.

7              Q.      Do you recall that vessel?

8              A.      Yes.

9              Q.      And that was September of

10     2006 --

11             A.      Yes.

12             Q.      -- correct?

13                     And then I believe you

14     testified earlier that the next shipment

15     would have been the Wuhu shipment, right --

16     or that was the Wuhu shipment.  I'm sorry.

17             A.      I think that was the Wuhu

18     shipment.

19             Q.      And then after that is when

20     y'all got some product from Metro, but that

21     was non-Knauf product, right?

22             A.      Correct.

23             Q.      All right.  Switching gears.

24             A.      Okay.

Confidential - Subject to Further Confidentiality Review

Page 354

1          Q.     You were shown Exhibit 3, and

2     you can dig it out, if you need to, but I

3     don't think you'll have to.  But if you feel

4     like you want to look at the document, let me

5     know.  And you were asked some questions

6     about a warranty that was provided by one of

7     the Knauf entities, that the product was free

8     from defects.  Do you recall that, generally?

9          A.     Yes, I do.

10         Q.     Now, your company has always

11    been in the business of reselling the

12    building materials that it purchases from

13    people like Knauf, correct?

14         A.     Correct.

15         Q.     And when you talked to the

16    people at Knauf, they understood you were in

17    the business of reselling this plasterboard

18    that you were buying from them, correct?

19              MR. SANDERS:  Object to the

20         form.

21         A.     Yes.

22    BY MR. NICHOLAS:

23         Q.     Well, let me deal with

24    Mr. Sanders' objection.

Confidential - Subject to Further Confidentiality Review

1              Did you ever have a

2      conversation with anyone at Knauf, Tianjin

3      specifically, where they -- where you

4      expressed to them that you were buying this

5      for resale?

6          A.     I can't tell you specifically,

7      but I would assume we would have.

8          Q.     And certainly when you had the

9      conversation with Mr. Brisley -- is that his

10     name?

11         A.     Brisley.

12         Q.     Brisley.  He understand that's

13     what you were doing?

14         A.     Yes, he did.

15         Q.     And you would agree with me, if

16     it turned out there was something wrong,

17     anything wrong that made that product

18     defective, that it would be your customers

19     who would feel that defect, correct?

20         A.     Yes.

21         Q.     And you understood that when

22     you were selling the product?

23         A.     Yes.

24         Q.     And by its very nature, Knauf

Confidential - Subject to Further Confidentiality Review

```
 1     would have understood that, correct?
 2                     MR. SANDERS:  Object to the
 3             form.
 4             A.    Yes.
 5     BY MR. NICHOLAS:
 6             Q.    That it's your customers
 7     involved, right?
 8             A.    Yes.  Yes.
 9                     MR. NICHOLAS:  Excuse me.  Give
10             me just a second.  I need to find the
11             next topic.
12     BY MR. NICHOLAS:
13             Q.    Let's talk about Mr. -- I'm
14     going to mispronounce it again, Brisley?
15             A.    Brisley.
16             Q.    Brisley.  Brisley.
17                     As I understand your testimony
18     earlier today, Mr. Brisley was employed by,
19     or you had a relationship with him from
20     selling your company insulation products?
21             A.    Correct.
22             Q.    What kind of products did y'all
23     buy through your connection with Mr. Brisley?
24             A.    We buy fiberglass insulation
```

Confidential - Subject to Further Confidentiality Review

Page 357

```
 1      from Knauf.
 2           Q.      And do you have an
 3      understanding as to where that insulation
 4      comes from?
 5           A.      Yes.
 6           Q.      Where it's manufactured?
 7           A.      Yes.
 8           Q.      What's that understanding?
 9           A.      They have a couple of plants
10      that we deal with.  One is in, I think,
11      Shelbyville, Indiana, and Lynette, Alabama.
12           Q.      Okay.  And you also, I believe,
13      said that there's a local representative for
14      that entity?
15           A.      Yes.
16           Q.      And what's that gentleman's
17      name?
18           A.      Kurt Heider.
19           Q.      Did you ever have a
20      conversation with Mr. Heider about obtaining
21      drywall?
22           A.      About obtaining drywall from?
23           Q.      From anybody.
24           A.      I don't think we called him.  I
```

Confidential - Subject to Further Confidentiality Review

Page 358

1    don't remember having a conversation with him

2    about it prior to talking to -- when Jim

3    talked to Jeff Brisley.

4           Q.    And so it was your brother that

5    talked to Mr. Brisley?

6           A.    Yes.

7           Q.    I was hoping to avoid it, but

8    I'm not going to be able to.  I'm going to

9    have to get him in here at some point.  I'll

10   defer all these things.

11                Well, did you ever talk to

12   Mr. Brisley about drywall, anything about

13   drywall?

14          A.    I think Jim had all the

15   conversations with him.

16          Q.    All right.  Okay.  I'll just

17   defer that, then.

18                There were a number of

19   exhibits, specifically Exhibit 9, 10, 11,

20   that were e-mails from a Mr. John Davis?

21          A.    Uh-huh.

22          Q.    Do you recall those e-mails?

23          A.    Yes.

24          Q.    And I think I may have picked

Confidential - Subject to Further Confidentiality Review

Page 359

1    them up.  Maybe I'd ask you to look for them,

2    Mr. Geary.

3                  MR. DUPLANTIER:  Yeah.

4                  MR. NICHOLAS:  Let me just pull

5         them real quick.

6    BY MR. NICHOLAS:

7         Q.    You see the e-mails from

8    Mr. Davis, he has a title under his name?

9         A.    Yes, "Business Development

10   Manager."

11        Q.    For what company or what

12   entity?

13        A.    It says, "Knauf Plasterboard

14   and Insulation China."

15        Q.    All right.  Did you ever have a

16   conversation with Mr. Davis about who that

17   was, who Knauf Plasterboard and Insulation

18   China was?

19        A.    No.

20        Q.    Did you ever gain any

21   understanding from any other source as to who

22   that company or who that entity was?

23        A.    No.

24        Q.    Sitting here today, do you know

Confidential - Subject to Further Confidentiality Review

1    if there is any such entity called Knauf

2    Plasterboard and Insulation China?

3         A.    I don't know.

4         Q.    Did you ever get a bill from a

5    company that had that name on it?

6         A.    Well, the letter of credit

7    had -- I can't remember the exact wording,

8    but it had "Tianjin" on it, I believe.

9         Q.    Okay.  But I'm talking about

10   specifically those -- that phrase or that

11   designation of a company, did you ever see

12   that in any of the paperwork?

13        A.    Not that I recall.

14        Q.    Looking at Exhibit 11, if you

15   have it there, where Mr. Davis is saying

16   that, "We have priced their product," and

17   some things like that.  Do you see that?

18        A.    Yes, I see that.

19        Q.    Do you have an understanding --

20   well, let me back up.

21             Did you ever ask Mr. Davis who

22   "we" was?

23        A.    I did not.

24        Q.    Did you have an understanding,

Confidential - Subject to Further Confidentiality Review

1    from either talking with Mr. Davis or talking

2    with anybody else, who "we" was?

3         A.     I don't know.

4         Q.     Now, correct me again:

5    Exhibit 12, which, I believe, are notes

6    regarding a conversation with Mr. Norris, was

7    that you or your brother?  Mark Norris?

8         A.     With Mark Norris, it would have

9    been me.

10        Q.     All right.  And who did you

11   understand Mr. Norris to be associated with

12   or employed by?

13        A.     Knauf in China.

14        Q.     Okay.  Did you have any more

15   specific understanding of Knauf in China, who

16   that was?

17        A.     No.  I guess I would have just

18   assumed it was some type of division of

19   Knauf.

20        Q.     Did Mr. Norris ever explain to

21   you the relationship between any of the

22   Chinese Knauf entities?

23        A.     No.

24        Q.     Did he ever explain to you the

Confidential - Subject to Further Confidentiality Review

1      relationship between any of the Chinese Knauf

2      entities and any other Knauf entity?

3              A.      No.

4              Q.      And when he said something to

5      the effect -- I believe your testimony was

6      that somebody owed -- owned, I'm sorry, 12%

7      of USG?  Is --

8              A.      Yes, 12-1/2%.

9              Q.      12-1/2%.

10                      As best you can recall, what

11      did he say as far as who owned 12-1/2% of

12      USG?

13              A.      Knauf.

14              Q.      Did he explain anything more

15      specific than "Knauf"?

16              A.      Not that I recall.

17              Q.      But that it was your

18      understanding, based on your conversation

19      with him, the ownership of 12-1/2% of USG

20      somehow affected your ability to do business

21      with Knauf Plasterboard Tianjin --

22                      MR. SANDERS:  Object to the

23              form.

24      BY MR. NICHOLAS:

Confidential - Subject to Further Confidentiality Review

1          Q.      -- right?

2          A.      The ability for them to ship

3     into the United States.

4          Q.      Well, the person who was

5     shipping into the United States was Knauf

6     Plasterboard Tianjin, right?

7          A.      Yes.

8          Q.      Or Knauf Plasterboard Wuhu?

9          A.      Correct.

10         Q.      And that somehow, the Knauf

11    ownership of 12-1/2% of USG impacted that

12    ability?

13         A.      Yes.

14              MR. SANDERS:  Object to form.

15    BY MR. NICHOLAS:

16         Q.      But he didn't explain to you

17    any further about how all that

18    interconnected?

19         A.      He did not.  He did not.

20         Q.      Did he say, "We own 12-1/2% of

21    USG," or anything like that?

22         A.      I don't recall.

23         Q.      Okay.  All right.  Switching

24    subjects.

Confidential - Subject to Further Confidentiality Review

Page 364

```
 1              You were asked a series of
 2    questions about how the product -- and I'm
 3    talking about the Chinese plasterboard, how
 4    it arrived and how it moved, and that's the
 5    general topic I want to ask you about.
 6              As I understand your testimony,
 7    on -- as I understand it, on every occasion,
 8    it would be off-loaded off the ship, and then
 9    disbursed to your various locations; is that
10    correct, or am I incorrect?
11        A.    With the Knauf?
12        Q.    Yes, sir.
13        A.    Yes.
14        Q.    Yeah, I'm only talking about
15    Knauf right now.
16        A.    Okay.
17        Q.    Would there be occasions,
18    though, when, let's say, Mobile or -- it's
19    actually Foley, right?
20        A.    Well, we have a place in Mobile
21    and in Foley.
22        Q.    Okay.  Where -- that's right.
23    Where either one of those locations would run
24    out of drywall, would they get some more
```

Confidential - Subject to Further Confidentiality Review

Page 365

1    from, say, New Orleans?

2         A.      Typically, what would happen

3    is, we would send another truck from the

4    wharf to Foley, if they needed it.

5         Q.      Well, I'm confused.

6              Was all the product off-loaded

7    from the ship and then sent somewhere?

8         A.      What happened was, they took

9    the product off the ship and they put it in

10   the wharf, you know, on the river, and we

11   sent them transfer tickets, and they shipped

12   the product to our various warehouses.

13        Q.      All right.  So I am confused.

14              So for a period of time, the

15   product, the Knauf plasterboard, would have

16   stayed at the wharf?

17        A.      Yes.

18        Q.      And so until it was then

19   disbursed out, there would be some there?

20        A.      Correct.

21        Q.      And we identified kind of the

22   dates of the shipments when I first started

23   this, but were there times when you ran out

24   at the wharf?

Confidential - Subject to Further Confidentiality Review

1          A.     I'm sure we did.

2          Q.     Well, if you ran out at the

3     wharf and I'm in -- I'm in Mobile and Mobile

4     ran out, would you move it from another

5     location to Mobile, or would you just deliver

6     it to somebody in Mobile?

7          A.     No, not typically.  What we

8     would do is probably order it from a domestic

9     manufacturer.  We didn't -- you didn't want

10    to transfer it any more than you needed to

11    because of the cost of the product -- the

12    cost of the freight is very high.

13         Q.     All right.  So it would be

14    unusual, and you don't think it happened,

15    that New Orleans would move it from its

16    warehouse to Mobile or --

17         A.     Not typically.

18         Q.     -- Birmingham to Mobile or

19    anything like that?

20         A.     Not typically.

21         Q.     All right.  Thank you.

22                Can you tell me whether it was

23    typical or atypical of how decentralized the

24    sales process was.  I mean, and where I'm

Confidential - Subject to Further Confidentiality Review

Page 367

1    going is let's say I'm a homebuilder in

2    Mobile.  Would I typically just deal with the

3    Mobile office?

4            A.     Our branches typically sell

5    product within about an hour-and-a-half

6    radius of our branches.  As I mentioned, it's

7    a very freight-intensive product, and you

8    don't go too far, usually, because it just

9    costs too much money.

10           Q.     All right.  So if I'm in

11   Mobile, I would probably, from what you're

12   telling me, never interact with the people in

13   New Orleans?

14           A.     Right.  Right.

15           Q.     And if the guy in Mobile

16   doesn't have the product, then I've got to go

17   find it somewhere else?

18           A.     On occasion, you know, if

19   there's something that New Orleans has, a

20   specific product -- not necessarily drywall,

21   but a specific product, they may transfer

22   that product over.

23           Q.     Okay.  All right.  Switching

24   gears on you again.

Confidential - Subject to Further Confidentiality Review

1          You were asked about the first

2     complaint or knowledge of any kind of issue

3     that you had from a customer about Chinese

4     drywall, correct?

5          A.     Uh-huh.  Actually, Jim was.

6          Q.     Okay.  What I want to ask you

7     is:  Did anyone internally at

8     Interior/Exterior ever report up the line

9     that they thought there was anything unusual

10    about the Chinese drywall?

11         A.     No.

12         Q.     Nobody handling it ever said,

13    you know, "This stuff smells funny"?

14         A.     No.

15         Q.     Did anyone ever report -- well,

16    let me back up.

17               As I understand the testimony,

18    the first report you got was about

19    air-conditioning coil corrosion in the Wall

20    Street Journal article; is that right?

21         A.     I don't remember the article

22    specifically.  I remember it was

23    January 12th, there was a Wall Street Journal

24    article.  I don't remember the -- I know the

Confidential - Subject to Further Confidentiality Review

1    general -- general make-up of the article,

2    but I can't tell you the specifics.

3        Q.    All right.  And prior to that

4    time, no one, either internally or

5    externally, had talked about odor?

6        A.    No.

7        Q.    And tell me, is this you or

8    your brother, but as I understand, at some

9    point in time, there was communication with

10   someone at Knauf, once you were put on --

11   once your company was put on notice there

12   might be a problem?

13       A.    That was Jim.

14       Q.    Did you ever have a

15   conversation with anyone who you understood

16   to be in any way connected with Knauf, prior

17   to litigation, about problems with its

18   product or alleged problems with its product?

19       A.    Jim and I had a conference call

20   with Doug Sanders.  I don't know if that was

21   pre- or post-litigation.  I think it was

22   pre- -- about getting -- you know, what are

23   they going to do, and they were going to go

24   do these inspections with Strategy.

Confidential - Subject to Further Confidentiality Review

Page 370

1          Q.     All right.  So prior to you
2     having a conference call with Mr. Sanders,
3     you personally had not talked to anyone?
4          A.     No.
5          Q.     Do y'all still do business with
6     Knauf USA?
7          A.     Yes, we do.
8          Q.     Up until this day, have you
9     ever had a conversation with anyone at
10    Knauf USA about Chinese drywall?
11         A.     Up until -- through today?
12         Q.     Yes, this minute.
13         A.     Yes.
14         Q.     Who have you talked to?
15         A.     I talked to Kurt Heider and
16    Jeff Brisley.
17         Q.     What did y'all talk about?
18         A.     We asked them, basically,
19    "What's going on," and didn't get any answer
20    at all.
21         Q.     Well, can you give me a little
22    more idea of what their response was?
23         A.     You know, basically, "We've
24    been told not to say anything, and can't say

Confidential - Subject to Further Confidentiality Review

Page 371

1     a word."

2             Q.      All right.   I assume your

3     answer is going to be the same.   I just want

4     to make sure:   Did you talk to them in any

5     way about any relationship between Knauf USA

6     and Knauf Plasterboard Tianjin, Knauf

7     Plasterboard Wuhu or any of these other

8     companies?

9             A.      No.

10            Q.      Has your company, to your

11    knowledge, ever purchased any product --

12    well, let me ask it this way.   Strike that.

13                    Has your company ever bought

14    anything related to Knauf, other than

15    insulation and drywall?

16            A.      No.

17            Q.      So there's never been another

18    occasion, for instance, where Knauf USA has

19    sold you something that may have come from

20    another Knauf company?

21            A.      No.

22            Q.      I probably should have asked

23    you this a minute ago, but I forgot about it.

24                    You and I talked about the

Confidential - Subject to Further Confidentiality Review

1      shipments and how they come into the wharf

2      and go out.  How do domestic drywall

3      shipments differ from that, in terms of how

4      y'all handle it?

5          A.      They deliver them directly to

6      our warehouses.

7          Q.      So, again, if I'm talking about

8      Mobile and Mobile runs out of drywall and has

9      a domestic source, it would be shipped

10     however it gets there, into that Mobile

11     warehouse?

12         A.      Call USG and deliver it on

13     Thursday to your warehouse.

14         Q.      Would there be a centralized

15     record of that delivery?

16         A.      We have a purchase-order system

17     in our computer system.

18         Q.      And that computer system is in

19     New Orleans?

20         A.      Yes.

21         Q.      So somebody in Mobile would

22     input that data, but you would have it?

23         A.      Yeah.

24         Q.      All right.  A couple of times

Confidential - Subject to Further Confidentiality Review

Page 373

```
 1    today -- well, let me strike that.  Let me
 2    just show you this.
 3                    (Whereupon, Deposition Exhibit
 4             INEX-30b6-82, Sales Documentation
 5             Between Creola Ace Hardware,
 6             Interior/Exterior and Mitchell Co.,
 7             700109, 70010, 700115, 700118, 700112,
 8             700124, 700127, was marked for
 9             identification.)
10    BY MR. NICHOLAS:
11             Q.     Let me show you what I've
12    marked as Exhibit 82, which I'm going to
13    represent to you are some of the documents
14    regarding your sales to Creola Ace Hardware,
15    and then in turn to The Mitchell Company,
16    okay?
17                    Do you recognize the one on
18    top?
19             A.     Yes.
20             Q.     And the way I read this, you
21    see it's to be delivered to the Bessemer
22    Family Rentals, Prichard, Alabama, right
23    above the signatures?
24             A.     Correct.
```

Confidential - Subject to Further Confidentiality Review

Page 374

1          Q.     And I'll represent to you that

2     that project was built by The Mitchell

3     Company; and I think if you look at the other

4     things, you'd bear that out.

5                 Who is the name on the left

6     side, that signature there?

7          A.     Jim Green.  He's our manager in

8     Mobile, branch manager.

9          Q.     All right.  Did you or anyone

10     in your New Orleans office have anything to

11     do with this transaction at the time of the

12     transaction?

13          A.     I remember it being rather

14     strange, in that they wanted to deposit -- I

15     think they gave us this money ahead of time.

16          Q.     Yeah, that's the second page.

17          A.     Okay.

18          Q.     It sort of memorializes that;

19     is that right?

20          A.     Yes.

21          Q.     So you were aware the

22     transaction was occurring in August of --

23     when it occurred in August of '05, is that

24     right, because of that --

Confidential - Subject to Further Confidentiality Review

Page 375

```
 1            A.      Yeah.  Yes.

 2            Q.      -- unusual event?

 3            A.      Uh-huh.

 4            Q.      Look at the third page there.

 5     Yeah, that's it.  That looks like a different

 6     kind of invoice.  Can you identify that

 7     document for me?  Is that your company's

 8     document?

 9            A.      It looks like our company's

10     document without the overlay from the

11     software.

12            Q.      Okay.  So would that document

13     have been generated out of Mobile?

14            A.      Well, they input the orders in

15     Mobile, and then they'll push a button to

16     invoice it.  The invoice is actually spit out

17     in New Orleans.

18            Q.      Okay.

19            A.      And then we mail them from

20     New Orleans.

21                    Now, they have the ability to

22     print an invoice in Mobile, but they can't --

23     they can't generate an invoice.  In other

24     words, they can print an invoice that's
```

Confidential - Subject to Further Confidentiality Review

Page 376

1    already been invoiced, but we run the

2    invoices in New Orleans and mail them out of

3    New Orleans.

4         Q.    Do you recall any information

5    coming to you from your company that Creola

6    Ace Hardware did not want Chinese drywall?

7         A.    Do I recall any correspondence?

8         Q.    Discussions, anything that

9    you've heard of that indicated they didn't

10   want imported drywall?

11        A.    I don't recall that.

12        Q.    You referred to it a couple of

13   times in your testimony today as a customer

14   preference.

15        A.    Uh-huh.

16        Q.    But if a customer said, "I

17   don't want imported drywall," is it your

18   testimony your company would not provide it?

19        A.    They would mark down on the

20   ticket that it shouldn't, and the

21   warehouseman should not deliver it.

22        Q.    And if they did deliver it, it

23   would be a mistake?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 377

1          Q.      It would not be what the

2     customer ordered?

3          A.      Correct.

4          Q.      Well, do you know whether

5     through, Creola Ace Hardware -- I'm having

6     trouble saying that today -- that Knauf

7     product was delivered to the Bessemer Family

8     housing project?

9          A.      I do not know.

10          Q.      Well, look at the third page

11     there, just below the dotted line across.

12     You see it says, "No import rock"?

13          A.      Yes.

14          Q.      So you would agree that, based

15     on this invoice, they should not have

16     delivered Knauf product, right?

17          A.      Yes.

18          Q.      And if you turn the page, the

19     next one says the same thing, right, just

20     below the dotted line?

21          A.      Yes.

22          Q.      And then turn the next page.

23     The next one says the same thing, correct?

24          A.      I will say that there were --

Confidential - Subject to Further Confidentiality Review

1    and I don't know the particulars, but there

2    was a difference -- two different parts of

3    this project, and one had requested -- I

4    think there was a -- requested USG board, and

5    one did not specify the type of board.  And I

6    don't know --

7           Q.    Well, how did you gain that

8    understanding?

9           A.    From my manager over there.

10          Q.    Mr. Green?

11          A.    Yeah.

12          Q.    What did he tell you?

13          A.    That there were -- there was

14   one project, I think, that we had -- had a

15   job commitment from another vendor, a

16   domestic vendor; and that project, I think,

17   was going to go domestic, and the other one

18   was not.

19          Q.    I'm sorry, I just didn't

20   understand what you said, and it's my fault.

21   But another job --

22          A.    I thought there was -- I'm

23   fuzzy on the details, but there was a

24   Bessemer Sales and a Bessemer Rentals, I

Confidential - Subject to Further Confidentiality Review

1    believe, and one part of the project had been

2    requested domestic, and one had not.

3         Q.    Do you have any understanding

4    as to why someone would have requested

5    domestic?

6         A.    I think it had to do with our

7    commitment from a domestic manufacturer on

8    price.  At this time, it was very

9    difficult -- we had a contract price, I

10   think -- a cost that we would buy the product

11   for, guaranteed from a domestic manufacturer.

12        Q.    So help me:  Was it cheaper to

13   have domestic?

14        A.    Well, at this point, the

15   problem was not just price, but availability,

16   the fact that they guaranteed the

17   availability -- well, they guaranteed the

18   price on this project.

19        Q.    Well, I still don't understand.

20   These invoices are May of '06, right?

21        A.    Uh-huh.

22        Q.    Upper right-hand corner.

23             So in May of '06 --

24             MR. DUPLANTIER:  You have to

Confidential - Subject to Further Confidentiality Review

Page 380

1          say "yes."

2      BY MR. NICHOLAS:

3          Q.      -- somebody, in connection with

4      either Ace Hardware or Mitchell or Bessemer

5      housing project or somebody, said, "I don't

6      want import rock," right?

7          A.      On this ticket, they said, "No

8      import rock," yes, sir.

9          Q.      All right.  And my question to

10     you is:  Can you help me figure out why?

11         A.      No.  I don't know.

12         Q.      And what you were trying to

13     tell me about shipments and domestic drywall

14     and all that, how does that help me figure

15     out why?

16         A.      I don't know.  I don't know why

17     they said, "No import rock."  I shouldn't

18     have spoken because I don't know the

19     particulars, but there was something to do

20     with Bessemer Sales versus Bessemer Rentals,

21     and I don't know the particulars.

22         Q.      All right.  Other than just

23     looking on the back of the board, is there

24     anything, to your knowledge, that would have

Confidential - Subject to Further Confidentiality Review

Page 381

1    indicated to anyone that handled the board

2    that it was not domestic board?

3         A.    The product has end tape on it.

4         Q.    Bad question.

5         I guess I'm saying:  Did you

6    ever have a conversation with anyone in this

7    transaction specifically or anywhere else

8    that says, "Hey, we're sending you imported

9    rock or imported drywall --

10        A.    No, I did not.

11        Q.    -- "is that okay," or anything

12   like that?

13        A.    I did not.

14             MR. NICHOLAS:  I think that's

15        all.  I need to ask the other

16        Mr. Geary a couple things.

17             THE VIDEOGRAPHER:  Off the

18        record at 3:56 p.m.

19             (Recess taken, 3:56 p.m. to

20        3:59 p.m.)

21             THE VIDEOGRAPHER:  Stand by.

22        We're back on the record.  The time is

23        3:59 p.m.  This is the start of

24        Tape 4.

Confidential - Subject to Further Confidentiality Review

Page 382

```
 1              JAMES F. GEARY, SR.,
 2      having been first duly sworn, testified as
 3                    follows:
 4                  EXAMINATION
 5   BY MR. NICHOLAS:
 6         Q.     Mr. Geary, good afternoon.  You
 7   understand you're still under oath?
 8         A.     Yes, I do.
 9         Q.     Let me pick up on the item I
10   started asking your brother about.  The
11   conversation with Mr. Brisley is what I want
12   to focus on.
13         A.     Yes.
14         Q.     Tell me, again:  Was it unusual
15   for you to be talking to Mr. Brisley?
16         A.     I didn't speak with him very
17   often.  Most of our contact and communication
18   was through Kurt Heider, the sales rep.
19   But -- so we had very little reason to talk
20   to Mr. Brisley, but we did communicate with
21   him from time to time.
22         Q.     And --
23         A.     And we knew each other.
24         Q.     I mean, he was basically your
```

Confidential - Subject to Further Confidentiality Review

1    local sales rep's boss; is that the way you

2    understood it?

3          A.    I can't tell you the exact

4    structure.  My appreciation, it could be

5    wrong, would be he would be something like an

6    overall general sales manager.

7          Q.    And how did the topic of Knauf

8    or any Knauf entity supplying you with

9    drywall come up?

10         A.    Again, we -- I had a

11   conversation with him shortly after Katrina,

12   when we had been relocated to our Mandeville

13   office.  And as some of our other suppliers

14   and vendors had done, he called just to check

15   in on us to see how we were doing, how we

16   fared through the storm.

17               And in the course of that

18   conversation was when we had discussion about

19   buying drywall from Knauf.

20         Q.    And as best you can recall, can

21   you tell me how Mr. Brisley described who

22   would be selling you the product?

23         A.    I don't recall.

24         Q.    Well, did he explain to you

Confidential - Subject to Further Confidentiality Review

Page 384

```
 1     that it was some other company that he could

 2     arrange for or help arrange for the sale of

 3     the product?

 4            A.     Not that I remember.  The

 5     understanding was, it was going to be Knauf

 6     drywall.

 7            Q.     And any explanation further

 8     than "Knauf drywall"?

 9            A.     Not that I recall.

10            MR. SANDERS:  Object to the

11        form.

12     BY MR. NICHOLAS:

13            Q.     Did -- and you may have been

14     asked this, and there may be a document and I

15     just didn't see it.  But did Mr. Brisley send

16     you a price list?

17            A.     Brisley sent a price list to

18     Kurt Heider, who -- via an e-mail.  And

19     because at the time our computer system -- or

20     our e-mail system was down, Kurt Heider

21     handed me a hard copy of that communication.

22            Q.     After the -- after this initial

23     conversation and you getting the rate sheet,

24     did you have further conversations with
```

Confidential - Subject to Further Confidentiality Review

Page 385

1     Mr. Brisley about drywall?

2          A.     We did, but I really couldn't

3     tell you the specifics of that.  I think we

4     had a couple of occasions to talk about it,

5     but just in general terms is what I remember.

6          Q.     Well, in any conversation with

7     Mr. Brisley, did he ever try to explain to

8     you any kind of relationship between his

9     company and the company that was actually

10    shipping you the product?

11         A.     Not that I recall.

12         Q.     Did you talk to Mr. Brisley

13    when the problems with Chinese drywall, or

14    specifically the Knauf drywall, first

15    surfaced?

16         A.     No.  We started with Kurt

17    Heider, the sales rep, and asked him to see

18    what he could do for us.

19         Q.     And anything -- did you ever

20    have a conversation with Kurt in addition to

21    what your brother talked to me about or

22    already testified to about?

23         A.     I'm sorry, could you --

24         Q.     Bad question.

Confidential - Subject to Further Confidentiality Review

1              Did you ever have a

2      conversation with Kurt about any problems

3      with Knauf drywall?

4          A.     Are you talking about after

5      that, things --

6          Q.     Yes, sir.

7          A.     Yeah, I mean, we -- when all

8      these things started surfacing, yeah, that

9      was the first person we contacted, was Kurt

10     Heider.  And, you know, if I remember

11     correctly, he indicated to us -- I mean, this

12     was beyond him.  He needed to go to his

13     higher-ups and go through the chain of

14     command.

15         Q.     Well, when the problem first

16     came up, am I correct that Kurt's the person

17     you called, not someone in China?

18         A.     That's correct.

19         Q.     And did he ever go through his

20     chain of command and get back to you?

21         A.     Did Kurt ever go through his

22     chain of command?

23         Q.     Yes, sir.

24         A.     My belief is, yes, he did.

Confidential - Subject to Further Confidentiality Review

Page 387

1          Q.     And what did he do?  What did

2     he tell you?

3          A.     Well, at the end of the day,

4     they got us in touch with their attorney.

5          Q.     And your brother talked to me a

6     little bit -- or just said a little bit about

7     having a conference call with Mr. Sanders?

8          A.     Yes.

9          Q.     Well, who set that up?  Who let

10    you know about that?

11         A.     I'm sorry, who let us know

12    about the...

13         Q.     About that you needed to talk

14    to Mr. Sanders.

15         A.     I believe it was from Kurt

16    Heider, but I'm not positive about that.

17    Yeah, I guess it had to have been Kurt

18    Heider.

19         Q.     Wasn't somebody from China?

20         A.     No, I'm fairly certain it was

21    not.

22         Q.     I talked to your brother about

23    Mr. Davis and Mr. Norris, I believe, and

24    having any better understanding about who

Confidential - Subject to Further Confidentiality Review

Page 388

1        they worked for.  You heard me ask your

2        brother that, right?

3                A.      Yes, I did.

4                Q.      Do you have anything to add to

5        anything he said about that situation?

6                A.      No, I do not, because I -- at

7        that point, then, Clay handled all the

8        communications directly with those gentlemen.

9                Q.      I'm not asking you to vouch for

10       every word that your brother testified to,

11       but in sitting there, hearing him testify, is

12       there anything he said you thought was

13       incorrect?

14               A.      No.

15               Q.      Let me ask you one more thing.

16       The wharf that he told me about when the

17       product was initially off-loaded from the

18       ships, is it open-air, or is it contained?

19               A.      Well, it's certainly got --

20       it's open in the sense that there are bay

21       doors or warehouse doors; but other than

22       that, it's enclosed.

23               Q.      And how big is it?

24               A.      Huge.  I could only guess how

Confidential - Subject to Further Confidentiality Review

1    big it is.

2           Q.     Is your -- does your company

3    have the exclusive -- is everything in there

4    yours?  And, again, I'm talking the '06/08

5    time frame.

6           A.     Yeah.  No, I don't think so.  I

7    think I'm if -- if I remember correctly,

8    there were some other products in those

9    warehouses.  You know, steel and other

10   products and such.

11          Q.     And when -- again, I'm trying

12   to get some idea of size.  But when a

13   shipload, one of these deliveries, was first

14   off-loaded and put in that warehouse, what

15   percentage of the warehouse would be taken up

16   by that product?

17          A.     Only a guess, something like

18   25%, something -- that's a guess.

19          Q.     And nobody ever made a comment

20   about odor when all that product was put in

21   that warehouse, correct?

22          A.     No, sir.

23          MR. NICHOLAS:  Give me just a

24   second.

Confidential - Subject to Further Confidentiality Review

Page 390

```
 1              That's all I have.  Thank you,
 2        sir.
 3              MR. DUPLANTIER:  Does anybody
 4        else who cross-noticed the deposition
 5        have questions?
 6              (Pause.)
 7              MR. DUPLANTIER:  Other than
 8        Knauf?
 9              (Pause.)
10              MR. DUPLANTIER:  We are --
11              THE VIDEOGRAPHER:  The
12        gentleman who left said he had some
13        questions.
14              MR. NICHOLAS:  Shilling said he
15        had like 15 minutes' worth.
16              MR. DUPLANTIER:  Well, let's
17        take a break while he comes back.
18              THE VIDEOGRAPHER:  Off the
19        record, 4:08 p.m.
20              (Recess taken, 4:08 p.m. to
21        4:17 p.m.)
22              (The following proceedings were
23        conducted off the videotaped record.)
24              MR. COHEN:  My name is Max
```

Confidential - Subject to Further Confidentiality Review

1      Cohen.  I represent Rockhill Insurance

2      Company in the Butler and Finger

3      litigation pending in civil district

4      court.  I'm not aware that anybody in

5      my cases has cross-noticed this

6      deposition.

7           I only became aware of the

8      deposition during a telephone status

9      conference the other day, so I decided

10     to attend, but I'm not going to ask

11     any questions today.

12          I want to reserve my rights to

13     ask questions at the appropriate time

14     when the deposition of

15     Interior/Exterior is noticed in those

16     two cases.  Thank you.

17          MR. SCHILLING:  Steven

18     Shilling, I represent Mayeaux

19     Construction, Inc. in the Chad Jerrell

20     vs. Knauf Gyps, et al. litigation.  I

21     also did not cross-notice this

22     deposition.

23          I became aware of it in a

24     status conference hearing about a

Confidential - Subject to Further Confidentiality Review

Page 392

1          month ago.  I reserve my right to

2          depose Interior/Exterior when the

3          Jerrell litigation and any other

4          litigation involving Mayeaux

5          Construction, Inc. comes up before the

6          Court.

7                   MR. DUPLANTIER:  As I

8          understand it, counsel for Knauf

9          has -- Doug, and you can correct me --

10         three to four hours of additional

11         questions.  We have agreed to discuss

12         the continuation of this deposition at

13         a later date beyond the time limits

14         allowed under the Federal Rules of

15         Civil Procedure.

16                  I am reserving my rights to

17         object to continuing beyond that time

18         limit, subject to those continued

19         negotiations with counsel for Knauf.

20                  MR. SANDERS:  Doug Sanders on

21         behalf of Knauf Plasterboard Tianjin.

22         I think that was stated correctly.

23         We're at about seven hours now, or

24         close to it.  And rather than start

Confidential - Subject to Further Confidentiality Review

Page 393

1           and have to stop, I'm going to try to

2           take it all up in one session.  If we

3           have to talk to the judge, we will;

4           but hopefully, we can agree.

5                   (Proceedings concluded at

6           4:19 p.m.)

7                       - - - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

```
 1                    CERTIFICATE
 2
 3           I, MICHAEL E. MILLER, Registered
      Diplomate Reporter, Certified Realtime
 4    Reporter and Notary Public, do hereby certify
      that prior to the commencement of the
 5    examination CLAYTON C. GEARY and JAMES F.
      GEARY, SR. were duly sworn by me to testify
 6    to the truth, the whole truth and nothing but
      the truth.
 7
              I DO FURTHER CERTIFY that the
 8    foregoing is a verbatim transcript of the
      testimony as taken stenographically by and
 9    before me at the time, place and on the date
      hereinbefore set forth, to the best of my
10    ability.
11           I DO FURTHER CERTIFY that I am
      neither a relative nor employee nor attorney
12    nor counsel of any of the parties to this
      action, and that I am neither a relative nor
13    employee of such attorney or counsel, and
      that I am not financially interested in the
14    action.
15
16
17    _____
      MICHAEL E. MILLER,
18    NCRA Registered Diplomate Reporter
      NCRA Certified Realtime Reporter
19    Certified LiveNote Reporter
      LA Certified Court Reporter #27009
20
      Dated: February 9, 2010
21
22
23
24
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 395

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2                  CLAYTON C. GEARY
 3

 4

 5              I, CLAYTON C. GEARY, do hereby
      certify that I have read the foregoing pages
 6    and that the same is a correct transcription
      of the answers given by me to the questions
 7    therein propounded, except for the
      corrections or changes in form or substance,
 8    if any, noted in the attached
      Errata Sheet.
 9

10

11

12

13    _____
      CLAYTON C. GEARY              DATE
14

15

16    Subscribed and sworn to before me this
17    _____ day of _____, 20 _____.
18    My commission expires: _____
19

20    Notary Public
21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

```
 1                        - - - - - - -

                ERRATA - CLAYTON C. GEARY

 2                        - - - - - - -

 3     PAGE   LINE        CHANGE

 4     _____  _____       _____

 5     REASON:            _____

 6     _____  _____       _____

 7     REASON:            _____

 8     _____  _____       _____

 9     REASON:            _____

10     _____  _____       _____

11     REASON:            _____

12     _____  _____       _____

13     REASON:            _____

14     _____  _____       _____

15     REASON:            _____

16     _____  _____       _____

17     REASON:            _____

18     _____  _____       _____

19     REASON:            _____

20     _____  _____       _____

21     REASON:            _____

22     _____  _____       _____

23     REASON:            _____

24
```

Confidential - Subject to Further Confidentiality Review

Page 397

1                ACKNOWLEDGMENT OF DEPONENT

2                    JAMES F. GEARY, SR.

3

4

5                I, JAMES F. GEARY, SR., do hereby

    certify that I have read the foregoing pages

6    and that the same is a correct transcription

    of the answers given by me to the questions

7    therein propounded, except for the

    corrections or changes in form or substance,

8    if any, noted in the attached

    Errata Sheet.

9

10

11

12

13    _____

    JAMES F. GEARY, SR.              DATE

14

15

16    Subscribed and sworn to before me this

17    _____ day of _____, 20 _____.

18    My commission expires: _____

19

20    Notary Public

21

22

23

24

Confidential - Subject to Further Confidentiality Review

```
 1                       - - - - - - -

                ERRATA - JAMES F. GEARY, SR.

 2                       - - - - - - -

 3     PAGE  LINE      CHANGE

 4     ____  ____      _____

 5     REASON:  _____

 6     ____  ____      _____

 7     REASON:  _____

 8     ____  ____      _____

 9     REASON:  _____

10     ____  ____      _____

11     REASON:  _____

12     ____  ____      _____

13     REASON:  _____

14     ____  ____      _____

15     REASON:  _____

16     ____  ____      _____

17     REASON:  _____

18     ____  ____      _____

19     REASON:  _____

20     ____  ____      _____

21     REASON:  _____

22     ____  ____      _____

23     REASON:  _____

24
```

Confidential - Subject to Further Confidentiality Review

Page 399

```
 1                        - - - - - - -

                         LAWYER'S NOTES

 2                        - - - - - - -

 3       PAGE    LINE

 4       _____   _____   _____

 5       _____   _____   _____

 6       _____   _____   _____

 7       _____   _____   _____

 8       _____   _____   _____

 9       _____   _____   _____

10       _____   _____   _____

11       _____   _____   _____

12       _____   _____   _____

13       _____   _____   _____

14       _____   _____   _____

15       _____   _____   _____

16       _____   _____   _____

17       _____   _____   _____

18       _____   _____   _____

19       _____   _____   _____

20       _____   _____   _____

21       _____   _____   _____

22       _____   _____   _____

23       _____   _____   _____

24       _____   _____   _____
```