UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  CHINESE MANUFACTURED DRYWALL PRODUCTS LIABILITY LITIGATION<br><br>**THIS DOCUMENT RELATES TO:**<br>*Gross v. Knauf Gips KG, 2:09-cv-6690*<br>*Amorin v. Taishan Gypsum, 2:11-cv-1672*<br>*Amorin v. Taishan Gypsum, 2:11-cv-1395*<br>*Amorin v. Taishan Gypsum, 2:11-cv-1673*<br>*Amorin v. SASAC, 2:14-cv-1727*<br>*State of Louisiana v. Knauf, 2:10-cv-340*<br>*Abner v. Taishan Gypsum, 2:11-cv-3094*<br>*Posey v. BNBM Co., 2:09-cv-6531*<br>*Morris v. BNBM Co., 2:09-cv-6530* | MDL No. 2:09-md-2047<br><br>SECTION L<br><br>JUDGE ELDON E. FALLON<br><br>MAGISTRATE JUDGE JOSEPH C. WILKINSON, JR. |

**REPLY IN SUPPORT OF DEFENDANTS CNBM GROUP, CNBM COMPANY, CNBM USA, CNBMIT, AND UNITED SUNTECH'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION AND FAILURE OF SERVICE**

# TABLE OF CONTENTS

**Page**

I.   PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING A BREAKDOWN IN CORPORATE SEPARATENESS, AND THEREFORE HAVE NOT ESTABLISHED PERSONAL JURISDICTION ON AN ALTER EGO THEORY. ................................................................................ 4

   A.   Under Chinese Law, Moving Defendants Are Not Alter Egos. .......................... 6

      1.   The Forum States' Choice Of Law Rules Require Application of Chinese Law .................................................................................. 6

      2.   Plaintiffs' Arguments For Disregarding Chinese Law Are Wrong. .......... 9

      3.   Under Chinese Law, Moving Defendants Are Not Alter Egos. .............. 13

   B.   Alternatively, Under The Substantive Law Of The Forum States, Plaintiffs Have Failed To Meet Their Burden of Demonstrating That Moving Defendants Are Alter Egos. ................................................................ 20

      1.   State Law Sets A High Bar For Establishing Personal Jurisdiction Under An Alter Ego Theory. ................................................................ 20

      2.   Plaintiffs Have Failed To Meet Their Burden Of Proving Taishan Was Treated As A Mere Instrumentality With No Separate Corporate Interest Whose Purpose Was To Perpetuate a Fraud. ............ 24

         a.   Moving Defendants' Exercise of Their Rights As Shareholders Is Commonplace, And Does Not Demonstrate They Are Alter Egos. .................................................................. 30

         b.   Shared Officers, Offices, And Logos Do Not Demonstrate Alter Ego Status, And Neither Does A Joint Defense Arrangement. .................................................................. 37

         c.   Plaintiffs' Claims That Corporate Policies Were Disregarded Are Inaccurate And Irrelevant. .............................. 43

         d.   Plaintiffs' Efforts To Impugn The Chinese Corporate System Are Irrelevant And Erroneous. ........................................ 45

   C.   Even If Any Such Theory Were Properly Preserved, Moving Defendants Are Not Subject To Jurisdiction Under An Agency Theory. .............................. 47

   D.   CNBMIT, CNBM USA, And United Suntech Lack The Requisite Minimum Contacts With The Forum States. ...................................................... 50

II.  PLAINTIFFS' FAILURE TO EFFECTUATE SERVICE OF PROCESS CANNOT BE EXCUSED. ........................................................................ 52

   A.   The Complaints Against CNBMIT Must Be Dismissed. .................................. 52

   B.   The *Morris*, *Posey*, And *Abner* Complaints Must Be Dismissed. ...................... 54

i

## TABLE OF CONTENTS
(continued)

C.     CNBM Group And CNBM Company Were Not Served By The Louisiana
       Attorney General.................................................................................................. 55

CONCLUSION..................................................................................................................... 57

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abner v. Taishan Gypsum,*
    Case No. 11-3094 (Rec. Doc. 1) .................................................................................... *passim*

*Administrators of Tulane Educ. Fund v. Ipsen, S.A.,*
    450 F. App'x. 326 (5th Cir. 2011) .............................................................................28, 35

*Aerielle Techs., Inc. v. Procare Intl, Co.,*
    No. 2:08-cv-284-TJW, 2011 WL 767775 (E.D. Tex. Feb. 28, 2011)....................................53

*Aldea Commc'ns, Inc. v. Gardner,*
    725 So. 2d 456 (Fla. Dist. Ct. App. 1999) .............................................................................21

*Amorin v. Taishan Gypsum,*
    Case No. 11-1395 (Rec. Doc. 1) .............................................................................48, 52

*Amorin v. Taishan Gypsum,*
    Case No. 11-1672 (Rec. Doc. 1) .............................................................................48, 52, 53

*Amorin v. Taishan Gypsum,*
    Case No. 11-1673 (Rec. Doc. 1) .............................................................................48, 53

*In re Anderson,*
    539 B.R. 277 (Bankr. W.D. La. 2015).............................................................................24

*Automotriz Del Golfo De CA S. A. de C. V. v. Resnick,*
    47 Cal. 2d 792 (Cal. 1957).............................................................................27

*Banks v. GM LLC,*
    2012 WL 7006844 (E.D. Va. Dec. 31, 2012) ................................................................38, 39

*Berg Chilling Sys., Inc. v. Hull Corp.,*
    435 F.3d 455 (3d Cir. 2006).............................................................................12

*Birbara v. Locke,*
    99 F.3d 1233 (1st Cir. 1996).............................................................................11

*Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana,*
    690 F. Supp. 2d 435 (E.D. La. 2010) .............................................................................24

*Brackens v. USA Credit,*
    233 F.R.D. 613 (D. Kan. 2005).............................................................................53

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Brainware, Inc. v. Scan-Optics, Ltd.*,
   No. 11-cv-755, 2012 WL 1999549 (E.D. Va. May 9, 2012) .....................................7

*Bridas SAPIC v. Government of Turkmenistan*,
   447 F.3d 411 (5th Cir. 2006) ...............................................................................41

*Burnet v. Clark*,
   287 U.S. 410 (1932) ............................................................................................28

*C.F. Trust, Inc. v. First Flight Ltd. P'ship*,
   111 F. Supp. 2d 734 (E.D. Va. 2000) .....................................................................1

*C.F. Trust, Inc. v. First Flight Ltd. P'ship*,
   359 F. Supp. 2d 497 (E.D. Va. 2005) .....................................................................7

*Calvert v. Huckins*,
   875 F. Supp. 674 (E.D. Cal. 1995).........................................................22, 38, 45

*Cannon Mfg. Co. v. Cudahy Packing Co.*,
   267 U.S. 333 (1925).......................................................................................29, 30

*Carimi v. Royal Carribean Cruise Line, Inc.*,
   959 F.2d 1344 (5th Cir. 1992) .............................................................................55

*Charming Charlie, Inc. v. Perkins Rowe Assocs., L.L.C.*,
   97 So. 3d 595 (La. App. 1 Cir. 2012) .....................................................................1

*Chin v. Roussel*,
   456 So. 2d 673 (La. Ct. App. 1984).....................................................................33

*In re Chinese-Manufactured Drywall Products Liab. Litig.*,
   753 F.3d 521 (5th Cir. 2014) ...............................................................................48

*Craig v. Johns-Manville Corp.*,
   1987 WL 10191 (E.D. Pa. Mar. 31, 1988)............................................................41

*Daimler AG v. Bauman*,
   134 S. Ct. 746 (2014)....................................................................................48, 49

*Darby v. Harvey*,
   No. 2101-02-2, 2003 WL 21448603 (Va. Ct. App. June 24, 2003) ......................27

*Derr v. Swarek*,
   766 F.3d 430 (5th Cir. 2014) ...........................................................................2, 10

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Dickson Marine Inc. v. Panalpina, Inc.*,
   179 F.3d 331 (5th Cir. 1999) ....................................................................6, 29

*Doe v. Unocal Corp.*,
   248 F.3d 915 (9th Cir. 2001) ..........................................................................34

*Dykes v. Maverick Motion Picture Grp., LLC*,
   No. CIV.A. 08-536-JJB-CN, 2011 WL 900276 (M.D. La. Mar. 14, 2011) ............................7

*Enic, PLC v. F.F. S. & Co., Inc.*,
   870 So. 2d 888 (Fla. Dist. Ct. App. 2004) ....................................................48, 49

*In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*,
   735 F. Supp. 2d 277 (W.D. Pa. 2010)...................................................................39

*Ferens v. John Deere Co.*,
   494 U.S. 516 (1990)........................................................................................6

*In re Friedlander Capital Management Corp.*,
   411 B.R. 434 (Bankr. S.D. Fla. 2009)....................................................................7

*Frith v. Martinsville Thermal, Inc.*,
   No. CIV A 4:05-CV-00074, 2006 WL 2994717 (W.D. Va. Oct. 20, 2006).........................49

*Gasparini v. Pordomingo*,
   972 So. 2d 1053 (Fla. Dist. Ct. App. 2008) ........................................................33

*Gerena v. Korb*,
   617 F.3d 197 (2d Cir. 2010).............................................................................54

*Gerritsen v. Warner Bros. Entm't Inc.*,
   No. 14-cv-03305, 2015 WL 3958723 (C.D. Cal. June 12, 2015)..............................32, 34, 39

*Goldschmidt v. Holman*,
   571 So. 2d 422 (Fla. 1990)..............................................................................48

*Green v. Champion Ins. Co.*,
   577 So. 2d 249 (La. Ct. App. 1991)................................................................23, 24

*Hargrave v. Fibreboard Corp.*,
   710 F.2d 1154 (5th Cir. 1983) ...........................................................................5

*Henry v. Offshore Drilling (W. A.) Pty., Ltd.*,
   331 F. Supp. 340 (E.D. La. 1971)......................................................................48

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Herman v. United States*,
    382 F. Supp. 818 (E.D. Wis. 1974).................................................................12

*In re Hillsborough Holdings Corp.*,
    123 B.R. 1004 (Bankr. M.D. Fla. 1990) ...........................................................7

*Hilton v. Guyot*,
    159 U.S. 113 (1895).........................................................................................2

*Hobbs v. Don Mealey Chevrolet, Inc.*,
    642 So. 2d 1149 (Fla. Dist. Ct. App. 1994) ....................................22, 25, 38

*Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers*
    *A Monaco*,
    192 F. Supp. 2d 467 (E.D. Va. 2002) ..........................................................7, 22

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)........................................................................................24

*ITL Int'l, Inc. v. Constenla, S.A.*,
    669 F.3d 493 (5th Cir. 2012) ...........................................................................4

*Jackson v. Tanfoglio Giuseppe, S.R.L.*,
    615 F.3d 579 (5th Cir. 2010) ..........................................................12, 28, 39

*In re James River Coal Co.*,
    360 B.R. 139 (Bankr. E.D. Va. 2007) ............................................................32

*JBR, Inc. v. Cafe Don Paco, Inc.*,
    No. 12-cv-02377, 2014 WL 5034640 (N.D. Cal. Aug. 25, 2014) ...........................8

*Kalb, Voorhis & Co. v. Am. Fin. Corp.*,
    8 F.3d 130 (2d Cir. 1993)................................................................................8

*Laker Airways Ltd. v. Sabena, Belgian World Airlines*,
    731 F.2d 909 (D.C. Cir. 1984)........................................................................2

*In re Mastercard Int'l, Inc. Internet Gambling Litig.*,
    No. 00-cv-0661, 2004 WL 287344 (E.D. La. Feb. 12, 2004)...........................6

*McCarthy v. Giron*,
    No. 13-cv-01559, 2014 WL 2696660 (E.D. Va. June 6, 2014) ...........................7

*McFadden Ford, Inc. v. Mancuso ex rel. Mancuso*,
    766 So. 2d 241 (Fla. Dist. Ct. App. 2000) ...................................................22

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Minnesota Min. & Mfg. Co. v. Eco Chem, Inc.*,
 757 F.2d 1256 (Fed. Cir. 1985)...........................................................................................40

*Morgan v. Burks*,
 611 P.2d 751 (Wash. 1980)..................................................................................................40

*Matter of Multiponics, Inc.*,
 622 F.2d 709 (5th Cir. 1980) .................................................................................................1

*Nelson v. Int'l Paint Co.*,
 716 F.2d 640 (9th Cir. 1983) .................................................................................................8

*Omega Homes, Inc. v. Citicorp. Acceptance Co.*,
 656 F. Supp. 393 (W.D. Va. 1987) ......................................................................................50

*ORX Res., Inc. v. MBW Exploration, LLC*,
 32 So. 3d 931 (La. Ct. App. 2010)...................................................................................26, 27

*Patin v. Thoroughbred Power Boats Inc.*,
 294 F.3d 640 (5th Cir. 2002) .................................................................................................6

*Perpetual Real Estate Services, Inc. v. Michaelson Properties, Inc.*,
 974 F.2d 545 (4th Cir. 1992) ....................................................................................22, 25, 38

*Phillips Petroleum Co. v. Shutts*,
 472 U.S. 797 (1985)..............................................................................................................12

*Riggins v. Dixie Shoring Co.*,
 590 So. 2d 1164 (La. 1991) ......................................................................................23, 25, 38

*Roberts' Fish Farm v. Spencer*,
 153 So. 2d 718 (Fla. 1963).....................................................................................................8

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
 490 U.S. 477 (1989)..............................................................................................................30

*Sakallah v. Harahan Living Ctr., Inc.*,
 No. CIV. A. 05-5492, 2006 WL 2228967 (E.D. La. Aug. 2, 2006) ....................................56

*Schlumberger Logelco Inc. v. Morgan Equip. Co.*,
 No. 94-cv-1776, 1996 WL 251951 (N.D. Cal. May 3, 1996)................................................8

*Scottsdale Ins. Co. v. Littlepage*,
 No. CIV. A. 92-2734,1993 WL 275162, (E.D. Pa. July 16, 1993).......................................53

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sonora Diamond Corp. v. Sup. Ct.*,
99 Cal. Rptr. 2d 824 (Cal. Ct. App. 2000) ..............................................22, 23, 32, 49

*Soviet Pan Am Travel Effort v. Travel Comm., Inc.*,
756 F. Supp. 126 (S.D.N.Y. 1991) .................................................................................8

*Stuart v. Spademan*,
772 F.2d 1185 (5th Cir. 1985) ................................................................................5, 21

*Talen's Landing, Inc. v. M/V Venture*, II
656 F.2d 1157 (5th Cir. 1981) ....................................................................................26

*In re Teleglobe Comms. Corp.*,
493 F.3d 345 (3d Cir. 2007)........................................................................................41

*Tremps v. Ascot Oils, Inc.*,
561 F.2d 41 (7th Cir. 1977) ........................................................................................53

*Unijax, Inc. v. Factory Ins. Ass'n*,
328 So. 2d 448 (Fla. Dist. Ct. App. 1976) .................................................................38

*United States v. A.H. Fischer Lumber Co.*,
162 F.2d 872 (4th Cir. 1947) ......................................................................................53

*United States v. Berry*,
977 F.2d 915 (5th Cir. 1992) ......................................................................................47

*United States v. Bestfoods*,
524 U.S. 51 (1998)................................................................................................ *passim*

*United States v. Brown*,
261 F. App'x 810 (5th Cir. 2008) ...............................................................................13

*United States v. Dabeit*,
231 F.3d 979 (5th Cir. 2000) ......................................................................................30

*USP Real Estate Inv. Trust v. Discount Auto Parts, Inc.*,
570 So. 2d 386 (Fla. Dist. Ct. App. 1990) .................................................................27

*Varnado v. Danek Med., Inc.*,
No. CIV. A. 95-1802, 1998 WL 524896 (E.D. La. Aug. 19, 1998) ...........................6

*In re Vioxx Prod. Liab. Litig.*,
478 F. Supp. 2d 897 (E.D. La. 2007)...........................................................................6

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc.*,
   121 Cal. Rptr. 2d 1 (Cal. Ct. App. 2002) ...............................................................48

*WH Smith, PLC v. Benages & Associates, Inc.*,
   51 So. 3d 577 (Fla. Dist. Ct. App. 2010) ...................................................... *passim*

*Whitener v. Pliva, Inc.*,
   No. 10-cv-1552, 2012 WL 1343964 (E.D. La. Apr. 18, 2012).............................34

*William v. AES Corp.*,
   28 F. Supp. 3d 553, 563 (E.D. Va. 2014) ............................................................34

**Statutes**

28 U.S.C. § 1608(b) .......................................................................................................56

Federal Rule of Civil Procedure 4 ................................................................................55

Federal Rule of Civil Procedure 4(m)...........................................................................54

**Other Authorities**

Chao Xi, *Piercing the Corporate Veil in China: How Did We Get There?*,
   2011 J. Business L. 413 (2011)............................................................................9

CSRC 2007 Annual Report, http://tinyurl.com/hqcdmvs ..........................................44

Hui Huang, *Piercing the Corporate Veil in China: Where Is It Now And Where Is
It Heading?*, 60 Am. J. Comp. L. 743 (2012) .......................................................10

J. Moore, Federal Practice P 4.44, at 1295.52 (1975)..................................................53

James Dunne, *Taking the Energy Out of Louisiana's Single Business Enterprise
Theory*, 69 La. L. Rev. 691 (2009) ......................................................................24

Lee C. Hodge, Andrew B. Sachs, *Piercing the Mist: Bringing the Thompson Study
into the 1990s*, 43 Wake Forest L. Rev. 341 (2008)............................................11

Restatement (Second) of Conflict of Laws § 6 (1971) ..................................................8

Restatement (Second) of Conflict of Laws § 292 (1971) ..............................................8

Restatement (Second) of Conflict of Laws § 302 (1971) ..............................................8

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Richmond McPherson & Nader Raja, *Corporate Justice: An Empirical Study of Piercing Rates and Factors Courts Consider When Piercing the Corporate Veil*, 45 Wake Forest L. Rev. 931 (2010) ...............................................................................11

Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036 (1991) .................................................................................11

Sandra P. Kister, China's Share-Structure Reform: An Opportunity to Move Beyond Practical Solutions to Political Problems, 45 Colum. J. Transnat'l L. 312, 334-35 (2006-2007). ..............................................................................44

Notwithstanding the volume of ink that Plaintiffs have spilled, the dispute here actually has been narrowed.  Plaintiffs do not even attempt to show that the Moving Defendants[1] themselves have contacts with the forum states that could give rise to personal jurisdiction, either general or specific.  At this point, their *only* argument is that the contacts of Taishan, a separate, fully capitalized corporation, must be imputed to the Moving Defendants—up multiple links in the corporate chain, and then sometimes over and down to distant corporate relations—on a theory of alter ego (with little more than a few fleeting references to agency theory along the way).  But Plaintiffs do not recognize, as this Court must, that "the alter ego doctrine … [is] truly [an] exceptional doctrine."  *Matter of Multiponics, Inc*., 622 F.2d 709, 724 (5th Cir. 1980).  Its application is permitted only "under exceptional circumstances."  *C.F. Trust, Inc. v. First Flight Ltd. P'ship*, 111 F. Supp. 2d 734, 740 (E.D. Va. 2000) (Virginia law); *Charming Charlie, Inc. v. Perkins Rowe Assocs., L.L.C.*, 97 So. 3d 595, 598 (La. App. 1 Cir. 2012) (Louisiana law).

Plaintiffs have not come close to proving that those rare circumstances exist here.  Instead, they have submitted a grossly overweight response (one can only marvel at the decision to include a 713th footnote) and thousands of pages of exhibits that go to great pains to exhaustively document facts that are trivial and unsurprising—for instance, that CNBM Group conducts performance evaluations for its nominees, PSC Resp. at 28 (what company does not?); that it has provided training for executives of other companies, PSC Resp. at 37 (a fact that is praiseworthy, not tortious); that certain defendants use the same accounting firm, PSC Resp. at 54 (which of course can be said of innumerable companies around the world); and that the defendants executed a joint defense strategy in this litigation, PSC Resp. at 98-115 (which is commonplace to say the least, and hardly evidence of abusing the corporate form).  To bolster

---

[1] Moving Defendants are CNBM Group, CNBM Company, CNBM USA, CNBMIT, and United Suntech.

1

this catalog of irrelevancies, they invent terms like "cascading control," e.g., PSC Resp. at 24, which seems intended to take the place of the actual governing legal standard; and pepper their presentation with questionable generalities about things like the supposed propensity of Chinese people to exaggerate, PSC Resp. at 5, and about Chinese companies as a whole, e.g., PSC Resp. at 159-63.

Ultimately, their argument boils down to a suggestion that corporate formalities *never* can be trusted in the case of Chinese state-owned enterprises ("SOEs"), *see, e.g.*, PSC Resp. at 3 & n. 10, 157-63, a sentiment laid bare by their repeated assertions that Defendants are "from … a communist country," PSC Resp. at 161.  In effect, Plaintiffs ask this Court to create a special rule that turns the presumption of corporate separateness on its head where Chinese corporations are concerned.  We are unaware of any court that has ever embraced such a position—on the contrary, courts repeatedly caution against disrespecting foreign legal systems.  *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) ("[R]ecognition [of foreign law] fosters international cooperation and encourages reciprocity."); *cf. Derr v. Swarek*, 766 F.3d 430, 437 (5th Cir. 2014) (comity is "the recognition which one nation allows within its territory to the legislative … acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws") (quoting *Hilton v. Guyot*, 159 U.S. 113, 164 (1895)).

At the end of the day, what Plaintiffs attack as so extraordinary as to merit disregard is a corporate structure that is employed not only in China, but by numerous major U.S. conglomerates.  Plaintiffs' theories would require piercing the veil of virtually any Disney or FedEx subsidiary.  After all, each such enterprise does the very things that, according to Plaintiffs, require a court to pierce the veil—e.g., setting corporate policies, allowing parents to

exercise their voting rights as shareholders, and facilitating intra-family exchanges that advance the conglomerate's broad corporate agenda.  Of course that cannot be the right answer.  Under any proper legal standard—whether Chinese law or forum law—Plaintiffs have not remotely met the test for taking the exceptional step of imputing Taishan's contacts to any of the Moving Defendants, much less all of them.  Each Moving Defendant operates as a distinct entity with separate registrations, articles, finances, and accounts.  All Plaintiffs have shown is the unremarkable fact that the Moving Defendants have exercised their rights as shareholders.  Far from fraudulent, or an abuse of the corporate form, significant shareholders like the Moving Defendants routinely exercise their voting rights in the companies in which they hold equity— and they do so, under both U.S. and Chinese law, without being considered alter egos.

This case is a particularly inappropriate one for piercing the veil.  It is not the usual case in which an asset-barren entity has left creditors holding the bag.  On the contrary, Taishan is fully funded and quite profitable.  Even more extraordinary, Plaintiffs seek to apply their "cascading control" theory for veil-piercing to entities that are owned, in part, by public shareholders.  No court in the United States or China has *ever* pierced the veil of a publicly-traded company.  Plaintiffs' invitation to be the first is an invitation to error, and this Court should decline it.

The proper focus of this litigation is on defendants who actually, admittedly manufactured and shipped drywall into the affected states as well as the plaintiffs who claim to have been affected.  There has been no suggestion that those defendants are unable to satisfy any judgment.  But what is absolutely clear is that distant corporate relatives, which have had no meaningful contacts with any forum state, cannot be haled into court as a leverage enhancement for the plaintiffs.  The motion to dismiss should be granted.

I.     **PLAINTIFFS HAVE NOT MET THEIR BURDEN OF PROVING A BREAKDOWN IN CORPORATE SEPARATENESS, AND THEREFORE HAVE NOT ESTABLISHED PERSONAL JURISDICTION ON AN ALTER EGO THEORY.**

For all Plaintiffs do say, their opposition is most notable for what it does not.  Plaintiffs do not dispute that this Court lacks general jurisdiction over nearly all of the Moving Defendants.[2]  Nor do Plaintiffs point to any activities undertaken by the Moving Defendants themselves that would confer specific jurisdiction.  And for good reason.  To do so, Plaintiffs would have to demonstrate, among other things, minimum contacts by the Moving Defendants directed at the forum states, and a nexus between those contacts and Plaintiffs' claims.  *ITL Int'l, Inc. v. Constenla, S.A.*, 669 F.3d 493, 498 (5th Cir. 2012).  But after months of discovery, it is abundantly clear that Moving Defendants had no contact of their own with the Taishan or BNBM drywall at issue, and, with the exception of the California entities' connection to California, with the forum states.[3]  At most, Plaintiffs have shown that some of the Moving Defendants invested in companies that themselves invested in companies that manufacture drywall, as the following graphic illustrates:[4]

---

[2] To the extent CNBM USA and United Suntech are deemed California-incorporated entities, they are subject to general jurisdiction in California.  PSC Resp. at 93; Am. Mem. ISO Mot. to Dismiss at 25 n. 16.

[3] *See, e.g.*, Am. Mem. ISO Mot. to Dismiss; Ex. 102, Cao Decl. ¶ 9; Ex. 103, Chang Decl. ¶ 3; Ex. 104, Chuan Decl. ¶ 10; Ex. 105, Zhang Decl. ¶ 8; Ex. 106, Liu Decl. ¶¶ 6-8.  Unless otherwise noted, all exhibit references are to those attached to the Declaration of Andrew Davidson, filed concurrently herewith.

[4] In 2006, CNBM Co.'s equity share in BNBM PLC decreased to 52.4% and BNBM's equity share in Taishan increased to 65%.  In 2014, CNBM Co.'s equity share in BNBM PLC decreased to 45.2%.



But "the mere existence of a parent-subsidiary relationship is not sufficient to warrant the assertion of jurisdiction over the foreign parent." *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983) (citation omitted). A contrary determination would undermine the "general principle of corporate law deeply 'ingrained in our economic and legal systems' that a parent corporation (so-called because of control through ownership of another corporation's stock) is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted). And the case for veil-piercing is even weaker for CNBMIT, CNBM USA, and United Suntech, which have no ownership stake at all, whether direct or indirect, in Taishan or BNBM PLC.

Accordingly, Plaintiffs are forced to pivot to a theory of veil-piercing. Specifically, their argument focuses on alter ego. PSC Resp. at 148-82. As the length of their filing reflects, Plaintiffs recognize their task is an arduous one. And it is their burden to bear. "When a nonresident defendant presents a motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing the district court's jurisdiction over the nonresident." *Stuart v. Spademan*, 772 F.2d 1185, 1192 (5th Cir. 1985). Veil-piercing *at all* is exceptional, yet Plaintiffs advance a "cascading theory" that would pierce through numerous entities, all the way

5

to various far-flung branches of the corporate family tree.  To pierce as extensively as Plaintiffs

request, they must not only overcome the presumption of corporate separateness as to each entity

up the chain, *see Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999),[5] but

affirmatively demonstrate that Moving Defendants used Taishan to commit fraud.  Plaintiffs do

not even attempt to do so.

   **A.**  **Under Chinese Law, Moving Defendants Are Not Alter Egos.**

     **1.**  **The Forum States' Choice Of Law Rules Require Application of Chinese Law.**

  "In MDL cases where a federal court applies state law, such as this one, the transferee

court is generally bound to apply the law the transferor court would follow."  *In re Mastercard*

*Int'l, Inc. Internet Gambling Litig.*, No. 00-cv-0661, 2004 WL 287344, at *2 (E.D. La. Feb. 12,

2004) (citation omitted).  Without addressing or disputing this basic principle, Plaintiffs simply

proceed to analyze alter ego under the substantive law of each forum state.[6]  *See, e.g.*, PSC Resp.

at 167 ("[T]he Court must apply the substantive state law of Louisiana."); 174-77 (Florida law);

177-80 (Virginia law).  But, as this Court has explained, applying "the law of the transferor

forum [in a MDL] … *includ[es] the transferor forum's choice-of-law rules*."  *In re Vioxx Prod.*

*Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007) (citing *Ferens v. John Deere Co*., 494

U.S. 516, 524 (1990) (emphasis added)); *Varnado v. Danek Med., Inc*., No. CIV. A. 95-1802,

1998 WL 524896, at *3 n. 1 (E.D. La. Aug. 19, 1998) ("A transferee forum applies the choice of

---

[5] As a consequence of Plaintiffs' approach and its general assertion that alter ego and/or agency relationships exist under a "cascading" theory, many of Plaintiffs' arguments necessarily require proof that more junior companies were alter egos before they can move to more senior entities.  Moving Defendants hereby adopt and incorporate BNBM's arguments in its reply brief.  Notably though, even if this Court were to find BNBM an alter ego or agent of Taishan, that does not demonstrate Moving Defendants are as well.  Resolution of that issue requires Plaintiffs to prove even more, as detailed below.

[6] Louisiana similarly skips over the choice of law step, identifying itself as the forum state and then proceeding immediately to apply its alter ego/single business enterprise standard.  Louisiana Resp. at 9-10.

6

law rules of the transferor court.") (citation omitted); *see also Patin v. Thoroughbred Power Boats Inc.*, 294 F.3d 640, 646 (5th Cir. 2002).

And here, the forum states' choice of law rules mandate applying Chinese law regarding alter ego status.[7]  First, under Louisiana law, "the law of the state of incorporation governs the determination" whether two companies may be treated as alter egos for jurisdictional purposes. *Patin*, 294 F.3d at 647 (analyzing alter ego status and applying that conclusion to personal jurisdiction); *see also Dykes v. Maverick Motion Picture Grp., LLC*, No. 08-cv-536, 2011 WL 900276, at *6-7 (M.D. La. Mar. 14, 2011) (citing *Patin* and applying Delaware law, the target entity's state of incorporation, to determine whether another company's contacts could be imputed to it for purposes of deciding personal jurisdiction).

The same is true under Virginia law.  *See, e.g.*, *Brainware, Inc. v. Scan-Optics, Ltd.*, No. 11-cv-755, 2012 WL 1999549, at *5 (E.D. Va. May 9, 2012) (analyzing personal jurisdiction; under Virginia law, "the law of the state of incorporation determines whether the corporate veil may be pierced") (*citing C.F. Trust, Inc.*, 359 F. Supp. 2d at 501 n. 6); *see also McCarthy v. Giron*, No. 13-cv-01559, 2014 WL 2696660, at *1 (E.D. Va. June 6, 2014) ("Virginia's choice of law principles dictate that the law of the state of incorporation determines whether a corporate veil may be pierced.").  Florida law is similar.  *See, e.g.*, *In re Hillsborough Holdings Corp.*, 123 B.R. 1004, 1014 (Bankr. M.D. Fla. 1990) ("the veil piercing issue must be resolved with reference to the laws of the state where the corporation is incorporated"); *In re Friedlander*

---

[7] In its Sept. 4, 2012 Order & Reasons, this Court drew a distinction between veil piercing, which it deemed applicable to liability determinations, and other forms of attribution or imputation of contacts, which it applied to the personal jurisdiction analysis.  Rec. Doc. 15755 at 74-75.  Other courts have used the terms interchangeably, and we do the same here.  *See, e.g.*, *Dykes v. Maverick Motion Picture Grp., LLC*, No. CIV.A. 08-536-JJB-CN, 2011 WL 900276, at *6-7 (M.D. La. Mar. 14, 2011) (discussing jurisdictional veil-piercing); *Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 477-78 (E.D. Va. 2002) (same); *WH Smith, PLC v. Benages & Associates, Inc.*, 51 So. 3d 577, 581 (Fla. Dist. Ct. App. 2010) (same).

*Capital Management Corp.*, 411 B.R. 434, 442 (Bankr. S.D. Fla. 2009) (the law of the state of

incorporation governs whether to pierce a corporate veil).

Any other rule would "be unfair and improper," as it would "hold a person liable under

the local law of one state when he had justifiably molded his conduct to conform to the

requirements of another state."  Restatement (Second) of Conflict of Laws § 6 (1971); *Kalb,*

*Voorhis & Co. v. Am. Fin. Corp.*, 8 F.3d 130, 132 (2d Cir. 1993) ("Because a corporation is a

creature of state law whose primary purpose is to insulate shareholders from legal liability, the

state of incorporation has the greater interest in determining when and if that insulation is to be

stripped away."); *Roberts' Fish Farm v. Spencer*, 153 So. 2d 718, 721 (Fla. 1963) ("Those who

utilize the laws of this state in order to do business in the corporate form have every right to rely

on the rules of law which protect them against personal liability.") (*quoting Soviet Pan Am*

*Travel Effort v. Travel Comm., Inc.*, 756 F. Supp. 126, 131 (S.D.N.Y. 1991)).[8]

Here, three of the Moving Defendants—CNBM Group, CNBM Company, and

CNBMIT—were incorporated in China.  So were Taishan and BNBM PLC.  Accordingly, under

each of the forum state's choice of law rules, Chinese law applies, as the Chinese Moving

Defendants' corporate behavior was conducted to conform with Chinese law, rather than the

laws of Florida, Louisiana, or Virginia.

---

[8] Chinese law also applies under the analysis mandated by the Second Restatement and followed by California.  That analysis looks to the law of the state with the strongest relationship to the parties and the transaction.  *See* Restatement (Second) of Conflict of Laws §§ 292, 302 (1971); *Nelson v. Int'l Paint Co.*, 716 F.2d 640, 644 (9th Cir. 1983) (laying out California's governmental interest approach to the choice of laws).  China, as the country of incorporation, has the strongest interest in ensuring that its corporations adhere to the corporate form dictated by its laws.  In contrast, the forum states have little interest in regulating the Moving Defendants' corporate form.  *See, e.g., Schlumberger Logelco Inc. v. Morgan Equip. Co.*, No. 94-cv-1776, 1996 WL 251951, at *3 (N.D. Cal. May 3, 1996) (finding, by applying California's government interest test, that "the law of Austria, *as the state of incorporation*, governs plaintiffs' alter ego claim") (emphasis added); *see also JBR, Inc. v. Cafe Don Paco, Inc.,* No. 12-cv-02377, 2014 WL 5034640, at *8 (N.D. Cal. Aug. 25, 2014) ("To determine whether a shareholder is the alter ego of a corporate entity in a diversity action, federal courts apply the law of the corporation's forum state.").

## 2.    Plaintiffs' Arguments For Disregarding Chinese Law Are Wrong.

Plaintiffs do not address, much less challenge, that under each state's choice of law rules, the law of the state of incorporation governs (here, Chinese law).  And, most critically—and as detailed below, *see infra* § I.A.3—they do not even argue that they can prevail under Chinese law, which they plainly cannot.  Instead, they suggest that the Court need not apply it.  They begin by characterizing Chinese law as improperly vague and then claim that under it, Chinese entities have been insulated from veil-piercing.  PSC Resp. at 152-55.  Plaintiffs are wrong on both points, and more fundamentally, they identify no authority to suggest that this would justify ignoring the law of the state of incorporation.

First, Plaintiffs say that there is no "specific guidance in China's own jurisprudence" for veil-piercing, *see* PSC Resp. at 153, the suggestion being that Chinese law cannot be applied.  But even if it were true that Chinese veil-piercing law is vague, Plaintiffs' own authority makes clear that the same is true of U.S. veil-piercing law.  *See* Chao Xi, *Piercing the Corporate Veil in China: How Did We Get There?*, 2011 J. Business L. 413, 413 (2011) ("In the United States, …the doctrine [of veil-piercing] is regularly criticised as vague, confused, unprincipled and unpredictable, and there are many proposals for reform of the present law or even abolition of the doctrine completely.").  Indeed, the Louisiana standard that Plaintiffs urge the Court to apply contains some *18* factors—which themselves are "non-exclusive."  PSC Resp. at 171-72.

Nor do Plaintiffs offer any authority for their suggestion that the governing law must be scrutinized to determine whether it is vague, or that it could be ignored on that basis.  There is no such authority.  Indeed, such an inquiry, which would invite a court to disparage foreign law, would raise serious concerns regarding international comity.  Directly contrary to what Plaintiffs urge here, respect for "international duty and convenience, and to the rights of [another nation's]

own citizens" requires "recognition [by] one nation … [of] the legislative … acts of another nation." *Derr*, 766 F.3d at 437.

Plaintiffs' other argument for refusing to apply Chinese law is a non-sequitur. They suggest that Chinese law should not be applied because Chinese courts do not reliably pierce the corporate veil. PSC Resp. at 154. If the suggestion is that Chinese courts cannot be trusted, that is an aspersion, unsupported by the record, that this Court should not embrace, and it is irrelevant—*this* Court is the one performing the analysis, and the only question is which law it should apply.

Plaintiffs also are wrong about what Chinese courts will do. Chinese courts indeed will pierce the corporate veil. During a recent five-year period, "Chinese courts pierced the veil in sixty-three cases, or almost two-thirds," which is substantially higher than rates in the U.K. and Australia. Hui Huang, *Piercing the Corporate Veil in China: Where Is It Now And Where Is It Heading?*, 60 Am. J. Comp. L. 743, 748 (2012). The fact that the veil rarely is pierced for SOEs, *see* PSC Resp. at 154, hardly proves Plaintiffs' point. What it shows is that, in contrast with small privately-held companies, which are the type of entity most likely to be able to abuse the corporate form,[9] SOEs are established entities that are more heavily regulated and subject to greater scrutiny than their privately held counterparts, and therefore less likely to abuse the corporate form. They tend to be large enterprises with many assets that are audited and regulated by the State-owned Assets Supervision and Administration Commission ("SASAC").

Publicly-traded companies, such as CNBM Company and BNBM PLC, are further audited to satisfy the requirements of the relevant exchange (Hong Kong, in the case of CNBM Company). Such oversight makes it particularly unlikely that a shareholder would be capable of

---

[9] S*ee, e.g.*, Supplemental Declaration of Donald Clarke ¶ 19, attached hereto as Exhibit 1 (hereinafter Clarke Supp. Decl.).

abusing the corporate structure.   Indeed, as explained by Professor Clarke—an expert in the field of Chinese commercial law—and Plaintiffs have not disputed, "courts in China have *never* pierced the veil in a publicly listed company."[10]   That is unsurprising, as an empirical analysis of veil-piercing in the United States similarly found "*no case*s in which [United States] courts pierced the corporate veil of a public corporation—piercing the corporate veil [in the United States] is limited to close corporations."   Richmond McPherson & Nader Raja, *Corporate Justice: An Empirical Study of Piercing Rates and Factors Courts Consider When Piercing the Corporate Veil*, 45 Wake Forest L. Rev. 931, 943 (2010) (emphasis added); *see also* Lee C. Hodge, Andrew B. Sachs, *Piercing the Mist: Bringing the Thompson Study into the 1990s*, 43 Wake Forest L. Rev. 341, 349 (2008); Robert B. Thompson, *Piercing the Corporate Veil: An Empirical Study*, 76 Cornell L. Rev. 1036, 1047, 1055 (Table 7) (1991); *Birbara v. Locke*, 99 F.3d 1233, 1237 (1st Cir. 1996) ("[T]he cases where courts have allowed creditors to reach the assets of shareholders have almost always involved close corporations.").   But all that matters here is that Chinese law is perfectly appropriate to apply.

Ultimately, Plaintiffs brush aside this foundational choice of law question as purely "academic," characterizing Defendants as "acknowledg[ing] … there is no real conflict between Chinese and the applicable domestic law."   PSC Resp. at 154, 155-56; *see also* Louisiana Resp. at 10.   The Defendants said no such thing.   It is true that Defendants believe they should prevail under either substantive law—whether Chinese law or the law of the forum states.   Am. Mem. ISO Mot. to Dismiss at 43-45 & n. 37.   But that does not mean that the legal standards are the same.

---

[10] Ex. 107, Clarke Decl. ¶ 44 (emphasis added); Clarke Supp. Decl. ¶¶ 13, 15, 25.

Plaintiffs invoke the "false conflict" doctrine, but it does not help them.  PSC Resp. at 155; *see also* Louisiana Resp. at 10.  That doctrine stands for the modest proposition that a court need not resolve which state's law actually applies when the outcome of the case would, in fact, be the same under both.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 838 n. 20 (1985) (Stevens, J., concurring in part and dissenting in part) ("'[F]alse conflict' really means 'no conflict of laws.' If the laws of both states relevant to the set of facts are the same, or would produce the same decision in the lawsuit, there is no real conflict between them.").  In such instances, "the Court should avoid the choice-of-law question." *Berg Chilling Sys., Inc. v. Hull Corp.*, 435 F.3d 455, 462 (3d Cir. 2006).  So certainly it is true that the Court need not choose which law to apply *if* it concludes that Plaintiffs lose either way.  *See, e.g.*, *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587 (5th Cir. 2010) ("Even applying the more flexible standard for which Plaintiffs argue [i.e., Louisiana alter ego law instead of Italian alter ego law], the other Tanfoglio entities' contacts with Louisiana cannot be imputed to Fratelli.").  But the court must undertake an analysis under both standards—Chinese and state substantive law—before it may conclude that the result would be the same under both.[11]  *See, e.g.*, *Herman v. United States*, 382 F. Supp. 818, 820 (E.D. Wis. 1974) (identifying a "false conflict"; declining to decide whether Minnesota or Wisconsin law governed *only after* applying the standards and concluding the outcome would be the same under either).

As we explained previously, and discuss further in the next section, under Chinese law, the Moving Defendants are not alter egos or agents of Taishan.

---

[11]  As we explain below, under the jurisdictional veil-piercing standard advanced by Plaintiffs, which purportedly requires no showing of fraud or misconduct, there is a considerable difference with Chinese law, which *does* require a showing of intent to evade debt and thereby cause damage.  PSC Resp. at 156-57.  The differences are not as pronounced if the traditional veil-piercing test is employed.

### 3.  Under Chinese Law, Moving Defendants Are Not Alter Egos.

Once the Court concludes that Chinese law applies—which it should, for all of the

reasons just set forth—Defendants must prevail.  That is because Plaintiffs do not even attempt

to apply Chinese veil-piercing law.  The *only* argument they have made is under the substantive

law of the forum states: Louisiana, Florida, and Virginia.[12]  Having failed to make any argument

under Chinese law, the contention is waived, and Defendants prevail under this standard.

It is with good reason that Plaintiffs waived the argument:  Under Chinese law, and the

record here, veil-piercing is manifestly inappropriate.  Plaintiffs do not contest Moving

Defendants' exposition of Chinese law.[13]  To pierce the corporate veil in China, Plaintiffs must

demonstrate that the shareholder has "abuse[d] the independent status of the company as a legal

person or the limited liability of shareholders" in order to "evade[] debts," and thereby "seriously

damage[] the interests of the creditors of the company."[14]  Regulations interpreting China's veil-

piercing Company Law look to corporate separateness, considering factors such as the

commingling of (1) shareholder and company income, (2) shareholder and company funds,

(3) shareholder and company business and (4) whether the company's business transactions are

under complete control of its shareholders.[15]  In short, "Chinese law generally respects the legal

---

[12] Plaintiffs do not adequately challenge the lack of jurisdiction over CNBM Group, CNBM Co., or CNBMIT in the California action, *Abner v. Taishan Gypsum*, 2:11-cv-3094.  In contrast with their arguments concerning the Florida, Louisiana, and Virginia actions, *see* PSC Resp. at 167–80, Plaintiffs offer no meaningful state-specific counter-argument concerning the jurisdictional basis for these entities in the California case.  Rather, the only mention occurs when they are lumped into a two-page conclusory, alter ego analysis applicable to *twenty-five* states.  PSC Resp. at 180-81.  That is insufficient to preserve an argument.  *See, e.g., United States v. Brown*, 261 F. App'x 810, 812 (5th Cir. 2008) (one sentence argument deemed waived in district court where, among other things, it did not attempt to apply the law to facts or explain how due process rights were violated).

[13] *See* Ex. 107, Clarke Decl., ¶¶ 20-39.

[14] *Id.* at ¶ 21; Clarke Supp. Decl. ¶16.

[15] Ex. 107, Clarke Decl. at ¶ 24; Clarke Supp. Decl. ¶17.

separateness provided by the corporate form, and requires a strong showing of commingling in order to negate it"—and this is particularly so "in the state-owned sector."[16]  Applying these factors (the most important being fraud and commingling),[17] there is no basis for piercing the veil or treating the separately incorporated entities as alter egos under Chinese law.[18]

**Independent Entities And Operations.**  Each Moving Defendant has its own articles of association and bylaws,[19] and each is registered as a distinct business entity.[20]  They all operate as separate businesses with distinct decision-making procedures.[21]  For instance, BNBM PLC's Annual Report explains that "[t]he Company is completely separated from and operates independently of its controlling shareholder in terms of labor, HR, and salary management."[22]

On the ground, decisions are made independently, except when a company must obtain approval from a parent according to the company's governing rules.[23]   Numerous witnesses

---

[16] Ex. 107, Clarke Decl. at ¶ 59; Clarke Supp. Decl. ¶17.

[17] Clarke Supp. Decl. ¶¶ 23, 33.

[18] *Id.*; Clarke Supp. Decl. ¶¶ 11-14, 27-28, 33.

[19] *Compare* Ex. 102, Cao Decl. ¶ 6, Ex B (CNBM Group Articles of Association); Ex. 103, Chang Decl. ¶ 9; Supplemental Declaration of Zhangli Chang ¶ 6, attached hereto as Exhibit 3 (hereinafter Chang Supp. Decl.), Ex. A; Ex. 62 (CNBM Co. Articles of Association) *with* Exs. 76-89 (BNBM PLC Articles of Association); Exs. 90-96 (BNBM Group Articles of Association); Exs. 97-98 (Taishan Articles of Association).

[20] *Compare* Ex. 102, Cao Decl. ¶ 5, Ex. A (CNBM Group Business License) *with* PSC Resp. Ex. 166 (Taishan registration).

[21] Ex. 102, Cao Decl. ¶ 15 ("Important business decisions of the Sharehold Entities are made in accordance with the law by a general meeting of shareholders and the Board of Directors of each entity.").

[22] PSC Resp. Ex. 16 at BNBMPLC0000303; *id.* (BNBM PLC "has its own independent production system and sales network, with an independent and complete business and self-management ability).

[23] Ex. 26, Jia, Tongchun (Taishan) Dep., 207:8-10, Sep. 18, 2015 [revised]; Exs. 36-36(A), Jinyu, Hu Dep., 99:3-14, Dec. 7, 2015; Ex. 22, Zhiping, Song Dep., 92:17-93:7, Sept. 14, 2015 [revised]; Ex. 1, Che, Gang (Taishan) Dep., 33:15-17, June 2, 2015; Ex. 2, Che Dep., 193:25-194:9, 197:16-198:15, June 3, 2015; Ex. 3, Che Dep., 331:24-332:5, 333:6-20, 337:2-15, 338:6-13, 366:23-367:6, June 4, 2015; Exs. 9-9(A), Zhou, Guoping (CNBM Group), 314:10-18, 314:20-315:4, June 18, 2015; Ex. 21, Wang, Bing (BNBM PLC) 353:1-13, 353:24-354:9, Aug. 27, 2015.

confirmed that the CNBM entities did not have decision-making power over their subsidiaries, including specifically Taishan.  As they explained, "All these transactions are decided by the board of directors meetings and shareholders meetings of all individual companies that are involved in it…. Each company makes their independent decision by their company's board of directors meetings and shareholder meetings…. I will express my point of view for the third time.  BNBMG and BNBM make independent decision[s] in regard to their interest by their individual shareholders meetings and board of directors meetings."[24]

Similarly, Jinyu Hu testified that when she served as Taishan's Director, she "ma[d]e up [her] own mind … regarding how [she] would vote on Taishan board of director issues" and she did not receive "any instruction or any guidance on how" she "should vote on any particular matter from anyone" outside of Taishan.[25]  Wang Bing testified to the same effect.[26]

**Separate Finances.**  The companies maintain distinct finances.  None has, or has ever had, a joint bank account with another.  CNBM Group and CNBM Company, for example, have never had a joint account with their sharehold entities.[27]  BNBM Group has also never had a joint bank account with BNBM PLC or Taishan.[28]  BNBM PLC "and its controlling shareholder are completely independent from each other in the aspect of finance."[29]

---

[24] Ex. 15, Zhao, Yanming (BNBM Group) Dep., 272:3-12, July 16, 2015.

[25] Exs. 36-36(A), Jinyu Dep., 92:25-93:10, Dec. 7, 2015.

[26] Ex. 20, Wang Dep., 291:9-12, Aug. 26, 2015.

[27] Ex. 102, Cao Decl. ¶ 12; Ex. 103, Chang Decl. ¶ 7; Ex. 16, Zhao Dep., 431:10-12, July 17, 2015.

[28] Ex. 16, Zhao Dep., 427:21-23, July 17, 2015; *see also* PSC Resp. Ex. 16 at BNBMPLC0000303 (BNBM PLC "has opened an independent bank account and does use the same bank account as its controlling shareholder").

[29] PSC Resp. Ex. 16 at BNBMPLC0000303; *id.* ("BNBM PLC's "assets … are independent" and there is a clear demarcation between the "industrial property rights and non-patented technologies" between BNBM PLC "and its controlling shareholder."); *id.* (BNBM PLC has "set up an independent finance department and an independent

Each company uses separate accounting systems, keeps separate financial statements, and files separate tax returns except where the company is required by regulation to file a consolidated financial statement.[30]  As Mr. Wang Bing testified, "Because BNBM is a shareholder of Taishan, therefore BNBM's financial statement also includes Taishan's consolidated financial statement."[31]

And, due to the shareholder arrangement, Chinese regulations concerning publicly-listed companies require "audit[ing] the financial statement of Taishan and BNBM."[32]  Each company is audited by an independent third-party accounting firm.[33]

Importantly, all subsidiaries of CNBM Group and CNBM Company are adequately capitalized.[34]  Thus, in contrast with the paradigmatic case for veil-piercing—involving an unfunded or under-funded subsidiary, and a danger of non-payment—Taishan in particular has the necessary funding for its operations.[35]

---

financial accounting system, and has implemented a strict financial management policy for subsidiaries controlled thereby").

[30] Ex. 102, Cao Decl. ¶ 13 ("Except as required under Chinese laws, regulations, and relevant accounting principles, CNBM Group and the Sharehold Entities prepare independent financial statements and file their tax returns separately."); Ex. 103, Chang Decl. ¶ 8  ("Except as required under Chinese laws, regulations, and relevant accounting principles, CNBM Co. and the subsidiaries prepare independent financial statements and file their tax returns separately."); Ex. 16, Zhao Dep., 428:3-432:19, July 17, 2015 (BNBM Group does not share financial statements, profit and loss statements or corporate accounting with Taishan, BNBM PLC, CNBM Co., or CNBM Group).

[31] Ex. 21, Wang Dep., 436:16-437:3, Aug. 27, 2015; see also Ex. 11, Chen, Yu (BNBM PLC) Dep., 209:5-9, July 9, 2015 ("Each company has its own independent financial statements. As a public traded company, BNBM would need to disclose its consolidated -- consolidated financial report, which includes the financial report of Taishan Gypsum.").

[32] Ex. 21, Wang, Dep., 436:16-437:3, Aug. 27, 2015.

[33] Ex. 102, Cao Decl. ¶ 13, Ex. 103, Chang Decl. ¶ 8.

[34] Ex. 102, Cao Decl. ¶ 12; Ex. 103, Chang Decl. ¶ 7.

[35] PSC Resp. Ex. 48.

16

**Exercise of Shareholder Rights.**  As would be expected, each entity exercises its rights as a shareholder when it is one.  During the relevant period, CNBM Group owned directly and indirectly 50% to 60% of CNBM Company, and CNBM Company's combined ownership of BNBM ranged from 52% to 60%.[36]  As shareholders, they exercise their rights to participate in shareholder votes, and to be kept apprised of major decisions and developments of their subsidiaries by the directors they nominate and elect.[37]

Directors and officers of each company are appointed in accordance with the company's articles of association.[38]  This means, for example, that CNBM Company has a right to nominate directors of BNBM PLC, but that the directors would ultimately be elected by a vote of all of BNBM PLC's shareholders.[39]  Testimony specifically demonstrated that the same procedure has been implemented by CNBM Group as a shareholder of BNBM Group;[40] CNBM Company as a shareholder of BNBM PLC[41]; and BNBM PLC as a shareholder of Taishan.[42]  As in the United States, there is nothing remarkable about shareholders exercising their rights in this fashion, nor is it a basis for veil-piercing.  *See infra* § I.B.2.a.

The fact that the shareholders have the right to nominate directors does not show that the shareholders exert control over those directors once they are elected, much less impermissible

---

[36] Ex. 107, Clarke Decl. ¶¶ 42, 47; Ex. 102, Cao Decl. ¶ 11; Ex. 103, Chang Decl. ¶ 6.

[37] Ex. 102, Cao Decl. ¶ 15; Ex. 103, Chang Decl. ¶ 11.

[38] Ex. 102, Cao Decl. ¶ 15.

[39] Ex. 103, Chang Decl. ¶ 11.

[40] Ex. 16, Zhao Dep., 386:23-387:13, July 17, 2015; Ex. 14, Zhao Dep., 87:7-88:8, July 15, 2015.

[41] Ex. 10, Chen Dep., 86:18-21, July 8, 2015.

[42] Ex. 36-36(A), Jinyu Dep., 91:3-16, Dec. 7, 2015; Ex. 21, Wang Dep., 416:17-417:1, Aug. 27, 2015; Ex. 10, Chen Dep., 75:9-24, July 8, 2015; Ex. 19, Wang Dep., 95:16-96:21, Aug. 25, 2015.

control sufficient to treat the subsidiary and the shareholder as alter egos.  After all, directors

owe fiduciary duties to the company for which they serve.[43]  That is no less true when the

director holds a position with multiple companies.  When a director of a subsidiary also holds a

position at a parent company, he must perform his duties on the subsidiary's board of directors in

accordance with the subsidiary's best interests.[44]

As Mr. Bing testified, "According to the regulation of Chinese law as well as company

law, companies' directors all serve the company itself, therefore when I attend Taishan Gypsum

board of directors meeting as Taishan Gypsum's director, I'm only Taishan Gypsum's director,

not somebody who holds any position in BNBM."[45]  Were a director to act contrary to the

interests of the board, a derivative action may be pursued.[46]  Plaintiffs have no response, which is

why they are reduced to characterizing this testimony as "incredible." PSC Resp. at 43-44.  But

they cannot point to any example of any director having failed to fulfill these obligations; and

Plaintiffs do not dispute that this arrangement is permitted under Chinese law,[47] nor indeed that

---

[43] Ex. 107, Clarke Decl. ¶ 49.

[44] Ex. 16, Zhao Dep., 386:23-387:13, July 17, 2015; Ex. 21, Wang Dep., 372:22-373:6, Aug. 27, 2015; Ex. 12, Chen Dep., 353:16-354:1, July 10, 2015; Ex. 20, Wang Dep., 280:24-281:24, Aug. 26, 2015; Ex. 102, Cao Decl. ¶ 15; Ex. 103, Chang Decl. ¶ 11.

[45] Ex. 20, Wang Dep., 280:24-281:24, Aug. 26, 2015; *see also id.* at 292:22-293:3 ("When we vote for the guaranty in the board of directors of BNBM, we would only consider whether it is beneficial to BNBM."); *id.* at 291:4-12 ("When I vote as a director of Taishan Gypsum, according to the law I am accountable to the interest of Taishan Gypsum.  I would only vote representing Taishan Gypsum.").

[46] Ex. 107, Clarke Decl. ¶ 49.

[47] *Id.*; Clarke Supp. Decl. ¶ 18 (director overlap is not a sufficient basis for piercing under Chinese law).

concurrent directorships is a common feature of U.S. conglomerates.[48]  Plaintiffs' incredulity is not evidence.

CNBM Group and CNBM Company's status as controlling shareholders does not alter the analysis.[49]  As Professor Clarke explained, in a declaration that is unrebutted on this point, "It is normal and expected in both China and the United States for corporations to have controlling shareholders."[50]  That is particularly true when, as here, major company decisions—such as increasing or decreasing registered capital, issuing corporate bonds, undertaking corporate mergers and dissolution, amending the articles of incorporation, and buying back shares—must be made by a vote of two-thirds of the shareholders, a number that exceeds Moving Defendants' voting shares.[51]

**Publicly-Traded Companies**.  Shares of CNBM Company not owned by CNBM Group are owned by public shareholders.[52]  The same is true for shares of BNBM PLC not owned by CNBM Company.[53]  As publicly-traded entities, both CNBM Company and BNBM PLC are subject to an exceptional degree of regulatory oversight.  It therefore is unsurprising that no Chinese court has ever pierced the veil of a publicly-traded company.[54]  The same is true in the

---

[48] *See, e.g.*, BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶ 67 (Rec. Doc. 19631-15) (Parents of U.S. firms commonly "designate or nominate the members of subsidiary boards, and often senior executives or board members of the parent or a first-tier subsidiary serve on a subsidiary board"); *id.* at ¶ 88.

[49] Ex. 107, Clarke Decl. ¶¶ 42, 48.

[50] *Id.* at ¶ 42.

[51] *See, e.g.*, Exs. 76-77 at Art. 88 (2005 BNBM Articles of Association).

[52] Ex. 107, Clarke Decl. ¶ 42.

[53] *See* BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶ 30 (Rec. Doc. 19631-15).

[54] *See* Ex. 107, Clarke Decl. ¶ 44; *see also supra* p. 10-11.

United States.[55]  *See* McPherson, *Corporate Justice*, 45 Wake Forest L. Rev. at 943.

Nonetheless, Plaintiffs ask the Court to adopt their novel "cascading control" theory of veil-

piercing, and thereby pierce the veil of every company from Taishan all the way through CNBM

Group.  That no court in China or the United States has ever pierced the veil of a publicly-traded

company demonstrates the extreme nature of Plaintiffs' position.  The Court should reject

Plaintiffs' utterly novel theory.

***

Under Chinese law, Moving Defendants are not alter egos of, or agents with, each other

or Taishan.  Each entity was independently established and is independently operated.  Moving

Defendants have not abused the corporate structure.  Plaintiffs offer no argument to the contrary

under Chinese law.  Accordingly, this Court should grant Defendants' motion to dismiss CNBM

Group, CNBM Company, and CNBMIT, as well as CNBM USA and United Suntech in the non-

California actions.

**B.      Alternatively, Under The Substantive Law Of The Forum States, Plaintiffs Have Failed To Meet Their Burden of Demonstrating That Moving Defendants Are Alter Egos.**

**1.      State Law Sets A High Bar For Establishing Personal Jurisdiction Under An Alter Ego Theory.**

Were this Court to disregard the forum states' choice of laws rules, and instead apply

each forum state's *substantive* alter ego law, there still would be no basis to pierce the corporate

veil.  Plaintiffs begin by asserting that the alter ego test is easier to satisfy in the jurisdictional

context than it is where liability is concerned.[56]  PSC Resp. at 156-57.  Where jurisdiction is at

---

[55] Clarke Supp. Decl. ¶ 15.

[56] The State of Louisiana also attempts to manufacture a concession—that CNBM Group purportedly admitted that if the FSIA is satisfied, there is personal jurisdiction over it.  Louisiana Resp. at 14-15.  Its sole support is a single slide from Defendants' visual presentation at the Foreign Sovereign Immunity Act hearing.  Louisiana Resp. at 14 n.

issue, Plaintiffs claim, they only need to show the existence of a shell corporation or fraud (which they do not do)[57] whereas, they say, alter ego in the liability context requires a showing that the corporate form was used to deprive claimants of legal redress.[58]  PSC Resp. at 156.  But the case Plaintiffs rely upon—*Stuart v. Spademan*, 772 F.2d 1185, 1198 n. 12 (5th Cir. 1985)— applied only Texas law.  And Plaintiffs do not cite any authority on this issue from Louisiana, Florida, or Virginia, which Plaintiffs assert govern here.  That is because the tests under those state laws do not draw the distinction Plaintiffs make.  They apply the same analysis in the jurisdictional context as they do in the liability context.  And each requires proof of wrongdoing, fraud, or abuse:

**Florida.**  Under Florida law, to pierce the corporate veil for jurisdictional purposes, the plaintiff must establish "*both* that the corporation is a 'mere instrumentality' or alter ego of the defendant, *and* that the defendant engaged in 'improper conduct' in the formation or use of the corporation.'"  *WH Smith, PLC v. Benages & Associates, Inc.*, 51 So. 3d 577, 581 (Fla. Dist. Ct.

---

20.  All that slide said was that the FSIA "is the exclusive means for obtaining jurisdiction over CNBM Group."  Louisiana Resp. Ex. 11 at 2.  What this means, as the very next slide demonstrates, is that a court cannot obtain jurisdiction over a foreign defendant unless the FSIA is satisfied.  *Id.* at 3.  Nowhere did Moving Defendants concede that if the FSIA is satisfied, then personal jurisdiction is too.  On the contrary, Moving Defendants specifically explained that "even if the Court concludes that it has statutory authority to assert personal jurisdiction over CNBM Group pursuant to an exception to sovereign immunity in the FSIA …, Plaintiffs still must show that the exercise of such jurisdiction would be consistent with the constitutional requirements of due process."  Am. Mem. ISO Mot. to Dismiss at 24 n. 13.

[57] As we explain below, *see infra* § I.B.2., Plaintiffs do not even satisfy their preferred veil-piercing test.

[58] The State of Louisiana also attempts to manufacture a jurisdictional concession—that CNBM Group purportedly admitted that if the FSIA is satisfied, there is personal jurisdiction over it.  Louisiana Resp. at 14-15.  Its sole support is a single slide from Defendants' visual presentation at the Foreign Sovereign Immunity Act hearing.  Louisiana Resp. at 14 n. 20.  All that slide said was that the FSIA "is the exclusive means for obtaining jurisdiction over CNBM Group."  Louisiana Resp. Ex. 11 at 2.  What this means, as the very next slide demonstrates, is that a court cannot obtain jurisdiction over a foreign defendant unless the FSIA is satisfied.  *Id.* at 3.  Nowhere did Moving Defendants concede that if the FSIA is satisfied, then personal jurisdiction is too.  On the contrary, Moving Defendants specifically explained that "even if the Court concludes that it has statutory authority to assert personal jurisdiction over CNBM Group pursuant to an exception to sovereign immunity in the FSIA …, Plaintiffs still must show that the exercise of such jurisdiction would be consistent with the constitutional requirements of due process."  Am. Mem. ISO Mot. to Dismiss at 24 n. 13.

App. 2010) (emphasis in original); *Aldea Commc'ns, Inc. v. Gardner*, 725 So. 2d 456, 457 (Fla. Dist. Ct. App. 1999) (same).  When plaintiffs fail to "meet their burden of proving that an alter ego relationship was maintained for an improper purpose," Florida courts are not hesitant to find they lack jurisdiction.  *McFadden Ford, Inc. v. Mancuso ex rel. Mancuso*, 766 So. 2d 241, 242-43 (Fla. Dist. Ct. App. 2000); *see also Hobbs v. Don Mealey Chevrolet, Inc.*, 642 So. 2d 1149, 1156 (Fla. Dist. Ct. App. 1994) ("Without evidence that AFSLIC was formed or used for some illegal, fraudulent, or other unjust purpose, the mere fact of the American Way Group's and Warmus's ownership and control of AFSLIC was insufficient to justify piercing AFSLIC's corporate veil.").

**Virginia.**  Virginia similarly requires a showing of abuse of the corporate form.  The proponent of veil-piercing must demonstrate that "the corporation was a device or sham used to disguise wrongs, obscure fraud, or conceal crime."  *Int'l Bancorp, L.L.C. v. Societe Des Baines De Mer Et Du Cercle Des Etrangers A Monaco*, 192 F. Supp. 2d 467, 478 (E.D. Va. 2002). Virginia courts have characterized this as a "more rigorous" veil-piercing standard that requires "the [alleged alter ego to have] used the corporation to 'disguise' some legal wrong." *Perpetual Real Estate Services, Inc. v. Michaelson Properties, Inc.*, 974 F.2d 545, 548 (4th Cir. 1992).

**California.**  As noted above, *see supra* n. 12, Plaintiffs have failed to meaningfully apprise this Court of any alter ego argument under California law; however, out of an abundance of caution, Moving Defendants briefly address the standard.  In California too, alter ego is "an extreme remedy" that is "sparingly used."  *Sonora Diamond Corp. v. Sup. Ct.,* 99 Cal. Rptr. 2d 824, 836 (Cal. Ct. App. 2000).  Plaintiffs arguing alter ego as a basis for jurisdiction must "overcome by clear evidence" the "presumption of corporate separateness" and demonstrate that "the parent in fact controls the activities of the subsidiary."  *Calvert v. Huckins*, 875 F. Supp.

674, 678 (E.D. Cal. 1995). Neither ownership nor control of a subsidiary corporation by a parent corporation without more, subjects the parent to jurisdiction in the state where the subsidiary does business. *Sonora Diamond Corp.*, 99 Cal. Rptr. at 836. Instead, "[t]he party asserting alter ego liability must establish (1) such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities of the corporation and the shareholder do not in reality exist and (2) an inequitable result if the acts in question are treated as those of the corporation alone." *Id.* And as to the latter, there must be some showing of "fraudulent or deceptive intent." *Id.*

**Louisiana.** In *Riggins v. Dixie Shoring Co.*, 590 So. 2d 1164 (La. 1991), the Louisiana Supreme Court set out the test for corporate veil-piercing. As the court explained, "the limited liability attendant to corporate ownership should be disregarded only in exceptional circumstances." *Id.* at 1168. Among these, alter ego "involves situations where fraud or deceit has been practiced by the shareholder acting through the corporation." *Id.* Relevant factors include "1) commingling of corporate and shareholder funds; 2) failure to follow statutory formalities for incorporating and transacting corporate affairs; 3) undercapitalization; 4) failure to provide separate bank accounts and bookkeeping records; and 5) failure to hold regular shareholder and director meetings." *Id.* Where, however, "plaintiffs do not allege shareholder fraud, they bear a *heavy burden* of proving that the shareholders disregarded the corporate entity to such an extent that it ceased to become distinguishable from themselves." *Id.* (emphasis added).

In the face of this settled authority, Plaintiffs urge this Court to apply the single business enterprise ("SBE") test, PSC Resp. at 167-72; Louisiana Resp. at 10, but they point to no decision overruling *Riggins*. They rely on *Green v. Champion Ins. Co.*, 577 So. 2d 249 (La. Ct.

App. 1991), but that decision has never been embraced by the Louisiana Supreme Court, and has been the subject of criticism by courts and scholars alike. *See Bona Fide Demolition & Recovery, LLC v. Crosby Const. Co. of Louisiana*, 690 F. Supp. 2d 435, 445 (E.D. La. 2010) (citing James Dunne, *Taking the Energy Out of Louisiana's Single Business Enterprise Theory*, 69 La. L. Rev. 691, 695 (2009)); *see also In re Anderson*, 539 B.R. 277, 287 (Bankr. W.D. La. 2015) (citations omitted). That is because many of the factors are entirely consistent with normal business operations, and a number of them contradict one another. Dunne, *Taking The Energy Out of Louisiana's Single Business Enterprise Theory*, 69 La. L. Rev. at 695. By embracing a malleable test that does not require fraud or misuse of the corporate form, "the first circuit in *Green* established a rule that would eliminate limited liability between the majority of parent and subsidiary companies based solely on the fact that one company controls the other." *Id.* at 693. Thus, by applying this standard, which can extend beyond traditional veil-piercing to reach entities with no expectation of being haled into Louisiana court, its application offends traditional notions of fair play and substantial justice. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). That is particularly so where, as here, Plaintiffs simply advance a test that focuses exclusively on the few factors least indicative of impermissible corporate behavior. Accordingly, any application of the SBE must first address the due process implications of doing so. And under any standard and in any event, there is no basis to pierce the corporate veil.

### 2.  Plaintiffs Have Failed To Meet Their Burden Of Proving Taishan Was Treated As A Mere Instrumentality With No Separate Corporate Interest Whose Purpose Was To Perpetuate a Fraud.

As we have demonstrated, Moving Defendants adhere to all corporate formalities. *See supra* § I.A.3. The uncontroverted testimony of every percipient witness has been absolutely uniform in this regard. The scope and extent of the discovery here cannot be overemphasized. Plaintiffs have taken far more discovery than ordinarily is permitted in the jurisdictional

context—including, thanks to their ability to capitalize on the supposedly separate "contempt track," discovery of a presumptively sovereign entity, CNBM Group.  Yet witness after witness, subjected to endless hours of grueling cross-examination, stated clearly and consistently, without refutation, that each company is separately organized and capitalized, that they observe corporate formalities, and that directors and officers obey fiduciary duties to each individual company. Accordingly, months of discovery has simply confirmed what was evident at the outset:  Each Moving Defendant maintains separate corporate registrations; publishes corporate bylaws; conducts financial audits; utilizes separate accounting systems; is run by independent officers and directors; and all but United Suntech holds regular board meetings.  *See supra* § I.A.3.

Adherence to these corporate formalities demonstrates that Moving Defendants have never used Taishan or BNBM PLC as a "mere instrumentality," *WH Smith, PLC,* 51 So. 3d at 581, much less formed or manipulated it for an "illegal, fraudulent, or unjust purpose."  *Hobbs*, 642 So. 2d at 1156-57 (Florida law); *Perpetual Real Estate Services, Inc.,* 974 F.2d at 548 ("used the corporation to 'disguise' some legal wrong;" Virginia law); *Riggins*, 590 So. 2d at 1168 (alter ego "involves situations where fraud or deceit has been practiced;" Louisiana law).

Even under Plaintiffs' proposed SBE theory, there is no basis for jurisdiction.  As to the SBE factors that describe typical corporate arrangements, Moving Defendants, like most major U.S. conglomerates,[59] hold significant shares in the entities at issue, have common directors, and adhere to global company policies.  However, the relevant factors weigh heavily in Moving Defendants' favor:  Directors at Taishan and Moving Defendants act in the best interest of the company whose boards they sit on;[60] the corporations do not finance each other;[61] none of the

---

[59] *See, e.g.*, BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶¶ 66-83 (Rec. Doc. 19631-15).

[60] *See supra* n. 43-44.

entities are inadequately capitalized (on the contrary, they are highly profitable);[62] no corporation has been alleged to have paid the salaries or losses of another; the companies obtain their own business from independent sources (e.g., Taishan's own interactions with Venture resulted in the drywall contracts at issue here);[63] Moving Defendants and Taishan have no common employees, nor have employees for one entity performed work on behalf of another;[64] Taishan does not share the same office space as Moving Defendants;[65] no company is alleged to have used another's property as its own nor have there been undocumented transfers of funds;[66] there is no centralized accounting among Moving Defendants or Taishan;[67] each company clearly allocates its profits and losses; and there is no excessive fragmentation of the companies (each has a specific and well-delineated purpose).  Moreover, each entity complies with corporate formalities.  *See supra* § I.A.3.

What is perhaps most striking here is just how remote this case is from the paradigmatic case for veil-piercing.  On the infrequent occasions in which courts pierce corporate veils, it ordinarily is when parent companies have treated their subsidiaries as personal instruments and bank accounts, reaping all the benefits of corporate personhood while leaving those with whom they transact business vulnerable by undercapitalizing the subsidiary.  *See, e.g.*, *Talen's Landing,*

---

[61] *See supra* n. 27-28.

[62] *See supra* n. 34.

[63] *See supra* n. 21, 24, 84.

[64] *See supra* n. 73.

[65] *See supra* n. 102.

[66] *See supra* n. 116-117.

[67] *See supra* n. 30-31.

*Inc. v. M/V Venture*, II, 656 F.2d 1157, 1160 (5th Cir. 1981) (piercing where entity "was always undercapitalized" and there was "total domination … , a confusion of corporate records and finances, and a failure to follow usual corporate formality"); *ORX Res., Inc. v. MBW Exploration, LLC*, 32 So. 3d 931, 937-38 (La. Ct. App. 2010) (corporation deemed a mere shell, warranting piercing of the veil, where there was commingling of funds which "occurred because [the corporation] was undercapitalized, and did not have a separate bank account to transact its own affairs"); *USP Real Estate Inv. Trust v. Discount Auto Parts, Inc.*, 570 So. 2d 386, 392 (Fla. Dist. Ct. App. 1990) (piercing the corporate veil where subsidiary did not have assets or separate bank accounts, did not have any funds of its own and "had no business purpose other than to act as an insulating entity between" the parent and the landlord from whom it had leased property).[68]

Here, there has been no such showing.  Like Moving Defendants, Taishan is a real company, not a shell, and it complies with corporate formalities.  Far from failing to "conduct[] any trade or business," *Darby*, 2003 WL 21448603, at *2, Taishan is one of the largest producers of gypsum board in China,[69] and has long manufactured its own products under its own brand name.[70]  Nor is Taishan "undercapitalized" or lacking its own "bank account [to] transact its own affairs."  *ORX Res., Inc.*, 32 So. 3d at 937-38.  Far from it.  In 2014, Taishan had net profits of

---

[68] *See also Automotriz Del Golfo De CA S. A. de C. V. v. Resnick*, 47 Cal. 2d 792, 797 (Cal. 1957) (citations omitted) ("If a corporation is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts, it is inequitable that shareholders should set up such a flimsy organization to escape personal liability. The attempt to do corporate business without providing any sufficient basis of financial responsibility to creditors is an abuse of the separate entity and will be ineffectual to exempt the shareholders from corporate debt."); *Darby v. Harvey*, No. 2101-02-2, 2003 WL 21448603, at *2 (Va. Ct. App. June 24, 2003) (finding corporation was a "shell corporation" where it did not "conduct[] any trade or business, never had an office, never had a payroll, never had income or losses necessitating the payment of taxes, and had four unpaid board members").

[69] Rec. Doc. 19631-26 at ALRMH-CNBM00000082.

[70] Rec. Docs. 19631-7; 19631-5.

1,020,505,550 RMB,[71] and it has always maintained its own finances, financial controls, accounting, and bank accounts.[72] Taishan is responsible for its own employees.[73] Employee salaries are decided exclusively by Taishan management. Despite Plaintiffs' best efforts, they muster no evidence to contest that Taishan is a fully functioning and operationally independent corporation. In fact, Plaintiffs' own expert confirmed that Taishan has its own management, maintains its own accounting, and has its own sales force.[74] He further testified that Taishan "[i]s not a shell."[75] It "has been a quite profitable company"[76] and "has shown substantial growth, … in some cases, greater growth than its parent corporation."[77] In these circumstances, it would be anomalous to impute Taishan's contacts to any of the Moving Defendants under an alter-ego, or even SBE, theory.

In light of the overwhelming and unrefuted evidence that confronts them, Plaintiffs face a daunting task. "Where a parent and subsidiary observe corporate formalities, the plaintiff has a heavy burden to establish a degree of control sufficient to impute the subsidiary's jurisdictional contacts to the parent." *Administrators of Tulane Educ. Fund v. Ipsen, S.A.*, 450 F. App'x. 326, 331 (5th Cir. 2011) (citations omitted); *Jackson*, 615 F.3d at 587-88 (where corporate formalities are maintained, including separate books, tax ID numbers, and separate shareholder meetings, the court declined to find alter ego even where other factors would support such a finding). This

---

[71] Rec. Docs. 19631-4 at BNBMPLC0003185; 19631-51 at BNBMPLC0002762.

[72] Rec. Docs. 19631-6; 19631-5.

[73] Ex. 2, Gang Dep., 196:23-197:2 June 3, 2015; Ex. 19, Wang Dep., 123:14-124:4, Aug. 25, 2015.

[74] Ex. 113, Milhaupt, Curtis J. Dep., 258:23-24, 259:7-18, Feb. 3, 2016.

[75] *Id.* at 262:13.

[76] *Id.* at 109:24.

[77] *Id.* at 257:20.

rule derives from first principles of corporate law.  "A corporation and its stockholders are generally to be treated as separate entities."  *Burnet v. Clark*, 287 U.S. 410, 415 (1932).  This is why there long has existed a presumption that even related corporations are institutionally independent.[78]

The respect for the corporate form is so strong that, even when a parent company owns "the entire capital stock" and thereby "dominates the [subsidiary], immediately and completely, and exerts its control both commercially and financially," "[t]he existence of the [parent] company as a distinct corporate entity … is … in all respects observed."  *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 335 (1925).  Indeed, the Supreme Court has explained, control by a parent corporation is customary.  As stockholders, a parent's rights include participating in "the election of directors, the making of by-laws … and the doing of all other acts incident to the legal status of stockholders."  *Bestfoods*, 524 U.S. at 61-62.  Likewise, "duplication of some or all of the [parent's] directors or executive officers" will not "be fatal."  *Id.* at 62.

Plaintiffs' submission is flatly at odds with these basic principles.  When their arguments are peeled back, Plaintiffs are left with little more than an assertion that a significant equity stake alone is somehow sufficient.  PSC Resp. at 6-24**.**  They employ experts in an effort to create an exception to the presumption of corporate separateness in the case of Chinese SOEs.  PSC Resp. at 162-63.  They seek to use admissions by a different party against the Moving Defendants, PSC

---

[78] *Dickson Marine Inc. v. Panalpina, Inc.*, 179 F.3d 331, 338 (5th Cir. 1999); *see also* Kluwer Law International, 24 ASA Bulletin 3/2006 at 584 (2006) ("This generally strict adherence to the doctrine of corporate separateness reflects, in part, a judicial awareness that the corporation is a basic building block of the modern economy, and that, by creating a heavy presumption that the corporate form (including limited liability) will be respected, courts can help foster an atmosphere of business certainty.").

Resp. at 168-69 n. 664[79]—all in an effort to circumvent these basic rules.  And eventually, they come right out and admit that they must depart from settled principles, asking this Court to disregard Supreme Court precedent.  PSC Resp. at 158-59.  Plaintiffs claim *Cannon* can be brushed aside because it is "seen as dated, and no longer authoritative." *Id.*  Plaintiffs offer no legal authority for this extraordinary request, because there is none.  Of course, lower courts must "leav[e] to th[e] [Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989); *United States v. Dabeit*, 231 F.3d 979, 984 (5th Cir. 2000) (lower courts must "follow faithfully a directly controlling Supreme Court precedent unless and until the Supreme Court itself determines to overrule it"), *abrogated on other grounds by United States v. Reyna*, 358 F.3d 344 (5th Cir. 2004).  The extreme nature of Plaintiffs' request reflects the lengths to which they must go in asking this Court to rule in their favor.  And the cavalier attitude with which they do so should give this Court pause as it considers Plaintiffs' arguments.

Ultimately, Plaintiffs deliver to the Court a dog's breakfast of factual assertions, many of which they never tether to any governing legal standard.  *E.g.*, PSC Resp. at 6-148.  That is because the whole of these assertions is far less than the sum of their parts.  We respond to the most prominent of them below.

### a. Moving Defendants' Exercise of Their Rights As Shareholders Is Commonplace, And Does Not Demonstrate They Are Alter Egos.

Plaintiffs devote much of their opposition to detailing the corporate structure of the CNBM and BNBM entities.  Indeed, the first 24 pages of their opposition, which largely mirror

---

[79] Plaintiffs attempt to bootstrap Taishan's admissions in earlier litigation, but their arguments for doing so are wholly circular.  They ask the court to assume Moving Defendants are affiliates/alter egos of Taishan as a basis for accepting admissions that they are affiliates/alter egos.  PSC Resp. at 168-69 at n. 664.

the factual recitations in their FSIA filings, identify the equity stake Moving Defendants have in

other companies including eventually, far downstream, BNBM PLC's equity interest in Taishan.

PSC Resp. at 6-24; *see also* PSC Resp. at 40-41.  Plaintiffs thereby conclude that CNBM Group

is positioned to exercise dominion over every aspect of each subsidiary's operations.  But

Plaintiffs neglect to mention that CNBM Group has *never* owned a direct interest in Taishan—

and the Group's indirect interest in Taishan has never exceeded 21%.[80]  CNBM Group FSIA

Reply Br. at 22 n. 16 (Rec. Doc. 19857).

Undeterred by this uncontroverted evidence, Plaintiffs revert to their assertion that

Moving Defendants have "cascading control" over their subsidiaries.  *See, e.g.*, PSC Resp. at 24.

They do not say what "cascading control" is, or what legal significance it has, or how it would

satisfy any recognized test for veil-piercing.  This is because it is a term of their invention, which

is utterly at odds with the basic principles of corporate law set forth in our motion and above.

This point cannot be made starkly enough:  Even having *complete, direct ownership* of a

subsidiary does not satisfy the test for veil-piercing, *see supra* p. 29, and a fortiori, "cascading"

control also does not.

Then, in an effort to bolster their novel theory, Plaintiffs seize upon terms used in

Chinese corporate documents, like "Controlling Shareholders," "Actual Controller," and

"Controlling Entity," as though the sinister invocation of these terms is enough to pierce the veil.

*See, e.g.*, PSC Resp. at 13-14, 18-20.  Nothing could be further from the truth.  Buried in

footnotes, Plaintiffs themselves have to acknowledge that, as those terms are used in China, they

simply refer to basic ownership structure and whether a shareholder is significant.  PSC Resp. at

---

[80] *See, e.g.*, Ex. 102, Cao Decl. ¶ 17 (CNBM Group "has no direct investment or shareholder stake in BNBM PLC, Taishan, or TTP, and has never held a majority ownership interest, either directly or indirectly, in [any] of these entities").

13-14, n. 41, 45; PSC Resp. at 18, n. 67.  For instance, "Controlling Entity" is defined as a

shareholder that owns more than 20% of a company's stock and has the right to nominate

directors.  PSC Resp. at 14 n. 45.  How that could prove that Defendants treated Taishan as a

"mere instrumentality" formed or used to "engage[] in improper conduct," *WH Smith, PLC*, 51

So. 3d at 581, Plaintiffs do not say.  In the end, Plaintiffs have simply shown that Moving

Defendants own shares of companies that own shares of other companies that own shares of

Taishan.  And, in the case of CNBMIT, CNBM USA, and United Suntech, they do not even do

that because none has even an indirect equity interest in Taishan.

To be sure, Moving Defendants have shareholder rights, which they exercise.[81]  But of

course this is true—it would be absurd to think that a shareholder would not exercise its rights—

and of course the decision to do so does not render the parent an alter ego of the separate

corporate subsidiary.  Even in the case of a wholly-owned subsidiary, the control a parent

exercises through its voting rights is not sufficient to impute contacts under an alter ego or

agency theory.  To do that, "[t]he nature of the control exercised by the parent … must be over

and above that to be expected as an incident of … ownership."  *Sonora Diamond Corp.*, 99 Cal.

Rptr. 2d at 838.  The authority on this point is black-letter, it is uniform, and Plaintiffs have not

shown otherwise.  *See Gerritsen v. Warner Bros. Entm't Inc.*, No. 14-cv-03305, 2015 WL

3958723, at *16 (C.D. Cal. June 12, 2015) (plaintiffs' factual allegations "to show 'total control'

suggest only that [the company] as parent, engaged in routine oversight of its subsidiaries, and

provided support for their activities"); *In re James River Coal Co.*, 360 B.R. 139, 173-74 (Bankr.

---

[81] *See, e.g.,* Ex. 22, Zhiping Dep., 41:2-11, Sep. 14, 2015 (any influence that CNBM Group exercises is only through its "shareholder rights"); Ex. 7, Zhou Dep., 207:17-208:18, 210:7-12, June 16, 2015 (CNBM Group manages subsidiaries only by "exercising as a shareholder's right" and does not have a "direct decision making power"); *see id.* at324:17-325:16, June 18, 2015 (the decision to conduct business in the United States is "decided independently by each individual company"); Ex. 19, Wang Dep., 161:12-16, Aug. 25, 2015 ("each company is entitled to make its own decision on the items related to production and operation of the company").

E.D. Va. 2007) ("Under Virginia law, mere proof that a shareholder may 'dominate or control' the corporation or may treat it as a 'mere department, instrumentality, agency' is not enough to pierce the corporate veil"); *Gasparini v. Pordomingo*, 972 So. 2d 1053, 1055 (Fla. Dist. Ct. App. 2008) ("mere ownership of a corporation by a few shareholders, or even one shareholder, is an insufficient reason to pierce the corporate veil"); *Chin v. Roussel*, 456 So. 2d 673, 678 (La. Ct. App. 1984) ("[a]n individual's status of being the sole shareholder of a corporation is insufficient to establish the corporation as the individual's alter ego and, hence, insufficient to hold the individual liable for a judgment rendered against the corporation."). Shareholder control alone—whether direct or "cascading"—is insufficient to pierce the corporate veil.

To similar effect Plaintiffs portray CNBM Group as having exercised impermissible control, sufficient to pierce the corporate veil, by issuing "group-wide" policies and procedures to its subsidiaries. For instance, Plaintiffs complain that CNBM Group sends leadership to Taishan to "instruct, supervise, and identify management problems." PSC Resp. at 30 n. 111. They claim that CNBM Group exerts too much control by "[a]cting as the strategic center, decision making center, resource center, policy and culture center." PSC Resp. at 31. Plaintiffs assert that CNBM Group impermissibly "standardizes and institutionalizes its management" by adopting strategy, decision-making, resource, and culture management policies. PSC Resp. at 31-32.[82]

---

[82] Elsewhere, Plaintiffs say that CNBM Group's Administrative Measures give it excessive control, sufficient to establish alter ego status, because they apply to the "appoint[ment] [of] CNBM Group representatives into high-level positions at subsidiaries." PSC Resp. at 24-25. What Plaintiffs neglect to mention is that the term "appointment," as used in the Measures, means "suggestion" or "recommendation." PSC Resp. Ex. 52. Moreover, "representatives of capital contributors" are defined as individuals—director, supervisor, etc…—who are appointed subject to "the capital contribution relationship," meaning any rights exercised by the Group are circumscribed by the number of shares it holds. *Id.* Much as Plaintiffs might like to extrapolate from this document that CNBM Group can appoint representatives to the BNBM PLC and Taishan boards, *see* PSC Resp. at 25-26, the evidence confirms that representatives, in fact, acquire their seats through the normal protocols: routine shareholder elections. Declaration of Guoping Zhou ¶ 3, attached hereto as Exhibit 2 (hereinafter Zhou Decl.) ("CNBM Group does not

But these are precisely "the type of macro-level management decisions that a parent company can permissibly make without exposing itself to alter ego liability." *Gerritsen*, 2015 WL 3958723, at *24; *William v. AES Corp.*, 28 F. Supp. 3d 553, 563 (E.D. Va. 2014) (parent's adoption of financial disclosure controls and procedures was "wholly consistent with the normal incidents of corporate ownership" and were not evidence of an alter ego relationship).[83]  As the Supreme Court itself has made plain, "supervision of the subsidiary's finance and capital budget decisions, and articulation of general policies and procedures" are perfectly "consistent with the parent's investor status." *Bestfoods*, 524 U.S. at 72.  This Court has similarly explained that high-level policies fall short of "infring[ing] on the day-to-day activities of any subsidiary" that would render it an alter ego.  *Whitener v. Pliva, Inc.*, No. 10-cv-1552, 2012 WL 1343964, at *7 (E.D. La. Apr. 18, 2012); *see also Doe v. Unocal Corp.*, 248 F.3d 915, 930 (9th Cir. 2001) (refusing to impute contacts where plaintiff simply proved that the parent "indirectly control[ed] or supervise[d] its subsidiaries" rather than "directly control[ed] the day-to-day activities").

There is no evidence here that Moving Defendants "directly controlled" Taishan's "day-to-day activities."  Those policies simply serve to further basic corporate ends; they set strategic goals, require annual risk management reports, identify management and shareholder voting guidelines, provide for training and supervisory oversight, set loan ceiling caps, and set rules for CNBM Group to exercise its shareholder rights on major issues.  PSC Resp. at 24-38, 50-54.  As

---

and cannot appoint or nominate directors, officers, or any other personnel to BNBM PLC or Taishan Gypsum."); *see also, e.g.,* Exs. 76-77 at Art. 105, 123, 143, 166 (2005 BNBM PLC Articles of Association); Exs. 97-98, Art. 63, 66, 85 (Taishan Articles of Association) (setting forth process by which directors and officers are appointed).  And Plaintiffs point to nothing in the record to suggest otherwise.  Finally, Plaintiffs also make much of the fact that "appointed" representatives are evaluated, PSC Resp. at 27-28, but there is no indication they are evaluated based on anything other than the requirements set out in the Measures, which include, for instance, participating in board meetings, reviewing and examining important decisions, and giving written reports to  CNMB Group concerning significant decisions. PSC Resp. Ex. 52.

[83] Clarke Supp. Decl. ¶¶ 20, 24, 33.

34

Jianglin Cao, a General Manager and director of CNBM Group and an executive director of

CNBM Company, declared, CNBM Group does "not directly manage or make ordinary business

decisions for any of the Sharehold Entities."[84]   Certainly, the Moving Defendants have

implemented government regulations concerning private coffers, adopted safety codes, and

completed risk management reports, but these do not constitute impermissible day-to-day

involvement in subsidiary affairs.  PSC Resp. at 36-37.  These actions are precisely the sort of

high-level activities implemented and practiced by major U.S. conglomerates.[85]  For instance,

loans and loan guarantees are commonplace among related corporate entities.[86]  That alone is

enough to foreclose Plaintiffs' claim of abuse of the corporate form.  *Administrators of Tulane*

*Educ. Fund*, 450 F. App'x at 334 ("[t]he existence of intercorporate loans does not establish the

requisite dominance, and in fact, interest-bearing loans suggest separation of corporate entities").

In response, Plaintiffs are reduced to cobbling together isolated ways in which Moving

Defendants have some involvement in the operations of their subsidiaries.  Their assertions,

however, are replete with mischaracterizations.[87]  Take, for instance, Plaintiffs' description of

Taishan's 2011 annual risk management report.  PSC Resp. at 37.  They claim the report shows

that CNBM Group undertakes "daily operational management."  *Id*.  It says no such thing.  In

fact, what the report states is that *Taishan*, not the CNBM Group, took steps "to achieve the

---

[84] Ex. 102, Cao Decl. ¶ 14.

[85] BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶¶ 16, 17, 19, 67 (Rec. Doc. 19631-15); *id*. at ¶ 75 (Rec. Doc. 19631-15) (describing FedEx as "coordin[ating] strategies across the operating subsidiaries"); *id*. at ¶¶ 69, 72 (explaining that Disney Parent commonly makes "major capital decisions" on behalf of subsidiaries and "monitors management" of the subsidiaries).

[86] *Id*. at ¶¶ 17, 19.

[87] For the Court's convenience, Moving Defendants have attached to this brief an appendix of misrepresentations with accompanying clarifications.

integration of risk management with daily operational management."[88]  Plaintiffs also claim,

relying on the report, that subsidiaries must obtain approval for risk management reports.  *Id.*

Not so.  The approval required is from "the Company," which refers to Taishan Gypsum.[89]

Plaintiffs assert that Taishan must submit project feasibility reports to "BNBM for

consideration."  *Id.*  That too is inaccurate.  Such reports are received by BNBM "for

archiving."[90]  Lastly, Plaintiffs mischaracterize the final approval process for project submissions

as flowing through BNBM, claiming that "BNBM considers the project proposals and seeks

approval from BNBM's Board of Directors and BNBM's shareholders, namely, CNBM."  *Id.*  In

fact, the report refers to *Taishan's* "Board of Directors" and shareholders.[91]  In short, Plaintiffs'

arguments rest on a persistent series of mischaracterizations.

Equally inaccurate is Plaintiffs' treatment of an August 28, 2006 CNBM Company filing

that reports on BNBM's acquisition of additional shares in Taishan.  PSC Resp. at 40.  They say

the document demonstrates CNBM Company's or its subsidiaries' involvement in Taishan's

daily operations.  *Id.*  But the uncontroverted testimony from the Chairman of Taishan, Mr. Jia,

is that CNBM Company and its subsidiaries were not involved in any way in the daily operations

of Taishan,[92] and that to the extent this document contained any such language, he himself

---

[88] PSC Resp. Ex. 62.

[89] PSC Resp. Ex. 62; Ex. 26, Jia Dep., 284:20-285:24, Sep. 18, 2015 [revised].

[90] PSC Resp. Ex. 62 at CNBMGRP 00371559; Ex. 26, Jia Dep., 285:25-286:7, Sep. 18, 2015 [revised].

[91] *See also* Ex. 26, Jia Dep., 286:7-10, Sep. 18, 2015 [revised] (identifying the "shareholder" as BNBM, thereby indicating that the company referred to is Taishan).

[92] Ex. 115, Jia Dep., 771:24-773:16, Jan. 9, 2012.

objected to it as inaccurate.[93]  Rather, as other evidence shows,[94] and as he confirmed, BNBM

was simply a shareholder in Taishan, which adhered to China Company Law.[95]

To similar effect, Plaintiffs inaccurately assert that, during a 2014 Board Meeting,

Chairman Song stated that Taishan "is not independent."  PSC Resp. at 7, 173.  But that simply

isn't what he said.  Chairman Song was not offering a factual representation concerning

Taishan's autonomy; rather, he was explaining the concept of veil-piercing in the United States

and the theory that would be—and in fact, has been—advanced against Moving Defendants.[96]

Chairman Song was explaining Plaintiffs' *allegation* that "although Taihe is a limited company,

[it] is not independent."  Plaintiffs' repeated misstatements and mischaracterizations of the

record simply serve to confirm the weakness of their position.

### b.     Shared Officers, Offices, And Logos Do Not Demonstrate Alter Ego Status, And Neither Does A Joint Defense Arrangement.

Unable to show actual control of day-to-day operations, as would be necessary (but not

sufficient) for them to establish alter ego status, Plaintiffs repeatedly highlight supposed points of

intersection among Moving Defendants and Taishan.  They often do so without citing any law or

explaining how such intersections are legally relevant, or how they could demonstrate the legally

required abuse of the corporate form.  So, for instance, Plaintiffs claim that the Moving

Defendants share officers and directors, offices, and logos.  PSC Resp. at 43-50, 55-59, 59-63.[97]

---

[93] Ex. 115, Jia Dep., 773:17-775:4, Jan. 9, 2012.

[94] Yanjun Yang (BNBM PLC) Decl. ¶ 8 (Rec. Doc. 19631-6).

[95] Ex. 115, Jia Dep., 774:13-23, Jan. 9, 2012.

[96] PSC Resp. Ex. 10 at CNBMGRP00023369.

[97] They also assert, in conclusory fashion, that CNBM and BNBM entities shared accounting firms and that BNBM and Taishan shared the same auditors.  But nowhere do they explain why those facts are relevant to an alter ego or agency analysis.  PSC Resp. at 54.

And elsewhere, they complain that the various defendants coordinated their response to this litigation.  PSC Resp. at 98-115**.**  As we describe below, each of these contentions is individually flawed.  But more fundamentally, together they demonstrate Plaintiffs' basic misapprehension of the critical legal inquiry.  Their task here is not to prove certain commonalities among these defendants.  Of course there are some; it would be surprising if there were not.  The question is whether Taishan was a "mere instrumentality" used by Moving Defendants for an "illegal, fraudulent, or unjust purpose."  *WH Smith, PLC*, 51 So. 3d at 581; *Hobbs*, 642 So. 2d at 1156-57; *see also Perpetual Real Estate Services, Inc.*, 974 F.2d at 548; *Riggins*, 590 So. 2d at 1168.  And on that issue, a decision to defend jointly against litigation, for instance, is flatly irrelevant.

**i.**  It is true that Moving Defendants have common directors.  But there is nothing abnormal about that.   It is endemic among major corporations.  At Disney, for instance, board members of the "Disney Parent (or its first-tier subsidiaries) also commonly serve as directors of the various other subsidiaries."[98]  Even in the case of wholly-owned subsidiaries, the presence of "common officers and directors" is not sufficient "to justify [p]iercing the corporate veil." *Unijax, Inc. v. Factory Ins. Ass'n*, 328 So. 2d 448, 454 (Fla. Dist. Ct. App. 1976); *see also Banks v. GM LLC*, 2012 WL 7006844, *5 (E.D. Va. Dec. 31, 2012) (mere fact that two companies "share the same corporate office and three of the same officers" is not inconsistent with their status as separate entities); *Calvert v. Huckins*, 875 F. Supp. 674, 679 (E.D. Cal. 1995) (fact of "three companies hav[ing] some interlocking directors and officers … do[es] not justify piercing the corporate veil").[99]

---

[98] BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶ 71 (Rec. Doc. 19631-15); *see also id.* at ¶ 77 (same as to FedEx).

[99] Clarke Supp. Decl. ¶¶ 18, 22.

Plaintiffs claim that "it would not have been possible for the decision-makers at these various companies to have acted independently when voting to provide loans, guarantees, financing, etc., when, in fact, the same people were operating in two or more of the subject companies at the same time." PSC Resp. at 43. Not only is it "possible," the Supreme Court has explained that it is a "well established principle [of corporate law] that directors and officers holding positions within a parent and its subsidiary can and do 'change hats' to represent the two corporations." *Bestfoods*, 524 U.S. at 69 (citation omitted). Even Plaintiffs' own expert testified that "it is a known phenomenon."[100] To conclude otherwise would undermine the "recognition that the corporate personalities remain distinct." *Id.* Accordingly, as Professor Milhaupt acknowledged, a mere showing of concurrent directorship is inadequate.[101] Plaintiffs must do more. They must demonstrate that when the officers took the complained-of action, they "were acting in their capacities as … officers and directors [of the parent], and not as officers and directors [of the subsidiary]." *Id.* Plaintiffs have made no showing, and indeed do not even contend that they have done so.

**ii.** Plaintiffs' arguments concerning shared office space and logos fail for similar reasons. Neither demonstrates alter ego status. *See, e.g.*, *Jackson v. Tanfoglio Giuseppe, S.R.L.*, 615 F.3d 579, 587-88 (5th Cir. 2010) (declining to pierce where two entities "operated in a way that their brands and products appear[ed] identical and their business relationships [we]re deeply intertwined," with shared office space, phone numbers, and officers and directors); *Gerritsen*, 2015 WL 3958723, at *24 (shared "office location," "website," "telephone number," and stationary with logo not reflective of alter ego relationship); *Banks,* 2012 WL 7006844, at *5

---

[100] Ex. 113, Milhaupt Dep., 49:2-23, Feb. 3, 2016.

[101] *Id.* at 49:24-50:5 (explaining that concurrent directorship would not on its own "constitute a grounds for …piecing").

(mere fact that fact that two companies "share the same corporate office and three of the same officers" is not inconsistent with the fact that they otherwise constitute separate entities"); *In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.*, 735 F. Supp. 2d 277, 323 (W.D. Pa. 2010) ("[C]ommon marketing image and joint use of trademarked logos fails to render [one company] an alter ego of [another].")  And even if any of this mattered at all, Plaintiffs neglect to mention that the only entity ultimately relevant here—Taishan, the only entity over which there is personal jurisdiction—maintains an office hundreds of miles away from the other defendants,[102] and does not use the same red logo as other CNBM Group subsidiaries.[103]

**iii.**  Nor do Plaintiffs explain how Moving Defendants' coordinated response to this litigation demonstrates that Taishan was a mere instrumentality designed to perpetuate fraud. Evidence of coordinated litigation strategy some ten years later is irrelevant to the fundamental question here: whether Moving Defendants controlled Taishan and its drywall sales.  Plaintiffs acknowledge that the pertinent time period for making that determination is the period during which the sales occurred.  PSC Resp. at 164 ("Without doubt….the time of the alleged tortious conduct is the relevant focus for the determination of control for imputation purposes.").  But now their claim is that activity occurring years later somehow shows control at the time of the alleged misconduct.  Even the cases cited by Plaintiffs do not do that work.  Those cases consider post-tort activity largely when it demonstrates an intent "to strip the corporation of its assets in anticipation of impending legal liability."  *Minnesota Min. & Mfg. Co. v. Eco Chem,*

---

[102] Ex. 19, Wang Dep., 151:16-151:19, Aug. 25, 2015; *see also* Yang Decl. ¶¶ 4-5, Exs. A-B (Rec. Doc. 19527-12) (CNBM Group's Beijing location); PSC Resp. Ex. 32, Art. 4 (Taishan's Articles of Association showing Taishan's Shangdong Province location).  The most Plaintiffs can say is that, over the course of a few years, Taishan held a few shareholder meetings and the Board of Directors once held a meeting in a CNBM Company conference room. PSC Resp. at 57-58.

[103] *See* http://www.taihegroup.com/english/channels/61.html (Taishan website with logo).  Likewise, BNBM PLC does not share the same logo; its logo is simply the letters "BNBM."  Ex. 125.

*Inc.*, 757 F.2d 1256, 1264 (Fed. Cir. 1985); *Bridas SAPIC v. Government of Turkmenistan*, 447 F.3d 411, 420 (5th Cir. 2006) ("Intentionally bleeding a subsidiary to thwart creditors is a classic ground for piercing the corporate veil."); *Morgan v. Burks*, 611 P.2d 751, 756 (Wash. 1980) ("However, in this case no 'gutting' of corporate assets such as gave rise to individual liability in the cited cases justifies disregard of the corporate entity.").[104]  Here, by contrast, there has been no allegation, much less affirmative evidence, that Moving Defendants endeavored to fraudulently extract funds from Taishan to evade liability and damages.  On the contrary, Taishan is a well-capitalized entity.[105]

Notwithstanding the irrelevance of the post-tort activity here, Plaintiffs characterize Moving Defendants' response to this litigation as an indication of the undue control they purportedly wielded over Taishan.  PSC Resp. at 98-115.  But joint meetings and teleconferences, coordination of counsel, and reports and requests for statistics about drywall do not suggest that Moving Defendants were controlling Taishan.  They merely show that the companies were sensibly taking a coordinated approach to a major international lawsuit.  That is not at all surprising given the extraordinary damages sought, and Plaintiffs' sweeping effort to reach remote corporate entities.  Plaintiffs cite no authority to support their suggestion that a joint-defense agreement is indicative of an alter-ego relationship, PSC Resp. at 107-09, rather, the purpose of such an agreement is to ensure that communications between attorneys of separate defendant companies remain privileged.  *See In re Teleglobe Comms. Corp.*, 493 F.3d 345, 364-

---

[104] Plaintiffs also cite extensively to *Craig v. Johns-Manville Corp.*, 1987 WL 10191 (E.D. Pa. Mar. 31, 1988), characterizing it as a "seminal" case on this point.  Plaintiffs neglect to mention the case was reversed by the Third Circuit, following its determination that the district court's alter ego determination was erroneous.

[105] *See supra* n. 35.

65 (3d Cir. 2007).  If two American companies coordinated their response to a lawsuit in China, no one would bat an eye.

Nor is there evidence that CNBM influenced Taishan's decision-making.  Plaintiffs claim the CNBM Group controlled Taishan's decision not to appear at the debtor examination, PSC Resp. at 99-107, but the very resolution they cite explains that the board voted to "respect *Taishan*'s decision not to attend the Judgement Debtor Hearing."  PSC Resp. Ex. 205 (emphasis added).  And officials of both CNBM Group and Taishan testified that Taishan made its decision independently.[106]  Plaintiffs' representations to the contrary, such as an email from Dong Chungang, are belied by Taishan's witnesses who testified that they did not have to obtain approval from high-level officers at CNBM Group,[107] and that Mr. Jia "could … make the decision for Taishan"—Taishan's decisions did not have "to be made by CNBMG directors."[108]

**iv.**  Similarly unavailing is Plaintiffs' characterization of CNBM as having been involved "in the issues" relating to Taishan's drywall sales.  PSC Resp. at 133; *see generally* PSC Resp. at 133-40.  All Plaintiffs can point to are statements by CNBM touting the business group's drywall sales and its request for a report on Taishan's exports in the wake of the drywall litigation.  PSC Resp. at 133-40.  Merely reviewing export data after the fact is a far cry from manipulating a subsidiary's corporate structure.  What it shows is a parent, totally appropriately, trying to understand the impact of litigation on a subsidiary.  If Plaintiffs were correct that CNBM was

---

[106] *See, e.g.*, Ex. 26, Jia Dep., 175:17-19, Sep. 18, 2015 ("Taishan Gypsum's board of directors' meeting decided not to respond to the US litigation"); *id*. at 206:12-15 (same); Ex. 2, Gang Dep., 266:13-267:1, June 3, 2015 ("[T]he decision… was made by Taishan's board of directors"); Exs. 23-23(A), Zhiping Dep., 131:6-11, Sep. 15, 2015 ("Taishan is an independent company and its decision was made independently"); Ex. 17, Cao Dep., 101:11-17, Aug. 4, 2015 [revised] ("Taishan itself made the decision"); Ex. 8, Zhou Dep., 182:3-10, June 17, 2015 (same); Exs. 9-9(A), Zhou Dep., 314:10-18, 314:20-315:4, June 18, 2015 (same).

[107] Ex. 26, Jia Dep., 178:15-21, Sep. 18, 2015.

[108] Ex. 1, Gang Dep., 46:21-47:1, June 2, 2015.

controlling Taishan, then of course such a report would not have been necessary—the information would already have been known to CNBM.  And it is even less surprising that CNBM publicized its subsidiaries' sales.  After all, like many U.S. conglomerates, it is a *business group* with a broad agenda—building materials—and diversification within.[109]  That CNBM Group did so is no more surprising than Disney's parent celebrating how many tourists visited its theme parks this year, how many ticket sales it rung up for Star Wars, and how many Elsa costumes were sold at the Disney Store.  At bottom, CNBM Group's conduct is indicative of nothing more than a parent company protecting and cultivating its investment in a subsidiary.[110]

### c.   Plaintiffs' Claims That Corporate Policies Were Disregarded Are Inaccurate And Irrelevant.

A different vein of Plaintiffs' arguments is devoted to attacking various activities and transactions as somehow improper.  Plaintiffs never exactly say why this is relevant; the implication is that these are companies that play fast and loose.  Of course, Plaintiffs never come out and say this, because they can cite no case suggesting that this is a basis for piercing the veil.  And ultimately, their claims that Defendants failed to adhere to various corporate policies are simply wrong.

First, Plaintiffs point to a BNBM PLC share conversion, and say that it was improperly orchestrated by CNBM Group.  *See* PSC Resp. at 18-20.  As an initial matter, Plaintiffs fail to explain how this transaction, which did not even involve Taishan, could have resulted in the

---

[109] BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶¶ 16, 18, 20 (Rec. Doc. 19631-15).  Plaintiffs' own expert testified that it is common "in U.S. conglomerates for corporate parents and their subsidiaries to be classified in the same primary industry."  Ex. 113, Milhaupt Dep., 48:20-49:1, Feb. 3, 2016.

[110] For the same reasons, CNBM Group's participation in road shows is of no significance.  PSC Resp. at 138-40.  It does not reflect total domination of its subsidiary but simply an interest in shareholder profitability.

manipulation of *that* company, as would be required to pierce the veil.  Moreover, the conversion was not "orchestrated" by CNBM Group.  It was directed by the government following passage of securities reform regulation.[111]  Pursuant to the China Securities Regulatory Commission's Administrative Measures on the Split Share Structure Reform of Listed Companies,[112] Chinese companies were to eliminate transfer restrictions placed on non-tradable shares through share conversion programs.[113]  BNBM was among the more than 98% of all listed companies subject to the reform that initiated or completed the share conversion by the end of 2007.[114]  And CNBM Group's role in that transaction was not remotely fraudulent.  Indeed, unlike the typical veil-piercing situation where funds are being *extracted* from subsidiaries, *see supra* pp. 26-27, in this transaction, CNBM Group affirmatively *supplied* funding to its subsidiaries.[115]

Second and similarly inaccurate is Plaintiffs' identification of a "nil consideration" asset transfer.  PSC Resp. at 63-65.  Despite the words used, the exchange was not for nothing: BNBM Group received shares of the newly formed CNBM Company in exchange for its transfer of equity during a significant reorganization.[116]  Moreover, these publicly-documented asset transfers from China United and China Composites are irrelevant; none involved assets of Taishan or BNBM PLC.[117]

---

[111] *See, e.g.*, Sandra P. Kister, China's Share-Structure Reform: An Opportunity to Move Beyond Practical Solutions to Political Problems, 45 Colum. J. Transnat'l L. 312, 334-35 (2006-2007).

[112] *See* CNBM 2006 Global Offering (PSC Resp. Ex. 38) at 40.

[113] *See* CSRC 2007 Annual Report at 5, http://tinyurl.com/hqcdmvs (last visited Feb. 11, 2016).

[114] *See id.* at 58.

[115] CNBM 2006 Global Offering (PSC Resp. Ex. 38) at 40.

[116] Zhao Dep., 270:12-20, July 16, 2015.

[117] PSC Resp. Ex. 38.

Third, what Plaintiffs characterize as a "commingling" of funds among CNBM, BNBM, and Taishan is nothing but a set of loan agreements.  PSC Resp. at 69-70.  When BNBM did not have the funds to provide a requested loan to Taishan, it borrowed them from CNBM.[118]  Upon repayment, Taishan paid BNBM, who then repaid CNBM.[119]

Even where Plaintiffs' arguments are factually accurate, they are legally flawed.  For instance, Plaintiffs suggest that there is something improper about CNBM having guaranteed loans for its subsidiaries.  PSC Resp. at 50-53.  But that is customary behavior in major conglomerates.[120]  *Calvert*, 875 F. Supp. at 678 (declining to pierce on the basis of a loan guarantee because "this is common business practice and a normal feature of parent-subsidiary relationships").[121]

### d.   Plaintiffs' Efforts To Impugn The Chinese Corporate System Are Irrelevant And Erroneous.

For all of the reasons just set forth, when the reams of Plaintiffs' paper are sorted through, one is left with nothing more than the story of a typical conglomerate structuring itself in the way corporations do the world over.  So Plaintiffs take a different tack.

Unable to overcome the presumption of corporate separateness, Plaintiffs effectively assert it does not apply.  They claim that Chinese companies, particularly those owned by the state, by their nature cannot be trusted.  As Plaintiffs explain it, the court must "look behind the Chinese curtain" and consider that many of the Moving Defendants "are from the People's

---

[118] Chang Supp. Decl. ¶ 6.

[119] Chang Supp. Decl. ¶ 6.

[120] BNBM PLC Mem. ISO Mot. to Dismiss at Ex. 12 Gordon Decl. ¶ 19 (Rec. Doc. 19631-15) (explaining that many subsidiaries within U.S. conglomerates rely on loan guarantees provided by parents, which is a means of lowering the cost of "credit for a borrowing subsidiary"); Ex. 21, Wang Dep., 362:21-363:9, Aug. 27, 2015 (within Chinese business groups, the largest shareholder often guarantee bank loans to subsidiaries).

[121] Clarke Supp. Decl. ¶¶ 20, 25.

Republic of China – a communist country."  PSC Resp. at 159, 161.  But after delivering a lengthy tale of government domination, Plaintiffs never provide any reasoned explanation why this is so.  Once stripped of its 1950s-style rhetoric, their argument relies on Professor Milhaupt's remarkable assertion that SOE status alone constitutes "evidence … that the CNBM Business Group is a single business entity."[122]

Moving Defendants are unaware of any court that has ever painted with so broad a brush, and indeed Milhaupt acknowledges that this sweeping conclusion was not rooted in the facts on the ground concerning the actual corporate entities in this litigation before this Court.  He engaged in no analysis concerning the degree of control wielded by the government in the case of CNBM Business Group.  On the contrary, when asked, Professor Milhaupt disclosed that his opinion was limited solely to "*capacity* to control,"[123] rather than actual influence.[124]  And he did so while fully acknowledging that "capacity" to control may or may not be exercised over particular entities.[125]  Accordingly, Milhaupt's declaration does not even qualify as an opinion but rather conditional speculation, which has no evidentiary value.

And, with respect to *that* question—the one actually presented here—Professor Milhaupt agreed that he saw no documentation that would allow him to ascertain whether the government has wielded undue influence over CNBM Business Group, particularly with regard to the sale of

---

[122] PSC Resp. Ex. 265 at ¶ 39.  Louisiana also relies on Milhaupt, explaining that his declaration "reflect[s]" "the point" that Moving Defendants and Taishan "all act as one, standing as alter egos of each other when it comes to drywall."  Louisiana Resp. at 6-7.

[123] Ex. 113, Milhaupt Dep., 130:1-7; 208:22-209:15, Feb. 3, 2016 (emphasis added).

[124] *Id.* at 130:1-132:5, 166:7-16.

[125] *Id.* at 166:7-16.

drywall into the United States.[126]  But that did not stop him from opining that there "is evidence

… CNBM Business Group is a single business entity."[127]  In short, what he relies on here is the

mere fact that CNBM Business Group is a SOE.  In turn, by relying upon Professor Milhaupt's

conclusion, Plaintiffs seek a declaration from this Court that a company's status as a SOE in and

of itself demonstrates the existence of an alter ego relationship.  That position is tantamount to

flipping the presumption of corporate separateness on its head, presuming certain companies

should be subject to veil-piercing, *even when* they adhere to corporate formalities.  Plaintiffs

offer no authority for such a sweeping proposition.[128]

### C.  Even If Any Such Theory Were Properly Preserved, Moving Defendants Are Not Subject To Jurisdiction Under An Agency Theory.

Plaintiffs' opposition revolves around the claim that Taishan and Moving Defendants are

alter egos.  But very occasionally, they hint at an alternate, "agency" theory.  This argument is

not sufficiently preserved.  In their 214-page submission, only one heading identifies agency law,

PSC Resp. at 178, and even when Plaintiffs do sprinkle in references to the topic—briefly on

pages 174-75 and 178—they do not even perform any substantive analysis under agency law, or

explain how it differs from alter ego law.[129]   Accordingly, this cursory argument is not

sufficiently developed to be preserved.  *United States v. Berry*, 977 F.2d 915, 918 (5th Cir. 1992)

(generic objection was not "sufficient to put the court on notice" of alleged error).

---

[126] *Id.*; *see also id.* at 97:9-98:21. 154:1-5.

[127] PSC Resp. Ex. 265 at ¶ 39.

[128] *Contra* Clarke Supp. Decl. ¶ 23 (mere fact of common purpose or common control is not sufficient in China to warrant piercing the corporate veil … What is relevant … is whether specific abuses took place: most notably, fraud or commingling of assets)

[129] Notably, Plaintiffs never identify governing Chinese agency law.  Nor do they offer any distinct Louisiana agency law separate and apart from their SBE theory.  PSC Resp. at 167-74.  Finally, Plaintiffs' scattershot, twenty-five state drive-by analysis is rooted entirely in an alter ego theory.  PSC Resp. at 180-81.

In any event, any agency argument would fail.  This is because Plaintiffs' theory is backward.  Their suggestion is that the Moving Defendants are the *agents*, not the principals.[130]  Accordingly, Plaintiffs would have to plead, which they did not, minimum contacts *by Moving Defendants* that were purposefully directed at the forum states.  *Henry v. Offshore Drilling (W. A.) Pty., Ltd.*, 331 F. Supp. 340, 342 (E.D. La. 1971) (to establish jurisdiction where parent is alleged to have acted as an agent for the subsidiary, plaintiff must demonstrate the subsidiary manipulated parent in its contacts with forum state).  Because they have failed to do so, any agency theory would fail.

Plaintiffs also do not dispute that the Supreme Court's decision in *Daimler AG v. Bauman*, 134 S. Ct. 746, 759 (2014), "suggests that an agency relationship alone may not be dispositive" in resolving whether a court has jurisdiction over a parent company.  *In re Chinese-Manufactured Drywall Products Liab. Litig.*, 753 F.3d 521, 531 (5th Cir. 2014).  Indeed, after *Daimler*, a plaintiff must demonstrate, at a minimum, that the parent company "purposefully avail[ed] itself of a forum by directing its agents or distributors to take action there."  *Id.*  Nowhere have Plaintiffs argued, much less demonstrated, that Moving Defendants specifically directed Taishan or BNBM to engage in drywall sales in the forum states.[131]  For that reason too, there is no agency relationship.

---

[130] *Amorin v. Taishan Gypsum*, Case No. 11-1395 (Rec. Doc. 1), ¶¶ 31, 34-35; *Amorin v. Taishan Gypsum*, Case No. 11-1672 (Rec. Doc. 1), ¶¶ 31, 34-35; *Amorin v. Taishan Gypsum*, Case No. 11-1673 (Rec. Doc. 1), ¶¶ 31, 34-35; *Abner v. Taishan Gypsum*, Case No. 11-3094 (Rec. Doc. 1), ¶¶ 45, 48-49.

[131] The closest Plaintiffs come is by arguing that *through BNBM* the Moving Defendants controlled Taishan's export of drywall.  To state Plaintiffs' argument is to disprove it.  There is no contention that Moving Defendants instructed Taishan to take action in the forum states.

*Daimler*'s recognition of the elevated showing necessary to find an agency relationship for jurisdictional purposes is reflected in Florida and Virginia law—the only agency law even mentioned by Plaintiffs.[132]

**Florida.**  Under Florida law, "the mere presence of a subsidiary [within the state], without more, does not subject a non-Florida corporate parent to long-arm jurisdiction." *Enic, PLC v. F.F. S. & Co., Inc.*, 870 So. 2d 888, 891 (Fla. Dist. Ct. App. 2004).  Plaintiffs must demonstrate "(1) acknowledgment by the principal that the agent will act for him, (2) the agent's acceptance of the undertaking, and (3) control by the principal over the actions of the agent." *Goldschmidt v. Holman*, 571 So. 2d 422, 424 n. 5 (Fla. 1990).  Under the last element, the degree of control exercised by the parent "must be high and very significant." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d at 530 (quoting *Enic, PLC*, 870 So. 2d at 891). To be liable for a subsidiary's conduct, the parent "must exercise control to the extent the subsidiary manifests no separate corporate interests of its own and functions solely to achieve the purposes of the dominant corporation." *Id*.

**Virginia.**  Under Virginia law, "the mere existence of a parent-subsidiary relationship does not conclusively indicate that a parent is within a court's jurisdiction by way of the subsidiary's in-state activities." *Frith v. Martinsville Thermal, Inc.*, No. CIV A 4:05-CV-00074, 2006 WL 2994717, at *2 (W.D. Va. Oct. 20, 2006).  Instead, jurisdiction will be exercised over the parent when it can be shown that the parent "controls the services that flow through its

---

[132] As noted, *see supra* n. 129, Plaintiffs identify no distinct strand of Louisiana agency law.  And the pin cite they offer from California directs the Court not to a discussion of agency law, but alter ego.  PSC Resp. at 180 (citing *Sonora Diamond Corp.*, 99 Cal. Rptr. 2d at 836).  In any event, the standard applied in California, like that in Florida and Virginia, requires a showing that the parent "moved beyond the establishment of general policy and direction for the subsidiary and in effect taken over performance of the subsidiary's day-to-day operations in carrying out that policy." *Virtualmagic Asia, Inc. v. Fil-Cartoons, Inc*., 121 Cal. Rptr. 2d 1, 14 (Cal. Ct. App. 2002) (quoting *Sonora Diamond*, 99 Cal. Rptr. at 839).

subsidiaries or that it maintains its subsidiaries solely to shield itself from legal liability."

*Omega Homes, Inc. v. Citicorp. Acceptance Co.*, 656 F. Supp. 393, 400 (W.D. Va. 1987).

To the extent Plaintiffs have not waived an agency-based argument, the argument fails in any event.  As we have explained, *see supra* pp. 26-28, there is no indication that any of the Moving Defendants have maintained Taishan simply to "shield [themselves] from legal liability," *Omega Homes*, 656 F. Supp. at 400, or to function entirely on behalf of Moving Defendants, *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, 753 F.3d at 530.  On the contrary, Taishan was not even created by the defendants.  Rather, it was acquired by BNBM PLC in 2005.  *See* BNBM PLC Mem. ISO Mot. to Dismiss at 6-7 and n. 10 (Rec. Doc. 19646-1). Clearly then, it was not created for a nefarious purpose.  And Taishan later entered into the drywall transactions at issue here on its own accord.  Moving Defendants have no direct involvement in drywall and did not participate in any way in the transaction that resulted in Taishan shipping drywall to the forum states.  Because Plaintiffs have offered no evidence that Moving Defendants manipulated Taishan to complete these transactions, any argument based on agency principles must fail.

### D.   CNBMIT, CNBM USA, And United Suntech Lack The Requisite Minimum Contacts With The Forum States.

For all the reasons set forth above, this Court should dismiss all the Moving Defendants.  Those reasons apply with particular force to CNBMIT, CNBM USA, and United Suntech.  Plaintiffs' claims have one thing in common: they are rooted in drywall sales in the United States.  Yet, CNBMIT, CNBM USA, and United Suntech have never participated in the sale of drywall.[133]  CNBMIT is a Chinese import and export agent for Chinese companies.[134]

---

[133] Ex. 104, Chuan Decl. ¶ 7; Ex. 105, Zhang Decl. ¶ 8; Ex. 106, Liu Decl. ¶ 6.

CNBM USA is a counterparty to agreements with U.S. entities for the sale of aluminum products, ceramic tiles, and solar panels.[135]  United Suntech functioned as American importer of Chinese cabinetry and hardware.[136]  Each is multiple levels removed even from CNBM Company and CNBM Group—to say nothing of Taishan, the drywall company over which the court actually has jurisdiction, with which these defendants have no relationship at all.  To connect these entities to Taishan, Plaintiffs must ascend, traverse, and descend through multiple corporations, some of which are publicly traded:



Plaintiffs therefore must demonstrate that each company in this chain is an alter ego of the next.  Plaintiffs do not even try.  That should be the end of the inquiry.

---

[134] Ex. 104, Chuan Decl. ¶ 6.

[135] Ex. 105, Zhang Decl. ¶ 5.

[136] Ex. 106, Liu Decl. ¶ 5.

The closest Plaintiffs come to connecting these entities with drywall is by linking them back to CNBM Group.  And for that they rest their argument on the claim that they were subject to audits by CNBM Group.  Even if this were a relevant consideration in the alter ego context (which it is not, *see supra* pp. 13-14, 20-24), neither Exhibit 179 nor 180 shows audits of United Suntech by CNBM Company or CNBM Group, as Plaintiffs claim.  The former document simply indicates that United Suntech was obliged to send the results of its own audit search to the CNBM entities.[137]  The latter seeks financial statements from subsidiaries.[138]  More to the point, neither shows that the entities played any role in treating Taishan as a mere instrumentality or a vehicle through which to perpetrate fraud.  Plaintiffs' failure to offer any meaningful defense of their decision to include these defendants lays bare Plaintiffs' strategy: to tag any Taishan-related entity with assets in the United States, irrespective of how remote.

## II. PLAINTIFFS' FAILURE TO EFFECTUATE SERVICE OF PROCESS CANNOT BE EXCUSED.

Several of the complaints against Moving Defendants should be dismissed for insufficient process and service of process.  Plaintiffs' efforts to justify their defective (and sometimes nonexistent) service all fail.

### A. The Complaints Against CNBMIT Must Be Dismissed.

In their Motion, Moving Defendants established that Plaintiffs' attempted service on CNBMIT was insufficient because CNBMIT was never named in any of the complaints purportedly served on it.  Am. Mem. ISO Mot. to Dismiss at 45-47.  Instead, Plaintiffs named

---

[137] PSC Resp. Ex. 179.

[138] PSC Resp. Ex. 180.

"CNBMI Co., Ltd"—a non-existent corporate entity.[139]  Plaintiffs now characterize their

misidentification of CNBMIT as an immaterial, "typographical" error.  PSC Resp. at 203-05.

Plaintiffs are wrong.  Their errors are precisely the sort that cause doubt and substantial

confusion as to who they intended to sue.  The name "CNBMI" could refer to multiple different

entities, including CNBM International, CNBM Investment Co. Ltd and CNBMIT.   And the

confusion was only bolstered by Plaintiffs' description in the complaint of CNBMI as the parent

company of United Suntech.[140]  CNBMIT is not United Suntech's parent; CNBM Investment is.

The cases on which Plaintiffs rely therefore provide no safe harbor because (unlike here) in none

of them was there any confusion as to the correct defendant.  *See, e.g.*, *United States v. A.H.

Fischer Lumber Co.*, 162 F.2d 872, 873 (4th Cir. 1947) ("[T]here was no other corporation in the

locality with a similar name, and nobody was misled.").[141]  Here, because Plaintiffs'

acknowledged error caused doubt and substantial confusion as to who it intended to sue, the

complaints against CNBMIT should be dismissed.[142]

---

[139] Plaintiffs' Proof of Service on CNBMIT (Rec. Doc. 17269), at p.5 (requesting service on CNBMI Co., Ltd.) (attached as Daley Decl. Ex. 8); *Amorin v. Taishan Gypsum*, Case No. 11-1395 (Rec. Doc. 1), ¶ 35; *Amorin v. Taishan Gypsum*, Case No. 11-1672 (Rec. Doc. 1), ¶ 35; *Amorin v. Taishan Gypsum*, Case No. 11-1673 (Rec. Doc. 1), ¶ 35; *Abner v. Taishan Gypsum*, Case No. 11-3094 (Rec. Doc. 1), ¶ 49.

[140] *Id.*

[141] *See also, e.g.*, *Aerielle Techs., Inc. v. Procare Intl. Co.*, No. 2:08-cv-284-TJW, 2011 WL 767775, at *2 (E.D. Tex. Feb. 28, 2011) (misnomer "is immaterial if it appears that [the corporation] *could not have been*, or was not, misled" ) (emphasis added and internal quotation marks omitted); *Brackens v. USA Credit*, 233 F.R.D. 613, 614 (D. Kan. 2005) ("A misnomer is not fatal when it is sufficiently close to the corporation's true name *as to distinguish it from other corporations*.") (emphasis added and internal quotation marks omitted); *Scottsdale Ins. Co. v. Littlepage*, No. CIV. A. 92-2734,1993 WL 275162, at *4 (E.D. Pa. July 16, 1993), *aff'd*, 27 F.3d 557 (3d Cir. 1994) (misnomer "in no way rendered the intended recipient unidentifiable"); *Tremps v. Ascot Oils, Inc.*, 561 F.2d 41, 44 (7th Cir. 1977) ("[T]he test of whether a misnomer invalidates process should be whether, on the basis of an objective standard, it is reasonable to conclude that the plaintiff had that defendant in mind or whether the plaintiff 'actually meant to serve and sue a different person.'") (quoting 2 J. Moore, Federal Practice P 4.44, at 1295.52 (1975)).

[142] Moving Defendants also showed that even if service upon the wrong entity were sufficient, Plaintiffs failed to complete service on CNBMIT in one of the *Amorin* complaints.  In their Response, Plaintiffs argue that they served CNBMIT with the *Amorin* complaints, and cite to purported proofs of service they filed with this Court in January 2016.  PSC Resp. at 205 (citing Rec. Docs. 19945 and 19947).  But neither of the documents refers to the *Amorin*

B.      The *Morris*, *Posey*, And *Abner* Complaints Must Be Dismissed.

Plaintiffs admit that service has not even been attempted in the *Morris* and *Posey* actions

despite the fact that those complaints were filed more than six years ago.  PSC Resp. at 206

n. 701.  Federal Rule of Civil Procedure 4(m) mandates dismissal of an action which has not

been served within 120 days (or, now as amended, 90 days) of its filing.  Plaintiffs represent that

service has not been attempted in these actions "to avoid the financial expenditure associated

with serving a complaint in China," *id.*, but offer no authority suggesting that such concerns

excuse noncompliance with the rule.  Indeed, in the last six-plus years, the *Morris* and *Posey*

plaintiffs have never even sought an extension of that limit.  The complaints should therefore be

dismissed.

The *Abner* complaint should be dismissed as well.  Plaintiffs argue that they were

excused from timely service under Rule 4(m) because they obtained an extension on April 12,

2012 and served the complaint more than three-and-a-half years later, on December 2, 2015—

three months *after* Moving Defendants had noted the failure in their Motion.  PSC Resp. at

205-06.   But as Moving Defendants explained previously, Rule 4(m) does not allow for

indefinite extensions.  *See Gerena v. Korb*, 617 F.3d 197, 204 (2d Cir. 2010).  And Plaintiffs

offer no specifics showing their diligence to carry out service over the forty-five month period.

Plaintiffs complain of the Hague Convention's service requirements and their own decision to

---

Florida complaint, 11-cv-1672.  And although the documents purport to reflect service in 2013, Plaintiffs never explain why their own process server in 2014 submitted a declaration stating that service in that case had not been completed, *see* Ex. 111, Nunn Aff. ¶¶ V(b)-V(c) (describing transmission of suit documents in May 2013 and stating that "[n]o certificate of any kind has been received"), nor—for that matter—why they waited three years (and more than three months after CNBMIT raised this issue in its Motion) to file those proofs with this Court.

stagger the service of process, but do not explain how either of those could justify such a lengthy delay.  The *Abner* complaint should therefore be dismissed.[143]

### C.      CNBM Group And CNBM Company Were Not Served By The Louisiana Attorney General.

Finally, the Court should dismiss the State of Louisiana's action because its prior service on Thomas Owen, Esq., who has never been counsel for any Moving Defendant, was insufficient.  Rather than defend its only prior attempt to serve the CNBM Group or CNBM Co., Louisiana tries instead to bootstrap through its service on Taishan's attorney.  But its arguments for doing so fall flat.

Louisiana first argues that it served CNBM Group and CNBM Company when it served Taishan in April 2010 because "CNBM is the alter ego of Taishan."  Louisiana Resp. at 15.  As explained at length above, neither CNBM Group nor CNBM Co. is an alter ego of Taishan.  *See supra* §§ I.A., I.B.  And it is clear that Louisiana knew that the April 2010 service on Taishan did not apply to CNBM Group or CNBM Co. because in December 2014, it sought this Court's permission to approve alternative service of process upon those separate entities.  *See* Memorandum in Support of State of Louisiana's Motion to Approve Alternative Service of Process (Rec. Doc. 18213-1).  If Louisiana had served CNBM Group and CNBM Co. in 2010 as it now argues, it would have been unnecessary to seek this Court's approval for alternative service in 2014.

Second, Louisiana argues that it served Hogan Lovells, and that CNBM Group and CNBM Co. have "provided no evidence that Hogan Lovells was not its counsel."  Louisiana Resp. at 16.  Louisiana has it backward.  It is Plaintiffs' burden to establish the sufficiency of

---

[143]  Plaintiffs also argue that Moving Defendants' service defense in *Abner* is moot, because they were served pursuant to this Court's November 9, 2015 Order permitting alternative service.  *See* Rec. Doc. No. 19713.  Moving Defendants continue to reserve all rights and objections as to that Order.

service, not the other way around.  *See Carimi v. Royal Carribean Cruise Line, Inc.*, 959 F.2d 1344, 1346 (5th Cir. 1992) ("[O]nce the validity of service of process has been contested, the plaintiff bears the burden of establishing its validity.").  In any event, as this Court is well aware, Hogan Lovells was not counsel for CNBM Group or CNBM Co.; it was counsel for Taishan Gypsum Co. Ltd. and Tai'an Taishan Plasterboard Co. Ltd.[144]  Service on withdrawn counsel for another party is not sufficient, and Louisiana provides no authority for its novel argument.

Third, Louisiana relies on its service of CNBM Group's and CNBM Co.'s present counsel in October 2015, after Moving Defendants had filed their Motion.  But as Moving Defendants have explained previously[145] and reiterate here, under Rule 4 a Chinese corporation must be served pursuant to the terms of the Hague Convention, and CNBM Group must be served in accordance with the FSIA, 28 U.S.C. § 1608(b).  Louisiana's attempted service accomplishes neither.

Finally, Louisiana complains that "CNBM's tired game of 'hide and seek'" must end because CNBM Group and CNBM Company have "willfully attempted to avoid service of complaints."  Louisiana Resp. at 17 (citing Memo in Support of PSC's Mot. to Approve Alternative Service of Process (Rec. Doc. 19522-1)).  This misstates the record.  The very pleading cited by Louisiana establishes that CNBM Group and CNBM Co. *have* accepted service of the complaints served on them since appearing in these proceedings.[146]  Moreover, Louisiana's own case authority shows that it was required to comply with service procedures. *See Sakallah v. Harahan Living Ctr., Inc.*, No. CIV. A. 05-5492, 2006 WL 2228967, at *2 (E.D.

---

[144] *See, e.g.*, Rec. Doc. 17930-1.

[145] *See* Rec. Doc. 19559.

[146] *See* Rec. Doc. 19522-1 at 3-4, Exhibits D-E (service upon CNBM pursuant to the Hague Convention).

La. Aug. 2, 2006) (service must be "effected in accordance with the applicable rules of civil procedure"). As discussed above, service on CNBM Group's and CNBM Co.'s counsel is not "in accordance with the applicable rules of civil procedure." Thus, CNBM Group and CNBM Co. have not been properly served and Louisiana's action should be dismissed.

## CONCLUSION

For the foregoing reasons, as well as those stated in the memorandum supporting the CNBM Entities' motion, the complaints against the CNBM entities should be dismissed.


Dated: February 12, 2016

Respectfully submitted,


/s/ L. Christopher Vejnoska


L. Christopher Vejnoska (CA Bar No. 96082)
Ian Johnson (CA Bar No. 208713)
Andrew Davidson (CA Bar No. 266506)
Jason Wu (CA Bar No. 279118)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
San Francisco, CA  94105
Tel:  415-773-5700
Email:  cvejnoska@orrick.com
         ijohnson@orrick.com
         adavidson@orrick.com
         jmwu@orrick.com

Ewell E. Eagan, Jr. (LA Bar No. 5239)
Donna Phillips Currault (LA Bar No. 19533)
Alex B. Rothenberg (LA Bar No. 34740)
GORDON, ARATA, MCCOLLAM,
DUPLANTIS & EAGAN, LLC
201 St. Charles Avenue, 40th Floor
New Orleans, LA 70170-4000
Tel: (504) 582-1111
Email: eeagan@gordonarata.com
         dcurrault@gordonarata.com
         arothenberg@gordonarata.com

James L. Stengel (NY Bar No. 1800556)
Xiang Wang (NY Bar No. 4311114)
ORRICK, HERRINGTON & SUTCLIFFE LLP
51 West 52nd Street
New York, NY, 10019
Tel:  212-506-5000
Email:  jstengel@orrick.com
         xiangwang@orrick.com

Eric A. Shumsky (D.C. Bar No. 477926)
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street NW
Washington, D.C. 20005
Tel: 202-339-8400
Email: eshumsky@orrick.com

*Counsel for CNBM Entities*

57

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the above and foregoing **Reply in Support of CNBM Entities'**

**Motion to Dismiss for Lack of Personal Jurisdiction and Failure of Service** and

accompanying documents have been served on Plaintiffs' Liaison Counsel, Russ Herman, and

Defendants' Liaison Counsel, Kerry Miller, by U.S. mail and e-mail and upon all parties by

electronically uploading the same to File & Serve in accordance with Pre-Trial Order No. 6, and

that the foregoing was electronically filed with the Clerk of Court of the United States District

Court for the Eastern District of Louisiana by using the CM/ECF System, which will send a

notice of electronic filing in accordance with the procedures established in MDL 2047, on

February 12, 2016.


/s/ L. Christopher Vejnoska


L. Christopher Vejnoska (CA Bar No. 96082)
ORRICK, HERRINGTON & SUTCLIFFE LLP
The Orrick Building
405 Howard Street
San Francisco, CA  94105
Tel:  415-773-5700
Fax: 415-773-5759
Email: cvejnoska@orrick.com

*Counsel for CNBM Entities*