Confidential - Subject to Further Confidentiality Review

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  CHINESE-MANUFACTURED      :   MDL NO. 2047
DRYWALL PRODUCTS LIABILITY        :
LITIGATION                        :   SECTION:  L
                                  :
------------------------------    :   JUDGE FALLON
This Document Relates to:         :
ALL CASES                         :   MAG. JUDGE
                                  :   WILKINSON


CONFIDENTIAL - SUBJECT TO FURTHER
CONFIDENTIALITY REVIEW

MONDAY, OCTOBER 1, 2012

- - -


        Videotaped deposition of CLAY GEARY, held
at the Law Offices of Galloway, Johnson, Tompkins,
Burr & Smith, One Shell Square, 701 Poydras Street,
40th Floor, New Orleans, Louisiana, commencing at
9:34 a.m., on the above date, before Leslie B.
Doyle, Certified Court Reporter (LA), Registered
Diplomate Reporter, Certified LiveNote Reporter.


- - -

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

EXHIBIT

1

Confidential - Subject to Further Confidentiality Review

Page 2

```
 1   A P P E A R A N C E S:
 2
 3   APPEARING ON BEHALF OF THE PLAINTIFFS' STEERING
 4   COMMITTEE:
 5        CHRISTOPHER A. SEEGER, ESQUIRE
              Email:  Cseeger@seegerweiss.com
 6        Phone:  (212) 584-0700
          SEEGER WEISS, LLP
 7        77 Water Street
          New York, New York  10005
 8
 9        SCOTT ALAN GEORGE, ESQUIRE
              Email:  Sgeorge@seegerweiss.com
10        Phone:  (215) 553-7982
          SEEGER WEISS, LLP
11        1515 Market Street, Suite 1380
          Philadelphia, Pennsylvania  19102
12
13        GERALD E. MEUNIER, ESQUIRE
              Email:  Gmeunier@gainsben.com
14        Phone:  (504) 522-2304
          GAINSBURGH, BENJAMIN, DAVID, MEUNIER &
15          WARSHAUER, LLC
          2800 Energy Centre
16        1100 Poydras Street
          New Orleans, Louisiana  70163
17
18   APPEARING ON BEHALF OF INTERIOR/EXTERIOR BUILDING
19   SUPPLY, L.L.C.:
20        RICHARD G. DUPLANTIER, JR., ESQUIRE
              Email:  Rduplantier@gjtbs.com
21        BENJAMIN R. GRAU, ESQUIRE
              Email:  Bgrau@gjtbs.com
22        Phone:  (504) 525-6802
          GALLOWAY, JOHNSON, TOMPKINS, BURR & SMITH, PLC
23        701 Poydras Street, 40th Floor
          New Orleans, Louisiana  70139
24
25
```

Confidential - Subject to Further Confidentiality Review

```
                                                        Page 3
 1   APPEARANCES (CONTINUED):
 2
 3   APPEARING ON BEHALF OF NORTH RIVER INSURANCE
 4   COMPANY:
 5        KEVIN F. RISLEY, ESQUIRE
              Email:  Krisley@thompsoncoe.com
 6        BRIAN S. MARTIN, ESQUIRE
              Email:  Bmartin@thompsoncoe.com
 7         Phone:  (713) 403-8210
          THOMPSON, COE, COUSINS & IRONS, L.L.P.
 8        One Riverway, Suite 1600
          Houston, Texas  77056
 9
10   APPEARING ON BEHALF OF LANDMARK AMERICAN INSURANCE
11   COMPANY:
12        JUDY L. BURNTHORN, ESQUIRE
              Email:  Jburnthorn@dkslaw.com
13         Phone:  (504) 593-0689
          DEUTSCH, KERRIGAN & STILES, LLP
14        755 Magazine Street
          New Orleans, Louisiana  70130
15
16   APPEARING ON BEHALF OF NATIONAL SURETY CORPORATION
17   AND FIREMAN'S FUND INSURANCE COMPANY:
18        MEGAN E. DONOHUE, ESQUIRE
              Email:  Mdonohue@joneswalker.com
19         Phone:  (337) 593-7600
          JONES, WALKER, WAECHTER, POITEVENT, CARRERE &
20          DENEGRE, L.L.P.
          600 Jefferson Street, Suite 1600
21        Lafayette, Louisiana  70501
22
23
24
25
```

Confidential - Subject to Further Confidentiality Review

```
                                                   Page 4
  1   APPEARANCES (CONTINUED):
  2
  3   APPEARING ON BEHALF OF KNAUF:
  4       JAY P. MAYESH, ESQUIRE
             Email:  Jmayesh@kayescholer.com
  5          Phone:  (212) 836-7606
          KAYE SCHOLER, LLP
  6       425 Park Avenue
          New York, New York  10022-3598
  7
  8   APPEARING ON BEHALF OF THE STATE OF LOUISIANA:
  9       L. CHRISTOPHER STYRON, ASSISTANT AG
             Email:  Styronl@ag.state.la.us
 10          Phone:  (225) 326-6468
          OFFICE OF THE ATTORNEY GENERAL
 11       PUBLIC PROTECTION DIVISION
          1885 North 3rd Street
 12       Baton Rouge, Louisiana  70802
 13       DAVID L. BLACK, ESQUIRE (VIA TELEPHONE)
             Email:  Dblack@perkinscoie.com
 14          Phone:  (303) 291-2300
          PERKINS COIE, L.L.P.
 15       1900 Sixteenth Street, Suite 1400
          Denver, Colorado  80202
 16
 17   APPEARING ON BEHALF OF VARIOUS HOME BUILDERS:
 18   (VIA TELEPHONE)
 19       BRIAN A. EVES, ESQUIRE
             Email:  Beves@defensecounsel.com
 20          Phone:  (305) 774-9966
          MINTZER, SAROWITZ, ZERIS, LEDVA & MEYERS, LLP
 21       1000 NW 57th Court, Suite 300
          Miami, Florida  33126
 22
 23
 24
 25
```

Confidential - Subject to Further Confidentiality Review

Page 5

```
 1    APPEARANCES (CONTINUED):

 2

 3    APPEARING ON BEHALF OF VARIOUS HOME BUILDERS:

 4    (VIA TELEPHONE)

 5         STEPHANIE L. CHERALLA, ESQUIRE
               Email:  Scheralla@degan.com

 6           Phone:  (504) 529-3333

           DEGAN, BLANCHARD & NASH, PLC

 7         400 Poydras Street, Suite 2600

           New Orleans, Louisiana  70130

 8

 9    ALSO PRESENT:

10         JIM GEARY

11

12    VIDEOGRAPHER:

13         HANK COBB

           Golkow Technologies, Inc.

14

15                             ---

16

17

18

19

20

21

22

23

24

25
```

Confidential - Subject to Further Confidentiality Review

Page 6

1                    INDEX OF EXAMINATIONS

2    EXAMINATION

3       BY MR. SEEGER................................8

4       BY MR. MAYESH..............................56

5    ACKNOWLEDGMENT OF DEPONENT....................81

6    ERRATA.......................................82

7    LAWYER'S NOTES...............................83

8    CERTIFICATE..................................84

9                         * * *

10

11                    INDEX OF EXHIBITS

12   EXHIBIT 1....................................21

13      TEST REPORT (INT/EXT05774 - INT/EXT05775)

14   EXHIBIT 2....................................26

15      E-MAIL CHAIN (INT/EXT05718 - INT/EXT05720)

16   EXHIBIT 3....................................26

17      E-MAIL CHAIN (INT/EXT05946 - INT/EXT05947)

18   EXHIBIT 4....................................45

19      PABCO GYPSUM PHYSICAL TEST (INT/EXT00696)

20   EXHIBIT 5....................................59

21      E-MAIL CHAIN (KI0000073)

22   EXHIBIT 6....................................64

23      E-MAIL CHAIN (KI0000084)

24   EXHIBIT 7....................................71

25      E-MAIL CHAIN (INT/EXT03843 - INT/EXT03844)

Confidential - Subject to Further Confidentiality Review

1    EXHIBITS (CONTINUED):

2

3    EXHIBIT 8...................................73

4        E-MAIL (KI0000011)

5    EXHIBIT 9...................................74

6        E-MAIL (KI0000088)

7                              *  *  *

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

```
 1                    PROCEEDINGS
 2             THE VIDEOGRAPHER:  We are now on the
 3       record.  My name is Henry Cobb.  I'm the
 4       videographer for Golkow Technologies.
 5       Today's date is October 1st, 2012.  The
 6       time on the video screen is 9:34 a.m.
 7             This video deposition is being held in
 8       New Orleans, Louisiana, in the matter of
 9       Chinese Drywall.  The deponent today is
10       Clay Geary.
11             Counsel will be noted on the
12       stenographic -- stenographic record, and
13       the court reporter is Leslie Doyle, and
14       will now swear in the witness.
15             MR. SEEGER:  Do you want appearances?
16             COURT REPORTER:  No, sir.  We're going
17       to -- I'll note them on the stenographic
18       record.
19                      * * *
20                   CLAY GEARY,
21    after having been first duly sworn, was examined and
22            testified as follows:
23                      * * *
24                   EXAMINATION
25    BY MR. SEEGER:
```

Confidential - Subject to Further Confidentiality Review

Page 9

```
 1         Q.    Good morning, Mr. Geary.  I'm Chris
 2    Seeger.
 3         A.    Good morning.
 4         Q.    I'm going to ask you some questions.  Jay
 5    may, also, so...
 6               Mr. Geary, how did you first become aware
 7    of your -- you know, of the fact that Chinese
 8    drywall was available to you to import into the
 9    United States?  I'm thinking up around the 2005 time
10    frame -- time line.
11         A.    Well, that question would probably be
12    better asked to Jim.  He was -- he was the first one
13    that had the contact with Knauf.
14         Q.    Okay.  So putting aside the first
15    contact, --
16         A.    Okay.
17         Q.    -- were you involved in any of those
18    contacts?
19         A.    Yeah.  After the storm -- actually, the
20    supply was very tight before the storm, so the storm
21    just kind of exacerbated the problem.  After the
22    storm, we were contacted by numerous people about
23    the possibility of importing gypsum board from
24    different parts of the country -- different parts of
25    the world.  I'm sorry.
```

Confidential - Subject to Further Confidentiality Review

Page 10

```
 1        Q.   So you were already kind of checking other
 2   areas for where you can get your hands on some more
 3   drywall during that time frame, is that fair enough?
 4        A.   Yes.  People had contacted us.
 5        Q.   Okay.  Was China one of the places you
 6   were looking, or was that the one area of focus?
 7        A.   It wasn't -- no.  It wasn't where we were
 8   looking.  It was where people had come to us and
 9   suggested.
10        Q.   Okay.  And to the extent you know -- and
11   we're going to get to question your brother --
12             MR. SEEGER:  Are you the brother?
13             MR. JAMES GEARY:  Yes.
14             MR. SEEGER:  Okay.  I got the faces
15        right.
16   BY MR. SEEGER:
17        Q.   To the extent, you know, can you talk to
18   me a little bit about those relationships, those
19   people that came to you?  Who came to you?
20        A.   Various people, mainly people we did not
21   have relationships with in the past.  People were
22   contacting us via telephone.  They'd come in various
23   ways.  Flyers.
24        Q.   Just cold calls?
25        A.   Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 11

1        Q.   Did you seek out anybody, brokers or

2   people that served in that kind of function that

3   would match, you know, your company up with

4   companies outside the U.S.?

5        A.   My recollection is we had -- we had

6   contacted the people who had imported some board

7   from -- for us back in '99, and we did not have any

8   luck with them.  I don't recall contacting anyone

9   else that I can think of.

10       Q.   Talk to me just a little bit about the

11  company, the people back in '99 where you had

12  imported board from outside the U.S.  Just tell me

13  what you know about it.

14       A.   Two different sources.  One was from

15  Indonesia, a company called Borel, and then there

16  was -- the name escapes me.  We shipped some other

17  product -- got some other product from Thailand.  I

18  think it was SCG or SCT was the name of the company,

19  I believe.

20       Q.   And in both cases, Indonesia and Thailand,

21  was that drywall?

22       A.   Yes.

23       Q.   And you said it didn't work out.  Can you

24  explain what you mean by that?

25       A.   What I mean is that, when we contacted

Confidential - Subject to Further Confidentiality Review

Page 12

1    them about the problems we were having with supply

2    in 2005, they were not able to supply us anything in

3    2005.

4         Q.   Okay.  And how did it work out back in

5    '99, when you imported drywall from Indonesia and

6    Thailand?  Were you satisfied with the product?

7         A.   It was fine.  Everything was fine.

8         Q.   No complaints that you can recall?

9         A.   The complaints were heavy and sometimes

10   brittle.

11        Q.   Okay.  Was that a common complaint or just

12   a sporadic once -- one off?

13        A.   I would say sporadic.

14        Q.   Coming from homeowners, builders or across

15   the --

16        A.   Usually, the guy who has to hang it,

17   because he's the guy that has to pick it up.

18        Q.   Okay.  So heavy and brittle.  Any other

19   complaints with that?

20        A.   Not that I can recall.

21        Q.   Now, other than the instances that you

22   just told us about, where you -- in '99 now, I'm

23   going to go back a little bit -- Indonesia and

24   Thailand, had you imported or brought drywall in

25   from any other country outside the U.S.?

Confidential - Subject to Further Confidentiality Review

Page 13

1          A.    The only other time I would tell you would

2    be -- is a company based in Mexico, Panel Rey, and

3    we've gotten a little bit of product through those

4    guys through the years, not much.  But that's very

5    similar to the way we get domestic product, because

6    you just call them and they send a truckload, an

7    18-wheeler.

8          Q.    How did that work out?

9          A.    I think that was fine.

10         Q.    The companies that you used to put you

11   together with the Indonesian board and the board

12   from Thailand, were they involved in 2005 at all?  I

13   mean, you said you contacted them and they couldn't

14   help you, but were they involved in any way with

15   bringing in Chinese board?

16         A.    No, no.

17         Q.    Okay.  So who assisted you -- to the

18   extent you know, who assisted you at INEX with

19   bringing in board from China, the names if you can

20   identify people?

21         A.    We dealt directly with Knauf --

22         Q.    Okay.

23         A.    -- with the Knauf shipments.

24         Q.    And what about what regard to the Taishan

25   board?

Confidential - Subject to Further Confidentiality Review

Page 14

1         A.    Jim had more of the dealings with that,

2    and that was through a broker.

3         Q.    Okay.  And just so I can really delineate

4    who did what, did you have any dealings with anybody

5    regarding Taishan board?

6         A.    I really did not.

7         Q.    Okay.  Because I -- there's a glimmer of

8    hope there, that I should keep asking you questions,

9    I think.

10         A.    No.  Jim dealt with most of the Metro

11    Resources transactions.  I dealt with most of the

12    Knauf transactions.  Jim had the initial

13    conversation with Knauf regarding the Knauf

14    transactions.  But as far as the transactions

15    themselves, I dealt with them; he dealt with Metro.

16         Q.    Okay.  But you are on some of the e-mails

17    regarding imported drywall from China, right?  I

18    mean, you recall being on e-mails?

19         A.    Yeah.  And we -- you know, we had

20    conversations back and forth.

21         Q.    Okay.  And do you know who -- I'm sorry.

22    I forgot the name.  I'm probably going to say all

23    these names wrong, but David Zhang, Zhang (different

24    pronunciation)?

25         A.    David Zhang, I think that was the broker

Confidential - Subject to Further Confidentiality Review

Page 15

1    for -- with Metro Resources.

2         Q.    Okay.  Who is Metro Resources?

3         A.    That was the broker that helped us secure

4    the Taishan board.

5         Q.    Okay.

6               And had you ever dealt directly or spoken

7    directly or been in any kind of communication with

8    David Zhang or anybody at Metro?

9         A.    Not that I recall.

10        Q.    Are you involved in quality --

11        A.    I take that back.  When the problem

12   surfaced, I think I was on a conference call with

13   Jim when we tried to call David Zhang, but I -- it's

14   very fuzzy.  I don't remember the exact

15   conversation.

16        Q.    When you say, "the problem surfaced,"

17   what's the time frame you're talking about?

18        A.    That would be, I guess May of '09,

19   probably.

20        Q.    And do you know who Susan Li is?

21        A.    Susan Li is -- was with Weida Freight.

22        Q.    And can you tell me who she is?

23        A.    J.W. Allen, who was our freight forwarder,

24   hired Weida Freight to inspect some of the product

25   as it was being loaded onto the ships.  In addition,

Confidential - Subject to Further Confidentiality Review

1    Susan Li contacted BNBM for us and tried to develop

2    a relationship so that we could possibly get board

3    from those guys.

4        Q.   Now, between you and Jim, would it be both

5    of you or one of you responsible for, like, making

6    sure that the board is ASTM compliant or just, you

7    know, up to your standards?  Who would be involved

8    in that?

9        A.   Well, we're both aware that you need an

10   ASTM standard.  I don't think either one of us could

11   tell you, you know, the specifics of what an AS --

12   what that standard is, but we are both aware that

13   you have to have that ASTM standard.

14       Q.   Okay.  Mr. Geary, you would agree that

15   that's a very important thing to have, particularly

16   with regard to drywall or bringing product -- buying

17   product outside the U.S. and bringing it in,

18   correct?

19       A.   Yes.

20       Q.   So what did you do -- and to the extent

21   you were involved, what did you do to satisfy

22   yourself that the board that came from Taishan --

23   put aside Knauf -- was ASTM compliant?

24       A.   As I said, Jim handled that, but --

25       Q.   So just speak as to what you know.

Confidential - Subject to Further Confidentiality Review

Page 17

```
 1        A.    We needed to make sure that it was ASTM
 2    compliant.
 3        Q.    How did you do that?
 4        A.    As I said, he handled that transaction.
 5        Q.    Okay.  So you want me to talk to Jim
 6    about --
 7        A.    Yes.
 8        Q.    Okay.  What kind of -- going now to
 9    Chinese drywall, the Taishan board or Knauf, when
10    did you personally first become aware of any kind of
11    complaints about the drywall itself?  Anything.  It
12    can be anything, small, big, you know.
13                MR. DUPLANTIER:  Let me object to the
14            form of the question.
15                Subject to that, you can answer it.
16    BY MR. SEEGER:
17        Q.    That would be something that you should
18    only answer what you can answer.
19        A.    In general, we heard that it was heavy.
20        Q.    Uh-huh.
21        A.    And some people said it was brittle.
22        Q.    And the heaviness and the brittleness in
23    your mind, it related to the gypsum itself, correct?
24        A.    The heaviness was just the weight of the
25    product.
```

Confidential - Subject to Further Confidentiality Review

1          Q.    It wasn't related to the paper; it was

2     related to the gypsum in the board, right?

3          A.    The board itself.

4          Q.    Did you receive any other complaints that

5     you can think of sitting here right now?

6          A.    No.

7          Q.    Putting aside drywall, have you ever

8     imported a product from China, any product?  Screws,

9     anything?

10         A.    Have we?

11         Q.    Yeah, INEX.

12         A.    I know -- I believe we've gotten imported

13    product before, but whether we did -- I don't recall

14    if we've imported any screws or not before.  I think

15    we may have, but I am not positive.

16         Q.    I didn't mean to limit it to screws.  I'm

17    sorry.  I was just trying to give an example.

18         A.    No.  That would probably be the only

19    product, I think.  Maybe fasteners, other types of

20    fasteners.  But whether someone else imported it for

21    us and we just bought it or we imported it directly,

22    I don't recall.

23         Q.    Any problems with the product?

24         A.    No.

25         Q.    Now, Mr. Geary, this may sound like a

Confidential - Subject to Further Confidentiality Review

1    crazy question, but I got to ask you.  Do you read

2    the newspaper every day?

3          A.    Skim it, yes.

4          Q.    Okay.  Which newspaper do you read?

5          A.    The Times Picayune.

6          Q.    And what about watch TV?  Do you watch

7    news on TV?

8          A.    On occasion.

9          Q.    And do you have a station that you prefer

10    to watch for news?

11          A.    I usually tend to watch Fox.

12          Q.    And had you been aware -- let's go back to

13    2005.  Had you been aware or do you recall being

14    aware of just problems that might have been reported

15    in the news regarding products from China, toys --

16    anything now?  I'm just -- the gamut.

17          A.    I'm sure I have.  I don't recall

18    specifically.

19          Q.    Do you -- when you buy product from

20    outside the U.S. -- and, again, I'm just talking

21    about any kind of product -- do your antennas go up;

22    do you say to yourself, I need to have sort of a

23    heightened level of carefulness here; I want to make

24    sure it's, you know, up to U.S. standards, it's a

25    good product?  Do you do that kind of --

Confidential - Subject to Further Confidentiality Review

1     A.   Well, we thought we were being as diligent
2  as possible.  We had, you know ASTM certifications.
3  We had a -- what I thought was a pretty
4  all-encompassing warranty.  We had, you know,
5  certification of quality, condition.  We thought we
6  were dotting our "I"s and crossing our "T"s.
7     Q.   When you say you had ASTM certifications,
8  I mean, I haven't seen anything produced -- I could
9  be wrong -- that showed actual, like, ASTM
10  certifications.  Do they exist as far as you know?
11  I'm not asking you what you might have discussed
12  with your lawyer or anything like that.  But did you
13  actually see U.S.-produced ASTM certifications?
14     A.   I don't know that we did or not.
15     Q.   I mean, you probably saw -- I saw one in
16  the production that was in Chinese, and it was kind
17  of translated into English.
18     A.   There was one that -- it did have --
19  correct.  There was an ASTM certification.
20     Q.   Okay.  Did you do anything to satisfy
21  yourself that that was actually a real ASTM
22  certification as opposed to something somebody might
23  have just created on their laptop?
24     A.   No.
25     Q.   Okay.  And you understand reps and

Confidential - Subject to Further Confidentiality Review

Page 21

1    warranties that you may get from a company that

2    sell you drywall, that's not an ASTM certification,

3    that's just their promise that there's a certification,

4    correct?

5         A.    Repeat the question.

6         Q.    If you get a representation or a warranty

7    from a company like Taishan and they say, we promise

8    we're ASTM certified, that's not an actual ASTM

9    certification, that's just them saying it's an ASTM

10   certification?

11              MR. DUPLANTIER:  I'm going to object

12         to the form of the question.

13              Subject to that, you can answer it.

14        A.    Yes.

15   BY MR. SEEGER:

16        Q.    So -- and other than getting reps and

17   warranties and a certificate in Chinese, you didn't

18   satisfy yourself, do any search, hire anybody to go

19   check records to determine whether it was an actual

20   ASTM certification; is that fair?

21        A.    You say it's in Chinese.  My under -- my

22   recollection was it was in Chinese, but it had

23   English writing on it, also.

24        Q.    I'll show it to you.  Might as well.

25              MR. SEEGER:  Can I just mark 1 and

Confidential - Subject to Further Confidentiality Review

Page 22

1          we'll put the name later?

2                COURT REPORTER:  Yes.

3                MR. SEEGER:  To save time.

4    BY MR. SEEGER:

5          Q.   Mr. Geary, what I've just marked as 1, is

6    this the ASTM certification you're talking about?

7          (Deposition Exhibit 1 was marked for

8                    identification.)

9          A.   Yes.

10         Q.   Okay.  Now, prior to the time that you got

11   that document in front of you, and the jury will get

12   to see it, which is somewhat in Chinese and there's

13   some English translations, had you ever received a

14   certification like that for either -- prior to the

15   time you got that one, for either drywall or any

16   kind of product that you sell at INEX?

17               MR. DUPLANTIER:  I'm going to object

18          to the form of the question.

19               Subject to that, if you understand it,

20          you can answer it, Clay.

21         A.   I'm not sure if I do understand it.

22   BY MR. SEEGER:

23         Q.   Okay.  Let me -- thank you for that.  Let

24   me try to do a better job.

25               So you imported -- you know, drywall is

Confidential - Subject to Further Confidentiality Review

Page 23

```
 1    not the only product that requires an ASTM -- that
 2    requires ASTM compliance; is that fair?
 3           A.    Correct.
 4           Q.    Okay.  And you have imported other
 5    products that require them to be compliant with ASTM
 6    or U.S. standards; fair enough?
 7           A.    As I said, I don't recall if we imported
 8    it or someone else imported it for us.
 9           Q.    Okay.  But you still would want to be sure
10    before you sold it to a builder or a homeowner that
11    it was compliant with U.S. standards anyway; is that
12    fair?
13           A.    Yes.
14           Q.    Okay.  Had you ever received a
15    certification for any product that was in two
16    languages like that that purported to say that it
17    was ASTM compliant?
18           A.    No, I did not -- I have not.
19           Q.    Okay.  Did you take that certification and
20    just compare it to what you would typically see as a
21    ASTM certification to satisfy yourself that, you
22    know, the testing looked appropriate, at least on
23    the surface?
24           A.    No, I did not.
25           Q.    Okay.  Do you know if anybody at INEX did
```

Confidential - Subject to Further Confidentiality Review

Page 24

1    that?

2         A.    It would have been either Jim or I.

3         Q.    Okay.  So we'll talk to Jim later about

4    that.

5              MR. MAYESH:  May I just ask, what is

6              the exhibit number for this?

7              MR. SEEGER:  Oh, thanks, Jay.

8              MR. GRAU:  1.

9              MR. SEEGER:  Oh, the exhibit number is

10             1.

11             MR. MAYESH:  We're not going to

12             continue the prior --

13             MR. SEEGER:  Oh, you know something?

14             I didn't even think about that.

15             MR. MAYESH:  Okay.  1 is good.  I

16             don't care.

17             MR. SEEGER:  Is that okay?

18             MR. MAYESH:  Yeah, sure.

19             MR. SEEGER:  All right.

20   BY MR. SEEGER:

21        Q.    Now, do you recall with regard to Taishan

22   board there actually -- in terms of the people you

23   dealt with, David Zhang and Susan Li, there being

24   somewhat of a conflict as to whether ASTM

25   certification even existed for the board?  Do you

Confidential - Subject to Further Confidentiality Review

1    have a recollection of that?

2         A.    David Zhang and Susan Li were two

3    different transactions.

4         Q.    That's correct.  Okay.  So then correct me

5    on that, please.  Which -- what was David Zhang

6    involved with, and what was Susan Li --

7         A.    I believe David Zhang was with Metro

8    Resources.

9         Q.    Right.

10        A.    Susan Li was with Weida Freight, and

11   she -- she did some of the inspection of the Knauf

12   product as it was loading onto the ships, and she's

13   the one that developed the relationship with BNBM.

14        Q.    Okay.  And was it your under -- let me

15   strike that.

16             But they both were assisting you in

17   importing board from Taishan; is that fair?

18        A.    Yes.

19        Q.    Okay.

20        A.    No, no, no, no.  Not from Taishan.

21        Q.    Okay.  That's what I want.

22        A.    Susan Li was helping us with Knauf.

23        Q.    Okay.  Let me just mark two exhibits and

24   give you a moment to look at them, Mr. Geary.

25                  MR. MAYESH:  Which one is 2 and which

Confidential - Subject to Further Confidentiality Review

Page 26

1            one is 3?

2                MR. SEEGER:  I'm going to tell you in

3            two seconds, Jay.  I thought as you got

4            older you'd be more patient, you know.

5                MR. MAYESH:  You know what?

6                MR. MEUNIER:  I think it works in the

7            other direction.

8                MR. MAYESH:  It sure does.  I often

9            chide -- I need more Zen.  I need more of

10           what you're doing, Chris.

11     BY MR. SEEGER:

12        Q.   For the record, I'm marking as Exhibit 2

13     the e-mail that's Bates stamped INT/E -- INEX 05718

14     through 20, and I'm going to hand that to you,

15     Mr. Geary.  And let me just identify the other one,

16     and then you can take a moment to look at them, if

17     you like.

18           (Deposition Exhibit 2 was marked for

19                 identification.)

20           Exhibit 3 I'm marking, which is INEX05946

21     through 47.

22           (Deposition Exhibit 3 was marked for

23                 identification.)

24           And here, now you have both of them.  I'm

25     going to start with the document that we marked as

Confidential - Subject to Further Confidentiality Review

Page 27

1    2, but if you want to take a quick look at both,

2    feel free to do that.

3              MR. DUPLANTIER:  Which one did you

4         mark as 2?  5718?

5              MR. SEEGER:  Yes.

6    BY MR. SEEGER:

7         Q.   Mr. Geary, let me ask you just a couple

8    questions, and if you feel you need to look at this

9    to answer any of them, just let me know and go ahead

10   and do it.  Okay?

11        A.   Okay.

12        Q.   All right.  You're on this e-mail, first

13   of all, right, on Exhibit 2?

14        A.   You're on 2?

15        Q.   Yeah.  You're looking at 3.

16        A.   Okay.  I'm sorry.

17        Q.   That's okay.

18        A.   Okay.

19        Q.   Okay.  And this is the e-mail that has --

20   that Susan Li is on, correct?

21        A.   Yes.

22        Q.   It's dated -- the one I'm looking at is at

23   the bottom of the first page dated December 28th,

24   2005.  Do you see that?

25        A.   Yes.

Confidential - Subject to Further Confidentiality Review

Page 28

```
 1        Q.    Okay.  The subject line says, "Gypsum
 2   wallboard market in China."  I'm just wondering,
 3   and you might know where, and I may have missed
 4   it, but is there any -- anywhere on the three
 5   pages of this exhibit where she's talking about
 6   Knauf board?  Because when I look on the second
 7   page, there's a mention of Shandon Taihe Tongxing,
 8   Limited, which I understand to be Taishan.
 9        A.    Okay.  Excuse me.  No, she's not.
10        Q.    All right.  So for the correction, it's
11   Taishan, correct, not Knauf?
12        A.    Well, they talk about BNBM in here, as
13   well.
14        Q.    Okay.  But BNBM you understand to be -- in
15   your mind, is linked up with the Taishan board,
16   correct?
17        A.    I did not know that at the time, but I'm
18   understanding that that's the case.
19        Q.    Okay.  Do you understand that -- did you
20   understand at the time that BNBM and TTP -- I think
21   it's Tongxing Taihe Plasterboard -- had a
22   relationship?
23        A.    No.
24        Q.    Okay.  But by looking at this e-mail, you
25   can see we're talking about the board from Taishan
```

Confidential - Subject to Further Confidentiality Review

Page 29

1    and not the Knauf board; correct?

2          A.   Yes.

3          Q.   Okay.  And if you look on the first page

4    of this, sir, she says -- she's writing to Rudy.

5    Who's Rudy Remont, by the way?

6          A.   Rudy Remont was an employee of J.W. Allen,

7    did some of the inspection of the product getting

8    onto the ships for us.

9          Q.   Okay.  And this e-mail was ultimately

10   forwarded to you, because if you look at the top of

11   the page, you're on the one that's dated

12   December 29th, 2005, 3:30 p.m., correct?

13         A.   Yes.

14         Q.   And she says -- you know, it's kind of

15   written in code, but it says, ASTM C-36 have not got

16   the license.  She says H-V, but I understand that to

17   be "have."  Is that a fair reading of that?

18              MR. DUPLANTIER:  Object to the form of

19         the question.

20              Subject to that, you can answer it,

21         Clay.

22         A.   Yes.

23   BY MR. SEEGER:

24         Q.   That would be a fair reading of ASTM C-36

25   H-V, meaning have not got the license, correct?

Confidential - Subject to Further Confidentiality Review

                                                        Page 30

 1          A.    Correct.

 2          Q.    Okay.  It means the factory of Taihe do

 3    not apply ASTM C-36 authentication in America, but

 4    they have got -- and then she says 100,000 pieces,

 5    correct?  Am I reading that correctly?

 6                 MR. DUPLANTIER:  Object to the form of

 7              the question.

 8                 You can answer.

 9          A.    They've got 100,000 pieces, it says.

10    BY MR. SEEGER:

11          Q.    And she also says that the factory of

12    Taihe do not apply ASTM C-36 authentication in

13    America, correct?

14          A.    Yes.

15          Q.    All right.  Now, I'm just curious.  When

16    you saw this -- because you're Clay Geary and you're

17    on this -- did you do anything to satisfy yourself

18    that that statement was either not true or, in

19    fact -- other than what we talked about, that

20    certificate we looked at.

21          A.    Uh-huh.

22          Q.    Did you do anything beyond that

23    certificate to satisfy yourself that there was, in

24    fact, ASTM compliant board coming from Taishan?

25          A.    This was in December of '05, and we did

Confidential - Subject to Further Confidentiality Review

Page 31

1    not buy the Taihe board at that time.

2        Q.   But you did buy board from Taihe, correct,

3    ultimately?

4        A.   We did.

5        Q.   Did you do anything at that time to

6    satisfy yourself, other than the certificate that we

7    talked about -- all right?  In your mind, that could

8    be whatever it is.  But I'm saying, other than that

9    certificate, did you do anything else to satisfy

10   yourself that the board was ASTM compliant?

11       A.   As I said, Jim handled that transaction.

12       Q.   Okay.  So we'll talk to Jim.

13            Now, if you look at the other document

14   that we marked as Exhibit 3, the e-mail from David

15   Zhang, I guess -- you can see at the very top of

16   this e-mail, it's dated December 14th, 2005,

17   also -- not also.  Strike that.

18            It's dated December 14th, 2005, correct?

19       A.   Yes.

20       Q.   Okay.  And I see your brother is on this

21   at the top, but you're not, correct?

22       A.   Correct.

23       Q.   Okay.  Did you have any direct dealings

24   with David Zhang or Metro Resources at -- in this

25   time frame I'm talking about?

Confidential - Subject to Further Confidentiality Review

Page 32

```
 1              MR. DUPLANTIER:  Object.  It's been
 2         asked and answered, but you can answer it
 3         again.
 4      A.   Not that I recall.
 5  BY MR. SEEGER:
 6      Q.   Okay.  At any time frame later than this?
 7      A.   I mentioned that I think we got on the
 8  phone with him in, you know, the spring of '09 time
 9  frame when the problems had arisen.
10      Q.   Okay.  I'll try not to ask you that again.
11              MR. DUPLANTIER:  You mean the third
12         time?
13              MR. SEEGER:  I'll try not to ask it a
14         third time, correct, because you look
15         grumpy today, and I don't want to get into
16         an argument.  You're a little
17         scary-looking.
18  BY MR. SEEGER:
19      Q.   Okay.  So we covered that.
20           Are you familiar with who King Wholesale
21  is?
22      A.   Yes.
23      Q.   Who is that?
24      A.   That's a predecessor company, I guess
25  you'd say.
```

Confidential - Subject to Further Confidentiality Review

Page 33

1          Q.   Okay.  Predecessor company to who?

2          A.   We had a family reorganization, and so

3     Interior/Exterior was formed in 2001.

4          Q.   I see.  Does King Wholesale still exist?

5          A.   I think we're still registered with the

6     Secretary of State, but there are no operations;

7     haven't been since 2002.

8          Q.   Is that -- to the extent it would still

9     exist, is that a company that you and your brother

10    own?

11         A.   Yes, amongst others.

12         Q.   Okay.  In the INEX family of companies,

13    could you identify who that -- like the corporate

14    organization -- who that is?  Is there a parent

15    company that owns INEX or a sister company --

16         A.   It's a limited partnership.  The general

17    partner is Interior/Exterior Enterprises.  The

18    limited partner is South Cortez, L.L.C.  Jim, myself

19    and two other siblings own -- are the members of the

20    general partnership.

21         Q.   Okay.  Are there companies that do this

22    kind of work, you know, supply type -- you know,

23    building supply work that are under INEX that are

24    owned by INEX?

25                   MR. DUPLANTIER:  I'm going to object

Confidential - Subject to Further Confidentiality Review

1              to the form of the question.

2                  You can answer it, though, Clay.

3       A.    No.  We have, you know, branches but no

4    other divisions.

5    BY MR. SEEGER:

6       Q.    Right.

7       A.    No.

8       Q.    But the branches are owned by INEX?

9       A.    Yes, yes.

10      Q.    Was it INEX or King Wholesale that

11   was involved in the purchase of the Indonesian

12   board?

13      A.    That would have been King Wholesale.

14      Q.    Okay.  And I'm sorry.  This is me asking

15   you the question over again.  When did you say INEX

16   sort of became -- when it took over the operations?

17   2001?

18      A.    INEX -- interior/Exterior was formed in

19   2001; began operations on January 1st, 2002.

20      Q.    Okay.  Thank you.  I won't ask you that

21   one again, either.

22                  I came across, looking through documents,

23   of a reference to Elephant Board.  Can you clarify

24   that for me?  What's that about?

25      A.    My recollection is Elephant Board was the

Confidential - Subject to Further Confidentiality Review

1    brand name of the gypsum board we brought in from

2    Thailand.

3         Q.   Okay.  And that would -- that brand name,

4    that was on the board?

5         A.   My recollection, yes.

6         Q.   Okay.  And you had customers at that

7    time -- and I asked you a little bit about it.  I

8    want to go a little bit more into it.  You had

9    customers at that time that specifically had asked

10   you not to ship or sell them Elephant Board; is that

11   right?

12        A.   We may have.  I don't recall.

13        Q.   When did you stop importing board from

14   Indonesia?  I know you bought it in '99.  Did it

15   continue for several years or --

16        A.   No.  Similar to the situation -- actually

17   shorter, I believe.  You know, it was a very tight

18   supply in the U.S., and we did it for a very short

19   period of time, and then supply freed up in the

20   U.S., so we stopped importing.

21        Q.    Okay.  And it would always be your

22   preference to buy board in the -- domestic board in

23   the U.S. as opposed to going outside the U.S.; is

24   that fair?

25        A.   It's much easier and less risky because

Confidential - Subject to Further Confidentiality Review

Page 36

1    your -- you know, the price fluctuates on the

2    product, and if you place an order today, normally

3    you can get it in two or three days.  If you order a

4    ship from overseas, the price could drop

5    tremendously by the time you get it.

6         Q.   Do you also, though, have a higher comfort

7    level with American products as opposed to going

8    outside the U.S.?

9         A.   We didn't -- I don't know that it was that

10   as much as it was -- it was convenience, easy, not

11   as much risk, price risk --

12        Q.   Sitting --

13        A.   -- or cost risk.

14        Q.   I'm sorry.  I didn't mean to cut you off.

15        A.   That's okay.

16        Q.   Sitting here today, do you have domestic

17   board in your supply houses, your warehouses?

18        A.   Yes.

19        Q.   Any foreign board?

20        A.   No.

21        Q.   Did the -- you can only answer this for

22   yourself.  We'll speak to your brother later.  But

23   did the experience with the Indonesian board shape

24   your impressions on what you should or should not do

25   with regard to importing board from outside the

Confidential - Subject to Further Confidentiality Review

Page 37

1    U.S.?

2         A.    To a certain degree.  I think in the

3    documents I produced, I remember, you know, getting

4    a copy of our letter of credit that we used for that

5    other board to make sure that we had all the

6    specifics as far as the requirements that we needed,

7    as far as warranties and ASTM certificates and so

8    forth.

9         Q.    Okay.

10              MR. SEEGER:  I'm going to streamline

11              this, and I know this is an early time to

12              take a five-minute break, but if I take a

13              five-minute break, I'll probably save us

14              an hour.

15              MR. DUPLANTIER:  You can take any

16              time -- take as many breaks as you like.

17              MR. SEEGER:  Okay.  And feel free to

18              use the bathroom.

19              THE WITNESS:  I'm fine.

20              MR. SEEGER:  Let's take a five-minute

21              break.

22              THE VIDEOGRAPHER:  The time now is

23              10:04 a.m.  We are now off the record.

24    (Recess.)

25              THE VIDEOGRAPHER:  The time now is

Confidential - Subject to Further Confidentiality Review

1            11 -- or, sorry -- 10:12 a.m.  We are now

2            back on the record.  This is a

3            continuation of tape 1.

4    BY MR. SEEGER:

5        Q.    Mr. Geary, I just want to clarify

6    something.  When I was asking you about the board

7    from Indonesia, and you had said some of the

8    complaints were about the weight of the board and

9    brittleness.  Do you recall us discussing that?

10       A.    Yes.

11       Q.    Okay.  And I said to you, the brittleness

12   and the weight, in your mind, did it relate to the

13   gypsum itself?  I just want to be clear on what you

14   thought the problem was there.  Was it the -- was it

15   the paper?  Was it the gypsum?

16            MR. DUPLANTIER:  I'm going to object

17            to the form of the question.

18            Subject to that, you can answer it.

19            MR. RISLEY:  Object to the form.

20       A.    I would assume it would be the product,

21   the whole product.  I can't imagine the weight of

22   the paper would have necessarily made much of a

23   difference, but the weight of the product itself.

24   BY MR. SEEGER:

25       Q.    Right.  Okay.

Confidential - Subject to Further Confidentiality Review

Page 39

1                COURT REPORTER:  I'm sorry.  Can you

2            say that one more time, please?

3                THE WITNESS:  The weight of the

4            product itself.

5    BY MR. SEEGER:

6        Q.   I can't imagine that the weight of the

7    paper would have made much -- it was the weight of

8    the product.  That was the answer, right?

9        A.   Yes.

10       Q.   Okay.  Now, I want to go back a little bit

11   now to the time frame when you're receiving the

12   Taishan board.  We talked a little bit about ASTM.

13   Are there things on the board itself that you would

14   look for to satisfy yourself that the board is ASTM

15   compliant?

16       A.   Things on the board?

17       Q.   Yeah.  Identification --

18       A.   I can't recall.  I believe it -- I can't

19   recall if it had ASTM stamped on it or not, the ASTM

20   number.

21       Q.   And if it did or didn't, would it have

22   other things?  Would the rule, the ASTM rule,

23   require the board to have things, like the name of

24   the -- you know, of the manufacturer or, you know, a

25   certain kind of bonding tape or something like that?

Confidential - Subject to Further Confidentiality Review

Page 40

1      A.   It did have the name of the -- it said
2  Taihe brand name on the end tape.
3      Q.   Okay.  And were there other things that
4  you can recall that would help you satisfy yourself
5  that the board is ASTM compliant that you would look
6  for?
7      A.   Not that I recall.
8      Q.   Okay.  Would you be -- would you have been
9  involved in that at that time, or would your
10  brother?
11      A.   As far as whether there was a marking, an
12  ASTM number on the board?
13      Q.   Either an ASTM number or that the board
14  itself had the things that the ASTM rule says it
15  needs to have.
16      A.   We had in a letter of credit that the
17  board would be ASTM certified.  We also had in there
18  that it had to say "Made in China" on it, because we
19  understood that to be a regulatory concern.
20      Q.   And did you satisfy yourself that those
21  things were there?
22      A.   "Made in China," yes.
23      Q.   What about with regard to the thickness?
24  Was that identified on the board?
25      A.   Yes, it is.

Confidential - Subject to Further Confidentiality Review

Page 41

1          Q.    The name of the producer or supplier?

2          A.    It said "Taihe."  You're talking about the

3    Taishan board?

4          Q.    Yeah.

5          A.    It said "Taihe" on the end tape.

6          Q.    Okay.  The brand name?

7          A.    I don't recall.

8          Q.    ASTM specification for the product?  And I

9    think you said you don't recall if that was there.

10         A.    I don't recall that.

11         Q.    Did you have dealings with SGH?

12         A.    SGH?

13         Q.    SGS.  So many initials here.  SGS; did you

14   have dealings with SGS?

15         A.    We discussed them doing some inspections

16   for us, but we did not -- not do any.

17         Q.    Didn't do any?

18         A.    Not with them.

19         Q.    What does SGS do?  What's their business?

20         A.    I believe they do inspections for products

21   coming into the U.S., but that's a guess.  I'm not

22   positive.

23         Q.    Well, why would you hire them?  Just to

24   get into your head a little bit, why would you -- I

25   understand you're saying they didn't do anything,

Confidential - Subject to Further Confidentiality Review

Page 42

1    but if you were to hire SGS, what would you hire

2    them to do?

3         A.   We were -- we wanted to make sure the

4    product was loaded onto the ship without damage,

5    that the quantity was correct, you know, whether

6    there were banged ends on the side when they get

7    loaded to the ship and so forth.

8         Q.   Would SGS be -- have the ability to do

9    testing on a product if you wanted them to?

10        A.   I don't -- I don't know if they do

11   testing, actual -- during the manufacturing process,

12   you're talking about?

13        Q.   Well, at any point.

14        A.   I don't know if they do testing during the

15   manufacturing process.  I don't know.

16        Q.   Would they do testing at any point?  Would

17   they do testing at the -- like, if you received the

18   board and you wanted to have some tests done to make

19   sure -- to check purity or things like that?

20        A.   I don't -- I don't know.

21        Q.   Okay.  Who -- and I'm sorry.  You said

22   that you wound up not using SGS with regard to the

23   Taishan board; is that right, or you did?

24        A.   We did not.

25        Q.   Did not.  So who did the inspections for

Confidential - Subject to Further Confidentiality Review

Page 43

1    you when the board came in?  Did you guys do that?

2         A.   As I said, Jim handled that.

3         Q.   Okay.  So we'll ask Jim.

4              Give me a second.

5              What would have been the minimum type of

6    testing or inspection that INEX would have wanted

7    with regard to the Taishan board?

8              MR. DUPLANTIER:  I'm going to object

9              to the form of the question.

10             Subject to that, you can answer it,

11             Clay.

12        A.   We were basically concerned whether it

13   had -- same with the Knauf board.  We were basically

14   concerned whether it was banged up and as it was --

15   well, let me take a step back.  The Taishan board

16   was shipped via container.  It was a broker who

17   handled it.  So we didn't inspect the product or

18   have anyone look at the product prior to delivery to

19   New Orleans.

20   BY MR. SEEGER:

21        Q.   Okay.  But what about when it got to New

22   Orleans?

23        A.   When it got to New Orleans, it came in

24   container, and we, you know, had to take the product

25   out of the containers, and we were looking for

Confidential - Subject to Further Confidentiality Review

Page 44

1    visual damage.

2         Q.    Would you have noticed -- like, you had

3    said that some of the complaints about the Taishan

4    board was also weight and brittleness.  Would that

5    have been noticed at the time of those inspections,

6    when the board came off the ship, or no?

7         A.    No.  The weight we would have known

8    probably before we ordered the product.

9         Q.    Okay.  Did you have the ability to

10   actually go and view the manufacturing processes in

11   Taishan if you wanted to?

12        A.    I don't believe so.

13        Q.    Did you ask or inquire?

14        A.    That would be Jim.

15        Q.    Okay.  Do you know what a material safety

16   data sheet is?

17        A.    In general.

18        Q.    Could you tell me what your general

19   understanding of that is?

20        A.    My general understanding is that's a sheet

21   used in case there's any problem with a product, be

22   it being ingested by an employee or an airborne

23   problem and what you should do in the event there's

24   some type of safety problem with the product.

25        Q.    Okay.  And you received actually a

Page 45

1    material safety data sleet for the Knauf board,
2    correct, Mr. Geary?
3        A.   Yes.
4        Q.   Did you ever get one for Taishan?
5        A.   You'd have to ask Jim that.
6        Q.   Who's David Alexander?
7        A.   I don't recall that name.
8        Q.   That's another Jim question?
9        A.   I'm not sure who that is.  I don't recall
10    that name.
11        Q.   Okay.  For the record, Mr. Geary, I'm
12    marking Exhibit 4, which is INEX00696.
13            (Deposition Exhibit 4 was marked for
14                    identification.)
15            Can you identify this for me?
16        A.   It says, "PABCO Gypsum Physical Test."
17        Q.   Do you see up in the upper left-hand
18    corner?
19        A.   Uh-huh.
20        Q.   That's your name there, right?
21        A.   Yes.
22        Q.   Okay.  Would that indicate that you
23    received that, that went to you in your files?
24        A.   That's not my writing.  That looks like
25    someone may have put my name on it.

Confidential - Subject to Further Confidentiality Review

Page 46

1       Q.   Do you recall receiving it?

2       A.   No, I don't.

3       Q.   I mean, prior to today, have you ever seen

4    it before?

5       A.   I think it was in the documents we

6    produced, but I really don't remember it.

7       Q.   Okay.  Does the general form of this

8    document look familiar to you?  Put aside it says,

9    "PABCO" at the top, "Gypsum Physical Test."  The

10   format, can you tell me what this is, why you would

11   get something like this?

12      A.   It says an ASTM C 1396 worksheet.

13      Q.   Okay.  Is this the kind of thing that you

14   would have requested with regard to buying drywall

15   from a manufacturer?

16      A.   I don't -- this looks like a different

17   format than some others that I've seen.

18      Q.   Is it similar to the others you've seen?

19      A.   Actually, it looks like it's got a lot

20   more numbers and a lot less wording than some of the

21   other ones.

22      Q.   Okay.  I'm just -- because I don't

23   understand the inner workings of INEX, why would

24   this go to you?  Is this something that would

25   typically go to you; would it go to Jim; would it go

Confidential - Subject to Further Confidentiality Review

1    to both of you?

2          A.    The only thing I can surmise is that, you

3    know, people were contacting us about product,

4    trying to get product, and they were sending over,

5    you know, brochures and coming to see us, and

6    possibly this was something that came over at that

7    time.

8          Q.    Okay.  It's not the kind of document you'd

9    request from a manufacturer, you know, selling to

10   you drywall to be resold?

11         A.    You know, I'm sure that during the

12   process, when people would come see us, we told them

13   some of our requirements, one of which was it had to

14   be ASTM certified.

15         Q.    Okay.

16         A.    And possibly they gave it to us because of

17   that.

18         Q.    Now, I want to bring you to 2009.  Have

19   you -- or your -- not you.  Has your company ever

20   been involved in a recall of a product that you

21   sold?

22         A.    No.

23         Q.    When did you tell your customers about the

24   problems with the Chinese drywall?

25         A.    We did not notify our customers.  We

Confidential - Subject to Further Confidentiality Review

Page 48

```
 1    notified the insurance company, and then we
 2    talked -- Jim talked to Knauf.
 3         Q.   But no notification directly to your
 4    customers; is that right?
 5         A.   We did not know who had the product and
 6    who did not.
 7         Q.   Did you notify installers or builders?
 8         A.   No.  We didn't know who had the product
 9    and who did not.
10         Q.   Did you ever send anything out saying
11    there's a possibility you might have received this
12    board that's being recalled?
13         A.   We did not.
14         Q.   How did you handle the -- did anybody try
15    to return Chinese board to you?
16         A.   Try to --
17         Q.   In this time frame, 2009, did people call
18    you up and say, look, we'd like to bring back the
19    Chinese board and get our money back?
20         A.   I think I need to talk to my attorney
21    about that first.
22         Q.   Okay.  We'll hold off on that.
23              Well, other -- I'm going to ask it through
24    you, because I want to make sure he doesn't step
25    over the line.  Other than any kind of a settlement
```

Confidential - Subject to Further Confidentiality Review

Page 49

1    that might have involved attorneys -- I'm talking

2    just a customer coming back saying, I got a few

3    boards, I'd like to get my money back.  Anything

4    like that happen?

5         A.   I don't know if it was during litigation

6    or not, if litigation had ensued, so I don't know if

7    I can answer that or not.

8         Q.   Okay.  In the 2009 time frame, did you

9    resolve any lawsuits that might have been brought

10   against INEX with regard to Chinese drywall?

11        A.   Did the company?

12        Q.   Yeah.

13        A.   No.

14        Q.   Did you determine -- when you first became

15   aware of the problem with Chinese drywall, did you

16   go and look and see how much of it might still be in

17   your warehouses?

18        A.   I don't think we had any.

19        Q.   Do you know if you had any?  Can you say

20   with certainty?

21        A.   I'm pretty sure.  I wouldn't swear to it,

22   but I'm pretty sure we didn't.

23        Q.   Okay.  Because you're under oath, so I

24   need you to swear to something.

25        A.   Well, then I'm not sure.

Confidential - Subject to Further Confidentiality Review

Page 50

1          Q.    Okay.  Did you do -- I mean, were you

2     involved in any procedures that the company might

3     have implemented to determine whether there was

4     still Chinese board in your warehouses?  Like, did

5     you go and say to your employees, go and find

6     anything marked with Taihe or Taishan or Knauf?

7          A.    My recollection is we checked and we did

8     not have any, but, like I said, I am not positive.

9          Q.    Okay.  And who would have been involved in

10    that process, just so we can get a final answer?

11         A.    Jim and I.

12         Q.    So Jim would be the better person to ask

13    on that?

14         A.    Ask him.  Maybe his memory is better than

15    mine.

16         Q.    Okay.  So with regard to the Knauf board,

17    you dealt with -- I believe your prior testimony is

18    that you dealt with some -- you dealt with somebody

19    in Knauf's U.S. -- it was a U.S. insulation person

20    for Knauf; is that fair?

21         A.    The initial conversation Jim had with Jeff

22    Brisley.

23         Q.    Okay.

24         A.    And so you probably want to ask him about

25    that.  As far as dealing with ordering the product

Confidential - Subject to Further Confidentiality Review

Page 51

1    and all the logistics and so forth, I handled most

2    of that.

3        Q.   Okay.  And who did you deal with?

4        A.   The primary guy was Mark Norris.

5        Q.   I'll come back to that.

6             When did INEX first admit in any public

7    way that it had sold Chinese drywall?

8             MR. RISLEY:  Objection to form.

9             MR. DUPLANTIER:  Let me just object

10                to the extent that you're asking him

11                to begin down that path that I think

12                you're asking for attorney-client

13                privilege.

14             MR. SEEGER:  I'm not asking for that.

15                So anything that you can be --

16             MR. DUPLANTIER:  You know, for the

17                record, and we'll -- let me clarify for

18                the record that -- but we have an

19                agreement and an understanding that we're

20                not going to repeat the 30(b)(6)

21                deposition of Interior/Exterior.

22             MR. SEEGER:  Uh-huh.

23             MR. DUPLANTIER:  These issues were

24                covered extensively in that deposition,

25                and it was explained at that time that, by

Confidential - Subject to Further Confidentiality Review

Page 52

1              the time INEX first became aware of the

2              problem, they were already in litigation.

3              So I think you're asking him what are the

4              consequences of what they did after they

5              consulted counsel, and I think what comes

6              after that is privileged.

7                   MR. SEEGER:  Okay.  I don't think we

8              needed the whole answer, but that would

9              have been fine if you just said, it came

10             after you consulted counsel.  So that's

11             what we have, right?

12     BY MR. SEEGER:

13        Q.   How did INEX deal with customer inquiries

14     once the news was out about problem Chinese drywall?

15                  MR. DUPLANTIER:  Again, you're asking

16             for attorney-client privilege.

17                  MR. SEEGER:  How?  How is that

18             possible?  A customer calls him up and

19             says, I want to know about this problem

20             with Chinese drywall.  You were involved

21             in every discussion?

22                  MR. DUPLANTIER:  Yes.

23                  MR. SEEGER:  Okay.  I can't argue with

24             that.

25                  MR. DUPLANTIER:  It was done under the

Confidential - Subject to Further Confidentiality Review

Page 53

```
 1                  direction of counsel.  It was done at the
 2                  direction of counsel.  Do you want him to
 3                  disclose that information?
 4                       MR. SEEGER:  No.  Only if you want to
 5                  let him --
 6                       MR. DUPLANTIER:  (Talking over one
 7                  another) -- instruct him to do?
 8                       MR. SEEGER:  Only if you want to let
 9                  him do that.  That's up to you.  I assume
10                  you're not waiving privilege, so --
11                       MR. DUPLANTIER:  No.
12                       MR. SEEGER:  Okay.
13                       Well, I mean, that's a very good
14                  point.  Anything that was said by the
15                  Gearys or INEX to the public.
16                       MR. DUPLANTIER:  You can say that --
17                  you can answer that, Clay.
18                       MR. SEEGER:  That's my fault, then.
19                       THE WITNESS:  I'm sorry.  Then what's
20                  your question?
21           BY MR. SEEGER:
22               Q.  My question is:  Did you -- how did you
23           respond directly to customers, to the public, about
24           inquiries about Chinese drywall?
25               A.  To customers or --
```

Confidential - Subject to Further Confidentiality Review

Page 54

1    Q.   Yeah.  A customer calls you up and said,

2    do I have this stuff; I mean, I bought drywall from

3    you, I'm concerned about it.  How did you deal with

4    that?  The discussion between you and the customer,

5    nothing to do with counsel.

6    A.   Well, we instructed our employees to have

7    the customer talk directly to our branch managers,

8    and the branch manager took down the information.

9    And I believe at that point in time, we had

10   contacted Doug Sanders with Knauf, and we gave them

11   Doug Sanders' phone number or Chuck Fossler, who is

12   with the inspection company that inspected the

13   houses.

14   Q.   Okay.  And Sanders, I think you said this,

15   but he represent -- he's a lawyer who represented

16   Knauf, correct?

17   A.   Yes.

18   Q.   Okay.  And why did you think to contact

19   Doug Sanders, because he didn't represent you,

20   right?

21   A.   I think Jim can tell you how that

22   transpired.  He -- well, I guess that'd be

23   secondhand, so you'd want to ask him that, how that

24   all began.

25   Q.   Okay.  You can only -- you can tell me

Confidential - Subject to Further Confidentiality Review

1    about your involvement to the extent you were

2    involved or involved in discussions with Jim.  Why

3    did you decide to contact Doug Sanders, to the

4    extent you were involved?

5         A.   My understanding is Jim contacted Kurt

6    Heider, who is our sales rep, which was in our

7    previous deposition, that Kurt Heider apparently

8    sent up the ladder, and went up the ladder and what

9    we got back from him is, you need to call Doug

10   Sanders; Knauf -- Knauf said, you got to call Doug

11   Sanders.

12        Q.   You got to call their lawyer?

13        A.   Yeah.

14        Q.   And then he wrote you an e-mail, which

15   kind of gave you some direction --

16        A.   Probably to Jim, as I recall.

17        Q.   You're right.  I'll ask Jim about it.

18   You're right.

19             MR. SEEGER:  We got ten minutes on the

20             tape, so we'll take another break.  We may

21             be done --

22             MR. DUPLANTIER:  Okay.

23             MR. SEEGER:  -- with you, Mr. Geary.

24             MR. DUPLANTIER:  Like I said, you can

25             take as many breaks as you want.

Confidential - Subject to Further Confidentiality Review

Page 56

1             MR. SEEGER:  You're so generous.

2             THE VIDEOGRAPHER:  The time now is

3        10:31 a.m.  We are now off the record.

4    (Recess.)

5             THE VIDEOGRAPHER:  The time now is

6        10:40 a.m.  We are now back on the record.

7        This is the beginning of tape 2.

8                     * * *

9                  EXAMINATION

10   BY MR. MAYESH:

11       Q.   Mr. Geary, did you do anything to prepare

12   for your deposition here today?

13       A.   Yes.

14       Q.   Okay.  What did you do?

15       A.   I reviewed previous -- my previous

16   deposition.

17       Q.   You read it?

18       A.   Yes.

19       Q.   And did you also take a look at the

20   exhibits that were marked at that deposition?

21       A.   I did.

22       Q.   Did you review any other documents in

23   addition to what was previously marked at your

24   deposition?

25       A.   I looked through my binder that I, you

Confidential - Subject to Further Confidentiality Review

1   know, produced and just glanced through the

2   documents.

3        Q.   Uh-huh.  Could you describe for us,

4   please, the condition of the market for wallboard

5   in -- after the storm in 2005?

6        A.   It was a -- actually, before the storm,

7   there was a shortage of drywall, and the storm just

8   kind of exacerbated the problem, so the

9   manufacturers put -- domestic manufacturers put the

10  suppliers on what they called allocation, meaning if

11  you bought 20 trucks a week, you know, prior to the

12  shortage, then you would get 20 trucks a week after

13  the shortage.  That's simplistic, but that's

14  basically what they did.  So there -- it was a

15  supply and demand problem.

16       Q.   Right.  So supply was short, demand was

17  high?

18       A.   Correct.

19       Q.   And demand was going higher, and you

20  anticipated demand would go higher, I take it?

21       A.   Correct.

22       Q.   So you guys had been in this business

23  many, many years, this business of buying and

24  distributing wallboard, right?

25       A.   Correct.

Confidential - Subject to Further Confidentiality Review

Page 58

1          Q.    Now, what did you do in that market to try

2     to assure that you would have a sufficient supply?

3          A.    Well, that's when we -- you know, we

4     talked about domestic manufacturers.  Actually, I

5     know I produced a letter I had written to National

6     Gypsum pleading for more product, and, you know,

7     they -- we got as much as they would allow us to

8     get, and so we explored other avenues, and that's

9     when we ended up importing product.

10         Q.    And were you forecasting at that time that

11    you would be able to sell virtually all the

12    wallboard you could manage to put your hands on?

13         A.    In the -- while that shortage --

14         Q.    Yeah.

15         A.    -- was occurring, yes.

16         Q.    Now, I believe I read in your brother's

17    deposition last time -- he said that your customers

18    were desperate to get wallboard product.  Do you

19    agree with that characterization?

20         A.    I don't know if desperate, but they needed

21    product, yes.

22         Q.    They needed product?

23         A.    Yeah.

24         Q.    I want to show you a document that I

25    believe was previously marked in this case, not your

Confidential - Subject to Further Confidentiality Review

Page 59

1    deposition, but I think you were present when

2    Mr. Brisley testified, right?

3         A.    I was.

4         Q.    Okay.  And I'll mark this as exhibit --

5                    MR. MAYESH:  I guess we're up to 5,

6              are we?

7                    COURT REPORTER:  Yes.

8                    MR. DUPLANTIER:  Yeah.

9         (Deposition Exhibit 5 was marked for

10                    identification.)

11                   MR. MAYESH:  Here's a couple more.

12             You may want them.

13                   MR. SEEGER:  Thank you.

14   BY MR. MAYESH:

15        Q.    Now, you'll see on Exhibit 5 here that

16   we've just marked, down in the lower right, it's got

17   an identification number that says KI, and then

18   there's a whole bunch of zeros and then the number

19   73.  And it also says, "Knauf Insulation 41."

20   That's Exhibit No. 41 from Mr. Brisley's deposition.

21   Take a look at that, if you will.

22        A.    (Reviewing document.)  Okay.

23        Q.    All right.  Let me ask you, in preparation

24   for today's deposition, did you review this

25   document?

Confidential - Subject to Further Confidentiality Review

Page 60

1      A.    No.

2      Q.    Is this the first time that you've seen

3   it?

4      A.    I don't recall seeing this document.

5      Q.    Okay.  And you'll see there -- and I'm

6   focusing on the lower e-mail.  There's really two

7   e-mails on the page.  The first one is from Kurt

8   Heider?

9      A.    Correct.

10     Q.    I believe you told us Kurt Heider was your

11   salesman at Knauf Insulation?

12     A.    Yes.

13     Q.    You know him?

14     A.    Yes.

15     Q.    Now, the e-mail from Mr. Heider says that

16   he, Mr. Heider, got a call from Clay Geary today.

17          My question to you is:  Did you call him

18   on that day?

19     A.    I don't recall.  I possibly did.

20     Q.    Okay.  So possibly it was you, not Jim --

21   your brother, Jim, who made the initial call to

22   Knauf on September 23rd, 2005; is that right?

23     A.    It could have been.

24     Q.    Okay.  You have no reason to deny what

25   Mr. Heider recorded here in this e-mail, do you?

Confidential - Subject to Further Confidentiality Review

Page 61

```
 1        A.   No.
 2        Q.   Okay.  And he goes on to say that he,
 3   meaning you, had a real interesting request.  He
 4   asked what is the availability of Knauf Gypsum
 5   Board.
 6             Did you make that request of him, sir?
 7        A.   I wouldn't be surprised if I didn't.  I
 8   don't recall it, but I wouldn't be surprised.
 9        Q.   If you did?
10        A.   Yeah.
11        Q.   Right.  Because you were looking for
12   supply?
13        A.   We were looking for board.  Yeah, we were.
14        Q.   All right.  He would be interested in
15   buying some if the opportunity presented itself.
16   Does that sound like something you said on that
17   date?
18             MR. DUPLANTIER:  Object to the form of
19             the question.  Subject to that, you can
20             answer it, Clay.
21        A.   Yes.
22   BY MR. MAYESH:
23        Q.   Again, do you have any reason to deny that
24   you said words like that --
25        A.   No.
```

Confidential - Subject to Further Confidentiality Review

Page 62

1          Q.    -- to Mr. Heider?

2          A.    No.

3          Q.    Okay.  He said, a present time -- I think

4    he meant to say "at," but it says -- he said a

5    present time -- board is harder and harder to get

6    and anticipates it to get even harder in the next

7    few months.

8               That is what you anticipated in late

9    September of 2005, isn't it, sir?

10         A.    Yes, it is.

11         Q.    Okay.  So here's my question:  You said

12   that you had foreign manufacturers call you and see

13   if you wanted to buy board from them.  Do you recall

14   that testimony?

15         A.     No, I wouldn't say foreign manufacturers.

16   We had people coming in.  I would tell you probably

17   for the most part they were brokers.

18         Q.    Brokers.  Okay.

19               But in this case, in the case of Knauf, it

20   was you who reached out to Knauf Insulation to see

21   if they could help get you some Knauf wallboard;

22   isn't that true?

23                    MR. DUPLANTIER:  I'm going to object

24               to the form of the question.  Subject to

25               that, you can answer it, Clay.

Confidential - Subject to Further Confidentiality Review

Page 63

1          A.    In this e-mail, yes.

2     BY MR. MAYESH:

3          Q.    Well, again, I understand this is what the

4     e-mail says, but I want to know from you, your best

5     recollection now, was it INEX through you, Clay

6     Geary, who picked up that phone and called Mr.

7     Heider and said, we need wallboard, can you help

8     us get some?

9          A.    I don't recall it, but I wouldn't be

10    surprised if I didn't.

11         Q.    Okay.  Now, if you look a little farther

12    down in the e-mail -- one, two, three -- fourth

13    paragraph, it says, Clay is trying to be a bit more

14    proactive in anticipating those needs and wants to

15    know if he could supply him -- if we could supply

16    him if he needs board as well as how soon Knauf

17    could supply him with a boatload of board.

18               Do you see that?

19         A.    Yes.

20         Q.    So is it true that you anticipated that,

21    when you called up Mr. Heider, you were looking for

22    board manufactured overseas, right?

23         A.    Yes.

24         Q.    Because that's the only board that would

25    require a boat to bring it in as opposed to a truck?

Confidential - Subject to Further Confidentiality Review

Page 64

 1        A.    Correct.

 2        Q.    Okay.  And did you discuss with him the

 3   availability of board in China?

 4        A.    I don't recall the conversation, so I

 5   don't know if I did or not.

 6        Q.    Okay.  Now, there did come a time when

 7   Knauf China plants were prepared to give you a quote

 8   on board from China, right?

 9        A.    Correct.

10        Q.    Okay.  And you did buy that board from

11   Knauf China?

12        A.    Correct.

13        Q.    Let me show you and mark Exhibit 6, a

14   document that was previously marked -- previously

15   marked as Knauf Insulation Exhibit 43.  Again, I

16   think that was to Mr. Brisley's deposition.  The

17   identification numbers are KI, a bunch of zeros, and

18   the last two digits are 84.

19             (Deposition Exhibit 6 was marked for

20                     identification.)

21             Please take a look at that, and I'm going

22   to focus on the lower part again, Mr. Heider's

23   e-mail to Mr. Brisley, talking about his discussion

24   with you.

25        A.    (Reviewing document.)  Okay.

Confidential - Subject to Further Confidentiality Review

Page 65

1      Q.   All right.  Can you explain what was going
2   on with this letter of credit problem?
3      A.    I don't remember any particular.  I think
4   it was just negotiating back and forth on the letter
5   of credit, and, apparently, we were concerned that
6   they could produce -- we had a ship, it looks like,
7   and we were concerned that they could produce the
8   product, package the product and have it ready for
9   that ship.  And I think what we were trying to do is
10   see if Knauf could just bill us as they do for their
11   domestic insulation, rather than doing the letter of
12   credit, which would have taken more time and
13   possibly slowed down the shipment.
14      Q.   Okay.  So you were anxious to get the
15   product, and you didn't want these financial terms
16   to essentially make you miss the boat, right?
17      A.    Miss the boat, exactly.
18      Q.   Okay.  Now, you had been a customer of
19   Knauf Insulation for sometime?
20      A.    Probably 15 or 20 years.
21      Q.   They're located in Indiana, right?
22      A.    Shelbyville, Indiana.
23      Q.   Shelbyville.
24            When you bought insulation from Knauf
25   Insulation in Shelbyville, Indiana, they didn't

Confidential - Subject to Further Confidentiality Review

1    have to ask you how good your credit was, did

2    they?

3         A.    We had an open line of credit with them.

4         Q.    Because you were a very good customer,

5    sir, right?

6         A.    Yes, we were.

7         Q.    And now, suddenly, you're dealing with

8    this Knauf operation over in China, right, on this

9    wallboard?

10        A.    Correct.

11        Q.    And for some reason that operation doesn't

12   want to sell you on open account, right?

13        A.    Correct.

14        Q.    They want a letter of credit to make sure

15   that you're going to pay the bill, right?

16        A.    Correct.  Correct.

17        Q.    They didn't trust your credit, did they?

18             MR. DUPLANTIER:  I'm going to object

19             to the form of the question.

20             MR. MAYESH:  I'll withdraw the

21             question.  I'll withdraw the question.

22             MR. DUPLANTIER:  Good.

23   BY MR. MAYESH:

24        Q.    Did you say in words or substance to

25   anybody at Knauf Insulation in Shelbyville, Indiana,

Confidential - Subject to Further Confidentiality Review

1    what is this with a letter of credit, we're one of

2    your best customers, why do you want a letter of

3    credit from us?

4         A.   I don't recall that conversation.

5         Q.   In fact, sir, you understood that you were

6    dealing with a different company in China.  You

7    weren't dealing with Knauf Insulation, you were

8    dealing with a Knauf company that made wallboard in

9    China, right?

10                   MR. DUPLANTIER:  I'm going to object

11              to the form of the question.  Actually,

12              the e-mail from Knauf Insulation says that

13              we were dealing with Knauf Gyps.

14              MR. MAYESH:  Okay.  Well, thank you,

15              sir, --

16                   MR. DUPLANTIER:  So it's a

17              mischaracterization.

18                   MR. MAYESH:  -- but I would ask you

19              just -- if you could just object.

20    BY MR. MAYESH:

21         Q.   Would you like my question read back?

22         A.   Please.

23         Q.   Sure.

24                   COURT REPORTER:  "In fact, sir, you

25              understood that you were dealing with a

Confidential - Subject to Further Confidentiality Review

1            different company in China.  You weren't

2            dealing with Knauf Insulation, you were

3            dealing with a Knauf company that made

4            wallboard in China, right?"

5            MR. RISLEY:  We join in the objection.

6            MR. DUPLANTIER:  You can answer it.

7       A.   I guess I never really thought about it at

8  the time.  I assumed that Knauf was Knauf.

9  BY MR. MAYESH:

10      Q.   Yeah, but you knew that this boat was

11  being loaded over in China, right?

12      A.   Yes.

13      Q.   Okay.  And you also knew that Knauf in

14  China was unwilling to sell you on open account;

15  they wanted a letter of credit?

16      A.   Correct.

17            MR. RISLEY:  Object to form.

18            MR. DUPLANTIER:  Objection.  Come on,

19            asked and answered, Jay.

20  BY MR. MAYESH:

21      Q.   What is it that you asked Mr. Heider to do

22  for you with respect to this letter of credit

23  situation?

24      A.   I think we just went through that.  I

25  asked him to -- the ship was -- according to the

Confidential - Subject to Further Confidentiality Review

1    e-mail, the ship was going to be leaving, and we

2    wanted to see if we could buy it on open account

3    rather than negotiating back and forth on the letter

4    of credit, which may, as we said before, might miss

5    the boat.

6         Q.    And what happened?

7         A.    We ended up doing a letter of credit.

8         Q.    They wouldn't accept it on open account,

9    would they?

10        A.    Correct.

11        Q.    And that was the seller of the drywall who

12   refused to accept it on -- accept your order on open

13   account, correct?

14        A.    I don't recall who made the decision.  I

15   didn't read the top of this.  You told me not to

16   look at the top of this.  Should I look at the

17   response?

18        Q.    Sure.  Go right ahead.

19        A.    (Reviewing document.)  It looks like Bob

20   Britton spoke with Tony -- and I can't remember

21   Tony's last name -- and it says, I'll be asking

22   Mr. Britton to speak with Tony, but I'm not sure

23   what that will do.

24        Q.    And you see that Mark Norris was involved

25   here?

Confidential - Subject to Further Confidentiality Review

Page 70

```
 1              MR. DUPLANTIER:  Object to the form of
 2          the question.  Subject to that, you can
 3          answer.
 4   BY MR. MAYESH:
 5       Q.   I'm just looking at the second paragraph
 6   in the top e-mail.  It says, the feedback I get from
 7   Mark Norris.
 8       A.   He's corresponding.  He's not copied on
 9   this e-mail, though.  Mark Norris is not.
10       Q.   You were dealing with Mark Norris, weren't
11   you?
12       A.   Yes, I was.
13       Q.   You knew Mark Norris was in China, right?
14       A.   Yes.
15       Q.   Is it fair to say you knew you were buying
16   wallboard from Mark's company in China?
17              MR. DUPLANTIER:  Object to the form of
18          the question.
19       A.   Buying wallboard from Knauf.
20   BY MR. MAYESH:
21       Q.   Okay.  Did you ever get an explanation as
22   to why the Chinese wallboard company with the name
23   Knauf was not accepting you on open account when an
24   American insulation company with the name Knauf was
25   perfectly prepared to accept your orders on open
```

Confidential - Subject to Further Confidentiality Review

Page 71

1    account?

2              MR. RISLEY:  Objection; form.

3         A.   I don't recall that.

4    BY MR. MAYESH:

5         Q.   Okay.  Let me mark this as exhibit next in

6    order.  It's a two-page document.  I'll identify it

7    for the record.  This was marked as Knauf Insulation

8    Exhibit 42 at Mr. Brisley's deposition.

9              MR. SEEGER:  Do you need this marked,

10        Jay?

11             MR. MAYESH:  Please.  Exhibit 7.

12        (Deposition Exhibit 7 was marked for

13             identification.)

14   BY MR. MAYESH:

15        Q.   Take a moment to look at that, sir, and

16   let me know when you've done so.

17             MR. DUPLANTIER:  This is 7?

18             MR. MAYESH:  I believe it is.  Am I

19        right?

20             COURT REPORTER:  Yes.

21             MR. MAYESH:  Numbers are not my forte.

22        A.   (Reviewing document.)  Okay.

23   BY MR. MAYESH:

24        Q.   All right.  So I take it you have seen

25   this bottom e-mail before, right?

Confidential - Subject to Further Confidentiality Review

Page 72

```
 1        A.   Yes.
 2        Q.   Because you wrote it?
 3        A.   Yes.
 4        Q.   And it says -- you're writing it to
 5   Mr. Barry Topple, correct?
 6        A.   Correct.
 7        Q.   It says, I am Clay Geary with INEX; Jeff
 8   Brisley sent you an e-mail on our behalf requesting
 9   your help in trying to get us some additional gypsum
10   board; I have been dealing with your China
11   operations, and we have our third ship arriving in
12   two days.
13             Do you see that?
14        A.   Yes.
15        Q.   By that time, by the time you wrote this,
16   were you still giving Mr. Norris letters of credit
17   or were they selling you on open account?
18        A.   Letters of credit.
19        Q.   Did you make a request after two thousand
20   and -- after 2007 -- I see this is April -- I'm
21   sorry.  April 2006.  Did you make a request
22   beginning in January of 2006 to dispense with the
23   letters of credit and/or Knauf in China to be
24   selling you on open account?
25        A.   I don't recall that.
```

Confidential - Subject to Further Confidentiality Review

Page 73

1      Q.    Okay.  I'll mark as Exhibit 8 this next

2   e-mail.  This is an e-mail that was previously

3   marked as Knauf Insulation Exhibit 40 to the

4   deposition of Mr. Brisley, and its identification

5   number is KI, a bunch of zeros, and the last two

6   digits are 11, one one.

7         (Deposition Exhibit 8 was marked for

8                  identification.)

9      A.    (Reviewing document.)  Okay.

10     Q.    This is an e-mail from you to Jeff

11   Brisley, right?

12     A.    Yes.

13     Q.    I believe it is May 2, 2006, right?

14     A.    Correct.

15     Q.    Now, you say here in the first sentence --

16   you're thanking him for increasing your allocation

17   of insulation.

18     A.    Correct.

19     Q.    Was insulation also a building material

20   that was in short supply at this time?

21     A.    I believe it was.  I don't remember if

22   it -- I don't think it was to the extent of drywall,

23   but I believe it was in some short supply.

24     Q.    And he helped you out, he increased your

25   allocation, and you were thanking him for that?

Confidential - Subject to Further Confidentiality Review

Page 74

1        A.    Yes.

2        Q.    Now, when you were buying this insulation,

3    did you have to post a letter of credit?

4        A.    No.

5        Q.    You bought this on open account, right?

6        A.    Yes.

7        Q.    You bought it from Knauf Insulation in

8    Shelbyville, Indiana, right?

9        A.    Yes.

10        Q.    All right.  Let me just mark this next one

11    as Exhibit 9.  I think it probably is the last one.

12    Don't hold me to that statement.

13            (Deposition Exhibit 9 was marked for

14                    identification.)

15            So what we've marked as Exhibit 9, it is a

16    document previously marked as Knauf Insulation

17    Exhibit 44 to the deposition of Mr. Jeff Brisley.

18    And the identifier number on this is KI, a whole

19    bunch of zeros, as usual, and the last two digits

20    are 88.

21        A.    (Reviewing document.)  Okay.

22        Q.    All right, sir?  And you say in -- this is

23    from you to Mr. Brisley, and you're thanking him for

24    helping you out; is that right?

25        A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 75

1          Q.    Okay.  You say one, two, three, four,

2     five, six lines down, you say, the fact that

3     we were able to partner with Knauf China during a

4     time of hard allocation was very beneficial.

5               Do you see that?

6          A.    Yes.

7          Q.    And what did you mean by Knauf China?

8          A.    You know, we refer to our branches as

9     Interior/Exterior Baton Rouge, Interior/Exterior

10    Mobile.  I thought it was just Knauf, a division of

11    Knauf.

12         Q.    Uh-huh.  That was the seller of

13    drywall that was asking you for a letter of

14    credit, correct?

15                   MR. RISLEY:  Objection to form.

16    BY MR. MAYESH:

17         Q.    Knauf China?

18         A.    That was asking us for a letter --

19         Q.    Yeah.

20         A.    It was -- it was -- yes, it was Knauf

21    China.  It was Tianjin, I think, and WuHu.

22         Q.    Okay.  You also hear -- you've heard of

23    KPT, Knauf --

24         A.    Yes.

25         Q.    -- Plasterboard Tianjin?

Confidential - Subject to Further Confidentiality Review

1        A.    Yes.

2        Q.    That was one of the companies in China?

3        A.    Yeah.  I don't remember what exactly was

4    on the letter of credit, but whatever it was.

5                MR. MAYESH:  That was Exhibit 9?

6                MR. DUPLANTIER:  Yes.

7                MR. MAYESH:  Give me one moment here.

8            I think that may be all for Mr. Clay.

9            Just a few more questions.

10   BY MR. MAYESH:

11       Q.    At your earlier deposition, you were asked

12   a number of questions -- both you and your brother,

13   Jim, were asked a number of questions about invoices

14   that were coming in from your -- I shouldn't say

15   invoices -- purchase orders that were coming in from

16   your customers that said right on them, no Knauf, no

17   China board, words like that.

18       A.    Invoices to our customers?

19       Q.    No.  I mean -- no, I corrected it.

20   Purchase orders from your customers to you ordering

21   drywall, but saying, no Knauf, no China board and

22   that kind of notation.

23       A.    I don't know if I remember the purchase

24   orders.  I remember the invoices to our customers

25   that said, no China board, no Knauf.

Confidential - Subject to Further Confidentiality Review

Page 77

```
 1          Q.   And why would your invoices to your
 2     customers say, no China board, no Knauf?
 3          A.   Why would they say that?
 4          Q.   Uh-huh.
 5          A.   That was a preference of the customer.
 6          Q.   Okay.  So it was -- an invoice is a bill,
 7     right?
 8          A.   Yes.
 9          Q.   So when you say you gave invoices to
10     customers, you were sending them a bill?
11          A.   Yes.
12          Q.   And on the bill, you put down their
13     preference, no China board, no Knauf?
14          A.   Correct.
15          Q.   There were a number of customers who
16     indicated such a -- shall I say negative preference
17     for China board or Knauf board, right?
18          A.   Correct.
19          Q.   Why did the customers not want Knauf board
20     or China board?
21          A.   My feeling was it was, once again, because
22     it's heavy and the other complaint was brittle.
23          Q.   That was your feeling?
24          A.   Yeah.
25          Q.   Did you ever -- and by the way, this was
```

Confidential - Subject to Further Confidentiality Review

1    a -- there was still kind of a shortage, right?

2         A.    Yes.

3         Q.    Did you ever pick up the phone and say to

4    a customer, why don't you want China board, why

5    don't you want Knauf board?

6         A.    No.  Understand that Jim and I were not

7    involved day-to-day in the sales process, so we

8    weren't actually getting those calls or necessarily

9    seeing those invoices at the time.  It would have

10   been various salesmen throughout the company.

11        Q.    Salesmen, your salespeople?

12        A.    Salespeople throughout the company.

13        Q.    So did you ever say to any of your

14   salespeople, what is it with these people not

15   wanting China board, not wanting Knauf board?

16        A.    My -- you know, we were aware that the

17   product was heavier.  We bought it, and it was

18   heavier.  As far as brittle, you hear the same thing

19   of domestic manufacturers.  You hear, you know, one

20   guy says, USG is more brittle, and the other guy

21   says, Temple is more brittle.  It's a preference.

22        Q.    Yeah.  Here's my question directly, sir:

23   Did you ever have a conversation with any of your

24   salespeople in which you directly asked why

25   customers did not want Knauf board?

Confidential - Subject to Further Confidentiality Review

Page 79

1        A.    I don't think so.

2        Q.    Did any of your salespeople ever say to

3   you, a customer told me they did not want Knauf

4   board because?

5        A.    No.

6        Q.    And was it you, sir, who yourself,

7   when you were doing some building in your own

8   home?

9        A.    Yes.

10       Q.    And you told your people, don't give me

11  any Knauf board?

12       A.    Actually, what I said was, USG board.

13       Q.    USG board?

14       A.    Yes.

15       Q.    Okay.

16            MR. MAYESH:   That's all my questions.

17            Thank you.

18            MR. DUPLANTIER:   Thank you.

19            MR. SEEGER:   You want to switch them

20            up, or you want to take a five-minute

21            break?

22            MR. DUPLANTIER:   Let's -- I want to

23            take a break for about five or six

24            minutes.   You're done?

25            MR. SEEGER:   I'm done with this

Confidential - Subject to Further Confidentiality Review

Page 80

1            Mr. Geary.

2                 THE VIDEOGRAPHER:  The time now is

3            11:13 a.m.  We are now off the record.

4            This is the end of tape 2.

5                 (DEPOSITION CONCLUDED.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 81

1                    ACKNOWLEDGMENT OF DEPONENT

2

3          I,_____, do hereby

4    certify that I have read the foregoing pages and

5    that the same is a correct transcription of the

6    answers given by me to the questions therein

7    propounded, except for the corrections or changes in

8    form or substance, if any, noted in the attached

9    Errata Sheet.

10        _____

11        CLAY GEARY                    DATE

12

13   Subscribed and sworn to before me this

14   _____ day of _____, 20 _____.

15   My commission expires: _____

16

17   Notary Public

18

19

20

21

22

23

24

25

Confidential - Subject to Further Confidentiality Review

Page 82

```
1                        - - - - - -

2                          ERRATA

3                        - - - - - -

4     PAGE   LINE   CHANGE/REASON

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25    _____  _____  _____
```

Confidential - Subject to Further Confidentiality Review

Page 83

1                          - - - - - -

2                        LAWYER'S NOTES

3                          - - - - - -

4     PAGE   LINE

5     _____  _____  _____

6     _____  _____  _____

7     _____  _____  _____

8     _____  _____  _____

9     _____  _____  _____

10    _____  _____  _____

11    _____  _____  _____

12    _____  _____  _____

13    _____  _____  _____

14    _____  _____  _____

15    _____  _____  _____

16    _____  _____  _____

17    _____  _____  _____

18    _____  _____  _____

19    _____  _____  _____

20    _____  _____  _____

21    _____  _____  _____

22    _____  _____  _____

23    _____  _____  _____

24    _____  _____  _____

25    _____  _____  _____

Confidential - Subject to Further Confidentiality Review

Page 84

1                    CERTIFICATE

2           I, LESLIE B. DOYLE, Certified Court

3     Reporter (LA), NCRA Registered Professional Reporter

4     and Certified LiveNote™ Reporter, do hereby certify

5     that prior to the commencement of the examination,

6     CLAY GEARY was duly sworn by me to testify to the

7     truth, the whole truth and nothing but the truth.

8           I DO FURTHER CERTIFY that the foregoing is

9     a verbatim transcript of the testimony as taken

10    stenographically by and before me at the time, place

11    and on the date hereinbefore set forth, to the best

12    of my ability.

13          I DO FURTHER CERTIFY that I am neither a

14    relative nor employee nor attorney nor counsel of

15    any of the parties to this action, and that I am

16    neither a relative nor employee of such attorney or

17    counsel, and that I am not financially interested in

18    the action.

19          This 12th day of October, 2012.

20

21

22          _____

            LESLIE B. DOYLE, RMR, RDR

23          Certified Court Reporter (LA)

            Certified LiveNote™ Reporter

24

25