Confidential - Subject to Further Confidentiality Review

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

_____

IN RE:                          §
CHINESE-MANUFACTURED            §   MDL NO. 2047
DRYWALL PRODUCTS                §
LIABILITY LITIGATION            §   SECTION: L
_____       §
                                §   JUDGE FALLON
This document applies           §
to all cases                    §   MAG. JUDGE WILKINSON
_____       §

FRIDAY, FEBRUARY 5, 2010

- CONFIDENTIAL -
SUBJECT TO FURTHER CONFIDENTIALITY REVIEW

        Videotaped deposition of CLAYTON C.
GEARY and JAMES F. GEARY, SR., AS JOINT
30(B)(6) REPRESENTATIVES OF THE
INTERIOR/EXTERIOR BUILDING SUPPLY, LP, held
at the offices of Frilot, LLC, 3700 Energy
Centre, 1100 Poydras Street, New Orleans,
Louisiana, commencing at 9:15 a.m., on the
above date, before Michael E. Miller,
Certified Court Reporter, Registered
Diplomate Reporter, Certified Realtime
Reporter.

GOLKOW TECHNOLOGIES, INC.
877.370.3377 ph | 917.591.5672 fax
deps@golkow.com

EXHIBIT
2

Confidential - Subject to Further Confidentiality Review

Page 2

1   CIVIL DISTRICT COURT FOR THE PARISH OF ORLEANS
                STATE OF LOUISIANA

2   NO. 09-8144                    DIVISION "H-12"

3

4     PATRICK DENNIS, M.D., AND WIFE KATHLEEN
    DENNIS, INDIVIDUALLY AND ON BEHALF OF THEIR

5       MINOR CHILDREN, ISABELLA DENNIS AND
                GABRIELLE DENNIS

6

                    -VERSUS-

7

      INTERIOR EXTERIOR BUILDING SUPPLY, L.P.;

8   INTERIOR EXTERIOR ENTERPRISES, L.L.C.; RSUI
          INDEMNITY COMPANY; LANDMARK AMERICAN

9    INSURANCE COMPANY; ARCH INSURANCE COMPANY;
      THE NORTH RIVER INSURANCE COMPANY; LIBERTY

10  MUTUAL FIRE INSURANCE COMPANY; UNITED STATES
      FIRE INSURANCE COMPANY; BITUMINOUS FIRE AND

11  MARINE INSURANCE COMPANY; SAVOIE REAL ESTATE
          HOLDINGS, L.L.C.; SAVOIE REALTY, L.L.C.;

12      CLARENDON AMERICAN INSURANCE COMPANY;
      PRAETORIAN SPECIALTY INSURANCE COMPANY; QBE

13      SPECIALTY INSURANCE COMPANY; COLONIAL
      INSPECTION SERVICES, L.L.C.; SEALS DRYWALL

14          AND HERMITAGE INSURANCE COMPANY

15  _____

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 3

```
 1     A P P E A R A N C E S :
 2         HERMAN, HERMAN, KATZ & COTLAR, LLP
           BY:  STEPHEN J. HERMAN, ESQUIRE
 3              sherman@hhkc.com
           820 O'Keefe Avenue
 4         New Orleans, Louisiana 70113
           (504) 581-4892
 5         Counsel for MDL Plaintiffs
 6
           LUMPKIN, REEVES & MESTAYER, PLLC
 7         BY:  JIM REEVES, ESQUIRE
                jrr@lumpkinreeves.com
 8              TOM BUSBY, ESQUIRE
                twb@lumpkinreeves.com
 9         160 Main Street
           Biloxi, Mississippi 39530
10         (228) 374-5151
           Counsel for MDL Plaintiffs
11
12         LAMBERT AND NELSON, PLC
           BY:  HUGH P. LAMBERT, ESQUIRE
13              hlambert@lambertandnelson.com
           701 Magazine Street
14         New Orleans, Louisiana 70130-3629
           (504) 581-1750
15         Counsel for MDL Plaintiffs
16
           BECNEL LAW FIRM, LLC
17         BY:  DANIEL E. BECNEL, JR., ESQUIRE
                dbecnel@becnellaw.com
18         106 West Seventh Street
           Reserve, Louisiana 70084
19         (985) 536-1186
           Counsel for MDL Plaintiffs
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 4
   1     A P P E A R A N C E S:
   2        LEMMON LAW FIRM, LLC
            BY:  ANDREW A. LEMMON, ESQUIRE
   3             andrew@lemmonlawfirm.com
            550 Poydras Street
   4        Suite 2335
            New Orleans, Louisiana 70130
   5        (504) 581-5644
            Counsel for Plaintiffs
   6
   7        KANNER & WHITELEY, LLC
            BY:  MELISSA M. FUSELIER, ESQUIRE
   8             m.fuselier@kanner-law.com
                 CYNTHIA ST. AMANT, ESQUIRE
   9             c.stamant@kanner-law.com
                 (via teleconference)
  10        701 Camp Street
            New Orleans, Louisiana 70130
  11        (504) 524-5777
            Counsel for Dennis Plaintiffs
  12
  13        GALLOWAY, JOHNSON, TOMPKINS,
            BURR & SMITH
  14        BY:  RICHARD G. DUPLANTIER, JR., ESQUIRE
                 rduplantier@gjtbs.com
  15             LAMBERT J. HASSINGER, JR., ESQUIRE
                 jhassinger@gjtbs.com
  16        One Shell Square
            701 Poydras Street, 40th Floor
  17        New Orleans, Louisiana 70139
            (504) 525-6802
  18        Counsel for Interior/Exterior
            Building Supply, LP, et al.
  19
  20        CARR ALLISON
            BY:  VINCENT A. NOLETTO, ESQUIRE
  21             vnoletto@carrallison.com
            6152 Monroe Street
  22        Suite 200
            Daphne, Alabama 36526
  23        (251) 626-9340
            Counsel for Interior/Exterior
  24        Building Supply, LP, et al.
```

Confidential - Subject to Further Confidentiality Review

Page 5

```
 1     A P P E A R A N C E S:
 2         BAKER & McKENZIE, LLP
           BY:  DOUGLAS B. SANDERS, ESQUIRE
 3              douglas.b.sanders@bakernet.com
           One Prudential Plaza, Suite 3500
 4         130 East Randolph Drive
           Chicago, Illinois 60601
 5         (312) 861-8000
           Counsel for Knauf Plasterboard
 6         Tianjin Company, Ltd.
 7
           FRILOT, LLC
 8         BY:  PAUL C. THIBODEAUX, ESQUIRE
                pthibodeaux@frilot.com
 9         3700 Energy Centre
           1100 Poydras Street
10         New Orleans, Louisiana 70163
           (504) 599-8000
11         Counsel for Knauf Plasterboard
           Tianjin Company, Ltd.
12
13         CUNNINGHAM BOUNDS, LLC
           BY:  STEVEN L. NICHOLAS, ESQUIRE
14              sln@cunninghambounds.com
           1601 Dauphin Street
15         Mobile, Alabama 36604
           (251) 471-6191
16         Counsel for The Mitchell Company
17
           BARRASSO, USDIN, KUPPERMAN,
18         FREEMAN & SARVER, LLC
           BY:  CHRISTY HAROWSKI, ESQUIRE
19              charowski@barassousdin.com
                (via teleconference)
20         909 Poydras Street
           Suite 2400
21         New Orleans, Louisiana 70112
           Phone: (504) 589-9700
22         Counsel for The Mitchell Company
23
24
```

Confidential - Subject to Further Confidentiality Review

                                                    Page 6

```
 1     A P P E A R A N C E S:
 2        WRIGHT GREEN, PC
          BY:  TIFFANY B. SMITH, ESQUIRE
 3             tiffanysmith@wrightgreen.com
               (via teleconference)
 4        Post Office Box 16818
          Mobile, Alabama 36616-0818
 5        (251) 344-7744
          Counsel for The Mitchell Company
 6
 7        DEUTSCH, KERRIGAN & STILES, LLP
          BY:   JAMES W. HAILEY, III, ESQUIRE
 8             jhailey@dkslaw.com
          755 Magazine Street
 9        New Orleans, Louisiana 70130
          (504) 581-5141
10        Counsel for Landmark American
          Insurance Company
11
12        JONES WALKER, LLP
          BY:  MEGAN E. DONOHUE, ESQUIRE
13             mdonohue@joneswalker.com
          201 St. Charles Avenue
14        New Orleans, Louisiana 70170-5100
          (504) 582-8000
15        Counsel for National Surety
          Insurance Company
16
17        SHARON B. KYLE, APLC
          BY:   STEVEN K. SCHILLING, ESQUIRE
18             SS@KYLELAW.NET
          4960 Bluebonnet Road
19        Suite A
          Baton Rouge, Louisiana 70809-3088
20        (225) 293-8400
          Counsel for Mayeaux Construction
21        Company, Inc.
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 7

```
 1     A P P E A R A N C E S:
 2         ADAMS, HOEFER, HOLWADEL & ELDRIDGE, LLC
           BY:  D. RUSSELL HOLWADEL, ESQUIRE
 3             drh@ahhelaw.com
           400 Poydras Street
 4         Suite 2450
           New Orleans, Louisiana 70130
 5         (504) 581-2606
           Counsel for Arch Insurance Company
 6
 7         BARRASSO, USDIN, KUPPERMAN,
           FREEMAN & SARVER, LLC
 8         BY:  JUDY Y. BARRASSO, ESQUIRE
               jbarasso@barassousdin.com
 9         909 Poydras Street
           Suite 2400
10         New Orleans, Louisiana 70112
           (504) 589-9700
11         Counsel for Liberty Mutual Insurance
           Company
12
13         WATSON, BLANCHE, WILSON & POSNER, LLP
           BY:  GARRETT S. CALLAWAY, ESQUIRE
14             gcallaway@wbwplaw.com
           505 North Boulevard
15         Post Office Drawer 2995
           Baton Rouge, Louisiana 70821
16         (225) 387-5511
           Counsel for Bituminous Fire and
17         Marine Insurance Company
18
           CHOPIN, WAGAR, RICHARD & KUTCHER, LLP
19         BY:  JASON P. FOOTE, ESQUIRE
               jfoote@chopin.com
20         Two Lakeway Center, Suite 900
           3850 North Causeway Boulevard
21         Metairie, Louisiana70002
           (504) 830-3838
22         Counsel for ASI Lloyds, Clarendon
           American Insurance Company and
23         Praetorian Specialty Insurance
           Company
24
```

Confidential - Subject to Further Confidentiality Review

Page 8

```
 1    A P P E A R A N C E S:
 2         LOWE, STEIN, HOFFMAN,
           ALLWEISS & HAUVER, LLP
 3         BY:  MAX J. COHEN, ESQUIRE
                mcohen@lshah.com
 4         One Shell Square, Suite 3600
           701 Poydras Street
 5         New Orleans, Louisiana70139-7735
           (504) 581-2450
 6         Counsel for Rockhill Insurance
           Company
 7
 8         PRINCE, McKEAN, McKENNA & BROUGHTON, LLC
           BY:  DENNIS MCKENNA, ESQUIRE
 9              dm@princemckean.com
           56 St. Joseph Street
10         Suite 1301
           Mobile, Alabama36602
11         (251) 433-5441
           Counsel for Creola Ace Hardware, Inc.
12
13         JAMES RYAN III & ASSOCIATES, LLC
           BY:  JAMES RYAN, III, ESQUIRE
14              jryan@ryan-law.us
           201 St. Charles Avenue
15         Suite 2420
           New Orleans, Louisiana70170
16         (504) 599-5990
           Counsel for Hermitage Insurance
17         Company
18
           FOWLER WHITE BURNETT, PA
19         BY:  ELIZABETH J. FERRY, ESQUIRE
                eferry@fowler-white.com
20              (via teleconference)
           Espirito Santo Plaza
21         1395 Brickell Avenue, 14th Floor
           Miami, Florida33131
22         (305) 789-9200
           Counsel for Black Bear Gypsum
23         Supply, Inc. and Smoky Mountain
           Materials, Inc.
24
```

Confidential - Subject to Further Confidentiality Review

```
                                                    Page 9

  1     A P P E A R A N C E S:
  2        HUNTON & WILLIAMS, LLP
           BY:  A. TODD BROWN, ESQUIRE
  3             tbrown@hunton.com
                (via teleconference)
  4        Bank of America Plaza
           101 South Tryon Street, Suite 350
  5        Charlotte, North Carolina28280
           (704) 378-4700
  6        Counsel for Stock Building Supply, LLC
  7
           LLOYD, GRAY & WHITEHEAD, PC
  8        BY:  J. RICK WALLIS, ESQUIRE
                rwallis@lgwpc.com
  9             (via teleconference)
           2501 20th Place South
 10        Suite 300
           Birmingham, Alabama35223
 11        (205) 967-8822
           Counsel for Capstone Partners, LLC
 12
 13        PARSONS, LEE & JULIANO, PC
           BY:  DOROTHY A. POWELL, ESQUIRE
 14             dpowell@pljpc.com
                (via teleconference)
 15        300 Protective Center
           2801 Highway 280 South
 16        Birmingham, Alabama 35223
           (205) 326-6600
 17        Counsel for George Drywall, Inc.
 18
           ADORNO & YOSS
 19        BY:  KRISTEN LAKE CARDOSO, ESQUIRE
                kcardoso@adorno.com
 20             (via teleconference)
           888 S.E. 3rd Avenue
 21        Suite 500
           Ft. Lauderdale, Florida 33316
 22        (954) 523-5885
           Counsel for Banner Supply Company
 23
 24
```

Confidential - Subject to Further Confidentiality Review

```
 1      A P P E A R A N C E S:
 2          FRIEDMAN, LEAK, DAZZIO,
            ZULANAS & BOWLING, PC
 3          BY:  CHRISTOPHER J. ZULANAS, ESQUIRE
                 czulanas@friedmanleak.com
 4               (via teleconference)
            3800 Corporate Woods Drive
 5          Birmingham, Alabama 35242
            (205) 278-7000
 6          Counsel for Larry Hodge Excavating, LLC
 7
            PHELPS DUNBAR, LLP
 8          BY:  SUSIE MORGAN, ESQUIRE
                 susie.morgan@phelps.com
 9               (via teleconference)
            365 Canal Street
10          Suite 2000
            New Orleans, Louisiana 70130-6534
11          (504) 566-1311
            Counsel for J.W. Allen & Co., Inc.
12
13          HAYNSWORTH SINKLER BOYD, PA
            BY:  W. DAVID CONNER, ESQUIRE
14               dconner@hsblawfirm.com
                 (via teleconference)
15          75 Beattie Place
            11th Floor
16          Greenville, South Carolina 29601-2119
            (864) 240-3200
17          Counsel for L&W Supply Corporation
18
            PORTEOUS, HAINKEL & JOHNSON, LLP
19          BY:  EMILY STICKNEY MORRISON, ESQUIRE
                 emorrison@phjlaw.com
20               (via teleconference)
            408 North Columbia Street
21          Covington, Louisiana 70433
            (985) 893-4790
22          Counsel for State Farm Fire &
            Casualty Company
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 11

1    A P P E A R A N C E S:

2        PUGH, ACCARDO, HAAS, RADECKER,
         CAREY & HYMEL, LLC

3        BY:  H. PHILIP RADECKER, JR., ESQUIRE
                 hpradecker@pugh-law.com

4            (via teleconference)
         1100 Poydras Street

5        Suite 3200
         New Orleans, Louisiana 70163-1132

6        (504) 799-4521
         Counsel for Murphy Bateman Building

7        Supplies, LLC

8

9    VIDEOGRAPHER:

10       WILLIAM GEIGERT,
         Golkow Technologies, Inc.

11

12                       - - -

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 12

1                    I N D E X

        CLAYTON C. GEARY & JAMES F. GEARY, SR.

2       AS JOINT 30(B)(6) REPRESENTATIVES FOR

         INTERIOR/EXTERIOR BUILDING SUPPLY

3                 February 5, 2010

4    APPEARANCES                                    3

5    PROCEEDINGS                                    25

6

7    EXAMINATION OF CLAYTON C. GEARY:

8         BY MR. HERMAN:                            27

9         BY MR. HERMAN:                            114

10        BY MR. REEVES:                            280

11        BY MR. NICHOLAS:                          347

12

13   EXAMINATION OF JAMES F. GEARY, SR.:

14        BY MR. HERMAN:                            54

15        BY MR. HERMAN:                            241

16        BY MR. NICHOLAS:                          382

17

18   CERTIFICATE                                    394

19   ACKNOWLEDGMENT - CLAYTON C. GEARY              395

20   ERRATA - CLAYTON C. GEARY                      396

21   ACKNOWLEDGMENT - JAMES F. GEARY, SR.           397

22   ERRATA - JAMES F. GEARY, SR.                   398

23   LAWYER'S NOTES                                 399

24

Confidential - Subject to Further Confidentiality Review

Page 13

```
 1                    DEPOSITION EXHIBITS
            CLAYTON C. GEARY & JAMES F. GEARY, SR.
 2         AS JOINT 30(B)(6) REPRESENTATIVES FOR
              INTERIOR/EXTERIOR BUILDING SUPPLY
 3                     February 5, 2010
 4     NUMBER           DESCRIPTION            MARKED
 5     INEX-30b6-1   Supplemental and Amended    28
                     Re-Notice of Oral and
 6                   Videotaped Deposition
 7     INEX-30b6-2   Interior Exterior           28
                     Building Supply
 8                   Distributor Profile Form
 9     INEX-30b6-3   Knauf Plasterboard Wuhu     29
                     Certificate of Origin,
10                   INT/EXT00084 -
                     INT/EXT00089
11
       INEX-30b6-4   Knauf Plasterboard          44
12                   Tianjin Mill
                     Certificate,
13                   INT/EXT00227 -
                     INT/EXT00231
14
       INEX-30b6-5   Knauf Plasterboard          69
15                   Tianjin Indicative Price
                     Summary,
16                   INT/EXT00659 -
                     INT/EXT00660
17
       INEX-30b6-6   Handwritten Notes, "John    71
18                   Davis," etc.,
                     INT/EXT00058
19
       INEX-30b6-7   Handwritten Notes, "Rick    72
20                   Wendel," etc.,
                     INT/EXT00951 -
21                   INT/EXT00952
22     INEX-30b6-8   Handwritten Notes,          74
                     "Storage fee at wharf,"
23                   etc.,
                     INT/EXT00294
24
```

Confidential - Subject to Further Confidentiality Review

Page 14

```
 1                   DEPOSITION EXHIBITS
 2
 3        NUMBER            DESCRIPTION         MARKED
 4     INEX-30b6-9    E-mail Chain Ending          74
                      10/18/05 Davis E-mail to
 5                    C. Geary,
                      Subject: Plasterboard to
 6                    New Orleans,
                      INT/EXT00638
 7
       INEX-30b6-10   E-mail Chain Ending          75
 8                    10/18/05 Davis E-mail to
                      C. Geary,
 9                    Subject: Plasterboard to
                      New Orleans,
10                    w/Handwritten
                      Interlineations,
11                    INT/EXT01292
12     INEX-30b6-11   E-mail Chain Ending          77
                      10/21/05 Davis E-mail to
13                    C. Geary, Subject: "Made
                      in China,"
14                    INT/EXT00635 -
                      INT/EXT00637
15
       INEX-30b6-12   10/28/05 Handwritten         79
16                    Notes, "Mark Norris of
                      Knauf," etc.,
17                    INT/EXT00608
18     INEX-30b6-13   E-mail Chain Ending          80
                      11/29/05 C. Geary E-mail
19                    to Srinivasan,
                      Subject: Sheetrock
20                    inspection in China,
                      INT/EXT05980
21
       INEX-30b6-14   12/5/05 Uni-Pac, Ltd.        86
22                    Letter to C. Geary,
                      INT/EXT00942
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 15

1                  DEPOSITION EXHIBITS
2
3      NUMBER            DESCRIPTION        MARKED
4    INEX-30b6-15   E-mail Chain Ending         86
                    3/31/06 App E-mail to
5                   Wei, Subject: Great
                    Immensity,
6                   INT/EXT03864
7    INEX-30b6-16   E-mail Chain Ending         91
                    4/3/06 Heider E-mail to
8                   C. Geary, Subject: U.S.
                    Wallboard Imports from
9                   Knauf,
                    INT/EXT04116
10
       INEX-30b6-17   E-mail Chain Ending       91
11                  4/7/06 Topple E-mail to
                    C. Geary,
12                  Subject: Gypsum Board,
                    INT/EXT03843
13
       INEX-30b6-18   7/21/06                    94
14                  Fumigation/Disinfection
                    Certificate,
15                  INT/EXT00080
16   INEX-30b6-19   PABCO Gypsum Physical       95
                    Test, ASTM C1396
17                  Worksheet,
                    INT/EXT00696
18
       INEX-30b6-20   Knauf MSDS for            97
19                  Plasterboard Standard
                    Core,
20                  INT/EXT00059 -
                    INT/EXT00061
21
       INEX-30b6-21   BNBM Authorization to    102
22                  Manufacture UL Marks,
                    INT/EXT02171
23
24

Confidential - Subject to Further Confidentiality Review

Page 16

|  | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|
| 1 | | DEPOSITION EXHIBITS | |
| 2 | | | |
| 3 | NUMBER | DESCRIPTION | MARKED |
| 4 | INEX-30b6-22 | 2/16/06 Test Report on Gypsum Wallboard, | 103 |
| 5 | | INT/EXT01990 | |
| 6 | INEX-30b6-23 | Addendum to Application and Agreement for | 107 |
| 7 | | Documentary Credit Between | |
| 8 | | Interior/Exterior and Knauf Plasterboard | |
| 9 | | Tianjin, INT/EXT00243 - | |
| 10 | | INT/EXT00246 | |
| 11 | INEX-30b6-24 | Knauf Plasterboard Tianjin Informal Tender | 110 |
| 12 | | for Freight Handling: January to April 2006, | |
| 13 | | INT/EXT04071 | |
| 14 | INEX-30b6-25 | 7/5/06 Contract Between Knauf Plasterboard Wuhu | 111 |
| 15 | | and Interior/Exterior, INT/EXT00171 | |
| 16 | | | |
| | INEX-30b6-26 | Knauf Plasterboard Wuhu | 112 |
| 17 | | Commercial Invoice, INT/EXT00077 | |
| 18 | | | |
| | INEX-30b6-27 | Gypsum Wallboard | 112 |
| 19 | | Producing Factory Information, BNBM, Co., | |
| 20 | | Ltd., INT/EXT00849 - | |
| 21 | | INT/EXT000850 | |
| 22 | INEX-30b6-28 | Handwritten Notes, "Tianjin Sheetrock," | 150 |
| 23 | | etc., INT/EXT00416 | |
| 24 | | | |

Confidential - Subject to Further Confidentiality Review

Page 17

1                    DEPOSITION EXHIBITS
2
3       NUMBER              DESCRIPTION        MARKED
4    INEX-30b6-29   E-mail Chain Ending          153
                    4/28/06 Li E-mail to to
5                   C. Geary, Subject: IEBS
                    company information,
6                   INT/EXT02069 -
                    INT/EXT02073
7
     INEX-30b6-30   E-mail Chain Ending          156
8                   5/8/06 App E-mail to Li,
                    Subject: Gypsum
9                   Wallboard,
                    INT/EXT02061 -
10                  INT/EXT02063
11   INEX-30b6-31   Application and              164
                    Agreement for
12                  Documentary Credit
                    Between BNBM and
13                  Interior/Exterior,
                    INT/EXT00814 -
14                  INT/EXT00817
15   INEX-30b6-32   Addendum to Application      165
                    and Agreement for
16                  Documentary Credit
                    Between
17                  Interior/Exterior and
                    BNBM,
18                  INT/EXT00809 -
                    INT/EXT00812
19
     INEX-30b6-33   SGS North America           167
20                  Inspection Request
                    Application,
21                  INT/EXT06089 -
                    INT/EXT06091
22
23
24

Confidential - Subject to Further Confidentiality Review

Page 18

```
 1                   DEPOSITION EXHIBITS
 2
 3        NUMBER            DESCRIPTION         MARKED
 4     INEX-30b6-34  6/13/06 Taian Taishan       172
                     Plasterboard Letter of
 5                   Certificate,
                     INT/EXT06045
 6
       INEX-30b6-35  Listing of                  173
 7                   Interior/Exterior
                     Branches and Managers,
 8                   INT/EXT04561
 9     INEX-30b6-36  Interior/Exterior           176
                     Product Shipment
10                   Documentation,
                     INT/EXT00331 -
11                   INT/EXT00344
12     INEX-30b6-37  Freight Company Shipping    183
                     Documents,
13                   INT/EXT00004 -
                     INT/EXT00005
14
       INEX-30b6-38  Interior/Exterior           186
15                   Invoices, INT/EXT19884,
                     INT/EXT24995,
16                   INT/EXT17768,
                     INT/EXT17901,
17                   INT/EXT19699,
                     INT/EXT17467,
18                   INT/EXT17432,
                     INT/EXT21205,
19                   INT/EXT31881,
                     INT/EXT33080,
20                   INT/EXT24700
21     INEX-30b6-39  10/24/05 Davis E-mail to    202
                     C. Geary, Subject: USA
22                   Wallboard,
                     INT/EXT00623
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 19

| | NUMBER | DESCRIPTION | MARKED |
|---|---|---|---|

1                      DEPOSITION EXHIBITS
2
3         NUMBER            DESCRIPTION        MARKED
4      INEX-30b6-40   11/23/05 App E-mail to       203
                      C. Geary,
5                     Subject: Wallboard
                      Business - Continuation,
6                     INT/EXT04048
7      INEX-30b6-41   E-mail Chain Ending          205
                      1/10/06 App E-mail to
8                     C. Geary,
                      Subject: Update - Pallet
9                     Weights - Imported
                      Wallboard,
10                    INT/EXT00030
11     INEX-30b6-42   E-mail Chain Ending          207
                      3/9/06 App E-mail to
12                    C. Geary, Subject: IEBS
                      and Pan Ocean,
13                    INT/EXT03928
14     INEX-30b6-43   E-mail Chain Ending          212
                      3/10/06 App E-mail to to
15                    Bernas, Subject: LOI of
                      8 tires hold -
16                    Wallboard,
                      INT/EXT03916
17
       INEX-30b6-44   E-mail Chain Ending          216
18                    3/24/06 Norris E-mail to
                      C. Geary,
19                    Subject: Interior/
                      Exterior Building Supply
20                    (IEBS),
                      INT/EXT02445 -
21                    INT/EXT02447
22
23
24

Confidential - Subject to Further Confidentiality Review

Page 20

1                    DEPOSITION EXHIBITS

2

3        NUMBER            DESCRIPTION          MARKED

4     INEX-30b6-45   E-mail Chain Ending            219
                     3/31/06 App E-mail to
5                    Wei & Li, Subject: Great
                     Immensity,
6                    INT/EXT03865

7     INEX-30b6-46   E-mail Chain Ending            221
                     4/6/06 App E-mail to to
8                    Li, Subject: IEBS/Knauf
                     Container Shipments,
9                    INT/EXT02442 -
                     INT/EXT02443

10

      INEX-30b6-47   E-mail Chain Ending            222
11                   6/19/06 App E-mail to to
                     C. Geary, Subject: Knauf
12                   and BNBM Business,
                     INT/EXT02000 -
13                   INT/EXT02003

14    INEX-30b6-48   6/20/06 App E-mail to          223
                     Wei & Li, No Subject,
15                   INT/EXT01999

16    INEX-30b6-49   Handwritten Notes,             223
                     "M/V MYSTRAS,"
17                   INT/EXT00053

18    INEX-30b6-50   Handwritten Notes,             225
                     "Break Bulk," etc.,
19                   INT/EXT00278

20    INEX-30b6-51   7/6/06 Interior/Exterior       226
                     Memo to Whitney National
21                   Bank,
                     INT/EXT00177

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 21

1                    DEPOSITION EXHIBITS
2
3        NUMBER              DESCRIPTION           MARKED
4    INEX-30b6-52  9/20/06 Remont E-mail to      227
                   C. Geary, et al.,
5                  Subject: Sheetrock /
                   Wed / Sep 20, 2006 /
6                  Evening,
                   INT/EXT02379
7
     INEX-30b6-53  E-mail Chain Ending           229
8                  7/11/06 Davis E-mail to
                   App, Subject: IEBS Wuhu
9                  Wallboard,
                   INT/EXT03767
10
     INEX-30b6-54  E-mail Chain Ending           229
11                 7/11/06 App E-mail to
                   Li, Subject: Wuhu
12                 Wallboard Order,
                   INT/EXT03757
13
     INEX-30b6-55  7/26/06 "Kevin" E-mail        230
14                 to "WL," Subject: M/V
                   ALEXANDERGRACHT,
15                 INT/EXT03699
16   INEX-30b6-56  Teamhead Surveyors Co.,       232
                   Ltd., Cargo Condition
17                 Report,
                   INT/EXT00447
18
     INEX-30b6-57  7/21/06                        209
19                 M/V ALEXANDERGRACHT
                   Pre-Loading Survey of
20                 Gypsum Boards,
                   INT/EXT00091 -
21                 INT/EXT00097
22
23
24

Confidential - Subject to Further Confidentiality Review

Page 22

```
 1                  DEPOSITION EXHIBITS
 2
 3        NUMBER           DESCRIPTION        MARKED
 4     INEX-30b6-58   7/21/06                   233
                      M/V ALEXANDERGRACHT
 5                    Pre-Loading Survey of
                      Gypsum Boards,
 6                    INT/EXT00091 -
                      INT/EXT00097
 7
       INEX-30b6-59   Mediterranean Shipping    234
 8                    Company Original Bill of
                      Lading,
 9                    INT/EXT00975
10     INEX-30b6-60   Addendum to Application   235
                      and Agreement for
11                    Documentary Credit
                      Between
12                    Interior/Exterior and
                      Knauf Plasterboard
13                    Tianjin,
                      INT/EXT00233 -
14                    INT/EXT00236
15     INEX-30b6-61   DestinAsia Material       237
                      Gypsum Board Price List,
16                    INT/EXT00940
17     INEX-30b6-62   5/26/06 Zhang E-mail to   238
                      J. Geary, Subject: D&B,
18                    INT/EXT05897
19     INEX-30b6-63   6/20/06 Metro Resources   242
                      Correspondence to
20                    Interior/Exterior,
                      INT/EXT00967 -
21                    INT/EXT00971
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 23

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER           DESCRIPTION          MARKED
 4     INEX-30b6-64   E-mail Chain Ending          246
                      11/23/05 Zeng E-mail to
 5                    C. Geary & Stetin,
                      Subject: Inspection of
 6                    Gypsum Board,
                      INT/EXT00738
 7
       INEX-30b6-65   6/20/06 Metro Resources      247
 8                    Certificate of Warranty
                      to Interior/Exterior,
 9                    INT/EXT00969
10     INEX-30b6-66   E-mail Chain Ending          248
                      1/19/07 J. Geary E-mail
11                    to C. Geary,
                      Subject: Sheetrock,
12                    INT/EXT02293 -
                      INT/EXT02294
13
       INEX-30b6-67   COMEX Int'l "Attention:      250
14                    Purchasing Department"
                      Fax,
15                    INT/EXT00707
16     INEX-30b6-68   Bubba Board                  252
                      Information &
17                    Certification Packet,
                      INT/EXT00897 -
18                    INT/EXT00939
19     INEX-30b6-69   4/16/07 Camden Builders      254
                      Fax re: Drywall
20                    Verification,
                      INT/EXT05747 -
21                    INT/EXT05750
22     INEX-30b6-70   11/06 AWCI Tech Update,      256
                      INT/EXT06042
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 24

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER              DESCRIPTION        MARKED
 4     INEX-30b6-71   6/13/06 Becnel E-mail to    259
                      C. Geary, et al.,
 5                    Subject: Coastal Cargo -
                      $75.00 "No-Show" Appt.
 6                    Fee Approved, Effective
                      July 01, 2006,
 7                    INT/EXT04689
 8     INEX-30b6-72   3/21/06 App E-mail to       260
                      C. Geary,
 9                    Subject: Corrected page
                      two of letter to BNBM,
10                    INT/EXT03888
11     INEX-30b6-73   E-mail Chain Ending         270
                      1/26/09 Heider E-mail to
12                    Brisley,
                      Subject: Bessemer Family
13                    Sales, Knauf
                      Plasterboard problem,
14                    INT/EXT34599 -
                      INT/EXT34605
15
       INEX-30b6-74   Interior/Exterior           318
16                    Invoices,
                      INT/EXT27357,
17                    INT/EXT28739,
                      INT/EXT28746,
18                    INT/EXT27312,
                      INT/EXT27316
19
       INEX-30b6-75   Interior/Exterior           325
20                    Invoice,
                      INT/EXT19773
21
       INEX-30b6-76   Interior/Exterior           332
22                    Invoices,
                      INT/EXT21416 -
23                    INT/EXT21417
24
```

Confidential - Subject to Further Confidentiality Review

Page 25

```
 1                    DEPOSITION EXHIBITS
 2
 3        NUMBER           DESCRIPTION        MARKED
 4     INEX-30b6-77  Interior/Exterior         336
                     Invoice,
 5                   INT/EXT32838
 6     INEX-30b6-78  Notice of 1442            341
                     Deposition (Dennis v.
 7                   Interior/Exterior,
                     et al.)
 8
       INEX-30b6-79  1/26/10 Kanner Letter to  341
 9                   Herman & Levin
10     INEX-30b6-80  Exhibit A, Knauf          348
                     Commercial Invoice,
11                   IE-000003, IE-000005,
                     IE-000007, IE-000009
12
       INEX-30b6-81  Customs Information on    349
13                   Knauf Plasterboard
                     Shipments
14
       INEX-30b6-82  Sales Documentation       373
15                   Between Creola Ace
                     Hardware,
16                   Interior/Exterior and
                     Mitchell Co.,
17                   700109, 70010, 700115,
                     700118, 700112, 700124,
18                   700127
19
20
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 26

1                    PROCEEDINGS

2              (February 5, 2010 at 9:15 a.m.)

3              THE VIDEOGRAPHER:  Stand by.

4        We're now on the record.  My name is

5        Bill Geigert.  I'm a videographer for

6        Golkow Technologies.  Today's date is

7        February 5th, 2010, and the time is

8        9:15 a.m.

9              This video deposition is being

10       held in New Orleans, Louisiana in the

11       matter of Chinese-Manufactured Drywall

12       Products Liability Litigation for the

13       U.S. District Court, Eastern District

14       of Louisiana.  The deponent is Clay

15       Geary.  Counsel will be noted on the

16       stenographic record.

17              The court reporter is Mike

18       Miller, and he will now swear in the

19       witness.

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 27

1                    CLAYTON C. GEARY,

2        having been first duly sworn, testified as

3                         follows:

4                         EXAMINATION

5    BY MR. HERMAN:

6            Q.      Good morning.

7            A.      Good morning.

8            Q.      Can you please state your name

9    for the record?

10           A.      Clayton Cook Geary.

11           Q.      And you are here today to

12   testify on behalf of Interior/Exterior; is

13   that right?

14           A.      Yes, sir.

15           Q.      And somebody else is here to

16   testify on behalf of Interior/Exterior?

17           A.      Yes, sir.

18           Q.      And who is that person?

19           A.      James Geary.

20           Q.      And what is it that you

21   perceive is your primary area of knowledge or

22   responsibility, in terms of the deposition?

23           A.      In terms of the deposition, I

24   had more of the interaction with Knauf.

Confidential - Subject to Further Confidentiality Review

 1                    (Whereupon, Deposition Exhibit

 2           INEX-30b6-1, Supplemental and Amended

 3           Re-Notice of Oral and Videotaped

 4           Deposition, was marked for

 5           identification.)

 6                    (Whereupon, Deposition Exhibit

 7           INEX-30b6-2, Interior Exterior

 8           Building Supply Distributor Profile

 9           Form, was marked for identification.)

10   BY MR. HERMAN:

11           Q.     Okay.  Just for the record, I'm

12   just going to make the notice INEX-30b6-1,

13   and there's also a Distributor Profile Form,

14   which will be INEX-30b6-2.

15                    Are you familiar with the

16   Distributor Profile Form that's Exhibit 2?

17           A.     Yes.

18           Q.     And did you participate in the

19   creation of that or the responses that were

20   given?

21           A.     With conjunction of counsel.

22           Q.     Okay.  Did anybody else

23   participate, in conjunction with counsel, in

24    the responses that are provided on the

Confidential - Subject to Further Confidentiality Review

1    Distributor Profile Form?

2         A.    Jim.

3         Q.    Okay.  And that's the other

4    person that's here to testify on behalf of

5    the company today, correct?

6         A.    Yes, sir.

7              (Whereupon, Deposition Exhibit

8              INEX-30b6-3, Knauf Plasterboard Wuhu

9              Certificate of Origin, INT/EXT00084 -

10             INT/EXT00089, was marked for

11             identification.)

12   BY MR. HERMAN:

13        Q.    I'm going to show you what's

14   been marked as INEX-30b6-3, previously

15   marked, with Interior/Exterior Bates numbers

16   84 to 89.

17             MR. HERMAN:  Doug, you might

18             want to...

19        A.    Yes, sir.

20   BY MR. HERMAN:

21        Q.    Are you familiar with INEX

22   Exhibit 3?

23        A.    Yes, sir.

24        Q.    What is it?

Confidential - Subject to Further Confidentiality Review

1      A.      These are warranties and

2  certifications that we had required of Knauf

3  when we purchased material from them.

4      Q.      And from your point of view,

5  everything that you purchased from Knauf came

6  with these certificates and warranties?

7      A.      Yes, sir.

8      Q.      Or certificates and warranties

9  that were substantially similar to this?

10      A.      Yes.

11      Q.      And why did you want these

12  certificates and warranties?

13      A.      To make sure it complied with

14  certain standards that were applicable in the

15  U.S.

16      Q.      Okay.  Did you have some

17  concern that they wouldn't be?

18      A.      Just wanted to make sure they

19  were.

20      Q.      Okay.  The first one, which is

21  Bates number 84, says, "Certificate of

22  Origin.  We hereby certify that the following

23  gypsum boards have been shipped from

24  Shanghai, China to New Orleans, Louisiana,"

Confidential - Subject to Further Confidentiality Review

Page 31

1      and then it says, "Country of Origin:

2      China."

3                       Why did you want a certificate

4      of origin?

5              A.      To verify where it came from.

6              Q.      Did you have some concern that

7      it might come from somewhere other than

8      China?

9              A.      No.  We just were under the --

10     well, we were under the understanding that

11     you had to have all the products marked that

12     they were made in China or wherever the

13     country of origin was.

14             Q.      That's some type of, to your

15     knowledge, U.S. regulation?

16             A.      Yes, sir.

17             Q.      Okay.  If we look at the second

18     one, which is -- well, let me ask you this.

19                      Based on your knowledge,

20     understanding and recollection, did Knauf

21     comply with this certificate?

22             A.      Yes, sir.

23             Q.      Okay.  Okay.  Let's go to 85.

24     That's something called a mill certificate?

Confidential - Subject to Further Confidentiality Review

```
 1             A.      Uh-huh.
 2             Q.      And it says, "We hereby certify
 3    that the 1/2" gypsum boards were manufactured
 4    in accordance to ASTM C36."
 5             A.      Yes, sir.
 6             Q.      Okay.  Why did you want that
 7    certificate?
 8             A.      Because that's the standard
 9    that is the U.S. standard.
10             Q.      ASTM C36 is the U.S. standard?
11             A.      Yes, sir.
12             Q.      And you have some concern that
13    this gypsum board might not comply with that
14    standard?
15                     MR. SANDERS:  Object to form.
16             A.      No, we just wanted to make sure
17    it did.
18    BY MR. HERMAN:
19             Q.      Okay.  And if you look on the
20    stamp, it says, "Knauf Plasterboard Wuhu
21    Company, Ltd."
22             A.      Yes.
23             Q.      Are you familiar with that?
24             A.      Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 33

```
 1          Q.     What is that, to your knowledge
 2     and recollection?
 3          A.     We had one shipment from their
 4     Wuhu plant, which is different from their
 5     Tianjin plant.
 6          Q.     And are there similar
 7     warranties and certificates and
 8     representations with respect to the Knauf
 9     plasterboard that you received from the
10     Tianjin plant?
11          A.     Yes, we got the same warranties
12     and certifications.
13          Q.     And from your point of view,
14     did Knauf comply with this certificate?
15          A.     The ASTM certificate?
16          Q.     Yes.
17          A.     We got the certificate saying
18     that they did.
19          Q.     Do you have any knowledge or
20     information at this point that some of the
21     gypsum boards might not have complied with
22     ASTM C36?
23          A.     No, sir, I don't.
24          Q.     Is that something you've looked
```

Confidential - Subject to Further Confidentiality Review

1      into?

2              A.      No.

3                      MR. DUPLANTIER:  Let me just

4              object to the form of the question.

5              To the extent that you're asking

6              information that he might have

7              obtained as part of attorney-client

8              privilege, I'm going to instruct the

9              witness not to answer what he's

10             learned from his counsel.

11                     MR. HERMAN:  Okay.

12     BY MR. HERMAN:

13             Q.      Outside of discussions with

14     your counsel, have you looked into that?

15             A.      No, sir.

16             Q.      Okay.  Bates number 86,

17     something called "Beneficiary Signed

18     Statement."  What's a Beneficiary Signed

19     Statement?

20             A.      We wanted to make sure that the

21     product was packaged correctly because it's

22     coming from overseas.

23             Q.      Okay.  And in terms of

24     "beneficiary," what are you the beneficiary

Confidential - Subject to Further Confidentiality Review

1    of, or what is Knauf the beneficiary of, if

2    you know?

3         A.    I guess they're certifying that

4    they shipped it, that they packaged it

5    properly for oceangoing shipment.

6         Q.    Okay.  And it says, "We hereby

7    certify that, (A), the gypsum boards goods

8    shipped were properly palletized, wrapped,

9    sealed, to protect them against damage in

10   shipment."

11              Do you see that?

12        A.    Yes, sir.

13        Q.    And is that something you were

14   concerned about?

15        A.    Yes.

16        Q.    And, to your knowledge, as we

17   sit here today, did Knauf comply with that

18   certification?

19        A.    Yes.

20        Q.    Okay.  "(B), that the packing

21   of each 68-piece pallet consisted of wrapping

22   them with six pieces of rejected boards on

23   each side to protect against damage.  Pallets

24   are constructed so as to allow for forklift

Confidential - Subject to Further Confidentiality Review

```
 1    loading."

 2                Do you see that?

 3        A.    Yes, sir.

 4        Q.    And, to your knowledge, as we

 5    sit here today, did Knauf comply with that

 6    certificate?

 7        A.    Yes, sir.

 8        Q.    And then it says that, "Each

 9    pallet was wrapped in plastic sheet and belts

10    to further protect against damage and

11    moisture.  Each pallet was marked for size

12    with thickness and, (D), the gypsum boards

13    have end tape."

14                Do you see that?

15        A.    Uh-huh.

16        Q.    As we sit here today, do you

17    have any knowledge or information that Knauf

18    did not comply with that certificate?

19                MR. DUPLANTIER:  Answer "yes"

20        or "no."

21        A.    Do I have information that they

22    did not comply?

23    BY MR. HERMAN:

24        Q.    Yeah.
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 37

```
 1              A.      No.
 2              Q.      Okay.  And why were you
 3       concerned that the gypsum boards would have
 4       end tape?
 5              A.      To mark where it came from.
 6              Q.      Okay.  And --
 7              A.      The manufacturer.
 8              Q.      And why was that of concern?
 9              A.      Just to show where it came
10       from.
11              Q.      From a client-customer
12       relations point of view, is it important to
13       be able to know or represent which
14       manufacturer is associated with which piece
15       of drywall?
16              A.      Can you repeat that question?
17              Q.      From a client-customer point of
18       view, is it important to know which
19       manufacturer is associated with which piece
20       of drywall?
21              A.      There's a preference,
22       sometimes.
23              Q.      On the part of customers?
24              A.      Yes.
```

Confidential - Subject to Further Confidentiality Review

1          Q.      The next Bates number is 87.

2     It says "Certificate of Quantity, Quality and

3     Condition."

4                  Do you see that?

5          A.      Yes, sir.

6          Q.      And it says, "Condition:    In

7     good conditions."

8                  You see that?

9          A.      Uh-huh.

10         Q.      As we sit here today, do you

11    have any knowledge or information that the

12    plasterboard that was shipped was not in good

13    condition?

14         A.      As far as the packaging?

15         Q.      Well, I don't know.  What does

16    this mean to you?

17         A.      That the product, I guess, is

18    in accordance with the ASTM standards.

19         Q.      Okay.  And that's all it means,

20    based on your knowledge and understanding?

21         A.      The package was made towards --

22    the product was manufactured in accordance to

23    the standards, it was packaged properly, and

24    it complied with all the standards that were

Confidential - Subject to Further Confidentiality Review

Page 39

```
 1    applicable and the warranty that was

 2    applicable.

 3          Q.    Okay.  And so above that, it

 4    says, "Quality in accordance to ASTM C36,"

 5    and we've covered that.

 6                And then separately, it says,

 7    "Condition:  In good conditions."  That

 8    doesn't have any meaning to you, besides the

 9    fact that it was packed correctly and is in

10    accordance with ASTM C36?

11          A.    That there are no problems --

12    there should be no problems with the product.

13          Q.    Okay.  And, as we sit here

14    today, to your knowledge, are there problems

15    with the product that was shipped?

16          A.    Yes, there are.

17          Q.    Okay.  And is it the position

18    of Interior/Exterior that Knauf breached this

19    certification?

20                MR. DUPLANTIER:  Let me object

21          to the form of the question.  You're

22          asking for a legal conclusion.  But

23          subject to that, you can answer it.

24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

1    BY MR. HERMAN:

2            Q.      Okay.   Then Bates number 88,

3    the next page, it says, "Certificate.   We

4    hereby certify that one set to nonnegotiable

5    copies of required documents has been sent to

6    applicant by courier service at the address

7    of: 727 South Cortez Street, New Orleans,

8    Louisiana 70119."

9                    What is that address?

10           A.      That's where our corporate

11   office is.

12           Q.      And did you, in fact, receive

13   documents from Knauf Plasterboard Wuhu at

14   that address?

15           A.      I don't recall if it was at

16   that address, but we received documents from

17   them.

18           Q.      And you received those

19   documents in the United States of America?

20           A.      Yes, sir.

21           Q.      You didn't have to go to China

22   to pick up the documents?

23           A.      No, sir.

24           Q.      Okay.   Then Exhibit 89 is

Confidential - Subject to Further Confidentiality Review

Page 41

1    "Certificate of Warranty.  We hereby certify

2    that the gypsum boards manufactured and sold

3    to Interior/Exterior Building Supply, LP are

4    guaranteed to be free from defects in

5    materials and workmanship."

6                Why were you interested in

7    getting that warranty?

8        A.    Should there be any problems,

9    that they would take care of it.

10       Q.    Okay.  And, as we sit here

11   today, do you have any knowledge or

12   information that the plasterboards that you

13   received were not free from defects in

14   materials and workmanship?

15               MR. SANDERS:  Object to form.

16               MR. DUPLANTIER:  Object to the

17       form.  But you can answer it.

18       A.    Well, we wouldn't be here, I

19   guess, if there weren't some problems.

20   BY MR. HERMAN:

21       Q.    Has Interior/Exterior, to your

22   knowledge, taken the position that Knauf

23   breached this warranty?

24               MR. DUPLANTIER:  I'm going to

Confidential - Subject to Further Confidentiality Review

Page 42

1          object to the form of the question.

2                    MR. SANDERS:  Can we just make

3          one objection for everybody, so I

4          don't have to chime in.

5                    MR. HERMAN:  Sure.

6                    MR. DUPLANTIER:  You're asking

7          for legal conclusions, so I -- you can

8          answer it, to the best of your

9          ability, but -- I'm not even sure that

10         that question is within the scope of

11         the 30(b)6 deposition, but you can

12         answer it.

13                    THE WITNESS:  Can you repeat

14         the question?

15                    MR. HERMAN:  I'll try to ask a

16         better one.

17    BY MR. HERMAN:

18         Q.    To your knowledge, has

19    Interior/Exterior made any claim to Knauf

20    that this warranty was breached?

21         A.    My understanding is we -- my

22    attorney could better answer it, but we've

23    made cross-claims in some of the suits that

24    we've been named.

Confidential - Subject to Further Confidentiality Review

1          Q.     And do those cross-claims

2     allege, among other things, that this

3     warranty, with respect to the plasterboards

4     being free from defects in materials and

5     workmanship, was breached?

6          A.     I don't know.

7          Q.     Based on your knowledge and

8     information as we sit here today, do you

9     believe that the plasterboards that you

10    received were free from defects in materials

11    and workmanship?

12         A.     No.

13         Q.     And what do you base that on?

14         A.     The problems that we've had.

15         Q.     What are the problems that

16    you've had?

17         A.     These lawsuits and customer

18    complaints.

19              MR. McKENNA:  Could we possibly

20         ask the witness to speak up a bit?

21              THE WITNESS:  Okay.

22              MR. DUPLANTIER:  Speak a little

23         louder, if you can.

24              THE WITNESS:  Okay.

Confidential - Subject to Further Confidentiality Review

1           MR. HERMAN:  Doug, I thought

2       you were going to pose an objection,

3       but just to be clear, you were just

4       saying that if one defendant makes an

5       objection, that's good for everyone?

6           MR. SANDERS:  (Nods head.)

7           MR. HERMAN:  Okay.

8           (Whereupon, Deposition Exhibit

9       INEX-30b6-4, Knauf Plasterboard

10      Tianjin Mill Certificate,

11      INT/EXT00227 - INT/EXT00231, was

12      marked for identification.)

13  BY MR. HERMAN:

14      Q.    I'm going to show you what's

15  been previously marked as INEX-30b6-4.

16          MR. HERMAN:  Doug might want

17      one.

18          MR. SANDERS:  Thanks.

19  BY MR. HERMAN:

20      Q.    These, for the record, are

21  Bates numbers INT/EXT227 through 231.

22          What is INEX-30b6-4, to the

23  best of your knowledge and understanding?

24      A.    Excuse me?

Confidential - Subject to Further Confidentiality Review

Page 45

1          Q.      What is this exhibit, to the

2     best of your knowledge and understanding?

3          A.      These are the warranties, the

4     mill certificates, certificate of quantity,

5     quality, ASTM certificates -- standards.

6     Well, actually, I don't see the ASTM in here.

7     Yes, I do.  Yes, I do.

8          Q.      And this is the same set of

9     warranties and certificates and

10    representations that we just looked at,

11    except it's from Knauf Plasterboard Tianjin

12    instead of Knauf Plasterboard Wuhu?

13         A.      Correct.

14         Q.      And, to your knowledge and

15    understanding, what is the difference, if

16    any, between Knauf Plasterboard Tianjin and

17    Knauf Plasterboard Wuhu?

18         A.      Manufactured at a different

19    facility.

20         Q.      Okay.  And if we look at the

21    certificate of warranty, which is Bates

22    number 230, as we sit here today, would it be

23    your knowledge and understanding that Knauf

24    Plasterboard Tianjin breached this warranty?

Confidential - Subject to Further Confidentiality Review

Page 46

1          A.      Yes.

2          Q.      And let's look at Bates

3     number 228, which is the statement.  I think

4     I'd asked you before about the term

5     "beneficiary."  There's something on this

6     that says, "This letter of credit."  What

7     does that mean, if you know?

8          A.      These were all conditions in

9     the letter of credit.

10         Q.      And who's the beneficiary of

11    the letter of credit, if you know?

12         A.      The beneficiary, I assume,

13    would be Knauf.

14         Q.      Okay.  And in this statement,

15    it says, "We hereby certify that the gypsum

16    boards goods shipped were properly

17    palletized, wrapped, sealed, to protect them

18    against damage in shipment."

19               Do you see that?

20         A.      Uh-huh.

21         Q.      Did the Knauf Tianjin

22    plasterboard come on the same shipment as the

23    Knauf Wuhu?

24         A.      No, it did not.

Confidential - Subject to Further Confidentiality Review

 1          Q.      And based on your knowledge and

 2     understanding, did Knauf Tianjin comply with

 3     this representation?

 4          A.      Yes.

 5          Q.      And it says, "that the packing

 6     of each 68-piece pallet consisted of wrapping

 7     them with six pieces of rejected boards on

 8     each side as to protect against damage.

 9     Pallets are constructed so as to allow for

10     forklift loading."

11                  Based on your knowledge,

12     understanding and recollection, did Knauf

13     Tianjin comply with this representation?

14          A.      Yes.

15          Q.      And then it says that each

16     pallet was wrapped in plastic sheet and belts

17     to further protect against damage and

18     moisture, each pallet was marked for

19     size/width/thickness, and the gypsum boards

20     have end tape.

21                  To your knowledge,

22     understanding and recollection, did Knauf

23     Tianjin comply with that statement?

24          A.      Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  If you'll look at

2     Exhibit 2, which is the Distributor Profile

3     Form, on page 2, there's a Section 3, which

4     talks about "Distributor's purchase of

5     Chinese drywall," and the first thing that's

6     listed as a source is Knauf Plasterboard

7     Tianjin?

8          A.     Uh-huh.

9          Q.     Are you the best person to talk

10    about how these purchases came about, or

11    would that be Jim?

12         A.     Originally, that would be Jim.

13         Q.     Okay.  I'll try to ask you what

14    questions I can, and then we'll take a short

15    recess and try to switch over.

16                In terms of these purchases

17    from Knauf Plasterboard Tianjin, on number 4,

18    it says, "Dates of purchases."  Do you see

19    that?

20         A.     Uh-huh.

21         Q.     And there's four different

22    dates there?

23         A.     Uh-huh.

24         Q.     What are those dates --

Confidential - Subject to Further Confidentiality Review

1              MR. DUPLANTIER:  "Yes" or "no."

2       BY MR. HERMAN:

3              Q.     I think you meant "yes"?

4              A.     I'm sorry?

5              Q.     When you said "uh-huh," I think

6       you meant "yes"?

7              A.     Okay.  I'm sorry.  Yes.

8              Q.     Okay.  Okay.  And with respect

9       to those four dates, what do those dates

10      relate to, to the best of your knowledge and

11      recollection?

12             A.     Best of my knowledge, those are

13      the dates of the contracts.

14             Q.     The contracts --

15             A.     But I'd have to verify those.

16             Q.     And those were formal contracts

17      between Interior/Exterior and Knauf Tianjin?

18             A.     And Knauf Wuhu.  One of those

19      is Knauf Wuhu, I believe.

20             Q.     Okay.  And are these --

21             A.     I'm sorry.  I'm sorry.  Those

22      four would be Knauf Tianjin.

23             Q.     And Knauf Wuhu is listed on

24      page 3 as a separate source, correct?

Confidential - Subject to Further Confidentiality Review

Page 50

1          A.      Yes.

2          Q.      Okay.  And did those four

3    purchases come on four different ships?

4          A.      Actually, they came on three

5    ships.

6          Q.      Okay.  Do you know which two

7    were shipped together?

8          A.      My recollection is the first

9    one and the second one each came on their own

10   ships, and then the third and fourth came

11   together.

12         Q.      Okay.  And do you know about

13   when each shipment actually arrived in the

14   U.S.?

15         A.      I don't recall exactly, but it

16   is in the documents.

17         Q.      Okay.  Did anything from China

18   get to the U.S. before 2006, to the best of

19   your recollection?

20         A.      No.

21         Q.      Do you know around when in 2006

22   was the first shipment?

23         A.      It was around January 26th.

24         Q.      And was that the first time

Confidential - Subject to Further Confidentiality Review

1      that Interior/Exterior ever received any

2      drywall that was manufactured in China?

3              A.      Yes.

4              Q.      If we go to page 3, we were

5      talking about how there's a separate entry

6      for Knauf Wuhu.  Do you see that?

7              A.      Uh-huh.

8              Q.      And are you --

9              A.      Yes.

10             Q.      Are you the best person to

11     address how that purchase came about?

12             A.      Yes.

13             Q.      How did that purchase come

14     about?

15             A.      My recollection was Knauf

16     Tianjin was having trouble producing enough

17     product, and they gave us an alternative to

18     try and get it from Wuhu.

19             Q.      And when you say "they" gave

20     you an alternative, who was it that actually

21     directed you to Knauf Wuhu, if you remember?

22             A.      Mark Norris was the, I believe,

23     manager, I guess, of Knauf over there; and

24     he's the one that was our main contact as far

Confidential - Subject to Further Confidentiality Review

1    as making decisions.

2        Q.    Do you remember having a

3    specific like phone conversation or something

4    with him, where he might have directed you

5    over to Knauf Wuhu?

6        A.    We had conversations.  I can't

7    remember if it was e-mails, but there was --

8    production was getting tight for them, and

9    they gave us this alternative.

10       Q.    And did Mr. Norris speak

11   English?

12       A.    Yes.

13       Q.    And so you were able to

14   communicate with him directly?  You didn't

15   have to go through a translator?

16       A.    Correct.

17       Q.    Did you ever meet Mr. Norris in

18   person?

19       A.    No.

20       Q.    Did Mr. Norris, to your

21   knowledge, ever come to the United States?

22       A.    Not to my knowledge.

23       Q.    Did you ever go to China?

24       A.    Did not.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  There's a date of

2     purchase in number 4 of July 5th, 2006.  Do

3     you see that?

4          A.     Uh-huh.

5          Q.     Is that a contract date, to the

6     best of your recollection?

7          A.     The best of my recollection,

8     yes.

9          Q.     And would that shipment have

10    come -- or would that purchase have come on a

11    different shipment than the Knauf Tianjin

12    shipments?

13         A.     Yes, it did.

14         Q.     And do you know about when that

15    arrived?

16         A.     I believe September, but I'm --

17    of '06, but I'm not sure.

18         Q.     I understand that the other

19    Mr. Geary is the best person to address the

20    Metro Resource purchases?

21         A.     Yes.

22                MR. HERMAN:  If nobody minds,

23         let's just go off the record for one

24         second and we can switch up.

Confidential - Subject to Further Confidentiality Review

1          MR. DUPLANTIER:  That's fine

2     with me.

3          THE VIDEOGRAPHER:  Off the

4     record, 9:39 a.m.

5          (Recess taken, 9:39 a.m. to

6     9:41 a.m.)

7          THE VIDEOGRAPHER:  Stand by.

8     Back on the record, 9:41 a.m.

9          JAMES F. GEARY, SR.,

10    having been first duly sworn, testified as

11              follows:

12              EXAMINATION

13    BY MR. HERMAN:

14        Q.    Could you please state your

15    name for the record?

16        A.    James Geary.

17        Q.    And you're also here to testify

18    on behalf of Interior/Exterior?

19        A.    Yes, I am.

20          MR. HERMAN:  Just as a

21     preliminary matter, I'll just state

22     for the record that we are optimistic

23     that we will reach a stipulation as to

24     the authenticity of the documents that

Confidential - Subject to Further Confidentiality Review

Page 55

1          have been produced by

2          Interior/Exterior as business records,

3          and so we're not going to waste time

4          in this deposition trying to

5          authenticate documents, except for

6          maybe some clarifications on

7          handwriting.  And if we have to

8          address that, we will later; but

9          hopefully, we'll resolve it by

10          stipulation.

11                    MR. DUPLANTIER:  That is

12          correct.

13                    MR. HERMAN:  Okay.

14     BY MR. HERMAN:

15          Q.     How did Interior/Exterior come

16     to start purchasing drywall from China?

17          A.     Shortly after the storm, we

18     were displaced from our offices in

19     New Orleans, and we relocated to our office

20     on the north shore in Mandeville.  We have a

21     warehouse, a branch warehouse over there, and

22     we have excess office, so we moved a lot of

23     our corporate people over there.

24                    Sometime after the storm, when

Confidential - Subject to Further Confidentiality Review

1    we finally got relocated, I would get

2    periodic calls from some of our vendors,

3    checking in with us, see how we did, see how

4    we were doing since the storm, you know, just

5    asking us how we made out.

6              My recollection is I got a call

7    from -- one day, from Mr. Jeff Brisley with

8    Knauf, who is an insulation vendor of ours.

9    We have bought insulation from Knauf for

10   many, many years, and he was calling to check

11   in with me to see how I was doing.

12             Prior to the storm, there was a

13   nationwide shortage of drywall.  In the

14   course of our conversation, he mentioned to

15   me that Knauf overseas had manufacturing

16   facilities that produced drywall, and we then

17   discussed the possibility of us getting some

18   product from them.

19        Q.    Okay.

20             MR. NICHOLAS:  I didn't get his

21        last name, Steve.  I'm sorry.

22             THE WITNESS:  Pardon?

23             MR. DUPLANTIER:  Brisley,

24        B-R-I-S-L-E-Y.

Confidential - Subject to Further Confidentiality Review

 1                    MR. NICHOLAS:  Thank you.

 2                    THE WITNESS:  B-R-I-S-L-E-Y.

 3                    MR. HERMAN:  Okay.

 4     BY MR. HERMAN:

 5          Q.    And so when you say "vendors,"

 6     you're talking about organizations that sold

 7     product to Interior/Exterior?

 8          A.    Correct.

 9          Q.    And do you know what company

10     Mr. Brisley was with?

11          A.    Yeah.  Mr. Brisley is with

12     Knauf USA.

13          Q.    Okay.  And who was it that made

14     the suggestion or recommendation or inquiry

15     that you might seek drywall from China?

16          A.    To the best of my recollection,

17     he did.

18          Q.    Okay.  Did you know that

19     drywall was even manufactured in China?

20          A.    I don't know.  I had suspicions

21     that it would be, but I don't recall if I did

22     at the time or not.

23          Q.    Okay.  Have you ever reviewed

24     any literature or product placement or

Confidential - Subject to Further Confidentiality Review

Page 58

1    advertising or marketing regarding any

2    drywall from China?

3         A.       At the time, no.

4         Q.       Did Mr. Brisley provide you

5    with some?

6         A.       I'm trying to remember.  I know

7    he sent us, via an e-mail through his local

8    sales rep, just a communication with some

9    contact information with their people in

10   China, as well as some prices.

11        Q.       Okay.  Did you have any

12   concerns about importing drywall from China?

13        A.       No.  Did not.

14        Q.       Did you have any concerns that

15   your customers might have concerns about

16   buying drywall that had been manufactured in

17   China?

18        A.       No, we didn't.  I did not think

19   that would be an issue, because at the time

20   there was such a severe shortage of drywall,

21   we were having to turn customers down because

22   of our lack of supply.  So this was an

23   attempt on us to get additional supply,

24   knowing that, additionally with the storm,

Confidential - Subject to Further Confidentiality Review

1    that there would be additional demand.

2         Q.    Okay.  After this phone call

3    with Mr. Brisley, how did either

4    Interior/Exterior follow up or Knauf follow

5    up, in terms of actually providing drywall

6    from China to Interior/Exterior?

7              MR. SANDERS:  Object to the

8         form.

9              THE WITNESS:  Can you repeat

10        that?  I'm not sure if I followed the

11        question.

12   BY MR. HERMAN:

13        Q.    What was the next step after

14   this phone call?

15        A.    The next step is, actually, I

16   kind of handed the ball off to Clay, and he

17   took it from there.  And then he had the

18   communications with the Knauf folks in China.

19        Q.    Okay.  And my understanding is,

20   if you look at Exhibit 2, which is in front

21   of you --

22        A.    Yeah.

23        Q.    -- if you go to page 4, it

24   says, "Source:  Metro Resources Corporation"?

Confidential - Subject to Further Confidentiality Review

Page 60

1          A.     Yes.

2          Q.     And it's my understanding that

3     you had more involvement in terms of

4     purchasing drywall from Metro Resources?

5          A.     That is correct.

6          Q.     How did that come about, that

7     you started purchasing drywall from Metro

8     Resources Corporation?

9          A.     We came to a time where Knauf,

10    for whatever reason -- I'm trying to remember

11    the particulars, but they essentially told us

12    they could no longer provide us any drywall,

13    and we were still -- the shortage was still

14    very severe.  And we were trying to get more

15    product, and so we used Metro to try and get

16    additional product.

17         Q.     Do you know why Knauf couldn't

18    provide you with more?

19         A.     I don't know for sure.  My

20    appreciation at the time was that it was just

21    a severe supply-and-demand situation, and

22    overseas as well.

23         Q.     Okay.  And it says that the

24    name of the Chinese drywall manufacturer

Confidential - Subject to Further Confidentiality Review

```
 1      is -- I don't know if I'll pronounce it
 2      right, but Taian Taishan Plasterboard
 3      Company?
 4             A.      Right.
 5             Q.      Do you have any idea what is
 6      that is?
 7             A.      It's a manufacturer.
 8             Q.      Okay.  But do you know any
 9      other companies or governments or anything
10      that that might be associated with?
11             A.      No.
12             Q.      Did you have any concern about
13      switching from Knauf drywall to Taian Taishan
14      plasterboard?
15             A.      No, we did not.
16             Q.      It says, "Name of the Chinese
17      drywall product, if known," and I -- Taihe --
18             A.      Taihe is the brand name of the
19      drywall, just as National Gypsum, you
20      probably heard, has -- their brand name is
21      called Gold Bond.  So it's a similar deal.
22             Q.      Okay.  Had you ever heard of
23      Taihe drywall before the storm?
24             A.      No, sir, I had not.
```

Confidential - Subject to Further Confidentiality Review

Page 62

1          Q.      It says on number 4, "Dates of

2     Purchase," and it has a contract date and

3     then four different invoice dates.  Could you

4     kind of explain the distinction between the

5     contract date and the invoice dates?

6          A.      I believe that the invoice date

7     would -- is the time in which the letter of

8     credit or the transaction on the letter of

9     credit occurs with the bank, but I'm not

10    positive about that.

11         Q.      Okay.  Did you get four

12    different shipments of Taihe drywall?

13         A.      Yes, we did.

14         Q.      And those correspond with the

15    four different invoice dates?

16         A.      That would be my understanding,

17    yes.

18         Q.      And do you know around when the

19    Taihe drywall started coming into

20    New Orleans?

21         A.      Taihe drywall -- it's in the

22    documents.  I'm trying to recall.  It was in

23    the neighborhood of July -- no, August

24    through September.

Confidential - Subject to Further Confidentiality Review

1          Q.     Of 2006?

2          A.     2006, yes.

3          Q.     Okay.  And at the time you

4    started selling Taihe drywall to your

5    customers, were you completely out of Knauf

6    drywall?

7          A.     No, I believe when we got the

8    Taihe, if my memory serves me right, the last

9    shipment of the Knauf was coming in.  So I

10   think that we did have some overlap, not a

11   lot, of having Knauf and Taihe at the same

12   time; but I'm not positive about that.

13         Q.     Do you know around when you ran

14   out of Knauf drywall?

15         A.     Essentially, we're not

16   positive.  We're fairly certain we ran out

17   before the end of 2006.  To err on the side

18   of caution, we're thinking that maybe we had

19   some in the early parts of 2007.

20         Q.     And do you know around when you

21   ran out of the Taihe drywall?

22         A.     About approximately the same

23   time, although we do think we had a little

24   bit that was -- had some beat-up board that

Confidential - Subject to Further Confidentiality Review

Page 64

1    was left over that didn't get out until

2    approximately May of '07.  This was product

3    that got damaged in either unloading or in

4    shipment.

5         Q.    In the earlier part of the

6    deposition, we looked at a couple of

7    certificates and warranties from the Knauf

8    companies.  Did you get a similar set of

9    certificates and warranties from either Metro

10   Resources Corporation or Taian Taishan?

11        A.    Yes, we did.

12        Q.    Okay.  And from your point of

13   view as we sit here today, did either Metro

14   or Taian Taishan comply with those

15   warranties?

16        A.    No.

17        Q.    Okay.  You mentioned some stuff

18   about some plasterboard that was damaged

19   during the shipment.  Do you believe that

20   that's because it was not packaged properly?

21        A.    No.  For the most part, it was

22   packaged well.  It came in okay.  And I think

23   a lot of the damage actually occurred with --

24   the Taihe came in on containers as opposed to

1     the break bulk that Knauf did.

2              We had to manually unload those

3     containers, which proved to be a little bit

4     more difficult because it was manually

5     involved.  And I think we incurred some

6     damage in that phase of it.

7          Q.     Okay.  Was there some claim

8     that was made by Interior/Exterior against --

9          A.     No, there wasn't.

10         Q.     -- a shipper or a marine

11    insurance company or anything like that?

12         A.     Was not.

13         Q.     Okay.  When you say that it's

14    your opinion or belief that some of the

15    warranties and certificates were breached

16    with respect to the Taihe drywall, is that

17    the warranty against defective materials and

18    workmanship?

19         A.     Yes.

20         Q.     What about the warranty that it

21    complies with ASTM C36?  Do you have any

22    knowledge or information that --

23         A.     I couldn't answer that.

24         Q.     Okay.  Is that something, other

Confidential - Subject to Further Confidentiality Review

```
 1    than conversations with your attorneys, that
 2    Interior/Exterior has looked into?
 3              MR. DUPLANTIER:  Let me, again,
 4         object to the question.  To the extent
 5         that those queries are asking for
 6         privileged information, I'm going to
 7         instruct him not to answer the
 8         question.
 9              MR. HERMAN:  I understand.  Can
10         you answer without...
11              THE WITNESS:  Would you repeat
12         the question, please?
13    BY MR. HERMAN:
14         Q.    I'm trying to find out if
15    Interior/Exterior, when they started getting
16    complaints or lawsuits or whatever, undertook
17    any type of investigation, other than talking
18    to their lawyers, about whether the drywall
19    complied with ASTM C36.
20         A.    Specific to ASTM C36, no.  Our
21    first reaction was to contact the Knauf
22    attorney -- or Knauf organization.  Pardon
23    me.
24         Q.    Okay.  Okay.  And what about
```

Confidential - Subject to Further Confidentiality Review

1    with respect to any of the other warranties

2    or quality control issues?  Did you take

3    any -- did you do any investigation, other

4    than talking to your own attorneys?

5         A.    Not on our own, no, sir.  We

6    did not.

7         Q.    What did you do for drywall

8    after the end of 2006, beginning of 2007,

9    when the Chinese drywall ran out?

10        A.    At that point in time,

11   throughout the country the availability of

12   domestic product was becoming a lot more

13   available, so it was no longer an issue.  So

14   we were able to supply our company with

15   enough domestic drywall.

16        Q.    You'd prefer to use domestic?

17        A.    Sure.

18        Q.    Was there some preference on

19   the part of the customers to have domestic as

20   opposed to Chinese?

21        A.    You had situations where people

22   would say yes, they would be brand-specific

23   or have a brand preference.

24             When we first got this drywall

1    in, though, from China, people were so

2    desperate to get product, there was very

3    little resistance to anybody.  They just

4    wanted drywall.

5          Q.    Did there continue to be a

6    price difference between Chinese drywall and

7    domestic drywall in, let's say, 2007?

8          A.    No, sir.  The prices were

9    relatively the same.

10         Q.    Is that something that you

11   checked into, to see if you could provide a

12   cheaper line of drywall from China?

13         A.    That was not our motivation,

14   no.  Our motivation was simply to get enough

15   product.

16         Q.    And so in 2008, for example,

17   you never undertook any investigation to try

18   to see if drywall might be available cheaper

19   from China than it could be provided

20   domestically?

21         A.    No, we did not.  You know, when

22   we did this, there was a -- actually, a large

23   risk involved.  Because of the period of time

24   that it took from inception to delivery, the

Confidential - Subject to Further Confidentiality Review

Page 69

1    price of drywall -- drywall is a commodity

2    product, and the price can fluctuate

3    tremendously.

4                    So there was a huge risk that

5    we undertook when we did this, because the

6    price, for whatever reason, could have

7    dropped.

8                    (Whereupon, Deposition Exhibit

9            INEX-30b6-5, Knauf Plasterboard

10           Tianjin Indicative Price Summary,

11           INT/EXT00659 - INT/EXT00660, was

12           marked for identification.)

13   BY MR. HERMAN:

14       Q.    I'm going to show you

15   INEX-30b6-5, which has the Bates numbers

16   INT/EXT659 and 660.

17                   Can you recall ever seeing

18   Exhibit 5 before?

19       A.    I don't recall seeing this, no.

20   I may have, but I don't recall.

21       Q.    Okay.  Can you tell from

22   looking at it what it is?

23       A.    Basically, a price list for

24   containers of drywall going to -- freight

Confidential - Subject to Further Confidentiality Review

Page 70

1    options to New Orleans or Mobile, from

2    Tianjin.

3            Q.      Okay.

4            A.      The first one is 4x8x5/8

5    Type X, and the second is 4x8x1/2" regular.

6            Q.      What's the difference between

7    5/8ths and 1/2" regular, just for the purpose

8    of the record?

9            A.      1/2" regular is a standard

10   wallboard product that is used throughout for

11   residential construction.  Five-eighths

12   fire-rated drywall is used in commercial

13   construction, in a building such as this.

14           Q.      Did Interior/Exterior purchase

15   both types of drywall?

16           A.      No, sir.  We only purchased

17   4x12x1/2" regular.

18           Q.      Did you sell -- did

19   Interior/Exterior sell 5/8ths during the

20   2006, early 2007 time frame?

21           A.      Sure, we did.  We -- supplied

22   by domestic manufacturers.

23           Q.      Okay.  They didn't have the

24   same crunch on 5/8ths as they did on 1/2"?

Confidential - Subject to Further Confidentiality Review

```
 1            A.      No, it was an overall crunch,

 2     so we elected to get just the commodity

 3     4x12x1/2" product from China, make it simple.

 4            Q.      Okay.  It says at the bottom,

 5     "Knauf Plasterboard Tianjin," and then

 6     there's a quote that says, "Delivering

 7     reliable quality across the globe."

 8                    Are you familiar with that as

 9     some type of slogan that Knauf uses?

10            A.      I don't recall ever seeing

11     that.

12                    MR. SANDERS:  Object to form.

13            A.      I may have.  I just don't

14     recall.

15                    (Whereupon, Deposition Exhibit

16            INEX-30b6-6, Handwritten Notes, "John

17            Davis," etc., INT/EXT00058, was marked

18            for identification.)

19     BY MR. HERMAN:

20            Q.      Okay.  Let me show you

21     INEX-30b6-6, which is Bates number 58.

22            A.      Okay.

23            Q.      Do you have any idea what

24     Exhibit 6 is?
```

Confidential - Subject to Further Confidentiality Review

Page 72

1           A.     This is handwriting by Clay.  I

2    can recognize the writing.  It's some contact

3    information for Knauf, different people with

4    Knauf; and, also, people down at the bottom,

5    Billy App would be our freight forwarder.

6    Phillip Gordillo is one of our bankers.

7           Q.     Okay.  And Mark Norris is the

8    person that you mentioned who's over at Knauf

9    in China?

10          A.     I didn't mention.  Clay did.

11          Q.     Oh.  I'm sorry.

12          A.     And my understanding is, yes,

13   that was his contact over there.

14          Q.     And Jeff Brisley is the person

15   you mentioned?

16          A.     Jeff Brisley is the person at

17   Knauf that I mentioned, yes.

18          Q.     And I guess I'll just save

19   this, ask your brother about it.

20          A.     Sure.

21                 (Whereupon, Deposition Exhibit

22                 INEX-30b6-7, Handwritten Notes, "Rick

23                 Wendel," etc., INT/EXT00951 -

24                 INT/EXT00952, was marked for

Confidential - Subject to Further Confidentiality Review

 1            identification.)

 2      BY MR. HERMAN:

 3            Q.      I'm going to show you

 4      INEX-30b6-7, which are Bates numbers 951 and

 5      952.

 6            A.      Uh-huh.

 7            Q.      Do you know whose handwriting

 8      this is?

 9            A.      That looks like Clay's writing.

10      Maybe not.

11            Q.      Okay.

12            A.      But it does look like his

13      writing.

14            Q.      Well, I'll probably save it for

15      him.  But I just wanted to ask, because it

16      has Taihe on here:  Do you have any idea what

17      this references, "Chinese board, Taihe,

18      Uni-Pac"?

19            A.      I'm not sure.

20            Q.      Do you have any idea who Rick

21      Wendel is?

22            A.      I'm not positive.

23            Q.      Or what "Saratoga" means, or

24      is?

Confidential - Subject to Further Confidentiality Review

```
 1          A.      I'm not positive on that
 2     either.
 3          Q.      At the bottom of 952, it says,
 4     "3% damaged."  Do you know what that means?
 5          A.      I'm not sure of that either.
 6                  MR. HERMAN:  Okay.  Save that.
 7                  (Whereupon, Deposition Exhibit
 8             INEX-30b6-8, Handwritten Notes,
 9             "Storage fee at wharf," etc.,
10             INT/EXT00294, was marked for
11             identification.)
12     BY MR. HERMAN:
13          Q.      I'll show you INEX-30b6-8,
14     which is Bates number 294.
15          A.      Same thing; I'm fairly certain
16     this is Clay's handwriting again.
17                  MR. HERMAN:  Okay.  Well, I'll
18             just wait and ask him about it.
19                  (Whereupon, Deposition Exhibit
20             INEX-30b6-9, E-mail Chain Ending
21             10/18/05 Davis E-mail to C. Geary,
22             Subject: Plasterboard to New Orleans,
23             INT/EXT00638, was marked for
24             identification.)
```

Confidential - Subject to Further Confidentiality Review

 1                    (Whereupon, Deposition Exhibit

 2            INEX-30b6-10, E-mail Chain Ending

 3            10/18/05 Davis E-mail to C. Geary,

 4            Subject: Plasterboard to New Orleans,

 5            w/Handwritten Interlineations,

 6            INT/EXT01292, was marked for

 7            identification.)

 8     BY MR. HERMAN:

 9            Q.     I'm going to show you two

10     exhibits, which I think go together.

11     Exhibit 9 is Bates number 638, and Exhibit 10

12     is Bates number 1292.

13            A.     Okay.

14            Q.     And I see, actually, that this

15     is addressed to your brother, so maybe I'll

16     ask him about it.  But do you know whose

17     handwriting that is?

18            A.     That is actually my

19     handwriting.

20            Q.     Okay.

21            A.     And I'm fairly certain that

22     this screen print of the e-mail did not come

23     out completely, and that's my writing,

24     filling in all the not-shown information.

Confidential - Subject to Further Confidentiality Review

Page 76

    1           Q.      Right.  It looks like
    2    Exhibit 10 has your supplementation of
    3    Exhibit 9; is that right?
    4           A.      Right.  That's what I believe
    5    too.
    6           Q.      And when you made these notes,
    7    did you make them at the time you got the
    8    e-mail, or is this something you've done
    9    recently --
   10           A.      No, this would have been at the
   11    time of the e-mail.
   12           Q.      Okay.  And how did you know
   13    what words to write in here?
   14           A.      I'm not sure.  I guess -- well,
   15    I don't -- I don't know.
   16           Q.      Okay.  It says -- if you look
   17    at the middle of the e-mail, it says, "We can
   18    then ship approximately 300,000 sheets per
   19    month from our Tianjin plant.  If you require
   20    additional board, we would employ the other
   21    two Knauf China plants to supplement your
   22    shipments."
   23                   Is that right, with your
   24    handwriting?

Confidential - Subject to Further Confidentiality Review

Page 77

```
 1              A.      That is my handwriting,
 2      that's -- yeah.
 3              Q.      And who is this e-mail from?
 4              A.      It says, "From:  John Davis."
 5              Q.      Do you know who that is?
 6              A.      Well, he's with Knauf.
 7              Q.      Okay.  And it says -- at the
 8      bottom, it says, "Business Development
 9      Manager, Knauf Plasterboard and Insulation,
10      China."
11                      Do you see that?
12              A.      Yes.
13              Q.      And is he somebody that you
14      dealt with to kind of coordinate shipments
15      from whichever Knauf China plant could
16      provide the drywall?
17              A.      Again, Clay had most of the
18      dealings with John Davis, yes.
19                      (Whereupon, Deposition Exhibit
20              INEX-30b6-11, E-mail Chain Ending
21              10/21/05 Davis E-mail to C. Geary,
22              Subject: "Made in China,"
23              INT/EXT00635 - INT/EXT00637, was
24              marked for identification.)
```

Confidential - Subject to Further Confidentiality Review

Page 78

1      BY MR. HERMAN:

2           Q.      Okay.   I'm going to show you

3      what's been marked INEX-30b6-11, which, for

4      the record, is Bates numbers 635 to 637.   And

5      it looks like this is a -- to your brother

6      too.   Is this handwriting his or yours, to

7      the best of your recollection?

8           A.      That appears to be his writing.

9           Q.      Okay.   Well, let me just ask

10     you if you can shed some light on this --

11          A.      Sure.

12          Q.      -- and I'll ask your brother as

13     well:   If you look at the second page, 636,

14     there's a sentence towards the bottom that

15     says, "We have priced your plasterboard order

16     according to 'sister company' rates upon the

17     request of Knauf USA."

18                  Do you see that?

19          A.      Yes, I do.

20          Q.      Do you know what that means?

21          A.      I would only assume that

22     because of our longstanding relationship with

23     Knauf USA as an insulation purchaser, that

24     that's what he's referring to.

Confidential - Subject to Further Confidentiality Review

1       Q.      From your point of view, were

2    these all sister companies?

3              MR. SANDERS:  Object to form

4          and foundation.

5          A.      Were they -- these all sister

6    companies --

7    BY MR. HERMAN:

8          Q.      These Knauf companies:  Knauf

9    USA, Knauf Tianjin, Knauf Wuhu?

10             MR. SANDERS:  Same objection.

11         A.      Yeah, I don't know.  My

12   assumption would have been yes, but I don't

13   know that to be true.

14   BY MR. HERMAN:

15         Q.      Okay.

16         A.      I mean, that was our perception

17   at the time, yes.

18             (Whereupon, Deposition Exhibit

19         INEX-30b6-12, 10/28/05 Handwritten

20         Notes, "Mark Norris of Knauf," etc.,

21         INT/EXT00608, was marked for

22         identification.)

23   BY MR. HERMAN:

24         Q.      Let me show you INEX-30b6-12,

Confidential - Subject to Further Confidentiality Review

Page 80

1    which, for the record, is Bates number 608.

2    Is this your handwriting or --

3         A.    This is Clay's, again.

4         Q.    Okay.

5             MR. REEVES:   What's the Bates

6        number, again?

7             MR. HERMAN:   It's 608.

8    BY MR. HERMAN:

9         Q.    Well, I'll ask your brother

10   about it, but just maybe you could shed some

11   light on this.  It looks like it says

12   "antitrust," maybe, or something.  Do you

13   know what that means, or if that's what it

14   says?

15        A.    Yeah, I think -- I have an

16   idea -- I think he can answer that question

17   for you a lot better than I could.

18        Q.    Well, I'll just hold off.

19        A.    Yeah.

20             MR. HERMAN:   Okay.  That's

21        fine.

22             (Whereupon, Deposition Exhibit

23        INEX-30b6-13, E-mail Chain Ending

24        11/29/05 C. Geary E-mail to

Confidential - Subject to Further Confidentiality Review

 1          Srinivasan, Subject: Sheetrock

 2          inspection in China, INT/EXT05980, was

 3          marked for identification.)

 4     BY MR. HERMAN:

 5          Q.     Let me show you INEX-30b6-13,

 6     which, for the record, is Bates number 5980.

 7     It looks like you're cc'd on this?

 8          A.     Right.

 9          Q.     And if you look at the e-mail

10     trail --

11                 MR. DUPLANTIER:  Someone on the

12          line needs to mute their line.

13     BY MR. HERMAN:

14          Q.     It looks like the beginning of

15     the e-mail trail, or at least what's provided

16     here, is from somebody at SGS North

17     America, Inc.  You see that?

18          A.     Yes, I do.

19          Q.     What is SGS North

20     America, Inc.?

21          A.     SGS, to the best of my

22     knowledge, is an international firm that does

23     inspections of manufacturing facilities.  I'm

24     not certain of this, but I believe their

Confidential - Subject to Further Confidentiality Review

Page 82

1    primary focus of attention is for

2    import/export.

3         Q.    Okay.  And it looks like

4    they're receiving some type of instruction.

5    "Please proceed to inspect the product while

6    it is being produced."

7              Do you have any recollection

8    about that?

9         A.    To the best of my recollection,

10   we had made some early -- or had some early

11   communications with them, when we were still

12   putting everything together, and trying to --

13   and inquiring with them as to whether or not

14   they could do some inspections for us.  And

15   when I say "inspections," you know, talking

16   about the shipments.

17        Q.    Well, what is it that you would

18   have hoped that SGS would have ascertained

19   about the drywall from observing the

20   production process?

21        A.    It was for them to check the

22   shipments as they were being loaded onto the

23   ship from a quantity and making sure that the

24   products were in good order and not damaged.

Confidential - Subject to Further Confidentiality Review

1          Q.     Oh.  So this doesn't mean that

2     they're supposed to inspect it during the

3     production process?

4          A.     That is correct.

5          Q.     Okay.  Do you know whether SGS

6     ever did attempt to do any type of inspection

7     of the production process?

8          A.     To my knowledge, they did not.

9          Q.     Or anybody else on

10    Interior/Exterior's behalf?

11         A.     We had someone from our freight

12    forwarder, J.W. Allen, who went to China to

13    observe the loading of the container ships,

14    which had a lot -- which was really why we

15    did not end up using SGS.

16         Q.     Does Interior/Exterior have a

17    certain level of knowledge or sophistication

18    about how drywall is produced?

19         A.     A basic understanding.

20         Q.     And where does that come from?

21         A.     Experience in the industry.

22         Q.     Would it have been common for

23    people from Interior/Exterior to go to

24    domestic manufacturers to see how drywall is

Confidential - Subject to Further Confidentiality Review

 1    produced?

 2         A.    No.  I have -- you know, we get

 3    invitations from some of our manufacturers,

 4    and we get our salespeople to go to these

 5    facilities, just so they have an

 6    understanding of how the product is made.

 7         Q.    And why is that important?

 8         A.    Just so -- just for them to

 9    have an understanding that, you know, what

10    the -- what the product is.

11         Q.    Okay.  Did you think, when you

12    first started importing drywall from China,

13    that it was important to understand how they

14    made drywall in China, as opposed to or,

15    perhaps, similar to --

16         A.    My appreciation would be that,

17    I mean, it's -- drywall is drywall, and

18    it's -- probably some variations; but for the

19    most part, it's all the same.

20         Q.    That's what you believed at the

21    time?

22         A.    That is correct.

23         Q.    Do you still believe that now?

24         A.    Obviously, there -- no.

Confidential - Subject to Further Confidentiality Review

1          Q.       Do you have any knowledge or

2     information, as we sit here today, that

3     doesn't come from your attorneys, that,

4     perhaps, comes from any other source, about

5     how drywall was manufactured in China as

6     distinguished from how it's manufactured

7     domestically?

8          A.       Nothing that I could say is

9     certain.  I've certainly read articles with

10    people making -- or having speculation on the

11    manufacturing process and what was done.

12         Q.       Okay.  Do you have some

13    understanding, as we sit here today, that

14    doesn't come from your attorneys, about what

15    the difference is, in your mind, between

16    Chinese drywall and domestic drywall?

17              MR. DUPLANTIER:  Again, the

18         objection isn't just what came from

19         his attorneys, but what's been

20         obtained in anticipation of

21         litigation.  Subject to that, you can

22         answer the question.

23              MR. SANDERS:  Object to form.

24              THE WITNESS:  Could you repeat

Confidential - Subject to Further Confidentiality Review

1           it for me, please?

2      BY MR. HERMAN:

3           Q.    As we sit here today, do you

4      have some knowledge or impression in your own

5      mind about what the difference is between

6      Chinese drywall and domestic drywall?

7           A.    Nothing that I could say for

8      sure.  You know, again, I've read the

9      articles and seen what people are saying was

10     done, but I -- you know, beyond that, I don't

11     know.

12          Q.    Okay.  I see this is addressed

13     to your brother, but just so we don't get out

14     of order on the exhibits, I'm just going to

15     identify INEX-30b6-14, which is Bates

16     number 942.

17               (Whereupon, Deposition Exhibit

18          INEX-30b6-14, 12/5/05 Uni-Pac, Ltd.

19          Letter to C. Geary, INT/EXT00942, was

20          marked for identification.)

21               (Whereupon, Deposition Exhibit

22          INEX-30b6-15, E-mail Chain Ending

23          3/31/06 App E-mail to Wei,

24          Subject: Great Immensity,

Confidential - Subject to Further Confidentiality Review

Page 87

```
 1          INT/EXT03864, was marked for

 2          identification.)

 3    BY MR. HERMAN:

 4          Q.     I'm going to show you

 5    INEX-30b6-15, which, for the record, is Bates

 6    number 3864.  You can read that, if you want.

 7          A.     Okay.  I'm sorry, you want me

 8    to read '42?

 9          Q.     If you want to.  I was going to

10    ask your brother about it, but --

11          A.     Okay.  Okay.

12          Q.     Have you ever seen that before?

13    We're talking about Exhibit 14 now.

14          A.     I'm not sure if I have.

15          Q.     Okay.  Have you ever seen

16    Exhibit 15 before?

17          A.     I believe I have seen this,

18    yes.

19          Q.     William App is with a company I

20    think you mentioned, J.W. Allen; is that

21    correct?

22          A.     That is correct, yes.

23          Q.     And what, in layman's terms,

24    does J.W. Allen do for Interior/Exterior?
```

Confidential - Subject to Further Confidentiality Review

Page 88

1          A.      They facilitated the shipments,

2     assisted us with, you know, the documents,

3     shored up the letters of credit, also with

4     the shipments and lining up freight

5     forwarders and such like that to just -- we

6     relied on them to help us because we're not

7     experts in the shipping process, and that's

8     what these guys do.

9          Q.      Is this some kind of assistance

10    that you had to acquire after the storm?

11         A.      We acquired their assistance to

12    help facilitate with importing the drywall

13    from overseas.

14         Q.      You didn't have a relationship

15    with them before the drywall shortage?

16         A.      Did we have a relationship

17    with -- no, we did not.

18         Q.      When you decided that you might

19    want to get drywall from China, you had to go

20    out and enlist the assistance of J.W. Allen

21    to facilitate getting it?

22         A.      Right.

23         Q.      They didn't come to you and

24    say, "Hey, we've got a great idea, we can

Confidential - Subject to Further Confidentiality Review

1    bring in drywall from China"?

2          A.      That is correct; they did not.

3          Q.      And who's Victor Wei, to the

4    extent you know?

5          A.      I've seen his name.  I'm not

6    positive who he is.

7          Q.      Okay.  Do you know what the

8    "Great Immensity" is?

9          A.      I'm sorry, the "great" --

10   where's that?

11         Q.      It's the subject, "great" --

12         A.      I do not know.

13         Q.      Okay.  Is "GWB market," gypsum

14   wallboard market?

15         A.      That would be my best guess,

16   yes.

17         Q.      It's not a term that you

18   commonly use?

19         A.      I've seen -- I think I've seen

20   it used, but it's not something we use,

21   typically.

22         Q.      Okay.  It says something on the

23   second line, "We look forward to you and

24   Mrs. Wei visiting New Orleans."

Confidential - Subject to Further Confidentiality Review

1           Do you have any recollection of

2      that?

3           A.     I'm sorry, where is that,

4      again?

5           Q.     It's in the second line.

6           A.     Oh, I see.

7           Q.     It looks like Mr. and Mrs. Wei

8      were going to visit New Orleans at some

9      point.

10          A.     And then your question was?

11     I'm sorry.

12          Q.     Do you recall meeting them?

13          A.     I do not.

14          Q.     Okay.  "I will inform Clay, and

15     we will plan to visit IEBS on Monday,

16     May 1st."

17                 Is "IEBS" Interior/Exterior

18     Building Supply?

19          A.     I would assume so.

20          Q.     Okay.  And -- but you don't

21     have any recollection of meeting them here in

22     the States?

23          A.     I do not, no.

24          Q.     Okay.

Confidential - Subject to Further Confidentiality Review

Page 91

```
 1            A.     We may have.  I just don't
 2      recall.
 3            Q.     Okay.  And do you have any idea
 4      of what relationship, if any, Mr. Wei had to
 5      any of the Knauf entities?
 6                   MR. SANDERS:  Object to form,
 7            foundation.
 8            A.     Clay could answer that question
 9      much better than I.
10                   (Whereupon, Deposition Exhibit
11            INEX-30b6-16, E-mail Chain Ending
12            4/3/06 Heider E-mail to C. Geary,
13            Subject: U.S. Wallboard Imports from
14            Knauf, INT/EXT04116, was marked for
15            identification.)
16                   (Whereupon, Deposition Exhibit
17            INEX-30b6-17, E-mail Chain Ending
18            4/7/06 Topple E-mail to C. Geary,
19            Subject: Gypsum Board, INT/EXT03843,
20            was marked for identification.)
21      BY MR. HERMAN:
22            Q.     Okay.  I'm just going to --
23      this looks like a Clay document, but just so
24      we don't get out of order, just identify
```

Confidential - Subject to Further Confidentiality Review

1          INEX-30b6-16, which, for the record, is Bates

2     number 4116.

3                    INEX-30b6-17, Bates

4     number 3843, this also seems to be addressed

5     to Clay, but I just want to ask you a

6     question about it.  Maybe you can shed some

7     light on it for us.

8          A.     Sure.

9          Q.     The e-mail seems to be from

10    somebody named Barry Topple at Knauf U.K.  Do

11    you know who Barry Topple is?

12         A.     I've heard that name.  I'm not

13    positive who Barry Topple is.

14         Q.     Okay.  And there's a cc to Jeff

15    Brisley at Knauf USA.  You see that?

16         A.     Yes.

17         Q.     And he's the gentleman that

18    you've mentioned before?

19         A.     That is correct.

20         Q.     And it starts out, "Currently,

21    the Knauf group is fully committed to supply

22    its usual markets."

23                    Do you see that?

24         A.     No, I'm sorry.  Where --

Confidential - Subject to Further Confidentiality Review

1          Q.     "Dear Clay:  Currently" --

2          A.     Oh.  Pardon me.  The wrong one.

3          Q.     Oh.  Sorry about that.

4                 (Witness reviews document.)

5          A.     Yes.

6     BY MR. HERMAN:

7          Q.     Do you have some perception or

8     impression, based on your experience, what

9     the Knauf group is?

10                MR. SANDERS:  Object to

11                foundation.  He's not part of this

12                e-mail.

13         A.     The Knauf group?

14    BY MR. HERMAN:

15         Q.     Yeah.

16         A.     I would assume that to be just

17    the whole company.

18         Q.     Including U.S., U.K. and these

19    Chinese companies?

20         A.     That would be my understanding

21    or appreciation.

22         Q.     Was that your impression from

23    doing business with the Knauf group or parts

24    of the Knauf group?

Confidential - Subject to Further Confidentiality Review

Page 94

1                    MR. SANDERS:  Object to form.

2           A.     Yes.  Yes.

3    BY MR. HERMAN:

4           Q.     Do you recall ever inquiring of

5    the Knauf group whether it could supply

6    gypsum board from Europe or South America?

7                    MR. SANDERS:  Object to form.

8           A.     I'm not sure.  When Jeff

9    Brisley and I spoke, I, quite frankly, don't

10   recall if the conversation was only about

11   China or if it was other parts of the world.

12                  (Whereupon, Deposition Exhibit

13           INEX-30b6-18, 7/21/06

14           Fumigation/Disinfection Certificate,

15           INT/EXT00080, was marked for

16           identification.)

17   BY MR. HERMAN:

18          Q.     Okay.  Let me show you

19   INEX-30b6-18, which, for the record, is Bates

20   number 80.  Do you know what Exhibit 18 is?

21          A.     I'm not sure.  It appears to

22   be -- it says, "Fumigation/Disinfection

23   Treatment."  My best guess would be that this

24   is one of the documents that come in -- comes

Confidential - Subject to Further Confidentiality Review

1    in when product is imported.

2          Q.      Do you recall any discussions

3    about whether the drywall would be fumigated

4    or disinfected at some point during the

5    shipping process?

6          A.      I do not recall any

7    conversation about that.

8          Q.      Do you recall whether that was

9    a concern by anyone at Interior/Exterior, as

10   to whether the drywall should or shouldn't be

11   fumigated or disinfected?

12         A.      No.

13         Q.      Do you know whether domestic

14   drywall is fumigated or disinfected at some

15   point?

16         A.      I don't know.

17                 (Whereupon, Deposition Exhibit

18                 INEX-30b6-19, PABCO Gypsum Physical

19                 Test, ASTM C1396 Worksheet,

20                 INT/EXT00696, was marked for

21                 identification.)

22   BY MR. HERMAN:

23         Q.      INEX-30b6-19 is Bates

24   number 696.  I see that it says "Clay" at the

Confidential - Subject to Further Confidentiality Review

1     top, but I don't know if he wrote that or

2     somebody else wrote it to give it to him.

3                 Do you know what this is?

4          A.     "ASTM C1396 Worksheet, 1/2"

5     gypsum board."  ASTM C1396 is, again, the

6     main ASTM standard for regular drywall.

7          Q.     Do you recall ever seeing this

8     worksheet or a worksheet similar to this?

9          A.     No, I do not.

10         Q.     Do you know which drywall it

11    relates to?

12         A.     No, I do not.

13         Q.     Okay.  Is there some person at

14    Interior/Exterior that would have checked

15    these types of technical documents?

16         A.     I'm not sure I understand at

17    what point in time you're referring to.

18         Q.     Well --

19         A.     Prior to or --

20         Q.     -- from October 2005 to the end

21    of 2006.

22         A.     And we would have -- and to

23    make sure I understand the question, we would

24    have checked --

Confidential - Subject to Further Confidentiality Review

Page 97

1          Q.      Well, let me see if I can ask a

2     better question.

3                  From the end of 2005 to 2006,

4     did Interior/Exterior have a designated like

5     quality assurance/quality control person?

6          A.      No.

7          Q.      Have you ever had that?

8          A.      No.

9          Q.      Do you know what that is?

10         A.      Yes.

11         Q.      Okay.  Is there some reason

12    that you didn't think it was necessary to

13    have a quality assurance/quality control

14    person?

15         A.      No, our feeling was as long as

16    the products would comply with ASTM, that we

17    were -- that's all we needed.  That's all we

18    get from our domestic manufacturers.

19         Q.      And you rely on the

20    manufacturer to make that certification,

21    correct?

22         A.      Yes, we do.

23                 (Whereupon, Deposition Exhibit

24         INEX-30b6-20, Knauf MSDS for

Confidential - Subject to Further Confidentiality Review

1              Plasterboard Standard Core,

2              INT/EXT00059 - INT/EXT00061, was

3              marked for identification.)

4      BY MR. HERMAN:

5              Q.     Let me show you INEX-30b6-20,

6      which, for the record, is Bates number 59

7      through 61.

8                    Do you know what a Material

9      Safety Data Sheet is?

10             A.     Yes, I do.

11             Q.     Just for the record, what is

12     it?

13             A.     It is issued on products.

14     That's just an overall description of the

15     product in question, you know, what it --

16     pardon me.  I'm trying to think of a good

17     explanation.

18                    Just an all -- a description

19     and -- of the product.  I'm sorry, I'm not

20     coming up with a good answer.

21             Q.     That's okay.  That's okay.

22                    Do you have any impression that

23     it's somehow associated with OSHA regulations

24     or requirements?

Confidential - Subject to Further Confidentiality Review

```
 1             A.      I'm not sure.
 2             Q.      Okay.  Do you have any idea of
 3     what a spec sheet is?
 4             A.      A spec sheet, to my
 5     appreciation, would be a product -- or a
 6     manufacturer would put out a listing of the
 7     qualities and functions of a product.
 8             Q.      Do you have any idea of what
 9     the difference is, if any, between a spec
10     sheet and an MSDS?
11             A.      I'm not sure.
12             Q.      Okay.  Do you recall ever
13     seeing Exhibit 20?
14             A.      Yes, I have.
15             Q.      Okay.  It says, "Product Name:
16     Knauf Plasterboard Standard Core."
17                     You see that?
18             A.      Yes, I do.
19             Q.      Do you have any idea what
20     "standard core" means?
21             A.      My belief would be that
22     standard core would be for the standard
23     drywall, which is the residential grade, as
24     opposed to a fire-rated core, again, that you
```

Confidential - Subject to Further Confidentiality Review

Page 100

```
 1    would use, say, in a commercial application.
 2           Q.      And that's, generically, the
 3    5/8ths that we talked about before?
 4           A.      The 5/8ths is fire-rated, yes.
 5    It can be 5/8ths --
 6           Q.      Not -- oh, I'm sorry.
 7           A.      I was just going to say, 5/8ths
 8    could be moisture-resistant or it could be an
 9    exterior-grade product, something of that
10    nature.
11           Q.      And is standard core the only
12    type of plasterboard that Interior/Exterior
13    imported from Knauf?
14           A.      That is correct.
15           Q.      And is standard core the only
16    type of Taihe plasterboard that
17    Interior/Exterior imported?
18           A.      Yes.
19           Q.      It says -- or it looks like it
20    says, "Per an e-mail from Knauf, spec sheet
21    and MSDS are one and the same."
22                   Do you see that?
23           A.      Yes, I do.
24           Q.      Do you have any information
```

Confidential - Subject to Further Confidentiality Review

Page 101

1    about that or...

2          A.      I don't.

3          Q.      Okay.  Are the Material Safety

4    Data Sheets something that Interior/Exterior

5    has available somewhere so that workers can

6    refer to them?

7          A.      Yes.

8          Q.      And do you know what the

9    purpose of that is?

10          A.      I think that, for example, say

11    if a worker got some drywall in their eye,

12    they would have procedures or instructions as

13    far as how to treat that.  Some dust in their

14    eye is what I meant.

15          Q.      Yeah.  In terms of how to

16    handle the --

17          A.      Yeah, the dust, or if they

18    cut -- or ingested something, some of the

19    product.

20          Q.      Is there some type of a process

21    or procedure that Interior/Exterior has when

22    employees have concerns or complaints about

23    whatever product they're handling?

24          A.      I don't ever recall having that

Confidential - Subject to Further Confidentiality Review

1    situation.

2         Q.    Okay.  You don't recall anybody

3    ever complaining about the drywall in any way

4    or handling it or dealing with it?

5         A.    No, sir.

6         Q.    Were you ever present when

7    drywall was being unloaded from the ship,

8    say?

9         A.    Yes, I was.

10        Q.    And did you have any

11   observations about the drywall?

12        A.    Absolutely none.

13             (Whereupon, Deposition Exhibit

14             INEX-30b6-21, BNBM Authorization to

15             Manufacture UL Marks, INT/EXT02171,

16             was marked for identification.)

17   BY MR. HERMAN:

18        Q.    Okay.  I'll show you

19   INEX-30b6-21, Bates number 2171.  Do you have

20   any idea what this is?

21        A.    I'm not positive, no.

22        Q.    Okay.  Are you familiar with a

23   company called Beijing New Building Materials

24   Company, Ltd.?

Confidential - Subject to Further Confidentiality Review

Page 103

1          A.      Yes, I am.

2          Q.      And that's sometimes referred

3    to as "BNBM"?

4          A.      Yes.

5          Q.      And does BNBM have any type of

6    relationship, to your knowledge, with Taihe?

7          A.       I don't know that for sure.  I

8    believe since all of this has occurred, I've

9    heard that there is some form of corporate

10   connection, but I don't know that for sure.

11         Q.      Did Interior/Exterior, at some

12   point in time, investigate importing or

13   purchasing BNBM drywall?

14         A.      Yes, we did.

15         Q.      And was there a decision made

16   not to do that?

17         A.      Clay could answer that question

18   better than I.

19              MR. HERMAN:  Okay.  Well, I'll

20         save that, then.

21              (Whereupon, Deposition Exhibit

22         INEX-30b6-22, 2/16/06 Test Report on

23         Gypsum Wallboard, INT/EXT01990, was

24         marked for identification.)

Confidential - Subject to Further Confidentiality Review

Page 104

1    BY MR. HERMAN:

2         Q.    I'm going to show you

3    INEX-30b6-22, which, for the record, is Bates

4    number 1990.  Have you ever seen Exhibit 22

5    before?

6         A.    Yes, I have.

7         Q.    What is it?

8         A.    A test report, which says that

9    it -- the product conforms to the ASTM

10   standard.

11        Q.    And who is providing, to your

12   knowledge and understanding, this

13   certificate?

14        A.    I'm fairly certain I received

15   this from the gentleman with Metro Resources.

16        Q.    Okay.  Do you know whether

17   similar test reports or certificates were

18   received from Knauf?

19        A.    We received -- I'm not sure.

20   Not in this form, but I believe -- I'm not

21   sure.

22        Q.    Okay.  You see at the bottom --

23   well, let me ask you this.

24             Did the report come with the

Confidential - Subject to Further Confidentiality Review

Page 105

1    translation?

2         A.    Did the report -- just as I'm

3    looking at it?

4         Q.    Yeah, with the English words

5    here too.

6         A.    Yes.

7         Q.    It's not something that anybody

8    expected you to supply?

9         A.    Correct.

10        Q.    And at the bottom, where it

11   says "Remarks," it says, "The test report is

12   responsible only for the sample delivered by

13   the manufacturer."

14             Do you know what that means?

15        A.    I'm not positive.

16        Q.    Was there some sample that was

17   provided by Taian Taishan?

18        A.    I do not recall us getting any

19   samples.  We may have, but I'm not sure of

20   that.

21        Q.    Do you recall getting any

22   samples from Knauf?

23        A.    I don't know.

24        Q.    And then it says, "The valid

Confidential - Subject to Further Confidentiality Review

1    period of the test report will only be within

2    one year exactly after the signed date."

3               Do you see that?

4        A.     Yes, I do.

5        Q.     And do you have any knowledge

6    about why the report would be efficacious for

7    a year?

8        A.     I do not know.

9        Q.     Is there some expectation that

10   nothing is going to go wrong with the drywall

11   within a year?

12       A.     I -- no, I don't know.

13       Q.     Do you know of any reason why

14   the manufacturer would be concerned about

15   changes to the drywall after a year?

16              MR. SANDERS:  Object to the

17         form.

18       A.     No, I don't know.

19   BY MR. HERMAN:

20       Q.     How long is drywall supposed to

21   last?

22       A.     I've never been asked that

23   question.  Drywall goes up on walls and --

24   you know, many, many years.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.  Have you ever had a

2     complaint from a customer that their drywall

3     didn't last long enough?

4          A.      No, never.

5          Q.      And how long have you guys been

6     in business?

7          A.      This company's been in since

8     19- -- excuse me, since 2001.

9          Q.      Since 2001?

10         A.      Right.

11         Q.      And what did you do before

12    2001?

13         A.      There was a company that

14    preceded this company.

15         Q.      Okay.  Were you in the drywall

16    business before 2001?

17         A.      Yes.

18         Q.      How long have you been in the

19    drywall business?

20         A.      Since -- in the distribution

21    business, since 1981.

22              (Whereupon, Deposition Exhibit

23              INEX-30b6-23, Addendum to Application

24              and Agreement for Documentary Credit

Confidential - Subject to Further Confidentiality Review

Page 108

1           Between Interior/Exterior and Knauf

2           Plasterboard Tianjin, INT/EXT00243 -

3           INT/EXT00246, was marked for

4           identification.)

5      BY MR. HERMAN:

6           Q.    Okay.  I'm going to show you

7      INEX-30b6-23, Bates number 243 to 246.  Is

8      this something I should ask your brother

9      about?

10          A.    If you want to ask me, there

11     may be a question I can answer.  I'm not

12     sure.

13          Q.    Okay.  Do you know whose

14     handwriting this is?

15          A.    I believe that to be Clay's.

16          Q.    Okay.  Maybe you can just help

17     me out with this.

18          A.    Sure.

19          Q.    Where it says, "Description of

20     Goods:  Gypsum board, tapered edge," what

21     does "tapered edge" mean, just for the

22     record?

23          A.    Tapered edge is along the long

24     side of drywall, so that when they -- you

Confidential - Subject to Further Confidentiality Review

1    have joints that abut from one board to the

2    next, it tapers in.  That allows the finisher

3    to put in the joint treatment and tape to get

4    a very smooth edge.

5              Without that tapered edge,

6    you'd have a bump in it because of the tape

7    and the mud.

8         Q.    Does all of the drywall that

9    Interior/Exterior imported from Knauf have

10   tapered edge?

11        A.    That's what we requested, and I

12   never heard anything to the contrary.

13        Q.    Okay.  And did all of the

14   drywall that Interior/Exterior imported from

15   Taihe have a tapered edge?

16        A.    Same thing, yes.

17        Q.    Okay.  Originally, it says,

18   "FOB:  Wuhu, China."

19              What does "FOB" mean?

20        A.    Freight on board.

21        Q.    And just in layman's terms,

22   does that have some significance?

23        A.    Again, I think Clay could

24   answer that question better than I.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.

2          A.      Yeah.

3          Q.      But somebody changed it from

4     "FOB" to "free alongside ship."  Do you see

5     that?

6          A.      Yes, I do.

7          Q.      Do you know what the difference

8     is between FOB and free alongside ship?

9          A.      Yeah, that -- you know, that

10    has to do with the freight and who's handling

11    the cost of shipping the material.

12                 (Whereupon, Deposition Exhibit

13           INEX-30b6-24, Knauf Plasterboard

14           Tianjin Informal Tender for Freight

15           Handling: January to April 2006,

16           INT/EXT04071, was marked for

17           identification.)

18    BY MR. HERMAN:

19          Q.      Okay.  I'll probably ask your

20    brother about this, but just for the record,

21    so we don't get out of order, INEX-30b6-24,

22    which, for the record, is Bates number 4071.

23                 What's an informal tender, to

24    the extent you know?

Confidential - Subject to Further Confidentiality Review

```
 1          A.      I do not know.
 2                  (Whereupon, Deposition Exhibit
 3          INEX-30b6-25, 7/5/06 Contract Between
 4          Knauf Plasterboard Wuhu and
 5          Interior/Exterior, INT/EXT00171, was
 6          marked for identification.)
 7   BY MR. HERMAN:
 8          Q.      Okay.  Let me show you
 9   INEX-30b6-25, which is Bates number 171.
10   Maybe I'll ask Clay about this, but at the
11   top, it says, "Contract."  Do you see that?
12          A.      Yes.
13          Q.      In your defendant profile forms
14   or Distributor Profile Forms, where you talk
15   about contract dates, is this the type of
16   contract that you're referring to?
17          A.      That would be my understanding,
18   yes.
19          Q.      Okay.  And this is a contract
20   between Knauf Plasterboard Wuhu and
21   Interior/Exterior?
22          A.      Yes.
23          Q.      And would it be your
24   understanding that Knauf accepted this
```

Confidential - Subject to Further Confidentiality Review

Page 112

```
 1      contract with all of these handwritten

 2      changes?

 3              MR. SANDERS:  Object to form,

 4          foundation.

 5          A.      Hard to say.  A lot of these

 6      contracts were changed many times over, so at

 7      the end of the day, I couldn't tell you for

 8      sure.

 9              (Whereupon, Deposition Exhibit

10          INEX-30b6-26, Knauf Plasterboard Wuhu

11          Commercial Invoice, INT/EXT00077, was

12          marked for identification.)

13      BY MR. HERMAN:

14          Q.      Okay.  Probably ask Clay about

15      this, but just for the record, INEX-30b6-26,

16      Bates number 77, you ever seen that before?

17          A.      I'm not sure.

18              (Whereupon, Deposition Exhibit

19          INEX-30b6-27, Gypsum Wallboard

20          Producing Factory Information, BNBM,

21          Co., Ltd., INT/EXT00849 -

22          INT/EXT000850, was marked for

23          identification.)

24      BY MR. HERMAN:
```

Confidential - Subject to Further Confidentiality Review

Page 113

1           Q.     And let me show you this,

2      INEX-30b6-27, Bates numbers 849 and 850.

3           A.     Yes.

4           Q.     Do you have any idea what this

5      is?

6           A.     You know, it appears to be from

7      BNBM, a -- it says "Introduction," and then

8      it goes into their specifications.

9           Q.     Do you have any recollection of

10     seeing it before?

11          A.     No, I do not.  I may have.

12     Probably did, but I don't recall.

13          Q.     And I think you mentioned that

14     Clay would be a better person to ask about

15     the evaluation of potentially buying BNBM

16     materials?

17          A.     That is correct, yes.

18               MR. HERMAN:  All right.  Why

19          don't we take a quick break, go off

20          the record and we can switch up.

21               MR. DUPLANTIER:  Why don't we

22          take a ten-minute break here, so that

23          way, everybody can...

24               THE VIDEOGRAPHER:  Off the

Confidential - Subject to Further Confidentiality Review

Page 114

1          record, 10:37 a.m.

2                    (Recess taken, 10:37 a.m. to

3          10:50 a.m.)

4                    THE VIDEOGRAPHER:  We're back

5          on the record.  The time is 10:50 a.m.

6                    CLAYTON C. GEARY,

7      having been first duly sworn, testified as

8                    follows:

9                    EXAMINATION

10    BY MR. HERMAN:

11          Q.     Your brother and I were looking

12    a little bit ago at Exhibit 27.  It says,

13    "Gypsum Wallboard Producing Factory

14    Information, BNBM."

15                 Do you see that?

16          A.     Yes.

17          Q.     Do you recall seeing this

18    document before?

19          A.     Yes, I do.

20          Q.     Do you know how you got it?

21          A.     I don't recall.

22          Q.     Do you know how you became

23    aware of BNBM's existence?

24          A.     In the beginning, after the

Confidential - Subject to Further Confidentiality Review

Page 115

1     storm, there were several people who
2     approached us, and I remember seeing that
3     name, BNBM.
4              Our recollection is, when we
5     began having troubles getting enough material
6     from Knauf -- you'd asked about Weida
7     Freight.  Weida Freight was helping out
8     J.W. Allen because they have a presence over
9     in China.  And they had, I believe, made some
10    connections with BNBM, and that's possibly
11    where this came from.
12         Q.    Okay.  And was it Weida Freight
13    that recommended to you that you might want
14    to look into buying drywall from BNBM --
15         A.    Yes.
16         Q.    -- to the best of your
17    recollection?
18         A.    Yes.
19         Q.    And have you ever heard of
20    Dragon wallboard?
21         A.    No.  Not prior to this.
22         Q.    Okay.  And what was your
23    evaluation process in terms of deciding
24    whether you wanted to import from BNBM?

Confidential - Subject to Further Confidentiality Review

 1          A.      It would require the same

 2     certifications, the same warranty, quality

 3     condition; all of the same certifications

 4     that we had with Knauf.

 5          Q.      Did anybody associated with

 6     Interior/Exterior ever go over to China and

 7     look at the BNBM operation?

 8          A.      Well, we had hired J.W. Allen,

 9     who had gotten Weida Freight, who were the

10     ones that actually brought them to us, as I

11     recall.

12          Q.      Okay.  Did anybody from BNBM or

13     anybody associated with BNBM come to

14     New Orleans?

15          A.      No.

16          Q.      And am I correct that at the

17     end of the day, for whatever reason,

18     Interior/Exterior decided not to buy drywall

19     from BNBM?

20          A.      We never got any BNBM product.

21          Q.      Is there a specific reason that

22     you didn't?

23          A.      I can't recall exactly.  I

24     think there was -- they had such trouble

Confidential - Subject to Further Confidentiality Review

1      getting ships, was the main part of the

2      problem; and that was one reason that we

3      didn't go forward with it.

4              Q.      Okay.  And you don't know who

5      put together this kind of information, huh --

6              A.      I don't know.

7              Q.      -- that's reflected in

8      Exhibit 27?

9              A.      I don't know.

10             Q.      If we go backwards to

11     Exhibit 26, it says, "Knauf Plasterboard Wuhu

12     to Interior/Exterior Building Supply," and it

13     says, "Commercial Invoice."

14                     What's a commercial invoice?

15             A.      It's an invoice where they're

16     showing the unit price, quantity and total

17     amount for the product.

18             Q.      And when we were looking at the

19     defendant profile form, which is Exhibit 2,

20     if you want to refer to it, there was a

21     contract date and then several different

22     invoice dates.  Do you remember that?

23             A.      Uh-huh.

24             Q.      Is this one of the several

Confidential - Subject to Further Confidentiality Review

1    invoices, to the best of your understanding?

2         A.     This would have been the one

3    that came from -- the only one that came from

4    the Wuhu plant.

5         Q.     Okay.  The other ones came

6    from --

7         A.     From Tianjin.

8         Q.     Okay.  It says the "Name of

9    Manufactured as Knauf Plasterboard."

10                Do you see that?

11        A.     Yes.

12        Q.     What does that mean, to the

13   best of your knowledge?

14        A.     Manufactured from Knauf.

15        Q.     Okay.  And it says, "Tapered

16   edge, 68,000 PCS."

17                What's "PCS" mean?

18        A.     I'm sorry, where are you?

19        Q.     I'm sorry.

20        A.     Okay.  There we go.

21                Pieces.

22        Q.     And those pieces are

23   4x12x1-1/2?

24        A.     Yes.

Confidential - Subject to Further Confidentiality Review

Page 119

1          Q.     And that would have been
2    standard?
3          A.     Yes.
4          Q.     Okay.  If we look at -- going
5    backwards to Exhibit 25, there's a contract.
6    And what's the distinction, if any, to your
7    impression, between the invoice and the
8    contract?
9          A.     The difference between the two?
10          Q.     If any.
11                MR. SANDERS:  Objection,
12          foundation.
13          A.     I guess the contract has some
14    more of the terms, I would assume, than the
15    invoice.
16    BY MR. HERMAN:
17          Q.     Okay.  It looks like there was
18    an "FAS Shanghai, China" that's scratched
19    out?
20          A.     Uh-huh.
21          Q.     And then it says, "CIF
22    New Orleans, Louisiana" --
23          A.     Yes.
24          Q.     -- something, "free out"?

Confidential - Subject to Further Confidentiality Review

1          A.      "Liner in, free out."

2          Q.      Okay.  What's the difference

3    between "FAS Shanghai, China" and "CIF

4    New Orleans, Louisiana, liner in, free out"?

5          A.      Well, I can't give you the

6    actual terminology, but in general, it meant

7    that the product would be -- "CIF" meant that

8    it would be delivered to New Orleans, so

9    Knauf was paying for the shipment, whereas

10   "FAS" would have meant that we would have

11   picked up the shipping cost.

12               That's also why you see the

13   difference in price compared to a lot of the

14   other invoices.

15         Q.      And is that change, to the best

16   of your recollection, something that

17   Interior/Exterior requested or something that

18   Knauf requested?

19         A.      We were having a lot of trouble

20   getting ships at the time, and Knauf,

21   somehow, was able to -- and I don't remember

22   the particulars, but they were able to secure

23   shipping, and that's why they handled it.

24         Q.      And the final contract or

Confidential - Subject to Further Confidentiality Review

Page 121

```
 1    agreement has them bringing the stuff to
 2    New Orleans, right?
 3         A.    Yes.
 4         Q.    And where you see "Shipping
 5    Date," and then there's some language below
 6    that that's changed --
 7         A.    Uh-huh.
 8         Q.    -- does that reflect the same
 9    type of change, instead --
10         A.    The seller -- yeah.  The
11    seller, rather than the buyer, would arrange
12    the bulk vessel.
13         Q.    And ocean freight will be for
14    seller's account?
15         A.    Correct.  Correct.
16         Q.    Now, is this something that
17    happened only with Knauf Wuhu, or did this
18    happen with Knauf Tianjin too?
19         A.    This was the only shipment with
20    Knauf where they handled the freight.
21         Q.    Okay.  Going back to
22    Exhibit 24, do you know what this informal
23    tender is?
24         A.    I don't recall it.  I believe
```

Confidential - Subject to Further Confidentiality Review

Page 122

1    it -- I really -- I don't know.  I'm not

2    sure.

3         Q.    Okay.  Do you have some just

4    general idea from your business, generally,

5    what an informal tender is?

6         A.    I would assume it's some type

7    of quote, you know, a quote sheet or -- well,

8    actually, it looks like vessel availability

9    dates.

10              Yeah, this seems to be some

11   type of sheet that they would use to quote

12   vessels at a certain time.

13        Q.    Do you know what the

14   distinction is between Shanghai, Dongwan --

15        A.    My understanding was, Dongwan

16   was another plant for Knauf, but we did not

17   get any product from there.

18        Q.    Is that something that Knauf

19   offered to do?

20        A.    There was a lot of talk.  I

21   don't think we ever got a quote from Dongwan,

22   to my recollection.

23        Q.    Did you ever speak to anyone

24   directly at Dongwan?

Confidential - Subject to Further Confidentiality Review

Page 123

1          A.      I don't think so.

2          Q.      That was coordinated by some

3    other Knauf entity or person?

4                  MR. SANDERS:  Object to the

5          form.

6          A.      Yes.  We talked to, you know,

7    my -- I guess the guy calling the shots, it

8    appeared to me, was Mark Norris.

9    BY MR. HERMAN:

10         Q.      Okay.  Going back to

11   Exhibit 23, Addendum to Application and

12   Agreement, and this was -- does this relate

13   to one of those letters of credit that

14   somebody discussed earlier?

15         A.      Yes.

16         Q.      And who, to your understanding,

17   are the parties to this letter of credit?

18         A.      Interior/Exterior and Knauf.

19         Q.      And is The Whitney somehow a

20   party to this?

21         A.      The Whitney is the bank that,

22   you know, take the funds, the letter of

23   credits.  Assuming that Knauf met all the

24   obligations of the letter of credit, then the

Confidential - Subject to Further Confidentiality Review

Page 124

```
 1    funds would transfer.
 2         Q.     Okay.  Do you know whether
 3    there's any direct contract or document
 4    between Knauf and The Whitney?
 5         A.     I'm not aware of any.
 6         Q.     Okay.  And where it says,
 7    "Description of Goods," there's "FOB Wuhu,
 8    China" scratched out, and then it says, "Free
 9    alongside ship, Shanghai, China"?
10         A.     Uh-huh.
11         Q.     What does that mean?
12         A.     There were a lot of iterations
13    as far as changes to the letter of credit
14    when we were having trouble with shipping and
15    so forth, and I guess at one point, it was --
16    we were going to get -- it's coming back to
17    me a little bit.
18              I may be off here, but Wuhu
19    was, I believe, inland, and they had to
20    somehow get the product from Wuhu to
21    Shanghai, is my recollection.
22         Q.     And then it was -- you were
23    going to take title from it at Shanghai?
24         A.     Well, there was talk at --
```

Confidential - Subject to Further Confidentiality Review

Page 125

1    yeah, at some point, they were going to get

2    it to Shanghai, then we were going to ship it

3    from Shanghai.  And then they ended up, with

4    the Wuhu shipment, bringing it to

5    New Orleans.

6            Q.    Okay.  If you look at the

7    second page, which is Bates number 244, it

8    says, "Documents Required," and then under

9    number 2, it says, "Bills of lading must show

10   shipment by 40-foot-high cube," and that's

11   scratched out and it says "under deck."  Do

12   you see that?  Or "by 40-foot-high cube

13   container," I guess, is scratched out.

14           A.    Okay.

15           Q.    Do you recall either you or

16   Knauf wanting to change it from containers to

17   under deck?

18           A.    They wanted to ship by

19   container.  I think it was easier for them.

20   And we preferred it break bulk.  It was

21   easier.  As Jim mentioned earlier, the labor

22   to unload the container was more difficult.

23           Q.    And just for the record, what

24   does "break bulk" mean?

Confidential - Subject to Further Confidentiality Review

```
 1          A.       "Break bulk" means that it was
 2    put on the ship, palletized, with protective
 3    covering and so forth, and they had slings
 4    underneath it.  And the crane would pick it
 5    up -- go into the ship, pick it up and bring
 6    it off the ship.
 7          Q.       Okay.  And what does "under
 8    deck" mean?
 9          A.       A covered deck.  You know, the
10    material would be covered.
11          Q.       Okay.
12          A.       In the ship.
13          Q.       And then if we look at the next
14    page, 245, it's been changed from "container
15    is sufficient" to "68-piece pallet," and
16    that's kind of the language that we saw
17    before on the certification; is that correct?
18          A.       Uh-huh.
19          Q.       And --
20                   MR. DUPLANTIER:  You have to
21          say "yes."
22          A.       Yes.  I'm sorry.
23    BY MR. HERMAN:
24          Q.       And Knauf agreed to that,
```

Confidential - Subject to Further Confidentiality Review

Page 127

```
 1     correct?
 2               MR. SANDERS:  Object.
 3          A.     Once again, this is a -- I
 4     don't know if this was the final one that
 5     occurred.
 6     BY MR. HERMAN:
 7          Q.     I understand.  But at the end
 8     of the day, Knauf agreed to ship by 68-piece
 9     pallet, correct?
10          A.     Yes.
11          Q.     And based on all of your
12     knowledge and understanding, all of the
13     shipping was done correctly?
14          A.     Yes.
15          Q.     Has there been a claim, to your
16     knowledge, by Interior/Exterior, as against
17     either Knauf or one of the carriers, that
18     there was some problem during shipping or
19     that the drywall was damaged during shipping?
20          A.     No.
21          Q.     Do you have any reason to
22     believe, as we sit here today, other than a
23     conversation you may have had with your
24     attorney, that the problems that people are
```

Confidential - Subject to Further Confidentiality Review

Page 128

1    experiencing or complain to be experiencing

2    with the drywall are caused by something that

3    happened during the shipping process?

4         A.    No.

5         Q.    You have no information that

6    seawater contamination during the shipping

7    process, if any, has anything to do with what

8    people are complaining about, correct?

9         A.    No, I do not.

10        Q.    If we go back to Exhibit 21,

11   it's Underwriters Laboratory.  Have you ever

12   seen this before?

13        A.    I don't recall it.

14        Q.    You don't remember where you

15   would have gotten this from or who would have

16   provided it or why?

17        A.    No.  No, I do not.

18        Q.    Okay.  If we go back to

19   Exhibit 17, it starts with an e-mail to you

20   from Barry Topple.

21        A.    Okay.

22        Q.    Who is Barry Topple, if you

23   remember?

24        A.    I don't remember his exact

Confidential - Subject to Further Confidentiality Review

1      title.

2            Q.      Do you remember dealing with

3      anybody at Knauf in the U.K.?

4            A.      Well, from his e-mail, it does

5      say "U.K."

6            Q.      Would it be fair to say that

7      you didn't really make any distinction

8      between Knauf USA and Knauf U.K.?

9                  MR. SANDERS:  Object to the

10           form.

11           A.    Yes.

12     BY MR. HERMAN:

13           Q.      Would it be fair to say that

14     you didn't make a distinction between Knauf

15     USA and the Knauf Chinese companies?

16                 MR. SANDERS:  Same objection.

17           A.    Yes.

18     BY MR. HERMAN:

19           Q.      And it says, "Dear Clay:

20     Currently, the Knauf group is fully committed

21     to supply its usual markets."

22                 Do you see that?

23           A.    Uh-huh.

24           Q.    Do you recall getting that?

Confidential - Subject to Further Confidentiality Review

Page 130

 1         A.      Yes.

 2         Q.      Do you know what that was in

 3    response to?

 4         A.      My e-mail below that.  I

 5    believe I called or e-mailed Jeff Brisley and

 6    said, "Look, things are getting tougher,

 7    and -- to get product, and anything you can

 8    do for us?"

 9              And he suggested, I believe,

10    that we contact Barry Topple.  I think he

11    even did that on our behalf, and I went ahead

12    and sent him an e-mail myself.  And this is

13    his response that they're fully committed, I

14    guess, in all their other markets.

15         Q.      Did you have some knowledge, by

16    this point in time, that there was like a

17    Knauf Brazil or some other Knauf companies

18    somewhere else in the world?

19         A.      You just heard things.  I don't

20    recall where I heard that.

21         Q.      Okay.  Did you have some

22    conception of what the Knauf group was when

23    you got this e-mail?

24         A.      I knew it was a worldwide

Confidential - Subject to Further Confidentiality Review

Page 131

1    company.

2           Q.      Okay.  If we go back to

3    Exhibit 16, do you recall looking at this

4    e-mail chain before?

5           A.      Yes.

6           Q.      And it starts off on the bottom

7    with Jeff Brisley sending something to

8    somebody that talks about Knauf Brazil.  Do

9    you have any recollection of that?

10          A.      I remember the e-mail.

11          Q.      It says, "They would like to

12   understand if they have any options to

13   purchase additional wallboard, but not in

14   containers, whether that is from China,

15   Brazil or Europe."

16          A.      Correct.

17          Q.      And you recall making that

18   inquiry?

19          A.      Yes.

20          Q.      And somebody at Knauf was

21   finding out if some Knauf entity could

22   accommodate you?

23          A.      Correct.

24          Q.      And it looks like a response

Confidential - Subject to Further Confidentiality Review

1     from Mr. Topple to Mr. Brisley was, "The

2     Knauf group currently is consuming all spare

3     capacity for its own needs."

4               Do you know what that means?

5          A.    Yes.

6          Q.    What does it mean, to your

7     knowledge?

8          A.    That they were maxed out, they

9     couldn't get us any more.

10         Q.    Okay.  And then somehow these

11    communications got forwarded to you, correct?

12         A.    Yes.

13         Q.    And is it fair to say that

14    because the Knauf group couldn't supply any

15    more drywall, that it was at that point that

16    Interior/Exterior went to get the Taihe

17    product?

18              MR. SANDERS:  Object to form.

19         A.    Yes.

20    BY MR. HERMAN:

21         Q.    But is it fair to say that

22    Interior/Exterior would have been happy to

23    continue to import product from any of these

24    other Knauf entities?

Confidential - Subject to Further Confidentiality Review

Page 133

```
 1              A.      Yes.
 2              Q.      If we go back to Exhibit 15, do
 3      you recall Mr. and Mrs. Wei visiting
 4      New Orleans?
 5              A.      I think I do recall Mr. Wei
 6      coming in.
 7              Q.      And was the GREAT IMMENSITY a
 8      ship?
 9              A.      Yes, it was.
10              Q.      Okay.  And that was one of the
11      Knauf Tianjin shipments?
12              A.      I don't recall which one it
13      was.
14              Q.      Don't recall.  Okay.
15              A.      But it was one of the ships.
16              Q.      Okay.  And is it your
17      understanding, or would it be your
18      impression, that GWB market is the gypsum
19      wallboard market?
20              A.      Yes.
21              Q.      And what, to your
22      understanding, was Mr. Wei's relationship, if
23      any, to the Knauf entities?
24              A.      No relationship.
```

Confidential - Subject to Further Confidentiality Review

Page 134

1          Q.     Okay.  What was, to your

2     understanding, Mr. Wei's role in helping to

3     facilitate the importation of Chinese

4     drywall?

5          A.     As I said earlier, J.W. Allen,

6     our freight forwarder, had contacted them

7     because they're based in China, or Victor Wei

8     is, and they actually inspected some of the

9     product as it was loading onto the ships,

10    took some pictures for us, made sure that

11    things were okay.  And then they were the

12    ones that investigated a possible

13    relationship with BNBM for us.

14         Q.     Okay.  If you go back to

15    Exhibit 14, do you know what Uni-Pac, Ltd.

16    is?

17         A.     Yes, it's a little fuzzy, but I

18    believe so.  I believe this was someone who

19    had approached us about buying product, as

20    did a lot of people at the time.

21         Q.     Do you know whether they had

22    any relationship with Knauf?

23         A.     No, I don't know.

24         Q.     Do you know what type of

Confidential - Subject to Further Confidentiality Review

```
 1    drywall they proposed to sell or broker?
 2          A.      I don't recall.
 3          Q.      Do you know whether they had a
 4    relationship with BNBM?
 5          A.      I don't recall.
 6          Q.      Or Taihe?
 7          A.      I don't recall.
 8          Q.      Did you ever respond to this?
 9          A.      We talked to them on numerous
10    occasions, but we never did anything with
11    them.
12          Q.      Okay.  It says, "In regards to
13    the stamping of the sheetrock, it will come
14    stamped 'Made in China.'"
15                  Was that some kind of
16    consideration?
17          A.      We were -- we talked to a lot
18    of people, and, you know, we told them what
19    some of the, you know, conditions would have
20    to be, so that's possibly where that came
21    from.
22          Q.      And it's your understanding,
23    and I don't know if I asked you or your
24    brother before -- but it's your understanding
```

Confidential - Subject to Further Confidentiality Review

1      that that's a regulatory requirement?

2           A.      Yes.

3           Q.      If you look at the fourth

4      bullet point, it says, "Your order will come

5      FOB Houston and will take four to six weeks

6      for delivery port to port."

7                   What does that mean?

8           A.      That -- I assume that they

9      would pay the -- to have the product shipped

10     to Houston.

11          Q.      Okay.  And then it says, "We

12     are willing to enter into an exclusive

13     arrangement with you, based on projected

14     quantities per territory."

15          A.      Uh-huh.

16          Q.      Did you ever -- do you recall

17     negotiating with them on that?

18          A.      I remember talking to them

19     about it, yes.

20          Q.      Was that a sticking point?

21          A.      They were -- they were -- I

22     think they were interested in having a person

23     who was in the industry take a big -- a large

24     volume of their business, rather than having

Confidential - Subject to Further Confidentiality Review

Page 137

1    a lot of little people, little customers.

2            Q.      And were you interested in

3    doing that?

4            A.      If it had been -- if it had

5    worked out.

6            Q.      Okay.  If we go back to

7    Exhibit 13, it says, "Please proceed to

8    inspect the product while it is being

9    produced."

10            Do you have any recollection

11    about that?

12            A.      I remember this was early on,

13    and we ended up having J.W. Allen do the

14    inspection of the product when it was loaded

15    onto the ship.

16            Q.      Was there ever any discussions

17    at Interior/Exterior about, "Maybe we should

18    have someone go and look at the manufacturing

19    process"?

20            A.      Only to the extent that we

21    talked about possibly looking at the product

22    as to whether it was out of square, whether

23    there were bubbles in the paper, you know,

24    busted edges, those type of things; but no,

Confidential - Subject to Further Confidentiality Review

Page 138

```
1      not the actual manufacturing of the
2      process -- of the product.
3           Q.     Did you ever get samples from
4      Knauf?
5           A.     I don't recall.
6           Q.     Okay.  Has there been, since
7      this litigation started, some effort to try
8      to go and see if there's any Knauf or Taihe
9      drywall sitting around somewhere?
10               MR. DUPLANTIER:  I'm going to
11            object to the form of the question.
12            To the extent you're asking him things
13            that have been done by counsel in
14            anticipation of litigation, I don't
15            think he can answer that question and
16            should answer that question.
17               If they did it independent of
18            the litigation, go ahead and answer
19            the question.
20               MR. HERMAN:  Well, I don't
21            think it's covered by privilege or
22            work product, but we'll fight about
23            that later.
24      BY MR. HERMAN:
```

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 139

1          Q.      Did you ever do it independent

2    of your counsel?

3          A.      Please repeat it.

4          Q.      Did Interior/Exterior ever,

5    independently of counsel, try to ascertain

6    whether there was still some -- either Knauf

7    or Taihe drywall in a warehouse somewhere or

8    otherwise within Interior/Exterior's

9    possession?

10         A.      I don't recall if we did or

11   not.

12                 MR. HERMAN:  And I'll reserve

13         our rights to ask further about that.

14   BY MR. HERMAN:

15         Q.      If we look back at Exhibit 12?

16         A.      Okay.

17         Q.      This is your handwriting?

18         A.      Yes, it is.

19         Q.      And it looks like the first

20   part says, "Mark Norris of Knauf"?

21         A.      Uh-huh.

22         Q.      And it looks like October 28th,

23   2005?

24         A.      Yes.

Confidential - Subject to Further Confidentiality Review

Page 140

1          Q.      Is this pretty early on in the

2     process when you started investigating

3     possibly importing Chinese drywall?

4          A.      Yes, it is.

5          Q.      What does that first line say?

6          A.       "Antitrust was the reason we

7     had to handle shipping, 12-1/2% of USG."

8          Q.      What does that mean?

9          A.      Originally, we'd gotten a quote

10    sheet -- Jim had gotten a quote sheet from

11    Knauf, and it had, basically, a delivered

12    price.

13               And my recollection in

14    talking -- and I jotted down the note,

15    talking to Mark, when they switched it to

16    they wanted us to handle the shipping, it had

17    something to do with antitrust as far as they

18    owned a certain -- I guess 12-1/2% of USG at

19    the time, and they couldn't ship any more

20    into the country without being over a

21    threshold and somehow having some regulatory

22    problem.

23          Q.      Okay.  Is it fair to say from

24    your perspective, that Knauf was desiring to

Confidential - Subject to Further Confidentiality Review

Page 141

```
 1    do business in the United States, subject to
 2    the antitrust restrictions?
 3                MR. SANDERS:  Object to form,
 4         foundation.
 5                THE WITNESS:  Repeat that
 6         again.
 7    BY MR. HERMAN:
 8         Q.    Knauf wanted to sell drywall to
 9    the United States, correct?
10                MR. SANDERS:  Same objection.
11         A.    Yes.
12    BY MR. HERMAN:
13         Q.    Based on your perception?
14         A.    Yes.
15         Q.    And the only hitch in that, to
16    your understanding, was that they couldn't
17    ship it to the United States directly,
18    correct?
19                MR. SANDERS:  Same objection.
20         A.    Yes.
21    BY MR. HERMAN:
22         Q.    But was there any discussion
23    about, "We don't want to ship it to the
24    United States because then we would somehow
```

Confidential - Subject to Further Confidentiality Review

Page 142

1    be subject to jurisdiction there"?

2                    MR. SANDERS:  Same objection.

3        A.     I guess I'll go back to what I

4    said earlier.  What he told me was they were

5    concerned about shipping -- because of their

6    interest in USG, shipping into the U.S.,

7    because somehow it would pass some threshold

8    and cause some regulatory problem.

9                    As far as on an ongoing basis

10   shipping into the U.S., this was a period of

11   time, I guess, that there was probably a

12   window of opportunity.  It's a very --

13   drywall is a very inexpensive product, very

14   freight-intensive, and --

15                   MR. COHEN:  You have to talk

16        up, please.

17                   THE WITNESS:  I'm sorry.

18       A.     The drywall is a very

19   inexpensive product, very freight-intensive,

20   and prices have come up.  And it would have

21   been difficult, in most circumstances, to

22   ship it into the U.S.

23   BY MR. HERMAN:

24       Q.     So from your perception at

Confidential - Subject to Further Confidentiality Review

1       least, Knauf was trying to monopolize on this

2       opportunity from the shortage to be able to

3       do business in the United States?

4                       MR. SANDERS:   Object to form.

5            A.      They were trying to ship

6       product into the U.S. to help with the demand

7       in the U.S.

8       BY MR. HERMAN:

9            Q.      Okay.   There's a line down here

10      that says, "Jeff Brisley explained to him

11      what happened."

12                      Do you know, or can you

13      remember, what it is that happened that he

14      explained?

15           A.      I don't recall what that is.

16           Q.      Okay.   If we go back to

17      Exhibit 11, it says, "Dear Clay:   After

18      speaking with our production manager, we've

19      discovered that to put an extra 'Made in

20      China' would be doubling up on the

21      information."

22                      Do you have any recollection

23      about that?

24           A.      Yeah.   We had been told by our

Confidential - Subject to Further Confidentiality Review

Page 144

```
1      freight forwarder that the product -- any
2      product coming into the U.S. has to say "Made
3      in China," and so that was one of our
4      stipulations.  And I guess he thought we
5      wanted it on there twice, apparently, and
6      having it on there once was fine with us.
7              Q.     Okay.  If we look at the second
8      page, which is Bates number 636, it says, "We
9      have priced your plasterboard order according
10     to 'sister company' rates upon the request of
11     Knauf USA."
12                    You see that?
13             A.     Uh-huh.
14             Q.     Do you have any recollection
15     about that?
16             A.     I remember reading that, yes.
17             Q.     Okay.  What did that mean to
18     you?
19             A.     I think Jim stated correctly
20     that because of our longstanding relationship
21     with Knauf here, that's why they were going
22     to give us the rates that they did.
23             Q.     If we look at Exhibit 10, it
24     says, "We can then ship approximately 300,000
```

Confidential - Subject to Further Confidentiality Review

1     sheets per month from our Tianjin plant.  If

2     you require additional board, we would employ

3     the other two Knauf China plants to

4     supplement your shipments."

5              Do you see that?

6        A.     Uh-huh.

7        Q.     And did you have an

8     understanding at that time that one Knauf

9     plant would fill in, if they could?

10              MR. SANDERS:  Object to form.

11        A.     At that point in time, it

12     appeared they could ship from any plant, any

13     of their plants.

14     BY MR. HERMAN:

15        Q.     Okay.  And as it turned out,

16     when Tianjin had a crunch, Knauf shipped from

17     their Wuhu plant, correct?

18              MR. SANDERS:  Object to form.

19        A.     Correct.

20     BY MR. HERMAN:

21        Q.     Let's look at Exhibit 8.  Do

22     you recognize Exhibit 8?

23        A.     It's my handwriting.

24        Q.     Okay.  And you have three Knauf

Confidential - Subject to Further Confidentiality Review

1    plants noted there?

2         A.    Yes.

3         Q.    Do you know what these notes

4    are from, what person you were maybe speaking

5    to when you made them?

6         A.    No, I don't recall.

7         Q.    If you look at Exhibit 7, do

8    you have any knowledge or recollection of

9    what Exhibit 7 is?

10        A.    My recollection was this was

11   somebody -- it might have been that Uni-Pac

12   guy.  I would have to look at that document

13   and see.  It might be one and the same.

14        Q.    Exhibit 14.

15        A.    14?

16        Q.    You can look at mine, if you

17   want.

18        A.    Okay.

19              Maybe I'm wrong.

20        Q.    Okay.  But somehow you heard

21   about Uni-Pac, apparently?  You don't --

22        A.    Or maybe he is with -- okay.

23   It does say "Uni-Pac."  That was probably

24   someone who had contacted us, also, and

Confidential - Subject to Further Confidentiality Review

Page 147

1      wanted to ship product to us.

2            Q.      Do you know who Rick Wendel is,

3      or Wendel?

4            A.      I remember meeting him or

5      talking to him.  I don't remember him.

6            Q.      Okay.  And then it says,

7      "Chinese board, Taihe."

8                    You see that?

9            A.      Uh-huh.  This would have been

10     very early in the program.

11           Q.      Okay.

12           A.      Like October-ish.  Probably

13     November would be my guess.

14           Q.      And if we look at the next

15     page, which is 952, there's another person

16     listed, Terry Williams.  And that's the same

17     person that's on --

18           A.      Yeah, that is.  Apparently,

19     these two must have been working together.

20           Q.      Okay.  And then it says,

21     "Uni-Pac," and then, "Taihe," and then

22     there's "Billy App."  Is that the same guy?

23           A.      He's J.W. Allen.  He's our

24     freight forwarder.

Confidential - Subject to Further Confidentiality Review

1          Q.     And would he have been somebody

2     that Uni-Pac would have recommended, or you

3     would have already been working with him?

4          A.     No, he wouldn't have.  We would

5     have already been working with Billy App.

6          Q.     And where it says "3% damage,"

7     do you know what that means?

8          A.     No, I don't.

9          Q.     Okay.

10          A.     No, I don't.

11          Q.     If we go back to Exhibit 6, is

12     this your handwriting?

13          A.     Yes, it is.

14          Q.     And do you know what this is?

15          A.     These are numerous contact

16     information for various people.

17          Q.     Okay.  And John Davis and

18     Cecelia Wang are, at least to your knowledge,

19     at Knauf in China?

20          A.     Correct.

21          Q.     And Jeff Brisley is the person

22     at Knauf USA that we talked about before?

23          A.     Yes.

24          Q.     Who is Kurt?

Confidential - Subject to Further Confidentiality Review

1        A.      Kurt is a sales rep for Knauf

2    in the U.S.

3        Q.      Okay.  And who is Lydia

4    Alvarez?

5        A.      Lydia Alvarez is -- she worked

6    at The Whitney Bank and helped with the

7    actual paperwork for the letter of credit.

8        Q.      Okay.  And Mark Norris is

9    another Knauf person?

10       A.      Yes.

11       Q.      Do you know where he's located?

12       A.      China, I believe.

13       Q.      Okay.  And we know who Billy

14   App is.

15               And who's Phillip somebody?

16       A.      Phillip is our Whitney banker.

17               MR. HERMAN:  Okay.  Okay.

18           Let's take a break right now, because

19           we're going to run out of tape,

20           anyway.

21               THE VIDEOGRAPHER:  Going off

22           the record.  The time is 11:23 a.m.

23           This is the end of Tape 1.

24               (Recess taken, 11:23 a.m. to

Confidential - Subject to Further Confidentiality Review

Page 150

```
 1              11:33 a.m.)
 2                   THE VIDEOGRAPHER:  We're back
 3              on the record.  The time is 11:33 a.m.
 4              This is the start of Tape 2.
 5                   (Whereupon, Deposition Exhibit
 6              INEX-30b6-28, Handwritten Notes,
 7              "Tianjin Sheetrock," etc.,
 8              INT/EXT00416, was marked for
 9              identification.)
10    BY MR. HERMAN:
11         Q.    I'm going to show you what's
12    been marked as Exhibit 28 for the deposition,
13    Bates number INT/EXT416.  Do you recall ever
14    seeing Exhibit 28 before?
15         A.    Actually, I think these are
16    sticky notes that were on top of a document.
17         Q.    Oh, okay.  Are they your
18    handwriting?
19         A.    Yes, they are.
20         Q.    Okay.  And if you look at the
21    top right, or the top sticky note, it seems
22    to say, "Tianjin sheetrock, executed
23    12/15/05, order #3."
24                   You see that?
```

Confidential - Subject to Further Confidentiality Review

1   A.  Yes.

2   Q.  Do you know what that means?

3   A.  Yeah.  That was just a

4 filename, I think, that was set up for the

5 name of it, the date it was executed, and

6 then that there was the third order with

7 Knauf.

8   Q.  Okay.  Do you know what the

9 "5/4/09, order #3" means?

10   A.  No, I don't.

11   Q.  And then if you look at the

12 left sticky note, it looks like it says,

13 "Trading company on West Coast."

14    Do you have any recollection of

15 what that might be?

16   A.  I'm sure it was someone who had

17 contacted us, but I don't recall the details.

18   Q.  BNBM?

19   A.  Yeah, but I don't recall the

20 details.

21   Q.  Do you see where it says --

22 what does it say below that, "Taishan,"

23 or "Tiaz-shan" or...

24   A.  "Taishan."  Maybe that was my

Confidential - Subject to Further Confidentiality Review

1    writing for "Taishan," would be my guess.

2           Q.     And then it looks like it says

3    "middle quality."

4                  Do you know what that means?

5           A.     No.

6           Q.     And then there was -- looks

7    like "Shan," something.  "Shandong Province,"

8    is that where it was made?

9           A.     I think that's where it was

10   made.

11          Q.     Do you have any recollection of

12   having any discussions with anybody about

13   Taishan being of -- sheetrock being of middle

14   quality?

15          A.     No, I don't.

16          Q.     Do you have any, as we sit here

17   today, definition of what "middle quality"

18   means?

19          A.     No.

20          Q.     Did you get some impression,

21   over the course of importing Chinese

22   sheetrock, that it was of somewhat lesser

23   quality than domestic?

24          A.     No.

Confidential - Subject to Further Confidentiality Review

```
 1           Q.      Would you consider domestic
 2     sheetrock to be middle quality?
 3           A.      They're all very similar.
 4           Q.      Was there any distinction that
 5     you recall discussing or hearing between
 6     Taishan sheetrock and Knauf sheetrock, in
 7     terms of quality?
 8           A.      Don't recall.
 9                   (Whereupon, Deposition Exhibit
10           INEX-30b6-29, E-mail Chain Ending
11           4/28/06 Li E-mail to to C. Geary,
12           Subject: IEBS company information,
13           INT/EXT02069 - INT/EXT02073, was
14           marked for identification.)
15     BY MR. HERMAN:
16           Q.      Okay.  Let me show you
17     INEX-30b6-29, which, for the record, are
18     Bates numbers 2069 through 2073.  Do you
19     recall dealing with somebody named Susan at
20     Weida Freight?
21           A.      Yes.
22           Q.      And was that person in China --
23           A.      I believe so, yes.
24           Q.      -- to your understanding?
```

Confidential - Subject to Further Confidentiality Review

1                    And IEBS is you guys?

2          A.    Yes.

3          Q.    It says, "Have got GWB sample

4    from BNBM just now and will mail them to you

5    today"?

6          A.    Uh-huh.

7          Q.    Do you see that?

8          A.    Yes.

9          Q.    And is "GWB" gypsum wallboard?

10         A.    Yes.

11         Q.    Do you recall getting a BNBM

12   sample?

13         A.    I don't recall.

14         Q.    Do you recall trying to locate

15   this BNBM sample since the litigation

16   started?

17         A.    All of my files were all

18   together in one spot, so it was -- it would

19   have been there.

20         Q.    Have you ever gotten a

21   wallboard sample from any other manufacturer?

22         A.    We did get some samples during

23   the process.  I don't recall from whom.

24         Q.    And how did the samples come?

Confidential - Subject to Further Confidentiality Review

1          A.       Small piece, I don't know, four

2     inches, six inches by six inches.

3          Q.       Were they wrapped in something?

4          A.       Possibly wrapped in plastic,

5     you know, overnighted or something like that.

6     We did get some.  I don't recall from whom.

7          Q.       Were you able to identify any

8     after the litigation started?

9          A.       Any samples?

10         Q.       Yeah.

11         A.       No.

12         Q.       When you got the samples, what

13    did you do with them?

14         A.       Nothing.

15         Q.       Did you run any testing on them

16    or --

17         A.       No.

18         Q.       What did you want them for?

19         A.       Just to have a sample of the

20    product.

21         Q.       Did you ever compare the

22    Chinese samples to domestic samples?

23         A.       No.

24         Q.       If you look at 2071, it says

Confidential - Subject to Further Confidentiality Review

1    it's from Mr. App.  It says, "Clay, does IEBS

2    have a website that we can let BNBM have to

3    give them a good introduction of the company

4    and its history, or what do you suggest?"

5                Do you know why BNBM would have

6    been interested in your business?

7                A.    The only thing I can guess is a

8    lot of people were trying to obtain drywall

9    at that time, and I assume they wanted to

10   know that we were a legitimate company.

11               (Whereupon, Deposition Exhibit

12               INEX-30b6-30, E-mail Chain Ending

13               5/8/06 App E-mail to Li,

14               Subject: Gypsum Wallboard,

15               INT/EXT02061 - INT/EXT02063, was

16               marked for identification.)

17   BY MR. HERMAN:

18               Q.    Let's look at INEX-30b6-30,

19   Bates numbers 2061 through 2063.  Do you

20   recall ever receiving or looking at

21   Exhibit 30?

22               A.    Yes.

23               Q.    What do you recall about it?

24               A.    I just reviewed the document in

Confidential - Subject to Further Confidentiality Review

Page 157

1    preparation for this, this deposition.  I

2    reviewed all my documents.

3           Q.    And at the time, do you recall

4    trying to negotiate and ultimately execute a

5    contract to import BNBM drywall?

6           A.    Yes, we did.

7           Q.    And that fell through, for some

8    reason, right?

9           A.    Yes, it did.

10          Q.    And maybe you already answered

11   this.  I apologize, if you did.  But why did

12   it fall through, again?

13          A.    I'm not positive, but I think

14   it had to do with the difficulty in getting

15   shipping.  But I'm not positive.

16          Q.    Okay.  And it talks about to --

17   item 5, "New Orleans, Louisiana, USA was

18   added."

19                Do you remember who --

20          A.    I'm sorry, where are you?

21          Q.    On the first page from App, it

22   says, "Dear Susan," and then there's a kind

23   of like four items?

24          A.    Yeah, I see it.  Okay.

Confidential - Subject to Further Confidentiality Review

Page 158

```
 1          Q.     One of them says, "Item 5,
 2     New Orleans, Louisiana, USA was added"?
 3          A.     Uh-huh.
 4          Q.     Do you know why somebody wanted
 5     that to be added, or what that means or...
 6          A.     I don't recall if that was to
 7     define where we were from or what.  I don't
 8     recall.
 9          Q.     Do you recall there being some
10     type of desire on Interior/Exterior's part to
11     make it clear, for some reason, that product
12     was going to be shipped to or somehow come
13     into New Orleans, Louisiana?
14          A.     That would be my guess, that we
15     were defining where it was coming, but I'm
16     not positive.
17          Q.     Is that for shipping purposes
18     or for some other purposes, or both?
19          A.     For shipping purposes.
20          Q.     Do you recall there being any
21     other concerns or discussions about
22     specifically identifying New Orleans or
23     Louisiana or the United States?
24          A.     As far as any markings?
```

Confidential - Subject to Further Confidentiality Review

Page 159

1          Q.     Well, as far as making it clear

2     in a contract that you have a Chinese company

3     doing business with a U.S. company.

4          A.     The letter of credit stated

5     where we were from, and that's possibly why

6     it was in there.

7          Q.     Okay.  It says, "Susan, we need

8     to get this contract signed and whatever else

9     we need to do to get BNBM to start producing

10    product.  Please review the document included

11    in this transmission, and we will forward you

12    a copy."

13          Was there -- to your

14    recollection, they wouldn't begin production

15    until they had a formal contract?  Is that

16    the way you recall it or --

17          A.     Yes, and the letter of credit

18    was until that was opened.

19          Q.     Well, they would have been in

20    production with the shortage all the time,

21    you would think, huh?

22          MR. DUPLANTIER:  Well, object

23     to the form of the question.

24     BY MR. HERMAN:

Confidential - Subject to Further Confidentiality Review

1          Q.     Based on your knowledge and

2     impression.

3          A.     But I can't -- I don't know

4     that they would make this -- you know, that

5     one specific product unless they had an

6     order.

7          Q.     Okay.  If we go to 2062,

8     "Dear Clay Geary:  We have contacted

9     SGS Company, but SGS Company can't determine

10    which side about quality and condition."

11               Do you have any idea what that

12    means?

13         A.     SGS, as I recall, was trying to

14    define the scope of what they needed to do

15    for us.

16         Q.     They were going to do some type

17    of inspection?

18         A.     Yes.

19         Q.     And then they didn't do it

20    because you got Allen to do it or they didn't

21    do it because you ended up not buying the

22    product, or both?

23         A.     I don't recall.  We didn't end

24    up getting the product.  I believe we would

Confidential - Subject to Further Confidentiality Review

1    have had Weida Freight do it, but I'm not

2    sure.

3              Q.    Okay.  "Please tell us which

4    side about quality and condition."

5                    Do you have any recollection

6    about --

7              A.    Where is that?

8              Q.    It's in --

9              A.    Oh, there it is.  Okay.

10             Q.    Do you know what they were

11   talking about, in terms of quality and

12   condition?  It says, "because quality and

13   condition is very wide"?

14             A.    I assume they're trying to

15   better define what we meant by "quality and

16   condition."

17             Q.    Okay.  It says, "If you can

18   delete 'in good order,' because SGS Company

19   will examine goods according to contract."

20                   Do you have any idea what that

21   means?

22             A.    I don't recall.

23             Q.    Do you recall ever agreeing to

24   accept Chinese drywall where there was no

Confidential - Subject to Further Confidentiality Review

Page 162

1       specific representation from the manufacturer

2       that the drywall was in good order?

3               A.      We would not do that.

4               Q.      I don't remember if it was you

5       or your brother, but I think somebody said

6       earlier in the deposition that there had

7       never been any claim by Interior/Exterior

8       that any of the drywall was damaged during

9       shipping, correct?

10              A.      Correct.

11              Q.      Or at least with respect to the

12      complaints here, correct?

13              A.      Correct.

14              Q.      And certainly if there had been

15      drywall that had been damaged during the

16      shipping process, Interior/Exterior wouldn't

17      have sold that to a customer, correct?

18              A.      We did have some that was

19      banged up.  We didn't make an insurance

20      claim, but we did have some banged up.

21              Q.      And you sold that damaged

22      drywall to customers?

23              A.      Yes.

24              Q.      And did they know it was

Confidential - Subject to Further Confidentiality Review

Page 163

1    damaged?

2          A.      Yeah.   Some people wanted, you

3    know, a distressed price for banged-up

4    drywall.  Happens all the time.

5          Q.      Okay.  And so when you're

6    talking about damage, what's the type of

7    damage that you're talking about?

8          A.      Banged-up ends, you know, hit

9    in some kind of way, by a forklift or -- or

10   what.

11         Q.      Was there any of the drywall

12   that, based on your impression, when it

13   reached the United States, it had been

14   contaminated by seawater?

15         A.      No.

16         Q.      If there had been drywall that

17   had been contaminated by seawater during the

18   shipping process, would you have sold that to

19   customers?

20         A.      No.

21         Q.      Did you change the marking or

22   the labeling with respect to any of the

23   damaged drywall?

24         A.      Did we change the marking or

Confidential - Subject to Further Confidentiality Review

Page 164

```
 1    the labeling on the product?
 2            Q.    Yeah.
 3            A.    No.
 4            Q.    Like sell it as Crescent City
 5    gypsum as opposed to --
 6            A.    No.  No.
 7            Q.    -- something else.
 8                  Do you know what Crescent City
 9    gypsum is?
10            A.    I've seen an e-mail in there.
11    I think someone had sent us a flier or
12    something on that.
13                  (Whereupon, Deposition Exhibit
14            INEX-30b6-31, Application and
15            Agreement for Documentary Credit
16            Between BNBM and Interior/Exterior,
17            INT/EXT00814 - INT/EXT00817, was
18            marked for identification.)
19    BY MR. HERMAN:
20            Q.    Okay.  Let me show you
21    INEX-30b6-31, Bates numbers 814 to 817.  What
22    is Exhibit 31?
23            A.    Application and Agreement for
24    Documentary Credit.
```

Confidential - Subject to Further Confidentiality Review

1          Q.     And is this similar to the

2     letters of credit that we had discussed

3     before, when we were looking at certificates?

4          A.     Yes.

5          Q.     And this one is for BNBM,

6     correct?

7          A.     Yes.

8          Q.     And so the letter of credit was

9     executed by Interior/Exterior, but then it

10    ended up not being needed, correct?

11         A.     Correct.

12         Q.     Is this similar to the letters

13    of credit that would have been executed with

14    respect to Knauf or Taihe?

15         A.     Similar.

16         Q.     Did you always use The Whitney

17    Bank?

18         A.     Yes, we did.

19              (Whereupon, Deposition Exhibit

20              INEX-30b6-32, Addendum to Application

21              and Agreement for Documentary Credit

22              Between Interior/Exterior and BNBM,

23              INT/EXT00809 - INT/EXT00812, was

24              marked for identification.)

Confidential - Subject to Further Confidentiality Review

Page 166

```
 1    BY MR. HERMAN:
 2         Q.    Okay.  I'm going to show you
 3    INEX-30b6-32, which, for the record, is Bates
 4    numbers 809 through 812.  Just for the
 5    record, what is Exhibit 32?
 6         A.    A letter of credit.
 7         Q.    And there is within this letter
 8    of credit some representations that are
 9    similar to the Knauf representations that we
10    looked at earlier?
11         A.    Uh-huh.
12         Q.    Am I correct about that?
13         A.    Yes.
14         Q.    The way that the gypsum boards
15    were going to be shipped, correct?
16         A.    Yes.
17         Q.    And that they were free from
18    defects in materials and workmanship?
19         A.    Yes.
20         Q.    And that they complied with
21    ASTM C36?
22         A.    Yes.
23         Q.    I realize that, ultimately,
24    Interior/Exterior never imported the drywall
```

Confidential - Subject to Further Confidentiality Review

1      from BNBM; but from your perspective, did

2      BNBM agree to these terms?

3              A.     Yes.

4                     (Whereupon, Deposition Exhibit

5              INEX-30b6-33, SGS North America

6              Inspection Request Application,

7              INT/EXT06089 - INT/EXT06091, was

8              marked for identification.)

9      BY MR. HERMAN:

10             Q.     I'm going to show you

11     INEX-30b6-33, Bates number 6089 through 6091.

12                    Do you know what Exhibit 33 is?

13             A.     It says, "Inspection Request

14     Application."

15             Q.     Do you have any idea what that

16     means?

17             A.     A request, I believe by us, to

18     have SGS do an inspection.

19             Q.     And it says, "Company Name for

20     Exporter Supplier:  Taihe Shandong Plant 2, a

21     Division of BNBM."

22                    You see that?

23             A.     Uh-huh.

24             Q.     Do you know what that is?

Confidential - Subject to Further Confidentiality Review

```
 1            A.    A Taihe plant, Taihe Shandong

 2     plant.

 3            Q.    If you look back at Exhibit 2,

 4     which is your responses, Distributor Profile

 5     Form, at page 4.

 6                  MR. HERMAN:  Thanks.

 7     BY MR. HERMAN:

 8            Q.    There's -- it says under 3,

 9     "Name of Chinese Drywall Product, if known,"

10     and it says "Taihe"?

11            A.    Uh-huh.

12            Q.    And then --

13                  MR. DUPLANTIER:  "Yes."

14            A.    Yes.

15     BY MR. HERMAN:

16            Q.    -- with respect to the Chinese

17     Drywall Manufacturer, if known, it says -- I

18     don't know if I'm pronouncing it right, but

19     "Taian Taishan Plasterboard Company"?

20            A.    I'm sorry, where are you?

21            Q.    On number --

22            A.    Okay.  I see.

23            Q.    -- 2 on page 1.  I'm sorry.

24            A.    Okay.
```

Confidential - Subject to Further Confidentiality Review

1           Q.      Do you know what, if any,
2    relationship there is between the Taihe
3    that's reflected on Exhibit 33 and the Taihe
4    that's reflected on page 4 of Exhibit 2, if
5    any?
6           A.      I assume they're affiliated.
7           Q.      Do you know whether there's a
8    relationship between Taian Taishan
9    Plasterboard Company and Beijing New Building
10   Materials?
11          A.      I don't know.
12          Q.      Did SGS ever do the inspection
13   that's requested here?
14          A.      No.
15          Q.      Is this something that you guys
16   filled out or that SGS filled out?
17          A.      I don't recall.
18          Q.      Okay.  If you look at 6090,
19   where it says, "Scope of Inspection"?
20          A.      Uh-huh.
21          Q.      "Verify correct quantity is
22   shipped and received," is that something that
23   you guys put in or that they typed in before
24   they sent it to you, if you know or if you

Confidential - Subject to Further Confidentiality Review

Page 170

1    remember?

2          A.      I don't remember.

3          Q.      Well, it says under number 2,

4    "Problems to look for include dents, cracks,

5    paper peel and bubbles on the paper."

6                  Do you see that?

7          A.      Yes.

8          Q.      Are those the types of things

9    that you were looking for?

10         A.      No, we did not.  We ended up

11   just inspecting the loading of the trucks.

12         Q.      Okay.

13         A.      I mean, the loading of the

14   ships.  Excuse me.

15         Q.      Okay.  When you talked about

16   damaged drywall that had come in and was sold

17   by Interior/Exterior at reduced prices, is

18   the damage that you're referring to things

19   like dents, cracks, paper peels and bubbles?

20         A.      No.  It was mainly damage,

21   forklift damage or possibly some damage on

22   the ship.  But no, not -- we didn't have any

23   paper peeling or bubbles or out of square or

24   any of those issues.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  It says, "Verify that

2     each sheet has been marked 'Made in China.'"

3                 Is there somebody that did that

4     with respect to the Knauf shipments that were

5     made?

6          A.     Yes.

7          Q.     In addition to the

8     certification that you got from Knauf?

9          A.     Oh, I'm sorry.  Did someone

10    verify that each sheet was marked "Made in

11    China"?

12         Q.     Yeah.

13         A.     No, they did not.

14         Q.     It says, "Verify all pallets

15    unloaded at port of discharge have no

16    apparent physical damage."

17                Is that the type of damage you

18    were referring to?

19         A.     Yeah, damage, you know, either

20    in the loading or unloading process of the

21    ship.

22         Q.     Okay.  "Verify that all pallets

23    have been loaded onto ship 'preslung,'" in

24    quotes.

Confidential - Subject to Further Confidentiality Review

1              What's "preslung" mean?

2       A.      Meaning it had the slings

3    underneath each pallet so that the crane in

4    New Orleans could take it off easily.

5              (Whereupon, Deposition Exhibit

6         INEX-30b6-34, 6/13/06 Taian Taishan

7         Plasterboard Letter of Certificate,

8         INT/EXT06045, was marked for

9         identification.)

10   BY MR. HERMAN:

11      Q.      Okay.  I'm going to show you

12   INEX-30b6-34, which is Bates number 6045.

13              Do you have any idea what

14   Exhibit 34 is?

15      A.      Letter of certificate.  A

16   letter of certificate.  Jim handled more of

17   the Taian or the Taihe shipments than I did.

18      Q.      Okay.  Okay.  It says -- well,

19   I'll just ask you about this, and then maybe

20   I'll ask your brother about it further, but

21   it says, "All gypsum wallboard does not

22   contain asbestos."

23              Do you see that?

24      A.      Yes.

Confidential - Subject to Further Confidentiality Review

1          Q.     Do you recall there being some

2     concern at some point about whether the

3     wallboard contained asbestos?

4          A.     I think Jim can better answer

5     that.

6                 MR. HERMAN:  Okay.  Thanks.

7                 (Whereupon, Deposition Exhibit

8          INEX-30b6-35, Listing of

9          Interior/Exterior Branches and

10         Managers, INT/EXT04561, was marked for

11         identification.)

12    BY MR. HERMAN:

13         Q.     Let me show you INEX-30b6-35,

14    which is Bates number 4561.  What is

15    Exhibit 35?

16         A.     These are locations, branch

17    locations.

18                MR. DUPLANTIER:  This is your

19         original.

20                MR. HERMAN:  Oh, okay.  Thanks.

21    BY MR. HERMAN:

22         Q.     Is this as of a certain point

23    in time?

24         A.     Yes, it was.

Confidential - Subject to Further Confidentiality Review

1        Q.      If we're talking about the

2    period from Katrina through the beginning of

3    2007, were some of these branches not in

4    operation?

5        A.      Well, Elmwood is where we went

6    after the storm, because our facility got

7    flooded.  So that's, you know, kind of one

8    and the same with New Orleans.

9        Q.      Okay.

10       A.      Those were in existence.  We

11   did open up Lafayette.  I don't remember the

12   time, but they never received any shipments

13   of Chinese board.

14       Q.      Okay.  And at some point,

15   didn't you have a place in Rome, Georgia?

16       A.      No.

17       Q.      No?  Okay.

18               Is there a place where you

19   shipped to in Rome, Georgia, like a customer?

20       A.      I believe we did.

21       Q.      Okay.  Do you remember who that

22   customer was?

23       A.      I'm not sure.

24       Q.      Okay.  I don't have copies of

Confidential - Subject to Further Confidentiality Review

Page 175

```
 1    these.  I apologize.  I just got them
 2    yesterday.  But at some point, did you have a
 3    location in Longview, Texas?
 4         A.    We do now.
 5         Q.    Was that a place that was open
 6    between Katrina and the beginning of 2007?
 7         A.    It was not -- it did not get
 8    any Chinese drywall.  It was opened, I think,
 9    about a year and a half ago.
10         Q.    Okay.  What about Tuscaloosa?
11         A.    It was opened subsequent to all
12    this.
13         Q.    What about Shreveport?
14         A.    Subsequent also.
15         Q.    And Birmingham -- oh, you have
16    Birmingham on here?
17         A.    Uh-huh.
18         Q.    Did all the locations on
19    Exhibit 35 receive Chinese drywall?
20         A.    Yes, they did.
21         Q.    What about Abita Springs?
22         A.    That's the same as Mandeville.
23    We just had moved.
24         Q.    Okay.  Is there any other place
```

Confidential - Subject to Further Confidentiality Review

1    like Rome, Georgia, where you would have made

2    shipments even though you didn't have a

3    definite location there, of Chinese drywall?

4         A.      There were a few shipments that

5    we made directly from the port to specific

6    customers.  Other than that -- and there

7    weren't that many.  Other than that,

8    everything went through our warehouses.

9              (Whereupon, Deposition Exhibit

10           INEX-30b6-36, Interior/Exterior

11           Product Shipment Documentation,

12           INT/EXT00331 - INT/EXT00344, was

13           marked for identification.)

14   BY MR. HERMAN:

15        Q.    Okay.  Let me show you

16   INEX-30b6-36, which, for the record, is

17   Bates-numbered 331 through 344.

18              Are you familiar with

19   Exhibit 36?

20        A.      Yes.

21        Q.      What is it?

22        A.      This was a -- I guess a

23   delivery form used --

24              MR. McKENNA:  I'm sorry, could

Confidential - Subject to Further Confidentiality Review

1        you speak up a little, please?

2        A.     This was a delivery form used,

3    or spreadsheet, that was set up when we were

4    shipping product from the wharf to various

5    locations.

6    BY MR. HERMAN:

7        Q.     And there's a -- I assume a

8    vessel, it says the "M/V MYSTRAS"?

9        A.     Yes.

10       Q.     And do you recall whether there

11   was drywall that came in on the M/V MYSTRAS?

12       A.     Yes, there was.

13       Q.     And do you know from which

14   manufacturer that came?

15       A.     Knauf.

16       Q.     Okay.  And then it says, just

17   so we can -- it may be kind of tedious, but

18   might be helpful to people understanding

19   later.

20            If we go through these columns,

21   the delivery date is when the drywall was

22   actually delivered or when it was expected to

23   be delivered, if you know?

24       A.     It appears to be the same as

Confidential - Subject to Further Confidentiality Review

Page 178

1    the scheduled pickup date, so, apparently --

2    it appears to be the date that it was

3    scheduled.

4            Q.    Okay.  And then it says, "From

5    WHSE."  What does that mean?

6            A.    I'm sorry, "From Warehouse A."

7            Q.    And where is warehouse A

8    located?

9            A.    We set up -- in our system, we

10   set up a warehouse for each ship that came

11   in, to make the accounting easier.

12           Q.    Okay.

13           A.    So it's shipped from

14   warehouse 1.  That first delivery, for

15   instance, went from warehouse 1 to Baton

16   Rouge, our Baton Rouge branch.

17           Q.    Okay.  And then there's a

18   product number, 41212R, which seems to --

19           A.    That's the only product that we

20   got.

21           Q.    That is kind of a product ID

22   for drywall?

23           A.    Yes, it is.

24           Q.    And is that like kind of an

Confidential - Subject to Further Confidentiality Review

1    Interior/Exterior internal number?

2           A.    Yes.

3           Q.    Is that a number that's used by

4    or for anybody else?

5           A.    For everybody else.

6           Q.    So like RSMeans, Xactimate,

7    people like that?

8           A.    I'm sorry, what?

9           Q.    Who else would use --

10          A.    That's just a number that we

11   generated years ago, and that's how we define

12   4x12x1/2" regular sheetrock.

13          Q.    Okay.  So it is just

14   Interior/Exterior?

15          A.    Just us.  Just us.

16          Q.    Okay.  I'm sorry, I

17   misunderstood you.

18                Then it says, "Quantity

19   Pallet"?

20          A.    Uh-huh.

21          Q.    Is that the number of pallets

22   or the quantity that's in each pallet?

23          A.    Quantity per pallet.

24          Q.    Okay.  And then it says,

Confidential - Subject to Further Confidentiality Review

Page 180

1     "Quantity Per Truck."  Is that the number of

2     pallets per truck or...

3           A.     Total number of pieces per

4     truck.

5           Q.     Oh, pieces per truck.  Okay.

6                  Then there's a BL number.  What

7     does a BL number mean?

8           A.     Bill of lading number.

9           Q.     And that shows what bill of

10    lading the shipment is associated with?

11          A.     Yes.

12          Q.     What's "WT Number"?

13          A.     That's a transfer number that

14    we use in our system.

15          Q.     What is it supposed to

16    describe?

17          A.     Just like you would have an

18    invoice number.  It's a number that shows,

19    you know, where it came from and where it

20    went to.

21          Q.     Okay.  And then it says, "To

22    Branch"?

23          A.     Baton Rouge.

24          Q.     And that's the

Confidential - Subject to Further Confidentiality Review

1    Interior/Exterior Baton Rouge branch?

2         A.    Yes.

3         Q.    And then it says, "Inland

4    Carrier"?

5         A.    That's the freight company that

6    handled it.

7         Q.    Okay.  "Scheduled Pickup Date,"

8    "Pickup Confirmed, Yes."

9               What's the "Coastal Dock

10   Receipt Number"?

11        A.    Coastal Cargo handled the -- I

12   guess the stevedoring for us, so that's their

13   number.

14        Q.    Okay.  And was that true for

15   all the shipments?

16        A.    I don't think so.

17        Q.    Okay.  What other stevedoring

18   outfits do you recall doing work for you?

19        A.    I don't recall.

20        Q.    Okay.  And what's "JWA Invoice

21   Number"?

22        A.    That's J.W. Allen, the freight

23   forwarder.  That's their invoice number to

24   us.

Confidential - Subject to Further Confidentiality Review

1      Q.     Okay.  And then is the invoice
2    date -- what's that relate to?
3      A.     I would assume that that's
4    related to the J.W. Allen invoice number, but
5    I'm not positive.
6      Q.     Okay.  Why would the same
7    shipment have different invoice dates, if you
8    know?
9      A.     Have different -- I'm sorry?
10      Q.     Why would the same shipment on
11    the same ship have different invoice dates,
12    if you know?
13      A.     Because, you know, we got in
14    quite a bit of material at one time, and
15    there's several -- you know, one truck at a
16    time would go out.
17      Q.     So it's an invoice that's
18    associated with the distribution, not the
19    importing?
20      A.     Correct.
21      Q.     Okay.  Are any of these numbers
22    on the drywall itself?
23      A.     Are any of these numbers?
24      Q.     I mean, is there any way to

Confidential - Subject to Further Confidentiality Review

1    look at the drywall and say, "Okay.  This

2    came in on this ship," or "in this shipment"?

3         A.    No.

4         Q.    I thought this was the thing

5    that talked about Rome, Georgia.  Oh, here it

6    is.

7              If you look at the last page,

8    344, does this refresh your recollection

9    about any shipments to Rome, Georgia?

10        A.    Yeah, I believe we shipped it

11   to -- I think it was a distributor in Rome,

12   Georgia, not to an end-user.  But I'm not

13   positive.

14             (Whereupon, Deposition Exhibit

15        INEX-30b6-37, Freight Company Shipping

16        Documents, INT/EXT00004 -

17        INT/EXT00005, was marked for

18        identification.)

19   BY MR. HERMAN:

20        Q.    Okay.  INEX-30b6-37, Bates

21   number 4 and 5.  Do you have any idea what

22   Exhibit 37 is?

23        A.    It looks like some sort of

24   receipt for the freight company that took

Confidential - Subject to Further Confidentiality Review

Page 184

1    it -- that took the product to our Houston

2    office.

3         Q.    Okay.  And can you tell which

4    type of sheetrock we're dealing with, in

5    terms of Knauf versus Taihe or anything like

6    that?

7         A.    No.

8         Q.    Okay.  On the front page, it

9    says, "Material Received in Good Condition,"

10   and somebody signed off on that.  Do you know

11   who that person is?

12        A.    I'm sorry, where are you seeing

13   that?

14        Q.    "Material Received in Good

15   Condition."  It looks like "Peter Gonzo" or

16   Ganza or something.  Garza?

17              It's not an employee of

18   Interior/Exterior in Houston that you

19   recognize?

20        A.    Not that I recognize.

21        Q.    Okay.  And it looks like

22   there's a notation that says, "No paperwork."

23              Do you know what that means?

24        A.    No.

Confidential - Subject to Further Confidentiality Review

Page 185

1          Q.      And if we look at the second

2     page, it says, "Carrier agrees to notify

3     Sutex of any problems as they occur and when

4     the load has been delivered.  Failure to do

5     so will result in $100 deduction from carrier

6     pay."

7                  Do you see that?

8          A.      Okay.

9          Q.      Is it fairly standard that the

10    carrier was supposed to notify of any

11    problems as soon as they occurred, if there

12    was some problem during shipping?

13         A.      I'm not sure who Sutex is.

14         Q.      Okay.  Well, you certainly

15    don't recall anybody -- you receiving any

16    notice of any problems during shipping,

17    correct?

18         A.      No.  No.

19         Q.      And --

20         A.      I will say there were a couple

21    of loads that -- you know, that were untarped

22    that we talked to the freight lines about,

23    but that's the only issue we ever had with

24    the freight lines.

Confidential - Subject to Further Confidentiality Review

1          Q.      If they were untarped, does

2    that mean that they would have incurred any

3    type of water intrusion?

4          A.      Possibly.

5          Q.      And did you inspect any of

6    those affected boards or potentially affected

7    boards?

8          A.      The manager would have at the

9    branch.

10         Q.      Okay.  And were you ever

11   advised by any manager at any branch that any

12   of the drywall had been affected by seawater

13   or other water?

14         A.      There were some untarped loads,

15   not seawater, but untarped loads, and it

16   could have had some rain on them.

17         Q.      Okay.  And what, if anything,

18   did Interior/Exterior do about that?

19         A.      I don't recall whether those

20   were thrown away or we back-charged the

21   freight company.  I don't recall.  It was a

22   minor amount in the big picture.

23                 (Whereupon, Deposition Exhibit

24         INEX-30b6-38, Interior/Exterior

Confidential - Subject to Further Confidentiality Review

```
 1            Invoices, INT/EXT19884, INT/EXT24995,
 2            INT/EXT17768, INT/EXT17901,
 3            INT/EXT19699, INT/EXT17467,
 4            INT/EXT17432, INT/EXT21205,
 5            INT/EXT31881, INT/EXT33080,
 6            INT/EXT24700, was marked for
 7            identification.)
 8     BY MR. HERMAN:
 9            Q.    Okay.  I'm going to show you
10     INEX-30b6-38.  And this consists of, for the
11     record, Bates numbers 19884, 24995, 17768,
12     17901, 19699, 17467, 17432, 21205, 31881,
13     33080 and 24700, which are just kind of a
14     sampling of invoices so we can try to get
15     some kind of understanding about how the
16     drywall is delivered to the customer.
17            Do you recognize these as basic
18     Interior/Exterior invoices?
19            A.    Yes.
20            Q.    And there's kind of a "Ship To"
21     date and then a "Bill To" date.  Do you see
22     that?
23            A.    Yes.
24            Q.    What's the distinction between
```

Confidential - Subject to Further Confidentiality Review

1    the "ship to" and the "bill to"?

2         A.     The "bill to" is where the

3    company wanted their invoices sent.  "Ship

4    to" is where the product was shipped.

5         Q.     Okay.  And if we look at the

6    first one, which is Bates-numbered 19884, it

7    looks like it was shipped to Lowe's

8    store 594.  Do you see that?

9         A.     Yes.

10         Q.     And then it says it's billed to

11    Lowe's Companies?

12         A.     Yes.

13         Q.     And there's a -- it shows

14    4x12x1/2" regular sheetrock.  You see that?

15         A.     Yes.

16         Q.     Can you tell by looking at this

17    invoice whether it's Chinese or domestic?

18         A.     No, I can't.

19         Q.     Do you recall selling Chinese

20    drywall to Lowe's?

21         A.     We sold domestic, and we sold

22    imported, and we did not make a distinction.

23         Q.     Well, for a certain time

24    period, it's my understanding that you were

Confidential - Subject to Further Confidentiality Review

Page 189

```
 1    generally selling the one-1/2" regular from
 2    China, and it was the 5/8ths that was
 3    domestic; is that right?
 4                 MR. DUPLANTIER:  I'm going to
 5            object to the form of the question.  I
 6            don't think that's been the testimony
 7            today.
 8                 MR. HERMAN:  Okay.  How am I
 9            wrong?
10                 THE WITNESS:  I'm sorry, can
11            you repeat?
12                 MR. HERMAN:  Yeah.
13    BY MR. HERMAN:
14         Q.    In terms of the time period
15    from January 26th, 2006, to the end of 2006
16    or early 2007, I had thought that you guys
17    said, or one of you said that you basically
18    made a decision that you would import Chinese
19    drywall for 4x12x1/2 regular, and then you
20    would use domestic for the 5/8ths; is that
21    not correct?
22         A.    We only brought in 4x12x1/2"
23    regular from overseas.  We did, however -- it
24    did not meet our demand, so we bought
```

Confidential - Subject to Further Confidentiality Review

1    domestic 4x12x1/2" also, along with 5/8ths

2    and all the other products.

3         Q.     Okay.  And do you have some

4    quantification of, you know, for that time

5    period, you got x amount from China -- I'm

6    just talking about the one-half regular.  You

7    know, x percentage from Chinese versus x

8    percentage from wherever you brought it from

9    domestically?

10        A.     I did a spreadsheet on that,

11   and I'm trying to remember what it was.  But

12   my recollection was -- I think in that time

13   frame, was we shipped somewhere in the

14   neighborhood of 1.8, 1.9 million sheets of

15   4x12x1/2".  That's including what was brought

16   from overseas.

17        Q.     And do you know how much of

18   that was brought from overseas?

19        A.     I believe, including Wuhu,

20   including Taihe, was in the neighborhood of

21   511,000 sheets.

22        Q.     And you didn't -- when I say

23   "you," I mean Interior/Exterior didn't

24   capture in its standard invoice whether it

Confidential - Subject to Further Confidentiality Review

1    was Chinese-manufactured or

2    domestic-manufactured or who the specific

3    manufacturer was; is that correct?

4         A.    No.  No.  There were notes on

5    occasion.  If a customer had a preference and

6    requested something, there were notes on

7    occasion, but nothing uniformly.

8         Q.    Okay.  Did you ever have anyone

9    from Lowe's say, "We don't want Chinese

10   wallboard"?

11        A.    No.

12        Q.    Do you ever recall delivering

13   Chinese wallboard to Lowe's and having them

14   send it back?

15        A.    I don't recall, no.

16        Q.    Was there a cost difference

17   between the Chinese wallboard and the

18   domestic wallboard during this 2006 time

19   frame?

20        A.    No.

21        Q.    Not to the customer?

22        A.    Are you talking about sale

23   price?

24        Q.    Well, I was going to try to

Confidential - Subject to Further Confidentiality Review

Page 192

1    break it down.

2            A.      Okay.

3            Q.      Let's talk about sale price

4    first to the customer.

5            A.      Okay.  Okay.

6                    No.  I mean, the market

7    fluctuated, and each market is different.  So

8    the sale price fluctuated by market and by

9    time frame.

10           Q.      Okay.  But you don't recall

11   having a clear distinction where you broke it

12   down where, you know, "I'll give you American

13   for x price and Chinese for less"?

14           A.      No.  No.  The only distinction

15   would have been the damaged product that we

16   talked to you about that was busted.

17           Q.      Okay.  What about on the

18   purchase side, was there a general difference

19   between the purchase price of the Chinese

20   versus the American?

21           A.      No, it was at or near the

22   market price.

23           Q.      And what were the American

24   brands that you were selling at that time?

Confidential - Subject to Further Confidentiality Review

Page 193

1          A.      National Gypsum.

2          Q.      And that's gold board?

3          A.      Gold Bond.

4          Q.      Gold Bond?

5          A.      National Gypsum, U.S. Gypsum, I

6      think Temple-Inland, and maybe CertainTeed

7      also, and possibly American Gypsum.

8          Q.      And this spreadsheet that you

9      did, was that done for litigation purposes,

10     or that was done just in ordinary business

11     purposes?

12         A.      It was done for litigation.

13         Q.      Okay.

14              MR. HERMAN:  Do you know

15         whether you produced it or whether

16         it's work product?  I mean, I can't

17         recall whether we got it or not.  We

18         may have, but I'm just --

19              MR. DUPLANTIER:  I believe we

20         produced it.

21              MR. HERMAN:  Okay.

22              THE WITNESS:  I don't know that

23         we did.

24              MR. DUPLANTIER:  Okay.

Confidential - Subject to Further Confidentiality Review

1                  MR. HERMAN:  Well, we'll figure

2          it out.  Okay.

3                  THE WITNESS:  It wasn't

4          something that anybody -- I just put

5          it together to see how much domestic

6          versus imported that we bought.

7                  MR. HERMAN:  Okay.

8                  MR. DUPLANTIER:  Oh, that

9          spreadsheet, you're talking about.

10                 THE WITNESS:  Yeah.

11                 MR. DUPLANTIER:  I thought you

12         were talking about the calculation of

13         the cost, because we did produce that.

14                 THE WITNESS:  Oh.  No.  No.

15                 MR. HERMAN:  Well, is it work

16         product?

17                 MR. DUPLANTIER:  The

18         calculation of the cost?  No, we don't

19         consider that to be work product.  I

20         believe that's been produced.

21                 MR. HERMAN:  Okay.  And what

22         about the breakdown of U.S. to

23         Chinese?

24                 MR. DUPLANTIER:  I -- we have

Confidential - Subject to Further Confidentiality Review

Page 195

1           no objection to producing that to you.

2           We've produced all invoices for all

3           sales of drywall during the relevant

4           period of time.

5                 THE WITNESS:  Yeah, the sum of

6           all those invoices should equal the

7           number that you're talking about.

8                 MR. DUPLANTIER:  So you can

9           take those and do your calculation.

10   BY MR. HERMAN:

11           Q.    The second one is Bates

12   number 24995.  There's a "ship to," which is

13   a Home Depot in Baton Rouge.  See that?

14           A.    Yes.

15           Q.    And then there's a "bill to,"

16   Home Depot in Atlanta, Georgia.  Is that just

17   the corporate headquarters of Home Depot?

18           A.    That's where they accept their

19   invoices.

20           Q.    Okay.  And then it says in the

21   invoice, "Off George O'Neal, T/L into White

22   Oak Place, first house on right."

23                 Do you know what that is?

24           A.    Appears to be kind of more

Confidential - Subject to Further Confidentiality Review

Page 196

1    specific directions to get to the -- possibly

2    to the house where it was delivered.

3         Q.    Did Home Depot somehow, on some

4    occasions, purchase drywall that

5    Interior/Exterior would deliver or arrange

6    for the delivery to specific properties?

7         A.    Normally, the only time we

8    shipped to Home Depot was -- we have crane

9    trucks, boom trucks with labor, and we'll go

10   and -- we call it stocking a job for them,

11   and spread the material out in the house and

12   then bill Home Depot, and Home Depot will

13   bill their customer.

14        Q.    Okay.  And did the same thing

15   happen with Lowe's?

16        A.    Yes.  We did not usually ship

17   directly to a Lowe's store.  They would buy

18   their own drywall for their own customers

19   that come in, but it would be product that

20   they wanted stocked at a house.

21        Q.    Okay.  But it looks like, to me

22   at least, if you look at the first page,

23   19884, it looks like it's actually going to a

24   store, huh?  Oh.  Oh, okay.

Confidential - Subject to Further Confidentiality Review

Page 197

```
 1          A.      "Lot 2, Acton Meadows."
 2          Q.      I see.  Okay.  So it's actually
 3    going to a lot?
 4          A.      Yeah.
 5          Q.      Okay.  And then Lowe's is going
 6    to bill the customer for that?
 7          A.      The customer, yeah.
 8          Q.      Okay.  And then if we look at
 9    the third one, 17768, it looks like it's
10    billed to Creola Ace Hardware.  Do you know
11    what that is?
12          A.      Creola Ace is a -- I think
13    they're a -- some type of hardware store, and
14    they bought product and sold it to -- looks
15    like Mitchell.
16          Q.      Okay.  And what's Mitchell, to
17    your knowledge?
18          A.      It's a construction company.
19          Q.      Okay.  And where -- there's an
20    address there.  Do you know whether that's
21    the actual Mitchell Corporation address or
22    whether that's a house that they were
23    building?
24          A.      I don't know.
```

Confidential - Subject to Further Confidentiality Review

Page 198

```
 1          Q.    Okay.  Do you know what was
 2     ordinarily the procedure, in terms of
 3     Mitchell?
 4          A.    In terms of Mitchell, no, I
 5     don't.
 6          Q.    Okay.  Then we've got Bailey
 7     Lumber in 17901.  Do you know what Bailey
 8     Lumber is?
 9          A.    Bailey Lumber is a customer of
10     ours.  They're a lumber yard, and we --
11     similar to what you mentioned with Home
12     Depot, we will -- they'll call us and say,
13     "Hey, deliver 200 sheets to Mrs. Smith's
14     house on number 12 Elmwood Lane," and we'll
15     go deliver it and bill them and they bill the
16     customer.
17          Q.    Okay.  So on 17901, where it
18     talks about 98 Mount Vernon Court in Ocean
19     Springs, based on your experience, that would
20     be the house that Bailey was building and not
21     the actual Bailey facility?
22          A.    Not building.  They're a supply
23     company also.  They're a lumber yard.
24          Q.    Okay.  They're -- okay.
```

Confidential - Subject to Further Confidentiality Review

```
 1          A.     Once again, we have the crane
 2    trucks and the labor, and they're not set up
 3    for that.
 4          Q.     Okay.  What is 84 Lumber?
 5          A.     A lumber company also.  Similar
 6    situation.
 7          Q.     And you supplied them with
 8    drywall?
 9          A.     Yes.
10          Q.     Do you know whether you gave
11    them Chinese, domestic or both?
12          A.     Do not know.
13          Q.     Do you know whether you gave
14    Bailey Chinese, domestic or both?
15          A.     Do not.
16          Q.     Do you know whether you gave
17    Mitchell Chinese, domestic or both?
18          A.     I do not.
19          Q.     Do you know whether you gave
20    Creola Ace Hardware Chinese, domestic or
21    both?
22          A.     Do not.
23          Q.     Do you know whether you gave
24    Home Depot Chinese, domestic or both?
```

Confidential - Subject to Further Confidentiality Review

Page 200

    1          A.      Do not.

    2          Q.      All right.  17467 is Llano

    3     Construction Company.  Do you know what that

    4     is?

    5          A.      A construction company here in

    6     New Orleans.

    7          Q.      And you supplied them with

    8     drywall?

    9          A.      Yes.

   10          Q.      Do you know whether you gave

   11     them Chinese, domestic or both?

   12          A.      Do not.

   13          Q.      Did you guys supply Habitat for

   14     Humanity with drywall?

   15          A.      Yes.

   16          Q.      Do you know whether you gave

   17     them Chinese, domestic or both?

   18          A.      Do not.

   19          Q.      Okay.  If you look at 24700, it

   20     says "Ship To:  Royal Homes."

   21               Do you know what Royal Homes

   22     is?

   23          A.      Royal Homes, I believe, is a

   24     builder.

Confidential - Subject to Further Confidentiality Review

1          Q.      Okay.  And it says, "Bill To:

2    Louisiana Lumber."

3                  Do you know what Louisiana

4    Lumber is?

5          A.      Yes.

6          Q.      What's that?

7          A.      A lumberyard.

8          Q.      And you supplied Louisiana

9    Lumber with drywall?

10          A.      Yes.

11          Q.      Would you generally give the

12    drywall to Louisiana Lumber, or you would

13    deliver it to the actual house that was being

14    built or under construction?

15          A.      Typically, deliver straight to

16    the house.

17          Q.      Okay.  So here we have "68034

18    Marion, corner of Strain Road and Marion" --

19          A.      Uh-huh.

20          Q.      -- in Mandeville?

21                  So that's the house that the

22    drywall would have been delivered to?

23          A.      Yes.

24          Q.      And you can't tell from looking

Confidential - Subject to Further Confidentiality Review

1    at this invoice whether it was Chinese,

2    domestic or both?

3             A.      No.

4                     (Whereupon, Deposition Exhibit

5             INEX-30b6-39, 10/24/05 Davis E-mail to

6             C. Geary, Subject: USA Wallboard,

7             INT/EXT00623, was marked for

8             identification.)

9    BY MR. HERMAN:

10            Q.      I show you INEX-30b6-39.  Do

11   you recall getting this or seeing it or...

12            A.      I recall seeing it.

13            Q.      Okay.  It says, "We have found

14   it difficult to find both marine insurance

15   and a vessel."

16                    This is from the guy at Knauf?

17            A.      This is from John Davis, who I

18   understood to be kind of the salesman.

19            Q.      Okay.  "There may be up to

20   60 days' wait for a vessel to the Gulf of

21   Mexico.  You may want to consider organizing

22   the shipping from your end.  Again, as

23   mentioned before, we've always sold strictly

24   FOB for all of our export orders."

Confidential - Subject to Further Confidentiality Review

1           And do you recall that you did

2      arrange for the shipping on your end?

3           A.      Yes.

4           Q.      And it says, "Previously, we

5      have sent over the ASTM test report via

6      e-mail.  Is that sufficient?"

7               Do you know whether that's the

8      test report that we looked at earlier?

9           A.      I don't know.

10              (Whereupon, Deposition Exhibit

11              INEX-30b6-40, 11/23/05 App E-mail to

12              C. Geary, Subject: Wallboard

13              Business - Continuation, INT/EXT04048,

14              was marked for identification.)

15      BY MR. HERMAN:

16           Q.      Okay.  This is INEX-30b6-40,

17      Bates number 4048.  It says, "Rudy leaves

18      for," I guess, "China tomorrow and will

19      return on December 7th."

20               Do you know who Rudy is?

21           A.      Rudy worked for J.W. Allen.

22           Q.      It says, "I want him to learn

23      as much as he can on how this business is

24      done in China."

Confidential - Subject to Further Confidentiality Review

```
 1                    Do you know specifically what
 2      Rudy was doing over there?
 3           A.     As I recall, Rudy was going
 4      over to, you know, inspect the product as it
 5      was -- that first shipment -- well, that
 6      would be too early, actually.
 7                    I don't recall.
 8           Q.     It says, "Rudy and Weida
 9      Freight Systems have an appointment to visit
10      Knauf on November 28th."
11                    Do you know what they were
12      supposed to be doing when they were visiting
13      Knauf?
14           A.     I don't remember.
15           Q.     In terms of observing the
16      actual shipping, that would be where the
17      plasterboard was loaded onto the ship?
18           A.     Yes.
19           Q.     Is the plasterboard loaded onto
20      the ship at the plant?  Is the plant on a
21      port?
22           A.     I don't know.
23           Q.     It says, "Would it be okay for
24      Rudy to visit Beijing New Building Materials
```

Page 205

1    Company?  The only reason we want to visit is

2    that the more you meet and have some dialogue

3    is the better we become and can better handle

4    your business."

5              Do you recall that?

6         A.    Yes.  I guess once again, at

7    that point in time, to try and develop any

8    relationships to try and get board from

9    another manufacturer.

10             (Whereupon, Deposition Exhibit

11             INEX-30b6-41, E-mail Chain Ending

12             1/10/06 App E-mail to C. Geary,

13             Subject: Update - Pallet Weights -

14             Imported Wallboard, INT/EXT00030, was

15             marked for identification.)

16   BY MR. HERMAN:

17        Q.    Okay.  I'm going to show you

18   INEX-30b6-41, which, for the record, is Bates

19   number 30.  And if you look at the e-mail on

20   the bottom from Mr. App, it says, "The

21   M/V MYSTRAS, our first vessel, will discharge

22   at 7th Street, January 13th."

23             Do you recall that?

24        A.    I recall the e-mail, yes.

Page 206

1        Q.     And is this the first shipment

2    of Chinese drywall coming in, to the best of

3    your recollection?

4        A.     Yes.

5        Q.     And then do you know who Ray

6    Hardin is?

7        A.     Where?

8        Q.     He's the middle e-mail.

9        A.     Oh.  No.  No, I don't know him.

10       Q.     Okay.  Do you recall using CSX

11   Transportation for something?

12       A.     I don't recall if we did or

13   not.

14       Q.     Okay.  It says, "CSX

15   Transportation will not accept for

16   transportation any AAR Section 5 Figure 101 A

17   or B loads with incomplete layers."

18          Do you have any idea what that

19   means?

20       A.     No, I do not.

21       Q.     "Loads must be level."

22          Do you know what that means?

23       A.     I'll assume it just means that

24   they need to be level.

Confidential - Subject to Further Confidentiality Review

Page 207

1          Q.     Okay.  "It will also be

2     necessary to replace the water barrier

3     because CSX does not pay for water damage

4     claims on open-top loads."

5               Do you know what that means?

6          A.     No.

7               (Whereupon, Deposition Exhibit

8          INEX-30b6-42, E-mail Chain Ending

9          3/9/06 App E-mail to C. Geary,

10         Subject: IEBS and Pan Ocean,

11         INT/EXT03928, was marked for

12         identification.)

13    BY MR. HERMAN:

14         Q.     Okay.  Let's look at

15    Exhibit 42, which, for the record, is Bates

16    number 3928.

17               Do you recall ever seeing this

18    e-mail?

19         A.     Yes.

20         Q.     Okay.  If you look under 8, it

21    says, "When you lift the Knauf package with a

22    forklift, the package bends from the lift,

23    machine forks out.  This breaks the outside

24    packaging and loosens the bands."

Confidential - Subject to Further Confidentiality Review

Page 208

1               Do you see that?

2          A.    Uh-huh.

3          Q.    Do you recall ever being

4     advised about that?

5          A.    What was happening at this time

6     was there's some shipments, apparently, in

7     other parts of the country that had a lot of

8     damage, and there was a lot of going back and

9     forth as far as the packaging and did more

10    need to be done as far as the packaging.

11         Q.    Did you have any concern that

12    this was an indication of some problem with

13    the drywall itself?

14         A.    No.

15         Q.    It says, "When you lift the

16    BNBM units with wood pallets, the unit

17    remains flexed and solid across the length of

18    the unit, thus not loosening the bands or

19    outer protection."

20              Do you know what that means?

21         A.    I assume that it means it's not

22    going to bend on the ends.

23         Q.    Okay.  Because of the way that

24    it's packaged?

Confidential - Subject to Further Confidentiality Review

Page 209

```
 1           A.     Yes.

 2           Q.     Okay.  And then it says, "I am

 3   by far not an expert, but I have seen the

 4   rehandled Knauf packages."

 5                  Do you know what that means?

 6           A.     He's seen our ships being

 7   loaded and unloaded in New Orleans.

 8           Q.     Okay.  This would have been

 9   after -- this is March of 2006, so it's after

10   you've already gotten a couple?

11           A.     Right.  I'm not sure if we got

12   a couple.  I know we had one at that point.

13                  (Whereupon, Deposition Exhibit

14                  INEX-30b6-57, 7/21/06

15                  M/V ALEXANDERGRACHT Pre-Loading Survey

16                  of Gypsum Boards, INT/EXT00091 -

17                  INT/EXT00097, was marked for

18                  identification.)

19   BY MR. HERMAN:

20           Q.     Okay.  Let me show you --

21                  MR. HERMAN:  Oh, I'm way ahead

22                  of myself, but that's okay.  Does it

23                  matter if the exhibit numbers are

24                  messed up?
```

Confidential - Subject to Further Confidentiality Review

```
 1                    THE REPORTER:  (Shakes head.)

 2                    MR. HERMAN:  Okay.

 3    BY MR. HERMAN:

 4         Q.    Skipping ahead to INEX-30b6-57,

 5    which, for the record, is Bates number 91 to

 6    97, do you have any idea what we're looking

 7    at?

 8         A.    It looks like a surveyor's

 9    report on a shipment.  The ship name was

10    ALEXANDERGRACHT.

11         Q.    And do you know whether this

12    relates to a specific shipment of Chinese

13    drywall?

14         A.    I believe it does.

15         Q.    It talks about "July 20th,

16    2006, in order to survey and report on the

17    preloading condition of gypsum boards to be

18    exported from Shanghai, China to New Orleans,

19    USA."

20                    Do you see that?

21         A.    Uh-huh.

22         Q.    And do you know whether this

23    was a Knauf shipment or a Taihe shipment?

24                    MR. SANDERS:  Object to form.
```

Confidential - Subject to Further Confidentiality Review

1           A.      If it was Shanghai, I would

2      assume it was the Wuhu shipment.

3      BY MR. HERMAN:

4           Q.      Okay.  And what was the purpose

5      of getting this report?

6           A.      Weida Freight -- well,

7      J.W. Allen had gone over there before to

8      inspect the shipments that had left.  And

9      Weida Freight, on our behalf, had -- well,

10     J.W. Allen contracted Weida Freight, who

11     apparently contracted these China Marine

12     Surveyors to inspect the product before it

13     got loaded on the ship.

14          Q.      China Marine Surveyors and

15     Sworn Measurers Corp.?

16          A.      Yes.

17          Q.      Okay.  And they were supposed

18     to make sure that there was nothing wrong

19     with the drywall at the time it got put on

20     the ship, right?

21          A.      Loaded onto the ship.

22          Q.      At least nothing obvious?

23          A.      Correct.

24                  (Whereupon, Deposition Exhibit

Confidential - Subject to Further Confidentiality Review

Page 212

```
 1            INEX-30b6-43, E-mail Chain Ending
 2            3/10/06 App E-mail to to Bernas,
 3            Subject: LOI of 8 tires hold -
 4            Wallboard, INT/EXT03916, was marked
 5            for identification.)
 6       BY MR. HERMAN:
 7            Q.    I'm going to show you
 8       INEX-30b6-43, which, for the record, is Bates
 9       number 3916.  You ever recall seeing this
10       e-mail?
11            A.    Vaguely.
12            Q.    It says, "Unfortunately on the
13       third vessel, on the water now, was delayed,
14       and the manufacturer had to put about a third
15       of the cargo into public storage."
16                 Do you recall that happening?
17            A.    Yes.  We had a lot of trouble
18       getting a ship at that point.
19            Q.    Do you recall having any
20       concerns, other than the delays, about the
21       cargo having to sit in public storage?
22            A.    No.
23            Q.    And there's never any
24       indication that there was any contamination
```

Confidential - Subject to Further Confidentiality Review

```
 1    or anything happened to the drywall while it
 2    was sitting in public storage, is there?
 3         A.    No.
 4         Q.    Okay.  "Rudy was present in
 5    China for the first loading, and we were both
 6    at the wharf in New Orleans for discharge.
 7    In our opinion, the package looks beat up,
 8    but the contents is in good shape.  The scrap
 9    board does what it is supposed to do and
10    protect the contents."
11              I think I have an
12    understanding, but just for the record, can
13    you explain how the packaging works to
14    protect the contents?
15         A.    They had rejected board, you
16    know, that they would put around the product
17    to protect it, and then I think they banded
18    it, as I recall, and it was palletized, so
19    you could get a forklift underneath the
20    pallet, or sling, as we talked about earlier.
21         Q.    And nobody was going to use
22    that external drywall anyway, correct?
23         A.    No.  No.
24         Q.    And did Interior/Exterior ever
```

Confidential - Subject to Further Confidentiality Review

Page 214

 1    sell that wrapped drywall --

 2         A.     No.

 3         Q.     -- at discounted prices or

 4    anything?

 5         A.     No.

 6         Q.     Okay.  And based on your

 7    recollection for this shipment, even though

 8    some of the outer stuff was banged up, the

 9    internal contents appeared to be in good

10    shape?

11         A.     Yes.

12         Q.     Okay.  It says, "Our Chinese

13    manufacturer is Knauf, and they use scrap

14    board cut in strips as risers under the

15    wallboard for pallets."

16                Is that pretty much what you

17    just described, or is that something else?

18         A.     Yeah, when they made the

19    pallets, they cut it into what they call

20    dunnage, and it was, I don't know, four or

21    six inches high, and spaced those so that you

22    can get a forklift under it.

23         Q.     Okay.  "Another Chinese

24    manufacturer, BNBM, uses wood strips and

Confidential - Subject to Further Confidentiality Review

Page 215

1    plywood under the package and is a better

2    package, but, again, I believe that Knauf's

3    is adequate."

4              Did this have anything to do

5    with your shipping -- with your -- excuse me.

6    Strike that.

7              Did the packaging that Knauf

8    used have anything to do with

9    Interior/Exterior switching from Knauf to

10   Taihe?

11        A.    No.

12        Q.    Do you have any idea what this

13   Pan Ocean Company is, that they're talking

14   about?

15        A.    Pan Ocean, I think, was one of

16   the vessels that they were trying to get, and

17   I don't know whether they got them or not.

18   But it was a time when, once again, we were

19   having trouble getting ships.

20        Q.    Okay.  And there's some talk

21   about how high the pallets are stacked or how

22   high the boards are stacked on the pallet.

23   Why is that a concern, if at all?

24        A.    Frankly, you know, we didn't

Confidential - Subject to Further Confidentiality Review

Page 216

1    end up having a problem with our shipments,

2    but apparently in some other places, there

3    were problems. And so the freight -- or the

4    shipping companies were concerned about the

5    packaging, more than we were.  We felt like

6    it discharged, for the most part, fine.

7                   (Whereupon, Deposition Exhibit

8              INEX-30b6-44, E-mail Chain Ending

9              3/24/06 Norris E-mail to C. Geary,

10             Subject: Interior/Exterior Building

11             Supply (IEBS), INT/EXT02445 -

12             INT/EXT02447, was marked for

13             identification.)

14   BY MR. HERMAN:

15        Q.    Okay.  Let me show you

16   INEX-30b6-44, Bates number 2445 through 2447.

17   First of all, do you remember this

18   correspondence from Mr. App to Cecilia Wang?

19        A.    Yes.

20        Q.    And do you recall the

21   circumstances under which this was generated?

22        A.    I guess I have to read it in

23   detail.

24        Q.    Was there a concern on

Confidential - Subject to Further Confidentiality Review

Page 217

1    J.W. Allen's part, to your knowledge, that

2    Knauf wasn't going to want to do business

3    with J.W. Allen or you guys anymore, for some

4    reason?

5         A.    Knauf got mad at Weida Freight

6    for a while, having to do with the logistics.

7    Everybody was getting frustrated because we

8    couldn't get a shipping line to take the ship

9    because it was a very busy time, apparently.

10   So there was some -- some difficulty between

11   those two, Weida and Knauf.

12        Q.    And they wanted to ship in

13   containers and you wanted to do the break

14   bulk, was the other thing, or...

15        A.    They said it would be a lot

16   easier for them to do it in container.

17        Q.    Okay.  There's something in

18   here one, two, three -- six paragraphs down,

19   that says, "Further, the inland distance to

20   Alabama, Texas and Georgia is 300 to

21   600 miles, and the containers need to be

22   returned to the Port of New Orleans at a

23   cost of $1.25 per mile."

24             We talked about Rome, Georgia.

Confidential - Subject to Further Confidentiality Review

Page 218

1      Were there any other places in Georgia that
2      you were shipping to or concerned about
3      delivering to?
4             A.     I don't know if we shipped
5      anywhere else in Georgia.  I don't think so,
6      but I'd have to check the invoices.
7             Q.     Okay.  It says at the bottom,
8      "GWB is not the preferred cargo of vessel
9      owners."
10            Do you know why that is?
11            A.     I think it had gotten a bad
12     reputation because of some damage they'd had
13     off-loading or in transit with one shipment.
14            Q.     Well, later in this, they talk
15     about, "We observed severe damage in
16     Virginia, 45%; and Port Manatee, 35%."
17            Do you have any idea whose
18     drywall that is or what shipments they're
19     talking about?
20            A.     We'd gotten some pictures sent
21     to us.  I'm sure they're in the -- what we
22     produced.  But I don't know any details about
23     them.
24            (Whereupon, Deposition Exhibit

Confidential - Subject to Further Confidentiality Review

Page 219

```
 1           INEX-30b6-45, E-mail Chain Ending
 2           3/31/06 App E-mail to Wei & Li,
 3           Subject: Great Immensity,
 4           INT/EXT03865, was marked for
 5           identification.)
 6      BY MR. HERMAN:
 7           Q.    Okay.  I'm going to show you
 8      INEX-30b6-45, which, for the record, is Bates
 9      number 3865.  Do you have any recollection of
10      this?
11           A.    Vaguely.  It had to do with we
12      were having, once again, trouble getting a
13      ship.  And, as I recall, Knauf had another
14      customer that we were trying to get that
15      ship, and apparently the other customer got
16      the ship, and we think it was with -- I think
17      he thought it was with the assistance of
18      Knauf.
19           Q.    So were you concerned that
20      Knauf had other preferred customers that they
21      were using a limited amount of ships to get
22      their product to, or were you trying to think
23      of a way -- or is this an opportunity for
24      Weida Freight or J.W. Allen to get a new
```

Page 220

```
 1    avenue towards getting shipping?
 2                    MR. SANDERS:  Object to form.
 3         A.    I think he was frustrated and
 4    felt like Knauf wasn't working with Weida,
 5    was the concern.
 6    BY MR. HERMAN:
 7         Q.    Okay.  And then there's a
 8    question, or two questions, in the middle of
 9    the Williams e-mail that says, "Did Knauf
10    sell the product to a Chinese company who
11    sold it to a company in the United States, or
12    was Knauf the principal party that took
13    responsibility and sold direct to the company
14    in Tampa?"
15                    Do you know if you ever got an
16    answer to that question or if Mr. App ever
17    got an answer to that question?
18         A.    I don't know.
19         Q.    Have you ever heard of Knauf
20    selling a product to another Chinese company,
21    which would then sell it to the United
22    States?
23         A.    No.
24         Q.    From your point of view, when
```

Confidential - Subject to Further Confidentiality Review

Page 221

1    you were doing business with Knauf, is it

2    fair to say that Knauf was the principal

3    party that took responsibility selling

4    directly to Interior/Exterior?

5                    MR. SANDERS:  Object to the

6            form.

7            A.     Yes.

8                    (Whereupon, Deposition Exhibit

9            INEX-30b6-46, E-mail Chain Ending

10           4/6/06 App E-mail to to Li,

11           Subject: IEBS/Knauf Container

12           Shipments, INT/EXT02442 -

13           INT/EXT02443, was marked for

14           identification.)

15   BY MR. HERMAN:

16           Q.     I show you INEX-30b6-46.  For

17   the record, it is Bates number 2442 and 2443.

18                   If you look at the top of

19   page 2, which is Bates number 2443, the

20   second bullet point says, "The terms of sale

21   are FOB Wuhu, but Knauf will handle the

22   pickup of the containers, loading at Wuhu and

23   delivery of the containers to Shanghai.

24                   "Further, Knauf is responsible

Confidential - Subject to Further Confidentiality Review

Page 222

```
 1    for all costs expensed to deliver other
 2    containers FAS Shanghai."
 3               Do you have any recollection
 4    about that?
 5         A.    Yeah.  This is when we were
 6    talking about containers, and I think I said
 7    earlier, I believe the Knauf Wuhu plant was
 8    inland, and they had to get -- you know, in
 9    this case, the containers inland to the port.
10         Q.    Do you know whether the Knauf
11    Tianjin plant was inland?
12         A.    I don't know.
13               (Whereupon, Deposition Exhibit
14         INEX-30b6-47, E-mail Chain Ending
15         6/19/06 App E-mail to to C. Geary,
16         Subject: Knauf and BNBM Business,
17         INT/EXT02000 - INT/EXT02003, was
18         marked for identification.)
19    BY MR. HERMAN:
20         Q.    I'll show you INEX-30b6-47,
21    Bates number 2000 through 2003.
22               MR. HERMAN:  While you're
23         reviewing that, let's go off the
24         record for just one second.
```

Confidential - Subject to Further Confidentiality Review

Page 223

1              THE VIDEOGRAPHER:  Off the

2        record, 12:48 p.m.

3              (Recess taken, 12:48 p.m. to

4        1:11 p.m.)

5              THE VIDEOGRAPHER:  Stand by.

6        We're back on the record.  The time is

7        1:11 p.m.

8              MR. HERMAN:  Okay.  We're back

9        on the record.  I had identified

10       Exhibit 47.

11             (Whereupon, Deposition Exhibit

12       INEX-30b6-48, 6/20/06 App E-mail to

13       Wei & Li, No Subject, INT/EXT01999,

14       was marked for identification.)

15             MR. HERMAN:  Exhibit 48 is

16       going to be -- INEX-30b6-48 is going

17       to be Bates number 1999.  I don't

18       think it's necessary to ask any

19       questions on it at this time, given

20       your previous answers.

21             (Whereupon, Deposition Exhibit

22       INEX-30b6-49, Handwritten Notes,

23       "M/V MYSTRAS," INT/EXT00053, was

24       marked for identification.)

Confidential - Subject to Further Confidentiality Review

Page 224

1    BY MR. HERMAN:

2            Q.      Deposition Exhibit INEX-30b6-49

3    is Bates number 53.  Do you know whose

4    handwriting that is?

5            A.      That's my handwriting.

6            Q.      Do you have any idea what

7    Exhibit 49 is?

8            A.      The top of it was calculation

9    on the -- looks like the weight per piece.

10           Q.      Okay.  And why were you

11   concerned about that, if you remember?

12           A.      For shipping, truck lines being

13   able to -- the weight we could put on the

14   truck.

15           Q.      Okay.  And then down at the

16   bottom, it looks like it says like "Temple"

17   or something, and then "USG" and "BPB"?

18           A.      Yes.

19           Q.      What does all that mean?

20           A.      Those are three different

21   manufacturers, and those are their weights.

22           Q.      All domestic?

23           A.      Yes.

24                   (Whereupon, Deposition Exhibit

Confidential - Subject to Further Confidentiality Review

Page 225

1          INEX-30b6-50, Handwritten Notes,

2          "Break Bulk," etc., INT/EXT00278, was

3          marked for identification.)

4     BY MR. HERMAN:

5          Q.     All right.  Let's look at

6     Deposition Exhibit INEX-30b6-50, which, for

7     the record, is Bates number 278.  Do you have

8     any idea what this is?

9          A.     Looks like I was trying to

10    calculate the price per square foot.  It

11    looks like containers versus break bulk at

12    the top.  Two variables on the top appear to

13    be the ocean freight.

14          The middle looks to be --

15    calculate the cost of the product with the

16    product and the ocean freight from BNBM; and

17    then at the bottom, break bulk versus

18    container on Taihe.

19          Q.     And what's the bottom line

20    price?  That's per square foot?

21          A.     Per square foot, yes.  That

22    does not include -- that would not include

23    transportation to our branches and probably a

24    lot of fees at the wharf.

Confidential - Subject to Further Confidentiality Review

1          Q.     Okay.  And then if you look at

2     the top right, this is where -- does this

3     account for the situation where Knauf shipped

4     directly from Wuhu to New Orleans?

5               MR. SANDERS:  Object to form.

6     BY MR. HERMAN:

7          Q.     Or is that just the two legs of

8     the trip?  I think I --

9          A.     I think if you -- if you add up

10    those two numbers, I think it comes out to

11    about $4178 per container, if I'm not

12    mistaken.

13         Q.     Okay.  I think I may have

14    misread it.  I'm sorry.  All right.

15         A.     Okay.

16         Q.     And then given this

17    information, did you use it to make any

18    decisions?

19         A.     We're evaluating costs all

20    along the process.

21               (Whereupon, Deposition Exhibit

22               INEX-30b6-51, 7/6/06 Interior/Exterior

23               Memo to Whitney National Bank,

24               INT/EXT00177, was marked for

Confidential - Subject to Further Confidentiality Review

Page 227

1           identification.)

2    BY MR. HERMAN:

3        Q.    I'm just going to mark this, so

4    we don't lose our place later, but I don't

5    need to ask you about it.  It's

6    Deposition Exhibit 51, which, for the record,

7    is Bates number 177.

8                (Whereupon, Deposition Exhibit

9           INEX-30b6-52, 9/20/06 Remont E-mail to

10          C. Geary, et al., Subject: Sheetrock /

11          Wed / Sep 20, 2006 / Evening,

12          INT/EXT02379, was marked for

13          identification.)

14   BY MR. HERMAN:

15       Q.    I'm going to show you

16   Deposition Exhibit 52, which is Bates

17   number 2379.  There's a notation in this PS,

18   where it says, "Please keep this

19   confidential.  They do not know the exact

20   relationship of me with IEBS."

21              Do you have any idea what this

22   is referring to?

23       A.    Phoenix Imports came and

24   approached us about buying board from them,

Confidential - Subject to Further Confidentiality Review

Page 228

1    and apparently Rudy Remont, who's with

2    J.W. Allen, had seen them, I guess, at the

3    port, and they didn't realize that he was

4    working with us.  He was our freight

5    forwarder.

6         Q.    So what was he trying to do on

7    INEX's behalf?

8         A.    I think he was just trying to

9    relate to me that they're very interested in

10   moving the product and getting it to

11   New Orleans -- I mean, just selling the

12   product.

13        Q.    It was still in short supply at

14   this time?

15        A.    It had eased up, so it was --

16   at this point, we weren't interested in

17   ordering any more.

18        Q.    Okay.  This is getting towards

19   the end of 2006?

20        A.    This is September 20th, 2006,

21   it looks like.

22        Q.    So it's fair to say that as

23   soon as you didn't really have to get drywall

24   from China anymore, you went right back to

Confidential - Subject to Further Confidentiality Review

Page 229

1    domestic?

2              A.     Yes.

3              Q.     They talk about 4x8 and 4x12.

4    My understanding and recollection is that

5    Interior/Exterior only imported 4x12; is that

6    correct?

7              A.     That's correct.

8              (Whereupon, Deposition Exhibit

9         INEX-30b6-53, E-mail Chain Ending

10        7/11/06 Davis E-mail to App,

11        Subject: IEBS Wuhu Wallboard,

12        INT/EXT03767, was marked for

13        identification.)

14             (Whereupon, Deposition Exhibit

15        INEX-30b6-54, E-mail Chain Ending

16        7/11/06 App E-mail to Li,

17        Subject: Wuhu Wallboard Order,

18        INT/EXT03757, was marked for

19        identification.)

20             MR. HERMAN:  Just for the

21        purposes of the record, I'm going to

22        identify Exhibit 53 as Bates

23        number 3767, and Exhibit 54 as Bates

24        number 3757.

Confidential - Subject to Further Confidentiality Review

Page 230

1                    (Whereupon, Deposition Exhibit

2             INEX-30b6-55, 7/26/06 "Kevin" E-mail

3             to "WL," Subject: M/V ALEXANDERGRACHT,

4             INT/EXT03699, was marked for

5             identification.)

6    BY MR. HERMAN:

7             Q.    Let me show you

8    Deposition Exhibit 55, which is Bates

9    number 3699.

10                  MR. SANDERS:  Are you just

11            identifying it?  Are you going to ask

12            any questions?

13                  MR. HERMAN:  I am going to ask

14            about this one, which is --

15                  MR. SANDERS:  But the ones you

16            just introduced into the record, that

17            was for what purpose?

18                  MR. DUPLANTIER:  They were

19            identified.

20                  MR. HERMAN:  Just so they're

21            noted.

22                  MR. DUPLANTIER:  Keep them in

23            order.

24                  MR. SANDERS:  But you're not

Confidential - Subject to Further Confidentiality Review

Page 231

1          asking anybody here questions?

2                    MR. HERMAN:   Somebody may

3               later.   I guess that's the potential

4               downside of marking them early, hope

5               that the advantages outweigh the

6               risks.

7     BY MR. HERMAN:

8               Q.     It talks about -- at some

9     point, it says, "Our Knauf boards can be

10    recognized easily."

11                   You see that?

12              A.     No, I'm sorry, I don't.

13              Q.     Is that on yours?

14              A.     Yes.   Okay.

15              Q.     Do you know who this person is

16    that's sending this e-mail, Xu Long Chun?

17              A.     No.

18              Q.     Well, I guess my question is:

19    Based on your experience in dealing with

20    Knauf drywall, is it your impression and do

21    you agree that Knauf boards can be recognized

22    easily?

23                   MR. SANDERS:   Object to the

24              form.

Confidential - Subject to Further Confidentiality Review

Page 232

```
 1            A.     I think they're referring to
 2      the packaging outside, and there was -- yes,
 3      it was easily recognizable.
 4      BY MR. HERMAN:
 5            Q.     From a packaging, shipping
 6      standpoint?
 7            A.     Yes.
 8                   (Whereupon, Deposition Exhibit
 9             INEX-30b6-56, Teamhead Surveyors Co.,
10             Ltd., Cargo Condition Report,
11             INT/EXT00447, was marked for
12             identification.)
13      BY MR. HERMAN:
14            Q.     I'm going to show you
15      Deposition Exhibit 56, which, for the record,
16      is Bates number 447.  Do you recall dealing
17      with Teamhead Surveyors?
18            A.     I don't recall it, but I -- it
19      says "DUAL CONFIDENCE," so I assume that was
20      us.
21            Q.     Is DUAL CONFIDENCE one of the
22      ships that brought over Knauf drywall?
23            A.     I believe it was.
24            Q.     Do you recall there being any
```

Confidential - Subject to Further Confidentiality Review

Page 233

```
 1      complaints about the condition of the Knauf
 2      drywall that came on the DUAL CONFIDENCE?
 3              A.      No.
 4                      (Whereupon, Deposition Exhibit
 5              INEX-30b6-58, 7/21/06
 6              M/V ALEXANDERGRACHT Pre-Loading Survey
 7              of Gypsum Boards, INT/EXT00091 -
 8              INT/EXT00097, was marked for
 9              identification.)
10      BY MR. HERMAN:
11              Q.      We may have looked --
12                      MR. DUPLANTIER:  We did that
13              already.
14                      MR. HERMAN:  We did this
15              already?
16                      MR. DUPLANTIER:  57.  Yeah,
17              this is the survey report.
18                      MR. HERMAN:  Okay.  And I think
19              that's just a different version of 58;
20              which I apologize, but -- whatever.
21                      MR. DUPLANTIER:  That's all
22              right.
23      BY MR. HERMAN:
24              Q.      Anyway, 58, for whatever
```

Confidential - Subject to Further Confidentiality Review

Page 234

1    purposes, is Bates number 3959 to 3965.

2                    (Whereupon, Deposition Exhibit

3              INEX-30b6-59, Mediterranean Shipping

4              Company Original Bill of Lading,

5              INT/EXT00975, was marked for

6              identification.)

7    BY MR. HERMAN:

8          Q.    I show you Exhibit 59, which is

9    Bates number 975.

10                   Just for purposes of explaining

11   for the record, what's a bill of lading, to

12   the best of your knowledge and understanding?

13         A.     Identification of the product

14   that the shipping company carried.

15         Q.    Okay.  And it says notify -- or

16   it looks like, "Notified Metro Resources

17   Corp."

18         A.     As I mentioned, Jim handled

19   more of the Taihe and Metro Resources

20   purchases.

21         Q.    Okay.  And it's your

22   understanding that Taihe gypsum board that's

23   manufactured in China was purchased through

24   Metro Resources by Interior/Exterior?

Confidential - Subject to Further Confidentiality Review

Page 235

1             A.      Yes.

2             Q.      And do you know where Metro

3       Resources is located?

4             A.      I do not.

5                     (Whereupon, Deposition Exhibit

6             INEX-30b6-60, Addendum to Application

7             and Agreement for Documentary Credit

8             Between Interior/Exterior and Knauf

9             Plasterboard Tianjin, INT/EXT00233 -

10            INT/EXT00236, was marked for

11            identification.)

12      BY MR. HERMAN:

13            Q.      Okay.  I'm going to show you

14      Deposition Exhibit 60, Bates numbers 233 to

15      236.

16                    What is Exhibit 60?

17            A.      A letter of credit.

18            Q.      And this relates to a purchase

19      from Knauf Tianjin?

20            A.      Well, I see where it says

21      "Beneficiary:  Knauf Tianjin," but the FOB

22      was Wuhu, China.

23            Q.      Okay.

24            A.      This was not a letter of credit

Confidential - Subject to Further Confidentiality Review

Page 236

1     that actually got executed.  I think there

2     was a later one that got executed for Wuhu.

3          Q.     Okay.  On 236, it looks like at

4     least Interior/Exterior executed, huh?

5          A.     Yeah, it does.  I think this

6     had to do with the problem with the shipping,

7     because as you can see -- I can tell by the

8     price, because the price ended up being, I

9     think, $10.67 because they handled the

10    shipping.

11               In the beginning, we were going

12    to, and then they secured a ship for us, so

13    Knauf handled the shipping.

14         Q.     Okay.  Do you recall a

15    situation where somebody said, "Oh, no, we've

16    got to change this letter of credit because

17    it's got to be a different company for Knauf

18    Wuhu instead of Knauf Tianjin"?

19         A.     I don't recall that.  I do --

20    we had to, obviously, make the description of

21    goods -- the terms, liner in, free out, or

22    whatever it was, those had to be changed and

23    put to New Orleans.

24         Q.     But from your point of view,

Confidential - Subject to Further Confidentiality Review

Page 237

1    whether the letter of credit was executed

2    with Knauf Tianjin as the beneficiary or

3    Knauf Wuhu as the beneficiary didn't make any

4    difference, right?

5         A.    Didn't matter to us.

6         Q.    Okay.  And based on your

7    recollection, you never got any indication

8    that it mattered to them, correct?

9              MR. SANDERS:  Object to form,

10        foundation.

11        A.    I don't recall if the final

12   letter of credit had -- was listed "Knauf

13   Wuhu" or not.

14             (Whereupon, Deposition Exhibit

15        INEX-30b6-61, DestinAsia Material

16        Gypsum Board Price List, INT/EXT00940,

17        was marked for identification.)

18   BY MR. HERMAN:

19        Q.    I'm going to show you

20   Deposition Exhibit 61, which is Bates

21   number 940.

22             Do you ever recall seeing

23   Exhibit 61 before?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 238

```
 1          Q.     What is it?
 2          A.     This was someone else trying to
 3     sell us board.
 4          Q.     Did you ever purchase drywall
 5     from DestinAsia?
 6          A.     No.
 7          Q.     Do you know where DestinAsia
 8     got their drywall?
 9          A.     No.
10          Q.     Did you ever sell any drywall
11     in Destin, that you recall?
12          A.     I don't think so, but I'm not
13     positive.  It would be in the invoices, if we
14     did.
15                 (Whereupon, Deposition Exhibit
16                 INEX-30b6-62, 5/26/06 Zhang E-mail to
17                 J. Geary, Subject: D&B, INT/EXT05897,
18                 was marked for identification.)
19     BY MR. HERMAN:
20          Q.     Okay.  I show you
21     Deposition Exhibit 62, which is Bates
22     number 5897.  Looks like Jim might be more
23     familiar with this than you are, but let me
24     just ask you.
```

Confidential - Subject to Further Confidentiality Review

Page 239

1              Do you have any recollection of
2     initially being solicited by Metro to try to
3     sell Chinese drywall?
4              A.     I can't remember how it all
5     came about, to tell you the truth.
6              Q.     Do you know why they were
7     providing, I guess Jim, with Dun & Bradstreet
8     information?
9              A.     I think that would be better
10    asked to Jim.
11             Q.     Okay.  Well, I can ask these to
12    Jim too.  Let me just ask you real quickly,
13    and then I may be able to switch over to Jim,
14    and then I may be able to finish up and pass
15    the baton to somebody else.
16             Are you familiar with ISO 9000
17    or ISO 9001 standards?
18             A.     I've heard of them.
19             Q.     Do you know what they are?
20             A.     Quality control, but I don't
21    know much about that, much more.
22             Q.     Do you recall, in any of your
23    dealings in terms with either Chinese
24    companies or people that were representing

Confidential - Subject to Further Confidentiality Review

Page 240

1    Chinese companies in some way, having any

2    discussions about whether the Chinese

3    manufacturers complied with ISO standards?

4           A.     I don't recall.

5           Q.     Would it have been your

6    expectation that the Chinese manufacturers

7    would have complied with ISO standards?

8           A.     No.

9           Q.     Is it your expectation that

10   U.S. domestic manufacturers comply with

11   ISO standards?

12          A.     No.

13               MR. HERMAN:  I think if we just

14          go off the record for a second, switch

15          up, then I can hopefully finish with

16          Jim and pass the baton.

17               THE VIDEOGRAPHER:  Off the

18          record, 1:29 p.m.

19               (Recess taken, 1:29 p.m. to

20          1:31 p.m.)

21               THE VIDEOGRAPHER:  Stand by.

22          We're back on the record.  The time is

23          1:31 p.m.

24                  ///

Confidential - Subject to Further Confidentiality Review

Page 241

```
 1                JAMES F. GEARY, SR.,

 2        having been first duly sworn, testified as

 3                      follows:

 4                     EXAMINATION

 5   BY MR. HERMAN:

 6        Q.     We were looking with your

 7   brother at Exhibit 62.  Do you recall getting

 8   this e-mail from somebody at Metro Resources?

 9        A.     Yes, I do.

10        Q.     And how did this come about, to

11   the best of your recollection?

12        A.     You know, I've thought about

13   it, and I do not recall how we first made

14   contact with Metro Resources.  I just -- I do

15   not recall.

16        Q.     Okay.  And do you recall asking

17   for Dun & Bradstreet information, for some

18   reason?

19        A.     I believe I did.

20        Q.     Okay.  And why were you

21   interested in that?

22        A.     Just -- I mean, just normal

23   course of business.

24        Q.     Okay.  What types of things are
```

Confidential - Subject to Further Confidentiality Review

Page 242

1    you looking for, in terms of requesting the

2    Dun & Bradstreet information?

3         A.    What their business activity

4    is, how long they've been in business, would

5    be primary.

6                   (Whereupon, Deposition Exhibit

7              INEX-30b6-63, 6/20/06 Metro Resources

8              Correspondence to Interior/Exterior,

9              INT/EXT00967 - INT/EXT00971, was

10             marked for identification.)

11   BY MR. HERMAN:

12        Q.    Okay.  Let me show you

13   Deposition Exhibit 63, which is Bates

14   numbers 967 through 971.  There's -- on the

15   first page, which is Bates number 967,

16   there's a certification, which we've seen

17   before associated with Knauf drywall.

18                   Am I correct that this is a

19   certification that similarly covers the Taihe

20   drywall that you imported?

21        A.    Yes, sir.

22        Q.    And if we look at 968, there's

23   a certification for Metro of warranty that

24   it's going to be free from defects in

Confidential - Subject to Further Confidentiality Review

Page 243

1    materials and workmanship.  Do you see that?

2          A.    Yes, I do.

3          Q.    And from your point of view,

4    that covers the Taihe drywall that was

5    imported?

6          A.    That is correct.

7          Q.    And from INEX's point of view,

8    did Taihe and/or Metro breach that warranty?

9          A.    Yes, they did.

10         Q.    If we look at 970, it says,

11   "Transportation by ocean vessel MSC INGRID

12   from Qingdao, China to New Orleans,

13   Louisiana, USA."

14               You see that?

15         A.    I'm sorry, where are you?  Down

16   here?

17         Q.    Yeah.

18         A.    Okay.  Yes.

19         Q.    And what was the transportation

20   arrangement with Metro regarding Taihe

21   drywall?

22         A.    It was a different situation

23   from what we had done with Knauf, in that we

24   purchased from him -- from Metro containers.

Confidential - Subject to Further Confidentiality Review

Page 244

1    These containers were shipped directly to our
2    warehouse, and everything was price
3    delivered.
4          Q.     So you took title in
5    New Orleans?
6          A.     We took -- if I'm saying that
7    correctly, we took title in New Orleans, yes,
8    because they had paid the freight for it.
9          Q.     Okay.  And you don't know to
10   what extent Metro Resources took title or was
11   simply acting as an agent for Taihe?
12         A.     I do not know.
13         Q.     If you look at 971, it says,
14   "No solid wood packing materials and no wood
15   packing materials."
16                What does that mean?
17         A.     You know, I believe that was
18   something that we requested on advice from
19   the freight forwarders, but I'm not positive
20   about that.
21         Q.     Okay.  And "CIF New Orleans,"
22   what does "CIF" mean, if you know?
23         A.     I couldn't tell you that.  You
24   know, I don't recall.

Confidential - Subject to Further Confidentiality Review

Page 245

1          Q.     And then at the bottom, it

2     says, "Two pieces boards one set."

3                 What does that mean?

4          A.     I would only assume that to

5     mean that the drywall is -- has two pieces

6     back to back or face to face, and then you

7     have the end tape; and that would be my

8     assumption, if that's what that means.

9          Q.     Okay.  And it says, "The board

10    is going to be labeled 'Made in China, meet

11    or exceed ASTM C1396-04 standard."

12                Did you see that?

13         A.     Yes, I do.

14         Q.     Based on your recollection, did

15    the board that came in from Taihe actually

16    have that designation?

17         A.     Yes, my -- yes, I believe it

18    did have that designation on it.

19         Q.     Do you recall whether there was

20    some other designation?

21         A.     I do not recall.

22         Q.     Like "Taian" or "Taihe" or...

23         A.     No.  The end tape said "Taihe,"

24    but stamped on the back of the board, was

Confidential - Subject to Further Confidentiality Review

1    this right here, "Made in China.  Meet or

2    exceed," et cetera, et cetera.

3         Q.    Okay.  Have you heard the term

4    "Dragon board"?

5         A.    I have heard the term, yes.

6         Q.    And did you ever see any

7    drywall marked "Dragon" or labeled "Dragon"?

8         A.    I have not, no.

9         Q.    Okay.  And the end tape, I

10   think you were saying, said "Taihe"?

11        A.    Yes, it did.

12        Q.    And is that end tape on all of

13   the board that you imported?

14        A.    Yes, it did.  Yes.  All of

15   the --

16        Q.    Taihe board?

17        A.    Yes.

18              MR. HERMAN:  Right.  Okay.

19        Thanks.

20              I apologize for the delay.

21              (Whereupon, Deposition Exhibit

22        INEX-30b6-64, E-mail Chain Ending

23        11/23/05 Zeng E-mail to C. Geary &

24        Stetin, Subject: Inspection of Gypsum

Confidential - Subject to Further Confidentiality Review

Page 247

1          Board, INT/EXT00738, was marked for

2          identification.)

3     BY MR. HERMAN:

4          Q.     Okay.  I'm going to show you

5     Exhibit 64.  It's actually to Clay, but for

6     the record, anyway, this is exhibit 738.

7               Do you know who Jeffrey Zeng

8     is?

9          A.     I don't, no.

10          Q.     Do you have any recollection of

11     dealing with him?

12          A.     I don't -- I'm fairly certain I

13     did not.  Clay may have, but I don't know.

14          Q.     Okay.  Do you consider drywall

15     to be a hard good?

16          A.     I don't know the answer to

17     that.

18          Q.     It says this guy was in charge

19     of inspection of toys and hard goods.  You

20     see that?

21          A.     I do.  I do.  I don't know what

22     that means.

23               (Whereupon, Deposition Exhibit

24          INEX-30b6-65, 6/20/06 Metro Resources

Confidential - Subject to Further Confidentiality Review

Page 248

```
 1            Certificate of Warranty to
 2            Interior/Exterior, INT/EXT00969, was
 3            marked for identification.)
 4     BY MR. HERMAN:
 5            Q.     This is Deposition Exhibit 65,
 6     Bates number 969.  And this is the same type
 7     of warranty that we saw before, "free from
 8     defects in materials and workmanship"?
 9            A.     Yes.
10            Q.     And this is a warranty that you
11     consider to be binding with respect to the
12     Taihe drywall, correct?
13            A.     That is correct.
14                   (Whereupon, Deposition Exhibit
15            INEX-30b6-66, E-mail Chain Ending
16            1/19/07 J. Geary E-mail to C. Geary,
17            Subject: Sheetrock, INT/EXT02293 -
18            INT/EXT02294, was marked for
19            identification.)
20     BY MR. HERMAN:
21            Q.     Okay.  I show you Exhibit 66,
22     which, for the record, is Bates numbers 2293
23     to 2294.
24                   Who is Allan Colley?
```

Confidential - Subject to Further Confidentiality Review

Page 249

```
 1          A.      Allan Colley is with Dupuy
 2     Storage Company.
 3          Q.      And what's Dupuy Storage
 4     Company?
 5          A.      They are a warehousing
 6     operation.  My belief is and understanding is
 7     that their primary business is in coffee
 8     storage at the wharf, at the port.
 9          Q.      Okay.  Did you use them to
10     store Chinese drywall at all?
11          A.      We did not.
12          Q.      Okay.  What was the
13     circumstances surrounding these
14     communications, if you remember?
15          A.      Allan Colley is an acquaintance
16     of mine.  And long after we had sold all of
17     our Chinese drywall, I remember having a
18     discussion with Allen and him telling me that
19     he had some Chinese drywall that he had in
20     storage for a client.
21               When all the news reports
22     started surfacing towards the end of January,
23     I remembered that conversation and called
24     Allen just to -- just for general
```

Confidential - Subject to Further Confidentiality Review

Page 250

1     information, to find out what he had, if he

2     had it.

3          Q.     And do you know who the client

4     was that had the -- that owned the sheetrock

5     or was storing the sheetrock?

6          A.     I do not.

7          Q.     And do you know what the

8     manufacturer was of the sheetrock that he

9     had, or who the manufacturer was?

10         A.     No, I do not.  Well, actually,

11    I think there was another e-mail, and he made

12    reference to Crescent City Gypsum.

13         Q.     Which is on --

14         A.     Oh, I'm sorry.  Pardon me.

15    Okay.

16         Q.     That's okay.

17                And do you have any idea what

18    Crescent City Gypsum is or who owns it or...

19         A.     No, I do not.

20         Q.     And did you guys ever have any

21    Crescent City Gypsum sheetrock?

22         A.     No, sir, we did not.

23                (Whereupon, Deposition Exhibit

24                INEX-30b6-67, COMEX Int'l "Attention:

Confidential - Subject to Further Confidentiality Review

Page 251

```
 1              Purchasing Department" Fax,

 2              INT/EXT00707, was marked for

 3              identification.)

 4      BY MR. HERMAN:

 5          Q.      Okay.  Here is

 6      Deposition Exhibit 67, which is Bates number

 7      707.  This looks like something else

 8      involving Crescent City Gypsum.  Do you ever

 9      remember seeing this before?

10          A.      I've seen this communication in

11      the last few months.  The writing down at the

12      bottom addresses Trey, who is our -- who at

13      the time was our purchasing manager, and then

14      it says, "Sent to Mandeville branch."

15              So our Mandeville branch

16      received this fax from this company, COMEX.

17          Q.      Have you ever dealt with COMEX

18      before?

19          A.      No, sir, we did not.

20          Q.      Do you know anything about

21      COMEX?

22          A.      I do not.

23          Q.      Okay.  And, to your knowledge,

24      did the Mandeville branch ever decide to
```

Confidential - Subject to Further Confidentiality Review

Page 252

1       purchase this Crescent City gypsum board?

2               A.      No, they did not.

3                       (Whereupon, Deposition Exhibit

4               INEX-30b6-68, Bubba Board

5               Information & Certification Packet,

6               INT/EXT00897 - INT/EXT 00939, was

7               marked for identification.)

8       BY MR. HERMAN:

9               Q.      Okay.  I'll hand you

10      Deposition Exhibit 68, which is Bates

11      numbers 897 through 939.

12                      Have you ever seen Exhibit 68

13      before?

14              A.      No, sir, I have not.

15              Q.      Have you ever heard of Bubba

16      Board?

17              A.      You know, in the back of my

18      mind, I think I may have heard the term, but

19      I'm not familiar with it at all.

20              Q.      Have you ever heard of World

21      Trade Brokers?

22              A.      No, I do not -- or I have not.

23      I'm sorry.

24              Q.      Did Interior/Exterior, to your

Confidential - Subject to Further Confidentiality Review

 1     knowledge, ever do any business with Bubba

 2     Board or --

 3          A.     We did not.

 4          Q.     -- World Trade Brokers?

 5          A.     Did not.

 6          Q.     If you look at Bates

 7     number 902, which is, I think, page 3 of

 8     the --

 9          A.     Yes.

10          Q.     It says, "Conclusion:

11     According to the national standard GB/T

12     9775-1999, paper plaster plate."

13               Do you have any idea what that

14     is, what that standard is?

15          A.     I'm not familiar with that at

16     all.

17          Q.     Okay.  Then there's some stuff

18     in here about ISO standards, and I'll ask you

19     the same question that I asked your brother:

20     Do you recall ever making -- anyone making

21     any representations that any of the Knauf

22     drywall complied with ISO standards?

23          A.     I do not recall.

24          Q.     What about Taihe drywall?

Confidential - Subject to Further Confidentiality Review

Page 254

 1          A.      I do not recall that either.

 2          Q.      Is it your expectation that

 3    they would have complied with ISO 9000 or

 4    9001 standards?

 5          A.      Not necessarily.

 6          Q.      What's your understanding of

 7    what the ISO standards are?

 8          A.      I'm not exactly sure.  It's

 9    some form of international testing or

10    something of that nature.

11          Q.      Do you know whether domestic

12    drywall manufacturers comply with

13    ISO standards?

14          A.      I do not know.

15                  (Whereupon, Deposition Exhibit

16                  INEX-30b6-69, 4/16/07 Camden Builders

17                  Fax re: Drywall Verification,

18                  INT/EXT05747 - INT/EXT05750, was

19                  marked for identification.)

20    BY MR. HERMAN:

21          Q.      I'm going to show you

22    Deposition Exhibit 69, which, for the record,

23    is Bates numbers 5747 through 5750.

24                  Do you know who or what Camden

Confidential - Subject to Further Confidentiality Review

Page 255

1    Builders, Inc. is?

2         A.    I do not.

3         Q.    Do you know who Ronnie Marek or

4    Ronnie Mauk is?

5         A.    No, I don't.

6         Q.    Do you recall seeing this

7    information about potential asbestos in

8    drywall?

9         A.    Yes, I do.  Sometime well after

10   we had sold all of the Chinese drywall, I

11   received this e-mail from a gentleman who

12   works for National Gypsum who knew that we

13   had imported some Chinese drywall.  So he had

14   forwarded me this e-mail, just, I think, as a

15   form of information.

16        Q.    Is there anything that

17   Interior/Exterior did, in terms of following

18   up with their clients or samples or anything

19   else, to try to determine whether there was

20   any asbestos in the drywall that they

21   imported?

22        A.    No, we did not.

23        Q.    Did you ever follow up with any

24   of the manufacturers to see whether there

Confidential - Subject to Further Confidentiality Review

Page 256

1    were any reports or they had any information

2    about asbestos?

3         A.     We had documentation that

4    stated that it did not contain asbestos.

5         Q.      From whom?

6         A.     I know we had from Taihe,

7    specifically; and I think we had something

8    from Knauf, but I can't tell you for sure.

9         Q.     Was that something that you

10   were interested in or concerned about when

11   you originally purchased the drywall, that it

12   might contain asbestos?

13        A.     No.  You know, that's something

14   that's so far off the radar screen, because I

15   don't think asbestos -- to my knowledge,

16   asbestos is not in any products these days.

17                   (Whereupon, Deposition Exhibit

18               INEX-30b6-70, 11/06 AWCI Tech Update,

19               INT/EXT06042, was marked for

20               identification.)

21   BY MR. HERMAN:

22        Q.     Let me show you

23   Deposition Exhibit 70.  I don't know why

24   there's two copies of it, but in any case...

Confidential - Subject to Further Confidentiality Review

Page 257

1                    This is Bates number 6042.  Do

2      you know anything about phosphogypsum

3      wallboard?

4              A.      I do now.

5              Q.      How did you come to find out

6      about it?

7              A.      Once all of the articles

8      started appearing that we saw in January of

9      last year, and then there was a lot of talk

10     about, you know, phosphogypsum, did it have

11     or did it not.  But that was the first time

12     we'd seen it.

13             Q.      Do you know how this article

14     got to be in Interior/Exterior's files or

15     where it was in Interior/Exterior's file?

16             A.      It was in our files, and I

17     found it.  It was an attachment with a number

18     of other attachments from Metro Resources

19     when I was getting verification on the ASTM

20     standards -- I'm sorry, the certificates.

21             Q.      Okay.  And did

22     Interior/Exterior make any efforts, either

23     with its customers or with the manufacturers,

24     to try to determine or make sure that there

Confidential - Subject to Further Confidentiality Review

Page 258

1    was no phosphogypsum in the wallboard that it

2    imported from China?

3         A.    What point of time are you

4    referring to?

5         Q.    Why don't we take it up to

6    January of 2009.

7         A.    No, we did not.

8         Q.    Outside of discussions with

9    counsel, have you made any efforts since

10   then?

11        A.    Have we made any efforts to

12   discuss this with our --

13        Q.    No.  No.  Outside of

14   information that you got from your counsel --

15        A.    Yes.

16        Q.    -- has Interior/Exterior made

17   any efforts since January of 2009 to try to

18   determine whether there is phosphogypsum in

19   the drywall that it imported from China?

20        A.    No, sir, we have not.

21             MR. HERMAN:  I think we need to

22        change the tape.  And as far as I'm

23        concerned, we can come right back on.

24             THE VIDEOGRAPHER:  Off the

Confidential - Subject to Further Confidentiality Review

1           record, 1:50 p.m.  End of Tape 2.

2                   (Recess taken, 1:50 p.m. to

3           1:53 p.m.)

4                   THE VIDEOGRAPHER:  Stand by.

5           We're back on the record.  The time is

6           1:53.  This is the start of Tape 3.

7                   (Whereupon, Deposition Exhibit

8           INEX-30b6-71, 6/13/06 Becnel E-mail to

9           C. Geary, et al., Subject: Coastal

10          Cargo - $75.00 "No-Show" Appt. Fee

11          Approved, Effective July 01, 2006,

12          INT/EXT04689, was marked for

13          identification.)

14      BY MR. HERMAN:

15          Q.    Deposition Exhibit 71, Bates

16      number 4689.  Do you ever recall seeing this?

17          A.    Do not, no.

18          Q.    There's a quote here that says,

19      "I fought the law, but the law won."

20                  Do you have any idea what that

21      means?

22          A.    No idea.

23          Q.    Or what it relates to?

24          A.    Well, it says, "Subject:

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

Page 260

1    Coastal Cargo, $70 no-show, fee approved."  I

2    do not know what that means.

3                 (Whereupon, Deposition Exhibit

4                 INEX-30b6-72, 3/21/06 App E-mail to

5                 C. Geary, Subject: Corrected page two

6                 of letter to BNBM, INT/EXT03888, was

7                 marked for identification.)

8    BY MR. HERMAN:

9         Q.    Okay.  Let me show you

10   Exhibit 72, Bates number 3888.  I think this

11   is addressed to your brother, but do you ever

12   recall seeing this before?

13        A.    No, sir, I do not.

14        Q.    Do you have any idea why Billy

15   App would not have wanted something forwarded

16   or copied or given to anyone?

17        A.    No, I don't.

18              MR. DUPLANTIER:  Object to the

19              form.

20   BY MR. HERMAN:

21        Q.    Have you ever heard of

22   something called Cretin Homes?

23        A.    Cretin Homes is a homebuilder

24   on the north shore.

Confidential - Subject to Further Confidentiality Review

```
 1          Q.      Did Interior/Exterior, to the

 2      best of your recollection, supply them with

 3      drywall?

 4          A.      Yes, I believe so.

 5          Q.      Do you know whether it was

 6      Chinese, domestic or both?

 7          A.      Do not know.

 8          Q.      Just real quickly, and then I'm

 9      going to let Jim take over his -- I don't

10      think we need these as exhibits, but I made a

11      couple copies, just in case you want to refer

12      to them.  These are your document responses.

13      I just wanted to try to get a few things

14      clear on the record.

15                  It says, "Documents" -- I'm

16      looking at Request for Production No. 2.

17      "Documents generated by, prepared for,

18      reviewed by, received by or concerning

19      defendants' board of directors or any

20      committee thereof or authorized thereby

21      concerning Chinese drywall or of problems

22      with the drywall," and after a bunch of

23      stuff, the bottom-line answer is,

24      "Interior/Exterior is not in possession of
```

Confidential - Subject to Further Confidentiality Review

Page 262

1    any documents responsive to No. 2."

2              You guys don't have any minutes

3    of meetings or any type of formal recordation

4    of the drywall issues?

5         A.    No, sir, we do not.

6         Q.    Okay.  If we look at on page 5,

7    Request for Production No. 7, "All filings

8    made to any state, federal, domestic and/or

9    foreign governmental agencies, departments,

10   divisions, bodies, entities or

11   representatives," and after some other

12   objections, it says, "Those governmental

13   investigations are confidential and not

14   subject to disclosure by Interior/Exterior."

15              Do you know of any law or

16   regulation or anything that protects or makes

17   confidential communications that you have

18   with governmental agencies?

19              MR. DUPLANTIER:  I'm going to

20         object to the form of the question.

21         You're asking for a legal conclusion.

22         We've objected to the production of

23         these reports, and we're not waiving

24         that objection.

Confidential - Subject to Further Confidentiality Review

1              MR. HERMAN:  Okay.

2              MR. DUPLANTIER:  We believe

3         that while an investigation is ongoing

4         with the Consumer Products Safety

5         Commission, that their investigation

6         material and interim material, until

7         their investigation is concluded, is

8         privileged and not to be released by

9         anyone except for the CPSC.

10             MR. HERMAN:  Okay.  And there's

11        some regulation or something that says

12        that?  I mean, I asked you, "What's

13        your authority" -- or no, I said, "Do

14        you have authority," and your answer

15        was yes, but you didn't tell me what

16        it was.

17             SPEAKER 1:  That was the only

18        question you asked, if we did it.

19             MR. HERMAN:  Well, I'll sic

20        Anthony Irpino on you, and you can

21        fight out the privileges.  Okay.  I

22        just wanted to get them on the record.

23        Okay.

24             MR. DUPLANTIER:  I will

Confidential - Subject to Further Confidentiality Review

Page 264

```
 1              reiterate that every piece of paper

 2              and every document that we have

 3              provided to any governmental agency

 4              has been produced in accordance with

 5              this request.

 6                   The only things that have not

 7              been produced are the actual letters

 8              written by the attorneys for

 9              Interior/Exterior in response to the

10              inquiries from the governmental

11              agencies.

12                   You can see most of our

13              response in the Attorney General

14              lawsuit and the Attorney General

15              response.

16                   MR. HERMAN:  Thank you.

17      BY MR. HERMAN:

18              Q.    On Request for Production

19      No. 9, it seems to be talking for documents

20      which might relate to Interior/Exterior's

21      participation or supervision of the design,

22      development, test, inspection, manufacture

23      and some other things of Chinese drywall, and

24      it says that you're not in possession of any
```

Confidential - Subject to Further Confidentiality Review

1    documents responsive.

2              I guess my question is:  Is it

3    Interior/Exterior's position that they were

4    never involved in any way with any aspect of

5    design, development, testing or inspection or

6    manufacture of Chinese drywall?

7              MR. DUPLANTIER:  I think we've

8         answered those questions today during

9         the deposition, and we reiterate our

10        objection to the vagueness of the way

11        the question was worded.

12             I think we have otherwise

13        answered those questions for the last

14        four hours.

15             MR. HERMAN:  So you're

16        instructing him not to answer?

17             MR. DUPLANTIER:  I'm

18        instructing him not to answer beyond

19        what he's answered already today.  I

20        think we have answered those

21        questions.

22             MR. HERMAN:  Well, if we have

23        to fight about it, we'll fight about

24        it later.

Confidential - Subject to Further Confidentiality Review

 1                    MR. DUPLANTIER:  We should.

 2      BY MR. HERMAN:

 3           Q.     On 14, it talks about any types

 4      of indemnity agreements or joint defense

 5      agreements or anything like that.

 6                    Are you aware of any agreements

 7      with any of the other defendants or

 8      cross-defendants in the litigation where one

 9      party is going to indemnify the other or

10      they're going to work together or anything

11      like that?

12           A.     No, I'm not.

13           Q.     In terms of -- well, I think

14      you've already answered this, but on page 11,

15      Request for Production 24 -- oh.  I know what

16      I wanted to ask you.

17                    You've already said you can't

18      differentiate sales of Chinese drywall from

19      domestic drywall; that's correct, right?

20           A.     Yes.

21           Q.     What is the system on which

22      these invoices are maintained?

23           A.     I'm sorry?

24           Q.     We've looked at a bunch of

Confidential - Subject to Further Confidentiality Review

Page 267

1    invoices?

2            A.      Right.

3            Q.      Is there some kind of database

4    that's like the invoice database or are they

5    generated piece by piece or...

6                    If you know.

7            A.      I'm still not sure I understand

8    the question.  I apologize.

9            Q.      I'm trying to find out if

10   Interior/Exterior has some type of database

11   in electronic form that keeps track of all

12   its customers and all the shipments.

13           A.      Then the answer is:  Yes, we

14   do.

15           Q.      Okay.  And the materials that

16   were provided are presumably printed out from

17   that database?

18           A.      That is correct, yes.

19           Q.      There's a request on page 14,

20   Request for Production No. 34, "All notices,

21   claims, complaints, communications or

22   documents of any kind between defendants'

23   employees and employees of affiliate

24   companies or consultants and any property

Confidential - Subject to Further Confidentiality Review

Page 268

```
 1    owners, homeowners associations, corporate
 2    condo boards, property managers, tenants,
 3    concerning problems with the drywall,
 4    including any symptoms of the drywall's
 5    presence and smells or odors,
 6    air-conditioning unit or component
 7    replacement, corrosion of metals, electrical
 8    and/or plumbing systems or components and any
 9    related health and safety concerns, issues or
10    claims."
11              Here, there's an objection.  My
12    understanding is that you claim that you
13    don't have any of those, even beyond the
14    objection?
15              MR. DUPLANTIER:  Let me clarify
16         one thing for the record.  You're
17         going through a set of discovery
18         responses that we have discussed with
19         both you and other members of the PSC.
20              MR. HERMAN:  Okay.
21              MR. DUPLANTIER:  Had you guys
22         wanted to address that in a memorandum
23         in a motion to the Court, we've made
24         our position on that -- on this issue
```

Confidential - Subject to Further Confidentiality Review

Page 269

1          patently clear.

2                  We do not have any of these

3          complaints prior to the first notice

4          of this litigation being instituted.

5          That is the way we interpreted the

6          question.  Beyond that, we believe

7          that it's privileged information.

8                  We're going to maintain our

9          objection to this discovery request,

10         and I will again explain, like I've

11         explained to you in writing, that we

12         do not have any complaints prior to

13         the first notice that litigation was

14         imminent.

15                 MR. HERMAN:  Okay.  Can I ask

16         the witness on the record if he's

17         aware of any complaints prior to the

18         first notice of the litigation?

19                 MR. DUPLANTIER:  Yes.

20    BY MR. HERMAN:

21         Q.    Are you?

22         A.    Absolutely not.

23                 MR. HERMAN:  Okay.  This is

24         going to be somewhat out of order,

Confidential - Subject to Further Confidentiality Review

Page 270

1          which I apologize for, but I just got

2          this yesterday afternoon.  I can make

3          it the next exhibit, if you think that

4          makes things easier, and just relabel

5          it.

6                    MR. DUPLANTIER:  It's up to

7          you.  I don't care.  What's it labeled

8          now?

9                    MR. HERMAN:  It's 94.  I'll

10         just make it the right number, which

11         is 73.

12                   (Whereupon, Deposition Exhibit

13         INEX-30b6-73, E-mail Chain Ending

14         1/26/09 Heider E-mail to Brisley,

15         Subject: Bessemer Family Sales, Knauf

16         Plasterboard problem, INT/EXT34599 -

17         INT/EXT34605, was marked for

18         identification.)

19    BY MR. HERMAN:

20         Q.    For the record, Exhibit No. 73

21    to the deposition is Bates-numbered 34599

22    through 34605.  I apologize.  I thought this

23    was one document, but then I realized last

24    night, when I was reviewing it, it's a bunch

Confidential - Subject to Further Confidentiality Review

Page 271

1    put together, but that's the way I thought it

2    was produced.

3              Anyway, are you familiar with

4    the e-mails that are -- that comprise

5    Exhibit 73?

6         A.    Yes, I am.

7         Q.    Okay.  If you go to the last

8    one, 34605, what is that?

9         A.    That is a communication that I

10   had with Doug Sanders.

11        Q.    Okay.  And how did this

12   communication come about?

13        A.    Well, when things started

14   happening and one of the first things we did

15   was try and contact -- that's right.  We

16   contacted Knauf and -- seeking their

17   assistance.

18        Q.    Okay.  What was the first

19   indication that you got that there might be a

20   problem with the drywall that you got from

21   Knauf?

22        A.    We had communication from --

23   our Mobile office, I believe, was the first

24   communication.  And then Jill Donaldson -- I

Confidential - Subject to Further Confidentiality Review

Page 272

1     got a phone call from Jill Donaldson right

2     around the same time.

3               She contacted our company,

4     stating that she had some problems and said

5     that she had gotten drywall from us and it

6     was Chinese, and essentially wanted to know

7     what we were going to do to take care of it.

8          Q.    Do you know around when that

9     was?

10         A.    It was very close to Mardi Gras

11    of last year.

12         Q.    Okay.  And how did -- who do

13    you recall contacting at Knauf, initially?

14         A.    Well, we went through the

15    chain, and the first person to contact was

16    our insulation local sales rep.

17         Q.    That's the -- is that

18    Jeffrey --

19         A.    No, that's Kurt Heider, who's

20    the local sales rep, and he reports to Jeff

21    Brisley.

22         Q.    Okay.  And somehow that got

23    funneled around to Doug Sanders?

24         A.    That's my understanding, yes.

Confidential - Subject to Further Confidentiality Review

Page 273

1          Q.      And is it your impression, or

2    was it your impression when you received

3    this, that this -- what's reflected in this

4    e-mail was kind of Knauf's formal statement

5    position at the time, in February of 2009?

6                  MR. SANDERS:  Object to the

7          form.

8          A.      Which -- I'm sorry, which

9    statement are you referring to?

10                 MR. DUPLANTIER:  He's talking

11         about the last.

12                 THE WITNESS:  Pardon me.  I'm

13         sorry.

14   BY MR. HERMAN:

15         Q.      In early 2006.  "KPT has been

16   investigating complaints"?

17         A.      Right.  And, I'm sorry, your

18   question again, please?

19         Q.      Is this what you understand to

20   be Knauf's kind of position at the time?

21         A.      At the time, yes, obviously

22   that's what they told us.

23         Q.      Okay.  And did you rely on that

24   in some way?

Confidential - Subject to Further Confidentiality Review

Page 274

1          A.      Yes, we did.

2          Q.      Did you pass what's

3    communicated in here along to your own

4    clients or customers?

5          A.      If -- well, specifically what

6    do you mean?  You know, in this

7    communication, it makes reference to Strategy

8    Claims, so if people were to contact us with

9    concerns that they had Chinese drywall, we

10   would then have them contact either Doug

11   Sanders or Charles Fossler of Strategy Claims

12   directly.

13         Q.      And were you aware of Strategy

14   Claims doing some type of investigation with

15   respect to some of the houses that

16   Interior/Exterior had provided Knauf drywall

17   to?

18         A.      Yes.

19         Q.      And were you present or

20   involved with those investigations?

21         A.      No, we were not.

22         Q.      Is there some reason why you

23   guys weren't involved?

24         A.      We felt like it was not our

Confidential - Subject to Further Confidentiality Review

Page 275

1    position.  It was Knauf's position to handle

2    these complaints.

3         Q.    Was there some type of letter

4    or something written to Knauf indicating that

5    it was Interior/Exterior's position that

6    under the warranties, et cetera, whatever

7    happened was going to be Knauf's

8    responsibility?

9               MR. DUPLANTIER:  Let me object

10         to the form of the question to the

11         extent that you're asking for any

12         attorney-client privilege.  Other than

13         that, you can answer the question.

14         A.    No, we did not send any letter,

15    formal letter, to Knauf for that regard.

16    BY MR. HERMAN:

17         Q.    Okay.  If you'll look at 34602,

18    who's Bert Allen, if you know?

19         A.    I'm not sure.

20         Q.    Do you know who Charles Farr

21    is?

22         A.    No, I'm not sure.

23         Q.    Is "BFS," to your knowledge,

24    Bessemer Family Sales?

Confidential - Subject to Further Confidentiality Review

Page 276

1          A.      I don't know.  That would be a

2     guess.

3          Q.      Have you ever done business, to

4     your recollection, with Bessemer Family

5     Sales?

6          A.      I know that we sold to Creola

7     Ace, who sold to contractor Mitchell Homes,

8     who was doing a project for Bessemer Family

9     Sales, to the best of my knowledge.

10         Q.      Okay.  If you look at

11    page 34600, it looks like Bert Allen may be

12    with Mitchell Company.  Does that refresh

13    your recollection?

14         A.      That's what it appears to be,

15    yes.

16         Q.      And the other place that you

17    mentioned was Creola Ace Hardware?

18         A.      Yes.

19         Q.      Okay.  And do you recall seeing

20    this e-mail at some point?

21         A.      Yes, I do.

22         Q.      And it says, "I met with Chris

23    on site last week.  He pointed out the

24    concerns regarding the copper on the

Confidential - Subject to Further Confidentiality Review

Page 277

```
 1    interior" --
 2            A.      Pardon me.  I'm sorry.  I got
 3    it.
 4            Q.      I'm sorry.
 5            A.      I got it now.  Thank you.
 6            Q.      I'm probably talking too fast
 7    anyway.
 8                    -- "on the interior of the
 9    houses noted above," I guess.  "The greatest
10    impact is on the copper coils in the
11    air-handling units.  We have narrowed the
12    cause down to sheetrock."
13                    Is that consistent with the
14    complaints that Interior/Exterior has
15    received thus far?
16            A.      It is consistent that the coils
17    in houses or...
18            Q.      That there's been problems with
19    the coils that has been caused by the
20    sheetrock?
21            A.      We've heard that.  I couldn't
22    tell you the consistency of it.  I don't
23    know.  But most definitely, we have heard
24    that --
```

Confidential - Subject to Further Confidentiality Review

Page 278

1          Q.     Okay.  Outside of --

2          A.     -- on numerous occasions.

3          Q.     Outside of what your lawyers

4     may have done that may be privileged, has

5     Interior/Exterior conducted its own

6     investigation of any kind that has produced

7     evidence that's inconsistent with the fact

8     that sheetrock causes problems with

9     air-conditioning coils?

10         A.     We have not done any testing in

11    that regard.

12         Q.     Okay.  And you see where

13    Mr. Allen says, "The potential impact of this

14    issue for all involved is catastrophic"?

15         A.     Yes, I do.

16         Q.     And what, if anything, did

17    Interior/Exterior do in response to this

18    information?

19         A.     Well, that was at the same time

20    we were contacting Knauf to get their

21    assistance in this.

22         Q.     And if you look at the first

23    page, which is 34599, you have

24    kurt.heider@us.knaufinsulation.com.  That's

Confidential - Subject to Further Confidentiality Review

Page 279

1       the person you referred to before?

2             A.      Yes.  He is the local sales

3       rep.

4             Q.      And Jeff Brisley is the same

5       Knauf USA guy that you referred to before?

6             A.      That is correct.

7                   MR. HERMAN:  Okay.  I don't

8             have any other questions right now,

9             but my comrade in arms from the PSC,

10            Jim Reeves, has some.  I don't know if

11            you want Jim or Clay.

12                  MR. REEVES:  Probably, it would

13            be more on the Knauf side of

14            questions.  That would be Clay,

15            wouldn't it?

16                  MR. DUPLANTIER:  Let's take a

17            five-minute break.

18                  THE VIDEOGRAPHER:  We're off

19            the record at 2:13 p.m.

20                  (Recess taken, 2:13 p.m. to

21            2:22 p.m.)

22                  THE VIDEOGRAPHER:  We're back

23            on record.  The time is 2:22 p.m.

24                  ///

Confidential - Subject to Further Confidentiality Review

Page 280

1                    CLAYTON C. GEARY,

2        having been first duly sworn, testified as

3                        follows:

4                       EXAMINATION

5     BY MR. REEVES:

6            Q.    Good afternoon, Mr. Geary.  My

7     name is Jim Reeves.  I'm a member of the PSC.

8     Glad to meet you.  I'm going to have some

9     follow-up questions.  I'm going to try not to

10    repeat what Mr. Herman has already asked, but

11    I do have a couple follow-ups on some

12    exhibits that were identified.

13               First of all, looking at

14    Exhibit 35 and 38, 35 lists the different

15    offices that Interior/Exterior had in 2006;

16    is that correct?

17           A.    Yes, sir.

18           Q.    I saw some additional

19    addresses, I thought, on some of the

20    letterhead, including a Tuscaloosa branch.

21    Did you have a Tuscaloosa branch as well?

22           A.    Not at that time.  The

23    Lafayette branch would have been next branch

24    after Foley, and it did not get any Chinese

Confidential - Subject to Further Confidentiality Review

Page 281

1    drywall.

2            Q.      The --

3            A.      Lafayette branch.

4            Q.      Lafayette did not?

5            A.      Did not.  And that was the next

6    branch that we opened after Foley.

7            Q.      Help me out here, because I

8    know you've said several times -- my

9    understanding is, the documents indicate when

10   drywall was delivered and where?

11           A.      Uh-huh.

12           Q.      But in some instances, you seem

13   to be sure that no Chinese drywall was

14   delivered to a particular location.  How do

15   you know that?

16           A.      From a transfer in our system.

17           Q.      All right.  Explain that to me.

18           A.      Well, those transfer numbers

19   that we went through on that exhibit earlier,

20   it shows a transfer number; and it shows that

21   it went from, say, the port to Baton Rouge, I

22   think is the one we were discussing.  So

23   we --

24                   MR. DUPLANTIER:  You're

Confidential - Subject to Further Confidentiality Review

Page 282

```
 1              referring to Exhibit 36.
 2                     MR. REEVES:  Yeah, I remember.
 3              Thanks.
 4              A.     And there were no transfers to
 5      Lafayette.
 6      BY MR. REEVES:
 7              Q.     Okay.  So, as I understand it,
 8      in some instances, you can verify that
 9      Chinese drywall was not sent to a particular
10      location and in others, you know that 1/2"
11      12-foot board was delivered, but it may be
12      domestic or may be Chinese; is that fair?
13              A.     I'm sorry, repeat that.
14                     MR. REEVES:  Can you repeat
15              that?
16                     (The following portion of the
17              record was read.)
18                     "QUESTION:  So, as I understand
19              it, in some instances, you can verify
20              that Chinese drywall was not sent to a
21              particular location and in others, you
22              know that 1/2" 12-foot board was
23              delivered, but it may be domestic or
24              may be Chinese; is that fair?
```

Confidential - Subject to Further Confidentiality Review

1          A.      I think I need you to rephrase

2     that.

3     BY MR. REEVES:

4          Q.      Well, let me ask you this:  Can

5     you tell me everywhere that you sent Chinese

6     drywall?

7          A.      No.

8          Q.      Why not?

9          A.      Because it's one product code,

10    whether it was domestic or imported.

11         Q.      But in some locations, you can

12    tell me that you didn't send Chinese drywall;

13    is that correct?

14         A.      Tell you that I didn't send?

15         Q.      You just told me you didn't

16    send any to Lafayette.

17         A.      Oh, I can -- yes.  I'm sorry.

18    We can look in the system and see if we had a

19    transfer from the wharf to Lafayette, and we

20    did not.

21         Q.      Okay.  And if you did have that

22    transfer, that would tell you what?

23         A.      That we had shipped it to our

24    branch in Lafayette, not to a specific

Confidential - Subject to Further Confidentiality Review

Page 284

1    customer.

2            Q.      "It" being the Chinese drywall?

3            A.      Yes.

4            Q.      All right.   The Tuscaloosa

5    branch opened when?

6            A.      I don't know the exact date and

7    time.

8            Q.      Was the Chinese drywall shipped

9    to Tuscaloosa?

10           A.      Not to our branch, no.

11           Q.      Anywhere else in Tuscaloosa?

12           A.      I don't know.   I'd have to look

13   at the invoices.

14           Q.      Let me ask you a little bit

15   about the invoices.   Who prepares those, or

16   who prepared them in '06 through '08?

17           A.      Well, it's pretty much done by

18   the salesman.   The salesman will take an

19   order and put the information in, then it's

20   invoiced.   But the salesman does most of the,

21   you know, writing-up of the order.

22           Q.      So a typical transaction,

23   somebody would either come or call in, order

24   a certain amount of drywall, talk to a

Confidential - Subject to Further Confidentiality Review

Page 285

1    salesman, he would type up or put in the

2    invoice, correct?

3         A.    Correct.

4         Q.    The invoice would then tell the

5    next person in line where to send the drywall

6    and how much to charge; is that --

7         A.    Well, no, he would put the

8    price in.

9         Q.    Okay.

10         A.    So he would put the price.  He

11    would put the quantity.  He would put ship

12    to, where it's going to go.  He would put the

13    sales taxes.  And really, then, it goes out

14    into the warehouse, gets delivered, comes

15    back; and then it's invoiced, really, at that

16    point.

17         Q.    All right.  In terms of the

18    structure, I'm going to take, for instance,

19    the Gulfport office.  I'm based in Biloxi.

20    You've got a branch manager listed as Chip

21    Williams.  Is he still with the company?

22         A.    Yes, he is.

23         Q.    Is he still a branch manager?

24         A.    Yes, he is.

Confidential - Subject to Further Confidentiality Review

Page 286

1        Q.      Where at?

2        A.      In Gulfport.

3        Q.      Still in Gulfport?

4        A.      Uh-huh.

5        Q.      Would he have a sales team

6    working under him, or would he be the primary

7    person to generate these invoices?

8        A.      A typical branch has a branch

9    manager, any number of inside salespeople, a

10   couple of outside salespeople, then probably

11   a warehouse manager, warehousemen, and then

12   drivers and laborers.

13       Q.      Salespeople work on commission?

14       A.      Commission along with salary.

15       Q.      I want to ask you on some of

16   these other names if these people are still

17   with the company.

18              Charles Gray is listed as the

19   Foley branch manager.  Is he still with --

20       A.      That should be Charles Gay, and

21   yes, he's still there.

22       Q.      Still in the same capacity?

23       A.      Yes.

24       Q.      Gary Hymel in Houston?

Confidential - Subject to Further Confidentiality Review

Page 287

```
 1          A.      He is not.

 2          Q.      Where is he now?

 3          A.      He is with a steel stud

 4     manufacturer in Houston.

 5          Q.      If we wanted to get his

 6     last-known address, where would you look to,

 7     if I asked you to do that?

 8          A.      We have his phone number.  We

 9     could get it for you.

10          Q.      All right.  Ben Diano in

11     Mandeville, is he still with the company?

12          A.      Still there.

13          Q.      He is?

14          A.      Yes.

15          Q.      Bobby Freedman?

16          A.      No longer with the company.

17          Q.      When did he leave?

18          A.      A few months ago.

19          Q.      Where is he now?

20          A.      Don't know.  He's in

21     Birmingham, but I don't know who he's working

22     for.

23          Q.      In the Birmingham area?

24          A.      He's in the Birmingham area,
```

Confidential - Subject to Further Confidentiality Review

Page 288

1       yes, sir.

2               Q.      Why did he leave?

3               A.      He was dismissed.

4               Q.      Why?

5                       MR. DUPLANTIER:  I'm going to

6               object to the form of the question.

7               That's actually a privilege

8               information.  It's also outside the

9               scope of the 30(b)(6) notice.  It has

10              nothing to do with this litigation,

11              but it's privileged for other reasons.

12                      MR. REEVES:  I guess that

13              depends on why he was fired.  So are

14              you instructing him not to answer?

15                      MR. DUPLANTIER:  Yeah, I am.

16              It's also outside the scope of the

17              notice, so...

18                      MR. REEVES:  Well, we don't

19              agree.  We'll take it up, if we deem

20              it necessary.

21                      MR. DUPLANTIER:  That's fine.

22                      MR. REEVES:  Okay.

23      BY MR. REEVES:

24              Q.      So Mr. Friedman is no longer

Confidential - Subject to Further Confidentiality Review

Page 289

```
 1      with the company as of a few months ago?

 2           A.    Yes.

 3           Q.    Jim Green in Mobile, is he

 4      still --

 5           A.    Still with the company.

 6           Q.    Still in the same capacity?

 7           A.    Yes.

 8           Q.    Bill Tarleton?

 9           A.    No longer with the company.

10           Q.    When did he leave?

11           A.    I don't recall.

12           Q.    Where is he now?

13           A.    I don't know.

14           Q.    Why did he leave?

15           A.    He resigned.

16           Q.    Why?

17           A.    We had a personnel issue that

18      we confronted him on, and he -- he basically

19      said, "I'm not enjoying what I'm doing

20      anymore.  I think it would better for me to

21      go."

22           Q.    All right.  I'll ask you the

23      same question with regard to Robert McCay:

24      Is he still with the company?
```

Confidential - Subject to Further Confidentiality Review

Page 290

```
 1          A.      Yes, he is.

 2          Q.      In the same capacity?

 3          A.      Yes.

 4          Q.      And in terms of all these

 5     individuals, your personnel records would

 6     have their last-known address and phone

 7     number?

 8          A.      Yes.

 9          Q.      Who is Mark Peterson?

10          A.      Mark Peterson is a warehouseman

11     in New Orleans.

12          Q.      Is he still with the company?

13          A.      Yes, he is.

14          Q.      Same capacity?

15          A.      Yes.

16          Q.      What's your current address,

17     Mr. Geary?

18          A.      My current address?

19          Q.      Yes.

20          A.      450 Fairway Drive.

21          Q.      Okay.  Let me ask you a little

22     bit about Bailey's Lumber.  They appear to be

23     a fairly large customer back in the '06

24     to '08 time period; is that fair?
```

Confidential - Subject to Further Confidentiality Review

Page 291

1          A.      Yes.

2          Q.      Do you have any primary

3    contacts over at Bailey's?

4          A.      My branch manager, Chip

5    Williams, deals primarily with them; but yes,

6    we have some contacts over there.

7          Q.      Mr. Kostal, Robert Kostal?

8          A.      Richard Kostal.

9          Q.      Richard Kostal.  I'm sorry.

10                 Anyone else?

11         A.      Steve Braun, I think it is.

12         Q.      Right.

13                 Would those be the two people,

14    primarily, that you would have dealt with or

15    your company would have dealt with during

16    this time?

17         A.      Well, they are more the

18    management.  Typically, what happened is a

19    salesman from Bailey would call my guy and

20    say, "Please make this delivery."

21         Q.      Okay.  Which brings me to sort

22    of my next question.  You did the same thing

23    with Bailey's, did you not, that you

24    described earlier with Lowe's and Home Depot,

Confidential - Subject to Further Confidentiality Review

```
 1    and that is a drop shipment method of
 2    delivery?
 3         A.    Yeah, where they would place
 4    the order with us, we would bill them, and
 5    they would bill the customer.
 6         Q.    Just so it's clear as to how
 7    that would work, a customer would come into
 8    Bailey's, a builder or somebody who wanted
 9    some drywall, they would place an order,
10    Bailey's --
11         A.    Well, actually, it would be,
12    you know, they would be building a house,
13    probably, and so they would have the
14    whole package --
15              MR. DUPLANTIER:  Let him ask
16         his question.
17              THE WITNESS:  I'm sorry.
18              MR. REEVES:  That's okay.
19    BY MR. REEVES:
20         Q.    So they'd come in and they
21    would -- for instance, with the sheetrock, if
22    they wanted sheetrock, they would ask
23    Bailey's, I guess, for the rock.
24              Bailey's would, in
```

Confidential - Subject to Further Confidentiality Review

Page 293

1      circumstances where they dealt with y'all,

2      pick up the phone or otherwise contact you

3      and say, "You need to deliver x amount of a

4      certain kind of sheetrock to a work site."

5      Is that how it worked?

6             A.     Yes.  Yes, sir.

7             Q.     Okay.  And then would it be a

8      paper trail generated, or would that be a

9      telephone call from Bailey's?

10            A.     Usually a telephone call.

11            Q.     Okay.  Who would be the person

12     at Bailey's that would be making those calls

13     during the '06 to '08 time period?

14            A.     I think it would be various

15     salesmen.

16            Q.     Same thing; salesmen on that

17     end?

18            A.     Yeah.

19            Q.     Who would they contact on your

20     end during that time period?

21            A.     Various salespeople on our end.

22            Q.     All right.  And then you would

23     actually -- in many instances, then, your

24     company would deliver that rock to that site?

Confidential - Subject to Further Confidentiality Review

Page 294

1          A.      Yes.

2          Q.      Okay.  And then Bailey's would

3    presumably bill the customer?

4          A.      Correct.

5          Q.      You would bill Bailey's?

6          A.      Yes.

7          Q.      All right.  And that's the same

8    sort of -- I've used -- I've seen the term

9    "drop ship."  Is that what's used to describe

10   that?

11         A.      No.  A drop ship would normally

12   be more of a direct shipment of product,

13   where we just send a truck and it's unloaded

14   there.  This is more we have a boom truck and

15   labor and go stock the house, for instance.

16         Q.      Okay.  And that's the way you

17   would generally deal with Bailey's, Lowe's,

18   Home Depot?

19         A.      Most -- yes.

20         Q.      Would you deal with 84 Lumber

21   in the same manner?

22         A.      Yes.

23         Q.      In those instances, would

24   the -- the product, then, would never

Confidential - Subject to Further Confidentiality Review

Page 295

1    actually be in Bailey's possession; is that

2    correct?

3         A.    It would not usually go to

4    Bailey's facility.  It would go straight to

5    the house.

6         Q.    Looking at Exhibit 38,

7    Bates-stamp page 17768, this is the invoice

8    for Creola Ace Hardware that you discussed

9    earlier.  It's listed as "drop ship."  Do you

10   see that in the middle of the page?

11        A.    Yes.

12        Q.    Just so I'm clear, what is

13   that -- what procedure is that describing?

14        A.    It could mean a couple of

15   things.  It appears to be -- it appears to be

16   an 18-wheeler, because it's 612 pieces, which

17   is a full 18-wheeler.  So my guess would be

18   is that this came straight from a domestic

19   manufacturer and went straight to the

20   jobsite.

21        Q.    Let me ask you in terms of your

22   situation with Bailey's.  Isn't it true that

23   at some point, you actually warehoused some

24   of Bailey's sheetrock in one of your

Confidential - Subject to Further Confidentiality Review

Page 296

1     facilities?

2          A.     I don't recall that.

3          Q.     Just don't recall, one way or

4     another --

5          A.     No.

6          Q.     -- or you deny doing it?

7          A.     I don't recall it.

8          Q.     Okay.

9          A.     It may have happened.  I don't

10    recall it.

11         Q.     You have a warehouse in the

12    Gulfport area?

13         A.     Yes, we do.

14         Q.     All right.  A large warehouse?

15         A.     I'm trying to remember the

16    footage.  Maybe 20,000 feet or so.

17         Q.     All right.  And I've seen some

18    e-mails about other warehouse facilities that

19    you have.  Where else did you have warehouse

20    facilities in the '06 to '08 time period?

21         A.     In that time frame, we were in

22    New Orleans, Baton Rouge, Mobile, Birmingham,

23    Gulfport, Mandeville, Houston, Foley.  And,

24    as I said, we brought Lafayette on right at

Confidential - Subject to Further Confidentiality Review

Page 297

```
 1    the tail end, but they did not get any

 2    imported board.

 3          Q.    Okay.  Did Bailey's, during

 4    this time period, sell you any domestic or

 5    imported drywall?

 6          A.    I think they may have sold us

 7    some domestic.  What was happening was

 8    everybody was on allocation from their

 9    manufacturers, and so I think Bailey's may

10    have sold us some domestic, but I can't swear

11    to it.

12          Q.    What would you need to look to

13    to verify that?

14          A.    I would have to -- I guess I

15    would go look in our purchase orders and pull

16    up "Bailey Lumber" and see if they sold us

17    any 4x12x1/2" regular sheetrock.

18          Q.    We haven't talked much about

19    your corporate structure.  How were you set

20    up, legally speaking, in '06 to '08 time

21    period?

22          A.    Limited partnership.

23          Q.    All right.  And describe for me

24    the members of the partnership.
```

Confidential - Subject to Further Confidentiality Review

1          A.     Well, the general partner is

2     Interior/Exterior Enterprises, and the

3     limited partner is South Cortez, LLC.

4          Q.     And you and your brother are

5     members of both?

6          A.     We are both members of the

7     general partnership.

8          Q.     Anybody else a member of

9     either?

10          A.     My two siblings -- other two

11     siblings are members of the general

12     partnership.

13          Q.     And who are they?

14          A.     Jeff and Sid Geary.

15          Q.     All right.  And that's true

16     today, as well as in the '06 to '08 time

17     period?

18          A.     Yes.  Yes.

19          Q.     In terms of your structure, who

20     would report to you with regard to sales?  If

21     we were looking at a flowchart from you down

22     to who directed sales, who would be the next

23     person in line?

24          A.     It's a pretty flat

Confidential - Subject to Further Confidentiality Review

Page 299

```
1    organization.  Jim and I pretty much -- I
2    guess you'd kind of consider us partners.
3    We're kind of interchangeable.  Below us, we
4    have functional managers and then branch
5    managers, and they report directly to us.
6         Q.    We went through the branch
7    managers, right?
8         A.    Uh-huh.
9         Q.    And the functional managers --
10        A.    We have accounting, human
11   resources, purchasing, credit.  Those type of
12   things.
13        Q.    Who is in charge of human
14   resources now?
15        A.    Now?
16        Q.    Yes.
17        A.    Jim McLaughlin.
18        Q.    What about in '06 to '08 time
19   period?
20        A.    Oh, we had a lady who was with
21   us in '05.  She's passed away; Tina Gorman, I
22   believe her name was.  And then Deana Eister
23   was with us for a period of time.  And I
24   can't remember when Jill came on.
```

Confidential - Subject to Further Confidentiality Review

 1          Q.      Did you have anybody in charge
 2    of customer or contractor complaints and/or
 3    quality control?
 4          A.      No.
 5          Q.      Do you have anybody that
 6    handles those jobs today?
 7          A.      No.
 8          Q.      Is there a procedure in place
 9    for handling contractor or customer
10    complaints?
11          A.      Yeah.  Usually if we get a --
12    you know, a salesman or manager gets a call,
13    he'll call the manufacturer rep, and the rep
14    will come out to the job and try and resolve
15    the problem.
16          Q.      Okay.  So the typical way you
17    would receive a complaint, I guess, with
18    regard to any product, would be somebody
19    calling in and complaining about what they
20    received?
21          A.      From a customer, yeah.
22          Q.      Right.
23                  And they would typically talk
24    to a salesperson?

Confidential - Subject to Further Confidentiality Review

1          A.      A salesperson, yes.

2          Q.      And the salesperson would go

3    out with who?

4          A.      He would call the

5    manufacturer's rep, and either the

6    manufacturer's rep would go out or he'd go

7    out with them.

8          Q.      Would there be a written

9    document or file set up with regard to the

10   complaint?

11         A.      I guess it would depend.  The

12   manufacturer would do that, not us.  But the

13   manufacturer would document any problems that

14   they have and replace the material or

15   whatever.

16         Q.      Well, I was asking specifically

17   with regard to Interior/Exterior.  Did you

18   have any procedure --

19         A.      No formal procedure.

20         Q.      Okay.  And so it wouldn't

21   necessarily be a file with a complaint?

22         A.      No.

23         Q.      Wouldn't necessarily be

24   electronic -- electronically stored anywhere,

Confidential - Subject to Further Confidentiality Review

Page 302

1       any history of a complaint --

2               A.      No.

3               Q.      -- is that correct?

4               A.      No.

5               Q.      Still the same today?

6               A.      Yes.

7               Q.      It's my understanding that

8       during this time period, you -- I think you

9       went through the various types of drywall

10      that y'all were selling:  several domestic,

11      then these Chinese that we're talking about.

12      And I've seen some different abbreviations in

13      the documents.

14                      "USG" would be?

15              A.      United States Gypsum, probably.

16              Q.      United States Gypsum.

17                      And if we're talking about gyp

18      board, that would be gypsum as well?

19              A.      "Gyp board" would just be a

20      generic term, like "drywall."

21              Q.      Okay.  There seemed to be some

22      discussion in the documents about competition

23      for product during this time period, that

24      there wasn't enough to go around, at least

Confidential - Subject to Further Confidentiality Review

Page 303

 1     for part of this time, right?

 2          A.     Yes.

 3          Q.     Who were some of your

 4     competitors who were also trying to get rock?

 5          A.     I'm sure everybody was.

 6                 MR. DUPLANTIER:  Just object to

 7          the form of the question.  But you can

 8          answer it.

 9          A.     I'm sure everyone was.

10     BY MR. REEVES:

11          Q.     You have primary competitors in

12     your field?

13          A.     In different markets, there are

14     different competitors.

15          Q.     Who would some of those be?

16          A.     In the New Orleans market?

17          Q.     Sure.

18          A.     Seacoast Supply, metal studs;

19     Acoustical Ceiling Supply; and then to a

20     certain degree, we compete with the Lowe's

21     and Home Depots and so forth.

22          Q.     What about on the Mississippi

23     Gulf Coast, who would you consider your

24     primary competitors during this time period?

Confidential - Subject to Further Confidentiality Review

Page 304

1           A.     Let's see.  I'm trying to
2      remember the name.  They just closed the
3      door.  We competed with Seacoast Supply, out
4      of Mobile.  We competed with Renfro, out of
5      Jackson, Mississippi.  The company that
6      closed down, and I can't recall their name.
7      Just Rite.  Just Rite Supply, that's what it
8      was.
9           Q.     When -- it was a little unclear
10     to me:  When did you last sell Chinese
11     drywall?
12          A.     Well, we don't know, exactly.
13     We feel like it was the end of 2006.  We
14     produced documents through the first quarter
15     of 2007, you know, to be as safe as we could.
16     And there were an additional 23 invoices that
17     we identified that were after March 31st, and
18     I think they ended in May of '07.
19          Q.     That were after March 31st
20     of '07?
21          A.     Yes, and they were -- I think
22     they went until May of '07.
23          Q.     And that includes Knauf,
24     obviously?

Confidential - Subject to Further Confidentiality Review

1          A.      Yes.

2          Q.      How were you able to estimate

3     when you last sold the Chinese drywall?

4          A.      Talking to our managers, and I

5     guess we could look and see -- well, really,

6     I guess it would just be -- we discussed it

7     with our managers, and our recollection,

8     mainly.

9          Q.      Who were the managers you

10    discussed it with?

11         A.      Probably Mandeville,

12    New Orleans, Gulfport.

13         Q.      You're talking about the branch

14    managers?

15         A.      The branch managers, yeah.

16    Yeah.

17         Q.      Okay.  So tell me how that

18    happened.  You basically -- you or your

19    brother, or both of y'all, called them or had

20    a conference and tried to figure out when it

21    was last sold?

22         A.      Yes.

23         Q.      Was it face-to-face or a

24    telephone call?

Confidential - Subject to Further Confidentiality Review

Page 306

1          A.      Telephone call.

2          Q.      Did everybody participate at

3    once, or did you just make the rounds

4    calling?

5          A.      No, I think we just made

6    various calls.

7          Q.      Create any notes with regard to

8    those conversations?

9          A.      No.

10         Q.      Just remembered it all?

11         A.      Yeah.

12         Q.      There's been a lot of

13   conversation about the Crescent City Gypsum

14   we talked about earlier.

15              When did you first hear that

16   name?

17         A.      I'd, frankly, forgotten about

18   it until I went and reviewed these documents

19   and I saw that document.  Sometime during the

20   whole process when we were trying to acquire

21   gyp board.

22         Q.      And your company has not issued

23   any type of notices or warning to customers

24   who bought the drywall, have they?

Confidential - Subject to Further Confidentiality Review

```
 1          A.      No.
 2          Q.      Just some names that popped out
 3     in the documents and I'm not sure if we've
 4     covered them all.  I want to see if you can
 5     tell me who they are.
 6                  Rudy Remont, does that name
 7     ring a bell?
 8          A.      Rudy Remont worked for
 9     J.W. Allen, which was the freight forwarder.
10          Q.      Is he still with them?
11          A.      I don't think so.
12          Q.      Do you know what happened to
13     him?
14          A.      I think he just retired, but
15     I'm not positive.
16          Q.      What did he do for J.W. Allen,
17     do you know?
18          A.      I don't know exactly.  For us,
19     he did a lot of -- he went over to China and
20     inspected the product as it was going onto
21     the ships and so forth.  I'm not sure what
22     his day-to-day duties were.
23          Q.      The inspections you talked
24     about earlier with my colleague, Mr. Herman?
```

Confidential - Subject to Further Confidentiality Review

Page 308

1          A.      Yes.  Yes.

2          Q.      Jerry Becnel, who is he?

3          A.      Jerry Becnel handled kind of

4     the logistics of the trucks for J.W. Allen,

5     so he helped coordinate, you know, the trucks

6     as they went off the wharf to our branches.

7          Q.      So he was a J.W. Allen

8     employee?

9          A.      Yes, he was.

10         Q.      Is he still with them?

11         A.      I don't know.

12         Q.      David Zhang?

13         A.      I don't recall David Zhang.

14         Q.      Ring a bell?

15         A.      No.

16         Q.      Jeffrey Zeng?

17         A.      I don't recall him either.

18         Q.      Susan Li, L-I?

19         A.      Susan Li was with Weida

20    Freight.  And a lot of correspondence back

21    and forth.  She had -- we were trying to --

22    she was the one that had a little contention

23    with Knauf, I think, for a while, as far as

24    the logistics of getting the ships and so

Confidential - Subject to Further Confidentiality Review

1    forth.

2         Q.     What did Weida Freight do for

3    you?

4         A.     Weida Freight was really

5    J.W. Allen's contact in China, and they made

6    a contact at BNBM for us.  They did some of

7    the inspections, I think, of the products as

8    it was going onto the ships also.

9         Q.     Cecil -- Cecilia Wang?

10        A.     Cecilia Wang was -- Mark Norris

11   made the call.  You know, he was the -- I

12   guess the manager, because he would make the

13   decision, and then she was kind of logistics.

14        Q.     Manager of?

15        A.     Mark?

16        Q.     Yeah.

17        A.     I don't know.  I'm not sure --

18        Q.     What company was he with?

19        A.     Knauf --

20        Q.     Knauf?

21        A.     -- in China.

22        Q.     And then David Alexander?

23        A.     I don't remember that name.

24        Q.     Barry Topple?

Confidential - Subject to Further Confidentiality Review

1          A.      Barry Topple was with Knauf.

2     When we tried to get more board from Knauf,

3     from Jeff Brisley, he, I guess, went up the

4     ladder to Barry Topple to see if Barry could

5     help him.

6          Q.      Carlos Cisneros?

7          A.      I can't remember who that is.

8          Q.      Has Interior/Exterior been

9     involved in any remediation of any properties

10    that have had the Chinese drywall problem?

11         A.      No.

12         Q.      And I was a little unclear:  In

13    terms of the inspections that were being

14    done, when people would call in with the

15    problem, they were referred to Knauf to be

16    handled; is that right?

17              MR. SANDERS:  Object to the

18         form.

19         A.      Yes.

20    BY MR. REEVES:

21         Q.      And I was unclear:  Did someone

22    from your company accompany the people with

23    Knauf out to these inspections of these

24    properties?

Confidential - Subject to Further Confidentiality Review

Page 311

1          A.      Did we accompany?

2          Q.      Yeah.

3          A.      To do the inspections?  No.  I

4    think one or two of my guys may have gone to

5    a couple of the houses with them, but not on

6    a regular basis, no.

7          Q.      But they've been to some.  Who

8    would have went?

9          A.      I believe Ben Diano went to

10   one.

11         Q.      Do you know what property?

12         A.      No, I don't.

13         Q.      And Ben is still with the

14   company?

15         A.      Yes, he is.

16         Q.      Who else went on these

17   inspections?

18         A.      I don't know if anybody else

19   did.

20         Q.      I want to talk a little bit

21   about insurance.  Y'all have identified a

22   number of policies in your profile form.

23               Have you been told by any of

24   your insurance companies that you may not

Confidential - Subject to Further Confidentiality Review

Page 312

```
 1    have coverage for these claims?
 2              MR. DUPLANTIER:  I'm going to
 3         object to the form of the question.
 4         I'm going to instruct the witness not
 5         to answer that question.
 6              MR. REEVES:  I just asking
 7         about communication with his insurance
 8         company.
 9              MR. DUPLANTIER:  I understand
10         that, but to the extent that those --
11         those communications occurred in
12         anticipation of litigation or as a
13         result of litigation or occurred with
14         lawyers, I'm instructing the witness
15         not to answer.  I think you're asking
16         for information that's both privileged
17         and irrelevant to this proceeding.
18              MR. REEVES:  Well, we'll
19         disagree; and if we have to address
20         that later, we will.  Okay.
21    BY MR. REEVES:
22         Q.    What types of warranties, if
23    any, did Interior/Exterior provide to those
24    who purchased Chinese drywall from them?
```

Confidential - Subject to Further Confidentiality Review

Page 313

1          A.      We did not --

2                  MR. DUPLANTIER:  Object to the

3          form of the question.  You can answer.

4          Go ahead.

5          A.      We did not provide any

6    warranties.

7    BY MR. REEVES:

8          Q.      Okay.  Let me make sure I just

9    kind of understand a few things from a

10   big-picture standpoint.

11                 The first shipment that y'all

12   actually received of Chinese drywall was in

13   January of '06; is that right?

14         A.      Yes.

15         Q.      And based upon your best

16   estimation in talking to your branch

17   managers, you sold through the end of that

18   year, maybe early into '07; is that your

19   testimony?

20         A.      Yes.

21         Q.      And I think we've confirmed

22   that you didn't have in place during this

23   time any sort of official complaint procedure

24   or policy to document complaints; is that

Confidential - Subject to Further Confidentiality Review

Page 314

1    correct?

2          A.     That's correct.

3          Q.     You had no certain person that

4    was designated as the contact person for

5    anybody who may have had a complaint with a

6    product you sold them; is that right?

7          A.     That's correct.

8          Q.     And I understand your testimony

9    is the first inclination or knowledge that

10   Interior/Exterior knew where they knew that

11   Chinese drywall was a problem was in January

12   of '08, or was that...

13                MR. DUPLANTIER:  I'm going to

14         object to the form of his question.

15         That's not his testimony.

16                MR. REEVES:  Okay.

17   BY MR. REEVES:

18         Q.     Tell me when it is.

19         A.     The first notice that we had

20   was we got an e-mail that's -- I think it was

21   January 12th from someone saying -- a Wall

22   Street Journal article, I believe it was, was

23   January 12th of '09.

24         Q.     Of '09?

Golkow Technologies, Inc. - 1.877.370.DEPS

Confidential - Subject to Further Confidentiality Review

1          A.      Yeah.

2          Q.      Okay.  You'd agree with me,

3     sir, as a seller of these products, that if

4     you become aware or if you have a lot of

5     complaints about a product that you're

6     selling, you ought to look into that, don't

7     you?  You agree with that?

8          A.      Yes.

9          Q.      That's just common sense,

10    right?

11         A.      Yes.

12         Q.      So if you're getting systematic

13    complaints of people saying that a product is

14    inferior, that's something that a responsible

15    seller of the product ought to look into;

16    you'd agree?

17              MR. DUPLANTIER:  Object to the

18         form of the question.  You can answer

19         it.

20         A.      Yes.

21    BY MR. REEVES:

22         Q.      Okay.  And you would certainly

23    agree with this, sir, that you shouldn't

24    continue to sell a product if you suspect

Confidential - Subject to Further Confidentiality Review

Page 316

1    it's unsafe or is an inferior product.  You

2    would agree with that, wouldn't you?

3         A.    Yes.

4         Q.    And I think I heard you testify

5    earlier that, basically, in your estimation,

6    I'm paraphrasing here, that drywall was --

7    was sort of drywall and there was no

8    significant difference between any of it; is

9    that fair?

10        A.    Correct.

11        Q.    But, sir, isn't it true that as

12   early as February and March of '06, you began

13   to get specific requests from builders who

14   routinely did business with you that they

15   didn't want to use the Knauf wall; isn't that

16   true?

17        A.    We have requests -- preference

18   requests all the time.  I mean, some people

19   wanted USG.  Some people want National.  Some

20   people wanted --

21             MR. McKENNA:  I'm sorry, I

22        can't hear the answer at all.

23        A.    We always have preference

24   requests, one vendor versus another, one

Page 317

1    manufacturer versus another.  So some people

2    preferred domestic; some people didn't.

3    BY MR. REEVES:

4         Q.    Well, some people specifically

5    didn't specify anything, other than they

6    didn't want Knauf, didn't they?

7         A.    There may have been someone who

8    did that.  I don't recall that.

9         Q.    There were several people that

10   did that, weren't there?

11        A.    I don't recall that.

12        Q.    Okay.  Well, if it's in the

13   documents, you wouldn't dispute that, would

14   you?  In the invoices?

15        A.    Correct.

16        Q.    Okay.  In fact, they didn't

17   want the Knauf product because they reported

18   to your company that it was an inferior

19   product, didn't they?

20             MR. SANDERS:  Object to form.

21        A.    I don't recall anyone reporting

22   to us that it was an inferior product.

23   BY MR. REEVES:

24        Q.    I'm going to mark --

Confidential - Subject to Further Confidentiality Review

Page 318

```
 1                MR. REEVES:  What are we up to,
 2          Court Reporter?
 3                (Whereupon, Deposition Exhibit
 4          INEX-30b6-74, Interior/Exterior
 5          Invoices, INT/EXT27357, INT/EXT28739,
 6          INT/EXT28746, INT/EXT27312,
 7          INT/EXT27316, was marked for
 8          identification.)
 9     BY MR. REEVES:
10          Q.    All right.  Sir, what's been
11     attached as Exhibit 74 to your deposition are
12     documents produced by Interior/Exterior,
13     27357, 28739, 28746, 27312, 27316; and those
14     are invoices, aren't they, sir?
15          A.    Yes, they are.
16          Q.    And the first one is dated
17     2/23/06, isn't it?
18          A.    Invoice date, 2/28/06?
19          Q.    Yes.  I'm sorry.  You're right.
20     2/28/06; is that correct?
21          A.    Yes.
22          Q.    So that's the date that the
23     invoice would have been generated?
24          A.    Yes.
```

Confidential - Subject to Further Confidentiality Review

Page 319

1          Q.      And this is roughly a month

2    after your first purchase of Chinese drywall;

3    is that correct?

4          A.      Yes.

5          Q.      And this is shipping to Rivers

6    Edge in Richmond, Texas, correct?

7          A.      Yes, it is.

8          Q.      Billing to Aurora Commercial

9    Construction, Inc. in Crosby, Texas; isn't

10   that correct?

11         A.      Yes.

12         Q.      And in the description, where

13   it says, "Product and Description," I'm going

14   to read this, and make sure I read it

15   correctly, sir.  It says, "No Knauf, no

16   Knauf, no Knauf, no Knauf, no Knauf, no

17   Knauf," doesn't it?

18         A.      Yes.

19         Q.      So this is a person, within a

20   month after your receipt of Chinese drywall,

21   specifying that they don't want the Knauf

22   product, correct?

23         A.      Correct.

24         Q.      And isn't it true, sir, that

Confidential - Subject to Further Confidentiality Review

1    they didn't want the Knauf product because

2    they told you it was an inferior product?

3    Isn't that true?

4              MR. SANDERS:  Object to form.

5         A.    I'm not aware of that.

6    BY MR. REEVES:

7         Q.    Do you know the persons at

8    Aurora Commercial?

9         A.    I don't know them personally.

10        Q.    Are they -- they've done a

11   significant amount of business with you over

12   the years, haven't they?

13        A.    I'm not sure what their sales

14   figures are.

15        Q.    Would they have any reason to

16   tell anything other than the truth here in

17   this case?

18        A.    I don't know why not.

19        Q.    Well, if they say that they

20   advised you they didn't want Knauf because it

21   wasn't a good product, you wouldn't dispute

22   that, then?

23        A.    I can't dispute what they have

24   to say.  I haven't heard what they had to

Confidential - Subject to Further Confidentiality Review

Page 321

1      say.

2             Q.     Okay.  What we know is, though,

3      that Interior/Exterior didn't have any method

4      to document whatever the complaints were or

5      the reason they didn't want Knauf, right?

6             A.     That's correct.

7             Q.     So if they had made complaints

8      and specified what the problems were, we

9      couldn't look to any document to find that

10     out because none were supposed to be kept,

11     necessarily; isn't that right?

12            A.     None were kept.

13            MR. DUPLANTIER:  Object to the

14            form of the question.  You can answer.

15     BY MR. REEVES:

16            Q.     Okay.  Let's go to the next

17     page of the document.  That's an invoice

18     dated 3/14/06, correct?

19            A.     Yes.

20            Q.     And this is a -- would have

21     been the date the invoice was generated,

22     right?

23            A.     3/14/06.

24            Q.     And generated just the way we

Confidential - Subject to Further Confidentiality Review

Page 322

1    talked about earlier, correct?

2         A.    Uh-huh.

3         Q.    And this says, "Ship To:  Glen

4    Abbey subdivision in Houston, Texas,"

5    correct?

6         A.    Yes.

7         Q.    And it says, "Bill To:  Titan

8    Drywall, Inc.," correct?

9         A.    "Bill To:  Titan," yes.

10        Q.    And this, again, is two months,

11   or maybe a month and a half, after you first

12   started selling Chinese drywall, correct?

13        A.    Yes.

14        Q.    And this is a different builder

15   than -- saying -- different builder than the

16   builder on the earlier page that said they

17   didn't want Knauf, right?

18        A.    Yes.

19        Q.    But these people don't want

20   Knauf either, correct?

21        A.    That's correct.

22        Q.    In fact, at the bottom, make

23   sure I read it correctly, it says, "Load only

24   American Board.  No Knauf, no Knauf, no

Confidential - Subject to Further Confidentiality Review

1    Knauf, no Knauf," correct?

2        A.      Correct.

3        Q.      Who generated these two

4    invoices?  Can you look at them and tell me?

5        A.      Yeah, that would probably be

6    Terri Collura.  "TYC," I think, is her

7    initials.

8        Q.      Is he still with the company,

9    or she?

10        A.      It's a she; and yes, she is.

11        Q.      Where does she work?

12        A.      Excuse me?

13        Q.      And she works here in

14    New Orleans?

15        A.      No.  Actually, she works in

16    Shreveport now.

17        Q.      And what is her job title?

18        A.      Inside sales.

19        Q.      Let's go to the next page of

20    this exhibit, Exhibit 74.  And it's dated

21    3/14/06 as well, correct?

22        A.      Yes.

23        Q.      And this is also from Titan for

24    delivery to another site, correct?

Confidential - Subject to Further Confidentiality Review

Page 324

1          A.      Yes.

2          Q.      And, again, they request no

3     Knauf, right?

4          A.      Correct.

5          Q.      Let's flip to the next page.

6     Invoice is dated 4/25/06, correct, sir?

7          A.      Yes.

8          Q.      Again, a delivery to bill to

9     Houston area, to be delivered in the Houston

10    area, right?

11         A.      Correct.

12         Q.      To David E. Smith.  Again, a

13    different builder than on the earlier two

14    pages that we looked at, correct?

15         A.      Correct.

16         Q.      So this is the third builder.

17    And at the bottom, I'm going to read it.

18    Make sure I read it correctly.  Specifically

19    says, "No Knauf, no Knauf, no Knauf,"

20    correct?

21         A.      Correct.

22         Q.      And 5/24 invoice date, is the

23    next one; and it's, again, the same builder

24    saying, "No Knauf," correct?

Confidential - Subject to Further Confidentiality Review

1          A.     Yes, it is.

2          Q.     So in light of all these

3     people, or at least four builders saying, "We

4     don't want Knauf," you can't point to us

5     any -- to any document or any investigation

6     that you did to determine why they didn't

7     want Knauf, can you?

8          A.     No, I can't.

9          Q.     And you have no document or

10    files that we can look at to see why they

11    didn't want Knauf, correct?

12         A.     No, I don't.

13         Q.     That's not documented in any

14    way?

15         A.     No.

16         Q.     If an invoice ever said, "No

17    Knauf," did you deliver Knauf anyway, in some

18    cases?

19         A.     They shouldn't, if it was a

20    customer preference to not.  They should not

21    have.

22                (Whereupon, Deposition Exhibit

23         INEX-30b6-75, Interior/Exterior

24         Invoice, INT/EXT19773, was marked for

Confidential - Subject to Further Confidentiality Review

Page 326

        1           identification.)

        2     BY MR. REEVES:

        3           Q.     Let me ask you about another

        4     series -- another invoice that I saw.  This

        5     will be 75.  Take a look at that, sir, and

        6     tell me, once you've had a chance to do so.

        7           A.     Okay.

        8                  MR. DUPLANTIER:  What are you

        9           numbering this?  Did you just number

       10           the last set 75?

       11                  THE REPORTER:  Yes.

       12                  MR. REEVES:  This should be 75.

       13           You got it?  This should be 75.

       14     BY MR. REEVES:

       15           Q.     Who generated this invoice,

       16     sir?

       17           A.     My guess would be Rebecca

       18     Galleon.

       19           Q.     Is she still with your company?

       20           A.     Yes, she is.

       21           Q.     And where is she employed, and

       22     in what capacity?

       23           A.     Mandeville branch, inside

       24     sales.

Confidential - Subject to Further Confidentiality Review

1          Q.     I want to ask you about the

2     first line under "Product and Description."

3     This is a sale to 84 Lumber, correct?

4          A.     Yes, it is.

5          Q.     And it's got a bunch of dollar

6     signs, right?

7          A.     Uh-huh.

8          Q.     And then, "China rock," and

9     then a bunch of dollar signs again, correct?

10         A.     Uh-huh.

11         Q.     And this is dated 3/28/07,

12    correct?

13         A.     Yes.

14         Q.     What does she mean by the

15    dollar signs?

16         A.     They usually just do that to

17    make a note.  They'll sometimes use a pound

18    sign or something to just -- to make sure

19    that you can see the note.

20         Q.     Is it your testimony they do

21    that frequently?

22         A.     They'll put notes on tickets

23    quite often.

24         Q.     Will they mark it with dollar

Confidential - Subject to Further Confidentiality Review

```
 1    signs frequently?

 2          A.      I don't know that it's

 3    frequently or not.

 4          Q.      This is the only one we found,

 5    is why I ask you --

 6          A.      Okay.  Okay.

 7          Q.      -- in the 30,000 or so

 8    documents that have been produced, so I'll

 9    ask you:  Is this something that's frequently

10    done, the dollar signs?

11               MR. DUPLANTIER:  He answered

12          the question.  Ask him another

13          question.  He answered the question.

14               MR. REEVES:  Well, maybe he

15          did.  Okay.

16    BY MR. REEVES:

17          Q.      Mr. Geary, isn't it true that

18    you, yourself, knew in '06 that the Knauf

19    product was an inferior product that you were

20    selling, didn't you?

21          A.      No, that's not true.

22          Q.      You were, in fact, in '06,

23    doing some work on your house, weren't you?

24          A.      Yes, I was.
```

Confidential - Subject to Further Confidentiality Review

Page 329

1          Q.     Or were you building your
2     house?
3          A.     Excuse me?
4          Q.     Were you building your house or
5     doing work on it?
6          A.     No, my house got flooded.
7          Q.     Okay.  So you got flooded in
8     the storm; and you bought product for your
9     home from your company, didn't you?
10          A.     Yes.
11          Q.     You bought drywall, didn't you?
12          A.     Yes, I did.
13          Q.     And the truth is, in the
14     invoice that you submitted for your home, for
15     your family, right, you specifically
16     requested domestic board, didn't you?
17          A.     I requested USG board.
18          Q.     Right.  That's domestic board,
19     isn't it?
20          A.     Yes, it is.
21          Q.     Okay.  You didn't request
22     Knauf?
23          A.     No, I did not.
24          Q.     You didn't say, "I don't care,

Confidential - Subject to Further Confidentiality Review

1     just send me half-inch."  You requested USG,

2     didn't you?

3             A.     Yes, I did.

4             Q.     And you did that because you

5     knew that was a better product, didn't you?

6             A.     It was a personal preference.

7             Q.     Right.

8                    In your opinion, it was a

9     superior product.  The Knauf product was

10    inferior; isn't that the truth?

11                   MR. SANDERS:  Object to form.

12                   MR. DUPLANTIER:  I'm going to

13            object to the form too.  He's answered

14            the question.  He's answered the

15            question.  You can ask him another

16            question.

17                   MR. REEVES:  I don't think he

18            has.

19                   MR. DUPLANTIER:  He just did.

20            He just said it was a personal

21            preference.

22                   MR. REEVES:  Read the question

23            back, please.

24                   (The following portion of the

Confidential - Subject to Further Confidentiality Review

Page 331

 1          record was read.)

 2                  "QUESTION:  In your opinion, it

 3          was a superior product.  The Knauf

 4          product was inferior; isn't that the

 5          truth?"

 6                  THE WITNESS:  Did you read back

 7          my answer?

 8                  THE REPORTER:  There was not an

 9          answer after that.

10                  THE WITNESS:  Okay.

11          A.      Knauf product was -- no, I'm

12      sorry.  It was not an inferior product, no.

13      BY MR. REEVES:

14          Q.      Well, you didn't request an

15      inferior product to go into your own home,

16      did you?

17          A.      I had a personal preference for

18      USG product.

19          Q.      You preferred a better product,

20      right, like most people?

21          A.      I preferred it over National

22      Gypsum, over Temple, over all of the domestic

23      manufacturers as well.

24          Q.      And the Chinese as well,

Confidential - Subject to Further Confidentiality Review

Page 332

1    correct?

2         A.    Yes.

3         Q.    And you preferred it over

4    Knauf?

5         A.    Yes.

6              MR. REEVES:  Let's mark that

7         invoice as the next exhibit.

8              (Whereupon, Deposition Exhibit

9         INEX-30b6-76, Interior/Exterior

10        Invoices, INT/EXT21416 - INT/EXT21417,

11        was marked for identification.)

12             MR. REEVES:  Do you need an

13        extra copy?

14             MR. DUPLANTIER:  Yeah, I'm

15        trying to keep two sets of copies.

16             MR. SANDERS:  Do you have

17        another copy, Jim?

18             MR. REEVES:  I'm sorry?

19             MR. SANDERS:  Do you have an

20        extra?

21             MR. REEVES:  I don't know.  Let

22        me see.

23             Yeah, here's an extra one.

24             MR. SANDERS:  Thanks.

Confidential - Subject to Further Confidentiality Review

Page 333

1     BY MR. REEVES:

2           Q.     I want to go back, sir, to

3     Exhibit -- I think we marked it 74 or 75, the

4     one with the dollar signs on it.   75?

5           A.     Okay.

6           Q.     Let me ask you:   This invoice

7     is dated 3/28/07, correct?

8           A.     Yes.

9           Q.     And it references specifically

10    China rock?   China rock.   It specifically

11    references to use China rock, doesn't by, it

12    the dollar signs?

13          A.     Yes, it does.   Yes.

14          Q.     So we know your company was

15    selling Chinese rock at least through

16    3/28/07, don't we?

17          A.     Yes.

18          Q.     Okay.   So at least until then,

19    based upon this invoice we just looked at,

20    correct?

21          A.     Yes.

22          MR. REEVES:   Let's take a quick

23          break.   I may can pull my stuff

24          together.

Confidential - Subject to Further Confidentiality Review

 1              MR. DUPLANTIER:  Why don't you

 2         try and finish up so that, when we

 3         take a break, someone else can kind of

 4         take into your spot?

 5              MR. REEVES:  It'd be more

 6         efficient if you'd let me kind of go

 7         through my things where I can check

 8         them off.  We'll just take five.

 9              THE VIDEOGRAPHER:  Off the

10         record at 3:07 p.m.

11              (Recess taken, 3:07 p.m. to

12         3:14 p.m.)

13              THE VIDEOGRAPHER:  Stand by.

14         We're back on the record.  The time is

15         3:14 p.m.

16   BY MR. REEVES:

17         Q.    Mr. Geary, just a few more

18   questions.

19              Describe for me the

20   procedure -- I think we went through it all,

21   but you basically had a telephone conference

22   with your branch managers, looked over

23   documentation and tried to determine when you

24   last sold the Chinese drywall.  Is that

Confidential - Subject to Further Confidentiality Review

Page 335

1    basically what you did?

2         A.    I had a telephone conversation

3    with them and, you know, I guess we all

4    wracked our brains to try and recall when,

5    you know, the last shipments were sent out.

6         Q.    Was it multiple phone

7    conversations, a single one?

8         A.    I don't recall.

9         Q.    All right.  Was your brother in

10   on those as well?

11        A.    Yes.

12        Q.    Okay.  And this would have been

13   after litigation had ensued?

14        A.    Yes.

15        Q.    Y'all understood this was an

16   important matter, to know when you last sold

17   it, correct?

18        A.    Yes, sir.

19        Q.    And it was important for a lot

20   of reasons, so that you'd know who ended up

21   with the Chinese drywall, right?

22        A.    Correct.

23        Q.    And could report that back and

24   figure out if they had a problem, right?

Confidential - Subject to Further Confidentiality Review

1           A.      Correct.

2                   (Whereupon, Deposition Exhibit

3           INEX-30b6-77, Interior/Exterior

4           Invoice, INT/EXT32838, was marked for

5           identification.)

6       BY MR. REEVES:

7           Q.      Let me show you what I'll mark

8       as the next exhibit.  And this, sir, what

9       we've marked as Exhibit 77, is Bates-stamped

10      32838; and it's an invoice dated 5/18/07,

11      correct?

12          A.      Yes, sir.

13          Q.      Who created this invoice?

14          A.      I'm not sure.

15          Q.      What were you looking to

16      earlier to determine who created a particular

17      invoice?

18          A.      I was looking at the initials,

19      "KLM," and it escapes me who that is.

20          Q.      Okay.  So the initials would be

21      there for the person that created a

22      particular invoice?

23          A.      Yes.

24          Q.      All right.  And that just

Confidential - Subject to Further Confidentiality Review

Page 337

1        doesn't ring a bell to you?

2                A.      Right.

3                Q.      Now, specifically here, they're

4        referencing the sale of Knauf, aren't they?

5        If you look in the middle of the page there,

6        it says, "Knauf, Knauf, Knauf," does it not?

7                A.      Yes, they are.

8                Q.      Okay.  And this is in May

9        of '07?

10               A.      Yes.

11               Q.      Actually, May 18th, correct?

12               A.      Uh-huh.

13               Q.      So that indicates that you were

14       selling Chinese drywall at least until that

15       date, correct?

16               A.      We identified -- I think it was

17       23 invoices past March 31st that were

18       imported board.

19               Q.      And this is one of those?

20               A.      I believe so.

21               Q.      I want to make sure we're

22       covering this insurance issue, because your

23       counsel and I have a disagreement over that

24       and I want to make sure it's clear for the

Confidential - Subject to Further Confidentiality Review

Page 338

1      judge.

2                  I'm not asking you for any

3      conversations you've had with your attorneys

4      with regard to your insurance coverage that

5      you've had with them in private.

6                  What I am asking you is:  Have

7      any of your insurers themselves or their

8      agents advised you as to whether you may or

9      may not have coverage for the Chinese drywall

10     litigation?

11                 MR. DUPLANTIER:  You can answer

12          that question.

13          A.     We've received a reservation of

14     rights letter from all of our carriers.

15     BY MR. REEVES:

16          Q.     From all of them?

17          A.     Well, I say that.  I know from

18     the underlying carriers.  I don't know about

19     the excess carriers.

20          Q.     All right.  And you have copies

21     of those letters?

22          A.     Yes.

23          Q.     All right.  And what's the

24     stated reason for the reservation, if any?

Confidential - Subject to Further Confidentiality Review

Page 339

1          A.     You have to talk to the

2     attorney about that.  We have a coverage

3     attorney who's looking at that for us.

4          Q.     All right.  And who is that?

5          A.     Phil Nizialek.

6               MR. REEVES:  Subject to the

7          reservations that -- we'd like to get

8          copies of those letters, if that's

9          okay.  Can we do a formal --

10               MR. DUPLANTIER:  We've objected

11          to that.

12               MR. REEVES:  To providing the

13          letter?

14               MR. DUPLANTIER:  Yeah.

15               MR. REEVES:  Okay.  We can take

16          that up with the Court.

17               Subject to taking up with the

18          Court the areas that we reserved the

19          right to do that on the record, we

20          will tender the witness.

21               MR. DUPLANTIER:  This

22          deposition was cross-noticed in a

23          number of state court proceedings by

24          Kanner & Whiteley, and we're going to

Confidential - Subject to Further Confidentiality Review

Page 340

```
 1           give them an opportunity to ask
 2           questions next.
 3                MR. LAMBERT:  Just on behalf of
 4           Allan, who's not here right now, he'll
 5           pass this witness until Knauf is
 6           finished, and hopefully he will be
 7           there by then.  We've contacted him.
 8           You can't set up an order of a
 9           deposition.
10                MR. DUPLANTIER:  Actually, I
11           can.
12                MR. LAMBERT:  Well, I don't
13           think so.
14                MR. DUPLANTIER:  Mr. Kanner
15           cross-noticed the deposition for
16           today.
17                MR. LAMBERT:  I --
18                MR. DUPLANTIER:  If he's not
19           here to ask questions, we're going to
20           pass his questions.
21                MR. LAMBERT:  You can go --
22                MR. DUPLANTIER:  So he's been
23           given an opportunity to ask questions
24           in accordance with the notice that he
```

Confidential - Subject to Further Confidentiality Review

Page 341

1          issued for today.  He issued his

2          notice before anybody else, other than

3          the PSC.

4                   MR. LAMBERT:  I understand.

5          And we'll just attach, for the record,

6          a copy of a letter dated the 26th of

7          2010 as the next number exhibit.  What

8          is that?

9                   THE REPORTER:  78.

10                  MR. DUPLANTIER:  We object to

11         that being attached to the deposition,

12         actually.

13                  MR. LAMBERT:  You can do that.

14         You can object.

15                  77?  78?  And 79 is the 1442

16         notice.

17                  (Whereupon, Deposition Exhibit

18         INEX-30b6-78, Notice of 1442

19         Deposition (Dennis v.

20         Interior/Exterior, et al.), was marked

21         for identification.)

22                  (Whereupon, Deposition Exhibit

23         INEX-30b6-79, 1/26/10 Kanner Letter to

24         Herman & Levin, was marked for

Confidential - Subject to Further Confidentiality Review

Page 342

1          identification.)

2                    MR. DUPLANTIER:  Can I have a

3          copy of the notice?

4                    77 [sic] is the cross-notice of

5          this deposition, which mimicked in its

6          entirety the notice issued by the PSC.

7          And this is issued in the Dennis case

8          by Kanner & Whiteley.

9                    Counsel for the Dennis

10         plaintiffs is Allan Kanner, along with

11         Ms. Fuselier, who is present here and

12         is being given the opportunity to ask

13         questions.  And it's not my fault that

14         they're not prepared to ask their

15         questions.

16                   MR. LAMBERT:  I don't want to

17         argue with you.  I just --

18                   MR. DUPLANTIER:  I understand.

19         I understand, Mr. Lambert, that you

20         didn't issue these notices, nor do you

21         represent these parties, from what I

22         understand.

23                   MR. LAMBERT:  That's correct.

24                   MR. DUPLANTIER:  I'm not sure

Confidential - Subject to Further Confidentiality Review

Page 343

```
 1          why you're handling this for the
 2          counsel that's present.  But we're
 3          going to -- if they are not willing to
 4          ask their questions at the present
 5          time, let's go to the next witness.
 6               MR. HERMAN:   Okay.  This is
 7          Steve Herman, and I'd just like to put
 8          something on the record.  You can take
 9          this up with Judge Bagneris or
10          Judge Fallon or whoever you want to
11          take it up with.
12               I just want to say, for the
13          record, that somebody from Allan's
14          office called me yesterday to see if
15          they thought that we would be going
16          all day and have to continue the
17          deposition onto another day, and I
18          thought that we would.
19               If that has created confusion,
20          I apologize to everyone involved.  But
21          they may have been relying on my
22          belief, which was a good-faith belief
23          that we would go at least all day and
24          have to continue it.
```

Confidential - Subject to Further Confidentiality Review

Page 344

```
 1              MR. DUPLANTIER:  And let me
 2         state for the record -- hold on.  I
 3         got that information, that Mr. Herman
 4         had made those representations to
 5         Kanner & Whiteley.
 6              I corrected those
 7         representations, that we were going to
 8         be here to complete this deposition
 9         today, and that we were not going to
10         agree to continue this deposition
11         beyond today.  So they should have
12         been on notice within an hour of the
13         conversation with Mr. Herman that we
14         intended to be prepared to answer
15         their questions.
16              MR. LAMBERT:  Rick, with all
17         due respect, you've got your position
18         on the record.  Cantor has his
19         position on the record, and with the
20         attachments.  There's no rush.  These
21         can be set at a later point in time.
22         There's no intention to go all night
23         or tomorrow.
24              MR. DUPLANTIER:  It's not all
```

Confidential - Subject to Further Confidentiality Review

Page 345

1          night.  It's only 3:19 in the

2          afternoon.

3                    MR. LAMBERT:  No, no, I

4          understand.  But I'm simply saying

5          that the convenience of the witnesses,

6          your convenience, can all be met.

7          There's no intention --

8                    MR. DUPLANTIER:  You're making

9          representations that you can't --

10         let's go off the record.  You're

11         making representations that you can't.

12         We don't have all the time.  There are

13         exceptions pending in state court that

14         you are unaware of, with deadlines.

15                   MR. LAMBERT:  Look, Rick --

16         excuse me.  Rick, I don't want to

17         argue with you right now.

18                   MR. DUPLANTIER:  Yes, you do.

19                   MR. LAMBERT:  Put your position

20         on the record.

21                   MR. DUPLANTIER:  You're arguing

22         with me.  You're making

23         representations that are, in fact,

24         untrue.  And there are deadlines that

Confidential - Subject to Further Confidentiality Review

Page 346

1          are applicable to the state court

2          proceeding.  Judge Bagneris has

3          ordered my client to be present for a

4          deposition.  They're here to answer

5          questions in accordance with this

6          deposition notice.

7                    MR. LAMBERT:  Okay.  I

8          understand your position.

9                    MR. DUPLANTIER:  Next?

10         Who's -- is anyone from Kanner &

11         Whiteley, on behalf of the Dennises,

12         going to ask questions?

13                    MS. FUSELIER:  No, we're not

14         going to ask any questions.

15                    MR. DUPLANTIER:  Okay.

16                    MR. LAMBERT:  Not right now.

17                    MR. DUPLANTIER:  Who's next?

18                    MR. SANDERS:  Plaintiffs go

19         before me.

20                    THE VIDEOGRAPHER:  Off the

21         record, 3:22 p.m.

22                    (Recess taken, 3:22 p.m. to

23         3:25 p.m.)

24                    THE VIDEOGRAPHER:  Stand by.

Confidential - Subject to Further Confidentiality Review

Page 347

1          We're back on the record.  The time is

2          3:25 p.m.

3                    MS. FUSELIER:  This is Melissa

4          Fuselier with Kanner & Whiteley.  I

5          just wanted to put on the record that

6          the exceptions in front of

7          Judge Bagneris are pending in April.

8          They're not pending next month or the

9          month after, so it's the end of April,

10          that they're pending.  That's all I

11          wanted to say.

12                     CLAYTON C. GEARY,

13     having been first duly sworn, testified as

14                     follows:

15                     EXAMINATION

16  BY MR. NICHOLAS:

17          Q.    Is it Geary or Geary?  I want

18  to get it straight.

19          A.    "GEER-ree."

20          Q.    Geary.

21          Mr. Geary, my name is Steve

22  Nicholas.  I represent The Mitchell Company,

23  who's been mentioned once or twice as a

24  plaintiff in the MDL.  I've got some

Confidential - Subject to Further Confidentiality Review

Page 348

1   questions to ask you.  I'm going to try not

2   to repeat, so, by nature, it's going to kind

3   of bounce around a little bit, but I'll try

4   to tell you where I'm headed?

5            And I've also, frankly, lost

6   track of, between you and your brother, maybe

7   who said what.  So if I ask you something and

8   you think your brother is better able to

9   answer the question, if you tell me that, I

10  would appreciate it --

11       A.    Okay.

12       Q.    -- is that fair?

13            If you don't understand me or

14  if I'm not clear in a question, please ask me

15  to rephrase it, okay?

16       A.    Okay.

17            (Whereupon, Deposition Exhibit

18            INEX-30b6-80, Exhibit A, Knauf

19            Commercial Invoice, IE-000003,

20            IE-000005, IE-000007, IE-000009, was

21            marked for identification.)

22  BY MR. NICHOLAS:

23       Q.    First, I'd like to just kind of

24  establish the timeline a little better.  Let

Confidential - Subject to Further Confidentiality Review

Page 349

1      me show you what I've marked as Exhibit 80,

2      and one of these may already be marked

3      somewhere else.  But do you recognize those

4      as invoices that would have come from Knauf

5      to Interior/Exterior Building Supply?

6              A.      Yes.

7              Q.      All right.  And from looking at

8      the invoices, at least for these, and I think

9      these are all the Knauf Tianjin shipments,

10     but it would tell you the vessel and the bill

11     of lading number.  Do you see that?

12             A.      Yes, I do.

13                     (Whereupon, Deposition Exhibit

14             INEX-30b6-81, Customs Information on

15             Knauf Plasterboard Shipments, was

16             marked for identification.)

17     BY MR. NICHOLAS:

18             Q.      All right.  And let me show you

19     what I've marked as Exhibit 81 to your

20     deposition, which I'm going to just see if we

21     can use to maybe help identify some dates.

22     And I'll represent to you that this is a

23     printout of the customs information regarding

24     those shipments.

Confidential - Subject to Further Confidentiality Review

Page 350

```
 1                   And so if you look at the
 2      second page first, the one at the top there,
 3      you see the vessel, the MYSTRAS?
 4              A.    Okay.
 5              Q.    You see that?
 6              A.    Yes, I do.
 7              Q.    Now, you also see it says,
 8      "Cosignee to the order of Whitney Bank."
 9                   On each of these shipments,
10      Whitney Bank issued a letter of credit,
11      correct?
12              A.    Yes.
13              Q.    And then it says, "Notify
14      Interior/Exterior Building Supply"?
15              A.    Yes.
16              Q.    And the actual arrival date,
17      you see towards the upper right-hand corner
18      of that block, says "1/14/2006"?
19              A.    Okay.  Yes.
20              Q.    Does that refresh your
21      recollection about the time you would have
22      received the first shipment of Knauf Tianjin
23      drywall?
24              A.    It was -- yeah, it was in that
```

Confidential - Subject to Further Confidentiality Review

Page 351

1    neighborhood.

2              Q.      All right.

3              A.      And then if you look back at

4    the first page again, the one just before

5    that one, you see it says the vessel is the

6    UPC TORONTO?  It would be the bottom of the

7    one with the sticker on it that you have in

8    your right hand.

9                    MR. DUPLANTIER:  I don't see

10        that.

11             A.      I don't see "UPC TORONTO"

12   either.

13   BY MR. NICHOLAS:

14             Q.      Right here.

15             A.      Okay.

16             Q.      And if you looked at the

17   invoice, you'll see, if you want to refer

18   back to it, that one of the vessels was the

19   UPC TORONTO?

20             A.      Yes.

21             Q.      Do you remember that?

22             A.      I do remember that.

23             Q.      All right.  And it's -- the

24   actual arrival date there is 2/1/06?

Confidential - Subject to Further Confidentiality Review

Page 352

1          A.     Correct.

2          Q.     Does that sound about right of

3    when the second shipment would have come in?

4          A.     Yes, sir.

5          Q.     And then if you look again on

6    the second page, again -- I'm sorry for

7    having to bounce around -- you see the second

8    one there, the second entry, talks about the

9    vessel DUAL CONFIDENCE, the bottom of the

10   second page --

11         A.     Yes.

12         Q.     -- or the second entry on the

13   second page?

14         A.     Yes.

15         Q.     And there are actually two

16   invoices with the DUAL CONFIDENCE.  That one

17   is on the third page as well.  And it came in

18   in May -- I mean, I'm sorry, April of 2006?

19   Does that sound right to you?

20         A.     That sounds right.  I thought

21   it was later than that, but...

22         Q.     Well, and then the final one

23   would be the first one on Exhibit 81, which

24   is the one that's notifying J.W. Allen

Confidential - Subject to Further Confidentiality Review

1    instead of notifying you.  But they were your

2    freight forwarder, correct?

3         A.    Yes, they were.

4         Q.    And that's the ALEXANDERGRACHT

5    or something like that?

6         A.    Yes.

7         Q.    Do you recall that vessel?

8         A.    Yes.

9         Q.    And that was September of

10   2006 --

11        A.    Yes.

12        Q.    -- correct?

13              And then I believe you

14   testified earlier that the next shipment

15   would have been the Wuhu shipment, right --

16   or that was the Wuhu shipment.  I'm sorry.

17        A.    I think that was the Wuhu

18   shipment.

19        Q.    And then after that is when

20   y'all got some product from Metro, but that

21   was non-Knauf product, right?

22        A.    Correct.

23        Q.    All right.  Switching gears.

24        A.    Okay.

Confidential - Subject to Further Confidentiality Review

Page 354

1            Q.      You were shown Exhibit 3, and

2      you can dig it out, if you need to, but I

3      don't think you'll have to.  But if you feel

4      like you want to look at the document, let me

5      know.  And you were asked some questions

6      about a warranty that was provided by one of

7      the Knauf entities, that the product was free

8      from defects.  Do you recall that, generally?

9            A.      Yes, I do.

10           Q.      Now, your company has always

11     been in the business of reselling the

12     building materials that it purchases from

13     people like Knauf, correct?

14           A.      Correct.

15           Q.      And when you talked to the

16     people at Knauf, they understood you were in

17     the business of reselling this plasterboard

18     that you were buying from them, correct?

19                   MR. SANDERS:  Object to the

20           form.

21           A.      Yes.

22     BY MR. NICHOLAS:

23           Q.      Well, let me deal with

24     Mr. Sanders' objection.

Confidential - Subject to Further Confidentiality Review

1             Did you ever have a

2    conversation with anyone at Knauf, Tianjin

3    specifically, where they -- where you

4    expressed to them that you were buying this

5    for resale?

6         A.    I can't tell you specifically,

7    but I would assume we would have.

8         Q.    And certainly when you had the

9    conversation with Mr. Brisley -- is that his

10   name?

11        A.    Brisley.

12        Q.    Brisley.  He understand that's

13   what you were doing?

14        A.    Yes, he did.

15        Q.    And you would agree with me, if

16   it turned out there was something wrong,

17   anything wrong that made that product

18   defective, that it would be your customers

19   who would feel that defect, correct?

20        A.    Yes.

21        Q.    And you understood that when

22   you were selling the product?

23        A.    Yes.

24        Q.    And by its very nature, Knauf

Confidential - Subject to Further Confidentiality Review

 1    would have understood that, correct?

 2                    MR. SANDERS:  Object to the

 3          form.

 4          A.    Yes.

 5    BY MR. NICHOLAS:

 6          Q.    That it's your customers

 7    involved, right?

 8          A.    Yes.  Yes.

 9                    MR. NICHOLAS:  Excuse me.  Give

10          me just a second.  I need to find the

11          next topic.

12    BY MR. NICHOLAS:

13          Q.    Let's talk about Mr. -- I'm

14    going to mispronounce it again, Brisley?

15          A.    Brisley.

16          Q.    Brisley.  Brisley.

17                    As I understand your testimony

18    earlier today, Mr. Brisley was employed by,

19    or you had a relationship with him from

20    selling your company insulation products?

21          A.    Correct.

22          Q.    What kind of products did y'all

23    buy through your connection with Mr. Brisley?

24          A.    We buy fiberglass insulation

Confidential - Subject to Further Confidentiality Review

```
 1    from Knauf.
 2          Q.      And do you have an
 3    understanding as to where that insulation
 4    comes from?
 5          A.      Yes.
 6          Q.      Where it's manufactured?
 7          A.      Yes.
 8          Q.      What's that understanding?
 9          A.      They have a couple of plants
10    that we deal with.  One is in, I think,
11    Shelbyville, Indiana, and Lynette, Alabama.
12          Q.      Okay.  And you also, I believe,
13    said that there's a local representative for
14    that entity?
15          A.      Yes.
16          Q.      And what's that gentleman's
17    name?
18          A.      Kurt Heider.
19          Q.      Did you ever have a
20    conversation with Mr. Heider about obtaining
21    drywall?
22          A.      About obtaining drywall from?
23          Q.      From anybody.
24          A.      I don't think we called him.  I
```

Confidential - Subject to Further Confidentiality Review

Page 358

```
1    don't remember having a conversation with him
2    about it prior to talking to -- when Jim
3    talked to Jeff Brisley.
4         Q.    And so it was your brother that
5    talked to Mr. Brisley?
6         A.    Yes.
7         Q.    I was hoping to avoid it, but
8    I'm not going to be able to.  I'm going to
9    have to get him in here at some point.  I'll
10   defer all these things.
11              Well, did you ever talk to
12   Mr. Brisley about drywall, anything about
13   drywall?
14        A.    I think Jim had all the
15   conversations with him.
16        Q.    All right.  Okay.  I'll just
17   defer that, then.
18              There were a number of
19   exhibits, specifically Exhibit 9, 10, 11,
20   that were e-mails from a Mr. John Davis?
21        A.    Uh-huh.
22        Q.    Do you recall those e-mails?
23        A.    Yes.
24        Q.    And I think I may have picked
```

Confidential - Subject to Further Confidentiality Review

1    them up.  Maybe I'd ask you to look for them,

2    Mr. Geary.

3                    MR. DUPLANTIER:  Yeah.

4                    MR. NICHOLAS:  Let me just pull

5           them real quick.

6    BY MR. NICHOLAS:

7           Q.    You see the e-mails from

8    Mr. Davis, he has a title under his name?

9           A.    Yes, "Business Development

10   Manager."

11          Q.    For what company or what

12   entity?

13          A.    It says, "Knauf Plasterboard

14   and Insulation China."

15          Q.    All right.  Did you ever have a

16   conversation with Mr. Davis about who that

17   was, who Knauf Plasterboard and Insulation

18   China was?

19          A.    No.

20          Q.    Did you ever gain any

21   understanding from any other source as to who

22   that company or who that entity was?

23          A.    No.

24          Q.    Sitting here today, do you know

Confidential - Subject to Further Confidentiality Review

Page 360

1          if there is any such entity called Knauf

2          Plasterboard and Insulation China?

3                    A.       I don't know.

4                    Q.       Did you ever get a bill from a

5          company that had that name on it?

6                    A.       Well, the letter of credit

7          had -- I can't remember the exact wording,

8          but it had "Tianjin" on it, I believe.

9                    Q.       Okay.  But I'm talking about

10         specifically those -- that phrase or that

11         designation of a company, did you ever see

12         that in any of the paperwork?

13                   A.       Not that I recall.

14                   Q.       Looking at Exhibit 11, if you

15         have it there, where Mr. Davis is saying

16         that, "We have priced their product," and

17         some things like that.  Do you see that?

18                   A.       Yes, I see that.

19                   Q.       Do you have an understanding --

20         well, let me back up.

21                            Did you ever ask Mr. Davis who

22         "we" was?

23                   A.       I did not.

24                   Q.       Did you have an understanding,

Confidential - Subject to Further Confidentiality Review

1      from either talking with Mr. Davis or talking

2      with anybody else, who "we" was?

3              A.      I don't know.

4              Q.      Now, correct me again:

5      Exhibit 12, which, I believe, are notes

6      regarding a conversation with Mr. Norris, was

7      that you or your brother?  Mark Norris?

8              A.      With Mark Norris, it would have

9      been me.

10             Q.      All right.  And who did you

11     understand Mr. Norris to be associated with

12     or employed by?

13             A.      Knauf in China.

14             Q.      Okay.  Did you have any more

15     specific understanding of Knauf in China, who

16     that was?

17             A.      No.  I guess I would have just

18     assumed it was some type of division of

19     Knauf.

20             Q.      Did Mr. Norris ever explain to

21     you the relationship between any of the

22     Chinese Knauf entities?

23             A.      No.

24             Q.      Did he ever explain to you the

Confidential - Subject to Further Confidentiality Review

Page 362

1    relationship between any of the Chinese Knauf

2    entities and any other Knauf entity?

3          A.     No.

4          Q.     And when he said something to

5    the effect -- I believe your testimony was

6    that somebody owed -- owned, I'm sorry, 12%

7    of USG?  Is --

8          A.     Yes, 12-1/2%.

9          Q.     12-1/2%.

10               As best you can recall, what

11   did he say as far as who owned 12-1/2% of

12   USG?

13         A.     Knauf.

14         Q.     Did he explain anything more

15   specific than "Knauf"?

16         A.     Not that I recall.

17         Q.     But that it was your

18   understanding, based on your conversation

19   with him, the ownership of 12-1/2% of USG

20   somehow affected your ability to do business

21   with Knauf Plasterboard Tianjin --

22               MR. SANDERS:  Object to the

23         form.

24   BY MR. NICHOLAS:

Confidential - Subject to Further Confidentiality Review

Page 363

1          Q.      -- right?

2          A.      The ability for them to ship

3     into the United States.

4          Q.      Well, the person who was

5     shipping into the United States was Knauf

6     Plasterboard Tianjin, right?

7          A.      Yes.

8          Q.      Or Knauf Plasterboard Wuhu?

9          A.      Correct.

10          Q.      And that somehow, the Knauf

11     ownership of 12-1/2% of USG impacted that

12     ability?

13          A.      Yes.

14          MR. SANDERS:  Object to form.

15     BY MR. NICHOLAS:

16          Q.      But he didn't explain to you

17     any further about how all that

18     interconnected?

19          A.      He did not.  He did not.

20          Q.      Did he say, "We own 12-1/2% of

21     USG," or anything like that?

22          A.      I don't recall.

23          Q.      Okay.  All right.  Switching

24     subjects.

Confidential - Subject to Further Confidentiality Review

Page 364

```
 1              You were asked a series of
 2     questions about how the product -- and I'm
 3     talking about the Chinese plasterboard, how
 4     it arrived and how it moved, and that's the
 5     general topic I want to ask you about.
 6                    As I understand your testimony,
 7     on -- as I understand it, on every occasion,
 8     it would be off-loaded off the ship, and then
 9     disbursed to your various locations; is that
10     correct, or am I incorrect?
11          A.     With the Knauf?
12          Q.     Yes, sir.
13          A.     Yes.
14          Q.     Yeah, I'm only talking about
15     Knauf right now.
16          A.     Okay.
17          Q.     Would there be occasions,
18     though, when, let's say, Mobile or -- it's
19     actually Foley, right?
20          A.     Well, we have a place in Mobile
21     and in Foley.
22          Q.     Okay.  Where -- that's right.
23     Where either one of those locations would run
24     out of drywall, would they get some more
```

Confidential - Subject to Further Confidentiality Review

Page 365

1       from, say, New Orleans?

2               A.      Typically, what would happen

3       is, we would send another truck from the

4       wharf to Foley, if they needed it.

5               Q.      Well, I'm confused.

6                       Was all the product off-loaded

7       from the ship and then sent somewhere?

8               A.      What happened was, they took

9       the product off the ship and they put it in

10      the wharf, you know, on the river, and we

11      sent them transfer tickets, and they shipped

12      the product to our various warehouses.

13              Q.      All right.  So I am confused.

14                      So for a period of time, the

15      product, the Knauf plasterboard, would have

16      stayed at the wharf?

17              A.      Yes.

18              Q.      And so until it was then

19      disbursed out, there would be some there?

20              A.      Correct.

21              Q.      And we identified kind of the

22      dates of the shipments when I first started

23      this, but were there times when you ran out

24      at the wharf?

Confidential - Subject to Further Confidentiality Review

Page 366

1          A.      I'm sure we did.

2          Q.      Well, if you ran out at the

3     wharf and I'm in -- I'm in Mobile and Mobile

4     ran out, would you move it from another

5     location to Mobile, or would you just deliver

6     it to somebody in Mobile?

7          A.      No, not typically.  What we

8     would do is probably order it from a domestic

9     manufacturer.  We didn't -- you didn't want

10    to transfer it any more than you needed to

11    because of the cost of the product -- the

12    cost of the freight is very high.

13         Q.      All right.  So it would be

14    unusual, and you don't think it happened,

15    that New Orleans would move it from its

16    warehouse to Mobile or --

17         A.      Not typically.

18         Q.      -- Birmingham to Mobile or

19    anything like that?

20         A.      Not typically.

21         Q.      All right.  Thank you.

22                 Can you tell me whether it was

23    typical or atypical of how decentralized the

24    sales process was.  I mean, and where I'm

Confidential - Subject to Further Confidentiality Review

Page 367

```
 1      going is let's say I'm a homebuilder in
 2      Mobile.  Would I typically just deal with the
 3      Mobile office?
 4           A.    Our branches typically sell
 5      product within about an hour-and-a-half
 6      radius of our branches.  As I mentioned, it's
 7      a very freight-intensive product, and you
 8      don't go too far, usually, because it just
 9      costs too much money.
10           Q.    All right.  So if I'm in
11      Mobile, I would probably, from what you're
12      telling me, never interact with the people in
13      New Orleans?
14           A.    Right.  Right.
15           Q.    And if the guy in Mobile
16      doesn't have the product, then I've got to go
17      find it somewhere else?
18           A.    On occasion, you know, if
19      there's something that New Orleans has, a
20      specific product -- not necessarily drywall,
21      but a specific product, they may transfer
22      that product over.
23           Q.    Okay.  All right.  Switching
24      gears on you again.
```

Confidential - Subject to Further Confidentiality Review

Page 368

1             You were asked about the first

2     complaint or knowledge of any kind of issue

3     that you had from a customer about Chinese

4     drywall, correct?

5          A.     Uh-huh.  Actually, Jim was.

6          Q.     Okay.  What I want to ask you

7     is:  Did anyone internally at

8     Interior/Exterior ever report up the line

9     that they thought there was anything unusual

10     about the Chinese drywall?

11          A.     No.

12          Q.     Nobody handling it ever said,

13     you know, "This stuff smells funny"?

14          A.     No.

15          Q.     Did anyone ever report -- well,

16     let me back up.

17             As I understand the testimony,

18     the first report you got was about

19     air-conditioning coil corrosion in the Wall

20     Street Journal article; is that right?

21          A.     I don't remember the article

22     specifically.  I remember it was

23     January 12th, there was a Wall Street Journal

24     article.  I don't remember the -- I know the

Page 369

1    general -- general make-up of the article,

2    but I can't tell you the specifics.

3         Q.    All right.  And prior to that

4    time, no one, either internally or

5    externally, had talked about odor?

6         A.    No.

7         Q.    And tell me, is this you or

8    your brother, but as I understand, at some

9    point in time, there was communication with

10   someone at Knauf, once you were put on --

11   once your company was put on notice there

12   might be a problem?

13        A.    That was Jim.

14        Q.    Did you ever have a

15   conversation with anyone who you understood

16   to be in any way connected with Knauf, prior

17   to litigation, about problems with its

18   product or alleged problems with its product?

19        A.    Jim and I had a conference call

20   with Doug Sanders.  I don't know if that was

21   pre- or post-litigation.  I think it was

22   pre- -- about getting -- you know, what are

23   they going to do, and they were going to go

24   do these inspections with Strategy.

Confidential - Subject to Further Confidentiality Review

Page 370

```
 1              Q.     All right.  So prior to you
 2       having a conference call with Mr. Sanders,
 3       you personally had not talked to anyone?
 4              A.     No.
 5              Q.     Do y'all still do business with
 6       Knauf USA?
 7              A.     Yes, we do.
 8              Q.     Up until this day, have you
 9       ever had a conversation with anyone at
10       Knauf USA about Chinese drywall?
11              A.     Up until -- through today?
12              Q.     Yes, this minute.
13              A.     Yes.
14              Q.     Who have you talked to?
15              A.     I talked to Kurt Heider and
16       Jeff Brisley.
17              Q.     What did y'all talk about?
18              A.     We asked them, basically,
19       "What's going on," and didn't get any answer
20       at all.
21              Q.     Well, can you give me a little
22       more idea of what their response was?
23              A.     You know, basically, "We've
24       been told not to say anything, and can't say
```

Confidential - Subject to Further Confidentiality Review

Page 371

1    a word."

2            Q.      All right.  I assume your

3    answer is going to be the same.  I just want

4    to make sure:  Did you talk to them in any

5    way about any relationship between Knauf USA

6    and Knauf Plasterboard Tianjin, Knauf

7    Plasterboard Wuhu or any of these other

8    companies?

9            A.      No.

10           Q.      Has your company, to your

11   knowledge, ever purchased any product --

12   well, let me ask it this way.  Strike that.

13                   Has your company ever bought

14   anything related to Knauf, other than

15   insulation and drywall?

16           A.      No.

17           Q.      So there's never been another

18   occasion, for instance, where Knauf USA has

19   sold you something that may have come from

20   another Knauf company?

21           A.      No.

22           Q.      I probably should have asked

23   you this a minute ago, but I forgot about it.

24                   You and I talked about the

Confidential - Subject to Further Confidentiality Review

1    shipments and how they come into the wharf

2    and go out.  How do domestic drywall

3    shipments differ from that, in terms of how

4    y'all handle it?

5         A.    They deliver them directly to

6    our warehouses.

7         Q.    So, again, if I'm talking about

8    Mobile and Mobile runs out of drywall and has

9    a domestic source, it would be shipped

10   however it gets there, into that Mobile

11   warehouse?

12        A.    Call USG and deliver it on

13   Thursday to your warehouse.

14        Q.    Would there be a centralized

15   record of that delivery?

16        A.    We have a purchase-order system

17   in our computer system.

18        Q.    And that computer system is in

19   New Orleans?

20        A.    Yes.

21        Q.    So somebody in Mobile would

22   input that data, but you would have it?

23        A.    Yeah.

24        Q.    All right.  A couple of times

Confidential - Subject to Further Confidentiality Review

Page 373

1    today -- well, let me strike that.  Let me

2    just show you this.

3                    (Whereupon, Deposition Exhibit

4              INEX-30b6-82, Sales Documentation

5              Between Creola Ace Hardware,

6              Interior/Exterior and Mitchell Co.,

7              700109, 70010, 700115, 700118, 700112,

8              700124, 700127, was marked for

9              identification.)

10   BY MR. NICHOLAS:

11        Q.    Let me show you what I've

12   marked as Exhibit 82, which I'm going to

13   represent to you are some of the documents

14   regarding your sales to Creola Ace Hardware,

15   and then in turn to The Mitchell Company,

16   okay?

17                    Do you recognize the one on

18   top?

19        A.    Yes.

20        Q.    And the way I read this, you

21   see it's to be delivered to the Bessemer

22   Family Rentals, Prichard, Alabama, right

23   above the signatures?

24        A.    Correct.

Confidential - Subject to Further Confidentiality Review

Page 374

1          Q.     And I'll represent to you that
2     that project was built by The Mitchell
3     Company; and I think if you look at the other
4     things, you'd bear that out.
5               Who is the name on the left
6     side, that signature there?
7          A.     Jim Green.  He's our manager in
8     Mobile, branch manager.
9          Q.     All right.  Did you or anyone
10    in your New Orleans office have anything to
11    do with this transaction at the time of the
12    transaction?
13         A.     I remember it being rather
14    strange, in that they wanted to deposit -- I
15    think they gave us this money ahead of time.
16         Q.     Yeah, that's the second page.
17         A.     Okay.
18         Q.     It sort of memorializes that;
19    is that right?
20         A.     Yes.
21         Q.     So you were aware the
22    transaction was occurring in August of --
23    when it occurred in August of '05, is that
24    right, because of that --

Confidential - Subject to Further Confidentiality Review

Page 375

1          A.     Yeah.  Yes.

2          Q.     -- unusual event?

3          A.     Uh-huh.

4          Q.     Look at the third page there.

5    Yeah, that's it.  That looks like a different

6    kind of invoice.  Can you identify that

7    document for me?  Is that your company's

8    document?

9          A.     It looks like our company's

10   document without the overlay from the

11   software.

12         Q.     Okay.  So would that document

13   have been generated out of Mobile?

14         A.     Well, they input the orders in

15   Mobile, and then they'll push a button to

16   invoice it.  The invoice is actually spit out

17   in New Orleans.

18         Q.     Okay.

19         A.     And then we mail them from

20   New Orleans.

21                Now, they have the ability to

22   print an invoice in Mobile, but they can't --

23   they can't generate an invoice.  In other

24   words, they can print an invoice that's

Confidential - Subject to Further Confidentiality Review

Page 376

1    already been invoiced, but we run the

2    invoices in New Orleans and mail them out of

3    New Orleans.

4         Q.    Do you recall any information

5    coming to you from your company that Creola

6    Ace Hardware did not want Chinese drywall?

7         A.    Do I recall any correspondence?

8         Q.    Discussions, anything that

9    you've heard of that indicated they didn't

10   want imported drywall?

11        A.    I don't recall that.

12        Q.    You referred to it a couple of

13   times in your testimony today as a customer

14   preference.

15        A.    Uh-huh.

16        Q.    But if a customer said, "I

17   don't want imported drywall," is it your

18   testimony your company would not provide it?

19        A.    They would mark down on the

20   ticket that it shouldn't, and the

21   warehouseman should not deliver it.

22        Q.    And if they did deliver it, it

23   would be a mistake?

24        A.    Yes.

Confidential - Subject to Further Confidentiality Review

Page 377

1          Q.      It would not be what the

2     customer ordered?

3          A.      Correct.

4          Q.      Well, do you know whether

5     through, Creola Ace Hardware -- I'm having

6     trouble saying that today -- that Knauf

7     product was delivered to the Bessemer Family

8     housing project?

9          A.      I do not know.

10          Q.      Well, look at the third page

11     there, just below the dotted line across.

12     You see it says, "No import rock"?

13          A.      Yes.

14          Q.      So you would agree that, based

15     on this invoice, they should not have

16     delivered Knauf product, right?

17          A.      Yes.

18          Q.      And if you turn the page, the

19     next one says the same thing, right, just

20     below the dotted line?

21          A.      Yes.

22          Q.      And then turn the next page.

23     The next one says the same thing, correct?

24          A.      I will say that there were --

Confidential - Subject to Further Confidentiality Review

1    and I don't know the particulars, but there

2    was a difference -- two different parts of

3    this project, and one had requested -- I

4    think there was a -- requested USG board, and

5    one did not specify the type of board.  And I

6    don't know --

7            Q.    Well, how did you gain that

8    understanding?

9            A.    From my manager over there.

10           Q.    Mr. Green?

11           A.    Yeah.

12           Q.    What did he tell you?

13           A.    That there were -- there was

14   one project, I think, that we had -- had a

15   job commitment from another vendor, a

16   domestic vendor; and that project, I think,

17   was going to go domestic, and the other one

18   was not.

19           Q.    I'm sorry, I just didn't

20   understand what you said, and it's my fault.

21   But another job --

22           A.    I thought there was -- I'm

23   fuzzy on the details, but there was a

24   Bessemer Sales and a Bessemer Rentals, I

Confidential - Subject to Further Confidentiality Review

1      believe, and one part of the project had been

2      requested domestic, and one had not.

3          Q.    Do you have any understanding

4      as to why someone would have requested

5      domestic?

6          A.    I think it had to do with our

7      commitment from a domestic manufacturer on

8      price.  At this time, it was very

9      difficult -- we had a contract price, I

10     think -- a cost that we would buy the product

11     for, guaranteed from a domestic manufacturer.

12         Q.    So help me:  Was it cheaper to

13     have domestic?

14         A.    Well, at this point, the

15     problem was not just price, but availability,

16     the fact that they guaranteed the

17     availability -- well, they guaranteed the

18     price on this project.

19         Q.    Well, I still don't understand.

20     These invoices are May of '06, right?

21         A.    Uh-huh.

22         Q.    Upper right-hand corner.

23              So in May of '06 --

24              MR. DUPLANTIER:  You have to

Page 380

1          say "yes."

2     BY MR. NICHOLAS:

3          Q.      -- somebody, in connection with

4     either Ace Hardware or Mitchell or Bessemer

5     housing project or somebody, said, "I don't

6     want import rock," right?

7          A.      On this ticket, they said, "No

8     import rock," yes, sir.

9          Q.      All right.  And my question to

10    you is:  Can you help me figure out why?

11         A.      No.  I don't know.

12         Q.      And what you were trying to

13    tell me about shipments and domestic drywall

14    and all that, how does that help me figure

15    out why?

16         A.      I don't know.  I don't know why

17    they said, "No import rock."  I shouldn't

18    have spoken because I don't know the

19    particulars, but there was something to do

20    with Bessemer Sales versus Bessemer Rentals,

21    and I don't know the particulars.

22         Q.      All right.  Other than just

23    looking on the back of the board, is there

24    anything, to your knowledge, that would have

Confidential - Subject to Further Confidentiality Review

Page 381

1      indicated to anyone that handled the board

2      that it was not domestic board?

3             A.     The product has end tape on it.

4             Q.     Bad question.

5             I guess I'm saying:  Did you

6      ever have a conversation with anyone in this

7      transaction specifically or anywhere else

8      that says, "Hey, we're sending you imported

9      rock or imported drywall --

10            A.     No, I did not.

11            Q.     -- "is that okay," or anything

12     like that?

13            A.     I did not.

14                   MR. NICHOLAS:  I think that's

15            all.  I need to ask the other

16            Mr. Geary a couple things.

17                   THE VIDEOGRAPHER:  Off the

18            record at 3:56 p.m.

19                   (Recess taken, 3:56 p.m. to

20            3:59 p.m.)

21                   THE VIDEOGRAPHER:  Stand by.

22            We're back on the record.  The time is

23            3:59 p.m.  This is the start of

24            Tape 4.

Confidential - Subject to Further Confidentiality Review

Page 382

 1                    JAMES F. GEARY, SR.,

 2       having been first duly sworn, testified as

 3                       follows:

 4                      EXAMINATION

 5   BY MR. NICHOLAS:

 6            Q.     Mr. Geary, good afternoon.  You

 7   understand you're still under oath?

 8            A.     Yes, I do.

 9            Q.     Let me pick up on the item I

10   started asking your brother about.  The

11   conversation with Mr. Brisley is what I want

12   to focus on.

13            A.     Yes.

14            Q.     Tell me, again:  Was it unusual

15   for you to be talking to Mr. Brisley?

16            A.     I didn't speak with him very

17   often.  Most of our contact and communication

18   was through Kurt Heider, the sales rep.

19   But -- so we had very little reason to talk

20   to Mr. Brisley, but we did communicate with

21   him from time to time.

22            Q.     And --

23            A.     And we knew each other.

24            Q.     I mean, he was basically your

Confidential - Subject to Further Confidentiality Review

Page 383

1    local sales rep's boss; is that the way you

2    understood it?

3         A.     I can't tell you the exact

4    structure.  My appreciation, it could be

5    wrong, would be he would be something like an

6    overall general sales manager.

7         Q.     And how did the topic of Knauf

8    or any Knauf entity supplying you with

9    drywall come up?

10        A.     Again, we -- I had a

11   conversation with him shortly after Katrina,

12   when we had been relocated to our Mandeville

13   office.  And as some of our other suppliers

14   and vendors had done, he called just to check

15   in on us to see how we were doing, how we

16   fared through the storm.

17             And in the course of that

18   conversation was when we had discussion about

19   buying drywall from Knauf.

20        Q.     And as best you can recall, can

21   you tell me how Mr. Brisley described who

22   would be selling you the product?

23        A.     I don't recall.

24        Q.     Well, did he explain to you

Confidential - Subject to Further Confidentiality Review

Page 384

1        that it was some other company that he could

2        arrange for or help arrange for the sale of

3        the product?

4              A.      Not that I remember.  The

5        understanding was, it was going to be Knauf

6        drywall.

7              Q.      And any explanation further

8        than "Knauf drywall"?

9              A.      Not that I recall.

10              MR. SANDERS:  Object to the

11        form.

12   BY MR. NICHOLAS:

13              Q.      Did -- and you may have been

14        asked this, and there may be a document and I

15        just didn't see it.  But did Mr. Brisley send

16        you a price list?

17              A.      Brisley sent a price list to

18        Kurt Heider, who -- via an e-mail.  And

19        because at the time our computer system -- or

20        our e-mail system was down, Kurt Heider

21        handed me a hard copy of that communication.

22              Q.      After the -- after this initial

23        conversation and you getting the rate sheet,

24        did you have further conversations with

Confidential - Subject to Further Confidentiality Review

Page 385

```
 1      Mr. Brisley about drywall?
 2           A.     We did, but I really couldn't
 3      tell you the specifics of that.  I think we
 4      had a couple of occasions to talk about it,
 5      but just in general terms is what I remember.
 6           Q.     Well, in any conversation with
 7      Mr. Brisley, did he ever try to explain to
 8      you any kind of relationship between his
 9      company and the company that was actually
10      shipping you the product?
11           A.     Not that I recall.
12           Q.     Did you talk to Mr. Brisley
13      when the problems with Chinese drywall, or
14      specifically the Knauf drywall, first
15      surfaced?
16           A.     No.  We started with Kurt
17      Heider, the sales rep, and asked him to see
18      what he could do for us.
19           Q.     And anything -- did you ever
20      have a conversation with Kurt in addition to
21      what your brother talked to me about or
22      already testified to about?
23           A.     I'm sorry, could you --
24           Q.     Bad question.
```

Confidential - Subject to Further Confidentiality Review

1            Did you ever have a

2    conversation with Kurt about any problems

3    with Knauf drywall?

4            A.    Are you talking about after

5    that, things --

6            Q.    Yes, sir.

7            A.    Yeah, I mean, we -- when all

8    these things started surfacing, yeah, that

9    was the first person we contacted, was Kurt

10   Heider.  And, you know, if I remember

11   correctly, he indicated to us -- I mean, this

12   was beyond him.  He needed to go to his

13   higher-ups and go through the chain of

14   command.

15           Q.    Well, when the problem first

16   came up, am I correct that Kurt's the person

17   you called, not someone in China?

18           A.    That's correct.

19           Q.    And did he ever go through his

20   chain of command and get back to you?

21           A.    Did Kurt ever go through his

22   chain of command?

23           Q.    Yes, sir.

24           A.    My belief is, yes, he did.

Confidential - Subject to Further Confidentiality Review

1          Q.      And what did he do?  What did

2     he tell you?

3          A.      Well, at the end of the day,

4     they got us in touch with their attorney.

5          Q.      And your brother talked to me a

6     little bit -- or just said a little bit about

7     having a conference call with Mr. Sanders?

8          A.      Yes.

9          Q.      Well, who set that up?  Who let

10    you know about that?

11         A.      I'm sorry, who let us know

12    about the...

13         Q.      About that you needed to talk

14    to Mr. Sanders.

15         A.      I believe it was from Kurt

16    Heider, but I'm not positive about that.

17    Yeah, I guess it had to have been Kurt

18    Heider.

19         Q.      Wasn't somebody from China?

20         A.      No, I'm fairly certain it was

21    not.

22         Q.      I talked to your brother about

23    Mr. Davis and Mr. Norris, I believe, and

24    having any better understanding about who

Confidential - Subject to Further Confidentiality Review

Page 388

1    they worked for.  You heard me ask your

2    brother that, right?

3         A.     Yes, I did.

4         Q.     Do you have anything to add to

5    anything he said about that situation?

6         A.     No, I do not, because I -- at

7    that point, then, Clay handled all the

8    communications directly with those gentlemen.

9         Q.     I'm not asking you to vouch for

10   every word that your brother testified to,

11   but in sitting there, hearing him testify, is

12   there anything he said you thought was

13   incorrect?

14        A.     No.

15        Q.     Let me ask you one more thing.

16   The wharf that he told me about when the

17   product was initially off-loaded from the

18   ships, is it open-air, or is it contained?

19        A.     Well, it's certainly got --

20   it's open in the sense that there are bay

21   doors or warehouse doors; but other than

22   that, it's enclosed.

23        Q.     And how big is it?

24        A.     Huge.  I could only guess how

Page 389

1    big it is.
2         Q.    Is your -- does your company
3    have the exclusive -- is everything in there
4    yours?  And, again, I'm talking the '06/08
5    time frame.
6         A.    Yeah.  No, I don't think so.  I
7    think I'm if -- if I remember correctly,
8    there were some other products in those
9    warehouses.  You know, steel and other
10   products and such.
11        Q.    And when -- again, I'm trying
12   to get some idea of size.  But when a
13   shipload, one of these deliveries, was first
14   off-loaded and put in that warehouse, what
15   percentage of the warehouse would be taken up
16   by that product?
17        A.    Only a guess, something like
18   25%, something -- that's a guess.
19        Q.    And nobody ever made a comment
20   about odor when all that product was put in
21   that warehouse, correct?
22        A.    No, sir.
23             MR. NICHOLAS:  Give me just a
24        second.

Confidential - Subject to Further Confidentiality Review

                                                    Page 390

1                     That's all I have.  Thank you,

2          sir.

3                     MR. DUPLANTIER:  Does anybody

4          else who cross-noticed the deposition

5          have questions?

6                     (Pause.)

7                     MR. DUPLANTIER:  Other than

8          Knauf?

9                     (Pause.)

10                    MR. DUPLANTIER:  We are --

11                    THE VIDEOGRAPHER:  The

12         gentleman who left said he had some

13         questions.

14                    MR. NICHOLAS:  Shilling said he

15         had like 15 minutes' worth.

16                    MR. DUPLANTIER:  Well, let's

17         take a break while he comes back.

18                    THE VIDEOGRAPHER:  Off the

19         record, 4:08 p.m.

20                    (Recess taken, 4:08 p.m. to

21         4:17 p.m.)

22                    (The following proceedings were

23         conducted off the videotaped record.)

24                    MR. COHEN:  My name is Max

Confidential - Subject to Further Confidentiality Review

Page 391

1      Cohen.  I represent Rockhill Insurance

2      Company in the Butler and Finger

3      litigation pending in civil district

4      court.  I'm not aware that anybody in

5      my cases has cross-noticed this

6      deposition.

7              I only became aware of the

8      deposition during a telephone status

9      conference the other day, so I decided

10     to attend, but I'm not going to ask

11     any questions today.

12             I want to reserve my rights to

13     ask questions at the appropriate time

14     when the deposition of

15     Interior/Exterior is noticed in those

16     two cases.  Thank you.

17             MR. SCHILLING:  Steven

18     Shilling, I represent Mayeaux

19     Construction, Inc. in the Chad Jerrell

20     vs. Knauf Gyps, et al. litigation.  I

21     also did not cross-notice this

22     deposition.

23             I became aware of it in a

24     status conference hearing about a

Confidential - Subject to Further Confidentiality Review

Page 392

```
 1          month ago.  I reserve my right to
 2          depose Interior/Exterior when the
 3          Jerrell litigation and any other
 4          litigation involving Mayeaux
 5          Construction, Inc. comes up before the
 6          Court.
 7                  MR. DUPLANTIER:  As I
 8          understand it, counsel for Knauf
 9          has -- Doug, and you can correct me --
10          three to four hours of additional
11          questions.  We have agreed to discuss
12          the continuation of this deposition at
13          a later date beyond the time limits
14          allowed under the Federal Rules of
15          Civil Procedure.
16                  I am reserving my rights to
17          object to continuing beyond that time
18          limit, subject to those continued
19          negotiations with counsel for Knauf.
20                  MR. SANDERS:  Doug Sanders on
21          behalf of Knauf Plasterboard Tianjin.
22          I think that was stated correctly.
23          We're at about seven hours now, or
24          close to it.  And rather than start
```

Confidential - Subject to Further Confidentiality Review

Page 393

1          and have to stop, I'm going to try to

2          take it all up in one session.  If we

3          have to talk to the judge, we will;

4          but hopefully, we can agree.

5                    (Proceedings concluded at

6          4:19 p.m.)

7                         - - - - - - -

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Confidential - Subject to Further Confidentiality Review

Page 394

1                       CERTIFICATE
2
3            I, MICHAEL E. MILLER, Registered
    Diplomate Reporter, Certified Realtime
4   Reporter and Notary Public, do hereby certify
    that prior to the commencement of the
5   examination CLAYTON C. GEARY and JAMES F.
    GEARY, SR. were duly sworn by me to testify
6   to the truth, the whole truth and nothing but
    the truth.
7
             I DO FURTHER CERTIFY that the
8   foregoing is a verbatim transcript of the
    testimony as taken stenographically by and
9   before me at the time, place and on the date
    hereinbefore set forth, to the best of my
10  ability.
11           I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
12  nor counsel of any of the parties to this
    action, and that I am neither a relative nor
13  employee of such attorney or counsel, and
    that I am not financially interested in the
14  action.
15
16
17  _____
        MICHAEL E. MILLER,
18      NCRA Registered Diplomate Reporter
        NCRA Certified Realtime Reporter
19      Certified LiveNote Reporter
        LA Certified Court Reporter #27009
20
        Dated: February 9, 2010
21
22
23
24

Confidential - Subject to Further Confidentiality Review

Page 395

```
 1                ACKNOWLEDGMENT OF DEPONENT
 2                    CLAYTON C. GEARY
 3

 4

 5              I, CLAYTON C. GEARY, do hereby
       certify that I have read the foregoing pages
 6     and that the same is a correct transcription
       of the answers given by me to the questions
 7     therein propounded, except for the
       corrections or changes in form or substance,
 8     if any, noted in the attached
       Errata Sheet.
 9

10

11

12

13     _____
       CLAYTON C. GEARY            DATE
14

15

16     Subscribed and sworn to before me this
17     _____ day of _____, 20 _____.
18     My commission expires: _____
19

20     Notary Public
21

22

23

24
```

Confidential - Subject to Further Confidentiality Review

Page 396

1                          - - - - - - -

                ERRATA - CLAYTON C. GEARY

2                          - - - - - - -

3      PAGE   LINE        CHANGE

4      _____  _____       _____

5      REASON:            _____

6      _____  _____       _____

7      REASON:            _____

8      _____  _____       _____

9      REASON:            _____

10     _____  _____       _____

11     REASON:            _____

12     _____  _____       _____

13     REASON:            _____

14     _____  _____       _____

15     REASON:            _____

16     _____  _____       _____

17     REASON:            _____

18     _____  _____       _____

19     REASON:            _____

20     _____  _____       _____

21     REASON:            _____

22     _____  _____       _____

23     REASON:            _____

24

Confidential - Subject to Further Confidentiality Review

Page 397

```
 1              ACKNOWLEDGMENT OF DEPONENT
 2                 JAMES F. GEARY, SR.
 3
 4
 5              I, JAMES F. GEARY, SR., do hereby
        certify that I have read the foregoing pages
 6      and that the same is a correct transcription
        of the answers given by me to the questions
 7      therein propounded, except for the
        corrections or changes in form or substance,
 8      if any, noted in the attached
        Errata Sheet.
 9
10
11
12
13      _____
        JAMES F. GEARY, SR.              DATE
14
15
16      Subscribed and sworn to before me this
17      _____ day of _____, 20 _____.
18      My commission expires: _____
19
20      Notary Public
21
22
23
24
```

Confidential - Subject to Further Confidentiality Review

Page 398

1                        - - - - - - -

              ERRATA - JAMES F. GEARY, SR.

2                        - - - - - - -

3        PAGE   LINE       CHANGE

4        _____  _____      _____

5        REASON:  _____

6        _____  _____      _____

7        REASON:  _____

8        _____  _____      _____

9        REASON:  _____

10       _____  _____      _____

11       REASON:  _____

12       _____  _____      _____

13       REASON:  _____

14       _____  _____      _____

15       REASON:  _____

16       _____  _____      _____

17       REASON:  _____

18       _____  _____      _____

19       REASON:  _____

20       _____  _____      _____

21       REASON:  _____

22       _____  _____      _____

23       REASON:  _____

24

Confidential - Subject to Further Confidentiality Review

Page 399

```
 1                          - - - - - - -

                      LAWYER'S NOTES

 2                          - - - - - - -

 3      PAGE    LINE

 4      _____   _____   _____

 5      _____   _____   _____

 6      _____   _____   _____

 7      _____   _____   _____

 8      _____   _____   _____

 9      _____   _____   _____

10      _____   _____   _____

11      _____   _____   _____

12      _____   _____   _____

13      _____   _____   _____

14      _____   _____   _____

15      _____   _____   _____

16      _____   _____   _____

17      _____   _____   _____

18      _____   _____   _____

19      _____   _____   _____

20      _____   _____   _____

21      _____   _____   _____

22      _____   _____   _____

23      _____   _____   _____

24      _____   _____   _____
```